

# Exhibit "A"

PROCOPIO
525 B Street
Suite 2200
San Diego, CA 92101
T. 619.238.1900
F. 619.235.0398

GERALD P. KENNEDY
P. 619.515.3239
gerald.kennedy@procopio.com

AUSTIN
DEL MAR HEIGHTS
PHOENIX
SAN DIEGO
SILICON VALLEY

April 10, 2019

**VIA FEDEX**
Samuels Jewelers, Inc. Claims Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, Suite 412
Brooklyn, NY 11232

Re:     *In re Samuels Jewelers, Inc., et al.*
        U.S. Bankruptcy Court, District of Delaware Case No. 18-11818 (KJC)

Dear Sir/Madam:

        Pursuant to the Notice of Bar Dates for Filing Claims, entered in the above-referenced bankruptcy on October 22, 2018 [Dkt. No. 364], enclosed please find the Proof of Claim filed on behalf of MCS Hemet Valley Center LLC with enclosures in the above-referenced bankruptcy.

        Please provide our office with written confirmation of your receipt of the Proof of Claim filed on behalf of MCS Hemet Valley Center LLC. If you have questions concerning the attached, please contact the undersigned.

Sincerely,

Gerald P. Kennedy

GPK:as
Enclosures

cc:     Daniel Weiss (*w/enclosure via electronic mail)*

procopio.com

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Samuels Jewelers, Inc. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | District of Delaware |
| Case number | 18-11818 (KJC) |

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | **MCS Hemet Valley Center LLC** |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |
| 2. **Has this claim been acquired from someone else?** | ☒ No |
| | ☐ Yes. From whom? |

| 3. **Where should notices and payments to the creditor be sent?** | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | MCS Hemet Valley Center LLC <br> Name <br> c/o Procopio, Cory, Hargreaves &7 Savitch, LLP <br> Attn:  Gerald P. Kennedy <br> 525 B Street, Suite 2200 <br> San Diego, Ca  92101 | MCS Hemet Valley Center LLC <br><br> c/o MC Strauss <br> Attn:  Daniel Weiss <br> 990 Highland Drive, Suite 200 <br> Solana Beach, CA  92075 |
| | Contact phone  619-238-1900 | Contact phone  858-792-7500 |
| | Contact email  gerald.kennedy@procopio.com | Contact email  dweiss@mcstraussco.com |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| 4. **Does this claim amend one already filed?** | ☒ No |
|---|---|
| | ☐ Yes. Claim number on court claims registry (if known) _____     Filed on _____ <br> MM / DD / YYYY |

| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No |
|---|---|
| | ☐ Yes. Who made the earlier filing? |



| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☒ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: 109 _____

**7. How much is the claim?** $ 66,536.59 _____ . **Does this amount include interest or other charges?**

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Rent, CAM, taxes, insurance and rejection damages under Section 501(g)(1) Store #109, 2200 W. Florida Ave. Suite 215, Hemet CA 92545

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☒ Yes. **Amount necessary to cure any default as of the date of the petition.** $ 66,536.59 _____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

American LegalNet, Inc.
www.FormsWorkFlow.com

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_____) that applies. | $ _____ |

*  Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

| Part 3: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/19/2019
                    MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Gerald P. Kennedy | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Partner | | |
| Company | Procopio, Cory, Hargreaves & Savitch LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 525        B Street Suite 2200 | | |
| | Number        Street | | |
| | San Diego | CA | 92101 |
| | City | State | ZIP Code |
| Contact phone | 619-238-1900 | Email | gerald.kennedy@procopio.com |


American LegalNet, Inc.
www.FormsWorkFlow.com

**MCS Hemet Valley Center**
**Samuel's Jewelers Detail**

Pre-Petition balance due                              4,570.28

| Rejection Damages: | | Prorated | |
|---|---|---|---|
| 08/07 - 08/31/18 Rent | | 4,336.00 | 3,496.77 |
| 08/07 - 08/31/18 Insurance | | 20.00 | 16.13 |
| 08/07 - 08/31/18 Property Tax | | 130.00 | 104.84 |
| 08/07 - 08/31/18 Utilities | | 500.00 | 403.23 |
| 08/07 - 08/31/18 Marketing | | 150.11 | 121.06 |
| 09/01/18 - 09/30/18 | Rent | | 4,336.00 |
| 09/01/18 - 09/30/18 | Insurance | | 20.00 |
| 09/01/18 - 09/30/18 | Prop Tax | | 130.00 |
| 09/01/18 - 09/30/18 | Utilities | | 500.00 |
| 09/01/18 - 09/30/18 | Marketing | | 150.11 |
| 10/01/18 - 10/31/18 | Rent | | 4,336.00 |
| 10/01/18 - 10/31/18 | Insurance | | 20.00 |
| 10/01/18 - 10/31/18 | Prop Tax | | 130.00 |
| 10/01/18 - 10/31/18 | Utilities | | 500.00 |
| 10/01/18 - 10/31/18 | Marketing | | 150.11 |
| 11/01/18 - 11/30/18 | Rent | | 4,336.00 |
| 11/01/18 - 11/30/18 | Insurance | | 20.00 |
| 11/01/18 - 11/30/18 | Prop Tax | | 130.00 |
| 11/01/18 - 11/30/18 | Utilities | | 500.00 |
| 11/01/18 - 11/30/18 | Marketing | | 150.11 |
| 12/01/18 - 12/31/18 | Rent | | 4,336.00 |
| 12/01/18 - 12/31/18 | Insurance | | 20.00 |
| 12/01/18 - 12/31/18 | Prop Tax | | 130.00 |
| 12/01/18 - 12/31/18 | Utilities | | 500.00 |
| 12/01/18 - 12/31/18 | Marketing | | 150.11 |
| 01/01/19 - 01/31/19 | Rent | | 4,509.44 |
| 01/01/19 - 01/31/19 | Insurance | | 20.00 |
| 01/01/19 - 01/31/19 | Prop Tax | | 130.00 |
| 01/01/19 - 01/31/19 | Utilities | | 500.00 |
| 01/01/19 - 01/31/19 | Marketing | | 150.11 |
| 02/01/19 - 02/28/19 | Rent | | 4,509.44 |
| 02/01/19 - 02/28/19 | Insurance | | 20.00 |
| 02/01/19 - 02/28/19 | Prop Tax | | 130.00 |
| 02/01/19 - 02/28/19 | Utilities | | 500.00 |
| 02/01/19 - 02/28/19 | Marketing | | 150.11 |
| 03/01/19 - 03/31/19 | Rent | | 4,509.44 |
| 03/01/19 - 03/31/19 | Insurance | | 20.00 |
| 03/01/19 - 03/31/19 | Prop Tax | | 130.00 |
| 03/01/19 - 03/31/19 | Utilities | | 500.00 |
| 03/01/19 - 03/31/19 | Marketing | | 150.11 |

**MCS Hemet Valley Center**
**Samuel's Jewelers Detail**

| | | | |
|---|---|---|---|
| 04/01/19 - 04/30/19 | Rent | | 4,509.44 |
| 04/01/19 - 04/30/19 | Insurance | | 20.00 |
| 04/01/19 - 04/30/19 | Prop Tax | | 130.00 |
| 04/01/19 - 04/30/19 | Utilities | | 500.00 |
| 04/01/19 - 04/30/19 | Marketing | | 150.11 |
| 05/01/19 - 05/31/19 | Rent | | 4,509.44 |
| 05/01/19 - 05/31/19 | Insurance | | 20.00 |
| 05/01/19 - 05/31/19 | Prop Tax | | 130.00 |
| 05/01/19 - 05/31/19 | Utilities | | 500.00 |
| 05/01/19 - 05/31/19 | Marketing | | 150.11 |
| 06/01/19 - 06/30/19 | Rent | | 4,509.44 |
| 06/01/19 - 06/30/19 | Insurance | | 20.00 |
| 06/01/19 - 06/30/19 | Prop Tax | | 130.00 |
| 06/01/19 - 06/30/19 | Utilities | | 500.00 |
| 06/01/19 - 06/30/19 | Marketing | | 150.11 |
| 07/01/19 - 07/31/19 | Rent | | 4,509.44 |
| 07/01/19 - 07/31/19 | Insurance | | 20.00 |
| 07/01/19 - 07/31/19 | Prop Tax | | 130.00 |
| 07/01/19 - 07/31/19 | Utilities | | 500.00 |
| 07/01/19 - 07/31/19 | Marketing **Prorated** | | 150.11 |
| 08/01/19 - 08/06/19 | Rent | 4,509.44 | 872.79 |
| 08/01/19 - 08/06/19 | Insurance | 20.00 | 3.87 |
| 08/01/19 - 08/06/19 | Prop Tax | 130.00 | 25.16 |
| 08/01/19 - 08/06/19 | Utilities | 500.00 | 96.77 |
| 08/01/19 - 08/06/19 | Marketing | 150.11 | 29.05 |

| | |
|---|---|
| 2018 YE CAM Reconciliation | (509.95) |
| 2018 YE Utility Reconciliation | (253.20) |
| 2018 YE Insurance Reconciliation | 114.08 |
| 2018 YE Property Tax Reconciliation | (265.59) |

**TOTAL REJECTION DAMAGES**     **66,536.59**

# Tenant Ledger

| | |
|---|---|
| Date: | 02/22/19 |
| Tenant Code: | samuels |
| Property: | hvmllc |
| Unit: | B-2 |
| Status: | Current |
| Rent: | 4,509.44 |
| Deposit: | 0.00 |
| Move In Date: | 01/01/02 |
| Move Out Date: | |
| Due Day: | 1 |
| Tel# (O) | |
| Tel# (H) | |

**Samuels Jewelers, Inc. # 109**
**Director of Real Estate**
**2914 Montopolis Dr., Ste 200**
**Austin, TX  78741**

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | Balance Forward | | | 0.00 |
| 01/01/18 | Recur - CAM Recovery Income (01/2018) | 1,500.00 | | 1,500.00 |
| 01/01/18 | Recur - Insurance Recovery Incom (01/201 | 20.00 | | 1,520.00 |
| 01/01/18 | Recur - Marketing Recovery (01/2018) | 150.11 | | 1,670.11 |
| 01/01/18 | Recur - Property Tax Recovery (01/2018) | 130.00 | | 1,800.11 |
| 01/01/18 | Recur - Utilities Recovery (01/2018) | 500.00 | | 2,300.11 |
| 01/01/18 | Rent Charges | 3,983.89 | | 6,284.00 |
| 01/01/18 | chk# 337235  January rent charges | | 6,284.00 | 0.00 |
| 02/01/18 | 2017 Percentage Rent | 4,569.02 | | 4,569.02 |
| 02/01/18 | Rent Charges (02/2018) | 3,983.89 | | 8,552.91 |
| 02/01/18 | Recur - CAM Recovery Income (02/2018) | 1,500.00 | | 10,052.91 |
| 02/01/18 | Recur - Insurance Recovery Incom (02/201 | 20.00 | | 10,072.91 |
| 02/01/18 | Recur - Marketing Recovery (02/2018) | 150.11 | | 10,223.02 |
| 02/01/18 | Recur - Property Tax Recovery (02/2018) | 130.00 | | 10,353.02 |
| 02/01/18 | Recur - Utilities Recovery (02/2018) | 500.00 | | 10,853.02 |
| 02/12/18 | chk# 338388  February rent charges | | 10,853.02 | 0.00 |
| 03/01/18 | Rent Charges (03/2018) | 4,336.00 | | 4,336.00 |
| 03/01/18 | Recur - CAM Recovery Income (03/2018) | 1,500.00 | | 5,836.00 |
| 03/01/18 | Recur - Insurance Recovery Incom (03/201 | 20.00 | | 5,856.00 |
| 03/01/18 | Recur - Marketing Recovery (03/2018) | 150.11 | | 6,006.11 |
| 03/01/18 | Recur - Property Tax Recovery (03/2018) | 130.00 | | 6,136.11 |
| 03/01/18 | Recur - Utilities Recovery (03/2018) | 500.00 | | 6,636.11 |
| 03/01/18 | Rent adjustment Jan. & Feb. | 704.22 | | 7,340.33 |
| 03/20/18 | chk# 339074  February rent charges | | 10,620.00 | -3,279.67 |
| 04/01/18 | Rent Charges (04/2018) | 4,336.00 | | 1,056.33 |
| 04/01/18 | Rent Charges (04/2018) | 3,983.89 | | 5,040.22 |
| 04/01/18 | Recur - CAM Recovery Income (04/2018) | 1,500.00 | | 6,540.22 |
| 04/01/18 | Recur - Insurance Recovery Incom (04/201 | 20.00 | | 6,560.22 |
| 04/01/18 | Recur - Marketing Recovery (04/2018) | 150.11 | | 6,710.33 |
| 04/01/18 | Recur - Property Tax Recovery (04/2018) | 130.00 | | 6,840.33 |
| 04/01/18 | Recur - Utilities Recovery (04/2018) | 500.00 | | 7,340.33 |
| 04/01/18 | April Rent Charge reversed (Billing Erro | -3,983.89 | | 3,356.44 |
| 04/12/18 | Mall access 4/06/18 | 42.49 | | 3,398.93 |
| 05/01/18 | Rent Charges (05/2018) | 4,336.00 | | 7,734.93 |
| 05/01/18 | Rent Charges (05/2018) | 3,983.89 | | 11,718.82 |
| 05/01/18 | Recur - CAM Recovery Income (05/2018) | 1,500.00 | | 13,218.82 |
| | | | | CONTINUED |

# Tenant Ledger

| | |
|---|---|
| Date: | 02/22/19 |
| Tenant Code: | samuels |
| Property: | hvmllc |
| Unit: | B-2 |
| Status: | Current |
| Rent: | 4,509.44 |
| Deposit: | 0.00 |
| Move In Date: | 01/01/02 |
| Move Out Date: | |
| Due Day: | 1 |
| Tel# (O) | |
| Tel# (H) | |

**Samuels Jewelers, Inc. # 109**
**Director of Real Estate**
**2914 Montopolis Dr., Ste 200**
**Austin, TX   78741**

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | Balance Forward | | | 13,218.82 |
| 05/01/18 | Recur - Insurance Recovery Incom (05/201 | 20.00 | | 13,238.82 |
| 05/01/18 | Recur - Marketing Recovery (05/2018) | 150.11 | | 13,388.93 |
| 05/01/18 | Recur - Property Tax Recovery (05/2018) | 130.00 | | 13,518.93 |
| 05/01/18 | Recur - Utilities Recovery (05/2018) | 500.00 | | 14,018.93 |
| 05/11/18 | chk# 340161  April/May Rent Charges | | 10,620.00 | 3,398.93 |
| 05/21/18 | May Rent Charge reversed (Billing Error) | -3,983.89 | | -584.96 |
| 05/31/18 | chk# 340689  June Rent Charges | | 10,620.00 | -11,204.96 |
| 06/01/18 | Rent Charges (06/2018) | 4,336.00 | | -6,868.96 |
| 06/01/18 | Recur - CAM Recovery Income (06/2018) | 1,500.00 | | -5,368.96 |
| 06/01/18 | Recur - Insurance Recovery Incom (06/201 | 20.00 | | -5,348.96 |
| 06/01/18 | Recur - Marketing Recovery (06/2018) | 150.11 | | -5,198.85 |
| 06/01/18 | Recur - Property Tax Recovery (06/2018) | 130.00 | | -5,068.85 |
| 06/01/18 | Recur - Utilities Recovery (06/2018) | 500.00 | | -4,568.85 |
| 06/26/18 | chk# 341007  Rent Charges - July | | 6,051.15 | -10,620.00 |
| 07/01/18 | Rent Charges (07/2018) | 4,336.00 | | -6,284.00 |
| 07/01/18 | Recur - CAM Recovery Income (07/2018) | 1,500.00 | | -4,784.00 |
| 07/01/18 | Recur - Insurance Recovery Incom (07/201 | 20.00 | | -4,764.00 |
| 07/01/18 | Recur - Marketing Recovery (07/2018) | 150.11 | | -4,613.89 |
| 07/01/18 | Recur - Property Tax Recovery (07/2018) | 130.00 | | -4,483.89 |
| 07/01/18 | Recur - Utilities Recovery (07/2018) | 500.00 | | -3,983.89 |
| 08/01/18 | Rent Charges (08/2018) | 4,336.00 | | 352.11 |
| 08/01/18 | Recur - CAM Recovery Income (08/2018) | 1,500.00 | | 1,852.11 |
| 08/01/18 | Recur - Insurance Recovery Incom (08/201 | 20.00 | | 1,872.11 |
| 08/01/18 | Recur - Marketing Recovery (08/2018) | 150.11 | | 2,022.22 |
| 08/01/18 | Recur - Property Tax Recovery (08/2018) | 130.00 | | 2,152.22 |
| 08/01/18 | Recur - Utilities Recovery (08/2018) | 500.00 | | 2,652.22 |
| 08/27/18 | 2017 YE CAM Reconciliation | 1,208.68 | | 3,860.90 |
| 08/27/18 | 2017 YE Utility Reconciliation | -1,316.38 | | 2,544.52 |
| 08/27/18 | 2017 YE Tax Reconciliation | -275.00 | | 2,269.52 |
| 08/29/18 | 2017 YE Insurance Reconciliation | 88.59 | | 2,358.11 |
| 09/01/18 | Rent Charges (09/2018) | 4,336.00 | | 6,694.11 |
| 09/01/18 | Recur - CAM Recovery Income (09/2018) | 1,500.00 | | 8,194.11 |
| 09/01/18 | Recur - Insurance Recovery Incom (09/201 | 20.00 | | 8,214.11 |
| 09/01/18 | Recur - Marketing Recovery (09/2018) | 150.11 | | 8,364.22 |
| 09/01/18 | Recur - Property Tax Recovery (09/2018) | 130.00 | | 8,494.22 |

CONTINUED

# Tenant Ledger

| | |
|---|---|
| Date: | 02/22/19 |
| Tenant Code: | samuels |
| Property: | hvmllc |
| Unit: | B-2 |
| Status: | Current |
| Rent: | 4,509.44 |
| Deposit: | 0.00 |
| Move In Date: | 01/01/02 |
| Move Out Date: | |
| Due Day: | 1 |
| Tel# (O) | |
| Tel# (H) | |

**Samuels Jewelers, Inc. # 109**
**Director of Real Estate**
**2914 Montopolis Dr., Ste 200**
**Austin, TX   78741**

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | Balance Forward | | | 8,494.22 |
| 09/01/18 | Recur - Utilities Recovery (09/2018) | 500.00 | | 8,994.22 |
| 09/07/18 | chk# 401063  Post Petition Rent | | 6,636.11 | 2,358.11 |
| 10/01/18 | Rent Charges (10/2018) | 4,336.00 | | 6,694.11 |
| 10/01/18 | Recur - CAM Recovery Income (10/2018) | 1,500.00 | | 8,194.11 |
| 10/01/18 | Recur - Insurance Recovery Incom (10/201 | 20.00 | | 8,214.11 |
| 10/01/18 | Recur - Marketing Recovery (10/2018) | 150.11 | | 8,364.22 |
| 10/01/18 | Recur - Property Tax Recovery (10/2018) | 130.00 | | 8,494.22 |
| 10/01/18 | Recur - Utilities Recovery (10/2018) | 500.00 | | 8,994.22 |
| 10/08/18 | chk# 401860  October Rent Charges | | 6,636.11 | 2,358.11 |
| 11/01/18 | Rent Charges (11/2018) | 4,336.00 | | 6,694.11 |
| 11/01/18 | Recur - CAM Recovery Income (11/2018) | 1,500.00 | | 8,194.11 |
| 11/01/18 | Recur - Insurance Recovery Incom (11/201 | 20.00 | | 8,214.11 |
| 11/01/18 | Recur - Marketing Recovery (11/2018) | 150.11 | | 8,364.22 |
| 11/01/18 | Recur - Property Tax Recovery (11/2018) | 130.00 | | 8,494.22 |
| 11/01/18 | Recur - Utilities Recovery (11/2018) | 500.00 | | 8,994.22 |
| 11/16/18 | chk# 402442  November Rent Charges | | 6,636.11 | 2,358.11 |
| 11/28/18 | chk# 402707  August Stub Rent | | 2,676.00 | -317.89 |
| 12/01/18 | Rent Charges (12/2018) | 4,336.00 | | 4,018.11 |
| 12/01/18 | Recur - CAM Recovery Income (12/2018) | 1,500.00 | | 5,518.11 |
| 12/01/18 | Recur - Insurance Recovery Incom (12/201 | 20.00 | | 5,538.11 |
| 12/01/18 | Recur - Marketing Recovery (12/2018) | 150.11 | | 5,688.22 |
| 12/01/18 | Recur - Property Tax Recovery (12/2018) | 130.00 | | 5,818.22 |
| 12/01/18 | Recur - Utilities Recovery (12/2018) | 500.00 | | 6,318.22 |
| 12/17/18 | chk# 403102  December Rent Charges | | 6,636.11 | -317.89 |
| 01/01/19 | Rent Charges (01/2019) | 4,509.44 | | 4,191.55 |
| 01/01/19 | Recur - CAM Recovery Income (01/2019) | 1,500.00 | | 5,691.55 |
| 01/01/19 | Recur - Insurance Recovery Incom (01/201 | 20.00 | | 5,711.55 |
| 01/01/19 | Recur - Property Tax Recovery (01/2019) | 130.00 | | 5,841.55 |
| 01/01/19 | Recur - Utilities Recovery (01/2019) | 500.00 | | 6,341.55 |
| 01/01/19 | Recur - Marketing Recovery (1/2019) | 155.78 | | 6,497.33 |
| 01/02/19 | chk# 403413  August Stub Rent Part-2 | | 2,676.00 | 3,821.33 |
| 01/14/19 | chk# 403708  January Rent Charges | | 6,341.55 | -2,520.22 |
| 01/21/19 | 2018 Percentage Rent | 6,934.72 | | 4,414.50 |
| 02/01/19 | Rent Charges (02/2019) | 4,509.44 | | 8,923.94 |
| 02/01/19 | Recur - CAM Recovery Income (02/2019) | 1,500.00 | | 10,423.94 |
| | | | | CONTINUED |

# Tenant Ledger

| | |
|---|---|
| Date: | 02/22/19 |
| Tenant Code: | samuels |
| Property: | hvmllc |
| Unit: | B-2 |
| Status: | Current |
| Rent: | 4,509.44 |
| Deposit: | 0.00 |
| Move In Date: | 01/01/02 |
| Move Out Date: | |
| Due Day: | 1 |
| Tel# (O) | |
| Tel# (H) | |

**Samuels Jewelers, Inc. # 109**
**Director of Real Estate**
**2914 Montopolis Dr., Ste 200**
**Austin, TX  78741**

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | Balance Forward | | | 10,423.94 |
| 02/01/19 | Recur - Insurance Recovery Incom (02/201 | 20.00 | | 10,443.94 |
| 02/01/19 | Recur - Property Tax Recovery (02/2019) | 130.00 | | 10,573.94 |
| 02/01/19 | Recur - Utilities Recovery (02/2019) | 500.00 | | 11,073.94 |
| 02/01/19 | Recur - Marketing Recovery (2/2019) | 155.78 | | 11,229.72 |
| 02/11/19 | chk# 404167  February Rent Charges | | 6,659.44 | 4,570.28 |

| Current | 30 Days | 60 Days | 90 Days | Amount Due |
|---|---|---|---|---|
| 155.78 | 4,360.49 | 0.00 | 0.00 | 4,570.28 |

# LEASE

## HEMET VALLEY MALL

### HEMET, CALIFORNIA

### TABLE OF CONTENTS

| ARTICLE | 1 | PARTIES | 1 |
|---|---|---|---|
| ARTICLE | 2 | TERMS AND DEFINITIONS | 1 |
| ARTICLE | 3 | PREMISES | 2 |
| ARTICLE | 4 | LEASE TERM | 3 |
| ARTICLE | 5 | RENTAL | 3 |
| ARTICLE | 6 | DEFINITION OF "NET SALES" | 6 |
| ARTICLE | 7 | USE | 7 |
| ARTICLE | 8 | UTILITIES | 8 |
| ARTICLE | 9 | INDEMNITY AND INSURANCE | 9 |
| ARTICLE | 10 | TITLE RESTRICTIONS | 11 |
| ARTICLE | 11 | TENANT'S RIGHT TO MAKE ALTERATIONS | 11 |
| ARTICLE | 12 | MECHANICS' LIENS | 12 |
| ARTICLE | 13 | SIGNS | 12 |
| ARTICLE | 14 | TRADE FIXTURES AND PERSONAL PROPERTY | 13 |
| ARTICLE | 15 | ASSIGNMENT, SUBLETTING AND FINANCING | 13 |
| ARTICLE | 16 | TENANT'S CONDUCT OF BUSINESS | 16 |
| ARTICLE | 17 | REPAIRS AND MAINTENANCE | 17 |
| ARTICLE | 18 | DAMAGE OR DESTRUCTION | 19 |
| ARTICLE | 19 | COMMON AREAS | 20 |
| ARTICLE | 20 | ENCLOSED MALL | 23 |
| ARTICLE | 21 | DEFAULTS; REMEDIES | 24 |
| ARTICLE | 22 | DEFAULT BY LANDLORD | 27 |
| ARTICLE | 23 | ATTORNEYS' FEES | 27 |
| ARTICLE | 24 | EMINENT DOMAIN | 27 |
| ARTICLE | 25 | SUBORDINATION TO FINANCING; ATTORNMENT | 28 |
| ARTICLE | 26 | SALE OF PREMISES BY LANDLORD | 29 |
| ARTICLE | 27 | HOLDOVER BY TENANT | 29 |
| ARTICLE | 28 | MARKETING FUND | 29 |
| ARTICLE | 29 | NOTICES | 29 |
| ARTICLE | 30 | EXPANSION | 30 |
| ARTICLE | 31 | LANDLORD'S RIGHT TO RELOCATE PREMISES | 30 |
| ARTICLE | 32 | CAPTIONS AND TERMS | 31 |
| ARTICLE | 33 | OBLIGATIONS OF SUCCESSORS | 32 |
| ARTICLE | 34 | MISCELLANEOUS PROVISIONS | 32 |
| ARTICLE | 35 | NONDISCRIMINATION | 36 |

| EXHIBIT | A | GENERAL SITE PLAN OF THE CENTER |
|---|---|---|
| EXHIBIT | B | DESCRIPTION OF PREMISES |
| EXHIBIT | C | PROVISIONS RELATING TO REMODELING OF TENANT'S STORE |
| EXHIBIT | D | GUARANTEE OF LEASE  [Intentionally Omitted] |
| EXHIBIT | E | FORM OF TENANT'S CERTIFICATE |
| EXHIBIT | F | SIGN CRITERIA |
| EXHIBIT | G | RULES AND REGULATIONS |
| EXHIBIT | H | MECHANICAL/ELECTRICAL SCHEDULE |

# LEASE

## ARTICLE 1
## PARTIES

THIS LEASE, dated as of the 31st day of December 2001 ("Effective Date"), is made by and between DONAHUE SCHRIBER REALTY GROUP, L.P., a Delaware limited partnership ("Landlord"), and SAMUELS JEWELERS, INC., a Delaware corporation ("Tenant").

## ARTICLE 2
## TERMS AND DEFINITIONS

**2.1    Definitions.**  For purposes of this Lease, the following terms shall have the following meanings:

| | | |
|---|---|---|
| Lease Term: | Ten (10) years. | (Section 4.1) |
| Rental Commencement Date: | January 1, 2002. | (Section 5.1) |
| Minimum Annual Rent: | Commencing on the Rental Commencement Date and continuing thereafter through the end of the third (3rd) year of the Lease Term, the Minimum Annual Rent shall be: **$36,856.00** per annum; and commencing on the first (1st) day of the fourth (4th) year and continuing thereafter through the end of the seventh (7th) year of the Lease Term, the Minimum Annual Rent shall be: **$39,024.00** per annum; and commencing on the first (1st) day of the eighth (8th) year and continuing thereafter through the end of the Lease Term occurring at the end of the tenth (10th) year of the Lease Term, the Minimum Annual Rent shall be: **$41,192.00** per annum. | (Section 5.1) |
| | The increase(s) in Minimum Annual Rent shall occur on the applicable anniversary of the Rental Commencement Date. | |
| Delayed Opening Rent: | None. | (Section 34.23) |
| Percentage Rent Rate: | Six percent (6%). | (Section 5.4) |
| Address for Notices: | | (Article 29) |
| To Landlord: | P. O. Box C-19525<br>Irvine, California 92713 | |
| To Tenant: | 2914 Montopolis<br>Suite 200<br>Austin, Texas 78741 | |
| Security Deposit: | None. | (Section 5.3) |
| Premises: | That certain space located in Building B, Store 2, having approximately one thousand eighty-four (1,084) square feet of floor area as more particularly described in Exhibit "B". | (Exhibit "B") |
| Occupancy Charge: | None. | (Exhibit "C") |
| Initial Opening Assessment: | None. | (Section 28.2) |
| Architectural Review Fee: | None. | (Exhibit "C") |
| Advertising: | Six (6) times per year. | (Section 28.3) |
| Center: | That certain shopping center known to be or known as Hemet Valley Mall or such other name as Landlord may select under Section 2.2 hereof which Landlord has constructed in the City of Hemet, County of Riverside, State of California. | (Article 3)<br>(Exhibit "A") |
| REA(s) | Any document or documents now or hereafter executed by and between Landlord or its | (Article 10) |

Handwritten annotations in the Minimum Annual Rent section:
3,071.33  1-3 yr
3,252.00  4-7
3,432.67  8-10



TLS

predecessors and the owner(s) or lessee(s) of the Other Stores or the owner(s) or lessee(s) of certain parcels of real property within the Center, and/or the City of Hemet ("City") and/or the Hemet Redevelopment Agency ("HRA") which provide, in part, for a scheme of reciprocal easements for the benefit of owners, tenants and customers of the Center.

Marketing Fund:        One Thousand Three Hundred Fifty-Five and        (Section 28.1)
00/100 Dollars ($1,355.00) per year as adjusted
pursuant to Section 28.1.

**2.2    Exhibits.**    The following drawings, documents and special provisions are attached hereto as Exhibits and made a part of this Lease:

Exhibit "A":    General site plan of the Center which Landlord has constructed. Tenant acknowledges that Landlord may change the shape, size, location, number and extent of the improvements to any portion of the Center without Tenant's consent, and further that Landlord may expand the Center pursuant to Article 30, or withdraw land from the Center without Tenant's consent. Landlord agrees that no change or addition to the Center by Landlord made pursuant to the terms of the Lease shall (except temporarily during repair, maintenance, restoration, refurbishment or construction or except as required by law): (i) reduce parking available to Tenant or Tenant's customers below the requirements of the City in which the Center is located; (ii) materially and adversely interfere with Tenant's ability to operate from the Premises; or (iii) materially impair customer access to or visibility of the Premises. Any such change or addition shall be made in a manner consistent with quality regional shopping centers and reasonable steps shall be taken to minimize any adverse impact upon the Premises occasioned by such change or addition. No new kiosks, displays, carts, stands or other permanent improvements which sell or offer for sale gold or fine jewelry ('Kiosks") shall be located in the common area within twenty-five feet (25') feet of the entrance to the Premises. The foregoing restriction shall not apply to any Kiosk in place in such restricted area prior to the Effective Date of this Lease. Landlord reserves the right, in its sole discretion, to change the name, address and logo of the Center at any time.

Exhibit "B":    Description of the Premises, the use to which the same shall be put under the terms and provisions of this Lease and the Trade Name to be utilized by Tenant.

Exhibit "C":    Description of work previously performed by Landlord ("Landlord's Work") and description of work to be performed by Tenant ("Tenant's Work") in or on the Premises. The Premises shall be constructed in accordance with the procedures outlined in Exhibit "C".

Exhibit "D":    Guarantee of Lease. [Intentionally Omitted]

Exhibit "E":    Form of Tenant's Certificate.

Exhibit "F":    Sign Criteria.

Exhibit "G":    Rules and Regulations.

Exhibit "H":    Mechanical/Electrical Schedule.

## ARTICLE 3
## PREMISES

**3.1**    Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises, which Premises are situated within the Center. This Lease is subject to the terms, covenants and conditions herein set forth and Tenant covenants as a material part of the consideration of this Lease to keep and perform each and all of said terms, covenants and conditions by it to be kept and performed. The Premises contain approximately the number of square feet of floor area specified in Section 2.1. Within the thirty (30) days following the date of Landlord's notice to Tenant pursuant to Section 4.1, each party shall have the right, at that party's expense to request Landlord's project architect to measure the exact floor area of the Premises and, if there is a deviation from the number specified in Section 2.1, this Lease shall be amended to reflect the actual floor area and corresponding Minimum Annual Rent and additional rent based on such actual floor area. In the event of such a deviation in floor area, the corresponding Minimum Annual Rent shall be the sum computed by a fraction, the numerator of which shall be the total number of square feet in the Premises after the remeasurement and the denominator of which shall be the total number of square feet in the Premises before the remeasurement. If no measurement is made by either party within such thirty (30) day period the floor area of the Premises specified in Section 2.1 shall be deemed to be the floor area of the Premises, subject to Landlord's right, at a later date, to remeasure the floor area of the Premises for accuracy. If Landlord elects to remeasure the floor area of the Premises for accuracy at a later date and an error is found, this Lease shall be amended in the manner provided above.




## ARTICLE 4
## LEASE TERM

**4.1    Commencement of Term.**    This Lease shall be effective and the Lease Term shall commence as of the Effective Date set forth in Article 1 above and shall continue thereafter for the period of the Lease Term set forth in Article 2 above, unless sooner terminated as hereinafter provided.  The Lease Term shall be computed from the first day of the calendar month immediately following the Rental Commencement Date or on the first day of the calendar month if the Rental Commencement Date occurs on the first day of the month, unless sooner terminated as hereinafter provided.  Landlord agrees to deliver to Tenant, and Tenant shall accept from Landlord, possession of the Premises in its "as is" condition upon notice of delivery of possession from Landlord.  Landlord shall have no obligation to perform any work in the Premises.  In the event that Tenant's obligation to pay rent has not commenced within three (3) years from the Effective Date hereof, this Lease shall automatically terminate, and Landlord and Tenant shall be relieved from any and all liability resulting hereunder.  Such termination shall be Tenant's sole and exclusive remedy at law or in equity for Landlord's failure to deliver possession of the Premises.

**4.2    Tenant's Certificate.**  Within fifteen (15) days after the Rental Commencement Date and at any other time during the Lease Term, within fifteen (15) days following request in writing by Landlord, Tenant shall execute and deliver to Landlord a certificate substantially in the form of Exhibit "E" attached hereto indicating therein any exceptions thereto which may exist at that time.  Failure of Tenant to timely execute and deliver such certificate shall constitute an acceptance of the Premises and an acknowledgment by Tenant that the statements included in Exhibit "E" are true and correct, without exception, and may, at Landlord's option, constitute a default and material breach under this Lease, subject to any applicable notice and cure period in Section 21.1 of this Lease.

**4.3    Tenant's Work.**  Tenant shall refurbish the Premises as set forth in this Section 4.3 and Section 11.4 of this Lease.  Tenant shall commence such refurbishment no later than July 1, 2002 and complete  such work no later than the date which is thirty (30) days from the date Tenant commences same or July 31, 2002, whichever is earlier ("Refurbishment Period").  During this period, Tenant, at its sole cost and expense, shall refurbish and reclad the Premises ("Refurbishment") and shall equip the Premises with all trade fixtures and personal property suitable or appropriate for the regular and normal operation of the type of business in which Tenant is engaged.  Tenant shall be permitted to close for business in the Premises during the Refurbishment Period to the extent necessary to complete such work but such closure shall not exceed thirty (30) days.  Tenant shall be open for business to the public on the Rental Commencement Date.  The scope of the Refurbishment shall include replacement of damaged or stained floor and ceiling tiles; replacement or repair of damaged, soiled, stained or threadbare carpeting; and repainting of the interior of the Premises and refinishing or repainting all surfaces.

## ARTICLE 5
## RENTAL

**5.1    Minimum Annual Rent.**  Tenant agrees to pay to Landlord, at the times and in the manner herein provided, the Minimum Annual Rent specified in Article 2 above.  Minimum Annual Rent shall be payable in advance in twelve (12) equal monthly installments on the first day of each calendar month, without demand or offset, commencing upon the Rental Commencement Date as provided in Article 2.  For the fractional year ending on December 31 first following the Rental Commencement Date, Tenant shall pay a sum equal to one-twelfth (1/12) of such Minimum Annual Rent for each full calendar month during said fractional lease year.  If the Rental Commencement Date falls on a day of the month other than the first day of such month, the rent for the first fractional month shall accrue on a daily basis for the period from the date of such commencement to the end of such calendar month at a rate equal to one-three hundred sixty-fifth (1/365) of the Minimum Annual Rent for each such day.  Unless expressly provided otherwise, all other payments required to be made under the terms of the Lease which require proration on a time basis shall be prorated on the same basis.

**5.2    Minimum Annual Rent Adjustment.**  [Intentionally Omitted]

**5.3    Security Deposit.**  [Intentionally Omitted]

**5.4    Percentage Rent.**  In addition to the Minimum Annual Rent, Tenant shall pay to Landlord, at the time and in the manner herein specified, the dollar amount by which the Percentage Rent Rate (specified in Article 2 hereof) of Tenant's Net Sales (as the term Net Sales is defined in Article 6 hereof), exceeds the Minimum Annual Rent paid by Tenant to Landlord during each calendar year (or portion thereof) of the Lease Term ("Percentage Rent").  Percentage Rent shall first be paid during each calendar year for the calendar month in which the aggregate Net Sales for each calendar year shall first have exceeded the volume level at which the percentage of Net Sales specified as the Percentage Rent Rate in Section 2.1 exceeds the Minimum Annual Rent paid with respect to such calendar year ("Breakpoint"), and thereafter shall be paid monthly on all Net Sales made during such calendar year and each subsequent calendar year when such point is reached  for the remainder of the Lease Term, such payment to be made not later than the fifteenth (15th) day following the end of each applicable calendar month in which such point is reached.  Percentage Rent shall be computed monthly.  For the purpose of computing Percentage Rent, Tenant's Net Sales for any period during which Tenant does not continuously and uninterruptedly conduct its business, as required by Article 16, shall be deemed to be Tenant's Net Sales for the corresponding period during the last calendar year in which Tenant operated continuously and uninterruptedly.  Within forty-five (45) days after the close of each calendar year, an accounting of Tenant's Net Sales during said calendar year and the amounts paid to Landlord as Minimum Annual Rent and as Percentage Rent during such calendar year shall be made by Tenant and, upon such accounting, an adjustment shall be made with respect to said Percentage Rent as

follows:  If Tenant shall have paid to Landlord an amount greater than Tenant is required to pay under the terms hereof, Tenant shall be entitled to a credit against Tenant's next payment of rent or other charge due to Landlord from Tenant in the amount of such excess rent paid, or if Tenant shall have paid an amount less than the rent required to be paid hereunder, Tenant shall pay to Landlord such difference within fifteen (15) days of such determination.  With respect to any partial calendar year at the beginning or ending of the Lease Term, the amount of Percentage Rent required to be paid for such partial calendar year shall be based upon the Net Sales and Minimum Annual Rent for such additional number of months in the Lease Term closest to such partial year to equal a twelve (12) month period.

### 5.5    Statement of Net Sales.

(a)    Tenant agrees to furnish or cause to be furnished to Landlord a statement of the monthly Net Sales of Tenant within twenty (20) days after the close of each calendar month and a statement of the annual Net Sales by month of Tenant within forty-five (45) days after the close of each calendar year. Such statements shall be certified as an accurate accounting of Tenant's Net Sales by an authorized representative of Tenant.  Tenant shall record at the time of each transaction in the presence of the customer, all receipts from sales or other transactions, whether for cash or on credit, in a cash register, or in cash registers, having a cumulative total and which shall number consecutive purchases.  Tenant shall keep full and accurate books of account including, but not limited to, a general ledger, sales journal, cash receipts journal, general journal, bank statements, financial statements, records and all such cash register receipts with regard to the gross sales and Net Sales, credits, refunds and other transactions made from or upon the Premises (including the gross sales and Net Sales of any subtenant, licensee or concessionaire).  Such books, receipts and records shall be kept for a period of three (3) years after the close of each calendar year and shall be available for inspection and audit by Landlord or its representatives (which representatives may include, without limitation, any ground lessor under a ground lease for all or any portion of the Center with Landlord as ground lessee) at all times during regular business hours.  In addition, upon request of Landlord, Tenant agrees to furnish to Landlord a copy of Tenant's sales tax return for California (State and Local Sales and Use Tax Return) if required by California law.  The receipt by Landlord of any statement or any payment of Percentage Rent for any period shall not be binding upon Landlord as to the accuracy of such statement or payment.

(b)    At any time within three (3) years of receipt of any such statements (excluding the period between November 1 through January 1), Landlord shall be entitled to an independent audit of Tenant's gross sales and Net Sales, to be conducted either by Landlord or an accountant to be designated by Landlord. Such audit shall be limited to items necessary to a determination of Tenant's Net Sales, as hereinafter defined, and shall be conducted during normal business hours at the Premises, unless Tenant shall operate its business at additional locations, in which case such audit shall be conducted at the principal place of business of Tenant.  If it shall be determined as a result of such audit that there has been a deficiency in the payment of Percentage Rent, such deficiency shall become immediately due and payable with interest at the maximum lawful rate [not to exceed fourteen percent (14%) per annum] from the date when said payment should have been made until paid.  In addition, if Tenant's statement for the pertinent calendar year shall be found to have understated Net Sales by more than three percent (3%), and Landlord is entitled to any additional Percentage Rent as a result of such understatement, Tenant shall pay to Landlord all reasonable costs and expenses which may be incurred by Landlord in determining and collecting the understatement or underpayment.  If Tenant's statement shall be found to have understated Net Sales by more than five percent (5%), such understatement shall, at Landlord's option, constitute an incurable material default under this Lease.  Any information gained from such statements or inspection shall be confidential and shall not be disclosed, except to carry out the purposes hereof; provided, however, that Landlord shall be permitted to divulge the contents of any such statements in connection with any financing or sale arrangements or assignments of Landlord's interest in the Center or in connection with any administrative or judicial proceeding including, without limitation, arbitration, in which Landlord is involved and where Landlord may be required to divulge such information.

### 5.6    Taxes and Insurance Expenses.

Commencing upon the Rental Commencement Date and for the balance of the Lease Term, Tenant shall pay to Landlord amounts designated herein as real property taxes and insurance expenses allocable to the Premises.  Said amounts shall mean all taxes and assessments levied with respect to any tax fiscal year applicable to the Lease Term, and the cost to Landlord with respect to any policy of insurance carried by Landlord pursuant to Section 9.6 on the building of which the Premises are a part (excluding Tenant's leasehold improvements) which are allocable to the Premises as provided herein.  During any portion of the Lease Term which is less than a full taxable fiscal year or less than a full period for which Landlord has obtained such insurance, Tenant's obligation for such real property taxes and insurance expenses shall be prorated on a daily basis.

### 5.7    Definition of Real Property Taxes.

As used herein, the term "real property taxes" shall include general real property and improvement taxes, any form of assessment, reassessment, license fee, license tax, business license tax, commercial rental tax, in lieu tax, levy, charge, penalty or similar imposition, whatsoever or at all imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, street, storm drain, sewer, sidewalk, community facility, park and ride, agricultural, lighting, drainage or other improvement or special assessment district thereof, or any agency or public body, as against any legal or equitable interest of Landlord in the Premises and buildings in the Center including, but not limited to, the following:

(a)    Any tax on Landlord's rent, right to rent or other income from the Premises or as against Landlord's business of leasing the Premises;

(b)     Any assessment, reassessment, tax, fee, levy or charge in addition to, or in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as fire protection, street, sewer, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants. It is the intention of Tenant and Landlord that all such new and increased assessments, reassessments, taxes, fees, levies, and charges and all similar assessments, reassessments, taxes, fees, levies and charges imposed now or hereafter be included within the definition of real property taxes for the purposes of this Lease;

(c)     Any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises, the sales generated from the Premises or the rent payable hereunder, including, without limitation, any gross income tax with respect to the receipt of such rent, or upon or with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof;

(d)     Any assessment, tax, fee, levy or charge upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises; and

(e)     Any assessment or reassessment related to any change of ownership of any interest in the Center or portion thereof held by Landlord or any addition or improvement to the Center or a portion thereof.

With respect to any assessment which may be levied against or upon the Premises and which under the laws then in force may be evidenced by improvement or other bonds, or may be paid in annual installments, there shall be included within the definition of real property taxes with respect to any tax fiscal year only the amount currently payable on such bonds, including interest, for such tax fiscal year, or the current annual installment for such tax fiscal year.

Real property taxes shall not include Landlord's federal or state income, franchise, inheritance or estate taxes, or documentary transfer taxes on documents for the sale or transfer of the Center to which Tenant is not a party.

If Landlord contests any real property taxes levied or assessed on the Premises, Center or underlying realty during the Lease Term, Tenant shall pay to Landlord that portion of all costs incurred by Landlord in connection with such contest, pursuant to the fraction set forth in the Section 5.8 for the allocation of real property taxes. If Landlord receives a refund pursuant to its contest of any real property taxes, then, provided Tenant has paid its share of the costs incurred by Landlord in connection with such contest as required by this Section 5.7, Landlord shall reimburse Tenant that portion of the total refund prorated in the same manner as set forth in Section 5.8. Landlord's obligation to refund Tenant's share of the contest of such taxes under this Section shall survive the expiration (or earlier termination) of the Lease Term for a period of two (2) years thereafter.

**5.8     Allocation of Real Property Taxes.**  The allocation of real property taxes to the Premises shall be a fractional portion of the real property taxes assessed against the land and improvements upon the Center after deduction of any sum or sums paid toward such taxes by the operators of the Other Stores, the numerator of which shall be the number of square feet of floor area comprising the Premises and the denominator of which shall be the total number of square feet of floor area of buildings (excluding the buildings of the Other Stores) located within the exterior boundaries of the entire Center which are occupied from time to time as of the commencement of each calendar quarter, but in no event shall the denominator be less than eighty percent (80%) of the total number of square feet of floor area of such buildings (excluding the buildings of the Other Stores) located within the exterior boundaries of the entire Center, provided that an equitable adjustment shall be made for floor area which is only partially completed on the date that such real property taxes become a lien. Portions of the Center are, or may be, owned or leased from time to time by various persons or entities occupying freestanding facilities or other facilities containing a substantial amount of floor area of buildings and contributing to real property taxes, insurance, common area and/or enclosed mall expenses on a basis other than that described in this Lease (collectively, "Other Stores"). The contributions, if any, of the Other Stores towards real property taxes, insurance, common area and/or enclosed mall expenses shall be credited toward payment of the entirety of such expenses and Tenant shall pay its share of the balance of such expenses as set forth in Article 5, Article 17, Article 19 and Article 20. The term "buildings" as used in the foregoing articles shall mean and refer to buildings constructed for occupancy by tenants excluding the common area and enclosed mall area.

**5.9     Insurance Allocation.**  In the event that the Premises are not separately appraised for insurance purposes, but are a part of a larger parcel for the purpose of determining the insurance value thereof, the allocation of insurance expenses to the Premises shall be a fractional portion of the insurance expenses for such larger parcel, the numerator of which shall be the number of square feet of floor area comprising the Premises and the denominator of which shall be the total number of square feet of floor area of buildings, located within such larger parcel which are occupied from time to time as of the commencement of each calendar quarter but in no event shall the denominator be less than eighty percent (80%) of the total number of square feet of floor area of buildings (excluding the buildings of the Other Stores) located within such larger parcel as of the commencement of the calendar quarter.

**5.10     Tax and Insurance Fund.**  Tenant shall pay to Landlord on account of such real property taxes and insurance expenses on the first day of each calendar month such respective amounts as Landlord

shall from time to time estimate and so notify Tenant are required for Landlord to establish a fund (which shall not pay interest to Tenant) with which to pay such expenses prior to delinquency except that, with respect to the first year's insurance expenses, Tenant shall pay its pro-rata share of such expenses concurrently with the first monthly installment of Minimum Annual Rent or at such later time as Landlord may designate. Tenant's pro-rata share of real property taxes payable pursuant to Article 19 and Article 20 may be treated as real property taxes pursuant to this Article. The definition of real property taxes for the Premises in Section 5.7 shall apply to the real property taxes due under Article 19 and Article 20, except that such taxes shall be on the common areas and enclosed mall respectively and not the Premises. Landlord shall deliver to Tenant at least once annually a statement setting forth the actual real property taxes and insurance expenses allocable to the Premises and the basis for computing the same and, if such actual expenses exceed Tenant's payments hereunder, Tenant shall pay the deficiency to Landlord within fifteen (15) days after receipt of such statement. If payments made by Tenant for such year exceed such actual expenses, Tenant shall be entitled to credit the excess against payments next coming due to Landlord for such expenses. If any overpayment to Landlord of Tenant's share of taxes, insurance, common area or enclosed mall expenses made by Tenant under this Lease occurs during the last year of the Term, Landlord shall refund to Tenant the amount of the overpayment within sixty (60) days following the expiration of the Term, provided Tenant has vacated the Premises on or before the expiration date in accordance with the terms of the Lease and provided Tenant is not otherwise in material default under the Lease which remains uncured.

   **5.11    Other Charges.**  Tenant shall pay to Landlord when due all sums of money required to be paid  pursuant to this Article 5, Article 19, Article 20, Article 28 and Article 34, and all other sums of money or charges required to be paid by Tenant under this Lease as additional rent, whether or not the same is designated additional rent. If such amounts or charges are not paid at the time provided in this Lease, they shall nevertheless be collectible with the next installment of Minimum Annual Rent thereafter falling due, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of Landlord. If Tenant shall fail to pay, when the same is due and payable, any rent or other charge, such unpaid amounts shall bear interest at the maximum lawful rate [not to exceed fourteen percent (14%) per annum] from the date due to the date of payment. An appropriate adjustment of all rent and other charges paid on an estimated basis under the terms of the Lease shall be made after the end of the calendar year following the expiration or earlier termination of the Lease, such that Tenant shall pay to Landlord the amount of any underpayment promptly upon Tenant's receipt of Landlord's request therefor, and Landlord shall refund to Tenant the amount of any excess promptly upon Landlord's receipt of Tenant's request therefor.

   **5.12    Place of Payment.**  All rent and other charges shall be paid by Tenant to Landlord at the address specified for service of notices upon Landlord in Article 2 of this Lease or at such other place as may from time to time be designated by Landlord in writing at least fifteen (15) days prior to the next ensuing payment date.

## ARTICLE 6
## DEFINITION OF "NET SALES"

   **6.1**    As used in this Lease, gross sales of Tenant is defined as the gross selling price of all merchandise or services sold upon or from the Premises by Tenant, its subtenants, licensees and concessionaires, whether for cash or on credit, whether collected or not, whether made by store personnel or by vending machines. The term Net Sales as used in this Lease shall mean the gross sales of Tenant excepting therefrom only the following:

   (a)    The selling price of all merchandise returned by customers, purchased at the Premises and accepted for full credit, or the amount of discounts and allowances made thereon;

   (b)    Goods returned to sources or transferred to another store or warehouse owned by or affiliated with Tenant;

   (c)    Sums and credits received in the settlement of claims for loss of or damage to merchandise;

   (d)    The price allowed on all merchandise traded in by customers or the amount of credit for discounts and allowances made in lieu of acceptance thereof;

   (e)    Cash or credit refunds made to customers in the ordinary course of business, but this exclusion shall not include any amount paid or payable for what are commonly referred to as trading stamps;

   (f)    Receipts from public telephones, stamp machines, public toilet locks or other vending machines solely for the use of Tenant's employees;

   (g)    Sales taxes, so-called luxury taxes, consumers' excise taxes, gross receipts taxes and other similar taxes now or hereafter imposed upon the sale of merchandise or services, but only if collected separately from the selling price of merchandise or services and collected from customers;

   (h)    Sales of fixtures, equipment or property which are not stock in trade;

   (i)    the amount of any finance, interest, service or carrying charges on sales which are separately stated and not actually included in the actual sales price of merchandise but specifically excluding fees paid to credit card companies or for the sue of a credit card;

(j)      Gift certificates or like vouchers, until such time as the same have been converted into a sale by redemption;

(k)      The amount of bad debts or uncollectible accounts relating to proceeds from sales made from the Premises previously included in Net Sales, after such time as Tenant has made its customary collection efforts and provided that Tenant has delivered to Landlord an itemized list of such bad debts and uncollectible amounts, subject to a maximum exclusion of two percent (2%) of Tenant's Net Sales in any year during the Lease Term;

(l)      amounts collected by Tenant from customers at the Premises for the purchase of warranties or service maintenance plans on goods purchased by customers at the Premises for the convenience of such customers provided that such warranties are provided by Tenant without profit and, to the extent any profit is realized by Tenant from the collection of charges, such profit shall be included in Net Sales;

(m)      Proceeds from sales to employees of Tenant employed at the Premises provided that Tenant has delivered to Landlord an itemized list of such sales and subject to a maximum exclusion of two percent (2%) of Tenant's Net Sales in any year during the Lease Term;

(n)      With respect to installment, credit and layaway sales, Tenant shall only be required to include as Net Sales the amount of payment actually received by Tenant on such sales as when it is received but shall, for reporting purposes, report the full selling price of the merchandise at the time of sale or deposit;

(o)      Proceeds from bulk or wholesale sales of large lots to jobbers, proceeds of sales of aged and/or damaged merchandise other than to retail customers (and not sold in any retail sales area of the Premises), mail order sales proceeds from mail orders not received at the Premises;

(p)      alterations and repair charges, provided that such services are performed at Tenant's cost (excluding the cost of parts) and, to the extent any profit is realized by Tenant from such alterations or repairs, such profit shall be included in Net Sales; and

(q)      certificates of group credit life, unemployment or disability insurance purchased by customers at the Premises to guaranty credit payments provided that, if Tenant receives the premiums, commissions or settlements for such insurance, such premiums, commissions and settlements shall be included in Net Sales;

All sales originating at the Premises shall be considered as made and completed therein, even though bookkeeping and payment of the account may be transferred to another place for collection and even though actual filling of the sale or service order and actual delivery of the merchandise may be made from a place other than the Premises. Net Sales shall also include any business interruption or loss of income insurance proceeds attributable to lost sales revenue received by Tenant with respect to the Premises.

## ARTICLE 7
## USE

### 7.1    Permitted Uses.

(a)      Tenant shall use the Premises solely for the purpose and under the trade name specified in Exhibit "B", and Tenant shall not use nor permit the Premises to be used for any other purpose or purposes or under any other trade name whatsoever. Tenant shall not change the use of the Premises from that set forth in Exhibit "B". Tenant further covenants and agrees that it will not use, nor suffer or permit any person or persons to use the Premises or any part thereof for any use or purpose contrary to the provisions of Exhibit "G" or in violation of the laws of the United States of America, the State of California, or the ordinances, regulations or requirements of the local municipal or county governing body or other lawful authorities (including the HRA) having jurisdiction over the Center. Tenant, at its cost, shall comply with the provisions of Exhibit "G" and all laws, ordinances, regulations and requirements referenced in this Section 7.1(a), including, without limitation, all federal, state and local environmental laws, ordinances, regulations or requirements and the Americans with Disabilities Act as it may be amended from time to time ("ADA") with respect to the Premises. Tenant shall indemnify and hold Landlord harmless from Tenant's failure to comply with this Section 7.1(a), including without limitation, any failure by Tenant to comply with the ADA. Tenant shall, at Tenant's expense, procure any and all governmental licenses and permits required to be obtained in Tenant's name for Tenant's Use of Premises set forth in Exhibit "B" and shall at all times comply with all requirements of each such license or permit. This Section shall require Tenant to make only non-structural changes in or to the Premises.

(b)      Tenant shall not conduct or operate its business in any manner which could jeopardize or increase the rate of any fire or other insurance or so that the same shall constitute a nuisance to or interfere with the other property of Landlord or its business or the property or business of other tenants of the Center. The foregoing sentence shall not be construed as to restrict business competition with other retail jewelers. Tenant shall not display or sell merchandise, or allow carts, portable signs, devices or any other objects to be stored or to remain outside the defined exterior walls or roof and permanent doorways of the Premises, or in enclosed malls or hallways. Any sign placed by Tenant, which may be permitted hereunder, shall be kept by Tenant safe and secure and conforming to the requirements of the local governing body having jurisdiction over the Center and the requirements of Exhibit "F". The exterior storefront sign on the Premises as of the Effective Date is hereby approved by Landlord. No satellite dish, aerial or antenna

shall be erected on the roof or exterior walls of the Premises without, in each instance, the prior written consent of Landlord. Any satellite dish, aerial or antenna so installed without such written consent shall be subject to removal by Landlord at Tenant's cost, without notice at any time. In addition, Tenant shall not solicit in any manner in any of the automobile parking and common areas or enclosed mall areas of the Center.

(c)    Tenant shall use its reasonable efforts to complete or cause to be completed all deliveries, loading, unloading and services to the Premises prior to 10:00 A.M. of each day, and to prevent delivery trucks or other vehicles servicing the Premises from parking or standing in service areas for undue periods of time. Landlord reserves the right to further reasonably regulate the activities of Tenant in regard to deliveries and servicing of the Premises, and Tenant agrees to abide by such further reasonable rules and regulations of Landlord.

(d)    Tenant recognizes that the success of the Center as a whole depends on the quality of merchandise maintained by Tenant in the Premises. As a material consideration by Landlord to enter into this Lease, Tenant will at all times maintain the quality of merchandise consistent with a first-class regional mall. To ensure consistent high quality merchandise, Tenant shall not double ticket or discount its merchandise in the Premises, except that Tenant may conduct seasonal sales of merchandise provided that no more than thirty-three percent (33%) of the total square feet of sales floor area in the Premises is devoted to the display of sale items.

## ARTICLE 8
## UTILITIES

**8.1    Utilities Installation.** Landlord agrees that it will cause to be made available to Tenant upon the Premises facilities for the delivery to and distribution within the Premises of water, power, electricity and telephone service, and for the removal of sewage from the Premises, all as provided in Exhibit "C". Tenant agrees to use such utilities with respect to the Premises.

**8.2    Payment of Utility Cost.** Tenant agrees, at its own expense, to pay for all water, power, gas, electric current, telephone and all other similar utilities used by Tenant on the Premises (including, without limitation, all sales, use and other taxes imposed thereon by any governmental authority) from and after the earlier of: commencement of Tenant's Work or delivery of possession of the Premises to Tenant. Tenant agrees to provide, at Tenant's sole cost and expense, any check meters of the type required by Landlord. In the event that any utilities are furnished by Landlord, whether sub-metered or otherwise, then and in that event Tenant shall pay Landlord for such utilities, including an administrative charge for Landlord's supervision of such utilities [not to exceed fifteen percent (15%)] and penalties for usage or other surcharges imposed by any utility company. At Landlord's option, Landlord may estimate Tenant's utility costs for each calendar year, in which event, Tenant shall pay to Landlord in monthly installments one-twelfth (1/12th) of the annual estimate on the first (1st) day of each calendar month. Landlord may adjust the utility estimates charged to Tenant at the end of any calendar quarter on the basis of Landlord's experience and reasonably estimated costs. Following the end of each calendar year, Landlord shall furnish Tenant with a statement covering the calendar year just expired, certified as correct by an authorized representative of Landlord, showing the total utility expenses for the preceding calendar year, the amount of Tenant's share of such utility expenses, and the payments made to Tenant with respect to the calendar year set forth above. If Tenant' share of the utility expenses exceeds Tenant's payments so made, Tenant shall pay Landlord the deficiency within fifteen (15) days after receipt of such statement. If such payments exceed Tenant's share of such utility expenses, Tenant shall be entitled to credit the excess against payments for utility expenses next thereafter to become due Landlord as set forth above. Failure of Tenant to pay any of the charges required by this Article to be paid when due shall constitute a material default under the terms of this Lease, subject to any applicable notice and cure periods in Section 21.1 hereof.

**8.3    Deregulation.** If legally permissible, Landlord, at any time, and from time to time, reserves the right to change utility providers. Tenant shall cooperate at all times with Landlord and all utility providers designated by Landlord, and as reasonably necessary subject to prior notice and the right of Tenant to accompany Landlord and such utility providers, shall allow Landlord and such utility providers, reasonable access to the electric lines, feeders, risers, wiring and any other utility related machinery in, about, or near the Premises. Tenant agrees to pay its pro rata share of reasonable attorneys' fees and consultant fees incurred by Landlord in securing a company or companies to supply utilities, as well as any fees, costs, or expenses related to equipment installation, maintenance, repair, change-over or termination. At Landlord's option, the utilities shall be measured either by meter or by survey of Tenant's capacity, assuming capacity would be fully utilized during normal business hours.

**8.4    No Liability.** Except for Landlord's negligence and except as expressly set forth herein, Landlord shall not be liable in damages or otherwise for any change, defect, failure or interruption in the supply or character of any utility service being furnished to the Premises, or if the quantity or character of the service supplied by the utility provider is no longer available or suitable for Tenant's requirements and no such change, defect, failure, interruption, unavailability or unsuitability, shall entitle Tenant to terminate this Lease or withhold any rent or any other sums due pursuant to the terms of this Lease, or constitute an actual or constructive eviction. Landlord shall not be liable for any failure or interruption of any utility or service unless such failure or interruption continues for a period in excess of forty-eight (48) hours, is shown by Tenant to be directly attributable to the negligence or intentional misconduct of Landlord, its agents or employees, or unless Landlord is providing the utility services which are interrupted and Landlord, after notice of the interruption from Tenant, fails to act reasonably and promptly to restore the interrupted utility service. In the event of any such interruption or failure of any utility service described above, Tenant's sole remedy shall be the equitable abatement of Minimum Annual Rent and Tenant's share of real property taxes, insurance,

common area expenses and enclosed mall expenses commencing on the expiration of such forty-eight (48) hours and continuing for the duration of the interruption or failure.

## ARTICLE 9
## INDEMNITY AND INSURANCE

**9.1     Indemnification and Waiver.**  To the fullest extent permitted by law, Tenant agrees that Landlord (and Landlord's agent, servants and employees) shall not be liable for any damage or liability of any kind or for any injury to or death of persons or damage to property of Tenant or any other person from the Effective Date or such earlier date that Tenant obtains access to the Premises, from any cause whatsoever, related to the use, occupation or enjoyment of the Premises or the operation of business therein or therefrom by Tenant or any person thereon or holding under Tenant including, without limitation, damages resulting from any labor dispute, except to the extent of the negligence or willful misconduct of Landlord, its employees, contractors or agents.  To the fullest extent permitted by law, Tenant shall protect, defend, indemnify and hold Landlord harmless from all liability whatsoever, including claims, loss, proceedings, damages, causes of action, real or claimed damage or injury, costs or expenses arising from or in connection with, or caused by (i) any act, omission or negligence of Tenant, its subtenants, contractors, licensees, invitees, agents, servants or employees, wheresoever the same may occur, or (ii) any use of the Premises, or any accident, injury, death or damage to any person or property occurring in, on or about the Premises, or any part thereof, and any service delivery facilities or any other portions of the Center used exclusively by Tenant, but Tenant shall not be liable for damage or injury occasioned by the negligence of Landlord or its designated agents, servants or employees unless covered by insurance Tenant is required to provide.  This obligation to indemnify shall include the reasonable costs of legal counsel (selected by Landlord in its sole discretion), investigation costs, court costs, and all other reasonable costs, expenses and liabilities incurred by Landlord or its counsel in connection with any and all claims of damage.  The indemnity by Tenant set forth in this Section 9.1 and all other indemnities by the Tenant in the Lease, shall survive the expiration or the earlier termination of Lease until any claim, action, or cause of action is fully and finally barred by the applicable statute of limitations.  To the extent such loss or damage is covered by insurance, Landlord and Tenant each hereby waive any rights one may have against the other, and Tenant waives all rights it may have against any of the parties to any REA(s), on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective properties and their successors, the Premises or their contents, or to other portions of the Center arising from any risk generally covered by fire and extended coverage insurance or from vandalism, malicious mischief or sprinkler leakage.  Each party shall cause its insurance companies insuring such losses, to waive any right of subrogation against the other party, and Tenant shall cause its insurance companies to waive any right of subrogation which such insurers may have against any of the parties of any REA(s) and their successors.  The foregoing waivers of subrogation shall be operative provided that no policy of insurance required herein is invalidated thereby.

**9.2     Tenant's Insurance Obligation.**  Tenant further covenants and agrees that it will carry and maintain during the entire Lease Term hereof, at Tenant's sole cost and expense, the following types of insurance, in the amounts specified and in the form hereinafter provided:

(a)   Worker's Compensation.  Worker's Compensation insurance in accordance with California law and employer's liability insurance, with limits of not less than Two Million and 00/100 Dollars ($2,000,000.00) per employee and Two Million and 00/100 Dollars ($2,000,000.00) per occurrence.

(b)   Commercial General Liability Insurance.  Commercial General Liability Insurance applying to the use and occupancy of the Premises and Center or any part thereof or adjacent to and the business operated by Tenant or any other occupant of the Premises in an amount not less than Two Million and 00/100 Dollars ($2,000,000.00) combined single limit (CSL) of liability and an amount not less than Five Million and 00/100 Dollars ($5,000,000.00) general aggregate limit per location.  Such insurance shall cover all bodily injury, property damage, products liability, cross-liability, personal injury, (including death resulting therefrom) however occasioned occurring during the Lease Term and any holdover period, products and completed operations coverage and broad form contractual liability coverage insuring all of Tenant's indemnity obligations under the Lease.  Such coverage shall also contain endorsements:  (i) deleting any employee exclusion on personal injury coverage and (ii) including employees as additional insureds.  All such insurance shall provide for severability of interests, shall provide that an act or omission of one of the additional insureds shall not reduce or avoid coverage to the other additional insureds and shall afford coverage for all claims based on acts, omissions, injury and damage, which claims occurred or arose (or the onset of which occurred or arose in whole or part during the policy period).  Fire damage insurance shall be maintained in the amount of Fifty Thousand and 00/100 Dollars ($50,000.00) or such higher amount deemed reasonable by Landlord.

(c)   Commercial Automobile Liability Insurance.   Commercial Automobile Liability Insurance, including the ownership, maintenance and operation of any automotive equipment owned, hired and non-owned in the following minimum amounts:  Bodily Injury and Property Damage, each occurrence, combined single limit of Two Million and 00/100 Dollars ($2,000,000.00).

(d)   Plate Glass.  Tenant shall be responsible for the maintenance of the plate glass on the Premises, but shall have the option either to insure the risk pursuant to Section 9.2(e) or to self insure the same which shall obligate Tenant to be personally liable for any claim, loss or damage related thereto.

(e)   Tenant Improvements.  Insurance covering all of Tenant's Work as referenced in Exhibit "C", Tenant's leasehold improvements, alterations or additions permitted under Article 11 hereof, Tenant's trade fixtures, merchandise and personal property from time to time in, on or upon the Premises, in an amount not less than ninety percent (90%) of their full replacement cost, without depreciation, from time

to time during the Lease Term, providing protection against any peril included within the classification "Fire and Extended Coverage", together with insurance against sprinkler damage, vandalism and malicious mischief and such other additional perils as covered in an "all risks" standard insurance policy. Any policy proceeds shall be used for the repair or replacement of the property damaged or destroyed unless this Lease shall cease and terminate under the provisions of Article 18 hereof, whereupon any proceeds of insurance covering Tenant's leasehold improvements and any alterations or additions permitted under Article 11 hereof shall be payable to Landlord.

(f)    Alcohol.  In the event Tenant is specifically authorized to sell alcohol pursuant to Exhibit "B", subarticle entitled "Use of Premises", as a condition thereto, Tenant shall obtain an alcohol liability insurance policy with a limit of not less than Two Million and 00/100 Dollars ($2,000,000.00), which policy names Landlord and Landlord's representative as additional insureds and which policy is subject to the review and approval of Landlord and Landlord's lenders or mortgagees.

(g)    Business interruption insurance in amounts sufficient to cover Minimum Annual Rent and additional rent due under the Lease for twelve (12) months.

(h)    Tenant shall procure and maintain in full force and effect boiler and machinery insurance on all heating and cooling equipment, boilers and other pressure vessels and systems, whether fired or unfired, installed by Tenant (or the prior tenant) pursuant to Exhibit "C" and located in or serving the Premises; and, if said objects, and damage that may be caused by them or result from them, are not covered by Tenant's extended coverage insurance, then such boiler insurance shall be in an amount of not less then Five Hundred Thousand and 00/100 Dollars ($500,000.00).

9.3    **Policy Requirements.**  All policies of insurance required to be carried by Tenant shall be issued by insurance companies with a general policy holder's rating of not less than A and a financial rating of not less than Class XII as rated in the most current available Best's Insurance Reports and qualified to do business in the State of California.  All such policies shall make Landlord, Landlord's managing agent and Landlord's representative additional insureds and, if requested by Landlord, Landlord's mortgagees or beneficiaries, which policies shall be for the mutual and joint benefit and protection of Landlord, Landlord's managing agent, Tenant, Landlord's representative and Landlord's mortgagees or beneficiaries.  The foregoing shall not require Tenant to include such additional insureds on its Workers Compensation policy if Tenant is prevented from doing so by rules, regulations ordinances of any governmental agency or the insurance industry as whole.  Executed copies of such policies of insurance or certificates thereof shall be delivered to Landlord prior to delivery of possession of the Premises to Tenant and thereafter at least thirty (30) days prior to the expiration of the term of each such policy.  All public liability and property damage policies shall contain a provision that Landlord, Landlord's representative and Landlord's mortgagees and beneficiaries, although additional insureds shall nevertheless be entitled to recovery under said policies for any loss occasioned to them, their servants, agents and employees by reason of any act or omission of Tenant or its servants, agents, employees or contractors.  As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent.  All policies of insurance delivered to Landlord must contain a provision that the company writing said policy will give to Landlord at least thirty (30) days' notice in writing in advance of any cancellation or lapse or the effective date of any reduction in the amount of insurance.  All public liability, property damage and other casualty policies shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry.  Any deductible amounts under any insurance policies required to be carried by Tenant hereunder shall be subject to Landlord's prior written approval.

9.4    **Increase in Coverage.**  In the event Landlord or one of Landlord's mortgagees or beneficiaries deem it necessary to increase the amounts or limits of insurance required to be carried by Tenant hereunder, Landlord may reasonably increase said amounts or limits, and Tenant shall increase the amounts or limits of the insurance required to be carried by Tenant hereunder and shall provide Landlord with policies or certificates indicating the increased amounts or limits as provided in Section 9.3.

9.5    **Blanket Coverage.**  Notwithstanding anything to the contrary contained in this Article, Tenant's obligation to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; provided, however, that Landlord, Landlord's managing agent, Landlord's representative, and Landlord's mortgagees or beneficiaries shall be additional insureds thereunder as their interest may appear; and that the amount of insurance carried and the type of coverage afforded Landlord will not be reduced or diminished by reason of the use of such blanket policy of insurance, and provided further that the requirements set forth herein are otherwise satisfied. Tenant agrees to permit Landlord at all reasonable times to inspect the policies of insurance of Tenant covering risks upon the Premises for which policies or copies of certificates thereof are not required to be delivered to Landlord.

9.6    **Landlord's Insurance Obligations.**  Landlord shall maintain in effect a policy or policies of insurance covering the building of which the Premises are a part, including the leasehold improvements included within "Landlord's Work" as referenced in Exhibit "C" (but not "Tenant's Work" as referenced in Exhibit "C", Tenant's leasehold improvements, alterations or additions permitted under Article 11 hereof, Tenant's trade fixtures, merchandise or other personal property), in an amount of not less than eighty percent (80%) of its full replacement cost (exclusive of excavations, foundations and footings) during the Lease Term, providing protection against any peril generally included within the classification "Fire and Extended Coverage" (and "Earthquake Insurance" and "Flood Insurance" if Landlord deems desirable), together with insurance against sprinkler damage, vandalism and malicious mischief and such further insurance as Landlord or Landlord's lender deems necessary or desirable.  Landlord's obligation to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and

maintained by Landlord, provided that the coverage afforded will not be reduced or diminished by reason of the use of such blanket policy of insurance. In the event Landlord carries insurance under a blanket policy, then the insurance allocation among shopping centers covered by such policy shall be determined according to standard industry practice.

**9.7    Insurance Use Restrictions.** Tenant shall not at any time during the Lease Term carry any stock of goods or do anything in or about the Premises which will tend to increase the insurance rates upon the building of which the Premises are a part. As of the Effective Date, Landlord is not aware that the operation of Tenant's business on the Premises as presently conducted therein is a violation of the immediately preceding sentence. Tenant shall pay to Landlord forthwith upon written demand the amount of any increase in premiums for insurance against loss by fire or any other peril normally covered by fire and extended coverage insurance that may be charged during the Lease Term on the amount of insurance to be carried by Landlord on the building of which the Premises are a part resulting from the foregoing or from Tenant doing any act in or about the Premises which does so increase the insurance rates, whether or not Landlord shall have consented to such act on the part of the Tenant. If Tenant installs upon the Premises any electrical equipment which constitutes an overload on the electrical lines of the Premises, Tenant shall, at its own expense, make whatever changes or provide whatever equipment safeguards are necessary to comply with the requirements of the insurance underwriters and any governmental authorities having jurisdiction thereover, but nothing herein contained shall be deemed to constitute Landlord's consent to such overloading.

## ARTICLE 10
## TITLE RESTRICTIONS

**10.1**    This Lease is made subject to all matters of record including any REA(s) referred to in Article 2, now or hereafter existing and to that certain document executed by Landlord, the City and the HRA dated November 17, 1997, entitled "Owner Participation Agreement," as such documents have been or may hereafter be supplemented, implemented, modified, replaced or amended, it being understood that none of the aforementioned documents shall prevent Tenant from using the Premises for the purposes set forth in Exhibit "B". Tenant agrees that, as to its leasehold estate, it and all persons in possession or holding under it, will conform to and not contravene the provisions of said agreements and, within fifteen (15) days after request therefor, shall execute and return to Landlord such documents in recordable form subordinating this Lease to the REA(s). It is further agreed that nothing in the covenants, conditions, restrictions, easements, mortgages or deeds of trust, any ground lease of record, any rights of way of record, and any other matters or documents of record including, but not limited to, the aforementioned REA(s), shall materially increase Tenant's obligations nor materially decrease Tenant's rights under this Lease.

## ARTICLE 11
## TENANT'S RIGHT TO MAKE ALTERATIONS

**11.1    Permitted Alterations.** Landlord agrees that Tenant may, at its own cost and expense and after giving Landlord at least thirty (30) days' prior notice in writing of its intention to do so, from time to time during the Lease Term, make such alterations, additions, and changes in and to the interior of the Premises (except those of a structural nature) as it may find necessary or convenient for its purposes, provided that the value of the Premises is not thereby diminished, and provided further that no alterations, additions or changes costing cumulatively in excess of Twenty-five Thousand and 00/100 Dollars ($25,000.00) in any twelve (12) month period, may be made without first procuring the prior written consent of Landlord to such alterations, additions or changes. In no event shall Tenant make any alterations, additions or changes to any storefront, or the exterior walls or roof of the Premises, nor shall Tenant erect any mezzanine or increase the size of same, if one be initially constructed, unless and until the written consent of Landlord shall first have been obtained, which consent may be granted or withheld in Landlord's sole and absolute discretion. Tenant shall not make or cause to be made any penetration through the roof of the Premises without the prior written consent of Landlord, which consent may be granted or withheld in Landlord's sole and absolute discretion. Tenant shall not make any alterations, additions or changes which disturb or affect any asbestos containing material ("ACM") located in, on or about the Premises without Landlord's prior written consent, which consent may be granted or withheld in Landlord's sole and absolute discretion. Tenant shall be directly responsible for any and all damages resulting from any violation of the provisions of this Article. In the event that at any time during the Lease Term, Landlord's Work in the Premises is in violation of any rule, regulation, law, or ordinance applicable to the Premises related to Hazardous Materials including ACM, Landlord shall, at its cost, place such work into lawful compliance, unless such noncompliance results from changes to the Premises by Tenant.

**11.2    Manner of Construction.** All alterations, additions or changes to be made to the Premises shall be under the supervision of a competent licensed architect or competent licensed structural engineer satisfactory to Landlord and shall be made in accordance with plans and specifications with respect thereto, approved in writing by Landlord before the commencement of work. Failure of Landlord to disapprove any such plans and specifications within fifteen (15) business days of submission shall be deemed its approval of same. Tenant, at its cost, shall obtain any and all permits and approvals required by any governmental law, ordinance or regulation for any alteration, addition or change to the Premises. All work with respect to any alterations, additions or changes must be done in a good and workmanlike manner and diligently prosecuted to completion to the end that the Premises shall at all times be a complete unit except during the period of work. Upon completion of any alterations, additions or changes, Tenant agrees to cause a Notice of Completion to be recorded in the Office of the Recorder of the county in which the Premises are located in accordance with Section 3093 of the Civil Code of the State of California or any successor statute. Such alterations, additions or changes shall be considered as improvements and shall become an integral part of the Premises upon installation thereof and shall not be removed by Tenant, excluding from the foregoing: safes, shelves, jewelry cases, cabinets, and chandeliers. All improvements to the Premises by Tenant including, but

not limited to, light fixtures, floor coverings and partitions, and other items comprising Tenant's Work pursuant to Exhibit "C", but excluding trade fixtures and signs, shall not be removed from the Premises. Removal of any portion of Tenant's Work from the Premises shall, at Landlord's option, constitute a material breach and default under this Lease. Any such alterations, additions or changes shall be performed and done strictly in accordance with the laws and ordinances relating thereto. In performing the work of any such alterations, additions or changes, Tenant shall have the work performed in such a manner as not to obstruct the access to the premises of any other occupant of the Center.

   **11.3    Construction Insurance.** In the event that Tenant shall make any permitted alterations, additions or changes to the Premises under the terms and provisions of this Article, Tenant agrees to carry "Builder's All Risk" insurance in an amount determined by Landlord covering the construction of such alterations, additions or changes, and such other insurance as Landlord may require, it being understood and agreed that all of such alterations, additions or changes shall be insured by Tenant pursuant to Section 9.2 immediately upon completion thereof. Such insurance shall make Landlord and Landlord's representative, additional insureds and, if requested by Landlord, Landlord's mortgagees or beneficiaries, and shall be for the mutual and joint benefit and protection of Landlord, Tenant and Landlord's mortgagees or beneficiaries. In addition, Landlord may, in its discretion, require Tenant to obtain a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount to assure the lien-free completion of such Tenant improvements.

   **11.4    Refurbishment.** Tenant shall, at its sole cost and expense, refurbish the Premises to the extent set forth in Section 4.3 of this Lease during the Refurbishment Period. and five (5) years thereafter in accordance with this Section 11.4 ("Second Refurbishment"). Landlord and Tenant shall use reasonable efforts and act in good faith in order to mutually agree prior to the end of such five (5) year period on the scope of the Second Refurbishment. Tenant shall commence the Second Refurbishment promptly upon Landlord's approval of Tenant's final plans. Thereafter, Tenant shall diligently pursue the refurbishment to completion, not to exceed forty-five (45) days. The scope of the Second Refurbishment shall not exceed that necessary to replace damaged or stained floor and ceiling tiles; replace or repair damaged, soiled, stained or threadbare carpeting; and repainting of the interior of the Premises if necessary and refurbishment of the storefront.

## ARTICLE 12
## MECHANICS' LIENS

   **12.1    Tenant's Lien Obligations.** Tenant shall pay all costs for work done by it and for materials supplied for it respecting the Premises, and shall keep the Premises and the Center free and clear of all mechanics' liens and other liens on account of work done by or for Tenant or by or for persons claiming under it or on account of materials supplied for work by Tenant or persons claiming under it on the Premises. Upon Landlord's request, Tenant shall immediately remove of record any lien by payment or recording an appropriate bond. Tenant agrees to and shall indemnify and save Landlord free and harmless against liability, loss, damage, costs, attorneys' fees, and all other expenses on account of claims of contractors, subcontractors, laborers, materialmen or others for work performed or materials or supplies furnished for Tenant or persons claiming under it.

   **12.2    Contest of Lien.** If Tenant shall desire to contest any claim of lien (or if any such lien is actually filed), it shall furnish Landlord adequate security of the value or in the amount of the claim, plus estimated costs and interest or a bond of a responsible corporate surety in such amount, conditioned on the discharge of a lien. If a final judgment establishing the validity or existence of a lien for any amount is entered, Tenant shall pay and satisfy the same. If Tenant fails to pay the judgment within three (3) days of its entry, Landlord may pay the judgment for Tenant's account and the amount so paid together with reasonable attorney's fees incurred in connection therewith, shall be immediately due and owing from Tenant to Landlord, and Tenant agrees, upon demand, to pay the same with interest at the maximum lawful rate per annum [not to exceed fourteen percent (14%) per annum] from the date of payment.

   **12.3    Right to Cure.** If Tenant's failure to pay causes a mechanics' lien claim and suit to foreclose the lien to be filed, and Tenant fails to give security to protect the property and Landlord against such claims of lien, Landlord may, but shall not be required to, pay said claim and any related costs. The amount paid by Landlord together with any related reasonable attorneys' fees shall be immediately paid by Tenant to Landlord, with interest at the maximum lawful rate per annum [not to exceed fourteen percent (14%) per annum] from the date of payment.

   **12.4    Notice.** Should any claim of lien regarding work done by Tenant or for Tenant be filed against the Premises or the Center or any action affecting the title to such property be commenced, upon receiving notice of such lien or action, Tenant shall forthwith give notice thereof to Landlord.

   **12.5    Inspection.** Landlord or its representative shall have the right to go upon and inspect the Premises at all reasonable times, and shall have the right to post and keep posted thereon notices as permitted or provided by law or which Landlord may deem to be proper for the protection of Landlord's interest in the Premises. Tenant shall, before the commencement of any work which might result in any lien on the Premises or the Center, give to Landlord written notice of its intention to do so in sufficient time to enable Landlord to file and record such notices.

## ARTICLE 13
## SIGNS

   **13.1** Tenant shall not affix or maintain upon the glass panes or supports of the show windows, nor within thirty-sixty inches (36") of any window [but excluding from such thirty-six inch (36") limitation, small

jewelry brand name identification signs as typically seen in all of Tenant's regional mall stores], nor upon the doors, roof or exterior walls of the Premises, any signs, advertising placards, names, insignia, trademarks, descriptive material or any other similar item or items except those which shall have been approved in writing, in advance, by Landlord including, but not limited to, approval of size, type, color, location, copy, nature and display qualities. Failure of Landlord to disapprove any such item within fifteen (15) business days of submission shall constitute approval of same. All signs erected by Tenant shall comply with the provisions of Exhibit "F". In addition, no device or advertising medium shall be utilized by Tenant the sound or effect of which extends beyond Tenant's Premises including, without limitation, flashing lights, searchlights, loudspeakers, phonographs, radios or television. Tenant shall not display, paint or place or cause to be displayed, painted or placed, any handbills, bumper stickers or other advertising devices on any vehicle parked in the parking area of the Center, whether belonging to Tenant, Tenant's agents or to any other person; nor shall Tenant distribute, or cause to be distributed in the Center, any handbill or other advertising devices. In no event may Tenant display any banners of any size or kind in the interior of the Premises without Landlord's prior written consent, which consent may be granted or withheld in Landlord's sole discretion. In addition to the penalty pursuant to Section 34.23 hereof, failure by Tenant to remove any banner after three (3) days' prior written notice shall constitute a material default under this Lease.

## ARTICLE 14
## TRADE FIXTURES AND PERSONAL PROPERTY

**14.1    Ownership.** Any trade fixtures, signs and other personal property of Tenant not permanently affixed to the Premises shall remain the property of Tenant, and Landlord agrees that Tenant shall have the right, provided Tenant is not in default and material breach (beyond any applicable cure period) under the terms of this Lease, at any time, and from time to time, to remove any and all of its trade fixtures, signs and other personal property which it may have stored or installed in the Premises including, without limitation, counters, shelving, showcases, mirrors and other movable personal property. Nothing contained in this Article shall be deemed or construed to permit or allow Tenant to remove so much of such personal property, without the immediate replacement thereof with similar personal property of comparable or better quality, as to render the Premises unsuitable for conducting the type of business described in Exhibit "B". Tenant, at its expense, shall immediately repair any damage occasioned to the Premises by reason of the removal of any such trade fixtures, signs, and other personal property, and upon expiration or earlier termination of this Lease, Tenant shall leave the Premises in a neat and clean condition and free of debris, reasonable wear and tear and damage due to casualty excepted. All trade fixtures, signs, and other personal property installed in or attached to the Premises by Tenant must be new or of like new quality when so installed or attached.

**14.2    Removal.** If Tenant fails to remove any of its trade fixtures, furniture and other personal property upon expiration or the earlier termination of this Lease, then subject to any prior security interest in such property, Landlord may at Landlord's option retain all or any of such property, and title thereto shall thereupon vest in Landlord without compensation to Tenant, or Landlord may remove from the Premises and dispose of, in any manner, all or any portion of such property without compensation to Tenant. In the latter event, Tenant shall, upon demand, pay to Landlord the actual expense of such removal and disposition and the repair of any and all damage to the Premises resulting from or caused by such removal.

**14.3    Personal Property Taxes.** Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation, as well as upon its trade fixtures, merchandise and other personal property in or upon the Premises. In the event any such items of property are assessed with property of Landlord, such assessment shall be divided between Landlord and Tenant to the end that Tenant shall pay only its equitable portion of such assessment as determined by Landlord. No taxes, assessments, fees or charges referred to in this paragraph shall be considered real property taxes under the provisions of Section 5.7 hereof.

## ARTICLE 15
## ASSIGNMENT, SUBLETTING AND FINANCING

**15.1    Restrictions.**

(a)    Landlord and Tenant agree that the Center consists of an interdependent group of retail enterprises and that the realization of the benefits of this Lease, both to Landlord and Tenant, is dependent upon Tenant's creating and maintaining a successful and profitable retail operation in the Premises and that the "tenant mix" of the Center is vital to the realization of the benefits of this Lease, both to Landlord and Tenant. Landlord and Tenant further acknowledge that the character and quality of Tenant's operation and of the Center will be enhanced by Tenant's use of its best efforts, for a reasonable period of time, to establish a successful character and image. Landlord and Tenant further acknowledge that two (2) years is a reasonable period of time for attempting to achieve the above-stated goal. Accordingly, as a material inducement for Landlord to enter into this Lease and as a matter specifically bargained for between Landlord and Tenant, Tenant agrees that, for a period of two (2) years from the date on which Tenant opens for business to the public in the Premises, Tenant shall not transfer, assign, sublet, enter into franchise, license or concession agreements, change ownership or voting control, mortgage, encumber, pledge or hypothecate all or any part of this Lease, Tenant's interest in the Premises or Tenant's business (collectively "Transfer") without first procuring the written consent of Landlord, which consent may be given or withheld in Landlord's sole and absolute discretion and to which no test of reasonableness shall be applied. After the expiration of this two (2) year period, Landlord's consent to any Transfer shall not be unreasonably withheld in accordance with the terms, covenants and conditions contained in this Lease and including the right of Landlord to elect to terminate this Lease as provided in Section 15.2. Any attempted or purported Transfer without Landlord's express prior written consent shall be voidable at the option of Landlord and shall constitute a material breach and incurable default on the part of Tenant hereunder.

Further, any such attempted or purported Transfer shall entitle Landlord to immediately terminate this Lease and all further obligations of Landlord hereunder. A consent to one (1) Transfer by Landlord shall not be deemed to be a consent to any subsequent Transfer to any other party. No Transfer of this Lease, or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant, any Guarantor or any other person liable for all or any portion of the Tenant's obligations from liability under this Lease.

(b)    After the two (2) year period described above, the consent of Landlord required hereunder shall not be unreasonably withheld; provided, however, that Landlord and Tenant agree that it shall not be unreasonable for Landlord to withhold its consent to any proposed Transfer for any of the following reasons, which are not exclusive:

(i)    A conflict of the contemplated use of the Premises by the proposed transferee, assignee, or sublessee (hereinafter referred to as the "Transferee") with the "Use of Premises" clause contained in Exhibit "B";

(ii)    The financial worth and/or financial stability of the Transferee is or may become, insufficient to operate the business to be conducted in the Premises and to support all of the financial and other obligations of the Lease;

(iii)    A Transferee whose reputation (or that of any of its affiliates) would have an adverse effect upon the reputation of the Center or the other businesses located therein;

(iv)    The Percentage Rent that would be reasonably anticipated from the sales of the Transferee would reasonably be expected to be less than that of Tenant hereunder;

(v)    A Transferee who would breach any covenant of Landlord respecting radius, location, use or exclusivity in any other lease, financing agreement, or other agreement relating to the Center;

(vi)    Tenant is in default or has been in default beyond any applicable cure period pursuant to this Lease;

(vii)    The nature of the Transferee's proposed or likely use of the Premises would involve any increased risk of the use, release, disposition or mishandling of Hazardous Materials; or

(viii)    The Transferee is not likely to conduct on the Premises a business of a quality substantially equal to that conducted by Tenant.

### 15.2    Procedure for Transfer.

(a)    Should Tenant desire to make a Transfer hereunder, Tenant shall, in each instance, give written notice of its intention to do so to Landlord at least sixty (60) days prior to the effective date of any such proposed Transfer, specifying in such notice whether Tenant proposes to assign or sublet, or enter into license, franchise or concession agreements, and the proposed date thereof, and specifically identifying the proposed Transferee, the net worth and previous business experience of the proposed Transferee including, without limitation, copies of the proposed Transferee's income statements for the immediately preceding four (4) years, tax returns for the immediately preceding two (2) years, balance sheet and statement of changes in financial position (with accompanying notes and disclosures of all material changes thereto) in audited form, if available, and certified as accurate by the proposed Transferee. Such notice shall be accompanied, in the case of subletting, license, franchise or concession agreement, by a copy of the proposed sublease, license, franchise or concession agreement or, if same is not available, a letter of commitment or a letter of intent and in the case of a sale of the business, by a copy of the proposed sale and financing agreements. Landlord shall, within thirty (30) days after its receipt of such notice of a proposed Transfer from Tenant, by mailing written notice to Tenant of its intention to do so: (i) pursuant to Section 15.1(b), withhold consent to the Transfer; (ii) consent to the Transfer; or (iii) terminate this Lease as to that portion of the Premises affected by the proposed Transfer, such termination to be effective thirty (30) days after receipt of such notice by Tenant.

(b)    If Landlord denies its consent to the proposed Transfer pursuant to Section 15.1(b), and if Tenant shall so request in writing, Landlord shall provide to Tenant a statement of the basis on which Landlord denied its consent within a reasonable time after the receipt of Tenant's notice. Landlord and Tenant agree that Tenant shall have the burden of proving that Landlord's consent to the proposed Transfer was withheld unreasonably, and that such burden may be satisfied if Landlord fails to provide a statement of a reasonable basis for withholding its consent within a reasonable time after Tenant's request therefor.

(c)    If Landlord elects to terminate this Lease, Tenant may nullify Landlord's election to terminate this Lease by furnishing Landlord with written notice of Tenant's election to withdraw its proposed Transfer within fifteen (15) days of Tenant's receipt of Landlord's notice of termination in which event the Lease shall remain in effect with the existing Tenant. Landlord and Tenant specifically agree that Landlord's election to terminate this Lease may be made in Landlord's sole and absolute discretion and that no test of reasonableness shall be applicable thereto. Failure of Tenant to furnish Landlord with the withdrawal notice within the required time period shall be deemed Tenant's election to terminate this Lease. Tenant hereby waives the right to contest or void Landlord's termination right as herein provided and acknowledges that Tenant has freely negotiated this provision with the assistance of experienced legal counsel. If Landlord does duly exercise its termination right hereunder, Landlord shall have the right to enter into a lease or other occupancy agreement directly with the proposed Transferee or any other person and Tenant shall have no

right to any of the rents or other consideration payable by such proposed Transferee or other such person under such other lease, even if such rents and other consideration exceed the rent payable under this Lease by Tenant. Landlord shall have the right to lease the Premises to any other tenant, or not lease the Premises, in its sole discretion.

(d)    Tenant acknowledges and agrees that each of the rights of Landlord set forth in this Article 15 in the event of a proposed Transfer is a reasonable restriction on Transfer for purposes of California Civil Code Section 1951.4. Landlord shall have no liability to Tenant or to any proposed Transferee in damages if it is adjudicated that Landlord's consent has been unreasonably withheld and such unreasonable withholding of consent constitutes a breach of this Lease or other duty to Tenant, the proposed Transferee or any other person on the part of Landlord. In such event, Tenant's sole remedy shall be to have the proposed Transfer declared valid as if Landlord's consent had been duly and timely given (although Tenant shall be entitled to reasonable attorneys' fees if it is the successful party in such litigation, in accordance with Section 23.1 of this Lease).

**15.3    Transfer Rent Adjustment.** In the event Tenant shall make a permitted Transfer hereunder then the Minimum Annual Rent specified in Article 2 shall be increased, effective as of the date of such Transfer, to the highest of: (a) the total rent payable by the Transferee pursuant to such Transfer; or (b) an amount equal to the total of the Minimum Annual Rent, plus Percentage Rent required to be paid by Tenant pursuant to this Lease during the twelve (12) month period immediately preceding such Transfer; or (c) a sum equal to the then fair-market rental value of the Premises as reasonably determined by Landlord, the amount of which Landlord shall notify Tenant before the effective date of the Transfer. In the event of any approved Transfer of the Lease in connection with the sale of all or substantially all of the assets of Tenant used in connection with the business operated at the Premises by Tenant, the amount of the consideration attributable to the assignment of the Lease shall be as reasonably determined by Landlord. Tenant agrees to furnish to Landlord, upon Landlord's request therefor, all information and/or documents requested by Landlord to enable Landlord to determine the amount of the transfer rent adjustment. In no event shall the Minimum Annual Rent, after the Transfer, be less than the Minimum Annual Rent in effect immediately before the Transfer. In addition to the foregoing, Tenant agrees that, in the event Tenant shall make a Transfer hereunder in accordance with the provisions of this Article, Tenant shall repay to Landlord upon the effective date of the Transfer any and all sums received by Tenant from Landlord for the construction and/or remodeling of the Premises.

**15.4    Required Documents and Fees.** Each Transfer to which Landlord has consented shall be evidenced by a written instrument in form satisfactory to Landlord, executed by Tenant and the Transferee under which the Transferee shall agree in writing for the benefit of Landlord to assume, perform and abide by all of the terms, covenants and conditions of this Lease to be done, kept and performed by Tenant, including the payment of all amounts due or to become due under this Lease directly to Landlord and the obligation to use the Premises only for the purpose specified in Exhibit "B". Tenant agrees to reimburse Landlord for Landlord's reasonable attorneys' and administrative fees incurred in conjunction with the processing and documentation for each such requested Transfer, whether or not the Transfer is consummated.

**15.5    Merger and Consolidation.** If Tenant is a corporation which, under the current laws, rules or guidelines promulgated by the governmental body or agency having jurisdiction and authority to promulgate the same, is not deemed a public corporation, or is an unincorporated association or partnership, the transfer, assignment or hypothecation, in the aggregate of more than twenty-five percent (25%) of the total outstanding stock or interest in such corporation, association or partnership, shall be deemed a Transfer within the meaning and provisions of this Article.

**15.6    Event of Bankruptcy.**

(a)    If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. Section 101 et seq. or any similar or successor statute ("Bankruptcy Code"), any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other consideration constituting Landlord's property under this Section 15.6 not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord.

(b)    Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment, including the obligation to operate the business which Tenant is required to operate pursuant to Exhibit "B".

BY PLACING THEIR INITIALS BELOW, LANDLORD AND TENANT HEREBY CERTIFY THAT THE PROVISIONS OF THIS ARTICLE 15 AND ARTICLE 16 HAVE BEEN FREELY NEGOTIATED.

LANDLORD _____ TENANT _____

**15.7    Other Transfers.** Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right, without the prior consent of Landlord, to assign this Lease or sublet the Premises to an entity which: (i) is Tenant's parent organization; or (ii) is a wholly-owned subsidiary of Tenant; or (iii) is a corporation or limited liability company of which Tenant or Tenant's parent corporation or company owns in excess of fifty percent (50%) of the outstanding capital stock or membership interests; or (iv) as a result of a consolidation, merger or other reorganization with Tenant and/or Tenant's parent corporation or company,

shall own all or substantially all of the capital stock or membership interests of Tenant or Tenant's parent corporation or company; or (v) acquires all or substantially all of the outstanding capital stock (or membership interests) of Tenant or all or substantially all of the assets of Tenant. Any assignment or subletting pursuant to (i), (ii), (iii), (iv) or (v) above shall be subject to the following conditions: (a) Tenant shall remain fully liable for the performance of all the terms required to be performed by Tenant hereunder during the unexpired Term of this Lease; (b) any such assignment or sublease shall be subject to all of the terms of the Lease, including without limitation, the Use Clause and Trade Name provisions contained in Exhibit "B" Sheet 2; (c) the assignee or sublessee shall have a net worth equal to or greater than that of Tenant as of the date of this Lease; (d) transferee assumes in a writing (satisfactory to Landlord) all of the terms and conditions contained in the Lease to be performed by Tenant; (e) Tenant is not in default of any provision of the Lease beyond any applicable cure period; and (f) Tenant reimburses Landlord for all reasonable attorneys' fees and administrative fees incurred by Landlord in connection with proposed transfer.

In addition, Tenant may, without Landlord's prior consent, transfer shares of Tenant's stock through a public offering on a nationally-recognized stock exchange, provided that, (w) Tenant delivers written notice thereof to Landlord when permitted by the securities regulations; (x) Tenant's officers and/or management personnel continue to actively participate in and control the management of the business at the Premises, (y) such issuance does not adversely affect the value of the net assets of Tenant and (z) such transfer does not adversely affect the quality and type of business operation which Tenant has conducted in the Premises theretofore.

## ARTICLE 16
## TENANT'S CONDUCT OF BUSINESS

**16.1    Operating Covenant.** Tenant covenants and agrees that it will operate and conduct within the Premises, continuously and uninterruptedly during the Lease Term (excluding closures permitted under other sections of this Lease such as Sections 4.3, 8.2, 16.2 and 34.6), the business which it is required to operate and conduct under the provisions hereof, except while the Premises are untenantable by reason of fire or other unavoidable casualty, and that it will at all times keep and maintain within and upon the Premises an adequate stock of merchandise and trade fixtures and have sufficient personnel to service and supply the usual and ordinary demands and requirements of its customers. In the event Tenant fails to continuously operate its business in the Premises as required by this Section 16.1, then in addition to all other remedies available to Landlord (including without limitation, injunction and/or damages), Landlord may, but is not obligated to, elect to terminate this Lease upon written notice of Landlord's intent to Tenant, whereupon this Lease shall terminate, and Tenant shall vacate the Premises upon the date specified in Landlord's notice to Tenant.

**16.2    Operating Hours.** Commencing with the opening for business by Tenant in the Premises, and for the remainder of the Lease Term (excluding closures permitted under other sections of this Lease such as Sections 4.3, 8.2, 16.2 and 34.6), Tenant shall remain open for business at least those days and hours any two (2) Other Stores and sixty-five percent (65%) of the retail in-line stores excluding kiosks, carts, licensees, and temporary tenants with lease terms of less than one (1) year) located in the Center shall be open for business, Christmas, Easter and Thanksgiving excepted. Tenant further agrees to have its window displays, exterior signs and exterior advertising displays adequately illuminated continuously during those hours that any Other Store shall illuminate its window displays, exterior signs and exterior advertising displays, or the Center shall be open. It is agreed, however, that the foregoing provision shall be subject, as respects any business controlled by governmental regulations or labor union contracts, in its hours of operation to the hours of operation so prescribed by such governmental regulations or labor union contracts, as the case may be. Tenant shall have the right to close for business in the Premises not more than two (2) days per calendar year for the sole purpose of taking inventory of the merchandise in the Premises after giving fifteen (15) days' prior written notice to Landlord of its intent in each instance.

**16.3    Rules and Regulations.** Tenant shall observe faithfully and comply with and shall cause its employees and invitees to observe faithfully and comply with reasonable rules and regulations governing the Center as may from time to time be promulgated by Landlord, which rules and regulations currently include the provisions of Exhibit "G". Tenant shall not be obligated to comply with new rules and regulations until Tenant has been given prior notice of same.

**16.4    New Locations.** [Intentionally Omitted]

**16.5    Pest Control.** Tenant, at its cost, shall at all times keep the Premises free of pests. Landlord may elect to implement a program of pest control and, in such event, Tenant hereby grants Landlord the right to enter the Premises (subject to reasonable prior notice of such entry and the right of Tenant to accompany Landlord and any contractor) and perform such spraying and/or inspections that Landlord deems appropriate, and Tenant shall reimburse Landlord for Tenant's share of the cost of such program through Articles 19 and 20. If Landlord does not elect to implement a pest control program, Tenant shall implement a program of pest control satisfactory to Landlord which may include, without limitation, (a) moving any furniture, fixtures, equipment or inventory during inspections and spraying by Tenant's exterminator; and (b) maintaining the Premises in a clean, trash-free and sanitary condition. Tenant further acknowledges that Tenant's exterminator shall, in accordance with all applicable laws, rules and regulations, perform inspections and/or spraying every two (2) weeks if Landlord deems such spraying necessary. Prior to entering into a contract with an exterminator, Tenant shall submit the proposed contract to Landlord for Landlord's review and approval. If Tenant fails to promptly and fully comply with this Section 16.5, Landlord shall have the right, but not the obligation, to enter the Premises (subject to prior reasonable notice and the right of Tenant to accompany Landlord and any contractor during such entry) to perform such spraying or inspections at Tenant's expense. Performance of such work by Landlord shall not constitute a waiver of Tenant's default

in failing to do the same nor shall it entitle Tenant to any damage for any injury or inconvenience occasioned thereby nor to any abatement of rent. Tenant shall reimburse Landlord for any cost incurred by Landlord pursuant to this Section within fifteen (15) days of demand therefor, except to the extent of the negligence or willful misconduct on the part of the Landlord, its contractors, agents or employees. Tenant shall not be in default of this Section 16.5 unless any applicable notice and cure period has expired under Section 21.1 of this Lease.

**16.6    Recycling Program.** Tenant, at its cost, shall participate in any and all recycling programs sponsored or implemented by Landlord as well as in any recycling programs in which Landlord is obligated to participate by law or if Tenant is otherwise required to do so pursuant to any federal, state or local law, rule or regulation.

**16.7    Water and Energy Conservation.** Tenant shall participate in any and all water and energy conservation programs sponsored or implemented by Landlord for the Premises and/or Center, and in any such programs in which Landlord is obligated to participate by law, or if Tenant is required to do so pursuant to any federal, state or local law, rule or regulation. The cost of compliance in any such program shall be borne by Tenant.

**16.8    Co-Tenancy** Provided that: (a) Tenant is not then in violation of the Lease beyond any applicable cure period; and (b) during the Lease Term, one (1) of the following events has persisted for a period of more than sixty (60) consecutive days for reasons unrelated to remodeling, construction, expansion, casualty or force majeure: (i) less than two (2) Other Stores were open for business; or (ii) less than sixty-five percent (65%) of the gross leasable area in the Center occupied by retail in-line tenants (exclusive of the gross leasable area occupied by the Other Stores, carts, kiosks, licensees, non-retail tenants and temporary tenants with Lease Terms of less than one (1) year) were open for business; then, while the Unmet Co-Tenancy Period (as defined below) exists (and Tenant is open for business and not otherwise in violation of the Lease) Tenant shall pay to Landlord each month thereof (in lieu of the Minimum Annual Rent otherwise due for such period), an amount equal to the Percentage Rent Rate of Tenant's monthly Net Sales for such month of the Unmet Co-Tenancy Period but not to exceed the amount of Minimum Annual Rent otherwise due for such period ("Alternative Rent"). Alternative Rent shall be paid monthly in arrears on or before the fifteenth(15th) day of each month while the Unmet Co-Tenancy Period is in effect. Except for Tenant's payment of Alternative Rent (in lieu of Minimum Annual Rent) during an Unmet Co-Tenancy Period, Tenant shall pay to Landlord all other charges in the manner and at the times provided in the Lease. The right to pay Alternative Rent shall cease on the earlier of: the expiration of the Termination Window Period; or the date on which the Unmet Co-Tenancy Period is not in effect; or upon the violation of the Lease by Tenant beyond any applicable cure periods. In no event shall the existence of an Unmet Co-Tenancy Period affect or delay any increases in Minimum Annual Rent or other charges under the Lease. The period that the events in (b)(i) or (b)(ii) are in effect beyond the stated initial sixty (60) consecutive day requirement shall be referred to as the "Unmet Co-Tenancy Period".

If an Unmet Co-Tenancy Period continues for eighteen (18) months [following the initial sixty (60) day stated period], and provided that Tenant is not then and has not during such eighteen (18) month period been in violation of the Lease beyond any applicable cure periods), Tenant shall have the right to terminate this Lease by giving Landlord written notice of its election to do so during the period commencing on the day that the eighteen (18) month period expires and continuing for sixty (60) days thereafter ("Termination Window Period"). In the event that such notice is properly and timely given then the Lease shall terminate upon the date which is thirty (30) days after the date of Landlord's receipt of such notice or Landlord's refusal to receive such notice, whichever is earlier. Tenant shall only be able to elect to terminate this Lease by giving notice to Landlord within the Termination Window Period. In the event that either: (1) Tenant fails or chooses not to terminate this Lease within the Termination Window Period; or (2) the Unmet Co-Tenancy Period is not in existence upon Tenant's election to terminate the Lease; then Tenant shall be deemed to have unconditionally waived such right to terminate the Lease as provided herein concerning such particular period of Unmet Co-Tenancy Period. If the Lease is not terminated by Tenant then upon the expiration of the Termination Window Period, the Alternative Rent shall end and Tenant shall thereafter pay to Landlord the full rent required under the Lease.

**ARTICLE 17**
**REPAIRS AND MAINTENANCE**

**17.1    Tenant's Maintenance Obligations.**

(a)    Tenant agrees at all times from and after delivery of possession of the Premises to Tenant, and at its own cost and expense, to repair, replace, and maintain in good and tenantable condition the Premises and every part thereof to the demising lease lines including, without limitation, floor coverings, utility meters, pipes and conduits, all fixtures, cooling equipment installed by Tenant or a previous tenant pursuant to Exhibit "C", and other equipment therein, the storefront or storefronts, all of Tenant's signs, locks and closing devices, and all window sash, casement or frames, doors and door frames, any gas lines which exclusively serve the Premises, and all items of repair, replacement, maintenance and improvement or reconstruction as may at any time or from time to time be required with respect to the Premises by any governmental agency having jurisdiction, but excluding the roof, exterior walls, structural portions of the Premises and structural floor. All glass, both exterior and interior, shall be maintained at Tenant's sole cost and expense, and any glass broken shall be promptly replaced by Tenant with glass of the same kind, size and quality. All storefront cleaning and repair shall be done when the Center is not open for business to the public, except in the event of an emergency.

(b)     Tenant agrees that it will keep the Premises in a neat, clean and orderly condition and that all trash and rubbish generated by it shall be deposited within prescribed receptacles in designated service areas. Tenant further agrees to cause such receptacles to be emptied and trash removed at its own cost and expense so as, on its part, to keep said service areas in a clean and orderly condition. Notwithstanding the foregoing, Landlord may elect in its sole and absolute discretion to implement a rubbish removal program for the Center in which event Tenant shall pay its pro-rata share of such system through common area expenses in Article 19 or enclosed mall expenses in Article 20.

**17.2     Landlord's Maintenance Obligations.** Subject to the foregoing, Landlord shall keep and maintain in good and tenantable condition and repair similar in quality to comparable regional malls in Southern California the roof, exterior walls, structural parts and structural floor of the Premises and pipes and conduits outside the Premises for the furnishing to the Premises of various utilities (except to the extent that the same are the obligation of the appropriate public utility company); provided, however, that Landlord shall not be required to make repairs necessitated by reason of the negligence or willful misconduct of Tenant, its servants, agents, employees or contractors, or anyone claiming under Tenant, or by reason of the failure of Tenant to perform or observe any conditions or agreements contained in this Lease, or caused by alterations, additions or improvements made by Tenant or anyone claiming under Tenant. Notwithstanding anything to the contrary contained in this Lease, Landlord shall not be liable to Tenant for failure to make repairs as herein specifically required of it unless Landlord has actual knowledge of such repairs or Tenant has previously notified Landlord, in writing, of the need for such repairs and Landlord has failed to commence and complete said repairs within a reasonable period of time following receipt of Tenant's written notification. The provisions of Section 1942 of the Civil Code of the State of California and any other similar or superseding statute, if applicable, are specifically waived by Tenant.

**17.3     Tenant`s Failure to Maintain.** If Tenant refuses or neglects to make repairs and/or maintain the Premises, or any portion thereof, including Tenant's storefront(s), in a manner reasonably satisfactory to Landlord, Landlord shall have the right, upon giving Tenant written notice of its election to do so, to make such repairs or perform such maintenance on behalf of and for the account of Tenant. In such event, the cost of such work shall be paid by Tenant promptly upon receipt of bills therefor. Failure of Tenant to pay any of said charges within fifteen (15) days of receipt of bills therefor shall constitute a default hereunder, subject to any applicable notice and cure periods in Section 21.1 hereof. Upon any surrender of the Premises, Tenant shall redeliver the Premises to Landlord in good order, condition and state of repair, ordinary wear and tear and casualty excepted, and excepting such items of repair as may be Landlord's obligation hereunder. Landlord may enter the Premises to ensure Tenant's compliance with the foregoing obligation and with all laws, ordinances, regulations and requirements of lawful authorities as required by Section 7.1 (a) and Section 34.20 hereof (subject to prior reasonable notice and the right of Tenant to accompany Landlord during such entry).

**17.4     Definition of Exterior Walls.** As used in this Article, the expression "exterior walls" shall not be deemed to include storefront or storefronts, plate glass, window cases or window frames, doors or door frames, security grilles or similar enclosures. It is understood and agreed that Landlord shall be under no obligation to make any repairs, alterations, renewals, replacements or improvements to or upon the Premises or the mechanical equipment exclusively serving the Premises at any time except as otherwise provided in this Lease.

**17.5     Right to Enter.** Tenant agrees to permit Landlord and its authorized representatives to enter the Premises at all times (subject to prior reasonable notice and the right of Tenant to accompany Landlord during such entry excluding emergency entries): (a) to examine the Premises; (b) to perform any obligation or exercise any right or remedy of Landlord under this Lease; or (c) for the purpose of making emergency repairs and during usual business hours for the purpose of inspecting the same. Tenant further agrees that Landlord may go upon the Premises and make any necessary repairs thereto and perform any work therein which may be necessary to comply with any laws, ordinances, rules or regulations of any public authority, or the Pacific Fire Rating Bureau or of any similar body, or that Landlord may deem necessary to prevent waste or deterioration in connection with the Premises if Tenant does not make or cause such repairs to be made or performed or cause such work to be performed promptly after receipt of written demand from Landlord. Nothing herein contained shall imply any duty on the part of Landlord to do any such work which under provisions of this Lease Tenant may be required to do, nor shall it constitute a waiver of Tenant's default in failing to do the same. No exercise by Landlord of any rights herein reserved shall entitle Tenant to any damage for any injury or inconvenience occasioned thereby nor to any abatement of rent.

**17.6     Grant of License.** Tenant hereby grants to Landlord such licenses or easements in, under or over the Premises or any portion thereof as shall be reasonably required for the installation or maintenance of mains, utilities (including, without limitation, any power or telephone duct banks, sanitary sewer facilities and storm drain lines), conduits, shafts, pipes or other facilities to serve any building or any part thereof including, but not by way of limitation, the premises of any occupant of the Center; provided, however, that: (i) Landlord shall pay for any alteration required on the Premises as a result of any such exercise, occupancy under or enjoyment of any such license or easement, (ii) no exercise, occupancy under or enjoyment of such license or easement shall result in any unreasonable interference with Tenant's use, occupancy or enjoyment of the Premises as contemplated by this Lease; and (iii) any such mains, utilities, conduits, shafts, pipes or other facilities shall if installed by Landlord shall be located within the walls, below the finished floor and above the finished ceiling. Landlord shall use commercially reasonable efforts to minimize any unreasonable interference with the operation of Tenant's business in the Premises as a result of the exercise of Landlord's rights under this Section 17.6.

In the event that the exercise of Landlord's rights under this Section 17.6 materially interferes with the operation of Tenant's business in the Premises to the extent that Tenant cannot operate its business from

the Premises from the standpoint of prudent business management for a period in excess of forty-eight (48) hours and such interference is, shown by Tenant to be directly attributable to the negligence or intentional misconduct of Landlord, its agents or employees, and after notice of the interference from Tenant, Landlord fails to act reasonably and promptly to take corrective measures so as to permit Tenant to re-open for business in the Premises, then Tenant's sole remedy shall be the equitable abatement of Minimum Annual Rent and Tenant's share of real property taxes, insurance, common area expenses and enclosed mall expenses commencing on the expiration of such forty-eight (48) hours and continuing for the duration of such interference and closure. The Minimum Annual Rent and all other charges provided to be paid under this Lease shall be equitably abated in the same proportion that Tenant's use of the Premises is impaired and only to the extent such rent is not covered by the insurance Tenant is required to carry under Section 9.2(g) of this Lease. Tenant shall continue the operation of its business in the Premises at all times to the extent reasonably practicable in from the standpoint of prudent business management.

**17.7    Air Conditioning Equipment.**

(a)    Tenant shall accept the air conditioning equipment serving the Premises in its "as is" condition. Landlord and Tenant shall operate, maintain, repair and replace the air conditioning equipment throughout the Lease Term pursuant to this Section 17.7. An individual package unit shall serve the Premises, which shall be connected to Tenant's electrical panel. Tenant shall, at its cost, replace the individual package unit serving the Premises as necessary throughout the Lease Term including upon Tenant's initial occupancy, if necessary. At the option of Landlord, to be exercised in Landlord's sole discretion, (i) Tenant shall contract with a service company designated by Landlord for the regular (but not less frequently than monthly) maintenance of the heating, ventilation and air conditioning equipment serving the Premises and shall provide Landlord with a copy of any service contract within fifteen (15) days following its execution and with a copy of any subsequent contract within fifteen (15) days following Landlord's request therefor, from time to time during the Lease Term; or (ii) Landlord may contract with a service company of its own choosing (or provide such service itself) for the maintenance, repair and replacement (when necessary) of the heating, ventilation and air conditioning equipment and bill Tenant for the cost of same as additional rent.

(b)    If the Landlord elects to proceed under Section 17(a)(ii), commencing on the date that possession of the Premises is delivered to Tenant and thereafter on the first (1st) day of each calendar month of the Lease Term, Tenant shall pay to Landlord as additional rent one-twelfth (1/12th) of an amount estimated by Landlord to be Tenant's share of such total annual air conditioning expenses for the ensuing calendar year or fraction thereof. Landlord may adjust the air conditioning expenses charged to Tenant at the end of any calendar quarter on the basis of Landlord's experience and reasonably anticipated costs. Within thirty (30) days following the end of each calendar year, Landlord shall furnish Tenant with a statement covering the calendar year just expired, certified as correct by an authorized representative of Landlord, showing the total air conditioning expenses for the preceding calendar year, and the amount of Tenant's share of such air conditioning expenses and payments made by Tenant with respect to such calendar year as set forth above. If Tenant's share of such air conditioning expenses exceeds Tenant's payments so made, Tenant shall pay Landlord the deficiency within fifteen (15) days after receipt of said statement. If said payments exceed Tenant's share of such air conditioning expenses, Tenant shall be entitled to offset the excess against any rent or other charge next coming due to Landlord. Failure of Tenant to pay any of the charges required by this Section 17.7 when due shall constitute a default under the terms of this Lease, subject to any applicable notice and cure periods in Section 21.1 hereof..

(c)    The expenses incurred in connection with the maintenance, repair and replacement of such air conditioning equipment may include, but not be limited to, all sums expended in connection with said air conditioning equipment for all general maintenance, lubrication and/or adjustments, cleaning and/or replacing filters, replacing belts, repairing and/or replacing worn out parts, repairing and/or replacing utilities, duct work and machinery, maintenance and insurance contracts carried on the air conditioning equipment and all other items of expense incurred by Landlord in connection with the maintenance, repair and replacement of the air conditioning equipment, together with a fifteen percent (15%) supervision fee on such expenses. Such expenses may, at Landlord's option, either be collected as part of common area expenses or billed to Tenant separately. In any event, Landlord may elect to be responsible for the replacement, as necessary, of the heating, ventilating and air conditioning equipment or any elements, components or portions thereof, in which event Landlord shall have the right to establish and collect from Tenant, as additional rent, a reasonable reserve to be maintained by Landlord and used for the purpose of paying the cost of such replacement. Such reserve may, at Landlord's option, either be collected as part of common area expenses or billed to Tenant separately.

**17.8    Sewer Lines.** All tenants serving food on the Premises pursuant to Exhibit "B", subarticle entitled "Use of Premises", shall clean their sewer lines from the Premises to the main as necessary but in no event less than on a quarterly basis at their sole cost and expense. In the event of any grease trap and shaft located on the Premises, such tenants shall also clean such traps and shafts as necessary but in no event less than on a quarterly basis at their sole cost and expense. If Tenant fails to perform any of its obligations under this Section 17.8 after reasonable notice of such failure, Landlord may elect to perform such cleaning at Tenant's sole cost and expense.

## ARTICLE 18
## DAMAGE OR DESTRUCTION

**18.1    Insured Casualty.** In the event that the Premises are partially or totally destroyed by fire or any other peril covered by insurance maintained by Landlord, Landlord shall, within a period of one hundred twenty (120) days after the occurrence of such destruction, but only to the extent that proceeds of such insurance are available to Landlord for such purpose, commence reconstruction and restoration of the

Premises and prosecute the same diligently to completion, in which event this Lease shall continue in full force and effect. In the event insurance proceeds are not sufficient to pay the cost of such reconstruction, or if the damage or destruction is due to the acts or omissions of Tenant, its agents, employees or contractors, or if Landlord is restricted by any governmental authority, Landlord shall either terminate this Lease or pay the cost of such reconstruction. Such reconstruction shall be only to the extent necessary to restore Landlord's Work in the Premises as described in Exhibit "C". Tenant shall be obligated for the restoration of all of the items specified as Tenant's Work in said Exhibit "C" in the event of such reconstruction, as well as Tenant's other leasehold improvements, trade fixtures and other personal property on the Premises.

**18.2    Uninsured Casualty.**  In the event that the Premises are partially or totally destroyed as a result of any casualty or peril not covered by Landlord's insurance, Landlord may within a period of one hundred twenty (120) days after the occurrence of such destruction (a) commence reconstruction and restoration of the Premises and prosecute the same diligently to completion, in which event this Lease shall continue in full force and effect; or (b) notify Tenant in writing that it elects not to so reconstruct or restore the Premises, in which event this Lease shall cease and terminate as of the date of service of such notice, unless Tenant is unable to continue the operation of its business after the occurrence of such destruction, in which event this Lease shall cease and terminate as of the date of such destruction. In the event of any reconstruction of the Premises by Landlord following destruction as a result of any casualty or peril not covered by Landlord's insurance, such reconstruction shall be only to the extent necessary to restore Landlord's Work in the Premises as described in Exhibit "C". Tenant shall be obligated for the restoration of all of the items specified as Tenant's Work in said Exhibit "C" in the event of such reconstruction, as well as Tenant's other leasehold improvements, trade fixtures and other personal property on the Premises.

**18.3    Damage to the Center.**  Notwithstanding anything to the contrary contained herein, in the event of a total destruction of the Center or a partial destruction of the Center, the cost of restoration of which would exceed one-third (1/3) of the then replacement value of the Center, by any cause whatsoever, whether or not insured against and whether or not the Premises are partially or totally destroyed, Landlord may, within a period of one hundred twenty (120) days after the occurrence of such destruction, notify Tenant in writing that it elects not to so reconstruct or restore the Center, in which event this Lease shall cease and terminate as of the date of destruction.

**18.4    Damage Near End of Term.**  Notwithstanding the foregoing, in the event that the Premises are partially or totally destroyed during the last three (3) years of the Lease Term, Landlord and Tenant each shall have the option to terminate this Lease by giving written notice to the other of the exercise of such option within thirty (30) days after such destruction, in which event this Lease shall cease and terminate as of the date of service of such notice. For the purposes of this Article, partial destruction shall be deemed to be a destruction to an extent of at least one-third (1/3) of the full replacement cost of the Premises as of the date of destruction.

**18.5    Release of Liability.**  In the event of any termination of this Lease in accordance with this Article, the parties shall be released thereby without further obligation to the other party coincidental with the surrender of possession of the Premises to Landlord except for items which have theretofore accrued and are then unpaid, or unperformed.

**18.6    Abatement of Rent.**  In the event of reconstruction and restoration as herein provided, Minimum Annual Rent and Tenant's share of real property taxes, insurance, common area expenses and enclosed mall expenses payable hereunder shall be thereafter abated proportionately with the degree to which Tenant's use of the Premises is impaired during the remainder of the period of reconstruction and restoration. Tenant shall continue the operation of its business on the Premises during any such period to the extent reasonably practicable from the standpoint of prudent business management, and the obligation of Tenant to pay Percentage Rent and all other charges, except the entire Minimum Annual Rent and Tenant's share of real property taxes, insurance, common area expenses and enclosed mall expenses shall remain in full force and effect. Tenant shall not be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises, Tenant's personal property or any inconvenience or annoyance occasioned by such destruction, reconstruction or restoration. Tenant hereby waives any statutory rights of termination which may arise by reason of any partial or total destruction of the Premises which Landlord is obligated to restore or may restore under any of the provisions of this Lease.

## ARTICLE 19
## COMMON AREAS

**19.1    Use of Common Areas.**  There shall be available in the Center certain areas to be used for automobile parking and for the general use, convenience and benefit of the customers and patrons of Tenant and of the other tenants, owners and occupants of the Center, which areas, together with service corridors and all other service facilities and equipment (except the enclosed mall and those areas exclusively serving the Other Stores), are referred to herein as "common areas". Except as otherwise specifically provided in this Lease, Tenant and its employees and invitees are authorized, empowered and privileged to use the common areas in common with other authorized persons, as determined by Landlord, during the Lease Term. Landlord shall keep or cause to be kept the common areas in a neat, clean and orderly condition, properly lighted and landscaped and shall repair any damage to the facilities thereof similar in quality to comparable regional malls in Southern California. Subject to the foregoing, the manner in which the Center shall be maintained shall be determined by Landlord in its sole discretion. If any Other Stores maintain their own common areas, then Landlord shall not have responsibility for the operation, maintenance, repair or replacement of that portion of the common areas.

**19.2    Common Area Expenses.**

(a)    The expenses incurred by Landlord in connection with (i) the operation, maintenance, repair and replacement of the common areas; and (ii) the maintenance, repair and replacement of the roofs of the buildings located within the Center (including the roofs of the enclosed mall and excluding the roofs of the Other Stores if separately maintained) ("common area expenses"), shall be apportioned among the various occupants of the Center, and Tenant hereby agrees to pay to Landlord a share of such common area expenses which shall be computed by multiplying the total common area expenses, after deduction of any sum or sums paid toward the total of such common area expenses by the operators of the Other Stores, by a fraction, the numerator of which shall be the number of square feet of floor area comprising the Premises and the denominator of which shall be the total number of square feet of floor area of buildings located within the exterior boundaries of the entire Center which are occupied from time to time as of the commencement of each calendar quarter, excluding the buildings of the Other Stores, but in no event shall the denominator be less than eighty percent (80%) of the total number of square feet of floor area of buildings located within the exterior boundaries of the entire Center, excluding the buildings of the Other Stores.  The number of square feet of floor area in the Premises and in the buildings in the Center which are occupied shall be as determined by Landlord.

(b)    Commencing on the Rental Commencement Date and thereafter on the first (lst) day of each calendar month of the Lease Term, Tenant shall pay to Landlord one-twelfth (1/12) of an amount estimated by Landlord to be Tenant's share of the total annual common area expenses for the ensuing calendar year or balance thereof.  Landlord may adjust the common area expenses charged to Tenant at the end of any calendar quarter on the basis of Landlord's experience and reasonably anticipated costs.  Following the end of any calendar year, Landlord shall furnish Tenant a statement covering the calendar year just expired, certified as correct by an authorized representative of Landlord, showing the total common area expenses for the preceding calendar year, the amount of Tenant's share of such common area expenses, and the payments made by Tenant with respect to the calendar year set forth above.  If Tenant's share of the common area expenses exceed Tenant's payments so made, Tenant shall pay Landlord the deficiency within fifteen (15) days after receipt of such statement.  If such payments exceed Tenant's share of such common area expenses (excluding reserve accounts), Tenant shall be entitled to credit the excess against payments for common area expenses next thereafter to become due Landlord as set forth above.  If any overpayment to Landlord of Tenant's share of taxes, insurance, common area or enclosed mall expenses made by Tenant under this Lease occurs during the last year of the Term, Landlord shall refund to Tenant the amount of the overpayment within sixty (60) days following the expiration of the Term, provided Tenant has vacated the Premises on or before the expiration date in accordance with the terms of the Lease and provided Tenant is not otherwise in default under the Lease beyond any applicable cure period.  Reserve accounts shall be reconciled only at the end of the calendar year in which the work has been completed, rather than each calendar year.  Failure of Tenant to pay any of the charges required by this Article to be paid when due shall constitute a material breach and default under the terms of this Lease, subject to any applicable notice and cure periods in Section 21.1 hereof.

**19.3    Expenses Included.**  Expenses incurred pursuant to Section 19.2 shall include, but are not limited to, all sums expended in connection with the common areas and any security offices, police sub-stations, park and ride areas and facilities, management offices, merchants' association offices, postal services, non-profit community buildings and child care centers located in the Center from time to time, for the operation, general maintenance, repair, replacement and restoration, resurfacing, painting, restriping, cleaning, sweeping and janitorial services; maintenance, repairs and replacement of sidewalks, curbs and Center signs; planting and landscaping; lighting and other utilities including meter reading; expenses and fees for changing utility providers, including related maintenance, repair, equipment, installation, connection and service costs; directional signs and other markers and bumpers; operation, maintenance, repairs and replacement of any fire protection and life safety systems, lighting systems, storm drainage systems, water conservation systems, irrigation systems, energy management systems, and any other utility systems; personnel to implement such services including, if Landlord deems necessary, the cost of security guards or devices; Landlord's share of personal and real property taxes and governmental charges, fees or assessments of any kind or nature (including reserves therefor) on improvements and land comprising the common areas (exclusive of the enclosed mall), including without limitation, parking structures and other facilities, street improvements, storm drainage, sewer facilities, park and ride facilities and community facility districts; the cost of any capital improvements made to the Premises or the Center by Landlord that reduce common area expenses or that are required under any governmental law or regulation not applicable to the Center at the time it was constructed, such cost to be amortized over such reasonable period as Landlord shall determine with a return on capital at the rate of ten percent (10%) per annum on the unamortized balance or at such higher rate as may have been paid by Landlord on funds borrowed for the purpose of constructing such capital improvements; all costs and expenses pertaining to a security alarm system for the tenants in the Center; purchase, storage, installation and removal of holiday decorations; depreciation on maintenance and operating machinery and equipment, if owned, and rental paid for such machinery and equipment, if rented; reasonable nonrefundable reserves for repair and/or replacement of equipment serving the common areas; nonrefundable contributions toward one (1) or more reserves for replacements other than equipment (including, without limitation reserves for parking lot and roof); premiums for public liability, property damage, fire and extended coverage insurance (including reasonable reserves for deductibles and any self-insured retention and including "Earthquake Insurance" and "Flood Insurance" if Landlord deems desirable) together with insurance against sprinkler damage, vandalism and malicious mischief, and other insurance carried by Landlord on the common areas; all costs and expenses necessary to maintain, repair or replace the roofs of the buildings located within the Center (including the roofs of the enclosed mall and excluding the roofs of the Other Stores if separately maintained); the cost of all government mandated environmental repair, permits, equipment, inspections, monitoring and replacement; the cost of all government mandated changes to the buildings in the Center and/or to the common areas pursuant to the ADA [as defined in Section 7.1(a) of this Lease]; and an

allowance to Landlord for Landlord's supervision of the common areas in an amount equal to fifteen percent (15%) of the total of the aforementioned expenses for each calendar year. In the event Landlord shall contest any tax or assessment affecting the Center, the expenses involved in such contest shall be part of the common area expenses, regardless of whether said contest affects the buildings in the Center or the common areas. Real property taxes under Sections 5.7, 19.3 and 20.1 shall not include Landlord's federal or state income, franchise, inheritance or estate taxes, or documentary transfer taxes on documents for the sale or transfer of the Center to which Tenant is not a party. Capital expenditures included in common area or enclosed mall expenses under Article 19 or Article 20 respectively shall be amortized over the useful life of such expenditures according to the useful life of the item and generally accepted accounting principles, and only the yearly amortized portion shall be included in expenses each year.

**19.4     Enlargement of Common Areas.**  Should Landlord acquire or make available additional land not shown as part of the Center on Exhibit "A" and make the same available as common areas, the expenses incurred by Landlord in connection with the operation, maintenance, repair and replacement of common areas also shall include all of the aforementioned expenses incurred and paid in connection with said additional land.   In the event the expenses incurred by Landlord in connection with the operation, maintenance, repair and replacement of the common area include expenses for common areas located within the tracts of the Other Stores, all sums paid or payable by the occupants of such tracts on account of such expenses shall be applied toward reimbursement to Landlord of the entirety of the common area expenses prior to calculation of Tenant's pro-rata share thereof as herein set forth.

**19.5     Common Area Rules and Regulations.**

(a)     Subject to the restrictions in Section 2.2 hereof, Landlord shall at all times have the right and privilege of determining the nature and extent of the common areas, whether the same shall be surface, underground or multiple-deck, and of making such changes therein and thereto from time to time which in its opinion are deemed to be desirable and for the best interests of all persons using the common areas, including the location and relocation of driveways, entrances, exits, automobile parking spaces, the direction and flow of traffic, designation of prohibited areas, landscaped areas and all other facilities thereof.

(b)     Nothing contained herein shall be deemed to create any liability upon Landlord for any damage to motor vehicles of customers or employees or for loss of property from within such motor vehicles, unless caused by the gross negligence of Landlord, its agents, servants or employees.

(c)     Subject to the restrictions in Section 2.2 hereof, Landlord shall have the right to establish and, from time to time, to change, alter and amend, and to enforce against Tenant and the other users of the common areas such reasonable rules and regulations (including the exclusion of employees' parking therefrom subject to Section 19.7 hereof) as may be deemed necessary or advisable for the proper and efficient operation, maintenance, repair and replacement of the common areas. The rules and regulations herein provided for may include, without limitation, the hours during which the common areas shall be open for use. Landlord may, if in its opinion the same be advisable, establish a system or systems of validation or similar operation, including a system of charges against non-validated parking checks of users, and Tenant agrees to conform to and abide by all such rules and regulations in its use and the use of its customers and patrons with respect to said automobile parking areas; provided, however, that all such rules and regulations and such types of operation or validation of parking checks and other matters affecting the customers and patrons of Tenant shall apply equally and without discrimination to all persons entitled to the use of said automobile parking areas. Receipts from any validated parking system will be used to offset common area costs which costs  may  include the operation, maintenance and repair of such system.

**19.6     Control of Common Areas.**  Subject to the restrictions in Section 2.2 hereof, Landlord shall at all times during the Lease Term have the sole and exclusive control of the common areas, as well as the right to make changes to the common areas, including the automobile parking areas, the parking spaces thereon, driveways, entrances and exits and the sidewalks and pedestrian passageways and other common areas and may, at any time and from time to time during the Lease Term, exclude and restrain any person from use or occupancy thereof, excepting, however, bona fide customers, patrons and service suppliers of Tenant, and other tenants of Landlord who make use of the common areas in accordance with the rules and regulations established by Landlord from time to time with respect thereto. The rights of Tenant in and to the common areas shall at all times be subject to the rights of Landlord, the other tenants of Landlord and the Other Store occupants of the Center to use the same in common with Tenant, and it shall be the duty of Tenant to keep all of the common areas free and clear of any obstructions created or permitted by Tenant or resulting from Tenant's operation and to permit the use of any of the common areas only for normal parking and ingress and egress by the customers, patrons and service suppliers to and from the building occupied by Tenant and the other tenants of Landlord.

If in the opinion of Landlord unauthorized persons are using any of the common areas by reason of the presence of Tenant in the Premises, Tenant, upon demand of Landlord, shall enforce such rights against all such unauthorized persons by appropriate proceedings.  Nothing herein shall affect the rights of Landlord at any time to remove any such unauthorized persons from the common areas or to restrain the use of any of the common areas by unauthorized persons.

**19.7     Employee Parking Restrictions.**  It is understood that the employees of Tenant and the other tenants within the Center and employees of other occupants of the Center shall not be permitted to park their automobiles or other vehicles in the automobile parking areas which may from time to time be designated for patrons of the Center.  Landlord agrees to furnish and/or cause to be furnished either within the Center parking area, or reasonably close thereto, space for employee parking. Landlord at all times shall have the right to designate the particular parking area to be used by any or all of such employees and any

such designation may be changed from time to time. Tenant and its employees shall park their cars only in those portions of the parking area, if any, designated for that purpose by Landlord, and shall attach to their cars any identification stickers required by Landlord. Tenant shall furnish Landlord with its and its employees' license numbers within five (5) days after requested by Landlord, and Tenant shall thereafter notify Landlord of any change within five (5) days after such change occurs. Tenant hereby authorizes Landlord to tow away from the Center any vehicle or vehicles belonging to Tenant or Tenant's employees which are parked in violation of the foregoing or the rules and regulations issued by Landlord from time to time and/or attach violation stickers or notices to such vehicles. If Landlord implements any program related to parking, parking facilities or transportation facilities including, but not limited to, any program of parking validation, employee shuttle transportation or other program to limit, control, enhance, regulate or assist parking by customers of the Center, Tenant agrees to participate in the program and to pay a share of the costs of the program under rules and regulations from time to time established by Landlord.

## ARTICLE 20
## ENCLOSED MALL

**20.1    Operation and Maintenance Expenses.**    Those portions of the Center which are constructed so that climatic control may be provided therein are referred to as the "enclosed mall". Expenses for the operation, maintenance, repair and replacement of the enclosed mall shall include, but are not limited to, all sums expended in connection with the enclosed mall for all general maintenance, repair, replacement and restoration, painting, cleaning, sweeping and janitorial services; maintenance, repair and replacement of floor coverings, floor finishes and any Center signs within the enclosed mall; all expenses incurred in the operation of marketing and management offices; utility expenses for lighting; the cost of changing companies providing utility services, including related maintenance, repair, equipment, installation, connection and service costs; operation, maintenance, repair and replacement of heating and cooling equipment; maintenance, repair and replacement of landscaping and plants within the enclosed mall; operation, maintenance, repair and replacement of mechanical equipment, including automatic door openers, lighting fixtures (including replacement of tubes and bulbs), heating and cooling equipment used exclusively in connection with the enclosed mall; operation, maintenance, repair and replacement of any fire protection and life safety systems, lighting systems, storm drainage systems, water conservation systems, energy management systems, irrigation systems and any other utility systems within the enclosed mall; personnel to implement such services including, if Landlord deems necessary, the cost of security guards or devices; the cost and operation of information booths; Landlord's share of personal and real property taxes and governmental charges, fees, or assessments of any kind or nature (including reserves therefor) on improvements and land comprising the enclosed mall including, without limitation, for parking structures or other facilities, street improvements, storm drainage, sewer facilities, park and ride facilities, and community facility districts; the cost of any capital improvements made to the enclosed mall by Landlord that reduce the expenses therefor or that are required under any governmental law or regulation not applicable to the enclosed mall at the time it was constructed, such cost to be amortized over such reasonable period as Landlord shall determine with a return on capital at the rate of ten percent (10%) per annum on the unamortized balance or at the rate paid by Landlord on funds borrowed for the purpose of constructing such capital improvements; all costs and expenses pertaining to a security alarm system for the enclosed mall portion of the Center; purchase, storage, installation and removal of holiday decorations; depreciation on maintenance and operating machinery and equipment, if owned, or rental paid for such machinery and equipment, if rented; repair and replacement of enclosed mall furniture and equipment as well as reasonable nonrefundable reserves therefor; nonrefundable contributions toward one (1) or more reserves for replacements other than equipment (including without limitation carpeting and other flooring); premiums for public liability, property damage, fire and extended coverage insurance (including reasonable reserves for deductibles and any self-insured retention and "Earthquake Insurance" and "Flood Insurance" if Landlord deems desirable), together with insurance against sprinkler damage, vandalism and malicious mischief, and other insurance carried by Landlord on the enclosed mall; the cost of all government mandated environmental repair, permits, equipment, inspection, monitoring and replacement; the cost of all government mandated changes to the premises located in or adjacent to the enclosed mall and/or to the enclosed mall pursuant to the ADA [as defined in Section 7.1(a) of this Lease]; and an allowance to Landlord for Landlord's supervision of said enclosed mall in an amount equal to fifteen percent (15%) of the total of the aforementioned expenses for each calendar year. Real property taxes under Sections 5.7, 19.3 and 20.1 shall not include Landlord's federal or state income, franchise, inheritance or estate taxes, or documentary transfer taxes on documents for the sale or transfer of the Center to which Tenant is not a party. Capital expenditures included in common area or enclosed mall expenses under Article 19 or Article 20 respectively shall be amortized over the useful life of such expenditures according to the useful life of the item and generally accepted accounting principles, and only the yearly amortized portion shall be included in expenses each year.

**20.2    Tenant's Share.**    If the Premises is located in or adjacent to the enclosed mall, Tenant agrees to pay to Landlord a share of the total annual enclosed mall operation, maintenance, repair and replacement expenses which shall be computed by multiplying such total, after deduction of any sum or sums paid toward the total of such expenses by the operators of the Other Stores, by a fraction, the numerator of which shall be the number of square feet of the floor area comprising the Premises and the denominator of which shall be the total number of square feet of the floor area of the premises located in or adjacent to the enclosed mall which are occupied from time to time as of the commencement of each calendar quarter, excluding the buildings of the Other Stores, but in no event shall the denominator be less than eighty percent (80%) of the total number of square feet of floor area of premises located in or adjacent to the enclosed mall, excluding the buildings of the Other Stores. The number of square feet of floor area of premises having storefronts on the enclosed mall shall be as determined by Landlord.

**20.3    Payment of Tenant's Share.**    Commencing on the Rental Commencement Date and thereafter on the first day of each calendar month of the Lease Term, Tenant shall pay to Landlord one-twelfth



(1/12) of an amount estimated by Landlord to be Tenant's share of such total annual enclosed mall operation, maintenance, repair and replacement expenses for the ensuing calendar year or balance thereof. Landlord may adjust the monthly enclosed mall operation and maintenance expenses charged to Tenant on the basis of Landlord's experience and reasonably anticipated costs. Following the end of each calendar year, Landlord shall furnish Tenant a statement covering the calendar year just expired, certified as correct by an authorized representative of Landlord, showing the total enclosed mall operation, maintenance, repair and replacement expenses for the preceding calendar year, the amount of Tenant's share of such expenses and the payments made by Tenant with respect to such calendar year as set forth above. If Tenant's share of the enclosed mall expenses exceeds Tenant's payments so made, Tenant shall pay Landlord the deficiency within fifteen (15) days after receipt of such statement. If Tenant's payments exceed Tenant's share of the enclosed mall expenses (excluding reserve accounts), Tenant shall be entitled to credit the excess against payments next thereafter to become due Landlord as set forth above. Reserve accounts shall be reconciled following the end of the calendar year in which the work has been completed rather then each calendar year.

**20.4    Operation.** Tenant, provided the Premises is located in or adjacent to the enclosed mall, agrees during all business hours to operate the air conditioning equipment serving the Premises so that inside temperatures are maintained (a) within a range in which a majority of adults will be comfortable in the Premises; and (b) which will not unduly drain ventilation or cooled air from the enclosed mall. Landlord agrees to cause the air conditioning equipment servicing the enclosed mall to be so operated during such hours that ventilation and cooled air are not unduly drained from the Premises.

**20.5    Control of the Enclosed Mall.** Subject to the restrictions in Section 2.2 hereof, the manner in which the enclosed mall shall be operated and maintained shall be determined by Landlord in its sole discretion. Landlord shall at all times have the right and privilege of determining the nature and extent of the enclosed mall area and of making such changes therein and thereto from time to time which in its opinion are deemed to be desirable and for the best interests of all persons using the enclosed mall areas, including the location and relocation of entrances, exits, moveable carts, designation of prohibited areas and all other facilities thereof. Subject to the restrictions in Section 2.2 hereof, Landlord shall have the right to establish and, from time to time, to change, alter and amend, and to enforce against Tenant and the other users of the enclosed mall areas such reasonable rules and regulations as may be deemed necessary or advisable for the proper and efficient operation, maintenance, repair and replacement of the enclosed mall areas. Landlord's sole and exclusive control of the enclosed mall areas shall include the right at any time and from time to time during the Lease Term to exclude and restrain any person from use or occupancy thereof. It shall be the duty of Tenant to keep all of the enclosed mall area free and clear of any obstructions created or permitted by Tenant or resulting from Tenant. If in the opinion of Landlord unauthorized persons are using any of the enclosed mall areas by reason of the presence of Tenant in the Premises, Tenant, upon demand of Landlord, shall enforce such rights against all such unauthorized persons by appropriate proceedings. Nothing herein shall affect the rights of Landlord at any time to remove any such unauthorized persons from the enclosed mall area or to restrain the use of any of the enclosed mall areas by unauthorized persons.

## ARTICLE 21
## DEFAULTS; REMEDIES

**21.1    Events of Default.** The occurrence of any of the following shall constitute a default and material breach of this Lease by Tenant:

(a)    Any failure by Tenant to pay any rent or any other charge required to be paid under this Lease, or any part thereof, for a period of seven (7) days after written notice from Landlord to Tenant (provided, however, any notice shall be in lieu of, and not in addition to, any notice required under Section 1161 of the Code of Civil Procedure of California or any similar, superseding statute); or

(b)    Any failure by Tenant to observe or perform any other provision, covenant or condition of this Lease to be observed or performed by Tenant where such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant; provided that, if the nature of such default is such that the same cannot reasonably be cured within a thirty (30) day period, Tenant shall not be deemed to be in default if it shall commence such cure within such period and thereafter rectify and cure such default with due diligence [in no event to exceed fifteen (15) days after written notice thereof from Landlord to Tenant specifying the particulars of the default (provided, however, any notice shall be in lieu of, and not in addition to, any notice required under Section 1161 of the Code of Civil Procedure of California or any similar, superseding statute)]; or

(c)    Abandonment or vacation of the Premises by Tenant; or

(d)    To the extent permitted by law, a general assignment by Tenant or any Guarantor for the benefit of creditors, or the filing by or against Tenant or any Guarantor of any proceeding under an insolvency or bankruptcy law, unless in the case of a proceeding filed against Tenant or any Guarantor the same is dismissed within ninety (90) days, or the appointment of a trustee or receiver to take possession of all or substantially all of the assets of Tenant or any Guarantor, unless possession is restored to Tenant or such Guarantor within thirty (30) days, or any execution or other judicially authorized seizure of all or substantially all of Tenant's assets located upon the Premises or of Tenant's interest in this Lease, unless such seizure is discharged within thirty (30) days.

**21.2    Remedies.**

(a)    In the event of a default by Tenant, in addition to any other remedies available to Landlord at law or in equity, including injunction, at Landlord's option, without further notice or demand of any kind to Tenant or any other person:

(i)    Landlord may declare the Lease Term hereof ended and re-enter the Premises and take possession thereof and remove all persons therefrom, and Tenant shall have no further claim thereon or hereunder; or

(ii)    Landlord has the remedy described in California Civil Code Section 1951.4 (Landlord may continue the Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations); or

(iii)    Even though it may have re-entered the Premises, Landlord may thereafter elect to terminate this Lease and all of the rights of Tenant in or to the Premises.

(b)    In addition to any rights or remedies hereinbefore or hereafter conferred upon Landlord under the terms of this Lease, the following remedies and provisions shall specifically apply in the event Tenant engages in any one or more of the acts contemplated by the provisions of Section 21.1(d) of this Lease:

(i)    In all events, any receiver or trustee in bankruptcy shall either expressly assume or reject this Lease within sixty (60) days following the entry of an appropriate order for relief or within such earlier time as may be provided by applicable law;

(ii)    In the event of an assumption of this Lease by a debtor or by a trustee, such debtor or trustee shall within fifteen (15) days after such assumption (A) cure any default or provide adequate assurance that any default will be promptly cured; and (B) compensate Landlord for actual pecuniary loss or provide adequate assurance that compensation will be made for actual pecuniary loss including, but not limited to, all attorneys' fees and costs incurred by Landlord resulting from any such proceedings; and (C) provide adequate assurance of future performance;

(iii)    Where a default exists in this Lease, the trustee or debtor assuming this Lease may not require Landlord to provide services or supplies incidental to this Lease before its assumption by such trustee or debtor, unless the Landlord is compensated under the terms of this Lease for such services and supplies provided before the assumption of such Lease;

(iv)    The debtor or trustee may only assign this Lease if:  (A) it is assumed; and (B) adequate assurance of future performance by the assignee is provided, whether or not there has been a default under this Lease. Any consideration paid by any assignee in excess of the rent reserved in this Lease shall be the sole property of, and paid to, Landlord;

(v)    Landlord shall be entitled to the fair market value for the Premises and the services provided by Landlord (but in no event less than the rent reserved in this Lease) subsequent to the commencement of a bankruptcy event;

(vi)    Any security deposit given by Tenant to Landlord to secure the future performance by Tenant of all or any of the terms and conditions of this Lease, shall be automatically transferred to Landlord upon the entry of an "Order of Relief";

(vii)    The parties agree that Landlord is entitled to adequate assurance of future performance of the terms and provisions of this Lease in the event of an assignment under the provisions of the Bankruptcy Code. For purposes of any such assumption or assignment of this Lease, the parties agree that the term "adequate assurance" shall include at least the following, without limitation:

(A)    Any proposed assignee must have, as demonstrated to Landlord's satisfaction, a net worth (as defined in accordance with generally accepted accounting principles consistently applied) of an amount sufficient to assure that the proposed assignee will have the resources with which to conduct the business to be operated in the Premises, including the payment of all rent. The financial condition and resources of Tenant are material inducements to Landlord entering into this Lease.

(B)    Any proposed assignee must have engaged in the permitted use described in Exhibit "B" for at least five (5) years prior to any such proposed assignment.

(C)    Any proposed assignee must have had minimum sales at each location at which it operated such a business equal to at least ninety percent (90%) of Tenant's average monthly sales at the Premises for the eighteen (18) month period preceding initiation of a proceeding under the Bankruptcy Code.

(D)    In entering into this Lease, Landlord considered extensively Tenant's permitted use and determined that such permitted business would add substantially to the tenant balance in the Center and, were it not for Tenant's agreement to operate only Tenant's permitted business on the Premises, Landlord would not have entered into this Lease.  Landlord's operation of the Center will be materially impaired if a trustee in bankruptcy or any assignee of this Lease operate any business other than Tenant's permitted business.

(E)     The provisions of Section 16.4 of this Lease regarding competing locations and Landlord's acceptance thereof, upon the terms and conditions specified therein, were a material inducement to Landlord to enter into this Lease. Any individual or entity proposed by a trustee in bankruptcy to be an assignee of this Lease must comply with the provisions of Section 16.4. Any proposed assignee of this Lease must assume and agree to be personally bound by the terms, provisions and covenants of this Lease.

(F)     Any assumptions of this Lease by a proposed assignee shall not adversely affect Landlord's relationship with any of the remaining tenants in the Center taking into consideration any and all other "use" clauses and/or "exclusivity" clauses which may then exist under their leases with Landlord.

(c)     Should Landlord have re-entered the Premises under the provisions of Section 21.2(a)(ii) above, Landlord shall not be deemed to have terminated this Lease or the liability of Tenant to pay any rent or other charges thereafter accruing, or to have terminated Tenant's liability for damages under any of the provisions hereof, by any such re-entry or by any action, in unlawful detainer or otherwise, to obtain possession of the Premises, unless Landlord shall have notified Tenant in writing that it has so elected to terminate this Lease, and Tenant further covenants that the service by Landlord of any notice pursuant to the unlawful detainer statutes of the State of California and the surrender of possession pursuant to such notice shall not (unless Landlord elects to the contrary at the time of or at any time subsequent to the serving of such notice and such election is evidenced by a written notice to Tenant) be deemed to be a termination of this Lease. In the event of any entry or taking possession of the Premises as aforesaid, Landlord shall have the right, but not the obligation, to (i) remove therefrom all or any part of the personal property located therein and may place the same in storage at the expense and risk of Tenant; and/or (ii) erect a barricade and partition the Premises at the expense of Tenant.

(d)     Should Landlord elect to terminate this Lease pursuant to the provisions of Section 21.2(a)(i) or (iii) above, Landlord shall recover from Tenant as damages, the following:

(i)     The worth at the time of the award of any unpaid rent and other charges which had been earned at the time of termination; plus

(ii)     The worth at the time of the award of the amount by which the unpaid rent and other charges which would have been earned after termination until the time of the award exceeds the amount of the loss of such rent and other charges that Tenant proves could have been reasonably avoided; plus

(iii)     The worth at the time of the award of the amount by which the unpaid rent and other charges for the balance of the Lease Term after the time of the award exceeds the amount of the loss of such rent and other charges that Tenant proves could have been reasonably avoided; plus

(iv)     Any other amount necessary to compensate Landlord for all of the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom including, but not limited to, any costs or expenses incurred by Landlord in (A) retaking possession of the Premises, including reasonable attorney's fees therefor; (B) maintaining or preserving the Premises after such default; (C) preparing the Premises for reletting to a new tenant, including repairs or alterations to the Premises for such reletting; (D) leasing commissions; or (E) any other costs necessary or appropriate to relet the Premises; plus

(v)     Any amount paid to Tenant by Landlord for the initial construction or remodeling of Tenant's Work in the Premises; plus

(vi)     At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable California law.

**21.3     Computations.**  For the purposes of the preceding paragraph, all rent and charges other than Minimum Annual Rent shall be computed on the basis of the average monthly amount thereof accruing during the twelve (12) month period immediately preceding default unless a twelve (12) month period of this Lease has not elapsed, in which case the average monthly amount shall be based upon the entire period of Tenant's occupancy of the Premises. In the event of default, all of Tenant's fixtures, furniture, equipment, improvements, additions, alterations and other personal property shall remain on the Premises and, during the period of such default, Landlord shall have the right to take the exclusive possession of same and to use the same free of charge until all defaults are cured or, at its option, to require Tenant to remove the same forthwith.

**21.4     Definition of Worth at the Time of Award.**  As used in Section 21.2(d)(i) and (ii) above, the "worth at the time of the award" shall be computed by allowing interest at the rate of ten percent (10%) per annum.  As used in Section 21.2(d)(iii) above, the "worth at the time of the award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%).

**21.5     Efforts to Relet.**  For the purposes of this Article, Tenant's right to possession shall not be deemed to have been terminated by efforts of Landlord to relet the Premises, by its acts of maintenance or preservation with respect to the Premises, or by appointment of a receiver to protect Landlord's interests hereunder. The foregoing enumeration is not exhaustive, but merely illustrative of acts which may be performed by Landlord without terminating Tenant's right to possession.

**21.6    No Waiver.** The waiver by Landlord of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant, or condition herein contained. The subsequent acceptance of rent by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No covenant, term or condition of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing.

**21.7    Waiver of Jury Trial.** It is mutually agreed between the parties to this Lease to hereby waive trial by jury in any action, proceeding or counterclaim or other claim brought by either of the parties against the other on any matters not relating to intentionally or negligently caused personal injury or property damage, but otherwise arising out of or in any way connected with the Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises and any other statutory remedy.

## ARTICLE 22
## DEFAULT BY LANDLORD

**22.1    Landlord** shall not be in default hereunder unless Landlord fails to perform the obligations required of Landlord under this Lease within a reasonable time, but in no event later than thirty (30) days after written notice by Tenant to Landlord and to the holder of any first mortgage or deed of trust covering the Premises whose name and address shall have theretofore been furnished to Tenant in writing specifying wherein Landlord has failed to perform such obligation; provided, however, if the nature of Landlord's obligation is such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and diligently prosecutes the same to completion. Should Landlord be deemed to be in default of this Lease, then, except as provided in Section 34.15 hereof, Landlord shall be liable to Tenant for all damages sustained by Tenant as a direct result of Landlord's breach, and Tenant shall not be entitled to terminate this Lease as a result thereof. Nothing herein contained shall be interpreted to mean that Tenant is excused from paying any rent due hereunder as a result of any default by Landlord.

## ARTICLE 23
## ATTORNEYS' FEES

**23.1    In the event** that either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease, or any default hereunder, the unsuccessful party in such action or proceeding agrees to pay to the successful party the reasonable attorneys' fees and costs incurred therein by the successful party.

## ARTICLE 24
## EMINENT DOMAIN

**24.1    Taking Resulting in Termination.** In the event that all or substantially all of the Premises shall be taken under the power of eminent domain, or that any portion of the Center shall be so taken which results in the termination of any REA(s), this Lease shall thereupon terminate as of the date possession shall be so taken. In the event that a portion of the floor area of the Premises shall be taken under the power of eminent domain and the portion not so taken will not be reasonably adequate for the operation of Tenant's business, notwithstanding Landlord's performance of restoration as hereunder provided, this Lease shall terminate as of the date possession of said portion is taken. If this Lease is terminated, all rent shall be paid up to the date that possession is taken by public authority, and Landlord shall make an equitable refund of any rent paid by Tenant in advance and not yet earned.

**24.2    Partial Taking.** In the event of any taking under the power of eminent domain which does not terminate this Lease as aforesaid, any obligation of Tenant under this Lease to pay Percentage Rent or other amounts and all of the other provisions of this Lease shall remain in full force and effect, except that Minimum Annual Rent and all charges under the Lease calculated on the number of square feet of floor area in the Premises shall be reduced in the same proportion that the amount of floor area of the Premises taken bears to the floor area of the Premises immediately prior to such taking, and Landlord shall, to the extent of the condemnation award, at Landlord's own cost and expense restore such part of Landlord's Work in the Premises described in Exhibit "C" as is not taken to as near its former condition as the circumstances will permit and Tenant shall do likewise with respect to such part of Tenant's Work as is not taken. During such period of restoration, Minimum Annual Rent and all charges under the Lease calculated on the number of square feet of floor area in the Premises shall abate to the extent Tenant's use of the Premises is impaired during restoration.

**24.3    Award.** All damages awarded for any such taking under the power of eminent domain, whether for the whole or a part of the Premises, shall belong to and be the property of Landlord, whether such damages shall be awarded as compensation for diminution in value of the leasehold or for the fee of the Premises; provided, however, that nothing herein contained shall prevent Tenant from making claim for loss or damage to Tenant's trade fixtures, removable personal property and relocation or moving expenses. Landlord and Tenant hereby waive the provisions of Section 1265.130 and 1265.150 of the California Code of Civil Procedure and any other similar statutes providing for termination of the Lease in the event of a taking.

**24.4    Transfer Under the Threat of Taking.** A voluntary sale by Landlord to any public or quasi-public body, agency or person, corporate or otherwise, having the power of eminent domain, either under threat of condemnation or while condemnation proceedings are pending, shall be deemed to be a taking by eminent domain.

**24.5    Requisitioning.** Notwithstanding anything to the contrary in the foregoing provisions, the requisitioning of the Premises or any part thereof by military or other public authority for purposes arising out of a temporary emergency or other temporary situation or circumstances shall constitute a taking of the Premises by eminent domain only when the use and occupancy by the requisitioning authority has continued for one hundred eighty (180) days. During such one hundred eighty (180) day period and, if this Lease is not terminated under the foregoing provisions, then for the duration of the use and occupancy of the Premises by the requisitioning authority, any obligation of Tenant under this Lease to pay Percentage Rent or other amounts and all of the other provisions of this Lease shall remain in full force and effect, except that Minimum Annual Rent and all charges calculated on the number of square feet of floor area in the Premises shall be reduced in the same proportion that the amount of the floor area of the Premises requisitioned bears to the total floor area of the Premises, and Landlord shall be entitled to whatever compensation may be payable from the requisitioning authority for the use and occupation of the Premises for the period involved.

### ARTICLE 25
### SUBORDINATION TO FINANCING; ATTORNMENT

**25.1    Subordination.** This Lease is subject and subordinate to all ground or underlying leases including sale and leaseback leases, mortgages and deeds of trust which now affect the Center, the Premises or any portion thereof, and to all renewals, modifications, consolidations, replacements and extensions thereof; provided, however, if the lessor under any such lease or the holder or holders of any such mortgage or deed of trust shall advise Landlord that it or they desire or require this Lease to be prior and superior thereto, then, upon written request of Landlord to Tenant, Tenant agrees to promptly execute, acknowledge and deliver any and all documents or instruments which Landlord or such lessor, holder or holders deem necessary or desirable for purposes therefor. Provided Tenant is not in default under any of the terms, covenants or conditions of the Lease, and upon Tenant's written request therefor, Landlord shall use commercially reasonable efforts to provide Tenant with a non-disturbance agreement which shall be in the form currently used by the ground lessor, or holder of such lien or encumbrance described herein.

**25.2    Future Encumbrance.** Landlord shall have the right to cause this Lease to be and become and remain subject and subordinate to any and all ground or underlying leases, including sale and leaseback leases, mortgages or deeds of trust which may hereafter be executed covering the Center, the Premises, the real property thereunder or any portion thereof for the full amount of all advances made or to be made thereunder and without regard to the time or character of such advance, together with interest thereon and subject to all of the terms and provisions thereof. Tenant agrees, within fifteen (15) days after Landlord's written request therefor, to execute, acknowledge and deliver upon request any and all documents or instruments requested by Landlord or necessary or proper to assure the subordination of this Lease to any such mortgages, deeds of trust or leasehold estates. Failure by Tenant to timely execute, acknowledge and deliver such documents shall, at Landlord's option, constitute a material breach and default of this Lease. Provided Tenant is not in default under any of the terms, covenants or conditions of the Lease, and upon Tenant's written request therefor, Landlord shall use commercially reasonable efforts to provide Tenant with a non-disturbance agreement which shall be in the form currently used by the ground lessor, or holder of such lien or encumbrance described herein.

**25.3    Attornment.** Notwithstanding anything to the contrary set forth in this Article, Tenant hereby attorns and agrees to attorn to any person, firm or corporation purchasing or otherwise acquiring the Center, the Premises or the real property thereunder or any portion thereof at any sale or other proceeding or pursuant to the exercise of any rights, powers or remedies under such mortgages or deeds of trust or ground or underlying leases as if such person, firm or corporation had been named as Landlord herein, it being intended hereby that if this Lease is terminated, cut off or otherwise defeated by reason of any act or actions by the owner or holder of any such mortgage or deed of trust, or the lessor under any such leasehold estate, then, at the option of any such person, firm or corporation so purchasing or otherwise acquiring the Center, the Premises or the real property thereunder or any portion thereof, this Lease shall continue in full force and effect. Tenant hereby irrevocably appoints Landlord the attorney-in-fact of Tenant to execute and deliver any documents provided herein for and in the name of Tenant, and such power, being coupled with an interest, is irrevocable. Provided Tenant is not in default under any of the terms, covenants or conditions of the Lease, and upon Tenant's written request therefor, Landlord shall use commercially reasonable efforts to provide Tenant with a non-disturbance agreement which shall be in the form currently used by the ground lessor, or holder of such lien or encumbrance described herein.

**25.4    Estoppel Certificates.** If, upon any sale, assignment or hypothecation of the Premises, the Center or the land thereunder by Landlord, an estoppel statement shall be required from Tenant, Tenant agrees to deliver, in recordable form within fifteen (15) days after written request therefor by Landlord, said statement substantially in the form of Exhibit "E". Tenant's failure or refusal to timely execute such certificate, or such other certificate the party (other than Landlord) to the sale, assignment or hypothecation may request, shall constitute an acknowledgment by Tenant that the statements contained in such certificate are true and correct without exception and may, at Landlord's option, constitute a material breach and default under this Lease.

**25.5    Mortgage Changes.** Tenant shall not unreasonably withhold its consent to changes or amendments to this Lease requested by Landlord's ground lessor, if any, the holder of a mortgage or deed of trust or such similar financing instrument covering Landlord's fee or leasehold interest in the Premises, as the case may be, so long as such changes do not materially alter the economic terms of this Lease or otherwise materially diminish the rights or materially increase the obligations of Tenant.

## ARTICLE 26
### SALE OF PREMISES BY LANDLORD

26.1    In the event of any sale, exchange or other conveyance of the Center or any portion or portions thereof by Landlord and an assignment by Landlord of this Lease, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission relating to the Premises or this Lease occurring after the consummation of such sale, exchange or conveyance and assignment.

## ARTICLE 27
### HOLDOVER BY TENANT

27.1    **Holdover Tenancy.**  This Lease shall terminate without further notice upon the expiration of the Lease Term. Upon the expiration or earlier termination of the Lease Term, Tenant shall peaceably and quietly surrender the Premises broom-clean and in the same condition as the Premises were in upon delivery of possession of same to Tenant by Landlord, reasonable wear and tear and any damage to the Premises which Tenant is not required to repair pursuant to Article 17 excepted. Should Tenant hold over in the Premises beyond the expiration or earlier termination of this Lease, the holding over shall not constitute a renewal or extension of this Lease or give Tenant any rights under this Lease. In such event, Landlord may, in its sole discretion, treat Tenant as a tenant at will, subject to all of the terms and conditions of this Lease, except that Minimum Annual Rent shall be an amount equal to one and one-half (1-1/2) times the sum of Minimum Annual Rent and Percentage Rent which was payable by Tenant for the twelve (12) month period immediately preceding the expiration or earlier termination of this Lease. In the event Tenant shall hold the Premises after the expiration of the Lease Term hereof with the consent of Landlord, express or implied, such holdover, in the absence of written agreement on the subject, shall be deemed to have created a tenancy from month-to-month terminable on thirty (30) days' written notice by either party to the other, upon a monthly rent basis, and otherwise subject to all of the terms and provisions of this Lease. Such monthly rent shall be computed on the basis of one eighth (1/8) of the total rent payable by Tenant to Landlord for the preceding twelve (12) month period including, but not limited to, Minimum Annual Rent, Percentage Rent and any other charges payable by Tenant under this Lease. If at the expiration of the Lease Term, Landlord and Tenant are negotiating in good faith for a new lease or extension of the existing Lease for the Premises, the applicable increase in Minimum Annual Rent set forth in this Section 27.1 shall be postponed for a period commencing on the day after the expiration of the Lease Term and continuing for forty-five (45) days thereafter. Upon the expiration of such forty-five (45) days, the increase in Section 27.1 shall commence unless the parties have executed an extension of the Lease or new Lease for the Premises, in which event such latter document shall govern.

27.2    **Failure to Surrender.**  If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall indemnify and hold Landlord harmless from any loss or liability resulting from such failure including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender. Acceptance by Landlord of any Minimum Annual Rent, Percentage Rent or additional rent after the expiration or earlier termination of this Lease shall not constitute a consent to a holdover hereunder, constitute acceptance of Tenant as a tenant at will, or result in a renewal of this Lease.

## ARTICLE 28
### MARKETING FUND

28.1    **Marketing Fund Charge.**  Tenant agrees to pay to Landlord a Marketing Fund Charge payable in advance on the first day of each month, as Tenant's contribution toward the advertising, promotion, public relations and administrative expenses related to the marketing of the Center. The Marketing Fund Charge payable by Tenant to Landlord will be subject to adjustment on January 1 of each year by a percentage equal to the percentage increase, if any, from the base period of the Index, which Index is defined in this Section  provided that the amount of the annual increase in the Marketing Fund Charge shall not exceed on a cumulative basis an amount equal to three percent (3%) of the amount of the Marketing Fund Charge in effect for the year immediately preceding an adjustment. The term "base period" as used in this Section 28.1 shall refer to the Index for the calendar month which is four (4) months prior to the month in which the Minimum Annual Rent commences. The Marketing Fund Charge then in effect shall be increased on January 1 of each year of the Lease Term following the calendar year in which the Lease Term commences ("Subsequent Year") if the Consumer Price Index for All Urban Consumers (Los Angeles/Anaheim/Riverside Area: Base 1982-84 = 100 All Items), as published by the United States Department of Labor, Bureau of Labor Statistics ("Index"), for the "Comparison Month" (described below) increases over the Index for the base period. The base period Index shall be compared with the Index for the same calendar month for each Subsequent Year ("Comparison Month"). If the Index for any Comparison Month is higher than the base period Index, then the Marketing Fund Charge for the Subsequent Year following the Comparison Month shall be increased commencing January 1 of such Subsequent Year by a percentage which shall be calculated by dividing the base period Index into that number which represents the difference, if any, when subtracting the base period Index from the Index for any Comparison Month. Should said Bureau discontinue the publication of the above Index, or publish the same less frequently, or alter the same in some other manner, then Landlord shall adopt a substitute index or substitute procedure which reasonably reflects and monitors consumer prices. Tenant's initial annual Marketing Fund Charge shall be the amount set forth in Section 2.1.

28.2    **Initial Opening Assessment.**  [Intentionally Omitted]

28.3    **Advertising.**  Tenant also agrees to advertise Tenant's business conducted in the Premises in six (6) newspaper sections and tabloids sponsored by Landlord each year. Tenant agrees to purchase in

each instance at least the ... . .um advertising space allowed in the tabloid or newspaper section as designed by the Center's Promotion Director. If Tenant shall refuse or neglect to timely submit its copy of such advertising, Landlord, at its election, shall have the right (but not the obligation) to submit copy consisting of Tenant's Trade Name and address to the printer for inclusion in such printed advertising media on behalf of and for the account of Tenant. If Tenant shall refuse or neglect to pay for such advertising, Landlord may pay such sum or sums of money by reason of the failure or neglect of Tenant to perform; and in such event, Tenant agrees to reimburse and pay to Landlord upon demand, all such sums so expended which shall be deemed to be additional rent for the purposes of enforcement and collection. Tenant shall have the right to credit toward Tenant's annual advertising obligation in this Section 28.3 the number of any inserts in a major local newspaper (as opposed to a newspaper or tabloid sponsored by Landlord) in the trade area during each year purchased by Tenant to promote Tenant's location in the Premises. The foregoing credit shall be applied on a one for one basis. For example if Tenant purchases two (2) such separate newspaper inserts during a calendar year, one for the winter holidays and another for Mother's Day, then in such year, the number of Landlord sponsored newspaper or tabloid sections Tenant shall be required to purchase under Section 28.3 shall be reduced by two (2).

**28.4   Contribution of Landlord.**  Landlord agrees to contribute not less than twenty-five percent (25%) of the total amount of promotional charges paid to said Marketing Fund by the tenants of the Center; provided, however, that Landlord's contribution will in no event exceed Twenty-Five Thousand and 00/100 Dollars ($25,000.00) during any calendar year. However, Landlord, at its option, may elect to contribute all or part of the services of a marketing director and/or secretary and their respective offices, as part of such cash contribution ("in lieu contribution"). The marketing director shall be under the exclusive control and supervision of Landlord and Landlord shall have the sole right and exclusive authority to employ and discharge such marketing director; provided, however, should the marketing director also be responsible for the management of the Center, Landlord's in lieu contribution shall be equitably prorated based upon the actual amount of time devoted to the promotion of the Center and its management, respectively.

**28.5   Merchant's Association.**  In lieu and instead of the Marketing Fund, Landlord shall have the right and option to form a Merchant's Association ("Association") and, in such case, Tenant shall become a member of and shall contribute Tenant's Marketing Fund Charge to the Association. The Articles of the Association shall be originally approved by a majority vote of the members of the Association and thereafter shall be subject to amendments as provided in said Articles. By-laws of the Association shall be adopted, amended or repealed as provided in the Articles. Landlord agrees to contribute to the Association an amount equal to that which would otherwise have been contributed by Landlord to the Marketing Fund including any in lieu contributions.

**28.6   Gift Certificates.**  Tenant shall participate in any program sponsored by Landlord awarding gift certificates redeemable at stores in the Center. Tenant shall honor any such certificates issued by such program. Tenant shall not be required to incur any cost associated with such gift certificate, which may be used by customers of the Center to purchase merchandise at the Premises and then redeemable by Tenant for the full value of the certificate.

**28.7   Grand Reopening Assessment.**  *Intentionally Omitted.*

### ARTICLE 29
### NOTICES

**29.1   Notices.**  Wherever in this Lease it shall be required or permitted that notice, approval, advice, consent or demand be given or served by either party to this Lease to or on the other, such notice, approval, advice, consent or demand shall be in writing and deemed to have been duly given by deposit in the United States Mail and forwarded by certified or registered delivery, addressed to the parties at the addresses listed in Article 2 or by personal service. Either party may change such address by written notice sent by certified or registered mail to the other.

**29.2   Default Notices.**  Notwithstanding anything to the contrary contained herein, any notices Landlord is required or authorized to serve upon Tenant in order to advise Tenant of alleged violations of Tenant's covenants contained in Article 13 (improper advertising medium/signs), Article 17 (failure of Tenant to properly repair and/or maintain the Premises) or Article 19 (improper parking of automobiles), must be in writing but shall be deemed to have been duly given or served upon Tenant by delivery of a copy of such notice to one of Tenant's managing or responsible employees at the Premises and by mailing a copy of such notice to Tenant in the manner specified above.

### ARTICLE 30
### EXPANSION

**30.1   Expansion.**  Subject to the limitations in Section 2.2 of this Lease, Landlord may, at its election (but shall in no event be obligated to), construct, modify, reduce or expand the Center or any part thereof. Tenant acknowledges that such construction, modification, reduction or expansion of the Center or any part thereof if and when it may occur, will involve barricading, materials storage, noise, dust, vibration, scaffolding, demolition, structural alterations, the presence of workmen and equipment, rearrangement of parking areas, common areas, roadways and lighting facilities, redirection of vehicular and pedestrian traffic, and other inconveniences typically associated with construction. In connection with such construction, modification, reduction or expansion of the Center, Tenant hereby agrees to permit Landlord and its authorized employees, agents, contractors, architects, structural engineers or representatives to enter the Premises at all reasonable times for the purpose of inspecting, working in and/or surveying the Premises, subject to prior reasonable notice and the right of Tenant to accompany Landlord during such entry. No exercise by Landlord of any rights herein reserved to inspect, work in and/or survey the Premises shall entitle Tenant to any compensation by Landlord for any inconvenience occasioned thereby except as set forth in Section 30.2 of the Lease.

(a)      Tenant acknowledges that such construction, modification, reduction or expansion of any portion of the Center by Landlord may require the closing of the Premises for business at the option

TLS

of Landlord. Any such closure by Landlord shall not exceed ninety (90) days and, for the duration of such closure, Tenant shall receive the Construction Abatement described in Section 30.2.

(b)    Tenant hereby grants to Landlord and its authorized employees, agents, contractors, architects, structural engineers or representatives such licenses or easements in, upon, through, above or below the Premises or any portion thereof as shall be reasonably required (i) for the installation, inspection, surveying, maintenance and/or construction of mains, conduits, shafts, columns, footings, piers, pipes, or other facilities to serve any building or any part thereof including, without limitation, the premises of any occupant of the Center, provided that any such mains, utilities, conduits, shafts, pipes or other facilities shall if installed by Landlord shall be located within the walls, below the finished floor and above the finished ceiling; or (ii) for any future construction, modification, reduction or expansion of the Center, provided that Landlord shall use its best efforts to minimize any unreasonable interference with Tenant's use, occupancy or enjoyment of the Premises as contemplated by this Lease caused by Landlord's exercise of such licenses or easements.

(c)    During any period of time that Landlord or its authorized employees, agents, contractors, architects, structural engineers or representatives enter the Premises pursuant to this Article, Landlord shall, at its sole cost and expense, provide adequate security for Tenant's inventory and personal property located in the Premises.

(d)    Tenant waives any claim or defense it may have against Landlord and its authorized employees, agents, contractors, architects, structural engineers or representatives and any right of offset against or deductions from rent or any other sum payable under this Lease or any cause of action based upon interruption of or interference with Tenant's conduct of business, loss of business, decreased sales, constructive or wrongful eviction, invasion of right of privacy or inconvenience to its customers caused by any construction, modification, reduction or expansion of the Center, except for the Construction Abatement. The Construction Abatement shall be Tenant's sole remedy against Landlord or Landlord's authorized employees, agents, contractors, architects, structural engineers and representatives for any such interruption of or interference with Tenant's conduct of business, loss of business, decreased sales, constructive or wrongful eviction, invasion of right of privacy or inconvenience to its customers caused by any construction, modification, reduction or expansion of the Center, except in the event of Landlord's willful misconduct or negligence resulting in punitive damages, in which event the Construction Abatement shall not be Tenant's sole remedy.

30.2    **Construction Abatement.**   In the event that any construction, modification, reduction or expansion of the Center or the Premises substantially interferes with the operation of Tenant's business in the Premises, then for the duration of such substantial interference, Minimum Annual Rent and all other charges provided to be paid under this Lease shall be equitably abated in the same proportion that Tenant's use of the Premises is impaired ("Construction Abatement"). Tenant shall continue the operation of its business in the Premises at all times to the extent reasonably practicable in Landlord's opinion from the standpoint of prudent business management. Tenant shall not be entitled to any compensation or damages from Landlord for any reason including, without limitation: (a) loss of the use of the whole or any part of the Premises; (b) damage to Tenant's personal property (except as expressly set forth in this Section); or (c) any inconvenience or annoyance or loss occasioned by such construction, modification, reduction or expansion, including any decrease in sales from the Premises, except (i) in the event of Landlord's willful misconduct or negligence resulting in punitive damages, or that of Landlord's agents, employees, servants or contractors; and (ii) for the Construction Abatement. If not covered by insurance Tenant is required to carry under this Lease, Tenant shall be entitled to compensation from Landlord for damage to Tenant's fixtures, furniture and equipment if disturbed and/or destroyed as a result of work performed in the Premises by Landlord unless such damage is a result of Tenant's negligence or willful misconduct ("Personal Property Damage"). As conditions to Tenant's reimbursement for damage to Tenant's above referenced items, Tenant shall (i) promptly after Tenant's discovery thereof, notify Landlord in writing of the nature and extent of such damage and (ii) submit evidence reasonably satisfactory to Landlord that any damage to such property was a direct result of Landlord's construction together with a reasonable estimate of the cost to repair the damage with supporting documentation.

30.3    **Additional Other Store.** *Intentionally Omitted.*

ARTICLE 31
LANDLORD'S RIGHT TO RELOCATE PREMISES

31.1    Landlord shall have the right to relocate the Premises to another part of the Center in accordance with the following:

(a)    Decor. The new Premises shall be substantially the same in size, decor, and nature as the Premises described in this Lease, and shall be placed in that condition by Landlord at its cost which shall include construction of Tenant's Work and Landlord's Work.

(b)    Cost of Physical Relocation. The physical relocation of the Premises shall be accomplished by Landlord at its cost.

(c)    Notice. Landlord shall give Tenant at least forty-five (45) days' notice of Landlord's intention to relocate the Premises.

(d)    Time. Landlord shall diligently pursue the relocation of the Premises and Minimum Annual Rent and all other sums and charges payable under this Lease shall abate during the period of such relocation.

(e)      Incidental Costs. All incidental costs incurred by Tenant as a result of the relocation including, without limitation, costs incurred in changing addresses on stationery, business cards, directories, advertising and other such items, shall be paid by Landlord in a sum not to exceed Two Thousand and 00/100 Dollars ($2,000.00), subject to the submission of receipts by Tenant of such costs incurred .

(f)      Frequency. Landlord shall not have the right to relocate the Premises more than one (1) time during the Lease Term.

(g)      Size. If the relocated Premises are smaller than the Premises as they existed before the relocation, Minimum Annual Rent shall be reduced by a sum computed by multiplying the Minimum Annual Rent by a fraction, the numerator of which shall be the total number of square feet in the relocated Premises and the denominator of which shall be the total number of square feet in the Premises before relocation.

(h)      Amendment. The parties shall immediately execute an amendment to this Lease stating the relocation of the Premises and the reduction of Minimum Annual Rent, if any.

(i)      Landlord shall endeavor to offer Tenant one (1) or more "Comparable Premises" (as herein defined), if available, for the relocated Premises. Landlord's right to relocate the Premises shall be subject to Tenant's reasonable consent, which shall not be withheld if Landlord offers to relocate Tenant to Comparable Premises. In the event Tenant does not consent to the relocation of the Premises, Landlord shall have the option to (i) keep Tenant in its existing Premises; or (ii) terminate this Lease upon written notice to Tenant. The term, "Comparable Premises", shall mean premises which are substantially the same in size as the Premises described in Exhibit "B" of this Lease and similar in location with respect to the Other Stores (not necessarily those shown on Exhibit "A" in proximity to the Premises) and vertical transportation (if applicable); provided, however, the particular location of Comparable Premises shall be subject to such covenants of Landlord respecting radius, location, use or exclusivity as may be contained in any other lease, financing agreement or any other agreement affecting the Center.

## ARTICLE 32
## CAPTIONS AND TERMS

32.1    Reference Only. The captions of Articles and Sections of this Lease are for convenience only, are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease. Except as otherwise specifically stated in this Lease, the "Lease Term" shall include the original term and any extension, renewal or holdover thereof.

32.2    Parties. If more than one person or corporation is named as Landlord or Tenant in this Lease and executes the same as such, the words "Landlord" or "Tenant" wherever used in this Lease are intended to refer to all such persons or corporations, and the liability of such persons or corporations for compliance with the performance of all of the terms, covenants and provisions of this Lease shall be joint and several. The masculine pronoun used herein shall include the feminine or the neuter, as the case may be, and the use of the singular shall include the plural.

## ARTICLE 33
## OBLIGATIONS OF SUCCESSORS

33.1    Each and all of the provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto, and except as otherwise specifically provided in this Lease, their respective heirs, executors, administrators, successors and assigns, subject at all times, nevertheless, to all agreements and restrictions contained elsewhere in this Lease with respect to the assignment, transfer, encumbering or subletting of all or any part of Tenant's interest in this Lease.

## ARTICLE 34
## MISCELLANEOUS PROVISIONS

34.1    Separability. It is agreed that, if any provisions of this Lease shall be determined to be void by a court of competent jurisdiction, then such determination shall not affect any other provisions of this Lease and all such other provisions shall remain in full force and effect.

34.2    Warranty of Authority. If Tenant is a corporation, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that Tenant is a duly qualified corporation and all steps have been taken prior to the date hereof to qualify Tenant to do business in the State of California; that all franchise and corporate taxes have been paid to date; and that all forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due.

34.3    Entire Agreement. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting this Lease and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. This Lease contains all of the terms, covenants, conditions, warranties and agreements of the parties relating in any manner to the rent, use and occupancy of the Premises, shall be considered to be the only agreement between the parties hereto and their representatives and agents, and none of the terms, covenants, conditions or provisions of this Lease can be modified, deleted or added to except in writing signed by the parties hereto. All negotiations and oral agreements acceptable to both parties have been merged into and are included herein. There are no other representations or warranties between

the parties and all reliance with respect to representations is totally upon the representations and agreements contained in this Lease.

**34.4    Right to Lease.**  Landlord reserves the absolute right to effect such other tenancies in the Center as Landlord in the exercise of its sole business judgment shall determine to best promote the interests of the Center. Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or type or number of tenants shall, during the Lease Term, occupy any space in the Center. Nothing contained in this Lease shall be deemed to give Tenant an express or implied exclusive right to operate any particular type of business in the Center.

**34.5    Governing Law.**  The laws of the State of California shall govern the validity, construction, performance and enforcement of this Lease. Should either party institute legal action to enforce any obligation contained herein, it is agreed that the venue of such suit or action shall be the County in which the Center is located. Although the printed provisions of this Lease were drawn by Landlord, this Lease shall not be construed either for or against Landlord or Tenant but shall be interpreted in accordance with the general tenor of its language.

**34.6    Force Majeure.**  Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental actions, civil commotions, fire or other casualty, and other non-financial causes beyond the reasonable control of the party obligated to perform, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage, except the obligations, once begun, imposed with regard to rent and other charges to be paid by Tenant pursuant to this Lease.

**34.7    Cumulative Rights.**  The various rights, options, elections, powers and remedies contained in this Lease shall be construed as cumulative and no one of them shall be exclusive of any of the others, or of any other legal or equitable remedy which either party might otherwise have in the event of breach or default in the terms hereof, and the exercise of one right or remedy by such party shall not impair its right to any other right or remedy until all obligations imposed upon the other party have been fully performed.

**34.8    Time.**  Except for the delivery of possession of the Premises to Tenant, time is of the essence with respect to the performance of each of the covenants and agreements contained in this Lease.

**34.9    Relationship of Parties.**  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant, and neither the method of computation of rent nor any other provisions contained in this Lease nor any acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

**34.10    Late Charges.**  Tenant hereby acknowledges that late payment by Tenant to Landlord of rent or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which is extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by the terms of any mortgage or deed of trust covering the Premises. Accordingly, if any installment of rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee when such amount is due, then Tenant shall pay to Landlord, as additional rent, a late charge equal to Two Hundred Fifty and 00/100 Dollars ($250.00), plus any attorneys' fees incurred by Landlord by reason of Tenant's failure to pay rent and/or other charges when due hereunder. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of the late payment by Tenant. Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder. Tenant hereby agrees that, if Tenant is subject to a late charge for two (2) consecutive months, Minimum Annual Rent for the following twelve (12) months shall automatically be adjusted to be payable quarterly, in advance, commencing upon the first day of the month following such consecutive late month and continuing for the next twelve (12) months on a quarterly basis in advance.

**34.11    Financial Statements and Credit Reporting.**

(a)    At any time during the Lease Term, Tenant shall, upon fifteen (15) days' prior written notice from Landlord, provide Landlord or any institutional lender which is negotiating with Landlord for interim, construction or permanent financing during the Lease Term, with a confidential current financial statement and financial statements for each of the two (2) years prior to the then current fiscal statement year. Such current statement shall be prepared in accordance with generally accepted accounting principles, and if such is the normal practice of Tenant, shall be audited by an independent certified public accountant.

(b)    Landlord shall have the right at any time and from time to time to obtain a credit report on Tenant. Tenant shall execute any forms reasonably required by Landlord or the credit reporting entity to enable Landlord to obtain a credit report. Tenant shall grant any consent required by any credit reporting agency if necessary or desirable to enable Landlord to obtain a credit report.

**34.12    Real Estate Brokers.**  Tenant acknowledges that Donahue Schriber is the real estate broker of Landlord, and that certain employees and/or principals thereof may also be principals of Landlord. Tenant hereby holds Donahue Schriber and Landlord (their employees, principals, predecessors and successors-in-interest) harmless with respect to any damage or liability of any kind or nature whatsoever, or at all, including reasonable attorneys' fees and court costs with respect to the negotiation of this Lease or collateral matters thereto.

Except as may be expressly set forth herein, Landlord and Tenant represent and warrant that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and agree to indemnify the other against and hold it harmless from all liability arising from any such claim including, without limitation, the cost of attorneys' fees and court costs in connection therewith.

**34.13   Interest.**   Tenant shall pay to Landlord when due all sums of money required to be paid pursuant to this Lease. If such amounts or charges are not paid at the time provided in this Lease, they shall nevertheless be collectible with the next installment of Minimum Annual Rent thereafter falling due, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of Landlord. If Tenant shall fail to pay, when the same is due and payable, any rent or other charge, such unpaid amounts shall bear interest at the maximum lawful rate [not to exceed fourteen percent (14%) per annum] from the date due to the date of payment.

**34.14   No Offer to Lease.**   The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises; and this document shall become effective and binding only upon execution hereof by both parties and delivery by Landlord (or, when duly authorized, by Landlord's agent or employee) to Tenant. No act or omission of any agent of Landlord or of Landlord's broker shall alter, change or modify any of the provisions hereof.

**34.15   Exculpation.**   Should Landlord be a partnership or corporation, the obligations of Landlord under this Lease do not constitute personal obligations of the individual partners of the partnership or shareholders, officers or directors of the corporation of Landlord, as the case may be, and Tenant shall look solely to the real estate that is the subject of this Lease (or the proceeds thereof) and to no other assets of Landlord for satisfaction of any liability in respect of this Lease and will not seek recourse against the individual partners of the partnership or shareholders, officers or directors of the corporation of Landlord, as the case may be, nor against any of their personal assets for such satisfaction. It is expressly understood and agreed that any money judgement resulting from any default or other claim arising under this Lease against Landlord shall be satisfied only out of the net rents, issues, profits and other income actually received from the operation of the Center.

**34.16   No Remuneration for Execution of Lease.**   Except as provided in Section 34.12, Landlord and Tenant each, for itself and for its directors, officers, shareholders, employees, partners and agents, warrants, covenants and represents to the other that neither it, nor any of its directors, officers, shareholders, employees, partners and agents, has given to or received from the other party or any such party's director, officer, shareholder, employee, partner or agent, any commission, fee, rebate, or other thing or service in connection with the execution of this Lease. Each party agrees that it shall submit to such reasonable audit as may be required to substantiate compliance with the foregoing provisions of this Section.

**34.17   Waiver of Rights of Redemption.**   Tenant waives any and all rights of redemption granted under any present and future laws in the event Landlord obtains the right to possession of the Premises by reason of the violation by Tenant of any of the covenants and conditions of this Lease or otherwise.

**34.18   Recording.**   Tenant shall not record this Lease or any short form memorandum of this Lease. Tenant, upon the request of the Landlord, shall execute and acknowledge a short form memorandum of this Lease for recording purposes. Upon the expiration or earlier termination of this Lease for any reason, Tenant, within three (3) days of the date of request by Landlord, shall deliver to Landlord a quitclaim deed conveying to Landlord any and all interest Tenant may have had under this Lease.

**34.19   Right to Show Premises.**   During the last one hundred twenty (120) days of the Lease Term or upon earlier termination of this Lease, Landlord shall have the right to go upon the Premises to show same to prospective tenants or purchasers and to post appropriate signs.

**34.20   Hazardous Materials.**

(a)   Tenant at its sole cost and expense, shall comply with all laws relating to the storage, use, handling and disposal of Hazardous Materials as defined in Section 34.20(e) below. Tenant represents and warrants that it and its agents, servants, employees, contractors and anyone else acting on Tenant's behalf will not store, dispose, produce, use, transport or manufacture any toxic or hazardous waste or materials as defined or regulated now or in the future, by local, state or federal laws, on the Premises or any portion of the Center ("Hazardous Materials"). Tenant shall give Landlord prompt written notice of Tenant's discovery of, the presence of or contamination of the Premises or the Center with Hazardous Materials. In the event Tenant or any of its agents, servants, employees, contractors or anyone else acting on Tenant's behalf violates the foregoing provision by storing, disposing, producing, using, transporting or manufacturing any Hazardous Materials in, on or about the Premises or the Center, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all damages, claims, injuries, cost and liability arising therefrom or related thereto, including all costs of clean-up, attorneys' fees and court costs. The clean-up and disposal of such Hazardous Materials, including required air monitoring and documentation, shall be performed by Tenant at Tenant's sole cost and expense and shall be performed in accordance with all applicable laws, rules, regulations and ordinances. Landlord may require Tenant to clean up the Hazardous Materials beyond the extent required by law. The extent of the clean-up shall be determined by Landlord. Landlord shall have the right, but not the obligation, to review, monitor and supervise any such clean-up and disposal by Tenant. Within forty-five (45) days following the clean-up of any Hazardous Materials, Tenant shall furnish to Landlord Hazardous Materials manifests and records which document proper transport and disposal of such material. The foregoing notwithstanding, Landlord, in Landlord's sole and absolute discretion, may elect by written notice to Tenant to perform the clean-up and disposal of such Hazardous Materials from the Premises and/or

the Center. In such event, Tenant shall pay to Landlord the actual cost of same upon receipt from Landlord of Landlord's written invoice therefor. The terms of the indemnification set forth in this Section 34.20 shall survive the expiration or the earlier termination of this Lease. Tenant shall be permitted to use limited quantities of standard office and janitorial supplies and jewelry cleaning and repair substances containing chemicals categorized as Hazardous Material provided that all such supplies and substances are used and stored on the Premises in small amounts necessary only for cleaning or repair and used, stored and disposed of in accordance with all applicable rules, regulations, ordinances and laws.

(b)     Tenant shall notify Landlord and provide to Landlord a copy or copies of the following environmental entitlements or inquiries related to the Premises if in Tenant's possession or control: Notices of violation, notices to comply, citations, inquiries and reports filed pursuant to self-reporting requirements. Underground tanks shall be prohibited without the prior written approval of Landlord, which approval Landlord may withhold in its sole and absolute discretion. In the event of a release of any Hazardous Materials or waste into the environment, Tenant shall furnish to Landlord a copy of any and all other environmental entitlements or inquiries relating to the Premises including, but not limited to, all permit applications, permits, monitoring reports, warnings and other reports and other related documents even if characterized as confidential. Tenant shall provide its employees, agents, subcontractors, as well as any governmental entities, the public and any other person or entity as required by law, with any and all notices, warnings, disclosures or other information concerning Hazardous Materials related to the Premises or Center, required by any law, rule, regulation or ordinance applicable to Tenant or the Premises. Tenant shall submit all such notices to Landlord prior to distribution or submission by Tenant of such notice and shall obtain Landlord's prior written approval thereof. Landlord shall have the right, but not the obligation, to review such notices and to prescribe their form and content prior to distribution or submission to any other person or entity.

(c)     Notwithstanding any other term or provision of the Lease, Tenant shall permit Landlord, it's agents and employees to enter the Premises at any time (subject to prior reasonable notice and the right of Tenant to accompany Landlord during such entry, excepting entries for emergencies or if Landlord has a good faith reasonable belief of a violation of the Tenant's obligations regarding Hazardous Materials), to inspect, audit, monitor and/or take emergency or long-term remedial action with respect to Hazardous Materials on or affecting the Premises or to discharge Tenant's obligations hereunder with respect to such Hazardous Materials when Tenant has failed to do so, all at Tenant's cost and expense. All costs and expenses incurred by Landlord in connection with performing Tenant's obligations hereunder shall be reimbursed by Tenant to Landlord within fifteen (15) days of Tenant's receipt of written request therefor.

(d)     All of Landlord's rights and remedies set forth in this Section 34.20 shall apply equally to ACM (as defined in Section 11.1 of the Lease). Landlord reserves the right to enter the Premises at any time and from time to time (subject to prior reasonable notice and the right of Tenant to accompany Landlord during such entry) for the purposes of and to monitor, inspect, remove, encapsulate, abate, enclose and/or remediate any ACM. Tenant shall comply with any and all federal, state, and local laws, rules, regulations, and ordinances regarding ACM located in, on or about the Premises. Tenant acknowledges that incorporation of any ACM into the Premises, or any portion of Tenant's Work, is strictly prohibited. Tenant agrees, represents and warrants that it shall not incorporate or permit or suffer to be incorporated, knowingly or unknowingly, any ACM into the Premises or Tenant's Work. If the presence of ACM is a result of Tenant's occupancy of the Premises, such compliance shall be at Tenant's sole cost and expense. Landlord may condition any remodeling or alteration of the Premises upon the removal or abatement of ACM, at Tenant's cost and expense. In such event, Landlord may elect to perform the work itself and Tenant shall pay Landlord for the cost and expense thereof. Tenant shall fully cooperate with Landlord to ensure compliance with all laws, rules, regulations and ordinances related to ACM.

(e)     As used herein, the term "Hazardous Materials" shall include any hazardous, toxic or radioactive material, substance or waste regulated by any law, rule and regulation of any local governmental authority, the State of California or the United States Government, now or in the future and as amended, including without limitation: (i) those materials identified in Sections 66680 through 66685 of Title 22 of the California Administrative Code, Division 4, Chapter 30 ("Title 22"), Sections 25115, 25117, 25122.7, 25281, 25316 and 25501 of the California Health and Safety Code, Section 311 of the Federal Water Pollution Control Act, Resource Conservation and Recovery Act as amended (42 U.S.C. Section 6901 et seq.), Comprehensive Environmental Response Compensation and Liability Act as amended (42 U.S.C. Section 9601 et seq.), Toxic Substances Control Act as amended (15 U.S.C. Section 2601 et seq.) and including such hazardous or toxic substances or wastes as are identified, defined or listed elsewhere and are incorporated into such acts or sections by reference as well as all products containing Hazardous Materials; (ii) petroleum; (iii) asbestos; (iv) formaldehyde; (v) polychlorinated biphenyls (PCBs) and (vi) freon and other chlorofluorocarbons.

(f)     In the event that at any time during the Lease Term, Landlord's Work in the Premises is in violation of any rule, regulation, law, or ordinance applicable to the Premises related to Hazardous Materials, Landlord shall, at its cost, place such work into lawful compliance, unless such noncompliance results from changes to the Premises by Tenant.

**34.21    Quiet Enjoyment.** Upon Tenant's payment of Minimum Annual Rent, Percentage Rent and additional rent and its observation and performance of all of the covenants, terms and conditions of this Lease to be observed and performed by Tenant, Tenant shall peaceably and quietly hold and enjoy the Premises from and after delivery thereof to Tenant; subject, however, to (a) the rights of the parties as set forth in this Lease; (b) any mortgage or deed of trust to which this Lease is subordinate; (c) any ground or underlying leases, agreements and encumbrances to which this Lease is subordinate; (d) all matters of record; and (e) disturbances, odors and similar inconveniences which are commonly associated with shopping centers of the type and size of the Center and/or with tenants located in such shopping centers.

**34.22    Modification Fees.**  In the event Tenant requests any modification or amendment to this Lease, including any request for termination, after this Lease has been executed by Landlord and Tenant, then Tenant shall reimburse Landlord for Landlord's reasonable attorneys' fees for the review, preparation, negotiation or drafting of each such modification and for Landlord's administrative costs incurred by the processing of each such request for modification in an amount determined by Landlord.  The foregoing attorneys' fees and administrative costs shall be due and payable upon Landlord's written demand therefor and as a condition precedent to document finalization.

**34.23    Charge for Failure to Comply.**  The charges described in this Section 34.23 shall be in addition to any other rights or remedies available to Landlord at law, in equity or under this Lease.

(a)    Delayed Opening Rent.  [Intentionally Omitted]

(b)    Books and Records.  If Tenant fails to furnish to Landlord any statements, books or records required to be kept by Tenant for Landlord under Section 5.5 upon Landlord's written request therefor, such failure shall constitute a material breach and default under the Lease, and Tenant shall pay to Landlord an amount equal to twenty percent (20%) of the greater of (i) Percentage Rent reported for the period or periods in question; or (ii) the Minimum Annual Rent payable for such period or periods.  The foregoing charge shall be imposed after Tenant's failure to comply with Landlord's second written request therefor.

(c)    Signs.  If Tenant violates any provision of Section 13.1 hereof, then Tenant shall pay a fine of Two Hundred Fifty and 00/100 Dollars ($250.00) per day to Landlord for each day that such violation continues.

(d)    Tenant to Remain Open.  Subject to Article 18 and Section 34.6, Tenant shall pay to Landlord a Two Hundred Fifty and 00/100 Dollars ($250.00) per day penalty for each day that Tenant fails to continuously remain open for business during the hours Tenant is required to remain open pursuant to Section 16.2 hereof.

(e)    Radius.  *Intentionally Omitted.*

(f)    Recycling.  If Tenant fails to fully and promptly comply with the provisions of Section 16.6 hereof after five (5) days' written notice from Landlord of such noncompliance, then Tenant shall pay to Landlord a fine of Fifty and 00/100 Dollars ($50.00) for each violation in addition to any penalty which may be imposed by law.

(g)    Rubbish.  If Tenant fails to strictly comply with the requirements of Section 17.1 (b) concerning the disposal of rubbish generated by Tenant, then Tenant shall pay to Landlord One Hundred and 00/100 Dollars ($100.00) per day for each day or partial day that each violation continues; provided, however, Landlord agrees to give Tenant written notice of the first violation of this provision, and Tenant shall have twenty-four (24) hours thereafter within which to cause the violation to be discontinued.  If not discontinued within the twenty-four (24) hour period, then the One Hundred and 00/100 Dollars ($100.00) per day fine shall commence.  After notice of such violation, no prior notice of any subsequent violation shall be required.  All amounts due under this subparagraph shall be payable by Tenant within fifteen (15) days after demand therefor.  After the third violation of this subparagraph, Landlord may declare such violations a material breach and incurable default under the Lease.

(h)    Employee Parking.  If Tenant or its employees fail to park their vehicles in designated parking areas as set forth in Section 19.7, Landlord may charge Tenant Twenty-Five and 00/100 Dollars ($25.00) per day for each day or partial day per vehicle parked in any areas other than those designated; provided, however, Landlord agrees to give Tenant written notice of the first violation of this provision and Tenant shall have two (2) days thereafter within which to cause the violation to be discontinued; if not discontinued with the two (2) day period, then the Twenty-Five and 00/100 Dollars ($25.00) per day fine shall commence.  After notice of such violation, no prior notice of any subsequent violation shall be required.  All amounts due under the provisions of this subsection 34.23(h) shall be payable by Tenant within fifteen (15) days after demand therefor.

**34.24    Partial Payment.**  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent and additional rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease, at law or in equity.

**34.25    Confidentiality.**  Tenant shall keep the terms and conditions of this Lease confidential throughout the Lease Term, except to the extent necessary:  (a) to carry out the purpose of the Lease; (b) in connection with any administrative or judicial proceeding including, without limitation, arbitration in which Tenant is involved and required to divulge such information; (c) if required in good faith for financing or accounting reasons; or (d) if required in connection with Tenant's reporting requirements under securities laws.

## ARTICLE 35
## NONDISCRIMINATION

**35.1**    The Tenant herein covenants by and for itself, its heirs, executors, administrators and assigns, and all persons claiming under or through it, that this Lease is made and accepted upon and subject to the following conditions:  That there shall be no discrimination against or segregation of any person or group of

persons on account of sex, marital status, race, age, handicap, color, religion, creed, national origin or ancestry, in the leasing, subleasing, transferring, use, or enjoyment of the land herein leased, nor shall the Tenant itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy, of tenants, lessees, sublessees, subtenants or vendees in the Premises.

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed and delivered this Lease as of the day and year first above written.

"LANDLORD"                                          "TENANT"

DONAHUE SCHRIBER REALTY GROUP, L.P.,        SAMUELS JEWELERS, INC.,
a Delaware limited partnership                      a Delaware corporation

By: DONAHUE SCHRIBER REALTY GROUP,
    INC., a Maryland corporation, as General       BY: _____
    Partner
                                                    ITS: PRESIDENT & CEO

By: _____

Name:   Thomas L. Schriber                          BY: _____
            President

Title: _____                    ITS: ASSISTANT SECRETARY


IF TENANT SHALL BE A CORPORATION, THE AUTHORIZED OFFICERS MUST SIGN ON BEHALF OF THE CORPORATION.  THE LEASE MUST BE EXECUTED BY THE PRESIDENT OR VICE-PRESIDENT AND THE SECRETARY OR ASSISTANT SECRETARY, UNLESS THE BY-LAWS OR A RESOLUTION OF THE BOARD OF DIRECTORS SHALL OTHERWISE PROVIDE, IN WHICH EVENT, THE BY-LAWS OR A CERTIFIED COPY OF THE RESOLUTION, AS THE CASE MAY BE, MUST BE FURNISHED. ALSO, THE APPROPRIATE CORPORATE SEAL MUST BE AFFIXED.



The purpose of this Exhibit is to show the approximate layout of the department stores, parking structures and related facilities and buildings in the Center.  Nothing contained in this Exhibit shall be deemed to be a warranty, representation or agreement on the part of the Landlord that the Center will be or remain as depicted hereon, or that the tenants depicted hereon (if any) are now in occupancy or will be in occupancy at any time during the Lease Term.  Landlord reserves the right to make changes in and to the Cwenter as set forth in the Lease.

| TITLE<br>SITE PLAN | HEMET VALLEY MALL<br>HEMET, CALIFORNIA | EXHIBIT "A" | SHEET NO.<br>1 |



THE PURPOSE OF THIS EXHIBIT IS ONLY TO SHOW THE APPROXIMATE LOCATION OF THE PREMISES AND IS NOT DEEMED TO BE A WARRANTY, REPRESENTATION OR AGREEMENT ON THE PART OF LANDLORD THAT THE CENTER WILL BE OR REMAIN AS DEPICTED HEREON OR THAT THE TENANTS DEPICTED HEREON (IF ANY) ARE NOW IN OCCUPANCY OR WILL BE IN OCCUPANCY AT ANY TIME DURING THE LEASE TERM.  THE LANDLORD RESERVES THE RIGHT TO MAKE CHANGES AS SET FORTH IN SECTION 2.2 AND ELSEWHERE IN THE LEASE.

**DONAHUE SCHRIBER**
3501 JAMBOREE ROAD
SUITE 300, SOUTH TOWER
NEWPORT BEACH, CA 92660
(949) 854-2100
FAX (714) 854-4251

| TITLE | | | SHEET NO. |
|---|---|---|---|
| FLOOR PLAN | HEMET VALLEY MALL<br>HEMET, CALIFORNIA | EXHIBIT "B" | 1 |

**EXHIBIT "B"**
**HEMET VALLEY MALL**
**DESCRIPTION OF PREMISES**
**FOR**

SAMUELS JEWELERS, INC., a Delaware corporation
(Tenant)

### DESCRIPTION OF PREMISES

Building B, Store 2, consisting of the approximate dimensions of 30.0' x 36.16' (irregular in shape), containing approximately one thousand eighty-four (1,084) square feet of floor area.

(All measurements of the Premises shall be made from the outside of exterior walls and from the center of the interior demising partitions, including those measurements to establish the length and width of the Premises. Deductions shall not be allowed for columns, sprinkler risers, roof drains, vents, piping, waste lines, conduit, ventilation shafts and related items serving the enclosed mall or other tenant spaces.)

### USE OF PREMISES

Tenant shall use the Premises only for the following purposes:

For the operation of a traditional fine jewelry store displaying and offering for sale at retail, only the following items and services: jewelry, precious gems and stones, rings and watches diamonds, rings (including class rings), mountings, pendants, earrings, bracelets, gold and gold-filled merchandise, and sterling silver; for the display and sale of watches provided the display area of watches does not exceed thirty percent (30%) of the sales display area in the Premises; for the incidental retail sale of china, stemware, plated ware and related gift items as found in a traditional fine jewelry store; and for the incidental operation of a jewelry and watch cleaning and repair department which shall be located in the rear of the Premises; and for no other purpose. The display of non-jewelry items in the Premises shall be on an incidental basis only.

### TRADE NAME

Tenant shall do business in the Premises only under the following Trade Name:

## SAMUELS JEWELERS

except that Tenant may, from time to time, change the trade name under which its business in the Premises is operated so long as: (i) the new trade name shall be used in the majority of Tenant's stores in California operated under the prior trade name; and, (ii) the new trade name will not conflict or be similar to the trade name of any other tenant in the Center.



EXHIBIT "C"
HEMET VALLEY MALL
PROVISIONS RELATING TO REMODELING
OF TENANT'S STORE

This Exhibit "C" sets forth the respective obligations and covenants of Landlord and Tenant to remodel for Tenant's use, the Premises demised to Tenant under the Lease to which this Exhibit is attached and incorporated by reference, and further sets forth the division of responsibility for the construction of improvements, the obligation for payment of design and construction costs and the procedures to be followed by Landlord and Tenant to accomplish the remodeling of the Premises.

Tenant acknowledges that the Premises were initially constructed by Landlord and a previous tenant or tenants. The term Landlord's Work, as defined herein, is merely illustrative of the work Landlord performed for a previous tenant. Landlord makes no representation that the Premises were constructed in accordance with the description of Landlord's Work. Landlord's Work originally performed in the Premises may have been modified by Landlord or a previous tenant. Tenant further acknowledges that it has inspected the Premises and accepts the same in their condition "as is" upon the Effective Date, and agrees that Landlord shall have no obligation to perform any further work upon the Premises. Tenant shall pay the entire cost and expense of completely remodeling the Premises and making it ready for Tenant's occupancy and use.

Notwithstanding the foregoing, Tenant shall not be required to remodel the Premises at the commencement of the Lease Term. Tenant shall refurbish the Premises as set forth in Sections 4.3 and 11.4 of the Lease. Exhibit "C" shall remain for purposes of the definition of Landlord's Work and Tenant's Work in the Premises and in the event of any reconstruction or later remodeling of the Premises.

1.    **FLOOR PLAN, TENANT PACKAGE.**   As soon after the execution of this Lease as is practical, Landlord will, at its cost and expense, provide Tenant with a schematic layout of the Premises showing thereon column spacing and overall dimensions, and/or existing tenant improvement drawings from the former tenant of the Premises whichever is available, such layout being hereinafter referred to as the "floor plan". Concurrently with its receipt of the floor plan, Tenant shall receive project details and specifications and design criteria, hereinafter referred to as the "tenant package", pertinent to "Tenant's Work" (hereinafter defined).

2.    **PRELIMINARY DRAWINGS.**   Within thirty (30) days after receipt of the tenant package, Tenant shall submit to Landlord three (3) sets of fully-dimensioned preliminary drawings and one (1) set of reproducibles prepared by Tenant's architect at Tenant's expense, which preliminary drawings shall indicate Tenant's intentions with respect to the design of the Premises. Said preliminary drawings shall contain a floor plan including fixture layout, an elevation of Tenant's storefront delineating all materials to be used, sections through the storefront, a perspective drawing of the storefront and a sample board containing all materials and colors to be used in the Premises.

3.    **DESIGN APPROVAL - PRELIMINARY DRAWINGS.**   Landlord and the Project Architect shall review Tenant's preliminary drawings to ensure that Tenant's proposed design will not conflict with the design of the enclosed mall or that of adjacent tenants and shall either approve said preliminary drawings or disapprove the same advising Tenant of the reasons for such disapproval within fifteen (15) days after receipt of said drawings. In the event Landlord disapproves said preliminary drawings, Tenant shall modify said drawings taking into account the reasons given by Landlord for said disapproval and shall resubmit the preliminary drawings to Landlord in the same number of sets within fifteen (15) days after receipt of Landlord's initial disapproval.

4.    **WORKING DRAWINGS, Exhibit "H".**   Within thirty (30) days after receipt of Landlord's approval of the preliminary drawings, Tenant shall submit to Landlord (a) six (6) sets of fully-dimensioned drawings and one (1) set of reproducibles, hereinafter referred to as "working drawings", prepared by Tenant's licensed architect and/or engineer, at Tenant's expense, which drawings shall indicate the specific requirements of Tenant's space, clearly outlining the storefront in detail, including sections and details, types of materials and colors (including separate drawings for signs in accordance with Exhibit "F" hereof), interior partitions and reflected ceiling plan; mechanical drawings and electrical drawings prepared by licensed, mechanical and electrical engineers setting forth all mechanical requirements of Tenant; and (b) a copy of Exhibit "H" completed by Tenant and Tenant's mechanical or electrical engineer, including heat and cooling requirements, all in conformity with the hereinafter set forth "Description of Landlord's Work" and "Description of Tenant's Work".

Tenant's drawings shall conform to the following minimum quality standards:

A.    **Floor Covering.**   Carpeting of commercial grade or hard surfaced floor covering such as glazed tile, slate, terrazzo or hardwood shall be used throughout the sales area, except that, at the entrance to the Premises to a depth of at least eight feet (8') into the Premises, hard surfaced floor coverings shall be required and carpeting will not be allowed in said eight foot (8') area. Resilient floor coverings will only be allowed in non-sales areas.

B.    **Drywall, Paint.**   Drywall shall be five-eighths inch (5/8") thick type "X" gypsum board with two-coat paint finish or other applied finish approved by Landlord.

C.    **Ceiling.**   Ceiling shall be either concealed spline acoustical tile, acoustical T-bar with 24" x 24" tile with three-eighths inch (3/8") revealed edge (tegular), drywall or plaster construction. Acoustical tile ceilings with standard 24" x 48" modules will not be permitted, except in non-sales areas.

**D.    Lighting.**  Lighting fixtures for general illumination will be recessed with no exposed lamps or tubes.

**E.    Storefront.**  The storefront shall harmonize with the general character of the Center. All storefront work including sliding door tracks and housing boxes for grilles, shall be supported at their head sections by welded structural steel framework which, in turn, is securely attached and braced to a structural member of the existing building structure.  All storefront material used within six feet (6') of the floor shall be durable material such as glass, anodized aluminum, glazed tile, stone, slate, terrazzo, marble or hardwood or similar materials approved by Landlord.  No door, in its open position, shall project beyond the furthest extension of Tenant's storefront.

**5.    APPROVALS OF WORKING DRAWINGS, Exhibit "H".**   All drawings required to be submitted by Tenant to Landlord are subject to the approval of Landlord and the Project Architect, and Exhibit "H" is subject to the approval of Landlord's Engineer.  In the event said drawings or Exhibit are not ultimately approved for any reason whatsoever, within ninety (90) days from the date of receipt by Tenant of the tenant package, this Lease shall, at the option of Landlord, be null and void and of no further force or effect.

Landlord, the Project Architect and Landlord's Engineer shall review, coordinate and approve Tenant's plans for conformance with provisions contained within this Exhibit "C" and Exhibit "H" and assist Tenant in coordinating with the applicable governing agencies.

Any subsequent changes, modifications or alterations requested by Tenant shall be subject to approval by Landlord and Landlord's Engineer, if required, and any additional charges, expenses or costs, including Landlord's fees, shall be at the sole cost and expense of Tenant, and Landlord shall have the right to demand payment for such changes, modifications or alterations prior to Landlord's performance of any work in the Premises.  No such changes, modifications or alterations in said approved drawings shall be made without the written consent of Landlord after written request therefor by Tenant.  In the event the Premises have not been constructed in accordance with said approved drawings, then Tenant shall not be permitted to open the Premises for business until the Premises comply, in the reasonably exercised judgement of Landlord, in all respects with said approved drawings; provided that Minimum Annual Rent and all other charges payable by Tenant hereunder shall commence to accrue and be payable as otherwise provided in this Lease.

**6.    LANDLORD'S WORK.**  As used herein, the term "Landlord's Work" shall refer to and include only the following items of work:

**A.    Structural Frame.**

(i)    Ground to underside of roof deck.  Columns, beams and joists of structural steel.  Unit masonry shear walls.

(ii)    Roof Deck.  Built-up composition roofing over lightweight insulating concrete over metal deck.

(iii)    Ceiling Height.  The maximum finished ceiling height in tenant spaces will be determined by physical constraints within the Premises.

(iv)    Exterior Walls.  Unit masonry and/or reinforced concrete.

**B.    Improvements within Structural**

(i)    Floor Construction.

Four inch (4") thick unreinforced slab on grade without depressed or raised areas, hand troweled surface sloped as required by the finished floor elevation of the enclosed mall.  Tenant should pay close attention to the "blocked out" areas indicated on the tenant package which are provided so that Tenant may complete toilet installation, including concrete "fill-in" of "blocked out" areas, according to local code requirements and criteria contained herein.  Tenant shall not locate toilet facilities in areas other than as designated without the approval of Landlord's Engineer.  In the event Landlord's Engineer approves the proposed new location of Tenant's toilet facilities, Tenant shall, at its expense, remove existing concrete and replace the same, and fill any used "blocked out" areas.

(ii)    Perimeter Work (except on enclosed mall).  Work separating the Premises from other tenant spaces will be of exposed laterally braced metal stud construction to an elevation of eleven feet three inches (11'3") above finished floor, and work separating the Premises from service areas will be of exposed metal stud construction with finished drywall on the service area side only to a height required by code.  Although perimeter partitions when constructed may be on the column center line, the column (being thicker than the finished partition) may project beyond the finished partition.  No deductions from the floor area of the Premises will be allowed for columns, fire sprinkler risers, roof drains, structural braces, masonry shear walls, air conditioning equipment exclusively serving Tenant and located within Tenant's Premises, or enclosures for piping and/or duct work serving the enclosed mall or other tenant spaces.

(iii)    Service Door.  If the Premises abut a service area or exterior, a single hollow metal service door with locking device at the rear of the Premises.

(iv)     Plumbing.

(a) Water Service.  Water line stubbed and capped into the Premises at a location determined by Landlord, except that, in the case of tenants such as restaurants, beauty shops, barber shops and tenants having in excess of three thousand (3,000) square feet of floor area, Landlord, at its option, may provide water service piping only from the Premises to a metering location selected by Landlord.

(b) Sanitary Sewer.  Sanitary sewer piping at the rear of the Premises located below finish floor for connection thereto.

(v)     Fire Sprinklers.  Complete fire sprinkler system was engineered and installed by Landlord per local codes and ordinances and will consist of standard upright type sprinkler heads with metal finish. Any modifications to the system shall be performed by Landlord's designated sprinkler contractor at Tenant's expense.  All tenants will be responsible for installing the required conceal mounted sprinkler heads in the first eight feet (8') of the store interior (storefront design zone).

(vi)     Electrical Service.  120/208 volt, 3-phase, 4-wire service will be provided in an electrical room, the location of which shall be determined by Landlord.  Tenant's main electrical service switch and empty electrical service conduit sized for aluminum wiring, from electrical room and stubbed into the Premises will be furnished and installed by Landlord, and the cost thereof will be reimbursed by Tenant to Landlord as an item of additional rent, promptly upon receipt of notice.

(vii)     Telephone.  Telephone terminal board in a location determined by Landlord, except that Landlord will provide empty telephone conduit from the terminal board to the Premises if Tenant does not abut a service corridor in which a terminal board is located.

(viii)     Air Conditioning.  Landlord shall have no obligation to supply air conditioning to the Premises.  Tenant shall inspect all air conditioning equipment serving the Premises and shall be responsible for its operation, repair and replacement throughout the Lease Term, unless Landlord elects to do so under Section 17.7 of the Lease.

(ix)     Service Facilities.

(a)  Common service corridors and exits as required by code and located as determined by Landlord.

(b)  Common delivery and trash storage areas as determined by Landlord.

(x)     Neutral Strips.  Where desirable in Landlord's opinion, a vertical neutral strip(s) will be located at the storefront line.

(xi)     Gas.  If required by Tenant as a result of the nature of Tenant's business, natural gas will be provided.  The gas main line will be brought to central distribution points and Landlord, at Tenant's expense, shall provide for gas piping to the Premises. Tenant, at its expense, shall arrange for a gas meter with the local utility company.

**7.     TENANT'S WORK.**  As used herein, the term "Tenant's Work" shall refer to and include any and all items of work necessary or appropriate to completely remodel the Premises for Tenant's occupancy, excepting only Landlord's Work; and such term shall include, by way of illustration and not limitation:

A.     Improvements.

(i)     Floor Construction.  See Paragraph 6(B)(i) above.

(ii)     Floor Finishes.  All required and permitted floor coverings and floor finishes and preparation of surfaces to receive the same, including tile, slate, terrazzo, marble, resilient floor coverings and base, carpeting and floor hardeners and dust proofing agents; provided that hard-surfaced flooring material must be of the type that may be applied by thin-set adhesive methods and will not require depressions.

(iii)     Perimeter Work.  Drywall or plaster finishes at the perimeter of the Premises to the underside of ceiling enclosure or as required by code, except that where the Premises abut a service corridor, drywall or plaster finishes must be installed to the underside of the deck or roof above.

(iv)     Plumbing.  All plumbing, including venting, fixtures and toilet accessories, meters [if required pursuant to Paragraph 6 (B)(iv) above], hot water heaters, including pans, water treatment systems and drinking fountains connected to that provided by Landlord under said Paragraph 6 (B)(iv), and approved receptors for air conditioning equipment condensate drains and/or water heater overflow as required.

(v)     Fire Sprinklers and Fire Protection.  The cost of all fire sprinkler and fire protection work and engineering as a result of any modification to the fire sprinkler system under Paragraph 6(B)(v) of this Exhibit "C".  Tenant's contractor shall perform any such modification or addition to said fire sprinkler system, unless Landlord designates a specific fire sprinkler contractor to perform such modifications for Tenant.  In either event Tenant shall pay for the cost of all such modifications.

(vi)     Electrical Work.  Any and all power and lighting distribution systems within the Premises including, but not limited to, kwh/peak demand meter, current limiting fuses in service switch, check meters, conductors to panel boards, panel boards, transformers, conduit, wiring, convenience outlets, time clocks, smoke alarms as required by the City of Hemet, sign circuiting and air conditioning equipment line and low voltage wire and conduit.  The Tenant shall provide electrical service to all air conditioning equipment and units related to the Premises from the Tenant's service including, but not limited to, heating, cooling, compressor, condenser, fan and toilet exhaust.  In the event the Landlord elects to utilize equipment which will serve multiple tenant premises, then only such equipment shall not be required to be on the Tenant's service, however, all remaining nonmultiple tenant premises' related equipment shall be served from the Tenant's service.  All special requirements such as intercoms, music, burglar alarm, surveillance, emergency battery powered egress lighting, fire warning system, doorbell or other signaling devices shall be installed by Tenant.  The Tenant shall coordinate installation of the Tenant's meter and all work at the Landlord's switchboard with the Landlord.  The Landlord's service capacity is 15 watts per square foot of gross leasable area.  The Landlord will not be responsible for the upgrade of any service above this allowance.

(vii)     Telephone.  Conduit, cable, cabinets and outlets within the Premises as required by the utility company supplying telephone service, including service from the terminal board under Paragraph 6(B)(vii) of this Exhibit "C".  The Tenant shall furnish and install all telephone equipment and locate same within the Premises.

(viii)     Air Conditioning Equipment.  Tenant's remodeling shall include the purchase by Tenant of a new heating,  ventilation and air conditioning unit to be installed by Landlord at Tenant's expense if the existing unit is not in good working order.  During the Lease Term, Tenant shall purchase a new heating, ventilation and air conditioning unit to be installed by Landlord at Tenant's expense if the existing unit is not or cannot be placed in good working order.  Tenant shall provide air conditioning equipment for the Premises capable of automatically maintaining seventy-five (75) degrees Fahrenheit dry bulb with outside conditions of ninety-three (93) degrees Fahrenheit dry bulb and sixty-eight (68) degrees Fahrenheit wet bulb.  Such equipment shall be able to handle a maximum of 3.85 watts per square foot of the floor area of the Premises.  Supply and return ducts may already have been extended to within the Premises.  All air conditioning equipment work from the distribution points within the Premises including, but not limited to: connection to supply and return ducts, extension of condensate drains to sanitary sewer as required by code, ductwork, grilles, registers and any controls (including T stat) or circuitry required for the satisfactory operation of said system (all of which shall be as specified in the tenant package).  Tenant to provide all exhaust systems, including fans, roof curbs, flashing, including system installation of duct and grille.  Any measurement system(s) reasonably required by Landlord at any time during the Lease Term for measuring Tenant's consumption of conditioned air, which system(s) shall be installed by Landlord at Landlord's option and paid for by Tenant.  In addition, Tenant shall furnish to Landlord prior to opening the Premises for business, a Certified Air Balance Report prepared by an independent contractor licensed and authorized by the State of California to prepare said report.

(ix)     Fire and Life Safety.  Tenant to provide all duct mounted smoke detectors if required now or in the future by code.  Detectors to be connected to the Center's fire life safety system, if any.  Tenant, at its cost, shall comply with all existing and future fire department rules and regulations as well as all other existing and future governmental rules, regulations, laws or ordinances with respect to fire or life safety.  Tenant, at its cost, shall take all reasonable steps to coordinate and hook into any future fire alarm or safety system which Landlord, the City or fire department requires for the Center, the Premises or any portion thereof.  Tenant is responsible for all design and testing to satisfy governing authorities.  Tenant to comply with city code and requirements in place at time of construction at Tenant's expense related to smoke exhaust and removal.

(x)     Partitions and Furring.  All interior partitions and furring (including toilet room partitions) and all curtain walls including, but not limited to, duct shaft walls.  All framing shall be metal studs.  Wood framing is not permitted.

(xi)     Ceilings.  All ceilings and suspension systems for same provided the maximum finished ceiling elevation shall be determined by physical constraints within the Premises.

(xii)     Storefront.  Storefront or enclosure, in each case compatible with the architectural design of the enclosed mall and approved by Landlord.

(a)     A maximum opening of eight feet (8') or thirty percent (30%) of the storefront width, whichever is greater, may be employed as an entry element.  The remaining area must be full-height storefront construction.

(b)     Storefront construction shall be a minimum of seventy percent (70%) transparent.

(c)     All tenants, without exception, shall provide a finished soffit.  [Dry wall, wood, metal etc., extending eight feet (8') minimum inside lease lines.]  Acoustical ceiling tile will not be permitted in this area.

(d)     The first eight feet (8') of the soffited area at the front of the store shall employ incandescent fixtures exclusively.  Fixtures shall be positioned so as not to direct glare into the mall.  Floor mounted fixtures are prohibited unless specifically approved by Landlord in writing.  Fixtures shall maintain a minimum fifty (50) footcandles light output.

(e) No fluorescent fixtures of any kind will be allowed in the projected storefront area.

(f) Sales counters and/or fixturizing may not be located closer than 6'0" from the storefront lease line. Cash registers shall not be visible from the enclosed mall and shall, in all cases, be recessed into counter tops.

(g) All security sensor equipment is to be submitted for approval by Landlord upon submittal of working drawings. All security devices must be physically integrated into storefront construction. Free-standing pedestals containing sensor equipment will not be allowed.

(h) No slatwall or other modular display system will be allowed in the first eight feet (8') of the store entrance.

(xiii) Joining with enclosed mall. In accordance with the project specifications and details, closures required to join to the existing enclosed mall surfaces.

(xiv) Show Windows. All show windows including, but not limited to, platforms, backs, sides, ceilings, bulkheads, ventilating and all finishes.

(xv) Painting, etc. All painting and special wall coverings including, but not limited to, paneling, trim and wallpaper.

(xvi) Mechanical Equipment. All mechanical equipment including, but not limited to, dumbwaiters, pneumatic systems, and conveyors, and their shafts and doors, and all electrical, mechanical and structural work required for the installation and operation of such equipment, including steam generators, exhaust hoods and intake and exhaust systems, including shafts. Grease interceptors will be required for all food preparation areas having pot sinks or any grease-producing appliances discharging into the waste system. Tenant shall be responsible for the proper care, cleaning and maintenance of the grease interceptors and any piping required therefor.

(xvii) Fixtures, etc. Furnishing and installation of all furniture, furnishings, equipment, shelving, trade fixtures, interior decorations, graphics, exterior and interior signs (as approved and permitted by Landlord), mirrors, cornices and coves, and decorative light fixtures and other special effects.

(xviii) Connections. Electrical and mechanical hookup and connection of all fixtures and equipment, including kitchen and food service equipment and any and all equipment utilized by Tenant.

(xix) Doors, Hardware. All doors and hardware including existing control devices required by governing authorities excepting only existing service door and locking device thereon described under paragraph 6(B)(iii) of this Exhibit "C".

(xx) Roof Openings. Roof openings, shafts through roof and penetrations (all located as directed by Landlord), including necessary curbs, flashings and patching. All of said work shall be performed by Landlord's contractor at Tenant's expense. Tenant's contractor shall provide equipment layout for all such openings. Roof plans depicting proposed roof opening locations shall be submitted to Landlord for approval together with Tenant's working drawings. Such roof plans shall include size, weight and noise data.

(xxi) Alterations. Alterations and additions to Landlord's structure which may be permitted by Landlord to accommodate Tenant's desired design will be performed by Landlord at Tenant's expense.

(xxii) Freight Charges, etc. All costs of receiving, warehousing, handling, re-shipping and transshipping and all freight charges relative to any item of Tenant's Work shall be paid by Tenant.

(xxiii) Course of Construction - Temporary Services. During the period of construction of Tenant's Work, Landlord shall provide for use by Tenant temporary services, including electrical service, water, sanitary toilet facilities and trash containers. Tenant shall reimburse to Landlord an amount estimated by Landlord to be Tenant's share of such temporary services. In addition, Tenant shall also pay for all of Tenant's plan check fees, building permit fees, plan reproduction charges, charges for supervision and coordination and all insurance and taxes.

(xxiv) Clean-up and Trash Disposal. Tenant shall be responsible for and pay the cost of periodic clean-up and removal to the containers provided by Landlord of all construction waste, as well as all waste material attributable to Tenant's occupancy of the Premises. Tenant shall cause Tenant's contractor to deliver cash or a cashier's check in the amount of One Thousand and 00/100 Dollars ($1,000.00) ("Construction Deposit") to Landlord prior to the commencement of Tenant's Work to ensure periodic clean-up of construction debris and other waste in the Premises and in the Center resulting from Tenant's Work. Upon satisfactory completion of Tenant's Work pursuant to Paragraph 20 of this Exhibit "C", the remaining balance of the Construction Deposit, if any, will be returned to Tenant's Contractor.

(xxv) Construction Barricades. Landlord shall erect a temporary barricade with a height of twelve feet (12') enclosing the storefront of a prefinished plywood paneling or such other material as Landlord may determine, and the cost thereof, together with the cost of painting graphics and signage

**Exhibit "C" - Page 5**

therefor, shall be reimbursed to Landlord as an item of additional rent hereunder. Upon completion of Tenant's Work as determined by Landlord, Landlord shall remove the barricade from the Center, at Tenant's cost and expense, and repair any damage caused by said removal.

**8.     LANDLORD'S APPROVAL OF WORKING DRAWINGS.**   Tenant's aforesaid working drawings are subject to the approval of Landlord and, if disapproved by Landlord, shall be changed by Tenant within fifteen (15) days, at its expense and so as to receive Landlord's approval, and resubmitted to Landlord in the same number of sets.  In any event, if Tenant's working drawings are not ultimately approved by Landlord within ninety (90) days of receipt of the tenant package, this Lease shall, at the option of Landlord, be null and void and of no further force or effect and both Landlord and Tenant shall be relieved of any and all liability hereunder.

**9.     MODIFICATIONS OF WORKING DRAWINGS.**   No changes, modifications or alterations in the approved working drawings may be made without the written consent of Landlord, after written request therefor by Tenant.

**10.     CONSTRUCTION OF TENANT'S WORK.**   Tenant shall, at its cost and expense, construct Tenant's Work in strict accordance with the approved Tenant drawings and requirements of this Exhibit "C", such construction to commence within ten (10) days after Landlord notifies Tenant that the Premises are ready for Tenant to commence Tenant's Work, and shall complete Tenant's Work within the number of days specified in this Lease.

**11.     COMPLIANCE OF TENANT'S WORK TO APPROPRIATE STANDARDS.**   Tenant shall ensure that Tenant's Work fully complies in all respects with the following:

A.     The Building Code of the City of Hemet and/or State, County, City or other laws, codes, ordinances and regulations, as each may apply according to the rulings of the controlling public official, agent or other person.

B.     Applicable standards of the National Board of Fire Underwriters, the National Fire Protection Association ("NFPA") and National Electrical Code.

C.     Building material manufacturers' specifications.

D.     Landlord's design criteria for the Premises.

E.     Americans with Disabilities Act.

**12.     LICENSED ARCHITECT.**   Working drawings shall be prepared and stamped by a licensed architect and/or engineer and shall include drawings, specifications and bid forms of such scope as to completely delineate the construction work to be performed, including the mechanical and electrical information contained in Exhibit "H".

**13.     WARRANTIES AND GUARANTEES.**   Each contractor and subcontractor participating in Tenant's Work shall guarantee that the portion thereof for which he is responsible shall be free from any defects in workmanship and materials for a period of not less than one (1) year from the date of completion thereof. Every such contractor or subcontractor shall be responsible for the replacement or repair, without additional charge, of all work done or furnished in accordance with its contract which shall become defective within one (1) year after substantial completion of Tenant's Work. The correction of such work shall include, without additional charge, all additional expenses and damages in connection with such removal or replacement of all or any part of Tenant's Work, and/or the building and/or common areas of work which may be damaged or disturbed thereby. All such warranties or guarantees as to materials or workmanship of or with respect to Tenant's Work shall be contained in the contract or subcontract which shall be so written that such guarantees or warranties shall inure to the benefit of both Landlord and Tenant, as their respective interests may appear, and can be directly enforced by either.  Tenant covenants to give to Landlord any assignment or other assurances necessary to effect such right of direct enforcement.

**14.     HIRING OF ARCHITECTS, ENGINEERS AND CONTRACTORS.**   Tenant shall hire only duly-licensed architects, engineers and contractors who will work in harmony with each other and those of Landlord so as to ensure proper maintenance of good labor relationships.  All work performed in any matter relating to Tenant's Work shall be in compliance with the master labor agreements existing between trade unions and the Southern California Chapter of the Associated General Contractors of America.

**15.     COORDINATION OF TENANT'S WORK.**   Tenant's Work shall be coordinated under Landlord's direction with the work being done or to be performed by Landlord for or by other tenants in the Center and the Other Stores, so that Tenant's Work will not interfere with or delay the completion of any other construction work in the Center.

**16.     QUALITY OF TENANT'S WORK.**   Tenant's Work shall be performed in a thoroughly first-class and workmanlike manner in conformity with the approved working drawings, and shall be in good and usable condition at the date of completion.

A.     Tenant shall be required to obtain and pay for all necessary permits and/or fees with respect to Tenant's Work.

B.      Each contractor and subcontractor shall be required to obtain approval from Landlord for any space outside of the Premises within the Center, which such contractor or subcontractor desires to use for storage, handling, and moving of its materials and equipment, as well as for the location of any field office and/or facilities for its personnel.

C.      The contractors and subcontractors shall be required to remove from the Premises and dispose of, at least once a week or more frequently as Landlord may direct, all debris and rubbish caused by or resulting from the construction and, upon completion of Tenant's Work, remove all temporary structures, surplus materials, debris and rubbish of whatever kind remaining in the building or within the Center which has been brought in or created by the contractors and subcontractors in the construction of Tenant's Work. If any contractor or subcontractor shall neglect, refuse or fail to remove any such debris, rubbish, surplus material or temporary structures within two (2) days after notice to Tenant from Landlord with respect thereto, Landlord may cause the same to be removed by contract or otherwise as Landlord may determine expedient, and charge the cost thereof to Tenant.

D.      Tenant's drywall subcontractor shall not dispose of any excess drywall joint compound at the Premises.

17.     **UTILITIES.**    Tenant shall obtain and convey to Landlord all approvals with respect to electrical, water, gas and telephone work as may be required by the respective utility company supplying the service. Tenant shall obtain utility service, including meter, from the utility company supplying service, unless Landlord elects to supply service and/or meters.

18.     **INSURANCE.**    All contractors and subcontractors shall carry Worker's Compensation Insurance covering all of their respective employees as more particularly specified below; and shall also carry public liability insurance, including property damage, with limits and in the same form and with the same companies as required to be carried by Tenant under the Lease except as stated otherwise below; and the policies therefor shall insure Landlord and Tenant, as their interests may appear, as well as the contractor or subcontractor. Such policies shall make Landlord, Landlord's managing agent and Landlord's representatives additional insureds and, if requested by Landlord, Landlord's mortgagees or beneficiaries, shall be for the mutual and joint benefit and protection of Landlord, Landlord's managing agent, Tenant and Landlord's mortgagees or beneficiaries. Tenant shall cause to be carried insurance against damage by fire to the construction and improvements to be made by Tenant. Such insurance shall be in amounts and with such extended coverage endorsements as may be required and approved by Landlord. Any deductible amount under any insurance policy required hereunder shall be subject to Landlord's prior written approval. Certificates for all insurance required to be carried herein shall be delivered to Landlord before the construction is started or contractor's equipment is moved onto the site. All policies of insurance must contain a provision that the company writing said policy will give to Landlord thirty (30) days' notice in writing in advance of any cancellation or lapse or the effective date of any reduction in the amounts of insurance. In the event that, during the course of Tenant's Work, any damage shall occur to the construction and improvements being made by Tenant, Tenant shall repair the same at Tenant's cost. Tenant's general contractor's and subcontractor's required minimum coverages and limits of liability are as follows:

A.      **Worker's Compensation.**   Worker's Compensation insurance in accordance with California law and employer's liability insurance with limits of not less than One Million and 00/100 Dollars ($1,000,000.00) per employee and One Million and 00/100 Dollars ($1,000,000.00) per occurrence.

B.      **Commercial General Liability Insurance.**   Commercial General Liability Insurance (including contractor's protective liability) in an amount not less than One Million and 00/100 Dollars ($1,000,000.00) combined single limit (CSL) of liability. Such insurance shall provide for explosion, collapse, underground hazards (X.C.U.) coverage, products and completed operations coverage and broad form contractual liability coverage and shall insure the general contractor and/or subcontractors against any and all claims for personal injury, including death resulting therefrom, and damage to the property of others and arising from its operations under the contract and whether such operations are performed by the general contractor, subcontractor or any of their subcontractors, or by anyone directly or indirectly employed by any of them. Fire damage insurance shall be maintained in the amount of Fifty Thousand and 00/100 Dollars ($50,000.00) or an appropriate amount deemed reasonable by the Landlord.

C.      **Commercial Automobile Liability Insurance.**   Commercial Automobile Liability Insurance including the ownership, maintenance and operation of any automotive equipment owned, hired and non-owned in the following minimum amounts:  Bodily injury and Property Damage, each occurrence, Combined Single Limit of Two Million and 00/100 Dollars ($2,000,000.00).

19.     **PERFORMANCE.**    Landlord shall have the right to require Tenant to furnish a bond or other security in form satisfactory to Landlord for the prompt and faithful performance by Tenant of Tenant's Work.

20.     **LANDLORD'S ACCEPTANCE.**    Landlord's acceptance of Tenant's Work as being complete in accordance with the approved working drawings shall be subject to Landlord's inspection and written approval. Tenant shall give Landlord prior written notice of the anticipated completion date of Tenant's Work.

21.     **NOTICE OF COMPLETION.**    Within five (5) days after the completion of construction of Tenant's Work, Tenant shall execute and file a Notice of Completion with respect thereto and furnish a copy thereof to Landlord upon recordation. Landlord, at Landlord's option, may itself execute and file the same on behalf of Tenant as Tenant's agent for such purpose.

22.     **OPEN FOR BUSINESS.**  Tenant shall, at its cost and expense construct, purchase, install and perform any and all items of Tenant's Work, stock its merchandise, employ its personnel and obtain the Certificate of Occupancy from the local Building Department so as to open the Premises for business to the general public on or before the date required therefor by this Lease.

23.     **EXPANSION JOINT.**  If an expansion joint occurs within the Premises, it is Tenant's responsibility to install finish floor covering to or to cover such joint in a workmanlike manner, and Landlord shall not accept responsibility for any finish floor, wall finish or ceiling finish applied to or installed over the expansion joint.

24.     **OCCUPANCY CHARGE.**  In consideration of the items of work previously performed by Landlord pursuant to Paragraph 6, Tenant shall pay to Landlord an Occupancy Charge in the amount specified in Section 2.1 of the Lease, which Occupancy Charge shall be paid to Landlord concurrently with the execution of this Lease.

25.     **ADDITIONAL COSTS.**  In addition, Tenant shall reimburse Landlord as an item of additional rent, promptly upon receipt of invoice, for any additional costs for the following items required as a result of the layout or design of Tenant's Premises:

A.     Any structural work beyond that described in this Exhibit "C"; and

B.     All roof openings, shafts through roofs and penetrations, curbs, flashings and patching performed by Landlord's contractor pursuant to Paragraph 7(A)(xx).

26.     **ARCHITECTURAL REVIEW FEE.**  [Intentionally Omitted]

////                                                                                    ////
////                                                                                    ////
////                                                                                    ////
////                                                                                    ////
////                                                                                    ////
////                                                                                    ////
////                                                                                    ////
////                                                                                    ////
////                                                                                    ////
////                                                                                    ////

**EXHIBIT "D"**
**HEMET VALLEY MALL**
**GUARANTEE OF LEASE**

[INTENTIONALLY OMITTED]

EXHIBIT "E"
HEMET VALLEY MALL
FORM OF TENANT'S CERTIFICATE

The undersigned as Tenant under that certain lease made and entered into as of _____, 20_ by and between DONAHUE SCHRIBER REALTY GROUP, L.P., a Delaware limited partnership, as Landlord, and the undersigned, as Tenant, for Premises in Hemet Valley Mall, Hemet, California ("Lease"), certifies as follows:

1.      The undersigned has commenced occupancy of the Premises described in the Lease.

2.      The Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way except as follows: _____

_____

3.      The Lease represents the entire agreement between the parties as to the Premises.

4.      Minimum Annual Rent became payable on _____, 20_.

5.      The Lease Term expires on _____, 20_.

6.      All conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied.

7.      No rent has been paid in advance and no security has been deposited with Landlord except as provided in the Lease.

8.      As of the date hereof, there are no existing defenses or offsets which the undersigned has precluding enforcement of the Lease by Landlord.

9.      Minimum Annual Rent in the sum of $ _____ for the month of _____ has been paid.

10.     Tenant is in full compliance with all provisions of the Lease regarding Hazardous Materials.

11.     The undersigned acknowledges that this Certificate may be delivered to Landlord's mortgagee or prospective purchaser, and acknowledges that it recognizes that, if same is done, said mortgagee or prospective purchaser will be relying upon the statements contained herein in making the loan or acquiring the property of which the Premises are a part, and in accepting an assignment of the Lease as collateral security, and that receipt by it of this Certificate is a condition of making the loan or acquisition of such property.

Executed at _____, on the _____ day of _____, 20 ___.


"TENANT"

_____
_____

BY:_____
BY:_____

EXHIBIT "F"
HEMET VALLEY MALL
SIGN CRITERIA

The sign criteria contained in this Exhibit ("Sign Criteria") have been established to assure an outstanding Center and for the mutual benefit of all tenants. Tenant covenants and agrees to design, construct and install Tenant's signage at the Premises at Tenant's sole cost and expense in accordance with these Sign Criteria, as set forth below, prior to Tenant opening for business in the Premises. Conformance to detailed sign drawings and specifications which have obtained the prior approval of Landlord will be strictly enforced and any non-conforming sign must be brought into conformance at the sole expense of Tenant. Landlord and the Project Architect shall administer and interpret these Sign Criteria.

While Landlord must retain strict control over the design and installation of Tenant's signage, more imaginative and creative designs that will lend themselves to the unique features of the Center are encouraged. To this end, Landlord will consider any signage and/or graphic design that may vary from the Sign Criteria as defined below, so long as, in Landlord's sole discretion, the design will enhance Tenant's storefront, not conflict with adjacent signage, and contribute to the overall theme of the Center. The graphic identification should be symbolic of the business therein rather than the standard "letter copy". The designer should consider using original art in the place of the standard advertising graphics.

All signs are required to be illuminated. Face light is preferred, although the signs may be backlit. Indirect lighting may be used as long as the source for the light is within Tenant's Premises.

Tenants will confine their signing and/or graphics to an area located directly on the storefront area.

1.    **General Requirements - All Tenants.**

A.  Tenant shall submit or cause to be submitted to Landlord for approval before fabrication, not less than four (4) copies of detailed drawings indicating the location, size, layout, design, materials and color of the proposed sign, including all lettering and graphics. Such drawings shall be submitted concurrently with sufficient architectural drawings to show the exact relationship with the store design.

B.  Tenant shall obtain and pay the entire cost of all permits, approvals, construction, installation and maintenance of its respective sign.

C.  Tenant shall be responsible for the fulfillment of all requirements of these Sign Criteria.

D.  Tenant shall not affix nor maintain upon any glass or other material on the mall storefront any signs unless Tenant shall first have received the written approval of Landlord.

E.  There will be no Tenant signage allowed upon the exterior of the building. No signs shall be permitted on canopy roofs or building roofs.

F.  Advertising Content. The advertising or informative content of Tenant's signs shall be limited to letters designating Tenant's Trade Name only. No additional advertising will be permitted; i.e., "Discount Sales"; "Quality Shoes"; "Men's Wear", etc., or miscellaneous brand names included in its operation. Crests, corporate shields or logos may be permitted at the sole discretion of Landlord. The Trade Name designation shall not specify the merchandise offered for sale or the services rendered, and shall contain no advertising devices, slogans, symbols or marks, such as symbols of credit cards accepted, etc. No advertising placards, banners, pennants or signs, other than those specifically approved by Landlord, shall be affixed upon the glass panes or supports of the store window and doors. Neither will they be affixed to the exterior of the storefront or within ten feet (10') of the lease line.

G.  Quality of Materials. All signs shall be constructed of premium quality.

H.  Mounting. Signs shall be applied directly to the storefront. (See Paragraph "T" below for construction requirements.)

I.  Underwriters Laboratory and Code Requirements. All illuminated signs shall be fabricated and installed in compliance with all applicable code requirements and shall bear an Underwriter's Laboratory (UL) label. No manufacturers' or approval agencies' label can be exposed to public view.

J.  Sign Dimension. Horizontal sign area shall be not more than two-thirds (2/3) of the width of the store frontage and at least three feet (3') from nearest adjacent lease line. Also, sign area shall not exceed ten percent (10%) of the area of the storefront. Sign dimensions are determined by circumscribing a rectangle around the main body of the sign. Should Tenant feel that a larger sign would contribute to the overall design of the Center, Landlord will review the proposal. Signs shall not exceed a depth of five inches (5"). (Refer to Sheet SC-1.)

K.  Miscellaneous. If Tenant has a non-customer door for receiving merchandise, it shall contract with Landlord to paint its name and address on the door in two inch (2") high block letters. Where the door may serve more than one tenant, each name and address shall be applied. Letters shall be of the type style shown on Sheet SC-2 attached hereto and shall be approximately four feet (4') to six feet (6') above the floor. Color of letters to be selected by Landlord. No other painted lettering shall be allowed.

L.   Contractors.  Tenant is fully responsible for the actions of its sign contractors, including the repair of any damage caused by the sign contractors.  Ladders, cranes, scaffolding or other equipment used for the installation of signs will not be permitted in the Center during business hours.

M.   Letter Height, Depth and Style.  The height of sign letters or other components must not exceed fourteen inches (14") if all letters are capitals.  If of capitals and lower case, capitals shall not exceed sixteen inches (16") with lower case letters proportionate thereto.  The depth of the letters must be such that the face of the letter does not extend more than five inches (5") from the storefront.  Letters applied to surfaces not protected by arcades above must be peg-mounted from the wall a maximum of three-quarters (3/4) inch.  No script will be allowed except where, in Landlord's opinion, Tenant has an established publicly recognizable "logo" or store signature or based on approval by Landlord.

N.   Location.  Tenants are encouraged to creatively integrate signage location into the storefront design.  Signs shall be permitted only within the sign areas designated by Landlord.  No sign or any portion thereof may project above the parapet or top of the wall upon which it is mounted.

O.   Trademarks or Manufacturers' Names.  Signs must not display on any portion of the storefront the name, stamps or decals of the sign manufacturer or installer.

P.   Permits.  All permits for signs and their installation will be obtained by Tenant with a copy sent to Landlord prior to installation.

Q.   Installation.  No exposed raceways, crossovers or conduits will be permitted.  All cabinets, conductors, transformers or other equipment must be concealed from public areas.  All illuminated lights must be activated during Center business hours and wired to a time clock on a separate circuit provided with a lock-off device.  Tenant's sign shall draw electrical power from Tenant's own electrical system.

R.   Brightness.  No sign within the Center shall exceed a maximum brightness of one hundred (100) foot lamberts.

S.   Sign Completion.  One sign or other graphic treatment will be required per storefront.  Where there is a storefront at a corner condition, one sign for each storefront face will be allowed.  All signs must be installed and operational before the store opens.

T.   Construction Requirements - All Occupants.

(i)   All metal signs, sign bolts, fastenings and clips shall be hot-dipped galvanized iron, stainless steel, aluminum, brass or bronze, and no black iron materials of any type will be permitted.  Angle clips attached to the letter sides will not be permitted.

(ii)   Location of all openings in Tenant's storefront for conduit and sleeves shall be shown on the drawings submitted to Landlord for approval, and installation shall conform with the approved drawings.

(iii)   Tenant or its sign contractor shall be responsible for and shall repair any damage to any work caused by its work.

(iv)   Tenant shall be responsible for the performance of its sign contractor.

U.   Other Stores.  The provisions of this Exhibit "F", except as may be otherwise expressly provided in the REA(s), shall not be applicable to the Other Stores, it being understood and agreed that these occupants may have their usual identification signs on their buildings, as the same exist on similar buildings operated by them in Southern California from time to time, including enclosed mall entrance signs which may be similar to those of the same occupants' which are located in other enclosed mall shopping centers in Southern California; provided, however, there will be no roof top signs which are flashing, moving or audible.  Not all of the provisions of this Exhibit "F" shall be applicable to signage on Other Store outbuildings or other buildings which are not part of the enclosed mall.  Nothing herein shall be deemed to prohibit the Other Stores from having identification signs attached to the exterior facades of any mechanical penthouse upon their respective stores, provided that such signs shall not extend higher than the top of any such penthouse.

V.   Administration.  In the event any conflict of opinion between Tenant and Landlord as to the application of these Sign Criteria cannot be satisfactorily resolved, Landlord shall submit the design to the Project Architect for a final recommendation to Landlord, whose decision shall be final and binding upon Tenant.

W.   Exceptions.  Signs required by law (i.e., barber pole, bank, etc.) will be permitted, but only as approved by Landlord.

X.   Prohibited Signs.

(i)   Individual letters with a plexiglass face.

(ii)   Signs employing luminous painted paper, cardboard signs, stickers or decals hung around or behind the storefront glazing.

(iii)   "Can" signs with illuminated translucent background and silhouette letters.

(iv)  Signs employing exposed conduit, raceways, illuminated tubes or lamps, except those approved by Landlord (i.e., neon).

(v)   Sandblasted or routed wood signs.

(vi)  No animated, moving, flashing or audible signs or elements thereof will be permitted.

(vii) Formed plastic or injection molded signs.

(viii) Signs or portions of signs projecting beyond the designated storefront area.

(ix)  Freestanding signs, i.e., pylon or pole signs, except a Center identification sign at the discretion of Landlord.

(x)   Painted lettering.

(xi)  Sign "Bands" (illuminated panels transversing across the storefront from one end to the other).

(xii) Acrylic faced letters with plastic trim cap.

(xiii) Temporary signs of whatever composition or material.

2.      **Allowable Sign Types.**

A.      Individual Letters. Three dimensional, individual, internally illuminated, back lit (halo) or metal letters at a maximum of fourteen inches (14") in height, if all letters are capitals and sixteen inches (16") in height if of capitals and lower case, four inches (4") in depth and pegged out 3/4" from the wall surface. All mounting attachments shall be sleeved to conceal fastening. Trim caps are not permitted.

B.      Exposed Neon. No exposed conduit or raceways will be permitted. No exposed neon lighting shall be used on signs, symbols or decorative elements on storefronts unless previously approved in writing by Landlord in Landlord's sole and absolute discretion. In the event Landlord grants such approval, at a minimum, the following shall be satisfied:

(i)    Neon lighting may only be utilized for the name identification, logo or graphics of the tenant in question;

(ii)   Exposed neon lighting shall only be utilized (a) in the sign band (which shall be nine feet (9') or more above the finished floor elevation of the enclosed mall); (b) exposed behind a window (and held together by a clear glass tube framing system); or (c) inside a light box and covered with a colored translucent or mirrored plexiglass; and

(iii)  Each tenant having a neon sign shall be fully responsible for the maintenance and repair of such. In the event that said neon sign becomes broken or malfunctions in any fashion, it shall be removed immediately by the tenant and the sign fascia shall be repaired within thirty (30) days.

C.      Letters or Graphic Applied Directly to the Storefront. A store name applied to the storefront glazing must be of etched glass, sandblasted glass, or metal leaf on Tenant's side of the lease line. Also, a cast or precision cut dimensional letter with a metal leaf or painted finish may be applied to the storefront. Graphic designs painted and sandblasted onto glazing shall be eighty percent (80%) generic in nature (logo, product type, etc.). A tenant electing to utilize a permanent method of signage (sandblasting, acid etching, etc.) must notify Landlord in writing with drawing submittal prior to installation to allow for Landlord's review and approval.

D.      Panel Signage. Lettering is to occur within a panel that has its own distinctive and creative design. Basic panel sign construction shall consist of letters and designs that are applied with a bake enamel paint finish onto a metal panel having a minimum edge thickness of one inch (1").

E.      Cabinet Signs. Cabinet signs will be allowed if detailed as an integral part of the storefront design.

F.      Plaque Signs. Tenant may place on its storefront, within the glass area, gold or silver leaf lettering not to exceed two inches (2") in height nor more than one (1) square foot, indicating hours of business and emergency telephone numbers. If required by the United States Post Office, Tenant's street address may be placed in the location specified by Landlord. The size, type and color of the address shall be specified by Landlord.

G.      Floor Signs. Floor signs may be allowed subject to Landlord's prior written approval.

H.      Sign Materials. Signs shall be constructed of the following materials: porcelain enamel on steel, cast metal or fiberglass with dimensional forms, sculpted or ornamental art, tile or other materials approved by Landlord. Landlord requires premium quality in the materials, design and execution of blade signs. Volumetric sign types are encouraged.

3.      **Conclusion.**

In summary, the basic concept for storefront signs is reflected by the following statements:

- Signs shall be an integral part of the storefront design.

- Signs should incorporate graphic symbolism of trade name or merchandise rather than written advertising.

- Signs should be an art form.

- Variety and individuality within each tenant's signage program and throughout the Center will be emphasized.

////  ////
////  ////
////  ////
////  ////
////  ////
////  ////
////  ////
////  ////
////  ////
////  ////



## ELEVATION
NO SCALE

## SECTION ①
NO SCALE

| TITLE | JOB | | |
|---|---|---|---|
| SIGN CRITERIA | HEMET VALLEY MALL<br>HEMET,   CALIFORNIA | EXHIBIT "F" | SHEET NO.<br>1 |

EXHIBIT "G"
HEMET VALLEY MALL
RULES AND REGULATIONS

1.      USE OF STORE PREMISES.

(a)  All floor area, including vestibules, entrances and returns, doors, fixtures, windows and plate glass shall be maintained in a safe, neat and clean condition.

(b)  All trash, refuse and waste material shall be regularly removed from the premises of each occupant and until removal shall be stored (i) in adequate containers, which containers shall be located so as not to be visible to the general public shopping in the Center; and (ii) so as not to constitute any health or fire hazard or nuisance to any occupant.

(c)  No portion of the Center shall be used for lodging purposes.

(d)  Neither sidewalks nor walkways shall be used to display, store or place any merchandise, equipment or devices.

(e)  No advertising medium, device, instrument or apparatus shall be utilized which can be heard or experienced outside the Premises including, without limiting the generality of the foregoing, flashing lights, searchlights, loudspeakers, phonographs, organs, radios, television or video monitors.

(f)  No auction, fire, bankruptcy, or going-out-of-business sale shall be conducted in, at, or about the Center or any portion or portions thereof, except pursuant to court order.

(g)  No use shall be made of the Center or any portion or portions thereof which would (i) violate any law, ordinance or regulation; (ii) constitute a nuisance; (iii) constitute a hazardous use; or (iv) violate, suspend, or void any policy or policies of insurance.

(h)  All occupants of the Center shall use their best efforts to cause all trucks servicing retail facilities within the Center to load and unload prior to the hours of the Center opening for business to general public.

2.      CONDUCT OF PERSONS.

The following rules and regulations govern the use of roadways, walkways, the enclosed mall, parking areas and other common areas and facilities:

(a)  No person shall use any roadway, walkway or the enclosed mall, except as a means of egress from or ingress to any floor area or parking area within the Center or adjacent public streets. Such use shall be in an orderly manner and in accordance with directional or other signs or guides. Roadways shall not be used at a speed in excess of twenty (20) miles per hour or any lesser posted speed limit and shall not be used for parking or stopping, except for the immediate loading or unloading of passengers. No walkways, hallways, corridors or mall shall be used for other than pedestrian travel.

(b)  No person shall use any parking area, except for ingress and egress to and from the Center and for the parking of motor vehicles during the period of time such person or the occupants of such vehicle are customers or business invitees of the retail establishments within the Center or are utilizing the park and ride. All motor vehicles shall be parked in an orderly manner within the painted lines defining the individual parking places. During peak periods of business activity, limitations may be imposed as to the length of time for parking use. Such limitations may be made in specified areas.

(c)  No person shall use any utility area, truck court or other area reserved for use in connection with the conduct of business, except for the specific purpose for which permission to use such area is given.

(d)  No tenant, contractor, agent or employee of any business in the Center shall use any area for motor vehicle parking, except the area or areas specifically designated by Landlord for employee parking and for the particular period of time such use is to be made as determined, or as established by ordinance.

(e)  Unless the following prohibitions are forbidden by law, no person shall, in or on any part of the common areas or enclosed mall:

(i)  Vend, peddle, store, display, place or solicit orders for sales or distribution of any merchandise, equipment, device, service, periodical, book, pamphlet or other matter whatsoever.

(ii)  Exhibit any sign, placard, banner, notice or other written material; distribute any circular, booklet, handbill, placard, or other material; solicit signatures or registration for membership in any organization, group or association or contribution for any purpose; parade, rally, patrol, picket, demonstrate, or engage in any conduct that might tend to interfere with or impede the use of any of the common areas by any person entitled to use the same, create a disturbance, attract attention or harass, annoy, disparage or be detrimental to the interest of any of the retail establishments within the Center.

(iii) Use any common areas or enclosed mall for any purpose when none of the retail establishments within the Center are open for business or employment except for the park and ride facility.

(iv) Throw, discard, or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles, or create litter or hazards of any kind.

(v) Use any sound-making device of any kind or create or produce in any manner noise or sound that is annoying, unpleasant, or distasteful to occupants or invitees.

(vi) Deface, damage or demolish any sign, light standard or fixture, landscaping material or other improvements within the Center, or the property of customers, business invitees or employees situated within the Center.

The listing of specific items as being prohibited is not intended to be exclusive, but to indicate in general the manner in which the right to use the common areas solely as a means of access and convenience in shopping at the establishments in the Center is limited and controlled.

3.   **PROHIBITED OPERATIONS AND NUISANCES.**

No use or operation will be made, conducted or permitted on any part of the Center site, which use or operation is clearly objectionable to the development or operation of the Center. Included among the uses or operations which are objectionable are uses or operations which produce or are accompanied by the following characteristics, which list is not intended to be all-inclusive:

(a) Any noise, litter, dust, dirt, odor or other activity which may constitute a public or private nuisance;

(b) Any unusual firing, explosive or other damaging or dangerous hazards (including the storage, display or sale of explosives or fireworks);

(c) Any warehouse operation, or any assembling, manufacturing, distilling, refining, smelting, industrial, agriculture, drilling or mining operation; provided, however, any area used for the storage of goods to be sold at any retail establishment in the Center shall not be deemed to be a warehouse operation;

(d) Any trailer court, mobile home park, lot for sale of new or used motor vehicles, labor camp, junkyard, stockyard or animal raising (other than pet shops if Exhibit "B" hereto permits such use);

(e) Any dumping, disposal, incineration or reduction of garbage or refuse other than handling or reducing such waste if produced on the Premises from authorized uses and if handled in a reasonably clean, sanitary and noiseless manner;

(f) Any commercial laundry or dry cleaning, laundromat, veterinary hospital, carwashing establishment, bowling alley, mortuary or similar service establishment; and

(g) Any automobile body and fender repair work.

/////
/////
/////
/////
/////
/////
/////
/////
/////
/////

**EXHIBIT "H"**
**HEMET VALLEY MALL**
**MECHANICAL/ELECTRICAL SCHEDULE**

1.   Tenant Name _____ Space No. _____

2.   Tenant Drawing No. _____ Mechanical _____ Electrical _____

3.   Floor Area (Sq. Ft.) _____

4.   Electrical Load Breakdown

     (a)   Lighting                                          _____ Watts

     (b)   Sign(s)                                           _____ Watts

     (c)   Appliances                                     _____ Watts

     (d)   Receptacles                                   _____ Watts

     (e)   Equipment                                      _____ Watts

     (f)   Electric Water Heater                      _____ Watts

     (g)   Electric Heater                              _____ Watts

     (h)   Miscellaneous                               _____ Watts

5.   Total Connected Electrical Load _____ Watts _____ Watts/Sq. Ft. of Floor Area

6.   Tenant Calculated Design Heating Load                              _____ BTUH

7.   Tenant Calculated Design Cooling Load                              _____ BTUH

8.   Tenant Calculated Design Air Supply _____ CFM (per Tenant plans)

9.   Landlord Allotted Air Supply Required                                 _____ CFM

10.  Additional Air Supply Required                                           _____ CFM

11.  Reimbursement for Additional Air Supply at $ _____/CFM = $ _____

12.  Variable Volume Air Terminal Units

     (a)   Air CFM Max            _____   _____   _____   _____   _____

     (b)   Inlet/Outlet Sizes     _____   _____   _____   _____   _____

13.  Special Exhaust/Make-Up Systems(s) Data (Use, CFM, HP, Method of Operation, Etc.)

     _____

     _____

     _____

     _____

## LEASE AMENDMENT #5

This LEASE AMENDMENT (this "Amendment") is executed this _7th_ day of _February_, 2018, by and between MCS Hemet Valley Center, LLC, a California Limited Liability Company, ("Landlord"), and SAMUELS JEWELERS, INC., a Delaware corporation, (Tenant").

WHEREAS, Landlord (as successor in interest to Donahue Schriber Realty Group, L.P., a Delaware limited partnership) and Tenant are parties to a Lease Agreement dated December 31, 2001, as amended by Lease Amendment dated August 26, 2013, Lease Amendment dated December 10, 2012, Lease Amendment dated July 11, 2011, and Lease Amendment #4 dated August 14, 2014, (said lease and prior amendments and modifications being collectively referred to herein as the "Lease"), covering certain premises more particularly described in the Lease as Building B, Store #2, Suite 215, (the "Premises"), in a shopping center known as Hemet Valley Mall, 2200 W. Florida Ave., located in Hemet, California (the "Shopping Center");

WHEREAS, Landlord owns the real property on which the Premises are located and holds Landlord's interest under the Lease;

WHEREAS, Landlord and Tenant mutually desire to amend the Lease as set forth herein.

NOW THERFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant, intending to be legally bound, hereby agree to amend the Lease, effective as of January 1, 2018, as follows:

1.  INCORPORATION OF RECITALS. The above Recitals are incorporated herein by reference as if set forth at length.

2.  LEASE TERM. The Term of the Lease is extended for a period of three (3) years, commencing on January 1, 2018 and ending at midnight on December 31, 2020, ("Extended Period") upon all of the terms, covenants, and conditions contained in the Lease, except as otherwise set forth in this Amendment.

3.  MINIMUM ANNUAL RENT. Notwithstanding anything to the contrary contained in the Lease, during the Extended Period, Tenant shall pay to Landlord as follows:

    Year One: $52,032.00 per annum, payable Four Thousand Three Hundred Thirty-Six and 00/100 Dollars ($4,336.00) per month

    Year Two: $54,113.28 per annum, payable Four Thousand Five Hundred Nine and 44/100 Dollars ($4,509.44) per month

    Year Three: $56,277.84 per annum, payable Four Thousand Six Hundred Eighty Nine and 82/100 Dollars ($4,689.82) per month

4.   NOTICES. Section 2.1 of the Lease dated December 31, 2001, Address for Notices, shall be modified to deleted the address for Landlord stated herein, and the following shall be substituted in its place;

"To Landlord:  Hemet Valley Mall c/o M.C. Strauss Company
2200 W. Florida Ave., Suite 300
Hemet, CA 92545"

5.   CONFIDENTIALITY. Tenant shall keep the content and all copies of this document strictly confidential as provided in Article 34.25 of the Lease.

6.   COUNTERPARTS. This Amendment may be executed in one or more counterparts, each of which counterparts shall constitute an original and all of which counterparts together shall constitute one and the same Amendment. The delivery by Landlord or Tenant of a facsimile or scanned signature of this Amendment shall have the same legally binding effect as the delivery of an original signature.

7.   ENFORCEABILITY. Landlord acknowledges and represents to Tenant that this Amendment is the binding obligation of Landlord enforceable in accordance with its terms and that Landlord has obtained the consent of its lender or any other third party from whom the Landlord is required to obtain consent for the execution and performance of this Amendment. Tenant acknowledges and represents to Landlord that this Amendment is the binding obligation of Tenant enforceable in accordance with its terms and that Tenant has obtained the consent of its lender, if any, or any other third party from whom the Tenant is required to obtain consent for the execution and performance of this Amendment.

8.   CONFLICT OF PROVISIONS; RATIFICATION. In the event of a conflict between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall govern. Except as specifically referenced or addressed herein, all other terms, covenants, and provisions of the Lease are hereby ratified and confirmed and shall remain unchanged and in full force and effect throughout the Term.

9.   ENTIRE AGREEMENT; BINDING. This Amendment represents the entire agreement between Landlord and Tenant regarding the subject matter contained in this Amendment and there are no other terms, obligations, covenants, representations, statements or conditions oral or otherwise of any kind whatsoever between the parties regarding the subject matter contained in this Amendment except as set forth in this Amendment. No amendment or modification to this Amendment shall be effective unless it is in writing and executed by both Landlord and Tenant. All references to the term "Lease" in this Amendment and the Lease shall mean the Lease as amended by this Amendment.

10.    CAPTIONS.  The captions and section numbers appearing in this Amendment are for convenience only and are not a part of this Amendment and do not in any way limit, amplify, define, construe or describe the scope or intent of the terms or provisions of this Amendment.

11.    CAPITALIZED TERMS.  All capitalized terms in this Amendment, unless specifically defined herein, shall have the same meaning as in the Lease.

12.    AUTHORITY TO EXECUTE.  Landlord and Tenant represent and warrant to each other that the person executing this Amendment on behalf of such applicable party has the full right, power and authority to execute this Amendment and perform its obligations under this Amendment.

13.    SEVERABILITY.  If any provision of this Amendment is determined by a court having jurisdiction to be illegal, invalid or unenforceable under any present or future law, the remainder of this Amendment will not be affected thereby.  It is the intention of the parties that if any provision is so held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provision as is possible that is legal, valid and enforceable.


Except as expressly modified by this Agreement, all of the terms set forth in the Lease are hereby ratified and confirmed. This Agreement shall be binding upon and shall inure to the benefit of the Parties' respective successors and assigns.

IN WITNESS WHEREOF, the parties have signed this Amendment effective on the date set forth above.

**LANDLORD:**
MCS HEMET VALLEY CENTER LLC,
A CALIFORNIA LIMITED LIABILITY
COMPANY

By: _____

Its: _____
    CEO

**TENANT:**
SAMUELS JEWELERS, INC.,
A DELAWARE CORPORATION

By: _____

Its: _____
    CEO

## LEASE AMENDMENT #4

This LEASE AMENDMENT (this "Amendment") is executed this 14th day of August, 2014, by and between MCS HEMET VALLEY CENTER, LLC, a California limited liability company, ("Landlord"), and SAMUELS JEWELERS, INC. a Delaware corporation, (Tenant").

WHEREAS, Landlord (as successor in interest to Donahue Schriber Realty Group, L.P., a Delaware limited partnership) and Tenant are parties to a Lease Agreement dated December 31, 2001, as amended by Lease Amendment dated August 26, 2013, Lease Amendment dated December 10, 2012 and Lease Amendment dated July 11, 2011(said lease and prior amendments and modifications being collectively referred to herein as the "Lease"), covering certain premises more particularly described in the Lease as Building B, Store #2 (the "Premises"), in a shopping center known as Hemet Valley Mall, 2200 W. Florida Ave., located in Hemet, California (the "Shopping Center");

WHEREAS, Landlord owns the real property on which the Premises are located and holds Landlord's interest under the Lease;

WHEREAS, Landlord and Tenant mutually desire to amend the Lease as set forth herein.

NOW THERFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant, intending to be legally bound, hereby agree to amend the Lease, effective as of January 1, 2015, as follows:

1.  INCORPORATION OF RECITALS. The above Recitals are incorporated herein by reference as if set forth at length.

2.  LEASE TERM. The Term of the Lease is extended for a period of three (3) years, commencing on January 1, 2015 and ending at midnight on December 31, 2017, ("Extended Period") upon all of the terms, covenants, and conditions contained in the Lease, except as otherwise set forth in this Amendment.

3.  MINIMUM ANNUAL RENT. Notwithstanding anything to the contrary contained in the Lease, during the Extended Period, Tenant shall pay to Landlord as follows:

    Year One: $44,200.00 per annum, payable Three Thousand Six Hundred Eighty Three and 33/100 Dollars ($3,683.33) per month

    Year Two: $45,968.00 per annum, payable Three Thousand Eight Hundred Thirty and 37/100 Dollars ($3,830.67) per month

    Year Three: $47,806.72 per annum, payable Three Thousand Nine Hundred Eighty Three and 89/100 Dollars ($3,983.89) per month

4.  DEFINED TERMS. All initial capitalized terms used in this Amendment shall have the same meaning given such terms in the Lease, unless otherwise defined in this Amendment.

5.  COUNTERPARTS. This Amendment may be executed in one or more counterparts, each of which counterparts shall constitute an original and all of which counterparts together shall constitute one and the same Amendment. The delivery by Landlord or Tenant of a facsimile signature of this Amendment shall have the same legally binding effect as the delivery of an original signature.

6.  ENFORCEABILITY. Landlord acknowledges and represents to Tenant that this Amendment is the binding obligation of Landlord enforceable in accordance with its terms and that Landlord has obtained the consent of its lender or any other third party from whom the Landlord is required to obtain consent for the execution and performance of this Amendment. Tenant acknowledges and represents to Landlord that this Amendment is the binding obligation of Tenant enforceable in accordance

with its terms and that Tenant has obtained the consent of its lender, if any, or any other third party from whom the Tenant is required to obtain consent for the execution and performance of this Amendment.

7. CONFLICT OF PROVISIONS; RATIFICATION. In the event of a conflict between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall govern. Except as specifically referenced or addressed herein, all other terms, covenants, and provisions of the Lease are hereby ratified and confirmed and shall remain unchanged and in full force and effect throughout the Extended Period.

8. ENTIRE AGREEMENT; BINDING. This Amendment represents the entire agreement between Landlord and Tenant regarding the subject matter contained in this Amendment and there are no other terms, obligations, covenants, representations, statements or conditions oral or otherwise of any kind whatsoever between the parties regarding the subject matter contained in this Amendment except as set forth in this Amendment. No amendment or modification to this Amendment shall be effective unless it is in writing and executed by both Landlord and Tenant. All references to the term "Lease" in this Amendment and the Lease shall mean the Lease as amended by this Amendment.

9. CAPTIONS. The captions and section numbers appearing in this Amendment are for convenience only and are not a part of this Amendment and do not in any way limit, amplify, define, construe or describe the scope or intent of the terms or provisions of this Amendment.

10. AUTHORITY TO EXECUTE. Landlord and Tenant represent and warrant to each other that the person executing this Amendment on behalf of such applicable party has the full right, power and authority to execute this Amendment and perform its obligations under this Amendment.

11. SEVERABILITY. If any provision of this Amendment is determined by a court having jurisdiction to be illegal, invalid or unenforceable under any present or future law, the remainder of this Amendment will not be affected thereby. It is the intention of the parties that if any provision is so held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provision as is possible that is legal, valid and enforceable.

IN WITNESS WHEREOF, the parties have signed this Amendment effective on the date set forth above.

TENANT:                              LANDLORD:
SAMUELS JEWELERS, INC.              MCS HEMET VALLEY CENTER, LLC,
a Delaware corporation              a California Limited Liability Company

By: _____        By: _____
        Ajay Rai
Its Deputy Chief Executive Officer   Its: _____

<u>LEASE AMENDMENT #3</u>

This LEASE AMENDMENT (this "Amendment") is executed this 26th day of August, 2013, by and between MCS HEMET VALLEY CENTER, LLC, a California limited liability company, ("Landlord"), and SAMUELS JEWELERS, INC. a Delaware corporation, (Tenant").

WHEREAS, Landlord (as successor in interest to Donahue Schriber Realty Group, L.P., a Delaware limited partnership) and Tenant are parties to a Lease Agreement dated December 31, 2001, as amended by Lease Amendment dated December 10, 2012 and Lease Amendment dated July 11, 2011(said lease and prior amendments and modifications being collectively referred to herein as the "Lease"), covering certain premises more particularly described in the Lease (the "Premises"), in a shopping center known as Hemet Valley Mall located in Hemet, California (the "Shopping Center");

WHEREAS, Landlord owns the real property on which the Premises are located and holds Landlord's interest under the Lease;

WHEREAS, Landlord and Tenant mutually desire to amend the Lease as set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant, intending to be legally bound, hereby agree to amend the Lease, effective as of January 1, 2013, as follows:

1. <u>INCORPORATION OF RECITALS.</u> The above Recitals are incorporated herein by reference as if set forth at length.

2. <u>LEASE TERM.</u> The Term of the Lease is extended for a period of one (1) year, commencing on January 1, 2014 and ending at midnight on December 31, 2014, ("Extended Period") upon all of the terms, covenants, and conditions contained in the Lease, except as otherwise set forth in this Amendment.

3. <u>MINIMUM ANNUAL RENT.</u> Notwithstanding anything to the contrary contained in the Lease, during the Extended Period, Tenant shall pay to Landlord Forty Two Thousand Five Hundred and 00/ 100 Dollars ($42,500.00) per annum, payable Three Thousand Five Hundred Forty One and 67/100 Dollars ($3,541.67) per month.

4. <u>ACCESSIBILITY.</u> The Premises has not undergone an inspection by a Certified Access Specialist (CASp).

5. <u>DEFINED TERMS.</u> All initial capitalized terms used in this Amendment shall have the same meaning given such terms in the Lease, unless otherwise defined in this Amendment.

6. <u>COUNTERPARTS.</u> This Amendment may be executed in one or more counterparts, each of which counterparts shall constitute an original and all of which counterparts together shall constitute one and the same Amendment. The delivery by Landlord or Tenant of a facsimile signature of this Amendment shall have the same legally binding effect as the delivery of an original signature.

7. <u>ENFORCEABILITY.</u> Landlord acknowledges and represents to Tenant that this Amendment is the binding obligation of Landlord enforceable in accordance with its terms and that Landlord has obtained the consent of its lender or any other third party from whom the Landlord is required to obtain consent for the execution and performance of this Amendment. Tenant acknowledges and represents to Landlord that this Amendment is the binding obligation of Tenant enforceable in accordance with its terms and that Tenant has obtained the consent of its lender, if any, or any other third party from whom the Tenant is required to obtain consent for the execution and performance of this Amendment.

8. <u>CONFLICT OF PROVISIONS; RATIFICATION.</u> In the event of a conflict between the

terms of the Lease and the terms of this Amendment, the terms of this Amendment shall govern. Except as specifically referenced or addressed herein, all other terms, covenants, and provisions of the Lease are hereby ratified and confirmed and shall remain unchanged and in full force and effect throughout the Extended Period.

9. ENTIRE AGREEMENT; BINDING. This Amendment represents the entire agreement between Landlord and Tenant regarding the subject matter contained in this Amendment and there are no other terms, obligations, covenants, representations, statements or conditions oral or otherwise of any kind whatsoever between the parties regarding the subject matter contained in this Amendment except as set forth in this Amendment. No amendment or modification to this Amendment shall be effective unless it is in writing and executed by both Landlord and Tenant. All references to the term "Lease" in this Amendment and the Lease shall mean the Lease as amended by this Amendment.

10. CAPTIONS. The captions and section numbers appearing in this Amendment are for convenience only and are not a part of this Amendment and do not in any way limit, amplify, define, construe or describe the scope or intent of the terms or provisions of this Amendment.

11. AUTHORITY TO EXECUTE. Landlord and Tenant represent and warrant to each other that the person executing this Amendment on behalf of such applicable party has the full right, power and authority to execute this Amendment and perform its obligations under this Amendment.

12. SEVERABILITY. If any provision of this Amendment is determined by a court having jurisdiction to be illegal, invalid or unenforceable under any present or future law, the remainder of this Amendment will not be affected thereby. It is the intention of the parties that if any provision is so held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provision as is possible that is legal, valid and enforceable.

IN WITNESS WHEREOF, the parties have signed this Amendment effective on the date set forth above.

**TENANT:**
SAMUELS JEWELERS, INC.
a Delaware corporation

By: _____
     Lou Menendez
     V.P. Real Estate and
Its: _____Construction_____

**LANDLORD:**
MCS HEMET VALLEY CENTER, LLC,
a California Limited Liability Company

By: _____

Its: _____Manager_____

LEASE AMENDMENT #2

This LEASE AMENDMENT (this "Amendment") is executed this 10th day of
December, 2012, by and between MCS HEMET VALLEY CENTER, LLC, a California
limited liability company, ("Landlord"), and SAMUELS JEWELERS, INC. a Delaware
corporation, (Tenant").

WHEREAS, Landlord (as successor in interest to Donahue Schriber Realty Group, L.P.,
a Delaware limited partnership) and Tenant are parties to a Lease Agreement dated December
31, 2001, as amended by Lease Amendment dated July 11, 2011(said lease and prior
amendments and modifications being collectively referred to herein as the "Lease"), covering
certain premises more particularly described in the Lease (the "Premises"), in a shopping center
known as Hemet Valley Mall located in Hemet, California (the "Shopping Center");

WHEREAS, Landlord owns the real property on which the Premises are located and
holds Landlord's interest under the Lease;

WHEREAS, Landlord and Tenant mutually desire to amend the Lease as set forth herein.

NOW THERFORE, for good and valuable consideration, the receipt and
sufficiency of which is hereby acknowledged, Landlord and Tenant, intending to be legally
bound, hereby agree to amend the Lease, effective as of January 1, 2013, as follows:

1. INCORPORATION OF RECITALS. The above Recitals are incorporated herein by
   reference as if set forth at length.

2. LEASE TERM. The Term of the Lease is extended for a period of one (1) year,
   commencing on January 1, 2013 and ending at midnight on December 31, 2013,
   ("Extended Period") upon all of the terms, covenants, and conditions contained in
   the Lease, except as otherwise set forth in this Amendment.

3. DEFINED TERMS. All initial capitalized terms used in this Amendment shall have the
   same meaning given such terms in the Lease, unless otherwise defined in this
   Amendment.

4. COUNTERPARTS. This Amendment may be executed in one or more counterparts,
   each of which counterparts shall constitute an original and all of which counterparts
   together shall constitute one and the same Amendment. The delivery by Landlord or ·
   Tenant of a facsimile signature of this Amendment shall have the same legally
   binding effect as the delivery of an original signature.

5. ENFORCEABILITY. Landlord acknowledges and represents to Tenant that this
   Amendment is the binding obligation of Landlord enforceable in accordance with its
   terms and that Landlord has obtained the consent of its lender or any other third party
   from whom the Landlord is required to obtain consent for the execution and
   performance of this Amendment. Tenant acknowledges and represents to Landlord
   that this Amendment is the binding obligation of Tenant enforceable in accordance
   with its terms and that Tenant has obtained the consent of its lender, if any, or any
   other third party from whom the Tenant is required to obtain consent for the
   execution and performance of this Amendment.

6. CONFLICT OF PROVISIONS; RATIFICATION. In the event of a conflict between the
   terms of the Lease and the terms of this Amendment, the terms of this Amendment
   shall govern. Except as specifically referenced or addressed herein, all other terms,
   covenants, and provisions of the Lease are hereby ratified and confirmed and shall
   remain unchanged and in full force and effect throughout the Extended Period.

7. ENTIRE AGREEMENT; BINDING. This Amendment represents the entire agreement
   between Landlord and Tenant regarding the subject matter contained in this
   Amendment and there are no other terms, obligations, covenants, representations,
   statements or conditions oral or otherwise of any kind whatsoever between the

parties regarding the subject matter contained in this Amendment except as set forth in this Amendment.   No amendment or modification to this Amendment shall be effective unless it is in writing and executed by both Landlord and Tenant.  All references to the term "Lease" in this Amendment and the Lease shall mean the Lease as amended by this Amendment.

8. CAPTIONS.  The captions and section numbers appearing in this Amendment are for convenience only and are not a part of this Amendment and do not in any way limit, amplify, define, construe or describe the scope or intent of the terms or provisions of this Amendment.

9. AUTHORITY TO EXECUTE.  Landlord and Tenant represent and warrant to each other that the person executing this Amendment on behalf of such applicable party has the full right, power and authority to execute this Amendment and perform its obligations under this Amendment.

10. SEVERABILITY.  If any provision of this Amendment is determined by a court having jurisdiction to be illegal, invalid or unenforceable under any present or future law, the remainder of this Amendment will not be affected thereby.  It is the intention of the parties that if any provision is so held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provision as is possible that is legal, valid and enforceable.

IN WITNESS WHEREOF, the parties have signed this Amendment effective on the date set forth above.

**TENANT:**                                    **LANDLORD:**
SAMUELS JEWELERS, INC.              MCS HEMET VALLEY CENTER, LLC,
a Delaware corporation                    a California Limited Liability Company

By: _____         By: _____

Lou Men~~~~~
Its: ___V.P. Rec~ ~~~~ and___        Its: ___Manager___
Construction

## LEASE AMENDMENT

This LEASE AMENDMENT (this "Amendment") is executed this 11th day of July, 2011, by and between MCS HEMET VALLEY CENTER, LLC, a California limited liability company, ("Landlord"), and SAMUELS JEWELERS, INC. a Delaware corporation, (Tenant").

WHEREAS, Landlord (as successor in interest to Donahue Schriber Realty Group, L.P., a Delaware limited partnership) and Tenant are parties to a Lease Agreement dated December 31, 2001, covering certain premises more particularly described in the Lease (the "Premises"), in a shopping center known as Hemet Valley Mall located in Hemet, California (the "Shopping Center");

WHEREAS, Landlord owns the real property on which the Premises are located and holds Landlord's interest under the Lease;

WHEREAS, Landlord and Tenant mutually desire to amend the Lease as set forth herein.

NOW THERFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant, intending to be legally bound, hereby agree to amend the Lease, effective as of January 1, 2012, as follows:

1. INCORPORATION OF RECITALS. The above Recitals are incorporated herein by reference as if set forth at length.

2. LEASE TERM. The Term of the Lease is extended for a period of one (1) year, commencing on January 1, 2012 and ending at midnight on December 31, 2012, ("Extended Period") upon all of the terms, covenants, and conditions contained in the Lease, except as otherwise set forth in this Amendment.

3. DEFINED TERMS. All initial capitalized terms used in this Amendment shall have the same meaning given such terms in the Lease, unless otherwise defined in this Amendment.

4. COUNTERPARTS. This Amendment may be executed in one or more counterparts, each of which counterparts shall constitute an original and all of which counterparts together shall constitute one and the same Amendment. The delivery by Landlord or Tenant of a facsimile signature of this Amendment shall have the same legally binding effect as the delivery of an original signature.

5. ENFORCEABILITY. Landlord acknowledges and represents to Tenant that this Amendment is the binding obligation of Landlord enforceable in accordance with its terms and that Landlord has obtained the consent of its lender or any other third party from whom the Landlord is required to obtain consent for the execution and performance of this Amendment. Tenant acknowledges and represents to Landlord that this Amendment is the binding obligation of Tenant enforceable in accordance with its terms and that Tenant has obtained the consent of its lender, if any, or any other third party from whom the Tenant is required to obtain consent for the execution and performance of this Amendment.

6. CONFLICT OF PROVISIONS; RATIFICATION. In the event of a conflict between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall govern. Except as specifically referenced or addressed herein, all other terms, covenants, and provisions of the Lease are hereby ratified and confirmed and shall remain unchanged and in full force and effect throughout the Extended Period.

7. ENTIRE AGREEMENT; BINDING. This Amendment represents the entire agreement between Landlord and Tenant regarding the subject matter contained in this Amendment and there are no other terms, obligations, covenants, representations, statements or conditions oral or otherwise of any kind whatsoever between the parties regarding the subject matter contained in this Amendment except as set forth in this Amendment.   No amendment or modification to this Amendment shall be

effective unless it is in writing and executed by both Landlord and Tenant. All references to the term "Lease" in this Amendment and the Lease shall mean the Lease as amended by this Amendment.

8. CAPTIONS. The captions and section numbers appearing in this Amendment are for convenience only and are not a part of this Amendment and do not in any way limit, amplify, define, construe or describe the scope or intent of the terms or provisions of this Amendment.

9. AUTHORITY TO EXECUTE. Landlord and Tenant represent and warrant to each other that the person executing this Amendment on behalf of such applicable party has the full right, power and authority to execute this Amendment and perform its obligations under this Amendment.

10. SEVERABILITY. If any provision of this Amendment is determined by a court having jurisdiction to be illegal, invalid or unenforceable under any present or future law, the remainder of this Amendment will not be affected thereby. It is the intention of the parties that if any provision is so held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provision as is possible that is legal, valid and enforceable.

IN WITNESS WHEREOF, the parties have signed this Amendment effective on the date set forth above.

TENANT:                                    LANDLORD:
SAMUELS JEWELERS, INC.                     MCS HEMET VALLEY CENTER, LLC,
a Delaware corporation                     a California Limited Liability Company

By: _____                By: _____

Its: _Lou Menendez_____                  Its: ___Manager_____
     V.P. Real Estate and
     Construction

N:\MCSDATA\Hemet Valley Mall leases\SamuelsJewelers\B2.LeaseAmend 7-6-11.docx



April 25,2019

Dear Customer:

The following is the proof-of-delivery for tracking number **774915952180**.

---

### Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Receptionist/Front Desk |
| Signed for by: | C.MORALES | Delivery location: | BROOKLYN, NY |
| Service type: | FedEx Standard Overnight | Delivery date: | Apr 9, 2019 10:08 |
| Special Handling: | Deliver Weekday | | |

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

---

### Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 774915952180 | Ship date: | Apr 8, 2019 |
| | | Weight: | 1.0 lbs/0.5 kg |
| Recipient: | | Shipper: | |
| BROOKLYN, NY US | | San Diego, CA US | |
| Reference | | 102197-78 [Sears] | |

Thank you for choosing FedEx.