# Exhibit A

=============================================================

*Lese*

L E A S E

PENNSYLVANIA MART PROPERTIES CORP.

AND

K MART ENTERPRISES OF PENNSYLVANIA, INC.

Dated as of March 20, 1975

=============================================================

TABLE OF CONTENTS
(Continued)

| Article | | Page |
|---|---|---|
| XX. | Events of Default...................... | 37 |
| XXI. | Lessor's Right to Cure Lessee's Default.............................. | 44 |
| XXII. | Provisions Relating to Offers by Lessee to Purchase the Leased Property and Purchase Thereof by Lessee....... | 44 |
| XXIII. | Renewal Terms........................ | 45 |
| XXIV. | No Claims Against Lessor............. | 45 |
| XXV. | Risk of Loss......................... | 46 |
| XXVI. | Indemnification by Lessee............ | 46 |
| XXVII. | Subletting and Assignment; Attornment................................. | 47 |
| XXVIII. | Officer's Certificates and Financial Statements........................... | 48 |
| XXIX. | Lessor's Right to Inspect............ | 49 |
| XXX. | No Waiver by Lessor.................. | 50 |
| XXXI. | Remedies Cumulative.................. | 50 |
| XXXII. | Acceptance of Surrender.............. | 50 |
| XXXIII. | No Merger of Title................... | 51 |
| XXXIV. | Conveyance by Lessor................. | 51 |
| XXXV. | Quiet Enjoyment...................... | 51 |
| XXXVI. | Notices.............................. | 52 |
| XXXVII. | Holding Over......................... | 52 |
| XXXVIII. | Miscellaneous........................ | 53 |
| XXXIX. | Memorandum of Lease.................. | 54 |

## LEASE

LEASE, dated as of the 20th day of March, 1975, between PENNSYLVANIA MART PROPERTIES CORP. ("Lessor"), a Pennsylvania corporation having an address c/o Merrill Lynch, Hubbard Inc., 165 Broadway, New York, New York 10006 and K MART ENTERPRISES OF PENNSYLVANIA, INC., ("Lessee"), a Pennsylvania corporation having its principal office c/o S.S. Kresge Company, 3100 West Big Beaver, Troy, Michigan 48084.

## ARTICLE I

1. Leased Property; Term. Upon and subject to the terms and conditions hereinafter set forth, Lessor leases to Lessee and Lessee rents from Lessor the following property (collectively, the "Leased Property"):

(a) the parcel of land (the "Land") located in the Township of Falls, County of Bucks and Commonwealth of Pennsylvania, more particularly described in Schedule A,

(b) all buildings, structures, Fixtures and other improvements presently or hereafter (except as provided in Section 13.3) situated upon the Land (the "Leased Improvements"),

(c) all easements, rights and appurtenances relating to the Land and the Leased Improvements, and

(d) all equipment, machinery, fixtures, and other items of property, including all components thereof, now or hereafter located in, on or used in connection with, the Leased Improvements or necessary to the operation or maintenance thereof (other than Lessee's Equipment, as described in Article IX) which are deemed by the parties hereto to constitute real estate under the laws of the Commonwealth of Pennsylvania, together with all replacements, modifications, alterations and additions thereto (the "Fixtures"),

SUBJECT, HOWEVER, to the matters set forth in Schedule A,

to have and to hold for (A) an interim term (the "Interim Term") commencing on the date hereof and ending at midnight on the day preceding the Commencement Date provided for in clause (B), (B) a fixed term of thirty (30) years (the "Fixed Term") commencing on either (i) January 7, 1977, if the Facility (as defined in Article II) is substantially completed by that date, or (ii) provided Lessee has not become obligated to purchase the Leased Property pursuant to the provisions of either Section 3.4 or Section 3.5, June 7, 1977 (the "Commencement Date") and ending at midnight on the day preceding the thirtieth anniversary of the Commencement Date, and (C) the renewal terms provided for in Article XXIII, unless this Lease is sooner terminated as hereinafter provided.

## ARTICLE II

2.  <u>Definitions</u>.  As used in this Lease, the following capitalized terms have the respective meanings set after them:

<u>Additional Facilities</u>:  One or more new buildings, or one or more additional structures annexed to any portion of the Leased Improvements, constructed on or adjacent to the Land during the Term.  No replacement or rebuilding of the Leased Improvements or any portion thereof shall be deemed an Additional Facility.

<u>Additional Rent</u>:  As defined in Article V.

<u>Alterations</u>:  As defined in Section 13.1.

<u>Basic Rent</u>:  As defined in Article IV.

<u>Basic Term</u>:  Collectively, the Interim Term and the Fixed Term.

<u>Commencement Date</u>:  As defined in Article I.

<u>Consent</u>:  A Consent and Agreement being executed by Lessee and Guarantor contemporaneously herewith.

2.

Construction Cost:  The cost of construction of the Facility which cost shall include (a) costs of site preparation and improvement, materials, labor, supervision, design, engineering and architectural services, (b) the cost of the Fixtures, (c) Impositions, utility charges, insurance premiums and other carrying charges in respect of the Leased Property incurred by Lessee during the Interim Term, and (d) miscellaneous costs approved by Lessor.

Cost of the Leased Property:  An amount equal to the sum (but without duplication of any item) of the following items, paid, or to be paid, to Lessee, as of the applicable date:  (a) the cost to Lessor of acquiring the Land, which may include brokerage commissions, if any, and attorneys' fees, (b) the Construction Cost of the Facility to the extent reimbursed to Lessee pursuant to Article III, (c) the cost of surveys, title reports and title insurance policies, (d) a portion of the debt service on funds borrowed to pay for the Land and the Construction Cost incurred through the date occurring six months after the Completion Date, (e) filing fees and other direct expenses (including reasonable attorneys' fees) incurred in connection with the organization of Lessor in the Commonwealth of Pennsylvania, (f) transfer taxes, documentary, stamp and similar taxes and all recording and filing fees and taxes incurred in connection with the acquisition of the Land and the financing of the Leased Property, and (g) the fees, expenses and disbursements of special counsel to Lessor's Assignees, if any, and counsel to Lessee and Guarantor.

Default:  Any condition or event which constitutes or would constitute an Event of Default either with or without notice or lapse of time, or both.

Discounted Future Basic Rent:  Prior to the Commencement Date, the unpaid principal balance of, and accrued interest on, any of Lessor's Notes then outstanding.  After the Commencement Date, (i) during the Fixed Term, the amount, as of the applicable date, as set forth in Schedule B to the Lease Supplement referred to in Section 4.2. and (ii) during any renewal term, the amount, as of the applicable date, of the future payments of Basic Rent otherwise payable in respect of the Leased Property for the remainder of the then current renewal term (regardless of any termination), discounted at the rate of 3% per annum, calculated on a quarter-annual basis.

Equity Investment:  An amount equal to approximately 5.0% of the Cost of the Leased Property, to be invested in the Leased Property by certain investors.

Event of Default:  As defined in Article XX.

Facility:  A distribution center with approximately 1,135,500 square feet of office and warehouse space and related facilities.

Fixed Term; Fixtures:  Each as defined in Article I.

Guarantor:  S. S. Kresge Company, a Michigan corporation, and its successors and assigns.

Guaranty:  The guaranty by Guarantor of Lessee's performance of the provisions of this Lease which is appended hereto as Exhibit I.

Impositions:  All taxes, assessments (including, without limitation, all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term), ground rents, water, sewer or other rents, rates and charges, excises, levies, license fees, permit fees, inspection fees, sales and use taxes and other authorization fees and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Leased Property and/or the Basic Rent or Additional Rent (including all penalties or interest thereon), which at any time prior to, during or in respect of the Term hereof may be assessed, levied, confirmed or imposed on or in respect of, or be a lien upon (a) Lessor or Lessor's Assignees, if any (including all gross receipts or similar taxes payable in respect of the Basic Rent and/or Additional Rent, and sales and use taxes which may be levied or assessed against or be payable by Lessor or Lessee on account of the acquisition, leasing or use of the Leased Property or any part thereof, the construction of the Facility, or upon the value thereof or upon the money borrowed, if any, to acquire the Land and construct the Facility thereon),

4.

(b) the Leased Property or any part thereof or any rent therefrom or any estate, right, title or interest therein, or (c) any occupancy, operation, use or possession of, or sales from, or activity conducted on, the Leased Property or any part thereof. Net income or excess profits taxes of Lessor determined on the basis of Lessor's general income or revenues shall not be deemed to be Impositions, except to the extent that such tax may be levied, assessed or imposed in lieu of, or as a total or partial substitute for, a tax upon the Leased Property, the Basic Rent, the Additional Rent, or any part of any thereof. Nothing contained in this Lease shall be construed to require Lessee to pay any tax imposed on Lessor or Lessor's Assignees, if any, in the nature of a franchise tax for the privilege of doing business in the Commonwealth of Pennsylvania, or any capital levy, estate, inheritance, succession, transfer, net income, excess profits or revenue tax of Lessor or Lessor's Assignees, if any, except to the extent that any such tax may be levied, assessed or imposed in lieu of, or as a total·or partial substitute for, a tax upon the Leased Property, the Basic Rent, the Additional Rent or any part of any thereof.

Indenture: Any mortgage covering the Leased Property, as the same may be modified, amended or supplemented from time to time, which Lessor may execute as security for Lessor's Notes.

Insurance Requirements: All terms of any insurance policy covering or applicable to the Leased Property, all requirements of the issuer of any such policy, and all regulations and then current standards applicable to or affecting the Leased Property or any use or condition thereof, which may, at any time, be recommended by the National Fire Protection Association (or any other body exercising similar functions).

Interim Term; Land: Each as defined in Article I.

Lease Supplement: As defined in Section 4.2.

Lease Amendment: As defined in Section 14.2.

5.

<u>Leased Improvements; Leased Property</u>:  Each as defined in Article I.

<u>Legal Requirements</u>:  All federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions affecting either the Leased Property or the construction, use or alteration thereof, whether now or hereafter enacted and in force, including any which may (i) require repairs, modifications or alterations in or to the Leased Property or (ii) in any way limit the use and enjoyment thereof, and all permits, licenses and authorizations and regulations relating thereto and all covenants, agreements, restrictions and incumbrances contained in any instruments, either of record or known to Lessee, at any time in force affecting the Leased Property, not including, however, the covenants contained in any Indenture, unless otherwise specifically required pursuant to the terms of this Lease.

<u>Lending Institution</u>:  Any insurance company, commercial or savings bank, national banking association, savings and loan association, employees' welfare, pension or retirement fund or system, corporate profit sharing or pension trust, college or university or real estate investment trust having a net worth of at least $50,000,000.

<u>Lessee's Equipment</u>:  As defined in Article IX.

<u>Lessor's Assignees</u>:  Collectively, any assignees designated in an assignment of Lessor's interest in this Lease given as security for Lessor's Notes.

<u>Lessor's Notes</u>: Collectively, any secured promissory notes of Lessor sold and delivered to finance part or all of (a) the Cost of the Leased Property or (b) the cost of any Additional Facilities, and any notes issued in substitution or exchange therefor or in replacement thereof.

<u>Officer's Certificate</u>:  A certificate of Lessee or Guarantor, as the case may be, signed by a Vice President or the Treasurer, or another officer authorized to so sign by either the Board of Directors or By-Laws of

6.

Lessee or Guarantor, as the case may be, and, in the case of a certificate of Lessee, either joined in by, or countersigned on behalf of, Guarantor by a Vice President or the Treasurer, or another officer so authorized.

Rent:  Collectively, the Basic Rent and Additional Rent.

Taking:  A taking or voluntary conveyance of all or part of the Leased Property, or any interest therein or right accruing thereto or use thereof, as the result of, or in lieu or in anticipation of, the exercise of the right of condemnation or eminent domain.

Tangible Net Worth:  The aggregate amount of all assets of Guarantor as may be properly classified as such, other than goodwill and such other assets as are properly classified as "intangible assets," less the aggregate indebtedness of Guarantor, all as shown on its most current balance sheet prepared in accordance with generally accepted accounting principles as at the date hereof and on a fully consolidated basis.

Term:  Collectively, the Interim Term, the Fixed Term and any renewal term or terms provided for in Article XXIII, or any of them as the context may require.

Unavoidable Delays:  Delays due to strikes, lockouts, inability to procure materials, power failure, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other causes beyond the control of Lessee, provided that lack of funds shall not be deemed a cause beyond the control of Lessee.

Year:  A twelve (12) month period commencing on the Commencement Date or on an anniversary date thereof, as the case may be.

7.

## ARTICLE III

3.1.  <u>Construction of Facility</u>.  Lessee shall construct, or cause to be constructed the Facility on the Land substantially in accordance with plans and specifications heretofore prepared for and approved by Lessee or Guarantor, and it shall make every effort to commence actual construction by December 1, 1975 and to complete such construction by May 31, 1977.  The Facility shall, from and after the date hereof, immediately become and remain the property of Lessor, shall be deemed part of the Leased Improvements and shall be subject to all of the terms and provisions of this Lease.  Pending reimbursement pursuant to Section 3.2, Lessee shall advance, or cause to be advanced, the Construction Cost and all other items of the Cost of the Leased Property.

3.2.  <u>Reimbursement by Lessor</u>.  Lessee agrees that in no event shall the aggregate amount paid by Lessor for the Cost of the Leased Property exceed $24,000,000 plus the Equity Investment nor be less than $19,200,000 plus the Equity Investment.  So long as (i) no Event of Default shall have occurred, (ii) the Tangible Net Worth of Guarantor shall be not less than the amount thereof on January 30, 1974, and (iii) Guarantor's pre-tax earnings during each fiscal quarter of Guarantor commencing on October 30, 1974 are not less than 175% of its fixed charges including, but not limited to, all fixed gross minimum annual rentals and all interest charges, all on a fully consolidated basis, Lessor shall promptly reimburse Lessee, or cause Lessee to be reimbursed, for unreimbursed advances toward the Cost of the Leased Property during the Interim Term hereof as provided in subparagraphs (a) through (e) below:

(a)  the first reimbursement shall be made on the date hereof, in the amount of $4,500,000, upon receipt by Lessor of those items specified in subsection 3.3(a) (as if a request had been made) and subsection 3.3(b);

(b)  the second reimbursement (the "Second Reimbursement") shall be made on January 21, 1976, in the amount of $7,450,000, after receipt by Lessor, at least ten (10) days prior to such date, of a request of Lessee setting forth the total amount theretofore paid or incurred by Lessee toward the

Cost of the Leased Property, and in reasonable
detail, the breakdown thereof, which amount shall
be not less than $11,950,000. Such request shall be
accompanied by the certificate referred to in sub-
section 3.3(a), and on the date fixed for payment
of the Second Reimbursement Lessee shall provide
Lessor with those items specified in subsection
3.3(b). If construction of the Facility shall be
interrupted due to an Unavoidable Delay, Lessee
shall have the right to postpone the date scheduled
for the Second Reimbursement for a period equal to
the number of days construction was interrupted due
to the Unavoidable Delay; provided, however, that
even though such interruption may continue for a
longer period, in no event shall the Second Reim-
bursement be postponed in excess of 180 days from
the date referred to above;

(c) provided the Second Reimbursement shall have
been made, the third reimbursement (the "Third Reim-
bursement") shall be made on June 7, 1976, in the
amount of $6,950,000, after receipt by Lessor, at
least ten (10) days prior to such date, of a request
of Lessee setting forth the total amount theretofore
paid or incurred by Lessee toward the Cost of the
Leased Property, and in reasonable detail, the
breakdown thereof, which amount shall be not less
than $18,900,000. Such request shall be accompanied
by the certificate referred to in subsection 3.3(a),
and on the date fixed for payment of the Third
Reimbursement Lessee shall provide Lessor with
those items specified in subsection 3.3(b). If
construction of the Facility shall be interrupted
due to an Unavoidable Delay, Lessee shall have the
right to postpone the date scheduled for the Third
Reimbursement for a period equal to the number of
days construction was interrupted due to the
Unavoidable Delay; provided, however, that even
though such interruption may continue for a longer
period, in no event shall the Third Reimbursement
be postponed in excess of 180 days from the date
referred to above; and

(d) if the Facility has been completed by the
Commencement Date, and if the Third Reimbursement
shall have been made, Lessor, after receipt of a
request of Lessee therefor at least ten (10) days

9.

prior to the Commencement Date, together with the
certificate referred to in subsection 3.3(a), shall
pay or cause to be paid to Lessee on the Commencement
Date, the then unreimbursed portion of the advances
(limited in amount as stated above) made by Lessee
toward the Cost of the Leased Property; provided
however, that Lessor shall have received on the Com-
mencement Date (1) those items specified in subsection
3.3(b) and (2) an Officer's Certificate of Lessee
accompanied by a certificate of the supervising
architect as to the matters specified in clauses
(i) and (iii) below, setting forth the amount of
the Equity Investment and in reasonable detail the
Cost of the Leased Property and certifying that (i)
the Facility has been (A) constructed in compliance
with all applicable Legal Requirements and Insurance
Requirements and all bills for labor and materials
in connection with the construction thereof have
been paid in full except for amounts specified there-
in, if any, as to which arrangements have been made
for prompt payment after receipt of funds from
Lessor and prior to the expiration of any retainage
period provided for in the applicable contract and
(B) completed substantially in accordance with the
plans and specifications prepared for, and accepted
by, Lessee or Guarantor in a good and workmanlike
manner, in conformity with good construction and
engineering practice; (ii) the Leased Property has
been accepted by Lessee for all purposes of this
Lease and there has been no material damage to
the Facility nor is any condemnation or eminent
domain proceeding pending with respect thereto;
(iii) all permits, licenses and certificates
(including a certificate of occupancy) which are
necessary to permit the use of the Leased
Property in accordance with the provisions of
this Lease have been obtained and are in full
force and effect; (iv) under applicable zoning
and use laws, ordinances, rules and regulations
the Leased Property may be used for the purposes
contemplated by Lessee and all necessary sub-
division approvals have been obtained; (v) there
are no mechanics' or materialmen's liens out-
standing or threatened to the knowledge of Lessee
against the Leased Property arising out of or in
connection with such construction, other than those
being contested by Lessee pursuant to Article XVI;

10.

(vi) any mechanics' or materialmen's liens being contested by Lessee will be promptly paid by Lessee if such contest is resolved in favor of the mechanic or materialman; (vii) any exceptions to Lessor's title to the Leased Property do not materially interfere with the intended use of the Leased Property by Lessee; (viii) all streets adjoining and serving the Leased Property have been dedicated to, and accepted by, the public authorities required to maintain them, and (ix) all drainage and sewage facilities serving the Leased Property have been connected and are adequate for the intended use of the Leased Property; or

(e)   if the Facility has not been completed by the Commencement Date, but so long as the Third Reimbursement shall have been made, Lessee, at least ten (10) days prior to the Commencement Date, upon furnishing Lessor with the certificate referred to in subsection 3.3(a), may request Lessor to pay, or cause to be paid, to Lessee on the Commencement Date the unreimbursed portion of the advances made by Lessee to such date toward the Cost of the Leased Property.  Lessor, at its option, may comply with such request on the Commencement Date provided Lessor shall have received on such date (1) those items specified in subsection 3.3(b) and (2) an Officer's Certificate of Lessee accompanied by a certificate of the supervising architect as to the matters specified in clauses (i) and (ii) below, setting forth the amount of the Equity Investment and in reasonable detail the Cost of the Leased Property to such date and the estimated additional time and cost, if any, necessary to complete construction of the Facility and certifying (i) the status of completion of the Facility and that construction to such date has been performed (A) in compliance with all applicable Legal Requirements and Insurance Requirements and all bills for labor and materials in connection with the construction thereof to the Commencement Date have been paid in full except for amounts specified therein, if any, as to which arrangements have been made for prompt payment after reimbursement by Lessor and prior to the expiration of any retainage period provided for in the applicable contract and (B) in accordance with plans and specifications prepared for, and approved by, Lessee in a good and workmanlike manner, in conformity with good construction and engineering practice; (ii) that

11.

all permits, licenses and certificates (including certificates of occupancy) which are necessary to permit the use of the Leased Property in accordance with the provisions of this Lease either have been obtained and are in full force and effect or will be obtained upon completion of the Facility; and (iii) as to the matters set forth in clauses (ii), (iv), (v), (vi), (vii), (viii), and (ix) of sub-paragraph (d) above.

3.3   Material To Be Provided In Support of a Request For Reimbursement. (a) Each request for reimbursement shall be accompanied by an Officer's Certificate of Guarantor certifying as to compliance with the matters set forth in clauses (i), (ii), and (iii) of the first sentence of Section 3.2.

(b) On the date fixed for payment to Lessee of a reimbursement, Lessee shall provide Lessor with (i) a revised survey of the Leased Property, dated within 30 days of such date, satisfactory in form and substance to the Lessor, showing all lot and street lines and the location of all improvements, easements and encroachments, if any, prepared and duly certified as an accurate survey by a surveyor licensed in the Commonwealth of Pennsylvania, (ii) prepaid amendments or endorsements to any title insurance policies (and reinsurance certificates, if any) at the time held by Lessor and Lessor's Assignees, if any, with respect to the Leased Property, (1) confirming the coverage thereof in an amount at least equal to all reimbursements made, and (2) updating the same to the date fixed for reimbursement without further exception, and (iii) such other certificates (including, but not limited to, endorsements increasing the insurance coverage, if any, at the time required by Section 17.1), documents, opinions of counsel and any other instruments required by Lessor, all in form and substance satisfactory to Lessor.

3.4   Offer to Purchase the Leased Property Upon Failure to Timely Commence Construction of the Facility. If construction of the Facility is not commenced within 16 months from January 30, 1975, Lessee shall offer (and failing to do so, Lessee shall be deemed to have offered) to purchase the Leased Property on the date occuring 16 months and 15 days from January 30, 1975 for a purchase price equal to 102% of the Cost of the Leased Property as of the date of purchase. Lessor shall

promptly notify Lessee of its acceptance of such offer,
and failing to give such notice shall be deemed to have
accepted the same.  Upon acceptance by Lessor of such
offer, Lessor shall convey the Leased Property to Lessee
on the date set for purchase thereof in accordance with
the provisions of Article XXII, upon receipt of the pur-
chase price therefor, and this Lease shall thereupon
terminate.

3.5.  Offer to Purchase the Leased Property upon
Failure to Timely Request Reimbursement.  If Lessee shall
fail to make a timely request (subject to an extension
of time due to Unavoidable Delays) for either the Second
Reimbursement, Third Reimbursement, or Fourth Reimburse-
ment, Lessee shall offer (and failing to do so, Lessee
shall be deemed to have offered) to purchase the Leased
Property on the date occurring ninety (90) days after
January 21, 1976, June 7, 1976, or June 7, 1977, as
the case may be, for a purchase price equal to 102% of
the Cost of the Leased Property as of the date of purchase.
Lessor shall promptly notify Lessee of its acceptance or
rejection, and failing to give such notice shall be deemed
to have accepted the same.  If Lessor accepts such offer,
Lessor shall convey the Leased Property to Lessee on the
specified date of purchase in accordance with the
provisions of Article XXII, upon receipt of the pur-
chase price therefor, and this Lease shall thereupon
terminate.  If Lessor rejects such offer, Lessee
shall complete construction of the Facility as expedi-
tiously as possible and shall request reimbursement (i)
in an amount, and on any alternate date, agreed to in
writing by Lessor, instead of the date on which Lessee
failed to make a timely request, and (ii) on the next
scheduled date therefor, unless an earlier date is agreed
upon in writing between Lessor and Lessee.

3.6  Offer to Purchase the Leased Property Upon
Failure to Timely Complete the Facility.  If the Facility
is not completed by May 31, 1977, Lessee shall offer (and
failing to do so, Lessee shall be deemed to have offered)
to purchase the Leased Property on June 7, 1977 for a
purchase price equal to 102% of the Cost of the Leased
Property as of the date of purchase.  Lessor shall
promptly notify Lessee of its acceptance or rejection
of such offer, and failing to give such notice shall be
deemed to have accepted the same.  If Lessor accepts such
offer, Lessor shall convey the Leased Property to Lessee
on June 7, 1977 in accordance with the provisions of

13.

Article XXII, upon receipt of the purchase price therefor,
and this Lease shall thereupon terminate.  If Lessor
rejects such offer, (a) Lessor shall reimburse Lessee
for the then unreimbursed portion of the Cost of the
Leased Property incurred to such date as requested by
Lessee pursuant to subparagraph (f) of Section 3.2, (b)
Lessor and Lessee shall enter into the Lease Supplement on
the Commencement Date and (c) the Fixed Term hereof shall
commence on that date.  Lessee shall thereafter complete
the construction of the Facility with due diligence at
its own cost and expense, without further reimbursement
by Lessor.

3.7.  <u>Lessee's Rights Upon Lessor's Failure to
Reimburse</u>.  If Lessor shall fail to reimburse Lessee
for the Cost of the Leased Property upon a timely request
therefor by Lessee as required by the provisions of
Section 3.2, and if no Event of Default shall have occurred,
Lessee may, at any time thereafter upon forty-five (45)
days prior written notice to Lessor, purchase the Leased
Property from Lessor on the date specified in such notice
(the "Transfer Date"), unless Lessor shall have reimbursed
Lessee prior to the Transfer Date in the specified amount
or any lesser amount agreed to by Lessee, for a purchase
price equal to the Cost of the Leased Property as of the
Transfer Date.  On the Transfer Date, Lessor shall convey
the Leased Property to Lessee in accordance with the
provisions of Article XXII, upon receipt of the purchase
price therefor, and this Lease shall thereupon terminate.

3.8  <u>Completion of the Facility</u>.  For all purposes of
this Article III, the Facility shall be deemed completed
if (1) a certificate of occupancy permitting the use of
the Leased Property in accordance with the provisions
of this Lease has been obtained, and (2) Lessor shall have
received an Officer's Certificate and architect's certificate
setting forth the matters required by subparagraph (d)
of Section 3.2.  If the Facility is not completed by the
Commencement Date, Lessee shall thereafter complete the
construction of the Facility as expeditiously as possible
after the Commencement Date at its own cost and expense,
without further reimbursement by Lessor and shall obtain
all certificates, permits and licenses which are necessary
to permit the use of the Facility as it is proposed to be
used by Lessee.  Upon such completion, Lessee shall deliver
to Lessor the certificates referred to in the first
sentence of this Section.

14.

## ARTICLE IV

4.1.  **Basic Rent**.  Lessee will pay to Lessor in law-ful money of the United States of America which shall be legal tender for the payment of public and private debts at Lessor's address set forth above or at such other place or to such other person, firm or corporation as Lessor from time to time may designate in writing, a net basic rental (the "Basic Rent") during the Basic Term as follows:

(a)  During the Interim Term, the sum of $1.00 payable on the date occuring nine months after the Commencement Date, and

(b)  during the Fixed Term, (i) the sum of $1.00 for the first six months thereof, payable on the date occuring nine months after the Commencement Date, and (ii) thereafter, an annual basic rent equal to the product of 10.33% of the Cost of the Leased Property as of the Commencement Date payable in equal, consecutive installments in arrears, commencing on the date occuring nine months after the Commencement Date and quarter-annually thereafter, through and including the date occurring thirty (30) years after the Commencement Date.  Lessee agrees to mail its checks in payment of the Basic Rent to Lessor, or as Lessor may direct, at least seven (7) days prior to the date each payment is due so that Lessor may, as nearly as possible, have good funds in Philadelphia, Pennsylvania on each date the Basic Rent is due.

The Basic Rent shall be paid absolutely net to Lessor, so that this Lease shall yield to Lessor the full amount of the installments of Basic Rent throughout the Term.

4.2.  **Confirmation of Basic Rent, etc**.  On or before the Commencement Date, Lessor and Lessee shall execute and deliver a supplement to this Lease (the "Lease Supplement") setting forth, among other things, (a) the Commencement Date, (b) the amount of the annual Basic Rent to be paid throughout the Fixed Term and renewal terms hereof and the dates of payment of the installments thereof, (c) the Cost of the Leased Property as of the Commencement Date, and (d) the Discounted Future Basic Rent as of each rent

15.

payment date during the Fixed Term.  If Lessor does not
have title to the Leased Property at the time of the
execution and delivery of the Lease Supplement, Lessor
shall cause the then owner of the Leased Property to
join in the execution thereof.

## ARTICLE V

5.  Additional Rent.  Lessee will also pay and dis-
charge as additional rent (the "Additional Rent") (i)
amounts equal to the deficiency, if any, between the
amounts received by Lessor's Assignees, if any, in pay-
ment of the debt service on Lessor's Notes, if any, and
the amounts actually due thereon at any time during the
Interim Term and the first six months of the Fixed Term,
and (ii) all other amounts, liabilities, obligations and
Impositions which Lessee assumes or agrees to pay under
this Lease and in the event of any failure on the part of
Lessee to pay any of the same, Lessor shall have all legal,
equitable and contractual rights, powers and remedies
provided either in this Lease or by statute or otherwise
as in the case of non-payment of the Basic Rent.  If any
installment of Basic Rent shall not be paid within five
(5) days after its due date, Lessee will pay Lessor on
demand, as Additional Rent, interest (to the extent
permitted by law) at the rate of 11.25% per annum on
the amount of such installment, from the due date of
such installment to the date of payment thereof.

## ARTICLE VI

6.1.  Payment of Impositions.  Subject to Article
XVI relating to contests, Lessee will pay, or cause to
be paid, all Impositions before any fine, penalty, interest
or cost may be added for non-payment, such payments to be
made directly to the taxing authorities where feasible,
and will promptly furnish to Lessor and Lessor's Assignees,
if any, official receipts or other satisfactory proof evidencing
such payments.  If any Imposition may, at the option of
the taxpayer, lawfully be paid in installments (whether
or not interest shall accrue on the unpaid balance of
such Imposition), Lessee may exercise the option to pay
the same (and any accrued interest on the unpaid balance
of such Imposition) in installments and in such event,

16.

shall pay such installments during the Term hereof as
the same respectively become due and before any fine,
penalty, further interest or cost may be added thereto.
Lessee, at its expense, shall prepare and file all tax
returns and reports in respect of any Imposition as may
be required by governmental authorities.

6.2.  Notice of Impositions.  Lessor shall give
prompt notice to Lessee of all Impositions payable by
Lessee hereunder of which Lessor at any time has knowl-
edge, but Lessor's failure to give any such notice shall
in no way diminish Lessee's obligations hereunder.
Lessor shall use its best efforts to obtain the coopera-
tion, at the expense of Lessee, of all taxing authorities
to send all bills and notices in respect of the Leased
Property directly to Lessee.

6.3.  Adjustment of Impositions.  Impositions im-
posed in respect of the tax-fiscal period during which
the Term terminates shall be adjusted and prorated
between Lessor and Lessee, whether or not such Imposition
is imposed before or after such termination, and Lessee's
obligation to pay its prorated share thereof shall survive
such termination.


ARTICLE VII


7.  Utility Services.  Lessee will pay or cause to
be paid all charges for electricity, power, gas, water
and other utilities used in the Leased Property.


ARTICLE VIII


8.  No Termination, Abatement, etc.  Except as other-
wise specifically provided herein, Lessee shall remain
bound by this Lease in accordance with its terms and
shall neither take any action to modify, surrender or
terminate the same, nor seek nor be entitled to any abate-
ment, deduction, deferment or reduction of Rent, or
set-off against the Rent, nor shall the respective obliga-
tions of Lessor and Lessee be otherwise affected by
reason of (a) any damage to, or destruction of, the
Leased Property or any portion thereof from whatever
cause or any Taking of the Leased Property or any portion

17.

thereof, (b) the lawful or unlawful prohibition of, or restriction upon, Lessee's use of the Leased Property or any portion thereof, the interference with such use by any person, corporation or other entity, or by reason of any eviction by paramount title, or Lessee's acquisition of ownership of the Leased Property otherwise than pursuant to an express provision of this Lease, (c) any claim which Lessee has or might have against Lessor or against any of Lessor's Assignees, if any, or by reason of any default or breach of any warranty by Lessor under this Lease or any other agreement between Lessor and Lessee, or to which Lessor and Lessee are parties, (d) any bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding up or other proceedings affecting Lessor or any assignee of Lessor, or any action with respect to this Lease that may be taken by a trustee or receiver of Lessor or any assignee of Lessor or by any court in any such proceeding, or (e) for any other cause whether similar or dissimilar to any of the foregoing.  Lessee hereby specifically waives all rights, arising from any occurence whatsoever, which may now or hereafter be conferred upon it by law to (i) modify, surrender or terminate this Lease or quit or surrender the Leased Property or any portion thereof, or (ii) entitle Lessee to any abatement, reduction, suspension or deferment of the Rent or other sums payable by Lessee hereunder, except as otherwise specifically provided in this Lease.  The obligations of Lessor and Lessee hereunder shall be separate and independent covenants and agreements and the net Basic Rent and Additional Rent and all other sums payable by Lessee hereunder shall continue to be payable in all events unless the obligations to pay the same shall be terminated pursuant to the express provisions of this Lease.  Lessee shall have the right, however, by separate and independent action to pursue any claims it may have against Lessor or any of Lessor's Assignees, if any.

## ARTICLE IX

9.1.  Ownership of Leased Property.  Lessee acknowledges that the Leased Property is the property of Lessor and that Lessee has only the right to the possession and use thereof upon the terms and conditions of this Lease.

18.

9.2.  <u>Lessee's Equipment</u>.  Lessee may at its expense install or assemble or place on the Land or in the Leased Improvements, and remove and substitute, any items of machinery, equipment, furniture, furnishings, trade fixtures or other personal property, including, but not limited to, the computer controlled overhead conveyer material handling system, used or useful in Lessee's business, which property shall constitute Lessee's Equipment, and Lessee shall remove the same upon the expiration or prior termination of the Term; provided, however, that Lessee shall have no right to remove any such item which constitutes a Fixture.  All Lessee's Equipment shall be and remain the property of Lessee, provided that any of Lessee's Equipment not removed by Lessee within 15 days after the expiration or earlier termination of this Lease shall be considered abandoned by Lessee and may be appropriated, sold, destroyed or otherwise disposed of by Lessor without first giving notice thereof to Lessee and without obligation to account therefor.  Lessee shall have the right during such 15-day period to enter upon the Leased Property and remove all or any part of Lessee's Equipment.  Lessee will pay (i) rental in advance for such 15-day period prorated on the basis of the Rent payable during the immediately preceeding term and (ii) all costs and expenses incurred in removing, storing and disposing of Lessee's Equipment.  Lessee will repair, at its expense, all damage to the Leased Property caused by the removal of Lessee's Equipment, whether effected by Lessee or Lessor.  Lessor shall not be responsible for any loss or damage to Lessee's Equipment.

## ARTICLE X

10.1.  <u>Condition of the Leased Property</u>.  Lessee acknowledges receipt and delivery of possession of the Leased Property and that Lessee has examined title to the Lease Property prior to the execution and delivery of this Lease and has found the same to be satisfactory for all purposes hereunder.  Lessee is renting the Leased Property "as is" in its present condition and state of repair.  LESSOR MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE CONDITION OF THE LEASED PROPERTY OR ITS FITNESS OR AVAILABILITY FOR ANY PARTICULAR USE AND LESSOR SHALL NOT BE LIABLE FOR ANY LATENT OR PATENT DEFECT THEREIN.

19.

10.2.  <u>Use of the Leased Property</u>.  Lessee may use the Leased Property for a distribution center with office space and related facilities or for any other lawful purpose.  Lessee agrees that it will not permit any unlawful occupation, business or trade to be conducted on the Leased Property or any use to be made thereof contrary to any Legal Requirements or Insurance Requirements applicable thereto.  Lessee shall not use or occupy or permit the Leased Property to be used or occupied, nor do or permit anything to be done in or on the Leased Property or any part thereof, in a manner that may make it impossible to obtain fire or other insurance thereon which Lessee is, or may be, required to furnish hereunder, or that will cause or be likely to cause structural injury to any of the Leased Improvements, or that will constitute a public or private nuisance or waste.  Except as provided in Article XIV, nothing in this Lease contained and no action or inaction by Lessor shall be deemed or construed to mean that Lessor has granted to Lessee any right, power or permission to do any act or to make any agreement that may create or be the foundation for any right, title, interest, lien, claim or other incumbrance upon the estate of Lessor in the Leased Property.

<u>ARTICLE XI</u>

11.  <u>Compliance with Legal and Insurance Requirements, Instruments, etc.</u>  Subject to Article XVI relating to contests, Lessee, at its expense, will promptly (a) comply with all Legal Requirements and Insurance Requirements in respect of the use, operation, maintenance, repair and restoration of the Leased Property, whether or not compliance therewith shall require structural changes in any of the Leased Improvements or interfere with the use and enjoyment of the Leased Property and (b) procure, maintain and comply with all licenses and other authorizations required for any use of the Leased Property then being made, and for the proper erection, installation, operation and maintenance of the Leased Improvements or any part thereof.

20.

## ARTICLE XII

12.1. <u>Maintenance and Repair</u>. Lessee, at its expense,
will keep the Leased Property and all roadways, sidewalks
and curbs appurtenant thereto in good order and repair
(ordinary wear and tear excepted), and subject to the pro-
visions of Section 18.3(b), with reasonable promptness,
make all necessary and appropriate repairs thereto of
every kind and nature, whether interior or exterior,
structural or non-structural, ordinary or extraordinary,
foreseen or unforeseen. All repairs shall, to the extent
possible, be at least equivalent in quality to the
original work. Lessee will not take or omit to take any
action the taking or omission of which might materially
impair the value or the usefulness of the Leased Property
or any part thereof or commit any waste of the Leased
Property or any part thereof.

Lessor shall not under any circumstances be required
to build any improvements on the Leased Property, or to
make any repairs, replacements, alterations or renewals
of any nature or description to the Leased Property,
whether ordinary or extraordinary, structural or non-
structural, foreseen or unforeseen, or to make any
expenditure whatsoever in connection with this Lease,
except as provided in Article XIV, or to maintain the
Leased Property in any way. Lessee hereby waives the
right to make repairs at the expense of Lessor pursuant
to any law in effect at the time of the execution of
this Lease or hereafter enacted. Nothing contained in
this Lease shall be construed as constituting the consent
or request of Lessor, expressed or implied, to any con-
tractor, subcontractor, laborer, materialman or vendor
to or for the performance of any labor or services or
the furnishing of any materials for the construction,
alteration, addition, repair or demolition of or to the
Leased Property or any part thereof. Notice is hereby
given that Lessor will not be liable for any labor,
services or material furnished or to be furnished to
Lessee, or to anyone holding the Leased Property or
any part thereof through or under Lessee, and that no
mechanics' or other liens for such labor, services or
materials shall attach to or affect the interest of
Lessor in and to the Leased Property or any part
thereof.

21.

Unless Lessor shall convey the Leased Property to
Lessee pursuant to the provisions of this Lease, upon
the expiration or prior termination of the Term, Lessee
will vacate and surrender the Leased Property to Lessor
in good repair, ordinary wear and tear excepted.

12.2. Encroachments, Restrictions, etc. If any
of the Leased Improvements shall, at any time, encroach
upon any property, street or right of way adjoining or
adjacent to the Leased Property, or shall violate the
agreements or conditions contained in any restrictive
covenant or other agreement affecting the Leased Property,
or any part thereof, or shall hinder or obstruct any
easement or right-of-way to which the Leased Property
is subject or shall impair the rights of others under
such easement or right-of-way, then promptly upon the
request of Lessor or at the behest of any person affected
by any such encroachment, violation, hindrance, obstruc-
tion or impairment, Lessee shall, at its expense, sub-
ject to its right to contest the existence of any
encroachment, and in such case, in the event of an
adverse final determination, either (i) obtain valid
and effective waivers or settlements of all claims,
liabilities and damages resulting from each such
encroachment, violation, hindrance, obstruction or
impairment, whether the same shall affect Lessor or
Lessee or (ii) make such changes in the Leased Improve-
ments and take such other actions as shall be necessary
to remove such encroachment, hindrance or obstruction
and to end such violation or impairment, including, if
necessary, the alteration of any of the Leased Improve-
ments. Any such alteration shall be made in conformity
with the requirements of Section 13.1.

ARTICLE XIII

13.1. Alterations, Substitutions and Replacements.
Lessee, at its expense, may at any time and from time to
time make alterations of the Leased Improvements or any
part thereof and substitutions and replacements for the
same (collectively, "Alterations"), provided that (a)
the market value of the Leased Property shall not be
reduced or its usefulness impaired, (b) the work shall
be done expeditiously and in a good and workmanlike
manner, (c) Lessee shall comply with all Legal Require-
ments and Insurance Requirements, if any, applicable

22.

to the work, and (d) Lessee shall promptly pay all costs
and expenses and discharge any and all liens arising
in respect of the work.  All Alterations shall imme-
diately become and remain the property of Lessor, shall
be deemed part of the Leased Property, and shall be
subject to all of the terms and provisions of this
Lease.

13.2.  Salvage.  All materials which are scrapped or
removed in connection with the making of either Altera-
tions permitted by Section 13.1 or repairs required by
Article XII may be dealt with by Lessee as its own prop-
erty and Lessee shall be entitled to all salvage result-
ing therefrom.

13.3.  Construction of Additional Facilities.  Sub-
ject to the requirements of Section 13.1 (a), (b), (c)
and (d), Lessee, at its expense, may at any time here-
after construct Additional Facilities.  Until the expira-
tion or earlier termination of this Lease or until the
cost of such Additional Facilities is financed by Lessor
pursuant to Article XIV, title to any Additional Facil-
ities shall remain solely in Lessee and Lessee alone
shall be entitled to deduct all depreciation on Lessee's
income tax returns with respect to such Additional
Facilities.  In case the estimated cost of such Addi-
tional Facilities exceeds $250,000 the same must be
constructed under the supervision of a qualified
architect or engineer, and prior to the commencement
of any work thereon, if the estimated cost thereof
exceeds $1,000,000, notice of the amount of such estimate
shall be given to Lessor in writing.


ARTICLE XIV

14.1.  Reimbursement of Additional Facility Cost.
If no Event of Default shall have occurred that has not
been waived, Lessee, at any time and from time to time
during the Fixed Term, may request Lessor (a "Request")
to provide funds, in amounts not less than two million
($2,000,000) dollars for each Request, to pay for the cost
of Additional Facilities constructed during the two-year
period immediately preceding the date of any such Request
and not reimbursed pursuant to this Article.  Such cost
(the "Additional Facility Cost"), for all purposes of

23.

this Lease, may include (a) the cost of construction of
the Additional Facilities, including site preparation
and improvement, materials, labor, supervision, design,
engineering and architectural services, the cost of any
Fixtures, the cost of construction financing and miscellaneous
costs approved by Lessor, (b) the cost of any land contiguous
to the Leased Property purchased for the purpose of placing
thereon the Additional Facilities or any portion thereof
or for providing means of access thereto, or parking facilities
therefor, including the cost of surveying the same, (c) the
cost of insurance, real estate taxes, water and sewer charges
and other carrying charges for such Additional Facilities
during construction, (d) cost of title insurance, (e) fees and
expenses of counsel, (f) filing, registration and recording
taxes and fees, (g) documentary stamp taxes, if any, and
(h) the amounts payable by Lessee to Lessor pursuant to
Section 14.6.

14.2.  Each Request shall be accompanied by an
Officer's Certificate setting forth (a) a description
of the Additional Facilities, (b) in reasonable detail,
the Additional Facility Cost, and (c) the willingness
of Lessee to amend this Lease upon reimbursement of the
Additional Facility Cost by executing and delivering an
amendment (the "Lease Amendment") to this Lease, with
the consent of Guarantor to the terms and provisions
thereof appended thereto, to provide for (i) payment of
additional annual basic rent ("Additional Basic Rent")
during the balance of the Fixed Term in an amount which
will amortize the Additional Facility Cost on a level
payment basis over such period, together with interest
thereon as hereinafter provided, (ii) payment of addi-
tional annual Basic Rent for the renewal terms in an
amount not less than 3% of the Additional Facility Cost,
and (iii) such other matters as are necessary or
appropriate.

14.3.  Lessor shall use its best efforts to obtain
the necessary funds to meet the Request.  Within 90 days
after receipt of the Request, Lessor shall advise Lessee
whether or not Lessor is prepared to reimburse the Addi-
tional Facility Cost and, if so, the interest rate on
which the Additional Basic Rent would be based.  If such
advice is in the affirmative, Lessee shall notify Lessor
within 30 days after receipt thereof that either (a) Lessee

is prepared to accept reimbursement at the rate proposed by
Lessor or (b) a specified Lending Institution ("Lessee's
Lender") is prepared to finance the Additional Facility
Cost at a lower interest rate and on terms no more onerous
to Lessor (including, but not limited to, rights of prepay-
ment and premiums payable in connection therewith) than
that offered by Lessor, as evidenced by an executed counter-
part of a commitment of Lessee's Lender addressed to both
Lessor and Lessee.  If notice is given pursuant to clause
(b), Lessor shall have a period of 30 days within which to
revise its offer to finance the Additional Facility Cost
to provide for an interest rate matching the rate proposed
by Lessee's Lender.  If either (i) Lessee is prepared to
accept reimbursement at the rate proposed by Lessor or (ii)
Lessor has agreed to match the interest rate proposed by
Lessee's Lender, Lessee shall accept reimbursement of the
Additional Facility Cost from Lessor.

14.4.  If Lessor is unable to either advance the
necessary funds to meet the Request or to match the
interest rate offered by Lessee's Lender, as the case
may be, Lessor shall be deemed to have rejected the
Request.  In such event Lessee shall have the option,
exercisable upon notice to Lessor, to either (a) with-
draw the Request, in which case this Lease shall con-
tinue in full force and effect without modification or
(b) arrange for financing by Lessor of the Additional
Facility Cost with Lessee's Lender.

14.5.  If the Request can be met by Lessor pur-
suant to Section 14.3 or through Lessee's Lender as
provided for in Section 14.4, Lessor shall expeditiously
reimburse Lessee, or cause Lessee to be reimbursed, for
the Additional Facility Cost, upon delivery by Lessee
to Lessor, Lessor's Assignees, if any, and Lessee's
Lender, if any, of the following:

(a)  an Officer's Certificate, accompanied by
a certificate of the supervising architect as to
the matters specified in clauses (i) and (iii) below,
confirming the Additional Facility Cost specified
in the Request and certifying that (i) the Addi-
tional Facilities have been (A) constructed in
compliance with all applicable Legal Requirements
and Insurance Requirements and all bills for labor

25.

and materials in connection with the construction
thereof have been paid in full except for amounts
specified therein, if any, as to which arrangements
have been made for prompt payment after receipt of
funds from Lessor and prior to the expiration of
any retainage period provided for in the applicable
contract and (B) completed in accordance with plans
and specifications prepared for, and approved by,
Lessee in a good and workmanlike manner, in con-
formity with good construction and engineering
practice; (ii) the Additional Facilities have
been accepted by Lessee for all purposes of this
Lease and there has been no material damage to
the Additional Facilities nor is any condemnation
or eminent domain proceeding pending with respect
thereto; (iii) all permits, licenses and certifi-
cates (including permanent, unconditional certifi-
cates of occupancy) which are necessary to permit
the use of the Additional Facilities in accordance
with the provisions of this Lease have been obtained
and are in full force and effect; (iv) under applic-
able zoning and use laws, ordinances, rules and
regulations the Additional Facilities may be used
for the purposes contemplated by Lessee and all
necessary subdivision approvals have been obtained;
(v) there are no unsatisfied mechanics' or material-
men's liens outstanding or threatened to the knowl-
edge of Lessee against the Leased Property, Addi-
tional Facilities or the land referred to in clause
(b) of Section 14.1 arising out of or in connection
with such construction, other than those being
contested by Lessee pursuant to Article XVI; (vi)
any mechanics' or materialmen's liens being con-
tested by Lessee will be promptly paid by Lessee
if such contest is resolved in favor of the
mechanic or materialman; (vii) construction of such
Additional Facilities has not impaired the value
of the Leased Property; (viii) there exists no
Default hereunder, and no defense, offset or claim
exists with respect to any sums to be paid by
Lessee hereunder, and (ix) any exceptions to Lessor's
title to the land referred to in clause (b) of
Section 14.1 do not materially interfere with the
intended use of the Additional Facilities by Lessee;

(b)   the Lease Amendment duly executed,
acknowledged and delivered by Lessee, in form and
substance satisfactory to Lessor, amending this
Lease to (i) provide for the Additional Basic
Rent and additional basic rent referred to in
clause (ii) of Section 14.2, (ii) increase the
Cost of the Leased Property by the amount of the
Additional Facility Cost, (iii) amend the defini-
tion of Discounted Future Basic Rent to reflect
the Additional Basic Rent and the interest rate
used in the computation thereof, (iv) add to the
description of the Land any land purchased for
the purpose of constructing the Additional
Facilities thereon, as referred to in clause
(b) of Section 14.1 and (v) make such other
changes herein as may be necessary or appropriate
under the circumstances;

(c)   a deed conveying title to Lessor to any
land acquired for the purpose of the Additional
Facilities, as referred to in clause (b) of
Section 14.1, free and clear of any liens or
incumbrances except those approved by Lessor,
accompanied by a final as-built survey thereof
satisfactory to Lessor;

(d)   endorsements to the outstanding policies
of title insurance covering the Leased Property
satisfactory in form and substance to Lessor and
any Lending Institution advancing the Additional
Facility Cost and its counsel (i) updating the
same without any additional exception except as
may be permitted by such counsel, (ii) increasing
the coverage thereof by an amount equal to the
Additional Facility Cost, (iii) insuring any
Indenture as a first lien of record on any land
conveyed to Lessor pursuant to subparagraph (c)
free and clear of all liens and incumbrances
except those approved by Lessor, and (iv) if
appropriate, amending any loan policy to add
Lessee's Lender as a named insured, as its
interest may appear;

(e)   such other certificates (including,
but not limited to, endorsements increasing the
insurance coverage, if any, at the time required

27.

by Section 17.1), documents, opinions of counsel,
surveys, certified copies of duly adopted resolu-
tions of the Board of Directors of (i) Lessee
authorizing the execution and delivery of the
Lease Amendment and (ii) Guarantor authorizing
the execution and delivery of its consent to
the Lease Amendment, and any other instruments
as may be reasonably required by Lessor and any
Lending Institution advancing the Additional
Facility Cost.

14.6.   Upon issuance of a commitment by a Lending
Institution to participate in the financing of the
Additional Facilities, whether or not such financing
is actually consumated, Lessee shall pay or cause to
be paid all reasonable costs and expenses of Lessor and
any Lending Institution which has committed to finance
the Additional Facility Cost paid or incurred by them
in connection with the financing of the Additional
Facilities, including, but not limited to, (i) the fees
and expenses of their respective counsel, (ii) all
printing expenses, (iii) the amount of any filing,
registration and recording taxes and fees, (iv) docu-
mentary stamp taxes, if any, and (v) title insurance
charges.

## ARTICLE XV

15.   Liens.  Subject to Article XVI relating to con-
tests, Lessee will not directly or indirectly create or
allow to remain and will promptly discharge at its expense
any mortgage, lien, incumbrance, attachment, title retention
agreement or claim upon the Leased Property or any attach-
ment, levy, claim or incumbrance in respect of the Basic
Rent or Additional Rent provided under this Lease, not
including, however, (a) this Lease, (b) any Indenture, (c)
such of the matters, if any, set forth in Schedule A as
shall at the time be in effect and applicable to the Leased
Property, (d) restrictions, liens and other incumbrances
which are consented to in writing by Lessor, or any ease-
ments which do not substantially interfere with the opera-
tion of the Leased Property or materially affect the value
thereof, (e) liens for those taxes of Lessor which Lessee
is not required to pay hereunder, (f) subleases permitted
by Article XXVII, (g) liens for Impositions or for sums

28.

resulting from non-compliance with Legal Requirements so
long as (1) the same are not yet payable or are payable
without the addition of any fine, penalty, interest, or
cost or (2) such liens are in the process of being con-
tested as permitted by Article XVI, and (h) liens of
mechanics, laborers, materialmen, suppliers or vendors
for sums either disputed or not yet due, provided that
(1) the payment of such sums shall not be postponed
under any related contract for more than sixty (60) days
after the completion of the action giving rise to such
lien and such reserve or other appropriate provisions
as shall be required by law or sound accounting prin-
ciples shall have been made therefor or (2) any such
liens are in the process of being contested as permitted
by Article XVI.

## ARTICLE XVI

16.  Permitted Contests.  Lessee, at its expense,
may contest, by appropriate legal proceedings conducted
in good faith and with due diligence, the amount or
validity or application, in whole or in part, of any
Imposition or any Legal Requirement or Insurance Require-
ment or any lien, incumbrance, charge or claim not per-
mitted by Article XV, provided that (a) in the case of
an unpaid Imposition, lien, incumbrance, charge or claim,
the commencement and continuation of such proceedings
shall suspend the collection thereof from Lessor and
from the Leased Property, (b) neither the Leased Property
nor any rent therefrom nor any part thereof or interest
therein would be in any immediate danger of being sold,
forfeited, attached or lost, (c) in the case of a Legal
Requirement, Lessor would not be in any immediate danger
of civil or criminal liability for failure to comply
therewith pending the outcome of such proceedings, (d)
Lessee shall deliver to Lessor, the trustee under any
Indenture, and their respective counsel an opinion of
Lessee's counsel to the effect set forth in clauses (a),
(b) and (c), to the extent applicable, (e) in the case
of an Imposition, Lessee shall have set aside on its
books such reserves with respect thereto as may be
required by sound accounting principles or shall have
furnished such security, if any, as may be required in
the proceedings, (f) in the case of an Insurance Require-
ment, the coverage required by Article XVII, if any,

29.

shall be maintained, and (g) if such contest be finally
resolved against Lessee, Lessee shall promptly pay the
amount required to be paid, together with all interest
and penalties accrued thereon, or comply with the applicable
Legal Requirement or Insurance Requirement.  Lessor, at
Lessee's expense, shall execute and deliver to Lessee
such authorizations and other documents as may reasonably
be required in any such contest, and, if reasonably
requested by Lessee, Lessor shall join as a party
therein.  Lessee shall indemnify and save Lessor harm-
less against any cost or expense of any kind that may
be imposed upon Lessor in connection with any such
contest and any loss resulting therefrom.

### ARTICLE XVII

17.1.  Insurance.  So long as (1) this Lease remains
in effect and (2) the Tangible Net Worth of Guarantor is
in excess of $250,000,000, Lessee may self-insure (pursuant
to a prudent program of self-insurance providing for
adequate reserves) against the risks hereinafter described
and shall not be required to maintain insurance hereunder.
If the Tangible Net Worth of Guarantor falls below the
above amount, Lessee agrees to maintain at all times and
at its expense insurance covering the Leased Property as
follows: (a) during the Interim Term, builder's risk insurance
(in completed value non-reporting form) and during the
balance of the Term, fire, with extended coverage,
vandalism and malicious mischief insurance in each case
in an amount not less than the full insurable value (actual
replacement value less physical depreciation) of the Leased
Property; (b) comprehensive liability insurance in the
amount of (i) at least $500,000 with respect to bodily
injury or death to any one person, (ii) at least $1,000,000
with respect to bodily injury or death arising out of any
one accident and (iii) at least $500,000 with respect to
property damage arising out of any one occurrence, (c)
adequate explosion insurance in respect of steam or pressure
boilers and similar apparatus, if any, located on the
Leased Property, (d) workmen's compensation insurance
subject to statutory limits or better in respect of
any work or other operations on or about the Leased
Property, (e) war risk insurance as and when such insur-
ance is obtainable from the United States Government or
any agency or instrumentality thereof, and a state of

30.

war or national or public emergency exists or threatens, in an amount not less than the full insurable value thereof as above defined, (f) if the area in which the Leased Property is located has been designated by the Secretary of Housing and Urban Development as having special flood hazards, and if flood insurance is available under the National Flood Insurance Act, flood insurance must be provided, in an amount equal to the Cost of the Property or the maximum amount available, whichever is less, and (g) such other insurance with respect to the Leased Property and in such amounts as Lessor from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against in respect of property similar to the Leased Property.  Lessee may effect all coverage required herein under its blanket insurance policies, if available thereunder, and all such policies shall be written by companies presently or hereafter insuring the properties of Lessee; provided, however, that (i) any such policy of blanket insurance either shall specify therein, or Lessee shall furnish Lessor a written statement from the insurer under such policy so specifying, the amount of the total insurance allocated to the Leased Property, which amount shall not be less than the amount required pursuant to this Article XVII, (ii) any policy of blanket insurance hereunder shall comply in all respects with the other provisions of this Article XVII and (iii) the protection afforded Lessor, the trustee under any Indenture, and Lessee under any such policy of blanket insurance shall be no less than that which would have been afforded under a separate policy or policies relating only to the Leased Property. Such insurance shall be written by companies of recognized financial standing which are authorized to do insurance business in the Commonwealth of Pennsylvania.

17.2.  _Policy Provisions and Certificates_.  The insurance maintained by Lessee under clauses (a), (b), (c), (d) and (e) of Section 17.1 shall name Lessor and Lessee, as insureds, as their respective interests may appear, and shall bear a standard non-contributory first mortgagee endorsement in favor of the trustee under any Indenture.  The insurance maintained by Lessee under clauses (a), (b), (c) and (e) of Section 17.1 shall provide that all property losses insured against shall be adjusted by Lessee (subject to Lessor's approval of final settlement of estimated losses of Two Hundred Thousand

31.

($200,000) Dollars or more) and that the proceeds thereof shall be paid to Lessor, to be applied in the manner hereinafter set forth in Sections 18.1 and 18.3. All insurance maintained by Lessee shall provide that (a) no cancellation or reduction thereof shall be effective until at least ten (10) days after receipt by Lessor and the trustee under any Indenture, of written notice thereof, and (b) all losses shall be payable notwithstanding any act or negligence of Lessor, the trustee under any Indenture, or Lessee or their respective agents or employees which might, absent such agreement, result in a forfeiture of all or part of such insurance payment and notwithstanding (i) the occupation or use of the Leased Property for purposes more hazardous than permitted by the terms of such policy, (ii) any foreclosure or other action or proceeding taken pursuant to any provision of any Indenture upon the happening of an event of default thereunder or (iii) any change in title or ownership of the Leased Property or any part thereof. Lessee will, on the date hereof, furnish to Lessor and the trustee under any Indenture certificates for the insurance required by Section 17.1, and not less than ten (10) days before the expiration of any such insurance, certificates evidencing the replacement or renewal thereof, together with written evidence that the premium has been paid.

17.3. <u>Other Insurance</u>. Lessee shall not take out separate insurance concurrent in form or contributing in the event of loss with that required by this Article XVII to be furnished by Lessee unless Lessor and the trustee under any Indenture are included therein as named insureds, with loss payable as in this Article provided. Lessee shall immediately notify Lessor and the trustee under any Indenture whenever any such separate insurance is taken out and shall deliver the policy or policies or duplicates thereof, or certificates evidencing the same as provided in this Article.

## ARTICLE XVIII

18.1.  Notice of Damage, Destruction or Taking;
Condemnation Awards.  In case of any material damage to
or destruction of the Leased Property or any part thereof,
or in case of any Taking, Lessee shall forthwith give
notice thereof to Lessor.  If Lessor shall be advised
by the condemning authority of a proposed Taking, Lessor
shall forthwith give notice thereof to Lessee, but its
failure to do so shall not affect the rights of the
parties as set forth in this Article XVIII.  In case of
any such Taking, Lessor shall be entitled to all awards
or payments on account thereof, and Lessee hereby irrev-
ocably assigns to Lessor all rights of Lessee to any
such award or payment and irrevocably authorizes and
empowers Lessor in the name of Lessee or otherwise, to
file and prosecute what would otherwise be Lessee's claim
for any such award or payment, and to collect, receipt for
and retain the same, except as hereinafter provided and
except that Lessee shall be entitled to submit a claim
for loss of profit, relocation expenses or injury to
Lessee's Equipment and retain any award applicable there-
to so long as the same does not diminish the amount of
the award or proceeds otherwise payable to Lessor.  If
no Lessor's Assignee shall exist, any such awards or
payments shall be paid over to a bank or other institu-
tion satisfactory to Lessee (the "Bank"), to be held
in escrow and applied as hereinafter provided.  All costs
and expenses of the Bank shall be paid by Lessee.  Unless
an Event of Default shall have occurred, all sums so
received by Lessor or the Bank, as the case may be, shall
be applied in accordance with the provisions of Section
18.3, except that any such sums received with respect
to a Taking for temporary use shall be applied in accord-
ance with the provisions of Section 18.2.  If an Event
of Default shall have occurred at the time of receipt
of any such award or payment, the same shall be paid
to and retained by Lessor.  Lessee will pay all costs
and expenses, including attorneys' fees, incurred by
Lessor or the trustee under any Indenture, in connection
with any such Taking and the seeking and obtaining of
any award or payment in respect thereof.  For the purposes
of this Lease, all amounts paid pursuant to any agreement
with any condemning authority in settlement of any con-
demnation or other eminent domain proceeding affecting
the Leased Property shall be deemed to constitute an

award made in such proceeding whether or not the same
shall have actually been commenced.

18.2.  Taking for Temporary Use.  In case of a Taking
for temporary use, there shall be no termination, cancella-
tion or modification of this Lease, and Lessee shall con-
tinue to perform and comply with (except as such performance
and such compliance may be rendered impossible by reason
of such Taking) all of its obligations under this Lease
and shall in no event be relieved of its obligation to pay
punctually all Rent or any other charges payable hereunder.
Lessor shall pay the net awards received by it (whether
by way of damages, rent or otherwise) by reason of such
Taking to Lessee, if no Event of Default shall have
occurred.

18.3.  Other Taking; Damage or Destruction; Repair
or Replacement.  (a)  Except as otherwise provided in
Section 18.3(b), in case of any damage to or destruction
of the Leased Property or any part thereof, or in case
of any Taking other than for temporary use, Lessee will,
at its expense, promptly commence and complete with due
diligence (subject to Unavoidable Delays) the replacement
and repair of the Leased Property in order to restore it
as nearly as practicable to the value and condition
thereof immediately prior to such damage, destruction
or Taking, whether or not the insurance proceeds or the
award for the Taking shall be sufficient for such purpose.
In such event, the net proceeds of insurance and the net
awards for the Taking received by Lessor or the Bank, as
the case may be, if no Event of Default shall have
occurred, shall be paid to Lessee (or as Lessee may
direct), from time to time as the Leased Property is
replaced or repaired, in amounts equal to the cost of
such replacement and repair, upon delivery to Lessor of
an Officer's Certificate certifying, in each case, the
amount to be paid (which may represent amounts thereto-
fore paid by Lessee in the effectuation of such repairs
or replacements and not reimbursed hereunder or amounts
due and payable by Lessee therefor, or both).  Upon
completion of construction, Lessee shall deliver to
Lessor (i) a copy of a permanent, unconditional certificate
of occupancy for the Leased Property and (ii) an Officer's
Certificate certifying to the completion of the repair or
replacement of the Leased Property, the payment of the cost
thereof in full, and the amount of such cost, and upon
receipt of such certificates by Lessor, any balance of

34.

such proceeds and awards not required to be held or applied in accordance with the preceding sentence, shall be paid over to Lessee, except that if during the Fixed Term the balance of an award or proceeds shall be $100,000 or more, the same shall be retained by Lessor and applied to the payment of the installments of Basic Rent, payable during the remainder of the Fixed Term, in the inverse order of their due dates. In the event of a Taking of such character as not to require any repair or replacement of the Leased Property, and upon delivery to Lessor of an Officer's Certificate certifying that such partial Taking has not materially affected the condition or use of the Leased Property, any net award for such Taking shall, if no Event of Default shall have occurred, be paid over to Lessee, except that if during the Fixed Term the amount of such award otherwise payable to Lessee shall be $100,000 or more, the same shall be retained by Lessor and applied to the payment of the installments of Basic Rent, payable during the remainder of the Fixed Term, in the inverse order of their due dates. If an Event of Default shall have occurred prior to the time of Lessor's receipt of any insurance proceeds or awards for a Taking pursuant to this Section 18.3(a), the same shall be retained by Lessor.

(b)   In case either of the following shall occur during the Basic Term:

(i)   a Taking of the entire Leased Property, or

(ii)   any material damage to or destruction of the Leased Property or a Taking of less than the entire Leased Property which, in either case, in the good faith judgment of the Board of Directors of Lessee, as reflected in an Officer's Certificate delivered to Lessor within 60 days after such damage, destruction or Taking, renders continued occupancy or use of the remainder of the Leased Property economically unsound,

Lessee, if no Event of Default shall have occurred, may, within sixty (60) days from the date of such damage, destruction or Taking, give Lessor notice of termination

of this Lease accompanied by an offer to purchase the
Leased Property (including the net amount of the award
or insurance proceeds, as the case may be) on the first
quarter-annual Basic Rent payment date occurring not
less than one hundred eighty (180) days after such
Taking or such determination (the "Purchase Date") for
a purchase price equal to the Discounted Future Basic
Rent as of the Purchase Date.

If Lessor accepts such offer, or fails to reject the
same by timely written notice, Lessor shall, upon receipt
from Lessee of the purchase price provided for above and
any Rent then due and payable hereunder (including the
installment of Basic Rent due on the Purchase Date), (a)
convey the Leased Property to Lessee on the Purchase Date
in accordance with the provisions of Article XXII and (b)
pay over or assign to Lessee the net award or net insurance
proceeds, and this Lease shall thereupon terminate.

If Lessor rejects Lessee's offer to purchase the
Leased Property by timely written notice, this Lease
shall terminate on the Purchase Date, provided Lessee
shall not then be in Default hereunder and Lessor shall
retain all proceeds of any insurance policies (or if
Lessee then be self-insuring the Leased Property, Lessee
shall pay over to Lessor amounts equal to what would have
been such proceeds under the policies as described in
Section 17.1) or condemnation awards.

(c)  In case either of the events specified in sub-
section (b) shall occur during any renewal term provided
for in Article XXIII hereof, Lessee may give Lessor not
less than ninety (90) days prior written notice of ter-
mination of this Lease and, upon payment by Lessee to
Lessor of all Rent due hereunder prorated to the date
of termination, this Lease shall terminate upon the date
fixed in such notice.  In such event Lessor shall retain
all proceeds of any insurance policies or condemnation
awards.

36.

## ARTICLE XIX

19.    Termination of Lease upon Discontinuance of
Operations on the Leased Property.    If in the good faith
judgment of the Board of Directors of Lessee, the Leased
Property becomes uneconomic or unsuitable for Lessee's
then use and occupancy, and Lessee has discontinued use of
the Leased Property in its business operations or intends
to discontinue such use within a period of one hundred
twenty (120) days, all as set forth in an Officer's
Certificate delivered to Lessor, Lessee, if no Event of
Default shall have occurred, may, at any time after the
expiration of the tenth Year, give Lessor notice of
termination of this Lease accompanied, if such notice
is given during the Fixed Term, by an offer to purchase
the Leased Property on the first Basic Rent payment date
(the "Economic Termination Purchase Date") occurring not
less than one hundred twenty (120) days after the date of
such offer for a purchase price equal to the Discounted
Future Basic Rent as of the Economic Termination Purchase
Date.

If Lessor accepts such offer, or fails to reject the
same by timely written notice, Lessor shall, upon receipt
from Lessee of the purchase price provided for above and any
Rent due and payable under this Lease (including the install-
ment of Basic Rent due on the Economic Termination Purchase
Date), convey the Leased Property to Lessee on the Economic
Termination Purchase Date in accordance with the provisions
of Article XXII and this Lease shall thereupon terminate.

If Lessor rejects Lessee's offer to purchase the
Leased Property by timely written notice, this Lease shall
terminate on the Economic Termination Purchase Date, provided
Lessee is not then in Default under this Lease, and the Rent
shall be paid to the Economic Termination Purchase Date.

## ARTICLE XX

20.    Events of Default.

20.1.    If any one or more of the following events
(individually, an "Event of Default") shall occur:

37.

(a)   if Lessee shall fail to make payment of any
Basic Rent or Additional Rent payable by Lessee under
this Lease when the same becomes due and payable and
such failure shall continue for a period of 10 days
after notice thereof, or

(b)   if Lessee shall fail to observe or perform
any other term, covenant or condition of this Lease and
such failure shall continue for a period of 30 days
after notice thereof, unless such failure cannot with
due diligence be cured within a period of 30 days, in
which case such failure shall not be deemed to continue
if Lessee proceeds promptly and with due diligence to
cure the failure and diligently completes the curing
thereof, or

(c)   if either Lessee or Guarantor shall make a
general assignment for the benefit of its creditors,
or shall file a voluntary petition in bankruptcy, or
shall be adjudicated a bankrupt or insolvent, or shall
file any petition or answer seeking, consenting to, or
acquiescing in reorganization, arrangement, adjustment,
composition, liquidation, dissolution or similar relief
under any present or future statute, law or regulation,
or shall file an answer admitting or failing to deny
the material allegations of a petition against it for
any such relief, or shall admit in writing its inability
to pay its debts as they mature, or

(d)   if any proceeding against either Lessee or
Guarantor seeking any of the relief mentioned in clause
(c) of this Section shall not have been stayed or
dismissed within ninety (90) days after the commencement
thereof, or

(e)   if a trustee, receiver or liquidator of either
Lessee or Guarantor or of any substantial part of the
properties or assets of either, or of Lessee's estate
or interest in the Leased Property, shall be appointed
with the consent or acquiescence of Lessee or Guarantor,
as the case may be, or if any such appointment, if not
so consented to or acquiesced in, shall remain unvacated
or unstayed for an aggregate of ninety (90) days (whether
or not consecutive), or

(f)  if either Lessee or Guarantor shall be
liquidated or dissolved (other than in connection
with a merger of Guarantor into, or a sale of all or
substantially all of Guarantor's assets to, another
corporation provided that the survivor of such merger
or the purchaser of such assets shall assume all of
Guarantor's obligations under the Guaranty and the
Consent, and provided further that immediately after
giving effect to any such merger the corporation
surviving the same shall have a Tangible Net Worth at
least equal to the greater of (i) the Tangible Net Worth
of Guarantor on the Commencement Date or (ii) the Tangible
Net Worth of Guarantor immediately prior to such merger),
or shall begin proceedings toward such liquidation or
dissolution, or shall, in any manner, permit the
divestiture of substantially all its assets, or

(g)  if Lessee or Guarantor shall fail to perform
any term or provision of the Consent and such failure
shall continue for a period of ten (10) days after
notice thereof from the trustee under any Indenture or
any of Lessor's Assignees, if any, or

(h)  the estate or interest of Lessee in the Leased
Property or any part thereof shall be levied upon or
attached in any proceeding and the same shall not be
vacated or discharged within 90 days after commencement
thereof (unless Lessee shall be contesting such lien or
attachment in good faith in accordance with Article XVI
hereof), or

(i)  if the then current use or occupancy of the
Leased Property shall be permitted pursuant to then
applicable zoning laws only for so long as such use or
occupancy shall be continued, and Lessee shall dis-
continue such use or occupancy without the prior
written consent of Lessor, or

(j)  if, as a result of any action by Lessee or
Guarantor or their omission to perform any act required
by this Lease or the Consent, an event of default shall
have occurred under any Indenture and written notice
of such event of default shall have been mailed or delivered
to Lessee contemporaneously with a notice thereof to Lessor
as required by any such Indenture; provided however, that
Lessor will not modify or amend any default or notice
provisions thereof affecting Lessee's obligations under
this subparagraph (j) without the prior written consent
of Lessee, which consent Lessee will not unreasonably
withhold; or

(k)  if Lessee shall fail to (i) commence construction of the Improvements within sixteen (16) months after January 30, 1975, or (ii) comply with the terms and conditions of an Agreement of Sale, dated November 4, 1974 between Warner Company and Guarantor, as amended,

then, and in any such event, either

(1)  if the same shall have occurred during the Interim Term hereof, Lessee shall forthwith offer (and failing to do so, Lessee shall be deemed to have offered) to purchase the Leased Property on the date occurring thirty (30) days after the earlier of (A) the date of Lessee's offer or (B) the date specified in a notice given by Lessor to Lessee, for an amount equal to 104% of the Cost of the Leased Property as of the date of purchase; thereafter, Lessor shall promptly notify Lessee of its acceptance or rejection of such offer and failing to give such notice shall be deemed to have accepted the same; and upon such acceptance, Lessor shall convey the Leased Property to Lessee on the date fixed therefor in accordance with the provisions of Article XXII, upon receipt of the purchase price therefor, and this Lease shall thereupon terminate, or

(2)  if the same shall occur during the Fixed Term or any renewal term hereof, Lessor may terminate this Lease by giving Lessee not less than ten (10) days' notice of such termination and upon the expiration of the time fixed in such notice, the Term shall terminate and all rights of Lessee under this Lease shall cease. Lessee will pay as Additional Rent all costs and expenses incurred by or on behalf of Lessor, including, without limitation, attorneys' fees and expenses, as a result of any Event of Default hereunder.

No Event of Default (other than a failure to make payment of money) shall be deemed to exist under clause (b) during any time the curing thereof is prevented by an Unavoidable Delay provided that upon the cessation of such Unavoidable Delay, Lessee shall remedy such default without further delay.

40.

20.2.    If an Event of Default shall have occurred,
whether or not this Lease has been terminated pursuant to
Section 20.1, Lessee shall, if required by Lessor so to do,
immediately surrender the Leased Property to Lessor and
quit the same, and Lessor may enter upon and repossess
the Leased Property by reasonable force, summary proceedings,
ejectment or otherwise, and may remove Lessee and all other
persons and any and all personal property from the Leased
Property.  Lessor shall be under no liability for or by
reason of any such entry, repossession or removal.

20.3.    After the termination of this Lease pursuant
to Section 20.1, Lessor, without notice to Lessee, may,
but shall be under no obligation to, relet the Leased
Property or any part thereof for the account of Lessee,
in the name of Lessee or otherwise, for such term or terms
(which may be greater or less than the period which would
otherwise have constituted the balance of the Term) and on
such conditions (which may include concessions or free rent)
and for such purposes as Lessor may determine, and may
collect, receive and retain the rents resulting from such
reletting.  If Lessee shall produce a new corporate tenant
which is financially sound and otherwise acceptable to
Lessor and is ready, willing and able to lease the Leased
Property upon terms reasonably satisfactory to Lessor,
Lessor shall lease the Leased Property to such new tenant,
provided Lessor has made no prior commitments to any other
prospective tenant.

20.4.    Neither (a) the termination of this Lease
pursuant to Section 20.1, (b) the repossession of the
Leased Property, (c) the failure of Lessor to relet the
Leased Property, (d) the reletting thereof, nor (e) the
failure of Lessor to collect or receive any rentals due
upon any such reletting, shall relieve Lessee of its
liability and obligations hereunder, all of which shall
survive any such termination, repossession or reletting.
In the event of any such termination, Lessee shall forth-
with pay to Lessor all Rent due and payable to and including
the date of such termination.  Thereafter, quarter-annually
on the days on which the Basic Rent would have been payable
under this Lease if the same had not been terminated and
until the end of what would have been the then current Term
in the absence of such termination, Lessee, at Lessor's option,
shall pay Lessor as and for liquidated and agreed current
damages for Lessee's default:

41.

(a)   the Rent that would have been payable by
Lessee hereunder if the Term had not been terminated,
less

(b)   the net proceeds, if any, of (i) any
reletting of the Leased Property or any part thereof,
after deducting all of Lessor's expenses in connection
therewith, including , without limitation, repossession
costs, brokerage commissions, attorneys' fees and
expenses and any repair or alteration costs and
expenses incurred in preparation for such reletting,
and (ii) the avails of any continuing subleases.

20.5.   At any time after the termination of this Lease
pursuant to Section 20.1, whether or not Lessor shall have
collected any current damages pursuant to Section 20.4,
Lessor, at its option, shall be entitled to recover from
Lessee and Lessee will pay to Lessor on demand as and for
liquidated and agreed final damages for Lessee's default (it
being agreed that it would be impractical or extremely diffi-
cult to fix the actual damages), and in lieu of all current
damages provided in Section 20.4 beyond the date to which the
same shall have been paid, either

(1)   an amount equal to 102% of the excess, if
any, of

(a)   the sum of (i) any past due Rent
together with interest thereon (to the extent
permitted by law) from the due date thereof
to the date of payment of such liquidated
damages at the rate of 11.25% per annum, (ii)
the Discounted Future Basic Rent as of the
later of the date to which Basic Rent shall
have been paid or the date to which Lessee
shall have paid current damages pursuant to
Section 20.4, together with interest thereon
from the later of such dates to the date of
payment of such liquidated damages at the rate
(to the extent permitted by law) of 11.25%
per annum, and (iii) the Additional Rent and
other charges (as reasonably estimated by
Lessor) which would be payable hereunder from
such date for what would have been the then
unexpired current Term had the same not been
terminated, the Additional Rent and such other
charges to be discounted to the date of payment
at the rate of 4% per annum, calculated on a
quarter-annual basis, over

42.

(b)   the then fair net rental value of the
Leased Property for the period from the date of
payment of such liquidated damages to the date
which would have been the expiration date of the
then current Term had this Lease not been ter-
minated (after deducting all reasonable estimated
expenses to be incurred in connection with relet-
ting the Leased Property, including, without
limitation, repossession costs, brokerage com-
missions, attorneys' fees and expenses and repair
and alteration costs and expenses) discounted
to the date of payment at the rate of 9.44% per
annum during the Fixed Term and at the rate of
3% per annum during any renewal term, in each
case calculated on a quarter-annual basis; or

(2)   the sum of (i) any past due Rent together
with interest thereon (to the extent permitted by
law) from the due date thereof to the date of payment
of such liquidated damages at the rate of 11.25% per
annum, (ii) 102% of the Discounted Future Basic Rent
as of the later of the date to which Basic Rent shall
have been paid or the date to which Lessee shall have
paid current damages pursuant to Section 20.4, together
with interest thereon from the later of such dates to
the date of payment of such liquidated damages at the
rate (to the extent permitted by law) of 11.25% per
annum, and (iii) the Additional Rent and other charges
(as reasonably estimated by Lessor) which would be
payable hereunder from such date for what would have
been the then unexpired current Term had the same not
been terminated without any discount therefrom.   If
Lessor shall elect this option and if Lessee shall
prepay in full all such Rent provided for in the
preceding sentence, Lessee shall thereafter have the
right to possession of the Leased Property under the
terms of this Lease for the entire period in respect
of which Rent shall have been so prepaid, unless and
until a further Default shall occur, at which time
Lessee's right of possession shall immediately
terminate.

If any statute or rule of law shall validly limit the amount
of such liquidated final damages to less than the amount above
agreed upon, Lessor shall be entitled to the maximum amount
allowable under such statute or rule of law.

43.

20.6.  If this Lease is terminated pursuant to Section 20.1, Lessee waives, to the extent permitted by applicable law, (a) any right of redemption, re-entry or repossession, (b) any right to a trial by jury in the event of summary proceedings, (c) the benefit of any laws now or hereafter in force exempting property from liability for rent or for debt, and (d) the service of any notice which may be required by any present or future statute, law or decision.

## ARTICLE XXI

21.  **Lessor's Right to Cure Lessee's Default.**  If Lessee shall fail to make any payment or perform any act required to be made or performed under this Lease, Lessor, after notice to and demand upon Lessee, and without waiving or releasing any obligation or Default, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Lessee, and may enter upon the Leased Property for such purpose and take all such action thereon as, in Lessor's opinion, may be necessary or appropriate therefor. No such entry shall be deemed an eviction of Lessee. All sums so paid by Lessor and all costs and expenses (including, without limitation, attorneys' fees and expenses) so incurred, together with interest thereon (to the extent permitted by law) at the rate of 11.25% per annum from the date on which such sums or expenses are paid or incurred by Lessor, shall be paid by Lessee to Lessor on demand.

## ARTICLE XXII

22.  **Provisions Relating to Offers by Lessee to Purchase the Leased Property and Purchase Thereof by Lessee.** In the event Lessee purchases the Leased Property from Lessor pursuant to any of the terms of this Lease, Lessor shall, upon receipt from Lessee of the applicable purchase price, together with full payment of any unpaid Rent due and payable on or before the date of the purchase, execute and deliver to Lessee, on the purchase date, an appropriate deed with covenants against grantor's acts conveying title to the Leased Property to Lessee free and clear of any Indenture and any liens and incumbrances that have been created by Lessor without consent of Lessee, other than those that Lessee has agreed hereunder to pay or discharge.  The purchase price shall be paid to

44.

Lessor or as Lessor may direct, in federal or other immediately
available funds without deduction or offset for any cause
whatever.  All expenses of such conveyance including, without
limitation, the cost of title examination, the cost (including
prepayment premium, if any) of obtaining and recording a release
of the Leased Property from the lien of any Indenture, broker's
fees, if any, attorneys' fees incurred by Lessor in connection
with such conveyance and release, transfer taxes and recording
fees, taxes and other charges shall be paid by Lessee.

## ARTICLE XXIII

23.  Renewal Terms.  If no Event of Default shall
have occurred, Lessee is hereby granted the right to renew
this Lease for seven successive terms of five years each, upon
giving written notice to Lessor of one or more of such renewals
at least one hundred eighty (180) days prior to the termination
of the then current Term.  During each such renewal term all
of the terms and conditions of this Lease shall continue in
full force and effect except that (i) the net annual Basic Rent
shall be an amount equal to 3% of the Cost of the Leased
Property, payable in equal, consecutive, quarter-annual
installments in advance and (ii) the number of renewal
terms permitted hereunder shall be reduced by one upon the
expiration of each renewal term for which Lessee has exer-
cised its option.  Anything contained in this Lease to the
contrary notwithstanding, Lessee may off-set against the
Basic Rent provided for in this Article XXIII any sums
constituting indebtedness of Lessor to Lessee, such
off-set expressly not permitted to be made at any
time other than during a renewal term for which Lessee
shall have exercised its option.

## ARTICLE XXIV

24.  No Claims Against Lessor.  Nothing contained
herein shall constitute any consent or request by Lessor,
express or implied, to or for the performance of any labor
or services or the furnishing of any materials or other
property in respect of the Leased Property, nor as giving
Lessee any right, power or authority to contract for or
permit the performance of any labor or services or the
furnishing of any materials or other property in such
fashion as would permit the making of any claim against
Lessor in respect thereof. No recourse shall be had against
the Lessor, or its successors or assigns, for any claim based

45.

on any failure by the Lessor in the performance or observance
of any of the agreements, covenants or provisions contained in
this Lease.  In the event of any such failure, recourse shall
be had solely against the Leased Property.

## ARTICLE XXV

25.  Risk of Loss.  The risk of loss or of decrease
in the enjoyment and beneficial use of the Leased Property
in consequence of the damage or destruction thereof by fire,
the elements, casualties, thefts, riots, wars or otherwise,
or in consequence of foreclosures, attachments, levies or
executions (other than by Lessor and those claiming from,
through or under Lessor) is assumed by Lessee, and Lessor
shall in no event be answerable or accountable therefor.
None of the events mentioned in this Section shall entitle
Lessee to any abatement of Basic Rent or Additional Rent,
except as specifically provided herein.

## ARTICLE XXVI

26.  Indemnification by Lessee.  Lessee will protect,
indemnify, save harmless and defend Lessor and the trustee
under any Indenture from and against all liabilities,
obligations claims, damages, penalties, causes of action,
costs and expenses (including, without limitation, attorneys'
fees and expenses) imposed upon or incurred by or asserted
against Lessor, such trustee or any of Lessor's Assignees, if
any, by reason of: (a) ownership of or the holding of any
security interest in the Leased Property, (b) any accident,
injury to or death of persons or loss of or damage to property
occurring on or about the Leased Property or adjoining
sidewalks, (c) any use, misuse, non-use, condition, maintenance
or repair of the Leased Property, (d) taxes and assessments
of any kind or nature assessed in respect of the Leased
Property. (e) any failure on the part of Lessee to perform
or comply with any of the terms of this Lease, or (f) the non-
performance of any of the terms and provisions of any and all
existing and future subleases of the Leased Property to be
performed by the landlord thereunder.  Any amounts which
become payable by Lessee under this Section and which are not
paid within ten (10) days after liability therefor on the part
of Lessee is determined by litigation or otherwise shall
bear interest (to the extent permitted by law) at the rate
of 11.25% per annum from the date of such determination.
Lessee, at its expense, shall contest, resist and defend

46.

any such claim, action or proceeding asserted or instituted
against Lessor, such trustee or any of Lessor's Assignees,
if any, and may compromise or otherwise dispose of the same
as Lessee sees fit.  Nothing herein shall be construed as
indemnifying Lessor against its own negligent or willful
acts.  The obligations of Lessee contained in this Article
shall survive any termination of this Lease.

## ARTICLE XXVII

27.1.  Subletting and Assignment; Attornment.  Lessee
shall have the right to sublet the Leased Property or any
part thereof or assign or transfer this Lease or any of
Lessee's rights or obligations hereunder, provided that (a)
in the case of a subletting, the sublease shall comply with
the provisions of Section 27.2, (b) in the case of an
assignment, the assignee shall assume in writing and agree
to keep and perform all of the terms of this Lease on the
part of Lessee to be kept and performed and shall be, and
become, jointly and severally liable with Lessee for the
performance thereof, (c) an original counterpart of each
such sublease and assignment and assumption, duly executed
by Lessee and such sublessee or assignee, as the case may
be, in form and substance satisfactory to Lessor, shall be
delivered promptly to Lessor, and (d) in case of either an
assignment or subletting, Lessee shall remain primarily
liable, as principal rather than as surety, for the prompt
payment of the Rent and for the performance and observance
of all of the covenants and conditions to be performed by
Lessee hereunder.

27.2.  Attornment.  Lessee shall insert in each
sublease permitted under Section 27.1 provisions to the
effect that (a) such sublease is subject and subordinate
to all of the terms and provisions of this Lease and to
the rights of Lessor hereunder, (b) in the event this Lease
shall terminate before the expiration of such sublease, the
sublessee thereunder will, at Lessor's option, attorn to
Lessor and waive any right the sublessee may have to
terminate the sublease or to surrender possession thereunder,
as a result of the termination of this lease, and (c) in
the event the sublessee thereunder receives a written
notice from Lessor, the trustee under any Indenture or
Lessor's Assignees, if any, stating that Lessee is in

47.

Default under this Lease, sublessee shall thereafter be
obligated to pay all rentals accruing under said sublease
directly to the party giving such notice, or as such party
may direct.

## ARTICLE XXVIII

28.  **Officer's Certificates and Financial Statements.**
(a)  At any time and from time to time upon not less than
ten (10) days prior request by Lessor, Lessee will fur-
nish to Lessor an Officer's Certificate certifying any or
all of the following as requested, (i) that this Lease is
unmodified and in full force and effect (or that this Lease
is in full force and effect as modified and setting forth the
modifications) and the dates to which the Basic Rent and all
Additional Rent have been paid, (ii) either that Lessee does
not know of any default in the performance of any provisions
of this Lease or specifying any Default of which Lessee may
have knowledge and stating what action Lessee is taking or
proposes to take with respect thereto, and (iii) that, to the
knowledge of Lessee, there are no proceedings pending or
threatened against Lessee or Guarantor before or by any
court or administrative agency which, if adversely decided,
would materially and adversely affect the financial condition
or operations of Lessee or Guarantor, or, if any such
proceedings are pending or threatened to the knowledge of
Lessee or Guarantor, specifying and describing the same.
Any such certificate furnished pursuant to this Section may
be relied upon by Lessor, the trustee under any Indenture,
Lessor's Assignees, if any, and any prospective purchaser
of the Leased Property.  Guarantor will also furnish Lessor,
upon the reasonable request of Lessor, an Officer's Certi-
ficate certifying the amount of the Tangible Net Worth of
Guarantor, as shown on the most current consolidated balance
sheet of Guarantor and its consolidated subsidiaries as
sent to its stockholders.

(b)  Guarantor will furnish the following statements
to Lessor:

(i)  within 120 days after the end of each
of Guarantor's fiscal years, the annual audit report
of Guarantor, including a balance sheet and an income

48.

and surplus statement for the fiscal year covered
thereby, setting forth in comparative form, the
figures for the previous fiscal year, all on a
fully consolidated basis and in reasonable detail
and duly certified by the independent certified
public accountants regularly employed by Guarantor,

(ii)  within 120 days after the end of each
of Guarantor's fiscal years, and together with the
annual audit report furnished in accordance with
clause (1), an Officer's Certificate stating that
to the best of the signer's knowledge and belief
after making due inquiry, neither Guarantor nor
Lessee is in Default in the performance or
observance of any of the terms of this Lease,
or if either Guarantor or Lessee shall be in
Default to his knowledge, specifying all such
Defaults, the nature thereof, and the steps being
taken to remedy the same,

(iii)  with reasonable promptness, copies of
all financial statements and reports which Guarantor
shall send to its stockholders, and, after a request
therefor, copies of each Form 10-K, Form 8-K, proxy
statement and registration statement (other than
Form S-8 registration statements), or copies of any
successor forms or statements substituted therefor,
which Guarantor shall file with the Securities and
Exchange Commission or any governmental agency
substituted therefor, and

(iv)  with reasonable promptness, such other
information, consistent with the disclosure require-
ments of the federal securities laws, respecting the
financial condition and affairs of Guarantor as Lessor
may request from time to time.

## ARTICLE XXIX

29.  Lessor's Right to Inspect.  Lessee shall permit
Lessor, the trustee under any Indenture and Lessor's Assignees,
if any, and their respective authorized representatives to
inspect the Leased Property during usual business hours.

ARTICLE XXX

30.  No Waiver by Lessor.  No failure by Lessor to
insist upon the strict performance of any term hereof or to
exercise any right, power or remedy consequent upon a breach
thereof, and no acceptance of full or partial payment of
Rent during the continuance of any such breach, shall consti-
tute a waiver of any  such breach or of any such term.  No
waiver of any breach shall affect or alter this Lease, which
shall continue in full force and effect with respect to any
other then existing or subsequent breach.  No foreclosure,
sale or other proceeding under any Indenture shall effectuate
a termination of this Lease or discharge or otherwise affect
the obligations of Lessee hereunder.

ARTICLE XXXI

31.  Remedies Cumulative.  Each legal, equitable
or contractual right, power and remedy of Lessor now or
hereafter provided either in this Lease or by statute or
otherwise shall be cumulative and concurrent and shall be
in addition to every other right, power and remedy and the
exercise or beginning of the exercise by Lessor of any one
or more of such rights, powers and remedies shall not preclude
the simultaneous or subsequent exercise by Lessor of any or
all of such other rights, powers and remedies.

ARTICLE XXXII

32.  Acceptance of Surrender.  No surrender to
Lessor of this Lease or of the Leased Property or any part
thereof or of any interest therein shall be valid or effec-
tive unless agreed to and accepted in writing by Lessor and
no act by Lessor or any representative or agent of Lessor,
other than such a written acceptance by Lessor, shall con-
stitute an acceptance of any such surrender.

50.

## ARTICLE XXXIII

33. <u>No Merger of Title.</u>  There shall be no merger
of this Lease or of the leasehold estate created hereby
with the fee estate in the Leased Property by reason of
the fact that the same person, firm, corporation or other
entity may acquire, own or hold, directly or indirectly,
(a) this Lease or the leasehold estate created hereby or
any interest in this Lease or such leasehold estate and
(b) the fee estate in the Leased Property or any interest
therein.

## ARTICLE XXXIV

34. <u>Conveyance by Lessor.</u>  If Lessor or any
successor owner of the Leased Property shall convey the
Leased Property other than as security for a debt, Lessor
or such successor owner, as the case may be, shall thereupon
be released from all future liabilities and obligations of
the lessor under this Lease and all such future liabilities
and obligations shall thereupon be binding upon the new owner,
subject to the provisions of Article XXIV.

## ARTICLE XXXV

35. <u>Quiet Enjoyment.</u>  So long as Lessee shall pay all
Rent as the same becomes due and shall fully comply with all
of the terms of this Lease and fully perform its obligations
hereunder, Lessee shall peaceably and quietly have, hold and
enjoy the Leased Property for the Term hereof, free of any
claim or other action by Lessor or the trustee under any
Indenture or Lessor's Assignees, if any, or anyone claiming
by, through or under any of them.  No failure to comply with
the foregoing covenant during the Fixed Term shall give Lessee
any right to cancel or terminate this Lease or abate, reduce
or make a deduction from or offset against the Basic Rent or
Additional Rent or any sum payable under this Lease, or to
fail to perform any other obligation of Lessee hereunder.

## ARTICLE XXXVI

36. <u>Notices.</u> All notices, demands, requests, consents, approvals and other communications hereunder shall be in writing and delivered, telegraphed or mailed (by first-class registered or certified mail, return receipt requested and postage prepaid), addressed to the respective parties, as follows:

       (a)  if to Lessee:

              K MART ENTERPRISES OF PENNSYLVANIA, INC.
              c/o S. S. Kresge Company
              3100 West Big Beaver
              Troy, Michigan  48084

              Attention:  Vice President—Real Estate

       (b)  if to Lessor:

              PENNSYLVANIA MART PROPERTIES CORP.
              c/o Merrill Lynch, Hubbard Inc.
              165 Broadway
              New York, New York 10006

              Attention:  Asset Financing Department

or at such other address as either party may hereafter designate, and shall be effective upon receipt as evidenced by a receipt signed by a person at such address.

## ARTICLE XXXVII

37. <u>Holding Over.</u>  If Lessee shall for any reason remain in possession of the Leased Property after the expiration or earlier termination of the Term hereof

(except pursuant to the provisions of Section 9.2), such possession shall be as a month-to-month tenant during which time Lessee shall pay as rental, (i) Basic Rent on the first day of each month at a rate equal to twice the amount of annual Basic Rent payable during the last Year of the Fixed Term, (ii) all Additional Rent and (iii) all other sums payable by Lessee pursuant to the provisions of this Lease. During such period of month-to-month tenancy, Lessee shall be obligated to perform and observe all of the terms, covenants and conditions of this Lease, but shall have no rights thereunder other than the right to continue its occupancy and use of the Leased Property. Nothing contained herein shall constitute the consent, express or implied, of Lessor to the holding over of Lessee after the expiration or earlier termination of this Lease, except pursuant to the provisions of Section 9.2.


## ARTICLE XXXVIII


38. **Miscellaneous.** If any term or provision of this Lease or any application thereof shall be invalid or unenforceable, the remainder of this Lease and any other application of such provision shall not be affected thereby. If any interest charges provided for in any provision of this Lease exceed the maximum rate permitted by applicable law, the parties agree that such charges shall be fixed at the maximum permissible rate. Neither this Lease nor any provision hereof may be changed, waived, discharged or terminated except by an instrument in writing and recordable form signed by Lessor and Lessee. All the terms and provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. The headings in this Lease are for convenience of reference only and shall not limit or otherwise affect the meaning hereof. This Lease shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

53.

## ARTICLE XXXIX

39.  **Memorandum of Lease**.  Lessor and Lessee shall,
promptly upon the request of either, enter into a short
form memorandum of this Lease, in form suitable for
recording under the laws of the Commonwealth of Pennsylvania,
in which reference to this Lease shall be made.

IN WITNESS WHEREOF, the parties have caused this
Lease to be executed and their respective corporate seals
to be hereunto affixed and attested by their respective
officers thereunto duly authorized.

PENNSYLVANIA MART PROPERTIES CORP.

By _____
                    ~~Vice~~ President

[Corporate Seal]

Attest:

_____
         Assistant Secretary

K MART ENTERPRISES OF PENNSYLVANIA, INC.

By _____
                    President

[Corporate Seal]

Attest:

_____
         ~~Assistant~~ Secretary

APPROVED

54.

ALL THAT CERTAIN piece or parcel of ground situate in Falls Township, Bucks County, Pennsylvania, and described according to a Plan of Property of "96.218 Acres Subdivision in Penn Warner Park" made by Yerkes Associates, Inc., dated 9/23/1974 as follows, to wit:

BEGINNING at a point on the north side of Tyburn Road (120.00 feet wide), L.R. 09136, marking the southeast corner of the subject tract; said point being the seven following courses and distances measured along the said north side line of Tyburn Road from the end of a radius round corner, having a radius of 75.00 feet on the west side of Newbold Road (100.00 feet wide); (1) South 66 degrees 06 minutes 53 seconds West 770.10 feet to a point of curve; (2) on a line curving to the right with a radius of 153.43 feet, the arc distance of 52.09 feet to a point of tangent; (3) South 85 degrees 34 minutes West 98.48 feet to a point; (4) South 04 degrees 26 minutes East 10.00 feet to a point; (5) South 85 degrees 34 minutes West 200.00 feet to a point; (6) South 04 degrees 26 minutes East 10.00 feet to a point; (7) South 85 degrees 34 minutes West 224.75 feet to said beginning point; thence from said beginning point along the North side line of said Tyburn Road, the two following courses and distances; (1) South 85 degrees 34 minutes West 2139.49 feet to a point of curve; (2) on a line curving to the right with a radius of 3009.55 feet, the arc distance of 352.31 feet to a point; thence partly by lands now or late of Chester Glenn and Thomas R. Owens, partly by land now or late of Marie Pellegrinni the three following courses and distances: (1) North 00 degrees 06 minutes West 107.32 feet to a point; (2) South 87 degrees 14 minutes West 160.00 feet to a point; (3) North 18 degrees 25 minutes West 905.94 feet to a point; thence by land now or late of Casper Beffert, North 44 degrees 53 minutes 57 seconds We 642.28 feet to a point; thence by other land now or late of Warner Company, of which this is a part, the following five courses and distances: (1) North 85 degrees 34 minutes East, partly along the south side line of a proposed road (60.00 feet wide) 3173.56 feet to a point of radius round corner at the intersection of another proposed road (60.00 feet wide); (2) on a line curving to the right with a radius of 45.00 feet, the arc distance of 70.69 feet to a point of tangent; (3) South 04 degrees 26 minutes East, along the west side line of a proposed road (60.00 feet wide) 871.21 feet to a point; (4) thence crossing said proposed road, North 85 degrees 34 minutes East 60.00 feet to a point; (5) South 04 degrees 26 minutes East 583.79 feet to the place of beginning. CONTAINING 96.218 acres be the same more or less.

BEING part of the same premises which Warner Company (A Dela. corp.), by Deed dated July 11, 1966 and recorded in Bucks County in Deed Book 1836 page 470, conveyed unto Warner Realty Investment Company (A Penna. corp.) in fee.

SUBJECT TO:

    1.   Possible additional assessments for taxes for new construction or for any major improvements pursuant to provisions of Acts of Assembly relating thereto hereafter assessed.

    2.   Rights granted to Philadelphia Electric Company and/or Bell Telephone Company as in Deed Book 1817 page 850.

SCHEDULE A, cont.

3.    Rights of the public and others entitled thereto in and to the use of that portion of the premises within the bounds of proposed road.

4.    Right of access to Tyburn Road (LR 09136) a limited access highway.

5.    Unsettled taxes due the Commonwealth of Pennsylvania by mortgagor corporation, not presently a lien, all of which taxes when assessed or settled, if not paid, will constitute a prior lien against any fund created at a judicial sale.

6.    Easement of Pennsylvania Department of Highways for "Channel Change" as shown on "final plan of 96.218 acres subdivision in Penn Warner Park" made by Yerkeys Associates, Inc. R.E., dated September 23, 1974 and last revised March 14, 1975.

7.    Liens for taxes not yet due and payable.

8.    Any state of facts shown on the survey made by Yerkeys Associates, Inc. R.E., dated September 23, 1974 and last revised March 14, 1975.

9.    Lease, dated as of March 20, 1975, between Pennsylvania Mart Properties Corp., as lessor, and K mart Enterprises of Pennsylvania, Inc., as lessee.

10.    Declaration of Protective Covenants made by Warner Co. dated January 10, 1975 and recorded January 31, 1975 in Deed Book No. 2152, page 431.

STATE OF NEW YORK )
                 :  SS.:
COUNTY OF NEW YORK )


On this the _25_ day of _MARCH_ , 1975, before
me, _RICHARD RUDDER_ , the undersigned officer, per-
sonally appeared _William M. Moore_, who acknowledged himself
to be ~~a Vice~~ President of PENNSYLVANIA MART PROPERTIES CORP.,
a Pennsylvania corporation, and that he, as such ~~Vice~~
President, being authorized so to do, executed the foregoing
instrument for the purposes therein contained, by signing
the name of the corporation by himself as ~~Vice~~ President.

IN WITNESS WHEREOF, I hereunto set my hand and
official seal.

_____
            Notary Public

[Notarial Seal]

RICHARD RUDDER
Notary Public, State of New York
No. 31-3392786
Qualified in New York County
Commission Expires March 30, 1975

STATE OF MICHIGAN)
                 :   SS.:
COUNTY OF OAKLAND)

On this the *2ND* day of *APRIL*, 1975, before me, *ROBERT V. PETERSON*, the undersigned officer, personally appeared *E. J. HAGLUND*, who acknowledged himself to be a ▨▨▨ President of K MART ENTERPRISES OF PENNSYLVANIA, INC., a Pennsylvania corporation, and that he, as such ▨▨▨ President, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as ▨▨▨ President.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Robert V. Peterson_
                              Notary Public

ROBERT V. PETERSON, NOTARY PUBLIC
Oakland County, Michigan
My Commission Expires Nov. 14, 1975

[Notarial Seal]

## GUARANTY AGREEMENT

THIS AGREEMENT dated as of                    , 1975
between PENNSYLVANIA MART PROPERTIES CORP., a Delaware
corporation (the "Company"), having an address c/o Merrill Lynch,
Hubbard Inc., 165 Broadway, New York, New York 10006, and
S. S. KRESGE COMPANY, a Michigan corporation ("Guarantor"),
having its principal office at 3100 West Big Beaver, Troy,
Michigan 48084.

## W I T N E S S E T H :

Contemporaneously herewith, the Company, as lessor,
is entering into a certain lease of real property located in
the Township of Falls, County of Bucks, and Commonwealth
of Pennsylvania, more particularly described in Schedule A
thereto (the "Lease") with K mart Enterprises of Pennsylvania,
Inc., a Pennsylvania corporation (the "Lessee"), as lessee.
Guarantor owns all of the outstanding capital stock of
K mart Enterprises, Inc., a Michigan corporation, which
owns all of the outstanding stock of the Lessee and is
executing this agreement as an inducement to the Company to
enter into the Lease.

## EXHIBIT I

NOW THEREFORE, in consideration of the premises,
Guarantor agrees as follows:

SECTION 1.  Guarantor hereby absolutely and
unconditionally guarantees, as principal and not as indemnitor,
to the Company the full and punctual performance and observance
by the Lessee of all of the terms, conditions, covenants and
obligations to be performed and observed by the Lessee under
the Lease and the Consent and hereby covenants and agrees
that if, for any reason, the Lessee shall fail fully and
punctually to perform or observe any of such terms, conditions,
covenants or obligations, Guarantor will forthwith perform
and observe the same.

SECTION 2.  Guarantor hereby assents to all of the
provisions of the Lease and the Consent and waives demand,
protest, notice of default, notice of any indulgences or
extensions granted to the Lessee, any requirement of dili-
gence or promptness on the part of the Company in the enforce-
ment of the rights and remedies of the Company under the
Lease and the Consent, any enforcement of the Lease and the
Consent and any notice thereof, and any other notice whereby
to charge Guarantor.

SECTION 3.  Guarantor agrees that its obligations
and the rights of the Company hereunder shall be unconditional
and shall not be terminated, impaired or otherwise affected
by any action taken by the Company pursuant to the Lease or
the Consent in the exercise of any right, remedy or power thereby
conferred upon it or otherwise available to it in respect thereof,

-3-

or by any failure or omission on the part of the Company

to enforce or exercise any such right, remedy or power,

or by any action of the Company in granting indulgences or

extensions to the Lessee or in waiving or acquiescing in

defaults by the Lessee, or by any assignment of the Lease, or

any subletting of the premises thereby demised, or by the

recovery of any judgment against the Lessee or any action

to enforce the same, or by the release or discharge of the

Lessee or the Company in any creditors', receivership, bankruptcy,

reorganization or other proceeding or the rejection or

disaffirmance of the Lease in any such proceedings, or any

other circumstance which might otherwise constitute a legal

or equitable discharge of a guarantor or a legal or equitable

discharge of the Lessee under the Lease or the Consent.  It

is understood and agreed that, in case of the bankruptcy

or insolvency of the Lessee, the claim of the Company against

Guarantor hereunder shall not be limited by any provision

of the Federal Bankruptcy Act or any similar or corresponding

provision of any State or Federal law which, by reason

of such bankruptcy or insolvency of the Lessee, would limit

the claim of the Company against the Lessee, and Guarantor

agrees that in any such case, upon demand of the Company, if

in the opinion of the Company such action is necessary or

desirable in the interests of any assignee of the Company

it will enter into a lease of the property covered by the

*See Deed Bk*
*2608 - 1159*
*Rec'd April 24, 1985*

## MEMORANDUM OF LEASE

MEMORANDUM OF LEASE, made and entered into as of the 20th day of March, 1975, between PENNSYLVANIA MART PROPERTIES CORP. ("Lessor"), a Pennsylvania corporation having an office c/o Merrill Lynch, Hubbard Inc., 165 Broadway, New York, New York 10006, and K MART ENTER-PRISES OF PENNSYLVANIA, INC. ("Lessee"), a Pennsylvania corporation having its principal office c/o S. S. Kresge Company, 3100 West Big Beaver, Troy, Michigan 48084.

### W I T N E S S E T H :

Lessor hereby leases to Lessee and Lessee rents from Lessor the parcel of land, together with all buildings and other improvements (other than Additional Facilities as defined in the Lease hereinafter described) presently situated or hereafter constructed thereon, located in the Township of Falls, Bucks County, Pennsylvania, more particularly described in Schedule A annexed hereto, and all easements, rights and appurtenances relating thereto (collectively, the "Leased Property") to have and to hold for (a) an interim term commencing on April 7, 1975 and ending at midnight on the day preceding the commencement date provided for in clause (b), (b) a fixed term of thirty (30) years commencing on either (i) January 7, 1977, if construction of the buildings and improvements is substantially completed by that date, or (ii) June 7, 1977, and (c) thereafter, if Lessee is not then in default, seven successive renewal terms of five years each, at the option of Lessee exercisable upon Lessee giving Lessor at least one hundred eighty (180) days prior written notice of each renewal. The Lease contains certain rights to lessee to make rejectable offers to purchase the Leased Property at the time and under such circumstances as are set forth in the Lease, and if such offers are rejected by lessor, the Lease will terminate.

This Memorandum of Lease constitutes a memorandum of a certain unrecorded lease ( the "Lease") of even date herewith between Lessor and Lessee covering the Leased Property, all the terms and conditions of which are hereby made a part hereof with the same force and effect as though fully set forth herein. Notice is hereby given that the right and power to charge any lien or incumbrance of any kind against Lessor or its estate in the Leased property is hereby expressly denied.

D2156   602

POOR COPY

**IN WITNESS WHEREOF,** the parties have caused this Memorandum of Lease to be executed and their respective corporate seals to be hereunto affixed and attested by their respective officers thereunto duly authorized as of the day and year first above written.

PENNSYLVANIA MART PROPERTIES CORP.

By _William W. Moore_

William W. Moore, President

[Corporate Seal]

Attest:

_Michael A. Forastiere III_
Michael A. Forastiere III,
Assistant Secretary

K MART ENTERPRISES OF PENNSYLVANIA, INC.

By _E. J. Haglund_

E. J/ Haglund    President

[Corporate Seal]

Attest:

_A. N. Palizzi_
A. N. PALIZZI
Assistant Secretary

D2156   603

ALL THAT CERTAIN piece or parcel of ground situate in Falls Township, Bucks County, Pennsylvania, and described according to a Plan of Property of "96.218 Acres Subdivision in Penn Warner Park" made by Yerkes Associates, Inc., dated 9/23/1974 as follows, to wit:

BEGINNING at a point on the north side of Tyburn Road (120.00 feet wide), L.R. 09136, marking the southeast corner of the subject tract; said point being the seven following courses and distances measured along the said north side line of Tyburn Road from the end of a radius round corner, having a radius of 75.00 feet on the west side of Newbold Road (100.00 feet wide); (1) South 66 degrees 06 minutes 53 seconds West 770.10 feet to a point of curve; (2) on a line curving to the right with a radius of 153.43 feet, the arc distance of 52.09 feet to a point of tangent; (3) South 85 degrees 34 minutes West 98.48 feet to a point; (4) South 04 degrees 26 minutes East 10.00 feet to a point; (5) South 85 degrees 34 minutes West 200.00 feet to a point; (6) South 04 degrees 26 minutes East 10.00 feet to a point; (7) South 85 degrees 34 minutes West 224.75 feet to said beginning point; thence from said beginning point along the North side line of said Tyburn Road, the two following courses and distances; (1) South 85 degrees 34 minutes West 2139.49 feet to a point of curve; (2) on a line curving to the right with a radius of 3009.55 feet, the arc distance of 352.31 feet to a point; thence partly by lands now or late of Chester Glenn and Thomas R. Owens, partly by land now or late of Marie Pellegrinni the three following courses and distances: (1) North 00 degrees 06 minutes West 107.32 feet to a point; (2) South 87 degrees 14 minutes West 160.00 feet to a point; (3) North 18 degrees 25 minutes West 905.94 feet to a point; thence by land now or late of Casper Beffert, North 44 degrees 53 minutes 57 seconds West 642.28 feet to a point; thence by other land now or late of Warner Company, of which this is a part, the following five courses and distances: (1) North 85 degrees 34 minutes East, partly along the south side line of a proposed road (60.00 feet wide) 3173.56 feet to a point of radius round corner at the intersection of another proposed road (60.00 feet wide); (2) on a line curving to the right with a radius of 45.00 feet, the arc distance of 70.69 feet to a point of tangent; (3) South 04 degrees 26 minutes East, along the west side line of a proposed road (60.00 feet wide) 871.21 feet to a point; (4) thence crossing said proposed road, North 85 degrees 34 minutes East 60.00 feet to a point; (5) South 04 degrees 26 minutes East 583.79 feet to the place of beginning. CONTAINING 96.218 acres be the same more or less.

BEING part of the same premises which Warner Company (A Dela. corp.), by Deed dated July 11, 1966 and recorded in Bucks County in Deed Book 1836 page 470, conveyed unto Warner Realty Investment Company (A Penna. corp.) in fee.

SUBJECT TO:

  1.  Possible additional assessments for taxes for new construction or for any major improvements pursuant to provisions of Acts of Assembly relating thereto hereafter assessed.
  2.  Rights granted to Philadelphia Electric Company and/or Bell Telephone Company as in Deed Book 1817 page 850.

SCHEDULE A, cont.

3.  Rights of the public and others entitled thereto in and to the use of that portion of the premises within the bounds of proposed road.

4.  Right of access to Tyburn Road (LR 09136) a limited access highway.

5.  Unsettled taxes due the Commonwealth of Pennsylvania by mortgagor corporation, not presently a lien, all of which taxes when assessed or settled, if not paid, will constitute a prior lien against any fund created at a judicial sale.

6.  Easement of Pennsylvania Department of Highways for "Channel Change" as shown on "final plan of 96.218 acres subdivision in Penn Warner Park" made by Yerkeys Associates, Inc. R.E., dated September 23, 1974 and last revised March 14, 1975.

7.  Liens for taxes not yet due and payable.

8.  Any state of facts shown on the survey made by Yerkeys Associates, Inc. R.E., dated September 23, 1974 and last revised March 14, 1975.

9.  Lease, dated as of March 20, 1975, between Pennsylvania Mart Properties Corp., as lessor, and K mart Enterprises of Pennsylvania, Inc., as lessee.

10.  Declaration of Protective Covenants made by Warner Co. dated January 30, 1975 and recorded January 31, 1975 in Deed Book No. 2152 page 431.

Apr 4  3 36 PH '75

BUCKS COUNTY SS.
RECORDED IN THE RECORDER'S
OFFICE OF SAID COUNTY IN
Deed        BOOK  2156
AT PAGE 602  &c
WITNESS MY HAND AND SEAL OF
OFFICE      April 4th    . 19 75

*George M. Metzger*

RECORDER OF DEEDS

0 0 6 2 8 3 HEALTH LAND
TITLE INSURANCE COMPANY
C 806 - 282 - M

MEMORANDUM OF LEASE

PENNSYLVANIA MART PROPERTIES
CORP.

TO

K. MART ENTERPRISES OF
PENNSYLVANIA, INC.

Premises: Falls Twp.
Bucks County, Pa.

①

1150

D2156    608

(5)

## ASSIGNMENT OF LEASE AND GUARANTY

PENNSYLVANIA MART PROPERTIES CORP. ("Assignor"), a
Pennsylvania corporation having an address c/o Merrill Lynch,
Hubbard Inc., 165 Broadway, New York, New York 10006, for valuable
consideration, the receipt of which is hereby acknowledged,
hereby assigns, transfers and sets over to GIRARD TRUST BANK
("Assignee"), a Pennsylvania banking corporation, having
its corporate trust office at 1 Girard Plaza, Philadelphia,
Pennsylvania 19101, as trustee, for the ratable benefit of THE
NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, | THE PUBLIC
EMPLOYEES RETIREMENT SYSTEM OF OHIO, | THE GUARDIAN LIFE
INSURANCE COMPANY OF AMERICA, | AMERICAN UNITED LIFE INSURANCE
COMPANY, | JEFFERSON STANDARD LIFE INSURANCE COMPANY, | LUTHERAN
BROTHERHOOD, | STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA, |
HARTFORD LIFE INSURANCE COMPANY, | PEOPLES LIFE INSURANCE
COMPANY, WASHINGTON, D.C. | UNITED FARM BUREAU FAMILY LIFE
INSURANCE COMPANY | THE BALTIMORE LIFE INSURANCE COMPANY, |
GUARANTEE MUTUAL LIFE COMPANY, | LUTHERAN MUTUAL LIFE INSURANCE
COMPANY, | WASHINGTON NATIONAL RETIREMENT PLAN, | HOME SECURITY
LIFE INSURANCE COMPANY, | SHENANDOAH LIFE INSURANCE COMPANY, |
GEORGIA INTERNATIONAL LIFE INSURANCE COMPANY, | NATIONAL TRUST
LIFE INSURANCE COMPANY, | NATIONAL STANDARD LIFE INSURANCE
COMPANY, | and PALMETTO STATE LIFE INSURANCE COMPANY, | their
successors and assigns as holders of the Notes hereinafter
mentioned (collectively, the "Beneficiaries"), all of Assignor's
right, title and interest in and to (i) a certain Lease (as
the same may from time to time be supplemented or amended,
the "Lease"), dated as of the date hereof, between Assignor,
as lessor, and K MART ENTERPRISES OF PENNSYLVANIA, INC.
("Lessee"), a Pennsylvania corporation, as lessee, covering
certain real property (the "Land"), located in the Township
of Falls, County of Bucks and Commonwealth of Pennsylvania,
more particularly described in Schedule A hereto, and the
buildings, structures and improvements thereon (collectively,
the "Improvements" and collectively with the Land, the
"Leased Property"), and (ii) the guaranty ("Guaranty") by S.
S. KRESGE COMPANY ("Guarantor"), a Michigan corporation, of
the performance by Lessee of the provisions of the Lease on
the part of Lessee to be performed, including but not limited
to:

(a) all payments due and to become due under
the Lease, whether as rent, damages, purchase price,
insurance payments, condemnation awards or otherwise,

(b) all claims, rights, powers, privileges
and remedies of the lessor under the Lease,

D2157   1

-2-

(c)  all rights of the lessor under the Lease, to exercise any election or option, to give or receive any notice, consent, waiver or approval, or to accept any surrender of the Leased Property or any part thereof, and

(d)  all rights of the lessor under the Lease to accept or reject any offer to purchase the Leased Property, made pursuant to any section of the Lease,

together with full power and authority, in the name of Assignor or otherwise, to demand, receive, enforce, collect or receipt for any or all of the foregoing, to endorse or execute any checks or other instruments or orders, to file any claims and to take any action which Assignee may deem necessary or advisable in connection therewith, Assignor hereby irrevocably constituting Assignee the attorney-in-fact of Assignor for such purposes, which appointment is coupled with an interest and is irrevocable.  No exercise by Assignee of any rights of Assignor shall release Assignor from its obligations under the Lease.

This Assignment of Lease is made pursuant to a certain Note Purchase Agreement (the "Agreement"), dated as of March 15, 1975, among Assignor and each of the Beneficiaries, as part of the collateral security for certain secured promissory notes of Assignor (collectively, the "Notes") being issued, and to be issued, and delivered to each of the Beneficiaries pursuant thereto.

If and so long as no event of default shall have occurred under a certain mortgage covering the Leased Property (as the same may from time to time be supplemented or amended, the "Indenture"), dated as of the date hereof, given by Assignor to Assignee as further security for the Notes, all moneys covered by this Assignment of Lease shall be paid and applied as follows:

(a)  each installment of Basic Rent (as defined in the Lease) shall be paid by Lessee to the Assignee which shall, to the extent of the payment becoming due on their respective Notes on the due date of such installment of Basic Rent, remit the same to the Beneficiaries to be applied in accordance with the terms of the Notes;

D2157    2

-3-

(b)   all Additional Rent (as defined in the Lease) shall be paid and applied directly to the obligation or liability in respect of which such Additional Rent was incurred;

(c)   all proceeds of insurance (including title insurance) and all awards and payments on account of a Taking (as defined in the Lease) shall be paid over to Assignee and be applied as provided in Article XVIII of the Lease or clause (e) below;

(d)   all amounts paid by Lessee in the event it purchases the Leased Property pursuant to the provisions of either (i) Section 3.4 of the Lease (relating to a failure of Lessee to timely commence construction of the Improvements), or (ii) Section 3.5 of the Lease (relating to a failure of Lessee to timely request a reimbursement for the cost of constructing the Improvements), or (iii) Section 3.6 of the Lease (relating to a failure of Lessee to timely complete construction of the Improvements), or (iv) Section 3.7 of the Lease (relating to a failure by the Company to make certain reimbursements and payments), or (v) Section 18.3(b) of the Lease (relating to a Taking of, or material damage or destruction to, the Leased Property), or (vi) Article XIX of the Lease (relating to a discontinuance of operations on the Leased Property) shall be paid to Assignee and applied to the prepayment of the Notes as provided in Section 2.2.2 of the Indenture;

(e)   the amount of any Cost Differential (as defined in the Agreement), and any insurance proceeds or awards held by Assignee and not required to be paid to, or upon the direction of, Lessee pursuant to the provisions of Section 18.3(a) or Section 18.3(b) of the Lease shall be applied to the prepayment of the Notes as provided in Section 2.2.3 of the Indenture; and

(f)   all other moneys covered by this Assignment of Lease (including any excess of an installment of Basic Rent over the concurrent aggregate payment due on the Notes) shall be remitted by Assignee to the Company or the persons then entitled thereto.

If an Event of Default (as defined in the Indenture)
shall have occurred under the Indenture, all moneys covered
by this Assignment of Lease shall be paid to Assignee who
shall hold all moneys received and shall apply the same in
the manner specified in Article XVI of the Indenture.

Neither this Assignment of Lease nor any action or
inaction on the part of Assignee or any of the Beneficiaries
shall, without the written consent of Assignee and the
Beneficiaries, constitute an assumption on its or their part
of any obligation under the Lease; nor shall Assignee or any
of the Beneficiaries have any obligation to make any payment
to be made by Assignor under the Lease, or to present or
file any claim, or to take any other action to collect or
enforce the payment of any amounts which have been assigned
to Assignee or to which it may be entitled hereunder at any
time or times.  No action or inaction on the part of Assignee
or any of the Beneficiaries shall adversely affect or limit
in any way the rights of Assignee or any of the Beneficiaries
hereunder or under the Lease.

Assignor shall have no right whatsoever to take any
action under the Lease without the written consent of
Assignee or two-thirds in interest of the Beneficiaries,
but shall take all such action as may from time to time
be requested by Assignee or two-thirds in interest of
the Beneficiaries.  Assignor shall, however, remain liable
to perform all of the obligations of the lessor under the
Lease and shall enforce the Lease in accordance with its
terms, maintain the Lease in full force and effect, and
comply with all the terms thereof.  The phrase "two-thirds
in interest of the Beneficiaries" as used in this Assignment
of Lease shall mean the holders, at the particular time, of
two-thirds of the aggregate principal amount of Notes then
outstanding.

Assignor represents and warrants that (a) the
Lease is a valid lease and is in full force and effect, and
has not been assigned or incumbered, except pursuant to this
Assignment of Lease, and (b) no default exists under the
Lease.

Assignor covenants that so long as this Assignment
of Lease shall remain in effect it will not assign (except
in connection with a conveyance of the Leased Property) or
incumber, to anyone other than Assignee, the whole or any
part of the rents, moneys, claims and rights hereby assigned,
and that it will not, without the prior written approval of
Assignee, amend, modify or cancel the Lease, accept the
surrender therof, give any consent or waiver or make any
acceptance or rejection thereunder, or take or omit to take any
action, the taking or omission of which might result in an

D2157    4

-5-

alteration or impairment of the Lease or this Assignment of Lease or any of the rights created by either of such instruments.

Assignor irrevocably appoints Assignee as its true and lawful attorney, in its name and stead and on its behalf with full power of substitution, to execute and deliver such deed, bill of sale, and other instruments as Assignee may consider necessary or appropriate in the event that Lessee purchases the Leased Property pursuant to any provision of the Lease, and Assignor hereby ratifies and confirms all that such attorney or any substitute shall lawfully do by virtue hereof. If so requested by Assignee, Assignor shall execute and deliver such instruments as may reasonably be requested to ratify and confirm such action.

Assignor, at its expense, will execute and deliver all such instruments and take all such action as Assignee or two-thirds in interest of the Beneficiaries from time to time may reasonably request in order to obtain the full benefits of this Assignment of Lease and of the rights and powers herein created.

This Assignment of Lease shall terminate upon payment in full of the principal of, and interest and premium, if any, on, the Notes and any other indebtedness secured by the Indenture. Assignee, at Assignor's expense, will execute and deliver such instruments as Assignor may reasonably request to evidence such termination.

This Assignment of Lease shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

This Assignment of Lease shall be binding upon Assignor, its successors and assigns, and shall inure to the benefit of Assignee and its successors and the Beneficiaries and their respective successors and assigns.

IN WITNESS WHEREOF, Assignor has caused this Assignment of Lease to be executed and its corporate seal to be hereunto affixed by its proper officers thereunto duly authorized as of the 20th day of March, 1975.

[Corporate Seal]

PENNSYLVANIA MART PROPERTIES CORP.

By _____
   Vice President       WILLIAM W. MOORE

ATTEST:

_____
Assistant Secretary
RICHARD A. FORASTIERE III

Accepted and agreed to as of
the 1st day of April, 1975.

GIRARD TRUST BANK,
Assigned, as trustee:

By _____
   Corporate/Trust Officer

D2157    5

ALL THAT CERTAIN piece or parcel of ground situate in Falls Township, Bucks County, Pennsylvania, and described according to a Plan of Property of "96.218 Acres Subdivision in Penn Warner Park" made by Yerkes Associates, Inc., dated 9/23/1974 as follows, to wit:

BEGINNING at a point on the north side of Tyburn Road (120.00 feet wide), L.R. 09136, marking the southeast corner of the subject tract; said point being the seven following courses and distances measured along the said north side line of Tyburn Road from the end of a radius round corner, having a radius of 75.00 feet on the west side of Newbold Road (100.00 feet wide); (1) South 66 degrees 06 minutes 53 seconds West 770.10 feet to a point of curve; (2) on a line curving to the right with a radius of 153.43 feet, the arc distance of 52.09 feet to a point of tangent; (3) South 85 degrees 34 minutes West 90.48 feet to a point; (4) South 04 degrees 26 minutes East 10.00 feet to a point; (5) South 85 degrees 34 minutes West 200.00 feet to a point; (6) South 04 degrees 26 minutes East 10.00 feet to a point; (7) South 85 degrees 34 minutes West 224.75 feet to said beginning point; thence from said beginning point along the North side line of said Tyburn Road, the two following courses and distances; (1) South 85 degrees 34 minutes West 2139.49 feet to a point of curve; (2) on a line curving to the right with a radius of 3000.55 feet, the arc distance of 352.31 feet to a point; thence partly by lands now or late of Chester Glenn and Thomas R. Owens, partly by land now or late of Marie Pellegrinni the three following courses and distances: (1) North 00 degrees 06 minutes West 167.32 feet to a point; (2) South 87 degrees 14 minutes West 160.00 feet to a point; (3) North 18 degrees 25 minutes West 905.94 feet to a point; thence by land now or late of Casper Beffert, North 44 degrees 53 minutes 57 seconds West 642.28 feet to a point; thence by other land now or late of Warner Company, of which this is a part, the following five courses and distances: (1) North 85 degrees 34 minutes East, partly along the south side line of a proposed road (60.00 feet wide) 3173.56 feet to a point of radius round corner at the intersection of another proposed road (60.00 feet wide); (2) on a line curving to the right with a radius of 45.00 feet, the arc distance of 70.69 feet to a point of tangent; (3) South 04 degrees 26 minutes East, along the west side line of a proposed road (60.00 feet wide) 871.21 feet to a point; (4) thence crossing said proposed road, North 85 degrees 34 minutes East 60.00 feet to a point; (5) South 04 degrees 26 minutes East 583.79 feet to the place of beginning. CONTAINING 96.218 acres be the same more or less.

BEING part of the same premises which Warner Company (A Dela. corp.), by Deed dated July 11, 1966 and recorded in Bucks County in Deed Book 1836 page 470, conveyed unto Warner Realty Investment Company (A Penna. corp.) in fee.

SUBJECT TO:

1. Possible additional assessments for taxes for new construction or for any major improvements pursuant to provisions of Acts of Assembly relating thereto hereafter assessed.
2. Rights granted to Philadelphia Electric Company and/or Bell Telephone Company as in Deed Book 1817 page 850.

D2157    7

POOR COPY

SCHEDULE A, cont.

3.   Rights of the public and others entitled thereto in and to the use of that portion of the premises within the bounds of proposed road.

4.   Right of access to Tyburn Road (LR 09136) a limited access highway.

5.   Unsettled taxes due the Commonwealth of Pennsylvania by mortgagor corporation, not presently a lien, all of which taxes when assessed or settled, if not paid, will constitute a prior lien against any fund created at a judicial sale.

6.   Easement of Pennsylvania Department of Highways for "Channel Change" as shown on "final plan of 96.218 acres subdivision in Penn Warner Park" made by Yerkeys Associates, Inc. R.E., dated September 23, 1974 and last revised March 14, 1975.

7.   Liens for taxes not yet due and payable.

8.   Any state of facts shown on the survey made by Yerkeys Associates, Inc. R.E., dated September 23, 1974 and last revised March 14, 1975.

9.   Lease, dated as of March 20, 1975, between Pennsylvania Mart Properties Corp., as lessor, and K mart Enterprises of Pennsylvania, Inc., as lessee.

10.   Declaration of Protective Covenants made by Warner Co. dated January 30, 1975 and recorded January 31, 1975 in Deed Book No. 2151, page 431.

D2157   8

Apr 4   3 38 PM '75

BUCKS COUNTY SS:
RECORDED IN THE RECORDER'S
OFFICE OF SAID COUNTY IN
Deed            BOOK 2157
AT PAGE 1   &c.
WITNESS MY HAND AND SEAL OF
OFFICE   April 4th        · 19   75

*George M. Fitzgerald*

RECORDER OF DEEDS

008385
THE INSURANCE COMPANY

CSOL-362-M

ASSIGNMENT OF LEASE AND GUARANTY

PENNSYLVANIA MART PROPERTIES CORP.
Assignor

TO

GIRARD TRUST BANK
Trustee, etc.
Assignee

Premises: Falls Twp.,
Bucks County, Pa.

(3)

23.50

D2157 / 9

## ASSIGNMENT OF LEASE

Agreement made this 17th day of April 1985 between K MART APPAREL FASHIONS CORP., a Delaware corporation (hereinafter referred to as "Assignor"), having an address at 7373 West Side Avenue, North Bergen, New Jersey 07047, and K MART CORPORATION, a Michigan corporation (hereinafter referred to as "Assignee"), having an address at 3100 West Big Beaver Road, Troy, Michigan 48084;

## W I T N E S S E T H :

WHEREAS, the Assignor is the successor to K mart Enterprises of Pennsylvania, Inc., as lessee under a lease dated March 20, 1975, (said lease being hereinafter referred to as the "Lease"); the Lease covers the property more particularly described in said Lease, located on premises in Falls Township, Bucks County, Pennsylvania, a legal description of which is annexed hereto and made a part hereof as Schedule A;

NOW, THEREFORE, in consideration of the sum of $10.00 and other good and valuable consideration paid by the Assignee to the Assignor, the receipt of which is hereby acknowledged, the Assignor hereby transfers, sets over and assigns the said Lease, together with all of Assignor's right, title and interest therein and thereunder, as well as Assignor's leasehold interest in all

*[handwritten notes:]*

3125
602

(1) Index K MART APPAREL Fashion Corp, GRANTOR and K MART ENTERPRISES OF Pennsylvania, Inc. GRANTOR and K MART CORPORATION GRANTEE

D2608-1159

(2) Marginal Note of Assignment via Deed Book 2156, page 602

leasehold improvements and all appurtenances thereto, to the Assignee, its successors and assigns;

TO HAVE AND TO HOLD the same unto the Assignee, its successors and assigns, effective on the day hereof for the remainder of the term of the said Lease, subject to the rental, terms, covenants and conditions of said Lease.

The foregoing assignment includes the right of exercise of renewal, extension or termination options set forth in said Lease, if any.

The Assignee hereby assumes the performance of all the terms, covenants and conditions of the said Lease on the part of the Lessee to be performed from and after the date hereof. Assignee shall have the right to amend or modify said Lease directly with Lessor.

Nothing contained herein shall be construed as preventing the further assignment or reassignment of the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this assignment to be executed as of the day and year first above written.

WITNESSED:                          K MART APPAREL FASHIONS CORP.

_____             By: _____

                                    Its: _____

-2-                    D2608-1160

SCHEDULE A

ALL THAT CERTAIN piece or parcel of ground situate in Falls Township, Bucks County, Pennsylvania, and described according to a Plan of Property of "96.218 Acres Subdivision in Penn Warner Park" made by Yerkes Associates, Inc., dated 9-23-1974, as follows, to wit:

BEGINNING at a point on the north side of Tyburn Road (120.00 feet wide), L.R. 09138, marking the southeast corner of the subject tract; said point being the seven following courses and distances measured along the said north side line of Tyburn Road from the end of a radius round corner, having a radius of 75.00 feet on the west side of Newbold road (100.00 feet wide); (1) South 66 degrees 06 minutes 53 seconds West 770.10 feet to a point of curve; (2) on a line curving to the right with a radius of 153.43 feet, the arc distance of 52.09 feet to a point of tangent; (3) South 85 degrees 34 minutes West 98.48 feet to a point; (4) South 04 degrees 26 minutes East 10.00 feet to a point; (5) south 85 degrees 34 minutes West 200.00 feet to a point; (6) South 04 degrees 26 minutes East 10.00 feet to a point; (7) South 85 degrees 34 minutes West 224.75 feet to said beginning point; thence from said beginning point along the North side line of said Tyburn Road, the two following courses and distances; (1) South 85 degrees 34 minutes West 2139.49 feet to a point of curve; (2) on a line curving to the right with a radius of 3009.55 feet, the arc distance of 352.31 feet to a point; thence partly by lands now or late of Chester Glenn and Thomas R. Owens, partly by land now or late of Marie Pellegrinni the three following courses and distances: (1) North 00 degrees 06 minutes West 107.32 feet to a point; (2) South 87 degrees 14 minutes West 160.00 feet to a point; (3) North 18 degrees 25 minutes West 905.94 feet to a point; thence by land now or late of Casper Beffert, North 44 degrees 53 minutes 57 seconds West 642.28 feet to a point; thence by other land now or late of Warner Company, of which this is a part, the following five courses and distances: (1) North 85 degrees 34 minutes East, partly along the south side line of a proposed road (60.00 feet wide) 3173.56 feet to a point of radius round corner at the intersection of another proposed road (60.00 feet wide); (2) on a line curving to the right with a radius of 45.00 feet, the arc distance of 70.69 feet to a point of tangent; (3) South 04 degrees 26 minutes East, along the west side line of a proposed road (60.00 feet wide) 871.21 feet to a point; (4) thence crossing said proposed road, North 85 degrees 34 minutes East 60.00 feet to a point; (5) South 04 degrees 26 minutes East 583.79 feet to the place of beginning.

CONTAINING 96.218 acres be the same more or less.

BEING the same premises which Pennsylvania Mart Properties Corp., a Pennsylvania Corporation, by Deed dated December 2, 1976 and recorded in the Office for the Recording of Deeds in and for the County of Bucks, Commonwealth of Pennsylvania in Deed Book 2221 page 396, granted and conveyed unto Pennsylvania Mart Limited Partnership (formerly known as Pennmart Properties Co.), a Pennsylvania limited partnership, in fee.

D2608-1163

Please return to:

**LAWYERS TITLE INS CORP**
1346 Chestnut St. STE. #609
Avenue of the Arts Bldg.
Phila., PA 19107

BUCKS COUNTY SS:
RECORDED IN THE RECORDER'S
OFFICE OF SAID COUNTY IN
Deed        BOOK      2608
AT PAGE     1159 &c.
WITNESS MY HAND AND SEAL OF
OFFICE      April 24th     , 19 85

**RECORDER OF DEEDS**

1985 APR 24 A 9 19      0174811      X

LTI-10551

**D2608-1164**

Lease Supplement, dated as of January 5, 1977, between PENNSYLVANIA MART PROPERTIES CORP. ("Lessor"), a Pennsylvania corporation, having an address c/o Merrill Lynch, Hubbard Inc., 165 Broadway, New York, New York 10006 and K MART ENTERPRISES OF PENNSYLVANIA, INC. ("Lessee"), a Pennsylvania corporation, having its principal office c/o S. S. Kresge Company, 3100 West Big Beaver, Troy, Michigan 48084, to lease dated as of March 20, 1975 (the "Lease") between Lessor and Lessee covering certain improved real property (the "Leased Property") in the Township of Falls, County of Bucks, and Commonwealth of Pennsylvania, more particularly described in Schedule A attached hereto.

## W I T N E S S E T H :

Pursuant to Section 4.2 of the Lease, Lessor and Lessee agree as follows:

1.    The Cost of the Leased Property (as that term and other capitalized terms used herein are defined in the Lease) for all purposes of the Lease is $19,917,478.44

2.    The annual Basic Rent payable under the Lease during the Fixed Term shall be the sum of $2,057,475.52 payable in equal installments in arrears of $514,368.88 each, commencing on October 16, 1977, and quarter-annually thereafter

on the 16th day of each January, April, July and October through and including January 16, 2007 (collectively, the "Rent Payment Dates").

    3.    The Commencement Date of the Fixed Term of the Lease for all purposes of the Lease is January 17, 1977.

    4.    The Discounted Future Basic Rent as of each of the Rent Payment Dates is as set forth in Schedule B attached hereto.

    5.    As supplemented hereby, the Lease shall continue in full force and effect in accordance with its terms.

    IN WITNESS WHEREOF, the parties have caused this Lease Supplement to be executed and their respective corporate seals to be hereunto affixed and attested by their respective officers thereunto duly authorized as of the day and year first above written.

PENNSYLVANIA MART PROPERTIES CORP.

By _____
        Vice President

ATTEST:

_____
        Secretary

K MART ENTERPRISES OF PENNSYLVANIA,

By _____
        President

ATTEST:

_____
        Secretary

Approved:

S. S. KRESGE COMPANY

By _____
        Vice President

The foregoing Lease Supplement is approved and
accepted by Pennsylvania Mart Limited Partnership as present
owner of the Leased Property.


Date: JANUARY 17 , 1977     PENNSYLVANIA MART LIMITED PARTNER-
SHIP BY MATAVIA CORP., ITS GENERAL
PARTNER


By _michael a Grassiere_
Vice President

ALL THAT CERTAIN piece or parcel of ground situate in Falls Township, Bucks County, Pennsylvania, and described according to a Plan of Property of "96.218 Acres Subdivision in Penn Warner Park" made by Yerkes Associates, Inc., dated 9/23/1974 as follows, to wit:

BEGINNING at a point on the north side of Tyburn Road (120.00 feet wide), L.R. 09136, marking the southeast corner of the subject tract; said point being the seven following courses and distances measured along the said north side line of Tyburn Road from the end of a radius round corner, having a radius of 75.00 feet on the west side of Newbold Road (100.00 feet wide); (1) South 66 degrees 06 minutes 53 seconds West 770.10 feet to a point of curve; (2) on a line curving to the right with a radius of 153.43 feet, the arc distance of 52.09 feet to a point of tangent; (3) South 85 degrees 34 minutes West 93.48 feet to a point; (4) South 04 degrees 26 minutes East 10.00 feet to a point; (5) South 85 degrees 34 minutes West 200.00 feet to a point; (6) South 04 degrees 26 minutes East 10.00 feet to a point; (7) South 85 degrees 34 minutes West 224.75 feet to said beginning point; thence from said beginning point along the North side line of said Tyburn Road, the two following courses and distances; (1) South 85 degrees 34 minutes West 2139.49 feet to a point of curve; (2) on a line curving to the right with a radius of 3009.55 feet, the arc distance of 352.31 feet to a point; thence partly by lands now or late of Chester Glenn and Thomas R. Owens, partly by land now or late of Marie Pellegrinni the three following courses and distances: (1) North 00 degrees 06 minutes West 107.32 feet to a point; (2) South 87 degrees 14 minutes West 160.00 feet to a point; (3) North 18 degrees 25 minutes West 905.94 feet to a point; thence by land now or late of Casper Beffert, North 44 degrees 53 minutes 57 seconds West 642.28 feet to a point; thence by other land now or late of Warner Company, of which this is a part, the following five courses and distances: (1) North 85 degrees 34 minutes East, partly along the south side line of a proposed road (60.00 feet wide) 3173.56 feet to a point of radius round corner at the intersection of another proposed road (60.00 feet wide); (2) on a line curving to the right with a radius of 45.00 feet, the arc distance of 70.69 feet to a point of tangent; (3) South 04 degrees 26 minutes East, along the west side line of a proposed road (60.00 feet wide) 871.21 feet to a point; (4) thence crossing said proposed road, North 85 degrees 34 minutes East 60.00 feet to a point; (5) South 04 degrees 26 minutes East 583.79 feet to the place of beginning. CONTAINING 96.218 acres be the same more or less.

BEING part of the same premises which Warner Company (A Dela. corp.), by Deed dated July 11, 1966 and recorded in Bucks County in Deed Book 1836 page 470, conveyed unto Warner Realty Investment Company (A Penna. corp.) in fee.

SUBJECT TO:

1.   Possible additional assessments for taxes for new construction or for any major improvements pursuant to provisions of Acts of Assembly relating thereto hereafter assessed.

2.   Rights granted to Philadelphia Electric Company and/or Bell Telephone Company as in Deed Book 1817 page 850.

SCHEDULE A, cont.

3.   Rights of the public and others entitled thereto in and to the use of that portion of the premises within the bounds of proposed road.

4.   Right of access to Tyburn Road (LR 09136) a limited access highway.

5.   Unsettled taxes due the Commonwealth of Pennsylvania by mortgagor corporation, not presently a lien, all of which taxes when assessed or settled, if not paid, will constitute a prior lien against any fund created at a judicial sale.

6.   Easement of Pennsylvania Department of Highways for "Channel Change" as shown on "final plan of 96.218 acres subdivision in Penn Warner Park" made by Yerkeys Associates, Inc. R.E., dated September 23, 1974 and last revised March 14, 1975.

7.   Liens for taxes not yet due and payable.

8.   Any state of facts shown on the survey made by Yerkeys Associates, Inc. R.E., dated September 23, 1974 and last revised March 14, 1975.

9.   Lease, dated as of March 20, 1975, between Pennsylvania Mart Properties Corp., as lessor, and K mart Enterprises of Pennsylvania, Inc., as lessee.

10.   Declaration of Protective Covenants made by Warner Co. dated January 10, 1975 and recorded January 31, 1975 in Deed Book No. 2152, page 431.

## SCHEDULE B

The Discounted Future Basic Rent on each Rent Payment Date shall be as follows:

| Rent Payment Date Number | Discounted Future Basic Rent |
|---|---|
| 1 | 20103051.38 |
| 2 | 20077998.83 |
| 3 | 20052304.31 |
| 4 | 20025951.37 |
| 5 | 19998923.13 |
| 6 | 19971202.30 |
| 7 | 19942771.12 |
| 8 | 19913611.38 |
| 9 | 19883704.44 |
| 10 | 19853031.12 |
| 11 | 19821571.80 |
| 12 | 19789306.34 |
| 13 | 19756214.07 |
| 14 | 19722273.82 |
| 15 | 19687463.84 |
| 16 | 19651761.86 |
| 17 | 19615145.02 |
| 18 | 19577589.87 |
| 19 | 19539072.37 |
| 20 | 19499567.86 |
| 21 | 19459051.05 |
| 22 | 19417495.99 |
| 23 | 19374876.08 |
| 24 | 19331164.04 |
| 25 | 19286331.88 |
| 26 | 19240350.89 |
| 27 | 19193191.64 |
| 28 | 19144823.94 |
| 29 | 19095216.81 |
| 30 | 19044338.50 |
| 31 | 18992156.43 |
| 32 | 18938637.20 |
| 33 | 18883746.54 |
| 34 | 18827449.30 |
| 35 | 18769709.45 |
| 36 | 18710490.01 |
| 37 | 18649753.08 |
| 38 | 18587459.76 |
| 39 | 18523570.18 |
| 40 | 18458043.42 |

## SCHEDULE B, cont.

| Rent Payment Date Number | Discounted Future Basic Rent |
|---|---|
| 41 | 18390837.54 |
| 42 | 18321909.51 |
| 43 | 18251215.21 |
| 44 | 18178709.35 |
| 45 | 18104345.54 |
| 46 | 18028076.15 |
| 47 | 17949852.36 |
| 48 | 17869624.09 |
| 49 | 17787339.97 |
| 50 | 17702947.31 |
| 51 | 17616392.10 |
| 52 | 17527618.90 |
| 53 | 17436570.90 |
| 54 | 17343189.79 |
| 55 | 17247415.78 |
| 56 | 17149187.57 |
| 57 | 17048442.26 |
| 58 | 16945115.35 |
| 59 | 16839140.70 |
| 60 | 16730450.43 |
| 61 | 16618974.99 |
| 62 | 16504642.98 |
| 63 | 16387381.21 |
| 64 | 16267114.62 |
| 65 | 16143766.19 |
| 66 | 16017256.96 |
| 67 | 15887505.93 |
| 68 | 15754430.02 |
| 69 | 15617944.05 |
| 70 | 15477960.63 |
| 71 | 15334390.13 |
| 72 | 15187140.63 |
| 73 | 15036117.87 |
| 74 | 14881225.15 |
| 75 | 14722363.31 |
| 76 | 14559430.62 |
| 77 | 14392322.79 |
| 78 | 14220932.82 |
| 79 | 14045150.99 |
| 80 | 13864864.74 |

## SCHEDULE 3, cont.

| Rent Payment Date Number | Discounted Future Basic Rent |
|---|---|
| 81 | 13679958.66 |
| 82 | 13490314.36 |
| 83 | 13295810.42 |
| 84 | 13096322.32 |
| 85 | 12891722.34 |
| 86 | 12681879.49 |
| 87 | 12466659.41 |
| 88 | 12245924.31 |
| 89 | 12019532.88 |
| 90 | 11787340.17 |
| 91 | 11549197.52 |
| 92 | 11304952.47 |
| 93 | 11054448.64 |
| 94 | 10797525.64 |
| 95 | 10534019.00 |
| 96 | 10263759.99 |
| 97 | 9986575.60 |
| 98 | 9702288.36 |
| 99 | 9410716.26 |
| 100 | 9111672.62 |
| 101 | 8804965.99 |
| 102 | 8490400.00 |
| 103 | 8167773.26 |
| 104 | 7836879.21 |
| 105 | 7497506.00 |
| 106 | 7149436.35 |
| 107 | 6792447.42 |
| 108 | 6426310.64 |
| 109 | 6050791.61 |
| 110 | 5665649.91 |
| 111 | 5270638.94 |
| 112 | 4865505.83 |
| 113 | 4449991.17 |
| 114 | 4023828.95 |
| 115 | 3586746.33 |
| 116 | 3138463.46 |
| 117 | 2678693.35 |
| 118 | 2207141.63 |
| 119 | 1723506.39 |
| 120 | 1227478.00 |

STATE OF NEW YORK )
                  : SS.:
COUNTY OF NEW YORK)

On this the ~7~ day of _January_ , 1977, before

me, _Elizabeth C. Buckner_, the undersigned officer, personally

appeared _Michael A. Doray_, who acknowledged himself to be

a Vice President of PENNSYLVANIA MART PROPERTIES CORP. a

Pennsylvania corporation, and that he, as such Vice President,

being authorized so to do, executed the foregoing instrument

for the purposes therein contained, by signing the name

of the corporation by himself as Vice President.

IN WITNESS WHEREOF, I hereunto set my hand and

official seal.

_Elizabeth C. Buckner_

Notary Public

ELIZABETH C. BUCKNER, Notary Public
State of New York, No. 03-5509693
Qualified in Bronx County
Certificate filed in New York County
Commission Expires March 30, 19 78

[Notarial Seal]

STATE OF MICHIGAN )
                 ) SS.
COUNTY OF OAKLAND

On this the 13th day of January, 1977, before me, Robert V. Peterson, the undersigned officer, personally appeared E. J. Haglund, who acknowledged himself to be a President of K MART ENTERPRISES OF PENNSYLVANIA, INC., a Pennsylvania corporation, and that he, as such President, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as President.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

By _Robert V. Peterson_

Robert V. Peterson
Notary Public .

ROBERT V. PETERSON
Notary Public, Oakland County, Michigan
My Commission Expires October 13, 1979

[Notarial Seal]