UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | | |
|---|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☒ Kmart Corporation (18-23549) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☐ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Holdings Management Corporation (18-23553) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22301) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc. (18-23584) | |

# Proof of Claim                                                  04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

**Part 1:   Identify the Claim**

| | |
|---|---|
| 1. Who is the current creditor? | Levcom Wall Plaza Associates<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☒ No<br>☐ Yes. From whom? _____ |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>Levcom Wall Plaza Associates<br>c/o Wasserman, Jurista & Stolz<br>Attn:  Donald W. Clarke, Esq.<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br><br>Contact phone  973-467-2700<br>Contact email  dclarke@wjslaw.com | Where should payments to the creditor be sent? (if different)<br><br>Levcom Wall Plaza Associates<br>c/o Mandelbaum & Mandelbaum<br>80 Main Street, Suite 510<br>West Orange, NJ  07052<br><br>Contact phone _____<br>Contact email _____ |
| 4. Does this claim amend one already filed? | ☒ No<br>☐ Yes.  Claim number on court claims registry (if known)_____   Filed on ____/____/____ MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No<br>☐ Yes. Who made the earlier filing? _____ |

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

7. How much is the claim?    $ *See Schedule "A"* _____ .  **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

*See Schedule "A"*

_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**  $_____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. Is this claim based on a lease?

☐ No

☑ Yes. Amount necessary to cure any default as of the date of the petition.    $_____101,545.31*

11. Is this claim subject to a right of setoff?

☑ No

☐ Yes. Identify the property: _____

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No<br>☑ Yes. *Check one:* | **Amount entitled to priority** |

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☑ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies.    $ 47,598.84

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

| | |
|---|---|
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.    $_____ |

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it.** FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Signature:   *David Mandelbaum*
David Mandelbaum (Apr 4, 2019)

**Email:**   dclarke@wjslaw.com

Signature

Print the name of the person who is completing and signing this claim:

Name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | David Mandelbaum | | |
| | First name | Middle name | Last name |
| Title | General Partner | | |
| Company | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | | | |
| | Number | Street | |
| | City | State | ZIP Code |
| Contact phone | | Email | |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ have supporting documentation.
(attach below)

☐ do **not** have supporting documentation.

Attachment

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

Modified Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.** Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://restructuring.primeclerk.com/sears.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Sears Holdings Corporation Claims Processing Center
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

---

**Do not file these instructions with your form**

Claim Forms may be electronically submitted by visiting https://restructuring.primeclerk.com/sears/EPOC-Index

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | | |
|---|---|---|---|---|
| Sears Holdings Corporation (18-23538) | ☒ Kmart Corporation (18-23549) | Sears, Roebuck de Puerto Rico, Inc. (18-23561) | MyGofer LLC (18-23573) | Kmart.com LLC (18-23585) |
| Sears, Roebuck and Co. (18-23537) | MaxServ, Inc. (18-23550) | SYW Relay LLC (18-23562) | Sears Brands Business Corporation (18-23574) | Sears Brands Management Corporation (18-23586) |
| Kmart Holding Corporation (18-23539) | Private Brands, Ltd. (18-23551) | Wally Labs LLC (18-23563) | Sears Holdings Publishing Company, LLC (18-23575) | SHC Licensed Business LLC (18-23616) |
| Kmart Operations LLC (18-23540) | Sears Development Co. (18-23552) | Big Beaver of Florida Development, LLC (18-23564) | Kmart of Michigan, Inc. (18-23576) | SHC Promotions LLC (18-23630) |
| Sears Operations LLC (18-23541) | Sears Holdings Management Corporation (18-23553) | California Builder Appliances, Inc. (18-23565) | SHC Desert Springs, LLC (18-23577) | SRe Holding Corporation (19-22301) |
| ServiceLive, Inc. (18-23542) | Sears Home & Business Franchises, Inc. (18-23554) | Florida Builder Appliances, Inc. (18-23566) | SOE, Inc. (18-23578) | MMLID: 4897191 |
| A&E Factory Service, LLC (18-23543) | Sears Home Improvement Products, Inc. (18-23555) | KBL Holding Inc. (18-23567) | StarWest, LLC (18-23579) | |
| A&E Home Delivery, LLC (18-23544) | Sears Insurance Services, L.L.C. (18-23556) | KLC, Inc. (18-23568) | STI Merchandising, Inc. (18-23580) | |
| A&E Lawn & Garden, LLC (18-23545) | Sears Procurement Services, Inc. (18-23557) | Sears Protection Company (Florida), L.L.C. (18-23569) | Troy Coolidge No. 13, LLC (18-23581) | |
| A&E Signature Service, LLC (18-23546) | Sears Protection Company (18-23558) | Kmart of Washington LLC (18-23570) | BlueLight.com, Inc. (18-23582) | |
| PBA Holdings Inc. (18-23547) | Sears Protection Company (PR) Inc. (18-23559) | Kmart Stores of Illinois LLC (18-23571) | Sears Brands, L.L.C. (18-23583) | |
| Innovel Solutions, Inc. (18-23548) | Sears Roebuck Acceptance Corp. (18-23560) | Kmart Stores of Texas LLC (18-23572) | Sears Buying Services, Inc. (18-23584) | |

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:    Identify the Claim

**1. Who is the current creditor?**

Levcom Wall Plaza Associates

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Levcom Wall Plaza Associates
c/o Wasserman, Jurista & Stolz, P.C.
Attn: Donald W. Clarke
110 Allen Rd.,
Ste. 304
Basking Ridge NJ 07920

Contact phone  873.467.2100
Contact email  DCLARKE@WJSLAW.COM

Where should payments to the creditor be sent? (if different)

Levcom Wall Plaza Assoc,
c/o Mandelbaum + Mandelbaum
80 Main St., Ste 510
West Orange, NJ 07052

Contact phone _____
Contact email _____

**4. Does this claim amend one already filed?**

☒ No
☐ Yes.   Claim number on court claims registry (if known) _____

Filed on ___/___/_____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

**Part 2:   Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $ *See Schedule "A"*. Does this amount include interest or other charges?

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

*See Schedule "A"*

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                         $_____

Amount of the claim that is secured:      $_____

Amount of the claim that is unsecured:   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☑ Yes. Amount necessary to cure any default as of the date of the petition.   $ *101,545.31* *

   * *See Schedule "A"*

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). $ _____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). $ _____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). $ _____

☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 2 ) that applies. $ 47,538.84
*plus any accrued unpaid rent and other charges under Lease*

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. $ _____

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 04/04/2019 (mm/dd/yyyy)

X _____
Signature

Print the name of the person who is completing and signing this claim:

Name of the person who is completing and signing this claim:

Name     DAVID               MANDELBAUM
         First name    Middle name    Last name

Title    GENERAL PARTNER

Company _____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address _____
         Number        Street

         _____
         City          State    ZIP Code

Contact phone _____     Email _____

## SCHEDULE "A"

WASSERMAN, JURISTA & STOLZ, P.C.
110 Allen Road, Suite 304
Basking Ridge, New Jersey 07920
Phone: (973) 467-2700
Fax: (973) 467-8126
Donald W. Clarke
*Attorneys for Levcom Wall Plaza Associates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In Re:                                                         :    Chapter 11
                                                               :
                                                               :    Case No. 18-23538-RDD
**SEARS HOLDINGS CORPORATION**, *et al.*                       :
                                                               :
                                               Debtors.        :    (Jointly Administered)
                                                               :
-------------------------------------------------------------x

### ADDENDUM TO PROOF OF CLAIM BY
### LEVCOM WALL PLAZA ASSOCIATES (STORE NO. 7602)
### AND RESERVATION OF RIGHTS

    *Levcom Wall Plaza Associates* ("Levcom"), creditor and landlord of the above-captioned

debtors ("Debtors"), by and through its attorneys, Wasserman, Jurista & Stolz, PC, submits this

schedule ("Schedule 'A'"), in support of their proof of claim, filed in connection with the Court's

Order establishing a bar date for proofs of claim (the "Bar Date Order") [Doc 2676]:

    1.      Levcom is the owner of certain real property on which Store No. 7602 is located.

The Debtors operate Store No. 7602 pursuant to the terms of that certain lease, dated June of 1985,

and as same has been amended (the "Lease"). **Exhibit "A."**

    2.      The Bar Date Order requires creditors to file proofs of claim by April 10, 2019, or

(where applicable) not later than thirty (30) days after an order authorizing the rejection of an

applicable unexpired lease for real property.

3.     Levcom also understands that the buyer (Transform Holdco, LLC) has until April 12, 2019 to notice counterparties to unexpired leases of their intention to assume or reject.

4.     Levcom has not been served with any notice and is aware of no such intention, by either the Debtors or Transform Holdco, LLC, of their intention to assume or reject the Lease.

5.     In an abundance of caution, Levcom submits this proof of claim for:

    a.  Real Estate Taxes through October 14, 2018 (**$53,946.47**); **Exhibit "B"**

    b.  Lease Rejection damages (to be determined upon notice of rejection, but not less than one (1) year of rent under the Lease, or **$571,186.08**);

    c.  Damages to real property covered by the Lease (**to be determined upon re-entry after rejection and surrender of the leased premises**);

    d.  Post-petition priority rent and other charges due under the Lease (pursuant to 11 U.S.C. §§ 365(b)(3), 503(b), and/or 507(a)(2)) not less than **$47,598.84** (*see Exhibit "B"*); and

    e.  Any other damages to which Levcom is entitled under the Lease or applicable law, including, but not limited to, post-petition occupancy and related charges under the Lease plus attorneys' fees and costs **to be determined upon rejection or assumption** of the Lease.

6.     Levcom reserves its right to amend or supplement this proof of claim.

                    **WASSERMAN, JURISTA & STOLZ, P.C.**
                    *Attorney for Levcom Wall Plaza Associates*

Dated: April 4, 2019
                    DONALD W. CLARKE

# EXHIBIT A

KMART/WALL
04/3/01

## THIRD AMENDMENT OF LEASE

THIS THIRD AMENDMENT OF LEASE made and entered into as of this 10th day April, 2001, by and between LEVCOM WALL PLAZA ASSOCIATES, a New Jersey partnership, having an address at c/o Mandelbaum & Mandelbaum, 80 Main Street, West Orange, New Jersey 07052 ("Landlord"), and KMART CORPORATION, a Michigan corporation, having an address at 3100 West Big Beaver Road, Troy, Michigan 48084 ("Tenant").

### W I T N E S S E T H :

WHEREAS:

1.   By Lease dated June 28, 1985 (said Lease, as amended by First Amendment of Lease dated September 15, 1985 and Second Amendment of Lease dated December 30, 1985, being hereinafter referred to collectively as the "Lease"), Landlord leased to Tenant certain demised premises (the "Demised Premises") located within a shopping center in Wall Township, New Jersey (the "Shopping Center") and more particularly described in Exhibit A to the Lease.

2.   Subject to the terms and conditions hereinafter set forth, Tenant desires to construct upon the Demised Premises an expansion of its store (and upon completion of construction, said expansion will become part of the Demised Premises, as said term is defined in the Lease), and the parties desire to amend the Lease.

3.   Subject to the terms and conditions hereinafter set forth, Tenant desires to make certain changes and/or improvements to the "common areas" (as said term is defined in the Lease) of the Shopping Center in connection with the Kmart Expansion (as hereinafter defined). The proposed Tenant expansion and the work required to be done in the common areas are more particularly depicted on Exhibit A attached hereto and made a part hereof ("Site Plan").

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of all of which is hereby mutually acknowledged, it is agreed as follows:

1.   The following terms shall have the meanings hereinafter ascribed:

a.   <u>Common Area Improvements</u>. Those modifications to the existing common areas of the Shopping Center shown on the Site Plan and to be constructed substantially in accordance with certain construction plans and specifications ("Construction Plans") to be prepared by Tenant and approved by Landlord (which approval shall not be unreasonably withheld or delayed) including without limitation any of the following: on-site excavation; filling; soil compaction; fine and rough grading; drainage, including necessary engineering that may be required; retaining walls; storm drains and retention basins; provision for building utilities; parking lot paving and striping; relocation of service drives around the perimeter of the Kmart building and Shopping Center; lighting; bumpers; landscaping (except landscaping which is part of Landlord's Work as hereinafter defined) and curb cuts all as shown on the new site plan attached hereto.

b.   <u>Tenant's Common Area Work</u>. Collectively, all such work as shall be necessary to fully perform and complete the Common Area Improvements.

c.   <u>Kmart Expansion</u>. Any work to construct an approximately 22,632 square foot addition to Tenant's existing building together with an approximately 6,580 square foot outdoor garden center (provided, however, the outdoor garden center shall not be included in calculations of the size of Tenant's building for purposes of computing Tenant's share of real estate taxes or common area reimbursements unless same is assessed as a building for real estate tax purposes. In determining if same has been assessed as a building for real estate tax purposes, the assessor's records or written assessor's certification shall be determinative as to same).

d.   <u>Kmart Expansion Area</u>. The area shown on the Site Plan attached hereto for construction of the Kmart Expansion. The Site Plan shall be substituted for and replace the existing site plan annexed as Exhibit B to the Lease. Upon completion of construction in accordance with the terms of this Third Amendment

2

of Lease, the Kmart Expansion Area will be deemed part of the Demised Premises.

    e.  Landlord's Work. Landlord's Work shall consist of (i) all landscaping and related work (including planting of grass, topsoil, trees and shrubs) required as a condition of the granting of any Municipal Approval (as hereinafter defined) and as more particularly shown on Sheet 4 of the Site Plan (ii) replacement of the roof of Tenant's existing building pursuant to specifications attached hereto as Exhibit B (hereinafter the "Roof Work") and (iii) compliance with conditions initialled with the letters "LL" (the initials "KM" signify that compliance with the condition is Tenant's responsibility; if a condition contains both of the initials "LL" and "KM", this signifies that Tenant shall comply with the condition as it relates to the Kmart Expansion and Landlord shall comply with the condition as it relates to the balance of the Shopping Center and/or Landlord's Work) of the Resolution of Approval of the Planning Board of Wall Township, New Jersey adopted September 25, 2000, the relevant portion of which is attached hereto as Exhibit C (hereinafter the aforesaid September 25, 2000 Resolution is referred to as the "Site Plan Approval"). Before starting Landlord's Work, Landlord shall submit for Tenant's consent detailed plans for Landlord's Work, which consent Tenant shall not unreasonably withhold or delay. Landlord agrees in the performance of Landlord's Work to use reasonable efforts to minimize disruption of Tenant's business. Landlord shall and does hereby agree to defend, indemnify and hold Tenant harmless from and against any damage, loss or claim to Tenant or its property arising from or in connection with the performance of Landlord's Work.

    2.  To induce Tenant to enter into this instrument, Landlord hereby represents, covenants and warrants as follows:

    a.  Landlord shall diligently endeavor to obtain all required governmental permits and approvals to permit Landlord's Work, and the construction and completion by Tenant of all Common Area Improvements and the Kmart Expansion (for any use permitted by the Lease) in compliance with all existing building, zoning, planning and all other applicable municipal or other laws,

3

ordinances, and regulations, including obtaining any required variances to parking requirements or otherwise (collectively, all such permits and approvals required to permit the construction of the Common Area Improvements and Kmart Expansion and any required utility approvals are referred to as the "Municipal Approvals");

b.    no tenant or other occupant under any existing lease in the Shopping Center has any right to prohibit or restrict the Tenant's Common Area Work or the construction of the Kmart Expansion or for any use of same permitted by the Lease(except that notwithstanding the foregoing, Tenant acknowledges that Landlord has advised it that First Union Bank currently has a lease (the "First Union Lease") which demises a portion of the common area where additional parking will be constructed in connection with the Kmart Expansion. Landlord represents it shall diligently endeavor to obtain a termination of the First Union Lease);

c.    no covenants, restrictions, easements or other matters of record against the Shopping Center or of which Landlord is aware, and whether or not set forth in the Lease, would prohibit or restrict the Tenant's Common Area Work or the construction of the Kmart Expansion or for any use permitted by the Lease; and

d.    the current zoning of the Demised Premises permits its use as a general merchandise store.

3.    The "Delivery Date" shall be the date upon which all of the following shall have occurred:

a.    Landlord shall have delivered to Tenant reasonably satisfactory evidence of the obtaining of all Municipal Approvals for Landlord's Work, Tenant's Common Area Work and the Kmart Expansion (and such approvals are final, unappealable and unconditional) other than the actual building permit for the Kmart Expansion and Landlord shall have provided satisfactory evidence to Tenant that the First Union Lease and all rights of the tenant therein have then been terminated. Tenant acknowledges that subject to the expiration of the applicable appeal period and there being no changes or revocations to any previously obtained Municipal Approval, including the Site Plan Approval, to the best

4

of Tenant's knowledge, all required Municipal Approvals have been obtained;

    b.   The Construction Plans have been approved by Landlord.

    c.   Tenant shall have obtained an unconditional building permit or permits or other required approvals for the Kmart Expansion and Common Area Improvements (including without limitation approval of any Tenant signs, and all required permits, approvals and service commitments for the construction and provision if any of electric, water and other utilities), subject only to compliance by Tenant with local building codes in such construction. Tenant agrees to apply for such permits and approvals promptly after the applicable appeal period has expired and Landlord has sent written notification and provided Tenant satisfactory evidence of the effective termination of the First Union Lease and its approval of the Construction Plans; and

    d.   All representations, covenants and warranties of Landlord set forth in Paragraph 2 above shall then be and remain true, correct and unbreached in all material respects.

    4.  Following the Delivery Date, Tenant agrees, at its sole cost and expense, to construct the Common Area Improvements and Kmart Expansion and Landlord agrees at its sole cost and expense to commence and complete Landlord's Work. All of such Tenant's Common Area Work and Kmart Expansion may be made by Tenant without requiring any consent from Landlord, provided that such Tenant's Common Area Work and Kmart Expansion shall (i) comply with all appropriate building codes; and (ii) not be materially incompatible with the remainder of the Shopping Center. Landlord and Tenant shall cooperate with each other in securing any building or other permits or authorizations (provided, however, that except for the cost of the actual building permit for the Kmart Expansion, Landlord shall pay for all costs including filing fees, to obtain the Municipal Approvals), and any additional electricity, water or other utilities, required for the Tenant's Common Area Work and Kmart Expansion (but the foregoing shall not be deemed to negate or impair the representations of Landlord in Paragraph 2).    The

provisions of this Paragraph 4 shall, with respect to all of the foregoing work, supersede any inconsistent or contradictory provisions of Article 16 of the Lease, and shall be and be deemed effective in lieu thereof (such superseded provisions to include, without limitation, requirement of Landlord's consent and requirement to furnish plans and specifications).

Notwithstanding anything to the contrary set forth in this Lease, Landlord agrees, at its sole cost and expense, to promptly and diligently pay for any other on or off site costs (including without limitation any so-called impact fees or traffic studies, including the financial contribution to the Wall Township Affordable Housing Trust Fund and the "Mount Laurel" contribution), which may be required by governmental authorities as a condition to granting or issuing the aforesaid Municipal Approvals or a building permit for the Kmart Expansion.

Tenant, its contractors and subcontractors, shall have and are hereby granted a right and license to enter upon any portion of the Shopping Center if and to the extent reasonably necessary or appropriate to construct the Common Area Improvements and Kmart Expansion provided however Tenant agrees that such construction shall be done in a manner so as not to unreasonably interfere with the business of other tenants of the Shopping Center. Tenant shall and does hereby agree to defend, indemnify and hold Landlord harmless from and against any damage, loss or claim to Landlord or its property arising from or in connection with the performance of the Common Area Improvements or the Kmart Expansion.

5. If the Delivery Date has not occurred by a date which is not later than one hundred eighty (180) days from the date of this Third Amendment of Lease or if a building permit has been issued but construction is prevented due to building moratorium, then at any time thereafter prior to the Delivery Date or cancellation of building moratorium as the case may be, Landlord or Tenant may give written notice to the other cancelling this instrument; whereupon this Third Amendment of Lease shall be and be deemed null and void, neither party shall have any rights or

6

liabilities hereunder, and the Lease, unamended hereby, shall continue in full force and effect.

6.   (a) Tenant and any of its authorized representatives shall have the right to investigate and inspect the Kmart Expansion Area and shall have access to the balance of the Shopping Center for determination of utility availability, soil, engineering and feasibility testing and other tests, surveys, inspections and investigations deemed necessary or appropriate by Tenant; provided, however, that Tenant shall indemnify and hold Landlord harmless from and against any and all claims, demands, penalties, fines, liabilities, costs and expenses, including without limitation reasonable attorney's fees, arising out of or related to such entry and activities; provided, however, that the foregoing agreement to defend, indemnify and hold harmless shall not apply to any claims, demands, penalties, fines, liabilities, costs or expenses, or attorneys' fees, arising out of or related to (i) any condition upon or under the Demised Premises not caused by Tenant, (ii) any violation of law existing with respect to the Demised Premises not caused by Tenant, (iii) the acts, omissions or negligence of Landlord, its agents, servants or independent contractors, or (iv) any matter for which Landlord is covered by insurance to the extent of proceeds received by Landlord.

(b) Landlord shall have ninety (90) days following the date of the Third Amendment of Lease to obtain a termination of the First Union Lease on terms satisfactory to Landlord in its sole discretion. In the event a then currently effective termination of the First Union Lease is not obtained within said ninety (90) day period, either Landlord or Tenant shall have the option upon notice to the other to terminate this Third Amendment of Lease; whereupon this Third Amendment of Lease shall be and be deemed null and void, neither party shall have any rights or liabilities hereunder, and the Lease, unamended hereby, shall continue in full force and effect.

7.   As used in this instrument, the Increased Rental Date shall mean the date which is the first to occur (subject to extension by reason of force majeure for events beyond Tenants's

7

reasonable control, such as acts of God, labor and material shortages, or weather, but in any event no extension by reason of force majeure shall exceed a period of forty (40) days of the following dates: (i) a date which is two hundred ten (210) days following the Delivery Date; and (ii) the date upon which Tenant shall open its expanded store for business to the public, but in any event, the Increased Rental Date shall not be deemed to have occurred until the Roof Work and any other item constituting part of Landlord's Work necessary for Tenant to obtain a final, permanent certificate of occupancy for the Kmart Expansion has been satisfactorily completed, provided that notwithstanding that Tenant has been issued such certificate of occupancy, Landlord shall diligently complete any incomplete portion(s) of Landlord's Work. Notwithstanding the foregoing, Tenant shall accept a temporary certificate of occupancy (notwithstanding noncompletion of any item of Landlord's Work, other than the Roof Work, which prevented issuance of a final, permanent certificate of occupancy) if issuance of same would permit the unrestricted operation of Tenant's business; provided that if Tenant is issued such temporary certificate of occupancy, Landlord shall remain obligated to expeditiously complete all incomplete portions of Landlord's Work thereafter and if because of the failure of Landlord to complete all of Landlord's Work, the temporary certificate of occupancy should expire, all rent and additional rent shall abate if Tenant must close its store (or the Kmart Expansion) or Tenant's operations are otherwise materially restricted or materially impaired. Furthermore, if because of Landlord's delay in completing Landlord's Work, either a temporary or permanent certificate of occupancy for the Kmart Expansion cannot be issued or if a temporary certificate of occupancy was issued but in Tenant's reasonable judgment same will expire before Landlord's Work is completed and Tenant reasonably believes the same will not be extended upon request, then in either of such events Tenant (in addition to any other remedies Tenant may have against Landlord at law or in equity for such delay) may, pursuant to the provisions of Article 30 of the Lease, exercise "self help" to complete any

8



12/KMARTA
01/26/01

<u>MEMORANDUM OF THIRD AMENDMENT OF LEASE</u>

THIS MEMORANDUM OF THIRD AMENDMENT OF LEASE is made by and between Landlord and Tenant effective as of _April 16_, 2001.

1.    The name and address of the Landlord is:

Levcom Wall Plaza Associates
c/o Mandelbaum & Mandelbaum
80 Main Street
West Orange, New Jersey 07052

2.    The name and address of the Tenant is:

Kmart Corporation
3100 West Big Beaver Road
Troy, Michigan 48084.

3.    By Lease dated June 28, 1985 (said Lease, as amended by First Amendment of Lease dated September 15, 1985 and Second Amendment of Lease dated December 30, 1985, being hereinafter referred to collectively as the "Lease"), Landlord leased to Tenant certain demised premises (the "Demised Premises") located within a shopping center in Wall Township, New Jersey (the "Shopping Center") and more particularly described in Exhibit A to the Lease and as attached hereto as Schedule A.

4.    The aforementioned Landlord and Tenant entered into a certain Third Amendment of Lease of even date herewith, with respect to the Demised Premises.

5.    Subject to the terms and conditions set forth in the Third Amendment of Lease, Landlord has granted Tenant the right to expand its existing store (defined in the Third Amendment of Lease as the "Kmart Expansion") and make certain changes to the "common areas" of the Shopping Center and Landlord has agreed to perform certain work (defined in the Third Amendment of Lease as "Landlord's Work"). The Kmart Expansion and the work to be done in the common areas are more particularly depicted on a new site plan attached as Exhibit A to the Third Amendment of Lease which site plan shall be substituted for and replace the existing site plan annexed as Exhibit B to the Lease.

6.    The Third Amendment of Lease is incorporated herein by reference and this Memorandum of Third of Amendment of Lease is and shall be subject to all the terms, agreements and conditions of said Third Amendment of Lease as fully as though said terms, agreements and conditions were expressly set forth herein.  In the event of any conflict or ambiguity between the provisions hereof and the provisions of the Third of Amendment Lease, the provisions of the Third Amendment of Lease shall be controlling and effective.

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum of Third Amendment of Lease as of the day and year first above written.

WITNESS:                          LANDLORD:

                                  Levcom Wall Plaza Associates

                                  By: _____
                                      DAVID MANDELBAUM,  Partner

                                  TENANT:

                                  KMART CORPORATION

                                  By _____
                                      LORRENCE T. KELLAR
                                      V.P. REAL ESTATE

PREPARED BY:
Stuart M. Pack, Esq.
Weinberger, Berman & Singer, P.C.
230 Park Avenue, Suite 545
New York, New York 10169

-2-

STATE OF New Jersey )
                    ) ss.:
COUNTY OF Essex )

On this 16th day of April , 2001, before me, the
undersigned officer, personally appeared DAVID MANDELBAUM
who, I am satisfied, are the individuals named in the foregoing
instrument as the Partners of LEVCOM WALL PLAZA ASSOCIATES, a
General Partnership and, on behalf of such General Partnership,
did acknowledge that they made, signed, sealed and delivered the
foregoing instrument as their voluntary act and deed and as the
voluntary act and deed of said General Partnership, for the
purposes therein contained.

Given under my hand and seal of office on this 16th day  of
April , 2001.

_____
Notary Public

BARBARA GAMBA
NOTARY PUBLIC ·State of New Jersey
My Commission Expires March 6, 2002

STATE OF Michigan )
                  ) ss.:
COUNTY OF Oakland )

On this 16th day of April , 2001 , before me, the
undersigned officer, personally appeared Lorraine T Keller , the
Vice President/Realty of KMART CORPORATION, a corporation, who, I am
satisfied, is the person who signed the within instrument, and
acknowledged that he/she, as such officer, made, signed, sealed,
and delivered the same as his/her voluntary act and deed and as
the voluntary act and deed of said Corporation, made by virtue of
a Resolution of its Board of Directors, for the purposes therein
contained.

Given under my hand and seal of office on this 16th day  of
April , 2001.

_____
Notary Public

DONNA M. HUBER
Notary Public, Oakland County, MI
My Commission Expires 08-31-2004.

-3-

## SECOND AMENDMENT OF LEASE

THIS SECOND AMENDMENT OF LEASE made as of the 30th day of December, 1985, between LEVCOM WALL PLAZA ASSOCIATES, a New Jersey general partnership, having its principal place of business at Plaza 46 West, West Paterson, New Jersey 07424 (herein "Landlord"), and K MART CORPORATION, a Michigan corporation, having its principal place of business at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein "Tenant").

## W I T N E S S E T H :

WHEREAS, by Lease dated June 28, 1985 (herein "Lease"), Landlord leased to Tenant certain premises (known as K mart #7602), located in a Shopping Center situate in Wall Township, Monmouth County, State of New Jersey, more particularly described in Exhibit A attached to said Lease, which Lease was thereafter amended by First Amendment of Lease dated September 17, 1985; and

WHEREAS, Landlord and Tenant desire to amend said Lease further in accordance with the terms and provisions hereinafter set forth;

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00), the receipt and sufficiency of which is hereby acknowledged by the parties hereto, and the mutual covenants herein contained, Landlord and Tenant agree as follows:

1. Parcel II, Exhibit A attached to said Lease is eliminated and Parcel II, Amended Exhibit A attached hereto and made a part hereof is hereby substituted in its place and stead.

2. Exhibit B attached to said Lease is eliminated and Exhibit B, revised 12/17/85, attached hereto and made a part hereof is hereby substituted in its place and stead.

3. Except as expressly amended hereby, said Lease as amended is hereby ratified, confirmed and approved and shall remain in full force and effect in accordance with its terms as heretofore and hereby amended.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the day and year first above written.

LEVCOM WALL PLAZA ASSOCIATES

By: _____

David Mandelbaum, Partner

LANDLORD

WITNESS:

_____

_____

_____

K MART CORPORATION

By: _____

M. L. Skiles, Vice President

Attest: _____

C. E. Lotzar, Jr., Assistant Sec'y.

-1-

STATE OF NEW JERSEY
                                SS.
COUNTY OF ESSEX

BE IT REMEMBERED that on this _8th_ day of ~~October 1985~~ _January 1986_, before me, the subscriber, a notary public of the State and County aforesaid, personally appeared DAVID MANDELBAUM, General Partner of LEVCOM WALL PLAZA ASSOCIATES, a New Jersey general partnership, who, I am satisfied is the person named in and who executed the within instrument on behalf of said Partnership, and thereupon he acknowledged that he signed, sealed and delivered the same as his voluntary act and deed, for the uses and purposes therein expressed.

_[signature]_

BARBARA GAMBA
Notary Public of New Jersey
My Commission Expires Dec 22, 1986

STATE OF MICHIGAN
                                SS.
COUNTY OF OAKLAND

BE IT REMEMBERED that on this        day of        before me, the subscriber, a notary public of the State and County aforesaid, personally appeared M. L. SKILES, Vice President of K mart CORPORATION, who, I am satisfied, is the person who signed the within instrument; and I having first made known to him the contents thereof, he thereupon acknowledged that he signed, sealed with the corporate seal, and delivered the said instrument as such officer aforesaid, and that the within instrument is the voluntary act and deed of said corporation, made by virtue of authority from its board of directors.

_____

- 2 -

DESCRIPTION OF PART OF LOT 4, 5, AND 6 AND ALL OF LOT 9 AND 10, BLOCK 88,
TOWNSHIP OF WALL TAX MAP, MONMOUTH COUNTY, NEW JERSEY.

BEGINNING at a point in the Southerly line, as widened to 40.00
feet from center-line, of Eighteenth Avenue (Monmouth County Highway Route
No. 30). Distance 24.38 feet on a course of South 84 degrees, 55 minutes,
40 seconds East from the point of intersection of the Easterly line, 35.00
feet from center-line, of Old Mill Road extended Northwardly with the
aforesaid Southerly line of Eighteenth Avenue extended Westwardly and
running from said BEGINNING point (1) South 84 degrees, 55 minutes, 40
seconds East along the aforesaid Southerly line, 40.00 feet from center-
line, of Eighteenth Avenue, 394.95 feet to an angle point in said line,
thence (2) South 82 degrees, 47 minutes, 20 seconds East, continuing along
the Southerly line of Eighteenth Avenue, 176.98 feet to its intersection
with the Westerly line of Lot 7, Block 88, Wall Township Tax Map, thence
(3) South 03 degrees, 01 minutes, 20 seconds West along the Westerly line
of Lot 7, 481.43 feet to a point in the Northerly line of Lot 8, thence
(4) South 89 degrees, 22 minutes, 47 seconds West along the Northerly line
of Lot 8, 9.01 feet to the most Westerly corner thereof, hence (5) South
58 degrees, 51 minutes, 23 seconds East along the Southwesterly line of
Lot 8, 221.09 feet to the Northwesterly right-of-way line of New Jersey
State Highway Route No. 35, thence (6) South 38 degrees, 29 minutes, 27
seconds West along the Northwesterly right-of-way line of New Jersey State
Highway Route No. 35, 316.49 feet to a point of curvature, thence (7)
Southwestwardly continuing along said Northwesterly right-of-way line
along the arc of a curve having a radius of 11,499.00 feet and bearing to
the left and arc Distance of 194.32 feet to its intersection with the
Northerly line of Lot 11, thence (8) North 83 degrees, 40 minutes, 40
seconds West along the Northerly line of Lot 11, 261.32 feet to the
Northwesterly corner thereof, thence (9) South 05 degrees, 30 minutes, 00
seconds West along the Westerly line of Lot 11, 205.20 feet to its
intersection with the Northerly line of Lot 3, thence (10) north 83
degrees, 04 minutes, 00 seconds West along the Northerly line of Lot 3,

PARCEL II,
AMENDED EXHIBIT A

195.70 feet t.  n angle point in said line, t  ce (11) South 09 degrees,
56 minutes, 00 seconds West continuing along the Northerly line of Lot 3,
225.00 feet to another angle point in said line, thence (12) North 80
degrees, 04 minutes, 00 seconds West still along the Northerly line of Lot
3, 140.00 feet to the Easterly line, as widened to 35.00 feet from
center-line, of Old Mill Road, thence (13) North 09 degrees, 56 minutes,
00 seconds East along the Easterly line, 35.00 feet from center-line, of
Old Mill Road, 434.53 feet to an angle point in said line, thence (14)
North 10 degrees, 00 minutes, 40 seconds East continuing along the
Easterly line of Old Mill Road 523.11 feet to another angle point in said
line, thence (15) North 06 degrees, 30 minutes, 40 seconds East still
along the Easterly line of Old Mill Road, as widened to 35.00 feet from
center-line, 429.92 feet to a point of curvature, thence (16)
Northeastwardly, Eastwardly, and Southeastwardly along the arc of a curve
having a radius of 25.00 feet and bearing to the right an arc Distance of
38.64 feet to the point or place of BEGINNING.


Containing 17.451 Acres


PARCEL II,
AMENDED EXHIBIT A - p. 2

continuing still along said Northerly line, 140.00 feet to the aforesaid Easterly line of Old Mill Road, thence (11) North 09 degrees 56 minutes 00 seconds East along the aforesaid Easterly line of Old Mill Road, 434.53 feet to an angle point in said line, thence (12) North 10 degrees 00 minutes 40 seconds East continuing along said Easterly line 350.74 feet to the point or place of BEGINNING.

Containing 8.043 acres.

This map is in accordance with a map entitled "Lease Area for K-Mart, Part of Lots 4, 5, 6, 9 & 10, Block 88, Wall Township Tax Map, Monmouth County, New Jersey" prepared by Birdsall Engineering, Inc. and dated June 12, 1985.

(9) South 05 degrees 30 minutes 00 seconds West along the westerly line of Lot 11, 205.20 feet to its intersection with the northerly line of Lot 3, thence (10) North 80 degrees 04 minutes 00 seconds West along the northerly line of Lot 3, 195.70 feet to an angle point in said line, thence (11) South 09 degrees 56 minutes 00 seconds West continuing along the northerly line of Lot 3, 225.00 feet to another angle point in said line, thence (12) North 80 degrees 04 minutes 00 seconds West still along the northerly line of Lot 3, 158.50 feet to the easterly line, 16.50 feet, from centerline of Old Mill Road, thence (13) North 09 degrees 56 minutes 00 seconds East along the aforesaid easterly line of Old Mill Road, 434.54 feet to an angle point in said line, thence (14) North 16 degrees 00 minutes 40 seconds East, continuing along the easterly line of Old Mill Road, 522.55 feet to another angle point in said line, thence (15) North 06 degrees 30 minutes 40 seconds East, still along the easterly line of Old Mill Road, 228.88 feet to another angle point in said line, thence (16) South 83 degrees 33 minutes 40 seconds East still along the easterly line of Old Mill Road, 8.50 feet, thence (17) North 06 degrees 30 minutes 40 seconds East along the easterly line, 25.00 feet from centerline, of Old Mill Road 229.84 feet to a point of curvature, thence (18) Northeastwardly, eastwardly and southeastwardly, along the arc of a curve having a radius of 10.00 feet and bearing to the right an arc distance of 15.46 feet to the point or place of BEGINNING.

Containing:  18.218 Acres

Subject to Easements of Record, if any.

This description is in accordance with a map entitled "Boundary Survey of Property, Lots 4, 5, 6, 9, and 10, Block 88, in the Township of Wall, Monmouth County, New Jersey", prepared by Birdsall Engineering, Inc., and dated February 4, 1985.

Subject to required Right of Way dedications to the Township of Wall on Old Mill Road and to The County of Monmouth on Eighteenth Avenue.

Job No.  24140.200

February 21, 1985

DESCRIPTION OF LOTS 4, 5, 6, 9, AND 10, BLOCK 88, WALL TOWNSHIP TAX MAP,
MONMOUTH COUNTY, NEW JERSEY.

BEGINNING at a point in the southerly line, 25.00 feet from
centerline, of Eighteenth Avenue (Monmouth County Highway Route No. 30)
distant 9.75 feet on a course of South 84 degrees 55 minutes 40 seconds
East from the point of intersection of the easterly line, 25.00 feet from
centerline, of Old Mill Road, extended Northwardly with the aforesaid
southerly line of Eighteenth Avenue, extended westwardly and running from
said BEGINNING POINT (1) South 84 degrees 55 minutes 40 seconds East along
the aforesaid southerly line of Eighteenth Avenue, 419.48 feet to an angle
point in said line, thence (2) South 82 degrees 47 minutes 20 seconds East
continuing along the southerly line of Eighteenth Avenue 178.16 feet to
its intersection with the westerly line of Lot 7, Block 88, Wall Township
Tax Map, extended northwardly, thence (3) South 03 degrees 01 minutes 20
seconds West along the aforesaid westerly line of Lot 7, 496.47 feet to a
point in the northerly line of Lot 8, thence (4) South 89 degrees 22
minutes 47 seconds West along said northerly line, 9.01 feet to the most
westerly corner of Lot 8, thence (5) South 58 degrees 51 minutes 23
seconds East along the southwesterly line of Lot 8, 221.09 feet to the
northwesterly Right of Way  line of New Jersey State Highway Route No. 35,
thence (6) South 38 degrees 29 minutes 27 seconds West along the
northwesterly Right of Way  line of New Jersey State Highway Route No. 35,
316.49 feet to a point of curvature thence (7) Southwestwardly continuing
along said northwesterly Right of Way  line along the arc of a curve
having a radius of 11,499.00 feet and bearing to the left an arc distance
of 194.32 feet to its intersection with the northerly line of Lot 11,
thence (8) North 83 degrees 40 minutes 40 seconds West along the northerly
line of Lot 11, 261.32 feet to the northwesterly corner thereof, thence

Signs

4.  The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the right, by complying with all applicable governmental law, to obtain the necessary permits and approvals to install and maintain, at its sole cost and expense, upon any portion of Tenant's building other than the roof, signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

The sole purpose of this instrument is to give notice of said lease and all its terms, covenants and conditions to the same extent as if said lease were fully set forth herein.

The conditions, covenants and agreements contained in this instrument shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this instrument and said lease shall run with the land.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:                         LEVCOM MALL PLAZA ASSOCIATES

G.S. _____       _____
                                   General Partner

     _____       _____
                                   General Partner

                                   K MART CORPORATION

     _____       By: _____
                                                    Vice President

     _____ Attest: _____
                                                    Assistant Secretary

-2-

## ACKNOWLEDGMENTS

STATE OF  NEW JERSEY )
COUNTY OF            )ss:

On the        day of          , 1985 , before me personally came          PETER LEVINE          , to me known, who, being by me duly sworn, did depose and say that he/she is/are a partner/partners      in   LEVCOM WALL PLAZA ASSOC. xxxXxxxxxxxxxxxXxxx xxxxxxxxxxxx          , a partnership, and that he/they executed the foregoing instrument on behalf of said firm.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires:_____          _____
                                                          Notary Public

**Parties**    THIS MEMORANDUM OF LEASE dated this ___ day of June, 1985, between LEVCOM HALL PLAZA ASSOCIATES a New Jersey partnership having is principal office at Plaza 46, West Patterson, New Jersey 07424 (herein referred to as "Landlord"), and K MART CORPORATION, a Michigan corporation having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant").

WITNESSETH: That for and in consideration of the sum of One Dollar ($1.00) and other good and valuable considerations and the further consideration of the rents reserved and the covenants and conditions more particularly set forth in a certain lease between Landlord and Tenant and bearing even date herewith, Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**    1.   Landlord does demise unto Tenant and Tenant does take from Landlord for the term hereinafter provided, and any extension thereof, the following property: Tenant's completed building (designated K mart), together with site improvements to be constructed as hereinafter specified, said completed building and site improvements to be constructed by Landlord, at its expense, on lands comprising approximately Eight and 43/1000 (8.043) acres more or less, described as Parcel I in Exzhibit A annexed hereto and made a part hereof, being part of lands described as Parcel II in Exhibit A annexed hereto and made a part hereof, comprising approximately Eighteen and 218/1000 (18.218) acres more or less, constituting the proposed Shopping Center site situate in Hall Township, Monmouth County, State of New Jersey, said K mart building to be located on Parcel I in the location depicted on the plot plan annexed hereto and made a part hereof as Exhibit B and of the following dimensions:

    K mart store unit – 321'4" x 212'8" = 68,337 s.f.
    Garden shop – 73'3" x 212'8", irregular in shape,

together with the full licenses, rights, privileges and easements hereby given and granted by Landlord unto Tenant, including Tenant's agents, employees subtenants, licensees, concessionaires, customers, guests and invitees, to the non-exclusive use of the common areas of Parcel II, including the sidewalks, service drives, parking aisles, parking areas, driveways, streets, enterances and exits in common with Landlord, and other tenants of the lands described as Parcel II in Exhibit A, and their respective agents, employees, subtenants, licensees, concessionaires, customers, guests and invitees.  Said completed building, as well as the land described as Parcel I in Exhibit A, together with the licenses, rights, privileges and easements appurtenant thereto shall be hereinafter collectively referred to as the "demised premises."

**Term**    2.   The lease term shall commence upon the date of occupancy by Tenant of said buildings, and shall terminate upon such date as shall be twenty five (25) years from the last day of the month in which said date of occupancy by Tenant shall occur; provided, however, Tenant shall have the option to extend the lease term for ten (10) successive periods of five (5) additional years each.

**Building Areas**    3.   Landlord covenants, during the period commencing with the date of execution of the aforesaid lease and ending upon the last day of the lease term and any extension or renewal thereof, that it will not erect or construct ... ... ... structures upon land described as Parcel II in ... "A", except as shown on Exhibit "B"; provided, however, in the event that the date of occupancy by Tenant of the demised premises shall not occur prior to such date as shall be seven (7) years from the date of the aforesaid lease, then the restriction imposed by this Article shall cease and determine and shall be of no further force or effect.

Job No. 24140.212
June 12, 1985

DESCRIPTION OF A LEASE AREA FOR K-MART ON PART OF LOTS 4, 5, 6, 9 & 10,
BLOCK 88, WALL TOWNSHIP TAX MAP, MONMOUTH COUNTY, NEW JERSEY.

BEGINNING at a point in the Easterly line, 35.00 feet from centerline of
Old Mill Road, said BEGINNING POINT being at the termination of the
following two Courses and Distances from the point of intersection of the
Southerly line, 40.00 feet from centerline of Eighteenth Avenue (Monmouth
County Highway Route No. 30) with the aforesaid Easterly line of Old Mill
Road (A) South 06 degrees 30 minutes 40 seconds West along the aforesaid
Easterly line of Old Mill Road, 454.30 feet to an angle point in said
line, (B) South 10 degrees 00 minutes 40 seconds West continuing along
said Easterly line, 172.37 feet and running from said BEGINNING POINT (1)
South 83 degrees 29 minutes 20 seconds East 289.33 feet to a point, thence
(2) South 80 degrees 24 minutes 44 seconds East 48.07 feet to a point,
thence (3) South 83 degrees 29 minutes 20 seconds East 451.05 feet to the
Westerly right-of-way line of New Jersey State Highway Route No. 35,
thence (4) South 38 degrees 29 minutes 27 seconds West along said Westerly
right-of-way line, 241.65 feet to a point of curvature, thence (5)
Southwardly continuing along said Westerly right-of-way line, along the
arc of a curve having a radius of 11,499.00 feet and bearing to the left
an arc distance of 194.32 feet to the Northerly line of Lot 11, Block 88,
Wall Township Tax Map, thence (6) North 83 degrees 40 minutes 40 seconds
West along said Northerly line, 261.32 feet to the Westerly line of the
aforesaid Lot 11, thence (7) South 05 degrees 30 minutes 00 seconds West
along said Westerly line, 205.20 feet to the Northerly line of Lot 3,
Block 88, Wall Township Tax Map thence (8) North 80 degrees 04 minutes 00
seconds West along said Northerly line, 195.70 feet to an angle point in
said line, thence (9) South 09 degrees 56 minutes 00 seconds West
continuing along said Northerly line, 225.00 feet to another angle point
in said line, thence (10) North 80 degrees 04 minutes 00 seconds West

PARCEL I   Exhibit "A"

Initials DJ
Prepared by
Approved by

K MART   1987 Final =      100,000     (1.46 ¢)

Excess over 100,000 deducted from average "cumulative"

K Mart Overage: 1% > 14,000,000         ·04.87¢

If sales   15,000,000 =      10,000
Taxes = 100,000              – 0 –
              Overage        10,000

If sale   15,000,000 =       10,000
Taxes = 110,000             (10,000)
              Overage        – 0 –

For every 1000 additional taxes = 100,000 in Sales over 14,000,000

ACKNOWLEDGMENTS

STATE OF *New Jersey* )
COUNTY OF *Essex* )ss:

On the 8th day of *July*, 19 85, before me personally
came DAVID MANDELBAUM, to me known, who,
being by me duly sworn, did depose and say that he/she is/are a
partner/partners in *Lexican Well Plaza Assc.*,
a partnership, and that he/they
executed the foregoing instrument on behalf of said firm.

In Witness Whereof, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

My commission expires:_____                     Notary Public
BARBARA GAMBA
Notary Public of New Jersey
My Commission Expires Dec. 22, 1985


STATE OF MICHIGAN)
COUNTY OF OAKLAND)ss:

I do hereby certify that on this 5th   day of July
, 19 85,
before me, Mary A. Schnitzler                     , a Notary
Public in and for the County and State aforesaid, and duly commissioned,
personally appeared M. L. Skiles                     and
D. H. Burdick, II                     , known to me to be the
Vice President and Assistant Secretary of K mart Corporation, who, being by me
duly sworn, did depose and say that they reside in  Rochester and
Birmingham, Michigan
respectively; that they are the Vice President and Assistant Secretary
respectively of K mart Corporation, the corporation described in and which
executed the foregoing instrument; that they know the seal of said
corporation; that the seal affixed to said instrument is the corporate seal of
said corporation; that, on behalf of said corporation and by order of its
board of directors, they signed, sealed and delivered said instrument for the
uses and purposes therein set forth, as its and their free and voluntary act;
and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

My commission expires:_____                     Notary Public
MARY A. SCHNITZLER
Notary Public, Oakland County, Mich.
My Commission Expires May 10, 1987


9167M

TENANT: **K MART CORPORATION**

GUARANTOR: (B) _Lease automatically continues to Jan 31 regardless if amount received if + minimum 72; Jan 31 option for month-to-month afterwards_

BILLING: ___ OT _mgr for lessor_

STORE: T  (A) _Rt. 8 yrs radius ± @ 67 days after commencing T_

NOTICE INSTRUCTIONS:

INITIAL TERM: _25 YRS FROM LAST 2 YRS_  MONTH OF OCCUPANCY

EXECUTION DATE: 81/85

COMMENCEMENT DATE: (A) 8/14 _16 DEN_

RENT COMMENCEMENT DATE: (B) 8/14 _3F_

EXPIRATION DATE: (B) 1/31/72

RENEWAL OPTIONS: 8 _10/5_ YRS EACH

LAST DATE TO RENEW: _6 month up._

FIRST LEASE YEAR:

SUCC. LEASE YRS.:

R/E:

ATTY:

CONST:

BILLING:

ST. MGR.: ___

| | | | SECURITY DEPOSIT $ ___ |
| --- | --- | --- | --- |
| | | | RECEIVABLE ___ RETURN ___ |

ALLOWANCE $ ___   _68,337 ± + GARDEN SHOP_
PER SQ FT $ ___   ST. DIM. ___
                  SQ. FT. ___

REMARKS:
1) _If Tenant elects to reimburse operator, Tenant pays LL + LL has 90 days to cure + Tenant has the right not to pay any reimb amt for 90 days–_
2) _Kmart Store's fund + penalties for delays for late commenced rent Rev. Jan 31 94/1/86._
3) _If premises not demised prior to 9/1/86, T may terminate w/opt to cancel lease._
4) _Permit guarantee to LL must for 1 year + holds T fully responsible to reclaim landlord's portion._
5) _Prepay prior to expiration of option due LL to pay Tenant reliving of their premises._
6) _LL agrees to give Tenant free laundry room the exclusive T._

| ADDITIONAL CHARGES | | |
| --- | --- | --- |
| TYPE AND FORMULA | STOPS | $ |
| R/E TAXES PRO RATA on Base Year (First Full Year fully assessed + offset to cover) – All of above – in the building not over stores' first year excess pro rata and all recoverable from CHARGE – CUMULATIVE (TRY TO GET SEPARATE ASSESSMENT) | | |
| PARKING – CAM PRORATA included CAM (CAM is) LL responsibility = roof + structural; utility; service + underground | | |
|     O   _partial LL + LOT_ | | |
| GLA = _They pay for CAM + Premium at +15%. We pay ¼ to K Mart in advance –_ | | |
| INSURANCE Liability _Insured by CAM + Linc – subject to K Mart + named insured 500k Expenses. They self insure – File_ | | |

| | MERCHANTS ASS'N | AMOUNT | SQ. FT. |
| --- | --- | --- | --- |
| | OPENING | | |
| | REGULAR | | |

FIXED MINIMUM RENTS

| LEASE YEAR(S) | INITIAL TERM | RENTS | BASE |
| --- | --- | --- | --- |
| 1–24 | 420,272/YR. (E?) | 1 | 14,000,000 |
|       | _(Lease Year)_ | | |
| 35 _or_ 27/40 | _12 cancellation months beyond_ | | |

| RENEWAL(S) | | | |
| --- | --- | --- | --- |
| OFFSET = TAXE over | _both_ | | |
| _any year cumulative_ | | _Red First year_ | |
| | | _Full lease Year_ | |
| _REPOSS → SAME AS ORIGINAL TERM_ | | 1 | 14,000,000 |
| 4–25 _or_ 27/40 | | | |

_p in 11.45_

_(right margin handwritten notes):_ _They pay for cleaning landscaping +, [annually landscaping] etc._

## FIRST AMENDMENT OF LEASE

THIS AMENDMENT made as of the .    day of September, 1985, between LEVCOM MALL PLAZA ASSOCIATES, a New Jersey general partnership, having its principal place of business at Plaza 46 West, West Paterson, NJ  07424 (herein "Landlord") and K MART CORPORATION, a Michigan corporation, having its principal place of business at 3100 West Big Beaver Road, Troy, MI  48084 (herein "Tenant").

### W I T N E S S E T H :

WHEREAS, by lease dated June 28, 1985 (herein "Lease"), Landlord leased to Tenant certain premises (known as K mart #7602), located in Wall Township, Monmouth County, State of New Jersey more particularly described in Exhibit A attached to said Lease; and

WHEREAS, Landlord and Tenant desire to amend said Lease in accordance with the terms and provisions hereinafter set forth;

NOW, THEREFORE, for and in consideration of Ten Dollars ($10), the receipt and sufficiency of which is hereby acknowledged by the parties hereto, and the mutual covenants herein contained, Landlord and Tenant agree as follows:

1.    The second full paragraph of Article 10 appearing on page 8 of said Lease is hereby amended by substituted a lower case "i" for the capital "I" in the first word of said paragraph and prefacing the said paragraph with the following:

"Subject to the provisions of Article 27, subdivision (e) hereof, ..."

2.    In the second paragraph of Article 15 appearing on page 10 of said Lease, the word "hereinabove" being the last word of said paragraph, is hereby eliminated and the word "hereinafter" is hereby substituted therefor.

3.    In the last sentence of Article 22 appearing on page 17 of said Lease, the word "primarily" is hereby inserted after the word "remain" and before the word "liable."

4.    In the second paragraph of Article 27 appearing on page 19 of said Lease, subdivision (e) is hereby eliminated and the following substituted in its place:

"(e) Declaration of Easements and Restrictions dated as of August 1, 1985 made by Jonathan Craig Corp., a New Jersey corporation, prior to the conveyance of the lands described in Exhibit A to Landlord herein, for the benefit of said lands, as well as the contiguous lands upon which there is now located a Shop Rite Shopping Center and Jonathan Craig Liquor.  However, notwithstanding this Declaration, Landlord shall be restricted in its development of the Shopping Center to the agreed to Exhibit B as attached to and incorporated in this Lease."

5.    In the second paragraph of Article 27 appearing on page 19 of said Lease, a new subdivision (f) is to be added as follows:

"(f) Slope and drainage rights granted to the State of New Jersey on the re it frac'ing the Shopping Cent..

6.    Except as expressly amended hereby, said Lease is hereby ratified, confirmed and approved and shall remain in full force and effect in accordance with its terms as hereby amended.

-1-

IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the day and year first above written.

WITNESS:

LEVCOM HALL PLAZA ASSOCIATES

By: _David Mandelbaum, Partner_

By: _Peter Levine, Partner_

LANDLORD

K MART CORPORATION

By: _____

Attest: _____

TENANT

STATE OF NEW JERSEY
                              SS.
COUNTY OF ESSEX

BE IT REMEMBERED that on this          day of September, 1985, before me, the subscriber, a notary public of the State and County aforesaid, personally appeared DAVID MANDELBAUM, General Partner of LEVCOM HALL PLAZA ASSOCIATES, a New Jersey general partnership, who, I am satisfied is the person named in and who executed the within instrument on behalf of said Partnership, and thereupon he acknowledged that he signed, sealed and delivered the same as his voluntary act and deed, for the uses and purposes therein expressed.

_____
BARBARA GAMBA
Notary Public of New Jersey
My Commission Expires Dec. 22, 1985

STATE OF NEW JERSEY
                              SS.
COUNTY OF ESSEX

BE IT REMEMBERED that on this 30 day of September, 1985, before me, the subscriber, a notary public of the State and County aforesaid, personally appeared PETER LEVINE, General Partner of LEVCOM HALL PLAZA ASSOCIATES, a New Jersey general partnership, who, I am satisfied is the person named in and who executed the within instrument on behalf of said Partnership, and thereupon he acknowledged that he signed, sealed and delivered the same as his voluntary act and deed, for the uses and purposes therein expressed.

_____
JOSEPH LA MARCO
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES AUGUST 11, 1990

-2-

## FIRST AMENDMENT OF LEASE

THIS AMENDMENT made as of the        day of September, 1985, between LEVCOM WALL PLAZA ASSOCIATES, a New Jersey general partnership, having its principal place of business at Plaza 46 West, West Paterson, NJ  07424 (herein "Landlord") and K MART CORPORATION, a Michigan corporation, having its principal place of business at 3100 West Big Beaver Road, Troy, MI  48084 (herein "Tenant").

### W I T N E S S E T H :

WHEREAS, by lease dated June 28, 1985 (herein "Lease"), Landlord leased to Tenant certain premises (known as K mart #7602), located in Wall Township, Monmouth County, State of New Jersey more particularly described in Exhibit A attached to said Lease; and

WHEREAS, Landlord and Tenant desire to amend said Lease in accordance with the terms and provisions hereinafter set forth;

NOW, THEREFORE, for and in consideration of Ten Dollars ($10), the receipt and sufficiency of which is hereby acknowledged by the parties hereto, and the mutual covenants herein contained, Landlord and Tenant agree as follows:

1.    The second full paragraph of Article 10 appearing on page 8 of said Lease is hereby amended by substituted a lower case "i" for the capital "I" in the first word of said paragraph and prefacing the said paragraph with the following:

"Subject to the provisions of Article 27, subdivision (e) hereof, ..."

2.    In the second paragraph of Article 15 appearing on page 10 of said Lease, the word "hereinabove" being the last word of said paragraph, is hereby eliminated and the word "hereinafter" is hereby substituted therefor.

3.    In the last sentence of Article 22 appearing on page 17 of said Lease, the word "primarily" is hereby inserted after the word "remain" and before the word "liable."

4.    In the second paragraph of Article 27 appearing on page 19 of said Lease, subdivision (e) is hereby eliminated and the following substituted in its place:

"(e) Declaration of Easements and Restrictions dated as of August 1, 1985 made by Jonathan Craig Corp., a New Jersey corporation, prior to the conveyance of the lands described in Exhibit A to Landlord herein, for the benefit of said lands, as well as the contiguous lands upon which there is now located a Shop Rite Shopping Center and Jonathan Craig Liquor. However, notwithstanding this Declaration, Landlord shall be restricted in its development of the Shopping Center to the agreed to Exhibit B as attached to and incorporated in this Lease."

5.    In the second paragraph of Article 27 appearing on page 19 of said Lease, a new subdivision (f) is to be added as follows:

"(f) Slope and drainage rights granted to the State of New Jersey on the ro  : fronting the Shopping Center."

6.    Except as expressly amended hereby, said Lease is hereby ratified, confirmed and approved and shall remain in full force and effect in accordance with its terms as hereby amended.

-1-

IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the day and year first above written.

WITNESS:

LEVCOM HALL PLAZA ASSOCIATES

By: _____
David Mandelbaum, Partner

By: _____
Peter Levine, Partner

LANDLORD

K MART CORPORATION

By: _____

Attest: _____

TENANT

STATE OF NEW JERSEY
SS.
COUNTY OF ESSEX

BE IT REMEMBERED that on this _____ day of September, 1985, before me, the subscriber, a notary public of the State and County aforesaid, personally appeared DAVID MANDELBAUM, General Partner of LEVCOM HALL PLAZA ASSOCIATES, a New Jersey general partnership, who, I am satisfied is the person named in and who executed the within instrument on behalf of said Partnership, and who executed the within instrument on behalf of said Partnership, and thereupon he acknowledged that he signed, sealed and delivered the same as his voluntary act and deed, for the uses and purposes therein expressed.

_____

STATE OF NEW JERSEY
SS.
COUNTY OF ESSEX

BE IT REMEMBERED that on this _____ day of September, 1985, before me, the subscriber, a notary public of the State and County aforesaid, personally appeared PETER LEVINE, General Partner of LEVCOM HALL PLAZA ASSOCIATES, a New Jersey general partnership, who, I am satisfied is the person named in and who executed the within instrument on behalf of said Partnership, and thereupon he acknowledged that he signed, sealed and delivered the same as his voluntary act and deed, for the uses and purposes therein expressed.

_____

-2-

STATE OF MICHIGAN)
COUNTY OF OAKLAND)ss:

I do hereby certify that on this *17th* day of *September*, 19*85*, before me, *Patricia A. Hewelt*, a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared *M. L. Skies* and *C. E. Lotzer Jr.*, known to me to be the Vice President and Assistant Secretary of K mart Corporation, who, being by me duly sworn, did depose and say that they reside in *Rochester, Michigan* and *Birmingham, Michigan* respectively; that they are the Vice President and Assistant Secretary respectively of K mart Corporation, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

PATRICIA A. HEWELT

My commission expires: Notary Public, Macomb County, Mich.        *Patricia A. Hewelt*
                        My Commission Expires May 17, 1989 1c
                        Acting In Oakland County

9808M

-3-

LAW OFFICES

## MANDELBAUM & MANDELBAUM

A PROFESSIONAL CORPORATION
80 MAIN STREET
WEST ORANGE, NEW JERSEY 07052

PHILIP MANDELBAUM
OF COUNSEL

DAVID MANDELBAUM
NATHAN MANDELBAUM

September 26, 1985

AREA CODE 201
325-0011

STEVEN R. IRWIN
ALAN J. SILVER

Mr. Peter Levine
Levcom 46 Associates
Plaza 46 West
West Paterson, NJ   07424

Re:  Levcom Wall Plaza Associates
     and K Mart Corporation

Dear Peter:

Please sign the enclosed and have it notarized and return to my office.
I enclose an extra copy without a blue backer for your files.

Very truly yours,

DAVID MANDELBAUM

DM:CR

Enclosures

ACKNOWLEDGMENTS

STATE OF
COUNTY OF                         SS:

    I do hereby certify that on this      day of      , 19      , before me,
                         , a Notary Public in and for the
County and State aforesaid, and duly commissioned, personally appeared
                       and
known to me to be the President and Secretary of

who, being by me duly sworn, did depose and say that they reside in

respectively; that they are the President and Secretary respectively of

the corporation described in and which executed the foregoing instrument; that they know the
seal of said corporation; that the seal affixed to said instrument is the corporate seal of said
corporation; that, on behalf of said corporation and by order of its board of directors, they
signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its
and their free and voluntary act; and that they signed their names thereto by like order.

    In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and
year in this certificate first above written.

My commission expires: _____    _____
                                                 Notary Public

STATE OF MICHIGAN
COUNTY OF OAKLAND                 SS:

    I do hereby certify that on this 3rd    day of   January     , 19 86   , before me,
    Patricia A. Hewelt             , a Notary Public in and for the
County and State aforesaid, and duly commissioned, personally appeared
    M. L. Skiles        and     C. E. Lotzar, Jr.
known to me to be the Vice President and Assistant Secretary of K mart Corporation, who,
being by me duly sworn, did depose and say that they reside in Rochester and
Birmingham, Michigan
respectively; that they are the Vice-President and Assistant Secretary respectively of K mart
Corporation, the corporation described in and which executed the foregoing instrument; that
they know the seal of said corporation; that the seal affixed to said instrument is the
seal of said corporation; that, on behalf of said corporation and by order of its board of
directors, they signed, sealed and delivered said instrument for the uses and purposes therein set
forth, as its and their free and voluntary act; and that they signed their names thereto by like
order.

    In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and
year in this certificate first above written.
                    PATRICIA A. HEWELT
My commission expires: Notary Public, Macomb County, Mich.             
               My Commission Expires Aug. 17, 1988          Notary Public
                   Acting in Oakland County

CODE 920-27—F18

STATE OF MICHIGAN)
COUNTY OF OAKLAND)ss.

I do hereby certify that on this *17th* day of *September*, 1985, before me, *Patricia A. Hewelt*, a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared *M. L. Shiles* and *C. E. Lortroy Jr.*, known to me to be the Vice President and Assistant Secretary of K mart Corporation, who, being by me duly sworn, did depose and say that they reside in *Rochester, Michigan* & *Birmingham, Michigan* respectively; that they are the Vice President and Assistant Secretary respectively of K mart Corporation, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires:_____        *Patricia A. Hewelt*
                                    Notary Public

PATRICIA A. HEWELT
Notary Public, Macomb County, Mich.
My Commission Expires Aug. 17, 1988
Acting in Oakland County

9808M

-3-

*Kmart*

**Parties**

THIS LEASE made and entered into as of this       day of June, 1985, between LEVCOM WALL PLAZA ASSOCIATES, a New Jersey partnership having its principal office at Plaza 46, West Patterson, NJ 07424 (herein referred to as "Landlord"), and K·MART CORPORATION, a Michigan corporation having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**

1. Landlord does demise unto Tenant and Tenant does take from Landlord for the lease term the following property: Tenant's completed building (designated K mart), together with site improvements to be constructed as hereinafter specified, said completed building and site improvements to be constructed by Landlord, at its expense, on lands comprising approximately Eight and 43/1000 (8.043) acres more or less, described as Parcel I in Exhibit A annexed hereto and made a part hereof, being part of lands described as Parcel II in Exhibit A annexed hereto and made a part hereof, comprising approximately Eighteen and 218/1000 (18.218) acres more or less, constituting the proposed Shopping Center site situate in Wall Township, Monmouth County, State of New Jersey, said K mart building to be located on Parcel I in the location depicted on the plot plan annexed hereto and made a part hereof as Exhibit B and of the following dimensions:

K mart store unit - 321'4" x 212'8" - 68,337 s.f.
Garden shop - 73'3" x 212'8", irregular in shape,
together with the full licenses, rights, privileges and easements hereby given and granted by Landlord unto Tenant, including Tenant's agents, employees subtenants, licensees, concessionaires, customers, guests and invitees, to the non-exclusive use of the common areas of Parcel II, including the sidewalks, service drives, parking aisles, parking areas, driveways, streets, entrances and exits in common with Landlord, and other tenants of the lands described as Parcel II in Exhibit A, and their respective agents, employees, subtenants, licensees, concessionaires, customers, guests and invitees. Said completed building, as well as the land described as Parcel I in Exhibit A, together with the licenses, rights, privileges and easements appurtenant thereto shall be hereinafter collectively referred to as the "demised premises." However, notwithstanding the reference to Parcels I and II, the parties hereto intend and covenant that the parcels consist of one Shopping Center which shall not be divided or physically separated.

**Term**

2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that term is defined in Article 11 hereof, and shall terminate upon such date as shall be twenty five (25) years from the last day of the month in which said date of occupancy by Tenant shall occur; provided, however, the term of this lease may be extended as provided in Article 13 hereof. The phrase "lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant to said Article 13.

**Annual Minimum Rental**

3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall designate in writing from time to time, an annual minimum rental of FOUR HUNDRED TWENTY THOUSAND TWO HUNDRED SEVENTY TWO DOLLARS ($420,272.00), unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of each month, in advance, commencing upon the first day of the lease term; provided, however, in the event the first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

**Additional Rental**

4. In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of FOURTEEN MILLION DOLLARS ($14,000,000.00), Tenant shall pay to Landlord as additional rental an amount equal to one per cent (1%) of gross sales exceeding FOURTEEN MILLION DOLLARS ($14,000,000.00).

-1-

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall on or before the thirtieth (30th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of the demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on the demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A", except that the following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax,

-2-

franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c)  Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public; and

(d)  Service and interest charges for time payment accounts and charge accounts.

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event, the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within ninety (90) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said ninety (90) day period and the Tenant shall be released from any further liability under this lease.

Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraph of this article shall be of no further force and effect. Tenant, however, shall also be obligated to pay all other charges and fulfill all of its other obligations contained in this lease during the remainder of the term of this lease.

**Real Estate Taxes**

5.  Tenant shall pay and discharge all ad valorem real estate taxes and assessments which shall be levied against the taxable premises during the lease term, excluding therefrom payment of assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

To the extent permitted by law, Tenant may pay any such assessment in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with nor be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord, the rents payable hereunder or the demised premises except the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 5.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed the first full year's taxes and assessments after completion of construction of the entire Shopping Center as described in Exhibit B during any lease year, shall be hereinafter referred to as an "excess tax payment." All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year on a cumulative basis.

-3-

The taxable premises, as defined below, shall be separately assessed if practicable from any contiguous lands and from any additional lands and improvements incorporated into the demised premises in the future.

Until such time as Parcel I has been constituted a single tax parcel or lot, Landlord shall pay and discharge or cause to be paid and discharged, all real estate taxes, assessments and other charges levied and assessed against the lands described in Exhibit A, together with all buildings and improvements now or hereafter erected thereon, as they become due and payable, together with all interest and penalties thereon, under or by virtue of all present or future applicable laws or rules.

Until such time as Parcel I is constituted a single tax parcel or lot, the provisions of this paragraph shall prevail. Tenant throughout the lease term shall and hereby agrees to pay to Landlord all ad valorem real estate taxes and assessments which shall be levied or assessed by lawful governmental taxing authorities against Tenant's building (including the land thereunder) and a proportionate share of such taxes upon the lands described as Parcel II in Exhibit A, as depicted on Exhibit B hereof. In the event that real estate taxes, assessments and other charges are billed for the real property described in Parcel II of Exhibit A as a whole, then and in such event, insofar as buildings are concerned, the same shall be, if possible, separately assessed against the Tenant's building thereon erected and the Tenant's building shall be deemed to be separately assessed according to the real estate tax bill, the assessor's records or assessor's written certification, and the Landlord agrees to payment by Tenant on said basis. If the figures therefor are not obtainable as aforesaid, then such real estate taxes and assessments shall be prorated so that the Tenant shall pay its proportionate share thereof which shall be based upon the proration that the leaseable area of Tenant's building (including the garden shop) bears to the total leasable area of all buildings at any time existing at the time of assessment of the Shopping Center described in Exhibit A.

With respect to the foregoing paragraph, Landlord shall submit to Tenant a bill for Tenant's tax portion, together with true copies of the tax bill and a statement of the facts and information needed to calculate the Tenant's tax portion, as soon as practicable after the tax bills are received, and Tenant shall pay the Tenant's tax portion within thirty (30) days after receipt of said bill and statement. Any real estate taxes and assessments for a real estate tax or assessment, a part of which is included in a period of time before the commencement date or after the termination date, shall be equitably adjusted between Landlord and Tenant as of the commencement date or termination date, as the case may be, for the purpose of computing the foregoing items under this Article. Provided Tenant pays Landlord the amount of Tenant's tax portion within the prescribed period of time as aforesaid, it shall be entitled to deduct any discount for prompt payment which Landlord would have been entitled to receive in computing the amount of tax due by Tenant, whether or not Landlord has taken advantage of obtaining such discount, Landlord hereby agreeing that it will pay and discharge, or cause to be paid and discharged, all real estate taxes, assessments and other charges levied and assessed against the lands described as Parcel II in Exhibit A in time to take advantage of any discount, unless it has reasonable cause not to do so, but in such case under no circumstances shall Tenant be liable for penalties.

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure

-4-

proceedings or similar action against the demised premises. Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the taxable premises, the Tenant will cooperate in such proceedings.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authorities. After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

The term "taxable premises", as used in this lease, shall be that certain land described as Parcel I in Exhibit "A" together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

**New Building by Landlord**

6.    Tenant's said buildings and site improvements shall be completed and delivered to Tenant promptly and with due diligence. If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental restrictions, construction delays not attributable to Landlord, scarcity of materials, fire or casualty, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay. Landlord warrants that a general contract for construction of said buildings and improvements referred to in Articles 1 and 12 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than April 1, 1986. If for any reason whatever other than force majeure as said term is defined in Article 39 hereof, Landlord shall fail to comply fully with this warranty, Landlord shall so notify Tenant in writing and in such event Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to September 1, 1986, then Tenant shall, prior to December 1, 1986, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

**Drawings and Specifications**

7.    Tenant's said buildings and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. B-1738 containing such

-5-

changes and modifications as are set forth in those letters dated February 11, 1985, March 29, 1985, June 4, 1985 and June 28, 1985, written by Mr. Paul H. Goldsmith, R.A., Manager, Design Division, Construction Department, addressed to Levcom, Plaza 46 West, West Patterson, NJ 07424, Attn: Mr. Peter L. Levine, President, copies of which are attached hereto and marked Exhibit "C".

Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

(a)  Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on store layout drawings which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b)  Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

Said working drawings and specifications shall be submitted to Tenant in time to permit a review and approval by Tenant prior to commencement of construction. Such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

Subsequent to approval of the typical drawings and specifications, in the event that criteria changes to the lease shall be requested by Tenant, which result in a savings to the Landlord in construction costs, then, Landlord shall pay Tenant an amount equal to the savings.

**Guarantee of Materials**

8.  Landlord shall unconditionally guarantee all work performed by or for Landlord in the construction of Tenant's buildings and site improvements against defective workmanship and materials for the period of one (1) year from the commencement of the lease term. Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it may receive.

**Advance Possession for Fixturing and Merchandising**

9.  For a period of sixty seven (67) days after completion of Tenant's building by Landlord, as set forth in Article II (b), Tenant shall have the privilege, at its sole risk and responsibility, rent free of entering said building for the purposes of installing stockroom equipment and salesfloor trade fixtures, storing merchandise, training personnel and other pre-opening activities which shall not create unreasonable interference with the work of Landlord. The Landlord's completion of the building shall be construed to mean the building is substantially complete except connections to tenants equipment, i.e. permanently enclosed, completely decorated inside and out, floor covering installed, electrical system complete, mechanical systems functioning on controls, toilet facilities complete for both sexes, fire protection system including alarms complete.

Landlord shall advise Tenant's Regional Construction Manager in writing ninety (90) days prior to his projected completion date to allow tenant to place orders for fixtures, arrange for personnel and order merchandise.

However, from and after the date Tenant enters said building as aforesaid, until the date of occupancy by Tenant as set forth in Article 11 hereof, Landlord shall adjust with Tenant's Construction Department in a just and equitable manner the cost of utilities consumed thereat by both Landlord and Tenant.

**Parking and Other Common Areas** 10. Prior to commencement of the lease term, Landlord shall construct, in accordance with said working drawings and specifications approved by Tenant, on the premises described in Exhibit "A", all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (not Tenant's pylon) and related improvements, substantially as shown on said working drawings and specifications (all of which improvements shall hereinafter, along with the land thereon constructed, be referred to as the "common areas").

Landlord shall also construct or cause to be constructed upon certain property or rights-of-way contiguous to the premises described in Exhibit "A", all sidewalks, driveways, streets, curbs, acceleration, deceleration and stacking lanes, traffic controls, and signals, directional signs and related improvements in accordance with said working drawings and specifications and the requirements of any governmental bodies.

Landlord covenants and represents that at the commencement of the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways, as shown on said working drawings and specifications.

Landlord further covenants that the aggregate area provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than seven hundred eighty one (781) automobiles on basis of arrangement depicted on Tenant's working drawings and specifications, subject to Article 21.

At least sixty-seven (67) days prior to the commencement of the lease term, Landlord shall provide paved driveways running from adjoining public streets around the front, sides and rear of Tenant's building in order to secure convenient ingress and egress from said public streets to the front and rear entrances of Tenant's building for the purpose of receiving and delivering fixtures, merchandise and other property, and parking sufficient for the personnel involved in Tenant's preopening activities. Such driveways shall be of sufficient width to permit the passage and unloading of trailer trucks and other commercial vehicles.

**Liability Insurance.** During the lease term, Landlord at its sole expense shall keep Tenant insured against all statutory and common law liabilities for damage to property or injuries, including loss of life, sustained by any person or persons within or arising out of said common areas, whether caused by Tenant's negligence or otherwise, in a policy or policies with minimum coverage of Five Hundred Thousand Dollars ($500,000) with respect to injury to any one person and One Million Dollars ($1,000,000) with respect to any one accident or disaster, and One Hundred Thousand Dollars ($100,000) with respect to damage to property. All such policies shall bear endorsements to the effect that Tenant is named an additional insured and that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

-7-

Indemnification. Landlord further agrees at its sole expense to defend, indemnify and hold Tenant (and all of its officers, agents and employees) harmless against any and all liabilities for damages or claims arising out of said common areas or Tenant's use thereof, by reason of any act, action, neglect or omission on the part of Landlord and/or Tenant.

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall at its sole expense, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

Tenant may, at any time and from time to time, subject to the provisions of Article 29 hereof, utilize portions of the demised premises for seasonal sales made from trucks, trailers, vans or other temporary facilities used by Tenant, and on sidewalks adjacent to Tenant's building, provided the same do not unreasonably impede pedestrian traffic. Sales, if any, from such use shall be included as part of "gross sales" under Article 4 hereof. Neither Landlord nor Tenant shall conduct, or allow to be conducted, outdoor shows, entertainment or other such similar uses which tend to attract the public upon the common areas.

**Store Opening**

11.  The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty-seven (67) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's buildings and site improvements shall be completed in accordance with said working drawings and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, upon giving Landlord prior written notice thereof, to complete, correct, or remedy in all or part any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

**Landlord's Represent- ations and Warranties**

12.  Landlord further represents, warrants and covenants that the land described in Exhibit A will, at the time of the commencement of construction by Landlord and at the time of the commencement of the lease term, be properly zoned for Tenant's intended use as a general retail discount department store, and that all necessary governmental consents, permits and approvals with respect to Landlord's work as required under the provisions of this lease shall have been obtained. Further Landlord shall deliver to Tenant a certificate of occupancy prior to commencement of the lease term. If, however, Landlord does not obtain such certificate of occupancy because Tenant takes or fails to take any action (including obtaining all necessary governmental consents, permits and approvals required to be obtained by Tenant, if any) which directly results in Landlord's inability to obtain a certificate of occupancy for Tenant's building at least fifteen (15) days before the date of occupancy by Tenant, which otherwise would have occurred

-8-

pursuant to the provisions of Article 11 hereof but for such delay, then the date of occupancy shall be deemed to have occurred fifteen (15) days after Landlord otherwise would have obtained the certificate of occupancy but for Tenant's action or inaction, provided Landlord has satisfied all other conditions precedent required of Landlord to the date of occupancy. Tenant covenants and agrees in such case to cooperate and take such steps as may be necessary to aid and facilitate Landlord in obtaining a certificate of occupancy for Tenant's building, if Landlord's failure to obtain the same is directly attributable to Tenant's action or inaction.

Landlord further represents, warrants and covenants that the land described in Exhibit "A" will, at the time of the commencement of construction by Landlord and at the time of the commencement of the lease term, be properly zoned for Tenant's intended use, and that all necessary governmental consents, permits and approvals for such use shall have been obtained. Further, Landlord shall deliver to Tenant a Certificate of Occupancy prior to commencement of the lease term.

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof.

In the event a certificate of occupancy is issued, but, however, Landlord's said representations and warranties, other than that required for the issuance of a certificate of occupancy, shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant shall notify Landlord thereof in writing of such defects and Landlord shall have thirty (30) days within which to fulfill such representations and warranties. If, however, said representations and warranties shall not have been fulfilled within such thirty (30) day period, Tenant thereafter shall have the option of either completing said representations and warranties at Landlord's cost and expense, or, alternatively, Tenant shall have an option to terminate this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Options to Extend Lease**

13. (a) Tenant shall have ten (10) successive options to extend the term of this lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term. If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or of this lease as extended.

(b) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or any extension thereof. Tenant's rental during this option period shall be the same rental payable under the terms of this lease at the time Tenant notifies Landlord of its intention to exercise this option.

-9-

First
Refusal to
Purchase
Option

14.  Intentionally omitted

Repairs and          15.  Tenant shall make and pay for all maintenance, replacement and repair
Maintenance     necessary to keep the demised premises in a good state of repair and
                tenantable condition, except for the following maintenance, replacement or
                repair which shall remain the Landlord's sole responsibility:

(a)  all maintenance, replacement and repair to the roof, outer walls and
     structural portion of the buildings which shall be necessary to
     maintain the buildings in a safe, dry and tenantable condition and
     in good order and repair; and

(b)  all repairs, maintenance or replacement of or to the utility
     services to the building and any underground storm sewers, sanitary
     sewers, water lines or electrical lines under the parking areas,
     service drives, streets, sidewalks, driveways, entrances; and

(c)  all repairs and replacement (exclusive of sweeping, striping and
     snow and ice removal) necessary to maintain all driveways,
     sidewalks, street and parking areas free of all settling, clear of
     standing water, and in a safe, sightly and serviceable condition,
     free of chuck holes, fissures and cracks.

In accordance with the foregoing, Tenant will assume the responsibility
to maintain the common areas and to perform the duties ~~hereinbefore~~. *Hereinafter.*

Tenant shall then contract for sweeping, striping and snow and ice
removal for parking areas, driveways, sidewalks and streets of the premises.

Landlord shall pay to Tenant its pro rata share of said costs.
Landlord's said share will be based upon the ratio that the ground floor area
of Landlord's other buildings bear to the total gross ground floor area
contained in all buildings actually erected on any portion of the land
described as Parcel II in Exhibit "A" and depicted on Exhibit "B".

For purposes of this Article the costs of maintaining the common areas
and common facilities shall mean the following:  All amounts paid for (1)
cleaning and restriping of parking areas, sidewalks and driveways, including
snow removal; (2) maintenance and repair of planted or landscaped areas; (3)
lighting of parking lot including repairs and replacements; (4) wages and
salaries of persons directly and actually performing services described
herein; and (5) an administrative overhead of fifteen (15%) percent.

The costs of maintaining the common area and common facilities shall not
include real estate taxes, capital expenses, license or permit fees, or
rubbish removal for other tenants.

Landlord shall pay to Tenant on account of the aforesaid costs an amount
equal to one-quarter (1/4) of Landlord's pro rata share of the estimated
annual costs of such work performed by Tenant on the first day of each quarter
in advance.  Said amount shall be adjusted and revised by Tenant as of the end
of the initial Lease year and each subsequent Lease year during the term
hereof on the basis of the actual maintenance costs incurred during the
immediately preceding Lease year plus reasonably anticipated increases in such
costs.  Upon Tenant's furnishing to Landlord a written statement setting forth
such revised estimate of maintenance costs to be incurred by Tenant pursuant
to this Article, Landlord shall pay to Tenant such revised estimated share in
quarterly installments, in advance, on the first day of each quarter in each
Lease year until the next succeeding revision of such estimate.  Tenant agrees

to provide the Landlord within thirty (30) days after the end of each Lease year a written statement signed by Tenant setting forth the cost of reimbursable items incurred by the Tenant pursuant to this Article and the calculations for determining the pro rata share of Landlord then due. If Landlord's pro rata share of the maintenance costs incurred exceeds Landlord's payment in that lease year, Landlord shall pay to Tenant the deficiency within thirty (30) days after receipt of the statement. In the event of a dispute between Landlord and Tenant concerning the dollar amounts or method of allocation contained in the statement of Tenant, initially, Landlord shall be responsible only for that portion of the billing not in dispute. Upon request, Tenant must provide copies of all paid receipts which form the basis for the statement. If Landlord's payment exceeds Landlord's pro rata share of the costs incurred, Landlord shall be entitled to a credit for such excess against estimated payments next thereafter due to Tenant on account of Landlord's pro rata share of the costs incurred by Tenant pursuant to this Article.

Should Landlord fail to make its common area maintenance payments as aforementioned, Tenant shall be entitled to deduct the same from the next due payment of minimum rent.

Landlord may, upon fifteen (15) days notice, have Tenant's records of common area expenditures for the previous calendar year audited by Landlord's accountant; should such audit disclose any overpayment by Landlord, Tenant shall remit said overpayment upon demand. With respect to parking lot illumination, Tenant shall have that portion of the common facilities as is described as Parcel I of Exhibit "A" metered directly into Tenant's meter. The balance of the common facilities lighting standards shall be metered into Landlord's other tenants as depicted on Exhibit "B" or to Landlord's own meter. It is further understood and agreed that all bulb replacement and care of the lighting standards for the entire common facilities described in Parcels I and II of Exhibit "A" shall be part of Tenant's performance of common areas maintenance and shall be added to other costs for such maintenance described above.

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Two Thousand Dollars ($2,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

The term "common areas," as used in this lease shall include the following: (a) common facilities indicated on Exhibit B and those which shall at any time and from time to time be contained within the site depicted on Exhibit B or any future enlargement thereof, (b) areas within the said site which shall be open to the public generally, and (c) all other areas (except those areas which shall be occupied from time to time by building structures) included within the confines of the lands described in Exhibit A or any enlargement of said site.

**Alterations and Additional Construction**     16. Tenant may, at its own expense, from time to time make such altera-tions, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable, provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for aesthetic exterior and structural alterations, additions or changes; provided, further, Landlord shall not withhold or delay its consent thereto if the structural integrity or the economic value of the building will not be impaired or

-11-

incomplete portion of Landlord's Work and deduct the cost of same from rental payments due Landlord in the manner provided in Article 30. Further notwithstanding the foregoing, if the Delivery Date occurs between the period September 1 through the next succeeding February 28, the two hundred ten (210) day period shall not commence until the March 1 next following said February 28. Further, notwithstanding anything to the contrary contained in this Third Amendment of Lease, if the 210th day (subject to any applicable extensions thereof) next succeeding the Delivery Date above would occur during any period from November 15 to the succeeding February 15, then in such event the Increased Rental Date shall be the first to occur of (y) the February 16 following such February 15 and (z) the date upon which Tenant shall open its expanded store for business to the public.

In, as of, and from and after the Increased Rental Date:

a.   The annual minimum rental set forth in Article 3 of the Lease shall be increased to FIVE HUNDRED SEVENTY ONE THOUSAND ONE HUNDRED EIGHTY SIX DOLLARS ($571,186.00);

b.   Wherever the sum of FOURTEEN MILLION DOLLARS ($14,000,000.00) appears in the first paragraph of Article 4 of the Lease, it shall be replaced by the amount of TWENTY NINE MILLION FIVE HUNDRED THOUSAND DOLLARS ($29,500,000.00) and thereafter, said sum of $29,500,000.00 shall be defined as the "Breakpoint Amount".

c.   Subparagraph (a) of Article 15 of the Lease shall be amended to read as follows:

"(a)   all maintenance, replacement and repair to the roof, outer walls, and structural portion of the buildings (except for the Kmart Expansion which shall be Tenant's sole responsibility unless said required maintenance, replacement and repair was made necessary by the acts, inaction or negligence of Landlord, its agents, employees or contractors). which shall be necessary to maintain the buildings in a safe, dry and tenantable condition and in good order and repair; and"

9

The balance of Article 15 shall remain unmodified.

d. Tenant shall be deemed to have exercised the first two (2) five (5) year renewal options set forth in Article 13 of the Lease, thus extending the Lease through January 31, 2022.

8. Effective as of the date the Kmart Expansion is fully assessed as part of the taxable premises (hereinafter the Lease Year during which the Kmart Expansion is fully assessed as part of the taxable premises is referred to as the "Base Tax Year"), the first sentence only of the fourth paragraph of Article "5" of the Lease captioned "Real Estate Taxes" shall be deemed deleted and replaced with the following:

"The amount, if any by which the ad valorem real estate taxes and assessments payable by Tenant hereunder exceeds the amount of real estate taxes and assessments payable by Tenant hereunder during the Base Tax Year, shall be hereinafter referred to as an "excess tax payment". The second sentence of said fourth paragraph of Article 5 of the Lease shall remain unchanged.

9. Landlord shall, without expense to Tenant, and concurrently with the execution of this Lease Amendment, furnish to Tenant (a) an as-built survey by a licensed surveyor of the land described in Exhibit A to the Lease; and (b) agreements wherein each holder of any lien against the property described in such Exhibit A shall consent to this Lease Amendment and warrant that Tenant's possession and right of use under the Lease (as same may be amended) in and to the Demised Premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions of the Lease and the Lease or Tenant's right to possession thereunder shall have been terminated in accordance with the provisions of the Lease.

10. Landlord shall be solely responsible to and hereby agrees to pay, as and when due, all transfer, intangible, recording, filing, documentary stamp and other taxes, fees and charges due any governmental or municipal authority upon the execution of this Third Amendment of Lease and/or recordation hereof or of a memorandum or short form hereof (regardless of who

10

presents same for recordation) and/or upon the effectiveness of the Third Amendment of Lease; and Landlord agrees to defend, indemnify and hold Tenant harmless from and against collection of any such taxes, fees and charges (including any interest and penalties thereon) from any assets of Tenant.

11. Except as expressly amended hereby, said Lease is hereby ratified, confirmed and approved and shall remain in full force and effect in accordance with its terms as hereby amended.

12. Landlord and Tenant each represents and warrants that it has not dealt with any real estate agent or broker in connection with this Third Amendment of Lease.

IN WITNESS WHEREOF, the parties have executed this Third Amendment of Lease as of the day and year first above written.

LANDLORD:

LEVCOM WALL PLAZA ASSOCIATES

By: _____

DAVID MANDELBAUM, Partner

TENANT:

KMART CORPORATION

By: _____
    Vice President

LORRENCE T. KELLAR
V.P. REAL ESTATE

11

STATE OF NJ        )
                   ) ss.:
COUNTY OF Essex    )

Before me, the undersigned authority, on this day personally appeared DAVID MANDELBAUM, Partner of Levanwee Plaza Associate, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated and as the act and deed of said partnership.

Given under my hand and seal of office on this 10th day of April 2001.

_____
          Notary Public

          BARBARA GAMBA
   NOTARY PUBLIC -State of New Jersey
     Commission Expires March 6, 2002

STATE OF MICHIGAN    )
                     ) ss.:
COUNTY OF Oakland    )

Before me, the undersigned authority, on this day personally appeared Lorence T Keller, Vice President of KMART CORPORATION, a Michigan corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated and as the act and deed of said corporation.

Given under my hand and seal of office on this 16th day of April, 2000. 2001

_____
          Notary Public
          DONNA M. HUBER
    Notary Public, Oakland County, MI
   My Commission Expires 08-31-2004.

12















decreased by such work. Tenant shall be responsible for all repairs, structural as well as non-structural, relating to or occasioned by such alterations, additions or changes, including those necessitated by fire or other casualty for which Tenant is responsible pursuant to the pertinent provisions of Article 20B hereof. Any such interior changes or alterations so made by Tenant shall become the property of Landlord, but shall be deemed included in the demise hereunder. The term "structural changes", as used herein, shall not include moving of non-loadbearing partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

Tenant may, at its own expense, at any time, erect or construct additional structures on the portion of the demised premises identified as garden shop on Exhibit B. Tenant shall also be solely responsible for exterior and interior repairs thereto. In the event Tenant constructs any such new construction, Landlord shall not be obligated to furnish additional parking areas.

**Utilities**   17. Landlord covenants and agrees that the Tenant's building shall be properly serviced with gas, unless unavailable due to a moratorium on gas service as established by a governmental authority, quasi-governmental authority or the utility company inself, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as provided for in this lease as of the commencement of the lease term. Tenant shall pay all charges for utility services rendered or furnished to the Tenant's building during the lease term, utilizing separate meters which shall be installed for Tenant as provided for in this Lease. Tenant shall also pay sprinkler supervisory charges, if any.

Sewer charges or sewer taxes, regardless of the manner billed or assessed, shall be paid by Tenant if separately metered for Tenant's building or otherwise on a pro rata basis.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

**Governmental**
**Regulations**   18. Tenant shall observe and comply with all requirements of rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said demised premises including the making of non-structural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes, including but not limited to, the erection of a fire escape or exit, or (b) require non-structural changes which would have been required irrespective of the nature of the tenancy, then in either such event, the same shall be complied with by Landlord at its sole expense.

**Exculpation**   19. Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Landlord owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon Landlord.

**Damage to**
**Demised**
**Premises**   20. A. From and after the date of occupancy by Tenant as specified in Article 11 hereof, Landlord shall promptly insure the permanent improvements then constituting the buildings and structures located on the lands described in Exhibit A depicted on Exhibit B, other than Tenant's building and structures, against damage or destruction by fire and other casualties insurable under a standard New Jersey fire insurance policy with endorsements

-12-

for standard forms of extended coverage, vandalism and malicious mischief, in an amount equal to but not less than eighty per cent (80%) but in any event in an amount so as to avoid co-insurance (with agreed amount clause) of the insurable repair and replacement value of the permanent improvements thereof as aforesaid (exclusive of foundation, foundation walls and excavation costs and costs of underground flues, pipes and drains). All such policies shall be carried by the Landlord in solvent and responsible companies rated AAA or better and licensed or authorized to do business in New Jersey and bear endorsements to the effect that Tenant shall be notified not less than ten (10) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof so endorsed, shall be promptly delivered to Tenant. Such policies shall provide for release of insurance proceeds to Landlord after restoration of loss. Irrespective of the cause thereof, Tenant shall not at any time be liable for any loss or damage to said buildings resulting from fire, explosion or any other casualty.

In the event that at any time during the lease term, the permanent improvements constituting Landlord's buildings or structures within the site depicted on Exhibit B, other than Tenant's building or structure, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, without unnecessary delay, repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or Landlord may, at its option, elect to raze any buildings or structures so damaged or destroyed and pave the area formerly occupied by said buildings or structures so as to provide additional parking facilities, said areas to be paved, marked, lighted, drained and maintained in the same manner as required in Articles 10 and 15 hereof for other parking areas located on the lands described in Exhibit A.

B.   (i)  At any time while Tenant's net worth shall exceed One Hundred Million Dollars ($100,000,000.00), Tenant may elect to be a self-insurer of its obligation to repair, restore or rebuild Tenant's building, in which case Tenant shall furnish Landlord and the first mortgagee of the fee of the demised premises (hereafter in this Article sometimes referred to as the "first mortgagee") with a certificate of self-insurance confirming the same obligations as would be provided by a carrier under the provisions hereinafter set forth.  Tenant shall notify Landlord and the first mortgagee if Tenant shall cease to be a self-insurer.

(ii) From and after the date of occupancy by Tenant of the demised premises as specified in Article 11 hereof, should Tenant's net worth at any time be less than One Hundred Million Dollars ($100,000,000.00), Tenant shall promptly insure Tenant's building and other of Tenant's structures on the demised premises for the benefit of Landlord and the first mortgagee, as their interests may appear, against damage or destruction by fire or other casualties, insurable under a standard New Jersey fire insurance policy with endorsements for standard forms of extended coverage, vandalism and malicious mischief, in an amount equal to not less than eighty per cent (80%) but in any event in an amount so as to avoid co-insurance (with agreed amount clause) of the insurable repair and replacement value of the permanent improvements of Tenant's building and other of Tenant's structures in the demised premises (exclusive of foundation, foundation walls and excavation costs and costs of underground flues, pipes and drains). All such policies shall be carried by Tenant in solvent and responsible companies rated AAA or better and licensed or authorized to do business in New Jersey, and bear endorsements to the effect that Landlord and the first mortgagee shall be notified not less than ten (10) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Landlord and the first mortgagee. Copies of such insurance policies or certificates, including replacements of either thereof not less than fifteen (15) days prior to expiration, evidencing the existence thereof, so endorsed and endorsed as provided below, shall be promptly delivered to Landlord and the first mortgagee.

-13-

Tenant shall not at any time be liable (a) for any loss or damage to the improvements including the buildings and structures within the site depicted on Exhibit B, resulting from fire, explosion or any other casualty, except as specifically set forth in Subdivision B, subparagraph (iv) of this Article 20, or (b) for any loss or damage to the property of Landlord, except as specifically set forth in this lease.

(iii)  Such policies shall provide for release of insurance proceeds to Tenant for restoration of loss. Landlord reserves the right of entry to the Tenant's building or structures to inspect damage and the method, quality and progress of repairs, restoration or rebuilding. Tenant shall not take out separate insurance concurrent in form or contributing, in the event of loss, with that required to be furnished by Tenant, or increase the amounts of any then existing insurance by securing an additional policy or additional policies, without including Landlord as an insured party.

(iv)  In the event that at any time during the lease term the permanent improvements then constituting Tenant's building or structures within the lands described in Parcel I in Exhibit A shall be damaged or destroyed (partially or totally) by fire or any other insurable casualty, whether the same was prior thereto altered, changed, repaired, rebuilt or restored by Tenant, Tenant shall, at its expense, without unnecessary delay, commence and continue diligently to repair, rebuild and restore Tenant's building or structures within the lands described in Parcel I in Exhibit A as nearly as practicable to at least the same condition existing immediately prior to such damage or destruction. However, if as a result of any such damage or destruction (1) during the last five (5) years of the lease term, Tenant's building and/or structures within the demised premises should be destroyed or damaged by fire or casualty (a) to the extent of fifty per cent (50%) or more of the cost of replacement thereof, or (b) so that fifty per cent (50%) or more of the gross floor area thereof shall be rendered untenantable (for the purposes hereof smoke or water damage shall not occasion untenantability); or (2) if during the last two (2) years of the lease term, Tenant's merchandise, trade fixtures or other equipment which Tenant is authorized by this lease to remove from the Tenant's building or structures from time to time and at the end of this lease (and as to which Tenant had not theretofore abandoned its property rights) shall be damaged or destroyed in an amount exceeding Two Hundred Thousand and no/100 Dollars ($200,000.00) replacement cost, then Tenant may terminate this lease as of the date of such damage or destruction by giving written notice to Landlord within thirty (30) days thereafter, and Tenant shall have an additional sixty (60) days rent free, within which to remove such property and its personal property from the demised premises. Notwithstanding the foregoing right of termination of this lease by Tenant as provided in the preceding sentence thereof, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 13(a) of this lease within thirty (30) days after the date of such damage or destruction, and upon the exercise of any such option by Tenant (other than the tenth successive option referred to in Article 13(a)), then this lease shall continue in full force and effect despite such damage or destruction, and Tenant shall repair, rebuild and restore the Tenant's building as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

(v)  During any period commencing upon the date of any such damage or destruction by fire or other casualties, whether Tenant is a self-insurer or insured as herein provided, the annual minimum rental shall abate and any other charges payable under this lease shall not abate.

-14-

(vi) In the event Tenant cancels this lease pursuant to the provisions of Subdivision B, subparagraph (iv) of this Article 20, then and in such event, whether or not Tenant is a self-insurer or carrying such insurance as hereinbefore specified, the adjustment of loss may be made on behalf of Landlord and the first mortgagee, by the General Adjustment Bureau, and if Tenant is carrying insurance, Tenant shall assign to Landlord all of Tenant's rights to the net proceeds thereof and the payment of the net proceeds thereof shall be made to Landlord and/or the first mortgagee, as their respective interests may appear. If Tenant is a self-insurer, the General Adjustment Bureau shall adjust the loss as if Tenant had carried sufficient insurance so as to have met its insurable obligation specified in Subdivision B, subparagraph (ii) of this Article 20. After adjustment of the loss, as aforesaid, if Tenant is a self-insurer, it agrees to pay over promptly to Landlord and/or the first mortgagee, as their interests may appear, such sums as are determined to be payable by reason thereof, but only in an amount equivalent to the amount which would have been payable under the above provisions of Subdivision B, subparagraph (iv) of this Article 20.

(vii) In the event that any such damage or destruction is caused by an uninsurable casualty (1) prior to or during the last five (5) years of the lease term to Tenant's building or structure within the demised premises, or (2) prior to or during the last two (2) years of the lease term to Tenant's merchandise, trade fixtures or equipment which Tenant is authorized by this lease to remove from the demised premises from time to time and at the end of this lease (and as to which Tenant has not abandoned its property rights) shall be damaged or destroyed in an amount exceeding Two Hundred Thousand and no/100 Dollars ($200,000.00) replacement cost, Tenant may, but shall not be obligated, to repair, rebuild or restore and may within sixty (60) days of such damage or destruction terminate this lease by giving notice thereof to Landlord. However, upon failure to so notify Landlord, Tenant shall have been deemed to obligate itself to repair, rebuild or restore such damage or destruction. However, if this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant. For the purposes hereof, an uninsurable casualty is defined as a casualty against which insurance is unobtainable under a standard New Jersey fire insurance policy with endorsements for standard forms of extended coverage, vandalism and malicious mischief, in an amount equal to not less than eighty per cent (80%) but in any event in an amount so as to avoid co-insurance (with agreed amount clause) of the insurable repair and replacement value of the permanent improvements of Tenant's building and other of Tenant's structures in the demised premises (exclusive of foundation, foundation walls, excavation costs and costs of underground flues, pipes and drains).

(viii) Except for the obligations of Tenant under Subdivision B of this Article 20, and otherwise set forth in this lease, each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty to its respective property covered by the insurance or self-insurance as hereinbefore more specifically set forth in this Article 20, irrespective of the negligence of such party or any officer, agent, employee or representative of such party.

**Eminent Domain**   21. In the event all of Tenant's buildings constructed by Landlord shall be expropriated or the points of ingress and egress to the public roadways substantially as depicted on Exhibit "B" be materially impaired by a public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than ten percent (10%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease

-15-

as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the land described in Exhibit "A", then, in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.

Use, Assignment and Subletting   22. The premises hereby demised shall be used only for any lawful retail purpose so long as the balance of the Shopping Center shall be used for lawful retail purposes of at least 75% of the square footage of the balance; should non-retail use of the square footage of the balance of the Shopping Center exceed 25%, the demised premises may be used for any lawful

-16-

purpose. Tenant may assign this lease or sublet the whole or any part of the demised premises, but if it does so, it shall remain liable and responsible under this lease.

Signs

23. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the right, by complying with all applicable governmental law, to obtain the necessary permits and approvals to install and maintain, at its sole cost and expense, upon any portion of Tenant's building other than the roof, signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

Tenant shall have the option, which if not exercised may be exercised may be exercised by Landlord, to erect a pylon structure, at its cost and expense, at a location within the lands described in Parcel II in Exhibit A as depicted in Exhibit B. Tenant shall have the right to install the primary identification panel thereon which shall be of such height and other dimensions as may be approved pursuant to applicable governmental law, and shall bear such legend or inscription as Tenant shall determine, with the understanding, however, that the same shall not preclude the inclusion of the Drug Fair or Cost Cutters identification panel thereon, in accordance with applicable governmental law, which shall be located beneath Tenant's primary identification panel, (and not exceed in size said Drug Fair or Cost Cutters proportionate share of the available space thereon). Drug Fair's (Cost Cutter) right to locate on said pylon shall be conditioned upon payment by such party of its proportionate share of the costs of manufacture and installation of the pylon to Tenant. Except as aforesaid, the pylon structure may not contain an identification or advertising panel of any other occupant of space within the shopping center or any other person, without the written consent of Tenant. Tenant shall have the right to change or replace, at its own cost and expense, its identification panel during the term of this lease at any time and from time to time. Landlord shall run the electrical wire and conduits to said pylon structure, at Landlord's cost and expense. The pylon structure shall be lighted and maintained in good repair by Tenant and the cost thereof shall be added to the annual common area maintenance charges to be appropriately borne proportionately by those tenants in the shopping center whose identification panels are affixed to the pylon structure.

Notwithstanding the foregoing, one free-standing sign may be erected at no expense to Tenant for the tenant of the free-standing building, as depicted on Exhibit B, designated Future L.L. Bank Bldg. 3,000 square feet, provided, however, any such free-standing sign shall be of lesser height than the pylon structure and shall not obstruct, hinder, inhibit or, impede the view of said pylon structure, and Landlord hereby agrees that such free-standing sign shall be maintained in good order and repair so as not to detract from the appearance of the Shopping Center.

-17-

No exposed neon sign, flashing or animated sign or roof or free-standing sign (except as aforementioned) will be permitted to be installed or erected for any occupant of the lands described in Exhibit A. Any other signs shall be affixed parallel to and shall not project more than 12 inches out from any building or marquee.

**Ingress and Egress**

24.  Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain, for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**

25.  If Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent and all other charges reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent and all other charges) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

26.  If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**

27.  Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall, subject to the matters referred to in the following paragraph, peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

-18-

Landlord further covenants, represents and warrants that prior to commencement of construction it, or its successors or assigns, will be seized of an indefeasible estate in fee simple absolute to the lands described in Exhibit "A", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

(a) Public utility easements not impairing Tenant's use of the demised premises.

(b) Real estate taxes for the year 1985 and ensuing years, not yet due.

(c) Leases to other tenants in the shopping center which will not impair any rights granted under this lease.

(d) Construction loan and permanent loan mortgages hereafter entered into.

(e) Reciprocal operating agreement to be entered into with the owner of the contiguous lands, upon which there is now located a Shop Rite Shopping Center and Jonathan Craig Liquor.

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) a copy of Landlord's fee title insurance policy, or if requested prior to the issuance of such policy, a copy of Landlord's fee title binder (title policy commitment), (b) a survey by a licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement executed by the fee owner of the demised premises wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such fee owner unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Subor- dination**   28. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease, and further that the mortgagee consent that all condemnation awards and proceeds of casualty insurance, if any, shall be applied and/or paid in the manner set forth in this lease.

**Tenant Indemnifies Landlord**   29. During the term of this lease and during any period prior to the date of occupancy by Tenant during which period Tenant has entered the Tenant's building as permitted hereunder, Tenant shall and does hereby indemnify and save Landlord and Landlord's ground lessor, if any, harmless of,

-19-

from and against all liabilities for damages or claims of whatsoever nature, including reasonable costs of defense and counsel fees, for personal injury, death and/or property damage arising from Tenant's use of Tenant's building or, the common areas located on lands described in Exhibit A only if occasioned by the conduct of truck sales or sidewalk sales as permitted hereunder, except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord or Landlord's ground lessor, if any. The foregoing sentence is intended to afford to Landlord and Landlord's ground lessor, if any, the same protection and coverage as would be provided if Tenant furnished general comprehensive liability insurance, naming Landlord and Landlord's ground lessor, if any, as additional insureds under such a policy.

**Tenant's Right to Cure Landlord's Defaults**

30. In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, pay said principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of seven percent (7%) per annum or the then current prime rate, whichever is the higher, and Tenant may to the extent necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**

31. At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

**Holding Over**

32. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant, from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

**Investment Tax Credit**

33. Landlord hereby agrees to elect under the applicable provisions of the Internal Revenue Code of 1954, as amended, (hereinafter referred to as the "Code") to pass through to the Tenant all investment tax credit which may be available from time to time in respect of the demised premises under Section 38 of said Code to the extent such investment tax credit is not usable under said Code by the Landlord, its successors and assigns. Landlord agrees to timely execute all documents required by said Code, and regulations issued thereunder, to enable Tenant to obtain such investment tax credit.

-20-

Landlord further agrees to maintain adequate records so that the qualifying property can be identified and the cost thereof can be determined and to provide such records to the Tenant upon written request and otherwise to cooperate with Tenant in said matter. Landlord agrees not to destroy or otherwise dispose of such records until written consent to such destruction or disposal has been obtained from Tenant.

**Notices**
34. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Troy, Michigan, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service.

**Captions and Definitions**
35. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provision thereof. The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**
36. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memorandum of Lease**
37. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

**Deed Restrictions**
38. Tenant hereby covenants and agrees that at no time during the term of this lease shall the premises demised be used as a supermarket or for the sale of wine, beer or other alcoholic beverages for off-premises consumption, as long as a supermarket or liquor store is located on the contiguous premises upon which there is now located a Shop Rite Shopping Center and Jonathan Craig Liquor, nor shall a pharmacist or druggist be employed, nor be engaged in any business, nor shall any prescription drugs be sold on any portion of the demised premises. Further, up to December 27, 1987 the demised premises may not be used as a pizzeria or for the sale or manufacture of pizza products. All of the foregoing restrictions are to be set forth in the deed of conveyance to be delivered to Landlord hereunder as fee owner of the lands described in Exhibit A which the Tenant acknowledges.

**Force Majeure**
39. If the performance by either party of any of its obligations hereunder is delayed by reason of the act or negligence of the other party, act of God, strike, labor dispute, boycott, governmental restrictions, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to the period by which performance is delayed.

**Commencement of Term**
40. Within ten (10) days after request of either party after the commencement date has been determined, Landlord and Tenant shall execute, acknowledge and deliver to each other duplicate originals of an agreement setting forth the commencement date, the date of expiration of the initial term of this lease, and the commencement dates of the extended periods.

-21-

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:                              LEVCOM WALL PLAZA ASSOCIATES

_____        _____
                                        General Partner

_____        _____
                                        General Partner


                                        K MART CORPORATION

_____   By: _____
                                                      Vice President

_____ Attest: _____
                                                   Assistant Secretary


9166M



-22-

ACKNOWLEDGMENTS

STATE OF New Jersey )
COUNTY OF Essex )ss:

On the 8th day of July , 1985 , before me personally
came DAVID M. LINDENBAUM to me known, who
being by me duly sworn, did depose and say that he/she is/are
partner/partners in Leven Wall Plaza Assoc.
XX , a partnership, and that he/they
executed the foregoing instrument on behalf of said firm.

In Witness Whereof, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

My commission expires:_____          Barbara Gamba
                                                        Notary Public

BARBARA GAMBA
Notary Public of New Jersey
My Commission Expires Dec. 22, 1986


STATE OF MICHIGAN)
COUNTY OF OAKLAND)ss:


I do hereby certify that on this 5th day of July , 1985 ,
before me, Mary A. Schnitzler , a Notary
Public in and for the County and State aforesaid, and duly commissioned,
personally appeared M. L. Skiles and
D. H. Burdick, II , known to me to be the
Vice President and Assistant Secretary of K mart Corporation, who, being by me
duly sworn, did depose and say that they reside in Rochester and
Birmingham, Michigan
respectively; that they are the Vice President and Assistant Secretary
respectively of K mart Corporation, the corporation described in and which
executed the foregoing instrument; that they know the seal of said
corporation; that the seal affixed to said instrument is the corporate seal of
said corporation; that, on behalf of said corporation and by order of its
board of directors, they signed, sealed and delivered said instrument for the
uses and purposes therein set forth, as its and their free and voluntary act;
and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

My commission expires:_____      Mary A. Schnitzler
                                                        Notary Public

MARY A. SCHNITZLER
Notary Public, Oakland County, Mich.
My Commission Expires May 10, 1987


9166M

Job No. 24140.212
June 12, 1985

DESCRIPTION OF A LEASE AREA FOR K-MART ON PART OF LOTS 4, 5, 6, 9 & 10,
BLOCK 88, WALL TOWNSHIP TAX MAP, MONMOUTH COUNTY, NEW JERSEY.

BEGINNING at a point in the Easterly line, 35.00 feet from centerline of
Old Mill Road, said BEGINNING POINT being at the termination of the
following two Courses and Distances from the point of intersection of the
Southerly line, 40.00 feet from centerline of Eighteenth Avenue (Monmouth
County Highway Route No. 30) with the aforesaid Easterly line of Old Mill
Road (A) South 06 degrees 30 minutes 40 seconds West along the aforesaid
Easterly line of Old Mill Road, 454.30 feet to an angle point in said
line, (B) South 10 degrees 00 minutes 40 seconds West continuing along
said Easterly line, 172.37 feet and running from said BEGINNING POINT (1)
South 83 degrees 29 minutes 20 seconds East 289.33 feet to a point, thence
(2) South 80 degrees 24 minutes 44 seconds East 48.07 feet to a point,
thence (3) South 83 degrees 29 minutes 20 seconds East 451.05 feet to the
Westerly right-of-way line of New Jersey State Highway Route No. 35,
thence (4) South 38 degrees 29 minutes 27 seconds West along said Westerly
right-of-way line, 241.65 feet to a point of curvature, thence (5)
Southwardly continuing along said Westerly right-of-way line, along the
arc of a curve having a radius of 11,499.00 feet and bearing to the left
an arc distance of 194.32 feet to the Northerly line of Lot 11, Block 88,
Wall Township Tax Map, thence (6) North 83 degrees 40 minutes 40 seconds
West along said Northerly line, 261.32 feet to the Westerly line of the
aforesaid Lot 11, thence (7) South 05 degrees 30 minutes 00 seconds West
along said Westerly line, 205.20 feet to the Northerly line of Lot 3,
Block 88, Wall Township Tax Map thence (8) North 80 degrees 04 minutes 00
seconds West along said Northerly line, 195.70 feet to an angle point in
said line, thence (9) South 09 degrees 56 minutes 00 seconds West
continuing along said Northerly line, 225.00 feet to another angle point
in said line, thence (10) North 80 degrees 04 minutes 00 seconds West

PARCEL I,  Exhibit "A"

continuing still along said Northerly line, 140.00 feet to the aforesaid

Easterly line of Old Mill Road, thence (11) North 09 degrees 56 minutes 0

seconds East along the aforesaid Easterly line of Old Mill Road, 434.53

feet to an angle point in said line, thence (12) North 10 degrees 00

minutes 40 seconds East continuing along said Easterly line 350.74 feet to

the point or place of BEGINNING.


Containing 8.043 acres.


This map is in accordance with a map entitled "Lease Area for K-Mart, Part

of Lots 4, 5, 6, 9 & 10, Block 88, Wall Township Tax Map, Monmouth County,

New Jersey" prepared by Birdsall Engineering, Inc. and dated June 12,

1985.

Job No.   24140.200

February 21, 1985

DESCRIPTION OF LOTS 4, 5, 6, 9, AND 10, BLOCK 88, WALL TOWNSHIP TAX MAP, MONMOUTH COUNTY, NEW JERSEY.

BEGINNING at a point in the southerly line, 25.00 feet from centerline, of Eighteenth Avenue (Monmouth County Highway Route No. 30) distant 9.75 feet on a course of South 84 degrees 55 minutes 40 seconds East from the point of intersection of the easterly line, 25.00 feet from centerline, of Old Mill Road, extended Northwardly with the aforesaid southerly line of Eighteenth Avenue, extended westwardly and running from said BEGINNING POINT (1) South 84 degrees 55 minutes 40 seconds East along the aforesaid southerly line of Eighteenth Avenue, 419.48 feet to an angle point in said line, thence (2) South 82 degrees 47 minutes 20 seconds East continuing along the southerly line of Eighteenth Avenue 170.16 feet to its intersection with the westerly line of Lot 7, Block 88, Wall Township Tax Map, extended northwardly, thence (3) South 03 degrees 01 minutes 20 seconds West along the aforesaid westerly line of Lot 7, 496.47 feet to a point in the northerly line of Lot 8, thence (4) South 89 degrees 22 minutes 47 seconds West along said northerly line, 9.01 feet to the most westerly corner of Lot 8, thence (5) South 58 degrees 51 minutes 23 seconds East along the southwesterly line of Lot 8, 221.09 feet to the northwesterly Right of Way  line of New Jersey State Highway Route No. 35, thence (6) South 38 degrees 29 minutes 27 seconds West along the northwesterly Right of Way  line of New Jersey State Highway Route No. 35, 316.49 feet to a point of curvature thence (7) Southwestwardly continuing along said northwesterly Right of Way  line along the arc of a curve having a radius of 11,499.00 feet and bearing to the left an arc distance of 194.32 feet to its intersection with the northerly line of Lot 11, thence (8) North 83 degrees 40 minutes 40 seconds West along the northerly line of Lot 11, 261.32 feet to the northwesterly corner thereof, thence

PARCEL II, Exhibit "A"

(9) South 05 degrees 30 minutes 00 seconds West along the westerly line of Lot 11, 205.20 feet to its intersection with the northerly line of Lot 3, thence (10) North 80 degrees 04 minutes 00 seconds West along the northerly line of Lot 3, 195.70 feet to an angle point in said line, thence (11) South 09 degrees 56 minutes 00 seconds West continuing along the northerly line of Lot 3, 225.00 feet to another angle point in said line, thence (12) North 80 degrees 04 minutes 00 seconds West still along the northerly line of Lot 3, 158.50 feet to the easterly line, 16.50 feet, from centerline of Old Mill Road, thence (13) North 09 degrees 56 minutes 00 seconds East along the aforesaid easterly line of Old Mill Road, 434.54 feet to an angle point in said line, thence (14) North 16 degrees 00 minutes 40 seconds East, continuing along the easterly line of Old Mill Road, 522.55 feet to another angle point in said line, thence (15) North 06 degrees 30 minutes 40 seconds East, still along the easterly line of Old Mill Road, 228.88 feet to another angle point in said line, thence (16) South 83 degrees 33 minutes 40 seconds East still along the easterly line of Old Mill Road, 8.50 feet, thence (17) North 06 degrees 30 minutes 40 seconds East along the easterly line, 25.00 feet from centerline, of Old Mill Road 229.84 feet to a point of curvature, thence (18) Northeastwardly, eastwardly and southeastwardly, along the arc of a curve having a radius of 10.00 feet and bearing to the right an arc distance of 15.46 feet to the point or place of BEGINNING.


Containing: 18.218 Acres


Subject to Easements of Record, if any.


This description is in accordance with a map entitled "Boundary Survey of Property, Lots 4, 5, 6, 9, and 10, Block 88, in the Township of Wall, Monmouth County, New Jersey", prepared by Birdsall Engineering, Inc., and dated February 4, 1965.

Subject to required Right of Way dedications to the Township of Wall on Old Mill Road and to The County of Monmouth on Eighteenth Avenue.

# EXHIBIT B

# Levcom Wall Plaza Assocs.,LP

Statement

c/o Mandelbaum & Mandelbaum
80 Main Street Ste 510
West Orange, NJ 07052
973-325-0011

| Account: | 1825r135-t0000364 |
|---|---|
| Date: | 04/03/19 |

Payment:  $ _____

Make checks payable to:    Levcom Wall Plaza Assocs.,LP

### Kmart Corporation Store #7602

John Moody
Sears Holding Corp.
3333 Beverly Road
Hoffman Estates, IL 60179

| Date | Description | Charges | Prior Paid | Balance |
|---|---|---|---|---|
| 11/01/18 | RETax Pre-Petition to 10/14/18 | 53,946.47 | | 53,946.47 |
| 04/01/19 | Base Rent (04/2019) (Post-Petition) | 47,598.84 | | 101,545.31 |

| Current | 30 Days | 60 Days | 90 Days | Amount Due |
|---|---|---|---|---|
| 47,598.84 | 0.00 | 0.00 | 53,946.47 | 101,545.31 |

This notice is being forwarded to you as a courtesy and should not delay your obligation to forward all rent payments in accordance with the terms and conditions of your Lease Agreement.

# Electronic Proof of Claim

Final Audit Report                                                         2019-04-04

| | |
|---|---|
| Created: | 2019-04-04 |
| By: | Sears Claims (searsclaims@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAziyKbQyXFO00fm0S2Ns_KW6LbGNJl9-k |

## "Electronic Proof of Claim" History

Widget created by Sears Claims (searsclaims@primeclerk.com)
2019-04-04 - 6:54:35 PM GMT

David Mandelbaum (dclarke@wjslaw.com) uploaded the following supporting documents:
Attachment
2019-04-04 - 7:05:35 PM GMT

Widget filled in by David Mandelbaum (dclarke@wjslaw.com)
2019-04-04 - 7:05:35 PM GMT- IP address: 142.54.92.98

(User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 6.1) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/73.0.3683.86 Safari/537.36)
2019-04-04 - 7:05:37 PM GMT- IP address: 142.54.92.98

Signed document emailed to Sears Claims (searsclaims@primeclerk.com) and David Mandelbaum (dclarke@wjslaw.com)
2019-04-04 - 7:05:37 PM GMT