# EXHIBIT A

0373:02/26/91
BDP20/7239E

K Mart #3886
Asheville, North Carolina

ADDENDUM

THIS ADDENDUM is hereby added to and made a part thereof to Lease dated March 27 1991, by and between BILTMORE PLAZA ASSOCIATES and K MART CORPORATION.

WITNESSETH:

A. DEFINITIONS

As used herein, the following shall have the meaning as specified below:

"Commencement Date" shall have the same meaning as "date of occupancy by Tenant," defined in Article 2 hereof.

"Common Area" or "Common Areas" shall mean all areas within the exterior boundaries of the Shopping Center Parcel (including, but not limited to, all items of common areas shown on Exhibit "B") which are for the general use and convenience and benefit of the Landlord, Tenant, (and their respective tenants, subtenants, customers, employees, concessionaires and other business invitees) and shall not include any Floor Area intended for the exclusive use and occupancy of any occupant of the Shopping Center and further excluding any dedicated roadways within the Shopping Center Parcel. Common Areas are to include, but not be limited to, (i) parking areas and individual parking spaces for motor vehicles of customers and employees, including any parking decks, (ii) roadways, driveways, aisles, islands, landscaping, entrances and exits to and from public roadways and streets to provide vehicular access, (iii) sidewalks, walkways and stairways to provide pedestrian access within the Common Areas, (iv) landscaped and exterior areas, (v) ramps, truckways, loading areas, delivery passages, truck tunnels and service corridors connecting therewith (excluding those designated or intended for the exclusive use of an individual Tenant), (vi) storm drainage systems (including a detention or retention pond), gas pipelines (if available), water pipelines, fire protection systems, power and telephone cables and similar utilities serving more than one of Landlord, Tenant and the other tenants of Landlord.

"Common Area Maintenance Costs" shall have the meaning defined in Article 15 hereof.

"Date of Occupancy by Tenant" shall have the meaning defined in Article 11 hereof.

"Demised Premises" or "demised premises" shall have the meaning defined in Article 1 hereof.

"Floor Area" shall mean the floor area measured in square feet within any building within the Shopping Center determined by the linear dimensions in feet from the center line of joint partitions, party walls or interior walls and from the outside of exterior walls.

"Gross Sales" or "gross sales" shall have the meaning as defined in Article 4 hereof.

"Lease Year" shall have the meaning as defined in Article 4 hereof.

"Occupant" or "occupant" shall mean any person including Tenant and Landlord's tenants who is legally entitled to the exclusive use and occupancy of any Floor Area within the Shopping Center pursuant to a deed or Lease.

"Rent" shall have the meaning as defined in Articles 3 and 4.

"Tenant's Building" or "tenant's building" shall mean Tenant's store building located on the Demised Premises.

0373:02/26/91
BDP20/7239E

"Term", "Lease Term" and "lease term" shall have the meaning as defined in Article 2 hereof.

B. UTILITIES. The following language shall be added to and made a part of Article 17:

Tenant shall pay for all utilities ordered or consumed by it for use within Tenant's Building, including gas, electricity, water, sewer and telephone.

C. USE, ASSIGNMENT AND SUBLETTING. The following language shall be added and made a part of Article 22:

The Demised Premises shall only be used by Tenant, its successors, assigns and subtenants, for retail purposes and will not be used for any purpose that is incompatible with the operation of a community shopping center or for any of the following purposes: (a) any public or private nuisance; (b) any use producing noise or sound that is reasonably objectionable due to excessive intermittence, bet frequency, shrillness or loudness; (c) any use producing an obnoxious odor; (d) any use involving noxious, toxic, caustic or corrosive fuel or gas; (e) any use producing dust, dirt or fly ash in excessive quantities; (f) any use involving an unusual fire, explosion or other damaging or dangerous hazard (including the storage, display or sale of explosives or fireworks); (g) any primary use as a warehouse, except storage of merchandise, materials and fixtures incidental to the operation of any other permitted use shall not be deemed a warehouse use; (h) any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation; (i) any establishment selling or exhibiting pornographic materials; (j) any primary use as a video arcade or gaming or amusement center; or (k) any mortuary. Tenant shall not use any part of the Common Areas to make sales from trucks, trailers, vans, booths or other temporary facilities or for any entertainment, carnival or other show. Nothwithstanding the foregoing, Tenant shall have the right to conduct sales from and on the sidewalk in front of the building. Tenant agrees that during the periods in which it conducts such sales, it will maintain the portion of the sidewalk which it is using in a manner which is consistent with a first-class shopping center and in a neat, clean and safe condition.

Tenant may assign this Lease or sublet the whole or any part of the Demised Premises, but if it does so, it shall remain liable and responsible under this Lease.

D. TENANT INDEMNIFIES LANDLORD. The following language shall be added and made a part of Article 29:

During the Lease Term, Tenant shall and does indemnify and save Landlord harmless against all costs, liabilities, damages, expenses, penalties, claims or demands of whatsoever nature, including all costs of defense and reasonable counsel fees for personal injury, death or property damage occurring in Tenant's portion of Tenant's Building arising from Tenant, its subtenants'; agents'; employees' or contractors' use of the Tenant's Building or any improvements therein or appurtenances thereto or by act or omission or negligence of Tenant, any subtenant, concessionaire or licensee of Tenant or their respective employees, agents, or contractors in Tenant's Building or its appurtenances except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord.

0373:02/26/91
BDP20/7239E

IN WITNESS WHEREOF, the parties hereto have executed this Addendum in triplicate as of the day and year first written above.

WITNESSES:

[signature] John F.A.V. Cecil
Partner

[signature]
[signature]

Attest: [signature]
Assistant Secretary

[signature]
[signature]

BILTMORE PLAZA ASSOCIATES

By: Seven Seas Partnership, General Partner

By: [signature] GEORGE H.V. CECIL
Its: Partner.

By: Asheville Plaza Associates, General Partner

By: [signature]
Its:

By: Crown American Corporation, General Partner

By: [signature]
Its: Executive Vice President
Nicholas O. Antonazzo

K MART CORPORATION

By: [signature]
Vice President

Attest: [signature]
Assistant Secretary

THE PLAZA AT BILTMORE SQUARE

Asheville, North Carolina

LEASE AGREEMENT

by and between

THE PLAZA AT BILTMORE SQUARE

and

K MART CORPORATION

K mart # 3886
Asheville, North Carolina

Parties

THIS LEASE made ~~and entered~~ into as of this 27th day of March, 1991, between BILTMORE PLAZA ASSOCIATES, a North Carolina general partnership, having its principal office at 7620 Market Street, Youngstown, Ohio 44512-6085 (herein referred to as "Landlord"), and K MART CORPORATION, a Michigan corporation having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant do hereby covenant, promise and agree as follows:

INSERT PARAGRAPH A OF THE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF

Demised Premises

1. Landlord does demise unto Tenant and Tenant does take from Landlord for the lease term the following property: Tenant's completed building (designated K mart), together with site improvements to be constructed by Landlord as hereinafter specified ~~by Landlord~~ at Landlord's ~~its~~ expense together with land comprising approximately Eight and Nine tenths (8.9) acres described in Parcel "A" of Exhibit "A", attached hereto and made a part hereof, and situated in the City of Asheville, County of Buncombe, State of North Carolina; said building to be in the locations depicted on Exhibit "B" attached hereto and made a part hereof, and of the following dimensions:

K mart Building: 381'. 33" in width by 273'. 33" in depth
Total Size: 104,231 sq. ft.

In addition, Landlord shall provide a fenced garden shop area having dimensions of 50' in width by 140' in depth, as indicated on Exhibit "B", attached hereto.

Said land, and completed building and site improvements, together with all ~~licenses~~, rights, privileges ~~and easements~~, appurtenant thereto shall be herein collectively referred to as the "demised premises".

Landlord hereby gives and grants unto Tenant and reserves unto itself, in common with others entitled thereto, including Tenant's agents, employees, customers, licensees and invitees the following licenses, rights, privileges and easements: the use of parking areas, common areas (including rest rooms, utilities and other facilities, if any), roadways, sidewalks and accessways to public streets and highways indicated on said Exhibit "B", together with the use of any delivery or servicing areas adjoining Tenant's said buildings or designated as such on Exhibit "B", which areas shall be adequate for the passage, unloading and, if necessary, turning around of trailer trucks and other commercial vehicles for the Shopping Center and the use of the Common Areas described in the Addendum.

Term

2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that term is defined in Article 11 hereof, and shall terminate upon such date as shall be twenty five (25) years from the last day of the month in which said date of occupancy by Tenant shall occur; provided, however, the term of this lease may be extended as provided in Article 13 hereof. The phrase "lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant to said Article 13.

Annual Minimum Rental

3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall designate in writing from time to time, an annual minimum rental of FOUR HUNDRED NINETY-FIVE THOUSAND NINETY-SEVEN DOLLARS ($ 495,097.00), unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of each month, in advance, commencing upon the first day of the lease term; provided, however, in the

Except as provided otherwise in this Lease, Tenant shall pay to Landlord all annual minimum rental, additional rental and other sums due under this Lease without setoff or deduction. Tenant shall have the right by separate independent action to pursue any claim Tenant may have against Landlord.

event the first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

Additional Rental

4. In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of NINETEEN MILLION EIGHT HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($ 19,875,000.00), Tenant shall pay to Landlord as additional rental an amount equal to one per cent (1%) of gross sales exceeding NINETEEN MILLION EIGHT HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($19,875,000.00). Insert Paragraph 4(a), Page 2A

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall on or before the thirtieth (30th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be. Insert Paragraph 4(b), Page 2A

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within twelve (12) ~~six (6)~~ months after end of the lease year covered thereby ~~the statement of sales shall be delivered to Landlord~~ and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records. Insert Paragraph 4(c), Page 2A

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of the demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on the demised premises and delivered from another place) ~~and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the demised premises, except that~~ The following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised

0373:10/02/90(2)
BDP22/7240E

4.(a) The Nineteen Million Eight Hundred Seventy-Five Thousand Dollar ($19,875,000) amount described above shall be referred to as "Tenant's Breakpoint." Therefore, by way of example, but not by way of limitation, if Tenant's Gross Sales exceeds its Breakpoint in a Lease Year (and partial month if applicable), the Additional Rental due from Tenant shall be an amount equal to one percent (1%) multiplied by the amount that the Gross Sales exceeds the Breakpoint.

4.(b) In the event of any abatement of the Annual Minimum Rental aforesaid by reason of damage or destruction to the Demised Premises, the Tenant's Breakpoint shall be reduced proportionately on a per-square-foot basis.

4.(c) If such audit shall disclose that Tenant's statement of Gross Sales is at variance with actual gross sales by three percent (3%) or more, Tenant shall, within ten (10) days after demand therefor, pay the reasonable cost of the audit as additional rental, together with the rent shown to be due and interest at the rate of one percent (1%) in excess of the prime lending rate announced by the largest asset-holding bank in North Carolina. Any rent discovered to be due shall be paid within ten (10) days after notice from Landlord. For the purpose of permitting verification by Landlord of any amounts due as Additional Rental, Tenant shall keep and preserve, at the Tenant's Notice Address, as set forth in Article 34, for at least one (1) year after the end of the lease year covered thereby, sales records and supporting documentation, together with original or duplicate books and records, which shall disclose all information required to determine Gross Sales.

premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c) Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d) Service and interest charges for time payment accounts and charge accounts.

~~(e) All sales of merchandise or services made by any food market which shall occupy any portion or portions of the demised premises; and~~

~~(f) All sales of automotive gasoline or diesel fuel.~~

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within ninety (90) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said ninety (90) day period and the Tenant shall be released from any further liability under this lease.

Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraph of this article shall be of no further force and effect, provided, however, that if Tenant shall reopen the store for operation as a K Mart, the additional rent provision shall once again be reinstated.

Notwithstanding the provisions of the two preceding paragraphs, Tenant shall be entitled, at any time prior to the discontinuance of the operation of its store and the delivery of the notice to Landlord of its election to discontinue its operation (as hereinabove provided) to assign this lease or sublet the whole or any part of the demised premises pursuant to Article 22 hereof; subject, however, to the terms and conditions of this lease including the provisions of Article 4 hereof. Any such assignment or subletting shall not be construed to be a discontinuance of Tenant's operation of its store.

In the event Landlord shall fail to exercise its option to cancel and terminate this lease after receiving notice from Tenant of its intention to discontinue the operation of its store (as hereinabove provided) and Tenant thereafter assigns this lease or sublets the whole or any part of the demised premises pursuant to Article 22, the rent which Tenant or Tenant's assignee shall be obligated to pay to Landlord during the remainder of this Lease shall

be the rent more particularly set forth in Article 3 and the word "minimum" in said Article 3 shall be deemed deleted and all the provisions contained in the preceding paragraphs of this Article 4 shall be of no further force and effect.

Real Estate <u>Taxes</u>

5. Tenant shall pay and discharge all ad valorem real estate taxes and all assessments, general or specific, levied against the taxable premises during the term of the Lease, excluding therefrom payment of general or special assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

The term "taxable premises", as used in this lease, shall be that certain land described in Parcel A of Exhibit "A" together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

Landlord and Tenant shall use their reasonable efforts to obtain a separate tax assessment with respect to the taxable premises. In the event that a separate tax assessment with respect to the taxable premises cannot be obtained, then for purposes of this lease, the parties shall refer to the office records of the assessing authority including but not limited to worksheets and field reports, in order to obtain the relevant land and building valuations required to calculate Tenant's separate liability for the real estate taxes hereunder.

In the event that neither a separate tax assessment for the taxable premises can be obtained nor an accurate tax liability established from the assessing office records can be determined, the taxes allocable to the taxable premises (and Tenant's share of taxes attributable to the Common Areas) shall be equal to: (1) Tenant's pro rata share of taxes attributable to the Tenant's Building, plus (2) Tenant's pro rata share of the taxes assessed against the total land described in Exhibit "A". Tenant's pro rata share of taxes attributable to the Tenant's building shall be computed by multiplying the total tax liability against the buildings located within the land described in Exhibit "A" by a fraction the numerator of which shall be the number of square feet of ground floor area of Tenant's Building at the end of such real estate fiscal tax year (excluding the garden shop) ~~multiplied by 70%~~ and the denominator of which shall be the total number of square feet of ground floor area of all of the buildings located within the land described in Exhibit "A" (excluding Tenant's building) at the end of such real estate fiscal tax year plus the total number of square feet of ground floor area of Tenant's building at the end of such real estate fiscal year (excluding the garden shop), ~~multiplied by 70%~~. Tenant's pro rata share of the taxes assessed against the total land described in Exhibit "A" shall be computed by multiplying the total tax liability against the land described in Exhibit "A" by a fraction, the numerator of which shall be the number of square feet of land within the demised premises and the denominator of which shall be the number of square feet of land within the land described in Exhibit"A". In no event shall Tenant be responsible for the payment of taxes and assessments incurred or levied on other buildings existing on the land other than the taxable premises.

The date of levy of all ad valorem real estate taxes shall be deemed to be the date specified by each applicable taxing jurisdiction for which such taxes become a lien on the taxable premises. The Tenant's liability and obligation hereunder to pay such ad valorem real estate taxes shall be fully accrued, fixed and final on the date of levy thereof.

To the extent permitted by law, Tenant may pay any such assessment in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall

Tenant shall pay annually the ad valorem real estate taxes assessed against the Leased Premises, within thirty (30) days after demand from Landlord.

due for the first full year that the Tenant's Premises are assessed as fully completed,

become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with, nor be obligated to pay any income, profit, inheritance, estate, succession, gift, franchise, or transfer taxes which are or may be imposed upon Landlord, its successors or assigns, by whatsoever authority imposed or howsoever designated.

Written evidence of the payment of taxes and assessments hereunder shall be furnished by Tenant to Landlord upon Landlord's written request therefor.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder during any Lease Year exceed the ad valorem real estate taxes and assessments during any lease year, shall be hereinafter referred to as an "excess tax payment". All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year. ~~In the event the excess tax payment for any lease year exceeds said additional rent due and payable during the same lease year, the amount by which said excess tax payment exceed said additional rentals shall be carried forward and be deductible from additional rentals due and payable for succeeding lease years on a cumulative basis.~~ and shall be on a non-cumulative basis.

In the event Tenant constructs, as provided in Article 16 hereof, additional buildings or structures on any portion of the land described in Parcel A of Exhibit "A", said additional buildings or structures shall be excluded from the taxable premises. Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall be paid and discharged by Tenant and shall not be deductible from additional rentals as provided herein.

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right at Tenant's sole expense, subject to reimbursement as provided in in the last paragraph of Article 5 below to contest the validity or the amount of any tax or assessment levied against the taxable premises or the Shopping Center by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises. Landlord shall, at Tenant's expense, cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

[Margin insertion: levied against the taxable premises.]

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the taxable premises or the ~~Shopping Center, the Tenant~~ will cooperate in such proceedings; provided, however, that Landlord shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises which might result in the termination of this Lease.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authorities. After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

New Building by Landlord

6. Tenant's said building and site improvements shall be completed and delivered to Tenant promptly and with due diligence. If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental restrictions, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay. Landlord agrees that a general contract for construction of Tenant's said buildings and improvements referred to in Articles 1 and 10 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than June 1, 1991. If for any reason whatever Landlord shall fail to comply fully with this Article 6, ~~warranty,~~ Landlord shall so notify Tenant in writing and in such event Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by written notice to Landlord; provided, further, in the event that, regardless of the reason therefor, Tenant's ~~said~~ buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to February 1,1992, then Tenant shall, at any time thereafter, have the further option of terminating this lease by written notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be Four (4) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

Drawings and Specifications

7. Tenant's said building and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. K0370 containing such additions, changes, and modifications as are more particularly set forth in that certain letter dated January 9, 1990 , written by Stephen K. Li, Manager of Design Division to The Edward J. DeBartolo Corporation, 7655 Market Street, P.O. Box 3787, Youngstown, Ohio 44513-6085, Attention: William D. Kutlick, a copy of which letter is attached hereto and marked Exhibit "C".

Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

(a) Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on store layout drawings which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b) Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

Said working drawings and specifications shall be submitted to Tenant in time to permit a review and approval by Tenant prior to commencement of construction. Such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for

If Tenant requests any change to the drawings and specifications which differ from or are not set forth in Set No. K0370 above, then, if such changes result in a savings to the Landlord in construction costs, Landlord shall pay Tenant an amount equal to the savings, and, if such changes result in extra construction costs to Landlord, Tenant shall pay Landlord the extra construction costs resulting from such changes. Each party shall pay the other party within ninety (90) days of completion of Tenant's Building, including any "punch list" items identified by Tenant.

Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

~~Subsequent to approval of the typical drawings and specifications, in the event that criteria changes to the lease shall be requested by Tenant, which result in a savings to the Landlord in construction costs, then, Landlord shall pay Tenant an amount equal to the savings. In the event such criteria changes result in extra construction costs to the Landlord, then Tenant shall pay Landlord the extra construction costs resulting from such changes.~~

Guarantee of Materials

8. Landlord shall unconditionally guarantee all work performed by or for the Landlord in the construction of Tenant's building and site improvements against defective workmanship and materials for a period of one (1) year from commencement of lease term or date of final acceptance by Tenant, whichever is later, unless a different period of time is expressly stated under a section of the criteria documents and/or job specifications. Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it may receive.

Advance Possession for Fixturing and Merchandising

Insert Paragraph 9, Page 7A

9. For a period of sixty seven (67) days after completion of Tenant's building by Landlord, as set forth in Article 11 ~~(b)~~, Tenant shall have the privilege, rent free of entering said buildings for the purposes of installing stockroom equipment and salesfloor trade fixtures, storing merchandise, training personnel and other pre-opening activities. The Landlord's completion of the building shall be construed to mean the building is substantially complete except connections to tenants equipment, i.e. permanently enclosed, completely decorated inside and out, floor covering installed, electrical system complete, mechanical systems functioning on controls, toilet facilities complete. for both sexes, fire protection system including alarms complete.

Landlord shall advise Tenant's Regional Construction Manager in writing ninety (90) days prior to his projected completion date to allow tenant to place orders for fixtures, arrange for personnel and order merchandise.

Parking and Other Common Areas

10. Prior to commencement of the lease term, Landlord shall construct, in accordance with said working drawings and specifications approved by Tenant, on the premises depicted on Exhibit B and described in Exhibit "A", all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (not Tenant's pylon) and related improvements, substantially as shown on said working drawings and specifications ~~(all of which improvements shall hereinafter, along with the land thereon constructed, be referred to as the "common areas")~~. Insert Paragraph 10, Page 7A

Landlord shall also construct or cause to be constructed upon certain property or rights-of-way contiguous to the premises described in Exhibit "A", all sidewalks, driveways, streets, curbs, acceleration, deceleration and stacking lanes, traffic controls, and signals, directional signs and related improvements in accordance with said working drawings and specifications and the requirements of any governmental bodies.

Landlord covenants and represents that at the commencement of the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways, as shown on said working drawings and specifications.

0373:11/15/90(2)
BDP22/7240E

9. After Tenant commences such work, Landlord shall have no responsibility or liability to Tenant for personal injuries sustained or death of any Tenant's employees (or representatives, agents, invitees, licensees), damage to any of Tenant's property or the property of any of its employees, agents, invitees, or licensees, stored on the Demised Premises, except as may result from the acts, omissions or negligence of Landlord's respective contractors, subcontractors, employees, representatives, agents, invitees or licensees.

10. Landlord reserves the right at any time and from time to time (a) to make or permit changes or revisions in its site plan for the Shopping Center, including additions to, subtractions from, rearrangement of, alterations of, modification or supplements to the buildings, sidewalks, service drives, parking areas, driveways, streets, curbs or other Common Areas; (b) to construct other buildings or improvements on the Shopping Center site and to make alterations thereof or additions thereto and to build adjoining the same; (c) to make or permit changes or revisions in Landlord's Buildings, and the Shopping Center site for the purpose of constructing thereon other buildings and improvements, including additions thereto and alterations thereof; (d) to enter upon the demised premises to make any and all repairs and satisfy all maintenance obligations as set forth herein; provided, however, that: (i) all such buildings, additions, improvements or structures shall be located within the "permissible building area" designated on Exhibit B and there shall be no changes to the Tenant's building or demised premises; (ii) no addition, building, improvement or structure shall be constructed if, after construction, the ratio of parking spaces available within the land described in Parcel B of Exhibit A to Floor Area would be reduced to less than five (5) parking spaces for every one thousand (1000) square feet of Floor Area in the Shopping Center; and (iii) the foregoing does not adversely affect the availability of parking for the Demised Premises or deny, impair, diminish or impede access to the Demised Premises.

Landlord also covenants that the area within the demised premises provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than FIVE HUNDRED ( 500 ) automobiles on the basis of arrangement depicted on Tenant's working drawings and specifications.

Landlord further covenants that the aggregate area depicted on Exhibit "B" provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than five (5) automobile parking spaces for each one thousand (1,000) square feet of Floor Area.
Tenant shall use reasonable diligence to remove and collect its shopping carts from the Common Areas.

At least sixty-seven (67) days prior to the commencement of the lease term, Landlord shall provide in accordance with said working drawings and specifications as approved by Tenant and as shown on Exhibit B all of the sidewalks, service drives, parking areas and entrances, from adjoining public streets to permit receiving and delivering of fixtures, merchandise and other property and to permit parking for persons involved in the pre-opening activities of the Tenant.

<u>Liability Insurance</u>. During the lease term, Landlord at its sole expense shall keep Tenant insured against all statutory and common law liabilities for damage to property or injuries, including loss of life, sustained by any person or persons within or arising out of said common areas, whether caused by Tenant's negligence or otherwise, in a policy or policies with minimum coverage of One Million and No/100 Dollars ($1,000,000) combined single limit with a Two Million and no/100 Dollars ($2,000,000) aggregate limit. ~~with respect to injury to any one person and Two Million and No/100 Dollars ($2,000,000) with respect to any one accident or disaster, and Five Hundred Thousand and No/100 Dollars ($500,000) with respect to damage to property~~. All such policies shall bear endorsements to the effect that Tenant is named an additional insured and that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. ~~Copies of such policies, so endorsed, or~~ certificates evidencing this coverage ~~the existence thereof~~, shall be promptly delivered to Tenant upon written request therefor.

<u>Indemnification</u>. Landlord further agrees at its sole expense to defend, indemnify and hold Tenant (and all of its officers, agents and employees) harmless against any and all liabilities for damages for claims arising out of said common areas or Tenant's use thereof, by reason of any act, action, neglect or omission on the part of Landlord and/or Tenant.

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described as Parcel B in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall at its sole expense, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

~~Should Tenant, at any time, utilize portions of the common areas for outdoor shows, entertainment or such other uses which in Tenant's judgment tend to attract the public, Tenant shall give Landlord notification of such intended use, a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against damage to property, injuries to persons and loss of life sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.~~

Store Opening

11. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty-seven



Notwithstanding the foregoing, Tenant acknowledges that the parcel of land designated on Exhibit B as Future Development Outparcel shall be entitled to cross access with the Shopping Center and said Future Development Outparcel shall be entitled to one curb cut on

Landlord's obligations hereunder are subject to Landlord's closing of satisfactory financing prior to May 1, 1991, and if such financing has not been obtained by May 1, 1991, Landlord or Tenant shall have the right to cancel this Lease.

(67) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's building and site improvements shall be completed in accordance with said working drawings and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said Tenant's buildings and site improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct, or remedy in all or part any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

Landlord's Represent-ations and Warranties

12. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of ~~said~~ common areas in accordance with the provisions of Article 10 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B". Except as permitted in Paragraph 10,

Landlord also represents, warrants, and covenants that a tenant of at least square feet shall be located within the shopping center premises as depicted on Exhibit B and shall open for business prior to or contemporaneously with Tenant K mart.

Landlord further represents, warrants and covenants that the land described in Exhibit "A" will, at the time of the commencement of construction by Landlord and at the time of the commencement of the lease term, be properly zoned for Tenant's intended use, and that all necessary governmental consents, permits and approvals for such use shall have been obtained. Further, Landlord shall deliver to Tenant a Certificate of Occupancy prior to commencement of the lease term.

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof.

In the event Landlord's representations and warranties shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant thereafter shall have the option of (i) completing said representations and warranties at Landlord's cost and expense including, without limitation, overhead plus interest at the lower rate of ~~eighteen~~ fifteen percent ~~(18%)~~ (15%) per annum or the highest rate not prohibited by law, (ii) continue to pay monthly in arrears one percent (1%) of said gross sales until Landlord's said representations and warranties shall be fulfilled or (iii) terminating the

If Tenant shall not be in material default under this Lease beyond any applicable cure period,

Lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

Options to Extend Lease

13. (a) Tenant shall have seven (7) ~~ten (10)~~ successive options to extend the term of this lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term. If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than one (1) year ~~six (6) months~~ prior to the expiration of the term of this lease or of this lease as extended.

(b) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or any extension thereof. Tenant's rental during this option period shall be the same rental payable under the terms of this lease at the time Tenant notifies Landlord of its intention to exercise this option.

~~First Refusal to Purchase Option~~

~~14. Anything in this lease contained to the contrary notwithstanding, and without in any manner affecting or limiting any of the rights, privileges, options or estates granted to Tenant under this lease, it is agreed that if the Landlord at any time during the term of this lease (excepting the first lease year) receives one or more bona fide offers from third parties to purchase the demised premises or property of which the demised premises are a part, and if any such offer is acceptable to the Landlord, then Landlord agrees to notify Tenant in writing, giving the name and address of the offeror, and the price, terms and conditions of such offer, and Tenant shall have thirty (30) days from and after the receipt of such notice from Landlord in which to elect to purchase the property for the consideration contained in the bona fide offer. If Tenant does not elect to purchase said property and Landlord thereafter sells the property, the purchaser shall take the property, subject to and burdened with all the terms, provisions and conditions of this lease, including this Article 14 and the rights of the Tenant under this lease as against the new owner shall not be lessened or diminished by reason of the change of ownership. Tenant's failure at any time to exercise its option under this Article 14 shall not affect this lease or the continuance of Tenant's rights and options under this Article 14 or any other article.~~

~~In the event Tenant elects to purchase the property as provided in this lease, then Landlord shall, within thirty (30) days after receipt of such notice of election by Tenant, deliver to Tenant a title insurance policy in the amount of the consideration set forth in such offer, issued by a responsible title guarantee company, showing a good and marketable title in Landlord. If Landlord fails or refuses to furnish the title policy, then Tenant may, at its election, procure the same at Landlord's expense, and in the amount of the purchase price, and deduct the cost thereof from the cash consideration to be paid for the property. Tenant shall have thirty (30) days after receipt of the title policy in which to examine the title and notify the Landlord whether or not the title is acceptable to Tenant. If Tenant is willing to accept Landlord's title and consummate the purchase, then Landlord shall, within ten (10) days after written notice thereof from Tenant, convey the premises to Tenant by full warranty deed, free and clear of all liens and encumbrances except highway easements, private road easements and restrictions of record which were of record as of the date of Tenant's acceptance of the premises hereunder or incorporated in an amendment to this lease, if any, and deliver such deed to Tenant upon tender of the consideration.~~

, including heating, ventilating, and air conditioning systems and equipment

~~Notwithstanding any other provisions of this lease, the provisions of this Article 14 will not apply to any sale of the demised premises or any property of which the demised premises are a part at foreclosure, and shall not be binding upon any purchaser at foreclosure, any mortgagee in possession, or any holder of a deed in lieu of foreclosure or the successors or assigns of any of the foregoing, or to any sale of the demised premises by Landlord in connection with sale and leaseback financing.~~

~~If Tenant is not willing to accept Landlord's title, Tenant shall make any objections thereto in writing to Landlord and Landlord shall be allowed one hundred twenty (120) days to utilize its best efforts to make such title acceptable to Tenant. If such title is not rendered marketable within one hundred twenty (120) days from the date of said written objections thereto, Tenant may, at its election, take such action, including instigation of legal process (in which the Landlord agrees to participate) to remedy any such defect in title making such acceptable to Tenant, and to deduct all costs thereof from the cash consideration to be paid for the property. If the Tenant is unable to correct such defects in title or elects not to attempt such remedy, neither party shall be held liable for damages to the other party and both parties shall be released of all liabilities and obligations under this Article 14.~~

Repairs and Maintenance

15. Tenant shall make and pay for all maintenance, replacement and repair necessary to keep the demised premises in a ~~good~~ state of repair and tenantable condition, except for the following maintenance, replacement or repair which shall remain the Landlord's sole responsibility: first class

consistent with first-class community shopping centers

(a) all maintenance, replacement and repair to the roof, outer walls and structural portion of the buildings which shall be necessary to maintain the buildings in a safe, dry and tenantable condition and in good order and repair; and

(b) all repairs, maintenance or replacement of or to the utility services to the building and any underground storm sewers, sanitary sewers, water lines or electrical lines under the parking areas, service drives, streets, sidewalks, driveways, entrances; and

(c) all repairs and replacement including resurfacing (exclusive of sweeping, striping and snow and ice removal) necessary to maintain all driveways, sidewalks, street and parking areas free of all settling, clear of standing water, and in a safe, sightly and serviceable condition, free of chuck holes, fissures and cracks.

Notwithstanding the foregoing provisions of Article 15 herein set forth, Landlord shall contract for sweeping, striping and snow removal for the parking areas, driveways, sidewalks and streets of the premises and maintain same in a clean, safe, sightly and serviceable condition. The Landlord shall further maintain all landscaped areas.

Tenant shall pay the Landlord its pro-rata share of said costs. Tenant's said share shall be based upon the ratio that the ground floor area of Tenant's building bears to the total gross ground floor area contained in all buildings actually erected on any portion of the land described in Exhibit "A", and depicted on Exhibit "B".

For purposes of this Article, the costs of maintaining the common areas and common facilities shall mean the following: (1) all amounts paid for maintaining, cleaning and sweeping (which shall be performed ~~as often as necessary but not less than once weekly~~) and restriping (which shall be done not less than once every two years) of the parking areas, sidewalks and driveways, including snow and ice removal, which shall be performed as often as necessary; (2) maintenance and repair of planted or landscaped areas; (3) maintenance, repair and replacement of bulbs and light standards with respect to the parking lot

as frequently as necessary to maintain the Shopping Center in a condition consistent with first class community shopping centers

in the event of any emergency where notice is not possible or delay caused by notice would not be prudent, and, in all other cases, after giving notice to Landlord's onsite manager, if any.

lighting; (4) and wages and salaries of persons directly and actually performing services described herein. The cost of maintaining the common areas and common facilities shall not include real estate taxes, capital expenses, depreciation, permit fees, rubbish removal for other tenants, or other administrative expenses, including overhead.

Landlord shall maintain accurate records with respect to the aforesaid costs and shall submit to Tenant a bill not more often than every 30 days during the term of the lease for the amount required to be paid by Tenant hereunder. Such bill will set forth the items and amounts charged to Tenant in reasonable detail and will reflect the calculations of Tenant's obligation. With such bill, Landlord shall also make available to Tenant, upon Tenant's request copies of paid receipts ~~to support each said item and amount. Tenant shall~~ pay such amounts within ~~thirty (30) days after receipt of Landlord's billing therefor.~~

Tenant may, upon fourteen (14) ~~seven (7)~~ days notice, ~~have~~ inspect Landlord's records of common area expenditures for the previous twelve (12) month period in Landlord's Youngstown, Ohio office as set forth in Paragraph 34; and have audited by Tenant's accountant; should such audit disclose any overpayment by Tenant, Landlord shall remit said overpayment upon demand.

Notwithstanding anything contained herein to the contrary, Tenant reserves the right, for any reason whatsoever, at any time upon thirty (30) days prior written notice to Landlord to assume the duties of Landlord to maintain the common areas located within Parcel A of Exhibit "A". If Tenant shall elect to maintain the common areas (Tenant shall maintain said area in a condition consistent with first class community shopping centers) located within Parcel A of Exhibit "A", then, and in such event, Tenant shall not during such period be required to make any contributions to the common area costs as hereinabove defined, however, Landlord shall maintain the remaining portions of the common area described in Exhibit "A".

With respect to parking lot illumination, Landlord shall, at Landlord's sole cost and expense, have that portion of the common facilities lighting standards located within the land described in Parcel A of Exhibit "A" metered directly into Landlord's ~~Tenant's~~ meter and Tenant shall be responsible for ~~the~~ Tenant's pro rata share of the cost of supplying electricity thereto, ~~The balance of the common facilities lighting~~ standards shall be metered into the meters of ~~Landlord's other~~ tenants as depicted on Exhibit "B" or ~~into Landlord's own meter and Landlord's other tenants or Landlord shall be responsible for the cost of supplying electricity thereto.~~ consistent with Exhibit C.

It is understood that Tenant will not be charged for electricity costs during periods outside of K Mart's normal business hours unless K Mart is actually

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, The cost of such repairs shall not exceed Five Thousand Dollars ($5,000.00) in any one instance, and may be deducted by Tenant from rentals subsequently accruing hereunder.

Alterations and Additional Construction

16. Tenant may, at its own expense, from time to time ~~expand its building or~~ make such alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural integrity of the buildings will not be impaired by such work and provided further that any such alteration or change to the exterior facade of Tenant's Building shall be architecturally compatible with adjoining buildings in the Shopping Center. The term "structural changes", as used herein, shall not include moving of non-loadbearing partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or

In any event, if Tenant shall make any changes or additions with Landlord's approval as set forth above, Tenant shall make such changes or additions subject to the rights and privileges which Landlord shall have granted as described in Article 1 hereof.

authorizations required from time to time for any work permitted hereunder or installations by Tenant. Upon completion of any change, addition or alteration, Tenant shall deliver to Landlord "as built" plans therefor. ~~Tenant may, at its own expense, at any time, erect or construct~~ additional buildings or structures on any portion of the demised premises. In such event gross sales made in or from said additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, said additional building or structure shall be excluded from the taxable premises and all ad valorem taxes and assessments levied thereon shall not be deductible from additional rents payable under the terms of Article 4 hereof. Tenant shall reimburse Landlord for any increase in insurance premiums attributable solely thereto. Tenant shall also be solely responsible for exterior and interior repairs thereto, except those necessitated by fire, the elements or other casualty. In the event Tenant constructs any such additions or new construction, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, and the number of parking spaces required under Article 10 shall be reduced by the number of ~~spaces covered by such additional buildings or structures.~~

Utilities

17. Landlord covenants and agrees that the demised premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the lease term. Tenant shall pay all charges for utility raw materials (gas, water, sewage, telephone, electricity, etc.) furnished to the demised premises during the lease term.

INITIALED

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

B INSERT PARAGRAPH ~~6~~ OF ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

Governmental Regulations

18. Tenant shall observe and comply with all requirements of rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said demised premises including the making of non-structural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes, including but not limited to, the erection of a fire escape or exit, or (b) require non-structural changes which would have been required irrespective of the nature of the tenancy, then in either such event, the same shall be complied with by Landlord at its sole expense.

Exculpation

19. Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Landlord owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon Landlord.

Damage to Demised Premises

20. From and after the date on which Tenant shall be privileged to enter upon the demised premises for the purposes specified in Article 9 hereof, Landlord shall insure the buildings depicted on Exhibit "B", excluding Tenant's buildings, against damage or destruction by fire and other casualties insurable under a standard extended coverage endorsement. All said insurance shall be in an amount equal to not less than eighty per cent (80%) of the replacement value of the permanent improvements thereof. All such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof so endorsed, shall be promptly delivered to Tenant upon written request therefore. Irrespective of the cause thereof, Tenant shall not at any time be liable for any loss or damage to said buildings resulting from fire, explosion or any other casualty.

Landlord or

INSERT TO PARAGRAPH 20, PAGE 13A

373:11/15/90
BKH71:7452E

20. Tenant shall be responsible to insure its demised premises against damage by fire and other casualties insurable under a standard extended coverage endorsement, or may self-insure as set forth below.

Self-insurance. From and after the "date of occupancy by Tenant," as that term is defined in Article 11 hereof, should Tenant's net worth at any time be less One Hundred Million Dollars ($100,000,000.00), upon written request of the Landlord or mortgagee, Tenant shall procure fire insurance with extended coverage endorsement upon the building erected by Landlord pursuant to Article 6 hereof in an amount equal to eighty per cent (80%) of the replacement value of the building above the foundation walls. At any time while Tenant's net worth shall exceed One Hundred Million Dollars ($100,000,000.00), the Tenant may elect to self-insure its obligation to restore.

Policies of fire insurance procured pursuant to this Article shall assure and be payable to Landlord, Tenant and mortgagee and shall provide for release of insurance proceeds to Tenant for restoration of loss.

Landlord and mortgagee, if any, shall be furnished certificates from the insuring company showing the existence of such insurance. In case of loss, Tenant is hereby authorized to adjust the loss and execute proof thereof in the name of all parties in interest.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's building and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insurable under a standard fire and extended coverage endorsement Tenant shall at its expense, promptly and with due diligence either (1) repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction or (2) repair, rebuild and restore the same for the same use and purposes but in accordance with such plans and specifications as are then generally in use by Tenant for the construction of K Marts and related structures, provided, however, the repaired, rebuilt or replaced building will have a value not less than its value just prior to said loss. Anything herein to the contrary notwithstanding, it is understood and agreed that if (1) as a result of any such damage or destruction during the last two years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding One Hundred Thousand Dollars ($100,000.00), or (2) if such damage or destruction shall have taken place within five years of the then scheduled expiration date of the current term of the lease and if the extent of such damage or destruction is such that the cost of restoration would exceed fifty per cent (50%) of the amount it would have cost to replace the Tenant's building on the demised land in its entirety at the time such damage or destruction took place, then Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice to the Landlord within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. If Tenant is carrying fire insurance to eighty per cent (80%) of the replacement value, all the insurance proceeds shall belong to Landlord and/or Landlord's mortgagee as their interest may appear; in the event the property is self-insured at the time of the loss Tenant shall reimburse Landlord and/or the mortgagee for an amount equivalent to the insurance proceeds that would have been paid had insurance been in force, but not to exceed eighty per cent (80%) of the replacement value of the building. In the event that this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction by fire, the elements or any other casualty whatsoever, and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant

shall open for business in that part of Tenant's buildings rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Tenant herein.

In the event that, at any time during the lease term, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or alternatively Landlord shall be required to clear, clean and raze the fire damaged buildings.

Each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insurable under a standard fire and extended coverage endorsement Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding ONE HUNDRED THOUSAND DOLLARS ($100,000), then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 13 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and upon the exercise of any such option (other than the option set forth in paragraph (b) of Article 13) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the said permanent improvements as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction by fire, the elements or any other casualty whatsoever, and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's buildings rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

In the event that, at any time during the lease term except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or Landlord may, at its option, elect to raze any buildings so damaged or destroyed and pave the area formerly occupied by said buildings so as to provide additional parking facilities, said areas to be paved, marked, lighted, drained and maintained in the same manner as required in Articles 10 and 15 hereof for other parking areas in the demised premises.

Each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

Eminent Domain

21. In the event all of Tenant's buildings constructed by Landlord shall be expropriated or the points of ingress and egress to the public roadways substantially as depicted on Exhibit "B" be materially impaired by a public or

provided, however, if the expropriation occurs during the last two (2) years of the Lease Term or the renewal term, either party may elect to cancel this Lease in lieu of restoration by written notice to the other party; provided that if Tenant exercises its next option to extend the Lease for at least five (5) years, Landlord's election to cancel this Lease shall be void and of no effect and Landlord shall restore Tenant's Buildings as required in this Article.

quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than ten percent (10%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation; The annual minimum rental and other charges shall abate pro rata during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Parcel A of Exhibit "A" shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the land described in Parcel A of Exhibit "A", then, in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises or on the Shopping Center, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.




C

INSERT PARAGRAPH ~~B~~ C OF THE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

Use, Assignment and Subletting

~~22. The premises hereby demised may be used for any lawful purpose. Tenant may assign this lease or sublet the whole or any part of the demised premises, but if it does so, it shall remain liable and responsible under this lease.~~

Signs

23. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of Tenant's Building ~~the demised premises~~ signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine. ~~Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.~~

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

~~Without limiting the foregoing, Tenant may, subject to applicable~~ governmental laws, statutes, and ordinances, install one ~~(1) pylon~~ sign at the location designated as "Tenant Pylon" on ~~Exhibit "B"~~. Landlord warrants that, except for Tenant's pylon, ~~no additional~~ pylon type signs shall be permitted on any ~~portion of the~~ shopping center premises located within the land ~~described in Exhibit "A"~~. INSERT TO PARAGRAPH 23, PAGE 16A.

Ingress and Egress

24. Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain, for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.

Landlord's Remedies

25. If Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of

subject to applicable municipal approvals and compliance with all applicable laws and rules. In the event of an assignment of this Lease or a sublease of all or any part of the demised premises, the size, location, dimensions, and style of any proposed sign for the assignee(s) or subtenant(s) shall be subject to Landlord's prior written consent, which shall not be unreasonably withheld or delayed. If Landlord has not responded to such request within 30 days after receipt of Tenant's written request for approval of a signage change for an assignee or subtenant as aforesaid, Landlord's consent shall be deemed to have been granted. Except as otherwise required by Article 7 hereof, all signs shall be erected and installed at Tenant's sole expense and Tenant shall maintain, operate, remove and keep such signs in good order

SGLEASE

373:11/15/90
BKM71:7452E

23. Landlord and Tenant acknowledge that Landlord has constructed a Shopping Center Pylon sign in the location designated as "Shopping Center Pylon" on Exhibit B. Tenant shall have the right to install or have installed it identification sign on said Shopping Center Pylon in the top tenant position. If another tenant's sign is already in the top tenant's position on the Shopping Center pylon, Tenant shall bear all the costs of moving said other tenant's sign to a lower position. The maintenance and operation costs for the Shopping Center pylon and electrical service to the sign cabinet thereon shall be the responsibility of Landlord who shall, upon demand, be entitled to reimbursement from Tenant on a pro rata basis. Tenant's pro rata share shall be in the same proportion that the area of the face of Tenant's sign panel bears to the total area of the face of the entire Shopping Center Pylon. Tenant shall be responsible for the costs of installation and replacement of its own sign panel on the Shopping Center Pylon and shall maintain its sign panel in good condition and repair. Landlord further agrees that, except for the Shopping Center identification sign, no identification sign other than that of a Shopping Center Tenant shall be placed on said Shopping Center Pylon and that no tenant occupying a building of less than 6,000 square feet shall be permitted to place an identification sign on said Shopping Center Pylon.

default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

Bankruptcy

26. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

Covenant of Title

27. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the land described in Parcel A of Exhibit "A", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

(a) Public utility easements not impairing Tenant's use of the demised premises or Tenant's Primary Parking Areas.

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) an ALTA leasehold policy of Title Insurance in form acceptable to Tenant in the amount of ~~an amount not less than~~ One Million Dollars ($1,000,000.00) showing that Landlord's title is as herein represented, (b) an as-built survey by a licensed surveyor of the land described in Parcel A of Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement executed by the fee owner of the demised premises wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such fee owner unless and until Tenant

"Cure Period" shall mean, for any default in the payment of money, seven (7) days after notice from Tenant. For any ~~other~~ default, "Cure Period" shall mean thirty (30) days after notice from Tenant; provided, in all instances, Landlord shall commence to remedy such default in ten (10) business days after receipt of notice from Tenant and provided further that if such default cannot be reasonably remedied within such thirty (30) day period, "Cure Period" shall mean such time as shall be reasonably necessary to remedy such default.

shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

Mortgage Subordination

28. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.



D INSERT PARAGRAPH ~~E~~ OF ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

Tenant Indemnifies Landlord

~~29. During the lease term Tenant shall indemnify and save Landlord and Landlord's ground lessor, if any, harmless against all penalties, or demands of whatsoever nature arising from Tenant's use of the Tenant's buildings except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord or Landlord's ground lessor, if any.~~

Tenant's Right to Cure Landlord's Defaults

30. In the event Landlord shall ~~neglect~~ be in default in any obligation to pay ~~when due any obligations on~~ any sum under any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, and for which Tenant and such mortgagee have not previously executed a non-disturbance agreement or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for the applicable "Cure Period" defined above ~~seven (7) days after notice thereof by Tenant~~, pay said principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the lower rate of eighteen percent (18%) per annum or the highest rate not prohibited by law, and Tenant may to the extent necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

Condition of Premises at Termination

31. At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty. All furniture and trade fixtures installed in ~~said~~ Tenant's buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures ~~(including, but not limited to, air conditioning machinery and lighting fixtures)~~, which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

INSERT PARAGRAPH 31, PAGE 18A

Holding Over

32. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, (and subsequent to receipt by Landlord of notice by Tenant of its intent to remain as tenant), it shall so remain as a tenant, from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect during the term of such month-to-month tenancy except (i) Tenant may not exercise any unexercised option rights and (ii) Tenant shall be obligated to pay Landlord a monthly minimum rental of one and one-quarter (1 1/4) times the amount of monthly annual minimal rental due under Article 3 of this Lease.

31. Upon Landlord's written request to Tenant prior to the expiration of the Lease Term, Tenant shall remove Tenant's improvements, trade fixtures, equipment and apparatus from the Demised Premises at the earlier of the expiration or termination of the Lease Term. Tenant shall be responsible for any and all repairs required to the Demised Premises resulting from the removal of the improvements, trade fixtures, equipment and apparatus.

Investment Tax Credit

~~33. Landlord hereby agrees to elect under the applicable provisions of the Internal Revenue Code, as amended, (hereinafter referred to as the "Code") to pass through to the Tenant all investment tax credit which may be available from time to time in respect of the demised premises under said Code. Landlord agrees to timely execute all documents required by said Code, and regulations issued thereunder, to enable Tenant to obtain such investment tax credit.~~

~~Landlord further agrees to maintain adequate records to enable Tenant to obtain such tax credit and to provide such records to the Tenant upon written request and otherwise to cooperate with Tenant in said matter. Landlord agrees not to destroy or otherwise dispose of such records until written consent to such destruction or disposal has been obtained from Tenant.~~

Notices

34. Notices required under this lease shall be in writing and deemed to be properly served upon notice from Landlord or on receipt thereof if sent by certified or registered mail to Landlord at The Plaza at Biltmore Square, 7620 Market Street, Youngstown, Ohio, 44512 Attention: General Counsel, ~~the last address where rent was paid~~ or to Tenant at its principal office in Troy, Michigan, Attention: Vice President Corporate Facilities or to any subsequent address which Landlord or Tenant, Tenant, shall designate for such purpose. Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service.

Captions and Definitions

35. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provision thereof. The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination. Any reference herein to "demised premises" shall have the same meaning as "Demised Premises" and vice versa.

Successors and Assigns

36. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

Severability

37. If any one or more of the provisions contained herein shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, unenforceability shall not affect any other provision of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

Choice of Law

38. This Lease shall be construed and enforced in accordance with the laws of the State of North Carolina. The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either Landlord or Tenant.

Waiver and Modifications

39. The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the agreements, terms, covenants, conditions or obligations of this lease, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or obligations of this lease or of the right to exercise such right, remedy or election, but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission. This lease may be changed or amended only by a writing signed by the party against whom enforcement thereof is sought.

Memorandum of Lease

40. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days

following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:

BILTMORE PLAZA ASSOCIATES

By: Seven Seas Partnership, General Partner

By:
Its: Partner

John E.A.V. Cecil

Partner

George H.V. Cecil

By: Asheville Plaza Associates, General Partner

By:
Its:

By: Crown American Corporation, General Partner

Attest: Assistant Secretary

By:
Its: Executive Vice President
Nicholas O. Antonazzo

K MART CORPORATION

By: Vice President

Attest: Assistant Secretary

ACKNOWLEDGMENTS

STATE OF OHIO
COUNTY OF MAHONING

BEFORE ME, a Notary Public, in and for said County and State, personally appeared the above-named BILTMORE SQUARE ASSOCIATES, a partnership, by its partner, DeBARTOLO ASHEVILLE ASSOCIATES, a partnership, by Edward J. DeBartolo and ______________, being duly authorized to act for said partnership and acknowledged that they did sign the foregoing instrument and that the same is their free and voluntary act and deed and is the free and voluntary act and deed of the partnership.

IN TESTIMONY WHEREOF, I have set my hand and official seal this 7th day of March, 1991.

Denise A. Leson
Notary Public

**DENISE A. LESON**
**Notary Public, State of Ohio**
**My Commission Expires 10/16/95**

STATE OF NORTH CAROLINA
COUNTY OF BUNCOMBE

BEFORE ME, a Notary Public, in and for said County and State, personally appeared the above-named BILTMORE SQUARE ASSOCIATES, a partnership, by its partner, SEVEN SEAS PARTNERSHIP, a partnership, by George H.V. Cecil and ______________, being duly authorized to act for said partnership and acknowledged that they did sign the foregoing instrument and that the same is their free and voluntary act and deed and is the free and voluntary act and deed of the partnership.

IN TESTIMONY WHEREOF, I have set my hand and official seal this 5th day of March, 1991.

KAREN LEONARD NOTARY PUBLIC BUNCOMBE COUNTY, NC

Karen Leonard
Notary Public
comm. expires 3-31-92

ACKNOWLEDGMENTS

STATE OF PENNSYLVANIA
COUNTY OF CAMBRIA

BEFORE ME, a Notary Public in and for said County and State, personally appeared the above-named BILTMORE SQUARE ASSOCIATES, a partnership, by its partner CROWN AMERICAN CORPORATION, by NICHOLAS O. ANTONAZZO, its Exec. V.P., and DENNIS J. KOVACH, its Asst. Secretary who acknowledged that they did sign and seal the foregoing instrument for and on behalf of said corporation, by authority of its Board of Directors, and that the same is the free act and deed of said corporation, and the free act and deed of each of them personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal, at Johnstown, Pennsylvania, this 1st day of March, 1991.

June J. Furman
Notary Public

NOTARIAL SEAL
JUNE J. FURMAN, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Sept. 26, 1991

STATE OF MICHIGAN
COUNTY OF OAKLAND

I do hereby certify that on this 27th day of March, 1991, before me, Marilyn J. Thomas, a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared Michael L. Skiles and Charles E. Lotzer Jr., known to me to be the Vice President and Assistant Secretary of K MART CORPORATION, who, being by me duly sworn, did depose and say that they reside in Rochester and Birmingham, Michigan respectively; that they are the Vice President and Assistant Secretary respectively of K MART CORPORATION, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

IN WITNESS THEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Marilyn J. Thomas
Notary Public

MARILYN J. THOMAS
Notary Public, Oakland County, Mich.
My Commission expires: My Commission Expires January 10, 1994

#147
2-13-91
REF. DWG. 2

EXHIBIT "A"

PARCEL "A"

THE PLAZA AT BILTMORE SQUARE
K MART DEMISED PREMISES
8.900 ACRES

Lying and being in Lower Hominy Township, Buncombe County, North Carolina and being the same property conveyed to Seven Seas Partnership as described in Deed Book 1459 Page 396 as recorded in the office of the Register of Deeds for Buncombe County, North Carolina and being more particularly described as follows:

BEGINNING on a concrete monument with N.C. Grid coordinates NAD 1927 of Northing = 666405.554 Easting = 928406.281 said concrete monument also being the beginning corner of the property conveyed to N.C.N.B. National Bank of North Carolina as described in Deed Book 1454 Page 628 as recorded in the office of the Register of Deeds for Buncombe County; thence from said beginning S 17° 40' 34" W with the West line of said N.C.N.B. National Bank property a distance of 845.94 feet to a point on the southerly right-of-way line of Sardis Road, said point also being the principal point and place of beginning of the following description:

Thence continuing along said west line S 17° 40' 34" W a distance of 642.07 feet to a concrete monument; thence N 84° 25' 40" W a distance of 351.63 feet to a point; thence N 19° 21' 06" E a distance of 210.96 feet to a point; thence N 13° 16' 57" W a distance of 88.97 feet to a point; thence N 70° 38' 54" W a distance of 297.74 feet to a point; thence N 19° 21' 06" E a distance of 98.75 feet to a point; thence N 70° 38' 54" W a distance of 69.88 feet to a point; thence N 19° 21' 06" E a distance of 314.84 feet to a point on the aforementioned southerly line of Sardis Road; thence along said southerly line 32.60 feet along an arc to the right having a radius of 1087.58 feet and a chord of 32.60 feet bearing S 71° 30' 25.2" E; thence continuing along said southerly line S 70° 38' 54" E a distance of 527.61 feet to a point; continuing along said southerly line 180.57 feet along an arc to the left having a radius of 632.70 feet and a chord of 179.96 feet bearing S 78° 49' 28" E to the point of beginning and containing 8.900 acres of land more or less.

#114
2-9-89
REF. DWG. 2
REV. 4/12/90
REV. 2-13-91

EXHIBIT "A"

PARCEL "B"

THE PLAZA AT BILTMORE SQUARE
ENTIRE DEVELOPMENT
16.543 ACRES

Lying and being in Lower Hominy Township, Buncombe County, North Carolina and being the same property conveyed to Seven Seas Partnership as described in Deed Book 1459 Page 396 as recorded in the office of the Register of Deeds for Buncombe County, North Carolina and being more particularly described as follows:

BEGINNING on a concrete monument with N.C. Grid coordinates NAD 1927 of Northing = 666405.554 Easting = 928406.281 said concrete monument also being the beginning corner of the property conveyed to N.C.N.B. National Bank of North Carolina as described in Deed Book 1454 Page 628 as recorded in the office of the Register of Deeds for Buncombe County; thence from said beginning S 17° 40' 34" W with the West line of said N.C.N.B. National Bank property a distance of 845.94 feet to a point on the southerly right-of-way line of Sardis Road, said point also being the principal point and place of beginning of the following description:

Thence continuing along said west line S 17° 40' 34" W a distance of 642.07 feet to a concrete monument; thence N 84° 25' 40" W a distance of 706.63 feet to a point; thence S 89° 32' 56" W a distance of 247.65 feet to a point on the future easterly right-of-way line of Brevard Road (N.C. Highway 191); thence along said future easterly line 283.84 feet along an arc to the right having a radius of 5689.08 feet and a chord of 283.81 feet bearing N 01° 32' 42.3" E; continuing along said future easterly line N 06° 03' 43.2" E a distance of 303.74 feet to a point; thence continuing along said future easterly line N 08° 01' 43.1" E a distance of 62.63 feet to a point; thence S 83° 26' 58.5" E a distance of 242.00 feet to a point; thence N 06° 33' 01.5" E a distance of 179.04 feet to a point on the aforementioned southerly line of Sardis Road; thence along said southerly line 168.05 feet along an arc to the right having a radius of 1087.58 feet and a chord of 167.88 feet bearing S 75° 04' 29.4" E; thence continuing along said southerly line S 70° 38' 54" E a distance of 527.61 feet to a point; continuing along said southerly line 180.57 feet along an arc to the left having a radius of 632.70 feet and a chord of 179.96 feet bearing S 78° 49' 28" E to the point of beginning and containing 16.543 acres of land more or less.

EXHIBIT C

WEINBERG AND GREEN
RECEIVED 1/24/90

K MART CORPORATION
INTERNATIONAL HEADQUARTERS
3100 WEST BIG BEAVER RD.
TROY, MICHIGAN 48084

January 9, 1990
"Express Mail"

The Edward J. DeBartolo Corporation
7620 Market Street
P.O. Box 3287
Youngstown, Ohio 44512-6085

Attention: Mr. William D. Kutlick

Re: K mart #3886 - Asheville, NC
SWC Brevard & I-26

Dear Mr. Kutlick:

Under my cover letter of January 6, 1989, we did forward to you two (2) sets of Typical Criteria Drawings and Outline Specifications, identified with the set number K-0370, for a 86,479 sq. ft. K mart. Since that time it has been determined that the size of the K mart store will be changed. We, therefore, ask that you consider all plans, specifications, the Preliminary Layout and information furnished you under my cover letter of January 6, 1989 to be Null and Void.

At the request of Mr. W. J. Moreland of our Real Estate Department, we are forwarding to you two (2) new sets of Typical Criteria Drawings and Outline Specifications identified, as before, with the set number K-0370, covering our minimum requirements for the construction of a K mart.

The Typical K mart Criteria Drawings and Specifications consist of the following:

104,231 sq. ft. K mart dated December 22, 1989 (Series 37)

SD-1 | M-1G thru M-4G
L-1, I-1 | P-1G thru P-4G
A-1 thru A-12 | E-1 thru E-12

Outline Specifications dated December 22, 1989.

Please Note:
1. Site irrigation is required at this location.

SITE DEVELOPMENT

The K mart Corporation shall be party to the initial site development decisions. To enable the K mart Corporation to properly evaluate the site conditions and have a meaningful input in these major decisions, the Developer shall submit to the K mart Corporation, in written and drawing form, a description of his proposed preliminary site development design.

SITE DEVELOPMENT (Continued)

The site development design shall encompass all aspects of the proposed K mart operation i.e. access, site drainage and the relationship of the K mart floor elevation to adjacent grades, roads and buildings. Land balance shall be given consideration but shall not be the overriding factor in the ultimate site design.

Preparation of final engineering drawings or commitments affecting site improvements and development shall not be made by the Developer until approval has been granted by the K mart Corporation.

The design package shall indicate the proposed building location, floor elevation, site drainage pattern and utilities. The design package shall also include a topographical survey of the entire site including an area extending approximately 150' onto all adjacent properties and to the centerline of all boundary roads, or as may be required to determine any adjacent terrain conditions which might influence the site development design. The survey shall also include the site description, measurements and all existing utilities. Preliminary test boring reports indicating the sub-surface soil conditions shall also be submitted.

The K mart Corporation will review all submitted data and if necessary, visit the site. If in the judgement of the K mart Corporation the proposed site development design would be detrimental to the K mart operation, the design will be returned to the Developer for re-study. Upon approval of the Site Development Design by the K mart Corporation, the Developer may proceed with final engineering drawing.

BUILDING DESIGN DEVELOPMENT

The K mart Corporation shall be party to the initial design phase of the K mart building exterior in order to ensure its compatability with the entire development. The K mart exterior can be modified to achieve this requirement. However, the economy of the design concept should be preserved.

The Developer shall submit to the Tenant's Design Division two (2) sets of preliminary design presentation drawings depicting the total project. The drawings shall include elevations, sections, dimensions and indicate proposed materials. A sample board of the proposed materials shall be submitted.

The submittal shall be made and Tenant's approval shall be obtained prior to the start of Construction Documents.

The checking and approval of the Contract Documents will not be processed without the compliance of the above.

These drawings and specifications describe an 104,231 sq. ft. K mart with the Garden Shop to the right. At this location, however, the K mart is opposite hand. We are including a Preliminary Layout #K-0370, dated January 6, 1990, for this size and hand store. This drawing also indicates any required modifications to the Typicals for this specific location.

We wish to re-direct your attention to paragraph 8 - SIGN APPROVALS as contained in the Criteria Specifications on page 1A-6 as follows:

8. SIGN APPROVALS

8.01 Landlord shall, at Landlord's expense, make every reasonable effort to procure the necessary governmental approval or variances, if required, for the erection and installation of the Tenant's exterior signs, herein specified. Said sign approvals shall be aggressively pursued simultaneously and with equal diligence accorded the general building permit application. If at any time opposition or objections are raised to the requested signs which indicate permits may be denied, Landlord shall promptly advise Tenant in writing.

A. Tenant's sign erector shall obtain the sign permit.

Please be advised that identification of K mart (Signing) is approved for the shopping center Pylon Sign.

Please advise your consultants regarding the following utilities, services, and the supplemental mechanical/electrical information which augments the enclosed drawings/specifications for the above mentioned location:

Secondary electric service from Carolina Power & Light is acceptable. Power factor correction is not required unless energy conservation codes in effect require improvement.

Uninterruptible natural gas shall be utilized for space heating and other equipment where specified in the Criteria Documents. Two pounds (2 psi) gas pressure may not be available from Public Service Company of North Carolina. Building gas piping size changes within the building and deletion of gas regulators must be coordinated with utility if the 2 psi gas at the meter outlet is not available. Coordinate gas pressure shown on the mechanical drawings with the gas utility. In the event that natural gas is not available as required at this site, Landlord shall advise K mart Corporation, Energy Systems immediately.

Provide one (1) meter for each utility to the K mart.

All public utilities (including the sprinkler system) for other co-tenant facilities, shall be separate and completely independent from the K mart and shall be provided by the Landlord.

The parking lot lighting and service drive lighting shall be on Landlord's separate meter and separate electric service. Landlord shall re-bill appropriate charges for the K mart area to K mart Corporation.

Landlord's Engineer shall consult the telephone company relative to proper facilities, including conduit, to handle the telephone installation.

The following features shall be incorporated into the design:

1. Stockroom air conditioning, per Criteria requirements, is not required.

Please be advised that our insurance underwriter is:

Protection Mutual Insurance Company
17330 Preston Road
Suite 200C
L.B. 436 & 442
Dallas, Texas 75252
Contact: Mr. G. Charles Striemer
Phone: (214) 931-7650

Direct any inquiries to the listed individual at the above address.

These sets of Typical plans and specifications are to be used only as a guide for the preparation of complete working drawings and specifications and as such are not intended, nor will their use be permitted, for construction purposes.

This project has been assigned a number (#3886) and you are at liberty to proceed with your site development design package and contract drawings and specifications. Please notify the writer of the names and addresses of your Architect and Engineers within thirty (30) days of projected date of completion of contract drawings and specifications. Also please notify Mr. C. E. Strom, Manager, Building Division, of the names and addresses of your Contractors as soon as possible.

Please Note: K mart Corporation requires that the Developer's Architects submit the contract drawings and specifications at least sixty (60) days before the start of construction.

Very truly yours,

Stephen K. Li, A.I.A.
Manager, Design Division
Construction Department

SKL:cm
cc: Mr. J. M. Vachon
Mr. C. E. Strom
Mr. W. J. Moreland
Mr. D. L. Dayne
Energy Systems
4T/61-64