**Exhibit "A"**

 **Procopio**®

PROCOPIO
525 B Street
Suite 2200
San Diego, CA 92101
T. 619.238.1900
F. 619.235.0398

GERALD P. KENNEDY
P. 619.515.3239
gerald.kennedy@procopio.com

AUSTIN
DEL MAR HEIGHTS
PHOENIX
SAN DIEGO
SILICON VALLEY

April 8, 2019

**VIA FEDEX**
Sears, Roebuck and Co. Claims Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, Suite 412
Brooklyn, NY 11232

Re:     *In re Sears Holdings, et al.*
        U.S. Bankruptcy Court, Southern District of New York Case No. 18-23538 (RDD)

Dear Sir/Madam:

    Pursuant to the order establishing deadline to file proofs of claim and procedures relating thereto entered in the above-referenced bankruptcy on February 22, 2019 [Dkt. No. 2676], enclosed please find the Proof of Claim filed on behalf of MCS Hemet Valley Center LLC with enclosures in the Sears, Roebuck and Co. bankruptcy (18-235437).

    Please provide our office with written confirmation of your receipt of the Proof of Claim filed on behalf of MCS Hemet Valley Center LLC.  If you have questions concerning the attached, please contact the undersigned.

Sincerely,

Gerald P. Kennedy

GPK:as
Enclosures

cc:     Daniel Weiss (*w/enclosure via electronic mail*)

**procopio.com**

DOCS 102197-000078/3598352.1

## UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | | |
|---|---|---|---|---|
| Sears Holdings Corporation (18-23538) | Kmart Corporation (18-23549) | Sears, Roebuck de Puerto Rico, Inc. (18-23561) | MyGofer LLC (18-23573) | Kmart.com LLC (18-23585) |
| ✓ Sears, Roebuck and Co. (18-23537) | MaxServ, Inc. (18-23550) | SYW Relay LLC (18-23562) | Sears Brands Business Unit Corporation (18-23574) | Sears Brands Management Corporation (18-23586) |
| Kmart Holding Corporation (18-23539) | Private Brands, Ltd. (18-23551) | Wally Labs LLC (18-23563) | Sears Holdings Publishing Company, LLC (18-23575) | SHC Licensed Business LLC (18-23616) |
| Kmart Operations LLC (18-23540) | Sears Development Co. (18-23552) | Big Beaver of Florida Development, LLC (18-23564) | Kmart of Michigan, Inc. (18-23576) | SHC Promotions LLC (18-23630) |
| Sears Operations LLC (18-23541) | Sears Holdings Management Corporation (18-23553) | California Builder Appliances, Inc. (18-23565) | SHC Desert Springs, LLC (18-23577) | SRe Holding Corporation (19-22301) |
| ServiceLive, Inc. (18-23542) | Sears Home & Business Franchises, Inc. (18-23554) | Florida Builder Appliances, Inc. (18-23566) | SOE, Inc. (18-23578) | |
| A&E Factory Service, LLC (18-23543) | Sears Home Improvement Products, Inc. (18-23555) | KBL Holding Inc. (18-23567) | StarWest, LLC (18-23579) | |
| A&E Home Delivery, LLC (18-23544) | Sears Insurance Services, L.L.C. (18-23556) | KLC, Inc. (18-23568) | STI Merchandising, Inc. (18-23580) | |
| A&E Lawn & Garden, LLC (18-23545) | Sears Procurement Services, Inc. (18-23557) | Sears Protection Company (Florida), L.L.C. (18-23569) | Troy Coolidge No. 13, LLC (18-23581) | |
| A&E Signature Service, LLC (18-23546) | Sears Protection Company (18-23558) | Kmart of Washington LLC (18-23570) | BlueLight.com, Inc. (18-23582) | |
| FBA Holdings Inc. (18-23547) | Sears Protection Company (PR) Inc. (18-23559) | Kmart Stores of Illinois LLC (18-23571) | Sears Brands, L.L.C. (18-23583) | |
| Innovel Solutions, Inc. (18-23548) | Sears Roebuck Acceptance Corp. (18-23560) | Kmart Stores of Texas LLC (18-23572) | Sears Buying Services, Inc. (18-23584) | |

# Proof of Claim

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

**Part 1:** **Identify the Claim**

| | |
|---|---|
| 1. **Who is the current creditor?** | MCS Hemet Valley Center LLC |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |

| | |
|---|---|
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |

| | | |
|---|---|---|
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>MCS Hemet Valley Center LLC<br>c/o Gerald P. Kennedy<br>Procopio, Cory, Hargreaves & Savitch LLP<br>525 B Street, Suite 2200<br>San Diego, CA  92101 | Where should payments to the creditor be sent? (if different)<br><br>MCS Hemet Valley Center LLC<br>c/o Daniel Weiss<br>MC Strauss<br>990 Highland Drive, Suite 200<br>Solana Beach, CA  92075 |
| | Contact phone  619-238-1900<br>Contact email  gerald.kennedy@procopio.com | Contact phone  858-792-7500<br>Contact email  dweiss@mcstraussco.com |

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known)_____          Filed on ___/___/___  MM / DD / YYYY |

| | |
|---|---|
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

**Part 2:**   **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☐ No<br>☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  _2_  _0_  _2_  _8_ |
| 7. How much is the claim? | $_____ 47,129.07  **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Rent, CAM, taxes & insurance for Store #2028, 22 W. Florida Ave    Hemet, CA  92545 |
| 9. Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**                              $_____<br><br>**Amount of the claim that is secured:**      $_____<br><br>**Amount of the claim that is unsecured:** $_____(The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**     $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |
| 10. Is this claim based on a lease? | ☐ No<br>☑ Yes. **Amount necessary to cure any default as of the date of the petition.**     $_____ 47,129.07 |
| 11. Is this claim subject to a right of setoff? | ☐ No<br>☐ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ❏ No<br>☑ Yes. *Check one:* | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ❏ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ❏ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ❏ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ❏ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ❏ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. ** | $ 6,433.17 |

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.
** Stub rent due for 10/13/19-10/31/19 Under 11 USC § 503(b)(1)

| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)? | ❏ No<br>❏ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | $_____ |
|---|---|---|

---

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it.
FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

❏ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
❏ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
❏ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/08/2019   (mm/dd/yyyy)

Signature

Print the name of the person who is completing and signing this claim:
Name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Gerald P. Kennedy | | |
| | First name | Middle name | Last name |
| Title | Partner | | |
| Company | Procopio, Cory, Hargreaves & Savitch LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 525 B Street Suite 2200 | | |
| | Number          Street | | |
| | San Diego | CA | 92101 |
| | City | State | ZIP Code |
| Contact phone | 619-238-1900 | Email gerald.kennedy@procopio.com | |

| MCS HEMET VALLEY MALL | *Revised* |
| SEARS | *04/08/19* |
| PRE PETITION/POST PETITION BALANCE DUE | |

**PRE-PETITION:**

| | |
|---|---|
| 2017 Property Tax (CAM Parking) | |
| 2nd 1/2 2016/2017 + 1st 1/2 2017/2018 | 23,154.81 |
| 2017 CAM Expense | |
| Expense CAP (.35 x 86,143rsf) | 30,150.05 |
| Less payments on account: | (25,842.96) |
| ***SUBTOTAL 2017 CAM EXPENSE DUE:*** | *27,461.90* |
| | |
| 2018 Property Tax (Store Parcel) 448420003-3 | |
| 1st 1/2 2018/2019  $45,970.69  prorated 07/01/18 - 10/14/18 | -      *Paid 12/3/18* |
| | |
| 2018 Property Tax (CAM Parking) | |
| 2nd 1/2 2017/2018 + Prorated 1st 1/2 2018/2019 | 18,241.27 |
| | |
| 2018 CAM Expense | |
| Expense CAP (.35 x 86,143rsf) prorated 01/01/18 - 10/14/18 | 23,707.03 |
| TOTAL PREPETITION EXPENSE | 41,948.30 |
| Less payments on account: | (28,714.30) |
| ***SUBTOTAL 2018 PREPETITION BALANCE DUE*** | *13,234.00* |
| | |
| **TOTAL PREPETITION BALANCE DUE** | **40,695.90** |

**POST-PETITION:**

| | |
|---|---|
| Property Tax (Store Parcel) 448420003-3 | |
| 1st 1/2 2018/2019  $45,970.69  prorated 10/15/18 - 12/31/18 | -      Paid 12/3/18 |
| | |
| Property Tax (CAM Parking) | |
| Prorated 1st 1/2 2018/2019 10/15/18 - 12/31/18 | 4,895.18 |
| | |
| CAM Expense | |
| Expense CAP (.35 x 86,143rsf) prorated 10/15 - 10/21/18 | 578.22 |
| Expense CAP (.40 x 86,143rsf) prorated 10/22 - 12/31/18 | 6,702.63 |
| TOTAL POST-PETITION BALANCE DUE | 12,176.03 |
| Less payments on account: | (5,742.86) |
| **TOTAL POST-PETITION BALANCE DUE** | **6,433.17** |
| | |
| **Grand total both pre-petition and post-petition** | **47,129.07** |

| | | |
|---|---|---|
| Sears store Parcel 1st 1/2 | - | *Due 12/10/18  PAID* |
| Sears store Parcel 2nd 1/2 | - | *Reported as paid 04/04/19* |
| | - | |

## SEARS HOLDINGS CORPORATION

Gwen A. Sandstrom
Paralegal Manager- Real Estate
Sears Holdings Corporation
3333 Beverly Rd., BC 117-B
Hoffman Estates, Illinois 60179
Phone: (847) 286- 4739
Fax: (847) 286-3803
Email: *gwen.sandstrom@searshc.com*

August 21, 2013

Ms. Shella Lizardi
MC Strauss Co.
2200 W. Florida Ave.
Suite 300
Hemet, CA 92545

> Re:  Shopping Cart Containment Agreement between MCS Hemet Valley Center, LLC
> ("Landlord") and Sears, Roebuck and Co. ("Sears")

Dear Shella:

In accordance with your recent correspondence with Carey Quintanilla, Store Manager at Sears' Hemet, CA location, enclosed are two original Shopping Cart Containment Agreements which have been executed by Sears.

Please have both copies executed by the appropriate individual on behalf of the Landlord and return one fully-executed original to me for our records.

Thank you for your assistance in this matter. Please do not hesitate to contact Ms. Quintanilla or me with any questions.

Very truly yours,

Gwen A. Sandstrom
Paralegal Manager

cc: Carey Quintanilla (via email)

RECEIVED
AUG 2 6 2013
HEMET VALLEY MC

## SHOPPING CART CONTAINMENT AGREEMENT

This Shopping Cart Containment Agreement (the "Agreement") is made and effective as of
_____, 2013 ("Effective Date") by and between SEARS, ROEBUCK AND CO., a New York
corporation (the "Tenant") and MCS HEMET VALLEY CENTER, LLC. a limited liability company (the
"Owner"). The Tenant and the Owner may be referred to individually as a "Party" or collectively as
the "Parties."

### RECITALS

WHEREAS, Tenant is the tenant under that certain Ground Lease made and entered into with
Donahue Schriber Realty Group, L.P. as Landlord, on the 20th day of November, 1997 (the "Lease") for
the premises located at the Property (as defined below), and Owner is the Landlord as successor in
interest to Landlord under the Lease; and

WHEREAS, the Owner is the current owner of the Property (as defined below); and

WHERAS, the Tenant wishes to perform the Work (as defined below) on the Property in order to
install a shopping cart containment system (the "System"); and

WHEREAS, each Party is duly authorized and capable of entering into this Agreement.

NOW THEREFORE, in consideration of the above recitals and the mutual promises and benefits
contained herein, the Parties hereby agree as follows:

1. SCOPE OF WORK.

   A. The Tenant shall furnish all of the necessary materials, tools, machinery, supervision,
   and site security and perform all of the work related to the System (the "Work"), all in
   accordance with the terms of this Agreement. Tenant intends to hire an independent
   contractor to perform the Work. The Work shall be performed on that certain
   property commonly known as Hemet Valley Mall located at 2200 W. Florida Ave.,
   Hemet, CA 92545 (the "Property"). The Tenant agrees that it and its contractor will
   perform the services and provide the materials for which it is responsible, and will
   accomplish this Work in the manner and in the time stated herein. The Work will be
   completed in accordance with the drawings and specifications which will be provided
   to Owner prior to commencement of Work. The drawings and specifications will
   include a site plan, showing the location of the perimeter of the system and of all signs
   to be installed in connection with the System.

   Commencement of the Work is contingent upon, and shall not commence prior to
   receiving, Owner's written approval of the drawings and specifications. Tenant shall,
   or shall cause, repair of any damage to the Property during, or as a result of, the Work,
   all at Tenant's sole expense. Such repair shall include, but shall not be limited to,
   filling in or otherwise appropriately covering any cuts or other intrusions made in the
   parking lot surface or sidewalks or elsewhere done in order to install the Work. Such
   restoration shall be made to the condition existing prior to the making of such cuts or
   intrusion or such damage. Further, Tenant shall be responsible for the repair of any

underground utilities that may be impacted by the Work, including any damages that
may result therefrom.

B. After the installation of the System, Tenant shall be responsible, at Tenant's sole cost,
   to maintain and repair the Work in good workmanlike condition, including signs,
   throughout the term of the Lease, as such may be extended between the Parties.

2. TIME OF COMPLETION.

The Parties agree that time is of the essence and that the Work to be performed under this
Agreement shall therefore start on or before September 1, 2013 and shall be substantially completed
on or before October 30, 2013. The Work will take place with advance notice to Owner and will occur
during non-peak business hours to the extent possible. Owner and Property Manager (as defined
below) shall be provided with reasonable advance notice of the schedule of installation of the Work.

3. LICENSES AND PERMITS.

The Tenant shall comply with all state and local licensing and registration requirements for the type of
work performed. The Tenant shall obtain and, as its expense, pay for any and all licenses or permits
required by law to accomplish any Work required in connection with this Agreement, agrees to hold
the Owner harmless for any violations, and shall accordingly indemnify the Owner in accordance with
Section 6 hereof.

4.    TERM.

The term of this Agreement shall commence upon the date that the Agreement shall have been fully
executed by all parties hereto, and shall expire concurrently with the expiration of the term of the
Lease, as such may be extended or sooner terminated by its terms.

5. REPRESENTATIONS AND WARRANTIES.

(a) The Parties each hereby represent and warrant as follows:

(1) Each Party has full power, authority, and right to perform its obligations under the
    Agreement.

(2) Entering into this Agreement will not violate the charter or bylaws of either Party or
    any material contract to which that Party is also a party.

(3) The drawings and specifications of the Work will be provided to Owner by Tenant in
    advance of the commencement of the Work.

(4) Tenant will engage a licensed contractor ("Contractor") to perform the Work.
    Tenant must fully pay any such Contractor and, in all instances, will remain
    responsible for the completion of this Agreement and the Work. Tenant shall not
    permit any liens by Tenant's Contractor or subcontractors to be placed on the
    Property. In the event any liens are placed on the Property in connection with the
    Work, Tenant shall immediately have them removed, including recording of a

satisfaction of lien, by payment in full or by purchasing a bond for credit to Owner in the amount of 125% of the amount of the lien.

(b) The Tenant hereby represents and warrants as follows:

    (1) The Work shall be performed in a workman-like manner, according to standard industry practices and in compliance with all building codes and other applicable laws; provided, however, that if other standards or requirements are set forth in any attached plans and specifications, those other standards or requirements shall control.

    (2) The Work shall be performed by individuals duly licensed and authorized by law to perform said work, to the extent required by law.

    (3) The Tenant warrants that it is adequately insured for injury to its employees and others incurring loss or injury as a result of the acts of the Tenant or its employees or Contractor, including appropriate amount of Workers' Compensation Insurance, and shall provide the Owner with proper certificates of insurance. The Tenant acknowledges that it is solely responsible for providing insurance coverage for itself and its staff. Tenant shall also ensure that Contractor has appropriate amounts of Workers' Compensation Insurance prior to the commencement of the Work.

    (4) The Tenant shall obtain all necessary approvals from local authorities or other statutory bodies concerned for the Work prior to the commencement of the Work and shall hold the Owner harmless for any violations and accordingly indemnify the Owner in accordance with Section 6 hereof.

    (5) The Tenant shall obtain insurance to protect itself and Owner against claims for property damage, bodily injury, or death due to its performance under this Agreement. Tenant shall ensure that Contractor has adequate amounts of general liability Insurance consistent with the amounts contained in the Insurance section below.

(c) The Owner hereby represents and warrants as follows:

    (1) The Owner is the registered owner of the Property.

    (2) The Owner shall provide such other assistance to the Tenant, at no cost to Owner as Owner deems reasonable and appropriate.

6.    WAIVER OF LIABILITY.

If the Tenant or Tenant's Contractors or subcontractors are injured while performing the work specified under this Agreement, Tenant shall ensure that the Owner and Owner's property management personnel ("Property Manager"), are exempt from liability for those injuries to the fullest extent allowed by law.

DM#432507_v3_Hemet_CA_S#2028_Shopping_Cart_Containment_Agreement

### 7.    INDEMNIFICATION.

The Tenant shall indemnify and hold harmless the Owner (including Owner's members, officers and employees) and Property Manager (and its shareholders, officers and employees), if any from and against any and all damages, liabilities, costs, expenses, claims, and/or judgments, including, without limitation, reasonable attorneys' fees and disbursements that any of them may suffer from or incur and that arise or result primarily from (i) any negligence or willful misconduct of the Tenant arising from or connected with Tenant's performance of its duties under this Agreement, or (ii) the Tenant's breach of any of its obligations, agreements, or duties under this Agreement.

### 8.    TERMINATION.

This Agreement may be terminated:

(a) By either Party for a material breach of any provision of this Agreement by the other Party, if the other Party's material breach is not cured within 10 days of receipt of written notice thereof.

(b) By the Owner, if the Tenant defaults or persistently fails or neglects to carry out the Work or fails to perform any provision of the Agreement after 10 days' written notice to Tenant.

(c) By the Owner at any time and without prior notice, if the Tenant is convicted of any crime of offense, fails or refuses to comply with the written policies or reasonable directives of the Owner, or is guilty of serious misconduct in connection with performance under this Agreement.

Upon termination of the Agreement as set forth above, or at such time as the term of the Agreement expires per Section 4 hereof, Tenant shall promptly remove the System and all associated signage and equipment. Tenant shall repair any damage to the Property caused by the removal of the System, its signage and/or equipment.

### 9.    ACCESS TO WORK.

The Owner, the Owner's representatives, and public authorities shall at all times have access to the Work.

### 10.    INSURANCE COVERAGE.

Prior to commencement of the Work, and notwithstanding anything contained or implied to the contrary in this Agreement, Tenant shall submit to Owner satisfactory proof that Tenant has purchased (or has in effect ) a comprehensive general liability insurance policy coving all aspects of its activities under this Agreement (including, without limitation, coverage for product liability and workers' compensation) in amounts of not less than $1,000,000 for personal injury and property damage, or in such other amounts as the Owner may reasonably request. Tenant shall maintain such insurance policies in full force and effect throughout the term of the Lease. Each such insurance policy shall (i) be issued by an insurance company satisfactory to Owner in the reasonable exercise of its discretion; and (ii) name Owner and Property Manager as an additional insured, including endorsements required to effect such naming.

DM#432507_v3_Hemet_CA_S#2028_Shopping_Cart_Containment_Agreement

### 11.    SIGNAGE.

Appropriate and professionally made signage for the System will be (i) subject to the laws, codes and ordinances of any governmental agency having jurisdiction thereon, and (ii) reasonably approved by Owner in advance of installation of the System, and such signage will be professionally installed and maintained at Tenant's sole expense.

### 12.    ASSIGNMENT.

The rights and the duties of the Tenant under this Agreement are personal, and may not be assigned or delegated without the prior written consent of the Owner. The Owner may assign its rights and duties under this Agreement with the prior written consent of the Tenant.

### 13.    SUCCESSORS AND ASSIGNS.

All references in this Agreement to the Parties shall be deemed to include, as applicable, a reference to their respective successors and assigns. The provisions of this Agreement shall be binding on and shall inure to the benefit of the successors and assigns of the Parties.

### 14.    NO IMPLIED WAIVER.

The failure of either Party to insist on strict performance of any covenant or obligation under this Agreement, regardless of the length of time for which such failure continues, shall not be deemed a waiver of such Party's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation under this Agreement shall constitute a consent or waiver to or of any other breach of default in the performance of the same or any other obligation.

### 15.    NOTICE.

Any notice or other communication provided for herein or given hereunder to a party hereto shall be in writing and shall be given in person, by overnight courier, or by mail (registered or certified mail, postage prepaid, return receipt requested) to the respective party as follows:

If to the Owner:

Michael Rubin
MCS Hemet Valley Center LLC
990 Highland Drive – Suite 200
Solana Beach, CA. 92075

If to Property Manager:

Hemet Valley Mall
2200 W. Florida Ave. Ste. 200
Hemet, CA 92545
Attn: Property Manager – Hemet Valley Mall

DM#432507_v3_Hemet_CA_S#2028_Shopping_Cart_Containment_Agreement

If to the Tenant:

Copy to:

Sears, Roebuck and Co.
3333 Beverly Road
Department 824 RE
Hoffman Estates, Illinois 60179
Attn: Vice President Real Estate

Sears Roebuck and Co.
2200 W. Florida Ave., Dept. 1
Hemet, CA 92545
Attn: Store Manager
and
Sears, Roebuck and Co.
3333 Beverly Road
Dept. 824RE
Hoffman Estates, Illinois 60179
Attn: Associate General Counsel

### 16.    GOVERNING LAW.

This Agreement shall be governed by the laws of the state of California. In the event that litigation results from or arises out of this Agreement or the performance thereof, the Parties agree to reimburse the prevailing party's reasonable attorneys' fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may entitled.

### 17.    COUNTERPARTS/ELECTRONIC SIGNATURES.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail, or other electronic medium shall have the same force and effect as an original signature.

### 18.    SEVERABILITY.

Whenever possible, each provision of this Agreement, will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal or unenforceable provisions had never been contained herein.

### 19.    ENTIRE AGREEMENT.

This Agreement, constitutes the final, complete, and exclusive statement of the agreement of the Parties with respect to the subject matter hereof, and supersedes any and all other prior and contemporaneous agreements and understandings, both written and oral, between the Parties.

### 20.    HEADINGS.

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

DM#432507_v3_Hemet_CA_S#2028_Shopping_Cart_Containment_Agreement

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written

OWNER

MCS Hemet Valley Center, LLC

By: _____
Name: Michael L. Rubin
Title Chief Operating Officer

TENANT

SEARS, ROEBUCK AND CO.

By: _____
Name: James B. Terrell
Title: Vice President Real Estate

REAL ESTATE
LEGAL

**GROUND LEASE**

between

DONAHUE SCHRIBER REALTY GROUP, L.P.,
a Delaware limited partnership

and

SEARS, ROEBUCK AND CO.,
a New York corporation

## TABLE OF CONTENTS

Page

1.  DEMISE AND LEGAL DESCRIPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

2.  USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

3.  TERM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

4.  OPTION TO RENEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

5.  ON-SITE AND OFF-SITE IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . .    3

6.  LESSEE'S CONTRIBUTION FOR SITE WORK . . . . . . . . . . . . . . . . . . . .    4

7.  CONSTRUCTION OF LESSEE'S STORE BUILDING . . . . . . . . . . . . . . . .    4
    (a)    Lessee's Store Building  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4
    (b)    Construction Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5
    (c)    Conditions of Lessee's Construction  . . . . . . . . . . . . . . . . . . . . . . .    5

8.  RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

9.  TITLE/SURVEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

10. LESSOR'S WARRANTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6
    (a)    Lessor as Owner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6
    (b)    Lessor's Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6
    (c)    Subordination and Non-Disturbance Agreements . . . . . . . . . . . . . . .    6
    (d)    Demised Premises Free From Tenancies/Zoning . . . . . . . . . . . . . . . .    7
    (e)    Quiet Enjoyment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
    (f)    Compliance of Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
    (g)    No Underground Storage Tanks . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
    (h)    Maintenance of Common Areas . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
    (i)    Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
    (j)    Operation of Entire Tract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
    (k)    Development of Entire Tract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
    (l)    Lessor's Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

11. LESSEE'S AND LESSOR'S OPERATING COVENANT . . . . . . . . . . . . . . .    8
    (a)    Lessee's Opening and Operating Covenant  . . . . . . . . . . . . . . . . . . .    8
    (b)    Conditions to Lessee's Operating Covenant . . . . . . . . . . . . . . . . . . .    8
    (c)    Intentionally Omitted  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
    (d)    Lessee's Operation of its Store . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
    (e)    Licensees, Subtenants, Concessionaires . . . . . . . . . . . . . . . . . . . . . .   10

Page

|     | (f) | No Restrictions Outside the Entire Tract | 10 |
|     | (g) | Cessation of Business | 10 |
|     | (h) | Lessor's Operating Covenant | 10 |
|     | (i) | Existing Sears Store | 10 |

12.   MAINTENANCE CONTRIBUTION ........................... 11
      (a)   Initial CAM Charge ............................... 11
      (b)   Periodic Increases in CAM ......................... 11
      (c)   Basis for Calculating CAM ......................... 11
      (d)   Lessor's Performance ............................. 11
      (e)   Self-Help ...................................... 11
      (f)   CAM Defined .................................... 11

13.   DELIVERY OF POSSESSION ............................ 11

14.   LESSOR'S RIGHT OF ENTRY ........................... 12

15.   ASSIGNMENT AND SUBLETTING ....................... 12

16.   ENCUMBRANCE OF LESSEE'S LEASEHOLD INTEREST ...... 12

17.   TAXES AND ASSESSMENTS ............................ 14
      (a)   Real Estate Taxes .............................. 14
      (b)   Lessor's Payment of Taxes ........................ 14
      (c)   Lessee's Payment of Taxes Attributable to the Demised Premises ...... 14
      (d)   Lessee's Payment of Taxes Attributable to the Exterior Common Area .. 15
      (e)   Contesting Taxes ............................... 15
      (f)   Disposition of Rebates/Payment of Costs ............. 16
      (g)   Proration in First and Last Year ................... 16

18.   MARKETING FUND .................................. 16

19.   COMMON AREA MAINTENANCE ....................... 16

20.   REPAIRS AND MAINTENANCE OF DEMISED PREMISES ..... 18

21.   ALTERATIONS/SIGNS ................................ 18
      (a)   Alterations, Improvements and Chances Permitted ..... 18
      (b)   Disposition of New Improvements .................. 19
      (c)   Lessee's Signs ................................. 19

Page

|     | (f) | No Restrictions Outside the Entire Tract | 10 |
|     | (g) | Cessation of Business | 10 |
|     | (h) | Lessor's Operating Covenant | 10 |
|     | (i) | Existing Sears Store | 10 |

12. MAINTENANCE CONTRIBUTION .......................... 11
    (a) Initial CAM Charge ................................. 11
    (b) Periodic Increases in CAM ......................... 11
    (c) Basis for Calculating CAM ......................... 11
    (d) Lessor's Performance .............................. 11
    (e) Self-Help ........................................ 11
    (f) CAM Defined ...................................... 11

13. DELIVERY OF POSSESSION ............................. 11

14. LESSOR'S RIGHT OF ENTRY ............................ 12

15. ASSIGNMENT AND SUBLETTING ......................... 12

16. ENCUMBRANCE OF LESSEE'S LEASEHOLD INTEREST ....... 12

17. TAXES AND ASSESSMENTS ............................. 14
    (a) Real Estate Taxes ................................ 14
    (b) Lessor's Payment of Taxes ........................ 14
    (c) Lessee's Payment of Taxes Attributable to the Demised Premises ...... 14
    (d) Lessee's Payment of Taxes Attributable to the Exterior Common Area .. 15
    (e) Contesting Taxes ................................. 15
    (f) Disposition of Rebates/Payment of Costs .......... 16
    (g) Proration in First and Last Year ................. 16

18. MARKETING FUND .................................... 16

19. COMMON AREA MAINTENANCE ........................... 16

20. REPAIRS AND MAINTENANCE OF DEMISED PREMISES ....... 18

21. ALTERATIONS/SIGNS ................................. 18
    (a) Alterations, Improvements and Chances Permitted ... 18
    (b) Disposition of New Improvements .................. 19
    (c) Lessee's Signs .................................. 19

ii

Page

22.   DAMAGE AND DESTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
      (a)   Demised Premises  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
            (i)    Damage or Destruction of Demised Premises  . . . . . . . . . . . .   19
            (ii)   Damage or Destruction of Demised Premises Occurring Toward
                   End of Lessee's Operating Covenant . . . . . . . . . . . . . . . . . .   19
            (iii)  Election Not to Terminate  . . . . . . . . . . . . . . . . . . . . . . . .   20
      (b)   To the Balance of the Mall  . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
      (c)   General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

23.   UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

24.   LIENS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
      (a)   Lessee's Duty to Keen Premises Free of Liens . . . . . . . . . . . . . . . .   22
      (b)   Contesting Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

25.   INDEMNIFICATION BY LESSOR AND LESSEE  . . . . . . . . . . . . . . . . . .   23
      (a)   Lessor's Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23
      (b)   Lessee's Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

26.   LESSEE'S INSURANCE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

27.   LESSOR'S INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

28.   SUBROGATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

29.   DEFAULTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
      (a)   Lessee's Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
            (i)    Non-Payment of Rent . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
            (ii)   Failure to Meet Other Obligations  . . . . . . . . . . . . . . . . . . .   26
      (b)   Lessor's Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
            (i)    Lessor's Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
            (ii)   Lessee's Performance of Lessor's Obligations . . . . . . . . . . . .   27
      (c)   Equity Proceedings/Reservation of Rights . . . . . . . . . . . . . . . . . .   27
      (d)   Default Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

30.   EFFECT OF EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
      (a)   Total Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
      (b)   Partial Condemnation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
      (c)   Condemnation Award  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

31.   OWNERSHIP OF IMPROVEMENTS ON TERMINATION OF LEASE  . . . . .   29

Page

32. HAZARDOUS MATERIALS ................................. 29
    (a)   Lessor's Representations ........................... 29
    (b)   Lessor's Covenants .............................. 29
    (c)   Lessee's Covenants .............................. 30
    (d)   Hazardous Materials ............................. 32

33. NOTICES ........................................... 32

34. WAIVER ........................................... 33

35. EFFECT OF LESSEE'S HOLDING OVER ...................... 33

36. TRANSFER AND RECORDING TAXES ....................... 33

37. ATTORNEYS' FEES ................................... 34

38. PARTIES BOUND ..................................... 34

39. TIME OF THE ESSENCE ............................... 34

40. BROKER ........................................... 34

41. PRIME RATE ....................................... 34

42. SECTION CAPTIONS .................................. 34

43. REDELIVERY OF PREMISES ............................ 34

44. REMEDIES CUMULATIVE .............................. 35

45. CONSENTS ......................................... 35

46. GOVERNING LAW ................................... 35

47. NO PARTNERSHIP ................................... 35

48. SEVERABILITY ..................................... 35

Ground Lease
Existing Mall

## GROUND LEASE

**THIS GROUND LEASE** (this "Lease") is made and effective as of the 20th day of November, 1997 by and between DONAHUE SCHRIBER REALTY GROUP, L.P., a Delaware limited partnership ("Lessor"), and SEARS, ROEBUCK AND CO., a New York corporation ("Lessee").

### RECITALS/DEFINITIONS

A.     Lessor is the owner of a parcel of land and the improvements located thereon (the "Entire Tract"), which parcel is located in Hemet, California, outlined in black on the site plan attached hereto as Exhibit "A" and made a part hereof (the "Site Plan"). The Entire Tract is approximately 27 acres in size.

B.     Lessor desires to lease to Lessee and Lessee desires to lease from Lessor that part of Entire Tract as identified on the Site Plan and legally described in Exhibit "B" attached hereto and made a part hereof.

C.     The Entire Tract contains a shopping center known as Hemet Valley Mall (the "Mall") containing approximately 252,000 square feet of Gross Leasable Area (the "Entire Tract GLA") of which approximately 61,736 square feet of Gross Leasable Area are in mall shops (the "Mall Shops"); approximately 21,502 square feet of Gross Leasable Area of outparcel buildings ("Outparcel Buildings"); and approximately 84,133 square feet of Gross Leasable Area are leased to department stores ("Department Stores"), as follows: The Harris Company is approximately 50,000 square feet and J.C. Penney Company, Inc. ("Penney") is approximately 34,133 square feet, with a right to expand its store by an additional 26,800 square feet as shown on the Site Plan.

D.     "Common Areas" shall mean all portions of the Entire Tract (both interior and exterior) which may from time to time be available for the general non-exclusive use, convenience and benefit of Lessee, and other tenants and occupants of the Entire Tract. The Common Areas shall include, without limitation, the interior of the Mall and the following, to the extent the same serve more than one occupant: truck ramps, fire corridors, service corridors, loading facilities and docks, all automobile parking areas, access roads, sidewalks (but excluding sidewalks, landscaping and irrigation within the Perimeter Area, as defined herein), traffic lanes, bus stations, taxi stations, parcel pickup areas (including specifically the parking area servicing Lessee's parcel pick up area located within the Demised Premises), entrances and exits from and to public roads, landscaping, restrooms and utility facilities. Common Areas shall include all curbing abutting the Perimeter Area.

E.     "Gross Leasable Area" shall mean the total number of square feet of floor space
       covered and enclosed within a particular store or building which is constructed
       within the permissible building areas of the Entire Tract shown on the Site Plan,
       whether rented or rentable or not, measured to the outside of the exterior walls
       of the store or building, to the center line of party walls and to the exterior of
       walls abutting exit or service corridors, but not including Common Areas,
       exterior open truck docks, outdoor sales area, mall offices or enclosures used
       exclusively for mechanical equipment or non-structural mezzanines.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the
parties agree as follows:

## 1.   DEMISE AND LEGAL DESCRIPTION

Lessor leases to Lessee and Lessee takes from Lessor the Demised Premises as shown
on Exhibit "A" and legally described on Exhibit "B" attached hereto and made a part
hereof, together with all rights, appurtenances, servitudes, charges, easements, rights of
ingress, parking, loading, unloading, licenses and hereditaments thereto.  Lessor further
grants Lessee a non-exclusive easement for parking the vehicles of Lessee, its customers,
employees and business invitees, and for access, use of, ingress and egress for vehicles
and pedestrians in common with the other tenants and occupants of the Entire Tract, over
the Common Areas, including, without limitation, all parking areas, alleys, roadways,
sidewalks, walkways, landscaped areas and surface water drainage systems and for use
of parking lot lighting, all as shown on the Site Plan.  Lessee grants to Lessor, for the
benefit of Lessor and the other tenants and occupants of the Mall, a non-exclusive
easement for the use of the sidewalks within the Perimeter Area, as defined herein, and
the parking area servicing Lessee's parcel pick up area located within the Demised
Premises.

As used herein the terms "Demised Premises" and "Premises" refer to the real property
legally described on Exhibit "B" attached hereto and to the other rights granted to Lessee
hereunder.

## 2.   USE

The Lessee's Store Building, as defined herein, shall be used by Lessee solely for the
sale of all items or services normally sold in Sears Department Stores, and the incidental
servicing and storing of such merchandise, with an attached Auto Center, as defined
herein, to be used for the sale of tires, batteries and other automotive items and services
incidental thereto, specifically excluding the sale of gasoline, and for no other purpose.
Lessee agrees to comply with all Federal, State and governmental laws, rules, regulations
and ordinances applicable to the Demised Premises.

3. **TERM**

(a) The initial Term of this Lease shall commence on the date of this Lease (the "Commencement Date") and end fifty (50) years from the Rent Commencement Date. Notwithstanding the Commencement Date, certain obligations of Lessee shall not commence until the earlier of the date that Lessee opens for business to the public or the day which is three hundred forty-five (345) days after the date that Lessor tenders to Lessee the completed Building Pad for Lessee's Store Building, as defined herein, pursuant to Section 5 below ("Rent Commencement Date"). As used herein, the expressions "Term" and "Term of this Lease" refer to the period of time from the Commencement Date through any duly exercised renewal thereof as hereinafter provided. The parties agree to execute a Supplemental Agreement to memorialize the Rent Commencement Date within thirty (30) days thereafter.

(b) The term "Lease Year" as used in this Lease shall mean each consecutive twelve (12) calendar month period during the Term with the first Lease Year commencing on the first day of the Term if the Term begins on the first day of a calendar month or the first day of the first full calendar month after the first day of the Term if the first day of the Term is not the first day of a calendar month, and each successive Lease Year shall commence on the anniversary of the first day of the first Lease Year. If any Lease Year consists of less than twelve (12) full calendar months, then any charges or payments due from Lessee hereunder shall be prorated accordingly.

4. **OPTION TO RENEW**

Provided Lessee is not in default of this Lease, Lessor grants to Lessee six (6) consecutive options to renew this Lease of five (5) years each. Each option can be exercised by Lessee giving Lessor written notice of the exercise thereof at least twelve months prior to the expiration of the then existing Term, provided, however, that if Lessee shall fail to give any such notice within such twelve month time limit, Lessee's right to exercise its option shall nevertheless continue until thirty (30) days after Lessor shall have given Lessee written notice of Lessor's election to terminate such option, and Lessee may exercise such option at any time until the expiration of said thirty (30) day period. It is the intention of the parties to avoid forfeiture of Lessee's rights to extend the Term of this Lease under any of the options set forth in this Section 4 through inadvertent failure to give notice thereof within the time limits prescribed. During any extension, all Sections of this Lease will be effective, and references to Term will incorporate the extensions.

5. **ON-SITE AND OFF-SITE IMPROVEMENTS**

(a) Lessor shall prepare at its sole cost the building pad (the "Building Pad") for Lessee's Store Building (as defined herein), which have been prepared by Lessor

in accordance with Sears Construction Standards-Company Owned-Minimum Site Requirements dated August 29, 1996 (the "Design Criteria"). Any deviations from the Design Criteria are noted by Lessor and shown on Exhibit C attached hereto. The Building Pads will be constructed by Lessor in such a manner so that:

(i)     Lessee has vehicular access to the Building Pad for its construction vehicles;

(ii)    They comply with the Design Criteria, especially as to elevation and location; and

(iii)   All temporary utility facilities and construction areas for Lessee's construction of Lessee's Store Building are in place as required in the Plans and fully usable for Lessee's construction of Lessee's Store Building.

(b)     In addition, Lessor agrees to perform all on-site and off-site improvements to the Entire Tract, including the Demised Premises as necessary for Lessee to construct Lessee's Store Building and to operate its store therein, including but not limited to all survey costs, municipal line installations, all civil engineering work, obtaining all municipal approvals except Lessee's building and occupancy permit, bringing all utility lines to within five (5) feet of the Building Pad in accordance with Lessee's Contract Limit Plan, site-grading, Building Pad preparation, and all other improvements normally contained in a first class regional shopping center. Lessor shall pay all charges or levies by governmental or quasi-governmental agencies for any such on-site work or any off-site work done in conjunction with the expansion of the Mall, including, but not limited to impact fees, upgrading of utilities or roads, traffic signals and charges for contributions required for schools or other infrastructure costs.

6.   **LESSEE'S CONTRIBUTION FOR SITE WORK.**

As a contribution toward the construction by Lessor of the on-site improvements as provided in Section 5, the Lessee agrees to pay Lessor the sum of $300,000.00, which sum shall be paid within thirty days after the Rent Commencement Date.

7.   **CONSTRUCTION OF LESSEE'S STORE BUILDING**

(a)     **Lessee's Store Building.** Lessee shall provide Lessor with Lessee's proposed plans and specifications (the "Plans") for informational purposes only. Lessee's plans shall be architecturally compatible in relationship to the design concept of the other improvements on the Entire Tract. The Lessor shall, within thirty days after receipt of the Plans, notify Lessee of any exterior design features, color or material which in Lessor's reasonable opinion are not compatible in relation to

the design concept of the other improvements on the Entire Tract. In the event of any such notice by Lessor, Lessee agrees to cause its architect thereafter to work in good faith with Lessor so that the Lessee's store building will be in harmony with the design concepts of the other improvements on the Entire Tract. Lessee shall construct Lessee's store building according to the Plans, which shall consist of a one level retail store building (the "Lessee's Store Building") containing approximately 75,643 square feet of Gross Leasable Area including an attached Auto Center (the "Auto Center") containing approximately 10,500 square feet of Gross Leasable Area. In addition to constructing Lessee's Store Building, Lessee shall construct, at its sole cost and expense, landscaping, sidewalks and any irrigation located in the area between (a) the curb line of the parking lot immediately adjacent and parallel to Lessee's Store Building and (b) the exterior wall of Lessee's Store Building (the "Perimeter Area").

(b)    **Construction Easements.** Lessor grants to Lessee construction easements over the Common Area of the Entire Tract to the extent reasonably necessary for Lessee to construct, repair, maintain and, if necessary, reconstruct Lessee's Store Building and to connect Lessee's Store Building to the Mall.

(c)    **Conditions of Lessee's Construction.** With regard to the construction of the Lessee's Store Building, Lessee shall:

(i)    Conform to all applicable building, zoning and use laws, regulations, codes and ordinances;

(ii)    not unreasonably interfere with other tenants or customers of the Mall; and

(iii)    construct a fence around the perimeter of the work areas in a location reasonably agreed to by the parties, for which Lessor grants Lessee a license to place such fences on the areas of Entire Tract adjacent to the Lessee's Store Building;

8.    **RENT**

Lessee shall pay to Lessor as rent, the sum of One and no 00/100 Dollars ($1.00) per year ("Rent"). Rent shall begin to accrue from and the initial rental payment shall be due to Landlord on the Rent Commencement Date. Rent shall be paid in advance on each anniversary of the Rent Commencement Date during the Term. Lessor will, from time to time, designate some one person, firm or corporation to receive Rent payments. The Rent provided for will be made payable to and mailed to the following address:

Donahue Schriber Realty Group, L.P.
3501 Jamboree Road, Suite 300, South Tower
Newport Beach, California 92660

until the address is changed by written notice from Lessor. Lessor's Federal Employer Identification Number is 33-0732886.

9.    **TITLE/SURVEY**

Prior to execution of this Lease Lessor will deliver to Lessee an ALTA title commitment (the "Title Commitment") for an ALTA extended coverage Form B Leasehold Policy of title insurance on the Demised Premises issued by Stewart Title Insurance Company (the "Title Company"). Lessee may, at its sole expense, require such endorsements from the Title Company as Lessee may require. Lessor will cause the Title Company to deliver to Lessee copies of all recorded documents affecting the Demised Premises or disclosed in the Title Commitment. Lessor shall pay the premium for a $1,000,000.00 ALTA extended coverage title policy and Lessee shall be obligated for any additional title charges for increased liability limits or endorsements (except for clearance of title matters).

Lessor will deliver to Lessee, a Survey of the Entire Tract and the Demised Premises, prepared in accordance with ALTA Standards and showing the location of all utility easements and the location of all utility lines on the Demised Premises or servicing the Demised Premises (the "Survey").

10.    **LESSOR'S WARRANTIES**

Lessor represents and warrants that:

(a)    **Lessor as Owner**. Lessor is the owner of the Entire Tract and, subject to the Consents, as defined herein, the provisions of this Lease do not violate any contract, mortgage, lease, operating agreement or any other written or oral agreement to which Lessor is a party.

(b)    **Lessor's Authority**. Lessor has the full right and lawful authority to enter into and perform its obligations under this Lease for the full Term.

(c)    **Subordination and Non-Disturbance Agreements**. If the Demised Premises are, on the Commencement Date, subject to any mortgage or mortgages, of if Lessor requests Lessee to subordinate this Lease to any mortgage in the future, Lessor will furnish Lessee a copy of such mortgage documents, together with Subordination and Non-Disturbance Agreements executed by each of Lessor's mortgagees in the form attached hereto as Exhibit "D". Lessor shall provide Lessee with executed Subordination and Non-Disturbance Agreements from all such mortgage holders existing on the Commencement Date prior to the execution of this Lease.

(d) **Demised Premises Free From Tenancies/Zoning**. Prior to the Commencement Date, Lessor will deliver actual possession of the Demised Premises to Lessee free of all tenancies and occupancies. The Demised Premises, when delivered to Lessee, will be zoned to permit the operation of a retail department store and an automobile service center of the sizes allowed pursuant to this Lease, including: the sale and servicing of merchandise; the filling of orders; the storage and sale, at retail, of all merchandise and services normally offered by Lessee at a typical retail department store of the size located on the Demised Premises, including, but not limited to the operation of an automobile service center selling and installing tires, batteries, mufflers and other motor vehicle accessories and other automobile services, excluding the sale of gasoline.

(e) **Quiet Enjoyment**. Lessee, upon paying the Rent and performing Lessee's other obligations under this Lease, shall peaceably and quietly have, hold and enjoy the Demised Premises for the Term, subject to this Lease and easements, restrictions and other matters of record.

(f) **Compliance of Laws**. As of the date hereof, the Demised Premises are and will on the Commencement Date be in full compliance with all applicable laws, regulations, and to Lessor's knowledge, environmental laws and building and health codes. Lessor shall obtain all necessary governmental consents, permits (other than building and occupancy permits and permits related to any special uses of Lessee), approvals and zoning approvals for the construction and operation of Lessee's Store Building on the Demised Premises.

(g) **No Underground Storage Tanks**. To its knowledge, there are no underground storage tanks under the Demised Premises.

(h) **Maintenance of Common Areas**. The Common Areas, including the parking area servicing Lessee's parcel pick up area, paved areas, and any parking and sidewalks, parking lot lighting and irrigation within the Common Areas shall be maintained by Lessor in the manner provided in Section 19(a) hereof.

(i) **Parking**. Unless required by law and subject to Section 30, Lessor shall not reduce or permit the reduction of the ratio on the Entire Tract of parking spaces to the number of square feet of Gross Leasable Area below (i) 5.26 cars per 1,000 square feet of Entire Tract Gross Leasable Area prior to the date that Penney expands its store building, and (ii) 4.39 cars per 1,000 square feet of Entire Tract Gross Leasable Area after the date that Penney expands its store building, nor charge for any of the parking spaces, without the prior written consent of Lessee, which consent shall not be unreasonably withheld. The parking configuration of the Entire Tract is shown in the Site Plan. Unless required by applicable law, Lessor agrees not to reconfigure or relocate any of the parking spaces without Lessee's prior written consent, which consent may be unreasonably denied.

(j)   **Operation of Entire Tract**. Lessor shall operate and maintain the Entire Tract in the manner provided in Section 11(h) hereof.

(k)   **Development of Entire Tract**. Lessor warrants that except as shown on the Site Plan, it shall not make or permit any changes to the Entire Tract which affect  Lessee's sight lines, visibility, access, ingress or egress, without Lessee's prior written consent, which consent shall not be unreasonably withheld or delayed. Lessee acknowledges that Penney has the right to expand its store building by an additional 26,800 square feet of Gross Leasable Area as shown on the Site Plan.

(l)   **Lessor's Indemnity**. Lessor will indemnify, defend and hold harmless Lessee from and against all claims, causes of action expenses, including reasonable attorneys fees and costs, excluding consequential damages, arising out of the inaccuracy of or breach of the foregoing warranties and representations.

## 11.   LESSEE'S AND LESSOR'S OPERATING COVENANT

Subject to the other provisions of this Lease, the parties agree as follows:

(a)   **Lessee's Opening and Operating Covenant**. Subject to any delay by an act of God, fire, strikes, or any other cause not within the reasonable control of Lessee (other than the lack or inability to procure monies), Lessee agrees to open its Store Building on October 17, 1998, provided Lessor has delivered to Lessee the Building Pad in compliance with Section 5(a) hereof at least three hundred forty-five (345) days prior to such opening date. Subject to the terms of this Section, Lessee will, from and after its opening for business in Lessee's Store Building and for the first fifteen (15) years thereafter, continuously operate or cause to be operated in at least 75,000 square feet of Gross Leasable Area of Lessee's Store Building a retail department store under the name of "Sears" or another name as Lessee is operating in the majority of its like retail department stores in the State of California ("Lessee's Operating Covenant"). Lessee's Operating Covenant will be personal to Lessor and not assignable, except to (i) a successor to Lessor or any subsequent lessor who acquires title to the Entire Tract or (ii) a mortgagee of the Entire Tract or its successors or assigns, except such mortgagee or its successors and assigns shall have no right to enforce the Lessee's Operating Covenant until such mortgagee or its successors and assigns are in possession of the Entire Tract, or (iii) a purchaser at the foreclosure sale, or its successors or assigns. Lessee's Operating Covenant is conditioned upon Lessor not entering into an agreement with a third party where the third party has the right to enforce Lessee's Operating Covenant.

(b)   **Conditions to Lessee's Operating Covenant**. Lessee's Operating Covenant is subject to the following conditions (i) Lessor is not in default of its obligations under Section 11(h) hereof beyond any applicable cure period; (ii) Mall tenants occupying not less than sixty-five percent (65%) of Gross Leasable Area of the

Mall Shops are open and operating; and (iii) at least one of the two named Department Stores are in fact operating under the Department Store's name (or such other name as such Department Store is operating in the majority of its like stores in California) of not less than eighty percent (80%) of their current square feet at the Mall. If, at any time during Lessee's Operating Covenant, Lessor has not met condition (iii) above, Lessor will have twelve (12) months after receipt of written Notice from Lessee in which to enter into a written agreement with a suitable replacement ("Suitable Replacement") to operate a retail department store in a vacated Department Store and eighteen (18) months [six (6) months after the end of the twelve (12) month period] after the date of said notice for the Suitable Replacement to open its retail department store to the public in a vacated Department Store in order to cure the condition. If Lessor does not cure the condition as provided herein, then Lessee shall be released from Lessee's Operating Covenant. In the event Lessor replaces or adds one or more department stores in order to comply with condition (iii) above, a "Suitable Replacement" shall be a department store operating a store in the Entire Tract similar to those operated in comparable regional malls in the State of California. If, at any time during Lessee's Operating Covenant, Lessor has not met condition (ii) above, Lessor shall have twelve (12) months after receipt of written Notice from Lessee in which to enter into written agreements with replacement tenants to operate stores in vacated portions of the Mall which would raise the percentage of Mall Shop tenants operating stores in the Mall to sixty-five percent (65%) of the Gross Leasable Area in the Mall Shops; provided, on or before the expiration of such twelve (12) month period, all such tenants must actually be open for business in the Mall so that sixty-five percent (65%) of the Gross Leasable Area of the Mall Shops is open and operated. If Lessor does not enter into written agreements for such replacement tenants within twelve (12) months of said Notice or if a sufficient number of tenants do not open for business in the Mall so that at some point during said twelve (12) month period sixty five percent (65%) of the Gross Leasable Area of the Mall Shops is open and operating, then Lessee's Operating Covenant shall be terminated.

(c)   **Intentionally Omitted**.

(d)   **Lessee's Operation of its Store**.  The number and types of departments to be operated in Lessee's Store Building and Auto Center, the particular contents, wares and merchandise to be offered for sale and the services to be rendered, the methods and extent of merchandising and storage thereof, and the manner of operating Lessee's Store Building and Auto Center in every respect whatsoever shall be within the sole and absolute discretion of Lessee. Notwithstanding the foregoing, Lessee agrees that it will not close off any of the openings of Lessee's Store Building into the enclosed areas of the Mall without Lessor's prior written consent.

(e) **Licensees, Subtenants, Concessionaires**. Lessee may operate Lessee's Store Building and Auto Center in whole or in part by licensees, subtenants or concessionaires; provided, however, that the appearance to the public shall be that of a major retail store building consistent with the appearance of the majority of Lessee's comparable major retail department stores being operated by Lessee in regional shopping centers in the same State.

(f) **No Restrictions Outside the Entire Tract**. Nothing contained herein shall be deemed to impose any radius or other restriction on the activities of Lessee outside of the Entire Tract.

(g) **Cessation of Business**. For the purpose of determining a cessation of business by Lessee, Lessor, a Department Store or any other tenant at the Mall, for the purposes of the respective Operating Covenants, the following shall specifically NOT be considered to be such a cessation if:

  (i) occasioned by the making of repairs, alterations or renovations to the premises; or

  (ii) occasioned by an eminent domain taking; or

  (iii) occasioned by a casualty, damage or destruction to the premises.

(h) **Lessor's Operating Covenant**. Lessor shall for the period of Lessee's Operating Covenant, and for so long thereafter as Lessee and one other Department Store is operating its retail store building at the Mall: (i) continuously operate the Entire Tract under the name "Hemet Valley Mall", in a first class manner; and (ii) use reasonable efforts to keep all store space in the Mall Shops leased, and substantially used for retail sales and such other uses of the type typically found in regional malls in the State in which the Entire Tract is located and related service and office purposes only.

(i) **Existing Sears Store**. Lessee is the existing tenant of a store located in Hemet, California pursuant to a Lease dated April 1, 1975, as amended by Supplemental Agreement dated May 1, 1975, Supplemental Agreement dated November 12, 1975, and Agreement of Extension of Lease dated April 3, 1995, all with Rybar Associates as the existing landlord ("**Existing Store Lease**"). The monthly rental payable by Tenant under the Existing Store Lease is the sum of $10,784.17 ("**Existing Store Rental**"). The Existing Store Rental together with other monetary payments payable by Lessee under the Existing Store Lease is hereinafter referred to as the "**Existing Lease Charges**". The term of the Existing Store Lease expires on September 30, 2000 ("**Expiration Date**"). From the date that Lessee opens its Store Building to the public until the Expiration Date, Lessor shall reimburse to Lessee the Existing Lease Charges paid by Lessee under the Existing Store Lease. Such reimbursement shall be paid by Lessor

within thirty (30) days of receipt of an invoice from Lessee with an itemization of the Existing Lease Charges paid by Lessee under the Existing Store Lease for the preceding month.

## 12.    MAINTENANCE CONTRIBUTION

Commencing with the Rent Commencement Date and continuing thereafter throughout the Term (including any extensions thereof), Lessee agrees to reimburse Lessor for its pro rata share of the cost to Lessor of maintaining and insuring the Common Areas, subject to the caps on such obligations as set forth below:

(a)    **Initial CAM Charge**. Commencing with the Rent Commencement Date through and including the fifth year thereafter, Lessee shall pay to Lessor as Lessee's contribution to maintenance of the Common Areas ("CAM"), Lessee's pro rata share of Common Area maintenance costs incurred by Lessor but not more than $0.20 per square foot of Gross Leasable Area in Lessee's Store Building per year (the "CAM Cap"), in equal monthly installments.

(b)    **Periodic Increases in CAM**. During the Term, the CAM Cap shall increase every five (5) years after the Rent Commencement Date, by $.05 per square foot of Gross Leasable Area in Lessee's Store Building, beginning in the sixth Lease Year.

(c)    **Basis for Calculating CAM**. The contribution amounts of Lessee set forth in this section shall be calculated on the basis of the square feet of Gross Leasable Area of Lessee's Store Building.

(d)    **Lessor's Performance**. Lessee shall pay the Common Area maintenance contribution during the Term so long as Lessor is performing maintenance of the Common Area as required in this Lease.

(e)    **Self-Help**. Lessee shall have the right to make repairs to the Common Area if Lessor fails to do so in the manner provided in Section 19(b) hereof.

(f)    **CAM Defined**. The term "maintenance of the Common Area" or "CAM" as used in this Section shall be the reasonable out of pocket costs incurred by Lessor in performing Common Area Maintenance as provided at Section 19, excluding any administrative or management fee and also excluding the cost of any capital improvements.

## 13.    DELIVERY OF POSSESSION

Lessor shall deliver the Demised Premises to Lessee with the Building Pad completed on or before the date which is three hundred forty five (345) days prior to Lessee's opening

date provided in Section 11(a) hereof, which date is estimated to be on or about November 30, 1997.

## 14. LESSOR'S RIGHT OF ENTRY

Lessee shall permit Lessor and the agents and employees of Lessor, including mortgagees, to enter into and upon the Demised Premises at reasonable times and with ten (10) days advance written notice for the purpose of inspecting the same. If Lessee has not exercised an option to renew, Lessee shall permit Lessor and its agents and employees, at any reasonable time upon reasonable notice during the last Lease Year prior to the expiration of the Term of this Lease, to exhibit the Demised Premises to prospective tenants, provided Lessor shall not interfere with Lessee's operations in exercising its rights under this Section.

## 15. ASSIGNMENT AND SUBLETTING

Prior to the expiration of Tenant's Operating Covenant, Tenant shall not, without the prior written consent of Landlord in each instance having been obtained thereto, which consent Landlord may grant or withhold in its sole and absolute discretion, assign, sell or otherwise transfer all or any part of Tenant's leasehold estate hereunder or sublet all or any portion of the Store Building. Notwithstanding the foregoing restriction on a Transfer, Tenant may, without the prior consent of Landlord, sublet in the aggregate by a sublease or a series of subleases less that twenty-five percent (25%) of the Gross Leasable Area of the Store Building. Prior to the expiration of Tenant's Operating Covenant, if Tenant desires to assign or sell this Lease, it shall first in writing notify Landlord of its desire to do so and shall submit in writing to Landlord, as applicable, (i) the name of the proposed transferee; (ii) the nature of the transferee's business to be carried on in the Demised Premises; and (iii) such reasonable financial information as Landlord may request concerning the proposed transferee.

After the expiration or earlier termination of Lessee's Operating Covenant, Lessee may assign this Lease or sublet all or any portion of the Demised Premises without Lessor's prior approval. Lessee shall remain liable for all obligations under this Lease through the initial Term and any option Term exercised by Lessee prior to Lessee assigning this Lease or subleasing the Demised Premises. Lessee shall not be liable for any obligations accruing under this Lease during any option period for an option exercised by any assignee or sublessee of Lessee. In any such assignment, Lessee shall require its assignee to assume all obligations under the Lease in writing, a copy of which shall be delivered to Lessor.

## 16. ENCUMBRANCE OF LESSEE'S LEASEHOLD INTEREST

Lessee may, without Lessor's consent, encumber by mortgage or deed of trust, or other proper instrument ("Leasehold Encumbrance"), its leasehold interest in the Demised Premises, Lessee's right title and interest in this Lease, together with all buildings and

improvements placed by Lessee thereon, as security for any indebtedness of Lessee. The execution of any such mortgage, or deed of trust, or other instrument, or the foreclosure thereof, or any sale thereunder, either by judicial proceedings or by virtue of any power reserved in such mortgage or deed of trust, or conveyance by Lessee to the holder of such indebtedness, or the exercising of any right, power or privilege reserved in any mortgage or deed of trust, shall not be held as a violation of any of the terms or conditions hereof, or as an assumption by the holder of such indebtedness personally of the obligations hereof prior to such lender's taking possession. No such encumbrance, foreclosure, conveyance or exercise of right shall relieve Lessee from its liability hereunder. The holder of any such mortgage, deed of trust or other security instrument being herein referred to as a "Leasehold Lender". If a Leasehold Lender shall have given Lessor written notice of the creation of a Leasehold Encumbrance, Lessor shall give to such Leasehold Lender a copy of each notice of any claimed default by Lessee at the same time and whenever any such notice is given to Lessee, addressed to such Leasehold Lender at the address last furnished to Lessor, and no such notice shall be deemed to have been given to Lessee, unless and until a copy thereof shall have been so given to such Leasehold Lender. Such Leasehold Lender shall thereupon have a period of thirty (30) days more, after service of such notice upon it, for remedying the default or causing the same to be remedied, than is given Lessee after service of such notice upon it. Such Leasehold Lender, in case Lessee shall be in default hereunder, shall, within such period and otherwise as herein provided, have the right to remedy such default, or cause the same to be remedied. Lessor will accept performance by the Leasehold Lender of any covenant, condition or agreement on Lessee's part to be performed hereunder with the same force and effect as though performed by Lessee. No event of default of Lessee in respect of the performance of work required to be performed, or acts to be done, or conditions to be remedied, shall be deemed to exist, so long as Leasehold Lender shall, in good faith, have commenced promptly to rectify and to prosecute the same to completion with diligence and continuity, but in no event later than 120 days after service of such notice to the Leasehold Lender. If Leasehold Lender cannot reasonably take the action required to cure the default without being in possession of the Premises, the time of Leasehold Lender to cure the default shall be deemed extended to include the period of time required by such Leasehold Lender to obtain such possession with due diligence, but in no event later than 120 days after service of such notice to the Leasehold Lender; provided, however, that during such period all other obligations of Lessee under this Lease, including the payment of rent and other sums required to be paid by Lessee, are being duly performed. No Leasehold Lender shall become liable under the provisions of this Lease, unless and until such time as it becomes, and then only for as long as it remains, the owner of the Leasehold Estate. Any assignment by a Leasehold Lender, or its successors and assigns, of its or their interest in the Leasehold Estate shall be subject to Lessor's approval to the same extent as provided at Section 15 hereof. From and after receiving notice of the existence of any Leasehold Lender, Lessor and Lessee will not, except as herein provided in case of Lessee's default, cancel or surrender this Lease without the prior consent of Leasehold Lender; any subsequent, modification or amendment of the Lease without Leasehold Lender's consent shall not be binding on Leasehold Lender.

17.    TAXES AND ASSESSMENTS

(a)    **Real Estate Taxes**. As used in this Lease, the term "Taxes" shall include all ad valorem real estate taxes, special taxes, general and special assessments or any other levy, charge, expense or imposition imposed by any Federal, state, county or city authority having jurisdiction, or any political subdivision thereof on any interest of Lessor or Lessee in the Demised Premises or the Entire Tract, or the improvements located thereon.

Notwithstanding anything in this Section 17(a) to the contrary, Taxes shall not include any estate, gift, sales, inheritance, succession, franchise, gross income or excess profits taxes or any Tax which is not imposed on an ad valorem basis, which shall be payable by Lessor or Lessor's legal representative, successors or assigns.

(b)    **Lessor's Payment of Taxes**. Lessee agrees to pay Taxes with respect to the Demised Premises and Lessee's pro rata share of the Taxes attributable to the parking lot and other improved exterior Common Areas (the "Exterior Common Area").

(c)    **Lessee's Payment of Taxes Attributable to the Demised Premises**. If the Lessee's Store Building and the land comprising the Demised Premises are separately assessed, Lessee shall pay directly to the taxing authority and discharge as they become due, promptly and before delinquency, all Taxes assessed against the Store Building and the land comprising the Demised Premises. If the Lessee's Store Building and land comprising the Demised Premises are not separately assessed, Lessee shall pay its pro rata share of Taxes to Lessor. Lessee shall be responsible for the Taxes assessed against the Store Building and land comprising the Demised Premises commencing as of the Commencement Date, based upon the assessor's workpapers; if the assessor's workpapers are not available or conclusive, the Taxes which shall be deemed to be assessed against the Store Building and land comprising the Demised Premises shall be computed as follows:

The Taxes against the improvements specified in the tax statement(s) in which the Store Building is contained (deducting on a ratable basis the Taxes attributable to the land on which the Exterior Common Area contained in such tax statement are situated) shall be multiplied by a fraction, the numerator of which shall be the Gross Leasable Area of the Store Building [to the extent taxed in such statement(s)] and the denominator of which shall be the total Gross Leasable Area of all improvements within the tax parcel in which the Store Building is a part. The Taxes against the land specified in the tax statement(s) in which the land comprising the Demised Premises are contained (deducting on a rateable basis the Taxes attributable to the land on which the Exterior Common Area contained in such tax statements are situated) shall be multiplied by a fraction, the

numerator of which shall be the total number of square feet of land in the
Demised Premises and the denominator of which shall be the total number of
square feet of land within the tax parcel in which the land comprising the
Demised Premises shall be a part. Lessee shall reimburse Lessor for the Taxes
attributable to the Store Building and land comprising the Demised Premises
within thirty (30) days after receipt by Lessee of an invoice for such amount
supported by appropriate tax bills.

(d)   **Lessee's Payment of Taxes Attributable to the Exterior Common Area.**
Lessor represents to Lessee that the Exterior Common Areas are not separately
assessed for Tax purposes. The Taxes attributable to the Exterior Common Areas
shall be determined by (i) subtracting the Taxes for the land beneath the
improvements on the Entire Tract (ratably determined) from the Taxes relating
to the land for the Entire Tract, and (ii) multiplying that difference times a
fraction, the numerator of which shall be the Gross Leasable Area in the Demised
Premises and the denominator of which shall be the total Gross Leasable Area of
all buildings in the Entire Tract, including the buildings within the Demised
Premises. Lessee shall reimburse Lessor for Lessee's pro rata share,
commencing as of the Commencement Date, of the Taxes attributable to the
Exterior Common Areas within thirty (30) days after receipt by Lessee of an
invoice for such amount supported by appropriate tax bills.

(e)   **Contesting Taxes.** Lessee may, in good faith and at Lessee's sole cost, contest
the validity or amount of any Tax on the Demised Premises, provided that Lessee
shall continue to pay such Taxes, if required, while Lessee is so contesting. In
the event that the Demised Premises shall not be separately assessed, then in
connection with the Taxes affecting the Demised Premises, Lessee may, in good
faith, contest the validity or amount of such Taxes at Lessee's expense, with
Lessor's prior consent, which consent shall not be unreasonably withheld. Lessee
shall be reimbursed its actual costs of such contest from any such Taxes refunded
as a result of such contest.

Lessor agrees that if at any time during the term of the Lease it desires to contest
the Taxes and/or assessments attributable to all or any portion of the Developer's
Tract or the improvements located thereon:

•   it shall take no action which would either increase the Taxes of the Demised
Premises; and

•   it shall not proffer or utilize in any such contest the Unitary Valuation and
Allocation approach, or any similar theory of real estate tax valuation and
assessment (the "UVA").

In the event that Lessor files and/or takes any position in violation of the foregoing provisions in any such real estate tax contest or other action involving or effecting the valuation of and/or real estate taxes attributable to the Developer's Tract, the Lessor agrees to pay, indemnify, protect and save and hold Lessee harmless from and against any and all increases in real estate property taxes and/or assessments on the Demised Premises attributable to Lessor's contest or action, or application of the UVA to the Developer's Tract, and all liabilities, obligations, losses, damages, costs, penalties, expenses (including reasonable attorney's fees and expenses), causes of action, suits, claims, demands and judgments of any nature whatsoever arising as a result thereof.

(f)     **Disposition of Rebates/Payment of Costs.** All rebates on account of Taxes paid by Lessee directly to the taxing authority under the provisions herein shall belong to Lessee, and Lessor shall pay over to Lessee any such rebates that may be received by Lessor, and will, on the request of Lessee, execute any receipts, assignments or other acquittances that may be necessary in order to secure the recovery of such rebates. If there are any rebates or tax savings with respect to Taxes reimbursed to Lessor by Lessee, Lessor shall pay over to Lessee such rebates, less Lessee's share of the costs incurred by Lessor with respect thereto or, to the extent such rebates are attributable to the contest prosecuted by Lessee, plus Lessor's costs so incurred.

(g)     **Proration in First and Last Year.** All Taxes under this Section as of the commencement and expiration of the Term shall be adjusted ratably.

## 18.   MARKETING FUND

Lessee agrees to join the existing Merchants' Association or Marketing Fund for a period of three (3) years commencing on the Rent Commencement Date. Lessee shall pay no more than $1,500.00 per year as its dues during such period. Any future decision by Lessee to continue as a member of the Merchants' Association or to make a contribution to the Marketing Fund, or to discontinue membership in the Merchants' Association, or to discontinue its contribution to the Marketing Fund Program, and any agreement as to the dues or contribution to be paid by Lessee if Lessee elects to be a member of the Merchants' Association, or to contribute to the Marketing Fund Program, will be made solely by Lessee's Store Manager. In no event shall Lessee ever be required to pay more than $1,500.00 per year to any Merchants' Association or Marketing Fund.

## 19.   COMMON AREA MAINTENANCE

(a)     Lessor will, or will cause a third party to, sweep, clean, operate, insure, maintain, repair, replace and provide lighting, snow removal and security for the Common Areas of the Entire Tract, and keep the same in a first-class condition

consistent with the majority of other similar shopping centers located in the State of California according to the following standards:

(i)     all hard-surfaced portions of the Common Area and improvements shall be swept and cleared of snow and ice at intervals sufficient to maintain the same in a clean condition before the retail stores within the Entire Tract open for daily business with the public;

(ii)    all sidewalks shall be swept, washed and cleared of snow and ice at intervals sufficient to maintain the same in a clean condition, and all surface waters and snow shall be promptly removed;

(iii)   all public trash and rubbish containers located in the Common Areas for the use of the public shall be emptied daily, and shall be washed at intervals sufficient to maintain the same in a clean condition;

(iv)    all landscaping shall be properly maintained, including irrigation, removal of weeds and foreign matter, and trimming, removal and replacement of dead plant materials, however, Lessee shall be responsible for performing the foregoing work, at Lessee's expense, with respect to landscaping on the Demised Premises located in the Perimeter Area;

(v)     all hard-surfaced markings shall be inspected at regular intervals and promptly repainted as they become unsightly or indistinct from wear and tear or other cause;

(vi)    all sewer catch basins shall be cleaned on a schedule sufficient to maintain all sewer lines in a free flowing condition; and all mechanical equipment which is part of storm and sanitary sewer facilities shall be regularly inspected and kept in proper working order;

(vii)   all asphalt paving shall be inspected at regular intervals and maintained in a good condition;

(viii)  all surface utility facilities servicing the Common Area, including, but not by way of limitation, hose bibs, standpipes, sprinklers and domestic water lines shall be inspected at regular intervals and promptly repaired or replaced, as the occasion may require, or upon the occurrence of any defect or malfunctions;

(ix)    all common utility facility amenities, benches and institutional, directional, traffic and other common area signs shall be inspected at regular intervals and maintained in a clean and attractive condition;

(x)     all lamps on lighting standards or otherwise on the Common Areas shall
be inspected at regular intervals, and all lamps shall be promptly replaced
when no longer properly functioning;

(xi)    provide lighting and snow removal for the parking lots and walkways
within the Common Areas of the Entire Tract, provide heating,
air-conditioning and lighting for the Mall and maintain the Mall during
periods when Lessee and one (1) other Department Store are open for
business and for one (1) hour after such business hours, but said lighting
and operation of the Mall shall not be required after 11:00 p.m.; and

(xii)   provide insurance as required in this Lease.

(b)    If Lessor fails to perform Lessor's obligations set out in Section 19(a) above,
within thirty (30) days after being given Notice by Lessee, Lessee may thereafter
perform all or any portion of said obligations and recover Lessee's costs and
expenses. If Lessee's costs and expenses are not paid within thirty (30) days of
written request (accompanied by invoices or paid receipts substantiating Lessee's
expenses), then Lessee may deduct such amount plus Default Interest (as defined
herein) on such amount from any CAM contribution payments otherwise payable
under Section 12 of this Lease by Lessee to Lessor, until reimbursed in full with
Default Interest.

## 20.    REPAIRS AND MAINTENANCE OF DEMISED PREMISES

Lessee shall, throughout the Term of this Lease, at its own cost, and without any expense
to Lessor, keep and maintain the Demised Premises, including the interior and the
exterior of all buildings and improvements of the Demised Premises of every kind which
may be constructed or installed thereon by Lessee, and all appurtenances thereto
including sidewalks, landscaping and irrigation within the Perimeter Area and truck
loading docks, in sanitary and clean order, and in good condition and repair. Lessee
shall comply with and abide by all federal, state, county and municipal statutes,
ordinances, laws and governmental regulations affecting the Demised Premises, the
improvements thereon or any activity or condition on or in the Demised Premises.

## 21.    ALTERATIONS/SIGNS

(a)    **Alterations, Improvements and Changes Permitted**. Lessee shall have the right
to make such alterations, improvements and changes to any building which may,
from time to time, be located on the Demised Premises as Lessee may deem
necessary and may replace any such building with a new building, provided that
prior to making any material structural alterations or replacing any such building
or making any material exterior alterations, Lessee shall obtain Lessor's approval
of plans and specifications therefor, which approval Lessor shall not unreasonably
withhold or delay. In the event of disapproval, Lessor shall give to Lessee an

itemized written statement of the reasons for the disapproval within thirty (30) days of submission of the plans. If Lessor does not disapprove the plans and specifications provided for in this Section or does not provide an itemized written statement of the reasons for disapproval within thirty (30) days after the same have been submitted to Lessor, such plans and specifications shall be deemed to have been approved by Lessor.

(b)    **Disposition of New Improvements**. Any building constructed by Lessee on the Demised Premises, and all alterations, improvements, changes or additions made in or to such Demised Premises shall during the Term, be the property of Lessee.

(c)    **Lessee's Signs**. Lessee shall have the right to install and maintain its typical signs on Lessee's Store Building which are usual and customary in Lessee's other department stores in California, subject only to governmental requirements or restrictions. Notwithstanding the foregoing, Lessee shall not install any rooftop signs, pylon signs or signs which are flashing, moving or audible. Lessee shall remove any such signs on the expiration of the Term. Lessee shall have the right to install at its sole cost and expense its sign panel on any pylon signs or monument signs installed on the Entire Tract. Lessee shall pay the cost of installing and maintaining its sign panels on any such pylon or monument signs. In addition, Lessee shall reimburse Lessor a proportionate share of the total cost of designing, fabricating and installing any such pylon or monument signs. Lessee's proportionate share shall be the number of Lessee's sign panels in proportion to the total number of sign panels on such pylon or monument signs.

## 22.    DAMAGE AND DESTRUCTION

(a)    **Demised Premises**.

(i)    **Damage or Destruction of Demised Premises**. Except as set forth below, the damage, destruction or partial destruction of any building, or other improvement which is a part of the Demised Premises shall not release Lessee from its obligations hereunder. In case of damage to or destruction of any such building or improvement, and except as otherwise provided in this Section, Lessee shall repair or restore the same. The proceeds of any insurance, maintained by Lessee, covering such damage or destruction shall be made available to Lessee regardless of whether Lessee elects to perform such repair or replacement.

(ii)    **Damage or Destruction of Demised Premises Occurring Toward End of Lessee's Operating Covenant**. In case of the destruction or damage to more than thirty-five percent (35%) of the Gross Leasable Area of Lessee's Store Building or damage thereto from any cause so as to make Lessee's Store Building untenantable which occurs any time within the last twelve (12) months of Lessee's Operating Covenant, or thereafter, Lessee

may elect to terminate this Lease by written notice served on Lessor within one hundred eighty (180) days after the occurrence of such damage or destruction. In the event of such termination, there shall be no obligation on the part of Lessee to repair or restore the building or improvements, nor any right on the part of Lessor to receive any proceeds collected under any insurance policies, maintained by Lessee, covering such building or any part thereof, but Lessee shall promptly comply with the requirements of Section 22(c)(ii) hereof. On such termination, rent, Taxes and any other sums payable by Lessee to Lessor hereunder shall be prorated as of the termination date and, in the event any rent, Taxes or other sums shall have been paid by Lessee in advance, Lessor shall rebate the same for the unexpired period for which payment was made.

(iii)   **Election Not to Terminate**. If, in the event of destruction or damage which would give Lessee the right to elect to terminate this Lease but for which Lessee does not elect to terminate this Lease, then Lessee shall repair or restore Lessee's Store Building, and the proceeds of all insurance covering such damage or destruction shall be made available to Lessee. If Lessee has not elected to terminate the Lease and has not commenced the repair or restoration of the Lessee's Store Building within six (6) months of the date of the casualty, Lessor may, on notice to Lessee, elect to terminate the Lease. Such notice of Lessor shall be effective forty five (45) days after the date of such notice unless within such forty five (45) days, Lessee begins the necessary repairs and restoration.

(b)   **To the Balance of the Mall**.

(i)   If the buildings or other improvements on the Entire Tract (excluding Lessee's Store Building), or any part thereof, are damaged or destroyed during the first fourteen (14) years of Lessee's Operating Covenant, and as often as any of these buildings or improvements during this period are destroyed or damaged by fire or other casualty, Lessor will rebuild, repair or replace all store buildings, Common Areas and improvements at the Mall (other than Lessee's Store Building) to the extent that there will be on the Entire Tract an enclosed, air-conditioned mall and other improvements constituting an architecturally complete unit.

(ii)   During the last twelve months of Lessee's Operating Covenant, and thereafter, if the buildings or other improvements on the Entire Tract (excluding Lessee's Store Building), or any part thereof, are damaged or destroyed and the cost to Lessor of repairing or restoring the Entire Tract to its pre-casualty condition equals or exceeds thirty-five percent (35%) of the replacement cost of all the buildings on the Entire Tract (excluding Lessee's Store Building), Lessor may elect not to rebuild or repair the damaged or destroyed improvements by giving notice of Lessor's election

to Lessee within one hundred twenty (120) days of the casualty. However, if Lessor elects not to rebuild or repair, Lessee may, within one hundred twenty (120) days of its receipt of such notice from Lessor, either a) terminate this Lease effective at any specified date within two (2) years after receipt of the notice, or b) within the 120-day period, require Lessor to rebuild and repair or replace all the store buildings leased and occupied at the time of the casualty and the Common Areas, to the extent that there will be on the Entire Tract an enclosed air-conditioned mall and other improvements constituting an architecturally complete unit, provided that each of the following three (3) conditions are met:

A.  The damage was caused by a peril insured by Lessor;

B.  At least ten (10) years remain on Lessee's Operating Covenant or Lessee elects to extend or renew Lessee's Operating Covenant for ten (10) years by notifying Lessor in writing within the one hundred twenty (120) day period; and

C.  At least two (2) other Department Stores, other than Lessee, have elected to rebuild or are open and operating after the completion of restoration and each covenant to operate a retail department store for at least ten (10) years from the date Lessor completes the required restoration.

(iii)  During the Term and, during any extension period, if the buildings or other improvements on the Entire Tract (excluding Lessee's Store Building) or any part thereof, are damaged or destroyed by a peril insured by Lessor, and the cost to Lessor of repairing or restoring the Entire Tract to its pre-casualty condition is less than thirty-five percent (35%) of the replacement cost of all the buildings on the Entire Tract (excluding Lessee's Store Building) Lessor shall rebuild and repair or replace all the store buildings leased and occupied at the time of the casualty and the Common Areas, to the extent that there will be on the Entire Tract an enclosed air-conditioned mall and other improvements constituting an architecturally complete unit.

(iv)  Nothing contained in this Section will require Lessor to rebuild a Department Store building if Lessor is not otherwise required to do so under the terms of Lessor's lease with the Department Store.

(v)  Lessor shall only be obligated to restore under this Section if Lessee, its assignees or sublessees have operated for business at some time during the thirty (30) day period prior to such destruction or damage, unless Lessee, its assignees or sublessees were not operating due to the making of repairs, alterations or renovations or due to casualty, destruction or

eminent domain taking or ceased operating during the 30-day period due to a default by Lessor under the terms of this Lease, in which event Lessor shall still have the obligation to restore.

(c)     **General Provisions.**

(i)     Any building or other improvements which either party is required to rebuild or repair pursuant to this Lease will be rebuilt and ready for occupancy within eighteen (18) months from the time of the loss or destruction. Once started all work, repair or reconstruction shall be carried through continuously and diligently to conclusion.

(ii)    Any buildings not required to be rebuilt by Lessor or Lessee pursuant to this Section will be razed and cleared and left in a sightly condition and landscaped or paved for parking as would be appropriate; provided, on notice from Lessor to Lessee, Lessor may direct that Lessee not raze such improvements, in which event Lessee shall have no further obligation with respect thereto and Lessor shall be entitled to the proceeds of any insurance which Lessor maintains with regard to such casualty.

## 23.   UTILITIES

Lessee shall contract in its own name and shall as of the Commencement Date promptly pay for all water, gas, heat, light, power, telephone service and other public utilities of every kind that Lessee desires to be furnished to the Demised Premises throughout the Term hereof, and all other costs and expenses of every kind whatsoever in connection with the use and operation of the Demised Premises and all activities conducted thereon.

## 24.   LIENS

(a)     **Lessee's Duty to Keep Premises Free of Liens.**  Lessee shall keep the Demised Premises and the Entire Tract free and clear of any and all mechanics', materialmen's and other liens for or arising out of or in connection with work or labor claimed to have been done, services performed or materials or appliances used or furnished for or in connection with any construction, repairs or operations of Lessee or permitted by Lessee on or about the Demised Premises. Lessee shall, subject to the provisions below, promptly and fully pay and discharge any such lien. Lessee shall indemnify and hold Lessor harmless against all such liens and claims of liens and suits or other proceedings pertaining thereto.

(b)     Contesting Liens.  If Lessee desires to contest any such lien, it shall notify Lessor of its intention to do so within sixty (60) days after Lessee receives written notice from Lessor of such lien. Lessee shall, within sixty (60) days after the final determination of the validity thereof, satisfy and discharge such lien to the extent held valid; but the satisfaction and discharge of any such lien shall be made

by Lessee before execution is had on any judgment rendered thereon. In the event of any such contest which may affect the Entire Tract, Lessee shall protect, defend and indemnify Lessor against all loss, expense and damage, excluding consequential damages, resulting therefrom and shall post such bond or provide such other assurances as the Title Company may reasonably require to insure over such liens in favor of Lessor or Lessor's mortgagee.

## 25. INDEMNIFICATION BY LESSOR AND LESSEE

(a)    **Lessor's Indemnity.** Lessor will protect, defend, hold harmless and indemnify Lessee and the directors, officers, agents and employees of Lessee, from and against any and all claims, actions, liabilities, losses and expenses (except for consequential damages and such as result from the sole negligence or willful misconduct of Lessee) relating to any and all losses or damages (including, without limitation, injury to or death of persons and damage to property) on the Entire Tract, (i) allegedly or actually suffered by any person or persons as a result of Lessor's failure to make repairs or improvements to the Entire Tract which Lessor is obligated or has agreed to make, or (ii) allegedly or actually arising out of or incidental to the work, services and activities or tortious acts or omissions of Lessor and any of its contractors and subcontractors, including, without limiting to foregoing, all acts and omissions of the partners, employees and agents of Lessor and its contractors and subcontractors in connection with any construction, repair or work performed pursuant to the provisions of this Lease, or (iii) allegedly or actually arising from or occasioned by the tortious acts or omissions of Lessor, or the condition, use or occupancy of all Common Areas on the Entire Tract.

(b)    **Lessee's Indemnity.** Lessee will protect, defend, hold harmless and indemnify Lessor, its officers, members, partners, agents and employees from and against any and all claims, actions, liabilities, losses and expenses (except for consequential damages and such as result from the sole negligence or willful misconduct of Lessor) relating to any and all losses or damages (including, without limitation, injury to or death of persons and damage to property) on the Entire Tract (i) allegedly or actually suffered by any person or persons as a result of Lessee's failure to make repairs or improvements to the Demised Premises which Lessee is obligated or has agreed to make or (ii) allegedly or actually arising out of or incidental to the work, services and activities or tortious acts or omissions of Lessee and any of its contractors and subcontractors including, without limiting to foregoing, all acts and omissions of the partners, employees and agents of Lessee and its contractors and subcontractors in connection with any construction, repair or work performed pursuant to the provisions of this Lease, or (iii) allegedly or actually arising from or occasioned by the tortious acts or omissions of Lessee, or the condition, use or occupancy of the Demised Premises.

26.    **LESSEE'S INSURANCE**

Subject to Lessee's right to self-insure as provided below, Lessee shall pay for and maintain, during the Term of this Lease, the following policies of insurance covering the Demised Premises, which insurance shall be obtained from rated "A-VII" or better by Bests Insurance Reports or its equivalent:

(a)    Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Lessee with a waiver of subrogation in favor of Lessor and Employer's Liability Insurance, with limits of $1,000,000.00 per accident or disease.

(b)    Commercial General Liability Insurance covering Lessee's operations at the Demised Premises, including, but not limited to, coverage for premises/operations, products/completed operations, contractual liability and personal/advertising injury with combined single limits of $5,000,000.00 per occurrence, for bodily injury and property damage.

(c)    Special Property Insurance including special coverage and builder's risk upon all buildings, building improvements, personal property owned by Lessee and improvements on the Entire Tract owned by Lessee, including, but not limited to, those perils generally covered on a Causes of Loss - Special Form, including fire, extended coverage, windstorm, vandalism, malicious mischief, and sprinkler leakage, earthquake and flood coverage in the amount of ninety percent (90%) of full replacement, without being a co-insurer.

Notwithstanding anything to the contrary contained herein, so long as Lessee's tangible net worth equals or exceeds $100,000,000.00, Lessee has the right to self-insure any of Lessee's insurance obligations under this Lease. In the event Lessee elects to self-insure any of such insurance obligations, then upon written request, Lessee shall provide Lessor with a statement that Lessee has elected to self-insure and, if Lessee is other than a publicly traded company, evidence of the net worth of Lessee.

In the event Lessee is not self-insuring for such risks as provided herein, Lessee shall furnish Lessor, concurrently with the execution of this Lease, and periodically (not to exceed one time per calendar year) with insurance certificates evidencing the coverages required herein and naming Lessor and Lessor's mortgagee as an additional insured on the Commercial General Liability policy. Each such certificate will expressly provide that it will not be subject to cancellation or material change without at least thirty (30) days prior notice to Lessor. Lessee shall promptly give Lessor a copy of any notice of non-renewal of such policy or policies it may receive.

At the end of each five (5) Lease Years of the initial Term and at the beginning of each extension period, or upon Lessor's and Lessee's request, Lessee shall review with Lessor the coverages and limits of any or all of the polices required above and, at that time,

shall cause such coverages and liability limits to be adjusted as reasonably agreed upon by Lessor and Lessee in view of reasonable exposure anticipated over the remainder of the Term.

27.   **LESSOR'S INSURANCE**

Lessor shall pay for and maintain, from the date of this Lease through the end of the Term, the following policies of insurance covering the Entire Tract (but excluding the Demised Premises), which insurance shall be obtained from companies rated "A-VII" or better as defined in the then current edition of Bests Insurance Reports (or the equivalent thereof if Bests Insurance Reports is no longer published):

(a)   If Lessor has employees working at the Entire Tract, Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Lessor with a waiver of subrogation in favor of Lessee, and Employer's Liability Insurance with limits of $1,000,000.00 per accident or disease.

(b)   Commercial General Liability Insurance covering Lessor's operations on the Entire Tract with coverage for premises/operations, products/completed operations, contractual liability, and personal/advertising injury liability with combined single limits of $5,000,000.00 per occurrence for bodily injury and property damage, including Lessee as an additional insured (as defined in ISO Form CG 20 26 11 85 or its equivalent).

(c)   If Lessor uses leased or owned motor vehicles on the Entire Tract, Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of liability of $3,000,000.00 per occurrence for bodily injury and property damage.

(d)   Special property insurance upon all buildings, building improvements and personal property owned by Lessor (excluding Lessee's Store Building and Auto Center and the Department Stores) and all alterations on the Entire Tract, including but not limited to, those perils generally covered by Causes of Loss-Special Form, including fire, extended coverage, wind storm, vandalism, malicious mischief, sprinkler leakage and flood (but excluding earthquake) coverage in the amount of ninety percent (90%) of the full replacement cost and with increased cost of construction and extra expense endorsements and all other endorsements reasonably requested by Lessee from time to time.

The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies. At the end of each five (5) Lease Years of the initial Term, and at the beginning of each extension period, or upon Lessee's or Lessor's request, Lessor shall review with Lessee the coverages and limits of any or all of the policies required above and, at that time, shall cause such coverages and liability

limits to be adjusted as reasonably agreed upon by Lessor and Lessee in view of reasonable exposure anticipated over the remainder of the Term.

Each policy shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice to Lessee, and that the coverage provided by such insurance policy shall be deemed primary insurance, and that any insurance provided by or on behalf of Lessee shall be in excess of any insurance provided by such policy. Lessor shall furnish Lessee, or cause to be furnished to Lessee, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates. All policies required to be provided by Lessor or Lessee hereunder shall include an endorsement to show that such insurance carrier acknowledges the mutual waiver of subrogation contained in Section 28 below.

## 28.    SUBROGATION

Notwithstanding any other provisions herein, Lessor and Lessee each releases the other and, on behalf of its insurers, waives its entire right to recovery against the other for loss or damage to the waiving party and its property located on the Entire Tract to the extent that the loss or damage is customarily insurable by Special Property and business interruption Insurance Policy. Lessor and Lessee agree to furnish to each insurance company which has or will issue policies of Special Insurance on their respective portions of the Entire Tract notice of the terms of the mutual waivers contained herein and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers contained herein.

## 29.    DEFAULTS

(a)    **Lessee's Default**:

(i)    **Non-Payment of Rent**. If Lessee fails to pay Rent or any other monetary obligation of Lessee under this Lease within the time provided and fails to cure the condition within thirty (30) days of its receipt of written notice from Lessor, Lessor may thereafter charge Default Interest on the sum past due and bring suit to recover such amounts. Lessor's suit to recover damages shall not waive or affect its right to terminate the Lease and/or to bring suit for possession of the Demised Premises.

(ii)    **Failure to Meet Other Obligations**. If Lessee fails to perform any of the terms or provisions of this Lease, other than the provisions for the payment of Rent or other monetary obligations, and Lessee fails to cure the default within thirty (30) days after receipt of written notice by Lessor, then Lessor may cure the default and the full amount so expensed by Lessor, plus Default Interest, will immediately be owing by Lessee. Notwithstanding the foregoing, if the default is of a character as to require more than thirty (30) days to cure, Lessee shall have such additional time

as may reasonably be required, so long as Lessee has commenced the cure within such 30 day period and thereafter diligently prosecutes the cure to completion.

(b) **Lessor's Default**:

(i) **Lessor's Default.** If Lessor fails to perform any of the terms or provisions of this Lease and Lessor fails to cure such condition within thirty (30) days after receipt of written notice, then Lessor shall be in default and Lessee may cure the default, at the expense of Lessor, and may sue Lessor for all sums expended, plus Default Interest, until Lessee is reimbursed in full or, at Lessee's option, Lessee may terminate this Lease effective upon written notice to Lessor. Notwithstanding the foregoing, if the default is of a character as to require more than thirty (30) days to cure, Lessor shall have such additional time as may reasonably be required, so long as Lessor has commenced the cure within such 30 day period and thereafter diligently prosecutes the cure to completion.

(ii) **Lessee's Performance of Lessor's Obligations.** In the event that Lessee withholds its CAM payment to the extent permitted under the terms of this Lease, then, in such event, Lessor shall not have the right to terminate this Lease or to evict Lessee for the non-payment of Rent or other charges nor shall Lessor have the right to commence a proceeding for forcible entry and detainer or other similar action to recover possession of the Demised Premises from Lessee. In the event that a court of competent jurisdiction rules that Lessee did not have the right to withhold its CAM payment to Lessor under the terms of this Lease, then, upon the issuance of such a judgment, Lessee shall pay to Lessor the amount so withheld plus Default Interest, failing which, Lessor may upon notice to Lessee and failure to cure within 30 days, file an action to terminate the Lease and for possession of the Demised Premises.

(c) **Equity Proceedings/Reservation of Rights.** If any of the covenants, conditions or other provisions of this Lease are breached, Lessor or Lessee, as the case may be, shall have the right to obtain an injunction or other appropriate judicial relief against the other. No failure by Lessor or Lessee to insist upon the performance or the strict performance of any covenant, condition or other provisions of this Lease or to exercise any right or remedy consequent upon a breach or other default thereof shall constitute a waiver of assumption thereof by the other party, and no acceptance, use or occupancy of the Demised Premises shall constitute a waiver or assumption by Lessee of any duty or obligations of Lessor with respect thereto. The grant or reservation herein or the exercise of any right or remedy, or of any supplementary or alternative rights or remedies, shall not affect or

prejudice any other rights or remedies which Lessor or Lessee may have under this Lease or under law.

(d) **Default Interest**. "Default Interest" means a rate of interest per annum equal to three percent (3%) plus the Prime Rate (as defined herein), but in any event not in excess of the maximum rate permitted by law.

## 30.   EFFECT OF EMINENT DOMAIN

(a) **Total Condemnation**.   In the event the entire Demised Premises shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority, this Lease shall terminate and expire as of the date of such taking, and Lessee shall thereupon be released from any liability thereafter accruing hereunder.

(b) **Partial Condemnation**.  In the event a portion of the Demised Premises shall be so appropriated or taken, except for a temporary taking which will not exceed one hundred twenty (120) days, and the remainder of the property shall not be suitable for the use then being made of the property by Lessee, Lessee shall have the right to terminate this Lease as of the date of such taking on giving to Lessor written notice of such termination within forty-five (45) days after Lessor has notified Lessee in writing that the property has been so appropriated or taken.

In the event of such partial taking and Lessee does not so terminate this Lease, then this Lease shall continue in full force and effect as to the part not taken. Rent and other charges to be paid by Lessee during the remainder of the Term shall be adjusted proportionately, on a square footage basis.

(c) **Condemnation Award**.

(i)   If Lessee does not elect or does not have the right to terminate this Lease as a result of a taking of the Demised Premises, the award for the Demised Premises shall be used first for the restoration of Lessee's Store Building to constitute the same as a complete architectural unit, to the extent practicable, and to reimburse Lessee for any actual costs incurred as a result of the taking, and the balance shall be paid to Lessor.

(ii)   If this Lease is terminated as a result of a taking, Lessee shall be entitled compensation from the award, to the extent so provided, for (A) the unamortized value (on a straight line basis over 25 years or the remaining term of this Lease, whichever is less) of leasehold improvements made by Lessee, at its cost and expense, and not reimbursed by Lessor; (B) Lessee's moving costs, and (C) damage to or loss of Lessee's inventory, personal property and trade fixtures caused by the taking; and the balance of the award, including, without limitation, any compensation

or damages with respect to Lessee's leasehold estate, shall be paid to
Lessor.

## 31. OWNERSHIP OF IMPROVEMENTS ON TERMINATION OF LEASE

On termination of this Lease for any cause, Lessee shall remove its personal property and
trade fixtures from the Demised Premises and Lessor shall become the owner of any
building or improvements remaining on the Demised Premises.

## 32. HAZARDOUS MATERIALS

Lessor and Lessee agree as follows with respect to the existence or use of "Hazardous
Material" (as defined below), on the Demised Premises:

(a)     **Lessor's Representations.** Lessor hereby represents and warrants to Lessee, to
the best of Lessor's knowledge, that it is not aware that any Hazardous Material
is being used, disposed of or is located on or under the Entire Tract or the soil
and ground water on or under the Entire Tract in violation of applicable law and
except as disclosed in the Phase II Site Investigation dated April 30, 1997
prepared by Ellis and Associates (the "Report"). Lessee acknowledges receipt of
a copy of the Report.

(b)     **Lessor's Covenants.** Lessor hereby covenants to Lessee as follows:

(i)     Lessor shall be responsible for all costs incurred in complying with any
order, ruling or other requirement of any court or governmental body or
agency having jurisdiction over the Entire Tract requiring Lessor to
comply with any laws which relate to Hazardous Material or which relate
to Hazardous Material created, handled, placed, stored, used, transported
or disposed of by Lessor, including, without limitation, the cost of any
required or necessary repair, cleanup or detoxification and the preparation
of any closure or other required plans, and Lessor shall diligently pursue
to completion all such work required in connection with the same
excluding however any such costs relating to Hazardous Material on the
Demised Premises established to have been brought onto the Demised
Premises by Lessee or its employees, agents, or contractors, invitees or
customers ("Lessee's Hazardous Material"), unless Lessee's Hazardous
Material is released onto the Demised Premises or the remainder of the
Entire Tract by reason of the negligence or fault of Lessor, its employees,
agents, or contractors; and

(ii)    Lessor shall indemnify, defend and hold Lessee, its directors, officers,
employees and agents and any successor to Lessee's interest in the
Demised Premises harmless from and against any and all claims,
judgments, damages, penalties, fines, costs, liabilities or losses (including,

CC1-326196.V6                            29                              11/07/97.

without limitation, sums paid in settlement of claims, attorneys fees, consultant fees, and expert fees) which might directly or indirectly (but excluding consequential damages) or in whole or in part be caused by, arise out of, or be related to (a) Hazardous Material which was created, handled, placed, stored, used, transported or disposed of by Lessor or its employees, agents or contractors in violation of applicable laws, or (b) Hazardous Material with respect to which any court, governmental body or agency having jurisdiction over the Entire Tract holds Lessor responsible or otherwise requires Lessor to undertake any repair, cleanup, detoxification or other remedial action (excluding Lessee's Hazardous Material, unless Lessee's Hazardous Material was released onto the Demised Premises or the remainder of the Entire Tract by reason of the negligence or fault of Lessor, its employees, agents, or contractors), to the extent not removed or remediated within a reasonable period of time after Lessor becomes aware of such condition, or (c) the breach of any representation, warranty or covenant of Lessor contained in this Section.

In the event of any such breach of any representation, warranty or covenant contained in this Section which is not cured within ninety (90) days of notice to Lessor, (excluding Lessee's Hazardous Material unless Lessee's Hazardous Material was released onto the Demised Premises or the remainder of the Entire Tract by reason of the negligence or fault of Lessor, its employees, agents or contractors), Lessee has the right (without waiving any of its other remedies) to either (a) terminate this Lease at its sole election by written notice to Lessor, such termination to be effective as of the date of Lessee's written notice, or (b) have its Rent and any other charges payable by Lessee hereunder abated in proportion to the extent of interference with Lessee's business until such time as the Demised Premises and the Entire Tract comply with all laws and Lessor has cured its breach of any representation, warranty or covenant contained herein in a manner reasonably satisfactory to Lessee. Lessee shall also have the right, but not the obligation to perform any necessary repair, cleanup detoxification or other remedial action with respect to Hazardous Material to which Lessor has failed to perform its obligation to repair cleanup, detoxify or take remedial action, and to offset from any monetary obligations of Lessee under this Lease the amount so expended by Lessee, except for amounts expended toward Lessee's Hazardous Material.

(iii)    Lessor shall diligently pursue any responsible parties in connection with the performance of any cleanup, repair, detoxification or other remedial action with respect to Hazardous Material to which Lessor is not obligated to take any action.

(c)    **Lessee's Covenants**. Lessee hereby covenants to Lessor as follows:

30

(i)     Lessee shall be responsible for all costs incurred in complying with any order, ruling or other requirement of any court or governmental body having jurisdiction over the Entire Tract requiring Lessee to comply with any laws which relate to Lessee's Hazardous Material including, without limitation, the cost of any required or necessary repair, cleanup or detoxification and the preparation of any closure or to other required plans, and Lessee shall diligently pursue to completion all such work required in connection with the same, excluding however any such costs relating to Hazardous Material on the Entire Tract established to have been caused directly either by use of the Entire Tract by the Lessor or Lessor's other tenants or Lessor's acts or omissions relating to the Demised Premises or Entire Tract, or use of the Entire Tract by any other third party; and

(ii)    Lessee shall indemnify, defend and hold Lessor, its directors, officers, employees and agents and any successor to Lessor's interest in the Demised Premises harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys fees, consultant fees and expert fees) and all foreseeable and unforeseeable consequential damages, whether known or unknown, which might directly or indirectly or in whole or in part be caused by, arise out of, or be related to (a) Lessee's Hazardous Material, or (b) Hazardous Material with respect to which any court, governmental body or agency having jurisdiction over the Demised Premises holds Lessee responsible or otherwise requires Lessee to undertake any repair, cleanup, detoxification or other remedial action, excluding however Hazardous Material on the Entire Tract established to have been caused directly either by use of the Entire Tract by Lessor, or Lessor's employees, agents or contractors acts or omissions relating to the Entire Tract, or use of the Entire Tract by any co-tenant or third party, or (c) the breach of any representation, warranty or covenant of Lessee contained in this Section.

(iii)   Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used, stored, treated, discharged, released, spilled or disposed of on, in under or about the Demised Premises or the Entire Tract by Tenant, its affiliates, agents, employees, contractors, sublessees, assignees, or invitees without the prior written consent of Landlord, which consent shall be granted or denied in Landlord's good faith non-arbitrary business judgment and shall not be unreasonably delayed. Notwithstanding the foregoing, Landlord's prior consent shall not be required for Tenant's use or storage of any ordinary and customary materials reasonably required to be used by Tenant in the normal course of Tenant's business permitted on the Demised Premises.

(iv)    Without the prior written consent of Landlord, which may be granted or withheld in Landlord's sole and absolute discretion, Tenant shall not: (a) install or use any below ground storage tank or regulated above ground storage tank; or (b) use friable or capable of becoming friable asbestos containing materials or PCBs.

(d)    **Hazardous Materials**. As used herein, the term "Hazardous Material" means petroleum products, asbestos, and any other hazardous or toxic substance, material or waste, which is or becomes regulated by any local government's authority, the State of California, or the United States government, whether originating from the Demised Premises or the Entire Tract or, as to Lessor, migrating, flowing, percolating, diffusing or in any way moving onto or under the Demised Premises or the Entire Tract.

## 33.    NOTICES

Notices shall be in writing and shall be deemed properly served: (a) two (2) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (b) one (1) business day after being deposited with a reputable overnight express carrier (e.g. Federal Express, Airborne, Express Mail, UPS) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery, or (c) upon receipt if personally delivered. Notices shall be addressed as follows:

Lessee-

**Sears, Roebuck and Co.**
3333 Beverly Road
Department 824RE
Hoffman Estates, Illinois  60179
Attn:  Vice President Real Estate

**Copy to:**

**Sears, Roebuck and Co.**
3333 Beverly Road
Department 766
Hoffman Estates, Illinois  60179
Attn:  Assistant General Counsel Real Estate

**For Real
Estate Tax
Invoices:**

**Sears, Roebuck and Co.**
Real Estate Taxes
Department 768TAX
3333 Beverly Road
Hoffman Estates, Illinois  60179

<table>
<tr><td>For Rent and<br>Other Real<br>Real Estate<br>Invoices:</td><td>Sears, Roebuck and Co.<br>Real Estate Payments<br>Department 824RE<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179</td></tr>
<tr><td>With a Copy to:</td><td>Sears Store Manager<br>Sears, Roebuck and Co.</td></tr>
</table>

Lessor-

c/o Donahue Schriber
3501 Jamboree Road
Suite 300, South Tower
Newport Beach, California  92660
Attention:  President

or to any other address furnished in writing by any of the foregoing. However, any change of addresses furnished shall comply with the notice requirements of this Section and shall include a complete outline of all current addresses to be used for all parties.

## 34.    WAIVER

The waiver by either party of, or the failure of either party to take action with respect to any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition, or subsequent breach of the same, or any other term, covenant or condition therein contained.

## 35.    EFFECT OF LESSEE'S HOLDING OVER

Any holding over after the expiration of the Term of this Lease, shall be construed to be a tenancy from month-to-month, at the same monthly rental as required to be paid by Lessee for the period immediately prior to the expiration of the Term hereof, and shall otherwise be on the terms and conditions herein specified, so far as applicable.

## 36.    TRANSFER AND RECORDING TAXES

Upon execution of this Lease, a memorandum of this Lease in the form attached hereto and made a part hereof as Exhibit "E" shall be executed by both parties and Lessor shall record such memorandum. Lessor will pay all recording charges incurred for the recordation of such memorandum of Lease.

## 37.   ATTORNEYS' FEES

In the event at anytime during the Term of this Lease the parties hereto shall institute any action or proceeding against the other relating to the provisions hereof, or any default hereunder, then, and in that event, the unsuccessful party, in such action or proceeding agrees to reimburse the successful party therein the reasonable expenses of attorneys' fees, court costs and disbursements incurred therein by the successful party.

## 38.   PARTIES BOUND

The covenants and conditions herein contained shall, subject to the provisions as to assignment, transfer and subletting, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

## 39.   TIME OF THE ESSENCE

Time is of the essence of this Lease, and of each and every covenant, term, condition and provision hereof.

## 40.   BROKER

Lessor and Lessee represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Lease. Lessor and Lessee each, as applicable indemnify, defend and hold the other harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any other broker.

## 41.   PRIME RATE

The term "Prime Rate" as used herein shall mean the rate of interest announced from time to time by The First National Bank of Chicago (or if The First National Bank of Chicago is not in existence, the largest bank headquartered in the City of Chicago, Illinois, measured in terms of net worth) as its "prime rate".

## 42.   SECTION CAPTIONS

The captions appearing under the section number designations of this Lease are for convenience only and are not a part of this lease and do not in any way limit or amplify the terms and provisions of this Lease.

43. **REDELIVERY OF PREMISES**

Lessee shall, at the expiration or sooner termination of this Lease, peaceably and quietly quit and surrender to Lessor the Demised Premises in broom clean condition subject to the other provisions of this Lease.

44. **REMEDIES CUMULATIVE**

All remedies hereinbefore and hereafter conferred on Lessor and Lessee shall be deemed cumulative and no one exclusive of the other, or of any other remedy conferred by law.

45. **CONSENTS**

Lessor agrees to obtain, at Lessor's sole cost, all consents and approvals necessary for Lessee to construct and operate its store on the Demised Premises, including, without limitation any required consents of Department Stores, lenders or other parties with any interest in the Entire Tract (collectively, "Consents").

46. **GOVERNING LAW**

This Lease shall be interpreted and construed under the laws of the state in which the Entire Tract is located.

47. **NO PARTNERSHIP**

Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Lessor and Lessee and neither the method of computation of rent nor any other provision contained in this Lease or any acts of the parties hereto shall be deemed to create any relationship between Lessor and Lessee other than the relationship of Lessor and Lessee.

48. **SEVERABILITY**

Any provision or provisions of this Lease which are or become illegal or legally void shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions of this Lease shall nevertheless remain in full force and effect.

49.    **NONDISCRIMINATION.**

The Lessee herein covenants by and for itself, its heirs, executors, administrators and assigns, and all persons claiming under or through him, that this Lease is made and accepted upon and subject to the following conditions:

That there shall be no discrimination against or segregation of any person or group of persons on account of sex, marital status, race, age, handicap, color, religion, creed, national origin or ancestry, in the leasing, subleasing, transferring, use, or enjoyment of the land herein leased, nor shall the Lessee itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy, of tenants, lessees, sublessees, subtenants or vendees in the land herein leased.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

IN WITNESS WHEREOF, the parties have caused this Lease to be executed:

LESSOR:

DONAHUE SCHRIBER REALTY GROUP, L.P.

By:    Donahue Schriber Realty Group, Inc.,
        a Delaware corporation,
        its general partner

        By:   Thomas L. Schriber
        Its:   PRESIDENT

LESSEE:

SEARS, ROEBUCK AND CO.

By:   
Barry D. Kaufman
Vice President Real Estate

ATTEST:

By:   
Assistant Secretary for Sears, Roebuck and Co.

Attachments:

Exhibit "A" - Site Plan
Exhibit "B" - Legal Description of Demised Premises
Exhibit "C" - Deviation from Design Criteria
Exhibit "D" - Non-Disturbance Agreement
Exhibit "E" - Memorandum of Lease

36

ORIGIN ID:SDMA
LORI GILMORE
525 B STREET

(619) 238-1900

SAN DIEGO, CA 92101
UNITED STATES US

TO
C/O PRIME CLERK LLC
SEARS ROEBUCK & CO CLAIMS PROCESSIN
830 3RD AVE., SUITE 412

BROOKLYN NY 11232

(844) 384-4460

SHIP DATE: 08APR19
ACTWGT: 1.00 LB
CAD: 109944/INET4100

BILL SENDER

REF: 102197/78 [SEARS]
INV:
PO:
DEPT:

TRK# 0201

XA FBTA

7749 1595 2180

TUE - 09 APR 3:00P
STANDARD OVERNIGHT

11232
EWR

NY-US

**FedEx**
Express

J191019010701urr

565J1/D7E5/23AD

---

**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.