**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 18-23538 (RDD) |
| SEARS HOLDINGS CORPORATION, et als. | (Jointly Administered) |
| Debtors.[1] | **Ref Nos. 2192, 3298** |

**OBJECTION OF SWZ, LLC TO NOTICE OF ASSUMPTION AND ASSIGNMENT OF
ADDITIONAL DESIGNATABLE LEASES AND SUPPLEMENTAL OBJECTIONS TO CURE
AMOUNT AND DUE TO LACK OF ADEQUATE ASSURANCE INFORMATION**

---

[1] 1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SRe Holding Corporation, filed as Case No. 19-22031 (the "**Additional Debtor**"). The separate chapter 11 case requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

4813-4235-6629, v. 1

SWZ, LLC ("**SWZ**") by and through its undersigned counsel submits this Objection ("**Objection**") to the *Notice of Assumption and Assignment of Additional Designatable Leases* [ECF No. 3298] filed by Transform Holdco LLC ("**Buyer**") on April 19, 2019 (the "**Designation**") and SWZ's supplemental objection (the "**Supplemental Objection**", collectively, the "**Objections**") to the cure amount and to the lack of adequate assurance information provided by Buyer's and Buyer's "*affiliated entity*" Transform Leaseco LLC, as the proposed assignee ("**Proposed Assignee**"). In support of the Objections, SWZ respectfully submits as follows:

1.       On October 15, 2018, the above-captioned debtors and debtors-in-possession ("**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**").

2.       The Objections pertain to a lease dated February 3, 1972, as amended, for the real property located at 23222 Valencia Boulevard, Valencia, California (the "**Lease**"). A true and correct copy of the Lease is attached hereto as Exhibit "A". The Lease is set to expire in May 2022. There are no additional extensions or options available under the Lease. The Lease was originally identified in the Debtors' *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Global Sale Transaction* ("**Supplemental Cure Notice**") [Docket No. 1774], on Exhibit B-1, Page 49 of 61, under the line item that references No. 174, Store No. 3018, Contract No. K3018-1-A. SWZ is the successor in interest as landlord under the Lease (and is identified on said exhibit as the Counter Party Name). Kmart Corporation is the successor in interest as tenant under the Lease (and was identified on said exhibit as the Debtor Counterparty(s)).

3.       The Lease is a lease "of real property in a shopping center" for purposes of 11 U.S.C. §365(b)(3).

4.       The Debtors sought to assume and assign certain executory contracts and unexpired leases to Buyer, including potentially the Lease, pursuant to the *Order Approving Global Procedures*

2

*and Granting Related Relief filed November 19, 2018 [ECF No. 816]* (the "**Global Bidding**

**Procedures**").

5.      In conjunction with the Global Bidding Procedures, the Debtors filed the Supplemental

Cure Notice, which listed the Debtor's proposed cure amount for the Lease as $0.00 (the "**Original**

**Proposed Cure Amount**"), the Designation also proposes a cure amount for the Lease in the amount of

$0.00.

6.      Among other terms and conditions of the Lease, Paragraph 11 expressly preserves to

SWZ "…for itself, and for its successors and assigns, a non-exclusive easement over and upon the

common area portion of the demised premises, as depicted on Exhibit "B", for the purpose of vehicular

and pedestrian ingress and egress, and for the parking of motor vehicles  of the customers, patrons,

suppliers and employees of tenants of Landlord, and the  subtenants and concessionaires of such tenants"

(the "Easement").  *See* Exhibit "A", at Page 5.

7.      The Lease is located at property which is subject to a Declaration of Covenants,

Conditions and Restrictions for Valencia Mart Shopping Center, dated as of July 10, 1986, as assigned,

which was duly recorded in the Recorder's Office, Los Angeles County, California (the "**Declaration**").

A true copy of the Declaration is attached hereto as Exhibit "B".

8.      Paragraph 9 of the Original Cure Notice further provided that specific adequate

assurance information for the Buyer was to be "distributed to the applicable Counterparties:"

> Adequate Assurance Information for the Buyer will be distributed to the applicable
> Counterparties. The Buyer's Adequate Assurance Information is intended  to provide the
> Counterparties to the  Contracts and Leases with adequate assurance of future
> performance and to support the Buyer's ability to comply with the requirements of
> adequate assurance  of future performance, including the Buyer's financial wherewithal and
> willingness to perform under the Contracts and Leases.

9.      Attached as Exhibit "C" to the Supplemental Cure Notice on  the Landlord was a letter

from the Buyer purporting to contain adequate assurance information (the "**Original Adequate**

**Assurance Letter**") which contained limited and general information concerning the Buyer, that it simply

3

had "sufficient capital to purchase the assets and to perform under the applicable assumed contracts and leases on a go forward basis" based upon anticipated financing.

### SWZ'S PRIOR LIMITED OBJECTION TO ASSUMPTION OF LEASE

10.    On January 30, 2019, SWZ timely filed its *Limited Objection of SWZ, LLC to Debtors' Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* [ECF No. 2192] (the "**Original Objection**"). The Original Objection is incorporated herein by reference as if set forth at length.

11.    Through the Original Objection, SWZ objected to the Original Proposed Cure Amount as set forth in the Supplemental Cure Notice because the correct cure amount due and owing under the Lease was at least $143,783.19 (plus any interest and penalties that may accrue on outstanding tax obligations) as of the date the Original Objection was filed. This amount has shifted based upon payments remitted and applied, as well as additional obligations which have accrued under the Lease, since the Original Objection was filed. SWZ filed a proof of claim which included all liquidated amounts due as of April 3, 2019, which totaled $145,131.83 (the "**Updated Cure Amount**"). The amounts included in the proof of claim include tax arrears, environmental costs and post-petition base rent. A true copy of SWZ's proof of claim is attached hereto as Exhibit "C".

12.    The Updated Cure amount does not include legal fees to which SWZ is entitled, and other charges which continue to accrue under the Lease that were not yet included in SWZ's proof of claim, including penalties and interest accruing on outstanding taxes. SWZ reserves the right to amend its proof of claim and provide a final updated cure amount through the date of any order approving the assumption and assignment of the Lease.

13.    Through its Original Objection, SWZ made clear that accrued but unbilled or not yet known or due amounts under the Lease (including without limitation, amounts owing on account of common area maintenance, taxes, utilities, year-end adjustments, indemnities or other obligations accruing pursuant to the terms of the lease) must be satisfied and assumed by any assignee of the Lease. Accordingly, any order establishing the cure amount in connection with the assumption and assignment

4

of the Lease must therefore provide for the payment of all such unknown, unreconciled, indemnification obligations and the like.

14.     In addition to the monetary defaults under the Lease, the Debtors are in default of their insurance obligations under the Lease.  Notice of said default was provided to the Debtors on April 4, 2019.  The Lease is subject to termination if this breach is not timely cured.

15.     Simply put, any order establishing cure amounts with respect to the Lease must require that any party assuming and or taking an assignment of the Lease, must comply with all lease obligations under the Lease pursuant to 11 U.S.C. § 365(d)(3) pending the actual assumption and assignment of the Lease, and cure any additional defaults that may occur under the Lease prior to the effective date of any assumption by the Debtors and assignment to the Buyer and/or potential assignee. See 11 U.S.C. § 365(b)(1).

16.     Finally, while expressly reserving its rights to assert any objections, by its Original Objection SWZ objected to any attempt to modify the Lease or any of SWZ's rights thereunder, since the Lease must be assumed and assigned without modification, with all of its benefits and burdens, as expressly provided in 11 U.S.C. §365(b)(3)(C).

## THE DESIGNATION OF THE LEASE

17.     In the schedule attached to the Designation (the "**Designation Schedule**"), the Lease is listed among the *Additional Designatable Leases,* with the Proposed Assignee identified as Transform Leaseco LLC.  Despite SWZ's Original Objection, the Designation Schedule again incorrectly lists the proposed cure amount for the Lease as $0.00.

18.     Paragraph 18 of the Designation provides that Buyer *"intends to designate the [Lease] for assumption and assignment free and clear"* of the Restrictive Covenants, but fails to describe any Restrictive Covenants that the Buyer is seeking to extinguish or otherwise diminish as required by Paragraphs 59 and 26 of the Sale Order and Assignment Order, respectively.

19.     The Designation further fails to provide any adequate assurance information for the Proposed Assignee, including (i) where the Proposed Assignee is in the Buyer's organizational structure, (ii) the Proposed Assignee's and Buyer's current financial position, including financial wherewithal and

5

current availability under any credit facilities, and/or any other financial resources, and (iii) the Buyer and Proposed Assignee's operating experience, resources and capabilities.

## CURE OBJECTION

20.     Section 365 of the Bankruptcy Code mandates that an assignment of a lease cannot be consummated unless all defaults under the lease have been cured as of the effective date of the assignment.    All existing defaults must be promptly cured before any unexpired lease of non-residential real property can be assumed. See 11 U.S.C. § 365(b)(1)(A) and (B); *Agri Star Meat & Poultry, LLC v. Nevel Props. Corp. (In re Nevel Props. Corp.)*, 765 F.3d 846, 849 (8th Cir. 2014) (stating that a lease cannot be assumed unless a cure has been effected); *In re Alipat, Inc.*, 36 B.R. 274, 276 (Bankr. E.D. Mo. 1984) ("[I]f there has been a default in an executory contract or unexpired lease, the trustee may not assume such contract or lease unless he or she cures the default, compensates the other party, and provides adequate assurance of future performance…").

21.     The Debtors, Buyer and/or the Proposed Assignee therefore, must promptly cure all existing defaults by paying SWZ the actual cure amounts due, including the amounts set forth in SWZ's proof of claim and any other additional amounts which have yet to be liquidated, reconciled and/or determined, as well as any other amounts which continue to accrue as obligations under the Lease pending assumption of the Lease.  The non-monetary defaults, including the Debtor's failure to provide required proof of insurance, must also be cured.

## THE LEASE MUST BE ASSUMED AND ASSIGNED *CUM ONERE*

22.     Section 365(b)(3)(C) of the Bankruptcy Code further provides that the assumption and assignment of a shopping center lease "is subject to all the provisions thereof . . . ."  11 U.S.C. §365(b)(3)(C).  Bankruptcy Courts have described the assumption of an unexpired lease (a prerequisite to assignment under § 365(f)(2)(A)) as "an all-or-nothing proposition – either the whole contract [or lease] is assumed or the entire contract [or lease] is rejected." *See, e.g.*, *In re CellNet Data Systems, Inc.*, 327 F.3d 242, 249 (3d Cir. 2003).  The Debtors must assume and assign leases in their entirety, and the assignee is subject to the terms and conditions thereof *cum onere.  See N.L.R.B. v. Bildisco & Bildisco*,

6

465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L. Ed. 2d. 482 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract cum onere").

23.    To the extent the Court is inclined to enter an order authorizing the assumption and assignment of the Lease, the Proposed Assignee must accept all terms of the Lease including, without limitation, the Easement terms, insurance requirements, and tax obligations and of course, the Lease is subject to May 2022, without any further options available. Moreover, the Lease is subject to any and all Covenants, Conditions and Restrictions as set forth in the Declaration. These obligations cannot be modified and the Lease cannot be assigned free and clear of the Declaration.

## ADEQUATE ASSURANCE OBJECTIONS

24.    Before assuming a shopping center lease, a debtor must also, *inter alia*, provide adequate assurance of future performance to the landlord. 11 U.S.C. §365(b)(1) and (b)(3). This section of the Bankruptcy Code is designed to ensure that parties receive the benefit bargained for if a lease is to be assumed. *In re Ionosphere Clubs, Inc.* 85 F.3d. 992, 999 (2d. Cir. 1996).

25.    Heightened adequate assurance requirements are imposed on assignees for shopping center leases to ensure that the essential terms of a lease are preserved. *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d. Cir. 2000), cert. denied, 121 S.Ct. 175 (2000) (citation omitted).

26.    To date, no financial information has been supplied whatsoever concerning the Proposed Assignee – accordingly, the heightened adequate assurance requirements have not been met. Before compelling SWZ to accept an assignment of the Lease, Proposed Assignee must provide satisfactory adequate assurance information, as mandated by the Bankruptcy Code.

## RESERVATION OF RIGHTS AND JOINDER

27.    SWZ also reserves the right to assert other objections as may be appropriate and reserves the right to supplement, amend or revise this Objection to raise other claims against the Debtors arising out of or related to the Lease, including without limitation, claims for (a) the costs of any repair or environmental remediation that may be necessary after inspection of the leases premises; (b) post-petition rent and other obligations accruing under the Lease that SWZ has yet to discover; (c) pecuniary losses suffered by SWZ as a result of any defaults by Debtors under the Lease, including without

4813-4235-6629, v. 1

limitation, attorney fees and costs incurred as a result of any defaults; and (d) non-monetary defaults which SWZ is not yet aware.

**WHEREFORE,** SWZ requests that this Court (i) sustain this Objection, and (ii) grant SWZ such other and further relief as this Court deems just and appropriate under the circumstances.

Respectfully submitted,

**STARK & STARK**
**A Professional Corporation**

By: /s /*Joseph H. Lemkin*

Dated: April 30, 2019

Joseph H. Lemkin
993 Lenox Drive
Lawrenceville, NJ 08648
(609) 791-7022 (direct)
(609) 895-7395 (facsimile)

*Attorneys for SWZ, LLC*

8

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to 28 U.S.C. §1746, that on April 30, 2019, I caused a true and correct copy of the foregoing Cure Objection to be sent to each persons named on the attached Service List, by email (unless otherwise stated).

**STARK & STARK**
**A Professional Corporation**

By: /s /*Joseph H. Lemkin*
Joseph H. Lemkin

Dated: April 30, 2019

993 Lenox Drive
Lawrenceville, NJ 08648
(609) 791-7022 (direct)
(609) 895-7395 (facsimile)
*Attorneys for SWZ, LLC*

9

4813-4235-6629, v. 1

# SERVICE LIST

1.   Bid Notice Parties
- Debtors
  Rob Riecker: rob.riecker@searshc.com
  Luke Valentino: luke.valentino@searshc.com
  Mohsin Meghji: mmeghji@miiipartners.com
  General Counsel: counsel@searshc.com

- Debtors' counsel
  Ray Schrock, Esq.: ray.schrock@weil.com
  Jacqueline Marcus, Esq.: jacqueline.marcus@weil.com
  Garrett A. Fail, Esq. garrett.fail@weil.com
  Sunny Singh, Esq. sunny.singh@weil.com

- Debtors' investment banker: project.blue.rx@lazard.com

II.   Buyer Parties
a.   Buyer
  Kunal S. Kamlani: kunal@eslinvest.com
  Harold Talisman: harold@eslinvest.com

b.   Counsel
  Christopher E. Austin, Esq.: caustin@cgsh.com
  Benet J. O'Reilly, Esq.: boreilly@cgsh.com
  Sean A. O'Neal, Esq.: soneal@cgsh.com

III.   Consultation Parties

a.   Bank of America
  Paul Leake, Esq.: Paul.Leake@skadden.com
  Shana Elberg, Esq.: Shana.Elberg@skadden.com
  George Howard, Esq.: George.Howard@skadden.com

b.   Wells Fargo Bank
  Kevin J. Simard, Esq.: ksimard@choate.com
  Jonathan D. Marshall, Esq.: jmarshall@choate.com

c.   Committee
  Ira S. Dizengoff, Esq. : idizengoff@akingump.com
  Philip C. Dublin, Esq.: pdublin@akingump.com
  Abid Qureshi, Esq.: aqureshi@akingump.com
  Sara L. Brauner, Esq.: sbrauner@akingump.com

4813-4235-6629, v. 1

**[CONTINUED ON NEXT PAGE]**
**[CONTINUED FROM PREVIOUS PAGE]**

Transform Holdco, LLC
c/o ESL Partners, Inc.
Attention: Kunal S. Kamlani and Harold Talisman
1170 Kane Concourse, Suite 200
Bay Harbor Islands, FL 33154
*Via First Class Mail*

Sears Holdings Corporation
Attn: General Counsel
3333 Beverly Road
Hoffman Estates, IL 60179
*Via First Class Mail*

Weil, Gotshal & Manges LLP
Attention: Ray C. Schrock, P.C.,
Ellen J. Odoner, Gavin Westerman and Sunny Singh
767 Fifth Avenue
New York, New York 10153
*Via First Class Mail*

Cleary Gottlieb Steen & Hamilton LLP
Attention: Christopher E. Austin,
Benet J. O'Reilly and Sean A. O'Neal
One Liberty Plaza
New York, NY 10006
*Via First Class Mail*

11

# EXHIBIT A

*K-Mart*
*Valancia Cap'y*

**Parties**

THIS LEASE made and entered into as of this      3rd   day of   February      , 19 72
between  VALEICIA HART, A PARTNERSHIP, COMPOSED OF RAYMOND H. STOTTER
and ELLIOTT CAPLOW

~~X~~      ~~XXXXXXXX~~ having~~its~~ their  principal office at 9538 Brighton Way,
Beverly Hills, California 90210
(herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having
its principal office at 2727 Second Avenue, Detroit, Michigan 48232 (herein referred to as "Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth,
Landlord and Tenant do hereby covenant, promise and agree as follows:  *no Ex wie A*

**Demised
Premises**

1. Landlord does demise unto Tenant and Tenant does take from Landlord for the term here-
inafter provided, and any extension thereof, the following property: Tenant's completed building
~~or building~~ (designated K mart ~~and K mart Food~~, together with site improvements to be con-
structed, as hereinafter specified, by Landlord at its expense on the land comprising not less than
Eight point eight three five   (8.835 ) acres described in Exhibit "A", attached hereto and made a part
hereof, situated in the     ....      ~~of~~      , County of  Los Angeles   , State
of  California     , said building ~~or buildings~~ to be in the locations depicted on Exhibit "B",
attached hereto and made a part hereof, and of the following dimensions:

*no
aglutt*

K mart Department store    - 400' x 210'    = 84,000 sq. ft.

TOTAL    = 84,000 sq. ft.

Plus Outdoor Garden shop - 65' x 93'7"

*no
Exhibit*

being part of a larger parcel described as Exhibit "D",

Said completed buildings and site improvements, together with the licenses, rights, privileges and
easements set forth in Article 9 hereof, shall be hereinafter collectively referred to as the "demised
premises".

**Term**

2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that
term is defined in Article 10 hereof, and shall terminate upon such date as shall be twenty-four
(24   ) years from the last day of the month in which said date of occupancy by Tenant shall occur;
provided, however, the term of this lease may be extended as provided in Article 12 hereof. The phrase
"lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant
to said Article 12.

**Annual
Minimum
Rental**

3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall desig-
nate in writing from time to time, an annual minimum rental of ONE HUNDRED NINETY TWO
THOUSAND -------------------------------------------------------------
DOLLARS ($192,000.00    ),
unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of
each month, in advance, commencing upon the first day of the lease term; provided, however, in the
event the first day of the lease term shall not be the first day of a calendar month, then the rental for
such month shall be prorated upon a daily basis.

*192,000
4,50*

1

*1/12/67*

**Additional Rental**

4.    In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of EIGHT MILLION TWO HUNDRED FIFTY THOUSAND ——————————————— ——————————— DOLLARS ($ 8,250,000.00    ), Tenant shall pay to Landlord as additional rental an amount equal to one percent (1%) of gross sales exceeding EIGHT MILLION TWO HUNDRED FIFTY THOUSAND ——————————————— DOLLARS ($ 8,250,000.00    ) up to but not in excess of SIXTEEN MILLION FIVE HUNDRED THOUSAND ——————————— DOLLARS ($ 16,500,000.00 ); and Tenant shall pay to Landlord as additional rental an amount equal to five-tenths of one per cent (.5%) of gross sales for such lease year exceeding SIXTEEN MILLION FIVE HUNDRED THOUSAND ——————————————— DOLLARS ($ 16,500,000.00 ) up to but not in excess of TWENTY MILLION ONE HUNDRED TWENTY-FIVE THOUSAND ——————— ——————————————DOLLARS ($ 20,125,000.00 ).

Said additional rental shall be paid on or before the twenty-first (21st) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall, on or before the twenty-first (21st) day following the end of each lease year or "lesser period", deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraphs shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 11 shall have been fulfilled, or an opening for business under Article 10 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A", except that the following shall be excluded:

(a)    Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been ussued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b)    Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise tax, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided, further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

2                                                                    7/15/71

Additional
Rental
(cont'd)

    (c)  Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

    (d)  Service and interest charges for time payment accounts and charge accounts;

    ~~(e) All sales of merchandise or services made by any supermarket grocery store, which shall occupy any portion or portions of demised premises, provided that the aggregate area of said portion or portions shall not exceed ( ) square feet of floor area.~~

  **(e)**  ~~¹(f)~~  All sales of automotive gasoline or diesel fuel.

New Build-
ing by
Landlord

    6.  Tenant's said building and site improvements shall be completed and delivered to Tenant promptly and with due diligence, giving consideration to scarcity of materials, strikes, lockouts, fire or other casualty, governmental restrictions and regulations, and Landlord warrants that a general contract for construction of said building and improvements referred to in Article 11 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than **August 1, 1972** . If for any reason whatever Landlord shall fail to comply fully with this warranty, Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with Tenant's typical plans and specifications and possession thereof tendered to Tenant prior to **April 1, 1973** , then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

Plans and
Specifi-
cations

    6.  Tenant's said building and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with working plans and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store plans and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. 1832.
Containing such additions, changes and modifications as are more particularly
set forth in that certain letter dated May 12, 1971, written by Mr. J. A.
Kilgore, Manager, Design Division, Construction Department, to Mr. Elliott
Caplow, Stotter & Caplow, 9538 Brighton Way, Beverly Hills, California 90210,
copy of which is attached hereto and marked Exhibit "C".

    Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

    (a)  Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on a store layout drawing which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

    (b)  Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

3

7/22/71

**Plans and Specifications (cont'd)**

Said working plans and specifications shall be submitted to Tenant for approval prior to commencement of construction and such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working plans and specifications Tenant shall, in writing, inform Landlord of required revisions or corrections thereto, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working plans and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical plans and specifications, store layout drawing and working plans and specifications, as approved by Tenant, shall constitute a part of this lease.

**Guarantee of Materials**

7. Landlord shall unconditionally guarantee all work performed by Landlord, or at its expense, in the construction of Tenant's building and site improvements against defective workmanship and materials either for the period of one (1) year from the date of completion thereof or for the period of any guarantee therefor given Landlord, whichever period shall be the longer.

**Advance Possession for Fixturing**

8. For a period of four (4) weeks prior to completion of Tenant's buildings by Landlord, Tenant shall have the privilege, rent free, of entering said buildings for installing storage bins, storing merchandise, and other purposes not creating unreasonable interference with the work of Landlord. Such entry shall not be construed as an acceptance thereof by Tenant under the provisions of this lease, or as a waiver of any of the provisions hereof.

**Parking and Other Common Areas**

and described in Exhibits "A" and "D".

9. Prior to the date of commencement of the lease term, Landlord shall construct (as hereinafter provided) the sidewalks, service drives, parking aisles, driveways, streets and parking areas (all of which shall be hereinafter sometimes referred to as the "common facilities") substantially as shown on Exhibit "B". The aggregate area provided for the parking of automobiles shall, during the lease term, be either in the ratio of ~~(        )~~ square foot of parking area for each square foot of gross floor area contained in buildings at any time located on the depicted on Exhibit "B" or sufficient to accommodate not less than eight hundred fifty ( 850 ) automobiles on basis of arrangement depicted on Tenant's typical plans, whichever shall be the greater. All sidewalks shall be of concrete construction, and all service drives, parking aisles, driveways, streets and parking areas shall be graded, levelled and paved with concrete or asphalt, and properly marked with painted lines to be repainted annually, for the orderly distribution of automobiles. Landlord covenants represents and warrants that, during the lease term, there shall be adequate sidewalks, driveways and roadways for automotive and pedestrian ingress and egress to and from Tenant's buildings and adjacent public streets and highways. Landlord shall make no charge of any kind or nature for the use of said common facilities or any additions thereto. All of said common facilities, including any signs owned by Landlord, shall be constructed in a workmanlike manner and shall, during the lease term, be maintained by Landlord, at its sole cost and expense, in good order and repair and in an adequate, sightly and serviceable condition. Said maintenance shall include, without limitation, keeping the same reasonably free and clear of foreign objects, papers, debris, obstructions, standing water, snow and ice, and supplying illumination during Tenant's business hours, and a reasonable period prior and subsequent thereto, to a minimum of one and one-half (1½) foot candles measured at ground level, for each square foot of common facilities. To assure the foregoing the Landlord shall cause the common facilities to be thoroughly cleaned not less than once weekly, and more often if necessary, and snow to be promptly removed on every occasion where it impedes the use of said facilities.

During the lease term, Landlord shall maintain paved driveways at the rear of Tenant's building in order to provide convenient ingress and egress from the delivery or service entrances to adjacent public streets and highways for the purpose of receiving and delivering merchandise and otherwise servicing said buildings. Said driveways shall be of sufficient width so as to permit the passage, loading and, if necessary, the turning around of trailer trucks and other commercial vehicles.

The term "common areas", as used in this lease, shall include the following: (a) said common facilities indicated on Exhibit "B" and those which shall at any time and from time to time be contained within the site depicted on Exhibit "B" or any future enlargement thereof, (b) areas within the site which shall be open to the public generally, such as rest rooms and other facilities, if any, as included within the confines of the land described in Exhibit "A" or any enlargement of said site (c) all other areas (except those areas which shall be occupied from time to time by building structures Landlord will maintain said "common areas" and the property, if any, between the demised premises and any street or roadway serving demised premises in a reasonably clean and sightly condition and will mow and weed not less than once weekly when necessary.

During the lease term, Landlord shall keep Tenant insured against all statutory and common law liabilities for damages on account of injuries to property or person, including death, sustained by any person or persons while within said common areas, in a policy or policies in the amount of Two Hundred Fifty Thousand Dollars ($250,000) with respect to injury to any one person and in the amount of One Million Dollars ($1,000,000) with respect to any one accident or disaster, and in the amount of One Hundred Thousand Dollars ($100,000) with respect to damage to property; and Landlord shall indemnify and save Tenant harmless against any such liability. Any such policies shall bear endorsement

4

**Common Areas (cont'd)**

modification or cancel~~ation thereof. Copies of such policies, so endorsed, or certificates evidencing~~ the existence thereof, ~~sha~~ll be promptly delivered to Tenant upo~~n written~~ request therefor.

Landlord hereb~~y g~~ives and grants unto Tenant, includ~~ing~~ Tenant's agents, employees, customers, licensees and invitees the full licenses, rights, privileges and easements to use said common areas, in common with Landlord and other tenants, if any, of the land described in Exhibit "A", and their respective agents, employees, customers, licensees and invitees. No persons other than those described in the preceding sentence of this paragraph shall be permitted to park upon or exercise any other rights over any of the parking areas of said site. In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now, or at any future time located beyond the limits of the land described in Exhibit "A", utilize said parking areas for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

Tenant may, at its election, from time to time, utilize portions of the common areas for carnival or circus type shows and entertainment, outdoor shows, home shows, automobile shows or such other uses which in Tenant's judgment tend to attract the public. Tenant shall give Landlord notification of such intended use a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against injuries to property or person, including death, sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.

**Store Opening**

10.   The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's buildings and site improvements shall be completed in accordance with said working plans and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 11 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 10, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working plans and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct or remedy in all or part, any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

**Landlord's Representations and Warranties**

~~11.   Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common facilities in accordance with the provisions of Article 9 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B".~~

11.   Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, (a) complete Tenant's building, a Safeway Supermarket, the shell of the Landlord's shop stores between Tenant's building and the Safeway store, and site improvements substantially in accordance with the site plan de picted on said Exhibit "B", including completion of said common facilities in accordance with the provisions of Article 9 hereof, and (b) have the Safeway store open concurrently with Tenant's building. In the event said Safeway Supermarket is not open for business concurrently with Tenant's opening, then Tenant shall be privileged, but not obligated, to open Tenant's building subject to rental provisions as set for in this same article. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibits "A" as shown on said Exhibit "B".

Landlord hereby reserves for itself, and for its successors and assigns, a non-exclusive easement over and upon the common area portion of the demised premises, as depicted on Exhibit "B", for the purpose of vehicular and pedestrian ingress and egress, and for the parking of motor vehicles of the customers, patrons, suppliers and employees of tenants of Landlord, and the subtenants and concessionaires of such tenants.

5

**Landlord's
Representa-
tions and
Warranties
(cont'd)**

Notwithstanding the provisions of Article 10 or any other provision of this lease, the lease term shall not commence and said annual minimum rental, and other charges payable under this lease, shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided further, in lieu thereof, Tenant shall pay monthly in arrears one per cent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental as set forth in Articles 3 and 4 hereof.

In the event Landlord's said representations and warranties shall not be fulfilled within twelve (12) months after such date as Tenant shall open for business, Tenant may notify Landlord in writing thereof and Landlord shall have ninety (90) days within which to fulfill said representations and warranties. If said representations and warranties shall not have been fulfilled within said ninety (90) day period, Tenant thereafter shall have the option of terminating this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Option to
Extend
Lease**

12.  (a)  Tenant shall have the option to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to expiration of the term hereof.

(b)  If Tenant shall have exercised the foregoing option, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such extended term.

(c)  If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such further extended term.

(d)  If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such further extended term.

(e)  If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such further extended term.

(f)  Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease, or any extension thereof.

**First
Refusal to
Purchase
Option**

13.  Anything in this lease contained to the contrary notwithstanding, and without in any manner affecting or limiting any of the rights, privileges, options or estates granted to Tenant under this lease, it is agreed that if the Landlord, at any time during the term of this lease or any extension thereof, receives one or more bona fide offers from third parties to purchase the demised premises, or property of which the demised premises are a part, and if any such offer is acceptable to the Landlord, then Landlord agrees to notify Tenant in writing, giving the name and address of the offeror, and the price, terms and conditions of such offer, and Tenant shall have thirty (30) days from and after the receipt of such notice from Landlord in which to elect to purchase the property for the consideration and on the terms and conditions contained in the bona fide offer. If Tenant does not elect to purchase said property and Landlord sells the property, the purchaser shall take the property, subject to and burdened with all the terms, provisions and conditions of this lease, including this Article 13, and the rights of the Tenant under this lease as against the new owner shall not be lessened or diminished by reason of the change of ownership. Tenant's failure at any time to exercise its option under this Article 13 shall not affect this lease or the continuance of Tenant's rights and options under this Article 13 or any other article.

6

**Repairs**

14.  Tenant shall make and pay for all replacement of plate glass and all nonstructural repairs and replacements to the interior of Tenant's building which it deems necessary to keep the premises in a good state of repair, but in no event shall Tenant be obligated to make repairs and replacements which Landlord shall be required to make under any provision of this lease or which shall be necessitated by Landlord's negligence, default or failure to repair. Landlord shall make and pay for all repairs and replacements (except those which Tenant shall be specifically obligated to make under the provisions of this Article and *those due to Tenant's negligence*) to said building which shall be necessary to maintain the same in a safe, dry and tenantable condition, and in good order and repair. Notwithstanding anything to the contrary herein contained, Tenant shall not be required to make any repairs or replacements (or be liable for the cost thereof) which shall be necessitated by any damage or destruction with respect to which Landlord shall be insured or against which Landlord shall be required by the terms of this lease to insure, but Landlord shall make all such repairs or replacements.

In the event/building or improvements constituting demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed One Thousand Dollars ($1000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations and Additional Construction**

15.  Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its building as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to plans and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural strength of the building will not be impaired by such work. The term, "structural changes", as used herein, shall not include moving of stud partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant. The area in which Tenant may expand shall be limited to the area of the northerly wall of the

**K mart building in the area shown by dashed lines on Exhibit "B".**

Tenant may, at its own expense, at any time erect or construct additional buildings or structures on any portion of the "common facilities" areas as defined in Article 9 and depicted on Exhibit "B"; provided, however, gross sales made in or from said additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, Tenant shall reimburse Landlord for any real estate taxes imposed on said additions or new construction, which taxes are solely attributable thereto, and Tenant shall reimburse Landlord for any increase in insurance premiums attributable thereto. Tenant shall also be solely responsible for exterior and interior repairs thereto, except those necessitated by fire or casualty for which Landlord is obligated to insure. In the event Tenant constructs any such additions or new construction Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, nor shall the floor area thereof be utilized in any computation with respect to required ratio of building area to parking area under said Article 9, and the number of parking spaces required thereunder shall be reduced by the number of spaces covered by such additional buildings or structures.

**Utilities**

16.  Tenant shall promptly pay for all public utilities rendered or furnished to Tenant's building during the lease term, including water, gas and electricity, provided separate meters shall be installed for Tenant. Landlord covenants, represents and warrants that, during the lease term, said buildings shall at all times be connected to electric, water and gas lines of an adequate source of supply, and to storm and sanitary sewer systems of adequate capacity.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition during the full term of this lease or any extension and at its sole expense. Sewer charges or sewer taxes, regardless of the manner billed or assessed, shall be paid by Landlord.

**Governmental Regulations**

17.  Tenant shall observe and comply with all rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said buildings, including the making of nonstructural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes including, but not limited to the erection of a fire escape or exit, installation of a sprinkler system or other fire preventive device of a structural nature, or (b) require nonstructural changes which would have been required irrespective of the nature of the tenancy, then, in either such event, the same shall be complied with by Landlord at its sole expense.

7

8/10/70

**Landlord's Covenant**

18. Landlord covenants, represents and warrants that, within the confines of the land described in Exhibit "A" now or in the future owned or controlled, directly or indirectly, by Landlord, Landlord's principal owners, stockholders, directors or officers, or their assignees or vendees, no premises (other than Tenant's buildings) shall be leased, rented, used or occupied for any purposes whatsoever without Tenant's prior written consent, which may be withheld or granted at Tenant's sole discretion and further, that in addition no premises so owned or controlled outside the confines of said area but within a four (4) mile radius thereof, shall be leased, rented, used or occupied for the operation of a variety store, department store, junior department store, private store, discount store, a store selling tires, batteries and auto accessories, a restaurant, drive-in restaurant, supermarket or a drug store. This covenant shall run with the land commencing with the date of execution of this lease and shall continue until such date as shall be the last day of the lease term or extension or renewal thereof; provided, however, this covenant shall cease and determine and be of no further force or effect in the event that either (a) subsequent to the commencement of the lease term, Tenant's buildings shall cease to be used for the operation of any store managed by Tenant for a period of six (6) consecutive months, excluding temporary interruptions of said operation because of causes beyond Tenant's control, or (b) said date of occupancy described in Article 10 hereof shall not occur prior to such date as shall be seven (7) years from the date of this lease. (See Rider Attached).

**Fire**

19. From and after the date on which Tenant shall be privileged to enter upon demised premises for the purposes specified in Article 8 hereof, Landlord shall insure the buildings depicted on Exhibit "B", including Tenant's buildings, against damage or destruction by fire and other casualties insured under a standard extended coverage endorsement. Said insurance shall be in an amount equal to not less than eighty per cent (80%) of the insurable value of the permanent improvements thereof. All such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof, so endorsed, shall be promptly delivered to Tenant upon written request therefor. Irrespective of the cause thereof, Tenant shall not be liable for any loss or damage to said buildings resulting from fire, explosion or any other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding

**One Hundred Thousand Dollars ($100,000.00)**

then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 12 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and, upon the exercise of any such option (other than the option set forth in subparagraph (f) of Article 12) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the said permanent improvements as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's building rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

In the event that, at any time during the lease term except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, during such period of time (including the last two (2) years of the lease term) that either (a) twenty per cent (20%) or more of the gross rentable floor area of said buildings shall be so rendered

The provisions of this paragraph relating to restoration shall be applicable only to the Safeway Supermarket building and the Landlord's shops between Tenant's building and Safeway Supermarket building.

8

Fire
(cont'd)

untenantable, or (b) any of the stores of tenants specifically required to be open for business prior to Tenant's opening for business (by terms of Article 11) shall not be open for business because of such damage or destruction, then the annual minimum rental for such period of time shall be abated, whether or not Tenant's buildings shall be damaged or destroyed and during such period Tenant shall pay monthly in arrears one per cent (1%) of its gross sales.

Eminent
Domain

20.  In the event all of Tenant's buildings shall be expropriated **permanently** by public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived of the physical possession thereof.

In the event that less than the whole, but more than ten per cent (10%) of Tenant's buildings shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said building which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and minimum basis of sales shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

**depicted on Exhibit "B"**

Without limiting the foregoing, in the event that more than ~~ten per cent (10%)~~ **Fifteen per cent (15%)** of the land ~~described in Exhibit "A"~~ shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date possession of the land shall be taken by such authority, by giving notice to Landlord of such election within ninety (90) days thereafter; provided, however, said termination by Tenant shall be null and void if, within ninety (90) days following the date possession of said land shall be so taken, Landlord shall substitute equivalent and similarly improved lands contiguous to said land and properly integrated with the remainder of the site depicted on Exhibit "B". Notwithstanding any other provision of this lease, in the event that more than ten per cent (10%) of the aggregate number of square feet of ground floor area in the buildings located on said site shall be expropriated by public or quasi-public authority, Tenant may terminate this lease at any time following notice of such expropriation. Any such termination shall be effective as of the date of notice to Landlord. Landlord shall immediately notify Tenant of any notice of any such proposed expropriation.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant so much of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

Assign-
ment and
Subletting

21.  The premises hereby demised shall not be used for any unlawful purpose. Tenant may assign this lease or sublet the whole or any part of said demised premises, but if it does so ~~without Landlord's consent~~, it shall remain liable and responsible under this lease.

Signs

22.  The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing, directly or indirectly,

9

**Signs
(cont'd)**

contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of the premises described in Exhibit "A", one or two pylon-type signs. Any such sign shall be of such height and other dimensions as Tenant shall determine and shall bear such legend or inscription advertising Tenant's store as Tenant shall determine. Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.

**and
Exhibit "D"**

Landlord shall not permit any other advertising signs, billboards or posters to be displayed on any portion of the premises described in Exhibit "A", hereof, excepting flat wall signs which may be placed on stores, if any, now depicted on Exhibit "B", or in the future erected on "future building areas"

**nd excepting
afeway pylon
ign**

as depicted thereon, providing such signs shall be utilized solely for the purpose of advertising the names of the respective tenants thereof.

Landlord shall not, without Tenant's written consent, at any time utilize the exterior of Tenant's building, or the space above, for sign display purposes.

**Ingress and
Egress**

23.  Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain for the period of this lease and any extension thereof, ingress and egress facilities to public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's
Remedies**

24.  If the rent reserved in this lease, or any part thereof, shall remain unpaid for a period of thirty (30) days or if Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of said nonpayment or other default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

25.  If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant
of Title**

26.  Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the lease term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

10

12/31/68

**Covenant of Title (cont'd.)**

a leasehold estate

Landlord further covenants, represents and warrants that it is seized of ~~an indefeasible estate in fee simple~~ in the land described in Exhibit "A" free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof) with exceptions as follows:

One-half interest in the mineral rights together with surface privileges in favor of Arthur E. Erwin & Gay M. Erwin, husband and wife, over land described in deed recorded July 7, 1952, Book 39317, Page 97 of Official Records.

Landlord shall, without expense to Tenant, and within thirty (30) days after written request by Tenant, furnish (a) a certification by an attorney acceptable to Tenant that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A", (b) a survey by licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Sub-ordination**

27. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**

28. During the lease term, Tenant and its assignees and sublessees shall indemnify and save Landlord harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of its buildings, except those which shall result, in whole or in part, and directly or indirectly, from the default or negligence of Landlord.

**Tenant's Right to Cure Landlord's Defaults**

29. In the event Landlord shall neglect to pay when due any taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, (two (2) days with respect to defaults under Article 9 hereof) pay said taxes, assessments, principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of six per cent (6%) per annum, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall, (with respect to taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate) in the event it shall notify Landlord to correct any default, give a similar notice to such holder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**

30. At the expiration or earlier termination of the lease term, Tenant shall surrender demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty or occurrence excepted. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time

11

**Condition of Premises at Termination (cont'd.)**

to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option, the property specified in said notice shall be the property of Landlord.

**Holding Over**

31.   In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of demised premises after the expiration of the lease term, it shall so remain as a tenant from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

**Notices**

32.   Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Detroit, Michigan, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be date on which such notice is deposited in a post office of the United States Post Office Department.

**Captions and Definitions**

33.   Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provisions thereof. The necessary grammatical changes which shall be required to make the provisions of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**

34.   The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memorandum of Lease**

35.   The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter. **(See Article Attached)**

IN WITNESS WHEREOF, the parties hereto have executed these presents in duplicate and affixed their seals hereto as of the day and year first above written.

WITNESSES:

VALENCIA MART, a partnership

By: _____

Elliott M. Caplow, President Partner

By: _____

Attest:

Raymond H. Stotter, Partner Secretary

S. S. KRESGE COMPANY

By: _____

John C. Cook          Vice President

Attest: _____

J. Kent Tewel    Assistant Secretary

12

ACKNOWLEDGMENTS

STATE OF                                      )

TO 442 C
(Partnership)

STATE OF CALIFORNIA    )
COUNTY OF  LOS ANGELES  } SS.

On _January 12, 1972_
before me, the undersigned, a Notary Public in and for said State, personally appeared
ELLIOTT M. CAPLOW and RAYMOND H. STOTTER

                                                        known to me
to be    all    of the partners of the partnership
that executed the within instrument, and acknowledged to me
that such partnership executed the same.

WITNESS my hand and official seal.

Signature _Anson I. Dreisen_

Name (Typed or Printed)
Anson I. Dreisen

OFFICIAL SEAL
ANSON I. DREISEN
NOTARY PUBLIC - CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires Dec. 10, 1972
9229 Sunset Blvd., Los Angeles, Calif. 90069

(This area for official notarial seal)

My commission expires: _____

before me,
and for the

the seal of
corporation;
led and de-
d voluntary

ay and year

_____
Notary Public

STATE OF MICHIGAN  )
COUNTY OF WAYNE    } SS:

I do hereby certify that on this _____ day of  February  , 19 72 , before me,
Beatrice L. McGaw  , a Notary Public in and for the
County and State aforesaid, residing therein and duly commissioned, personally appeared
JOHN C. COCK  and  J. KENT TEWEL
known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by
me duly sworn, did depose and say that they reside in  Grosse Pointe Park, Michigan
and  Detroit, Michigan
respectively; that they are the Vice President and Assistant Secretary respectively of S. S. Kresge
Company, the corporation described in and which executed the foregoing instrument; that they know
the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corpora-
tion; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and
delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary
act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year
in this certificate first above written.

My commission expires: November 22, 1975    _Beatrice L. McGaw_
                                                        Notary Public

BEATRICE L. McGAW
Notary Public, Wayne County, Mich.
My Commission Expires Nov. 22, 1975

13

CODE No. 824-88—200—Onlys—6/70—1366/10K—X26—Printed in U.S.A.                    (2/24/65)

REAL ESTATE
TAXES:

36.  Tenant shall pay and discharge all ad valorem real estate taxes and assessments which shall be levied against the taxable premises during the lease term, excluding therefrom payment of assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

To the extent permitted by law, Tenant may pay any such assessments in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with nor be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord, the rents payable hereunder or the demised premises except the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 36.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed FORTY FIVE THOUSAND DOLLARS ($45,000.00) during any lease year, shall be hereinafter referred to as an "excess tax payment". All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year. In the event the excess tax payment for any lease year exceeds said additional rental due and payable during the same lease year, the amount by which said excess tax payment exceeds said additional rental shall be carried forward and be deductible from additional rentals due and payable for succeeding lease years on a cumulative basis.

The taxable premises, as defined below, shall be separately assessed from any contiguous lands and from any additional lands and improvements incorporated into the demised premises in the future.

~~In the event Tenant constructs, as provided in Article 15 hereof, additional buildings or structures on any portion of the land described in Exhibit "A", said additional buildings or structures shall be excluded from the taxable premises.  Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall not be deductible from additional rentals as provided herein.~~

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises. Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the taxable premises, the Tenant will cooperate in such proceedings.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 36 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled

**L ESTATE**
**AXES**
**(Cont'd)**

to receive all refunds paid by the taxing authorities. After payment
of all of Landlord's and Tenant's expenses incurred in any such
proceeding in which a refund is paid, the Tenant shall pay to the
Landlord either the balance of such refund or, alternatively, Tenant
shall pay to the Landlord that part of the excess tax payment which may
have been deducted from additional rent in the tax year for which the
refund was granted, whichever amount shall be the lesser. Any balance
of said refund remaining after such payment to Landlord shall belong
to the Tenant. If no refund shall be secured in any given proceeding,
the party instituting the proceeding shall bear the entire cost.

The term "taxable premises", as used in this lease, shall be that
certain land described in Exhibit "A", ~~respectively~~, together with such
buildings and other improvements required by Tenant to be constructed
thereon by Landlord under the terms of this lease.

RIDER

~~LANDLORD'S
COVENANT~~

~~The following additional language is being added to
Article 35, which appears on page 12 of this Lease.~~

~~35. The provisions set forth in Article 19 of this lease
prohibiting~~ Landlord, Landlord's principal owners, stockholders,
director or officers, or their assignees or vendees from leasing
renting, using or occupying any premises within ¼ mile radius of
the leased premises for the operation of a variety store, depart-
ment store, junior department store, cut-rate store, discount
store, a store selling tires, batteries and auto accessories, a
restaurant, drive-in restaurant or a drug store, shall not apply
to Newhall Land & Farming Company, the present fee owner of the
land underlying the leased premises, or to any purchaser of the
fee from Newhall Land & Farming Company nor to any successors
~~in interest by reason of foreclosure or by deed in lieu of fore-
closure.~~

ATTORNEY'S
FEES

37. In the event that either party to this lease is in
default as to any term, condition or representation or warranty
of this lease, and such default is not corrected by the party in
default within a reasonable period of time after the receipt of
written notice of such default, the party offended by such default
shall be reimbursed by the defaulting party for attorney fees
incurred in causing the correction of such default or in the
prosecution of a cause of action for affirmative relief to damages,
in addition to any other damages caused by such default.

OFFSET
STATEMENT

38. Within ten (10) days after request therefor by Landlord,
Tenant agrees to deliver in recordable form a certification to any
proposed mortgagee, beneficiary of a deed of trust, or purchaser,
certifying (if such be the case) that this lease is in full force
and effect and that there are no defense or offsets thereto, or
stating those claimed by the Tenant.

MECHANICS'
LIENS

39. Tenant agrees to pay any and all liens and claims of
liens arising out of any repairs or work done by Tenant on the
demised premises; if a lien is filed, to immediately remove the
effect thereof from the demised premises; and to hold Landlord
harmless from, and indemnify Landlord against any loss or damage
Landlord may suffer or incur by reason of any such claim or lien,
including court costs and reasonable attorneys' fees in the defense
thereof.

CONVEYANCE
BY LANDLORD

40. Should Landlord sell its interest in the demised premises
or this lease subsequent to the completion of the initial improvements
provided for in this lease, Landlord shall be released of all liability
under this lease for matters accruing after the consummation of such
sale, provided the purchaser assumes in writing all the covenants and
obligations of Landlord relating to matters accruing after the con-
summation of such sale. If such sale is made prior to the completion
of the building and improvements (as provided in Articles 6 and 7),
then Landlord shall not be relieved of its obligations under this lease
until Landlord has completed such construction work.

LEGAL DESCRIPTION

~~PARCEL 1:~~
K mart Site
8.835 Acres

That portion of the Rancho San Francisco, in the county of Los
Angeles, State of California, as per map recorded in Book 1 pages, 521 and
522 of Patents, in the office of the county recorder of said county, bounded
and described as follows:

Beginning at the intersection of the easterly line of the land
described in Area "C" in the grant deed recorded February 6, 1968 as Instrument
No. 508 in Book D-3905 Page 546, of Official Records of said county with the
southerly line of Valencia Boulevard as described in Parcels 3-2 to 5 inclusive
of Parts "A" and "C" in Road Deed recorded September 12, 1966 as Instrument No.
3512 in Book D-3424 Page 10 of Official Records of said county, and described
in Road Deed recorded September 3, 1965 as Instrument No. 3731 in Book D-3039,
Page 365 of Official Records of said county; said southerly line being a curve
concave to the south having a radius of 1449.00 feet, a radial line through said
point bears N 13° 28' 56" W; thence easterly along said southerly line through
a central angle of 12° 59' 54" an arc distance of 328.73 feet to the beginning
of a non-tangent curve concave to the south having a radius of 1850.00 feet, a
line radial to said 1449.00 feet radius curve bears N 0° 29' 02" W, aline radial
to said 1850.00 feet radius curve bears N 2° 30' 23" E; thence continuing easterly
along said southerly line through a central angle of 10° 37' 24" an arc distance
of 343.01 feet; thence tangent to said last mentioned curve S 76° 52' 13" E. a
distance of 162.96 feet to the west line of the land described in the modification
of lease recorded September 2, 1966 as Instrument No. 2217 in Book M-2332 Page 992
of Official Records of said county; thence leaving said southerly line S 17° 33' 09"
W, along said westerly line a distance of 165.00 feet to the southwest corner of
the land described in said modification of lease; thence along the southerly line of
said land S 70° 58' 40" E, a distance of 125.00 feet to the intersection thereof
with the westerly line of Bouquet Canyon Road, as described in the Road Deed recorded
February 4, 1965 as Instrument No. 3322 in Book D-2788, page 386 of Official Records
of saidcounty said westerly line being a curve concave to the southeast having a
radius of 2060.00 feet a radial line through said point bears N 64° 31' 45" W; thence
southerly along said westerly line through a central angle of 6° 09' 31" an arc distance
of 221.42 feet; thence leaving said westerly line S 72° 10' 16' W, adistance of
333.11 feet; thence N 17° 49' 44" W. a distance of 95.00 feet thence S 72° 10' 16" W,
a distance of 299.15 feet to the easterly line of the land described in Area "C"
in the above mentioned grant deed recorded February 6, 1968 as Instrument No. 508;
thence along said easterly line N 17° 49' 44" W, a distance of 577.29 feet to the
point of beginning.

EXHIBIT "A"

-1-



S.W.C. BOQUET CANYON RD.(SAN FERNANDO RD) & VALENCIA BL.

NEWHALL, CALIF

EXHIBIT B
1/31/72





## S. S. KRESGE COMPANY
### GENERAL OFFICES
2727 SECOND AVENUE
DETROIT, MICHIGAN 48232
AREA CODE 313  PHONE 965-7300

May 12, 1971

Stotter & Caplow
8536 Brighton Way
Beverly Hills, California  90210

Attention: Mr. Elliot Caplow

Reference: K mart #      - Newhall, California
SWC Bouquet Canyon Road and Valencia Boulevard

Dear Mr. Caplow:

At the request of Mr. R. E. Davis of our Real Estate Department, we are
forwarding to you two (2) sets of Typical Plans and Outline Specifications
identified with the set number 1832, covering our minimum requirements for
the construction of a K mart.

The Typical K mart Store plans and specifications consist of the following:
400 x 210 K mart plans dated January 1, 1971

| | | | |
|---|---|---|---|
| A1a | A9b | 6M1 | 6M1 |
| 6A2 | A12b | 6E2 | M2b |
| 6A3 | A13a | 6E3 | M3b |
| 6A4 | A14a | E4c | M4b |
| 6A5 | A15a | E5c | N5a |
| A6c | A16b | | N6b |
| A7a | A17a | | M8a |
| A8a | A18a | | |

Supplementary Auto Service Center drawings all dated March 20, 1970
Title - Index Sheet
A-1 thru A-4                     E-1 thru E-4
P-1 and P-2                      TD-1 and TD-2

K mart Pylon Sign drawing KS-18 dated September 20, 1965, revised
January 16, 1970

Outline Specifications dated January 1, 1971

These plans and specifications describe a 400' wide x 210' deep K mart,
containing 84,000 square feet, with an attached Food Market to the left.

EXHIBIT "C"

Stotter & Caplow
Mr. Elliot Caplow                            - 2 -                May 12, 1971

Re:  K mart #        - Newhall, California

At this location, however, the Food Market has been eliminated.  We are
including a Preliminary Layout 1032 dated 5-3-71 for this size and
hand store.  This drawing also indicates the required modification to the
Typicals for this specific location.

Secondary electric service at 277/480 volt - 3 phase wye is acceptable.
Necessary capacitors are required to maintain the power factor at minimum
of 97% under all load conditions.  Utility transformer shall be located
where shown on layout.

Due to the additional width (61'-0") Garden Shop, the type "W" fixtures in
the Garden Shop shall be 250 W mounted on 15'-0" fence posts and not as
indicated on drawings 6E2 and E4c.  Type "F" canopy lighting shall be
extended to handle additional width.

Firm gas is acceptable for space heating, domestic hot water heaters and
cooking equipment.

At this location, the following modifications may be made:

1.  Gas fired duct furnaces may be used in the Main Mechanical Equipment
    Room to serve the main heating system.
2.  Front vestibule may be deleted.
3.  Supply registers "G" at front salesroom where shown on drawing 6M1
    may be deleted.  We do require three (3) ceiling supply air registers
    "K" at main entrance doors.
4.  An electric duct heater (thermostatically controlled) may be substituted
    for hot water booster coil #1 where shown on drawing 6M1.  Electric duct
    heater shall handle a minimum of 1880 CFM with output capacity of 40 KW.

Provide one (1) meter for each utility to the K mart.  Electricity for the
parking lot lighting, sidewalk (under canopy) lighting and service drive
lighting shall be on the Landlord's separate meter and separate electric
service.

All public utilities for the Food Store area including the sprinkler system
will be separate and completely independent from K mart and will be provided
by the Landlord.

Air conditioning for the main system shall require the use of three (3) open
compressors and the required remote air cooled condensers to limit maximum
condensing temperature to 120 degrees F.  All systems shall be of equal
capacity.  Outside summer design temperatures are 100 degrees F. dry bulb
and 72 degrees F. wet bulb.

Stotter & Caplow                                        May 12, 1971
Mr. Elliot Caplow                      - 3 -

Re:  K mart #        - Newhall, California

All stock rooms, both upper and lower levels, shall be air conditioned.  See
drawing 6M1 which shows dotted lines to main stock areas, Auto Center stock
room and layaway and stock over offices.

We do require the 100% outside air through the roof, H-O-V-C selector
switch, 7 day time clock, automatic dampers, etc., as outlined in temperature
controls section of specifications.

These sets of Typical plans and specifications are to be used only as a
guide for the preparation of complete working drawings and specifications.
When a Lease is formalized, we will furnish additional supplemental informa-
tion with specific layouts for sales fixtures, electrical and plumbing
underfloor locations.

                                        Very truly yours,

                                        James A. Kilgore, A.I.A.
                                        Manager, Design Division
                                        Construction Department

JAK:crd
cc:  Mr. C. R. Miller
     Mr. A. D. Korkau
     Mr. R. E. Davis, W.R.O.
     Public Utilities

LEGAL DESCRIPTION

RECIPROCAL PARKING AND EASEMENT FOR INGRESS AND EGRESS.

That portion of the Rancho San Francisco in the county of Los Angeles, State of California, as per map recorded in Book 1, pages 521 and 522 of Patents, in the office of the county recorder of said county, bounded and described as follows:

Bounded on the west and southwest by the easterly and northeasterly boundary lines of the land described in Area "C" in the grant deed recorded February 6, 1968 as Instrument No. 508 in Book D-3905 Page 546 of Official Records of said county.

Bounded on the north by the southerly line of Valencia Boulevard as described in Parcels 3-2 to 5 inclusive of Parts "A" and "C" in Road Deed recorded September 12, 1966 as Instrument No. 3512 in Book D-3424 Page 10 of Official Records of said county, and described in Road Deed recorded September 3, 1965 as Instrument No. 3731 in Book D-3039, Page 365 of Official Records of said county; and

Bounded on the east by the westerly line of Bouquet Canyon Road, as described in the Road Deed recorded February 4, 1965 as Instrument No. 3322, in Book D-2788 Page 386 of Official Records of said county.

EXCEPT that portion thereof as described in the modifications of lease recorded September 2, 1966 as Instrument No. 2217 in Book M-2332 Page 992, of Official Records of said county.

EXHIBIT "D"

**Parties**

THIS MEMORANDUM OF LEASE dated this   3rd   day of   February   , 1972 ,
between VALENCIA MART, A PARTNERSHIP, COMPOSED OF RAYMOND H. STOTTER
AND ELLIOTT CAPLON   ~~a~~   their
~~%~~   ~~corporation~~ having its principal office at  9538 Brighton   Way
Beverly Hills, California 90210
(herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having
its principal office at 2727 Second Avenue, Detroit, Michigan 48232 (herein referred to as "Tenant"),

WITNESSETH: That for and in consideration of the sum of One Dollar ($1.00) and other good
and valuable considerations and the further consideration of the rents reserved and the covenants
and conditions more particularly set forth in a certain lease between Landlord and Tenant and bearing
even date herewith, Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**

1. Landlord does demise unto Tenant and Tenant does take from Landlord for the term here-
inafter provided, and any extension thereof, the following property: Tenant's completed building ~~or~~
~~buildings~~ (designated K mart ~~and K mart Foods~~), together with site improvements to be con-
structed, as specified in said lease, by Landlord at its expense on the land described in Exhibit
"A" and depicted on Exhibit "B", attached hereto and made a part hereof, situated in the
~~of~~                               , County of  Los Angeles  , State of  California  , said
building ~~or buildings~~ to be in the locations and of the dimensions depicted on said Exhibit "B".

Landlord hereby gives and grants unto Tenant, in common with others entitled thereto,
including Tenant's agents, employees, customers, licensees and invitees the following licenses, rights,
privileges and easements: the use of parking areas, common areas (including rest rooms and other
facilities, if any), roadways, sidewalks and accessways to public streets and highways indicated on said
Exhibit "B", together with the use of any delivery or servicing areas adjoining Tenant's said buildings
or designated as such on Exhibit "B", which areas shall be adequate for the passage, unloading and,
if necessary, turning around of trailer trucks and other commercial vehicles.

Said completed buildings and site improvements, together with the licenses, rights, privileges and ease-
ments herein set forth, shall be hereinafter collectively referred to as the "demised premises".

**Term**

2. The lease term shall commence upon the date of occupancy by Tenant of said buildings,
and shall terminate upon such date as shall be  twenty-four   (24  ) years from the last day
of the month in which said date of occupancy by Tenant shall occur; provided, however, Tenant shall
have the option to extend the lease term for  five   (5  ) successive periods of  five
( 5  ) additional years each.

**Landlord's Covenant**

~~3. Landlord covenants and warrants that, within the confines of the land described~~
in Exhibit "A" now or in the future owned or controlled, directly or indirectly, by Landlord, Landlord's
principal owners, stockholders, directors or officers, or their assignees or vendees, no premises (other
than Tenant's buildings) shall be leased, rented, used or occupied for any purposes whatsoever without
Tenant's prior written consent, which may be withheld or granted at Tenant's sole discretion and
further, that in addition no premises so owned or controlled outside the confines of said area but within
a four (4) mile radius thereof, shall be leased, rented, used or occupied for the operation of a variety
store, department store, junior department store, cut-rate store, discount store, a store selling tires,
batteries and auto accessories, a restaurant, drive-in restaurant, supermarket or a drug store. This
covenant shall run with the land commencing with the date of execution of this lease and shall continue
until such date as shall be the last day of the lease term or extension or renewal thereof; provided,
however, this covenant shall cease and determine and be of no further force or effect in the event
that either (a) subsequent to the commencement of the lease term, Tenant's buildings shall cease to be
used for the operation of any store managed by Tenant for a period of six (6) consecutive months,
excluding temporary interruptions of said operation because of causes beyond Tenant's control, or (b)
said date of occupancy described in the aforesaid lease shall not occur prior to such date as shall be
~~seven (7) years from the date of this lease.~~

**Building Areas**

4. Landlord covenants, during the period commencing with the date of execution of aforesaid
lease and ending upon the last day of the lease term and any extension or renewal thereof, that it
will not erect or construct any buildings or other structures upon land described in Exhibit "A", except
as shown on Exhibit "B"; provided, however, in the event that the date of occupancy by Tenant of
the demised premises shall not occur prior to such date as shall be seven (7) years from the date of
the aforesaid lease, then the restrictions imposed by this Article shall cease and determine and shall be
of no further force or effect.

1

2/1/71

Signs    5.  The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing, directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

exclusive

of common
facilities
Tenant shall have the option to erect at its sole cost and expense upon any portion of the premises described in Exhibit "A", one or two pylon-type signs. Any such sign shall be of such height and other dimensions as Tenant shall determine and shall bear such legend or inscription advertising Tenant's store as Tenant shall determine. Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.

and
Exhibit "D"

and excepting
Safeway pylon
sign
Landlord shall not permit any other advertising signs, billboards or posters to be displayed on any portion of the premises described in Exhibit "A", hereof, excepting flat wall signs which may be placed on stores, if any, now depicted on Exhibit "B", or in the future erected on "future building areas" as depicted thereon, providing such signs shall be utilized solely for the purpose of advertising the names of the respective tenants thereof.

Landlord shall not, without Tenant's written consent, at any time utilize the exterior of Tenant's buildings, or the space above, for sign display purposes.

2

12/31/60

The sole purpose of this instrument is to give notice of said lease and all its terms, covenants and conditions to the same extent as if said lease were fully set forth herein.

The conditions, covenants and agreements contained in this instrument shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this instrument and said lease shall run with the land.

IN WITNESS WHEREOF, the parties hereto have executed these presents in duplicate and affixed their seals hereto as of the day and year first above written.

VALENCIA MART, a partnership

WITNESSES:

By: _____
Elliott M. Caplow, Part President

By: _____
Raymond H. Stotter, Par Secretary

S. S. KRESGE COMPANY

By: _____
John C. Cook          Vice President

Attest: _____
J. Kent Tewel        Assistant Secretary

## ACKNOWLEDGMENTS

TO 442 C
(Partnership)

STATE OF CALIFORNIA
COUNTY OF   LOS ANGELES   } SS.

On _January 13, 1972_,
before me, the undersigned, a Notary Public in and for said State, personally appeared
ELLIOTT M. CAPLOW and RAYMOND H. STOTTER
_____ known to me
to be    all      of the partners of the partnership
that executed the within instrument, and acknowledged to me
that such partnership executed the same.

WITNESS my hand and official seal.

Signature _____
Anson I. Dreisen
Name (Typed or Printed)

therein and duly com-

, who, being by me

, respectively:

of said corporation; that
orporation and by order
therein set forth, as its

r in this certificate first

ic

OFFICIAL SEAL
ANSON I. DREISEN
NOTARY PUBLIC CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires Dec. 12, 1972

9229 Sunset Blvd, Los Angeles, Calif. 90069

(This area for official notarial seal)

COUNTY OF WAYNE   }
I do hereby certify that on this          day of February    , 19 72, before me,       Beatrice L. McGaw
, a Notary Public in and for the County and State aforesaid, residing therein and duly com-
missioned, personally appeared     JOHN C. COOK          and       J. KENT TEWEL
, known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by
me duly sworn, did depose and say that they reside in     Grosse Pointe Park, Michigan
and               Detroit, Michigan
, respectively; that they are the Vice President and Assistant Secretary
respectively of S. S. Kresge Company, the corporation described in and which executed the foregoing instrument; that
they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that
on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for
the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto
by like order.
In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first
above written.

My commission expires: November 22, 1975     _____
Notary Public

CODE No. 920-84—200—Onlye—9/70—2650/70K—C1 & C2—Printed in U.S.A.

BEATRICE L. McGAW
Notary Public, Wayne County, Mich.
My Commission Expires Nov. 22, 1975 (2/24/65)

3

LEGAL DESCRIPTION


PARCEL "A"
K mart Site
8.835 Acres


That portion of the Rancho San Francisco, in the county of Los Angeles, State of California, as per map recorded in Book 1 pages, 521 and 522 of Patents, in the office of the county recorder of said county, bounded and described as follows:

Beginning at the intersection of the easterly line of the land described in Area "C" in the grant deed recorded February 6, 1968 as Instrument No. 508 in Book D-3905 Page 546, of Official Records of said county with the southerly line of Valencia Boulevard as described in Parcels 3-2 to 5 inclusive of Parts "A" and "C" in Road Deed recorded September 12, 1966 as Instrument No. 3512 in Book D-3424 Page 10 of Official Records of said county, and described in Road Deed recorded September 3, 1965 as Instrument No. 3731 in Book D-3039, Page 365 of Official Records of said county; said southerly line being a curve concave to the south having a radius of 1449.00 feet, a radial line through said point bears N 13° 28' 56" W; thence easterly along said southerly line through a central angle of 12° 59' 54" an arc distance of 328.73 feet to the beginning of a non-tangent curve concave to the south having a radius of 1850.00 feet, a line radial to said 1449.00 feet radius curve bears N 0° 29' 02" W, a line radial to said 1850.00 feet radius curve bears N 2° 30' 23" E; thence continuing easterly along said southerly line through a central angle of 10° 37' 24" an arc distance of 343.01 feet; thence tangent to said last mentioned curve S 76° 52' 13" E. a distance of 162.96 feet to the west line of the land described in the modification of lease recorded September 2, 1966 as Instrument No. 2217 in Book M-2332 Page 592 of Official Records of said county; thence leaving said southerly line S 17° 33' 09" W, along said westerly line a distance of 165.00 feet to the southwest corner of the land described in said modification of lease; thence along the southerly line of said land S 70° 58' 40" E, a distance of 125.00 feet to the intersection thereof with the westerly line of Bouquet Canyon Road, as described in the Road Deed recorded February 4, 1965 as Instrument No. 3322 in Book D-2788, page 386 of Official Records of said county said westerly line being a curve concave to the southeast having a radius of 2060.00 feet a radial line through said point bears N 64° 31' 45" W; thence southerly along said westerly line through a central angle of 6° 09' 31" an arc distance of 221.42 feet; thence leaving said westerly line S 72° 10' 16' W, a distance of 333.11 feet; thence N 17° 49' 44" W. a distance of 95.00 feet thence S 72° 10' 16" W, a distance of 299.15 feet to the easterly line of the land described in Area "C" in the above mentioned grant deed recorded February 6, 1968 as Instrument No. 508; thence along said easterly line N 17° 49' 44" W, a distance of 577.29 feet to the point of beginning.


EXHIBIT "A"

-1-

*WRO*

ATTORNMENT AGREEMENT

THIS AGREEMENT, made this 31st day of January, 1972, by and among THE NEWHALL LAND AND FARMING COMPANY, a California corporation, of Valencia, California (hereinafter called "Lessor"); VALENCIA MART, a General Partnership composed of RAYMOND H. STOTTER and ELLIOTT M. CAPLOW (hereinafter called "Lessee"); and S. S. KRESGE COMPANY, a corporation of the State of Michigan (hereinafter called "Kresge");

R E C I T A L S:

A.  Whereas, Lessor and Lessee have entered into a certain Lease dated _____, 19__, covering certain premises more particularly described in said Lease and situated in the County of Los Angeles, State of California (which Lease is sometimes hereinafter referred to as the "Underlying Lease"); and

B.  Whereas, Lessee proposes to execute an agreement with Kresge, leasing a portion of the property described in the "Underlying Lease" to Kresge, a copy of which lease is attached hereto as Exhibit "1", and hereinafter referred to as "Kresge Lease"; and

C.  Whereas, all of the parties desire to provide that the "Kresge Lease" shall remain in full force and effect in the event of a termination of the "Underlying Lease".

NOW, THEREFORE, in consideration of the premises and in order to induce Kresge to enter into said sublease, the parties hereby mutually agree as follows:

1.  The Lessor consents to the execution and delivery of the "Kresge Lease".

2.  The Lessor has read and examined said "Kresge Lease" and agrees that no act which Lessee or Kresge is required or permitted to do under the terms of the "Kresge Lease" shall constitute default under the terms of the "Underlying Lease".

3.  The Lessee and Kresge agree with the Lessor that they will perform and comply with all of the terms, covenants and conditions of the "Kresge Lease" which are binding upon them, respectively.  Such terms and conditions are for the benefit of Lessor.

4.  The "Kresge Lease" shall not be amended, modified or changed without the prior written consent of Lessor.

5.  In the event that the Lessee shall default in keeping, observing or performing any of the covenants, conditions and agreements contained in said "Underlying Lease" between it and the Lessor, required to be kept, observed or performed by Lessee, and if the said "Underlying Lease" shall be terminated by the Lessor by reason of any such default, or if the "Underlying Lease" shall be terminated by consent of the parties thereto or otherwise, the Lessor, provided that Kresge has fully kept, observed or performed all of the terms, covenants, conditions and agreements of the "Kresge Lease" on its part to be kept, observed and performed, hereby adopts the said "Kresge Lease" between the Lessee and the said Kresge as and for its Lease; and thereupon, Lessor will, and shall, be deemed the Landlord and the Kresge its tenant under the "Kresge Lease" as so adopted, and, in such

- 2 -

event, the Lessor hereby agrees that, notwithstanding any default by Lessee and subsequent termination of said "Underlying Lease", Kresge's possession and right of use under the "Kresge Lease" in and to the demised premises shall not be disturbed by Lessor unless and until Kresge shall breach any of the provisions of the "Kresge Lease" or Kresge's right to possession of said premises shall have been terminated in accordance with the provisions of the "Kresge Lease".

Upon any adoption of the "Kresge Lease" by the Lessor, pursuant to the foregoing provisions, the Lessor shall not be obligated to perform the covenants, conditions and agreements required to be kept, observed and performed by the Lessee, under the "Kresge Lease". However, Kresge retains all rights acquired by reason of the covenants, conditions and agreements set forth in the "Kresge Lease" and Kresge, when Lessor fails to do so, upon written notice to Lessor, may perform covenants, conditions and agreements and deduct the cost to Kresge of such performance from the rent payable by Kresge to Lessor under the terms of the "Kresge Lease". In the event such cost exceeds the amount of any rent due and payable, it may be accrued against future rent as it becomes due and payable.

In the event of termination or cancellation of the "Underlying Lease", Lessor shall give written notice thereof to Kresge and at said time Lessor shall advise Kresge in writing whether or not it intends to perform the covenants, conditions or agreements set forth in the "Kresge Lease". In the event that Lessor shall decline to perform, Kresge may carry out such covenants, conditions and agreements as set forth above.

- 3 -

The "Kresge Lease" applies to only a portion of the premises described and conveyed by the "Underlying Lease".  In the event of termination of the "Underlying Lease", the covenants, conditions or agreements, as the same shall apply to the portion of the land conveyed by the "Underlying Lease" and not subleased to Kresge by the "Kresge Lease", and as specifically referred to in Articles 9 and 22 of said "Kresge Lease", shall be binding on Lessor as set forth above.

6.  Upon any adoption by the Lessor of the "Kresge Lease" between the Lessee and Kresge as hereinbefore provided, Kresge agrees to pay the rental required to be paid by it under the "Kresge Lease", subject to off-sets as provided above, directly to the Lessor, and the Lessor hereby agrees to accept such rental; and the Kresge further agrees to comply with every other term, covenant, condition and agreement of said "Kresge Lease" on its part to be kept, observed or performed.  Further, under the circumstances of this paragraph, the Lessee releases and waives any interest in and to said rental and/or other payments and benefits in favor of the Lessor.

7.  Lessor agrees that during the term of the "Kresge Lease", it will be bound by the provisions of such lease, save and except for Article 18 thereof, and in the event of termination of the "Underlying Lease" that the affirmative warranties and representations set forth therein shall be binding on Lessor except so much thereof as concerns performance by Lessee prior to the termination of the "Underlying Lease".

8.  This Agreement shall be binding upon the heirs, representatives, successors and assigns of the parties hereto.

- 4 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers, thereunto duly authorized, and their respective corporate seals to be affixed hereto, duly attested, as of the day and year first above written.

THE NEWHALL LAND AND FARMING
COMPANY, a California corporation

By _____
PETER C. KREMER    SENIOR VICE PRESIDENT

By _____
EDWARD A. TONEY    ASSISTANT SECRETARY

"Lessor"

VALENCIA MART, a General Partnership composed of RAYMOND H. STOTTER
and ELLIOTT M. CAPLOW

By _____

By _____

"Lessee"

S. S. KRESGE COMPANY, a Michigan
corporation

By_____

By_____

"Kresge"

- 5 -

# EXHIBIT B


TICOR TITLE INSURANCE COMPANY
8285394 HORN

Recording Requested by and
When Recorded Return to:
Newhall Investment Properties
23823 Valencia Boulevard,
Valencia, California 91355
Attention: Mr. Stephen C. Schmidt,
Director of Real Estate

86- 875385

RECORDED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
1 MIN. 2 P.M. JUL 11 1986
PAST.

FEE $ 29⁰⁰ B
13

DECLARATION OF COVENANTS
CONDITIONS AND RESTRICTIONS FOR
VALENCIA MART SHOPPING CENTER

DATED AS OF JULY 10, 1986

DECLARATION OF

COVENANTS, CONDITIONS AND RESTRICTIONS FOR

VALENCIA MART SHOPPING CENTER

THIS DECLARATION is made this 10th day of July, 1986, by NEWHALL INVESTMENT PROPERTIES, a California limited partnership, hereinafter called "Declarant."

<u>RECITALS</u>

A.    The Declarant is the present fee title owner of certain real property commonly referred to as the Valencia Mart Shopping Center, located in the unincorporated community of Valencia, County of Los Angeles, State of California, and more particularly described in Exhibit "A" attached hereto, which real property is hereinafter referred to as the "Property";

B.    The Newhall Land and Farming Company (a California Limited Partnership) ("NLF"), is affiliated with Declarant. NLF and Declarant own additional property surrounding, abutting, or adjoining the Property or to any street or public right of way that is abutting, surrounding or adjoining the Property ("Adjacent Property"). From time to time, Declarant and NLF intend to develop, redevelop or cause the development or redevelopment of various portions of the Adjacent Property for commercial, office, retail, residential, industrial or other uses;

C.    SWZ Partnership, a California general partnership (hereinafter called "Owner") has agreed to purchase the Property from Declarant subject to the covenants, conditions, and restrictions contained herein pursuant to an Agreement of Purchase and Sale ("Purchase Agreement") dated as of May 23, 1986, between Declarant, as Seller, and Owner, as Buyer. Owner acknowledges that Declarant would not have agreed to sell the Property to Owner without Owner's agreeing to be bound by the covenants, conditions, and restrictions imposed hereby; and

D.    Owner wishes to purchase the Property as part of a like-kind exchange under Section 1031 of the Internal Revenue Code, as amended. For the purposes of effectuating the like-kind exchange, Declarant and Owner have agreed, pursuant to the terms and conditions set forth in that certain Amendment to Escrow Instructions by and among Declarant, Owner and Sterik Company, a New York general partnership, to substitute Sterik Company as the buyer under the Purchase Agreement, solely to enable Sterik Company to purchase and simultaneously transfer the Property to Owner as part of the like-kind exchange and subject to the exculpation from liability for Sterik Company as set forth in Section 7.08 hereof.

ARTICLE I.
<u>DEFINITIONS</u>

Unless the context requires otherwise, the terms defined in this Article I shall, for all purposes of this Declaration, have the meaning herein specified.

"Adjacent Property" is defined in Recital B hereof.

"Affiliates" shall mean any and all affiliates or successors-in-interest or assignees of NLF and Declarant.

"Assessment" is defined in Section 6.02 below.

"Claim of Lien" is defined in Section 6.03B below.

"Declarant" shall mean Newhall Investment Properties, its successors in interest or assignees.

"Declaration" shall mean this Declaration of Covenants, Conditions and Restrictions, as amended from time to time.

"Effective Date" shall mean the date of recordation of this Declaration.

1.                              WAL-37-15:7/9/86

86- 875385

3

"Improvements" shall mean and include, but not be limited to, buildings, the parking areas, loading areas, fences, walls, water wells, hedges, landscaping, plantings, poles, signs, and any other structures or improvements of any type or kind located on the Property and any replacements, additions, repairs, or alterations thereto of any kind whatsoever.

"Leases" shall mean those certain leases encumbering the Property that are listed in the Purchase Agreement. The leases and any and all assignments, addenda, amendments, exhibits, modifications and subleases thereto or thereof shall be collectively referred to herein as "Leases".

"NLF" shall mean the Newhall Land and Farming Company (A California Limited Partnership), it's successors-in-interest and assignees.

"Owner" shall mean SWZ Partnership, a California general partnership, and its permitted successors in interest and assignees, together with each lessee, licensee, or other occupant in possession of any portion of the Property.

"Permitted Exceptions" shall mean the Permitted Exceptions, as defined in the Purchase Agreement.

"Plans" is defined in Section 4.01 hereof.

"Property" is defined in Recital A hereof.

"Record or Recorded" shall mean, with respect to any document, the recordation of said document in the Office of the County Recorder of the County of Los Angeles, State of California.

"Regulations" shall mean all present and future applicable laws, statutes, codes, ordinances, rules, regulations, limitations, restrictions, orders, judgments, or other requirements of any governmental authority having jurisdiction over the Property, Improvements, Owner, Declarant, or NLF.

"Signs" shall mean all names, insignia, trademarks, service marks and descriptive words or material of any kind affixed, inscribed, erected or maintained on the Property or on any Improvements thereon.

"Site Plan" means Exhibit B.

"Slopes" shall mean all real property on or contiguous to the Property that has an incline upward or downward.

"Title Report" shall mean that certain title report with respect to the Property, issued by Ticor Title Insurance Company of California, dated as of April 15, 1986, Order No. 8285394.

### ARTICLE II.
### PROPERTY SUBJECT TO THIS DECLARATION

2.01 <u>General Declaration.</u> Declarant hereby declares that the Property is and shall be, conveyed, hypothecated, encumbered, leased, occupied, built upon or otherwise used, improved, or transferred in whole or in part subject to this Declaration. All of the covenants and restrictions contained in this Declaration are declared and agreed to be in furtherance of a general plan for the use, maintenance, and development of the Property and are established for the purposes of enhancing and perfecting the value, desirability, and attractiveness of the Property. All of the covenants and conditions contained in this Declaration shall be both personal obligations of Owner and run with all of the Property for all purposes and shall be binding upon and inure to the benefit of both Declarant and Owner.

2.02 <u>Term.</u> This Declaration shall continue and remain in full force and effect at all times with respect to all the Property, and each part thereof, until thirty-five (35) years after the Effective Date. This Declaration shall continue in effect after the expiration of said thirty-five (35) year period for additional periods of ten (10) years each, unless within one (1) year prior to the expiration of the initial period or any such extension period, this Declaration is terminated by a written notice from either Owner or Declarant to the other party stating its intention to terminate the Declaration. Any such termination shall be effective on the expiration of the then current period.

86- 875385

2.                    WAL-37-15:7/9/86

Description: Los Angeles,CA Document-Year.DocID 1986.875385 Page: 3 of 13
Order: 23222 VALENCIA Comment:

4

2.03  Easements Over Property.  The Property is burdened by easements for such purposes as slopes, utilities, sewer, ingress and egress, pipelines, water, and other purposes as more particularly described in the Title Report. Owner hereby accepts title to the Property subject to the Permitted Exceptions and all of the easements and exceptions to title currently encumbering the Property. Owner hereby agrees that the easements shown on the Title Report do not and will not substantially impair Owner's operation of the Property. Owner shall perform all obligations required of Owner as owner of the servient tenement under any such easements now existing. Owner shall indemnify, defend, and hold Declarant, its Affiliates, and their officers, partners, agents, successors-in-interest and assigns, harmless from and against any and all claims, demands, suits, actions, losses, damages, costs and expenses, including court costs and reasonable attorneys' fees, in any manner arising out of, related to, or in connection with, the use or enjoyment by any person or entity of the Property or of any such existing easements.

## ARTICLE III.
## REGULATION OF OPERATIONS AND USES

3.01  Permitted Uses.  The Property shall be used exclusively for the Term hereof as a first-class shopping center and for any other use approved by Declarant and NLF in writing, and not inconsistent with the current zoning regulations, the master plan, land use ordinances and Regulations for the Property.  No other use shall be permitted during the Term of this Declaration.  Throughout the Term, Owner shall continuously operate or lease the Property for the continuous operation of the uses permitted for the Property as set forth above.

3.02  Prohibited Uses.

A.  Nuisance.  No noxious or offensive trade or activity shall be carried on upon any part of the Property nor shall anything be done thereon which may be, or may become, an annoyance or nuisance to the Adjacent Property or which shall in any way interfere with the quiet enjoyment of each of the owners of the Adjacent Property. No animals, livestock or poultry of any kind shall be raised, bred, or kept upon the Property.  All weeds, rubbish, debris, or unsightly material or objects of any kind shall be regularly removed from the Property and shall not be allowed to accumulate thereon. Except for current uses of the Property that are consistent with the Leases, all refuse containers, trash cans, storage areas, machinery and equipment used in the operation of the Property shall not be visible from adjoining streets or portions of the Adjacent Property.

B.  Oil and Mineral Rights.  No oil drilling, oil development operations, oil refining, quarrying, or mining operations of any kind shall be permitted upon or in the Property nor shall oil wells, tanks, tunnels, or mineral excavations or shafts be installed upon the surface of the Property or within five hundred (500) feet below the surface of the Property.  No derrick or other structure designed for use in boring for water, oil, or natural gas shall be erected, maintained, or permitted upon the Property.

C.  Antennae/Lights.  No television, radio, or other electronic towers, aerials, antennae or device of broadcasts or reception or other means of communication shall hereafter be erected, constructed, placed or permitted to remain on the Property, unless and until the same shall have been approved in writing by the Declarant or unless the same is contained within a building or in underground conduits in compliance with all applicable Regulations.  All outdoor lighting shall be shielded and confined within the Property and shall not be glaring or shine on the public right of way or the Adjacent Property.

D.  Vehicle Storage.  No portion of the Property shall be used for storage, parking, construction or repair of mobile homes, boats, trucks, trailers or recreational vehicles.  Only parking for patrons of the businesses operated on the Property and employees thereof (for periods not to exceed twenty-four (24) hours) and the temporary parking of delivery trucks, service vehicles, and other vehicles not related to operations of the businesses located on the Property while furnishing services to such businesses shall be permitted.

E.  Environmental Compliance.  Owner shall at no time use or permit the Property, or easements encumbering or that will in the future encumber the Property, to be used in violation of any Regulations relating to the environmental conditions on, under or about the Property including, but not limited to, soil and ground water conditions, and Owner agrees to assume sole and full responsibility and cost to

86- 875385

3.                    WAL-37-15:7/9/86

Description: Los Angeles,CA Document-Year.DocID 1986.875385 Page: 4 of 13
Order: 23222 VALENCIA Comment:

5

remedy any such violations that may affect the Property and easements so long as the violations are not directly caused by Declarant and/or its successors and assigns. Owner shall at no time use, generate, store or dispose of on, under or about the Property and such easements, or transport to or from the Property and such easements any hazardous wastes, toxic substances or related materials ("Hazardous Materials") or permit or allow any third party to do so, without Declarant's prior, written consent and compliance with all Regulations. For the purposes of this Section 3.02E, Hazardous Materials shall include, but not be limited to, substances defined as "hazardous substances" or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq.; Hazardous Materials Transportation Act, 49 U.S.C. Section 1802; and Resource Conversation Recovery Act, 42 U.S.C. Section 6901, et seq.; and those substances defined as "hazardous wastes" in Section 25117 of the California Health and Safety Code and in the regulations adopted and publications promulgated pursuant to said laws. Owner shall provide Declarant with written notification immediately upon the discovery or notice by Owner, its successors, assigns, licensees, invitees, employees, agents, partners or any other third party, that each and every provision of this Section 3.02E has not been strictly complied with.

3.03 Parking. Owner shall provide all necessary parking spaces, driveways, and signs necessary to comply with the Regulations and to meet the needs of the patrons and employees of the businesses operated on the Property and of the tenants under the Leases and to eliminate the need for any on-street parking. Owner shall maintain such parking spaces, driveways and signs in a first-class condition and repair, including restriping and resurfacing and shall provide adequate security and parking control to prevent any nuisance or interference with the use or enjoyment of the Adjacent Property.

ARTICLE IV.
REGULATION OF IMPROVEMENTS

4.01 General Restrictions. Unless the Leases permit a tenant to make any construction, alteration or repair of the Improvements located on the Property without the landlord's prior written consent, Owner shall not construct or consent to any construction, alteration or repair to any exterior portion of the Improvements that: (i) substantially modifies the appearance of the Improvements' exterior or (ii) is obnoxious, offensive or is architecturally and asthetically incompatible with the architecture of the Adjacent Property, without obtaining the prior written consent of Declarant and NLF, which shall not be unreasonably withheld or delayed. After a Lease has been terminated, no exterior Improvements shall be constructed, erected, or substantially altered or modified if the construction, erection, substantial alteration or modification (i) substantially modifies the appearance of the Improvements' exterior or (ii) is obnoxious, offensive or is architecturally and asthetically incompatible with the architecture of the Adjacent Property, unless Owner obtains the prior written consent of Declarant and NLF, which consent shall not be unreasonably withheld or delayed, and complies with the provisions of this Declaration. Before Owner causes or permits any construction, alteration or repair of the Improvements on the Property that requires Declarant's and NLF's consent, or before Owner commences or permits the commencement of any grading, landscaping, excavations or modifications to the Property or the Improvements that requires Declarant's and NLF's consent, Owner shall submit preliminary and final plans and specifications ("Plans") for such work to Declarant and NLF for their approval. If Declarant and NLF fail to approve or disapprove any Plans submitted to it in accordance with the procedures set forth herein within thirty (30) days after receipt thereof, Declarant and NLF shall be deemed to have approved such Plans; provided, however, that if within said thirty (30) day period, Declarant or NLF gives written notice that more time is required for the approval of such Plans, the time period for review shall be automatically extended an additional fifteen (15) day period. Neither Declarant nor NLF shall unreasonably withhold its consent to the Plans. Once any work of improvement has commenced, Owner shall diligently cause such work to be performed in a workmanlike manner in compliance with the Plans and the Regulations and completed within a reasonable time. Neither Declarant, NLF, their Affiliates, nor their officers, directors, partners, unitholders, shareholders, agents, employees, attorneys, architects, or engineers shall be liable for any damage, loss, or prejudice suffered or claimed by Owner, its tenants, agents or any other person or entity on account of: (i) the approval or disapproval of any Plans submitted for approval whether or not defective; (ii) the construction or performance of any work whether or not pursuant to approved Plans; (iii) the development of any portion of the Property or alteration or modification to any portion of the Improvements; or (iv) the enforcement or failure to enforce any of the covenants, conditions, and restrictions contained herein.

4.    WAL-37-15:7/9/86

86-- 875385

6

4.02 Signage. Signs identifying the name of the businesses operated on the Property shall be permitted; provided, however, that except for signs permitted under the Leases and existing on the Effective Date, any substantial modification in the setback, location, size, style, design, and color of any exterior signs located on the Property shall have first received the prior written approval of the Declarant and NLF for asthetic and architectural harmony with the architecture of the Adjacent Property and compliance with the Regulations.  No roof or pole signs, billboards or advertising signs, flashing or blinking signs, display flags of paper, cloth, plastic, or metal shall be permitted, unless such signs are permitted under the Leases and are existing on the Effective Date.

4.03 Utilities, Excavations. Except for existing utility connections that are in compliance with the Leases and the Regulations, all utility connections, made after the Effective Date, including without limitation, all electrical and telephone connections and installation of wires to buildings, shall be made underground.  No transformer, electric, gas or other meter of any type or other apparatus shall be located on any power pole, nor hung on the outside of any building, but the same shall be placed on or below the surface of the Property or if placed on the surface, shall be adequately screened and fenced. Except for facilities existing as of the Effective Date and in compliance with the Leases and the Regulations, all vents, piping, air conditioning, water conditioning, heating, mechanical and electrical facilities shall be screened such that they are not visible from the Adjacent Property.  No excavation shall be made on the Property except in connection with the construction of any Improvements approved by Declarant and NLF pursuant to Section 4.01 above.  Upon completion thereof, any exposed openings shall be backfilled and disturbed ground shall be graded, leveled, landscaped and restored to its original condition.  The restrictions of this Section shall not apply to any utility connections, facilities and trash storage areas existing as of the Effective Date.

## ARTICLE V.
## MAINTENANCE AND REPAIR

Owner shall at all times maintain or cause the maintenance of the Property and all future easements encumbering the Property in a first-class condition and repair. Owner shall:  (i) keep the Property and easements free from rubbish, litter, and noxious weeds; (ii) maintain, cultivate and keep in good condition and repair shrubs, trees, grass, lawns, planting and other landscaping located or from time to time placed upon the Property; (iii) maintain in good condition and repair and adequately painted or otherwise finished all structures and buildings located or from time to time placed upon the Property and easements; and (iv) maintain all paved surfaces and keep them clean, reasonably dry and free of oil and other extraneous matter and repave, paint and restripe as necessary.  Owner shall defend, indemnify and hold Declarant, NLF, and their Affiliates harmless from and against all liabilities, losses, damages, costs and expenses (including attorneys fees' and expenses) claims, actions or causes of action arising directly or indirectly from Owner's performance of or failure to perform any of the terms or conditions of the Declaration.

## ARTICLE VI.
## EVENTS OF DEFAULT AND REMEDIES

6.01 Events of Default. It shall be an event of default ("Event of Default") under this Declaration if Owner fails to observe and perform any provision of this Declaration to be observed or performed by Owner if such failure continues for thirty (30) days after written notice thereof by Declarant, NLF or any other benefited owner of Adjacent Property to Owner; provided, however, that if the nature of such default is such that: (i) the same is an emergency that must be cured immediately to prevent damage to the Property or Adjacent Property, then Owner must cure the Event of Default within twenty-four (24) hours of notice or such shorter time period as is reasonable under the circumstances; or (ii) the same cannot reasonably be cured within such thirty (30) day period, then Owner shall not be deemed to be in default if Owner shall commence such cure within such period and thereafter diligently prosecute the same to completion. Notwithstanding the foregoing, it shall be an Event of Default immediately upon Owner's failure to observe and perform any provision of Section 3.02E hereof.

6.02 Declarant's Right to Cure Owner's Default. If Owner breaches this Declaration pursuant to Section 6.01 above, then Declarant, NLF or any other benefited owner of Adjacent Property shall have the right and power, but not the obligation, to pay all amounts and to perform or cause to be performed all acts necessary to remedy the Event of Default by Owner.  If Declarant, NLF or any other benefited owner of Adjacent

5.                WAL-37-15:7/9/86

86- 875385

7

Property elects to remedy any such Event of Default, Owner shall be liable to any such remedying party for an assessment equal to the sum of the following: (i) any amounts expended by any such party to so cure the Event of Default; (ii) an administrative fee for any such party's services with respect to such remedial work equal to ten percent (10%) of the cost of such work; (iii) attorneys' fees and disbursements; (iv) all costs of collection of the assessment or enforcement of the Claim of Lien, including without limitation, court fees, recording fees, and title fees; (v) such other amounts as may be due and payable under this Declaration whether incurred or accruing before or after recordation of the Claim of Lien; and (vi) interest on the aggregate of the amounts listed as items (i) through (v) above at the maximum rate allowed by law from the date each such cost was incurred by any such party until paid in full (the foregoing are collectively referred to as the "Assessment"). If Owner fails to pay the Assessment to any such party within thirty (30) days after delivery of a written demand from such party setting forth the amount of the Assessment, then at any time thereafter any such party may pursue any of the remedies set forth in Section 6.03 below. Owner hereby irrevocably appoints any such remedying party as its attorney-in-fact for such purposes, which agency is coupled with an interest.

6.03  Remedies. In addition to any other remedies herein or provided by law or equity, Declarant may enforce the obligations of Owner to pay the Assessment by either or both of the procedures set forth below. All remedies of Declarant are cumulative.

A.  Enforcement by Suit. Declarant may commence and maintain a suit against the Owner for damages (actual, punitive and consequential) declaratory or injunctive relief, specific performance, abatement of nuisance or waste, or any other legal or equitable relief permitted under applicable law.

B.  Enforcement by Lien. There is hereby created a claim of lien, with power of sale, on the Property to secure payment to the Declarant of any and all Assessments levied against the Owner pursuant to this Declaration. Declarant may elect to record a claim of lien ("Claim of Lien") against the Property in the Office of the County Recorder of Los Angeles County. The Claim of Lien shall be executed and acknowledged by Declarant and shall contain substantially the following information:

(i)  The name of the record owner of the Property;

(ii)  The legal description of the Property;

(iii)  The total amount claimed to be due and owing for the amount of the delinquency, interest thereon, collection costs, and estimated attorneys' fees;

(iv)  That the claim of lien is made by the Declarant pursuant to this Declaration; and

(v)  That a lien is claimed against the Property in the amount stated, together with all other amounts becoming due from time to time in accordance with this Declaration.

Upon such recordation of a duly executed and acknowledged original of the Claim of Lien, the lien claimed therein shall immediately attach and become effective in favor of the Declarant as a lien upon and against the Property. Any such lien may be foreclosed by appropriate action in court or in the manner now or hereafter provided by California Civil Code Sections 2924 et seq., as amended or recodified from time to time, for the foreclosure of a deed of trust with power of sale, or in any other manner permitted by law. Declarant is hereby authorized to appoint any person as trustee for the purpose of conducting such foreclosure by power of sale. Declarant shall have the power to bid at any foreclosure sale and to purchase, acquire, hold, lease, mortgage, and convey the Property. Upon the timely and complete curing of any Event of Default for which a Claim of Lien has been filed by the Declarant prior to the expiration of the statutory reinstatement period, Declarant shall record an appropriate release of such Claim of Lien in the Office of the County Recorder of Los Angeles County, California.

6.04  Priority and Reversion of Enforcement Rights. NLF and the Affiliates of Declarant may enforce the obligations of Owner in the same way Declarant could do so, including without limitation, exercising any of the rights and remedies set forth in this Article VI as if such person or entity were the Declarant. Notwithstanding anything to the contrary contained herein, in the event of any conflicting demands of how to cure an Event of Default between Declarant and any other person or entity, or between NLF and any other person other than Declarant, Declarant first and then NLF shall prevail and

6.    WAL-37-15:7/9/86

86- 875385

Owner shall be required to respond to Declarant's or NLF's demand rather than the conflicting portion of such other demand, provided that Owner shall comply with the non-conflicting portion of such other demand. Notwithstanding anything to the contrary contained herein, the rights and preferential enforcement rights of Declarant shall be vested in NLF if Declarant is dissolved by liquidation or operation of law. Upon any such dissolution, NLF shall be immediately and automatically deemed the Declarant hereunder and vested with all of Declarant's rights, powers and privileges hereunder.

6.05  Mortgagee Protection.  No breach or violation of these restrictions shall defeat or render invalid the lien of any mortgage, deed of trust or similar instrument securing a loan made in good faith and for value with respect to the development or permanent financing of any portion of the Property; provided, that all of these restrictions shall be binding upon and effective against any subsequent owner of the Property or any portion thereof whose title is acquired by foreclosure, trustee's sale, deed in lieu of foreclosure or otherwise pursuant to such lien rights, but such subsequent owner shall take title free and clear of any violations of these restrictions occurring prior to such transfer of title.

ARTICLE VII.
MISCELLANEOUS

7.01  Interpretation.  This Declaration shall be construed in accordance with and governed by the laws of the State of California. If any provision of this Declaration or application thereof to any person or circumstances shall to any extent be invalid, the remainder of this Declaration shall not be affected and each provision of this Declaration shall be valid and enforced to the fullest extent permitted by law. All exhibits attached hereto are incorporated by reference herein. Both parties hereto have assisted in the drafting of this Declaration and the Declaration shall not be construed against either party. This Declaration contains all the agreements, covenants, conditions, and restrictions and understandings of the parties or expressly incorporates them by reference to other documents and there are no other agreements concerning the subject matter covered by this Declaration. This Declaration can only be modified by a writing executed by Owner, NLF and Declarant. No waiver of any Event of Default of any covenant, condition or restriction imposed by this Declaration shall be implied from any omission by either party to take action on account of such Event of Default if such Event of Default persists or is repeated. Owner shall comply with all Regulations in the use, maintenance, development, enjoyment, and occupancy of the Property.

7.02  Attorneys' Fees.  If either party commences an action against the other to enforce any obligation under this Declaration, the prevailing party shall be entitled to recover its costs and reasonable attorneys' fees from the other, whether or not such action is pursued to judgment.

7.03  Notices.  All notices required or permitted to be given hereunder shall be in writing delivered in person or by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

"Declarant"

Newhall Investment Properties
23823 Valencia Boulevard
Valencia, California 91355
Attention: Mr. Stephen C. Schmidt

with a copy to:    The Newhall Land and Farming Company
(a California Limited Partnership)
23823 Valencia Boulevard
Valencia, California 91355
Attention: Mr. Thomas L. Lee

"Owner"

SWZ Partnership
32044 Waterside Lane
Westlake Village, California 91361

7.04  Assignment of Declarant's Rights and Duties.  Subject to NLF's right to become the Declarant pursuant to Section 6.04 hereof, the rights, powers and reservations of Declarant herein contained may be assigned in whole or in part by

7.                          WAL-37-15:7/9/86

86- 875385

9

Declarant to any person, corporation, or association.  Upon any such assignment, Declarant shall be relieved from all liabilities, obligations, and duties hereunder.

7.05  Constructive Notice and Acceptance.  Every person or other entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property subject to this Declaration is and shall be conclusively deemed to have consented and agreed to every covenant, condition, and restriction contained herein, whether or not any reference to this Declaration is contained in the instrument by which such person or entity acquired an interest in the Property.

7.06  Right of Entry.  Upon giving reasonable prior notice to Owner, Declarant and its authorized representatives, shall have the right during reasonable hours to enter upon and inspect the Property and the Improvements thereon for the purpose of ascertaining whether or not the provisions of this Declaration have been or are being complied with and shall not be deemed guilty of trespass or any other wrongful act by reason of such entry or inspection.

7.07  Limitation of Liability.  The obligations of Declarant, NLF and their Affiliates under this Declaration shall be without recourse to the assets of the general partners or of any general partner, officer, shareholder, unitholder, director or employee of Declarant, NLF and their Affiliates or any general partner of Declarant, NLF or their Affiliates.  The sole recourse of Owner or any other person or entity for any obligation of Declarant, NLF or their Affiliates under this Declaration shall be limited solely to Declarant's, NLF's or their Affiliates' respective profits from the Adjacent Property.

7.08.  Sterik Company's Limited Liability.  Owner and Declarant hereby agree that Sterik Company shall have no duty or obligation whatsoever, to assume and/or perform, and no personal liability whatsoever, for failure to assume and/or perform, any of the obligations of Owner hereunder.  The obligations of Sterik Company, as Owner, under this Declaration shall be without recourse to the assets of Sterik Company, other than the Property, and without recourse to the assets of any general partner, officer or employee of Sterik Company.  The sole recourse of Declarant and NLF or their Affiliates or any other person or entity under this Declaration for any obligation of Sterik, as Owner, shall be limited solely to the Property. .

IN WITNESS WHEREOF, Declarant has executed this Declaration this 11th day of  JUNE        , 1986.

NEWHALL INVESTMENT PROPERTIES,
a California limited partnership

By:   Newhall Properties Management Company,
      a California general partnership,
      Managing General Partner

By:   _Robert D. Wills_____
      A General Partner

Agreed to and Accepted By:

OWNER

SWZ PARTNERSHIP,
a California general partnership

By: _____
         A General Partner

By: _____
         A General Partner

By: _____
         A General Partner

8.            WAL-37-15:7/9/86

86- 875385

Description: Los Angeles,CA Document-Year.DocID 1986.875385 Page: 9 of 13
Order: 23222 VALENCIA Comment:

*10*

SWZ PARTNERSHiP, a California
general partnership

By: *Corrine Laurel Joseph Shukartsi*
    CORRINE LAUREL JOSEPH SHUKARTSI,
    Partner

By: *Leslie Adrian Joseph By Ben Joseph att, in fact*
    LESLIE ADRIAN JOSEPH , Partner

By: *Jeffrey Craig Joseph By Ben Joseph att, in fact*
    JEFFREY CRAIG JOSEPH , Partner

By:  CORRINE LAUREL JOSEPH SHUKARTSI
    and MOSHE SHUKARTSI, Trustees of
    the Shukartsi Children's Trust
    dated December 28, 1979, Partner

BY: *Corrine Laurel Joseph Shukartsi*
    Corrine Laurel Joseph Shukartsi, Trustee

BY: *Moshe Shukartsi*
    Moshe Shukartsi, Trustee

86- 875385

Description: Los Angeles,CA Document-Year.DocID 1986.875385 Page: 10 of 13
Order: 23222 VALENCIA Comment:

STATE OF CALIFORNIA          )
                             )SS.
COUNTY OF _Los Angeles_      )

On this _10th_ day of _July_, 19_86_, before me, the
undersigned, a Notary Public in and for said County and
State, personally appeared _Ben Joseph_
_____, known to me to be the person
whose name is subscribed to the within instrument as the
Attorney-in-fact of _Leslie Adrian Joseph_
_____, one of the partners of the partnership
that executed the within instrument and acknowledged to me
that ____ he subscribed the name of _Leslie Adrian_
_Joseph_ _____ thereto as principal and
_his_ own name as Attorney-in-fact, and further acknow-
ledged to me that such partnership executed the same.

WITNESS my hand and official
seal.

( FOR NOTARY SEAL OR STAMP )
(                          )
(                          )
(       OFFICIAL SEAL       )
(      JAMES R. PUTJENTER   )
(   NOTARY PUBLIC - CALIFORNIA )
(    PRINCIPAL OFFICE IN    )
(     LOS ANGELES COUNTY    )
(  MY COMMISSION EXPIRES APRIL 27, 1990 )
(                          )

_____
Notary Public in and for
said County and State.


STATE OF CALIFORNIA          )
                             )SS.
COUNTY OF _Los Angeles_      )

On this _10th_ day of _July_, 19_86_, before me, the
undersigned, a Notary Public in and for said County and
State, personally appeared _Ben Joseph_
_____, known to me to be the person
whose name is subscribed to the within instrument as the
Attorney-in-fact of _Jeffrey Craig Joseph_
_____, one of the partners of the partnership
that executed the within instrument and acknowledged to me
that ____ he subscribed the name of _Jeffrey Craig Joseph_
_____ thereto as principal and
_his_ own name as Attorney-in-fact, and further acknow-
ledged to me that such partnership executed the same.

WITNESS my hand and official
seal.

( FOR NOTARY SEAL OR STAMP )
(                          )
(                          )
(       OFFICIAL SEAL       )
(      JAMES R. PUTJENTER   )
(   NOTARY PUBLIC - CALIFORNIA )
(    PRINCIPAL OFFICE IN    )
(     LOS ANGELES COUNTY    )
(  MY COMMISSION EXPIRES APRIL 27, 1990 )
(                          )

_____
Notary Public in and for
said County and State.

86- 875385

*12*

STATE OF CALIFORNIA        )
                           ) SS.
COUNTY OF *Los Angeles*    )

On *July 10, 1986*        , 1986, before me, the undersigned, a Notary
Public in and for said county and State, personally appeared *Corrine Laurel*
*Joseph, Shukartsi & Moshe Shukartsi*, personally known to be or proved to me
on the basis of satisfactory evidence to be the trustees of *The Shukartsi*
*Childrens Trust, Dated 12-28-79*, one of the partners of the partnership
that executed the within instrument and known to me to be the persons who
executed the within instrument as trustees on behalf of said *Shukartsi*
*Childrens Trust Dated 12-28-79*, said *Shukartsi, Childrens Trust*
*Dated 12-28-79* being known to me to be one of the partners of *S W Z*
*Partnership*, the partnership that executed the within instrument and
acknowledged to me that such trustee as trustee of the *Shukartsi*
*Childrens Trust dated 12-28* executed the same as such partner and that such
partnership executed the same.

WITNESS my hand and official seal.

Signature _____

_____
*JAMES R. PUTJENTER*
(name typed or printed)

OFFICIAL SEAL
JAMES R. PUTJENTER
NOTARY PUBLIC · CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
MY COMMISSION EXPIRES APRIL 27, 1990

---

CAT. NO. NN00630
TO 21048 CA (1–83)
(Partnership)

## TICOR TITLE INSURANCE

STATE OF CALIFORNIA
COUNTY OF *Los Angeles* } SS.

On *July 10, 1986* before me, the undersigned, a Notary Public in and for
said State, personally appeared *Corrine & Laurel Joseph,*
*Shukartsi*
_____
, personally known to me or
proved to me on the basis of satisfactory evidence to be
the person __ who executed the within instrument as
__ one __ of the partners of the partnership
that executed the within instrument, and acknowledged
to me that such partnership executed the same.
WITNESS my hand and official seal.

Signature _____

OFFICIAL SEAL
JAMES R. PUTJENTER
NOTARY PUBLIC · CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
MY COMMISSION EXPIRES APRIL 27, 1990

(This area for official notarial seal)

86- 875385

*/3*

EXHIBIT A

EXHIBIT A TO DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS by and between NEWHALL INVESTMENT PROPERTIES, a California limited partnership, as Declarant, and SWZ PARTNERSHIP, a California general partnership, as Owner, dated as of July 10, 1986.

The legal description of the Property is as follows:

Parcel 1 in the County of Los Angeles, State of California, as shown on Parcel Map No. 16765, filed in Book 182 Pages 39 to 44 inclusive of Parcel Maps, in the Office of the County Recorder of said County.

Reserving to Newhall Investment Properties all rights, title, and interest to water, aquafiers, reservoirs, and wells of every kind, together with the right to drill or pump for the same, without, however, the right to drill or pump through the surface or upper 500 feet of the subsurface of said land and further reserving to Newhall Investment Properties all rights, title and interest to any and all transferable development rights that may now or hereafter attach to the Property.

EXCEPT therefrom all rights to minerals, oil, gas, tars, hydrocarbons, and metalliferous substances of every kind, together with the right to drill or mine for same, without, however, the right to drill or mine through the surface or the upper 500 feet of the subsurface of said land as reserved by The Newhall Land and Farming Company, a Delaware corporation, in Deeds recorded March 24, 1983 as Instrument No. 83-323367 Official Records and as Instrument No. 83-323359 Official Records.

EXCEPT therefrom an equal one-half of all oil, gas, petroleum, coal, oil, naphtha, asphaltum and other hydrocarbon and mineral substances located in, under and upon that portion of said land hereinafter described, together with the perpetual and unrestricted right to go upon said real property at any time for the purposes of developing, producing and removing therefrom any and all of said substances; Grantors also reserved the right to erect, construct and maintain on said premises derricks, buildings, machinery, roads and all other structures or easements necessary or incidental to the development, production, extraction and removal of reserved substances, as reserved by Arthur E. Erwin and Gay M. Erwin, husband and wife, in deed recorded July 7, 1952 as Instrument No. 193 in Book 39317 Page 97, Official Records.

Subject to such exceptions to title listed: (A) in the preliminary title report regarding the Property dated as of April 15, 1986, Order No. 8285394 issued by Ticor Title Insurance Company of California; (B) those certain "Leases", as defined in the Agreement of Purchase and Sale dated as of May 23, 1986, by and between SWZ Partnership, a California general partnership, as Buyer, and Newhall Investment Properties, a California limited partnership, as Seller ("Purchase Agreement"); and, (C) the "Permitted Exceptions", as defined in the Purchase Agreement; provided, however, that Sterik Company, a New York general partnership, does not assume or agree to perform and shall have no personal liability whatsoever for any obligation or payment arising out of, relating to, or required under the foregoing exceptions to title.

EXHIBIT A

86- 875385




87-1886018



RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

The Newhall Land and Farming Company
(A California Limited Partnership)
23823 Valencia Boulevard
Valencia, California 91355
Attn: Mr. Thomas L. Lee

| RECORDED IN OFFICIAL RECORDS |
| RECORDER'S OFFICE |
| LOS ANGELES COUNTY |
| CALIFORNIA |
| 1 MIN.  4 P.M NOV 25 1987 |
| PAST. |

FEE $15    N
6

ASSIGNMENT OF DECLARATION OF
COVENANTS, CONDITIONS AND RESTRICTIONS
FOR VALENCIA MART SHOPPING CENTER

This Assignment of Declaration of Covenants, Conditions and Restrictions ("Assignment") is entered into as of October 30, 1987, by and between NEWHALL INVESTMENT PROPERTIES, a California limited partnership ("NEWHALL"), and THE NEWHALL LAND AND FARMING COMPANY (A California Limited Partnership) ("NLF").

R E C I T A L S

A.    NEWHALL is the Declarant under that certain Declaration of Covenants, Conditions and Restrictions for the Valencia Mart Shopping Center ("Declaration") dated July 10, 1986, and recorded July 11, 1986, in Official Records, Los Angeles County, California, as Instrument Number 86-875385. The Declaration encumbers that certain real property which is commonly known as the Valencia Mart Shopping Center, and which is located in Los Angeles County, California, and is more particularly described in Exhibit A attached hereto and incorporated herein by reference.

B.    NEWHALL desires to assign all of its rights, powers, and privileges as Declarant under the Declaration to NLF in accordance with the terms of this Assignment.

NOW, THEREFORE, in consideration of the premises and covenants contained herein, the adequacy and sufficiency of which are hereby acknowledged, NEWHALL and NLF hereby agree as follows:

1.    Assignment.  NEWHALL hereby assigns, conveys, and transfers to NLF all of its rights, powers, and privileges as Declarant under the Declaration. Upon recordation of this Assignment in the Official Records of Los Angeles County, California, all of the rights, powers, and privileges of NEWHALL as Declarant under the Declaration shall be automatically vested in NLF, NLF shall become the Declarant under the Declaration, and NEWHALL shall be relieved of all rights, liabilities, obligations, and duties as Declarant under the Declaration from and after the date of recordation of this Assignment.

2.    Limitation of Liability.  The obligations of NEWHALL and NLF under this Assignment and the Declaration shall be without recourse to the assets of the general partners or of any general partner, officer, shareholder, unitholder, director, or employee of NEWHALL and NLF or any general partner of NEWHALL or NLF. The sole recourse of Owner (as defined in the Declaration) or any other person or entity for any obligation of NEWHALL under this Assignment or the Declaration shall be limited solely to the assets and properties of NEWHALL. The sole recourse of Owner or any other person or entity for any obligation of NLF under this Assignment or the Declaration shall be limited solely to NLF's profits from the Adjacent Property (as defined in the Declaration).

1.

SCO-10-20:10/23/87

Description: Los Angeles,CA Document-Year.DocID 1987.1886018 Page: 1 of 6
Order: 23222 VALENCIA Comment:



3.    Acceptance by NLF.  NLF hereby accepts the foregoing Assignment, and hereby expressly agrees, that from and after the date of recordation of this Assignment in the Official Records of Los Angeles County, California, it shall assume all liabilities, obligations and duties, and shall be entitled to all rights, powers and privileges, as Declarant under the Declaration.

This Assignment may be executed in counterparts, each of which shall constitute and be deemed an original of this Assignment.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date first written above.

NEWHALL:

NEWHALL INVESTMENT PROPERTIES,
a California limited partnership,

By:    NEWHALL PROPERTIES MANAGEMENT
COMPANY, a California general partnership,
Managing General Partner

By:    _____
A General Partner

NLF:

THE NEWHALL LAND AND FARMING COMPANY (A
California Limited Partnership)

By:    NEWHALL MANAGEMENT CORPORATION,
a California corporation, Managing General
Partner

By:    _____
Its:  Executive Vice President
Chief Operating Officer

By:    _____
Its:    **Assistant Secretary**

87  1886018

2.                    SCO-10-20:10/23/87




3

EXHIBIT A

(Legal Description)

EXHIBIT A to Assignment of Declaration of Covenants, Conditions and Restrictions for Valencia Mart Shopping Center, executed by Newhall Investment Properties, a California limited partnership, in favor of The Newhall Land and Farming Company (A California Limited Partnership), dated as of October 30, 1987.

The legal description of the Property is as follows:

Parcel 1 in the County of Los Angeles, State of California, as shown on Parcel Map No. 16765, filed in Book 182 Pages 39 to 44 inclusive of Parcel Maps, in the Office of the County Recorder of said County.

Reserving to Newhall Investment Properties all rights, title, and interest to water, aquifers, reservoirs, and wells of every kind, together with the right to drill or pump for the same, without, however, the right to drill or pump through the surface or upper 500 feet of the subsurface of said land and further reserving to Newhall Investment Properties all rights, title and interest to any and all transferable development rights that may now or hereafter attach to the Property.

EXCEPT therefrom as equal one-half of all oil, gas, petroleum, coal, oil, naphtha, asphaltum and other hydrocarbon and mineral substances located in, under and upon that portion of said land hereinafter described, together with the perpetual and unrestricted right to go upon said real property at any time for the purposes of developing, producing and removing therefrom any and all of said substances; Grantors also reserved the right to erect, construct and maintain on said premises derricks, buildings, machinery, roads and all other structures or easements necessary or incidental to the development, production, extraction and removal of reserved substances, as reserved by Arthur E. Erwin and Gay M. Erwin, husband and wife, in deed recorded July 7, 1952 as Instrument No. 193 in Book 39317 Page 97, Official Records.

EXCEPT therefrom all rights to minerals, oil, gas, tars, hydrocarbons, and metalliferous substances of every kind, together with the right to drill or mine for same, without, however, the right to drill or mine through the surface or the upper 500 feet of the subsurface of said land as reserved by The Newhall Land and Farming Company, a Delaware corporation, in Deeds recorded March 24, 1983 as Instrument No. 83-323367 Official Records and as Instrument No. 83-323359, Official Records.

Subject to such exceptions to title listed: (A) in the preliminary title report regarding the Property dated as of April 15, 1986, Order Nos. 8285394 issued by Ticor Title Insurance Company of California; (B) those certain "Leases" as defined in the Agreement of Purchase and Sale dated as of May 23, 1986, by and between SWZ Partnership, as Buyer, and Newhall Investment Properties, as Seller ("Purchase Agreement"); and (C) the "Permitted Exceptions", as defined in the Purchase Agreement; provided, however, that Sterik Company, a New York general partnership, does not assume or agree to pay and shall have no personal liability whatsoever for any obligation or payment arising out of, relating to, or required under these exceptions to title.

EXHIBIT A
Page 1 of 2 Pages                    SCO-10-20:10/23/87

87   1886018

Description: Los Angeles,CA Document-Year.DocID 1987.1886018 Page: 3 of 6
Order: 23222 VALENCIA Comment:




Subject to all covenants, conditions, restrictions, easements and other matters, as set forth in that certain Declaration of Covenants, Conditions and Restrictions executed by Newhall Investment Properties, as Declarant, and SWZ Partnership, as Owner, and recorded in the Official Records of Los Angeles County, California, together with any amendments thereto, now or hereafter of record, all of which are incorporated herein by this reference with the same effect as though fully set forth herein; provided, however, that Sterik Company, a New York general partnership, does not assume or agree to perform and shall have no duty or obligation whatsoever, to assume and/or perform, and no personal liability whatsoever, for failure to assume and/or perform, any obligation of Owner thereunder.

EXHIBIT A
Page 2 of 2 Pages

SCO-10-20:10/23/87

87  1886018



5

STATE OF CALIFORNIA        )
                           ) ss:
COUNTY OF LOS ANGELES      )

            November
    On ~~October 11,~~ 1987, before me, the undersigned, a Notary Public in and for said County and State, personally appeared _____Robert D. Wilke_____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed the within instrument on behalf of NEWHALL PROPERTIES MANAGEMENT COMPANY, a California general partnership, that executed the within instrument on behalf of NEWHALL INVESTMENT PROPERTIES, a California limited partnership, as managing general partner thereof, and acknowledged to me that NEWHALL INVESTMENT PROPERTIES executed the within instrument.

    IN WITNESS WHEREOF, I have set my hand and affixed my official seal the day and year last above written.


_____
Notary Public in and for
said County and State

My Commission Expires:
    October 30, 1991
_____
      [seal]

OFFICIAL SEAL
JANICE GUNTHER
NOTARY PUBLIC - CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Exp. Oct. 30, 1991

87  1886018

   

STATE OF CALIFORNIA       )
                          ) ss:
COUNTY OF LOS ANGELES     )

On September 11 1987, before me, the undersigned, a Notary Public in and for said County and State, personally appeared  Gary Cusumano  , and Donald L. Puente, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons who executed the within instrument on behalf of NEWHALL MANAGEMENT CORPORATION, a California corporation, as Exec. Vice Pres.  and Assistant Secty , respectively, of such corporation, which corporation executed the within instrument as the managing general partner of THE NEWHALL LAND AND FARMING COMPANY (A California Limited Partnership), and acknowledged to me that such partnership executed the within instrument.

IN WITNESS WHEREOF, I have set my hand and affixed my official seal the day and year last above written.

Notary Public in and for
said County and State

My Commission Expires:

October 30, 1991

[seal]



87   1886018

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## Fill in this information to identify the case (Select only one Debtor per claim form):

| | | | |
|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☒ Kmart Corporation (18-23549) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☐ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Home Management Corporation (18-23553) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22301) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc. (18-23584) | |

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:  Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | SWZ LLC f/k/a  SWZ Partners, LLC |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |
| 2. **Has this claim been acquired from someone else?** | ☑ No  ☐ Yes. From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?**  Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?  Stark & Stark  Att: Joseph H. Lemkin  PO Box 5315  Princeton, NJ 08543-5315 |
| | Where should payments to the creditor be sent? (if different) |
| | Contact phone 609-791-7022  Contact email jlemkin@stark-stark.com | Contact phone _____  Contact email _____ |
| 4. **Does this claim amend one already filed?** | ☑ No  ☐ Yes.  Claim number on court claims registry (if known)_____  Filed on ____/____/____  MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No  ☐ Yes. Who made the earlier filing? _____ |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

**7. How much is the claim?**  $ 145,131.83 . **Does this amount include interest or other charges?**

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Lease obligations.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $_____

**Amount of the claim that is secured:**  $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☑ Yes. Amount necessary to cure any default as of the date of the petition.  $_____143,783.19

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No<br>☑ Yes. *Check one:* | **Amount entitled to priority** |

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 2  ) that applies.  $ 145,131.83

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

| | | |
|---|---|---|
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | $_____ |

## Part 3: Sign Below

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |

Signature:   *Joseph H. Lemkin*
Joseph H. Lemkin (Apr 8, 2019)

Email:   jlemkin@stark-stark.com

Signature
Print the name of the person who is completing and signing this claim:
Name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Joseph H. | Lemkin | |
| | First name | Middle name | Last name |
| Title | Attorney | | |
| Company | Stark & Stark | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | PO Box 5315 | | |
| | Number        Street | | |
| | Princeton | NJ | 08543-5315 |
| | City | State | ZIP Code |
| Contact phone | 609-791-7022 | Email | jlemkin@stark-stark.com |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ have supporting documentation.
(attach below)

☐ do **not** have supporting documentation.

Attachment

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

Modified Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                    12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- Fill in all of the information about the claim as of the date the case was filed.

- Fill in the caption at the top of the form.

- If the claim has been acquired from someone else, then state the identity of the last party who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- Attach any supporting documents to this form. Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- Do not attach original documents because attachments may be destroyed after scanning.

- If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.

- A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth. See Bankruptcy Rule 9037.

- For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian. For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://restructuring.primeclerk.com/sears.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Sears Holdings Corporation Claims Processing Center
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

**Do not file these instructions with your form**

**RIDER TO PROOF OF CLAIM OF**
**SWZ LLZ f/k/a SWZ PARTNERS, LLC ("CLAIMANT")**
**DEBTORS: SEARS HOLDINGS CORPORATION, et als.**
**(Case No.: 18-23538 (RDD)**

Claimant is a landlord relative to a lease dated February 3, 1972, as amended (the "Lease"), for the premises located at 23222 W. Valencia Blvd., Valencia, CA and previously known as Kmart Store #3018 (the "Property"). Claimant is owed amounts under the lease as follows:

### 1. Post-Petition Administrative Charges

Post-petition administrative charges are due as follows (i) real estate taxes in the amount of $110,720.33 plus any interest and penalties that may accrue on those taxes; (ii) base rent in the amount of $16,000; (iii) environmental costs incurred post-petition in the amount of $17,400, regarding Landlord's inspection of potential contamination on the Property, related to activities of the Debtor's sub-tenant; and (iii) such additional amounts which continue to accrue under the lease including monthly rent, CAM charges, other reconciliation amounts, claims for damage to the property, claims for environmental contamination, reasonable attorney fees and also for any and all damages caused by the Debtor's failure to provide proof of insurance, which was due by or before March 31, 2019. Documents supporting this claim are attached hereto as Exhibit "A".

Claimant also reserves its right to assert any offset, recoupment and other such equitable doctrines and defenses to which it may be entitled under the Lease or other applicable law.

The total liquidated amount of Claimant's administrative claim is $145, 131.83. Claimant reserves the right to amend and/or supplement this claim to include additional amounts due which have not yet been liquidated and/or discovered.

For additional information and/or documentation regarding this claim, please contact counsel for Claimant:

> Joseph H. Lemkin, Esq.
> **Stark & Stark**
> PO Box 5315
> Princeton, NJ 08543-5315
> (609)791-7022
> jlemkin@stark-stark.com

EXHIBIT "A"



OLIVE BRANCH PROPERTIES
1733 ABBOT KINNEY BLVD. • UNIT C • VENICE, CA 90291
TEL./FAX: 310 301 4237

STATEMENT

4/3/2019                    ACCOUNT NUMBER

Kmart Corporation #3018                    KMART          1
3333 Beverly Road
Hoffman Estates, IL  60179

MAKE CHECKS PAYABLE TO:   SWZ, LLC          BALANCE DUE      127,731.33

| Date | Code | Description | Charges | Payments | Amount Due |
|---|---|---|---|---|---|
| 11/1/2018 | TAX | 2018/19 Prop Tax 1st inst | 70,891.58 | 30,051.84 | 40,839.74 |
| 2/1/2019 | TAX | 2nd Inst 2018/19 RE Taxes | 70,891.59 | 0.00 | 70,891.59 |
| 4/1/2019 | BRT | Base Rent | 16,000.00 | 0.00 | 16,000.00 |

PLEASE PAY BY DUE DATE TO AVOID LATE CHARGES
4/3/2019                              ACCOUNT NUMBER

Please send this portion of the statement with your remittance to the
address below.

INVOICE #:                    KMART          1
Kmart Corporation #3018

SWZ, LLC
c/o Olive Branch Properties
1733 ABBOT KINNEY BLVD. #C
VENICE          CA  90291

| BALANCE DUE | 127,731.33 | | | | |
|---|---|---|---|---|---|
| Current | 30 | 60 | 90 | 120 | BALANCE DUE |
| 16,000.00 | 0.00 | 70,891.59 | 0.00 | 40,839.74 | 127,731.33 |

Mr. Elan Shukartsi
February 11, 2019
Proposal No. 010115219
Page 3

## REPORTING

Following receipt of analytical data, a report will be prepared which summarizes the results of the investigation. The report will provide background information, a description of methods used to collect samples, a summary of data, comparison to regulatory limits, and appropriate conclusions and recommendations. The report will also include supporting documentation such as boring logs, figures, laboratory reports, and chain-of-custody forms. The report will be submitted to the client approximately three weeks after fieldwork has been completed.

## ESTIMATED COSTS

Estimated costs for completing the subsurface soil investigation as outlined above are as follows:

| SUBSURFACE INVESTIGATION ACTIVITIES | Rate | Unit(s) | Number | Amount ($) |
|---|---|---|---|---|
| Premark borings, notify Digalert, and geophysical survey | $1,200 | each | 1 | $1,200 |
| SCS Field Personnel for Oversight of Sampling Activities | $1,500 | per day | 1 | $1,500 |
| Field equipment/supplies/vehicle | $250 | per day | 2 | $500 |
| Direct-push drill rig for installation of soil borings/vapor probes | $5,150 | each | 1 | $5,150 |
| Soil Vapor Collection/Analysis (EPA Method 8260SV) | $900 | each | 1 | $900 |
| Laboratory Analysis - Soil Samples (Normal Turn-around) | | | | |
|     Metals | $115 | each | 8 | $920 |
|     TPH Hydrocarbon Chain (EPA Method 8015M) | $85 | each | 18 | $1,530 |
|     VOCs (EPA Method 8260) | $95 | each | 4 | $380 |
|     5035 Sampling kits | $25 | each | 6 | $150 |
|     Pesticides (EPA 8081) | $95 | each | 4 | $380 |
| Summary Report | $2,500 | each | 1 | $2,500 |
| Coordination and Administration | $2,290 | each | 1 | $2,290 |
| Total Estimated Cost | | | | $17,400 |

The costs for completing the scope of work to conduct a soil and soil vapor investigation as outlined above will be conducted on a fixed-fee basis of $17,400. This estimate is based on the assumption that work can be completed during normal working hours and that we will have unlimited access to the Property.

If this proposal meets with your approval, please sign and return a copy of this proposal and agreement to our office. A fully executed copy of the agreement will be returned for your records. Client agrees to arrange access to the Property during normal working hours.

# Electronic Proof of Claim

Final Audit Report                                                    2019-04-08

| | |
|---|---|
| Created: | 2019-04-08 |
| By: | Sears Claims (searsclaims@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAT3WhJI49r_8IAFXKQ4a8qXj55fCuL4nE |

## "Electronic Proof of Claim" History

Widget created by Sears Claims (searsclaims@primeclerk.com)
2019-04-08 - 2:23:25 PM GMT

Joseph H. Lemkin (jlemkin@stark-stark.com) uploaded the following supporting documents:
  Attachment
2019-04-08 - 2:37:51 PM GMT

Widget filled in by Joseph H. Lemkin (jlemkin@stark-stark.com)
2019-04-08 - 2:37:51 PM GMT- IP address: 98.110.41.226

(User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 10.0; WOW64; Trident/7.0; rv:11.0) like Gecko)
2019-04-08 - 2:37:54 PM GMT- IP address: 98.110.41.226

Signed document emailed to Joseph H. Lemkin (jlemkin@stark-stark.com) and Sears Claims (searsclaims@primeclerk.com)
2019-04-08 - 2:37:54 PM GMT

Prime Clerk       Adobe Sign