RECEIVED MAY 2 2 2017

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

May 18, 2017

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0653 1772**

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0653 1789**

Lockhart Gardens, Inc.
Fort Mylner Commercial Center, 2nd Floor
Estate Charlotte Amalie, Unit #6
St. Thomas, VI  00802
Attn: Marna Green, V.P. - Property Management

Lockhart Gardens, Inc.
P.O. Box 7020
St. Thomas, VI  00801
Attn:  Marna Green, V.P. - Property Management

Re:    Lease dated October 22, 1997, as amended, for the
premises located at 9000 Lockhart Gardens Shopping Center,
Suite 1, St. Thomas, VI, and known as Kmart Store # 7793

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years,
commencing March 1, 2018, to and including February 28, 2023, upon the terms, conditions, and
rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION,
a Michigan corporation

By:_____
S. Jeffrey Stollenwerck
SVP and President, Real Estate

JS/cm

cc:  J. Catanese
Lease File

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0653 1796**

Banco Popular de Puerto Rico
Account Name:  Lockhart Gardens, Inc.
P.O. Box 8580
St. Thomas, VI  00801-8580

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL 60179

May 16, 2012

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0645 6136**

Lockhart Gardens, Inc.
9800 Buccaneer Mall
Bldg. 2 – Suite 9
St. Thomas, VI 00802-2409
Attn: Marna Green, V.P. Property Mgmt.

Re:    Lease dated October 22, 1997, as amended,
for the premises located at 9000 Lockhart Gardens SC, Suite 1,
St. Thomas, VI , and known as Kmart #7793

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing March 1, 2013, to and including February 28, 2018, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

Kmart Corporation,
a Michigan corporation

By: _____
Jeffrey Stollenwerck
Sr. Vice President of Real Estate

JS/ljb

cc:    J. Catanese
Lease File

**RECEIVED** MAY 2 3 2012

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0645 6150**

Lockhart Gardens, Inc.
P. O. Box 7020
St. Thomas, U.S.V.I. 00801
Attn: Marna Green, V.P. Property Mgmt.

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

May 23, 2007

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7006 0810 0002 7421 4259**

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7006 0810 0002 7421 4075**

Lockhart Companies, Inc.
P. O. Box 7020
No. 44 Estate Thomas
St. Thomas,, VI  00801
Attn:  Wesley Williams

HE Lockhart Mgmt., Inc.
P. O. Box 7020
No. 44 Estate Thomas
St. Thomas, VI  00801
Attn:  John DeJongh, Jr.

Re:  Lease dated October 22, 1997, as amended,
for the premises located at 9000 Lockhart GDNS S/C,
Suite 1, St. Thomas, VI, and known as Kmart #7793

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing March 1, 2008, to and including February 28, 2013, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION

By _____

Jeffrey Stollenwerck
Senior Vice President of Real Estate

JS/jc

cc:    J. Catanese
Lease File

# SEARS HOLDINGS

RECEIVED
APR 1 6 2007

**CERTIFIED/REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**

H. E. LOCKHART MANAGEMENT, INC.
NO. 44 ESTATE THOMAS
P O BOX 7020
ST. THOMAS                    VI        00801

Kmart Store #    7793    **St. Thomas, US Virgin Islands**

Re:    **NOTICE OF ADDRESS CHANGE**

You are hereby notified that all notices required or permitted from Lessor [Landlord/Tenant/Lessee] to Lessee [Tenant/Lessor/Landlord] shall be addressed as follows:

Kmart Corporation
c/o Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, IL 60179
Attn.: Vice President Real Estate
        Department 824RE

With a copy to:

Kmart Corporation
c/o Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, IL 60179
Attn.: Vice President Law – Real Estate
        Department 766X

Also, for quick reference, please include the unit # referenced above in all correspondence and invoices.

Dated this 12th day of March, 2007.

KMART CORPORATION

By: Kim Facer, Divisional Vice President
Its: Authorized Agent

cc: Real Estate File



**Kmart Corporation**
Resource Center
3100 West Big Beaver Road
Troy MI 48084-3163

October 30, 2003

Mary Ann Detroit, CPM
Vice President
Lockhart Realty, Inc.
P. O. Box 7020
No. 44 Estate Thomas
St. Thomas, VI  00801

RE:   Lease dated October 22, 1997 for
      The premises located in St. Thomas, VI
      and known as Kmart #7793
      Lease Extension

Dear Ms. Detroit:

Pursuant to your conversation with Ms. Cynthia Lapensee, please allow this letter to serve as our agreement as it relates to the referenced matter.  Notwithstanding anything to the contrary, and from this point forward, we have expressly agreed that the lease term for the referenced property shall be deemed as commenced as of March 1, 1998 ("Commencement Date") and was set to expire by its own terms on February 28, 2003.  On May 29, 2002, pursuant to Section 1.3 of the lease agreement, Kmart provided written notice of its intention to exercise its option to extend this lease for another period of five (5) years, commencing on March 1, 2003 and expiring February 28, 2008.

By affixing your signature below in the space so provided, you agree with the terms stated in the preceding paragraph.  Please retain one original for your records and return an original to the attention of Cynthia Lapensee at the address noted on this letterhead.  Thank you again for your cooperation with this matter.

Very Truly Yours,

S. Jeffrey Stollenwerck
Vice President

SJS/cjl

Lockhart Realty, Inc.

By: Etienne Bertrand
Its: President / COO

Date: 11/06/03



Cynthia Lapensee
Real Estate Information & Strategy
(248) 463-1490
(248) 463-2689 Fax

RECEIVED
OCT 3 1 2003
By Viola

**Kmart Corporation**
Resource Center
3100 West Big Beaver Road
Troy MI 48084-3163

October 30, 2003

Mary Ann Detroit, CPM
Vice President
Lockhart Realty, Inc.
P. O. Box 7020
No. 44 Estate Thomas
St. Thomas, VI  00801

RE:    Kmart #7793 – St. Thomas, VI
       _____

Dear Mary Ann:

I apologize for my delay in forwarding you the letter agreements you requested last week.  Please have both originals signed and return one to my attention.

It was a pleasure working with you.  Please do not hesitate to contact me with any questions.  Thank you.

Very Truly Yours,

Cynthia Lapensee
Real Estate Representative

\7792.2

**Kmart Corporation**
Resource Center
3100 West Big Beaver Road
Troy MI 48084-3163

October 30, 2003

Mary Ann Detroit, CPM
Vice President
Lockhart Realty, Inc.
P. O. Box 7020
No. 44 Estate Thomas
St. Thomas, VI  00801

RE:    Lease dated October 22, 1997 for
       The premises located in St. Thomas, VI
       and known as Kmart #7793
       Lease Extension
       _____

Dear Ms. Detroit:

Pursuant to your conversation with Ms. Cynthia Lapensee, please allow this letter to serve as our agreement as it relates to the referenced matter. Notwithstanding anything to the contrary, and from this point forward, we have expressly agreed that the lease term for the referenced property shall be deemed as commenced as of March 1, 1998 ("Commencement Date") and was set to expire by its own terms on February 28, 2003. On May 29, 2002, pursuant to Section 1.3 of the lease agreement, Kmart provided written notice of its intention to exercise its option to extend this lease for another period of five (5) years, commencing on March 1, 2003 and expiring February 28, 2008.

By affixing your signature below in the space so provided, you agree with the terms stated in the preceding paragraph. Please retain one original for your records and return an original to the attention of Cynthia Lapensee at the address noted on this letterhead. Thank you again for your cooperation with this matter.

Very Truly Yours,

S. Jeffrey Stollenwerck
Vice President

SJS/cjl


Lockhart Realty, Inc.

By: ETIENNE BERTRAND
Its: PRESIDENT / COO

Date: 11-6-03

TO 913487161948    P.02/02

**K** mart®

Kmart Corporation
Resource Center
3100 West Big Beaver Road
Troy MI 48084-3163

May 29, 2002

H. E. Lockhart Management, Inc.
c/o Mr. John De Jongh, Jr.
P. O. Box 7020
No. 44 Estate Thomas
St. Thomas, VI  00801

> Re:  Lease dated October 22, 1997 for
> the premises located in St. Thomas, VI
> and known as Kmart #7793

Dear Mr. De Jongh, Jr.:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing March 1, 2003, to and including February 28, 2008, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Please be advised that this election does not constitute an assumption of the Lease, and the undersigned reserves all rights under bankruptcy law.

Sincerely,

KMART CORPORATION

By _____

Lorrence T. Kellar
Vice President Real Estate

LTK/cjl

cc:    F. Duzzie
       D. Hurley
       C. Lapensee
       J. Mesenbring
       T. Slimp
       M. Stephens (Finance)
       B. Troxtel
       Corres. File
       Lease File

**CERTIFIED MAIL -
RETURN RECEIPT REQUESTED**

**Kmart Store No. 7793**
**St. Thomas, U.S.V.I.**

## LEASE

THIS LEASE, made and entered into this $22^{\underline{nd}}$ day of October, 1997, by and between H.E. LOCKHART MANAGEMENT, INC., (hereinafter also referred to as "Landlord"), P.O. Box 7020, St. Thomas, U.S. Virgin Islands 00801, and KMART CORPORATION, a Michigan corporation (hereinafter referred to as "Tenant"), whose mailing address is 3100 West Big Beaver Road, Troy, Michigan 48084.

### ARTICLE I.  LEASED PREMISES AND TERM

Section 1.1  Leased Premises.

Landlord hereby leases to Tenant, and Tenant hereby hires and takes from Landlord, the Unit A in Lockhart Gardens Shopping Center (the "Leased Premises"), located in the shopping center on the property located in St. Thomas, U.S. Virgin Islands, more particularly described in Exhibit A attached hereto and made a part hereof (the "Shopping Center"), and as described and shown more particularly on Exhibit B, the Site Plan attached hereto and made a part hereof, which premises extend to the interior of the exterior face of all exterior walls, and to the center line of those walls separating the Leased Premises from other premises in the Shopping Center, which Leased Premises, Landlord and Tenant hereby agree, shall be deemed to consist of a Floor Space of sixty thousand (60,000) (more or less) square feet for all purposes of this Lease;

Subject to and with the benefit of the terms, covenants, conditions and provisions of this Lease;

Together with the appurtenances specifically granted in this Lease, but reserving and excepting to the Landlord (i) (a)the exterior faces of the exterior walls of the Leased Premises (provided Tenant may place such signs thereon as may be permitted hereby, and Landlord shall place no signage thereon except as may be permitted hereby); (b) the upper surface of the roof (provided Tenant may place such communications equipment thereon as may be permitted hereby); and(ii) the right to install, maintain, use, repair and replace pipes, ducts, conduits and wires which now or hereafter may serve other parts of the Shopping Center and which now or hereafter may pass through the Leased Premises, so long as such pipes, ducts, conduits and wires are not placed in locations which will materially adversely interfere with Tenant's use of the Leased Premises, and in such manner as is hereinafter set forth.

Subject to the terms and limitations set forth herein, Landlord hereby reserves the right at any time and from time to time to make alterations or additions to and to build additional stories on any section of the buildings which comprise the Shopping Center other than the Leased Premises, and

to build other buildings or improvements on the Property and to make alterations thereof or additions thereto and to build additional stories in any such buildings; provided, no such other buildings or additions thereto shall be constructed in the "no build area" shown on Exhibit B (the area in front of the Leased Premises).

Section 1.2 Term. — *5yrs*.                                                                3-1-98.

To Have and to Hold the Leased Premises unto Tenant for a term which shall commence on the earlier of: (a) the date Tenant takes possession of the Leased Premises to construct Tenant's Work, as hereinafter defined, or (b) ten (10) days after Landlord's notice to Tenant that it has completed Landlord's Work, as hereinafter set forth ("Commencement Date"), and which shall end at midnight on the fifth anniversary of the Commencement Date ("Expiration Date") unless sooner terminated as hereinafter provided.  The time period commencing on the Commencement Date and running until the Expiration Date shall hereafter be referred to as the Lease Term ("Lease Term").

Section 1.3 Option to Extend. + *5- 5 y/terms*

(a)  Landlord grants to Tenant, subject to the conditions set forth below, the right and option to extend this Lease for five (5) additional terms of five (5) years each ("Option Terms") at a rental determined as provided below, and otherwise subject to and on all of the terms and conditions herein contained, except there shall be no further options to extend the Lease.  An option must be exercised by giving to Landlord, at least nine (9) months before the expiration of the initial Term or then Option Term, a written notice of the exercise thereof by Tenant, but Tenant shall in no event be entitled to extend the Term hereof, even though such notice be timely given, unless Tenant shall have timely performed all of its obligations hereunder, and shall not be in default in the performance of any thereof, on the date of the expiration of the initial and each subsequent Term hereof.  All obligations to be performed by Landlord or Tenant during the "Term" hereof shall include performance by the party during any Option Term elected by Tenant.

(b)     Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the Lease Term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the Term of this Lease for such period of time as shall cause the last day of the Term of this Lease to be the January 31 next succeeding the date upon which the Term of this Lease would expire but for the exercise of this option.  This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the Term of this Lease or any extension thereof.  Tenant's rental during this option period shall be the same rental payable under the Terms of this Lease at the time Tenant notifies Landlord of its intention to exercise this option.

St. Thomas, V.I. Store #7793
M:\2206\33\kmart. lease.wpd
October 22, 1997

-2-

## ARTICLE II.  CONSTRUCTION

Section 2.1  Landlord's Work.

(a)  Neither Landlord nor Landlord's agents have made any representations or promises with respect to the physical condition of the building or the Shopping Center, the land upon which it is erected or the Leased Premises, the rents, leases, expenses of operation or any other matter or thing affecting or related to the Leased Premises except as herein expressly set forth in the provisions of Section 2.1(b) and any other Section of this Lease.  Tenant has inspected the building, the Shopping Center and the Leased Premises, is thoroughly acquainted with their condition, agrees to take the same "AS IS" and acknowledges that the taking of possession of the Leased Premises by Tenant shall be conclusive evidence that the Leased Premises and the building and Shopping Center of which the same form a part were in good and satisfactory condition at the time such possession was so taken.  Except as set forth in Section 2.1(b), Landlord shall be under no obligation to do any work whatsoever to make the Leased Premises ready for Tenant's occupancy.

(b) Landlord has agreed to install, at Landlord's sole cost and expense, a passenger elevator with a maximum capacity of 2,100 lbs. in the existing elevator shaft in the Leased Premises. Landlord has submitted cut sheets and architectural drawings for the elevator and the installation thereof to Tenant, for Tenant's approval, which approval shall not be unreasonably withheld.  Tenant shall provide such approval within five (5) days after receipt of the cut sheets and drawings, or if Tenant shall disapprove, shall offer specific comments delineating Tenant's disapproval.  Upon approval by Tenant, Landlord shall immediately order the elevator, and shall use reasonable efforts to obtain and install the elevator as soon as possible.  Upon installation thereof, Landlord shall give notice to Tenant, so that Tenant may inspect the completed work and, if installed in a good and workmanlike manner in accordance with the approved drawings, shall accept same.  If Tenant has not previously taken possession of the Leased Premises to perform Tenant's Work as set forth in Section 2.3 below, then Tenant shall take possession of the Leased Premises ten (10) days after completion of the installation of the elevator and acceptance thereof by Tenant.

Section 2.2  Tenant's Work.

Except as set forth in Section 2.1(b), all work within the Leased Premises required for the occupancy of the Leased Premises and Tenant's opening for business, shall be completed by Tenant ("Tenant's Work") at Tenant's sole cost and expense and in accordance with (i) the Tenant's Design Criteria attached hereto as Exhibit C and (ii) plans and specifications prepared by Tenant and approved by Landlord; and if Tenant desires to or is required to perform work in the Leased Premises after the completion of Tenant's Work, then Tenant shall perform such work in accordance with plans and specifications prepared by Tenant and approved by Landlord, such approval not to be unreasonably withheld.

Tenant shall submit to Landlord within thirty (30) days of the date of execution hereof, a preliminary plan of the Tenant's Work, which plan shall be subject to Landlord's approval in its reasonable discretion. Tenant shall not change the Preliminary Plan without first obtaining the written consent of the Landlord.

Tenant shall deliver to Landlord for its approval the working plans and specifications ("Working Plans") prepared in conformity with the approved Preliminary Plan, for Landlord's review and approval, such approval not to be unreasonably withheld or delayed. If Landlord shall not specifically disapprove of all or portions of the Working Plans within ten (10) working days of Landlord's receipt thereof, such Working Plans shall be deemed approved. (The Preliminary Plan and the Working Plans shall hereinafter be collectively referred to as "Plans").

Section 2.3  Performance of Tenant's Work.

If Tenant has not been required pursuant to Section 2.1, and has not elected, pursuant to the following sentence to accept possession of the Leased Premises prior to January 1, 1998, then Tenant shall accept possession of the Leased Premises for construction of Tenant's Work on January 1, 1998. If (a) Landlord has approved Tenant's Working Plans, (b) the previous tenant has vacated the Leased Premises, and (c) Tenant has executed a contract with its general contractor, and materials and labor are available on the island, Tenant, at Tenant's sole option, may request and receive possession on an earlier date of Tenant's choosing. The date on which Tenant accepts possession of the Leased Premises shall be the "Commencement Date" of the Term. If Landlord has not completed Landlord's Work on the Commencement Date, Landlord and Tenant shall each direct their contractors to use all reasonable efforts to coordinate their work, with the goal of minimizing both the cost of the work and the time required to perform same. Tenant will perform and complete Tenant's Work within approximately thirty (30) days after the Commencement Date and in compliance with (i) the terms of this Lease, (ii) the Tenant's Design Criteria, (iii) such reasonable rules and regulations as Landlord and its architect and contractor, or agents, may make and (iv) all applicable laws, orders, regulations and requirements of all governmental authorities and board of fire underwriters having jurisdiction thereof. Landlord shall not be subject to, and Tenant hereby agrees to indemnify Landlord and hold Landlord harmless from and against any claim, action or any liability respect with such statutes, ordinances, regulations and codes. Tenant acknowledges that Tenant's Work may be subject to various federal laws governing new construction, including without limitation, the Americans with Disabilities Act of 1990 (Public Law 101-336), as amended and all rules and regulations promulgated pursuant thereto. Tenant agrees to assume responsibility for compliance with all such laws which may apply to it or any construction which may take place in the Leased Premises, excluding, however, Landlord's Work. Upon completion of Tenant's Work, Tenant shall fixture and inventory the Leased Premises in a timely fashion, and use reasonable efforts to open for business in the Leased Premises within an additional sixty (60) days.

Section 2.4  Ownership of Improvements.

All installations, alterations, additions, or improvements upon the Leased Premises, made or required to be made under this Lease by either party, including, but not limited to, all pipes, ducts, conduits, equipment, wiring, air conditioners, light fixtures, panelling, decorations, partitions, railings, galleries and the like, shall become and remain the property of Landlord, who, alone, shall have the right to encumber same and shall remain upon and be surrendered with the Leased Premises as a part thereof on the Expiration Date.  Movable office furniture and trade fixtures, other than those herein specifically identified, which are installed by Tenant at its expense, shall remain its property and may be removed at any time during the Lease Term, provided Tenant promptly repairs any damage caused by such removal.

Section 2.5  Construction on Adjacent Premises.

If any excavation or other building operation shall be about to be made or shall be made on any premises adjoining the Leased Premises the Tenant shall permit the Landlord, its agents, employees, licensees and contractors, to enter the Leased Premises and to shore-up the foundations and/or walls thereof, and to erect scaffolding and/or protective barricades around and about the Leased Premises (but not so as to preclude entry thereto) and to do any act or thing necessary for the safety or preservation of the Leased Premises.  The Tenant's obligations under this lease shall not be affected by any such construction or excavation work or any such shoring-up, provided if such construction or excavation work or shoring-up shall materially obstruct visibility of the Leased Premises for more than thirty (30) days, Tenant shall, from and after said thirty (30) days, until visibility shall be restored, pay 1% of Gross Sales monthly, in arrears, in lieu of Base Rent.  The Landlord shall not be liable in any such case for any inconvenience, disturbance, loss of business or any other annoyance arising from any such construction, excavation, shoring-up scaffolding or barricades, but the Landlord shall use its best efforts to coordinate with Tenant so that such work will cause as little inconvenience, annoyance and disturbance to the Tenant as possible consistent with accepted construction practice in the vicinity, that the work is performed in the off-season (i.e. July 1 through October 15) to the extent commercially reasonable, and so that such work shall be expeditiously completed.

ARTICLE III.  RENT

Section 3.1  Rent and Payment.

The rent payable to the Landlord under the provisions of this Lease for the initial Lease Term and the first five (5) year Option Term is THREE HUNDRED FIVE THOUSAND DOLLARS ($305,000.00) per Lease Year, for the second and third Option Terms is THREE HUNDRED THIRTY-FIVE THOUSAND, FIVE HUNDRED DOLLARS ($335,500.00) per Lease Year, and for the fourth and fifth Option Terms is THREE HUNDRED EIGHTY-TWO THOUSAND DOLLARS ($382,000.00) per Lease Year (the "Base Rent").  In addition to Base Rent, Tenant shall pay

Percentage Rent, as set forth in Section 3.5 et. seq., Additional Rent for taxes and Additional Rent for Common Area Expenses, as hereinafter set forth. The rent shall be paid to Landlord at the Landlord's Office, or other such place as Landlord may designate in writing.

### Section 3.2  Installments of Base Rent.

Provided Landlord has completed Landlord's Work on or before such date, then commencing on the earlier of sixty (60) days after the Commencement Date or the date Tenant opens for business in the Leased Premises, Tenant covenants and agrees to pay Landlord rentals due hereunder in equal monthly installments of TWENTY FIVE THOUSAND FOUR HUNDRED SIXTEEN and 66/100 DOLLARS ($25,416.66), during the initial Term and the first Option Term, TWENTY-SEVEN THOUSAND NINE HUNDRED FIFTY-EIGHT and 33/100 DOLLARS ($27,958.33) during the second and third Option Terms, and THIRTY-ONE THOUSAND EIGHT HUNDRED THIRTY-THREE and 33/100 DOLLARS ($31,833.33) during the fourth and fifth Option Terms, without any abatement, counterclaim, setoff or deduction whatsoever, and without any prior demand thereof, payable in advance on the first day of each calendar month included in the Lease Term. If Landlord has not completed Landlord's Work on the date payment of Base Rent should commence, then, until Landlord completes Landlord's Work, Tenant shall pay, in lieu of Base Rent, one percent (1%) of Gross Sales, as hereinafter defined, per month, in arrears, until the date Landlord completes Landlord's Work. If the Commencement Date shall be any day other than the first day of a calendar month, the rental due for the partial calendar month shall be prorated on a per diem basis, and Tenant shall pay the prorated amount on the first day Base Rent shall be due.

### Section 3.3  Additional Rent.

INTENTIONALLY DELETED

### Section 3.4  No Reduction in Additional Rent.

INTENTIONALLY DELETED

### Section 3.5  Percentage Rent.

Tenant covenants and agrees also to pay percentage rent (the "Percentage Rent") for each Lease Year, or Partial Lease Year, as hereinafter defined, included in the Lease Term, payable as hereinafter provided, equal to the sum of two and one half percent (2.5%) of Tenant's Gross Sales (as hereinafter defined) transacted during such Lease Year or Partial Lease Year in excess of : (a) $12,000,000 up to and including $20,000,000, during the initial Term and the first Option Term; (b) $13,200,000 up to and including $20,000,000 during the second Option Term and the third Option Term; and (c) $15,080,000 up to and including $20,000,000 during the fourth and fifth Option Terms; plus two percent (2%) of Gross Sales during each Lease Year or Partial Lease Year in excess of $20,000,000 up to and including $30,000,000.

Section 3.6.

INTENTIONALLY DELETED

Section 3.7  Gross Sales Defined.

A.      The term "gross sales" as used herein is defined to mean the total amount in dollars of the actual prices charged, whether for cash or on credit or partly for cash and partly on credit, for all sales of merchandise, food, beverages, and services, gift or merchandise certificates, and all other receipts of business conducted at, in, on, about or from the Leased Premises, including, but not limited to, all main or telephone orders received or filled at or from the Leased Premises, and including all deposits not refunded to purchasers, all orders taken in and from the Leased Premises, whether or not said orders are filled elsewhere, and sales by any sub-lessee, concessionaire or licensee, or otherwise, at, in, on, about or from the Leased Premises, and sales and receipts occurring or arising as a result of solicitation of the Leased Premises conducted by personnel operating from, or reporting to, or under the supervision of any employee of Tenant located at the Leased Premises. Tenant agrees not to intentionally avoid Gross Sales by shifting sales to any other store operated by Tenant.  Gross Sales shall not, however, include the amount of returns to shippers or manufacturers or to Tenant's warehouse, or another store of Tenant, nor the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is hereafter returned by the purchaser and accepted by Tenant, nor sales of Tenant's used fixtures or fixtures in use by Tenant which are not a part of Tenant's stock in trade.   Also excluded from Gross Sales shall be the following:

1) Any and all taxes levied upon, assessed against, or measured by the purchase of merchandise by any occupant of said Leased Premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, after collection by such occupant from its customers as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances; provided, further, Tenant agrees that the currently existing gross receipts tax imposed by the government of the Virgin Islands, and aggregating approximately 4% of gross receipts shall <u>not</u> be deducted from Gross Sales hereunder.

2) Receipts from cigarettes; provided, however, that this exclusion from Gross Sales shall not apply to any assignee, subtenant or successor to the Tenant;

St. Thomas, V.I. Store #7793
M:\2206\33\kmart. lease.wpd
October 22, 1997

3) Service and interest charges for the time payment accounts and charge accounts; and

4) Employee purchases.

B.    Tenant agrees to prepare and keep at its main accounting office for a period of not less than two (2) years following the end of each Lease Year or Partial Lease Year, adequate records which shall show inventories and receipts of merchandise at the Leased Premises, and daily receipts from all sales and other transactions on the Leased Premises by Tenant and any other person conducting any business upon said premises.  Tenant shall record and shall cause to be recorded at the time of sale, in the presence of the customers, all such receipts from sales or other transactions whether for cash or credit in a cash register or in cash registers having a cumulative total which shall be sealed in a manner consistent with Tenant's other stores.  Tenant further agrees to keep at Tenant's main accounting office for at least two (2) years following the end of each Lease Year or Partial Lease Year all pertinent original sales records.  Pertinent original sales records shall include: (a) cash register tapes including tapes from temporary registers; (b) serially numbered sales slips) (c) the originals of all mail order at and to the Leased Premises; (d) the original records of all telephone orders at and to the Leased Premises; (e) settlement report sheets of transactions with subtenants, concessionaires and licensees; (f) the original records showing that merchandise returned by customer was purchased at the Leased Premises by such customers; (g) memorandum receipts or other records of merchandise taken out on approval; (h) bank deposit records; (i) such other records, if any, which would normally be examined by an independent accountant pursuant to generally accepted accounting principles in performing an audit of Tenant's sales) and (j) the records specified in (a) to (i) above of subtenants, assignees, concessionaires, or licensees.  Within thirty (30) days after the end of each Lease Year or Partial Lease Year during the Lease Term, Tenant shall furnish to Landlord a statement of the Tenant's Gross Sales transacted during such Lease Year, in such detail as is satisfactory to the Landlord, certified by an officer of the Tenant.  Landlord shall have the right for a period of twenty-four (24) months after receipt of Tenant's certificate of Gross Sales by its accountants or representatives to audit the statement of Gross Sales and in connection with such audit to examine all of the Tenant's records (including all supporting data and any other records from which Gross Sales may be tested or determined) of Gross Sales disclosed in that statement given to Landlord by Tenant; and Tenant shall make all such records readily available for such examination.  If any such audit discloses that the actual Gross Sales transacted by Tenant exceeded those reported by more than two percent (2%), Tenant shall forthwith pay to Landlord the cost of such audit and examination, (including reasonable travel costs) together with such additional Percentage Rent as may be shown to be payable.  Any information obtained by Landlord pursuant to the provisions of this Section shall be treated as confidential, except in any litigation between the parties and, except further, that Landlord may disclose such information to prospective buyers and lenders.

C.    On or before the thirtieth (30th) day after the expiration of each Lease Year or Partial Lease Year included in the Lease Term, and on or before the thirtieth (30th) day after the expiration or earlier termination of the Lease Term, Tenant shall pay to Landlord the Percentage Rent calculated

pursuant to Section 3.5 above. Tenant's obligation to pay Percentage Rent for periods during the Term, and Landlord's right to audit, as set forth herein, shall survive the termination of this Lease.

D.      All statements deliverable by Tenant to Landlord under this Lease shall be delivered to the address set forth in the preamble to this Lease or at such other place or places as Landlord may from time to time direct by written notice to Tenant.

E.      Computation of the Percentage Rent specified herein, shall be made separately with regard to each Lease Year of the term hereof, it being understood and agreed that the gross sales of any Lease Year and the Percentage Rent due thereon, shall have no bearing on, or connection with, the gross sales of any other Lease Year of the term hereof. It is further understood and agreed that Landlord shall in no event be construed or held to be a partner or associate of Tenant in the conduct of Tenant's business, nor shall Landlord be liable for any debts incurred by Tenant in the conduct of Tenant's business, but it is understood and agreed that the relationship is and at all times shall remain that of Landlord and Tenants. Percentage Rent is also hereby deemed to be Additional Rent when applicable.

F.      Tenant agrees that it or any national retailer operating as successor, an assignee, or subtenant of Tenant, shall open for business in accordance herewith and continuously operate a store the Leased Premises from the date Tenant opens its store for business with the public throughout the Term and any Option Terms Tenant may elect (the "Continuous Operation Covenant"). The term "continuous operation" as used herein shall not prohibit temporary cessation of business in connection with (i) remodeling or refixturing, or conversion or changeover of the store in the event of a sale of stock or assets to another entity or store operation, or an assignment of subletting to another national retailer not to exceed 60 days, or (ii) other temporary cessation of business that might occur from time to time as a result of inventory monitoring or control, or other normal aspects of Tenant's business not to exceed 7 days in any Lease Year. The parties further agree that the term "continuous operation" as used herein shall not prohibit a cessation of operations, regardless of duration, caused by events or factors beyond the control of Tenant (or its successors, assignee or subtenant) as a result of any "Act of God" or "force majeure", as those terms are commonly used and understood in the commercial context, subject, however, to Tenant's obligation to make Tenant repairs and reopen for business within the time periods proscribed under Article IX hereof. Tenant shall have sole discretion to establish the hours of operation (which in no event shall be less than six days per week for at least eight hours per day), staffing, inventory and other aspects of its store operations. Tenant further agrees to use, occupy and operate only for Permitted Uses and for no other purpose all of the Leased Premises other than such minor portions thereof as are reasonably required for storage and office purposes; to use such storage and office space only in connection with the business conducted by Tenant in the Leased Premises; to furnish, install and maintain all trade fixtures and permitted signs; and to carry a full and complete stock of seasonable merchandise.

## Section 3.8  Definition of Lease Year.

The term "Lease Year" is defined to mean a period of twelve (12) consecutive calendar months, the first Lease Year ("First Lease Year") to commence on the Commencement Date, and each succeeding Lease Year to commence on the first day of January.  Any portion of the Lease Term which is less than a Lease Year as hereinbefore defined shall be deemed a "Partial Lease Year".  Any reference in this Lease to a "Lease Year" shall, unless the context clearly indicates otherwise, be deemed to be a reference to a "Partial Lease Year" if the period in question involves less than a period of twelve (12) consecutive calendar months.

## Section 3.9  Tax Rent.

During the Lease Term Tenant shall pay to Landlord, as Additional Rent, the amount determined in accordance with this Section for real estate taxes and sewer user fees assessed or levied against the Shopping Center for each year during the Term.  The amount payable by Tenant for real estate taxes shall be such amount determined by multiplying the assessed real estate tax by a fraction, the numerator of which shall be the Floor Space of the Leased Premises and the denominator of which shall be the net floor space in the in the Shopping Center.  The amount payable by Tenant for sewer user fees shall be computed in accordance with the formula from time to time determined by the Government of the Virgin Islands, as such formula may apply to the Leased Premises.  As soon as practicable after Landlord's receipt of the real estate tax bill applicable to any year during the Term, Landlord will submit to Tenant a statement showing the real estate tax payment then due, and the calculation for determining the amount due from Tenant.  The amount so determined shall be paid by Tenant within thirty (30) days of receipt of such statement from Landlord.

To the extent permitted by law, Tenant may pay any such assessment in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment.  If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable for any period occurring during the lease term.  Any such installments due and payable for the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with, nor be obligated to pay any income, profit, inheritance, estate, succession, gift, franchise, or transfer taxes which are or may be imposed upon Landlord, its successors or assigns, by whatsoever authority imposed or howsoever designated.

Provided Tenant shall timely pay each installment of Tenant's Proportionate Share of taxes as set forth above, written evidence of the payment of taxes and assessments hereunder shall be furnished to Tenant by Landlord upon Tenant's written request therefor.

Tenant shall have the right to participate in all negotiations of tax assessments. Tenant may request that Landlord contest the validity or the amount of any tax or assessment levied against the taxable premises or the Shopping Center by such appellate or other proceedings as may be appropriate in the jurisdiction, and may request Landlord to pay taxes under protest, or take such other steps as Landlord may deem appropriate. Landlord may determine, in Landlord's reasonable business judgment whether to comply with Tenant's requests, and, if Landlord shall determine not to comply, shall consult with Tenant prior to finalizing Landlord's decision.

Should Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the Shopping Center, whether at Tenant's request or otherwise, Tenant will cooperate in such proceedings; provided, however, that Landlord shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises which might result in the termination of this lease.

Should any of the proceedings referred to in the preceding paragraphs result in reducing the total annual real estate tax and assessment liability against the taxable premises for any period occurring during the Term, Tenant shall be entitled to receive its pro rata share of refunds paid by the taxing authorities, less its pro rata share of the cost of such proceedings. If no refund shall be secured in any given proceeding, the party requesting or instituting the proceeding shall bear the entire cost.

Section 3.10 Interest.

Interest ("Interest") shall accrue at the prime rate announced by Chase Manhattan Bank, or its successors (or in its absence, the largest bank in New York City), as same may change from time to time, plus two (2%) percent per annum, from and after the due date of any payment of Base Rent or Additional Rent.

Section 3.11 Base Rent and Additional Rent for a Partial
Month.

For any portion of a calendar month included in the Lease Term, Tenant shall pay 1/30 of the monthly installment of Base Rent or Additional Rent for each day of such month included within the Lease Term payable in advance on the first day of such portion of the calendar month.

Section 3.12 No Waiver by Landlord.

Any delay or failure by Landlord for any Lease Year in computing or billing Tenant for the adjustment in the Additional Rent or Common Area Charges as herein provided shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay the Base Rent, Percentage Rent, Common Area Charges and any Additional Rent. Notwithstanding any expiration or termination of this Lease prior to the Expiration Date, Tenant's obligation to pay rent as

determined under this Article and Common Area Charges as determined under Article IV shall continue and shall cover the period up to the Expiration Date, and shall survive any expiration or termination of this Lease subject, however, to all of the other terms and conditions of this Lease, it being specifically understood that in the event of any termination pursuant to rights reserved to Tenant hereunder, the Tenant's obligation to pay Base Rent, Percentage Rent, Common Area Charges, any Additional Rent and Tenant's share of Tax Rent shall be prorated to the date of termination and Tenant's obligation to pay such prorated amounts shall survive such termination.

### Section 3.13  Late Fees and Returned Check Charges.

In addition to the Interest provisions set forth in Section 3.7 hereof, any payment of Base Rent, Percentage Rent or Additional Rent not received by the Landlord within ten (10) days from the date on which said payment is due shall be assessed a late charge of two (2%) percent of the amount due (the "Late Charge").

Any checks tendered as payment of Base Rent, Percentage Rent or Additional Rent which are returned by the Landlord's bank for any reason whatsoever, except deficiencies in the Landlord's endorsement of the check, shall result in a charge to the Tenant in the amount of Twenty Five Dollars ($25.00) or such amount as may be charged by Landlord's Bank, whichever is greater (the "Returned Check Charge").

The Late Charge and the Returned Check Charge are hereby deemed to be Additional Rent, when applicable.

### ARTICLE IV.  COMMON AREAS

### Section 4.1  Common Areas.

Landlord shall make available within the Shopping Center such areas and facilities ("Common Areas"), including, but not limited to walkways, parking lots, stairways, entrances, directory signs, rest rooms, and other like public facilities and utility rooms used by Landlord for the operation, maintenance and management of the Shopping Center, as Landlord shall deem reasonably appropriate to normal operation of the Shopping Center; provided, Landlord covenants that such Common Areas shall be substantially as shown on Exhibit B subject, however, to reasonable reconfiguration by Landlord in the event of destruction of the Shopping Center and reconstruction of same, provided the reconfiguration shall not materially adversely affect visibility of, ingress or egress to the Shopping Center or the Leased Premises, or substantially reduce the parking areas available for customer parking.  Landlord shall present any plan for such reconfiguration to Tenant for Tenant's approval prior to construction thereof, such approval not to be unreasonably withheld. Landlord shall operate, manage, equip, light, repair, replace and maintain the Common Areas for their intended purposes, all in such manner as Landlord shall in its reasonable discretion determine,

but in keeping with customary operation of shopping centers of the type and size in the U.S. Virgin Islands similar to the Shopping Center.

Landlord covenants and represents that throughout the Lease Term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the Leased Premises and adjacent public streets and highways, as shown on Exhibit B, as same may be reasonably adjusted in the event of any governmental taking or other regulation, which may alter or adjust the location of any of the above.

Landlord also covenants that the area within the Common Areas provided for the parking of automobiles shall during the Lease Term be sufficient to accommodate not less than two hundred ten (210) automobiles on the basis of arrangement depicted on Exhibit B, subject to reasonable adjustment in the event of any governmental taking or other regulation which may affect the number or size of parking spaces thereon.

### Section 4.2  Use of Common Areas.

Tenant and its concessionaires, officers, employees, agents, customers and invitees shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant rights, to use the Common Areas, subject to such reasonable rules and regulations as Landlord may from time to time impose, in accordance with the terms hereof, provided such rules shall not conflict with the terms hereof.  Tenant further agrees, after notice thereof, to abide by such rules and regulations provided such rules shall not conflict with the terms hereof, and to use its best efforts to cause its concessionaires, officers, employees and agents, to abide thereby.  Landlord may, at any time and from time to time, temporarily close any Common Area to make repairs or changes therein or to effect construction, repairs or changes within the Shopping Center, to prevent the acquisition of public rights in such area, and may do such other acts in and to the Common Areas as in its reasonable judgment may be desirable to improve the convenience thereof; provided Landlord shall use its best efforts to minimize interference with Tenant's business at the Leased Premises.

### Section 4.3  Common Area Charges.

A.     As used herein:

(i)     The term "Common Area Charges" shall mean an amount equal to the sum of the actual cost of operating, equipping, cleaning, lighting, cooling, repairing, replacing and otherwise maintaining order and security in the Common Areas, including, but not limited to, all costs of insurance relating thereto, all taxes allocable thereto (other than those payable by Tenant pursuant to Section 3.9) and the following:

(1)     the total annual costs and expenses of insuring the Shopping Center and the improvements and equipment located thereon, in such manner and force, with such companies and such coverage and in such amounts as the Landlord, or the Landlord's mortgagee, from time to time reasonably determines, including the costs of all insurance appraisals required from time to time;

(2)     the general cleaning, landscaping, and operation of the common areas and facilities;

(3)     the aggregate of the costs and amounts paid for:

   (a)     all electricity furnished by the Landlord to the Shopping Center other than electricity paid for by the tenants directly to the WAPA or other supplier;

   (b)     all water other than that chargeable directly to tenants;

   (c)     telephone and other utility costs, used by the Landlord in the maintenance, operation and administration of the Shopping Center;

   (d)     any system used in or serving in the reasonable business discretion of the Landlord, all of the Tenants in the Shopping Center, (provided, if any such system shall be duplicative of any system serving solely the Leased Premises, the cost thereof shall not be included in common area charges.)

(4)     the costs of security, supervision and traffic control of the common areas and facilities if deemed advisable by the Landlord from time to time, including without limiting the generality of the foregoing the costs of installation and monitoring of security devices in and around the Shopping Center (but Tenant shall be responsible for the security of the Leased Premises);

(5)     salaries, wages, employment benefits and other amounts paid or payable for any superintendent, operating and maintenance staff, security personnel, engineers, caretakers and other employees of the Landlord involved in the maintenance, administration and operation of the Shopping Center, but excluding executive level management employees employed by Landlord, the total charges of any independent contractors employed by the Landlord in the repair, care, maintenance and cleaning of any parts of the building and any portion of the land on which the building is located;

(6)     the cost of the rental of any equipment and signs and the cost of supplies, used by the Landlord in the maintenance and operation of the building;

(7)     audit fees, if any, and the cost of accounting services incurred in the preparation of the statements relating to the Shopping Center and in the computation of the rents and charges payable by tenants of the Shopping Center;

(8)     all repairs (including major repairs) and replacements to and maintenance and operation of the building, and the systems, facilities and equipment serving the building except where the cost of any such repairs or replacements relates to foundations, structural portions or roof of the building; and

(9)     all gardening and landscaping maintenance and, repair and replacement of gardening equipment.

From the total of the above costs, there is deducted:

(aa)     all net recoveries which reduce the expenses incurred by the Landlord in operating and maintaining the Shopping Center received by the Landlord from tenants of the Shopping Center as a result of any act, omission, default or negligence of such tenants or by reason of a breach by such tenants or provisions in their respective leases (other than recoveries from such tenants under clauses in their respective leases similar to this Section);

(bb)     net proceeds received by the Landlord from insurance policies taken out by the Landlord to the extent that such net proceeds are available to be used by the Landlord for the maintenance and operation of the Shopping Center;

(cc)     any recoveries from tenants of the Shopping Center for all additional costs and expenses incurred by the Landlord as a result of any such tenants carrying on business outside of normal business hours;

(dd)     except as specifically permitted above, the cost of maintaining the common areas shall not include real estate taxes, capital expenses, depreciation, permit fees, electric lighting charges beyond Tenant's normal business hours unless Tenant is operating during extended hours, rubbish removal for other tenants, or management expenses.

(ii)     The term "Tenant's Proportionate Share of Common Area Charges" shall mean an amount equal to the Common Area Charges multiplied by a fraction the numerator of which shall be the Floor Space of the Leased Premises and the denominator of which shall be the floor space in the Shopping Center.

B.     Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of Common Area Charges in equal monthly installments in advance on the first day of each calendar month. Landlord shall furnish to Tenant, for each Lease Year, a statement of (i) the actual Common

Area Charges for the prior Lease Year (or Partial Lease Year), with itemization of such Charges by category, (ii) Tenant's Proportionate Share of Common Area Charges for the prior Lease Year (or Partial Lease Year), (iii) the amount paid by Tenant during the prior Lease Year (or Partial Lease Year) in respect of such Common Area Charges, (iv) either the deficiency or overage in such payments and (v) Landlord's reasonable estimate of Tenant's Proportionate Share of Common Area Charges for the then current Lease Year.  Any deficiency in payment by Tenant shown on any statement for the prior Lease Year (or Partial Lease Year) shall be due and payable within thirty (30) days after the receipt of such statement and any overage in payment will be refunded to Tenant within thirty (30) days after the date of such statement.  After receipt of a statement, Tenant shall pay to Landlord on the first day of each succeeding calendar month an amount equal to one-twelfth (1/12) of Landlord's estimate of Tenant's Proportionate Share of Common Area Charges as shown on such statement until receipt of a new statement.  If a statement is furnished to Tenant after the commencement of a Lease Year, Tenant shall pay to Landlord, within thirty (30) days after the receipt of such statement or Landlord shall credit against the next succeeding payments of Tenant's Proportionate Share of Common Area Charges, an amount equal to the deficiency or overpayment allocable to the part of the Lease Year which shall have elapsed prior to the first day of the calendar month next succeeding the calendar month in which the statement is furnished to Tenant.  Each statement shall be conclusive and binding upon Tenant unless within six (6) months after receipt of such statement Tenant shall notify Landlord that it disputes the correctness of the statement, specifying the respect in which the statement is claimed to be incorrect.  Pending the determination of such dispute by agreement or otherwise, Tenant shall pay Tenant's Proportionate Share of Common Area Charges in accordance with the then current statement and such payment shall be without prejudice to Tenant's position.  If the dispute shall be determined in Tenant's favor, the amount of Tenant's overpayment of Tenant's Proportionate Share of Common Area Charges resulting from compliance with Landlord's estimate will be credited to the next Rent due from Tenant to Landlord, or, if this Lease has terminated, refunded to Tenant within thirty (30) days after such determination.

    C.  Notwithstanding the above provisions of this Section 4.3, Tenant's Proportionate Share of Common Area Expenses shall not exceed the sum of $126,000 during the initial Term and the first Option Term, $156,000 during the second Option Term and the third Option Term and $186,000 during the fourth Option Term and the fifth Option Term (the "Common Area Charge Cap") for each Lease Year during the term and the Option Terms, (such amount to be prorated on a per diem basis for any partial Lease Year); provided, if during any Lease Year in which Tenant's Proportionate Share of Common Area Charges shall exceed the Common Area Charge Cap, the cost of Landlord's insurance as set forth above (1) during Lease Years two through ten shall exceed the cost of such insurance for the first Lease Year of the Term, (2) during Lease Years eleven through twenty shall exceed the cost of such insurance for the tenth Lease Year of the Term, and (3) during years twenty one through thirty shall exceed the cost of such insurance for the twentieth Lease Year ("Excess Insurance Costs"), Tenant shall pay the amount of Tenant's Proportionate Share of Common Area Charges which exceeds the Common Area Charge Cap, but not in excess of the Excess Insurance Costs for that Lease Year.

*(handwritten: 10,500)*
*(handwritten: 13,000)*

St. Thomas, V.I. Store #7793
M:\2206\33\kmart.lease.wpd
October 22, 1997

-16-

## ARTICLE V.  SECURITY DEPOSIT

Section 5.1  Security Deposit.

INTENTIONALLY DELETED.

## ARTICLE VI.  UTILITIES

Section 6.1  Gas, Telephone, Water and Electricity.

Tenant shall obtain for itself (through Landlord's utility connections brought to the Premises by Landlord) and shall pay all charges for utilities, including, but not limited to, fuel, telephone, water, electricity and other like utilities used or consumed upon the Leased Premises. Tenant expressly agrees that, in order to coordinate with Landlord's need for standardized, consistent, adequately recorded and well coordinated maintenance of its property, any and all electrical improvements, installations and repairs to the Leased Premises undertaken by Tenant shall be performed by such electrical contractor as the Landlord may from time to time approve in its reasonable discretion, and any and all air conditioning installations and repairs shall be performed by such air conditioning contractor as the Landlord may from time to time approve in its reasonable discretion. Landlord further reserves the right to reasonably approve the installation and repair contractor for all telephone service to the Leased Premises. All such work shall be performed in accordance with plans submitted to Landlord in accordance with the provisions of Sections 2.2 and 2.3 of this Lease.

Landlord shall not be responsible for the supply of electricity to the Leased Premises, but shall use commercially reasonable efforts to insure an adequate supply of electricity provided, however, Landlord shall be responsible for the maintenance of electrical wiring from the point said service enters the Shopping Center to the point where the Tenant's electrical utility meters are located and provided further that, commercially reasonable efforts to insure an adequate supply of electricity shall not include any obligation on the Landlord's part to provide standby electrical power generators or the equivalent.

Landlord shall not be responsible for the supply of water to the Leased Premises, but shall use commercially reasonable efforts to insure an adequate supply of water; provided, however, Landlord shall be responsible for the maintenance of pipes from the point said pipes enter the Shopping Center to the point where the Leased Premises begin. The Tenant acknowledges that the current water supply is from rainfall, the Virgin Islands Water and Power Authority and commercial water services. As a result, the Landlord makes no representations or warranties regarding the potability of water supplied to the Lease Premises. Landlord reserves a right of access to the mechanical room located in the Leased Premises for purposes of maintaining and repairing the Shopping Center's water pump equipment.

Landlord may submeter the Tenant's use of water and Tenant shall pay Landlord the cost of such water, plus a pro rata share of Landlord's administrative costs for the meter reading, billing and collection of such water consumption and related charges.

Provided, however, that any damage sustained to such pipes or wiring which result from Tenant's use thereof shall be repaired at Tenant's expense. Provided further, that Landlord shall not be responsible for any injury or loss sustained by Tenant by any interruption in said services, unless caused by Landlord's gross negligence or wilful misconduct.

## ARTICLE VII.  LANDLORD'S ADDITIONAL COVENANTS

### Section 7.1  Repairs by Landlord.

Landlord covenants to keep, or cause to be kept, in good order, repair and condition, the foundations of the Leased Premises, the structural soundness of the walls and roof thereof, except such repairs as are necessitated or occasioned by the wilful misconduct or negligence of Tenant in the performance of Tenant's Work or while occupying the Leased Premises. Landlord shall not be required to commence any such repair, except in the case of any emergency, until fourteen (14) days after written notice by Tenant to Landlord that such repair is necessary. The provisions of this Section shall not apply in the case of damage or destruction by fire or other casualty or by eminent domain, in which events the obligations of Landlord shall be controlled by Article IX. Except as provided herein, Landlord shall not be obligated to make repairs or improvements of any kind to the Leased Premises or to any equipment, facilities or fixtures contained therein.

### Section 7.2  Quiet Enjoyment.

Landlord covenants that upon Tenant paying the Base Rent and Additional Rent and observing and performing all the terms, agreements, covenants, provisions and conditions of this Lease on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the Leased Premises, subject nevertheless to the terms and conditions of this Lease.

### Section 7.3  Landlord's Liability.

A.    In the event of a sale or transfer of all or any portion of the Shopping Center, or any undivided interest therein, or in the event of the making of any underlying or overriding lease of all or any part of the Shopping Center which includes the Leased Premises, the grantor, transferror or lessor, as the case may be, shall thereafter be entirely relieved of all terms, covenants and obligations thereafter to be performed by Landlord under this Lease to the extent of the interest or portion so sold, transferred or leased, provided that the said purchaser, transferee or lessee, as the case may be, has assumed and agreed to carry out any and all covenants of Landlord hereunder; provided, further, that (i) any amount then due and payable to Tenant or for which the grantor, transferror or lessor would otherwise then be liable to pay to Tenant (it being understood that the owner of a undivided

St. Thomas, V.I. Store #7793
M:\2206\33\kmart. lease.wpd
October 22, 1997

-18-

interest in the fee or any such lease shall be liable only for his or its proportionate share of such amount) shall be paid to Tenant by such grantor, transferror or lessor) (ii) the interest of the grantor, transferror or lessor, as Landlord, in any funds then in the hands of the grantor, transferror or lessor in which Tenant has an interest, shall be turned over, subject to such interest, to the then grantee, transferee or lessee; and (iii) notice of such sale, transfer or lease shall be delivered to Tenant.

B.    In any action brought to enforce the obligations of Landlord under this Lease, any judgment or decree shall be enforceable against Landlord only to the extent of Landlord's interest in the Shopping Center and no such judgment shall be the basis of execution, levy or other enforcement procedures for the satisfaction of Tenant's remedies under or with respect to this Lease or arising out of the relationship of Landlord and Tenant hereunder or out of Tenant's use or occupancy of the Leased Premises on, or be a lien on, any asset of Landlord other than its interest in the Shopping Center.

Section 7.4    Landlord's Insurance.

Landlord covenants during the term of this Lease to use reasonable efforts to carry insurance on the Shopping Center (excluding foundations and excavation) and the equipment contained therein and owned by Landlord (specifically excluding any portion of the Shopping Center and any property which the Tenant or other tenants are obliged to insure under the terms of this Lease or similar sections of their respective leases) against damage by fire, windstorm and extended perils coverage in such reasonable amounts and with such reasonable deductibles as would be carried by a prudent owner of reasonably similar improvements, having regard to size, age and location. The Tenant, however, is not relieved of any liability arising from or contributed to by its negligence or its willful acts or omissions.

## ARTICLE VIII.  TENANT'S ADDITIONAL COVENANTS

Section 8.1  Affirmative Covenants.

Tenant covenants, at its expense, at all times during the Lease Term:

A.    Performance of Obligations and Payment of Base Rent and Additional Rent.  To perform promptly all of the obligations of Tenant set forth in this Lease; and to pay when due the Base Rent and Additional Rent.

B.    Use.  To use and occupy the Leased Premises for the purpose of conducting therein the following ("Permitted Uses"), AND ONLY THE FOLLOWING BUSINESS, AND ANY UNAUTHORIZED OR EXCLUDED USE OF THE PREMISES SHALL WORK A FORFEITURE OF THIS LEASE AT LANDLORD'S OPTION, except by prior written consent of the Landlord, which consent Landlord may arbitrarily withhold:

Department store selling goods and services typically available in a Kmart store and for no other purpose.

Tenant agrees that until April 30, 2004, being the termination date of the Grand Union lease for a portion of the Shopping Center, the portion of Tenant's selling area which may be devoted to sale of food or food type items shall be limited to a maximum of 4,500 square feet, including the display racks, and an equitable portion of the aisles immediately adjacent to the racks, and thereafter during the term of this Lease and any Option Term, the portion of Tenant's selling area which may be devoted to sale of food or food type items shall be limited to a maximum of 6,000 square feet, including the display racks, and an equitable portion of the aisles immediately adjacent to the racks. Tenant further agrees that, unless Landlord shall have successfully negotiated a release of the Grand Union restriction referred to below (which Landlord shall use reasonable efforts to obtain, provided that Tenant waives any claims against Landlord for Landlord's failure to do so), Tenant shall not sell any products which are required to be stored in and available for sale from refrigerated show cases after that date on which a new supermarket is constructed and open for business at the Shopping Center.

Tenant further acknowledges and agrees that the Grand Union Lease may be construed to prohibit the sale of supermarket related goods and Tenant agrees to hold harmless, indemnify and defend Landlord against any loss of rents, claims made or lawsuits brought pursuant to terms of the Grand Union Lease or any substitute lease containing the same or similar provisions, nor shall Landlord be liable to Tenant for any damages Tenant may suffer as a result of successful enforcement of such provisions.

C.     Storage and Deliveries.  To store in the Leased Premises only such merchandise as is to be offered for sale at retail or are necessary or useful for the Permitted Use of the Leased Premises; and to receive and deliver goods and merchandise only in the area shown on Exhibit B; to store all trash and refuse in appropriate containers within the Leased Premises or the areas designated for dumpsters on Exhibit B so as not to be visible to the public and to attend to daily disposal thereof.

D.     Repairs.  Except for repairs required in Section 7.1 to be performed by Landlord, to keep and maintain the Leased Premises (and toilet room, if any), including equipment, air conditioning equipment, elevator, fire pump, sprinkler systems, sump pumps, facilities and fixtures therein (and sewer runs, if any), and the entire Leased Premises including any storefront, clean, neat and in good order, repair and condition (including all necessary painting and decorating) and free of vermin; and to keep all glass, including that in windows and doors, clean and in good condition, and to replace any glass which may be damaged or broken with glass of the same quality.

E.     Repairs, etc.  Required by Governmental Regulations.  To make all non-structural (i.e., except for foundations, load bearing walls and roof) repairs, alterations, additions or replacements to the Leased Premises, including equipment, facilities and fixtures therein, as required

by any law or ordinance or any order or regulation of any governmental authority or board of fire underwriters having jurisdiction thereof or of any insurance company providing coverage on any part of the Shopping Center, and otherwise to comply with the orders and regulations of all such governmental authorities, board of fire underwriters and insurance companies.

F.    Performance of Work.  To pay promptly when due the entire cost of any work done in or with respect to the Leased Premises or the installation of any equipment, facilities and fixtures therein, undertaken by Tenant so that the Leased Premises shall at all times be free of liens for labor and materials; to procure all necessary permits before undertaking such work; to maintain throughout the course of the performance of such work, Workmen's Compensation Insurance in statutory limits; to obtain, prior to doing such work, Landlord's approval, in accordance with the first and third paragraphs of Section 2.2, and Section 2.3 above,(except decorating or refixturing not costing in excess of $100,000 which may be done without Landlord's approval), to do all such work in accordance with plans approved by Landlord as set forth in the first and third paragraphs of Section 2.2 above and in a good and workmanlike manner, in accordance with section 2.3 above, employing materials of good quality; to comply with all governmental requirements relating thereto; and to save Landlord harmless and indemnified from all injury, loss, claims or damage to any person or property occasioned by or growing out of such work.  At the completion of any work, whether or not Landlord's approval shall be required for such work, Tenant shall deliver to Landlord "as built" drawings of any revisions to electrical and mechanical work in the Leased Premises.

G.    Indemnity.  To defend, indemnify and hold Landlord harmless from all injury, loss, claims, demands, actions or damage (including attorney's fees and disbursements) to any person or property, arising from, among other causes, the negligence of Tenant or any of Tenant's employees or agents related to, or in connection with work performed on or about the Leased Premises by Tenant, its agents, servants, employees or contractors or the use or occupancy of the Leased Premises or conduct or operation of Tenant's business caused, suffered or permitted by Tenant or Tenant's concessionaires or by any of their respective officers, agents, servants, employees or contractors.

H.    Insurance.  To maintain with responsible companies authorized to do business in the U.S. Virgin Islands and approved by Landlord (i) commercial general liability insurance, with contractual liability endorsement covering the matters set forth in Subsection H above, against all claims, demands or action for injury to or death of any one person in an amount of not less than $2,000,000.00, and for injury to or death of more than one person in any one accident in an amount of not less than $2,000,000.00 and for damage to property in an amount not less than $100,000.00, made by or on behalf of any person, firm or corporation, arising from, related to, or connected with the conduct or operation of Tenant's business, or caused by acts or omissions of Tenant or Tenant's concessionaires, or their respective officers, agents, servants, employees or contractors and (ii) fire insurance, with the usual extended coverage endorsement and endorsements for vandalism and malicious mischief and such other extended coverage endorsements as Tenant may determine, covering all Tenant's stock in trade, fixtures, furniture, furnishings, floor coverings, equipment, signs, and all other non-structural installations and improvements made by or for Tenant in, on or

about the Leased Premises, or existing therein at the Commencement Date, to the extent of their full insurable value. Landlord, its agents, servants and employees and tenants and occupants of the Shopping Center shall not be liable for any damage by fire or other casualty covered by Tenant's insurance, no matter how caused, it being understood that the Tenant will look solely to its insurer for reimbursement. Whenever, in Landlord's reasonable judgment, properties of a similar nature are carrying additional insurance coverage or different types of insurance, Landlord and Tenant shall meet to discuss increasing the above limits. All of said insurance shall be in form reasonably satisfactory to Landlord and with companies reasonably satisfactory to Landlord and shall provide that it shall not be subject to cancellation, termination or change except after at least thirty (30) days prior written notice to Landlord. All insurance provided by Tenant as required by this Lease shall name Landlord as an additional insured as its interests may appear. Tenant agrees to deliver to Landlord, at least five (5) days prior to the time such insurance is first required to be carried by Tenant, and thereafter at least fifteen (15) days prior to the expiration of any such policy, either a duplicate original or a certificate and true copy of all policies procured by Tenant in compliance with its obligations hereunder, together with evidence of payment therefor and including an endorsement which states that such insurance may not be canceled except upon thirty (30) days written notice to Landlord and any designee(s) of Landlord. Any renewals, replacements or endorsements thereto shall also be deposited with Landlord to the end that said insurance shall be in full force and effect during the Lease Term. If Tenant fails to comply with the requirements of this Subsection, Landlord may, but shall not be obligated to, obtain such insurance and keep the same in effect, and Tenant shall pay Landlord as Additional Rent upon demand the premium therefor. Notwithstanding anything contained herein to the contrary, subject to Landlord's consent, which Landlord may withhold in its reasonable discretion, Tenant may maintain the above required insurance as part of a funded self-insurance program at any time that Tenant's net worth exceeds $300,000,000 and so long as Landlord is an additional insured under such program in accordance with the terms and provisions hereof.

I.    Property Loss or Damage. To the extent permitted by law, that neither Landlord nor Landlord's agents shall be liable for, and Tenant waives all claims for any and all loss, cost, liability, damage and expense (including attorney's fees and disbursements), penalties and fines incurred in connection with or arising from any injury to Tenant or for any damage to, or loss (by theft or otherwise) of, any of Tenant's property, irrespective of the cause of such injury, damage or loss (including the acts or negligence of any tenant or occupant of the Shopping Center or of any owners or occupants of adjacent or contiguous property) and whether occasioned by or from explosion, falling plaster, broken glass, electricity, smoke, wind, water, being upon or coming through or from the street, roof, subsurface, skylight, trapdoor or other pipes or sewage, or the failure of the air conditioning or refrigeration system, or the breaking of any electric wire, the bursting, leaking or running of water from any tank, washstand, watercloset, waste-pipe, sprinkler system, radiator, or any other pipe in, above, upon or about the Leased Premises or the building, or which may at any time hereafter be placed therein, or from any other cause whatsoever.

J.      Right of Entry.  That Landlord and Landlord's agents, contractors, servants and employees shall have the right to enter upon the Leased Premises at all reasonable times upon not less than forty-eight hours notice (or with such reasonable notice as may be possible in the event of an emergency, including post-entry, if no notice may be given prior to entry), (a) for the purpose of performing any obligation of Landlord or exercising any right or remedy reserved to Landlord in this Lease; (b) to exhibit the Leased Premises to prospective purchasers or mortgagees, or during the final one hundred eighty (180) days of the Lease Term, prospective lessees; (c) to make such repairs, alterations, improvements or additions in the Leased Premises or in the Shopping Center as may be required in accordance with the Terms of this Lease, or to reasonably protect the Landlord's interest in the Leased Premises or Shopping Center; and (d) to take all materials into and upon the Leased Premises that may be required in connection with such repairs, alterations, improvements or additions without the same constituting a constructive or actual eviction of Tenant, in whole or in part, and the Base Rent and Additional Rent shall not abate while such repairs, alterations, improvements or additions are being made.  Tenant shall permit Landlord to install, use and maintain pipes, ducts and conduits within or through the Leased Premises, or through the walls, columns and ceilings therein, provided that Landlord shall use best efforts to perform such work in a manner that shall not disrupt Tenant's business, the installation work is performed at such times and by such methods as will not unreasonably interfere with Tenant's use and occupancy of the Leased Premises, or substantially damage the appearance thereof, or materially adversely affect the layout of the Leased Premises.  Nothing herein contained however, shall be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever for the care, supervision or repair of the Shopping Center or of the Leased Premises, other than as in this Lease otherwise provided.

K.      Fees and Expenses.  Except as specifically provided herein, each party agrees to pay upon demand the other party's expenses (including reasonable attorney's fees and disbursements) incurred in successfully enforcing any obligation of the party under this Lease or in curing any default by the party under this Lease, as provided in herein.

L.      Mechanics' Liens.  To cause promptly to be discharged of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien at any time filed against the Leased Premises, or the Shopping Center, for any work, labor, services or materials claimed to have been performed at, or furnished to, the Leased Premises, for or on behalf of Tenant, or any one holding the Leased Premises through or under Tenant.  If Tenant shall fail to cause such lien to be discharged within fifteen (15) days after demand, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due or by bonding or other proceeding deemed appropriate by Landlord, and the amount so paid by Landlord and/or all costs and expenses (including attorney's fees and disbursements) incurred by Landlord in procuring the discharge of such lien, together with interest on the amount of costs and expenses so incurred at the interest rate set forth in Section 3.10 above, shall be paid to Landlord on demand and shall be recoverable as Additional Rent.

M.      End of Lease Term.  Upon the Expiration Date to quit and surrender to Landlord the Leased Premises broom clean, in good order, condition and repair except for ordinary wear and tear and damage by fire or other insured casualty and free of all property of Tenant.  Tenant shall use reasonable efforts to repair all damage to the Leased Premises caused by removal of any of Tenant's property.

N.      Subordination.  Subject to Tenant's receipt of a nondisturbance agreement in the form attached hereto as Exhibit E, as provided below, (i) this Lease is and all of Tenant's rights hereunder are and shall be subject and subordinate to any existing or future ground, overriding or underlying lease of all or any part of the Shopping Center and grants of term of all or any part of the land and/or the building or the portion thereof in which the Leased Premises are located, in whole or in part, and (ii) this Lease and all of Tenant's rights are and shall be subject and subordinate to the lien of any fee or leasehold mortgages, deeds, of trust, and/or building loan agreements that now exist or may hereafter be placed upon the Shopping Center or any part thereof and to any and all advances to be made thereunder, and to the interest thereon, and all renewals, replacements, modifications, consolidations, spreaders and extensions thereof (the foregoing provisions of this Subsection shall be self-operative and no further instrument of subordination shall be required); that Tenant shall execute and deliver whatever instruments may be reasonably required to acknowledge such subordination in recordable form, and in the event Tenant fails so to do within ten (10) days after demand in writing, Tenant shall be deemed to have reaffirmed such subordination.  Landlord agrees that any subordination of this Lease provided for under this Section 8.1.N, above, shall be subject to the condition that the Landlord, Tenant and any subsequent lender or ground lessor execute and deliver Tenant's form of Subordination, Non-Disturbance and Attornment Agreement ("SNDA"), in the form attached hereto as Exhibit E, providing, inter alia, that such lender or ground lessor recognizes this Lease and all of Tenant's rights hereunder, and that, as long as Tenant is not in default hereunder, this Lease shall not terminate, and Tenant's right of possession and other leasehold rights shall not be disturbed in the event of a foreclosure of any such mortgage or deed of trust and upon receipt of same, Tenant agrees to promptly execute and deliver same to such lender or ground lessor. In addition, if the Building in which the Leased Premises is located is subject to a mortgage or ground lease as of the date of this Lease, Landlord, Tenant and Landlord's lender shall enter into a SNDA in the form acceptable to Tenant attached hereto as Exhibit E, if Landlord's lender agrees within thirty days of the date hereof or the form attached as Exhibit F if Landlord's Lender does not agree to the SNDA attached hereto as Exhibit E.

O.      Signs.  To provide a suitable identification sign or signs of such size, design and character as is reasonably approved by Landlord, or as is typically used by Tenant on a substantial number of its stores (but not larger than the initial sign package approved by Landlord) and in compliance with all applicable laws or regulations.  Landlord acknowledges that it has approved the sign package included in the Tenant Design Criteria attached hereto as Exhibit C, as Tenant's initial sign package.  Tenant shall maintain any such sign or other installation in good condition and repair. Tenant and Landlord specifically agree that Landlord, at Landlord's sole cost may place the following signs on the exterior walls of the Leased Premises: Shopping Center identification signs

in the areas shown in the Tenant Design Criteria attached hereto as Exhibit C; and one Shopping Center directory, at eye level, with dimensions not to exceed 3' x 8' also as shown in the Tenant Design Criteria attached hereto as Exhibit C.

P.      Rules and Regulations.  To abide by and act in compliance with Landlord's existing and future existing rules and regulations for all tenants, provided such rules and regulations are reasonably designed to protect the interests and safety of all parties in the Shopping Center, impose no additional costs on Tenant, and do not reduce Tenant's rights granted herein.

Q.      Control of Tenant.  (Intentionally deleted.)

R.      Tenants' Association.  To join, if formed, and pay any and all dues assessed but not in excess of Five cents ($.05) per square foot per year, a Tenants' Association to accomplish the following purposes:

Marketing and promotion of the Shopping Center

all expenses for the services above mentioned shall be paid by said Association and Landlord accepts no responsibility for the above mentioned services.

S.      Entrance Doors.  To maintain and keep open during normal business hours all entrance doors designated by Landlord and located in the Leased Premises as a public entrance to, and exit from, the Leased Premises.

Section 8.2  Negative Covenants.

Tenant covenants at all times during the Lease Term and such further time as Tenant occupies the Leased Premises or any part thereof:

A.      Rules and Regulations as to Use.  Not to overload, deface or otherwise damage the Leased Premises or any part thereof or any equipment or installation therein; or commit any nuisance; or permit the emission of any objectionable noise or odor; or use or permit the use of any advertising medium, including, without limitation, flashing lights, search lights, loudspeakers, televisions, phonographs, radios, sound amplifiers or other devices in a manner so as to constitute a nuisance or be heard or experienced outside the Leased Premises; or burn any trash or refuse within the Leased Premises; to sell, display, or distribute any alcoholic liquors or beverages except in closed containers only, with no consumption on the Premises; or install or cause to be installed any automatic garbage disposal equipment, other than compacting equipment; or conduct business at, in, on, about or from all or any part of the Leased Premises on any day when the conduct of business is prohibited by any statutes, laws, regulations, or ordinances of the U.S. Virgin Islands or any governmental authority having jurisdiction over the Leased Premises; or make any use of the Leased Premises or of any part thereof or equipment therein which is improper, offensive or contrary to any

law or ordinance or to rules and regulations of Landlord as such may be promulgated from time to time in accordance herewith, or which will invalidate or increase the cost of any of Landlord's insurance over a standard mercantile rating, notwithstanding the permitted uses; or use any advertising medium or sound producing mechanism that may constitute a nuisance, such as radios, television sets, loudspeakers, sound amplifiers or phonographs in a manner to be heard outside the Leased Premises; or conduct any auction, fire, "going out of business", "close out" or bankruptcy sales, or do any act tending to injure the reputation of the Shopping Center or the Leased Premises; not to use or occupy the Leased Premises, or to suffer or permit them to be used or occupied, in whole or in part, as a discount house, discount store, surplus store, army-navy type store, bargain store, or by any similar business or activity; or sell or display merchandise on, or otherwise obstruct the driveways, walks, malls, court, parking areas and other common areas in the Shopping Center (except on the portion of the Common Areas shown on Exhibit "B" as "permitted sidewalk sale area" which may be used in accordance with the provisions set forth below) or use the malls, courts and walks for any purpose other than pedestrian traffic (except on the portion of the Common Areas shown on Exhibit "B" as "permitted sidewalk sale area" which may be used in accordance with the provisions set forth below); or suffer or commit any nuisance or other act or thing which may disturb the quiet enjoyment of any tenant in the Leased Premises, to be installed, if at all, in accordance with Sections 2.2 and 2.3 hereinabove.

Tenant shall have the right, as set forth herein, to use designated portions of the Common Areas adjacent to the Leased Premises as shown on Exhibit B, for an initial period of outdoor sales not to exceed seven days, which may include sale of food ("Sidewalk Sale"). If Tenant proposes to hold an initial Sidewalk Sale, Tenant shall so inform Landlord, describing in detail the area to be occupied by the Sidewalk Sale, and the items to be sold during the Sidewalk Sale, for Landlord's consent, which Landlord may withhold in its reasonable discretion, and shall be given or denied within 15 days. If Landlord fails to respond within the 15 day period, Landlord shall be deemed to have consented to Tenant's initial Sidewalk Sale.

If Landlord determines in its sole discretion that the Tenant's initial Sidewalk Sale is unsightly, disruptive of other businesses in the Shopping Center, or violates the terms of any other tenant's lease in the Shopping Center existing as of the date of this Lease, Landlord may withhold its consent to any future Sidewalk Sales proposed by Tenant. If Landlord consents in its sole and absolute discretion, Tenant may conduct further Sidewalk Sales at Tenant's sole discretion, within substantially the same portion of the Common Area, on a maximum of 12 days per year, and shall give Landlord reasonable notice thereof.

At any time when Tenant is conducting a Sidewalk Sale, Tenant agrees to assume all liability for injury to persons or damage to property occurring in that section of the Common Areas during the period of Tenant's Sidewalk Sale, and hereby agrees to indemnify, defend and hold harmless Landlord from any such liability.

B.    Assignment, etc.   Not to assign, by operation of laws or otherwise, sell, mortgage, pledge or in any manner transfer this Lease or any interest herein, or sublet the Leased Premises or any part or parts thereof, or grant any concession or license or otherwise permit occupancy of all or any part thereof by any person, firm or corporation without the Landlord's express written consent which Landlord may not unreasonable withhold.   Tenant acknowledges that Landlord's refusal to consent would be reasonable if the proposed assignee, subtenant, licensee, concessionaire or occupant intends to use the Leased Premises for anything other than a retail department store strictly in accordance with the Permitted Uses.   Tenant acknowledges and agrees that Landlord's absolute right to prohibit the transfer of Tenant's interest in the Lease or subletting of the Leased Premises under such circumstances has been freely negotiated and constitutes an integral part of this lease agreement between Tenant and Landlord.   Neither the consent by Landlord to an assignment, subletting, concession or license, nor the references in this Lease to concessionaires and licensees shall in any wise be construed to relieve Tenant from obtaining the express consent of Landlord to any further assignment or subletting or the granting of any concession or license for the use of any part of the Leased Premises, nor shall the collection of Base Rent or Additional Rent by Landlord from any assignee, subtenant or other occupant be deemed a waiver of this covenant or the acceptance of the assignee, subtenant or occupant as Tenant or a release of Tenant from the further performance by Tenant of the terms, covenants and conditions in this Lease on Tenant's part to be performed.

C.   Changes in Exterior.   Not to change the exterior color or architectural treatment of the Leased Premises or the Shopping Center or any part thereof or install any exterior lighting; provided Landlord shall maintain adequate security lighting at all times in the Common Areas (subject to reasonable lapses in such lighting due to causes beyond Landlord's reasonable control.)

D.    Signs.   Not to place, install or maintain or suffer to be placed or installed or maintained any sign upon or outside the Leased Premises or in the Shopping Center except as provided pursuant to Subsection 8.1; or any awning, canopy, banner, flag, pennant, aerial, antenna or the like in or on the Leased Premises or the Shopping Center; provided this shall not be deemed to prohibit a satellite communications facility on the roof of the Leased Premises subject to applicable law and further that Tenant agrees to place such facility on the roof at its sole risk and expense, including any damage to the roof.

E.    Floor Loads.   Not to place a load upon any floor of the Leased Premises which exceeds the floor load per square foot area which such floor was designed to carry.

F.    Barkers.  Not to engage or hire or permit any barker on or about the Leased Premises or the Shopping Center.

## ARTICLE IX: DESTRUCTION: CONDEMNATION

Section 9.1  Fire or other Casualty.

A.      Tenant shall give prompt notice to Landlord of fire damage or other casualty to or in the Leased Premises or the Shopping Center or any part thereof.

B.      If the Leased Premises or the Shopping Center shall be damaged  Landlord shall, at its expense, promptly proceed with so much of the repair or restoration of the Leased Premises and Shopping Center as to provide Tenant with an enclosed space with lines connected for electricity and pipes for plumbing, i.e., foundations, load bearing walls and roof of Leased Premises.  If the Leased Premises or the Shopping Center shall be damaged as a result of an uninsured risk and Landlord is terminating all other leases in the Shopping Center, then within ninety (90) days after any such event, Landlord may terminate this Lease by notice to Tenant and upon the date specified in such notice, which shall be not less than thirty (30) days nor more than sixty (60) days after the giving of said notice, this Lease shall terminate as if such date were the Expiration Date; provided, however, that if Landlord does rebuild the Shopping Center, Tenant shall have a right of first refusal to relet the Leased Premises (or such new premises of substantially the same size) upon the same terms and conditions set forth herein, provided, further that Landlord shall be under no obligation to relet to Tenant beyond the date which would have been the expiration date of this Lease assuming Tenant had exercised all Option Terms under this Lease.  Tenant shall have thirty (30) days from the date Landlord advises Tenant in writing that premises are available to relet to make such election, failing which, Tenant's right to relet shall lapse and be of no further force or effect.

C.  If this Lease shall not be terminated as provided in Subsection B of this Section, All repairs and restoration of the Leased Premises not required of Landlord to undertake shall be performed by Tenant, at its expense, promptly and with due diligence.  All repairs by Tenant shall be performed in accordance with Section 2.2 and 2.3 above.

D.      If the fire or other casualty shall render the leased Premises untenantable, in whole or in part, proportionate abatement of the Base Rent and Additional Rent shall be allowed from the date when the damage occurred until substantial completion of the repairs or rebuilding (including the substantial completion by Tenant of Tenant's repairs or restoration within a reasonable time not to exceed 150 days after the Premises are made available to Tenant).  Said proportion shall be computed on the basis of the ratio which the amount of Floor Space rendered untenantable bears to the total Floor Space of the Leased Premises.  If the Leased Premises is damaged to the extent of ten percent (10%) or more, or the Shopping Center to the extent of twenty-five percent (25%) or more of the total retail space therein during the final two years of the initial term or any option term, Tenant may terminate this Lease upon notice to Landlord within thirty (30) days after the date of casualty, such notice effective thirty (30) days after the date thereof, provided, if Tenant so elects to terminate this Lease, then (a) if Tenant is carrying insurance on the Leased Premises, all the insurance proceeds related to rebuilding Tenant would be required to perform pursuant hereto shall

belong to Landlord; and (b) if Tenant is self-insuring at the time of the loss, Tenant shall pay Landlord an amount equivalent to the proceeds Landlord would have received, had insurance been in force.

### Section 9.2  Condemnation.

A.    If the whole of the Leased Premises shall be taken by any public or quasi-public authority under the power of condemnation, eminent domain, or expropriation, or in the event of conveyance in lieu thereof, the Lease Term shall cease as of the day possession shall be taken by such authority.

B.    If ten percent (10%) or less of the Floor Space of the Leased Premises shall be so taken or conveyed, the Lease Term shall cease only with respect to the part so taken or conveyed, as of the day possession shall be taken by such authority.

C.    If more than ten percent (10%) of the Floor Space of the Leased Premises or more than twenty-five percent (25%) of the parking area of the Shopping Center, shall be so taken or conveyed,  or the curb cuts servicing the Shopping Center shall be closed and not replaced with curb cuts providing substantially the same access to the Shopping Center within thirty (30) days after such closings,  Tenant shall have the right to terminate this Lease upon thirty (30) days notice in writing given within ninety (90) days after such taking of possession.  If Tenant shall not elect to terminate this Lease: in the case of a taking of the Leased Premises, the Lease Term shall cease only with respect to the part so taken or conveyed, as of the day possession shall be taken by such authority; in the case of taking of the curb cuts such election shall not limit Tenant's remedies hereunder.

D.    If more than twenty-five percent (25%) of the total Floor Space in the Shopping Center shall be taken or conveyed under threat of taking, and the Shopping Center or Tenant's Store can no longer be operated as a reasonable economic unit, either Tenant or Landlord may terminate this Lease by notice to the other within ninety (90) days after the surrender of possession to the authority and this Lease shall terminate as of the date possession is taken as if such date were the Expiration Date and the Base Rent and Additional Rent shall be apportioned as of such date of sooner termination and any prepaid portion of Base Rent and Additional Rent for any period after such date shall be refunded by Landlord to Tenant.

E.    In the event of any such taking or conveyance of the Leased Premises or any portion thereof, Tenant shall pay Base Rent and Additional Rent to the day when possession thereof shall be taken by such authority with an appropriate refund by Landlord of such Base Rent and Additional Rent as may have been paid in advance for a period subsequent to such date.  If this Lease shall continue in effect as to any portion of the Leased Premises not so taken or conveyed, the Base Rent shall be reduced to an amount equal to the product of the remaining Floor Space of the Leased Premises multiplied by the Base Rent per square foot as specified in Section 1.1.  If this Lease shall so continue, Landlord shall, at its expense, make all necessary repairs or alterations so as to

constitute the remaining Leased Premises a complete architectural and tenantable unit, but only if the portion of the Leased Premises not taken is sufficient to render the remaining Leased Premises a complete architectural and tenantable unit.

F.    INTENTIONALLY DELETED

G.    All compensation awarded for any taking or conveyance pursuant to this Section, whether for all or any part of the Leased Premises, or the Shopping Center, shall be the property of Landlord, whether such damages shall be awarded as compensation for diminution in the value of the leasehold or the fee of the Leased Premises, and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all such compensation.  Tenant shall be entitled to claim, prove and receive in a separate proceeding such awards as may be allowed for trade fixtures and depreciation or injury to and cost of removal of stock in trade and loss of Tenant's leasehold interest so long as such claims in no way reduce the compensation to which Landlord is entitled as provided above.

## ARTICLE X.  DEFAULT AND REMEDIES

Section 10.1  Default.

A.    This Lease and the term and estate hereby granted are subject to the limitation that:

(i)    if Tenant shall default in the payment when due of any installment of Base Rent or in the payment when due of any Additional Rent, and such default shall continue for a period of ten (10) business days after notice of non-payment; or

(ii)    if Tenant shall default in the observance or performance of any term, covenant or condition of this Lease on Tenant's part to be observed or performed (other than the covenants for the payment of Base Rent and Additional Rent) and Tenant shall fail to remedy such default within thirty (30) days after notice by Landlord to Tenant of such default, or if such default is of such a nature that it cannot be completely remedied within said period of thirty (30) days if Tenant (a) shall not within thirty (30) days after the giving of such notice, advise Landlord in writing of Tenant's intention duly to institute all steps necessary to remedy such situation, (b) shall not within thirty (30) days institute and thereafter diligently prosecute to completion all steps necessary to remedy the same, and (c) shall not remedy the same within a reasonable time after the date of the giving of said notice by Landlord;

then in any of said events Landlord may give to Tenant notice of intention to end the Lease Term at the expiration of ten (10) days from the date of the giving of such notice, and, in the event such notice is given, this Lease and the term and estate hereby granted shall terminate upon the expiration of said ten (10) days with the same effect as if that day were the Expiration Date, and Tenant shall

St. Thomas, V.I. Store #7793
M:\2206\33\kmart. lease.wpd
October 22, 1997

then quit and surrender the Leased Premises to Landlord but Tenant shall remain liable as hereinafter set forth.

B.    If the notice provided for in Subsection A of this Section shall have been given and this Lease shall be terminated, or if any execution or attachment shall be issued against Tenant or any of Tenant's property; then, in any of such events Landlord may, after notice and entry of an order by a court of competent jurisdiction, re-enter the Leased Premises, and by summary proceedings or otherwise, dispossess Tenant and the legal representative of Tenant or other occupant of the Leased Premises as if this Lease had not been made.

Section 10.2  Remedies of Landlord.

A.    If this Lease and the Lease Term shall terminate as provided in Section 10.1, or by or under any summary proceeding or any other action or proceeding, then, in any of said events:

(i)    Tenant shall pay to Landlord all Base Rent, Percentage Rent and Additional Rent to the date upon which this Lease and the Lease Term shall have terminated or to the date of re-entry upon the Leased Premises by Landlord, as the case may be;

(ii)    Landlord shall be entitled to retain all monies, if any, paid by Tenant to Landlord, whether as Base Rent, Additional Rent, or otherwise, but such monies shall be credited by Landlord against any Base Rent or Additional Rent due at the time of such termination or reentry or, at Landlord's option, against any damages payable by Tenant;

(iii)    Tenant shall be liable for and shall pay to Landlord, as damages, any deficiency between the Base Rent and Additional Rent payable hereunder and Percentage Rent (determined using an average of the Percentage Rent during the prior two Lease Years or such shorter period if two Lease Years have not elapsed) for the period which otherwise would have constituted the unexpired portion of the Lease Term and the net amount, if any, of rents ("Net Rent") collected under any reletting for any part of such period (first deducting from the rents collected under any such reletting all of Landlord's reasonable expenses in connection with the termination of this Lease or Landlord's re-entry upon the Leased Premises and in connection with such reletting including all repossession costs, brokerage commissions, legal expenses, attorneys' fees, alteration costs and other expenses of preparing the Leased Premises for such reletting);

(iv)    Any such deficiency shall be paid in monthly installments by Tenant on the days specified in this Lease for the payment of installments of Base Rent. Landlord shall be entitled to recover from Tenant each monthly deficiency as the same shall arise and no suit to collect the amount of the deficiency for any month shall prejudice Landlord's right to collect the deficiency for any subsequent month by a similar proceeding. Alternatively, suit

or suits for the recovery of such deficiencies may be brought by Landlord from time to time at its election;

(v)    (a) In no event shall Tenant be entitled to receive any excess of such Net Rent over the sums payable by Tenant to Landlord hereunder, (b) in no event shall Tenant be entitled in any suit for the collection of damages pursuant to this Section to a credit in respect of any Net Rent from a reletting except to the extent that such Net Rent is actually received by Landlord prior to the commencement of such suit, and (c) if the Leased Premises or any part thereof shall be relet in combination with other space, then proper apportionment on a square foot area basis shall be made of the rent received from such reletting and of the expenses of reletting;

(vi)    Landlord and Landlord's agents may immediately reenter the Leased Premises or any part thereof, after notice and entry of a judgment by a court of competent jurisdiction, either by summary proceedings or by any other applicable action or proceeding, and may repossess the Leased Premises and dispossess Tenant and any other persons from the Leased Premises and remove any and all of its or their property and effects from the Leased Premises and in no event shall re-entry be deemed an acceptance of surrender of this Lease, and in the event that the Tenant has abandoned the Leased Premises, title to any property of the Tenant left in the Leased Premises shall immediately pass to the Landlord, and the Landlord shall be entitled to dispose of, use or otherwise own such property of Tenant, with the value thereof being credited to the account of the Tenant; and

(vii)    Landlord shall use reasonable efforts to relet the whole or any part or parts of the Leased Premises from time to time to such tenant or tenants, for such term or terms ending before, on or after the Expiration Date, at such market rental or rentals and upon such other conditions, which may include market level concessions and free rent periods, as Landlord, in its sole discretion, may determine.  Landlord shall have no obligation for refusal or failure of any new tenant to pay any rent due upon such reletting (except Landlord shall use reasonable efforts to collect same), and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease.   Landlord, at Landlord's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Leased Premises as Landlord, in its reasonable discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

B.    In the event of any breach or threatened breach by Tenant or any persons claiming through or under Tenant of any of the agreements, terms, covenants or conditions contained in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any right and remedy allowed at law or in equity or by statute or otherwise as if reentry, summary proceedings or other specific remedies were not provided for in this Lease.

### Section 10.4  Waiver of Trial by Jury; Tenant Not To
### Counterclaim In Summary Proceeding.

It is mutually agreed by and between Landlord and Tenant that the respective parties hereto shall, and they hereby do, waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matter whatsoever arising out of, or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use of or occupancy of Leased Premises.  In the event Landlord commences any summary proceeding for possession of the Leased Premises, Tenant agrees not to interpose any counterclaim or third party claim involving matters outside the subject matter jurisdiction of the Court hearing the summary proceeding for possession. The Tenant also agrees not to raise any affirmative defenses, except for those involving title to the premises, that might divest the Court hearing the summary proceeding of subject matter jurisdiction. The Tenant expressly agrees to assert any such claim against Landlord or third party claim, if at all, in a separate proceeding, before a Court with proper subject matter jurisdiction, and agrees not to move to consolidate any such separate proceeding with the summary proceeding filed by Landlord.

### Section 10.5  Holdover by Tenant.

In the event Tenant remains in possession of the Leased Premises after the Expiration Date, and without the execution of a new lease, Tenant, at the option of Landlord, shall be deemed to be occupying the Leased Premises as a tenant from month to month, at a monthly rental equal to one hundred twenty-five percent (125%) the sum of the monthly installment of the Base Rent and Additional Rent, subject to all the other conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.

### Section 10.6  Landlord's Right to Cure Defaults.

Landlord may, but shall not be obligated to, cure, at any time, upon thirty (30) days notice to Tenant, or in the event of an emergency, without notice to Tenant, any default by Tenant under this Lease; and whenever Landlord so elects, all costs and expenses incurred by Landlord in curing a default, including, without limitation, reasonable attorneys' fees and disbursements, shall be paid by Tenant to Landlord on demand, and shall be recoverable as Additional Rent and shall accrue interest at the rate set forth in Section 3.10 from the date of demand.

### Section 10.7  Effect of Waivers of Default.

No consent or waiver, express or implied, by either party to or of any breach of any term, covenant or condition of this Lease on the part of the other party shall be construed as a consent or waiver to or of any other breach of the same or any other term, covenant or condition, unless in writing signed by the party.  The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the agreements, terms, covenants, conditions or

obligations of this Lease, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this Lease or of the right to exercise such election, but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission whether of a similar nature or otherwise. No executory agreement hereafter made between Landlord and Tenant shall be effective to change, modify, waive, release, discharge, terminate or effect an abandonment of this Lease, in whole or in part, unless such executory agreement is in writing, refers expressly to this Lease, is signed by the party against whom enforcement of the change, modification, waiver, release, discharge or termination or effectuation of the abandonment is sought.

## ARTICLE XI.  MISCELLANEOUS PROVISIONS

Section 11.1  Notice From One Party to the Other.

All notices, demands and other writings in this Lease provided to be given or made or sent, or which may be given, made or sent, by either party hereto to the other, shall be deemed to have been fully given or made or sent when mailed in writing and deposited in the United States Mail, registered or certified and postage paid, and addressed as follows:

        To LANDLORD:        H.E. Lockhart Management, Inc.
                            P.O. Box 7020
                            St. Thomas, U.S.V.I.  00801

        To TENANT:          Kmart Corporation
                            3100 West Big Beaver Road
                            Troy, MI 48084
                            Attn: Vice President — Real Estate

The address to which any notice, demand, or other writing may be given or made or sent to any party as above provided may be changed by written notice given by such party as above provided.

Section 11.2 Department Store Noncompete Provision.

Landlord covenants that during the Term hereof and any Option Term and for so long as this Lease is not terminated or expired, Landlord shall include in any new supermarket lease for the Shopping Center a negative covenant providing that the supermarket tenant shall not use more than the lesser of (a) fifteen thousand square feet of its retail lease space for the sale of non food or non food related items or (b) fifty percent (50%) of its retail space for the sale of non food or non food related items.

Section 11.3 Guaranty of Principal Shareholders.

INTENTIONALLY DELETED

Section 11.4  Relationship of the Parties.

Nothing contained herein shall be deemed or construed by the parties hereto, or by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 11.5  Estoppel Certificates.

Landlord and Tenant hereby agree that they will, at any time and from time to time, within ten (10) business days following written notice by the other party hereto specifying that it is given pursuant to this Section, execute, acknowledge and deliver to the party who gave such notice a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), and the dates to which the Base Rent and Additional Rent and any other payments due hereunder from Tenant have been paid and stating whether or not to the best of the knowledge of the signer of such certificate the other party is in default in performance of any term, covenant or condition contained in this Lease, and, if so, specifying each such default of which the signer may have knowledge.

Section 11.6  Brokers.

Tenant hereby certifies that it has not dealt with any broker with regard to the Leased Premises or this Lease.  Tenant will indemnify, hold harmless and defend Landlord against any loss, liability and expense (including attorneys' fees and court costs) arising out of claims for fees or commissions from anyone in connection with the Leased Premises or this Lease.

Section 11.7  Applicable Law and Construction.

The laws of the U.S. Virgin Islands shall govern the validity, performance and enforcement of this Lease.  The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision.  All negotiations, considerations, representations and understandings between the parties are incorporated in this Lease. The captions as to contents or particular paragraphs herein are inserted only for convenience, and are in no way to be construed as a part of this Lease or as a limitation on the scope of the particular paragraphs to which they refer.  Whenever herein the singular number is used, the same shall include the plural; and the neuter gender shall include the masculine and feminine gender.

Section 11.8  Binding Effect of Lease.

The terms, covenants and conditions herein contained, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and permitted assigns.  Each term, covenant and condition herein contained shall be deemed and construed as a separate and independent covenant of the party bound by, undertaking or making the same, not dependent on any other provision of this Lease unless otherwise expressly provided.

Notwithstanding anything to the contrary contained in this Lease, Tenant acknowledges that the Leased Premises are currently leased to F. W. Woolworth Corporation (the "Woolworth's Lease"),  that Landlord has negotiated the basic terms of an agreement to terminate the Woolworth Lease and that Landlord's obligations hereunder are subject to the execution and delivery by F. W. Woolworth Corporation of a lease termination agreement acceptable to Landlord.  Landlord agrees to use all reasonable efforts to complete the agreement to terminate the Woolworth's Lease, so that the Leased Premises may be available for Tenant as soon as possible and Tenant agrees to reimburse Landlord for any termination fee to F. W. Woolworth Corporation in an amount not to exceed $200,000; provided, if Landlord fails to complete the termination of the Woolworth's Lease so that the Leased Premises is available for Tenant on or before January 1, 1999, Landlord shall so notify Tenant, and Tenant may, by notice to Landlord, elect to terminate this Lease at any time thereafter prior to the termination of the Woolworth's Lease, whereupon both parties will be released from all liability or obligation hereunder.  To the extent permitted by the Woolworth's Lease, Landlord agrees to withhold its consent to any assignment of the Woolworth's Lease to any third party other than the Tenant.

Section 11.9  No Oral Changes.

All negotiations, representations, considerations, undertakings, understandings and agreements heretofore made between the parties hereto are merged in this Lease, which alone fully and completely expresses the agreement between Landlord and Tenant and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect and abandonment of it in whole or part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

Section 11.10.  INTENTIONALLY DELETED

Section 11.11 Zoning.

Landlord represents, warrants and covenants that:  the land described in Exhibit "A" will, at the Commencement Date of the Lease Term, be properly zoned for Tenant's intended use (which shall include a retail department store selling, inter alia, packaged liquor; and is permitted by

applicable laws and regulations.  Landlord shall deliver to Tenant a Certificate of Occupancy prior to the commencement of the Lease Term.

### Section 11.12 Signs.

The Leased Premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the services mark and trademarks "Kmart" and "Big Kmart" are the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said marks "Kmart" or "Big Kmart," or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said marks or any term, word, mark or designation which is in any aspect similar to the marks of Tenant.  Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid marks, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid marks or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid marks.

Tenant shall have the option to erect at its sole cost and expense upon any portion of the Leased Premises signs of such height and other dimensions as shall be permitted by Section 8.10 hereof.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the Leased Premises, except as permitted by Section 8.10.

### Section 11.13. Access.

Landlord warrants as a consideration for Tenant entering into this Lease it will initially provide and will maintain, for the period of this Lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary or permanent relocations necessitated by public authority or other circumstances beyond Landlord's control, provided substantially comparable access shall be maintained at all times other than when construction outside of Landlord's reasonable control shall prevent such access.

### Section 11.14. Tenant's Right to Cure Landlord's Defaults.

In the event Landlord shall fail to perform any obligation specified in this Lease for a period in excess of thirty (30) days after notice from Tenant (forthwith in the event of emergency) or such reasonable longer period as may be required so long as Landlord is diligently pursuing cure of such default, then Tenant may cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on

St. Thomas, V.I. Store #7793
M:\2206\33\kmart. lease.wpd
October 22, 1997

-37-

demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the interest rate set forth in Section 3.10, and Tenant may to the extent necessary to reimburse Tenant for actual out of pocket costs and expenses as provided herein withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the Leased Premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

### Section 11.15 Memorandum of Lease.

The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which shall be recorded at Tenant's cost within sixty (60) days following delivery of this lease.

### Section 11.16 Hazardous Waste.

A.    Landlord represents that it is generally familiar with the present and prior uses of the Leased Premises and that to Landlord's knowledge there are not now nor have there been any toxic or hazardous wastes or substances used, generated, stored, treated or disposed on the Leased Premises. Landlord hereby indemnifies Tenant from and against any loss, liability, claim or expense, including, without limitation, cleanup, engineering and attorneys fees and expenses that Tenant may incur by reason of the above representation being false or by reason of any toxic or hazardous wastes or substances used, generated, stored, treated, or disposed on the Leased Premises prior to the Commencement Date, and any investigation or claim of any governmental agency in connection therewith. Landlord's representations and indemnity to Tenant under this paragraph shall survive the cancellation or termination of this Lease.

At any time from the date of this Lease until the Commencement Date, Tenant (or Tenant's contractor) may inspect the Leased Premises for the presence of such wastes or substances. If toxic or hazardous wastes or substances are discovered in the Leased Premises, Tenant may cancel this Lease by giving notice to Landlord and returning possession of the premises to Landlord prior to the Commencement Date, if Tenant has taken possession.

B.    Tenant shall duly comply with and the Leased Premises and Tenant's business operations, assets, equipment, property, and other facilities thereon shall comply with the provisions of all federal and territorial environmental, health, and safety laws, codes and ordinances, and all rules and regulations promulgated thereunder. The Tenant shall obtain and maintain all required federal and territorial permits, licenses, certificates, and approvals required for the operation of

Tenant's store in the Shopping Center, and shall operate in accordance therewith.  The Tenant shall not commit or permit on the Leased Premises any violations of any federal or territorial environmental, health, or safety laws, codes or ordinances, and any rules or regulations promulgated thereunder with respect to the Leased Premises or Tenant's business, operations, assets, equipment, property, leasehold, or other facilities thereof.  Tenant shall and hereby does agree to hold harmless, indemnify and defend the Landlord from and against any and all claims relating to any of the environmental matters set forth above.  Tenant's representations and indemnity to Landlord under this paragraph shall survive the cancellation or termination of this Lease.

### Section 11.17 Counterparts.

This Lease may be executed in any one or more counterparts by the parties hereto and upon attaching the duly executed signature pages to a final version of this Lease with all exhibits attached thereto, this Lease shall be valid, binding and enforceable for all purposes.  Furthermore, facsimile signatures shall be binding on the parties hereto so long as original executed copies of this Lease are in both parties possession within seven business days of the date of execution hereof by facsimile.

IN WITNESS WHEREOF, Landlord and Tenant have hereunto executed this Lease as of the day and year first above written.

LANDLORD:

Witnesses:

H.E. LOCKHART MANAGEMENT, INC.

By: _____
  John P. de Jongh, Jr., President

      (SEAL)

Attest: _____
  Cornel A. Williams, Secretary

TENANT:

KMART CORPORATION

By: _____
  Vice President-Real Estate

      (SEAL)

Attest: _____
  Assistant Secretary

M:\2206\33\kmart. lease.wpd 10/22/97

St. Thomas, V.I. Store #7793
M:\2206\33\kmart. lease.wpd
October 22, 1997

-40-

## EXHIBIT A

## SHOPPING CENTER DESCRIPTION

"Shopping Center" means Parcel Nos. 1, 1A, 1A-a, 1A-2, and 3 Estate Thomas, St. Thomas, U.S. Virgin Islands, plus (1) any other parcel(s) of land at any time designated by the Landlord to be added (but only so long as such designation remains unrevoked) which are, or are to be, used for the Shopping Center or related purposes, including, but not limited to, employee parking, or the furnishing to the Shopping Center of any utility or other service, or for any other improvement appropriate or related to the operation or functioning of the Shopping Center, together with all buildings on and improvements to any such parcel(s) of land (provided same are included in square footage of Shopping Center); plus (2) any plant or other facility, including, but not limited to, a sewage or garbage disposal plant, serving the Shopping Center, even though it is not located upon land which is a part of the Shopping Center, and the facilities connecting any such plant or facility (whether or not so located) to the remainder of the Shopping Center (but not including the land under or through which any such connection passes, if not otherwise included within the Shopping Center). The term "the Shopping Center" also means, when used not solely to designate the geographical location thereof, the operation and functioning thereof primarily as a general shopping center for the sale of goods, wares, merchandise, food, beverages, and services at retail, together with such services and facilities as are incident to or desirable in connection with the operation thereof, including, but not limited to, medical, dental and other office space. No road, way, street, easement, utility or facility otherwise included within the Shopping Center shall be deemed for any purpose to be partially or wholly excluded therefrom by reason of the fact that the same may also serve or be used by the occupant of any other premises or the customers thereof. Any portion of the Shopping Center which is condemned or dedicated to public use or ceded or conveyed to any governmental authority for street or related purposes shall be thereafter excluded from the Shopping Center.

# EXHIBIT B

# SITE PLAN



EXHIBIT – "B"

1-2 Furniture World
3 Proposed Garden Mall
4 Proposed Retail
5 Banco Popular
6 FootLocker
7 Truckdock / Dumpster Area
8 Sidewalk Sale Area
9 Generator Tank
10 "No-Build" Area

SITE PLAN

LOCKHART GARDENS SHOPPING CENTER
St. Thomas, U.S. Virgin Islands

H.E. Lockhart Management, Inc.

RT. 38    SUGAR ESTATE ROAD

Grand Union

TENTH STREET

WEST INDIAN COMPANY ROAD    RT. 313

Kmart

Second Level

Basement Level

Kmart

Kmart

# EXHIBIT C

## TENANT'S DESIGN CRITERIA

# Lockhart Gardens Shopping Center
## Tenant Design Criteria

Exhibit – C

# TABLE OF CONTENTS

PROJECT DIRECTORY                                                    3

INTRODUCTION                                                        4

GENERAL CRITERIA                                                    5

    Sign Criteria                                                  5
    Lighting Criteria                                             12
    Finishes Criteria                                             13
    Mechanical Systems Criteria                                   15
    Plumbing Criteria                                             16
    Fire Protection Systems Criteria                              17
    Electrical Systems Criteria                                   17

TENANT SUBMISSION REQUIREMENTS                                    19

    Submission Material/Procedure                                 19
    Building Codes                                                21
    Mechanical and Electrical Submission Forms                    22

# PROJECT DIRECTORY

**LANDLORD**

**H. E. Lockhart Management Inc.**
P.O. Box 7020
St. Thomas, Virgin Islands 00801
(340) 776-1900

**LEASING AND MANAGEMENT**

**H. E. Lockhart Management Inc.**
P.O. Box 7020
St. Thomas, Virgin Islands 00801
(340) 776-1900

**ARCHITECT**

**Wallace Roberts & Todd**
Architects, Landscape Architects
260 South Broad Street
Philadelphia, PA. 19102
(215) 732-5215

191 Giralda Avenue
Penthouse
Coral Gables, FL. 33134
(305) 448-0788

# INTRODUCTION

The Lockhart Gardens Shopping Center is a traditional neighborhood shopping center containing approximately 145,000 G: of leasable retail space.

It is located just east of downtown Charlotte Amalie, in the heart of the residential area of Estate Thomas and within sight and walking distance of the Havensite cruise ship dock.

It was originally constructed as the first modern shopping center in the Virgin Islands and was completely rebuilt after it was totally devasted by hurricane Marilyn in September 1995.

It has two main anchor stores, a three-story 60,000 square foot general merchandise store (Woolworth) at one end, and a 30,000 square foot grocery store (Grand Union) at the other. In between these two anchors are the normal assortment of neighborhood retail outlets and a branch bank, which make up the remaining square footage.

There is ample well lit parking and the center is located at the intersection of Rt.38 and Rt. 313, two of St. Thomas' busiest thoroughfares.

This brochure is designed to assist you in achieving your marketing goals in a manner compatible with the project's intent and requirements. While establishing a point of departure, it encourages great variety of expression in the creation of individual spaces.

# GENERAL CRITERIA

Each Tenant should become familiar with the intent, scope, requirements and details of the Lockhart Gardens Shopping Center. Reference should be made to other sections of the Lease Agreement for a full description of the obligations of Landlord and Tenant in the construction of the Premises. All Tenant design and work will be subject to review and approval by the Landlord.

## SIGN CRITERIA

Each Tenant is required to design, fabricate, install, finish, and maintain a sign(s) at Tenant expense. The following basic set of guidelines will be used by the Landlord to review and approve all Tenant signs. The purpose of these criteria is to ensure tasteful, quality signing and to encourage imaginative designs. All signs will be subject to the Landlord's prior written approval as described under *Tenant Submission Requirements*. Project directory signs will be provided and installed by the Landlord. A key plan with their locations is attached for reference.

1.  No signs will be permitted on or shall be visible from the exterior of the building except as designated by the Landlord. Exterior signage, including signage in the exterior courtyard, is limited to the types and optional locations indicated on pages 7 -10. Only one hanging sign per street or courtyard facade is permitted per Tenant. Brackets for the hanging (flag type) signs will be provided and installed by the Landlord at Tenant expense. See page 11. for the typical hanging sign.

2.  Signing shall be limited to the trading name and/or logo only.

3.  Lighting for interior signage is limited to the following:
    *   front-lit
    *   bare bulb
    *   neon
    *   backlit silhouette
    Lamps for bare bulbs signs will be of a type intended for sign or other purely decorative application and will not be a source of glare when in the installed sign configuration. Unless specifically approved, clear bulbs will not exceed 15 watts and frosted bulbs will not exceed 25 watts.

4. The following signs are not permitted:
   • animated components, flashing lights, formed plastic, injection molded plastic, backlit luminous panels, iridescent painted.
   • exposed raceways, transformers, ballast boxes, cross overs, conduit, or sign cabinets, etc.
   • sign company names visible on the sign.
   • decals and lettering on show window glass, door glass, or other part of storefront, except glass-applied gold-leafing, sand-blasted designs, silk screen on glass, and black opaquing with Landlord approval.
   • temporary signs, posters, notices, announcements or advertisements except as noted herein.

5. Postal number, if required, will be designed by Landlord and installed by Landlord at Tenant expense.

6. Door leaf signs N/A

7. The Landlord reserves the right to remove at Tenant's expense any signs installed by Tenant which have not received prior written approval by Landlord as described under 'Tenant Submission Requirements'.



# Elevation 1

Logo Signage Area
(Anchor Tenant)



# Elevation 2



Shopping Center
I.D. Signage Area

Logo Signage Area
(Anchor Tenant )

Building Directory
Sign Area

# Elevation 3



Logo Signage Area
(Anchor Tenant)

# Section thru Covered Walkway

**Hanging Sign**

## LIGHTING CRITERIA

1.  The Landlord will provide general illumination lighting fixtures in the Common Areas.

2.  The Landlord does not provide specific lighting of individual storefronts. General lighting in Common Areas will provide adequate lighting for storefront visibility.

3.  There shall be no direct glare from the Tenant Premises to the Common Area or the exterior of the building. All lighting fixtures will incorporate shielding of a kind and nature which, when they are in their installed and aimed position, will prevent glare to the Common Area and all exterior areas.

4.  Exposed lamps, other than purely decorative, will be shielded or concealed from view from the Common Areas or the exterior of the building. Lighting fixtures which are aimed or located in a manner to direct most of their light to surfaces in the Common Area or to the exterior are not permitted.

5.  All sign, logo, and show window illumination lighting fixtures shall be energized during the operating hours.

6.  All lighting fixtures and devices will incorporate all safety features which are required by code or are recommended by the lamp manufacturer. Further, all lighting auxiliary equipment such as ballasts, transformers, and dimmers will have the lowest applicable sound rating and will incorporate the electronic devices necessary to prevent electrical interference with the building audio/visual and communications systems.

7.  All illumination fixtures, their location, and use are subject to prior Landlord approval. The Landlord reserves the right to remove any lighting at Tenant expense installed by Tenant which has not received prior written approval by Landlord as described in "Tenant Submission Requirements".

8.  Lighting on the outside (Common Area) surface of the storefront or at the Tenant Lease Line is not allowed, except where permitted for signs or displays by Landlord review and approval.

## FINISHES CRITERIA

**Walls**

Landlord will furnish and install at Landlord expense framing (as required by code) for the demising partitions as indicated on the plans and in accordance with other sections of the Lease Agreement. Tenant will furnish and install 5/8" firecode type 'X' wallboard to achieve a minimum one (1) hour fire rating and any permanent finish materials on demising partitions and on all other walls and partitions, subject to Landlord approval.
The use of the following materials and treatments is not permitted:

- simulated brick, stone and wood
- wood grained laminates
- pegboard walls and fixture systems
- textured paint

**Storefronts (interior, exterior or both)**

Storefronts are existing or will be furnished and installed by Landlord at Tenant expense. A alternate storefront type, if desired by the tenant is to match the existing hieght and finish. Any alternate types must receive prior approval of the Landlord before installation.

In keeping with the merchandising concept of an open market place, the view through an exterior wall or through a storefront into Premises may not be obstructed by an opaque display or fixture, i.e. closed shelving, dressing rooms, etc. Merchandising in storefront windows is encouraged, however, and may be achieved by, but is not limited to, the following methods:

- open (etagere) shelving
- hanging display or merchandise
- openwork grills or latticework to which merchandise is attached

Exterior or interior awnings and framing will not be permitted.

## Ceilings

Ceiling is existing steel bar joist and metal deck by Landlord. Ceiling is to be finished by Tenant at Tenant expense. Suspended ceiling systems or finishes furnished and installed by the Tenant at Tenant expense will be permitted within the Premises, subject to Landlord review and approval. Finished ceiling height shall be designed to meet the existing walls to be above the bottom of the existing arched openings.

## Flooring

Within Tenant premises, Tenant will design, furnish and install, at Tenant expense, with Landlord approval, steps/platform/ramp/railings/thresholds, where needed, to make the transition with the adjacent floor elevations. Steps, ramps and railings shall comply with all applicable codes (incl. ADA). Tenant will furnish and install at Tenant expense all finish flooring and base. Floor finishes must be carried to the storefront line. Asphalt tile and similar resilient floor coverings are permitted in sales area and must be approved by the Landlord prior to installation.

## Fixturing

Tenant will furnish and install at Tenant expense and with Landlord approval, all interior partitions, shelving, storage and display units, will paint and decorate sales and office areas of store demised Premises; and will furnish and install all store fixtures, equipment, furnishings, items of interior decor, personal property, internal communications systems, security devices and alarm systems, as required.

## Toilet Room

Where required by Tenant's operations and with prior Landlord approval, a toilet may be installed by Tenant at Tenant expense.

## Counters

The Tenant may furnish and install at Tenant option and expense counter fronts and tops. Materials for countertops and tops are restricted to the following:

- tile
- hardwood
- glass
- brass
- stainless steel

## Utilities

Landlord may have to route utilities through Tenant areas. Tenant shall accommodate and provide access.

## MECHANICAL SYSTEMS CRITERIA

### HVAC

The Tenant shall furnish and install at Tenant expense a complete HVAC system in conformance with the criteria specified herein. Complete plans and specifications covering the HVAC work, adequate for permit and construction purposes, shall be provided to the Landlord for approval in writing before any work is started. Plans shall be prepared and sealed by a professional Engineer/Architect. All work shall be installed by Tenant, at Tenant expense.

All air conditioning units  shall be sspllt systems, direct expansion type, complete with casing, fan(s), DX coil, compressor, filter, refrigerant and safety controls.  The air handling unit is to be located in the tenant space, and the condensing unit to be located on a structural support system to be provided and installed by the landlord at tenant's expense.  All equipment provided shall be new and have an energy efficiency ratio equal or greater than 10.0

Total capacity of the equipment shall be based on the internal sensible heat load during peak loading period under the following design conditions.

Indoor Conditions: 76 degrees DB at 50% RH
Outdoor Conditions: 90 degrees DB, 79 degrees WB

All duct work shall be constructed and installed in accordance with the standard of the American Society of Heating, Refrigerating and Air Conditioning Engineers (ASHRAE), and the Sheet Metal and Air Conditioning Contractors National Association (SMACNA), and the standards of NFPA 90A and NFPA 90B, Air Conditioning and Ventilation Systems Standards.

The Contractor shall guarantee all work and the complete system operation will be free from defects in workmanship and materials.  The contractor agrees to replace without expense to the Landlord, any part of the apparatus on this installation which proves defective within one (1) year after acceptance of the work.

Fibrous Glass Duct shall be 1 inch thick of 3-1/4 LB density rigid fibrous glass with aluminum foil, glass scrim and draft or plastic jacket vapor barrier, R valve a minimum of 4.2

Vibration Isolators for Air Handlers shall be rubber waffle pads, 30 durometer, minimum 1/2 inch thick, maximum loading 40 PSI.

Increase duct sizes gradually, not exceeding 15 degrees divergence wherever possible.  Maximum divergence upstream of equipment to be 30 degrees and 45 degrees convergence downstream.

Use a machine to fabricate fibrous ducts and fittings. Make only minor on site manual adjustments. Wipe clean surfaces being joined.

Install items in accordance with manufacturer's printed instructions.

The HVAC Contractor will check, test and start up the system in accordance with the unit manufacturer's instructions. All forms, charts and start up information requested by the unit manufacturer shall be completed and returned to the manufacturer as requested. A copy of this information shall be furnished to the Landlord, prior to final acceptance of the work.

## Plumbing

Waste line and water line connections are provided in each retail space for restroom facilities to be installed by the tenant. If the tenant requires additional supplementary plumbing facilities, these shall also be provided, with prior Landlord review and approval, by the Tenant at Tenant expense. Water closets, urinals, lavatories, etc., shall be of good standard manufacture such as American Standard, Eljer or Kohler.

All fixtures and equipment shall have individual cut-off stops on supply lines. Where the same are not specified as a part of fixture trim, they shall be installed as close to fixtures as possible in hot and cold water supply lines.

Provide non-conducting type connections wherever joining dissimilar metals.
Grade horizontal drainage and vent piping 1/8 inch per foot minimum unless otherwise stated on plans. Install piping to allow for expansion and contraction without stressing pipe or equipment connected.

## FIRE PROTECTION SYSTEMS CRITERIA

**Fire Protection Systems**
Fire hoses, cabinets fire extinguishers, and other required equipment within the Tenant's demised Premises shall be installed in accordance with the Landlord's insurance underwriter and any local agencies having jurisdiction.

## ELECTRICAL SYSTEMS CRITERIA

### Electrical Systems

The Landlord has provided a space allocated for  480 volt, three phase electrical service. All step-down transformers (for 120/208v req'mts.), switchgear, panels, distribution etc. shall be provided and installed by the tenant at tenant's expense. An emply 1-1/4" conduit has been routed from the main 480 volt transcloser to each retail Tenant area for Tenant's power use. An additional 1" conduit has been routed from the electrical room to each Tenant area for telephone usage. All wiring to the Tenant space, and all work within the Tenant space, is to be done by the Tenant, at Tenant expense.

All work shall be performed by a licensed Electrical Contractor in a first class workmanship-like manner.  The completed system shall be fully operative and acceptance by Owner is a condition of the subcontract.

All conduit, devices, equipment, etc., purchased by the contractor shall be UL listed and so indicated by the UL label.

The installation shall comply with all laws applying to electrical installations in effect with the regulations of the NEC and local regulations and with the regulations of WAPA.

Fines incurred, compliance with occasional safety and health act (William-Steiger Act), and safety and welfare of all persons on the construction site are the sole responsibility of the Contractor and the Owner is not liable for the aforementioned.

Minimum wire size shall be 12 AWG excluding control wiring.  Unless otherwise noted, all conductors shall be copper with TH-WN insulation for size #10 and smaller.  All conductors #10 and smaller may be solid, all those #8 and larger shall be stranded.

3-wire grounding type receptacle shall be specification grade 125 volt, 20 amp ivory color equal to General Electric #GE4750 with cover plate.

Switches shall be flush toggle Type AC quiet of specification grade, 20 amp, 120/277 VAC, ivory color equal to General Electrical #GE5951-2G.

Outlet boxes shall be hot dip galvanized 1.25 oz. per sq. ft. or cadmium plated, and shall conform to UL requirements.

Construct panel boards to UL Standards and provide UL Labels.  All panel boards shall have a ground bar assembly.

Make connections to motors and equipment with PVC jacketed flexible conduit and liquid tight connectors.
Minimum size 1/2 inch for motor connections.
Use three-eights (3/8) inch flexible conduit only for fixture and control wiring.  Provide sufficient length of flexible conduit to avoid transmission or vibration.

Splices, taps and terminals shall be made in accordance with NEC and shall be made only in junction boxes, outlets and panel boards.  All wires shall run in metallic raceways.

# TENANT SUBMISSION REQUIREMENTS

## SUBMISSION MATERIAL/PROCEDURES

The Tenant shall provide complete working drawings and specifications for the construction of his leased Premises for Landlord's written approval.

Drawings must be submitted in two phases:

Preliminary Phase (Submission I)
Final Phase (Submission II)

Drawings, specifications and samples must be submitted to the Tenant Coordinator as follows:

One set of reproducible sepia prints
One set of black or blue-line prints
Specifications, if not drawings, should be submitted on 8 1/2" x 11" paper in two sets with protective transparent cover.
Samples and color chips must be firmly applied to 8 1/2" x 11" illustration board and clearly labeled.

All drawings will be submitted on sheets sized to one of the following sets of dimensions:

8 1/2" x 11"
11" x 17"
18" x 24"
30" x 42"

### Submission I

Should be made as soon as Tenant or Tenant's designer has completed the conceptual idea of his particular store. The purpose of this phase is to acquaint the Landlord with the Tenant's intentions and to catch and correct as many criteria problems before the final drawings phase. Drawings shall include the following information at a minimum (additional information is encouraged):

Preliminary floor plan(s) (scale 1/4" = 1'-0") indicating interior design concept.
Preliminary reflected ceiling plan(s) (scale 1/4" = 1'-0") indicating interior design concept and lighting fixture types and location.
Typical interior sections (scale 1/4" = 1'-0")
Storefront elevation and section (scale 1" = 1'-0"), including any graphics and signage. Indicate materials and finishes.
Completed Schedule A.

### Submission II

Drawings shall include the following:

Floor plan(s) (scale 1/4" = 1'-0") indicating storefront construction, materials, colors and finishes as well as locations of partitions and type of construction, toilet room locations and placement of fixtures.

Reflected ceiling plan(s) (scale 1/4" = 1'-0") indicating ceiling materials, various ceiling heights, location of all light fixtures, their manufacturer's name and catalog number, lamps to be used and mounting (recessed, surface, etc.).

Sign Details (scale 1 1/2" = 1'-0") indicating elevation and section views, letter style and size, all colors and materials, method of illumination including lighting fixture details and specifications.

Interior elevations, sections, and details sufficient for construction.

Interior finish schedule.

Completed Schedule A.

Mechanical Drawings:

HVAC Drawing Requirements: Where applicable to the specific design, the Tenant submission shall include the following information:

1. HVAC equipment specifications:
   a. cooling capacity and control steps
   b. condenser water flow and pressure drop
   c. total air flow and minimum outside air flow
   d. supply air fan motor horsepower and electrical characteristics
   e. manufacturer and model number

2. Piping specifications:
   a. condenser water pipe sizing and flow diagram
   b. chilled water pipe sizing and flow diagram
   c. condensate piping to waste drain
   d. Landlord piping

3. Duct specifications:
   a. duct sizing and materials for outside air, supply, return, relief systems
   b. duct sizing and materials for toilet and special exhaust systems
   c. fire dampers
   d. Landlord ducts
   e. diffusers type and sizing

4. Controls:
 a. type, manufacturer and legend
 b. control diagrams

5. Support systems:
 a. support method
 b. isolation method

Complete mechanical drawings and specifications including electrical, HVAC and plumbing, adequate for permit and construction purposes. Plans shall be prepared and sealed by a professional Engineer / Architect. Drawings must indicate connected electrical loads, weight of heavy equipment, cases, etc.

Copies of all permits.

## BUILDING CODES

Tenants have total responsibility for compliance with all applicable Federal, State and Local Codes and Ordinances for their occupancy types.

All communications shall be sent to:
 Property Manager
 H. E. Lockhart Management Inc.
 P.O. Box 7020
 St. Thomas, Virgin Islands 00801
 (340) 776-1900

Note:

Tenant construction shall proceed only on the basis of drawings approved be Landlord. Landlord's approval shall be in writing. Changes made between approved drawings and actual construction will require alterations to comply with approved drawings at Tenant's expense. Deviations from Landlord approved Submission II are not permitted during Tenant construction without prior approval by Landlord. Tenant construction that deviates from the approved submission and is not approved by Landlord shall be removed and redone by Tenant at Tenant expense. Additional costs resulting from Tenant's deviations as they affect other Tenants and/or Landlord shall be at Tenant expense.

# SCHEDULE 'A' - ELECTRICAL LOAD DATA

NOTE: ELECTRICAL CHARACTERISTICS ARE: 120/208V/3∅/4W

TO BE FILLED IN BY TENANT.

TENANT _____    SPACE NUMBER _____    GLA _____

_____    DATE _____

| LOAD | CONNECTED KV | DEMAND KV | REMARKS |
|---|---|---|---|
| LIGHTING | | | |
| SIGNS | | | |
| RECEPTACLES | | | |
| HVAC | | | |
| OTHER | | | |
| TOTALS | | | |

LARGEST MOTOR IS _____ HP, _____ PHASE

30 MINUTE COINCIDENT DEMAND WILL NOT EXCEED _____ KV.

NOTE:

# EXHIBIT D

## PRELIMINARY PLAN
## (INTENTIONALLY DELETED)

# EXHIBIT E

## KMART SUBORDINATION AGREEMENT

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

THIS AGREEMENT, made and entered into as of the _____ day of _____, 1997, by and between KMART CORPORATION, a Michigan corporation, formerly known as S. S. KRESGE COMPANY ("Tenant"), whose address is 3100 West Big Beaver Road, Troy, Michigan 48084, and _____ ("Lender"), whose address is _____

A.    Lender has agreed to make a mortgage loan (the "loan") to _____ (the "Borrower") to be secured by a mortgage or deed of trust (the "Deed of Trust") on the real property legally described in Exhibit "A" attached hereto (the "Premises"); and

B.    Tenant is the present lessee under a lease dated _____, made by _____ (as assigned to _____), as Landlord, demising a portion of the Premises and other property (said lease and all amendments thereto being referred to as the "Lease"); and that Landlord has or will assign the lease to Borrower; and

C.    The loan terms require that Tenant subordinate the Lease and its interest in the Premises in all respects to the lien of the Deed of Trust and that Tenant attorn to Lender; and that Tenant has executed a prior Subordination, Nondisturbance and Attornment Agreement in favor of _____; and or

that Tenant has executed prior Subordination, Nondisturbance and Attornment Agreements in favor of _____; and

D.    In return, Lender is agreeable to not disturbing Tenant's possession of the portion of the Premises covered by the Lease (the "Demised Premises"), so long as Tenant is not in default under the Lease;

NOW, THEREFORE, the parties hereby agree as follows:

1.    Subordination.  The Lease, and the rights of Tenant in, to and under the Lease and the Demised Premises, are hereby subjected and subordinated to the lien of the Deed of Trust.

2.    Tenant Not To Be Disturbed.  So long as Tenant is not in default (beyond any period given Tenant by the terms of the Lease to cure such default) in the payment of rent or additional rent or of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed, (a) Tenant's possession of the Demised Premises, and its rights and privileges under the Lease, including but not limited to any extension or renewal rights, shall not be diminished or interfered with by Lender, and (b) Lender will not join Tenant as a party defendant in any action or proceeding foreclosing the Deed of Trust unless such joinder is necessary to foreclose the Deed of Trust and then only for such purpose and not for the purpose of terminating the Lease.  If Lender joins Tenant in

1

any judicial foreclosure proceeding, Lender shall reimburse Tenant for any and all reasonable legal expenses incurred by Tenant in defending the same.

3.      Tenant To Attorn To Lender.  If Lender shall become the owner of the Premises or the Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Premises shall be transferred by deed in lieu of foreclosure, the Lease shall continue in full force and effect as a direct Lease between the then owner of the Premises, who shall succeed to the rights and duties of the Landlord, and Tenant.  Tenant shall attorn to Lender or any other such owner as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments, Tenant shall be under no obligation to pay rent to Lender or any such other owner until Tenant receives written notice and a certified copy of an executed transferring document or certified court order from Lender or any such other owner that it has succeeded to Borrower's interest under the Lease.  The notice shall be provided to Tenant at least 30 days prior to Tenant having any obligation to pay rent to the Lender or any other owner that has succeeded to Borrower's interest under the Lease.

4.      Purchase Options.  Any option or rights contained in the Lease, or otherwise existing, to acquire any or all of the Premises are hereby made subject and subordinate to the rights of Lender under the Deed of Trust and acquisition of any or all of the Premises made by Tenant during the term of the Deed or Trust shall be made subordinate and subject to the Deed of Trust.

5.      Lender's Option to Cure Borrower's Default.  Tenant agrees that Borrower shall not be in default under the Lease unless written notice specifying such default is given to Lender.  Tenant agrees that Lender shall have the right to cure such default on behalf of Borrower within 30 days after the receipt of such notice.  Tenant further agrees not to invoke any of its remedies under the Lease (except the Lease emergency repair clause) until said 30 days have elapsed.

6.      Notice of Discharge.  Borrower or Lender shall give notice to Tenant of the reconveyance or other release of the Deed of Trust within 30 days of the date the reconveyance or other release is recorded.

7.      Limitation.  This Agreement shall not apply to any equipment owned or leased by Tenant which is now or hereafter placed or installed on the Demised Premises, and Tenant shall have the full right to remove said equipment at the expiration of the Lease term.

8.      Successors and Assigns.  This Agreement and each and every covenant, agreement and other provision hereof shall be binding upon and shall inure to the benefit of the parties hereto and their representatives, successors and assigns.

9.      If Lender is a federally insured depository institution, tender certifies to Tenant that this Agreement has been approved by the board of directors or the loan committee of Lender, which approval is reflected in the minutes of said board or committee, and further undertakes to continuously maintain the Agreement as part of Lender's official records.

2

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed as of the date first above written.

"Lender"

NAME

By:_____

       Its:_____

"Tenant"

KMART CORPORATION, a Michigan
corporation formerly known as
S. S. KRESGE COMPANY

By:_____
  Anne Hancock
  Real Estate Legal Counsel and
  Assistant Secretary

And:_____
  D. H. Burdick II
  Assistant Secretary

STATE OF _____ )
                                    ) SS
COUNTY OF _____ )

On this _____ day of _____, 1997, before me personally appeared _____, to me known to be the _____ of _____, the corporation that executed the within and foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed or said corporation, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument, and that the seal affixed (if any) is the corporate seal of said corporation.

IN WITNESS WHEREOF I have hereunto set my hand and official seal this day and year first above written.

_____
Notary Public
County of _____
My commission expires: _____


STATE OF MICHIGAN     )
                                          ) SS
COUNTY OF OAKLAND   )

On this _____ day of _____, 1997, before me personally appeared Anne Hancock and D. H. Burdock II to me known to be the Real Estate Legal Counsel and Assistant Secretary and Assistant Secretary respectively, of KMART CORPORATION, the corporation that executed the within and foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they were authorized to execute said instrument, and that the seal affixed (if any) is the corporate seal of said corporation.

IN WITNESS WHEREOF I have hereunto set my hand and official seal this day and year first above written.

_____
Notary Public
County of _____
My commission expires:

4

# EXHIBIT F

## LANDLORD'S SUBORDINATION AGREEMENT

## AGREEMENT OF SUBORDINATION, NON-DISTURBER
## AND ATTORNMENT

THIS AGREEMENT is made this _____ day of _____, 199__ by and among H.

E. LOCKHART MANAGEMENT, INC., a U.S. Virgin Islands corporation (the "Lessor") whose

mailing address is P.O. Box 7020, St. Thomas, U.S. Virgin Islands  00801, BANCO POPULAR

de PUERTO RICO ("Banco Popular") whose mailing address is P.O. Box 8580, St. Thomas,

U.S. Virgin Islands  00801, and _____ (the

"Lessee") whose mailing address is _____

_____.

## W I T N E S S E T H:

WHEREAS, Lessor is the owner in fee simple of the following described real property:

_____

_____

St. Thomas, U.S. Virgin Islands

WHEREAS, under the terms of a certain lease agreement dated

_____ between the Lessor and the Lessee, as amended (collectively, the

"Lease") Lessor did lease, let and demise to Lessee a portion of the improvements located on the

above-described real property as described in the Lease (the "Premises"); and

WHEREAS, the Lessor has mortgaged the real property described above by First

Amendment of First Priority Mortgage Construction Security Interest dated October 21, 1996

(the "BP Mortgage") to Banco Popular as security for a loan to Lessor (the "Loan"); and

WHEREAS, the Lessor has conditionally assigned the Lease and the rents to be derived

therefrom to Banco Popular as security for the Loan (the "Assignment"); and

WHEREAS, by this Agreement of Subordination, Non-Disturber and Attornment the parties hereto desire to establish their rights and obligations with respect to the Lease, the BP Mortgage and the Assignment;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lessor, the Lessee, and Banco Popular, intending to be legally bound, hereby consent and agree as follows:

1.    This Agreement shall control notwithstanding any contrary provisions in the Lease.

2.    As provided in Article _____ of the Lease, the Lessee hereby agrees that the Lease and any and all liens, estates, rights, options and charges created thereby are subject to and subordinate to the lien created by the BP Mortgage.

3.    Except as set forth herein, and provided that the Lessee is not in default under the terms of the Lease and the Lessee is then in possession of the Premises the following shall apply:

(a)    The right of possession of the Lessee to the Premises and Lessee's rights arising out of the Lease shall not be affected or disturbed by Banco Popular in the exercise of any of its rights under the BP Mortgage or the Assignment; and

(b)    Notwithstanding the exercise by Banco Popular of all or any of its rights and remedies under the BP Mortgage or the Assignment, the Lease shall continue in full force and effect, and Banco Popular shall recognize the Lease and the Lessee's rights thereunder, including any extension options provided therein, and will thereby establish direct privity of contract as between Banco Popular and the Lessee with the same force and effect and with the

- 2 -

same relative priority in time and right as though the Lease were originally made directly from Banco Popular in favor of the Lessee.

4.      Except as set forth herein, in the event Banco Popular obtains title to the real property described above through foreclosure or deed in lieu of foreclosure under the BP Mortgage, the Lessee agrees to continue occupancy of the Premises and to make full and complete attornment to Banco Popular, its successors and assigns, for the balance of the term of the Lease, including any extensions and renewals thereof, upon the same terms, covenants and conditions as provided in the Lease subject, however, in all events to the terms, covenants and conditions of this Agreement, so as to establish direct privity of estate and contract as between Banco Popular, its successors and assigns, and the Lessee with the same force and effect and relative priority in time as though the Lease were originally made directly from Banco Popular, or such successors or assigns, to Lessee.

5.      Banco Popular shall not, by virtue of the BP Mortgage, the Assignment or this Agreement, or by virtue of its exercise of all or any rights and remedies thereunder, be liable to Lessee in any way or to any extent:

(a)      For any past act or default on the part of the Lessor under the Lease occurring at any time prior to Banco Popular succeeding to the rights of the Lessor, and Lessee shall have no right to assert same or any damages arising therefrom as an offset or defense against Banco Popular; or

(b)      For any prepayment of rent or security deposit given to or held by the Lessor under the Lease, except to the extent that Banco Popular has actually received such prepaid rent or security deposit out of accounts of the Lessor specifically designated for such

- 3 -

purpose prior to the exercise of any rights or obligations of Banco Popular under the BP Mortgage, the Assignment or this Agreement.

6.    After notice is given to Lessee by Banco Popular, pursuant to the Assignment, that the rental under the Lease should be paid to Banco Popular, Lessee shall pay to Banco Popular, or in accordance with the directions of Banco Popular, all rentals and other monies due and to become due to the Lessor under the Lease from and after the date of Lessee's receipt of such notice, and Lessor hereby expressly authorizes Lessee to make such payments to Banco Popular and hereby releases and discharges Lessee of and from any liability to Lessor on account of any such payments.

7.    It is expressly agreed among the parties hereto that Banco Popular shall be subject to any modifications or amendments to the Lease entered into after the date hereof so long as such modifications and amendments are consistent with prevailing market conditions and in the ordinary course of Lessor's business; provided that the Lessor shall provide fully executed copies of any such modifications or amendments to Banco Popular, upon request of Banco Popular, in order for Banco Popular to be bound by the provisions thereof.

8.    Lessee agrees to give Banco Popular, by registered mail, a copy of any notice of default served upon the Lessor.  Lessee further agrees that if Lessor shall have failed to cure such default within the time period provided for in the Lease, then Banco Popular shall have an additional thirty (30) days within which to cure such default or, if such default cannot be cured within that time, then such additional time as may be necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings, if necessary to effect such cure) in which event, the Lease shall not be terminated by Lessee while such remedies are being so

– 4 –

diligently pursued. Lessee expressly acknowledges that Banco Popular shall have no obligation to cure such default of Lessor.

9.    This Agreement shall inure to the benefit of and shall be binding upon Lessee, Lessor, and Banco Popular, and their respective heirs, personal representatives, successors and assigns. In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, the remaining provisions of this Agreement shall not be affected thereby, and in the place of such invalid illegal or unenforceable provisions there shall be substituted a like, but valid, legal and enforceable provision which most nearly accomplishes the original intention of the parties, as evidenced by this Agreement. This Agreement shall be governed by and construed according to the laws of the U.S. Virgin Islands.

IN WITNESS WHEREOF, the parties hereto have caused this writing to be signed, sealed and delivered on the day and year first above written.

LESSOR:

WITNESSES:

H. E. LOCKHART MANAGEMENT, INC., a U.S. Virgin Islands corporation

By: _____
John P. de Jongh, Jr., President

[SEAL]

Attest: _____
Cornel A. Williams, Secretary

- 5 -

BANCO POPULAR de PUERTO RICO

By: _____
Valentino I. McBean, Senior Vice President

LESSEE:

_____

By: _____

_____, duly authorized

TERRITORY OF THE U.S. VIRGIN ISLANDS    )

                                        ) SS.:

JUDICIAL DISTRICT OF ST. THOMAS AND ST. JOHN )

The foregoing instrument was acknowledged before me this _____ day of _____,
199___ by John P. de Jongh, Jr., as President of H. E. Lockhart Management, Inc., on behalf of
said corporation.

_____
NOTARY PUBLIC

- 6 -

TERRITORY OF THE U.S. VIRGIN ISLANDS        )
                                            ) SS.:
JUDICIAL DISTRICT OF ST. THOMAS AND ST. JOHN )


     The foregoing instrument was acknowledged before me this _____ day of _____,
199___ by Valentino I. McBean, Senior Vice President of Banco Popular de Puerto Rico.


                    _____
                        NOTARY PUBLIC


STATE OF _____ )
                               ) SS.:
COUNTY OF _____ )


     The foregoing instrument was acknowledged before me this _____ day of _____,
199___ by _____, as _____ of _____
on behalf of said corporation.


                    _____
                        NOTARY PUBLIC

-M:\2206\61\sub-frm

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE dated this 22nd day of October, 1997, between H. E. LOCKHART MANAGEMENT, INC., having its principal office at No. 44 Estate Thomas, P. O. Box 7020, St. Thomas, U. S. Virgin Islands 00801(herein referred to as "Landlord"), and KMART CORPORATION, a Michigan corporation having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant"),

WITNESSETH: That for and in consideration of the sum of One Dollar ($1.00) and other good and valuable considerations and the further consideration of the rents reserved and the covenants and conditions more particularly set forth in a certain lease between Landlord and Tenant and bearing even date herewith, Landlord and Tenant do hereby covenant, promise and agree as follows:

1.    Demised Premises. Landlord does demise unto Tenant and Tenant does take from Landlord for the lease term hereinafter provided, and any extension thereof, the following property: Unit A in Lockhart Gardens Shopping Center (the "demised premises"), located in the shopping center on the property located in St. Thomas, U. S. Virgin Islands, more particularly described in Exhibit A attached hereto and made a part hereof, and as described and shown more particularly on Exhibit B, the site plan attached hereto and made a part hereof, consisting of sixty thousand (60,000) square feet of space.

2.    Term. The lease term shall commence upon the Commencement Date set forth in the Lease, and shall terminate upon such date as shall be five (5) years from the Commencement Date; provided, however, (a) Tenant shall have the option to extend the lease term for five (5) successive periods of five (5) additional years each and (b) Tenant shall have the option to extend (or further extend) the term of the said lease for such period of time as shall cause the last day of the term of the lease to be the January 31 next succeeding the date on which the term of the lease would expire but for the exercise of such option.

3.    Signs. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service marks and trademarks "Kmart" and "Big Kmart" are the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said marks, or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said marks or any term, word, mark or designation which is in any aspect similar to the marks of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid marks, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid marks or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid marks.

Tenant shall have the right to place such signs on the exterior walls of the demised premises as may be permitted by the Lease.

4.      Purpose.  The sole purpose of this instrument is to give notice of said lease and all its terms, covenants and conditions to the same extent as if said lease were fully set forth herein.

5.      Covenants Run With the Land.  The conditions, covenants and agreements contained in this instrument shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns.  All covenants and agreements of this instrument and said lease shall run with the land, but only for so long as the Lease is not terminated or expired in accordance with its terms.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

WITNESSES:

H. E. LOCKHART MANAGEMENT, INC.
"Landlord"

By: _____

Attest: _____

KMART CORPORATION
"Tenant"

By: _____
Vice President Real Estate

Attest: _____
Assistant Secretary

## ACKNOWLEDGMENTS

TERRITORY OF THE U.S. VIRGIN ISLANDS    )
                                         ) SS
DISTRICT OF ST. THOMAS AND ST. JOHN      )

     I do hereby certify that on this __22__ day of October, 1997, before me, A. James Casner III, a Notary Public in and for the Territory of the U.S. Virgin Islands as aforesaid, and duly commissioned, personally appeared John P. de Jongh, Jr., known to me to be the President of H.E Lockhart Management, Inc., who, being by me duly sworn, did depose and say that he resides in St. Thomas, U.S. Virgin Islands; that he is the President of H.E. Lockhart Management, Inc., the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, he signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that he signed his name thereto by like order on behalf of said corporation.

     In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public, _U. S. V. I._

My commission expires: _10/23/2000_

STATE OF MICHIGAN   )
                     ) SS
COUNTY OF OAKLAND    )

I do hereby certify that on this _24_ day of _October_, 19_97_ before me,
_Tammy l. Hall_, a Notary Public in and for the County and
State aforesaid, and duly commissioned, personally appeared _Lorence T. Kalla_ and
_Daniel H. Burdick II_, known to me to be a Vice President Real Estate and Assistant
Secretary of KMART CORPORATION, who, being by me duly sworn, did depose and say that they
reside in _Troy + Birmingham_, respectively; that they are the Vice President Real Estate and
Assistant Secretary respectively of KMART CORPORATION, the corporation described in and
which executed the foregoing instrument; that they know the seal of said corporation; that the seal
affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation
and by order of its board of directors, they signed, sealed and delivered said instrument for the uses
and purposes therein set forth, as its and their free and voluntary act; and that they signed their names
thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and
year in this certificate first above written.

_Tammy Hall_
Notary Public, _Oakland_ County,
State of _Michigan_

My commission expires: _5/9/2001_

**TAMMY L. HALL**
Notary Public, Macomb County, Mich.
Acting in Oakland County
My Commission Expires: May 9, 2001

## EXHIBIT A

### SHOPPING CENTER DESCRIPTION

"Shopping Center" means Parcel Nos. 1, 1A, lA-a, 1A-2, and 3 Estate Thomas, St. Thomas, U.S. Virgin Islands, plus (1) any other parcel(s) of land at any time designated by the Landlord to be added (but only so long as such designation remains unrevoked) which are, or are to be, used for the Shopping Center or related purposes, including, but not limited to, employee parking, or the furnishing to the Shopping Center of any utility or other service, or for any other improvement appropriate or related to the operation or functioning of the Shopping Center, together with all buildings on and improvements to any such parcel(s) of land (provided same are included in square footage of Shopping Center); plus (2) any plant or other facility, including, but not limited to, a sewage or garbage disposal plant, serving the Shopping Center, even though it is not located upon land which is a part of the Shopping Center, and the facilities connecting any such plant or facility (whether or not so located) to the remainder of the Shopping Center (but not including the land under or through which any such connection passes, if not otherwise included within the Shopping Center). The term "the Shopping Center" also means, when used not solely to designate the geographical location thereof, the operation and functioning thereof primarily as a general shopping center for the sale of goods, wares, merchandise, food, beverages, and services at retail, together with such services and facilities as are incident to or desirable in connection with the operation thereof, including, but not limited to, medical, dental and other office space. No road, way, street, easement, utility or facility otherwise included within the Shopping Center shall be deemed for any purpose to be partially or wholly excluded therefrom by reason of the fact that the same may also serve or be used by the occupant of any other premises or the customers thereof. Any portion of the Shopping Center which is condemned or dedicated to public use or ceded or conveyed to any governmental authority for street or related purposes shall be thereafter excluded from the Shopping Center.



EXHIBIT – "B"

1-2  Furniture World
3    Proposed Garden Mall
4    Proposed Retail
5    Banco Popular
6    FootLocker
7    Truckdock / Dumpster Area
8    Sidewalk Sale Area
9    Generator Tank
10   "No-Build" Area

SITE PLAN

KMART GARDENS SHOPPING CENTER
H.E. Lockhart Management, Inc.
S. Virgin Islands