SIMON ARON (CA State Bar No. 108183)
   saron@wrslawyers.com
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
11400 West Olympic Boulevard, 9th Floor
Los Angeles, California 90064-1582
Telephone:  (310) 478-4100
Facsimile:   (310) 479-1422

Attorneys for Creditor WOLF FAMILY SERIES LP d/b/a SERIES III, WOLF FAMILY SERIES LP d/b/a SERIES VII; ONTARIO ENTERPRISES OF THE WOLF FAMILY SERIES LP

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 18-23538-RDD |
| **SEARS HOLDINGS CORPORATION,** | (Jointly Administered) |
| Debtor. | |

### OBJECTION OF WOLF FAMILY SERIES LP D/B/A SERIES III, WOLF FAMILY SERIES LP D/B/A SERIES VII, ONTARIO ENTERPRISES OF THE WOLF FAMILY SERIES LP TO (A) NOTICE OF CURE COSTS AND (B) NOTICE OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES

Wolf Family Series LP d/b/a Series III, Wolf Family Series LP d/b/a Series VII, Ontario Enterprises of the Wolf Family Series LP (collectively "Wolf") hereby files this objection along with the declarations of Simon Aron and Rosalie Rubaum in support thereof (the "Objection") to (a) the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Global Sale Transaction* [Docket No. 1731] (the "Cure Notice"); and (b) the *Notice Of Assumption And Assignment Of Additional Designatable Leases* [Docket No. 3298] (the "Designable Notice"). In support of this Objection, Wolf states as follows:

### BACKGROUND

1. Beginning on October 15, 2018 (the "Petition Date") and continuing thereafter, the Debtors each filed a voluntary petition for relief under Chapter 11 of Title

11 of the United States Code (the "Bankruptcy Code").

2. On November 19, 2018, the Court entered the *Order Approving Global Bidding Procedures and Granting Related Relief* [Docket No. 816] (the "Global Bidding Procedures Order").[1]

3. On November 26, 2018, the Court entered the *Final Order Approving (I) Procedures for Store Closing Sales and (II) Assumption of Liquidation Consulting Agreement* [Docket No. 876] (the "Store Closing Order").

4. On January 10, 2019, the Debtors closed the Kmart store located at 2530 S. Euclid Avenue, Ontario, California ("Store #3483"). Wolf and debtor Kmart Corporation, Inc., ("Kmart") are parties to a written lease for Store #3483 (the "Master Lease").

5. On January 18, 2019, the Debtors filed the *Notice of Successful Bidder and Sale Hearing* [Docket No. 1730] (the "Successful Bidder Notice"), which gave notice, among other things, that Debtors had determined the offer submitted by Transform Holdco, LLC (the "Buyer"), established by ESL Investments, Inc., to acquire all or substantially all of the Global Assets was the highest and best off for the Global Assets received. Attached to the Successful Bidder Notice as Exhibit B was a copy of the asset purchase agreement between the Buyer and Debtors (the "APA").

6. Also on January 18, 2019, the Debtors filed the Cure Notice. Exhibit A to the Cure Notice identifies a purported "executory contract" with "Series VII of the Wolf Family" and no other information. *See,* Cure Notice, Exhibit A., p. 263, at No. 6308. Although unclear from the Cure Notice, it appears that the Debtors were proposing to assume an unidentified executory contract with Wolf. The problem begins with there is no such executory contract.

7. On January 23, 2019, the Debtors filed the *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired*

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Global Bidding Procedures Order.

*Leases in Connection with Global Sale Transaction* ("Supplemental Cure Notice"). [Docket No. 1774]  Exhibit A thereto identifies a "Master Lease" with "Joseph Wolf, Marvin L. Wolf, Rosalie Rubaum" and no cure amount or other information.  *See,* Supplemental Cure Notice, Exhibit B-1., p. 49, at No. 194.

8. On January 25, 2019, Wolf filed an Objection to the Cure Notice. [Docket No. 1889].  Wolf (and specifically Wolf Family Series LP d/b/a Series VII) is a party to an unexpired sublease of real property with Debtors (the "Sublease") for a portion of the real property leased by Debtors from Wolf (and specifically Wolf Family Series LP d/b/a Series III) under the Master Lease and identified as 2502 S. Euclid Avenue, Ontario, California.[2]

9. On January 31, 2019, Wolf filed a Supplemental Objection to the Supplemental Cure Notice. [Docket No. 2286].

10. On March 5, 2019, the Debtors filed a *Third Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Global Sale Transaction* [Docket No. 2753] (the "3rd Cure Notice"), in which Debtors correctly identify Wolf as the counter-party to the Sublease.

11. On March 13, 2019, Wolf filed an Objection the 3rd Cure Notice. [Docket No. 2824].[3]

12. On April 19, 2019, Buyer filed the Designable Notice [Docket No. 3298], in which the Master Lease and Sublease are identified as unexpired leases to be assumed and assigned. *See,* Designable Notice, Exhibit 1., p. 8, at No. 247 & 248.

13. Prior to the Petition Date, Kmart entered into the Master Lease relating to Store # 3483.

14. Prior to the Petition Date, Kmart entered into a series of agreements relating

---

[2] The Sublease is incorrectly identified in the Designable Notice as 2531 S. Euclid Avenue, Ontario, California.

[3] The Cure Objections filed by Wolf are referred to collectively hereinafter as the "Cure Objections" and all incorporated by reference herein.

1  to the Sublease.  The Sublease is, in all respects, intertwined with the Master Lease.

**OBJECTIONS TO ASSUMPTION AND ASSIGNMENT.**

15.    The Master Lease and Sublease are leases "of real property in a shopping center" as that term is defined under Section 365(b)(3) of the Bankruptcy Code.  *In re Joshua Slocum LTD.,* 922 F. 2d 1081 (3rd Cir, 1990).

16.    The Cure Objections assert, among other things, that the Master Lease has been default since January 11, 2019, by reason of Debtors' *de facto* abandonment of Store #3483 as demonstrated by their continuous failure to secure, maintain, repair or clean the premises or surrounding area or to permit Wolf to conduct an interior inspection despite repeated notices and requests therefor.  The day after Store #3483 closed Debtors defaulted on the obligations to secure, maintain, repair and clean the premises and surrounding areas.

17.    On January 17, 2019, Wolf gave written notice of default under the Master Lease by reason of Debtors' post-Petition Date defaults thereunder.  Wolf's written notice was ignored, as were Wolfs repeatedly communications to Debtors' counsel.

18.    Debtors are also in direct violation of the Store Closing Order.  The Store Closing Order provides: "Debtors will keep each store premises and surrounding areas clear and orderly consistent with past practices."  *Store Closing Order,* at Exhibit 2. ¶ (m).  Since Store #3483 was closed on January 10, 2019, the Debtors effectively abandoned Store #3483 and the surrounding areas and had not once secured, maintained, repaired or cleaned the premises or surrounding areas.

19.    The Cure Objections further asserted that the Cure Amount associated with Store #3483 was "no less than $50,000.00", but was not fixed as Wolf continued to incur costs and expenses by reason of Debtors' continuous defaults and have not been allowed access to the interior of Store #3483 to conduct a thorough inspection.

20.    Finally, on April 3, 2019, Wolf entered into Store #3834 accompanied by a representative of the Debtors.  Wolf and two of its contractors toured the interior, which was filthy with urine and feces, extensive damage to the flooring, electrical wiring, electric fixtures, walls and general interior, and only half of the interior had power due to extensive

neglect and damage. The condition of the interior was horrific and dangerous as Wolf's manager almost fell through the floor boards on the mezzanine level.

21. In order to assume and assign the Lease and Sublease, the Debtors, the Buyer or an assignee must promptly cure all defaults. 11 U.S.C. §365(b)(1). Wolf objects to the proposed assumption and assignment of the Master Lease and Sublease because the Debtors' Proposed Cure Amounts set forth in the Designable Notice falls far short of the "Supplemented Cure Amounts" (defined below). Given Wolf's limited access to Store #3483, Wolf expressly reserves it right to further amend this Objection and the "Supplemental Cure Amounts" set forth below. While Wolf continues to gather information regarding the extent of the damages to the caused by the Debtors' post-Petition Date breaches of the Master Lease, Wolf has already established that the following amounts are due (the "Supplemental Cure Amounts"):

  a. Outstanding real property taxes, including penalties for non-payment of $36,061.99;[4]

  b. Approximately $1,192,621.19 in costs, expenses and repairs caused by Debtors' ongoing and continuous breaches of the Master Lease; and,

  c. Approximately $13,327.00 in recurring monthly expenses caused by Debtors' ongoing and continuous breach of the Master Lease.

Attached hereto as Exhibit "A" hereto is a detailed accounting of Wolf's Supplement Cure Amounts.

22. Wolf further anticipates added costs and expenses to repair the interior and exterior of Store #3483. Until Wolf is able to gain full access and conduct thorough inspections of the premises, systems and infrastructure, these amounts remain uncertain. However, Wolf did receive an estimate from one of the contractors who toured the premises on April 3, 2019, who stated:

---

[4] After June 1, 2019, interest accrues on the amount of the principal tax at the rate of 1½% per month. California Rev. & Tax Code.

I know that you are looking for cost to bring the store up to code and safe for retail. There are so many items that need attention before the store can open to the public. This store has been neglected for many years now and it would take me another week to seek out all of the items that need to be resolved. I am going to just put a few items below so that you have a heads up moving forward. I hope this helps. · Complete store front doors and glass need to be removed and have new installed. I know that we just repaired the locks and replaced some too but the complete store entrance is in bad shape. · The sub floor on the 2nd floor has many areas that are falling apart and have holes in it. The handrails to the upstairs are not legal. · There is wood framing with chicken wire wrapped around it for security, but is dangerous. · The conveyor is unsafe to operate. · The store is full of broken pieces of several items that have been destroyed by the homeless when they were living inside. · All of the gondolas in the store are in bad shape and not useable. · There are several miscellaneous large items in the store that need to be removed before any upgrades can be started. · There are several pieces of broken glass throughout the store that effect the inside and the outside of the store. · There is a large area on in the rear of the store that the homeless has ruined breaking pieces and section off to make entry. This complete area we have boarded up recently for you. This complete section is on rollers and it is destroyed. · The complete plumbing system is not working , we found several of the toilets with different articles of clothing shoved down them to stop the water from overflowing when they were living inside. The urinals and toilets need major attention before they can be used again, and the majority will need to be replaced. · The restrooms were being used as housing and are in really bad shape, once the plumbing stopped working and the water stopped they were urinating and defecating on the floors in all of the restrooms. · The power supply inside the building with all the temp power poles for the registers are damaged, Most of the copper wires have been pulled from the inside of the store so there will be many items that need power to will not work until addressed. · We haven't even addressed the sprinkler system inside, this will have to be looked into before moving forward. The list could go on and on. You have Hundreds of thousands dollars of work here…."

23.    In addition, Wolf is informed and believes that the interior of Store #3483 must be brought up to code and made ADA compliant, which it is not.

24.    Wolf objects to the assumption and assignment of the Master Lease and Sublease for other reasons:

a.    The Sublease is inescapably intertwined with the Master Lease and cannot be assumed or assigned without the Master Lease being similarly assumed and assigned;

b.    The Master Lease and Sublease are subject to termination for post-Petition Date defaults, which were not timely cured or even responded to by Debtors. Debtors effectively abandoned Store #3483 by virtue of their failure to secure, repair, clean or maintain the premises and surrounding areas or to respond to the numerous store

invasions and damages to the premises and surrounding area. Store No. 3483 as well as the surrounding leased property were breached a number of times and a number of squatters took up residence therein. Wolf was denied access to the leased premises for purposes of conducting an inspection and securing the property before most of the squatters took up residence.

25. The Debtors' security alarm systems were rendered inoperative after January 10, 2019, by the persons breaking and entering. On or about March 6, 2019, the Ontario Municipal Utilities Company shut off the water to Store #3483 because of Debtors' failure to comply with testing of the backflow prevention devices. This triggered fire alarms that could not be silenced until police, fire and Wolf entered the premises to disconnect that alarm. Wolf has been required to install new fire and security alarms in order to protect the property from further damage and potential loss.

26. On a number of occasions, security engaged by Wolf and Ontario Police removed vagrants and squatters from inside Store #3483 and from the surrounding area. From January 10, 2019 to April 22, 2019, there have been 37 police and/or fire department calls to the premises for drugs, prostitution, street car racing, breaking and entering, and trespass resulting in several arrests. As a consequence, Wolf has been forced to engage active security services on a 24/7 basis to patrol Store #3483.

27. Despite repeated requests from Wolf to Debtors' counsel before, during and after these events occurred, the Debtors continued to ignore Store #3483.

28. Wolf also objects to the Global Asset Transaction to the extent is includes an assumption or assignment of the Master Lease or Sublease without first complying with Section 365(b) of the Bankruptcy Code.

### THE DEBTOR MUST PROVIDE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE FOR THE MASTER LEASE

29. In connection with the assumption of leases, shopping center landlords are afforded special statutory protections under the Bankruptcy Code in the form of adequate assurance of future performance. *In re Joshua Slocum*, 922 F.2d 1086; *In re Trak Auto*

*Corp.*, 277 B.R. 655 (Bankr. E.D. Va. 2002). In connection with a shopping center lease, adequate assurance of future performance includes adequate assurance:

  (A) of the source of rent… due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee… shall be similar to the financial condition and operating performance of the debtor…;

  B) that any percentage rent due under such lease will not decline substantially;

  C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, use, or exclusivity, … and

  D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).

30.  The Debtor bears the burden of proving adequate assurance of future performance in connection with the assumption of the Lease. *In re F.W. Restaurant Assoc., Inc*., 190 B.R. 143 (Bankr. D. Conn. 1995); *In re Rachels Indus. Inc*., 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990); *In re Lafayette Radio Electronics Corp*., 12 B.R. 302, 312 (Bankr. E.D.N.Y. 1981).

31.  To determine whether the requirements of adequate assurance of future performance will be satisfied, at a minimum, Wolf and its attorneys must receive the following information from the exact proposed assignee of the Master Lease:

  (i) The exact name of the entity which is going to be designated as the proposed assignee;

  (ii) The proposed assignee's and any guarantor's tax returns and audited financial statements (or un-audited, if audited financials are not available) and any supplemental schedules for the calendar or fiscal years ending 2016, 2017, and 2018;

  (iii) The number of stores the proposed assignee operates and all trade names that the proposed assignee uses;

(iv) A statement setting forth the proposed assignee's intended use of the premises;

(v) The proposed assignee's retail experience and experience operating stores in a shopping center;

(vi) The proposed assignee's 2018 and 2019 business plans, including sales and cash flow projections; and

(vii) Any financial projections, calculations, and/or financial pro-formas prepared in contemplation of purchasing the Master Lease.

32. Until Wolf receives all of this information, the Debtors have not satisfied their burden pursuant to 11 U.S.C. § 365(b)(3).

## THE MASTER LEASE AND SUBLEASE MUST BE ASSUMED AND ASSIGNED *CUM ONERE*

33. Section 365(b)(3)(C) of the Bankruptcy Code provides that the assumption and assignment of a shopping center lease "is subject to all the provisions thereof . . . ." 11 U.S.C. § 365(b)(3)(C). Bankruptcy Courts have described the assumption of an unexpired lease (a prerequisite to assignment under § 365(f)(2)(A)) as "an all-or-nothing proposition – either the whole contract [or lease] is assumed or the entire contract [or lease] is rejected." See,e.g., *In re CellNet Data Systems, Inc.*, 327 F.3d 242, 249 (3d Cir. 2003).

34. As the court noted in *In re Washington Capital Aviation & Leasing*, 156 B.R. at 167, 175 n. 3 (Bankr. E.D. Va. 1993):

> Adequate assurance of future performance by the assignee is important because 11 U.S.C. § 365(k) "relieves the ... estate from any liability for any breach of such ... lease occurring after such assignment." A party subject to a contractually created obligation ordinarily cannot divest itself of liability by substituting another in its place without the consent of the party owed the duty. *See* Douglas G. Baird and Thomas H. Jackson, Bankruptcy 285 (2d ed. 1990) (citing Restatement (Second) of Contracts § 318(3) (1981) ("delegation of performance ... does not discharge any duty or liability of the delegating obligor")). While the assignee may be entitled to perform for the original obligor, the original obligor remains ultimately liable until discharged by performance or otherwise. Section 365(k) changes this common law rule and relieves the estate from all liability under the lease following assignment.

*See also In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) (Adequate assurance is "necessary to protect the rights of the non-debtor party to the contract or lease, because assignment relieves the trustee and the estate from liability arising from a post-assignment breach.").

35. The Debtors are not entitled to the benefits and protections of section 365(k) if they do not assume and assign a lease *cum onere* – with all benefits and burdens.

36. Thus, the Buyer or assignee must provide adequate assurance that they will pay all amounts due under the Master Lease and Sublease, including amounts for damages to Store #3483 and the surrounding area caused by Debtors *de facto* abandonment. The Buyer or assignee must be responsible to satisfy all such amounts, regardless of whether such amounts were incurred before or after assumption or assignment of the Master Lease and Sublease, including bringing the premises into compliance with all applicable building and safety codes and regulations and the ADA.

37. Further, the Buyer and assignee must provide adequate assurances that they will comply with all contractual obligations to indemnify and hold Wolf harmless under the Master Lease and Sublease with respect to events which occurred before assumption and assignment but which were unknown to Wolf as of the date of such assumption and assignment, including (i) claims for personal injury; (ii) damage and destruction to Store #3483 and the surrounding area; and (iii) environmental damage or clean up. To cure possible pre-assignment, non-monetary defaults and provide adequate assurance of future performance under the Master Lease and Sublease, the Buyer or assignee must be required to assume all responsibility for any and all such claims, notwithstanding anything contained in any court order or the Debtors must be required to demonstrate or obtain adequate insurance (by purchase of "tail" coverage or otherwise) in order to satisfy potential indemnification obligations based upon events and occurrences prior to the effective date of an assignment.

38. Finally, neither the Master Lease, nor Sublease can be assumed or assigned until all issues raised regarding the Global Sale Transaction are resolved.

## **JOINDER AND RESERVATION OF RIGHTS**

39. For the reasons set forth herein and above, Wolf hereby joins and adopts the legal and factual argument in the other objections to debtors' proposed assumption and assignment asserted by other landlords.

1004343                                        -10-
OBJECTION TO NOTICE OF ADDITIONAL DESIGNATABLE LEASES

40. Wolf reserves the right to amend and/or supplement this Objection, including, without limitation, to add or supplement the Supplemental Cure Amounts and/or to raise any additional objections to the potential assumption or assignment of the Master Lease or Sublease. Given the Debtors refusal to provide access to the interior of Store #3483 to Wolf, Wolf will require discovery in connection with any potential assumption or assignment so that it can continue to gather information regarding the extent of the damages caused by the Debtors' post-Petition Date breaches. In addition, a number of other agreements, pleadings and information may not yet be disclosed until after the filing of this Objection. Accordingly, Wolf expressly reserves the right to amend, supplement, and/or modify this Objection and to file in the future additional appropriate pleadings.

DATED: May 1, 2019                    WOLF, RIFKIN, SHAPIRO,
                                       SCHULMAN & RABKIN, LLP


                                       By:    /s/ Simon Aron
                                              SIMON ARON
                                       Attorneys for Creditor WOLF FAMILY SERIES
                                       LP d/b/a SERIES III, ONTARIO ENTERPRISES
                                       OF THE WOLF FAMILY SERIES LP