# DECLARATION OF ROSALIE RUBAUM

I, Rosalie Rubaum, declare as follows:

1. I am the manager of Wolf Family Series LP D/B/A Series III, Wolf Family Series LP D/B/A Series VII; Ontario Enterprises Of The Wolf Family Series LP (collectively "Wolf"), a landlord to debtor Kmart Corporation ("Debtor") with respect to the retail premises located at 2530 S. Euclid Avenue,, Ontario, California, which is designated by Debtor as "Store #3483".

2. As manager for Wolf, I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

3. In addition, I am the primary custodian of the books, records, files and other records of Wolf relating to lease with the Debtor. I have personally worked on said books, records, files and credit records of Wolf, and I have personal knowledge of the following facts, or have gained knowledge from the business records of Wolf maintained by me and its employees in the ordinary course of its business at or near the times mentioned herein. If called to testify in this action as to matters set forth in this Declaration, I could and would testify competently thereto.

4. This declaration is submitted in support of the concurrently filed *Objection Of Wolf Family Series LP D/B/A Series Iii, Wolf Family Series LP D/B/A Series VII, Ontario Enterprises Of The Wolf Family Series LP To (A) Notice Of Cure Costs And (B) Notice Of Assumption And Assignment Of Additional Designatable Leases* (the "Objection") in these chapter 11 cases with respect to the proposed assumption and assignment of certain leases, including a "Master Lease" and a related sublease (the "Sublease"), to Transform Holding LLC (the "Buyer"), which upon information and belief is an affiliate of ESL Investments, Inc.

5. Debtor executed a written lease dated May 2, 1979 (the "Master Lease"). The Master Lease applies to the premises and surrounding area located at 2530 Euclid

{01004389.DOCX;1 }

1  Avenue, Ontario, California leased by the Debtor from Wolf and identified by Debtor as
2  "Store #3483".  Store #3483 is part of an outdoor shopping center purposely developed
3  along Euclid Avenue in Ontario.  The shopping center is occupied exclusively by tenants
4  engaged in retail distribution of goods, has shared parking areas, and includes percentage
5  rent provisions and joint participation by tenants in trash removal and maintenance.  The
6  shopping center was anchored by Debtor, which rented a total of 97,714.71 square feet,
7  consisting of 84,180 square feet [K mart Store], 5,662 square feet [12-bay drive thru], and
8  7,872.71 square feet [Outdoor Garden Shop] (the "Premises").

9      6.    The Master Lease was entered into between Debtor and Wolf's predecessor,
10 Diversified Investment Company, a California general partnership. A true and correct copy
11 of the Master Lease is attached hereto as Exhibit "A".

12     7.    Additionally, Wolf leases back a portion of the leased property (the
13 "Sublease Land") from Debtor pursuant to the Sublease. On October 17, 1983, Debtor and
14 Furr's Cafeterias, Inc. ("Original Subtenant") entered into the Sublease for the Sublease
15 Land, which stated that Original Subtenant would construct a building on the Sublease
16 Land.  On June 22, 1994, Original Subtenant's successor assigned the Sublease to
17 predecessors of Wolf, which was eventually assigned to Wolf.  Subsequent amendments
18 between Wolf and Debtor resulted in a payment of $1250 from Debtor to Wolf, as
19 landlord, and a concurrent payment of $1250 from Wolf, as subtenant, to Debtor as tenant
20 under the Sublease.  More recently, both Wolf and Debtor agree to dispense with the
21 offsetting monthly payments under the Sublease.  The Sublease is intertwined with the
22 Master Lease.

23     8.    On January 10, 2019, Debtor closed Store #3483.  Since that date, the
24 Debtors effectively abandoned the Premises and the surrounding areas and had not once
25 secured, maintained, repaired or cleaned the premises or surrounding areas.

26     9.    I made numerous efforts to contact the Debtor's representatives during the
27 week after Store #3483 closed.  I received no response and, on January 17, 2019, Wolf
28

1004389                                    -2-

gave written notice of default under the Master Lease by reason of Debtors' failures to secure, maintain, repair or clean the Premises or surrounding areas.

10. The Debtor's defaults under the Master Lease have been continuous and, in addition, the Debtor failed to allow me or my representatives access to the interior of the Premises to conduct a thorough inspection. Beginning on January 11, 2019, and repeatedly thereafter, the Premises as well as the surrounding areas were breached by squatters who took up residence therein. Attached hereto as Exhibit "B" are true and correct copies of pictures taken of the Premises and surrounding areas during the period after January 11, 2019, by myself and agents of Wolf.

11. On January 11, 2019, the Debtor's locks and security alarm systems were rendered inoperative by the persons breaking and entering. Despite repeated notices and requests from Wolf's counsel, no one from the Debtor came to inspect, repair, secure or clean the premises. On a number of occasions, security engaged by Wolf and Ontario Police removed vagrants and squatters from inside the Premises and the surrounding areas. From January 10, 2019 to April 22, 2019, there have been 37 police and/or fire department calls to the premises for drugs, prostitution, street car racing, breaking and entering, and trespass resulting in numerous arrests. Attached hereto as Exhibit "C" are a true and correct copies of some of these reports.

12. In order to secure the Premises and surrounding areas, and since the Debtor continued to ignore the Premises and surrounding areas, we were forced to engage full time (24/7) security. Attached hereto as Exhibit "D" are true and correct copies of a sampling of the reports from Corporate Alliance Strategies, Inc.

13. On or about March 6, 2019, the Ontario Municipal Utilities Company shut off the water to Premises because of Debtors' failure to comply with testing of the backflow prevention devices. This triggered fire alarms that could not be silenced until police, fire and I entered the premises to disconnect that alarm. Since Debtor remained nonresponsive, I was required to install new fire and security alarms in order to protect the Premises from further damage and potential harm.

14. Finally, on April 3, 2019, I entered the Premises accompanied by a representative of the Debtor. Wolf and two contractors toured the interior, which was filthy with urine and feces. There was extensive damage to the flooring, electrical wiring, electric fixtures, walls and the general interior. Only half of the interior had power due to extensive neglect and damage. The condition of the interior was horrific and dangerous as I almost fell through the floor boards on the mezzanine level.

15. Wolf objects to the proposed assumption and assignment of the Master Lease and Sublease because the Debtor's Proposed Cure Amounts set forth in the "Designable Notice" falls far short of the actual costs, expenses and damages caused by the Debtor's continuous defaults under the Master Lease. Based only upon my limited access to the Premises on April 4, 2019, the amounts set forth below are due at a minimum in order to "cure" the defaults under the Master Lease. (the "Supplemental Cure Amounts"):

 a. Outstanding real property taxes, including penalties for non-payment of $36,061.99; [a true and correct copy of the outstanding tax bill is attached hereto as Exhibit "E"];

 b. Approximately $1,192,621.19 in costs, expenses and repairs caused by Debtors' ongoing and continuous breaches of the Master Lease [a true and correct copy of Wolf's accounting of these expenses is attached hereto as Exhibit "F"]; and,

 c. Approximately $13,327.00 in recurring monthly expenses caused by Debtors' ongoing and continuous breach of the Master Lease [as noted on Exhibit "F" hereto.

16. I further anticipate added costs and expenses to repair the interior and exterior of Premises. Until we can gain full access and conduct thorough inspection of the Premises and all systems and infrastructure, these amounts remain uncertain. I did receive an estimate from one of the contractors who toured the premises on April 3, 2019, who stated:

> I know that you are looking for cost to bring the store up to code and safe for retail. There are so many items that need attention before the store can open to the public. This store has been neglected for many years now and it would

1004389  -4-

take me another week to seek out all of the items that need to be resolved. I am going to just put a few items below so that you have a heads up moving forward. I hope this helps. ·     Complete store front doors and glass need to be removed and have new installed. I know that we just repaired the locks and replaced some too but the complete store entrance is in bad shape. ·     The sub floor on the 2nd floor has many areas that are falling apart and have holes in it. The handrails to the upstairs are not legal. ·     There is wood framing with chicken wire wrapped around it for security, but is dangerous. ·     The conveyor is unsafe to operate. ·     The store is full of broken pieces of several items that have been destroyed by the homeless when they were living inside. ·     All of the gondolas in the store are in bad shape and not useable. ·     There are several miscellaneous large items in the store that need to be removed before any upgrades can be started. ·     There are several pieces of broken glass throughout the store that effect the inside and the outside of the store. ·     There is a large area on in the rear of the store that the homeless has ruined breaking pieces and section off to make entry. This complete area we have boarded up recently for you. This complete section is on rollers and it is destroyed. ·     The complete plumbing system is not working , we found several of the toilets with different articles of clothing shoved down them to stop the water from overflowing when they were living inside. The urinals and toilets need major attention before they can be used again, and the majority will need to be replaced. ·     The restrooms were being used as housing and are in really bad shape, once the plumbing stopped working and the water stopped they were urinating and defecating on the floors in all of the restrooms. ·     The power supply inside the building with all the temp power poles for the registers are damaged, Most of the copper wires have been pulled from the inside of the store so there will be many items that need power to will not work until addressed. ·     We haven't even addressed the sprinkler system inside, this will have to be looked into before moving forward. The list could go on and on. You have Hundreds of thousands dollars of work here…."

17. I am informed and believes that the Premises must be brought up to code and made ADA compliant, which it is not.

18. In the ordinary course of its business, Wolf requires credit enhancements, in the form of security deposits, letters of credit and third party guaranties when leasing (or assessing a proposed assignment of a lease) to certain companies based on their financial information and history. In the case of a new company, particularly a recently-capitalized "newco" created for the purpose of acquiring distressed assets, Wolf would ordinarily seek substantial security in the form of cash deposits or letters of credit and/or written guarantees covering monetary obligations under assigned leases. The requirements for such additional security is dependent on the proposed tenant's financial information, which has not been provided to date.

19. Neither the Debtor, nor the Buyer has identified the proposed assignee of the Master Lease. Similarly, Debtor, the Buyer, and any proposed assignee have not provided any information analyzing the proposed assignee's current or projected financial condition or operational capabilities.

20. Neither Debtor, Buyer nor any assignee have to my knowledge proposed to invest the significant sums in the Premises that would be required to repair, remodel, restore and for other capital improvements that would demonstrate a long-term commitment to the Premises and potentially ameliorate some or all of Wolf's credit risk. Neither, to my knowledge, has Debtor, Buyer or any assignee made any such commitment to the Premises and, indeed, has presented no information demonstrating that it has the liquidity to do so.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed May 1, 2019, at Los Angeles, California.

/S/Rosalie Rubaum
**ROSALIE RUBAUM**