K-M ONTARIO

Lease Started April 1, 1980

**Parties**

THIS LEASE made and entered into as of this 2nd day of May, 1979, between Diversified Investment Company general partnership a California/ ~~corporation~~ having its principal office at 270 S. Bristol, Suite 201, Costa Mesa, California 92626 (herein referred to as "Landlord"), and K MART CORPORATION, a Michigan corporation having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**

1. Landlord does demise unto Tenant and Tenant does take from Landlord for the lease term the following property: Tenant's completed building ~~or buildings~~ (designated K mart ~~and Food Market~~), together with site improvements to be constructed as hereinafter specified by Landlord at its expense together with land comprising not less than nine & 3/10 ( 9.8 ) acres described in Exhibit "A", attached hereto and made a part hereof, and situated in the City of Ontario, County of San Bernardino, State of California; said building ~~or buildings~~ to be in the locations depicted on Exhibit "B" attached hereto and made a part hereof, and of the following dimensions:

K mart Store: 401'4" in Width by 209'9" in Depth....................84,180 sq.ft.

Plus 12-Bay Drive-Thru TBA........................5,662 sq.ft.

TOTAL K mart Store...........89,842 sq.ft.

Plus Outdoor Garden Shop with approximate dimensions of 66'3" x 113'10".

Said land, completed buildings and site improvements, together with all licenses, rights, privileges and easements, appurtenant thereto shall be herein collectively referred to as the "demised premises".

**Term**

2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that term is defined in Article 11 hereof, and shall terminate upon such date as shall be twenty-five ( 25 ) years from the last day of the month in which said date of occupancy by Tenant shall occur; provided, however, the term of this lease may be extended as provided in Article 13 hereof. The phrase "lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant to said Article 13.

**Annual Minimum Rental**

3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall designate in writing from time to time, an annual minimum rental of THREE HUNDRED SIXTY-EIGHT THOUSAND AND NO/100------------------------------------ DOLLARS ($ 368,000.00 ), unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of each month, in advance, commencing upon the first day of the lease term; provided, however, in the event the first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

**Additional Rental**

4. In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of TWELVE MILLION TWO HUNDRED THOUSAND AND NO/100------------------------------- DOLLARS ($ 12,200,000.00 ), Tenant shall pay to Landlord as additional rental an amount equal to one percent (1%) of gross sales exceeding TWELVE MILLION TWO HUNDRED THOUSAND AND NO/100------------------------------- DOLLARS ($ 12,200,000.00 ) ~~up to but not in excess of DOLLARS ($ ); and Tenant shall pay to Landlord as additional rental an amount equal to five-tenths of one percent (.5%) of gross sales for such lease year exceeding DOLLARS ($ ) up to but not in excess of DOLLARS ($ ).~~

**Additional Rental (continued)**

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall on or before the thirtieth (30th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of the demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on the demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A", except that the following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c) Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d) Service and interest charges for time payment accounts and charge accounts; **and**

~~(e) All sales of merchandise or services made by any food market which shall occupy any portion or portions of the demised premises; and~~

(e) ~~(f)~~ All sales of automotive gasoline or diesel fuel.

**Additional Rental (continued)**

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within ninety (90) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said ninety (90) day period and the Tenant shall be released from any further liability under this lease.

Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraph of this article shall be of no further force and effect.

**Real Estate Taxes**

5. Tenant shall pay and discharge all ad valorem real estate taxes and assessments which shall be levied against the taxable premises during the lease term, excluding therefrom payment of assessments which are incurred or levied as a result of Landlord's activity in developing the ~~demised premises for Tenant's occupancy~~. property shown on Exhibit "B".

To the extent permitted by law, Tenant may pay any such assessment in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with nor be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord, the rents payable hereunder or the demised premises except the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 5.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed THIRTY ONE THOUSAND AND NO/100-------------------------------------------------------- DOLLARS ($ 31,000.00 ) during any lease year, shall be hereinafter referred to as an "excess tax payment". All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year. In the event the excess tax payment for any lease year exceeds said additional rental due and payable during the same lease year, the amount by which said excess tax payment exceeds said additional rental shall be carried forward and be deductible from additional rentals due and payable for succeeding lease years on a cumulative basis.

The taxable premises, as defined below, shall be separately assessed if practicable from any contiguous lands and from any additional lands and improvements incorporated into the demised premises in the future.

In the event Tenant constructs, as provided in Article 16 hereof, additional buildings or structures on any portion of the land described in Exhibit "A", said additional buildings or structures shall be excluded from the taxable premises. Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall be paid and discharged by Tenant and shall not be deductible from additional rentals as provided herein.

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises. Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the taxable premises, the Tenant will cooperate in such proceedings.

**Real Estate Taxes (continued)**

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authorities. After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

The term "taxable premises", as used in this lease, shall be that certain land described in Exhibit "A" together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

**New Building by Landlord**

6. Tenant's said buildings and site improvements shall be completed and delivered to Tenant promptly and with due diligence. If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental restrictions, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay. Landlord warrants that a general contract for construction of said buildings and improvements referred to in Articles 1 and 12 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than **June 1, 1979** . If for any reason whatever Landlord shall fail to comply fully with this warranty, Landlord shall so notify Tenant in writing and in such event, Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to **May 1, 1980** , then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

**Drawings and Specifications**

7. Tenant's said buildings and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. **B-0419, containing such additions, changes and modifications as are more particularly set forth in those certain letters dated February 22, 1978, May 10, 1978 and August 11, 1978 written by Mr. James A. Kilgore, Manager, Design Division, K mart Corporation, 3100 West Big Beaver, Troy, Michigan 48084 to Diversified Investment Company, 1000 Quail Street, Suite 190, Newport Beach, California 92660, Attention: Mr. Jack Tarr, copies of which are attached hereto and made a part hereof, and marked as Exhibits "C", "C-1" and "C-2", respectively.**

**The parties hereto agree that the required steel deck roof assembly shall be treated as a construction extra.**

(a) Said working drawings are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department.

(b) Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

Drawings and Specifications (continued)

Said working drawings and specifications shall be submitted to Tenant for approval prior to commencement of construction and such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

Guarantee of Materials

8. Landlord shall unconditionally guarantee all work performed by or for Landlord in the construction of Tenant's buildings and site improvements against defective workmanship and materials for the period of one (1) year from the commencement of the lease term. Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it may receive.

Advance Possession for Fixturing

9. For a period of thirty (30) days prior to completion of Tenant's buildings by Landlord, as set forth in Article 11(b), Tenant shall have the privilege, rent free, of entering said buildings for the purposes of installing storage bins, storing merchandise, and other of Tenant's construction activities in conjunction with Landlord's preparation for Tenant's acceptance of said buildings, which shall not create unreasonable interference with the work of the Landlord. Such entry shall not be construed as an acceptance of the demised premises by the Tenant under the provisions of this lease or as a waiver of any of the provisions hereof.

Parking and Other Common Areas

10. Prior to commencement of the lease term, Landlord shall construct, in accordance with said working drawings and specifications approved by Tenant, on the premises described in Exhibit "A" and "A-1", all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (not Tenant's pylon) and related improvements, substantially as shown on said working drawings and specifications (all of which improvements shall hereinafter, along with the land thereon constructed, be referred to as the "common areas").

Landlord shall also construct or cause to be constructed upon certain property or rights-of-way contiguous to the premises described in Exhibit "A", all sidewalks, driveways, streets, curbs, acceleration, deceleration and stacking lanes, traffic controls, and signals, directional signs and related improvements in accordance with said working drawings and specifications and the requirements of any governmental bodies.

Landlord covenants and represents that at the commencement of the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways, as shown on said working drawings and specifications.

Landlord further covenants that the aggregate area provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than seven hundred ( 700 ) automobiles on basis of arrangement depicted on Tenant's working drawings and specifications.

At least sixty (60) days prior to the commencement of the lease term, Landlord shall provide paved driveways running from the adjoining public streets around the front, sides and rear of Tenant's buildings in order to secure convenient ingress and egress from said public streets to the front and rear entrances of Tenant's buildings for the purpose of receiving and delivering fixtures, merchandise and other property. Such driveways shall be of sufficient width to permit the passage, unloading, and if necessary, the turning around of trailer trucks and other commercial vehicles.

During the lease term, Landlord shall keep Tenant insured against all statutory and common law liabilities for damages on account of damage to property or injuries and loss of life sustained by any person or persons within said common areas, in a policy or policies in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) with respect to injury to any one person and in the amount of One Million Dollars ($1,000,000.00) with respect to any one accident or disaster, and in the amount of One Hundred Thousand Dollars ($100,000.00) with respect to damage to property; and Landlord shall also indemnify and save Tenant harmless against any such liability. Any such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

3483

Parking and Other Common Areas (continued)

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be objectionable to Tenant Landlord shall at its sole expense, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

~~Should Tenant, at any time, utilize portions of the common areas for outdoor shows, entertainment~~ CONTINUED ON ADDENDUM or such other uses which in Tenant's judgment tend to attract the public, ~~Tenant shall~~ give Landlord notification of such intended use, a reasonable time in ~~advance thereof,~~ and on request supply Landlord with reasonable proofs of adequate ~~insurance or indemnification~~ against damage to property, injuries to persons and loss of life ~~sustained in~~ connection therewith. In addition, Tenant shall be responsible for any ~~physical damage~~ to said common areas resulting from said use. Rent, if any, from such use ~~shall be included as part of "gross sales" under Article 4 hereof.~~

Store Opening

11. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's building/and site improvements shall be completed in accordance with said working drawings and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 16and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said building/ and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said building/and improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct, or remedy in all or part any such deficiency, and the cost therof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

Landlord's Representations and Warranties

12. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the building/ and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common areas in accordance with the provisions of Article 10 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" and "A-1" except as shown on said Exhibit "B".

Landlord further represents, warrants and covenants that the land described in Exhibit "A" will, at the time of the commencement of construction by Landlord and at the time of the commencement of the lease term, be properly zoned for Tenant's intended use, and that all necessary governmental consents, permits and approvals for such use shall have been obtained. Further, Landlord shall deliver to Tenant a Certificate of Occupancy prior to commencement of the lease term.

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof.

In the event Landlord's said representations and warranties shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant thereafter shall have the option of either completing said representations and warranties at Landlord's cost and expense, or, alternatively, Tenant shall have an option to terminate this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

Options to Extend Term

13. (a) Tenant shall have ten(10) successive options to extend the term of this lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term. If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or of this lease as extended.

3483

Options to Extend Lease (continued)

(b) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or any extension thereof. Tenant's rental during this option period shall be the same rental payable under the terms of this lease at the time Tenant notifies Landlord of its intention to exercise this option.

First Refusal to Purchase Option

THIS LEASE CONTAINS NO ARTICLE 14.

~~14. Anything in this lease contained to the contrary notwithstanding, and without in any manner~~ affecting or limiting any of the rights, privileges, options or estates granted to Tenant under this lease, it is agreed that if the Landlord at any time during the term of this lease (excepting the first lease year) receives one or more bona fide offers from third parties to purchase the demised premises or property of which the demised premises are a part, and if any such offer is acceptable to the Landlord, then Landlord agrees to notify Tenant in writing, giving the name and address of the offeror, and the price, terms and conditions of such offer, and Tenant shall have thirty (30) days from and after the receipt of such notice from Landlord in which to elect to purchase the property for the consideration contained in the bona fide offer. If Tenant does not elect to purchase said property and Landlord thereafter sells the property, the purchaser shall take the property, subject to and burdened with all the terms, provisions and conditions of this lease, including this Article 14 and the rights of the Tenant under this lease as against the new owner shall not be lessened or diminished by reason of the change of ownership. Tenant's failure at any time to exercise its option under this Article 14 shall not affect this lease or the continuance of Tenant's rights and options under this Article 14 or any other article.

In the event Tenant elects to purchase the property as provided in this lease, then Landlord shall, within thirty (30) days after receipt of such notice of election by Tenant, deliver to Tenant a title insurance policy in the amount of the consideration set forth in such offer, issued by a responsible title guarantee company, showing a good and marketable title in Landlord. If Landlord fails or refuses to furnish the title policy, then Tenant may, at its election, procure the same at Landlord's expense, and in the amount of the purchase price, and deduct the cost thereof from the cash consideration to be paid for the property. Tenant shall have thirty (30) days after receipt of the title policy in which to examine the title and notify the Landlord whether or not the title is acceptable to Tenant. If Tenant is willing to accept Landlord's title and consummate the purchase, then Landlord shall, within ten (10) days after written notice thereof from Tenant, convey the premises to Tenant by full warranty deed, free and clear of all liens and encumbrances except highway easements, private road easements and restrictions of record which were of record as of the date of Tenant's acceptance of the premises hereunder or incorporated in an amendment to this lease, if any, and deliver such deed to Tenant upon tender of the consideration.

Notwithstanding any other provisions of this lease, the provisions of this Article 14 will not apply to any sale of the demised premises or any property of which the demised premises are a part at foreclosure, and shall not be binding upon any purchaser at foreclosure, any mortgagee in possession, or any holder of a deed in lieu of foreclosure or the successors or assigns of any of the foregoing, or to any sale of the demised premises by Landlord in connection with sale and leaseback financing.

If Tenant is not willing to accept Landlord's title, Tenant shall make any objections thereto in writing to Landlord and Landlord shall be allowed one hundred twenty (120) days to utilize its best efforts to make such title acceptable to Tenant. If such title is not rendered marketable within one hundred twenty (120) days from the date of said written objections thereto, Tenant may, at its election, take such action, including instigation of legal process (in which the Landlord agrees to participate) to remedy any such defect in title making such acceptable to Tenant, and to deduct all costs thereof from the cash consideration to be paid for the property. If the Tenant is unable to correct such defects in title or elects not to attempt such remedy, neither party shall be held liable for damages to the other ~~party and both parties shall be released of all liabilities and obligations under this Article 14.~~

Repairs and Maintenance

15. Tenant shall make and pay for all maintenance, replacement and repair necessary to keep the demised premises in a good state of repair and tenantable condition, except for the following maintenance, replacement or repair which shall remain the Landlord's sole responsibility:

(a) all maintenance, replacement and repair to the roof, outer walls and structural portion of the buildings which shall be necessary to maintain the buildings in a safe, dry and tenantable condition and in good order and repair; and

(b) all repairs, maintenance or replacement of or to the demised premises, including but not limited to, underground utility installations and underground electrical conduit and wire, which are occasioned by settlement of the premises or a portion thereof, or caused by soil conditions; and

Repairs and Maintenance (continued)

(c) all repairs and replacement (exclusive of landscaping, sweeping, striping and snow and ice removal) necessary to maintain all driveways, sidewalks, street and parking areas free of all settling, clear of standing water, and in a safe, sightly and serviceable condition, free of chuck holes, fissures and cracks.

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the building~~s~~ or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Two Thousand Dollars ($2,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

Alterations and Additional Construction

16. Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its building~~s~~ as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural integrity of the building~~s~~ will not be impaired by such work. The term "structural changes", as used herein, shall not include moving of non-loadbearing partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

Tenant may, at its own expense, at any time, erect or construct additional buildings or structures on any portion of the demised premises. In such event gross sales made in or from said additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, said additional building or structure shall be excluded from the taxable premises and all ad valorem taxes and assessments levied thereon shall not be deductible from additional rents payable under the terms of Article 4 hereof. Tenant shall reimburse Landlord for any increase in insurance premiums attributable solely thereto. Tenant shall also be solely responsible for exterior and interior repairs thereto, except those necessitated by fire, the elements or other casualty. In the event Tenant constructs any such additions or new construction, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, and the number of parking spaces required under Article 10 shall be reduced by the number of spaces covered by such additional buildings or structures.

Utilities

17. Landlord covenants and agrees that the demised premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the lease term. Tenant shall pay all charges for utility services furnished to the demised premises during the lease term.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

Governmental Regulations

18. Tenant shall observe and comply with all requirements of rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said demised premises including the making of non-structural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes, including but not limited to, the erection of a fire escape or exit, or (b) require non-structural changes which would have been required irrespective of the nature of the tenancy, then in either such event, the same shall be complied with by Landlord at its sole expense.

Exculpation

19. Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Landlord owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon Landlord.

Damage to Demised Premises

20. ~~From and after the date on which Tenant shall be privileged to enter upon the demised premises~~ for the purposes specified in Article 9 hereof, Landlord shall insure the buildings ~~depicted~~ on Exhibit "B", including Tenant's buildings, against damage or destruction by ~~fire and~~ other casualties insurable under a standard extended coverage endorsement. Said ~~insurance~~ shall be in an amount equal to not less than eighty percent (80%) of the ~~insurable~~ value of the permanent improvements thereof. All such policies shall bear ~~endorsements~~ to the effect that Tenant shall be notified not less than five (5) days in ~~advance of~~ modification or cancellation thereof and that the assured has waived right of recovery ~~from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof so~~

**Damage to Demised Premises (continued)**

~~endorsed, shall be promptly delivered to Tenant upon written request therefor.~~ Irrespective of the cause thereof, Tenant shall not at any time be liable for any loss or damage to said buildings resulting from fire, explosion or any other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insurable under a standard fire and extended coverage endorsement Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding Twenty-five Thousand Dollars ($25,000.00), then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 13 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and upon the exercise of any such option (other than the option set forth in paragraph (b) of Article 13) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the said permanent improvements as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction by fire, the elements or any other casualty whatsoever, and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's buildings rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion ~~of the repairs, rebuilding and restoration required of Landlord herein.~~ SEE ADDENDUM.

In the event that, at any time during the lease term except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building ~~or buildings~~, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or Landlord may, at its option, elect to raze any buildings so damaged or destroyed and pave the area formerly occupied by said buildings so as to provide additional parking facilities, said areas to be paved, marked, lighted, drained and maintained in the same manner as required in Articles 10 and 15 hereof for other parking areas in the demised premises.

Each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

**Eminent Domain**

21. In the event all of Tenant's buildings constructed by Landlord shall be expropriated or the points of ingress and egress to the public roadways substantially as depicted on Exhibit "B" be materially impaired by a public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than ten percent (10%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

**Eminent Domain (continued)**

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ~~ten percent (10%)~~ fifteen percent (15%) of the land described in Exhibit "A", then, in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.

**Use, Assignment and Subletting**

22. The premises hereby demised may be used for any lawful purpose. Tenant may assign this lease or sublet the whole or any part of the demised premises, but if it does so, it shall remain liable and responsible under this lease.

**Signs**

23. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of the demised premises signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine. Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

**Ingress and Egress**

24. Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain, for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**

25. If Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

26. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**

27. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the land described in Exhibit "A", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

(a) Public utility easements not impairing Tenant's use of the demised premises.

(b) Other items of record not impairing Tenant's use of the demised premises.

a copy of an ALTA type policy of title insurance showing

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) ~~a certification by an attorney acceptable to Tenant~~ that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A" and "A-1", (b) a survey by a licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Covenant of Title (continued)**

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement executed by the fee owner of the demised premises wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such fee owner unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Subordination**

28. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**

29. During the lease term Tenant shall indemnify and save Landlord and Landlord's ground lessor, if any, harmless against all penalties, claims, or demands of whatsoever nature arising from Tenant's use of the Tenant's buildings except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord or Landlord's ground lessor, if any.

**Tenant's Right to Cure Landlord's Defaults**

30. In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, pay said principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of seven percent (7%) per annum or the then current prime rate, whichever is the higher, and Tenant may to the extent necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**

31. At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

**Holding Over**

32. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant, from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

**Investment Tax Credit**

33. Landlord hereby agrees to elect under the applicable provisions of the Internal Revenue Code of 1954, as amended, (hereinafter referred to as the "Code") to pass through to the Tenant all investment tax credit which may be available from time to time in respect of the demised premises under Section 38 of said Code to the extent such investment tax credit is not usable under said Code by the Landlord, its successors and assigns. Landlord agrees to timely execute all documents required by said Code, and regulations issued thereunder, to enable Tenant to obtain such investment tax credit.

**Investment Tax Credit (continued)**

Landlord further agrees to maintain adequate records so that the qualifying property can be identified and the cost thereof can be determined and to provide such records to the Tenant upon written request and otherwise to cooperate with Tenant in said matter. Landlord agrees not to destroy or otherwise dispose of such records until written consent to such destruction or disposal has been obtained from Tenant.

**Notices**

34. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Troy, Michigan, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service.

**Captions and Definitions**

35. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provision thereof. The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**

36. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memorandum of Lease**

37. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:

DIVERSIFIED INVESTMENT COMPANY

By: DIVERSIFIED ASSOCIATES, Its General Partner

By: ____________
Ranney E. Draper, General Partner

By: DIVERSIFIED INVESTMENT COMPANY

By: ____________
Charles J. Tarr, General Partner

K MART CORPORATION

By: ____________ Vice President
J. P. Johnson

Attest: ____________ Assistant Secretary
C. E. Lotzar, Jr.

APPROVED

same.

WITNESS my hand and official seal.

OFFICIAL SEAL
SHARON L. COONEY
NOTARY PUBLIC—CALIFORNIA
PRINCIPAL OFFICE IN
ORANGE COUNTY
My Commission Expires Aug. 30, 1982

Sharon L. Cooney
Notary Public in and for said County and State

STATE OF CALIFORNIA )
) SS.
COUNTY OF ORANGE )

On this 22nd day of May, 1979, before me, the undersigned, a Notary Public in and for said County and State, personally appeared Ranney E. Draper, known to me to be one of the partners of Diversified Associates, a partnership, said partnership being known to me to be one of the partners of Diversified Investment Company, the partnership that executed the within instrument and acknowledged to me that they executed the same as partners of the partnership first above named, that said partnership executed the same as a partner of Diversified Investment Company, and that said last named partnership executed the same.

WITNESS my hand and official seal.

OFFICIAL SEAL
SHARON L. COONEY
NOTARY PUBLIC—CALIFORNIA
PRINCIPAL OFFICE IN
ORANGE COUNTY
My Commission Expires Aug. 30, 1982

Sharon L. Cooney
Notary Public in and for said County and State

STATE OF MICHIGAN }
COUNTY OF OAKLAND } ss:

I do hereby certify that on this 29th day of June, 1979, before me, Margaret T. Grant, a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared J. P. Johnson and C. E. Lotzar, Jr., known to me to be the Vice President and Assistant Secretary of K mart Corporation, who, being by me duly sworn, did depose and say that they reside in Birmingham, Michigan respectively; that they are the Vice President and Assistant Secretary respectively of K mart Corporation, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

**In** Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Margaret T. Grant
Notary Public

My commission expires: MARGARET T. GRANT
Notary Public, Oakland County, Mich.
My Commission Expires June 30, 1981

THIS ADDENDUM, CONSISTING OF TWO PAGES, IS ATTACHED TO AND FORMS A PART OF THAT CERTAIN LEASE DATED MAY 2, 1979, BETWEEN K MART CORPORATION, AS TENANT, AND DIVERSIFIED INVESTMENT COMPANY, AS LANDLORD, FOR PREMISES IN ONTARIO, CALIFORNIA

ARTICLE 10
Parking and Other Common Areas (cont'd)

Landlord hereby reserves a non-exclusive easement over and upon the common area of the demised premises for vehicular and pedestrian ingress and egress, and for the parking of motor vehicles for itself, its tenants occupying space in buildings located on land described in Exhibit "A-1" and such tenants' customers, invitees, licensees, agents and other employees.

Landlord hereby gives and grants a non-exclusive easement over and upon the common area of the land described in Exhibit "A-1" for vehicular and pedestrian ingress and egress and for the parking of motor vehicles to Tenant and Tenant's customers, invitees, licensees, agents and employees.

The parties hereto agree to execute and file with the county recorder of San Bernardino County, California, a Declaration of Easement running with the property, which document reflects the reciprocal easements described above.

ARTICLE 20
Damage to Demised Premises

From and after the "date of occupancy by Tenant", as that term is defined in Article 11 hereof, should Tenant's net worth at any time be less than One Hundred Million Dollars ($100,000,000), upon written request of the landlord or Mortgagee, Tenant shall procure fire insurance with extended coverage endorsement upon the building erected by Landlord pursuant to Article 6 hereof in an amount equal to eighty percent (80%) of the replacement value of the building above the foundation walls. At any time while Tenant's net worth shall exceed One Hundred Million Dollars ($100,000,000), the Tenant may elect to self-insure its obligation to restore.

Policies of fire insurance procured pursuant to this article shall assure and be payable to Landlord, Tenant and mortgagee and shall provide for release of insurance proceeds to Tenant for restoration of loss. Landlord and Landlord's mortgagee, if any, shall be furnished certificates from the insuring company showing the existence of such insurance. In case of loss, Tenant is hereby authorized to adjust the loss and execute proof thereof in the name of all parties in interest.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insurable under a standard fire and extended coverage endorsement, Tenant shall, at its expense, promptly and with due diligence either (a) repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction, or, (b) repair, rebuild and restore the same for the same use and purposes but in accordance with such plans and specifications as are then generally in use by Tenant for the construction of K marts and related structures, provided, however, the repaired, rebuilt or replaced building shall have a value not less than its value just prior to said loss. Anything herein to the contrary notwithstanding, it is understood and agreed that (a) if as a

ARTICLE 20
Damage to
Demised
Premises
(Cont'd)

result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding One Hundred Thousand Dollars ($100,000), or (b) if such damage or destruction shall take place during the last five (5) years of the lease term and if the cost of restoration thereof would exceed fifty percent (50%) of the cost to replace Tenant's building in its entirety at the time such damage or destruction takes place, then Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice to the Landlord within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event this Lease shall so terminate, if Tenant is then carrying fire insurance to eighty percent (80%) of the replacement value, all the insurance proceeds shall belong to Landlord or Landlord's mortgagee as their interests may appear or if the property is then self-insured Tenant shall reimburse Landlord or Landlord's mortgagee for an amount equivalent to the insurance proceeds that would have been paid had insurance been in force, but not to exceed eighty percent (80%) of the replacement value of the building above the foundation walls. In the event this Lease shall be so terminated, all unearned rent and other charges paid in advance shall be refunded to Tenant.

K MART DEMISED PREMISES

(PARCEL 1)

A portion of Lots 32 and 33, in Section 6, Township 2 South, Range 7 West, S.B.M., according to map of Subdivision of part of Rancho Santa Ana Del Chino, as per Map Recorded in Book 6, Page 15, of Maps, Records of San Bernardino County, California, described as follows:

Beginning at the northeast corner of said Lot 32, being at a point on the west line of Euclid Avenue, 200.00 feet wide; thence along said west line, South 390.37 feet; thence South 89° 47' 00" West, 155.78 feet; thence South, 225.00 feet to the north line of Walnut Street, 88.00 feet wide; thence along said north line, South 89° 47' 00" West, 596.55 feet; thence North, 615.60 feet to the north line of said Lot 32; thence along said north line, North 89° 48' 04" East, 752.33 feet to the True Point of Beginning.

BALANCE OF SHOPPING CENTER

(PARCEL 2)

A portion of Lot 33, in Section 6, Township 2 South, Range 7 West, S.B.M., according to Map of Subdivision of part of Rancho Santa Ana Del Chino, as per Map Recorded in Book 6, Page 15, of Maps, Records of San Bernardino County, California, described as follows:

Beginning at a point on the west line of Euclid Avenue, 200 feet wide, distant thereon South, 390.37 feet from the northeast corner of Lot 32 of said Map; thence along said west line, South 210.06 feet to the beginning of a tangent curve, concave northwesterly and having a radius of 15.00 feet; thence southwesterly along said curve through a central angle of 89° 47' 00", an arc distance of 23.51 feet, a chord bearing and distance of North 44° 53' 27" East, 21.17 feet, to a point of tangency on a line parallel with, and 44.00 feet north of the centerline of Walnut Street as measured at right angles; thence along said parallel line, South 89° 47' 00" West, 140.84 feet; thence North, 225.00 feet; thence North 89° 47' 00" East, 155.78 feet to the Point of Beginning.

EXHIBIT "A-1"

K mart CORPORATION

INTERNATIONAL HEADQUARTERS

3100 WEST BIG BEAVER ROAD
TROY, MICHIGAN 48084
(313) 643-1000

February 22, 1978

Diversified Investment Company
1000 Quail Street - Suite 190
Newport Beach, CA 92660

Attention: Mr. Jack Tarr

Re: K mart # - Ontario, CA
NWC Euclid Ave. & Walnut St.

Dear Mr. Tarr:

At the request of Mr. W. F. Herrington of our Real Estate Department, we are forwarding to you two (2) sets of Typical Plans and Outline Specifications identified with the set number B-0419, covering our minimum requirements for the construction of a K mart.

The Typical K mart Store plans and specifications consist of the following:

401'-4" x 209'-8" K mart plans all dated September 1, 1975

10A1 thru 10A9 10E1 thru 10E7 10M1 thru 10M11

K mart Pylon Sign drawing NS-18 dated March 7, 1975

Outline Specifications dated August 1, 1975 including a Net Lease Appendix dated revised September 30, 1976, sheets SPR-8, SPR-8a and SPR-8b all dated revised through January 1, 1976, sheet SPR-9 dated March 15, 1976, sheets SPR-15 through SPR-15f all dated revised February 1, 1978, sheets SPR-16, SPR-16a and SPR-16b all dated September 30, 1976, sheets SPR-17 and SPR-17a dated February 15, 1977, sheet SPR-18 dated February 17, 1977, SPR-20, Special Code Requirements, dated May 20, 1977, sheets SPR-25 thru SPR-25c dated August 15, 1977, and SPR-28, Elimination of Wood Roof Construction, dated February 1, 1978.

The Typical K mart store plans and specifications described above are to be modified as indicated in the criteria revisions outlined in the following paragraphs.

1. Stereo Displayer Plugmold consisting of drawing E-266 dated December 4, 1975.

2. Service Desk Wiring Detail consisting of drawing E-267 dated December 23, 1975.

3. Aluminum Door & Frame Reinforcing consisting of drawing TD-1 dated March 15,

4. Vestibule Plan for 3'-0" Wide Doors consisting of drawing TD-9 dated March 15, 1976.

5. Manager's Office Partitions consisting of drawing TD-10 dated May 27, 1976.

6. Typical Signal System consisting of drawing E-272 dated May 18, 1976.

7. Power and Communication Wiring (ARS) consisting of drawing 10ARS/KPE-1R dated revised November 3, 1977.

8. Observation Window at Dwarf Partition consisting of drawing TD-12 dated June 8, 1976.

9. Enlarged Outdoor Garden Shop consisting of drawing TD-15 dated revised February 2, 1977.

10. One Line Diagram for A.R.S. 726/255 Electrical System consisting of drawing E-273 dated revised August 10, 1976.

11. Illuminated Sign at (6) Bay Auto Service Center consisting of drawing TD-19 dated June 16, 1976.

12. Handicapped Parking Sign consisting of drawing TD-20 dated revised December 6, 1976.

13. Enlarged Entrance Ramp consisting of drawing TD-22 dated revised December 6, 1976.

14. Sales Area Lighting and Diffuser Layout (for lighting 12'-0" on centers with energy saving lamps) consisting of drawing 10E2/10M2 dated revised April 1, 1977.

15. Security Office consisting of drawing TD-24 dated January 5, 1977.

16. Canopy Over Truck Dock consisting of drawing TD-29 dated January 10, 1977.

17. Partial Floor Plan consisting of drawing TD-26 dated January 6, 1977.

18. Hang Rods For Infants Department consisting of drawing TD-33 dated August 12, 1977.

19. Minimum Heavy Duty Paving consisting of drawing TD-37 dated August 12, 1977.

20. Jewelry & Camera Department consisting of drawing E-293R dated November 22, 1977.

21. Cafeteria Power Plan consisting of drawing E-296R dated revised October 10, 1977.

22. Cafeteria Plumbing Plan consisting of drawing SK-PL-3R dated September 16, 1977.

23. Revised Mezzanine Stock Area consisting of drawing TD-40 dated October 24, 1977.

24. Detail of Plugmold for Small Appliances consisting of drawing E-302 dated November 15, 1977.

25. Relocated Shelving "C" consisting of drawing TD-42 dated January 10, 1978.

26. Condensing Unit Support consisting of drawing TD-43 dated January 10, 1978.

The auto service center equipment designated as E-3, E-8, E-8a and E-9 and described on sheets 10A8 and 10M10 of the criteria documents will be Rotary Equipment. We are, therefore, including two (2) copies of Dover Corporation shop drawing PR721014 revised through March 11, 1975.

These plans and specifications describe a 401'-4" wide x 209'-8" deep K mart, containing 84,180 square feet, with the Auto Service Center to the right. At this location, however, the K mart is opposite hand. We are including a Preliminary Layout B-0419 dated February 8, 1978 for this size and hand store. This drawing also indicates the required modification to the Typicals for this specific location.

Please advise your consultants regarding the following mechanical and electrical information which supplements and/or modifies the enclosed drawings and specifications.

Secondary electric service is acceptable. No power factor correction is required. Utility transformer shall be located where shown on layout.

The three compartment delicatessen sink required by criteria revision is Washington Equipment Company Model #SSK-1; NSF approved stainless steel body construction enclosed on three (3) sides; 10" high back splash; three (3) 14" x 16" x 12" deep sinks; three (3) basket strainers; one (1) standard faucet with 14" spout; stainless steel kick plates; three (3) sides with standard raised "V" edge and with removable front panel. "No alternates". This supersedes the three (3) compartment sink indicated in the criteria specifications.

NOTE: No underfloor plumbing changes will be required because of this change of sink units.

Delete electrical for Curtain Displayers. This includes:

a. 2 - 120 V. circuit.
b. Approx. 60' underfloor duct.
c. 48-40 watt fluorescent lamps.
d. All electrical connections.

In Advertising and Merchandising Manager's Office provide and install 10'-0" of plugmold - Wiremold #2000 - single circuit type - 12" o/c in lieu of one duplex receptacle on one wall, on the other, shorter wall install 6'-0" of plugmold instead of one duplex receptacle.

For each lighting and appliance panelboard, provide metal framed directory cardholders with typewritten circuit directory.

Electrical contractor shall provide and install manual motor starters for motor-compressed unit at Griddle Stand refrigerated drawers, refrigerated display case and the carbonator in the cafeteria.

Delete separate empty 3/4" conduit in floor from service desk to fifth checkout.

Delete all special 120 volt and communication outlets, wiring and conduit in General Office for ARS equipment. Also delete special 120 volt and communication outlet in Cashier's office for electronic cash register. Circuit breakers to remain in CR panel as spares.

Delete Jewelry Dept. special lighting as shown on Drawing 10E-2 & 10E-5.

In lieu of Edwards #88-100 transformer for low voltage signal and electrical door latches use Edwards #599 transformer.

Firm gas, if available, shall be utilized for space heating, domestic hot water heater and cooking equipment. Landlord's consulting engineer shall verify availability of firm natural gas and obtain a commitment from Southern California Gas before proceeding with design drawings. When firm commitment is obtained, Landlord shall advise K mart Corporation, Public Utility Department accordingly.

All gas infra-red heaters shall be mounted at 30 degree angle. Infra-red heaters located at the Checking-Receiving Area and in the Building Supplies Area (where applicable) shall maintain 16'-0" clearance from center line of heater to rear wall and are to be mounted 14'-0" above finished floor. Suspend infra-red heaters with pipe hangers (chain hangers are not acceptable).

All stock rooms, both upper and lower levels, shall be air conditioned. See drawing Nos. 10M2 and 10M4 which show dotted lines to auto stock departments which branch from main system (A.C. unit #4); layaway storage area which branches from main system (A.C. unit #6); plus an independent air conditioning system for bulk storage, stock room area, checking and receiving and candy room (A.C. unit #10). When stock rooms are air conditioned, Power Roof Exhausters #2 and #6 shall be eliminated.

Provide one (1) meter for each utility to the K mart.

The K mart parking lot lighting, sidewalk (under canopy) lighting and service drive lighting shall be connected directly to K mart switchboard through K mart meter except where the site includes one or more co-tenants the parking lot lighting in front and on the Auto Center side shall be fed through the K mart meter and the remaining portion on the Landlord or other meters.

All underground oil and air piping in Auto Service area shall be black iron pipe coated with polyvinyl caloride or polyethylene.

All sprinkler lines shall be run concealed in General Offices, corridors and all other finished areas, avoiding interferences with lights, ducts, pipes, etc. Exposed piping in finished areas will not be acceptable.

Landlord's engineer shall consult the telephone company relative to proper facilities, including conduit, to handle the telephone installation.

These sets of Typical plans and specifications are to be used only as a guide for the preparation of complete working drawings and specifications. If, at the time this project is formalized, modifications which affect electrical or plumbing underfloor locations have occured additional information covering such modifications will then be furnished.

Very truly yours,

James A. Kilgore, A.I.A.
Manager, Design Division
Construction Department

JAK:1al
cc: Mr. G. L. Hostetter
Mr. W. J. Mottershaw
Mr. A. D. Kerkau
Mr. W. F. Herrington
Public Utilities
Mr. P. Leonard - K.E.I.

K mart CORPORATION

INTERNATIONAL HEADQUARTERS

3100 WEST BIG BEAVER ROAD
TROY, MICHIGAN 48084
(313) 643-1000

May 10, 1978

Diversified Investment Company
1000 Quail St. Suite 190
Newport Beach, CA 92660

Attention: Mr. Jack Tarr

Re: K mart #3483 - Ontario, CA
NWC Euclid Ave. & Walnut St.

Dear Mr. Tarr:

Under my cover letter of February 22, 1978 we did forward to you two (2) sets of Typical Plans and Outline Specifications, identified with the set number B-0419, for a 401'-4" wide by 209'-8" deep K mart. Since that time it has been determined that a twelve (12) Bay Drive-Thru Auto Service Center will be incorporated into the K mart at this location.

At the request of Mr. W. F. Herrington of our Real Estate Department, we are forwarding to you two (2) sets of supplementary drawings describing the twelve (12) Bay Auto Service Center. These drawings are to be used in conjunction with the criteria drawings sent to you on February 22, 1978.

Supplemental drawings dated January 25, 1978

10A2b 10A8b 10M6b 10E4b
10A4b 10M10b

Specification Sheets SPR-26 thru SPR-26b dated December 5, 1977.

We are also enclosing two (2) prints of the Preliminary Layout B-0419 dated February 8, 1978 and revised thru April 26, 1978 indicating this twelve (12) Bay Auto Service Center.

During the period between the issuance of the typical criteria documents and the writing of this letter, certain revisions and modifications have been added to the criteria for implementation into the contract documents. In order that you and your Architect might incorporate these revisions and modifications into your contract documents, we are forwarding to you at this time two (2) copies each of the criteria revisions described in the following paragraphs.

1. Specification Sheets SPR-30 thru SPR-30b dated April 12, 1978.

2. Power and Communication Wiring for ARS consisting of drawing 10bARS/KPE-1R dated April 14, 1978. This drawing supersedes similar drawing dated November 3, 1977 previously issued.

3. One Line Diagram for ARS 726/255 Electrical System consisting of drawing E-273 dated revised June 17, 1977. This supersedes similar drawing dated August 10, 1976 previously issued.

4. Revised Insulation and Sheathing at Main Entrance Canopy consisting of drawing TD-45 dated February 8, 1978.

5. Telephone Locations - Appliance Dept. consisting of drawing E-303 dated February 22, 1978.

Please advise your consultants regarding the following mechanical and electrical information which supplements and modifies the information and/or drawings forwarded to you under my letter dated February 22, 1978.

A Lavatory is no longer required in the Lay-a-way Room. This item, along with associated hot and cold water piping, waste, vent and all related accessories, are to be deleted from your drawings and specifications.

The aforementioned criteria revisions are to be implemented into your contract documents prior to their submission for our approval. Any cost adjustments resulting from these revisions are to be submitted to Mr. W. J. Mottershaw, Manager, Building Division, Construction Department, the K mart Corporation within sixty (60) days of receipt of this letter for approval and construction authorization. Failure to submit any anticipated cost adjustments within this sixty (60) day period shall be deemed, at the discretion of the K mart Corporation, either a "No Change" in construction cost or in the event a construction cost rebate is in order, the rebate will be negotiated with the K mart Corporation.

These sets of Typical plans and specifications are to be used only as a guide for the preparation of complete working drawings and specifications. This project has been assigned a number (#3483) and you are at liberty to proceed with contract drawings and specifications. Please notify the writer and Mr. W. J. Mottershaw, Manager, Building Division, of the names and addresses of your architect, engineers and contractors as soon as possible.

Very truly yours,

James A. Kilgore, A.I.A.
Manager, Design Division
Construction Department

JAK:lal
cc: Mr. G. L. Hostetter
Mr. W. J. Mottershaw
Mr. A. D. Kerkau
Mr. W. F. Herrington
Public Utilities
Mr. P. Leonard, K.E.I.
Ms. H. T. Kremski

EXHIBIT "C-1"
Page 2 of 2