**Hearing Date and Time: May 21, 2019 at 10:00 a.m. (Eastern Time)**
**Objection Deadline Date and Time: May 14, 2019 at 4:00 p.m. (Eastern Time)**

FERRAIUOLI LLC
390 N. Orange Avenue
Suite 2300
Orlando, Florida 32801
Telephone: (407) 982-7310
Facsimile: (787) 766-7001
Email: scolon@ferraiuoli.com
Email: gchico@ferraiuoli.com

Attorneys for *Santa Rosa Mall, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND MEMORANDUM IN SUPPORT THEREOF AND/OR TO DECLARE THAT THE INSURANCE PROCEEDS ARE NOT PART OF THE BANKRUPTCY ESTATE

TO THE HONORABLE COURT:

COMES NOW Santa Rosa Mall, LLC ("Santa Rosa Mall"), by and through its undersigned counsel, and pursuant to 11 U.S.C. §§ 362(d)(1), Fed. R. Bankr. P. 4001(d) ("Rule 4001(d)"), Rule 4001-1 of the Local Bankruptcy Rules for the Southern District of New York ("LBR 4001-1"), and the Amended Case management Order (Docket No. 405), hereby moves for relief from the automatic stay for cause as follows:

### Jurisdiction and Venue

This Honorable Court has jurisdiction over the present controversy pursuant to 28 U.S.C. § 157, 1334 and 11 U.S.C. § 362. Venue is proper under 28 U.S.C. § 1409.

### Factual and Procedural Background

1.     Sears Holding Corporation and its affiliated co-debtors (collectively, the

"Debtors"), filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on

October 15, 2018 (the "Petition Date"). The Debtors continue to operate their business and manage

their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

2.      Pursuant to a *Lease Agreement* executed by Santa Rosa Mall and Sears, Roebuck

of Puerto Rico, Inc. ("Sears") on September 22, 1965, Sears leases from Santa Rosa Mall its anchor

store ("Store No. 1915" or the "Demised Premises"). A copy of the *Lease Agreement* was duly

filed with the Court at Docket No. 1240-1 (the "Lease Agreement").

3.      In addition to the fixed rent, the *Lease Agreement* includes other monetary and non-

monetary obligations typical of commercial leasing agreements, including the payment of common

area maintenance fees. See *Lease Agreement* at § 2.01, p. 12; § 2.03, p. 14.

4.      As part of its non-monetary obligations, the *Lease Agreement* requires Sears to

"keep the Demised Premises [] in good order and repair and in such condition as may be required

by law and by the terms of any insurance policies covering the Demised Premises", including

repairs that are "extraordinary as well as ordinary and whether or not such repairs shall be of a

structural nature []". Id. § 4.01, p. 23.

5.      Section 4.01 of the *Lease Agreement* further extends Sears' obligation for

maintenance and repair, and requires that:

> [Sears] pay and discharge, and indemnify and save harmless [Santa Rosa Mall]
> against and from all liabilities, obligations, damages, penalties, claims, costs, charges
> and expenses, including reasonable attorneys' fees, which may be imposed upon to
> incurred by or asserted against [Santa Rosa Mall] by reason of [] [a]ny work or thing
> done in, on or about the Demised Premises or any part thereof; [a]ny [] maintenance,
> repair or management of the Demised Premises []; [and/or] [a]ny failure on the part
> of [Sears] to perform or comply with any of the covenants, agreements, terms or
> conditions contained in [the] lease on its part to be performed or complied with.

Id. § 4.03, pp. 23-24.

6.      Section 6.01 of the *Lease Agreement further* requires that Sears "maintain at [its]

sole cost and expense, for the benefit of [Santa Rosa Mall] and [Sears], insurance with respect to

the Demised Premises" for risks including "windstorm". Id. § 6.01(a), p. 26. Such insurance policy

"shall be secured promptly and certificates thereof shall be furnished to [Santa Rosa Mall]" and

"shall contain loss payable clause to [Santa Rosa Mall] and [Sears]". Id., § 6.02(a), pp. 26-27.

Renewals of the insurance policies are also subject to the foregoing. Id., 6.02(b), p. 27.

     7.     In the event of damage by windstorm or any other casualty to the Demised Premises

in an amount over $100,000, such as that caused by Hurricanes Irma and Maria, Section 6.03(b)(2)

of the *Lease Agreement* requires Sears "proceed with all reasonable expedition to restore or rebuild

[] the building so destroyed or rendered untenantable, free from liens of any kind, in substantial

accordance with the plans and specifications of the building so destroyed or rendered untenantable

[]". Id., § 6.03(b)(2), p. 28. Section 6.03(b)(2) activates the requirements specified in Section 5.02

of the *Lease Agreement*, which requires that Sears "furnish to [Santa Rosa Mall] a duplicate set of

the working plans, sketches and specifications for the proposed work", "at its own cost and expense

obtain or cause to be obtained all the insurance coverage specified in Section 3.04", and that "[a]ny

alteration or addition [] be carried out in such a way  as to interfere as little as is reasonably possible

with the operations of the Shopping Center []". Id., § 5.02(a), (c) and (d), p. 25.

     8.     Section 6.03(b)(3) of the *Lease Agreement* further mandates as follows:

> **The net sums recovered by [Santa Rosa Mall] and [Sears] on account of loss or damage whether under the policies taken out as aforesaid, or under other insurance policies taken out by [Sears] and indemnifying for <u>physical loss</u>** (as distinguished from the loss of use and occupancy. or profits), **shall by <u>deposited in a special account in the name of [Santa Rosa Mall]</u> separate and distinct from all other funds of [Santa Rosa Mall] <u>in a bank or trust company of the City of San Juan, Puerto Rico, approved by [Santa Rosa Mall] and [Sears]</u> to be applied on account of the cost of such restoration or rebuilding**, as the case may be, as the work of restoration or rebuilding progresses, and [Sears] shall pay any and all additional moneys required in such restoration or rebuilding in excess of said net sums recovered, and shall be entitled to receive any surplus, if any, remaining of said deposit after such restoration .. or rebuilding has been completed as aforesaid,

provided, however, that should the aforesaid damage by fire or other casualty occur within the last three years of the initial term or any extended term this lease, [Sears] shall have the option to surrender the proceeds of any insurance to [Santa Rosa Mall] and vacate the premises.

Id., § 6.03(b)(3), pp. 28-29 (emphasis and underline added).

9.     The deposit of the insurance proceeds in a separate account is essential and Section

6.03(d) explains its importance:

> If [Sears] does not commence promptly to repair or restore the injury or destruction, or if, having commenced the repair or restoration, [Sears] does not proceed diligently to complete the same, [Santa Rosa Mall] shall be entitled (but shall be under no obligation) at any time thereafter to enter the Demised Premises and repair or restore the injury or destruction and to apply any insurance proceeds in the said special account to the payment of the cost thereof; but if the insurance proceeds are insufficient for the cost of the repair, restoration or reconstruction, [Sears] shall pay to [Santa Rosa Mall], upon demand and as additional rent as the work progresses; such amounts as shall be necessary to complete the repair, restoration or reconstruction.

Id., § 6.03(d), p. 29.

10.    On or about May 30, 2017, a Sears obtained a *Contract of Insurance* (the "*Contract of Insurance*") for Policy No. PTNAM1701557 (the "*Insurance Policy*") for the period of June 1, 2017 to June 1, 2018 with AIG Europe Limited.  Pursuant to the *Contract of Insurance*, Santa Rosa Mall is included among the insured.

11.    On or about October 25, 2017, Aon Risk Services Central, Inc. issued a *Certificate of Insurance* regarding Policy No. PTNAM1701557 for the period of June 1, 2017 to June 1, 2018 issued by AIG Europe Limited.  A copy of the *Certificate of Insurance* was filed with the Court at Docket No. 1240-1.  As stated in the *Certificate of Insurance*, the coverage limit of the *Insurance Policy* is of $50,000,000. Id.  The "Additional Remarks Schedule" of such *Certificate*, under Special Conditions /other Coverages "Santa Rosa Mall LLC … and Commercial Management…, LLC (sic) are included as Loss Payee in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location."  The *Certificate of Insurance* when refers "Location of the Premises" to "Sears

Store No. 1915 – Santa Rosa Mall, Bayamon, PR". Id.

12.    Sears has operated Store No. 1915 at Santa Rosa Mall since 1965 until the passing of Hurricane Maria on September 20, 2017, when it closed its doors.  The Court may take judicial notice of the passing of Hurricane Maria, as well as its trajectory and aftermath under Fed. R. Evid. 201.

13.    Store No. 1915 has been, and continues to be, the "anchor" of the Santa Rosa Shopping Mall.  As such, it is the main driver of traffic for other tenants who have suffered from Store No. 1915's closure and may exercise their right to terminate their respective leases if Sears, an assigned, or a replacement tenant does not operate the Demised Premises soon.

14.    The thirteen-month period between the passing of Hurricane Maria and the Petition Date, Sears had ample time to rebuild the Demised Premises and reopen the store, however, the scope of the work completed was limited to demolition, clean up and roof replacement.

15.    After the Petition Date, the Debtors suspended all reconstruction efforts in the Demised Premises.

16.    On November 1, 2018, the Debtors filed a *Motion for Approval of Global Bidding Procedures* (the "*Global Bidding Procedures Motion*", Docket No. 429) in connection with a sale or disposition of certain assets of Sears and its debtor affiliates (the "*Global Bidding Procedures*").

17.    On November 19, 2018, the Court entered an *Order Approving Global Bidding Procedures and Granting Related Relief* (the "*Global Bidding Procedures Order*", Docket No. 816) regarding the sale/disposition of certain assets, scheduling auctions and hearings for approval of proposed sale transactions and approving the procedures for the assumption and assignment of executory contracts and unexpired non-residential leases.

18.    On November 21, 2018, the Debtors filed a *Notice of Filing of Global Bidding Procedures Process Letter* (the "*Process Letter*", Docket No. 862) soliciting bids for all or some

of Sears' stores and related assets identified as "Go Forward Stores", either on a going concern basis or on a liquidation basis. Pursuant to the asset schedule attached thereto, Sears identified Santa Rosa Mall as a "Go Forward Store". Id., p. 43, line no. 381.

19.    On December 20, 2018, Santa Rosa Mall filed a *Motion for Entry of Order for the Debtor to: (i) Disclose Status of Insurance Claim; (ii) Deposit Any Insurance Proceed into Separate Account to be Used Exclusively to Repair the Insured Demised Premises; and (iii) Alternatively, Find the Automatic Stay Inapplicable to the Insurance Proceeds* (the "*Motion to Compel Insurance Proceeds*", Docket No. 1240).   We incorporate by reference the *Motion to Compel Insurance Proceeds* as if fully transcribed herein.   In short, Santa Rosa Mall sustained that pursuant to the obligations under the Lease Agreement (Docket No. 1240-1) and the evidence provided by the Debtors, Santa Rosa Mall was a "loss payee" under insurance policy no. PTNAM1701557 (Certificate of Property Insurance, Docket No. 1240-2).   Santa Rosa Mall sustained that the insurance proceeds were not part of the bankruptcy estate and must be exclusively applied to the restoration or rebuilding of the Demised Premises in accordance to the *Lease Agreement*.   Santa Rosa Mall was not then or now been privy to the insurance claims filed by Sears with AIG or the insurance settlement or negotiations, if any, in spite of its express request.

20.    A hearing to consider the *Motion to Compel Insurance Proceeds* was held on March 21, 2019 wherein Santa Rosa Mall proffered to the Court discovery material designated as "Confidential Material" by the Debtors in accordance with the *Amended Stipulated Protective Order* (Docket No. 1084), including the *Contract of Insurance*.

21.    On January 14, 2019, the Debtors commenced an Auction for the assets identified as "Go Forward Stores" in connection with the *Global Bidding Procedure* Order.  See Docket No. 816, p. 32; Docket No. 1730, p. 2, ¶ 4.

22.     On January 18, 2019, the Debtors filed a *Notice of Successful Bidder and Sale Hearing* (Docket No. 1730).  Attached thereto as Exhibit "A" (Docket No. 1730) is a copy of the *Asset Purchase Agreement* ("*Asset Purchase Agreement*") executed by and between Sears and Transform Holdco LLC (the "Buyer"), for the purchase of the *Acquired Assets*, as defined therein, on January 17, 2019.  Id. at p. 2, ¶ 4.

23.     On January 26, 2019, Santa Rosa Mall filed a *Standing Objection to Global Asset Sale Transaction* (the "*Standing Objection*", Docket No. 2013).  Pursuant to the terms of the *Asset Purchase Agreement*, specifically Section 2.1(q), Transform Holdco LLC (the "Buyer") acquired all proceeds relating to loss or damage occurring prior to the closing date of the Global Sale Transaction minus a cap of $13,000,000.00.[1]  In its *Standing Objection*, Santa Rosa Mall sustained that the insurance proceeds from the global settlement relative to Santa Rosa Mall's claim for damages should be used for the reconstruction of Store No. 1915 or be deposited in escrow with the Landlord, in accordance with the terms of the *Lease Agreement*.  We incorporate by reference the *Standing Objection to Global Asset Sale Transaction* (Docket No. 2013) as if fully transcribed herein.

24.     On February 8, 2019, the Court entered and *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith, and (IV) Granting Related Relief* (the "*Sale Order*", Docket No. 2507).

25.     Section 2.1(q) of the *Asset Purchase Agreement* specifically provides the following:

---

[1] The $13,000,000.00 insurance cap language remained unchanged pursuant to the February 8, 2019 *Sale Order* (Docket No. 2507).

> [O]n the Closing Date, Sellers shall sell, transfer, assign, convey and deliver… to Buyer… any and all insurance proceeds… in respect of loss or damage to… any Acquired Asset… relating to a casualty occurring prior to… [the] Closing Date… less any proceeds… in an aggregate amount not to exceed $13,000,000.

Docket No. 2507-1, pp. 56-58, § 2.1(q).

26.    Upon information and belief, the Debtors and the applicable insurance Underwriters reached a global settlement in regard to the claim for damages caused by Hurricanes Irma and Maria.  See Docket No. 2507-1, Schedule 2.1(q), p. 1003.  As part of the *Asset Purchase Agreement*, the Debtors transferred all title to the proceeds from the global settlement to the Buyer, minus a cap of $13,000,000.00.[2]

27.    On that same date, February 8, 2019, the Debtors filed an *Objection* to the Motion *to Compel Insurance Proceeds* (the "*Debtor's Objection*", Docket No. 2512), arguing, for the first time, that Santa Rosa Mall is not a loss payee under the Insurance Policy, and that the Certificate of Insurance provided by the Debtor to Santa Rosa Mall is erroneous and "not determinative of the extent of coverage under the Insurance Policy", despite the Debtor's obligations under § 6.02(a) the *Lease Agreement*. Docket No. 2512, p. 10, ¶ 24.

28.    On March 13, 2019, Santa Rosa Mall field a *Reply* to the *Debtor's Objection* (Docket No. 2828) for the *Contract of Insurance* to be reformed to specifically include Santa Rosa Mall as a loss payee in accordance with property rights obtained under the *Lease Agreement* and, in the alternative, impose an equitable lien over the insurance proceeds in favor of Santa Rosa Mall.

29.    On April 10, 2019, Santa Rosa Mall filed Proof of Claim No. 17454 in the amount of $16,500,000.00.

---

[2] *Declaration of Sunny Sigh* (Docket No. 2344 pp. 236-237, ¶¶ 9-9) ("In addition, the debtors… retain 13 million dollars in hurricane insurance proceeds").

30.    On April 17, 2019, the Debtors filed a *Joint Chapter 11 Plan* (the "*Plan*", Docket No. 3275) and a *Joint Disclosure Statement* (the "*Disclosure Statement*", Docket No. 3276). Sections 11.9 and 11.10 of the *Plan* provide for the release of certain Released Parties and the exculpation of certain Exculpated Parties, as respectively defined therein.

31.    Further, Section 11.9(b) of the *Plan of Reorganization* contemplates third-party releases and expressly states as follows:

> As of the Effective Date… for good and valuable consideration, on and after the Effective Date, in accordance with section 1141 of the Bankruptcy Code, each of the Released Parties shall be deemed released and discharged… from any and all Causes of Action that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' Estates, the Plan, the filing and administration of the Chapter 11 Cases, including the Asset Purchase Agreement, the Sale Transaction, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (other than assumed contracts or leases), the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation or consummation of the Plan (including the Plan Supplement), the Definitive Documents, or any related agreements, instruments or other documents, or the solicitation of votes with respect to the Plan, in all cases based upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that, nothing in this Section 11.9(b) shall be construed to release the Released Parties from gross negligence, willful misconduct, criminal misconduct or intentional fraud as determined by a Final Order by a court of competent jurisdiction; provided, further, that, nothing in this Section 11.9(b) shall be construed to release any Claim or Cause of Action relating to or arising from the Sale Transaction following entry of the Sale Order by the Bankruptcy Court. The Releasing Parties shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 11.9(b) against each of the Released Parties.

Docket No. 3275, § 11.9(b), pp. 50-51.

32.    On April 30, 2019, the Debtors filed a *Notice of Rejection of Certain Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* (Docket No. 3449) rejecting the *Lease Agreement* for Store No. 1915. <u>Id.</u> at p. 11.

33.     Accordingly, pursuant to Section 362(d)(1) of the Bankruptcy Code, Fed. R. Bankr.

P. 4001(d) ("Rule 4001(d)"), Rule 4001-1 of the Local Bankruptcy Rules for the Southern District

of New York ("LBR 4001-1"), and as explained below, Santa Rosa Mall moves for relief from the

automatic stay and/or for the entry of an order to declare that the insurance proceeds are not part

of the bankruptcy estate.

Applicable Law and Discussion

A.     *The Insurance Proceeds are <u>not</u> part of the bankruptcy estate under Section 541(a)(1) and not subject to the automatic stay under 11 U.S.C. § 362(c)*

34.     Santa Rosa Mall is included among the insured under the *Contract of Insurance*.

As such, Santa Rosa Mall has an insurable interest over the insurance proceeds for the damages of

Store No. 1915 under Policy No. PTNAM1701557.

35.     As a general rule, Section 541(a)(1) of the Bankruptcy Code provides that when a

debtor files for bankruptcy, a bankruptcy estate that is created, comprised of all legal or equitable

interests of the debtor in property as of the commencement of the case wherever located and by

whomever held.  Section 541(a)(6) extends the bankruptcy estate to "proceeds, product, rents of

profits or from property of the estate…".

36.     Although the definition of the bankruptcy estate is comprehensive, it is not all-

encompassing.  In <u>United States v. Whiting Pools, Inc</u>., 462 U.S. 198, 204 n.8 (1983), the U.S.

Supreme Court acknowledged that property of the estate does not comprise those interests in which

the debtor holds only "a minor interest such as a lien or bare legal title."

37.     The parameters of estate property are circumscribed by the language of 11 U.S.C.

§ 541(d).  Section 541(d) provides that "[p]roperty in which the debtor holds, as of the

commencement of the case, only legal title and not an equitable interest, … becomes property of

the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title

-10-

to such property…"  11 U.S.C. § 541(d).  Accordingly, courts have concluded that Section 541(a)(1) does not extend to property in which the debtor possesses merely a reversionary interest.

38.     Insurance policies purchased and paid for by a debtor are usually property of the bankruptcy estate.  See *e.g.* MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 92 (2nd Cir. 1988); In re SN Liquidation, Inc., 388 B.R. 579, 583–84 (Bankr. D. Del. 2008); Ascands, Inc. v. Travelers Cas. and Sur. Co., 435 F.3d 252 (3rd Cir. 2006); Estate of Lellock v. Prudential Ins. Co. of Am., 811 F.2d 186, 189 (3rd Cir. 1987).

39.     Notwithstanding, even when a debtor's insurance policies themselves may be property of the bankruptcy estate, the proceeds of those policies may not necessarily be.  "It is well settled that ownership of an insurance policy that is property of a debtor's estate does not necessarily result in a determination that the debtor's estate owns the proceeds from a policy."  In re Hill, 174 B.R. 949 (Bankr. S.D. Ohio 1994).  "The question is not who owns the policies, but who owns the liability proceeds."  In re Louisiana World Exposition, Inc., 832 F.2d 1391, 1399 (5th Cir. 1987).

40.     As such, Bankruptcy Courts distinguish between ownership of insurance policy and the ownership of the proceeds.  The mere fact that debtor's insurance policy is included in bankruptcy estate does not necessarily mean that proceeds are also included in the estate.  See 3A Bankr. Service L. Ed. § 29:235 (2018 update).  "[T]he inquiry remains, as it has always been, a fact-specific one."  In re OGA Charters, L.L.C., 901 F.3d 599, 603 (5th Cir. 2018).  Also see In re Sfuzzi, Inc., 191 B.R. 664, 668 (Bankr. N.D. Tex. 1996) ("[T]he question of whether the proceeds are property of the estate must be analyzed in light of the facts of each case.").  A party's right to receive and keep the insurance policy's proceeds is inevitably limited by the insurance and contractual provisions resulting in the purchase of the policy.  See In re Jones, 179 B.R. 450, 455

(Bankr. E.D. Pa. 1995) ("the Debtor's rights to the proceeds of his policy are inevitably subject to the contractual restrictions in his insurance policy and mortgage agreement."). Also see 17A Am. Jur. 2d Contracts § 442 (the rights of a loss payee depend upon the substantive rights under the contracts).

41.    The Debtors have no present right or title to the funds in accounts, and such proceeds, and the funds contained therein, do not comprise property of the bankruptcy estate under 11 U.S.C. § 541(a)(1). Santa Rosa Malls' contention that the insurance funds on deposit do not constitute estate property is further supported by case law.

42.    In re Amiel Rest. Partners, LLC, 510 B.R. 744 (Bankr. D.N.J. 2014) (Kaplan, B.J.), is a case involving the ownership of the flood insurance proceeds.  In that case, the debtor's commercial landlord moved the Bankruptcy Court for an order compelling Debtor to release insurance proceeds derived from the prepetition destruction of property caused by Hurricane Sandy.  The landlord and debtor had entered into a commercial lease agreement that required the debtor to maintain several types of insurance coverage, including property insurance. The Court held that the landlord had an insurable interest at the time the property was destroyed and, as an additional insured on a flood insurance policy purchased by debtor, was entitled to proceeds of flood insurance property.  The Court also considered that, like the *Lease Agreement* in the instant case, the lease agreement in that case provided that at the expiration of the lease the alterations and improvements to the leased properties would become the "sole property" of the landlord. Compare id. at 753 with *Lease Agreement*, 1240-1, § 15.01, pp. 43-44.  Ultimately, the Court held that under the property rights created by the lease agreement, the proceeds of the flood insurance were not property of the bankruptcy estate, and landlord was entitled to payment of those proceeds. Id. at 753.

43.    Courts within the Second Circuit have ruled in a similar vein.  For instance, in Pine Bush Equipment Co. v. Florian (In re Florian), 233 B.R. 25, 26 (Bankr. D. Conn. 1999) (Krechevsky, B.J.), the plaintiff, a New York corporation in the business of leasing equipment, leased a forklift on a monthly basis pursuant to a rental agreement to the debtor.  The rental agreement required the debtor to carry insurance against all risk of physical damage and that such policies of insurance will name the lessor as additional insureds.  The debtor purchased, as the named insured, a general liability insurance policy from Travelers Casualty & Surety Co. which included coverage for the rental of the forklift and a certificate of insurance issued by the insurance agency provided that the plaintiff be a "Loss Payee".  The forklift was damaged requiring repairs totaling $33,090.  The insurance claim was submitted to Travelers Casualty.  The Debtor filed a Chapter 7 bankruptcy petition.  After the petition, the debtor received the insurance proceeds from the insurance company and submitted them to the Chapter 7 trustee, who refused to deliver them to the plaintiff and instead deposited them into the Chapter 7 Trustee account.  The Trustee contended that the insurance proceeds were property of the bankruptcy estate because, pursuant to Section 541(a)(1) of the Bankruptcy Code, the insurance policy purchased by the debtors is property of the bankruptcy estate.   The plaintiff argued that, notwithstanding an insurance policy may be property of the estate, the issue was who was entitled to the proceeds of the claim paid by the insurance carrier.  The plaintiff contended that it was entitled to the check proceeds.  The Court analyzed as follows:

> The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds which the insurer paid on a claim when a payment by the insurer cannot inure to the debtor's pecuniary benefit.  Then that payment should neither enhance nor decrease the bankruptcy estate.  In other words, when the debtor had no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.

In re Florian, 233 B.R. at 27 (emphasis added), quoting from Houston v. Edgeworth (In re Edgeworth), 993 F.2d 51, 55 (5th Cir. 1993).

44.     The Florian Court decided that "although the insurance policy was purchased by the debtors, [it] was intended to cover damages to non-estate property --- the forklift owned by the plaintiff" and ordered the trustee to turn over to the plaintiff the insurance proceeds plus any accrued interests. In re Florian, 233 B.R. at 27.

45.     Similarly, in In re McLean Industries, Inc., 132 B.R. 271, 284 (Bankr. S.D.N.Y. 1991) (Blackshear, B.J.), the Court determined that the insurance proceeds to cover damages to a damaged cargo ship were not property of the bankruptcy estate inasmuch as the U.S. Department of Transportation, Maritime Administration and Chemical Bank had been assigned the proceeds as loss payee and additional insured, respectively.

46.     In In re Suter, 181 B.R. 116, 119 (Bankr. N.D. Ala. 1994), the Court determined that "because AmSouth was the loss payee of the insurance policy, the proceeds of the policy are not property of the bankruptcy estate and are payable to AmSouth, at least to the extent of AmSouth's interest in the property insured."

47.     We move the Court to follow the same reasoning in favor of Santa Rosa Mall and declare that because Santa Rosa Mall is an additional insured under the *Contract of Insurance*, the proceeds to repair the Demised Properties are not property of the bankruptcy estate and thus not subject to Section 362(a) of the Bankruptcy Code.  Furthermore, pursuant to the *Lease Agreement*, the Insurance Proceeds must be "deposited in a special account in the name of [Santa Rosa Mall], separate and distinct from all other funds of [Santa Rosa Mall] in a bank or trust company of the City of San Juan, Puerto Rico" and such monies must only be used to "be applied on account of the cost of such restoration or rebuilding, as the case may be, as the work of restoration or

rebuilding [of the Demised Premises] progresses". *Lease Agreement*, 1240-1, § 6.03(b)(3), p. 28 (underline added).

48.    Because the Insurance Proceeds are not part of the bankruptcy estate, they are not subject to the automatic stay. Section 362(c)(1) of the Bankruptcy Code states that the automatic stay continues until the property is no longer property of the bankruptcy estate.   If Section 362(c)(1) is applicable, then Section 362(j), a companion statute, mandates that:

> On request of a party in interest, the court <u>shall</u> issue an order under <u>subsection</u> <u>(c)</u> confirming that the automatic stay has been terminated.

11 U.S.C § 362(j) (underline added).

49.    "[B]y its own terms, Section 362(j) mandates the entry of comfort orders only if the request arises under Section 362(c) of the Bankruptcy Code".  <u>In re Hill</u>, 364 B.R. 826, 829 (Bankr. M.D. Fla. 2007).  An order under Section 362(j) may be granted without notice and a hearing.  <u>See</u> <u>In re Jupiter</u>, 344 B.R. 754, 760 (Bankr. D.S.C. 2006).

50.    Based on the foregoing, Santa Rosa Mall moves the court for the entry of an order to determine that the Insurance Proceeds are not part of the bankruptcy estate and thus, not subject to the automatic stay under Sections 362(c)(1) and 362(j) of the Bankruptcy Code.

B.    *In the alternative, even if the Insurance Proceeds are part of the bankruptcy estate, there is cause for relief from the automatic stay*

51.    The Debtors allege that the *Certificate of Insurance* for Insurance Policy No. PTNAM1701557 provided to Santa Rosa Mall, which expressly states that Santa Rosa Mall is a loss payee (Docket No. 1240-2, p. 3), is erroneous and that it "is not determinative of the extent of coverage under the Insurance Policy", despite Sears' obligations under the *Lease Agreement*.  <u>See</u> Sears' *Objection*, Docket No. 2512, p. 10, ¶ 24.

52.     If that is so, Santa Rosa Mall has causes of action against AIG Europe Limited, that is, the Debtors' insurance company that issued the *Contract of Insurance*, and Aon Risk Services Central, Inc., as insurance producer or agency who issued a *Certificate of Insurance* regarding Policy No. PTNAM1701557.

53.     Generally, Section 362(a)(3) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate". 11 U.S.C. § 362(a)(3).

54.     Upon information and belief, the Debtors and the related insurance underwriters reached a global settlement regarding the Insurance Proceeds for the damages caused by Hurricanes Irma and Maria.  See Docket No. 2507-1, Schedule 2.1(q), p. 1003.

55.     In an abundance of caution, even if the Insurance Proceeds are in possession of the Debtors, Santa Rosa Mall seeks relief from the automatic stay to prosecute independent non-bankruptcy claims against the insurance company, its underwriters, agents and/or producers under non-bankruptcy law arising from the resolution and payment of such insurance claim in detriment of Santa Rosa Mall.

56.     Pursuant to 11 U.S.C. § 362(d), the Court may terminate, modify, annul or condition the automatic stay.  The first ground for obtaining relief from the automatic stay is for "for cause".  11 U.S.C. §362(d)(1).

57.     The Bankruptcy Code "does not define 'cause', nonetheless, generally speaking, 'cause' is said to exist when the harm that would result from a continuation of the stay would outweigh any harm that might be suffered by the debtor or the debtor's estate if the stay is lifted. See In re Sonnax Industries, Inc., 907 F.2d 1280, 1285 (2nd Cir. 1990).

58.     Determining whether 'cause' exists requires a fact intensive inquiry that must be made on a case by case basis.  See Peerless Ins. Co. v. Rivera, 208 B.R. 313, 315 (D.R.I. 1997), citing In re Turner, 161 B.R. 1, 3 (Bankr.D.Me.1993); Assocs. Ltd. v. Aetna Cas. & Sur. Co., 30 F.3d 734, 737 (6th Cir. 1994); In re Balco Equities Ltd., 312 B.R. 734, 738 (Bankr. S.D.N.Y. 2004).  Courts make this determination through a balancing test, where it weighs the hardship to the creditor, if he or she is not allowed to proceed with his or her lawsuit, against the potentiation prejudice to the debtor and debtor's other creditors. See In re R.J. Groover Constr. LLC, 411 B.R. 460, 463-64 (Bankr. N.D. Ga. 2008).

59.     "[B]ecause § 362(d)(1) does not define 'cause,' bankruptcy courts have the discretion to consider what constitutes cause based on the totality of the circumstances." Bainbridge v. Ocwen Loan Servicing, LLC, 2017 U.S. Dist. LEXIS 48032, *42 (M.D.Pa. 2017) citing In re Flintkote Co., 533 B.R. 887, 894 (D. Del. 2015), citing In re Wilson, 116 F.3d 87, 90 (3rd Cir. 1997).

60.     Thus the "facts of each request will determine whether relief is appropriate under the circumstances."  In re Sonnax Industries, Inc., 907 F.2d at 1286, quoting H.R.Rep. No. 95–595, at 343–44 (1977), reprinted in 1978 U.S.C.C.A.N. 6300).  "The burden is on the moving party to make an initial showing of 'cause' for relief from the stay."  In re Mazzeo, 167 F.3d 139, 142 (2nd Cir. 1999). Only if the movant makes such a showing does any burden shift to the debtor; absent a showing of cause, the court should simply deny relief from the stay.  See In re Boodrow, 126 F.3d 43, 48 (2nd Cir. 1997).

61.     In In re Sonnax Industries, Inc., *supra*, the U.S. Court of Appeals for the Second Circuit listed a number of factors that may be relevant in deciding whether the stay should be lifted

in order to permit litigation in another forum. Not all of these factors must be present to grant relief from stay. The Sonnax factors are the following:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

In re Sonnax Industries, Inc., 907 F.2d at 1286.

62.     The above-delineated factors favor the granting of Santa Rosa Mall's motion for relief from the stay. The request herein will not prejudice the interests of other creditors. By contrast, continuing the automatic stay will impose substantial hardship on Santa Rosa Mall that outweighs any hardships on the Debtor, if any, because it has already waived any rights to the Lease Agreement and the Demised Premises.

63.     Santa Rosa Mall has an insurable interest over the Demised Properties and its prompt repair and reopening. As a named insured under the *Contract of Insurance* and as a result of the parties' earlier covenants, Santa Rosa Mall has a right to any and all insurance monies due under the *Contract of Insurance* to the extent of its damages, including, but not limited to, earned or unearned funds, and/or any monies due or to become due. Accordingly, Santa Rosa Mall has standing to claim coverage under such Contract of Insurance and successfully demand its fulfillment.

64.     The granting of a limited relief from the automatic stay allowing Santa Rosa Mall to file a claim exclusively against third parties would not harm the Debtors.  Thus, the second and sixth *Sonnax Factors* favor granting Santa Rosa Mall limited relief from the automatic stay.

65.     Aon UK Limited, AIG Europe Limited, Lex-London and other third parties will be made liable under non bankruptcy law.  Other creditors will not be harmed by granting Santa Rosa Mall limited relief from the automatic stay because Santa Rosa Mall will not enforce any judgment directly against the Debtors or the bankruptcy estate.

66.     Furthermore, the Debtors cannot establish that the insurance funds contained are necessary for their reorganization.  See <u>Standard Mortgage Corp. v. Stewart (In re Stewart)</u>, 11 B.R. 93, 95 (Bankr. N.D. Ga. 1981) (acknowledging that debtor has burden of demonstrating that property is necessary to its effective to its effective reorganization).

67.     In the case of Santa Rosa Mall, as previously disclosed, the Debtors have operated Store No. 1915 at Santa Rosa Mall shortly after September 22, 1965 until the passing of Hurricane Maria on September 20, 2017, when it closed its doors. Store No. 1915 has remained closed and in ill-repair ever since.

68.     Critically, Store No. 1915 is, has been and continues to be the "anchor store" and the largest store at Santa Rosa Mall, acting as the main driver of customers for other tenants. Moreover, two (2) of the four (4) main entrances to Santa Rosa Mall are through Sears, which directly impedes traffic flow. Store No. 1915's presence in Santa Rosa Mall is so essential that lease agreements for other tenants include co-tenancy clauses directly related to Sears' operations, meaning that if Sears closes, other tenants at the mall have a right to terminate their leases and/or if Sears closes operations for a determined period, other tenants at the mall have the right to have their rents significantly reduced. <u>See</u> Docket No. 2828, *Declaration of Yvette Melendez*, Exhibit

"I" thereto at ¶ 6. The damages to Santa Rosa Mall will only increase the longer Store No. 1915 remains closed and in ill repair.

69.     Pursuant to the provision in the *Lease Agreement*, specifically Section 6.02(a), the Debtors provided certificates of insurance to Santa Rosa and Santa Rosa relied on those representations. This has serious and direct impact for Santa Rosa Mall. First, upon the expiration of the *Lease Agreement*, the restorations in the Demised Property will be ultimately vested on Santa Rosa Mall. See *Lease Agreement*, Docket No. 1240-1, § 15.01, p. 44. This is the essence and main reason of the "loss payee" requirement in Section 6.02(a) of the *Lease Agreement* and the other insurance provisions in Sections 6.01-6.05. Id., pp. 26-30. The insurance proceeds must only be used to fix the Demised Premises after the substantial physical damages caused by Hurricane Maria back in September 20, 2017.

70.     The Debtors initially commenced repairs to Store No. 1915 but as of the filing of the bankruptcy petition have been completely halted. The damages to Store No. 1915 by Hurricane Maria are substantial. The repairs of such damages to bring Store No. 1915 back to functional may take an additional six (6) months at best and would mean that Santa Rosa Mall's most profitable shopping seasons will be directly affected by Sears' closing, including Mother's Day, Father's Day, Fourth of July, Back to School, Labor Day Weekend, Halloween, Black Friday and Christmas.

71.     In a balance of harms, the impact of denying relief from stay is much greater than any the benefit derived by the Debtor. Thus, the final *Sonnax Factors* favors granting Santa Rosa Mall limited relief from the automatic stay.

72.     In Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 232 (1959), the U.S. Supreme Court analyzed that "[t]o decide the case, we need look no further than the maxim that

no man may take advantage of his own wrong.  Deeply rooted in our jurisprudence this principle

has been applied in many diverse classes of cases by both law and equity courts …".  Likewise, in

Deitrick v. Greaney, 309 U.S. 190, 197 (1940), the Supreme Court stated that "[i]t is a principle

of the widest application that equity will not permit one to rely on his own wrongful act, as against

those affected by it but who have not participated in it, to support his own asserted legal title or to

defeat a remedy which except for his misconduct would not be available".

73.    Premised on these maxims, Sears cannot agree to include Santa Rosa Mall as

additional named insured or as loss payees in the insurance policy for the Demised Premises and

then turn around and settle its claim with the insurer while reneging on its promise by keeping

Santa Rosa Mall in the dark.

C.    *Third party releases in the Plan of Reorganization*

74.    Section 11.9(b) of the *Plan of Reorganization* contemplates third-party releases

broad enough that could be construed in favor of the Debtors' insurance company, their

underwriters and/or agents.  See Docket No. 3275, § 11.9(b), pp. 50-51. Santa Rosa Mall hereby

objects to the permanent continuation of the automatic stay through a permanent discharge

injunction for the reasons stated herein.

75.    Accordingly, the automatic stay should be lifted to permit Santa Rosa Mall to file

a claim with regards to its non-bankruptcy legal and equitable rights to the insurance proceeds

under the *Lease Agreement* and the *Contract of Insurance.*

<u>Prayer for Relief</u>

WHEREFORE, Santa Rosa respectfully requests that the Court declare that the insurance

proceeds are not part of the bankruptcy estate and must be exclusively applied to the restoration or

rebuilding of the Demised Premises and grant limited relief from the automatic stay in favor of

Santa Rosa Mall so that it may seek non-bankruptcy relief against the insurance company,
produces, agents, and/or underwriters involved with the settlement and payment of the Insurance
Proceeds.

Respectfully submitted.
Dated: May 1, 2019
Orlando, Florida

**Ferraiuoli** LLC

390 N. Orange Avenue
Suite 2300
Orlando, Florida 32801
Phone: (407) 982-7310
Fax: (787) 766-7001

-and-

221 Ponce de León Avenue
5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001

 */s/ Sonia E. Colon Colon*
By: Sonia E. Colón Colón
Admitted *Pro Hac Vice*
USDC-PR No. 213809
scolon@ferraiuoli.com

 */s/ Gustavo A. Chico-Barris*
GUSTAVO A. CHICO-BARRIS
USDC-SDNY No. 929147
gchico@ferraiuoli.com

Attorneys for
*Santa Rosa Mall, LLC*