David S. Kupetz
Claire K. Wu
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Tel:  (213) 626-2311
Fax: (213) 629-4520

*Counsel for Izek Shomof and Aline Shomof Irrevocable
Children's Trust Dated February 11, 1999,
Vegas Group, LLC, and East River Group, LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDING CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL CURE OBJECTION AND
RESERVATION OF RIGHTS (STORE #1008) FILED BY
IZEK SHOMOF AND ALINE SHOMOF IRREVOCABLE CHILDREN'S TRUST
DATED FEBRUARY 11, 1999, VEGAS GROUP, LLC, AND EAST RIVER GROUP, LLC**

Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999,

Vegas Group, LLC, and East River Group, LLC (collectively, "Landlord"), by and through its

undersigned counsel, hereby submits this supplemental cure objection and reservation of rights

(the "Supplemental Cure Objection") to the Debtors' *Notice of Assumption and Assignment of*

*Additional Designatable Leases* (the "Cure/Designation Notice") (ECF No. 3298), as follows:

**BACKGROUND**

1.      Landlord is the lessor and debtor Sears, Roebuck and Co., a New York corporation

("Sears Roebuck" or "Tenant"), is the lessee of part of the iconic Sears building located at 2650

East Olympic Boulevard in Boyle Heights, Los Angeles, California (the "Building"), Store No.

1008 (the "Premises"), under the terms of that certain Amended and Restated Building Lease

dated May 5, 2011 (the "2011 Lease"), as amended pursuant to that certain amendment known as

"Amendment to Amended and Restated Building Lease" between Landlord and Sears Roebuck,

dated as of December 30, 2015 (the "Amendment," and collectively with the 2011 Lease, the

"Lease").[1]

2.      The Lease arises out of a portion of a sale-leaseback transaction, in which it was

contemplated that Landlord would, during the term of the Lease, be able to rehabilitate and

renovate the Building.

3.      On January 25, 2019, Landlord timely and properly filed its *Objection to Cure*

*Amount for Store #1008 Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust*

*Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC* (the "Cure Objection")

(ECF No. 1837).[2]

4.      In the Cure Objection, Landlord asserted, among other things, that the cure amount

(the "Cure Amount") for the Lease would increase substantially if Tenant did not cooperate with

Landlord to enable the commencement of renovation work to be done at the Premises prior to

March 16, 2019.

Paragraphs 9 and 10 of the Cure Objection provide as follows:

> 9.      Additionally, the Building is in immediate need of
> extensive renovations that require the cooperation of Tenant and
> such cooperation (as of this time) has not been forthcoming.  The
> City of Los Angeles passed Ordinance 183893, which requires the
> retrofit of pre-1978 wood-frame soft-story buildings and non-
> ductile concrete buildings.  The Building is a non-ductile concrete
> building that requires structural upgrades.  Pursuant to section
> 2(e)(ii)(3) of the Lease, Landlord is required to operate and
> maintain the Building in accordance with all applicable law, which
> would include structural upgrades in conformance with Ordinance
> 183893.  Landlord is ready, willing, and able to commence

---

[1] A true and correct copy of the 2011 Lease is attached hereto as **Exhibit A**.

[2] The Cure Objection is hereby incorporated by reference in its entirety.  A true and correct copy of the Amendment
is attached to the Cure Objection as "Exhibit C."

necessary renovation construction at the Building, but has received no cooperation from Tenant since the Debtors' commencement of their bankruptcy cases.

10.     The lack of cooperation from Tenant regarding the necessary renovations, if it continues, will be the direct cause of Landlord losing the entitlements it secured from the City of Los Angeles in March of 2016.  In the event that Landlord loses the entitlements as a result of not being able to renovate the Building due to the lack of cooperation from Sears Roebuck, Landlord will suffer a catastrophic financial loss that would result in significant financial liability for the Debtors and would substantially increase the Cure Amount set forth above.  Landlord's entitlements will expire unless construction begins prior to March 16, 2019.

5.     As of the filing of this Supplemental Cure Objection, March 16, 2019 has passed, and Tenant continues to fail to cooperate with Landlord regarding the necessary renovation construction at the Building.

6.     In the Cure Objection, Landlord reserved its right to amend or supplement the Cure Objection through and including the effective date of any proposed assumption and assignment of the Lease.

7.     On April 19, 2019, the Debtors filed the Cure/Designation Notice.  In the Cure/Designation Notice, the Debtors list (a) $0.00 as the "Proposed Cure Amount" to Landlord, (b) $1,474,940.61 as the Landlord's "Asserted Cure," and (c) $1,474,940.61 as the "Disputed Amount."[3]

8.     Paragraph 17 of the Cure/Designation Notice provides that a counterparty to an "Additional Assigned Agreement" that properly filed and served a cure objection, may file and serve a supplemental objection for cure costs that could not have been raised in the prior objection.

---

[3]At page 6 of 13, No. 3, Exhibit 1 of Debtors' Cure/Designation Notice.

## SUPPLEMENTAL OBJECTION

9.     Landlord asserts there are additional cure claim amounts in the sum of $5,696,046.02 (the "Supplemental Cure Amount"), that could not have been raised in Landlord's previously filed Cure Objection.  As of the date hereof, the total Cure Amount is an amount not less than **$7,170,986.63**, as set forth in further detail below.

10.     "In leases, as in contracts, a covenant of good faith and fair dealing has been implied.  The covenant requires that neither party do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the lease.  One of the benefits provided to the [landlord] by this lease is the promise of the defendants that they will not violate governmental laws and regulations which apply to the leasehold."  *Sachs v. Exxon Co., U.S.A.* (1992) 9 Cal. App. 4th 1491, 1498 (citing *Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500-501).

11.     Here, good faith and fair dealing as respects Landlord's obligations to comply with governmental laws and regulations requires a reasonable means by which Landlord could have coordinated with Tenant to do the necessary renovation construction at the Building.  Prior to the commencement of the above-captioned cases, Landlord was in discussions with Tenant for the planned rehabilitation of the Building, i.e., seismic retrofitting, new HVAC system, ADA compliant access, new freight elevator, and other improvements to and work to be done on the Premises, including structural upgrades in conformance with Ordinance 183893.  Following commencement of the cases, Landlord made repeated requests to Tenant for coordination and cooperation to commence the necessary renovation construction, but received no substantive response from Tenant.  As Tenant operates its Store No. 1008 at the Premises, good faith and fair dealing required that Tenant, among other things, coordinate with Landlord to stage and phase the construction work at the Premises (including to minimize the disruption and/or interference with

Tenant's operating business), respond to Landlord's requests, and otherwise communicate and/or work with Landlord to allow Landlord to discharge its legal and safety obligations.

12.    Due to the lack of cooperation from Tenant, construction at the Building did not begin prior to March 16, 2019, Landlord lost the construction financing it was in the process of finalizing, and the entitlements Landlord secured from the City of Los Angeles (which Landlord recently obtained an extension of) are rapidly expiring.

13.    As of March 16, 2019 (and prior thereto, as communicated by Landlord to Tenant), Landlord had been ready, willing, and able to commence the necessary renovation construction at the Building.  Among other things, Landlord had secured entitlements from the City of Los Angeles, was in the process of finalizing loan documents, pulled building permits and submitted plans, and engaged the necessary services of architects, engineers, consultants, and contractors in order to prepare for the renovation construction.  As a direct result of Tenant's failure to respond to and cooperate with Landlord, Landlord lost the construction financing that was in the process of being finalized and was otherwise in place for the necessary renovation and rehabilitation of the Building, and lost the amounts expended by Landlord to be prepared to move forward with the necessary construction that was to be done at the Building.  Landlord would have been able to timely begin the renovation construction, but for the failure of Sears to cooperate, and would not have incurred the following losses, as reflected on the chart below:[4]

| Supplemental Cure Amount (as of April 15, 2019) | |
| --- | --- |
| Architects, Engineers and Consultants | $4,559,194.82 |
| Permit Fees | $121,851.20 |
| Contractors | $1,015,000.00 |

---

[4]A breakdown of the costs is attached hereto as **Exhibit B**.

| TOTAL | $5,696,046.02[5] |
|---|---|

14.     In order to assume the Lease, the Debtors must cure the total Cure Amount of

**$7,170,986.63**.

15.     Landlord submits with this Supplemental Cure Objection a Declaration of

Landlord's representative, Izek Shomof, attesting to the facts set forth herein.

## **RESERVATION OF RIGHTS**

16.     Landlord reserves all of its rights, claims, defenses, and remedies, including,

without limitation, the right to amend, modify, or supplement this Supplemental Cure Objection,

to seek discovery, and to raise additional objections during or prior to any hearing regarding the

issues identified in the Cure Objection and this Supplemental Cure Objection.


Dated: May 1, 2019          By: */s/ David S. Kupetz*
      Los Angeles, California     David S. Kupetz
                             **Sulmeyer**Kupetz
                             A Professional Corporation
                             333 South Grand Avenue, Suite 3400
                             Los Angeles, California 90071
                             Tel:  (213) 626-2311
                             Email: dkupetz@sulmeyerlaw.com

                             *Counsel for Izek Shomof and Aline Shomof Irrevocable*
                             *Children's Trust Dated February 11, 1999,*
                             *Vegas Group, LLC, and East River Group, LLC*

---

[5] This amount is in addition to the $1,474,940.61 asserted in the Landlord's previously filed Cure Objection.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Supplemental Cure Objection and Reservation of Rights (Store #1008) Filed by Izek Shomof and Aline Shomof Irrevocable Children's Trust Dated February 11, 1999, Vegas Group, LLC, and East River Group, LLC, was electronically filed and served upon all those who receive electronic notification on May 1, 2019.

/s/David S. Kupetz

**VIA REGULAR MAIL**

The Chambers of the Honorable Judge Robert D. Drain
United States Bankruptcy Court for the SDNY
300 Quarropas Street, Room 248
White Plains, New York 10601

The Debtors, c/o Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates IL 60179
Attn: Stephen Sitley Esq., and Luke J. Valentino, Esq.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Ray C. Schrock, P.C., Jacqueline Marcus, Esq.,
Garret A. Fail, Esq., and Sunny Singh, Esq.

The Office of the United States Trustee
201 Varick Street, Suite 1006
New York, New York 10014
Attn: Paul Schwartzberg, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036
Attn: Paul D. Leake, Esq., Shana A. Elberg, Esq.,
and George R. Howard, Esq.

Davis Polk & Wardell LLP
450 Lexington A venue
New York, NY, 10017
Attn: Marshall S. Huebner, Esq. and Eli J. Vonnegut, Esq.

Cleary, Gottlieb
One Liberty Plaza
New York, NY, 10006
Attn: Sean A. O'Neal, Esq. and Luke A. Barefoot, Esq.
Attorneys for Transform Holdco LLC

Kelley Drye & Warren LLP
101 Park A venue
New York, NY 10178
Attn: Eric R. Wilson, Esq., Benjamin D. Feder, Esq.,
and T. Charlie Liu, Esq.

Seyfarth Shaw LLP
620 Eighth A venue
New York, NY 10018
Attn: Edward M. Fox, Esq.

Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10015
Attn: James Gadsden, Esq.

Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
Attn: Brian A. Raynor, Esq.

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn: Philip C. Dublin, Esq., Ira Dizengoff, Esq.,
and Sara Lynne Brauner, Esq

# EXHIBIT A

LA -- Restated Building Lease
Execution

# AMENDED AND RESTATED BUILDING LEASE

by and between

## 10309 FOLSOM BLVD., LP

and

## SEARS, ROEBUCK AND CO.

LA – Restated Building Lease
Execution

# TABLE OF CONTENTS

PAGE

1.   DEFINITIONS ................................................................................................... 1

2.   LEASE PROVISIONS ....................................................................................... 5

4.   OPERATION OF THE ENTIRE TRACT AND COMMON AREAS ........................... 10

5.   DAMAGE AND DESTRUCTION / CONDEMNATION ............................................ 15

6.   INDEMNIFICATION AND INSURANCE .......................................................... 19

7.   REAL ESTATE TAXES AND ASSESSMENTS .................................................. 22

8.   DEFAULTS AND REMEDIES ......................................................................... 23

9.   HAZARDOUS MATERIALS ............................................................................. 26

10.  END OF TERM .............................................................................................. 27

11.  GENERAL PROVISIONS ................................................................................ 27

LA -- Restated Building Lease
Execution

## AMENDED AND RESTATED BUILDING LEASE

**THIS AMENDED AND RESTATED BUILDING LEASE** (this "Restated Lease") is made and entered into as of May 5, 2011, by and between 10309 Folsom Blvd., LP, a California limited partnership ("Landlord"), and Sears, Roebuck and Co. ("Tenant").

## RECITALS

A.    Landlord is the owner of certain real property located in the City of Los Angeles, County of Los Angeles, State of California, legally described on Exhibit "A" attached hereto and incorporated herein by this reference (the "Entire Tract").

B.    Landlord's predecessor in interest, Univest Olympic Realty, L.L.P., and Tenant previously entered into a (a) Building Lease  (LA-Current Retail Store Lease) and (b) a Building Lease (LA -- New Building Lease) each dated as of December 8, 2000 (as previously amended, collectively, the "Prior Lease").

C.    Landlord and Tenant now desire to further amend and continue the priority of the Prior Lease, and as so amended, for the sake of convenience and ease of reference, restate the Prior Lease in its entirety with the same priority as the Prior Lease, on the terms and conditions set forth below. From and after execution of this Restated Lease, the Prior Lease shall be deemed amended and restated in its entirety, and its priority shall be continued on the terms and conditions set forth herein, and the entire agreement between the parties concerning the subject matter herein shall be set forth in this Restated Lease.

D.    Landlord wishes to lease to Tenant and Tenant wishes to lease from Landlord the Premises on the terms and conditions contained in this Restated Lease.

## AGREEMENT:

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the parties agree as follows:

## 1.    **DEFINITIONS**

(a)    "Building" shall mean that certain 9-story building commonly known as 2650 East Olympic Blvd., Los Angeles, California and located on the Building Parcel.

(b)    "Building Area" shall mean the GLA of the Building.

(c)    "Building Parcel" shall mean Lot 1 of Tract No. 9410 (being approximately 12.30 acres), in the City of Los Angeles, as per Map recorded in Book 136, Pages 7 and 8 of Maps, in the Office of the County Recorder of said County ("Parcel 1") (which Parcel 1 is a portion of the tax parcel (APN 5169-010-006) on which the Building (together with the Tenant's Control Area and associated additional parking) is located as described on Exhibit C attached hereto and made a part hereof.

LA – Restated Building Lease
Execution

(d)    "CAM Cap" shall mean an amount expressed in dollars, equal to the Controllable Base CAM, increased by the cost of living increases pursuant to the Index from the year such Controllable Base CAM has been calculated, as further described herein. "Controllable Base CAM" shall mean the amount of the Controllable CAM Portion of the Tenant's CAM Contribution for the first Lease Year after the Building is at least 80% leased and occupied (the "Stabilized Year").  The CAM Cap shall be equal to the Controllable Base CAM (i) multiplied by the fraction equal to the Index (as defined below) for September 1 of the Lease Year for which the CAM Contribution is being calculated (the "Comparison Year"), divided by the Index for September 1 of the Stabilized Year, (ii) minus the Controllable Base CAM for the Stabilized Year. For example, if the Controllable Base CAM were $4 per foot, the Index for the Stabilized Year was 220, the Index for the Comparison Year was 242, then the CAM Cap would be $(4 per foot x 242/220) minus 4 equals a CAM Cap of $.40 per foot.

(e)    "Commencement Date" shall mean May 5, 2011.

(f)    "Common Areas" means all portions of the Entire Tract (both interior and exterior) that may from time to time be available for the general non-exclusive use, convenience and benefit of Tenant, and other owners, tenants and occupants of the Entire Tract, including, without limitation, truck ramps, fire corridors, service corridors, loading facilities and docks, automobile parking areas, access roads, sidewalks, traffic lanes, bus stations, taxi stations, parcel pickup areas, entrances and exits from and to public roads, landscaping, restrooms and utility facilities, including areas that are not available to any tenant  but are used for the general operation of the improvements and facilities on the Building Parcel or Entire Tract.

(g)    "Controllable CAM Portion" shall mean that portion of Tenant's CAM Contribution remaining, after excluding all insurance costs, utility costs and any wages or fees for union labor.

(h)    "Development" shall mean the retail and/or mixed-use development located from time to time on the Building Parcel.

(i)    "Development Site Plan" shall mean the Development Site Plan for the Building Parcel attached hereto as Exhibit B.

(j)    "Entire Tract" shall mean the property legally described on Exhibit A attached hereto.

(k)    "Force Majeure" or "force majeure events" shall mean any prevention, delay or stoppage of work which is a direct result of causes (except financial) beyond the reasonable control of the party obligated to perform, including acts of God (but excluding rain, winds and other typical weather conditions), labor strikes, inability to obtain labor and/or materials or reasonable substitutes therefor (but only if such materials were timely ordered in the first instance), government actions or restrictions, civil disturbances, war or casualty, of which the party intending to seek an extension as a result of such condition or event has given the other party written notice within ten (10) days of the occurrence or event, in which event such party shall be allowed such additional period of time to complete such work as is reasonably

2

LA – Restated Building Lease
Execution

necessary, but in no event more time than is equivalent to the actual time lost as a result of such condition or event.

(l)    "Gross Leasable Area" (or "GLA") means the total number of square feet of floor space covered and enclosed within a particular store, premises or building on the Entire Tract or Building Parcel, as applicable, whether rented or rentable, measured to the outside of the exterior walls of the store or building, to the center line of party walls and to the exterior of walls abutting exit or service corridors, but not including Common Areas, exterior open truck docks, outdoor sales areas, garden shop areas, mall offices or enclosures used exclusively for mechanical equipment or nonstructural mezzanines.

(m)    "Hazardous Material" means petroleum products, asbestos, and any other hazardous or toxic substance, material or waste, that is or becomes regulated by any local, state or federal governmental authority.

(n)    "Index" shall mean the Consumer Price Index - All Urban Consumers (Los Angeles- Riverside-Orange County, CA, All items; Base 1982-84=100), as published by the United States Department of Labor, Bureau of Labor Statistics. Should the Bureau discontinue the publication of the Index, or publish the same less frequently, or alter the same in some other manner, Landlord, in its discretion will adopt a substitute index or procedure that reasonably reflects and monitors consumer prices substantially to the same extent and to the same degree of accuracy for substantially the same geographic area..

(o)    "Lease Year" shall mean any period of 12 consecutive months during the Term that begins on the first day of the first full calendar month after the date hereof.

(p)    "Leasehold Encumbrance" is defined in Section 15(f) of this Restated Lease.

(q)    "Leasehold Estate" means all of Tenant's right, title and interest in the Premises and under this Restated Lease.

(r)    "Partial Lease Year" means the period, if any, commencing with the Commencement Date and continuing through the last day before the first Lease Year of the Term and the portion of the Term, if any, after the last Lease Year of the Term through termination of this Restated Lease.

(s)    "Premises" means the area within the Building outlined on Exhibit B-1 attached hereto. The Premises shall include any renovations and/or new improvements that may in the future be constructed and occupied by Tenant within the area outlined on Exhibit B-1 from time to time.

(t)    "Prime Rate" means, at any time, the rate of interest most recently published as the "Prime Rate" in the Money Rates section of the Wall Street Journal.

(u)    "Prohibited Uses" shall mean any of the uses described on Exhibit D attached hereto and made a part hereof.

3

LA -- Restated Building Lease
Execution

        (v)    "Real Estate Taxes" means: (a) real property taxes for the tax parcel or
parcels which include the Building Parcel and now known as APN 5169-010-006 (which may be
subdivided subsequently due to the Development in which event Real Estate Taxes shall only be
computed with respect to the portion of the existing Building Parcel that includes the Building
and the Tenant's Control Area (the "Adjusted Tax Parcel")) including special assessments which
are specifically and directly related to the Building, but does not include any special assessments
relating to the existing or any future improvements thereon or the Entire Tract,  and (b) does not
include any estate, gift, inheritance, succession, franchise, income or excess profits taxes which
may be payable by Landlord or Landlord's legal representative, successors or assigns and any
tax that might become due on account of ownership of property other than the Entire Tract that
might become a lien on the Entire Tract or collectable out of the same provided, however, that if,
at any time during the Term, in lieu of or as a substitute for Real Estate Taxes levied, assessed or
imposed as of the date of this Restated Lease, there shall be levied, assessed or imposed: (i) a
tax on rents received from real property or (ii) a license fee measured by rents received from real
property or (iii) a tax or license fee otherwise measured or based in whole or in part upon
ownership of or income from real property, then such tax or license fee levied, assessed or
imposed on the Rent or the Premises shall be considered Real Estate Taxes provided that such
tax or license fee is levied, assessed or imposed generally on real property owners as such and
only to the extent that such tax or license fee would be payable by Landlord if the Premises were
the only real property of Landlord and income from the Premises were the sole income of
Landlord; (c) provided that with respect to Real Estate Taxes accruing after the Commencement
Date,  Tenant's Share of Real Estate Taxes shall be computed by excluding from Real Estate
Taxes for purposes of this Restated Lease any increases in Real Estate Taxes arising out of or
resulting from any transfer or  change of  ownership for property tax purposes (including,
without limitation, by way of sale, assignment, ground lease, long term lease, transfer of
ownership interests in the entity owning the Entire Tract or any portion thereof, or any other
transfer, including this Restated Lease)  of  the Entire Tract or any portion thereof (excluding the
Building Parcel or the Adjusted Tax Parcel, as applicable). However, except as expressly set
forth in the next paragraph, increases due to changes in ownership of the Building Parcel or
Adjusted Tax Parcel, as applicable, shall be included in Real Estate Taxes.

        In addition to and independent of the foregoing, it is further agreed that if and to
the extent there occurs during any five year period during the Term of this Restated Lease ("5-
Year Period") beginning on the Commencement Date more than one transfer or change of
ownership for property tax purposes of the Premises, the Building, or the Building Parcel, or any
portion thereof (any such transfer being a "Subsequent Transfer"), Tenant shall not be obligated
to pay any increases in Real Estate Taxes arising out of or resulting from any such Subsequent
Transfer(s) until such 5-Year Period ends.  By way of example, if a change of ownership of the
Building Parcel occurs in 2012, increases in Real Estate Taxes resulting from such change of
ownership shall be payable by Tenant under this Lease (subject to the exclusions set forth
above).  However, if a change of ownership of the Building Parcel also occurs in each of 2015
and 2016, such transfers shall be Subsequent Transfers hereunder, and Tenant shall not be
obligated to pay any increases in Real Estate Taxes resulting from such Subsequent Transfers
until the date which is five (5) years following the date of the change of ownership in 2012.  For
the avoidance of doubt, if there are in the future special assessments which affect or are assessed
partly with respect to the Entire Tract (excluding the Building Parcel or Adjusted Tax Parcel, as

4

LA – Restated Building Lease
Execution

applicable) and partly with respect to the Building Parcel or Adjusted Tax Parcel, such special assessments shall be excluded from Real Estate Taxes.

(w) **"Tenant's CAM Contribution"** means, with respect to each Lease Year during the Term, Tenant's Share of Landlord's actual costs for the maintenance and operation of the Common Areas of the Building Parcel (excluding all improvements and parking structures (if any) constructed thereon after the Commencement Date) ("CAM Charges"), (A) excluding: Real Estate Taxes; all capital costs and expenditures and all other costs and expenses in connection with the Development, except as expressly provided below; all costs and expenses which are expressly provided to be borne by Tenant under this Restated Lease or by other tenants or occupants of the Entire Tract (other than as a share of CAM Charges) , or which are otherwise reimbursed or paid to or recovered by Landlord in whole or in part by or from third-parties or third-party sources, such as insurance proceeds and litigation recoveries; all costs of major repairs and/or replacements to the roofs of the Building or to the paved parking areas through April 30, 2026; and all costs and expenses which are otherwise provided or described in this Restated Lease as being at the sole cost, expense or responsibility of Landlord; but (B) specifically including without limitation: casualty and liability insurance premiums which are fairly allocable to the Building Parcel and Tenant's Control Area only and costs of Los Angeles Regulation 4 fire testing; and for Lease Years commencing after the commencement of the Stabilized Year, including capital costs of improvements reasonably designed to lower costs otherwise included in Landlord's costs of maintenance and operation of the Building Parcel, all such capital costs of such improvements to be amortized over the useful life of such items as reasonably determined by Landlord. Tenant's Share of the Controllable CAM Portion of Tenant's CAM Contribution shall not increase by more than the CAM Cap. Without limiting the foregoing, Landlord shall not include any overhead or administrative charges of Landlord or its affiliates or related entities or principals thereof in CAM Charges, but may include a reasonable management fee (inclusive of all third-party management fees and fees paid to Landlord or its affiliates) which do not exceed the otherwise arms'-length market fees for such services then customarily charged for similar projects in the vicinity of the Building.

(x) "Tenant's Control Area" is defined in Section 2(a) of this Restated Lease.

(y) "Tenant's Hazardous Material" means Hazardous Material brought or released (or permitted to be brought or released) onto the Premises during the term of this Restated Lease by Tenant, its agents, contractors or employees.

(z) "Tenant's Share" means with respect to each Lease Year during the Term, an amount equal to 20%.

(aa) "Term" is defined in Section 2 (c) of this Restated Lease.

## 2. **LEASE PROVISIONS**

(a) Lease of Premises / Tenant's Control Area. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the following:

5

LA – Restated Building Lease
Execution

(1)   The Premises, together with all rights, appurtenances, servitudes, easements, rights of ingress and egress, parking, loading, unloading, licenses and hereditaments necessary or useful for Tenant's use of the Premises as a retail department store and otherwise as permitted hereunder;

(2)   A non-exclusive easement for parking the vehicles of Tenant, its customers, employees and business invitees, and for access, use, ingress and egress for vehicles and pedestrians in common with the other tenants and occupants of the Building Parcel and their respective customers, employees and business invitees, over the Common Areas, including without limitation, all parking areas, alleys, roadways, sidewalks, walkways, landscaped areas and surface water drainage systems and for use of parking lot lighting.

(3)   The parties acknowledge that it is most critical to the successful operation of Tenant's business at the Premises that Tenant has access, use and enjoyment of those portions of the Building Parcel shown on the Site Plan as "Tenant's Control Area", including such rights as are set forth below. Without Tenant's prior approval, which may be withheld for any or no reason in its sole discretion, Landlord shall not construct or install any improvements or make any changes to Tenant's Control Area or interfere with or obstruct Tenant's use thereof in any manner whatsoever, including without limitation the re-configuring of parking spaces.

(4)   During the first 12 month period after the Commencement Date, Tenant shall have the right (but not the obligation) to repair and/or repave, improve and restripe, the parking areas in Tenant's Control Area, including the curbs, gutters, sidewalks, fencing, signage and lighting located thereon, at Tenant's sole cost and expense, provided that Tenant first gives Landlord a reasonably detailed notice of the anticipated repair/improvement items and an opportunity to perform such repair items/improvements (and Landlord must give written notice that it elects to make such repairs within ten (10) days after Tenant's notice and must commence such repairs within thirty (30) days after Tenant's notice; provided, however, if Tenant performs such repairs the entire cost thereof (up to a maximum of $100,000.00 for such other improvements) shall be deducted from time to time, as and when paid or incurred by Tenant, from all payments or reimbursements which Tenant is otherwise required to make under this Restated Lease.

(b)   Use of Premises. During the Term, Tenant may use the Premises for the sale, servicing and storing of merchandise, and all other items and services normally sold in Sears stores from time to time, and/or all other lawful uses that are consistent with uses typically

6

LA – Restated Building Lease
Execution

found in regional shopping centers or lifestyle centers (the "Permitted Use") that are not Prohibited Uses, and for no other use or purpose without Landlord's prior written consent, which consent shall not be unreasonably withheld.

Tenant shall have no right to approve the use of or leasing by any tenants in the Building Parcel or the Entire Tract so long as none of them engage in any Prohibited Uses. Landlord shall not use, or permit the use, of the Entire Tract or any portion thereof for any Prohibited Uses.

(1)    Tenant may operate in whole or in part by licensees, subtenants or concessionaires.

(2)    Tenant will set its own hours and days of operation.

(c)    Term of Lease / Tenant's Right to Terminate.

(1)    The term of this Restated Lease shall be ninety-nine (99) Lease Years (the "Term") and shall commence on the Commencement Date.

(2)    Notwithstanding the foregoing, Tenant shall have the right to terminate this Restated Lease at any time during the Term on six months prior written notice to Landlord.

(d)    Rent.

(1)    The rent under this Restated Lease is one dollar ($1.00) per Lease Year, which Landlord acknowledges has been prepaid by Tenant through the Term of this Restated Lease.

(2)    The parties acknowledge that the prior sale of the Building Parcel and other property by Tenant to Landlord's predecessor in interest and the respective covenants under this Restated Lease represent additional consideration for this Restated Lease.

(e)    Maintenance of the Premises and the Building.

(1)    Tenant shall, at Tenant's expense:

(i)    Except as provided in Section 2(e)(ii)(1), during the Term, Tenant shall repair, maintain, and replace, as necessary, the Premises (excluding all "Structural and Foundational Elements of the Building", as defined below), including any systems located wholly therein which exclusively service the Premises and which do not serve any other parts of the Building or the Building Parcel (including, without limitation, any such electrical, mechanical, plumbing, heating, ventilation and air-conditioning systems ("HVAC"), fire/life safety and any elevators or escalators), as well as any systems located outside the Premises on the Building Parcel exclusively serving the Premises (including, without

7

LA – Restated Building Lease
Execution

limitation, all HVAC components on or around the Premises which do not serve
any other portions of the Building, and any external wiring, lighting, plumbing
fixtures and electrical exclusively serving the Premises).

(A)    Landlord hereby grants Tenant all reasonable rights of access and
use to any and of all portions of the Building, Building Parcel and Tenant's
Control Area for the foregoing repair, maintenance and replacement obligations
of Tenant, provided that Tenant shall first give Landlord at least three (3) business
days' prior written notice, except in case of emergency, when only such notice
(written or oral), if any, as is practical shall be required, and provided that Tenant
in utilizing any such rights shall minimize disruption of any other tenant's
business and shall coordinate entry into any such other tenant's premises with
such tenant.

(B)    Without limiting the foregoing, Landlord acknowledges and agrees
that any walls separating the Premises from the remainder of the Building are
party walls to be shared by Tenant and the other owners, tenants and occupants of
Building (which party walls shall be deemed to be Structural and Foundational
Elements of the Building).  Landlord hereby grants to Tenant the non-exclusive
right to use such party walls for all purposes for which they may be intended or to
such use by Tenant as may be desirable and/or convenient, including, without
limitation, utilities, maintenance and fixturing.  Landlord hereby acknowledges
and agrees that Tenant shall have the right at any time and at all times throughout
the Term to install, maintain, alter, repair and replace any cabling, conduit,
utilities, venting, pipes, wiring and other items through and into such party walls
to serve or service the remainder of the Premises (collectively, "Party Wall
Work"); provided, however, all Party Wall Work (I) shall be deemed Alterations
and subject to the requirements of Exhibit I, (II) no Party Wall Work shall
materially and adversely affect any Building systems outside of the Premises or
other tenants' premises, (III) all Party Wall Work shall be performed in such a
manner  so as to minimize any interference with any other tenant's  occupancy in
the Building.

(C)    In connection with Tenant's maintenance requirements, Tenant
shall maintain all such elevators and escalators and shall conduct testing thereof,
as well as any other testing of facilities or systems which serve the Premises only
that may be required under all applicable laws.  Upon Landlord's request (not
more than once in any calendar year), Tenant shall endeavor to provide Landlord
with copies of all reports of such tests maintained at the Premises.  In the event
Tenant fails to comply with the terms of this Section, upon the expiration of all
applicable notice and grace periods provided hereunder, Landlord may, but shall
not be obligated, to take such reasonable actions on behalf of Tenant, and Tenant
shall pay Landlord for the actual reasonable costs incurred by Landlord in
connection therewith. For the avoidance of doubt, if any of the foregoing
obligations of Tenant would otherwise apply to elements, facilities or systems
which partly serve other portions of the Building or other premises or locations,

8

LA – Restated Building Lease
Execution

regardless of the location of such elements, facilities or systems, Landlord shall be solely responsible for such obligations.

(2)    Tenant shall maintain the interior of the Premises in a clean condition according to local ordinances; and

(3)    Tenant shall contract in its own name and promptly pay for all water, sewer, gas, heat, light, power, telephone service and other public utilities of every kind that Tenant desires to be furnished to the Premises throughout the Term; and

(4)    Tenant shall perform all non-structural interior maintenance, repairs and replacements which are required solely to the Premises, subject to Landlord's enforcement of any applicable warranties.

(ii)    Except as expressly excluded or otherwise provided in Section 2(e)(i)(1) Landlord shall, at Landlord's expense, perform and be solely responsible for:

(1)    All repairs and replacements necessary to the exterior portions of Building and the Common Areas within the Building;

(2)    All structural and foundational elements and systems, footings, shoring, floor slabs, penetrations and ramps, columns and transfer beams, structural steel and reinforcements, and shear walls of, at or under the Building, including without limitation the roof and the exterior walls (collectively, "Structural and Foundational Elements of the Building"), and

(3)    The Common Areas and all other improvements on the Building Parcel, as provided at Section 4 of this Restated Lease.

Notwithstanding any other provision of this Restated Lease, all work which Landlord is required or permitted to do under this Restated Lease or with respect to the Premises, the Building or the Building Parcel, or Tenant's Control Area, shall be done in compliance in all material respects with applicable law, and the provisions in subdivision (f) (Mechanics Liens) of Exhibit I attached hereto shall apply to all Landlord's work, and Landlord shall similarly indemnify Tenant and its respective Indemnitees from all Claims (as such capitalized terms are defined in Exhibit I).

Landlord shall at all times operate and maintain the Building and the Building Parcel in accordance with all applicable law. No repairs, alterations or improvements to the Building or Building Parcel by Landlord shall increase the scope or costs of or otherwise adversely affect Tenant's obligations pursuant to Section 2(e) ((1), and Landlord shall use all reasonable efforts to minimize disruption or other the effects on Tenant and its operations on or within the Premises and Tenant's Control Area in conducting such activities. In the event despite Landlord's such reasonable efforts there shall be any material interference with Tenant's

9

LA – Restated Building Lease
Execution

operations for a period in excess of three days, Landlord shall provide suitable additional space
in as close proximity to the affected portion of the Premises as is practicable under the
circumstances, including use of the Tenant's Control Area at Tenant's election, in which Tenant
may conduct its operations without cost or expense to Tenant until Landlord's disruption or
interference has ceased. During the period of any such material interference, and until the
resumption of Tenant's normal activities, Tenant's Share of Real Estate Taxes and CAM
Charges shall be equitably abated. Landlord shall give Tenant reasonable prior notice (except in
case of emergencies, when such notice as is practical shall be given) of any such activities.

      (f)    Quiet Enjoyment. Tenant shall peaceably and quietly have, hold and
enjoy the Premises for the Term as against Landlord and any person claiming by, through or
under Landlord or claiming title paramount to that of Landlord.

## 3.    **INTENTIONALLY DELETED.**

## 4.    **OPERATION OF THE ENTIRE TRACT AND COMMON AREAS**

      (a)    Parking.

      (1)    Landlord shall not charge for the use of any parking spaces on the
Building Parcel except as may be required by law; provided Tenant
shall not be charged for parking on the Entire Tract under any
circumstances, except for expenses of operation permitted to be
charged as part of Tenant's CAM Contributions. Landlord may
charge for parking on portions of the Entire Tract that are not part
of the Building Parcel so long as it is limited to valet parking
operations for restaurants or similar establishments or to parking
areas that charge patrons other than Tenant's customers (through
the establishment of validation or other similar mechanisms).

      (2)    Landlord shall not change the location or configuration of any
parking spaces within Tenant's Control Area as shown on the
Development Site Plan except with the prior written consent of
Tenant, which consent may be given or withheld by Tenant in
Tenant's sole and absolute discretion. Notwithstanding the
foregoing or Section 2(a)(iii), however, if Landlord elects to
construct a parking structure within Tenant's Control Area in the
area shown on the Development Site Plan (but no other area
without Tenant's consent, to be given or withheld in its sole
discretion) for spaces that will not (when constructed) reduce the
number of parking spaces available for Tenant's and its customers'
use, and provided Landlord gives Tenant not less than 45 days'
notice of the anticipated commencement of excavation, grading
and construction and provides reasonably adequate replacement
parking during the period of construction (including not less than
the number of spaces reduced in as close proximity to the Premises
as reasonably possible on the Building Parcel, Landlord shall have

10

LA – Restated Building Lease
Execution

the right to construct such parking structure at its sole cost and expense, on the condition that such parking structure shall not contain reserved spaces (other than for Tenant, at Landlord's election), and Tenant's customers shall not be charged for parking within the parking structure (through the establishment of validation or similar mechanisms). Landlord shall calculate in a reasonable manner any additional Real Estate Taxes that are attributable to the construction of the parking structure, which shall be excluded from Tenant's Share of Real Estate Taxes. .

(3)    Landlord shall maintain, throughout the Term, a parking ratio on the Entire Tract of at least four (4) parking spaces for every 1,000 square feet of GLA of the Premises, and any other retail space at the Entire Tract which is under lease or occupied from time to time. Landlord shall maintain such additional parking for the non-retail space within the Building and at the Entire Tract in conformance with code requirements.

(4)    Subject to the foregoing provisions of this Section 4 and the provisions of Section 2, provided that (A) Landlord shall not (i) take any actions that materially and adversely obstruct or interfere with or inconvenience vehicular or pedestrian (including truck loading and unloading) access to or use of the Premises or the parking areas in Tenant's Control Area or the visibility of the storefront of the Premises, or (ii) permit any sales, exhibits, promotions, advertising, shows or other commercial use or exploitation in Tenant's Control Area, or (iii) otherwise detract from Tenant's use and enjoyment of the Premises and Tenant's Control Area, and (B) neither Tenant's CAM Contribution nor Tenant's costs of maintenance, repair or operation of the Premises are increased thereby, then in such event Landlord will have the reasonable right, from time to time, upon reasonable notice to Tenant but without Tenant's consent, to: (a) enter into, modify and terminate easement and other non-exclusive agreements pertaining to the use and maintenance of the common areas of the Building Parcel and the Entire Tract; (b) temporarily close portions of such common or public areas for necessary maintenance, repairs and replacements, so long as adequate and proximate parking is provided; (c) make or permit changes or revisions in such common or public areas (other than Tenant's Control Area); (d) construct improvements in such common or public areas (other than Tenant's Control Area); and (e) do and perform such other acts in and to such common or public areas (other than Tenant's Control Area) not inconsistent with the foregoing as Landlord shall reasonably determine to be advisable for the benefit of the Building Parcel.

11

LA – Restated Building Lease
Execution

(b)    <u>Other Improvements</u>. Landlord shall maintain or shall cause others to maintain any additional improvements on the Entire Tract in conformance with the standards of Subsection 4.(c), below, and in compliance with all laws, and in a clean and sightly condition, without any interference to the pedestrian or traffic flow through and around Tenant's Control Area.

(c)    <u>Maintenance of Common Areas</u>. Landlord shall maintain, or shall cause a third party to maintain, sweep, clean, repair, replace and provide a security service for the Common Areas and keep the Common Areas in a condition comparable to other multi-use developments of similar size in the Los Angeles, California area, and consistent with the following standards:

(1)    all hard-surfaced portions of the Common Areas shall be swept at intervals sufficient to maintain the same in a clean condition before the retail stores within the Entire Tract open for daily business with the public;

(2)    all sidewalks shall be swept and washed at intervals sufficient to maintain the same in a clean condition;

(3)    all public trash and rubbish containers located in the Common Areas for the use of the public shall be emptied as reasonably required, and shall be washed at intervals sufficient to maintain the same in a clean condition;

(4)    all landscaping shall be properly maintained, including irrigation, removal of weeds and foreign matter, and trimming, removal and replacement of dead plant materials;

(5)    all hard-surfaced markings shall be inspected at regular intervals and promptly repainted as they become unsightly or indistinct from wear and tear or other cause;

(6)    all sewer catch basins shall be cleaned on a schedule sufficient to maintain all sewer lines in a free flowing condition; and all mechanical equipment which is part of storm and sanitary sewer facilities shall be regularly inspected and kept in proper working order;

(7)    all asphalt paving shall be inspected at regular intervals and maintained in a good condition;

(8)    all surface utility facilities servicing the Common Areas, including, but not by way of limitation, hose bibs, standpipes, sprinklers and domestic water lines shall be inspected at regular intervals and promptly repaired or re-placed, as the occasion may require, or upon the occurrence of any defect or malfunctions;

12

LA – Restated Building Lease
Execution

(9)    all common utility facility amenities, benches and institutional, directional, traffic and other signs shall be inspected at regular intervals and maintained in a working, clean and attractive condition; and

(10)    all lamps on lighting standards or otherwise on the Common Areas shall be inspected at regular intervals, and all lamps shall be promptly replaced when no longer properly functioning.

(d)    Tenant's CAM Contribution.

(1)    Subject to the further provisions hereof, from and after the Commencement Date, Tenant shall pay the reasonably estimated Tenant's CAM Contribution for each Lease Year to Landlord in equal monthly payments, which shall be due and payable on or before the first day of each month of such Lease Year commencing with the first full month after the Commencement Date. Notwithstanding the foregoing, for each of the first and second Lease Years, the estimated Tenant's CAM Contribution shall be $0.25 per square foot of GLA of the Premises, and the actual Tenant's CAM Contribution for each of the first and second Lease Years (after reconciliation) shall not exceed such amount. Not less than 90 days after the end of each Lease Year, Landlord shall send Tenant (A) a reconciliation statement of actual CAM Charges and actual Tenant's CAM Contribution, against the actual payments made by Tenant on account of Tenant's CAM Contribution, and Landlord or Tenant shall, as appropriate, promptly pay to the other any overpayment or underpayment, and (B) Landlord's proposed estimate of the estimated Tenant's CAM Contribution for the next succeeding Lease Year and the basis therefor, including a proposed budget in reasonable detail, for Tenant's reasonable review.

(2)    Tenant shall have no obligation to pay Tenant's CAM Contribution with respect to any period during which Landlord is in default of any of its obligations under Section 2 (e) and/or Section 4 of this Restated Lease.

(3)    Tenant shall have the right, exercisable upon at least ten (10) days prior notice to Landlord, to audit or cause a third party to audit the books, invoices and records of Landlord and/or its management company related to charges for Common Area maintenance and Tenant's Share of CAM Charges. If such audit discloses any error in the amount of the statement, the appropriate adjustment and payment or reimbursement, as the case may be, shall promptly be made between Landlord and Tenant to correct such error. If it is determined by such audit that a reimbursement to Tenant is due, and such reimbursement is more than 2% of the actual amount of

13

LA – Restated Building Lease
Execution

Landlord's costs, then Landlord shall reimburse Tenant for the reasonable cost of its audit, which reimbursement shall not be considered a Common Area maintenance cost.

(4)    Landlord shall have the right to establish different cost pools to reflect different uses within the Building (for example, for residential or office uses as opposed to retail uses) and to adjust the method of calculation of Tenant's CAM Contribution (provided that no otherwise excluded or prohibited classes or types of costs or expenses may be included), provided any such establishment of different cost pools shall not be inequitable to Tenant and shall be no less favorable to Tenant than to any other tenant or participant in Tenant's cost pool (which shall include all retail tenants or occupants of the Building), and provided further that allocations within any cost pool applicable to Tenant's CAM Contribution shall be calculated on the GLA of the tenants or occupants within such cost pool on the same basis, and in no event shall Tenant's Share be increased such that Tenant's CAM Contribution (subject to the CAM Cap) shall ever exceed the amount of Tenant's CAM Contribution (subject to the CAM Cap) which would have otherwise applied but for the different cost pool.

(e)    <u>Signage.</u>

(1)    Tenant shall have the right to retain the use of, and shall maintain at Tenant's cost, all of its existing exterior signage on the Entire Tract, and to modify the same (without increasing size or location, subject to subdivision (e)(2) below) and/or permit the same to be shared and/or used by Tenant's assignees and sublessees.

(2)    Subject to compliance with applicable laws, Tenant, its assignees and sublessees shall have the right to replace, remove, construct, install or modify their signage from time to time existing on the Building Parcel. In addition, Tenant shall have the right to increase the size of such signage by up to 50% of the area of such signs as of the Commencement Date (other than the sign at the top of the Building), provided, however, that no such increase in signage area shall diminish the amount of signage (by number of signs or signage area) that can be erected elsewhere on the Entire Tract (but this last proviso shall not limit Tenant's right to increase the area of the two existing signs at the entrance to the existing store premises by up to 50% each). Without limiting the foregoing, Tenant, its assignees, sublessees and licensees may, in accordance with applicable law, affix signage on the interior or exterior of the windows of the Premises, and/or signage anywhere in the interior of the Premises which may be viewed from the exterior of such windows.

14

LA – Restated Building Lease
Execution

(3)    Without limiting the foregoing, Landlord shall not remove the "Sears" sign currently located at the top portion of the center tower on the north elevation of the Building.  That sign shall be maintained at Tenant's cost, and Landlord grants to Tenant the right to maintain such sign during the Term of this Restated Lease.

(4)    Landlord may construct and install signage on the Building Parcel (but not which would materially obstruct the visibility of any Tenant's signage) and the Entire Tract in its sole discretion, but in no event on the top portion of the center tower on the north elevation of the Building, provided that (i) Tenant (and/or Tenant's assignees or and sublessees) shall have the right to have one identification panel (which may be shared by them) on the uppermost portion of any panel sign for the Building Parcel (in size, style and prominence at least equal to the most favorable on such panel, subject to size reduction of text if such single panel is shared) that lists multiple tenants, and one identification panel (which may be shared by them) on any panel sign for any other portion of the Entire Tract that lists multiple tenants (except that with respect to any such panel sign along 12th Street, Tenant (and/or any  designated assignees or sublessees) shall be in no less than third position from the top, and no less than third (including with others that may have similar priority) in style, size and prominence, subject to size reduction of text if such single panel is shared),  (ii) directional signage installed by Landlord on the Building Parcel and on any parking structures within Tenant's Control Area, shall include reasonable directional signage identifying and indicating the location of the Premises,  and Tenant, its designated assignees  and sublessees from time to time, and (iii) Landlord shall not construct or install any signage on Tenant's Control Area or on the exterior of the Building without first securing Tenant's approval, which approval shall not be unreasonably withheld or delayed.

## 5.    DAMAGE AND DESTRUCTION / CONDEMNATION

(a)    To the Premises.

(i)    If the Premises (which term, as used in this Section 5, shall mean and include the Tenant's Control Area) are damaged, destroyed or rendered unfit for their intended use, either in part or totally, by any casualty to be insured by Landlord or through condemnation or the threat of condemnation by any governmental authority having jurisdiction, Landlord shall, at its expense, promptly restore the Premises to substantially the same condition as existed immediately prior to such casualty, destruction or condemnation.  If Landlord fails to repair or restore the Premises as required by this Section 5(a)(i), Tenant may, upon

15

LA -- Restated Building Lease
Execution

thirty (30) days prior notice to Landlord, repair and restore the Premises, and Landlord will pay to Tenant, upon demand, Tenant's expense incurred in so repairing or restoring the Premises, plus Interest thereon. If Tenant does not receive such payment from Landlord within fifteen (15) days of its demand, Tenant will have the right to deduct the same from any payments otherwise due from Tenant to Landlord under this Restated Lease until Tenant has been reimbursed in full.

(ii)     If the cause of the damage is not covered by the insurance policies which Landlord or Tenant maintains hereunder, and Landlord does not elect to rebuild the Premises within ninety (90) days after the damage, loss or condemnation event, Tenant may elect in writing within 4 months after the date of damage or destruction or condemnation, to build in its discretion a replacement store, and in such case Landlord shall provide Tenant with a building and site large enough for up to a 250,000 square foot store and parking as provided herein but not less than per then current codes ("Replacement Store"), in which event the Restated Lease shall be amended to substitute the Replacement Store (together with a suitable replacement Tenant's Control Area) for the Premises and the existing Tenant's Control Area, for the remainder of the Term (but not less than 30 years), upon which Sears shall have the right but not the obligation to construct a replacement store.

(b)     To the other Improvements.

(i)     Subject to the provisions of Section 5(a)(ii), if any part of the Building is damaged or destroyed during the Term of this Restated Lease by any casualty to be insured by Landlord, or damaged or taken through condemnation or the threat of condemnation by any governmental authority having jurisdiction, and in Tenant's reasonable determination such casualty or taking could adversely affect Tenant's use and occupancy of the Premises or access to the Premises or parking or use of the parking, then Landlord will promptly rebuild, repair or replace all such improvements, buildings and the Common Areas so as to eliminate such adverse effect.

(ii)     Notwithstanding the provisions of Section 5(b)(i) to the contrary, if the Building and the Premises are materially damaged or destroyed by an insured casualty, or taken by condemnation, then Landlord shall elect, by written notice to Tenant within 120 days of such casualty or taking, to either (A) restore the Building as provided in Section 5(b)(i), or (B) build a new two level store building replacement store containing approximately 250,000 square feet of GLA, for Tenant on the Entire Tract, at a location reasonably acceptable to Tenant. Tenant shall lease such new store building under terms substantially as contained in this Restated Lease, which shall be amended for such purpose.

16

LA – Restated Building Lease
Execution

(iii)    If Landlord fails to repair or restore any portion of the Building as required by Section 5(b)(i), within 180 days after the date of the casualty or taking, then as to any such conditions which, in Tenant's reasonable determination, could adversely affect Tenant's use or occupancy of the Premises or access to the Premises or parking or access within Tenant's Control Area, Tenant may, after thirty (30) days prior notice to Landlord, repair and restore such conditions, in which event Landlord will pay to Tenant, upon demand, Tenant's expense incurred in so repairing or restoring such conditions, plus Interest thereon. If Tenant does not receive such payment from Landlord within fifteen (15) days of its demand, Tenant will have the right to deduct the same from any payments otherwise due from Tenant to Landlord under this Restated Lease until Tenant has been reimbursed in full.

(iv)    If any part of the Building is damaged, destroyed or taken during the Term of this Restated Lease, and the resulting conditions, in Tenant's reasonable determination, could adversely affect Tenant's use or occupancy of the Premises or access to the Premises or parking or access within Tenant's Control Area, then until such conditions are restored, repaired and rendered fit for customer occupancy, Tenant's obligation to reimburse Landlord for Tenant's CAM Contribution, including real estate taxes, shall abate during such period to the extent such conditions interfere with Tenant's use of the Premises, as determined in Tenant's reasonable determination.

(c)    As suggested by the provisions of Section 5(a)(ii) and 5(b)(ii), the parties acknowledge that a material casualty to the Building could reasonably require a change in the Building other than a restoration, or a change in the Development on the Building Parcel. The parties will cooperate in determining any such changes, with reasonable consideration for their respective needs. Any material alteration to the Development on the Building Parcel will be subject to Tenant's approval, which approval will not be unreasonably withheld.

(d)    Landlord will promptly commence and diligently prosecute to completion the repair of any building or other improvements which require substantial repair or which must be rebuilt by reason of casualty or condemnation pursuant to this Restated Lease, and will (subject to force majeure) be rebuilt and ready for occupancy within twenty four (24) months from the time of the loss or destruction.

(e)    All work, repair or reconstruction by Landlord will be:

(1)    performed with the least interruption reasonably possible to the operation of Tenant's business at the Premises;

(2)    once started, diligently carried through continuously to conclusion.

(3)    if any improvements are not required to be rebuilt pursuant to this Section, Landlord shall clear the properties and maintain the area

17

LA – Restated Building Lease
Execution

in a sightly condition, landscaped or paved for parking, as would be appropriate.

(f)    Notwithstanding the foregoing:

(1)    Tenant shall retain the right at all times, in its sole discretion, to insure the Premises pursuant to separate insurance policies in addition to those of Landlord, which shall be the sole property of Tenant. Tenant shall have the right of full participation in any insurance claim or adjustment with respect to Landlord's insurance with respect to the Premises or the Building.

(2)    Upon not less than 30 days' notice to Landlord after the later of (A) the occurrence of any loss, damage or condemnation, and (B) the expiration of landlord's time to elect to rebuild, without having made such election, then whether or not Landlord's insurance proceeds are available or sufficient therefor, Tenant shall have the right (but not the obligation) to perform all work of repair or reconstruction to the Premises so affected, and if Tenant so elects, Tenant shall be solely responsible therefor and have the control thereof and Landlord shall not be responsible therefor.

(3)    If Tenant makes any election in (ii), Landlord shall turn over all Landlord's insurance proceeds which are fairly allocable to the Premises to Tenant, as and when received, for the purposes of repair or reconstruction of the Premises.

(4)    If the Premises are partially or totally destroyed by fire or other casualty, or rendered totally or partially unfit for their intended use by any casualty to be insured by Landlord or through condemnation or the threat of condemnation by any governmental authority having jurisdiction, then, until the Premises are restored, repaired and rendered fit for customer occupancy, or until a new or replacement store building has been constructed, Tenant's obligation to reimburse Landlord for Tenant's CAM Contribution and Tenant's Share of Real Estate Taxes shall abate during such period as to the area of the Premises within which Tenant is unable to operate its business, as determined in Tenant's reasonable determination.

(5)    For the avoidance of doubt, all of the foregoing provisions of this Section 5 shall apply to any new Replacement Store or any other replacement store.

(g)    Upon any condemnation of the Premises which results in termination of the Restated Lease with respect to the Premises, the award (or separate awards, if the jurisdiction permits) shall be paid as follows:

LA -- Restated Building Lease
Execution

 (1) Tenant shall be entitled to receive and retain the full award which may be claimed, made or allocable to its trade fixtures, fittings, furniture and personal property, good will, business damages, and costs and expenses of removal and relocation to the Replacement Store or other replacement store, site and all other elements, components and awards which Tenant may be entitled to claim as a tenant under California law, without reference to any limitations or restrictions in this Restated Lease;

 (2) Tenant shall be entitled to receive the full amount of the "Premises Award", as hereinafter defined, determined without any reference to the condemnation or the termination of the Restated Lease with respect to the Premises. The "Premises Award" shall mean an amount equal to the fair market value of Tenant's interest in the Premises, the Replacement Store or other replacement store and the Restated Lease (as amended) for the remainder of the Term (but not less than 30 years), computed as of the date of the determination of the award, but without duplication of items described in Subparagraph (g) (1) above; and

 (3) Landlord shall be entitled to receive and retain the full balance of any and all such awards.

## 6. INDEMNIFICATION AND INSURANCE

 (a) <u>Indemnification.</u>

 (1) Landlord's Indemnity and Defense Obligations.

 (i) Landlord waives any right of contribution and shall indemnify Tenant, its directors, officers, employees and agents against, and hold Tenant, its directors, officers, employees and agents harmless from, all claims, actions, losses, damages, costs, expenses and liabilities (except those caused by the willful misconduct or negligent acts or omissions of Tenant, its agents, contractors or employees), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Entire Tract (excluding the Premises) or caused by the willful misconduct or negligent acts of Landlord, its agents, contractors or employees, including injury to or death of, or loss of or damage to any property of, Tenant, its directors, officers, employees, agents, invitees, licensees or others.

 (ii) Landlord shall defend Tenant, its directors, officers, employees and agents against any and all claims and actions described in Section 6(a)(i)(1) hereof.

 (2) Tenant's Indemnity and Defense Obligations.

LA – Restated Building Lease
Execution

     (i)    Tenant waives any right of contribution and shall indemnify Landlord, its constituent partners, and its and their directors, officers, employees and agents against, and hold Landlord, its constituent partners, and its and their directors, officers, employees and agents harmless from, all claims, actions, losses, damages, costs, expenses (including, but not limited to, attorneys' fees) and liabilities (except those caused by the willful misconduct or negligent acts or omissions of Landlord, its agents, contractors or employees), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Premises or caused by the willful misconduct or negligent acts of Tenant, its agents, contractors or employees, including injury to or death of, or loss of or damage to any property of, Landlord, its directors, officers, employees, agents, invitees, licensees or others.

     (ii)    Tenant shall defend Landlord, its constituent partners, and its and their directors, officers, employees and agents against any and all claims and actions described in Section 6(a)(ii)(1) hereof.

    (b)    <u>Tenant's Insurance</u>. Subject to Tenant's right to self-insure, Tenant shall pay for and maintain, during the Term of this Restated Lease, the following policies of insurance covering the Premises, which insurance shall be obtained from insurers rated "A-VIII" or better by Best's Insurance Reports or its equivalent:

    (1)    Workers' Compensation Insurance covering all costs, benefits and liabilities under State Workers' Compensation and similar laws for employees of Tenant and Employer's Liability Insurance, with limits of $500,000 per accident or disease and $500,000 aggregate by disease.

    (2)    If Tenant uses leased or owned motor vehicles on the Entire Tract, Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of liability of $3,000,000 per occurrence for bodily injury and property damage.

    (3)    Commercial General Liability Insurance covering Tenant's operations at the Premises, including, but not limited to, coverage for premises/operations, products/completed operations, contractual and personal/advertising injury liabilities with combined single limits of $5,000,000 per occurrence, for bodily injury and property damage, including Landlord and its managing agent as additional insureds (as defined in ISO 20 26 11 85).

    (4)    All-Risk Property Insurance upon all trade fixtures, merchandise, inventory, personal property, fixtures and equipment, including but not limited to those perils generally covered on a Causes of Loss – Special Form, including fire, extended coverage, windstorm, vandalism, malicious mischief and sprinkler leakage coverage in

20

LA – Restated Building Lease
Execution

the amount of 100% of full replacement cost. The policies that Tenant is required to obtain pursuant to this Article shall name Landlord and, upon Landlord's request, any Landlord's Lender as additional insureds and shall be in excess of coverage which Landlord may have.

Anything contained herein to the contrary notwithstanding, Tenant has the right to self-insure any of Tenant's insurance obligations under this Restated Lease provided that Tenant has a net worth of at least $250,000,000.

(c)    Landlord's Insurance.  Landlord shall pay for and maintain, from the date of this Restated Lease through the end of the Term, the following policies of insurance covering the Entire Tract, which insurance shall be obtained from insurers rated "A-/VIII" or better as defined in the then-current edition of Best's Insurance Reports (or the equivalent thereof if Best's Insurance Reports is no longer published):

(1)    Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Landlord, and Employer's Liability Insurance with limits of $500,000 per accident or disease and $500,000 aggregate by disease.  In addition, Landlord shall require that all contractors hired by Landlord maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and will require all subcontractors to maintain such insurance and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss, injury, damage or liability that Tenant may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

(2)    Commercial General Liability Insurance covering Landlord's operations on the Entire Tract with coverage for premises/operations, products/completed operations, contractual and personal/advertising injury liabilities with combined single limits of $5,000,000 per occurrence for bodily injury and property damage, including Tenant as an additional insured (as defined in ISO Form CG 20 26 11 85 or its equivalent).

(3)    "All-Risk" Property Insurance upon all buildings, building improvements, personal property owned by Landlord and improvements on the Entire Tract, including, but not limited to, those perils generally covered on a Causes of Loss – Special Form, including fire, extended coverage, wind-storm, vandalism, malicious mischief, and sprinkler leakage coverage in the amount of 100 % of full replacement cost.

(4)    If Landlord uses leased or owned motor vehicles on the Entire Tract, Motor Vehicle Liability Insurance with coverage for all

21

LA – Restated Building Lease
Execution

owned, non-owned and hired vehicles with combined single limits of liability of $3,000,000 per occurrence for bodily injury and property damage.

(5) The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies.

(d) <u>No Cancellation.</u> No insurance policy required of Landlord or Tenant under this Restated Lease shall be subject to cancellation or material change without at least 30 days' prior written notice to the other party. Each party shall furnish the other, or cause to be furnished, concurrently with the execution of this Restated Lease, and prior to the inception of each successive policy period, insurance certificates evidencing the polices required to be maintained hereunder (or, in the event Tenant has elected to self-insure, a statement that Tenant has elected to self-insure and evidence of the amount of Tenant's net worth).

(e) <u>Waivers of Subrogation.</u> Any other provisions herein to the contrary notwithstanding, Landlord and Tenant each releases the other and, on behalf of its insurers, waives its entire right to recovery against the other for loss or damage to the waiving party and its property located on the Entire Tract to the extent that the loss or damage is customarily insurable by an "all risk" property insurance policy. Landlord and Tenant agree to furnish to each insurance company that has or will issue an "all risk" policy on their respective portions of the Entire Tract notice of the terms of the mutual waivers contained herein and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers contained herein.

(f) <u>Adjustments.</u> Notwithstanding the foregoing, the limits and terms set forth above are to be minimums and shall be adjusted every five (5) years by mutual agreement of the parties and in accordance with industry standards.

(g) <u>Tenant as Additional Insured.</u> Landlord shall name Tenant as an additional insured on all Landlord's liability insurance policies and shall provide certificates thereof to Tenant promptly after the issuance and renewal of all such policies.

## 7. **REAL ESTATE TAXES AND ASSESSMENTS**

(a) <u>Payment by Landlord.</u> Landlord shall pay Real Estate Taxes levied on the Premises (or any real property that includes the Premises) and the Building Parcel with respect to any period after the Commencement Date.

(b) <u>Reimbursement by Tenant.</u> Tenant shall reimburse Landlord for a portion of Real Estate Taxes paid by Landlord pursuant to Section 7(a) with respect to the Building Parcel only levied with respect to the period beginning with the fiscal year commencing July 1, 2011. Until June 30, 2013, Tenant shall pay the sum of $124, 982.24 (but not more than 50% of the Real Estate Taxes for APN 5169-010-006 for the applicable tax year) for each tax year, subject to the further provisions of this subdivision (b). From and after July 1, 2013, such reimbursement shall be in an amount equal to the product of (i) such Real Estate Taxes and (ii)

LA – Restated Building Lease
Execution

Tenant's Share, provided that until the end of the Stabilized Year (but not thereafter), increases in Real Estate Taxes due to improvements to the Building (excluding the Premises) made after the Commencement Date shall not cause Tenant's Share of Real Estate Taxes to exceed $124,982.24. Tenant shall pay any such reimbursement due within 30 days after receiving evidence of payment of such Real Estate Taxes by Landlord.

      (c)    <u>Disposition of Rebates</u>. Tenant shall be entitled to receive its pro rata share of any rebates, refunds, or credits awarded to Landlord on account of any taxes paid by Landlord for which Landlord has been reimbursed by Tenant. Landlord will, on the request of Tenant, execute any receipts, assignments or other acquittances that may be necessary to secure the recovery of any such rebates, and will pay over to Tenant any such rebates that may be received by Landlord. Landlord shall with reasonable diligence apply for all reductions in Real Estate Taxes as may be permitted by applicable law (including, without limitation, reductions in assessed value under the terms of Proposition 8), as applicable in Landlord's reasonable discretion.

      (d)    <u>Indemnity by Landlord</u>. Landlord shall indemnify Tenant against and hold Tenant harmless from any Real Estate Taxes and assessments levied on the Entire Tract and any other taxes or impositions, unless due from Tenant but unpaid within the time provided.

      (e)    <u>Building Parcel and Adjusted Tax Parcel</u>. If Landlord shall combine the Building Parcel with any legal or tax lot or parcel on or comprising the Entire Tract other than for the creation of the Adjusted Tax Parcel, Tenant's Share of Real Estate Taxes shall be calculated as if the Building Parcel were a separate tax lot. If at any time Real Estate Taxes include any buildings or improvements other than the Building, the amount of real estate taxes attributable to such other buildings or improvements shall not be included in calculating Real Estate Taxes to be paid by Tenant.

## 8.   **DEFAULTS AND REMEDIES**

      (a)    <u>Tenant's Defaults</u>.

           (1)    <u>Non-Payment of Rent</u>. Tenant has prepaid rent through the Term. Tenant's failure to pay rent (other than required Tenant's CAM Contributions or Tenant's Share of Real Estate Taxes) under this Restated Lease shall not be a default under any circumstances.

           (2)    <u>Monetary Default</u>. It shall be a default under this Restated Lease if Tenant fails to make any payment of any amount (other than rent) payable to Landlord hereunder and fails to cure the default within 30 days of its receipt of written notice, which unpaid amount shall bear Interest (as hereinafter defined) after the expiration of the 30-day cure period.

           (3)    <u>Failure to Meet Other Obligations</u>. It shall be a default under this Restated Lease if Tenant fails to perform any term or condition of this Restated Lease (other than monetary obligations) within the

23

LA – Restated Building Lease
Execution

time provided for and, after receiving written notice of such failure, does not cure such condition within thirty (30) days of receipt of such written notice. Notwithstanding the foregoing, if the condition is of a nature that it cannot reasonably be completed within thirty (30) days, then Tenant shall not be in default so long as Tenant has commenced the cure within thirty (30) days and thereafter diligently prosecutes the cure to completion within such additional time as may reasonably be necessary.

(b)    Landlord's Default.

(1)    It shall be an event of default hereunder if Landlord shall fail to fulfill or perform, in whole or in part, any of its obligations under this Restated Lease and such failure or nonperformance shall continue for a period of thirty (30) days after written notice thereof has been given by Tenant to Landlord; provided, however, that if such default is of a nature that it cannot reasonably be completed within such thirty (30) day period, then Landlord shall not be in default so long as Landlord has commenced the cure within such thirty (30) day period and thereafter diligently and continuously prosecutes the cure to completion within such additional time as may reasonably be necessary.

(2)    Notwithstanding the foregoing, if Landlord fails to perform Landlord's obligations to maintain the Common Areas as set out in Section 2(e) and/or Section 4(b) or Section 5 hereof, or shall fail to pay or perform any other obligation of Landlord hereunder, within thirty (30) days after receiving notice from Tenant demanding such payment or performance, then Tenant may (but shall not be obligated) to pay or perform all or any portion of such payments or obligations and shall be entitled to be reimbursed by Landlord for Tenant's reasonable cost and expense of such payment or performance, together with interest at the Prime Rate ("Interest"), accruing from the date Tenant incurs such cost or expense or makes such payment until the date reimbursed by Landlord. If Tenant's cost, expense or payment and such Interest are not paid within thirty (30) days after Tenant gives Landlord notice demanding such reimbursement (accompanied by invoices or paid receipts substantiating Tenant's expenses), then Tenant may deduct such amount from any amounts otherwise theretofore or thereafter payable from or reimbursable by Tenant to Landlord under this Restated Lease, until Tenant has been fully reimbursed. Without limiting the foregoing, Tenant may deduct all amounts which may be owing by Landlord hereunder against any and all amounts otherwise payable or reimbursable by Tenant under this Restated Lease.

24

LA – Restated Building Lease
Execution

       (c)   Remedies. On default by Landlord or Tenant under this Restated Lease and expiration of the applicable cure period, Landlord or Tenant, as applicable, shall have the right to obtain an injunction or other appropriate judicial relief against the other, provided that Landlord shall not have the right to initiate an unlawful detainer or other summary dispossess or similar summary action against Tenant, subject to the further provisions of this subdivision (c). Notwithstanding the preceding sentence, however, in the event of any disputes and controversies with respect to any of the following matters, events or occurrences (and only such matters, events and occurrences, together with any default with respect to any such events, occurrences and other matters, collectively "EDR Matters") shall be subject to binding arbitration in accordance with the procedures set forth in Exhibit H hereto (together will all of the proceedings thereunder, "EDR"), which shall be the exclusive remedy with respect to any and all such EDR Matters: any failure by Landlord or Tenant to pay or reimburse any amounts required hereunder including without limitation with respect to any amounts pursuant to Section 2, Section 4, Section 5(f) (3) but not any other provision of Section 5 (as to which Section 5 (f) (3) disputes ("Rebuilding Insurance Proceeds Disputes") there shall be special procedures "Modified EDR") as provided on Exhibit H attached hereto), and Section 6 or Section 7 (including any dispute as to any deduction or offset by Tenant or any reconciliation, audit, discrepancy or error in the calculation or computation of any such amounts under any or all of the foregoing Sections); any failure by Landlord or Tenant to deliver any documents required under (1) Section 11 (n), only with respect to Tenant's obligation to deliver the form of agreement specified in Exhibit "G", but not with respect to any lease modification or subordination agreement or any other provision or document in Section 11(n), or (2) Section 11(o); any failure or refusal by Landlord or Tenant to perform any other obligation pursuant to Section 2 (provided that disputes with respect to Section 2 (b), including Prohibited Uses by either Landlord (including tenants of Landlord) or Tenant ("Use Disputes"), shall be expressly subject to Modified EDR) or Section 4; or any failure or refusal by Landlord or Tenant to perform any other obligations pursuant to Section 6 or Section 7. No failure by Landlord or Tenant to insist upon the performance or the strict performance of any covenant, condition or other provisions of this Restated Lease, or to exercise any right or remedy consequent upon a breach or other default thereof, shall constitute a waiver or assumption thereof by the other party, and no acceptance, use or occupancy of the Premises or Common Areas shall constitute a waiver or assumption by Tenant of any duty or obligation of Landlord with respect thereto. The grant or reservation herein or the exercise of any right or remedy, or of any supplementary or alternative rights or remedies, shall not affect or prejudice any other rights or remedies which Landlord or Tenant may have under this Restated Lease or under law, subject to the provisions herein with respect to EDR. Notwithstanding the foregoing or any other provision in this Restated Lease to the contrary, in the event of any legal action or proceeding, or EDR, between the parties, Landlord shall not be entitled to exercise any remedy or take any action to terminate this Restated Lease or regain possession of the Premises, or otherwise interfere with Tenant's use, occupancy and enjoyment of the Premises, until the expiration of 30 days (or such longer period as shall be reasonably necessary with the exercise by Tenant of diligence and dispatch) from any final, unappealable judgment or final award in any EDR, as the case may be, in favor of Landlord, without Tenant's payment, cure or compliance with any such judgment or award (including, with respect to non-monetary judgments and awards, by way of example only, cessation of any non-Permitted Use or the taking of other prospective corrective action).

LA -- Restated Building Lease
Execution

## 9.    **HAZARDOUS MATERIALS**

    (a)    <u>Landlord's Covenants</u>.

        (1)    Landlord shall comply with all orders, rulings or other requirements concerning Hazardous Material (other than Tenant's Hazardous Material) of any court, governmental body or agency having jurisdiction over the Entire Tract, including, without limitation, any requirement to perform repair, cleanup or detoxification work or prepare any closure or other plans, and shall diligently pursue to completion all such work. Landlord shall pay all costs and expenses of such compliance and performance except for costs and expenses relating to Tenant's Hazardous Material.

        (2)    Landlord waives any right of contribution and shall indemnify Tenant, its directors, officers, employees and agents against, and hold Tenant, its directors, officers, employees and agents harmless from, any and all claims, actions and liabilities arising from (1) Hazardous Material brought or released (or permitted to be brought or released) onto the Entire Tract by Landlord, its agents, contractors or employees or (2) the breach of any representation, warranty or covenant contained in this Section and all reasonable costs and expenses, including attorneys' fees, paid or incurred by Tenant in defending or otherwise responding to, such claims, actions and liabilities.

        (3)    Landlord shall diligently pursue any responsible parties in connection with the performance of any cleanup, repair, detoxification or other remedial action with respect to Hazardous Material to which Landlord is not obligated to take any action.

    (b)    <u>Tenant's Covenants</u>.

        (1)    Tenant shall comply with all orders, rulings or other requirements concerning Tenant's Hazardous Material of any court, governmental body or agency having jurisdiction over the Entire Tract, including, without limitation, performance of any repair, cleanup or detoxification work and the preparation of any closure or other plans, and shall diligently pursue to completion all such work and shall pay all costs and expenses of such compliance and performance.

        (2)    Tenant waives any right of contribution and shall indemnify Landlord, its constituent partners and its officers, employees and agents against, and hold Landlord, its constituent partners and its and their directors, officers, employees and agents harmless from, any and all claims, actions and liabilities arising from Tenant's

LA – Restated Building Lease
Execution

> Hazardous Material and all reasonable costs and expenses,
> including attorneys' fees, paid or incurred by Landlord in
> defending or otherwise responding to, such claims, actions and
> liabilities.

## 10.    END OF TERM

(a)    Effect of Tenant's Holding Over.  Any holding over after the expiration of the Term of this Restated Lease shall be construed to be a tenancy from month to month, at a market monthly rental rate and shall otherwise be on the terms and conditions herein specified, so far as applicable.

(b)    Redelivery of Premises.  Tenant shall, at the expiration or sooner termination of the Term of this Restated Lease, peaceably and quietly quit and surrender to Landlord the Premises in broom clean condition subject to the other provisions of this Restated Lease.

## 11.    GENERAL PROVISIONS

(a)    Notices.  Notices shall be in writing and shall be deemed given:  (i) two business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (ii) one business day after being deposited with a reputable overnight express carrier (e.g. Federal Express, Airborne, Express Mail, UPS) for guaranteed next business day delivery, or (iii) upon receipt if personally delivered.  Notices shall be addressed as follows:

| | |
|---|---|
| Tenant: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Department 824RE<br>Hoffman Estates, Illinois  60179<br>Attn:  Vice President – Real Estate |
| Copy to: | Sears, Roebuck and Co.<br>3333 Beverly Road<br>Department 824RE<br>Hoffman Estates, Illinois  60179<br>Attn:  Associate General Counsel – Real Estate |
| For Real<br>Estate Tax<br>Invoices, with a copy to: | Sears, Roebuck and Co.<br>Real Estate Taxes<br>Department 768TAX<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179 |
| Landlord: | c/o MJW Investments, Inc.<br>1640 5th Street, Suite 112<br>Santa Monica, CA  90401 |

27

LA -- Restated Building Lease
Execution

Telephone Number:  (310) 395-3430 ext 104
Facsimile transmission number: (310) 395-3145
Attention: Mark Weinstein

with a copy to:

Fragner Seifert Pace & Winograd, LLP
601 South Figueroa St., Suite 2320
Los Angeles, California 90071
Telephone No.: 213-687-2320
Facsimile No.: 310 496-2887
Attention: Matthew C. Fragner, Esq.

or to any other address furnished in writing by any of the foregoing.  However, any change of addresses furnished shall comply with the notice requirements of this Section and shall include a complete listing of all current addresses to be used for all parties.

(b)    Waiver.  No provision of this Restated Lease will be deemed waived by either party unless expressly waived in a writing signed by the waiving party.  No waiver shall be implied by delay or any other act or omission of either party.  No waiver by either party of any provision of this Restated Lease shall be deemed a waiver of such provision with respect to any subsequent matter relating to such provision, and consent respecting any action by a party shall not constitute a waiver of the requirement for obtaining such party's consent respecting any subsequent action.  Acceptance of any payment by Landlord shall not constitute a waiver of any breach by Tenant of any term or provision of this Restated Lease.  No acceptance of a lesser amount than the amount due shall be deemed a waiver of Landlord's right to receive the full amount due, nor shall any endorsement or statement on any check or payment or any letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the full amount due.

(c)    Restated Memorandum of Lease and Transfer and Recording Taxes.  Upon execution of this Restated Lease, a restated memorandum of this Restated Lease in the form of Exhibit "E" attached hereto and by this reference incorporated herein shall be executed by both parties and Landlord shall record such memorandum.  The parties believe that not transfer taxes or assessments shall be due upon such recordation, but if any such transfer taxes or assessments are imposed then Landlord will pay all transfer and recording taxes, charges and assessments levied, assessed or incurred upon execution, delivery or recordation of this Restated Lease or such memorandum, as they become due.  In the event of a change in the configuration of the Building Parcel due to the creation of an Adjusted Tax Parcel or a change in the configuration of the Entire Tract due to a similar re-mapping process, the parties agree to record a second restated memorandum of this Restated Lease reflecting the changed legal description, provided, however, there shall be no change in the priority of this Restated Lease or other material adverse effect on any of the parties' rights as contained in this Restated Lease.

28

LA -- Restated Building Lease
Execution

(d)    <u>Assignment and Subletting</u>. Tenant shall have the absolute right to assign this Restated Lease or sublease all or any part of the Premises, during the Term of this Restated Lease. Without limiting the foregoing, Tenant may, in its sole discretion, grant to any assignee or sublessee the right to exercise any or all rights and remedies of Tenant under this Restated Lease. Any assignment or subletting of the Premises by Tenant shall not release Tenant from the obligations under this Restated Lease.

(e)    <u>Successors and Assigns</u>. The covenants and conditions herein contained shall, subject to the provisions as to assignment, transfer and subletting, be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. In no event shall Tenant have any right to approve any tenant of the Building Parcel or the Entire Tract or any purchaser or lender of all or any portion of the Building Parcel or the Entire Tract.

(f)    <u>Encumbrance of Tenant's Leasehold Interest</u>. Tenant may, without Landlord's consent, grant a lien on or a security interest in its leasehold interest in the Premises, and its right, title and interest in this Restated Lease (a "<u>Leasehold Encumbrance</u>"), as security for any indebtedness or obligation of Tenant provided that the grantee of such Leasehold Encumbrance is an institutional lender (a "<u>Leasehold Lender</u>"). If a Leasehold Lender shall have given Landlord notice of the creation of a Leasehold Encumbrance, Landlord shall give to such Leasehold Lender a copy of each notice of any claimed default by Tenant at the same time and whenever any such notice is given to Tenant, addressed to such Leasehold Lender at the address last furnished to Landlord. Such Leasehold Lender shall thereupon have a period of thirty (30) days more, after service of such notice upon it, for remedying the default or causing the same to be remedied, than is given Tenant after service of such notice upon it. Such Leasehold Lender, in case Tenant shall be in default hereunder, shall, within such period and otherwise as herein provided, have the right to remedy such default, or cause the same to be remedied. Landlord will accept performance by the Leasehold Lender of any covenant, condition or agreement on Tenant's part to be performed hereunder with the same force and effect as though performed by Tenant. If the Leasehold Lender cannot reasonably take the action required to cure the default without being in possession of the Premises, the time of Leasehold Lender to cure the default shall be deemed extended to include the period of time required by such Leasehold Lender to obtain such possession with due diligence; provided, however, that during such period all other obligations of Tenant under this Restated Lease, including the payment of rent and other sums required to be paid by Tenant, are being duly performed. No Leasehold Lender shall become liable under the provisions of this Restated Lease, unless and until such time as it becomes, and then only for as long as it remains, the owner of the Leasehold Estate.

(g)    <u>Time of the Essence</u>. Time is of the essence of this Restated Lease, and of each and every covenant, term, condition and provision hereof.

(h)    <u>Broker</u>. Landlord and Tenant represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Restated Lease. Landlord shall pay any commission or other compensation claimed by any broker.

(i)    <u>Captions</u>. The captions used in this Restated Lease are for convenience only and are not a part of this Restated Lease and do not in any way limit or amplify the terms and provisions of this Restated Lease.

29

LA – Restated Building Lease
Execution

(j)    <u>Governing Law</u>. This Restated Lease shall be interpreted and construed under the laws of the State of California.

(k)    <u>No Partnership</u>. Nothing contained in this Restated Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant and neither the method of computation of rent nor any other provision contained in this Restated Lease or any acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

(l)    <u>Severability</u>. Any provision or provisions of this Restated Lease that are or become a legal or legally void shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions of this Restated Lease shall nevertheless remain in full force and effect.

(m)    <u>Authority</u>. Each party hereto represents and warrants to the other that it has all requisite corporate or partnership authority, as the case may be, to enter into and perform this Restated Lease.

(n)    <u>Subordination, Nondisturbance and Attornment Agreement</u>. Upon the request of Landlord, Tenant and any and all leasehold mortgagees shall execute and deliver any documents or instruments that may be reasonably required by Landlord's Lender under any mortgage, ground lease or deed of trust which affects the Premises, to effectuate subordination according to the terms and conditions hereof, provided that any such Landlord's Lender agrees not to disturb Tenant's right to quiet possession so long as Tenant is not in default, and after notice and passage of time would not be in default, under the terms, covenants, conditions and provisions of this Restated Lease. The form attached hereto as Exhibit G is deemed reasonable, provided Landlord and its Lender may require a different commercially reasonable form that does not preclude or condition Tenant from exercising its remedies for a Landlord default, permits the payment and application of insurance and condemnation proceeds as provided herein, and otherwise preserves and respects the rights, remedies and privileges of Tenant under the Restated Lease. Upon its taking possession of the Premises, Tenant shall attorn to and shall recognize Landlord's Lender as Tenant's landlord under this Restated Lease and shall promptly execute and deliver any instrument that Landlord's Lender may reasonably require to evidence such attornment. If Landlord's Lender reasonably requires a modification of this Restated Lease in connection with the execution of such subordination agreement, Tenant shall, at Landlord's Lender's request and at Landlord's Lender's expense (including payment of Tenant's reasonable attorneys' fees), promptly execute, acknowledge and deliver instruments effecting the modifications that Landlord's Lender reasonably requires, provided that such modifications are not inconsistent with and otherwise do not adversely affect any of Tenant's rights, remedies or privileges nor increase any Tenant's liabilities or obligations nor indirectly increase Landlord's or Landlord's Lender's rights nor materially decrease their liabilities and obligations, in each case under this Restated Lease or under the subordination agreement, and provided that Landlord's Lender procures and pays for a modification endorsement to any Tenant's leasehold title insurance policy insuring Tenant's interest in the Restated Lease against any intervening liens. If Landlord's Lender has given prior written notice to Tenant that it is the Landlord's Lender and such notice includes the address at which notices to such Landlord's Lender are to be

LA – Restated Building Lease
Execution

sent, then Tenant shall give Landlord's Lender written notice simultaneously with any notice given to Landlord to correct any failure of Landlord to perform any of Landlord's obligations. Landlord's Lender shall have the right after receipt of said written notice to correct or remedy such failure within a reasonable period of time, not to exceed any additional 30 days beyond that afforded Landlord under the Restated Lease.. The covenants and agreements of Landlord under this Restated Lease first arising after the transfer of interest, shall not be binding upon the transferor at any time after the transfer of that person's interest, as Landlord, in the Premises upon notice to tenant and the successor's written assumption of this Restated Lease, subject to the provisions of Section 11(r). In the event of such a transfer, the covenants and agreements of Landlord shall thereafter be binding upon the transferee of Landlord's interest.

(o)    Estoppel Certificates. Either party shall, within thirty (30) days after receipt of a written request from the other party (not to exceed more than 2 requests by either party in any 12 month period, provided that until the end of the Stabilization Year, such maximum number shall be 3), provide an estoppel certificate substantially in the form of Exhibit "F" attached hereto and by this reference incorporated herein.

(p)    Construction. Each party hereto has participated in the preparation of this Restated Lease and it should be interpreted without reference to any rule of construction requiring that it be construed against the drafter.

(q)    Survival of Indemnities. Each obligation of either party to this Restated Lease to indemnify, defend or hold the other party harmless from any claim or liability shall survive the expiration or termination of the Term of this Restated Lease.

(r)    Limitation on Recourse to Landlord. Tenant shall look solely to (i) Landlord's interest in the Entire Tract and the improvements thereon ("Landlord's Interest"), (ii) the proceeds of sale receivable from any execution of any judgments against Landlord's interest, (iii) any consideration receivable by Landlord from the sale or other disposition of all or any part of Landlord's Interest, which consideration shall be deemed to include any nonrefundable assets at any time held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, (iv) rents and other income from the Entire Tract receivable by Landlord (including funds misapplied by Landlord), (v) Landlord's share of any condemnation award in respect of the Entire Tract or the proceeds payable from any casualty insurance required to be maintained by Landlord hereunder, and (vi) amounts due and payable to Landlord under this Restated Lease for the enforcement of any judgment, order or other remedy under or in connection with this Restated Lease and shall not have recourse to Landlord personally for any such judgment, order or other remedy or any deficiency after execution thereof; provided, however, that nothing herein shall limit Tenant's rights to obtain injunctive or other equitable relief. Except for matters with respect to which Landlord may be personally liable hereunder, no other properties or assets of Landlord or its partners shall be subject to levy, execution or other enforcement procedures for the satisfaction of any judgment (or other judicial process) arising out of this Restated Lease. Anything in this Section to the contrary notwithstanding, Landlord shall be personally liable for fraud and for fraudulent misapplication (i) of proceeds paid under any insurance policies maintained pursuant to the provisions hereof or (ii) of proceeds or awards resulting from any taking of the Premises or any transfer in lieu thereof. Upon transfer by Landlord of its entire interest in the Premises to a transferee who expressly assumes all of

31

LA – Restated Building Lease
Execution

Landlord's obligations under this Restated Lease, Landlord shall be released from liability for any matters hereunder arising after such transfer.

     (s)   Ratification. Neither this Restated Lease nor any restated memoranda of lease recorded in connection herewith is or is intended to be a substitution or novation of the Prior Lease, nor extinguishes nor releases nor in any other way adversely affects the continued Priority of the Prior Lease. The Prior Lease, as hereby amended, and as so amended, restated in its entirety and the priority of which is continued hereby, together with all those certain documents or agreements executed and delivered by the parties (including with others) in connection with this Restated Lease, expressly include and integrate any and all previous negotiations, arrangements, representations, brochures, displays, projections, estimates, agreements, and understandings, if any, made by, to, or between Landlord and Tenant and their respective agents and employees with respect to the subject matter thereof, and except for the any other documents between the Parties and dated concurrently with this Restated Lease, none shall be used to interpret, construe, supplement or contradict this Restated Lease, including any and all amendments thereto. To be effective and binding on Landlord and Tenant, any amendment, revision, change or modification to the provisions of this Restated Lease must be in writing and executed by both parties. For avoidance of doubt, the execution of this Restated Lease constitutes withdrawal and nullification of all prior notices of default and all so-called "pay rent or quit" notices of Landlord.

     (t)   Tenant's Rights. For the avoidance of doubt, wherever in this Restated Lease Tenant has or may have the right to pay, perform or do any act or thing, unless the context otherwise expressly requires, such right shall be deemed permissive only but shall not obligate or require Tenant to pay, perform or do any such thing unless Tenant elects to do so in Tenant's sole discretion.

     (u)   Counterparts. This Restated Lease may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.

## 12.  **CONSTRUCTION OF NEW STORE.**

     Tenant shall have the right to alter, renovate, construct, expand and improve the Premises (including exterior storefronts, loading and receiving docks and areas, entrances and exits, and garden shops and patios that are part of the Premises, such exterior areas collectively "Exterior Areas"), at any time and from time to time, in such manner and to such extent as Tenant shall determine in its discretion (collectively, "Alterations"), so long as all work is done in accordance with all applicable legal requirements and is otherwise in conformity with this Restated Lease. Subject to Landlord's obligations pursuant to Sections 2, 4 and 5, all New Store Improvements shall be made and performed at Tenant's sole cost and expense, and shall be the property of and owned by Tenant during the Term (subject to Landlord's obligation to pay all Real Estate Taxes thereon, further subject to Tenant's obligations to pay Tenant's Share thereof). Any such Alterations shall conform to the requirements of Exhibit I attached hereto.

SIGNATURES ON FOLLOWING PAGE

LA – Restated Building Lease
Execution

**IN WITNESS WHEREOF,** Landlord and Tenant have duly executed this Restated Lease as of the date first above written.

**"Landlord":**

**10309 FOLSOM BLVD., L.P.,**
a California limited partnership

By MJW Investments, Inc., its general partner

By: Mark J Weinstein
Its: President

**"Tenant":**

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By:
Its:

33

LA – Restated Building Lease

 

 

 

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed this Restated Lease as of the date first above written.

**"Landlord"**:

**10309 FOLSOM BLVD., L.P.,**
a California limited partnership

By MJW Investments, Inc., its general partner

By: _____
Its: _____

**"Tenant"**:

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By: _____
Its: _____
      J. Kal Gibron
      V.P. Real Estate

LA – Restated Building Lease
Execution

## Exhibit A

## Legal Description of Entire Tract

PARCEL 1: (PORTION OF APN: 5169-010-006)

LOT 1 OF TRACT NO. 9410, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK
136, PAGES 7 AND 8 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2: (PORTION OF APN: 5169-010-006)

THOSE PORTIONS OF LOTS 2, 3, 4 AND 5 IN BLOCK 8 OF TRACT NO. 6783, IN THE CITY OF
LOS ANGELES, AS PER MAP RECORDED IN BOOK 99 PAGE 77 ET SEQ., OF MAPS, IN THE
OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

COMMENCING AT THE MOST WESTERLY CORNER OF SAID LOT 3; THENCE SOUTH 62° 31' 30"
EAST, ALONG THE SOUTHWESTERLY LINE THEREOF, 400 FEET TO THE MOST SOUTHERLY
CORNER OF THE LAND DESCRIBED IN DEED TO LOS ANGELES PAPER BOX FACTORY,
RECORDED IN BOOK 10041 PAGE 15 OFFICIAL RECORDS, SAID MOST SOUTHERLY CORNER
BEING THE TRUE POINT OF BEGINNING; THENCE NORTH 27° 28' 30" EAST ALONG THE
SOUTHEASTERLY LINE OF SAID LAND SO DESCRIBED AND THE NORTHEASTERLY
PROLONGATION THEREOF, 180 FEET TO THE SOUTHWESTERLY LINE OF TRACT NO. 9410, AS
PER MAP RECORDED IN BOOK 136 PAGES 7 AND 8 OF MAPS; THENCE SOUTH 62° 31' 30" EAST
ALONG SAID LAST MENTIONED SOUTHWESTERLY LINE, 412.44 FEET TO THE EASTERLY LINE
OF SAID LOT 5 (BEING ALSO THE WEST LINE OF SOTO STREET) ; THENCE SOUTH 4° 59' 47"
WEST, ALONG SAID EASTERLY LINE; 164.87 FEET TO THE BEGINNING OF A CURVE THEREIN,
CONCAVE TO THE NORTH, HAVING A RADIUS OF 20 FEET; THENCE WESTERLY ALONG SAID
CURVE, 39.26 FEET TO THE END THEREOF; THENCE NORTH 62° 31' 30" WEST, ALONG THE
SOUTHWESTERLY LINES OF SAID LOTS 5, 4 AND 3, A DISTANCE OF 457.00 FEET TO THE TRUE
POINT OF BEGINNING.

PARCEL 3: (PORTION OF APN: 5169-010-006)

ALL THOSE PORTIONS OF LOTS 2 AND 3 IN BLOCK 8 OF TRACT NO. 6783, IN THE CITY OF LOS
ANGELES, AS PER MAP RECORDED IN BOOK 99 PAGE 77 ET SEQ., OF MAPS, IN THE OFFICE OF
THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHWESTERLY LINE OF SAID LOT 3, SOUTH 62° 31' 30"
EAST, 100 FEET FROM THE MOST WESTERLY CORNER OF SAID LOT 3; THENCE NORTH 27° 28'
30" EAST, 163 FEET, MORE OR LESS, TO THE INTERSECTION WITH A LINE DRAWN PARALLEL
WITH AND DISTANT NORTHEASTERLY 13 FEET, MEASURED AT RIGHT ANGLES FROM THE
NORTHEASTERLY LINE OF SAID LOT 3 AND DISTANT SOUTH 62° 31' 30" EAST THEREON,
167.46 FEET FROM THE WEST LINE OF SAID LOT 2; THENCE SOUTH 62° 31' 30" EAST ALONG
SAID PARALLEL LINE, 300 FEET; THENCE SOUTH 27° 28' 30" WEST, 163 FEET, MORE OR LESS,
TO THE INTERSECTION WITH AFORESAID SOUTHWESTERLY LINE OF LOT 3; THENCE NORTH
62° 31' 30" WEST, ALONG SAID SOUTHWESTERLY LINE, 300 FEET TO THE POINT OF
BEGINNING.

PARCEL 4: (PORTION OF APN: 5169-010-006)

34

THOSE PORTIONS OF LOTS 2 AND 4, IN BLOCK 8 OF TRACT NO. 6783, IN THE CITY OF LOS -ANGELES, AS PER MAP RECORDED IN BOOK 99 PAGE 77 ET SEQ., OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWESTERLY CORNER OF SAID LOT 2; THENCE SOUTH 62° 31' 30" EAST, ALONG THE NORTHEASTERLY LINE OF SAID LOT 2 AND ITS SOUTHEASTERLY PROLONGATION, 724.59 FEET TO A POINT IN THE EASTERLY LINE OF SAID LOT 4; THENCE SOUTH 4° 59' 47" WEST, ALONG SAID EASTERLY LINE, 194.80 FEET TO THE SOUTHEASTERLY CORNER OF SAID LOT 4; THENCE NORTH 62° 31' 30" WEST, ALONG THE SOUTHWESTERLY LINE OF SAID LOT 4, A DISTANCE OF 18.42 FEET TO A POINT IN A CURVE CONCAVE WESTERLY HAVING A RADIUS OF 330.43 FEET, THE TANGENT TO SAID CURVE AT SAID POINT BEARING SOUTH 4° 23' 07" WEST; THENCE NORTHERLY ALONG SAID CURVE, A DISTANCE OF 51.46 FEET; THENCE NORTH 4° 32' 13" WEST 9.93 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 231.99 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE, A DISTANCE OF 234.79 FEET TO A LINE PARALLEL WITH AND DISTANT 17 FEET SOUTHWESTERLY, MEASURED AT RIGHT ANGLES, FROM SAID NORTHEASTERLY LINE OF LOT 2; THENCE NORTH 67° 31' 30" WEST TANGENT TO SAID LAST MENTIONED CURVE, ALONG SAID PARALLEL LINE, 547.87 FEET TO A POINT IN THE WESTERLY

LINE OF SAID LOT 2; THENCE NORTH 4° 59' 47" EAST ALONG SAID WESTERLY LINE, 18.40 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

EXCEPT ANY PORTION OF SAID LAND THAT IS DESCRIBED IN PARCEL 2.

PARCEL 5: (APN: 5169-010-005)

THOSE PORTIONS OF LOTS 2 AND 3 IN BLOCK 8 OF TRACT 6783; IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK

99 PAGE 77 ET SEQ. OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY CORNER OF SAID LOT 3; THENCE NORTH 4° 59' 47" EAST, ALONG THE WESTERLY LINES OF SAID LOTS 3 AND 2, 176.40 FEET, MORE OR LESS, TO THE INTERSECTION THEREOF WITH A LINE DRAWN PARALLEL WITH AND DISTANT NORTHEASTERLY 13 FEET; MEASURED AT RIGHT ANGLES, FROM THE NORTHEASTERLY LINE OF SAID LOT 3; THENCE SOUTH 62° 31' 30" EAST, ALONG SAID PARALLEL LINE, 167.46 FEET; THENCE SOUTH 27° 28' 30" WEST, 163.0 FEET, MORE OR LESS, TO A POINT IN THE SOUTHWESTERLY LINE OF SAID LOT 3, DISTANT SOUTH 62° 31' 30" EAST THEREON, 100 FEET

FROM THE POINT OF BEGINNING; THENCE NORTH 62° 31' 30" WEST ALONG SAID SOUTHWESTERLY LINE, 100 FEET TO THE POINT OF BEGINNING.

LA – Restated Building Lease
Execution

## Exhibit B

## Development Site Plan

EXHIBIT



LA -- Restated Building Lease
Execution

## **Exhibit B-1**

## **Floor Plan of Premises**

LA – Restated Building Lease
Execution



LA -- Restated Building Lease
Execution



LA – Restated Building Lease
Execution

## **Exhibit C**

## **Legal Description of Building Parcel**

PARCEL 1: (PORTION OF APN: 5169-010-006)

LOT 1 OF TRACT NO. 9410, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 136, PAGES 7 AND 8 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

LA – Restated Building Lease
Execution

## Exhibit D

## Prohibited Uses

(a)    A surplus store; gun range; the sale of guns as a primary use; car wash facility; theater, auditorium; or hotel or motel.

(b)    No portion of the Entire Tract shall be used for any of the following purposes: a flea or swap market or a business selling so-called "second hand" goods (the term "second hand" shall mean stores that sell goods primarily as a service to the public rather than to a retail customer for a profit); a business selling damaged or imperfect merchandise as a regular part of its inventory other than stores such as Marshall's or Ross that sell seconds as part of their inventory; cemetery; funeral home, mortuary; any establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene materials; a so-called "head shop"; pawn shop; off-track betting parlor; junk yard; recycling facility or stockyard; motor vehicle or boat dealership, body and fender shop, or motor vehicle or boat storage facility; a laundromat or dry-cleaning facility (but this shall not be deemed to prohibit nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer); a bar, tavern or cocktail lounge; a discotheque, dance hall, comedy club, night club or adult entertainment facility; billiard or pool hall; massage parlor; a gambling facility or operation; a beauty school, barber college, reading room; industrial or manufacturing uses; school or house of worship.

(c)    No portion of the Entire Tract shall be used for a business or use that creates strong, unusual or offensive odors, fumes, dust or vapors; emits noise or sounds that are objectionable due to intermittence, beat, frequency, shrillness or loudness; creates unusual fire, explosive or other hazards, or materially increases the rate of insurance for any other parcel in the Entire Tract, Landlord or any tenant.

(d)    No oil development operations, oil refining, quarrying or mining operations of any kind shall be permitted upon or in any portion of the Building Parcel, nor shall oil wells, tanks, tunnels, or mineral excavation or shafts be permitted upon the surface of any portion of the Entire Tract, or within five hundred (500) feet below the surface of the Building Parcel.  No derrick or other structure designed for use in boring for water, oil, natural gas or other minerals shall be erected, maintained or permitted on any portion of the Building Parcel. For the avoidance of doubt, the foregoing shall not prohibit any operations under the existing separate lease with respect to the facility currently operated by Tenant as a tire, battery and automotive accessories facility.

40

LA – Restated Building Lease
Execution

## Exhibit E

## Form of Restated Memorandum of Lease

Recording Requested by and

When recorded, return to:

Sears, Roebuck and Co.
3333 Beverly Road, Dept. 824RE
Hoffman Estates, Illinois  60179
Attention:  Assistant General Counsel, Real Estate

(Space Above for
Recorder's Use Only)

State of California
County of Los Angeles

## AMENDED AND RESTATED MEMORANDUM OF LEASE

THIS AMENDED AND RESTATED MEMORANDUM OF LEASE ("Restated Memorandum") is made and entered into as of May 5, 2011, by and between 10309 Folsom Blvd., LP, a California limited partnership ("**Landlord**"), and SEARS, ROEBUCK AND CO., a New York corporation ("**Tenant**").

### WITNESSETH:

A.      Landlord is the owner of certain real property located in the City of Los Angeles, County of Los Angeles, State of California, legally described on Exhibit "A" attached hereto and incorporated herein by this reference ("Entire Tract"), a portion of which is more particularly described on Exhibit B attached hereto and incorporated herein by reference (the "Building Parcel").

B.      Landlord's predecessor in interest, Univest Olympic Realty, L.L.P., and Tenant previously entered into (a) a Building Lease  (LA-Current Retail Store Lease) and

(b) a Building Lease (LA – New Building Lease), each dated as of December 8, 2000 (as previously amended, collectively, the "Prior Lease").

C.    Landlord and Tenant have entered into an unrecorded Amended and Restated Building Lease dated as of May 5, 2011 (the "**Restated Lease**"), with respect to the Building Parcel and, for certain purposes, the Entire Tract, which amends, and for ease of reference and convenience restates in its entirety, and continues the priority of, the Prior Lease, on the terms and conditions set forth in the Restated Lease. In connection with the execution of the Restated Lease, Landlord and Tenant desire to execute and record this Restated Memorandum, which will amend and restate in their entirety the following previously recorded instruments (the "Prior Memoranda"):

    a.    Memorandum of Lease recorded December 19, 2000 as Instrument No. 00-1969498, as amended by that certain document recorded March 21, 2002 as Instrument No. 02-0683470, that certain instrument recorded October 9, 2003 as Instrument No. 03-3012087, and that certain instrument recorded December 4, 2002 as Instrument No. 02-2951575.

    b.    Memorandum of Lease and Notice of Control Area and Notice of Reverter recorded December 19, 2000 as Instrument No. 00-1969499, as amended by that certain instrument recorded December 4, 2002 as Instrument No. 02-2951575.

    c.    Memorandum of Lease recorded December 19, 2000 as Instrument No. 00-1969500, as amended by that certain instrument recorded December 4, 2002 as Instrument No. 02-2951575.

1.    From and after recordation of this Restated Memorandum, the Prior Memoranda shall be deemed amended and restated in their entirety, and the priority of the Prior Memoranda and the Prior Lease, and the Restated Lease shall be continued without change. For the avoidance of doubt, neither this Restated Memorandum nor the Restated Lease shall or is intended to be a substitution or novation of the Prior Memoranda or the Prior Lease, nor do either extinguish or release or in any other way adversely affect the continued priority of the Prior Memoranda or the Prior Lease.

2.    The addresses of the parties to the Restated Lease are as follows:

    (a)    Landlord -    c/o MJW Investments, Inc.
                              1640 5th Street, Suite 112
                              Santa Monica, CA 90401
                              Telephone Number: (310) 395-3430 ext 104
                              Facsimile transmission number: (310) 395-3145
                              Attention: Mark Weinstein

(b)    Tenant -    Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179

3.    The Term of the Lease, more particularly described in Section 3 thereof, commences on May 5, 2011 (the **"Commencement Date"**). The Term of the Lease ends on May 4, 2110.

4.    The Premises under the Restated Lease are located in the 9-story building located on the Building Parcel.

5.    For avoidance of doubt, Tenant has no right of reverter with respect to the Entire Tract or any portion thereof, including without limitation the Building Parcel, (ii) no right to acquire fee title to the Entire Tract (or any portion thereof) or the Building Parcel, (iii) no approval rights over the transfer of the Entire Tract or the Building Parcel or leases related thereto by Landlord or any successor-in-interest, and (iv) no approval rights over the execution of any leases by Landlord or any successor-in-interest with respect to the Entire Tract or Building Parcel; provided however the foregoing shall not modify, impair or otherwise affect any of the other provisions in the Restated Lease, nor the liabilities and obligations of Landlord or any successor-in-interest, nor any rights or remedies of Tenant with respect to any breach or default of any of the provisions under the Restated Lease.

6.    Landlord and Tenant have agreed that neither the premises described in the Restated Lease nor the Entire Tract shall be used for any "Prohibited Uses", which are described on Exhibit C attached hereto.

7.    The purpose of this Restated Memorandum is to give notice of the Restated Lease. The terms and provisions of the Restated Lease are hereby incorporated by reference as if fully set forth herein. Neither the Restated Lease nor this Restated Memorandum shall give any enforcement or other rights or benefits to any third party, other than the rights of successors and assigns to Landlord's and Tenant's respective rights under the Restated Lease.

8.    This Restated Memorandum is not a complete summary of the Restated Lease, nor shall any provisions of this Restated Memorandum be used in interpreting the provisions of the Restated Lease, other than as expressly set forth in Paragraph 5 above. In the event of any conflict between this Restated Memorandum and the Restated Lease, the Restated Lease shall control (other than as expressly set forth in Paragraph 5 above).

9.      This Restated Memorandum is being executed and delivered for recording in the
        Office of the Clerk of Los Angeles County, California.


10.     This Restated Memorandum may be executed in counterparts, each of which shall
        be deemed an original and all of which shall constitute one and the same
        agreement.

IN WITNESS WHEREOF, this Restated Memorandum has been duly executed and delivered as of the day and year first above written.

LANDLORD:

**10309 FOLSOM BLVD., L.P.**
a California limited partnership

**by MJW Investments, Inc., its general partner**

By: _____
Its:

**SEARS, ROEBUCK AND CO.,**
a New York corporation

_____

By: _____

## EXHIBIT A

## LEGAL DESCRIPTION OF ENTIRE TRACT

# EXHIBIT A

## LEGAL DESCRIPTION OF ENTIRE TRACT

PARCEL 1: (PORTION OF APN: 5169-010-006)

LOT 1 OF TRACT NO. 9410, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 136, PAGES 7 AND 8 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2: (PORTION OF APN: 5169-010-006)

THOSE PORTIONS OF LOTS 2, 3, 4 AND 5 IN BLOCK 8 OF TRACT NO. 6783, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 99 PAGE 77 ET SEQ., OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

COMMENCING AT THE MOST WESTERLY CORNER OF SAID LOT 3; THENCE SOUTH 62° 31' 30" EAST, ALONG THE SOUTHWESTERLY LINE THEREOF, 400 FEET TO THE MOST SOUTHERLY CORNER OF THE LAND DESCRIBED IN DEED TO LOS ANGELES PAPER BOX FACTORY, RECORDED IN BOOK 10041 PAGE 15 OFFICIAL RECORDS, SAID MOST SOUTHERLY CORNER BEING THE TRUE POINT OF BEGINNING; THENCE NORTH 27° 28' 30" EAST ALONG THE SOUTHEASTERLY LINE OF SAID LAND SO DESCRIBED AND THE NORTHEASTERLY PROLONGATION THEREOF, 180 FEET TO THE SOUTHWESTERLY LINE OF TRACT NO. 9410, AS PER MAP RECORDED IN BOOK 136 PAGES 7 AND 8 OF MAPS; THENCE SOUTH 62° 31' 30" EAST ALONG SAID LAST MENTIONED SOUTHWESTERLY LINE, 412.44 FEET TO THE EASTERLY LINE OF SAID LOT 5 (BEING ALSO THE WEST LINE OF SOTO STREET) ; THENCE SOUTH 4° 59' 47" WEST, ALONG SAID EASTERLY LINE; 164.87 FEET TO THE BEGINNING OF A CURVE THEREIN, CONCAVE TO THE NORTH, HAVING A RADIUS OF 20 FEET; THENCE WESTERLY ALONG SAID CURVE, 39.26 FEET TO THE END THEREOF; THENCE NORTH 62° 31' 30" WEST, ALONG THE SOUTHWESTERLY LINES OF SAID LOTS 5, 4 AND 3, A DISTANCE OF 457.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 3: (PORTION OF APN: 5169-010-006)

ALL THOSE PORTIONS OF LOTS 2 AND 3 IN BLOCK 8 OF TRACT NO. 6783, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 99 PAGE 77 ET SEQ., OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHWESTERLY LINE OF SAID LOT 3, SOUTH 62° 31' 30" EAST, 100 FEET FROM THE MOST WESTERLY CORNER OF SAID LOT 3; THENCE NORTH 27° 28' 30" EAST, 163 FEET, MORE OR LESS, TO THE INTERSECTION WITH A LINE DRAWN PARALLEL WITH AND DISTANT NORTHEASTERLY 13 FEET, MEASURED AT RIGHT ANGLES FROM THE NORTHEASTERLY LINE OF SAID LOT 3 AND DISTANT SOUTH 62° 31' 30" EAST THEREON, 167.46 FEET FROM THE WEST LINE OF SAID LOT 2; THENCE SOUTH 62° 31' 30" EAST ALONG SAID PARALLEL LINE, 300 FEET; THENCE SOUTH 27° 28' 30" WEST, 163 FEET, MORE OR LESS, TO THE INTERSECTION WITH AFORESAID SOUTHWESTERLY LINE OF LOT 3; THENCE NORTH 62° 31' 30" WEST, ALONG SAID SOUTHWESTERLY LINE, 300 FEET TO THE POINT OF BEGINNING.

PARCEL 4: (PORTION OF APN: 5169-010-006)

THOSE PORTIONS OF LOTS 2 AND 4, IN BLOCK 8 OF TRACT NO. 6783, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 99 PAGE 77 ET SEQ., OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWESTERLY CORNER OF SAID LOT 2; THENCE SOUTH 62° 31' 30" EAST, ALONG THE NORTHEASTERLY LINE OF SAID LOT 2 AND ITS SOUTHEASTERLY PROLONGATION, 724.59 FEET TO A POINT IN THE EASTERLY LINE OF SAID LOT 4; THENCE SOUTH 4° 59' 47" WEST, ALONG SAID EASTERLY LINE, 194.80 FEET TO THE SOUTHEASTERLY CORNER OF SAID LOT 4; THENCE NORTH 62° 31' 30" WEST, ALONG THE SOUTHWESTERLY LINE OF SAID LOT 4, A DISTANCE OF 18.42 FEET TO A POINT IN A CURVE CONCAVE WESTERLY HAVING A RADIUS OF 330.43 FEET, THE TANGENT TO SAID CURVE AT SAID POINT BEARING SOUTH 4° 23' 07" WEST; THENCE NORTHERLY ALONG SAID CURVE, A DISTANCE OF 51.46 FEET; THENCE NORTH 4° 32' 13" WEST 9.93 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 231.99 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE, A DISTANCE OF 234.79 FEET TO A LINE PARALLEL WITH AND DISTANT 17 FEET SOUTHWESTERLY, MEASURED AT RIGHT ANGLES, FROM SAID NORTHEASTERLY LINE OF LOT 2; THENCE NORTH 67° 31' 30" WEST TANGENT TO SAID LAST MENTIONED CURVE, ALONG SAID PARALLEL LINE, 547.87 FEET TO A POINT IN THE WESTERLY

LINE OF SAID LOT 2; THENCE NORTH 4° 59' 47" EAST ALONG SAID WESTERLY LINE, 18.40 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

EXCEPT ANY PORTION OF SAID LAND THAT IS DESCRIBED IN PARCEL 2.

PARCEL 5: (APN: 5169-010-005)

THOSE PORTIONS OF LOTS 2 AND 3 IN BLOCK 8 OF TRACT 6783, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK

99 PAGE 77 ET SEQ. OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY CORNER OF SAID LOT 3; THENCE NORTH 4° 59' 47" EAST, ALONG THE WESTERLY LINES OF SAID LOTS 3 AND 2, 176.40 FEET, MORE OR LESS, TO THE INTERSECTION THEREOF WITH A LINE DRAWN PARALLEL WITH AND DISTANT NORTHEASTERLY 13 FEET; MEASURED AT RIGHT ANGLES, FROM THE NORTHEASTERLY LINE OF SAID LOT 3; THENCE SOUTH 62° 31' 30" EAST, ALONG SAID PARALLEL LINE, 167.46 FEET; THENCE SOUTH 27° 28' 30" WEST, 163.0 FEET, MORE OR LESS, TO A POINT IN THE SOUTHWESTERLY LINE OF SAID LOT 3, DISTANT SOUTH 62° 31' 30" EAST THEREON, 100 FEET

FROM THE POINT OF BEGINNING; THENCE NORTH 62° 31' 30" WEST ALONG SAID SOUTHWESTERLY LINE, 100 FEET TO THE POINT OF BEGINNING.

**EXHIBIT B**

**LEGAL DESCRIPTION OF BUILDING PARCEL**

## EXHIBIT B

## LEGAL DESCRIPTION OF BUILDING PARCEL

PARCEL 1: (PORTION OF APN: 5169-010-006)

LOT 1 OF TRACT NO. 9410, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 136, PAGES 7 AND 8 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**EXHIBIT C**

**PROHIBITED USES**

(a)    A surplus store; gun range; the sale of guns as a primary use; car wash facility; theater, auditorium; or hotel or motel.

(b)    No portion of the Entire Tract shall be used for any of the following purposes: a flea or swap market or a business selling so-called "second hand" goods (the term "second hand" shall mean stores that sell goods primarily as a service to the public rather than to a retail customer for a profit); a business selling damaged or imperfect merchandise as a regular part of its inventory other than stores such as Marshall's or Ross that sell seconds as part of their inventory; cemetery; funeral home, mortuary; any establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene materials; a so-called "head shop"; pawn shop; off-track betting parlor; junk yard; recycling facility or stockyard; motor vehicle or boat dealership, body and fender shop, or motor vehicle or boat storage facility; a laundromat or dry-cleaning facility (but this shall not be deemed to prohibit nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer); a bar, tavern or cocktail lounge; a discotheque, dance hall, comedy club, night club or adult entertainment facility; billiard or pool hall; massage parlor; a gambling facility or operation; a beauty school, barber college, reading room; industrial or manufacturing uses; school or house of worship.

(c)    No portion of the Entire Tract shall be used for a business or use that creates strong, unusual or offensive odors, fumes, dust or vapors; emits noise or sounds that are objectionable due to intermittence, beat, frequency, shrillness or loudness; creates unusual fire, explosive or other hazards, or materially increases the rate of insurance for any other parcel in the Entire Tract, Landlord or any tenant.

(d)    No oil development operations, oil refining, quarrying or mining operations of any kind shall be permitted upon or in any portion of the Building Parcel, nor shall oil wells, tanks, tunnels, or mineral excavation or shafts be permitted upon the surface of any portion of the Entire Tract, or within five hundred (500) feet below the surface of the Building Parcel.  No derrick or other structure designed for use in boring for water, oil, natural gas or other minerals shall be erected, maintained or permitted on any portion of the Building Parcel.  For the avoidance of doubt, the foregoing shall not prohibit any operations under the existing separate lease with respect to the facility currently operated by Tenant as a tire, battery and automotive accessories facility.

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF _____        )

On _____ before me, _____ (here insert name and title of the officer), personally appeared _____ (insert name(s) of signer(s)) who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

LA – Restated Building Lease
Execution

## Exhibit F

### Form of Estoppel Certificate

**ESTOPPEL CERTIFICATE FOR TENANT**

[Letterhead of Tenant]

Date:

To:                    [Insert Name and Address(es) of Recipient(s)]


Re:

Ladies and Gentlemen:

The undersigned ("*Tenant*") certifies to _____, as owner and landlord, and_____ _____ _____, as [lender/purchaser], as of the date hereof as follows:

1.      It is the tenant under the lease described on *Exhibit "A"* hereto (the "*Lease*"), for _____, as described in the Lease (the "*Leased Premises*") at           , Los Angeles, California (the "*Project*"). All capitalized terms not otherwise defined herein shall have the meanings provided in the Lease.

2.      The Lease is in full force and effect. The Lease has not been amended, modified or supplemented except as set forth on *Exhibit "A"* hereto. There are no other agreements or understandings, whether written or oral, between Tenant and Landlord with respect to the Lease, the Leased Premises or the Project.

3.      Tenant has accepted possession of and occupies the entire Leased Premises under the Lease. The term of the Lease commenced on _____, and expires on _____ _____, subject to the renewal options set forth in the Lease.

4.      To Tenant's knowledge, both Tenant and Landlord have performed all of their respective obligations under the Lease through the date hereof, and Tenant has no knowledge of any event which with the giving of notice, the passage of time or both would constitute a default by Landlord under the Lease, except as set forth on *Exhibit "B"* hereto.

5.      To Tenant's knowledge, Tenant has no present claim against Landlord and no offset or defense to enforcement of any of the terms of the Lease. Tenant has not advanced any funds for or on behalf of Landlord for which Tenant has a present right to deduct from or offset against future rent payments. The foregoing is subject to any matters set forth on *Exhibit "C"* hereto.

6.      To Tenant's knowledge, all improvements required to be completed as of the date hereof by Landlord have been completed and there are no sums due to Tenant from Landlord. Landlord has not agreed to grant Tenant any free rent or rent rebate or to make any contribution to tenant improvements, except as expressly set forth in the Lease. Landlord has not agreed to reimburse Tenant for or to pay Tenant's rent obligation under any other lease. The foregoing is subject to any matters set forth on *Exhibit "D"* hereto.

45

LA – Restated Building Lease
Execution

7.    Tenant has not assigned the Lease and has not subleased the Leased Premises or any part thereof, except as set forth on *Exhibit "E"* hereto..

8.    Tenant has no right or option pursuant to the Lease or otherwise to purchase all or any part of the Leased Premises or the Project.

9.    Attached hereto as *Exhibit "F"* is a true copy of the Lease and all amendments, modifications and supplements thereto.

The undersigned individual hereby certifies that he or she is duly authorized to sign, acknowledge and deliver this letter on behalf of Tenant.

Tenant acknowledges that the addressees will rely on this letter in [making a loan or otherwise extending credit to/purchasing the Project from] Landlord.   The information contained in this letter shall be for your benefit only and may not be relied upon by any other person. To Tenant's knowledge the statements herein are true as of the date hereof and Tenant has no obligation to supplement, correct or update this certificate as to matters or knowledge arising after the date hereof.

Very truly yours,

_____

By:  _____

46

LA – Restated Building Lease
Execution

## Exhibit F-1

### Form of Estoppel Certificate

**ESTOPPEL CERTIFICATE FOR LANDLORD**

[Letterhead of Landlord]

Date:

To:                    [Insert Name and Address(es) of Recipient(s)]


Re:

Ladies and Gentlemen:

The    undersigned    ("*__Landlord__*")    certifies    to    _____,    as [lender/purchaser/assignee/sublessee], as of the date hereof as follows:

4.      It is the Landlord under the lease described on *__Exhibit "A"__* hereto (the "*__Lease__*"), for _____, as described in the Lease (the "*__Leased Premises__*") at              , Los Angeles, California (the "*__Project__*"). All capitalized terms not otherwise defined herein shall have the meanings provided in the Lease.

5.      The Lease is in full force and effect. The Lease has not been amended, modified or supplemented except as set forth on *__Exhibit "A"__* hereto. There are no other agreements or understandings, whether written or oral, between Sears, Roebuck and Co. ("Tenant") and Landlord with respect to the Lease, the Leased Premises or the Project.

6.      Tenant has accepted possession of and occupies the entire Leased Premises under the Lease. The term of the Lease commenced on _____, and expires on _____ _____, subject to the renewal options set forth in the Lease. Tenant has paid all rent under the Lease for the entire term.

4.      To Landlord's knowledge, both Tenant and Landlord have performed all of their respective obligations under the Lease through the date hereof, and Landlord has no knowledge of any event which with the giving of notice, the passage of time or both would constitute a default by Tenant under the Lease, except as set forth on *__Exhibit "B"__* hereto..

6.      To Landlord's knowledge, Landlord has no present claim against Tenant and no present offset or defense to enforcement of any of the terms of the Lease. Landlord has not advanced any funds for or on behalf of Tenant for which Landlord has a right to deduct from or offset against future rent payments. The foregoing is subject to any matters set forth on *__Exhibit "C"__* hereto.

7.      To Landlord's knowledge, all improvements required to be completed as of the date hereof by Landlord have been completed and there are no sums due to Tenant from Landlord. Landlord has not agreed to grant Tenant any free rent or rent rebate or to make any

47

LA – Restated Building Lease
Execution

contribution to tenant improvements, except as expressly set forth in the Lease.  Landlord has not agreed to reimburse Tenant for or to pay Tenant's rent obligation under any other lease. The foregoing is subject to any matters set forth on *Exhibit "D"* hereto.

        8.    Landlord  has not assigned its interest the Lease, except as set forth on *Exhibit "E"* hereto..

        9. .    Attached hereto as *Exhibit "F"* is a true copy of the Lease and all amendments, modifications and supplements thereto.

        The undersigned individual hereby certifies that he or she is duly authorized to sign, acknowledge and deliver this letter on behalf of Tenant.

        Landlord acknowledges that the addressees will rely on this letter in [making a loan or otherwise extending credit to/purchasing or taking an assignment of the Lease or accepting a sublease from] Tenant.  The information contained in this letter shall be for your benefit only and may not be relied upon by any other person. To Landlord's knowledge the statements herein are true as of the date hereof  and Landlord has no obligation to supplement, correct or update this certificate as to matters or knowledge arising after the date hereof.

Very truly yours,

_____

By:  _____

LA – Restated Building Lease
Execution

## Exhibit G

### Form of Subordination, Non-disturbance and Attornment Agreement

RECORDING REQUESTED BY,
AND WHEN RECORDED RETURN TO:


Attention:

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement (this "**Agreement**") is as of _____, 20__, between _____ ("**Lender**") and _____ ("**Tenant**").

### RECITALS

A.    Tenant is the tenant under a certain lease (the "**Lease**"), dated as of _____ _____, 20_, with 10309 Folsom, L.P. ("**Landlord**"), of premises described in the Lease (the "**Premises**") as more particularly described in ***Exhibit "A"*** hereto.

B.    This Agreement is being entered into in connection with a certain loan (the "**Loan**") which Lender has made to Landlord, and secured, in part, by a [Deed of Trust, Assignment of Leases and Rents and Security Agreement] on the Premises (the "**Mortgage**") dated as of _____, 20__ and an Assignment of Leases and Rents dated as of _____, 20 (the "**Assignment**"; the Mortgage, the Assignment and the other documents executed and delivered in connection with the Loan are hereinafter collectively referred to as the "**Loan Documents**").

### AGREEMENT

For mutual consideration, including the mutual covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Tenant agrees that the Lease and all terms and conditions contained therein and all rights, options, liens and charges created thereby are and shall be subject and subordinate in all respects to the lien of the Loan Documents and to all present or future advances under the obligations secured thereby (whether obligatory or non-obligatory, or pursuant to any increase in the principal amount thereof, whether or not presently contemplated) and all renewals, amendments, modifications, consolidations, replacements and extensions of secured obligations and the Loan Documents, to the full extent of all amounts secured by the Loan Documents from time to time; provided however that except as expressly set forth herein to the contrary, all rights, remedies and privileges of Tenant, and all liabilities and obligations of Landlord, as set forth in the Restated Lease, shall continue in full force and unaffected by this Agreement.

49

LA – Restated Building Lease
Execution

2.     Lender agrees that, if Lender exercises any of its rights under the Loan Documents such that it becomes the owner of the Premises, including but not limited to an entry by Lender pursuant to the Mortgage, a foreclosure of the Mortgage, a power of sale under the Mortgage or otherwise, then so long as Tenant is not in default beyond any applicable notice, cure or grace period of any material term, covenant or condition of the Lease: (a) the Lease shall continue in full force and effect as a direct lease between Lender and Tenant, and subject to all the terms, covenants and conditions of the Lease, and (b) Lender shall not disturb Tenant's right of quiet possession of the Premises under the terms of the Lease, whether prior to or subsequent to such ownership or entry.

3.     Tenant agrees that, in the event of a exercise of the power of sale or foreclosure of the Mortgage by Lender or the acceptance of a deed in lieu of foreclosure by Lender or any other succession of Lender to ownership of the Premises, Tenant will attorn to and recognize Lender as its landlord under the Lease for the remainder of the term of the Lease (including all extension periods which have been or are hereafter exercised) upon the same terms and conditions as are set forth in the Lease, and Tenant hereby agrees for the benefit of Lender to pay and perform all of the obligations of Tenant pursuant to the Lease, subject to all of the terms and conditions of the Lease.  Tenant shall be under no obligation to pay rent to Lender until Tenant receives written notice from Lender that it has succeeded to the interest of Landlord under the Lease.  Tenant shall rely on such written notice, regardless of whether Tenant receives any conflicting or contrary notice from Landlord, and Tenant shall thereafter pay rent to Lender without taking any further action and Tenant shall incur no liability to Landlord in the event Tenant relies in good faith on such written notice to begin rent payments to Lender.  The respective rights and obligations of Tenant and Lender upon such attornment (including, but not limited to, the disposition of fire insurance proceeds and/or condemnation awards), to the extent of the then remaining balance of the Lease Term shall be and are the same as set forth in the Lease, it being the intention of the parties to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth herein, except as and to the extent set forth in Paragraph 4 below.

4.     Tenant agrees that, in the event Lender succeeds to the interest of Landlord under the Lease, Lender shall not be:

(a)     liable in any way for any act, omission, neglect or default of any prior Landlord (including, the then defaulting Landlord), provided, however, that Lender shall be responsible for any default of Landlord which continues after the date Lender acquires title to the Premises, or

(c)     bound by any payment of rent or additional rent which Tenant might have paid for more than one month in advance of the due date under the Lease to any prior Landlord (including, the then defaulting Landlord), or

(d)     bound by any obligation to make any payment to Tenant which was required to be made prior to the time Lender succeeded to any prior Landlord's interest, subject to all of Tenant's rights of deduction and offset, or

(e)     accountable for any monies deposited with any prior Landlord (including security deposits), except to the extent such monies are actually received by Lender (subject to Tenant's rights of deduction or offset), or

(f)     bound by any amendment or modification of the Lease made without the prior written consent of Lender.

50

LA – Restated Building Lease
Execution

Lender shall not name Tenant as a party in any foreclosure or other action or proceeding initiated in order for Lender to avail itself of and complete any such foreclosure or other action or proceeding or pursue any other remedy, unless required by state law (and then, only subject to the provisions of this Agreement).

      5.    Subject at all times to Tenant's rights to perform and pay Landlord's obligations and to deduct and offset the same against all of Tenant's obligations, all as provided in the Lease:

      Tenant hereby agrees to give to Lender copies of all notices of Landlord default(s) under the Lease any other notice, in the same manner as, and whenever, Tenant shall give any such notice to Landlord and no notice of default shall be effective as against Lender unless and until a copy of such notice shall have been so delivered to Lender. Lender shall have the right but no obligation to remedy any landlord default under the Lease, or to cause any default of Landlord under the Lease to be remedied, and for such purpose Tenant hereby grants Lender, in addition the period given to Landlord for remedying defaults, an additional 30 days to remedy, or cause to be remedied, any such default (but without limiting Tenant's rights of deduction and offset). Tenant shall accept performance by Lender of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. No Landlord default under the Lease shall permit Tenant to terminate the Lease (i) as long as Lender, in good faith, shall have commenced to cure such default within the above reference time period and shall be prosecuting the same to completion with reasonable diligence, subject to force majeure, or (ii) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by Lender, as long as Lender, in good faith, shall have notified Tenant that Lender intends to institute proceedings under the Loan Documents, and, thereafter, as long as such proceedings shall have been instituted and shall be prosecuted with reasonable diligence. Except as provided in Section 11 (r): (a) neither Lender nor its designee or nominee shall become liable under the Lease unless and until Lender or its designee or nominee becomes, and then only with respect to periods in which Lender or its designee or nominee remains, the owner of the Premises; and (b) in no event shall Lender have any personal liability as successor to Landlord and Tenant shall look only to the estate and interest of Lender in the Premises for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by Lender as Landlord under the Lease, and no other property or assets of Lender shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the Lease. Lender shall have the right, without Tenant's consent, to foreclose the Mortgage or to accept a deed in lieu of foreclosure of the Mortgage or to exercise any other remedies under the Loan Documents.

      6.    Except as otherwise disclosed to Lender, Tenant has not received written notice of any prior assignment or pledge of the rents accruing under the Lease by Landlord. Tenant hereby acknowledges the making of the Assignment from Landlord to Lender in connection with the Loan. Tenant acknowledges that the interest of the Landlord under the Lease is to be assigned to Lender solely as security for the purposes specified in the Assignment, and Lender shall have no duty, liability or obligation whatsoever under the Lease or any extension or renewal thereof, either by virtue of the Assignment or by any subsequent receipt or collection of rents thereunder, unless Lender shall specifically undertake such liability in writing.

      7.    If Tenant is a corporation, each individual executing this Agreement on behalf of said corporation represents and warrants that s/he is duly authorized to execute and deliver this Agreement on behalf of said corporation. If Landlord is a partnership or limited liability company, each individual executing this Agreement on behalf of said partnership or limited liability company represents and warrants the s/he is duly authorized to execute and deliver this Agreement on behalf of said partnership or limited liability company in accordance

51

LA – Restated Building Lease
Execution

with the partnership agreement for the partnership or operating agreement for the limited liability company.

8.      Any notice, election, communication, request or other document or demand required or permitted under this Agreement shall be in writing and shall be deemed delivered on the earlier to occur of (a) receipt or (b) the date of delivery, refusal or nondelivery indicated on the return receipt, if deposited in a United States Postal Service Depository, postage prepaid, sent certified or registered mail, return receipt requested, or if sent via recognized commercial courier service providing for a receipt, addressed to Tenant or Lender, as the case may be, as follows:

If to Tenant:

Attention: _____

with a copy to:

Attention: _____

If to Lender:

Attention: _____

with a copy to:

Attention: _____

9.      The term "**Lender**" as used herein includes any successor or assign of the named Lender herein, including without limitation, any co-lender at the time of making the Loan, any purchaser at a foreclosure sale and any transferee pursuant to a deed in lieu of foreclosure, and the term "Tenant" as used herein includes any successor and assign of the named Tenant herein. Upon Tenant's request, Lender shall execute, acknowledge and deliver an agreement substantially similar to this agreement, to and with any assignee or of Tenant or a lease recognition agreement in commercially reasonable form consistent with this Agreement to any sublessee.

10.     If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect.

11.     Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

12.     This Agreement shall be construed in accordance with the laws of the State where the Premises is located.

LA – Restated Building Lease
Execution

13.    No personalty, real property, merchandise, trade fixtures or other fixtures of Tenant, (or leased by Tenant from third parties) now or hereafter located on the Premises or Tenant's Control Area are or shall be subject to or subordinate to the lien of the Loan Documents.

Witness the execution hereof as of the date first above written.

**[NAME OF LENDER]**

By: _____

      Name:
      Title:

**[NAME OF TENANT]**

By: _____

      Name:
      Title:

LA – Restated Building Lease
Execution

## Exhibit H

## Expedited Dispute Resolution Procedure ("EDR")

(i)    Expedited Dispute Resolution.  All EDR Matters specified in Section 8(c) of this Restated Lease requiring resolution under the Expedited Dispute Resolution Procedure, shall be determined pursuant to the following, which shall constitute the EDR (which term shall refer to both the procedures and the actual proceeding or hearing, as the context may require).

For the avoidance of doubt, (A) if any EDR Matter may potentially include, reference or involve any other collateral matters which are not expressly specified as an EDR Matter and which accordingly may not be determined in any EDR ("Other Matters"), then the existence of such Other Matters shall not remove or disqualify the EDR Matter from the EDR, but such Other Matters shall be determined solely by proceedings other than EDR as otherwise provided in the Restated Lease, and no ruling, decision or award by the sole arbitrator in the EDR shall be deemed to constitute a decision or estoppel for any purpose with respect to the Other Matters, and (B) if any Other Matters which are subject to determination by proceedings other than EDR may potentially include, reference or involve any collateral EDR Matter, then the existence of such EDR Matter shall not remove or disqualify the Other Matters from determination solely by proceedings other than EDR, and no ruling, decision or award by the adjudicator in such other proceedings  shall be deemed to constitute a ruling, decision or estoppel for any purpose with respect to any EDR Matters,

(ii)    Commencement of Expedited Dispute Resolution.  To commence the EDR, either party must send a "Notice of Commencement of Dispute Resolution" ("Notice of Commencement") to the JAMS/Endispute, Los Angeles office, with a copy to the other party, in accordance with the provisions of Section 11(a) of this Restated Lease.

(iii)    Rules of Arbitration and Selection of Arbitrator.  The arbitration shall be held before a sole arbitrator and the EDR will be conducted pursuant to JAMS Comprehensive Arbitration Rules and Procedures as those Rules exist on the effective date of this Agreement, including the Expedited Procedures except as expressly modified herein, provided that the terms set forth in this Exhibit H will govern to the extent in conflict with such Rules (including the Expedited Procedures).  If the parties have not agreed on the sole arbitrator within five (5) business days of the delivery of the Notice of Commencement, the sole arbitrator shall be selected in accordance with Rule 15 of the Rules.

(iv)    Date of EDR.  Within five (5) business days after selection of the sole arbitrator, the sole arbitrator will contact both parties to set a date to hold the EDR, which date shall be not less than fifteen (15) nor more than twenty-five (25) business days after the sole arbitrator has contacted the parties ("EDR Period"), subject to the provisions in subdivision (v) with respect to Rebuilding Insurance Proceeds Disputes and Use Disputes. If the parties and the sole arbitrator are unable to agree on a date within such EDR Period, then the sole arbitrator shall

LA – Restated Building Lease
Execution

select an appropriate date and time within such EDR Period which shall be binding on the parties.

(iv)    EDR Procedure.  The EDR will be held on the date and time agreed by the parties or otherwise set by the sole arbitrator at the office of the sole arbitrator.  Each party shall have eight hours to present its claim to the sole arbitrator (including documentary evidence and the testimony of any live witnesses).  The party initiating the EDR shall present its claim first followed by the party responding to the EDR.  No later than three (3) business days before the EDR , each party shall provide the other party with copies of the documents it intends to submit as evidence at the EDR and the names of the witnesses it intends to call at the EDR.  Unless directed by the sole arbitrator upon a finding that specifically identified additional information appears necessary to resolution of the dispute, the parties shall not be required to make additional discovery, and, in making any such direction, the sole arbitrator shall consider it to be the mutual objective of the parties to achieve a prompt and economical resolution of the dispute.  Following completion of the presentation of the claims by both parties, the sole arbitrator shall be permitted to request such further evidence as he deems necessary to render a decision.  The sole arbitrator shall have the discretion to continue the EDR hearing until the next business day after the presentation of the claims of the parties, but in no event shall the EDR hearing continue beyond the close of business on such third (3rd) business day.  The sole arbitrator shall issue a written decision with his or her reasons to both parties within not more than ten (10) business days of the completion of the EDR hearing.  The arbitrator shall have no right to alter the terms of this Restated Lease or the terms of this Exhibit H. The decision of the sole arbitrator shall be final and conclusive on the parties hereto, and not subject to appeal. All of the foregoing shall be subject to the provisions in subdivision (v) with respect to Rebuilding Insurance Proceeds Disputes and Use Disputes.

(v)    Rebuilding Insurance Disputes; Use Disputes.  Notwithstanding the foregoing, the EDR with respect to Rebuilding Insurance Proceeds Disputes and/or Use Disputes shall be expressly modified as follows, subject to any further modification as may be mutually agreed by the parties in writing:

(A)    The EDR Period shall be 120 days.

(B)    Each party shall have 16 hours to present its claim.

(C)    In no event shall the EDR hearing extend beyond the close of business on the 5th business day after presentation of the claims of the parties.

(D)    No later than 45 days before the commencement of the EDR hearing, the parties shall provide to each other copies of all documents to be introduced as evidence and the names of all witnesses intended to be called at the EDR hearing.

(E)    The arbitrator shall issue its written decision no later than 15 business days after the completion of the EDR hearing.

(vi)    Costs of Expedited Dispute Resolution.  The costs of the arbitrator shall initially be divided equally between the parties, and otherwise each of the parties shall bear its

55

LA – Restated Building Lease
Execution

own costs, fees and expenses of the arbitration, including legal fees; provided, however, that the sole arbitrator shall be authorized and instructed to make a finding whether or not either party ("Offending Party") has made or engaged in any "Improper Conduct", as hereinafter defined, and in the event of a finding of such Improper Conduct, the sole arbitrator shall make an award to the party which is not the Offending Party, of such other party's costs, fees and expenses of the arbitration (including its legal fees and its share of the costs of the sole arbitrator). The term "Improper Conduct" shall mean:  the submission or presentation by a party or its attorneys in connection with the arbitration,  by means of the Notice of Commencement or  any other pleading, written motion or other paper, or oral argument (collectively, "Pleadings and Arguments"), which Pleadings and Arguments or any portion thereof :

(1) are presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) contain claims, defenses, and other legal contentions that are not warranted by existing law or  contain frivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) contain factual contentions which do not have evidentiary support or, if specifically so identified, will not likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) contain denials of factual contentions which are not warranted on the evidence or, if specifically so identified, are not reasonably based on belief or a lack of information.

In determining whether a party has engaged in Improper Conduct, the arbitrator may consider, and any party shall be entitled to submit and argue, evidence of previous conduct or Improper Conduct by a party in any other judicial or arbitration proceedings between the parties (other than any such proceedings which may be subject to any settlement or confidentiality agreement between the parties), including repetitive or similar claims which have been denied by the previous tribunal.

56

LA – Restated Building Lease
Execution

.

## Exhibit I

## Alterations Requirements

(a)    <u>Alterations by Tenant</u>.  At its sole cost and expense, Tenant shall have the right to make any or all Alterations, which shall meet the following conditions:

(i)    The proposed Alterations:

(1)    Comply with the Permitted Use;

(2)    Will not alter the exterior appearance of the Building other than Exterior Areas;

(3)    Are not of a structural nature, will not weaken or impair the structural strength of the Building;

(4)    Will not adversely affect or increase demands on any of the Building's mechanical, electrical, sanitary, or other Systems and Equipment which are not remediated or mitigated by Tenant;

(5)    Will not unreasonably interfere with the normal and customary business operations of other tenants in the Building; and

(6)    Comply in all material respects with all applicable laws.

(ii)    Prior to or concurrently with the commencement of any Alterations, Landlord shall have been furnished with original certificates of insurance from Tenant's contractors, showing Landlord as an additional insured on commercial general liability, automobile liability, property damage, and worker's compensation policies, with such limits as Landlord may reasonably require; and

(iii)    Prior to or concurrently with commencement of any Alterations, Landlord shall have been furnished with copies of all (A) submissions to the Department of Building & Safety of the City of Los Angeles and (B) building and/or other applicable permits or licenses required for the prosecution of the work. The copy of submissions described in (A) may be delivered to Landlord within fifteen (15) days after submission to the City.

(b)    <u>Work Done by Tenant</u>.  Any Alterations shall comply with the following:

(i)    All work shall be in compliance in all material respects with all applicable laws.  Any work not acceptable to any governmental authority or agency having jurisdiction over such work or not reasonably acceptable to Landlord shall be promptly corrected by Tenant at Tenant's expense.

(ii)    All work by Tenant shall be performed diligently until completed, subject to force majeure.

57

LA – Restated Building Lease
Execution

(c)    No Liability of Landlord.  Landlord shall have no liability for any faulty work or defect regardless of Landlord's receipt or review of plans and specifications.

(d)    Property of Landlord.  All Alterations shall remain in the Premises at the termination of the Lease, and upon such termination, shall become the property of Landlord, without any compensation to Tenant.

(e)    Notice of Work Commencement.  Before commencing any substantial work with an estimated cost in excess of $250,000.00 with respect to the Alterations, Tenant shall notify Landlord in writing not less than 5, nor more than 15, business days prior to the anticipated date such work commences.  Landlord shall have the right to post all appropriate notices of non-responsibility.  Notwithstanding the foregoing, Tenant shall not be required to give Landlord advance notice of the installation or removal of trade fixtures, shelving, carousels, bins, racking, merchandise and other store displays, and other similar interior work in the ordinary course of Tenant's business.

(f)    Mechanics' Liens.  Tenant shall pay for all labor and materials supplied to the Premises for Tenant.  Tenant shall use all commercially reasonable efforts not to permit any mechanics' or similar liens to be filed against the Building Parcel or the Building, or against Tenant's leasehold interest in the Premises.  Tenant shall indemnify, defend and hold harmless Landlord, its partners and its and their respective successors, assigns, partners, directors, officers, shareholders, employees, agents, lenders, ground lessors and attorneys (collectively, Indemnitees"), and the Building, from and against any and all claims, damages and losses incurred by such indemnified persons, or any of them, as the result of the enforcement or foreclosure of any mechanics' lien filed against the Building Parcel, Building or against Tenant's leasehold interest in the Premises ("Claims").  If Tenant causes a lien on the Building, Tenant shall, at its sole cost and expense, either (i) remove such lien or (ii) provide a bond in accordance with California Civil Code Section 3143 or other applicable provision of law.  No action to remove a lien, as provided herein, shall affect Tenant's right to contest the legitimacy of the lien or the payment of any amounts in connection therewith and/or seek appropriate legal remedies against the party placing such lien on the Building or the Building Parcel.

# EXHIBIT B

**SEARS PROJECT COST BREAKDOWN**
**As of April 15, 2019**

| CONSULTANTS | Scope of Work | TOTAL |
|---|---|---|
| **Omgiving** | Architectural Services | 1,184,119.39 |
| **S Y Lee Associates, Inc.** | | |
| Phase 1 | MEP & Civil Engineering | 486,620.00 |
| Phase 2 | MEP & Civil Engineering | 700,000.00 |
| B-Permit & QSD-SWPPP* | MEP & Civil Engineering | 69,600.00 |
| **HansonLA** | | |
| Phase 1 | Architectural Services | 285,000.00 |
| Phase 2 (MOD) | Architectural Services | 145,000.00 |
| **Crain & Associates, Inc.** | Traffic Engineering | |
| Proj#JB69178: Sears Site Boyle Heights B-Permit | | 297,600.00 |
| **Charles Tan & Associates** | | |
| Sears Olympic | Structural Engineering | 395,000.00 |
| Landmark Sears | Structural Assessment Report | 12,400.00 |
| Sears Olympic: Annex Bldgs, Façade | | |
| Access, Train Canopy, Retaining Wall | Structural Engineering | 66,000.00 |
| **KSA Design Studio/SQLA** | Landscape Architectural Services | 148,950.00 |
| **David Takacs Architecture** | Architectural Services | 8,412.50 |
| **STO Design Group, Inc.** | Water Feature Engineering | 34,000.00 |
| **Olympique Façade Access Consulting** | Façade access code compliance | 54,026.51 |
| **Wiss, Janney, Elstner Associates, Inc.** | Waterproofing | 71,900.00 |
| **PSOMAS** | Design Survey | 14,650.00 |
| **Cosentini Associates, Inc.** | Fire Protection, Disabled Access & Life Safety | 107,000.00 |
| **Chattel, Inc.** | Historic Consultant | 180,000.00 |
| **The Ruzika Company** | Lighting Design Services | 42,500.00 |
| **Isenberg & Associates, Inc.** | Arts Development | 69,879.00 |
| **Akerman LLP** | Sears Construction Loan | 154,886.42 |
| | Tax Advice | 31,651.00 |
| | TOTAL | $  4,559,194.82 |
| | | |
| **CONTRACTORS** | | |
| | | |
| **Alliance Mechanical Group, Inc.** | HVAC Mobilization, equipment & installation | 915,000.00 |
| **SPC Building Services** | Exterior Repair | 100,000.00 |
| | TOTAL | 1,015,000.00 |
| | | |
| **PERMIT FEES** | | |
| **Department of Building & Safety** | | |
| Structural Building Permit | | 38,998.07 |
| MOD # 18,19,20,21 & 22 | | 1,112.40 |
| MOD #23 | | 481.78 |
| LADBS PERMIT: LAFD FEE FOR MOD#15 | | 444.96 |
| Sump Pump Code Mod | | 368.42 |
| LAFD Fee | | 222.48 |
| Plan Check Fee | | 46,458.00 |
| Dedication processing fee & Investigation fee | | 4,000.73 |
| Fire Dept. MODs | | 667.44 |
| Bond preparation Fee | | 566.50 |
| MOD 16 / MOD 17R1/MOD 17R3/ MOD 10 R3/ MOD 10 R2 | | 2,408.90 |
| B-Permit Plan Check Fee | | 4,795.00 |
| LID Application Fee | | 1,030.00 |
| SCAR Fee | | 2,568.50 |
| RFM Application Fee | | 368.42 |
| RFM Application Fee | | 368.42 |
| Application/Permit Fee | | 2,000.00 |
| Plan Check Fee | | 255.06 |
| River Improvement Overlay Clearance | | 240.79 |
| Building Permit | | 365.11 |
| Sears sign permit | | 292.97 |
| Business tax | | 403.86 |
| citation # 4258763040 | | 63.00 |
| Business License 0002736015-0001-5 | | 449.34 |
| Plan Check Fee | | 1,068.00 |
| Plan Check Fee | | 7,311.60 |
| Plan Check Fee | | 3,682.00 |
| Plan Check Fee | | 859.45 |
| | TOTAL | $    121,851.20 |
| | | |
| **TOTAL** | | $  5,696,046.02 |