Claim Forms may be electronically submitted by visiting https://restructuring.primeclerk.com/sears/EPOC-Index

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## Fill in this information to identify the case (Select only one Debtor per claim form):

| | | | | |
|---|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☐ Kmart Corporation (18-23549) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☐ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Holdings Management Corporation (18-23554) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22301) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | MMLID: 4905486 |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | RECEIVED |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | APR 1 0 2019 |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | PRIME CLERK LLC |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc. (18-23584) | |

|||| 182353880007484

☐ Date Stamped Copy Returned
☐ No Self-Addressed Stamped Envelope
☒ No Copy Provided

# Proof of Claim
04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:  Identify the Claim

**1. Who is the current creditor?**
Sterik Burbank, L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**
☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**
Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Sterik Burbank, L.P.
c/o Auburndale Properties, Inc.
50 Tice Boulevard Suite 320
Woodcliff Lake NJ 7677

Contact phone 201-930-8800
Contact email Tbower@aubproperties.com

Where should payments to the creditor be sent? (if different)

Contact phone _____
Contact email _____

**4. Does this claim amend one already filed?**
☒ No
☐ Yes. Claim number on court claims registry (if known) _____  Filed on ___/___/___  MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☒ No
☐ Yes. Who made the earlier filing? _____

Claim Number: 18354

Proof of Claim

page 1

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**    $ _55,799.00_    Does this amount include interest or other charges?

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_Retail Real Estate Lease dated    July 26, 1989_

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**  $_____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☒ Yes. Amount necessary to cure any default as of the date of the petition.  $_65,520.00_

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)? | ☑ No | |
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | $_____ |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  4/9/19  (mm/dd/yyyy)

_Signature_

Print the name of the person who is completing and signing this claim:
Name of the person who is completing and signing this claim:

| Name | Tara Bowen |
| | First name    Middle name    Last name |
| Title | Controller |
| Company | Sterli Bobank LP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 50 Tice Blvd  STE 320 |
| | Number    Street |
| | Woodcliff Lake    NJ    07677 |
| | City    State    ZIP Code |
| Contact phone | 201-930 8800 | Email | Tbowen @ aubproperties.com |

**ATTACHMENT TO STERIK BURBANK LP  PROOF OF CLAIM**

CREDITOR:             Sterik Burbank, LP
DEBTOR:               Kmart of Michigan, Inc
CASE NO.:             18-23576

Claimant, Sterik Burbank, LP, has an unsecured claim and a first priority expense
of administration pursuant to 11  Section U.S.C. 503(b)(1)(A) and 507 (a)(1) against Debtor,
Kmart of Michigan, Inc, arising out of a lease, whereby the Debtor leased  non-
residential real property located at

Sterik Burbank LP  has a general unsecured claim in the amount of $55,799.00
broken down as follows:

**PRE-PETITION RENT OWED (Through October 15, 2018)**

| | |
|---|---|
| Minimum Rent: | $0.00 |
| CAM | $25,850.00 |
| Real Estate Taxes: | $29,949.00 |
| Total Pre-petition: | $55,799.00 |

**REJECTION CLAIM**

1. Based on One Year Computation
   (January 1 2019 - December 31 2019):

| | |
|---|---|
| Minimum Rent: | |
| CAM | |
| Real Estate Taxes: | |
| Total One Year Amount: | $0.00 (2) |

2. Based on 15% of the remainder of the lease
   (November 1, 2018 to October 31, 2021):
   The total can not exceed three years of rent

| | |
|---|---|
| Minimum Rent: | $0.00 |
| Real Estate Taxes: | $0.00 |
| Insurance | $0.00 |
| CAM | $0.00 * |
| Total  Rent | $0.00 |
| @ 15% | $0.00  (1) |

Greater on 1 or 2:

**RESTORATION**

Costs of restoring the building to its original state:

| | |
|---|---|
| TO BE DETERMINED | $0.00 |
| Total Restoration Claim | $0.00 |

**TOTAL CLAIM**

| | |
|---|---|
| Pre-Petition Rent Owed: | $55,799.00 |
| Rejection Claim | $0.00 |
| Restoration Claim | $0.00 |
| Total Claim: | $55,799.00 |

The attached documents supporting this Proof of Claim are The Lease ,
Option to Extend, Option to Extend. The 2018 Annual Cam Billing and 2018 real
estate tax bills. The remaining documents
are voluminous and not attached hereto.

Claimant Sterik Burbank, LP reserves the right to modify, amend and support the Proof
Claim.

*   Based upon estimates

## ATTACHMENT TO STERIK BURBANK, LP PROOF OF CLAIM

CREDITOR:  Sterik Burbank, LP
DEBTOR:     Kmart of Michigan, Inc
CASE NO.:   18-23576

Sterik Burbank, LP has a first priority expense of administration
pursuant to 11 U.S.C. Section 503(b)(1)(A) for the use of the premises
for the time period of October 15, 2018- April 9, 2019
broken down as follows:

| | |
|---|---|
| Real Estate Taxes | 51,987.00 |
| Common Area Charges | 13,533.00 |
| | 65,520.00 |

**STERIK BURBANK, LP**
**2018-2019 Real Estate Taxes Invoice**

**POST-PETITION**
**REVISED 2/27/19**

Property:        Burbank, CA

Tenant:          K-Mart #3834

Reconciliation Period (07/01/18 - 06/30/19)

| 2018-2019<br>Parcel # | Description | Assessed Value | Tax | Pro-Rata<br>Share | Pro-Rata<br>Taxes |
|---|---|---|---|---|---|
| 2460 007 036 05 | Land | 3,649,273 | 42,888 | 69.93% | 29,994 |
| 2460 007 036 05 | Improvements | 4,706,910 | 55,318 | 96.03% | 53,122 |
| 2460 006 045 05 | Land | 2,557,110 | 29,824 | 69.93% | 20,857 |
| | Total Taxes | | | | 103,973 |
| | Total Due | | | | 103,973 |
| | First Payment due upon receipt<br>Pre-Petition vacancy 1/1/18-10/14/18 | | 51,987 | (29,949) | 22,038 |
| | Second Payment due February 1, 2019 | | | | 51,987 |

**2018    ANNUAL SECURED PROPERTY TAX INFORMATION STATEMENT    2018**

CITIES, COUNTY, SCHOOLS AND ALL OTHER TAXING AGENCIES IN LOS ANGELES COUNTY

**SECURED PROPERTY TAX FOR FISCAL YEAR JULY 1, 2018 TO JUNE 30, 2019**

JOSEPH KELLY, TREASURER AND TAX COLLECTOR

FOR ASSISTANCE CALL 1(213) 974-2111 OR 1(888) 807-2111, ON THE WEB AT  lacountypropertytax.com

**PROPERTY IDENTIFICATION**
ASSESSOR'S ID.NO.: 2460 006 045 18 000

OWNER OF RECORD AS OF JANUARY 1, 2018
SAME AS BELOW

**MAILING ADDRESS**
0234656-0236560 8SKL 006 1234-- 724494

STERIK BURBANK L P
AUBURNDALE PROPERTIES INC
50 TICE BLVD
WOODCLIFF LAKE NJ 07877-7603

**ELECTRONIC FUND TRANSFER (EFT) NUMBER**
ID#:19 2460 006 045 2 YEAR:18 SEQUENCE:000 0
PIN:    687P6H

**SPECIAL INFORMATION**

| DETAIL OF TAXES DUE FOR | | 2460 006 045 | 18 000 | 30 | |
|---|---|---|---|---|---|
| | | ASSESSOR'S ID. NO. | YR | SEQ | CK |
| AGENCY | AGENCY PHONE NO. | RATE | | | AMOUNT |
| GENERAL TAX LEVY | | | | | |
| ALL AGENCIES | | 1.000000 | $ | | 45,957.84 |
| **VOTED INDEBTEDNESS** | | | | | |
| METRO WATER DIST | | .003500 | $ | | 160.85 |
| COMMNTY COLLEGE | | .046213 | | | 2,123.85 |
| UNIFIED SCHOOLS | | .050954 | | | 2,341.73 |
| **DIRECT ASSESSMENTS** | | | | | |
| FLOOD CONTROL | | | $ | | 1,061.69 |
| COUNTY PARK DIST | (626) 458-5165 | | | | 292.71 |
| LACO VECTR CNTRL | (833) 265-2600 | | | | 13.09 |
| RPOSD MEASURE A | (800) 273-5167 | | | | 420.78 |
| MWD STANDBY #5 | (833) 265-2600 | | | | 39.76 |
| TRAUMA/EMERG SRV | (866) 807-6864 | | | | 1,189.40 |
| | (866) 587-2862 | | | | |

INFORMATION ONLY

**PROPERTY LOCATION AND/OR PROPERTY DESCRIPTION**
1000 N SAN FERNANDO BLVD    BURBANK CA
TRACT NO 3548 LOT COM NW ON SW LINE OF
LOT 17 BLK 5,9.74 FT FROM MOST S COR OF
COMPLETE DESCRIPTION IN ASSESSOR RECORDS
32,33,34,35 AND LOT    36 BLK    5

**ASSESSOR'S REGIONAL OFFICE**
REGION #28 INDEX:          TRA:02530
SPECIAL PROPERTIES
500 W TEMPLE STREET RM. 180
LOS ANGELES CA 90012
(213)974-3108

ACCT. NO.: 572 PRINT NO.:    261 BILL ID.:IB

| TOTAL TAXES DUE | | $53,801.70 |
|---|---|---|
| FIRST INSTALLMENT TAXES | DUE NOV. 1, 2018 | $26,800.86 |
| SECOND INSTALLMENT TAXES | DUE FEB. 1, 2019 | $26,800.84 |

| | VALUATION INFORMATION | |
|---|---|---|
| ROLL YEAR 18-19 | CURRENT ASSESSED VALUE | TAXABLE VALUE |
| LAND | 2,557,110 | 2,557,110 |
| IMPROVEMENTS | 2,038,674 | 2,038,674 |
| | | |
| TOTAL | | 4,595,784 |
| LESS EXEMPTION: | | |
| NET TAXABLE VALUE | | 4,595,784 |

ANY RETURNED PAYMENT MAY BE SUBJECT TO A FEE UP TO $50.00.

---

**INFORMATION ONLY**                                                        **2018**

STERIK BURBANK L P
50 TICE BLVD
WOODCLIFF LAKE NJ 07675

| | ASSESSOR'S ID. NO. | YR | SEQ | CK | PK |
|---|---|---|---|---|---|
| | 2460 006 045 | 18 000 | 30 | | 2 |

2ND INSTALLMENT DUE    INDICATE AMOUNT PAID

PLEASE USE THIS FOR PAYMENT, ONLY IF YOUR TAXES ARE NOT PAID BY YOUR LENDER/MORTGAGE COMPANY.

**PAYMENT DUE 02/01/19**        $26,800.84
IF NOT RECEIVED OR POSTMARKED BY 04/10/19
REMIT AMOUNT OF    $29,490.92

**MAKE PAYMENT PAYABLE TO:**
Please write the ASSESSOR'S ID. NO. on the lower left corner of your payment.
30321

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

1931800002460006045000268008400029490923212041 0

**2ND**

---

**INFORMATION ONLY**                                                        **2018**

STERIK BURBANK L P
50 TICE BLVD
WOODCLIFF LAKE NJ 07675

| | ASSESSOR'S ID. NO. | YR | SEQ | CK | PK |
|---|---|---|---|---|---|
| | 2460 006 045 | 18 000 | 30 | | 1 |

1ST INSTALLMENT DUE    INDICATE AMOUNT PAID

PLEASE USE THIS FOR PAYMENT, ONLY IF YOUR TAXES ARE NOT PAID BY YOUR LENDER/MORTGAGE COMPANY.

**PAYMENT DUE 11/01/18**        $26,800.86
IF NOT RECEIVED OR POSTMARKED BY 12/10/18
REMIT AMOUNT OF    $29,480.94

**MAKE PAYMENT PAYABLE TO:**
Please write the ASSESSOR'S ID. NO. on the lower left corner of your payment.
40323

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

1841800002460006045000268008600029480943231121 0

**1ST**

## 2018    ANNUAL SECURED PROPERTY TAX INFORMATION STATEMENT    2018

CITIES, COUNTY, SCHOOLS AND ALL OTHER TAXING AGENCIES IN LOS ANGELES COUNTY

### SECURED PROPERTY TAX FOR FISCAL YEAR JULY 1, 2018 TO JUNE 30, 2019

JOSEPH KELLY, TREASURER AND TAX COLLECTOR

FOR ASSISTANCE CALL 1(213) 974-2111 OR 1(888) 807-2111, ON THE WEB AT  lacountypropertytax.com

**PROPERTY IDENTIFICATION**
ASSESSOR'S I.D.NO.: 2460 007 036 18 000

OWNER OF RECORD AS OF JANUARY 1, 2018
SAME AS BELOW

OCT 2 2 2018

**MAILING ADDRESS**

0236551-0236551 BNGL 001 1234--- 730436

STERIK BURBANK L P
AUBURNDALE PROPERTIES INC
50 TICE BLVD
WOODCLIFF LAKE NJ 07677-7603

**ELECTRONIC FUND TRANSFER (EFT) NUMBER**
ID#:19 2460 007 036 1 YEAR:18 SEQUENCE:000 0
PIN:    EV18BH

**SPECIAL INFORMATION**

INFORMATION ONLY

| DETAIL OF TAXES DUE FOR | 2460 007 036 | 18 000 | 20 | CK |
|---|---|---|---|---|
| AGENCY | AGENCY PHONE NO. | RATE | | AMOUNT |
| GENERAL TAX LEVY | | | | |
| ALL AGENCIES | | 1.000000 | $ | 83,561.83 |
| | | | | |
| VOTED INDEBTEDNESS | | | | |
| METRO WATER DIST | | .003500 | $ | 292.46 |
| COMMNTY COLLEGE | | .046213 | | 3,861.64 |
| UNIFIED SCHOOLS | | .050954 | | 4,257.81 |
| | | | | |
| DIRECT ASSESSMENTS | | | | |
| FLOOD CONTROL | | | $ | 1,641.69 |
| COUNTY PARK DIST | (626) 458-5165 | | | 182.38 |
| LACO VECTR CNTRL | (833) 265-2600 | | | 13.09 |
| RPOSD MEASURE A | (800) 273-5167 | | | 1,135.00 |
| RWD STANDBY #5 | (833) 265-2600 | | | 52.24 |
| TRAUMA/EMERG SRV | (866) 807-6864 | | | 3,208.28 |
| | (866) 587-2862 | | | |

**PROPERTY LOCATION AND/OR PROPERTY DESCRIPTION**
1000 N SAN FERNANDO BLVD    BURBANK CA
TRACT NO 3548 LOT BD NE BY 3RD ST SE BY
WALNUT AVE VAC SW BY SAN FERNANDO BLVD
COMPLETE DESCRIPTION IN ASSESSOR RECORDS
LOT   22 BLK   4

**ASSESSOR'S REGIONAL OFFICE**
REGION #28 INDEX:    TRA:02530
SPECIAL PROPERTIES
500 W TEMPLE STREET RM. 180
LOS ANGELES CA 90012
(213)974-3108

ACCT. NO.:  572 PRINT NO.:  262 BILL ID.:18

| | |
|---|---|
| TOTAL TAXES DUE | $98,206.22 |
| FIRST INSTALLMENT TAXES    DUE NOV. 1, 2018 | $49,103.11 |
| SECOND INSTALLMENT TAXES    DUE FEB. 1, 2019 | $49,103.11 |

| VALUATION INFORMATION | | |
|---|---|---|
| ROLL YEAR 18-19 | CURRENT ASSESSED VALUE | TAXABLE VALUE |
| LAND | 3,649,273 | 3,649,273 |
| IMPROVEMENTS | 4,706,910 | 4,706,910 |
| | | |
| TOTAL | | 8,356,183 |
| LESS EXEMPTION: | | |
| NET TAXABLE VALUE | | 8,356,183 |

ANY RETURNED PAYMENT MAY BE SUBJECT TO A FEE UP TO $50.00.

---

**INFORMATION ONLY**    2018

STERIK BURBANK L P
50 TICE BLVD
WOODCLIFF LAKE NJ 07675

| ASSESSOR'S I.D. NO. YR SEQ | CK | PK |
|---|---|---|
| 2460 007 036  18 000  20 | | 2 |

2ND INSTALLMENT DUE    INDICATE AMOUNT PAID

PLEASE USE THIS FOR
PAYMENT, ONLY IF YOUR
TAXES ARE NOT PAID BY
YOUR LENDER/MORTGAGE
COMPANY.

PAYMENT DUE 02/01/19
IF NOT RECEIVED OR POSTMARKED BY 04/10/19
REMIT AMOUNT OF    $54,023.42

$49,103.11

MAKE PAYMENT PAYABLE TO:
Please write the ASSESSOR'S I.D. NO.
on the lower left corner of your payment.

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

30266

1931800002460007036000491031100054023422 6620410

**2ND**

---

**INFORMATION ONLY**    2018

STERIK BURBANK L P
50 TICE BLVD
WOODCLIFF LAKE NJ 07675

| ASSESSOR'S I.D. NO. YR SEQ | CK | PK |
|---|---|---|
| 2460 007 036  18 000  20 | | 1 |

1ST INSTALLMENT DUE    INDICATE AMOUNT PAID

PLEASE USE THIS FOR
PAYMENT, ONLY IF YOUR
TAXES ARE NOT PAID BY
YOUR LENDER/MORTGAGE
COMPANY.

PAYMENT DUE 11/01/18
IF NOT RECEIVED OR POSTMARKED BY 12/10/18
REMIT AMOUNT OF    $54,013.42

$49,103.11

MAKE PAYMENT PAYABLE TO:
Please write the ASSESSOR'S I.D. NO.
on the lower left corner of your payment.

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

40280

1841800002460007036000491031100054013422 8011210

**1ST**

**STERIK BURBANK, LP**
**COMMON AREA MAINTENANCE CHARGES**
**January 1, 2018 through December 31, 2018**

### POST-PETITION

LOCATION:    1000 NORTH SAN FERNANDO BOULEVARD
             BURBANK, CALIFORNIA

TENANT:      Kmart #3834

|  |  | AMOUNT |
|---|---|---|
| LANDSCAPE MAINTENANCE | | 30,251 |
| PARKING LOT SWEEPING | | 24,902 |
| PRESSURE CLEANING | | 8,775 |
| PARKING LOT MAINTENANCE | | 36,580 |
| SECURITY | | 45,928 |
| GENERAL REPAIRS AND MAINTENANCE | | 23,381 |
| TOTAL | | 169,817 |
| TENANT ALLOCATION | 69.93% | 118,761 |
| KMART ONLY | | 10,416 |
| MANAGEMENT FEE | 10.00% | 12,918 |
| SUBTOTAL | | 142,095 |
| INSURANCE | | 6,092 |
| SUBTOTAL | | 148,187 |
| PRE-PETITION VACANCY 1/1/2018-10/14/2018 | 287 DAYS | (116,520) |
| SUBTOTAL | | 31,667 |
| LESS  CAM PAYMENTS | | (18,134) |
| BALANCE DUE / (CREDIT TO BE APPLIED) | | 13,533 |

01/KMARl0
07/07/89

<u>LEASE</u>

-between-

STERIK COMPANY

Landlord,

-and-

K MART CORPORATION

Tenant.

Dated: July 26, 1989

Location:

Burbank, California

THIS LEASE made and entered into as of this 26ᵀᴴ day of July, 1989, between STERIK COMPANY, a New York general partnership, having its principal office at 430 Lexington Avenue, Auburndale, Massachusetts 02166 (herein referred to as "Landlord"), and K MART CORPORATION, a Michigan corporation, having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant").

W I T N E S S E T H :

In consideration of the rents, covenants, agreements and conditions herein reserved and contained, Landlord and Tenant do hereby covenant, promise and agree as follows:

1.  Definitions.

As used in this Lease, the following terms shall have the meanings set forth below:

"Additional Rent" shall mean and include any amounts other than Base Rent and Percentage Rent required to be paid by Tenant to Landlord pursuant to any of the provisions of this Lease.

"Force Majeure" shall mean causes beyond the reasonable control of Tenant or Landlord, as the case may be, including but not limited to "acts of God"; fire and other casualties, earthquakes and floods; strikes; lock-outs; protests, riots; insurrection; war; nuclear disaster; unavailability of materials or reasonable substitutes; or acts or conduct of the other party to this Lease, its employees or agents, in violation of this Lease. Such causes shall not include financial difficulties or inability to obtain financing.

"Landlord" shall mean Sterik Company, or following a transfer of its interest, any purchasers of the fee title of the Demised Premises or any assignee of their interest under this Lease.

"Fraction" shall mean, at any time, a fraction whose numerator shall be the number of square feet of ground floor area of the Building and whose denominator shall be the number of square feet of ground floor area of all buildings in the Shopping Center (including the Building) at such time. The parties acknowledge that at the commencement of the term hereof the Fraction is 70.03%.

"Legal Requirements" shall mean (i) all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, departments, commissions, boards and courts, or any other body exercising similar functions, foreseen or unforeseen, ordinary as well as extraordinary, which may be applicable to the Demised Premises or to the use or manner of use of the Demised Premises by the owners, tenants, or occupants thereof; and (ii) the standard and reasonable requirements of all companies providing public liability, fire and other

- 2 -

policies of insurance at any time in force with respect to the Demised Premises.

"Original Tenant" shall mean K mart Corporation.

"Personalty" shall mean and include any and all personal property, inventory, goods, stock, chattels, trade fixtures, furniture, furnishings and equipment (excluding those items included within the definition of Demised Premises as set forth in Article 2, which items (and any replacements, substitutions, and additions to same) are and shall remain the property of Landlord from and after the time they are installed) owned by Tenant or any subtenant, concessionaire or licensee and now or hereafter located on or used in connection with the Demised Premises.

"Mortgage" shall mean any mortgage, deed of trust or security agreement now or hereafter encumbering or creating a lien on any portion of the Demised Premises as same may be consolidated, renewed, replaced, extended or modified, excluding security interests encumbering Tenant's leasehold interest only.

"Mortgagee" shall mean the holder(s) of any Mortgage or the beneficiary(ies) under any deed of trust constituting a Mortgage.

"Real Estate Taxes" shall mean all ad valorem real estate taxes and special assessments, extraordinary as well as ordinary, levied or assessed by the lawful taxing authorities upon the Shopping Center (including all buildings and improvements thereon). Real Estate Taxes shall not include (a) any net income, franchise or similar corporate or other tax, gross receipts or revenue (unless imposed in lieu of or in substitution for real estate taxes), capital levy (other than real estate special assessments), excess profits, inheritance, devolution, gift, estate or payroll tax, or tax on Landlord on commercial rentals by whatsoever authority imposed or howsoever designated (other than such a tax similar to the presently existing Florida or New York City statutes imposing taxes on commercial rents, which such taxes shall be deemed "Real Estate Taxes"), (b) any tax upon the sale, transfer and/or assignment of the title or estate of Landlord which at any time may be assessed against or become a lien upon the Property or the Demised Premises, this leasehold or the rent accruing therefrom, (c) any interest, charge or other penalty for untimely payment, and (d) any assessments (or installments thereof) for improvements to the Property (including buildings and improvements) or assessments (or installments thereof) for public streets, public sidewalks, sewers, water and other installations made at governmental expense before the Commencement Date and for which any lien now exists or has heretofore been assessed and paid.

"Related Company" of a party shall mean an entity affiliated with or which directly or indirectly controls, is controlled by or shares substantial common ownership with such party (including without limitation, a parent, subsidiary or sister corporation).

"Tenant" shall mean the party named as Tenant above and any party or parties succeeding to the

- 3 -

interest in the Demised Premises of such named party in accordance with the provisions of this Lease.

"Unamortized Leasehold Costs" shall mean the sum of products of (x) each item of cost or expense incurred by Tenant (exclusive of any interest costs thereon and any costs of in-house Tenant employees such as architects, engineers, etc.) with respect to any leasehold improvements which Tenant (i.e. the then current Tenant, excluding any amounts paid by any predecessor Tenants) may have made to the Demised Premises, including, without limitation, preparation of such Premises for Tenant's occupancy, installation of leasehold improvements by Tenant and alterations, extensions and improvements to the Building made by Tenant, and (y) a fraction, the numerator of which is the number of unelapsed years remaining from the date upon which the Termination Notice is given (the lease year in which the Termination Notice is given being included as an unelapsed lease year) to the then current Expiration Date and the denominator of which is the number of years from the date on which such item of cost or expense was incurred by Tenant to the then current Expiration Date.  Notwithstanding the foregoing, the "Unamortized Leasehold Cost" of any item or improvement shall never exceed the then current depreciated value of same as carried on Tenant's books.  If Tenant exercises a renewal option following or in contemplation of an expropriation or the giving of a Termination Notice for the purpose of increasing Unamortized Leasehold Costs, such option shall not be considered in determining same.

2.    Demised Premises and Common Area.

Landlord does hereby demise and lease to Tenant, and Tenant does hereby lease and take from Landlord, for the term hereinafter set forth, premises hereinafter described ("Demised Premises"), together with and included as part thereof, a reasonable area not in excess of 5,000 square feet for loading and unloading adjacent to each service door of the Demised Premises, within the shopping center hereinafter described (the "Shopping Center"), situated in the City of Burbank, and State of California together with any and all easements, licenses, rights, appurtenances and privileges now or hereafter belonging or appertaining unto said Demised Premises.  The Shopping Center is more particularly described on Exhibit A attached hereto and made a part hereof.  The Shopping Center consists of the land (and all improvements that may from time to time be thereon) represented by the area outlined by a bold line upon a certain plan (the "Plot Plan") attached hereto and made a part hereof as Exhibit B.  The Demised Premises consist of (i) a one-story building (the "Building") containing approximately 72,577 square feet of ground floor area, which Building is in the location designated on the Plot Plan as "K mart" and (ii) the land immediately thereunder, all as depicted on Exhibit B.  Landlord hereby grants to Tenant the non-exclusive right to use, in common with other tenants of the Shopping Center, the portions of the Shopping Center intended to be for common use, including, but not limited to, any parking areas, roads, curb-cuts, streets, drives, tunnels, passageways, landscaped areas, open and enclosed malls, exterior ramps, walks and arcades (hereinafter collectively called "Common Area").

3.    Term.

- 4 -

The term of this Lease shall commence on the date ("Commencement Date") which is the date of delivery of possession in accordance with Article 7.

The term of this Lease shall continue to and shall include the date (such date, or if the term of this Lease be extended, the date of expiration of the latest extension period, as hereinafter defined, for which Tenant shall have exercised its option to extend, being hereinafter called the "Expiration Date"), which is (1) 20 years from the day before the Commencement Date if the Commencement Date is the first day of a month, or (2) 20 years from the last day of the month in which the Commencement Date occurs if the Commencement Date is not the first day of a month. Within ten (10) days after request of either party after the Commencement Date has been determined, Landlord and Tenant shall execute, acknowledge and deliver to each other duplicate originals of an agreement in the form provided in Exhibit C, setting forth the Commencement Date, the date of expiration of the initial term of this Lease and the commencement dates of the extended periods. The term "Lease Year" shall mean the following: the first Lease Year shall be the 12-month period commencing (i) on the Commencement Date if the Commencement Date is the first day of a month, or (ii) on the first day of the month immediately following the month in which the Commencement Date occurs if the Commencement Date is not the first day of a month (provided that with respect to computing Tenant's obligations under and pursuant to Paragraph 5 hereof, all sales generated between the Commencement Date and the first day of the first Lease Year, shall be pro-rated and included with the sales generated in the first Lease Year); and each succeeding 12-month period thereafter shall be a Lease Year.

4.   <u>Annual Minimum Rental.</u>

Tenant shall, during the Lease term, which shall commence upon the Commencement Date, pay to Landlord, at such place as Landlord shall designate in writing from time to time, annual minimum rental ("Base Rent"), as follows:

For the 1st through 5th Lease Years, inclusive, the sum of $616,904 per annum (subject to the last paragraph of this Article 4);

For the 6th through 10th Lease Years, inclusive, the sum of $635,049 per annum;

For the 11th through 15th Lease Years, inclusive, the sum of $653,193 per annum;

For the 16th through 20th Lease Years, inclusive, the sum of $671,337 per annum;

and, if Tenant shall extend the Lease term as provided in Article 9 hereof:

For the 21st through 25th Lease Years, inclusive, the sum of $689,481 per annum;

For the 26th through 30th Lease Years, inclusive, the sum of $707,626 per annum; and

For the 31st through 34th Lease Years, inclusive, the sum of $725,770 per annum; all without deduction, set-off or abatement except as specifically provided in this Lease, in equal monthly installments on the first day of each month, in advance, commencing upon the first day of the Lease term; provided,

- 5 -

however, in the event the first day of the Lease term shall not be the first day of a calendar month, then the Base Rent for such month shall be prorated upon a daily basis.

The foregoing rents have been computed based upon Landlord's measurement of the exterior of the Building as 72,577 square feet of space. Either Landlord or Tenant shall have the right, at its option, to be exercised not later than six (6) months of the date hereof, to have the Building remeasured, and if such remeasurement should demonstrate, to the reasonable satisfaction of the other party that there are more or less than 72,577 square feet, the foregoing rents shall be appropriately revised based on such remeasurement.

Notwithstanding anything to the contrary set forth in this Article 4, in Articles 6 or 8, or elsewhere in this lease, during the period from the Commencement Date until the Full Rent Commencement Date (as hereinafter defined), Tenant shall be required to pay and Landlord shall accept as full payment, only fifty percent (50%) of Base Rent accruing under Article 4 during such period, (but Tenant shall nevertheless be required to pay 100% of Tenant's Tax Portion accruing under Article 6 during such period, and Tenant's Common Area charge accruing under Article 8 during such period). The "Full Rent Commencement Date" shall mean: (x) if the Commencement Date occurs on or prior to August 1, 1989, the Full Rent Commencement Date shall be the first to occur of (i) Tenant opening its store for business with the public and (ii) November 22, 1989; and (y) if the Commencement Date has not occurred on or prior to August 1, 1989, the Full Rent Commencement Date shall be the first to occur of (i) Tenant opening its store for business with the public and (ii) March 1, 1990.

5.    Percentage Rent.

In addition to the aforesaid annual Base Rent, with respect to any Lease Year during the Lease term in which "gross sales", as hereinafter defined for such Lease year, shall exceed the sum of Eighteen Million Four Hundred Thousand Dollars ($18,400,000) (the "Breakpoint Amount"), Tenant shall pay to Landlord, as Additional Rental for such Lease Year, a sum ("Percentage Rent") equal to one percent (1%) of the amount by which gross sales for such Lease Year exceed the Breakpoint Amount. Notwithstanding the foregoing, in the event that Tenant at any time and from time to time hereafter sublets any portion of the Demised Premises to any party other than a Related Company, the Breakpoint Amount shall, from and after any time of any such subletting (and pro-rata for any year in which any such subletting shall occur), be equal to the product of (i) $18,400,000 multiplied by (ii) a fraction whose numerator is the aggregate gross square feet of floor area of the Building occupied (immediately following such subletting) by Tenant and all Related Companies, and whose denominator is 72,577. There shall be such an adjustment in Breakpoint Amount each time Tenant sublets to a non-Related Company any portion of the Demised Premises formerly occupied by Tenant or a Related Company. Furthermore, if at the time of any such adjustment more than one entity of Tenant or Related Companies are occupying separately demised spaces in the Building, the Breakpoint Amount then applicable to Tenant shall be prorated in proportion to the amount of space occupied by each such Tenant or Related Company entity, and Percentage Rent shall be separately calculated for each such entity based on such proportion of the overall Breakpoint Amount.

For each Lease Year from and after the 6th Lease Year (including such 6th Lease Year) Tenant shall receive and be

- 6 -

entitled to a non-cumulative offset and credit against any Percentage Rent due for each such Lease Year equal to the amount by which (i) Base Rent payable during such Lease Year exceeds (ii) $616,904 (Base Rent payable during each of the first 5 Lease Years). In the event of any reduction in the Breakpoint Amount pursuant to sublettings to non-Related Companies as set forth in the preceding paragraph, said credit shall be proportionately reduced. Furthermore, in the event the Breakpoint Amount has been prorated due to occupancy by more than one entity of Tenant or Related Companies, said credit shall be similarly prorated.

Said Percentage Rent shall be paid on or before the thirtieth (30th) day following the end of each Lease Year. Tenant shall, on or before the 30th day following the end of each Lease Year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such Lease Year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any Lease Year and ending, by reason of the termination of this Lease, prior to the end of such Lease Year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the Breakpoint Amount shall be proportionately increased or decreased, as the case may be.

Landlord or its agent may inspect or audit Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within two (2) years after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. If Tenant shall be found by such inspection or audit to have understated gross sales, then Tenant shall immediately pay any additional Percentage Rent to which Landlord is entitled, and if Tenant shall be found by such audit to have paid Percentage Rent in excess of that due for said Lease Year, Landlord shall refund any excess due Tenant within fifteen (15) days of Landlord's receipt of such audit. If Tenant shall be found by such audit to have understated gross sales by more than three percent (3%), then Tenant shall immediately pay all of Landlord's reasonable costs incurred in connection with said audit, along with interest on any additional Percentage Rent owing to Landlord at the lower of fifteen percent (15%) per annum or the maximum rate allowed by California law from the date such Percentage Rent was due. Except to the extent that disclosure shall be in connection with any prospective sale or mortgage of the Demised Premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services, rentals of merchandise, and other similar retail activities typically considered as "gross sales" for percentage rent purposes, made by Tenant or any occupant (except subtenants [other than subleased departments, concessions, or licensees] who are not Related Companies, whose sales shall not be deemed part of "gross sales", unless Tenant is not required to split "Net Profits" from such non-Related Company subtenant pursuant to the last sentence of Article 19F, in which event such subtenant's sales will be deemed "gross sales") of the Demised Premises, whether wholesale or retail, cash or credit or in exchange for other merchandise not originally purchased at the Demised Premises or another store of Tenant (including merchandise ordered on the Demised Premises and delivered from another place) and shall include sidewalk sales made by Tenant, except that the following shall be excluded:

- 7 -

(a)    sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant for purposes other than to avoid the reporting of a sale thereof from the Demised Premises, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps (not to exceed 1% of gross sales), if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b)    any and all taxes levied upon, assessed against or measured by the receipt or purchase of merchandise by customers of any occupant of said Demised Premises, and any and all sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailer's occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise tax, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided, further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances.

(c)    receipts from vending machines, video and/or amusement games, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", sales of insurance, certificates of deposit and other financial instruments, stocks and bonds, and/or investments, if any, money orders, real estate (should a real estate brokerage office be on the Demised Premises), sale or placement of mortgages and other loans, and all licenses, if any, sold to the public, travel agency and other services rendered to increase customer traffic; provided that all of the foregoing to be excluded shall not occupy more than an aggregate of 5,000 square feet of ground floor area; and

(d)    service and interest charges for time payment accounts and charge accounts.

6.    Real Estate Taxes.

(a)    Throughout the term of this Lease Landlord shall not consent to the combination of the Shopping Center with any other tax lot or parcel not now part of the Shopping Center.

(b)    Tenant agrees to pay Tenant's portion of Real Estate Taxes ("Tax Portion") as hereinafter defined. Tenant's Tax Portion for any Real Estate Calendar (Fiscal) Tax Year shall mean the following: the product of (i) such Real Estate Taxes for such Real Estate Calendar (Fiscal) Tax Year attributable to the Shopping Center, and (ii) the Fraction.

(c)    Notwithstanding the formula set forth in (b) above, if Tenant's Building shall be separately assessed (and the Building shall be deemed to be separately assessed if the same is separately assessed according to the Real Estate Tax bill, the assessor's records or written assessor's certification), then Tenant's Tax Portion for any Real Estate Calendar (Fiscal) Tax Year that Tenant's Building shall be separately assessed shall be the sum of (i) such Real Estate Taxes upon the Tenant's Building and (ii) the product of (a) such Real Estate Taxes for such Real

- 8 -

Estate Calendar (Fiscal) Tax Year attributable to only the land comprising the Shopping Center (including Common Areas but excluding all buildings and all land not comprising Common Areas which is separately assessed, hereinafter the "Land"), and (b) the Fraction.

(d)    Where bills are rendered for different Real Estate Taxes (i.e., county, school, city or the like) the measurement of Tenant's liability under the provision shall be separately made, according to the tax liability stated on each bill.

(e)    Where the applicable tax bill is not available prior to the end of the term hereof, then the aforesaid adjustment shall be made, tentatively, on the basis of the last year's taxes, and the amount due shall be treated as an addition to the minimum rent for the last month of the term of this Lease; and final adjustment shall be made between Landlord and Tenant promptly after Landlord shall have received the tax bill for such period.

(f)    Intentionally Omitted.

(g)    Landlord shall submit to Tenant a bill for Tenant's Tax Portion, together with true copies of the tax bill and a statement of the facts and information needed to calculate the Tenant's Tax Portion, as soon as practicable after the same is received by Landlord, and Tenant shall pay Tenant's Tax Portion to Landlord as additional rent within thirty (30) days after Tenant receives said bill and statement but Tenant shall not have to pay any part of Tenant's Tax Portion any earlier than 10 days before the corresponding tax payment is due by Landlord.

(h)    If, by law, any Real Estate Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise the option to pay the same in installments and shall pay the installments (and any interest due thereon if required) as the same respectively become due and before any fine may be added for non-payment thereof.  Only installments becoming due during the term of this Lease shall be included in Real Estate Taxes, and any installments of Real Estate Taxes due for any year, a part of which is included within the term of this Lease and a part of which is included in a period of time before the Commencement Date or after the Expiration Date (or sooner expiration or termination date), shall be equitably adjusted between Landlord and Tenant as of the Commencement Date or the Expiration Date (or sooner expiration or termination date), as the case may be, for the purpose of computing Tenant's Tax Portion.

(i)    Tenant may undertake at its expense, by appropriate proceeding in the name of Landlord or Tenant, to contest the validity or amount of the assessed valuation or of the Real Estate Taxes for any Real Estate Calendar (Fiscal) Tax Year.  Within a reasonable time after demand therefor, Landlord shall execute and deliver to Tenant any documents required to enable Tenant to prosecute any such proceedings, and in consideration thereof, the Tenant shall indemnify and save harmless the Landlord from and against any and all costs, expenses, claims, actions and causes of action associated therewith.  Landlord shall inform Tenant, in time to permit Tenant to undertake such contest, of all pertinent data required to undertake such contest.  If Tenant shall obtain for Landlord a remission or a refund of all or any part of the Real Estate Taxes for any Real Estate Calendar (Fiscal) Tax Year, Landlord shall promptly reimburse Tenant out of such remission or refund for all of

- 9 -

Tenant's costs and expenses in connection therewith, including, but not limited to, attorneys' fees. If Landlord or Tenant shall obtain a remission or a refund of all or any part of the Real Estate Taxes for any Real Estate Calendar (Fiscal) Tax Year, Landlord shall promptly refund to Tenant (or credit Tenant with) a proportionate share (based upon the Fraction) of the remission or refund, such proportionate share to be calculated after deduction of actual costs and expenses incurred in obtaining such remission or refund.

(j)  Tenant covenants and agrees to pay promptly when due all taxes imposed upon its business operations, its Personalty, and any fixtures or appurtenances included as a part of the Demised Premises.

7.    Delivery of Possession.

Landlord shall be deemed to have delivered to Tenant possession of the Demised Premises on the date on which the latest of all of the following shall have occurred:

(a)  All of the following work ("Landlord's Work") shall have been fully completed in a good and workmanlike manner by Landlord and fully paid for by Landlord and evidence of such payment presented to Tenant:

(i)  Landlord shall have replaced the existing Building roof with a new, watertight roof furnished and installed in accordance with plans and specifications therefore set forth in Exhibit E hereto. Said roof work shall be deemed completed when (x) both Landlord and Tenant state in writing that same is complete in their opinion (but said statements shall not be deemed to confer any rights or benefits on the roof contractor(s), or waive any rights Landlord or Tenant may have against said contractor(s)); and (y) a full guaranty and warranty of such roof work covering all labor and materials, for a period of not less than 10 years and assignable to Tenant, has been delivered by the contractor to Landlord and assigned to Tenant (or alternatively made directly for Tenant's benefit). Landlord and Tenant agree to make such statement immediately upon completion of such roof work. Landlord, upon or prior to the Commencement Date, shall assign to Tenant all rights Landlord may have against any contractor(s) performing Landlord's Work, including without limitation, the aforesaid roof guarantee and any other guarantees and warranties.

(ii)  Landlord shall have performed, in compliance with all applicable federal, state and local laws, rules and regulations, removal and/or replacement (as recommended in and by the Asbestos Study of the Shopping Center dated February 23, 1989 prepared by Hall-Kimbrell Environmental Services, Inc., hereinafter the "Hall-Kimbrell Study") of all asbestos containing material shown to be in the Demised Premises by the Hall-Kimbrell Study.

(b)  Actual possession of the Demised Premises shall have been delivered to Tenant with the Demised Premises broom clean, free of trade fixtures and furniture owned by, leased or used by the predecessor tenant or anyone claiming under it, and free of all leases (other than this Lease), tenancies and occupancies, and Landlord shall be the title owner of the fee simple or have a valid leasehold title to the Demised Premises, free and clear of any assignments, restrictions, violations of record, mortgages and other liens and encumbrances, and free and clear of any contracts or agreements (including without limitation union contracts, it being understood that Tenant does not recognize or assume any obligations or liabilities under any labor agreements with any previous occupant of the Demised

- 10 -

Premises) that might be binding on or obligate Tenant, except as set forth in Exhibit D attached hereto and made a part hereof.

Landlord represents and warrants that, since the date Tenant last inspected the Demised Premises, it did not remove or permit to be removed, and that it will not remove or permit the removal of, any equipment and leasehold improvements (other than trade fixtures) made or installed by or for the previous occupant of the Demised Premises.

### 7A. Entry for Fixturing.

Tenant shall have the right and privilege, after the execution and delivery of this Lease and prior to the Commencement Date, whenever Tenant shall deem it appropriate, to enter Tenant's building, rent free, to make such improvements and alterations thereto (including without limitation any work required to accomplish the initial alterations and conversion of premises to a K mart store; all of which work, whether structural or non-structural in nature, is hereby consented to by Landlord), and shall have the right to make and install therein fixtures, supplies, merchandise and other property, as it shall deem necessary or appropriate to fit it for its occupancy in conducting business thereat. Tenant agrees that such entry as aforesaid shall be at its own risk and Landlord shall have no liability to Tenant for personal injuries sustained or death of any Tenant's employees or representatives, or damages to any property of Tenant or any of its employees or representatives stored on the Demised Premises, nor for the payment of any cost, expense, fee, or claim or performance of any obligation undertaken to be paid or performed by Tenant in connection with the activities permitted under this Article 7A (but Landlord shall nevertheless be solely responsible for all Landlord's Work). Such entry shall not be construed as an acceptance of possession by Tenant under the provisions of this Lease, or as a waiver of any of the provisions hereof. Tenant shall pay the cost of water, electricity, heat, air conditioning and other utilities used upon the Demised Premises during any period of entry by Tenant. Notwithstanding any entry into the building by Tenant prior to the date of delivery of possession as defined in Article 7 hereof, Landlord shall deliver possession of the Demised Premises to Tenant in accordance with the provisions of Article 7 hereof.

### 8. Parking and Other Common Areas.

A. During the term of this Lease the number of parking spaces in the Common Area shall not be reduced below the number existing on the date of this lease, nor shall the size of said existing spaces or layout or striping thereof be reduced or changed without Tenant's prior written consent. Landlord agrees, upon request of Tenant and at Tenant's sole cost, to reconfigure, relocate and/or restripe the driveway area from Delaware Street in front of the Tenant's building, and the existing parking spaces to the east thereof, in order to create increased parking in front of Tenant's building. In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the lands described in Exhibit A and depicted on Exhibit B, utilize the Common Area located on said lands for parking or other purposes to an extent which shall be reasonably objectionable to Tenant, Landlord, at its sole expense, upon written request of Tenant, shall take whatever action as shall be so reasonably requested to prevent said unauthorized utilization.

B. Landlord shall keep and maintain, at Landlord's cost and expense, the Common Area (not including Tenant's loading dock area which shall be the sole responsibility of Tenant) in good condition and repair and in compliance with all

- 11 -

Legal Requirements, including, but not limited to, repairing and replacing paving; keeping the Common Area properly cleaned, drained, free of snow, ice, water, rubbish (other than as generated by Tenant from the Demised Premises) and other obstructions, and in a safe, neat, clean, orderly and sanitary condition; providing adequate utility services to the Common Area including the installation and maintenance of meters to measure the consumption thereof, keeping the Common Area suitably lighted during, and for periods not to exceed 30 minutes both before and after, Tenant's business hours (but not earlier than 7:00 A.M. nor later than 11:00 P.M.); maintaining signs, markers, painted lines (painting lines as may be necessary) and other means and methods of pedestrian and vehicular traffic control; maintaining adequate roadways, entrances and exits; and maintaining any plantings and landscaped areas; and also, if required by appropriate governmental authority having jurisdiction thereof, maintaining traffic signals or lights, as the case may be, which are presently installed or may be installed hereafter, servicing tenants' businesses conducted in the Shopping Center. Should Tenant require Common Area lighting beyond the limits of this Paragraph 8B, it shall be required to pay to Landlord the full cost of such extended use.

C.    The parking spaces in the Common Area shall be used non-exclusively for the parking of private automobiles of the respective tenants of the Shopping Center and their respective customers, licensees, subtenants, employees, agents, concessionaires, guests and invitees, and for no other purpose, and the access, perimeter and through roads, streets and drives shall be used for pedestrian and vehicular traffic and no other purpose (subject to the provisions of Articles 19 and 22 and Exhibit D). The layout of, and striping in, the Common Area, as depicted on Exhibit B, shall not be changed without Tenant's consent. If so designated on Exhibit B, employees of the tenants of the Shopping Center shall not park their automobiles in the Common Area, except in the area designated as "Employee Parking" on Exhibit B, and Landlord shall use its best efforts to prevent any violation of this provision, and Tenant covenants and agrees that it shall not permit to be parked or stored thereon, trailers from which it receives its goods, wares, and merchandise, except in Tenant's loading dock area.

D.    Landlord shall not exact any charge or permit others to exact any charge for use of the Common Area from customers, invitees, licensees, subtenants or employees of Tenant or any other tenant in the Shopping Center.

E.    There will be no advertisements or signs in the Common Area except the pylon sign or signs hereinafter provided for and the traffic control signs. No merchandise shall be sold or displayed, and no loudspeakers shall be operated in the Common Area, except as otherwise set forth in this Lease. Notwithstanding the foregoing, Tenant acknowledges that the Hardin Group Inc. d/b/a Penguin Place Frozen Yogurt shall have the right to sidewalk seating pursuant to the terms of the Lease Addendum between Landlord and such Tenant dated December 23, 1986.

F.    Notwithstanding any provision to the contrary, in making any replacement, change, restoration, alteration, improvement, or repair of or to the Tenant's Building, Tenant and its contractors and suppliers may use the portion of the Common Area adjacent to the Tenant's Building for the parking of trucks and delivery vehicles, temporary storage of materials, temporary structures and other matters incidental to such work; provided, however, that no such use shall unreasonably interfere with the operation of the Shopping Center or with the business of any tenant in the Shopping Center; and that any damage to such Common Area, or any cleaning, policing or security resulting from or required by reason of any of the foregoing work by Tenant shall be repaired and/or otherwise performed by and at the sole cost and expense of Tenant. In making any permitted or required

- 12 -

replacement, change, restoration, alteration, improvement or repair of or to any portion of the Shopping Center, Landlord, any tenant in the Shopping Center and their or Landlord's contractors and suppliers may use such portions of the Common Area as are not directly adjacent to the Tenant's building for the parking of trucks and delivery vehicles, storage of materials, temporary structures and other matters incidental to such work; provided, however, that no such use shall unreasonably interfere with the operation of the Shopping Center or of the business of Tenant or any subtenant or licensee of Tenant.

G. During the Lease term, Landlord shall keep Tenant insured (as an additional insured) against all statutory and common law liabilities for damages on account of damage to property or injuries and loss of life sustained by any person or persons within said Common Area, in a policy or policies in the combined single limit amount of Two Million Dollars ($2,000,000) with respect to any one accident or disaster, and in the amount of Five Hundred Thousand Dollars ($500,000) with respect to damage to property. Each of the foregoing amounts shall be adjusted upward every three Lease Years if required to keep such coverage in line with coverage typically carried for comparable shopping centers in Southern California. Landlord shall and hereby does indemnify Tenant from and defend and hold Tenant harmless against any and all claims, including without limitation legal fees and expenses, for personal injury, death and property damage occurring on the Common Area. Any such policies shall bear endorsements to the effect that Tenant shall be notified not less than ten (10) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant.

H. Tenant may, at any time and from time to time, subject to the provisions of Article 26 hereof, utilize portions of the sidewalks adjacent to the Building for sales, provided the same do not unreasonably impede pedestrian traffic. Sales, if any, from such use shall be included as part of "gross sales" under Article 5 hereof.

I. (i) Tenant's "Common Area charge" shall mean, for any period, the product of (a) the actual cost and expense to Landlord for the maintenance and operation of the Common Area (hereinafter called "Common Area costs") for such period, plus an amount equal to 10% of such aggregate amount, (provided that such 10% figure shall not be applied to any Common Area costs for utilities or insurance) to reimburse Landlord for the costs incurred by it in performing the accounting and collection functions associated therewith, and (b) the Fraction. The Common Area costs shall be limited to amounts paid by Landlord in respect of the Common Area for the work Landlord is required to do and the items Landlord is required to furnish under subdivision B of Article 8 and the cost of Common Area liability insurance under subdivision G of Article 8; not including any amounts for removal of rubbish of individual tenants of the Shopping Center. The Common Area costs shall not include Real Estate Taxes, casualty or other insurance covering any Shopping Center buildings or any property other then the Common Area of the Shopping Center, office overhead, salaries of persons whose functions extend beyond the care of the Common Area or profit for Landlord on any Common Area costs. The Common Area costs shall be allocated to each period without any duplication, all in accordance with generally accepted accounting principles.

- 13 -

(ii)  For each calendar year during the term hereof, Tenant shall pay to Landlord as additional rent, for maintenance and operation of the Common Area, Tenant's Common Area charge for such year.  Such charge shall be paid in 12 equal monthly installments on the first day of each month based upon Landlord's estimate of such charge, and Landlord's estimate shall be based on the previous year's charge with reasonable increases (not to exceed 10% in aggregate) expected for the year being estimated (but notwithstanding the foregoing, if actual increases as shown by the annual reconciliation exceed 10%, Tenant shall pay such increases as hereinafter set forth).  Tenant's initial estimated monthly charge shall be $3,735.00.  If the Commencement Date is a day other than a January 1, or if the term of this Lease ends on a day other than a December 31, Tenant shall pay for each of the two periods less than a calendar year at the beginning and the end of the term of this Lease the Tenant's Common Area charge prorated for each such period, respectively, by the fraction, the numerator of which shall be the number of days in such period, and the denominator of which shall be 365.

(iii)  In determining the amount of Tenant's Common Area charge for any period in which any enlargement or contraction in ground floor area shall occur, such enlargement or contraction shall be deemed effective as of the first day of the month next following (a) the month in which the area first becomes ready for its intended use by the occupant or intended occupant, or (b) the month in which the same first becomes unusable by reason of condemnation or otherwise.

As soon as is practicable after the end of each calendar year (or lesser period at the end of this lease) Landlord shall submit to Tenant a bill and annual reconciliation for the amount required to be paid by Tenant under this Article 8 for previous year, setting forth in reasonable detail the items and amounts included in, and setting forth the method of calculating, Tenant's Common Area charge.  Tenant shall pay any amount still owing to Landlord as additional rent within thirty (30) days after receipt thereof and if there is any overpayment, Landlord shall promptly refund such amount to Tenant (or at Tenant's option Tenant may take credit against rent next coming due).

(iv)  Landlord shall keep, for a period of one (1) year following the end of each calendar year (or period), complete and accurate books and records in respect of the Common Area costs for such calendar year (or period), and Tenant, upon two (2) days' notice at any time during such period, shall have the right to have such books and records audited by a certified public accountant, and in the event that such audit discloses that Tenant paid an amount in excess of the proper Tenant's Common Area charge, Landlord shall refund the excess to Tenant promptly upon demand and shall pay to Tenant promptly upon demand the reasonable cost of such audit.

9.   Landlord's Representations and Warranties.

Landlord represents, warrants and covenants that it will not erect hereafter (or suffer, permit, or allow any Shopping Center tenant, subtenant or other occupant to erect) any buildings or other structures on the lands described in Exhibit A, except as shown on Exhibit B, and neither at this time nor at any time hereafter will any part of the Shopping Center be used for industrial or warehouse purposes, except that an occupant of retail space may utilize a portion of its space for incidental storage of merchandise or other items in conjunction with the conduct of business thereat.

- 14 -

Notwithstanding the foregoing, solely with regard to the building marked "Savings & Loan" at the northwest corner of the Shopping Center as shown on Exhibit B (hereinafter referred to as the "Outparcel Site"), Landlord shall have the right to demolish the existing building thereon and replace same with a building which has minor deviations in configuration from existing building, provided that: (i) any such replacement building shall be in substantially the same location as, and shall be no larger in height or square foot area than, the presently existing building; (ii) any such replacement building shall not result in a reduction of parking spaces in the Common Area; and (iii) any change of use from (savings bank) in any building now or hereafter on the Outparcel Site shall be subject to the provisions of Article 41(b).

Landlord further represents, warrants and covenants that: (i) the Shopping Center described in Exhibit A and the Demised Premises are and will be at the time of the commencement of the Lease term, properly zoned for retail store use operation to permit a standard K mart store and parking areas in connection therewith, and that all necessary governmental consents, permits (other than building permit that may be required for Tenant to perform the work mentioned in Article 7A) and approvals for such use have been obtained; and (ii) no other lease of space in the Shopping Center, nor any other instrument encumbering the Shopping Center, whether or not set forth in Exhibit D, would prohibit, restrict, or be violated by the use of the Demised Premises (including without limitation the Outside Areas) by Tenant as permitted under this Lease.

Notwithstanding anything to the contrary herein contained, if within sixty (60) days next following the Commencement Date any of the representations, warranties, and covenants of Landlord set forth in Article 9 should be breached and Landlord shall not correct same within 15 days following notice from Tenant; then in either such event Tenant, in addition to and not in limitation of any other legal or equitable remedies it may have under law or this Lease by reason of such Landlord default, (but subject to Article 16) may cancel and terminate this Lease on notice to Landlord given at any time prior to the full cure by Landlord of any such default.

Landlord will not hereafter enter into any easement or other agreement giving any parties (other than Shopping Center tenants) any rights of ingress, egress or parking in and to the Shopping Center without the prior written consent of Tenant (but Landlord may nevertheless, without Tenant's consent, enter into public utility easements which do not reduce parking spaces or otherwise adversely affect Tenant).

10.    Options to Extend Lease.

(a)    Tenant shall have three (3) successive options to extend the term of this Lease for an additional period of five (5) years for each of the first two such options and an additional period of four (4) years for the third such option, such extended term to begin respectively upon the expiration of the term of this Lease or of this Lease as extended, and the same terms and conditions as herein set forth shall apply to each such extended term, except that the annual Base Rent during each such extended term shall be increased as set forth in Article 4.  If Tenant shall elect to exercise any of the aforesaid options, it shall do so by giving notice to Landlord not less than one (1) year prior to the expiration of the term of this Lease or of this Lease as extended.

(b)  Regardless of the exercise or non-exercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the Lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this Lease for such period of time as shall cause the last day of the term of this Lease to be the January 31 next succeeding the date upon which the term of this Lease would expire but for the exercise of this option.  This option shall be exercised by notice to Landlord not less than one (1) year prior to the expiration of the term of this Lease or any extension thereof.  Tenant's rental during the option period shall be the same rental payable under the terms of this Lease during such period had the next five (or four) year option been exercised (except if there is no further option period, the rent shall remain the same rental payable at the time immediately preceding the beginning of such option period).

11.    Repairs and Maintenance, Utilities.

A.    Landlord shall be responsible for and make all repairs (both exterior and interior) to Tenant's Building, ordinary and extraordinary, foreseen and unforeseen, required by reason of the negligence of Landlord or its employees or agents or any breach by Landlord of any provision of this Lease. Landlord shall maintain and repair all sewerage facilities and other utility facilities outside of Tenant's Building.  Landlord shall cause all such repairs and changes to be made without unreasonable interference with the operation of the Shopping Center or the business of Tenant or any subtenant or licensee of Tenant.  Landlord shall reimburse Tenant promptly upon demand for any cost and expense of Tenant for the temporary moving of any merchandise and trade fixtures to enable Landlord to make such repairs and changes.

In the event Tenant's Building or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs as provided in the preceding paragraph of this Article, there shall be a just and equitable abatement of said annual rental and all other charges payable under this Lease until said premises shall be made usable.

B.    Subject to the Landlord's obligation to install a new roof, as set forth in Article 7, Tenant thereafter shall maintain the heating and air conditioning equipment serving the Tenant's Building in good order and repair, shall repair and maintain (and if and when required, replace) the roof of the Building and shall make such structural or non-structural repairs and maintenance to the Tenant's Building as are not required under Subdivision A of this Article to be made by Landlord (provided that any repairs relating to removal of asbestos or other toxic or hazardous wastes shall be subject to the provisions of Article 42(b)).

C.    If unexpired, Landlord shall assign to Tenant all assignable warranties and guarantees received in connection with the construction and/or maintenance of the Demised Premises and fixtures and systems therein, including without limitation those pertaining to Landlord's Work.

D.    Tenant shall pay for all utility services rendered or furnished to the Demised Premises, including, but not limited to, water, gas, electricity, telephone and sewer charges from and after the Commencement Date.

12.    Alterations.

- 16 -

Tenant may, at its own expense, from time to time, make such interior or exterior alterations or changes, structural or otherwise, in and to the Demised Premises as it may deem necessary or suitable, provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for such exterior structural alterations or changes to the Building; provided, further, Landlord shall not withhold or delay its consent thereto if the structural integrity and the economic value of the Building will not be materially decreased by such work. Tenant shall make all repairs, structural as well as non-structural, relating to or occasioned by such alterations or changes as may be required to keep same in good condition and repair. The term "exterior structural changes", as used herein, shall not include plumbing and electrical work, modification and rearrangement of fixtures or addition or deletion or doorways, or construction of structures constituting a garden area. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted under the Lease or installations by Tenant. Notwithstanding anything to the contrary above set forth, Tenant shall not require Landlord's consent for any alteration (interior or exterior, structural or non-structural) Tenant desires to make in connection with Tenant's initial conversion of the premises to a K mart store as set forth in Article 7A; provided that Tenant shall require Landlord's consent for any exterior or structural alterations that would materially adversely affect the structural integrity or economic value of the Building.

13. _Legal Requirements._

Throughout the term of this Lease, Tenant will promptly and fully comply with all Legal Requirements affecting said Demised Premises, including the making of alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall (i) require structural or non-structural changes which would have been required irrespective of the nature of the tenancy, including by way of example and without limitation regulations requiring sprinklers or other fire protection or additional earthquake protection (hereinafter called "Non-Use Legal Requirements") or (ii) require the removal of asbestos or other toxic or hazardous wastes or materials; compliance with same shall be subject to the provisions of Article 42(b).

14. _Condition of Demised Premises._

A.    Tenant acknowledges that except as may be specifically set forth in this Lease (including without limitation Landlord's Work and the provisions of Article 42 hereof), Landlord makes no representations of warranties concerning the title to or condition of the Demised Premises, and except as so specifically set forth, Tenant takes the Demised Premises in "As Is" condition on the Commencement Date.

B.    Landlord hereby represents and warrants to Tenant that Landlord has all necessary right, power and authority to lease the Demised Premises, and to execute, deliver, and perform this Lease.

15. _Late and Partial Payments._

Should Tenant fail to pay when due or within thirty (30) days after the due date any installment of Base Rent, Additional Rent, Percentage Rent or any other sum payable to Landlord under the terms of this Lease, then Tenant shall pay to Landlord on demand, in addition to amounts owing and unpaid,

- 17 -

interest at the lower of fifteen percent (15%) or the highest
rate permitted by the laws of the State of California from the
due date until the required payment(s) are made.  Landlord may
apply any partial payments as Landlord deems appropriate.
Notwithstanding the foregoing, Tenant acknowledges that as set
forth in Article 4 Base Rent is payable in advance, not in
arrears.

16.  Landlord Exculpation.

A.    Notwithstanding anything to the contrary in
this Lease, any judgment obtained by Tenant against Landlord
shall be satisfied only out of Landlord's interest in the Shop-
ping Center and the rents receivable by Landlord therefrom.
Neither Landlord nor any of its general or limited partners,
officers, directors, shareholders or beneficiaries shall have any
personal liability for any matter in connection with this Lease
or its obligations as Landlord of the Demised Premises, except as
provided above.  Tenant will not institute, seek or enforce any
personal or deficiency judgment against Landlord or any of its
general or limited partners, officers, directors, shareholders or
beneficiaries and none of their property, except the Shopping
Center and rents as aforesaid, shall be available to satisfy any
judgment hereunder.

B.    In the event of any sale or transfer of the
Demised Premises, the seller, transferor or assignor shall be and
hereby is entirely freed and relieved of all agreements, cove-
nants and obligations of Landlord thereafter to be performed and
it shall be deemed and construed without further agreement
between the parties or their successors in interest or between
the parties and the purchaser, transferee or assignee on any such
sale, transfer or assignment that such purchaser, transferee or
assignee has assumed and agreed to carry out any and all agree-
ments, covenants and obligations of Landlord hereunder.

C.    The provisions of this Article 16 shall
survive any termination of this Lease.

17.  Personal Property of Tenant.

A.    All Personalty (or similar property of any
other occupant) shall remain the property of Tenant (or such
other occupant).  Landlord shall under no circumstances whatsoev-
er be responsible for any loss or damage occurring to any Per-
sonalty, except for the negligence of Landlord, or default by
Landlord hereunder following written notice and a reasonable
opportunity to cure.

B.    Upon the expiration or earlier termination of
this Lease, Tenant shall remove any and all Personalty and repair
any damage to the Demised Premises caused thereby.    If Tenant
shall fail to so remove its Personalty at the termination of this
Lease, such Personalty not removed by Tenant shall be deemed
abandoned by Tenant, and, at the option of Landlord, (i) shall
become the property of Landlord or (ii) may be disposed of at the
expense of Tenant and without accountability in such manner as
Landlord may see fit.

18.  Damage to Building.

A.    From and after the Commencement Date, Tenant,
at its own cost and expense, shall promptly insure, and during
the term of the Lease, shall maintain insurance (subject to the
provisions of Article 18B) covering the Building (including for
all purposes of this Article 18 leasehold improvements) against

- 18 -

the perils commonly covered under standard California "extended
coverage" and all risk coverage including, without limitation,
coverage against the following perils to the extent then obtain-
able under such standard California extended coverage all-risk
policy:  fire, lightning, windstorm, hail, explosion, riot, riot
attending a strike, civil commotion, aircraft, vehicles, smoke,
vandalism, malicious mischief, sprinkler leakage, boiler, col-
lapse, and water damage other than by flood or sprinkler leakage.
In addition, Tenant shall keep in full force and effect a stan-
dard "all-risk" builders risk insurance policy during the period
of any construction costing in excess of $100,000.  All of such
insurance shall be in an amount equal to 100% of the replacement
cost of the Building (exclusive of foundation, foundation walls
and excavation costs and the costs of underground flues, pipes
and drains) and shall contain an "agreed amount endorsement" to
avoid any co-insurance penalties.  Each insurer selected must be
rated at least A-XII in the most recently published A.M. Best's
Rating Guide and shall bear endorsements to the effect that Land-
lord and Landlord's Mortgagee shall be named in such policies as
their interests may appear and shall be notified not less than
thirty (30) days in advance of modification or cancellation
thereof.  Copies of such insurance policies or certificates
evidencing the existence thereof so endorsed, shall be promptly
delivered to Landlord.

        B.    Notwithstanding the foregoing provisions of
Article 18A, so long as the Original Tenant has not assigned this
Lease or sublet all or substantially all of the Demised Premises
to other than a Related Company and so long as such Original
Tenant has a net worth not less than $250,000,000, in lieu of
providing insurance policies as set forth above, the Original
Tenant may elect on notice to Landlord to self-insure the afore-
said risks.  Notwithstanding the foregoing or anything else in
this Article 18, any non-Related Company assignee or sublessee
shall have the same self-insurance rights as the Original Tenant
provided and for so long as such assignee or sublessee has a net
worth of not less than $250,000,000.  The Original Tenant, from
and after the Commencement Date and until further notice, hereby
elects to so self-insure (it being agreed that the Original
Tenant may at any time and from time to time, subject to the
foregoing requirements, on notice to Landlord, revoke or rein-
state the self-insurance election).

        In addition to the foregoing, if the Original
Tenant has assigned this Lease or sublet all or substantially all
of the Demised Premises to other than a Related Company or a
company with a net worth of at least $250,000,000, no insurance
policy covering any portion of the Demised Premises shall have a
deductible clause in excess of Twenty Five Thousand Dollars
($25,000).

        C.    Intentionally Omitted.

        D.    In the event of damage to the Building or
Demised Premises by fire or other casualty whether or not of a
type required to be insured by Tenant pursuant to Article 17A,
and whether or not Tenant's self insurance election is in effect,
Tenant shall, at its sole cost and expense, without unnecessary
delay, commence and continue diligently to repair, rebuild and
restore the Building and leasehold improvements therein (other
than trade fixtures, furniture and merchandise) as nearly as
practicable to at least the same condition existing immediately
prior to such casualty (subject to Tenant's right to make al-
terations as set forth in Article 12 and subject to the pro-
visions of Article 18E).

- 19 -

Tenant shall have the sole right to settle any insurance claims, and (except as expressly set forth in Article 18F) all insurance proceeds shall be paid over to Tenant for use in such rebuilding and restoration work. Any balance of such proceeds following completion of such work shall belong solely to Tenant.

Landlord and Tenant hereby each waives the provisions of California Civil Code Sections 1932, 1933(4), 1265.150 and 1265.130 to the extent any of such provisions are inconsistent with the terms of this Lease. The foregoing waiver, however, shall not be deemed to impair, diminish or waive any rights granted to Landlord or Tenant in this Lease.

E. Notwithstanding the provisions of Article 18, if the Demised Premises have been damaged or destroyed as a result of an earthquake to the extent that the Demised Premises cannot be reasonably used as intended by this Lease, and if the damage to the land underlying the Demised Premises is to such extent that it is not economically reasonable to restore the Demised Premises, then Tenant shall have the right to terminate this Lease by delivering written notice to Landlord within 60 days following the date of such earthquake, in which event Tenant shall pay to Landlord:

(i) if such earthquake shall occur during the first ten years of the first term of this Lease, an amount equal to ten (10) times the Annual Base Rent existing at the beginning of such ten-year period times a fraction the numerator of which is the number of full months remaining in the first ten years of the term of this Lease and the denominator of which is 120; but in no event shall such amount payable to Landlord be less than five (5) times the Annual Base Rent in effect at the time of such earthquake.

(ii) if such earthquake shall occur after the first ten years of the term of this Lease, an amount equal to seven and one-half (7½) times the Annual Base Rent existing at the beginning of the applicable ten-year period following the first ten years of the term of this Lease times a fraction the numerator of which being the number of months remaining in the applicable ten-year period following the first ten years of the term of this Lease [for example, if the earthquake occurs in the last month of the seventeenth year of the term of this Lease, then the numerator shall be 36, and if the earthquake occurs in the last month of the twenty-second year of the term of this Lease, the numerator shall be 96]; and the denominator of which shall be 120; but in no event shall such amount be less than five (5) times the Annual Base Rent in effect at the time of the earthquake.

F. Notwithstanding any provisions of this Article 18 (other than Article 18E), if, as a result of any such damage or destruction (1) during the last two (2) years of the Lease term, the Building should be destroyed or damaged by fire or casualty (a) to the extent of twenty-five percent (25%) or more of the cost of replacement thereof, or (b) so that twenty-five percent (25%) or more of the gross floor area of the Building shall be rendered untenantable; or (2) if during the last two (2) years of the Lease term Tenant's merchandise, trade fixtures or other equipment which Tenant is authorized by this Lease to remove from the Demised Premises from time to time and at the end of the Lease term (and as to which Tenant had not

theretofore abandoned its property rights) shall be damaged or destroyed in an amount exceeding One Hundred Fifty Thousand Dollars ($150,000) replacement cost, then Landlord or Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter, and Tenant shall have an additional sixty (60) days, rent free, within which to remove such property and its personal property from the Demised Premises. Whether or not Tenant's self-insurance election is in effect on the date of such damage or destruction, Tenant shall perform the restoration work set forth in Article 18D notwithstanding any such termination or at Tenant's option pay to Landlord the cost thereof (less any insurance proceeds paid or assigned to Landlord). In the event that this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant. Notwithstanding any such termination of this Lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accor- dance with the provisions of Article 10, within twenty (20) days after the date of the receipt of Landlord's notice of termina- tion, and upon the exercise of any such option (other than the option set forth in paragraph (b) of Article 10) by Tenant, then this Lease shall continue in full force and effect despite such notice of termination by Landlord and Tenant shall repair, rebuild and restore the improvements as above provided. In the event that this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

G.    In the event of any damage or destruction to the Building or any other portion of the Demised Premises not resulting in the termination of this Lease, there shall be no abatement of rent or other charges under this Lease.

H.    The undertakings of either Landlord or Tenant set forth in this Article 18 or elsewhere in this Lease are not intended to confer any rights on any third parties (who are not successors or assigns of Landlord or Tenant), or to render either Landlord or Tenant liable to same.

I.    In the event that at any time during the Lease term, except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit B, other than Tenant's Building, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, or the Common Area shall be damaged by earthquake or other casualty, Landlord shall promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or in the event of damage to a building Landlord may, at its option, elect to raze any buildings so damaged or destroyed and pave the area formerly occupied by said buildings so as to provide additional parking facilities, said areas to be paved, marked, lighted, drained and maintained in the same manner as required herein for other parking areas in the Shopping Center. Notwithstanding anything to the contrary herein contained, it is agreed and understood that Landlord shall have the continuing right to rebuild and restore any buildings it may have previously razed, so long as the same are in the same location, same height, one story, and no greater in ground floor area than existing before casualty.

J.    Tenant shall not at any time be liable (a) for any loss or damage to the improvements, including the build- ings and structures located on the balance of the Shopping Center as aforesaid, resulting from fire, explosion or any other

- 21 -

casualty, or (b) for any loss or damage to the property of
Landlord or the other tenants or occupants of the Shopping
Center, except as specifically set forth in this Lease.  All
insurance carried by Landlord on the respective buildings or
structures erected within the Shopping Center, or by Landlord on
any of its property, shall require Landlord to waive right of
recovery against Tenant, shall contain a clause whereby the
insurer agrees to waive any right of subrogation against Tenant
on any claim covered by said insurance, and shall also bear
standard California first mortgagee fee or leasehold
endorsements, as may be required.

        K.      Except for the obligations of Landlord or
Tenant under this Article 18 and/or otherwise set forth in this
Lease, each party hereto does hereby remise, release and dis-
charge the other party hereto and any officer, agent, employee or
representative of such party, of and from any liability whatsoev-
er hereafter arising from loss, damage or injury caused by fire
or other casualty to its respective property coverable by the
insurance specified in Article 18A hereof (whether or not
self-insured) or actually covered by the insurance of such party,
irrespective of the negligence of such party or any officer,
agent, employee or representative of such party.

        19.    Eminent Domain.

        In the event all of the Building shall be expro-
priated (the term "expropriated" to include any transfer of the
property by an eminent domain proceeding or the giving of a deed
in lieu thereof) this Lease shall terminate as of the date Tenant
shall be deprived of possession thereof.  In the event the points
of ingress and egress from the Shopping Center to the public
roadways substantially as depicted on Exhibit B be materially
impaired (resulting, in the reasonable judgment of Tenant, in a
material impairment of Tenant's business) by reason of expro-
priation by a public or consecutive quasipublic authority and
such impairment continues for nine consecutive months without
reasonably satisfactory substitute ingress and egress being
provided, then after such nine month period all rent and addi-
tional rent (if Tenant shall have ceased operations) or (if
Tenant shall not have ceased operations) an equitable portion
(depending on the degree of impairment), of all rent and addi-
tional rent hereunder shall be abated until such access is
restored.  Should such abatement continue for a period in excess
of nine months (subject to Force Majeure if same interrupts
Landlord's ongoing repair or replacement efforts, then either
Landlord or Tenant may at any time thereafter prior to restora-
tion of such access cancel this Lease on notice to the other;
provided that if Landlord gives such notice of termination Tenant
may nullify same by, within 30 days of receipt thereof, notifying
Landlord that Tenant will immediately commence paying full rent
and additional rent due hereunder, in which event Tenant shall
also be liable to repay Landlord all previously abated rent by
reason of such impairment.  Notwithstanding the foregoing, if in
Tenant's reasonable judgment such material impairment will be
permanent, Tenant may cancel this Lease on notice to Landlord at
any time within 6 months following such expropriation.

        In the event that less than the whole but more
than ten percent (10%) of the Building shall be expropriated by
public or quasi-public authority and in Tenant's reasonable
judgment such taking would materially impair Tenant's use of the
Demised Premises, Tenant shall have the option to terminate this
Lease as of the date Tenant shall be dispossessed from the part
so expropriated, by giving notice to Landlord of such election so

to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of the Building and if this Lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the Demised Premises which shall not have been expropriated or taken, in which event Tenant shall, at its sole cost and expense, promptly and with due diligence restore the Building as nearly as practicable to a unit of like quality and character as existed just prior to such expropriation (pursuant to plans which have been approved by Landlord, which approval Landlord agrees not to unreasonably withhold or delay), provided that Landlord shall pay to Tenant all condemnation proceeds to be applied towards such restoration.  Any remaining balance after completion shall be repaid to Landlord, provided that if Tenant has not recovered a separate award for rent payable during any period of demolition and restoration, Landlord will pay from such balance the amount of such rent to Tenant.  There shall be no abatement of rent during any period of demolition and restoration; provided that notwithstanding the foregoing, from and after any such partial taking the annual Base Rent and the Breakpoint Amount set forth in Article 5 then relating to any portion of the space so expropriated shall be reduced in the proportion the ground floor area of the part of the Building so expropriated shall bear to the total ground floor area of the Building prior to such expropriation.

If one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the Common Area, then, in such event, Tenant shall have the option to terminate this Lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this Lease shall be terminated pursuant to this Article, any annual Base Rent and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional thirty (30) days, rent free, within which to remove its property from the Demised Premises.  In the event that at the time of any expropriation of the Building there shall be Unamortized Leasehold Costs, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the aggregate of all Unamortized Leasehold Costs (provided that for purposes of determining same, the date of expropriation shall be used rather than the date of the "Termination Notice").

Tenant shall not be entitled to share in any award made by reason of expropriation of on the Demised Premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to Unamortized Leasehold Costs.

Tenant shall also have the right to prosecute any claim directly and recover any compensation from the public or quasi-public authority (expropriating authority) as may be separately awarded and recoverable by Tenant in its own right for loss of business, or depreciation to , damage to, or cost of removal of, or for the value of stock, trade fixtures, furniture and other personal property belonging to Tenant, and also relocation expenses.  Tenant shall in no event be entitled to any award or portion of Landlord's award for the loss of its leasehold interest.

20.  <u>Use, Assignment and Subletting</u>.

- 23 -

A.    The Demised Premises may, except as set forth in the following sentence, be used for any lawful retail purpose and office and storage uses ancillary thereto, and also for the conduct of such other businesses and professions as from time to time are customarily conducted in community shopping centers in Southern California.  Notwithstanding the foregoing, the Demised Premises may not be used for any business which is noxious or unreasonably offensive because of omission of unreasonable amount of noise, smoke, dust or odors; or for an operation which regularly sells in a garish manner "factory reject," "distressed," "damaged" or "bankruptcy" goods; and the Demised Premises may not be used as a tavern or bar (unless its primary business is the sale of meals), or for off-track betting parlors, video or "penny" arcades, "discos", "strip shows," or for other than occasional or incidental live entertainment; or for a massage parlor, or primarily for the business of the sale of so-called "adult material" such as, without limitation, magazines, books, movies, and photographs; or for general office use other than "service" uses such as professional offices, banking, travel and insurance agencies, etc.; or for a use that would violate any of the "exclusive" clauses expressly set forth in Exhibit F (but the foregoing restriction shall only be in effect as long as the leases containing them remain in effect).  Tenant may assign this entire Lease (it being understood that no partial assignments, i.e. assignment of less than the whole of the Demised Premises, will be permitted without the prior written consent of Landlord which may be withheld for any reason) or sublet the whole or any portion of the Demised Premises, but if it assigns or subleases, it shall remain liable and responsible under this Lease.

B.    Tenant covenants and agrees that it shall fixturize, stock and initially open for business in the Demised Premises as a K mart store within 270 days of the Commencement Date, subject to Force Majeure (of which Tenant shall give Landlord notice within fifteen (15) days after each such delay began), but in no event later than twelve (12) months from the Commencement Date unless Landlord consents to a later opening date.  Failure to do so shall be default of this Lease.  Following such initial opening for business, Tenant shall not be obligated to conduct or to remain open for the conduct of any business in the Demised Premises.

C.    Notwithstanding anything to the contrary in this Article 20, Tenant agrees to notify Landlord not less than ten (10) days prior to any time and from time to time that (i) Tenant intends to cease operating bona fide business on all material portions of the Demised Premises or (ii) Tenant intends to assign this Lease or sublet, in the aggregate, more (when combined with any previous sublettings to non-Related Companies) than 44,000 square feet of ground floor area of the Building (any such assignment or subletting of more than an aggregate of 44,000 square feet of the Building being herein referred to as a "Tenant Transfer").  Tenant shall include with such notice (the "Tenant Notice") a statement and calculation of Unamortized Leasehold Costs (provided that in the event of a subletting of less than all of the Building, the Unamortized Leasehold Costs so set forth shall be only those applying solely to the space so sublet, or a pro-rata portion of leasehold improvements covering more than just said sublet space).  Within sixty (60) days of receiving a Tenant Notice, Landlord shall be entitled to terminate this Lease by giving written notice to Tenant (the "Termination Notice"), such termination to be effective on the 120th day following the date of the Termination Notice (the "Termination Date"); provided that the Termination Notice shall not be effective unless (i) included therein is Landlord's payment to Tenant of a sum equal to 50% of Tenant's Unamortized Leasehold Costs as set forth in the

- 24 -

Tenant Notice, and (ii) the remaining 50% of Tenant's Unamortized Leasehold Costs is paid to Tenant not later than 100 days following the date of the Termination Notice (subject to the 10 day cure period hereinafter set forth).  Following the giving of the Termination Notice and the making of both installments of the required payment, this Lease shall (provided the full payment has been made as aforesaid, it being understood that if Landlord does not pay the balance of Tenant's Unamortized Leasehold Costs when due and such failure continues for 10 days following written notice from Tenant of such failure given by Tenant after the said 100 day period Tenant may retain the 50% thereof paid as liquidated damages, the Termination Notice shall be void, and this Lease shall continue as if Landlord had failed to give a Termination Notice) terminate as if the Termination Date were the date herein fixed as the Expiration Date, and Tenant shall vacate the Demised Premises on or prior to the Termination Date.  Notwithstanding the foregoing, if the Tenant is any party other than the Original Tenant or a Related Company, Landlord at its option may deposit such payments into escrow with Tenant's attorney, in lieu of making same directly to Tenant, to be released to Tenant (together with any interest thereon) when Tenant vacates the Demised Premises (or upon Landlord failing to pay the second installment when due if such failure continues for 10 days following written notice from Tenant given after the end of such 100 day period).  If Landlord shall fail to give a Termination Notice within 60 days of receiving a Tenant Notice, Landlord shall have no right to terminate this Lease pursuant to this Article 20C if, during the one-year period following the giving of such Tenant Notice, Tenant should either cease operating bona fide business on all material portions of the Demised Premises or make a Tenant Transfer.  Notwithstanding the foregoing (i) should Tenant cease operating bona fide business on all such material portions during such one-year period and then resume operating, any subsequent cessation of operations shall be subject to the provisions of this Article 20C; (ii) if Tenant does not so cease operations or make a Tenant Transfer during such one-year period, Tenant shall be required to give another Tenant Notice before thereafter (i.e. following such one-year period) ceasing operations of bona fide business on all such material portions or making a Tenant Transfer; and (iii) should Tenant make a Tenant Transfer during such one-year period, it shall be required to again give a Tenant Notice before making any subsequent Tenant Transfer (or so ceasing operations).

D.    The provisions of Article 20C shall not apply to any of the following (and accordingly Landlord shall have no right to terminate this Lease in the event of any of the following):

(i)  A cessation of operation of business due to Force Majeure (provided that if Tenant shall not reopen for business within 12 months following cessation of the condition giving rise to such Force Majeure (or 18 months if such condition would require rebuilding of more than 50% of the Building) Tenant shall be required to give a Tenant Notice) or temporary cessations due to alteration or remodelling of the Demised Premises;

(ii)  An assignment of this Lease or subletting of all or part of the Demised Premises to a Related Company;

(iii)  An assignment of this Lease or a subletting of all or part of the Demised Premises to other than a Related Company made in connection with the sale

- 25 -

or transfer of three or more of Tenant's stores to a single entity (or Related Companies of such entity), provided that in the event of any such multiple sale or transfer, Landlord shall have no right to terminate this Lease pursuant to Article 20C but the provisions of Article 20E shall apply;

    (iv)  a collateral assignment or mortgage of this Lease made in connection with financing secured by Tenant; or

    (v)  a cessation of business in any part of the Building as long as bona fide business continues in a material portion of the remainder of the Building.

    Notwithstanding anything to the contrary set forth in this Article 20, regardless of any subletting or assignment, there shall at all times be at least one separate space in the Building of not less than 40,000 square feet.

    E.  In the event of a Tenant Transfer to other than a Related Company (it being understood that the provisions of this Article 20E shall not apply to an assignment of this Lease or a subletting of all or part of the Demised Premises to a Related Company) and if this Lease is not terminated pursuant to the provisions of Article 20C in connection with such proposed Tenant Transfer, Tenant shall pay to Landlord one-half (50%) of any Net Profit received by Tenant on account of any such Tenant Transfer to a non-Related Company.  Within 60 days following the end of any Lease Year in which Tenant realizes such a Net Profit, Tenant shall pay to Landlord one-half of such Net Profit realized during such preceding Lease Year, and shall accompany such payment with a statement setting forth in reasonable detail Tenant's calculation of Net Profit.  Tenant shall also deliver a statement for any Lease Year in which there exists subletting(s) of at least 20% of the gross floor area of the Building to a non-Related Company even if same shows no Net Profit.

    Landlord or its agent may inspect or audit Tenant's records relating to the computation of such Net Profit, provided such inspection shall be made at Tenant's principal office within two years after the statement of Net Profit shall be delivered to Landlord and shall be limited to the Lease Year covered by such statement.  If Tenant shall be found by such inspection or audit to have understated Net Profit, then Tenant shall immediately pay any Net Profit to which Landlord is entitled, and if Tenant shall be found by such audit to have paid Net Profit in excess of that due for said Lease Year, Landlord shall refund any excess due Tenant within fifteen (15) days of Landlord's receipt of such audit.  If Tenant shall be found by such audit to have understated Net Profit by more than three (3%), then Tenant shall immediately pay all of Landlord's reasonable costs incurred in connection with said audit, along with interest on any additional Net Profit owing to Landlord at the lower of fifteen percent (15%) per annum or the maximum rate allowed by California law from the date such Net Profit was due.  Except to the extent that disclosure shall be in connection with any prospective sale or mortgage (or existing mortgage) of the Demised Premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence figures and information obtained from Tenant's records relating to the computation of Net Profit.

    As used in this Article 20E:

- 26 -

"Net Profit" for any Lease Year shall mean the amount, if any, by which (i) the total of (A) any Transfer Payments received by Tenant during such Lease Year and (B) any Leasing Profits for such Lease Year exceeds (ii) the total of (A) all Tenant Costs theretofore incurred which have not been theretofore deducted in the calculation of Net Profits for previous Lease Years and (B) any Leasing Losses for such Lease Year. If for any Lease Year the amount of (ii) above should exceed the amount of (i) above, then there shall be no Net Profit for such Lease Year and the amount of any such excess shall be deemed Tenant Costs for the purpose of computing Net Profits in future Lease Years.

"Leasing Profits" or "Leasing Losses" shall be determined for any Lease Year in which there shall exist a subletting or sublettings of an aggregate of not less than 20% of the gross floor area of the Building to other than a Related Company. "Leasing Profits" for any Lease Year shall mean the amount by which Sublease Rents for such Lease Year exceeds Lease Rents for such Lease Year; and "Leasing Losses" for any Lease Year shall mean the amount by which Lease Rents for such Lease Year exceeds Sublease Rents for such Lease Year. There may not be both Leasing Profits and Leasing Losses for the same Lease Year.

"Sublease Rents" for any Lease Year shall mean any rent and additional rent (including percentage rent) paid to or on behalf of Tenant under all subleases for the Demised Premises or portions thereof with other than Related Companies during such Lease Year. Sublease Rents shall not include any amounts paid by Related Companies.

"Lease Rents" for any Lease Year shall mean a pro rata share attributable to all portions of the Building subleased to other than Related Companies (based upon a fraction whose numerator is the number of square feet of the Building subleased to other than Related Companies and whose denominator is 72,577) of all rent and additional rent (excluding only percentage rent and any Net Profits under this Article 19E) paid to or on behalf of Landlord under this Lease during such Lease Year.

"Transfer Payments" means any amounts actually received by Tenant from any third party as consideration for entering into a Tenant Transfer, excluding (i) any Sublease Rents and (ii) any amounts up to an aggregate of $50,000 allocable in good faith by the agreement between Tenant and such third party to the purchase of Tenant's trade fixtures. Should the consideration paid by any such third party be in the form of a note or other deferred payment obligation, Tenant shall be deemed to have received "Transfer Payments" only as and when it actually receives each installment of such note or obligation, provided that any interest thereon shall also be deemed a "Transfer Payment" as and when received by Tenant.

"Tenant Costs" shall mean the total of all of the following to the extent not theretofore deducted in computation of Net Profit: (i) Unamortized Leasehold Costs (to the extent, including any appropriate prorations, same apply to the area covered by the instant Tenant Transfer), (ii) Transfer Expenses, and (iii) Vacancy Costs. Notwithstanding the foregoing, there shall not be deducted as Tenant Costs in any Lease Year an amount of Unamortized Leasehold Costs in excess of the sum of (i) Transfer Payments received by Tenant in such Lease Year plus (ii) the amount of Unamortized Leasehold Costs deducted or amortized on Tenant's books for such Lease Year; except that

- 27 -

if there shall be a sublease to a non-Related Company which expires, and thereafter the space formerly occupied by such subtenant remains vacant for a period and is re-subleased, upon such re-subleasing Tenant may (in addition to deductions as aforesaid) deduct as Tenant Costs all Unamortized Leasehold Costs which would have been deductible during such vacancy period had the space been subleased during such period.

"Transfer Expenses", with respect to any Tenant Transfer, shall mean any bona fide expenses actually incurred by Tenant in connection with such Tenant Transfer, including without limitation any advertising costs, any brokerage or finders fees or commissions paid to third parties in obtaining an assignee or subtenant, any outside legal fees, any renovation, construction or other costs incurred in connection with or preparation for the Tenant Transfer, any transfer taxes, recording fees, and title insurance expenses.

"Vacancy Costs" means:

(a)  In the event of a cessation of business by Tenant with regard to all or any material portion of the Building prior to any subletting of the space in which business has ceased, 50% of any amounts paid to or on behalf of Landlord under this Lease as rent or Additional Rent during the period from and after the cessation of business up to the effective date (i.e. the date when regular rental payments by the assignee or sublessee begin) of a Tenant Transfer (provided that if the Tenant Transfer is a sublease of less than all of the Demised Premises, there shall be an appropriate proration (based on square footage of space leased and vacant) of the rent and additional rent hereunder and 50% of any prorated amounts attributable to the vacant portion shall continue to be Vacancy Costs until such space is leased); and

(b)  Following an initial subletting of all or any portion of the Building, should Tenant regain possession of such subleased portion, whether through expiration of the sublease or otherwise, Vacancy Costs shall mean 100% of any amounts paid to or on behalf of Landlord under this Lease as rent or Additional Rent during the period from and after the cessation of rent payments by such sublessee up to the said effective date of a new sublease (subject to proration as set forth above if the new sublease covers less than all of the formerly sublet space).

"Unamortized Leasehold Costs" shall be determined by using the date of the relevant Tenant Transfer rather than the Termination Date.

In the event of a Tenant Transfer pursuant to a multiple store transaction as set forth in Article 20D(iii), the specific allocations relating to this Lease and/or the Demised Premises set forth in any written agreement between Tenant and the transferee shall be used for the purpose of determining Transfer Payments, Transfer Expenses, and Sublease Rents for the purposes of this Article 20E (unless same are not bona fide and not made in good faith by Tenant); provided that if there are no such specific allocations as to any of the foregoing items, same shall be determined through a fair and reasonable proration of any such unallocated amounts for all stores and leases involved in the transaction.

- 28 -

F.    In the event of any subletting of 20% (by itself or aggregating at least 20% when combined with all previous sublettings to non-Related Companies) or more of the gross floor area of the Building to other than a Related Company, the provisions of Article 20E relating to division of Net Profits from such subletting shall be applicable notwithstanding that such subletting would not constitute a "Tenant Transfer" by reason of not being (together with previous sublettings) more than 44,000 square feet of the Building.  The foregoing shall only apply to any sublettings which result in an aggregate of more than 20% being subleased to non-Related Companies, and not to any previous (i.e. less than an aggregate 20%) such sublettings or replacements thereof.

G.    Notwithstanding anything to the contrary set forth in this Article 20, Landlord agrees upon request of Tenant to enter into a non-disturbance and attornment agreement in recordable form with any party (other than a Related Company) with whom Tenant hereafter proposes to enter into a sublease (provided that Landlord has not theretofore delivered a Termination Notice, and there does not then exist an unexpired period of time within which Landlord then has the right to deliver such a Termination Notice, pursuant to Article 20C).  Such non-disturbance and attornment agreement shall contain provisions to the effect that (i) in the event of the termination of this Lease by Landlord prior to its scheduled expiration date by reason of exercise by Landlord of its rights under Article 19C, the sublease would not terminate, but would continue as a direct lease between Landlord and such subtenant on all terms, covenants, and conditions contained in such sublease (including without limitation any renewal rights of such subtenant [in all instances where Tenant has agreed in the sublease to exercise a renewal right under this Lease to effectuate a renewal right of subtenant under such sublease], not to extend beyond the maximum term of this Lease including all renewal options granted to Tenant), provided that Landlord would not be bound by any amendment of such sublease that would materially adversely affect Landlord to which Landlord did not consent in writing, or by any rental paid by such subtenant to Tenant more than one month in advance; and (ii) in the event of such conversion of the sublease to a direct lease, such subtenant shall attorn to Landlord.  Such agreement shall be in form reasonably acceptable to Landlord and such subtenant.  If Landlord fails or refuses to execute such a non-disturbance and attornment agreement within 20 days of written request by Tenant, then:  (a) notwithstanding the failure to execute such agreement, such subtenant shall have the rights set forth in (i) above, which rights shall be deemed self-operative, and (b) in addition to any other remedies Tenant may have, if such refusal continues for 10 days following written notice from Tenant given after the end of such 20 day period, Landlord shall be liable for any damages Tenant incurs if such sublease is not entered into due to such failure or refusal. Notwithstanding the foregoing, Landlord shall not be required to enter into a non-disturbance agreement with any Related Company of Tenant.

H.    Within 10 days following execution of any assignment or sublease by Tenant to other than a Related Company, Tenant shall furnish Landlord with a true and complete copy of such assignment or sublease document (in which, if an assignment, the assignee shall assume the terms of this lease to be performed by Tenant from and after the assignment date), and shall furnish Landlord with true and complete copies of any material amendments or modifications thereof within 10 days after execution of same.

21.  Signs.

- 29 -

Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this Lease or thereafter, directly or indirectly, contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing, directly or indirectly, contesting or in any way impairing or tending to impair any part of Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this Lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect, and the correlative obligation to maintain, repair, and to the extent necessary , replace at its sole cost and expense and subject to obtaining any necessary permits, upon any portion of the Demised Premises, signs (including signs on the exterior of the Building) of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of Tenant's Building.

Except as presently permitted pursuant to pertinent provisions of existing leases, no exposed neon signs, flashing or animated sign, or roof or free-standing sign hereafter will be permitted to be erected for any occupant of the Shopping Center.

Landlord represents and warrants that a so-called pylon structure availed of by the predecessor tenant is located as depicted on Exhibit B.  Tenant shall be entitled to install and maintain the primary identification panel thereon, which shall be of such height and other dimensions as may be approved pursuant to applicable governmental law, and shall bear such legend and description as Tenant shall determine.  The pylon structure may not contain an identification or advertising panel of any other occupant of space within the Shopping Center or any other person except as may be presently existing, without the written consent of Tenant.  The aforementioned panel shall be maintained in good repair and in an attractive appearance and shall be lighted by Tenant, at its sole cost and expense.  Tenant shall have the right to change or replace its panel at any time or from time to time during the term of this Lease.  The pylon structure shall be maintained in good repair by Landlord and the cost thereof and the cost of lighting the same (other than Tenant's panel) shall be borne by Landlord (provided that if Tenant's is the only sign on such pylon, Tenant shall maintain the pylon).

22.    Ingress and Egress.

Landlord warrants as a consideration for Tenant entering into this Lease that it will not take any action, or omit to take any action reasonable in nature and exclusive of legal action which Landlord may decline in its sole discretion, during the period of this Lease and any extension thereof that would change ingress and egress facilities to the adjoining public streets and highways in the number and substantially in

- 30 -

the locations depicted on Exhibit B, subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control, and subject to the provisions of Article 19.

### 23. Landlord's Remedies.

If the Tenant shall be in default under any provisions of this Lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, (a) terminate this Lease, or (b) re-enter the Demised Premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; or (c) exercise Landlord's rights under Section 1951.4 of the California Civil Code, as in effect at the date hereof, which is incorporated by this reference herein; provided, however, in any event, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein, less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of the Demised Premises including, without limitation, reasonable attorney's fees, any repairs and alterations necessary to prepare it for reletting, and all other costs reasonably incurred in connection with such reletting including, without limitation, real estate broker's commissions. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except non-payment of rent and additional rent) cannot reasonably be remedied within thirty (30) days after notice of default, the Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this Lease can be terminated or other remedy enforced by Landlord so long as Tenant commences (within such 30 days) and diligently and continuously prosecutes the cure thereof. In no event shall Landlord be entitled to consequential damages. Landlord, in all instances, shall be required to make reasonable efforts to mitigate Landlord's damages. Nothing herein shall prevent Landlord from availing itself of any equitable remedies to which it may be entitled in the event of breach by Tenant.

### 24. Bankruptcy.

If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this Lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of Tenant to be performed by Tenant or anyone claiming under Tenant are complied with and Tenant is not in default with respect thereto. Notwithstanding anything to the contrary herein contained it is agreed and understood that this Lease is intended and shall therefore be deemed a Shopping Center lease within the meaning of Section 365 of Title 11 of the Federal Bankruptcy Code.

### 25. Quiet Enjoyment.

- 31 -

Landlord covenants, represents and warrants that as of the date of execution hereof and upon the Commencement Date (if different), it has and will have unrestricted full right, power and lawful authority to execute and perform this Lease for the term hereof and to grant the estate demised herein and that it is seized of an indefeasible estate in fee simple of the real property described in Exhibit A, vacant and free and clear of any leases, tenancies, occupancies, assignments, contracts, agreements, restrictions, violations, mortgages and other liens and encumbrances, except as set forth in Exhibit D (but notwithstanding the foregoing Landlord shall have no liability for breach of such representations if there should exist any other matter of record other than set forth in Exhibit D which does not materially adversely affect the rights of Tenant under this Lease), and that Tenant on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the Demised Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the Lease term without molestation or hindrance of any person whomsoever claiming by, through, or under Landlord.

26.  Mortgage Subordination.

If there be a first mortgage lien affecting the fee interest of the Demised Premises and/or the Landlord's interest in and to any ground lease, Landlord shall obtain and shall deliver to Tenant concurrently with the execution of this Lease, a non-disturbance agreement, and this Lease shall become subject and subordinate thereto and to any renewals, modifications, or extensions thereof or to any bona fide first or second mortgage that may be hereafter placed, (provided the holder of any such renewed, modified, replaced or extended or new first or second mortgage is not a Related Company to Landlord), but only if and when such a non-disturbance agreement in accordance with the provisions of this Article is entered into in respect of any such mortgage.

Such non-disturbance agreement shall be an agreement in recordable form between Tenant and the holder of such mortgage binding on such holder and on future holders of such mortgage in form reasonably satisfactory to Tenant or its counsel, or an agreement by such holder expressed in such mortgage, which shall provide in substance as follows:  (a) all condemnation awards and proceeds of insurance shall be applied in the manner provided for in this Lease, and (b) neither such holder nor any other holder of such mortgage shall name or join Tenant as a party-defendant or otherwise in any suit, action or proceeding (unless Tenant is a necessary party therein) to enforce, nor will this Lease or the term hereof be terminated (except as permitted by the provisions of this Lease) or otherwise affected by the enforcement of any rights given to any holder of said mortgage, pursuant to the terms, covenants or conditions contained in such mortgage or any other documents held by any holder or any rights given to any holder as a matter of law.  Any such non-disturbance agreement from a second mortgagee shall also provide that its consent or approval will not be necessary for any consent, approval, or lease amendment given or agreed by Landlord.  Upon request of the holder of a mortgage to which this Lease becomes subordinate, Tenant shall (i) execute, acknowledge and deliver to such holder an agreement to attorn to such holder as Landlord if such holder becomes Landlord hereunder, and/or (ii) execute, acknowledge and deliver to such holder an agreement not to make any payment of Base Rent for a period of more than one (1) month in advance.  If the holder of any first mortgage requires that this Lease have priority over such mortgage, Tenant

- 32 -

shall, upon request of such holder, execute, acknowledge and deliver to such holder an agreement acknowledging such priority.

Notwithstanding the foregoing, if there be any other Mortgage lien affecting the fee interest of the Demised Premises or a leasehold mortgage affecting an underlying ground lease, then and in any such case, Landlord shall obtain and shall deliver to Tenant, concurrently with the execution of this Lease, an agreement whereby such Mortgagee executes, acknowledges and delivers to Tenant an agreement in recordable form acknowledging the priority of this Lease over any such Mortgage. Except as expressly above set forth (and subject to the conditions above set forth) this Lease is and shall remain prior to and shall not be subject or subordinate to any Mortgage.

27.    Tenant Indemnifies Landlord.

During the term of this Lease, Tenant shall and does hereby indemnify and save Landlord and Landlord's ground lessor and mortgagees, if any, harmless of, from and against all costs, liabilities, damages, expenses, penalties, claims or demands of whatsoever nature, including all costs of defense and reasonable counsel fees, for personal injury, death and/or property damage occurring in or about the Demised Premises including all statutory and common law liability for damage to property or injuries or loss of life sustained by any person in or about the Demised Premises and sidewalk sales conducted by Tenant, except those which shall result primarily from the default, negligence or tortious acts of Landlord or Landlord's ground lessor or mortgagees, (if any) or of any tenant or other occupant (or any employee or agent thereof) of the Shopping Center.

Notwithstanding the foregoing, if the Original Tenant shall have assigned or sublet all or substantially all of the Demised Premises to other than a Related Company, or if at any time Tenant shall have a net worth of less than $250,000,000, Tenant shall be required to furnish Landlord with public liability insurance on the Demised Premises (excepting acts of Landlord and other parties as aforesaid) naming Landlord as an insured or additional insured in the combined single limit amount of $2,000,000 for bodily injuries and to property damage. Such amounts shall be adjusted upward every three Lease Years if required to keep such coverage in line with coverage typically carried for comparable shopping centers in Southern California.

The provisions of this Article 27 shall survive any termination of this Lease as to matters or occurrences which preceded the termination.

28.    Tenant's Right to Cure Landlord's Defaults.

In the event Landlord shall neglect to pay when due any obligations on any Mortgage or encumbrance affecting title to the Demised Premises and to which this Lease shall be subordinate unless the Mortgagee shall have granted Tenant non-disturbance, or shall fail to perform any obligation specified in this Lease, then Tenant may, after the continuance of any such default for thirty (30) days after notice thereof by Tenant with respect to a monetary default, pay said principal, interest or other charges or cure such default with respect to any default which does not involve payment of money after continuance of such default for forty-five (45) days after notice thereof by Tenant (provided that if such default is not capable of being fully cured within 45 days, Tenant may not exercise its rights hereunder if Landlord commences to cure such default

- 33 -

during such 45 day period and thereafter diligently proceeds to completion), all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall, within 30 days following demand, pay Tenant forthwith the amount so paid by Tenant, and Tenant may, to the extent necessary, deduct the same from any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the Demised Premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted forty-five (45) days after receipt thereof to correct or remedy such default.

29.  Landlord's Right to Cure Tenant's Defaults.

If Tenant, at any time after the lapse of thirty (30) days from the receipt of written notice from Landlord, shall fail to make any payment or to commence to perform any other act on its part to be made or performed (and thereafter diligently pursue such performance), then Landlord, without waiving Tenant's default, may (but shall be under no obligation to) make any payment or perform any other act on Tenant's part to be made or performed as provided in this Lease.  All sums paid by Landlord and all reasonable costs and expenses incurred by Landlord in connection with the performance of any such act including, without limitation, reasonable attorneys' fees, shall constitute Additional Rent and shall be paid by Tenant to Landlord within thirty (30) days after receipt of an invoice.

30.  Inspection by Landlord.

Tenant will permit Landlord and its authorized representatives to enter the Demised Premises at reasonable intervals and at reasonable times during Tenant's business hours for the purpose of (i) inspecting the same, (ii) making any necessary repairs and performing any work as contemplated in Articles 11 and 29 of this Lease, (iii) showing the same to prospective purchasers or Mortgagees, and (iv) during the last year of the Lease term, showing the same to prospective tenants. Any such inspection shall be made with a minimum of disruption to Tenant's business.

31.  Waiver of Distraint.

Landlord hereby expressly waives any and all rights granted by or under any present or future laws to levy or distrain for rent, in arrears, in advance, or both, upon all goods, merchandise, equipment, fixtures, furniture, Personalty and other personal property of Tenant or any subtenant or licensee of Tenant in the Demised Premises, delivered or to be delivered thereto.

32.  Unavoidable Delays.

If either party shall be prevented or delayed from punctually performing any obligation or satisfying any condition under this Lease by Force Majeure, then the time to perform such obligation or satisfy such condition shall be extended by the delay caused by such event for a period which in each instance shall not exceed 180 days, except for the payment of rent or other charges.

- 34 -

33. Adjoining or Adjacent Property.

Landlord shall use good faith efforts to promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Demised Premises or from any municipal or governmental authority in connection with any hearing or other administrative procedure relating to the use thereof or any adjoining or adjacent property.

34. Rent Notices.

If the ownership of the Demised Premises or the name or address of the party entitled to receive the rent shall be changed, Tenant may, until receipt of proper notice of such change from the grantor, assignor or party entitled to receive the rent immediately preceding such change, continue to pay the rent and additional rent to the party to which, and in the manner in which, the last preceding installment of rent was paid.

35. Notices.

Any notice, notification, demand, request or approval provided for herein shall be in writing and, any law or statute to the contrary notwithstanding, shall be effective for any purpose if given or served by intracity messenger service with a receipt obtained, Federal Express or similar document delivery service, or by mailing by registered or certified mail, postage prepaid, return receipt requested, addressed as follows: (a) If by Landlord, to Tenant at the address set forth on the first page of this Lease or at such other address as Tenant may from time to time designate by notice given to Landlord; and (b) If by Tenant, to Landlord at 430 Lexington Street, Auburndale, Massachusetts 02166, or at such other address as Landlord may from time to time designate by notice given to Tenant. Every notice, demand, request, approval or other communication hereunder shall be deemed to have been given or served at the earlier of actual receipt or one day after first attempted delivery.

36. Broker.

Tenant and Landlord each represent and warrant that it has dealt with no broker, agent or finder on account of this Lease. Tenant and Landlord agree, subject to the limitations set forth in Article 15 hereof, to defend, indemnify and hold harmless each other from and against any and all claims, damages, costs, liabilities, suits, settlements, judgments, actions, fees, including attorneys' fees, court costs and expenses of every nature in connection with any claim for or matter related to brokerage, finder's or similar fees, compensation or otherwise in any way directly or indirectly related to this Lease, the subject transaction or the consummation thereof, which may be made or alleged as a result of claimed acts or omissions of the indemnifying party. The provisions of this Article 36 shall survive any termination of this Lease.

37. Condition of Premises at Termination.

At the expiration or earlier termination of the Lease term, Tenant shall surrender the Demised Premises, together with alterations and improvements then a part thereof, in good order and broom clean condition, except for the following: ordinary wear and tear, repairs (if any) required to be made by Landlord pursuant to the provisions of this Lease, and loss or

- 35 -

damage by fire, the elements and other casualty (subject to the relevant provisions of Article 18).

38. Holding Over.

In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the Demised Premises after the expiration of the Lease term, it shall (without prejudice to any damage rights of Landlord) so remain as a tenant from month to month, and all provisions of this Lease applicable to such tenancy shall remain in full force and effect.

39. No Waiver.

The failure of either party to seek redress for violation of, or to insist upon the strict performance of any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

40. Waiver of Trial by Jury.

It is mutually agreed by and between Landlord and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Demised Premises and/or any claim of injury or damage.

41. Shopping Center Standards.

(a)  For the purpose of enhancing the overall appeal of the Shopping Center, Landlord acknowledges that the selection of tenants shall be consistent with maintaining a balanced and diversified grouping of retail stores.  Landlord warrants, covenants and agrees that no building now or hereafter erected within the lands described in Exhibit A shall be leased or permitted to be used or occupied by Landlord or its tenants or any successors or assigns of either Landlord or its tenants, or by any subtenant, licensee or concessionaire of a tenant, for an establishment selling or exhibiting pornographic materials, massage parlor, funeral parlor, automobile show room, auto service center (except K mart TBA), body and fender shop, car wash, amusement gallery, health spa or exercise facility, theatre or cinema, office space (other than "service" uses such as professional offices, banking, travel and insurance agencies, etc.) off-track betting parlor, bowling alley, billiard parlor, so-called "head shop", discotheque, roller skating rink or for industrial or warehouse purposes, or for any illegal use.

(b)  Landlord further warrants, covenants and agrees that no existing or future building on the Outparcel Site shall be leased or permitted to be used or occupied by Landlord or its tenants or any successors or assigns of either Landlord or its tenants, or by any subtenant, licensee or concessionaire of a tenant, for (i) a fast food or other restaurant or establishment selling food or drink for on or off premises consumption or (ii) for any other use which would materially adversely affect the amount of parking available to customers of Tenant (i.e. would generate customer traffic that would use materially more parking than that generated by the present tenant, a bank).

42. Hazardous Waste; Non-Use Legal Requirements.

- 36 -

(a)    Tenant, and any all successors in interest of Tenant shall at all times during the term of this Lease (including any renewals or extensions of such term), be prohibited from storing, displaying, generating, offering for sale, installing, maintaining and/or incorporating within the Demised Premises, or upon the Common Area or other portion or portions of the Shopping Center any asbestos containing materials which do not fully comply with all applicable laws and regulations or other toxic or hazardous materials or wastes (hereinafter collectively referred to as "Hazardous Substances") and shall in all events be and remain liable for the performance of any obligation and/or payment of any and all costs associated with the removal, treatment and/or replacement of any such substances, which in violation of such prohibition, are installed, incorporated, used, generated, stored, treated or disposed of by Tenant within or upon the Demised Premises, the Common Area, or any other portion or portions of the Shopping Center as the case may be.

(b)    As hereinbefore set forth, as part of Landlord's Work, Landlord shall comply with the provisions of the Hall-Kimbrell Study.  If prior to or following the Commencement Date and throughout the term of this Lease (i) any other Hazardous Substances (not placed or generated by Tenant) shall be discovered in or on the Demised Premises; or (ii) any presently existing or hereinafter enacted law, rule, regulation, or order of any federal, state or local authority or agency shall require the removal from the Demised Premises of any Hazardous Substance (not placed or generated by Tenant); or (iii) there shall be any Non-Use Legal Requirements applicable to the Demised Premises; and if any such occurrence or incidence set forth in (i) or (ii) or (iii) above would cost in excess of $50,000 to remove, correct, or comply with, then Tenant, within 30 days of becoming aware of such occurrence or incidence, shall have the right to cancel this Lease by giving written notice to Landlord specifying such a cancellation date (which may not be less than 30 days prior to the date of Tenant's notice).  If Tenant does not give such notice, Tenant shall be responsible, at its sole cost, to take all actions in accordance with all applicable laws and regulations to remove, correct, and/or comply with such occurrence or incidence involving Hazardous Substances or Non-Use Legal Requirements (hereinafter the "Compliance Work").  If Tenant gives such notice of cancellation, Tenant shall have no obligation to perform any such Compliance Work and this Lease shall cease and terminate on the date specified in the notice; unless not less than 10 days prior to such cancellation date Landlord gives written notice to Tenant that Landlord elects to perform all Compliance Work at Landlord's sole cost.  If Landlord gives such notice, Landlord shall be obligated to perform all such Compliance Work as promptly as practicable in compliance with all such applicable laws and regulations and with the least practicable disruption of Tenant's business, and Tenant's cancellation notice shall be deemed null and void.

43.    Invalidity of Certain Provisions.

If any provision of this Lease shall be invalid or unenforceable, the remainder of the provisions of this Lease shall not be affected thereby and each and every provision of this Lease shall be enforceable to the fullest extent permitted by law.

44.    Choice of law.

This Lease, and the rights and obligations of the parties hereto, shall be interpreted and construed in accordance with the laws of the State in which the Shopping Center is located.

- 37 -

45.   Memorandum of Lease.

The parties hereto have simultaneously with the execution and delivery of this Lease executed and delivered a Memorandum of Lease setting forth such information as may be necessary to constitute a "short form lease", which Landlord shall cause to be recorded within thirty (30) days following delivery of this Lease and returned to Tenant by Landlord within thirty (30) days thereafter.  Landlord agrees that it will comply with the requirements of the applicable recording office wherein said Memorandum of Lease is to be recorded, including filing any transfer or documentary transfer tax affidavit or declaration (subject to Article 51) so that the Memorandum of Lease will be accepted for recording.

In jurisdictions requiring a statutory Notice of Lease for recordation purposes, Landlord and Tenant agree that upon the written request of Tenant or Landlord such an instrument will be executed in recordable form, setting forth such information as may be necessary to constitute a Notice of Lease, which Landlord shall, at the equal expense of Landlord and Tenant, cause to be recorded within thirty (30) days following delivery of this Lease and returned to Tenant by Landlord within thirty (30) days thereafter.

46.   Entire Agreement.

This Lease contains the entire agreement between the parties and cannot be changed, modified or amended unless such change, modification or amendment is in writing and executed by the party against which the enforcement of the change, modification or amendment is sought.

47.   Independent Operation.

Nothing in this Lease shall cause Landlord in any way to be construed as a partner, joint venturer or an associate of Tenant in the operation of the Demised Premises.

48.   Successors and Assigns.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  All covenants and agreements of this Lease shall run with the land.

49.   Captions and Gender.

The captions of this Lease are solely for convenience of reference and shall not in any way define, describe, limit or amplify the scope, terms, provisions and intent of this Lease.  The necessary grammatical changes which shall be required to make the provisions of this Lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed.  Unless otherwise provided, upon the termination of this Lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder, except as to acts, omissions or defaults occurring prior to such termination.

50.   Estoppel Certificates.

Either party shall, without charge, at any time and from time to time within ten (10) days after request by the other, certify by written instrument, duly executed, acknowledged and delivered to such other party, or to any actual or proposed mortgagee, purchaser, assignee, or sublessee:

(a)  whether or not such other party is, to the best knowledge of the party giving the certificate, in default in any way, in the performance of any of the covenants, conditions and agreements to be performed by such party in accordance with this Lease and if there is any such default, specifying the nature of same;

(b)  what the amount of annual Base Rent and most recently payable Percentage Rent is pursuant to the terms hereof;

(c)  whether or not this Lease is unmodified and in full force and effect, or in the event that there have been modifications, whether the same is in full force and effect as modified and setting forth the modifications; and

(d)  whether or not there have been any prepayments of rent.

51.  <u>Transfer and Recording Taxes</u>.

Landlord and Tenant shall each be responsible to and each hereby agrees to pay, as and when due, 50% of all transfer, intangible, recording, filing, documentary stamp and other taxes, fees and charges due any governmental or municipal authority upon the execution of this Lease and/or the recordation hereof or of a memorandum or short form hereof (regardless of who presents same for recordation).

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

LANDLORD:

WITNESS:

STERIK COMPANY,
a New York general partnership

By:   MTC Associates I, a
      Massachusetts general
      partnership, Managing
      General Partner

By: _____
    General Partner

TENANT:

K MART CORPORATION

By: _____
    M. L. SKILES, VICE PRESIDENT

Attest: _____
    Assistant Secretary

PREPARED BY:

Bruce M. Kauderer, Esq.
Fink, Weinberger, Fredman,
   Berman, Lowell & Fensterheim, P.C.
420 Lexington Avenue
New York, New York  10170

- 40 -

STATE OF MASSACHUSETTS)
                       ) ss.:
COUNTY OF MIDDLESEX   )


    Before me, the undersigned authority, on this day personally appeared Joseph J. Dempsey, Jr., Gen.Part. of MTC ASSOCIATES I, a Massachusetts General Partnership, Managing General Partner of Sterik Company, a New York general partnership, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated and as the act and deed of said MTC Associates I and of said Sterik Company.

    Given under my hand and seal of office on this 20th day of July, 1989.


                                    _Ella F. McDowell_
                                    Notary Public




STATE OF Michigan
COUNTY OF Oakland


    Before me, the undersigned authority, on this day personally appeared M. L. Skiles, Vice Pres. of K MART CORPO-RATION, a Michigan corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and ac-knowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated and as the act and deed of said corporation.

    Given under my hand and seal of office on this 27th day of July, 1989.


                                    _Mary A. Schnitzler_
                                    NOTARY PUBLIC
                                    Notary Public, Oakland County, Mich.
                                    My Commission Expires May 20, 1991


                                    MARY A. SCHNITZLER
                                    Notary Public, Oakland County, Mich.
                                    My Commission Expires May 20, 1991


- 41 -

## EXHIBITS

A.   Legal Description of Shopping Center

B.   Plot Plan

C.   Commencement of Term Agreement

D.   Title Exceptions

E.   Roof Plans and Specifications

F.   Existing Exclusive Clauses

EXHIBIT A

DESCRIPTION:

PARCEL 1:

THE NORTHWESTERLY 15.26 FEET OF LOT 17, ALL OF LOTS 18 TO 38 INCLUSIVE AND THE NORTHWESTERLY 34 FEET OF LOT 39, IN BLOCK 5 OF TRACT NO. 3548, IN THE CITY OF BURBANK, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 40 PAGE 75 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO THE ALLEY 20 FEET WIDE, IN SAID BLOCK 5, AS VACATED BY RESOLUTION NO. 9820 OF THE COUNCIL OF SAID CITY, LYING PARALLEL WITH SAN FERNANDO BOULEVARD, AND EXTENDING SOUTHEASTERLY FROM THE SOUTHEASTERLY LINE OF WALNUT AVENUE, 90 FEET WIDE, TO THE SOUTHWESTERLY PROLOGNATION OF THE SOUTHEASTERLY LINE OF THE NORTHWESTERLY 34 FEET OF LOT 39 IN SAID BLOCK 5.

ALSO THE ALLEY IN SAID BLOCK 5, AS VACATED BY SAID RESOLUTION, LYING PARALLEL WITH WALNUT AVENUE AND EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF THIRD STREET, 60 FEET WIDE, TO THE NORTHEASTERLY LINE OF SAID LAST MENTIONED ALLEY.

PARCEL 2:

LOTS 1 TO 36 INCLUSIVE IN BLOCK 4 OF TRACT NO. 3548, IN THE CITY OF BURBANK, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 40 PAGE 75 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO THE ALLEY 20 FEET WIDE, IN SAID BLOCK 4, AS CAVATED BY RESOLUTION NO. 9820 OF THE OCUNCIL OF SAID CITY, LYING PARALLEL WITH SAN FERNANDO BOULEVARD, AND EXTENDING SOUTHEASTERLY FROM A LINE PARALLEL WITH AND DISTANT SOUTHEASTERLY 40 FEET MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF DELAWARE ROAD, 60 FEET WIDE, TO THE NORTHWESTERLY LINE OF WALNUT AVENUE, 90 FEET WIDE.

ALSO THE ALLEY IN SAID BLOCK 4, AS VACATED BY SAID RESOLUTION, LYING PARALLEL WITH DELAWARE ROAD AND EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF THIRD STREET, 60 FEET WIDE, TO THE NORTHEASTERLY LINE OF SAID LAST MENTIONED ALLEY.

ALSO THAT PORTION OF WALNUT AVENUE, 90 FEET WIDE, AS SHOWN ON SAID MAP AND AS VACATED BY SAID RESOLUTION, EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WIYH AND DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF THIRD STREET, 60 FEET WIDE, TO THE NORTHEASTERLY LINE OF SAN FERNANDO BOULEVARD, 100 FEET WIDE.



SITE PLAN

02/KMAR10
04/26/89

EXHIBIT C

COMMENCEMENT OF TERM AGREEMENT

THIS AGREEMENT, made effective as of the ____ day of
_____, 1989, between STERIK COMPANY, a New York general
partnership, having its principal office at 430 Lexington Street,
Auburndale, Massachusetts 02166 (hereinafter called "Landlord")
and K MART CORPORATION, a Michigan corporation, having its
principal office at 3100 West Big Beaver Road, Troy, Michigan
48084 (hereinafter called "Tenant").

W I T N E S S E T H :

WHEREAS, Landlord is the owner of that certain real
property described in Exhibit A annexed hereto and made a
part hereof; and

WHEREAS, by a certain lease (hereinafter called
"Lease"), dated the ____ day of _____, 19___, Landlord
demised to Tenant the premises constituting a portion of
said real property more particularly described in said
Lease; and

WHEREAS, Tenant is now in possession of the premises
demised under the Lease; and

WHEREAS, under Article 3 of the Lease, Landlord and
Tenant agreed to execute, acknowledge and deliver to each
other duplicate originals of an agreement setting forth the
date upon which the term of the Lease commenced (hereinafter
called and in the Lease defined as the "Commencement Date")
and the Commencement Dates of the extended terms (as such
term is defined in the Lease);

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.   The term of the Lease commences on, and the
Commencement Date is the ____ day of _____, 19__.

2.   The Commencement Dates of each extended term and
the dates when each such option to renew is to be exercised
are as follows:

| EXTENDED TERM | COMMENCEMENT DATE | LAST DATE TO EXERCISE OPTION |
|---|---|---|
| 1st | | |
| 2nd | | |
| etc. | | |

IN WITNESS WHEREOF, Landlord and Tenant have caused
this agreement to be executed as of the day and year first
above written.

_____          _____

                                            LANDLORD

Attest:                          K MART CORPORATION

                                 By:_____
_____
   Assistant Secretary               Vice President

                                            TENANT

[add acknowledgements]

EXHIBIT D

GENERAL AND SPECIAL COUNTY AND CITY TAXES
R THE FISCAL YEAR 1989-1990, A LIEN NOT YET PAYABLE.
R THE FISCAL YEAR 1988-1989
TAL AMOUNT            : $52,076.86
RST INSTALLMENT      : $26,038.44 PAID
COND INSTALLMENT     : $26,038.42, PLUS PENALTY OF $2,613.84

RCEL NO. 2460-7-36

AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
N FAVOR OF     : TITLE INSURANCE AND TRUST COMPANY, A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
OR             : POLE LINES AND CONDUITS
RECORDED       : SEPTEMBER 7, 1923 IN BOOK 2670 PAGE 222, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOTS 17, 20 AND 21 OF PARCEL 1.

AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : TITLE INSURANCE AND TRUST COMPANY, A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : POLE LINES AND CONDUITS
RECORDED       : SEPTEMBER 7, 1923 IN BOOK 2790 PAGE 90, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOTS 18, 19 AND 22 TO 39 INCLUSIVE OF PARCEL 1.

AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : POLE LINES AND CONDUITS
RECORDED       : IN BOOK 6613 PAGE 398, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOTS 37, 38 AND 39 OF PARCEL 1.

AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : SOUTHWEST ESTATES, INC., A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : POLE LINES AND CONDUITS
RECORDED       : IN BOOK 7750 PAGE 77, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOT 21 OF PARCEL 1.

AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES, DISCLOSED BY A
DECLARATION OF RESTRICTIONS
EXECUTED BY    : BENMAR HILLS CORPORATION, A CORPORATION
FOR            : POLE LINES AND CONDUITS
RECORDED       : SEPTEMBER 19, 1941 IN BOOK 18758 PAGE 221, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET OF LOTS OF SAID LOTS IN TRACT NO. 3548.

AND AS INCORPORATED BY REFERENCE THERETO IN VARIOUS DEEDS OF RECORD.

COVENANTS, CONDITIONS AND RESTRICTIONS IN THE ABOVE RECORDED
INSTRUMENT.

WHICH PROVIDE THAT A VIOLATION THEREOF SHALL NOT DEFEAT OR RENDER
INVALID THE LIEN OF ANY MORTGAGE OR DEED OF TRUST MADE IN GOOD FAITH
AND FOR VALUE.

RESTRICTIONS, IF ANY, BASED ON RACE, COLOR, RELIGION OR NATIONAL ORIGIN
ARE DELETED.

PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF   : CITY OF BLANK                              ,
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR           : PUBLIC UTILITY AND SEWER PURPOSES
RECORDED      : JULY 22, 1954 IN BOOK 45134 PAGE 77, OFFICIAL RECORDS
AFFECTS       : AS FOLLOWS:

PARCEL 1:

THE ALLEY 20 FEET WIDE, IN BLOCK 5 IN SAID TRACT NO. 3548, LYING PARALLEL WITH
WALNUT AVENUE AND EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WITH AND
DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM SAID CENTER LINE
OF THIRD STREET TO THE NORTHEASTERLY LINE OF ALLEY 20 FEET WIDE, IN SAID BLOCK
5, LYING PARALLEL WITH SAN FERNANDO BOULEVARD.

PARCEL 2:

THAT PORTION OF THE ALLEY 20 FEET WIDE, AND THE NORTHWESTERLY PROLONGATION
THEREOF IN SAID BLOCK 5, LYING PARALLEL WITH SAN FERNANDO BOULEVARD, EXTENDING
NORTHWESTERLY FROM THE SOUTHWESTERLY PROLONGATION OF THE SOUTHEASTERLY LINE OF
THE ALLEY DESCRIBED IN PARCEL 1 ABOVE, TO A LINE PARALLEL WITH AND DISTANT
SOUTHEASTERLY 20 FEET MEASURED AT RIGHT ANGLES FROM SAID CENTER LINE OF WALNUT
AVENUE.

SAID MATTER AFFECTS: PARCEL 1.


     AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF   : CITY OF BURBANK
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR           : PUBLIC ROAD AND HIGHWAY
RECORDED      : JULY 22, 1954 IN BOOK 45134 PAGE 77, OFFICIAL RECORDS
AFFECTS       : THE NORTHEASTERLY 10 FEET OF LOTS 37, 38 AND 49, THE
                SOUTHWESTERLY LINE OF SAID 10 FOOT STRIP OF LAND BEING
                COINCIDENT WITH A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY
                40 FEET MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF THIRD
                STREET, 60 FEET WIDE, AS SHOWN ON SAID MAP OF TRACT NO. 3548.

SAID PORTIONS OF LAND TO BE KNOWN AS THIRD STREET.

SAID MATTER AFFECTS: PARCEL 1.


     AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF   : CITY OF BURBANK
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR           : PUBLIC UTILITIES, SEWER
RECORDED      : SEPTEMBER 16, 1954 IN BOOK 45591 PAGE 410, OFFICIAL RECORDS
AFFECTS       : THAT PORTION OF THE ALLEY 20 FEET WIDE, IN BLOCK 5 OF TRACT
                NO. 3548, AS VACATED JUNE 20, 1954 BY RESOLUTION NO. 9820 BY
                THE COUNCIL OF THE CITY OF BURBANK, LYING PARALLEL WITH SECOND
                STREET, (NOW SAN FERNANDO BOULEVARD) AND EXTENDING
                SOUTHEASTERLY FROM THE SOUTHWESTERLY PROLONGATION OF THE
                SOUTHEASTERLY LINE OF THE ALLEY IN SAID BLOCK 5, LYING
                PARALLEL WITH WALNUT AVENUE TO THE NORTHWESTERLY LINE OF
                FAIRMOUNT ROAD (NOW BURBANK BOULEVARD) 90 FEET WIDE, AS SHOWN
                ON SAID MAP OF TRACT NO. 3548.

SAID MATTER AFFECTS: PARCEL 1.

     AN EASEMENT AFFECTING PARCEL 1, FOR A COVERED STORM DRAIN AND
APPURTENANT STRUCTURES OVER THAT PORTION OF LOT 24 AND OF WALNUT AVENUE, 90
FEET WIDE, AS SHOWN ON SAID MAP VACATED BY CITY OF BURBANK, RESOLUTION NO.
9820, RECORDED IN BOOK 45154 PAGE 280, OFFICIAL RECORDS, WITHIN A STRIP OF
LAND 20 FEET WIDE, LYING 10 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE INTERESECTION OF THE CENTER LINE OF THIRD STREET, 80 FEET
WIDE, SHOWN AS 60 FEET WIDE ON SAID MAP, WITH A LINE PARALLEL WITH AND
SOUTHEASTERLY 10 FEET MEASURED AT RIGHT ANGLES, FROM THE CENTER LINE OF SAID
WALNUT AVENUE; THENCE ALONG SAID PARALLEL LINE, SOUTH 41 DEGREES 15 MINUTES 11
SECONDS WEST 362.86 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE
SOUTHEAST AND HAVING A RADIUS OF 450 FEET; THENCE SOUTHWESTERLY 150.85 FEET
ALONG SAID CURVE; THENCE TANGENT TO SAID CURVE, SOUTH 22 DEGREES 02 MINUTES 49
SECONDS WEST 62.94 FEET TO A POINT IN A LINE PARALLEL WITH AND SOUTHWESTERLY
60 FEET, MEASURED AT RIGHT ANGLES, FROM THE NORTHEASTERLY LINE OF SAN FERNANDO
BOULEVARD, 100 FEET WIDE, SHOWN AS SECOND STREET, 100 FEET WIDE, ON SAID MAP,
SAID POINT BEING DISTANT ALONG SAID LAST MENTIONED PARALLEL LINE, SOUTH 49

- - -

DEGREES 45 SECONDS 48 SECONDS EAST 57 FEET FROM SAID CENTER LINE OF WALNUT AVENUE.

RESERVING UNTO SAID GRANTORS, THIER HEIRS, SUCCESSORS AND ASSIGNS, THE RIGHT TO CONSTRUCT PERMANENT STRUCTURES IN, OR AND ACROSS LAND FIRST HEREIN DESCRIBED OVER WHICH A PERPETUAL EASEMENT IS BEING GRANTED, SUBJECT TO THE FOLLOWING CONDITIONS WHICH SAID GRANTORS, THEIR HEIRS, SUCCESSORS AND ASSIGNS, AGREE TO KEEP AND PERFORM, VIZ:

GRANTORS, THEIR HEIRS, SUCCESSORS AND ASSIGNS, AGREE THEY WILL NOT PERFORM OR ARRANGE FOR THE PERFORMANCE OF ANY CONSTRUCTION OR RECONSTRUCTION WORK OF SAID PERMANENT STRUCTURES IN, OVER AND ACROSS THE LAND FIRST HEREIN DESCRIBED UNTIL THE PLANS AND SPECIFICATIONS FOR SUCH CONSTRUCTION OF SAID PERMANENT STRUCTURES SHALL HAVE FIRST BEEN SUBMITTED TO AND BEEN APPROVED IN WRITING BY THE CHIEF ENGINEER OF LOS ANGELES COUNTY FLOOD CONTROL DISTRICT.

IT IS EXPRESSLY UNDERSTOOD THAT THE GRANTEE WILL NOT BE CALLED UPON TO CONSTRUCT, REPAIR, REPLACE OR RECONSTRUCT ANY PORTION OF THE PERMANENT STRUCTURES THAT MAY BE CONSTRUCTED BY GRANTORS, THEIR HEIRS, SUCCESSORS AND ASSIGNS, IN, OVER AND ACROSS THE FIRST HEREIN DESCRIBED REAL PROPERTY.

THE PROVISIONS AND AGREEMENT CONTAINED IN THIS EASEMENT DEED SHALL BE BINDING UPON THE GRANTORS, THEIRS HEIRS, SUCCESSORS AND ASSIGNS AND GRANTEE, ITS SUCCESSORS AND ASSIGNS.


    AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF   : CITY OF BURBANK
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR        : PUBLIC SANITARY SEWERS
RECORDED   : OCTOBER 15, 1962 IN BOOK D-1788 PAGE 372, OFFICIAL RECORDS
AFFECTS    : THAT PORTION OF VACATED WALNUT AVENUE ON LOT 24 OF SAID PARCEL
             1, LYING 5 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE INTERSECTION OF TH NORTHWESTERLY PROLONGATION OF THE SOUTHWESTERLY LINE OF LOT 25 OF SAID TRACT, WITH A LINE PARALLEL TO AND DISTANT SOUTHEASTERLY 20 FEET, MEASURED AT RIGHT ANGLES TO THE CENTER LINE OF VACATED WALNUT AVENUE; SAID POINT BEING ON A CURVE CONCAVE SOUTHEASTERLY AND HAVING A RADIUS OF 441.50 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE TO ITS INTERSECTION WITH THE MOST WESTERLY CORNER OF LOT 24 OF SAID TRACT.

THE SIDE LINES OF SAID 10 FOOT STRIP OF LAND ARE TO BE PROLONGED OR SHORTENED RESPECTIVELY SO AS TO TERMINATE ON THE NORTHEASTERLY LINE OF SAN FERNANDO BOULEVARD, 100 FEET WIDE AND THE NORTHWESTERLY PROLONGATION OF THE SOUTHWESTERLY LINE OF SAID LOT 25.

    AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF   : TITLE INSURANCE AND TRUST COMPANY, A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR        : POLE LINES AND CONDUITS
RECORDED   : MARCH 19, 1923 IN BOOK 2099 PAGE 108, OFFICIAL RECORDS
AFFECTS    : REAR 5 FEET.

SAID MATTER AFFECTS: LOT 18 OF PARCEL 2.


    AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF   : TITLE INSURANCE AND TRUST COMPANY, A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR        : PIPE LINES, POLE LINES AND CONDUITS
RECORDED   : SEPTEMBER 7, 1923 IN BOOK 2670 PAGE 222, OFFICIAL RECORDS
AFFECTS  ·  : REAR 5 FEET.

SAID MATTER AFFECTS: LOT 17 OF PARCEL 2.


    AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF   : TITLE INSURANCE AND TRUST COMPANY, A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR        : PIPE LINES, POLE LINES AND CONDUITS
RECORDED   : SEPTEMBER 7, 1923 IN BOOK 2790 PAGE 90, OFFICIAL RECORDS
AFFECTS    : REAR 5 FEET.

SAID MATTER AFFECTS: PARCEL 2.

AN EASEMENT AFFECTI.  THE PORTION OF SAID LAND  \D FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : TITLE INSURANCE AND TRUST COMPANY, A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : PIPE LINES, POLE LINES AND CONDUITS
RECORDED       : OCTOBER 14, 1924 IN BOOK 3459 PAGE 332, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOT 15 OF PARCEL 2.


AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : TITLE INSURANCE AND TRUST COMPANY, A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : POLE LINES AND CONDUITS
RECORDED       : OCTOBER 10, 1924 IN BOOK 3466 PAGE 315, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOT 23 OF PARCEL 2.


AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : SOUTHERN CALIFORNIA EDISON COMPANY, A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : PIPE LINES, POLE LINES AND CONDUITS
RECORDED       : IN BOOK 3990 PAGE 201, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOT 16 OF PARCEL 2.


AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : SOUTHWEST ESTATES, INC., A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : POLE LINES AND CONDUITS
RECORDED       : IN BOOK 6613 PAGE 398, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOT 36 OF PARCEL 2.


AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : SOUTHWEST ESTATES, INC., A CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : PIPE LINES, POLE LINES AND CONDUITS
RECORDED       : IN BOOK 6749 PAGE 390, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOTS 32 AND 33 OF PARCEL 2.


AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : SOUTHWEST ESTATES, INC.
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : PIPE LINES, POLE LINES AND CONDUITS
RECORDED       : IN BOOK 7068 PAGE 314, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOTS 2 AND 3 OF PARCEL 2.


AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : SOUTHWEST ESTATES, INC.
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : PIPE LINES, POLE LINES AND CONDUITS
RECORDED       : IN BOOK 7706 PAGE 389, OFFICIAL RECORDS
AFFECTS        : REAR 5 FEET.

SAID MATTER AFFECTS: LOT 1 OF PARCEL 2.

-4-

AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF  : SOUTHERN CALIFORNIA GAS COMPANY
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR          : PIPE LINES
RECORDED     : JULY 9, 1954 IN BOOK 45017 PAGE 215, OFFICIAL RECORDS
AFFECTS      : THAT PORTION OF WALNUT AVENUE, BEING A STRIP OF LAND 40 FEET
               IN WIDTH, LYING 20 FEET ON EACH SIDE OF A LINE THAT IS 45 FEET
               SOUTHEASTERLY OF AND PARALLEL TO THE NORTHWESTERLY LINE OF
               WALNUT AVENUE, 90 FEET IN WIDTH, BETWEEN A LINE THAT IS
               PARALLEL TO AND 40 FEET SOUTHWESTERLY, MEASURED AT RIGHT
               ANGLES, FROM THE CENTER LINE OF THIRD STREET, SHOWN ON SAID
               MAP AS 60 FEET IN WIDTH AND THE NORTHEASTERLY LINE OF SAN
               FERNANDO BOULEVARD, 100 FEET WIDE, DESIGNATED ON SAID MAP OF
               TRACT NO. 3548, AS SECOND STREET.

SAID MATTER AFFECTS: PARCEL 2.


   .   AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF  : CITY OF BURBANK
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR          : PUBLIC UTILITY, SEWER, STORM DRAIN
RECORDED     : JULY 22, 1954 IN BOOK 45134 PAGE 73, OFFICIAL RECORDS, AS
               INSTRUMENT NO. 349 AND IN BOOK D-1789 PAGE 459, OFFICIAL
               RECORDS
AFFECTS      : THAT PORTION OF WALNUT AVENUE, (NOW VACATED) WITH A STRIP OF
               LAND 40 FEET WIDE, LYING 20 FEET ON EACH SIDE OF THE CENTER
               LINE OF SAID WALNUT AVENUE, 90 FEET WIDE AND EXTENDING
               SOUTHWESTERLY FROM A LINE PARALLEL WITH AND DISTANT
               SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE
               CENTER LINE OF THIRD STREET, 60 FEET WIDE, AS SHOWN ON MAP OF
               SAID TRACT, TO THE NORTHWESTERLY LINE OF SAN FERNANDO
               BOULEVARD, AS SHOWN, 100 FEET WIDE ON SAID MAP.


   SAID MATTER AFFECTS: PARCEL 2.

BY A DEED DATED OCTOBER 10, 1962, EXECUTED BY THE CITY OF BURBANK, A MUNICIPAL
CORPORATION, RECORDED OCTOBER 15, 1962, SAID EASEMENT WAS QUITCLIAMED TO THE
RECORD OWNERS, EXCEPT AS TO THE FOLLOWING DESCRIBED LAND:

THAT PORTION OF VACATED WALNUT AVENUE AND LOT 24 OF BLOCK 5 OF TRACT NO. 3548,
AS SHOWN ON MAP RECORDED IN BOOK 40 PAGE 75 OF MAPS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY, LYING 5 FEET ON EACH SIDE OF THE FOLLOWING
DESCRIBED LINE:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY PROLONGATION OF THE
SOUTHWESTERLY LINE OF LOT 25 OF SAID TRACT, WITH A LINE PARALLEL TO AND
DISTANT SOUTHEASTERLY 20 FEET, MEASURED AT RIGHT ANGLES TO THE CENTER LINE OF
VACATED WALNUT AVENUE; SAID POINT BEING ON A CURVE CONCAVE SOUTHEASTERLY AND
HAVING A RADIUS OF 441.50 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE TO ITS
INTERSECTION WITH THE MOST WESTERLY CORNER OF LOT 24 OF SAID TRACT.

THE SIDE LINES OF SAID 10 FOOT STRIP OF LAND ARE TO BE PROLONGATION OR
SHORTENED RESPECTIVELY SO AS TO TERMINATE ON THE NORTHEASTERLY LINE OF OF SAN
FERNANDO BOULEVARD, 100 FEET WIDE AND THE NORTHWESTERLY PROLONGATION OF THE
SOUTHWESTERLY LINE OF SAID LOT 25.


   AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF  : CITY OF BURBANK
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR          : PUBLIC UTILITY AND SEWER PURPOSES
RECORDED     : IN BOOK 45134 PAGE 77, OFFICIAL RECORDS, AS INSTRUMENT NO. 349
               AND IN BOOK D-1787 PAGE 459, OFFICIAL RECORDS
AFFECTS      : THOSE PORTIONS OF ALLEYS AND STREETS (NOW VACATED) IN SAID
               TRACT NO. 3548, DESCRIBED AS FOLLOWS:

PARCEL 1:

THE ALLEY 20 FEET WIDE, IN BLOCK 4 IN SAID TRACT NO. 3548, LYING PARALLEL WITH WALNUT AVENUE AND EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM SAID CENTER LINE OF THIRD STREET, 60 FEET WIDE AND TO THE NORTHEASTERLY LINE OF ALLEY 20 FEET WIDE, IN SAID BLOCK 4, LYING PARALLEL WITH SAN FERNANDO BOULEVARD.

PARCEL 2:

THAT PORTION OF THE ALLEY 20 FEET WIDE AND THE SOUTHEASTERLY PROLONGATION THEREOF IN SAID BLOCK 4, LYING PARALLEL WITH SAN FERNANDO BOULEVARD AND EXTENDING SOUTHEASTERLY FROM THE SOUTHWESTERLY PROLONGATION OF THE NORTHWESTERLY LINE OF THE ALLEY DESCRIBED IN PARCEL 1 ABOVE, TO A LINE PARALLEL WITH AND DISTANT NORTHWESTERLY 20 FEET MEASURED AT RIGHT ANGLES FROM SAID CENTER LINE OF WALNUT AVENUE, 90 FEET WIDE.

SAID MATTER AFFECTS: PARCEL 2.


    AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF   : CITY OF BURBANK
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR          : PUBLIC ROAD PURPOSES
RECORDED     : JULY 22, 1954 IN BOOK 45134 PAGE 168, OFFICIAL RECORDS
AFFECTS      : THOSE PORTIONS OF SAID LAND, DESCRIBED AS FOLLOWS:

PARCEL 1:

THE NORTHEASTERLY 10 FEET OF SAID LOTS 1 AND 36, THE SOUTHWESTERLY LINE OF SAID 10 FOOT STRIP OF LAND BEING COINCIDENTAL WITH A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF THIRD STREET, 60 FEET WIDE, AS SHOWN ON SAID MAP OF TRACT NO. 3548.

SAID PORTIONS OF LAND TO BE KNOWN AS THIRD STREET.

PARCEL 2:

THE NORTHWESTERLY 10 FEET OF SAID LOTS 23 TO 36 INCLUSIVE, EXCEPT THE NORTHEASTERLY 10 FEET OF SAID LOT 36. THE SOUTHWESTERLY LINE OF SAID 10 FOOT STRIP OF LAND BEING COINCIDENT WITH A LINE PARALLEL WITH AND DISTANT SOUTHEASTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF DELAWARE ROAD, 60 FEET WIDE, AS SHOWN ON SAID MAP OF TRACT NO. 3548.

SAID PORTIONS OF LAND TO BE KNOWN AS DELAWARE ROAD.

PARCEL 3:

THAT PORTION OF LOT 36, BOUNDED ON THE NORTHEAST BY THE SOUTHWESTERLY LINE OF THE ABOVE DESCRIBED PARCEL 1 AND ON THE NORTHWEST BY THE SOUTHEASTERLY LINE OF THE ABOVE DESCRIBED PARCEL 2 AND ON THE SOUTH BY A CURVE CONCAVE TO THE SOUTH, HAVING A RADIUS OF 15 FEET, SAID CURVE BEING TANGENT AT ITS SOUTHEASTERLY TERMINUS TO SAID SOUTHWESTERLY LINE AND TANGENT AT ITS SOUTHWESTERLY TERMINUS TO SAID SOUTHEASTERLY LINE.

SAID PORTION OF LAND TO BE KNOWN AS DELAWARE ROAD.

PARCEL 4:

THAT PORTION OF SAID LOT 23, BOUNDED ON THE SOUTHWEST BY THE SOUTHWESTERLY LINE OF SAID LOT 23 AND ON THE NORTHWEST BY THE SOUTHEASTERLY LINE OF SAID ABOVE DESCRIBED PARCEL 2 AND ON THE EAST BY A CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 15 FEET, SAID CURVE BEING TANGENT AT ITS NORTHEASTERLY TERMINUS TO SAID SOUTHEASTERLY LINE AND TANGENT AT ITS SOUTHEASTERLY TERMINUS TO SAID SOUTHWESTERLY LINE.

SAID PORTION OF LAND TO BE KNOWN AS DELAWARE ROAD.

SAID MATTER AFFECTS: PARCEL 2.


COVENANTS, CONDITIONS AND RESTRICTIONS IN THE DECLARATION OF
RESTRICTIONS
EXECUTED BY    : SDH REALTY CORPORATION, A CALIFORNIA CORPORATION, ERNEST G.
                 HEMAN AND GUNTER F. HERMAN
RECORDED       : DECEMBER 31, 1984 AS INSTRUMENT NO. 84-158683.


THE EFFECT OF: SHORT FORM EASEMENT AND WAIVER
DATED        : FEBRUARY 2, 1987
EXECUTED BY: STERIK COMPANY, A NEW YORK GENERAL PARTNERSHIP
RECORDED     : APRIL 27, 1987 AS INSTRUMENT NO. 87-653662
WHICH AMONG OTHER THINGS PROVIDES: AS SET OUT THEREIN.


*.. A DEED OF TRUST TO SECURE AN INDEBTEDNESS IN THE ORIGINAL AMOUNT
STATED HEREIN
DATED        : SEPTEMBER 21, 1987
AMOUNT       : AS SET OUT THEREIN
TRUSTOR      : STERIK COMPANY, A NEW YORK GENERAL PARTNERSHIP
TRUSTEE      : FCA SERVICE COMPANY, A CALIFORNIA CORPORATION
BENEFICIARY  : AMERICAN SAVINGS AND LOAN ASSOCIATION, A CALIFORNIA
               CORPORATION
RECORDED     : SEPTEMBER 30, 1987
INSTRUMENT NO.: 87-1564774

AN ASSIGNMENT OF ALL RENTS, ROYALTIES, ISSUES AND PROFITS ACCRUING FROM
SAID LAND TOGETHER WITH THE LESSOR'S INTEREST IN ANY AND ALL EXISTING
AND FUTURE LEASES NOW OR HEREAFTER PLACED ON SAID PREMISES, AS
ADDITIONAL SECURITY FOR THE PAYMENT OF THE INDEBTEDNESS SECURED BY SAID
DEED OF TRUST,
ASSIGNOR: STERIK COMPANY, A NEW YORK GENERAL PARTNERSHIP
ASSIGNEE: AMERICAN SAVINGS AND LOAN ASSOCIATION, A CALIFORNIA CORPORATION.
RECORDED: SEPTEMBER 30, 1987 AS INSTRUMENT NO. 87-1564775

33.   AN EASEMENT AFFECTING THE PORTION OF SAID LAND AND FOR THE
PURPOSES STATED HEREIN, AND INCIDENTAL PURPOSES,
IN FAVOR OF    : CITY OF BURBANK, A MUNICIPAL CORPORATION
(NO REPRESENTATION IS MADE AS TO THE PRESENT OWNERSHIP OF SAID EASEMENT)
FOR            : PUBLIC UTILITY, SANITARY SEWERS
RECORDED       : JANUARY 7, 1988 AS INSTRUMENT NO. 88-21428
AFFECTS        : THOSE PORTIONS OF LOTS 17, 18, 38 AND 39 OF BLOCK 5 OF TRACT
                 NO. 3548, TOGETHER WITH PORTIONS OF THE ALLEYS (NOW VACATED)
                 WITHIN SAID BLOCK 5, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST EASTERLY CORNER OF LOT 37 OF SAID BLOCK 5; THENCE SOUTH
41 DEGREES 15 MINUTES 29 SECONDS WEST ALONG THE SOUTHEASTERLY LINE OF SAID LOT
37, A DISTANCE OF 10 FEET, MORE OR LESS, TO A POINT IN THE SOUTHWESTERLY LINE
OF THIRD STREET, AS DESCRIBED IN THE DEED TO THE CITY OF BURBANK, DATED JULY
2, 1954, RECORDED ON JULY 22, 1954 IN BOOK 45134 PAGE 81, OFFICIAL RECORDS, AS
INSTRUMENT NO. 3700 OF SAID COUNTY RECORDER, SAID POINT BEING THE TRUE POINT
OF BEGINNING; THENCE SOUTH 48 DEGREES 43 MINUTES 30 SECONDS EAST ALONG SAID
SOUTHWESTERLY LINE, 20.00 FEET TO THE SOUTHEASTERLY LINE OF THE VACATED ALLEY
ADJACENT TO LOT 38 OF SAID BLOCK 5, SAID LINE BEING ALSO THE NORTHWESTERLY
LINE OF SAID LOT 38; THENCE SOUTH 41 DEGREES 15 MINUTES 29 SECONDS WEST ALONG
THE NORTHWESTERLY LINE OF SAID LOT 38, A DISTANCE OF 131.05 FEET; THENCE SOUTH
3 DEGREES 02 MINUTES 35 SECONDS EAST 120.27 FEET TO THE SOUTHEASTERLY LINE OF
THE NORTHWESTERLY 34 FEET OF SAID LOT 39; THENCE SOUTH 41 DEGREES 15 MINUTES
29 SECONDS WEST ALONG SAID SOUTHEASTERLY LINE AND ITS SOUTHWESTERLY
PROLONGATION 253.42 FEET TO THE NORTHEASTERLY LINE OF SAN FERNANDO BOULEVARD,
100 FEET WIDE, AS SHOWN ON THE MAP OF SAID TRACT NO. 3548; THENCE NORTH 48
DEGREES 44 MINUTES 17 SECONDS WEST ALONG SAID NORTHEASTERLY LINE, 20.00 FEET;
THENCE NORTH 41 DEGREES 15 MINUTES 29 SECONDS EAST 245.28 FEET; THENCE NORTH 3
DEGREES 02 MINUTES 35 SECONDS WEST 120.27 FEET TO THE NORTHWESTERLY LINE OF
SAID VACATED ALLEY; THENCE NORTH 41 DEGREES 15 MINUTES 29 SECONDS EAST ALONG
SAID NORTHWESTERLY LINE, 139.20 FEET TO THE TRUE POINT OF BEGINNING.


WATER RIGHTS, CLAIMS OR TITLE TO WATER,
WHETHER OR NOT SHOWN BY THE PUBLIC RECORDS.


EXISTING TENANT LEASES FOR PORTIONS OF THE SHOPPING CENTER OTHER THAN THE
DEMISED PREMISES, SUBJECT TO PROVISIONS OF LEASE ARTICLE 8.


** requires Non-Disturbance Agreement

EXHIBIT E



SINGLE-PLY ROOFING

## re-roofing spec

Kmart #3834 · BURBANK · CA·

MAY 12, 1989

JUN 22 '89 14:14 K MART CORP. REAL ESTATE DEP.



## ROOF DIAGRAM
SCALE 1" = 80'

CONTRACTOR SHALL VERIFY ALL
DIMENSIONS AND CONDITIONS
NOT INDICATED.

## Kmart #3834 · BURBANK · CA ·
MAY 12, 1989

JUN 22 '89 14:15 K MART CORP. REAL ESTATE DEP.

SP-1

# SPECIFICATION FOR RE-ROOFING
# SINGLE-PLY ROOFING SYSTEM

1. **GENERAL**
   1.01 **Scope of Work**
   - A. Removal of existing roofing to deck at main roof.
   - B. Preparation of existing plywood deck.
   - C. Installation of new single-ply roofing membrane including insulation, base and pipe flashings, etc. as required.
   - D. Installation of new sheet metal components or reworking of existing.
   - E. Installation of walkway pads and any items not specified but required.

   1.02 **Description**
   - A. The following are minimum requirements and shall govern, except that all Federal, Local and/or State Codes and Ordinances shall govern when their requirements are in excess hereof.
   - B. Furnish the administration, facilities, materials, and labor with the expertise to integrate the work into the total building system, so that no leakage into the roof systems or building occurs.

   1.03 **Quality Assurance**
   - A. The roofing system shall be single ply, mechanically attached, installed only by a Roof Contracting Firm with has been licensed by the roofing system materials Manufacturer for at least one year.
     1. Submit certification of approval by Manufacturer with proposal.
   - B. The roofing system shall be mechanically attached.
     1. Acceptable Manufacturers: Bond Cote Systems, Cooley Roofing Systems and J. P. Stevens.

   1.04 **Submittals**
   - A. Submit to the K mart Corporation a "letter of intent" describing roofing material for approval.
     1. Submit a complete description of the roofing system, listing all components, including insulation boards.
     2. Accompanying approval request, submit a written statement indicating that the project has been reviewed with a qualified representative of the Manufacturer of the roofing materials submitted for approval, and that there is agreement that the proposed Manufacturer's system and materials are proper and adequate for use on this project in conjunction with the other components of the roof system, and that the conditions are not in conflict with the requirements of the Manufacturer.

JUN 22 '89 14:15 K MART CORP. REAL ESTATE DEP.

P.4

SP-2

1. GENERAL    (Continued)
   1.04 Submittals    (Continued)
        B. Submit to the Manufacturer shop drawings for approval.
           1. Shop drawings shall include:  Outline of roof and
              roof size, location and type of penetrations,
              flashings and fasteners,  perimeter details,
              special details and Bill of Material.

           2. Submit to K mart Corporation shop drawings after
              approval by Manufacturer.

   1.05 Product Delivery and Storage
        A. All materials must be clearly labeled with all
           pertinent information.

        B. All materials shall be delivered to the project in the
           Manufacturer's original unopened packages.  Store all
           materials off the ground on pallets minimum 4" high
           and cover completely to prevent the intrusion of
           moisture. Materials subjected to improper storage
           shall be identified, conspicuously marked as rejected,
           and permanently removed from the site.
           1. Storage of materials on the roof is prohibited.
           2. Consult K mart Corporation Representative
              regarding location of storage area.

   1.06 Substitutions
        A. Submit evidence that materials have been ordered
           within ten (10) days after acceptance.
           1. Requests for acceptance of material substitutions
              due to unavailability or delay in delivery of
              materials must be endorsed by the roofing
              materials manufacturer.
           2. Submit requests for changes in writing
              immediately and receive written authorization
              before proceeding with changes.

   1.07 Pre-Roofing Conference
        A. Immediately following the selection and approval of
           the Roofing Contractor and the roofing system
           Manufacturer, a job-site meeting with the roofing
           Manufacturer's Technical Representative and K mart
           Representative shall be arranged by the Roofing
           Contractor to discuss the Contract Document
           requirements, construction procedures and application,
           surface preparation and material storage and
           protection.

        B. All materials shall be approved prior to the meeting
           and samples of all materials shall be brought to the
           meeting by the Roofing Contractor.

   1.08 Job Conditions
        A. The Roofing Contractor shall be responsible for the
           proper attachment of the roofing to any accessory or
           related work which is in contact with, or which
           becomes and integral part of the roofing or flashing
           system.

SP-3

1. **GENERAL**    (Continued)
   **1.08** **Job Conditions**    (Continued)
   A. The Roofing Contractor shall be    (Continued)
   1. Where wood blocking and other roofing accessories
      not indicated, but necessary to complete the
      roofing are required, such work is to be
      furnished and installed under this section at no
      additional cost to the K mart Corporation.

   **1.09** **Warranty**
   A. Upon completion of the installation, an inspection
      shall be made by a Technical Representative of the
      roofing membrane Manufacturer to ascertain that the
      roofing system has been installed to the published
      specifications and details.
      1. Furnish copy of inspection certificate to the
         K mart Corporation upon approval of
         installation. The Manufacturer shall issue a ten
         (10) year labor and material Warranty.

   B. Acceptance of the roof by the K mart Corporation is
      contingent upon approval of the installation by the
      Membrane Manufacturer.

2. **REMOVAL OF EXISTING WORK**
   **2.01** Remove existing built-up roofing complete to plywood
   deck. Existing roofing consists one four (4) ply built-up
   roof and cap sheet system superimposed.
   A. Removal work shall be conducted in sections of such
      size as to assure completion of re-roofing operation
      of each section at the end of each day. No roof deck
      may be left uncovered overnight.
      1. Contractor shall dispose of all removed materials
         from site.

   B. Remove all existing cant strips, composition base
      flashing and defective metal counterflashing.

   C. Remove all roof drain domes and clamping rings and
      re-set on completion.

   D. Remove any existing roof fixtures as required for
      proper installation of new roof and re-set at
      completion.

   E. Remove any abandoned equipment, curbs, etc..

   F. Protect the building, its contents, grounds, and
      landscape from damage, providing guards and coverings
      as necessary. Any damage caused by insufficient
      protection or maintenance of such protection will be
      made good and to the satisfaction of K mart without
      additional cost to K mart.

3. **PREPARATION OF ROOF DECK**
   **3.01** Remove existing adhesive, if any, broom and vacuum clean
   existing plywood deck. Deck to be free of nails and other
   protrusions and generally smooth and clean for application
   of new roofing.

SP-4

3. **PREPARATION OF ROOF DECK**   (Continued)
3.02  Inspect deck for deterioration, sagging and securement to structure.  Re-nail plywood panels where required, and replace any deteriorated sections of deck.

   A.  Unit price for replacement of plywood deck shall be ____ per square foot, installed.  Plywood shall be 1/2" exterior type.

     1.  Nailing pattern shall be 3" o.c. at edges of panels and 12" o.c. field.  Use 10d nails.

   B.  Inspect structural roof supports (purlins) and replace deteriorated sections.

     1.  Any structural repair must be carried out with Structural Engineers supervision, recommendations and approval.

     2.  Cost of Engineer's services and structural replacement/repairs shall be K mart Corporation responsibility.

3.03  Install new plywood decking over openings formed by removal of abandoned equipment and curbs.

   A.  Provide additional purlins, if required.  Consult Structural Engineer.

3.04  If conditions are uncovered which are not conducive to the proper application of specified work, these conditions shall be immediately called to K mart Representative's attention for his decision as to treatment.  Start of roofing installation will indicate acceptance of the deck by Roofing Contractor.

4. **PRODUCTS**
4.01  **Recover Board**

   A.  Recover board shall be 3/4" Fiberglas or perlite board over one layer of Manniglas (if Manniglas required by code).

     1.  Vertify acceptability with Manufacturer.

   B.  Mechanical fasteners shall be appropriate for use with board and plywood deck, and shall be non-corrosive coated.

4.02  **Membrane**

   A.  Roofing membrane shall be single-ply, mechanically attached, "Bond Cote" 40 mil as manufactured by West Point Pepperell, "Cool-Top 40" as manufactured by Cooley and "Hi-Tuff" roofing system as manufactured by Stevens Roofing Systems.

     1.  All flashing material shall be provided by membrane Manufacturer.

     2.  Mechanical fasteners, splice adhesives, lap sealants, bonding adhesives, etc., shall be furnished by membrane Manufacturer.

4.03  **Lumber**

   A.  Types and dimensions as required, Volmanized or treated with gas or water-borne preservatives for above-ground use; kiln or air-dried to a moisture content of 15% or less.

JUN 22 '89 14:19 K MART CORP. REAL ESTATE DEP

SP-5

4. **PRODUCTS**    (Continued)
   4.04 **Miscellaneous**

   A.  Sealant:  Federal Specification TT-00230
       (Single-component); TT-S-00227 (two components).

   B.  Lead:  4 pound hard lead, containing not less than 6%
       or more than 7-1/2% of antimony.

   C.  Copper:  16 oz. soft copper flashing sheet.

   D.  Galvanized steel (minimum 24-gauge): ASTM A-361
       (hot-dipped type), backpainted.

   E.  Fasteners:  Solders and fluxes as necessary and
       compatible for the work.  (Solder ASTM B-32, 50% block
       tin and 50% pig lead).

   F.  Pressure bar:  3/16" x 1-1/4" x 5' maximum length
       sections, galvanized steel bar stock.

5. **EXECUTION**
   5.01 **Installation/Recover Board**

   A.  Install recover board, mechanically fasten to the deck.
       1.  Place recover board to straddle joints in plywood
           deck.

   B.  Replace any insulation at metal curbs damaged during
       removal of existing roofing.

   5.02 **Installation/Membrane**

   A.  Furnish and install complete mechanically attached
       roofing system in strict accordance with
       specifications and details by Manufacturer.  Include
       all base flashings.

   B.  Flash pipe and other protrusions with molded pipe
       flashings where installation is possible.  Where
       molded pipe flashings cannot be installed, use field
       fabricated pipe seals.

   C.  Furnish additional components, such as wood nailers,
       etc. as required for proper installation of system.

   D.  Re-set roof drain domes and clamping rings.

   E.  Clean out any existing pitch pockets, flash and
       re-fill with pourable sealer.

   F.  Re-set roof fixtures removed for re-roofing operations.
       1.  Start up and leave in working order.

SP-6

5. **EXECUTION**   (Continued)

5.05 **Installation/Flashing**

    A.  Installation of all flashings shall be in strict accordance with the roofing systems Manufacturer's specifications and details.

    B.  Provide and install all sheet metal counterflashing, parapet caps, etc.

        1.  Re-use existing sheet metal if in good condition and only if acceptable to membrane Manufacturer.

6. **PAINTING**

6.01 Paint exterior metal, fascias, vents and steel supports with two (2) finish coats of paint compatible with membrane.

    A.  All new exterior metal to be prepared for painting.

    B.  Consult with K mart Representative regarding repainting of existing surfaces.

    C.  Colors as directed.

7. **ADJUST AND CLEAN**

7.01 The Roofing Contractor shall protect the building from damage by materials or operations resulting from the performance of the work.

    A.  The Roofing Contractor shall be responsible for the cost of repairs and restoration of work of other trades damaged by roofing materials or operations.

    B.  At completion of the work and before acceptance, the Contractor shall remove all debris and excess material resulting from the performance of the work.

END

JUN 22 '89 14:21 K MART CORP. REAL ESTATE DEP.

B. CBANK
LEASE W/ MUSIC PLUS VIDEO          EXHIBIT F
4/12/87

5.    Adjustment of Fixed Minimum Rent.  Fixed Minimum Rent shall be increased every thirty (30) months commencing the thirty-first (31st) month by ten percent (10%) calculated as follows:

| Months | Amount |
|--------|--------|
| 1-30 | Base Annual Rent |
| 31-60 | $154,722.35 |
| 61-90 | $170,194.58 |
| 91-120 | $187,214.04 |
| 121-150 | $205,935.46 |
| 151-180 | $226,528.99 |
| 181-210 | $249,181.89 |
| 211-240 | $274,100.08 |

7.1    Use.  Section 7.F. is amended by adding after the words "night club" on the second line thereof the following:

    ", skating rink, health spa, offices except as incidental to retail sales or services connected therein)".

7.2    Landlord hereby agrees not to lease to any other tenant whose primary business is in the selling and leasing of audio and visual tapes, records and ticket sales. This exclusive is not intended to prohibit other Tenants in the shopping center to sell or lease said items as an incidental side of their business?*

9.    Within 10 days after premises are turned over to Tenant in substantially complete condition as per Exhibit "B", Tenant will prepare a written punch list describing those items that have not been completed.  Landlord will immediately move to make such repairs so that Tenant's interior improvement construction is not delayed.  If Tenant is delayed in its construction work because of Landlord's inability to make repairs, rent will be prorated on a per diem basis.

12.1    Late Closing.  Section 12.A. is amended by deleting the period at the end thereof and adding the following:

    "(provided that if Tenant requires the shopping center remain open or illuminated after 10:00 P.M., Tenant shall be responsible for all costs, including security, allocable to said requirement).  In section 7.M. the time of "11:00 P.M." is changed to "10:00 P.M."

12.2    Measurement.  Section 12 is amended by adding at the end thereof the following:

    "As used herein, "ground floor area" means "gross leasable area" measured to the exterior face of all exterior walls and the center of all common walls."

** Further, this exclusive does not include the building currently occupied by Sports Club so long as the building is leased by Sports Club or any related entity pursuant to that Lease dated July 10, 1986 between Sports Club and Sterik Company, as such lease may be extended.

3

EXCLUSIVE
CLASE

... Tenant shall occupy and use the Premises only for the operation of a Mexican restaurant ... and he no other purposes whatsoever without the prior written consent of Landlord which may be withheld for any reason whatsoever, as is necessary to protect Landlord's interests regarding Percentage Rent and the tenant mix of the shopping center.
Tenant shall ... **shall be no other Mexican restaurant within the shopping center ... no other warrants there** ...

B. Not so permit the use of the Leased Premises in any manner that will tend to create a nuisance or disturb other tenants or occupants of the shopping center.

C. Conduct its business to be conducted in the Leased Premises only for sale, auction, bankruptcy sale, second-hand or army navy sale, thereof ... the normal course of business of Tenant.

D. Allow any activity to be conducted on the Leased Premises or store any material on the Leased Premises which will increase premiums for or violate the rates of any insurance policy maintained by or for the benefit of Landlord or the shopping center. In no event shall any explosive, toxic, radioactive or temporary materials be stored at the Leased Premises.

E. Use or allow the Leased Premises to be used for any gaming quarters or dwelling rooms, or for any unlawful or immoral purpose ...

F. Use or allow the Leased Premises to be used for the serving of alcoholic beverages without Landlord's prior written consent ...

G. Solicit business, distribute advertising, discount place any merchandise, vending or amusement machines on or otherwise use in the conduct of its business, any part of the Common Area of the shopping center.

H. Operate in such a manner or place signs or window or door signs, advertising media in window or door lighting ...

I. Install and maintain at all times, displays of merchandise in the display windows of, of the Leased Premises ...

J. Keep the Leased Premises unless required ...

K. Keep the Leased Premises ...

UTILITIES. Tenant agrees to pay before delinquency all charges for gas, heat, power, electricity, telephone, storm drain, water service and ...

REPAIRS. Tenant agrees that its appointment of the Leased Premises endorsed ...

ALTERATIONS. Tenant shall not make any alterations, additions, modifications or changes (" alterations") to the Leased Premises without first ...

TAXES AND ASSESSMENTS. Tenant shall be responsible for and shall pay ...

\* Extract from lease dated 4/2/87 with Edward Chin, effec 9/16/87 Fast Taco.

01/KMA10A
07/07/89
RECORDED AT THE REQUEST OF
TICOR TITLE INS. CO.
WHEN RECORDED MAIL TO:
(see attached Exhibit "C")

89-1318527

FEE $ 23.00 R

**PARTIES**

THIS MEMORANDUM OF LEASE dated as of this 26th day of July, 1989, between STERIK COMPANY, having its notice address at 430 Lexington Street, Auburndale, Massachusetts 02166 (herein referred to as "Landlord"), and K MART CORPORATION, a Michigan corporation having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084, (herein referred to as "Tenant").

WITNESSETH: That for and in consideration of the sum of One Dollar ($1.00) and other good and valuable considerations and the further consideration of the rents reserved and the covenants and conditions more particularly set forth in a certain lease between Landlord and Tenant and bearing even date herewith, Landlord and Tenant do hereby covenant, promise and agree as follows:

**DEMISED
PREMISES**

1. Landlord does hereby demise and lease to Tenant, and Tenant does hereby lease and take from Landlord, for the term hereinafter set forth, premises hereinafter described ("Demised Premises"), together with and included as part thereof, a reasonable area not in excess of 5,000 square feet for loading and unloading adjacent to each service door of the Demised Premises, within the shopping center hereinafter described (the "Shopping Center"), situated in the City of Burbank, and State of California together with any and all easements, licenses, rights, appurtenances and privileges now or hereafter belonging or appertaining unto said Demised Premises. The Shopping Center is more particularly described on Exhibit A attached hereto and made a part hereof. The Shopping Center consists of the land (and all improvements that may from time to time be thereon) represented by the area outlined by a bold line upon a certain plan (the "Plot Plan") attached hereto and made a part hereof as Exhibit B. The Demised Premises consist of (i) a one-story building (the "Building") containing approximately 72,577 square feet of ground floor area, which Building is in the location designated on the Plot Plan as "K mart" and (ii) the land immediately thereunder, all as depicted on Exhibit B. Landlord hereby grants to Tenant the non-exclusive right to use, in common with other tenants of the Shopping Center, the portions of the Shopping Center intended to be for common use, including, but not limited to, any parking areas, roads, curb-cuts, streets, drives, tunnels, passageways, landscaped areas, open and enclosed malls, exterior ramps, walks and arcades (hereinafter collectively called "Common Area").

RECORDED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
31 MIN. 11 A.M. AUG 16 1989
PAST.

**TERM**

2. The lease term shall commence upon the date ("Commencement Date") which is the

85 62 138

date of delivery of possession in accordance
with Article 7 of said Lease and shall
terminate (1) 20 years from the day before
the Commencement Date if the Commencement
Date is the first day of a month, or (2) 20
years from the last day of the month in which
the Commencement Date occurs if the
Commencement Date is not the first day of a
month; provided, however, Tenant shall have
the option to extend the lease term for three
(3) successive periods of five (5) years for
each of the first two such options and an
additional period of four (4) years for the
third such option.

MISCELLANEOUS          3.   Said lease also contains the
following provisions:

The parking spaces in the Common Area
shall be used non-exclusively for the
parking of private automobiles of the
respective tenants of the Shopping
Center and their respective customers,
licensees, subtenants, employees,
agents, concessionaires, guests and
invitees, and for no other purpose, and
the access, perimeter and through roads,
streets and drives shall be used for
pedestrian and vehicular traffic and no
other purpose (subject to the provisions
of Articles 19 and 22 and Exhibit D).
The layout of, and striping in, the
Common Area, as depicted on Exhibit B,
shall not be changed without Tenant's
consent.  If so designated on Exhibit B,
employees of the tenants of the Shopping
Center shall not park their automobiles
in the Common Area, except in the area
designated as "Employee Parking" on
Exhibit B, and Landlord shall use its
best efforts to prevent any violation of
this provision, and Tenant covenants and
agrees that it shall not permit to be
parked or stored thereon, trailers from
which it receives its goods, wares, and
merchandise, except in Tenant's loading
dock area.

Landlord represents, warrants and
covenants that it will not erect here-
after (or suffer, permit, or allow any
Shopping Center tenant, subtenant or
other occupant to erect) any buildings
or other structures on the lands
described in Exhibit A, except as shown
on Exhibit B, and neither at this time
nor at any time hereafter will any part
of the Shopping Center be used for
industrial or warehouse purposes, except
that an occupant of retail space may
utilize a portion of its space for
incidental storage of merchandise or
other items in conjunction with the
conduct of business thereat.

Landlord will not hereafter enter into
any easement or other agreement giving
any parties (other than Shopping Center

- 2 -      89  1318527

tenants) any rights of ingress, egress or parking in and to the Shopping Center without the prior written consent of Tenant (but Landlord may nevertheless, without Tenant's consent, enter into public utility easements which do not reduce parking spaces or otherwise adversely affect Tenant).

For the purpose of enhancing the overall appeal of the Shopping Center, Landlord acknowledges that the selection of tenants shall be consistent with maintaining a balanced and diversified grouping of retail stores. Landlord warrants, covenants and agrees that no building now or hereafter erected within the lands described in Exhibit A shall be leased or permitted to be used or occupied by Landlord or its tenants or any successors or assigns of either Landlord or its tenants, or by any subtenant, licensee or concession-aire of a tenant, for an establishment selling or exhibiting pornographic materials, massage parlor, funeral parlor, automobile show room, auto service center (except K mart TBA), body and fender shop, car wash, amusement gallery, health spa or exercise facility, theatre or cinema, office space (other than "service" uses such as professional offices, banking, travel and insurance agencies, etc.) off-track betting parlor, bowling alley, billiard parlor, so-called "head shop", discotheque, roller skating rink or for industrial or warehouse purposes, or for any illegal use.

Landlord further warrants, covenants and agrees that no existing or future building on the Outparcel Site (i.e. the building marked "Savings and Loan" on Exhibit B) shall be leased or permitted to be used or occupied by Landlord or its tenants or any successors or assigns of either Landlord or its tenants, or by any subtenant, licensee or concessionaire of a tenant, for (i) a fast food or other restaurant or establishment selling food or drink for on or off premises consumption or (ii) for any other use which would materially adversely affect the amount of parking available to customers of Tenant (i.e. would generate customer traffic that would use materially more parking than that generated by the present tenant, a bank).

The sole purpose of this instrument is to give notice of said lease and all of its terms, covenants and conditions.

Said lease is hereby incorporated herein by reference and this Memorandum of Lease is and shall be subject to all the terms, agreements and conditions of said lease as fully as though said terms, agreements and conditions were expressly set forth herein.

- 3 -    89  1318527

The conditions, covenants and agreements contained in this instrument shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this instrument and said lease shall run with the land.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

LANDLORD:

WITNESS:

STERIK COMPANY,
A New York general partnership

By:  MTC Associates I, a
     Massachusetts general
     partnership, Managing
     General Partner

By:
     Joseph J. Dempsey, Jr.
     General Partner

TENANT:

K MART CORPORATION

By:
     M. L. SKILES, VICE PRESIDENT

Attest:

PREPARED BY:

Bruce M. Kauderer, Esq.
Fink, Weinberger, Fredman,
  Berman, Lowell & Fensterheim, P.C.
420 Lexington Avenue
New York, New York  10170

- 4 -

STATE OF MASSACHUSETTS )
                       ) ss.:
COUNTY OF MIDDLESEX    )

        Before me the undersigned authority, on this day
personally appeared   Joseph J. Dempsey Jr.  of MTC ASSOCIATES I, A
Massachusetts General Partnership, Managing General Partner of
Sterik Company, a New York general partnership, known to me to be
the person whose name is subscribed to the foregoing instrument
and acknowledged to me that he executed the same for the purposes
and consideration therein expressed, in the capacity therein
stated and as the act and deed of said MTC Associates I and of
said Sterik Company.

        Given under my hand and seal of office on this 20th day
of    July       , 1989.

                                  _Ellen Tyrrell Russell_
                                    Notary Public

STATE OF Michigan )
                  ) ss.:
COUNTY OF Oakland )

        Before me the undersigned authority, on this day
personally appeared M.R. Miller  and C.E. Dotson Jr.
of K MART CORPORATION, a Michigan corporation, known to me to be
the persons whose names are subscribed to the foregoing
instrument and acknowledged to me that they executed the same for
the purposes and consideration therein expressed, in the capacity
therein stated and as the act and deed of said corporation.

        Given under my hand and seal of office on this 26th day
of   July      , 1989.

                        _Mary A. Schnitzler_
                        Notary Public
                        MARY A. SCHNITZLER
                        Notary Public, Oakland County, Mich.
                        My Commission Expires May 20, 1991

                                  **89   1318527**

EXHIBIT "A"

**PARCEL 1:**

THE NORTHWESTERLY 15.26 FEET OF LOT 17, ALL OF LOTS 18 TO 38 INCLUSIVE AND THE NORTHWESTERLY 34 FEET OF LOT 39, IN BLOCK 5 OF TRACT NO. 3548, IN THE CITY OF BURBANK, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 40 PAGE 75 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO THE ALLEY 20 FEET WIDE, IN SAID BLOCK 5, AS VACATED BY RESOLUTION NO. 9820 OF THE COUNCIL OF SAID CITY, LYING PARALLEL WITH SAN FERNANDO BOULEVARD, AND EXTENDING SOUTHEASTERLY FROM THE SOUTHEASTERLY LINE OF WALNUT AVENUE, 90 FEET WIDE, TO THE SOUTHWESTERLY PROLOGNATION OF THE SOUTHEASTERLY LINE OF THE NORTHWESTERLY 34 FEET OF LOT 39 IN SAID BLOCK 5.

ALSO THE ALLEY IN SAID BLOCK 5, AS VACATED BY SAID RESOLUTION, LYING PARALLEL WITH WALNUT AVENUE AND EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF THIRD STREET, 60 FEET WIDE, TO THE NORTHEASTERLY LINE OF SAID LAST MENTIONED ALLEY.

**PARCEL 2:**

LOTS 1 TO 36 INCLUSIVE IN BLOCK 4 OF TRACT NO. 3548, IN THE CITY OF BURBANK, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 40 PAGE 75 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO THE ALLEY 20 FEET WIDE, IN SAID BLOCK 4, AS CAVATED BY RESOLUTION NO. 9820 OF THE OCUNCIL OF SAID CITY, LYING PARALLEL WITH SAN FERNANDO BOULEVARD, AND EXTENDING SOUTHEASTERLY FROM A LINE PARALLEL WITH AND DISTANT SOUTHEASTERLY 40 FEET MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF DELAWARE ROAD, 60 FEET WIDE, TO THE NORTHWESTERLY LINE OF WALNUT AVENUE, 90 FEET WIDE.

ALSO THE ALLEY IN SAID BLOCK 4, AS VACATED BY SAID RESOLUTION, LYING PARALLEL WITH DELAWARE ROAD AND EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF THIRD STREET, 60 FEET WIDE, TO THE NORTHEASTERLY LINE OF SAID LAST MENTIONED ALLEY.

ALSO THAT PORTION OF WALNUT AVENUE, 90 FEET WIDE, AS SHOWN ON SAID MAP AND AS VACATED BY SAID RESOLUTION, EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WIXH AND DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF THIRD STREET, 60 FEET WIDE, TO THE NORTHEASTERLY LINE OF SAN FERNANDO BOULEVARD, 100 FEET WIDE.

89   1318527

EXHIBIT A

DESCRIPTION:

PARCEL 1:

THE NORTHWESTERLY 15.26 FEET OF LOT 17, ALL OF LOTS 18 TO 38 INCLUSIVE AND THE
NORTHWESTERLY 34 FEET OF LOT 39, IN BLOCK 5 OF TRACT NO. 3548, IN THE CITY OF
BURBANK, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 40 PAGE 75 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF
SAID COUNTY.

ALSO THE ALLEY 20 FEET WIDE, IN SAID BLOCK 5, AS VACATED BY RESOLUTION NO.
9820 OF THE COUNCIL OF SAID CITY, LYING PARALLEL WITH SAN FERNANDO BOULEVARD,
AND EXTENDING SOUTHEASTERLY FROM THE SOUTHEASTERLY LINE OF WALNUT AVENUE, 90
FEET WIDE, TO THE SOUTHWESTERLY PROLONGATION OF THE SOUTHEASTERLY LINE OF THE
NORTHWESTERLY 34 FEET OF LOT 39 IN SAID BLOCK 5.

ALSO THE ALLEY IN SAID BLOCK 5, AS VACATED BY SAID RESOLUTION, LYING PARALLEL
WITH WALNUT AVENUE AND EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WITH AND
DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE
OF THIRD STREET, 60 FEET WIDE, TO THE NORTHEASTERLY LINE OF SAID LAST
MENTIONED ALLEY.

PARCEL 2:

LOTS 1 TO 36 INCLUSIVE IN BLOCK 4 OF TRACT NO. 3548, IN THE CITY OF BURBANK,
IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK
40 PAGE 75 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO THE ALLEY 20 FEET WIDE, IN SAID BLOCK 4, AS CAVATED BY RESOLUTION NO. --
9820 OF THE OCUNCIL OF SAID CITY, LYING PARALLEL WITH SAN FERNANDO BOULEVARD,
AND EXTENDING SOUTHEASTERLY FROM A LINE PARALLEL WITH AND DISTANT
SOUTHEASTERLY 40 FEET MEASURED AT RIGHT ANGLES FROM THE CENTER LINE OF
DELAWARE ROAD, 60 FEET WIDE, TO THE NORTHWESTERLY LINE OF WALNUT AVENUE, 90
FEET WIDE.

ALSO THE ALLEY IN SAID BLOCK 4, AS VACATED BY SAID RESOLUTION, LYING PARALLEL
WITH DELAWARE ROAD AND EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WITH AND
DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER LINE
OF THIRD STREET, 60 FEET WIDE, TO THE NORTHEASTERLY LINE OF SAID LAST
MENTIONED ALLEY.

ALSO THAT PORTION OF WALNUT AVENUE, 90 FEET WIDE, AS SHOWN ON SAID MAP AND AS
VACATED BY SAID RESOLUTION, EXTENDING SOUTHWESTERLY FROM A LINE PARALLEL WIYH
AND DISTANT SOUTHWESTERLY 40 FEET, MEASURED AT RIGHT ANGLES FROM THE CENTER
LINE OF THIRD STREET, 60 FEET WIDE, TO THE NORTHEASTERLY LINE OF SAN FERNANDO
BOULEVARD, 100 FEET WIDE.



**SITE PLAN**

EXHIBIT "C"

WHEN RECORDED MAIL TO:
THE STERIK COMPANY
430 Lexington St.
Auburndale, MA  02166
Attn:  Mr. Gerald Decker
          General Counsel

89   1318527

LEASEHOLD

DECLARATION RE DOCUMENTARY TRANSFER TAX

(A)  The attached instrument is a:

Ⓧ  LEASE (MEMORANDUM OF SAME)

◯  ASSIGNMENT OF LEASE

◯  TERMINATION OF LEASE

◯  _____

(B)  The monthly lease amount is See Schedule "A" Attached ...........$ _____

(C)  The remaining term of the lease is (in months)...........  408  months

(D)  The remaining value of the lease (B multiplied by C) on

which documentary transfer tax is based is...............$ 5,664,682.26 ____

(E)  Total documentary transfer tax which is due............$ 6,231.50 ____

⑫

_____
SIGNATURE OF DECLARANT

AS GENERAL COUNSEL
AND AUTHORIZED SIGNATORY OF

STERIK COMPANY
FIRM NAME

NOTE:  PAYMENT OF THE DOCUMENTARY
TRANSFER TAX INDICATED ABOVE IS
REMITTED UNDER PROTEST AND WITHOUT
PREJUDICE TO AND SUBJECT TO A FULL
RESERVATION OF RIGHTS ON THE PART
OF THE PAYOR, STERIK COMPANY, OF
430 LEXINGTON STREET, AUBURNDALE,
MASSACHUSETTS 02166, TO CONTEST
THE VALIDITY AND/OR TO DEMAND A
FULL REFUND THEREOF IN THE EVENT
THAT THE PENDING APPEAL OF THE
RECORDER IN AND FOR THE COUNTY OF
LOS ANGELES RESULTS IN A FINAL
JUDICIAL DETERMINATION THAT SUCH
TAX IS INAPPLICABLE TO LEASE
DOCUMENTS SUCH AS IS HEREWITH
BEING FILED FOR PUBLIC RECORD.

89   1318527

5/20/85 Approved by Recorders Office
Add $2.00 for extra page

```
1st Five (5) years:        $51,408.67 per mo.
2nd Five (5) years:         52,920.75 per mo.
3rd Five (5) years:         54,432.75 per mo.
4th Five (5) years:         55,944.75 per mo.
1st five (5) Year option:   57,456.75 per mo.
2nd five (5) Year option:   58,968.83 per mo.
Last four (4) Year option:  60,480.83 per mo.
```

59   1318527

SCHEDULE "A"
(Schedule of Rents)
408 Months

07/28/2008 11:10 FAX 13239381459        AUBURNDALE PROPERTIES-LA → SHALOM-BEN SUSAN    ☑002
JUL-25-2008  11:39                                                                    P.01/01

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL 60179

July 22, 2008

**CERTIFIED MAIL /**
**RETURN RECEIPT REQUESTED**
**#7007 0220 0004 3211 0647**

Sterik Co.
c/o Auburndale Properties, Inc.
50 Tice Blvd.
Woodcliff Lake, NJ 07677

Re:   Lease dated July 26, 1989, as amended,
for the premises located at 1000 San Fernando Road,
Burbank, CA, and known as Kmart # 3834

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five
(5) years, commencing August 1, 2009 to and including July 31, 2014, upon the terms,
conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION

By _____
     Jeffrey Stollenwerck
     Sr. Vice President of Real Estate

JS/al

cc:   J. Catanese
      Lease File

**CERTIFIED MAIL /**
**RETURN RECEIPT REQUESTED**
**#7007 0220 0004 3211 0463**

Morgan Stanley Credit Corporation
c/o ARCAP Servicing, Inc.
5221 N. O'Connor Blvd., Suite 600
Irving, TX 75039

·JUL 2 5 2008

BY:------------------

TOTAL P.01

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

July 20, 2018

**VIA OVERNIGHT DELIVERY**
**AND CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
#7010 0290 0000 0645 1667

JUL 30 2018

Sterik Burbank, LP
c/o Auburndale Properties, Inc.
50 Tice Boulevard, Suite 320
Woodcliff Lake, NJ  07677
Attn:  Benjamin Dempsey

Re:    Lease dated July 26, 1989, as amended, for the
       premises located at 1000 San Fernando Road,
       Burbank, CA, and known as Kmart Unit # 3834

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of four (4) years, commencing August 1, 2019, to and including July 31, 2023, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION,
a Michigan corporation

By: _JoAnn Catanese_
JoAnn Catanese
Divisional Vice President, Real Estate

JC/cm

cc:  Lease File

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
#7010 0290 0000 0645 1674

Sterik Burbank, LP
P.O. Box  785822
Philadelphia, PA  19178-5822

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
#7010 0290 0000 0645 1681

Morgan Stanley Credit Corporation
c/o ARCap Servicing, Inc.
5221 N. O'Connor Blvd., Suite 600
Irving, TX  75039

**STERIK BURBANK, LP**
**COMMON AREA MAINTENANCE CHARGES**
**January 1, 2018 through December 31, 2018**

PRE-PETITION

LOCATION:    1000 NORTH SAN FERNANDO BOULEVARD
BURBANK, CALIFORNIA

TENANT:    Kmart #3834

| | | AMOUNT |
|---|---|---|
| LANDSCAPE MAINTENANCE | | 30,251 |
| PARKING LOT SWEEPING | | 24,902 |
| PRESSURE CLEANING | | 8,775 |
| PARKING LOT MAINTENANCE | | 36,580 |
| SECURITY | | 45,928 |
| GENERAL REPAIRS AND MAINTENANCE | | 23,381 |
| TOTAL | | 169,817 |
| TENANT ALLOCATION | 69.93% | 118,761 |
| KMART ONLY | | 10,416 |
| MANAGEMENT FEE | 10.00% | 12,918 |
| SUBTOTAL | | 142,095 |
| INSURANCE | | 6,092 |
| SUBTOTAL | | 148,187 |
| LESS  CAM PAYMENTS | | (90,670) |
| POST-PETITION VACANCY 10/15/2018-12/31/2018 | 78 DAYS | (31,667) |
| BALANCE DUE / (CREDIT TO BE APPLIED) | | 25,850 |

**STERIK BURBANK, LP**
**2018-2019 Real Estate Taxes Invoice**

**PRE-PETITION**

Property:       Burbank, CA

Tenant:         K-Mart #3834

Reconciliation Period (07/01/18 - 06/30/19)

| 2018-2019 Parcel # | Description | Assessed Value | Tax | Pro-Rata Share | Pro-Rata Taxes |
|---|---|---|---|---|---|
| 2460 007 036 05 | Land | 3,649,273 | 42,888 | 69.93% | 29,994 |
| 2460 007 036 05 | Improvements | 4,706,910 | 55,318 | 96.03% | 53,122 |
| 2460 006 045 05 | Land | 2,557,110 | 29,824 | 69.93% | 20,857 |
| Total Taxes | | | | | 103,973 |
| Total Due | | | | | 103,973 |
| First Payment due upon receipt Post-petition vacancy 10/15/18-12/31/18 | | | 51,987 | (22,038) | 29,949 |
| Second Payment due February 1, 2019 | | | | | 51,987 |

**2018  ANNUAL SECURED PROPERTY TAX INFORMATION STATEMENT  2018**

CITIES, COUNTY, SCHOOLS AND ALL OTHER TAXING AGENCIES IN LOS ANGELES COUNTY

**SECURED PROPERTY TAX FOR FISCAL YEAR JULY 1, 2018 TO JUNE 30, 2019**

JOSEPH KELLY, TREASURER AND TAX COLLECTOR

FOR ASSISTANCE CALL 1(213) 974-2111 OR 1(888) 807-2111, ON THE WEB AT lacountypropertytax.com

PROPERTY IDENTIFICATION
ASSESSOR'S ID. NO.: 2460 007 036 18 000

OWNER OF RECORD AS OF JANUARY 1, 2018
SAME AS BELOW

OCT 2 2 2018

MAILING ADDRESS

STERIK BURBANK INC
AUBURNDALE PROPERTIES INC
50 TICE BLVD
WOODCLIFF LAKE NJ 70677-7603

ELECTRONIC FUND TRANSFER (EFT) NUMBER
ID#:19 2460 007 036 1 YEAR:18 SEQUENCE:000 0
PIN:   EV18BH

| DETAIL OF TAXES DUE FOR | 2460 007 036 | 18 000 | 20 | |
|---|---|---|---|---|
| AGENCY | AGENCY PHONE NO. | RATE | | AMOUNT |
| GENERAL TAX LEVY | | | | |
| ALL AGENCIES | | 1.000000 | $ | 83,561.83 |
| VOTED INDEBTEDNESS | | | | |
| METRO WATER DIST | | .003500 | $ | 292.46 |
| COMNNTY COLLEGE | | .046213 | | 3,861.64 |
| UNIFIED SCHOOLS | | .050954 | | 4,257.81 |
| DIRECT ASSESSMENTS | | | | |
| FLOOD CONTROL | | | $ | 1,641.69 |
| COUNTY PARK DIST | (626) 458-5165 | | | 182.18 |
| LACO VECTR CNTRL | (833) 265-2600 | | | 13.09 |
| RPOSD MEASURE A | (800) 273-5167 | | | 1,135.00 |
| MWD STANDBY #5 | (833) 265-2600 | | | 52.24 |
| TRAUMA/EMERG SRV | (866) 807-6864 | | | 3,208.28 |
| | (866) 587-2862 | | | |

SPECIAL INFORMATION

*INFORMATION ONLY*

PROPERTY LOCATION AND/OR PROPERTY DESCRIPTION
1000 N SAN FERNANDO BLVD        BURBANK CA
TRACT NO 3548 LOT 8D NE BY 3RD ST SE BY
WALNUT AVE VAC SW BY SAN FERNANDO BLVD
COMPLETE DESCRIPTION IN ASSESSOR RECORDS
LOT   22 BLK   4

ASSESSOR'S REGIONAL OFFICE
REGION #28 INDEX:        TRA:02530
SPECIAL PROPERTIES
500 W TEMPLE STREET RM. 180
LOS ANGELES CA 90012
(213)974-3108

ACCT. NO.: 572 PRINT NO.:   262 BILL ID.:18

| TOTAL TAXES DUE | $98,206.22 |
|---|---|
| FIRST INSTALLMENT TAXES | DUE NOV. 1, 2018 | $49,103.11 |
| SECOND INSTALLMENT TAXES | DUE FEB. 1, 2019 | $49,103.11 |

| VALUATION INFORMATION | | |
|---|---|---|
| ROLL YEAR 18-19 | CURRENT ASSESSED VALUE | TAXABLE VALUE |
| LAND | 3,649,273 | 3,649,273 |
| IMPROVEMENTS | 4,706,910 | 4,706,910 |
| TOTAL | | 8,356,383 |
| LESS EXEMPTION: | | |
| NET TAXABLE VALUE | | 8,356,383 |

ANY RETURNED PAYMENT MAY BE SUBJECT TO A FEE UP TO $50.00.

---

*INFORMATION ONLY*                                              2018

STERIK BURBANK L P
50 TICE BLVD
WOODCLIFF LAKE NJ 07675

PLEASE USE THIS FOR PAYMENT, ONLY IF YOUR TAXES ARE NOT PAID BY YOUR LENDER/MORTGAGE COMPANY.

PAYMENT DUE 02/01/19
IF NOT RECEIVED OR POSTMARKED BY 04/10/19
REMIT AMOUNT OF   $54,023.42

| ASSESSOR'S ID. NO. YR SEQ  CK   PK |
|---|
| 2460 007 036  18 000  20   2 |
| 2ND INSTALLMENT DUE   INDICATE AMOUNT PAID |
| $49,103.11 |

MAKE PAYMENT PAYABLE TO:
Please write the ASSESSOR'S ID. NO.
on the lower left corner of your payment.

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

30266

1931800002460007036000491031100054023422662041 0

**2ND**

---

*INFORMATION ONLY*                                              2018

STERIK BURBANK L P
50 TICE BLVD
WOODCLIFF LAKE NJ 07675

PLEASE USE THIS FOR PAYMENT, ONLY IF YOUR TAXES ARE NOT PAID BY YOUR LENDER/MORTGAGE COMPANY.

PAYMENT DUE 11/01/18
IF NOT RECEIVED OR POSTMARKED BY 12/10/18
REMIT AMOUNT OF   $54,013.42

| ASSESSOR'S ID. NO. YR SEQ  CK   PK |
|---|
| 2460 007 036  18 000  20   1 |
| 1ST INSTALLMENT DUE   INDICATE AMOUNT PAID |
| $49,103.11 |

MAKE PAYMENT PAYABLE TO:
Please write the ASSESSOR'S ID. NO.
on the lower left corner of your payment.

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

40280

1841800002460007036000491031100054013422681121 0

**1ST**

**2018    ANNUAL SECURED PROPERTY TAX INFORMATION STATEMENT    2018**

CITIES, COUNTY, SCHOOLS AND ALL OTHER TAXING AGENCIES IN LOS ANGELES COUNTY

**SECURED PROPERTY TAX FOR FISCAL YEAR JULY 1, 2018 TO JUNE 30, 2019**

JOSEPH KELLY, TREASURER AND TAX COLLECTOR

FOR ASSISTANCE CALL 1(213) 974-2111 OR 1(888) 807-2111, ON THE WEB AT lacountypropertytax.com

**PROPERTY IDENTIFICATION**
ASSESSOR'S ID.NO.: 2460 006 045 18 000

OWNER OF RECORD AS OF JANUARY 1, 2018
SAME AS BELOW

**MAILING ADDRESS**
0246550-0236550 B%5L 084 1234-- 738494

STERIK BURBANK L P
AUBURNDALE PROPERTIES INC
50 TICE BLVD
WOODCLIFF LAKE NJ 07877-7603

**ELECTRONIC FUND TRANSFER (EFT) NUMBER**
ID#:19 2460 006 045 2 YEAR:18 SEQUENCE:000 0
PIN: 6B7P6H

**SPECIAL INFORMATION**

| DETAIL OF TAXES DUE FOR | | 2460 006 045  18 000  30 | |
|---|---|---|---|
| ASSESSOR'S ID. NO. YR SEQ CK | | | |
| AGENCY | AGENCY PHONE NO. | RATE | AMOUNT |
| GENERAL TAX LEVY | | | |
| ALL AGENCIES | | 1.000000 $ | 45,957.84 |
| VOTED INDEBTEDNESS | | | |
| METRO WATER DIST | | .003500 $ | 160.85 |
| COMMNTY COLLEGE | | .046213 | 2,123.85 |
| UNIFIED SCHOOLS | | .050954 | 2,341.73 |
| DIRECT ASSESSMENTS | | | |
| FLOOD CONTROL | (626) 458-5165 | $ | 1,061.69 |
| COUNTY PARK DIST | (833) 265-2600 | | 292.71 |
| LACO VECTR CNTRL | (800) 273-5167 | | 13.09 |
| RPOSD MEASURE A | (833) 265-2600 | | 420.78 |
| RWD STANDBY #5 | (866) 807-6864 | | 39.76 |
| TRAUMA/EMERG SRV | (866) 587-2862 | | 1,189.40 |

**PROPERTY LOCATION AND/OR PROPERTY DESCRIPTION**
1000 N SAN FERNANDO BLVD        BURBANK CA
TRACT NO 3548 LOT COM HW ON SW LINE OF
LOT 17 BLK 5,9.74 FT FROM MOST S COR OF
COMPLETE DESCRIPTION IN ASSESSOR RECORDS
32,33,34,35 AND  LOT  36 BLK    5

**ASSESSOR'S REGIONAL OFFICE**
REGION #28 INDEX:           TRA:02530
SPECIAL PROPERTIES
500 W TEMPLE STREET RM. 180
LOS ANGELES CA 90012
(213)974-3108

ACCT. NO.: 572 PRINT NO.:  261 BILL ID.:18

| | |
|---|---|
| **TOTAL TAXES DUE** | **$53,601.70** |
| FIRST INSTALLMENT TAXES    DUE NOV. 1, 2018 | **$26,800.86** |
| SECOND INSTALLMENT TAXES  DUE FEB. 1, 2019 | **$26,800.84** |

**VALUATION INFORMATION**

| ROLL YEAR 18-19 | CURRENT ASSESSED VALUE | TAXABLE VALUE |
|---|---|---|
| LAND | 2,557,110 | 2,557,110 |
| IMPROVEMENTS | 2,038,674 | 2,038,674 |
| | | |
| TOTAL | | 4,595,784 |
| LESS EXEMPTION: | | |
| NET TAXABLE VALUE | | 4,595,784 |

ANY RETURNED PAYMENT MAY BE SUBJECT TO A FEE UP TO $50.00.

---

*INFORMATION ONLY*                                                    2018

STERIK BURBANK L P
50 TICE BLVD
WOODCLIFF LAKE NJ 07675

ASSESSOR'S ID. NO. YR SEQ  CK      PK
2460 006 045  18 000   30       2

2ND INSTALLMENT DUE          INDICATE AMOUNT PAID
$26,800.84

PLEASE USE THIS FOR
PAYMENT, ONLY IF YOUR
TAXES ARE NOT PAID BY
YOUR LENDER/MORTGAGE
COMPANY.

PAYMENT DUE 02/01/19
IF NOT RECEIVED OR POSTMARKED BY 04/10/19
REMIT AMOUNT OF  $29,490.92

MAKE PAYMENT PAYABLE TO:
Please write the ASSESSOR'S ID. NO.
on the lower left corner of your payment.
30321

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

1931800002460006045000268008400029490923212041 0

**2ND**

---

*INFORMATION ONLY*                                                    2018

STERIK BURBANK L P
50 TICE BLVD
WOODCLIFF LAKE NJ 07675

ASSESSOR'S ID. NO. YR SEQ  CK      PK
2460 006 045  18 000   30       1

1ST INSTALLMENT DUE          INDICATE AMOUNT PAID
$26,800.86

PLEASE USE THIS FOR
PAYMENT, ONLY IF YOUR
TAXES ARE NOT PAID BY
YOUR LENDER/MORTGAGE
COMPANY.

PAYMENT DUE 11/01/18
IF NOT RECEIVED OR POSTMARKED BY 12/10/18
REMIT AMOUNT OF  $29,480.94

MAKE PAYMENT PAYABLE TO:
Please write the ASSESSOR'S ID. NO.
on the lower left corner of your payment.
40323

LOS ANGELES COUNTY TAX COLLECTOR
P.O. BOX 54018
LOS ANGELES, CA 90054-0018

1841800002460006045000268008600029480943231121 0

**1ST**

