Claim Forms may be electronically submitted by visiting https://restructuring.primeclerk.com/sears/EPOC-Index

## UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### Fill in this information to identify the case (Select only one Debtor per claim form):

| | | | | |
|---|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☐ Kmart Corporation (18-23549) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☐ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Holdings Management Corporation (18-23553) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22301) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | MMLID: 4808239 |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | **RECEIVED** |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | APR 1 0 2019 |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | PRIME CLERK LL |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc. (18-23584) | |

182353880007477

☐ Date Stamped Copy Returned
☐ No Self-Addressed Stamped Envelope
☒ No Copy Provided

# Proof of Claim                                    04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:    Identify the Claim

**1. Who is the current creditor?**

KEY PLAZA I INC TRUSTEE LAND TRUST AGREE
_____
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☐ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

KEY PLAZA I INC TRUSTEE LAND TRUST AGREE
50 TICE BOULEVARD, STE 320
C/O AUBURNDALE PROPERTIES
ATTN BENJAMIN J DEMPSEY
ACH#806
WOODCLIFF LAKE NJ 07675

Contact phone 201-930-8800
Contact email Tbauer@aubproperties.com

Where should payments to the creditor be sent? (if different)

Contact phone _____
Contact email _____

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known)_____    Filed on ____/____/____ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

**Claim Number: 18339**

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No <br> ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

---

**7. How much is the claim?**    $ _41,727.41_    **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_Retail Real Estate Lease dated 4/29/1983, as_
_Amended 12/28/1990_

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $_____

Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured:    $_____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $_____

Annual Interest Rate (when case was filed) _____%

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☐ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No ☐ Yes. *Check one:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)( ) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)? | ☑ No ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | $_____ |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  4/9/11  (mm/dd/yyyy)

_Signature_

Print the name of the person who is completing and signing this claim:

Name of the person who is completing and signing this claim:

| Name | _Tara M Bawn_ |
| | First name        Middle name        Last name |
| Title | _Controller_ |
| Company | _Ky Plaza I Inc Trustee of Ky Plaza Land Trust_ |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | _50 Tice Blvd STE 320_ |
| | Number        Street |
| | _Woodcliff Lake        NJ    07677_ |
| | City        State    ZIP Code |
| Contact phone | _201-930-8800_    Email _Tbawn@abpmgmt.com_ |

## ATTACHMENT TO KEY PLAZA I, INC  PROOF OF CLAIM

| | |
|---|---|
| CREDITOR: | Key Plaza I, Inc |
| DEBTOR: | Kmart of Michigan, Inc |
| CASE NO.: | 18-23576 |

Claimant, Key Plaza I, Inc Trustee for Key Plaza Land Trust, has an unsecured claim and a first priority expense of administration pursuant to 11  Section U.S.C. 503(b)(1)(A) and 507 (a)(1) against Debtor, Kmart of Michigan, Inc, arising out of a lease, whereby the Debtor leased  non-residential real property located at

Key Plaza I, Inc  has a general unsecured claim in the amount of $41,727.41 broken down as follows:

### PRE-PETITION RENT OWED (Through October 15, 2018)

| | | |
|---|---|---|
| Minimum Rent: | | $0.00 |
| Annual Cam Billing | 2011 | $2,559.05 |
| Annual Cam Billing | 2015 | $402.11 |
| Annual Cam Billing | 2017 | $776.75 |
| Annual Cam Billing | 2018 | $5,458.00 |
| Percentage Rent | 2018 | $1,420.50 |
| Real Estate Taxes: | 2018 | $31,111.00 |
| | Total Pre-petition: | $41,727.41 |

### REJECTION CLAIM

1. Based on One Year Computation
   (January 1 2019 - December 31 2019):

| | |
|---|---|
| Minimum Rent: | |
| CAM | |
| Real Estate Taxes: | |
| Total One Year Amount: | $0.00  (2) |

2. Based on 15% of the remainder of the lease
   (November 1, 2018 to October 31, 2021);
   The total can not exceed three years of rent

| | |
|---|---|
| Minimum Rent: | $0.00 |
| Real Estate Taxes: | $0.00 |
| Insurance | $0.00 |
| CAM | $0.00 * |
| Total  Rent | $0.00 |
| @ 15% | $0.00  (1) |

Greater on 1 or 2:                                                   -

### RESTORATION

Costs of restoring the building to its original state:

| | |
|---|---|
| TO BE DETERMINED | $0.00 |
| Total Restoration Claim | $0.00 |

### TOTAL CLAIM

| | |
|---|---|
| Pre-Petition Rent Owed: | $41,727.41 |
| Rejection Claim | $0.00 |
| Restoration Claim | $0.00 |
| Total Claim: | $41,727.41 |

The attached documents supporting this Proof of Claim are The Lease , Assignment of Lease, Amendment to Lease, Assignment of Lease, Letters Exercising of option, 2011 Cam Billing, 2015 Cam billing, 2017 Cam billing 2018 Cam billing and 2018 Real Estate Taxes.
The remaining documents are voluminous and not attached hereto.

Claimant Key Plaza I, Inc reserves the right to modify, amend and support the Proof Claim.

*  Based upon estimates

COMMON AREA MAINTENANCE RECONCILIATION
KEY PLAZA I, INC
January 1, 2011 through December 31, 2011

**ORIGINAL SPACE**

TENANT:    K-MART

| EXPENSE | AMOUNT | PRO-RATE SHARE | TENANT'S SHARE |
|---|---|---|---|
| LANDSCAPING | 38,971.62 | 34.82% | 13,569.28 |
| SWEEPING | 23,113.72 | 34.82% | 8,047.82 |
| PRESSURE CLEANING | 13,206.00 | 34.82% | 4,598.11 |
| RUBBISH REMOVAL | 6,883.35 | 34.82% | 2,396.67 |
| PARKING LOT REPAIRS | 10,539.00 | 34.82% | 3,669.51 |
| PLUMBING REPAIRS | 25,135.48 | 34.82% | 8,751.77 |
| GENERAL REPAIRS & MAINT | 79,665.20 | 34.82% | 27,738.13 |
| WATER & SEWER - MAIN | 80,617.15 | 34.82% | 28,069.58 |
| ELECTRICITY | 26,172.43 | 34.82% | 9,112.81 |
| MANAGEMENT FEES | 120,530.63 | 34.82% | 41,966.81 |
| | 424,834.58 | | |

|  |  |  |
|---|---|---|
| | EXPENSES | 147,920.50 |
| Beginning 10/01/03 | CAP at $32,168.04/Year | 32,168.04 |
| | LESS CAM PAYMENTS | (32,168.04) |
| | INVOICE AMOUNT | - |

COMMON AREA MAINTENANCE RECONCILIATION
KEY PLAZA I, INC
January 1, 2011 through December 31, 2011

**EXPANDED SPACE**

TENANT:    K-MART

| EXPENSE | AMOUNT | PRO-RATE SHARE | TENANT'S SHARE |
|---|---|---|---|
| LANDSCAPING | 38,971.62 | 2.70% | 1,051.53 |
| SWEEPING | 23,113.72 | 2.70% | 623.65 |
| PRESSURE CLEANING | 13,206.00 | 2.70% | 356.32 |
| RUBBISH REMOVAL | 6,883.35 | 2.70% | 185.73 |
| PLUMBING REPAIRS | 24,085.48 | 2.70% | 649.87 |
| GENERAL REPAIRS & MAINT | 79,665.20 | 2.70% | 2,149.52 |
| SECURITY | 21,335.00 | 2.70% | 575.66 |
| ELECTRICITY | 26,172.43 | 2.70% | 706.18 |
| | EXPENSES | | 6,298.45 |

|  |  |
|---|---|
| Payments | (3,739.40) |
| INVOICE AMOUNT | 2,559.05 |

COMMON AREA MAINTENANCE RECONCILIATION
KEY PLAZA I, INC.
January 1, 2015 through December 31, 2015

**ORIGINAL SPACE**

TENANT:    K-MART

| EXPENSE | AMOUNT | PRO-RATE SHARE | TENANT'S SHARE |
|---|---|---|---|
| LANDSCAPING | 41,336.60 | 34.82% | 14,392.73 |
| SWEEPING | 35,758.86 | 34.82% | 12,450.65 |
| PRESSURE CLEANING | 22,173.30 | 34.82% | 7,720.38 |
| RUBBISH REMOVAL | 19,143.36 | 34.82% | 6,665.41 |
| PARKING LOT REPAIRS | 51,603.53 | 34.82% | 17,967.51 |
| PLUMBING REPAIRS | 9,700.29 | 34.82% | 3,377.48 |
| GENERAL REPAIRS & MAINT | 37,630.67 | 34.82% | 13,102.39 |
| WATER & SEWER - MAIN | 28,337.22 | 34.82% | 9,866.56 |
| ELECTRICITY | 24,427.52 | 34.82% | 8,505.27 |
| MANAGEMENT FEES | 142,705.33 | 34.82% | 49,687.68 |
| | 412,816.68 | | |

|  |  |  |
|---|---|---|
| | EXPENSES | 143,736 |
| Beginning 10/01/03 | CAP at $36,189/Year | 36,189 |
| | LESS CAM PAYMENTS | (36,189) |

COMMON AREA MAINTENANCE RECONCILIATION
KEY PLAZA I, INC
January 1, 2015 through December 31, 2015

**EXPANDED SPACE**

TENANT:    K-MART

| EXPENSE | AMOUNT | PRO-RATE SHARE | TENANT'S SHARE |
|---|---|---|---|
| LANDSCAPING | 41,336.60 | 2.70% | 1,115.34 |
| SWEEPING | 35,758.86 | 2.70% | 964.84 |
| PRESSURE CLEANING | 22,173.30 | 2.70% | 598.28 |
| RUBBISH REMOVAL | 19,143.36 | 2.70% | 516.52 |
| PLUMBING REPAIRS | 8,650.29 | 2.70% | 233.40 |
| GENERAL REPAIRS & MAINT | 37,104.09 | 2.70% | 1,001.14 |
| SECURITY | 105.00 | 2.70% | 2.83 |
| ELECTRICITY | 24,427.52 | 2.70% | 659.10 |
| | | EXPENSES | 5,091 |

| | |
|---|---|
| Payments | (4,689) |
| INVOICE AMOUNT | 402 |

COMMON AREA MAINTENANCE RECONCILIATION
KEY PLAZA I, INC
January 1, 2017 through December 31, 2017

**REVISED 10/25/18**

**ORIGINAL SPACE**

TENANT:       K-MART

| EXPENSE | AMOUNT | PRO-RATE SHARE | TENANT'S SHARE |
|---|---|---|---|
| LANDSCAPING | 48,720 | 34.82% | 16,963 |
| SWEEPING | 77,708 | 34.82% | 27,057 |
| PRESSURE CLEANING | 24,387 | 34.82% | 8,491 |
| RUBBISH REMOVAL | 19,267 | 34.82% | 6,708 |
| PARKING LOT REPAIRS | 49,602 | 34.82% | 17,271 |
| PLUMBING REPAIRS | 664 | 34.82% | 231 |
| GENERAL REPAIRS & MAINT | 9,133 | 34.82% | 3,180 |
| WATER & SEWER - MAIN | 34,445 | 34.82% | 11,993 |
| ELECTRICITY | 22,628 | 34.82% | 7,879 |
| STORMWATER | 41,797 | 34.82% | 14,554 |
| MANAGEMENT FEES | 142,413 | 34.82% | 49,586 |
| | 470,764 | | |

| | | |
|---|---|---|
| | EXPENSES | 163,913 |
| Beginning 10/01/03 | CAP at $36,189/Year | 36,189 |
| | LESS CAM PAYMENTS | (36,189) |

COMMON AREA MAINTENANCE RECONCILIATION
KEY PLAZA I, INC
January 1, 2017 through December 31, 2017

**EXPANDED SPACE**

TENANT:       K-MART

| EXPENSE | AMOUNT | PRO-RATE SHARE | TENANT'S SHARE |
|---|---|---|---|
| LANDSCAPING | 48,720 | 2.70% | 1,314.55 |
| SWEEPING | 77,708 | 2.70% | 2,096.71 |
| PRESSURE CLEANING | 24,387 | 2.70% | 658.01 |
| RUBBISH REMOVAL | 19,267 | 2.70% | 519.86 |
| PLUMBING REPAIRS | 664 | 2.70% | 17.91 |
| GENERAL REPAIRS & MAINT | 9,133 | 2.70% | 246.42 |
| ELECTRICITY | 22,628 | 2.70% | 610.54 |
| | | EXPENSES | 5,464 |

| | |
|---|---|
| Less Payments | (4,687.00) |
| INVOICE AMOUNT | 777 |

COMMON AREA MAINTENANCE RECONCILIATION
KEY PLAZA I, INC
January 1, 2018 through December 31, 2018

**PRE-PETITION**

**ORIGINAL SPACE**

TENANT:    K-MART

| EXPENSE | AMOUNT | PRO-RATE SHARE | TENANT'S SHARE |
|---|---|---|---|
| LANDSCAPING | 49,458 | 34.82% | 17,220 |
| SWEEPING | 63,703 | 34.82% | 22,180 |
| PRESSURE CLEANING | 29,980 | 34.82% | 10,439 |
| RUBBISH REMOVAL | 20,309 | 34.82% | 7,071 |
| PARKING LOT REPAIRS | 163,713 | 34.82% | 57,002 |
| PLUMBING REPAIRS | 19,961 | 34.82% | 6,950 |
| GENERAL REPAIRS & MAINT | 56,721 | 34.82% | 19,749 |
| WATER & SEWER - MAIN | 30,880 | 34.82% | 10,752 |
| ELECTRICITY | 17,138 | 34.82% | 5,967 |
| STORMWATER | 41,797 | 34.82% | 14,554 |
| MANAGEMENT FEES | 144,051 | 34.82% | 50,156 |
| | 637,711 | | |

|  |  |  |
|---|---|---|
| | EXPENSES | 222,041 |
| Beginning 10/01/03 | CAP at $36,189/Year | 36,189 |
| | LESS CAM PAYMENTS | (36,189) |

COMMON AREA MAINTENANCE RECONCILIATION
KEY PLAZA I, INC
January 1, 2018 through December 31, 2018

**EXPANDED SPACE**

TENANT:    K-MART

| EXPENSE | AMOUNT | PRO-RATE SHARE | TENANT'S SHARE |
|---|---|---|---|
| LANDSCAPING | 49,458 | 2.70% | 1,334.47 |
| SWEEPING | 63,703 | 2.70% | 1,718.81 |
| PRESSURE CLEANING | 29,980 | 2.70% | 808.92 |
| RUBBISH REMOVAL | 20,309 | 2.70% | 547.98 |
| PLUMBING REPAIRS | 19,961 | 2.70% | 538.59 |
| GENERAL REPAIRS & MAINT | 56,721 | 2.70% | 1,530.43 |
| ELECTRICITY | 17,138 | 2.70% | 462.42 |
| EXPENSES | | | 6,942 |

| | | |
|---|---|---|
| POST-PETITION VACANCY 10/15/2018-12/31/2018 | 78 DAYS | (1,483) |
| INVOICE AMOUNT | | 5,458 |

MAR 11 2019

**K**

Kmart Corporation
Real Estate Accounting
2301 West plano Parkway
Suite 201,
Plano, TX 75075
(1-888) 335 - 7720 Ext: 5511122

KEY PLAZA I INC TRUSTEE LAND TRUST AGREE
50 TICE BOULEVARD
ATTN BENJAMIN J DEMPSEY, C/O
AUBURNDALE PROPERTIES
WOODCLIFF LAKE          NJ          7675

| STORE NO: | 4725 | CITY/STATE | KEY WEST  FL | LEASE YR END DATE: | JANUARY | 31 | 2019 |
|---|---|---|---|---|---|---|---|

GROSS SALES:                                      $12,405,065.02

PERCENTAGE RENT                    (24110):       $2,025.33

| LESS    REAL ESTATE TAXES | | (24110): | 0.00 |
|---|---|---|---|
| UNRECOVERED TAX BALANCE | $0.00 | | |
| TAXES PAID | $40,547.28 | | |
| BREAKPOINT | $41,000.00 | | |
| EXCESS | $0.00 | | |

LESS    SEWER CHARGES            (65150):

NET AMOUNT                                        2,025.33
Pre-Petition (02/01/18 - 10/14/18)                $1,420.50
Post-Petition (10/15/18 - 01/31/19)               $604.82
Post-Petition payment issued via 34001980 03/01/19.  ($60.48)
Balance due-Post petition period ($604.82-$60.48)  $544.34

**KEY PLAZA SHOPPING CENTER**
**2018 Real Estate Taxes Invoice**
**Key West, Florida**

**PRE-PETITION**

Tenant:   K-MART STORE # 4725

| | | Real Estate Taxes |
|---|---|---|
| Current Tax Bill | | 192,540 |
| Less Stormwater with applicable 4% discount | | (41,797) |
| Less Base | | (41,000) |
| Subtotal | | 109,743 |
| Tenant's Pro-Rata Share | 36.0532% | 39,566 |
| Post-petition vacancy 10/15/18-12/31/18 | 78 DAYS | (8,455) |
| Total Payments | | 0 |
| Total Due/ (Credit) | | **31,111** |

```
17
30
31
__
78
```

## DANISE D. HENRIQUEZ, C.F.C.
TAX COLLECTOR MONROE COUNTY

**2018 REAL ESTATE**

**NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS**

| PROPERTY ID # | ESCROW CD | MILLAGE CODE | ACCOUNT # |
|---|---|---|---|
| 1068403 | | 10KW | 1068403 |

R

**NOV 0 5 2018**

19 - 33772

MTC KEY PLAZA LIMITED PARTNERSHIP
VASILIOU BASIL K
50 TICE BLVD STE 320
WOODCLIFF LAKE NJ 07677-7603

00065640000000336725
2900 N ROOSEVELT Blvd KEY WEST
KW PLAT OF SURVEY OF LANDS ON IS
LAND OF KEY WEST MONROE COUNTY F
LA PT TR 9 AND PT TR 14 PB3-35 A
ND A PARCEL OF LAND LYING SWLY O
F 13TH ST AND A PARCEL OF LAND L
SEE TAX ROLL FOR ADDITIONAL LEGAL

### AD VALOREM TAXES

| TAXING AUTHORITY | MILLAGE RATE | ASSESSED VALUE | EXEMPTION AMOUNT | TAXABLE VALUE | TAXES LEVIED |
|---|---|---|---|---|---|
| SCHOOL STATE LAW | 1.5600 | 16,556,009 | | 16,556,009 | 25,827.37 |
| SCHOOL LOCAL BOARD | 1.7980 | 16,556,009 | | 16,556,009 | 29,767.70 |
| GENERAL REVENUE FUND | .7495 | 16,556,009 | | 16,556,009 | 12,408.73 |
| F&F LAW ENFORCE JAIL JUDICIAL | 1.9068 | 16,556,009 | | 16,556,009 | 31,569.00 |
| HEALTH CLINIC | .0394 | 16,556,009 | | 16,556,009 | 652.31 |
| FLORIDA KEYS MOSQUITO CONTROL | .4555 | 16,556,009 | | 16,556,009 | 7,541.26 |
| CITY OF KEY WEST | 2.2074 | 16,556,009 | | 16,556,009 | 36,545.73 |
| SO FL WATER MANAGEMENT DIST | .1209 | 16,556,009 | | 16,556,009 | 2,001.62 |
| OKEECHOBEE BASIN | .1310 | 16,556,009 | | 16,556,009 | 2,168.84 |
| EVERGLADES CONSTRUCTION PRJT | .0417 | 16,556,009 | | 16,556,009 | 690.39 |
| **TOTAL MILLAGE** | **9.0102** | | | **AD VALOREM TAXES** | **149,172.95** |

### NON-AD VALOREM ASSESSMENTS

| LEVYING AUTHORITY | RATE | AMOUNT |
|---|---|---|
| KEY WEST STORMWATER | | 42,910.60 |

PAY YOUR BILL

**PAY ONLY ONE AMOUNT IN YELLOW SHADED AREA**

| NON-AD VALOREM ASSESSMENTS | 42,910.60 |
|---|---|

| COMBINED TAXES AND ASSESSMENTS | 192,083.55 | See reverse side for important information. |
|---|---|---|

| NOVEMBER | DECEMBER | JANUARY | FEBRUARY | MARCH | TAX + PEN | IF PAID |
|---|---|---|---|---|---|---|
| 184,400.21 | 186,321.04 | 188,241.88 | 190,162.71 | 192,083.55 | | BY |

RETAIN THIS PORTION FOR YOUR RECORDS. WALK-IN CUSTOMERS PLEASE BRING FOR RECEIPT.

---

## DANISE D. HENRIQUEZ, C.F.C.
TAX COLLECTOR MONROE COUNTY

**2018 REAL ESTATE**

**NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS**

| PROPERTY ID # | ESCROW CD | MILLAGE CODE | ACCOUNT # |
|---|---|---|---|
| 1068403 | | 10KW | 1068403 |

R

MTC KEY PLAZA LIMITED PARTNERSHIP
VASILIOU BASIL K
50 TICE BLVD STE 320
WOODCLIFF LAKE, NJ 07677-7603

00065640000000336725
2900 N ROOSEVELT Blvd KEY WEST
KW PLAT OF SURVEY OF LANDS ON IS
LAND OF KEY WEST MONROE COUNTY F
LA PT TR 9 AND PT TR 14 PB3-35 A
ND A PARCEL OF LAND LYING SWLY O
F 13TH ST AND A PARCEL OF LAND L
SEE TAX ROLL FOR ADDITIONAL LEGAL

CHECKS ON U.S. BANKS ONLY TO DANISE D. HENRIQUEZ, C.F.C. • P.O. BOX 1129 • KEY WEST, FL 33041-1129        (305) 295-5000

| NOVEMBER | DECEMBER | JANUARY | FEBRUARY | MARCH | TAX + PEN |
|---|---|---|---|---|---|
| 184,400.21 | 186,321.04 | 188,241.88 | 190,162.71 | 192,083.55 | |

RETURN WITH PAYMENT

0000000000  0019208355  000000001068403  0001 9

# DANISE D. HENRIQUEZ, C.F.C.
TAX COLLECTOR MONROE COUNTY

**2018 REAL ESTATE**

**NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS**

| PROPERTY ID # | ESCROW CD | MILLAGE CODE | ACCOUNT # |
|---|---|---|---|
| 1068501 | | 10KW | 1068501 |

R

**NOV 0 5 2018**



MTC KEY PLAZA LIMITED PARTNERSHIP
VASILIOU BASIL K
50 TICE BLVD STE 320
WOODCLIFF LAKE, NJ 07677-7603

0006564000080033 6725
3022 N ROOSEVELT Blvd KEY WEST
KW PLAT OF SURVEY OF LANDS ON IS
LAND OF KEY WEST MONROE COUNTY F
LORIDA A 90 X 115.75 FT PARCEL B
EING A PT OF TR 9 OF PB3-35 OR56
3-1045/46 OR703-464/76 OR706-292
SEE TAX ROLL FOR ADDITIONAL LEGAL

## AD VALOREM TAXES

| TAXING AUTHORITY | MILLAGE RATE | ASSESSED VALUE | EXEMPTION AMOUNT | TAXABLE VALUE | TAXES LEVIED |
|---|---|---|---|---|---|
| SCHOOL STATE LAW | 1.5600 | 871,368 | | 871,368 | 1,359.33 |
| SCHOOL LOCAL BOARD | 1.7980 | 871,368 | | 871,368 | 1,566.72 |
| GENERAL REVENUE FUND | .7495 | 871,368 | | 871,368 | 653.09 |
| F&F LAW ENFORCE JAIL JUDICIAL | 1.9068 | 871,368 | | 871,368 | 1,661.52 |
| HEALTH CLINIC | .0394 | 871,368 | | 871,368 | 34.33 |
| FLORIDA KEYS MOSQUITO CONTROL | .4555 | 871,368 | | 871,368 | 396.91 |
| CITY OF KEY WEST | 2.2074 | 871,368 | | 871,368 | 1,923.46 |
| SO FL WATER MANAGEMENT DIST | .1209 | 871,368 | | 871,368 | 105.35 |
| OKEECHOBEE BASIN | .1310 | 871,368 | | 871,368 | 114.15 |
| EVERGLADES CONSTRUCTION PRJT | .0417 | 871,368 | | 871,368 | 36.34 |

| TOTAL MILLAGE | 9.0102 | AD VALOREM TAXES | 7,851.20 |
|---|---|---|---|

**RETAIN THIS PORTION FOR YOUR RECORDS. WALK-IN CUSTOMERS PLEASE BRING FOR RECEIPT.**

## NON-AD VALOREM ASSESSMENTS

| LEVYING AUTHORITY | RATE | AMOUNT |
|---|---|---|
| KEY WEST STORMWATER | | 627.96 |

PAY YOUR BILL

**PAY ONLY ONE AMOUNT IN YELLOW SHADED AREA**

| NON-AD VALOREM ASSESSMENTS | 627.96 |
|---|---|

| COMBINED TAXES AND ASSESSMENTS | 8,479.16 | See reverse side for important information. |
|---|---|---|

| NOVEMBER | DECEMBER | JANUARY | FEBRUARY | MARCH | TAX + PEN | IF PAID BY |
|---|---|---|---|---|---|---|
| 8,139.99 | 8,224.79 | 8,309.58 | 8,394.37 | 8,479.16 | | |

---

# DANISE D. HENRIQUEZ, C.F.C.
TAX COLLECTOR MONROE COUNTY

**2018 REAL ESTATE**

**NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS**

| PROPERTY ID # | ESCROW CD | MILLAGE CODE | ACCOUNT # |
|---|---|---|---|
| 1068501 | | 10KW | 1068501 |

R

RETURN WITH PAYMENT

MTC KEY PLAZA LIMITED PARTNERSHIP
VASILIOU BASIL K
50 TICE BLVD STE 320
WOODCLIFF LAKE, NJ 07677-7603

0006564000080033 6725
3022 N ROOSEVELT Blvd KEY WEST
KW PLAT OF SURVEY OF LANDS ON IS
LAND OF KEY WEST MONROE COUNTY F
LORIDA A 90 X 115.75 FT PARCEL B
EING A PT OF TR 9 OF PB3-35 OR56
3-1045/46 OR703-464/76 OR706-292
SEE TAX ROLL FOR ADDITIONAL LEGAL

CHECKS ON U.S. BANKS ONLY TO DANISE D. HENRIQUEZ, C.F.C. • P.O. BOX 1129 • KEY WEST, FL 33041-1129     (305) 295-5000

| NOVEMBER | DECEMBER | JANUARY | FEBRUARY | MARCH | TAX + PEN |
|---|---|---|---|---|---|
| 8,139.99 | 8,224.79 | 8,309.58 | 8,394.37 | 8,479.16 | |

0000000000  0000847916  0000000001068501  0001  6

*KO7*
*1234*

Lease dated ~~herein~~ *April 29* , 1983 between Market Place Property,
N.V., a Netherlands Antilles corporation, as landlord
(hereinafter referred to as "Landlord"), and Zayre
Corp., a Delaware corporation, as tenant, (hereinafter
referred to as "Tenant").

## ARTICLE I

PREMISES     1.1  In consideration of the rents, agreements and
conditions herein reserved and contained on the part of
Tenant to be paid, performed and observed, Landlord
does hereby demise and lease to Tenant, for the term
hereinafter set forth, the premises described in Sched-
ule A attached hereto as the Demised Premises ("the
Demised Premises") within the shopping center described
in Schedule A as the Shopping Center ("the Shopping
Center").

## ARTICLE II

INTER-
RELATION-
SHIPS     2.1  The Demised Premises are demised subject to,
and with the benefit of, the easements, rights, restric-
tions, agreements and encumbrances (collectively called
"Title Matters") set forth in Paragraph 13 of Schedule
B attached hereto.  Schedules A, B and C attached here-
to are hereby made a part hereof and incorporated here-
in to the same extent as if fully set forth herein.

## ARTICLE III

CONSTRUC-
TION     3.1  Landlord agrees that the work hereinafter
described as "Landlord's Delivery Obligations" will be
commenced promptly after the delivery of possession of
the Demised Premises to Landlord by the current occu-
pant thereof and will be prosecuted to completion with
due diligence.  Landlord's Delivery Obligations shall
consist of (a) constructing a fully insulated, steel-
studded (16" on-center) floor-to-roofdeck demising
wall, with 5/8" plywood and 5/8" dry wall on each side,
along the interior boundaries of the Demised Premises
shown upon the Lease Plan and labelled NEW WALL thereon
(defined in Schedule A) suitable for application of Ten-
ant's paint and wall coverings and installations, (b)
providing fully operational and completely separate
electrical, water and sewer systems and electric and
water meters for and within the Demised Premises, except
that the Demised Premises and the premises labelled
TENANT (9,217 sq. ft.) upon the Lease Plan may be served
by the same sewer system, (c) separating the HVAC from
all other portions of the Building, (d) putting the
heating-ventilating-airconditioning system serving the
Demised Premises ("HVAC"), and the electrical, plumbing
and mechanical systems, fixtures and equipment serving
the Demised Premises, all into good working order and
condition, (e) putting the property Landlord is required
to maintain (as defined in Section 8.2) all into good
working order and condition and (f) putting the Demised
Premises into so-called "broom clean" condition and
free of all personal property of the existing occupant.
Except for performance of Landlord's Delivery Obliga-
tions, as aforesaid, and the obligations of Landlord
under Sections 4.5 and 8.4, Landlord shall deliver
possession of the Demised Premises to Tenant, free of
all occupancies, in the same condition the Demised
Premises were in on December 16, 1982 ("the Inspection

Date"). The date on which Landlord shall deliver possession of the Demised Premises to Tenant in the condition required by this Section 3.1 and by Sections 4.5 and 8.4 is herein referred to as "the Delivery Date." Approximately forty (40) feet from the northerly side of the Demised Premises is an area (within the Common Area defined in Paragraph 2 of Schedule B) of approximately one hundred (100) square feet euphemistically and herein referred to as "the sink hole"; it is understood and agreed that the existence of the sink hole shall not be deemed a default by Landlord under this Section 3.1 or Section 8.2 or Paragraph 9 of Schedule B so long as Landlord shall continue to maintain the sink hole in no worse manner or condition as Landlord was maintaining the sink hole at or about the Inspection Date.

PRE-TERM OCCUPANCY AND POSSESSION
3.2 Tenant shall have the right, without payment of rent or other charge, after the execution of this lease and prior to the "Commencement Date" (hereinafter defined), whenever Tenant shall deem it appropriate, to enter the Demised Premises to inspect the same and to make such improvements thereto as it shall have the right to make ("Tenant's Work") and install therein fixtures, supplies, merchandise and other property, and Tenant shall commence such improvements therein not later than the sixtieth (60th) day after the Delivery Date. Tenant agrees that any such entry and the making of any such improvements and any such installation shall be done without unreasonably hampering Landlord's compliance with Landlord's Delivery Obligations. No such entry by Tenant shall be deemed an acceptance of the Demised Premises. Prior to the Commencement Date while Tenant may be making improvements to the Demised Premises or installing in the Demised Premises fixtures, supplies, merchandise and other property, as hereinabove provided, Tenant shall be in the Demised Premises at its own risk.

## ARTICLE IV

ORIGINAL TERM
4.1 The original term of this lease shall be a period of twenty (20) years and a fraction of a month commencing on "the Commencement Date" (hereinafter defined), and terminating on the last day of the month in which the twentieth (20th) anniversary of the Commencement Date occurs. Notwithstanding the foregoing, Tenant shall have one right, at its election, to terminate the original term of this lease on the ninth (9th) anniversary of the Commencement Date by giving Landlord notice of the exercise of its election at least six (6) months prior to the ninth (9th) anniversary of the Commencement Date accompanied by payment to Landlord of an amount equal to the product of the annual rate of minimum rent then payable by Tenant under Section 5.1 multiplied by two (2) minus Thirty Thousand Dollars ($30,000).

OPTIONS
4.2 Tenant shall have the right, at its election, to extend the original term of this lease, or the original term as it may have been previously extended pursuant to the third sentence of this Section 4.2, an extension period of five (5) years commencing upon the expiration of the original term, or the original term as so previously extended (sometimes herein referred to as an "Extension Period" or "the First Extension Period"), provided that Tenant shall give Landlord

notice of the exercise of its election at least six (6)
months, and no earlier than nine (9) months, prior to
the expiration of the original term, or the original
term as previously extended. In addition, Tenant shall
have the right, at its election, to extend the original
term, as it may have been previously extended pursuant
to the provisions of this Section 4.2, three (3) addi-
tional extension periods of five (5) years each, each
commencing upon the expiration of the original term as
previously extended, (each sometimes herein referred to
as an "Extension Period" or as the "Second", "Third"
and "Fourth Extension Period(s)," respectively) pro-
vided that Tenant shall give Landlord notice of the
exercise of its election at least six (6) months, and
no earlier than nine (9) months, prior to the expira-
tion of the original term as previously extended. In
addition, Tenant shall have the further right, at its
election, to extend the original term, or the original
term as it may have been previously extended, as afore-
said, an extension period of a fraction of a year ending
upon the January 31st next following the expiration of
the original term, or the original term as previously
extended, as the case may be, (herein referred to as
"the Extra Period") provided that Tenant shall give
Landlord notice of the exercise of its election at
least six (6) months prior to the expiration of the
original term as previously extended, as the case may
be. The expression "the original term" means the
period described in Section 4.1 as the original term.
Prior to the exercise by Tenant of any of said elec-
tions under this Section 4.2 to extend the original
term, the expression "the term of this lease" shall
mean the original term; after the exercise by Tenant of
any of said elections, the expression "the term of this
lease" shall mean the original term as it may have been
then extended. Except as expressly otherwise provided
in this lease, all the agreements and conditions in
this lease contained shall apply to the period or
periods to which the original term shall be extended,
as aforesaid. If Tenant shall give notice of the exer-
cise of an election under this Section 4.2 in the manner
and within the time provided aforesaid, the term shall
be extended upon the giving of such notice without the
requirement of any action on the part of Landlord.

COMMENCE-      4.3 "The "Commencement Date" shall be the later
MENT DATE to occur of the following dates:

        (1)  the sixtieth (60th) day after both the
completion of Landlord's Delivery Obligations and
the Delivery Date and the receipt by Tenant of
notice thereof from Landlord;

        (2)  the ninetieth (90th) day after Landlord
shall have delivered to Tenant all of the fully
executed and acknowledged instruments referred to
in Paragraph 12 of Schedule B; and

        (3)  the ninetieth (90th) day after Landlord
shall deliver to Tenant satisfactory evidence of
notice of the termination of the lease and occu-
pancy of the current lessee of the Demised Prem-
ises, such termination to take effect as of a date
no later than the date set forth in Section 4.6.

Notwithstanding the foregoing, if Tenant shall be
unable to obtain a certificate of occupancy (or local
equivalent) for the Demised Premises because of the

-3-

condition of the property Landlord is required to maintain (as defined in Section 8.2) or any default by Landlord under either Sections 3.1, 4.5 or 8.4 then in any such event (a) Landlord shall promptly correct such condition so that such certificate may be obtained and (b) the Commencement Date shall be ten (10) days after such certificate is obtained.  The immediately preceding sentence shall not apply with respect to any condition existing in the Common Areas upon the Inspection Date.  However, if the Demised Premises shall be formally opened for business with customers prior to the Commencement Date determined as above provided, such date of formal opening shall be the Commencement Date.  For the purposes of this Section 4.3, (i) Landlord's Delivery Obligations shall be deemed completed notwithstanding that certain "touch-ups" or "adjustments" may be required for full completion provided that (1) neither the failure of completion nor the act of completion shall interfere with Tenant's use or enjoyment of the Demised Premises or any rights of Tenant under this lease and (2) Landlord shall diligently complete any such touch-up or adjustment upon receiving notice of the need therefor, and (ii) Landlord's obligations under clause (e) of the second sentence of Section 3.1 shall be deemed completed if neither the failure of completion nor the act of completion thereof shall interfere with the performance by Tenant of any acts referred to in the first sentence of Section 3.2 to the extent that Tenant's opening of the Demised Premises with customers shall be delayed as a result thereof; it being understood and agreed that Landlord shall diligently complete any of such obligations then incomplete upon receiving notice of the need therefor.

RECORDING    4.4  Simultaneously with the execution of this lease Landlord and Tenant shall execute an instrument, recordable in form, setting forth the parties, a description of the Demised Premises and the Shopping Center, the term, the Commencement Date and such other provisions of this lease as may be reasonably requested by either party to constitute a "short form lease" or other instrument adequate, in the opinion of Tenant, for recording purposes.  Tenant shall have the right to terminate this lease by notice to Landlord prior to the sixtieth (60th) day following the date of this lease provided Tenant shall have received a report addressed to it from a title company acceptable to Tenant, or an opinion addressed to Tenant from a lawyer acceptable to Tenant which may be based upon a policy of title insurance issued previously to Landlord and a then current update thereof, that at the time of the recording of said short form lease or other such instrument Landlord was not the sole owner, in fee simple, of the Shopping Center or there were easements, rights, restrictions, agreements or encumbrances affecting the Demised Premises or the Shopping Center or any rights of Tenant under this lease, in addition to the Title Matters set forth in this lease (including Schedule B), unless Landlord shall fully discharge such easements, rights, restrictions, agreements or encumbrances, of record, within thirty (30) days after receipt of such notice from Tenant.  Failure of Tenant to exercise its right to terminate this lease, if any shall arise, under the immediately preceding sentence, within the time therein provided, shall constitute a complete waiver of its right to object to such easement, right, restriction, agreement or encumbrance as shall have given rise thereto.  Promptly upon execution of this lease, Landlord shall request the report or opinion referred to in the second sentence of this Section 4.4,

-4-

including in such request the further instruction that
the same is to be furnished to Tenant within fifteen
(15) days thereafter.  Landlord and Tenant each shall
pay one-half (1/2) the fee charged by the lawyer fur-
nishing such opinion or the charge made by such title
company furnishing such report, as the case may be.
After the Commencement Date shall be fixed, upon the
written request of either Landlord or Tenant, Landlord
and Tenant will enter into an amended "short form lease"
or other such instrument to fix the Commencement Date
of record.  After the termination of this lease or the
expiration of the term, as the case may be, Landlord
and Tenant will, upon the written request of either
Landlord or Tenant, enter into a recordable instrument
confirming the occurrence of the last day of the term
of this lease as then determined.

TITLE            4.5  Landlord agrees that upon the Delivery Date,
the Demised Premises and all rights of Tenant under
this lease will be free and clear of all Title Matters
superior in lien to the lien of this lease, except as
set forth in Paragraph 13 of Schedule B of this lease.
If at any time during the term of this lease, any per-
son having a superior right to Tenant not set forth in
Paragraph 13 of Schedule B shall cause an injunction to
be entered against Tenant restricting Tenant's using or
enjoying the Demised Premises or any rights of Tenant
under this lease, and if such injunction shall not be
dismissed within ninety days after Tenant shall give
Landlord notice thereof, then Tenant, without waiving
any other rights Tenant may have against Landlord on
account thereof, may terminate this lease by giving
Landlord notice thereof.

STARTING         4.6  If performance of Landlord's Delivery Obliga-
DEADLINE         tions shall not be commenced before July 1, 1983, then
at any time thereafter but prior to the commencement
thereof Tenant shall have the right at its election to
terminate this lease by giving Landlord notice thereof.

COMPLETION       4.7  If performance of Landlord's Delivery Obliga-
DEADLINE         tions shall not be completed, and if possession of the
Demised Premises shall not be delivered to Tenant be-
fore August 1, 1983, then at any time thereafter but
prior to completion of Landlord's Delivery Obligations
and tender of delivery of possession of the Demised
Premises to Tenant, Tenant shall have the right, at its
election, to terminate this lease by giving Landlord
notice thereof.

RADIUS           4.8  During the term of this lease, Tenant shall
RESTRIC-         not operate a retail store containing more than forty
TION             thousand (40,000) square feet of floor area (excluding
non-selling mezzanine and basement floor area from the
completion thereof), other than the Demised Premises,
within a radius of seven (7) miles of the Shopping
Center.  If at any time Tenant shall acquire any store
which is in operation at the time of the acquisition
thereof and is acquired together with at least three
(3) other stores, then the restriction imposed by the
immediately preceding sentence shall not apply to any
such other stores.  If at any time Tenant, or substan-
tially all the assets of Tenant, is or are acquired by
a business organization that is not affiliated with
Tenant (as determined under Section 17.3), the restric-
tion imposed by the first sentence of this Section 4.8
shall not be applicable to any store operated by such
business organization at such time.

OPERATIONS   4.9. (A)  Tenant shall, on or before the one hun-
dred fiftieth (150th) day after the Commencement Date,
open a store in the Demised Premises under the trade-
name Zayre. Nothing in this lease shall obligate
Tenant thereafter to use said tradename in connection
with the Demised Premises or to keep the Demised
Premises open for business at any time or times or
prohibit Tenant from closing the Demised Premises for
business temporarily or permanently at any time.

(B)  That date on which the Demised Premises
shall have been closed for retail business to customers
for any period of one hundred twenty (120) consecutive
days commencing after the date upon which Tenant is
obligated to open the Demised Premises under Section
4.9(A) other than as the result of any cause or event
referred to in Articles X or XI or Section 18.3, is
herein referred to as a "Closing Date." If Tenant
shall elect to close the Demised Premises for retail
business for any period of one hundred twenty (120)
consecutive days or more, other than as the result of
any cause or event referred to in Articles X or XI or
Section 18.3, then Tenant shall give Landlord notice
thereof ("a Closing Notice") not less than ninety (90)
days prior to the Closing Date applicable thereto. If,
while the Demised Premises are closed for retail busi-
ness as the result of any cause or event referred to
in Articles X or XI or Section 18.3, Tenant shall elect
not to re-open the same for one hundred twenty (120)
consecutive additional days or more following the period
of closing which resulted from the cause or event re-
ferred to in Articles X or XI or Section 18.3 then Ten-
ant shall promptly give notice to Landlord of the exer-
cise of such election (also "a Closing Notice"). (i)
If Tenant shall give Landlord a Closing Notice when the
Demised Premises are open for business then at any time
between the date of receipt thereof and the thirtieth
(30th) day after the Closing Date therein referred to,
or (ii) if Tenant shall give Landlord a Closing Notice
when the Demised Premises are not open for retail busi-
ness then at any time within one hundred twenty (120)
days thereafter, or (iii)if, without a Closing Notice,
the Demised Premises shall have been closed for retail
business to customers for any period of one hundred
twenty (120) consecutive days commencing after the
date upon which Tenant is obligated to open the Demised
Premises under Section 4.9(A), other than as the result
of any cause or event referred to in Articles X or XI
or Section 18.3, then at any time within one hundred
twenty (120) days thereafter, Landlord may, in any such
case, elect to terminate the term of this lease by giv-
ing Tenant notice thereof ("Landlord's Notice") and the
term of this lease shall then terminate on the thirtieth
(30th) day after either such Closing Date or the receipt
by Tenant of Landlord's Notice, whichever occurs last,
to the same extent as if said day were the date set
forth for the expiration of the term in Sections 4.1
and 4.2. If Landlord shall not give Landlord's Notice
within the time provided above and if retail business
shall thereafter be commenced in substantially all of
the Demised Premises then Landlord shall have no further
right to terminate the term of this lease under this
Section unless and until the Demised Premises are again
thereafter closed (or not re-opened, as the case may
be) for retail business; it being understood and agreed
that the foregoing provisions of this Section 4.9(B)
shall apply to each such closing of (and failure to re-
open) the Demised Premises under the circumstances
stated in this Section 4.9(B). If Landlord shall not
give Landlord's Notice within the time above provided

-6-

and if retail business shall not be commenced in sub-
stantially all of the Demised Premises on or before any
anniversary of the Closing Date then Landlord may for a
period of thirty (30) days after each such anniversary
elect to terminate the term of this lease by giving
Landlord's Notice and the term shall then terminate as
provided in the second sentence of this Section 4.9(B).
Without limiting the generality of the foregoing, it is
understood and agreed that a closing of the Demised
Premises for retail business following the occurrence
of any cause or event referred to in Articles X or XI
or Section 18.3 or for remodelling or in connection
with an assignment of the interest of Tenant in this
lease or a subletting of all or any part of the Demised
Premises shall not be deemed a closing thereof.

## ARTICLE V

**MINIMUM
RENT**

5.1  During the term of this lease, Tenant shall
pay minimum rent to Landlord at the annual rate of
Three Hundred Twenty Nine Thousand Seven Hundred Twenty
Two Dollars ($329,722) per year.

5.2  All minimum rent shall be payable, without
demand, in monthly installments of one-twelfth the annual
rate thereof then in effect, in advance, upon the first
day of each calendar month included within the term of
this lease.  All rent and other payments to be made by
Tenant to Landlord shall be made payable to Landlord
and sent to Landlord at the place to which notices to
Landlord are required to be sent, unless Landlord shall
direct otherwise by notice to Tenant.  Rent for any
fraction of a month at the commencement or expiration
of the term, or in which the rate thereof changes pur-
suant hereto, shall be prorated on a per diem basis.

## ARTICLE VI

**REAL
ESTATE
TAXES**

6.1  Tenant shall pay the real estate taxes allo-
cable to the Demised Premises (determined as hereinafter
provided) for each tax year included within the term of
this lease and a pro rata portion thereof for the tax
years partially included in the term at the commencement
and expiration thereof.  The real estate taxes allocable
to the Demised Premises for any tax year shall be the
sum of (A) the real estate taxes upon the Demised Prem-
ises for said tax year (excluding the land beneath the
same) and (B) the product of Tenant's Fraction (herein-
after defined) and the real estate taxes for said tax
year upon the land of the Shopping Center (including
land under buildings) and all improvements upon the
Common Areas.  Tenant's Fraction is that fraction the
numerator of which shall be the number of square feet
of floor area in the Demised Premises and the denomina-
tor of which shall be the number of square feet of
floor area in all the buildings in the Shopping Center.
(Floor area of mezzanines not open to customers and
incidental to ground floor retail operations shall not
be counted; other mezzanine floor area, basement floor
area and upper story floor area shall be counted at
half actual floor area).  If the Demised Premises shall
not be separately assessed, but shall be assessed
jointly with other improvements, an allocation shall be
made to determine the real estate taxes upon the De-
mised Premises.  Such allocation of taxes shall be made
according to the assessors' records or written asses-
sor's certifications, or in the absence thereof, by the
decision of a majority of three appraisers, one desig-

nated by Landlord, one by Tenant and the third by the
two so designated, the expenses of such appraisers
being borne equally by Landlord and Tenant, all subject
to the following provisions.  Real estate taxes shall
not include any income, excess profits, estate, inheri-
tance, succession, transfer, franchise, capital or
other tax or assessment upon Landlord, all of which
shall be the obligation of Landlord.  If the Demised
Premises shall not be separately assessed, the assess-
ments on all the buildings jointly assessed shall be
deemed to be uniformly assessed on a square-foot-of-
floor-area basis, floor area being counted as above
provided, except that (1) if additional premises (not
improved existing premises) shall be first assessed as
completed improvements after the Commencement Date, the
real estate taxes allocable to said additional premises
and the floor area of said additional premises shall be
substracted from the joint assessment and the floor
area, respectively, for the purposes of applying the
apportionment formula in this sentence above and (2) if
any improvements to any existing building premises (not
merely restoration of premises damaged by fire or other
casualty) shall be first assessed as completed improve-
ments after the Commencement Date, the real estate
taxes allocable to said improvements shall be sub-
tracted from the joint assessment for the purposes of
applying said apportionment formula.  Similarly taxes
upon signs and upon equipment of occupants used in the
conduct of their business (as distinguished from equip-
ment used in the operation of the building, such as
heating and air conditioning equipment) shall not be
included in real estate taxes for the purposes of
applying said apportionment formula.  Tenant shall pay
all ad valorem taxes allocable to such improvements in
the Demised Premises, signs of Tenant and such business
equipment in the Demised Premises.

    6.2  The real estate taxes for any lease year
shall be the real estate taxes for the tax year termi-
nating during said lease year.  If any lease year shall
be greater than or less than twelve months or if the
real estate tax year shall be changed, an appropriate
adjustment shall be made to carry out the intent of the
parties.  If there shall be more than one taxing autho-
rity, the real estate taxes for any period shall be the
sum of the real estate taxes for such period attribu-
table to each taxing authority.  If the number of
square feet of floor area of any building shall change
during any tax year, the condition existing upon the
day as of which the real estate taxes are assessed for
such tax year shall control.

    6.3  The real estate taxes for any tax year shall
mean such amounts as shall be finally determined to be
the real estate taxes for said tax year, that is, the
real estate taxes assessed for said tax year less any
abatements, refunds or rebates made thereof.  For the
purpose of determining payments due from Tenant to
Landlord in accordance with the provisions of this
Article VI: (A) the real estate taxes for any tax year
shall be deemed to be the real estate taxes assessed
for said tax year until such time as the same may be
reduced by abatement, refund or rebate; and (B) if any
abatement, refund or rebate shall be made for such tax
year, the real estate taxes for said year shall be
deemed to be the real estate taxes as so reduced plus
the expenses of obtaining the reduction, and an appro-
priate adjustment shall be made in the amount payable
from or paid by Tenant to Landlord on account of real
estate taxes and on account of percentage rent.

-8-

6.4  Tenant shall have such rights to contest the validity or amount of any real estate taxes as permitted by law, either in its own name or in the name of Landlord.  Landlord shall cooperate with Tenant in any such contest and, in connection therewith, shall make available to Tenant such information in its files as Tenant may reasonably request.  If any abatement, refund or rebate shall be obtained, the expenses of obtaining the same shall be a first charge thereon.

6.5  Landlord shall submit to Tenant copies of the real estate tax bills for each tax year.  Landlord shall bill Tenant for any amount that may be payable by Tenant pursuant to the provisions of this Article VI.  Said bill shall be accompanied by a computation of the amount payable.  The amount payable by Tenant hereunder for any tax year shall be payable on or before the fourteenth (14th) day before the last day that Landlord may pay real estate taxes to the taxing authority for said tax year (presently November 30 of the calendar year for which taxes are assessed) in order to receive the maximum discount therefor allowed to ad valorem taxpayers, but, if Tenant shall not have received a bill therefor together with such evidence of the cost and computation thereof as Tenant may request, at least fourteen days prior to said time for payment by Landlord, then Tenant shall not be required to make such payment until fourteen days after the receipt of such bill and evidence.  (If real estate taxes are payable to any taxing authority for any tax year in installments, the amount payable by Tenant hereunder shall be payable in similar installments.  If real estate taxes are payable to different taxing authorities for any tax year at different times, an appropriate apportionment shall be made of the amount payable by Tenant for said tax year and the apportioned amounts shall be payable at such times).  Landlord agrees that real estate taxes upon the Shopping Center shall be paid by Landlord prior to the last day that the same may be paid without penalty or interest (presently February 28 of the following calendar year).  Tenant shall have the benefit of the largest discount available for early payment provided Tenant has made payment to Landlord of the amount due under this Article for such tax year at least fourteen (14) days prior to the last day Landlord may pay such amount to the taxing authority in order to obtain such discount.

6.6  Until the law of Florida is hereafter changed so as to excuse Landlord from collecting the same, Tenant shall pay to Landlord any Florida sales and use tax upon the rent and other payments payable by Tenant under this lease which is payable pursuant to Section 212.031 (1)(c) of the Florida Revenue Act of 1949, as amended from time to time, and shall make such payments at the time Florida law mandates that Landlord collect the same. Tenant may, either in its own name or in the name of Landlord, appeal or contest any such taxes, and/or the amount thereof, and, in such event (i) Landlord shall cooperate with Tenant in so doing and (ii) Tenant may defer payment thereof to the extent permitted by law.

ARTICLE VII

PERCENTAGE        7.1  A "lease year" is defined to mean any twelve
RENT         month period commencing upon a February 1 except, however,

(a)  if Tenant shall first open the Demised Premises to customers for retail business on a day

-9-

other than the first day of February, the first
lease year shall commence on the day Tenant shall
first so open the Demised Premises and end on the
last day of January which shall be more than six
months but not more than eighteen months after the
Commencement Date, and

(b)  if the term of this lease shall termi-
nate on a day other than the last day of January,
the last year shall end upon such termination day
and commence on that first day of February which
shall be more than six months but not more than
eighteen months prior to such termination day.
(If a lease year of more than twelve months shall
occur upon the termination of the term, any amount
paid during such lease year for the first twelve
months of such lease year shall be deemed a pay-
ment on account).

7.2  The "Gross Sales" for any lease year shall be
the total amount of all sales of merchandise and ser-
vices and lottery tickets made in, upon, about or from
the Demised Premises during such lease year, in each
case whether the same shall be made by Tenant or by any
subtenant or concessionaire of Tenant or any such sub-
tenant, whether for cash or on credit, whether delivered
from the Demised Premises or elsewhere, except that the
following shall not be included in Gross Sales for such
lease year or, if previously included in Gross Sales
for any lease year, the same shall be deducted from
Gross Sales for said lease year, as the case may be:

(a)  The amounts of all discounts, refunds,
credits, allowances and adjustments made to cus-
tomers;

(b)  The amounts of all sales taxes or other
taxes in the nature of sales taxes, whether or not
the same be called sales taxes, imposed by any
governmental authorities, federal, state or local,
irrespective of whether the same be imposed by
present or future laws;

(c)  The amounts of all sales to employees of
Tenant or of any subtenants or concessionaires of
Tenant, which are made at discounts off prices
charged to customers;

(d)  The amounts received for merchandise
transferred to any other place of business of Ten-
ant or any subtenant or concessionaire of Tenant
or any business organization affiliated with Ten-
ant or any subtenant or concessionaire of Tenant,
wherever located, provided such merchandise is not
used to fill a sale made in, upon or from the De-
mised Premises; and the amounts received for mer-
chandise returned to suppliers for credit;

(e)  Interest or other carrying charges on
lease, credit or time sales;

(f)  The amounts charged to customers for
mailing, delivery, alterations or other services
where the service is rendered to the customer
without profit;

(g)  Unpaid balances of credit sales which
shall be charged off as "bad debts", provided that
if at any time after any such unpaid balance shall
be so charged off, but prior to the expiration of
the term of this lease, any amount shall be col-

-10-

lected on account thereof, such amount shall then be included in Gross Sales;

(h) The amounts paid by customers and commissions received by Tenant in connection with the following customer conveniences: sale of postage stamps, public telephone, weighing machines, parcel lockers, payments of public utility bills, cashing of checks, and issuance of money orders and register checks;

(i) The amounts received from sales of distressed, damaged or obsolescent merchandise sold to other than retail customers, and the amounts received from sales of used trade fixtures and store operating equipment which have been used in the Demised Premises;

(j) The amounts received from vending machine sales or cafeteria or luncheonette sales where such vending machines, cafeteria or luncheonette sales are for the convenience of employees and not open to customers;

(k) The taxes received upon the sale of cigarettes, cigars and tobacco; and

(l) The amounts received from concessionaires of Tenant for occupancy, for services rendered to concessionaires by Tenant, or for supplies or equipment furnished to concessionaires by Tenant.

Notwithstanding anything herein to the contrary:

(i) except for such of the same as are expressly excluded by the provisions immediately preceding, the amounts of all sales of merchandise or services through vending machines operated by concessionaires of Tenant whose operations upon the Demised Premises consist solely of vending machines shall not be included in Gross Sales, but, in lieu thereof, the rent received by Tenant from concessionaires operating such vending machines shall be included in Gross Sales, and

(ii) there shall not be included in Gross Sales the amounts paid by customers to concessionaires operating travel departments, insurance sales departments, finance company departments or banking departments or similar service departments, or to legal services departments, medical or dental departments or other departments which provide professional services, or to concessionaires who pay an occupancy fee to Tenant independent of sales; but, in lieu thereof, the rent received by Tenant from the concessionaires operating such departments shall be included in Gross Sales.

7.3  Tenant shall pay to Landlord, for each lease year included within the term of this lease, in addition to the minimum rent, the amount, if any, by which the Tax Excess, if any, for said lease year shall be less than the tentative percentage rent for said lease year. The tentative percentage rent for each lease year included within the term of this lease shall be the following sum:

(i)  one-half per cent (.5%) of so much of the Gross Sales for said lease year as shall be between Twelve Million Dollars ($12,000,000) and Thirteen Million Dollars ($13,000,000) for said lease year;

-11-

(ii)   one per cent (1%) of the next One Million Dollars
       ($1,000,000) of the Gross Sales for said lease year;

(iii)  two per cent (2%) of the next One Million Dollars
       ($1,000,000) of the Gross Sales for said lease year;

(iv)   one and three-quarters per cent (1.75%) of the
       next One Million Dollars ($1,000,000) of the Gross
       Sales for said lease year; and

(v)    one and one-half per cent (1.5%) of all remaining
       Gross Sales for said lease year.

Said amount is herein sometimes called "percentage
rent". If any lease year shall be greater than or less
than twelve (12) months, the aforesaid amounts (some-
times herein called "Breaking Points") of Twelve Mil-
lion Dollars ($12,000,000), Thirteen Million Dollars
($13,000,000) and One Million Dollars ($1,000,000)
shall be increased or decreased for said lease year in
the same proportion that said lease year shall be
greater than or less than twelve (12) months.

7.4  "The Base Year" shall be the first full tax
year (for purposes of assessing real estate taxes upon
the Shopping Center) commencing after the Commencement
Date. "The Base Taxes" shall be the real estate taxes
allocable to the Demised Premises for the Base Year
(determined under Article VI) less any portion of said
real estate taxes attributable to an increase in the
assessed valuation of the Shopping Center not resulting
from Tenant's Work over the assessed valuation thereof
for the immediately preceding tax year. The Tax Excess
for any lease year shall be the amount payable by Tenant,
referred to in Article VI, on account of real estate
taxes for said lease year in excess of the Base Taxes.

7.5  On or before the seventy-fifth day after the
expiration of each lease year, Tenant shall submit to
Landlord a statement signed by an authorized officer of
Tenant, showing the Gross Sales for said lease year,
and at such time Tenant shall pay to Landlord the per-
centage rent, if any, due for said lease year. Tenant
agrees that it will keep in its principal accounting
office true and accurate records, in accordance with
generally accepted accounting practices for retail
stores, showing all sales made in, upon or from the
Demised Premises and that Landlord and its duly autho-
rized agents may, from time to time and at reasonable
times during Tenant's business hours, upon five days
written notice to Tenant, examine and audit such records
for the purpose of verifying the aforesaid statements
submitted by Tenant to Landlord. Acceptance by Landlord
of Tenant's payment of percentage rent shall not pre-
clude either party hereto from challenging the accuracy
thereof, except that Tenant may not challenge the accu-
racy of any payment of percentage rent more than six
(6) months after Tenant has paid the same. If Landlord
does not give Tenant notice that it challenges any
statement or payment within one year after the expira-
tion of the lease year to which such statement or pay-
ment relates, said statement or payment shall be deemed
final and conclusive, and the obligation of Tenant to
keep available for Landlord's examination the sales
records upon which said statement or payment was based
shall cease. If the first or last lease year shall
exceed twelve months, an interim statement (but no pay-
ment) of sales from the commencement of said lease year
to the first January 31st within said lease year shall
be submitted to Landlord within seventy-five days after
said January 31st and the sales for such interim period

-12-

shall be again included in the statement of sales for
said lease year submitted within seventy-five days
after the expiration of said lease year.

## ARTICLE VIII

**TENANT'S**
**REPAIRS**   8.1  Tenant shall make all repairs and alterations
to the property which Tenant is required to maintain,
as hereinafter set forth, which may be necessary to
maintain the same in as good repair and condition as
the same are in on the Commencement Date or which may
be required by any laws, ordinances or regulations of
any public authorities having jurisdiction, reasonable
wear and tear excepted and subject to Articles X and XI
of this lease.  Upon the expiration or other termination
of the term of this lease, Tenant shall remove its goods
and effects and those of all persons claiming under it
and shall yield up peaceably to Landlord the Demised
Premises with so much of the same as Tenant is obli-
gated to maintain pursuant to the provisions of this
Section 8.1 in as good repair and condition as the same
were in on the Delivery Date, reasonable wear and tear
excepted and subject to Articles X and XI of this lease.
However, notwithstanding anything in this lease contained
to the contrary, Landlord, not Tenant, shall make all
repairs and alterations to the property which Tenant is
required to maintain which may be required as the re-
sult of repairs, alterations, other improvements or
installations made by Landlord or Landlord's agents.
The property which Tenant is required to maintain is
the loading dock of the Demised Premises, the sump
pumps and catch basin in the loading pit serving the
Demised Premises, all windows, plate glass and doors of
the Demised Premises, and the interior of the Demised
Premises, including, without limitation, the HVAC, any
fixture or appurtenance composed of glass and all utili-
ties conduits, fixtures and equipment within the Demised
Premises serving the Demised Premises exclusively, but
excluding all property which Landlord is required to
maintain as below provided.  In addition, Tenant shall
make any repairs to the property Landlord is required
to maintain which are required as a result of a default
by Tenant hereunder in making repairs to the property
Tenant is required to maintain.

**LANDLORD'S**
**REPAIRS**   8.2  Landlord shall make all repairs and altera-
tions to the property which Landlord is required to
maintain, as hereinafter set forth, which may be neces-
sary to maintain the same in good repair and condition
or which may be required by any laws, ordinances or
regulations of any public authorities having jurisdic-
tion, subject to Articles X and XI.  However, notwith-
standing anything in this lease contained to the con-
trary, Tenant, not Landlord, shall make all repairs and
alterations to the property which Landlord is required
to maintain which may be required as the result of
repairs, alterations, other improvements or installa-
tions made by Tenant or any subtenant or concessionaire
of Tenant or the agents of any of them, including with-
out limitation, any installations by any of them upon
the Pylon Sign (defined in Paragraph 3 of Schedule B).
The property which Landlord is required to maintain is
the foundation, the roof, the exterior walls, the roof
drainage system, the canopy, the structural parts of
the Demised Premises, plus all Common Areas and Common
Facilities of the Shopping Center, and, to the extent
not included in the foregoing, all utilities conduits,
fixtures and equipment serving the Demised Premises
which serve other premises or are located within the

-13-

Shopping Center but outside the Demised Premises, in-
cluding, without limitation, slab-floors, but excluding
all glass, windows and doors.  In addition, Landlord
shall make any repairs to the property Tenant is re-
quired to maintain which are required as a result of a
defect in, or failure of repair of, the property Land-
lord is required to maintain.  Notwithstanding anything
in Section 18.9 contained to the contrary, if Landlord
shall, pursuant to the foregoing provisions of this
Section 8.2, make any repairs to any sewer pipes serv-
ing the Demised Premises exclusively which are neces-
sitated as the result of any objects deposited in the
drains or toilets of the Demised Premises for which the
same were not designed then Tenant shall, upon receipt
of reasonable evidence thereof, reimburse Landlord for
the reasonable cost to Landlord of making such repairs.

SPECIAL        8.3  Landlord shall make any repairs or altera-
REPAIRS   tions that shall be required at any time during the
AND       term of this lease as a result of movement of the
NOTICES   building upon the Demised Premises such as settling, or
          as the result of settling of the Common Areas.  Land-
          lord agrees that it will give to Tenant the benefit of
          all guarantees it may have from its contractors or
          materialmen and that Tenant may enforce such guarantees
          either in Tenant's name or in Landlord's name, to the
          extent assignable.  Each party shall give the other
          party prompt notice of the requirement of any repairs
          and alterations then to be made by the other party
          under this Article VIII promptly after such party first
          has knowledge thereof.

UTILITIES      8.4  Landlord agrees that on the Delivery Date the
          Demised Premises shall be connected to the electric
          lines serving the municipality wherein the Demised
          Premises are located and to the water and sewer systems
          of such municipality.  Landlord agrees that on the
          Delivery Date (i) all such water and electricity shall
          be in such amounts per unit of time as existed on the
          Inspection Date and (ii) all such sewerage disposal
          facilities shall be of such capacity as existed on the
          Inspection Date.  Landlord shall not take any action
          which shall interrupt, or interfere with, any electric,
          gas, water, sewerage or telephone service to the De-
          mised Premises, except as may be necessary in the case
          of emergency or in connection with the making of re-
          pairs.


                         ARTICLE IX

ALTERATIONS    9.1  Tenant agrees that all repairs, alterations,
          other improvements or installations made by Tenant to
          or upon the Demised Premises, including without limi-
          tation, pursuant to Articles III and X, shall be done
          in a good and workmanlike manner and in conformity with
          all laws, ordinances and regulations of all public
          authorities having jurisdiction and in a manner which
          shall not interfere with the operation of the businesses
          in the Shopping Center, that materials of good quality
          shall be employed therein, that the structure of the
          Demised Premises shall not be endangered or impaired
          thereby, that the Demised Premises shall not be dimin-
          ished in value thereby, and that, except for signs,
          antennae and heating, airconditioning and utilities
          equipment Tenant is permitted to erect and maintain
          pursuant to the provisions of this lease, neither the
          perimeter of the Demised Premises nor the height of the

                           -14-

Demised Premises shall be increased without the written consent of Landlord. Tenant agrees that Tenant shall not make any alterations to the foundation, roof, exterior walls, gutters, downspouts, canopy or any structural parts of the Demised Premises without first submitting plans and specifications therefor to Landlord and obtaining Landlord's approval thereof. Failure of Landlord to give notice of approval or disapproval of said plans and specifications within thirty days after receipt thereof shall be deemed approval. Notwithstanding the foregoing, Tenant may, from time to time, without the consent of Landlord, make any non-structural changes to the exterior of the Demised Premises (other than the roof) which will be consistent with the exterior appearance of a majority of the other premises which are then operated in Florida under the same tradename as is then used in the operation of the Demised Premises and which were renovated during the immediately preceding period of four (4) years. All salvage in connection with any work done by Tenant pursuant to provisions of this Article shall be disposed of by Tenant. It is agreed and understood that Landlord will accept the Demised Premises as altered pursuant to the provisions hereof without any obligation upon Tenant to restore the Demised Premises to their former condition. Notwithstanding the foregoing, Tenant shall not separate the Demised Premises into premises which shall appear to the public as more than four separate units and the Demised Premises shall always contain at least one separate unit containing fifty thousand (50,000) or more square feet of floor area.

9.2    (A)   Landlord agrees that Tenant may erect and maintain its usual signs, from time to time, upon the exterior of the Demised Premises and the usual signs, from time to time, of any subtenant of Tenant, but Tenant may not attach any sign to the roof.  For purposes of the immediately preceding sentence, "usual signs" shall mean signs similar to the signs used on a majority of stores then operated in Florida under the same tradename as is then used in the operation of the Demised Premises.  Landlord further agrees that Tenant may erect and maintain upon the parapet, but not upon the roof, of the Demised Premises antennae for electronic receivers and transmitters in the Demised Premises and that Tenant may erect and maintain upon the roof and on the adjacent ground, utilities equipment serving the Demised Premises.

(B)   If Tenant shall elect not to install its identification sign upon the Pylon Sign (defined in Paragraph 3 of Schedule B), then Tenant may erect a separate free standing sign and all appurtenances thereto in the Common Areas at the northwesterly corner of Parcel 2, advertising Tenant's business in the Shopping Center, including without limitation, a pylon, an identification panel, the base, the utilities service therefor and all other appurtenances thereto, (herein referred to as "Tenant's Pylon." The precise location and general appearance of Tenant's Pylon shall be subject to the approval of Landlord, which approval shall not be unreasonably withheld, and, in any event, Landlord shall not withhold its approval of such color, size or style as is then Tenant's typical identification panel.  Landlord shall cooperate with Tenant in obtaining all permits as shall be required by law for the installation of Tenant's Pylon.  On or before the ninetieth (90th) day prior to the Commencement Date Landlord

-15-

The supporting documents for this claim are too voluminous to include in the proof of claim PDF. They are available upon request by emailing searsinfo@primeclerk.com or by calling 844-384-4460.



ORIGIN ID:GMVA    (201) 930-8800    SHIP DATE: 09APR19
AMANDA CANNONE    ACTWGT: 1.00 LB
AUBURNDALE PROPERTIES, INC.    CAD: 4160829/NET4100
50 TICE BLVD
SUITE 320
WOODCLIFF LAKES, NJ 07677    BILL SENDER
UNITED STATES US

TO SEARS HOLDINGS CORPORATION
   CLAIMS PROCESSING CENTER
   C/O PRIME CLERK LLC
   850 3RD AVENUE, SUITE 412
   BROOKLYN NY 11232
   (201) 930-8800    REF: KEY PLAZA
   INV:
   PO:    DEPT:

RECEIVED
APR 1 0 201
PRIME CLERK

WED - 10 APR 10:
PRIORITY OVERNIG

TRK# 7749 2611 7449
0201

E2 FBTA    112
NY-US  EV