# Exhibit B

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | | |
|---|---|---|---|---|
| ☐ Sears Holdings Corporation (18-23538) | ☐ Kmart Corporation (18-23549) | ☐ Sears, Roebuck de Puerto Rico, Inc. (18-23561) | ☐ MyGofer LLC (18-23573) | ☐ Kmart.com LLC (18-23585) |
| ☒ Sears, Roebuck and Co. (18-23537) | ☐ MaxServ, Inc. (18-23550) | ☐ SYW Relay LLC (18-23562) | ☐ Sears Brands Business Unit Corporation (18-23574) | ☐ Sears Brands Management Corporation (18-23586) |
| ☐ Kmart Holding Corporation (18-23539) | ☐ Private Brands, Ltd. (18-23551) | ☐ Wally Labs LLC (18-23563) | ☐ Sears Holdings Publishing Company, LLC (18-23575) | ☐ SHC Licensed Business LLC (18-23616) |
| ☐ Kmart Operations LLC (18-23540) | ☐ Sears Development Co. (18-23552) | ☐ Big Beaver of Florida Development, LLC (18-23564) | ☐ Kmart of Michigan, Inc. (18-23576) | ☐ SHC Promotions LLC (18-23630) |
| ☐ Sears Operations LLC (18-23541) | ☐ Sears Holdings Management Corporation (18-23553) | ☐ California Builder Appliances, Inc. (18-23565) | ☐ SHC Desert Springs, LLC (18-23577) | ☐ SRe Holding Corporation (19-22301) |
| ☐ ServiceLive, Inc. (18-23542) | ☐ Sears Home & Business Franchises, Inc. (18-23554) | ☐ Florida Builder Appliances, Inc. (18-23566) | ☐ SOE, Inc. (18-23578) | |
| ☐ A&E Factory Service, LLC (18-23543) | ☐ Sears Home Improvement Products, Inc. (18-23555) | ☐ KBL Holding Inc. (18-23567) | ☐ StarWest, LLC (18-23579) | |
| ☐ A&E Home Delivery, LLC (18-23544) | ☐ Sears Insurance Services, L.L.C. (18-23556) | ☐ KLC, Inc. (18-23568) | ☐ STI Merchandising, Inc. (18-23580) | |
| ☐ A&E Lawn & Garden, LLC (18-23545) | ☐ Sears Procurement Services, Inc. (18-23557) | ☐ Sears Protection Company (Florida), L.L.C. (18-23569) | ☐ Troy Coolidge No. 13, LLC (18-23581) | |
| ☐ A&E Signature Service, LLC (18-23546) | ☐ Sears Protection Company (18-23558) | ☐ Kmart of Washington LLC (18-23570) | ☐ BlueLight.com, Inc. (18-23582) | |
| ☐ FBA Holdings Inc. (18-23547) | ☐ Sears Protection Company (PR) Inc. (18-23559) | ☐ Kmart Stores of Illinois LLC (18-23571) | ☐ Sears Brands, L.L.C. (18-23583) | |
| ☐ Innovel Solutions, Inc. (18-23548) | ☐ Sears Roebuck Acceptance Corp. (18-23560) | ☐ Kmart Stores of Texas LLC (18-23572) | ☐ Sears Buying Services, Inc. (18-23584) | |

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

CROSSROADS MALL, LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor    The Lerner  Company manages the property

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

c/o Lerner Company
10855 W. Dodge Road, Suite 270
Omaha, NE 68154-2666

Contact phone  402-343-3756

Contact email _____

Where should payments to the creditor be sent? (if different)

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known)_____    Filed on ____ / ____ / ____
                                                                    MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

Claim Number: 16967

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**  $ 1,354,110.00 . **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

### Lease - repairs and maintenance outstanding under the Lease

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.** $ 1,354,110.00

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)( ____ ) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.    $ _____

---

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Signature:   *Frank Krejci*
             Frank Krejci (Apr 10, 2019)

Email:   teri.gibbons@koleyjessen.com

Signature

Print the name of the person who is completing and signing this claim:

Name of the person who is completing and signing this claim:

| | | |
|---|---|---|
| Name | Frank | Krejci |
| | First name        Middle name | Last name |
| Title | Manager | |
| Company | Crossroads Mall, LLC | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | 10855 W. Dodge Road, Suite 270 | |
| | Number         Street | |
| | Omaha | NE    68154-2666 |
| | City | State    ZIP Code |
| Contact phone | 402-343-3756 | Email |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ **have supporting documentation.**
  **(attach below)**

☐ **do not have supporting documentation.**

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

Modified Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                    12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

<div style="border:1px solid">

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
18 U.S.C. §§ 152, 157 and 3571.

</div>

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.** Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child (John Doe, parent, 123 Main St., City, State)*. See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://restructuring.primeclerk.com/sears.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Sears Holdings Corporation Claims Processing Center
c/o Prime Clerk LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

**Do not file these instructions with your form**

# Electronic Proof of Claim

Final Audit Report                                                                 2019-04-10

| | |
|---|---|
| Created: | 2019-04-10 |
| By: | Sears Claims (searsclaims@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAMno1BrmJS1VUcFWP0Xjf8nyKocZHv9yQ |

## "Electronic Proof of Claim" History

📄 Widget created by Sears Claims (searsclaims@primeclerk.com)
   2019-04-10 - 8:16:08 PM GMT

📄 Widget filled in by Frank Krejci (teri.gibbons@koleyjessen.com)
   2019-04-10 - 8:21:36 PM GMT- IP address: 209.34.196.130

🔏 (User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64)
   AppleWebKit/537.36 (KHTML, like Gecko) Chrome/73.0.3683.86 Safari/537.36)
   2019-04-10 - 8:21:38 PM GMT- IP address: 209.34.196.130

✅ Signed document emailed to Frank Krejci (teri.gibbons@koleyjessen.com) and Sears Claims
   (searsclaims@primeclerk.com)
   2019-04-10 - 8:21:38 PM GMT

## PROOF OF CLAIM OF CROSSROADS MALL, LLC

## ATTACHMENT NO. 1

## U.S. BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### *IN RE SEARS, ROEBUCK AND CO.*
### CASE NO. 18-23537
### (JOINTLY ADMINISTERED UNDER CASE NO. 18-23538)

The $1,354,110.00 amount identified on this Proof of Claim is the total claim due as of the bankruptcy filing date (October 15, 2018) (the "Petition Date"), based upon the damages incurred by Crossroads Mall, LLC as a result of Sears, Roebuck and Co.'s ("Sears") breach of the Lease Agreement dated June 23, 1958, along with all subsequent amendments thereto (collectively the "Lease") relating to the premises at 7400 Dodge Street, Omaha, Nebraska, by failing to maintain the property in the condition required by the terms of the Lease.

The claim of Crossroads Mall, LLC in the sum of $1,354,110.00 consists of the following:

| Description | Amount |
|---|---|
| Roofing repairs to main roof | $798,000.00 |
| Roofing repairs to auto center roof | $240,000.00 |
| Roofing repairs to canopies | $276,980.00 |
| Painting of overhangs | $24,730.00 |
| Sidewalk repair (bid of AM Contracting) | $14,400.00 |
| **TOTAL CLAIM** | **$1,354,110.00** |

The following documents form the basis of this Proof of Claim and are attached and incorporated herein by reference:

1.    Lease Agreement executed on or about June 23, 1958, marked as <u>Exhibit A</u>;

2.    Amendment to Lease executed on or about July 11, 1958, marked as <u>Exhibit B</u>;

3.    Amendment to Lease executed on or about November 12, 1958, marked as <u>Exhibit C</u>;

4.    Amendment to Lease executed on or about November 13, 1958, marked as <u>Exhibit D</u>;

5.     Amendment to Lease executed on or about February 19, 1959, marked as Exhibit E;

6.     Amendment to Lease executed on or about June 25,1959, marked as Exhibit F;

7.     Letter Agreement dated August 11, 1983, confirming the property line, marked as Exhibit G;

8.     Letter Agreement dated December 1, 1983, approving the operation of financial offices within the Sears' premises, marked as Exhibit H;

9.     Letter Agreement dated February 11, 1986, regarding expansion of the Crossroads Mall, marked as Exhibit I;

10.    Letter Agreement dated January 31, 1991, regarding construction of a bus transmit center in the Crossroads Mall parking lot, marked as Exhibit J;

11.    Letter Agreement dated January 9, 1995, regarding the potential dissolution of the Merchant's Association, marked as Exhibit K;

12.    Amendment to Lease executed March 30, 2006, marked as Exhibit L;

13.    Letter Agreement dated October 10, 2011, regarding expansion of the Avis Rental Cars at Sears' Crossroads Mall location, marked as Exhibit M;

14.    Estimates of PDI Construction for painting and repairs to the canopies on the building occupied by Sears, collectively marked as Exhibit N;

15.    Estimate of Independent Roofing for roof repairs to the building occupied by Sears, marked as Exhibit O; and

16.    Estimate of AM Contracting for removal and replacement of the sidewalk at the building occupied by Sears, marked as Exhibit P.

Crossroads Mall, LLC also reserves the right to add future damages upon rejection of the lease.

DATED this 10th day of April, 2019.

CROSSROADS MALL, LLC

By: _Frank Krejci_ _____

Frank Krejci, Manager

THIS INDENTURE OF LEASE made and entered into this 2nd
day of _____, 19 58 by and between THE BRANDEIS
INVESTMENT COMPANY, a Nebraska corporation with its principal
place of business in Omaha, Douglas County, Nebraska, Party
of the First Part and hereinafter referred to as Landlord,
and SEARS, ROEBUCK & CO., a New York corporation and auth-
orized to carry on business in the State of Nebraska, Party
of the Second Part and hereinafter referred to as Tenant,
WITNESSETH:

WHEREAS, Under date of April 21, 1954, Myron N. Blank,
of Des Moines, Iowa, as Lessor, entered into a lease, which
shall hereinafter be referred to as the "Major Lease" (the
interests of said Lessor in said lease having been assigned
prior to the date hereof to Myron Co., a Nebraska corporation)
with The Brandeis Investment Company, a Nebraska corporation,
as Lessee, by which Lessor demised to Lessee, upon the terms,
covenants, rentals and conditions contained and set forth in
said lease, a copy of which is attached hereto marked EXHIBIT A
and by specific reference herein made a part hereof, the here-
inafter described premises for a period of ninety-nine (99)
years from and after August 1, 1954, to wit:

    The Northeast Quarter (N.E.) of the Northeast Quarter
    (N.E.) of Section Twenty-three (23), Township Fifteen
    (15) North, Range Twelve (12) East of the 6th P.M.,
    Douglas County, Nebraska, except county roads,

and

WHEREAS, Tenant desires to lease from Landlord a portion
of said above-described premises upon which Tenant will con-
struct and thereafter continuously maintain during the re-
mainder of the term hereof, upon the rentals, terms, agreements
and conditions hereinafter set forth, and subject to the terms
and provisions of the Major Lease, a building for the purpose
of conducting a retail department-store operation therein and
parking areas, said portion of said above-described premises
to be demised hereunder being hereinafter referred to as the

**EXHIBIT A**

"Sears' Tract," and the remainder of said above-described premises being hereinafter referred to as the "Brandeis Tract."

NOW, THEREFORE, Landlord for and in consideration of the rents hereinafter reserved to be paid, and of the covenants and agreements hereinafter mentioned to be kept and performed by Tenant, does by these presents lease and let unto Tenant and Tenant does hereby hire and take from Landlord that portion of the premises demised by the Major Lease, described, set forth and delineated on the plat attached hereto, marked EXHIBIT B, which by specific reference herein is made a part hereof, together with all easements, rights and appurtenances in connection therewith and thereunto belonging and together with the right of Tenant and its customers, agents and employees to use jointly with Landlord and its customers, agents and employees and tenants and sublessees of Landlord and their respective customers, agents and employees, the parking areas, sidewalks, streets, alleys and all other improved public areas (other than buildings) located and to be constructed on the Brandeis Tract, said Brandeis Tract being shown, described and delineated on said EXHIBIT B, subject, however, to the right of Landlord and its customers, agents and employees and the tenants and sublessees of Landlord and their respective customers, agents and employees, to use jointly with Tenant and its customers, agents and employees, the parking areas, sidewalks, streets, alleys and all other improved public areas (other than buildings) located and to be constructed on the Sears' Tract, which said right Landlord and its tenants and sublessees and the customers, agents and employees of itself and its tenants and sublessees shall have and enjoy for the entire term of this lease.

## Article 1

### Term and Purpose

This lease shall commence on the 1st day of August, 1958

2

and shall continue up to and including the 31st day of July, 2053, unless sooner terminated in accordance with any of the provisions herein contained. Tenant agrees that during the term of this lease it will not use the demised premises or any part thereof nor permit or suffer same to be used for any purpose except the maintaining and operating of a department store for the sale at retail of goods, wares and merchandise (and the storage of goods, wares and merchandise to be thus sold) and the rendering of services now sold and rendered or that may hereafter be customarily sold and rendered by Tenant in other shopping center retail department-store operations, provided, however, that the foregoing sale of goods, wares and merchandise and rendering of services shall in no event include the operation of a bank or finance business (except such finance business as may be owned and operated by Tenant or its subsidiary, for the financing of Tenant's own business operations), beauty parlor, barber shop, insurance business (except such insurance business as may be owned and operated by Tenant or its subsidiary), real-estate rental and sales business, medical office or center, dental office, restaurant (Tenant to have the right to operate a snack bar), or grocery and meat business. Tenant further covenants and agrees that for a period of not less than twenty-five (25) years from and after the date of the completion of the construction of the department-store building provided for in Paragraph (1) of Article 3 of this lease, it will continuously maintain and operate such a department store (as in this lease specified and limited) on the demised premises, except when such department-store building is untenantable by reason of damage by fire or other unavoidable casualty or when such department store (as in this lease specified and limited) is prevented from being maintained and operated during periods of construction, repair or replacement and periods occasioned by acts of governmental authority, strikes and labor disputes.

3

Tenant further covenants and agrees that at no time during the term of this lease, will it maintain, use or operate, or permit or suffer the maintenance, use or operation (whether by itself or by subtenants, sublessees or concessionaires, *go, see (all introduced)* or otherwise) of more than eighty-five thousand (85,000) square feet in the aggregate of inside building space of the department-store building at any time located on the demised premises as selling space (meaning the space provided for the selling of permitted goods, wares and merchandise, ~~and rendering of permitted services~~), all of which said space shall be delineated and set forth on the Plans and Specifications, EXHIBIT C, hereinafter provided for. In the event the demised premises shall not be used for the maintenance and operation of a department store (as in this lease specified and limited) for a period of sixty (60) consecutive days (excluding such periods when said department-store building is untenantable by reason of damage by fire or other unavoidable cause, or when said department store is prevented from being maintained and operated during periods of construction, repair or replacement, and periods occasioned by acts of governmental authority, strikes and labor disputes), or in the event Tenant (either by itself or by subtenants, lessees or concessionaires) shall at any time maintain, use or operate or permit or suffer the maintenance, use or oper- *go, see (as amended there) /* ation of more than eighty-five thousand (85,000) square feet in the aggregate of inside building space as selling space as in this lease provided, then in either of such events, Landlord shall have the right, at its option, to terminate this lease in the following manner, to wit:

(a) Landlord shall notify Tenant, in writing, of its election to terminate, and said notice shall set forth which of the above covenants has been breached.

(b) Tenant shall have the right to cure any such default within a period of ninety (90) days from and after the date of said Landlord's notice of election, except as hereinafter provided.

4

(c)  If Tenant shall fail to cure any such default within the period of said ninety (90) days, as aforesaid, then and in such event upon the expiration of said ninety (90) day period this lease shall terminate, and from and after such date Tenant shallhave no further rights thereunder.

(d)  If Tenant shall have cured any of such defaults, as aforesaid, on two separate and different occasions, then and thereafter in the event of the occurrence of any further such default, Landlord shall have the right, at its option, to terminate this lease by the giving of thirty (30) days' notice in writing to such effect to Tenant and Tenant shall not have the right to cure such default.

## Article 2

### Rental

Tenant covenants and agrees to pay to Landlord at its office in Omaha, Nebraska, or at such other place as Landlord may from time to time designate, in writing, in lawful money of the United States by way of rent for said premises, the following amounts of money, to wit:

(1)  Twelve Thousand Six Hundred Sixty-six and 66/100 Dollars ($12,666.66) per annum for the four (4) year period beginning August 1, 1958 and ending July 31, 1962, and Thirteen Thousand Three Hundred Thirty-three and 33/100 Dollars ($13,333.33) per annum for the six (6) year period beginning August 1, 1962 and ending July 31, 1969, all payable in annual installments in advance on the 1st day of August of each year; and

(2)  Fifteen Thousand Dollars ($15,000.00) per annum for the ten (10) year period beginning August 1, 1969 and ending July 31, 1979, payable in annual installments in advance on the 1st day of August of each year; and

(3)  Twenty Thousand Dollars ($20,000.00) per annum for the

5

ten (10) year period beginning August 1, 1979 and ending
July 31, 1989, payable in annual installments in advance on
the 1st day of August of each year.

(4)  For the ten (10) year period beginning August 1, 1989
and ending July 31, 1999, an annual rental equal to two-thirds
(2/3) of that percentage of **Thirty** Thousand Dollars ($30,000.00)
which the C. P. index number, as hereinafter defined, for the
calendar year 1988 bears to the said C. P. Index number for the
calendar year 1954; provided, always, that the annual rental
for this period shall **not be less** than two-thirds (2/3) of
Thirty Thousand Dollars ($30,000.00), nor more than two-thirds
of Forty Thousand Dollars ($40,000.00). Said rental shall be
payable in annual installments in advance on the 1st day of
August of each year.

(5)  For the ten (10) year period beginning August 1, 1999
and ending July 31, 2009, an annual rental equal to two-thirds
(2/3) of that percentage of Thirty Thousand Dollars ($30,000.00)
which said C. P. Index number for the calendar year 1998 bears
to the said C. P. Index number for the calendar year 1954; pro-
vided, always, that the annual rental for this period shall not
be less than two-thirds (2/3) of Thirty Thousand Dollars
($30,000.00), nor more than two-thirds (2/3) of Fifty Thousand
Dollars ($50,000.00). Said rental shall be payable in annual
installments in advance on the 1st day of August of each year.

(6)  For the ten (10) year period beginning August 1, 2009
and ending July 31, 2019, an annual rental equal to two-thirds
(2/3) of that percentage of Thirty Thousand Dollars ($30,000.00)
which the said C. P. Index number for the calendar year 2008
bears to the said C. P. Index number for the calendar year 1954;
provided, always, that the annual rental for this period shall
not be less than two-thirds (2/3) of Thirty Thousand Dollars
($30,000.00), nor more than two-thirds (2/3) of Fifty Thousand
Dollars ($50,000.00). Said rental shall be payable in annual
installments in advance on the 1st day of August of each year.

(7) For the ten (10) year period beginning August 1, 2019 and ending July 31, 2029, an annual rental equal to two-thirds (2/3) of that percentage of Thirty Thousand Dollars ($30,000.00) which the said C. P. Index number for the calendar year 2018 bears to the said C. P. Index number for the calendar year 1954; provided, always, that the annual rental for this period shall not be less than two-thirds (2/3) of Thirty Thousand Dollars ($30,000.00), nor more than two-thirds (2/3) of Fifty Thousand Dollars ($50,000.00). Said rental shall be payable in annual installments in advance on the 1st day of August of each year.

(8) For the ten (10) year period beginning August 1, 2029 and ending July 31, 2039, an annual rental equal to two-thirds (2/3) of that percentage of Thirty Thousand Dollars ($30,000.00) which the said C. P. Index number for the calendar year 2028 bears to the said C. P. Index number for the calendar year 1954; provided, always, that the annual rental for this period shall not be less than two-thirds (2/3) of Thirty Thousand Dollars ($30,000.00), nor more than two-thirds of Fifty Thousand Dollars ($50,000.00). Said rental shall be payable in annual installments in advance on the 1st day of August of each year.

(9) For the fourteen (14) year period beginning August 1, 2039 and ending July 31, 2053, an annual rental equal to two-thirds (2/3) of that percentage of Thirty Thousand Dollars ($30,000.00) which the said C. P. Index number for the calendar year 2038 bears to the said C. P. Index number for the calendar year 1954; provided, always, that the annual rental for this period shall not be less than two-thirds (2/3) of Thirty Thousand Dollars ($30,000.00), nor more than two-thirds (2/3) of Fifty Thousand Dollars ($50,000.00). Said rental shall be payable in annual installments in advance on the 1st day of August of each year.

In making the computations provided for in Paragraphs (1) to (9), above, the following shall apply:

7

(a) – The words "C. P. Index" whenever used in this lease means that Index which is and is expected to be determined and published b. the Bureau of Labor Statistics of the United States Department of Labor and whose complete name is, "Index of Change in Prices of Goods and Services Purchased by City Wage-Earner and Clerical-Worker Families to Maintain their Level of Living" as revised in January 1953, with the years 1947, 1948 and 1949 as the base period of the Index, with the Index number for the average of said three (3) years as 100. In the event that the base period for calculating the C. P. Index is changed, with years other than 1947-1949 to equal 100, then the C. P. Index as used herein shall be changed in relation to the new basis for determining the C. P. Index. The C. P. Index for any calendar year shall be the average for the twelve (12) months of that year, unless a C. P. Index for that calendar year be published.

(b) The annual rental to be paid by Tenant for each period shall be two-thirds (2/3) of the resulting sum computed and limited as follows:

   1. Multiplying Thirty Thousand Dollars (±30,000.±) by a fraction of which the C. P. Index number for the calendar year preceding the beginning of the period for which the computation is being made is the numerator and the C. P. Index number for the calendar year 1954 is the denominator; provided

   2. If two-thirds (2/3) of the resulting sum is less than two-thirds (2/3) of the sum of Thirty Thousand Dollars (±30,000.00), then the annual rental for that period shall be two-thirds (2/3) of the sum of Thirty Thousand Dollars (±30,000.00) and not the resulting sum; and provided, further,

   3. That if two-thirds (2/3) of the resulting sum is greater than two-thirds (2/3) of the sum of Forty Thousand Dollars (±40,000.00) for the ten (10) year period beginning August 1, 1989 and ending July 31, 1999, then the annual rental for that period shall be two-thirds (2/3) of the sum of Forty Thousand Dollars (±40,000.00) and not two-thirds (2/3) of the resulting sum, and provided, further,

   4. That if two-thirds (2/3) of the resulting sum is greater than two-thirds (2/3) of the sum of Fifty Thousand Dollars (±50,000.00) for any period beginning on or after August 1, 1999, then the annual rental for any such period for which the resulting sum is greater than two-thirds (2/3) of the sum of Fifty Thousand Dollars (±50,000.00) shall be two-thirds of the sum of Fifty Thousand Dollars (±50,000.00) and not two-thirds (2/3) of the resulting sum.

(c) In the event that the United States Bureau of Labor Statistics does not publish a C. P. Index at the time when the use of such Index to determine the rental is required, the "Revised Wholesale Price Index" published by the United States Department of Labor shall be used in the same manner as an alternative. In the event that neither the C. P. Index nor the Revised Wholesale Price Index is being published at such time, the index setting forth the Purchasing Power of the Dollar based on wholesale prices and published by the United States Department of Commerce, Office of Business Economics, shall be used in the same manner

8

and for such purpose. In the event that no one of these indices is being published at such time, some other standard of measuring the value of the dollar then available shall be used to determine the rental, and if Landlord and Tenant are unable to agree on such standard the rental for the ensuing period shall be determined by arbitration. The arbitrators are to base their determination on the relative purchasing power of the dollar during the calendar year 1954 to the purchasing power of the dollar in the calendar year preceding the beginning of the period for which the rental is being determined by arbitration. Such arbitration shall be held under the auspices of and in accordance with the laws, rules and regulations, then obtaining, of the American Arbitration Association. Landlord and Tenant agree to be bound by each and every provision of such laws, rules and regulations with respect to the institution of arbitration proceedings, the selection of arbitrators, the conduct of the proceedings, etc., and to abide by the determination so made. If arbitration through the American Arbitration Association is not then possible, arbitration shall be had through arbitrators selected in the manner provided for in Article 10 hereof. However, in no event shall the annual rental for any period beginning on or after August 1, 1989 be less than two-thirds (2/3) of the sum of Thirty Thousand Dollars ($30,000.00) per year, nor more than two-thirds (2/3) of the sum of Forty Thousand Dollars ($40,000.00) per year for the period beginning August 1, 1989 and ending July 31, 1999, and no more than two-thirds (2/3) of the sum of Fifty Thousand Dollars ($50,000.00) per year for any period beginning on or after August 1, 1999. The expenses involved in any arbitration or appraisal shall be borne equally by Landlord and Tenant.

## Article 3

### Construction, Repairs, Maintenance and Use of Buildings and Parking Areas

(1)  As a further consideration for the granting of this lease, Tenant hereby agrees that it will with all reasonable diligence (taking into account any delays occasioned by strikes or other causes beyond its control) and in all events within five (5) years from the date of this lease and at Tenant's sole cost and expense, complete or cause to be completed, subject to the conditions hereinafter set forth, the erection and construction on the demised premises of a department-store building of three (3) stories in height and containing not more than one hundred ninety thousand (190,000) square feet and not less than one hundred seventy-five thousand (175,000) square feet of inside building space, parking areas, a permanent garden area not to exceed five thousand (5,000) square feet in area, and an automobile service station which shall not be more than one (1) story in height and shall not exceed more than eight thousand (8,000) square feet in area, all in accordance with the Plans and

9

Specifications therefor referred to and provided for in Paragraph (2) of Article 3 of this lease and the Plot Plan, EXHIBIT D, referred to and provided for in Paragraph (4) of Article 3 of this lease.

(2) All of the Plans and Specifications for the department-store building, service station, garden area and parking areas provided for in Paragraph (1) of Article 3 of this lease shall be prepared by Tenant and at its cost and expense, and such Plans and Specifications shall be submitted by Tenant to Landlord for Landlord's approval, and when approved by Landlord shall be attached to this lease, marked EXHIBIT C, and by specific reference herein made a part hereof; it being the specific understanding and agreement of the parties hereto that Tenant shall in all events first obtain written approval of said Plans and Specifications, EXHIBIT C, from Landlord before commencement of any construction of any building, service station, garden area or parking areas on the demised premises.

(3) Tenant agrees that if it fails to complete the erection and construction of the department-store building and the parking areas provided for in Paragraph (1) of Article 3 of this lease, within five (5) years from the date of this lease, it will immediately upon the expiration of said five (5) year period, pay to Landlord in addition to the rents and all other charges provided by this lease, the sum of Five Hundred Thousand Dollars ($500,000.00) which said sum at the election of Landlord shall be payable either in a lump sum or in equal monthly installments, without interest, over a period of five (5) or ten (10) years, as liquidated damages, it being recognized by the parties hereto that the amount of the damages to Landlord caused by such failure on the part of Tenant cannot be readily or definitely ascertained. Payment by Tenant and the receipt and acceptance by Landlord of the said sum of Five Hundred Thousand Dollars ($500,000.00) shall not affect Landlord's right of termination or any other rights or remedies of Landlord allowed by law or which Landlord may have under any other provision of this lease, except only that if Landlord shall desire to terminate this lease because of Tenant's failure to complete the erection and construction of the department-store building and parking areas within five

10

(5) years from the date of this lease, Landlord shall give notice to Tenant of Landlord's election to terminate within one hundred twenty (120) days from and after the expiration of said five(5) year period. The aforesaid period of five (5) years shall be extended for loss of time resulting from strikes or governmental restrictions.

(4) The parties hereto understand that it is desirable that the premises demised by the Major Lease be ultimately developed into a shopping center, and that by reason thereof they have prepared and developed a master plan locating all ground areas and delineating the dimensions thereof within which buildings, parking areas and other improvements, including the department-store building, parking areas and other improvements, specified in Paragraphs (1) and (13) of Article 3 of this lease to be constructed and maintained by Tenant on the Sears' Tract, may be constructed and maintained. The parties hereto have identified said master plan by their respective signatures which said master plan, marked EXHIBIT D, is attached hereto and by specific reference herein made a part hereof, said master plan being herein referred to as "Plot Plan." Each of the parties hereto agrees that it will not, without the prior written consent of the other, construct or maintain, cause to be constructed or maintained or permit or suffer the construction or maintenance of any building, parking area or other improvements not in conformity with said Plot Plan, EXHIBIT D.

(5) Landlord agrees that at no time during the term of this lease, will it maintain, use or operate, or permit or suffer the maintenance, use or operation (whether by itself or subtenants, sublessees or concessionaires) of more than two hundred ten thousand (210,000) square feet in the aggregate of inside building space of any buildings that may be constructed and maintained by Landlord on the Brandeis Tract, as selling space. Tenant agrees that it will not construct or maintain or permit or suffer the construction or maintenance on the demised premises, buildings or other improvements except those specified in Paragraphs (1) and (13) of Article 3 of this lease.

11

(6) Tenant may, at its option and at its sole cost and expense, at any time during the term of this lease, provided, however, that Tenant shall not be in default of any of the covenants and agreements to be performed by Tenant hereunder at such time, alter or remodel the exterior of the building and improvements to be constructed by Tenant under the provisions of Paragraph (1) of Article 3 of this lease, or any of them, provided, however, that rior to the commencement of any such alteration or remodeling, Tenant shall have prepared, at its cost and expense, by a recognized architect, Plans and Specifications therefor, which said Plans and Specifications shall be submitted to Landlord for its approval, Landlord agreeing in this respect not to unreasonably withhold such approval, and provided, further, that said Plans and Specifications shall in all respects conform to all provisions of this lease, including, but not in limitation of the foregoing, the Plot Plan, EXHIBIT D, and the minimum and maximum size and area limitations provided for in Paragraph (1) of Article 3.

(7) Tenant agrees that it will, at its own cost and expense, keep and maintain or cause to be kept and maintained, all buildings and other improvements (except such improvements as Landlord is required to maintain under the provisions of Article 4 of this lease) located on the demised premises and all additions and all appurtenances (which shall include all streets, parking areas, alleys, sidewalks and all improved public areas other than buildings) and each and every part thereof in first-class, orderly, secure, safe, clean and sanitary condition and repair. Tenant agrees that with respect to the foregoing, it will at all times conform in all matters and things with every law and every regulation, order and requirement of any governmental or public authority whatsoever, and will hold and save Landlord free and harmless of all expenses including attorney fees and liability or claim of liability therefor of every kind, character and description.

(8) At any time after the expiration of twenty-five (25) years

12

from the date of the completion of the construction of the
department-store building provided for by Paragraph (1) of
Article 3 of this lease, Tenant shall have the right, provided,
however, that Tenant shall not at such time be in default of any
of the covenan s and agreements to be performed by Tenant under
this lease, to tear down or remove the department-store building
then on the demised premises; provided and on condition, however,
that Tenant shall and Tenant agrees that it will immediately
thereafter with all reasonable diligence (except delays occa-
sioned by strikes or other causes beyond its control), and at
its cost and expense, construct, complete or cause to be completed
the erection and construction on the demised premises, in place
and instead of the torn own and removed building, a building of
the same dimensions and type of construction as that torn down and
removed, and at least equal to the value of that torn down and
removed, and in all events in accordance with the Plot Plan,
EXHIBIT D, and in an attractive and harmonious architectural design
consistent with any buildings and other improvements which may be
then located on the Brandeis Tract.  Tenant hereby agrees to submit
to Landlord for approval all the plans and specifications for the
replacement of the torn down and removed building prior to the
commencement of such replacement.  Landlord agrees that approval
of the Plans and Specifications for such replacement as requested
by Tenant shall not be unreasonably withheld.  Tenant agrees that
if it fails to complete the erection and construction of a build-
ing in place and in stead of the torn down and removed building
in the manner aforesaid, within three (3) years from and after
said tearing down and removal, that it will immediately upon the
expiration of said three-year period pay to Landlord in addition
to the rents and all other charges provided by this lease, the
least of the following amounts:  Five Hundred Thousand Dollars
($500,000.00) or the aggregate of the rentals, taxes, charges, etc.
payable under this lease and accruing from and after the date of
said tearing down and removal for the remainder of the term of this

13

lease (in making said computation the annual rentals shall be the
sum of Twenty Thousand Dollars ($20,000.0), and the annual taxes
shall be the amount of those assessed on the land for the year
immediately preceding the year during which said tearing down and
removal occurred), or the appraised value of the building torn down
and removed immediately prior to such tearing down and removal, as
liquidated damages, it being recognized by the parties hereto
that the amount of the damages to the Landlord caused by such
failure on the part of Tenant cannot be readily or definitely ascer-
tained. Payment by Tenant and the receipt and acceptance by Land-
lord of the lease of said amounts, as aforesaid, shall not affect
Landlord's right of termination or any other rights or remedies
of Landlord allowed by law or which Landlord may have under any
other provisions of this lease, and this lease from and after
said payment and all of the provisions thereof shall continue
and be and remain in full force and effect, except only that if
Landlord shall desire to terminate this lease because of Tenant's
failure to complete the erection and construction of a building in
place and in stead of the torn-down and removed building, in the
manner aforesaid, within said three (3) year period, Landlord shall
give notice to Tenant of Landlord's election to terminate within one
hundred twenty (120) days from and after the expiration of said
three (3) year period. All sums payable under this paragraph of
Article 3 shall, at the election of Landlord, be payable either in
a lump sum or in equal monthly installments, without interest, over
a period of five (5) or ten (10) years.

(9)   Nothing herein contained in this Article 3 of this lease
shall in any manner restrict the right to Tenant to alter, remodel
or change the interior of any buildings or improvements placed upon
the demised premises without first obtaining written approval
therefor from Landlord.

(10)   Tenant agrees, at its sole cost and expense except as
hereinafter provided, to level and finish grade the entire premises
demised by the Major Lease (including the Brandeis Tract) in a
manner and according to the Plans and Specifications prepared by
the Leo A. Daly Company, such leveling and grading to commence

14

within thirty (30) days from the date of execution of this lease
and thereafter to be continued and pursued with reasonable dili-
gence (except delays occasioned by strikes or other causes beyond
Tenant's control), the cost and expense of such leveling and
grading to be approved in writing by Landlord prior to the commence-
ment of any work in connection therewith.  The acceptance of a bid
from a Contractor or Contractors for such work by Tenant shall be
deemed the commencement of such work.  In the event that the cost
and expense of such leveling and grading of the entire premises
demised by the Major Lease shall exceed the sum of $ 24,127.00
(the parties hereto agreeing that the Leo A. Daly Company shall
determine the cost and expense of such leveling and grading),
then and in such event, Landlord agrees to pay to Tenant on or
before the expiration of _____ 30 _____ days from and after the date
of the rendering, after the completion of said leveling and grad-
ing, of a certified statement prepared by the Leo A. Daly Company
setting forth the cost and expense of such leveling and grading
as aforesaid, _____ 70 _____ percent of the amount in excess of the
sum of $ 24,127.00.

(11)  It is understood and agreed between the parties hereto
that no contractor or subcontractor, materialmen, mechanics or
laborers shall have the right to file or claim any Mechanic's Lien
against the fee title interest of the premises demised by the
Major Lease or against the respective leasehold interests of both
Tenant and Landlord, or upon any building or improvement to be
constructed on the premises demised by this lease, by Tenant, by
reason of furnishing material or performing labor or services,
and notice is hereby given that no contractor or subcontractor
or anyone else who may furnish any material, service or labor
for any building or improvement, or any part thereof, to be con-
structed on the premises demised by this lease shall at any time
be or become entitled to any lien whatsoever thereon.

(12)  Tenant agrees that in excavating for and in construction
of any building or improvements on the premises demised by this

15

lease, it will conform to and observe all laws, rules and regula-
tions relating to such excavation and construction, and at all
times have and keep the Landlord and the premises demised by
this lease free and the Lessor under the Major Lease discharged
of any liability in favor of the owners of adjoining premises
or any other person or persons on account of such excavation
or construction.

(13)  Landlord agrees, at its cost and expense, to pave
with concrete, stripe, fixture and install lights on a parking
area consisting of approximately seven (7) acres, located along
and abutting Dodge Street and extending from the East boundary
line of the premises demised by this lease to the East boundary
line of the premises demised by the Major Lease, the said parking
area being more particularly delineated and shown on the Plan
attached hereto and marked EXHIBIT E, and by specifid reference
herein made a part hereof.  Landlord agrees to complete such pav-
ing, marking, fixturing and lighting of said parking area simul-
taneously with or prior to the completion of the erection and
construction of the buildings and improvements to be made by Tenant
in accordance with the provisions of Paragraph (1) of Article 3
of this lease.  Tenant agrees at its cost and expense to pave
with concrete, stripe, fixture and install lights on the parking
areas to be constructed by it upon the demised premises, simul-
taneously with or prior to the completion of the erection and
construction of the buildings and improvements to be made by
Tenant in accordance with the provisions of Paragraph (1) of
Article 3 of this lease.

(14)  As set forth hereinabove, the parties desire to ulti-
mately develop the premises demised by the Major Lease as a shop-
ping center, but the parties hereto understand and agree that the
construction of only the buildings and improvements provided for
in Paragraphs (1) and (13) of Article 3 of this lease is contem-
plated at this time, and that the construction of any buildings
and improvements on the Brandeis Tract (if any) other than those

16

provided for in said Paragraph (13) of Article 3 shall be left
to the sole discretion of Landlord in all respects, except if
and when Landlord constructs any building or buildings or any
improvement or improvements on the Brandeis Tract, such construc-
tion will be made within the area provided therefor as shown on
the Plot Plan, EXHIBIT D.

(15)   The parties hereto recognize that it is necessary at
this time to make provision for, locate, construct and install
below the surface of the premises demised by this lease, all
necessary and requisite pipes and all other installations, for
the construction and installation of a sanitary sewer and a
storm sewer, which shall be of sufficient capacity so as to
provide adequate and sufficient sanitary sewer and storm sewer
services for the entire premises demised by the Major Lease,
including but not in limitation of the foregoing, adequate and
sufficient sanitary sewer and storm sewer services for all the
buildings and improvements that may be constructed on the premises
demised by the Major Lease.   Tenant agrees, at its cost and ex-
pense, to have prepared by its Architect prior to the commence-
ment of the construction and improvements to be constructed by
Tenant under the provisions of Paragraph (1) of Article 3 of this
lease, all the Plans and Specifications for the installation and
construction of the storm sewer and the sanitary sewer, which
said Plans and Specifications shall be approved in writing by Land-
lord before the commencement of any such installation or construc-
tion, and when so approved shall be attached hereto, marked EX-
HIBIT F, and by specific reference herein made a part hereof.
Tenant agrees on or before the commencement of the construction
of the buildings and improvements provided for under the provi-
sions of Paragraphs (1) and (13) of Article 3 of this lease, or
simultaneously therewith, to install and construct below the sur-
face of the premises demised by the Major Lease, at its cost and
expense (subject to partial reimbursement by Landlord as herein-
after set forth) and in accordance with the Plans and Specifications

17

set forth in EXHIBIT F, all the necessary and requisite pipes and all other installations necessary and requisite for the construction and installation of said sanitary sewer and the storm sewer. Landlord shall have the right, at all times and at any time during the term of this lease and in any manner, to make and maintain connections with the storm sewer and the sanitary sewer to be thus constructed and installed by Tenant for the purpose of making such storm sewer and sanitary sewer services available to the Brandeis Tract, the cost and expense of such connections and the cost and expense of any and all necessary and requisite additional construction to be made on the Brandeis Tract therefor to be paid by Landlord. On or before the expiration of __30__ days from and after the date of the making of such connections as aforesaid, Landlord agrees to pay to Tenant one-half (1/2) of the net amount of the cost and expense incurred and/or expended by Tenant for construction of that part of the sanitary sewer extending from the point where said sanitary sewer crosses or intersects the East boundary line of the Sears' Tract to the source of disposal (the net amount of such cost and expense to be determined by the Leo A. Daly Company) and one-half (1/2) of the net amount of the cost and expense expended and/or incurred by Tenant for construction of that part of the storm sewer extending from the point where said storm sewer crosses or intersects the East boundary line of the Sears' Tract on the South side of the Brandeis Tract to the source of disposal (the net amount of such cost and expense to be determined by the Leo A. Daly Company). Prior to the time of making of connections by Landlord with the said storm sewer and the said sanitary sewer, Tenant shall, at its cost and expense, make all necessary repairs to and replacements of such sanitary sewer and storm sewer installations. From and after the time that connections shall be made by Landlord with the said storm sewer and the said sanitary sewer, the parties hereto shall each be required, and each party agrees to make all necessary repairs to and replacements of such sanitary sewer and storm sewer installations located

18

upon its respective Tract, that is to say, Landlord shall make
all the repairs and replacements to that part of the sanitary
sewer and storm sewer located on the Brandeis Tract, and Tenant
shall make all repairs and replacements to that part of the sani-
tary sewer and storm sewer located on the Sears' Tract, and all
repairs to and replacements of that part of the sanitary sewer
constructed and installed by Tenant which extends from the West
line of the Sears' Tract to the source of disposal shall be made
by Tenant, and the cost and expense therefor shall be borne
equally by the parties hereto.

Tenant agrees to construct and install, at its cost
and expense, and below the surface of the premises demised by
this lease, all necessary and requisite pipes, conduits and other
underground installations for water, gas, electricity, electric
power, telephone and all other utilities and services that it may
deem necessary or requisite for its use, and the necessary cables
and wires therefor, and Tenant agrees, at its cost and expense,
to make all repairs to and replacements of such installations.

(16)  Prior to the time that Landlord shall need the premises
hereinafter described for its use or for the use of any of its
tenants or sublessees, Tenant shall have the right to use for
parking purposes only, in connection with its retail-store operation
on the premises demised by this lease, the premises located on the
Brandeis Tract, described and delineated on the plans marked
EXHIBIT G, which said plans shall be prepared at the cost and
expense, and by the architect of Tenant, and when approved in
writing by Landlord, shall by specific reference herein become a
part hereof; provided, however, that such use by Tenant and the
paving thereof, which shall be only with asphalt, by Tenant and
at Tenant's cost and expense, shall not be commenced until Landlord
shall have approved said Plans and Specifications, as aforesaid.
In this connection, it is further agreed that Landlord shall have
the right any time that it desires to install and construct any
building or buildings or any improvement or improvements on the

19

Brandeis Tract, to notify Tenant of its desire so to do, and
Tenant agrees that it will, if directed in said notice (on or
before the expiration of ninety (90) days from and after the date
of said notice, and at its cost and expense), remove, dismantle
and raze any and all of the pavement placed by Tenant on the
premises described and delineated on EXHIBIT G.

(17)  Up to and including the time when Landlord shall com-
plete the construction of a building on the Brandeis Tract, to be
used for a complete and integrated retail department-store oper-
ation (excluding thereby any retail operation other than a complete
and integrated department-store business), and until same or any
portion thereof shall become occupied for such purpose, Landlord
and Tenant each hereby covenant and agree with the other as follows:

(a)  Tenant shall under its exclusive supervision and
direction, maintain, clean, repair, replace (which shall in-
clude the replacement of light fixtures, paving, curbing,
sidewalks, streets, landscaping, drainage and the like),
remove debris, ice and snow, plant and cultivate shrubbery,
inspect, and and keep lighted all of the parking areas,
sidewalks, alleys, streets and other public areas (not includ-
ing buildings), whether improved or unimproved located on the
premises demised by the Major Lease, all at the cost and ex-
pense of Tenant; subject, however, to the provisions of said sub-
paragraph (f)  of Paragraph (17) of Article 3 of this lease.

(b)  Tenant agrees at all times to protect, indemnify
and save Landlord's title and estate in the demised premises
and Landlord from and against any and all penalties, fines,
charges, costs, expenses, reasonable attorney fees, and
liability or loss of any and every kind and character that
may result to Landlord in any manner and at any time arising
out of or resulting from or on account of any act or omission
of Tenant out of any accident causing injury to any person
whomsoever and whatever or any damages to property of every
kind, character and description, due directly or indirectly

20

to the use of all or any part of the premises demised by
the Major Lease by Tenant or by any of its sublessees or sub-
tenants or any agent, employee or customer of Tenant or any
of its sublessees or subtenants, or due directly or indirectly
to the operation and conduct of any business of Tenant or of
any of its sublessees or subtenants, or due directly or in-
directly from any cause whatsoever.

(c)  Tenant agrees to pay before they become delinquent
any and all taxes that may be levied and assessed against or
to the improvements made pursuant to the provisions of Para-
graphs (13) and (16) of this Article 3 of this lease, in addi-
tion to the taxes provided for in Article 11 of this lease.

(d)  Landlord shall, at its cost and expense, maintain
the unpaved and unimproved portions of the Brandeis Tract
in a clean condition, "clean condition" to mean and be limited
to the removing of debris and the cutting of weeds if required
by any ordinance of the City of Omaha made and provided therefor.

(e)  Tenant shall have the right, power and authority to
compile and promulgate and thereafter change or modify all
rules and regulations which it may, in its sole discretion,
deem necessary for the common use of the parking areas, side-
walks, alleys, streets and other public areas (not including
buildings) by Tenant and by its customers, officers, agents
and employees and tenants and sublessees of Landlord and their
respective customers, officers, agents and employees, if any.
Copies of all such rules and regulations and any changes or
modifications thereof shall be delivered to tenants and sub-
lessees of Landlord.

(f)  In the event that Landlord shall construct and lease
for occupation by tenants or sublessees on the Brandeis Tract,
a building or buildings to be used for purposes other than the
operation of a complete and integrated retail department store
as hereinabove defined, then in such event, such tenants or
sublessees of Landlord shall pay to Tenant their respective

21

proportionate shares of the cost and expense of maintaining, operating and supervising all of the parking areas, sidewalks, alleys, streets and other public areas (not including buildings), expended or incurred by Tenant under the provisions of this Paragraph (17) of Article 3 of this lease. At the end of each lease year (the lease year for such purpose to begin on August 1st of one year and end on July 31st of the succeeding year), Tenant shall calculate the actual amount of all costs and expenses that have been expended and/or incurred by Tenant with respect to such supervision, direction and maintenance, as aforesaid, for such lease year, and shall thereafter render to Landlord an invoice for Landlord's proportionate share thereof, which invoice shall include a tabulation of all costs and expenses expended and/or incurred by Tenant therefor for such lease year (or for such shorter initial period). The proportionate share allocable to Landlord shall be an amount equal to the resulting sum obtained by multiplying the total of such costs and expenses by the ratio by which the total square feet of enclosed building space located on the Brandeis Tract bears to the total square feet of similar enclosed building space located on all of the premises demised by the Major Lease, provided, however, that in calculating the total square feet of enclosed building space, as aforesaid, all space occupied by public meeting halls shall be excluded therefrom, and Landlord shall pay its proportionate share, as aforesaid, on or before the expiration of fifteen (15) days from and after the rendering of said invoice by Tenant to Landlord.

(18) Landlord agrees that from and after the giving of notice to Tenant of its intention to construct a building on the Brandeis Tract, it will thereafter use its best efforts to complete such construction (except for delays occasioned by strikes or other causes beyond its control) as expeditiously as possible. Toward that end, Landlord after giving such notice to Tenant, shall make diligent

effort for the occupancy of said building and/or to enter into a
lease or leases upon all or a portion thereof with a tenant or
tenants for such period or periods of time and upon such rent or
rentals as Landlord, in its sole discretion, may deem proper and
expedient, it being understood and agreed that such building and
any and all other buildings or improvements that may be constructed
by Landlord on the Brandeis Tract may be used for any purposes what-
soever, and especially for, but not in limitation of the foregoing,
any purpose or use as may be reasonably expected to be a part of
a shopping center or necessary for the promotion of a retail shop-
ping and trading area; save and except that in no instance (re-
strictions therefor to be incorporated in all leases) shall any
building or improvements constructed on the Brandeis Tract be used
primarily for manufacturing or warehousing (excluding the ware-
housing of such goods, wares and merchandise in any retail loca-
tion where the primary purpose is to conduct a retail business
for the sale of goods, wares and merchandise) or agricultural pur-
poses.  The term "agricultural purposes" as used herein shall not
include the operation of a retail business for the sale of seeds,
plants, flowers, trees, garden tools, fixtures and similar products.

(19)  All buildings and improvements located on the premises
demised by this lease, when constructed and erected, shall become
a part of the real estate demised by the Major Lease, to be held
as security for the performance of Landlord's obligations under
the Major Lease and Tenant's obligations under this lease.

### Article 4

### Supervision of Public Areas

After the completion of the construction of a complete and
integrated retail department store building on the Brandeis Tract
and the commencement of occupancy thereof for such purpose, the
provisions of Paragraph (17) of Article 3 of this lease shall
terminate and cease to be in force and effect, and Landlord and
Tenant, for the remainder of the term of this lease, each hereby

23.

covenants and agrees with the other as follows:

(1)  Landlord shall under its exclusive supervision and
direction, maintain, clean, repair, replace (which shall include
the replacement of light fixtures, paving, curbing, sidewalks,
streets,landscaping, drainage and the like), remove debris, ice and
snow, plant and cultivate shrubbery, inspect, paint and keep lighted
all of the parking areas, sidewalks, alleys, streets and other public
areas (not including buildings), whether improved or unimproved,
located on the premises demised by the Major Lease, regardless of
whether or not same shall have been constructed by Tenant or Land-
lord, and all costs and expenses therefor shall first be paid by
Landlord, subject, however, to reimbursement from Tenant of Tenant's
proportionate share thereof, all as hereinafter provided.

(2)  Landlord shall have the right, power and authority to
compile and promulgate and thereafter change or modify all rules
and regulations which it may, in its sole discretion deem neces-
sary for the common use of the parking areas, sidewalks, alleys,
streets and other public areas (not including buildings) by Land-
lord and Tenant,by their respective tenants and sublessees and by
their respective customers, officers, agents and employees and the
respective customers, agents, officers and employees of their re-
spective tenants and sublessees, provided that such rules and regu-
lations so promulgated by Landlord shall be reasonable and not
interfere with Tenant's right of ingress and egress, to all of
which said rules and regulations Tenant for itself and for its
tenants and sublessees and its customers, agents and employees and
the customers, agents and employees of its tenants and sublessees
agree to continuously abide by and comply with.  Copies of all such
rules and regulations and any changes or modifications thereof shall
be delivered to Tenant.  Said rules and regulations may include,
if Landlord so determines, the designation of special areas for
parking use by Tenant and Landlord and their respective agents and
employees, and their respective tenants and its sublessees, and their
agents and employees; provided, however, that such rules and regulations

24

shall not discriminate against ~~employees of~~ Tenant.  Upon written
request from Landlord, Tenant for itself and its tenants and sub-
lessees will furnish Landlord with the names, automobile license
numbers and make of automobile of all of their respective agents
and employees.  Tenant agrees to abide by all such rules and regu-
lations.

(3)  Landlord and Tenant may, when necessary, by reason of
repairs and replacements temporarily close portions of the parking
areas, sidewalks, alleys, streets and other public areas (not in-
cluding buildings) and such actions shall not constitute an evic-
tion or disturbance of either Landlord's or Tenant's use of said
areas.

(4)  Landlord agrees, at its cost and expense, subject, however,
to reimbursement from Tenant of Tenant's proportionate share thereof
as hereinafter set forth, to obtain and maintain in force and effect
in reliable and solvent insurance companies authorized to carry on
business in the State of Nebraska, policies of insurance as follows:

(a)  Public liability insurance with limits of lia-
bility of not less than $100,000 for death or injury to
one person, and of not less than $500,000 for death of
or injury to more than one person in or resulting from
any one event or accident.

(b)  Property damage insurance with limits of liability
of not less than $100,000 for each claim and an aggregate
annual maximum liability of the insurer of not less than
$200,000.

(c)  All of the foregoing policies of insurance shall
contain provisions insuring Tenant, Landlord and any and
all subtenants and lessees of Landlord against claims for
death of or injury to person or damage to property result-
ing from any accident, collision or event whatsoever occur-
ring in or upon the parking areas, sidewalks, alleys, streets
and other public areas (not including buildings).  Landlord
agrees, from time to time, to furnish Tenant copies of or
certificates evidencing such policies of insurance, to-
gether with copies of receipted invoices, showing that the
premiums therefor have been paid by Landlord.

(5)  Tenant agrees to pay to Landlord, Tenant's proportionate
shares of the cost and expense of maintaining, operating and super-
vising (which shall include premiums for the afore-mentioned insur-
ance) all of the parking areas, sidewalks, alleys, streets and other
public areas (not including buildings) under the provisions of this
Article 4 of this lease (the aggregate of said areas being herein-
after referred to as "public areas") in the manner, at the times,

25

and in the amounts hereinafter set forth. Tenant shall pay in
advance on the 1st day of each month during the entire term of
this lease, Tenant's tentative proportionate share of such costs
and expenses, such payments to commence on the 1st day of the
month during which Landlord undertakes the supervision, direction
and maintenance of said public areas, the amount of such monthly
payment to be determined exclusively by Landlord. At the end of
each lease year (a lease year for such purpose to begin on August
1st of one year and end on July 31st of the next succeeding year),
Landlord shall calculate the actual amount of all costs and ex-
penses that shall have been expended and/or incurred by Landlord
with respect to such supervision, direction and maintenance, as
aforesaid, for such lease year (or for such shorter initial period),
and shall thereafter render to Tenant an invoice for Tenant's propor-
tionate share thereof, which shall include a tabulation of all of
the costs and expenses expended and/or incurred by Landlord there-
for for such lease year and Tenant's proportionate share of such
costs and expenses for each lease year shall be an amount equal to
the resulting sum obtained by multiplying the total of such costs
and expenses by the ratio by which the total square feet of en-
closed building space located on the Sears' Tract (which for this
purpose shall include the space occupied by the automobile ser-
vice station and the garden area, and shall exclude the space
occupied by public meeting halls) bears to the total square feet
of similar enclosed building space, located on all of the premises
demised by the Major Lease. If the amount of Tenant's proportionate
share of such costs and expenses for any lease year is more than
the aggregate total of the monthly payments theretofore paid
therefor by Tenant to Landlord during such lease year, then in
such event, Tenant agrees to pay Landlord on or before the expira-
tion of fifteen (15) days after the receipt of such invoice, the
difference between Tenant's said proportionate share of said costs

26

and expenses and the aggregate total of said monthly payments.
If the amount of Tenant's proportionate share of such costs and
expenses for any lease year is less than the aggregate total of
the monthly payments theretofore paid therefor by Tenant to Land-
lord during such lease year, then in such event, Landlord shall
deliver to Tenant, simultaneously with said invoice, its check
for the difference between Tenant's said proportionate share of
such costs and expenses and the aggregate total of said monthly
payments.  After the first lease year, the tentative monthly pay-
ments to be made by Tenant to Landlord for Tenant's proportionate
share of the costs and expenses that may be expended and/or in-
curred by Landlord for the supervision, direction and maintenance
of the public areas shall be based and calculated on the total of
such costs and expenses expended and/or incurred by Landlord dur-
ing the previous lease year.

<div align="center">

### Article 5

#### Covenants and Representations of
#### Landlord

</div>

(1)  Landlord hereby represents that Landlord is authorized
to enter into this sublease; that the above-mentioned Major Lease,
EXHIBIT A, is in full force and effect and that all of the condi-
tions, covenants and agreements therein required to be fulfilled
by Landlord to the date of this lease have been fully performed
and discharged.  Landlord covenants that it will faithfully and
punctually perform and observe all the covenants and conditions
set forth in said Major Lease to be performed by Landlord herein
during the term thereof, and that if at any time default shall be
made or suffered to be made in the performance or observance of
any of the covenants or conditions of said Major Lease, or any part
thereof, for the period of time and under conditions whereby the
then owner in fee of the premises demised by the Major Lease and
the then lessor thereof, should give Landlord notice (under Sections
8 and 9 on pages 14 and 15 of said Major Lease) of the proposed
termination of said lease, Landlord hereby agrees to give Tenant
written notice of such proposed termination of said Major Lease

at least twenty (20) days prior to the effective date thereof, and Landlord further agrees that if such proposed termination shall become effective, Tenant shall then have no further obligations under this sublease to pay rentals hereunder to Landlord or perform any of the other covenants and agreements herein contained insofar as those covenants and agreements are obligations hereunder to Landlord, but that all rentals due and payable hereunder, from the effective date of such termination of said Major Lease, and all covenants and agreements herein contained to be thereafter performed by Tenant, shall thereafter be payable and performed to the then lessor under said Major Lease, and Tenant agrees that from and after the effective date of such termination of the Major Lease, Landlord shall be completely released and discharged from performance of any and all obligations to be performed by Landlord under this lease and from compliance with any and all of the provisions of this lease. The consent to and acceptance of the terms and provisions of this lease as a sublease of the Major Lease are evidenced by a separate agreement entered into as of this date between Tenant, Landlord and the then lessor under said Major Lease, which agreement is attached hereto, marked EXHIBIT H, and by specific reference herein made a part hereof.  This lease is made upon the express condition that Tenant's peaceable and quiet possession of the herein-demised premises will not be disturbed on account of any termination of the Major Lease, or anything done or caused to be done thereunder, so long as Tenant pays the rentals and performs the covenants and agreements on its part herein contained.

(2)  Landlord hereby represents that it owns good and merchantable title to the leasehold estate derived by virtue of the said Major Lease, and that the same is now and will be at the beginning of the term hereof, free and clear of all encumbrances, mechanics' liens and any liens whatsoever except the liens of current taxes, subject, however, to zoning and subject also to rights of way and easements as shown on the Plat hereto attached, marked EXHIBIT I, and by specific reference herein made a part hereof.  As evidence

of such title, Landlord hereby agrees to furnish to Tenant on
or before the 1st day of August, 1958, an abstract of title certi-
fied within a reasonable time of such date, showing such good
and merchantable title to said leasehold estate in Landlord, free
and clear of any encumbrances, except as above, for examination
by Tenant's counsel, or in the alternative, a title opinion of
counsel for Landlord, addressed to Landlord, and for Landlord's
benefit only, stating that Landlord owns such good and merchant-
able leasehold title.  If, however, either of such opinions
should show that there is any substantial defect or any defects
in such leasehold title, then Tenant shall have the right, within
fifteen (15) days after the rendition of such opinion by Tenant's
counsel, or the receipt of such opinion of Landlord's counsel, to
require Landlord to correct or remove such defect or defects.
Thereafter, Landlord shall have a period of thirty (30) days within
which to commence whatever proceedings might be necessary to cor-
rect such defect or defects and a period of one hundred eighty
(180) days thereafter within which to carry out such corrections
and cure such defect or defects in said leasehold title, and if
such corrections cannot be carried out and such title cured within
one (1) year after the rendition of such opinion by Tenant's
counsel, or the receipt of such opinion of Landlord's counsel,
then and in that event, this lease shall terminate and all rights
of both parties hereto shall cease and determine.

(3)  Landlord covenants that Tenant, on paying the rentals
and performing all of the covenants and agreements herein pro-
vided to be performed by Tenant, shall and may peaceably and
quietly have, hold and enjoy the demised premises for the term
of this lease; subject, however, to all of the rights of Lessor
under the Major Lease and the provisions of Article 9 of this lease.

## Article 6

### Plat or Survey

Landlord agrees promptly to furnish Tenant with a Plat or
Survey of the entire premises demised by the Major Lease prepared
by a licensed surveyor showing the boundary lines and dimensions of

29

the Sears' Tract and the boundary lines and dimensions of the Brandeis
Tract, which said Plat or Survey shall be marked EXHIBIT J, ap-
proved in writing by the parties hereto and by specific reference
herein made a part hereof.

## Article 7

### Zoning

(1)  Landlord represents that the premises described by the
Major Lease have been zoned as follows:

(a)  The North 150 feet thereof lying immediately
South of Cass Street produced (otherwise known as Under-
wood Avenue) as the 4th residence district;

(b)  The next 150 feet immediately adjacent thereto
on the South, being the South 150 feet of the North 300
feet of the entire tract, as the 8th residence district;

(c)  The balance of the tract has been rezoned as
the 2nd commercial district.

(2)  In the event that either Tenant or Landlord shall at any
time desire to file an application with appropriate public authori-
ties requesting a rezoning of said 4th residence district and said
8th residence district or either of them to 2nd commercial dis-
trict, then in such event, the other party, whether Landlord or
Tenant, agrees to join with such applying party in the filing of
such application.

## Article 8

### Covenants by Landlord as to
### Condition of Buildings and
### Improvements on Brandeis Tract

Landlord agrees that it will, at its cost and expense, keep
and maintain or cause to be kept and maintained all buildings and
improvements (except such improvements on the Brandeis Tract as
Tenant is required to maintain under the provisions of Paragraph
(17) of Article 3 of this lease, and except such improvements
located on the Brandeis Tract as Landlord and Tenant are propor-
tionately required to maintain under the provisions of Article 4
of this lease) located on the Brandeis Tract, in first-class,
orderly, secure, safe, clean and sanitary condition and repair.
Landlord agrees that with respect to the foregoing that it will

30

at all times conform on all matters and things with every law, regulation, order and requirement of any governmental or public authority whatsoever. Landlord further agrees that any buildings or improvements that may be constructed on the Brandeis Tract and any remodeling or altering of any such buildings and improvements, shall be constructed and made generally in an attractive and harmonious architectural design and generally consistent with any buildings and other improvements which may then be located on the Sears' Tract.

## Article 9

### Condemnation

(1)  If during the term of this lease the demised premises, or a part thereof, be taken by appropriation to public use under the right of eminent domain, or be conveyed by the parties hereto and the Lessor under the Major Lease to avoid proceedings in appropriation:

(a)  If the award is a single award for the Lessor under the Major Lease and Landlord and Tenant hereunder, the arbitrators chosen pursuant to the provisions of Article 10 hereof, shall make an apportionment as between Landlord and Tenant hereunder, of the balance, if any, of the said single award remaining after deducting therefrom the portion of such single award allocable to the Lessor under the Major Lease pursuant to the provisions of Section 10 of Division III of the Major Lease.

(b)  If the award consists of a separate award for the Lessor under the Major Lease and a separate award jointly for Landlord and Tenant hereunder, the arbitrators chosen pursuant to the provisions of Article 10 hereof shall make an apportionment as between Landlord and Tenant hereunder of the said joint award made to Landlord and Tenant.

(2)  In case of a partial appropriation or conveyance of the demised premises, as aforesaid, this lease shall continue in force and effect and there shall be an abatement of the rent thereafter to be paid in the proportion that the amount of land so appropriated or conveyed bears to the total of the amount of land demised by the Major Lease.

(3)  In the event of the condemnation or taking in fee of a part of that portion of the herein-demised premises on which a department-store building or any portion thereof is located for any public use under the right of eminent domain, and thereafter

31

if Tenant cannot continue the use of the remaining portion of
said department-store building without substantial loss of effi-
ciency or economy in the conduct of its business upon the re-
mainder of such department-store building, then in such event,
Tenant shall have the right at its cost and expense, at any time
thereafter to tear down, remove, remodel and/or replace such
department-store building or relocate same in such place on the
demised premises as Tenant deems desirable and advantageous for
the conduct of its business, notwithstanding the provisions of
Paragraphs (4) and (5) of Article 3 of this lease. Tenant agrees,
in the event of the necessity for remodeling, replacing or relo-
cating such department-store building that it will with all reason-
able diligence (except delays occasioned by strikes or other causes
beyond its control), construct, complete or remodel in place and in
stead of the torn-down and removed department-store building, a
department-store building generally of the same dimensions and
type of construction as that torn down and removed, provided, how-
ever, that the reconstructed department-store building shall in
all events generally conform to the architectural design of any
building or improvement which may then be located on the Brandeis
Tract. With respect to any remodeling or tearing down and removal
of any such department-store building and with respect to reloca-
tion and reconstruction of any such department-store building and
the repair and maintenance thereof in the manner provided for in
Article 3 of this lease, Tenant agrees to fully comply with every
law and every regulation, orders and requirements provided there-
for of any public authority whatsoever, and further agrees to hold
and save Landlord free and harmless of all costs and expenses
thereof and all liability and claim of liability therefor of every
kind, character and description.

(4) In the event of the condemnation or taking in fee of a
portion of the Brandeis Tract on which a building or improvement
or any portion thereof is located, for any public use under the
right of eminent domain, and thereafter Landlord and/or any of its

32

tenants and sublessees cannot continue the use of the remaining por-
tion of said building or improvement, without substantial loss of
efficiency or economy in the conduct of the business of Landlord
or any of its tenants or sublessees upon the remainder of such
building or improvement, then in such event, Landlord in its sole
discretion, may at any time thereafter, tear down, remove, remodel
and/or replace such building or improvements or relocate same in
such place on the Brandeis Tract as Landlord or any of its tenants
or sublessees deem desirable and advantageous for the conduct of
their respective business or businesses, notwithstanding the pro-
visions of Paragraphs (4) and (5) of Article 3 of this lease.
Landlord agrees, in the event it determines to reconstruct any
such building or improvement, that it will with all reasonable dili-
gence (except delays occasioned by strikes or other causes beyond
its control), construct and complete on the Brandeis Tract, a build-
ing or improvement in place and in stead of the torn-down and re-
moved building or improvements; provided, however, that the recon-
structed building or improvement shall generally conform to the
architectural design of the department-store building which may then
be located on the Sears' Tract.  In the tearing down and removal
of any such building or improvement, the relocating and construction
of any such building or improvement, and in the repair and mainten-
ance of any such building or improvement, Landlord agrees that it
will at all times conform in all matters and things with every law
and every regulation, orders and requirements provided therefor,
of any public authority whatsoever.

(5)  If more than fifty (50%) percent of land area of the Sears'
Tract is appropriated or conveyed, as aforesaid, then in such event
either Landlord or Tenant may, by the giving of sixty (60) days'
notice in writing to such effect to the other party, terminate this
lease, provided, however, that such election to terminate this lease
must be exercised within one hundred eighty (180) days from and
after the date of said appropriation or conveyance.

33

## Article 10

### Arbitrators

(1)  Wherever in this lease any provision is made for arbitration by arbitrators, there shall be three (3) arbitrators and one shall be chosen by each of the parties hereto and the third chosen by the two so chosen.  The decision of any two of the arbitrators shall be final and conclusive upon the parties hereto.  The decision shall be in writing, signed in duplicate by any two (2) of said arbitrators, and one copy shall be delivered to each of the parties hereto.

(2)  The party desiring arbitration, as aforesaid, shall give written notice to the other party of such desire, naming therein the arbitrator selected by it.  In the event the other party shall fail, within a period of fifteen (15) days after the giving of such notice, to notify the other in writing of the arbitrator selected by it, or in the event the two (2) arbitrators chosen shall fail, within fifteen (15) days after their selection, to agree upon the third, then the senior judge in service of the United States District Court for the State of Nebraska shall, on request of the party not in default, or upon the request of either party if neither is in default, appoint, within fifteen (15) days after such request, an arbitrator or arbitrators to fill the place or places remaining vacant.

(3)  After the appointment of the arbitrators in accordance with the provisions of Paragraph (2) above, such arbitrators shall immediately commence consideration of the problem presented by the parties hereto.  A full opportunity shall be given to both Landlord and Tenant to present facts and evidence for consideration by said arbitrators.  A decision shall be made by the arbitrators within thirty (30) days of the date of their appointment.  If such arbitrators should not be able to reach a decision within such thirty-day period, then and in that event, they shall be relieved of their duties and the problem or problems shall be determined by a new and different group of arbitrators to be

34

appointed in the same manner as provided above, and this process
shall be repeated until a decision is finally reached by a majority
of such arbitrators.

(4)  Whenever, in any arbitration procedure under the terms
of this lease, it becomes necessary to determine the land and/or
building or improvements value of the premises demised by the said
Major Lease, then and in such event, all arbitrators appointed in
accordance with the provisions of this Article 10 must be members
of the American Institute of Appraisers.

### Article 11

### Taxes and Assessments

(1)  Tenant covenants and agrees to pay or cause to be paid,
in addition to all other sums required to be paid by Tenant under
the provisions of this lease, all taxes, assessments and levies,
whether general or special, ordinary or extraordinary, of every
nature or kind whatsoever, including sewer use fees and charges
for utilities, which may be taxed, charged, assessed, levied or
imposed by the State of Nebraska, County of Douglas, City of Omaha,
or any political subdivision or public agency authorized to levy
and assess taxes, special assessments or other charges, upon or
against this lease, or on all or any part of the herein-demised
premises and any buildings, structures, fixtures or improvements
now or hereafter located thereon or arising in respect of the occu-
pancy, use or possession of the herein-demised premises, or any
estate, right, title or interest of the owner of the fee, Land-
lord and Tenant, or any of them, or of any of their respective
successors or assigns, in or to said herein-demised land, or to
said buildings, structures, fixtures or improvements now or here-
after located thereon and which are assessed or become a lien at
any time or from time to time during the term of this lease.
Landlord having paid all the taxes that became due on January 1,
1958 (hereinafter referred to as the 1958 taxes) on the entire
premises demised by the Major Lease, Tenant agrees to pay to Land-
lord an amount equal to five-twelfths (5/12) of thirty (30%) percent
of the 1958 taxes on the entire premises demised by the Major Lease.

35

It is further agreed that taxes assessed during the term of this lease, but payable in whole or in installments after the termination of this lease, shall be adjusted and prorated, and that Tenant shall be required to pay only the prorated share for the length of time that shall have elapsed at the time of termination of this lease; and that Tenant shall not be obliged to pay any installment of any special assessment which may be levied, assessed or confirmed during the term of this lease, but which installment does not fall due and is not required to be paid during said term, or any special assessment levied during said term for any improvement not made during said term.

(2)  Nothing herein contained shall be construed to require Tenant to pay any transfer, estate, inheritance, succession or gift tax or taxes imposed in respect of any devise or gift of any interest of Landlord or of its successors or assigns in the demised premises, nor any income tax imposed in respect of Landlord's income from the demised premises; provided, however, if the State of Nebraska, the City of Omaha or any other agency or subdivision of said state shall levy a tax or charge upon the rents of Landlord from the demised premises, and said tax or charge shall not be levied on incomes from whatever source arising, but is in effect an additional or a substitute tax on the demised premises or the owner thereof or the Landlord herein, then Tenant shall, upon demand and notice pay to Landlord, in addition to rental, the amount of any and all such tax or charge so levied.

(3)  Except as permitted by the next paragraph, each and all of the taxes, assessments or other impositions above provided to be borne and paid by Tenant shall be paid and discharged by Tenant before any delinquency can occur therein, or in any part or installment thereof, in the name of the owner of the fee, and certificates of payment shall be promptly delivered to Landlord or its successors or assigns.

(4)  Tenant shall have the right to contest the legality or validity of any of the taxes, assessments, charges, fees or other impositions herein provided to be paid by Tenant, but no such contest

shall be carried on or maintained by Tenant after the time limited for the payment of any such taxes, assessments, charges, fees or other impositions unless Tenant, at its option (a) shall pay the amount involved under protest, or (b) shall procure and maintain a stay of all proceedings to enforce any collection of such taxes, assessments, charges, fees or other impositions, together with all penalties, interest, costs and expenses, by a deposit of a sufficient sum of money or by a good and sufficient undertaking as may be required or permitted by law to accomplish such stay, or (c) shall deposit with Landlord, as security for the performance by Tenant of its obligations hereunder with respect to such taxes, assessments, charges, fees or other impositions, an amount equal to the principal of the contested taxes, assessments, charges, fees or other impositions, plus such further amounts as Landlord may reasonably require from time to time to cover all penalties, interests, costs and expenses that may accrue during the period of the contest.  In the event any such contest is made by Tenant, Tenant shall, within fifteen (15) days after final determination thereof adversely to Tenant, fully pay and discharge the amount involved in or affected by any such contest, together with all penalties, fines, interest, costs or expenses that may have accrued thereon or that may result from any such action by Tenant, whereupon Landlord shall return to Tenant all amounts, if any, deposited by Tenant in accordance with the next preceding sentence. Tenant shall have and Landlord hereby irrevocably grants to Tenant, full right, power and authority to act in Landlord's name but at Tenant's discretion and expense in any action, proceeding or contest with respect to the determination of the amount, validity or legality of any and every obligation which is to be borne or paid by Tenant under this Article 11.

(5)  Should Tenant fail within the time provided and before the same become delinquent to pay any of the taxes or assessments to be paid by Tenant including all penalties, fines, interest, costs and expenses, or should Tenant attempt any such contest without

37

paying the amount involved under protest or making the deposit or
delivering an undertaking or bond, as aforesaid, thereupon or at
any time thereafter, without notice to or demand upon Tenant,
Landlord may, but shall not be obliged to pay, discharge or in
any manner compromise or adjust the payment or obligation involved
or any part thereof, and in case of any sale or sales to enforce
or collect the same, Landlord may seek and effect any redemption
therefrom as Landlord may deem fit, and Tenant shall repay to
Landlord the full amount so paid and expended by Landlord, includ-
ing any costs, expenses and reasonable attorney fees incurred by
Landlord, on or before the first day of the next ensuing calendar
month, together with interest thereon at the rate of six (6%)
percent per annum from the date of payment of any such obligations,
costs, expenses or attorney fees by Landlord until repaid, and in
any and every one of such instances the legality and the validity
of any such payment to the full amount paid or expended by Landlord
and the regularity of all proceedings had in respect thereof or
toward the enforcement thereof shall as between the parties hereto
be conclusively deemed to exist.

(6)  As between the parties hereto, Tenant alone shall have
the duty of attending to making and filing any statement or report
which may be provided or required by law as a basis of or in con-
nection with the determination, equalization, reduction, payment
or abatement of any and every obligation which is to be borne or
paid or which may become payable by Tenant according to this
Article 11, and Landlord shall not in any wise be or become respon-
sible therefor nor for the contents of any such statement or report.

## Article 12

### Binding upon Successors and Assigns

It is further covenanted and agreed by and between the parties
hereto that all the covenants, agreements, conditions and under-
takings in this lease contained shall extend and inure to the
benefit of and be binding upon the successors and assigns of the
respective parties hereto the same as if they were in every case

38

named and expressed, and that the same shall be construed as covenants running with the land, and wherever in this lease reference is made to either of the parties hereto, it shall be held to include and apply to, wherever and whenever applicable, the successors and assigns of such party the same as if in each case so expressed.

### Article 13

#### Short Form Lease

Simultaneously herewith, Landlord and Tenant have executed a short form of lease for recording purposes and the terms thereof constitute a part hereof as though recited at length herein.

### Article 14

#### Notices

(1)  The rentals payable hereunder shall be paid in the form of checks, drafts or like instruments and shall be paid or mailed to:

> The Brandeis Investment Company
> Omaha 2, Nebraska.

(2)  Any notice herein provided to be given to Landlord shall be given by registered United States mail, postage prepaid, addressed to Landlord, as above provided, for the payment of rentals.

(3)  Any notice herein provided to be given to Tenant shall be given by registered United States mail, postage prepaid, and shall be addressed as follows:

> Sears, Roebuck and Co.
> Attn:  Real Estate Manager
> 1409 South Lamar Street
> Dallas, Texas.

(4)  Any and all notices given as above provided shall be deemed to be given when deposited in the United States mail.

(5)  Each party shall have the right to specify as its proper address any other address in the United States of America by giving to the other party at least fifteen (15) days' prior written notice of such change of address.

(6)  If, at the time of making, giving or serving any declaration,

39

demand or notice under the provisions of this lease, the estate
or interest of Landlord shall be encumbered by mortgage, or
deed of trust in the nature of a mortgage, and Tenant shall have
been notified by Landlord or the Lender, in writing, of the ex-
istence of such mortgage or deed of trust, and the address of
the Lender thereunder or its designated agent or representative,
then a duplicate copy of said every such declaration, demand or
notice by Tenant shall also either (a) be delivered or caused
to be delivered to such Lender or his designated representative
or agent, or (b) be sent to said Lender or its designated repre-
sentative or agent by registered or certified mail at the address
so furnished to Tenant. Such Lender, at its option, at any time
within which Landlord could so do, may do any act or thing re-
quired of Landlord by the terms of this lease, or do any act
or thing which may be necessary and proper to be done in the
observance of Landlord's covenants contained in this lease in
order to prevent and preclude termination and surrender by Tenant
hereunder; and any payments to be made and all things so done
and performed by such Lender shall be as effective to prevent
and preclude termination and surrender by Tenant as if made,
done or performed by Landlord instead of by such Lender.

### Article 15

### Insurance - Tenant's Buildings and Improvements

(1) At all times during the term of this lease, including
the period of construction or reconstruction of any building or
improvement, Tenant shall, at its own cost and expense, keep
all buildings and improvements at the time on the premises de-
mised by this lease, insured against fire, lightning, windstorm,
cyclone, tornado, hail, explosion, riot, riot attending strike,
civil commotion, aircraft damage, vehicle damage and smoke, and
other perils, if any, included within extended coverage and addi-
tional extended coverage (and also against war risks in the event
insurance against such damage be provided by the United States

40

Government or an instrumentality thereof). In good and responsible insurance companies authorized to do business in the State of Nebraska, in an amount not less than eighty (80%) percent of the full insurable value thereof, exclusive of cellars and foundations. All such policies shall be payable to The Omaha National Bank, Omaha, Nebraska, as Trustee, for the benefit of Landlord and Tenant and the Lessor of the Major Lease, and all such policies and renewals thereof shall be deposited with said Bank, to the end that said Trustee shall be entitled to collect, for the use and benefit of Landlord and Tenant and the Lessor of the Major Lease, all money due under said policies, payable in the event of loss to or damage of said buildings and improvements. So far as the same may be procurable, said policies shall provide by rider or endorsement that any loss shall be payable to the Trustee for the benefit of Landlord and Lessor of the Major Lease, notwithstanding any act or neglect of Tenant which might result in the forfeiture of said insurance.

(2) In the event that the building or buildings on the Sears' Tract shall be totally destroyed or rendered totally unfit for their accustomed uses, by fire or any other casualty, within the period of twenty-five (25) years from the time of the completion of the construction of the department-store building provided for in Paragraph (1) of Article 3 of this lease, or in the event that the building or the buildings on the Sears' Tract shall be damaged or destroyed to the extent of fifty (50%) percent or more during said twenty-five (25) year period, as aforesaid, by fire or any other casualty, then in either of such events Tenant agrees to repair, rebuild and restore the said building or buildings and to remodel and alter the same to such extent and in such manner as Tenant, in its sole discretion, deems proper for the operation of its business, provided, however, that Tenant rebuilds and restores at least the approximate amount of square feet of building space contained in the said building

41

or buildings immediately existing prior to the occurrence of
such destruction and that such rebuilt, restored, remodeled or
altered building or buildings shall be in conformity with all
other provisions of this lease, including EXHIBIT C and D.
Tenant agrees that it will commence such reconstruction work
promptly and will prosecute same with diligence to completion
thereof.

(3)  In the event that the building or buildings on the Sears'
Tract shall be totally destroyed or rendered wholly unfit for
their accustomed uses, by fire or any other casualty listed in
Paragraph (1) of this Article 15, or in the event that said build-
ings be damaged or destroyed to the extent of fifty (50) percent
or more, after the expiration of the twenty-five (25) year period
referred to in Paragraph (2) of this Article 15 of this lease,
then in either of such events, Tenant shall have, and is hereby
expressly granted the right and option (to be exercised by the
giving of notice to such effect to Landlord and the Trustee on
or before the expiration of one hundred eighty (180) days from
and after the date of destruction) to repair, rebuild and restore
the said buildings and to remodel and alter the same to such ex-
tent and in such manner as Tenant, in its sole discretion, deems
proper for the operation of its business, providing Tenant rebuilds
and restores at least the approximate amount of square feet of
space contained in the said building or buildings immediately ex-
isting prior to the occurrence of such destruction and that such
rebuilt, restored, remodeled or altered building or buildings shall
be in conformity with all other provisions of this lease including
EXHIBITS C and D; and if Tenant elects to repair, rebuild and re-
store or to remodel and alter the said buildings, as aforesaid,
Tenant agrees that it will commence such reconstruction work
promptly and will prosecute the same with diligence to completion
thereof.  If Tenant does not elect to rebuild, restore, remodel
or alter such damaged or destroyed building or buildings, as afore-
said, then it shall at the request of Landlord, promptly put the
portion of the demised premises occupied by said building or buildings

42

in the same condition as same was as of the beginning of the term hereof.

(4)  In the event that the said buildings on the Sears' Tract shall be partially damaged or destroyed by fire or any other casualty at any time during the term of this lease, to the extent of less than fifty (50%) percent, Tenant shall repair and restore said buildings to such extent and in such manner as Tenant shall, in its sole discretion, deem suitable for the operation of its retail-store business therein, providing Tenant rebuilds and restores at least the approximate amount of square feet of space contained in the said building or buildings immediately existing prior to the occurrence of such damage or destruction, and provided, further, that Tenant shall commence such repair and restoration promptly and prosecute the same with diligence, and provided, further, that such repairs and restoration shall in all events conform with the Plans and Specifications of EXHIBITS C and D.

(5)  The proceeds of all insurance policies received by said The Omaha National Bank as Trustee shall be held by it in trust to be applied in the following order:

First:  Such insurance proceeds shall be subject to the option of mortgagee or trustee under a trust deed from Tenant upon its leasehold buildings and improvements thereon to apply such insurance proceeds to the total or partial retirement of the indebtedness secured by such mortgage or trust deed.

Second:  The balance of such insurance proceeds remaining and not applied to the total or partial retirement of the mortgage or trust deed indebtedness, but not to exceed (i) the aggregate insurance proceeds received by trustee, (ii) Five Hundred Thousand Dollars ($500,000.00) or (iii) the aggregate of the rentals, taxes, charges, etc. payable hereunder and accruing on and after date of the damage to or destruction of the buildings and improvements, whichever is the least, shall be held by the Trustee,

43

(a)  As additional security for the payment to the
Landlord and to Lessor under the Major Lease, of rentals
and other charges provided for herein and in the Major
Lease, pending the rebuilding or repairing of the build-
ings and improvements damaged or destroyed, or the ter-
mination or expiration of the lease term of the Major
Lease, whichever first occurs;

(b)  if Tenant rebuilds or repairs, for the purpose
of defraying the cost of rebuilding or repairing such
buildings and improvements as hereinafter provided.

(c)  for the purpose of paying to Lessor any excess
thereof remaining in the hands of the Trustee after the
work of rebuilding or repairing, which has been completed
and fully paid for, as more particularly set forth below.
For the first twenty-five (25) years of the Lease term hereunder,
Tenant agrees to deposit with the Trustee concurrently with the
payment under "First" above to the mortgagee or trustee under
the deed of trust the amount, if any, by which the lesser of
(i), (ii) or (iii) above, exceeds the amount of insurance pro-
ceeds in the hands of the Trustee after making said payment
under "First" above; provided, that if after damage or destruc-
tion of one or more buildings on the demised premises, an un-
damaged building or buildings having a value of Five Hundred
Thousand Dollars ($500,000.00) or more remain on the demised
premises, no such deposit shall be required to be made.

Third:  As to the excess of any such insurance proceeds
remaining after the application of "First" and "Second," supra,
the Trustee shall pay all such excess to the Tenant.

With respect to the proceeds held under "Second" (a) above,
and subject to (a) thereof, if at any time after such insurance
proceeds come into the possession of said Trustee, the Lessee
under said Major Lease (Landlord herein) is in default in the
payment of any rent, taxes, assessments, liens or charges which

by the terms of the Major Lease has been agreed to be paid by
the Lessee under the Major Lease, or if such default shall occur
during the time such insurance proceeds or any part thereof are
in possession of the Trustee, then the lessor under the Major
Lease shall have the right, upon demand, to require the Trustee
to pay over to such Lessor so much of the insurance money as
may be necessary to fully pay or discharge any such sum of money
in the payment of which the Lessee under the Major Lease is in
default, as aforesaid, and such Lessor may demand and require
whenever and as often as any such default shall have occurred
on the part of the Lessee under the Major Lease.  Should the
fund held by the Trustee under said "Second" (a) above, by pay-
ments as above provided by the Trustee to the Lessor under the
Major Lease, be reduced to less than twenty-five (25%) percent of
said original sum held under "Second" (a) above, and should the
Lessor under the Major Lease declare a default and forfeiture
of said lease, then and in such events, upon demand to Trustee
by the Lessor under the Major Lease, Trustee shall pay the
balance in said fund to such Lessor in a lump sum.  For each sum
so paid by the Trustee to the Lessor under the Major Lease under
the provisions of either of the two next preceding sentences,
Tenant shall be entitled to a credit on the next maturing install-
ment or installments of rental hereunder in the amount of such
sum plus interest thereon at the rate of five (5%) percent per
annum from the date of payment thereof by the Trustee to the
Lessor under the Major Lease to the date or respective dates of
maturity of the next maturing installment or installments of
rental hereunder.  Nothing herein contained shall be construed
to permit Tenant to default in the performance of any covenants
of this lease, but any rental paid by application of the credit
hereinabove provided for shall not be considered to be in default.
If pursuant to the provisions of the Major Lease, the Lessor
thereunder proceeds against the Lessee thereunder and re-enters,
such proceeding and re-entry shall be without prejudice to such

45

Lessor's right to the benefit of such insurance money in accordance with the foregoing provisions.

The insurance proceeds held under "Second" (b) and subject to (b) shall be paid out by the Trustee from time to time to the persons certified to be entitled thereto on architect's or engineer's estimates showing the amount due to designated persons for labor and material and other proper items of building costs incurred or supplied for the repair, reconstruction or replacement of the damaged or destroyed improvements; provided, however, that it first be made to appear to the satisfaction of the Trustee that the amount necessary to pay the cost of the same, repair or reconstruction according to the plans adopted therefor, which is in excess of the amount in the hands of the Trustee available therefor, has been provided by the Tenant for such purpose and its application assured. Only at the expiration of the lease term under the Major Lease, or prior thereto, the Tenant not being in default under the terms of this lease, when Tenant has completed the reconstruction, repair or replacement of such damaged or destroyed buildings and improvements free from all materialmen's, mechanics', laborers' or other similar liens resulting from said reconstruction, repair or replacement, the Trustee shall pay the balance of any sum remaining to Tenant, as provided in "Second" (c), supra. In making the computation of the aggregate of the rentals, taxes, charges, etc. payable hereunder and accruing on and after the date of the damage to or destruction of the buildings and improvements, the rentals shall be computed on the basis of the rental currently payable at the time of the damage or destruction, and the taxes shall be computed on the basis of the amount thereof paid or payable for the year preceding the damage or destruction.

In case Tenant shall at any time, by trust deed or mortgage of its leasehold estate, authorize the mortgagees or trustees therein named in its behalf to enter upon the leased premises

and to take or prosecute the reconstruction or repair of any
building or improvements on the leased premises damaged or
destroyed and to have and receive for his or their use for
such purpose such insurance proceeds, then in that case such
insurance proceeds shall be equally available to such mort-
gagee or Trustee as to the Tenant as above provided, and it
shall in like manner and to like extent at his or their re-
quest be applied to the reconstruction and repair of any such
building so injured or destroyed.

(6)  In the event Tenant shall at any time neglect or
fail to insure or to cause to be insured the buildings and
improvements on the demised premises, as herein provided,
Landlord may, at its option, but shall not be obligated so to
do, procure or renew such insurance and pay the premiums thereon,
which amounts shall be immediately payable by Tenant to Land-
lord, together with interest thereon at the rate of six (6%)
percent per annum from the date of payment by Landlord.

### Article 16

#### Mortgages

(1)  Nothing herein contained shall in any manner restrict
the right of Landlord at any time, and from time to time, to
mortgage (or convey by trust deed or other appropriate instrument
intended as security) its leasehold interest as Lessee under the
Major Lease and its interest as Landlord under this lease (same
to be a first mortgage or trust deed or a mortgage or trust deed
subsequent in lien thereto); provided and on condition, that any
mortgage or trust deed that may hereafter be made by Landlord
(which shall include all renewals, replacements and extensions)
shall recognize the lease of Tenant in the event of foreclosure,
if Tenant is not in default.  In the event that the mortgagee
or trustee named in any mortgage or trust deed from Landlord shall
come into possession of the premises demised by the Major Lease
as a result of foreclosure proceedings, or as a result of an
assignment of conveyance by Landlord, such mortgagee's and/or

47

trustee's possession shall be subject to the rights and interest
of Tenant in the within lease, and from and after such time,
the obligation of Tenant to pay rent, and the obligation of
Tenant to perform each and all of the other covenants to be
performed to the said mortgagee or trustee.

(2)  Tenant shall have the right to convey or encumber by
mortgage, deed of trust, or other proper instrument in the nature
thereof a security for any bona fide debt, its interest as
Tenant under this lease in the demised premises with the build-
ings and improvements thereon, in an amount not to exceed seventy
(70%) percent of the appraised value of the buildings, said
mortgage or deed of trust to be amortized during a period of
not more than thirty (30) years, but every such conveyance or
encumbrance shall at all times be subject to the right, title
and interest of the Lessor under the Major Lease, and the right,
title and interest of the Landlord under this lease.  If at any
time after execution and recording in the Recorder's Office of
Douglas County, Nebraska of any such mortgage or deed of trust,
the mortgagee or trustee therein shall notify Landlord in writing
that any such mortgage or deed of trust has been so given and
executed by Tenant, and shall at the same time, either furnish
Landlord with the address to which it desires copies of notices
to be mailed, or designate some person or corporation in the city
of Omaha as its agent or representative for the purpose of re-
ceiving copies of notices.  Landlord hereby agrees that it will
thereafter mail either to said mortgagee or trustee or the agent
or representative so designated, at the address so given, a dupli-
cate copy of any and all notices in writing, which Landlord may
from time to time give or serve upon Tenant, under and pursuant
to the terms and provisions of this lease.

Such mortgagee or trustee may at its option, before the
rights of Tenant shall have been forfeited as provided for in
this lease, pay any of the rents due hereunder, effect any insur-
ance, pay any taxes or assessment,  make any repairs or improvements,

48

make any deposits or do any act or thing required of or permitted to Tenant by the terms of this lease, or do any act or thing which may be necessary or proper to be done in the observance of the covenants and conditions of this lease, or prevent a forfeiture of this lease; and all payments so made, and all things so done or performed in any mortgage or trustee shall be as effective to prevent a forfeiture of the rights of the Tenant hereunder as the same would have been, if done or performed by the Tenant in stead of by any such mortgagee or trustee.

No such mortgagee or trustee of the rights and interest of the Tenant hereunder shall be or become liable to Landlord as an assignee of this lease, until such time as such mortgagee or trustee shallby foreclosure or other appropriate proceedings in the nature thereof, or as a result of any other action or remedy provided for by such mortgage or deed of trust, or by proper assignment or conveyance from Tenant, acquire the rights and interest of the Tenant under the terms of this lease; but any person or persons, corporation or company other than a bank, an insurance company, or similar type of lending institution, acquiring the rights and interest of the Tenant under the terms and provisions of this lease, either by judicial sale thereof, made under and pursuant to the terms and provisions of any such mortgage or deed of trust, or as a result of any other action or remedy provided for by such mortgage or deed of trust, or as a result of any legal process or proceedings whatsoever, shall thereby be and become liable to Landlord for the performance of each and all of the terms, provisions and conditions of this lease as fully and completely as herein provided for an assignee of this lease. Said acquiring person or persons, corporation or company, shall furnish to Landlord a certified copy of all judicial proceedings showing their acquisition of Tenant's interest in said lease and leasehold.

### Article 17

#### Mechanic's or other Liens or Charges -- Indemnification -- Conformity with Law

(1)   Tenant will at all times protect, indemnify and save

49

Landlord's title and estate in the demised premises from and
against any prescription, right or easement whatever that might
be acquired or established upon or to said demised premises or
any part thereof, adverse to the title and estate of Lessor of
the major lease and to the interest and estate of the Land-
lord herein under the Major Lease, and also from and against
any and all penalties, fines, charges, liens, damages, costs,
expenses, reasonable attorney fees and liability or loss of
any and every kind and character with respect to Landlord
herein and/or Lessor of the major lease, that may be imposed
on the major lease directly under Major Lease or any part of said
premises, on any building and improvements at any time on
the premises or any part of said
premises and loss or resulting from any act of any act or
omission of Tenant, or from default in default of Tenant in the
performance of any of its covenants and agreements contained in
this lease or arising out of or in connection with the repair
or erection of any buildings or improvements upon the demised
premises, or out of any accident causing injury to any person or
property whomsoever and whatever done directly or indirectly to
the use of the premises leased by the Major Lease, or any part
thereof, by Tenant or any of its sublessees or any agent, employee
or customer of Tenant or of any of its sublessees.  Tenant will
save harmless and indemnify Landlord from the payment of all costs
and expenses, including reasonable attorney fees, incurred or
expended in collecting money due Landlord from Tenant under this
lease or in enforcing the proper performance of Tenant's obliga-
tions hereunder, or in obtaining possession of the demised premises
after default by Tenant or in prosecuting any suit or other pro-
ceeding in discharging the demised premises or any part thereof
from any liens, judgments or encumbrances suffered by Tenant,
or in defending any suit commenced by or against Tenant or any
other person using or occupying any part of the demised premises
to which said Landlord is made a party without any fault on

50

Landlord's part; it being the intent and purpose of this para-
graph to impose upon Tenant the responsibility of protecting
the demised premises so that at the termination of this lease
the demised premises shall be returned to Landlord free and
clear of encumbrances, liens and charges, and further that Land-
lord shall receive the rentals herein provided for without
diminution or abatement in any amount whatsoever, except as and
to the extent herein otherwise provided with respect to appro-
priation by condemnation.

(2)  Tenant will not permit any mechanics', laborers' or
materialmen's liens to stand against the herein-demised premises
for any labor or material furnished to Tenant, or claimed to
have been furnished to Tenant, in connection with work of any
character performed or claimed to have been performed on the
demised premises by or at the direction or sufferance of Tenant,
provided, however, that Tenant shall have the right to contest
the validity or amount of any such lien or claimed lien, and
provided, further, that Tenant shall give Landlord reasonable
security in such amount and in such manner, as may be desired by
Landlord, to insure payment thereof and prevent any sale, fore-
closure or forfeiture of the premises by reason of such nonpay-
ment; save and except that such security in all events need not
exceed one and one-half times the amount of such lien or claimed
lien.  On final determination of the lien or claim for lien,
Tenant will immediately pay any judgment rendered against it,
together with all costs and charges and shall have the lien
released or judgment satisfied and released of record, all at
Tenant's cost and expense.  If Tenant shall fail to pay any such
judgment or if Tenant shall fail to pay any such lien or claimed
lien, not contested by Tenant, Landlord may, but shall not be
obligated to pay any such judgment, lien or claimed lien and
Tenant agrees to forthwith repay to Landlord any and all amounts
so paid by Landlord together with interest thereon at the rate
of six (6%) percent per annum thereon to date of repayment by
Tenant.

51

(3)  Tenant agrees that in the construction, altering,
remodeling or changing (both exterior and interior), tearing down
and removing of any and all buildings or improvements upon the
demised premises, and in the conduct of its business on and in
the use of the demised premises, it will fully conform with all
laws, rules, regulations and ordinances of every governmental
authority made and provided therefor.

## Article 18

### Defaults

(1)  This lease is made upon the express condition that
Tenant shall faithfully and punctually perform and observe all
the agreements, covenants and conditions herein set forth to be
performed by Tenant, and that if at any time any installment of
rent, taxes, assessments, charges or any other moneys required
to be paid by Tenant hereunder, or any part thereof, shall be in
arrears and unpaid for a period of thirty (30) days after becoming
due, or as to taxes and assessments, delinquent, or if default
shall be made or suffered in the performance or observance of
any of the other covenants or conditions of this lease, and if
any such default shall continue for a period of ninety (90) days
after notice in writing thereof shall have been given by Landlord
to Tenant, Landlord shall have the right, at its election, to
terminate this lease or to enter upon the demised premises and
take immediate possession thereof, and to bring suit for and
collect from Tenant all rents, taxes, assessments, payments or
other charges which shall have accrued up to the time of such
entry, and thenceforward from the time of such entry this lease
shall become void to all intents and purposes whatsoever, and
this lease and all improvements upon the demised premises shall
be forfeited to Landlord without compensation therefor to Tenant;
provided that Tenant may at any time before the expiration of
such period of thirty (30) days or ninety (90) days, as the case
may be, pay and perform the engagements of this lease for which
Tenant shall be in default, and thereby prevent such entry

and forfeiture. Such right to sue and the right to forfeit and
re-enter upon the terms above provided are cumulative and not
exclusive either of each other or of any other lawful right or
remedy that Landlord may have, and the fact that Landlord may
have brought suit and recovered judgment for rent or other sums
in default hereunder shall not impair its right to forfeit this
lease and re-enter, upon the terms hereinbefore provided, in
case the default upon which such suit was based shall continue
unsatisfied for the period of time hereinbefore stipulated for
such forfeiture and entry. In case Landlord does not elect to
exercise its right to terminate this lease conferred by the fore-
going provisions of this Paragraph (1), Landlord shall neverthe-
less have and Landlord is hereby expressly given the right at
its sole election to re-enter the demised premises with or
without legal process, should any of the events of default here-
inbefore specified take place or occur, and to remove Tenant's
signs and all property and effects of the Tenant or other occu-
pants of said premises, and if Landlord so desires and elects,
to relet the said premises or any part thereof upon such terms
and to such person or persons and for such period or periods
as may seem fit to Landlord; and in case of such reletting,
Tenant shall be liable to Landlord for the difference between
the rents and payments herein reserved and agreed upon for the
residue of the entire stipulated term of this lease (except as
hereinafter otherwise provided) and the net rents and payments
for such residue of the term (except as hereinafter otherwise
provided) realized by Landlord by such reletting, such net
rents and payments to be determined by deducting from the entire
rents and payments received by Landlord from such reletting,
the expenses of recovering possession, reletting, altering and
repairing said premises and collecting rents therefrom; and
Tenant hereby agrees to pay to Landlord such deficiency each
month (for the purpose of computing such deficiency the rent
and other payments herein reserved per month shall be considered

53

to be one-twelfth (1/12) of the then applicable annual rent
and payments herein reserved) as the same may accrue.  Tenant
shall pay to Landlord within ten (10) days after the expiration
of each month during such residue of the term (except as herein-
after otherwise provided) the difference between the reserved
rents and payments for said month, and the net amount realized
by Landlord from the premises during said month from such
reletting, provided that if Landlord shall relet the entire
demised premises for the entire residue of the term of this
lease, then, if Landlord so elects, Tenant shall and hereby
agrees to pay to Landlord in a lump sum the entire deficiency
for the entire residue of the term, the same being the aggre-
gate of all future deficiencies discounted at the legal rate of
interest, such lump sum payment to be made within thirty (30)
days after notice by Landlord to Tenant of such election.
Nevertheless, except upon such discounted lump sum payment as
aforesaid, Landlord shall have the right at its option at any
time after such re-entry and reletting, in its sole discretion,
to terminate this lease with forfeiture as hereinbefore provided,
and thenceforward there shall be no liability on the part of
Tenant for any future accruing rents or payments reserved under
this lease.

(2)  Neither this lease nor any interest therein, nor any
estate thereby created shall pass to any trustee or receiver or
assignee for the benefit of creditors or otherwise by operation
of law.  In the event the estate created hereby shall be taken
in execution or by other process of law, or if Tenant shall be.
adjudicated insolvent or bankrupt pursuant to the provisions of
any state or federal insolvency or bankruptcy act, or if a re-
ceiver or trustee of the property of Tenant shall be appointed
by reason of Tenant's insolvency or inability to pay its debts,
or if any assignment shall be made of Tenant's property for the
benefit of creditors, then and in any of such events, Landlord may

54

at its option terminate this lease and all rights of **Tenant herein**,
by giving to Tenant **notice** in writing of the election of Landlord
so to terminate.  Tenant shall not cause or give cause for the
institution of legal proceedings seeking to have Tenant adjudi-
cated bankrupt, reorganized or rearranged under the bankruptcy
laws of the United States, and shall not cause or give cause
for the appointment of a trustee or a receiver for Tenant's
assets, and shall not make an assignment for the benefit of
creditors or become or be adjudicated insolvent.

### Article 19

### Assignment

(1)  It being of the essence of this **lease** agreement and a
primary consideration for Landlord's entering into this lease
that Sears, Roebuck and Co., the Tenant herein, shall construct
a department-store building on the demised premises and for a
period of at least twenty-five (25) years after the completion
of said department-store building, maintain and operate on the
demised premises a department store all as hereinabove provided,
and the Landlord entering into this lease with special faith in,
and reliance upon, the establishment, maintenance and operation
of such department store by Sears, Roebuck and Co. only, Tenant
agrees that prior to and until the expiration of said twenty-five
(25) year period stipulated for in Article 1 of this lease. Tenant
shall not assign or transfer this lease (except by mortgage or
trust deed as provided in **Article 16**), or sublet the demised
premises or any part thereof (except as provided in Paragraph
(2) of this Article 19), without the written consent of Landlord
first had and obtained, and any purported transfer or assignment
of this lease by Tenant or any purported subletting of the demised
premises or any part thereof, except such assignment or subletting
as may be authorized hereunder, shall be null and void.

From and after the expiration of said twenty-five (25) year
period, Tenant shall have the right to assign or transfer this
lease upon prior written consent thereto by Landlord, which written
consent Landlord shall not unreasonably withhold, if (a) the rents,

all taxes, assessments, charges, liens, penalties, claims for
deposits and other sums at the time payable hereunder by Tenant
shall have been fully paid; (b) there be at the time no existing
default on the part of Tenant under any of the other covenants,
agreements and conditions of this lease; (c) the assignee shall
in writing expressly assume and agree to perform all of the
engagements hereunder and all and singular the covenants and
agreements hereof; (d) Tenant shall deliver to Landlord a dupli-
cate original of said instrument of assignment, transfer and
assumption; (e) such instrument shall be duly filed and recorded
in the office of the Register of Deeds of Douglas County, Nebraska
by Tenant or the assignee within ten (10) days after execution
thereof; and (f) Tenant shall in all events remain primarily liable
jointly and severally together with the assignee for the payment
of all rents and all other moneys required to be paid by Tenant
hereunder, and the performance of all of the terms, covenants,
agreements and obligations to be performed by Tenant hereunder.
Landlord on its part agrees that it will at any time, upon
reasonable notice and request, give to Tenant a written statement
as to whether there is to its knowledge any existing default on
the part of Tenant in the performance and observance of the
covenants, agreements, conditions and obligations of this lease
to be performed and observed on the part of Tenant.  No assign-
ment of this lease unless conforming in all respects to the above
conditions shall be of any validity or effect.

(2)  Nothing hereinabove contained shall in any manner pre-
vent Tenant from subletting any portion of the hereindemised
premises to any concessionaires or licensees who operate such
concessions on the herein-demised premises as an integral unit
of Tenant's operation without the consent of Landlord; provided,
however, and on condition that the aggregate total of the premises
subleased to such concessionaires or licensees shall in no event
exceed twenty (20%) percent of Tenant's building space.

56

## Article 23

### Landlord's Rights Cumulative
#### -- No Change Except by Writing

All rights and remedies of Landlord under or in connection with this lease shall be cumulative and none shall be exclusive of any other rights or remedies allowed by law.

No agreement shall be held as changing or in any manner modifying, adding to or detracting from any of the terms or conditions of this lease unless such agreement shall be in writing and executed by both parties hereto.

## Article 24

### Compliance with Major Lease

Tenant agrees that its performance under this lease shall in all respects conform to and comply with the terms and conditions of said Major Lease; and Tenant in this respect further agrees for itself and for its officers, agents, employees, tenants and sublessees that it will not do or permit to be done, anything that will in any manner cause or furnish ground for a termination or forfeiture of said Major Lease and Landlord's rights and interests thereunder.

## Article 25

### Right of Entry

Landlord, its agents and representatives and employees, shall, in addition to all other rights as to use granted herein, have the right to enter upon the premises demised hereunder, at all times, for the purpose of examining or exhibiting same or for the purpose of doing anything which it has the right to do under this lease.

## Article 26

### Signs

(1)  Tenant shall not place, affix or display in any manner, or suffer or permit the affixing or displaying upon or in connection with demised premises, any display or advertising sign or device without the written consent of Landlord first obtained,

58

which consent shall not unreasonably be withheld by Landlord,
nor shall Tenant designate, subject to the provisions of Para-
graph (2) of Article 26 of this lease, the name by which the
shopping center shall be known.

(2)  At and after the time when any building shall be con-
structed on the Brandeis Tract to be used for a retail store
operation,

(a)  Landlord and Tenant shall jointly designate a
name by which the shopping center shall be known, provided
however, that such name shall not include either the name
of the Tenant or Landlord, and Tenant shall thenceforth
at all times use as its business address the name so desig-
nated.

(b)  Landlord shall have the exclusive right, power
and authority to install and construct, at such location
or locations as it may deem advisable, on the premises
demised by the Major Lease (including the premises demised
herein) such sign or signs as Landlord, in its sole discre-
tion, may deem advisable for advertising the Shopping Center.
The cost and expense of the installation and construction
of such sign or signs shall be paid in the first instance by
Landlord, but subject to reimbursement by Tenant of its pro-
portionate share (as hereinafter defined) thereof, or Ten
Thousand Dollars ($10,000.00) whichever shall be the lesser
sum.  The cost and expense of the maintenance, repair and
replacement thereof and the cost of electric power and other
expense in connection with keeping such sign or signs il-
luminated shall be paid in the first instance by Landlord,
but subject to reimbursement by Tenant of its proportionate
share thereof.  The term "proportionate share" as used
herein shall mean the resulting sum obtained by multiply-
ing the total of such costs and expenses by the ratio by
which the total square feet of enclosed building space

(as defined in Paragraph (5) of Article 4) located on the
Spars' tract bears to the total square feet of enclosed
building space (as defined in Paragraph (5) of Article 4
located on all of the premises demised by the Major Lease.
On or before the 10th day of each calendar month, Landlord
shall submit to Tenant an invoice tabulating such cost and
expense, incurred or expended during the previous calendar
month and Tenant agrees to pay its proportionate share of
the amount of such invoice within ten (10) days after the
receipt of such invoice.

### Article 27

### Subleasing

Except as provided in Paragraph (2) of Article 19 hereof,
Tenant shall not sublease the herein-demised premises or any
portion thereof without the written consent of Landlord, and
any such sublease without such consent of Landlord shall be
of no validity or effect.

### Article 28

### Possession of Premises at Termination

Tenant agrees that at the termination of this lease by ex-
piration of time or otherwise, it will surrender and deliver up
the herein-demised premises together with all buildings and im-
provements thereon, peaceably to Landlord.

### Article 29

### Tenant Not to Operate or Own
### Competitive Business within
### Defined Area

Except for its present store located in Council Bluffs,
Iowa, Tenant agrees that it will not be or become interested in,
directly or indirectly, financially or otherwise, nor own, main-
tain or operate during the first ten (10) years of the term of
this lease within an area twenty-five (25) miles distant in
every direction from the boundaries of the demised premises, a
department store business conducted in a building or structure

60

containing more than one hundred thousand (10ʼ,000) square feet of enclosed building space, and similar to or in any manner competitive with the business to be operated by Tenant on the demised premises. Notwithstanding the foregoing, this restriction shall not apply to Tenant's present two (2) stores located in Omaha, Nebraska, (namely, the Farnam Street Store and the South Omaha store) until the Department store building provided for in Paragraph (1) of Article 3 of this lease is completed and occupied.

## Article 30

### Lease governed by Laws of the State of Nebraska

This lease and all the provisions thereof shall be governed by and construed in accordance with the laws of the State of Nebraska.

IN WITNESS WHEREOF, Landlord and Tenant have caused this lease to be executed the day and year first above written and their respective corporate seals to be affixed thereto, all pursuant to authority therefor from their respective boards of directors.

THE WOODS INVESTMENT COMPANY

By _____
    Vice-President

Attest: _____
        Secretary

                    LANDLORD


J. L. BRANDEIS AND CO.

By _____
    Vice-President

Attest: _____
        Assistant Secretary

                    TENANT


STATE OF NEBRASKA     )
                      )  SS
COUNTY OF DOUGLAS     )

On this 23rd day of _____, 1958 before me, a Notary Public in and for the said County, personally appeared

the above-named — *Alen Baer* — , Vice-President of THE BRANDEIS INVESTMENT COMPANY, a Nebraska corporation, who is personally known to me to be the identical person whose name is affixed to the above instrument as Vice-President of said Corporation, and acknowledged the execution thereof to be his voluntary act and deed and the voluntary act and deed of said The Brandeis Investment Company.

WITNESS my hand and Notarial Seal the date last aforesaid.

*Thelma G. Douglas*
Notary Public

My Commission expires *November 29, 1961*.

STATE OF *Texas* }
COUNTY OF *Dallas* } SS

On this *22nd* day of *July*, 1958 before me, a Notary Public in and for the said County, personally appeared the above-named *R. L. Taylor*, Vice-President of SEARS, ROEBUCK AND CO., a New York corporation, who is personally known to me to be the identical person whose name is affixed to the above instrument as Vice-President of said Corporation, and acknowledged the execution thereof to be his voluntary act and deed and the voluntary act and deed of said Sears, Roebuck and Co.

WITNESS my hand and Notarial Seal the date last aforesaid.

*Alida Macune*
Notary Public

My Commission expires *June 1, 1959*.

62

CROSSROADS
MALL

OMAHA,
NEBRASKA

MELVIN SIMON
& ASSOCIATES, INC.

*F le*
*X Rds*
*Lease*

## LEASE SUMMARY

| | | |
|---|---|---|
| Date of Lease | : | June 23, 1958 |
| Lessor | : | The Brandeis Investment Company |
| Lessee | : | Sears, Roebuck and Co. |
| Term | : | August 1, 1958 to July 31, 2053 |
| Use | : | Lessee agreed to use premises ex-clusively for operation of a department store for the sale at retail of goods, wares and merchandise. Lessee further agreed to operate a department store on the premises for a period of 25 years after the date of construction of the department store building.  Lessee agreed not to use more than 90,000 square feet in the aggregate of inside building space. |
| Rental | : | $12,666.66 annually for the 4-year period from August 1, 1958 to July 31, 1962; $13,333.33 annually for the 6-year period from August 1, 1962 to July 31, 1969; $15,000 annually for the 10-year period from August 1, 1979 to July 31, 1979; $20,000 annually for the 10-year period from August 1, 1979 to July 31, 1989; and amounts for the 10-year periods between 1989 and 2053 which are derived by computing 2/3 of the percentage of $30,000 which the Consumer Price Index of a given calendar year bears to the Consumer Price Index for the calendar year 1954 (consult lease for details). |

 

2

| | | |
|---|---|---|
| Construction, Re-<br>pairs, Maintenance<br>and Use of Buildings<br>Parking Areas | : 1. | Lessee promised to construct a 3-story department store building, parking area and automotive service station within 5 years after the date of lease. Lessee had right to use Brandeis tract for parking purposes prior to time Lessor constructed an integrated retail department store building. |
| | 2. | Lessee agreed to keep and maintain all buildings and other improvements in first-class, safe and sanitary condition until the integrated retail department store building was completed. |
| | 3. | At any time after 25 years from the date the department store building is completed, Lessee has right to tear down or remove the building. |
| | 4. | Lessor agreed to pave, stripe, fixture and install lights on a 7-acre parking area. |
| Supervision of<br>Public Areas | : | After the construction of an integrated retail department store building, Lessor must maintain, repair, remove debris, ice and snow, etc. from all of the parking areas, sidewalks, alleys, streets and other public areas, whether constructed by Lessee or Lessor. Lessor also has right to promulgate or change any rules and regulations for use of commom areas. |



3

Lessee agreed to pay proportionate
shares of cost and expense of
maintaining and operating all of
the common areas on 1st day of each
month during term of lease, based
on percentage of total square feet
of Sears building space to the
total square feet of similar
building space located on entire
premises.

**Taxes and**              :    Lessee agreed to pay all taxes,
**Assessments**                 and assessments against the
                           department store building.

**Insurance**              :    Lessee must keep all its
                           buildings and improvements insured.

CROSSROADS TENANT LEASE

Sears, Roebuck and Company

(1)    Lease dated June 23, 1958 between Brandeis Investment
Company as Landlord, and Sears as Tenant.
TERM:  August 1, 1958 to July 31, 2053

(2)    Amendment  to Lease dated July 11, 1958 between
Brandeis Investment Company and Sears modifying
language of Lease.

(3)    Agreement dated November 12, 1958 between Brandeis
Investment Company and Sears further modifying Lease.

(4)    Amendment to Lease dated November 13, 1958 between
Brandeis Investment Company and Sears further modi-
fying Lease.

(5)    Agreement dated February 19, 1959 between Myron Co.,
Brandeis Investment Co. and Sears modifying Lease
between Myron Co. and Brandeis Investment Co., and
providing for Lease between Myron Co. and Sears in
the event of termination of the Myron-Brandeis Invest-
ment Co. Lease.

(6)    Agreement dated April 28, 1959 between Myron Co.
and Brandeis Investment Co. and Sears, Roebuck and
Company

(7)    Agreement dated April 28, 1959 between Myron Co. and
Brandeis Investment Co. and Sears regarding 10 foot
strip of land on Cass Street.

(8)    Agreement dated June 25, 1959 between Myron Co. and
Brandeis Investment Co. regarding utilities easement.

(9)    Easement dated June 25, 1959 between Myron Co.,
Brandeis Investment Co. and Sears granting utilities
easement.

(10)    Acceptance of Grant dated August 6, 1959 signed by
Metropolitan Utilities District.

(11)    Indemnity Agreement dated August 26, 1959 signed by
Brandeis Investment Co. indemnifying Myron Company
regarding curbing and paving.

 

# Sears, Roebuck and Co.

### MIDWESTERN TERRITORY ADMINISTRATIVE OFFICES

7447 SKOKIE BOULEVARD

### SKOKIE, ILLINOIS 60076

August 11, 1983

Security Title Insurance Agency
700 Grain Exchange Building
1905 Harney Street
Omaha, Nebraska  68102

Attention:  Dave Stuczynski

Dear Mr. Stuczynski:

Sears Roebuck & Co. ("Sears"), is the lessee under the lease ("Lease")
dated June 23, 1958 by and between Sears and The Brandeis Investment Company
("BIC") for a portion of the property commonly known as the Crossroads Shopping
Center.  It is the mutual understanding of Sears and BIC that the property line
shown on the survey prepared by Lamp Rynearson & Associates in connection with
the sale of the Crossroads Shopping Center by BIC to an affiliate of Melvin
Simon & Associates correctly shows the demarcation of the Sears property line
under the lease.

The statement above is subject to the following:

1.  Neither BIC nor Sears Roebuck & Co. has in their files a copy
of Exhibit B to the lease which showed both the legal description and the plot
plan for the Sears tract.

2.  Both BIC and Sears have reviewed the survey and believe that it
conforms to the property line as it has been recognized by the parties during
the lease term.

Yours truly,

SEARS, ROEBUCK and CO.

By _____          APPROVED

THE BRANDEIS INVESTMENT COMPANY

By _____


**EXHIBIT G**



**Sears**

Merchandise Group

Midwestern Territory Administrative Offices
7447 SKOKIE BOULEVARD
SKOKIE, ILLINOIS 60077

December 1, 1983

Crossroads Shopping Center
Company Limited Partnership
c/o M.S. Management Associates, Inc.
P. O. Box 7033
Indianapolis, Indiana  46207

Re:  Omaha, Nebraska
     Crossroads Shopping Center

Please be advised that as a part of our Financial Services Network program, Sears intends to locate and operate offices of Coldwell Banker and Dean Witter in our retail store at the subject location.

Article 1 of our lease dated June 23, 1958, with The Brandeis Investment Company, to whose interest you have succeeded as Landlord, prohibits, in part, operation of a bank or finance business or real estate rental and sales business in the demised premises.

Kindly indicate your approval of our operation of a bank or finance business and real estate rental and sales business (so long as same are operated by Sears or its subsidiary) in the demised premises, by executing the enclosed copy of this letter and returning it to me.

Very truly yours,

SEARS, ROEBUCK AND CO.

By: _____
    Real Estate Manager

APPROVED

Approved and agreed to this
_____ day of December, 1983

CROSSROADS SHOPPING CENTER
COMPANY LIMITED PARTNERSHIP

By: Crossroads Shopping Center
    Company, Inc.

By: _____
    Herbert Simon, President

A SEARS ROEBUCK COMPANY

7781

**EXHIBIT H**



**MELVIN SIMON & ASSOCIATES, INC.**

Merchants
P.O. Box 7000
Indianapolis, IN 46207
Phone: (317) 636-1600
Writer's Direct Dial:_____

February 11, 1986

George B. Shaw
Sears, Roebuck & Company
7447 Skokie Blvd.
Skokie, IL  60077

RE:  Crossroads Mall
     Omaha, Nebraska

Dear George:

The purpose of this letter is to confirm the agreements reached between
Herman Renfro of this office and Ed Rosenhower concerning the expansion
of the Crossroads Mall in Omaha, Nebraska.

We understand that Sears has approved our plans for the Phase I expansion
of the Crossroads Mall.  This expansion will include the addition of
40,000 square feet of mall shops on one level on the south side of the
existing shopping center.  In addition to the expansion, we will renovate
the existing interior mall area, including the mall area in front of the
Sears store which is located on the Sears leased premises.

It is our understanding that you have also approved, in concept, a Phase
II expansion which would add a new department store and two levels of
mall shops on the north side of the center.  We recognize that you have
reserved the right to approve the final site plan for this Phase II
expansion, but that you will cooperate in every reasonable way to make
the Phase II expansion a reality.

In connection with our Phase I expansion, we will prepare and forward to
you for review an amendment to your existing lease which incorporates,
among other things, a new site plan for the center and also provides that
in consideration for Sears granting of their approval to the Phase I
expansion, Sears' share of shopping center common area costs shall be
reduced, beginning January 1, 1986, to a proportionate share of the cost
of maintaining and repairing the exterior common areas of the shopping
center only.

In addition, the amendment will provide that Sears shall have the right,
exerciseable upon the later to occur of (i) January 1, 1989, or (ii) the
day on which the Phase II expansion opens for business, to elect to
maintain the exterior common areas located on the Sears leased premises
at Sears sole cost and expense.  So long as Sears maintains its own
exterior common areas, it shall have no obligation to pay Landlord any
share of common area costs, provided, however, if studies indicate that

**EXHIBIT I**

either the Landlord or Sears experiences a shortage of parking spaces to support their respective gross leaseable area, Sears and the Landlord shall work together to arrive at a mutually agreeable solution which will require the party who must "borrow" sufficient parking to support its own GLA to bear a proportionate share of the cost of maintaining the borrowed parking.

If you find the contents of this letter satisfactory, please so indicate by signing both of the enclosed copies and returning one to our attention. Upon our receipt of the signed letter, we will prepare and forward to your attention for review a draft of lease amendment.

Very truly yours,

CROSSROADS JOINT VENTURE, an
Indiana General Partnership
By: Crossroads Shopping Center
Company Limited Partnership,
an Indiana corporation, its
General Partner

By: _____
     Herbert Simon, President

AGREED AND ACKNOWLEDGED:

SEARS, ROEBUCK AND COMPANY

By _____
     George B. Shaw

Date: _____Feb 19 '86_____

AUG. 9.2002  10:25AM   SEARS REAL ESTATE                                NO.789    P.3

# SIMON

MELVIN SIMON & ASSOCIATES, INC.

January 31, 1991

**VIA FACSIMILE**
**(312) 906-0132**
**AND VIA FEDERAL EXPRESS**

Sears Roebuck and Co.
Merchandise Group
Department 766
Sears Tower
Chicago, Illinois 60684

RE:  Sears Roebuck and Co. ("Sears")
     (0582/0010)
     Crossroads Shopping Center
     Omaha, Nebraska

Gentlemen:

Over the course of the last several months, the local Transit
Authority for the City of Omaha ("Transit Authority") and
Crossroads Joint Venture ("Crossroads") have been in negotiations
regarding the relocation and construction of a new Bus Transit
Center in that area of the Crossroads Shopping Center parking lot
area as shown on the attached site plan. Construction of this Bus
Transit Center shall also involve the creation of a bus lane in
that area shown on the attached site plan.

Pursuant to Article III, paragraph 14 of your Lease dated June
23, 1958 by and between The Brandeis Investment Company,
predecessor in interest to Crossroads, as Landlord and Sears, as
Tenant, all buildings are to be constructed within those areas as
shown on Exhibit D to the Lease. As the proposed Transit Center
is not within those approved areas, Crossroads requests Sears
consent to the construction of the Transit Center and related
facilities in that area as outlined in red.

MERCHANTS PLAZA  P.O. BOX 7033  INDIANAPOLIS, IN 46207  (317) 636-1600

# EXHIBIT J

January 31, 1991
Page 2


        I trust that you find this proposal acceptable and Sears will
evidence its consent to the same by executing this Letter Agreement
in the space provided below and return a pen and ink original to
me.

                              Respectfully yours,

                              CROSSROADS JOINT VENTURE


                              Garry L. Witt
                              Attorney at Law


GLW/jaj
GK:333.L
Enclosure

cc:  Jim Barkley
     Karen Bowen


ACKNOWLEDGED AND ACCEPTED

SEARS ROEBUCK AND CO.

By: _____
Name:    Ronald B. Ruth
Title:   National Manager
            Real Estate Planning Group

AUG. 9.2002  10:25AM    SEARS REAL ESTATE    NO.789



AUG. 9.2002  10:25AM   SEARS REAL ESTATE    NO.789    P.2    5/5

RECEIVED
JAN 0 9 1995

Ms. Linda Bonen
Sears
3333 Beverly Road
B2-201A
Hoffman Estates, IL  60179

RE:  Sears
Crossroads Mall
Omaha, Nebraska

Dear Ms. Bonen:

Reference is herein made to that certain lease dated June 23, 1958, by and between Crossroads Joint Venture, as Landlord, and Sears, Inc., as Tenant for the above referenced location.

By signing the attached copy of this letter in the space provided below, Tenant acknowledges that at Landlord's option, Landlord may, at any time, dissolve the Merchant's Association and create in its place and stead a promotional fund (the "Fund"), the primary purpose of which is to provide sums of necessary for professional advertising and promotional services which benefit the tenants in the center.  Tenant agrees that it shall cooperate fully with the Landlord elect to dissolve the Merchant's Association and create the Fund.  In the event Landlord does elect to create and maintain the Fund, the terms and conditions relating to the Merchant's Association,* ~~including the provisions relating to Fund Assessment and the adjustments thereto~~, shall thereafter be equally applicable to the said Fund.

Please return the signed copy of this letter to my attention at your earliest convenience

Very truly yours,

CROSSROADS JOINT VENTURE

Julie A. Heigel

Julie A. Heigel
Marketing Director

By: _Linda R Bonen_
    Linda R. Bonen
    Property Manager
Date: _____

*including Tenant's voluntary participation in said "Fund" and any assessments paid therein.

CROSSROADS MALL
7400 DODGE STREET = SUITE 10 = OMAHA, NEBRASKA = 68114 = 402-397-2343 = 402-393-3765

**EXHIBIT K**

## AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE is made as of this 30th day of MARCH 2006, by and among CROSSROADS MALL, LLC, a Delaware limited liability company ("Landlord"), having an address at 115 West Washington Street, Indianapolis, Indiana 46204, and SEARS, ROEBUCK AND CO., a New York corporation ("Tenant"), having an address at 3333 Beverly Road, Hoffman Estates, Illinois 60179.

### WITNESSETH:

WHEREAS, The Brandeis Investment Company, a Nebraska corporation, and Tenant entered into a lease dated June 23, 1958, which has been amended by Amendment to Lease dated July 11, 1958, Agreement dated November 12, 1958, Amendment to Lease dated November 13, 1958, and Letter Agreements dated August 11, 1983, December 1, 1983, February 11, 1986, January 31, 1991, and January 9, 1995 (as amended, the "Lease") for the lease by Tenant of certain property commonly known as Crossroads Mall Shopping Center, Omaha, Douglas County, Nebraska, which property is more specifically described in the Lease (the "Sears Tract");

WHEREAS, Landlord is the ground lessee of the Crossroads Mall Shopping Center pursuant to ground lease with Simon Property Group, L.P., a Delaware limited partnership, fee owner of the Shopping Center, and as such is the Landlord under the Lease;

WHEREAS, Landlord has altered the Shopping Center by the addition of approximately 116,450 square feet of gross leasable area for the construction and operation of Target (the "Target Addition") in the approximate location as depicted on the site plan dated April 20, 2005, attached hereto as Exhibit "D" and made a part hereof (hereinafter, the "Site Plan");

WHEREAS, in consideration for Tenant granting their acknowledgment of the Target Addition, Tenant's share of shopping center common area costs shall be capped beginning January 1, 2006; and

WHEREAS, Landlord and Tenant desire to amend the Lease as hereinafter set forth;

NOW THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant do hereby covenant and agree as follows:

1.    The Plot Plan annexed as Exhibit D to the Lease shall be deleted and the Site Plan attached hereto as Exhibit "D" shall be substituted in its place. Tenant hereby acknowledges the Target Addition as shown on Exhibit "D".

2.    Subparagraph (5) of Article 4 appearing on pages 25-26 of said Lease shall be deleted in its entirety, and the following substituted in lieu thereof:

**EXHIBIT L**

"Tenant agrees to pay to Landlord, Tenant's proportionate shares of the cost and expense of maintaining, operating and supervising (which shall include premiums for the afore-mentioned insurance) all of the parking areas, sidewalks, alleys, streets and other exterior public areas (not including buildings) under the provisions of this Article 4 of this lease (the aggregate of said areas being hereinafter referred to as "public areas") in the manner, at the times, and in the amounts hereinafter set forth.  Tenant shall pay in advance on the 1st day of each month during the entire term of this lease, Tenant's tentative proportionate share of such costs and expenses, such payments to commence on the 1st day of the month during which Landlord undertakes the supervision, direction and maintenance of said public areas, the amount of such monthly payment to be determined exclusively by Landlord.  At the end of each calendar year (or partial calendar year), Landlord shall calculate the actual amount of all costs and expenses that shall have been expended and/or incurred by Landlord with respect to such supervision, direction and maintenance, as aforesaid, for such calendar year (or partial calendar year), and shall thereafter render to Tenant an invoice for Tenant's proportionate share thereof, which shall include a tabulation of all of the costs and expenses expended and/or incurred by Landlord therefor for such calendar year and Tenant's proportionate share of such costs and expenses for each calendar year shall be an amount equal to the resulting sum obtained by multiplying the total of such costs and expenses by the ratio by which the total square feet of enclosed building space located on the Sears' Tract (which for this purpose shall include the space occupied by the automobile service station and the garden area, and shall exclude the space occupied by public meeting halls) bears to the total square feet of similar enclosed building space, located on all of the premises demised by the Major Lease.  If the amount of Tenant's proportionate share of such costs and expenses for any calendar year is more than the aggregate total of the monthly payments theretofore paid therefor by Tenant to Landlord during such calendar year, then in such event, Tenant agrees to pay Landlord on or before the expiration of fifteen (15) days after the receipt of such invoice, the difference between Tenant's said proportionate share of said costs and expenses and the aggregate total of said monthly payments.  If the amount of Tenant's proportionate share of such costs and expenses for any calendar year is less than the aggregate total of the monthly payments theretofore paid therefor by Tenant to Landlord during such calendar year, then in such event, Landlord shall deliver to Tenant, simultaneously with said invoice, its check for the difference between Tenant's said proportionate share of such costs and expenses and the aggregate total of said monthly payments.  The tentative monthly payments to be made by Tenant to Landlord for Tenant's proportionate share of the costs and expenses that may be expended and/or incurred by Landlord for the supervision, direction and maintenance of the public areas shall be based and calculated on the total of such costs and expenses expended and/or incurred by Landlord during the previous calendar year.  Notwithstanding the foregoing, beginning January 1, 2006, the payments to be made by Tenant to Landlord for Tenant's proportionate share of the costs and expenses that may be expended and/or incurred by Landlord for the supervision, direction and maintenance of the public areas shall be capped at seventy cents ($.70) per square foot of enclosed building space located on the Sears Tract (which for this purpose shall include the space occupied by the automobile service station and the garden area, and shall exclude the space occupied by public meeting halls) per annum.  This cap on Tenant's proportionate share of costs and expenses for supervision, direction and

2

maintenance of the public areas shall be increased beginning on January 1, 2011, and every five (5) years thereafter by five cents ($.05) per square foot of enclosed building space located on the Sears Tract (which for this purpose shall include the space occupied by the automobile service station and the garden area, and shall exclude the space occupied by public meeting halls)."

3.    This Amendment to Lease shall bind and inure to the benefit of Landlord and Tenant and their respective successors and assigns.

4.    The Lease except as amended herein, is in all other respects fully ratified and confirmed.

5.    Except as specifically defined herein, all capitalized terms used in this Amendment to Lease shall have the meanings ascribed to such terms in the Lease.

6.    This Amendment to Lease may be executed in multiple counterparts, and signature pages from any counterpart may be appended to any other counterpart; all such counterparts shall constitute a single, unified instrument.

[Balance of this sheet left intentionally blank]

3

IN WITNESS WHEREOF, the parties have executed this Amendment to Lease as of the day and year first above written.

LANDLORD:

CROSSROADS MALL, LLC, a Delaware limited liability company
By:    SIMON PROPERTY GROUP, L.P., a Delaware
       limited partnership, its sole member
       By:    SIMON PROPERTY GROUP, INC., a
              Delaware corporation, its general Partner

              By: _____
                   Stephen E. Sterrett
                   Executive Vice President

TENANT:

SEARS, ROEBUCK AND CO.

By: _____

Printed: ___James B. Terrell_____
              Its Authorized Signatory

Its: _____

PROPERTY
MANAGER

LEGAL

The undersigned fee owner of the Crossroads Mall Shopping Center hereby consents to, approves and agrees to recognize the rights by the Tenant pursuant to the terms of the above Amendment to Lease.

FEE OWNER:

SIMON PROPERTY GROUP, L.P., a Delaware limited Partnership
By:    SIMON PROPERTY GROUP, INC., a Delaware
       corporation, General Partner

       By: _____
            Stephen E. Sterrett
            Executive Vice President





John Kern
Director- Asset Management
Real Estate Department

*Sears, Roebuck and Co.*
3333 Beverly Rd-BC-103A
Hoffman Estates, Il. 60179
(847) 286-4718
Fax (847) 286-7976
E-mail: john.kern@searshc.com

October 10, 2011

Mr. James Prysiazny
Director of Property Management
The Lerner Company
10855 West Dodge Road
Omaha, NE 68154

Re: Avis at Crossroads

Dear Mr. Prysiazny,

I am pleased to advise you that Avis Rental Cars has plans for expansion at Sears locations nationwide, including the Sears store at Crossroads Mall in Omaha, NE

The rental transaction will take place at a counter located within the Sears auto center. Plans also include utilizing up to ten (10) parking spaces for Avis rental vehicles. No advertising will be displayed on any rental vehicles. Avis will install signage on the exterior of the Sears building. The signage will comply with existing sign criteria and all applicable codes.

Additional information concerning signage and the location of Avis parking spaces is enclosed.

Sears and Avis would like to begin this project immediately. Please acknowledge your approval by signing in the space provided below. If you have any questions, please do not hesitate to contact me.

Sincerely,

John Kern
Director- Asset Management

Acknowledged and Approved By: _____    Date: _____

**EXHIBIT M**

## AMENDMENT TO LEASE

THIS AGREEMENT made and entered into this ___11___ day of
July, 1958, by and between THE BRANDEIS INVESTMENT COMPANY,
a Nebraska corporation, with its principal place of business
in Omaha, Douglas County, Nebraska, Party of the First Part
and hereinafter referred to as Landlord, and SEARS, ROEBUCK
AND CO., a New York corporation, and authorized to carry on
business in the State of Nebraska, Party of the Second Part,
hereinafter referred to as Tenant, WITNESSETH:

WHEREAS, under date of June 23, 1958, the parties hereto
entered into a lease for a term beginning August 1, 1958 and
ending July 31, 2053, demising a portion of the hereinafter
described premises located in Omaha, Douglas County, Nebraska,
to-wit:

The Northeast Quarter (NE¼) of the
Northeast Quarter (NE¼) of Section
Twenty-three (23), Township Fifteen
(15) North, Range Twelve (12), East
of the 6th P.M., Douglas County,
Nebraska, except county roads;

such demised portion being more particularly shown and delineated
on a plat attached to said lease marked "Exhibit B", and made a
part thereof, and

WHEREAS, the parties hereto desire to modify and amend
the said lease in the manner hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants
herein contained and the sum of One Dollar ($1.00) in hand paid
by each of the parties hereto to the other, and other good and
valuable consideration, the receipt and sufficiency of which are
hereby acknowledged, the parties hereto agree as follows:

I.

The words "and rendering of permitted services" appearing
in the parenthesis in the ninth and tenth lines of the second
paragraph of Article 1 on Page 4 of said lease, shall be deleted
and the parenthetical clause shall end, and the parenthesis mark
shall be placed after the word "merchandise" appearing in said
ninth line.

II.

There shall be added in Line 7 of Paragraph (5) of
Article 3 on Page 11 of said lease, after the word "space",
the following:   "(meaning the space to be used for the selling
of goods, wares and merchandise)".

III.

The first sentence of Subparagraph (13) of Article 3,
appearing on page 16 of said Lease, shall be deleted, and the
following substituted in lieu thereof:

"Landlord agrees, at its cost and expense, to
pave with concrete, strips, fixture, and install
lights, consistent with the paving hereinbelow

**EXHIBIT B**

provided to be done by Tenant on the Sears' Tract, on a parking area consisting of approximately seven (7) acres, located along and abutting Dodge Street and extending from the East boundary line of the premises demised by this lease to the East boundary line of the premises demised by the Major Lease, all according to plans and specifications for said paving, which said plans and specifications shall be approved in writing by Tenant before the commencement of such paving, and when so approved shall be attached hereto, marked EXHIBIT B, and by specific reference herein made a part hereof."

### IV.

Subparagraph (f) of Paragraph (17) of Article 3 of said Lease shall be, and is hereby, amended by adding the word "insuring" after the word "maintaining" appearing in the first line on Page 22 of said lease.

### V.

The first sentence of Paragraph (2) of Article 4 of said Lease shall be deleted in its entirety and the following substituted in lieu thereof:

"Landlord shall have the right, power and authority to compile and promulgate and thereafter change or modify all rules and regulations which will acknowledge the mutual rights of both Landlord and Tenant for the common use of the parking areas, sidewalks, alleys, streets and other public areas (not including buildings) by Landlord and Tenant, by their respective tenants and sublessees and by their respective customers, officers, agents and employees and the respective, customers, agents, officers and employees of their respective tenants and sublessees, provided that such rules and regulations so promulgated by Landlord shall be reasonable and not interfere with Tenant's operation of its business on said premises or its right of ingress and egress, to all of which said rules and regulations Tenant for itself and for its tenants and sublessees and its customers, agents and employees and the customers, agents and employees of its tenants and sublessees agree to continuously abide by and comply with."

### VI.

Irrespective of the provisions of Paragraph (1) of Article 16 of said lease, it is understood and agreed by and between the parties hereto that Landlord's right to mortgage (or convey by trust deed or other appropriate instrument intended as security) its leasehold interest as Lessee under the Major Lease, and its interest as Landlord under the lease between the parties, shall exclude the improvements made by Tenant on the premises demised by said last mentioned lease; provided, however, and on condition, however, that nothing contained in this Paragraph VI of this Agreement, shall in any manner subordinate the rights of Landlord under the lease between the parties hereto, or under the Major Lease, to the rights of any mortgagee or trustee under any mortgage or trust deed, or any party under any other appropriate instrument intended as security, effected by Tenant.

-2-

## VII.

Article 27 of said lease shall be, and is hereby amended by deleting the words "Paragraph (2) of" appearing in the first line thereof.

## VIII.

Article 29 of said lease shall be, and it is hereby deleted in its entirety.

## IX.

Save and except for the amendments and modifications herein set forth, the parties hereto agree that the said lease of June 23, 1958 as herein amended and modified, shall be and remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written and their respective corporate seals to be affixed thereto, all pursuant to authority therefor from their respective Board of Directors.

THE BRANDEIS INVESTMENT COMPANY

By _____
             Vice-President

Attest: _____
             Secretary

             LANDLORD


SEARS, ROEBUCK AND CO.

By _____
             Vice-President

Attest: _____
             Assistant Secretary

             TENANT

Omaha, Nebraska
Retail Store

THIS AGREEMENT made and entered into this 12 day of November, 1958, by
and between THE BRANDEIS INVESTMENT COMPANY, a Nebraska corporation, with its prin
cipal place of business in Omaha, Douglas County, Nebraska, hereinafter referred
to as "Landlord", and SEARS, ROEBUCK AND CO., a New York corporation, authorized
to carry on business in the State of Nebraska, hereinafter referred to as "Tenant"

## W I T N E S S E T H:

WHEREAS, under date of June 23, 1958, the parties hereto entered into
a lease for a term beginning August 1, 1958, and ending July 31, 2053, demising
a portion of the hereinafter described premises located in Omaha, Douglas County,
Nebraska, to-wit:

> The Northeast Quarter (NE¼) of th
> Northeast Quarter (NE¼) of Section
> Twenty-three (23), Township Fif-
> teen (15) North, Range Twelve (12),
> East of the 6th P. M., Douglas
> County, Nebraska, except county roads;

such demised portion being more particularly shown and delineated on a plat attach-
ed to said lease marked "Exhibit B", and made a part thereof, and

WHEREAS, thereafter, by written agreement dated July 11, 1958, said Lease
was modified and amended; and

WHEREAS, the parties hereto desire to further modify and amend said Lease
all as hereinafter provided:

NOW, THEREFORE, in consideration of the mutual covenants herein contained
and the sums of One Dollar ($1.00) in hand paid by each of the parties hereto to
the other, and other good and valuable consideration, the receipt and sufficiency
of which are hereby acknowledged, the parties hereto agree as follows:

### I.

The words and figures "eighty-five thousand (85,000) square feet" appear-
ing in the 5th and 24th lines on Page 4, in Article I, of said Lease shall be de-
leted, and the words and figures "ninety thousand (90,000) square feet, excluding
dressing rooms and perimeter stock" shall be, and they are hereby, substituted in
lieu thereof.

## II.

The words and figures "one hundred ninety thousand (190,000) square feet" appearing in the 10th line of Article 3, Sub-section (1), on Page 9 of said Lease shall be deleted, and the words and figures "one hundred seventy-five thousand (175,000) square feet" shall be, and they are hereby, substituted in lieu thereof.

## III.

The words and figures "one hundred seventy five thousand (175,000) square feet" appearing in the 11th line of Article 3, Sub-section (1), on Page 9 of said Lease shall be deleted, and the words and figures "one hundred seventy thousand (170,000) square feet" shall be, and they are hereby, substituted in lieu thereof.

## IV.

The words and figures "a permanent garden area not to exceed five thousand (5,000) square feet in area," appearing in the 12th and 13th lines of Sub-section (1) of Article 3, on page 9 of said Lease, shall be deleted and the words and figures "a permanent garden and outdoor activity sales area not to exceed two thousand four hundred (2,400) square feet of building area and four thousand six hundred and twenty (4,620) square feet of fenced, canopied area adjoining said building", shall be, and they are hereby, substituted in lieu thereof.

## V.

The words and figures "one (1) story in height and shall not exceed more than eight thousand (8,000) square feet in area" appearing in the 14th, 15th and 16th lines of Article 3, Sub-section (1), on Page 9 of said Lease shall be deleted, and the words and figures "one (1) story in height with basement and shall not exceed eleven thousand two hundred fifty (11,250) square feet in area on the first (1st) floor and eight thousand seven hundred twenty-one (8,721) square feet as basement storage area" shall be, and they are hereby, substituted in lieu thereof.

## VI.

The words "from the date of this lease" appearing in the 5th line of Sub-section (1) of Article 3, on Page 9 of said Lease, and in the 4th line of Sub-section (3) of Article 3, on Page 10 of said Lease, and in the 1st line on Page 11 of said Lease, and the words "from the date of execution of this Lease" appearing in the 1st line on Page 15 of said Lease, are hereby deleted, and the words "from the date of ratification of this Lease by the landlord under the Major Lease" shall be, and they are hereby, substituted in lieu thereof.

## VII.

It is understood and agreed that the suggested buildings shown on the Brandeis Tract on the master plan, marked "EXHIBIT D", attached to and made a part of said Lease, are suggestions only, and Landlord is in no way bound by same, irrespective of the provisions of Sub-section (4) of Article 3, except to the extent that boundary lines of any buildings Landlord, at its option, shall construct shall be so constructed within the building lines, as shown on said Master Plan, as it is the intent of the parties hereto that said Master Plan, in so far as the Brandeis Tract is concerned, delineates only building lines and parking areas as the obligation of Landlord under the provisions of Sub-section (4) of Article 3 of said Lease.

The above mentioned Lease, as heretofore and herein modified and supplemented, is in all other respects fully ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and affixed their seals the day and year first above written, the corporate parties by their proper officers duly authorized thereunto.

THE BRANDEIS INVESTMENT COMPANY

By _____
        Vice President

ATTEST:

_____
        Secretary

LANDLORD

SEARS, ROEBUCK AND CO.

By _____
        Vice President

ATTEST:

_____
        Assistant Secretary

TENANT

Page 3 of 3

## AMENDMENT TO LEASE

THIS AGREEMENT made and entered into this 13th day of
November, 1958, by and between THE BRANDEIS INVESTMENT COMPANY,
a Nebraska corporation, party of the first part and hereinafter
referred to as Landlord, and SEARS, ROEBUCK AND CO., a New York
corporation, and authorized to carry on business in the State of
Nebraska, party of the second part and hereinafter referred to
as Tenant, WITNESSETH:

WHEREAS, under date of June 23, 1953, the parties hereto
entered into a lease for a term beginning August 1, 1958 and
ending July 31, 2053, demising a portion of the hereinafter
described premises located in Omaha, Douglas County, Nebraska,
to wit:

> The Northeast Quarter (NEā) of the Northeast Quarter
> (NEā) of Section Twenty-three, Township Fifteen (15),
> North, Range Twelve (12), East of the 6th P.M., Douglas
> County, Nebraska, except county roads;

such demised portion being more particularly shown and delineated
on a plat attached to said lease marked "EXHIBIT B", and made a
part thereof, and

WHEREAS, said lease was modified by an agreement entered
into on July 11, 1953, said agreement to be hereinafter re-
ferred to as Amendment No. 1, and further modified by an agree-
ment entered into on November 12, 1958, said agreement to be
hereinafter referred to as Amendment No. 2, and

WHEREAS, the parties hereto desire to further amend and
modify said lease in the manner hereinafter set forth by this
agreement which shall be hereinafter referred to as Amendment
No. 3.

NOW, THEREFORE, in consideration of the mutual covenants
herein contained and the sum of One Dollar ($1.00) in hand paid
by each of the parties hereto to the other, and other good and
valuable consideration, the receipt and sufficiency of which
are hereby acknowledged, the parties hereto agree as follows:

**EXHIBIT D**

### I.

It is understood and agreed by and between the parties hereto that notwithstanding the provisions of paragraph (h) of Article 3 of the said lease, which among other things designates the area in which buildings and improvements may be constructed on the Brandeis Tract, [Landlord may and shall have the right to erect, construct and maintain a permanent garden and outdoor activity sales area not to exceed Two Thousand Four Hundred (2,400) square feet of building area and Four Thousand Six Hundred and Twenty (4,620) square feet of fenced canopied area adjoining said building and a service station which shall not be more than one (1) story in height with basement ~~construction~~, such basement to be optional with Landlord and shall not exceed Eleven Thousand Two Hundred Fifty (11,250) square feet in area on the first floor, and Landlord may erect, construct and maintain either said garden and outdoor activity area or service station, or both of them, at any location which is either south or north of the boundary lines of the area shown on the Plot Plan "EXHIBIT D" for the construction of the suggested Brandeis Store; and it is further understood and agreed in this connection that nothing herein contained shall in any manner limit or reduce the amount of inside building selling space of any building or buildings that may be constructed on the Brandeis Tract, as provided for in paragraph (h) of Article 3 of said lease.]

### II.

It is further understood and agreed by and between the parties hereto that neither of the parties hereto shall (whether by itself or by subtenants or sublessees or concessionaires) sell gasoline from their respective service stations nor from any other building or improvements that may be located on their respective tracts.

### III.

Save and except for the amendments and modifications herein set forth, the parties hereto agree that the said lease of

une 23, 195  as herein amended and modified and as heretofore
amended and modified by  mendments  os. 1 and 2 shall be and
remain in full force and effect.

    IN  ITLES WHEREOF, the parties her to have caused this
agreement to be executed the day and date  irst above written
and their respective corporate seals to be affixed thereto,
all pursuant to authority from their respective board of
directors.

THE  WINREIS INVESTMENT COMPANY

Attest:

_____        By _____
Secretary                            Vice President

LANDLORD

SEARS, ROEBUCK AND CO.

Attest:

_____        By _____
Assistant Secretary                  Vice President

TENANT

3

THIS AGREEMENT made and entered into this 19th day of
F. January , 1959, by and between MYRON CO., a Neb-
raska corporation, Party of the First Part and hereinafter re-
ferred to as "Myron," THE BRANDEIS INVESTMENT COMPANY, a Nebr-
aska corporation, Party of the Second Part and hereinafter re-
ferred to as "Brandeis," and SEARS, ROEBUCK AND CO., a New
York corporation, Party of the Third Part and hereinafter re-
ferred to as "Sears," WITNESSETH:

WHEREAS, under date of April 21, 1954 Brandeis, as lessee,
entered into a lease with Myron N.Blank, as Lessor, for a term
of ninety-nino (99) years from and after August 1, 1954 (which
said lease was assigned by Myron N. Blank to Myron Co., a
Nebraska corporation), and which said lease demised upon the
terms, covenants, rentals and conditions contained and set
forth therein, the following described premises, to wit:

> The Northeast Quarter (NE¼) of the Northeast
> Quarter (NE¼) of Section Twenty-three (23),
> Township Fifteen (15) North, Range Twelve
> (12) East of the Sixth P.M., Douglas County,
> Nebraska, except county roads.

AND, WHEREAS, under date of January 11, 1955, Myron and
Brandeis amended said lease by reducing the quantum of ground
by approximately .052 acres in extent covered by said lease,
which said lease, as amended, will hereinafter be referred to
as the "Myron Lease," and

WHEREAS, on or about June 23, 1958, Brandeis, as land-
lord, entered into a lease with Sears, as tenant, and on
July 11, 1958, November   , 1958 and November 13, 1958 entered
into amendments thereto, which said lease as amended will here-
inafter be referred to as the "Sears' Lease," a copy of which
said lease and amendments thereto are hereto attached marked
EXHIBIT A and by specific reference herein made a part hereof,
and which said lease demised, upon the terms, covenants, ren-
tals and conditions contained and set forth therein, for a
term beginning on August 1, 1958 and ending on July 31, 2053,
that portion of the above-described premises, particularly
described and set forth in EXHIBIT B referred to in and made
a part of the Sears' Lease, and

WHEREAS, Brandeis at the request of Sears desires to
obtain certain modifications of the Myron Lease as more par-
ticularly hereinafter set forth.

NOW, THEREFORE, IT IS AGREED by and between Myron and
Brandeis that the Myron Lease be and the same is hereby amended
and modified as follows:

1. Section (6) of Division III is modified by adding
thereto the following: If after the erection and construc-
tion of a department store building by Sears under the Sears'
Lease and the expiration of twenty-five (25) years from the
completion of the construction of said department store build-
ing, Sears, pursuant to the provisions of paragraph (8) of
Article 3 of the Sears' Lease, tears down and removes the de-
partment store building, except as set forth in the proviso be-
low,Brandeis shall not be required to make the deposit above pro-
vided for, and the failure of Brandeis to make such deposit

**EXHIBIT E**

14

prior to the removal or destruction of the department store
building shall not constitute a default hereunder; provided
always that if Sears fails to complete the erection and
construction of a building of the same dimensions and type
of construction as that torn down and removed and at least
equal to the value of that torn down and removed, within
three (3) years from and after said tearing down and removal,
a deposit in the amount above required shall be made on a date
which is three (3) years after the tearing down and removal
of said department store building and failure by Brandeis
to make such deposit shall constitute a default under this
lease.

Before beginning the removal or destruction of said
department store building, the appraised value thereof shall
be determined by a board of appraisers chosen, selected and
appointed as provided in Section (15) of Division III of
this lease.

2.   Section (8) of Division III is hereby modified and
changed in the following respects, to wit:

(a)   That the words and numerals thirty (30)
wherever the same appears in said Section (8) shall
be eliminated and there shall be substituted in
place and in lieu thereof the words and numerals
sixty (60).

(b)   That the words and numerals ninety (90)
wherever the same appears in Section (8) shall be
eliminated and there shall be substituted in place
and in lieu thereof the words and numerals one
hundred twenty (120).

3.   (a)   Notwithstanding the provisions of subsection
(b) of Section (7) of Division II, it is agreed that any
insurance policies covering the buildings and improvements
on the premises demised by the Sears' Lease shall be pay-
able to The Omaha National Bank of Omaha, Nebraska, as
trustee, for the benefit of Myron, Brandeis and Sears, and
shall be deposited with said Bank, to the end that said
trustee shall be entitled to collect for the use and benefit
of Myron, Brandeis and Sears all money due under said poli-
cies, payable in the event of loss to or damage of said build-
ings and improvements on the premises demised by the Sears'
Lease.

(b)   Notwithstanding the requirement contained
in subsection (b) of Section (7) of Division II of this lease,
that insurance be written in companies authorized to do busi-
ness in the State of Nebraska or for war risk insurance if
such insurance be provided by the United States Government
or an instrumentality thereof, it is agreed that with respect
to buildings and improvements situated on the premises demised
by the Sears' Lease that Brandeis and Sears may agree that
Sears may self-insure said buildings and improvements on terms
agreeable to Brandeis and Sears, and if such self-insurance
agreement be made between Brandeis and Sears, Brandeis shall
not be required to carry insurance on the buildings and im-
provements situated on the premiss demised by the Sears'
Lease, while such self insurance agreement is in effect, and
the failure to carry such insurance shall not constitute a

default under this lease; subject, always, to the following:
That Sears in such agreement shall promise, in case of any
loss or damage to said buildings or improvements from perils
herein otherwise agreed to be covered by insurance, to deposit
within sixty (60) days after the occurrence of any such loss
or damage with The Omaha National Bank, as trustee, an amount
equivalent to what said Bank would be entitled to collect
under policies of insurance if the same had been written as
in the lease provided.  The Omaha National Bank, as Trustee,
after receipt of said monies, shall, for the purpose of this
lease, treat said monies in all respects as though they had
been collected as proceeds under policies of insurance, and
shall hold and disburse the same as provided in said lease,
and make disbursements of funds to which Brandeis and/or Sears
shall be entitled under this lease (as modified and changed
hereby) to Sears and Brandeis, or either of them, as may from
time to time be agreed upon between Brandeis and Sears.  If
any self-insurance agreement be made between Brandeis and
Sears, Brandeis agrees to promptly deliver an executed copy
thereof to Lessor and executed copies of any and all amend-
ments of any such agreement made after the execution thereof.

It is further agreed by and between Myron, Brandeis
and Sears, as follows:

4.  Myron does hereby warrant and represent unto Sears
that as of the date of the commencement of the term of the
Sears' Lease, namely, August 1, 1958, that Brandeis was not
in default in the payment of any monies required to be paid
or in the performance of any obligations required to be per-
formed by Brandeis under the Myron Lease.

5.  If the Myron Lease be terminated, entry made and
said lease becomes void as provided in Section (6) of Divi-
sion III of said lease, Myron, Brandeis and Sears agree, as
follows:

(a)  Brandeis shall from and after the date that
such termination becomes effective have no further
right, title or interest in and to the property de-
mised under the Myron Lease, nor in or to any build-
ings, structures and improvements thereon.

(b)  The Sears' Lease shall terminate on the date
the termination of the Myron Lease becomes effective.

(c)  Myron and Sears shall enter into a new lease
for a term beginning on the date of the termination of
the Sears' Lease as provided in (b) above and ending
on July 31, 2053 covering the same property and upon
the same terms, conditions, covenants and rentals as
are contained in the Sears' Lease applicable to the
period subsequent to the date of termination, except
that Sears shall pay rent, taxes, assessments and
levies from the commencement of the term, and refer-
ence to the Myron Lease shall be omitted with appro-
priate references to the property demised by the Myron
Lease substituted therefor.

6.  Except as modified and supplemented herein, the
Myron Lease shall continue to remain in full force and effect,
and the obligations and liabilities of Myron and Brandeis
thereunder shall remain unimpaired.

3

IN WITNESS WHEREOF, the parties hereto have caused this
agreement to be executed the day and date first above written
and their respective corporate seals to be affixed thereto,
all pursuant to authority from their respective boards of
directors.

THE BRANDEIS INVESTMENT COMPANY

By _____
                Vice President

Attest: _____
                Secretary


SEARS, ROEBUCK AND CO.

By _____
                Vice President

Attest: _____
                Assistant Secretary


MYRON CO.

By _____
                Vice President

Attest: _____
                Secretary

4

AGREEMENT

THIS AGREEMENT made and entered into this __25th__ day
of June, 1959 by and between MYRON CO., a Nebraska Corpo-
ration, Party of the First Part, and hereinafter referred
to as Myron, and THE BRANDEIS INVESTMENT COMPANY, a Nebraska
Corporation, Party of the Second Part, and hereinafter re-
ferred to as Brandeis,

W I T N E S S E T H :

WHEREAS, under date of April 21, 1954, Brandeis as
Lessee entered into a lease (which has been amended and
modified prior to the date hereof by written agreements
with Myron H. Blank as Lessor, for a term of ninety-nine
(99) years from and after August 1, 1954 (which lease was
assigned by Myron H. Blank to Myron Co., a Nebraska Corpo-
ration, and is hereinafter referred to as the lease between
Brandeis and Myron) which said lease demised upon the terms,
covenants, rentals and conditions set forth therein the fol-
lowing described premises, to wit:

> The Northeast Quarter (NE¼) of the North-
> east Quarter (NE¼) of Section Twenty-three
> (23), Township Fifteen (15) North, Range
> Twelve (12), East of the 6th P.M., Douglas
> County, Nebraska, except county roads,

and

WHEREAS, on June 23, 1958 Brandeis as Landlord entered
into a lease (which has been amended and modified prior to
the date hereof by written agreements) with Sears, Roebuck
and Co., as Tenant, for a term beginning August 1, 1958 and
ending July 31, 2053, which said lease demised upon the terms,
covenants, rentals and conditions set forth therein, a portion
of the premises demised by the aforedescribed lease between
Brandeis and Myron, and

WHEREAS, in connection with the development of the premises
demised by the lease between Brandeis and Myron, it is neces-
sary to grant utilities easements to the Metropolitan Utilities
District of Omaha, Nebraska, which grant is to be made jointly
by Brandeis, Myron and Sears, Roebuck and Co., and

WHEREAS, the lease between Brandeis and Myron, among other
things, makes provision for and grants to Brandeis options to
purchase the demised premises upon designated terms and condi-
tions, all as set forth in Sections 11, 12 and 13 of Division
III of said lease, and Myron has agreed to execute together
with Brandeis and Sears, Roebuck and Co. the afore-mentioned
utilities easement, upon the condition that the said lease be-
tween Brandeis and Myron be modified in a manner so that the
granting of said easement as aforesaid shall in no manner
affect the determination of the fair market value of the de-
mised premises for the purposes of Sections 11, 12 and 13 of
Division III of the said lease between Brandeis and Myron.

NOW, THEREFORE, IT IS AGREED by and between the parties
hereto as follows:

1. For the purpose of inducing Myron to execute, together
with Brandeis and Sears, Roebuck and Co., the easement attached
hereto and marked EXHIBIT A, Myron and Brandeis agree that the

**EXHIBIT F**

appraised value of the premises, demised by the lease between
Brandeis and Myron, dated April 21, 1954, to be determined
under Sections 11, 12 and 13 of Division III of said lease,
shall be made and determined without giving any considera-
tion or effect to the said easement and as if said easement
were not in existence.

2.   The parties hereto further agree that the grant-
ing of the said easement, EXHIBIT A, by the parties hereto
and Sears, Roebuck and Co. shall not change, modify or affect
the said lease between Brandeis and Myron, dated April 21,
1954, in any manner or way or to any extent whatsoever, and
that said lease as modified by the previous written agree-
ments between the parties hereto and as modified by this
agreement, shall remain and continue to remain in full force
and effect.

IN WITNESS WHEREOF, the parties hereto have caused this
agreement to be executed on the day and date first above writ-
ten and their respective Corporate Seals to be affixed thereto,
all pursuant to authority from their respective Boards of Direc-
tors.

MYRON CO., a Nebraska Corporation

By _____
                        President

Attest: _____
                        Secretary

Party of the First Part

THE BRANDEIS INVESTMENT COMPANY,
a Nebraska Corporation

By _____

Attest: _____

Party of the Second Part

STATE OF IOWA   )
                ) SS.
COUNTY OF POLK  )

On this 15 day of _____ 1959, before me, a
Notary Public, personally came _____ and
_____ President and Secretary respectively
of MYRON CO., a Nebraska Corporation, who are personally known to
me to be the identical persons whose names are affixed to the
above instrument, and they acknowledged the execution thereof to
be their voluntary act and deed and the voluntary act and deed of
said Corporation.

Norma Tilden
                        Notary Public

My Commission expires
7/4/60

2

STATE OF NEBRASKA  )
                   )  SS.
COUNTY OF DOUGLAS  )

On this ____ day of _____, 1959, before me, a
notary Public, personally came _____ and Secretary
respectively of THE BRANDEIS INVESTMENT COMPANY, a Nebraska Cor-
poration, who are personally known to me to be the identical per-
sons whose names are affixed to the above instrument, and they
acknowledged the execution thereof to be their voluntary act and
deed and the voluntary act and deed of said Corporation.

_____
Notary Public

My Commission expires
_____

3

WHEREAS, the undersigned, The Brandeis Investment
Company, a Nebraska corporation, on August 31,
1949, entered into a lease with Byron Co., lessor of Des
Moines, Iowa, as Lessor, said Lessor having assigned
its interest in said lease or having control of the
premises described by said lease, to wit:

The Northeast Quarter (NE¼) of the Northeast
Quarter (NE¼) of Section Twenty-three (23),
Township Fifteen (15) North, Range Twelve (12)
East of the 6th P.M., Douglas County, Nebraska,
except county roads

to Byron Co., a Nebraska corporation, and

WHEREAS, Sears, Roebuck & Co., the sub-lessee of The
Brandeis Investment Company for a portion of the above
described premises, together with The Brandeis Investment
Company, desire to widen and construct a center median on
72nd Street from eight hundred twenty-two (822) feet
west of centerline of 72nd Street to eighteen hundred
fifty and eight tenths (1158.8) feet west of centerline
of 72nd Street and on south side of Dodge Street, from
nine hundred twenty-two (922) feet west of centerline
of 72nd Street to fifteen hundred fifty-six and thirteen
hundredths (1556.13) feet west of centerline of 72nd
Street, all in Omaha, Douglas County, Nebraska, and
by reason thereof it is necessary for Byron Co., a Nebraska corporation, as the owner of said above described
premises, to file an application with the City of Omaha
for a permit authorizing such construction and the installation of the necessary curbing and paving connected
therewith, and

WHEREAS, Byron Co., a Nebraska corporation, in said
application undertakes to be responsible for all curbing
and paving not complying with City Standards and Specifications.

NOW, THEREFORE, in consideration of the execution
and filing by Byron Co., a Nebraska corporation, of the
above described application for permit, the undersigned
The Brandeis Investment Company, a Nebraska corporation,
does hereby agree to indemnify Byron Co. for and hold
Byron Co. harmless from any and all costs and expenses
of every kind, character and description, resulting from
and arising out of the agreement of Byron Co. to "be
responsible for all curbing and paving not complying
with City Standards and Specifications," as provided
in the above described application for permit.

Dated at Omaha, Nebraska, this 14th day of
_____, 1966.

THE BRANDEIS INVESTMENT COMPANY

By _____
    John Baum, Vice-President

Attest: _____
        Secretary

## EASEMENT

FOR AND IN CONSIDERATION of the sum of One Dollar ($1.00)
and other good and valuable consideration, in hand paid to
MYRON CO., a Nebraska Corporation, THE BRANDEIS INVESTMENT
COMPANY, a Nebraska Corporation, and SEARS, ROEBUCK AND CO.,
a New York Corporation, Grantors, by the Metropolitan UTILITIES
DISTRICT of Omaha, Nebraska, Grantee, the receipt of which is
hereby acknowledged, and in consideration of the agreements by
Grantee herein contained, the said Myron Co., the said The
Brandeis Investment Company, and the said Sears, Roebuck and
Co. hereby grant to the said Metropolitan Utilities District
of Omaha, Nebraska, and to its successors and assigns, for a
term beginning on May 1, 1959 and ending on April 30, 2009,
the right to construct, lay, maintain, operate, reconstruct,
repair, relay, enlarge and inspect, at any time and from time
to time, a pipe line or lines under the surface of the herein-
after described premises for the conveyance of water and/or gas
or both water and gas in and through same, together with full
and complete right of ingress to and egress from the surface of
the hereinafter described premises, for the purposes herein set
forth, to wit:

    (a)  A strip of land twenty-five (25) feet wide and
running North and South and described as the East twenty-
five (25) feet of the West thirty-five (35) feet of the
Northeast Quarter (NE¼) of the Northeast Quarter (NE¼)
of Section Twenty-three (23), Township Fifteen (15)
North, Range Twelve (12) East of the 6th P.M., except
roads, in Douglas County, Nebraska.

    (b)  A strip of land twenty (20) feet wide and run-
ning East and West, located in the Northeast Quarter
(NE¼) of the Northeast Quarter (NE¼) of Section Twenty-
three (23), Township Fifteen (15) North, Range Twelve
(12) East of the 6th P.M., except roads, in Douglas
County, Nebraska, the center line of which strip is
described as follows:

    Beginning on the West right-of-way line of
72nd Street in Omaha, Nebraska, at a point 427.5
feet South of the Northeast Corner of said Sec-
tion 23, thence in a westerly direction parallel
with the South right-of-way line of Cass Street
in Omaha, Nebraska, for a distance of 1242.4 feet
to a point on the East line of the premises de-
scribed in "(a)" hereinabove.

Subject, however, to the right which the Grantors, for themselves

(both individually and collectively) and for their respective
successors and assigns, retain and reserve from this grant, to
exclusively use the surface of the above-described areas for park-
ing or for any other purpose, including but not in limitation
of the foregoing, the right to pave all or any part of said sur-
face areas with concrete or other paving material. Grantors,
for themselves (both individually and collectively) and for their
respective successors and assigns, agree not to construct any
building on the said surface areas during the term of this grant.

Grantee, in consideration of this grant, agrees to commence
the construction and laying of water and gas pipe lines for sup-
plying gas and water to the Grantors and their successors and
assigns and to the Lessees of any of them, under the surface of
the above-described areas, and thereafter with due diligence to
continue said construction and laying of the pipe lines to com-
pletion, except that the cost and expense of construction and
laying of the pipe lines under the surface of the areas described
in "(b)" above, shall be borne in a manner to be agreed upon
between The Brandeis Investment Company, Sears, Roebuck and Co.
and the Metropolitan Utilities District of Omaha, Nebraska.
Grantee further agrees from and after the completion of such con-
struction and laying, as aforesaid, and for the remainder of the
term of this grant, to maintain, operate, repair, relay, enlarge
or reconstruct when necessary, said pipe line or lines. Grantee
further agrees, upon completion of the original construction and
laying and thereafter upon completion of any repairs, reconstruc-
tion, inspection, enlargement or relaying of all or any part of
said pipe line or lines, to restore the surface and the remainder
of said easement areas to their condition prior to such construc-
tion and laying and such repairs, reconstruction, inspection, re-
laying or enlargement, including but not in limitation of the fore-
going, the restoration to its prior condition and with like materials
and in good and workmanlike manner, any paving destroyed or damaged

2

of MYRON CO., a Nebraska Corporation, who are personally known
to me to be the identical persons whose names are affixed to the
above instrument, and they acknowledged the execution thereof to
be their voluntary act and deed and the voluntary act and deed
of the Corporation, all pursuant to resolution duly adopted by
Grantor's Board of Directors.

_Nornia Tilden_
Notary Public

My Commission expires
_7/4/60_

STATE OF NEBRASKA )
                  ) SS.
COUNTY OF DOUGLAS )

On this _2nd_ day of _July_, 1959, before me, a
Notary Public, personally came _____ and Secretary re-
spectively of THE BRANDEIS INVESTMENT COMPANY, a Nebraska Corpo-
ration, who are personally known to me to be the identical persons
whose names are affixed to the above instrument, and they acknowl-
edged the execution thereof to be their voluntary act and deed and
the voluntary act and deed of the Corporation, all pursuant to
resolution duly adopted by Grantor's Board of Directors.

_Diary Bcole_
Notary Public

My Commission expires
_July 14, 1960_

STATE OF TEXAS   )
                 ) SS.
COUNTY OF DALLAS )

On this _20th_ day of _July_, 1959, before me, a Notary
Public, personally came _R. L. Tayloe_ and
_R B Monson, Vice President_ and _Asst Sec._ respectively
of SEARS, ROEBUCK AND CO., a New York Corporation, who are person-
ally known to me to be the identical persons whose names are affixed
to the above instrument, and they acknowledged the execution thereof
to be their voluntary act and deed and the voluntary act and deed
of the Corporation, all pursuant to resolution duly adopted by Grant-
or's Board of Directors.

_Alida Macune_
Notary Public

My Commission expires
_June 1, 1961_

4

5-

## ACCEPTANCE OF GRANT

The Undersigned, METROPOLITAN UTILITIES DISTRICT of Omaha, Nebraska, for itself and its successors and assigns, hereby accepts the above grant, upon the terms and conditions herein-above set forth, and agrees for itself and its successors and assigns to fully perform all of such terms and provisions to be performed by it.

Dated at Omaha, Nebraska this *6th* day of *August*, 1959.

METROPOLITAN UTILITIES DISTRICT
of Omaha, Nebraska

By_____
General Manager

(NO SEAL)

STATE OF NEBRASKA )
                 ) SS.
COUNTY OF DOUGLAS )

On this *6th* day of *August*, 1959, before me, a Notary Public, personally came *R. H. Trester*, General Manager of METROPOLITAN UTILITIES DISTRICT of Omaha, Nebraska, who is personally known to me to be the identical person whose name is affixed to the above instrument, and he acknowledged the execution thereof to be his voluntary act and deed and the voluntary act and deed of said Metropolitan Utilities District of Omaha, Nebraska.

_____
Notary Public

My Commission expires
*May 26, 1960*

5



# Proposal

**FROM:**   **PDI CONSTRUCTION**                          Page. No.   1
            **PO Box 522**
            **Gretna, NE 68028**
            **Phone No.: (402) 510-7011**

**PROPOSAL SUBMITTED TO:**

Name:   The Lerner Company

Phone:   402-330-5480                Date:   April 8, 2019

Street:   10855 West Dodge Rd

City:   Omaha

State:   NE                          Zip:   68154

BUDGET PRICING GOOD FOR 30 DAYS

I propose to furnish all materials and perform all labor necessary to complete the following: Sears Crossroads Painting

-Provide supervision for all phases of construction
-All work performed during regular working hours
-Scrape and prep overhangs
-Painting of overhangs

All of the work is to be completed in a substantial and workmanlike manner for the sum of ($24,730.00). Payment to be made as follows: 25% deposit before work begins, balance due upon completion.

Any alterations or deviation from the above specifications involving extra cost of material or labor will be executed upon written change order, and will become an extra charge over the sum mentioned in this contract.  All agreements must be made in writing.

**ACCEPTANCE**

You are hereby authorized to furnish all materials and labor required to complete the work mentioned in the above proposal for which The Lerner Company agrees to pay the amount mentioned in said proposal and according to the terms thereof.

_____          _____



# Proposal

**FROM:**  **PDI CONSTRUCTION**               **Page. No.** 1
         **PO Box 522**
         **Gretna, NE 68028**
         **Phone No.:  (402) 510-7011**

**PROPOSAL SUBMITTED TO:**

Name:  The Lerner Company

Phone:  402-330-5480          Date:  April 8, 2019

Street:  10855 West Dodge Rd

City:  Omaha

State:  NE                    Zip:  68154

BUDGET PRICING GOOD FOR 30 DAYS

I propose to furnish all materials and perform all labor necessary to complete the following:
Sears Crossroads Canopies

-Provide permits as needed to complete the project
-Provide supervision for all phases of construction
-All work performed during regular working hours
-Removal of 9 existing canopies on main Sears building
-Provide and install 10 new canopies on main Sears building

All of the work is to be completed in a substantial and workmanlike manner for the sum of
($276,980.00). Payment to be made as follows: 25% deposit before work begins, balance due
upon completion.
Any alterations or deviation from the above specifications involving extra cost of material or labor
will be executed upon written change order, and will become an extra charge over the sum
mentioned in this contract.  All agreements must be made in writing.

**ACCEPTANCE**

You are hereby authorized to furnish all materials and labor required to complete the work
mentioned in the above proposal for which The Lerner Company agrees to pay the amount
mentioned in said proposal and according to the terms thereof.



6102 Arbor Street Suite 5
Omaha, Nebraska 68106
Office 402.348.0909
Fax 402.348.0101

 

| PROPOSAL SUBMITTED TO: | DATE: | April 8, 2019 | TEL: |
|---|---|---|---|
| NAME: Crossroads Mall | JOB NAME: | Former Sears Main Roof, Tire Cntr & Canopys | |
| STREET: 7400 Dodge Street | JOB LOCATION: | 7400 Dodge Street | |
| CITY: Omaha, NE | CITY: | Omaha, NE | |

Independent Roofing Company, hereinafter called the "Company", proposes to furnish labor and material
necessary to complete the work according to the following specifications:
Scope of work for replacing the roofs on the former Sears main store and the former Tire Center:

- Furnish material and labor to replace the existing roof system on the former Sears main store with a new fully adhered .60 mil epdm roof system.
- Budget number: $798,000.00
- Furnish material and labor to replace the existing roof system on the former Sears Tire Center with a new fully adhered .60 epdm roof system.
- Budget number: $240,000.00

**\*Note: The pricing for the above work is for Budget purposes only.\***

Contract Price.    The net sum payable for the work above described is:
As Above                                                                    ($As Above            )

1. Terms. If the work is completed within 30 days of its commencement, payment in full due on or before the 10th day of the month following the date of invoice. In all other cases, payment of 90% of the work completed shall be made on or before the 10th day of the following month, with final payment due 30 days after completion. Non-payment in accordance with the above shall be cause for terminating performance. If payments are not made when due, interest, cost incidental to collection and attorneys' fees (if an attorney is retained) shall be added to the unpaid balance. Interest shall accrue at the rate of 1 1/2% per month (on the unpaid balance).
2. SERVICE or FINANCE CHARGE are applicable on past due accounts at the rate of 1 1/2% per month on amounts 30 days past due, which is equal to an ANNUAL PERCENTAGE RATE of 18%. Such charges are shown as "SERVICE CHARGE". There is no SERVICE CHARGE if accounts are paid according to terms.

### ACCEPTANCE OF PROPOSAL
The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized
to do the work as specified.

| INDEPENDENT ROOFING CO., Inc. | Company: |
|---|---|
| By *Thomas Swanda* | Signature: |
| Thomas Swanda – Service Manager | Name:                    Date: |

NOTE: This Proposal subject to revision if not accepted within thirty days

## COMMERCIAL · RESIDENTIAL · SHEET METAL

### INDEPENDENTROOFING.NET

## EXHIBIT O

General Conditions Continued...

3. This written "Agreement" represents the entire integrated agreement between parties hereto and supersedes prior negotiations, representations, or agreements, either written or oral. Any modifications, changes, alterations or additions thereto shall not be binding or enforceable unless approved in writing by both parties.

4. If roof tear-off is to be performed, Contractor shall not be responsible for damages caused by water penetration into the building resulting from moisture contained or trapped in or under the existing roof surface, which is released during tear-off. Contractor shall not be respons ble for damages from leaks through any area of the existing (present) roof surface where Contractor has not performed tear-off surface preparation work.

5. In the event Customer asserts there is a deficiency in or arising out of the planning, and/or supervision of construction of the work (collectively, "Defect") resulting from defective materials, code violation due to installation, failure to meet applicable standards of care, and/or failure to construct the work in a good and workmanlike manner and in accordance with accepted trade standards, then Customer shall, as an absolute condition precedent to the institution of any dispute resolution proceeding, present to Contractor a written notice of said Defect, and shall allow Contractor to inspect the said Defect and present to Customer, within thirty (30) days after receipt of Customer's written notice, a written response which shall include Contractor's recommendations to reach an agreement about Defect. In the event Customer initiates any dispute resolution proceeding without fulfilling these conditions precedent, Contractor shall be entitled to a stay of proceedings until such conditions have been fulfilled.

6. Notwithstanding anything in this Agreement to the contrary to the extent Contractor is directed to accelerate its Work or work overtime or premium time to overcome a delay not from the fault of Contractor, the Contractor shall be entitled to additional compensation.

7. Contractor's repair obligations during the Warranty Period are limited to the original price of the roof installation. In no event shall contractor's liability exceed the original installation price of the roof system, even if it is claimed or determined that the warranty provided has failed of its essential purpose.

8. Damage occurring to the installed or onsite roofing material, resulting from acts of other contractors or persons authorized by Owner to conduct operations, shall be the respons bility of the Owner.

9. Contractor accepts no liability to indemnify or hold Owner harmless for damages to person or property, except those that are the direct result of Contractor's direct negligence which occurs during performance of Contractor's work.

10. *Each paragraph of the General Conditions and the Agreement Conditions shall be construed as an express condition of this Agreement in consideration of the contract price agreed to by Contractor.*

CONTRACT CONDITIONS

*DUTIES AND RESPONSIBILITIES OF CONTRACTOR*

11. *Contractor's price includes furnishing all labor, material and equipment necessary to complete the contract, subject to latent conditions of the work area, which could not be reasonably anticipated by the examination, or the visual inspection ordinarily employed in the roofing trade. If such latent conditions cause or require additional labor or material in the performance of the Agreement, Contractor shall promptly notify Owner of such condition, and such additional material and work will be supplied and performed on a time-and-materials basis by Contractor, unless the parties agree to a stated price for such additional work.*

12. *Contractor will perform the work specified herein in accordance with the written specifications, if any, attached to or stated in the specifications of the Manufacturer of the roofing system to be installed, so that the installation will qualify for the issuance of the Manufacturer's warranty (identified above) to Owner. Contractor shall not be responsible for any defects or deficiencies in said specifications. Contractor EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE with respect to any design or specifications related to the design*

13. *Contractor makes no warranty respecting "Wind Uplift Resistance" of the installed roof system. If a "Factory Mutual Insurance Co. Wind Uplift Standard" is specified, Contractor represents only that the roofing system installed is represented by the Manufacturer thereof to meet such specified standard.*

14. *Contractor warrants that the materials and accessories supplied will be those specified for this Agreement and will be new and of recent manufacture and free from obvious defects. Contractor shall not be responsible for latent defects in material and accessories.*

15. *Contractor shall not be responsible for damages arising from delay due to inclement weather (including the threat of inclement weather), strikes, fires, vandalism, accidents, delays in shipment or delivery of Manufacturer's materials, or other causes beyond its reasonable control; or, if any interruption of Contractor's work occurs by reason of operations of other contractors at the job site, or from Owner's failure to provide Contractor with reasonable access to the job site to perform this contract. If Contractor is delayed in completing the project and the delay is not caused by Contractor, then Contractor shall be entitled to recover reasonable delay costs from the Owner. Owner waives all claims against Contractor for any incidental, indirect or consequential damages arising out of or connected in any way to the work or to this Agreement. This waiver of consequential damages shall include, but is not limited to, delay, disruptions, accelerations, inefficiencies, increased construction costs, increased home office overhead, loss of use, loss of profit, loss of business, loss of income, loss of reputation or any other consequential damages that Owner may have incurred from any cause of action it claims against*

16. *Contractor will have Worker's Compensation Insurance in limits required by state law and Comprehensive General Liability Insurance coverage in force for all of its operations under this Agreement.*

17. *Contractor shall take all reasonable safety precautions with respect to its work, and shall have responsibility for compliance of its equipment and employees with all applicable laws, ordinance, rules, regulations and orders of any public authority for the safety and health of Contractor's Employees. Contractor shall have specific responsibility for housekeeping in its immediate work area, and will remove rubbish and debris caused by its work. Contractor shall not be responsible for the safety and health of any persons present at the job site who are not employees of Contractor.*

*DUTIES AND RESPONSIBILITIES OF OWNER*

18. *Owner represents to Contractor that the roof deck on which the installation is to be made in a sound weight-bearing condition, sufficient for the proposes of Contractor's work and that all surfaces to be utilized by Contractor for fastening, adhering or attaching the roofing system will be adequate for the installation to be performed. Promptly after execution of this agreement and prior to commencement of contractor's work, Owner will inform Contractor in writing of any deck or subsurface conditions which could be damaged by penetrations made by Contractor in installing the roofing system.*

19. *At the time Contractor commences its work, Owner will provide Contractor with exclusive access and use of all roof areas where work is to be performed and such additional area as are reasonably necessary for the Contractor to perform its work without interruption. All roof area work surfaces shall be free of debris and in a dry accessible condition. If preliminary work on the roof area is to be performed by others prior to Contractor's work, such work will be complete. Contractor shall not be required to perform its work while snow or other moisture conditions exist on the roof surface, unless Owner provides compensation for removal or curing of such conditions.*

20. *Owner shall make no changes in the scope of the roof installation described herein or the specifications which would disqualify the installation from the issuance of the Manufacturer's warranty referred to above.*

21. *If Contractor's work is to be inspected by Owner's representative, an architect or other design professional, Owner agrees to firm arrangements to have such person available promptly after notice to make inspection as Contractor's progresses, so as not cause delay. Owner Designates_____ to execute additional work orders or changes and to act for and on behalf of Owner to accept completed work.*

22. *If, in order for Contractor to perform its work under this Agreement, it becomes necessary to disconnect, remove, relocate or otherwise deal with any mechanical or other equipment located on the deck or other surface on which Contractor's work is to be performed, Owner or Owner's agent shall promptly provide for the disconnection, removal, relocation or other appropriate action with respect to such mechanical or other equipment and further, shall provide for the reconnection, replacement or relocation of such mechanical or other equipment following completion of Contractor's work. Contractor shall have no responsibility with respect to any such rooftop equipment, unless it is specifically provided otherwise in this Agreement.*

23. *Owner agrees to provide at its expense builder's risk insurance for the full value of the Contractor's scope of work and for the benefit and protection of Contractor.*

24. *Prior to Contractor's commencement of performance of its work under this Agreement, an appropriate number of test of substances and materials above and below the roof deck shall be conducted by or on behalf of the Owner, at Owner's expense, to determine if asbestos or similar hazardous substances are present above or below the roof deck, which could be disturbed or otherwise affected by Contractor's work under this contract. If such tests indicate the presence of asbestos or similar hazardous substance, Contractor may, at its option, (a) terminate this agreement upon written notice by Contractor to Owner; (b) delay*

*commencement of performance of its work under this Agreement until such products or materials, and any hazards connected therewith, are located and abated, encapsulated or removed (in which case Contractor shall receive an extension of time to complete its work hereunder and compensation for delays encountered as a result of such situation and correction); or (c) proceed to locate, abate, encapsulate and remove such products or materials and any hazards connected therewith at a price to be determined by mutual agreement of Contractor and Owner and to be paid by Owner. If contractor proceeds with its work under this agreement on the assumption that there in asbestos or similar hazardous substance present, based upon results of tests conducted prior to commencement of its performance and does in fact encounter any such products or materials in the course of performing its work, or if such hazardous materials are encountered by any other firm performing work at the job site, and Contractor determines that such materials present a hazard to its employees, Contractor shall have the right to discontinue its work and remove its employees from the job site until such products or materials, and any hazards connected therewith are located and abated, encapsulated or removed or it is determined that no hazard exists (as the case may be) and Contractor shall receive an extension of time to complete its work hereunder and compensation for delays encountered as a result of such situation and correction.*

25. *This Agreement is to be constructed according to the laws of the State of Nebraska with exclusive venue in Omaha, NE.*



**Estimate**

| Date | Estimate # |
|------|-----------|
| 4/8/19 | E2598 |

| Customer |
|----------|
| CROSSROADS MALL |

| Terms | Project |
|-------|---------|
| Net 30 | SEARS SIDEWALK T&R |

| Description | Qty | Rate | Total |
|-------------|-----|------|-------|
| 1,600 SQFT OF 4" SIDEWALK TO BE REMOVED AND REPLACED.  PRICE INCLUDES 16" - 24" OF MUD REMOVAL AND ROCK TO BE HAULED IN. | 1,600 | 9.00 | 14,400.00 |
| Sales Tax | | | 0.00 |

| **Total** | **$14,400.00** |
|-----------|----------------|

**EXHIBIT P**