# EXHIBIT 1

# Sears, Roebuck and Co.
## (Sears)

### DP PARTNERS
### STANDARD INDUSTRIAL LEASE
### (NET-NET-NET)

Lease Preparation Date:  January 20, 2009

DP Partners Logan II K, LLC, Landlord
and
Sears, Roebuck and Co., Tenant

LogistiCenter at Logan

# TABLE OF CONTENTS

**Page**

1. LEASE TERMS ................................................................................................ 1
   1.01 Premises ......................................................................................... 1
   1.02 Project ............................................................................................ 1
   1.03 Parcel ............................................................................................. 1
   1.04 Tenant's Notice Address ................................................................. 1
   1.05 Landlord's Notice Address ............................................................. 1
   1.06 Tenant's Permitted Use .................................................................. 1
   1.07 Initial Lease Term .......................................................................... 1
   1.08 Commencement Date ...................................................................... 1
   1.09 Option to Renew ............................................................................ 2
   1.10 Intentionally Omitted ..................................................................... 2
   1.11 Base Monthly Rent ......................................................................... 2
   1.12 Intentionally Omitted ..................................................................... 2
   1.13 Proportionate Share ....................................................................... 2
   1.14 Parking .......................................................................................... 2
   1.15 Landlord's Work ............................................................................ 2
   1.16 Lease Year ...................................................................................... 3
   1.17 Declarations ................................................................................... 3
   1.18 Business Day .................................................................................. 3

2. DEMISE AND POSSESSION ........................................................................ 3
   2.01 Demise ............................................................................................ 3
   2.02 Intentionally Omitted ..................................................................... 3
   2.03 Early Access ................................................................................... 3

3. BASE MONTHLY RENT ............................................................................... 4
   3.01 Base Monthly Rent ......................................................................... 4
   3.02 Late Payment ................................................................................. 4

4. COMMON AREAS ........................................................................................ 4
   4.01 Definition ....................................................................................... 4
   4.02 Rights to Common Areas ............................................................... 5
   4.03 Changes to Common Areas ............................................................ 5
   4.04 Common Vestibule. ........................................................................ 5

5. ADDITIONAL RENT ..................................................................................... 5
   5.01 Definition ....................................................................................... 5
   5.02 Operating Costs .............................................................................. 5
   5.03 Taxes .............................................................................................. 8

6. INTENTIONALLY OMITTED ...................................................................... 9

7. USE OF PREMISES; HAZARDOUS WASTES ............................................ 9
   7.01 Use ................................................................................................. 9

## TABLE OF CONTENTS
### (continued)

**Page**

| | | | |
|---|---|---|---|
| | 7.02 | Hazardous Wastes | 10 |
| | 7.03 | Tenant's Environmental Covenants | 11 |
| | 7.04 | Landlord's Environmental Covenants | 12 |
| | 7.05 | Indemnity | 12 |
| | 7.06 | Remedial Acts | 14 |
| 8. | PARKING | | 14 |
| 9. | UTILITIES | | 14 |
| | 9.01 | Utility Metering; Tenant Responsible for Payment | 14 |
| | 9.02 | Landlord Not Responsible | 14 |
| | 9.03 | Services | 15 |
| | 9.04 | Separate Common Area Utilities | 15 |
| 10. | ALTERATIONS, MECHANIC'S LIENS | | 15 |
| | 10.01 | Alterations | 15 |
| | 10.02 | Landlord's Consent | 16 |
| | 10.03 | System Installation | 16 |
| | 10.04 | Tenant's Costs | 16 |
| | 10.05 | Landlord Improvements | 17 |
| 11. | FIRE INSURANCE:  HAZARDS AND LIABILITY INSURANCE | | 17 |
| | 11.01 | No Increases in Insurance Premiums | 17 |
| | 11.02 | Tenant's Insurance | 17 |
| | 11.03 | Landlord's Insurance | 18 |
| | 11.04 | Policy Limits | 19 |
| | 11.05 | Policy Requirements | 19 |
| 12. | SUBROGATION AND INDEMNIFICATION | | 20 |
| | 12.01 | Subrogation | 20 |
| | 12.02 | Indemnification | 20 |
| 13. | MAINTENANCE AND REPAIRS | | 20 |
| | 13.01 | Tenant's Maintenance and Repair Obligations | 20 |
| | 13.02 | Repairs at Tenant's Cost | 21 |
| | 13.03 | Intentionally Omitted | 21 |
| | 13.04 | HVAC Maintenance | 21 |
| | 13.05 | Landlord's Maintenance | 21 |
| 14. | AUCTIONS, SIGNS, AND LANDSCAPING | | 22 |
| 15. | ENTRY BY LANDLORD | | 22 |
| 16. | INTENTIONALLY OMITTED | | 23 |

# TABLE OF CONTENTS
(continued)

Page

17. DESTRUCTION ...................................................................................... 23
    17.01 Casualty .......................................................................................... 23
    17.02 Partial Casualty .............................................................................. 23
    17.03 Tenant-Caused Casualty ................................................................ 23
    17.04 Major Casualty to Building ............................................................ 24
    17.05 Effect of Termination .................................................................... 24
    17.06 Restoration ..................................................................................... 24
    17.07 Casualty Proceeds ......................................................................... 24

18. ASSIGNMENT, SUBLETTING AND TRANSFERS OF OWNERSHIP ........... 24

19. BREACH BY TENANT ............................................................................ 26

20. REMEDIES OF LANDLORD .................................................................... 27
    20.01 No Waiver of Remedies ................................................................. 27
    20.02 Cure Periods .................................................................................. 27
    20.03 Landlord's Rights ........................................................................... 27
    20.04 Removal of Tenant ......................................................................... 28
    20.05 Damages ......................................................................................... 28
    20.06 No Waiver ...................................................................................... 29
    20.07 Interest on Past Due Sums ............................................................. 29
    20.08 Rights and Remedies Cumulative .................................................. 29

21. SURRENDER OF LEASE NOT MERGER ................................................. 29

22. ATTORNEYS' FEES; COLLECTION CHARGES ...................................... 29

23. CONDEMNATION ................................................................................. 30

24. RULES AND REGULATIONS .................................................................. 30

25. INTENTIONALLY OMITTED .................................................................. 31

26. SALE BY LANDLORD ........................................................................... 31

27. NOTICES .............................................................................................. 31

28. WAIVER ............................................................................................... 31

29. HOLDOVER; SURRENDER ..................................................................... 31
    29.01 Holdover ........................................................................................ 31
    29.02 Move Out Standards ...................................................................... 31

30. DEFAULT OF LANDLORD; LIMITATION OF LIABILITY ......................... 31
    30.01 Landlord Default ............................................................................ 31

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| | 30.02  Tenant Remedies | 32 |
| | 30.03  Self-Help | 32 |
| | 30.04  Limitation of Landlord's Liability | 32 |
| 31. | SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT; ESTOPPEL | 33 |
| | 31.01  Subordination of Lease | 33 |
| | 31.02  Subordination Agreement | 33 |
| | 31.03  Estoppel Certificates | 33 |
| 32. | INTENTIONALLY OMITTED | 34 |
| 33. | GOVERNING LAW | 34 |
| 34. | NEGOTIATED TERMS | 34 |
| 35. | SEVERABILITY | 34 |
| 36. | BROKERS | 34 |
| 37. | QUIET POSSESSION | 34 |
| 38. | MISCELLANEOUS PROVISIONS | 34 |
| | 38.01  Use of Terms | 34 |
| | 38.02  Headings | 35 |
| | 38.03  Lease Contains Entire Agreement | 35 |
| | 38.04  Time of the Essence | 35 |
| | 38.05  Payments | 35 |
| | 38.06  Successors and Assigns | 35 |
| | 38.07  Performance at Tenant's Expense | 35 |
| | 38.08  Confidentiality | 35 |
| | 38.09  Intentionally Omitted | 35 |
| | 38.10  Landlord's Consent | 35 |
| | 38.11  Force Majeure | 35 |
| | 38.12  Counterparts; Electronic Signature | 36 |
| | 38.13  Submission Not Offer | 36 |
| | 38.14  Authority to Sign Lease | 36 |
| 39. | EXHIBITS | 36 |

**DP Partners Logan II K, LLC**
**STANDARD INDUSTRIAL LEASE**
**(NET-NET-NET)**

For Landlord Use Only:
Building #:
L/A:

Lease Preparation Date: January *20*, 2009

Landlord: DP Partners Logan II K, LLC, a Delaware limited liability company, located at 1200 Financial Boulevard, Reno, Nevada 89502.

Tenant: Sears, Roebuck and Co., a New York corporation.

1.    LEASE TERMS.

1.01    Premises:    The Premises referred to in this Lease contain approximately 87,321 square feet within Building "K" (the "Building") as shown on Exhibit A attached hereto and made a part hereof.  The address of the Premises is: 2100 Center Square Road, Suite 125, Logan Township, New Jersey 08085.

1.02    Project:    The Project in which the Premises are located is known as "LogistiCenter at Logan," located in Logan Township, Gloucester County, New Jersey, and presently consists of approximately 212 developed acres shown in Exhibit A.

1.03    Parcel:    The parcel of land within the Project upon which the Building is located, together with the Building and all other improvements thereon.

1.04    Tenant's Notice Address:    Tenant's Notice Address is Sears, Roebuck and Co., 3333 Beverly Road, Department 824 RE, Hoffman Estates, Illinois 60179, Attn: Vice President, Real Estate; with a copy to: Roebuck and Co., 3333 Beverly Road, Department 824 RE, Hoffman Estates, Illinois 60179, Attn: Associate General Counsel, Real Estate.

1.05    Landlord's Notice Address:    1200 Financial Boulevard, Reno, Nevada 89502 (tel. 775-858-8080).

1.06    Tenant's Permitted Use:    Warehousing and distribution associated with delivery and pick-up of merchandise (the foregoing, the "Intended Use"), ancillary office activities and all other lawful uses on a 24-hour, seven day work week.

1.07    Initial Lease Term:    The Initial Lease Term is for seven (7) years and commences on the Commencement Date and expires at 11:59 PM, local time, on the day immediately preceding the seventh (7th) anniversary of the Commencement Date (the "Expiration Date").

1.08    Commencement Date:    The "Commencement Date" shall be on the date which is the later to occur of:  (i) May 1, 2009; or (ii) the date that Landlord has Substantially Completed (as defined in "Work Letter" attached hereto as Exhibit B) the Landlord's Work (as defined in the Work Letter) (except for items relating to Tenant's racking and material handling system;

PHBF/ 649807.13

and, Punch List Items, as defined in the Work Letter) and has delivered the Premises to the Tenant.

1.09    Option to Renew: Subject to the terms and conditions of this Lease, Tenant shall have the option to renew the term of this Lease beyond the end of the Initial Lease Term for two (2) periods of five (5) years each (the "Renewal Term"). Except as other specifically provided for herein, the terms and conditions of this Lease shall apply during the Renewal Term. If Tenant wishes to exercise its option to renew this Lease for the Renewal Term, it shall give written notice to Landlord not later than seven (7) months prior to the expiration of the Initial Lease Term, or the then current Renewal Term, if applicable; provided, however, that if Tenant shall fail to give any such notice on or before the date which is seven (7) months prior to the then-scheduled expiration of the Term, Tenant's right to exercise its option shall nevertheless continue until ten (10) Business Days after Landlord gives Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said ten (10) Business Day period. It is an express condition to the Tenant's right to exercise an option to renew this Lease, that Tenant not be in default of any of the terms or conditions of this Lease, either at the time of the delivery of the notice of renewal to the Landlord, or the commencement of the Renewal Term; provided, however, that Landlord shall have the right, in its sole discretion, to waive any such term for purposes of Tenant exercising its option to renew. If a Tenant default exists when Tenant delivers its exercise of a Renewal Term, or exists upon the commencement date of such Renewal Term, and any notice and cure period applicable to such default has not expired, Tenant's exercise of such Renewal Term shall be reinstated if Tenant cures such default prior to the expiration of the applicable cure period. As used in this Lease, "Term" shall mean the Initial Lease Term and the Renewal Term for which Tenant has properly exercised its option to renew, and upon the exercise of the Renewal Term, the "Expiration Date" shall be deemed to be the final day of the Renewal Term.

1.10    Intentionally Omitted.

1.11    Base Monthly Rent: As per Schedule 1.

1.12    Intentionally Omitted.

1.13    Proportionate Share: Tenant's Proportionate Share of the Building 23.87%, based upon the square footage of the Premises in relation to the square footage of the Building; the Building's Proportionate Share of the Project is 8% based upon the acreage of the Parcel in relation to the developed acreage of the Project; each of which shall be increased or decreased if the square footage of the Premises or the Building, or the developed acreage of the Parcel or other portions of the Project, changes during the Term.

1.14    Parking: Tenant shall have the exclusive right to use forty (40) paved and striped passenger car-sized parking spaces, which includes one (1) "handicapped" parking space, and ten (10) twenty-six (26) foot long overnight trailer parking spaces, subject to the provisions of Section 8 of the Lease, all as shown on Exhibit I.

1.15    Landlord's Work: Landlord's Work to be performed in the Premises will be performed in accordance with the terms and provisions of the Work Letter.

- 2 -

1.16   Lease Year:  Each twelve (12) month period during the Term, commencing upon the Commencement Date.

1.17   Declarations:   All recorded declarations, cross-easements, covenants and restrictions encumbering the Project, including, but not limited to, the Declaration of Environmental Standards (Pureland) dated August 23, 1973, recorded in the Gloucester County Clerk's Office (the "Clerk's Office") on October 4, 1973 in Book 1250, page 560, the Declaration of Reciprocal Easements (Pureland) dated August 23, 1973, recorded in the Clerk's Office on October 4, 1973 in Book 1250, page 608, each as amended by a First Amendment dated November 17, 1976 and recorded in Clerk's Office in Book 1356, pages 182 and 219, respectively, and the Declaration of Restrictions for Northeast Business Center dated May 16, 1997, recorded in the Clerk's Office on May 23, 1997 in Book B2765, page 215, as all of said instruments have been, and shall be, amended, modified, or revised from time to time.  Landlord will provide Tenant with a copy of any amendment to each Declaration made after the execution of this Lease.  Tenant acknowledges it has received a copy of the Declarations and, as a result of such examination of them as Tenant has deemed necessary, is familiar with and understands their content.  Landlord represents and warrants to Tenant that (i) the Intended Use of the Premises and the Common Areas shall not violate the Declarations, nor shall the Declarations unreasonably interfere with the Intended Use, and (ii) the provisions of the Declarations shall not materially increase Tenant's obligations or liabilities under this Lease.

1.18   Business Day:  Any day other than a Saturday, Sunday or a day on which national banking associations are authorized or required to close.

2.   DEMISE AND POSSESSION.

2.01   Demise.  Landlord leases to Tenant and Tenant leases from Landlord the Premises described in Section 1.01 and Landlord grants Tenant a non-exclusive right to use the Common Areas (as defined in Section 4.01).  Tenant acknowledges that it has examined the Premises and accepts the Premises in their present condition, subject to Landlord's performance of the Landlord's Work described on Exhibit B.  Landlord shall be solely responsible to deliver the Premises on the Commencement Date such that the Premises comply with the Americans with Disabilities Act upon such delivery.  Tenant shall be solely responsible to the extent that the Premises do not comply with the Americans with Disabilities Act where such non-compliance results solely from the particular use of the Premises by Tenant.  Tenant shall be responsible for obtaining, at its cost and expense, all permits and approvals for any work to be done by Tenant on the Premises.  Landlord expressly reserves its right to lease any other space available in the Project to whomever it wishes.  Further Tenant hereby acknowledges that it did not rely on any other tenant remaining a tenant in the Project as a consideration for entering into this Lease.

2.02   Intentionally Omitted.

2.03   Early Access.  Thirty (30) days prior to the Commencement Date, Lessee shall have the right to enter the Premises for the purpose of beginning to prepare the Premises for the operation of Tenant's business, including without limitation, installation of racking, IT equipment and lines (the "Early Access Period").  The parties agree that construction activities relating to Landlord's Work will be ongoing during the Early Access Period, and Tenant shall

- 3 -

cooperate and coordinate its activities, and the activities of its employees, agents and contractors, such that those activities do not delay or interfere with the performance of Landlord's Work. Tenant shall be responsible for protecting its racking and other equipment, product and property from dust, dirt and other conditions resulting from any construction activities of Landlord during the Early Access Period.  Prior to accessing the Premises during the Early Access Period, Tenant shall provide Landlord with evidence of liability insurance as provided in Section 11.02 and will provide Landlord with evidence of the liability insurance of any contractor or contractors engaged by Tenant, in accordance with Section 10.01 and have the contractor to contractors execute and timely deliver and duly file a waiver of mechanics lien in accordance with Section 10.01.  Under no circumstances shall Tenant ship products, or otherwise conduct business in the Premises prior to the Commencement Date.

3.    BASE MONTHLY RENT.

    3.01    Base Monthly Rent.

    A.    Beginning on the Commencement Date and continuing on the first day of every calendar month of the Term, Tenant will pay, without deduction or offset, prior notice or demand, Base Monthly Rent at the place designated by Landlord.  Base Monthly Rent and Additional Rent (if applicable) for any partial month during the Term shall be prorated on a per diem basis.  In the event that the Term of this Lease is to commence upon a date not ascertained on execution, both parties agree to complete and execute a Commencement Date Certificate in the form of Exhibit C within ten (10) days of the date on which the parties agree the Term commences, if applicable.

    B.    Base Monthly Rent for the Initial Lease Term shall be as set forth on Schedule 1 attached hereto and made a part hereof.

    C.    Base Monthly Rent for the first Lease Year of the first renewal period will equal the prior year's rental.  Each Lease Year of the Renewal Term thereafter shall equal 102.5% of the Base Monthly Rent payable hereunder during the immediately preceding Lease Year.

    3.02    Late Payment.  Any installment of Rent or any other charge payable which is not paid within ten (10) days after it becomes due will be considered past due and Tenant will pay to Landlord, as Additional Rent, a sum (the "Late Charge") equal to eight percent (8%) per annum times the amount due, calculated from the date due to the date paid (but no greater than the maximum rate permitted by applicable Legal Requirements (as hereinafter defined)) or twenty-five dollars ($25.00), whichever is greater.  A twenty-five dollar ($25.00) handling charge will be paid by Tenant to Landlord for each returned check.

4.    COMMON AREAS.

    4.01    Definition.  "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project that are provided and designated by Landlord, from time to time, for the non-exclusive use of Landlord, Tenant and other tenants of the Project and their respective employees, agents, customers and invitees.  Common Areas include, but are not limited to: all parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, parkways, driveways, corridors, landscaped areas, exterior

- 4 -

lighting, monument and directional signs, storm and sanitary sewer lines and facilities, and any common restrooms.

4.02    <u>Rights to Common Areas</u>. Except as specifically provided in this Lease, Tenant, its employees, agents, customers and invitees have the non-exclusive right (in common with other tenants, Landlord, and any other person granted use by Landlord) to use of the Common Areas. Tenant agrees to abide by and conform to, and to cause its employees, agents, customers and invitees to abide by and conform to all Rules and Regulations established by Landlord in accordance with <u>Section 24</u>.

4.03    <u>Changes to Common Areas</u>.    Landlord, and/or the applicable declarant or association pursuant to the Declarations (the "<u>Association</u>"), has the right, in its sole discretion, from time to time, provided that the changes do not unreasonably interfere with the use of and access to the Premises by Tenant, to: (1) make changes to the Common Areas, including without limitation, changes in the location, size, shape and number of driveways, entrances, non-exclusive parking spaces and parking areas, ingress, egress, direction of driveways, entrances, corridors parking areas and walkways; (2) close temporarily any of the Common Areas for maintenance purposes; (3) add additional buildings and improvements to the Common Areas; (4) use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project or any portion thereof; and (5) do and perform any other acts or make any other changes in, to or with respect to the Common Areas and Project as Landlord or the Association, as applicable, may, in the exercise of sound business judgment, deem to be appropriate.

4.04    <u>Common Vestibule</u>. The Common Areas include the vestibule entrance adjacent to the main entrance door to the Premises (the "<u>Vestibule</u>"). Notwithstanding anything to the contrary contained in this Lease, Tenant, and not Landlord, shall be responsible, at Tenant's sole cost and expense, for all maintenance, repair, and replacements within and to the Vestibule to the extent of Tenant's maintenance and repair obligations as described in <u>Sections 13.01 through 13.04</u>, and for any security measures therein, however, for the purposes of Landlord's insurance obligations, and the indemnity provisions of this Lease, the Vestibule shall be considered a Common Area.

5.    ADDITIONAL RENT.

5.01    <u>Definition</u>. All charges payable by Tenant other than Base Monthly Rent are called "<u>Additional Rent</u>." Unless this Lease provides otherwise, Additional Rent is to be paid commencing on the Commencement Date, and on the first day of each month until the Commencement Date, and thereafter, with the next monthly installment of Base Monthly Rent, and is subject to the provisions of <u>Section 3.03</u>. The term "<u>rent</u>" or "<u>Rent</u>" whenever used in this Lease means Base Monthly Rent and Additional Rent.

5.02    <u>Operating Costs</u>.

A.    Except as excluded by <u>Section 5.02B</u> below, the term, "<u>Operating Costs</u>" means all costs and expenses of ownership, operation, maintenance, management, repair, replacement, and insurance incurred by Landlord for or with respect to the Parcel, including, but not limited to, the following:  (1) all supplies, materials, labor and equipment, used in or related to the

- 5 -

operation and maintenance of the Parcel; (2) all utilities related to the Common Areas, including but not limited to: water, electricity, gas, telecommunications, heating, lighting, sewer, cable, and waste disposal related to the maintenance or operation of the Parcel; (3) in addition to Tenant's obligations under Section 13, all air-conditioning and ventilating costs related to the maintenance, repair, or operation of the Parcel; (4) all labor, payroll, and employee costs incurred in managing, maintaining, repairing, operating and insuring the Parcel, including, without limitation, clerical, supervisory, and janitorial staff; (5) all maintenance, maintenance supervision, management, environmental monitoring and service agreements, including but not limited to, janitorial, security and trash removal, related to the maintenance or operation of the Parcel; (6) all legal and accounting costs and fees related to the ownership, maintenance, management, and operation of the Parcel; (7) all insurance premiums, deductibles, and other costs of fire, casualty, and liability coverage, rent abatement and earthquake insurance and any other type of insurance related to the Parcel; (8) all operation, maintenance and repair costs to the Common Areas, including but not limited to, sidewalks, walkways, parkways, parking areas, loading and unloading areas, trash areas, roadways, driveways, corridors, and landscaped area, including for example, costs of resurfacing and re-striping parking areas; (9) all maintenance of the Parcel, including, without limitation, building exteriors, restrooms used in common by tenants, signs and directories of the Parcel, painting, caulking, asphalt maintenance; (10) amortization (along with reasonable financing charges) of capital improvements made to the Parcel which may be required by any government authority, law, rule, code, or regulation, or which will improve the operating efficiency of the Parcel; (11) all fees, costs, charges or expenses due or owing by Landlord pursuant to any Declaration, or to the LogistiCenter Maintenance Corporation (or successor thereto) from time to time; (12) a two percent (2%) fee for Landlord's management of the Parcel (2% of the Base Monthly Rent payable in each calendar year); and (13) repairs to or replacement of any HVAC systems, capitalized in accordance with GAAP and amortized over the useful life of such systems. For purposes of calculating Operating Costs each year, the Operating Costs which are controllable by Landlord shall not increase more than four percent (4%) per annum on a cumulative basis during the Initial Lease Term. (By way of explanation and example, if controllable Operating Costs were $100 in the first calendar year of the Term, then the controllable Operating Costs could not exceed $104 in the second calendar year of the Term, and the controllable Operating Costs could not exceed $108.16 in the third calendar year of the Term.) "Controllable" Operating Costs shall not include expenses for Real Estate Taxes, snow removal, insurance and utilities.

      B.    The term "Operating Costs" shall not include: (1) the cost of any off-site personnel, or any on-site personnel above the level of facility manager or superintendent; (2) the cost of any "tenant allowances," alterations, leasing commissions, legal fees, advertising or promotional expenses, or other costs incurred in preparing space for occupancy or developing the Building; (3) amounts paid for professional services in connection with the leasing of space or in connection with relationships or disputes with tenants, former tenants, prospective tenants or other occupants of the Building; (4) debt amortization or financing or refinancing costs; (5) expenses for which Landlord is or will be reimbursed; (6) expenses in the nature of interest, fines and penalties; (7) rent, additional rent and other charges payable under any ground lease or any lease superior to this Lease; (8) any management or similar fee in excess of two percent (2%) of the Base Monthly Rent for the Parcel; (9) any costs or other sums paid to any person or entity related to or affiliated with Landlord to the extent that same exceeds the reasonable and customary cost thereof; (10) professional fees incurred in connection with the preparation of

- 6 -

financial statements, tax returns and other documents and information for Landlord or its mortgagees or other costs associated with the operation of the business of the entity which constitutes Landlord, as the same are distinguished from the costs of operation of the Building, (11) costs of defending any lawsuits with any mortgagee, costs of selling, syndicating, financing, mortgaging, or hypothecating any of Landlord's interest in the Building or the land thereunder, costs of disputes between Landlord and its employees or Building management or other tenants; (12) any repairs or alterations made by Landlord to comply with laws, regulations, codes or ordinances existing as of the execution hereof; (13) depreciation; (14) expenses arising from the negligence of Landlord, its agents, employees or contractors; (15) bad debt or rent loss reserves; (16) charitable contributions; (17) overtime utility charges for utilities benefiting other tenants; (18) costs incurred in connection with the original construction of the Building or the repair of any defects in or inadequacy of the initial design or construction of the Building, or costs incurred in connection with any major change in the Building or Parcel, such as but not limited to adding or expanding floors or decreasing the size thereof; (19) any recalculation of or additional Operating Expenses for which Landlord first notifies Tenant of required payment more than six (6) months after the year in which said Operating Expenses were incurred; (20) rental for the building management office, or any costs attributable to the operation or maintenance of the building management office, or wages, salaries, fringe benefits, or other costs attributable to building management employees; (21) capital expenditures and rental costs for any item which, if purchased, would constitute a capital expenditure; (22) capital repairs or replacements as defined by GAAP, except for repairs to or replacement of any HVAC systems capitalized in accordance with GAAP, the cost of which shall be included in Operating Costs and capitalized over the useful life of the repair or replacement; (23) repair and/or replacement of the foundation, structure, roof, paved areas, exterior painting, exterior walls of the Premises, exterior storm sewage and drainage systems, utility lines to the point of entry into the interior of the Premises; and (24) any maintenance, repair, replacement or security costs or expenses of the Vestibule for which Tenant is responsible under this Lease.

Operating Costs shall be reduced by all cash or credit discounts, trade discounts, or quantity discounts received by Landlord or Landlord's managing agent in the purchase of any goods, utilities, or services in connection with the operation of the Parcel. Landlord shall make payments of all Operating Costs in a timely manner. In the event Landlord leases any item otherwise constituting an Operating Cost, Landlord's election to lease such item rather than purchase it shall not serve to increase Tenant's proportionate share of Operating Costs beyond that which would have applied had said item been purchased. Landlord shall maintain its books and records pertaining to Operating Costs and Real Estate Taxes in accordance with generally accepted accounting principles consistently applied.

Notwithstanding anything there to the contrary, Landlord shall not recover as Real Estate Taxes or Operating Costs more than one hundred percent (100%) of the Real Estate Taxes and Operating Costs actually paid by Landlord. If Landlord receives a refund or credit toward Operating Costs subsequent to the year in which such expense was paid and charged to Operating Costs, Landlord shall pay to Tenant the amount of such refund or credit to the extent Tenant directly or indirectly was charged for such expense during a prior year. If any tenant of the Building receives a refund of a disputed amount from the Landlord as a result of a lease audit, Landlord shall notify Tenant thereof within thirty (30) days thereof, and Tenant shall receive an adjustment and refund from its proportionate share of such amount.

- 7 -

C.    Tenant shall pay to Landlord, Tenant's Proportionate Share of the Operating Costs. Such payment shall be paid by Tenant monthly as Additional Rent commencing as of Commencement Date of this Lease. During the first calendar year of the Term, Tenant's share of the Operating Costs is estimated (which estimate is not intended to be binding) to be $1.23/per sq. ft. of the Premises. Tenant pay to Landlord on a monthly basis, in advance, the amount which Landlord reasonably estimates to be Tenant's Proportionate Share of the Operating Costs. Landlord shall periodically determine Tenant's share of the actual Operating Costs, and in the event that the amount which Tenant has paid to Landlord on account of the Operating Costs is less than the Tenant's share of such actual Operating Costs, Tenant shall pay such difference to Landlord on the next rent payment date. In the event that Tenant has paid to Landlord more than Tenant's share of such actual Operating Costs, the amount of such difference shall be credited against Tenant's payment of estimated Operating Costs next due or refunded at the end of the Term.

D.    Failure by Landlord to provide Tenant with a statement for each year shall not constitute a waiver by Landlord of its right to collect Tenant's share of Operating Costs or estimates for a particular calendar year, and Landlord's right to charge Tenant for such expenses in subsequent years is not waived.

E.    Tenant shall have a period of one (1) year from delivery by Landlord to Tenant of each annual statement of Tenant's Proportionate Share of Operating Costs to audit Landlord's books and records, at Tenant's cost, to determine the accuracy of the statement. Landlord's books and records shall be maintained in accordance with generally accepted accounting principles and kept at Landlord's office at the address set forth at the beginning of the Lease, or at such other address as Landlord may determine. If Tenant fails to review Landlord's books and records within the one (1) year period following the delivery of the statement, then Tenant shall be deemed to have accepted this statement and waived its right to object to the amount set forth on the statement. In the event that Tenant's audit determines that Tenant has overpaid or underpaid its Proportionate Share of Operating Costs for the year being audited, then Tenant shall be entitled to a credit for such overpayment against, or Tenant shall pay the deficiency with, as applicable, the payment or payments of Operating Costs which shall be then next due (or such overpayment shall be refunded, or deficit paid, as applicable, at the end of the Term). In the event that Tenant's audit determines that Tenant has overpaid its Proportionate Share of Operating Costs for the year being audited by four percent (4%) or more, then Tenant shall be entitled to reimbursement for its reasonable out-of-pocket audit costs (other than those of any contingent fee auditor).

5.03    Taxes.

A.    "Real Estate Taxes" are: (i) any tax or fee on Landlord's right to receive, or the receipt of, rent or income from the Parcel or against Landlord's business of leasing the Parcel; (ii) any tax or charge for fire protection, streets, sidewalks, road maintenance, refuse or other services provided to the Parcel by any governmental agency; (iii) any commercial rental tax, levy, fee or charge imposed by any taxing authority; (iv) any tax imposed upon this transaction, or based upon a re-assessment of the Parcel and/or Building due to a change in ownership or transfer of all of part of Landlord's interest in the Parcel and/or Building; (v) any charge or fee

- 8 -

replacing, substituting for, or in addition to any tax previously included within the definition of real property tax; and (vi) the Landlord's reasonable cost of any tax protest relating to any of the above. Notwithstanding the foregoing, Real Estate Taxes: (1) shall not include Landlord's federal or state income, franchise, inheritance or estate taxes; (2) shall not include any special or extraordinary assessments arising from any capital improvements or replacements affecting the Parcel or the Building made by any governmental authority, unless the cost or charges for such capital improvements or replacements, as reflected in such assessments, at Landlord's election, in Landlord's reasonable business judgment, have been spread over (x) the useful life, determined in accordance with GAAP, of the capital improvement or replacement, (y) if such assessment may be paid in installments, the maximum number of installments that Landlord is permitted by the taxing authority to elect, or (z) a number of periodic payments as reasonably determined by Landlord; and (3) shall include only such periodic payment relating to special or extraordinary assessments becoming due and payable during the Term.

B.     Tenant shall pay to Landlord Tenant's Proportionate Share of the Real Estate Taxes. Such payment shall be paid by Tenant monthly as Additional Rent, in advance, the amount which Landlord reasonably estimates to be Tenant's Proportionate Share of the Real Estate Taxes. Landlord shall periodically determine Tenant's share of the actual Real Estate Taxes, and in the event that the amount which Tenant has paid to Landlord on account of the Real Estate Taxes is less than Tenant's share of such actual Real Estate Taxes, Tenant shall pay such difference to Landlord on the next rent payment date. In the event that Tenant has paid to Landlord more than Tenant's Proportionate Share of such actual Real Estate Taxes, the amount of such difference, at Tenant's direction, shall be credited against Tenant's payment of Real Estate Taxes next due or refunded to Tenant.

C.     Tenant will pay all taxes charged against trade fixtures, furnishing, equipment or any other personal property belonging to Tenant. Tenant will have personal property taxes billed separately from the Project. If any of Tenant's personal property is taxed with the Project, Tenant will pay Landlord the taxes for the personal property upon demand by Landlord.

6.     INTENTIONALLY OMITTED.

7.     USE OF PREMISES; HAZARDOUS WASTES.

7.01   Use.

A.     The Premises may be used and occupied only for Tenant's Permitted Use (as defined in Section 1.06) and for no other purpose, without obtaining Landlord's prior written consent, which Landlord may deny for any reasonable business purpose. Tenant will comply with (i) all current and future statutes, laws, ordinances, orders, policies, rules and regulations of any federal, state, county or municipal governmental (or quasi-governmental) body, bureau, department, court or agency affecting the Premises (collectively, "Legal Requirements"), other than those Legal Requirements for which Landlord is responsible to comply under this Lease and Legal Requirements related to the condition of the Premises which were violated as of the Commencement Date, and (ii) the Declarations except where expressly contrary to the terms of this Lease. Tenant will not perform any act or carry on any practices that are likely to injure the Parcel or the Premises or be a nuisance or menace, or disturb the quiet enjoyment of other

- 9 -

tenants in the Parcel, including but not limited to equipment which causes vibration, use or storage of chemicals, or heat or noise which is not properly insulated. Tenant will not cause, maintain or permit any outside storage on or about the Premises.

B.     Tenant will not allow any condition or thing to remain on or about the Premises which causes Tenant, Landlord or any other party to be in breach or default of any terms or conditions of any Declaration. Furthermore, Tenant shall comply with the Declarations as the same may be applicable to it and as the same may be amended in a commercially reasonable manner, pursuant to the terms thereof, from time to time, and, without limiting the generality of the foregoing, to perform all of the obligations of a Secondary Tenant in Pureland under the Declarations, and not to act or neglect to act in any way that will cause Landlord to violate any of the obligations of the Landlord as a Site Owner in Pureland. All capitalized terms used in this paragraph without definition shall have the meanings ascribed to them in the Declarations.

7.02   Hazardous Wastes. As used in this Section, the term "Hazardous Waste" means:

A.     Those substances defined as "hazardous substances," "hazardous materials," "toxic substances," "regulated substances," "solid waste," "asbestos-containing materials," "lead-based paint" or "petroleum by-products" in the following or like statues, as now in effect or as hereinafter amended or supplemented, and all rules and regulations now in effect or hereafter promulgated with respect to each of the following or like statues: the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq. ("TSCA"); the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource, Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901 et seq. ("RCRA"); the Federal Hazardous Substances Act, 15 U.S.C. § 1261 et seq. ("FHSA"), the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq. ("OSHA"); the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq. ("HMTA"); and the Industrial Site Recovery Act of the State of New Jersey, N.J.S.A. 13:K-6, et seq. ("ISRA").

B.     Any and all elements, compounds, chemical mixtures, contaminants, pollutants or other substances identified as "hazardous substances" under CERCLA, HSCA, ISRA or any comparable statutes and/or regulations of the State of New Jersey, or any petroleum or petroleum products, or asbestos;

C.     Those substances listed in the United States Department of Transportation table (49 CFR § 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 CFR Part 302 and amendments thereto); and

D.     Such other substances, mixtures, materials and waste which are regulated under, or which are classified as hazardous or toxic under, any applicable Legal Requirements.

All Legal Requirements referenced in Paragraphs A, B, C and D of this Section 7.02 are collectively referred to as "Environmental Laws." However, Hazardous Wastes as described in Paragraphs A, B, C, and D of this Section 7.02 shall not include any lubricating oil or similar substance used for or placed on Tenant's products to prevent corrosion or on lift trucks for routine maintenance application, provided same are used and stored in compliance with all applicable Environmental Laws.

- 10 -

7.03    Tenant's Environmental Covenants.

A.    Tenant does not intend, and Tenant will not, nor will Tenant allow any other person (including partnerships, corporations and joint ventures), during the Term of this Lease, to manufacture, process, store, distribute, use, discharge or dispose of any Hazardous Waste in, under or on the Project, the Common Areas, or any property adjacent thereto.  Notwithstanding any other provision of this Lease, Tenant shall have no liability, obligation or responsibility whatsoever for Hazardous Waste (or any related inspection, reporting, remediation or other work or related costs) except those brought onto the Premises or Project by or at the direction of Tenant, its employees, agents, contractors, licensees, invitees and subtenants.

B.    Tenant shall notify Landlord promptly in the event of any spill or release of Hazardous Waste into, on, or onto the Parcel regardless of the source of spill or release, whenever Tenant knows or suspects that such a release occurred.  As used herein, the term "release" means any spilling, leaking, pumping, admitting, emptying, discharging, injecting, escaping, leaching, dumping, discarding, burying, abandoning, or disposing into the environment at or about the Premises on or prior to the termination or expiration of this Lease.

C.    Tenant will not be involved in operations at or near the Project which are likely to lead to the imposition on the Tenant or the Landlord of liability or the creation of a lien on the Project, under the Environmental Laws.

D.    Tenant shall, upon twenty-four (24) hour prior notice by Landlord, permit Landlord or Landlord's agent access to the Premises to conduct an environmental site assessment with respect to the Premises.

E.    Tenant covenants and warrants and represents to Landlord that the Tenant Questionnaire attached as Exhibit D is true and correct in all respects and does not omit any material fact concerning the Tenant's use of the Premises as relating to Environmental Laws. Tenant shall, at Tenant's expense, take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and monitoring of the Premises, Parcel or neighboring properties, to the extent such was caused or materially contributed to by Tenant, or pertaining to or involving any Hazardous Waste brought onto the Premises or Parcel by or for Tenant, or, in either case, Tenant's employees, agents, contractors, licensees or invitees.

F.    If Tenant's operations at the Premises now or hereafter constitute an "Industrial Establishment" (as defined under ISRA) or are similarly subject to the provisions of any other Environmental Law, then Tenant agrees to comply, at its sole cost and expense, with all requirements of ISRA and any other applicable Environmental Law to the satisfaction of Landlord and the governmental entity, department or agency having jurisdiction over such matters (including, but not limited to, performing site investigations and performing any removal and remediation required) in connection with (i) the occurrence of the expiration or termination of the Term, (ii) any closure, transfer or consolidation of Tenant's operations at the Premises, (iii) any change in the ownership or control of Tenant, (iv) any assignment of this Lease by

- 11 -

Tenant or sublease of all or part of the Premises, or (v) any other action by Tenant which triggers ISRA or any other Environmental Law.

     7.04    <u>Landlord's Environmental Covenants</u>.

     A.    Landlord does not intend, and Landlord will not, nor will Landlord allow any other person (including partnerships, corporations and joint ventures), during the Term of this Lease, to manufacture, process, store, distribute, use, discharge or dispose of any Hazardous Waste in, under or on the Premises, or any Common Areas of the Parcel. Landlord represents and warrants to Tenant that, as of the date of this Lease, and except as expressly set forth in that certain Phase I Environmental Site Assessment of LogistiCenter at Logan Vacant Lots, Logan Township, New Jersey 08085 dated June 26, 2007 prepared by VATC Associates, Inc., a copy of which has previously been delivered to Tenant, Landlord has no actual knowledge of the presence of any Hazardous Materials upon the Premises or the Parcel in violation of Environmental Laws.

     B.    Landlord shall notify Tenant promptly in the event of any spill or release of Hazardous Waste into, on, or onto the Parcel regardless of the source of spill or release, whenever Landlord knows or suspects that such a release occurred.

     C.    Landlord will not be involved in operations at or near the Project which is likely to lead to the imposition on the Landlord or the Tenant of liability or the creation of a lien on the Project, under the Environmental Laws. Landlord shall, at Landlord's expense, take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and monitoring of the Premises or Parcel (or cause such activities to occur), except to the extent such was caused or materially contributed to by Tenant, or pertaining to or involving any Hazardous Waste brought onto the Premises or Parcel by or for Tenant, or, in either case, Tenant's employees, agents, contractors, licensees or invitees.

     7.05    <u>Indemnity</u>. Tenant for itself and its successors and assigns undertakes to protect, indemnify, save and defend Landlord, its agents, employees, directors, officers, shareholders, affiliates, consultants, independent contractors, successors and assigns (collectively the "<u>Landlord Indemnitees</u>") harmless from any and all liability, loss, damage and expense, including reasonable attorneys' fees, claims, suits and judgments that Landlord or any other Indemnitee, whether as Landlord or otherwise, may suffer as a result of, or with respect to:

     A.    The violation by Tenant or Tenant's agents, employees, invitees, licensees or contractors of any Environmental Law, including the assertion of any lien thereunder and any suit brought or judgment rendered regardless of whether the action was commenced by a citizen (as authorized under the Environmental Laws) or by a government agency;

     B.    To the extent caused, directly or indirectly by Tenant or Tenant's agents, employees, invitees, licensees or contractors, any spill or release of or the presence of any Hazardous Waste affecting the Project whether or not the same originates or emanates from the Project or any contiguous real estate, including any loss of value of the Project as a result of a spill or release of or the presence of any Hazardous Waste;

- 12 -

C.    To the extent caused, directly or indirectly by Tenant or Tenant's agents, employees, invitees, licensees or contractors, any other matter affecting the Project within the jurisdiction of the United States Environmental Protection Agency or the New Jersey Department of Environmental Protection, including costs of investigations, remedial action, or other response costs whether such costs are incurred by the United States Government, the State of New Jersey or any Landlord Indemnitee;

D.    To the extent caused, directly or indirectly by Tenant or Tenant's agents, employees, invitees, licensees or contractors, liability for clean-up costs, fines, damages or penalties incurred pursuant to the provisions of any applicable Environmental Law; and

E.    To the extent caused, directly or indirectly by Tenant or Tenant's agents, employees, invitees, licensees or contractors, liability for personal injury or property damage arising under any statutory or common-law tort theory, including, without limitation, damages assessed for the maintenance of a public or private nuisance, or for the carrying of an abnormally dangerous activity, and response costs.

Landlord for itself and its successors and assigns undertakes to protect, indemnify, save and defend Tenant, its agents, employees, directors, officers, shareholders, affiliates, consultants, independent contractors, successors and assigns (collectively the "Tenant Indemnitees") harmless from any and all liability, loss, damage and expense, including reasonable attorneys' fees, claims, suits and judgments that Tenant or any other Tenant Indemnitee, whether as Tenant or otherwise, may suffer as a result of, or with respect to:

1.    Except to the extent caused by Tenant, its agents, employees, invitees, licensees or contractors, the violation of any Environmental Law, including the assertion of any lien thereunder and any suit brought or judgment rendered regardless of whether the action was commenced by a citizen (as authorized under the Environmental Laws) or by a government agency;

2.    Except to the extent caused by Tenant, its agents, employees, invitees, licensees or contractors, any spill or release of or the presence of any Hazardous Waste affecting the Parcel whether or not the same originates or emanates from the Parcel or any contiguous real estate as a result of a spill or release of or the presence of any Hazardous Waste;

3.    Except to the extent caused by Tenant, its agents, employees, invitees, licensees or contractors, any other matter affecting the Parcel within the jurisdiction of the United States Environmental Protection Agency or the New Jersey Department of Environmental Protection, including costs of investigations, remedial action, or other response costs whether such costs are incurred by the United States Government, the State of New Jersey or any Tenant Indemnitee;

4.    Except to the extent caused by Tenant, its agents, employees, invitees, licensees or contractors, liability for clean-up costs, fines, damages or penalties incurred pursuant to the provisions of any applicable Environmental Law; and

5.    Except to the extent caused by Tenant, its agents, employees, invitees, licensees or contractors, liability for personal injury or property damage arising under any statutory or

- 13 -

common-law tort theory, including, without limitation, damages assessed for the maintenance of a public or private nuisance, or for the carrying of an abnormally dangerous activity, and response costs.

       7.06   <u>Remedial Acts</u>.

       A.    In the event of any spill or release of or the presence of any Hazardous Waste affecting the Project caused by Tenant, its employees, agents, invitees, licensees, or contractors, whether or not the same originates or emanates from the Project or any contiguous real estate, and/or if Tenant shall fail to comply with any of the requirements of any Environmental Law relating to such spill or release within thirty (30) days after such spill, release or discovery of Hazardous Wastes (or such longer period as may be reasonably necessary to so comply, if same cannot be completed within thirty (30) days), but in no event longer than any period as required by such applicable Environmental Law, Landlord may, without notice to Tenant, at its election, but without obligation to do so, cause such work to be performed at the Project and/or take any and all other actions as Landlord shall deem necessary or advisable in order to remedy said spill or release of Hazardous Waste or cure said failure of compliance and any amounts paid as a result thereof shall be paid by Tenant within thirty (30) days thereafter, together with the Late Charge, as Additional Rent hereunder.

       B.    If Landlord learns of the release or existence of Hazardous Waste affecting the Project and the same was not caused by Tenant, Landlord shall immediately disclose the nature of such Hazardous Waste to Tenant.  If the presence of the Hazardous Waste causes material harm to Tenant's business, creates an unsafe work environment and Landlord fails to cause the responsible party to remove the Hazardous Waste with reasonable promptness, Tenant shall have the right, at its sole option, to abate Rent proportionately to the detrimental effect on Tenant's business, and, if such detrimental effect has not been remediated within one hundred eighty (180) days, Tenant may terminate this Lease at no cost.

8.    <u>PARKING</u>.  In addition to the exclusive parking rights set forth in <u>Section 1.13</u>, Tenant and Tenant's customers, suppliers, employees, and invitees have the non-exclusive right to park in common with other tenants in the parking facilities as designated by Landlord.  Tenant agrees not to overburden such parking facilities and agrees to cooperate with Landlord and other Tenants in the use of the parking facilities.  Except for the exclusive parking spaces and rights provided in <u>Section 1.13</u>, Landlord reserves the right to, on an equitable basis, assign specific spaces, make changes in the parking layout from time to time.

9.    <u>UTILITIES</u>.

       9.01   <u>Utility Metering; Tenant Responsible for Payment</u>.  The utility services to the Premises shall be separately metered or submetered.  Tenant will be responsible for and shall pay for all water, gas, heat, light, power, sewer, electricity, or other services metered, chargeable to or provided to the Premises separate from and in addition to the costs outlined in <u>Section 5.02</u> dealing with the utility costs for Operating Costs.

       9.02   <u>Landlord Not Responsible</u>.  Landlord will not be liable or deemed in default to Tenant nor will there be any abatement of rent for any interruption or reduction of utilities or

PHBF/ 649807.13

services not caused by an act of Landlord, its agents, employees or contractors. Tenant agrees to comply with commercially reasonable energy conservation programs implemented by Landlord by reason of enacted laws or ordinances.

9.03    Services. Tenant will contract and pay for all telephone, television, broadband cable, and such other services for the Premises, subject to the provisions of Section 10.03.

9.04    Separate Common Area Utilities. All utility charges included in Operating Costs are separately metered to the Common Areas, and shall not include utility charges allocated to any tenant premises or space upon the Parcel.

10.    ALTERATIONS, MECHANIC'S LIENS.

10.01    Alterations.

A.    Except as expressly provided in Paragraph B of this section, Tenant will not make any alterations to the Premises without Landlord's prior written consent. Landlord's consent shall be contingent upon Tenant providing Landlord with the following items or information, all subject to Landlord's approval: (i) name and address of Tenant's contractor, (ii) certificates of insurance insuring Tenant's contractor for commercial general liability insurance with limits not less than $2,000,000 General Aggregate, $1,000,000 Products/Complete Operations Aggregate, $1,000,000 Personal & Advertising Injury, $1,000,000 Each Occurrence, $50,000 Fire Damage, $5,000 Medical Expense, $1,000,000 Auto Liability (Combined Single Limit, including Hired/Non-Owned Auto Liability) (all of the foregoing coverages shall be endorsed to show Landlord as an additional insured), and Workers Compensation, including Employer's Liability, as required by state statute and (iii) detailed plans and specifications for such work. Tenant will release or bond over any mechanic's liens placed against the Project arising from such alterations as provided in Section 10.04. In addition, before alterations may begin, valid building permits or other permits or licenses required must be furnished to Landlord, and, once the alterations begin, Tenant will diligently and continuously pursue their completion. All alterations to the Premises by Tenant shall be completed in compliance with all applicable laws, ordinances, regulations, rules and other applicable governmental requirements, and shall be constructed in a good and workmanlike manner with new materials. At Landlord's option, any alterations may become part of the realty and belong to Landlord. If requested by Landlord, Tenant will pay, prior to the commencement of the construction, an amount determined by Landlord necessary to cover the costs of demolishing such alterations and/or the cost of returning the Premises to its condition prior to such alterations. Tenant, at Landlord's option, shall at Tenant's expense prior to the expiration or earlier termination of this Lease, remove all alterations and repair all damage to the Premises.

B.    Upon prior written receipt of Landlord's approval, which shall be obtained in a manner consistent with Section 10.01A, Tenant may, at Tenant's option and expense, add additional heating capacity to the Premises if in the Tenant's sole discretion the Premises are not adequately heated for the comfort of its employees. Landlord's consent shall not be unreasonably withheld. Tenant will not be responsible for removal of heating units added to the Premises through the rights granted under the preceding sentence. Notwithstanding anything in this Lease to the contrary, Tenant shall have the right, at any time, to make non-structural, non-

- 15 -

Building system interior alterations, additions, improvements or replacements, including, but not limited to, interior lighting, electrical wiring, plumbing (serving the Premises only), and HVAC (serving the Premises only) mechanical alterations (collectively, "Tenant's Future Improvements"), provided that if the cost of such Tenant's Future Improvements (1) is less than or equal to $50,000, Tenant shall notify Landlord and, if applicable, deliver a copy of any plans therefor, at least five (5) Businesses Days prior to the commencement thereof, and thereafter may perform same without Landlord's approval, and (2) is greater than $50,000, Tenant shall obtain Landlord's prior written consent thereto, which consent shall not be unreasonably withheld, and, as a condition to granting its consent, Landlord may require such Tenant's Future Improvements to be removed from the Premises by Tenant prior to the expiration of the Term (and Landlord shall so inform Tenant in writing as part of its consent). If Tenant proposes to perform any structural, Building system or exterior work, alterations or improvements (collectively, "Major Alterations"), Tenant shall obtain Landlord's prior written consent, which may be withheld or denied in Landlord's sole discretion. Prior to any Major Alterations (excluding computer cables and phone lines), or any other Tenant's Future Alterations which cost in excess of $50,000, Tenant shall submit to Landlord specification, engineering or architectural drawings (as applicable) (collectively, the "Drawing") outlining the scope of work for Landlord's written consent in accordance with this paragraph. If Landlord fails to object in writing, or give written notice to Tenant requiring additional information, within ten (10) Business Days after Landlord's receipt of Tenant's Drawing, Tenant shall have the right to send Landlord a second notice, stating that Landlord has failed to respond to the initial request for consent. If Landlord fails to object in writing or, give written notice to Tenant requiring additional information, within five (5) Business Days after Landlord's receipt of such second notice, the submitted Drawing shall be deemed approved, unless it relates to a Major Alteration, in which case it shall be deemed disapproved. If Landlord requests additional information from Tenant, Landlord shall have five (5) Business Days from Landlord's receipt of such additional information from Tenant to approve or reject such additional information following the same process as set forth above for the initial submittal to the Landlord, and if Landlord does not follow the process, then the Drawing shall be deemed approved or disapproved, as applicable, after the expiration of such five (5) Business Day review period.

10.02   Landlord's Consent.  Notwithstanding anything in Section 10.01, Tenant may, without the written consent of Landlord, install trade fixtures (such as racks), equipment, and machinery in conformance with the applicable Legal Requirements, and may remove such items upon termination of its Lease, provided the Premises are not damaged by their removal.

10.03   System Installation.  Any private telephone systems, television or broadband cable, and/or other communications equipment and lines must be installed within the Premises and, upon termination of this Lease removed, at Tenant's expense, and the Premises restored to the same condition as before such installation.

10.04   Tenant's Costs.  Tenant will pay for the costs of its alterations and will keep the Premises, the Parcel and the underlying property free from any liens arising out of work performed for, materials furnished to or obligation incurred by Tenant. Tenant shall not permit any lien or claim for lien of any mechanic, labor or supplier or any other lien to be filed against the Building, the Parcel or the Premises or any part thereof, arising out of any work performed or alleged to be performed, by or at the direction of Tenant. If any such lien or claim for lien is

- 16 -

filed, Tenant shall, within thirty (30) days of receiving notice of such lien or claim, (i) have such lien or claim for lien released of record, or (ii) deliver to Landlord a bond, title insurance policy or other security in form, content, and amount satisfactory to Landlord (and, if required, any Mortgagee of the Premises) relative to such lien or claim for lien (whereupon, in the case of this subclause (ii), Tenant shall thereafter diligently contest such lien or claim for lien).

10.05   Landlord Improvements.   Landlord will have the right to construct or permit construction of tenant improvements in or about the Parcel for existing and new tenants and to alter any public areas in and around the Parcel.   Notwithstanding anything which may be contained in this Lease, Tenant understands this right of Landlord and agrees that such construction will not be deemed to constitute a breach of this Lease by Landlord, and Tenant waives any such claim which it might have arising from such construction, provided that the improvements do not unreasonably interfere with the use of the Premises by Tenant.

11.    FIRE INSURANCE: HAZARDS AND LIABILITY INSURANCE.

11.01   No Increases in Insurance Premiums.   Except as expressly provided as Tenant's Permitted Use, or as otherwise consented to by Landlord in writing, Tenant shall not do or permit anything to be done within or about the Premises which will increase the existing rate of insurance on the Parcel and shall, at Tenant's sole cost and expense, comply with any requirements, pertaining to the Premises, of any insurance organization insuring the Parcel and Parcel-related apparatus.   Tenant agrees to pay to Landlord, as Additional Rent, any increases in premiums on policies resulting from Tenant's Permitted Use or other use consented to by Landlord which increases Landlord's premiums or requires extended coverage by Landlord to insure the Premises.

11.02   Tenant's Insurance.

A.    Tenant's Casualty Insurance.   Tenant, at all times during the Term of this Lease and at Tenant's sole expense, will maintain a policy of standard fire and extended coverage insurance with "all risk" coverage on all Tenant's improvements and alterations in or about the Premises and on all personal property and equipment to the extent of at least ninety percent (90%) of the full replacement value thereof.   The proceeds from this policy will be used by Tenant for the replacement of personal property and equipment and the restoration of Tenant's improvements and/or alterations.

B.    Tenant's Liability Insurance.   Tenant, at all times during the Term of this Lease, and at Tenant's sole expense, will maintain a policy of commercial general liability coverage with limits of not less than $3,000,000 (or the amount customarily carried by Tenant, whichever is greater) combined single limit for bodily injury and property damage insuring against all liability of Tenant and its authorized representatives arising out of or in connection with Tenant's use or occupancy of the Premises.

C.    Policy Requirements.   All Tenant's insurance will name Landlord and/or Landlord's designated partners and affiliates, mortgagees and property managers (if applicable) as additional insureds (as defined in ISO 20 26 07 04 or its equivalent), and shall provide Landlord with a policy endorsement to that effect.   All insurance required to be provided by

- 17 -

Tenant under this Lease will (a) be issued by an insurance company authorized to do business in the state in which the Premises are located and which has and maintains a rating of "A-/X" or better as defined in the then-current edition of Best's Insurance Reports (or the equivalent thereof if Best's Insurance Reports is no longer published), (b) be primary and noncontributing with any insurance carried by Landlord, and (c) contain an endorsement requiring at least thirty (30) days prior written notice of cancellation to Landlord before cancellation or change in coverage, scope or limit of any policy. Tenant will deliver a certificate of insurance or a copy of the policy to Landlord within thirty (30) days of execution of this Lease and will provide evidence of renewed insurance coverage at each anniversary, and prior to the expiration of any current policies; however, in no event will Tenant be allowed to occupy the Premises before providing adequate and acceptable proof of insurance as stated above.

D.    Workers' Compensation Insurance. Tenant, at all times during the Term of this Lease and at Tenant's sole expense, will maintain a policy of Workers' Compensation covering all costs, benefits and liabilities under State Workers' Compensation and similar laws with statutory limits for employees of Tenant, with a waiver of subrogation in favor of Landlord, and Employer's Liability Insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease. In addition, Tenant agrees to require and warrants that all contractors hired by Tenant will maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and will require all subcontractors to maintain such insurance. Tenant shall indemnify, defend and hold Landlord harmless from any loss, injury, damage or liability which Landlord may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

E.    Self-Insurance. Anything contained herein to the contrary notwithstanding, Tenant has the right to fulfill Tenant's insurance obligations under this Lease through its alternative risk management programs, including self-insurance, provided that: (i) Tenant gives Landlord reasonable prior notice that Tenant has elected to so fulfill Tenant's insurance obligations; (ii) Tenant has a net worth of at least $100,000,000.00 in accordance with generally accepted accounting principles consistently applied; and (iii) such right is personal to originally-named Tenant. If an assignee or subtenant of Tenant under an Approved Affiliate Assignment or Sublease (as hereinafter defined) desires to utilize this right and such assignee or subtenant has a net worth of at least $100,000,000.00 in accordance with generally accepted accounting principals consistently applied as evidenced by audited statements provided to Landlord, such assignee or subtenant shall obtain Landlord's prior written consent, such consent not to be unreasonably withheld, delayed or conditioned. If Tenant elects to self-insure Tenant's insurance obligations hereunder, Tenant shall provide Landlord with a letter of self-insurance and a copy of such company's most recent annual report. Upon request by Landlord, Tenant shall provide Landlord with copies of its subsequent annual reports as they become available during any periods of self-insurance.

11.03    Landlord's Insurance.

At its sole cost and expense, but subject to inclusion in Operating Costs to the extent permitted under Section 5.02, Landlord shall pay for and maintain, from the Commencement Date through the end of the Term, the following policies of insurance covering the Project, which insurance shall be obtained from companies rated "A-/X" or better (as of the date of

- 18 -

execution of this Lease), as defined in the then-current edition of Best's Insurance Reports (or the equivalent thereof if Best's Insurance Reports is no longer published). Landlord shall furnish Tenant, or cause to be furnished to Tenant, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates of such policies required to be maintained hereunder:

A.    Workers' Compensation covering all costs, benefits and liabilities under State Workers' Compensation and similar laws with statutory limits for employees of Landlord, with a waiver of subrogation in favor of Tenant, and Employer's Liability Insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease. In addition, Landlord agrees to require and warrants that all contractors hired by Landlord will maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and will require all subcontractors to maintain such insurance. Landlord shall indemnify, defend and hold Tenant harmless from any loss, injury, damage or liability which Tenant may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

B.    Commercial General Liability Insurance covering Landlord's operations on the Property with coverage for premises/operations, products/completed operations, contractual liability, and personal/advertising injury liability with combined single limits of not less than $2,000,000.00 per occurrence for bodily injury and property damage, and at least an additional $1,000,000 in coverage carried via an umbrella policy.

C.    Property insurance upon the Building, including the Premises as improved by Landlord's Work), and personal property owned by Landlord used in connection with the Parcel, including those perils generally covered on a Causes of Loss - Special Form, in an amount equal to 90% of the insurable replacement cost.

11.04    Policy Limits.    The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies. At the end of each five (5) Lease Years of the Term (or more frequently if required by any mortgagee of the Premises), and at the beginning of each Renewal Term, the parties shall review the coverages and limits of any or all of the policies required above, and at that time, shall cause such coverages and liability limits to be adjusted as reasonably agreed upon by Landlord and Tenant in view of reasonable exposure anticipated over the remainder of the Term.

11.05    Policy Requirements.    Each policy shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice to the other party, and that the coverage provided by Tenant's insurance policies shall be deemed primary insurance and that any insurance provided by or on behalf of the other party shall be in excess of any insurance provided by such policy. Each party shall furnish to the other party on demand, evidence of the insurance required by this Section 11. All policies required to be provided hereunder, other than liability policies, shall include an endorsement to show that such insurance carrier acknowledges the waiver of subrogation contained in Section 12.

- 19 -

12.    SUBROGATION AND INDEMNIFICATION.

12.01    Subrogation.    Notwithstanding any other provisions herein, Landlord and Tenant each releases the other and, on behalf of its insurers, waives its entire right to recovery against the other for loss or damage to the waiving party and its property to the extent that the loss or damage is required to be insured under the "All-Risk" Property Insurance policy described in Section 11, above.    Landlord and Tenant agree to furnish to each insurance company which has or will issue policies of "All-Risk" Property Insurance on the Premises, notice of the terms of the mutual waivers contained herein and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers contained herein.    This waiver shall not be effective to relieve either party of liability if such party fails to maintain such "All-Risk" Property Insurance (or a valid program of self-insurance permitted under Section 11.02E).

12.02    Indemnification.

A.    Landlord agrees to indemnify, protect, defend and hold Tenant, its directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses (including, but not limited to, attorneys' fees and court costs) and liabilities (except to the extent caused by the willful or negligent acts or omissions of Tenant), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Parcel.

B.    Tenant agrees to indemnity, protect, defend and hold Landlord, its members, directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses (including, but not limited to, attorneys' fees and court costs) and liabilities (except to the extent caused by the willful or negligent acts or omissions of Landlord), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Premises.

13.    MAINTENANCE AND REPAIRS.

13.01    Tenant's Maintenance and Repair Obligations.

A.    Tenant shall, at its sole expense, keep and maintain the interior of the Premises (excepting common use equipment, which Landlord agrees to repair or replace pursuant to Section 5.02 unless damages are due to the neglect or intentional acts of Tenant or its agents, employees, visitors, invitees, or licensees), including interior windows, skylights, doors, the surfaces of floor slabs, plate glass, any store fronts, in good and sanitary order, condition and repair.    Tenant will, also, at its sole cost keep and maintain all utilities (from the point of entry into the Premises), fixtures, plumbing and mechanical equipment used by Tenant in good order and repair and furnish all expendables (light bulbs, paper goods, soaps, etc.) used in the Premises.    The standard for comparison and need of repair will be the condition of the Premises at the time of commencement of this Lease (reasonable wear and tear excepted).

B.    Tenant shall keep all sidewalks, loading docks and areas, and exterior stairways (if any) adjoining the Premises free of accumulation of dirt, rubbish, snow and ice.

- 20 -

C.    When used in this Lease, the term "repairs" shall include replacements and renewals that are necessary to maintain the Premises in good order and condition, and all such repairs made by Tenant shall be at least equal in quality and usefulness to the Premises and the Project as the original construction of such improvements.

D.    Tenant shall not commit or suffer any waste or damage, disfigurement or injury to the Premises, or commit or suffer any overloading of the floors or other use of the Premises which would place an undue stress on the same.

13.02    Repairs at Tenant's Cost. Except as provided in Section 30, Tenant will not make repairs to the Premises at the cost of Landlord whether by deductions of rent or otherwise, or vacate the Premises or terminate the Lease if repairs are not made. If during the Term, any alteration, addition or change (each a "Modification") to the Premises is required by governmental authorities (whether required under current or future laws, ordinances, regulations, rulings or other governmental requirements, or any amendments thereto), relating to any portion of the Premises which is Tenant's obligation to maintain, repair or replace, Tenant, at its sole expense, shall promptly make such Modification; provided, however, if such Modification is required pursuant to the Americans with Disabilities Act, Tenant shall not be responsible to perform such Modification unless such Modification relates to Tenant's particular manner of use of the Premises. Upon thirty (30) days prior written notice, Landlord shall have the right to make any Tenant repairs that Tenant fails to make, and Tenant shall reimburse Landlord for all such costs upon demand. Notwithstanding the foregoing, if Tenant is obligated to make any Modification to the Premises pursuant to this paragraph, and such Modification would be considered a "capital improvement" or "capital expense" in accordance with GAAP, Landlord shall perform such Modification. If Landlord performs any Modification pursuant to the immediately preceding sentence, the costs and expenses of such Modification shall be amortized over the useful life of such Modification, and Tenant shall be responsible to pay the portion of such amortization schedule falling due during the Term (on a monthly basis together with payments of Base Monthly Rent), and Landlord shall be responsible, without reimbursement from Tenant, for the portion of such amortization schedule falling due after the Expiration Date.

13.03    Intentionally Omitted.

13.04    HVAC Maintenance. Tenant shall, at its own expense, within thirty (30) days of lease commencement, contract with a vendor acceptable to Landlord for the maintenance service of the HVAC, including, at a minimum, four (4) filter replacements per year, a copy of which contract will be furnished to the Landlord upon request. If Tenant fails to obtain and maintain such a maintenance service contract Landlord shall have the right to obtain such a maintenance service contract at the expense of Tenant.

13.05    Landlord's Maintenance. In addition to Landlord's other obligations under this Lease, Landlord shall at all times:

(1)    make all structural repairs (including all sub-surface repairs), restorations and replacements to the Premises, including but not limited to, all structural repairs to the foundation, floor slabs, roof, exterior walls (but excluding alterations installed by Tenant);

- 21 -

    (2)    make all repairs, including all subsurface repairs, to electric wiring, risers, plumbing and utility systems serving the Premises except those within the boundaries of the Premises and solely serving the Premises (or otherwise installed by Tenant) and shall make all capital repairs and replacements on the HVAC and other systems serving the Premises beyond routine maintenance for which Tenant is responsible;

    (3)    maintain the exterior of the Building, roof, landscaping, access and parking areas adjacent to or serving said Building or Premises in good order and repair; and

    (4)    be responsible for bringing into compliance (or causing others to do same) any violations of law relating to the Building and Premises existing on the Commencement Date or thereafter relating to conditions existing on the Commencement Date or otherwise caused by Landlord, except to the extent caused by Tenant (including, without limitation, Tenant's alterations or improvements).

The costs and expenses incurred by Landlord in performing its obligations under this Section 13.05 shall be included in Operating Costs to the extent permitted by, and subject to the limitations set forth in, Section 5.02 hereof. Landlord shall promptly make such repairs or perform such maintenance or replacement within a reasonable time after Landlord receives notice from Tenant describing the need therefor in reasonable detail. Landlord shall not be liable to Tenant for interruptions in utilities or services, unless caused by the gross negligence or intentional misconduct of Landlord, its agents, employees, contractors, or licensees. Notwithstanding anything to the contrary contained herein, the cost and expense of any maintenance, repairs, or replacements necessitated by the acts or omissions of Tenant, its employees, agents, contractors, licensees, invitees or subtenants shall be paid by Tenant within thirty (30) days following a bill or invoice therefor.

14.    AUCTIONS, SIGNS, AND LANDSCAPING. Tenant will not conduct or permit to be conducted any sale by auction on the premises. Landlord will have the right to control landscaping and approve the placement, size, and quality of signs pursuant to Exhibit E, "Sign Criteria." Tenant will not make alterations or additions to the landscaping and will not place any signs nor allow the placement of any signs, which are visible from the outside, on or about the Building or the Parcel, nor in any landscape area, without the prior written consent of Landlord, which consent shall not unreasonably be withheld. Any signs not in conformity with this lease or in accordance with the provisions of Exhibit E may be removed by Landlord at Tenant's expense.

15.    ENTRY BY LANDLORD. Upon no less than forty-eight (48) hours prior written notice (except in emergency situations), Tenant will permit Landlord and Landlord's agents to enter the Premises at all reasonable times for the purpose of inspecting the same, or for the purpose of maintaining the Parcel, or for the purpose of making repairs, alterations or additions to any portion of the Parcel, including the erection and maintenance of such scaffolding, canopies, fences and props as may be required, or for the purpose of posting notices of non-responsibility for alterations, additions or repairs, or for the purpose of showing the Premises to prospective tenants during the last six (6) months of the Lease Term, or placing upon the Parcel (exclusive of the Premises) any usual or ordinary "for sale" signs, without any rebate of rents and without any liability to Tenant for any loss of occupation or quiet enjoyment of the Premises thereby

- 22 -

occasioned. Tenant will permit Landlord, at any time within sixty (60) days prior to the expiration of this Lease, to place upon the Premises any usual or ordinary "to let" or "to lease" signs. Tenant will not install a new or additional lock or any bolt on any door of the Premises without the prior written consent of Landlord, which will not be unreasonably withheld. If Landlord gives its consent, such work shall be undertaken by a locksmith approved by Landlord, at Tenant's sole cost. Landlord retains the right to charge Tenant for restoring any altered doors to their condition prior to the installation of the new or additional locks.

16.    INTENTIONALLY OMITTED.

17.    DESTRUCTION.

17.01    Casualty.    In the case of total destruction of the Premises, or any portion thereof exceeding fifty percent (50%) of the rentable square footage thereof, whether by fire or other casualty, not caused by the intentional act or gross negligence of Tenant, its agents, employees, servants, contractors, subtenants, licensees, customers or business invitees, this Lease shall terminate as of the date of the casualty, except as herein provided.

17.02    Partial Casualty.    If during the Term, the Premises are partially damaged or destroyed by fire or any other casualty and this Lease has not been terminated as a result thereof in accordance with this Section 17, Landlord shall provide to Tenant within thirty (30) days of such damage a written professional opinion from Landlord's architect or engineer as to the date (the "Restoration Date") that Landlord's rebuilding, repair and restoration of the Premises to the condition specified in Section 17.06 below. If such opinion states that the Restoration Date shall not occur within one hundred eighty (180) days from the date of the casualty, then Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof within thirty (30) days after receipt of such written opinion. If this Lease is not so terminated by Landlord or Tenant, then Landlord thereafter shall, at Landlord's expense, with due diligence to condition specified in Section 17.06 below. If Landlord fails to so complete the restoration following the later to occur of the Restoration Date or the date which is one hundred eighty (180) days after the casualty, Tenant may terminate this Lease upon not less than thirty (30) days' prior notice to Landlord for a period of thirty (30) days following the date which is the later to occur of the Restoration Date or the date which is one hundred eighty (180) days after the casualty; provided, however, if the restoration is substantially completed prior to the effective date of such termination, Tenant's termination shall be nullified, and this Lease shall continue in full force and effect. From the date of the damage or destruction, Rent and all other charges payable by Tenant shall abate in the proportion that the square footage of the part of the Premises destroyed or rendered unfit for Tenant's use bears to the total square footage in the Premises. Notwithstanding the foregoing, if such a casualty occurs in the last two (2) years of the Term, either Landlord or Tenant may, at its sole option, elect to terminate the Lease as of the date of the casualty on written notice to the other party to be delivered within thirty (30) days of the date of the casualty.

17.03    Tenant-Caused Casualty.    Notwithstanding the foregoing provisions, in the event the Premises, or any portion thereof, shall be damaged by fire or other casualty due to the intentional act or gross negligence of Tenant, its agents, employees, servants, contractors, subtenants, licensees, customers or business invitees which causes the proceeds of Landlord's

- 23 -

insurance to be unavailable, in whole or in part, then, without prejudice to any other rights and remedies of Landlord, if this Lease is not terminated, there shall be no apportionment or abatement of any Rent (but only to the extent that rent interruption insurance proceeds are unavailable to Landlord).

17.04    Major Casualty to Building.  In the event of any damage not limited to, or not including, the Premises, such that the Building is damaged to the extent of thirty-five (35%) percent or more of the cost of replacement, Landlord may elect to terminate this Lease upon giving notice of such election in writing to Tenant within thirty (30) days after the occurrence of the event causing the damage.  If Landlord does not elect to terminate this Lease in accordance with this Section 17.04, Landlord shall restore any damage to the Premises in accordance with the procedures established in Section 17.02 for a partial casualty.

17.05    Effect of Termination.  If this Lease is terminated pursuant to this Section 17, Tenant's obligations to pay Rent shall end as of the date of the casualty (and Landlord shall, within thirty (30) days, refund to Tenant any paid but unearned Rent), and all rights and obligations hereunder shall cease and terminate.  Notwithstanding anything to the contrary contained in this Lease, if this Lease is terminated under this Section 17 at any time that Tenant is in default hereunder, it is understood that Landlord shall not waive any rights or remedies against Tenant with respect to the outstanding default, including, without limitation, the right to recover all Rent due and owing up until the date of termination, and any and all costs or expenses to which Landlord is otherwise entitled under this Lease in enforcing Tenant's obligations with respect to such default and recovering such sums from Tenant.

17.06    Restoration.  The provisions of this Section 17 with respect to Landlord shall be limited to such repair as is necessary to place the Premises in the condition at Commencement Date as specified in the Work Letter attached hereto as Exhibit B and when placed in such condition the Premises shall be deemed restored and rendered tenantable; promptly following which time Tenant, at Tenant's expense shall perform Tenant's work required by Exhibit B and Tenant shall also repair or replace its stock in trade, fixtures, furniture, furnishings, floor coverings and equipment, and if Tenant has closed, Tenant shall promptly reopen for business.

17.07    Casualty Proceeds.  All insurance proceeds payable under the fire, and/or rental insurance maintained by Landlord shall be payable solely to Landlord and Tenant shall have no interest therein.  Tenant shall in no case be entitled to compensation for damages from Landlord on account of any annoyance or inconvenience in making repairs under any provision of this Lease.  Except to the extent provided for in this Section 17, neither the Rent payable by Tenant nor any of Tenant's other obligations under any provision of this Lease shall be affected by any damage to or destruction of the Premises or any portion thereof by any cause whatsoever.

18.    ASSIGNMENT, SUBLETTING AND TRANSFERS OF OWNERSHIP.

A.    Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right, without the consent of Landlord, but upon prior written notice to Landlord, to assign this Lease or sublet all or a portion of the Premises to a corporation or other entity which: (i) is Tenant's parent corporation; (ii) is a wholly-owned subsidiary of Tenant or Tenant's parent company; (iii) is a corporation of which Tenant or Tenant's parent corporation owns in excess of

- 24 -

fifty percent (50%) of the outstanding capital stock of; (iv) as a result of a consolidation, merger or other reorganization with Tenant and/or Tenant's parent corporation, shall own all or substantially all of the capital stock or assets of Tenant or Tenant's parent corporation; (v) acquires all or substantially all of the outstanding capital stock of Tenant or all or substantially all of the assets of Tenant; (vi) acquires all or substantially all of the warehouse locations of Tenant and the retail store locations of Tenant; (vii) as a result of a change of the domicile of Tenant or the reincorporation of Tenant in another jurisdiction in a manner provided for under state law (provided that the newly constituted entity shall own all or substantially all of the assets of Tenant) (collectively, the "Approved Affiliate Assignments and Subleases"). Any Approved Affiliate Assignments and Subleases shall be subject to the following conditions: (a) the originally-named Tenant, and each and every assignor or transferor Tenant, shall remain fully and primarily liable during the unexpired Term of this Lease including all then remaining Renewal Terms if exercised, and (b) any such assignment or subletting shall be subject to all of the terms, covenants and conditions this Lease, including, but not limited to, the restrictions regarding use of the Premises set forth in Section 2. Notwithstanding anything to the contrary contained in this Section 18A, Tenant shall not be permitted to assign this Lease pursuant to a series of transfers which, each individually, would constitute an "Approved Affiliate Assignment," but, taken together in the aggregate, would not constitute an "Approved Affiliate Assignment," and, in such instance, Landlord's consent shall be required pursuant to Section 18B hereof. If any default by Tenant exists at the time of any proposed Approved Affiliate Assignment or Sublease, or upon the effective date thereof, such default must be cured as a condition precedent to the effectiveness of such Approved Affiliate Assignment or Sublease.

B.        Excluding only the Approved Affiliate Assignments and Subleases, in the event Tenant proposes to assign this Lease or sublet all or any portion of the Premises or otherwise transfer its interests in this Lease or the Premises, directly or indirectly, including, without limitation, by a change in the controlling interest of Tenant or Tenant's parent, Tenant shall notify Landlord of its intent to assign or sublet this Lease. Landlord shall have twenty (20) days from Landlord's receipt of Tenant's notice within which to approve or disapprove of the proposed assignee or sublessee, or request additional information with respect thereto, in writing, such approval not to be unreasonably withheld, conditioned or delayed. No assignment or sublease, regardless of Landlord's approval thereof, shall release Tenant from ongoing obligations under this Lease, and Tenant shall remain fully liable during the unexpired Term of this Lease and as hereinafter described any exercised renewal options. In the event Tenant sublets or assigns this Lease, no Renewal Term contained in Section 1.09 of this Lease shall be valid unless Tenant specifically agrees to be liable for such Renewal Terms. Any such assignment or subletting shall be subject to all of the terms, covenants and conditions of this Lease, including, but not limited to, the restrictions regarding use of the Premises set forth in Section 1.06. Any assignee or sublessee shall, as a condition to the effectiveness of such transfer, execute an agreement assuming all of the rights and obligations conferred upon Tenant under this Lease and a copy of such agreement shall be provided to the Landlord prior to the effective date of such transfer. Notwithstanding anything to the contrary contained in this paragraph, if any default by Tenant exists at the time of any proposed assignment or sublease, or upon the effective date thereof, such default must be cured as a condition precedent to the effectiveness of such assignment or sublease, and Landlord shall be deemed to be acting reasonably if Landlord withholds consent to any assignment or sublease due to the existence of any such default.

- 25 -

C.      Any consent to any assignment or sublease which may be given by Landlord, or the acceptance of any rent, charges or other consideration by Landlord from Tenant or any third party, will not constitute a waiver by Landlord of the provisions of this Lease or a release of Tenant from the full payment and performance by it of the covenants stated herein; and any consent given by Landlord to any assignment or sublease will not relieve Tenant (or any transferee of Tenant) from the above requirements for obtaining the written consent of Landlord to any subsequent assignment or sublease.

D.      If an Event of Default under this Lease should occur while the Premises or any part of the Premises are assigned, sublet or otherwise transferred, Landlord, in addition to any other remedies provided for within this Lease or by law, may at its option collect directly from the transferee all such rent or subrent becoming due to Tenant under the assignment or sublease and apply these monies against any sums due to Landlord by Tenant; and Tenant authorizes and directs any transferee to make payments of such rent or subrent or directly to Landlord upon receipt of notice from Landlord. No direct collection by Landlord from any transferee should be construed to constitute a novation or a release of Tenant from the further performance of its obligations in connection with this Lease.

E.      Landlord acknowledges that Tenant may from time to time hire a third party vendor to operate Tenant's business in the Premises and such an operation arrangement shall not require Landlord's consent so long as Tenant is not assigning this Lease or subletting any portion of the Premises to such party. Tenant agrees to provide Landlord notice of any such arrangement and Tenant shall be responsible for such third party vendor and its actions or omissions, such actions and omissions being included within the scope of Tenant's indemnity obligations under this Lease.

19.     BREACH BY TENANT. Tenant will be in breach of this Lease, each and all of which shall be an "Event of Default," if at any time during the Term of this Lease (and regardless of the pendency of any bankruptcy, reorganization, receivership, insolvency or other proceedings in law, in equity or before any administrative tribunal which have or might have the effect of preventing Tenant from complying with the terms of this Lease):

A.      Tenant fails to make payment of any installment of Base Monthly Rent, Additional Rent, or of any other sum herein specified to be paid by Tenant; provided, however, no more than two (2) times in any Lease Year, Landlord shall give Tenant written notice of Tenant's failure to pay Rent, in which case, such non-payment shall not constitute an Event of Default unless and until Tenant has failed to pay such delinquent Rent within five (5) Business Days following Landlord's notice of such delinquency; or

B.      Tenant fails to observe or perform any of its other covenants, agreements or obligations hereunder, and such failure is not cured within thirty (30) days after Landlord's written notice to Tenant of such failure; provided, however, that if the nature of Tenant's obligation is such that more than thirty (30) days are required for performance, then Tenant will not be in breach if Tenant commences performance within such thirty (30)-day period and thereafter diligently prosecutes the same to completion.

- 26 -

C.      Tenant, Tenant's assignee, subtenant, guarantor, or occupant of the Premises becomes insolvent, makes a transfer in fraud of its creditors, makes a transfer for the benefit of its creditors, is the subject of a bankruptcy petition (provided that Tenant shall have 60 days to vacate an involuntary petition), is adjudged bankrupt or insolvent in proceedings filed against Tenant, a receiver, trustee, or custodian is appointed for all or substantially all of Tenant's assets, fails to pay its debts as they become due, convenes a meeting of all or a portion of its creditors, or performs any acts of bankruptcy or insolvency, including the selling of its assets to pay creditors;

D.      Failure of Tenant to vacate the Premises immediately upon the expiration or earlier termination of the Term of this Lease; or

E.      Any levy or attachment upon the leasehold interest of Tenant under this Lease.

20.    REMEDIES OF LANDLORD.

20.01  No Waiver of Remedies.  Nothing contained herein shall constitute a waiver of Landlord's right to recover damages by reason of Landlord's efforts to mitigate the damage to it by Tenant's default; nor shall anything in this Section adversely affect Landlord's right, as in this Lease elsewhere provided, to indemnification against liability for injury or damages to persons or property occurring prior to a termination of this Lease.

20.02  Cure Periods.  All cure periods provided herein shall run concurrently with any periods provided by law.

20.03  Landlord's Rights.  Upon any Event of Default, in addition to any other rights or remedies provided for herein, Landlord, at its sole option, shall have the following rights:

A.      The right to declare the Term of this Lease ended and reenter the Premises and take possession thereof, and to terminate all of the rights of Tenant in and to the Premises.

B.      The right, without declaring the Term of this Lease ended, to reenter the Premises and to occupy the same, or any portion thereof, for and on account of the Tenant as hereinafter provided, and Tenant shall be liable for and pay to Landlord on demand all such expenses as Landlord may have paid, assumed or incurred in recovering possession of the Premises, including costs, expenses, attorney's fees and expenditures placing the same in good order, or preparing or altering the same for reletting, and all other expenses, commissions and charges paid by the Landlord in connection with reletting the Premises.  Landlord agrees to use reasonable efforts to relet the Premises.  Notwithstanding such reasonable efforts, any such reletting may be for the remainder of the Term or for a longer or shorter period, such reletting shall be for such rent and on such other terms and conditions as Landlord, in its sole discretion deems appropriate, and Landlord shall have no obligation to lease the Premises prior to, or in favor of, any other space owned by Landlord (or any affiliate of Landlord).  Landlord may execute any lease made pursuant to the terms hereof in the Landlord's own name (whether on Landlord's or Tenant's behalf, but not in any way utilizing Tenant's name) or assume Tenant's interest in any existing subleases to any tenant of the Premises, as Landlord may see fit, and Tenant shall have no right or authority whatsoever to collect any rent from such tenants, subtenants, of the Premises.  In any case, and whether or not the Premises or any part thereof is

- 27 -

relet, Tenant, until the end of the Term shall be liable to Landlord for an amount equal to the amount due as rent hereunder, less net proceeds, if any of any reletting effected for the account of Tenant. Landlord reserves the right to bring such actions for the recovery of any deficits remaining unpaid by the Tenant to the Landlord hereunder as Landlord may deem advisable from time to time without being obligated to await the end of the term of the Lease. Commencement of maintenance of one or more actions by the Landlord in this connection shall not bar the Landlord from bringing any subsequent actions for further accruals. In no event shall Tenant be entitled to any excess rent received by Landlord over and above that which Tenant is obligated to pay hereunder.

C.      The right, even though it may have relet all or any portion of the Premises in accordance with the provisions of Section 20.03B above, to thereafter at any time elect to terminate this Lease for such previous default on the part of the Tenant, and to terminate all the rights of Tenant in and to the Premises.

D.      In the event that Tenant is in default as provided in Section 19C above only with respect to the originally-named Tenant or any Tenant pursuant to an Approved Affiliate Assignment or Sublease, or following any Event of Default hereunder if the Tenant is an assignee or transferee pursuant to Section 18.02 hereof, Landlord shall have the right to declare the entire Base Monthly Rent and Additional Rent for the remaining balance of the Term immediately due and payable as if by the terms of this Lease, such amounts were all payable in advance.

20.04   Removal of Tenant. Pursuant to the rights of re-entry provided above, Landlord may remove all persons from the Premises and may, but shall not be obligated to, remove all property therefrom, and may, but shall not be obligated to, enforce any rights Landlord may have against said property or store the same in any public or private warehouse or elsewhere at the cost and for the account of Tenant or the owner or owners thereof. Tenant agrees to hold Landlord free and harmless from any liability whatsoever for the removal and/or storage of any such property, whether of Tenant or any third party whomsoever. Such action by Landlord shall not be deemed to have terminated this Lease.

20.05   Damages. If an Event of Default occurs and continues before the end of the Term, or if its right of possession is terminated by Landlord because of Tenant's Event of Default, then this Lease may be terminated by Landlord at its option. On such termination, if it becomes necessary for Landlord to file suit against Tenant to recover damages against Tenant, Landlord agrees that it will file any suit to recover damages against Tenant within sixty (60) days following such termination, and may recover from Tenant, in addition to the remedies provided elsewhere in this Lease:

A.      The worth, at the time of the award, of the unpaid Base Monthly Rent and Additional Rent which had been earned at the time this Lease is terminated;

B.      The worth, at the time of the award, of the amount by which the unpaid Base Monthly Rent and Additional Rent which would have been earned after the date of termination of this Lease until the time of award exceeds the amount of the loss of rents that Tenant proves could be reasonably avoided; and

- 28 -

C.    The following expenses, (i) expenses for cleaning, repairing or restoring the Premises, (ii) expenses for altering, remodeling or otherwise improving the Premises for the purpose of reletting the Premises, (iii) brokers' fees and commissions, advertising costs and other expenses of reletting the Premises, (iv) expenses of retaking possession of the Premises, (v) reasonable attorney's fees and court costs, and (vi) any unearned brokerage commissions paid in connection with this Lease.

In no event may Landlord recover consequential or punitive damages against Tenant.

20.06  <u>No Waiver</u>.    The waiver by Landlord of any breach or default of Tenant hereunder shall not be a waiver of any preceding or subsequent breach of the same or any other term.  Acceptance of any rent payment shall not be construed to be a waiver of the Landlord of any preceding breach of the Tenant.

20.07  <u>Interest on Past Due Sums</u>.  All past due amounts owed by Tenant under the terms of this Lease shall bear interest from the date due until paid in accordance with <u>Section 3.03</u>.

20.08  <u>Rights and Remedies Cumulative</u>.  All of Landlord's rights and remedies herein set forth shall be the exclusive rights and remedies of Landlord and are cumulative and may be pursued simultaneously or separately at the sole option of the Landlord.  The pursuit of any remedies shall not constitute a waiver or forfeiture of any rent or other sum due to Landlord or any damages occurring to Landlord by reason of an Event of Default.  No act or thing done by Landlord or any of its agents shall be deemed a termination of this Lease or acceptance of the surrender of the Premises, and no agreement to terminate this Lease or accept a surrender of the Premises shall be valid unless in writing and signed by a duly authorized agent of Landlord. Forbearance by Landlord in enforcing one or more of the rights or remedies herein upon an Event of Default shall not be deemed or constitute a waiver of such default or of Landlord's right to enforce any such rights or remedies with respect to such default or any subsequent default. Notwithstanding anything to the contrary contained in this <u>Article 20</u>, nothing contained herein shall preclude Landlord from seeking an injunction or an action of specific performance to enforce Landlord's rights hereunder in the event that Landlord will not be adequately compensated by monetary damages as a result of Tenant's Event of Default.

21.    <u>SURRENDER OF LEASE NOT MERGER</u>.  The voluntary or other surrender of this Lease by Tenant, or mutual cancellation thereof, will not work a merger and will, at the option of Landlord, terminate all or any existing transfers, or may, at the option of Landlord, operate as an assignment to it of any or all of such transfers.

22.    <u>ATTORNEYS' FEES; COLLECTION CHARGES</u>.  In the event of any legal action or proceeding between the parties hereto, reasonable attorneys' fees and expenses of the prevailing party in any such action or proceeding will be added to the judgment therein.  Notwithstanding the foregoing, if Landlord utilizes the services of any attorney at law for the purpose of collecting any rent due and unpaid by Tenant after seven (7) days written notice to Tenant of such nonpayment of rent, Tenant agrees to pay Landlord reasonable attorneys' fees as determined by Landlord for such services, regardless of the fact that no legal action may be commenced or filed by Landlord.

23.   <u>CONDEMNATION</u>.

23.01   <u>Taking</u>. If all or any portion of the Premises, the Building or the Parcel is taken under the power of eminent domain or sold under the threat of that power (all of which are called "<u>Condemnation</u>"), this Lease shall terminate as to the part taken or sold on the date the condemning authority takes title or possession, whichever occurs first. If: (a) more than twenty percent (20%) of the floor area of the Premises is taken; or (b) more than twenty percent (20%) of then existing parking spots upon the Parcel are taken (or such lesser amount if such reduction causes Tenant to violate applicable Legal Requirements based on the parking required by its then current use of the Premises) and not replaced by Landlord with reasonably equivalent parking spots reasonably acceptable to Tenant within a commercially reasonable period of time; or (c) any ingress or egress points to the Parcel are taken so that Tenant cannot access the Premises and Landlord does not replace same within a reasonable period of time; then as to <u>clauses (a) and (b)</u> either Landlord or Tenant may terminate this Lease, and as to <u>clause (c)</u> Tenant may terminate this Lease, as of the date the condemning authority takes title or possession, by delivering written notice to the other within ten (10) days after receipt of written notice of such taking (or in the absence of such notice, within ten (10) days after the condemning authority takes title or possession). If neither Landlord nor Tenant terminates this Lease, this Lease shall remain in effect as to the portion not taken, except that the Base Monthly Rent and the Tenant's Proportionate Share shall be reduced in proportion to the reduction in the floor area of the Premises. Any Condemnation award or payment shall be distributed in the following order: (i) first, to any ground lessor, mortgagee or beneficiary under a deed of trust encumbering the Premises, to the extent of any rights therein; and (ii) second, to Landlord, the remainder of such award, whether as compensation for reduction in the value of the leasehold, the taking of the fee, or otherwise. Tenant shall have the right to seek a separate award Tenant's trade fixtures, for moving costs and loss to personal property.

23.02   <u>Restoration</u>. If Tenant or Landlord does not elect to terminate this Lease pursuant to <u>Section 23.01</u>, Landlord shall, at its sole cost, promptly and diligently repair, alter, raze and restore the remaining part of the Premises, Building and/or Parcel, replace the parking area taken and/or replace the points of ingress and egress taken (or other affected Common Areas upon the Parcel), so the improvements are made into a complete architectural unit, and the Premises, Building and/or Parcel, parking areas and points of ingress and egress (or other affected Common Areas upon the Parcel) are returned to, as nearly as reasonably possible, the condition existing prior to the Condemnation, except that Landlord shall not be obligated to repair any damage for which Tenant has been reimbursed by the condemning authority. Tenant shall not be obligated to make any payment or contribution toward the repair or restoration work. Rent shall be proportionately reduced as stated in <u>Section 23.01</u>.

24.   <u>RULES AND REGULATIONS</u>.   Tenant will faithfully observe and comply with the Rules and Regulations attached hereto as <u>Exhibit F</u> attached hereto and made a part hereof promulgated by Landlord for the Project. Landlord reserves the right to modify, amend and supplement the Rules and Regulations in a reasonable and non-discriminatory manner from time to time as Landlord deems necessary or appropriate, in Landlord's discretion. Landlord will not be responsible to Tenant for the nonperformance by any other tenant or occupant of the Project of any Rules and Regulations.

PHBF/ 649807.13

25.    INTENTIONALLY OMITTED.

26.    SALE BY LANDLORD.  In the event of a sale or conveyance by Landlord of the Project and Landlord's delivery to Tenant of an explicit assumption of the Lease from the Landlord's successor, the same shall operate to release Landlord from any liability upon any of the covenants or conditions occurring after the date of such conveyance, expressed or implied, herein contained in favor of Tenant, and in such event Tenant agrees to look solely to the responsibility of the successor in interest of Landlord in and to this Lease.  This Lease will not be affected by any such sale, and Tenant agrees to attorn to the purchaser or assignee.

27.    NOTICES.    All notices, statements, demands, requests, consents, approvals, authorizations, offers, agreements, appointments, or designations under this Lease by either party to the other will be in writing and will be considered sufficiently given and served upon the other party if sent by certified or registered mail, return receipt requested, postage prepaid, delivered personally, or by a national overnight delivery service and addressed as indicated in Section 1.04 and 1.05.

28.    WAIVER.  The failure of Landlord to insist in any one or more cases upon the strict performance of any term, covenant or condition of the Lease will not be construed as a waiver of a subsequent breach of the same or any other covenant, term or condition; nor shall any delay or omission by Landlord to seek a remedy for any breach of this Lease be deemed a waiver by Landlord of its remedies or rights with respect to such a breach.

29.    HOLDOVER; SURRENDER.

    29.01  Holdover.  If Tenant remains in the Premises after the Lease expiration date without the consent of the Landlord, such continuance of possession by Tenant will be deemed to be a month-to-month tenancy at the sufferance of Landlord terminable on thirty (30) day notice at any time by either party.  All provisions of this Lease, except those pertaining to term and rent, will apply to the month-to-month tenancy.  Tenant will pay a new Base Monthly Rent in an amount equal to 150% of the Base Monthly Rent payable for the last full calendar month during the Term of this Lease; provided that nothing herein shall be construed to give Tenant the right to the continued possession of the Premises subsequent to the expiration of the Term, and Landlord shall have the right to utilize all remedies at law and equity, including self-help and summary action for ejectment to immediately recover possession of the Premises.

    29.02  Move Out Standards.  The terms and conditions set forth in Exhibit G, "Move Out Standards," shall be applicable to the surrender of the Premises by Tenant upon the expiration or earlier termination of this Lease.

30.    DEFAULT OF LANDLORD; LIMITATION OF LIABILITY.

    30.01  Landlord Default.  Landlord shall be in default under this Lease if Landlord fails to: (1) make any monetary payment which is past due under this Lease within thirty (30) days after written notice; or (2) commence to cure any non-monetary covenant or agreement to be performed by Landlord under this Lease within thirty (30) days after written notice and thereafter to complete such cure within such time as may reasonably be necessary ("Landlord's Initial Cure Period").

- 31 -

30.02    Tenant Remedies.  If Landlord is in default under this Lease, and such default is continuing, then Tenant may, at its sole option, either (1) bring an action to recover such sums past due; (2) set off any sums so due from Landlord against Rent and other charges due by Tenant only as expressly permitted under Section 30.03; or (3) if the Tenant under this Lease is the originally-named Tenant or any Tenant pursuant to an Approved Affiliate Assignment or Sublease, and Landlord's default materially and adversely impacts Tenant's ability to operate its business within the Premises, terminate this Lease and have no further obligation or liability hereunder.  If Tenant has exercised its remedy pursuant to clause (2) and has set off against Rent or other charges due by Tenant with respect to any Landlord default, then Tenant may not, thereafter, elect to exercise its remedy pursuant to clause (3) for the same Landlord default.

30.03    Self-Help.  If Landlord is in default beyond Landlord's Initial Cure Period (except that, in the event of a material threat to human health and safety, or a condition which threatens the imminent closure of Tenant's business within the Premises (each an "emergency"), Tenant shall be obligated only to provide Landlord with such notice as is reasonably practicable under the circumstances) with regard to Landlord's maintenance, repair and replacement obligations under this Lease which materially and adversely impact Tenant's ability to operate its business within the Premises, provided that Tenant is not then in default of its obligations under this Lease, Tenant shall have the right to cure such default(s), provided that such curative actions do not adversely affect the Building structure or any Building system or utility shared with any other tenant, or otherwise adversely impact any other tenant of the Building.  If Tenant exercises the self-help rights granted to Tenant in this paragraph, Tenant shall thereafter have the right to submit to Landlord an invoice for its reasonable, out-of-pocket costs and expenses incurred as a result of such cure.  If such costs are not paid within thirty (30) days after demand (which such demand shall include copies of all invoices for such repair or default), Tenant shall have the right to deduct such cost, with interest thereon at the Default Rate, from up to fifty percent (50%) of installments of Base Monthly Rent payable by Tenant to Landlord, and such deduction shall not be a default of the Lease.  Notwithstanding the foregoing, if Landlord notifies Tenant, prior to the expiration of the Landlord's Initial Cure Period, that Landlord, in good faith, disputes whether or not Landlord is in default of its obligations under this Lease, Tenant shall not be precluded from exercising its self-help rights set forth in this paragraph, but any such exercise shall be at Tenant's risk, and Tenant shall not be permitted to exercise such right of offset with respect to any self-help measures taken by Tenant to cure such alleged default, but shall not waive its other rights and remedies against Landlord in attempting to recover any sums which Tenant claims are owed by Landlord with respect thereto; provided, however, that if it is determined by a court of competent jurisdiction that, despite Landlord's dispute thereof, Landlord was, in fact, obligated to make such maintenance, repair or replacement, Landlord's reimbursement to Tenant of its costs and expenses in exercising Tenant's self-help rights shall include interest at the Default Rate from the date Tenant incurred such costs or expenses.  Furthermore, if Tenant exercises any such rights with respect to the roof of the Building, Tenant shall be liable for all costs, expenses, losses, claims and damages resulting therefrom if Tenant's actions void or invalidate the roof warranty.

30.04    Limitation of Landlord's Liability.  In the event of any actual or alleged failure, breach or default hereunder by Landlord, Tenant's sole and exclusive remedy will be against Landlord's interest in the Building and Parcel, and Landlord, its directors, officers, employees and any partner of Landlord will not be sued, be subject to service or process, or have a judgment

- 32 -

obtained against him in connection with any alleged breach or default, and no writ of execution will be levied against the assets of any partner, shareholder or officer of Landlord. The covenants and agreements are enforceable by Landlord and also by any partner, shareholder or officer of Landlord.

31.    SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT; ESTOPPEL.

31.01    Subordination of Lease. Without the necessity of any additional document being executed by Tenant for the purpose of effecting a subordination, and at the election of Landlord or any mortgagee with a lien on the Parcel or any ground lessor with respect to the Parcel, this Lease will be subject and subordinate at all times to (a) all ground leases or underlying leases which may now exist or hereafter be executed affecting the Parcel, and (b) the lien of any mortgage or deed of trust which may now exist or hereafter be executed in any amount for which the Parcel, ground leases or underlying leases, or Landlord's interest or estate in any of said items is specified as security; provided that such mortgagee, ground lessor or other lienholder agrees in writing not to disturb Tenant's tenancy hereunder, either within its mortgage, ground lease or other instrument, or pursuant to a subordination, non-disturbance and attornment agreement reasonably acceptable to all parties thereto (an "SNDA"). An SNDA shall not be deemed to be reasonably acceptable to Tenant if the SNDA requires Tenant to increase its obligations or liability under this Lease (other than providing the mortgagee with reasonable notices of default and a reasonable opportunity to cure same), or decreases or abrogates Tenant's rights under this Lease. In the event that any ground lease or underlying lease terminates for any reason or any mortgage or deed of trust is foreclosed or a conveyance in lieu of foreclosure is made for any reason, Tenant will, notwithstanding any subordination, attorn to and become the tenant of the successor-in-interest to Landlord, at the option of such successor-in-interest. Tenant covenants and agrees to execute and deliver to Landlord an SNDA reasonably requested by Landlord or its ground lessor, mortgagee or beneficiary under a deed of trust, provided it is reasonably acceptable to all parties thereto (as described herein) evidencing such subordination of this Lease with respect to any such ground lease or underlying leases or the lien of any such mortgage or deed of trust. No personalty, real property or fixtures of Tenant shall be subject to the lien of such mortgage.

31.02    Subordination Agreement. Landlord has informed Tenant that Landlord currently has mortgage financing secured by the Parcel. Landlord hereby agrees, within sixty (60) days following the Commencement Date, to cause its current mortgagee to execute and deliver to Tenant an SNDA substantially in the form attached hereto as Exhibit J, and Tenant covenants and agrees to promptly execute and deliver same following written request of Landlord. If Landlord has not caused such SNDA to be executed and delivered to Tenant within such sixty (60) day period, Tenant shall have the right to (i) terminate this Lease; or (ii) stop paying Rent and other charges hereunder until such SNDA is delivered to Tenant. In executing and delivering to Landlord's current mortgagee the SNDA attached hereto as Exhibit J, Tenant shall not be deemed to have agreed that Exhibit J is a form reasonably acceptable to Tenant, and shall not be bound to deliver the SNDA form attached as Exhibit J if so requested by future mortgagees, ground lessor or other lien holders.

31.03    Estoppel Certificates. Each party will, within thirty (30) days after written request from the other party, provide an estoppel certificate, in the form attached hereto as Exhibit K,

- 33 -

whereby such party will represent to the other, or to any prospective purchaser, assignee or mortgagee designated by the requesting party, the status of Rent payments under this Lease and, to the parties' actual knowledge, whether or not the Lease is in full force and effect, or in default. If the party contends that the Lease is not in full force or is in default, it will specify the default.

32.    INTENTIONALLY OMITTED.

33.    GOVERNING LAW.  This Lease is governed by and construed in accordance with the laws of the State of New Jersey, and venue of any suit will be in the county where the Premises are located.

34.    NEGOTIATED TERMS.  This Lease is the result of the negotiations of the parties and has been agreed to by both Landlord and Tenant after prolonged discussion.

35.    SEVERABILITY.  If any provision of this Lease is found to be unenforceable, all other provisions shall remain in full force and effect.

36.    BROKERS.  Landlord and Tenant represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Lease other than Colliers Lanard & Axilbund ("Tenant's Broker") and CB Richard Ellis ("Landlord's Broker").  When this Lease is signed by and delivered to both Landlord and Tenant, Landlord shall pay a real estate commission to Landlord's Broker as provided in the written agreement between Landlord and Landlord's Broker, for services rendered to Landlord by Landlord's Broker.  Landlord shall pay a real estate commission to Tenant's Broker as provided in any agreement between Landlord or Landlord's Broker and Tenant's Broker.  Landlord hereby agrees to indemnify and hold Tenant harmless from all losses, damages, claims, liens, liabilities, costs and expense (including without limitation reasonable attorney's fees) arising from any Landlord's failure to pay the real estate commission hereunder due to the Landlord's Broker and Tenant's Broker or arising from any claims or demands of any broker (other than Tenant's Broker or Landlord's Broker), agent or finder with whom Landlord has dealt for any commission or fee alleged to be due in connection with its participation in the procurement of Tenant or the negotiation of this lease.  Tenant hereby agrees to indemnify and hold Landlord harmless from all losses, damages, claims, liens, liabilities, costs and expense (including without limitation reasonable attorney's fees) arising from any claims or demands of any broker (other than Tenant's Broker or Landlord's Broker whose commissions shall be paid by Landlord), agent or finder with whom Tenant has dealt for any commission or fee alleged to be due in connection with its participation in the procurement of Tenant or the negotiation with Tenant of this Lease, other than a Broker with whom Landlord has signed a written agreement relating to this Lease.

37.    QUIET POSSESSION.  For so long as no Event of Default by Tenant has occurred, Landlord covenants that Tenant shall quietly have, hold and enjoy the Premises during the Term of this Lease without disturbance from Landlord or from any other person claiming through Landlord, subject, in all events, to the terms and conditions of the Declarations.

38.    MISCELLANEOUS PROVISIONS.

38.01  Use of Terms.  Whenever the singular number is used in this Lease and when required by the context, the same will include the plural, and the masculine gender will include

- 34 -

the feminine and neuter genders, and the word "person" will include corporation, firm, partnership, or association. If there is more than one Tenant, the obligations imposed upon Tenant under this Lease will be joint and several.

38.02  Headings. The headings or titles to paragraphs of this Lease are not a part of this Lease and will have no effect upon the construction or interpretation of any part of this Lease.

38.03  Lease Contains Entire Agreement: This instrument contains all of the agreements and conditions made between the parties to this Lease. Tenant acknowledges that neither Landlord nor Landlord's agents have made any representation or warranty as to the suitability of the Premises to the conduct of Tenant's business. Any agreements, warranties or representations not expressly contained herein will in no way bind either Landlord or Tenant, and Landlord and Tenant expressly waive all claims for damages by reason of any statement, representation, warranty, promise or agreement, if any, not contained in this Lease.

38.04  Time of the Essence. Time is of the essence of each term and provision of this Lease.

38.05  Payments. Except as otherwise expressly stated, each payment required to be made by Tenant is in addition to and not in substitution for other payments to be made by Tenant.

38.06  Successors and Assigns. Subject to Section 18, the terms and provisions of this Lease are binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of Landlord and Tenant.

38.07  Performance at Tenant's Expense. Except as specifically provided in this Lease to the contrary, all covenants and agreements to be performed by Tenant under any of the terms of this Lease will be performed by Tenant at Tenant's sole cost and expense and without any abatement of rent.

38.08  Confidentiality. In consideration of Landlord's covenants and agreements hereunder, Tenant hereby covenants and agrees not to disclose any terms, covenants or conditions of this Lease to any other party without the prior written consent of Landlord unless necessary in litigation or upon order of the court.

38.09  Intentionally Omitted.

38.10  Landlord's Consent. If Tenant shall request Landlord's consent and Landlord shall fail or refuse to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent; Tenant's sole remedy shall be an action for specific performance or injunction, and such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold its consent or where as a matter of law Landlord may not unreasonably withhold its consent.

38.11  Force Majeure. Whenever a day is appointed herein on which, or a period of time is appointed in which, either party is required to do or complete any act, matter or thing, the time for the doing or completion thereof shall be extended by a period of time equal to the number of

- 35 -

days on or during which such party is prevented from, or is reasonably interfered with, the doing or completion of such act, matter or thing because of labor disputes, civil commotion, war, warlike operation, sabotage, governmental regulations or control, fire or other casualty, inability to obtain materials, or to obtain fuel or energy, weather or other acts of God, or other causes beyond such party's reasonable control (financial inability excepted); provided, however, that nothing contained herein shall excuse Tenant from the prompt payment of any Rent or charge required of Tenant hereunder, except to the extent expressly provided elsewhere in this Lease.

38.12  <u>Counterparts; Electronic Signature</u>.  This Lease may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but all of which shall together constitute one and the same instrument.  Counterparts hereof executed by telephone facsimile, or electronic mail, transmission shall have the same force and effect as original counterparts.

38.13  <u>Submission Not Offer</u>.  The submission of this Lease by Landlord, its agent, or representative for examination or execution by Tenant does not constitute an option or offer to lease the Premises upon the terms and conditions contained herein or a reservation of the Premises in favor of Tenant, it being intended hereby that this Lease shall only become effective upon the execution hereof by Landlord and delivery of a fully executed counterpart to Tenant.

38.14  <u>Authority to Sign Lease</u>.  Individuals signing on behalf of Tenant and Landlord warrant that they have the authority to bind the respective Tenant and Landlord.

39.    EXHIBITS.  Exhibits <u>A</u>, <u>B</u>, <u>C</u>, <u>D</u>, <u>E</u>, <u>F</u>, <u>G</u>, <u>H-1</u>, <u>H-2</u>, <u>I</u>, <u>J</u> and <u>K</u> and <u>Schedule 1</u>, are attached hereto and made a part hereof.

[SIGNATURE PAGE FOLLOWS]

- 36 -

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year indicated by Landlord's execution date as written below.

THIS LEASE, WHETHER OR NOT EXECUTED BY TENANT, IS SUBJECT TO ACCEPTANCE AND EXECUTION BY LANDLORD, ACTING ITSELF OR BY ITS AGENT ACTING THROUGH ITS PRESIDENT, VICE PRESIDENT, OR ITS DIRECTOR OF LEASING AND MARKETING.

Landlord:                                              Tenant:

**DP Partners Logan II K, LLC**, a Delaware            **Sears, Roebuck and Co.**, a New York
limited liability company                              corporation

By: _____                           By: _____
Name: Michael C. Dermody                              Name: _____
Its:    Member                                        Its:    James B. Terrell
                                                              Vice President Real Estate

By: _____                           Date: February 9, 2009
Name: John Atwell                                            (Execution date)
Its:

By: _____
Name: Michael Alderman
Its:    Partner - Member

Date: January 20, 2009
       (Execution date)

## SCHEDULE "1":  BASE RENT SCHEDULE

| Month of Lease Term | Monthly Base Rent | Annual Base Rent | Annual Base Rent Per Rentable SF of Premises |
|---|---|---|---|
| Months 1-12 | $36,091.16 | $433,093.94 | $4.96 |
| Months 13-24 | $36,937.08 | $443,245.00 | $5.08 |
| Months 25-36 | $37,804.15 | $453,649.84 | $5.20 |
| Months 37-48 | $38,692.90 | $464,314.81 | $5.32 |
| Months 49-60 | $39,603.87 | $475,246.40 | $5.44 |
| Months 61-72 | $40,537.61 | $486,451.27 | $5.57 |
| Months 73-84 | $41,494.69 | $497,936.27 | $5.70 |

Schedule "1" to Lease dated January 20, 2009
by and between DP Partners Logan II K, LLC, a Delaware limited liability company,
and Sears, Roebuck and Co., a New York corporation

PHBF/ 649807.13

**Exhibit "A-1"** Legal Description
(to be attached)

Exhibit A-1

PHBF/ 649807.13



# TAYLOR WISEMAN & TAYLOR

### ENGINEERS | SURVEYORS | SCIENTISTS

124 Gaither Drive | Suite 150 | Mt. Laurel, NJ 08054

856.235.7200 tel | 856.722.9250 fax | www.taylorwiseman.com

#17645

## DESCRIPTION OF PROPERTY

### BLOCK 2803 LOT 1.05

**ALL THAT CERTAIN** tract or parcel of land situate and lying in the Township of Logan, County of Gloucester, State of New Jersey being more particularly bounded and described as follows:

**BEGINNING AT A POINT** in the curved Southwesterly line of Center Square Road (County Route Number 620) (variable width right of way, as measured 44.00 feet from centerline) where the same in intersected by the division line between Block 2803 lots 1.03 and 1.05 as illustrated on a plan entitled, "ALTA/ACSM (2005) Land Title Survey, Block 2801 Lots 27, 29 thru 31, and 34 thru 38, Block 2803 Lots 1, 1.01, 1.03 1.05, 4, 6, 8, 8.01, 9 & 10 and Block 3001 Lot 16" prepared by Taylor Wiseman & Taylor, dated March 29, 2005, last revised May 10, 2007 (dwg. 367-17645-SUR), and from said beginning point runs; Thence, along the division line between lots 1.03 and 1.05 (1) S. 44° 10'34" W. a distance of 712.25 feet to a point corner to lot 1.03; Thence, along the same (2) S 45° 49'26" E. a distance of 61.00 feet to a point in the line of lot 1.03 and corner to lot 1.04; Thence, along the same (3) S. 44° 10' 34" W., a distance of 387.83 feet to a point in the line of lot 1.04 and corner to lot 1.02; Thence, along the same (4) N. 45° 49' 26" W., a distance of 1063.12 feet to a point in the line of lot 28; Thence, along the same (5) N. 65° 39' 39" E., a distance of 99.72 feet to a point corner to the same; Thence, still along the same (6) N. 24° 20' 22" W., a distance of 350 feet to a point corner to lots 26 and 25; Thence, along the same (7) N. 65° 39' 30" E., a distance of 123.36 feet to a point corner to lots 25 and 24; Thence, along the same (8) N. 66° 39' 38" E., a distance of 247.47 feet to a point corner to lots 24 and 21; Thence, along the same and extending along the line of lot 20 (9) S. 31° 15' 22" E., a distance of 251.15 feet to a point corner to lot 20; Thence, along the same (10) N. 46° 44' 43" E., a distance of 438.43 feet to a point in the aforementioned southwesterly line of Center Square Road; Thence, along the same (11) S. 56° 43' 08" E., a distance of 368.86 feet to an angle point in the same; Thence, still along the same (12) S. 56° 37' 16" E., a distance of 203.70 feet to a point of curvature; Thence, curving to the right, said curve having a radius of 5,991.00 feet, and a central angle of 03° 09' 47", (13) Southwestwardly, an arc length of 330.75 feet



(said curve having a chord bearing and distance of S. 55° 02' 22" E, 330.71 feet) to the POINT AND PLACE OF BEGINNING.

**SAID ABOVE DESCRIBED** tract or parcel of land containing within said bounds 24.85 acres of land, more or less.

**SAID PARCEL BEING SUBJECT TO** easements of record.

**Keith M. Ludwig**
New Jersey Licensed Land Surveyor 24GS04324400
Certificate of Authorization No. 24GA28032900

August 17, 2007

**Exhibit "A-2"**    Plan Description of Premises and Project

Project (Premises is located within Building "K")



Exhibit A-2

**Exhibit "A-3"**    Plan Description of Premises and Parcel

### Building



Exhibit A-3

**Exhibit "A-4"**    Plan Description of Premises and Parcel

## Premises



Exhibits "A-1", "A-2", "A-3" and "A-4" to lease dated January ⓧ , 2009
by and between DP Partners Logan II K, LLC, a Delaware limited liability company
and Sears, Roebuck and Co., a New York corporation

Exhibit A-4

## Exhibit "B"

### WORK LETTER

This Work Letter ("**Work Letter**") is attached to, supplements, and is made a part of the Lease. These provisions define the terms and conditions relating to the completion of and payment for the Tenant Improvements (as defined below). All initially capitalized terms not defined herein shall have the same meaning as set forth in the Lease.

1.    **Definitions**. As used in this Work Letter and in the Lease, the term "**Tenant Improvements**" shall mean those improvements set forth on the "**Final Tenant Plans**" (as defined in Section 5(c) of this Work Letter and as approved by the appropriate governmental entities set forth in Section 5(e) of this Work Letter), which shall include those Tenant Improvements in those certain Premises containing approximately 87,321 square feet (the "**Premises**") located in that certain industrial center commonly known as LogistiCenter at Logan and located at 2100 Center Square Road, Suite 125, Logan Township, New Jersey 08085 (the "**Building**") located on the Project constructed by Landlord. The Tenant Improvements shall be constructed at Landlord's sole cost and expense. The construction and installation of the Tenant Improvements is sometimes referred to herein as the "**Landlord's Work**". The costs of the Landlord's Work shall include, but shall not be limited to, any and all construction costs (including labor and materials), ceiling systems, lighting, HVAC, sprinkler systems, life safety systems, architect's fees, engineer's fees, construction management fees, fees for permits and approvals, all as more particularly set forth in the Outline Specification attached hereto as **Schedule 2** and as may be provided in the Final Tenant Plans or otherwise.

2.    **Completion of Improvements**. Subject to the terms of the Lease and this Work Letter and any "**Tenant Delay**" (as defined in Section 10 hereof), Landlord shall cause the "**Contractor**" (defined in Section 7 of this Work Letter) to complete the construction and installation of the Tenant Improvements in the Premises and Building in accordance with the terms of this Work Letter, in a good and workman like manner using new materials, except where otherwise provided in the final Tenant Plans.

3.    **Appointment of Construction Representatives**.

a.    By Landlord. Landlord hereby appoints the following person as Landlord's representative ("**Landlord's Representative**") to act for Landlord in all matters covered by this Tenant Work Letter: Stephen Bailey (sbailey@dermody.com; 717-233-8800) and James Mascaro (jmascaro@dermody.com; 717-233-8800).

b.    By Tenant. Tenant hereby appoints the following person as Tenant's representative ("**Tenant's Representative**") to act for Tenant in all matters covered by this Tenant Work Letter: Tom Eisele (teisele@searshc.com, Architectural Project Manager, A2 253B, 333 Beverly Road, Hoffman Estates, IL 60179), Sears, Roebuck and Co.

c.    Communications. All communications with respect to the matters covered by this Work Letter shall be made to Landlord's Representative or Tenant's

Exhibit B-1

Representative, as the case may be. Either party may change its representative under this Work Letter at any time by written notice to the other party.

4.    **Architect and Engineer**.

a.    An architectural firm selected by Landlord and acceptable to Tenant ("**Architect**"), shall act as the architect with respect to the design and construction of the Tenant Improvements. Landlord shall enter into a contract with Architect for such services (the "**Architect Contract**"). Tenant hereby approves TransSystems as the Architect.

b.    An engineering firm selected by Landlord and acceptable to Tenant ("**Engineer**"), shall act as the architect with respect to the design and construction of the Tenant Improvements. Landlord shall enter into a contract with Engineer for such services (the "**Engineer Contract**"). Tenant hereby approves Marathon Engineers as the Engineer.

5.    **Improvement Plans**.

a.    Landlord and Tenant have each approved the preliminary outline specifications for the construction of the Premises which consists of the Preliminary Specifications – Outline Specification which defines the scope of work to construct the Premises, is attached hereto as **Schedule 1**. Landlord and Tenant have each approved (i) the preliminary outline specifications for the Tenant Improvements (the "**Preliminary Specifications**") which consist of the Landlord Expense Outline Specification Addendum attached hereto as **Schedule 2**; (ii) the Sears/DP Partners Tenant Improvements Approved Drawing List attached hereto as **Schedule 3** (the "**Drawing List**"); and (iii) the Preliminary Tenant Improvement Plans for Office Space and Warehouse attached hereto as **Schedule 4**.

b.    Landlord and Tenant have each approved the Space Plans for the Premises, including the warehouse and the office portions of the (the "**Preliminary Tenant Plans**") as set forth in **Schedule 4** attached hereto.

c.    <u>Final Tenant Plans</u>. Tenant hereby approves the final architectural plans and drawings listed in the Drawings List. Within fifteen (15) days after the date of this Lease (being the last date of Landlord's and Tenant's signatures set forth on the signature page to this Lease), Landlord shall complete engineering, mechanical, fire/life safety, structural and electrical working drawings for all of the Tenant Improvements (collectively, the "**Tenant Working Drawings**") for Tenant's review and approval, which approval shall not be unreasonably withheld. Tenant shall provide written approval or rejection (and stating the reason therefore) of the Tenant Working Drawings within five (5) Business Days after receipt of the Tenant Working Drawings from Landlord. If Tenant has any changes to the Tenant Working Drawings, within three (3) business days after receipt thereof, Landlord shall cause the Tenant Working Drawings to incorporate such revisions as may have been made by Tenant and shall resubmit the revised Tenant Drawings for Tenant's review and approval as set forth above. Landlord and Tenant shall follow the above process until the Tenant Working Drawings are approved by both parties. The Tenant Working Drawings which shall be approved by Landlord and Tenant are referred to herein as the "**Final Tenant Plans**." The Preliminary Specifications, the Preliminary Tenant Plans, the Tenant Working Drawings (including any layout, dock equipment locations, partition

Exhibit B-2

plan, lighting plan, electrical plan, or mechanical plan) and the Final Tenant Plans (as approved by the appropriate governmental entities as set forth in Section 5(e) below) are sometimes hereinafter referred to collectively as the "**Tenant Construction Drawings.**" Landlord shall not make or permit any changes to the Tenant Construction Drawings without the prior written consent of Tenant. Any changes to the Tenant Construction Drawings required to correct Landlord's construction errors or flaws, shall be at Landlord's sole cost. At least three (3) days prior to commencement of construction of the Tenant Improvements, Landlord shall deliver to Tenant a full set of the Final Tenant Plans (as approved by the appropriate governmental entities as set forth in Section 5(e) below).

      d.    Design Problem; Tenant Changes.    Tenant shall make no changes or modifications to the Final Tenant Plans without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion only if such change or modification would result in any of the following (each a "**Design Problem**"): (i) directly or indirectly delay "**Substantial Completion,**" by more than five (5) days as that term is defined in Section 9 below, of the Tenant Improvements, unless Tenant agrees that any such delay shall constitute a Tenant Delay (as defined in Section 10 below); (ii) increase the cost of designing or constructing any of the Tenant Improvements above the cost of the Tenant Improvements depicted in the Final Tenant Plans, unless Tenant agrees to pay for such increased cost as if such increased cost were a Change Order Cost (as defined below), unless the change or modification requested by Tenant is due to a Landlord error in the Final Tenant Plans; (iii) be a quality lower than the quality of the Tenant Improvements set forth in the Final or Preliminary Tenant Plans; and/or (iv) violate any applicable laws, rules, regulations, ordinances, directives, covenants, easements and restrictions of record, and permits (collectively, "**Applicable Law**"). Landlord must give Tenant written notice within ten (10) days after Landlord receives a request from Tenant to make a change or modification to the Final Tenant Plans of whether Landlord accepts or rejects the requested change or modification. If Landlord rejects, Landlord must state the reason therefore.

      e.    Governmental Approvals.    Within five (5) days after Final Tenant Plans have been approved by Tenant and Landlord, Landlord will submit, and shall thereafter expeditiously pursue until approval is obtained, the Final Tenant Plans to the appropriate governmental agencies for plan checking and the issuance of a building permit for the Tenant Improvements. Tenant acknowledges that Landlord has already submitted the architectural and civil drawings to the Township. Architect shall make any and all changes to the Final Tenant Plans required by any applicable governmental entity, including, without limitation, any non-material changes required by any applicable governmental entity, to obtain a building permit for the Tenant Improvements; provided, however, Tenant shall be notified of such changes prior to the Architect revising the Final Tenant Plans and Tenant shall have the option to select alternative means of modifying said Final Tenant Plans, if other options are available. The timeframes for reviewing and approving the required change shall be the same as for reviewing and approving the Tenant Working Drawings stated above in Section 5(c). If the cost of the Tenant Improvements increases due to a change required by a governmental entity: (i) if the change solely benefits Tenant's use of the space, then Tenant shall pay such additional cost; or (ii) if the change mutually benefits Tenant and the other tenants within the Building, then Landlord and Tenant shall at that time agree on an allocation of the increased cost between Landlord and Tenant. Landlord shall be responsible for obtaining approval of the Final Tenant Plans by all governmental agencies having jurisdiction, including all necessary permits and the temporary

PHBF/ 649807.13

and permanent Certificate of Occupancy (or other required, equivalent approval from the local governmental authority permitting occupancy of the Premises). Tenant and Landlord shall cooperate with each other in obtaining such approvals. Notwithstanding the foregoing, Tenant shall be responsible for obtaining, at Tenant's sole cost and expense, all approvals required in connection with Tenant's proposed product mix, particular use of the Premises or commodity class in order that Tenant may conduct its business in the Premises in accordance with the terms of the Lease, and the cost of any changes required to any of the Tenant Construction Drawings or the Tenant Improvements as a result of such product mix, use, and/or commodity class shall be paid for by Tenant as set forth in the payment schedule.

   f.    No Representations; Construction Warranties. Notwithstanding anything to the contrary contained in the Lease or herein, but without limiting any covenants, representations or warranties in the Lease, Landlord's participation in the preparation of the Tenant Construction Drawings, the selection of the Architect, Engineers, consultants and Contractor, the cost estimates for the Tenant Improvements and the construction thereof shall not constitute any representation or warranty, express or implied, that the Tenant Improvements, if built in accordance with the Final Tenant Plans but subject to latent defects, will be suitable for Tenant's intended purpose, and Landlord specifically disclaims any such effect. Tenant acknowledges and agrees that the Tenant Improvements are intended for use by Tenant and the specifications and design requirements for such Tenant Improvements are not within the special knowledge or experience of Landlord. Landlord's sole obligation shall be to arrange the construction of the Tenant Improvements in accordance with the requirements of the Final Tenant Plans; and any additional costs or expenses required for the modification thereof to more adequately meet Tenant's use, whether during or after Landlord's construction thereof, shall be borne entirely by Tenant except as otherwise provided in this Tenant Work Letter. Notwithstanding the foregoing, (i) Landlord agrees to cause the Contractor to assign to Tenant no later than thirty (30) days after Substantial Completion, on a non-exclusive basis, the benefit of all manufacturers' and construction warranties pertaining to the Tenant Improvements for the original Term; (ii) Landlord hereby warrants that the Tenant Improvements performed by Landlord's contractors and all operating systems in the Building shall remain in good operating condition for a period of one (1) year from the Commencement Date; (iii) all materials shall be new and of good quality; (iv) intentionally deleted; (v) all work shall be of good workmanship and like quality; (vi) the Building and Tenant Improvements shall be built as to comply with applicable building codes and other applicable codes, regulations, statutes and ordinances; and (vii) Landlord shall, during the Term of the Lease and at Landlord's sole cost and expense, remedy or correct any material or workmanship in the Building and Tenant Improvements or any part of the Building and Tenant Improvements which is inconsistent with the warranties made in the foregoing subsections (i) through (vi) (as to any such item which requires remediation or correction is referred to as the "**Defective Item**" or collectively the "**Defective Items**") within sixty (60) days after written notice from Tenant to Landlord specifying the Defective Items, or in the case of any Defective Item which cannot with reasonable diligence be remediated or corrected within said sixty (60) day period, Landlord shall immediately proceed, after written notice from Tenant, to commence the remediation or correction of such Defective Item and thereafter shall diligently pursue the same to completion (the "**Correction Period**"). In the event the Landlord fails to complete the remediation or correction of a Defective Item within the Correction Period, Tenant may complete or may cause to be completed such remediation or correction, and Landlord shall reimburse

Exhibit B-4

Tenant for the reasonable cost thereof within thirty (30) days after written notice from Tenant to Landlord containing an invoice for the same.

6.      **Change Orders**. If Tenant desires any change in the Final Tenant Plans relative to the Tenant Improvements which is reasonable and practical, such changes may only be requested by the delivery to Landlord by Tenant of a proposed written "**Change Order**" specifically setting forth in detail the requested change and the reasons for such requested change. Landlord shall have five (5) Business Days from the receipt of the proposed Change Order to provide the following items: (a) a reasonable summary of any estimated increase in the cost caused by such change ("**Change Order Cost**"); and (b) a statement of the estimated number of days of any delay caused by such proposed change (the "**Change Order Delay**"). Tenant shall then have five (5) Business Days to approve the Change Order Cost and the Change Order Delay. If Tenant approves these items, Tenant shall pay to Landlord the Change Order Cost, if any, within thirty (30) days after Landlord's invoice therefore, which shall be accompanied by evidence of Landlord's payment of such Change Order Cost. Landlord shall, promptly upon Tenant's approval of the Change Order Cost and Change Order Delay, execute the Change Order and cause the appropriate changes to the Final Tenant Plans to be made. If Tenant fails to respond to Landlord within said five (5) Business Day period, the Change Order Cost and the Change Order Delay shall be deemed disapproved by Tenant and Landlord shall have no further obligation to perform any work set forth in the proposed Change Order. The Change Order Cost shall include all reasonable actual out-of-pocket costs associated with the Change Order, including, without limitation, architectural fees, engineering fees and construction costs, as reasonably determined by the Architect and the Contractor. The Change Order Delay shall include all actual unavoidable delays caused by the Change Order, including, without limitation, all design and construction delays, as reasonably determined by the Architect and the Contractor, respectively.

7.      **Selection of Contractor**. A contractor, under the supervision of and selected by Landlord, with Tenant's consent shall construct the Tenant Improvements (the "**Contractor**"). Landlord shall also approve and select all subcontractors performing such work. The Contractor shall be Blue Rock Construction pursuant to that certain construction contract by and between Landlord and Contractor (the "**Construction Contract**").

8.      **Intentionally Omitted.**

9.      **Substantial Completion.**

a.      Except as provided in this <u>Section 9</u>, the Commencement Date shall be as set forth in <u>Section 1.06</u> of the Lease. Landlord shall Substantially Complete (as herein defined) the Tenant Improvements pursuant to the Tenant Construction Drawings and deliver to Tenant a certificate of occupancy for the Premises (or the local equivalent) by May 1, 2009. For purposes of this Lease, "**Substantially Complete**" shall mean that (i) subject to minor punch list items, construction of the Tenant Improvements is substantially in accordance with the Final Approved Plans as approved by Tenant and any Tenant – approved changes thereto and by the appropriate governmental entities as set forth in <u>Section 5(e)</u> hereof, and construction of the Tenant Improvements is in accordance with this Work Letter; (ii) Landlord has secured a, and provided Tenant with a copy of the, temporary certificate of occupancy (or the local equivalent if the

Exhibit B-5

municipality does not issue a temporary certificate of occupancy) from the proper authority; provided, however, that Landlord shall deliver to Tenant a final certificate of occupancy (or the local equivalent if the municipality does not issue a final certificate of occupancy) within thirty (30) days after the Commencement Date, subject to Tenant Delays (as defined below); (iii) Landlord's architect has issued a certificate of substantial completion; (iv) Landlord has delivered a certificate executed by Landlord's architect or project engineer, in accordance with AHERA requirements, confirming that no asbestos containing materials were used in the construction and/or build out of the Premises; and (v) all utilities are available and operating in the Premises, the parking lot of the Building is paved, striped, and illuminated, and all means of ingress and egress as shown on the Site Plan have been completed.

b.      Upon completion of Tenant Improvements, the Premises shall be in compliance with all zoning and building codes, environmental and all other governmental laws, the ADA, as defined herein, and state accessibility laws, rules and regulations applicable to the Project.

c.      Subject to Tenant Delays and Force Majeure (as defined in Section 10 below), if Landlord fails to so Substantially Complete the Tenant Improvements by May 1, 2009, then Tenant shall have the right, at Tenant's sole option, to extend the period within which Landlord may complete the Tenant Improvements, in which event to partially compensate Tenant for its damages in the delay in receiving the Premises, Tenant shall take a credit equal to one day's Rent for each day beyond May 1, 2009 that it takes for Landlord to complete construction of Tenant Improvements; provided, however, if Landlord fails to complete Tenant Improvements by May 15, 2009, in addition to the foregoing Rent credit, Tenant shall have the right to take a credit equal to two day's Rent for each day beyond May 15, 2009 that it takes for Landlord to complete Tenant Improvements.

d.      If Landlord fails to Substantially Complete the Tenant Improvements by July 1, 2009, Tenant may terminate this Lease upon written notice to Landlord (and to any lender as may be required pursuant to any Subordination, Non-Disturbance and Attornment Agreement executed by Tenant), with no cost or liability to Tenant. Said period shall be extended on a day-for-day basis for each day that Landlord fails to Substantially Complete the Tenant Improvements due to Tenant Delay. If Tenant desires to exercises its termination right, Tenant must exercise its right to terminate the Lease by giving notice thereof to Landlord within ninety (90) days after July 1, 2009, so long as on the date of such notice Landlord shall not have Substantially Completed the Tenant Improvements.

e.      Landlord shall notify Tenant approximately thirty (30) days prior to Landlord's Substantial Completion and delivery of the Premises (the "**Delivery Notice**").

f.      All equipment in and systems servicing the Premises shall be in good working order and shall be warranted by Landlord for one (1) year from the Commencement Date.

g.      If Landlord shall be delayed in Substantially Completing the Tenant Improvements as a result of the occurrence of any Tenant Delays, then, for purposes of determining the Commencement Date, the date of Substantial Completion shall be deemed to be the day that the Landlord's Work and the Tenant Improvements would have been substantially completed absent any such Tenant Delays.

Exhibit B-6

10.    **Definitions**.

a.    Tenant Delays.  As used herein, "**Tenant Delays**" means any delay in the design or construction of the Tenant Improvements resulting from any or all of the following:  (i) Tenant's material failure to timely perform any of its obligations pursuant to this Tenant Work Letter, including any failure to complete, on or before the due date therefore, any action item which is Tenant's responsibility pursuant to this Tenant Work Letter, including Tenant's failure to grant approvals, disapprovals and/or make payments within the time frames described herein, or if no time period is prescribed, then within five (5) Business Days after receipt such request; (ii) any interference with the performance of Landlord's Work by Tenant, its employees, agents or contractors during its performance of any work in or to the Premises during the Early Access Period; (iii) Tenant's request for materials, finishes, or installations which are not readily available and Tenant does not desire to switch to a materials, finishes or installations that are readily available; or (iv) Change Order Delays.

b.    Force Majeure.  Force Majeure is deemed to mean the following unless occurring due to Landlord's fault or negligence: Acts of God, governmental restrictions, wars, riots, insurrections, strikes, material shortages or any other cause outside of the reasonable control of Landlord ("**Force Majeure**"); provided, however, that to claim Force Majeure has occurred, Landlord shall provide Tenant with written notice within five (5) days following the occurrence of the Force Majeure event.

11.    **Tenant's Inspection Rights**.  Landlord shall schedule and attend periodic progress meetings, walk-throughs and any other meetings with the Contractor and Tenant to discuss the progress of the construction of the Tenant Improvements ("**Meetings**").  Landlord shall give Tenant at least forty-eight (48) hours prior notice (written or telephonic) of all such Meetings.  Tenant shall designate in writing the person or persons appointed by Tenant to attend the Meetings and such designated party shall be entitled to be present at and to participate in the discussions during all Meetings; but Landlord may conduct the Meetings even if Tenant's appointees are not present as long as the required notice was given.  In addition to the foregoing and to Tenant's early entry rights as provided in Section 2.03 of the Lease, Tenant or its agents shall have the right at any and all reasonable times to conduct inspections, tests, surveys and reports of work in progress ("**Inspections**") for the purpose of reviewing whether the Tenant Improvements are being constructed in accordance with the Final Tenant Plans, as amended by any approved Change Orders or other agreed upon changes.  Tenant agrees to protect, hold harmless and indemnify Landlord from all claims, demands, costs and liabilities (including reasonable attorneys' fees) arising from Tenant's or Tenant's agents entry onto the land for the purpose of conducting Inspections, except those claims, demands, costs and liabilities resulting from the negligence or willful misconduct of Landlord or its Contractor, their employees, agents, subcontractors and licensees.  Landlord and Tenant shall hold project meetings or have a conference call at least once a week to discuss the status of the Work.

12.    **Walk-Through and Punch List**.  As a requirement to meet Substantial Completion of the Tenant Improvements, Tenant and/or the Tenant's Representative or its designee, Landlord, and the Contractor shall jointly conduct a walk-through of the Tenant Improvements and shall jointly prepare a punch list ("**Punch List**") of items needing additional

Exhibit B-7

work ("**Punch List Items**"); provided, however, the Punch List shall be limited to items which are required by the Construction Contract, the Tenant Construction Drawings, as modified under this Work Letter, Change Orders and any other changes agreed to by the parties, and the Punch List Items must be completed within thirty (30) days of Substantial Completion or Tenant shall have the right to complete the Punch List Items, after providing ten (10) days written notice to Landlord, and Landlord shall reimburse Tenant for Tenant's costs within thirty (30) days of receipt of an invoice therefore. The Landlord will notify Tenant's Representative at least ten (10) days prior to the date on which Landlord plans on having obtained Substantial Completion to schedule the walk-through on the anticipated Substantial Completion date so that the parties can create the Punch List. If Tenant does not appear on the scheduled date and at the scheduled time for the walk-through, Landlord shall send written notice of such failure to appear to Tenant and Landlord and Tenant shall re-schedule such walk-through within forty-eight (48) hours after Tenant receives such notice. If Tenant does not appear on the re-scheduled date and at the re-scheduled time for the walk-through, the re-scheduled date shall be deemed to be the date of walk-through and Landlord shall complete the Punch List and send a copy thereof to Tenant.

13.    **Miscellaneous Construction Covenants.**

a.    <u>Coordination with Lease</u>. Nothing herein contained shall be construed as (i) constituting Tenant as Landlord's agent for any purpose whatsoever, or (ii) a waiver by Landlord or Tenant of any of the terms or provisions of the Lease.

b.    <u>Cooperation</u>. Landlord and Tenant agree to cooperate with one another and to cause their respective employees, agents and contractors to cooperate with one another to coordinate any work being performed by Landlord and/or Tenant under this Tenant Work Letter, and their respective employees, agents and contractors so as to avoid unnecessary interference and delays with the completion of the Tenant Work.

14.    **Representations**. Except as set forth to the contrary in the Lease, Landlord does not warrant that the Property or any component thereof will be free of latent defects or that it will not require maintenance and/or repair within any particular period of time, except as expressly provided herein.

a.    Prior to commencing construction of the Tenant Improvements, Landlord shall:

(i)    Secure all permits for the construction of the Tenant Improvements and any consents or approvals of lenders, tenants of the Building, or any other party with approval rights to Tenant's occupancy of the Premises or the performance of the Tenant Improvements.

(ii)    Furnish Tenant with evidence of any required approvals, including, without limitation, the local authorities having jurisdiction over the Premises.

*(Remainder of Page Intentionally Left Blank; Signature Page Follows)*

Exhibit B-8

## SIGNATURE PAGE TO TENANT WORK LETTER

**LANDLORD:**

DP PARTNERS LOGAN II K, LLC,
a Delaware limited liability company

By: _____

Name: Michael Alderman

Title: Partner - Member

**TENANT:**

SEARS, ROEBUCK AND CO., a New York
corporation

By: _____

Name: James B. Terrell

Title: Vice President Real Estate

REAL ESTATE
NWZD
LEGAL

PHBF/ 649807.13

SCHEDULE 1
(To Work Letter)

PRELIMINARY SPECIFICATIONS – OUTLINE SPECIFICATIONS

| | |
|---|---|
| Total Sq. ft. | 365,760 |
| Dimensions | approximately 762' X 480' |
| Construction | Concrete and structural steel. |
| Ceiling Height | 32' structural clear. |
| Warehouse Floor | 7", Ashford Sealed, 4,000 psi concrete.  Laser-screed, burnished, hard machine finish to meet or exceed overall FF55/FL35. (Joint & Saw Cut caulking to be tenant improvement). |
| Columns | 60' x 60' typical grid pattern.  Loading bays 60' x 60'.  Columns are square tubes, floor-bolted, painted primer-grey. |
| Roof | Single ply 45 mil EPDM UL Class A/UL – I-90 rating.  Poly-isocyanurate insulation (R 17).  Roof deck painted white. |
| Wall Panels | Cementious pre-cast panels. |
| Fire Protection | 75-psi ESFR system, as per NFPA 13 (section 231C) and FM Global. |
| Loading Docks | 98 loading docks, each equipped with 9' 0" x 10' 0" overhead sectional door, 6' x 8' mechanical pit-type levelers with 35,000lb rating, bumpers and cushion seals. |
| Drive In Loading | Four (4) drive-in doors each with 12' X 14' overhead sectional doors. |
| Lighting | T5HO flourescent fixtures on 25' flexible whips to provide 30 fc @ 36" AFF (empty configuration). |
| Heating & Ventilation | Four direct-fired wall-mounted S3200 Cambridge units.  Air-turn rate to be determined. |
| Electrical | Two 480/277 volt, 2500 amp services.  Service by Atlantic City Electric |
| Water | New Jersey American Water |
| Sewer | Logan Township Municipal Utilities Authority |
| Gas | South Jersey Gas |
| Car Parking | 235 parking spaces |
| Landscaping | Extensive landscape package.  Automatic irrigation system. |
| Office | TBD |

Exhibit B-Schedule 1-1

SCHEDULE 2
(To Work Letter)

LANDLORD EXPENSE OUTLINE SPECIFICATIONS ADDENDUM

## PREMISES

In addition to the planned finished exterior Landlord will provide and install:
A.   Loading
1.    Total of 28 doors
a.    One – Kelley, (Hulk Lift) 72" x 96" 5,000 lb. Mechanical pit leveler with a single rain hood as shown on plan. (6.5 HP 208-230/460V 3 phase 60 Hz motor). Tenant to provide hood and installation.
b.    Kelley, 30,000 lb. Mechanical Edge of dock levelers shown on plan and referenced in "Dock Schedule" herein. It is anticipated that one position will compliment the "haul away" business component.
c.    Kelley CM Mechanical Dock Leveler 40,000 lb capacity as shown on "SCHEDULE 4 PRELIMINARY TENANT PLANS" and referenced in "Dock Schedule" herein.
d.    One door position will be used for the compactor.   Note: There will be no need for a dock leveler at this position.
2.    Dock Equipment
a.    Frommelt (or equal) dock shelters (seals) and bumpers as shown and in the "Dock Schedule" herein.
b.    Interior mounted Dock lights with articulate arms for each dock door. Dockmaster DMR 40 or equal as shown and in the "Dock Schedule" herein.
c.    Fourteen (14) weather proof 120V duplex outlet between dock doors for diesels heater plug in as shown in "SCHEDULE 4 PRELIMINARY TENANT PLANS".
d.    Label each dock door with a number 1 thru 28 (includes grade-level/ramp door and compactor position)

B.   Parking
1.  Please refer to plans in Exhibit A.
2. Parking will be ADA compliant.

C.   Utilities:
1.    All utilities including but not limited to water gas, sewer, electric, phone will be provided to the building.
2.    All circuit breakers for our space will be located in our space preferably close to our office complex.
3.    Landlord to provide conduit and run leader lines.
4.    Landlord to provide conduit runs that will allow Tenant's vendor to extends phone & data to Tenant's computer room.

Exhibit B-Schedule 2-1

D.    Exterior Lighting:  Existing exterior lighting OK if at least to code.

E.    Exterior Entrance
1.    The landlord is to construct a new ADA accessible entrance into our facility.
2.    The exterior door will be ½ Glass panel with mesh security inset in the glass panel.
3.    Emergency doors to adjacent Tenant's space will contain panic hardware and alarms.
4.    A concrete landing with rails and an ADA ramp to the landing will be provided.
5.    Landlord to install Sears provided a 5' High x 10 ft L x 48" Deep Sign canopy over the entrance.
6.    Fire Egress will be confirmed and provided by landlord for Sears space in compliance with applicable codes.
7.    Landlord to install a 6 ft x 8 ft recessed walk off mat in the vestibule off the entrance.

### Dock Schedule

| Sears # | Door | Descript. | Hulk-Lift | Pit Leveler | Edge of Dock | Bumper | Door | Light | Seal / Shelter | Rain Hood |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | OH 44 | Pick-up | X | | | | X | | | X |
| 2 | OH 43 | Dock | | | X | X | X | X | X | |
| 3 | OH 42 | Dock | | X | | X | X | X | X | |
| 4 | OH 41 | Dock | | | X | X | X | X | X | |
| 5 | OH 40 | Dock | | X | | X | X | X | X | |
| 6 | OH 39 | Dock | | | X | X | X | X | X | |
| 7 | OH 38 | Dock | | X | | X | X | X | X | |
| 8 | OH 37 | Dock | | | X | X | X | X | X | |
| 9 | OH 36 | Dock | | X | | X | X | X | X | |
| 10 | OH 35 | Dock | | | X | X | X | X | X | |
| 11 | OH 34 | Dock | | X | | X | X | X | X | |
| 12 | OH 33 | Dock | | | X | X | X | X | X | |
| 13 | OH 32 | Dock | | X | | X | X | X | X | |
| 14 | OH 31 | Dock | | | X | X | X | X | X | |
| 15 | OH 30 | Dock | | | X | X | X | X | X | |
| 16 | OH 29 | Dock | | | X | X | X | X | X | |
| 17 | OH 28 | Dock | | | X | X | X | X | X | |
| 18 | OH 27 | Dock | | | X | X | X | X | X | |
| 19 | OH 26 | Dock | | | X | X | X | X | X | |
| 20 | OH 25 | Dock | | | X | X | X | X | X | |
| 21 | OH 24 | Dock | | | X | X | X | X | X | |
| 22 | OH 23 | Dock | | | X | X | X | X | X | |
| 23 | OH 22 | Dock | | | X | X | X | X | X | |
| 24 | OH 21 | Dock | | | X | X | X | X | X | |
| 25 | OH 20 | Dock | | | X | X | X | X | X | |
| 26 | OH 19 | Dock | | | X | X | X | X | X | |
| 27 | OH 18 | Dock | | | X | X | X | X | X | |
| 28 | OH 17 | Haul-Away | | | | X | X | | | |
| | OH 16 | Compactor | | | | X | X | | | |
| TOTALS | 29 | | 1 | 6 | 20 | 28 | 29 | 26 | 26 | 1 |

Exhibit B-Schedule 2-2

**OFFICE AREA**

A.    Ceiling:  Landlord will provide a 2' x 2' acoustical lay in ceiling tile system at a height of approximately 9 ft AFF with R-9 insulation batting installed above the ceiling.

B.    Lighting:  Standard 2'-0" x 4'-0" four lay in (4) T8 bulb fluorescent light fixtures shall be installed. One (1) per eighty (80) square feet of floor space.  Preferred voltage is 277v if available. The lighting in the 6 enclosed offices, the break room and the conference room will contain energy efficient motion sensors.

C.    Office Finish
    1.    VCT:  Azrock V984 Elemental with two coats of wax.
    2.    Carpet:  Mohawk Charm Modular MT083 (Color 8718 Affection Tan)
    3.    Wall Base:  Johnsonite 49 Beige
    4.    Paint:  Sherwin Williams 7559 Décor White (eggshell finish)
    5.    Interior office door & trim (if not factory finish) SW 7521 Dormer Brown (gloss finish)
    6.    Landlord to install a vinyl cove base on all drywall walls except stock room

D.    Walls:  Landlord will stud over exterior and block walls in office area to accommodate power.

E.    Restrooms:
    1.    Restroom and fixtures to ADA, fixtures to be selected by landlord but will use (IN-site Lev-R-Mastic Hard Roll towel dispenser) in each restroom.
    2.    Bathroom flooring to be ceramic tile.
    3.    Water coolers and Floor Slop sink will be landlord specified.
    4.    Hot/Cold water will be supplied for all sinks.

F.    Electrical:
    1.    Landlord will install box and conduit in the walls for low voltage as indicated on the final plan.
    2.    Landlord to install electrical to plan. Sears to provide loads if needed. HVAC installed to code.
    3.    Landlord to install a 48" x 96" phone panel board in computer room.

G.    Break Room Finish:  Landlord to install (Off White) base and top cabinet and sink/faucet in the break room to plan. Materials selected by landlord. Approved by Sears

H.    Office Equipment Room/Station:  Landlord to supply and Install (Off White) cabinet base and counter for printer, FAX, phone on the plan.

I.    Door Hardware:  All locked doors from the warehouse into the office area as well as exterior doors will be a Master Keyed with removable cores by Landlord as shown on the attached Drawings.

J.   Intentionally Omitted.

K.   HVAC:
    1.   Landlord shall install one (1) ton of concentric HVAC per approximately 350 square feet of floor space. It is anticipated there will be a multiple control feature controlling the HVAC unit and thermostat shall service the Office area.
    2.   Indoor designing conditions (winter 70 degrees, Summer 75 degrees ±3 with 60% maximum humidity.
    3.   Exhaust from premise to code

## WAREHOUSE

A.   Power:
    1.   Minimum of 1000 Amp service, 480 V, 3 phase service to the building. Total amperage may adjusted based on analysis and justification by the power company (owing to a demonstration of Tenant's demand load).
    2.   Power to final plan (exceptions noted below) provided by Landlord.

B.   Lighting:
    1.   LL to provide T5 HO lighting to 30 foot candles measured 36" above finished floor assuming empty configuration (Tenant will rack the space, however no modification to lighting layout needed).
    2.   The lighting will contain energy efficient sensor controls, the location of which will be coordinated with Sears' construction representative . Motion censoring in the storage area zoned by building bays (5 zones).

C.   Intentionally Omitted.

D.   Floor Finishing:
    1.   Landlord will acid etch the sealer in the interior loading area and install 4"yellow floor tape or a painted strip for defining aisles.
    2.   Landlord will finish floor with 2 coats of Asford floor sealer after the lines are applied on the floor.

E.   Heating: Landlord to provide unit heaters to code in the warehouse area to maintain 60-degree temperature, Air exchanges to code.

F.   Alarming:
    1.   Landlord to provide a Radionics 9412 fire panel (assuming it is reasonably compatible with the existing Simplex-Grinnell system) panel or other approved panel.
    2.   Landlord to provide conduit and run leader lines and install dmark in coordination with Sears' construction representative.

Exhibit B-Schedule 2-4

G.   Equipment Installation (to be performed by Landlord):
1.   Intentionally Omitted.
2.   Intentionally Omitted.
3.   Landlord shall provide and install merchandise pick up customer notification buzzer inside building entrance.
4.   Intentionally Omitted.
5.   Tenant will provide and deliver to the Premises, BAF fans which will be installed by Landlord as per the approved drawings.
6.   Provide and install eye wash station to code.
7.   Trash compactor installation will utilize an existing dock door.

H.   Battery Charging Stations:  Wire and connect 11 Charging stations to the plan to be used with lift equipment. Chargers to be provided by Sears. Electrical will be hard wired with its own subpanels.
1.   Voltage will be confirmed by Sears for relocated units.
2.   Charger #1
3.   Enersys model wg3-18-865
4.   Battery type L-A
5.   Amp hrs 865
6.   No of cells -18
7.   Charge time 8
8.   Input
9.   AC volts 480
10.  AC amps 26/22/11
11.  hertz-60
12.  Phase 3
13.  Output D.C. volts 36
14.  DC amps max 164I.

I.   Floor Drain:
1.   At the location identified on the attached drawing, landlord will install a floor drain with appropriate pitch and curbing.
2.   Within the curbing of the storm drain, Landlord to install a faucet with hot and cold water. On adjacent wall, Landlord to install a 110V outlet duplex.

NOTWITHSTANDING THE FOREGOING, TENANT WILL PROVIDE AND INSTALL:
A.   Signage:
1.   Tenant to install two non-lighted (Sears Home Services) individual letters 36" or 48" in height but will meet sign code. Locations will be identified on the site plan.
2.   A Sears provided sign will be permitted on the back of the building for Merchandise Pick Up.  The sign will be a non- lighted panel sign approximately 36" x 48" in size. We will also put a merchandise pick up window decal in the front window to accommodate ADA as that is where the parking is.
B.   Tenant to provide and install Burglar Alarms and Camera system
C.   Tenant to provide and install IT equipment and cables, phone system,

Exhibit B-Schedule 2-5

D.   Tenant to provide, permit and install all racking equipment pursuant to a certified and approved racking plan.

E.   Tenant to provide and install Compactor.  Landlord will provide electric to compactor. ADDITIONAL INFORMATION REQUIRED FOR PERMIT SUBMISSION.

F.   Tenant to permit, provide and install Canopy over Entrance and Pickup Door

G.   Tenant to provide and install Bailer.  Landlord will provide electric to bailer.

H.   Tenant to furnish and install all furniture and partitions.

PHBF/ 649807.13

SCHEDULE 3
(To Work Letter)

**SEARS/DP PARTNERS TENANT IMPROVEMENTS
APPROVED DRAWING LIST**

| | | | |
|---|---|---|---|
| G-001 | COVER SHEET | 12-10-08 | ISSUED FOR PERMITTING |
| G-002 | ABBREVIATIONS | 12-10-08 | ISSUED FOR PERMITTING |
| G-003 | EGRESS FLOOR PLAN | 12-10-08 | ISSUED FOR PERMITTING |
| A-101 | OVERALL FLOOR PLAN | 12-10-08 | ISSUED FOR PERMITTING |
| A-102 | PARTIAL FLOOR PLAN | 12-10-08 | ISSUED FOR PERMITTING |
| A-103 | RECEPTACLE PARTIAL FLOOR PLAN | 12-10-08 | ISSUED FOR PERMITTING |
| A-401 | ENLARGED PARTIAL FLOOR PLANS | 12-10-08 | ISSUED FOR PERMITTING |
| A-402 | REFLECTED CEILING PLAN | 12-10-08 | ISSUED FOR PERMITTING |
| A-403 | INTERIOR ELEVATIONS | 12-10-08 | ISSUED FOR PERMITTING |
| A-404 | RECEPTACLE ENLARGED PARTIAL FLOOR PLANS | 12-10-08 | ISSUED FOR PERMITTING |
| A-501 | DETAILS | 12-10-08 | ISSUED FOR PERMITTING |
| A-601 | SCHEDULES | 12-10-08 | ISSUED FOR PERMITTING |
| C-2202 | BUILDING K PARKING REVISION | 10-21-08 | APPROVED BY TOWNSHIP |

Exhibit B-Schedule 3-1

SCHEDULE 4
(To Work Letter)

PRELIMINARY TENANT PLANS FOR OFFICE SPACE AND WAREHOUSE



Exhibit B-Schedule 4-1

Office Detail:



Exhibit B-Schedule 4-2

**Exhibit "C"**  Commencement Date Certification

THIS AGREEMENT, made this ___ day of _____, 2009, between **DP PARTNERS LOGAN, II K, LLC** (hereinafter "Landlord") and **SEARS, ROEBUCK AND CO.** ("Tenant").

WITNESSETH:

WHEREAS, Landlord and Tenant have entered into that certain Leased dated _____, 2009 ("Lease") for Premises located at 2100 Center Square Road, Suite 125 (Building "K"), Logan Township, New Jersey; and

WHEREAS, Landlord and Tenant wish to set forth their agreements as to the commencement of the term of the Lease.

NOW, THEREFORE, in consideration of the Premises as described in the Lease and the covenants set forth therein Landlord and Tenant agree as follows:

1.    The Initial Lease Term commenced on _____, 2009.

2.    The Initial Lease Term shall expire on _____, 200_.

3.    Tenant has two (2) option of five (5) years which may be exercised in accordance with the terms of the Lease.

4.    The Commencement Date under the Lease is _____, 2009.

5.    To the best of Landlord's and Tenant's knowledge, there are currently no uncured defaults on the part of either party.

Exhibit C-1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

| Landlord:<br>DP Partners Logan II K, LLC, a Delaware limited liability company | Tenant:<br>Sears, Roebuck and Co., a New York corporation |
|---|---|
| By:<br>Name: Michael C. Dermody<br>Its:     Member<br><br><br>By: _____<br>Name: John Atwell<br>Its:<br><br><br>By: _____<br>Name: Michael Alderman<br>Its: | By: _____<br>Name: _____<br>Its:<br><br><br>Date: _____<br>    (Execution date) |
| Date: _____<br>    (Execution date) | |

Exhibit C-2

**Exhibit "D"  Intentionally Omitted**

Exhibit D-1

PHBF/ 649807.13

**Exhibit "E"** Sign Criteria

## SECTION I:  Purpose and Intent

The purpose of Dermody Properties planned sign program is to provide minimum standards to safeguard life, health, property and the public welfare and to provide the means for adequate identification and advertisement of both the existing and future business by regulating and controlling the design, location, and maintenance of all signs.

The intent of this program is to assure compatibility of proposed signs with existing signs by providing tenants with individual identification while maintaining overall consistency.   All existing and proposed signs must comply with the standards set forth in this planned sign program and applicable governmental laws, ordinances, regulations, rulings and other requirements.

## SECTION II:    General Sign Requirements

1.    Compliance Required

No person shall erect, re-erect, construct, enlarge, alter, repair, move, improve, remove, convert, or equip any sign or sign structure, or paint a new wall sign or cause or permit the same to be done, contrary to or in violation of any of the provisions of this planned sign program. Conformance will be strictly enforced and any installed non-conforming or unapproved signs must be brought into conformance at the expense of the Tenant.

2.    Sign Content

All signs shall be limited to Tenant's trade name and/or logo or logo-type.  Wording of signs shall not include the product sold except as part of the Tenant's trade name or logo. Registered trademarks may be allowed subject to approval by landlord.

3.    Administration

a.    Tenant shall submit or cause to be submitted to the Landlord for approval prior to fabrication at least 3 copies of detailed sign drawings covering the location, size, layout mounting method, design, color, and materials of the proposed sign or signs.

b.    After the Landlord has approved the sign drawings, Tenant shall submit the plans to the applicable governmental authorities for approval.  If any changes are made in the Landlord approved plans by the applicable governmental authorities, Tenant shall re-submit revised plans to the Landlord for review and approval prior to fabrication and installation.

c.    All permits and fees for signs and their installation shall be obtained and paid for by the Tenant or his representative.

Exhibit E-1

    d.      Tenant shall be fully responsible for their sign and choice of sign contractor. Tenant sign contractor shall be licensed to work in the State of New Jersey and the appropriate local jurisdiction and shall carry workers compensation and public liability insurance in the amount of $500,000.00 per occurrence against all damage suffered or done to any person and/or property while engaged in the construction or erection of signs.

    e.      Tenant shall be responsible for the fulfillment of all requirements and specifications of this document and any applicable local laws, ordinances, regulations and other governmental requirements.

    f.      All submittals should be addressed to your leasing agent:    Dermody Properties, Post Office Box 7098, Reno, Nevada 89510

4.    Prohibited Signs

The following signs shall not be permitted:

    a.      Signs which incorporate in any manner any flashing, moving or intermittent lighting or which emit noise;

    b.      Signs which by color, wording, design, location, or illumination resemble or conflict with any traffic control device or with safe and efficient flow of traffic;

    c.      Signs that create a safety hazard by obstructing clear view of pedestrian and vehicular traffic;

    d.      Flags, banners and pennants when used for advertising purposes.  National or state flags displayed in an appropriate manner shall not be prohibited;

    e.      Signs projecting into the public right-of-way;

    f.      Any proposed sign that would adversely affect conforming residential development or conforming tenant signing.

    g.      Portable signs;

    h.      Signs which project above a parapet or the highest point of a roof.

5.    Proper Maintenance Required

All signs, together with all of their supports, braces, guys and anchors, shall be properly maintained with respect to appearance, structural and electrical features. The display surfaces of all signs shall be kept neatly painted or posted at all times.  All signs shall be subject to maintenance provisions as follows:

Exhibit E-2

a.    All signs shall be refinished to remove rust or other corrosion due to the elements and any cracked or broken faces and malfunctioning lamps shall be replaced within thirty (30) days following notification by Landlord.

b.    Any location where business goods are no longer sold or produced or where services are no longer provided shall have thirty (30) days following move out to remove any remaining or derelict signs or copy therein and restore the mounting surface to a good and satisfactory condition.

**SECTION III:    General Specifications**

Signs for individual tenants will be limited to the following:

6.    Building Signage:  The size of Tenant's sign shall be as limited by local ordinance. When a logo is incorporated into the signage program it will count against the total allowable signage square footage.  The sign shall consist of individual styrene letters with acrylic faces.  Flat plastic cut-out letters shall have a  1" (one inch) of larger trim cap around each letter.

Shipping and receiving signs along with dock door numbers are exempt from the total sign area.

7.    Door Entry Signage:  Tenant entry signage shall consist of individual dye cut vinyl adhesive letters not to exceed 2" in height or 12" in length nor 144 square inches in area.

Signs shall be restricted to either the Tenant's main entry door or to the first glass sidelight immediately adjacent to the main entry door.  Signs shall not be mounted on other parts of the building.

All letters shall be white vinyl.

Exhibit "E" to lease dated January 20, 2009
by and between DP Partners Logan II K, LLC, a Delaware limited liability company, and Sears, Roebuck and Co., a New York corporation

Exhibit E-3

PHBF/ 649807.13

**Exhibit "F"** Rules and Regulations

It is further agreed that the following "Rules and Regulations" shall be and are hereby made a part of this Lease, and the Tenant agrees that its employees and agents, or any others permitted by the Tenant to occupy or enter said Premises, will at all times abide by said Rules and Regulations and that a default in the performance and observance thereof shall operate the same as any other defaults herein:

8.   The sidewalks, entries, and driveways shall not be obstructed by the Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from their Premises. Landlord may remove any such obstruction or thing (unauthorized by Landlord) without notice or obligation to Tenant.

9.   Tenant shall not place any movable objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped area or other areas outside of said Premises, or on the roof of said Premises.

10.   No person shall disturb the occupants of this or adjoining buildings or premises by the use of any radio or musical instrument or by the making of loud or improper noises.

11.   Parking any type of recreational vehicles is specifically prohibited. No vehicle which is unrelated to the operation of the Tenant's business shall be stored in the parking areas at any time. In the event that a vehicle is disabled, it shall be removed within 48 hours. There shall be no "For Sale" or other advertising signs on or about any parked vehicle. All vehicles shall be parked in the designated parking areas in conformation with all signs and markings.

12.   Tenant shall not use, keep or permit to be used or to be kept any foul or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors and/or vibrations, or interfere in any way with other tenants or those having business therein. Tenant shall maintain the leased Premises free from mice, bugs, and ants attracted by food, water or storage materials.

13.   Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of the Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

14.   Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment or any dangerous or hazardous condition existing on the Premises.

15.   No outside storage of pallets, boxes, cartons, drums or any other containers or materials used in shipping or transport of goods is allowed. Tenant shall place all refuse in proper receptacles provided by Tenant, at Tenant's expense, on the Premises or inside enclosures (if any) provided by Landlord for the Building, and shall keep sidewalks and driveways

Exhibit F-1

outside the Building and lobbies, corridor stairwells, ducts or shafts of the Building free of all refuse.

16. All moveable trash receptacles provided by the trash disposal firm must be kept in the trash enclosure areas where provided for that purpose.

17. The Landlord reserves the right to make such other and further reasonable rules and Regulations as in its judgment may from time to time be needful and desirable for the safety, care and cleanliness of the Project and for the preservation of good order therein.

18. Tenant shall not use any method of heating or air conditioning other than that supplied by Landlord without the consent of Landlord.

19. No person shall go on the roof without Landlord's permission.

20. All goods, including material used to store goods, delivered to the Premises of Tenant shall be immediately moved into the Premises and shall not be left in parking or receiving areas overnight.

21. Tenant shall not do or permit anything to be done in the Premises or bring or keep anything therein which will in any way obstruct or interfere with the rights of other tenants, or do, or permit anything to be done in the Premises which shall, in the judgment of the Landlord or its manager, in any way injure or annoy other tenants, or conflict with the laws relating to fire, or with the regulations of the fire department or with any insurance policy upon the Building or any part thereof or any contents therein or conflict with any of the of the rules and ordinances of the public building or health authorities.

22. All electrical equipment used by Tenant shall be U.L. approved. Nothing shall be done or permitted in Tenant's Premises, and nothing shall be brought into or kept in the Premises which would impair or interfere with any of the Building services or the proper and economic heating, cooling, cleaning or other servicing of the Building or the Premises. Tenant's computers and other equipment are hereby expressly allowed.

23. Tenant shall not install or operate any steam or gas engine or boiler, or carry on any mechanical business in the Building. Except for propane necessary for the operation of forklifts permitted to be on the Premises, so long as such use is in compliance with all applicable Legal Requirements, the use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Building. Tenant shall not use any other method of heating than that supplied by Landlord.

24. Tenant shall not remove any carpet, or wall coverings, window blinds, or window draperies in the Premises without the prior written approval from Landlord.

25. No animals, birds or pets (other than seeing-eye dogs) of any kind shall be allowed in Tenant's Premises or Building.

Exhibit F-2

26.   The water closets, urinals, waste lines, vents or flues of the Building shall not be used for any purpose other than those for which they were constructed, and no rubbish, acids, vapors, newspapers or other such substances of any kind shall be thrown into them. The expense caused by any breakage, stoppage or damage resulting from a violation of this rule by any Tenant, its employees, visitors, guests or licensees, shall be paid by Tenant.

27.   All decorating, carpentry work, or any labor required for the installation of Tenant's (a) equipment, such as an alarm system, computer, telephone/telegraph equipment, lines, cables or other electrical devices; or (b) furnishings or other property shall be performed at Tenant's expense, and will not require Landlord's prior verbal or written approval. Should any such work require alterations that affect the heating, ventilation, air conditioning, plumbing, electrical or mechanical systems of the Building, the roof, or the structure of the Building, Landlord's prior written approval will be required. Structural changes are defined as changes that affect a vital and substantial portion of the Premises, changing its characteristic appearance, fundamental purpose of its erection or uses, or a change of such a nature as to affect the very realty itself, extraordinary in scope and effect, or unusual in expenditure.

28.   The Premises shall not be used or permitted to be used for residential, lodging or sleeping purposes.

29.   Except as permitted under the Lease or approved by Landlord, Tenant shall not mark upon, paint signs upon, cut, drill into, or in any way deface the walls, ceilings, partitions or floors of the Premises or of the Building, and the repair cost of any defacement, damage, or injury caused by Tenant, its agents or employees shall be paid for by the Tenant.

30.   The cost of repairing any damage to the public partitions of the Building or the public facilities, or to any facilities used in common with other tenants, caused by Tenant or the employees, licensees, agents or invitees of Tenant, shall be paid by Tenant.

31.   Landlord reserves the right to restrict or prohibit canvassing, soliciting or peddling in the Building.

32.   Tenant shall not re-key or change any lock in any exterior door which provides access to spaces with fire monitoring equipment, electrical services, or any doors to Common Areas. At the expiration or termination of the Lease, the Tenant shall provide the Landlord with keys to all locks in the Premises.

33.   Any rules or regulations promulgated pursuant to the Declarations shall constitute a part of the Rules and Regulations, as if they were fully set forth on this Exhibit F.

Exhibit "F" to lease dated January 20, 2009
by and between DP Partners Logan II K, LLC, a Delaware limited liability company,
and Sears, Roebuck and Co., a New York corporation

Exhibit F-3

**Exhibit "G"** Move-Out Standards

THIS Move Out Standards Exhibit is dated for the reference purposes January 20, 2009, and is made between DP Partners Logan II K, LLC, a Delaware limited liability company ("Landlord"), and Sears, Roebuck and Co., a New York corporation ("Tenant") to be a part of that certain Industrial Lease (DP Partners Industrial Lease Net-Net-Net form) of even date herewith between Landlord and Tenant (the "Lease") concerning a portion of the Project more commonly known as LogistiCenter at Logan, as described in Section 1.01 of the Lease (the "Premises"). Landlord and Tenant agree that the Lease is hereby modified and supplemented as follows:

At the expiration of the term of this Lease, Tenant shall surrender the Premises in the same condition as they were upon delivery of possession thereto under this Lease, reasonable wear and tear accepted, and shall deliver all keys to Landlord. Before surrendering the Premises, Tenant shall remove all of its personal property and trade fixtures and such alterations or additions to the Premises made by Tenant as may be specified for removal thereof. If Tenant fails to remove its personal property and fixtures upon the expiration of this Lease, the same shall be deemed abandoned and shall become the property of the Landlord.

The Tenant shall surrender the Premises, at the time of the expiration of the Lease, in a condition that shall include, but is not limited to, addressing the following items:

1.    Lights:  Office and warehouse lights will be fully operational with all bulbs functioning. Broken lenses and housings shall be replaced or repaired in a workmanlike manner.

2.    Dock Levelers & Roll Up Doors:     Should be in good working condition, less normal wear & tear.

   a.    Dock Leveler working condition:  The leveler's condition is such that, when actuated, whether manually or power-assisted, the leveler rises and the lip extends such that the lip is higher than the level of the floor of the trailer. The leveler then can be lowered, with the lip extended, down to the floor of the trailer. The leveler's condition is such that it can carry its design load. When actuated to lift off of the trailer floor (for storage), the leveler rises, the lip falls, then the leveler drops such that the lip and leveler return to their storage position with the leveler's decking level with the floor of the building. Repairs made to restore levelers to working condition shall be done in workmanlike manner.

   b.    Dock Leveler normal wear & tear shall mean:  worn or scratched paint; scuffs; surface oxidation; and other cosmetic damage. Hinges will not be broken or bent and will work properly. Welds are not broken or have been repaired properly. Toe-guards, if any, will function properly. No missing side-seals or brushes or dock bumpers. No deflection in the leveler decking such that a gap exists between the leveler decking and the bottom of the Roll Up Door. The leveler's point of attachment to the floor is intact such that the angle-iron is not bent and the concrete is not spalled significantly.

Exhibit G-1

c.    Roll Up Door working condition:  The door's condition is such that, when actuated, whether manually or power-assisted, the door rises to clear the door opening.    When closed the door forms a weatherproof seal.    The locking mechanism shall work normally.

d.    Roll Up Door wear & tear shall mean:  worn or scratched paint; scuffs; small dents and other cosmetic damage.  No broken or missing hinges, tracks, rollers, handles or windows.  Weather seals shall form an effective barrier.  No gap shall exist between the bottom of the door and the leveler.

3.    Dock Seals:  Shall be in working condition, less normal wear and tear.

a.    Dock Seal working condition:  The seal's condition is such that it forms an effective weather seal along the sides and top of a trailer such that wind and rain are prevented from entering into the dock door opening and building.

b.    Dock Seal normal wear & tear shall mean:  minor scratches, scuffs, and other cosmetic damage.  Minor cuts and tears, less than 6" in length and that do not affect a proper seal from being formed around the trailer shall be considered normal wear & tear.  Excessive wear & tear or damage is defined as damage that results in the improper functioning of the dock seal, such as:  missing foam pads or curtains, unrepaired cuts and tears greater than 6" in length; broken side or top curtains, if any; broken mountings; missing pleats, if any; or broken frames, if any.  Repair are to be made in a good workmanlike manner.

4.    Warehouse Floor:  Shall be broom clean and in normal working condition, less normal wear & tear.

a.    Working condition shall mean that the floor is usable for handling, storage and assembly of products without preventing efficient, safe and clean operations including safe walking conditions as well as unfettered operation of motorized lift equipment, racking, conveyors and other handling equipment designed for warehousing and distribution uses.  The floor's condition will not cause excessive tire wear or other damage to motorized equipment so long as that equipment is operated normally.  The floor's condition will not cause damage to product or packaging in the course of normal handling and storage.  Normal wear & tear shall be defined as:  minor scuffs and scratches less than ¼" deep; minor surface spalling of less than ½" wide and ¼" deep; minor floor joint spalling of less than ¼" wide per edge (or ½" wide per joint); normal non-structural shrinkage cracking; and moderate staining.  The floor's condition will be smooth.  Floor stripping shall be removed in a manner that leaves the stripped area nearly indistinguishable from other areas.  No racking bolts or mounting hardware or other protrusions will be left in the floor, their holes repaired in accordance with American Concrete Institute (ACI).  All repairs to the floor and floor joints are to be done in a workmanlike manner consistent with published guideline of the American Concrete Institute (ACI).

Exhibit G-2

b.  Excessive wear & tear shall mean any damage to the floor that: (1) prevents normal, efficient or safe operations; or (2) is likely to produce damage to product or packaging in normal working conditions; or (3) is likely to produce damage or premature wear to material handling equipment. Examples of excessive wear & tear:

i.  * surface spalling or scratches greater than ½" wide and ¼" deep;

ii.  * damaged floor joints where the damage results in a joint width, measured edge to edge, or more than ½" wide;

iii.  * the spalled or damaged surface area of structural cracks when those cracks were not reported to Landlord for prompt repair;

iv.  * improperly removed mounting hardware;

v.  * structurally-damaged areas resulting from excessive loads, improperly designed or mounted racking or handling equipment, or other Tenant abuse; or

vi.  * areas not repaired in accordance with ACI standards.

5.  Tenant-Installed Equipment & Wiring: Removed and space turned to original condition when originally leased (Remove air lines, junction boxes, conduit, etc.).

6.  Walls:  Sheetrock (drywall) damage should be patched and fire-taped so that there are no holes in either office or warehouse.

7.  Roof:  Any tenant-installed equipment must be removed and roof penetrations properly repaired by licensed roofing contractor. Active leaks must be fixed and latest landlord semi-annual maintenance and repairs recommendation must have been followed.

8.  Signs:  All exterior signs must be removed and holes patched and paint touched-up as necessary. All window signs should likewise be removed.

9.  Heating & Air Conditioning System: A written report from a licensed HVAC contractor within the last three months stating that all evaporative coolers within the warehouse are operational and safe and that office HVAC system is also in operational and safe condition.

10.  Overall Cleanliness:  Clean windows, sanitize bathroom(s), vacuum carpet, and remove any and all debris from office and warehouse. Remove all pallets and debris from exterior of Premises.

11.  Upon Completion:  Contact DP Partners (775) 858-8080 to coordinate date of turning off power, turning in keys, and obtaining final DP Partners inspection of premises which, in turn, will facilitate refund of security deposit.

Exhibit G-3

Exhibit "G" to Lease dated January 𝟸𝟶, 2009
by and between DP Partners Logan II K, LLC, a Delaware limited liability company,
and Sears, Roebuck and Co., a New York corporation

**DP Partners Logan II K, LLC**

By: _____

Name:   Michael C. Dermody

Its:      Member


By: _____

Name:  John Atwell

Its: _____


By: _____

Name:  Michael Alderman

Its:   Partner - Member


**Sears**

By: _____

Name:   James B. Terrell

Its:      Vice President Real Estate


REAL ESTATE
MRD
LEGAL
SMS/DC


Exhibit G-4

**Exhibit "H-1"**

**INTENTIONALLY OMITTED**

Exhibit H1-1

**Exhibit "H-2"**

**INTENTIONALLY OMITTED**

PHBF/ 649807.13

Exhibit "I"

## TENANT'S PARKING PLAN



Exhibits I to lease dated January 20, 2009
by and between DP Partners Logan II K, LLC, a Delaware limited liability company
and Sears, Roebuck and Co., a New York corporation

Exhibit I – Page 1

# Exhibit "J"

Prepared by and after recording
return to:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL  60179
Attn:_____

[this space reserved for recording purposes]

### SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT

THIS SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT (this "**Agreement**") is made and entered into as of the ___ day of February, 2009, by and between **BANK OF AMERICA, N.A.** ("**Lender**"), and **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Tenant**").

### RECITALS

DP Partners Logan II K, LLC ("**Landlord**") is the owner of certain real property, legally described on Exhibit "A", attached hereto and made a part hereof (the "**Parcel**"), which is located in Logan Township, Gloucester County, New Jersey and commonly known as Sears #_____.

By the Industrial Lease between Landlord and Tenant dated February ___, 2009 (the "**Lease**"), the Tenant has leased from Landlord a portion of the Parcel and the improvements thereon (the "**Premises**"), containing approximately 87,321 square feet, together with various easements and rights as stated therein.

Lender is the mortgagee under the Construction Loan Mortgage, Assignment, Security Agreement and Fixture Filing on the Parcel, given to the Lender by Landlord dated as of December 18, 2007, recorded on December 20, 2007, in the Office of the County Clerk of Gloucester County, New Jersey, as Docket No. 72905, Document No. MB11019271 (collectively referred to herein with any other documents securing the debt secured by the mortgage as the "**Mortgage**").

The loan terms require Tenant to subordinate the Lease and its interest in the Premises to the lien of the Mortgage and that Tenant attorn to Lender.

Tenant desires recognition of and consent to the Lease terms by Lender and to be assured of continued occupancy of the Premises under the terms of the Lease in the event Lender succeeds to the rights of Landlord under the Lease pursuant to the terms of the Mortgage.

8330990.4

PHBF/ 649807.13

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Lender hereby consents to the Lease.

2.  The Lease is and shall be subject and subordinate to the lien of the Mortgage and to all renewals, replacements and extensions of the Mortgage to the full extent of the principal sum secured thereby and interest thereon.

3.  In the event that Lender shall commence an action to foreclose the Mortgage or to obtain a receiver of the Premises, or shall foreclose the Mortgage by advertisement, entry and sale according to any procedure available under the laws of the state where the Parcel is located, Tenant shall not be joined as a party defendant in any such action or proceeding and Tenant shall not be disturbed in its possession of the Premises, provided Tenant is not in default under the Lease past any applicable cure period.

4.  In the event that Lender shall acquire the Premises upon foreclosure, or by deed in lieu of foreclosure, or by any other means:

    (a)  Tenant shall be deemed to have made a full and complete attornment to Lender as the landlord under the Lease so as to establish direct privity between the Lender and Tenant; and

    (b)  All rights and obligations of Tenant under the Lease shall continue in full force and effect and be enforceable by and against Tenant respectively with the same force and effect as if the Lease had originally been made and entered into directly by and between Lender as the landlord thereunder, and Tenant; and

    (c)  Lender shall recognize and accept the rights of Tenant and shall thereafter assume the obligations of Landlord under the Lease.

5.  Nothing herein contained shall impose any obligations upon Lender to perform any of the obligations of Landlord under the Lease, unless and until Lender shall become owner or mortgagee in possession of the Premises.

6.  Notwithstanding anything to the contrary in the Lease or the Mortgage, Lender shall not be liable for or bound by any of the following matters:

    (i)  any payment of Rent that Tenant may have made to Landlord more than thirty (30) days before the date such Rent was first due and payable under the Lease with respect to any period after the date of attornment,

8330990.4                                 2

PHBF/ 649807.13

Exhibit J – Page 2

other than, and only to the extent of, prepayments expressly required under the Lease; and

(ii)    any obligation (a) to pay Tenant any sum(s) that any Landlord owed to Tenant, or (b) with respect to any security deposited with Landlord, except to the extent that such security was actually delivered to Lender by Landlord and Lender has the legal right to use or apply such security for the purposes provided in the Lease; and

(iii)    any amendment or modification of the Lease made without the written consent of Lender which reduces Base Monthly Rent, Additional Rent or Tenant's other payment obligations, reduces the Initial Lease Term; or changes Tenant's Option to Renew; and

(iv)    any claims, set offs or defenses that Tenant might have against any prior landlord (including Landlord), except (1) as for Tenant set off rights set forth in Section 30.03 of the Lease; or (2) relating to landlord (including Landlord) defaults for which Lender received notice and failed to cure; and

(v)    any consensual termination of the Lease between Landlord and Tenant to which Lender did not consent; and

(vi)    any of Landlord's initial construction and improvement work set forth in the Work Letter attached to the Lease, as opposed to Landlord's repair or reconstruction obligations.

7.    <u>Exculpation of Successor Landlord.</u>

Notwithstanding anything to the contrary in this Agreement or the Lease upon any attornment pursuant to the Agreement:

(a)    The Lease shall be deemed to have been automatically amended to provide that Lender's obligations and liability under the Lease shall never extend beyond Lender's (or its successors' or assign's) interest, if any, in the Premises from time to time, including insurance and condemnation proceeds, Lender's interest in the Lease, and the proceeds from any sale or other disposition of Premises by Lender's (provided that Tenant shall have no interest in or right to participate in (i) any payments made under any promissory note received by Lender in connection with any such sale or other disposition, or (ii) any collateral held by Lender to secure such payments) (collectively, "Lender's Interest"), and Tenant shall look exclusively to Lender's Interest (or that of its successors and assigns) for payment or discharge of any obligations of Lender under the Lease as affected by this Agreement.

(b)    The obligations under the Lease of Lender or any affiliate of Lender which becomes a successor landlord shall terminate upon the transfer by such successor landlord of its interest in the Premises, and thereupon Tenant shall look solely to the transferee for the performance of all obligations of the landlord under the Lease which accrue or otherwise become performable following the date of such transfer. If Tenant obtains any money judgment against Lender with respect to the Lease or the relationship between Lender and Tenant, then Tenant shall look solely to Lender's Interest (or that of its successors and assigns) to collect such judgment. Tenant shall not collect or attempt to collect any such judgment out of any other assets of Lender. Nothing herein shall be construed to grant Tenant any right to seek any recovery from Landlord or any successor landlord to the extent that such recovery is not permitted under or is restricted by the provisions of the Lease.

(c)    Tenant shall not be entitled to recover consequential or punitive damages.

8.    <u>Lender's Right to Cure.</u>

Notwithstanding anything to the contrary in the Lease or this Agreement, before exercising any right based on a landlord default under the Lease, including but not limited to any right to terminate the Lease, Tenant shall provide Lender with a copy of notice of the breach or default by Landlord giving rise to same (the "Default Notice") and, thereafter, the opportunity to cure such breach or default.  Except as provided below relating to Tenant's set-off rights, after Lender receives a Default Notice, Lender shall have a period of thirty (30) days beyond the time available to Landlord under the Lease in which to cure the breach or default by Landlord. Lender shall have no obligation to cure (and shall have no liability or obligation for not curing) any breach or default by Landlord, except to the extent that Lender agrees or undertakes otherwise in writing. Notwithstanding anything to the contrary in the Lease or this Agreement, the Lender's additional thirty (30) day cure period shall not be applicable to any Landlord non-performance or default under the Lease giving rise to Tenant's set-off rights as provided in Section 30.03 of the Lease.

9.    Any notice required or desired to be given under this Agreement shall be in writing and (a) personally delivered, or (b) given by certified or registered mail, return receipt requested, postage prepaid, or (c) sent by reputable overnight air courier service (i.e., Federal Express, Airborne, etc,) with guaranteed overnight delivery; in each instance addressed to the party as provided below. Notices shall be deemed given when actually received by the recipient, receipt thereof is refused by the recipient, or the

impossibility of delivery due to the failure to provide a new address as required herein All notices hereunder shall be addressed as follows:

If to Lender:          BANK OF AMERICA, N.A.
                       6th Floor, CA5-705-06-11
                       555 California Street
                       San Francisco, California  94104-1503
                       Attn:   Nancy Li

If to Tenant:          SEARS, ROEBUCK AND CO.
                       333 Beverly Road
                       Hoffman Estates, Illinois  60179
                       Attn:   Vice President
                               Real Estate
                               Department 824RE

With a copy to:        SEARS, ROEBUCK AND CO.
                       3333 Beverly Road
                       Hoffman Estates, Illinois  60179
                       Attn:   Assistant General Counsel, Real Estate
                               Law Department 824RE

Either party, at any time and from time to time (by providing notice to the other party in the manner set forth above), may designate a different address or person, or both, to whom such notice may be sent.

10.   This Agreement shall be binding upon and inure to the benefit of any person or entity acquiring rights to the Premises by virtue of the Mortgage, and the successors, administrators and assigns of the parties hereto.

11.   No personalty, real property, or fixtures of Tenant are subject to the lien of the Mortgage.

12.   Landlord or Lender shall give written notice to Tenant of the reconveyance or other release of the Mortgage within thirty (30) days of the date the reconveyance or other release is recorded.

13.   This Agreement shall not apply to any equipment owned or leased by Tenant which is now or hereafter placed on or installed in the Premises, and Tenant shall have the full right to remove said equipment at the expiration of the Lease term.

**[Remainder of Page Intentionally Left Blank; Signature Page(s) Follow]**

8330990.4                                    5

IN WITNESS WHEREOF, this Subordination, Attornment and Non-Disturbance Agreement has been signed and sealed on the day and year first above set forth.

Lender:

**BANK OF AMERICA, N.A.**

By: _____

Name: _____

Its: _____

STATE OF _____ )
                                 ) SS:
COUNTY OF _____ )

The undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that _____, personally known to me to be the _____ of Bank of America, N.A., and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that in such capacity he/she signed and delivered the said instrument pursuant to authority duly given to him/her by said corporation.

GIVEN under my hand and seal this ___ day of _____, 2009.

_____
Notary Public

My Commission expires:

_____

Exhibit J – Page 6

**Landlord:**

**DP PARTNERS LOGAN II K, LLC,**
a Delaware limited liability company

By: _____
Name: _____
Its: _____

STATE OF _____ )
                                                    ) SS:
COUNTY OF _____ )

    The undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that _____, personally known to me to be the _____ of DP Partners Logan II K, LLC, a Delaware limited liability company, and personally know to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that in such capacity he/she signed and delivered the said instrument pursuant to authority duly given to him/her by said company.

    GIVEN under my hand and seal this ___ day of _____, 2009.

_____
Notary Public

My Commission expires:

_____

Exhibit J – Page 7

**Tenant:**

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By: _____
Name: _____
Its: _____

STATE OF _____ )
           ) SS:
COUNTY OF _____ )

  The undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that _____, personally known to me to be the _____ of SEARS, ROEBUCK AND CO., a New York corporation, appeared before me this day in person and acknowledged under oath that in such capacity he/she signed and delivered the said instrument pursuant to authority duly given to him/her by said corporation.

  GIVEN under my hand and seal this ___ day of _____, 2009.


_____
      Notary Public

My Commission expires:


_____

8330990.4            8

Exhibit J – Page 8

## EXHIBIT A

## DESCRIPTION OF PROPERTY

### BLOCK 2803 LOT 1.05

ALL THAT CERTAIN tract or parcel of land situate and lying in the Township of Logan, County of Gloucester, State of New Jersey being more particularly bounded and described as follows:

BEGINNING AT A POINT in the curved Southwesterly line of Center Square Road (County Route Number 620) (variable width right of way, as measured 44.00 feet from centerline) where the same in intersected by the division line between Block 2803 lots 1.03 and 1.05 as illustrated on a plan entitled, "ALTA/ACSM (2005) Land Title Survey, Block 2801 Lots 27, 29 thru 31, and 34 thru 38, Block 2803 Lots 1, 1.01, 1.03 1.05, 4, 6, 8, 8.01, 9 & 10 and Block 3001 Lot 16" prepared by Taylor Wiseman & Taylor, dated March 29, 2005, last revised May 10, 2007 (dwg. 367-17645-SUR), and from said beginning point runs; Thence, along the division line between lots 1.03 and 1.05 (1) S. 44° 10'34" W. a distance of 712.25 feet to a point corner to lot 1.03; Thence, along the same (2) S 45° 49'26" E. a distance of 61.00 feet to a point in the line of lot 1.03 and corner to lot 1.04; Thence, along the same (3) S. 44° 10' 34" W., a distance of 387.83 feet to a point in the line of lot 1.04 and corner to lot 1.02; Thence, along the same (4) N. 45° 49' 26" W., a distance of 1063.12 feet to a point in the line of lot 28; Thence, along the same (5) N. 65° 39' 39" E., a distance of 99.72 feet to a point corner to the same; Thence, still along the same (6) N. 24° 20' 22" W., a distance of 350 feet to a point corner to lots 26 and 25; Thence, along the same (7) N. 65° 39' 30" E., a distance of 123.36 feet to a point corner to lots 25 and 24; Thence, along the same (8) N. 66° 39' 38" E., a distance of 247.47 feet to a point corner to lots 24 and 21; Thence, along the same and extending along the line of lot 20 (9) S. 31° 15' 22" E., a distance of 251.15 feet to a point corner to lot 20; Thence, along the same (10) N. 46° 44' 43" E., a distance of 438.43 feet to a point in the aforementioned southwesterly line of Center Square Road; Thence, along the same (11) S. 56° 43' 08" E., a distance of 368.86 feet to an angle point in the same; Thence, still along the same (12) S. 56° 37' 16" E., a distance of 203.70 feet to a point of curvature; Thence, curving to the right, said curve having a radius of 5,991.00 feet, and a central angle of 03° 09' 47", (13) Southwestwardly, an arc length of 330.75 feet

(said curve having a chord bearing and distance of S. 55° 02' 22" E, 330.71 feet) to the POINT AND PLACE OF BEGINNING.

　　　　SAID ABOVE DESCRIBED tract or parcel of land containing within said bounds 24.85 acres of land, more or less.

　　　　SAID PARCEL BEING SUBJECT TO easements of record.

Keith M. Ludwig
New Jersey Licensed Land Surveyor 24GS04324400
Certificate of Authorization No. 24GA28032900

August 17, 2007

8330990.4                             10

Exhibit J – Page 10

PHBF/ 649807.13

## Exhibit "K"

### ESTOPPEL CERTIFICATE

TO: _____ ("Lender" or "Purchaser") [Revise as applicable]

_____

RE:    Sears Unit # _____

The undersigned, Sears, Roebuck and Co., as the tenant under that certain lease dated _____, as modified by _____ (the "Lease"), by and between DP Partners Logan II K, LLC, as Landlord, and Sears, Roebuck and Co., as Tenant, covering the approximately 86,400 square feet of space in the building commonly known as 2100 Center Square Road, Suite 125 at LogistiCenter at Logan, Logan Township, New Jersey (the "Premises"), hereby certifies that as of the date hereof:

1.    Tenant is in possession of the Premises under the Lease.

2.    The current term of the Lease expires on _____, but may be extended as specified in Section _____ of the Lease.

3.    Rental payments under the Lease have been made through _____. The current fixed minimum monthly rental amount is $_____.

4.    The Lease is in full force and effect and has not been modified, altered or amended, except as stated above.

5.    To Tenant's knowledge and without having made an in-depth inspection of the Premises (but having made reasonable inquiry), there are no outstanding repair/maintenance obligations of Landlord under the Lease. This certification is intended to indicate the serviceability of the Premises for Tenant's business purposes as of the date hereof and may not be deemed a warranty as to their continuing fitness nor shall it relieve Landlord or its successors or assigns of any obligations provided for in the Lease.

6.    Tenant makes the certifications contained herein with the knowledge that Landlord intends to [refinance] [sell] the Premises. The certifications contained herein are for the sole reliance of the Landlord, the [Lender] [Purchaser] to whom this Estoppel is addressed (if any), Lender's respective successors and assigns, and for no other entity, person or purpose whatsoever.

7.    Tenant:  (i) has not made a thorough inspection of the Premises or of the bills or other documents issued by Landlord under, pursuant to, or in connection with the Lease (but has made reasonable inquiries prior to the delivery of this certificate); (ii) expressly reserves the right to conduct such an inspection at a later date; (iii) makes no representation as to Landlord's obligations under the Lease except as specifically stated herein; and (iv) expressly reserves:  (a) any and all claims Tenant has or may have against Landlord and/or its representatives, agents,

successors, and assigns under, pursuant to, or in connection with the Lease, including, without limitation, claims relating to overcharges or other incorrect billings by Landlord and Landlord's failure to perform its obligations under the Lease, and (b) all rights and remedies available to Tenant under the Lease or as otherwise provided at law or in equity.

8.     If any conflict between the terms of this document and the Lease should arise, the terms of the Lease shall prevail.

9.     This Estoppel Certificate is given solely for the information of the party or parties to whom addressed, and it may not be relied upon by any other person or entity except as noted above.  This Estoppel Certificate shall not create any liability in, or provide any right of action against Tenant, its officers, directors, agents, employees and representatives, and is given for the sole effect of estopping the undersigned from taking a position against the intended recipient inconsistent with the statements contained in this Estoppel Certificate.

By: _____

Its: _____

Exhibit K – Page 2