# EXHIBIT 1

## AGREEMENT OF LEASE

**Parties**

THIS AGREEMENT OF LEASE made and entered into in duplicate
originals this 9th day of December , A. D. 1955, by and between
THE MYRON STRATTON HOME, a charitable corporation organized and
existing under and by virtue of the laws of the State of Colorado (herein-
after sometimes for convenience referred to as "Landlord") and SEARS,
ROEBUCK AND CO., a corporation organized and existing under and by
virtue of the laws of the State of New York and qualified to do business in
the State of Colorado (hereinafter sometimes for convenience referred to
as "Tenant").

### WITNESSETH:

**Premises**

For and in consideration of the payments of monies and rentals
hereinafter provided, to be paid to the Landlord by the Tenant and of
the mutual covenants and agreements mentioned hereinafter, to be kept
and performed by Tenant, the Landlord does hereby lease, let, and
demise unto the Tenant that certain tract of real estate, together with
all rights of ingress and egress and all appurtenances thereunto apper-
taining, situate in the County of El Paso and State of Colorado, which "Sears
Tract"
said tract of real estate is herein sometimes for convenience referred
to as the "Sears Tract" and is more fully described in the Rider hereto "Rider
Number one"
attached, marked "Rider Number One", signed by the parties hereto
and hereby made a part of this Lease, upon the terms and subject to
the conditions hereinafter stated:

### ARTICLE I

The term of this Lease shall commence on the 1st day of December,
1955, and shall continue thereafter to and including the 30th day of November,

- 1 -

1995, being a period of forty (40) years, unless this Lease shall be ear-
lier terminated in accordance with any of the provisions herein contained.

### ARTICLE II

Rental

(a)  The Tenant hereby covenants and agrees to pay, and the
Landlord hereby agrees to accept as rental for the premises leased
hereunder, the sum of Two Thousand ($2,000.00) Dollars per year
for each year of the term hereof, payable in instalments of One Hun-
dred Sixty-six Dollars and Sixty -seven Cents ($166.67), commencing
on the First day of the month following the notification by the Landlord
to the Tenant, in writing, that the preparation of the site has been com-
pleted as hereinafter more particularly set forth, and the payment of a
like sum of One Hundred Sixty-six Dollars and Sixty-seven Cents ($166.67)
upon the First day of each and every month thereafter during the said forty
(40) year period.

Contribution
For Site

(b)  As an additional consideration for the granting of this Lease
b  the Landlord to the Tenant, the Tenant hereby agrees to pay to the
Landlord the sum of Thirty Thousand Dollars ($30,000.00) as a contri-
bution towards the Landlord's expense of preparation of the tract of land
covered by this Lease, together with other lands owned by the Landlord
for development as a suburban shopping center.  It is agreed that such
preparation of such tract of land shall consist only of leveling, filling,
grading, dedication of any perimeter roadways, and the surfacing of
such roadways as provided in Article XV hereof.  Said sum of Thirty Thou-
sand Dollars ($30,000.00) shall be paid by the Tenant to the Landlord with-
in ten (10) days after receipt by the Tenant from the Landlord's engineer
in charge of such work a certificate stating that fifty (50%) per cent of
the amount of work necessary to complete the preparation of the site as
above spelled out has been completed.

- 2 -

Taxes,
Utility
Charges

(c)   The Tenant covenants and agrees to pay or cause to be paid,
in addition to all other sums required to be paid by the Tenant under the
provisions of this Lease, all taxes, assessments and levies, whether
general or special, ordinary or extraordinary, of every nature or kind
whatsoever, including water, gas and electric rates, which may be
taxed, charged, assessed, levied or imposed by the State of Colorado
or any political subdivision thereof upon or against this Lease or on all
or on any part of the leased land and any buildings, structures, fixtures
or improvements now or hereafter located thereon or arising in respect
of the occupancy, use or possession of the leased premises or any estate,
right, title or interest of Landlord and of Tenant or of either of them or
of any of their respective successors or assigns in or to said leased land
or said buildings, structures, fixtures or improvements, and which are
assessed or become a lien at any time or from time to time during the
term of this Lease, including taxes for the year 1955.  It is expressly
agreed, however, (a)  that taxes assessed during the term of this Lease
but payable in whole or in instalments after the termination of this Lease
shall be adjusted and prorated, and that Tenant shall only be required to
pay the prorated share for the length of time that shall have elapsed at
the time of termination of this lease; and (b)  that Tenant shall not be
obligated to pay any instalment of any special assessment which may be
levied, assessed or confirmed during the term of this Lease but which
does not fall due and is not required to be paid during said term, or any
special assessment levied during said term for any improvement not
made during said term.

Nothing herein contained shall be construed to require the Tenant

- 3 -

to pay any transfer, estate, inheritance, succession, or gift tax or
taxes imposed in respect of any devise or gift of any interest of Land-
lord or of its successors or assigns in the leased premises, nor any
income tax imposed in respect of Landlord s income from the demised
premises, except as stated in the next paragraph.

If an income tax shall be levied, assessed or imposed by the
State of Colorado or any political subdivision thereof upon the income
arising from the rents payable hereunder, in lieu of or as a substitute
for the tax upon the leased premises, the Tenant and not the Landlord
shall be required and hereby agrees to pay the same, provided that in
no event Tenant be obligated to pay for any year any greater amount
by way of such substituted income tax than would have been payable by
Landlord by way of such substituted income tax had the rental upon
which such tax was imposed been the sole taxable income of Landlord
for the year in question.

Except as permitted by the next paragraph, each and all of the
taxes or assessments above provided to be borne and paid by Tenant
shall be paid and discharged by Tenant before any delinquency can oc-
cur therein, or in any part or instalment thereof, in the name of the
owner of the fee, and certificates of payment shall be promptly deliv-
ered to the Landlord or its successors or assigns.

Tenants shall have the right to contest the legality or validity of
any of the taxes, assessments or other impositions herein provided to
be paid by Tenant, but no such contest shall be carried on or maintained
by Tenant after the time limited for the payment of any such taxes, as-
sessments or other impositions unless Tenant, at its option, (a) shall
pay the amount involved under protest, or (b) shall procure and main-

tain a stay of all proceedings to enforce any collections of such taxes,
assessments or other impositions, together with all penalties, inter-
est, costs and expenses, by a deposit of a sufficient sum of money or
by a good and sufficient undertaking as may be required or permitted
by law to accomplish such stay, or (c)  shall deposit with the Landlord,
as security for the performance by Tenant of its obligations hereunder
with respect to such taxes, assessments or other impositions, an am-
ount equal to the principal of the contested taxes, assessments or other
impositions, plus such further amounts as Landlord may reasonably
require from time to time to cover all penalties, interests, costs and
expenses that may accrue during the period of the contest.  In the event
any such contest is made by Tenant, Tenant shall, within five (5) days
after final determination thereof adversely to Tenant, fully pay and dis-
charge the amount involved in or affected by any such contest, together
with all penalties, fines, interest, costs or expenses that may have ac-
cnued thereon or that may result from any such action by Tenant, where-
upon Landlord shall return to Tenant all amounts, if any, deposited by
Tenant in accordance with the next preceding sentence.  Tenant shall
have and Landlord hereby irrevocably grants to Tenant full right, po-
wer and authority to act in Landlord's name but at·Tenant's discretion
and expense in any action, proceeding or contest with respect to the det-
ermination of the amount, validity or legality of any and every obligation
which is to be borne or paid by Tenant under this sub-paragraph (c) of
this Article II.

**Sears
Buildings**

## ARTICLE III

(a)   As a further consideration for the granting of this Lease the
Tenant hereby agreesto construct a building on the herein demised pre-

mises containing not less than ninety-six thousand (96,000) square

feet of floor space, constructed of good and substantial materials and

fit for the operation of the retail merchandising business of the Tenant.

The Landlord further grants unto the Tenant the right and privilege of

constructing a larger building or buildings on the herein demised pre-

mises including the right to construct a service station provided, how-

ever, that Tenant shall set aside as a parking area on the herein de-

mised premises, at least one and seventy-five one-hundredths (1.75)

square feet of parking space for each square foot of ground covered by

such building or buildings.  The size, location and design of said "Sears

Buildings"  shall be such as in Tenant's opinion to be best adapted for the

conduct and operation of a retail store and the storing and service of

merchandise in connection with the conduct and operation of such store,

provided that in the opinion of the Landlord, the size, location and de-

sign of said buildings conform with the Landlord's general plan and de-

sign of development of the areas adjacent to the Sears Tract, as a sub-

urban shopping center, as more fully described in Articles XIX, XX

and XXI hereof, and to that end Tenant hereby agrees to submit to

Landlord any and all plans and specifications for the design and location

of any and all buildings erected on the demised premises prior to the

commencement of any such construction.  The Tenant further agrees

that all buildings constructed by it shall conform to all applicable build-

ing codes and zoning laws.                    **Commencement
                                                      of Construction**

    (b)  Tenant further agrees that it will commence the construction

of that building or those buildings which will have the minimum floor area

above provided, within eight (8) months from the date of the execution of

this agreement.  If, however, Tenant be prevented from commencing such

- 6 -

construction within said period of time, then and in that event, both
parties heretoshall have the right any time thereafter and until Tenant
shall have commenced such construction, to terminate this Lease by
giving written notice to the other party of the exercise of such right.
After commencing such construction Tenant shall use its best efforts
to complete the same as soon as possible.

Alterations

(c)    During the term of this Lease, Tenant shall have the
right to alter, remodel, enlarge or replace the said Sears Buildings
or any of them in such manner and to such extent as Tenant may
deem advisable for the conduct of its business upon said Sears Tract,
provided that in the opinion of the Landlord, such alteration, remod-
eling, enlargement or replacement conform with the Landlord's gen-
eral plan and design of development of the areas adjacent to the Sears
Tract, as a suburban shopping center, as more fully described in
Article 14 hereof, and to that end Tenant hereby agrees to submit to
Landlord any and all plans and spcifications for such alteration, re-
modeling, enlargement or replacement of any and all buildings located
on the demised premises prior to the commencement of any such alter-
ation, remodeling, enlargement or replacement.  Landlord hereby agrees
that approval of such alteration, remodeling, enlargement or replacement
as requested by Tenant shall not be withheld unless, because of such alter-
ation, remodeling, enlargement or replacement, Tenant should be in violation
of any other provision of this lease.

Maintenance

(d)    During the term of this Lease, Landlord shall have no
obligation whatsoever with respect to the repair or maintenance of
the said Sears Buildings.

Warranty of
Title

### ARTICLE IV

(a)    The Landlord hereby represents that it owns good and

merchantable title to the demised premises and that the same are now

and will be at the beginning of the term hereof, free and clear of all

encumbrances, mechanics liens and any liens whatsoever except the

liens of current taxes, subject, however, to the zoning resolutions of

El Paso County, Colorado, and to rights of way for irrigation ditches

running through or across said premises as shown on Plats numbered

1 and 2 attached hereto.  As evidence of such title, the Landlord    **Evidence
of Title**

hereby agrees to furnish to Tenant on or before the ___31st___ day of

___December___, 1955, an abstract of title certified within a

reasonable time of such date showing such good and merchantable title

in the Landlord, free and clear of any encumbrances, for examination

by Tenant's counsel, or in the alternative, a title opinion of counsel

for Landlord, addressed to Landlord, and for Landlord's benefit only

stating that Landlord owns such good and merchantable title.  If, how-

ever, either of such opinions should show that there is any defect or

any defects in such title, then Tenant shall have the right, within fifteen

(15) days after the delivery of such abstract and the rendition of such

opinion to Tenant, to require Landlord to correct or remove such de-

fect or defects.  Thereafter, Landlord shall have a period of thirty (30)

days within which to commence whatever proceedings might be nec-

essary to correct such defects and a reasonable time thereafter within

which to carry out such corrections and if such corrections cannot be

carried out within a reasonable time after such thirty (30) days, then

and in that event, this Lease shall terminate and all rights of both    **Covenant of
Quiet
Possession**

parties hereunder shall cease and determine.

(b)  Landlord covenants that Tenant, on paying the rental and

performing all of the covenants and agreements herein provided to be

performed by Tenant, shall and may peaceably and quietly have, hold and

- 8 -

enjoy the demised premises for the term of this Lease.

<span style="float:right">Mortgages<br>Subordination</span>

    (c)   Landlord agrees that, if at any time during the term of this Lease, the demised premises should be encumbered by a mortgage or trust deed in the nature of a mortgage, Landlord will cause the mortgagee or trustees, for itself and for each and every holder or owner of such mortgage or trust deed, respectively, and for any received or purchaser of the premises in the event of foreclosure, to agree in writing that Tenant's peaceable and quiet possession of the premises demised under this Lease will not be disturbed on account of such mortgage or trust deed, or by reason of anything done or caused to be done thereunder, so long as Tenant pays the rentals and performs the covenants and agreements provided in this Lease to be paid and performed by Tenant.  At any time during the term of this Lease, if requested to do so by Landlord, Tenant will subordinate the lien hereof to the lien of any valid and enforceable mortgage or trust deed in the nature of a mortgage, on condition, however, that Tenant's peaceable and quiet possession of the premises demised hereunder, will not be disturbed under or by reason of such mortgage or trust deed or by reason of anything done or caused to be done thereunder, so long as Tenant pays the rentals and performs the covenants and agreements provided in this Lease to be paid and performed by Tenant.

ARTICLE V

<span style="float:right">Zoning</span>

    Landlord represents that the premises demised under this Lease and the entire Southgate Shopping Center tract (hereinafter described) have been rezoned to a "C-2, Suburban Shopping Center" classification, by proper Resolution of the Board of County Commissioners of El Paso County, Colorado, and Landlord agrees to provide Tenant with a certified copy of said Resolution.

- 9 -

## ARTICLE VI

Survey-Plat
Number one

Landlord agrees promptly to furnish Tenant with a Plat or Survey of the premises demised under this Lease and of the entire "Southgate Shopping Center Tract" (hereinafter described) prepared by a licensed surveyor and showing the boundary lines and the grade elevation in reasonable detail of said premises and said "Southgate Shopping Center Tract". The said Plat of Survey shall be marked "Plat Number One", shall be signed by the parties hereto and when so signed shall become a part of this Lease by express reference thereto.

Condemnation

## ARTICLE VII

(a)   In the event of the condemnation or taking in fee of all of the premises demised under this Lease for any public or quasi-public use, then this Lease shall terminate, effective as of the date of such condemnation or taking.

(b)   In the event of the condemnation or taking in fee of more than fifteen per cent (15%) of the area of the demised premises for any public or quasi-public use, and if, in Tenant's opinion, Tenant cannot continue the use of the remaining portion of said premises without substantial loss of efficiency or economy in the conduct of its business upon said remainder, then Tenant shall have the right to terminate this Lease, effective as of the date of such condemnation or taking, by giving to Landlord written notice of such termination within ninety (90) days following such condemnation or taking.  If such notice be not given, then this Lease shall not terminate.

(c)   In the event of the condemnation or taking in fee of fifteen per cent (15%) or less of the area of the demised premises for any public or quasi-public use, then this Lease shall not terminate except by mutual agreement between Landlord and Tenant.

- 10 -

(d) In the event of the condemnation or taking in fee of all or
any part of the demised premises, then upon payment of any award for
such condemnation or taking, there shall be such division of the proceeds
of said award and such other adjustments as the parties hereto may agree
upon as being just and equitable under all the circumstances, regardless
of any technical rule of law. If Landlord and Tenant be unable to agree
as to what division of the proceeds and other adjustments are just and
equitable, these matters shall be determined by arbitration by three (3)
arbitrators who shall be chosen and shall act as and within the limitations
hereinafter provided in the next following Article hereof,

Arbitration

## ARTICLE VIII

(a) Wherever in this Lease any provision is made for arbitration
by three (3) arbitrators, one shall be chosen by each of the parties hereto
and the third by the two so chosen. The decision of any two (2) of the ar-
bitrators shall be final and conclusive upon the parties hereto. The decision
shall be in writing, signed in duplicate by any two (2) of said arbitrators,
and one copy shall be delivered to each of the parties hereto.

(b) The party desiring arbitration, as aforesaid, shall give writ-
ten notice to other party of such desire, naming therein the arbitrator
selected by it. In the event the other party shall fail, within a period of
fifteen (15) days after the giving of such notice, to notify the other in writ-
ing of the arbitrator selected by it, or in the event the two (2) arbitrators
chosen shall fail, within fifteen (15) days after their selection, to agree
upon the third, then the senior Judge in service of the United States Dis-
trict Court for the State of Colorado shall, on request of the party not in
default, or upon the request of either party if neither is in default, appoint,
within fifteen (15) days after such request, an arbitrator/s to fill the place/s

- 11 -

remaining vacant.

(c)  After the appointment of the arbitrators in accordance with the provisions of Paragraph (b) hereof, such arbitrators shall immediately commence consideration of the problem or problems presented by the parties hereto.  A full opportunity shall be given to both Landlord and Tenant to present facts and evidence for consideration by said arbitrators.  A decision shall be made by the arbitrators within thirty (30) days of the date of their appointment.  If such arbitrators should not be able to reach a decision within such thirty (30) day period, then and in that event, they shall be relieved of their duties and the problem or problems shall be determined by a new and different group of arbitrators to be appointed in the same manner as provided above, and this process shall be repeated until a decision is finally reached by a majority of such arbitrators.

(d)  Whenever, in any arbitration procedure under the terms of this Lease, it becomes necessary to determine the ground value of the land herein demised, then and in such event, all arbitrators appointed in accordance with the provisions of this Article, must be members of the American Institute of Appraisers, if such organization is still in existence.

Covenants Bind
Successors, Ru
With Land

## ARTICLE IX

It is further covenanted and agreed by and between the parties hereto that all the covenants, agreements, conditions and undertakings in this Lease contained shall extend and inure to and be binding upon the successors and assigns of the respective parties hereto the same as if they were in every case named and expressed, and that the same shall be construed as covenants running with the land, and wherever

- 12 -

in this Lease reference is made to either of the parties hereto, it
shall be held to include and apply to, wherever and whenever appli-
cable, the successors and assigns of such party the same as if in
each case so expressed.

Notice of Lease

### ARTICLE X

Simultaneously herewith, Landlord and Tenant have executed
a short form of lease for recording purposes and the terms thereof
constitute a part hereof as though recited at length herein.

Rental Payments

### ARTICLE XI

(a)  The rentals payable hereunder shall be paid in the form
of checks, drafts or like instruments and shall be paid or mailed to:

THE MYRON STRATTON HOME
Box 178
Colorado Springs, Colorado

(b)  Any notice herein provided to be given to Landlord shall
be given by registered United States mail, postage prepaid, addressed
to Landlord as above provided for the payment of rentals.

(c)  Any notice herein provided to be given to Tenant shall be
given by registered United States mail, postage prepaid, and shall be
addressed as follows:

SEARS, ROEBUCK AND CO.
Attention:  Vice President and Comptroller
925 South Homan Avenue
Chicago 7, Illinois

(d)  Any and all notices given as above provided shall be deemed
to be given when deposited in the United States mail.

(e)  Each party shall have the right to specify as its proper
address any other address in the United States of America by giving
to the other party at least fifteen (15) days prior notice of such
change of address.

- 13 -

Marginal Notes

## ARTICLE XII

It is agreed that marginal notes in this Lease and the front

cover sheet hereof are for the mere convenience of the parties and

are not to be considered in any construction or interpretation of this Lease.

Southgate Shopping
Center Tract-Plat
Number Two

## ARTICLE XIII

(a)  There is attached hereto a Plat, marked "Plat Number Two",

showing the elliptically shaped tract of land (herein referred to

as the "Southgate Shopping Center Tract") located in El Paso County,

Colorado, south of the City of Colorado Springs, and consisting of thir-

ty-five (35) acres, more or less, and bounded on the north and east by

Southgate Road and on the south and west by U. S. Highway 85-87.

(b)  The said Sears Tract, consisting of the premises demised

under this Lease, lies within the said Southgate Shopping Center Tract.

(c)  The entire northwesterly portion of the said Southgate

Shopping Center Tract which lies on the northwesterly side of the said

Sears Tract is herein for convenience referred to as "Southgate's

Northern Tract"; and the entire southeasterly portion of the said South-

gate Shopping Center Tract which lies on the southeasterly side of the

said Sears Tract is herein for convenience referred to as "Southgate's

Southern Tract".  The said Southgate's Northern Tract and the said

Southgate's Southern Tract are more fully described in the Rider which    Rider
Number Tw

is hereto attached, marked "Rider Number Two", signed by the parties

hereto and hereby made a part hereof.

(d)  The strip of land, One Hundred (100) feet wide, more or

less, lying along the northeasterly side of U. S. Highway 85-87 is mut-

ually understood to be a sloping area between the grade levels of said

- 14 -

Highway and the Center.  It is not contemplated by the parties hereto

that any driveways will cross said strip nor that any part of said strip

will be included in the areas upon which the buildings of said Center

will be erected.                                          Shopping Center-
                                                          General

### ARTICLE XIV

It is mutually intended by the parties hereto that there be con-

structed, developed and operated upon the said Southgate Shopping

Center Tract an integrated retail store shopping center (herein some-

times for convenience referred to as the "Center") containing buildings

of reasonable harmonious architectural design and equipped with auto-

mobile parking space for the customers and invitees of the parties hereto

and their tenants, concessionnaires and licensees.  To that end the parties

hereto hereby agree to cooperate one with the other prior to the commence-

ment of any construction in developing an overall plan.

                                                          Grading

### ARTICLE XV

Landlord agrees, at Landlord's expense, to level and grade the

said Sears Tract to conform to the elevations of the land as shown on

Plat Number Two.  Landlord hereby agrees to commence such leveling

and grading within a reasonable time after the execution of this Lease

and diligently to pursue such construction until its completion.  The cal-

ling for bids of contractors for such work shall be taken and held to be

the commencement of such construction.

                                                          Mechanics'
                                                          Liens

### ARTICLE XVI

Tenant will not permit any mechanics', laborer's or material-

men's liens to stand against the demised premises for any labor or

material furnished to Tenant or claimed to have been furnished to Ten-

ant in connection with work of any character performed or claimed to

have been performed on said premises by or at the direction or sufferance

- 15 -

of Tenant, provided, however, that the Tenant shall have the right to
contest the validity or amount of any such lien or claimed lien, pro-
vided Tenant shall give reasonable security as may be demanded by
the Landlord to Landlord to insure payment thereof and prevent any
sale, foreclosure or forfeiture of the premises by reason of such non-
payment, provided such security need not exceed one and one-half
( 1 1/2) times the amount of such lien or claimed lien.  On final deter-
mination of the lien or claim for lien, Tenant will immediately pay any
judgment rendered with all proper costs and charges and shall have the
lien released or judgment satisfied at Tenant's own expense.

**Closing of Sears Store—Landlord's Right to Terminate Lease and Purchase Sears Buildings**

### ARTICLE XVII

In the event that, after completing that building or
those buildings which will have the minimum floor area above provided and
commencing the operation of its retail store therein, Tenant should
cease operation of said store for more than ninety (90) days for any
reason except where such cessation of operation is caused by act of
God, strikes, accidents, destruction of buildings or serious damage
thereto by fire or any casualty, or by war, insurrection or govern-
mental order curtailing the sale of merchandise or operation of said
store, then Landlord shall have the right, at Landlord's sole option,
to terminate this Lease by giving to Tenant Written notice of such
termination within a period of One (1) year next following such ces-
sation of the operation of said store and by accompanying said notice
with a written, bona fide offer to purchase the said Sears Buildings
and all of the structures and improvements made by Tenant upon the
said Sears Tract effective as of the date of the termination of this
Lease, for a price equal to the cost to Tenant of said Sears Buildings

- 16 -

structures and improvements, less actual depreciation taken thereon by Tenant, as then shown on Tenant's books of account. The said offer to purchase shall then be accepted forthwith by Tenant and upon payment by Landlord to Tenant of the purchase price, computed as aforesaid, Tenant shall convey to Landlord all of Tenant's right, title and interest in and to the said Sears Buildings, structures and improvements on the said Sears Tract, and this Lease shall thereupon terminate and shall be of no further force nor effect. It is expressly understood and agreed between the parties hereto, however, that nothing contained in this Article shall limit the Landlord's right to terminate this Lease under the terms and provisions of Articles 18, 24, and 26 hereof.

**Destruction of
Sears Buildings
By Fire, Etc.**

## ARTICLE XVIII

(a)   The Tenant hereby agrees to keep all buildings and improvements upon the herein demised premises insured at all times during the term of this Lease or any extension thereof, against fire, windstorm, cyclone, tornado, hail, explosion, riot, riot attending strike, civil commotion, aircraft damage, vehicle damage, and smoke in the name of the Landlord and Tenant as their respective interests may from time to time appear and shall further carry all public liability and workmen's compensation insurance as provided by law.

(b)   In the event that the said Sears Buildings be totally destroyed or rendered wholly unfit for their accustomed uses by fire or any other casualty listed in Paragraph (a) hereof, or in the event that a substantial portion of said Sears Buildings be damaged or destroyed to the extent that more than fifty per cent (50%) of said Sears Buildings are, in Tenant's opinion, unusuable by Tenant in the operation of its retail store business therein, then in either such event Tenant shall have and is hereby expressly granted the following rights:

- 17 -

(i)  To repair, rebuild and restore the said Sears Buildings and to remodel and alter the same to such extent and in such manner as Tenant shall, in its sole discretion, deem proper for the operation of its business, providing Tenant rebuilds and restores at least the approximate amount of square feet of space contained in the said building or buildings immediately prior to the occurrence of such destruction; and if Tenant elects to repair, rebuild and restore or to remodel and alter the said Sears Buildings as aforesaid, Tenant agrees that it will commence such reconstruction work promptly and will prosecute the same with diligence;

<u>or</u>

(ii)  To terminate this Lease, effective on the date of the happening of said casualty, by giving to Landlord written notice of such termination within thirty (30) days next following such casualty; if this Lease be so terminated, the remaining portions of the said Sears Buildings then located on the demised premises and any permanent structures erected on said premises by Tenant, shall remain on said premises and be the absolute property of Landlord, unless, within sixty (60) days following such termination of this Lease, Landlord shall request Tenant in writing to raze and remove the same, and if Landlord shall so request, Tenant shall promptly raze and remove the said remaining portions of said Sears Buildings and said structures at Tenant's expense.

<u>Partial Damage to Sears Buildings by Fire, Etc.</u>

(c)  In the event that said Sears Buildings be partially damaged by fire or any casualty to the extent that less than fifty per cent (50%) of said Sears Buildings are, in Tenant's opinion, unusuable by Tenant in the operation of its retail store business therein, then Tenant shall not have the right to terminate this Lease. In such event, Tenant shall repair and restore said Sears Buildings to such extent and in such manner as Tenant shall, in its sole discretion, deem suitable for the operation of its retail

store business therein, providing Tenant rebuilds and restores at
least the approximate amount of square feet of space contained in the
said building or buildings immediately prior to the occurrence of such
destruction; and Tenant shall commence such repair and restoration
promptly and prosecute the same with diligence.

(c)   The insurance policy or policies carried by Tenant under
the provisions of Paragraph (a) hereof, shall contain provisions to the
effect that in case of any loss, all monies payable under the terms of
said policy or policies shall be paid to The Exchange National Bank of
Colorado Springs, Colorado as Escrow Agent.  Thereafter, if Tenant
determines to rebuild or repair the building or buildings erected by it,
then and in that event, The Exchange National Bank of Colorado Springs,
Colorado shall be directed to deliver to Tenant all of the funds held by
it under such insurance payments.  If, however, Tenant does not desire
either to rebuild or repair, then and in that event, The Exchange National
Bank of Colorado Springs, Colorado as such Escrow Agent shall be in-
structed to pay all of such monies to Landlord.  If Tenant in any event
desires to rebuild or repair in case of any fire or other casualty, it shall
commence such construction or repairing within a period of ninety (90)
days after the occurrence of such fire or other casualty listed in Paragraph
(a) hereof.  Otherwise its delay shall be taken to mean that it does not wish
to rebuild or repair and The Exchange National Bank of Colorado Springs,
Colorado shall be directed to pay over all of such monies received by it from
the respective insurance companies to the Landlord.

(d)   It is hereby understood that Tenant, if it so desires, may self-
insure itself and Landlord against the casualties listed in Paragraph (a) here-
of in lieu of purchasing insurance with some independent company, provided
that in every year in which Tenant desires to so self-insure itself and Land-
lord, that Tenant's net worth as shown by its most recent balance sheet shall

not be less than One Hundred (100,000,000) Million Dollars.

(e)   Tenant hereby agrees that it shall carry in compliance
with Paragraphs (a) and (d) hereof, an amount of insurance equal to
eighty (80%) per cent of ninety (90%) per cent of the replacement cost
of all buildings and improvements erected upon the herein demised
premises, less one (1%) per cent of the replacement cost of such
buildings and improvements, times the number of years expired under
the term of this lease.  Such replacement cost shall be determined in
each year of the term of this lease and the insurance coverage required
by this Paragraph shall be changed or adjusted to conform to the above
formula.

(f)   It is expressly understood by the Landlord and Tenant that
if any of the buildings or improvements located on the herein demised
premises should be destroyed by any means and because of governmental
orders or court decrees or for any other reason beyond the control of Ten-
ant, it is impossible for Tenant to reconstruct and repair such buildings,
then and in that event, this lease shall terminate, and The Exchange Na-
tional Bank of Colorado Springs, Colorado as Escrow Agent of the insur-
ance proceeds as provided for in Paragraph (c) hereof, shall deliver to
Landlord such portion of the proceeds of any insurance funds equal to
one/fortieth (1/40th) times the number of years of the expired portion of
the term of this lease and the balance of such proceeds, if any, unto Tenant.

Shopping
Center
Development

### ARTICLE XIX

Toward the end that the said Center be developed, improved and
placed in operation as expeditiously as possible, Landlord shall make
diligent effort to enter into leases upon portions of the Southgate's
Northern Tract and the Southgate's Southern Tract with other Tenants
for such periods of time and upon such rentals as Landlord, in its sole

and absolute discretion, may deem proper or expedient, it being
mutually understood and agreed that such other tenants shall be per-
mitted under their respective leases to occupy and use their respec-
tive demised premises primarily for the selling of goods and services
at retail, for banking, for offices for the practice of the medical arts
and for other purposes which may reasonably be expected to promote
the said Center as a retail shopping and trading area, but said tenants
shall not be permitted under said Leases to occupy and use said pre-
mises primarily for manufacturing, warehousing or agricultural pur-
poses.

### ARTICLE XX

(a)  Landlord expressly reserves the right to install upon and
across the premises demised under this Lease, for the benefit of the
said Southgate's Northern Tract and the said Southgate's Southern Tract,
pipes and conduits for water, sewerage and gas, electric power and tele-
phone wires and necessary supporting poles or underground cables for
such electric power and telephone wires, it being understood, however,
that Landlord will cause such pipes, conduits, wires, poles and cables
to be installed at such places as will not interfere with the location of any
of the buildings or improvements to be erected by Tenant on the demised
premises or with the layout or operation of Tenant's automobile parking
lot on the premises herein demised.

(b)  Landlord hereby grants to Tenant, as a part of the demise of
the Lease, for the benefit of the premises herein demised, the right to
install upon and across the said Southgate's Northern Tract and the said
Southgate's Southern Tract, pipes and conduits for water, sewerage and
gas, electric power and telephone wries and necessary supporting poles

- 21 --

or underground cables for such electric power and telephone wires,
it being understood, however, that Tenant will cause said pipes, con-
duits, wires, poles and cables to be installed at such places as will
not interfere with the location of any of the buildings or improvements
to be erected by Landlord on the said Southgate's Northern and Southern
Tracts or with the layout or operation of Landlord's automobile parking
lot thereon.

Sears
Parking
Lot

### ARTICLE XXI

(a)  The portion of the said Sears Tract not occupied by the
Sears Buildings and not used for outside selling or storage purposes
shall be used as an automobile parking lot for the parking of the ve-
hicles of Sears' customers, employees and invitees and is herein re-
ferred to as the "Sears Parking Lot".

(b)  Landlord agrees that it will, during the term of this Lease,
provide automobile parking spaces (herein referred to as the "Southgate
Parking Lots") on the said Southgate's Northern Tract and the said
Southgate's Southern Tract.  The said Southgate Parking Lot on each of
said tracts shall have a total area for automobile parking (including nec-
essary driveways and walkways ) of at least three and one-half times the
area occupied by buildings on said respective tracts.

Equipment

(c)  Except as provided elsewhere in this Lease, each of the parties
hereto shall, at its expense, level its own respective parking lot or lots,
and cover the same with suitable surfacing material, and shall equip
said lot or lots with adequate lighting and drainage equipment and  suffi-
cient driveways and walkways.  Each party hereto shall, at its expense,
maintain and keep in repair its own respective parking lot or lots.

Maintenance

Use of Sears
Parking Lot

(d)  Landlord hereby expressly reserves the unrestricted

- 22 -

right and privilege of freely using and of permitting its tenants,
their agents, customers and invitees having business at the said
Center to use freely the said Sears Parking Lot for the parking of
passenger automobiles and for uninterrupted ingress and egress to
and from said Sears Parking Lot during business hours in common
with Tenant, its tenants, licensees, concessionaries, agents and
invitees.

Use of South-
gate Parking
Lots

(e)  Landlord hereby grants unto Tenant, as a part of the
demise of this Lease, the unrestricted right and privilege of using
freely and of permitting its tenants, licensees, concessionaries,
agents and invitees having business at the said Center to use freely
the said Southgate Parking Lots for the parking of passenger automo-
biles and for uninterrupted ingress and egress to and from said South-
gate Parking Lots during business hours in common with Landlord, its
tenants, and its and their agents, customers and invitees.

Rules and
Regulations

(f)  Each party may establish reasonable rules and regulations
for the care and maintenance of the parking lot area on its respective
tract, the restriction and regulation of employee parking (which each
party agrees shall be strictly enforced), the safety and protection of
persons and vehicles using the same, the orderly direction of traffic
and the parking of automobiles, together with such other rules and rea-
sonable regulations which may be deemed necessary by such parties;
provided, however, that such rules and regulations shall not unduly re-
strict the use of such parking areas by the other party under the provisions
of this Lease.

Accidents-
Indemnity

(g)  Each party hereto expressly agrees that, with respect to any
and all claims and liability for death of or injury to person, or damage to
property (and all loss, cost, damage or expense arising out of such claim)

- 23 -

which may arise out of any accident occurring on its respective parking
lot or lots as herein described, or which may be occasioned by or arise
out of or from any act or omission of such party, its agents or employees,
it will protect, defend, hold harmless and indemnify the other party here-
to, except as to liability or claims which may result from the negligence
of the latter party or its agents or employees.

Option of
Renewal

### ARTICLE XXII

(a)  The Landlord hereby grants unto the Tenant the right, priv-
ilege and option at the expiration of this Lease to extend the period of
the term thereof for ten (10) years upon the same terms and conditions
as are herein stated, except that the yearly rental to be reserved for said
ten (10) year period shall not be as herein provided but shall be payable at
the rate of five per cent (5%) of the then ground value of the property here-
in demised.  It is understood and agreed, however, between the Landlord
and the Tenant that such rental shall not exceed the sum of Ten Thousand
($10,000.00) Dollars per year.  Such ground value shall be determined by
a board of arbitrators appointed as provided in Article VIII hereof.  Such
arbitrators shall be appointed within ten (10) days after the beginning of
the six (6) months period immediately preceding the end of the term hereof.
Such arbitrators in their deliberation shall not consider any evidence in
connection with previous rentals for said property.

(b)  The Landlord further grants unto the Tenant the right,
privilege and option of extending the period of the term hereof for one
or two more ten (10) year periods in addition to the first ten (10) year
period provided in Paragraph (a) of this Article if it may elect to do so,
upon the same terms as are herein provided for the original ten (10)
year extension.  It is understood and agreed, however, that the rental
for such ten (10) year periods shall be redetermined at the commence-

- 24 -

ment of each of such ten (10) year periods by using the same method
as outlined in Paragraph (a) hereof.

(c)  In case the Tenant desires to exercise any of the privileges
of renewal granted by the terms and provisions of this Article, then and
in that event, Tenant shall notify Landlord in writing of such desire at
least six (6) month prior to the end of the term or terms.  The right
to exercise any of the privileges granted by this Article absolutely ceas-
ing and terminating after the beginning of the six (6) months period im-
mediately preceding the end of the term hereof or of any ten (10) year
renewal period.

**Removal of Trade Fixtures**

### ARTICLE XXIII

Tenant shall have the right privilege and option upon the expir-
ation of this Lease either by lapse of time or by forfeiture, to remove
all trade fixtures, provided, however, that in doing so it shall repair
any and all damage to the structure of such buildings and provided,
further, that it does so with all reasonable diligence after such termin-
ation; otherwise, such trade fixtures shall thereupon become the pro-
perty of the Landlord.

**Bankruptcy**

### ARTICLE XXIV

In the event that Tenant should be declared bankrupt or insolvent
according to law, or should make an assignment for the benefit of credi-
tors during the term of this lease or any extension thereof, then and in
such event, this Lease and all right hereunder shall terminate and the
Landlord, its successors or assigns, may enter into said premises and
expel Tenant or those claiming under it without being guilty of any tres-
pass.

### ARTICLE XXV

(a)  Subject to the approval of Landlord which will not be unreasonably

- 25 -

withheld.  Tenant shall have and is hereby expressly granted the right

to sell, assign, mortgage or hypothecate this Lease, any and all of

Tenant's rights and privileges hereunder, and Tenant's leasehold inter-

est and other interest in the premises demised hereunder.

(b)    Tenant is hereby expressly granted the right to sublet any

portion of the demised premises to any concessionaire or licensee who

operates such concession on the demised premises as an integral unit

of Sears' operation, without the consent of Landlord.  Tenant is further

granted the right to sublet the demised premises in any other fashion,

subject to the approval of Landlord, which approval will not be unrea-

sonably withheld.

(c)    Nothing contained herein shall prevent Sears, at any time,

from selling all or any part of Sears' interest in Sears Tract and all

buildings thereon, provided that as a part of such transaction in which

said sale is made, the purchaser therein shall lease back to Sears for

a term of not less than the unexpired portion of the initial term and any

extension thereof, all of the said Sears leasehold and buildings.

### ARTICLE XXVI

Whenever, under the provisions of this lease, Tenant is required

to erect, repair, restore, or to otherwise carry out any construction on

any buildings or improvements to be erected on the herein demised pre-

mises, and Tenant is required to complete such construction or to start

such construction within some period of time, it is understood between

Landlord and Tenant that if the commencement or completion of such

construction is delayed by reason of Acts of God, fires, strikes, lock-

outs, governmental restrictions and all other similar or dissimilar causes

beyond the control of Tenant, then and in such event, the time for the per-

formance of such construction shall be extended until such causes have

- 26 -

terminated or been corrected.

Forfeiture

### ARTICLE XXVII

It is expressly understood and agreed by and between the parties
hereto that if the rent called for by this Lease or any part thereof shall
be behind or unpaid for a period of thirty (30) days after the day of pay-
ment whereon the same ought to be paid as set forth in this Lease, or if
Tenant should be in default in any of the covenants or agreements herein
contained to be kept by Tenant or its successors and assigns for a period
of thirty (30) days after receiving written notice from Landlord of such
default, then it shall and may be lawful for the Landlord and its successors
or assigns to declare said term ended and to enter on said premises either
with or without process of law, and expel and remove the Tenant using such
force as may be necessary in so doing and again to repossess and enjoy the
premises as in its first and former state.

The Tenant further agrees that in case of the termination of this
Lease as provided herein, that it will surrender and deliver up the above
premises peaceably to the Landlord and if it should remain in possession
of same for a period of ninety (90) days after notice of any default or after
the termination of this Lease, it shall be deemed guilty of a forcible de-
tainer of said premises and shall be subject to all the conditions and prov-
isions above named and to eviction and removal forcibly or otherwise,
with or without process of law.

IN WITNESS WHEREOF, the Landlord and Tenant have caused
this Lease to be duly executed the day and year first above written.

THE MYRON STRATTON HOME

By _____
Vice President

ATTEST:

WITNESSES:

_____

_____

_____
Secretary

- 27 -

SEARS, ROEBUCK AND CO.

By _W. G. Skoning_

WITNESSES:

ATTEST:

_____ Secretary

## LEASE AMENDMENT

THIS LEASE AMENDMENT ("Amendment") is made this *17th* day of March, 1999, by and between UNIVEST-BROADMOOR, LLC, a Colorado limited liability company (hereinafter described as "Landlord" and sometimes as "Developer") and SEARS, ROEBUCK AND CO., a New York corporation ("Tenant").

## WITNESSETH:

WHEREAS, by Lease Agreement dated December 9, 1955, as amended by Lease Supplement dated April 16, 1956, and as extended by Notice of Extension of Lease dated May 19, 1995 (collectively, the "Lease"), Tenant leased from The Myron Stratton Home that certain tract of land (the "Sears Parcel") containing approximately 11.5 acres in Colorado Springs, Colorado, as described therein;

WHEREAS, Landlord is the successor-in-interest to the prior landlord as the landlord under the Lease;

WHEREAS, on *March 17*, 1999, Landlord purchased approximately 50 acres from The Myron Stratton Home, which includes the Sears Parcel, the Univest Parcel and the Home Depot Parcel, all as depicted on the Site Plan attached hereto as **Exhibit "B"**;

WHEREAS, Landlord wishes to develop the Univest Parcel and the Home Depot Parcel as depicted on the Site Plan; and

WHEREAS, Landlord and Tenant wish to amend the Lease to provide for certain improvements to be made by Landlord to Tenant's building ("Tenant's Building") and to the parking area located on the Sears Parcel, to increase the rent under the Lease, to establish parking ratios for the Sears Parcel, and to address other matters, all as more fully set out herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree to amend the Lease as follows:

1.  Article II(a) of the Lease is hereby deleted in its entirety and the following is substituted therefor:

    "Effective the first (1st) day of the month following the full execution of this Amendment and through November 30, 2005, Tenant shall pay to Landlord the sum of Eighty Two Thousand Five Hundred and No/100 Dollars ($82,500.00) per year as rent, payable in equal monthly installments of Six Thousand Eight Hundred Seventy-Five and No/100 Dollars ($6,875.00)."

2.  Article II(c) of the Lease is hereby amended by adding the following language at the end of the Article:

    "Landlord covenants and agrees that it will take no action nor consent to any action to have the Sears Parcel assessed with other property as part of a larger parcel."

3.  Article III(a) is hereby amended by deleting the words and figures "...provided, however, that Tenant shall set aside as parking area on the herein described Premises, at least one and seventy-

five hundredths (1.75) square feet of parking space for each square foot of ground covered by such building or buildings." and inserting the following:

"During the Term of the Lease, Tenant agrees to maintain on the Sears Parcel the greater of: (i) 3.9 automobile parking spaces for each 1,000 square feet of floor area within Tenant's Building, or (ii) the number parking spaces within the Sears Parcel necessary to comply with all applicable legal requirements."

4.    Articles XI(b) and (c) of the Lease are hereby deleted in its entirety and the following is substituted therefor:

"Notices shall be in writing and shall be deemed properly served: (a) two (2) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, being deemed delivered as of the date evidenced by the date of the return receipt, or (b) one (1) business day after being deposited with a reputable overnight express carrier (e.g., Federal Express, Airborne, Express Mail, UPS) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery.  Notices shall be addressed as follows:

Landlord:    Univest-Broadmoor, LLC
Attn: Property Manager
3550 North Central Avenue, Suite 1800
Phoenix, Arizona 85012

Tenant:    Sears, Roebuck and Co.
Attn: Vice President, Real Estate
3333 Beverly Road
Department 824RE
Hoffman Estates, Illinois 60179

with a copy to:    Sears, Roebuck and Co.
Attn: Assistant General Counsel, Real Estate
3333 Beverly Road
Department 766
Hoffman Estates, Illinois 60179"

5.    Article XVIII(a) of the Lease is hereby deleted in its entirety and the following is substituted therefor:

"Subject to Tenant's right to self-insure, Tenant shall pay for and maintain, from the date of this Amendment through the end of the Term, the following policies of insurance covering the Sears Parcel, which insurance shall be obtained from companies rated "A-/VII" or better, as defined in the then current edition of Bests Insurance Reports (or the equivalent thereof is Bests Insurance Reports is no longer published):

A.    Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Tenant and Employer's Liability Insurance, with limits of $500,000.00 per accident or disease.  In addition, Tenant agrees to require

and warrants that all contractors hired by Tenant will maintain such insurance and Tenant agrees to indemnify, defend and hold Landlord harmless from any loss, injury, damage or liability which Landlord may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

B.    Commercial General Liability Insurance covering Tenant's operations on the Sears Parcel with coverage for premises/operations, products/complete operations, contractual liability and personal/advertising injury liability with combined single limits of $2,000,000.00 per occurrence for bodily injury and property damage.

C.    "All-Risk" Property Insurance upon all buildings, building improvements, personal property owned by Tenant and improvements on the Sears Parcel owned by Tenant, including, but not limited to, those perils generally covered by Causes of Loss - Special Form, including fire, extended coverage, windstorm, vandalism, malicious mischief, and sprinkler leakage coverage in the amount of ninety percent (90%) of the full replacement cost."

6.    The second Article XVIII(c) of the Lease is hereby deleted in its entirety and the following is substituted therefor:

"The insurance proceeds from the policy of insurance or policies of insurance carried by Tenant under the provisions of Paragraph (a) hereof shall be held by Tenant for the rebuilding or repair of Tenant's Building, to the extent required hereunder. To the extent Tenant is not required to rebuild or repair and Tenant does not in fact rebuild or repair, Tenant shall pay to Landlord an amount equal to the difference in the fair market value of Tenant's Building immediately prior to such damage or destruction and the fair market value of Tenant's Building after such damage or destruction. If Tenant desires to rebuild or repair in the case or fire or casualty, it shall commence such construction or repairing within ninety (90) days after the occurrence of such fire or casualty listed in Paragraph (a) hereof. Otherwise, Tenant's delay shall be taken to mean it does not wish to rebuild or repair, and Tenant shall pay to Landlord an amount equal to the difference in the fair market value of Tenant's Building immediately prior to such damage or destruction and the fair market value of Tenant's Building after such damage or destruction."

7.    Articles XVIII(e) and (f) of the Lease are hereby deleted in their entirety.

8.    Article XXI(b) of the Lease is hereby deleted in its entirety and the following is substituted therefor:

"Landlord agrees that it will during the term of this Lease, provide automobile parking spaces on the Southgate Northern Parcel (herein referred to as the "Southgate Parking Lot"). The said Southgate Parking Lot shall have a total area for automobile parking (including, necessary driveways and walkways) of at least three and one-half (3½) times the area occupied by buildings on the Southgate Northern Parcel."

9.    Article XXVII of the Lease is hereby deleted in its entirety and the following is substituted therefor:
"

A.    If Tenant defaults in the payment of rent and fails to cure the default within fifteen (15) days of its receipt of written notice of default by Tenant, Landlord may bring suit to recover rent due and unpaid after the fifteen (15) day period. Landlord's suing to recover rent shall not waiver or affect its right to bring suit for possession of the Sears Parcel. If Landlord has given Tenant the foregoing notices and if there are two (2) months or more of rent covered by such notices that are sixty (60) days or more overdue, Landlord shall be entitled to terminate this Lease by giving Tenant written notice of said termination.

B.    If Tenant is in default in performing any of the terms or provisions of the Lease and this Amendment, other than the provisions for the payment of rent, and Tenant receives written notice of the default from Landlord, and Tenant fails to cure the default within thirty (30) days after receipt of the written notice by Tenant, or if the default is of a character as to require more than thirty (30) days to cure, and Tenant fails to promptly commence and diligently pursue to completion to curing the default after service of the written notice, then Landlord may cure the default and the reasonable costs incurred by Landlord plus interest equal to the greater of: (i) twelve percent (12%), or (ii) four percent (4%) over the prime rate of interest published from time to time by the then largest commercial bank doing business in Chicago, Illinois (the "Penalty Rate") and will be paid by Tenant within thirty (30) days after Landlord's written demand. Landlord shall also provide Tenant with copies of invoices and other back-up documentation for Landlord's costs.

C.    If Landlord is in default in performing any of the terms or provisions of this Lease, and Landlord receives written notice of the default from Tenant, and Landlord fails to commence to cure the default within thirty (30) days after receipt of the written notice, or if the default is of a character as to require more than thirty (30) days to cure, then Tenant may cure the default, at the expense of Landlord and may deduct from rent all sums expended, plus interest at the Penalty Rate, until Tenant is reimbursed in full or, at Tenant's option, Tenant may terminate this Lease effective upon written notice to Landlord.

D.    In the event that (i) Tenant in good faith takes the position that Landlord has failed to perform its obligations under this Lease; (ii) Tenant undertakes to cure such failure on the part of Landlord to perform such obligations; and (iii) Tenant withholds rent and/or other charges to the extent permitted under the terms of this Lease after Tenant cures a default of Landlord in order to receive reimbursement for the funds expended in curing the default of Landlord, then, in such event, Landlord shall not have the right to terminate this Lease or to evict Tenant for the non-payment of rent or other charges nor shall Landlord have the right to commence a proceeding for forcible entry and detainer or other similar action to recover possession of the Sears Parcel from Tenant until such dispute is resolved. In the event that a court of competent jurisdiction rules that Tenant did not have the right to withhold rent or other payments to Landlord under the terms of this Lease after Tenant cures a default of Landlord in order to receive reimbursement for the funds expended in curing the default of Landlord, then, in such event, Landlord shall not have the right to terminate this Lease or to evict Tenant for the non-payment of rent or other charges nor shall Landlord have the right to commence a proceeding for forcible entry and detainer or other similar action to recover possession of the Sears Parcel from Tenant until such dispute is resolved. In the event that a court of competent jurisdiction rules that Tenant did not have the right to withhold rent or other payments to Landlord under the terms of this Lease, then, upon the issuance of such a judgment, Tenant shall pay to Landlord the amount so withheld plus interest at the Penalty Rate."

10.    The following Article XXVIII is hereby added to the Lease:

"**LANDLORD'S INSURANCE.**   Landlord shall maintain or cause to be maintained by its contractors during their construction of the "Landlord Improvements", as defined in Section 12A, the following policies of insurance, which insurance shall be obtained from companies rated "A-/VII" or better as defined in the then current edition of Bests Insurance Reports (or the equivalent thereof if Bests Insurance Reports is no longer published):

A.    Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Landlord with a waiver of subrogation in favor of Tenant, and Employer's Liability Insurance with limits of $500,000.00 per accident or disease.  In addition, Landlord agrees to require and warrants that all contractors hired b landlord will maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and will require all subcontractors to maintain such insurance and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss, injury, damage or liability which Tenant may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

B.    Commercial General Liability Insurance covering Landlord's operations on the Univest Parcel with coverage for premises/operations, products/completed operations with combined single limits of $2,000,000.00 per occurrence for bodily injury and property damage, including Tenant as an additional insured.

C.    Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of liability of $1,000,000.00 per occurrence for bodily injury and property damage.

Each policy shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice to Tenant, and that the coverage provided by such insurance policy shall be deemed primary insurance, and that any insurance provided by or on behalf of Tenant shall be in excess of any insurance provided by such policy.  Landlord shall furnish Tenant, or cause to be furnished to Tenant, insurance certificates prior to the commencement of construction of the Landlord Improvements."

11.    **WAIVER OF INSURER'S RIGHT OF SUBROGATION.**  Notwithstanding any other provisions herein, Landlord and Tenant each releases the other and, on behalf of its insurers, waives its entire right to recovery against the other for loss or damage to the waiving party and its property located on the Sears Parcel to the extent that the loss or damage is customarily insurable by "All-Risk" Property Insurance policy.  Tenant agrees to furnish to each insurance company which has or will issue policies of "All-Risk" Insurance on personal property or improvements (including Tenant's Building) on the Sears Parcel, notice of the terms of the mutual waivers contained herein and to have the insurance polices properly endorsed, if necessary, to acknowledge the subrogation waivers contained herein.  This waiver shall not be effective to relieve Tenant of

liability if such party fails to maintain the required "All-Risk" Property Insurance or such party is self-insured as to such risks.

12.   The following Article XXX is hereby added to the Lease:

"LANDLORD'S IMPROVEMENTS.

A.   At Landlord's cost and expense, Landlord shall improve the Sears Parcel with the following improvements (the "Landlord Improvements"), the plans for such improvements shall be agreed upon by and between Landlord and Tenant prior to December 31, 1999:

   (a)   Repair, reseal and restripe the Tenant's parking lot on the Sears Parcel so that there are no fewer than five hundred seventy-five (575) parking spaces upon completion of the parking lot improvements on the Sears Parcel, which parking lot improvements and parking spaces shall be in full compliance with Title III of the Americans with Disabilities Act of 1990, all regulations issued thereunder and the Accessibility Guidelines for Buildings and Facilities issued pursuant thereto, as the same are in effect on the date of such work and all similar state and local laws (the "ADA") and also, landscape and relocate the lighting fixtures, as needed, within the parking areas on the Sears Parcel; and

   (b)   Refurbish the eastern exterior face and the northern exterior face of Tenant's Building, which refurbishings shall be completed by landlord on or before July 30, 2000, said refurbishing to be in accordance with the building elevations, plans and specifications to be developed and approved by Landlord and Tenant ("Landlord's Improvement Documents").

B.   Landlord shall:

   (a)   Submit Landlord's Improvements Documents to Tenant for comment. Landlord shall promptly correct and resubmit Landlord's Improvements Documents in accordance with Tenant's comments until Landlord receives Tenant's written notice that it has no further comment. Tenant shall have thirty (30) days from the date of receipt by Tenant for written comment after any submission, or the documents submitted will be deemed acceptable;

   (b)   Design and construct, or cause to be designed and constructed, all improvements in accordance with Landlord's Improvements Documents; and cause Landlord's construction of Landlord's Improvements (but not other existing improvements), to comply with all building, environmental, zoning and all other applicable laws of the Federal, State, County, Municipal and all other authorities having jurisdiction over the Sears Parcel. (Landlord's failure to comply with this Section after thirty (30) days written notice to Landlord) shall give Tenant the option to comply with such applicable laws. Within thirty (30) days after written notice from Tenant, Landlord shall pay Tenant an amount equal to the cost of complying with such laws. If Landlord fails to pay to Tenant the cost of compliance within said time frame, then Tenant may, subject to the overall limitation on Landlord's costs set out in subparagraph 14C below, deduct such cost with interest thereon at the Penalty Rate from rent and other charges owed by Tenant to Landlord; and

   (c)   Unconditionally guarantee all work performed pursuant to this Section against defective workmanship and materials for the period of one (1) year from completion of such work. Landlord shall assign to Tenant all guarantees of workmanship and materials.

C.   Notwithstanding anything to the contrary contained herein, Landlord's hard and soft costs for the performance of the work under Article XXX(A), specifically excluding the cost of all work performed in connection with Article XXX(D) and Article XXX(E), shall be limited to Five Hundred Fifty Thousand and No/100 Dollars ($550,000.00). In the event Landlord determines that the cost to perform such work shall exceed Five Hundred Fifty Thousand and No/100 Dollars ($550,000.00), Landlord shall notify Tenant in writing and Tenant shall have the option to pay such costs and expenses in excess of Five Hundred Fifty Thousand and No/100 Dollars ($550,000.00) or to require a reduction in the work to be performed by Landlord so that the costs thereof will not exceed Five Hundred Fifty Thousand and No/100 Dollars ($550,000.00), which option shall be exercised by Tenant within fifteen (15) days of receipt of Landlord's notification. The foregoing Five Hundred Fifty Thousand and No/100 Dollars ($550,000.00) limitation shall not apply to any Penalty Interest payable under Section 12E hereof.

D.   Landlord agrees, at its sole cost and expense, to relocate the sewer lines and telephone lines servicing Tenant's Building, as necessary. During such relocation, Landlord warrants that there will be no unnecessary cessation of sewer and telephone service to Tenant's Building and Landlord shall use reasonable efforts to minimize any interference with Tenant's use of the Sears Parcel, including advance notice to Tenant of such relocation and the coordination with Tenant's store manager of any necessary interruption of such utility service. In the event of any unnecessary cessation of utility service in connection with the relocation of the sewer lines and telephone lines servicing Tenant's Building, Tenant shall have the self-help rights provided for in Section 12E hereof, upon the giving of not less than twelve (12) hours advance written notice.

E.   If, after the deadlines just mentioned above, Landlord's Improvements are not completed, Tenant, at its sole option, may, at any time thereafter until the completion of the construction, either (i) terminate this Lease by giving written notice to Landlord, or (ii) upon 72 hours' notice to Landlord, complete or require completion, the construction in accordance with the Landlord's Improvement Documents, pay all outstanding bills for labor and materials and cure any failure of compliance with or completion in accordance with the Landlord Improvement Documents and deduct the cost incurred by Tenant hereunder together with interest at the Penalty Rate, subject to the overall limitation on Landlord's cost set out in Article XXXC, excluding any interest payable, from any rentals or other charges payable by Tenant under the Lease, until Tenant has been fully reimbursed, with interest. However, where delay in Landlord's completion, if any, is caused by Tenant, then Landlord shall have as much additional time to complete the Landlord Improvements as is equivalent to the delay caused by Tenant."

13.   Article XXII is hereby deleted and the following paragraph is substituted therefor:

"**EXTENSION TERMS**. Landlord acknowledges that Tenant has two (2) remaining ten (10) year extension options, which may be exercised by Tenant, upon the same terms and conditions as are stated in the Lease, except that the rental shall be as hereinafter provided, which extension terms may be exercised upon the giving by Tenant to Landlord of not less than eight (8) months written notice of the intent to extend the term; provided, however, that if Tenant shall fail to give any such notice within the aforesaid time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said thirty (30) day period. Landlord and Tenant acknowledge that Tenant is in the first extension term under the

Lease, which extension term runs through November 30, 2005. Notwithstanding anything herein to the contrary, in the event Tenant exercises the first of the two (2) remaining ten (10) year extension terms, Tenant shall pay the sum of One Hundred Seventeen Thousand Five Hundred and No/100 Dollars ($117,500.00) per year as rent, payable in equal monthly installments of Nine Thousand Seven Hundred Ninety-One and 67/100 Dollars ($9,791.67). In the event Tenant exercises the second remained ten (10) year extension term, Tenant shall pay the sum of One Hundred Fifty-Five Thousand Five Hundred and No/100 Dollars ($155,500.00) per year as rent, payable in equal monthly installments of Twelve Thousand Nine Hundred Fifty-Eight and 33/100 ($12,958.33)."

14.    The following Article XXXII is hereby added to the Lease:

"**EXPANSION.** Landlord agrees that Tenant shall have the right to expand Tenant's Building within the area cross-hatched in the southwest corner of Tenant's Building, said expansion not to exceed 6,000 square feet of floor area. Any such expansion shall be at Tenant's sole cost and expense and Tenant shall submit to Landlord the plans and specifications for such expansion in advance of the commencement of construction thereof, said submittal to be for information purposes only. Tenant further agrees that any expansion constructed by Tenant shall conform to all applicable laws, rules and regulations and shall be constructed lien free and in accordance with the other applicable provisions of the Sears Lease. "

15.    The following Article XXXIII is hereby added to the Lease:

"**LEGAL DESCRIPTION.** In conjunction with the redevelopment of the Broadmoor Towne Center, Landlord has resurveyed the Sears Parcel, as depicted on the Site Plan and the legal description from said survey is attached hereto as **Exhibit "A"**. The legal description for the Sears Parcel attached hereto as **Exhibit "A"** is substituted for and shall take the place of both Exhibit "A", the survey drawings, and Exhibit "B", the land description attached to the Lease Supplement dated April 16, 1956. Landlord and Tenant acknowledge that the legal description attached hereto as **Exhibit "A"** constituted the land area of the Sears Parcel under the Lease."

16.    The following Article XXXIII is hereby added to the Lease:

"**ATTORNEY'S FEES.** In the event at any time during the term of the Lease, the parties hereto shall institute any action or proceeding against the other relating to the provisions hereof, or any default hereunder, then, and in that event, the unsuccessful party, in such action or proceeding agrees to reimburse the successful party therein the reasonable expenses of attorney's fees, court costs and disbursements incurred therein by the successful party."

17.    The following Article XXXVI is hereby added to the Lease:

"**MISCELLANEOUS.**

A.    Except as defined herein, all capitalized items used in this Amendment shall have the meaning ascribed to such terms in the Lease.

B.    If there are any conflicts between the terms of the Lease and this Amendment, the terms of this Amendment shall prevail.

C.    Each party executing this Amendment represents and warrants that he/she has the power
and authority to execute this document on behalf of his/her respective party.

D.    Landlord represents and warrants that it is the successor-in-interest to the prior landlord as
the landlord under the Lease, and that Landlord has the full power and authority to enter
into this Amendment and to amend the Lease and that Landlord does not need the consent
of any lender holding a mortgage or a deed of trust on the Sears Parcel or any other party.

E.    Except as amended herein, the Lease is hereby ratified and confirmed."

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed
the day and year first above written.

UNIVEST-BROADMOOR, LLC,
a Colorado limited liability company

SEARS, ROEBUCK AND CO.,
a New York corporation

By:    Univest Development Services, L.L.C.
Its: Manager

    By:    Univest Equity Partners, Inc.

        By: _____
        John R. Maus, President

By: _____

Name:_  Ronald P. Douglass
       Vice President, Real Estate

Title:_____

Attest:_____

Name:_____

Its:_____

Attest: _____

Name:___  Victoria S. Berghel
       Assistant Secretary

Its:_____

Exhibit "A" - Sears Parcel Legal Description
Exhibit "B" - Site Plan

EXHIBIT "A"

Legal Description of Sears Parcel

PARCEL 2:

A TRACT OF LAND LOCATED IN THE E1/2 OF SECTION 30, TOWNSHIP 14 SOUTH, RANGE 66 WEST OF THE 6TH P.M., EL PASO COUNTY, COLORADO, DESCRIBED AS FOLLOWS:

COMMENCING AT THE S1/4 CORNER OF SAID SECTION 30, THENCE N 88 DEGREES 44 MINUTES 03 SECONDS E, 86.04 FEET ALONG THE SOUTH LINE OF THE SE1/4 OF SAID SECTION 30 TO THE WEST LINE OF PARCEL NO. 9 CONVEYED TO THE DEPARTMENT OF HIGHWAYS, STATE OF COLORADO, AS DESCRIBED IN SPECIAL WARRANTY DEED RECORDED IN BOOK 2349 AT PAGE 485 OF THE RECORDS OF EL PASO COUNTY, COLORADO; THENCE NORTHERLY, 871.06 FEET ALONG THE ARC OF A CURVE CONCAVE TO THE EAST AND ALONG THE WESTERLY LINE OF SAID PARCEL NO. 9 TO THE SOUTHWESTERLY CORNER OF PARCEL NO. 3 CONVEYED TO THE MYRON STRATTON HOME AS DESCRIBED IN QUIT CLAIM DEED RECORDED IN BOOK 2349 AT PAGE 483 OF THE RECORDS OF EL PASO COUNTY, COLORADO, SAID ARC HAVING A RADIUS OF 2212.00 FEET, A CENTRAL ANGLE OF 22 DEGREES 33 MINUTES 45 SECONDS AND BEING SUBTENDED BY A CHORD THAT BEARS N 16 DEGREES 34 MINUTES 38 SECONDS E, 865.45 FEET; THENCE N 60 DEGREES 08 MINUTES 00 SECONDS W, 65.30 FEET ALONG THE WESTERLY LINE OF SAID PARCEL NO. 3; THENCE N 11 DEGREES 30 MINUTES 30 SECONDS W, 779.30 FEET ALONG THE WESTERLY LINE OF SAID PARCEL NO. 3; THENCE N 00 DEGREES 21 MINUTES 00 SECONDS W, 223.10 FEET ALONG THE WESTERLY LINE OF SAID PARCEL NO. 3; THENCE N 26 DEGREES 55 MINUTES 00 SECONDS W, 111.80 FEET ALONG THE WESTERLY LINE OF SAID PARCEL NO. 3; THENCE N 00 DEGREES 21 MINUTES 00 SECONDS W, 238.80 FEET ALONG THE WESTERLY LINE OF SAID PARCEL NO. 3; THENCE N 00 DEGREES 51 MINUTES 00 SECONDS W, 881.30 FEET ALONG THE WESTERLY LINE OF SAID PARCEL NO. 3 TO THE WESTERLY LINE OF THAT TRACT OF LAND AS DESCRIBED IN RESOLUTION OF THE BOARD OF COUNTY COMMISSIONERS OF EL PASO COUNTY, COLORADO, RECORDED IN BOOK 1731 AT PAGE 252 OF THE RECORDS OF EL PASO COUNTY, COLORADO; THENCE SOUTHEASTERLY, 440.65 FEET ALONG THE ARC OF A CURVE CONCAVE TO THE EAST AND ALONG THE WESTERLY LINE OF THAT TRACT OF LAND AS DESCRIBED IN SAID BOOK 1731 AT PAGE 252 TO THE TRUE POINT OF BEGINNING, SAID ARC HAVING A RADIUS OF 2785.00 FEET, A CENTRAL ANGLE OF 9 DEGREES 03 MINUTES 56 SECONDS AND BEING SUBTENDED BY A CHORD THAT BEARS S 12 DEGREES 15 MINUTES 13 SECONDS E, 440.19 FEET:

THENCE CONTINUING SOUTHEASTERLY, 556.17 FEET ALONG THE ARC OF A CURVE CONCAVE TO THE EAST AND ALONG THE WESTERLY LINE OF THAT TRACT OF LAND AS DESCRIBED IN SAID BOOK 1731 AT PAGE 252, SAID ARC HAVING A RADIUS OF 2785.00 FEET; A CENTRAL ANGLE OF 11 DEGREES 26 MINUTES 31 SECONDS AND BEING SUBTENDED BY A CHORD THAT BEARS S 22 DEGREES 30 MINUTES 27 SECONDS E, 555.24 FEET;

A(1)

THENCE N 62 DEGREES 57 MINUTES 10 SECONDS E, 414.49 FEET;

THENCE N 27 DEGREES 02 MINUTES 50 SECONDS W, 15.00 FEET;

THENCE N 62 DEGREES 57 MINUTES 10 SECONDS E, 61.00 FEET;

THENCE S 27 DEGREES 02 MINUTES 50 SECONDS E, 15.00 FEET;

THENCE N 62 DEGREES 57 MINUTES 10 SECONDS E, 455.92 FEET TO THE WESTERLY

RIGHT-OF-WAY LINE OF SOUTHGATE ROAD CONVEYED TO EL PASO COUNTY AS DESCRIBED IN QUIT CLAIM DEED RECORDED IN BOOK 602 AT PAGE 553 OF THE RECORDS OF EL PASO COUNTY, COLORADO;

THENCE NORTHWESTERLY, 204.66 FEET ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SOUTHGATE ROAD AND ALONG THE ARC OF A CURVE CONCAVE TO THE WEST TO A POINT TANGENT. SAID ARC HAVING A RADIUS OF 686.20 FEET, A CENTRAL ANGLE OF 17 DEGREES 05 MINUTES 20 SECONDS AND BEING SUBTENDED BY A CHORD THAT BEARS N 26 DEGREES 57 MINUTES 20 SECONDS W, 203.91 FEET;

THENCE N 35 DEGREES 30 MINUTES 00 SECONDS W, 354.11 FEET ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID SOUTHGATE ROAD TO A POINT FROM WHICH THE TRUE POINT OF BEGINNING BEARS S 62 DEGREES 54 MINUTES 24 SECONDS W;

THENCE S 62 DEGREES 54 MINUTES 24 SECONDS W, 835.73 FEET TO THE TRUE POINT OF BEGINNING.

A(2)

## SECOND AMENDMENT TO LEASE

**THIS SECOND AMENDMENT TO LEASE** ("Amendment") is made and entered into this __17__ day of December, 2002, by and between UNIVEST-BTC S&R, LLC, a Colorado limited liability company ("Landlord") and SEARS, ROEBUCK AND CO., a New York corporation ("Tenant").

### WITNESSETH:

**WHEREAS,** Landlord's predecessor and Tenant entered into that certain written Agreement of Lease dated December 9, 1955, as amended and modified by Lease Amendment dated March 17, 1999 (collectively, the "Lease"), pertaining to that certain tract of real estate situated in El Paso County, Colorado, which tract for convenience referred to as the "Sears Tract" and is more fully described in the Lease; and

**WHEREAS,** Landlord is currently the fee owner of the Univest Parcel, as shown on the Plan (as defined herein); and

**WHEREAS,** New Haven WG, L.L.C., a Connecticut limited liability company ("WG"), a ground lease tenant of that certain tract of real estate immediately north of the Sears Tract (hereafter the "Southgate Tract") as is more fully described in Exhibit "A" attached hereto, has approached Landlord and Tenant seeking assistance to redevelop the Southgate Tract in accordance with WG's Development Plan – Site Plan dated October 17, 2002 ("Plan"), attached hereto as Exhibit "B"; and

**WHEREAS,** WG's Plan provides for, among other things, (i) certain improvements and the signalization on Southgate Road at the point of intersection of the Sears Parcel and Southgate Parcel, (ii) a new entrance to the shopping center, (iii) various improvements on the Sears Parcel, (iv) the creation of a new approximately one (1) acre parcel and pad out of the Sears Parcel, and (v) replacement of the Southgate Center signage (including Sears' current signage); and

**WHEREAS,** Sears and Landlord are agreeable to WG's Plan for the redevelopment of the Southgate Tract under the terms and conditions set-forth herein.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, and conditions set forth below, Landlord and Tenant hereby acknowledge and agree to amend and modify the Lease as follows:

### AGREEMENT:

1.    _Effective Date_.  This Amendment is to take effect as of the day and year first written above (the "Effective Date").

2.    _Agreement to Redevelopment_.  Landlord and Tenant, each hereby consent to and authorize WG to proceed with the redevelopment of the Southgate Tract and the

Sears Tract in accordance with the Plan. Landlord and Tenant each agree to timely execute such additional documents as may reasonably be necessary or required to fulfill the intent of this paragraph. Landlord shall oversee WG and manage the redevelopment on behalf of Landlord and Tenant.

3.    Sears Contribution to the Redevelopment. Tenant shall have no financial obligation to contribute to any of the cost of the redevelopment.

4.    Lease Modification. As of the Effective Date, Landlord and Tenant agree to modify the Lease such that "Premises" or "Sears Tract", as defined in the Lease, shall be reduced in size and replaced with the Legal Description for the Proposed Lot 1, when established, as shown on the Plan. Without cost to Sears, Landlord will cause the Sears Tract to be subdivided so that from and after the Effective Date, all costs and expenses related to the portion of the Sears Tract so removed shall be paid by Landlord. Landlord shall promptly provide Sears with a copy of the final plat of subdivision or other governmental approval. Until the Sears Tract is formally reconfigured, Landlord shall pay or reimburse Sears for all real estate taxes assessed against that portion of the Sears Tract which has been so removed from the definition of the Sears Tract, on an equitable basis.

5.    New Pad Location. Landlord and Tenant agree that Proposed Lot 2, as shown on the Plan (the "Pad") shall be created out of the current Sears Tract. Any improvements on the Pad shall not exceed the size necessary to maintain self contained parking on the Pad at the ratio of five (5) space per 1000 s.f. of the improvements. In consideration of Sears agreement to reduce the size of the Sears Tract to allow the creation of the Pad, beginning (the "Start Date") the earlier of (i) the date on which Landlord first receives rent for the Pad, or (ii) May 1, 2004, Landlord shall pay Sears (the "Compensation") $20,000.00 per year (based upon the twelve month period commencing as of the Start Date) for the duration of the term of the Lease (including extensions). At Sears sole option, Sears shall be entitled to off-set against the rent otherwise due under the Lease the amount of such Compensation, as it may be adjusted as provided herein. In the event Landlord obtains a ground lease rent in excess of $70,000 per year, or Landlord obtains increases in the Pad ground lease rental over the term of the Pad ground lease, such increases shall be shared with Sears on a 50/50 basis. In the event Landlord constructs a build-to-suit on the Pad, rather than a ground lease, Landlord and Tenant agree that all increases over the initial rent shall be shared 25% with Tenant. Within thirty (30) days of the end of each anniversary of the Start Date, Landlord shall certify to Tenant the lease income from the Pad and supply Tenant with any documents reasonably requested by Tenant in support of same. As of the Effective Date, Landlord shall assume all obligations with regard to maintenance, insurance and real estate taxes as to that portion of the Sears Tract which has been so removed from the definition of the Sears Tract.

6.    Reciprocal Easement. Landlord and Tenant hereby grant to each other a non-exclusive easement for access, use, ingress and egress for vehicles and pedestrians in common with the other tenants and occupants of the center and their respective

customers, employees and business invitees, over the common areas of the Proposed Lot 1 and Proposed Lot 2, as shown on the Plan.

7.  <u>Counterparts</u>.  This Amendment may be executed in counterparts, each of which, when taken together, shall constitute one entire agreement.

8.  <u>Full Force and Effect</u>.  To the extent not inconsistent herewith, all other terms and provisions of the Lease shall remain in full force and effect.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the day and year first above written.

**LANDLORD:**

**UNIVEST-BTC S&R, LLC**, a Colorado limited liability company

By:    John R. Maus
Its:    Manager

**TENANT:**

**SEARS, ROEBUCK AND CO.**, a New York corporation

By:    Douglas W. Walrod
Its:    Vice President
        Real Estate