GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
T: 212.813.8800
F: 212.355.3333
Michael H. Goldstein (admitted *pro hac vice*)
Barry Z. Bazian
mgoldstein@goodwinlaw.com
bbazian@goodwinlaw.com

*Counsel to Urban Edge Properties LP*
*and its subsidiaries*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>**SEARS HOLDINGS CORPORATION,** *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>(Jointly Administered) |

## OBJECTION OF URBAN EDGE PROPERTIES LP TO
## NOTICE OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL
## DESIGNATABLE LEASES

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Urban Edge Properties LP ("Urban Edge"), on behalf of UE Bruckner Plaza LLC ("UE Bruckner") and UE Montehiedra Acquisition LP ("UE Montehiedra") (collectively, the "UE Landlords"), by and through its undersigned counsel, hereby files this objection (the "Objection")[2] to the *Notice of Assumption and Assignment of Additional Designatable Leases* [Docket No. 3298] (the "April 19 Designation Notice") filed by Transform Holdco LLC (the "Buyer"), pursuant to which, in accordance with the Sale Order (defined below) and the procedures set forth in the Assumption and Assignment Order (defined below), which incorporate and preserve various rights in favor of various landlords, the Debtors and the Buyer seek to assume and assign the UE Leases (defined below) to Transform Operating Stores LLC (the "Proposed Assignee").[3]  In support of this Objection, Urban Edge submits the Declaration of Robert R. DiVita, the Deputy General Counsel of Urban Edge, attached hereto as Exhibit A (the "DiVita Declaration"), and the Declaration of Artem Skorostensky, an associate of Goodwin Procter LLP, attached hereto as Exhibit B (the "Skorostensky Declaration"), and states as follows:

---

[2]     On May 1, 2019, the Buyer filed a *Notice of Hearing on Assumption and Assignment and Cure Notices of Transform Holdco LLC*  [Docket No. 3461] (the "Notice of Hearing") scheduling a hearing on, *inter alia*, the Objection for May 8, 2019 (the "Hearing").  The Notice of Hearing provides seven (7) days' notice of the Hearing, which does not comply with the Assumption and Assignment Order (defined below), which provides that "[i]f a timely objection is received and not resolved consensually the Court shall resolve such objection (following request for a hearing by the Debtors and/or the Buyer and/or the applicable counterparty filed with the Court and *on not less than ten (10) days' notice to the other party*) . . . ."  Assumption and Assignment Order at ¶ 27.  Urban Edge reserves all of its rights on this issue.

[3]     The April 19 Designation Notice establishes May 3, 2019 at 11:30 a.m. (EST) as the deadline to object to the proposed assumption and assignment.  As noted in paragraph 29 of the Assumption and Assignment Order, the Sale Order includes specific provisions making certain findings of fact and conclusions of law contained in the Sale Order inapplicable to the Objecting Landlords (defined below) and reserved the Preserved Landlord Issues (defined below) in favor of the Objecting Landlords.  Urban Edge previously filed its *Objection of Urban Edge Properties LP to Notice and Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale* [Docket No. 2265] (the "Initial Objection"), which is incorporated by reference herein, along with the *Declaration of Mei Cheng* and *Declaration of Artem Skorostensky* in support of the Initial Objection.  The matters raised in the Initial Objection and herein are included within the Preserved Landlord Issues and, therefore, all of Urban Edge's rights with respect thereto are fully preserved pending further order of this Court.

ACTIVE/98242928.7

## BACKGROUND

### I.    The Bruckner and Montehiedra Leases

1.    Urban Edge is a real estate investment trust that, through its affiliates, acquires, develops, owns, manages and improves shopping centers in and on the edge of urban communities located throughout the United States and Puerto Rico.  *See* DiVita Declaration at ¶ 6.  Urban Edge and certain of its affiliates directly or indirectly own UE Bruckner and UE Montehiedra.

#### A.  The Bruckner Lease and Premises

2.    UE Bruckner, as landlord, and Kmart Corporation ("Kmart"), as tenant, are parties to that certain lease dated July 2, 1982 (as amended from time to time, the "Bruckner Lease"), covering certain premises located in a shopping center known as "Bruckner Commons". The store, which the Debtors have referred to as Store # 9420, has an address of 1998 Bruckner Blvd., Bronx, NY 10473 (the "Bruckner Premises").[4]  Kmart became the lessee under the Bruckner Lease by way of that certain Assignment and Assumption Agreement dated March 17, 1999.

3.    As noted, the Bruckner Premises is part of a shopping center commonly known as "Bruckner Commons", which is located in the Bronx, New York.[5]  In addition to Kmart, Bruckner Commons is home to a number of other commercial tenants such as Shop Rite, T-Mobile, Burlington Coat Factory, AT&T Mobility, The Children's Place, Kicks USA and Boston Market.  The tenants occupying Bruckner Commons share a common parking area consisting of

---

[4]    As the Bruckner Lease is voluminous, contains commercially sensitive information and is presumably already in the Buyer's possession, a copy is not attached.  However, Urban Edge will provide a copy to the Buyer upon request.

[5]    The Bruckner Commons property website can be found at http://uedge.com/property_home/?propid=BrucknerCommons_NY&tabType=property#.

approximately 1,108 parking spaces.[6]  The Bruckner Commons leasing plan is attached as Exhibit B to the DiVita Declaration.[7]

4.      Many of the Bruckner Commons tenants' leases (a) contain exclusive and/or prohibited use provisions that restrict the use of other premises within the shopping center; (b) contain percentage rent provisions; and (c) require the tenants to pay their share of common area maintenance.  *See* DiVita Declaration at ¶ 10.

### B.  The Montehiedra Lease and Premises

5.      UE Montehiedra, as landlord, and Kmart, as tenant, are parties to that certain lease executed by the predecessor landlord on April 28, 1997 and by Kmart on July 8, 1997 (as amended from time to time, the "Montehiedra Lease", and together with the Bruckner Lease, the "UE Leases"), covering certain premises located in The Outlets at Montehiedra (also known as the Montehiedra Town Center) in San Juan, Puerto Rico, which premises the Debtors have referred to as Store # 4844 (the "Montehiedra Premises").[8]

6.      The Montehiedra Premises is part of a shopping center commonly known as The Outlets at Montehiedra (the "Montehiedra Outlets"), which is located in San Juan, Puerto Rico.[9] The Montehiedra Outlets is a one level enclosed mall with over 100 stores such as Kmart, Polo Ralph Lauren, Nike Factory Store, The Gap, Marshalls, GNC and Home Depot. Tenants

---

[6]      The Bruckner Commons property flyer is attached as Exhibit A to the DiVita Declaration and can be found at http://uedge.com/property-factsheet/?propid=BrucknerCommons_NY.

[7]      Bruckner Commons is located between White Plains Road, Turnbull Avenue, Pugsley Avenue and Bruckner Boulevard.  The stores identified on the upper left portion of the leasing plan located between Bolton Avenue, Lafayette Avenue, White Plains Road and Story Avenue are not a part of Bruckner Commons; they are part of a separate shopping center called The Shops at Bruckner, which is owned by a separate Urban Edge subsidiary.

[8]      As the Montehiedra Lease is voluminous, contains commercially sensitive information and is presumably already in the Buyer's possession, a copy is not attached. However, Urban Edge will provide a copy to the Buyer upon request.

[9]      The Montehiedra Outlets property website can be found at http://uedge.com/property_home/?propid=TheOutletsatMontehiedra_PR&tabType=property.

4

occupying the Montehiedra Outlets share a common parking area consisting of approximately 3,050 parking spaces and are jointly advertised on the Montehiedra Outlets website.[10]  A recent version of the Montehiedra Outlets leasing plan is attached as Exhibit C to the DiVita Declaration.

7.      Many of the Montehiedra Outlets tenants' leases (a) contain exclusive and/or prohibited use provisions that restrict the use of other premises within the shopping center; (b) contain percentage rent provisions; and (c) require the tenants to pay their share of common area maintenance.  *See* DiVita Declaration at ¶ 13.  In addition, the Montehiedra Lease is subject to, and specifically incorporates, the Deed of Constitution of Reciprocal Easements and Restrictive Covenants, dated December 19, 1991, as amended (the "Montehiedra REA") that sets forth, *inter alia*, additional use provisions that restrict the use of the premises within the shopping center.  *See* DiVita Declaration at ¶ 13.

## II.     Sale to Transform Holdco, LLC and Subsequent Notices of Assumption and Assignment

8.      Beginning on October 15, 2018 (the "Petition Date") and continuing thereafter, the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Since the Petition Date, the Debtors have been operating and managing their businesses as debtors-in-possession.

9.      On January 18, 2019, the Debtors filed the *Notice of Successful Bidder and Sale Hearing* [Docket No. 1730] (the "Successful Bidder Notice"), which, among other things, announced that the Debtors determined that the offer submitted by Transform Holdco LLC

---

[10]      The    Montehiedra    Outlets/Montehiedra    Town    Center    website    can    be    found    at http://www.montehiedratowncenter.com/english/mall_info_inter.aspx.

ACTIVE/98242928.7

(the "Buyer"), established by ESL Investments, Inc., was the highest or best offer to acquire all or substantially all of the Debtors' assets (the "Global Sale").

10.    The Debtors concurrently filed the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* [Docket No. 1731] (the "Initial Cure Notice"), which listed a number of executory contracts and unexpired real property leases, including the UE Leases for potential assumption and assignment as part of the Global Sale. Exhibit B to the Initial Cure Notice identified (a) the Bruckner Lease with a proposed cure amount of "$ - "; and (b) the Montehiedra Lease with a proposed cure amount of $11,362. *See* Initial Cure Notice, Exhibit B, Line Nos. 265, 343.

11.    On January 31, 2019, Urban Edge timely filed the Initial Objection[11] seeking an order from the Court (i) providing that, as a condition to any assumption and assignment of the UE Leases, the Debtors and the Buyer (or, if the Buyer is not the assignee, any other proposed assignee) shall each be jointly and severally liable to pay certain obligations that are due and owing under the applicable UE Lease; and (ii) denying any assignment of the UE Leases to the Buyer or any other proposed assignee unless the Debtors and such assignee provide to Urban Edge adequate assurance of future performance as required by sections 365(b)(3) and 365(f)(2) of the Bankruptcy Code. Capitalized terms used but not defined herein have the meanings given to them in Initial Objection.

12.    As of the date of the Initial Objection, the known and liquidated amounts (the "Known Obligations") due and owing to (a) UE Bruckner under the Bruckner Lease were

---

[11]    Urban Edge filed the Initial Objection protesting both the Initial Cure Notice and the *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* [Docket No. 1774].

ACTIVE/98242928.7

$315,297.40 on account of unpaid pre-petition obligations and an additional $719,070.06 on account of unpaid post-petition obligations, and (b) to UE Montehiedra under the Montehiedra Lease was $6,971.44 on account of unpaid post-petition obligations. *See* Initial Obj. at ¶¶ 16-18. Neither the Debtors nor the Buyer requested further information from Urban Edge regarding these outstanding obligations.

13.    On February 4, 2019, Urban Edge joined various other landlords (the "<u>Objecting Landlords</u>") in raising the full panoply of rights and remedies under the affected leases and the Bankruptcy Code and the numerous factual and legal issues raised by the proposed Global Sale and the proposed order approving the same as they related to any proposed assumption and assignment of their respective leases.[12]

14.    On February 8, 2019, the Court entered the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assomption and Assignement of Certain Executory Contractes and Leases in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 2507] (the "<u>Sale Order</u>"), approving

---

[12]    *See Objection of Various Landlords to Notices of Filing of Revised Proposed Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief* [Docket No. 2380].

ACTIVE/98242928.7

the Global Sale.  The Sale Order fully preserved all of the rights and remedies of the Objecting

Landlords for future resolution.[13, 14]

---

[13]    Paragraph 3 of the Sale Order provides, *inter alia*, that "(i) all timely filed objections to the assumption and assignment of a Contract or Lease that is not an Initial Assigned Agreement, including, without limitation, as to adequate assurance of future performance and to the payment of all amounts due and owing and performance of all other obligations under a Contract or Lease, but not as to any other objections to approval of the Sale Transaction itself pursuant to section 363 of the Bankruptcy Code, are adjourned and all parties' rights as to such issues are fully preserved and will be determined if and to the extent the applicable Contract or Lease is designated for assumption and assignment pursuant to the procedures described in this Sale Order; (ii) no finding of fact or conclusion of law set forth herein with respect to the assumption and assignment of the Initial Assigned Agreements shall apply, be binding upon, be law of the case, or operate to collaterally estop any issue, with respect to the assumption and assignment of any other Contract or Lease, other than with respect to the Initial Assigned Agreements; (iii) no Contract or Lease with a Debtor other than the Initial Assigned Agreements as set forth in Exhibit A shall be part of the Acquired Assets unless and until assumption and assignment of such Contract or Lease is approved in accordance with the procedures in this Sale Order (iv) notwithstanding anything to the contrary herein, including, without limitation, paragraphs M, R, FF.27, and 28, nothing in this Sale Order shall be a determination of the terms and conditions of the assumption and assignment of any Contract or Lease not on Exhibit A, including, without limitation, the Assignee's obligations in connection with the same; and (v) notwithstanding anything herein or in the Asset Purchase Agreement or any related document to the contrary, all parties' rights are fully reserved with respect to (x) all issues relating to the Buyer's, any other Assignee's and/or the Debtors' obligations to comply with all terms, conditions, covenants and obligations, whether related to the pre- or post-assignment period and (y) the issues set forth in clauses (a) and (b) of paragraph 59 of this Order (the 'Reserved Lease Issues')".  Sale Order at ¶ 3.  The issues preserved in paragraph 3 of the Sale Order and the Reserved Lease Issues are collectively referred to herein as the "Preserved Landlord Issues."  The UE Leases were not Initial Assigned Agreements.

[14]    Paragraph 59 of the Sale Order provides as follows: "(a) Nothing herein or in the Asset Purchase Agreement or any related document shall authorize, absent further order of the Court or agreement among the Debtors or the Buyer, on the one hand, and the applicable non-Debtor counterparty, on the other hand, the sale of any real estate property owned by any of the Debtors, free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "Restrictive Covenants") that are not executory or that run with the land. To the extent that the Debtors or any other party seek to assume and assign any real estate leases to which a Debtor is a party free and clear of any Restrictive Covenant, the Debtors or such party shall file a notice that describes the Restrictive Covenant that the party is seeking to extinguish or otherwise diminish and any non-Debtor counterparty to a Restrictive Covenant will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and serve an objection thereto; any such issues shall be determined by the Court or otherwise resolved consensually prior to the effectiveness of the assignment of any Lease, and all rights, remedies, and positions of all parties with respect to any such relief are preserved.

(b) Nothing in this Sale Order, the Asset Purchase Agreement, or any other related agreements, documents or other instruments shall be deemed to authorize or shall be argued to permit the Debtors, the Buyer, or any Proposed Assignee, their agents or advisors to take any action in connection with an unexpired master lease of nonresidential real property to which a Debtor is a party (each such lease,  "Master Lease") that is not in compliance with, or that would result in a default or breach under, such Master Lease, without an amendment to or waiver under such Master Lease, in accordance with its terms and all consents required for such amendment or waiver under such Master Lease. To the extent that the Debtors or any other party seek to sever a Master Lease for any reason prior to an assumption and assignment of such Master Lease in accordance with the terms of this Sale Order, the Debtors shall file a notice that describes the nature and reason of such severing, and any non-Debtor counterparty to such Master Lease will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and

ACTIVE/98242928.7

15.     On April 2, 2019, the Court entered the *Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief* [Docket No. 3008] (the "<u>Assumption and Assignment Order</u>"), which established additional procedures with respect to any future proposed assumption and assignment of executory contracts and unexpired leases.  The Assumption and Assignment Order requires, *inter alia*, (i) to the extent the Buyer seeks to designate an executory contract or unexpired lease for assumption and assignment to a party other than the Buyer, the assignee must provide evidence of adequate assurance of future performance to the counterparty;[15] and (ii) to the extent that the Debtors or any other party seek to assume and assign any real property lease "free and clear of any interests, covenants, or rights applicable to such real estate assets that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, '<u>Restrictive Covenants</u>'), the applicable Designated Lease Notice **shall describe the Restrictive Covenant that the party is seeking to extinguish or otherwise diminish** and any non-Debtor counterparty to a Restrictive Covenant . . ." *See* Assumption and Assignment Order at ¶ 26 (emphasis added).

16.     On April 19, 2019, the Buyer filed the April 19 Designation Notice designating for assumption and assignment various real property leases, including the UE Leases.  According

---

serve an objection thereto; any such issues shall be determined by the Court or otherwise resolved consensually prior to the effectiveness of the assignment of any lease, and all rights, remedies, and positions of all parties with respect to any such relief are preserved."  Sale Order at ¶ 59.

[15]     *See* Assumption and Assignment Order at ¶ 13 ("In connection with any designation to a third party Assignee, each such Assignee has provided or will provide, as applicable, adequate assurance of future performance of and under the applicable Additional Assigned Agreements, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code."); *see also* Assumption and Assignment Order at ¶ 26 (stating that a counterparty's objection to adequate assurance of future performance must be filed no later than eight (8) days after "(i) the applicable Designated Lease Notice or Designated Additional Contract Notice is filed with the Court and (ii) evidence of adequate assurance of future performance required pursuant to the preceding sentence is served on the applicable Designatable Contract Counterparty . . ."

ACTIVE/98242928.7

to the April 19 Designation Notice, the Buyer seeks to assign the UE Leases to an entity named "Transform Operating Stores LLC" (the "<u>Proposed Assignee</u>"), which upon information is a newly created subsidiary of the Buyer, without any operating history.   The Assumption and Assignment Order obligates the Buyer to provide adequate assurance of future performance information regarding the Proposed Assignee.   Notwithstanding this obligation ordered by this Court, the Buyer has not provided an adequate assurance package *for the Proposed Assignee.*

17.     On April 26, 2019, the Buyer's counsel provided a letter containing limited general information regarding the Buyer and its affiliated entities *on a consolidated basis* (the "<u>Adequate Assurance Letter</u>").   A true and correct copy of the Adequate Assurance Letter is attached to the DiVita Declaration as Exhibit D.   In sum, the Buyer asserts that it will be able to



ACTIVE/98242928.7

*See* Adequate Assurance Letter, Ex. 1.    Urban Edge, through its counsel, requested certain specific clarifications, elaboration and additional detail regarding ███████████ and other information contained in the Adequate Assurance Letter and, ███████████████████████ ███████████████████████████, most of the specific information requested has not been provided as of the time of filing this Objection.  *See* Skorostensky Declaration.

18.    The Adequate Assurance Letter is completely absent of any information ***specifically*** relating to the Proposed Assignee, let alone any pertinent data points that would permit Urban Edge to properly evaluate the Proposed Assignee's overall financial wherewithal and creditworthiness.  *See* DiVita Declaration at ¶ 29.

19.    The April 19 Designation Notice states that "[i]n accordance with paragraph 59 of the Sale Order and paragraph 26 of the Assumption and Assignment Order, Buyer intends to designate the Additional Designatable Leases for assumption and assignment free and clear of any interests, covenants, or rights applicable to such real estate leases to the extent the same limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "Restrictive Covenants") that are executory and do not run with the land." April 19 Designation Notice at ¶ 18.  However, the April 19 Designation Notice fails to specify the Restrictive Covenants the Proposed Assignee seeks to extinguish or diminish, as it is required to do pursuant to paragraph 59(a) of the Sale Order and in paragraph 26 of the Assumption and Assignment Order.

20.    The April 19 Designation Notice also sets forth revised proposed cure amounts for the UE Leases.  Exhibit 1 to the April 19 Designation Notice identifies (i) the Bruckner Lease with a proposed cure amount of "**$0.00**"; and (ii) the Montehiedra Lease with a proposed cure

ACTIVE/98242928.7

amount of "**$0.00**". *See* April 19 Designation Notice, Exhibit 1, Line Nos. 354, 582-86 (emphasis in original). The proposed cure amounts at "$0.00" ignores, without explanation, the detailed information Urban Edge has provided regarding the cure amounts, both in the previously filed Initial Objection and in their filed proofs of claim. *See* Proofs of Claim Nos. 16454 and 16606.

21.    While Urban Edge and the Buyer have engaged in productive discussions in an attempt to consensually resolve all of the issues raised herein, the parties have not, as of the filing of this Objection, reached a definitive agreement. Accordingly, Urban Edge files this Objection to preserve its rights and the arguments set forth herein. Urban Edge will continue its efforts to engage with the Buyer in an attempt to reach a resolution with the Buyer regarding all issues raised herein.

## RELIEF REQUESTED

22.    Urban Edge files this Objection to the April 19 Designation Notice and renews its objections raised in the Initial Objection in connection with the assumption and assignment of the UE Leases. Urban Edge respectfully requests that the Court deny approval of the assumption and assignment of the UE Leases to the Proposed Assignee unless and until (i) the Debtors, Buyer or the Proposed Assignee pay all pre-petition and post-petition Known Obligations that are due and owing under the applicable UE Lease through the effective date of its assumption and assignment, and (ii) the Proposed Assignee (a) pays or assumes all Surviving Obligations (defined below), regardless of when such obligations accrued or arose; and (b) provides Urban Edge with adequate assurance of future performance as required by sections 365(b)(3) and 365(f)(2) of the Bankruptcy Code.

ACTIVE/98242928.7

## OBJECTION

23.      Urban Edge objects to the assumption and assignment of the UE Leases on two grounds.  First, the proposed cure amounts set forth in the April 19 Designation Notice substantially understate the Known Obligations necessary to cure all defaults under the UE Leases by designating them at zero when the Buyer had detailed information from Urban Edge that the cure amounts were substantially higher.  In addition, the cure must explicitly include an assumption by the Proposed Assignee of all Known Obligations that are not yet due as of the effective date of the assignment, as well as Surviving Obligations, regardless of when such obligations accrued or arose.

24.      Second, Urban Edge objects to assumption and assignment of the UE Leases to the Proposed Assignee due to its failure to provide adequate assurance of future performance under the UE Leases as required by sections 365(b)(3) and 365(f)(2) of the Bankruptcy Code.

## I.      Cure Objection

25.      Pursuant to section 365(b)(1) of the Bankruptcy Code, the proposed assumption and assignment of the UE Leases may not be consummated unless all defaults under the UE Leases have been cured.  Such cure includes all Known Obligations and Surviving Obligations.

### A.      The Known Obligations

26.      The total pre-petition and post-petition Known Obligations due and owing to each UE Landlord under its UE Lease, are as follows:

#### i.      *Bruckner Lease*

27.      The Known Obligations due and owing to UE Bruckner under the Bruckner Lease as of the Petition Date is $315,297.40, which is comprised as follows:

| Category of Obligation | Relevant Section of Lease | Amount Owing |
|---|---|---|

ACTIVE/98242928.7

| | | |
|---|---|---|
| Base Rent | *See* Bruckner Lease, § 4. | ($51,178.32) |
| Common Area Maintenance | *See* Bruckner Lease, § 7. | $89,920.45 |
| Real Estate Taxes | *See* Bruckner Lease, § 9. | $273,090.27 |
| Pass Through Billing | | $3,465.00 |
| **Total Pre-Petition Amounts Due** | | **$315,297.40** |

*See* DiVita Declaration at ¶ 19.

28.     In addition to the above amounts, various obligations under the Bruckner Lease totaling $737,462.65 (which includes amounts recently becoming due for the month of May 2019) have become due and owing after the Petition Date (through the date of this Objection), which is comprised as follows:

| **Category of Obligation** | **Amount Owing** |
|---|---|
| Base Rent | $154,880.82 |
| Common Area Maintenance | $74,708.71 |
| Real Estate Taxes | $507,573.12 |
| Pass Through Billing | $300.00 |
| **Total Post-Petition Amounts Due** | **$737,462.65** |

*See* DiVita Declaration at ¶ 20.

29.     Thus, the total cure amount due on the Bruckner Lease is **$1,052,760.05**. This amount might change to the extent additional amounts become due, or to the extent any of the amounts described above are paid, after the date hereof and prior to the effective date of any assumption and assignment of the Bruckner Lease.

ACTIVE/98242928.7

### ii.    *Montehiedra Lease*

30.    There are no Known Obligations due and owing to UE Montehiedra under the Montehiedra Lease as of the Petition Date.  There is an existing pre-petition net credit owing to Kmart in the amount of ($28,287.23).  However, various obligations under the Montehiedra Lease totaling $154,458.04 (which includes amounts recently becoming due for the month of May 2019) have become due and owing after the Petition Date (through the date of this Objection), which amount is comprised as follows:

| Category of Obligation | Category of Obligation | Amount Owing |
|---|---|---|
| Base Rent | *See* Montehiedra Lease, § 3. | $121,282.42 |
| Common Area Maintenance | *See* Montehiedra Lease, § 13. | $9,842.24 |
| Real Estate Taxes | *See* Montehiedra Lease, § 4. | $24,475.07 |
| Other Credits | | ($1,141.69) |
| **Total Post-Petition Amounts Due** | | **$154,458.04** |

*See* DiVita Declaration at ¶ 22.

31.    Thus, the total cure amount due on the Montehiedra Lease, net of the pre-petition credit described above, is **$126,170.81**.  This amount might change to the extent additional amounts become due, or to the extent any of the amounts described above are paid, after the date hereof and prior to the effective date of any assumption and assignment of the Montehiedra Lease.

### B.    Additional Surviving Obligations

32.    The amounts described above reflect Known Obligations as of the date of this Objection and do not include (a) pre-petition and post-petition monetary obligations under the UE Leases that accrued or arose prior to the date of any assignment but that were unknown, undetermined, unliquidated, contingent or not yet due as of the date of the assignment, including

ACTIVE/98242928.7

but not limited to obligations not yet determined on account of year-end adjustments and reconciliations for rent, taxes, and common area maintenance charges; and (b) pre-petition and post-petition non-monetary obligations under the UE Leases, including but not limited to insurance, contribution and indemnification obligations (such obligations described in (a) and (b) the "Surviving Obligations"). *See* DiVita Declaration at ¶ 25. The Surviving Obligations must be (i) paid as part of the cure on the effective date of the assignment to the extent known, due and owing as of such date; and (ii) assumed by the Proposed Assignee to the extent they are unknown, unliquidated or not yet due as of effective date of the assignment.

33.    As currently proposed, the Proposed Assignee intends to circumvent the requirements of section 365(b)(1) of the Bankruptcy Code by either extinguishing or leaving with the Debtors' estates the Surviving Obligations arising under the UE Leases.[16] The Court should not permit the Proposed Assignee to avoid its obligations under the UE Leases. It is well-established that a contract or lease may only be assumed in its entirety, and the debtor or third party assignee is subject to all of the terms and conditions thereof *cum onere*. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*."); *In re MF Glob. Holdings*

---

[16]    The Assumption and Assignment Order provides: "[u]pon assumption and assignment of any Designatable Lease or Additional Contract, solely to the extent designated for assumption by the Sellers and assignment to Buyer by written notice from Buyer to Sellers delivered prior to the end of the Designation Rights Period (the "Designated Agreements"), the Debtors and their estates shall be relieved of any liability for breach of such Designated Agreement after the Closing pursuant to the Asset Purchase Agreement and section 365(k) of the Bankruptcy Code; provided that, except as expressly provided herein or in the Asset Purchase Agreement or Related Agreements, **neither the Buyer (except to the extent such obligations constitute Cure Costs or Expenses (as defined in section 2.9 of the Asset Purchase Agreement) nor the applicable Assignee shall have any obligations under any Designated Agreement that is an Additional Assigned Agreement in respect of any costs or expenses (including, without limitation, for royalties, rents, utilities, taxes, insurance, fees, any common area or other maintenance charges, promotional funds and percentage rent) arising under any of the Additional Assigned Agreements attributable to (x) the portion of such calendar year occurring prior to such Lease Assignment or (y) for any previous calendar year, and the Sellers shall fully indemnify and hold harmless the Buyer and the applicable Assignee with respect thereto.**" Assumption and Assignment Order at ¶ 17 (emphasis added). Pursuant to paragraph 28 of the Assumption and Assignment Order, all parties' rights with respect to such obligations were preserved pending further determination of the Court.

16

*Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012)  ("An executory contract may not be assumed in part and rejected in part . . . The trustee must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits.").  Accordingly, the proposed assumption and assignment of the UE Leases may not be consummated unless the assignee agrees to pay or assume, as applicable, the Surviving Obligations under the UE Leases.

34.    Therefore, Urban Edge requests that any order approving the assumption and assignment of the UE Leases must provide that (a) the Proposed Assignee is required to pay all the prepetition and post-petition Known Obligations described above in the amount of **$1,052,760.05** on account of the Bruckner Lease and in the amount of **$126,170.81** on account of the Montehiedra Lease, and (b) the Proposed Assignee shall pay or assume, as applicable, all Surviving Obligations under the UE Leases.

## II.    Adequate Assurance of Future Performance of Shopping Center Leases Under Section 365(b)(3)

35.    Urban Edge also objects to the proposed assignment of the UE Leases because neither the Buyer nor the Proposed Assignee has provided the UE Landlords adequate assurance of future performance under the UE Leases as required by the Bankruptcy Code.

36.    "In all cases the debtor must cure any defaults, compensate the lessor for any pecuniary injury, and provide 'adequate assurance of future performance.'" *In re Martin Paint Stores*, 199 B.R. 258 (Bankr. S.D.N.Y. 1996) (citing sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code); *see also In re RS Legacy Corp.*, 2015 Bankr. LEXIS 2206, *1 (Bankr. D. Del. June 25, 2015) (observing that to win approval of assumption and assignment of a lease, the debtor and proposed assignee must provide adequate assurance of future performance under the operative lease).  Where an assumed lease is proposed to be assigned, section 365(f)(2)(B) provides that a debtor may assign an unexpired nonresidential lease only if "adequate assurance

17

of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." While adequate assurance of future performance is not defined in the Bankruptcy Code, "courts have determined that whether adequate assurance of future performance has been provided is determined by the facts and circumstances of each case." *In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666, 674 (S.D.N.Y. 2012) (citing *In re M. Fine Lumber Co.,* 383 B.R. 565, 572 (Bankr. E.D.N.Y. 2008). At the same time, courts have noted that the "the primary focus of adequate assurance concerns the assignee's ability to fulfill the financial obligations under the lease." *Martin*, 199 B.R. at 263 (collecting cases); *In re Natco Industries, Inc.*, 54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985) ("[T]he obvious purpose of this section . . . is to afford landlords with a measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy.").

37.     The Bankruptcy Code imposes heightened restrictions on the assumption and assignment of leases for shopping centers, which are intended "to protect the rights of the lessors and the center's other tenants." *In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1086 (3d Cir. 1990) ("The Bankruptcy Code imposes heightened restrictions on the assumption and assignment of leases for shopping centers.") (citing section 365(b)(3)); *Great Atlantic*, 472 B.R. at 676 (observing the same); *see also In re Sun TV & Appliances, Inc.*, 234 B.R. 356, 359 (Bankr. D. Del. 1999) ("In order to assume and assign a lease or executory contract, a debtor typically need only cure any arrearages and provide adequate assurance of future performance of the lease or contract. 11 U.S.C. § 365(b)(1). In the case of shopping center leases, however, Congress has placed additional restrictions on the right to assume and assign."). The heightened adequate assurance requirements for shopping centers under section 365(b)(3) include adequate assurance:

> (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, **that the financial condition and operating performance of**

ACTIVE/98242928.7

> the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
>
> (B) that any percentage rent due under such lease will not decline substantially;
>
> (C) that **assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center**; and
>
> (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3)(A)-(D) (emphasis added).

38.     "The debtor bears the burden of showing that the requirements for assumption under § 365 have been met." *In re M. Fine Lumber Co.*, 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008) (citing *In re Embers 86th St.*, 184 B.R. 892, 902 (Bankr. S.D.N.Y. 1995)); *In re R & J, Inc.,* 140 B.R. 316, 317 (Bankr. D. Mass. 1992) ("The debtor carries an additional burden of proof with respect to adequate assurance if the lease is one involving a shopping center. § 365(b)(3).").

39.     Where a debtor seeks to assume and assign a shopping center lease, courts require the debtor and proposed assignee to make specific factual showings through competent evidence that they have satisfied section 365(b)(3)'s heightened adequate assurance requirements. *See In re Service Merchandise Company, Inc.*, 297 B.R. 675, 682 (Bankr. M.D. Tenn. 2002) (describing debtor's burden under section 365(b)(3)(A) of the Bankruptcy Code); *Matter of Haute Cuisine, Inc.,* 58 B.R. 390, 393-394 (Bankr. M.D. Fla. 1986).  The Proposed Assignee has failed to

ACTIVE/98242928.7

provide adequate assurance of future performance under the UE Leases.[17]   Accordingly, the

proposed assignments of the UE Leases must be denied.

### A.  Bruckner Commons and the Montehiedra Outlets Are "Shopping Centers"

40.    Bruckner Commons and the Montehiedra Outlets are each a "shopping center" as

that term is used in section 365(b)(3) of the Bankruptcy Code.   Accordingly, the proposed

assignments of the UE Leases are subject to section 365(b)(3)'s heightened adequate assurance

requirements.

41.    Although "shopping center" is not a term defined by the Bankruptcy Code, courts

determining whether a group of stores constitutes a "shopping center" regularly employ the

criteria set forth by the Court of Appeals for the Third Circuit in *Joshua Slocum*.  *See, e.g.*, *In re

Ames Dep't Stores, Inc.*, 348 B.R. 91, 95 (Bankr. S.D.N.Y. 2006) (applying the *Joshua Slocum*

criteria).   Accordingly, courts typically consider the following factors: (1) whether there is a

combination of leases; (2) whether a single landlord holds all of the leases; (3) whether all

tenants are engaged in the commercial retail distribution of goods; (4) the presence of a common

parking area; (5) whether the premises was purposefully developed as a shopping center; (6) the

existence of a master lease; (7) the existence of fixed hours during which all stores are open;

(8) the existence of joint advertising; (9) whether there is contractual interdependence of the

tenants as evidenced by restrictive-use provisions in their leases; (10) the existence of percentage

rent provisions in the leases; (11) whether tenants have the right to terminate their leases if the

anchor tenant terminates its lease; (12) whether tenants jointly participate in trash removal and

---

[17]    Indeed, there is no evidence in the record regarding the assets, liabilities, management or projections of the Proposed Assignee.  And no effort has been made by the Proposed Assignee to meet the burden "that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease."  § 365(b)(3)(A).

ACTIVE/98242928.7

other maintenance; (13) the existence of a tenant mix; and (14) the contiguity of the stores.  *See Ames*, 348 B.R. at 95 (citing *Joshua Slocum*, 922 F.2d at 1087–88).

42.    Bruckner Commons and the Montehiedra Outlets are "shopping centers" under the *Joshua Slocum* criteria:

(1) **Combination of Leases.**  Bruckner Commons and the Montehiedra Outlets are each comprised of a mix of many retailers and each of these tenants is subject to a separate lease.  *See* DiVita Declaration at ¶ 26(1).

(2) **Single Landlord.** UE Bruckner is the landlord of all stores within Bruckner Commons, and UE Montehiedra is the landlord of all stores within the Montehiedra Outlets. *See* DiVita Declaration at ¶ 26(2).

(3) **Commercial Retail Distribution.**  Each of the retailers at Buckner Commons and Montehiedra Outlets are engaged in the commercial retail distribution of goods.  Retailers at Bruckner Commons include, among others: Kmart, Shop Rite, Burlington Coat Factory, Kick USA, AT&T Mobility and The Children's Place.  *See* DiVita Declaration at ¶ 26(3). Retailers at Montehiedra include, among others: Kmart, Marshalls, Gap Factory Store, Nike Factory Store, Polo Ralph Lauren Factory Store, Aldo, T-Mobile, Boost Mobile, Puma Outlet, Sketchers Outlet and the Sunglass Hut.  *See* DiVita Declaration at ¶ 26(3).

(4) **Common Parking Area.**  The stores within each of Bruckner Commons and the Montehiedra Outlets share common parking lots and other common areas, and the stores are accessible by customers through common access roads.  *See* DiVita Declaration, Ex. A and C.

(5) **Shopping Center Development.**  Bruckner Commons and the Montehiedra Outlets were purposely developed as shopping centers.  *See* DiVita Declaration at ¶ 26(5).  Indeed, as described by the Montehiedra Outlets website, the Montehiedra Outlets is "a one level enclosed

mall with over 100 stores [a]nchored by Big Kmart, Home Depot, Marshall's, Capri, a fourteen-screen theater complex and a food court that offers over a dozen choices."[18]  *See Joshua Slocum,* 922 F.2d at 1086 (3d Cir. 1990) ("[T]he mall is the archetypal 'shopping center.'").

 (6) **Fixed Hours.**  All or nearly all of the tenants within each of Bruckner Commons and the Montehiedra Outlets abide by fixed hours during which their stores are open.  *See* DiVita Declaration at ¶ 26(6).

(7) **Joint Advertising.**   The stores within the Montehiedra Outlets engage in joint advertising, such as through the Montehiedra Outlets website.  *See* DiVita Declaration at ¶ 26(7).

(8) **Contractual Interdependence.**  The leases in each of the shopping centers, including the UE Leases, are contractually interdependent.  For example, many of the leases, including the UE Leases, contain exclusivity and/or restrictive use provisions which limit other tenant's uses of their respective stores.   Moreover, many of the leases, including the UE Leases, contain percentage rent provisions.  In addition, all or nearly all of the tenants in Bruckner Commons and the Montehiedra Outlets are required, pursuant to their leases, to pay a share of the costs of common area maintenance as well as a share of real estate taxes, and nearly all of the tenants in the Montehiedra Outlets share the costs of trash removal.  *See* DiVita Declaration at ¶ 26(8).

(9) **Percentage Rent.**  The UE Leases contain percentage rent provisions.  Many of the other tenants' leases at both Bruckner Commons and the Montehiedra Outlets contain percentage rent provisions.   *See* DiVita Declaration at ¶ 26(9).

 (10) **Joint Trash Removal and Other Maintenance.** All or nearly all of tenants in Bruckner Commons and the Montehiedra Outlets are required, pursuant to their leases, to pay a

---

[18]    The    Montehiedra    Outlets/Montehiedra    Town    Center    website    can    be    found    at http://www.montehiedratowncenter.com/english/mall_info_inter.aspx.

ACTIVE/98242928.7

share of the costs of common area maintenance (usually calculated based on the square footage of the tenant's premises), real estate taxes and, at the Montehiedra Outlets, trash removal. *See* DiVita Declaration at ¶ 26(10).

(11) **Tenant Mix.** As contemplated and evidenced by the exclusive and prohibited use provisions in the UE Leases and many other tenants' leases, each of Bruckner Commons and the Montehiedra Outlets contain a mix of many different types of commercial retail tenants. *See* DiVita Declaration at ¶ 26(11).

(12) **Contiguity.** As illustrated by the Bruckner Commons leasing plan, Bruckner Commons is a contiguous area with common parking lots connecting all of the stores, many of which share common walls. The stores at Bruckner Commons are accessible to customers through common access roads. *See* DiVita Declaration at ¶ 26(12). The Montehiedra Outlets is a one level enclosed mall with over 100 stores, which share common walls and internal doors or passageway for customers to pass between. The stores at the Montehiedra Outlets are accessible to customers through common access roads. *See* DiVita Declaration at ¶ 26(12).

43.    Accordingly, as Bruckner Commons and the Montehiedra Outlets are each a "shopping center" as such term is used in the Bankruptcy Code, the proposed assignments of the UE Leases are subject to section 365(b)(3)'s heightened adequate assurance requirements.

**B.    The Proposed Assignee Must Provide Adequate   Assurance of Future Performance Pursuant to Section 365(3)(b)(A)**

44.    "In order to meet the burden under section 365(b)(3)(A), the debtor must establish that the financial condition and operating performance of [the assignee] [is] similar to the debtors' at the time of lease signing." *Service Merch.*, 297 B.R. at 682. The "comparative test" required by Section 365(b)(3)(A) is *not* the same test required for executory contracts or nonresidential real property leases that are *not* in a shopping center. Landlords of shopping

ACTIVE/98242928.7

centers enjoy the benefit of a heightened adequate assurance test that requires that the creditworthiness of the proposed assignee not be worse than the landlord's original tenant at the time it became a tenant under the lease. Here, the Proposed Assignee must demonstrate that its financial condition and operating performance are similar to Kmart's financial condition and operating performance at the time Kmart because a tenant under the UE Leases in 1997 and 1999, respectively. Neither the Proposed Assignee nor the Buyer have provided any proof that *the Proposed Assignee* meets this comparative test, and given the financial prowess of Kmart in the late 90s, they cannot do so.

45.    Kmart became a tenant under the Bruckner Lease in 1999 and a tenant under the Montehiedra Lease in 1997. When Kmart entered into the UE Leases it was one of the world's largest mass merchandisers and for many years ranked as this nation's second largest discount retailer and either the second or third largest general merchandise retailer. *See* Kmart Corp., Annual Report (Form 10-K), at 2 (April 19, 2000) ("Kmart Corporation . . . is the nation's second largest discount retailer and the world's third largest general merchandise retailer . . ."); Kmart Corp., Annual Report (Form 10-K), at 2 (April 14, 1998) ("Kmart Corporation . . . [is] one of the world's largest mass merchandise retailers . . .").

46.    In addition, Kmart's financial statements in the years when it because a tenant under each of the UE Leases evidence its financial strength at that time. Kmart's Annual Reports Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal years ended January 28, 1998, January 27, 1999, and January 26, 2000 are attached as Exhibits 1, 2, and 3, to the Skorostensky Declaration. In relevant part, Kmart's financial condition for the during these years can be summarized as follows:

| Fiscal Year Ended | Sales Revenue (in millions) | Net Income (in millions) | Cash and Cash Equivalents (in millions) | Shareholders' Equity (in millions) |
|---|---|---|---|---|
| January 28, 1998 | $32,183 | $249 | $498 | $5,434 |
| January 27, 1999 | $33,674 | $518 | $710 | $5,979 |
| January 26, 2000 | $35,925 | $403 | $344 | $6,304 |

47.    Here, the Proposed Assignee is a newly formed entity.  It is not Kmart at its apex. The Buyer states ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████   ██

████████████   Adequate Assurance Letter at 2.   ███████████████████

███████████████████████████   ██████████████   In fact, no information has been provided regarding the assets, liabilities, or projections of the Proposed Assignee.   Likewise, the Buyer alleges ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████   See Adequate Assurance Letter at 2-3.  However, without further specificity, it is impossible for Urban Edge to develop an understanding as to what extent the ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████   the liabilities the Buyer assumed under the Global Sale.  See DiVita Declaration at ¶ 30.

48.    The Proposed Assignee has not even attempted to meet its burden to prove that its financial condition and operating performance are similar to those of Kmart at the time Kmart

became a tenant under the UE Leases.  Urban Edge has serious concerns about the future performance of the Proposed Assignee that has no operating history, and whose specific assets, liabilities, management and projections are unknown.

49.    In the ordinary course of its business, Urban Edge typically requires credit enhancements, in the form of security deposits, letters of credit and third party guaranties when leasing (or assessing a proposed assignment of a lease) to certain companies based on their financial information and history.  *See* DiVita Declaration ¶ 31.  In situations where the assignee is a newly formed entity, "the assignee's future performance is to be judged, *inter alia,* by the financial strength of its backers, and its operating performance is to be judged by its principal's operating performance."  *Serv. Merch. Co.*, Inc., 297 B.R. at 682. (holding that a combination of the proposed assignee's projected unpledged cash flows from subleases, **absolute guaranties by assignee's members with substantial assets and shareholders' equity, additional guaranties from subtenants**, and extensive and successful operating history and performance of the assignee's members and other guarantors, satisfied burden under section 365(b)(3)(A) of the Bankruptcy Code) (emphasis added).

50.    Indeed, the Bankruptcy Code recognizes that a landlord may require a proposed assignee to provide a guaranty, deposit or other form of security as the landlord would require from a similar tenant.  *See e.g.*, 11 U.S.C. § 365(l) ("If an unexpired lease under which the debtor is the lessee is assigned pursuant to this section, the lessor of the property may require a deposit or other security for the performance of the debtor's obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant.").

51.    But even if the Proposed Assignee offers such a guaranty from the Buyer or other affiliates, even assuming that the Buyer and its affiliates can achieve all of its aggressive growth,

ACTIVE/98242928.7

cost cutting, and loyalty program assumptions presented in connection with the Global Sale, they are no Kmart of the 1990s.[19] Moreover the ongoing financial feud between the Debtors and the Buyer is well documented and casts doubt on the Buyer's financial health, particularly if the Buyer is required to pay $166 million of accounts payable the Debtors persuasively argue it assumed. *See Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* [Docket No. 2796].

52.    Lastly, given the fact that the Buyer ███████████████████████████



█████████████████████████████████████████████████ provides little comfort that the Buyer itself will have sufficient cash to operate and meet its financial obligations going forward. *See* DiVita Declaration ¶ 33. Urban Edge is not alone in this assessment as recent news reports have also called into question the Buyer's financial wherewithal. *See Creditntell, New Sears* – Appearance vs. Reality, Wed (April 2, 2019) ("Not surprisingly we expect [Transform] to struggle, with little margin for error, due to the same problems that plagued Sears Holdings.").

53.    In sum, the Adequate Assurance Letter ██████████████████████ that fails to sufficiently explain how the Buyer and its affiliates will turn around an enterprise that has experienced a near decade-long decline in highly competitive conditions, and falls far short of the Proposed Assignee's burden of proof that it has the capacity to meet its obligations under the

---

[19]    The information provided by the Buyer prior to the sale hearing regarding its go-forward business plan is now several months stale, and neither the Buyer nor Proposed Assignee has updated this information or provided current information on its financial resources or operating capabilities as it relates specifically to the Proposed Assignee.

ACTIVE/98242928.7

UE Leases for the remainder of their terms.   Likewise, the fact that ███████████████
███████████████████████████████████████████ says nothing
about the Buyer's ability to ████████████ to run a retail business, earn a profit, and pay
debts as they come due.

54.     Having failed to meet their burden under section 365(b)(3)(A) of the Bankruptcy
Code, the proposed assignments should not be approved.

**C.      Any Assignment Must be Subject to All Provisions in the UE Leases and in all Other Leases relating to the Shopping Centers Pursuant to Section 365(b)(3)(C)**

55.     Section 365(b)(3)(C) provides that, with regard to a proposed assumption or
assignment of a lease within a shopping center, adequate assurance includes assurance that the
assumption or assignment of "such lease is subject to **all the provisions** thereof, including (but
not limited to) provisions such as a radius, location, **use**, or exclusivity provision, **and will not
breach any such provision contained in any other lease, financing agreement, or master
agreement relating to such shopping center** . . . " (emphasis added).

56.     According to the April 19 Designation Notice, the Proposed Assignee seeks to
take an assignment of the UE Leases "free and clear of any interests, covenants, or rights
applicable to such real estate leases to the extent the same limit or condition the permitted use of
the property such as easements, reciprocal easement agreements, operating or redevelopment
agreements, covenants, licenses, or permits (collectively, "Restrictive Covenants") that are
executory and do not run with the land."

57.     The UE Leases themselves, as well as many of the leases of other tenants within
Bruckner Commons and the Montehiedra Outlets, contain exclusivity provisions and prohibited
use covenants, which limit other tenant's uses of their respective stores and prohibit the UE

ACTIVE/98242928.7

Landlords from allowing such uses. As required by section 365(b)(3)(C), any assignment to the Proposed Assignee must be subject to all such exclusivity and prohibits use covenants. In addition, the Montehiedra Lease is specifically subject to, and incorporates by reference, the Montehiedra REA. The Montehiedra Lease states: "The foregoing demise is subject to that certain Deed of Constitution of Reciprocal Easements and Restrictive Covenants dated December 19, 1991, as amended . . ." Montehiedra Lease at 1. Thus, any proposed assignment of the Montehiedra Lease is subject to the Montehiedra REA and all of the covenants set forth therein.

58.    Urban Edge objects to any attempt by the Proposed Assignee to extinguish or diminish any Restrictive Covenants, including those contained within the UE Leases, other tenants' leases, or the Montehiedra REA, as described above.

59.    Section 365(b)(3)(C) is clear and consistent with the *cum onere* principle described above. If the Proposed Assignee wishes to take an assignment of the UE Leases, it must take all of the provisions and burdens associated with such leases. *See MF Glob.*, 466 B.R. at 241 ("The trustee must either assume the entire contract, *cum onere,* or reject the entire contract, shedding obligations as well as benefits."). There is no legal basis for the Proposed Assignee to strip Restrictive Covenants from the UE Leases. *See In re Texaco Inc.*, 254 B.R. 536, 550 (Bankr. S.D.N.Y. 2000) ("The law is clear that a debtor who assumes a lease or other executory contract assumes the contract *cum onere,* without any diminution in its obligations or impairment of the rights of the lessor in the present or the future.").

60.    As in any shopping center, these provisions are part of an integrated relationship and understanding among all tenants within each of Bruckner Commons and the Montehiedra Outlets. In addition to harming the businesses of other tenants and tenant mix within the

ACTIVE/98242928.7

shopping centers, extinguishing such provisions may arguably subject the UE Landlords to potential liability to the other tenants who will argue that the UE Landlords have breached the exclusivity or prohibited use covenants.

61.    Moreover, the Debtors cannot simply sell free and clear of easements, such as Montehiedra REA, under applicable law as such rights are generally non-executory (and therefore not subject to rejection) and/or to run with the land.  *See e.g.*, *In re Three A's Holdings LLC*, 364 B.R. 550 (Bankr. D. Del. 2007) (holding that covenants, conditions and restrictions that governed and limited lease ran with the land under California law, and any assumption and assignment of that lease to party that did not qualify as tenant under terms of covenants, conditions and restrictions would violate California law); *In re Arden & Howe Assocs.*, 152 B.R. 971, 976 (Bankr. E.D. Cal. 1993) (court found that tenant could not "shed restrictive use covenants except by vacating. If the debtor tenant wants to stay in possession of the property, it must assume the lease, including all restrictive use provisions").  Although the April 19 Designation Notice claims that the Proposed Assignee seeks to extinguish only Restrictive Covenants "that are executory and do no run with the land", the Proposed Assignee has not specified which Restrictive Covenants it is referring to.  Furthermore, to the extent the Proposed Assignee seeks to distinguish a specific Restrictive Covenant on the basis that such Restrictive Covenant is executory and does not run with the land, it has not appropriately requested such relief, as the determination regarding whether an easement or restrictive covenant runs with the land must be addressed pursuant to an adversary proceeding.  *See In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 73 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 F. App'x 64 (2d Cir. 2018) ("[T]he Court concludes that it cannot decide substantive legal issues, including whether the covenants at issue run with the land, in the context of a motion to reject,

ACTIVE/98242928.7

unless such motion is scheduled simultaneously with an adversary proceeding or contested matter to determine the merits of the substantive legal disputes related to the motion.").

62.    For all of the foregoing reasons, the Proposed Assignee has not satisfied its burden of proof of adequate assurance of future performance under the UE Leases pursuant to 365(b)(3)(C) of the Bankruptcy Code.  Accordingly, Urban Edge respectfully requests that the Court deny the proposed assignment of the UE Leases.

## **JOINDER**

63.    Urban Edge hereby joins in the objections filed by the Debtors' other landlords to the extent not inconsistent herewith.

## **RESERVATION OF RIGHTS**

63.    Urban Edge expressly reserves the right to amend, supplement, and/or modify this Objection and to file in the future additional appropriate pleadings as may be appropriate.


*[Remainder of Page Intentionally Left Blank]*

ACTIVE/98242928.7

WHEREFORE, Urban Edge respectfully requests that this Court enter an Order (A) denying  approval of the assumption and assignment of the UE Leases unless and until (i) the Debtors, Buyer or the Proposed Assignee pay all pre-petition and post-petition Known Obligations that are due and owing under the applicable UE Lease through the effective date of its assumption and assignment, and (ii) the Proposed Assignee (a) pays or assumes all Surviving Obligations, regardless of when such obligations accrued or arose; and (b) provides Urban Edge with adequate assurance of future performance as required by sections 365(b)(3) and 365(f)(2) of the Bankruptcy Code; and (B) granting to Urban Edge such other and further relief as this Court deems just and proper.

Dated:    New York, NewYork
          May 3, 2019

/s/Michael H. Goldstein
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
T: 212.813.8800
F: 212.355.3333
Michael H. Goldstein *(admitted pro hac vice)*
Barry Z. Bazian
mgoldstein@goodwinlaw.com
bbazian@goodwinlaw.com
*Counsel to Urban Edge Properties LP*
*and its subsidiaries*

ACTIVE/98242928.7