**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | Case No. 18-23538 (RDD) |
|  | (Jointly Administered) |
| **Debtors.**[1] |  |

**DECLARATION OF ARTEM SKOROSTENSKY IN SUPPORT OF OBJECTION OF
URBAN EDGE PROPERTIES LP TO NOTICE OF ASSUMPTION AND ASSIGNMENT
OF ADDITIONAL DESIGNATABLE LEASES**

I, Artem Skorostensky, pursuant to 28 U.S.C. § 1746 declare:

      1.    I am an associate at the law firm of Goodwin Procter LLP, which is counsel to Urban Edge Properties LP ("Urban Edge") in connection with the above-captioned jointly administered case. This declaration is submitted in support of the *Objection of Urban Edge Properties LP to Notice of Assumption and Assignment of Additional Designatable Leases*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

(the "Objection").[2]  Unless otherwise indicated, I have personal knowledge of the facts set forth

herein.

2.       On April 19, 2019, the Buyer filed the April 19 Designation Notice

designating for assumption and assignment various real property leases, including the UE

Leases.  According to the April 19 Designation Notice, the Buyer seeks to assign the UE Leases

to an entity named "Transform Operating Stores LLC" (the "Proposed Assignee").

3.       On April 22, 2019, Urban Edge, through counsel, contacted counsel for

the Buyer requesting an adequate assurance package for the Proposed Assignee (the "April 22nd

Email").

4.       On April 24, 2019, Urban Edge, through counsel, again contacted counsel

for the Buyer requesting, *inter alia*, an adequate assurance package containing certain specific

financial and business information regarding the Proposed Assignee and the Buyer (the "April

24th Email").  In the April 24th Email, Urban Edge's counsel also requested a call with the

Buyer's counsel to meet and confer regarding adequate assurance and other outstanding issues in

connection with the proposed assumption and assignment of the UE Leases.

5.       On April 26, 2019 (the "April 26th Email"), the Buyer's counsel

responded to the April 24th Email by providing a letter containing limited general information

regarding the Buyer and affiliated entities on a consolidated basis (the "Adequate Assurance

Letter").

6.       On April 29, 2019 (the "April 29th Email" together with the April 22nd

Email and April 24th Email, the "Adequate Assurance Emails"), Urban Edge, through counsel,

in response to the April 26th Email, raised certain issues regarding the information contained in

---

[2]        Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in the
Objection.

2

the Adequate Assurance Letter and requested certain specific clarifications, elaboration and additional detail regarding ████████ and other information contained in the Adequate Assurance Letter.  Urban Edge's counsel again requested a call to meet and confer on these and other outstanding issues in connection with the proposed assumption and assignment of the UE Leases.

7.    On May 1, 2019, counsel to Urban Edge and counsel to the Buyer engaged in a preliminary and productive discussion in an attempt to consensually resolve certain or all of the issues raised in the Adequate Assurance Emails and other outstanding issues in connection with the proposed assumption and assignment of the UE Leases.  The parties have not, as of the time of the filing of the Objection, reached a definitive agreement.

8.    Although the Buyer has provided ████████████████████ ████████████████ most of the specific information Urban Edge has requested has not yet been provided as of the filing of the Objection.

9.    Attached hereto as **Exhibit 1** is a true and correct copy of Kmart Corporation's Form 10-K for the fiscal year ended January 28, 1998, filed with the Securities Exchange Commission on April 14, 1998, which I accessed through the following website on January 28, 2019:  https://www.sec.gov/Archives/edgar/data/56824/0000950124-98-002149-index.html.

10.    Attached hereto as **Exhibit 2** is a true and correct copy of Kmart Corporation's Form 10-K for the fiscal year ended January 27, 1999, filed with the Securities Exchange Commission on April 15, 1999, which I accessed through the following website on January 28, 2019:  https://www.sec.gov/Archives/edgar/data/56824/0000950124-99-002618-index.html.

3

11.     Attached hereto as **Exhibit 3** is a true and correct copy of Kmart Corporation's Form 10-K for the fiscal year ended January 26, 2000, filed with the Securities Exchange Commission on April 19, 2000, which I accessed through the following website on January 28, 2019:   https://www.sec.gov/Archives/edgar/data/56824/0000950124-00-002311-index.html.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: May 3, 2019
New York, New York

/s/ *Artem Skorostensky*
Artem Skorostensky
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
askorostensky@goodwinlaw.com

ACTIVE/99459656.2

# **Exhibit 1**

**(Kmart Corporation's Form 10-K for the fiscal year ended January 28, 1998)**

ACTIVE/99459656.1

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 OOtFTqktfRnIRN9Bv70zDaqkIdeG6iw96ETqxP41pzco9AR2UXaQv3icKpOA/8wW
 4NuYj1WdJSDUD6+lQTDOkw==

<SEC-DOCUMENT>0000950124-98-002149.txt : 19980415
<SEC-HEADER>0000950124-98-002149.hdr.sgml : 19980415
ACCESSION NUMBER:                     0000950124-98-002149
CONFORMED SUBMISSION TYPE:            10-K
PUBLIC DOCUMENT COUNT:                9
CONFORMED PERIOD OF REPORT:           19980128
FILED AS OF DATE:                     19980414
SROS:                   CSX
SROS:                   NYSE
SROS:                   PCX

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           KMART CORP
                CENTRAL INDEX KEY:                0000056824
                STANDARD INDUSTRIAL CLASSIFICATION:   RETAIL-VARIETY STORES [5331]
                IRS NUMBER:                       380729500
                STATE OF INCORPORATION:           MI
                FISCAL YEAR END:                  0129

        FILING VALUES:
                FORM TYPE:            10-K
                SEC ACT:
                SEC FILE NUMBER:      001-00327
                FILM NUMBER:          98593210

        BUSINESS ADDRESS:
                STREET 1:             3100 W BIG BEAVER RD
                CITY:                 TROY
                STATE:                MI
                ZIP:                  48084
                BUSINESS PHONE:       8106431000

        MAIL ADDRESS:
                STREET 1:             3100 W  BIG BEAVER ROAD
                CITY:                 TROY
                STATE:                MI
                ZIP:                  48084

        FORMER COMPANY:
                FORMER CONFORMED NAME:    KRESGE S S CO
                DATE OF NAME CHANGE:      19770921
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FORM 10-K
<TEXT>

<PAGE>    1


                    SECURITIES AND EXCHANGE COMMISSION
                        Washington, D.C.     20549

                            FORM 10-K


X  ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT
- -- OF 1934
For the fiscal year ended January 28, 1998


                                  or


__  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
    EXCHANGE ACT OF 1934
For the transition period from_____to_____.

Commission File No. 1-327
```

```
                     (Exact name of registrant as specified in its charter)


                 Michigan                        38-0729500
- ------------------------------------------------------------------------
           (State or other jurisdiction of       (I.R.S. Employer
           incorporation or organization)        Identification No.)


     3100 West Big Beaver Road - Troy, Michigan       48084
- ------------------------------------------------------------------------
     (Address of principal executive offices)      (zip code)


     Registrant's telephone number, including area code    (248) 643-1000
                                                     ------------------
```

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE SECURITIES EXCHANGE ACT
OF 1934:

```
                                    Name of each Exchange
       Title of each class          on which registered
       -------------------          -------------------

Common Stock, $1.00 par value       New York, Pacific and Chicago Exchanges
```

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE SECURITIES EXCHANGE ACT
OF 1934:  None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934
during the preceding 12 months (or for such shorter period that the registrant
was required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days. YES X  NO
                                       --

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [ ]

The aggregate market value of voting stock including common stock, held by
non-affiliates of the registrant on March 25, 1998 was $8,087,934,327. The
market value of the common stock is based on the closing price on the New York
Stock Exchange on such date.

As of March 25, 1998, 490,177,839 shares of Common Stock of the Registrant, held
by approximately 86,682 shareholders, were outstanding.

Portions of the Registrant's 1997 Annual Report to Shareholders are
incorporated by reference into Parts I, II and IV of this report. Portions of
the Registrant's Proxy Statement dated April 10, 1998 in
connection with the 1998 Annual Meeting of Stockholders are incorporated by
reference into Part III of this report.


     <PAGE>    2


                              PART I
     Item 1.  Business

          History

          Kmart Corporation ("Kmart", or the "Registrant"), one of the world's
     largest mass merchandise retailers, was incorporated under the laws of the State
     of Michigan on March 9, 1916, as the successor to the business developed by its
     founder, S. S. Kresge, who opened his first store in 1899. After operating
     Kresge department stores for over 45 years, the Kmart store program commenced
     with the opening of the first Kmart store in March 1962.


          U.S. General Merchandise Operations

          The Registrant operates in the general merchandise retailing industry
     through 2,136 Kmart discount stores with locations in each of the 50 United
     States, Puerto Rico, the U.S. Virgin Islands and Guam, including 99 Super Kmart
     Centers, all located in the United States. Kmart's general merchandise retail
     operations are located in 311 of the 316 Metropolitan Statistical Areas (MSAs)
     in the United States. In addition, Kmart stores occupy each of the three MSAs in
     Puerto Rico. Kmart stores are generally one-floor, free-standing units.
     Traditional Kmart general merchandise stores range from 40,000 to 120,000 square
     feet with the majority of modernized stores ranging from 85,000 to 120,000
     square feet. The Big Kmart format was rolled out to an additional 458 stores in

1997, bringing the total to more than 500 stores offering food
consumables and convenience. It is the Registrant's plan, should performance
continue meeting expectations, to convert as many as 500 stores per year over
the next two years to this format. Super Kmart Centers range from 135,000 to
194,000 square feet and feature a full line of general merchandise and groceries
as well as a variety of ancillary services including video rentals, dry
cleaning, hair care, optical and floral shops. Full-size stores operate in the
most densely populated urban areas and are geographically located to increase
customer awareness and maximize customer convenience and accessibility.

        Information regarding the Registrant's analysis of consolidated
operations appearing in the "Management's Discussion and Analysis of Results of
Operations and Financial Condition" on pages 18 through 20 of the Registrant's
1997 Annual Report to Shareholders, is incorporated herein by reference.

        Information regarding the Registrant's discontinued operations and
dispositions appearing in Note 3 of the "Notes to Consolidated Financial
Statements" on page 27 of the Registrant's 1997 Annual Report to Shareholders,
is incorporated herein by reference.

        Competition

        Kmart has several major competitors on a national level, including
Dayton-Hudson's Target stores, J.C. Penney, Sears and Wal-Mart, and many
competitors on a local level which compete with Kmart's individual stores.
Success in this competitive market is based on factors such as price, quality,
service, product mix and convenience.


        Seasonality

        The Registrant's business is highly seasonal and depends to a
significant extent on the results of operations for the last quarter of the
fiscal year.

        Credit Sales

        In March 1996, the Registrant launched a new private label Kmart Credit
Card, available in all Kmart Stores, through Beneficial National Bank USA ("BNB
USA"), a unit of Beneficial Corporation. BNB USA owns the receivables and
retains the credit risk associated with this program. All of the Registrant's
stores accept major bank credit cards as payment for merchandise.

        Employees

        The Registrant employed approximately 261,000 persons as of January 28,
1998.

                                        2


<PAGE>   3


        Effect of Compliance with Environmental Protection Provisions

        Compliance with federal, state and local provisions which have been
enacted or adopted regulating the discharge of materials into the environment,
or otherwise relating to the protection of the environment, has not had, and is
not expected to have, a material effect on capital expenditures, earnings or the
competitive position of the Registrant and its subsidiaries.

Item 2.   Properties

        At January 28, 1998, Kmart operated a total of 2,136 general merchandise
stores which are located in the United States, Puerto Rico, the U.S. Virgin
Islands and Guam. With the exception of 105 store facilities which are wholly
owned, the Registrant leases its store facilities.

        The Registrant owns its headquarters and one administrative building in
Troy, Michigan and leases administrative buildings in Royal Oak, Michigan and
North Bergen, New Jersey. The Registrant leases 18 United States distribution
and port centers for initial terms of 10 to 30 years with options to renew for
additional terms. In addition, the Registrant owns or leases 725 parcels not
currently used for store operations, the majority of which are rented to others.

        A description of the Registrant's leasing arrangements, appearing in
Note 9 of the "Notes to Consolidated Financial Statements" on page 29 of the
Registrant's 1997 Annual Report to Shareholders, is incorporated herein by
reference.

Item 3.   Legal Proceedings

most of which are routine and all of which are incidental to its business. Some
matters involve claims for large amounts of damages as well as other relief.
Although the consequences of these proceedings are not presently determinable,
in the opinion of management, they will not materially affect the Registrant's
liquidity, financial position or results of operations.

Item 4.  Submission of Matters to a Vote of Security Holders

        Not applicable.

                      3

<PAGE>   4

Executive Officers of the Registrant

        The name, position, age and a description of the business experience
for each of the executive officers of the Registrant is listed below as of
March 25, 1998. There is no family relationship among the executive officers.
Executive officers of the Registrant are elected each year at the Annual
Meeting of the Board of Directors to serve for the ensuing year and until their
successors are elected and qualified. The business experience for each of the
executive officers described below includes their principal positions held by
them since 1992. None of the corporations or organizations listed below is a
parent, subsidiary or other affiliate of the Registrant.

        Floyd Hall - Chairman of the Board, President and Chief Executive Officer,
59. Mr. Hall joined the Registrant under his current title in June 1995. Prior
thereto he served concurrently as Chairman and Chief Executive Officer of The
Museum Company, Alva Reproductions, Inc. and Glass Masters, Inc. from 1989 to
1995.

        Andrew A. Giancamilli - President and General Merchandise Manager, U.S.
Kmart, 47. Mr. Giancamilli has been in his current title since January 1998.
Prior thereto he held the following positions at the Registrant: Senior Vice
President, General Merchandise Manager-Consumables and Commodities from 1996 to
1998; Vice President, Pharmacy Merchandising and Operations from 1995 to 1996.
Prior to joining the Registrant in 1995 he was President, Chief Operating
Officer, Perry Drug Stores, Inc. from 1993 to 1995; and Executive Vice
President, Chief Operating Officer, Perry Drug Stores, Inc. from 1992 to 1993.

        Warren Cooper - Executive Vice President, Human Resources & Administration,
53. Mr. Cooper joined the Registrant under his current title in March 1996.
Prior thereto he was Senior Vice President, Human Resources, General Cable from
1995 to 1996; Vice President, Human Resources, the Sears Merchandise Group,
Sears, Roebuck & Co. from 1993 to 1995; and Vice President, Corporate Human
Resources, Sears, Roebuck & Co. from 1987 to 1993.

        Laurence L. Anderson - Executive Vice President and President, Super Kmart,
56. Mr. Anderson joined the Registrant under his current title in July 1997.
Prior thereto he was President and Chief Operating Officer, Retail Food,
SuperValu Inc. from 1995 to 1997; and Executive Vice President, SuperValu Inc.
from 1992 to 1995.

        Donald W. Keeble - Executive Vice President, Store Operations, 49. Mr.
Keeble has served as an executive officer of the Registrant since 1989 and has
served in his current position since February 1995. Prior thereto he held the
following positions at the Registrant: Executive Vice President, Merchandising
and Operations from 1994 to 1995; and Senior Vice President, General Merchandise
Manager, Fashions from 1991 to 1994.

        Anthony N. Palizzi - Executive Vice President, General Counsel, 55. Mr.
Palizzi has served as an executive officer of the Registrant since 1985 and has
served in his current position since 1992.

        Marvin P. Rich - Executive Vice President, Strategic Planning, Finance and
Administration, 52. Mr. Rich joined the Registrant under his current title in
1994. Prior thereto he was Executive Vice President, Specialty Companies,
Wellpoint Health Networks/Blue Cross of California from 1992 to 1994.  Mr. Rich
resigned his position effective April 3, 1998.

        William N. Anderson - Senior Vice President and General Merchandise Manager
- - Hardlines, 50. Mr. Anderson joined the Registrant under his current title in
September 1996. Prior thereto he was President and Chief Operating Officer,
Oshman's Sporting Goods, Inc. from 1994 to 1996; and Senior Vice President and
General Manager, Ames Department Stores, Inc. from 1992 to 1994.

        Ernest L. Heether - Senior Vice President, Merchandise Planning and
Replenishment, 52. Mr. Heether joined the Registrant under his current title in
April 1996. Prior thereto he served as Senior Vice President, Merchandise

Planning and Control, Caldor from 1990 to 1993.


     Paul J. Hueber - Senior Vice President, Sales and Operations, 49.
Mr. Hueber has served as an executive officer of the Registrant since 1991 and
has served in his current position since 1994. Prior thereto he was Vice
President, West/Central Region from 1991 to 1994.

          4

<PAGE>   5


     Cecil B. Kearse - Senior Vice President and General Merchandise Manager
- - Home, 45. Mr. Kearse has served in his current position since November 1997.
Prior thereto he held the following positions with the Registrant: Vice
President, Merchandise Presentation and Communication from 1996 to 1997; Vice
President and General Merchandise Manager, Men's and Children's from 1995 to
1996; Divisional Vice President, Merchandising Fashions from 1994 to 1995; and
Senior Buyer, Bed, Bath & Kitchen from 1990 to 1994.


     Jerry J. Kuske - Senior Vice President and General Merchandise Manager
Health and Beauty Care/ Pharmacy/Consumables, 46. Mr. Kuske has served in his
current position since November 1997. Prior thereto he held the following
positions with the Registrant: Vice President, General Merchandise Manager,
Health and Beauty Care/Pharmacy from 1996 to 1997; Divisional Vice President,
Consumables and Commodities from 1995 to 1996. Prior to joining the Registrant
he served as Senior Vice President, Merchandising and Marketing, Perry Drug
Stores from 1994 to 1995; and Senior Vice President, Operations, Payless Drug
Stores, Inc. from 1992 to 1994.

     James Mixon - Senior Vice President, Logistics, 53. Mr. Mixon joined the
Registrant in his current position in July 1997. Prior thereto he served as
Senior Vice President, Logistics/Service, Best Buy Stores from 1994 to 1997; and
Senior Vice President, Distribution/Transportation, Marshall Stores from 1987 to
1994.

     Donald E. Norman - Senior Vice President, Chief Information Officer, 61.
Mr. Norman joined the Registrant in 1995 as Divisional Vice President, Business
Process Reengineering, Merchandise Inventory Controls and has served in his
current position since December 1995. Prior thereto he was President, DNA, Inc.
from 1994 to 1995; and Senior Vice President, Logistics, Ames Department Stores
from 1990 to 1994.

     E.Jackson Smailes - Senior Vice President and General Merchandise
Manager - Apparel, 55. Mr. Smailes joined the Registrant in his current position
in July 1997. Prior thereto he served as President, Chief Executive Officer,
Hills Department Stores from 1995 to 1997; and Executive Vice President,
Merchandising and Marketing, Hills Department Stores from 1992 to 1995.

     William D. Underwood - Senior Vice President, Global Sourcing, 57.
Mr. Underwood has served as an executive officer of the Registrant since 1986
and has served in his current position since 1994. Prior thereto he was Senior
Vice President, General Merchandise Manager - Hardlines from 1991 to 1994.

     Martin E. Welch III - Senior Vice President and Chief Financial Officer,
49. Mr. Welch joined the Registrant under his current title in December 1995.
Prior thereto he was Senior Vice President, Chief Financial Officer,
Federal-Mogul Corporation from 1991 to 1995.


          5


<PAGE>   6


                              PART II

Item 5.  Market for Registrant's Common Equity and Related Stockholder Matters

     Information as to the market for the Registrant's common stock and
related stockholder matters, as set forth in Note 17 of the "Notes to
Consolidated Financial Statements" on page 32 of the Registrant's 1997 Annual
Report to Shareholders, is incorporated herein by reference.

Item 6.  Selected Financial Data

     The "Selected Financial Data" summary, insofar as it relates to the five
fiscal years ended January 28, 1998, appearing on page 17 of the Registrant's
1997 Annual Report to Shareholders is incorporated herein by reference.

January 28, 1998, appearing in the "Management's Discussion and
Analysis of Results of Operations and Financial Condition" on page 18 of the Registrant's
1997 Annual Report to Shareholders, are incorporated herein by reference.

U.S. Kmart selling square footage for the five fiscal years ended
January 28, 1998, appearing in the "Selected Financial Data" on page 17 of the
Registrant's 1997 Annual Report to Shareholders, is incorporated herein by
reference.

Item 7.  Management's Discussion and Analysis of Results of Operations and
Financial Condition

The information under the caption "Management's Discussion and Analysis
of Results of Operations and Financial Condition", appearing on pages 18 through
20 of the Registrant's 1997 Annual Report to Shareholders, is incorporated
herein by reference.

Item 7a. Quantitative and Qualitative Disclosures about Market Risk

Not applicable

Item 8.  Financial Statements and Supplementary Data

The financial statements of the Registrant consisting of the
consolidated balance sheets at January 28, 1998 and January 29, 1997 and the
related consolidated statements of operations, shareholders' equity and cash
flows for each of the three fiscal years in the period ended January 28, 1998,
and the notes to consolidated financial statements, together with the report of
Price Waterhouse LLP, appearing on pages 21 through 32 of the Registrant's 1997
Annual Report to Shareholders, are incorporated herein by reference.

Item 9.  Changes in and Disagreements with Accountants on Accounting and
Financial Disclosure

Not applicable.

6


<PAGE>    7


PART III


Item 10.  Directors of the Registrant

The information set forth under the caption "Proposal 1 - Election
of Directors" on page 5 of the Registrant's Proxy Statement dated April
10, 1998 filed with the Securities and Exchange Commission pursuant to
Regulation 14A is incorporated herein by reference.

Item 11.  Executive Compensation

The information set forth on pages 7 and 9 through 14 of the
Registrant's Proxy Statement dated April 10, 1998 filed with the Securities
and Exchange Commission pursuant to Regulation 14A is incorporated herein
by reference.

Item 12.  Security Ownership of Certain Beneficial Owners and Management

The information set forth under the caption "Stock Ownership of
Executive Officers and Directors" on pages 3 through 5 of the Registrant's
Proxy Statement dated April 10, 1998 filed with the Securities and Exchange
Commission pursuant to Regulation 14A is incorporated herein by reference.


Item 13.  Certain Relationships and Related Transactions.

The information set forth under the caption "Executive Compensation" on
pages 9 through 14 of the Registrant's Proxy Statement dated April
10, 1998 filed with the Securities and Exchange Commission pursuant to
Regulation 14A is incorporated herein by reference.

7


<PAGE>    8


PART IV

Item 14.  Exhibits, Financial Statement Schedules and Reports on Form 8-K

a)      The following documents are filed as part of this report:

    1.      Financial Statements

            The following consolidated financial statements of the Registrant
            are incorporated herein by reference from the Registrant's 1997
            Annual Report to Shareholders:

<TABLE>

|  |  | Page(s) in Registrant's Annual Report |
|---|---|:---:|
| <S> |  | <C> |
|  | Report of Independent Accountants | 21 |
|  | Consolidated Statements of Operations for each of the three fiscal years in the period ended January 28, 1998 | 22 |
|  | Consolidated Balance Sheets at January 28, 1998 and January 29, 1997 | 23 |
|  | Consolidated Statements of Cash Flows for each of the three fiscal years in the period ended January 28, 1998 | 24 |
|  | Consolidated Statements of Shareholders' Equity for each of the three fiscal years in the period ended January 28, 1998 | 25 |
|  | Notes to Consolidated Financial Statements | 26 through 32 |

    2.      Financial Statement Schedules

            The separate financial statements and summarized financial
            information of majority-owned subsidiaries not consolidated and
            of 50% or less owned persons of the Registrant have been omitted
            because they are not required pursuant to conditions set forth in
            Rules 3-09(a), 4-08(g) and 1-02(v) of Regulation S-X.

            All other schedules have been omitted because they are not
            applicable or the required information is shown in the
            Registrant's 1997 Annual Report to Shareholders, which is
            incorporated herein by reference.

    3.      Exhibits

            See Exhibit Index included in this report.

b)      Reports On Form 8-K

        The Registrant did not file a report on Form 8-K during the last quarter
of the fiscal year ended January 28, 1998.

</TABLE>

                                        8

<PAGE>   9

                                    SIGNATURES

            Pursuant to the requirements of Section 13 or 15(d) of the Securities
Exchange Act of 1934, the Registrant has duly caused this report to be signed on
its behalf by the undersigned, thereunto duly authorized on April 14, 1998.

            Each signatory hereby acknowledges and adopts the typed form of his or
her name in the electronic filing of this document with the Securities and
Exchange Commission.

                                Kmart Corporation

                                By: Floyd Hall
                                ----------------------------------------------
                                        (Floyd Hall)
                                Chairman of the Board, President and
                                    Chief Executive Officer

```
                      By: Martin E. Welch III
              -----------------------------------------
                      (Martin E. Welch III)
                   Senior Vice President and
                     Chief Financial Officer
                   (Principal Financial Officer)


                      By: William C.
                            Najdecki
              -----------------------------------------
                      (William C. Najdecki)
                    Vice President, Controller
                   (Principal Accounting Officer)


        Pursuant to the requirements of the Securities Exchange Act of 1934,
this report has been signed below by the following persons, on behalf of the
Registrant and in the capacities indicated, on April 14, 1998.

        Each signatory hereby acknowledges and adopts the typed form of his or
her name in the electronic filing of this document with the Securities and
Exchange Commission.

<TABLE>
<S>             <C>                                     <C>
              James B. Adamson                             Floyd Hall
------------------------------------------       ------------------------------------------
      James B. Adamson, Director                         Floyd Hall,
                                                    Chairman of the Board,
              Lilyan H. Affinito                 President and Chief Executive Officer
------------------------------------------
      Lilyan H. Affinito, Director                  (Principal Executive Officer
                                                        and Director)
            Stephen F. Bollenbach
------------------------------------------
      Stephen F. Bollenbach, Director                  Robert D. Kennedy
                                                 ------------------------------------------
                                                    Robert D. Kennedy, Director


------------------------------------------
      Joseph A. Califano, Jr., Director                J. Richard Munro
                                                 ------------------------------------------
              Richard G. Cline                      J. Richard Munro, Director
------------------------------------------
      Richard G. Cline, Director                       Robin B. Smith
                                                 ------------------------------------------
              Willie D. Davis                       Robin B. Smith, Director
------------------------------------------
      Willie D. Davis, Director                        William P. Weber
                                                 ------------------------------------------
              Enrique C. Falla                      William P. Weber, Director
------------------------------------------
      Enrique C. Falla, Director                       James O. Welch, Jr.
                                                 ------------------------------------------
            Joseph P. Flannery                      James O. Welch, Jr., Director
------------------------------------------
      Joseph P. Flannery, Director

</TABLE>


                          9


<PAGE>   10



                      EXHIBIT INDEX
<TABLE>
<CAPTION>

<S>      <C>          <C>
         Exhibit
         Number       Description
         ------       -----------
    **** (3a)    Restated Articles of Incorporation of Kmart Corporation
    **** (3b)    Bylaws of Kmart Corporation, as amended
    *   (10a)    Kmart Corporation 1973 Stock Option Plan, as amended [10a] [A]
```

| | | |
|---|---|---|
| **** | (10c) | Kmart Corporation Directors Retirement Plan, as amended  [10d] [A] |
| ** | (10d) | Kmart Corporation Performance Restricted Stock Plan, as amended [10e] [A] |
| *** | (10e) | Kmart Corporation Deferred Compensation Plan for Non-Employee Directors, as amended [10f] [A] |
| *** | (10f) | Kmart Corporation 1992 Stock Option Plan, as amended [10g] [A] |
| **** | (10g) | Kmart Corporation Directors Stock Plan, as amended  [10h] [A] |
| ** | (10h) | Form of Employment Agreement with Executive Officers [10j] [A] |
| *** | (10i) | Kmart Corporation Executive Deferred Compensation Plan [10j] [A] |
| *** | (10j) | Amended and Restated Kmart Corporation Annual Incentive Bonus Plan [10k] [A] |
| *** | (10k) | Amended and Restated Kmart Corporation Management Stock Purchase Plan [10l] [A] |
| *** | (10l) | Supplemental Pension Benefit Plan [10m] [A] |
| **** | (10m) | Agreement between Kmart Corporation and Executive [10n] [A] |
| ***** | (10n) | Kmart Corporation 1997 Long-term Equity Compensation Plan |
| | (10o) | Kmart Corporation 1998 Management Deferred Compensation and Restoration Plan |
| | (11) | Statement Regarding Computation of Per Share Earnings |
| | (12) | Statement Regarding Computation of Ratios |
| | (13) | Annual Report to Shareholders of Kmart Corporation for the Fiscal Year Ended January 28, 1998 |
| | (23) | Consent of Independent Accountants |
| | (27) | Financial Data Schedules |

Notes:

    *           Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal year ended January 27, 1993
(file
                number 1-327) and are incorporated herein by reference.

    **          Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal year ended January 26, 1994
(file
                number 1-327) and are incorporated herein by reference.

    ***         Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal year ended January 25, 1995
(file
                number 1-327) and are incorporated herein by reference.

    ****        Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal year ended January 31, 1996
(file
                number 1-327) and are incorporated herein by reference.

    *****       Filed as part of the 1996 Proxy Statement, and is incorporated herein by reference

    [#]         Exhibit numbers in the Form 10-K Reports for the fiscal
                years ended: January 27, 1993, January 26, 1994, January
                25, 1995, and January 31, 1996, respectively.

    [A]         This document is a management contract or compensatory plan.

</TABLE>


                                      10


<PAGE>   11




The Registrant agrees to furnish a copy to the Commission upon request of the
following instruments defining the rights of holders of long-term debt:

Indenture dated as of February 1, 1985, between Kmart Corporation and The Bank
of New York, Trustee, as supplemented by the First Supplemental Indenture dated
as of March 1, 1991


12-1/2% Debentures Due 2005
8-1/8% Notes Due 2006
7-3/4% Debentures Due 2012
8-1/4% Notes Due 2022
8-3/8% Debentures Due 2022
7.95% Debentures Due 2023
Fixed-Rate Medium-Term Notes (Series A, B, C, D)




                                      11


</TEXT>

</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(O)
<SEQUENCE>2
<DESCRIPTION>EXHIBIT-10.(O)
<TEXT>

<PAGE>    1

                                                          EXHIBIT 10(O)




                    KMART CORPORATION
                    1998 MANAGEMENT DEFERRED
                    COMPENSATION AND RESTORATION PLAN

                    (Effective January 1, 1998)




<PAGE>    2


CONTENTS

- -------------------------------------------------------------------------------
Article 1. Establishment and Purpose                             1

Article 2. Definitions                                           1

Article 3. Administration                                        6

Article 4. Eligibility and Participation                         7

Article 5. Voluntary Deferrals                                   7

Article 6. Mandatory Deferrals                                   8

Article 7. Savings Plan Deferral Restoration                     9

Article 8. Company 401(k) Match Restoration                      9

Article 9. Company Profit Sharing Restoration                   10

Article 10. Discretionary Company Credits                       11

Article 11. Participant Accounts and the Rabbi Trust            12

Article 12. Allocation of Prior Deferrals and Company Credits   14

Article 13. Beneficiary Designation                             15

Article 14. Withholding of Taxes                                15

Article 15. Replacement Assurance                          15

Article 16. Amendment and Termination                      16

Article 17. Miscellaneous                                  16

<PAGE>    3


KMART CORPORATION 1998 MANAGEMENT
DEFERRED COMPENSATION AND RESTORATION PLAN

ARTICLE 1. ESTABLISHMENT AND PURPOSE
    1.1 ESTABLISHMENT. Kmart Corporation, a Michigan corporation (together
with its participating subsidiaries, the "Company"), hereby establishes,
effective as of January 1, 1998 (the "Effective Date"), a deferred compensation
and savings restoration plan for key management employees as described herein,
which shall be known as the "Kmart Corporation 1998 Management Deferred
Compensation and Restoration Plan" (the "Plan").

    1.2 PURPOSE. The primary purpose of the Plan is to provide key management
employees of the Company with the opportunity to defer a portion of their
compensation and to restore certain retirement benefits lost due to statutory
limits imposed by the Code, subject to the terms of the Plan. By adopting the
Plan, the Company desires to enhance its ability to attract and retain key
management employees.

ARTICLE 2. DEFINITIONS
    2.1 DEFINITIONS. Whenever used herein, the following terms shall have the
meanings set forth below, and when the meaning is intended, the term is
capitalized:

    (a)    "Accrued Account Balances" means the then current aggregate
           account balances of a Participant through a specific date
           in question, including Voluntary Deferrals (as described in
           Article 5 hereof), Mandatory Deferrals (as described in
           Article 6 hereof), Savings Plan Deferral Restoration (as
           described in Article 7 hereof), Company 401(k) Match
           Restoration (as described in Article 8 hereof), Company
           Profit Sharing Restoration (as described in Article 9
           hereof), Discretionary Company Credits (as described in
           Article 10 hereof), and earnings thereon (as described in
           Article 11 hereof).

    (b)    "Accrued Rabbi Trust Obligations" means the then current
           Accrued Account Balances of all Participants through a
           specific date in question, except for amounts credited to
           Treasury Note Accounts.

    (c)    "Base Salary" means all regular basic wages earned by a
           Participant for services rendered during a Plan Year,
           before any deductions. (See Section 5.2 for an explanation
           of the amount of Base Salary that may be deferred by a Tier
           I Participant.)

    (d)    "Beneficial Ownership" has the same meaning ascribed to
           such term in Rule 13d-3 of the General Rules and
           Regulations under the Exchange Act.

    (e)    "Board" or "Board of Directors" means the Board of
           Directors of Kmart Corporation.


                                    1
    <PAGE>    4

    (f)    "Change in Control" of Kmart Corporation is deemed to have
           occurred as of the first day that any one or more of the
           following conditions shall have been satisfied:

           (i)    The "Beneficial Ownership" of securities
                  representing more than thirty-three percent (33%)
                  of the combined voting power of Kmart Corporation
                  is acquired by any "person" as defined in Sections
                  13(d) and 14(d) of the Exchange Act (other than
                  Kmart Corporation, any trustee or other fiduciary
                  holding securities under an employee benefit plan

1/28/2019      18-23538-shl    Doc 3560-2    Filed 05/03/19    Entered 05/03/19 10:30:54    Exhibit B -
Declaration of Artem Skorostensky in Support of Objection of Urban E    Pg 17 of 166

https://www.sec.gov/Archives/edgar/data/56824/0000950124-98-002149.txt

               directly or indirectly, by the stockholders of
Kmart Corporation in substantially the same
proportions as their ownership of stock of Kmart
Corporation); or

    (ii)    The stockholders of Kmart Corporation approve a
definitive agreement to merge or consolidate Kmart
Corporation with or into another corporation or to
sell or otherwise dispose of all or substantially
all of its assets, or adopt a plan of liquidation;
or

    (iii)   During any period of three consecutive years,
individuals who at the beginning of such period
were members of the Board cease for any reason to
constitute at least a majority thereof (unless the
election, or the nomination for election by the
stockholders of Kmart Corporation, of each new
director was approved by a vote of at least a
majority of the directors then still in office who
were directors at the beginning of such period or
whose election or nomination was previously so
approved).

(g)    "Closing Price" means the last price at which the Common
Stock shall have been sold on the specific date in
question, or if no such sale was made on such date then on
the next preceding day on which there was such a sale of
Common Stock. The price shall be as reported on the
Composite Transactions reporting system, or if not so
reported, as reported by the New York Stock Exchange.

(h)    "Code" means the Internal Revenue Code of 1986, as amended
from time to time.

(i)    "Committee" means the Compensation and Incentives Committee
of the Board (or such other committee as designated by the
Board as a successor thereto) which has the authority to
administer the Plan.

(j)    "Common Stock" means the common stock of Kmart Corporation.

(k)    "Company Stock Fund" has the same meaning ascribed to such
term in the Retirement Savings Plan.

(l)    "Compensation" has the same meaning ascribed to such term
in the Retirement Savings Plan. (See Section 7.2 for an
explanation of the amount of Compensation that may be
deferred by a Tier II Participant.)

2

&lt;PAGE&gt;    5

(m)    "Disability" has the same meaning ascribed to such term in
Kmart Corporation's long-term disability plan.

(n)    "Discretionary Company Credits Account" has the meaning set
forth in Section 10.2 hereof.

(o)    "Employee Directed Contributions" has the same meaning
ascribed to such term in the Retirement Savings Plan.

(p)    "Employer Matching Contributions" has the same meaning
ascribed to such term in the Retirement Savings Plan.

(q)    "ERISA" means the Employee Retirement Income Security Act
of 1974, as amended from time to time, or any successor
thereto.

(r)    "Exchange Act" means the Securities Exchange Act of 1934,
as amended from time to time, or any successor act thereto.

(s)    "Form of Payout" means a Participant's elected method of
payout. A Participant may choose from either (i) a Lump-Sum
Payment or (ii) Installment Payments. If no Form of Payout

Payment.

A Participant may at any time at least twelve (12) months
prior to a Payout Commencement Date, petition the Committee
to change the Form of Payout previously elected by such
Participant to a different Form of Payout otherwise
available under the Plan (i.e., a Lump-Sum Payment or
Installment Payments).

If a Participant remains employed with the Company through
a Payout Commencement Date, and if the Accrued Account
Balances payable on such Payout Commencement Date are less
than ten thousand dollars ($10,000), then, regardless of
any Form of Payout election(s) made by a Participant to
receive or continue to receive Installment Payments
thereon, such Accrued Account Balances shall be paid on
such Payout Commencement Date, or as soon as
administratively practicable thereafter, in a Lump-Sum
Payment.

If a Participant's employment with the Company terminates
for any reason and the Participant's Accrued Account
Balances payable on any coincident or future Payout
Commencement Date are individually less than ten thousand
dollars ($10,000) at the time of such termination of
employment, then all Accrued Account Balances payable on
such Payout Commencement Date(s) shall be paid in a
Lump-Sum Payment as soon as administratively practicable,
regardless of the Participant's previous elections.

If a Participant's employment with the Company terminates
due to Disability or death, and the Participant's Accrued
Account Balances payable on any coincident or future Payout
Commencement Date are individually equal to or greater than
ten thousand dollars ($10,000), such Participant, or such
Participant's estate, as the

3

<PAGE>    6

case may be, may petition the Committee to pay out all such
Accrued Account Balances in a single Lump-Sum Payment as
soon as administratively practicable regardless of the
Participant's previous elections. In the case of employment
termination due to Disability, the termination shall be
deemed to have occurred on the day that the Committee, or
the Committee's designee, determines the Disability to be
total and permanent. The decision of whether to allow for
an accelerated Lump-Sum Payment shall be at the discretion
of the Committee.

(t)    "Installment Payments" means a series of payments, from two
(2) up to twenty (20) approximately equal annual payments,
as elected by the Participant, to be made in cash with the
initial payment due within thirty (30) calendar days after
the applicable Payout Commencement Date elected by the
Participant. Each of the remaining Installment Payments
shall be made in cash each year thereafter on the
anniversary of such Payout Commencement Date, until all
Accrued Account Balances deferred to such Payout
Commencement Date have been paid in full. Earnings shall
continue to accrue on any remaining Accrued Account
Balances in the manner provided in Section 11.2 hereof
until all Accrued Account Balances deferred to such Payout
Commencement Date have been paid in full. The amount of
each Installment Payment shall be equal to the applicable
portion of the Accrued Account Balances remaining
immediately prior to each such payment, multiplied by a
fraction, the numerator of which is one (1), and the
denominator of which is the number of Installment Payments
remaining to be paid (including such payment).

(u)    "Investment Funds" has the same meaning ascribed to such
term in the Retirement Savings Plan.

(v)    "Lump-Sum Payment" means a single payment to be made in
cash within thirty (30) calendar days after the applicable

(w)     "Mandatory Deferral Account" has the meaning set forth in
        Section 6.1 hereof.

(x)     "Match Restoration Account" has the meaning set forth in
        Section 8.2 hereof.

(y)     "Participant" means any Tier I Participant or Tier II
        Participant.

(z)     "Payout Commencement Date" means a date irrevocably elected
        by a Participant, or as otherwise provided herein, upon
        which payment of Accrued Account Balances begins.

        A Payout Commencement Date shall be no earlier than one
        year following the end of the year in which amounts
        deferred hereunder are otherwise earned, and no later than
        the January following the Participant's sixty-fifth (65th)
        birthday. No limit exists on the number of different Payout
        Commencement Dates that can be elected by each Participant.


                                    4

<PAGE>     7


        If no Payout Commencement Date is specified by a
        Participant for any Voluntary Deferrals or Savings Plan
        Deferral Restorations, then payout of these amounts shall
        occur in the January following the Participant's
        termination of employment.

        All Company Profit Sharing Restoration and Company 401(k)
        Match Restoration shall automatically be paid out beginning
        in the January following the Participant's termination of
        employment.

(aa)    "Plan Year" means the calendar year.

(ab)    "Predecessory Deferral/Restoration Arrangements" has the
        meaning set forth in Article 12 hereof.

(ac)    "Profit Sharing Contributions" has the same meaning
        ascribed to such term in the Retirement Savings Plan.

(ad)    "Profit Sharing Restoration Account" has the meaning set
        forth in Section 9.2 hereof.

(ae)    "Rabbi Trust" means a grantor trust, as intended by
        Sections 671-678 of the Code, established by Kmart
        Corporation for the benefit of Participants and their
        beneficiaries.

(af)    "Retirement Savings Plan" means the Kmart Corporation
        Retirement Savings Plan B.

(ag)    "Retirement Savings Plan Deferral Restoration Account" has
        the meaning set forth in Section 7.2 hereof.

(ah)    "Stock Unit" means a bookkeeping entry for the value of the
        Common Stock equal to the Closing Price of the Common Stock
        on a specific day.

(ai)    "Stock Unit Subaccount" means the bookkeeping account
        established for a Participant which is credited with Stock
        Units equal to the number of shares of Common Stock
        (including fractions of a share) that could have been
        purchased with the corresponding amount of Company 401(k)
        Match Restoration (as provided under Article 8 hereof) at
        the Closing Price of the shares of Common Stock on the date
        as of which such Stock Unit Subaccount is so credited. The
        Stock Unit Subaccount shall be reduced in a similar manner
        as of the day that any amount is distributed, based on the
        Closing Price of the Common Stock on the date in question.

        As of the date any dividend is paid to holders of shares of
        Common Stock, a Participant's Stock Unit Subaccount shall

of shares of Common Stock (including fractions of a share)
that could have been purchased, at the Closing Price of a
share of Common Stock on such date, with the amount that
would have been paid as dividends on that

5

&lt;PAGE&gt;    8

number of shares of Common Stock (including fractions of a
share) which is equal to the number of Stock Units
attributable to the Participant's Stock Unit Subaccount as
of the record date of such dividend. In the case of
dividends paid in property, the amount of the dividend
shall be deemed to be the fair market value of the property
at the time of the payment thereof, as determined by the
Committee. A distribution from the Stock Unit Subaccount
shall be paid in an amount of cash equal to the product of
(i) the number of Stock Units distributable and (ii) the
Closing Price.

(aj)    "Tier I Participant" means each key management employee
designated by the Board as a Senior Officer of the Company,
each Divisional Vice President, each Operations Vice
President, each Regional Vice President, and each other
person so designated by the Committee.

(ak)    "Tier II Participant" means each key management employee of
the Company, except for Tier I Participants, who (i) is
qualified to participate in the Retirement Savings Plan;
and (ii) experiences a cutback in Employee Directed
Contributions, Employer Matching Contributions, and/or
Profit Sharing Contributions due to the limitations imposed
by the Code; and (iii) meets such other qualification
standards (including pay level) as determined by the
Committee from time to time, and who is thereby selected
for participation in the Plan by the Committee.

(al)    "Treasury Note Account" means a separate bookkeeping
account not funded by the Rabbi Trust, to be maintained by
the Company, that shall offer a rate of return equal to the
average ten (10) year U.S. Treasury Note rate for the most
recently ended calendar quarter plus five percent (5%).

(am)    "Voluntary Deferral Account" has the same meaning set forth
in Section 5.2 hereof.

2.2 GENDER AND NUMBER. Except where otherwise indicated by the context,
any masculine term used herein shall include the feminine, the plural shall
include the singular, and the singular shall include the plural.

ARTICLE 3. ADMINISTRATION
3.1 ADMINISTRATION OF THE PLAN. The Plan shall be administered by the
Committee except as limited by law or by the Articles of Incorporation or the
Bylaws of Kmart Corporation. Subject to the terms hereof, the Committee shall
have full power to (a) determine the terms and conditions of each Participant's
participation in the Plan; (b) construe and interpret the Plan and any agreement
or instrument entered into under the Plan; (c) establish, amend, or waive rules
and regulations for the Plan's administration; (d) amend (subject to the
provisions of Article 16 hereof) the terms and conditions of the Plan and any
agreement or instrument entered into under the Plan; (e) designate one or more
persons to administer the Plan; and (f) make other determinations which may be
necessary or advisable for the administration of the Plan.

6

&lt;PAGE&gt;    9

3.2 DECISIONS BINDING. All determinations and decisions of the Committee
as to any disputed question arising under the Plan, including questions of
construction and interpretation, shall be final, conclusive, and binding on all
parties.

ARTICLE 4.

4.1 ELIGIBILITY. Eligibility to participate in the Plan shall be limited to Tier I Participants and Tier II Participants. In the event a Participant no longer meets the requirements for eligibility to participate in the Plan, such Participant shall become an inactive Participant retaining all of the rights described under the Plan pertaining to such Participant's then Accrued Account Balances, except the right to make any further deferrals hereunder and the right to receive any further Company credits. An inactive Participant may become an active Participant again in the future.

4.2 PARTICIPATION. When a Participant first becomes eligible to participate in the Plan, such Participant shall, as soon as practicable thereafter, be notified of his or her eligibility to participate. At such time, or as soon as administratively practicable thereafter, all Participants shall be provided with deferral and investment election form(s); such election forms must be completed and returned, within the time period specified, to the Company in order for the Participant to participate in the Plan.

ARTICLE 5. VOLUNTARY DEFERRALS

5.1 PARTICIPATION. Eligibility to defer Base Salary pursuant to the terms of this Article 5 shall be limited to Tier I Participants.

5.2 DEFERRAL. Prior to the beginning of the Plan Year in which the Base Salary is otherwise earned, each Tier I Participant may voluntarily elect to defer up to one hundred percent (100%) of his or her Base Salary for that Plan Year. Subject to the terms hereof, such election shall be irrevocable for the Plan Year in question. Amounts deferred pursuant to this Section 5.2, and earnings thereon, shall be credited to such Participant's Voluntary Deferral Account. Each Participant shall be one hundred percent (100%) vested in amounts deferred pursuant to this Section 5.2, and earnings thereon, at all times.

Notwithstanding anything herein to the contrary, the amount of Base Salary that a Tier I Participant may defer pursuant to this Section 5.2 shall be limited by (a) amounts deferred pursuant to the Retirement Savings Plan; (b) amounts withheld for applicable federal, state, and local taxes; (c) amounts deducted pursuant to any insurance or benefit program; (d) voluntary payroll deductions (e.g., United Way contributions); (e) involuntary payroll deductions (e.g., garnishments); and (f) all other proper deductions, as determined by the Committee.

5.3 PARTIAL PLAN YEAR PARTICIPATION. In the event a Tier I Participant first becomes eligible to participate in the Plan after the beginning of a Plan Year, the Committee may, in its discretion, allow such Participant to complete a deferral election form and investment election form within thirty (30) calendar days of becoming eligible to participate.

7

<PAGE> 10

5.4 DEFERRAL ELECTION. Tier I Participants shall make elections to defer Base Salary prior to the beginning of the Plan Year in which the Base Salary is otherwise earned, or not later than thirty (30) calendar days following notification of initial eligibility to participate for a partial Plan Year, as applicable. The deferral election shall apply only to Base Salary earned subsequent to the first day of the month following the date on which a valid deferral election form is received by the Committee or the Committee's designee. Each such election shall indicate the following:

      (a)    The amount of Base Salary earned during the Plan Year to be deferred, which shall be irrevocable pursuant to Section 5.2 hereof;

      (b)    The Payout Commencement Date for the deferred Base Salary, and earnings thereon, which shall be irrevocable pursuant to Section 5.5 hereof; and

      (c) The Form of Payout pursuant to Section 2.1(s) hereof.

5.5 LENGTH OF DEFERRAL AND FORM OF PAYOUT. Subject to Section 2.1(z) hereof, each Tier I Participant may irrevocably elect the length of deferral of Base Salary deferred each Plan Year by designating a corresponding Payout Commencement Date for such deferral. The Form of Payout will be as elected by such Participant pursuant to Section 2.1(s) hereof.

ARTICLE 6. MANDATORY DEFERRALS

6.1 DEFERRAL. If the Committee in its discretion determines that, with respect to any tax year, a Participant is a "covered employee" for purposes of Section 162(m) of the Code, the Committee shall impose a mandatory deferral of

such amounts meet the definition of "applicable employee remuneration" (as such
term is defined in Section 162(m) of the Code) and such amounts exceed
$1,000,000 (or such other amount as may be specified by Section 162(m) from time
to time) as determined by the Committee.

Amounts required to be deferred pursuant to this Section 6.1 shall be
credited to such Participant's Mandatory Deferral Account. Each Participant
shall be one hundred percent (100%) vested in amounts deferred pursuant to this
Section 6.1, and earnings thereon, at all times.

6.2 LENGTH OF DEFERRAL. All amounts deferred pursuant to Section 6.1
hereof, and earnings thereon, shall be paid out to the Participant on the
earliest date on which such amounts can be received by such Participant without
subjecting the Company to a loss of deductibility (due to Section 162(m) of the
Code) with respect to any part of such amounts. However, subject to Section
2.1(z) hereof, a Participant can make an irrevocable election to have these
amounts deferred to a later Payout Commencement Date at which time no loss of
the Company deduction would occur (due to Section 162(m)); such election must be
made prior to lapse of the restriction set forth in this Section 6.2.

6.3 FORM OF PAYOUT. Subject to Sections 6.2 and 6.4 hereof, the payout of
Mandatory Deferrals, and earnings thereon, will be in a Lump-Sum Payment to the
extent not deferred by the Participant to a Payout Commencement Date. If
deferred to a Payout Commencement Date, the Form of Payout will be as elected by
such Participant pursuant to Section 2.1(s) hereof.

<div align="center">8</div>

<PAGE>    11

6.4 COMMITTEE DISCRETION. In the event that any payment under this Plan
would cause the Company a loss of deductibility (due to Section 162(m)), the
Committee reserves the right hereunder to (i) delay such payment; (ii) require
additional mandatory deferrals to offset such payment; or (iii) to take any
other action necessary and appropriate to avoid such loss of deductibility.

ARTICLE 7. SAVINGS PLAN DEFERRAL RESTORATION
7.1 PARTICIPATION. Eligibility to defer Compensation pursuant to the terms
of this Article 7 shall be limited to Tier II Participants.

7.2 DEFERRAL. Prior to the beginning of the Plan Year in which the
Compensation is otherwise earned, each Tier II Participant may voluntarily elect
to defer up to ten percent (10%) of his or her Compensation for that Plan Year.
Subject to the terms hereof, such election shall be irrevocable for the Plan
Year in question. Amounts deferred pursuant to this Section 7.2, and earnings
thereon, shall be credited to such Participant's Retirement Savings Plan
Deferral Restoration Account. Each Participant shall be one hundred percent
(100%) vested in amounts deferred pursuant to this Section 7.2, and earnings
thereon, at all times.

7.3 PARTIAL PLAN YEAR PARTICIPATION. In the event a Tier II Participant
first becomes eligible to participate in the Plan after the beginning of a Plan
Year, such Participant must wait until the following Plan Year to be eligible to
make deferrals pursuant to this Article 7.

7.4 DEFERRAL ELECTION. Tier II Participants shall make elections to defer
Compensation prior to the beginning of the Plan Year in which the Compensation
is otherwise earned. Each such election shall indicate the following:

(a)    The amount of Compensation (up to ten percent (10%)) earned
       during the Plan Year to be deferred, which shall be
       irrevocable pursuant to Section 7.2 hereof;

(b)    The Payout Commencement Date for the deferred Compensation,
       and earnings thereon, which shall be irrevocable pursuant
       to Section 7.5 hereof; and

(c)    The Form of Payout, pursuant to Section 2.1(s) hereof.

7.5 LENGTH OF DEFERRAL AND FORM OF PAYOUT. Subject to Section 2.1(z)
hereof, each Tier II Participant may irrevocably elect the length of deferral of
Compensation deferred each Plan Year by designating a corresponding Payout
Commencement Date for such deferral, and earnings thereon. The Form of Payout
will be as elected by such Participant pursuant to Section 2.1(s) hereof.

ARTICLE 8. COMPANY 401(K) MATCH RESTORATION

are eligible to participate in the Retirement Savings Plan and experience a
cutback in Employer Matching Contributions due to the limitations imposed by the
Code, and Tier II Participants, who are employed with the Company at the
beginning of a Plan Year, shall be eligible to receive Company credits pursuant
to this Article 8 for such Plan Year.

<center>9</center>

        8.2 COMPANY 401(K) MATCH RESTORATION. For each Plan Year in which an
employee is eligible to receive Company credits pursuant to this Article 8, the
Company will credit to such Participant's Match Restoration Account an amount
equal to the excess of (a) over (b):

        (a)    The Employer Matching Contribution that would have been
               credited to the Participant's account for that Plan Year
               under the Retirement Savings Plan had the contribution been
               based on the Participant's total Compensation for the Plan
               Year (including all deferred compensation), unreduced by
               tax-qualified plan limits of the Code, and increased by
               amounts deferred pursuant to the Retirement Savings Plan.

        (b)    The actual Employer Matching Contribution credited to the
               Participant's account for that Plan Year under the
               Retirement Savings Plan.

        Each Participant hired before April 1, 1997 shall be one hundred percent
(100%) vested in amounts credited to such Participant's Match Restoration
Account pursuant to this Section 8.2, and earnings thereon, at all times; each
Participant hired on or after April 1, 1997 shall become one hundred percent
(100%) vested in amounts credited to such Participant's Match Restoration
Account pursuant to this Section 8.2, and earnings thereon, upon the date such
Participant becomes one hundred percent (100%) vested in Employer Matching
Contributions credited to such Participant under the Retirement Savings Plan.
Notwithstanding the immediately preceding sentence, a Participant, who is an
active employee of the Company, automatically becomes one hundred percent (100%)
vested in amounts credited to such Participant's Match Restoration Account
pursuant to this Section 8.2, and earnings thereon, upon such Participant's
sixty-fifth (65th) birthday or death.

        8.3 PARTIAL PLAN YEAR PARTICIPATION. In the event a Participant first
becomes eligible to participate in the Plan after the beginning of a Plan Year,
such Participant must wait until the following Plan Year to be eligible to
accrue Company credits pursuant to this Article 8. Notwithstanding the
immediately preceding sentence, the Committee may, in its discretion, allow such
Participant to participate during such partial Plan Year.

        8.4 LENGTH OF DEFERRAL AND FORM OF PAYOUT. Subject to Section 2.1(z)
hereof, any vested amounts credited to a Participant's Match Restoration Account
pursuant to Section 8.2 hereof, and earnings thereon, shall be paid out to the
Participant beginning in the January following such Participant's termination of
employment with the Company. The Form of Payout will be as elected by such
Participant pursuant to Section 2.1(s) hereof.

ARTICLE 9. COMPANY PROFIT SHARING RESTORATION
        9.1 PARTICIPATION. Subject to Section 9.3 hereof, Tier I Participants, who
are eligible to participate in the Retirement Savings Plan and experience a
cutback in Profit Sharing Contributions due to the limitations imposed by the
Code, and Tier II Participants, who are employed with the Company on December 31
of a Plan Year, shall be eligible to receive Company credits pursuant to this
Article 9 for such Plan Year.

<center>10</center>

        9.2 COMPANY PROFIT SHARING RESTORATION. For each Plan Year in which an
employee is eligible to receive Company credits pursuant to this Article 9, the
Company will credit to such Participant's Profit Sharing Restoration Account an
amount equal to the excess of (a) over (b):

        (a)    The Profit Sharing Contribution that would have been
               credited to the Participant's account for the Plan Year
               under the Retirement Savings Plan had the contribution been

Year (including all deferred compensation), unreduced by
tax-qualified plan limits of the Code, and increased by
amounts deferred pursuant to the Retirement Savings Plan.

       (b)    The actual Profit Sharing Contribution credited to the
Participant's account for that Plan Year under the
Retirement Savings Plan.

Each Participant shall become one hundred percent (100%) vested in amounts
credited to such Participant's Profit Sharing Restoration Account pursuant to
this Section 9.2, and earnings thereon, automatically upon the first to occur of
(a) five (5) years of service with the Company; (b) such Participant's
sixty-fifth (65th) birthday; or (c) such Participant's death.

Company credits credited to Participants pursuant to this Section 9.2
shall in no way reduce amounts available to the Company to make Profit Sharing
Contributions under the Retirement Savings Plan.

9.3 PARTIAL PLAN YEAR PARTICIPATION. In the event a Participant first
becomes eligible to participate in the Plan after the beginning of a Plan Year,
such Participant must wait until the following Plan Year to be eligible to
accrue Company credits pursuant to this Article 9. Notwithstanding the
immediately preceding sentence, the Committee may, in its discretion, allow such
Participant to participate during such partial Plan Year.

9.4 LENGTH OF DEFERRAL AND FORM OF PAYOUT. Subject to Section 2.1(z)
hereof, any vested amounts credited to a Participant's Profit Sharing
Restoration Account pursuant to Section 9.2 hereof, and earnings thereon, shall
be paid out to the Participant beginning in the January following such
Participant's termination of employment with the Company. The Form of Payout
will be as elected by such Participant pursuant to Section 2.1(s) hereof.

ARTICLE 10. DISCRETIONARY COMPANY CREDITS
10.1 PARTICIPATION. Employees designated by the Committee in its
discretion are eligible to receive Company credits pursuant to this Article 10.

10.2 DISCRETIONARY COMPANY CREDITS. In addition to the Company 401(k)
Match Restoration and Company Profit Sharing Restoration, as set forth in
Sections 8.2 and 9.2 hereof, the Committee in its discretion may cause
additional Company credits to be credited to the Discretionary Company Credits
Account of any Participant, or group of Participants, for any reason whatsoever.
The Committee shall establish rules and procedures for, and the terms of, such
credits.

11

&lt;PAGE&gt;  14

ARTICLE 11. PARTICIPANT ACCOUNTS AND THE RABBI TRUST
11.1 PARTICIPANT ACCOUNTS. The Company shall establish and maintain
individual bookkeeping accounts for each Participant's Accrued Account Balances.
Each component of a Participant's Accrued Account Balances shall be credited to
such Participant's bookkeeping account as soon as administratively practicable
following the date such credits can first be calculated. The establishment and
maintenance of such accounts, however, shall not be construed as entitling any
Participant to any specific asset of the Company.

Each Participant who has a balance in any account will be furnished a
statement of his or her Accrued Account Balances at least annually.

11.2 INVESTMENT ELECTIONS. All Accrued Account Balances shall be credited
with earnings based upon the rate of return actually achieved by the underlying
investments, as described in this Section 11.2.

       (a) Amounts credited to a Participant's Voluntary Deferral Account
shall be invested as elected by such Participant in one or more Investment
Funds, except the Company Stock Fund and other investment choices excluded
due to applicable law or regulation or by action of the Committee.

       (b) Amounts credited to a Participant's Mandatory Deferral Account
shall be invested as elected by the Participant in one or more Investment
Funds, except the Company Stock Fund and other investment choices excluded
due to applicable law or regulation or by action of the Committee.
Notwithstanding the immediately preceding sentence, amounts credited to
the Mandatory Deferral Account of a Participant who has a preexisting
Treasury Note Account balance, due to credits to such Treasury Note
Account pursuant to Section 12(b) hereof, shall continue to be invested in
such Participant's Treasury Note Account, unless the Participant elects to

except the Company Stock Fund and other investment choices excluded due to
applicable law or regulation or by action of the Committee. Amounts
deferred into the Treasury Note Account shall be general asset obligations
of the Company, and shall not be eligible for payment out of Rabbi Trust
assets. Once a Participant who has a balance in his or her Treasury Note
Account elects to have amounts deferred pursuant to Section 6.1 hereof
invested in anything other than the Treasury Note Account, then such
Participant may never again elect to have amounts deferred pursuant to
Section 6.1 hereof invested in the Treasury Note Account. Notwithstanding
anything herein to the contrary, once the restriction set forth in Section
6.2 hereof is no longer applicable to a Participant, any amounts invested
in the Treasury Note Account shall thereafter be invested as elected by
such Participant in one or more Investment Funds, except the Company Stock
Fund and other investment choices excluded due to applicable law or
regulation or by action of the Committee.

        (c) Amounts credited to a Participant's Match Restoration Account
shall be automatically invested in the Stock Unit Subaccount. Once a
Participant reaches age fifty-five (55), all or any part of amounts
credited both before or after age fifty-five (55), to such Participant's
Match Restoration Account shall be invested as elected by each Participant
in either (i) the Stock Unit Subaccount; or (ii) one or more Investment
Funds, except the Company Stock

                                12
<PAGE>    15

Fund and other investment choices excluded due to applicable law or
regulation or by action of the Committee. No such transfer is allowed
prior to a Participant's fifty-fifth (55th) birthday. A Participant may
not transfer amounts into the Stock Unit Subaccount from any other
account. Once amounts are transferred out of the Stock Unit Subaccount,
they cannot be transferred back into this investment choice.

        (d) Amounts credited to a Participant's Profit Sharing Restoration
Account shall be invested as elected by such Participant in one or more
Investment Funds, except the Company Stock Fund and other investment
choices excluded due to applicable law or regulation or by action of the
Committee.

        (e) Amounts credited to a Participant's Retirement Savings Plan
Deferral Restoration Account shall be invested as elected by such
Participant in one or more Investment Funds, except the Company Stock Fund
and other investment choices excluded due to applicable law or regulation
or by action of the Committee.

        (f) Amounts credited to a Participant's Discretionary Company
Credits Account shall be invested pursuant to the rules and procedures
determined by the Committee in its discretion.

    Participants shall be permitted to change their investment elections in
the same frequency as participants under the Retirement Savings Plan.

    Notwithstanding anything herein to the contrary, the Committee reserves
the right to (a) change the number and availability of the investment
alternatives at any time; and (b) not actually invest deferrals and/or Company
credits into the investment alternatives elected by each Participant.

    11.3 CHARGES AGAINST ACCOUNTS. There shall be charged against each
Participant's Accrued Account Balances any payments made thereunder to the
Participant or to his or her beneficiary.

    11.4 ESTABLISHMENT OF A RABBI TRUST. As soon as administratively
practicable following the Effective Date, Kmart Corporation shall establish an
irrevocable Rabbi Trust, governed by a Rabbi Trust Agreement (which shall be a
grantor trust within the meaning of Code Sections 671-678) for the benefit of
Participants and beneficiaries of Participants, as appropriate and applicable.
The Rabbi Trust shall have an independent Trustee (such Trustee to have a
fiduciary duty to carry out the terms and conditions of the Trust) as selected
by the Company, and shall have restrictions as to the Company's ability to amend
the Trust or to cancel benefits provided thereunder.

    Assets contained in the Rabbi Trust shall at all times be specifically
subject to the claims of Kmart Corporation's general creditors in the event of
insolvency; such term shall be specifically defined within the provisions of the
Rabbi Trust, along with a required procedure for notifying the Trustee of any
such insolvency.

All benefits hereunder, except for benefits associated with the Treasury
Note Account, shall be paid first from the Rabbi Trust, to the extent assets
exist in the Rabbi Trust and then, as necessary, by Kmart Corporation from
general assets. All amounts payable pursuant to the Treasury Note Account shall
be paid by Kmart Corporation from general assets.

                                    13
<PAGE>   16


        11.5 FUNDING OF THE RABBI TRUST. At the discretion of the Committee, Kmart
Corporation may contribute cash, cash equivalents, and/or Kmart Stock to the
Rabbi Trust, for the benefit of Participants and beneficiaries of Participants,
as the Committee deems appropriate. It is intended that the Rabbi Trust will be
fully funded at all times to cover the Accrued Rabbi Trust Obligations of Kmart
Corporation. Upon a Change in Control, Kmart Corporation shall be required to
make an immediate contribution to the Rabbi Trust to cause all Accrued Rabbi
Trust Obligations to be fully or overfunded as of that date.

ARTICLE 12. ALLOCATION OF PRIOR DEFERRALS AND COMPANY CREDITS
        Any outstanding Participant deferrals and Company 401(k) match or profit
sharing restoration amounts, and earnings thereon, credited to any Participant
account under either the Kmart Corporation Supplemental Savings Plan or the
Kmart Corporation Executive Deferred Compensation Plan (together the
"Predecessory Deferral/Restoration Arrangements"), as of the Effective Date of
this Plan, shall be withdrawn and automatically transferred to such
Participant's account under this Plan within ninety (90) calendar days from the
Effective Date, or as soon as otherwise administratively practicable.

        Amounts transferred pursuant to this Article 12 shall be invested as
follows:

        (a)     Amounts transferred, and earnings thereon, that meet the
                definition of Employer Matching Contributions and that were
                originally credited to a Participant under the Kmart Corporation
                Supplemental Savings Plan shall be invested pursuant to Section
                11.2(c) hereof;

        (b)     Amounts transferred, and earnings thereon, that meet the
                definition of Mandatory Deferrals and that were originally
                credited to a Participant pursuant to Section 2(b) of the Kmart
                Corporation Executive Deferred Compensation Plan shall be invested
                as elected by the Participant either (i) solely in the Treasury
                Note Account; or (ii) in one or more Investment Funds, except the
                Company Stock Fund and other investment choices excluded due to
                applicable law or regulation or by action of the Committee; and

        (c)     All other amounts transferred, and earnings thereon, shall be
                invested as elected by the Participant in one or more Investment
                Funds, except the Company Stock Fund and other investment choices
                excluded due to applicable law or regulation or by action of the
                Committee.

        By no later than the end of the first Plan Year, Kmart Corporation shall
contribute cash, cash equivalents, and/or Common Stock of Kmart Corporation to
the Rabbi Trust for the benefit of Participants in an amount equal to the amount
of all deferrals and Company credits, and earnings thereon, accrued in prior
years under Predecessory Deferral/Restoration Arrangements except outstanding
credits to the Treasury Note Account.

        It is intended that this Plan replace the PredecessoryDeferral/Restoration
Arrangements. No Participant will be allowed to defer any amounts or accrue any
benefits under the Predecessory Deferral/Restoration Arrangements after the
Effective Date hereof.

                                    14
<PAGE>   17


ARTICLE 13. BENEFICIARY DESIGNATION
        13.1 DESIGNATION OF BENEFICIARY. Each Participant may designate or change
a beneficiary or beneficiaries who, upon the Participant's death, will receive
the amounts that otherwise would have been paid to the Participant under the
Plan. All such designations and any changes thereto shall be signed by the
Participant, and shall be in such form as prescribed by the Committee. Each

designated by the Committee. The payment of an amount equal to the amount that
otherwise would have been paid to the Participant shall be paid in accordance
with the last unrevoked written designation of beneficiary that has been signed
by the Participant and delivered by the Participant to the Company's designee
prior to the Participant's death.

13.2 DEATH OF BENEFICIARY. In the event that all the beneficiaries named
by a Participant, pursuant to Section 13.1 hereof, predecease the Participant,
the amount that otherwise would have been paid to the Participant or the
Participant's beneficiaries under the Plan shall be paid to the Participant's
estate or the person designated by the Participant's estate.

13.3 INEFFECTIVE DESIGNATION. In the event a Participant does not
designate a beneficiary, or for any reason such designation is ineffective, in
whole or in part, the amounts that otherwise would have been paid to the
Participant or the Participant's beneficiaries under the Plan shall be paid to
the person or persons the Participant designated as the beneficiary or
beneficiaries under the Retirement Savings Plan, and if no such designation was
made, then to the Participant's estate or the person designated by the
Participant's estate.

13.4 INDEMNITY. The Company may require an indemnity and/or evidence or
other assurances as it deems necessary in connection with any payment hereunder
to a Participant's beneficiary, estate, legal representative, or guardian.

ARTICLE 14. WITHHOLDING OF TAXES
      The Company shall have the right to require Participants to remit to the
Company, or any person or entity designated by the Committee to administer the
Plan, an amount sufficient to satisfy federal, state, and local tax withholding
requirements, or to deduct from all payments made pursuant to the Plan amounts
sufficient to satisfy such withholding requirements.

ARTICLE 15. EMPLOYMENT/MISCONDUCT
      15.1 EMPLOYMENT. No provision of the Plan, nor any action taken by the
Committee or the Company pursuant to the Plan, shall give or be construed as
giving a Participant any right to be retained in the employ of the Company, or
affect or limit in any way the right of the Company to terminate his or her
employment.

      15.2 MISCONDUCT. Notwithstanding anything hereof to the contrary, all
rights with respect to the Accrued Account Balances of a Participant are subject
to the conditions that the Participant not engage or have engaged (a) in fraud,
dishonesty, conduct in violation of Company policy, or similar acts at any time
while an employee of the Company; or (b) in activity directly or indirectly in
competition with any business of the Company, or in other conduct inimical to
the best interests of the Company during or following the Participant's
employment with the Company. If it is determined

                                   15
<PAGE>  18

by the Committee, either before or after termination of employment of a
Participant, that there has been a failure of any such conditions, the Committee
shall:

            (a)    Withhold, and such Participant shall forfeit all rights
                   with respect to, all amounts then remaining in such
                   Participant's Match Restoration Account, Profit Sharing
                   Restoration Account, and/or Discretionary Company Credits
                   Account; and

            (b)    Accelerate the payout of all amounts then remaining in such
                   Participant's Mandatory Deferral Account, Voluntary
                   Deferral Account, and/or the Retirement Savings Plan
                   Deferral Restoration Account to a date to be determined by
                   the Committee in its discretion.

ARTICLE 16. AMENDMENT AND TERMINATION
      The Company hereby reserves the right to amend, suspend, or terminate the
Plan at any time by action of the Board, in its sole discretion. No such
amendment, suspension, or termination shall in any material manner adversely
affect any Participant's rights to amounts theretofore accrued and payable
hereunder, without the written consent of the Participant.

ARTICLE 17. MISCELLANEOUS
      17.1 FINANCIAL OR MEDICAL HARDSHIP. The Committee shall have the authority
to alter the timing or manner of payment of Accrued Account Balances in the

event that https://www.sec.gov/Archives/edgar/data/56824/0000950124-98-002149.txt
severe financial or medical hardship. In such event, the Committee may, in its
discretion:

    (a)  Authorize the cessation of Voluntary Deferrals pursuant to
Section 5.2 hereof, and Savings Plan Deferral Restoration
amounts pursuant to Section 7.2 hereof;

    (b)  Provide that all, or a portion, of the Accrued Account
Balances shall immediately be paid in cash in a Lump-Sum
Payment; and/or

    (c)  Provide that all, or a portion of, Installment Payments
payable over a period of time shall instead be paid
immediately in cash in a Lump-Sum Payment; and/or

    (d)  Provide for such other payment schedule as deemed
appropriate by the Committee under the circumstances.

However, the amount paid pursuant to this Section 17.1 shall not exceed
that amount which the Committee determines to be reasonably necessary for the
Participant to meet the financial or medical hardships at the time of such
payment. The severity of the financial or medical hardship shall be judged by
the Committee. Severe financial or medical hardship will be deemed to exist in
the event of the Participant's long and serious illness, impending bankruptcy,
or similar unforeseeable and extraordinary circumstances arising as a result of
events beyond the control of the Participant. The Committee's decision with
respect to the severity of financial or medical hardship and the manner in
which, if at all, the Participant's future deferral opportunities hereunder
shall cease, and/or the manner in which, if at all, the payment of Accrued
Account Balances to the Participant shall be altered or modified, shall be
final, conclusive, and not subject to appeal.

16

<PAGE>   19

17.2 NOTICE. Any notice or filing required or permitted to be given to the
Company under the Plan shall be sufficient if in writing and hand delivered, or
sent by registered or certified mail to the Chairman of the Committee or the
Committee's designee. Such notice, if mailed, shall be addressed to the
principal executive offices of Kmart Corporation. Notice mailed to a Participant
shall be at the last known address as is given in the records of Kmart
Corporation. Notices shall be deemed given as of the date of delivery or, if
delivery is made by mail, as of the date shown on the postmark on the receipt
for registration or certification.

17.3 UNFUNDED PLAN. This Plan is intended to be an unfunded plan
maintained primarily to provide deferred compensation benefits for "a select
group of management or highly compensated employees" within the meaning of
Sections 201, 301, and 401 of ERISA, and therefore is further intended to be
exempt from the provisions of Parts 2, 3, and 4 of Title I of ERISA.
Accordingly, the Committee may terminate the Plan for any or all Participants,
subject to Article 16 hereof, in order to achieve and maintain this intended
result.

17.4 SUCCESSORS. All obligations of Kmart Corporation under the Plan shall
be binding on any successor to Kmart Corporation, whether the existence of such
successor is the result of a direct or indirect purchase, merger, consolidation,
or otherwise, of all or substantially all of the business and/or assets of Kmart
Corporation.

17.5 NONTRANSFERABILITY. Participants' rights to Accrued Account Balances
under the Plan may not be sold, transferred, assigned, or otherwise alienated or
hypothecated, other than pursuant to Article 13 hereof or by will or by the laws
of descent and distribution. In no event shall Kmart Corporation make any
payment under the Plan to any assignee or creditor of a Participant.

17.6 SEVERABILITY. In the event any provision of the Plan shall be held
illegal or invalid for any reason, the illegality or invalidity shall not affect
the remaining parts of the Plan, and the Plan shall be construed and enforced as
if the illegal or invalid provision had not been included.

17.7 COSTS OF THE PLAN. All costs of implementing and administering the
Plan shall be borne by Kmart Corporation.

17.8 OTHER PERMITTED DEFERRAL OPPORTUNITIES. The Committee may, in its
discretion, permit a Participant to defer such Participant's receipt, if any, of
the payment of cash or the delivery of capital stock of Kmart Corporation that

would otherwise be entitled under the Participant's deferral elections under the
Kmart Corporation Long-Term Equity Compensation Plan, or any other stock plan of
the Company, and any successor plans thereto. If any such deferral is permitted,
the Committee shall establish rules and procedures for such deferrals.

    17.9 GOVERNING LAW. The Plan shall be governed by and construed in
accordance with the laws of the State of Michigan without giving effect to any
choice or conflict of law provision or rule.


Effective Date: January 1, 1998



                              17
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-11
<SEQUENCE>3
<DESCRIPTION>EXHIBIT 11
<TEXT>

<PAGE>   1


                                                        EXHIBIT 11



                           KMART CORPORATION
                INFORMATION ON COMPUTATION OF PER SHARE EARNINGS
<TABLE>
<CAPTION>


($ Millions)                                                      Fiscal Year Ended
-----                                            -----------------------------------------------------------

26,                                              January 28,  January 29,  January 31,  January 25,  January

                                                    1998         1997        1996*        1995*       1994*
-----                                            -----------------------------------------------------------
<S>                                                 <C>          <C>          <C>          <C>          <C>
I.  Basic earnings per common share:

Income (loss) from continuing operations before
  extraordinary item and the effect of accounting changes  $  249    $  231    $(230)     $  96      $(179)
Less:  Series B and C convertible preferred shares dividend    --        --        (6)        (9)        (9)
 payment                                          -----------------------------------------------------------
-----

(a)  Income (loss) available to common shareholders from continuing
     operations before extraordinary item            249         231       (236)         87       (188)
     and the effect of accounting changes
(b)  Discontinued operations including the effect of accounting
     changes, net of income taxes                     --          (5)      (260)         83       (234)
(c)  Gain (loss) on disposal of discontinued operations,
     net of income taxes                              --        (446)       (30)        117       (520)
(d)  Extraordinary item, net of income taxes          --          --        (51)         --        (10)
(e)  Effect of accounting changes, net of income taxes  --        --         --          --        (31)
-----                                            -----------------------------------------------------------

(f)  Adjusted net income (loss) (1)               $  249    $ (220)    $(577)     $  287     $(983)


                                                 ===========================================================
(g)  Weighted average common shares outstanding   487.1       483.6      459.8       427.2      408.1

                                                 ===========================================================
Basic earnings per common share:
</TABLE>

<TABLE>

| | | | | |
|---|---|---|---|---|
| Income (loss) available to common shareholders from continuing operations before extraordinary item and the effect of accounting changes (a)/(g) | $  0.51 | $    0.48 | $(0.51) | $0.20 $(0.46) |
| Discontinued operations including the effect of accounting changes, net of income taxes (b)/(g) | -- | (0.01) | (0.57) | 0.20 (0.57) |
| Gain (loss) on disposal of discontinued operations, net of income taxes (c)/(g) | -- | (0.92) | (0.06) | 0.27 (1.27) |
| Extraordinary item, net of income taxes (d)/(g) | -- | -- | (0.11) | -- (0.02) |
| Effect of accounting changes, net of income taxes (e)/(g) | -- | -- | -- | -- (0.08) |
| Net income (loss) (f)/(g) | $  0.51 | $   (0.45) | $(1.25) | $ 0.67 $(2.40) |

================================================================

</TABLE>

        * Prior year amounts have been restated for the
        effect of discontinued operations.

        (1) Adjusted net income (loss) included an after-tax provision of $81
        million or $0.17 per share for fiscal 1997 related to the non recurring
        charge for the voluntary early retirement program, $150 million or $0.33
        per share for fiscal 1995 related to the adoption of Financial Accounting
        Standard No. 121 "Accounting for the Impairment of Long-Lived Assets and
        for Long-Lived Assets to Be Disposed Of" and an after-tax provision of $579
        million or $1.27 per share for fiscal 1993 for store restructuring and
        other charges.

                                1

<PAGE>    2

                        KMART CORPORATION
            INFORMATION ON COMPUTATION OF PER SHARE EARNINGS

<TABLE>
<CAPTION>

| ($ Millions) | | Fiscal Year Ended | | | |
|---|---|---|---|---|---|
| | January 28, 1998 | January 29, 1997 | January 31, 1996* | January 25, 1995* | January 26, 1994* |
| <S> | <C> | <C> | <C> | <C> | <C> |
| II  Earnings per common and common equivalent share assuming dilution: | | | | | |
| Income (loss) from continuing operations before extraordinary item and the effect of accounting changes | $  249 | $   231 | $ (230) | $   96 | $ (179) |
| Add: Dividends Preferred Stock, Net | 49 | 31 | -- | -- | -- |
| (h)  Adjusted Income (loss) from continuing operations before extraordinary item and the effect of accounting changes | 298 | 262 | (230) | 96 | (179) |
| (i)  Discontinued operations including the effect of accounting changes, net of income taxes | -- | (5) | (260) | 83 | (234) |
| (j)  Gain (loss) on disposal of discontinued operations, net of income taxes | -- | (446) | (30) | 117 | (520) |
| (k)  Extraordinary item, net of income taxes | -- | -- | (51) | -- | (10) |
| (l)  Effect of accounting changes, net of income taxes | -- | -- | -- | -- | (31) |

| (m)  Adjusted net income (loss)(1) | $ 298 | $ (189) | $ (571) | $ 296 | $ (974) |
|---|---|---|---|---|---|

```
==============================================================
```

| | | | | | |
|---|---|---|---|---|---|
| Weighted average common shares outstanding | 487.1 | 483.6 | 459.8 | 427.2 | 408.1 |
| Weighted average $3.41 Depository Shares outstanding (each representing 1/4 share Series A conversion preferred) | -- | -- | -- | 29.2 | 46.0 |
| Weighted average Series B and C convertible preferred shares outstanding | -- | -- | -- | 9.7 | 8.0 |
| Weighted Average Trust Convertible Preferred | 66.7 | 41.4 | -- | -- | -- |
| Stock Options: | | | | | |
| Common shares assumed issued | 16.3 | 13.0 | 1.6 | 2.2 | 16.1 |
| Less:  common shares assumed repurchased | (11.7) | (10.5) | (1.5) | (2.0) | (13.5) |

```
          -------------------------------------------------------
```

| | 4.6 | 2.5 | 0.1 | 0.2 | 2.6 |
|---|---|---|---|---|---|

```
          -------------------------------------------------------
```

| (n)  Applicable common shares, as adjusted | 558.4 | 527.5 | 459.9 | 466.3 | 464.7 |
|---|---|---|---|---|---|

```
==============================================================
```

Diluted earnings per common and common equivalent share:

| | | | | | |
|---|---|---|---|---|---|
| Adjusted income (loss) from continuing operations before extraordinary item and the effect of accounting changes (h)/(n) | $ 0.53 | $ 0.50 | $ (0.50) | $ 0.21 | $(0.39) |
| Discontinued operations including the effect of accounting changes, net of income taxes (i)/(n) | -- | (0.01) | (0.57) | 0.17 | (0.50) |
| Gain (loss) on disposal of discontinued operations, net of income taxes (j)/(n) | -- | (0.85) | (0.06) | 0.25 | (1.12) |
| Extraordinary item, net of income taxes (k)/(n) | -- | -- | (0.11) | -- | (0.02) |
| Effect of accounting changes, net of income taxes (l)/(n) | -- | -- | -- | -- | (0.07) |

```
          -------------------------------------------------------
```

| Net income (loss) (m)/(n) | $ 0.53 $ | $ (0.36) | $ (1.24) | $ 0.63 | $(2.10) |
|---|---|---|---|---|---|

```
==============================================================
```

| | (2) | (2) | (2) | (2) | (2) |
|---|---|---|---|---|---|

```
</TABLE>
```

*Prior year amounts have been restated for the effect of discontinued operations.

(1) Adjusted net income (loss) included an after tax provision of $81 million or $0.15 per share for fiscal 1997 related to the charge for the voluntary early retirement program, an after tax provision of $150 million or $0.33 per share for fiscal 1995 related to the adoption of Financial Accounting Standard No. 121 "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" and an after tax provision of $579 million or $1.25 per share for fiscal 1993 for store restructing and other charges.

2) This calculation is submitted in accordance with Regulation S-K item 601(b)(11) although it is contrary to paragraph 13 of SFAS 128 because it produces an anti-dilutive result.

2

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-12
<SEQUENCE>4
<DESCRIPTION>EXHIBIT 12
<TEXT>

<PAGE>   1
```

                                                        EXHIBIT 12


                              KMART CORPORATION
                     INFORMATION ON RATIO OF EARNINGS
                        TO FIXED CHARGES COMPUTATION

```
<TABLE>
<CAPTION>
```

|  | Fiscal Year Ended | | |
|---|---|---|---|
| ($ Millions) | January 29,<br>1997 | January 29,<br>1997 | January 31,<br>1996* |
| <S> | <C> | <C> | <C> |
| Net income (loss) from continuing retail operations before<br>  extraordinary items and the effect of accounting changes | $ 249 | $ 231 | $ (230) |
| Dividends on Convertible Preferred, Net | 49 | 31 | - |
| Income taxes | 120 | 68 | (83) |
| Pretax income (loss) from continuing retail operations | 418 | 330 | (313) |
| Distributions from unconsolidated affiliated<br>  retail companies that exceed equity income | 1 | 28 | 14 |
| Fixed charges per below | 660 | 733 | 641 |
| Less:  interest capitalized during the period | (8) | (9) | (6) |
|        Preferred Dividends of Majority owned subsidiaries<br>          not deducted in the determination of pre-tax<br>          income | (75) | (47) | - |
| Earnings (loss) from continuing retail operations | $ 996 | $ 1,035 | $ 336 |
| Fixed Charges: | | | |
|   Interest expense | 378 | 498 | 483 |
|   Rent expense - portion of operating rentals representative<br>    of the interest factor | 159 | 146 | 151 |
|   Preferred Dividend requirements of Majority owned subsidiaries | 75 | 47 | - |
|   Other | 48 | 42 | 7 |
| Total Fixed Charges | $ 660 | $ 733 | $ 641 |
| Ratio of income to fixed charges (1) | 1.5 | 1.4 | - |

</TABLE>

      *Prior year amounts have been restated for the effect of discontinued
      operations.

      (1) The deficiency of earnings from continuing retail operations versus
      fixed charges was $305 million for the fiscal year ended January 31, 1996.


                                    1
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-13
<SEQUENCE>5
<DESCRIPTION>EXHIBIT 13
<TEXT>


<PAGE>   1
CONSOLIDATED SELECTED FINANCIAL DATA


<TABLE>
<CAPTION>


| DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA | 1997 | 1996 | 1995 | 1994 | 1993 |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| SUMMARY OF OPERATIONS(1) | | | | | |
| Sales | $ 32,183 | $ 31,437 | $ 31,713 | $ 29,563 | $ 28,039 |
| Cost of sales, buying and occupancy | 25,152 | 24,390 | 24,675 | 22,331 | 20,732 |
| Selling, general and administrative expenses | 6,136 | 6,274 | 6,876 | 6,651 | 6,241 |
| Interest expense, net | 363 | 453 | 434 | 479 | 467 |
| Continuing income (loss) before income taxes | 418 | 330 | (313) | 102 | (306) |
| Net income (loss) from continuing operations(2) | 249 | 231 | (230) | 96 | (179) |
| Net income (loss) | 249 | (220) | (571) | 296 | (974) |
| PER SHARE OF COMMON | | | | | |
| Basic continuing income (loss) | $ 0.51 | $ 0.48 | $ (0.51) | $ 0.20 | $ (0.46) |
| Diluted continuing income (loss)(3) | 0.51 | 0.48 | (0.51) | 0.19 | (0.46) |
| Dividends declared | -- | -- | 0.36 | 0.96 | 0.96 |

| FINANCIAL DATA | | | | | |
|---|---|---|---|---|---|
| Working capital | $ 4,202 | $ 4,131 | $ 5,558 | $ 3,562 | $ 3,793 |
| Total assets | 13,558 | 14,286 | 15,033 | 16,085 | 15,875 |
| Long-term debt | 1,725 | 2,121 | 3,922 | 1,989 | 2,209 |
| Long-term capital lease obligations | 1,179 | 1,478 | 1,586 | 1,666 | 1,609 |
| Trust convertible preferred securities | 981 | 980 | -- | -- | -- |
| Capital expenditures | 678 | 343 | 540 | 1,021 | 793 |
| Depreciation and amortization | 660 | 654 | 685 | 639 | 650 |
| Ending market capitalization - common stock | 5,469 | 5,418 | 2,858 | 6,345 | 9,333 |
| Inventory turnover | 3.5 | 3.5 | 3.4 | 3.2 | 2.9 |
| Current ratio | 2.3 | 2.1 | 2.9 | 1.7 | 1.9 |
| Long-term debt to capitalization | 32.4% | 37.2% | 51.1% | 37.7% | 38.5% |
| Ratio of income from continuing operations to fixed charges(4) | 1.5 | 1.4 | -- | 1.1 | -- |
| | | | | | |
| Basic weighted average shares outstanding (millions) | 487 | 484 | 460 | 427 | 408 |
| Diluted weighted average shares outstanding (millions)(3) | 492 | 486 | 460 | 456 | 408 |
| | | | | | |
| NUMBER OF STORES | | | | | |
| United States | 2,136 | 2,134 | 2,161 | 2,316 | 2,323 |
| International and other | -- | 127 | 149 | 165 | 163 |
| | -------- | -------- | -------- | -------- | -------- |
| Total stores | 2,136 | 2,261 | 2,310 | 2,481 | 2,486 |
| | | | | | |
| U.S. Kmart store sales per comparable selling square foot | $ 211 | $ 201 | $ 195 | $ 181 | $ 182 |
| U.S. Kmart selling square footage (millions) | 151 | 156 | 160 | 166 | 160 |

- ------------------------------------------------------------------------------------------------------
</TABLE>

(1) Kmart Corporation and subsidiaries ("the Company" or "Kmart") fiscal year
ends on the last Wednesday in January. Fiscal 1995 consisted
of 53 weeks.

(2) Net income from continuing operations in 1997 includes a $114 million ($81
million net of tax) non-recurring charge related to the Voluntary Early
Retirement Program. The net loss from continuing operations in 1993 included a
pretax provision of $904 million ($579 million net of tax) for store
restructuring and other charges.

(3) Consistent with the requirements of Financial Accounting Standards No. 128,
preferred securities were not included in the calculation of diluted earnings
per share for 1997, 1996 and 1994 due to their anti-dilutive effect. Due to the
Company's loss from continuing operations in 1995 and 1993, diluted earnings per
share is equivalent to basic earnings per share.

(4) Fixed charges represent total interest charges, a portion of operating
rentals representative of the interest factor, amortization of debt discount and
expense and preferred dividends of majority owned subsidiaries. The deficiency
of income from continuing retail operations versus fixed charges was $305 and
$315 million for 1995 and 1993, respectively.

                    Kmart Corporation 1997 Annual Report 17


<PAGE>  2
MANAGEMENT'S DISCUSSION AND ANALYSIS
OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION

RESULTS OF OPERATIONS

<TABLE>
<CAPTION>

| ($ Millions) | 1997 | 1996 | 1995 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| SALES | | | |
| United States | $31,884 | $30,378 | $30,429 |
| International | 299 | 1,059 | 1,284 |
| | ------- | ------- | ------- |
| Total | $32,183 | $31,437 | $31,713 |
| | ======= | ======= | ======= |
| OPERATING INCOME (LOSS) | | | |
| United States | $ 898 $ | 780 $ | 179 |
| International | (3) | (7) | (17) |
| | ------- | ------- | ------- |

| | ======= | ======= | ======= |
|---|---|---|---|
| COMPARABLE SALES % | | | |
| United States | 4.8% | 2.6% | 5.6% |
| International | -- | (2.8%) | 3.0% |
| Total | 4.8% | 2.5% | 5.5% |

</TABLE>

OPERATING INCOME (LOSS) EXCLUDES THE VOLUNTARY EARLY RETIREMENT CHARGE IN 1997
TOTALING $114 MILLION ON A PRETAX BASIS, AND OTHER GAINS AND (LOSSES) OF $10 AND
($41) IN 1996 AND 1995, RESPECTIVELY.

FISCAL 1997 COMPARED TO FISCAL 1996

    Sales and comparable store sales increased 2.4% and 4.8%, respectively, for
1997. Sales per square foot also continued its upward trend in 1997 to $211 from
$201. The increases were primarily due to the successful conversion of an
additional 458 traditional Kmart locations to the Big Kmart format, increased
promotional activity, as well as the overall success of unique product offerings
such as Martha Stewart Everyday home fashions and Sesame Street children's
apparel, partially offset by soft performance in the women's apparel segment and
in the case of consolidated sales, the sale of all remaining international
operations.
    Gross margin, as a percentage of sales, was 21.8% and 22.4% in 1997 and
1996, respectively. The decrease in the percentage reflects increased
promotional activity, growth in consumables sales, the soft performance of
women's apparel, and increased distribution, buying and occupancy costs.
    Selling, general and administrative expenses ("SG&A"), which includes
advertising, as a percentage of sales were 19.1% and 19.9% in 1997 and 1996,
respectively. This was the second consecutive year that SG&A as a percentage of
sales was below 20%. The 0.8 percentage point reduction compared to 1996, or
$138 million, was the result of the sale of certain international operations,
increased leverage given additional sales volume, and the Company's continuing
focus on its core business units.
    Operating income increased $122 million in 1997 compared to 1996, excluding
other gains and losses and the charge for the Voluntary Early Retirement
Program. This increase was the direct result of the 2.4% increase in sales
during the year along with the $138 million savings in SG&A. These amounts were
partially offset by the 60 basis point decline in gross margin percentage.

    The Voluntary Early Retirement Program offered to certain of the Company's
hourly associates during the fourth quarter of 1997 resulted in a charge of $114
million in the quarter based on actual acceptance. Other gains and losses in
1996 included a $108 million gain on the sale of Rite Aid stock and a charge of
$98 million related to the valuation of certain international operations.
    Net interest expense was $363 and $453 million in 1997 and 1996,
respectively. The reduction in net interest expense was due to reduced
borrowings including the paydown of the remaining balance of the term loan in
the first quarter of 1997.
    Effective income tax rates were 28.7% and 20.5% in 1997 and 1996,
respectively. The increase in the effective tax rate during 1997 was due to the
impact in 1996 of tax benefits resulting from foreign losses and basis
differences. See Note 11 of the Notes to Consolidated Financial Statements.

FISCAL 1996 COMPARED TO FISCAL 1995

    Sales decreased 0.9% during 1996 primarily due to one less week in fiscal
1996 compared to 1995, the sale of certain international operations and the
closing of 48 U.S. Kmart stores during the year, partially offset by the opening
of 21 new U.S. Kmart stores. Comparable sales per square foot in U.S.Kmart
stores reached $201, exceeding $200 for the first time in the Company's history.
Comparable store sales increased 2.5% as a result of continued promotional
activity, a larger average transaction size, improved in-stock percentages, and
the conversion of 152 stores to the Big Kmart format.
    Gross margin, as a percentage of sales, was 22.4% and 22.2% in 1996 and
1995, respectively. The percentage increase reflected significantly lower levels
of markdowns related to clearance of discontinued merchandise and closure of
stores. Additionally, lower levels of buying and occupancy costs together with
an improved sales mix towards higher margin departments contributed to the
increase. This increase was partially offset by the effect of the sale of the
auto service business to Penske Auto Centers, Inc. in late 1995.
    Selling, general and administrative expenses, which include advertising, as
a percentage of sales were 19.9% and 21.7% in 1996 and 1995, respectively. In
1996, SG&A as a percentage of sales was below 20% for the first time in the past
25 years. The 1.8 percentage point reduction compared to 1995, or $602 million,
was a direct result of the Company's continuing focus on its core business
units, expense controls, one less week in fiscal 1996 and the sale of certain
international operations.

Kmart Corporation 1997 Annual Report 18

<PAGE>    3

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION (CONT.)

Operating income increased $611 million in 1996 compared to 1995, excluding other gains and losses. Other gains and losses in 1996 included a $108 million gain on the sale of Rite Aid stock and a charge of $98 million related to the valuation of international operations in Mexico and Canada. In 1995, other gains and losses included a charge of $162 million related to the adoption of Financial Accounting Standard No. 121 "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of" ("FAS 121") and a pension curtailment gain of $121 million.

Net interest expense was $453 and $434 million in 1996 and 1995, respectively. The increase was a result of restrictions on the repayment of certain indebtedness in the first half of 1996, prior to the Company's refinancing of its bank lines and issuance of trust convertible preferred securities in June 1996. Additionally, the Company's inability to borrow in commercial paper markets beginning in the fall of 1995, as a result of its lower corporate debt ratings, contributed to higher interest rates. This higher level of interest was partially offset by higher levels of investment income from accumulated cash balances prior to the refinancing and a significant improvement in cash flow from operations.

Effective income tax rates were 20.5% and 26.6% in 1996 and 1995, respectively. The 1996 rate was favorably impacted by recognition of tax benefits related to foreign losses and basis differences. The 1995 rate reflected the recognition of refundable taxes, at statutory rates, plus tax credits partially offset by valuation allowances against certain deferred tax assets. See Note 11 of the Notes to Consolidated Financial Statements.

Discontinued operations, net of taxes, represented losses of $451 and $290 million in 1996 and 1995, respectively. The 1996 loss was comprised of an estimated loss of $385 million related to the Company's decision to sell the operations of its Builders Square subsidiary, $5 million of current year net losses of Builders Square and a loss of $61 million related to the sale of a portion of its investment in Thrifty PayLess Holdings, Inc. ("TPH") in the first quarter together with a revaluation of its remaining holdings at that time. The 1995 loss included a $260 million loss from Builders Square, including a charge of $240 million related to the adoption of FAS 121, and a $30 million loss related to the disposal of Borders Group, Inc. and remaining equity interests in OfficeMax, Inc. and The Sports Authority, Inc. See Note 3 of the Notes to Consolidated Financial Statements.

ANALYSIS OF FINANCIAL CONDITION

Kmart's primary sources of working capital are cash flows from operations and borrowings under its credit facilities. The Company had working capital of $4,202 and $4,131 million at year end 1997 and 1996, respectively. Working capital fluctuates in relation to profitability, seasonal inventory levels net of trade accounts payable and the level of store openings and closings.

In June 1996, the Company restructured its credit facilities to enhance its liquidity and financial flexibility. This restructuring consisted of a secured three year $2.5 billion revolving credit facility ("Revolver") and a secured three year $1.2 billion term loan facility ("Term Loan") (collectively, the "Credit Agreement"). Additionally, in June 1996, the Company issued $1 billion of 7-3/4% Trust Convertible Preferred Securities ("TCPS") through a wholly owned subsidiary trust. The net proceeds from these transactions were used to retire existing indebtedness, including certain obligations related to real estate.

In May of 1997, the Revolving Credit Agreement was amended. Under the terms of the amended agreement, the maturity was extended to June 2000 and the commitment fee and interest rate spreads were reduced.

The Company has met the financial requirements to release collateral under the Revolving Credit Agreement upon delivery of the 1997 audited financial statements.

The Credit Agreement contains several affirmative and negative covenants, regarding, among other items: the granting of liens, loans and guarantees; mergers and sales of certain assets; dividends and other payments in respect of capital stock; the maintenance of certain leverage and coverage ratios; and limitations on indebtedness and capital expenditures. The Company was in compliance with all covenants throughout 1997.

The Company had no borrowings outstanding on its Revolver as of year ends 1997 and 1996 and the Term Loan was repaid during 1997.

In March 1997, the Company issued, through a subsidiary, $335 million in Commercial Mortgage Pass Through Certificates ("CMBS"). The CMBS weighted average floating interest rate was LIBOR plus 47 basis points. Net proceeds were used to repay a portion of the Term Loan.

In 1997, the Company continued to achieve significant improvement in liquidity and operating cash flow performance. At the Company's peak borrowing level in 1997, over $1.5 billion remained available for borrowings under its Revolver. In addition, cash flow from continuing operations improved by $141 million. Management believes that its current financing arrangements will be sufficient to meet the Company's liquidity needs for operations and capital

demands.

Net cash provided from continuing operations was $879 million in 1997 compared
to $738 million in 1996.


                    Kmart Corporation 1997 Annual Report 19


    <PAGE>  4
    MANAGEMENT'S DISCUSSION AND ANALYSIS
    OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION (CONT.)

        Net cash used for investing was $185 million in 1997 compared to $471
    million in 1996. Cash used for investing in 1997 was primarily the result of
    $678 million in capital expenditures partially offset by the proceeds from sale
    leaseback transactions which occurred during the year, as well as proceeds from
    the sale of the Company's Canadian, Mexican and Builders Square operations. The
    Company continues to maintain property held for sale with a net book value of
    $307 million as of January 28, 1998. Cash used for investing in 1996 was the
    result of an increase in property held for sale of $632 million as a result of
    refinancing certain real estate debt and capital additions of $343 million.
    These items were partially offset by the receipt of proceeds from the sale of
    the Company's investment in Rite Aid common stock, the sale of its Czech and
    Slovak Republics operations and the IPO of TPH.
        Net cash used for financing was $564 million in 1997 compared to $974
    million in 1996. Cash used for financing during 1997 was the result of paying
    down the Company's remaining balance on the Term Loan as well as payments on
    certain mortgages and medium term notes. These amounts were partially offset by
    the issuance of $335 million in CMBS securities. Cash used for financing in 1996
    was the result of the refinancing of the Company's former credit facilities and
    certain real estate debt with net proceeds from the Term Loan, TCPS and
    Revolver.


    RESTRUCTURING RESERVE STATUS

        In 1993, Kmart recorded a pretax charge of $904 million, $579 million
    after tax, primarily for anticipated costs associated with Kmart stores which
    were to be closed or relocated, enlarged or refurbished in the U.S. and Canada.
    The restructuring program was completed during fiscal 1997 with the cost of
    completing the plan approximating the original estimate. The following
    summarizes the reserve balance as of January 28, 1998.


    <TABLE>
    <CAPTION>

                                            1997 Activity
                                          ----------------
                        Original                  Net    Change in
    ($ Millions)        Reserve   1995    1996  Charges  Estimate  1997
    - ---------------------------------------------------------------
    <S>                 <C>       <C>     <C>    <C>      <C>       <C>
      Lease costs       $479      $397    $297   $(35)   $ (33)    $229
      Asset writedowns   148        23      5    (23)      18       --
      Inventory          201        79     12    (17)      15       10
      Other charges       76         9      4     (2)      --        2
                        ----      ----   ----   ----    -----     ----
                        $904      $508   $318   $(77)    $ --      $241
                        ====      ====   ====   ====    =====     ====

    </TABLE>


    NET CHARGES DURING 1997, 1996 AND 1995 INCLUDED $19, $25 AND $32 MILLION FOR
    INTEREST EXPENSE ACCRETED, RESPECTIVELY.


        The primary components of the reserve consist of: cash outlays for future
    lease obligations once a store is closed until it can be assigned, bought-out or
    terminated, offset by any sublease income; asset writedowns relating to
    furniture and fixtures and leasehold improvements and inventory disposition
    costs. Changes in estimates are representative of management's assessments in
    the fourth quarters of 1997, 1996 and 1995 that based on actual experiences to
    date, certain charges would be higher than originally planned while others would
    be less than planned.


        Due to favorable sublease and termination experience for stores closed to
    date, Kmart lowered the estimate of net lease obligation costs for domestic and
    Canadian stores by $33 million in 1997. These favorable results have been offset
    by increased fixed asset disposition costs for domestic stores.
        Kmart anticipates that pretax cash outflows will approximate $70, $50 and
    $30 million in 1998 through 2000, respectively. At January 28, 1998, the total
    remaining gross lease obligations related to the U.S. Kmart 1993 restructuring
    plan aggregated approximately $1.1 billion, of which it is management's
    estimate, based upon historical results, approximately $800 million will be

recovered p...    https://www.sec.gov/Archives/edgar/data/56824/0000950124-98-002149.txt

flow using a 7% discount rate which resulted in an aggregate remaining effect of
discounting of approximately $60 million. Future cash outlays are based upon
management's estimate of the period of time between store closing and the
ultimate disposition of the lease obligation, the remaining charge being
substantially noncash in nature.


Other Matters

     The Company is currently working to resolve the potential impact of the
Year 2000 on the processing of date-sensitive information by the Company's
computerized information systems. The Year 2000 problem is the result of
computer programs being written using two digits (rather than four) to define
the applicable year. Any of the Company's programs that have time-sensitive
software may recognize a date using "00" as the year 1900 rather than the year
2000, which could result in miscalculations or system failures. Costs of
addressing potential problems are estimated to be approximately $50 million and
are not expected to have a material adverse impact on the Company's financial
position, results of operations or cash flows in future periods. However, if the
Company or its vendors are unable to resolve such processing issues in a timely
manner, it could result in a material financial risk. Accordingly, the Company
plans to devote the necessary resources to resolve all significant Year 2000
issues in a timely manner.

                   Kmart Corporation 1997 Annual Report 20


<PAGE>    5
MANAGEMENT'S RESPONSIBILITY
FOR FINANCIAL STATEMENTS


     Management is responsible for the preparation of the Company's consolidated
financial statements and related information appearing in this annual report.
These financial statements have been prepared in conformity with generally
accepted accounting principles on a consistent basis applying certain estimates
and judgments based upon currently available information and management's view
of current conditions and circumstances. On this basis, we believe that these
financial statements reasonably present the Company's financial position and
results of operations.
     To fulfill our responsibility, we maintain comprehensive systems of
internal controls designed to provide reasonable assurance that assets are
safeguarded and transactions are executed in accordance with established
procedures. The concept of reasonable assurance is based upon a recognition that
the cost of the controls should not exceed the benefit derived. We believe our
systems of internal controls provide this reasonable assurance.
     The Company has adopted a code of conduct to guide our management in the
continued observance of high ethical standards of honesty, integrity and
fairness in the conduct of the business and in accordance with the law.
Compliance with the guidelines and standards is periodically reviewed and is
acknowledged in writing by all management associates.
     The Board of Directors of the Company has an Audit Committee, consisting
solely of outside directors. The duties of the Committee include keeping
informed of the financial condition of the Company and reviewing its financial
policies and procedures, its internal accounting controls and the objectivity of
its financial reporting. Both the Company's independent accountants and the
internal auditors have free access to the Audit Committee and meet with the
Committee periodically, with and without management present.




Floyd Hall
Floyd Hall
Chairman of the Board,
President and Chief Executive Officer




Martin E. Welch III
Martin E. Welch III
Senior Vice President
and Chief Financial Officer

REPORT OF INDEPENDENT ACCOUNTANTS

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS
OF KMART CORPORATION


    In our opinion, the accompanying consolidated balance sheets and the
related consolidated statements of operations, of shareholders' equity and of
cash flows present fairly, in all material respects, the financial position of
Kmart Corporation and its subsidiaries at January 28, 1998 and January 29, 1997,
and the results of their operations and their cash flows for each of the three
years in the period ended January 28, 1998, in conformity with generally
accepted accounting principles. These financial statements are the
responsibility of the Company's management; our responsibility is to express an
opinion on these financial statements based on our audits. We conducted our
audits of these statements in accordance with generally accepted auditing
standards which require that we plan and perform the audit to obtain reasonable
assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements, assessing the
accounting principles used and significant estimates made by management, and
evaluating the overall financial statement presentation. We believe that our
audits provide a reasonable basis for the opinion expressed above.




Price Waterhouse LLP
Price Waterhouse LLP
Detroit, Michigan
March 3, 1998



        Kmart Corporation 1997 Annual Report 21
<PAGE>   6

CONSOLIDATED STATEMENTS OF OPERATIONS


<TABLE>
<CAPTION>
YEARS ENDED JANUARY 28, 1998, JANUARY 29, 1997 AND JANUARY 31, 1996
DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA

| | 1997 | 1996 | 1995 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| SALES | $ 32,183 | $ 31,437 | $ 31,713 |
| Cost of sales, buying and occupancy | 25,152 | 24,390 | 24,675 |
| Gross margin | 7,031 | 7,047 | 7,038 |
| Selling, general and administrative expenses | 6,136 | 6,274 | 6,876 |
| Voluntary early retirement program | 114 | -- | -- |
| Other (gains) losses | -- | (10) | 41 |
| Continuing income before interest, income taxes and dividends on convertible preferred securities of subsidiary | 781 | 783 | 121 |
| Interest expense, net | 363 | 453 | 434 |
| Income tax provision (credit) | 120 | 68 | (83) |
| Dividends on convertible preferred securities of subsidiary, net of income taxes of $26 and $16 | 49 | 31 | -- |
| NET INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE EXTRAORDINARY ITEM | 249 | 231 | (230) |
| Loss from discontinued operations, net of income taxes of $(3) and $(139) | -- | (5) | (260) |
| Loss on disposal of discontinued operations, net of income taxes of $(240) and $88 | -- | (446) | (30) |
| Extraordinary loss, net of income taxes of $(27) | -- | -- | (51) |
| Net income (loss) | $ 249 | $ (220) | $ (571) |
| BASIC/DILUTED INCOME (LOSS) PER COMMON SHARE | | | |
| Continuing operations | $ .51 | $ .48 | $ (.51) |
| Discontinued operations | -- | (.01) | (.57) |
| Loss on disposal of discontinued operations | -- | (.92) | (.06) |
| Extraordinary item | -- | -- | (.11) |
| Net income (loss) | $ .51 | $ (.45) | $ (1.25) |

| | 1997 | 1996 | |
|---|---|---|---|
| Basic weighted average shares (millions) | 491.0 | 485.3 | 459.8 |
| Diluted weighted average shares (millions) | 491.7 | 486.1 | 459.9 |

</TABLE>

SEE ACCOMPANYING NOTES TO CONSOLIDATED FINANCIAL STATEMENTS.


                    Kmart Corporation 1997 Annual Report 22
    <PAGE>   7



    <TABLE>
    <CAPTION>

CONSOLIDATED BALANCE SHEETS

AS OF JANUARY 28, 1998 AND JANUARY 29, 1997
DOLLARS IN MILLIONS

| | 1997 | 1996 |
|---|---|---|
| <S> | <C> | <C> |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $   498 | $   406 |
| Merchandise inventories | 6,367 | 6,354 |
| Other current assets | 611 | 973 |
| Total current assets | 7,476 | 7,733 |
| | ------- | ------- |
| Property and equipment, net | 5,472 | 5,740 |
| Property held for sale or financing | 271 | 200 |
| Other assets and deferred charges | 339 | 613 |
| | ------- | ------- |
| Total Assets | $13,558 | $14,286 |
| | ======= | ======= |
| CURRENT LIABILITIES | | |
| Long-term debt due within one year | $   78 | $   156 |
| Trade accounts payable | 1,923 | 2,009 |
| Accrued payroll and other liabilities | 1,064 | 1,298 |
| Taxes other than income taxes | 209 | 139 |
| | ------- | ------- |
| Total current liabilities | 3,274 | 3,602 |
| Long-term debt and notes payable | 1,725 | 2,121 |
| Capital lease obligations | 1,179 | 1,478 |
| Other long-term liabilities | 965 | 1,013 |
| Company obligated mandatorily redeemable convertible preferred securities of a subsidiary trust holding solely 7-3/4% convertible junior subordinated debentures of Kmart (redemption value of $1,000) | 981 | 980 |
| Common stock, $1 par value, 1,500,000,000 shares authorized; 488,811,271 and 486,996,145 shares issued, respectively | 489 | 486 |
| Capital in excess of par value | 1,620 | 1,608 |
| Retained earnings | 3,343 | 3,105 |
| Treasury shares and restricted stock | (15) | (37) |
| Foreign currency translation adjustment | (3) | (70) |
| | ------- | ------- |
| Total Liabilities and Shareholders' Equity | $13,558 | $14,286 |
| | ======= | ======= |

    </TABLE>

SEE ACCOMPANYING NOTES TO CONSOLIDATED FINANCIAL STATEMENTS.



                    Kmart Corporation 1997 Annual Report 23
    <PAGE>   8


CONSOLIDATED STATEMENTS OF CASH FLOWS


    <TABLE>

https://www.sec.gov/Archives/edgar/data/56824/0000950124-98-002149.txt

```
<Caption>
YEARS ENDED JANUARY 28, 1998, JANUARY 29, 1997 AND JANUARY 31, 1996
DOLLARS IN MILLIONS                                            1997        1996        1995
- --------------------------------------------------------------------------------------------
<S>                                                           <C>         <C>         <C>
CASH FLOWS FROM OPERATING ACTIVITIES
  Net income (loss) from continuing operations           $    249    $    231    $   (230)
  Adjustments to reconcile net income (loss) from continuing
    operations to net cash provided by (used for) operating activities:
      Depreciation and amortization                           660         654         685
      Voluntary early retirement program                      114          --          --
      Cash used for store restructuring and other charges    (105)       (129)       (171)
      (Increase) decrease in inventories                      (31)       (349)        222
      Increase (decrease) in trade accounts payable          (86)        215        (609)
      Deferred income taxes and taxes payable                 72         228        (296)
      Increase (decrease) in other long-term liabilities     (27)       (194)          9
      Changes in certain assets, liabilities and other items  33          82         293
                                                         ---------   ----------   ---------
  Net cash provided by (used for) continuing operations      879         738         (97)
  Net cash provided by (used for) discontinued operations    (38)         30         (92)
                                                         ---------   ----------   ---------
NET CASH PROVIDED BY (USED FOR) OPERATING ACTIVITIES         841         768        (189)
                                                         ---------   ----------   ---------
Cash Flows From Investing Activities
  Decrease (increase) in property held for sale or financing 262        (632)       (474)
  Proceeds from divestitures                                 133         434       1,479
  Proceeds from real estate financing and other             158          27         179
  Other, net                                                 (60)         43        (244)
  Capital expenditures                                      (678)       (343)       (540)
                                                         ---------   ----------   ---------
NET CASH PROVIDED BY (USED FOR) INVESTING ACTIVITIES        (185)       (471)        400
                                                         ---------   ----------   ---------

Cash Flows From Financing Activities
  Proceeds from issuance of long-term debt and notes payable 337       1,202       1,948
  Change in common stock                                     37          34           3
  Proceeds from issuance of convertible preferred securities --         971          --
  Dividends paid                                             --          --        (283)
  Refinancing costs related to long-term debt and notes payable (15)   (212)         --
  Payments on capital lease obligations                    (112)       (114)       (160)
  Payments on long-term debt                               (811)     (2,855)       (983)
                                                         ---------   ----------   ---------
NET CASH PROVIDED BY (USED FOR) FINANCING ACTIVITIES       (564)       (974)        525
                                                         ---------   ----------   ---------

NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS        92        (677)        736
CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR               406       1,083         347
                                                         ---------   ----------   ---------
Cash and cash equivalents, end of year                  $   498    $   406    $  1,083
                                                         =========   ==========   =========


</TABLE>




SEE ACCOMPANYING NOTES TO CONSOLIDATED FINANCIAL STATEMENTS.




            Kmart Corporation 1997 Annual Report 24
<PAGE>   9




CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

<TABLE>
<CAPTION>

                                    SERIES B, C                     TREASURY SHARES
                                      AND D          CAPITAL        AND PERFORMANCE
FOREIGN
                                   CONVERTIBLE      IN EXCESS       RESTRICTED STOCK
CURRENCY
                              PREFERRED   COMMON    OF PAR    RETAINED   DEFERRED
TRANSLATION
DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA  STOCK    STOCK    VALUE    EARNINGS   COMPENSATION
ADJUSTMENT
- --------------------------------------------------------------------------------------------
```

```
------
<S>                                           <C>       <C>       <C>       <C>       <C>       <C>
Balance at January 25, 1995                   $   132   $   465   $ 1,505   $ 4,074   $   (86)  $
(58)

Net loss for the year                                                                (571)
Cash dividends declared:
  Common, $.36 per share                                                             (165)
  Series C convertible preferred                                                       (6)
Common issued from redemption
  of Series C and D convertible preferred        (132)       20       112
Foreign currency translation adjustment
(6)
Other                                                         1         7              (6)       (6)

                                              -------   -------   -------   -------   -------   -------
--
Balance at January 31, 1996                       --       486     1,624     3,326       (92)
(64)

Net loss for the year                                                                (220)
Treasury shares reissued to retirement
  savings plan                                                       (19)               53
Foreign currency translation adjustment
(6)
Other                                                                  3        (1)       2

                                              -------   -------   -------   -------   -------   -------
--
Balance at January 29, 1997                       --       486     1,608     3,105       (37)
(70)

Net income for the year                                                               249
Treasury shares reissued to retirement
  savings plan                                                        (4)               23
Foreign currency translation adjustment
67
Other                                                         3        16       (11)      (1)

                                              -------   -------   -------   -------   -------   -------
--
Balance at January 28, 1998                   $    --   $   489   $ 1,620   $ 3,343   $   (15)  $
(3)

                                              =======   =======   =======   =======   =======
=========

</TABLE>
```

PREFERRED STOCK, AUTHORIZED 10,000,000 SHARES, NO PAR VALUE.
SEE ACCOMPANYING NOTES TO CONSOLIDATED FINANCIAL STATEMENTS.


                    Kmart Corporation 1997 Annual Report 25
<PAGE>    10



NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

1) Summary of Significant Accounting Policies
    The significant accounting policies followed by Kmart Corporation and
subsidiaries ("the Company" or "Kmart") in the preparation of these financial
statements, are summarized below.
    Nature of Operations: The Company's operations consist principally of
discount department stores located in all 50 states, Puerto Rico, the U.S.
Virgin Islands and Guam. Kmart's equity investment consists of 49% of
substantially all of the Meldisco subsidiaries of Footstar, Inc. ("FTS"), which
operate the footwear departments in Kmart stores.
    Basis of Consolidation: Kmart includes all majority owned subsidiaries in
the consolidated financial statements. Investments in affiliated retail
companies owned 20% or more are accounted for by the equity method. Intercompany
transactions and accounts have been eliminated in consolidation.
    Fiscal Year: The Company's fiscal year ends on the last Wednesday in
January. Fiscal years 1997 and 1996 each consisted of 52 weeks and ended on
January 28, 1998 and January 29, 1997, respectively. Fiscal year 1995 consisted
of 53 weeks and ended on January 31, 1996.

maturities of three months or less. Included in cash and cash equivalents are
temporary investments of $241 and $131, at year end 1997 and 1996, respectively.

Inventories: Inventories are stated at the lower of cost or market,
primarily using the retail method. The last-in, first-out (LIFO) method,
utilizing internal inflation indices, was used to determine the cost for $5,990,
$5,883 and $5,518 of inventory as of year end 1997, 1996 and 1995, respectively.
Inventories valued on LIFO were $457, $440 and $485 lower than amounts that
would have been reported using the first-in, first-out (FIFO) method at year end
1997, 1996 and 1995, respectively.

Property and Equipment: Property and equipment are recorded at cost, less
any impairment losses. Capitalized amounts include expenditures which materially
extend the useful lives of existing facilities and equipment. Expenditures for
owned properties, which Kmart intends to sell and lease back within one year,
are included in other current assets, and those with expected transaction dates
extending beyond one year are included in property held for sale or financing.

Depreciation and Amortization: Depreciation and amortization, including
amortization of property held under capital leases, are computed based upon the
estimated useful lives of the respective assets using the straight-line method
for financial statement purposes and accelerated methods for tax purposes. The
general range of lives are 25 to 50 years for buildings, 5 to 25 years for
leasehold improvements, and 3 to 17 years for furniture and fixtures.

Financial Instruments: Cash and cash equivalents, accounts receivable,
trade accounts payable and accrued liabilities are reflected in the financial
statements at cost which approximates fair value. The fair value of the
Company's debt and other financial instruments are discussed in Notes 8 and 10.

Foreign Currency Translations: Foreign currency assets and liabilities are
translated into U.S. dollars at the exchange rates in effect at the balance
sheet date, and revenue and expenses are translated at average exchange rates
during the period.

Stock-Based Compensation: The Company has elected under the provisions of
Statement of Financial Accounting Standards No. 123 ("FAS 123") to continue
using the intrinsic value method of accounting for employee stock based
compensation in accordance with Accounting Principles Board Opinion No. 25,
"Accounting for Stock Issued to Employees".

Pre-Opening and Closing Costs: Costs associated with the opening of a new
store are expensed during the first full month of operations. When the decision
to close a retail unit is made, any future net lease obligation and
nonrecoverable investment in fixed assets directly related to discontinuance of
operations are expensed.

Advertising Costs: Advertising costs, net of co-op recoveries from vendors,
are expensed the first time the advertising occurs and amounted to $420, $385
and $459 in 1997, 1996 and 1995, respectively.

Income Taxes: Deferred income taxes are provided for temporary differences
between financial statement and taxable income. Kmart accrues U.S. and foreign
taxes payable on all of the earnings of subsidiaries, except with respect to
earnings that are intended to be permanently reinvested, or are expected to be
distributed free of additional tax by operation of relevant statutes currently
in effect and by utilization of available tax credits and deductions.

Earnings (Loss) Per Common Share: Effective for its January 28, 1998
consolidated financial statements, Kmart adopted Statement of Financial
Accounting Standards No. 128, "Earnings per Share," ("FAS 128"). FAS 128
replaces the presentation of primary earnings per share ("EPS") and fully
diluted EPS with a presentation of basic EPS and diluted EPS, respectively.

Use of Estimates: The preparation of financial statements in conformity
with generally accepted accounting principles requires management to make
estimates and assumptions that affect the reported amounts of assets and
liabilities at the date of the financial statements and the reported amounts of
revenues and expenses during the reporting period. Actual results could differ
from those estimates.

Reclassifications: Certain reclassifications of prior year amounts have
been made to conform to the 1997 presentation.


                    Kmart Corporation 1997 Annual Report 26
        <PAGE>    11




NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

2) Subsequent Events
    In February 1998, the Company's minority interest in Kmart Canada Co. was
purchased by Hudson's Bay Co. Under the terms of the purchase, Kmart will
receive approximately $8 for its remaining equity interest in Kmart Canada Co.,

In the first quarter of 1998, the Company's requirement to maintain
collateral under the revolving credit facility will be eliminated.

### 3) Discontinued Operations and Dispositions

Discontinued operations for 1997 include Builders Square, Inc. ("Builders
Square"). Discontinued operations for 1996 and prior, include Builders Square,
Borders Group, Inc. ("Borders Group"), OfficeMax, Inc. ("OfficeMax"), The Sports
Authority, Inc. ("The Sports Authority"), Thrifty PayLess Holdings, Inc.
("TPH"), Coles Myer, Ltd. ("Coles Myer"), and Furr's/Bishop's, Inc. ("Furr's").

### 1997 Activity

During the first and second quarters of 1997, the Company completed the
sale of its interests in the Mexico and Canada operations, respectively. Under
the terms of the Mexico agreement the Company received $74, which approximated
the book value of its interest. Under the terms of the Canada agreement, the
Company received $54 in cash, a $76 note receivable and retained a 12.5%
non-voting equity interest. The net proceeds from the sale approximated book
value.

In the third quarter of 1997, the Company completed the sale of
substantially all of the assets of its subsidiary, Builders Square, to an
affiliate of Leonard Green & Partners, L.P. The net proceeds from the sale
approximated book value.

### 1996 Activity

During the first half of 1996, the Company received $70 from the sale of
approximately 33% of its investment in the common stock of TPH and revalued its
remaining investment by recording a $61 loss from discontinued operations, net
of income taxes. In the fourth quarter, Rite Aid Corporation ("Rite Aid")
merged  TPH into Rite Aid and exchanged 0.65 of its shares for each share of
TPH. Kmart sold its Rite Aid shares received resulting in net proceeds of
approximately $257 and a pretax gain of $108, which was included in other gains
and losses.

In the first quarter, the Company completed the sale of its store
operations in the Czech and Slovak Republics and received net proceeds of $115.

In the fourth quarter of 1996, the Company recorded a $385 after tax charge
as a result of its plan to dispose of Builders Square. This charge was included
in loss on disposal of discontinued operations. The Company also recorded a
pretax charge of $98, relating to the anticipated losses on the disposal of its
international operations. This charge was included in other gains and losses.

### 1995 Activity

Borders Group's initial public offering ("IPO") was completed in the second
quarter of 1995. In this IPO, Kmart sold 87% of its equity interest in Borders
Group for net proceeds of approximately $493. Borders Group purchased Kmart's
remaining 13% interest in the second quarter which resulted in net proceeds of
approximately $73. The effect of these transactions was an after tax loss of
$185.

OfficeMax completed the public offering of Kmart's remaining equity
interest in the second quarter. Kmart received net proceeds of approximately
$360 and recorded an after tax gain of $107.

The Sports Authority completed the public offering of Kmart's remaining
equity interest in the third quarter. Kmart received approximately $151 in net
proceeds and recorded an after tax gain of $48.

In the fourth quarter, Kmart sold the assets of its automotive service
centers to Penske Auto Centers, Inc. for $84. Under the terms of the agreement,
the centers continue to operate at Kmart locations in exchange for various rents
and fees for services provided by Kmart.

The Company also sold certain senior notes of TPH acquired in 1993 in
connection with the sale of PayLess Drug Stores Northwest, Inc., for
approximately $102.

In the fourth quarter of 1995, the Company and its subsidiaries adopted
Financial Accounting Standard No. 121 "Accounting for the Impairment of
Long-Lived Assets and for Long-Lived Assets to be Disposed Of" ("FAS 121").
Based on management's considerations of the current and expected operating cash
flow together with a judgment as to the fair value the Company could receive
upon the sale of its investments in certain international operations, the
Company recorded a $162 pretax charge, $150 after tax, which was included in
other gains and losses. In addition, Builders Square recorded an after tax
charge of $240 related to its adoption of FAS 121.

<center>Kmart Corporation 1997 Annual Report 27</center>

<PAGE>    12

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

4)    Restructuring and Other Charges
      In 1993, the Board of Directors approved a restructuring plan. The
restructuring provision of $904 included anticipated costs associated with Kmart
stores which were to be closed and relocated, enlarged or refurbished in the
U.S. and Canada. These costs included lease obligations for store closings as
well as fixed asset writedowns and inventory dispositions.
      Cash costs related to the 1993 restructuring reserve amounted to $105,
$129 and $117 for 1997, 1996 and 1995, respectively. Noncash charges were $28,
$61 and $134 for the same periods, respectively. The remaining restructuring
obligation is included primarily in "other long-term liabilities" in the
consolidated balance sheets.
      In 1995, the Company entered into agreements whereby holders of
approximately $550 of certain real estate related debt agreed to eliminate put
features which would have required Kmart to purchase the debt from the holders
if Kmart's long-term debt rating was lowered to non-investment grade. In the
fourth quarter of 1995, the Company recorded an extraordinary noncash charge of
$51, net of income taxes, relating to various expenses and make whole premiums
payable under such agreements.

5)    Property and Equipment

| | YEAR END | |
| --- | --- | --- |
| | 1997 | 1996 |
| <S> | <C> | |
| Property owned: | | |
|   Land | $    319 | $    346 |
|   Buildings | 822 | 995 |
|   Leasehold improvements | 1,834 | 1,470 |
|   Furniture and fixtures | 4,832 | 5,050 |
|   Construction in progress | 60 | 87 |
| Total owned | 7,867 | 7,948 |
| Property under capital leases | 2,264 | 2,820 |
| | 10,131 | 10,768 |
| Less-accumulated depreciation | | |
|   and amortization: | | |
|   Property owned | (3,427) | (3,487) |
|   Property under capital leases | (1,232) | (1,541) |
| Total | $ 5,472 | $ 5,740 |

The following table provides a breakdown of the number of stores leased compared
to owned:

| | YEAR END | |
| --- | --- | --- |
| | 1997 | 1996 |
| <S> | <C> | <C> |
| Number of U.S.Kmart Stores Owned | 105 | 118 |
| Number of U.S.Kmart Stores Leased | 2,031 | 2,016 |

6)    Investments in Affiliated Retail Companies
      All Kmart footwear departments are operated under license agreements with
the Meldisco subsidiaries of FTS, substantially all of which are 49% owned by
Kmart and 51% owned by FTS. Income earned under various agreements was $210,
$211 and $220, in 1997, 1996 and 1995, respectively. The Company received
dividends from Meldisco in 1997, 1996 and 1995 of $36, $64 and $52,
respectively.

| | FISCAL YEAR | | |
| --- | --- | --- | --- |
| MELDISCO INFORMATION | 1997 | 1996 | 1995 |

```
<S>
Net sales                      $   1,142 $  1,109 $   1,141
Gross profit                         491      476        487

Net income                            74       74         79

Inventory                      $     142 $    134 $     135
Other current assets                  17       24         74
Non-current assets                    --        1          1
                               --------- -------- ---------
Total assets                         159      159        210
Current liabilities                   24       25         15
                               --------- -------- ---------
Net assets                     $     135 $    134 $     195
                               ========= ======== =========
Equity of Kmart                $      65 $     65 $      94
                               ========= ======== =========
</TABLE>
```

Unremitted earnings included in consolidated retained earnings were $42, $41 and
$72 at year end 1997, 1996 and 1995, respectively.


7)   Other Commitments and Contingencies
     Kmart has outstanding guarantees for property leased by certain formerly
owned subsidiaries as follows:

```
<TABLE>
<CAPTION>
                                                 Gross
                         Present Value            Lease
                            at 7%        ---------------------
                            1997          1997         1996
- --------------------------------------------------------------
<S>                        <C>          <C>          <C>
Furr's                   $     134    $     193 $     199
Borders Group                  114          205        218
Office Max                     111          168        186
The Sports Authority           250          424        453
Builders Square                849        1,568      1,655
                         ---------    --------- ---------
Total                    $   1,458    $   2,558 $   2,711
                         =========    ========= =========
</TABLE>
```

     As of January 28, 1998, Kmart has guaranteed $139 of indebtedness of other
parties related to certain of its leased properties financed by industrial
revenue bonds. These agreements expire from 2004 through 2009.
     There are various claims, lawsuits and pending actions against Kmart
incident to its operations. It is the opinion of management that the ultimate
resolution of these matters will not have a material adverse effect on Kmart's
liquidity, financial position or results of operations.




              Kmart Corporation 1997 Annual Report 28
     <PAGE>  13
     NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

     (DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

     8)  LONG-TERM DEBT AND NOTES PAYABLE

```
<TABLE>
<CAPTION>
                                           YEAR END
                 FISCAL YEAR  INTEREST  -------------------
     TYPE        MATURITY     RATES        1997      1996
- --------------------------------------------------------------
<S>              <C>          <C>        <C>       <C>
Term loan         1997        7.8%       $    -- $     600
Debentures      2005-2023  7.8%-12.5%        967       995
Medium-term
  notes         1998-2020   6.8%-9.8%        512       682
CMBS              2002       Floating        324        --
                                         --------- --------
Total                                      1,803     2,277
Current portion                             (78)     (156)
                                         --------- --------
```

```
                              =========  ========

</TABLE>
```

In the first quarter of 1997, the Company transferred to Troy CMBSProperty, L.L.C., an affiliated Delaware limited liability company, 81 store properties (the "Properties") with a net book value of $964 which were then leased back to the Company. Simultaneously with such transfer of the Properties, Troy CMBS Property, L.L.C. completed a $335 offering of commercial mortgage pass through certificates, secured by mortgages on the Properties. The mortgages and the mortgage notes have been purchased by Kmart CMBS Financing, Inc., a Delaware corporation wholly owned by the Company, and assigned to the trustee of the security holders.

The mortgage loan is subject to monthly payments of interest and principal, according to a schedule which amortizes the initial outstanding principal amount over approximately 15 years with a balloon payment of approximately $261 on the scheduled maturity date in February 2002. The CMBSweighted average interest rate is 1 month LIBOR plus 47 basis points.

In the second quarter of 1996, the Company entered into a $3.7 billion credit agreement with a group of financial institutions which provides for (i) a three year $2.5 billion secured revolving credit facility ("Revolver") and (ii) a three year $1.2 billion secured term loan ("Term Loan"). The Term Loan was repaid in full in March 1997.

In the second quarter of 1997, the revolving credit agreement was amended to extend the maturity to June 2000, and reduce the commitment fee and interest rate spreads to 0.3% and LIBORplus 125 basis points, respectively. Based on the Company's continued improved performance during 1997, the commitment fee and interest rate spreads were further reduced to 0.25% and LIBORplus 100 basis points.

The Company has met the financial requirements to release collateral under the revolving credit agreement upon delivery of the 1997 audited annual financial statements.

The Revolver contains certain affirmative and negative covenants customary to these types of agreements. The Company is in compliance with all such covenants.

As of January 28, 1998 and January 29, 1997, there were no outstanding amounts under the Revolver.

Based on the quoted market prices for the same or similar issues or on the current rates offered to Kmart for debt of the same remaining maturities, the fair value of long-term debt was approximately $1,817 at year end 1997, and approximated book value at year end 1996.

The principal maturities of long-term debt for the five years subsequent to 1997 are: 1998-$78, 1999-$77, 2000-$73, 2001-$68, 2002-$357 and 2003 and later-$1,150.

Cash paid for interest was $333, $459 and $467 in 1997, 1996 and 1995, respectively.

9)  Leases
Kmart conducts operations primarily in leased facilities. Kmart store leases are generally for terms of 25 years with multiple five-year renewal options which allow the Company the option to extend the life of the lease up to 50 years beyond the initial noncancelable term.

Selling space has been sublet to other retailers, including Penske Auto Centers, Inc. and the Meldisco subsidiaries of FTS, in certain of Kmart's leased facilities.

```
<TABLE>
<CAPTION>
```

|  | Minimum Lease Commitments | |
| --- | --- | --- |
| As of January 28, 1998 | Capital | Operating |
| `<S>` | `<C>` | `<C>` |
| Fiscal Year: | | |
| 1998 | $    286 | $    528 |
| 1999 | 274 | 516 |
| 2000 | 258 | 505 |
| 2001 | 247 | 499 |
| 2002 | 238 | 486 |
| Later years | 2,052 | 6,232 |
| | --------- | --------- |
| Total minimum lease payments | 3,355 | 8,766 |
| Less-minimum sublease income | -- | (3,631) |
| | --------- | --------- |
| Net minimum lease payments | 3,355 | $  5,135 |
| | | ========= |
| Less: | | |
| Estimated executory costs | (926) | |
| Amount representing interest | (1,163) | |
| | --------- | |
| | 1,266 | |

Current
                                    ---------
Long-term                           $   1,179
                                    =========

<CAPTION>

| RENT EXPENSE | 1997 | 1996 | 1995 |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Minimum rentals | $ 673 | $ 642 | $ 649 |
| Percentage rentals | 39 | 36 | 35 |
| Less-sublease rentals | (234) | (236) | (232) |
| | ----- | ----- | ----- |
| Total | $ 478 | $ 442 | $ 452 |
| | ===== | ===== | ===== |

</TABLE>

    Kmart incurred capital lease obligations to obtain store facilities and
equipment of $9 and $21 in 1997 and 1995, respectively. There were no capital
lease obligations incurred in 1996.


                    Kmart Corporation 1997 Annual Report 29

<PAGE>   14


NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

10) Convertible Preferred Securities
    In June 1996, a trust sponsored and wholly owned by the Company issued
20,000,000 shares of trust convertible preferred securities ("Preferred
Securities"), the proceeds of which were invested by the trust in $1 billion
aggregate principal amount of the Company's newly issued 7-3/4% Convertible
Junior Subordinated Debentures ("Debentures"). The Preferred Securities accrue
and pay cash distributions quarterly at a rate of 7-3/4% per annum of the stated
liquidation amount of $50 per Preferred Security. Kmart has guaranteed, on a
subordinated basis, distributions and other payments due on the Preferred
Securities.
    The Preferred Securities are convertible at the option of the holder at any
time at the rate of 3.3333 shares of Kmart common stock for each Preferred
Security, and are mandatorily redeemable upon the maturity of the Debentures on
June 15, 2016, or to the extent of any earlier redemption of any Debentures by
Kmart and are callable beginning June 15, 1999.
    Based on the quoted market prices, the fair value of the Preferred
Securities was approximately $1,040 as of year end 1997, and approximated book
value at year end 1996.

11)  Income Taxes


<TABLE>
<CAPTION>

| INCOME (LOSS) BEFORE INCOME TAXES | 1997 | 1996 | 1995 |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| U.S. | $  390 | $  351 | $  (114) |
| Foreign | 28 | (21) | (199) |
| | ------ | ------ | ------- |
| Total | $  418 | $  330 | $  (313) |
| | ====== | ====== | ======= |

<CAPTION>

| INCOME TAX PROVISION (CREDIT) | 1997 | 1996 | 1995 |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Current: | | | |
| Federal | $  (126) | $   54 | $  (164) |
| State and local | (5) | 5 | -- |

```
Foreign                        -------       ------       -------
                               (120)           76         (167)

Deferred:
  Federal                        240          (7)           96
  Foreign                         --          (1)          (12)
                               -------       ------       -------

Total                        $   120      $    68      $   (83)
                               =======       ======       =======
```

<CAPTION>

```
EFFECTIVE TAX RATE
RECONCILIATION                 1997         1996         1995
- -------------------------------------------------------------
<S>                            <C>          <C>          <C>
Federal income
  tax rate                     35.0%        35.0%        (35.0%)
State and local taxes,
  net of federal tax benefit   (0.8)         0.9           --
Tax credits                    (1.9)          --          (2.5)
Equity in net income
  of affiliated companies      (2.3)        (3.1)         (3.4)
Valuation allowance             --           --           18.4
International tax rate
  and basis differential        --         (13.9)         (4.2)
Other                          (1.3)         1.6           0.1
                               -----        -----        ------
                               28.7%        20.5%        (26.6%)
                               =====        =====        ======
```

</TABLE>


<TABLE>
<CAPTION>

```
                                            YEAR END
                                       --------------------
DEFERRED TAX
ASSETS AND LIABILITIES                   1997         1996
- -------------------------------------------------------------
<S>                                      <C>          <C>
Deferred tax assets:
  Federal benefit for
      state and foreign taxes         $   27       $   28
  Discontinued operations                135          413
  Accruals and other liabilities         258          174
  Capital leases                         101          132
  Store restructuring                     94          136
  Other                                  182          129
                                       ------       ------
Total deferred tax assets                797        1,012
                                       ------       ------

Deferred tax liabilities:
  Inventory                              272          281
  Property and equipment                 417          455
  Valuation allowance                     --           50
  Other                                   23            9
                                       ------       ------
Total deferred tax liabilities           712          795
                                       ------       ------
Net deferred tax assets               $   85       $  217
                                       ======       ======
```

</TABLE>


    The Company has available alternative minimum tax credit carryforwards of
approximately $137 which may be carried forward indefinitely.

    Cash paid (received) for income taxes was $7, $(238), and $80 in 1997,
1996 and 1995, respectively.

12)  Common and Treasury Stock


<TABLE>
<CAPTION>

```
SHARES (000s)
- --------------------------------------------------------------
<S>                                  <C>       <C>       <C>
Common Shares:
  Beginning of the year            486,996   486,511   464,550
  Sold under stock option plan       1,469        49       171
  Issued under performance
   restricted stock plan             1,220       420       504
   Issued under directors stock plan     5        21         9
  Issued from redemption of Series
   C and D convertible preferred        --        --    21,314
  Forfeited or withheld under
   performance restricted stock plan  (879)       (5)      (37)
                                    -------   -------   -------
  End of the year                  488,811   486,996   486,511
                                    =======   =======   =======

Treasury Shares:
  Beginning of the year              2,261     5,883     5,883
  Reissued shares for
   the retirement savings plan      (1,635)   (3,622)       --
                                    -------   -------   -------
  End of the year                      626     2,261     5,883
                                    =======   =======   =======
</TABLE>
```

     As of the end of 1997, the Board of Directors has approved the repurchase
of 2,000,000 shares of Kmart common stock to be used to fund the Retirement
Savings Plan and other employee benefit plans or trusts.




                    Kmart Corporation 1997 Annual Report 30
<PAGE>   15
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

13)  Pension Plans
     In the fourth quarter of 1997, the Company announced a Voluntary Early
Retirement Program for certain Kmart hourly associates over 45 years of age with
at least 10 years of service by December 31, 1997. Of the 28,785 Kmart
associates eligible for this program, 11,587 accepted the early retirement
offer, and the Company recorded a charge of $114, ($81 after tax). Payouts under
this program will be fully funded through existing pension plan assets.
     Prior to 1996, U.S. Kmart had defined benefit pension plans covering
eligible associates who met certain requirements of age, length of service and
hours worked per year. Effective January 31, 1996, the pension plans were frozen
and associates no longer earn additional benefits under the plans. As a result
of freezing the plans, the Company recorded a pretax curtailment gain of $121,
included in other gains and losses, in the first quarter of 1995.
     Benefits paid to retirees are based upon age at retirement and years of
credited service and earnings as of January 31, 1996. Kmart's policy is to fund
at least the minimum amounts required by the Employee Retirement Income Security
Act of 1974. The plans' assets consist primarily of equity securities, fixed
income securities and real estate. Kmart contributed $6 to its principal pension
plan during fiscal 1995. No contributions were made in fiscal 1997 or 1996. The
total consolidated pension expense (income) was $(63), $(32) and $42 in 1997,
1996 and 1995, respectively.
     The following tables summarize the funded status, components of pension
cost and actuarial assumptions for Kmart's employee pension plans.


<TABLE>
<CAPTION>

                                          YEAR END
                                 -----------------------------
                                    1997            1996
- -------------------------------------------------------------
<S>                                 <C>             <C>
Actuarial value of benefit obligations:
  Present value of vested benefits  $ (1,927)    $ (1,699)
  Present value of non-vested benefits  (128)        (92)
                                    --------     --------
  Projected benefit obligation (PBO)  (2,055)      (1,791)
Market value of assets                 2,219        1,974
Voluntary early retirement lump
  sum payout                            (277)          --
                                    --------     --------
Plan assets over (under) PBO            (113)         183
```

Unrecognized (gain) loss                              72              (157)
                                                 --------        --------
Accrued pension costs                        $   (104)      $    (54)
                                                 ========        ========

<CAPTION>

| PENSION COST (INCOME) | 1997 | 1996 | 1995 |
| - ------------------------------------------------------- | | | |
| <C> | <C> | <C> | <C> |
| Normal service cost | $    -- | $    -- | $    51 |
| Interest cost on PBO | 139 | 132 | 133 |
| Return on assets | (334) | (273) | (378) |
| Net amortization and deferral | 132 | 100 | 232 |
| | -------- | -------- | ------- |
| Total | $   (63) | $   (41) | $   38 |
| | ======== | ======== | ======= |
| Actuarial assumptions: | | | |
| Discount rates | 6.75% | 7.75% | 7.25% |
| Expected return | 10.00% | 9.50% | 9.50% |
| Salary increases | -- | -- | 4.50% |

</TABLE>

The Company has a non-qualified plan for directors and officers which was
unfunded as of year end 1997 and 1996. Total benefits under the plan totaled $36
and $35, at the end of 1997 and 1996, respectively.

14)  Other Postretirement and Postemployment
     Benefit Plans
     Full-time associates who have worked 10 years and who have retired after
age 55, have the option of participation in Kmart's medical plan until age 65.
The plan is contributory, with retiree contributions adjusted annually. The
accounting for the plan anticipates future cost-sharing changes that are
consistent with Kmart's expressed intent to increase the retiree contribution
rate annually. The accrued postretirement benefit costs were $70 and $78 at the
end of 1997 and 1996, respectively.

15)  Retirement Savings Plan
     The Retirement Savings Plan provides that associates of Kmart who have
completed six months of service can invest from 1% to 16% of their earnings in
the associate's choice of various investments. For each dollar the participant
contributes, up to 6% of earnings, Kmart will contribute an additional 50 cents
which is invested in the Employee Stock Ownership Plan.
     The Retirement Savings Plan has a profit sharing feature whereby the
Company makes contributions based on profits, with minimum yearly contributions
required of $30. Kmart's expense related to the Retirement Savings Plan was $69
in 1997 and $71 in both 1996 and 1995.




                    Kmart Corporation 1997 Annual Report 31


     <PAGE>   16


NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

16)  Stock Option Plans
     The Company applies APB Opinion 25 and related interpretations in
accounting for its stock option and restricted stock plans. Accordingly, no
compensation cost has been recognized for its stock based compensation plans.
     Had the compensation cost for the Company's stock based compensation plans
been determined based on the fair value at the grant dates for awards under
those plans consistent with the method of FAS 123, the Company's net income
would have been reduced by $27, $22 and $3 for 1997, 1996 and 1995,
respectively, and earnings per share would have been reduced by $0.06, $0.05 and
$0.01 for 1997, 1996 and 1995, respectively. To determine these amounts, the
fair value of each stock option has been estimated on the date of the grant
using a Black-Scholes option-pricing model with the following weighted-average
assumptions used for grants in 1997, 1996 and 1995, respectively: expected
volatility of .3902, .3788 and .2980, dividend yield of 0%, risk-free interest
rates of 6.47%, 6.05% and 5.98%; and expected lives of 5 years. The
weighted-average fair value per share of options granted in 1997, 1996 and 1995
were $5.37, $3.37 and $4.52, respectively. Options vest over 3 years on a
graduated basis with a term of 10 years.

https://www.sec.gov/Archives/edgar/data...-98-002149.txt

grant awards of common stock to officers and other key employees of Kmart and
its subsidiaries. As of January 28, 1998, there were awards for 3,240,000 shares
outstanding and shares available for grant of 155,278.

| STOCK OPTION PLANS (000'S) | SHARES | OPTION PRICE |
| --- | --- | --- |
| January 31, 1996 | | |
| Outstanding | 26,466 | $6.31 - $26.03 |
| Granted | 14,303 | 7.00 - 12.50 |
| Exercised | (49) | 7.81 |
| Forfeited | (23,753) | 6.31 - 26.03 |
| January 29, 1997 | | |
| Outstanding | 16,967 | 6.31 - 26.03 |
| Granted | 7,233 | 10.79 - 14.85 |
| Exercised | (1,507) | 7.81 - 12.38 |
| Forfeited | (1,705) | 7.81 - 21.94 |
| January 28, 1998 | | |
| Outstanding | 20,988 | 6.31 - 26.03 |
| Exercisable | 5,539 | 7.81 - 26.03 |
| Available for grant | 22,903 | |

17)  Quarterly Financial Information (Unaudited)
     Earnings per share amounts for each quarter are required to be computed
independently and may not equal the amount computed for the total year.

| 1997 | First | Second | Third | Fourth |
| --- | --- | --- | --- | --- |
| Sales | $ 7,263 | $ 7,846 | $ 7,315 | $ 9,759 |
| Cost of sales | 5,637 | 6,197 | 5,683 | 7,635 |
| Net income from | | | | |
| continuing operations | 14 | 31 | 18 | 186 |
| Net income | 14 | 31 | 18 | 186 |
| Basic Earnings per share | | | | |
| Continuing | $ .03 | $ .06 | $ .04 | $ .38 |
| Net | .03 | .06 | .04 | .38 |
| Diluted Earnings per share | | | | |
| Continuing | $ .03 | $ .06 | $ .04 | $ .35 |
| Net | .03 | .06 | .04 | .35 |
| Common stock price | | | | |
| High | $ 13-5/8 | $ 14-1/2 | $ 15-1/16 | $ 13-13/16 |
| Low | 10-5/8 | 10-3/8 | 11-3/8 | 10-5/8 |

| 1996 | FIRST | SECOND | THIRD | FOURTH |
| --- | --- | --- | --- | --- |
| Sales | $ 6,975 | $ 7,566 | $ 7,212 | $ 9,684 |
| Cost of sales | 5,398 | 5,875 | 5,528 | 7,589 |
| Net income (loss) from | | | | |
| continuing operations | (36) | 23 | 8 | 236 |
| Net income (loss) | (99) | 34 | 9 | (164) |
| Basic Earnings (loss) per share | | | | |
| Continuing | $ (.08) | $ .05 | $ .02 | $ .49 |
| Net | (.21) | .07 | .02 | (.34) |
| Diluted Earnings (loss) per share | | | | |
| Continuing | $ (.08) | $ .05 | $ .02 | $ .45 |
| Net | (.21) | .07 | .02 | (.27) |
| Common stock price | | | | |
| High | $ 10-5/8 | $ 14 | $ 11-1/8 | $ 11-3/8 |
| Low | 6-5/8 | 9-3/4 | 9-1/4 | 9-1/2 |

     The Preferred Securities were not included in the calculation of diluted
EPS for the first, second and third quarters of 1997, and for the second and
third quarters of 1996 due to the anti-dilutive effect on EPS if converted. Had

the Preferred...

have been higher by $0.02 for all respective quarters except the second quarter
of 1996 which would have been $0.01 higher and would have been $0.02 higher for
fiscal 1997 and 1996.

As of January 28, 1998, there were approximately 90,000 Kmart common
shareholders of record. In addition, there were approximately 365,000 street
name holders of Kmart common stock. Kmart common stock is listed on the New
York, Pacific and Chicago stock exchanges (trading symbol KM).


                    Kmart Corporation 1997 Annual Report 32
    </TEXT>
    </DOCUMENT>
    <DOCUMENT>
    <TYPE>EX-23
    <SEQUENCE>6
    <DESCRIPTION>EXHIBIT 23
    <TEXT>


    <PAGE>   1

                                                        EXHIBIT 23


                KMART CORPORATION AND SUBSIDIARY COMPANIES
                EXHIBIT 23-CONSENT OF INDEPENDENT ACCOUNTANTS



    We hereby consent to the incorporation by reference in the Registration
    Statement on Form S-8 (Registration Statement Nos. 33-54879, 33-48490,
    33-48673, 33-52797, and 33-52799) of Kmart Corporation of our report dated
    March 3, 1998 appearing on page 22 of the Annual Report to Shareholders which
    is incorporated by reference in this Annual Report on Form 10-K for the year
    ended January 28, 1998.

    /s/ Price Waterhouse LLP
    Price Waterhouse LLP
    Bloomfield Hills, Michigan
    April 13, 1998




    </TEXT>
    </DOCUMENT>
    <DOCUMENT>
    <TYPE>EX-27.1
    <SEQUENCE>7
    <DESCRIPTION>EXHIBIT 27.1
    <TEXT>

    <TABLE> <S> <C>


    <ARTICLE> 5
    <LEGEND>
    THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM THE
    CONSOLIDATED STATEMENTS OF INCOME AND CONSOLIDATED BALANCE SHEETS AND IS
    QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH FINANCIAL STATEMENTS.
    </LEGEND>
    <MULTIPLIER> 1,000,000

    <S>                             <C>
    <PERIOD-TYPE>                   YEAR
    <FISCAL-YEAR-END>                   JAN-28-1998
    <PERIOD-START>                      JAN-30-1997
    <PERIOD-END>                        JAN-28-1998
    <CASH>                                      257
    <SECURITIES>                                241
    <RECEIVABLES>                               441
    <ALLOWANCES>                                  0
    <INVENTORY>                               6,367
    <CURRENT-ASSETS>                          7,476
    <PP&E>                                   10,131
    <DEPRECIATION>                            4,659
    <TOTAL-ASSETS>                           13,558
    <CURRENT-LIABILITIES>                     3,274
    <BONDS>                                   1,725
    <PREFERRED-MANDATORY>                       981

1/28/2019　18-23538-shl　Doc 3560-2　Filed 05/03/19　Entered 05/03/19 10:30:54　Exhibit B - Declaration of Artem Skorostensky in Support of Objection of Urban E　Pg 53 of 166

https://www.sec.gov/Archives/edgar/data/56824/0000950124-98-002149.txt

```
<PREFERRED>
<COMMON>                                    489
<OTHER-SE>                                4,945
<TOTAL-LIABILITY-AND-EQUITY>             13,558
<SALES>                                  32,183
<TOTAL-REVENUES>                         32,183
<CGS>                                    25,152
<TOTAL-COSTS>                            25,152
<OTHER-EXPENSES>                              0
<LOSS-PROVISION>                              0
<INTEREST-EXPENSE>                          363
<INCOME-PRETAX>                             418
<INCOME-TAX>                                120
<INCOME-CONTINUING>                         249
<DISCONTINUED>                                0
<EXTRAORDINARY>                               0
<CHANGES>                                     0
<NET-INCOME>                                249
<EPS-PRIMARY>                             (.51)
<EPS-DILUTED>                             (.51)


</TABLE>
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27.2
<SEQUENCE>8
<DESCRIPTION>EXHIBIT 27.2
<TEXT>


<TABLE> <S> <C>


<ARTICLE> 5
<LEGEND>
THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM THE
CONSOLIDATED STATEMENTS OF INCOME AND CONSOLIDATED BALANCE SHEETS AND IS
QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH FINANCIAL STATEMENTS.
</LEGEND>
<RESTATED>
<MULTIPLIER> 1,000,000


<S>                              <C>
<PERIOD-TYPE>                    YEAR
<FISCAL-YEAR-END>                       JAN-29-1997
<PERIOD-START>                          FEB-01-1996
<PERIOD-END>                            JAN-29-1997
<CASH>                                          381
<SECURITIES>                                     25
<RECEIVABLES>                                   441
<ALLOWANCES>                                      0
<INVENTORY>                                   6,354
<CURRENT-ASSETS>                              7,733
<PP&E>                                       10,768
<DEPRECIATION>                                5,028
<TOTAL-ASSETS>                               14,286
<CURRENT-LIABILITIES>                         3,602
<BONDS>                                       2,121
<PREFERRED-MANDATORY>                           980
<PREFERRED>                                       0
<COMMON>                                        486
<OTHER-SE>                                    4,606
<TOTAL-LIABILITY-AND-EQUITY>                 14,286
<SALES>                                      31,437
<TOTAL-REVENUES>                             31,437
<CGS>                                        24,390
<TOTAL-COSTS>                                24,390
<OTHER-EXPENSES>                                  0
<LOSS-PROVISION>                                  0
<INTEREST-EXPENSE>                              453
<INCOME-PRETAX>                                 330
<INCOME-TAX>                                     68
<INCOME-CONTINUING>                             231
<DISCONTINUED>                                (451)
<EXTRAORDINARY>                                   0
<CHANGES>                                         0
<NET-INCOME>                                  (220)
<EPS-PRIMARY>                                 (.45)
<EPS-DILUTED>                                 (.45)


</TABLE>
```

```
  </TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27.3
<SEQUENCE>9
<DESCRIPTION>EXHIBIT 27.3
<TEXT>


<TABLE> <S> <C>


<ARTICLE> 5
<LEGEND>
THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM THE
CONSOLIDATED STATEMENTS OF INCOME AND CONSOLIDATED BALANCE SHEETS AND IS
QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH FINANCIAL STATEMENTS.
</LEGEND>
<RESTATED>
<MULTIPLIER> 1,000,000

<S>                                <C>
<PERIOD-TYPE>                      YEAR
<FISCAL-YEAR-END>                        JAN-31-1996
<PERIOD-START>                           JAN-26-1995
<PERIOD-END>                             JAN-31-1996
<CASH>                                         1,076
<SECURITIES>                                       7
<RECEIVABLES>                                    335
<ALLOWANCES>                                       0
<INVENTORY>                                    6,022
<CURRENT-ASSETS>                               8,553
<PP&E>                                        10,116
<DEPRECIATION>                                 4,751
<TOTAL-ASSETS>                                15,033
<CURRENT-LIABILITIES>                          2,995
<BONDS>                                        3,922
<PREFERRED-MANDATORY>                              0
<PREFERRED>                                        0
<COMMON>                                         486
<OTHER-SE>                                     4,794
<TOTAL-LIABILITY-AND-EQUITY>                  15,033
<SALES>                                       31,713
<TOTAL-REVENUES>                              31,713
<CGS>                                         24,675
<TOTAL-COSTS>                                 24,675
<OTHER-EXPENSES>                                   0
<LOSS-PROVISION>                                   0
<INTEREST-EXPENSE>                               434
<INCOME-PRETAX>                                (313)
<INCOME-TAX>                                    (83)
<INCOME-CONTINUING>                            (230)
<DISCONTINUED>                                 (290)
<EXTRAORDINARY>                                 (51)
<CHANGES>                                          0
<NET-INCOME>                                   (571)
<EPS-PRIMARY>                                 (1.25)
<EPS-DILUTED>                                 (1.25)


  </TABLE>
  </TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# **Exhibit 2**

**(Kmart Corporation's Form 10-K for the fiscal year ended January 27, 1999)**

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 O8PrIdMzQ7htZcMaMHNMwd3gSkBnethIHTUMt6srws5VfQYPV2gxkphYCM/xeUc7
 Pn6EOkoarKjAa7DL0nRJ2g==
```

<SEC-DOCUMENT>0000950124-99-002618.txt : 19990416
<SEC-HEADER>0000950124-99-002618.hdr.sgml : 19990416
ACCESSION NUMBER:        0000950124-99-002618
CONFORMED SUBMISSION TYPE:        10-K
PUBLIC DOCUMENT COUNT:        9
CONFORMED PERIOD OF REPORT:        19990127
FILED AS OF DATE:        19990415

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:        KMART CORP
                CENTRAL INDEX KEY:        0000056824
                STANDARD INDUSTRIAL CLASSIFICATION:        RETAIL-VARIETY STORES [5331]
                IRS NUMBER:        380729500
                STATE OF INCORPORATION:        MI
                FISCAL YEAR END:        0129

        FILING VALUES:
                FORM TYPE:        10-K
                SEC ACT:
                SEC FILE NUMBER:        001-00327
                FILM NUMBER:        99595138

        BUSINESS ADDRESS:
                STREET 1:        3100 W BIG BEAVER RD
                CITY:        TROY
                STATE:        MI
                ZIP:        48084
                BUSINESS PHONE:        8106431000

        MAIL ADDRESS:
                STREET 1:        3100 W  BIG BEAVER ROAD
                CITY:        TROY
                STATE:        MI
                ZIP:        48084

        FORMER COMPANY:
                FORMER CONFORMED NAME:  KRESGE S S CO
                DATE OF NAME CHANGE:        19770921
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FORM 10-K
<TEXT>

<PAGE>    1

                    SECURITIES AND EXCHANGE COMMISSION
                        Washington, D.C. 20549

                            FORM 10-K


  X    ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE
- ----
ACT OF 1934

For the fiscal year ended January 27, 1999

                                or

  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
    EXCHANGE ACT OF 1934
For the transition period from         to         .

Commission File No. 1-327

## KMART CORPORATION
(Exact name of registrant as specified in its charter)

| Michigan | 38-0729500 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 3100 West Big Beaver Road - Troy, Michigan | 48084 |
| (Address of principal executive offices) | (zip code) |

Registrant's telephone number, including area code    (248) 643-1000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE SECURITIES EXCHANGE ACT
OF 1934:

<TABLE>
<CAPTION>

| Title of each class | Name of each Exchange on which registered |
|---|---|
| Common Stock, $1.00 par value | New York, Pacific and Chicago Exchanges |

</TABLE>

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE SECURITIES EXCHANGE
ACT OF 1934:  None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934
during the preceding 12 months (or for such shorter period that the Registrant
was required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days. YES X  NO
                            ---

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of the Registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [ ]

The aggregate market value of voting stock including Common Stock held by
non-affiliates of the Registrant on March 24, 1999 was $7,876,925,721. The
market value of the Common Stock is based on the closing price on the New York
Stock Exchange on such date.

As of March 24, 1999, 494,238,477 shares of Common Stock of the Registrant, held
by approximately 80,120 shareholders, were outstanding.

Portions of the Registrant's 1998 Annual Report to Shareholders are incorporated
by reference into Parts I, II and IV of this report. Portions of the
Registrant's Proxy Statement dated April 12, 1999 in connection with the 1999
Annual Meeting of Stockholders are incorporated by reference into Part III of
this report.

<PAGE>    2

                            PART I


Item 1.  Business

        History

        Kmart Corporation ("the Registrant") is the nation's second
largest discount retailer and the world's third largest general merchandise
retailer. Kmart was incorporated under the laws of the State of Michigan on
March 9, 1916, as the successor to the business developed by its founder, S. S.
Kresge, who opened his first store in 1899. After operating Kresge department
stores for over 45 years, the Kmart store program commenced with the opening of
the first Kmart store in March 1962. The principal executive offices of Kmart

are located at 3100 West Big Beaver Road, Troy, Michigan 48084, and whose
telephone number is (248) 643-1000.

## Operations

The Registrant operates in the general merchandise retailing industry
through 2,161 Kmart discount stores with locations in each of the 50 United
States, Puerto Rico, the U.S. Virgin Islands and Guam. Kmart's general
merchandise retail operations are located in 311 of the 316 Metropolitan
Statistical Areas in the United States. Kmart stores are generally one-floor,
free-standing units ranging in size from 40,000 to 180,000 square feet.

In 1995, Kmart converted 29 of its traditional stores to feature a new,
high-frequency format. In April 1997, this design was renamed Big Kmart. Big
Kmart offers customers an increased mix of frequently-purchased, everyday basics
and consumables in a "Kmart Pantry" area located near the front of each store. A
total of 1,245 traditional Kmart stores had been converted to the Big Kmart
format at year-end 1998, with another 586 stores scheduled for conversion during
fiscal 1999. At year-end 1999, including new stores built in the Big Kmart
format, it is expected that approximately 1,840 stores will be in the Big Kmart
format.

Super Kmart Centers represent the Registrant's supercenter concept.
Super Kmart Centers combine a full grocery assortment, including fresh and
frozen food, bakery, meats, and other items, with a broad selection of general
merchandise found at Big Kmart and traditional Kmart stores. Open 24 hours a
day, seven days a week, the 102 Super Kmart Centers are the third-largest
supercenter operation in the nation.

Information regarding the Registrant's analysis of consolidated
operations appearing in "Management's Discussion and Analysis of Results of
Operations and Financial Condition" on pages 18 through 20 of the Registrant's
1998 Annual Report to Shareholders, is incorporated herein by reference.

Information regarding the Registrant's discontinued operations and
dispositions appearing in Note 2 of the "Notes to Consolidated Financial
Statements" on page 27 of the Registrant's 1998 Annual Report to Shareholders,
is incorporated herein by reference.

## Competition

Kmart has several major competitors on a national level, including
Dayton-Hudson's Target stores, J.C. Penney, Sears and Wal-Mart, and many
competitors on a local and regional level which compete with Kmart's individual
stores. Success in this competitive market is based on factors such as price,
quality, service, product mix and convenience.

## Seasonality

The Registrant's business is highly seasonal and depends to a
significant extent on the results of operations for the last quarter of the
fiscal year.

## Credit Sales

The Registrant offers a private label Kmart Credit Card, available in
all Kmart stores, through Beneficial National Bank USA ("BNB USA"), a unit of
Beneficial Corporation. BNB USA owns the receivables and retains the credit risk
associated with this program. In addition to the Kmart Credit Card program, all
of the Registrant's stores accept major bank credit cards as payment for
merchandise.

## Employees

The Registrant employed approximately 278,525 persons as of January 27,
1999.

2

<PAGE>    3


Effect of Compliance with Environmental Protection Provisions

Compliance with federal, state and local provisions which have been

enacted or adopted, or with respect to any expenditures for pollution control
or otherwise relating to the protection of the environment, has not had, and is
not expected to have, a material effect on capital expenditures, earnings or the
competitive position of the Registrant and its subsidiaries.

Item 2.    Properties

     At January 27, 1999, Kmart operated a total of 2,161 general merchandise
stores which are located in the United States, Puerto Rico, the U.S. Virgin
Islands and Guam. With the exception of 110 store facilities which are wholly
owned, the Registrant leases its store facilities.

     The Registrant owns its headquarters and one administrative building in
Troy, Michigan and leases administrative buildings in Royal Oak, Michigan and
North Bergen, New Jersey. The Registrant leases 18 United States distribution
and port centers for initial terms of 10 to 30 years with options to renew for
additional terms. In addition, the Registrant owns or leases 549 parcels not
currently used for store operations, the majority of which are rented to others.

     A description of the Registrant's leasing arrangements, appearing in
Note 7 of the "Notes to Consolidated Financial Statements" on page 29 of the
Registrant's 1998 Annual Report to Shareholders, is incorporated herein by
reference.

Item 3.    Legal Proceedings

     The Registrant is a party to a substantial number of legal proceedings,
most of which are routine and all of which are incidental to its business. Some
matters involve claims for large amounts of damages as well as other relief.
Although the consequences of these proceedings are not presently determinable,
in the opinion of management, they will not have a material adverse affect on
the Registrant's liquidity, financial position or results of operations.

Item 4.    Submission of Matters to a Vote of Security Holders

     Not applicable.

                                      3

<PAGE>    4

Executive Officers of the Registrant

          The name, position, age and a description of the business experience for
each of the executive officers of the Registrant is listed below as of March 24,
1999. There is no family relationship among the executive officers. Executive
officers of the Registrant are elected each year at the Annual Meeting of the
Board of Directors to serve for the ensuing year and until their successors are
elected and qualified. The business experience for each of the executive
officers described below includes principal positions held since 1992. None of
the corporations or organizations listed below is a parent, subsidiary or other
affiliate of the Registrant.

          Floyd Hall - Chairman of the Board, President and Chief Executive
                    Officer, 60.
Mr. Hall joined the Registrant under his current title in June 1995. Prior
thereto he served concurrently as Chairman and Chief Executive Officer of The
Museum Company, Alva Reproductions, Inc. and Glass Masters, Inc. from 1989 to
1995.

          Michael Bozic - Vice Chairman, 58.
Mr. Bozic joined the Registrant under his current title in December 1998. Prior
thereto he was Chairman and Chief Executive Officer, Levitz Furniture
Corporation from 1995 to 1998 and President and Chief Executive Officer, Hills
Department Stores, Inc. from 1991 to 1995. Mr. Bozic was also with Sears Roebuck
& Company for 28 years, serving as Chairman and Chief Executive Officer, Sears
Merchandise Group, from 1987 to 1991.

          Andrew A. Giancamilli - President and General Merchandise Manager, U.S.
                    Kmart, 48.
Mr. Giancamilli has been in his current position since January 1998. Prior

President, General Merchandise Manager-Consumables and Commodities from 1996 to
1998; Vice President, Pharmacy Merchandising and Operations from 1995 to 1996.
Prior to joining the Registrant in 1995, he was President, Chief Operating
Officer, Perry Drug Stores, Inc. from 1993 to 1995; and Executive Vice
President, Chief Operating Officer, Perry Drug Stores, Inc. from 1992 to 1993.


        Laurence L. Anderson - Executive Vice President and President, Super
                        Kmart, 57.
Mr. Anderson joined the Registrant under his current title in July 1997. Prior
thereto he was President and Chief Operating Officer, Retail Food, SuperValu
Inc. from 1995 to 1997; and Executive Vice President, SuperValu Inc. from 1992
to 1995.


        Warren Cooper - Executive Vice President, Human Resources and
                        Administration, 54.
Mr. Cooper joined the Registrant under his current title in March 1996. Prior
thereto he was Senior Vice President, Human Resources, General Cable from 1995
to 1996; Vice President, Human Resources, the Sears Merchandise Group, Sears,
Roebuck & Co. from 1993 to 1995; and Vice President, Corporate Human Resources,
Sears, Roebuck & Co. from 1987 to 1993.


        Donald W. Keeble - Executive Vice President, Store Operations, 50.
Mr. Keeble has served as an executive officer of the Registrant since 1989 and
has served in his current position since February 1995. Prior thereto he held
the following positions at the Registrant: Executive Vice President,
Merchandising and Operations from 1994 to 1995; and Senior Vice President,
General Merchandise Manager, Fashions from 1991 to 1994.


        Anthony N. Palizzi - Executive Vice President, General Counsel, 56.
Mr. Palizzi has served as an executive officer of the Registrant since 1985 and
has served in his current position since 1992.


        William N. Anderson - Senior Vice President and General Merchandise
                        Manager - Hardlines, 51.
Mr. Anderson joined the Registrant under his current title in September 1996.
Prior thereto he was President and Chief Operating Officer, Oshman's Sporting
Goods, Inc. from 1994 to 1996; and Senior Vice President and General Manager,
Ames Department Stores, Inc. from 1992 to 1994. Mr. Anderson terminated
employment with the Registrant effective April 9, 1999.


        Ernest L. Heether - Senior Vice President, Merchandise Planning and
                        Replenishment, 53.
Mr. Heether joined the Registrant under his current title in April 1996. Prior
thereto he served as Senior Vice President, Merchandise Operations, Bradlees,
Inc. from 1993 to 1996; and Vice President, Merchandise Planning and Control,
Caldor from 1990 to 1993.


                                4

<PAGE>   5


        Paul J. Hueber - Senior Vice President, Store Operations, 50.
Mr. Hueber has served as an executive officer of the Registrant since 1991 and
has served in his current position since 1994. Prior thereto he was Vice
President, West/Central Region from 1991 to 1994.


        Cecil B. Kearse - Senior Vice President and General Merchandise
                        Manager - Home, 46.
Mr. Kearse has served in his current position since November 1997. Prior thereto
he held the following positions with the Registrant: Vice President, Merchandise
Presentation and Communication from 1996 to 1997; Vice President and General
Merchandise Manager, Men's and Children's from 1995 to 1996; Divisional Vice
President, Merchandising Fashions from 1994 to 1995; and Senior Buyer, Bed, Bath
& Kitchen from 1990 to 1994.


        Jerry J. Kuske - Senior Vice President and General Merchandise
                        Manager  - Health and Beauty Care, Pharmacy,
                        Consumables, 47.
Effective April 1, 1999 Mr. Kuske assumed the position of Senior Vice President
and General Merchandise Manager - Hardlines. Mr. Kuske served in his previous
position from November 1997 to March 1999. Prior thereto he held the following
positions with the Registrant: Vice President, General Merchandise Manager,
Health and Beauty Care/Pharmacy from 1996 to 1997; Divisional Vice President,

1/28/2019  18-23538-shl  Doc 3560-2  Filed 05/03/19  Entered 05/03/19 10:30:54  Exhibit B -
Consumable Goods Commitments edgar/data/56824/0000950124-99-002618.txt
Declaration of Artem Skorostensky in Support of Objection of Urban E    Pg 61 of 166

he served as Senior Vice President, Merchandising and Marketing, Perry Drug
Stores, Inc. from 1994 to 1995; and Senior Vice President, Operations, Payless
Drug Stores, Inc. from 1992 to 1994.

James Mixon - Senior Vice President, Logistics, 54.
Mr. Mixon joined the Registrant in his current position in July 1997. Prior
thereto he served as Senior Vice President, Logistics/Service, Best Buy Stores
from 1994 to 1997; and Senior Vice President, Distribution/Transportation,
Marshall Stores from 1987 to 1994.

E. Jackson Smailes - Senior Vice President and General Merchandise
Manager - Apparel, 56.
Mr. Smailes joined the Registrant in his current position in July 1997. Prior
thereto he served as President, Chief Executive Officer, Hills Department Stores
from 1995 to 1997; and Executive Vice President, Merchandising and Marketing,
Hills Department Stores from 1992 to 1995.

William D. Underwood - Senior Vice President, Global Operations,
Corporate Brands and Quality Assurance, 58.
Mr. Underwood has served as an executive officer of the Registrant since 1986
and has served in his current position since 1994. Prior thereto he was Senior
Vice President, General Merchandise Manager - Hardlines from 1991 to 1994. Mr.
Underwood announced his retirement effective May 1, 1999.

Martin E. Welch III - Senior Vice President and Chief Financial
Officer, 50.
Mr. Welch joined the Registrant under his current title in December 1995. Prior
thereto he was Senior Vice President, Chief Financial Officer, Federal-Mogul
Corporation from 1991 to 1995.

5

<PAGE>   6

PART II

Item 5.  Market for Registrant's Common Equity and Related Stockholder Matters

Information as to the market for the Registrant's common stock and
related stockholder matters, as set forth in Note 14 of the "Notes to
Consolidated Financial Statements" on page 32 of the Registrant's 1998 Annual
Report to Shareholders, is incorporated herein by reference.

Item 6.  Selected Financial Data

The "Consolidated Selected Financial Data" summary, insofar as it
relates to the five fiscal years ended January 27, 1999, appearing on page 17 of
the Registrant's 1998 Annual Report to Shareholders, is incorporated herein by
reference.

Sales and comparable store statistics for the three fiscal years ended
January 27, 1999, appearing in "Management's Discussion and Analysis of Results
of Operations and Financial Condition" on page 18 of the Registrant's 1998
Annual Report to Shareholders, are incorporated herein by reference.

U.S. Kmart selling square footage for the five fiscal years ended
January 27, 1999, appearing in the "Consolidated Selected Financial Data" on
page 17 of the Registrant's 1998 Annual Report to Shareholders, is incorporated
herein by reference.

Item 7.  Management's Discussion and Analysis of Results of Operations and
Financial Condition

The information appearing in "Management's Discussion and Analysis of
Results of Operations and Financial Condition" on pages 18 through 20 of the
Registrant's 1998 Annual Report to Shareholders, is incorporated herein by
reference.

CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

Statements, other than those based on historical facts, including the
discussion of management's expectations for Year 2000 compliance, which address
activities, events or developments that the Registrant expects or anticipates
may occur in the future are forward-looking statements which are based upon a
number of assumptions concerning future conditions that may ultimately prove to
be inaccurate. Actual events and results may materially differ from anticipated
results described in such statements. The Registrant's ability to achieve such
results is subject to certain risks and uncertainties, including, but not
limited to, economic and weather conditions which affect buying patterns of the
Registrant's customers, changes in consumer spending and the Registrant's
ability to anticipate buying patterns and implement appropriate inventory
strategies, continued availability of capital and financing, competitive factors
and other factors affecting business beyond the Registrant's control.
Consequently, all of the forward-looking statements are qualified by these
cautionary statements and there can be no assurance that the results or
developments anticipated by the Registrant will be realized or that they will
have the expected effects on the Registrant or its business or operations.


STATEMENT REGARDING YEAR 2000 DISCLOSURE


        For purposes of any action brought under the securities laws, as that
term is defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15
U.S.C. 78c(a)(47)), the Year 2000 Information and Readiness Disclosure Act does
not apply to any statements contained in any documents or materials filed with
the Securities and Exchange Commission, or with Federal banking regulators,
pursuant to section 12(i) of the Securities Exchange Act of 1934 (15 U.S.C.
78l(i)), or disclosures or writing that when made accompanied the solicitation
of an offer or sale of securities.

Item 7a. Quantitative and Qualitative Disclosures about Market Risk

        Not applicable


Item 8.  Financial Statements and Supplementary Data

        The financial statements of the Registrant consisting of the
consolidated balance sheets at January 27, 1999 and January 28, 1998 and the
related consolidated statements of operations, shareholders' equity and cash
flows for each of the three fiscal years ended January 27, 1999 and the notes to
consolidated financial statements, together with the report of
PricewaterhouseCoopers LLP, appearing on pages 21 through 32 of the Registrant's
1998 Annual Report to Shareholders, are incorporated herein by reference.

Item 9.  Changes in and Disagreements with Accountants on Accounting and
         Financial Disclosure

        Not applicable.




                                        6

<PAGE>   7

                                    PART III



Item 10.  Directors of the Registrant

        The information set forth under the caption "Proposal 1 - Election of
Directors" on page 6 of the Registrant's Proxy Statement dated April 12, 1999
filed with the Securities and Exchange Commission pursuant to Regulation 14A is
incorporated herein by reference.

Item 11.  Executive Compensation

        The information set forth on pages 9 and 11 through 17 of the
Registrant's Proxy Statement dated April 12, 1999 filed with the Securities and
Exchange Commission pursuant to Regulation 14A is incorporated herein by
reference.

Item 12.  Security Ownership of Certain Beneficial Owners and Management

       The information set forth under the caption "Stock Ownership" on pages 4
through 6 of the Registrant's Proxy Statement dated April 12, 1999 filed with
the Securities and Exchange Commission pursuant to Regulation 14A is
incorporated herein by reference.

Item 13.  Certain Relationships and Related Transactions.

       The information set forth under the caption "Section 16(a) Filings/Legal
Proceedings/Management Transactions" on page 6 of the Registrant's Proxy
Statement dated April 12, 1999 filed with the Securities and Exchange Commission
pursuant to Regulation 14A is incorporated herein by reference.


                                   7

<PAGE>   8

                                 PART IV


Item 14.  Exhibits, Financial Statement Schedules and Reports on Form 8-K

a)     The following documents are filed as part of this report:

       1.     Financial Statements

              The following consolidated financial statements of the Registrant
              are incorporated herein by reference from the Registrant's 1998
              Annual Report to Shareholders:

<TABLE>
<CAPTION>

|  |  | Page(s) in Registrant's Annual Report |
|---|---|---|
| <S> |  | <C> |
| Report of Independent Accountants |  | 21 |
| Consolidated Statements of Operations for each of the three fiscal years ended January 27, 1999 |  | 22 |
| Consolidated Balance Sheets at January 27, 1999 and January 28, 1998 |  | 23 |
| Consolidated Statements of Cash Flows for each of the three fiscal years ended January 27, 1999 |  | 24 |
| Consolidated Statements of Shareholders' Equity for each of the three fiscal years ended January 27, 1999 |  | 25 |
| Notes to Consolidated Financial Statements |  | 26 through 32 |

</TABLE>

       2.     Financial Statement Schedules

              The separate financial statements and summarized financial
              information of majority-owned subsidiaries not consolidated and
              of 50% or less owned persons of the Registrant have been omitted
              because they are not required pursuant to conditions set forth in
              Rules 3-09(a), 4-08(g) and 1-02(v) of Regulation S-X.

              All other schedules have been omitted because they are not
              applicable or the required information is shown in the
              Registrant's 1998 Annual Report to Shareholders, which is
              incorporated herein by reference.

       3.     Exhibits

b)    Reports On Form 8-K

     The Registrant did not file a report on Form 8-K during the last quarter
of the fiscal year ended January 27, 1999.


                                      8
<PAGE>    9

                                SIGNATURES

     Pursuant to the requirements of Section 13 or 15(d) of the Securities
Exchange Act of 1934, the Registrant has duly caused this report to be signed on
its behalf by the undersigned, thereunto duly authorized on April 15, 1999.

     Each signatory hereby acknowledges and adopts the typed form of his or
her name in the electronic filing of this document with the Securities and
Exchange Commission.


                            Kmart Corporation

                            By: Floyd Hall
          -----------------------------------------------
                            (Floyd Hall)
               Chairman of the Board, President and
                       Chief Executive Officer

                       By: Martin E. Welch III
          -----------------------------------------------
                        (Martin E. Welch III)
                      Senior Vice President and
                        Chief Financial Officer
                      (Principal Financial Officer)

                       By: Lois M. Connelly
          -----------------------------------------------
                         (Lois M. Connelly)
                      Vice President, Controller
                     (Principal Accounting Officer)

     Pursuant to the requirements of the Securities Exchange Act of 1934,
this report has been signed below by the following persons, on behalf of the
Registrant and in the capacities indicated, on April 15, 1999.

     Each signatory hereby acknowledges and adopts the typed form of his or
her name in the electronic filing of this document with the Securities and
Exchange Commission.

<TABLE>
<CAPTION>

<S><C>
            James B. Adamson                                 Floyd Hall
     ---------------------------------------    ---------------------------------------
-
         James B. Adamson, Director                          Floyd Hall,
                                                     Chairman of the Board,
            Lilyan H. Affinito                   President and Chief Executive Officer
     ---------------------------------------
         Lilyan H. Affinito, Director              (Principal Executive Officer
                                                           and Director)
           Stephen F. Bollenbach
     ---------------------------------------
        Stephen F. Bollenbach, Director                   Robert D. Kennedy
                                                 ---------------------------------------
-
                                                     Robert D. Kennedy, Director
          Joseph A. Califano, Jr.
     ---------------------------------------
       Joseph A. Califano, Jr., Director                  J. Richard Munro
                                                 ---------------------------------------

```
                                                              J. Richard Munro, Director
              Richard G. Cline
-----------------------------------------
         Richard G. Cline, Director                               Robin B. Smith
                                                  -----------------------------------------
 -
                                                              Robin B. Smith, Director


 -----------------------------------------
         Willie D. Davis, Director                               William P. Weber
                                                  -----------------------------------------
 -
                                                            William P. Weber, Director

              Joseph P. Flannery
 -----------------------------------------
       Joseph P. Flannery, Director                             James O. Welch, Jr.
                                                  -----------------------------------------
 -
                                                            James O. Welch, Jr., Director
 -
</TABLE>




                                  9


<PAGE>   10



                              EXHIBIT INDEX

<TABLE>
<CAPTION>

        Exhibit
        Number     Description
        ------     -----------
<S>                <C>
     **** (3a)     Restated Articles of Incorporation of Kmart Corporation
     **** (3b)     Bylaws of Kmart Corporation, as amended
        * (10a)    Kmart Corporation 1973 Stock Option Plan, as amended [10a][A]
        * (10b)    Kmart Corporation 1981 Stock Option Plan, as amended [10b][A]
     **** (10c)    Kmart Corporation Directors Retirement Plan, as amended [10d][A]
       ** (10d)    Kmart Corporation Performance Restricted Stock Plan, as amended [10e][A]
          (10e)    Kmart Corporation Deferred Compensation Plan for Non-Employee Directors, as amended [A]
      *** (10f)    Kmart Corporation 1992 Stock Option Plan, as amended [10g][A]
          (10g)    Kmart Corporation Amended and Restated Directors Stock Plan [A]
       ** (10h)    Form of Employment Agreement with Executive Officers [10j][A]
        * (10i)    Kmart Corporation Supplemental Executive Retirement Plan [10c][A]
      *** (10j)    Amended and Restated Kmart Corporation Annual Incentive Bonus Plan [10k][A]
      *** (10k)    Amended and Restated Kmart Corporation Management Stock Purchase Plan [10l][A]
      *** (10l)    Supplemental Pension Benefit Plan [10m][A]
   ****** (10m)    Employment Agreement with Floyd Hall [10n][A]
  ******* (10n)    Amendment to Employment Agreement [99][A]
    ***** (10o)    Kmart Corporation 1997 Long-Term Equity Compensation Plan [10n][A]
          (10p)    Amended and Restated Kmart Corporation 1998 Management Deferred Compensation and Restoration Plan [A]
          (11)     Statement Regarding Computation of Per Share Earnings
          (12)     Statement Regarding Computation of Ratios
          (13)     Annual Report to Shareholders of Kmart Corporation for the Fiscal Year Ended January 27, 1999
          (23)     Consent of Independent Accountants
          (27)     Financial Data Schedule
</TABLE>

<TABLE>

  Notes:

<S>                <C>
        *          Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal year ended January 27, 1993
(file
                   number 1-327) and are incorporated herein by reference.
       **          Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal year ended January 26, 1994
(file
                   number 1-327) and are incorporated herein by reference.
```

| | | |
|---|---|---|
| *** (file | Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal year ended January 25, 1995 number 1-327) and are incorporated herein by reference. | |

**** (file

Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal year ended January 31, 1996

number 1-327) and are incorporated herein by reference.

*****

Filed as part of the 1997 Proxy Statement and is incorporated herein by reference.

******

Filed as Form 8-K dated June 4, 1995 and is incorporated herein by reference.

******* (file number

Filed as Exhibit to the Form 10-Q Report of the Registrant for the quarter ended October 28, 1998

1-327) and is incorporated herein by reference.

[#]

Exhibit numbers in the Form 10-K or 10-Q Reports for the periods indicated.

[A]

This document is a management contract or compensatory plan.

</TABLE>


In reliance upon Item 601(b)(4)(iii)(A) of Regulation S-K,
various instruments defining the rights of holders of long-term
debt of the Registrant are not being filed herewith because
the total amount of securities authorized under each such
instrument does not exceed 10% of the total assets of the
Registrant.

The Registrant agrees to furnish a copy to the Commission upon
request of the following instruments defining the rights of
holders of long-term debt:

Indenture dated as of February 1, 1985, between Kmart
  Corporation and The Bank of New York, Trustee, as
  supplemented by the First Supplemental Indenture
  dated as of March 1, 1991
12-1/2% Debentures Due 2005
8-1/8% Notes Due 2006
7-3/4% Debentures Due 2012
8-1/4% Notes Due 2022 8-3/8% Debentures Due 2022
7.95% Debentures Due 2023
Fixed-Rate Medium-Term Notes (Series A, B, C, D)


                              10
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(E)
<SEQUENCE>2
<DESCRIPTION>DEFERRED COMP. PLAN FOR NON-EMPLOYEE DIRECTORS
<TEXT>

<PAGE>    1

                                                        EXHIBIT 10e



                         KMART CORPORATION

              DEFERRED COMPENSATION PLAN FOR NON-EMPLOYEE DIRECTORS
              ---------------------------------------------------

SECTION 1.

Each member of the Board of Directors (the "Board") of Kmart Corporation (the "Company") who is not an employee of the Company or any of its subsidiaries (an "Eligible Director") is eligible to participate in the Kmart Corporation Deferred Compensation Plan for Non-Employee Directors (the "Plan").

SECTION 2.        PARTICIPATION

(a) Prior to the beginning of any calendar year, commencing with the calendar year 1991, each Eligible Director may elect to participate in the Plan by directing that all or any part of the compensation otherwise payable in cash for services as an Eligible Director (including services as non-executive Chairman or Vice-Chairman of the Board) during such calendar year and subsequent calendar years shall be credited to a deferred compensation account subject to the terms of the Plan.

(b) An election to participate in the Plan shall be in the form of a document executed by the director and filed with the Secretary of the Company. An election related to cash compensation otherwise payable currently in any calendar year shall become irrevocable on the last day prior to the beginning of such calendar year. An election shall continue until the director ceases to be a director of the Company or until he or she terminates or modifies such election by written notice. Any such termination or modification shall become effective as of the end of the calendar year in which such notice is given with respect to all cash compensation otherwise payable in subsequent calendar years.

(c) A director who has filed a termination of election may thereafter again file an election to participate for any calendar year or years subsequent to the filing of such election.

SECTION 3.        DEFERRED CASH COMPENSATION ACCOUNTS

All deferred cash compensation shall be held in the general funds of the Company and shall be credited to the director's account and shall bear interest from the date such cash compensation would otherwise be payable. The interest credited to the account shall be compounded quarterly at the end of each calendar quarter. For all amounts whenever credited, the rate of interest credited thereon shall be equal to the average ten-year U.S. Treasury note rate for the previous calendar quarter plus 5%.

<PAGE>    2

SECTION 4.        DISTRIBUTION

(a) At the time of election to participate in the Plan, a director shall also make an election with respect to the distribution (during the director's lifetime or in the event of the director's death) of amounts deferred under the Plan plus accumulated interest. Such an election shall be contained in the document referred to in Section 2(b) hereof, executed by the director and filed with the Secretary of the Company. Such an election related to cash compensation otherwise payable currently in any calendar year shall become irrevocable on the last day prior to the beginning of such calendar year.

(b) A director may elect to receive amounts credited to his or her account in one lump sum or in some other number of equal annual installments (not exceeding ten), with the first installment (or lump sum if the director has so elected) to be distributed on the tenth day of the calendar year immediately following the year in which the director ceases to be a director of the Company.

(c) Notwithstanding an election pursuant to Section 4(b) hereof: (i) if, as determined by the Board in its sole discretion, the director (during or following his or her membership on the Board) engaged in any activity or association in competition with or adverse or detrimental to the interest of the Company, the entire balance of the director's deferred cash compensation hereunder, including interest, shall be distributed immediately in a lump sum payment; (ii) upon the occurrence of a Change in Control (as defined below), the entire balance of all deferred cash compensation hereunder, including interest, shall be distributed immediately in a lump sum payment.

(as defined in Rule 13d-3 under the Securities Exchange Act of 1934 as amended
(the "Exchange Act")) of securities representing more than 50% of the combined
voting power of the Company is acquired by any "person" as defined in Sections
13(d) and 14(d) of the Exchange Act (other than the Company, any trustee or
other fiduciary holding securities under an employee benefit plan of the
Company, or any corporation owned, directly or indirectly, by the stockholders
of the Company in substantially the same proportions as their ownership of stock
of the Company), or (ii) the stockholders of the Company approve a definitive
agreement to merge or consolidate the Company with or into another corporation
or to sell or otherwise dispose of all or substantially all of its assets, or
adopt a plan of liquidation, or (iii) during any period of two consecutive
years, individuals who at the beginning of such period were members of the Board
cease for any reason to constitute at least a majority thereof (unless the
election or the nomination for election by the Company's stockholders of each
new director was approved by a vote of at least two-thirds of the directors then
still in office who were directors at the beginning of such period).

     (d) Installments subsequent to the first installment to the director shall
be distributed on the tenth day of each succeeding calendar year until the
entire amount credited to the director's deferred account shall have been
distributed. Deferred amounts held pending distribution shall continue to be
credited with interest, determined in accordance with Section 3 hereof.

                                       2
<PAGE>   3

     (e) In the event the director should die before full distribution of all
amounts credited to the director's account, the balance of the deferred amounts
shall be distributed in a lump sum payment to the beneficiary or beneficiaries
designated in writing by the director, or if no designation has been made, to
the estate of the director.

     (f) The Committee shall have the authority to alter the timing or manner
of payment of deferred cash compensation in the event an Eligible Director
establishes, to the satisfaction of the Committee, severe financial or medical
hardship. In such event, the Committee may, in its discretion:

        (a)    Authorize the cessation of deferrals of cash compensation;
               and/or

        (b)    Provide that all, or a portion of such deferred cash
               compensation payable over a period of time shall immediately
               be paid in a lump sum; and/or

        (c)    Provide for such other payment schedule as deemed appropriate
               by the Committee under the circumstances.

     However, any amount paid pursuant to this Section 4(f) shall not exceed
that amount which the Committee determines to be reasonably necessary for the
Eligible Director to meet the financial or medical hardship at the time of such
payment. The severity of the financial or medical hardship shall be judged by
the Committee. Severe financial or medical hardship shall be deemed to exist in
the event of the Eligible Director's long and serious illness, impending
bankruptcy or similar unforeseeable and extraordinary circumstances arising as a
result of events beyond the control of the Eligible Director. The Committee's
decision with respect to the severity of financial or medical hardship and the
manner which the distribution of deferred cash compensation to an Eligible
Director is altered shall be final, conclusive and not subject to appeal.

SECTION 5.        MISCELLANEOUS

     (a) The right of a director to any deferred cash compensation and/or
interest thereon shall be non-assignable and shall not be subject in any manner
to the debts or other obligations of the director or any other person.

     (b) The Company shall not be required to reserve or otherwise set aside
funds to meet any obligations of the Plan.

     (c) The Plan shall remain in effect until the earlier to occur of a Change
in Control or the termination of the Plan by the Board; provided, however, that,
except as provided in Section 4(c)(ii) hereof, distribution may be made pursuant
to a deferral election after such date.

     (d) The Plan may be amended or discontinued by the Board at any time in

its sole judgment that the Plan is terminated, amounts of eligible
directors' accounts shall be

<PAGE>   4

distributed at such time and in such manner as the Board shall determine, no
later than they would have been made as elected under Section 4 hereof.

        (e) Nothing in the Plan shall be construed as conferring any right upon
any director to continuance as a member of the Board.

        (f) The Plan and all rights hereunder shall be construed in accordance
with and governed by the laws of the State of Michigan.


6.    RABBI TRUST

        (a) Establishment of a Rabbi Trust. As soon as practicable following
December 16, 1997, the Company shall establish an irrevocable Rabbi Trust,
governed by a Rabbi Trust Agreement (which shall be a grantor trust within the
meaning of Code Sections 671-678) for the benefit of Eligible Directors and
beneficiaries of Eligible Directors, as appropriate and applicable. The Rabbi
Trust shall have an independent Trustee (such Trustee to have a fiduciary duty
to carry out the terms and conditions of the Trust) as selected by the Company,
and shall have restrictions as to the Company's ability to amend the Trust or to
cancel benefits provided thereunder.

        Assets contained in the Rabbi Trust shall at all times be specifically
subject to the claims of the Company's general creditors in the event of
insolvency, which term shall be specifically defined within the provisions of
the Rabbi Trust, along with a required procedure for notifying the Trustee of
any such insolvency.

        All benefits hereunder, shall be paid first from the Rabbi Trust, to the
extent assets exist in the Rabbi Trust and then, as necessary, by the Company
from general assets.

        (b) Funding of the Rabbi Trust. At the discretion of the Committee, the
Company may contribute cash and/or cash equivalents to the Rabbi Trust, for the
benefit of Eligible Directors and beneficiaries of Eligible Directors as the
Committee deems appropriate. It is intended that the Rabbi Trust will be fully
funded at all times to cover the accrued obligations of the Company under the
Plan. Upon a Change in Control (as defined in Section 4.c), the Company shall be
required to make an immediate contribution to the Rabbi Trust to cause all such
accrued obligations to be fully or overfunded as of that date.

        The Committee reserves the right to invest the Trust assets in any
investment deemed appropriate by the Committee.



Dated:  December 18, 1990  (Amended as of December 16, 1991, March 28, 1995,
            September 19, 1995, December 16, 1997 and March 16, 1999)

                                        4


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(G)
<SEQUENCE>3
<DESCRIPTION>AMENDED AND RESTATED DIRECTORS STOCK PLAN
<TEXT>

<PAGE>   1

                                                    EXHIBIT 10g


                        KMART CORPORATION
                        AMENDED AND RESTATED
                        DIRECTORS STOCK PLAN
                        --------------------


1.  PURPOSE

1.1 The Kmart Corporation Directors Stock Plan (the "Plan") is intended to increase the proprietary interest of nonemployee members of the Board of Directors (the "Board") of Kmart Corporation (the "Company") by providing further opportunity for ownership of the Company's common stock ("Stock"), and to increase their incentive to contribute to the success of the Company's business.

1.2 The Plan is intended to comply with Rule 16b-3 under the Securities Exchange Act of 1934 as amended (the "Exchange Act"), as such Rule may be amended from time to time ("Rule 16b-3") and shall be construed to so comply.

2. ADMINISTRATION

2.1 The Plan shall be administered by the Compensation and Incentives Committee (the "Committee") of the Board.

2.2 The Committee may make such rules and establish such procedures for the administration of the Plan as it deems appropriate to carry out the purpose of the Plan. The interpretation and application of the Plan or of any rule or procedure, and any other matter relating to or necessary to the administration of the Plan, shall be determined by the Committee, and any such determination shall be final and binding on all persons.

3. SHARES OF STOCK

3.1 Shares Reserved. Shares of Stock which may be issued under the Plan may either be authorized and unissued shares or issued shares which have been reacquired by the Company, provided that the total amount of Stock which may be issued under the Plan shall not exceed 400,000 shares.

3.2 Capital Adjustments. In the event of a change in the number or class of shares of Stock as a result of reorganization, recapitalization, stock split, stock dividend, combination of shares, merger, consolidation or a similar corporate transaction, the maximum number or class of shares available under the Plan, and the number or class of shares of Stock to be delivered hereunder shall be proportionately adjusted to reflect any such change.

4. STOCK IN LIEU OF CASH COMPENSATION

4.1 Mandatory Portion. For each calendar year commencing with the calendar year beginning January 1, 1996, each member of the Board who is not an employee of the Company or any of its subsidiaries (an "Eligible Director") shall receive a whole number of shares of Stock equal in value to 50% of any cash compensation payable for services as an Eligible Director (including services as non-executive Chairman or Vice-Chairman of the Board) during each such calendar year in lieu of payment of such percentage of such cash compensation. Such shares shall be delivered to each such director, in substantially equal installments, on the last

<PAGE>   2

business day of each calendar quarter of each such calendar year (the "Normal Stock Payment Date"), except to the extent that a Deferral Election (as defined in Section 4.3 hereof) shall be in effect with respect to such shares or that Section 4.6 hereof applies.

Each such share shall be valued at the closing price per share of Stock as reported on the Composite Transactions reporting system, or if not so reported, as reported by the New York Stock Exchange (the "Closing Price") on the last business day preceding each Normal Stock Payment Date (the "Share Value Price"). The value of fractional shares shall be paid to the director in cash.

4.2 Elective Portion. In addition to the shares of stock received pursuant to Section 4.1 hereof, for each calendar year commencing with the calendar year beginning January 1, 1996, each Eligible Director may elect to receive a whole number of shares of Stock equal in value (based on the Share Value Price) to up to 50% of his or her cash compensation payable for services as an Eligible Director (including services as non-executive Chairman or Vice Chairman of the Board) during each such calendar year in lieu of payment of such percentage of such cash compensation. Such shares shall be delivered to each such director, in substantially equal installments, on the Normal Stock Payment Dates, except to the extent that a Deferral Election (as defined in Section 4.3 hereof) shall be

The value of fractional shares shall be paid to the director in cash.

4.3 Deferral Election. Each Eligible Director may elect to defer the
receipt (a "Deferral Election") of all or a portion of the shares of Stock
otherwise deliverable on a Normal Stock Payment Date ("Deferred Shares").

The director shall elect that Deferred Shares be distributed in a lump sum
or in equal annual installments (not exceeding ten), with the lump sum or first
installment to be distributed on the tenth day of the calendar year immediately
following the year in which the director ceases to be a director of the Company;
provided, however, that the foregoing shall be subject to Section 4.6 hereof.
Installments subsequent to the first installment shall be distributed on the
tenth day of each succeeding calendar year until all of the director's Deferred
Shares shall have been distributed.

In the event the director should die before all of the director's Deferred
Shares have been distributed, the balance of the Deferred Shares shall be
distributed in a lump sum to the beneficiary or beneficiaries designated in
writing by the director, or if no designation has been made, to the estate of
the director.

4.4 Dividend Equivalents. Deferred Shares shall be credited with an amount
equivalent to the dividends which would have been paid on an equal number of
outstanding shares of Stock ("Dividend Equivalents"). Dividend Equivalents shall
be credited (i) as of the payment date of such dividends, and (ii) only with
respect to Deferred Shares which were otherwise deliverable as of a Normal Stock
Payment Date, or into which Dividend Equivalents were converted pursuant to the
second paragraph of this Section 4.4, prior to the record date of the dividend.
Deferred Shares held pending distribution shall continue to be credited with
Dividend Equivalents.

Dividend Equivalents so credited shall be converted into an additional
whole number of Deferred Shares as of the payment date of the dividend (based on
the Closing Price on such payment date). Such Deferred Shares shall thereafter
be treated in the same manner as any other Deferred Shares under the Plan.
Dividend

2

<PAGE> 3

Equivalents resulting in fractional shares shall be held for the credit
of the director until the next dividend payment date and shall be converted into
Deferred Shares on such date. Any Dividend Equivalents not converted into
Deferred Shares shall be paid in cash upon the final distribution of the
director's Deferred Shares.

4.5    Timing and Form of Elections.  Any election described in Sections
4.2 and 4.3 hereof:

         (a)    shall be in the form of a document executed by the director
                and filed with the Secretary of the Company,

         (b)    shall be made before the first day of the calendar year in
                which the applicable cash compensation is earned and shall
                become irrevocable on the last day prior to the beginning
                of such calendar year, and

         (c)    shall continue until a director ceases to be a director of
                the Company or until he or she terminates or modifies such
                election by written notice, any such termination or
                modification to be effective, except as otherwise provided
                in the second paragraph of paragraph 4.2 hereof, as of the
                end of the calendar year in which such notice is given with
                respect to cash compensation otherwise payable in
                subsequent calendar years.

4.6    Effect of Certain Events.  Notwithstanding an election pursuant to
Section 4.2 or Section 4.3 hereof:

         (a)    If, as determined by the Board in its sole discretion, the
                director (during or following his or her membership on the
                Board) engaged in any activity or association in
                competition with or adverse or detrimental to the interest
                of the Company (i) all of such director's Deferred Shares
                shall be distributed immediately in the form of shares of

yet converted into Deferred Shares shall be distributed
immediately in cash, and (ii) all of such director's cash
compensation earned and not yet converted into shares of
Stock or Deferred Shares under the terms of this Plan shall
be distributed in the form of shares of Stock as soon as
practicable after the next Normal Stock Payment Date.

    (b)    Upon the occurrence of a Change in Control (as defined
below), (i) all Deferred Shares to the extent credited
prior to the Change in Control shall be distributed
immediately in the form of shares of Stock or their cash
equivalent value, and (ii) all Dividend Equivalents not yet
converted into Deferred Shares and all cash compensation
earned and not yet converted into shares of Stock or
Deferred Shares under the terms of this Plan shall be
distributed immediately in cash.

    A Change in Control shall have occurred if (i) the "beneficial ownership"
(as defined in Rule 13d-3 under the Exchange Act) of securities representing
more than 50% of the combined voting power of the Company is acquired by any
"person" as defined in Sections 13(d) and 14(d) of the Exchange Act (other than
the Company, any trustee or other fiduciary holding securities under an employee
benefit plan of the Company, or any corporation owned, directly or indirectly,
by the stockholders of the Company in substantially the same proportions as
their ownership of stock of the Company), or (ii) the stockholders of the
Company

<div align="center">3</div>

<PAGE>    4

approve a definitive agreement to merge or consolidate the Company with or into
another corporation or to sell or otherwise dispose of all or substantially all
of its assets, or adopt a plan of liquidation, or (iii) during any period of two
consecutive years, individuals who at the beginning of such period were members
of the Board cease for any reason to constitute at least a majority thereof
(unless the election or the nomination for election by the Company's
stockholders of each new director was approved by a vote of at least two-thirds
of the directors then still in office who were directors at the beginning of
such period).

    The provisions of this Section 4.6 shall not apply to the extent
inconsistent with the requirements of Rule 16b-3, as the same may be interpreted
from time to time.

5.  RESTRICTED STOCK UNITS

    5.1 Awards. For each year beginning January 1, 1996, each Eligible
Director who as of such date is not entitled to receive benefits under the
Company's Directors Retirement Plan (the "Retirement Plan") for a period of ten
years following retirement from the Board shall be credited with Restricted
Stock Units ("Units") equal in value to 50% of the annual Board retainer fee
then in effect for an Eligible Director. Such Units shall be credited to each
such director, in substantially equal installments, on Normal Stock Payment
Dates. Each Unit shall be valued at the Share Value Price.

    An Eligible Director shall be entitled to be credited with such Units (a)
for ten years, (b) until the period during which the director is credited with
such Units when combined with the period for which the director is entitled to
receive benefits under the Retirement Plan is equal to ten years or (c) until
the director's retirement from the Board, whichever first occurs.

    5.2 Committee Chairs. For each year beginning January 1, 1996 during which
an Eligible Director serves as chair of a regular committee of the Board, such
director shall be credited with Units equal in value to 10% of the annual Board
retainer fee then in effect for an Eligible Director. Such Units shall be
credited to each such director, in substantially equal installments, on the
Normal Stock Payment Dates. Each Unit shall be valued at the Share Value Price.

    5.3 Distribution. Following the director's retirement from the Board, the
value of the Units credited to the director shall be distributed to the director
in shares of Stock pursuant to the election of the director.

    The director shall elect that distribution be in a lump sum or in equal
annual installments (not exceeding ten), with the lump sum or first installment
to be distributed on the tenth day of the calendar year immediately following

the year in which the director ceases to be a director of the Company; provided,
however, that the foregoing shall be subject to Section 5.6 hereof. Installments
subsequent to the first installment shall be distributed on the tenth day of
each succeeding calendar year until all of the director's Units shall have been
distributed.

In the event the director should die before all of the director's Units
have been distributed, the balance of the Units shall be distributed in a lump
sum to the beneficiary or beneficiaries designated in writing by the director,
or if no designation has been made, to the estate of the director.

4

<PAGE>   5

5.4 Dividend Equivalents. Units shall be credited with Dividend
Equivalents. Dividend Equivalents shall be credited (i) as of the payment date
of such dividends, and (ii) only with respect to Units which were credited as of
a Normal Stock Payment Date, or into which Dividend Equivalents were converted
pursuant to the second paragraph of this Section 5.4, prior to the record date
of the dividend. Units held pending distribution shall continue to be credited
with any Dividend Equivalents.

Dividend Equivalents so credited shall be converted into an additional
whole number of Units as of the payment date of the dividend (based on the
Closing Price on such payment date). Such Units shall thereafter be treated in
the same manner as any other Units under the Plan. Dividend Equivalents
resulting in fractional shares shall be held for the credit of the Eligible
Director until the next dividend payment date and shall be converted into Units
on such date. Any Dividend Equivalents not converted into Units shall be paid in
cash upon the final distribution of the director's Units.

5.5     Timing the Form of Elections.  The election described in Section
5.3 hereof:

        (a)     shall be in the form of a document executed by the director
                and filed with the Secretary of the Company,

        (b)     shall be made no later than 12 months prior to the
                director's retirement from the Board, and

        (c)     shall become irrevocable 12 months prior to the director's
                retirement from the Board.

If no election is made, the Units shall be distributed in a lump sum on
the tenth day of the calendar year immediately following the year in which the
director ceases to be a director of the Company.

5.6     Effect of Certain Events.  Notwithstanding an election pursuant to
Section 5.3 hereof:

        (a)     If, as determined by the Board in its sole discretion, the
                director (during or following his or her membership on the
                Board) engaged in any activity or association in
                competition with or adverse or detrimental to the interest
                of the Company (i) all of such director's Units credited
                under Section 5.1 hereof, as well as Dividend Equivalents
                and other Units resulting from such Units, shall be
                immediately forfeited and (ii) all of such director's Units
                credited under Section 5.2 hereof, as well as Dividend
                Equivalents and other Units resulting from such Units,
                shall be distributed immediately in the form of shares of
                Stock or cash.

        (b)     Upon the occurrence of a Change in Control, (i) all Units
                to the extent credited prior to the Change in Control shall
                be distributed immediately in the form of shares of Stock
                or their cash equivalent value, and (ii) all Dividend
                Equivalents not yet converted into Units shall be
                distributed immediately in cash.

The provisions of this Section 5.6 shall not apply to the extent
inconsistent with the requirements of Rule 16b-3, as the same may be interpreted
from time to time.

5

5.7 Financial or Medical Hardship. The Committee shall have the authority to alter the timing or manner of distribution of Deferred Shares and/or Restricted Stock Units in the event that the Eligible Director establishes, to the satisfaction of the Committee, severe financial or medical hardship. In such event, the Committee may, in its discretion:

    (a)    Authorize the cessation of the deferral of Deferred Shares; and/or

    (b)    Provide that all, or a portion, of the Deferred Shares distributable over a period of time shall instead be immediately distributed; and/or

    (c)    Provide that all, or a portion, of the Restricted Stock Units shall be immediately distributed; and/or

    (d)    Provide for such other distribution schedule as deemed appropriate by the Committee under the circumstances.

However, the Deferred Shares/Restricted Stock Units distributed pursuant to this Section 5.7 shall not exceed that amount which the Committee determines to be reasonably necessary for the Eligible Director to meet the financial or medical hardship at the time of such payment. The severity of the financial or medical hardship shall be judged by the Committee. Severe financial or medical hardship shall be deemed to exist in the event of the Eligible Director's long and serious illness, impending bankruptcy or similar unforeseeable and extraordinary circumstances arising as a result of events beyond the control of the Eligible Director. The Committee's decision with respect to the severity of financial or medical hardship and the manner which the distribution of Deferred Shares and/or Restricted Stock Units to an Eligible Director is altered shall be final, conclusive and not subject to appeal.

6.  TERM OF PLAN

6.1 The Plan, as amended by the Board as of January 1, 1996, is subject to approval by the stockholders of the Company at the Company's 1996 annual meeting of stockholders; provided, however, that if the Plan as so amended is approved by stockholders, any election described in Sections 4.2, 4.3 and 5.3 hereof which was made prior to such approval shall be deemed to be effective as of the date such election was made. In no event shall any delivery of shares of Stock be made to any director or other person under the Plan as so amended until such time as stockholder approval of the Plan as so amended is obtained.

6.2 The Plan shall remain in effect until the earlier to occur of a Change in Control or December 31, 2011, unless sooner terminated by the Board; provided, however, that, except as provided in Sections 4.6(b) and 5.6(b) hereof, shares of Stock and Dividend Equivalents may be delivered after such date pursuant to an election made prior to such date.

7.  AMENDMENT; TERMINATION

7.1 The Board may at any time and from time to time alter, amend, suspend or terminate the Plan in whole or in part.

<div align="center">6</div>

<PAGE>    7

7.2 Except as provided in Sections 4.6 and 5.6 hereof, in the event the Plan is terminated, Deferred Shares, Units and Dividend Equivalents shall be distributed at such time and in such manner as the Board shall determine, no later than they would have been distributed pursuant to the election applicable thereto.

8.  MISCELLANEOUS

8.1 The right of a director to Deferred Shares, Units and/or Dividend Equivalents shall be non-assignable and shall not be subject in any manner to the debts or other obligations of the director or any other person.

8.2 The Company shall not be required to reserve or otherwise set aside funds to meet any obligations under this Plan.

8.3 _____ ... ___ member of the Board, ... ___ under any obligation
any director to continuance as a member of the Board.

8.4 This Plan and all rights hereunder shall be construed in accordance
with and governed by the laws of the State of Michigan.

9.  RABBI TRUST

9.1 Establishment of a Rabbi Trust. As soon as practicable following
December 16, 1997, the Company shall establish an irrevocable Rabbi Trust,
governed by a Rabbi Trust Agreement (which shall be a grantor trust within the
meaning of Code Sections 671-678) for the benefit of Eligible Directors and
beneficiaries of Eligible Directors, as appropriate and applicable. The Rabbi
Trust shall have an independent Trustee (such Trustee to have a fiduciary duty
to carry out the terms and conditions of the Trust) as selected by the Company,
and shall have restrictions as to the Company's ability to amend the Trust or to
cancel benefits provided thereunder.

Assets contained in the Rabbi Trust shall at all times be specifically
subject to the claims of the Company's general creditors in the event of
insolvency, which term shall be specifically defined within the provisions of
the Rabbi Trust, along with a required procedure for notifying the Trustee of
any such insolvency.

All benefits hereunder, shall be paid first from the Rabbi Trust, to the
extent assets exist in the Rabbi Trust and then, as necessary, by the Company
from general assets.

9.2 Funding of the Rabbi Trust. At the discretion of the Committee, the
Company may contribute cash and/or cash equivalents to the Rabbi Trust, for the
benefit of Eligible Directors and beneficiaries of Eligible Directors as the
Committee deems appropriate. It is intended that the Rabbi Trust will be fully
funded at all times to cover the accrued obligations of the Company under the
Plan. Upon a Change in Control (as defined in Section 4.6 hereof), the Company
shall be required to make an immediate contribution to the Rabbi Trust to cause
all such accrued obligations to be fully or overfunded as of that date.

The Committee reserves the right to invest the Trust assets in any
investment deemed appropriate by the Committee.

Dated:  December 16, 1991 (Amended as of March 28, 1995, January 1, 1996,
        August 20, 1996, December 16, 1997 and March 16, 1999)

7

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(P)
<SEQUENCE>4
<DESCRIPTION>AMENDED & RESTATED 1998 MANAGEMENT DEF. COMP.
<TEXT>

<PAGE>   1

                                                    EXHIBIT 10p

                          AMENDED AND RESTATED
                          KMART CORPORATION
                          1998 MANAGEMENT DEFERRED
                          COMPENSATION AND RESTORATION PLAN

                          (Effective January 1, 1998; as amended
                          and restated as of September 1, 1998)

<PAGE>   2


CONTENTS


<TABLE>
- ------------------------------------------------------------------------------
<S>                                                                        <C>
Article 1. Establishment and Purpose                                       1

Article 2. Definitions                                                     1

Article 3. Administration                                                  7

Article 4. Eligibility and Participation                                   7

Article 5. Voluntary Deferrals                                             8

Article 6. Mandatory Deferrals                                             9

Article 7. Voluntary Stock Unit Deferrals                                  9

Article 8. Savings Plan Deferral Restoration                              10

Article 9. Company 401(k) Match Restoration                               11

Article 10. Company Profit Sharing Restoration                            12

Article 11. Discretionary Company Credits                                 13

Article 12. Participant Accounts and the Rabbi Trust                      13

Article 13. Allocation of Prior Deferrals and Company Credits             15

Article 14. Beneficiary Designation                                       16

Article 15. Withholding of Taxes                                          17

Article 16. Employment/Misconduct                                         17

Article 17. Amendment and Termination                                     17

Article 18. Miscellaneous                                                 18
</TABLE>
<PAGE>   3


AMENDED AND RESTATED KMART CORPORATION 1998 MANAGEMENT
DEFERRED COMPENSATION AND RESTORATION PLAN

ARTICLE 1. ESTABLISHMENT AND PURPOSE
     1.1 ESTABLISHMENT. Kmart Corporation, a Michigan corporation (together
with its participating subsidiaries and affiliates, the "Company"), hereby
establishes, effective as of January 1, 1998 (the "Effective Date"), a deferred
compensation and savings restoration plan for key management employees as
described herein, which shall be known as the "Kmart Corporation 1998 Management
Deferred Compensation and Restoration Plan" (the "Plan").

     1.2 PURPOSE. The primary purpose of the Plan is to provide key management
employees of the Company with the opportunity to defer a portion of their
compensation and to restore certain retirement benefits lost due to statutory
limits imposed by the Code, subject to the terms of the Plan. By adopting the
Plan, the Company desires to enhance its ability to attract and retain key
management employees.

ARTICLE 2. DEFINITIONS

2.1 DEFINITIONS. Whenever used herein, the following terms shall have the meanings set forth below, and when the meaning is intended, the term is capitalized:

(a)   "Accrued Account Balances" means the then current aggregate account balances of a Participant through a specific date in question, including Voluntary Deferrals (as described in Article 5 hereof), Mandatory Deferrals (as described in Article 6 hereof), Voluntary Stock Unit Deferrals (as described in Article 7 hereof); Savings Plan Deferral Restoration (as described in Article 8 hereof), Company 401(k) Match Restoration (as described in Article 9 hereof), Company Profit Sharing Restoration (as described in Article 10 hereof), Discretionary Company Credits (as described in Article 11 hereof), and earnings thereon (as described in Article 12 hereof).

(b)   "Accrued Rabbi Trust Obligations" means the then current Accrued Account Balances of all Participants through a specific date in question, except for amounts credited to Treasury Note Accounts.

(c)   "Base Salary" means all regular basic wages earned by a Participant for services rendered during a Plan Year, before any deductions. (See Section 5.2 for an explanation of the amount of Base Salary that may be deferred by a Tier I Participant.)

(d)   "Beneficial Ownership" has the same meaning ascribed to such term in Rule 13d-3 of the General Rules and Regulations under the Exchange Act.

(e)   "Board" or "Board of Directors" means the Board of Directors of Kmart Corporation.

1

<PAGE>    4

(f)   "Change in Control" of Kmart Corporation is deemed to have occurred as of the first day that any one or more of the following conditions shall have been satisfied:

(i)   The "Beneficial Ownership" of securities representing more than thirty-three percent (33%) of the combined voting power of Kmart Corporation is acquired by any "person" as defined in Sections 13(d) and 14(d) of the Exchange Act (other than Kmart Corporation, any trustee or other fiduciary holding securities under an employee benefit plan of Kmart Corporation, or any corporation owned, directly or indirectly, by the stockholders of Kmart Corporation in substantially the same proportions as their ownership of stock of Kmart Corporation); or

(ii)   The stockholders of Kmart Corporation approve a definitive agreement to merge or consolidate Kmart Corporation with or into another corporation or to sell or otherwise dispose of all or substantially all of its assets, or adopt a plan of liquidation; or

(iii)   During any period of three consecutive years, individuals who at the beginning of such period were members of the Board cease for any reason to constitute at least a majority thereof (unless the election, or the nomination for election by the stockholders of Kmart Corporation, of each new director was approved by a vote of at least a majority of the directors then still in office who were directors at the beginning of such period or whose election or nomination was previously so approved).

1/28/2019    18-23538-shl    Doc 3560-2    Filed 05/03/19    Entered 05/03/19 10:30:54    Exhibit B - Declaration of Artem Skorostensky in Support of Objection of Urban E    Pg 78 of 166

https://www.sec.gov/Archives/edgar/data/56824/0000950124-99-002618.txt

Stock shall have been sold on the specific date in question, or if no such sale was made on such date then on the next preceding day on which there was such a sale of Common Stock. The price shall be as reported on the Composite Transactions reporting system, or if not so reported, as reported by the New York Stock Exchange.

(h)     "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(i)     "Committee" means the Compensation and Incentives Committee of the Board (or such other committee as designated by the Board as a successor thereto) which has the authority to administer the Plan.

(j)     "Common Stock" means the common stock of Kmart Corporation.

(k)     "Company Stock Fund" has the same meaning ascribed to such term in the Retirement Savings Plan.

(l)     "Compensation" has the same meaning ascribed to such term in the Retirement Savings Plan. (See Section 8.2 for an explanation of the amount of Compensation that may be deferred by a Tier II Participant.)

                                2

<PAGE>    5

(m)     "Disability" has the same meaning ascribed to such term in Kmart Corporation's long-term disability plan.

(n)     "Discretionary Company Credits Account" has the meaning set forth in Section 11.2 hereof.

(o)     "Employee Directed Contributions" has the same meaning ascribed to such term in the Retirement Savings Plan.

(p)     "Employer Matching Contributions" has the same meaning ascribed to such term in the Retirement Savings Plan.

(q)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, or any successor thereto.

(r)     "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, or any successor act thereto.

(s)     "Exercise Date" has the meaning set forth in Section 7.2 hereof.

(t)     "Expiration Date" has the meaning set forth in Section 7.2 hereof.

(u)     "Form of Payout" means a Participant's elected method of payout. A Participant may choose from either (i) a Lump-Sum Payment or (ii) Installment Payments. If no Form of Payout is elected, then payment will be made in a Lump-Sum Payment.

A Participant may at any time at least twelve (12) months prior to a Payout Commencement Date, petition the Committee to change the Form of Payout previously elected by such Participant to a different Form of Payout otherwise available under the Plan (i.e., a Lump-Sum Payment or Installment Payments).

If a Participant remains employed with the Company through a Payout Commencement Date, and if the Accrued Account Balances payable on such Payout Commencement Date are less than ten thousand dollars ($10,000), then, regardless of any Form of Payout election(s) made by a Participant to receive or continue to receive Installment Payments thereon, such Accrued Account Balances shall be paid on such Payout Commencement Date, or as soon as administratively practicable thereafter, in a Lump-Sum

If a Participant's employment with the Company terminates
for any reason and the Participant's Accrued Account
Balances payable on any coincident or future Payout
Commencement Date are less than ten thousand dollars
($10,000) at the time of such termination of employment,
then all Accrued Account Balances payable on such Payout
Commencement Date(s) shall be paid in a Lump-Sum Payment as
soon as administratively practicable, regardless of the
Participant's previous elections.

                              3
<PAGE>   6


If a Participant's employment with the Company terminates
due to Disability or death, and the Participant's Accrued
Account Balances payable on any coincident or future Payout
Commencement Date are individually equal to or greater than
ten thousand dollars ($10,000), such Participant, or such
Participant's estate, as the case may be, may petition the
Committee to pay out all such Accrued Account Balances in a
single Lump-Sum Payment as soon as administratively
practicable regardless of the Participant's previous
elections. In the case of employment termination due to
Disability, the termination shall be deemed to have
occurred on the day that the Committee, or the Committee's
designee, determines the Disability to be total and
permanent. The decision of whether to allow for an
accelerated Lump-Sum Payment shall be at the discretion of
the Committee.

(v)    "Installment Payments" means a series of payments, from two
       (2) up to twenty (20) approximately equal annual payments,
       as elected by the Participant, to be made in cash or Common
       Stock, as applicable, with the initial payment due within
       thirty (30) calendar days after the applicable Payout
       Commencement Date elected by the Participant. Each of the
       remaining Installment Payments shall be made in cash or
       Common Stock, as applicable, each year thereafter on the
       anniversary of such Payout Commencement Date, until all
       Accrued Account Balances deferred to such Payout
       Commencement Date have been paid in full. Earnings shall
       continue to accrue on any remaining Accrued Account
       Balances in the manner provided in Section 12.2 hereof
       until all Accrued Account Balances deferred to such Payout
       Commencement Date have been paid in full. The amount of
       each Installment Payment shall be equal to the applicable
       portion of the Accrued Account Balances remaining
       immediately prior to each such payment, multiplied by a
       fraction, the numerator of which is one (1), and the
       denominator of which is the number of Installment Payments
       remaining to be paid (including such payment).

(w)    "Investment Funds" has the same meaning ascribed to such
       term in the Retirement Savings Plan.

(x)    "Lump-Sum Payment" means a single payment to be made in
       cash or Common Stock, as applicable, within thirty (30)
       calendar days after the applicable Payout Commencement
       Date.

(y)    "Mandatory Deferral Account" has the meaning set forth in
       Section 6.1 hereof.

(z)    "Match Restoration Account" has the meaning set forth in
       Section 9.2 hereof.

(aa)   "Participant" means any Tier I Participant or Tier II
       Participant.

(ab)   "Payout Commencement Date" means a date irrevocably elected
       by a Participant, or as otherwise provided herein, upon
       which payment of Accrued Account Balances begins.

A Payout Commencement Date shall be no earlier than one
year following the end of the year in which amounts
deferred hereunder are otherwise earned, and no later than
the January following the Participant's sixty-fifth (65th)
birthday. No limit exists on the number of different Payout
Commencement Dates that can be elected by each Participant.

If no Payout Commencement Date is specified by a
Participant for any Voluntary Deferrals, Savings Plan
Deferral Restorations or Voluntary Stock Unit Deferrals,
then payout of these amounts shall occur in the January
following the Participant's termination of employment.

All Company Profit Sharing Restoration and Company 401(k)
Match Restoration shall automatically be paid out beginning
in the January following the Participant's termination of
employment.

(ac)    "Plan Year" means the calendar year.

(ad)    "Predecessory Deferral/Restoration Arrangements" has the
meaning set forth in Article 13 hereof.

(ae)    "Profit Sharing Contributions" has the same meaning
ascribed to such term in the Retirement Savings Plan.

(af)    "Profit Sharing Restoration Account" has the meaning set
forth in Section 10.2 hereof.

(ag)    "Rabbi Trust" means a grantor trust, as intended by
Sections 671-678 of the Code, established by Kmart
Corporation for the benefit of Participants and their
beneficiaries.

(ah)    "Retirement Savings Plan" means the Kmart Corporation
Retirement Savings Plan B.

(ai)    "Retirement Savings Plan Deferral Restoration Account" has
the meaning set forth in Section 8.2 hereof.

(aj)    "Stock Unit" means a bookkeeping entry which is the
equivalent of one share of Common Stock.

(ak)    "Stock Unit Subaccount" means the bookkeeping account
established for a Participant which is credited with Stock
Units equal to the number of shares of Common Stock
(including fractions of a share) that could have been
purchased with the corresponding amount of Company 401(k)
Match Restoration (as provided under Article 9 hereof) at
the Closing Price of the shares of Common Stock on the date
as of which such Stock Unit Subaccount is so credited. The

5

Stock Unit Subaccount shall be reduced in a similar manner
as of the date that any Common Stock is distributed from
such Subaccount to the Particpant.

As of the date any dividend is paid to holders of shares of
Common Stock, a Participant's Stock Unit Subaccount shall
be credited with additional Stock Units equal to the number
of shares of Common Stock (including fractions of a share)
that could have been purchased, at the Closing Price of a
share of Common Stock on such date, with the amount that
would have been paid as dividends on that number of shares
of Common Stock (including fractions of a share) which is
equal to the number of Stock Units attributable to the
Participant's Stock Unit Subaccount as of the record date
of such dividend. In the case of dividends paid in
property, the amount of the dividend shall be deemed to be
the fair market value of the property at the time of the

distribution from the Stock Unit Subaccount shall be paid
in a number of shares of Common Stock equal to the number
of Stock Units distributable.

(al)     "Tier I Participant" means each key management employee
designated by the Board as a Senior Officer of the Company,
each Divisional Vice President, each Operations Vice
President, each Regional Vice President, and each other
person so designated by the Committee.

(am)     "Tier II Participant" means each key management employee of
the Company, except for Tier I Participants, who (i) is
qualified to participate in the Retirement Savings Plan;
and (ii) experiences a cutback in Employee Directed
Contributions, Employer Matching Contributions, and/or
Profit Sharing Contributions due to the limitations imposed
by the Code; and (iii) meets such other qualification
standards (including pay level) as determined by the
Committee from time to time, and who is thereby selected
for participation in the Plan by the Committee.

(an)     "Treasury Note Account" means a separate bookkeeping
account not funded by the Rabbi Trust, to be maintained by
the Company, that shall offer a rate of return equal to the
average ten (10) year U.S. Treasury Note rate for the most
recently ended calendar quarter plus five percent (5%).

(ao)     "Voluntary Deferral Account" has the same meaning set forth
in Section 5.2 hereof.

(ap)     "Voluntary Stock Unit Deferral Account" means the
bookkeeping account established for a Participant which is
credited with Stock Units equal to the number of shares of
Common Stock (including fractions of a share) that were
voluntarily deferred into the Voluntary Stock Unit Deferral
Account by a Participant in connection with a stock option
exercise, or the lapse of restrictions on a restricted
stock grant or purchase, pursuant to the provisions of a
Company stock plan. The Voluntary Stock Unit Deferral
Account shall be reduced in a similar manner as of the date
that any Common Stock is distributed from such account to
the Participant.

                                    6

<PAGE>     9

As of the date any dividend is paid to holders of shares of
Common Stock, a Participant's Voluntary Stock Unit Deferral
Account shall be credited with additional Stock Units equal
to the number of shares of Common Stock (including
fractions of a share) that could have been purchased, at
the Closing Price of a share of Common Stock on such date,
with the amount that would have been paid as dividends on
that number of shares of Common Stock (including fractions
of a share) which is equal to the number of Stock Units
attributable to the Participant's Voluntary Stock Unit
Deferral Account as of the record date of such dividend. In
the case of dividends paid in property, the amount of the
dividend shall be deemed to be the fair market value of the
property at the time of the payment thereof, as determined
by the Committee. A distribution from the Voluntary Stock
Unit Deferral Account shall be paid in a number of shares
of Common Stock equal to the number of Stock Units
distributable.

(aq)     "Voluntary Stock Unit Deferral" has the same meaning
ascribed to such term in Article 7 hereof.

     2.2 GENDER AND NUMBER. Except where otherwise indicated by the context,
any masculine term used herein shall include the feminine, the plural shall
include the singular, and the singular shall include the plural.

ARTICLE 3. ADMINISTRATION
     3.1 ADMINISTRATION OF THE PLAN. The Plan shall be administered by the

1/28/2019    18-23538-shl    Doc 3560-2    Filed 05/03/19    Entered 05/03/19 19:30:54    Exhibit B - Committee Declaration of Artem Skorostensky in Support of Objection of Urban E    Pg 82 of 166

https://www.sec.gov/Archives/edgar/data/56824/0000950124-99-002618.txt

Bylaws of Kmart Corporation. Subject to the terms hereof, the Committee shall have full power to (a) determine the terms and conditions of each Participant's participation in the Plan; (b) construe and interpret the Plan and any agreement or instrument entered into under the Plan; (c) establish, amend, or waive rules and regulations for the Plan's administration; (d) amend (subject to the provisions of Article 17 hereof) the terms and conditions of the Plan and any agreement or instrument entered into under the Plan; (e) designate one or more persons to administer the Plan; and (f) make other determinations which may be necessary or advisable for the administration of the Plan.

3.2 DECISIONS BINDING. All determinations and decisions of the Committee as to any disputed question arising under the Plan, including questions of construction and interpretation, shall be final, conclusive, and binding on all parties.

ARTICLE 4. ELIGIBILITY AND PARTICIPATION
4.1 ELIGIBILITY. Eligibility to participate in the Plan will be limited to Tier I Participants and Tier II Participants. In the event a Participant no longer meets the requirements for eligibility to participate in the Plan, such Participant shall become an inactive Participant retaining all of the rights described under the Plan pertaining to such Participant's then Accrued Account Balances, except the right to make any further deferrals hereunder and the right to receive any further Company credits. An inactive Participant may become an active Participant again in the future.

                                    7
<PAGE>   10


4.2 PARTICIPATION. When a Participant first becomes eligible to participate in the Plan, such Participant shall, as soon as practicable thereafter, be notified of his or her eligibility to participate. At such time, or as soon as administratively practicable thereafter, all Participants shall be provided with deferral and investment election form(s); such election forms must be completed and returned, within the time period specified, to the Company in order for the Participant to participate in the Plan.

ARTICLE 5. VOLUNTARY DEFERRALS
5.1 PARTICIPATION. Eligibility to defer Base Salary pursuant to the terms of this Article 5 shall be limited to Tier I Participants.

5.2 DEFERRAL. Prior to the beginning of the Plan Year in which the Base Salary is otherwise earned, each Tier I Participant may voluntarily elect to defer up to one hundred percent (100%) of his or her Base Salary for that Plan Year. Subject to the terms hereof, such election shall be irrevocable for the Plan Year in question. Amounts deferred pursuant to this Section 5.2, and earnings thereon, shall be credited to such Participant's Voluntary Deferral Account. Each Participant shall be one hundred percent (100%) vested in amounts deferred pursuant to this Section 5.2, and earnings thereon, at all times.

Notwithstanding anything herein to the contrary, the amount of Base Salary that a Tier I Participant may defer pursuant to this Section 5.2 shall be limited by (a) amounts deferred pursuant to the Retirement Savings Plan; (b) amounts withheld for applicable federal, state, and local taxes; (c) amounts deducted pursuant to any insurance or benefit program; (d) voluntary payroll deductions (e.g., United Way contributions); (e) involuntary payroll deductions (e.g., garnishments); and (f) all other proper deductions, as determined by the Committee.

5.3 PARTIAL PLAN YEAR PARTICIPATION. In the event a Tier I Participant first becomes eligible to participate in the Plan after the beginning of a Plan Year, the Committee may, in its discretion, allow such Participant to complete a deferral election form and investment election form within thirty (30) calendar days of becoming eligible to participate.

5.4 DEFERRAL ELECTION. Tier I Participants shall make elections to defer Base Salary prior to the beginning of the Plan Year in which the Base Salary is otherwise earned, or not later than thirty (30) calendar days following notification of initial eligibility to participate for a partial Plan Year, as applicable. The deferral election shall apply only to Base Salary earned subsequent to the first day of the month following the date on which a valid deferral election form is received by the Committee or the Committee's designee. Each such election shall indicate the following:

(a)    The amount of Base Salary earned during the Plan Year to be
deferred, which shall be irrevocable pursuant to Section
5.2 hereof;

(b)    The Payout Commencement Date for the deferred Base Salary,
and earnings thereon, which shall be irrevocable pursuant
to Section 5.5 hereof; and

(c)    The Form of Payout pursuant to Section 2.1(u) hereof.

<center>8</center>

<PAGE>    11


5.5 LENGTH OF DEFERRAL AND FORM OF PAYOUT. Subject to Section 2.1(ab)
hereof, each Tier I Participant may irrevocably elect the length of deferral of
Base Salary deferred each Plan Year by designating a corresponding Payout
Commencement Date for such deferral. The Form of Payout shall be as elected by
such Participant pursuant to Section 2.1(u) hereof.

ARTICLE 6. MANDATORY DEFERRALS
6.1 DEFERRAL. If the Committee in its discretion determines that, with
respect to any tax year, a Participant is a "covered employee" for purposes of
Section 162(m) of the Code, the Committee shall impose a mandatory deferral of
all amounts otherwise payable to such employee by the Company to the extent that
such amounts meet the definition of "applicable employee remuneration" (as such
term is defined in Section 162(m) of the Code) and such amounts exceed
$1,000,000 (or such other amount as may be specified by Section 162(m) from time
to time) as determined by the Committee.

Amounts required to be deferred pursuant to this Section 6.1 shall be
credited to such Participant's Mandatory Deferral Account. Each Participant
shall be one hundred percent (100%) vested in amounts deferred pursuant to this
Section 6.1, and earnings thereon, at all times.

6.2 LENGTH OF DEFERRAL. All amounts deferred pursuant to Section 6.1
hereof, and earnings thereon, shall be paid out to the Participant on the
earliest date on which such amounts can be received by such Participant without
subjecting the Company to a loss of deductibility (due to Section 162(m) of the
Code) with respect to any part of such amounts. However, subject to Section
2.1(ab) hereof, a Participant can make an irrevocable election to have these
amounts deferred to a later Payout Commencement Date at which time no loss of
the Company deduction would occur (due to Section 162(m)); such election must be
made prior to lapse of the restriction set forth in this Section 6.2.

6.3 FORM OF PAYOUT. Subject to Sections 6.2 and 6.4 hereof, the payout of
Mandatory Deferrals, and earnings thereon, will be in a Lump-Sum Payment to the
extent not deferred by the Participant to a Payout Commencement Date. If
deferred to a Payout Commencement Date, the Form of Payout will be as elected by
such Participant pursuant to Section 2.1(u) hereof.

6.4 COMMITTEE DISCRETION. In the event that any payment under this Plan
would cause the Company a loss of deductibility (due to Section 162(m)), the
Committee reserves the right hereunder to (i) delay such payment; (ii) require
additional mandatory deferrals to offset such payment; or (iii) to take any
other action necessary and appropriate to avoid such loss of deductibility.

ARTICLE 7. VOLUNTARY STOCK UNIT DEFERRALS
7.1 PARTICIPATION. Eligibility to defer the receipt of shares of Common
Stock which were voluntarily cancelled and Stock Units granted in lieu thereof
by the election of a Participant in connection with (a) the exercise of a stock
option under a Company stock plan, or (b) the lapse of restrictions on
restricted stock granted or purchased under a Company stock plan, shall be
limited to Tier I Participants.

<center>9</center>

<PAGE>    12

7.2 DEFERRAL. At least six (6) months prior to the exercise of a stock
option (the "Exercise Date") under a Company stock plan or the lapse of
restrictions (the "Expiration Date") on restricted stock granted or purchased
under a Company stock plan, each Tier I Participant may voluntarily elect to
cancel the applicable shares of Common Stock and receive Stock Units in lieu
thereof and to defer such Stock Units pursuant to the terms hereof.

Subject to the terms hereof, such election shall be irrevocable. Such Stock Units deferred pursuant to this Section 7.2, and earnings thereon, shall be credited to the Participant's Voluntary Stock Unit Deferral Account. A Participant shall be one hundred percent (100%) vested in such Stock Units, and earnings thereon, at all times.

7.3 DEFERRAL ELECTION. Tier I Participants shall make elections to defer Stock Units described in Section 7.2 hereof by submitting a valid deferral election form to the Committee, or the Committee's designee, at least six (6) months prior to the Exercise Date or Expiration Date, as applicable, and by entering into a written agreement with the Company under the applicable Company stock plan. Each such election shall indicate the following:

    (a)    The number of restricted shares, or the option shares, as applicable, to be deferred as Voluntary Stock Unit Deferrals, which shall be irrevocable pursuant to Section 7.2 hereof;

    (b)    The Payout Commencement Date for the Voluntary Stock Unit Deferrals, and earnings thereon, which shall be irrevocable pursuant to Section 7.4 hereof; and

    (c)    The Form of Payout pursuant to Section 2.1(u) hereof.

7.4 LENGTH OF DEFERRAL AND FORM OF PAYOUT. Subject to Section 2.1(ab) hereof, each Tier I Participant may irrevocably elect the length of deferral of each Voluntary Stock Unit Deferral by designating a corresponding Payout Commencement Date for each such Deferral. Any Stock Units credited to a Participant's Voluntary Stock Unit Deferral Account shall be paid out to the Participant in shares of Common Stock. The Form of Payout shall be as elected by such Participant pursuant to Section 2.1(u) hereof.

ARTICLE 8. SAVINGS PLAN DEFERRAL RESTORATION
8.1 PARTICIPATION. Eligibility to defer Compensation pursuant to the terms of this Article 8 shall be limited to Tier II Participants.

8.2 DEFERRAL. Prior to the beginning of the Plan Year in which the Compensation is otherwise earned, each Tier II Participant may voluntarily elect to defer up to ten percent (10%) of his or her Compensation for that Plan Year. Subject to the terms hereof, such election shall be irrevocable for the Plan Year in question. Amounts deferred pursuant to this Section 8.2, and earnings thereon, shall be credited to such Participant's Retirement Savings Plan Deferral Restoration Account. Each Participant shall be one hundred percent (100%) vested in amounts deferred pursuant to this Section 8.2, and earnings thereon, at all times.

<div align="center">10</div>

<PAGE>    13

8.3 PARTIAL PLAN YEAR PARTICIPATION. In the event a Tier II Participant first becomes eligible to participate in the Plan after the beginning of a Plan Year, such Participant must wait until the following Plan Year to be eligible to make deferrals pursuant to this Article 8.

8.4 DEFERRAL ELECTION. Tier II Participants shall make elections to defer Compensation prior to the beginning of the Plan Year in which the Compensation is otherwise earned. Each such election shall indicate the following:

    (a)    The amount of Compensation (up to ten percent (10%) earned during the Plan Year to be deferred, which shall be irrevocable pursuant to Section 8.2 hereof;

    (b)    The Payout Commencement Date for the deferred Compensation, and earnings thereon, which shall be irrevocable pursuant to Section 8.5 hereof; and

    (c)    The Form of Payout, pursuant to Section 2.1(u) hereof.

8.5 LENGTH OF DEFERRAL AND FORM OF PAYOUT. Subject to Section 2.1(ab) hereof, each Tier II Participant may irrevocably elect the length of deferral of Compensation deferred each Plan Year by designating a corresponding Payout Commencement Date for such deferral, and earnings thereon. The Form of Payout will be as elected by such Participant pursuant to Section 2.1(u) hereof.

ARTICLE 9. COMPANY 401(K) MATCH RESTORATION

are eligible to participate in the Retirement Savings Plan and experience a
cutback in Employer Matching Contributions due to the limitations imposed by the
Code, and Tier II Participants, who are employed with the Company at the
beginning of a Plan Year, shall be eligible to receive Company credits pursuant
to this Article 9 for such Plan Year.

9.2 COMPANY 401(K) MATCH RESTORATION. For each Plan Year in which an
employee is eligible to receive Company credits pursuant to this Article 9, the
Company shall credit to such Participant's Match Restoration Account an amount
equal to the excess of (a) over (b):

     (a)    The Employer Matching Contribution that would have been
credited to the Participant's account for that Plan Year
under the Retirement Savings Plan had the contribution been
based on the Participant's total Compensation for the Plan
Year (including all deferred compensation), unreduced by
tax-qualified plan limits of the Code, and increased by
amounts deferred pursuant to the Retirement Savings Plan.

     (b)    The actual Employer Matching Contribution credited to the
Participant's account for that Plan Year under the
Retirement Savings Plan.

Each Participant hired before April 1, 1997 shall be one hundred percent
(100%) vested in amounts credited to such Participant's Match Restoration
Account pursuant to this Section 9.2, and earnings thereon, at all times; each
Participant hired on or after April 1, 1997 shall become one hundred percent
(100%) vested in amounts credited to such Participant's Match Restoration
Account pursuant to this Section 9.2, and earnings thereon, upon the date such
Participant becomes one

<center>11</center>

<PAGE>    14

hundred percent (100%) vested in Employer Matching Contributions credited to
such Participant under the Retirement Savings Plan. Notwithstanding the
immediately preceding sentence, a Participant, who is an active employee of the
Company, automatically becomes one hundred percent (100%) vested in amounts
credited to such Participant's Match Restoration Account pursuant to this
Section 9.2, and earnings thereon, upon such Participant's sixty-fifth (65th)
birthday or death.

9.3 PARTIAL PLAN YEAR PARTICIPATION. In the event a Participant first
becomes eligible to participate in the Plan after the beginning of a Plan Year,
such Participant must wait until the following Plan Year to be eligible to
accrue Company credits pursuant to this Article 9. Notwithstanding the
immediately preceding sentence, the Committee may, in its discretion, allow such
Participant to participate during such partial Plan Year.

9.4 LENGTH OF DEFERRAL AND FORM OF PAYOUT. Subject to Section 2.1(ab)
hereof, any vested amounts credited to a Participant's Match Restoration Account
pursuant to Section 9.2 hereof, and earnings thereon, shall be paid out to the
Participant in shares of Common Stock beginning in the January following such
Participant's termination of employment with the Company. The Form of Payout
will be as elected by such Participant pursuant to Section 2.1(u) hereof.

ARTICLE 10. COMPANY PROFIT SHARING RESTORATION
10.1 PARTICIPATION. Subject to Section 10.3 hereof, Tier I Participants,
who are eligible to participate in the Retirement Savings Plan and experience a
cutback in Profit Sharing Contributions due to the limitations imposed by the
Code, and Tier II Participants, who are employed with the Company on December 31
of a Plan Year, shall be eligible to receive Company credits pursuant to this
Article 10 for such Plan Year.

10.2 COMPANY PROFIT SHARING RESTORATION. For each Plan Year in which an
employee is eligible to receive Company credits pursuant to this Article 10, the
Company will credit to such Participant's Profit Sharing Restoration Account an
amount equal to the excess of (a) over (b):

     (a)    The Profit Sharing Contribution that would have been
credited to the Participant's account for the Plan Year
under the Retirement Savings Plan had the contribution been
based on the Participant's total Compensation for the Plan
Year (including all deferred compensation), unreduced by

amounts deferred pursuant to the Retirement Savings Plan.

    (b)    The actual Profit Sharing Contribution credited to the
Participant's account for that Plan Year under the
Retirement Savings Plan.

    Each Participant shall become one hundred percent (100%) vested in amounts
credited to such Participant's Profit Sharing Restoration Account pursuant to
this Section 10.2, and earnings thereon, automatically upon the first to occur
of (a) five (5) years of service with the Company; (b) such Participant's
sixty-fifth (65th) birthday; or (c) such Participant's death.

    Company credits credited to Participants pursuant to this Section 10.2
shall in no way reduce amounts available to the Company to make Profit Sharing
Contributions under the Retirement Savings Plan.

<div align="center">12</div>

&lt;PAGE&gt;   15


    10.3 PARTIAL PLAN YEAR PARTICIPATION. In the event a Participant first
becomes eligible to participate in the Plan after the beginning of a Plan Year,
such Participant must wait until the following Plan Year to be eligible to
accrue Company credits pursuant to this Article 10. Notwithstanding the
immediately preceding sentence, the Committee may, in its discretion, allow such
Participant to participate during such partial Plan Year.

    10.4 LENGTH OF DEFERRAL AND FORM OF PAYOUT. Subject to Section 2.1(ab)
hereof, any vested amounts credited to a Participant's Profit Sharing
Restoration Account pursuant to Section 10.2 hereof, and earnings thereon, shall
be paid out to the Participant beginning in the January following such
Participant's termination of employment with the Company. The Form of Payout
will be as elected by such Participant pursuant to Section 2.1(u) hereof.

ARTICLE 11. DISCRETIONARY COMPANY CREDITS
    11.1 PARTICIPATION. Employees designated by the Committee in its
discretion are eligible to receive Company credits pursuant to this Article 11.

    11.2 DISCRETIONARY COMPANY CREDITS. In addition to the Company 401(k)
Match Restoration and Company Profit Sharing Restoration, as set forth in
Sections 9.2 and 10.2 hereof, the Committee in its discretion may cause
additional Company credits to be credited to the Discretionary Company Credits
Account of any Participant, or group of Participants, for any reason whatsoever.
The Committee shall establish rules and procedures for, and the terms of, such
credits.

ARTICLE 12. PARTICIPANT ACCOUNTS AND THE RABBI TRUST
    12.1 PARTICIPANT ACCOUNTS. The Company shall establish and maintain
individual bookkeeping accounts for each Participant's Accrued Account Balances.
Each component of a Participant's Accrued Account Balances shall be credited to
such Participant's bookkeeping account as soon as administratively practicable
following the date such credits can first be calculated. The establishment and
maintenance of such accounts, however, shall not be construed as entitling any
Participant to any specific asset of the Company.

    Each Participant who has a balance in any account will be furnished a
statement of his or her Accrued Account Balances at least annually.

    12.2 INVESTMENT ELECTIONS. All Accrued Account Balances shall be credited
with earnings based upon the rate of return actually achieved by the underlying
investments, as described in this Section 12.2.

    (a) Amounts credited to a Participant's Voluntary Deferral Account
shall be invested as elected by such Participant in one or more Investment
Funds, except the Company Stock Fund and other investment choices excluded
due to applicable law or regulation or by action of the Committee.

    (b) Amounts credited to a Participant's Mandatory Deferral Account
shall be invested as elected by the Participant in one or more Investment
Funds, except the Company Stock Fund and other investment choices excluded
due to applicable law or regulation or by action of the

<div align="center">13</div>

&lt;PAGE&gt;   16

Committee. Notwithstanding the immediately preceding sentence, amounts credited to the Mandatory Deferral Account of a Participant who has a preexisting Treasury Note Account balance, due to credits to such Treasury Note Account pursuant to Section 13(b) hereof, shall continue to be invested in such Participant's Treasury Note Account, unless the Participant elects to voluntarily have such amounts invested in one or more Investment Funds, except the Company Stock Fund and other investment choices excluded due to applicable law or regulation or by action of the Committee. Amounts deferred into the Treasury Note Account shall be general asset obligations of the Company, and shall not be eligible for payment out of Rabbi Trust assets. Once a Participant who has a balance in his or her Treasury Note Account elects to have amounts deferred pursuant to Section 6.1 hereof invested in anything other than the Treasury Note Account, then such Participant may never again elect to have amounts deferred pursuant to Section 6.1 hereof invested in the Treasury Note Account. Notwithstanding anything herein to the contrary, once the restriction set forth in Section 6.2 hereof is no longer applicable to a Participant, any amounts invested in the Treasury Note Account shall thereafter be invested as elected by such Participant in one or more Investment Funds, except the Company Stock Fund and other investment choices excluded due to applicable law or regulation or by action of the Committee.

(c) Stock Units credited to a Participant's Match Restoration Account shall be automatically credited to the Stock Unit Subaccount. Once a Participant reaches age fifty-five (55), all or any part of the Stock Units credited both before or after age fifty-five (55), to such Participant's Match Restoration Account shall be invested as elected by each Participant in either (i) the Stock Unit Subaccount; or (ii) one or more Investment Funds, except the Company Stock Fund and other investment choices excluded due to applicable law or regulation or by action of the Committee. No such transfer is allowed prior to a Participant's fifty-fifth (55th) birthday. A Participant may not make transfers into the Stock Unit Subaccount from any other account. Once amounts are transferred out of the Stock Unit Subaccount, they cannot be transferred back into this investment choice.

(d) Voluntary Stock Unit Deferrals shall be credited to a Participant's Voluntary Stock Unit Deferral Account. A Participant may not make transfers into or out of the Voluntary Stock Unit Deferral Account.

(e) Amounts credited to a Participant's Profit Sharing Restoration Account shall be invested as elected by such Participant in one or more Investment Funds, except the Company Stock Fund and other investment choices excluded due to applicable law or regulation or by action of the Committee.

(f) Amounts credited to a Participant's Retirement Savings Plan Deferral Restoration Account shall be invested as elected by such Participant in one or more Investment Funds, except the Company Stock Fund and other investment choices excluded due to applicable law or regulation or by action of the Committee.

(g) Amounts credited to a Participant's Discretionary Company Credits Account shall be invested pursuant to the rules and procedures determined by the Committee in its discretion.

14

<PAGE>    17

Participants shall be permitted to change their investment elections in the same frequency as participants under the Retirement Savings Plan. Investment elections are not permitted with respect to the Voluntary Stock Unit Deferral Account, or, except as provided in Section 12.2(c), with respect to the Match Restoration Account.

Notwithstanding anything herein to the contrary, the Committee reserves the right to (a) change the number and availability of the investment alternatives at any time; and (b) not actually invest deferrals and/or Company credits into the investment alternatives elected by each Participant.

12.3 CHARGES AGAINST ACCOUNTS. There shall be charged against each Participant's Accrued Account Balances any payments made thereunder to the

1/28/2019   18-23538-shl   Doc 3560-2   Filed 05/03/19   Entered 05/03/19 10:30:54   Exhibit B -
Declaration of Artem Skorostensky in Support of Objection of Urban E   Pg 88 of 166
Participant or (c) his or her beneficiary.

12.4 ESTABLISHMENT OF A RABBI TRUST. As soon as administratively practicable following the Effective Date, Kmart Corporation shall establish an irrevocable Rabbi Trust, governed by a Rabbi Trust Agreement (which shall be a grantor trust within the meaning of Code Sections 671-678) for the benefit of Participants and beneficiaries of Participants, as appropriate and applicable. The Rabbi Trust shall have an independent Trustee (such Trustee to have a fiduciary duty to carry out the terms and conditions of the Trust) as selected by the Company, and shall have restrictions as to the Company's ability to amend the Trust or to cancel benefits provided thereunder.

Assets contained in the Rabbi Trust shall at all times be specifically subject to the claims of Kmart Corporation's general creditors in the event of insolvency; such term shall be specifically defined within the provisions of the Rabbi Trust, along with a required procedure for notifying the Trustee of any such insolvency.

All benefits hereunder, except for benefits associated with the Treasury Note Account, shall be paid first from the Rabbi Trust, to the extent assets exist in the Rabbi Trust and then, as necessary, by Kmart Corporation from general assets. All amounts payable pursuant to the Treasury Note Account shall be paid by Kmart Corporation from general assets.

12.5 FUNDING OF THE RABBI TRUST. At the discretion of the Committee, Kmart Corporation may contribute cash, cash equivalents, and/or Kmart Stock to the Rabbi Trust, for the benefit of Participants and beneficiaries of Participants, as the Committee deems appropriate. It is intended that the Rabbi Trust will be fully funded at all times to cover the Accrued Rabbi Trust Obligations of Kmart Corporation. Upon a Change in Control, Kmart Corporation shall be required to make an immediate contribution to the Rabbi Trust to cause all Accrued Rabbi Trust Obligations to be fully or overfunded as of that date.

ARTICLE 13. ALLOCATION OF PRIOR DEFERRALS AND COMPANY CREDITS
Any outstanding Participant deferrals and Company 401(k) match or profit sharing restoration amounts, and earnings thereon, credited to any Participant account under either the Kmart Corporation Supplemental Savings Plan or the Kmart Corporation Executive Deferred Compensation Plan (together the "Predecessory Deferral/Restoration Arrangements"), as of the Effective Date of this Plan, shall be withdrawn and automatically transferred to such Participant's account under this Plan within ninety (90) calendar days from the Effective Date, or as soon as otherwise administratively practicable.

15

<PAGE>   18


Amounts transferred pursuant to this Article 13 shall be invested as follows:

(a)   Amounts transferred, and earnings thereon, that meet the definition of Employer Matching Contributions and that were originally credited to a Participant under the Kmart Corporation Supplemental Savings Plan shall be invested pursuant to Section 12.2(c) hereof;

(b)   Amounts transferred, and earnings thereon, that meet the definition of Mandatory Deferrals and that were originally credited to a Participant pursuant to Section 2(b) of the Kmart Corporation Executive Deferred Compensation Plan shall be invested as elected by the Participant either (i) solely in the Treasury Note Account; or (ii) in one or more Investment Funds, except the Company Stock Fund and other investment choices excluded due to applicable law or regulation or by action of the Committee; and

(c)   All other amounts transferred, and earnings thereon, shall be invested as elected by the Participant in one or more Investment Funds, except the Company Stock Fund and other investment choices excluded due to applicable law or regulation or by action of the Committee.


By no later than the end of the first Plan Year, Kmart Corporation shall contribute cash, cash equivalents, and/or Common Stock of Kmart Corporation to the Rabbi Trust for the benefit of Participants in an amount equal to the amount of all deferrals and Company credits, and earnings thereon, accrued in prior years under Predecessory Deferral/Restoration Arrangements except outstanding credits to the Treasury Note Account.

It is intended that this Plan replace the Predecessory Deferral/Restoration Arrangements. No Participant will be allowed to defer any amounts or accrue any benefits under the Predecessory Deferral/Restoration Arrangements after the Effective Date hereof.

ARTICLE 14. BENEFICIARY DESIGNATION

14.1 DESIGNATION OF BENEFICIARY. Each Participant may designate or change a beneficiary or beneficiaries who, upon the Participant's death, will receive the amounts that otherwise would have been paid to the Participant under the Plan. All such designations and any changes thereto shall be signed by the Participant, and shall be in such form as prescribed by the Committee. Each designation shall be effective as of the date delivered to a Company employee so designated by the Committee. The payment of an amount equal to the amount that otherwise would have been paid to the Participant shall be paid in accordance with the last unrevoked written designation of beneficiary that has been signed by the Participant and delivered by the Participant to the Company's designee prior to the Participant's death.

14.2 DEATH OF BENEFICIARY. In the event that all the beneficiaries named by a Participant, pursuant to Section 14.1 hereof, predecease the Participant, the amount that otherwise would have been paid to the Participant or the Participant's beneficiaries under the Plan shall be paid to the Participant's estate or the person designated by the Participant's estate.

16

<PAGE>    19

14.3 INEFFECTIVE DESIGNATION. In the event a Participant does not designate a beneficiary, or for any reason such designation is ineffective, in whole or in part, the amounts that otherwise would have been paid to the Participant or the Participant's beneficiaries under the Plan shall be paid to the person or persons the Participant designated as the beneficiary or beneficiaries under the Retirement Savings Plan, and if no such designation was made, then to the Participant's estate or the person designated by the Participant's estate.

14.4 INDEMNITY. The Company may require an indemnity and/or evidence or other assurances as it deems necessary in connection with any payment hereunder to a Participant's beneficiary, estate, legal representative, or guardian.

ARTICLE 15. WITHHOLDING OF TAXES

The Company shall have the right to require Participants to remit to the Company, or any person or entity designated by the Committee to administer the Plan, an amount sufficient to satisfy federal, state, and local tax withholding requirements, or to deduct from all payments made pursuant to the Plan amounts sufficient to satisfy such withholding requirements.

ARTICLE 16. EMPLOYMENT/MISCONDUCT

16.1 EMPLOYMENT. No provision of the Plan, nor any action taken by the Committee or the Company pursuant to the Plan, shall give or be construed as giving a Participant any right to be retained in the employ of the Company, or affect or limit in any way the right of the Company to terminate his or her employment.

16.2 MISCONDUCT. Notwithstanding anything hereof to the contrary, all rights with respect to the Accrued Account Balances of a Participant are subject to the conditions that the Participant not engage or have engaged (a) in fraud, dishonesty, conduct in violation of Company policy, or similar acts at any time while an employee of the Company; or (b) in activity directly or indirectly in competition with any business of the Company, or in other conduct inimical to the best interests of the Company during or following the Participant's employment with the Company. If it is determined by the Committee, either before or after termination of employment of a Participant, that there has been a failure of any such conditions, the Committee shall:

(a)    Withhold, and such Participant shall forfeit all rights with respect to, all amounts then remaining in such Participant's Match Restoration Account, Profit Sharing Restoration Account, and/or Discretionary Company Credits Account; and

(b)    Accelerate the payout amounts of all then remaining in such Participant's Voluntary Deferral Account, Mandatory Deferral Account, Voluntary Stock Unit Deferral Account

Account to a date to be determined by the Committee in its
discretion.

ARTICLE 17. AMENDMENT AND TERMINATION
    The Company hereby reserves the right to amend, suspend, or terminate the
Plan at any time by action of the Board, in its sole discretion. No such
amendment, suspension, or termination shall in

<div align="center">17</div>

<PAGE>    20


any material manner adversely affect any Participant's rights to amounts
theretofore accrued and payable hereunder, without the written consent of the
Participant.

ARTICLE 18. MISCELLANEOUS
    18.1 FINANCIAL OR MEDICAL HARDSHIP. The Committee shall have the authority
to alter the timing or manner of payment of Accrued Account Balances in the
event that the Participant establishes, to the satisfaction of the Committee,
severe financial or medical hardship. In such event, the Committee may, in its
discretion:

        (a)    Authorize the cessation of Voluntary Deferrals pursuant to
             Section 5.2 hereof, and Savings Plan Deferral Restoration
             amounts pursuant to Section 8.2 hereof;

        (b)    Provide that all, or a portion, of the Accrued Account
             Balances shall immediately be paid in cash in a Lump-Sum
             Payment; and/or

        (c)    Provide that all, or a portion of, Installment Payments
             payable over a period of time shall instead be paid
             immediately in cash in a Lump-Sum Payment; and/or

        (d)    Provide for such other payment schedule as deemed
             appropriate by the Committee under the circumstances.


    However, the amount paid pursuant to this Section 18.1 shall not exceed
that amount which the Committee determines to be reasonably necessary for the
Participant to meet the financial or medical hardships at the time of such
payment. The severity of the financial or medical hardship shall be judged by
the Committee. Severe financial or medical hardship will be deemed to exist in
the event of the Participant's long and serious illness, impending bankruptcy,
or similar unforeseeable and extraordinary circumstances arising as a result of
events beyond the control of the Participant. The Committee's decision with
respect to the severity of financial or medical hardship and the manner in
which, if at all, the Participant's future deferral opportunities hereunder
shall cease, and/or the manner in which, if at all, the payment of Accrued
Account Balances to the Participant shall be altered or modified, shall be
final, conclusive, and not subject to appeal.


    18.2 NOTICE. Any notice or filing required or permitted to be given to the
Company under the Plan shall be sufficient if in writing and hand delivered, or
sent by registered or certified mail to the Chairman of the Committee or the
Committee's designee. Such notice, if mailed, shall be addressed to the
principal executive offices of Kmart Corporation. Notice mailed to a Participant
shall be at the last known address as is given in the records of Kmart
Corporation. Notices shall be deemed given as of the date of delivery or, if
delivery is made by mail, as of the date shown on the postmark on the receipt
for registration or certification.


    18.3 UNFUNDED PLAN. This Plan is intended to be an unfunded plan
maintained primarily to provide deferred compensation benefits for "a select
group of management or highly compensated employees" within the meaning of
Sections 201, 301, and 401 of ERISA, and therefore is further intended to be
exempt from the provisions of Parts 2, 3, and 4 of Title I of ERISA.
Accordingly, the Committee may terminate the Plan for any or all Participants,
subject to Article 17 hereof, in order to achieve and maintain this intended
result.

<div align="center">18</div>

<PAGE>    21


    18.4 SUCCESSORS. All obligations of Kmart Corporation under the Plan shall

successor is the result of a direct or indirect purchase, merger, consolidation,
or otherwise, of all or substantially all of the business and/or assets of Kmart
Corporation.

18.5. EFFECT OF CERTAIN CHANGES. In the event of any extraordinary
dividend, stock dividend, recapitalization, merger, consolidation, stock split,
warrant or rights issuance, or combination or exchange of shares, or other
similar transactions with respect to the Common Stock, the number of Stock Units
credited to the Stock Unit Subaccount, the number of Stock Units credited to the
Voluntary Stock Unit Deferral Account, and the number of shares of Common Stock
to be distributed hereunder pursuant to Articles 6, 7, 9, 11 and 12 (as
applicable) shall be equitably adjusted by the Committee to reflect such event
and to preserve the value of such Stock Units, and the Committee may make such
other adjustments to the terms of outstanding Stock Units as it may deem
equitable under the circumstances; provided, however, that any fractional shares
resulting from such adjustment shall be disregarded.

18.6 NONTRANSFERABILITY. Participants' rights to Accrued Account Balances
under the Plan may not be sold, transferred, assigned, or otherwise alienated or
hypothecated, other than pursuant to Article 14 hereof or by will or by the laws
of descent and distribution. In no event shall Kmart Corporation make any
payment under the Plan to any assignee or creditor of a Participant.

18.7 SEVERABILITY. In the event any provision of the Plan shall be held
illegal or invalid for any reason, the illegality or invalidity shall not affect
the remaining parts of the Plan, and the Plan shall be construed and enforced as
if the illegal or invalid provision had not been included.

18.8 COSTS OF THE PLAN. All costs of implementing and administering the
Plan shall be borne by Kmart Corporation.

18.9 OTHER PERMITTED DEFERRAL OPPORTUNITIES. The Committee may, in its
discretion, permit a Participant to defer such Participant's receipt, if any, of
the payment of cash or the delivery of capital stock of Kmart Corporation that
would otherwise be due to such Participant pursuant to the terms of the 1997
Kmart Corporation Long-Term Equity Compensation Plan, or any other stock plan of
the Company, and any successor plans thereto. The Committee shall establish
rules and procedures for such deferrals.

18.10 GOVERNING LAW. The Plan shall be governed by and construed in
accordance with the laws of the State of Michigan without giving effect to any
choice or conflict of law provision or rule.

Effective Date:  January 1, 1998; amended and restated as of September 1, 1998.


                                    19
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-11
<SEQUENCE>5
<DESCRIPTION>STATEMENT REGARDING COMPUTATION OF PER SHARE EARN.
<TEXT>

<PAGE>   1

                                                          EXHIBIT 11

                          KMART CORPORATION
            INFORMATION ON COMPUTATION OF PER SHARE EARNINGS

<TABLE>
<CAPTION>
($ MILLIONS)                                              Fiscal Year Ended
                                                   ------------------------------------

------

29,                                            January 27,  January 28,   January

                                                  1999         1998        1997
                                                   ------------------------------------

------

I. Basic earnings per common share:
<S>                                                <C>          <C>          <C>
   Income (loss) from continuing operations before
     extraordinary item and the effect of accounting changes   $   518   $   249   $

```
      Less: Series B and C convertible preferred shares dividend
        payment                                                          -           -            -
                                                                    -------------------------------------
------
      (a) Income (loss) available to common shareholders from continuing
          operations before extraordinary item and the effect of accounting changes   518         249
231
      (b) Discontinued operations including the effect of accounting
          changes, net of income taxes                                   -           -
(5)
      (c) Gain (loss) on disposal of discontinued operations,
          net of income taxes                                            -           -
(446)
      (d) Extraordinary item, net of income taxes                        -           -            -
                                                                    -------------------------------------
------
      (e) Adjusted net income (loss) (1)                            $    518    $    249    $
(220)

      ===========================================
      (f) Weighted average common shares outstanding                    492.1       487.1
483.6

      ===========================================
      Basic earnings per common share:
      Income (loss) available to common shareholders from continuing operations
          before extraordinary item and the effect of accounting changes (a)/(f)   $  1.05  $  0.51  $
0.48
      Discontinued operations including the effect of accounting
          changes, net of income taxes (b)/(f)                           -           -
(0.01)
      Gain (loss) on disposal of discontinued operations,
          net of income taxes (c)/(f)                                    -           -
(0.92)
      Extraordinary item, net of income taxes (d)/(f)                    -           -            -
                                                                    -------------------------------------
------
      Net income (loss) (e)/(f)                                    $    1.05   $    0.51   $
(0.45)

      ===========================================
```

```
<CAPTION>                                                           Fiscal Year Ended
                                                                    ---------------------------
                                                                    January 31,  January 25,
                                                                       1996*        1995*
                                                                    ---------------------------

I. Basic earnings per common share:
<S>                                                                 <C>          <C>
   Income (loss) from continuing operations before
    extraordinary item and the effect of accounting changes    $      (230) $      96
   Less: Series B and C convertible preferred shares dividend
     payment                                                          (6)          (9)
                                                                    ---------------------
   (a) Income (loss) available to common shareholders from continuing
       operations before extraordinary item and the effect of accounting changes  (236)    87
   (b) Discontinued operations including the effect of accounting
       changes, net of income taxes                                  (260)        83
   (c) Gain (loss) on disposal of discontinued operations,
       net of income taxes                                           (30)        117
   (d) Extraordinary item, net of income taxes                       (51)          -
                                                                    ---------------------
   (e) Adjusted net income (loss) (1)                          $     (577) $     287
                                                                    =====================
   (f) Weighted average common shares outstanding                   459.8        427.2
                                                                    =====================


   Basic earnings per common share:

   Income (loss) available to common shareholders from continuing operations
       before extraordinary item and the effect of accounting changes (a)/(f)  $  (0.51) $  0.20
   Discontinued operations including the effect of accounting
       changes, net of income taxes (b)/(f)                          (0.57)      0.20
   Gain (loss) on disposal of discontinued operations,
```

```
   Extraordinary item, net of income taxes (d)/(f)                  (0.11)         -
                                                                  ---------------

   Net income (loss) (e)/(f)                                  $    (1.25) $   0.67
                                                                  ===============
```

</TABLE>


- --------------------------------------------------------------------------

* Prior year amounts have been restated for the effect of discontinued
  operations.

(1) Adjusted net income (loss) included an after-tax provision of $13 million or
$0.03 per share for fiscal 1998 and $81 million or $0.17 per share for fiscal
1997 related to non recurring charges for voluntary early retirement programs
and an after tax provision of $150 million or $0.33 per share for fiscal 1995
related to the adoption of Financial Accounting Standard No. 121 "Accounting for
the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed
Of".

- --------------------------------------------------------------------------




                                1


<PAGE>    2



                                                       EXHIBIT 11


<TABLE>
<CAPTION>
($ Millions)                                              Fiscal Year Ended
                                                   ---------------------------------------

                                                   January 27,  January 28,   January
29,
                                                      1999         1998         1997
                                                   ---------------------------------------
<S>                                                   <C>          <C>          <C>
II. Earnings per common and common equivalent share
    assuming dilution:
    Income (loss) from continuing operations before extraordinary item
       and the effect of accounting changes        $     518  $      249  $      231
    Add: Dividends trust convertible preferred, net       50          49          31
                                                   ---------------------------------------
    (h) Adjusted Income (loss) from continuing operations before
           extraordinary item and the effect of accounting changes
                                                         568         298         262
    (i) Discontinued operations including the effect of accounting
           changes, net of income taxes                    -           -
(5)
    (j) Gain (loss) on disposal of discontinued operations,
           net of income taxes                             -
(446)
    (k) Extraordinary item, net of income taxes            -           -           -
                                                   ---------------------------------------
    (1) Adjusted net income (loss) (1)             $     568  $      298  $
(189)

===========================================

    Weighted average common shares outstanding         492.1       487.1       483.6
    Weighted average $3.41 depository shares outstanding
    (each representing 1/4 share Series A conversion preferred)   -      -           -
    Weighted average Series B and C convertible preferred shares outstanding   -   -   -
    Weighted average trust convertible preferred        66.7        66.7        41.4

    Stock Options:
     Common shares assumed issued                       21.2        16.3        13.0
     Less: common shares assumed repurchased           (15.1)      (11.7)
```

```
(10.5)

------                                                          --------------------------------------
                                                                   6.1           4.6           2.5
                                                                --------------------------------------
------
   (m) Applicable common shares, as adjusted                       564.9         558.4         527.5

=============================================

   Diluted earnings per common and common equivalent share:

   Adjusted income (loss) from continuing operations before
      extraordinary item and the effect of accounting changes (h)/(m)   $   1.01 $  $   0.53      $    0.50
   Discontinued operations including the effect of accounting
      changes, net of income taxes (i)1(m)                                  -             -
(0.01)
   Gain (loss) on disposal of discontinued operations,
      net of income taxes (j)/(m)                                           -             -
(0.85)
   Extraordinary item, net of income taxes (k)/(m)                          -             -             -

------                                                          --------------------------------------
   Net income (loss) (l)/(m)                                        $   1.01 $  $   0.53      $
(0.36)

=============================================
                                                                               (2)           (2)


<CAPTION>
                                                                Fiscal Year Ended
                                                                ----------------------------
                                                                January 31,   January 25,
                                                                   1996*         1995*
                                                                ----------------------------
II. Earnings per common and common equivalent share
    assuming dilution:
<S>                                                             <C>           <C>
   Income (loss) from continuing operations before extraordinary item
      and the effect of accounting changes                      $   (230) $      96
   Add: Dividends trust convertible preferred, net                  -             -
                                                                ----------------------------
   (h) Adjusted Income (loss) from continuing operations before
       extraordinary item and the effect of accounting changes      (230)          96
   (i) Discontinued operations including the effect of accounting
       changes, net of income taxes                                 (260)          83
   (j) Gain (loss) on disposal of discontinued operations,
       net of income taxes                                          (30)          117
   (k) Extraordinary item, net of income taxes                      (51)           -
                                                                ----------------------------
   (1) Adjusted net income (loss) (1)                           $   (571)         296
                                                                ============================

   Weighted average common shares outstanding                       459.8         427.2
   Weighted average $3.41 depository shares outstanding
   (each representing 1/4 share Series A conversion preferred)      -             29.2
   Weighted average Series B and C convertible preferred shares outstanding   -     9.7
   Weighted average trust convertible preferred                    -             -

   Stock Options:
    Common shares assumed issued                                    1.6           2.2
    Less: common shares assumed repurchased                        (1.5)         (2.0)
                                                                ----------------------------
                                                                   0.1           0.2
                                                                ----------------------------
   (m) Applicable common shares, as adjusted                       459.9         466.3
                                                                ============================

   Diluted earnings per common and common equivalent share:

   Adjusted income (loss) from continuing operations before
      extraordinary item and the effect of accounting changes (h)/(m)   $   (0.50) $   0.21
   Discontinued operations including the effect of accounting
      changes, net of income taxes (i)1(m)                          (0.57)         0.17
   Gain (loss) on disposal of discontinued operations,
      net of income taxes (j)/(m)                                   (0.06)         0.25
   Extraordinary item, net of income taxes (k)/(m)                  (0.11)          -
```

```
Net income (loss) (1)/(m)                                    $    (1.24)        0.63
                                                                 ==========  ==========
                                                                    (2)          (2)
```

</TABLE>

- --------------------------------------------------------------------------------
Prior year amounts have been restated for the effect of discontinued operations.

(1) Adjusted net income (loss) included an after tax provision of $13 million or
$0.02 per share for fiscal 1998 and $81 million or $0.15 per share for fiscal
1997 related to non recurring charges for voluntary early retirement programs
and an after tax provision of $150 million or $0.33 per share for fiscal 1995
related to the adoption of Financial Accounting Standard No. 121 "Accounting for
the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed
Of".

(2) This calculation is submitted in accordance with Regulation S-K item 601(b)
(11) although it is contrary to paragraph 13 of SFAS 128 because it produces an
anti-dilutive result.


- --------------------------------------------------------------------------------




                                    2
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-12
<SEQUENCE>6
<DESCRIPTION>STATEMENT REGARDING COMPUTATION OF RATIOS
<TEXT>

<PAGE>    1


                                                        EXHIBIT 12


                                KMART CORPORATION
                        INFORMATION ON RATIO OF EARNINGS
                            TO FIXED CHARGES COMPUTATION

<TABLE>
<CAPTION>

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| ($ Millions) | January 27, 1999 | January 28, 1998 | January 29, 1997 |
| <S> | <C> | <C> | <C> |
| Net income (loss) from continuing retail operations before extraordinary items and the effect of accounting changes | $ 518 | $ 249 | $ 231 |
| Dividends on trust convertible preferred, net | 50 | 49 | 31 |
| Income taxes | 230 | 120 | 68 |
| Pretax income (loss) from continuing retail operations | $ 798 | $ 418 | $ 330 |
| Distributions from unconsolidated affiliated retail companies that exceed equity income | (42) | 1 | 28 |
| Fixed charges per below | 579 | 660 | 733 |
| Less: Interest capitalized during the period | (13) | (8) | (9) |
| Preferred dividends of wholly awned trust subsidiary not deducted in the determination of pre-tax income | (78) | (75) | (47) |
| Earnings (loss) from continuing retail operations | $ 1,244 | $ 996 | $ 1,035 |
| Fixed charges: | | | |
| Interest expense | 281 | 378 | 498 |
| Rent expense - portion of operating rentals representative of the interest factor | 173 | 159 | 146 |
| Preferred dividends of wholly owned trust subsidiary | 78 | 75 | 47 |
| Other | 47 | 48 | 42 |

```
Total fixed charges                               $     579   $     660   $     733
                                                  ===========================================


Ratio of income to fixed charges                      2.1         1.5         1.4
                                                  ===========================================

</TABLE>




                                    1
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-13
<SEQUENCE>7
<DESCRIPTION>ANNUAL REPORT TO SHAREHOLDERS FOR THE FISCAL YEAR
<TEXT>


<PAGE>   1
CONSOLIDATED SELECTED FINANCIAL DATA                           EXHIBIT 13


<TABLE>
<CAPTION>

Dollars in millions, except per share data          1998        1997        1996        1995
1994
- ----------------------------------------------------------------------------------------------
-----------
<S>                                                 <C>         <C>         <C>         <C>
<C>
SUMMARY OF OPERATIONS (1)
Sales                                             $ 33,674    $ 32,183    $ 31,437    $ 31,713
$ 29,563
Comparable sales %                                    4.8%        4.8%        2.5%        5.5%
1.5%
Total sales %                                         4.6%        2.4%       (0.9%)       7.3%
5.4%
U.S. Kmart total sales %                              5.6%        5.0%       (0.2%)       7.2%
5.3%
Cost of sales, buying and occupancy                 26,319      25,152      24,390      24,675
22,331
Selling, general and administrative expenses         6,245       6,136       6,274       6,876
6,651
Interest expense, net                                  293         363         453         434
479
Continuing income (loss) before income taxes           798         418         330        (313)
102
Net income (loss) from continuing operations(2)        518         249         231        (230)
96
Net income (loss)                                      518         249        (220)       (571)
296


PER SHARE OF COMMON
Basic continuing income (loss)                    $   1.05    $   0.51    $   0.48    $  (0.51)
$   0.20
Diluted continuing income (loss)(3)               $   1.01    $   0.51    $   0.48    $  (0.51)
$   0.19
Dividends declared                                      --          --          --    $   0.36
$   0.96
Book value                                        $  12.12    $  11.15    $  10.51    $  10.99
$  13.15


FINANCIAL DATA
Working capital                                   $  4,139    $  4,202    $  4,131    $  5,558
$  3,562
Total assets                                        14,166      13,558      14,286      15,033
16,085
Long-term debt                                       1,538       1,725       2,121       3,922
1,989
```

| | | | | |
|---|---|---|---|---|
| Long-term capital lease obligations | 798 | 1,179 | 1,978 | 1,586 |
| | 1,666 | | | |
| Trust convertible preferred securities | 984 | 981 | 980 | -- |
| | -- | | | |
| Capital expenditures | 981 | 678 | 343 | 540 |
| | 1,021 | | | |
| Depreciation and amortization | 671 | 660 | 654 | 685 |
| | 639 | | | |
| Ending market capitalization - common stock | 7,894 | 5,469 | 5,418 | 2,858 |
| | 6,345 | | | |
| Current ratio | 2.1 | 2.3 | 2.1 | 2.9 |
| | 1.7 | | | |
| Long-term debt to capitalization | 28.6% | 32.4% | 37.2% | 51.1% |
| | 37.7% | | | |
| Ratio of income from continuing operations to fixed charges(4) | 2.1 | 1.5 | 1.4 | -- |
| | 1.1 | | | |
| Basic weighted average shares outstanding (millions) | 492 | 487 | 484 | 460 |
| | 427 | | | |
| Diluted weighted average shares outstanding (millions)(3) | 565 | 492 | 486 | 460 |
| | 456 | | | |
| NUMBER OF STORES | | | | |
| United States | 2,161 | 2,136 | 2,134 | 2,161 |
| | 2,316 | | | |
| International and other | -- | -- | 127 | 149 |
| | 165 | | | |
| | -------- | -------- | -------- | -------- |
| | -------- | | | |
| Total Stores | 2,161 | 2,136 | 2,261 | 2,310 |
| | 2,481 | | | |
| U.S. Kmart store sales per comparable selling square foot | $ 222 | $ 211 | $ 201 | $ 195 |
| | $ 181 | | | |
| U.S. Kmart selling square footage (millions) | 154 | 151 | 156 | 160 |
| | 166 | | | |

- --------------------------------------------------------------------------------------------
- -----------
</TABLE>

(1) Kmart Corporation and subsidiaries ("the Company" or "Kmart") fiscal year
ends on the last Wednesday in January. Fiscal 1995 consisted of 53 weeks.

(2) Net income from continuing operations in 1998 and 1997 include non-recurring
charges related to Voluntary Early Retirement Programs of $19 million ($13
million net of tax) and $114 million ($81 million net of tax), respectively.

(3) Consistent with the requirements of Statement of Financial Accounting
Standards No. 128, preferred securities were not included in the calculation of
diluted earnings per share for 1997, 1996 and 1994 due to their anti-dilutive
effect. Due to the Company's loss from continuing operations in 1995, diluted
earnings per share is equivalent to basic earnings per share.

(4) Fixed charges represent total interest charges, a portion of operating
rentals representative of the interest factor, amortization of debt discount and
expense and preferred dividends of majority owned subsidiaries. The deficiency
of income from continuing retail operations versus fixed charges was $305 for
1995.

            Kmart Corporation 1998 Annual Report 17
<PAGE>   2
MANAGEMENT'S DISCUSSION AND ANALYSIS
OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION


RESULTS OF OPERATIONS

<TABLE>
<CAPTION>
($ MILLIONS)          1998      1997      1996
- -----------------------------------------------------
<S>                   <C>       <C>       <C>

SALES

| | | | |
|---|---|---|---|
| United States | $33,674 | $31,884 | $30,378 |
| International | -- | 299 | 1,059 |
| | ------- | ------- | ------- |
| Total | $33,674 | $32,183 | $31,437 |
| | ======= | ======= | ======= |

OPERATING INCOME (LOSS)

| | | | |
|---|---|---|---|
| United States | $ 1,110 | $  898 | $  780 |
| International | -- | (3) | (7) |
| | ------- | ------- | ------- |
| Total | $ 1,110 | $  895 | $  773 |
| | ======= | ======= | ======= |

COMPARABLE SALES %

| | | | |
|---|---|---|---|
| United States | 4.8% | 4.8% | 2.6% |
| International | -- | -- | (2.8%) |
| Total | 4.8% | 4.8% | 2.5% |

</TABLE>

Operating income (loss) excludes the voluntary early retirement charges in 1998
and 1997 totaling $19 and $114, respectively, on a pretax basis, and other gains
of $10 in 1996.

FISCAL 1998 COMPARED TO FISCAL 1997

        SALES and comparable store sales for 1998 increased 4.6% and 4.8%,
respectively, improving sales per square foot to a record $222 in 1998. The
increased productivity can be attributed to the continued successful rollout of
the Big Kmart format, now 58% of the chain, the strong performance of key
brands, including Martha Stewart Everyday home fashions, Route 66 apparel and
accessories, Sesame Street children's apparel, and ladies apparel, and the
execution of the Company's competitive pricing strategy.

        GROSS MARGIN, as a percentage of sales, was 21.8% in both 1998 and
1997. The impact of the Company's competitive pricing strategy and growth in
lower margined sales categories, such as consumables, was offset by improved
margins resulting from increased import and private label goods.

        SELLING, GENERAL AND ADMINISTRATIVE EXPENSES ("SG&A"), which includes
advertising, declined for the fourth consecutive year as a percentage of sales
improving to 18.5% in 1998 from 19.1% in 1997. This was the third consecutive
year that SG&A as a percentage of sales was below 20%. The 0.6 percentage point
reduction compared to 1997 was the result of the sale of international
operations and the increased leverage from additional sales volume, offset by
increased Year 2000 compliance expenses and the addition of new stores.

        OPERATING INCOME increased $215 million in 1998 compared to 1997,
excluding other gains and losses and the charges for Voluntary Early Retirement
Programs. This increase was the direct result of the improved profitability of
the apparel and consumables areas and the increased leverage of SG&A expenses
from higher sales.

        A Voluntary Early Retirement Program offered to certain hourly
associates during the second quarter of 1998 resulted in a charge of $19 million
based on actual acceptance.

        NET INTEREST EXPENSE was $293 and $363 million in 1998 and 1997,
respectively. The reduction in net interest expense was due to increased cash
flow from operations, resulting in lower borrowings and increased investment
income.

        EFFECTIVE INCOME TAX RATE was 28.8% and 28.7% in 1998 and 1997,
respectively. See Note 9 of the Notes to Consolidated Financial Statements.

FISCAL 1997 COMPARED TO FISCAL 1996

        SALES and comparable store sales increased 2.4% and 4.8%, respectively,
for 1997. Sales per square foot also continued its upward trend in 1997 to $211
from $201. The increase was primarily due to the successful conversion of an
additional 458 traditional Kmart locations to the Big Kmart format, increased
promotional activity, as well as the overall success of unique product offerings
such as Martha Stewart Everyday home fashions and Sesame Street children's
apparel, partially offset by soft performance in the ladies apparel segment and
the sale of all remaining international operations.

https://www.sec.gov/Archives/edgar/data/56824/0000950124-99-002618.txt

1996, respectively. The decrease in the percentage reflects increased
promotional activity, growth in consumables sales, soft performance of ladies
apparel, and increased distribution, buying and occupancy costs.

SELLING, GENERAL AND ADMINISTRATIVE EXPENSES ("SG&A"), which includes
advertising, as a percentage of sales were 19.1% and 19.9% in 1997 and 1996,
respectively. This was the second consecutive year that SG&A as a percentage of
sales was below 20%. The 0.8 percentage point reduction compared to 1996 was the
result of the sale of all remaining international operations, increased leverage
from additional sales volume, and the Company's continued focus on its core
business units.

OPERATING INCOME increased $122 million in 1997 compared to 1996,
excluding other gains and losses and the charge for a Voluntary Early Retirement
Program. This increase was the direct result of the 2.4% increase in sales
during 1997 along with the $138 million savings in SG&A. These amounts were
partially offset by the 60 basis point decline in gross margin percentage.

A Voluntary Early Retirement Program offered to certain hourly
associates during the fourth quarter of 1997 resulted in a charge of $114
million based on actual acceptance. Other gains in 1996 included a $108 million
gain on the sale of Rite Aid stock and a charge of $98 million related to the
valuation of certain international operations.

NET INTEREST EXPENSE was $363 and $453 million in 1997 and 1996,
respectively. The reduction in net interest expense was due to reduced
borrowings including the paydown of the remaining balance of a $1.2 billion term
loan facility ("Term Loan") in the first quarter of 1997.

EFFECTIVE INCOME TAX RATES were 28.7% and 20.5% in 1997 and 1996,
respectively. The increase in the effective tax rate for 1997 was due to the
impact in 1996 of tax benefits resulting from foreign losses and basis
differences. See Note 9 of the Notes to Consolidated Financial Statements.


                    Kmart Corporation 1998 Annual Report 18
<PAGE>   3

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION


ANALYSIS OF FINANCIAL CONDITION

        Kmart's primary sources of working capital are cash flows from
operations and borrowings under its credit facilities. The Company had working
capital of $4,139 and $4,202 million at year end 1998 and 1997, respectively.
Working capital fluctuates in relation to profitability, seasonal inventory
levels net of trade accounts payable, and the level of store openings and
closings.

        In March 1997, the Company issued, through a subsidiary, $335 million
in Commercial Mortgage Pass Through Certificates ("CMBS"). The CMBS weighted
average floating interest rate was LIBOR plus 47 basis points. Net proceeds were
used to repay a portion of the Term Loan.

        In May 1997, the Company amended its $2.5 billion Revolving Credit
Agreement ("Revolver"). Under the terms of the amended agreement, the maturity
was extended to June 2000 and the commitment fee and interest rate spreads were
reduced from .25% and LIBOR plus 100 basis points to .225% and LIBOR plus 75
basis points.

        In March 1998, the collateral securing the Company's borrowings under
the Revolver was released. The Revolver contains several affirmative and
negative covenants customary to these types of agreements. The Company was in
compliance with all covenants throughout 1998.

        The Company had no borrowings outstanding on its Revolver as of year
ends 1998 and 1997. The Term Loan was repaid during 1997.

        In 1998, the Company continued to achieve significant improvement in
liquidity and operating cash flow performance. At the Company's peak borrowing
level in 1998, over $1.4 billion remained available for borrowings under its

Revolver compared to continuing operations improved by $358 million over 1997. Management believes that its current financing arrangements will be sufficient to meet the Company's liquidity needs for operations and capital demands.

Net cash provided by operating activities was $1,237 million in 1998 compared to $841 million in 1997.

Net cash used for investing was $795 million in 1998 compared to $185 million in 1997. Cash used for investing in 1998 was primarily the result of $981 million in capital expenditures partially offset by the proceeds from the sale of the Company's remaining interest in Kmart Canada Co. Cash used for investing in 1997 was the result of capital expenditures of $678 million partially offset by the proceeds from sale leaseback transactions, as well as proceeds from the sale of the Company's Canadian, Mexican, and Builders Square operations.

Net cash used for financing was $230 million in 1998 compared to $564 million in 1997. Cash used for financing during 1998 was the result of payments on long-term debt and capital lease obligations offset by increased stock option activity. Cash used for financing in 1997 was the result of paying down the Company's remaining balance on the Term Loan as well as payments on certain mortgages and medium term notes. These amounts were partially offset by the issuance of $335 million in CMBS securities.

NEW STORE ACTIVITY

For the first time in five years, Kmart ended the year with an increase in its number of stores. The Company ended 1998 with 2,161 U.S. Kmart stores versus 2,136 in 1997. During 1998, the Company opened 63 stores, 60 Big Kmarts and 3 Super Kmarts. Of the 60 Big Kmarts opened during the year, 46 were stores previously operated by Venture Stores, Inc., which the Company acquired in a lease agreement with Kimco Realty Company.

The Company expects to open 24 Big Kmarts and 4 Super Kmarts during 1999. In addition, the Company will complete its Big Kmart program with the conversion of another 586 stores. Capital expenditures relating to these projects will be funded through operating cash flows.

YEAR 2000

The Company's Year 2000 Compliance Program consists of four phases, (I) inventory and assessment, (II) remediation and unit testing, (III) return to production and (IV) integration testing. For information technology systems, the Company has substantially completed phases I, II and III. Phase IV has commenced and is planned to continue in the second, third and, if necessary, the fourth quarters of 1999. Substantially all business critical applications have been returned to production. The non-information technology equipment at a significant number of the Company's operating locations is already fully Year 2000 compliant. Non-information technology equipment at the remainder of the Company's locations is expected to be Year 2000 compliant by the end of the third quarter of 1999.

The Company has initiated a formal communication program with significant vendors to evaluate their Year 2000 compliance, and is assessing their responses to the Company's Year 2000 readiness questionnaire. Approximately 90 percent of significant merchandise vendors have responded, most indicating that their ability to supply the Company will not be affected by the Year 2000 issue. Although the Company values its relationships with significant vendors, should such a vendor become unable to deliver merchandise or services, substitutes for many of the goods the Company sells and services it receives can be obtained from other vendors. However, the Company cannot assure timely compliance of vendors and may be adversely affected by failure of a significant vendor to supply merchandise or services due to Year 2000 compliance failures. In addition, the Company is currently conducting integration testing with third parties' systems with which the Company's systems interface. The Company anticipates that such testing will be substantially completed by the end of the third quarter of 1999.

Kmart Corporation 1998 Annual Report 19

<PAGE>    4
MANAGEMENT'S DISCUSSION AND ANALYSIS
OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION (CONT.)

Should the Company not successfully complete a significant portion of
its Year 2000 Compliance Program, its financial condition may be materially
adversely impacted. Management does not consider the possibility of such
occurrences to be likely. The Company anticipates that the most reasonably
likely worst case scenarios include, but are not limited to, loss of
communication with stores, loss of electric power, and inability to process
transactions or engage in similar normal business activity. Certain contingency
plans have been or will be created, such as installation of backup power
supplies and around-the-clock support teams. Despite these contingency plans,
the Company may be adversely affected by failure of a significant third party
(such as suppliers of utilities, communication, transportation, banking, and
other services) to become Year 2000 compliant.

In addition, due to the uncertainty of the effect of Year 2000 failures
on Kmart's customers, the Company is unable to assess the effect these failures
will have on consumer spending, or on returns of merchandise that may contain
hardware or software components. As a result, the Company cannot estimate the
impact of these events on the Company's results of operations, liquidity, or
financial condition.

The total cost of the Company's Year 2000 Compliance Program is
estimated at $75 million, with $5 million incurred in 1997 and $46 million
incurred in 1998. Year 2000 Compliance Program costs are being funded through
operating cash flows. Certain information technology projects have been delayed
as a result of the Company's Year 2000 compliance effort. Estimated future
expenditures and the delay of information technology projects are not expected
to have a significant impact on the Company's financial position, results of
operations, or cash flows.

Estimated costs of the Company's Year 2000 Compliance Program and
projected completion dates are based on management's best estimates of future
events and are forward-looking statements which may be updated as additional
information becomes available. Readers are cautioned that forward-looking
statements contained herein should be read in conjunction with the Company's
disclosures under the heading "Cautionary Statement Regarding Forward-looking
Information" located on the back cover.

The Year 2000 statement set forth above is a Year 2000 Readiness
Disclosure, pursuant to the Year 2000 Information and Readiness Disclosure Act,
15 U.S.C. ss. 1 note.

OTHER MATTERS

Kmart has guaranteed leases for properties operated by certain former
subsidiaries including Borders Group, Inc., OfficeMax, Inc., The Sports
Authority, Inc., and Builders Square, Inc. The present value of the lease
obligations guaranteed by Kmart is approximately $1.2 billion. The possibility
of the Company having to honor its contingent obligations is dependent upon the
future operating results of the former subsidiaries. See Note 5 of the Notes to
Consolidated Financial Statements.

Builders Square

Builders Square is now part of Hechinger Company ("Hechinger"), an
affiliate of Leonard Green and Partners, LP ("LGP"). Hechinger operates in the
highly competitive "do-it-yourself" marketplace. To provide additional financial
flexibility as well as liquidity for seasonal requirements anticipated during
the first half of 1999, Hechinger amended certain aspects of its bank credit
agreement on December 31, 1998. As part of that amendment, Kmart guaranteed 80%
and GEI II, also an affiliate of LGP, guaranteed 20% of an additional secured
supplemental facility totaling $50 million and expiring June 30, 1999. At
January 27, 1999, there were no borrowings outstanding under the supplemental
facility.

On February 22, 1999, in its first quarter 10-Q filing, Hechinger
indicated that it may not be in compliance with the EBITDA covenant contained in
its bank agreement for its second quarter, ending April 3, 1999, and has
therefore arranged with its lenders for a temporary waiver, which expires April
30, 1999.

On March 1, 1999, Hechinger entered into a commitment letter for a new
three-year credit facility which would replace all existing credit facilities.

The Sports Authority

would take a $55 million after-tax charge, as a result of store closings, inventory writedowns and other charges and costs, and that operating results for the third quarter of 1998 would be weaker than expected. In October 1998, TSA announced that it amended certain aspects of its bank credit agreement, including modifying certain financial covenants in light of the restructuring charge. Pursuant to that amendment, TSA also granted its bank lenders a security interest in its inventory and certain accounts receivable. On December 9, 1998, in its third quarter 10-Q filing, TSA noted that its ability to satisfy ongoing working capital and capital expenditure requirements depends on successfully negotiating a new credit facility prior to the expiration of its bank credit agreement in April 1999.

    Kmart's rights and obligations with respect to its guarantee of TSA leases are governed by a Lease Guaranty, Indemnification and Reimbursement Agreement dated as of November 23, 1994 (the "LGIRA"). Kmart and TSA are presently in discussions to amend and restate the LGIRA, the terms of which have not been finalized, in connection with TSA's refinancing activities related to the procurement of a new three-year credit facility prior to April 1999.

Other

    There are various claims, lawsuits and pending actions against Kmart incident to its operations. It is the opinion of management that the ultimate resolution of these matters will not have a material adverse effect on Kmart's liquidity, financial position, or results of operations.




                 Kmart Corporation 1998 Annual Report 20

<PAGE>   5
MANAGEMENT'S RESPONSIBILITY FOR FINANCIAL STATEMENTS

    Management is responsible for the preparation of the Company's consolidated financial statements and related information appearing in this annual report. These financial statements have been prepared in conformity with generally accepted accounting principles on a consistent basis applying certain estimates and judgments based upon currently available information and management's view of current conditions and circumstances. On this basis, we believe that these financial statements reasonably present the Company's financial position and results of operations.

    To fulfill our responsibility, we maintain comprehensive systems of internal controls designed to provide reasonable assurance that assets are safeguarded and transactions are executed in accordance with established procedures. The concept of reasonable assurance is based upon a recognition that the cost of the controls should not exceed the benefit derived. We believe our systems of internal controls provide this reasonable assurance.

    The Company has adopted a code of conduct to guide our management in the continued observance of high ethical standards of honesty, integrity, and fairness in the conduct of the business and in accordance with the law. Compliance with the guidelines and standards is periodically reviewed and is acknowledged in writing by all management associates.

    The Board of Directors of the Company has an Audit Committee, consisting solely of outside directors. The duties of the Committee include keeping informed of the financial condition of the Company and reviewing its financial policies and procedures, its internal accounting controls, and the objectivity of its financial reporting. Both the Company's independent accountants and the internal auditors have free access to the Audit Committee and meet with the Committee periodically, with and without management present.


Floyd Hall
- ----------------------------------------
Floyd Hall
Chairman of the Board,
President and Chief Executive Officer

```
Martin E. Welch
- ----------------------------------------
Martin E. Welch III
Senior Vice President
and Chief Financial Officer
```

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS OF KMART CORPORATION

        In our opinion, the accompanying consolidated balance sheets and the
related consolidated statements of operations, of shareholders' equity and of
cash flows present fairly, in all material respects, the financial position of
Kmart Corporation and its subsidiaries at January 27, 1999 and January 28, 1998,
and the results of their operations and their cash flows for each of the three
years in the period ended January 27, 1999, in conformity with generally
accepted accounting principles. These financial statements are the
responsibility of the Company's management; our responsibility is to express an
opinion on these financial statements based on our audits. We conducted our
audits of these statements in accordance with generally accepted auditing
standards which require that we plan and perform the audit to obtain reasonable
assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements, assessing the
accounting principles used and significant estimates made by management, and
evaluating the overall financial statement presentation. We believe that our
audits provide a reasonable basis for the opinion expressed above.

```
PricewaterhouseCoopers LLP
- ----------------------------------------
PricewaterhouseCoopers LLP
Detroit, Michigan
March 1, 1999
```

              Kmart Corporation 1998 Annual Report 21
<PAGE>  6
CONSOLIDATED STATEMENTS OF OPERATIONS

```
<TABLE>
<CAPTION>
YEARS ENDED JANUARY 27, 1999, JANUARY 28, 1998 AND JANUARY 29, 1997
DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA
```

| | 1998 | 1997 | 1996 |
|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` |
| Sales | $ 33,674 | $ 32,183 | $ 31,437 |
| Cost of sales, buying and occupancy | 26,319 | 25,152 | 24,390 |
| Gross margin | 7,355 | 7,031 | 7,047 |
| Selling, general and administrative expenses | 6,245 | 6,136 | 6,274 |
| Voluntary early retirement programs | 19 | 114 | -- |
| Other gains, net | -- | -- | (10) |
| Continuing income before interest, income taxes and dividends on convertible preferred securities of subsidiary | 1,091 | 781 | 783 |
| Interest expense, net | 293 | 363 | 453 |
| Income tax provision | 230 | 120 | 68 |
| Dividends on convertible preferred securities of subsidiary, net of income taxes of $28, $26 and $16 | 50 | 49 | 31 |
| Net income from continuing operations | 518 | 249 | 231 |
| Loss on disposal of discontinued operations, net of income taxes of $(243) | -- | -- | (451) |
| Net income (loss) | $ 518 | $ 249 | $ (220) |

```
Basic income (loss) per common share
    Continuing operations                           $   1.05    $    .51    $    .48
    Loss on disposal of discontinued operations         --          --        (.93)
                                                    --------    --------    --------
    Net income (loss)                               $   1.05    $    .51    $   (.45)
                                                    ========    ========    ========

Diluted income (loss) per common share
    Continuing operations                           $   1.01    $    .51    $    .48
    Loss on disposal of discontinued operations         --          --        (.93)
                                                    --------    --------    --------
    Net income (loss)                               $   1.01    $    .51    $   (.45)
                                                    ========    ========    ========

Basic weighted average shares (millions)              492.1       487.1       483.6
Diluted weighted average shares (millions)            564.9       491.7       486.1
</TABLE>
```

See accompanying Notes to Consolidated Financial Statements.


              Kmart Corporation 1998 Annual Report 22
    <PAGE>   7
    CONSOLIDATED BALANCE SHEETS


    <TABLE>
    <CAPTION>
    AS OF JANUARY 27, 1999 AND JANUARY 28, 1998

| DOLLARS IN MILLIONS | 1998 | 1997 |
|---|---|---|
| <S> | <C> | <C> |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $   710 | $   498 |
| Merchandise inventories | 6,536 | 6,367 |
| Other current assets | 584 | 611 |
| Total current assets | 7,830 | 7,476 |
| Property and equipment, net | 5,914 | 5,472 |
| Other assets and deferred charges | 422 | 610 |
| Total Assets | $14,166 | $13,558 |
| CURRENT LIABILITIES | | |
| Long-term debt due within one year | $    77 | $    78 |
| Trade accounts payable | 2,047 | 1,923 |
| Accrued payroll and other liabilities | 1,359 | 1,064 |
| Taxes other than income taxes | 208 | 209 |
| Total current liabilities | 3,691 | 3,274 |
| Long-term debt and notes payable | 1,538 | 1,725 |
| Capital lease obligations | 1,091 | 1,179 |
| Other long-term liabilities | 883 | 965 |
| Company obligated mandatorily redeemable convertible preferred securities of a subsidiary trust holding solely 7-3/4% convertible junior subordinated debentures of Kmart (redemption value of $1,000) | 984 | 981 |
| Common stock, $1 par value, 1,500,000,000 shares authorized; 493,358,504 and 488,811,271 shares issued, respectively | 493 | 489 |
| Capital in excess of par value | 1,667 | 1,605 |
| Retained earnings | 3,819 | 3,340 |
| Total Liabilities and Shareholders' Equity | $14,166 | $13,558 |

    </TABLE>


    See accompanying Notes to Consolidated Financial Statements.


              Kmart Corporation 1998 Annual Report 23
    <PAGE>   8
    CONSOLIDATED STATEMENTS OF CASH FLOWS

```
<TABLE>
<CAPTION>
YEARS ENDED JANUARY 27, 1999, JANUARY 28, 1998 AND JANUARY 29, 1997
DOLLARS IN MILLIONS                                          1998      1997      1996
- ------------------------------------------------------------------------------------
<S>                                                          <C>       <C>       <C>
CASH FLOW FROM OPERATING ACTIVITIES
  Net income from continuing operations                   $   518   $   249   $   231
  Adjustments to reconcile net income to net cash
    provided by operating activities:
    Depreciation and amortization                             671       660       654
    Voluntary early retirement programs                        19       114        --
    Cash used for store restructuring and other charges       (94)     (105)     (129)
    Increase in inventories                                  (169)      (31)     (349)
    Increase (decrease) in trade accounts payable            124       (86)      215
    Deferred income taxes and taxes payable                   308        72       228
    Decrease in other long-term liabilities                  (138)      (27)     (194)
    Changes in certain assets, liabilities and other items     (2)       33        82
                                                          -------   -------   -------
  Net cash provided by continuing operations                1,237       879       738
  Net cash provided by (used for) discontinued operations     --       (38)       30
                                                          -------   -------   -------
NET CASH PROVIDED BY OPERATING ACTIVITIES                   1,237       841       768
                                                          -------   -------   -------

CASH FLOW FROM INVESTING ACTIVITIES
  Proceeds from divestitures                                   87       133       434
  Decrease (increase) in property held for sale or financing and other  99  420  (605)
  Capital expenditures                                       (981)     (678)     (343)
  Other, net                                                   --       (60)       43
                                                          -------   -------   -------
NET CASH USED FOR INVESTING ACTIVITIES                       (795)     (185)     (471)
                                                          -------   -------   -------

CASH FLOW FROM FINANCING ACTIVITIES
  Proceeds from issuance of long-term debt and notes payable   --       337     1,202
  Change in common stock                                       46        37        34
  Proceeds from issuance of convertible preferred securities   --        --       971
  Refinancing costs related to long-term debt and notes payable --      (15)     (212)
  Payments on capital lease obligations                       (88)     (112)     (114)
  Payments on long-term debt                                 (188)     (811)   (2,855)
                                                          -------   -------   -------
NET CASH USED FOR FINANCING ACTIVITIES                       (230)     (564)     (974)
                                                          -------   -------   -------

NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS          212        92      (677)
CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR                  498       406     1,083
                                                          -------   -------   -------
CASH AND CASH EQUIVALENTS, END OF YEAR                    $   710   $   498   $   406
                                                          =======   =======   =======

</TABLE>
```

See accompanying Notes to Consolidated Financial Statements.

Kmart Corporation 1998 Annual Report 24

```
<PAGE>   9
```

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

```
<TABLE>
<CAPTION>
                                                     CAPITAL              ACCUMULATED
                                                   IN EXCESS                OTHER
                                        COMMON      OF PAR     RETAINED  COMPREHENSIVE
DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA  STOCK    VALUE     EARNINGS     INCOME
- ------------------------------------------------------------------------------------
<S>                                       <C>       <C>        <C>        <C>
BALANCE AT JANUARY 31, 1996             $   486   $ 1,532    $ 3,336    $   (74)
Net loss for the year                        --        --       (220)        --
Shares reissued to retirement savings plan   --        34         --         --
Foreign currency translation adjustment      --        --         --         (6)
Other                                        --         5         (1)        --
                                        -------   -------    -------    -------
```

| | | | |
|---|---|---|---|
| Net income for the year | -- | -- | 249 | -- |
| Shares reissued to retirement savings plan | -- | 19 | -- | -- |
| Foreign currency translation adjustment | -- | -- | -- | 67 |
| Additional minimum pension liability | -- | -- | -- | (10) |
| Common stock issued for stock option plans | 3 | 13 | -- | -- |
| Other | -- | 2 | (1) | -- |
| BALANCE AT JANUARY 28, 1998 | 489 | 1,605 | 3,363 | (23) |
| Net income for the year | -- | -- | 518 | -- |
| Shares reissued to retirement savings plan | 2 | (9) | -- | -- |
| Repurchased shares | (2) | -- | -- | -- |
| Common stock issued for stock option plans | 4 | 73 | -- | -- |
| Additional minimum pension liability | -- | -- | -- | (37) |
| Other | -- | (2) | (2) | -- |
| BALANCE AT JANUARY 27, 1999 | $ 493 | $ 1,667 | $ 3,879 | $ (60) |

</TABLE>

See accompanying Notes to Consolidated Financial Statements.

Kmart Corporation 1998 Annual Report 25

<PAGE>    10

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(DOLLARS IN MILLIONS PER SHARE DATA)

1)   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
     The significant accounting policies followed by Kmart Corporation and
subsidiaries ("the Company" or "Kmart") in the preparation of these financial
statements, are summarized below.
     NATURE OF OPERATIONS: The Company's operations consist principally of
discount department stores located in all 50 states, Puerto Rico, the U.S.
Virgin Islands, and Guam. Kmart's equity investment consists of 49% of
substantially all of the Meldisco subsidiaries of Footstar, Inc. ("FTS"), which
operate the footwear departments in Kmart stores.
     BASIS OF CONSOLIDATION: Kmart includes all majority owned subsidiaries in
the consolidated financial statements. Investments in affiliated retail
companies owned 20% or more are accounted for by the equity method. Intercompany
transactions and accounts have been eliminated in consolidation.
     FISCAL YEAR: The Company's fiscal year ends on the last Wednesday in
January. Fiscal years 1998, 1997, and 1996 each consisted of 52 weeks and ended
on January 27, 1999, January 28, 1998, and January 29, 1997, respectively.
     CASH: Cash and cash equivalents include all highly liquid investments with
maturities of three months or less. Included are temporary investments of $437
and $241, at year end 1998 and 1997, respectively.
     INVENTORIES: Inventories are stated at the lower of cost or market,
primarily using the retail method. The last-in, first-out (LIFO) method,
utilizing internal inflation indices, was used to determine the cost for $6,148,
$5,990, and $5,883 of inventory as of year end 1998, 1997, and 1996,
respectively. Inventories valued on LIFO were $407, $457, and $440 lower than
amounts that would have been reported using the first-in, first-out (FIFO)
method at year end 1998, 1997, and 1996, respectively.
     PROPERTY AND EQUIPMENT: Property and equipment are recorded at cost, less
any impairment losses. Capitalized amounts include expenditures which materially
extend the useful lives of existing facilities and equipment. Expenditures for
owned properties, which Kmart intends to sell and lease back within one year,
are included in other current assets, and those with expected transaction dates
extending beyond one year are included in other assets and deferred charges.
     DEPRECIATION AND AMORTIZATION: Depreciation and amortization, including
amortization of property held under capital leases, are computed based upon the
estimated useful lives of the respective assets using the straight-line method
for financial statement purposes and accelerated methods for tax purposes. The
general range of lives are 25 to 50 years for buildings, 5 to 25 years for
leasehold improvements, 3 to 5 years for computer systems and equipment, and 3
to 17 years for furniture and fixtures.
     FINANCIAL INSTRUMENTS: Cash and cash equivalents, trade accounts payable,
and accrued liabilities are reflected in the financial statements at cost which
approximates fair value. The fair value of the Company's debt and other
financial instruments are discussed in Notes 6 and 8.
     FOREIGN CURRENCY TRANSLATIONS: Foreign currency assets and liabilities are
translated into U.S. dollars at the exchange rates in effect at the balance
sheet date, and revenue and expenses are translated at average exchange rates
during the period.

Statement of Financial Accounting Standards No. 123 ("FAS 123") to continue
using the intrinsic value method of accounting for employee stock based
compensation in accordance with Accounting Principles Board Opinion No. 25,
"Accounting for Stock Issued to Employees".

PRE-OPENING AND CLOSING COSTS: In fiscal 1998 and prior years, costs
associated with the opening of a new store were expensed during the first full
month of operations. Effective for fiscal 1999, Kmart will expense pre-opening
costs in the period in which they are incurred in conformity with Statement of
Position 98-5, "Reporting on the Costs of Start-Up Activities" ("SOP 98-5").
Implementation of SOP 98-5 is not expected to have a material effect on the
Company's financial position, results of operations, or cash flows for a fiscal
year. However, since the Company generally opens new locations during the second
half of the year, the change in accounting for pre-opening costs could have an
effect on quarterly results. When the decision to close a retail unit is made,
any future net lease obligation and nonrecoverable investment in fixed assets
directly related to discontinuance of operations are expensed.

ADVERTISING COSTS: Advertising costs, net of co-op recoveries from vendors,
are expensed the first time the advertising occurs and amounted to $443, $420,
and $385 in 1998, 1997, and 1996, respectively.

INCOME TAXES: Deferred income taxes are provided for temporary differences
between financial statement and taxable income. Kmart accrues U.S. and foreign
taxes payable on all of the earnings of subsidiaries, except with respect to
earnings that are intended to be permanently reinvested, or are expected to be
distributed free of additional tax by operation of relevant statutes currently
in effect and by utilization of available tax credits and deductions.

COMPREHENSIVE INCOME: Effective for fiscal 1998, Kmart adopted Statement of
Financial Accounting Standards No. 130, "Reporting Comprehensive Income" ("FAS
130") which establishes standards for reporting and display of changes in equity
from non-owner sources in the financial statements. Components of accumulated
other comprehensive income in shareholders' equity consists of foreign currency
translation adjustments and minimum pension liability adjustments.

USE OF ESTIMATES: The preparation of financial statements in conformity
with generally accepted accounting principles requires management to make
estimates and assumptions that affect the reported amounts of assets and
liabilities at the date of the financial statements and the reported amounts of
revenues and expenses during the reporting period. Actual results could differ
from those estimates.


                    Kmart Corporation 1998 Annual Report 26


<PAGE>   11
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS PER SHARE DATA)

RECLASSIFICATIONS: Certain reclassifications of prior year amounts have
been made to conform to the 1998 presentation.

2)  DISCONTINUED OPERATIONS AND DISPOSITIONS
Discontinued operations for 1997 include Builders Square, Inc. ("Builders
Square"). Discontinued operations for 1996, include Builders Square, Borders
Group, Inc. ("Borders Group"), OfficeMax, Inc. ("OfficeMax"), The Sports
Authority, Inc. ("TSA"), Thrifty PayLess Holdings, Inc. ("TPH"), Coles Myer,
Ltd. ("Coles Myer"), and Furr's/Bishop's, Inc. ("Furr's").

1997 ACTIVITY
During the first and second quarters of 1997, the Company completed the
sale of its interests in the Mexico and Canada operations, respectively. Under
the terms of the Mexico agreement the Company received $74, which approximated
the book value of its interest. Under the terms of the Canada agreement, the
Company received $54 in cash, a $76 note receivable and retained a 12.5%
non-voting equity interest. The net proceeds from the sale approximated book
value. During the first quarter of 1998, the note receivable was collected and
the equity interest was sold at a gain of $7.
In the third quarter of 1997, the Company completed the sale of
substantially all of the assets of its subsidiary, Builders Square, to an
affiliate of Leonard Green and Partners, LP ("LGP"). The net proceeds from the
sale approximated book value.

1996 ACTIVITY
During the first half of 1996, the Company received $70 from the sale of
approximately 33% of its investment in the common stock of TPH and revalued its
remaining investment by recording a $61 loss from discontinued operations, net
of income taxes. In the fourth quarter, Rite Aid Corporation ("Rite Aid") merged
TPH into Rite Aid and exchanged 0.65 of its shares for each share of TPH. Kmart
sold its Rite Aid shares received resulting in net proceeds of approximately

$257 and ... pretax gain of $185 which was included in other gains and losses.

In the first quarter, the Company completed the sale of its Czech and Slovak
Republic operations and received net proceeds of $115.

In the fourth quarter of 1996, the Company recorded a $385 after tax charge
as a result of its plan to dispose of Builders Square. This charge was included
in loss on disposal of discontinued operations. The Company also recorded a
pretax charge of $98, relating to the anticipated losses on the disposal of its
international operations. This charge was included in other gains and losses.

3)  PROPERTY AND EQUIPMENT

<TABLE>
<CAPTION>

| | YEAR END | |
| | 1998 | 1997 |
| --- | --- | --- |
| <S> | <C> | <C> |
| Land | $    334 | $    319 |
| Buildings | 944 | 822 |
| Leasehold improvements | 2,156 | 1,834 |
| Furniture and fixtures | 5,142 | 4,832 |
| Construction in progress | 62 | 60 |
| | 8,638 | 7,867 |
| Property under capital leases | 2,140 | 2,264 |
| | 10,778 | 10,131 |
| Less: | | |
| Accumulated depreciation and amortization | (3,674) | (3,427) |
| Accumulated depreciation-capital leases | (1,190) | (1,232) |
| Total | $  5,914 | $  5,472 |

</TABLE>

The following table provides a breakdown of the number of stores leased compared
to owned:

<TABLE>
<CAPTION>

| | YEAR END | |
| | 1998 | 1997 |
| --- | --- | --- |
| <S> | <C> | <C> |
| Number of U.S. Kmart Stores Owned | 110 | 105 |
| Number of U.S. Kmart Stores Leased | 2,051 | 2,031 |

</TABLE>

4)  INVESTMENTS IN AFFILIATED RETAIL COMPANIES
All Kmart footwear departments are operated under license agreements with
the Meldisco subsidiaries of FTS, substantially all of which are 49% owned by
Kmart and 51% owned by FTS. Income earned under various agreements was $225,
$210, and $211, in 1998, 1997, and 1996, respectively. The Company received
dividends from Meldisco in 1998, 1997, and 1996 of $36, $36, and $64,
respectively.

<TABLE>
<CAPTION>

| | FISCAL YEAR | | |
| MELDISCO INFORMATION | 1998 | 1997 | 1996 |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Net sales | $1,139 | $1,142 | $1,109 |
| Gross profit | 499 | 491 | 476 |
| Net income | 78 | 74 | 74 |
| Inventory | $  147 | $  142 | $  134 |
| Other current assets | 22 | 17 | 24 |
| Non-current assets | -- | -- | 1 |

```
Total assets                 169      159      159
Current liabilities           29       24       25
                          ------   ------   ------
Net assets                $  140   $  135   $  134
                          ======   ======   ======
Equity of Kmart           $   68   $   65   $   65
                          ======   ======   ======
```

</TABLE>


Unremitted earnings included in consolidated retained earnings were $38, $42 and
$41 at year end 1998, 1997, and 1996, respectively.


                    Kmart Corporation 1998 Annual Report 27
<PAGE>   12
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS PER SHARE DATA)


5)  OTHER COMMITMENTS AND CONTINGENCIES
    Kmart has outstanding guarantees for property leased by certain former
subsidiaries as follows:


<TABLE>
<CAPTION>
                                               GROSS
                          PRESENT VALUE        LEASE
                             AT 7%       -------------------
                             1998         1998       1997
                             ----         ----       ----
<S>                          <C>          <C>        <C>
Borders Group             $  112       $  194     $  205
OfficeMax                    107          156        168
The Sports Authority         234          397        424
Builders Square              761        1,378      1,568
                          ------       ------     ------
Total                     $1,214       $2,125     $2,365
                          ======       ======     ======

</TABLE>


    The possibility of the Company having to honor its contingent obligations
is dependent upon the future operating results of the former subsidiaries.
Should a reserve be required, it would be recorded at the time the obligation
was determined to be probable.


BUILDERS SQUARE
    Builders Square is now part of Hechinger Company ("Hechinger"), an
affiliate of LGP. Hechinger operates in the highly competitive "do-it-yourself"
marketplace. To provide additional financial flexibility as well as liquidity
for seasonal requirements anticipated during the first half of 1999, Hechinger
amended certain aspects of its bank credit agreement on December 31, 1998. As
part of that amendment, Kmart guaranteed 80% and GEI II, also an affiliate of
LGP, guaranteed 20% of an additional secured supplemental facility totaling $50
and expiring June 30, 1999. At January 27, 1999, there were no borrowings
outstanding under the supplemental facility.

    On February 22, 1999, in its first quarter 10-Q filing, Hechinger indicated
that it may not be in compliance with the EBITDA covenant contained in its bank
agreement for its second quarter, ending April 3, 1999, and has therefore
arranged with its lenders for a temporary waiver, which expires April 30, 1999.
    On March 1, 1999, Hechinger entered into a commitment letter for a new
three-year credit facility which would replace all existing credit facilities.


THE SPORTS AUTHORITY
    On October 6, 1998, TSA announced that it would take a $55 after-tax
charge, as a result of store closings, inventory writedowns and other charges
and costs, and that operating results for the third quarter of 1998 would be
weaker than expected. In October 1998, TSA announced that it amended certain
aspects of its bank credit agreement, including modifying certain financial
covenants in light of the restructuring charge. Pursuant to that amendment, TSA
also granted its bank lenders a security interest in its inventory and certain
accounts receivable. On December 9, 1998, in its third quarter 10-Q filing, TSA
noted that its ability to satisfy ongoing working capital and capital
expenditure requirements depends on successfully negotiating a new credit
facility prior to the expiration of its bank credit agreement in April 1999.
    Kmart's rights and obligations with respect to its guarantee of TSA leases
are governed by a Lease Guaranty, Indemnification and Reimbursement Agreement
dated as of November 23, 1994 (the "LGIRA"). Kmart and TSA are presently in

1/28/2019    18-23538-shl    Doc 3560-2    Filed 05/03/19    Entered 05/03/19 19:30:54    Exhibit B -
discussion of the terms were the govern edgare data 56824/0000950124 99 002618.txt
Declaration of Artem Skorostensky in Support of Objection of Urban E    Pg 110 of 166

finalized, in connection with TSA's refinancing activities related to the
procurement of a new three-year credit facility prior to April 1999.


OTHER
      As of January 27, 1999, Kmart has guaranteed $132 of indebtedness of other
parties related to certain of its leased properties financed by industrial
revenue bonds. These agreements expire from 2004 through 2009.
      There are various claims, lawsuits, and pending actions against Kmart
incident to its operations. It is the opinion of management that the ultimate
resolution of these matters will not have a material adverse effect on Kmart's
liquidity, financial position, or results of operations.


6)  LONG-TERM DEBT AND NOTES PAYABLE

<TABLE>
<CAPTION>

|  |  |  | YEAR END | |
| --- | --- | --- | --- | --- |
| TYPE | FISCAL YEAR MATURITY | INTEREST RATES | 1998 | 1997 |
| <S> | <C> | <C> | <C> | <C> |
| Debentures | 2005-2023 | 7.8%-12.5% | $ 867 | $ 967 |
| Medium-term notes | 1999-2020 | 6.8%-9% | 438 | 512 |
| CMBS | 2002 | Floating | 310 | 324 |
| Total |  |  | 1,615 | 1,803 |
| Current portion |  |  | (77) | (78) |
| Long-term debt |  |  | $ 1,538 | $ 1,725 |

</TABLE>


      The Commercial Mortgage Pass Through Certificates ("CMBS") mortgage loan is
subject to monthly payments of interest and principal, according to a schedule
which amortizes the initial outstanding principal amount of $335 over
approximately 15 years with a balloon payment of approximately $261 on the
scheduled maturity date in February 2002. The CMBS weighted average interest
rate is 1 month LIBOR plus 47 basis points.
      The $2.5 billion Revolving Credit Agreement ("Revolver"), which expires in
June 2000, includes commitment fees and interest rate spreads of 0.225% and
LIBOR plus 75 basis points. The Revolver also contains certain affirmative and
negative covenants customary to these types of agreements. The Company is in
compliance with all such covenants. As of January 27, 1999 and January 28, 1998,
there were no outstanding amounts under the Revolver.
      Based on the quoted market prices for the same or similar issues or on the
current rates offered to Kmart for debt of the same remaining maturities, the
fair value of long-term debt was approximately $1,664 and $1,817 at year end
1998 and 1997, respectively.
      The principal maturities of long-term debt for the five years subsequent to
1998 are: 1999-$77, 2000-$66, 2001-$68, 2002-$351 and 2003-$50, and 2004 and
later- $1,003. Cash paid for interest was $278, $333, and $459 in 1998, 1997,
and 1996, respectively.


                  Kmart Corporation 1998 Annual Report 28
<PAGE>  13
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS PER SHARE DATA)


7)  LEASES
      Kmart conducts operations primarily in leased facilities. Kmart store
leases are generally for terms of 25 years with multiple five-year renewal
options which allow the Company the option to extend the life of the lease up to
50 years beyond the initial noncancelable term.
      In certain Kmart leased facilities, selling space has been sublet to other
retailers, including Olan Mills, Inc.; Penske Auto Centers, Inc.; and the
Meldisco subsidiaries of FTS.


<TABLE>
<CAPTION>

|  | MINIMUM LEASE COMMITMENTS | |
| --- | --- | --- |
| AS OF JANUARY 27, 1999 | CAPITAL | OPERATING |
| <S> | <C> | <C> |

```
Fiscal Year
  1999                              $   271      $   597
  2000                                  256          586
  2001                                  245          579
  2002                                  236          567
  2003                                  224          540
  Later years                         1,825        6,888
                                    -------      -------

Total minimum lease payments         3,057        9,757
Less-minimum sublease income            --       (3,074)
                                    -------      -------

Net minimum lease payments           3,057      $ 6,683
                                                 =======
Less:
  Estimated executory costs          (846)
  Amount representing interest     (1,033)
                                   -------
                                     1,178
Current                                (87)
                                   -------
Long-term                          $ 1,091
                                   =======
```

<CAPTION>

```
RENT EXPENSE              1998      1997      1996
- -----------------------------------------------------
<S>                       <C>       <C>       <C>
Minimum rentals         $ 711     $ 673     $ 642
Percentage rentals         40        39        36
Less-sublease rentals    (227)     (234)     (236)
                        -----     -----     -----
Total                   $ 524     $ 478     $ 442
                        =====     =====     =====
```

</TABLE>

8)  CONVERTIBLE PREFERRED SECURITIES
    In June 1996, a trust sponsored and wholly owned by the Company issued
20,000,000 shares of trust convertible preferred securities ("Preferred
Securities"), the proceeds of which were invested by the trust in $1 billion
aggregate principal amount of the Company's 7-3/4% Convertible Junior
Subordinated Debentures ("Debentures"). The Preferred Securities accrue and pay
cash distributions quarterly at a rate of 7-3/4% per annum of the stated
liquidation amount of $50 per Preferred Security. Kmart has guaranteed, on a
subordinated basis, distributions and other payments due on the Preferred
Securities.
    The Preferred Securities are convertible at the option of the holder at any
time at the rate of 3.3333 shares of Kmart common stock for each Preferred
Security, and are mandatorily redeemable upon the maturity of the Debentures on
June 15, 2016, or to the extent of any earlier redemption of any Debentures by
Kmart and are callable beginning June 15, 1999.
    Based on the quoted market prices, the fair value of the Preferred
Securities was approximately $1,199 and $1,040 as of year end 1998 and 1997,
respectively.

                 Kmart Corporation 1998 Annual Report 29
<PAGE>   14

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS PER SHARE DATA)

9)  INCOME TAXES

<TABLE>
<CAPTION>

```
INCOME BEFORE
INCOME TAXES                     1998      1997      1996
- --------------------------------------------------------------
<S>                              <C>       <C>       <C>
U.S.                           $ 766     $ 390     $ 351
Foreign                           32        28       (21)
                               -----     -----     -----
```

```
                                =====    =====    =====

<CAPTION>

INCOME TAX
PROVISION (CREDIT)              1998     1997     1996
- ---------------------------------------------------------
<S>                             <C>      <C>      <C>
Current:
        Federal               $  70    $(126)   $  54
        State and local          21      (5)        5
        Foreign                  12       11       17
                              -----    -----    -----

                                103     (120)      76

Deferred:
        Federal and state       127      240       (7)
        Foreign                  --       --       (1)
                              -----    -----    -----

Total                         $ 230    $ 120    $  68
                              =====    =====    =====

<CAPTION>

EFFECTIVE TAX RATE
RECONCILIATION                  1998     1997     1996
- ---------------------------------------------------------
<S>                             <C>      <C>      <C>
Federal income
        tax rate               35.0%    35.0%    35.0%
State and local taxes,
        net of federal tax benefit  1.9  (0.8)     0.9
Tax credits                    (0.7)    (1.9)      --
Equity in net income
        of affiliated companies (1.4)   (2.3)    (3.1)
International tax rate
        and basis differential   --       --    (13.9)
Adjustments to prior
        year's accruals        (6.0)      --       --
Other                            --     (1.3)     1.6
                              -----    -----    -----
                               28.8%    28.7%    20.5%
                              =====    =====    =====

<CAPTION>

                                        YEAR END
                                      ----------------
DEFERRED TAX
ASSETS AND LIABILITIES          1998     1997
- ---------------------------------------------------------
<S>                             <C>      <C>
Deferred tax assets:
        Federal benefit for
                state and foreign taxes  $  36   $  27
        Discontinued operations     129      135
        Accruals and other liabilities  197   258
        Capital leases               98      101
        Store restructuring          69       94
        Other                        84      182
                                  -----    -----
Total deferred tax assets           613      797
                                  -----    -----

Deferred tax liabilities:
        Inventory                   279      272
        Property and equipment      367      417
        Other                        24       23
                                  -----    -----
Total deferred tax liabilities      670      712
                                  -----    -----
Net deferred tax (liabilities) assets  $ (57)  $  85
                                  =====    =====

</TABLE>
```

The Company has available alternative minimum tax credit carryforwards of

The Internal Revenue Service has completed its examination of the Company's federal income tax returns through 1994. The Company believes that adequate tax accruals have been provided for all years.

Cash paid (received) for income taxes was $(99), $7, and $(238) in 1998, 1997, and 1996, respectively.

10) EARNINGS PER SHARE

|  | 1998 | 1997 | 1996 |
|---|---|---|---|
| **Basic EPS:** | | | |
| Net income (loss) | $   518 | $   249 | $  (220) |
| Weighted average shares | 492.1 | 487.1 | 483.6 |
| | -------- | -------- | ------- |
| Basic earnings (loss) per share | $   1.05 | $   0.51 | $ (0.45) |
| | ======== | ======== | ======= |
| **Diluted EPS:** | | | |
| Net income (loss) $ | 518 | $   249 | $  (220) |
| Add back: | | | |
| Preferred dividends | 50 | -- | -- |
| | -------- | -------- | ------- |
| Net income (loss) adjusted for preferred dividends | $   568 | $   249 | $  (220) |
| | ======== | ======== | ======= |
| Weighted average shares | 492.1 | 487.1 | 483.6 |
| Dilutive effect of stock options | 6.1 | 4.6 | 2.5 |
| Convertible preferred securities | 66.7 | -- | -- |
| | -------- | -------- | ------- |
| Weighted average shares and equivalents - diluted | 564.9 | 491.7 | 486.1 |
| | ======== | ======== | ======= |
| Diluted earnings (loss) per share | $   1.01 | $   0.51 | $ (0.45) |
| | ======== | ======== | ======= |

The Preferred Securities and preferred dividends were not included in the calculation of diluted EPS for 1997 and 1996 due to the anti-dilutive effect on EPS if converted. Had the Preferred Securities been included in the calculation, diluted EPS would have been higher by $0.02 and $0.11 for fiscal 1997 and 1996, respectively.

Kmart Corporation 1998 Annual Report 30
<PAGE>   15
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS PER SHARE DATA)

11) PENSION PLANS AND OTHER POST-RETIREMENT BENEFITS
In the second quarter of 1998, the Company announced a Voluntary Early Retirement Program for certain Kmart distribution center associates over 45 years of age with at least 10 years of service by May 31, 1998. Of the 1,050 Kmart associates eligible for this program, 456 accepted the early retirement offer, and the Company recorded a charge of $19 ($13 after tax). Payouts under this program will be fully funded through existing pension plan assets.
In the fourth quarter of 1997, the Company announced a Voluntary Early Retirement Program for certain Kmart hourly associates over 45 years of age with at least 10 years of service by December 31, 1997. Of the 28,785 Kmart associates eligible for this program, 11,587 accepted the early retirement offer, and the Company recorded a charge of $114 ($81 after tax). Payouts under this program will be fully funded through existing pension plan assets.
Prior to 1996, U.S. Kmart had defined benefit pension plans covering eligible associates who met certain requirements of age, length of service, and hours worked per year. Effective January 31, 1996, the pension plans were frozen, and associates no longer earn additional benefits under the plans.
Benefits paid to retirees are based upon age at retirement and years of credited service and earnings as of January 31, 1996. Kmart's policy is to fund at least the minimum amounts required by the Employee Retirement Income Security Act of 1974. The plans' assets consist primarily of equity securities, fixed income securities, and real estate. No contributions were made in fiscal 1998, 1997, or 1996. The total consolidated pension income was $63, $63, and $32 in 1998, 1997, and 1996, respectively.
The following tables summarize the change in benefit obligation, change in

plan assets. Funded status, amounts recognized and actuarial assumptions for
Kmart's employee pension plans.

```
<TABLE>
<CAPTION>
                                                             YEAR END
                                                     -----------------------
                                                       1998          1997
- -------------------------------------------------------------------------------
<S>                                                   <C>           <C>
Change in benefit obligation:
     Benefit obligation at beginning of year        $ 2,055       $ 1,791
     Interest costs                                     139           139
     Voluntary early retirement program(VERP)           19           114
     Actuarial loss                                     131           378
     Benefits paid including VERP                      (136)         (367)
                                                    -------       -------
     Benefit obligation at end of year              $ 2,208       $ 2,055
                                                    =======       =======
Change in plan assets:
     Fair value of plan assets at
          beginning of year                         $ 1,942       $ 1,974
     Actual return on plan assets                       292           335
     Benefits paid including VERP                      (136)         (367)
                                                    -------       -------
     Fair value of plan assets at
          end of year                               $ 2,098       $ 1,942
                                                    =======       =======

<CAPTION>

                                                             YEAR END
                                                     -----------------------
                                                       1998          1997
- -------------------------------------------------------------------------------
<S>                                                   <C>           <C>
     Funded status                                  $  (110)      $  (113)
     Unrecognized net loss                               99            72
     Unrecognized transition asset                      (54)          (63)
                                                    -------       -------
     Net recognized liability                       $   (65)      $  (104)
                                                    =======       =======
Amounts recognized in the statement of financial position consist of:
     Accrued benefit liability                      $  (109)      $  (113)
     Accumulated other comprehensive income             44             9
                                                    -------       -------
     Net amount recognized                          $   (65)      $  (104)
                                                    =======       =======
Weighted-average assumptions as of January 31
     Discount rate                                      6.5%         6.75%
     Expected return on plan assets                     10%           10%


<CAPTION>
                                                             YEAR END
                                                  ------------------------------------
                                                    1998          1997          1996
- ----------------------------------------------------------------------------------------
Components of Net Periodic Benefit (Income) Expense
     Interest costs                               $   139       $   139       $   132
     Expected return on plan assets                  (195)         (193)         (165)
     Amortization of unrecognized
   transition asset                                    (7)           (9)           (8)
                                                  -------       -------       -------
     Net periodic benefit                         $   (63)      $   (63)      $   (41)
                                                  =======       =======       =======

</TABLE>
```

     The Company has non-qualified plans for directors and officers which were
partially funded as of year end 1998 and were unfunded as of year end 1997.
Benefits under the plans totaled $37 and $36, at the end of 1998 and 1997,
respectively, which have been accrued in the accompanying balance sheets. Plan
assets totaled $11 as of year end 1998.
     Full-time associates who have worked 10 years and who have retired after age
55, have the option of participation in Kmart's medical plan until age 65. The
plan is contributory, with retiree contributions adjusted annually. The
accounting for the plan anticipates future cost-sharing changes that are
consistent with Kmart's expressed intent to increase the retiree contribution

end of 1998 and 1997, respectively.


12) RETIREMENT SAVINGS PLAN
     The Retirement Savings Plan provides that associates of Kmart who have
completed six months of service can invest from 1% to 16% of their earnings in
the associate's choice of various investments. For each dollar the participant
contributes, up to 6% of earnings, Kmart will contribute an additional 50 cents
which is invested in the Employee Stock Ownership Plan.
     The Retirement Savings Plan has a profit sharing feature whereby the
Company makes contributions based on profits, with minimum yearly contributions
required of $30. Kmart's expense related to the Retirement Savings Plan was $68,
$69, and $71 in 1998, 1997, and 1996, respectively.


                    Kmart Corporation 1998 Annual Report 31
<PAGE>    16
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS PER SHARE DATA)

13) STOCK OPTION PLANS
     The Company applies APB Opinion 25 and related interpretations in
accounting for its stock option and restricted stock plans. Since stock options
were granted at exercise prices equal to the stock price on the grant date,
under APB Opinion 25, no compensation cost has been recognized for the Company's
stock based compensation plans.
     Had the compensation cost for the Company's stock based compensation plans
been determined based on the fair value at the grant dates consistent with the
method of FAS 123, net earnings would have been the pro forma amounts shown
below.

<TABLE>
<CAPTION>

| PRO FORMA INCOME (LOSS) | 1998 | 1997 | 1996 |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Net income (loss) - as reported | $    518 | $    249 | $    (220) |
| EPS - as reported | 1.01 | .51 | (.45) |
| Net income (loss) - pro forma | 496 | 222 | (242) |
| EPS - pro forma | .97 | .45 | (.50) |

</TABLE>


     To determine these amounts, the fair value of each stock option has been
estimated on the date of the grant using a Black-Scholes option-pricing model
with a dividend yield of 0%. Options vest over 3 years on a straight- line basis
with a term of 10 years.


<TABLE>
<CAPTION>

|  | 1998 | 1997 | 1996 |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Expected volatility | .4230 | .3902 | .3788 |
| Risk-free interest rates | 5.32 | 6.47 | 6.05 |
| Expected life in years | 5 | 5 | 5 |
| Weighted-average fair |  |  |  |
| value per share | $   7.11 | $   5.37 | $   3.37 |

</TABLE>

<TABLE>
<CAPTION>

| STOCK OPTION PLANS (000'S) | SHARES | OPTION PRICE |
| --- | --- | --- |
| <S> | <C> | <C> |
| January 29, 1997: |  |  |
| Outstanding | 16,967 | $  6.31 - $26.03 |
| Granted | 7,233 | $ 10.79 - $14.85 |
| Exercised | (1,507) | $  7.81 - $12.38 |
| Forfeited | (1,705) | $  7.81 - $21.94 |
|  | ------ |  |
| January 28, 1998: |  |  |
| Outstanding | 20,988 | $  6.31 - $26.03 |
| Granted | 10,495 | $ 11.29 - $20.34 |
| Exercised | (4,679) | $  6.31 - $18.88 |

```
Forfeited                                    ------
January 27, 1999:
  Outstanding                       24,622      $  7.00 - $26.03
  Exercisable                       11,983      $  7.13 - $26.03
  Available for grant               64,515
</TABLE>
```

The following table summarizes information about stock options outstanding
as of January 27, 1999.

```
<TABLE>
<CAPTION>
                      OPTIONS OUTSTANDING           OPTIONS EXERCISABLE
                 ------------------------------    ----------------------
                 NUMBER    WEIGHTED
                 OF SHARES  AVERAGE   WEIGHTED     NUMBER       WEIGHTED
   RANGE OF      OUTSTANDING REMAINING AVERAGE     OF SHARES    AVERAGE
   EXERCISE      (000'S)    LIFE      PRICE        EXERCISABLE  EXERCISE
   PRICE                                           (000'S)      PRICE
- ------------------------------------------------------------------------
<C>              <C>        <C>       <C>          <C>          <C>
$ 7.00 to $10.00   5,761     7.1      $   7.85      4,398        $   7.85
$10.01 to $15.00  12,223     7.7      $  12.23      6,579        $  12.24
$15.01 to $26.03   6,638     8.3      $  16.99      1,006        $  20.93
- ------------------------------------------------------------------------
$ 7.00 to $26.03  24,622     7.7      $  12.49     11,983        $  11.36
</TABLE>
```

```
<PAGE>  17
```

14) QUARTERLY FINANCIAL INFORMATION (UNAUDITED)
   Earnings per share amounts for each quarter are required to be computed
independently and may not equal the amount computed for the total year.

```
<TABLE>
<CAPTION>
- -----------------------------------------------------------------------
1998                        FIRST      SECOND     THIRD      FOURTH
- -----------------------------------------------------------------------
<S>                         <C>        <C>        <C>        <C>
Sales                       $  7,515   $  8,116   $  7,642   $ 10,401
Cost of sales                  5,908      6,336      5,954      8,121
Net income                        47         80         38        353
Basic earnings per share         .10        .16        .08        .72
Diluted earnings per share       .10        .16        .08        .65
Common stock price
  High                      $18-11/16  $20-9/16   $18-11/16  $16-11/16
  Low                             11    16-7/16    11-1/16    13-12/16
<CAPTION>
- -----------------------------------------------------------------------
1997                        FIRST      SECOND     THIRD      FOURTH
- -----------------------------------------------------------------------
<S>                         <C>        <C>        <C>        <C>
Sales                       $  7,263   $  7,846   $  7,315   $  9,759
Cost of sales                  5,637      6,197      5,683      7,635
Net income                        14         31         18        186
Basic earnings per share         .03        .06        .04        .38
Diluted earnings per share       .03        .06        .04        .35
Common stock price
  High                      $ 13-5/8   $ 14-1/2   $ 15-1/16  $13-13/16
  Low                          10-5/8    10-3/8     11-3/8     10-5/8
</TABLE>
```

The Preferred Securities were not included in the calculation of diluted EPS
for the first, second, and third quarters of 1998 and 1997, due to the
anti-dilutive effect on EPS if converted. Had the Preferred Securities been
included in the calculation, diluted EPS would have been higher by $0.01 for the
first and third quarters of 1998, and $0.02 for the first, second, and third
quarters of 1997. There was no effect during the second quarter of 1998.

```
              Kmart Corporation 1998 Annual Report 32
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23
```

```
<SEQUENCE>
<DESCRIPTION>CONSENT OF INDEPENDENT ACCOUNTANTS
<TEXT>


<PAGE>    1
                                                    EXHIBIT 23




                    CONSENT OF INDEPENDENT ACCOUNTANTS



We hereby consent to the incorporation by reference in the Registration
Statements on Form S-8 (Registration Statement Nos. 33-54879, 33-48490,
33-48673, 33-52797, 33-52799 and 33-61351) and the Prospectus constituting part
of the Registration Statement on Form S-3 (Registration Statement No. 33-74665)
of Kmart Corporation of our report dated March 1, 1999 appearing on page 21 of
the Annual Report to Shareholders which is incorporated by reference in this
Annual Report on Form 10-K for the year ended January 27, 1999.




PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Detroit, Michigan
April 12, 1999
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27
<SEQUENCE>9
<DESCRIPTION>FINANCIAL DATA SCHEDULE
<TEXT>


<TABLE> <S> <C>


<ARTICLE> 5
<LEGEND>
THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM (A) THE
CONSOLIDATED STATEMENTS OF INCOME AND CONSOLIDATED BALANCE SHEETS AND IS
QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH (B) FINANCIAL STATEMENTS.
</LEGEND>

<S>                              <C>
<PERIOD-TYPE>                    YEAR
<FISCAL-YEAR-END>                     JAN-27-1999
<PERIOD-START>                        JAN-29-1998
<PERIOD-END>                          JAN-27-1999
<CASH>                                        710
<SECURITIES>                                    0
<RECEIVABLES>                                   0
<ALLOWANCES>                                    0
<INVENTORY>                                 6,536
<CURRENT-ASSETS>                            7,830
<PP&E>                                     10,778
<DEPRECIATION>                              4,864
<TOTAL-ASSETS>                             14,166
<CURRENT-LIABILITIES>                       3,691
<BONDS>                                     1,538
<PREFERRED-MANDATORY>                         984
<PREFERRED>                                     0
<COMMON>                                      493
<OTHER-SE>                                  5,486
<TOTAL-LIABILITY-AND-EQUITY>               14,166
<SALES>                                    33,674
<TOTAL-REVENUES>                           33,674
<CGS>                                      26,319
<TOTAL-COSTS>                              26,319
<OTHER-EXPENSES>                                0
<LOSS-PROVISION>                                0
```

```
<INTEREST-EXPENSE>                   293
<INCOME-PRETAX>                      798
<INCOME-TAX>                         230
<INCOME-CONTINUING>                  518
<DISCONTINUED>                         0
<EXTRAORDINARY>                        0
<CHANGES>                              0
<NET-INCOME>                         518
<EPS-PRIMARY>                       1.05
<EPS-DILUTED>                       1.01


</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

## Exhibit 3

**(Kmart Corporation's Form 10-K for the fiscal year ended January 26, 2000)**

ACTIVE/99459656.1

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 C4VmA3pqLPF+ZNYvQ+PZjLicTzggjikRSTT6O+TYVtxE6YNV9jE4vdLH1jRGJx5a
 RePTMIy03HrHQIuojwlCsw==

<SEC-DOCUMENT>0000950124-00-002311.txt : 20000420
<SEC-HEADER>0000950124-00-002311.hdr.sgml : 20000420
ACCESSION NUMBER:                0000950124-00-002311
CONFORMED SUBMISSION TYPE:       10-K
PUBLIC DOCUMENT COUNT:           6
CONFORMED PERIOD OF REPORT:      20000126
FILED AS OF DATE:                20000419

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           KMART CORP
                CENTRAL INDEX KEY:                0000056824
                STANDARD INDUSTRIAL CLASSIFICATION:  RETAIL-VARIETY STORES [5331]
                IRS NUMBER:                       380729500
                STATE OF INCORPORATION:           MI
                FISCAL YEAR END:                  0129

        FILING VALUES:
                FORM TYPE:           10-K
                SEC ACT:
                SEC FILE NUMBER:     001-00327
                FILM NUMBER:         604969

        BUSINESS ADDRESS:
                STREET 1:            3100 W BIG BEAVER RD
                CITY:                TROY
                STATE:               MI
                ZIP:                 48084
                BUSINESS PHONE:      2486431000

        MAIL ADDRESS:
                STREET 1:            3100 W  BIG BEAVER ROAD
                CITY:                TROY
                STATE:               MI
                ZIP:                 48084

        FORMER COMPANY:
                FORMER CONFORMED NAME:  KRESGE S S CO
                DATE OF NAME CHANGE:    19770921
</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FORM 10-K
<TEXT>


<PAGE>   1


                    SECURITIES AND EXCHANGE COMMISSION
                         Washington, D.C. 20549


                             FORM 10-K
```

X ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT
OF 1934 For the fiscal year ended January 26, 2000
                 ----------------

                            or

__    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
      EXCHANGE ACT OF 1934
For the transition period from            to         .

Commission File No. 1-327
         -----

                        KMART CORPORATION
           (Exact name of registrant as specified in its charter)

          Michigan                              38-0729500
-------------------------------------------------------------------------
       (State or other jurisdiction of          (I.R.S. Employer
       incorporation or organization)          Identification No.)

    3100 West Big Beaver Road - Troy, Michigan          48084
-------------------------------------------------------------------------
      (Address of principal executive offices)          (zip code)

     Registrant's telephone number, including area code   (248) 643-1000
                                                          --------------


SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE SECURITIES EXCHANGE ACT
OF 1934:

                                   Name of each Exchange
         Title of each class       on which registered

     Common Stock, $1.00 par value    New York, Pacific and Chicago Exchanges

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE SECURITIES EXCHANGE ACT
OF 1934:  None

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934
during the preceding 12 months (or for such shorter period that the Registrant
was required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days. YES  X      NO
                  -----
Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of the Registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [ ]

The aggregate market value of voting stock including Common Stock held by
non-affiliates of the Registrant on March 22, 2000 was $4,844,341,860. The
market value of the Common Stock is based on the closing price on the New York
Stock Exchange on such date.

As of March 22, 2000, 481,425,278 shares of Common Stock of the Registrant, held
by approximately 76,644 shareholders, were outstanding.

Portions of the Registrant's 1999 Annual Report to Shareholders are incorporated
by reference into Parts I, II and IV of this report. Portions of the
Registrant's Proxy Statement dated April 13, 2000 in connection with the 2000
Annual Meeting of Stockholders are incorporated by reference into Part III of

<PAGE>    2

                              PART I
Item 1.  Business

        History

        Kmart Corporation ("the Registrant" or "Kmart") is the nation's second
largest discount retailer and the third largest general merchandise retailer.
Kmart was incorporated under the laws of the State of Michigan on March 9, 1916,
as the successor to the business developed by its founder, S. S. Kresge, who
opened his first store in 1899. After operating Kresge department stores for
over 45 years, the Kmart store program commenced with the opening of the first
Kmart store in March 1962. The principal executive offices of Kmart are located
at 3100 West Big Beaver Road, Troy, Michigan 48084, and its telephone number is
(248) 643-1000.

        Operations

        The Registrant operates in the general merchandise retailing industry
through 2,171 Kmart discount stores with locations in each of the 50 United
States, Puerto Rico, the U.S. Virgin Islands and Guam. Kmart's general
merchandise retail operations are located in 299 of the 316 Metropolitan
Statistical Areas in the United States. Kmart stores are generally one-floor,
free-standing units ranging in size from 40,000 to 180,000 square feet.

        In 1995, Kmart converted 29 of its traditional stores to feature a new,
high-frequency format. In April 1997, this design was renamed Big Kmart. Big
Kmart offers customers an increased mix of frequently-purchased, everyday basics
and consumables in a "Kmart Pantry" area located near the front of each store. A
total of 1,860 traditional Kmart stores had been converted to the Big Kmart
format at year-end 1999, with another 156 stores scheduled for conversion during
fiscal 2000. At year-end 2000, including new stores built in the Big Kmart
format, it is expected that approximately 2,030 stores will be in the Big Kmart
format.

        Super Kmart Centers represent the Registrant's supercenter concept.
Super Kmart Centers combine a full grocery assortment, including fresh and
frozen food, bakery, meats and other items, with a broad selection of general
merchandise found at Big Kmart and traditional Kmart stores. The Registrant's
105 Super Kmart Centers are open 24 hours a day, seven days a week.

        Information regarding the Registrant's analysis of consolidated
operations appearing in "Management's Discussion and Analysis of Results of
Operations and Financial Condition" on pages 18 through 20 of the Registrant's
1999 Annual Report to Shareholders, is incorporated herein by reference.

        Information regarding the Registrant's discontinued operations and
dispositions appearing in Note 2 of the "Notes to Consolidated Financial
Statements" on page 27 of the Registrant's 1999 Annual Report to Shareholders,
is incorporated herein by reference.

        Competition

        Kmart has several major competitors on a national level, which include
J.C. Penney, Sears, Target and Wal-Mart, and many competitors on a local and
regional level which compete with Kmart's individual stores. Success in this
competitive market is based on factors such as price, quality, service, product
mix and convenience.

        Seasonality

The Registrant's business is highly seasonal and depends to a
significant extent on the results of operations for the last quarter of the
fiscal year.

Credit Sales

The Registrant offers a private label Kmart Credit Card, available in
all Kmart stores, through Household Bank (SB), N.A. ("Household"), a unit of
Household International, Inc. Household owns the receivables and retains the
credit risk associated with this program. In addition to the Kmart Credit Card
program, all of the Registrant's stores accept major bank credit cards as
payment for merchandise.

Employees

The Registrant employed approximately 271,000 persons as of January 26,
2000.

2

<PAGE>    3


Effect of Compliance with Environmental Protection Provisions

Compliance with federal, state and local provisions which have been
enacted or adopted regulating the discharge of materials into the environment,
or otherwise relating to the protection of the environment, has not had, and is
not expected to have, a material effect on capital expenditures, earnings or the
competitive position of the Registrant and its subsidiaries.

Item 2.  Properties

At January 26, 2000, Kmart operated a total of 2,171 general merchandise
stores which are located in the United States, Puerto Rico, the U.S. Virgin
Islands and Guam. Kmart leases its store facilities, with the exception of 120
stores that it owns. Kmart store leases are generally for terms of 25 years with
multiple five-year renewal options which allow Kmart the option to extend the
life of the lease up to 50 years beyond the initial noncancelable term.

The Registrant owns its headquarters and one administrative building in
Troy, Michigan and leases administrative buildings in Royal Oak, Michigan and
North Bergen, New Jersey. The Registrant owns two United States distribution
centers, and leases 16 United States distribution centers for initial terms of
10 to 30 years with options to renew for additional terms. In addition, the
Registrant owns or leases 497 parcels not currently used for store operations,
the majority of which are rented to others.

A description of the Registrant's leasing arrangements, appearing in
Note 7 of the "Notes to Consolidated Financial Statements" on page 29 of the
Registrant's 1999 Annual Report to Shareholders, is incorporated herein by
reference.

Item 3.  Legal Proceedings

The Registrant is a party to a substantial number of legal proceedings,
most of which are routine and all of which are incidental to its business. Some
matters involve claims for large amounts of damages as well as other relief.
Although the consequences of these proceedings are not presently determinable,
in the opinion of management, they will not have a material adverse affect on

the Registrant's liquidity, financial position or results of operations.

Item 4.  Submission of Matters to a Vote of Security Holders

        Not applicable.

<div align="center">3</div>

<PAGE>    4

Executive Officers of the Registrant

        The name, position, age and a description of the business experience for each of the executive officers of the Registrant is listed below as of March 22, 2000. There is no family relationship among the executive officers. Executive officers of the Registrant are elected each year at the Annual Meeting of the Board of Directors to serve for the ensuing year and until their successors are elected and qualified. The business experience for each of the executive officers described below includes principal positions held since 1992. None of the corporations or organizations listed below is a parent, subsidiary or other affiliate of the Registrant.

        Floyd Hall - Chairman of the Board, President and Chief Executive
        Officer, 61.
Mr. Hall joined the Registrant under his current title in June 1995. Prior thereto he served concurrently as Chairman and Chief Executive Officer of The Museum Company, Alva Reproductions, Inc. and Glass Masters, Inc. from 1989 to 1995.

        Michael Bozic - Vice Chairman, 59.
Mr. Bozic joined the Registrant under his current title in December 1998. Prior thereto he was Chairman and Chief Executive Officer, Levitz Furniture Corporation from 1995 to 1998 and President and Chief Executive Officer, Hills Department Stores, Inc. from 1991 to 1995. Mr. Bozic was also with Sears Roebuck & Company for 28 years, serving as Chairman and Chief Executive Officer, Sears Merchandise Group, from 1987 to 1991.

        Andrew A. Giancamilli - President and General Merchandise Manager, U.S.
        Kmart, 49.
Mr. Giancamilli has been in his current position since January 1998. Prior thereto he held the following positions at the Registrant: Senior Vice President, General Merchandise Manager-Consumables and Commodities from 1996 to 1998; Vice President, Pharmacy Merchandising and Operations from 1995 to 1996. Prior to joining the Registrant in 1995, he was President, Chief Operating Officer, Perry Drug Stores, Inc. from 1993 to 1995; and Executive Vice President, Chief Operating Officer, Perry Drug Stores, Inc. from 1992 to 1993.

        Donald W. Keeble - President, Store Operations, U.S. Kmart, 51.
Mr. Keeble has served as an executive officer of the Registrant since 1989 and has served in his current position since July 1999. Prior thereto he held the following positions at the Registrant: Executive Vice President, Store Operations from 1995 to 1999, Executive Vice President, Merchandising and Operations from 1994 to 1995; and Senior Vice President, General Merchandise Manager - Fashions from 1991 to 1994.

        Warren Cooper - Executive Vice President, Human Resources and
        Administration, 55.
Mr. Cooper joined the Registrant under his current title in March 1996. Prior thereto he was Senior Vice President, Human Resources, General Cable from 1995 to 1996; Vice President, Human Resources, the Sears Merchandise Group, Sears, Roebuck & Co. from 1993 to 1995; and Vice President, Corporate Human Resources, Sears, Roebuck & Co. from 1987 to 1993.

Ernest L. Heether - Senior Vice President, Merchandise Planning and
Replenishment, 54.
Mr. Heether joined the Registrant under his current title in April 1996. Prior
thereto he served as Senior Vice President, Merchandise Operations, Bradlees,
Inc. from 1993 to 1996; and Vice President, Merchandise Planning and Control,
Caldor from 1990 to 1993.

Paul J. Hueber - Senior Vice President, Store Operations, 51.
Mr. Hueber has served as an executive officer of the Registrant since 1991 and
has served in his current position since 1994. Prior thereto he was Vice
President, West/Central Region from 1991 to 1994.

Cecil B. Kearse - Senior Vice President and General Merchandise Manager
- Home, 47.
Mr. Kearse has served in his current position since November 1997. Prior thereto
he held the following positions at the Registrant: Vice President, Merchandise
Presentation and Communication from 1996 to 1997; Vice President and General
Merchandise Manager - Men's and Children's from 1995 to 1996; Divisional Vice
President, Merchandising Fashions from 1994 to 1995; and Senior Buyer - Bed,
Bath & Kitchen from 1990 to 1994.

Jerry J. Kuske - Senior Vice President and General Merchandise Manager
- Hardlines, 48.
Mr. Kuske has served in his current position since April 1999. Prior thereto he
held the following positions at the Registrant: Senior Vice President and
General Merchandise Manager - Health and Beauty Care, Pharmacy and Consumables
from 1997 to 1999; Vice President, General Merchandise Manager - Health and
Beauty Care/Pharmacy from 1996 to 1997; Divisional Vice President, Consumables
and Commodities from 1995 to 1996. Prior to joining the Registrant, he served as
Senior Vice President, Merchandising and Marketing, Perry Drug Stores, Inc. from
1994 to 1995; and Senior Vice President, Operations, Payless Drug Stores, Inc.
from 1992 to 1994.

4

<PAGE>   5

James Mixon - Senior Vice President, Logistics, 55.
Mr. Mixon joined the Registrant in his current position in July 1997. Prior
thereto he served as Senior Vice President, Logistics/Service, Best Buy Stores
from 1994 to 1997; and Senior Vice President, Distribution/Transportation,
Marshall Stores from 1987 to 1994.

Joseph A. Osbourn - Senior Vice President and Chief Information
Officer, 52.
Mr. Osbourn joined the Registrant in his current position in October 1999. Prior
thereto he served as Vice President, Information Services, Walt Disney World
from 1989 to 1999.

E. Jackson Smailes - Senior Vice President and General Merchandise
Manager - Apparel, 57.
Mr. Smailes joined the Registrant in his current position in July 1997. Prior
thereto he served as President, Chief Executive Officer, Hills Department Stores
from 1995 to 1997; and Executive Vice President, Merchandising and Marketing,
Hills Department Stores from 1992 to 1995.

Martin E. Welch III - Senior Vice President and Chief Financial
Officer, 51.
Mr. Welch joined the Registrant under his current title in December 1995. Prior
thereto he was Senior Vice President, Chief Financial Officer, Federal-Mogul

5

<PAGE>   6

PART II

Item 5.  Market for Registrant's Common Equity and Related Stockholder Matters

        The Registrant's common stock is listed on the New York, Pacific
and Chicago Stock Exchanges. There were approximately 76,644 shareholders of the
Registrant's common stock as of March 22, 2000.

        The quarterly high and low sales prices for Kmart's common stock for
the two most recent fiscal years, as set forth in Note 14 of the "Notes to
Consolidated Financial Statements" on page 32 of the Registrant's 1999 Annual
Report to Shareholders, is incorporated herein by reference.

Item 6.  Selected Financial Data

        The "Consolidated Selected Financial Data" summary, insofar as it
relates to the five fiscal years ended January 26, 2000, appearing on page 17 of
the Registrant's 1999 Annual Report to Shareholders, is incorporated herein by
reference.

        Sales and comparable store statistics for the three fiscal years ended
January 26, 2000, appearing in "Management's Discussion and Analysis of Results
of Operations and Financial Condition" on page 18 of the Registrant's 1999
Annual Report to Shareholders, are incorporated herein by reference.

        U.S. Kmart selling square footage for the five fiscal years ended
January 26, 2000, appearing in the "Consolidated Selected Financial Data" on
page 17 of the Registrant's 1999 Annual Report to Shareholders, is incorporated
herein by reference.

Item 7.  Management's Discussion and Analysis of Results of Operations and
         Financial Condition

        The information appearing in "Management's Discussion and Analysis of
Results of Operations and Financial Condition" on pages 18 through 20 of the
Registrant's 1999 Annual Report to Shareholders, is incorporated herein by
reference.

CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

        Statements, other than those based on historical facts, including the
Year 2000 statements, which address activities, events or developments that the
Registrant expects or anticipates may occur in the future are forward-looking
statements which are based upon a number of assumptions concerning future
conditions that may ultimately prove to be inaccurate. Actual events and results
may differ materially from anticipated results described in such statements. The
Registrant's ability to achieve such results is subject to certain risks and
uncertainties, including, but not limited to, economic and weather conditions
which affect buying patterns of the Registrant's customers, changes in consumer
spending and the Registrant's ability to anticipate buying patterns and
implement appropriate inventory strategies, continued availability of capital
and financing, competitive factors and other factors affecting business beyond
the Registrant's control. Consequently, all of the forward-looking statements
are qualified by these cautionary statements and there can be no assurance that
the results or developments anticipated by the Registrant will be realized or
that they will have the expected effects on the Registrant or its business or

STATEMENT REGARDING YEAR 2000 DISCLOSURE

        For purposes of any action brought under the securities laws, as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), the Year 2000 Information and Readiness Disclosure Act does not apply to any statements contained in any documents or materials filed with the Securities and Exchange Commission, or with federal banking regulators, pursuant to section 12(i) of the Securities Exchange Act of 1934 (15 U.S.C. 78l(i)), or disclosures or writing that when made accompanied the solicitation of an offer or sale of securities.

Item 7a. Quantitative and Qualitative Disclosures about Market Risk

        Not applicable.

Item 8.  Financial Statements and Supplementary Data

        The financial statements of the Registrant, consisting of the consolidated balance sheets as of January 26, 2000 and January 27, 1999 and the related consolidated statements of income, shareholders' equity and cash flows for each of the three fiscal years ended January 26, 2000 and the notes to consolidated financial statements, together with the report of PricewaterhouseCoopers LLP, appearing on pages 21 through 32 of the Registrant's 1999 Annual Report to Shareholders, are incorporated herein by reference.

6

<PAGE>   7

Item 9.   Changes in and Disagreements with Accountants on Accounting and
          Financial Disclosure

        Not applicable.

7

<PAGE>   8

PART III

Item 10.  Directors of the Registrant

        The information set forth under the caption "Proposal 1 - Election of Directors" on pages 6 to 8 of the Registrant's Proxy Statement dated April 13, 2000 filed with the Securities and Exchange Commission pursuant to Regulation 14A is incorporated herein by reference.

Item 11.  Executive Compensation

        The information set forth on pages 8, 9 and 10 to 16 of the Registrant's Proxy Statement dated April 13, 2000 filed with the Securities and Exchange Commission pursuant to Regulation 14A is incorporated herein by reference.

Item 12.   Security Ownership of Certain Beneficial Owners and Management

         The information set forth under the caption "Stock Ownership" on pages 4
to 6 of the Registrant's Proxy Statement dated April 13, 2000 filed with the
Securities and Exchange Commission pursuant to Regulation 14A is incorporated
herein by reference.

Item 13.   Certain Relationships and Related Transactions

         The information set forth under the caption "Legal
Proceedings/Transactions with Management" on page 6 of the Registrant's Proxy
Statement dated April 13, 2000 filed with the Securities and Exchange Commission
pursuant to Regulation 14A is incorporated herein by reference.




                                      8

<PAGE>   9



                                  PART IV


Item 14.   Exhibits, Financial Statement Schedules and Reports on Form 8-K

a)       The following documents are filed as part of this report:

         1.    Financial Statements

               The following consolidated financial statements of the Registrant
               are incorporated herein by reference from the Registrant's 1999
               Annual Report to Shareholders:

<TABLE>
<CAPTION>

Page(s) in

Registrant's

Annual Report

-----------                                                                    --
<S>                                                                           <C>

               Report of Independent Accountants
21

               Consolidated Statements of Income for each of the
                  three fiscal years ended January 26, 2000
22

               Consolidated Balance Sheets as of January 26, 2000
                  and January 27, 1999
23

               Consolidated Statements of Cash Flows for each
                  of the three fiscal years ended January 26, 2000
24

               Consolidated Statements of Shareholders' Equity for
                  each of the three fiscal years ended January 26, 2000

                    Notes to Consolidated Financial Statements                          26
through 32
</TABLE>

          2.    Financial Statement Schedules

                The separate financial statements and summarized financial
                information of majority-owned subsidiaries not consolidated and
                of 50% or less owned persons of the Registrant have been omitted
                because they are not required pursuant to conditions set forth in
                Rules 3-09(a), 4-08(g) and 1-02(v) of Regulation S-X.

                All other schedules have been omitted because they are not
                applicable or the required information is shown in the
                Registrant's 1999 Annual Report to Shareholders, which is
                incorporated herein by reference.

          3.    Exhibits

                See Exhibit Index included in this report.




                                        9


<PAGE>    10




Item 14.  Exhibits, Financial Statement Schedules and Reports on Form 8-K
          (cont.)


b) The Registrant filed the following Current Reports on Form 8-K during the
fiscal quarter ended January 26, 2000:

<TABLE>
<CAPTION>

   Filing Date              Date of Report                    Item Reported
   -----------              --------------                    -------------
<S>                      <C>                          <C>
December 3, 1999          November 10, 1999            Item 5.1. Press release announcing
                                                       earnings for the third quarter 1999.

                                                       Item 5.2. Filing of Statement of
                                                       Eligibility and Qualification on Form
                                                       T-1 of the Bank of New York to act as
                                                       trustee under the senior debt
                                                       securities indenture in connection
                                                       with the Registrant's Registration
                                                       Statement on Form S-3 (Registration
                                                       No. 333-74665).

December 15, 1999         December 6, 1999             Item 5. Announcement of Registrant
                                                       entering into a $1.1 Billion
                                                       Three-Year Revolving Credit Agreement

```
                                              and a $600 Million 364-Day Revolving
                                              Credit Agreement on December 6, 1999;
                                              and the filing of the related
                                              agreements.

December 17, 1999       December 8, 1999      Item 5. Filing of certain exhibits
                                              under Item 7 relating to the
                                              Registrant's offering of $300,000,000
                                              principal amount of its 8 3/8% Notes
                                              due 2004, which have been registered
                                              under the Securities Act of 1933 on
                                              Form S-3 (Registration No.
                                              333-74665).

    </TABLE>




                                   10


<PAGE>   11



                               SIGNATURES


        Pursuant to the requirements of Section 13 or 15(d) of the Securities
Exchange Act of 1934, the Registrant has duly caused this report to be signed on
its behalf by the undersigned, thereunto duly authorized on April 18, 2000.


        Each signatory hereby acknowledges and adopts the typed form of his or
her name in the electronic filing of this document with the Securities and
Exchange Commission.



                            Kmart Corporation

                            By: Floyd Hall
            -----------------------------------------------
                              (Floyd Hall)
                Chairman of the Board, President and
                      Chief Executive Officer
                    (Principal Executive Officer)



                         By: Martin E. Welch III
            -----------------------------------------------
                          (Martin E. Welch III)
                       Senior Vice President and
                       Chief Financial Officer
                (Principal Financial and Accounting Officer)



        Pursuant to the requirements of the Securities Exchange Act of 1934,
this report has been signed below by the following persons, on behalf of the
Registrant and in the capacities indicated, on April 18, 2000.


        Each signatory hereby acknowledges and adopts the typed form of his or
her name in the electronic filing of this document with the Securities and
Exchange Commission.
```

```
<S><C>
      James B. Adamson                                              Floyd Hall
-----------------------------------------------       ---------------------------
--------------------
     James B. Adamson, Director                             Floyd Hall, Director


      Lilyan H. Affinito                                      Robert D. Kennedy
-----------------------------------------------       ---------------------------
--------------------
     Lilyan H. Affinito, Director                          Robert D. Kennedy,
Director

     Stephen F. Bollenbach                                     J. Richard Munro
-----------------------------------------------       ---------------------------
--------------------
     Stephen F. Bollenbach, Director                        J. Richard Munro,
Director

     Joseph A. Califano, Jr.                                    Robin B. Smith
-----------------------------------------------       ---------------------------
--------------------
    Joseph A. Califano, Jr., Director                        Robin B. Smith,
Director

      Richard G. Cline                                       Thomas T. Stallkamp
-----------------------------------------------       ---------------------------
--------------------
     Richard G. Cline, Director                           Thomas T. Stallkamp,
Director

      Willie D. Davis                                         James O. Welch, Jr.
-----------------------------------------------       ---------------------------
--------------------
     Willie D. Davis, Director                             James O. Welch, Jr.,
Director


     Joseph P. Flannery
-----------------------------------------------
     Joseph P. Flannery, Director
</TABLE>
```

11

<PAGE>   12


                          EXHIBIT INDEX
<TABLE>
<CAPTION>


        Exhibit
        Number          Description

```
    <S>           <C>          <C>
        ****  (3a)    Restated Articles of Incorporation of Kmart Corporation
        ****  (3b)    Bylaws of Kmart Corporation, as amended
           * (10a)    Kmart Corporation 1973 Stock Option Plan, as amended [10a][A]
           * (10b)    Kmart Corporation 1981 Stock Option Plan, as amended[10b] [A]
        **** (10c)    Kmart Corporation Directors Retirement Plan, as amended [10d] [A]
          ** (10d)    Kmart Corporation Performance Restricted Stock Plan, as amended [10e] [A]
       ***** (10e)    Kmart Corporation Deferred Compensation Plan for Non-Employee Directors, as
amended [A]
         *** (10f)    Kmart Corporation 1992 Stock Option Plan, as amended [10g] [A]
       ***** (10g)    Kmart Corporation Amended and Restated Directors Stock Plan [10h] [A]
          ** (10h)    Form of Employment Agreement with Executive Officers [10j] [A]
           * (10i)    Kmart Corporation Supplemental Executive Retirement Plan [10c] [A]
         *** (10j)    Amended and Restated Kmart Corporation Annual Incentive Bonus Plan [10k] [A]
         *** (10k)    Amended and Restated Kmart Corporation Management Stock Purchase Plan [10l]
[A]
         *** (10l)    Supplemental Pension Benefit Plan [10m] [A]
     ******* (10m)    Employment Agreement with Floyd Hall [10n] [A]
    ******** (10n)    Amendment to Employment Agreement [99] [A]
      ****** (10o)    Kmart Corporation 1997 Long-Term Equity Compensation Plan [10n] [A]
       ***** (10p)    Amended and Restated Kmart Corporation 1998 Management Deferred Compensation
and Restoration Plan [A]
             (11)     Statement Regarding Computation of Per Share Earnings
             (12)     Statement Regarding Computation of Ratios
             (13)     Annual Report to Shareholders of Kmart Corporation for the Fiscal Year
                      Ended January 26, 2000
             (23)     Consent of Independent Accountants
             (27)     Financial Data Schedule
    </TABLE>



    <TABLE>

        <S>           <C>
        Notes:

           *          Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal
    year ended January 27, 1993 (file
                      number 1-327) and are incorporated herein by reference.

          **          Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal
    year ended January 26, 1994 (file
                      number 1-327) and are incorporated herein by reference.

         ***          Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal
    year ended January 25, 1995 (file
                      number 1-327) and are incorporated herein by reference.

        ****          Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal
    year ended January 31, 1996 (file
                      number 1-327) and are incorporated herein by reference.

       *****          Filed as Exhibits to the Form 10-K Report of the Registrant for the fiscal
    year ended January 27, 1999 (file
                      number 1-327) and are incorporated herein by reference.

      ******          Filed as part of the 1997 Proxy Statement and is incorporated herein by
    reference.

     *******          Filed as Form 8-K dated June 4, 1995 and is incorporated herein by reference.

    ********          Filed as Exhibit to the Form 10-Q Report of the Registrant for the fiscal
```

quarter ended October 28, 1998
                        (file number 1-327) and is incorporated herein by reference.

        [ #]            Exhibit numbers in the Form 10-K or 10-Q Reports for the periods indicated.

        [A]             This document is a management contract or compensatory plan.

</TABLE>




                                            12

<PAGE>    13


                    In reliance upon Item 601(b)(4)(iii)(A) of Regulation S-K,
                    various instruments defining the rights of holders of
                    long-term debt of the Registrant are not being filed
                    herewith because the total amount of securities authorized
                    under each such instrument does not exceed 10% of the total
                    assets of the Registrant.

                    The Registrant agrees to furnish a copy to the Commission
                    upon request of the following instruments defining the
                    rights of holders of long-term debt:


                    Indenture dated as of February 1, 1985, between Kmart
                        Corporation and The Bank of New York, Trustee, as
                        supplemented by the First Supplemental Indenture dated
                        as of March 1, 1991
                    12-1/2% Debentures Due 2005
                    8-3/8% Notes Due 2004
                    8-1/8% Notes Due 2006
                    7-3/4% Debentures Due 2012
                    8-1/4% Notes Due 2022
                    8-3/8% Debentures Due 2022
                    7.95% Debentures Due 2023
                    Fixed-Rate Medium-Term Notes (Series A, B, C, D)




                                            13
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-11
<SEQUENCE>2
<DESCRIPTION>STATEMENT RE COMPUTATION OF PER SHARE EARNINGS
<TEXT>

<PAGE>    1


                                                            EXHIBIT 11
- --------------------------------------------------------------------------------

                        KMART CORPORATION

INFORMATION ON COMPUTATION OF PER SHARE EARNINGS

```
<TABLE>
<CAPTION>
```

($ Millions)

| | Fiscal Year Ended | | | | |
|---|---|---|---|---|---|
| | January 26, 2000 | January 27, 1999 | January 28, 1998 | January 29, 1997 | January 31, 1996* |
| **I. Basic earnings per common share** | | | | | |
| Income (loss) from continuing operations before extraordinary item and the effect of accounting changes | $ 633 | $ 518 | $ 249 | $ 231 | $ (230) |
| Less: Series B and C convertible preferred shares dividend payment | -- | -- | -- | -- | (6) |
| (a) Income (loss) available to common shareholders from continuing operations before extraordinary item and the effect of accounting changes | 633 | 518 | 249 | 231 | (236) |
| (b) Discontinued operations including the effect of accounting changes, net of income taxes | (230) | -- | -- | (5) | (260) |
| (c) Gain (loss) on disposal of discontinued operations, net of income taxes | -- | -- | -- | (446) | (30) |
| (d) Extraordinary item, net of income taxes | -- | -- | -- | -- | (51) |
| (e) Adjusted net income (loss) (1) | $ 403 | $ 518 | $ 249 | $ (220) | $ (577) |
| (f) Weighted average common shares outstanding | 491.7 | 492.1 | 487.1 | 483.6 | 459.8 |

Basic earnings per common share:

| | | | | | |
|---|---|---|---|---|---|
| Income (loss) available to common shareholders from continuing operations before extraordinary item and the effect of accounting changes (a)/(f) | $ 1.29 | $ 1.05 | $ 0.51 | $ 0.48 | $ (0.51) |
| Discontinued operations including the effect of accounting changes, net of income taxes (b)/(f) | (0.47) | -- | -- | | |

```
                                                           (0.01)
   (0.37)
Gain (loss) on disposal of discontinued
        operations, net of income taxes (c)/(f)       --          --          --
(0.92)       (0.06)
Extraordinary item, net of income taxes (d)/(f)       --          --          --
 --          (0.11)
                                              -------------------------------------------------

----------------------

Net income (loss) (e)/(f)                     $  0.82     $  1.05     $  0.51     $
(0.45)     $ (1.25)

=================================================================
```

</TABLE>


```
- ----------
```

\* Prior year amounts have been restated for the effect of discontinued
operations.

(1) Adjusted net income (loss) included an after-tax provision of $13 million or
$0.03 per share for fiscal 1998 and $81 million or $0.17 per share for fiscal
1997 related to non-recurring charges for voluntary early retirement programs
and an after tax provision of $150 million or $0.33 per share for fiscal 1995
related to the adoption of Financial Accounting Standard No. 121 "Accounting for
the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed
Of".


                                       1

<PAGE>   2

                                                      EXHIBIT 11

<TABLE>
<CAPTION>

($ Millions)                                          Fiscal Year Ended
                                     -------------------------------------------------

----------------------
                                     January 26,   January 27,   January 28,
January 29,    January 31,             2000          1999          1998
1997           1996*
                                     -----------   -----------   -----------   ----
-------   -----------
<S>                                     <C>          <C>          <C>          <C>
<C>
II. Earnings per common and common equivalent share
     assuming dilution:

    Income (loss) from continuing operations
        before extraordinary item and the effect
        of accounting changes               $  633     $  518     $  249     $
231     $  (230)
        Add: Dividends trust convertible preferred, net       50          50          49
31          -
                                     -------------------------------------------------

----------------------

    (h) Adjusted income (loss) from continuing
        operations before extraordinary item and
```

the effect of accounting changes                                           683        588         298
262         (230)
    (i) Discontinued operations including the effect
        of accounting changes, net of income taxes       (230)        -           -
(5)         (260)
    (j) Gain (loss) on disposal of discontinued
        operations, net of income taxes                  -            -           -
(446)       (30)
    (k) Extraordinary item, net of income taxes          -            -           -
-           (51)
                                                  ------------------------------------------------
----------------------

    (l) Adjusted net income (loss) (1)             $   453      $   568     $   298      $
(189)       $  (571)

================================================================

Weighted average common shares outstanding         491.7        492.1       487.1
483.6         459.8
Weighted average trust convertible preferred        66.7         66.7        66.7
41.4           -

Stock Options:
    Common shares assumed issued                    17.5         21.2        16.3
13.0          1.6
    Less: common shares assumed repurchased        (14.2)       (15.1)      (11.7)
(10.5)        (1.5)
                                                  ------------------------------------------------
----------------------

                                                    3.3          6.1         4.6
2.5           0.1
                                                  ------------------------------------------------
----------------------

    (m) Applicable common shares, as adjusted       561.7        564.9       558.4
527.5         459.9

================================================================


Diluted earnings per common and common equivalent share:

Adjusted income (loss) from continuing operations
        before extraordinary item and the effect
        of accounting changes (h)/(m)              $  1.22      $  1.01     $  0.53      $
0.50        $ (0.50)
Discontinued operations including the effect of
        accounting changes, net of income taxes
        (i)/(m)                                     (0.41)        -           -
(0.01)        (0.57)
Gain (loss) on disposal of discontinued operations,
        net of income taxes (j)/(m)                 -            -           -
(0.85)        (0.06)
Extraordinary item, net of income taxes (k)/(m)     -            -           -
-           (0.11)
                                                  ------------------------------------------------
----------------------

Net income (loss) (l)/(m)                          $  0.81      $  1.01     $  0.53      $
(0.36)      $  (1.24)

================================================================
                                                                              (2)
(2)         (2)

</TABLE>

- ----------
* Prior year amounts have been restated for the effect of discontinued
operations.

(1) Adjusted net income (loss) included an after tax provision of $13 million or
$0.02 per share for fiscal 1998 and $81 million or $0.15 per share for fiscal
1997 related to non-recurring charges for voluntary early retirement programs
and an after tax provision of $150 million or $0.33 per share for fiscal 1995
related to the adoption of Financial Accounting Standard No. 121 "Accounting for
the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed
Of."

(2) This calculation is submitted in accordance with Regulation S-K item
601(b)(11) although it is contrary to paragraph 13 of SFAS 128 because it
produces an anti-dilutive result.


                                    2
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-12
<SEQUENCE>3
<DESCRIPTION>STATEMENT REGARDING COMPUTATION OF RATIOS
<TEXT>

<PAGE>    1

                                                            EXHIBIT 12


                            KMART CORPORATION
                    INFORMATION ON RATIO OF EARNINGS
                      TO FIXED CHARGES COMPUTATION


<TABLE>
<CAPTION>

|  |  | Fiscal Year Ended | |
| --- | --- | --- | --- |
| ($ Millions) | January 26, 2000 | January 27, 1999 | January 28, 1998 |
| <S> | <C> | <C> | <C> |
| Net income from continuing retail operations | $    633 | $    518 | $    249 |
| Dividends on trust convertible preferred, net | 50 | 50 | 49 |
| Income taxes | 337 | 230 | 120 |
| Pretax income from continuing retail operations | 1,020 | 798 | 418 |
| Distributions from unconsolidated affiliated retail companies that exceed equity income | (44) | (42) |  |

| | | | | |
|---|---|---|---|---|
| Fixed charges per below | | 585 | | 579 |
| 660 | | | | |
| Less: Interest capitalized during the period | | (16) | | (13) |
| (8) | | | | |
| Preferred dividends of wholly owned trust subsidiary not deducted in the determination of pre-tax income | | (78) | | (78) |
| (75) | | | | |
| | | ------------------------------------ | | |
| ------ | | | | |
| Earnings from continuing retail operations | $ | 1,467 | $ 1,244 | $ |
| 996 | | | | |
| | | ======================================== | | |
| Fixed charges: | | | | |
| Interest expense | $ | 263 | $ 281 | $ |
| 378 | | | | |
| Rent expense - portion of operating rentals representative of the interest factor | | 189 | | 173 |
| 159 | | | | |
| Preferred dividends of wholly owned trust subsidiary | | 78 | | 78 |
| 75 | | | | |
| Other | | 55 | | 47 |
| 48 | | | | |
| | | ------------------------------------ | | |
| ------ | | | | |
| Total fixed charges | $ | 585 | $ 579 | $ |
| 660 | | | | |
| | | ======================================== | | |
| Ratio of income to fixed charges | | 2.5 | | 2.1 |
| 1.5 | | | | |

========================================
</TABLE>


                              1


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-13
<SEQUENCE>4
<DESCRIPTION>ANNUAL REPORT TO SHAREHOLDERS OF KMART CORP.
<TEXT>

<PAGE>    1

                                        EXHIBIT 13


CONSOLIDATED SELECTED FINANCIAL DATA

(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

```
<TABLE>
<CAPTION>
```

|  | 1999 | 1998 | 1997 | 1996 | 1995 |
| --- | --- | --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| SUMMARY OF OPERATIONS (1) | | | | | |
| Sales | $ 35,925 | $ 33,674 | $ 32,183 | $ 31,437 | $ 31,713 |
| Comparable sales % | 4.8% | 4.8% | 4.8% | 2.5% | 5.5% |
| Total sales % | 6.6% | 4.6% | 2.4% | (0.9%) | 7.3% |
| U.S. Kmart total sales % | 6.6% | 5.6% | 5.0% | (0.2%) | 7.2% |
| Cost of sales, buying and occupancy | 28,102 | 26,319 | 25,152 | 24,390 | 24,675 |
| Selling, general and administrative expenses | 6,523 | 6,245 | 6,136 | 6,274 | 6,876 |
| Interest expense, net | 280 | 293 | 363 | 453 | 434 |
| Continuing income (loss) before income taxes | 1,020 | 798 | 418 | 330 | (313) |
| Net income (loss) from continuing operations(2) | 633 | 518 | 249 | 231 | (230) |
| Net income (loss) | 403 | 518 | 249 | (220) | (571) |
| | | | | | |
| PER SHARE OF COMMON | | | | | |
| Basic continuing income (loss) | $ 1.29 | $ 1.05 | $ 0.51 | $ 0.48 | $ (0.51) |
| Diluted continuing income (loss)(3) | $ 1.22 | $ 1.01 | $ 0.51 | $ 0.48 | $ (0.51) |
| Book value | $ 13.10 | $ 12.12 | $ 11.15 | $ 10.51 | $ 10.99 |
| | | | | | |
| FINANCIAL DATA | | | | | |
| Working capital | $ 4,084 | $ 4,139 | $ 4,202 | $ 4,131 | $ 5,558 |
| Total assets | 15,104 | 14,166 | 13,558 | 14,286 | 15,033 |
| Long-term debt | 1,759 | 1,538 | 1,725 | 2,121 | 3,922 |
| Long-term capital lease obligations | 1,014 | 1,091 | 1,179 | 1,478 | 1,586 |
| Trust convertible preferred securities | 986 | 984 | 981 | 980 | -- |
| Capital expenditures | 1,277 | 981 | 678 | 343 | 540 |
| Depreciation and amortization | 770 | 671 | 660 | 654 | 685 |
| Current ratio | 2.0 | 2.1 | 2.3 | 2.1 | 2.9 |
| Long-term debt to capitalization | 28.6% | 28.6% | 32.4% | 37.2% | 51.1% |
| Ratio of income from continuing operations to fixed charges(4) | 2.5 | 2.1 | 1.5 | 1.4 | -- |
| | | | | | |
| Basic weighted average shares outstanding (millions) | 492 | 492 | 487 | 484 | 460 |
| Diluted weighted average shares outstanding (millions)(3) | 562 | 565 | 492 | | |

1/28/2019
486

18-23538-shl   Doc 3560-2 Filed 05/03/19 Entered 05/03/19 10:30:54 Exhibit B -
Declaration of Artem Skorostensky in Support of Objection of Urban E   Pg 140 of 166

```
Number of Stores
United States                                              2,171      2,161      2,136
2,134       2,161
International and other                                       --         --         --
127         149
                                                        --------   --------   --------
--------    --------
Total Stores                                               2,171      2,161      2,136
2,261       2,310


U.S. Kmart store sales per comparable selling square foot  $   233  $   222  $   211
$   201   $   195
U.S. Kmart selling square footage (millions)                 155        154        151
156         160
- -----------------------------------------------------------------------------------
--------------------------
</TABLE>
```

(1) Kmart Corporation and subsidiaries ("the Company" or "Kmart") fiscal year
ends on the last Wednesday in January. Fiscal 1995 consisted of 53 weeks.

(2) Net income from continuing operations in 1999 includes a one-time, non-cash
earnings reduction of $11 million ($7 million net of tax) to reflect the
cumulative effect of the change in accounting method for layaway sales. Net
income from continuing operations in 1998 and 1997 includes non-recurring
charges related to Voluntary Early Retirement Programs of $19 million ($13
million net of tax) and $114 million ($81 million net of tax), respectively.

(3) Consistent with the requirements of Statement of Financial Accounting
Standards No. 128, preferred securities were not included in the calculation of
diluted earnings per share for 1997 and 1996 due to their anti-dilutive effect.
Due to the Company's loss from continuing operations in 1995, diluted earnings
per share is equivalent to basic earnings per share.

(4) Fixed charges represent total interest charges, a portion of operating
rentals representative of the interest factor, amortization of debt discount and
expense and preferred dividends of majority owned subsidiaries. The deficiency
of income from continuing retail operations versus fixed charges was $305 for
1995.


                    Kmart Corporation 1999 Annual Report 17


<PAGE>    2
MANAGEMENT'S DISCUSSION AND ANALYSIS
OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION


RESULTS OF OPERATIONS

<TABLE>
<CAPTION>
```

| (Dollars in millions) | 1999 | 1998 | 1997 |
|---|---|---|---|
| \<S\> | \<C\> | \<C\> | \<C\> |
| Sales | | | |
| United States | $35,925 | $33,674 | $31,884 |
| International | -- | -- | 299 |
| | ------- | ------- | ------- |
| Total | $35,925 | $33,674 | $32,183 |
| | ======= | ======= | ======= |

Operating Income (Loss)

|  |  |  |  |
|---|---|---|---|
| United States | $ 1,300 | $ 1,110 | $ 898 |
| International | -- | -- | (3) |
|  | ------- | ------- | ------- |
| Total | $ 1,300 | $ 1,110 | $ 895 |
|  | ======= | ======= | ======= |
| Comparable Sales % | 4.8% | 4.8% | 4.8% |

</TABLE>

Operating income (loss) excludes the voluntary early retirement charges in 1998
and 1997 totaling $19 and $114, respectively, on a pretax basis.

FISCAL 1999 COMPARED TO FISCAL 1998

        SALES and comparable store sales for 1999 increased 6.6% and 4.8%,
respectively, improving sales per square foot to $233 in 1999. The increased
productivity is attributed to the continued successful rollout of the Big Kmart
format into 587 additional locations during the year for a cumulative total of
1,860 locations or nearly 90% of the chain. In addition, the increased
productivity was driven by increased promotional activity, continued execution
of the Company's competitive pricing strategy and expansion of our exclusive
brands such as Thom McAn, Route 66, Sesame Street and Martha Stewart Everyday
home, baby and garden products.
        GROSS MARGIN, as a percentage of sales, was 21.8% in both 1999 and
1998. The impact of the Company's competitive pricing strategy and growth in
lower margin sales categories, such as consumables, was offset by improved
margins resulting from increased import and private label goods.
        SELLING, GENERAL AND ADMINISTRATIVE EXPENSES ("SG&A"), which includes
advertising, declined for the fifth consecutive year as a percentage of sales
improving to 18.2% in 1999 from 18.5% in 1998. This was the fourth consecutive
year that SG&A as a percentage of sales was below 20%. The 0.3 percentage point
reduction compared to 1998 was the result of the increased leverage from
additional sales volume and the decrease in Year 2000 compliance expenses versus
1998, offset by the net addition of new stores.
        OPERATING INCOME increased $190 million in 1999 compared to 1998,
excluding the 1998 charge for Voluntary Early Retirement Programs. This increase
was the direct result of the 6.6% increase in sales over 1998 partially offset
by the increase in SG&A expenses versus 1998.
        A Voluntary Early Retirement Program offered to certain hourly
associates during the second quarter of 1998 resulted in a charge of $19 million
based on actual acceptance.
        NET INTEREST EXPENSE was $280 million and $293 million in 1999 and
1998, respectively. The reduction in net interest expense was primarily due to
lower outstanding debt balances in capitalized lease obligations, medium term
notes and mortgages resulting from normal pay-down activity partially offset by
an increase in interest associated with revolving credit borrowings.
        EFFECTIVE INCOME TAX RATE was 33.0% and 28.8% in 1999 and 1998,
respectively. See Note 10 of the Notes to Consolidated Financial Statements.
        DISCONTINUED OPERATIONS relate to Hechinger Company ("Hechinger"),
which had previously acquired substantially all of the operating assets of
Builders Square, Inc. On June 11, 1999, Hechinger filed for Chapter 11
bankruptcy protection. As a result, Kmart recorded a non-cash charge of $354
million, $230 million after tax, which reflected Kmart's best estimate of the
impact of Hechinger's default on lease obligations for up to 117 former Builders
Square locations, which are guaranteed by Kmart.

FISCAL 1998 COMPARED TO FISCAL 1997

        SALES and comparable store sales for 1998 increased 4.6% and 4.8%,
respectively, improving sales per square foot to a record $222 in 1998. The
increased productivity can be attributed to the continued successful rollout of
the Big Kmart format, which represented 58% of the chain, the strong performance
of key brands, including Martha Stewart Everyday home fashions, Route 66 apparel
and accessories, Sesame Street children's apparel and ladies' apparel, and the
execution of the Company's competitive pricing strategy.

1997. The impact of the Company's competitive pricing strategy and growth in lower margin sales categories, such as consumables, was offset by improved margins resulting from increased import and private label goods.

SELLING, GENERAL AND ADMINISTRATIVE EXPENSES ("SG&A"), which includes advertising, declined for the fourth consecutive year as a percentage of sales improving to 18.5% in 1998 from 19.1% in 1997. This was the third consecutive year that SG&A as a percentage of sales was below 20%. The 0.6 percentage point reduction compared to 1997 was the result of the sale of international operations and the increased leverage from additional sales volume, offset by increased Year 2000 compliance expenses and the addition of new stores.

OPERATING INCOME increased $215 million in 1998 compared to 1997, excluding other gains and losses and the charges for Voluntary Early Retirement Programs. This increase was the direct result of the improved profitability of the apparel and consumables areas and the increased leverage of SG&A expenses from higher sales.

A Voluntary Early Retirement Program offered to certain hourly associates during the second quarter of 1998 resulted in a charge of $19 million based on actual acceptance.


Kmart Corporation 1999 Annual Report 18


<PAGE>    3
MANAGEMENT'S DISCUSSION AND ANALYSIS
OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION (CONT.)


Net interest expense was $293 million and $363 million in 1998 and 1997, respectively. The reduction in net interest expense was due to increased cash flow from operations, resulting in lower borrowings and increased investment income.

Effective income tax rate was 28.8% and 28.7% in 1998 and 1997, respectively. See Note 10 of the Notes to Consolidated Financial Statements.

ANALYSIS OF FINANCIAL CONDITION

Kmart's primary sources of working capital are cash flows from operations and borrowings under its credit facilities. The Company had working capital of $4,084 million and $4,139 million at year end 1999 and 1998, respectively. Working capital fluctuates in relation to profitability, seasonal inventory levels net of trade accounts payable, and the level of store openings and closings.

On December 6, 1999, the Company entered into new financing agreements ("New Facilities") aggregating $1.7 billion with a group of financial institutions which replaced a $2.5 billion revolving credit facility. The New Facilities provide for a 3-year, $1.1 billion revolving credit facility and a 364-day $600 million revolving credit facility. The 3-year revolving credit facility matures in December 2002 and has a commitment fee of 25 basis points and interest rate of LIBOR plus 100 basis points during the first year. The 364-day revolving credit facility has a commitment fee of 20 basis points and interest rate of LIBOR plus 100 basis points.

On January 12, 2000, the Company entered into an agreement for a $40.6 million revolving line of credit ("Minority Facility") with a consortium of 26 minority-owned banks in 20 states and the District of Columbia. The 364-day revolving credit facility has a commitment fee of 20 basis points and interest rate of LIBOR plus 100 basis points.

The New Facilities and the Minority Facility contain certain affirmative and negative covenants customary to these types of agreements. At January 26, 2000, the Company was in compliance with all such covenants. The Company had no borrowings outstanding under any of these credit agreements as of year-ends 1999 and 1998.

On December 8, 1999, the Company sold in an underwritten offering $300 million of 8 3/8% Notes due December 1, 2004 ("Notes"). Interest is payable semiannually on June 1 and December 1. The Company expects to use the net proceeds from the Notes for property acquisition and development, including the

purchase of existing leased properties, and for other general corporate
purposes.

At the Company's peak borrowing level in 1999, over $264 million would
have been available for borrowings under its New Facilities and Minority
Facility compared to $1.4 billion in 1998. Management believes that its current
financing arrangements will be sufficient to meet the Company's liquidity needs
for operations and capital demands.

Net cash provided by operating activities was $1,004 million versus
$1,237 million in 1998. The decline resulted from an increase in inventory
partially offset by an increase in income from continuing operations.

Net cash used for investing was $1,363 million in 1999 compared to $795
million in 1998. Cash used for investing in 1999 was the result of $1,277
million in capital expenditures and $86 million for lease acquisitions. Cash
used for investing in 1998 was the result of capital expenditures of $981
million partially offset by the proceeds from the sale of the company's
remaining interest in Kmart Canada and proceeds from other property sales.

Net cash used for financing was $7 million in 1999 compared to $230
million in 1998. Cash used for financing during 1999 was the result of
repurchases of common stock of $200 million under the Company's stock repurchase
program, payments on long-term debt and capital lease obligations offset by the
proceeds from the issuance of long term debt and common shares. Cash used for
financing during 1998 was the result of payments on long term debt and capital
lease obligations offset by increased stock option activity.

NEW STORE ACTIVITY

For the second year in a row, Kmart ended the year with an increase in
its number of stores. The Company ended 1999 with 2,171 U.S. Kmart stores versus
2,161 in 1998. During 1999, the Company opened 34 stores, 32 Big Kmarts and 2
Super Kmarts. Of the 32 Big Kmarts opened during the year, 16 were stores
previously operated by Caldor, Inc.

The Company expects to open 20 to 25 Big Kmarts and 5 Super Kmarts
during 2000, and complete the conversions of approximately 150 smaller
traditional Kmart stores to a new "Best of Big K" prototype. Capital
expenditures relating to these projects will be funded through operating cash
flows.

YEAR 2000

The Company's Year 2000 Compliance Program consisted of four phases,
(I) inventory and assessment, (II) remediation and unit testing, (III) return to
production and (IV) integration testing, all of which were successfully
completed. As of March 1, 2000, the Company concluded its Year 2000 Compliance
Program, as no Year 2000 related events had occurred that materially affected
either the Company's operations or its financial statements.

The total cost of the Company's Year 2000 Compliance Program will
approximate $80 million, with $29 million incurred in 1999, $46 million incurred
in 1998 and $5 million incurred in 1997. Certain information technology projects
were delayed as a result of the Company's Year 2000 compliance efforts, which is
not expected to have a significant impact on the Company's financial position,
results of operations or cash flows.

Kmart Corporation 1999 Annual Report 19

<PAGE>   4
MANAGEMENT'S DISCUSSION AND ANALYSIS
OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION (CONT.)

OTHER MATTERS

In December 1999, BlueLight.com was formed as an independent e-commerce
company, based in San Francisco, by a group of investors led by Kmart (59%

ownership interest, SoftBank Venture Capital (18.9%), BlueLight.com management
and employees (15%) and others, including Martha Stewart Living Omnimedia and
Yahoo!. As Kmart's e-commerce venture, BlueLight.com's mission is to open the
doors to the dynamic world of information, goods and services of the World Wide
Web by providing easy-to-use, unlimited free Internet service to the world's
shoppers. See Note 4 of the Notes to Consolidated Financial Statements.

       In the first quarter of 1999, the Company completed a year long program
to repurchase an aggregate of 2 million shares of the Company's common stock to
fund certain employee benefit plans. On May 18, 1999, the Board of Directors
approved a common stock repurchase program to acquire up to $1 billion of the
Company's common shares over a period of up to three years. For 1999, the
Company repurchased 17 million shares of common stock at a cost of approximately
$200 million. In addition, the Company received $8.7 million in proceeds from
the sale of put options on its common stock. As of January 26, 2000, the Company
had outstanding put options on 5 million shares of its common stock with an
average strike price of $11 per share. The contracts are structured to ensure
the options are recorded in shareholders' equity, with no income statement
effect upon redemption. In February 2000, the Company announced plans to extend
the scope of the repurchase program to include up to $200 million of Kmart
Financing I Convertible Preferred Securities.

       During the third quarter of 1999, the Company signed agreements with
SUPERVALU INC. and Fleming Companies Inc. under which they will assume
responsibility for the distribution and the replenishment of $3.9 billion
(annualized at cost) of grocery-related products to all of the Company's stores.
The Company also created a Food and Consumables merchandising group. These
initiatives are expected to improve operating efficiency, reduce working capital
requirements and improve logistics capabilities. Forward looking statements
contained herein should be read in conjunction with the Company's disclosures
under the heading "Cautionary Statement Regarding Forward-looking Information"
located on the back cover.

       In November 1995, Kmart sold its auto service center business to a new
corporation controlled by Penske Corporation ("Penske"). In connection with the
sale, Kmart and Penske entered into a multi-year master sublease agreement for
the auto service center locations that are operated by Penske as Penske Auto
Centers. To strengthen the auto center operation, Kmart and Penske entered into
an agreement in January 2000 to restructure and recapitalize the Penske Auto
Center business. As part of the recapitalization, Kmart received a 22% interest
in a limited liability company that now owns and operates the Penske Auto Center
business. The Company accounts for its investment in the Penske Auto Center
business under the equity method and has recorded no initial investment.

       Kmart has guaranteed leases for properties operated by certain former
subsidiaries including Borders Group, Inc., OfficeMax, Inc. and The Sports
Authority, Inc. The present value of the lease obligations guaranteed by Kmart
is approximately $418 million. The possibility of the Company having to honor
its contingent obligations is dependent upon the future operating results of the
former subsidiaries. See Note 5 of the Notes to Consolidated Financial
Statements.

The Sports Authority

       On April 13, 1999, The Sports Authority, Inc. ("TSA") replaced its
existing revolving credit facility with a new three year, $200 million revolving
credit agreement. The new agreement is secured by inventory and contains no
financial covenants related to operating results. For its third quarter 1999,
TSA announced a year-to-date same store sales decrease of 4.3% and a
year-to-date operating loss of $9.9 million, as compared to an operating loss of
$94.5 million for the same period of the prior year.

       On December 16, 1999, TSA announced that it expected to take a non-cash
charge of approximately $130 million, net of taxes, in its fiscal fourth quarter
as a result of the write-down of long-lived assets, including goodwill and
deferred tax assets, and the closing of its Canadian subsidiary. TSA also
announced that it had increased its revolving credit facility to $275 million
and extended the maturity to 2003. The amendments to the facility required no
changes in the collateralization.

       Kmart's rights and obligations with respect to its guarantee of TSA

Agreement dated as of November 23, 1994.

Other

       There are various claims, lawsuits and pending actions against Kmart
incident to its operations. It is the opinion of management that the ultimate
resolution of these matters will not have a material adverse effect on Kmart's
liquidity, financial position, or results of operations.


                 Kmart Corporation 1999 Annual Report 20
<PAGE>   5
MANAGEMENT'S RESPONSIBILITY
FOR FINANCIAL STATEMENTS


       Management is responsible for the preparation of the Company's
consolidated financial statements and related information appearing in this
annual report. These financial statements have been prepared in conformity with
generally accepted accounting principles on a consistent basis applying certain
estimates and judgments based upon currently available information and
management's view of current conditions and circumstances. On this basis, we
believe that these financial statements reasonably present the Company's
financial position and results of operations.
       To fulfill our responsibility, we maintain comprehensive systems of
internal controls designed to provide reasonable assurance that assets are
safeguarded and transactions are executed in accordance with established
procedures. The concept of reasonable assurance is based upon a recognition that
the cost of the controls should not exceed the benefit derived. We believe our
systems of internal controls provide this reasonable assurance.
       The Company has adopted a code of conduct to guide our management in
the continued observance of high ethical standards of honesty, integrity, and
fairness in the conduct of the business and in accordance with the law.
Compliance with the guidelines and standards is periodically reviewed and is
acknowledged in writing by all management associates.
       The Board of Directors of the Company has an Audit Committee,
consisting solely of outside directors. The duties of the Committee include
keeping informed of the financial condition of the Company and reviewing its
financial policies and procedures, its internal accounting controls and the
objectivity of its financial reporting. Both the Company's independent
accountants and the internal auditors have free access to the Audit Committee
and meet with the Committee periodically, with and without management present.




/s/ Floyd Hall
- -------------------------------------
Floyd Hall
Chairman of the Board,
President and Chief Executive Officer




/s/ Martin E. Welch
- -------------------------------------
Martin E. Welch III
Senior Vice President
and Chief Financial Officer

REPORT OF INDEPENDENT ACCOUNTANTS

TO THE SHAREHOLDERS AND BOARD OF DIRECTORS
OF KMART CORPORATION


        In our opinion, the accompanying consolidated balance sheets and the
related consolidated statements of income, shareholders' equity and cash flows
present fairly, in all material respects, the financial position of Kmart
Corporation and its subsidiaries at January 26, 2000 and January 27, 1999, and
the results of their operations and their cash flows for each of the three years
in the period ended January 26, 2000, in conformity with accounting principles
generally accepted in the United States. These financial statements are the
responsibility of the Company's management; our responsibility is to express an
opinion on these financial statements based on our audits. We conducted our
audits of these statements in accordance with auditing standards generally
accepted in the United States, which require that we plan and perform the audit
to obtain reasonable assurance about whether the financial statements are free
of material misstatement. An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the financial statements, assessing
the accounting principles used and significant estimates made by management, and
evaluating the overall financial statement presentation. We believe that our
audits provide a reasonable basis for the opinion expressed above.




PRICEWATERHOUSECOOPERS LLP
PricewaterhouseCoopers LLP
Detroit, Michigan
March 6, 2000




                    Kmart Corporation 1999 Annual Report 21
<PAGE>    6


CONSOLIDATED STATEMENTS OF INCOME
(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

<TABLE>
<CAPTION>

| YEARS ENDED JANUARY 26, 2000, JANUARY 27, 1999 AND JANUARY 28, 1998 | 1999 | 1998 | 1997 |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Sales | $ 35,925 | $ 33,674 | $ 32,183 |
| Cost of sales, buying and occupancy | 28,102 | 26,319 | 25,152 |
| Gross margin | 7,823 | 7,355 | 7,031 |
| Selling, general and administrative expenses | 6,523 | 6,245 | 6,136 |
| Voluntary early retirement programs | -- | 19 | 114 |
| Continuing income before interest, income taxes and dividends on convertible preferred securities of subsidiary trust | 1,300 | 1,091 | 781 |
| Interest expense, net | 280 | 293 | 363 |
| Income tax provision | 337 | 230 | 120 |
| Dividends on convertible preferred securities of subsidiary trust, net of income taxes of $27, $27 and $26 | 50 | 50 | 49 |
| Net income from continuing operations | 633 | 518 | 249 |

```
Discontinued operations, net of income taxes of $(124)                            (236)         --           --
                                                                               --------     --------     --------
Net income                                                                     $    403     $    518     $    249
                                                                               ========     ========     ========


Basic earnings per common share
Net income from continuing operations                                          $   1.29     $   1.05     $    .51
Discontinued operations                                                            (.47)         --           --
                                                                               --------     --------     --------
Net income                                                                     $    .82     $   1.05     $    .51
                                                                               ========     ========     ========

Diluted earnings per common share
Net income from continuing operations                                          $   1.22     $   1.01     $    .51
Discontinued operations                                                            (.41)         --           --
                                                                               --------     --------     --------
Net income                                                                     $    .81     $   1.01     $    .51
                                                                               ========     ========     ========


Basic weighted average shares (millions)                                          491.7        492.1        487.1
Diluted weighted average shares (millions)                                        561.7        564.9        491.7
</TABLE>
```

See accompanying Notes to Consolidated Financial Statements.


                    Kmart Corporation 1999 Annual Report 22
<PAGE>    7


CONSOLIDATED BALANCE SHEETS
(DOLLARS IN MILLIONS)

```
<TABLE>
<CAPTION>
AS OF JANUARY 26, 2000 AND JANUARY 27, 1999                                      1999        1998
- --------------------------------------------------------------------------------------------------
<S>                                                                              <C>         <C>
Current Assets
Cash and cash equivalents                                                        $   344     $   710
Merchandise inventories                                                            7,101       6,536
Other current assets                                                                715         584
                                                                                 -------     -------
Total current assets                                                               8,160       7,830

Property and equipment, net                                                        6,410       5,914
Other assets and deferred charges                                                    534         422
                                                                                 -------     -------
Total Assets                                                                      $15,104     $14,166
                                                                                 =======     =======


Current Liabilities
Long-term debt due within one year                                               $    66     $    77
Trade accounts payable                                                             2,204       2,047
Accrued payroll and other liabilities                                             1,574       1,359
Taxes other than income taxes                                                       232         208
                                                                                 -------     -------
Total current liabilities                                                         4,076       3,691

Long-term debt and notes payable                                                  1,759       1,538
Capital lease obligations                                                         1,014       1,091
Other long-term liabilities                                                         965         883
Company obligated mandatorily redeemable convertible preferred securities of a
```

| | | |
|---|---|---|
| subsidiary trust holding solely 9 ¾% convertible junior subordinated | | |
| debentures of Kmart (redemption value of $1,000) | 986 | 984 |
| Common stock, $1 par value, 1,500,000,000 shares authorized; | | |
| 481,383,569 and 493,358,504 shares issued, respectively | 481 | 493 |
| Capital in excess of par value | 1,555 | 1,667 |
| Retained earnings | 4,268 | 3,819 |
| | ------- | ------- |
| Total Liabilities and Shareholders' Equity | $15,104 | $14,166 |
| | ======= | ======= |

</TABLE>


See accompanying Notes to Consolidated Financial Statements.


                    Kmart Corporation 1999 Annual Report 23
<PAGE>   8


CONSOLIDATED STATEMENTS OF CASH FLOWS
(DOLLARS IN MILLIONS)

<TABLE>
<CAPTION>

| YEARS ENDED JANUARY 26, 2000, JANUARY 27, 1999 AND JANUARY 28, 1998 1997 | 1999 | 1998 |
|---|---|---|
| <S> | <C> | <C> |
| <C> | | |
| Cash Flow From Operating Activities | | |
| Net income from continuing operations $   249 | $   633 | $   518 |
| Adjustments to reconcile net income from continuing operations | | |
| to net cash provided by operating activities: | | |
| Depreciation and amortization 660 | 770 | 671 |
| Cash used for store restructuring and other charges (105) | (80) | (94) |
| Increase in inventories (31) | (565) | (169) |
| (Increase) decrease in accounts receivable 18 | (62) | (76) |
| Increase (decrease) in trade accounts payable (86) | 157 | 124 |
| Deferred income taxes and taxes payable 72 | 258 | 308 |
| Decrease in other long-term liabilities (27) | (116) | (64) |
| Changes in other assets and liabilities 15 | 92 | 60 |
| Voluntary early retirement programs 114 | -- | 19 |
| | ------- | ------- |
| Net cash provided by continuing operations 879 | 1,087 | 1,297 |
| Net cash used for discontinued operations (38) | (83) | (60) |
| | ------- | ------- |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 1,004 | 1,237 |

```
                                                                          -------   -------
Cash Flow From Investing Activities
  Capital expenditures                                                    (1,277)     (981)
(678)
  Acquisition of Caldor leases                                              (86)       --
--
  Proceeds from divestitures                                                 --        87
133
  Decrease in property held for sale or financing and other                 --        99
420
  Other, net                                                                 --        --
(60)
                                                                          -------   -------
NET CASH USED FOR INVESTING ACTIVITIES                                    (1,363)     (795)
(185)
                                                                          -------   -------
Cash Flow From Financing Activities
  Proceeds from issuance of long-term debt and notes payable                297        --
337
  Purchase of common shares                                                (200)      (30)
--
  Issuance of common shares                                                  63        76
37
  Payments on long-term debt                                               (90)      (188)
(811)
  Payments on capital lease obligations                                    (77)       (88)
(112)
  Refinancing costs related to long-term debt and notes payable             --        --
(15)
                                                                          -------   -------
NET CASH USED FOR FINANCING ACTIVITIES                                      (7)      (230)
(564)
                                                                          -------   -------
NET (DECREASE) INCREASE IN CASH AND CASH EQUIVALENTS                       (366)      212
92
CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR                                710       498
406
                                                                          -------   -------
Cash and cash equivalents, end of year                               $    344   $    710
$   498
                                                                          =======   =======
</TABLE>
```

See accompanying Notes to Consolidated Financial Statements.


               Kmart Corporation 1999 Annual Report 24
<PAGE>    9


CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(DOLLARS IN MILLIONS)


<TABLE>
<CAPTION>

| | COMMON STOCK | CAPITAL IN EXCESS OF PAR VALUE | RETAINED EARNINGS | ACCUMULATED OTHER COMPREHENSIVE INCOME |
| --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> |
| Balance at January 29, 1997 | $    486 | $ 1,571 | $ 3,115 | $    (80) |
| | | | | |
| Net income for the year | -- | -- | 249 | -- |
| Shares reissued to retirement savings plan | -- | 19 | -- | -- |
| Foreign currency translation adjustment | -- | -- | -- | 67 |
| Additional minimum pension liability | -- | -- | -- | (10) |
| Common stock issued for stock option plans | 3 | 13 | -- | -- |
| Other | -- | 2 | (1) | -- |
| | ------- | ------- | ------- | ------- |
| Balance at January 28, 1998 | 489 | 1,605 | 3,363 | (23) |
| | | | | |
| Net income for the year | -- | -- | 518 | -- |
| Shares reissued to retirement savings plan | 2 | (9) | -- | -- |
| Repurchased shares | (2) | -- | -- | -- |
| Common stock issued for stock option plans | 4 | 73 | -- | -- |
| Additional minimum pension liability | -- | -- | -- | (37) |
| Other | -- | (2) | (2) | -- |
| | ------- | ------- | ------- | ------- |
| Balance at January 27, 1999 | 493 | 1,667 | 3,879 | (60) |
| | | | | |
| Net income for the year | -- | -- | 403 | -- |
| Shares reissued to retirement savings plan | 3 | 40 | -- | -- |
| Repurchased shares | (17) | (174) | -- | -- |
| Common stock issued for stock option plans | 2 | 18 | -- | -- |
| Reduction of minimum pension liability | -- | -- | -- | 47 |
| Other | -- | 4 | (1) | -- |
| | ------- | ------- | ------- | ------- |
| Balance at January 26, 2000 | $    481 | $ 1,555 | $ 4,281 | $    (13) |
| | ======= | ======= | ======= | ======= |

</TABLE>




See accompanying Notes to Consolidated Financial Statements.

        Kmart Corporation 1999 Annual Report 25
<PAGE>   10
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)


1)  Summary of Significant Accounting Policies
    The significant accounting policies followed by Kmart Corporation and
subsidiaries ("the Company" or "Kmart") in the preparation of these financial
statements are summarized below.
    Nature of Operations: The Company's operations consist principally of
discount department stores located in all 50 states, Puerto Rico, the U.S.
Virgin Islands, and Guam. Kmart's equity investments consist of its 59% interest
in BlueLight.com and its 49% interest in substantially all of the Meldisco
subsidiaries of Footstar, Inc. ("FTS"), which operate the footwear departments
in Kmart stores.
    Basis of Consolidation: Kmart includes all majority owned subsidiaries in
the consolidated financial statements, except for BlueLight.com, which is
accounted for under the equity method. Investments in affiliated retail
companies owned 20% or more are accounted for under the equity method.
Intercompany transactions and accounts have been eliminated in consolidation.

Fiscal Year: The Company's fiscal year ends on the last Wednesday in January. Fiscal years 1999, 1998 and 1997 each consisted of 52 weeks and ended on January 26, 2000, January 27, 1999 and January 28, 1998, respectively.

Cash: Cash and cash equivalents include all highly liquid investments with maturities of three months or less. Included are temporary investments of $50 and $437, at year end 1999 and 1998, respectively.

Inventories: Inventories are stated at the lower of cost or market, primarily using the retail method. The last-in, first-out (LIFO) method, utilizing internal inflation indices, was used to determine the cost for $6,690, $6,148 and $5,990 of inventory as of year end 1999, 1998 and 1997, respectively. Inventories valued on LIFO were $360, $407 and $457 lower than amounts that would have been reported using the first-in, first-out (FIFO) method at year end 1999, 1998 and 1997, respectively.

Property and Equipment: Property and equipment are recorded at cost, less any impairment losses. Capitalized amounts include expenditures which, materially extend the useful lives of existing facilities and equipment. Expenditures for owned properties, which Kmart intends to sell and lease back within one year, are included in other current assets, and those with expected transaction dates extending beyond one year are included in other assets and deferred charges.

Capitalized Software Costs: Costs associated with the acquisition or development of software for internal use are capitalized in accordance with the provisions of AICPA Statement of Position 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use," and amortized using the straight-line method over the expected useful life of the software, which ranges from 3 to 7 years.

Depreciation and Amortization: Depreciation and amortization, including amortization of property held under capital leases, are computed based upon the estimated useful lives of the respective assets using the straight-line method for financial statement purposes and accelerated methods for tax purposes. The general range of lives are 25 to 50 years for buildings, 5 to 25 years for leasehold improvements, 3 to 5 years for computer systems and equipment and 3 to 17 years for furniture and fixtures.

Financial Instruments: Cash and cash equivalents, trade accounts payable and accrued liabilities are reflected in the financial statements at cost, which approximates fair value. The fair value of the Company's debt and other financial instruments are discussed in Notes 6 and 8.

Foreign Currency Translations: Foreign currency assets and liabilities are translated into U.S. dollars at the exchange rates in effect at the balance sheet date, and revenue and expenses are translated at average exchange rates during the period.

Layaway Sales: In consideration of guidance issued by the Securities and Exchange Commission under Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" ("SAB 101"), the Company has retroactively changed its method of accounting for layaway sales effective January 28, 1999. Based upon the new guidance, the Company defers recognition of layaway sales and profit to the accounting period when the merchandise is delivered to the customer. Under the prior method of accounting, sales and profits were recognized at the time the customer put the merchandise into layaway, with a reserve for anticipated merchandise to be returned to stock. The Company has recorded a one-time, non-cash after-tax earnings reduction of $7, or $0.01 per share, in the fourth quarter of 1999 to reflect the cumulative effect of the accounting change.

Stock-Based Compensation: The Company has elected under the provisions of Statement of Financial Accounting Standards No. 123 ("FAS 123") to continue using the intrinsic value method of accounting for employee stock-based compensation in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").

Pre-Opening and Closing Costs: Effective for fiscal 1999, Kmart expensed pre-opening costs in the period in which they occurred in conformity with Statement of Position 98-5, "Reporting on the Costs of Start-Up Activities". In prior years, costs associated with the opening of a new store were expensed during the first full month of operations. When the decision to close a retail unit is made, any future net lease obligation and non-recoverable investment in fixed assets directly related to discontinuance of operations are expensed.

Advertising Costs: Advertising costs net of co-op recoveries from vendors,
are expensed the first time the advertising occurs and amounted to $453, $443
and $420 in 1999, 1998 and 1997, respectively.

Income Taxes: Deferred income taxes are provided for temporary differences
between financial statement and taxable income. Kmart accrues U.S. and foreign
taxes payable on its pro rata share of the earnings of subsidiaries, except with
respect to earnings that are intended to be permanently reinvested, or are
expected to be distributed free of additional tax by operation of relevant
statutes currently in effect and by utilization of available tax credits and
deductions.

                    Kmart Corporation 1999 Annual Report 26
<PAGE>    11


NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)


    Use of Estimates: The preparation of financial statements in conformity
with generally accepted accounting principles requires management to make
estimates and assumptions that affect the reported amounts of assets and
liabilities at the date of the financial statements and the reported amounts of
revenues and expenses during the reporting period. Actual results could differ
from those estimates.
    Reclassifications: Certain reclassifications of prior year amounts have
been made to conform to the 1999 presentation.

2)  Discontinued Operations and Dispositions
    Discontinued operations relate to Builders Square, Inc. ("Builders Square").

1999 Activity
    On June 11, 1999, Hechinger Company ("Hechinger"), which had previously
acquired substantially all of the operating assets of Builders Square, filed for
Chapter 11 bankruptcy protection. In the second quarter of 1999, the Company
recorded a non-cash charge of $354, $230 after tax, which reflected Kmart's best
estimate of the impact of Hechinger's default on lease obligations for up to 117
former Builders Square locations which are guaranteed by Kmart. The foregoing
non-cash charge does not reflect an amount, if any, which Kmart may ultimately
recover on account of any claims previously filed by Kmart or an amount, if any,
which may be sought by others against Kmart.
    On September 9, 1999, Hechinger announced that it would liquidate its
stores. During the third and fourth quarters of 1999, certain locations with
leases guaranteed by Kmart were auctioned by Hechinger as part of its
liquidation. As of January 26, 2000, the Company had new lease agreements for 38
locations and planned to convert approximately 6 locations to Big Kmarts or
Super Kmarts, leaving approximately 73 vacant locations to be remarketed. The
Company is currently assessing its remarketing efforts for these vacant stores
and believes its reserve to be adequate.

1997 Activity
    During the first and second quarters of 1997, the Company completed the
sale of its interests in the Mexico and Canada operations, respectively. Under
the terms of the Mexico agreement, the Company received $74, which approximated
the book value of its interest. Under the terms of the Canada agreement, the
Company received $54 in cash, a $76 note receivable and retained a 12.5%
non-voting equity interest. The net proceeds from the sale approximated book
value. During the first quarter of 1998, the note receivable was collected and
the equity interest was sold at a gain of $7.
    In the third quarter of 1997, the Company completed the sale of
substantially all of the operating assets of its subsidiary, Builders Square, to
Hechinger, an affiliate of Leonard Green and Partners, LP. The net proceeds from
the sale approximated book value.

3)  Property and Equipment

```
<TABLE>
<CAPTION>
                                          YEAR END
                                   --------------------
                                     1999        1998
 - --------------------------------------------------------
<S>                                  <C>         <C>
Land                               $    374    $    334
Buildings                             1,008         944
Leasehold improvements                2,502       2,156
Furniture and fixtures                5,509       5,142
Construction in progress                123          62
                                   --------    --------
                                      9,516       8,638
Property under capital leases         2,038       2,140
                                   --------    --------
                                     11,554      10,778
Less:
Accumulated depreciation
  and amortization                   (3,977)     (3,674)
Accumulated depreciation-
  capital leases                     (1,167)     (1,190)
                                   --------    --------
Total                              $  6,410    $  5,914
                                   ========    ========

</TABLE>
```

The following table provides a breakdown of the number of stores leased compared
to owned:

```
<TABLE>
<CAPTION>
                                     YEAR END
                                  -------------
                                  1999    1998
 - ----------------------------------------------
<S>                               <C>     <C>
Number of U.S.Kmart Stores Owned   120     110
Number of U.S.Kmart Stores Leased 2,051   2,051
</TABLE>
```

4)   Investments in Affiliated Retail Companies

Meldisco

     All Kmart footwear departments are operated under license agreements with
the Meldisco subsidiaries of FTS, substantially all of which are 49% owned by
Kmart and 51% owned by FTS. Income earned under various agreements was $245,
$225 and $210 in 1999, 1998 and 1997, respectively. The Company received
dividends from Meldisco in 1999, 1998 and 1997 of $38, $36 and $36,
respectively.

```
<TABLE>
<CAPTION>
                                FISCAL YEAR
                          -----------------------
MELDISCO INFORMATION      1999     1998     1997
 - ---------------------------------------------------
<S>                       <C>      <C>      <C>
Net sales                $1,212   $1,139   $1,142
Gross profit                544      499      491

Net income                   91       78       74

Inventory                $  138   $  147   $  142
```

```
Other current assets           --        --        --
Non-current assets             --        --        --
                            ------    ------    ------
Total assets                   201       169       159
Current liabilities             47        29        24
                            ------    ------    ------
Net assets               $     154  $    140  $    135
                            ======    ======    ======
Equity of Kmart          $      74  $     68  $     65
                            ======    ======    ======
```

</TABLE>


Unremitted earnings included in consolidated retained earnings were $44, $38 and
$42 at year end 1999, 1998 and 1997, respectively.


BlueLight.com
    In December 1999, BlueLight.com was formed as an independent e-commerce
company, based in San Francisco, by a group of investors led by Kmart (59%
ownership interest), SOFTBANK Venture Capital (18.5%), BlueLight.com management
and employees


                    Kmart Corporation 1999 Annual Report 27

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)


(15%) and others, including Martha Stewart Living Omnimedia and Yahoo!.
    For its capital, BlueLight.com issued $62.5 of Series A Preferred shares
for cash to SOFTBANK and other investors. Kmart issued return of capital puts
relating to the initial cash paid for the Series A Preferred stock. The puts are
payable in cash, expire in December 2002, and are exercisable in the nine-month
period prior to expiration. Kmart did not make an initial cash investment in
BlueLight.com.
    Kmart also issued 4.4 million warrants for Kmart common stock to SOFTBANK
and other investors. The warrants have a strike price of $14.32, expire in
December 2002, and are exercisable at any time prior to expiration provided that
SOFTBANK has cancelled the Company's return of capital puts.
    Kmart accounts for its investment in BlueLight.com under the equity method.
As of January 26, 2000, the Company's investment in BlueLight.com amounted to
$62.8, including the issuance of return of capital puts and direct acquisition
costs. Kmart's portion of BlueLight.com's 1999 loss was insignificant.

Penske
    In November 1995, Kmart sold its auto service center business to a new
corporation controlled by Penske Corporation ("Penske"). In connection with the
sale, Kmart and Penske entered into a multi-year master sublease agreement for
the auto service center locations that are operated by Penske as Penske Auto
Centers.
    To strengthen the auto center operation, Kmart and Penske entered into an
agreement in January 2000 to restructure and recapitalize the Penske Auto Center
business. As part of the recapitalization, Kmart received a 22 percent interest
in a limited liability company that now owns and operates the Penske Auto Center
business. The Company accounts for its investment in the Penske Auto Center
business under the equity method and has recorded no initial investment.


5)  Other Commitments and Contingencies
    Kmart has outstanding guarantees for property leased by certain former
subsidiaries as follows:


<TABLE>
<CAPTION>
                Present Value        Gross

|  | 1999 | 1999 | 1998 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| The Sports Authority | $218 | $369 | $397 |
| Borders Group | 104 | 176 | 194 |
| OfficeMax | 96 | 141 | 156 |
| | ---- | ---- | ---- |
| Total | $418 | $686 | $747 |
| | ==== | ==== | ==== |

</TABLE>

The possibility of the Company having to honor its contingent obligations
is dependent upon the future operating results of the former subsidiaries.
Should a reserve be required, it would be recorded at the time the obligation
was determined to be probable.

The Sports Authority
- --------------------

On April 13, 1999, The Sports Authority, Inc. ("TSA") replaced its existing
revolving credit facility with a new three year, $200 revolving credit
agreement. The new agreement is secured by inventory and contains no financial
covenants related to operating results. For its third quarter 1999, TSA
announced a year-to-date same store sales decrease of 4.3 percent, and a
year-to-date operating loss of $9.9, as compared to an operating loss of $94.5
for the same period of the prior year.
On December 16, 1999, TSA announced that it expected to take a non-cash
charge of approximately $130, net of taxes, in its fiscal fourth quarter as a
result of the write-down of long-lived assets, including goodwill and deferred
tax assets, and the closing of its Canadian subsidiary. TSA also announced that
it had increased its revolving credit facility to $275 and extended the maturity
to 2003. The amendments to the facility required no changes in the
collateralization.
Kmart's rights and obligations with respect to its guarantee of TSA leases
are governed by a Lease Guaranty, Indemnification and Reimbursement Agreement
dated as of November 23, 1994.

Other
- -----

As of January 26, 2000, Kmart had guaranteed $93 of indebtedness of other
parties related to certain of its leased properties financed by industrial
revenue bonds. These agreements expire from 2004 through 2009.

There are various claims, lawsuits and pending actions against Kmart
incident to its operations. It is the opinion of management that the ultimate
resolution of these matters will not have a material adverse effect on Kmart's
liquidity, financial position or results of operations.

6)  Long-Term Debt and Notes Payable

<TABLE>
<CAPTION>

| | | | YEAR END | |
| | FISCAL YEAR | INTEREST | -------------------- | |
| TYPE | MATURITY | RATES | 1999 | 1998 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Debentures | 2005-2023 | 7.8%-12.5% | $  1,166 | $  867 |
| Medium-term | | | | |
| notes | 2000-2020 | 7%-9% | 371 | 438 |
| CMBS | 2002 | Floating | 288 | 310 |
| | | | --------- | ------- |

Current portion                              (66)       (77)
                                          ---------   --------
Long-term debt                           $   1,759   $ 1,538
                                          =========   =======

</TABLE>


     The Commercial Mortgage Pass Through Certificates ("CMBS") mortgage loan is
subject to monthly payments of interest and principal, according to a schedule
which amortizes the initial outstanding principal amount of $335 over
approximately 15 years with a balloon payment of approximately $253 on the
scheduled maturity date in February 2002. The CMBS weighted average interest
rate is 1 month LIBOR plus 47 basis points.


                    Kmart Corporation 1999 Annual Report 28
<PAGE>    13


NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)


     On December 6, 1999, the Company entered into new financing agreements
aggregating $1.7 billion with a group of financial institutions ("New
Facilities") which replaced a $2.5 billion revolving credit facility. The New
Facilities provide for a 3-year, $1.1 billion revolving credit facility and a
364-day $600 revolving credit facility. The 3-year revolving credit facility
matures in December 2002 and has a commitment fee of 25 basis points and
interest rate of LIBOR plus 100 basis points during the first year. The 364-day
revolving credit facility has a commitment fee of 20 basis points and interest
rate of LIBOR plus 100 basis points.
     On January 12, 2000, the Company entered into an agreement for a $40.6
revolving line of credit ("Minority Facility") with a consortium of 26
minority-owned banks in 20 states and the District of Columbia. The 364-day
revolving credit facility has a commitment fee of 20 basis points and interest
rate of LIBOR plus 100 basis points.
     The New Facilities and the Minority Facility contain certain affirmative
and negative covenants customary to these types of agreements. The Company is in
compliance with all such covenants. As of January 26, 2000 and January 27, 1999,
there were no outstanding amounts under any of these credit agreements.
     On December 8, 1999, the Company sold in an underwritten offering $300 of
8 3/8% Notes due December 1, 2004 ("Notes"). Interest is payable semiannually on
June 1 and December 1. The Company expects to use the net proceeds from the
Notes for property acquisition and development, including the purchase of
existing leased properties, and for other general corporate purposes.
     Based on the quoted market prices for the same or similar issues or on the
current rates offered to Kmart for debt of the same remaining maturities, the
fair value of long-term debt was approximately $1,752 and $1,664 at year end
1999 and 1998, respectively.
     The principal maturities of long-term debt for the five years subsequent to
1999 are: 2000-$66; 2001-$68; 2002-$343; 2003-$350; 2004-$27 and 2005 and
later-$971. Cash paid for interest was $262, $278 and $333 in 1999, 1998 and
1997, respectively.

7)  Leases
     Kmart conducts operations primarily in leased facilities. Kmart store
leases are generally for terms of 25 years with multiple five-year renewal
options which allow the Company the option to extend the life of the lease
up to 50 years beyond the initial noncancelable term.
     In certain Kmart leased facilities, selling space has been sublet to other
retailers, including Olan Mills, Inc. and the Meldisco subsidiaries of FTS.

<TABLE>
<CAPTION>

```
                                    MINIMUM LEASE COMMITMENTS
                                    --------------------------
AS OF JANUARY 26, 2000              CAPITAL           OPERATING
- -----------------------------------------------------------------
<S>                                 <C>               <C>
Fiscal Year:
   2000                          $       254       $       627
   2001                                  243               623
   2002                                  235               606
   2003                                  225               578
   2004                                  210               552
   Later years                         1,624             6,928
                                   ---------         ---------
Total minimum lease payments           2,791             9,914
Less-minimum sublease income              --            (2,654)
                                   ---------         ---------
Net minimum lease payments             2,791       $     7,260
Less:                              =========         =========
   Estimated executory costs            (773)
   Amount representing interest         (923)
                                   ---------
                                       1,095
Current                                  (81)
                                   ---------
Long-term                        $     1,014
                                   =========
```

`</TABLE>`

`<TABLE>`
`<CAPTION>`

```
RENT EXPENSE               1999          1998         1997
- ------------------------------------------------------------
<S>                        <C>           <C>          <C>
Minimum rentals         $     784     $     711    $     673
Percentage rentals             41            40           39
Less-sublease rentals        (253)         (227)        (234)
                          --------      --------     --------
Total                   $     572     $     524    $     478
                          ========      ========     ========
```

`</TABLE>`


8)   Convertible Preferred Securities
     In June 1996, a trust sponsored and wholly owned by the Company issued
20,000,000 shares of trust convertible preferred securities ("Preferred
Securities"). The Preferred Securities accrue and pay cash distributions
quarterly at a rate of 7-3/4% per annum. Kmart has guaranteed, on a subordinated
basis, distributions and other payments due on the Preferred Securities.
     The Preferred Securities are convertible at the option of the holder at any
time at the rate of 3.3333 shares of Kmart common stock for each Preferred
Security, and are mandatorily redeemable upon the maturity of the Debentures on
June 15, 2016, or to the extent of any earlier redemption of any Debentures by
Kmart and were callable beginning June 15, 1999.
     Based on the quoted market prices, the fair value of the Preferred
Securities was approximately $844 and $1,199 as of the years ended 1999 and
1998, respectively.

9)   Share Repurchase Programs
     In the first quarter of 1999, the Company completed a year-long program to
repurchase an aggregate of 2,000,000 shares of the Company's common stock to
fund certain employee benefit plans. On May 18, 1999, the Board of Directors
approved a common stock repurchase program to acquire up to $1 billion of the
Company's common shares over a period of up to three years. For 1999, the
Company repurchased 17 million shares of common stock at a cost of approximately
$200. In addition, the Company received $8.7 in proceeds from the sale of put

1/28/2019    18-23538-shl    Doc 3560-2   Filed 05/03/19   Entered 05/03/19 10:30:54   Exhibit B -
Declaration of Artem Skorostensky in Support of Objection of Urban E    Pg 158 of 166
options on its common stock. As of January 26, 2000,

Kmart Corporation 1999 Annual Report 29

<PAGE>   14


NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)


the Company had outstanding put options on 5 million shares of its common stock.
In February 2000, the Company announced plans to extend its repurchase program
to include up to $200 of its Preferred Securities.

10)  Income Taxes

<TABLE>
<CAPTION>

| INCOME BEFORE INCOME TAXES | 1999 | 1998 | 1997 |
| --- | --- | --- | --- |
| U.S. | $   992 | $   766 | $   390 |
| Foreign | 28 | 32 | 28 |
| Total | $ 1,020 | $   798 | $   418 |

</TABLE>

<TABLE>
<CAPTION>

| INCOME TAX PROVISION (CREDIT) | 1999 | 1998 | 1997 |
| --- | --- | --- | --- |
| Current: | | | |
| Federal | $   133 | $    70 | $  (126) |
| State and local | 17 | 21 | (5) |
| Foreign | 11 | 12 | 11 |
| | 161 | 103 | (120) |
| Deferred: | | | |
| Federal | 169 | 124 | 240 |
| State | 7 | 3 | -- |
| Total | $   337 | $   230 | $   120 |

</TABLE>

<TABLE>
<CAPTION>

| EFFECTIVE TAX RATE RECONCILIATION | 1999 | 1998 | 1997 |
| --- | --- | --- | --- |
| Federal income tax rate | 35.0% | 35.0% | 35.0% |
| State and local taxes, net of federal tax benefit | 1.5 | 1.9 | (0.8) |
| Tax credits | (0.7) | (0.7) | (1.9) |
| Equity in net income of affiliated companies | (1.2) | (1.4) | (2.3) |
| Adjustments to prior | | | |

```
Other                              (1.6)      --      (1.3)
                                   ----      ----     ----
                                   33.0%     28.8%    28.7%
                                   ====      ====     ====
```

</TABLE>


<TABLE>
<CAPTION>

```
                                         YEAR END
                                   --------------
DEFERRED TAX
ASSETS AND LIABILITIES             1999      1998
- ------------------------------------------------
<S>                                <C>       <C>
Deferred tax assets:
  Federal benefit for
     state and foreign taxes       $  44     $  36
  Discontinued operations           239       129
  Accruals and other liabilities    176       197
  Capital leases                     86        98
  Store restructuring                48        69
  Other                              14        84
                                   -----     -----
Total deferred tax assets           607       613
                                   -----     -----
Deferred tax liabilities:
  Inventory                         336       279
  Property and equipment            389       367
  Other                              19        24
                                   -----     -----
Total deferred tax liabilities      744       670
                                   -----     -----
Net deferred tax liabilities      $(137)    $ (57)
                                   =====     =====
```

</TABLE>


     In 1998, the Internal Revenue Service completed its examination of the
Company's federal income tax returns through 1994. The Company believes that
adequate tax accruals have been provided for all years.
     Cash paid (received) for income taxes was $59, $(99) and $7 in 1999, 1998
and 1997, respectively.

11)  Earnings Per Share

<TABLE>
<CAPTION>

```
                                   1999        1998       1997
- -------------------------------------------------------------
<S>                                <C>         <C>        <C>
Continuing net income          $    633    $    518    $   249
Discontinued operations            (230)        --         --
                               --------    ---------   -------
Net income                     $    403    $    518    $   249
                               ========    =========   =======
Preferred dividends            $     50    $     50    $    --
                               ========    =========   =======
Basic weighted average shares     491.7       492.1      487.1
Dilutive effect of stock options    3.3         6.1        4.6
Convertible preferred securities   66.7        66.7         --
                               --------    ---------   -------
Diluted weighted average shares   561.7       564.9      491.7
                               ========    =========   =======
Basic earnings per share:
  Continuing net income        $   1.29    $   1.05    $   .51
```

```
Discontinued operations             (.27)
                               --------  ---------  -------
  Net income                  $   .82  $   1.05  $   .51
                               ========  =========  =======

Diluted earnings per share:
  Continuing net income       $  1.22  $   1.01  $   .51
  Discontinued operations         (.41)       --       --
                               --------  ---------  -------
  Net income                  $   .81  $   1.01  $   .51
                               ========  =========  =======
```

</TABLE>


     The Preferred Securities and preferred dividends were not included in the
calculation of diluted EPS for 1997 due to the anti-dilutive effect on EPS if
converted. Had the Preferred Securities been included in the calculation,
diluted EPS would have been higher by $0.02 for fiscal 1997.


12)  Pension Plans and Other Post-Retirement Benefits
     In the second quarter of 1998, the Company announced a Voluntary Early
Retirement Program for certain Kmart distribution center associates over 45
years of age with at least 10 years of service by May 31, 1998. Of the 1,050
Kmart associates eligible for this program, 456 accepted the early retirement
offer, and the Company recorded a charge of $19 ($13 after tax). Payouts under
this program will be fully funded through existing pension plan assets.
     In the fourth quarter of 1997, the Company announced a Voluntary Early
Retirement Program for certain Kmart hourly associates over 45 years of age with
at least 10 years of service by December 31, 1997. Of the 28,785 Kmart
associates eligible for this program, 11,587 accepted the early retirement
offer, and the Company recorded a charge of $114 ($81 after tax). Payouts under
this program will be fully funded through existing pension plan assets.
     Prior to 1996, U.S. Kmart had defined benefit pension plans covering
eligible associates who met certain requirements of age, length of service, and
hours worked per year. Effective January 31, 1996, the pension plans were
frozen, and associates no longer earn additional benefits under the plans.


               Kmart Corporation 1999 Annual Report 30
<PAGE>   15


NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)


     The plans' assets consist primarily of equity and fixed income securities.
No contributions were made in fiscal 1999, 1998, or 1997. The total consolidated
pension income was $68, $63 and $63 in 1999, 1998 and 1997, respectively.
     The following tables summarize the change in benefit obligation, change in
plan assets, funded status, amounts recognized and actuarial assumptions for
Kmart's employee pension plans.


<TABLE>
<CAPTION>

```
                                                    Year End
                                               -------------------
                                                 1999      1998
- ----------------------------------------------------------------------
<S>                                            <C>       <C>
Change in benefit obligation:
  Benefit obligation at beginning of year      $ 2,208   $ 2,055
  Interest costs                                   141       139
  Voluntary early retirement program(VERP)          --        19
  Actuarial (gain)/loss                           (300)      131
  Benefits paid including VERP                    (105)     (136)
                                               -------   -------
```

Benefit obligation at end of year                        $ 1,944     $ 2,108
                                                         =======     =======

Change in plan assets:
  Fair value of plan assets at
    beginning of year                                    $ 2,098     $ 1,942
  Actual return on plan assets                               145         292
  Benefits paid including VERP                             (138)       (136)
                                                         -------     -------

  Fair value of plan assets at
    end of year                                          $ 2,105     $ 2,098
                                                         =======     =======

</TABLE>

<TABLE>
<CAPTION>

|                                                       | Year End |       |
|-------------------------------------------------------|----------|-------|
|                                                       | 1999     | 1998  |
| <S>                                                   | <C>      | <C>   |
| Funded status                                         | $ 161    | $(110)|
| Unrecognized net (gain)/loss                          | (110)    | 99    |
| Unrecognized transition asset                         | (48)     | (54)  |
| Net recognized prepaid benefit/(liability)            | $  3     | $ (65)|
| Amounts recognized in the statement of financial position consist of: | | |
| Prepaid benefit cost/ (Accrued benefit liability)     | $  3     | $(109)|
| Accumulated other comprehensive income                | --       | 44    |
| Net amount recognized                                 | $  3     | $ (65)|
| Weighted-average assumptions as of January 31         |          |       |
| Discount rate                                         | 7.5%     | 6.5%  |
| Expected return on plan assets                        | 10%      | 10%   |

</TABLE>

<TABLE>
<CAPTION>

|                                                       | Year End |       |       |
|-------------------------------------------------------|----------|-------|-------|
|                                                       | 1999     | 1998  | 1997  |
| <S>                                                   | <C>      | <C>   | <C>   |
| Components of Net Periodic Benefit (Income)/Expense    |          |       |       |
| Interest costs                                        | $ 141    | $ 139 | $ 139 |
| Expected return on plan assets                        | (202)    | (195) | (193) |
| Amortization of unrecognized transition asset         | (7)      | (7)   | (9)   |
| Net periodic benefit                                  | $ (68)   | $ (63)| $ (63)|

</TABLE>


     The Company has non-qualified plans for directors and officers which were
partially funded as of years ended 1999 and 1998 and were unfunded as of year
end 1997. Benefits under the plans totaled $34 and $37 at the end of 1999 and
1998, respectively, which have been accrued in the accompanying balance sheets.
Plan assets totaled $13 and $11 as of year end 1999 and 1998, respectively.
     Full-time associates who have worked 10 years and who have retired after
age 55, have the option of participation in Kmart's medical plan until age 65.
The plan is contributory, with retiree contributions adjusted annually. The
accounting for the plan anticipates future cost-sharing changes that are

consistent with Kmart's expressed intent to increase the retiree contribution
rate annually. The accrued post-retirement benefit costs were $54 and $62 at the
end of 1999 and 1998, respectively.

13)  Retirement Savings Plan
    The Retirement Savings Plan provides that associates of Kmart who have
completed 1,000 hours of service within a twelve month period can invest from 1%
to 16% of their earnings in the associate's choice of various investments. For
each dollar the participant contributes, up to 6% of earnings, Kmart will
contribute an additional 50 cents which is invested in the Employee Stock
Ownership Plan.
    The Retirement Savings Plan also has a profit sharing feature whereby the
Company makes contributions based on profits, with minimum yearly contributions
required of $30. Kmart's total expense related to the Retirement Savings Plan
was $94, $68 and $69 in 1999, 1998 and 1997, respectively.

14)  Stock Option Plans
    The Company applies APB 25 and related interpretations in accounting for
its stock option and restricted stock plans. Since stock options were granted at
exercise prices equal to the stock price on the grant date, under APB 25, no
compensation cost has been recognized for stock options granted under the
Company's stock based compensation plans.
    Had the compensation cost for the Company's stock based compensation plans
been determined based on the fair value at the grant dates consistent with the
method of FAS 123, net earnings would have been the pro forma amounts shown
below.

<TABLE>
<CAPTION>

| Pro Forma Income | 1999 | 1998 | 1997 |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Net income - as reported | $    403 | $    518 | $    249 |
| EPS - as reported | .81 | 1.01 | .51 |
| Net income - pro forma | 376 | 496 | 222 |
| EPS - pro forma | .76 | .97 | .45 |

</TABLE>


    To determine these amounts, the fair value of each stock option has been
estimated on the date of the grant using a Black-Scholes option-pricing model
with a dividend yield of 0%. Options vest over 3 years on a straight-line basis
with a term of 10 years.

                    Kmart Corporation 1999 Annual Report 31
<PAGE>   16




NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT.)
(DOLLARS IN MILLIONS, EXCEPT PER SHARE DATA)

<TABLE>
<CAPTION>

| | 1999 | 1998 | 1997 |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Expected volatility | .4506 | .4230 | .3902 |
| Risk-free interest rates | 4.93 | 5.32 | 6.47 |
| Expected life in years | 5 | 5 | 5 |
| Weighted-average fair   value per share | $   7.90 | $   7.11 | $   5.37 |

</TABLE>

```
<TABLE>
<CAPTION>
STOCK OPTION PLANS (000'S)        SHARES        OPTION PRICE
- ------------------------------------------------------------
<S>                               <C>           <C>
January 28, 1998:
   Outstanding                    20,988        $  6.31 - $26.03
   Granted                        10,495        $ 11.29 - $20.34
   Exercised                      (4,679)       $  6.31 - $18.88
   Forfeited                      (2,182)       $  7.81 - $26.03
                                  ------
January 27, 1999:
   Outstanding                    24,622        $  7.00 - $26.03
   Granted                         6,376        $  9.78 - $17.56
   Exercised                      (1,723)       $  7.81 - $16.28
   Forfeited                      (1,382)       $  7.81 - $26.03
                                  ------
January 26, 2000:
   Outstanding                    27,893        $  7.00 - $26.03
   Exercisable                    15,638        $  7.00 - $26.03
   Available for grant            11,671
</TABLE>
```

The following table summarizes information about stock options outstanding as of
January 26, 2000.

```
<TABLE>
<CAPTION>
               Options Outstanding                    Options Exercisable
               -----------------------                ----------------------
                    Number    Weighted                     Number    Weighted
                  of Shares    Average         Weighted   of Shares    Average
       Range of  Outstanding  Remaining        Average   Exercisable  Exercise
       Exercise    (000's)      Life            Average    (000's)      Price
        Price                                    Price
- --------------------------------------------------------------------------------
<S>               <C>          <C>             <C>        <C>          <C>
$  7.00 to $10.00   4,541       5.7            $  7.86     4,533       $  7.86
$ 10.01 to $15.00  11,847       6.6            $ 12.29     8,566       $ 12.18
$ 15.01 to $26.03  11,505       8.2            $ 17.12     2,539       $ 17.52
- --------------------------------------------------------------------------------
$  7.00 to $26.03  27,893       7.1            $ 13.56    15,638       $ 11.80
</TABLE>
```

15)  Quarterly Financial Information (Unaudited)
     Earnings per share amounts for each quarter are required to be computed
independently and may not equal the amount computed for the total year.

```
<TABLE>
<CAPTION>
- --------------------------------------------------------------------------------
1999 Restated (A)                   First      Second      Third     Fourth
- --------------------------------------------------------------------------------
<S>                                 <C>        <C>         <C>       <C>
Sales                               $ 8,078    $ 8,781     $ 7,962   $11,104
Cost of sales                         6,368      6,851       6,246     8,637
Continuing net income                    56        138          27       412
Discontinued operations                  --       (230)         --        --
Net income (loss)                        56        (92)         27       412
Basic earnings (loss) per share:
   Continuing net income                .11        .28         .05       .85
   Discontinued operations              --        (.47)         --        --
                                    ------------------------------------------
   Net income (loss)                    .11       (.19)        .05       .85
                                    ==========================================
</TABLE>
```

Diluted earnings (loss) per share:
```
    Continuing net income            .11       .26        .05        .77
    Discontinued operations          --      (.41)         --         --
                               -----------------------------------------
    Net income (loss)               .11      (.15)        .05        .77
                               =========================================
```

</TABLE>


<TABLE>
<CAPTION>

```
                                First    Second      Third   Fourth (B)
1999 Reported                                                 Pro forma
- ----------------------------------------------------------------------
<S>                              <C>       <C>        <C>        <C>
Sales                         $ 8,144 $  8,757 $   8,057 $   10,955
Cost of sales                   6,417     6,835      6,317      8,510
Continuing net income              67       134         43        396
Discontinued operations             -     (230)          -          -
Net income (loss)                  67      (96)         43        396
Basic earnings (loss) per share:
    Continuing net income         .14       .27        .09        .82
    Discontinued operations         -     (.47)          -          -
                               -----------------------------------------
    Net income (loss)             .14      (.20)        .09        .82
                               =========================================

Diluted earnings (loss) per share:
    Continuing net income         .14       .26        .09        .74
    Discontinued operations         -     (.41)          -          -
                               -----------------------------------------
    Net income (loss)             .14      (.15)        .09        .74
                               =========================================

Common stock price
    High                      $ 17-7/8 $ 17-5/8 $14-15/16 $   12-1/4
    Low                         16-1/16    14-7/8    9-3/8          9
```
</TABLE>


<TABLE>
<CAPTION>
```
- ----------------------------------------------------------------------
1998 Pro forma (C)              First    Second      Third     Fourth
- ----------------------------------------------------------------------
<S>                              <C>       <C>        <C>        <C>
Sales                         $  7,458 $  8,125 $  7,539   $10,565
Cost of sales                    5,868     6,341     5,876     8,245
Continuing net income               34        83        20       382
Net income                          34        83        20       382
Basic earnings per share:          .07       .17       .04       .77
Diluted earnings per share:        .07       .17       .04       .70
```
</TABLE>


<TABLE>
<CAPTION>
```
- ----------------------------------------------------------------------
1998 Reported                   First    Second      Third     Fourth
- ----------------------------------------------------------------------
<S>                              <C>       <C>        <C>        <C>
Sales                         $  7,515 $  8,116 $   7,642 $   10,401
Cost of sales                    5,908     6,336     5,954     8,121
Continuing net income               47        80        38       353
Net income                          47        80        38       353
Basic earnings per share:          .10       .16       .08       .72
Diluted earnings per share:        .10       .16       .08       .65
Common stock price
    High                      $18-11/16 $20-9/16 $18-11/16 $16-11/16
```

```
    Low
</TABLE>

(A) In consideration of SAB 101, the Company has restated its first three
quarters of 1999.

(B) For comparability, pro forma results for the fourth quarter of 1999 exclude
the effects of SAB 101 and represent results as if the change in accounting
policy had not occurred.

(C) For informational purposes only, 1998 quarterly results have been presented
on a pro forma basis as if SAB 101 had been applied to 1998 quarterly results.


              Kmart Corporation 1999 Annual Report 32

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23
<SEQUENCE>5
<DESCRIPTION>CONSENT OF INDEPENDENT ACCOUNTANTS
<TEXT>

<PAGE>   1

                                                      EXHIBIT 23



            CONSENT OF INDEPENDENT ACCOUNTANTS


We hereby consent to the incorporation by reference in the Registration
Statements on Form S-8 (Registration Statement Nos. 33-54879, 33-48490,
33-48673, 33-52797, 33-52799, 33-61351, 33-28621, and 33-93023) and the
Prospectus constituting part of the Registration Statement on Form S-3
(Registration Statement No. 33-74665) of Kmart Corporation of our report dated
March 6, 2000 relating to the financial statements, which appears in the Annual
Report to Shareholders, which is incorporated in this Annual Report on Form
10-K.

/s/ PricewaterhouseCoopers LLP
- -----------------------------
PricewaterhouseCoopers LLP
Detroit, Michigan
April 19, 2000


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27
<SEQUENCE>6
<DESCRIPTION>FINANCIAL DATA SCHEDULE
<TEXT>

<TABLE> <S> <C>


<ARTICLE> 5
<LEGEND>
THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM (A) THE
CONSOLIDATED STATEMENTS OF INCOME AND CONSOLIDATED BALANCE SHEETS AND IS
QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH (B) FINANCIAL STATEMENTS.
</LEGEND>


<S>                                  <C>
<PERIOD-TYPE>                         YEAR
<FISCAL-YEAR-END>                                JAN-26-2000
```

```
<PERIOD-START>                          JAN-28-1999
<PERIOD-END>                            JAN-26-2000
<CASH>                                          344
<SECURITIES>                                      0
<RECEIVABLES>                                     0
<ALLOWANCES>                                      0
<INVENTORY>                                   7,101
<CURRENT-ASSETS>                              8,160
<PP&E>                                       11,554
<DEPRECIATION>                                5,144
<TOTAL-ASSETS>                               15,104
<CURRENT-LIABILITIES>                         4,076
<BONDS>                                       1,759
<PREFERRED-MANDATORY>                           986
<PREFERRED>                                       0
<COMMON>                                        481
<OTHER-SE>                                    5,823
<TOTAL-LIABILITY-AND-EQUITY>                 15,104
<SALES>                                      35,925
<TOTAL-REVENUES>                             35,925
<CGS>                                        28,102
<TOTAL-COSTS>                                28,102
<OTHER-EXPENSES>                                  0
<LOSS-PROVISION>                                  0
<INTEREST-EXPENSE>                              280
<INCOME-PRETAX>                               1,020
<INCOME-TAX>                                    337
<INCOME-CONTINUING>                             633
<DISCONTINUED>                                  230
<EXTRAORDINARY>                                   0
<CHANGES>                                         0
<NET-INCOME>                                    403
<EPS-BASIC>                                     .82
<EPS-DILUTED>                                   .81


</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```