## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>SEARS HOLDINGS CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-23538 (RDD)<br>(Jointly Administered)<br><br>**Re: Docket No. 1730, 1731, and 2063** |

## DECLARATION OF WILLIAM R. LANG SUPPORTING OBJECTION OF GRAZIADIO INVESTMENT COMPANY PARTNERSHIP TO PROPOSED ASSIGNMENT OF LEASE PURSUANT TO NOTICE OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES

I, WILLIAM R. LANG, declare:

1.     I am the President of Graziadio Investment Corporation, a California corporation ("Graziadio"), which is the general partner of Graziadio Investment Company Partnership, a California limited partnership ("Landlord"), the landlord of debtor Kmart Corporation ("Tenant") with respect to retail premises located in the Temple City Plaza shopping center in Temple City,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); SHC Licensed Business LLC (3718); and SHC Promotions LLC (9626). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

California, designated by Tenant as Kmart Store No. 3127. I have been employed by Graziadio and affiliates, including Commerce Realty, its property management firm, since April 2005 and have offices in Redondo Beach, California. I am personally involved in asset management, tenant leasing, acquisitions, dispositions, redevelopment and new development activities for Graziadio and affiliates.

2.       On or about December 15, 1977, EGS of California, Landlord's predecessor-in-interest, as landlord, and Kmart Enterprises of California, Inc., Tenant's predecessor-in-interest, as tenant, entered into a written Lease (the "Lease") for the land and improvements consisting of approximately 94,500 square feet commonly known as 5665 North Rosemead Boulevard #3127, Temple City, California (the "Premises"), located in the Temple City Plaza, as more particularly described in the Lease. A true and correct copy of the Lease is attached hereto as Exhibit "1" and incorporated herein by this reference. The Lease was amended by that certain First Amendment To Lease, dated as of May 29, 1978, a true and correct copy of which is attached hereto as Exhibit "2" and incorporated herein by this reference.

3.       The term of the Lease was for a primary term of twenty-five (25) years plus seven (7) five (5)-year options in favor of the Tenant. The Lease was fully guaranteed by Kmart Corporation. Pursuant to Tenant's most recent exercise of its option, the term of the Lease is currently scheduled to expire on January 1, 2023.

4.       This declaration is submitted in response to the *Notice of Assumption and Assignment of Additional Designatable Leases* [Docket No. 3298] in the above-entitled case, designating the Lease for assignment to Transform Operating Stores LLC, purportedly a subsidiary of Transform Holdco LLC ("Buyer"), the buyer of certain of Debtors' assets, including lease designation rights.

2

5.      As a consequence of my position, I am one of the custodians of records of Landlord

as those books, records, and files relate to Tenant's use and occupancy of retail premises at Temple

City Plaza. I am personally familiar with the premises leased by Tenant and, as part of my duties,

I regularly visit the shopping center. If called upon to testify in this proceeding, as to the matters

set forth in this declaration, I could and would competently testify thereto, since the facts set forth

herein are personally known to me to be true.

6.      Temple City Plaza is an open-air community shopping center, consisting of

approximately 225,000 rentable square feet, located at Rosemead Boulevard and Las Tunas Drive

in Temple City, California, approximately fourteen (14) miles northeast of downtown Los

Angeles. Anchored by Kmart, Office Depot, HomeTown Buffet and Super A Foods, the shopping

center has spaces for over ten retail stores, restaurants and services. Temple City Plaza has shared,

non-exclusive parking areas with approximately 991 parking spaces. A copy of the site plan for

the Temple City Plaza shopping center, containing an identification of the location and identity of

particular tenants and other information regarding Temple City Plaza, is attached hereto as Exhibit

"3" and incorporated herein by this reference. Landlord currently owns the Premises leased to

Tenant, the two parcels identified on the site plan as "Denny's" and "Bank," and the parcel

identified as "Small Shops," leased to five tenants (Orange Chicken, Perfection Beauty, Olympic

Bakery, Sally's Shoes and Rising Star Threading).

7.      Temple City Plaza was developed as a shopping center in the mid-1970's by

Eltinge, Graziadio & Sampson Development Co., an affiliate of Graziadio, A.D. Clark and

Albertsons, Inc., each of whom owned parcels in the shopping center at that time.

8.      The Temple City Plaza property, including the Premises, is subject to (1) a

Construction, Operation and Reciprocal Easement Agreement, dated August 1, 1974, as

3

subsequently amended, (2) an Option, Maintenance and Management Agreement, dated October 1, 1975, as subsequently amended, and (3) an Agreement For Operation and Maintenance of Parking Facilities, dated November 1, 1975, as subsequently amended (collectively, the "REAs"), true and correct copies of which are attached hereto as Exhibits "4" through "6," inclusive, and incorporated herein by this reference. The REAs and the covenants and cost-sharing arrangements contained therein are designed to ensure that the Temple City Plaza development as a whole functions and is operated in a manner for the mutual benefit of the various owners and their tenants, including (a) shared parking areas and driveways for vehicular and pedestrian access, and (b) shared expenses for such matters as electricity charges servicing the common area of the shopping center, irrigation for common area landscaping, and the interconnected fire sprinkler systems among the buildings in the shopping center.

9.    In the ordinary course of its business, Graziadio and its affiliates, including Landlord, require credit enhancements, in the form of security deposits, letters of credit and third party guaranties when leasing (or assessing a proposed assignment of a lease) to certain companies based on their financial information and history. In the case of a new company, particularly a recently-capitalized "newco" created for the purpose of acquiring distressed assets, Graziadio would ordinarily seek security in the form of cash deposits or letters of credit covering monetary obligations under assigned leases for at least one month's rent and charges, potentially increasing by additional months depending on the financial information provided by the proposed tenant/assignee. Alternatively, or in combination with such deposits, when a parent holding company forms a new entity without an operating history that seeks an initial lease from a Graziadio-affiliated landlord, the landlord would typically seek a continuing guaranty of lease

4

obligations from a parent company or another entity with sufficient assets to meet those underlying lease obligations.

10.    I have received and reviewed the 4-page letter from Buyer, with attachment, dated April 26, 2019, purporting to provide, on a "confidential and proprietary" basis, evidence of adequate assurance of future performance required by the Bankruptcy Code in connection with Buyer's proposed acquisition of substantially all of Debtors' assets and the prospective assignment of leases, including Tenant's Lease for the Premises.  Buyer has not provided any information comparing its current or projected financial condition or operational capabilities compared to that of Tenant at any time period.  We have not been provided with any financial information regarding the actual proposed assignee, Transform Operating Stores, LLC.  By comparison, at the time the Lease was entered into in 1977, Kmart was the second-largest retailer in the United States.

11.    Based on the foregoing, if Landlord was presented with an initial proposal by an entity similar to Buyer to lease the Premises, Landlord would require a credit enhancement consisting of some combination of a security deposit (in the form of cash or letter of credit) of at least three months' rent and charges and a guaranty of lease obligations by a parent entity or other third party, as its predecessor did in connection with the Lease in 1977.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Redondo Beach, California
       May 2, 2019

                                    _____
                                    WILLIAM R. LANG

# EXHIBIT 1

*Temple 7*

===========================================================

# L E A S E

### EGS OF CALIFORNIA

Lessor

AND

### K mart ENTERPRISES OF CALIFORNIA, INC.

Lessee

Dated as of December 15, 1977

===========================================================


WORKING FILE COPY

# TABLE OF CONTENTS

| Article | | Page |
|---|---|---|
| I. | Leased Property; Term.............. | 1 |
| II. | Definitions...................... | 2 |
| III. | Basic Rent; Additional Rent........ | 7 |
| IV. | Payment of Impositions; Utility Charges; Insurance Premiums....... | 9 |
| V. | No Termination, Abatement, etc...... | 10 |
| VI. | Ownership of Leased Property; Lessee's Equipment............... | 11 |
| VII. | Condition and Use of the Leased Property...................... | 12 |
| VIII. | Compliance with Legal and Insurance Requirements, Instruments, etc.... | 13 |
| IX. | Maintenance and Repair; Encroachments, Restrictions, etc.. | 14 |
| X. | Alterations, Substitutions and Replacements; Salvage; Construction of Additional Facilities...................... | 16 |
| XI. | Reimbursement of Additional Facility Cost.................... | 17 |
| XII. | Liens............................ | 24 |
| XIII. | Permitted Contests................ | 25 |
| XIV. | Insurance........................ | 26 |
| XV. | Notice of Damage, Destruction or Taking; Condemnation Awards.... | 29 |

TABLE OF CONTENTS
(Continued)

| Article | | Page |
|---------|---|------|
| XVI. | Compliance with the REA............. | 33 |
| XVII. | Compliance with Unrecorded Parking and Maintenance Agreements ..................... | 34 |
| XVIII. | Termination of Lease upon Discontinuance of Operations of the Leased Property........... | 36 |
| XIX. | Events of Default................... | 37 |
| XX. | Lessor's Right to Cure Lessee's Default......................... | 45 |
| XXI. | Provisions Relating to Purchase of the Leased Property by Lessee....................... | 46 |
| XXII. | Renewal Terms...................... | 47 |
| XXIII. | No Recourse Against Lessor.......... | 47 |
| XXIV. | Risk of Loss....................... | 48 |
| XXV. | Indemnification by Lessee........... | 48 |
| XXVI. | Subletting and Assignment; Attornment........................ | 49 |
| XXVII. | Officer's Certificates and Financial Statements............. | 50 |
| XXVIII. | Lessor's Right to Inspect........... | 52 |
| XXIX. | No Waiver by Lessor................. | 52 |
| XXX. | Remedies Cumulative................. | 52 |
| XXXI. | Acceptance of Surrender............. | 53 |
| XXXII. | No Merger of Title................. | 53 |

# TABLE OF CONTENTS
## (Continued)

| Article | | Page |
|---------|--|------|
| XXXIII. | Conveyance by Lessor................ | 53 |
| XXXIV. | Quiet Enjoyment..................... | 53 |
| XXXV. | Notices............................. | 54 |
| XXXVI. | Holding Over........................ | 55 |
| XXXVII. | Offer by Lessee to Purchase the Leased Property................... | 55 |
| XXXVIII. | No Discrimination................... | 56 |
| XXXIX. | Miscellaneous....................... | 56 |
| XL. | Memorandum of Lease................. | 57 |

## LEASE

LEASE, dated as of the 15th day of December, 1977, be-tween EGS OF CALIFORNIA ("Lessor"), a California general partnership having an address c/o Eltinge, Graziadio, & Sampson Development Company, P.O. Box 92959, Los Angeles, California 90009, and K mart ENTERPRISES OF CALIFORNIA, INC. ("Lessee"), a Michigan corporation having an address c/o K mart Corporation, 3100 West Big Beaver, Troy, Michigan 48084.

## ARTICLE I

1.  Leased Property; Term.  Upon and subject to the terms and conditions hereinafter set forth, Lessor leases to Lessee and Lessee rents from Lessor all of Lessor's rights and interest in and to the following property (collectively, the "Leased Property"):

(a)   the parcel of land (the "Land") located in the City of Temple City, County of Los Angeles and State of California, more particularly described in Schedule A, and as shown in the Plot Plan attached hereto as Schedule B,

(b)   all buildings, structures, Fixtures and other improvements presently or hereafter (except as provided in Section 10.3) situated upon the Land (collectively, the "Leased Improvements"),

(c)   all easements, rights and appurtenances relating to the Land and the Leased Improvements and all rights with respect to the Parking and Maintenance Agreements hereinafter referred to, and

(d)   all equipment, machinery, fixtures, and other items of property, including all components thereof, now or hereafter located in, on or used in connection with, the Leased Improvements or necessary to the operation or maintenance thereof, including, without limitation, all furnaces, boilers, heaters, electrical equipment, heating, plumbing,

ventilating, waste disposal, air-cooling and air-conditioning apparatus, sprinkler systems and fire and theft protection equipment (other than Lessee's Equipment, as described in Article VI) which are hereby deemed by the parties hereto to constitute real estate under the laws of the State of California, together with all replacements, modifications, alterations and additions thereto (collectively, the "Fixtures"),

SUBJECT, HOWEVER, to (i) the covenants and provisions of an REA (hereinafter referred to), the Parking Agreement, the Maintenance Agreement and (ii) the matters set forth in Schedules A and B; to have and to hold for (A) an interim term (the "Interim Term") commencing on the date hereof and ending at midnight on January 1, 1978, and (B) a fixed term of twenty-five (25) years (the "Fixed Term") commencing on January 2, 1978 and ending at midnight on January 1, 2003, and (C) the renewal terms provided for in Article XXII, unless this Lease is sooner terminated as hereinafter provided.

### ARTICLE II

2.  Definitions.  As used in this Lease, the following capitalized terms have the respective meanings set after them:

Additional Facilities:  One or more new buildings, or one or more additional structures annexed to any portion of the Leased Improvements, constructed on or adjacent to the Land during the Term.  No replacement or rebuilding of the Leased Improvements or any portion thereof shall be deemed an Additional Facility.

Additional Rent:  As defined in Article III.

Alterations:  As defined in Section 10.1.

Basic Rent:  As defined in Article III.

Basic Term:  Collectively, the Interim Term and the Fixed Term.

2.

or (c) any occupancy, operation, use or possession of, or sales from, or activity conducted on, or in connection with the Leased Property or any part thereof, or the acquisition or financing of the acquisition of the Leased Property. Nothing contained in this Lease shall be construed to require Lessee to pay any tax imposed on Lessor or Lessor's Assignees, if any, in the nature of a franchise tax for the privilege of doing business in the State of California, or any capital levy, value added, single business, estate, inheritance, succession, transfer or revenue tax of Lessor or Lessor's Assignees, if any, except to the extent, and only to the extent, that any such tax may be levied, assessed or imposed as a total or partial substitute for a tax upon the Leased Property, the Basic Rent, the Additional Rent or any part of any thereof which Lessee would otherwise have been required to pay.

Indenture: Any mortgage or deed of trust covering the Leased Property, as the same may be modified, amended or supplemented from time to time, which Lessor may execute as security for Lessor's Notes.

Insurance Requirements: All terms of any insurance policy covering or applicable to the Leased Property, all requirements of the issuer of any such policy, and all regulations and then current standards applicable to or affecting the Leased Property or any use or condition thereof, which may, at any time, be recommended by the National Fire Protection Association (or any other body exercising similar functions).

Interim Term; Land: Each as defined in Article I.

Lease Amendment: As defined in Section 11.2.

Leased Improvements; Leased Property: Each as defined in Article I.

Legal Requirements: All Federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions affecting either the Leased Property or the construction, use or alteration thereof, whether now or hereafter enacted and in force, including any which may (i) require repairs, modifications or altera-

4.

tions in or to the Leased Property or (ii) in any way
limit the use and enjoyment thereof, and all permits,
licenses and authorizations and regulations relating
thereto, the requirements of the REA, the Parking Agree-
ment and the Maintenance Agreement (insofar as any of the
same affect the Leased Property) and all covenants, agree-
ments, restrictions and incumbrances contained in any in-
struments, either of record or known to Lessee, at any time
in force affecting the Leased Property, not including,
however, the covenants contained in any Indenture, unless
otherwise specifically required pursuant to the terms of
this Lease.

Lending Institution: Any insurance company, commer-
cial or savings bank, national banking association,savings
and loan association, employees' welfare, pension or re-
tirement fund or system, corporate profit sharing or pen-
sion trust, college or university or real estate investment
trust having a Tangible Net Worth of at least $50,000,000.

Lessee's Equipment: As defined in Article VI.

Lessor's Assignees: Collectively, any assignees
designated in an assignment of Lessor's interest in this
Lease given as security for Lessor's Notes.

Lessor's Notes: Collectively, any secured promis-
sory notes of Lessor sold and delivered to finance part
or all of (a) the Cost of the Leased Property or (b)
the cost of any Additional Facilities, and any notes
issued in substitution or exchange therefor or in re-
placement thereof.

Maintenance Agreement: As defined in Article XVII.

Officer's Certificate: A certificate of Lessee or
Guarantor, as the case may be, signed by a vice presi-
dent or treasurer, or another officer authorized to so
sign by either the board of directors or by-laws of
Lessee or Guarantor, as the case may be, and in the
case of a certificate of Lessee, either joined in by,
or countersigned on behalf of, Guarantor by a vice
president or treasurer or another officer so authorized.

Other Consents: Collectively, (i) a consent and
agreement entered into or to be entered into among Lessor,

5.

Lessee and Guarantor, relating to the assignment and re-assignment of the Other Lease of the retail store property located in Redwood City, California, and (ii) two consents and agreements entered into or to be entered into among EGS of Alabama, K mart Enterprises of Alabama, Inc., and Guarantor, relating to the assignment and re-assignment of the Other Leases of the retail store properties located in Hoover, Alabama and Gardendale, Alabama, in each case as at the time supplemented or amended.

Other Leases: Collectively, (i) a lease entered into or to be entered into between Lessor and Lessee covering a retail store property located in Redwood City, California and (ii) two leases entered into or to be entered into between EGS of Alabama, as lessor, and K mart Enterprises of Alabama, Inc., as lessee, covering retail store properties located in Hoover, Alabama, and Gardendale, Alabama, respectively, in each case at the time as supplemented or amended.

Parking Agreement: As defined in Article XVII.

REA: A Construction, Operation and Reciprocal Easement Agreement, dated as of August 1, 1974, between Eltinge, Graziadio & Sampson Development Co. and A. D. Clark, Inc., as amended by a First Modification thereto, dated as of October 8, 1975, between the same parties and a Second Modification thereto, dated on or prior to December 31, 1977, among the same parties and Colonial Property Company, Albertson's, Inc., T. C. Associates, Temple City Holding Corporation and Vornado, Inc. affecting the land and adjoining the Land and comprising a shopping center of which the Leased Property is a part, which agreement provides, among other things, for joint use and maintenance of parking and common areas within said shopping center, at the time as supplemented or amended.

Rent: Collectively, the Basic Rent and Additional Rent.

Taking: A taking or voluntary conveyance during the Term hereof of all or part of the Leased Property, or any interest therein or right accruing thereto or use thereof, as the result of, or in lieu or in anticipation of, the exercise of the right of condemnation or eminent domain.

6.

Tangible Net Worth:  The aggregate amount of all assets of any person, partnership, corporation or other entity which may be properly classified as such, other than goodwill and such other assets as are properly classified as "intangible assets," less the aggregate indebtedness of such person, partnership, corporation or other entity, all as shown on its then most current balance sheet prepared in accordance with generally accepted accounting principles in effect as at the date thereof and on a fully consolidated basis.

Term:  Collectively, the Interim Term, the Fixed Term and any renewal term or terms provided for in Article XXII, or any of them as the context may require.

Unavoidable Delays:  Delays due to strikes, lock-outs, inability to procure materials, power failure, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other causes beyond the control of Lessee, provided that lack of funds shall not be deemed a cause beyond the control of Lessee.

Year:  A twelve (12) month period commencing on the Commencement Date or on an annual anniversary date thereof, as the case may be.

## ARTICLE III

3.1.  Basic Rent.  Lessee will pay to Lessor in lawful money of the United States of America which shall be legal tender for the payment of public and private debts at Lessor's address set forth above or at such other place or to such other persons, firms or corporations as Lessor from time to time may designate in writing, a net basic rental (the "Basic Rent"), in arrears during the Term, as follows:

(a)  during the Interim Term, an amount per month computed by multiplying the Cost of the Leased Property times .694358% (prorated for any portion of the Interim Term which is less than a full 30-day month) (assuming a five (5) day Interim Term, an amount equal to $4,091.74), payable on January 2, 1978,

7.

$35,700.00 rent
X .694358
÷ 25 yrs = $98,201.66
÷ 12 = 8183.47 ÷ 15/3°
4091.74

(b)  during the first three Years of the Fixed Term, the sum of $329,626.80 per annum, payable in equal, consecutive installments of $27,468.90 each, commencing on February 1, 1978 and monthly thereafter on the first day of each succeeding month of each such Year, through and including January 1, 1981,

(c)  during the fourth through seventh Years of the Fixed Term, the sum of $329,392.92 per annum payable in equal, consecutive installments of $27,449.41 each, commencing on February 1, 1981, and monthly thereafter on the first day of each succeeding month of each such Year through and including January 1, 1985,

(d)  during each remaining Year of the Fixed Term, the sum of $329,053.20 per annum payable in equal, consecutive installments of $27,421.10 each, commencing on February 1, 1985, and monthly thereafter on the first day of each succeeding month of each such Year, through and including January 1, 2003, and

(e)  during the renewal terms, if any, the sums provided in Article XXII hereof.

Lessee agrees to mail its checks in payment of the Basic Rent to Lessor, or as Lessor may direct, at least three (3) business days prior to the date each payment is due so that Lessor may, as nearly as possible, receive immediately available funds in Boston, Massachusetts on each such due date.  The Basic Rent shall be paid absolutely net to Lessor, so that this Lease shall yield to Lessor the full amount of the installments of Basic Rent throughout the Term.

3.2.  Additional Rent.  In addition to the Basic Rent, Lessee will also pay and discharge as additional rent (collectively, the "Additional Rent") (i) all sums required to be paid by Lessor or Lessee pursuant to any provisions of the REA, the Maintenance Agreement or the Parking Agreement and (ii) all other amounts, liabilities, obligations and Impositions which Lessee assumes or agrees to pay under this Lease, and in the event of any failure on the part of Lessee to pay any of the foregoing, Lessor shall have all legal, equitable and contractual rights, powers and remedies

8.

provided either in this Lease or by statute or otherwise as
in the case of non-payment of the Basic Rent.  If any in-
stallment of Basic Rent shall not be paid within five
(5) days after its due date, Lessee will pay Lessor on
demand, as Additional Rent, a late charge (to the extent
permitted by law) computed at the rate of 9.375% per annum
(or at the maximum rate permitted by law, whichever is
the lesser) on the amount of such installment, from the
due date of such installment to the date of payment thereof.

ARTICLE IV

4.1.  Payment of Impositions; Utility Charges and
Insurance Premiums.  Subject to Article XIII relating
to contests, Lessee will pay, or cause to be paid, all
Impositions before any fine or penalty, interest or cost
may be added for non-payment, such payments to be made
directly to the taxing authorities where feasible, and
will promptly, upon request in each instance, furnish
to Lessor and Lessor's Assignees, if any, copies of
official receipts or other satisfactory proof evidencing
such payments.  If any Imposition may, at the option
of the taxpayer, lawfully be paid in installments (whether
or not interest shall accrue on the unpaid balance of
such Imposition), Lessee may exercise the option to pay
the same (and any accrued interest on the unpaid balance
of such Imposition) in installments and in such event,
shall pay such installments during the Term hereof as
the same respectively become due and before any fine,
penalty, further interest or cost may be added thereto.
Lessee, at its expense, shall prepare and file all tax
returns and reports in respect of any Imposition as may
be required by governmental authorities.  If any refund
shall be due from any taxing authority in respect of any
Imposition paid by Lessee, the same shall be retained by
Lessee if no Event of Default shall have occurred hereunder.

4.2.  Notice of Impositions.  Lessor shall give prompt
notice to Lessee of all Impositions payable by Lessee here-
under of which Lessor at any time has knowledge, but Les-

9.

sor's failure to give any such notice shall in no way
diminish Lessee's obligations hereunder.  Lessor shall use
its best efforts to obtain the cooperation, at the expense
of Lessee, of all taxing authorities to send all bills and
notices in respect of the Leased Property directly to Lessee.

     4.3.   Adjustment of Impositions.  Impositions im-
posed in respect of the tax-fiscal period during which
the Term terminates shall be adjusted and prorated be-
tween Lessor and Lessee, whether or not such Imposition
is imposed before or after such termination, and Lessee's
obligation to pay its prorated share thereof shall sur-
vive such termination.

     4.4.   Utility Charges.  Lessee will pay or cause
to be paid all charges for electricity, power, gas,
water, sanitation services and other utilities used in
the Leased Property.

     4.5.   Insurance Premiums.  Lessee will pay or cause
to be paid all premiums for the insurance coverage re-
quired to be maintained pursuant to Article XIV.


                        ARTICLE V


     5.   No Termination, Abatement, etc.  Except as
otherwise specifically provided herein, Lessee shall
remain bound by this Lease in accordance with its terms
and shall neither take any action to modify, surrender
or terminate the same, nor seek nor be entitled to any
abatement, deduction, deferment or reduction of Rent,
or set-off against the Rent, nor shall the respective
obligations of Lessor and Lessee be otherwise affected
by reason of (a) any damage to, or destruction of, the
Leased Property or any portion thereof from whatever
cause or any Taking of the Leased Property or any por-
tion thereof, (b) the lawful or unlawful prohibition
of, or restriction upon, Lessee's use of the Leased
Property or any portion thereof, the interference with
such use by any person, corporation or other entity,
or by reason of any eviction by paramount title, or
Lessee's acquisition of ownership of the Leased Prop-


                          10.

erty otherwise than pursuant to an express provision of this Lease, (c) any claim which Lessee has or might have against Lessor or against any of Lessor's Assignees, if any, or by reason of any default or breach of any warranty by Lessor under this Lease or any other agreement between Lessor and Lessee, or to which Lessor and Lessee are parties, (d) any bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding up or other proceedings affecting Lessor or any assignee of Lessor, or any action with respect to this Lease that may be taken by a trustee or receiver of Lessor or any assignee of Lessor or by any court in any such proceeding, (e) the cancellation or termination of the REA for any cause whatsoever, or (f) the cancellation or termination of the Parking Agreement for any cause whatsoever, or (g) for any other cause whether similar or dissimilar to any of the foregoing. Lessee hereby specifically waives all rights, arising from any occurrence whatsoever, which may now or hereafter be conferred upon it by law to (i) modify, surrender or terminate this Lease or quit or surrender the Leased Property or any portion thereof, or (ii) entitle Lessee to any abatement, reduction, suspension or deferment of the Rent or other sums payable by Lessee hereunder, except as otherwise specifically provided in this Lease. The obligations of Lessor and Lessee hereunder shall be separate and independent covenants and agreements and the net Basic Rent and Additional Rent and all other sums payable by Lessee hereunder shall continue to be payable in all events unless the obligations to pay the same shall be terminated pursuant to the express provisions of this Lease. Lessee shall have the right, however, by separate and independent action to pursue any claims it may have against Lessor or any of Lessor's Assignees, if any.

## ARTICLE VI

6.1. _Ownership of Leased Property_. Lessee acknowledges that the Leased Property is the property

11.

of Lessor and that Lessee has only the right to the possession and use thereof upon the terms and conditions of this Lease.

6.2.  Lessee's Equipment.  Lessee may, at its expense, install or assemble or place on the Land or in the Leased Improvements, and remove and substitute, any items of machinery, equipment, furnishings or trade fixtures or other personal property used or useful in Lessee's business including without limitation cash registers, scales, safes, office equipment, furniture, restaurant, snack bar and kitchen equipment, trash compactors and incinerators, counters, racks, bins, cabinets, shelving, conveyors, shopping carts, signs and automotive center hoists, machinery and equipment (collectively, "Lessee's Equipment"), and Lessee shall remove the same upon the expiration or prior termination of the Term; provided, however, that Lessee shall have no right to remove any such item which constitutes a Fixture.  All Lessee's Equipment shall be and remain the property of Lessee, provided that any of Lessee's Equipment not removed by Lessee within 15 days after the expiration or earlier termination of this Lease shall be considered abandoned by Lessee and may be appropriated, sold, destroyed or otherwise disposed of by Lessor without first giving notice thereof to Lessee and without obligation to account therefor.  Lessee shall have the right during such 15-day period to enter upon the Leased Property and remove all or any part of Lessee's Equipment. Lessee will pay (i) rental in advance for such 15-day period prorated on the basis of the Rent payable during the immediately preceding term and (ii) all costs and expenses incurred in removing, storing and disposing of Lessee's Equipment.  Lessee will repair, at its expense, all damage to the Leased Property caused by the removal of Lessee's Equipment, whether effected by Lessee or Lessor.  Lessor shall not be responsible for any loss or damage to Lessee's Equipment.


ARTICLE VII


7.1.  Condition of the Leased Property.  Lessee acknowledges receipt and delivery of possession of the

12.

Leased Property and that Lessee has examined title to,
and the condition of, the Leased Property prior to the
execution and delivery of this Lease and has found the
same to be satisfactory for all purposes hereunder.
Lessee is renting the Leased Property "as is" in its
present condition and state of repair.  LESSOR MAKES
NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE CON-
DITION OF THE LEASED PROPERTY OR ITS FITNESS OR AVAIL-
ABILITY FOR ANY PARTICULAR USE AND LESSOR SHALL NOT BE
LIABLE FOR ANY LATENT OR PATENT DEFECT THEREIN.

　　　　7.2.  Use of the Leased Property.  Lessee may use
the Leased Property for a full-line department store
with office space and related facilities or for any
other lawful purpose.  Lessee agrees that it will not
permit any unlawful occupation, business or trade to
be conducted on the Leased Property or any use to be
made thereof contrary to any Legal Requirements or In-
surance Requirements applicable thereto.  Lessee shall
not use or occupy or permit the Leased Property to be
used or occupied, nor do or permit anything to be done
in or on the Leased Property or any part thereof, in
a manner that may make it impossible to obtain fire or
other insurance thereon which Lessee is, or may be,
required to furnish hereunder, or that will cause or
be likely to cause structural injury to any of the
Leased Improvements, or that will constitute a public
or private nuisance or waste.  Except as provided in
Article XI, nothing in this Lease contained and no
action or inaction by Lessor shall be deemed or con-
strued to mean that Lessor has granted to Lessee any
right, power or permission to do any act or to make
any agreement that may create or be the foundation
for any right, title, interest, lien, claim or other
incumbrance upon the estate of Lessor in the Leased
Property.


ARTICLE VIII


　　　　8.  Compliance with Legal and Insurance Require-
ments, Instruments, etc.  Subject to Article XIII re-
lating to contests, Lessee, at its expense, will promptly
(a) comply with all Legal Requirements and Insurance

13.

Requirements in respect of the use, operation, maintenance, repair and restoration of the Leased Property, whether or not compliance therewith shall require structural changes in any of the Leased Improvements or interfere with the use and enjoyment of the Leased Property and (b) procure, maintain and comply with all licenses and other authorizations required for any use of the Leased Property then being made, and for the proper erection, installation, operation and maintenance of the Leased Improvements or any part thereof.

## ARTICLE IX

9.1.  _Maintenance and Repair_.  (a) Lessee, at its expense, will keep the Leased Property and all private roadways, sidewalks and curbs appurtenant thereto in good order and repair (ordinary wear and tear excepted), and subject to the provisions of subsection 15.3(b), with reasonable promptness, make all necessary and appropriate repairs thereto of every kind and nature, whether interior or exterior, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen.  All repairs shall, to the extent possible, be at least equivalent in quality to the original work.  Lessee will not take or omit to take any action the taking or omission of which might materially impair the value or the usefulness of the Leased Property or any part thereof or commit any waste of the Leased Property or any part thereof.

(b)  Lessor shall not under any circumstances be required to build any improvements on the Leased Property, or to make any repairs, replacements, alterations or renewals of any nature or description to the Leased Property, whether ordinary or extraordinary, structural or non-structural, foreseen or unforeseen, or to make any expenditure whatsoever in connection with this Lease, except as provided in Article XI, or to maintain the Leased Property in any way.  Lessee hereby waives the right to make repairs at the expense of Lessor pursuant to any law in effect at the time of the execution of this Lease or hereafter enacted.

(c)  Nothing contained in this Lease and no action or inaction by Lessor shall be construed as (i)

14.

constituting the consent or request of Lessor, expressed
or implied, to any contractor, subcontractor, laborer,
materialman or vendor to or for the performance of any
labor or services or the furnishing of any materials
or other property for the construction, alteration,
addition, repair or demolition of or to the Leased
Property or any part thereof, or (ii) giving Lessee
any right, power or permission to contract for or per-
mit the performance of any labor or services or the
furnishing of any materials or other property in such
fashion as would permit the making of any claim against
Lessor in respect thereof or to make any agreement that
may create, or in any way be the basis for, any right,
title, interest, lien, claim or other incumbrance upon
the estate of Lessor in the Leased Property.

(d)   Unless Lessor shall convey the Leased Property
to Lessee pursuant to the provisions of this Lease, upon
the expiration or prior termination of the Term, Lessee
will vacate and surrender the Leased Property to Lessor
in good repair, ordinary wear and tear excepted.

9.2.   Encroachments, Restrictions, etc.   If any
of the Leased Improvements shall, at any time, encroach
upon any property, street or right-of-way adjacent to
the Leased Property, or shall violate the agreements
or conditions contained in any restrictive covenant or
other agreement affecting the Leased Property, or any
part thereof, or shall impair the rights of others under
any easement or right-of-way to which the Leased Prop-
erty is subject, then promptly upon the request of Lessor
or at the behest of any person affected by any such
encroachment, violation or impairment, Lessee shall,
at its expense, subject to its rights to contest the
existence of any encroachment, and in such case, in the
event of an adverse final determination, either (i)
obtain valid and effective waivers or settlements of all
claims, liabilities and damages resulting from each such
encroachment, violation or impairment, whether the same
shall affect Lessor or Lessee or (ii) make such changes
in the Leased Improvements and take such other actions as
shall be necessary to remove such encroachment and to end
such violation or impairment, including, if necessary,
the alteration of any of the Leased Improvements.   Any
such alteration shall be made in conformity with the
requirements of Section 10.1.

15.

<u>ARTICLE X</u>

10.1.  <u>Alterations, Substitutions and Replacements</u>.
Lessee, at its expense, may at any time and from time
to time make alterations of the Leased Improvements or
any part thereof and substitutions and replacements for
the same (collectively, "Alterations"), provided that
(a) the market value of the Leased Property shall not
be reduced or its usefulness impaired, (b) the work shall
be done expeditiously and in a good and workmanlike manner,
(c) Lessee shall comply with all Legal Requirements and
Insurance Requirements, if any, applicable to the work,
and (d) Lessee shall promptly pay all costs and expenses
and discharge any and all liens arising in respect of
the work.  All Alterations shall immediately become and
remain the property of Lessor, shall be deemed part of
the Leased Property, and shall be subject to all of the
terms and provisions of this Lease.  Provided Lessee
is not then in default under this Lease, upon the expira-
tion or earlier termination of the Term hereof, Lessee
shall have no obligation to restore the Leased Improve-
ments to their condition existing prior to the making
of Alterations permitted by this Section 10.1.

10.2.  <u>Salvage</u>.  All materials which are scrapped
or removed in connection with the making of either Al-
terations permitted by Section 10.1 or repairs required
by Article IX may be dealt with by Lessee as its own
property and Lessee shall be entitled to all salvage
resulting therefrom.

10.3.  <u>Construction of Additional Facilities</u>.
Subject to the requirements of subsections 10.1(a), (b),
(c) and (d), Lessee, at its expense, may at any time
hereafter construct Additional Facilities.  Until the
expiration or earlier termination of this Lease or until
the cost of such Additional Facilities is financed by
Lessor pursuant to Article XI, title to any Additional
Facilities shall remain solely in Lessee and Lessee
alone shall be entitled to deduct all depreciation on
Lessee's income tax returns with respect to such Addi-
tional Facilities.  In case the estimated cost of such
Additional Facilities exceeds $100,000 the same must

16.

be constructed under the supervision of a qualified
architect or engineer, and prior to the commencement
of any work thereon, if the estimated or actual cost
thereof exceeds $250,000, notice of the amount of such
estimated or actual cost shall be given to Lessor in
writing after receipt of such estimate or incurrence of
said cost.

## ARTICLE XI

11.1.  <u>Reimbursement of Additional Facility Cost</u>.
If no Event of Default shall have occurred which has not
been waived, Lessee, at any time and from time to time
during the remainder of the Fixed Term, may request
Lessor (a "Request") to provide funds, in amounts not
less than Two Hundred Fifty Thousand ($250,000) Dollars
for each Request, to pay for the cost of Additional
Facilities constructed during the two-year period imme-
diately preceding the date of any such Request and not
reimbursed pursuant to this Article.  Such cost (the
"Additional Facility Cost"), for all purposes of this
Lease, may include (a) the cost of construction of the
Additional Facilities, including site preparation and
improvement, materials, labor, supervision, design,
engineering and architectural services, the cost of
any Fixtures, the cost of construction financing and
miscellaneous costs approved by Lessor, (b) the cost of
any land contiguous to the Leased Property purchased for
the purpose of placing thereon the Additional Facilities
or any portion thereof or for providing means of access
thereto, or parking facilities therefor, including the
cost of surveying the same, (c) the cost of insurance,
real estate taxes, water and sewer charges and other
carrying charges for such Additional Facilities during
construction, (d) cost of title insurance, (e) fees
and expenses of counsel, (f) filing, registration and
recording taxes and fees, (g) documentary stamp taxes,
if any, and (h) the amounts payable by Lessee to Lessor
pursuant to Section 11.7.  In no event shall the por-
tion of the Additional Facility Cost comprised of land,
if any, materials, labor charges and Fixtures be less
than 85% of the total amount of such cost.

17.

11.2.  Each Request shall be accompanied by an
Officer's Certificate setting forth (a) a description
of the Additional Facilities, (b) in reasonable detail,
the Additional Facility Cost, and (c) the willingness
of Lessee to amend this Lease upon reimbursement of
the Additional Facility Cost by executing and deliver-
ing an amendment (the "Lease Amendment") to this Lease,
with the consent of the Guarantor to the terms and pro-
visions thereof appended thereto, to provide for (i)
payment of additional annual basic rent ("Additional
Basic Rent") during the balance of the Fixed Term in
an amount which will fully amortize the Additional
Facility Cost over such period, together with interest
thereon as hereinafter provided, (ii) payment of addi-
tional annual Basic Rent for the renewal terms in an
amount computed as set forth in Article XXII, and (iii)
such other matters as may be necessary or appropriate.

11.3.  Lessor shall use its best efforts to obtain
the necessary funds from Lessor's Assignees, if any,
to meet the Request.  Within 90 days after receipt of
the Request, Lessor shall advise Lessee whether or not
Lessor is prepared to reimburse the Additional Facility
Cost and, if so, the interest rate on which the Addi-
tional Basic Rent would be based.

(a)  If such advice is in the negative or
if Lessor does not respond to the Request, the
Request shall be deemed denied.  In such event,
Lessee shall have the option to obtain a commit-
ment from a Lending Institution of its selection
("Lessee's Lender") to finance the Additional
Facility Cost for Lessor at an interest rate
acceptable to Lessee, provided, however, that all
of the other terms thereof shall not unreasonably
prejudice the rights and security of Lessor and
Lessor's Assignees, if any.

(b)  If Lessor's advice is in the affirmative,
Lessee shall notify Lessor within thirty (30) days
after receipt thereof whether or not Lessee is
prepared to accept reimbursement at the rate pro-
posed by Lessor.  If not, Lessee shall have an
additional period of sixty (60) days to obtain a

18.

commitment from Lessee's Lender to finance the
Additional Facility Cost at a lower interest rate
than that offered by Lessor and on terms (includ-
ing, but not limited to, rights of prepayment and
premiums payable in connection therewith) no more
onerous than those available to Lessor nor in any
way, in the opinion of counsel to Lessor's Assignee's,
be structured so as to prejudice the rights and security
of Lessor's Assignees, if any.  Any such commitment
shall be deemed satisfactory for the purposes of this
Section and Section 11.4.  If such a commitment is not
obtained, the Request shall be deemed withdrawn.  If the
Request is not denied, but Lessee obtains a satisfactory
commitment at a lower interest rate than that offered
by Lessor, Lessor shall have a period of thirty (30)
days within which to revise its offer by matching the
rate proposed by Lessee's Lender.

Any commitment obtained from Lessee's Lender shall
provide for repayment of the loan on a level debt service
basis on the Basic Rent payment dates occurring through-
out the balance of the Fixed Term.  Such commitment
shall be addressed to both Lessor and Lessee and a signed
counterpart thereof shall be delivered to Lessor promptly
upon receipt of the same by Lessee.

11.4.  If either (i) Lessee is prepared to accept
reimbursement at the interest rate offered by Lessor
or (ii) Lessor has agreed to match the interest rate
proposed by Lessee's Lender, Lessee shall accept reim-
bursement of Additional Facility Cost from Lessor.  If,
however, a satisfactory commitment has been obtained
from Lessee's Lender pursuant to Section 11.3 and either
(A) Lessor has agreed to match the proposed interest
rate but is not prepared to finance the Additional Facil-
ity Cost in full, Lessee shall accept reimbursement of
the Additional Facility Cost from Lessor and Lessee's
Lender (with priority of amounts to be given to Lessor)
or (B) either (1) the Request has been denied or (2)
Lessor has not agreed to match the proposed interest
rate, Lessor shall proceed promptly to arrange for
financing of the Additional Facility Cost with Lessee's
Lender on the terms set forth in its commitment.  If
no such commitment has been obtained and the Request
has been denied or withdrawn, this Lease shall continue
in full force and effect without modification.

19.

11.5.    If the Request can be met by Lessor pur-
suant to Section 11.3 or jointly through Lessor and Les-
see's Lender as provided for in clause (A) of the second
sentence of Section 11.4, Lessor shall expeditiously re-
imburse Lessee, or cause Lessee to be reimbursed, for
the Additional Facility Cost, upon delivery by Lessee
to Lessor, Lessor's Assignees, if any, and Lessee's
Lender, if any, of the following:

(a)    an Officer's Certificate, accompanied
by a certificate of the supervising architect as
to the matters specified in clauses (i) (except as
to Legal Requirements and Insurance Requirements)
and (iii) below, confirming the Additional Facility
Cost specified in the Request and certifying that
(i) the Additional Facilities have been (A) con-
structed in compliance with all applicable Legal
Requirements and Insurance Requirements and all
bills for labor and materials in connection with
the construction thereof have been paid in full
except for amounts specified therein, if any, as
to which arrangements have been made for prompt
payment after receipt of funds from Lessor and
prior to the expiration of any retainage period
provided for in the applicable contract and (B)
completed in accordance with plans and specifica-
tions prepared for, and approved by, Lessee in a
good and workmanlike manner, in conformity with
good construction and engineering practice; (ii)
the Additional Facilities have been accepted by
Lessee for all purposes of this Lease and there
has been no material damage to the Additional
Facilities nor is any condemnation or eminent
domain proceeding pending with respect thereto;
(iii) all permits, licenses and certificates (in-
cluding permanent, unconditional certificates of
occupancy) which are necessary to permit the use
of the Additional Facilities in accordance with
the provisions of this Lease have been obtained
and are in full force and effect; (iv) under appli-
cable zoning and use laws, ordinances, rules and
regulations the Additional Facilities may be used
for the purposes contemplated by Lessee and all
necessary subdivision approvals have been obtained;

20.

(v) there are no unsatisfied mechanics' or material-
men's liens outstanding or threatened to the knowl-
edge of Lessee against the Leased Property, Addi-
tional Facilities or the land referred to in clause
(b) of Section 11.1, if any, arising out of or in
connection with such construction, other than those
being contested by Lessee pursuant to Article XIII;
(vi) any mechanics' or materialmen's liens being
contested by Lessee will be promptly paid by Lessee
if such contest is resolved in favor of the me-
chanic or materialman together with any attorneys'
fees and expenses for which Lessee is liable; (vii)
construction of such Additional Facilities has not
impaired the value of the Leased Property; (viii)
there exists no Default hereunder, and no defense,
offset or claim exists with respect to any sums to
be paid by Lessee hereunder, and (ix) any exceptions
to Lessor's title to the land referred to in clause
(b) of Section 11.1, if any, do not materially
interfere with the intended use of the Additional
Facilities by Lessee;

(b)   the Lease Amendment duly executed, ac-
knowledged and delivered by Lessee, in form and
substance satisfactory to Lessor, amending this
Lease to (i) provide for the Additional Basic Rent
and additional Basic Rent referred to in clause
(ii) of Section 11.2, (ii) increase the Cost of
the Leased Property by the amount of the Additional
Facility Cost, (iii) amend the definition of Dis-
counted Payment to reflect the Additional Basic Rent
and the interest rate used in the computation
thereof, (iv) add to the description of the Land any
land purchased for the purpose of constructing the
Additional Facilities thereon, as referred to in
clause (b) of Section 11.1 and (v) make such other
changes herein as may be necessary or appropriate
under the circumstances;

(c)   a deed conveying title to Lessor to any
land acquired for the purpose of the Additional
Facilities, as referred to in clause (b) of Section
11.1, free and clear of any liens or incumbrances
except those approved by Lessor, accompanied by a
final as-built survey thereof satisfactory to Lessor;

21.

(d)  endorsements to the outstanding policies
of title insurance covering the Leased Property
satisfactory in form and substance to Lessor and
any Lending Institution advancing the Additional
Facility Cost and its counsel (i) updating the
same without any additional exception except as
may be permitted by such counsel, (ii) increas-
ing the coverage thereof by an amount equal to the
Additional Facility Cost, and (iii) if appropri-
ate, amending any loan policy to add Lessee's Lender
as a named insured, as its interest may appear;

(e)  if appropriate, a loan policy of title
insurance insuring any Indenture as a first lien
of record and any land conveyed to Lessor pursuant
to subparagraph (c) free and clear of all liens
and incumbrances except those approved by Lessor;

(f)  an amendment to the Guaranty expanding
Guarantor's liability thereunder to cover Lessee's
obligations under the Lease Amendment; and

(g)  such other certificates (including, but
not limited to, endorsements increasing the in-
surance coverage, if any, at the time required
by Section 14.1), documents, opinions of counsel,
surveys, certified copies of duly adopted resolu-
tions of the Board of Directors of (i) Lessee
authorizing the execution and delivery of the Lease
Amendment and the amendment to the Guaranty and (ii)
Guarantor authorizing the execution and delivery of
its consent to the Lease Amendment, and any other
instruments as may be reasonably required by Lessor
and any Lending Institution advancing the Additional
Facility Cost.

11.6.  (a)  If the Request can be met solely through
Lessee's Lender as provided for in clause (B) of the
second sentence of Section 11.4 and the Additional Facili-
ties constructed on the Land are freestanding structures
not contiguous to the Leased Improvements, Lessee, if no
Event of Default shall have occurred, may, upon prior
written notice to Lessor purchase the portion of the
Land, if any, upon which the Additional Facilities have

22.

been constructed on the first Basic Rent payment date
(the "Special Purchase Date") occurring not less than
one hundred twenty (120) days after the date of such
offer, for a purchase price determined by multiplying the
size of that portion of the Land to be purchased, ex-
pressed in square feet, times the value per square foot
of the Land to be purchased as determined by a qualified
real estate appraiser acceptable to Lessor and Lessee;
provided, however, that the purchase price shall not be
less than an amount determined by multiplying a
fraction, the numerator of which shall be the size of
that portion of the Land to be purchased, expressed in
square feet, and the denominator of which shall be the
size of the Land, also expressed in square feet, times
$989,062; provided, however, the right of purchase
hereunder shall be operative only in the event Lessor
fails to respond to Lessee's Request or fails promptly
to proceed to arrange for financing of the Additional
Facility Cost with Lessee's Lender on the terms set forth
in its committment referred to in Section 11.4(b).

(b)    Lessor shall, upon receipt from Lessee of (i)
the purchase price provided for above and any Rent due
and payable under this Lease (including the installment
of Basic Rent due on the Special Purchase Date), (ii)
an Officer's Certificate stating that (1) the portion
of the Land to be conveyed is not necessary to the effi-
cient and economic operation of the Leased Property
for the then current use thereof, and (2) all subdivi-
sion approvals, zoning variances and other approvals
(including approval of sewage and other waste disposal
facilities) necessary to permit the conveyance have been
obtained and are in full force and effect, together with
an opinion of counsel for Lessee to the effect set forth
in clause (2) hereof, (iii) a certified survey, contain-
ing the metes and bounds description of the portion of
the Land to be conveyed and the portion of the Land
remaining subject to this Lease, (iv) agreements, in
form and substance satisfactory to Lessor modifying this
Lease, any assignment hereof, and any Indenture, as may
be necessary or advisable to reflect the conveyance of
the portion of the Land, and (v) such other certificates,

23.

documents, opinions of counsel, resolutions, and other
instruments (including reciprocal easement and operating
agreements) as may be reasonably required by Lessor
in connection with such conveyance, convey the particular
portion of the Land to Lessee on the Special Purchase
Date in accordance with the provisions of Article XXI,
and, as to such portion of the Land, this Lease shall
thereupon terminate.  Upon any such purchase, the amount
of the purchase price paid in connection therewith shall
be applied to the payment of installments of Basic Rent,
payable during the remainder of the Fixed Term in the
inverse order of their due dates.

    11.7.  Upon making a Request to finance the
Additional Facilities, whether or not such financing
is actually consummated, Lessee shall pay or cause to
be paid all reasonable costs and expenses of Lessor
and any Lending Institution which has committed to fi-
nance the Additional Facility Cost paid or incurred
by them in connection with the financing of the Addi-
tional Facilities, including, but not limited to, (i)
the fees and expenses of their respective counsel, (ii)
all printing expenses, (iii) the amount of any fil-
ing, registration and recording taxes and fees, (iv)
documentary stamp taxes, if any, and (v) title insurance
charges.

## ARTICLE XII

    12.  Liens.  Subject to Article XIII relating to
contests, Lessee will not directly or indirectly create
or allow to remain and will promptly discharge at its ex-
pense any mortgage, lien, incumbrance, attachment, title
retention agreement or claim upon the Leased Property
or any attachment, levy, claim or incumbrance in re-
spect of the Basic Rent or Additional Rent provided
under this Lease, not including, however, (a) this
Lease, (b) any Indenture, (c) the REA, the Maintenance
Agreement and the Parking Agreement, (d) such of the
matters, if any, set forth in Schedule A as shall at

24.

the time be in effect and applicable to the Leased Prop-
erty, (e) restrictions, liens and other incumbrances which
are consented to in writing by Lessor, or any easements
which (1) do not unduly interfere with the use of the
Leased Property or (2) materially impair the value
thereof, provided that Lessee shall first have delivered
an Officer's Certificate to Lessor and Lessor's Assignee,
if any, certifying as to the matters set forth in clauses
(1) and (2), (f) liens for those taxes of Lessor which
Lessee is not required to pay hereunder, (g) subleases
permitted by Article XXVI, (h) liens for Impositions or
for sums resulting from non-compliance with Legal Re-
quirements so long as (1) the same are not yet payable
or are payable without the addition of any fine or
penalty or (2) such liens are in the process of being
contested as permitted by Article XIII, (i) purchase
money second mortgages placed on the Property by Lessor
without the consent of Lessee, and (j) liens of mechanics,
laborers, materialmen, suppliers or vendors for sums
either disputed or not yet due, provided that (1) the
payment of such sums shall not be postponed under any
related contract for more than sixty (60) days after the
completion of the action giving rise to such lien and such
reserve or other appropriate provisions as shall be
required by law or sound accounting principles shall have
been made therefor or (2) any such liens are in the
process of being contested as permitted by Article XIII.


                          ARTICLE XIII


     13.  Permitted Contests.  Lessee, at its expense,
may contest, by appropriate legal proceedings conducted
in good faith and with due diligence, the amount or
validity or application, in whole or in part, of any
Imposition or any Legal Requirement or Insurance Re-
quirement or any lien, incumbrance, charge or claim
not permitted by Article XII, provided that (a) in
the case of an unpaid Imposition, lien, incumbrance,
charge or claim, the commencement and continuation of
such proceedings shall suspend the collection thereof
from Lessor and from the Leased Property, (b) neither
the Leased Property nor any rent therefrom nor any part
thereof or interest therein would be in any immediate


                             25.

danger of being sold, forfeited, attached or lost, (c)
in the case of a Legal Requirement, Lessor would not
be in any immediate danger of civil or criminal lia-
bility for failure to comply therewith pending the out-
come of such proceedings, (d) Lessee shall deliver to
Lessor, Lessor's Assignees, if any, and their respec-
tive counsel an opinion of Lessee's counsel to the
effect set forth in clauses (a), (b) and (c), to the
extent applicable, (e) in the case of an Imposition,
lien, incumbrance or charge, Lessee shall have set
aside on its books such reserves with respect thereto
as may be required by sound accounting principles or
shall have furnished such security, if any, as may
be required in the proceedings, (f) in the case of
an Insurance Requirement, the coverage required by
Article XIV, if any, shall be maintained, and (g)
if such contest be finally resolved against Lessee,
Lessee shall promptly pay the amount required to be
paid, together with all interest and penalties accrued
thereon, or comply with the applicable Legal Require-
ment or Insurance Requirement.  Lessor, at Lessee's
expense, shall execute and deliver to Lessee such au-
thorizations and other documents as may reasonably be
required in any such contest, and, if reasonably
requested by Lessee, Lessor shall join as a party therein.
Lessee shall indemnify and save Lessor harmless against
any cost or expense of any kind that may be imposed upon
Lessor in connection with any such contest and and loss
resulting therefrom.


ARTICLE XIV


    14.1.  Insurance.  So long as (1) this Lease remains
in effect and (2) the Tangible Net Worth of Guarantor is
in excess of One Hundred Million ($100,000,000) Dollars,
Lessee may self-insure (pursuant to a prudent program of
self-insurance) against the risks hereinafter described
and shall not be required to maintain insurance hereunder.
If the Tangible Net Worth of Guarantor falls below the
above amount, Lessee agrees to maintain, at all times
and at its expense, insurance covering the Leased Prop-
erty, without deductible provisions, as follows:  (a)
fire, with extended coverage, vandalism and malicious


26.

mischief endorsements (commonly known as "all risk"
coverage) in each case in an amount not less than the
full insurable value (actual replacement cost less the
costs of land excavation, foundations and footings)
of the Leased Property; (b) comprehensive liability
insurance in the amount of (i) at least $500,000 with
respect to bodily injury or death to any one person,
(ii) at least $1,000,000 with respect to bodily injury
or death arising out of any one accident and (iii) at
least $500,000 with respect to property damage arising
out of any one occurrence, (c) adequate explosion in-
surance in respect of steam or pressure boilers and
similar apparatus, if any, located on the Leased Prop-
erty, (d) workmen's compensation insurance subject to
statutory limits or better in respect of any work or
other operations on or about the Leased Property, (e)
war risk insurance as and when such insurance is ob-
tainable from the United States Government or any agency
or instrumentality thereof, and a state of war or national
or public emergency exists or threatens, in an amount
not less than the full insurable value (as defined in
clause (a) above) of the Leased Property, (f) flood
insurance in an amount equal to the full insurable value
(as defined in clause (a) above) of the Leased Property
or the maximum amount available, whichever is less, if
the area in which the Leased Property is located has
been designated by the Secretary of Housing and Urban
Development as having special flood hazards, and if
flood insurance is available under the National Flood
Insurance Act, and (g) such other insurance with re-
spect to the Leased Property and in such amounts as
Lessor from time to time may reasonably request against
such other insurable hazards which at the time are
commonly insured against in respect of property similar
to the Leased Property.  Lessee may effect all coverage
required herein under its blanket insurance policies,
if available thereunder, and all such policies shall
be written by companies presently or hereafter insuring
the properties of Lessee; provided, however, that (i)
any such policy of blanket insurance either shall specify
therein, or Lessee shall furnish Lessor a written state-
ment from the insurer under such policy so specifying,
the amount of the total insurance allocated to the Leased
Property, which amount shall not be less than the amount

27.

required pursuant to this Article XIV, (ii) any policy
of blanket insurance hereunder shall comply in all re-
spects with the other provisions of this Article XIV
and (iii) the protection afforded Lessor, the Lessor's
Assignees, if any, and Lessee under any such policy of
blanket insurance shall be no less than that which would
have been afforded under a separate policy or policies
relating only to the Leased Property.  Such insurance
shall be written by companies of superior financial
standing which are authorized to do insurance business
in the State of California.

14.2.  Policy Provisions and Certificates.  The
insurance maintained by Lessee under clauses (a), (b),
(c), (e) and (f) of Section 14.1 shall name Lessor and
Lessee, as insureds, as their respective interests
may appear, and shall bear a standard non-contributory
first mortgagee endorsement in favor of Lessor's Assignees,
if any.  The insurance maintained by Lessee under clauses
(a), (b), (c), (e) and (f) of Section 14.1 shall provide
that all property losses insured against shall be adjusted
by Lessee (subject to Lessor's approval of final settlement
of estimated losses of Two Hundred Thousand ($200,000)
Dollars or more) and that the proceeds thereof shall
be paid to Lessor, to be applied in the manner hereinafter
set forth in Sections 15.1 and 15.3.  All insurance main-
tained by Lessee shall provide that (a) no cancellation
or reduction thereof shall be effective until at least
ten (10) days after receipt by Lessor and Lessor's As-
signees, if any, of written notice thereof, and (b) all
losses shall be payable notwithstanding any act or negli-
gence of Lessor, Lessor's Assignees, if any, or Lessee
or their respective agents or employees which might,
absent such agreement, result in a forfeiture of all
or part of such insurance payment and notwithstanding
(i) the occupation or use of the Leased Property for
purposes more hazardous than permitted by the terms of
such policy, (ii) any foreclosure or other action or
proceeding taken pursuant to any provision of any Inden-
ture upon the happening of an event of default there-
under or (iii) any change in title or ownership of the
Leased Property or any part thereof and (c) if obtain-
able, a statement that the insurance shall not be in-
validated should any insured waive in writing prior to

28.

a loss any or all right of recovery against any party for such loss.  Lessee will, on the date hereof, furnish to Lessor and Lessor's Assignees, if any, certificates for the insurance required by Section 14.1, and not less than ten (10) days before the expiration of any such insurance, certificates evidencing the replacement or renewal thereof, together with written evidence that the premium therefor has been paid.

14.3.  Other Insurance.  Lessee shall not take out separate insurance concurrent in form or contributing in the event of loss with that required by this Article XIV to be furnished by Lessee unless Lessor and Lessor's Assignees, if any, are included therein as named insureds, with loss payable as in this Article provided.  Lessee shall immediately notify Lessor and Lessor's Assignees, if any, whenever any such separate insurance is taken out and shall deliver the policy or policies or duplicates thereof, or certificates evidencing the same as provided in this Article.

ARTICLE XV

15.1.  Notice of Damage, Destruction or Taking; Condemnation Awards.  In case of any material damage to or destruction of the Leased Property or any part thereof, or in case of any Taking, Lessee shall forthwith give notice thereof to Lessor.  If Lessor shall be advised by the condemning authority of a proposed Taking, Lessor shall forthwith give notice thereof to Lessee, but its failure to do so shall not affect the rights of the parties as set forth in this Article XV. In case of any such Taking, Lessor shall be entitled to all awards or payments on account thereof, and Lessee hereby irrevocably assigns to Lessor all rights of Lessee to any such award or payment and irrevocably authorizes and empowers Lessor in the name of Lessee or otherwise, to file and prosecute what would otherwise be Lessee's claim for any portion of such award or payment, and to collect, receipt for and retain the same, except as hereinafter provided and except that

29.

Lessee shall be entitled to submit a claim for loss of profit, relocation expenses and injury to Lessee's Equipment and retain any award applicable thereto so long as the same does not diminish the amount of the award or proceeds otherwise payable to Lessor. If no Lessor's Assignee shall exist, any such awards or payments shall be paid over to a bank or other institution satisfactory to Lessee (the "Bank"), to be held in escrow and applied as hereinafter provided. All costs and expenses of the Bank shall be paid by Lessee. Unless an Event of Default shall have occurred, all sums so received by Lessor or the Bank, as the case may be, shall be applied in accordance with the provisions of Section 15.3, except that any such sums received with respect to a Taking for temporary use shall be applied in accordance with the provisions of Section 15.2. If an Event of Default shall have occurred at the time of receipt of any such award or payment, the same shall be paid to and retained by Lessor. Lessee will pay all costs and expenses, including attorneys' fees (to the extent permitted by law) incurred by Lessor or Lessor's Assignees, if any, in connection with any such Taking and the seeking and obtaining of any award or payment in respect thereof. For the purposes of this Lease, all amounts paid pursuant to any agreement with any condemning authority in settlement of any condemnation or other eminent domain proceeding affecting the Leased Property shall be deemed to constitute an award made in such proceeding whether or not the same shall have actually been commenced.

15.2. <u>Taking for Temporary Use</u>. In case of a Taking for temporary use, there shall be no termination, cancellation or modification of this Lease, and Lessee shall continue to perform and comply with (except as such performance and such compliance may be rendered impossible by reason of such Taking) all of its obligations under this Lease and shall in no event be relieved of its obligation to pay punctually all Rent or any other charges payable hereunder. Lessor shall pay the net awards received by it (whether by way of damages, rent or otherwise) by reason of such Taking to Lessee, if no Event of Default shall have occurred.

30.

15.3.    Other Taking; Damage or Destruction; Repair or Replacement.    (a)  Except as otherwise provided in subsection 15.3(b), in case of any damage to or destruction of the Leased Property or any part thereof, or in case of any Taking other than for temporary use, Lessee will, at its expense, promptly commence and complete with due diligence (subject to Unavoidable Delays) the replacement and repair of the Leased Property in order to restore it as nearly as practicable to the value and condition thereof immediately prior to such damage, destruction or Taking, whether or not the insurance proceeds or the award for the Taking shall be sufficient for such purpose.  In such event, the net proceeds of insurance and the net awards for the Taking received by Lessor or the Bank, as the case may be, if no Event of Default shall have occurred, shall be paid to Lessee (or as Lessee may direct), from time to time as the Leased Property is replaced or repaired, in amounts equal to the cost of such replacement and repair, upon delivery to Lessor of an Officer's Certificate certifying, in each case, the amount to be paid (which may represent amounts theretofor paid by Lessee in the effectuation of such repairs or replacements and not reimbursed hereunder or amounts due and payable by Lessee therefor, or both).  Upon completion of construction, Lessee shall deliver to Lessor (i) a copy of a permanent, unconditional certificate of occupancy for the Leased Property and (ii) an Officer's Certificate certifying to the completion of the repair or replacement of the Leased Property, the payment of the cost thereof in full, and the amount of such cost, and upon receipt of such certificates by Lessor, any balance of such proceeds and awards not required to be held or applied in accordance with the preceding sentence, shall be paid over to Lessee, except that if during the Fixed Term the balance of an award or proceeds shall be $100,000 or more, the same shall be retained by Lessor and applied to the payment of the installments of Basic Rent, payable during the remainder of the Fixed Term, in the inverse order of their due dates.  In the event of a Taking of such character as not to require any repair or replacement of the Leased Property, and upon delivery to Lessor of an Officer's Certificate certifying that such partial Taking has not materially affected the condition or use of the Leased Property, any net

31.

award for such Taking shall, if no Event of Default
shall have occurred, be paid over to Lessee, except
that if during the Fixed Term the amount of such award
otherwise payable to Lessee shall be $100,000 or more,
the same shall be retained by Lessor and applied to
the payment of the installments of Basic Rent, payable
during the remainder of the Fixed Term, in the inverse
order of their due dates.  If an Event of Default shall
have occurred prior to the time of Lessor's receipt
of any insurance proceeds or awards for a Taking pur-
suant to this Section 15.3(a), the same shall be re-
tained by Lessor.

(b)  In case either of the following shall occur
during the Basic Term:

(i)  a Taking of the entire Leased Property,
or

(ii)  any material damage to or destruction
of the Leased Property or a Taking of less than
the entire Leased Property which, in either case,in
the good faith judgment of the Board of Directors
of Lessee, as reflected in an Officer's Certi-
ficate delivered to Lessor within 60 days after
such damage, destruction or Taking, renders con-
tinued occupancy or use of the remainder of the
Leased Property economically unsound,

Lessee, if no Event of Default shall have occurred, may,
within sixty (60) days from the date of such damage,
destruction or Taking, give Lessor notice of termina-
tion of this Lease accompanied by an offer to purchase
the Leased Property (including the net amount of the
award or insurance proceeds, as the case may be) on
the first Basic Rent payment date occurring not less
than two hundred twenty-five (225) days after such Taking
or such determination (the "Purchase Date") for a pur-
chase price equal to the Discounted Payment as of the
Purchase Date.

If Lessor accepts such offer, or fails to reject
the same by written notice given at least forty-five (45)
days prior to the Purchase Date, Lessor shall, upon receipt
from Lessee of the purchase price provided for above and any

32.

Rent due and payable under this Lease (including the installment of Basic Rent due on the Purchase Date), (a) convey the Leased Property to Lessee on the Purchase Date in accordance with the provisions of Article XXI and (b) pay over or assign to Lessee the net award or net insurance proceeds, as the case may be, and this Lease shall thereupon terminate.

If Lessor rejects Lessee's offer to purchase the Leased Property by written notice given at least forty-five (45) days prior to the Purchase Date, this Lease shall terminate on the Purchase Date, provided Lessee shall not then be in Default under this Lease and Lessor shall retain all condemnation awards or proceeds of any insurance policies (or if Lessee then be self-insuring the Leased Property, Lessee shall pay over to Lessor amounts equal to what would have been such proceeds under the policies described in Section 14.1).

(c)   In case either of the events specified in subsection (b) shall occur during any renewal term provided for in Article XXII hereof, Lessee may give Lessor not less than thirty (30) days prior written notice of termination of this Lease and, upon payment by Lessee to Lessor of all Rent due hereunder prorated to the date of termination, this Lease shall terminate upon the date fixed in such notice.  In such event Lessor shall retain all condemnation awards or proceeds of any insurance policies (or if Lessee then be self-insuring the Leased Property, Lessee shall pay over to Lessor amounts equal to what would have been such proceeds under the policies described in Section 14.1).


## ARTICLE XVI


16.   Compliance with the REA.  Lessee will promptly pay all costs, expenses and all other charges payable with respect to the Leased Property by Lessor or Lessee under the REA, will at all times perform and comply with all of the covenants and provisions thereof to be performed or complied with by Lessor or Lessee with respect to the Leased Property thereunder, and will do all

33.

things necessary to keep unimpaired the estate created thereby and to prevent any default thereunder or forfeiture thereof. Lessee will take, or cause to be taken, any action consistent with the provisions of this Lease permitted to be taken by Lessor or Lessee under the REA with respect to enforcement of the terms of the REA against the other parties thereto, (i) if any breach of the REA shall materially adversely affect the rights and benefits created thereby, or (ii) as may be requested by Lessor's Assignees, if any. Lessee acknowledges that its rights pursuant to this Lease are, and shall be, subject and subordinate to the duties and obligations of Lessor under the REA and Lessee agrees (a) not to take any action pursuant to this Lease, or otherwise, which in any way, either with the passage of time or the giving of notice or both, would constitute a default by Lessor or Lessee under such REA and (b) to take, or cause to be taken, any action under such REA necessary to avoid a default by Lessor or Lessee thereunder before taking any action under this Lease which might give rise to such default. For the purposes of this Article XVI, Lessor hereby appoints Lessee as its agent and attorney-infact to take any action required by, or permitted by, Lessor under the REA in order to comply with and enforce the terms of the REA. Lessee and Lessor, as the case may be, will deliver to the other and to Lessor's Assignees, if any, promptly upon receipt, a copy of any notice, demand, declaration or other communication received from any other party in interest under the REA relating to the alleged or actual or potential default or breach on the part of Lessor or Lessee thereunder or to any proposed amendment, modification or change to the REA. Lessee's liability for a breach of the provisions of this Article arising during the Term hereof shall survive the expiration or earlier termination of this Lease. Lessee's obligations under this Article shall be limited to the obligations of the Lessor or Lessee under the REA with respect to the Leased Property only.

ARTICLE XVII

17. <u>Compliance with the Unrecorded Parking and Maintenance Agreements</u>. Lessee will promptly pay all costs, expenses and all other charges payable by Lessor or Lessee under (i) the Agreement for Operation and Maintenance of Parking Facilities, dated as of November 1, 1975, as amended by a First Amendment, dated March 22, 1976, and a Second

34.

Amendment, dated on or prior to December 31, 1977, by
and among the City of Temple City, California, Eltinge,
Graziadio and Sampson Development Co., A. D. Clark, Inc.
and Albertson's, Inc., as the same may be from time to
time further supplemented and amended (the "Parking Agree-
ment"), and (ii) the Option Maintenance and Management
Agreement Covenants, dated as of October 1, 1975, as
amended by a First Amendment, dated as of October 1,
1975, by a Second Amendment, dated as of March 22, 1976,
and a Third Amendment, dated on or prior to December 31,
1977, by and among The Temple City Community Redev-
elopment Agency, Eltinge, Graziadio and Sampson Develop-
ment Co., A. D. Clark, Inc. and Albertson's, Inc., as
the same may be further supplemented and amended (the
"Maintenance Agreement", and together with the Parking
Agreement, the "Parking and Maintenance Agreements"), will
at all times perform and comply with all the covenants and
provisions thereof to be performed or complied with by Les-
sor or Lessee, and will do all things necessary to prevent any
default thereunder or forfeiture of any rights thereunder.
Lessee will take or cause to be taken any action consistent
with the provisions of this Lease permitted to be taken by
Lessor or Lessee under the Parking and Maintenance Agree-
ments with respect to enforcement of the terms thereof
against the other parties thereto, (i) if any breach of the
Parking and Maintenance Agreements shall materially adversely
affect the rights and benefits created thereby, or (ii) as
may be requested by Lessor's Assignees, if any.  Lessee
acknowledges that its rights pursuant to this Lease are, and
shall be, subject and subordinate to the duties and obliga-
tions of Lessor under the Parking and Maintenance Agreements
and Lessee agrees (a) not to take any action pursuant to
this Lease or otherwise, which in any way, either with the
passage of time or the giving of notice or both, would
constitute a default by Lessor or Lessee under either of the
Parking and Maintenance Agreements and (b) to take, or cause
to be taken, any action under such Parking and Maintenance
Agreements necessary to avoid a default by Lessor or Lessee
under either of them before taking any action under this
Lease which might give rise to such default.  For the
purposes of this Article XVII, Lessor hereby appoints Lessee
as its agent and attorney-in-fact to take any action required
of, or permitted by, Lessor under the Parking and Maintenance
Agreements in order to comply with and enforce the terms of
the Parking and Maintenance Agreements.  Lessee and Lessor,
as the case may be, will deliver to the other and to Lessor's
Assignees, if any, promptly upon receipt, a copy of any notice,

35.

demand or declaration or other communications received under
either of the Parking and Maintenance Agreements relating
to any alleged or actual or potential default or breach on
the part of Lessor or Lessee thereunder or any proposed
amendment, modification or change to the Parking Agreement
or the Maintenance Agreement.  Lessee's liability for a
breach of the provisions of this Article arising during the
Term hereof shall survive the expiration or earlier termina-
tion of this Lease.  Lessee's obligations under this Article
shall be limited to the obligations of Lessor or Lessee
under the Parking and Maintenance Agreements with respect to
the Leased Property only.


ARTICLE XVIII


     18.  Termination of Lease upon Discontinuance of
Operations on the Leased Property.  If, in the good
faith judgment of the Board of Directors of Lessee,
using the same criteria as would be utilized by said
Board in evaluating the economic feasibility or suita-
bility of property similar to the Leased Property, the
Leased Property becomes uneconomic or unsuitable for
Lessee's then use and occupancy, and Lessee (i) has
totally discontinued the use of the Leased Property in its
business operations for a continuous period of one hundred
eighty (180) days, or (ii) intends to permanently discon-
tinue such use within a period of one hundred eighty (180)
days and thereafter does so discontinue such use, all as
to be set forth in an Officer's Certificate delivered to
Lessor, Lessee, if no Event of Default shall have occurred
at any time after the expiration of the tenth (10th) Year,
may give Lessor a notice of termination of this Lease
accompanied, if such notice is given during the Fixed
Term, by an offer to purchase the Leased Property on the
first Basic Rent payment date (the "Economic Termination
Purchase Date") occurring not less than two hundred
twenty-five (225) days after the date of such offer for a
purchase price equal to the Discounted Payment as of the
Economic Termination Purchase Date plus an amount equal to
two percent (2%) of the Cost of the Leased Property
(the "Premium").  After Lessee has discontinued the use of
the Leased Property in its business operations and
exercised its rights under this Article XVIII, Lessee or
its subsidiaries or affiliates or Guarantor or its subsidi-
aries or affiliates shall not thereafter resume using the
Leased Property in its business operations, provided,

36.

however, nothing herein shall be construed as preventing Lessee or Guarantor from leasing the Leased Property to a third party other than Lessee, Guarantor or an affiliate or subsidiary of Lessee or Guarantor.  The rights hereunder may not be exercised by Lessee in any calendar year when the same rights under any Other Lease have been exercised.

If Lessor accepts such offer, or fails to reject the same by written notice given at least forty-five (45) days prior to the Economic Termination Purchase Date, Lessor shall, upon receipt from Lessee of the purchase price provided for above and any Rent due and payable under this Lease (including the installment of Basic Rent due on the Economic Termination Purchase Date), convey the Leased Property to Lessee on the Economic Termination Purchase Date in accordance with the provisions of Article XXI and this Lease shall thereupon terminate.  If Lessee fails to pay the purchase price and any Rent due and payable under this Lease on the Economic Termination Purchase Date, Lessee's offer to purchase shall be deemed to have been withdrawn and this Lease shall remain in full force and effect.

If Lessor rejects Lessee's offer to purchase the Leased Property by timely notice, Lessee shall pay Lessor the Premium, and this Lease shall terminate on the Economic Termination Purchase Date; provided Lessee is not then in default under this Lease.


ARTICLE XIX


19.  Events of Default.

19.1.  If any one or more of the following events (individually, an "Event of Default") shall occur:

(a)  Lessee shall fail to make payment of any Basic Rent or Additional Rent payable by Lessee under this Lease when the same becomes due and payable and such failure shall continue for a period of ten (10) days after notice thereof, or

37.

(b)   Lessee shall fail to observe or perform
any other term, covenant or condition of this
Lease and such failure shall continue for a period
of thirty (30) days after notice thereof, unless
such failure cannot with due diligence be cured
within a period of thirty (30) days, in which case
such failure shall not be deemed to continue if
Lessee proceeds promptly and with due diligence
to cure the failure and diligently completes the
curing thereof, or

(c)   either Lessee or Guarantor shall make a
general assignment for the benefit of its creditors,
or shall file a voluntary petition in bankruptcy, or
shall be adjudicated a bankrupt or insolvent, or
shall file any petition or answer seeking, consenting
to, or acquiescing in reorganization, arrangement,
adjustment, composition, liquidation, dissolution
or similar relief under any present or future statute,
law or regulation, or shall file an answer admitting
or failing to deny the material allegations of a
petition against it for any such relief, or shall
admit in writing its inability to pay its debts
as they mature, or

(d)   any proceeding against either Lessee or
Guarantor seeking any of the relief mentioned in
clause (c) of this Section shall not have been stayed
or dismissed within ninety (90) days after the com-
mencement thereof, or

(e)   a trustee, receiver or liquidator of
either Lessee or Guarantor or of any substantial
part of its properties or assets, or of Lessee's
estate or interest in the Leased Property, shall
be appointed with the consent or acquiescence of
Lessee, or if any such appointment, if not so
consented to or acquiesced in, shall remain un-
vacated or unstayed for an aggregate of ninety (90)
days (whether or not consecutive), or

(f)   either Lessee or Guarantor shall be liqui-
dated or dissolved, or shall begin proceedings to-
ward such liquidation or dissolution, or shall, in
any manner, permit the divestiture of substantially

38.

all its assets (other than in connection with a
merger of Guarantor into, or a sale of all or sub-
stantially all of Guarantor's assets to, another
corporation provided that the survivor of such merger
or the purchaser of such assets shall assume all of
Guarantor's obligations under the Guaranty and the
Consent, and provided further that immediately after
giving effect to any such merger the corporation
surviving the same shall have a Tangible Net Worth
at least equal to the greater of (i) the Tangible
Net Worth of Guarantor on the Commencement Date or
(ii) the Tangible Net Worth of Guarantor immediately
prior to such merger), or

(g)   either Lessee or Guarantor shall fail to
perform any term or provision of the Consent and such
failure shall continue for a period of (i) ten (10)
days after notice thereof from any of Lessor's Assignees,
if any, in case of a failure to make a payment of money
or to comply with the provisions of Paragraph 7 thereof,
or (ii) thirty (30) days after notice thereof from any
of Lessor's Assignees, if any, in case of a failure to
perform any other term or provision thereof, or `

(h)   the estate or interest of Lessee in the
Leased Property or any part thereof shall be levied
upon or attached in any proceeding and the same shall
not be vacated or discharged within ninety (90) days
after commencement thereof (unless Lessee shall be
contesting such lien or attachment in good faith
in accordance with Article XIII hereof), or

(i)   the then current use or occupancy of
the Leased Property shall be permitted pursuant to
then applicable zoning laws only for so long as such
use or occupancy shall be continued, and Lessee shall
discontinue such use or occupancy without the prior
written consent of Lessor,except in the event such
use or occupancy is rendered impossible due to a
Taking of, or damages to, the Property and is in-
voluntarily discontinued by Lessee, or

(j)   any of the representations or warran-
ties made by Lessee or Guarantor in this Lease,
the Consent, the Guaranty  or in any other

39.

document, certificate or instrument delivered in connection therewith proves to be untrue in any material respect, or

(k)  Lessee shall fail to comply with any covenant or provision of the REA, the Maintenance Agreement or the Parking Agreement applicable to the Leased Property and shall fail to cure any such default within the applicable grace period, if any, or

(l)  Lessee shall modify, supplement or amend or consent to the modification, supplement or amendment to the REA, the Maintenance Agreement, the Parking Agreement or the instruments listed as items 5, 6 or 11 on Schedule A hereto without the prior written approval of Lessor or Lessor's Assignees, if any, or

(m)  an Event of Default (as defined in the Other Leases) with respect to the payment of Basic Rent shall have occurred under any of the Other Leases, or

(n)  Guarantor or any lessee under any of the Other Leases shall fail to comply with paragraph 7 of any of the Other Consents to which any of them is a party and such failure shall continue for a period of ten (10) days after notice thereof;

then, and in any such event, either

(1)  if the same shall have occurred during the Interim Term hereof, Lessee shall forthwith offer (and failing to do so, Lessee shall be deemed to have offered) to purchase the Leased Property on the first Basic Rent payment date occurring thirty (30) days after the earlier of (A) the date of Lessee's offer or (B) the date specified in a notice given by Lessor to Lessee, for an amount equal to the Cost of the Leased Property plus all Rent then due and payable (including the install-ment of Basic Rent due on the purchase date) as of the date of purchase; thereafter, Lessor shall promptly notify Lessee of its acceptance or re-jection of such offer and failing to give such notice shall be deemed to have accepted the same; and upon such acceptance, Lessor shall convey the

40.

Leased Property to Lessee on the date fixed there-
for in accordance with the provisions of Article
XXI, upon receipt of the purchase price therefor,
and this Lease shall thereupon terminate, or

(2)    if the same shall have occurred during
the Fixed Term or any renewal term hereof, Lessor
may terminate this Lease by giving Lessee not less
than ten (10) days' notice of such termination and
upon the expiration of the time fixed in such notice,
the Term shall terminate and all rights of Lessee
under this Lease shall cease.

Lessee will pay as Additional Rent all costs and
expenses incurred by or on behalf of Lessor, including,
without limitation, attorneys' fees and expenses (to the
extent permitted by law), as a result of any Event of
Default hereunder.

No Event of Default (other than a failure to make
payment of money) shall be deemed to exist under clause
(b) during any time the curing thereof is prevented by
an Unavoidable Delay provided that upon the cessation
of such Unavoidable Delay, Lessee shall remedy such de-
fault without further delay.

19.2.    If an Event of Default shall have occurred,
whether or not this Lease has been terminated pursuant
to Section 19.1, Lessee shall, if required by Lessor
so to do, immediately surrender the Leased Property to
Lessor and quit the same, and Lessor may enter upon and
repossess the Leased Property by reasonable force,
summary proceedings, ejectment or otherwise, and may re-
move Lessee and all other persons and any and all personal
property from the Leased Property.  Lessor shall be under
no liability for or by reason of any such entry, repos-
session or removal.

19.3.    If an Event of Default shall have occurred,
Lessor, without notice to Lessee, may, but shall be under no
obligation to, relet the Leased Property or any part thereof
for the account of Lessee, in the name of Lessee or otherwise,
for such term or terms (which may be greater or less than
the period then current which would otherwise have consti-
tuted the balance of the Term) and on such conditions (which

41.

may include concessions or free rent) and for such purposes as Lessor may determine, and may collect, receive and retain the rents resulting from such reletting. If Lessee shall produce a new corporate tenant which is financially sound and otherwise acceptable to Lessor and is ready, willing and able to lease the Leased Property upon terms reasonably satisfactory to Lessor, Lessor shall lease the Leased Property to such new tenant, provided Lessor has made no prior commitments to any other prospective tenant.

19.4.  Neither (a) the termination of this Lease pursuant to Section 19.1, (b) the repossession of the Leased Property, (c) the failure of Lessor to relet the Leased Property, (d) the reletting of all or any portion thereof, nor (e) the failure of Lessor to collect or receive any rentals due upon any such reletting, shall relieve Lessee of its liability and obligations hereunder, all of which shall survive any such termination, repossession or reletting.  In the event of any such termination, Lessee shall forthwith pay to Lessor all Rent due and payable to and including the date of such termination. Thereafter, monthly on the days on which the Basic Rent would have been payable under this Lease if the same had not been terminated and until the end of what would have been the then current Term in the absence of such termination, Lessee, at Lessor's option, shall pay Lessor as and for liquidated and agreed current damages for Lessee's default, either (1), upon suit brought in a jurisdiction outside the State of California:

(i)  an amount equal to the Rent that would have been payable by Lessee hereunder if the Term had not been terminated, less

(ii)  the net proceeds, if any, of (a) any reletting of the Leased Property or any part thereof, after deducting all of Lessor's expenses in connection therewith, including, without limitation, repossession costs, brokerage commissions, attorneys' fees and expenses and any repair or alteration costs and expenses incurred in preparation for such reletting, and (b) the avails of any continuing subleases,

or (2), upon suit brought in a jurisdiction within the State of California, either (A):

42.

(i)   the worth at the time of award by the court having jurisdiction thereof, of the unpaid Rent which had been earned at the time of termination,

(ii)   the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Lessee proves could have been reasonably avoided,

(iii)   the worth at the time of award of the amount by which the unpaid Rent for the balance of the then current Term after the time of award exceeds the amount of such rental loss that Lessee proves could be reasonably avoided, and

(iv)   any other amount necessary to compensate Lessor for all the detriment proximately caused by Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom,

or (B):

without termination of Lessee's right to possession of the Leased Property, each installment of Rent or other sum as the same becomes due and payable, which Rent or other sum shall bear interest at the maximum annual rate permitted by law from the date when due until paid, and Lessor may enforce, by action or otherwise, any other term or covenant of this Lease.

The "worth at the time of award" of the amounts referred to in subparagraphs (i) and (ii) of this subsection 19.4(2) is to be computed by allowing interest at the maximum annual rate permitted by law.  The "worth at the time of award" of the amount referred to in subparagraph (iii) of this subsection 19.4(2) is to be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1%.

19.5.  At any time after the termination of this Lease pursuant to Section 19.1, whether or not Lessor shall have collected any current damages pursuant to Section 19.4,

43.

Lessor, at its option, shall be entitled to recover from Lessee and Lessee will pay to Lessor on demand as and for liquidated and agreed final damages for Lessee's default (it being agreed that it would be impractical or extremely difficult to fix the actual damages), and in lieu of all current damages provided in Section 19.4 beyond the date to which the same shall have been paid,

(a)   the sum of (i) any past due Rent together with a late charge thereon (to the extent permitted by law) computed from the due date thereof to the date of payment of such liquidated damages at the rate of 9.375% per annum (or at the maximum rate permitted by law, whichever is the lesser), (ii) the Discounted Payment as of the later of the date to which Basic Rent shall have been paid or the date to which Lessee shall have paid current damages pursuant to Section 19.4, together with a late charge thereon computed from the later of such dates to the date of payment of such liquidated damages at the rate (to the extent permitted by law) of 9.375% per annum (or at the maximum rate permitted by law, whichever is the lesser), and (iii) an amount equal to the Additional Rent and other charges (as reasonably estimated by Lessor) which would be payable hereunder from such date for what would have been the then unexpired current Term had the same not been terminated, the Additional Rent and such other charges to be discounted to the date of payment at the rate of 4% per annum, calculated on a monthly basis, less

(b)   the then fair net rental value of the Leased Property for the period from the date of payment of such liquidated damages to the date which would have been the expiration date of the then current Term had this Lease not been terminated (after deducting all reasonable estimated expenses to be incurred in connection with reletting the Leased Property, including, without limitation, repossession costs, brokerage commissions, attorneys' fees and expenses and repair and alteration costs and expenses) discounted to the date of payment at the rate of 8.25% per annum during the Fixed Term and at the rate of 4% per annum during any renewal term, in each case calculated on a monthly basis.

44.

If any statute or rule of law shall validly limit the amount
of such liquidated final damages to less than the amount
above agreed upon, Lessor shall be entitled to the maximum
amount allowable under such statute or rule of law.

19.6.  If Lessor shall elect the remedy provided for
in Section 19.5, Lessee shall have the option to immedi-
ately prepay all Basic Rent for the balance of the then
current Term, discounted at the rate of 4% per annum dur-
ing the Fixed Term and at the rate of 4% per annum during
any renewal term, in each case calculated on a monthly
basis, as though expressly made payable in advance prior
to the occurrence of an Event of Default.  If Lessee
shall exercise such right and shall prepay in full all
such Basic Rent, Lessee shall thereafter have the right
to possession of the Leased Property under the terms of
this Lease for the entire period in respect of which the
Basic Rent shall have been so prepaid, unless and until a
further default shall occur, at which time Lessee's right
of possession shall immediately terminate.

19.7.  If this Lease is terminated pursuant to Section
19.1, Lessee waives, to the extent permitted by applicable
law, (a) any right which may require Lessor to sell, lease
or otherwise use its interest in the Leased Property or any
part thereof in mitigation of Lessor's damages as set forth
in this Article XIX, (b) any notice of re-entry or of the
institution of legal proceedings to that end, (c) any right
of redemption, re-entry or repossession, (d) any right to a
trial by jury in the event of summary proceedings to enforce
the remedies set forth in this Article XIX, (e) the benefit
of any laws now or hereafter in force exempting property from
liability for rent or for debt, and (f) any other rights which
might otherwise limit or modify any of Lessor's rights or
remedies under this Article XIX.

ARTICLE XX

20.  Lessor's Right to Cure Lessee's Default.  If
Lessee shall fail to make any payment or perform any act
required to be made or performed under this Lease or the
REA, the Maintenance Agreement or the Parking Agreement
(insofar as applicable to the Leased Property), Lessor,

45.

after notice to and demand upon Lessee, and without waiv-
ing or releasing any obligation or Default, may (but shall
be under no obligation to) at any time thereafter make such
payment or perform such act for the account and at the ex-
pense of Lessee, and may enter upon the Leased Property for
such purpose and take all such action thereon as, in Lessor's
opinion, may be necessary or appropriate therefor. No such
entry shall be deemed an eviction of Lessee.  All sums so
paid by Lessor and all costs and expenses (including, with-
out limitation, attorneys' fees and expenses to the extent
permitted by law) so incurred, together with a late charge
thereon (to the extent permitted by law) at the rate of
9.375% per annum (or at the maximum rate permitted by
law, whichever is the lesser) from the date on which such
sums or expenses are paid or incurred by Lessor, shall be
paid by Lessee to Lessor on demand.

## ARTICLE XXI

21.  Provisions Relating to Purchase of the Leased
Property by Lessee.  In the event Lessee purchases the
Leased Property from Lessor pursuant to any of the terms
of this Lease, Lessor shall, upon receipt from Lessee
of the applicable purchase price, together with full
payment of any unpaid Rent due and payable on or before
the date of the purchase, execute and deliver to Lessee,
on the purchase date, an appropriate deed with covenants
against grantor's acts conveying title to the Leased
Property to Lessee free and clear of any Indenture and
any liens and incumbrances that have been created by
Lessor without consent of Lessee, other than those that
Lessee has agreed hereunder to pay or discharge.  The
purchase price shall be paid to Lessor or as Lessor may
direct, in Federal or other immediately available funds
without deduction or offset for any cause whatever.  All
expenses of such conveyance including, without limitation,
the cost of title examination, the cost (including prepay-
ment premium, if any) of obtaining and recording a release
of the Leased Property from the lien of any Indenture,
broker's fees, if any, attorneys' fees incurred by Lessor
in connection with such conveyance and release, transfer
taxes and recording fees, taxes and other charges shall
be paid by Lessee.

46.

## ARTICLE XXII

22.  Renewal Terms.  If no Event of Default shall
have occurred that has not been waived, Lessee is hereby
granted the right to renew this Lease for seven successive
terms of five years each, upon giving written notice to
Lessor of one or more of such renewals at least one hundred
eighty (180) days prior to the termination of the then
current Term.  During each such renewal term all of the
terms and conditions of this Lease shall continue in full
force and effect except that (i) the net annual Basic Rent
payable during the first renewal term shall be in an amount
equal to the fraction, the numerator of which shall be equal
to the product of (a) the annual debt service constant which
will fully amortize, on a level payment basis monthly in
arrears, a five-year loan at the lowest interest rate then
generally available to Guarantor, times (b) the sum of
$706,550.68, and the denominator of which shall be the
Cost of the Leased Property; provided, however, that such
Basic Rent shall not be less than 4% of the Cost of the
Leased Property nor be more than 7% of the Cost of the
Leased Property, (ii) the net annual Basic Rent for the
second through seventh successive renewal term shall be the
sum of $141,428 per annum, (iii) the Basic Rent shall
be payable during each renewal term hereof in equal, consec-
utive, monthly installments, in arrears, and (iv) the number
of renewal terms permitted hereunder shall be reduced by one
upon the expiration of each renewal term for which Lessee
has exercised its option.

## ARTICLE XXIII

23.  No Recourse Against Lessor.  No recourse shall
be had against the Lessor, its employees, agents, partners
or its successors or assigns, for any claim based on any
failure by the Lessor in the performance, nonperformance,
observance or nonobservance of any of the agreements,
covenants or provisions contained in this Lease.  In
the event of any such failure, recourse of the Lessee or
Guarantor shall be had solely against the Leased Property.

47.

ARTICLE XXIV

24.  Risk of Loss.  The risk of loss or of decrease
in the enjoyment and beneficial use of the Leased Prop-
erty in consequence of the damage or destruction thereof
by fire, the elements, casualties, thefts, riots, wars
or otherwise, or in consequence of foreclosures, attach-
ments, levies or executions (other than by Lessor and
those claiming from, through or under Lessor) is assumed
by Lessee, and Lessor shall in no event be answerable
or accountable therefor.  None of the events mentioned
in this Section shall entitle Lessee to any abatement
of Basic Rent or Additional Rent, except as specifically
provided herein.

ARTICLE XXV

25.  Indemnification by Lessee.  Lessee will protect,
indemnify, save harmless and defend Lessor and Lessor's
Assignees, if any, from and against all liabilities, obli-
gations, claims, damages, penalties, causes of action,
costs and expenses (including, without limitation, at-
torneys' fees and expenses to the extent permitted by law)
imposed upon or incurred by or asserted against Lessor or
any of Lessor's Assignees, if any, by reason of:  (a) the
acquisition and ownership of, or the holding of any secur-
ity interest in, the Leased Property, (b) any accident,
injury to or death of persons or loss of or damage to
property occurring on or about the Leased Property or
adjoining sidewalks, (c) any use, misuse, non-use, condi-
tion, maintenance or repair of the Leased Property, (d)
taxes and assessments of any kind or nature assessed
in respect of the Leased Property, or (e) the non-perform-
ance of any of the terms and provisions of any and all
existing and future subleases of the Leased Property to
be performed by the landlord thereunder.  Any amounts
which become payable by Lessee under this Section shall
be paid within ten (10) days after liability therefor on
the part of Lessee is determined by litigation or other-
wise, and if not timely paid, shall bear a late charge
(to the extent permitted by law) at the rate of 9.375%
per annum (or at the maximum rate permitted by law,

48.

whichever is the lesser) from the date of such determi-
nation to the date of payment.  Lessee, at its expense,
shall contest, resist and defend any such claim, action
or proceeding asserted or instituted against Lessor, or
any of Lessor's Assignees, if any, and may compromise
or otherwise dispose of the same as Lessee sees fit.
Nothing herein shall be construed as indemnifying Lessor
against its own negligent or willful acts.  Lessee's
liability for a breach of the provisions of this Article
arising during the Term hereof shall survive any termi-
nation of this Lease.


ARTICLE XXVI


26.1.  Subletting and Assignment; Attornment.  Lessee
shall have the right to sublet the Leased Property or
any part thereof or assign or transfer this Lease or
any of Lessee's rights or obligations hereunder, pro-
vided that (a) in the case of a subletting, the sub-
lease shall comply with the provisions of Section 26.2,
(b) in the case of an assignment, the assignee shall
assume in writing and agree to keep and perform all of
the terms of this Lease on the part of Lessee to be
kept and performed and shall be, and become, jointly
and severally liable with Lessee for the performance
thereof, (c) an original counterpart of each such
sublease and assignment and assumption, duly exe-
cuted by Lessee and such sublessee or assignee, as
the case may be, in form and substance satisfactory
to Lessor, shall be delivered promptly to Lessor,
and (d) in case of either an assignment or sublet-
ting, Lessee shall remain primarily liable, as prin-
cipal rather than as surety, for the prompt payment
of the Rent and for the performance and observance of
all of the covenants and conditions to be performed
by Lessee hereunder.

26.2.  Attornment.  Lessee shall insert in each
sublease permitted under Section 26.1 provisions to
the effect that (a) such sublease is subject and sub-
ordinate to all of the terms and provisions of this
Lease and to the rights of Lessor hereunder, (b) in
the event this Lease shall terminate before the ex-
piration of such sublease, the sublessee thereunder

49.

will, at Lessor's option, attorn to Lessor and waive
any right the sublessee may have to terminate the sub-
lease or to surrender possession thereunder, as a
result of the termination of this Lease, and (c) in
the event the sublessee thereunder receives a written
notice from Lessor or Lessor's Assignees, if any,
stating that Lessee is in Default under this Lease,
the sublessee shall thereafter be obligated to pay
all rentals accruing under said sublease directly to
the party giving such notice, or as such party may
direct.  All rentals received from the sublessee by
Lessor or Lessor's Assignees, if any, as the case may
be, shall be credited against the amounts owing by
Lessee under this Lease.

## ARTICLE XXVII

27.  Officer's Certificates and Financial Statements.
(a) At any time and from time to time upon not less than
ten (10) days prior request by Lessor, Lessee will furnish
to Lessor an Officer's Certificate certifying as to the
following: (i) that this Lease, the REA, the Maintenance
Agreement and the Parking Agreement are in full force and
effect as unmodified and in full force and effect (or that
this Lease, the REA, the Maintenance Agreement or the
Parking Agreement are in full force and effect as modified
and setting forth the modifications) and the dates to which
the Basic Rent and all Additional Rent have been paid, (ii)
either that Lessee does not know of any default in the
performance of any provisions of this Lease or specifying
any Default of which Lessee may have knowledge and stating
what action Lessee is taking or proposes to take with
respect thereto, and (iii) that, to the knowledge of Lessee,
there are no proceedings pending or threatened against
Lessee or Guarantor before or by any court or administrative
agency which, if adversely decided, would materially and
adversely affect the financial condition or operations of
Lessee or Guarantor, or, if any such proceedings are pending
or threatened to the knowledge of Lessee, specifying and
describing the same.  Any such certificate furnished pursuant
to this Section may be relied upon by Lessor, Lessor's Assignees,
if any, and any prospective purchaser of the Leased Property.

50.

Lessee will also furnish Lessor, upon the reasonable request
of Lessor, an Officer's Certificate certifying the amount of
the Tangible Net Worth of Guarantor, as shown on the most
current consolidated balance sheet of Guarantor and its
consolidated subsidiaries as sent to its stockholders.

(b)  Lessee will cause Guarantor to furnish the
following statements to Lessor:

(i)  within 120 days after the end of each of
Guarantor's fiscal years, the annual audit report
of Guarantor, including a balance sheet and an income
and surplus statement for the fiscal year covered
thereby, setting forth in comparative form, the figures
for the previous fiscal year, all on a fully consoli-
dated basis and in reasonable detail and duly certified
by the independent certified public accountants regu-
larly employed by Guarantor,

(ii)  within 120 days after the end of each of
Guarantor's fiscal years, and together with the
annual audit report furnished in accordance with
clause (i), an Officer's Certificate stating that to
the best of the signer's knowledge and belief after
making due inquiry, neither Lessee nor Guarantor is
in Default in the performance or observance of any of
the terms of this Lease, or if either Lessee or
Guarantor shall be in Default to his knowledge,
specifying all such Defaults, the nature thereof,
and the steps being taken to remedy the same,

(iii)  with reasonable promptness, copies of all
financial statements and reports which Guarantor
shall send to its stockholders, and, after a request
therefor, copies of each Form 10-K, Form 8-K, proxy
statement and registration statement (other than Form
S-8 registration statements), or copies of any
successor forms or statements substituted therefor,
which Guarantor shall file with the Securities and
Exchange Commission or any governmental agency
substituted therefor, and

(iv)  with reasonable promptness, such other
information, consistent with the disclosure require-
ments of the federal securities laws, respecting the

51.

financial condition and affairs of Guarantor as Lessor
may reasonably request from time to time.

## ARTICLE XXVIII

28. <u>Lessor's Right to Inspect</u>.  Lessee shall permit
Lessor, and Lessor's Assignees, if any, and their re-
spective authorized representatives to inspect the Leased
Property during usual business hours.

## ARTICLE XXIX

29. <u>No Waiver by Lessor</u>.  No failure by Lessor to
insist upon the strict performance of any term hereof or
to exercise any right, power or remedy consequent upon a
breach thereof, and no acceptance of full or partial pay-
ment of Rent during the continuance of any such breach,
shall constitute a waiver of any such breach or of any
such term.  No waiver of any breach shall affect or alter
this Lease, which shall continue in full force and effect
with respect to any other then existing or subsequent
breach.  No foreclosure, sale or other proceeding under
any Indenture shall effectuate a termination of this
Lease or discharge or otherwise affect the obligations
of Lessee hereunder.

## ARTICLE XXX

30. <u>Remedies Cumulative</u>.  Each legal, equitable or
contractual right, power and remedy of Lessor now or here-
after provided either in this Lease or by statute or other-
wise shall be cumulative and concurrent and shall be in
addition to every other right, power and remedy and the
exercise or beginning of the exercise by Lessor of any one
or more of such rights, powers and remedies shall not pre-
clude the simultaneous or subsequent exercise by Lessor
of any or all of such other rights, powers and remedies.

52.

## ARTICLE XXXI

31. **Acceptance of Surrender**. No surrender to Lessor of this Lease or of the Leased Property or any part thereof or of any interest therein shall be valid or effective unless agreed to and accepted in writing by Lessor and no act by Lessor or any representative or agent of Lessor, other than such a written acceptance by Lessor, shall constitute an acceptance of any such surrender.

## ARTICLE XXXII

32. **No Merger of Title**. There shall be no merger of this Lease or of the leasehold estate created hereby with the fee estate in the Leased Property by reason of the fact that the same person, firm, corporation or other entity may acquire, own or hold, directly or in-directly, (a) this Lease or the leasehold estate created hereby or any interest in this Lease or such leasehold estate and (b) the fee estate in the Leased Property or any interest therein.

## ARTICLE XXXIII

33. **Conveyance by Lessor**. If Lessor or any successor owner of the Leased Property shall convey the Leased Property other than as security for a debt, Lessor or such successor owner, as the case may be, shall there-upon be released from all future liabilities and obli-gations of the Lessor under this Lease and all such future liabilities and obligations shall thereupon be binding upon the new owner, subject to the provisions of Article XXI.

## ARTICLE XXXIV

34. **Quiet Enjoyment**. So long as Lessee shall pay all Rent as the same becomes due and shall fully comply with all of the terms of this Lease and fully perform

53.

its obligations hereunder, Lessee shall peaceably and
quietly have, hold and enjoy the Leased Property for the
Term hereof, free of any claim or other action by Lessor
or Lessor's Assignees, if any, or anyone claiming by,
through or under any of them.  No failure by Lessor to
comply with the foregoing covenant during the Fixed
Term shall give Lessee any right to cancel or terminate
this Lease or abate, reduce or make a deduction from
or offset against the Basic Rent or Additional Rent or
any other sum payable under this Lease, or to fail to
perform any other obligation of Lessee hereunder.

## ARTICLE XXXV

35.  Notices.  All notices, demands, requests,
consents, approvals and other communications hereunder
shall be in writing and delivered, telegraphed or mailed
(by registered or certified mail, return receipt re-
quested and postage prepaid), addressed to the respec-
tive parties, as follows:

(a)   if to Lessee:

K MART ENTERPRISES OF
   CALIFORNIA, INC.
c/o K mart CORPORATION
3100 West Big Beaver
Troy, Michigan  48084

Attention:  Vice President-Real Estate

(b)   if to Lessor:

EGS OF CALIFORNIA
c/o Eltinge, Graziadio & Sampson
   Development Company
P.O. Box 92959
Los Angeles, California  90009

or to such other address as either party may hereafter
designate, and shall be effective upon receipt as evi-
denced by a receipt signed by a person at such address.

54.

ARTICLE XXXVI

36.  <u>Holding Over</u>.  If Lessee shall for any rea-
son remain in possession of the Leased Property after
the expiration or earlier termination of the Term here-
of (except pursuant to the provisions of Section 6.2),
such possession shall be as a month-to-month tenant dur-
ing which time Lessee shall pay as rental, (i) Basic
Rent on the first day of each month at a rate equal to
the amount of annual Basic Rent payable during the last
Year of the Fixed Term, (ii) all Additional Rent, and
(iii) all other sums payable by Lessee pursuant to the
provisions of this Lease.  During such period of month-
to-month tenancy, Lessee shall be obligated to perform
and observe all of the terms, covenants and conditions
of this Lease, but shall have no rights thereunder other
than the right to continue its occupancy and use of the
Leased Property.  Nothing contained herein shall con-
stitute the consent, express or implied, of Lessor to
the holding over of Lessee after the expiration or earlier
termination of this Lease, except pursuant to the pro-
visions of Section 6.2.

ARTICLE XXXVII

37.  <u>Offer by Lessee to Purchase the Leased</u>
<u>Property</u>.  On the date occurring six months prior to
the last day of the Fixed Term hereof, Lessee shall
offer (and failing to do so, Lessee shall be deemed
to have offered) to purchase the Leased Property
on the last day of the Fixed Term hereof (the "Final
Purchase Date"), for a purchase price equal to
$706,550.68.

If Lessor accepts such offer, or fails to reject the
same by written notice given forty-five (45) days preceding
the last day of the Fixed Term, Lessor shall, upon receipt
from Lessee of the purchase price provided for above and
any Rent due and payable under this Lease (including the
installment of Basic Rent due on the Final Purchase Date),
convey the Leased Property to Lessee on the Final Purchase
Date in accordance with the provisions of Article XXI and
this Lease shall thereupon terminate.

55.

If Lessor rejects Lessee's offer to purchase the Leased Property by written notice given forty-five (45) days preceding the last day of the Fixed Term, this Lease shall terminate on the Final Purchase Date (unless this lease shall have been renewed pursuant to the provisions of Article XXII), provided Lessee is not then in Default under this Lease, and the Rent shall be paid to the Final Purchase Date.

## ARTICLE XXXVIII

38. _No Discrimination_. Lessee covenants by and for itself, its successors and assigns, and all persons claiming under or through Lessee, that this Lease is made and accepted upon and subject to the condition that there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, national origin, or ancestry, in the leasing, subleasing, transferring, use, or enjoyment of the Land, nor shall the Lessee, or any person claiming under or through Lessee, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy, of tenants, lessees, sublessees, subtenants or vendees in the Land.

## ARTICLE XXXIX

39. _Miscellaneous_. If any term or provision of this Lease or any application thereof shall be invalid or unenforceable, the remainder of this Lease and any other application of such term or provision shall not be affected thereby. If any interest charges or penalties provided for in any provision of this Lease exceed the maximum rate permitted by applicable law, the parties agree that such charges shall be fixed at the maximum permissible rate. Neither this Lease nor any provision hereof may be changed, waived, discharged or terminated except by an instrument in writing and recordable form signed by Lessor and Lessee. All the terms and provisions of this Lease shall be binding upon and inure to the benefit

56.

of the parties hereto and their respective successors and
assigns.  The headings in this Lease are for convenience of
reference only and shall not limit or otherwise affect the
meaning hereof.  This Lease shall be governed by and con-
strued in accordance with the laws of the State of
California.  Compliance by the Guarantor with any provi-
sion of this Lease shall be deemed compliance by Lessee
therewith.

### ARTICLE XL

40.  <u>Memorandum of Lease</u>.  Lessor and Lessee shall,
promptly upon the request of either, enter into a short
form memorandum of this Lease, in form suitable for
recording under the laws of the State of California,
in which reference to this Lease shall be made.

IN WITNESS WHEREOF, the parties have caused this
Lease to be executed and Lessee has caused its corporate
seal to be hereunto affixed and attested by its respective
officers thereunto duly authorized.

EGS OF CALIFORNIA

By _____
          Authorized Signatory

Witness:

K mart ENTERPRISES OF CALIFORNIA, INC.

By _____
                    President

[Corporate Seal]

Attest: _____
          Assistant Secretary

57.

# EXHIBIT 2

==============================================================

# FIRST AMENDMENT

Dated as of May 29, 1978

TO

LEASE

Dated as of December 15, 1977

BETWEEN

EGS OF CALIFORNIA
Lessor

AND

K mart ENTERPRISES OF CALIFORNIA, INC.
Lessee

Covering property located in Temple City, California

==============================================================

FIRST AMENDMENT TO LEASE

First Amendment (this "First Amendment"), dated as of May 29, 1978, between EGS OF CALIFORNIA ("Lessor"), a California general partnership having an address c/o Eltinge, Graziadio & Sampson Development Company, P. O. Box 92959, Los Angeles, California 90009, and K mart ENTERPRISES OF CALIFORNIA, INC. ("Lessee"), a Michigan corporation having an address at 3100 West Big Beaver, Troy, Michigan 48084, to Lease (the "Lease"), dated as of December 15, 1978.

W I T N E S S E T H:

Pursuant to the Lease between Lessor, as lessor, and Lessee, as lessee, dated as of December 15, 1978, Lessor leased to Lessee a parcel of real property and the improvements thereon located in Temple City, California and more particularly described in Schedule A thereto and hereto. Except as defined herein, all capitalized terms used herein are intended to have the respective meanings set forth in the Lease. Lessor and Lessee now desire to amend the Lease as provided in this First Amendment.

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lessor and Lessee hereby agree as follows:

(1) Article XXII of the Lease is hereby amended to read in its entirety as follows:

"ARTICLE XXII

22. Renewal Terms. If no Event of Default shall have occurred that has not been waived and Lessor shall have rejected Lessee's offer to purchase the Leased Property pursuant to Article XXXVII,

Lessee is hereby granted the right to renew this
Lease for seven successive terms of five years
each, upon giving written notice to Lessor of one
or more of such renewals at least one hundred eighty
(180) days prior to the termination of the then
current Term.   During each such renewal term all of
the terms and conditions of this Lease shall continue
in full force and effect except that (i) the net
annual Basic Rent payable during the first renewal
term shall be in an amount equal to the product of
(a) the annual debt service constant which will
fully amortize, on a level payment basis monthly
in arrears, a five-year loan at the lowest interest
rate then generally available to Guarantor, times
(b) the sum of $706,550.68, provided, however, that
such Basic Rent shall not be less than 4% of the
Cost of the Leased Property nor be more than 7%
of the Cost of the Leased Property, (ii) the net
annual Basic Rent for the second through seventh
successive renewal terms shall be the sum of $141,428
per annum, (iii) the Basic Rent shall be payable
during each renewal term hereof in equal, consecutive,
monthly installments, in arrears, and (iv) the number
of renewal terms permitted hereunder shall be reduced
by one upon the expiration of each renewal term for
which Lessee has exercised its option."

(2)   This First Amendment is expressly made a part
of the Lease and the term "Lease" as used herein and
therein shall be deemed to include this First Amendment.
Except as hereby expressly amended, the Lease is in all
respects ratified and confirmed and all the terms, con-
ditions and provisions thereof, as amended hereby, shall
remain in full force and effect.


IN WITNESS WHEREOF, the parties have caused this
First Amendment to be executed and Lessee has caused
its corporate seal to be hereunto affixed and attested
by its officers thereunto duly authorized.

                    EGS OF CALIFORNIA

                    By _____
                          Authorized Signatory

                    By _____
                          Authorized Signatory

          2.

Witness:

K mart ENTERPRISES OF CALIFORNIA, INC.

By _____
                 President

Attest:

_____
        Secretary

Witness:

_____

Approved:

                                    [Corporate Seal]

THIRD/KML PROPERTIES CORP.

By_____
          Vice President

SHAWMUT BANK OF BOSTON, N.A.,
                As Trustee

By_____

_____
W.B. Wadland, as Trustee

3.

Witness:

_____

_____          K mart ENTERPRISES OF CALIFORNIA, IN

                                 By _____
                                            President

Attest:

_____
     Secretary

Witness:

_____          [Corporate Seal]

Approved:

THIRD KML PROPERTIES CORP.

By_____
     Vice President

SHAWMUT BANK OF BOSTON, N.A.,
          As Trustee

By _____ TRUST OFFICER
_____
W.B. Wadland, as Trustee

3.

COMMONWEALTH OF MASSACHUSETTS )
                              : ss.
COUNTY OF SUFFOLK             )


     On the 5th day of June , 1978, before me the
undersigned authority personally came W. B. Wadland to me
known to be the individual described in and who executed
the foregoing instrument, and acknowledged before me that
being informed of the contents of said instrument he executed
the same voluntarily.


                                    _____
                                         Notary Public

[Notarial Seal]                     CLINTON W. CASHMAN
                                    My Commission Expires Sep. 27, 1979

COMMONWEALTH OF MASSACHUSETTS )
                              :  ss.
COUNTY OF SUFFOLK             )

       On the *5th* day of   *June* , 1978, before me the
undersigned authority personally came    J. J. QUIGLEY    whose
name as a Trust Officer of Shawmut Bank of Boston, N.A., a
Massachusetts corporation, is signed to the foregoing
instrument and to me known, who, being by me duly sworn,
did depose, say and acknowledge before me that he resides
at No. *207 West Eighth St. South Boston Mass 02127*
               ; that he is a Trust Officer of Shawmut
Bank of Boston, N.A., the corporation described in and which
executed the foregoing instrument; that he knows the seal
of said corporation; that the seal affixed to said instrument
is such corporate seal; that it was so affixed by order of
the board of directors of said corporation, the he signed
his name thereto by like order, and that being informed of
the contents of said instrument, he, as such officer and
with full authority, executed the same voluntarily for
and as the act of said corporation.

                              _____
                                    Notary Public

[Notary Seal]                 CLINTON W. CASHMAN
                              My Commission Expires Sep. 27, 1979

STATE OF CALIFORNIA,
LOS ANGELES COUNTY

I, *SHARRON A. Aron*                , a Notary Public in
and for said county in said state, hereby certify that
*George M. Eltinge* and *James K. Sampson*, whose names as partners
of EGS of California, a general partnership are signed to
the foregoing instrument, and who are known to me, ac-
knowledged before me on this day that, being informed of
the contents of the instrument they, as such partners,
and with full authority executed the same voluntarily
for and as the act of said general partnership.

Given under my hand and seal of office this *18 th*
day of *July*      , A.D: 1978.

_____
Notary Public

[Notarial Seal]

My commission expires:

OFFICIAL SEAL
SHARRON A. ARON
NOTARY PUBLIC CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires Sept. 21, 1980

STATE OF MICHIGAN    )
                     : SS.:
COUNTY OF OAKLAND    )


     I,                    , a Notary Public in and for said
county and state, hereby certify that
whose name as            of K mart ENTERPRISES OF CALIFORNIA,
INC., a corporation, is signed to the foregoing instrument
and who is known to me, acknowledged before me on this
day that, being informed of the contents of the instrument,
he, as such officer, and with full authority, executed the
same voluntarily for and as the act of said corporation.

     Given under my hand and seal of office this
day of           , A.D., 1978.


                              _____
                                   Notary Public


[Notarial Seal]

Los Angeles County
Temple City, California

SCHEDULE A

PARCEL A:

PARCEL 1, in the City of Temple City, in the County of Los
Angeles, State of California, as shown on Parcel Map No.
6145, filed in Book 62, Pages 51 and 52 of parcel maps, in
the office of the County Recorder of said county.

Except therefrom all oil, gas and other hydrocarbon sub-
stances in and under said land, but without any right to
penetrate, use or disturb the surface of said property or
any portion of said property within 500 feet of the surface
thereof, as reserved from various portions thereof by deeds
recorded December 31, 1974, as Instrument No. 590, 592, 594,
599, 603, 605, 607, 610, 613, 616, deeds recorded January 2,
1975, as Instrument No. 195 and 200, deed recorded February
26, 1975, as Instrument No. 294 and deed recorded July 9,
1975, as Instrument No. 396.

PARCEL B:

A non-exclusive easement for ingress and egress, passage of
and parking of automobiles, and the passage of pedestrians
over those certain portions of Parcels 2, 3 and 4 of said
Parcel Map 6145 filed in Book 62, Pages 51 and 52 of parcel
maps, in the office of the County Recorder of said county
not designated as "building areas" on a plot plan marked
Exhibit "A" attached to that certain instrument entitled
"Construction, Operation and Reciprocal Easement Agreement"
and "First Modification, Construction, Operation and Recip-
rocal Easement Agreement" recorded December 31, 1975 as
Document No. 5877.

PARCEL C:

A non-exclusive right and easement for vehicular and pedestrian
ingress and egress and for parking of vehicles over those
portions of Lots 25, 26 and 39, 40 and 42 of Tract 3623 in
the City of Temple City, in the County of Los Angeles, State
of California, as per map recorded in Book 40, Page 52, of
maps in the office of the County Recorder, together with
that portion of Live Oak Avenue as shown on said map described
as a whole as follows:

Beginning at a point on the west line of said Lot 42, said
point being the northeast corner, Parcel Map 6145, as per
map recorded in Book 62, Pages 51 and 52 of Parcel Maps,
records of said county, said point also being on the southerly

-2-

line of Las Tunas Drive, 134.00 feet wide, as described in
the final decree of condemnation in the Superior Court of
Los Angeles County Case No. 269622, a certified copy thereof
recorded in Book 12289, Page 277 Official Records of said
county, said southerly line being on a curve concave north-
erly and having a radius of 1612.00 feet, a radial line to
said point of beginning bears south 0 degrees, 16 minutes,
37 seconds east, as shown on said Parcel Map 6145; thence
easterly along said southerly line of Las Tunas Drive an arc
length of 150.25 feet through a central angle of 5 degrees,
20 minutes, 25 seconds to the easterly line of said Lot 42,
a radial line to said point bears south 5 degrees, 37 minutes,
02 seconds east; thence along the easterly line of said Lot
42 south, 0 degrees, 09 minutes, 18 seconds, west 208.84
feet to the southeasterly corner thereof; thence along the
northerly line of said Lot 40, north 89 degrees, 59 minutes,
52 seconds, east 130.04 feet to the westerly line of the
easterly 20.00 feet of said Lot 40, said point being on the
westerly line of Rosemead Boulevard, 100.00 feet wide, as
shown on File Map No. 11264 on file in the office of the
County Engineer of said county; thence along said westerly
line of Rosemead Boulevard south 0 degrees, 09 minutes, 00
seconds, west 341.43 feet; thence leaving said westerly line
north 89 degrees, 48 minutes, 49 seconds, west 192.49 feet;
thence south 0 degrees, 11 minutes, 11 seconds, west 140.00
feet; thence south 89 degrees, 48 minutes, 49 seconds, east
193.20 feet to said aforementioned westerly line of Rosemead
Boulevard; thence along said westerly line south 1 degree,
06 minutes, 45 seconds, east 33.27 feet; thence leaving said
westerly line north 89 degrees, 48 minutes, 49 seconds, west
243.95 feet; thence north 0 degrees, 11 minutes, 11 seconds,
east 141.36 feet; thence north 89 degrees, 48 minutes, 49
seconds, west 37.49 feet to the westerly line of said Lot
26, also being the easterly line of said Parcel Map 6145;
thence along said easterly line north 0 degrees, 09 minutes,
00 seconds, east 573.53 feet to the northeast corner thereof
and to the point of beginning.

PARCEL D:

An easement for vehicular and pedestrian ingress and egress
in, over and across those portions of Lot 6, Tract No. 3623,
in the City of Temple City, in the County of Los Angeles,
State of California, as per map recorded in Book 40, Page 52
of maps, and of those portions of Parcel 5, Parcel Map No.
6145, in the City of Temple City, in the County of Los
Angeles, State of California, as per map filed in Book 62,
Page 51 of parcel maps, both official records of the
County Recorder of said county, lying within a strip of land
30 feet in width, described as follows:

-3-

Beginning at the intersection of the northeasterly line of the Los Angeles County Flood Control District, Eaton Wash Channel with the northerly line of Broadway, as shown on said Parcel Map No. 6145; thence along said northeasterly line of Eaton Wash north 14 degrees, 10 minutes, 42 seconds, west 136.66 feet and north 9 degrees, 44 minutes, 30 seconds, west 330.17 feet to the intersection with a curve concave westerly and having a radius of 79.00 feet, a radial line to said point bears south 34 degrees, 02 minutes, 01 seconds east; thence northerly along said curve an arc length of 45.48 feet; through a central angle of 32 degrees, 58 minutes, 58 seconds to the northerly line of Parcel 5 of said Parcel Map No. 6145, a radial line to said point bears south 67 degrees, 00 minutes, 59 seconds east; thence along said northerly line of said Parcel 5 north 80 degrees, 15 minutes, 30 seconds east, 33.82 feet to the intersection with a curve concave westerly and having a radius of 109.00 feet, said curve being concentric with and distant 30.00 feet east, measured radially, from said aforementioned curve having 79.00 feet radius, a radial line to said point of inter-section bears south 76 degrees, 40 minutes, 26 seconds east; thence southerly along said curve an arc length of 60.77 feet through a central angle of 31 degrees, 56 minutes, 43 seconds to the intersection with a line that is parallel with and distant 30.00 feet east, measured at right angles, from said aforementioned northeasterly line of Eaton Wash; thence along said parallel line south 9 degrees, 44 minutes, 30 seconds, east 311.71 feet and south 14 degrees, 10 minutes, 42 seconds, east 143.42 feet to the northerly line of Broadway; thence along said northerly line north 89 degrees, 23 minutes, 45 seconds, west 31.03 feet to said northeasterly line of Eaton Wash and the point of beginning.

SUBJECT TO:

1.    Taxes and assessments not yet due and payable.

2.    Easement in favor of the Los Angeles County Flood Control District reported in Book D-410 at page 801, as instrument No. 4662.

3.    An access easement in favor of the City of Temple City recorded as instrument No. 3989, on August 12, 1975.

4.    Sanitary sewer easement in favor of the City of Temple City recorded as instrument No. 3990, on August 12, 1975.

-4-

5.   The terms and provisions of the Redevelopment Plan of the Temple City Community Redevelopment Agency referred to in instrument No. 3581 recorded in Book M-4077 at page 837.

6.   The terms and provisions of that certain unrecorded Disposition and Development Agreement, dated April 27, 1974, and entered into by and between the Temple City Community Redevelopment Agency and Eltinge, Graziadio and Sampson Development Company, and a first amendment thereto, dated December 3, 1974, which documents are referred to in deeds recorded as instrument No. 45 and instrument No. 447, both on September 25, 1975.

7.   Covenants, conditions and restrictions in deeds recorded as instrument No. 445 and instrument No. 447, both on September 25, 1975.

8.   Covenants, conditions and restrictions in deed recorded as instrument No. 449, on September 25, 1975.

9.   Ingress and egress easement recorded as instrument No. 449, on September 25, 1975.

10.   The terms and provisions of a Construction, Operation and Reciprocal Easement Agreement recorded in Book D-6923 at page 619, as modified by a First Modification Agreement, dated October 8, 1975, and recorded in Book D-6923 at page 603, and as further modified by a Second Modification Agreement, dated on or prior to December 31, 1977.

11.   Ingress and Egress easement as shown on parcel map No. 6145 and recorded as instrument no. 5880, on December 31, 1975.

12.   Lease, dated December 1, 1974, and recorded as document No. 2849, on July 30, 1975.

13.   Pipe line easement in favor of the Sunny Slope Water Company recorded in Book 1000 at page 115 of Deeds.

14.   Pole easement in favor of Southern California Edison Company referred to as document No. 988 in Book 16451 at page 32.

-5-

15.   Pole easement in favor of Southern California Edison Company referred to in Book D-243 at page 729, as instrument No. 3946.

16.   The terms and provisions of Declaration of Establishment of Easements, Covenants and Option recorded as document No. 3315, on March 9, 1976.

17.   An unrecorded Option, Maintenance and Management Agreement, Covenants, dated as of October 1, 1975, by and between the Temple City Redevelopment Agency, Eltinge, Graziadio and Sampson Development Company, A.D. Clark, Inc. and Albertson's, Inc., as amended by a First Amendment, dated as of October 1, 1975, a Second Amendment, dated on or about March 22, 1976 and a Third Amendment, dated on or prior to December 31, 1977.

18.   An unrecorded agreement for Operation and Maintenance of Parking Facilities, dated as of November 1, 1975, by and between the City of Temple City, Eltinge, Graziadio and Sampson Development Company, A.D. Clark, Inc. and Albertson's, Inc., as amended by a First Amendment, dated on or about March 22, 1976 and amended by a Second Amendment, dated on or prior to December 31, 1977.

19.   An easement for telephone lines in favor of the Pacific Telephone and Telegraph Company referred to as document No. 1405, on June 28, 1976.

20.   An easement for electrical systems in favor of Southern California Edison Company referred to as document No. 2957, on August 16, 1976.

21.   Any state of facts as shown on survey dated 6/1/77 prepared by Seaboard Engineering Company.

# EXHIBIT 3



## PARKING ANALYSYS

| TOTAL AREA | OCCUPANCY | SQUARE FOOTAGE | DIVISOR | TOTAL |
|---|---|---|---|---|
| K-MART | RETAIL | 94,500 | 375 | 252 |
| SMALL SHOPS | RETAIL | 6000 | 375 | 16 |
| SUPER A FOODS | RETAIL | 30810 | 375 | 82 |
| CVS | RETAIL | 25740 | 375 | 69 |
| SMALL SHOPS | RETAIL | 20400 | 375 | 54 |
| HOME TOWN BUFFET | RESTAURANT | 20000 | 125 | 160 |
| OFFICE DEPOT | RETAIL | 20000 | 375 | 53 |
| DENNYS | RESTAURANT | 4490 | 125 | 36 |
| BANK | OFFICE | 3148 | 200 | 16 |
| PARKING SPACES REQUIRED | | | | 738 |
| PARKING SPACES AVAILABLE | | | | 911 |
| ADA SPACES = 1% OF TOTAL OVER 500 | | | | 9 |
| VAN ACCESSIBLE 1 IN EVERY 8 ADA SPACES | | | | 2 |

N    SITE PLAN
Scale 1"= 50'-0"

A0.0

# EXHIBIT 4

CONSTRUCTION, OPERATION AND RECIPROCAL

EASEMENT AGREEMENT

This Construction, Operation and Reciprocal Easement Agreement is made

DEE:4
11/2/74

as of the first day of August 1974, between ELTINGE, GRAZIADIO & SAMPSON

DEVELOPMENT CO., a California Partnership, hereinafter referred to as "E,G

& S" and A. D. CLARK, INC., a California Corporation, hereinafter referred

to as "Clark".

RECITALS

1.   The parties hereto are acquiring their respective portions of

that certain real property generally bounded by Las Tunas Drive at the

North, Broadway Avenue at the South, North Rosemead Boulevard at the East,

and the Eaton Wash Control Channel at the West, in the City of Temple City,

County of Los Angeles, State of California.  Said property is delineated on

the Plot Plan attached hereto, marked Exhibit "A", and by this reference

made a part hereof; said property is also described in the legal descriptions

attached hereto, marked Exhibit "B", and by this reference made a part

hereof; the legal boundaries shown on Exhibit "A" are approximately, and in

the event of conflict with Exhibit "B", the descriptions of Exhibit "B"

shall be controlling.  Said real property is hereinafter sometimes referred

to as the "Shopping Center."

2.   The entire property which is the subject of this Agreement is

comprised of Parcels B-1(a), B-1(b), B-1(c), B-2, B-3, B-4, and the Agency

Parking Area, all as shown on Exhibit "A".  There is no Parcel B-5.  Parcels

B-6, B-7, B-8 and B-9 are not presently a part hereof, notwithstanding the

fact they are delineated on Exhibit "A";

(a)   The Temple City Community Redevelopment Agency, hereinafter

referred to as "Agency", is or will be acquiring Parcels B-1(a),

B-1(b), B-1(c), B-2, B-3 and B-4 from their existing owners.   The

parties hereto will be acquiring their respective parcel(s) from the

Agency, pursuant to Disposition and Development Agreements and respective

-1-

VITAL
DOCUMENT

1    amendments thereto (hereinafter collectively referred to as the "D.D.A."),

2    which Agreements (and the respective amendments thereto) provide,

3    among other things, for the terms and conditions of acquisition by

4    each party of its respective parcel or parcels and for the initial

5    construction obligations of each party hereto with respect to each

6    parcel being acquired.

7         (b)   The Agency Parking Area is that portion of the Shopping

8    Center between Rosemead and the eastern boundary line of Parcels B-1(a),

9    B-1(b), B-3 and B-4.  The western boundary of the Agency Parking Area

10   is shown on Exhibit "A".  Parcels B-1(c), B-6, B-7, B-8 and B-9 are

11   not a part of the Agency Parking Area.

12        (i)   The Agency Parking Area is to be acquired and developed

13   by the Agency as a facility for paved surface parking.  Acquisition

14   of the property and development of the surface parking facilities

15   is to be financed by the issuance of parking lease revenue bonds

16   by the Agency.  The Agency is to lease the Agency Parking Area

17   and the facilities thereon to the City of Temple City ("City").

18   The term of the Agency-City lease is to be equal to the term of

19   the bonds, and the annual lease payments made by the City to the

20   Agency are to be equal to, and are to be pledged to secure, the

21   annual payments of principal and interest on the bonds.

22        (ii)   The Agency is to pay all costs of acquiring the land

23   comprising the Agency Parking Area and of constructing, or

24   causing the construction of, the surface parking facilities (with

25   the exception of landscaping, which is to be borne by the parties

26   hereto as provided in Sections 1.5 and 5.1 hereof and the D.D.A.).

27        (iii)   Upon completion of the surface parking facilities,

28   the Agency is to cause the City to sublet to the parties hereto

29   their respective portions of the Agency Parking Areas and the

30   facilities thereon.  Each party's portion(s) of the Agency Parking

31   Area is shown on Exhibit "A".  The sublease term is to be equal

32   to that of Agency-City lease term.  The Agency Parking Area shall

-2-

thereafter be maintained and operated in the manner and for the uses described in Sections 4.1, 4.2, 4.3, 4.4, 5.5, 6 (all), 8, 9, 10, 11.1.f, 12 (all), and 13.1, and 14 (all);

(iv)  The sublease of the Agency Parking Area is to contain an option for the owners of Parcels B-1(a), B-1(b), B-1(c), B-2, B-3, and B-4 to purchase (or lease) their respective portions of the Agency Parking Area (as shown on Exhibit "A") and the facilities thereon at the end of the sublease term.

3.    E,G & S is acquiring, and at the time of the recording of this Agreement will be the owner of, that portion of the entire property that is designated as Parcels B-1(a), B-1(b) and B-1(c) on Exhibits "A" and "B"; and

4.    Clark is acquiring, and at the time of the recording of this Agreement will be the owner of, that portion of the entire property delineated as Parcel B-2 on Exhibits "A" and "B".

5.    The Agency is acquiring Parcel B-3 and may in the future acquire Parcel B-4.

6.    Parcel B-3 shall be entitled to the benefits of this Agreement only if the then existing owner agrees to be bound by this Agreement and to subject Parcel B-3 to the covenants and restrictions of this Agreement and further agrees to grant the easements hereinafter described.

7.    Parcel B-4 shall be entitled to the benefits of this Agreement only if the then existing owner agrees to be bound by this Agreement and to subject Parcel B-4 to the covenants and restrictions of this Agreement and further agrees to grant the easements hereinafter described.

8.    The parties hereto desire that the entire property (Parcels B-1(a), B-1(b), B-1(c), B-2, B-3, and B-4 as delineated on Exhibits "A" and "B") be developed, owned, operated and maintained as a Community Shopping Center and therefore desire to subject each and every parcel of said entire real property the Shopping Center to the covenants and restrictions hereinafter set forth, and further desire to establish the easements hereinafter described, pursuant to a general plan of improvement of the Shopping Center

-3-

as a shopping center, and for the mutual benefit of the owners of any and
all portions thereof and their respective heirs, successors, assigns,
grantees, mortgagees, tenants and subtenants.

9.    The parties hereto agree to abide by the covenants hereinafter
contained and do hereby establish the covenants and restrictions hereinafter
set forth, and do hereby grant the easements hereinafter described.

COVENANTS, RESTRICTIONS AND EASEMENTS

Section 1.   Common Area Preparation

1.1. For the purpose of this Agreement, the Shopping Center is divided
into "Building Areas" and "Common Areas".   The Building Areas are indicated
on Exhibit "A" and are further described in Section 3.   The Common Areas
are described in Section 4.   It is the intent of this Agreement that each
party hereto develop its respective parcel(s) at its sole cost and expense,
in accordance with the D.D.A., the grading plan, and in accordance with
Exhibit "A" attached hereto.

1.2. However, preliminary to the development of the Common Area,
certain investigatory and preliminary planning work must be accomplished,
which investigatory and preliminary planning work is hereinafter defined.
The parties hereto hereby appoint and agree to hire E,G & S to perform this
preliminary investigatory and planning work, and E,G & S agrees to assume
responsibility for the completion of same.

1.3. The work that E,G & S is to undertake and has already undertaken
is as follows:

a.    All architectural and engineering work required to plan and
design the Common Area and off-site improvements and the Agency Parking
Area in accordance with Exhibit "A" attached hereto, including, but
not limited to the following items:

i.    Boundary surveys to the entire Shopping Center and each
parcel and the Agency Parking Area.

-4-

1     ii. Topographic survey.

2     iii. Site layout, geology and soil testing.

3     iv. Engineering of Common Area, Agency Parking Area, and

4    off-site improvements including, but not limited to, the prepara-

5    tion of the rough grading plan, drainage plan, landscaping plan,

6    and plans for walls, fences, utilities (including fire loop),

7    yard lighting, and irrigation.

8     v. Preparation and submittal of an application for a

9    permit as required by the EPA regulations on Indirect Sources and

10    the California Transportation Plan.

11    b. Preparation of this Construction, Operation and Reciprocal

12  Easement Agreement.

13  1.4  E,G & S shall submit to the Agency, for the Agency's approval, a

14 preliminary and a final landscaping plan and a rough grading plan for the

15 Building Area, Common Area of the Shopping Center and for the Agency Parking

16 Area.  It is understood and agreed that all of said plans regarding grading,

17 landscaping, and development of Common Areas and the Agency Parking Area

18 shall be in substantial accordance with Exhibit "A" attached hereto.

19 E,G & S agrees to use reasonable efforts to prepare and submit these plans

20 within the times established in the D.D.A.

21  1.5. Subsequent to approval by the Agency of said plans, each party,

22 at its sole cost and expense, shall improve its parcel in accordance with

23 said approved plans and shall landscape its portion of the Agency Parking

24 Area in accordance with said approved landscaping plan.

25  1.6. The parties hereto agree to reimburse E,G & S for their pro rata

26 share of Expense (as defined below) incurred by E,G & S (past and future)

27 in performance of the investigatory and preliminary work outlined in

28 Section 1.3.  The pro rata share of each party shall be the percentages set

29 forth in Section 6.7 for each party's Parcel(s).  Each party shall periodi-

30

31

32

1    cally reimburse E,G & S upon receipt of a statement from E,G & S indicating

2    the work performed and paid by E,G & S and the pro rata share of the

3    respective party.  The statement from E,G & S for the work performed shall

4    contain photographic copies of the amount of the contractual obligation as

5    submitted to E,G & S, and in the case of billings for drawings prepared by

6    the in-house draftsman of E,G & S, shall contain a signed statement by that

7    draftsman concerning his time spent regarding the investigatory and

8    preliminary work of the Shopping Center.  The term "cost" as used herein

9    means the actual total amount of the fees of the architects, engineers,

10   soil testing firm, surveyors and other contractual obligations plus billings,

11   for drawings (including Exhibit "A") prepared by E,G & S's in-house draftsman,

12   on the basis of twice the gross wages earned by the in-house draftsman for

13   the time spent regarding the investigatory and preliminary work of the

14   Shopping Center.  All parties agree that E,G & S's Expense for the investiga-

15   tory and preliminary work is all costs plus an overhead allowance equal to

16   ten per cent (10%) of such costs other than attorney's fees for preparation

17   of this Agreement and other than billings for the in-house draftsman of

18   E,G & S. In no event shall the overhead allowance to E,G & S exceed a total

19   of four thousand dollars ($4,000.00), provided, however, this limitation

20   shall in no way affect the right of E,G & S to collect from the parties

21   their pro rata shares of all costs, even those in excess of forty thousand

22   dollars ($40,000.00).

23                    Section 2.  Use in General

24        2.1. Neither the Shopping Center nor any part of it will be used, and

25   no building or other improvement will be constructed, maintained, or used,

26   for any purpose other than the following: those generally located in similar

27   shopping centers in California.  Such purposes include, without limiting

28   the foregoing, food market, retail, offices, and service establishments.

29   Service establishments include, without limitation, financial institutions,

30   brokerage houses, restaurants, automotive service stations, travel and

31   other agencies.  Such purposes exclude, without limiting the foregoing,

32

                                    -6-

1    automotive sales, display areas, bowling alleys, skating rinks, motion

2    picture theatres, other similar recreational uses, mortuary, commercial

3    laundry plant, transportation depots of any sort, and similar establishments

4    unless specifically approved in writing by the owner of each parcel.  These

5    restrictions are for the sole purpose of maintaining the integrity and

6    adequacy of the Common Area.

7        2.2  All uses shall comply with all of the requirement of all municipal,

8    regional, state and federal authorities now in force or which may hereinafter

9    be in force pertaining to the use of this Shopping Center.

10        2.3. In advertising of owners, tenants and subtenants of owners and

11    businesses of owners, tenants and subtenants of owners in the Shopping

12    Center, the Shopping Center shall not be referred to or described by any

13    name other than Temple City Shopping Center, Temple City Plaza, Camellia

14    Plaza, or such other name as may be first consented to in writing by all

15    owners.  Nothing herein shall be construed to prohibit an owner or tenant

16    or subtenant from using its own business name (provided such name does not

17    expressly purport to be a name for the Shopping Center) and the address of

18    the Shopping Center or the address of that owner, tenant or subtenant.

19                        Section 3.  Building Areas

20        3.1. No building shall be initially erected, constructed or placed on

21    any part of the Shopping Center until and unless the construction drawings,

22    plans, specifications and related documents have been approved by the

23    Project Architect and by the Agency.  The Project Architect shall be

24    John K. Grist, 2749 West Broadway, Los Angeles, California 90041, telephone

25    number (213) 254-1777.  The perogatives and authority of the Project

26    Architect shall be limited to developing an integrated architectural design

27    theme for all of the buildings in the Shopping Center, and the authority of

28    the Project Architect to disapprove or approve the construction drawings,

29    specifications and related documents shall be limited to achieving such

30    integrated architectural design theme.  The shape, scale of volume,

31    exterior design, and exterior finish of each building must be consistent

32

-7-

1   with, visually related to, physically related to, and an enhancement to

2   each other and to adjacent buildings within the Shopping Center.   The

3   Project Architect may be over-ruled or disregarded by the Agency, in which

4   event approval of the Project Architect shall not be required.   The

5   construction drawings, specifications and related documents must be submitted

6   to the Agency in two stages: preliminary and final drawings, with final

7   drawings to be submitted as each element of such drawings is completed.

8   Final drawings and plans and specifications are hereby defined as those in

9   sufficient detail to obtain a building permit.   The filing of a Certificate

10   of Compliance in accordance with the D.D.A. shall be deemed to conclusively

11   evidence compliance with this Section 3.1.

12       3.2. After the initial construction, erection or placement of each

13   building, such building shall not be reconstructed, altered, added to, or

14   maintained in such a fashion as to alter in any material way its exterior

15   appearance or color until such alteration in exterior appearance or color

16   be approved (which approval shall not be unreasonably withheld) by the

17   owners of Parcels B-1(a), B-1(b), B-1(c), B-2, B-3, and B-4.   Each of the

18   owners, or their successors in interest, shall, upon giving such above

19   mentioned approval, evidence same on the final specifications and the

20   elevation sheets of the working drawings for such building or alteration.

21   If disapproval has not been given within fifteen (15) days after written

22   request for approval, then such approval shall be deemed to have been given

23   by any owner who has not disapproved within that period.   Any disapproval

24   shall set forth the reasons for that disapproval.

25       3.3. The construction, establishment and maintenance of buildings and

26   other structures in the Shopping Center must be confined within the lines

27   of those Building Areas described in Exhibit "A" and within the maximum

28   allowable square footages for each parcel as set forth in Section 6.7 and

29   must be limited in height to buildings of one story not higher than thirty

30   (30) feet.   Provided, however, the foregoing restrictions shall not prohibit:

31   any building with a mezzanine not used for conducting retail sales and not

32

-8-

larger than fifteen per cent (15%) of the maximum allowable square footage

for each parcel as set forth in Section 6.7; any building of two stories on

that portion of Parcel B-1(a) identified on Exhibit "A" as "Offices, Two

Stories", but any second story or mezzanine shall be included in the

computation of the maximum allowable square footage for Parcel B-1(a); or a

mezzanine of any size on Parcel B-1(c), but such mezzanine shall be included

in the computation of the maximum allowable square footage for Parcel B-

1(c).  Furthermore:

    a.    The Building Area for Parcel B-1(a) includes the area of

approximately 5365 square feet identified on Exhibit "A" as "Garden

Shop."  The Building Area for Parcel B-3 includes the area of

approximately 1690 square feet identified on Exhibit "A" as "O.S.A."

    b.    The maximum allowable square footage for Parcel B-1(a) is

119,065 square feet, and the owner, tenant or subtenant of Parcel B-

1(a) is not required to maintain the divisions of that Building Area

as depicted on Exhibit "A".

    c.    The owner, tenants and subtenants of Parcel B-1(a) are

restricted from occupying or using any office building within the area

identified on Exhibit "A" as "Offices, Two Stories" until at least

5,000 square feet of retail store space has been constructed facing the

front of the Shopping Center and within that portion of Parcel B-1(a)

immediately north of the building area of Parcel B-1(c).

<u>Section 4.  Common Areas and Agency Parking Area</u>

4.1. For the purpose of this Agreement, all of the areas within the

Shopping Center to be used in common shall be referred to as "Common Area",

and said Common Area shall include all areas within the Shopping Center

other than Building Areas.  All of the area within the Agency Parking Area

shall also be used in common.  Said Common Area and said Agency Parking

Area are delineated on Exhibit "A".  This Agreement does not enlarge the

rights of the sublessees under the lease of the Agency Parking Area, but

-9-

1   this Agreement does restrict the rights of the parties hereto with respect

2   to the Agency Parking Area.

3       4.2. The "Common Area", as that term is used herein, and the Agency

4   Parking Area shall be used, maintained, and built to include and permit

5   only the following:

6           a.   The parking of passenger vehicles, and pedestrian and

7       vehicular traffic, of all persons who may own or hold portions of real

8       property within the Shopping Center or any leasehold estate, or any

9       security interest therein, or building space thereon, and their

10      respective heirs, successors, assigns, grantees, mortgagees, tenants

11      or subtenants; and the officers, directors, concessionaires, agents,

12      employees (subject to Sections 6.15, 6.14 and 6.17), customers, visitors,

13      and other licensees or invitees of any of them;

14          b.   The ingress and egress of any of the persons designated in

15      4.2.a. and their vehicles, to any and from any portion of the Common

16      Area or Agency Parking Area and the public streets adjacent to the

17      Common Area or Agency Parking Area;

18          c.   The installation, maintenance and operation of public

19      utility services for landscaped areas and any Building Area within the

20      Shopping Center.  Vaults, manholes, meters, pipelines, valves, hydrants,

21      sprinkler controls, conduits, related facilities, and sewage facilities,

22      all of which (except hydrants and transformer pads, provided the

23      latter are west of the Building Areas and within ten (10) feet of the

24      Building Areas) shall, whenever reasonably feasible, be even with or

25      below the surface; provided, however, that all the parties may mutually

26      agree in writing that the foregoing such facilities may be above the

27      surface.  In no event, however, shall such facilities be located in

28      such a manner as to hinder or impede the other uses or maintenance of

29      any portion of the Common Area or Agency Parking Area provided for in

30      this Agreement, and in no event shall such facilities be located upon

31

32

-10-

any parcel of the Shopping Center without the prior written consent, in recordable form, of the owner thereof, which consent shall not be unreasonably withheld, as set forth in Section 4.10.

d.    Pedestrian and vehicular movement by the persons designated in 4.2.a. of this Agreement to and from adjacent streets and between mercantile, business and professional establishments and occupants located or to be located within said building area;

e.    The provision of other facilities such as mailboxes, public telephones and benches for the comfort and convenience of the customers, visitors, invitees, licensees and patrons of mercantile, business and professional establishments and occupants located or to be located upon the building areas or any portion thereof, as said owners and their respective heirs, successors, assigns or grantees may from time to time deem appropriate.  In no event, however, shall such facilties be located in such a manner as to hinder or impede the other uses or maintenance of any portion of the Common Area or Agency Parking Area provided for in this Agreement, and in no event shall such facilities be located upon any parcel of the Shopping Center without the prior written consent of the owner thereof;

f.    The construction, maintenance, repair, replacement, rearrangement and reconstruction of parking sites and stalls, private streets, sidewalks, ramps, driveways, lanes, curbs, customer traffic control areas, signals, traffic islands, traffic and parking light facilities;

g.    Subject to applicable laws and regulations and other conditions precedent hereinafter described, the construction, maintenance, repair, replacement and reconstruction of pylon signs and other free-standing signs, with appropriate underground electrical services provided they are separately metered.  The size, color and lighting of each sign during the initial construction period are subject to the approval of

-11-

the Agency.  No pylon or other free-standing sign shall be erected, placed or maintained on any part of the Shopping Center without the prior consent of the City of Temple City.

i.  If the necessary permits can be obtained, the pylon signs shall be placed approximately as indicated on Exhibit "A", unless the parties hereto agree otherwise in writing.

ii.  If the necessary permits cannot be obtained for the pylon signs indicated on Exhibit "A", the following provisions shall apply:

If three (3) pylon signs are approved by the City of Temple City for the entire Shopping Center, one such pylon sign shall be located on Parcel B-1(a) for the sole benefit of the occupant of the building on that parcel and one such pylon sign shall be located on Parcel B-3 for the sole benefit of the occupant of the building on that parcel.

If there are two (2) pylon signs allowed by the City of Temple City, one of those pylon signs shall be located on Parcel No. B-1(a) and shall be for the sole benefit of the occupants of Parcel B-1(a) and B-1(b) and one of those pylon signs shall be located on Parcel B-3 and shall be for the occupants of Parcels B-3 and B-2.

If there is only one (1) pylon sign allowed by the City of Temple City, that pylon sign shall be located on Parcel B-1(a) and shall be for the benefit of the occupants of Parcels B-1(a), B-1(b), B-2 and B-3.  The top spot or place on that pylon sign shall be for the sole benefit of the occupant of Parcel B-1(a).  The second place or spot on that pylon sign shall be for the sole benefit of the occupant of Parcel B-3.  The occupant of Parcel B-1(b) shall have its choice of the remaining two places on that pylon sign.

-12-

iii. The square footage of the signs, both pylon and free-standing, for the occupants of Parcels B-1(a), B-1(b), B-2 and B-3 must be of approximately equal square footage (as determined by the Temple City ordinances). No signs shall be permitted within the Shopping Center other than pylon, free-standing and wall signs that identify the occupants of the Shopping Center. No party to this Agreement, no owner of any parcel within the Shopping Center, and no occupant of the Shopping Center, shall submit an application for a sign permit or erect any sign that is inconsistent with the provisions of this Agreement. Except as stated in subsections i and ii above, nothing herein shall be deemed to allow a sign to be placed on any parcel without the permission of the owner of that parcel. If signs are shared, the initial cost of installation and construction and costs of maintenance, repairs and taxes shall be shared pro rata by the occupants whose names appear on the shared signs (it being understood that there shall be no rental charge for the ground upon which the sign is situated).

h.    The construction, maintenance, repair, replacement and reconstruction of any landscaping area, including planters, planting boxes, edgers, decorative walls and sprinklers and valves, all as may be required by the Agency or other competent local authority.

i.    The ingress and egress of all delivery and service trucks and vehicles to and from the rear or side of the Building Area or any portion thereof and any public streets adjacent to the Shopping Center, for the delivery of goods, wares, merchandise and the rendition of services to all persons or other entities who may own or hold portions of the Building Area or any leasehold estate, or any security interest therein, or building space thereon, and their respective heirs, successors, grantees, assigns, tenants and subtenants thereof,

-13-

1    and the officers, directors, concessionaires, agents, employees and

2    licensees of any of them.

3          j.    The parking of the automobiles of the employees of the

4    occupants of any building area, such use being subject to the provisions

5    contained herein.

6    4.3. Except as provided in the sublease of the Agency Parking Area, no

7    persons other than those described in Section 4.2.a. shall be permitted to

8    park upon or exercise any other rights over any of the Common Areas (except

9    the Agency Parking Area) of the Shopping Center.

10          a.    In the event that unauthorized persons, including tenants or

11    invitees of tenants occupying buildings now or any future time located

12    beyond the limits of the Shopping Center located within the real

13    property described in Recital No. 1, utilize said Common Areas (except

14    the Agency Parking Area) for parking or other purpose, the Operator,

15    as that term is described in Section 6, shall take whatever action

16    shall be so requested by the owner of any parcel with the Shopping

17    Center to prevent said unauthorized utilization.

18          b.    In the event that any person unauthorized by the sublease of

19    the Agency Parking Area utilizes the Agency Parking Area or in the

20    event any person utilizes the Agency Parking Area for a purpose

21    unauthorized by said sublease, the Operator, as that terms is described

22    in Section 6, shall take whatever action shall be so requested by the

23    owner of any parcel with the Shopping Center, to prevent said

24    unauthorized utilization.

25    4.4. Notwithstanding the foregoing, portions of the Agency Parking

26    Area may be used for the purposes set forth in Sections 4.4.b, 4.4.g, and

27    4.4.h.  Each owner, and that owner's tenants and subtenants, may use those

28    portions of the Common Area adjacent to that owner's Building Area(s)

29    for any of the following:

30

31

32

-14-

a. The installation, removal, repair, replacement and mainte-
nance of building canopies from any Building Area over pedestrian
sidewalks and over other Common Areas a distance not exceeding fifteen
(15) feet together with canopy support columns upon and over such
sidewalks and other Common Areas;

b. Subject to the approval of the Agency during the initial
construction, such advertising or identification signs of the owner of
each parcel and the occupants, contractors, subcontractors, and
material suppliers of such owner as may be desired and allowed by such
owner to be attached to or mounted upon such canopies projecting from
that owner's Building Area or on such owner's parcel; nothing herein
shall be deemed to allow such signs be placed on any parcel without
the permission of the owner of that parcel.

c. The installation, removal, replacement, repair, use and
maintenance of fire hose connections, down spouts, hose bibbs, stand
pipes, lights or floodlights, roof overhangs, and subsurface building
footings (to a maximum of three (3) feet), walls, and foundations of
buildings (to a maximum of six (6) inches) and such signs if not
otherwise prohibited or shadow boxes of building occupants as may be
attached to or form an integral part of a building at any time lawfully
situated upon any portion of the Building Area;

d. Providing it would not prevent a reasonable flow of vehicular
traffic, the construction, repair, reconstruction and operation of a
ramp and loading dock adjacent to and behind the Building Area which
it is to service;

e. Provided it would not prevent a reasonable flow of vehicular
traffic, the construction, repair, reconstruction and operation of
trash rooms or trash bins and temporary storage of pallets and shipping
containers adjacent to and behind the Building Area which is to be
serviced thereby;

-15-

f.    The opening outward of doors from contiguous Building Area;

g.    The temporary erection of ladders, scaffolding and store front barricades during periods of construction, reconstruction, remodeling or repair of buildings and building appurtenances, upon the condition, however, that such construction, reconstruction, remodeling or repair is diligently performed and subsequent to such performance such ladders, scaffolding and barricades are thereupon promptly removed.

h.    The temporary storage of construction materials, construction offices (including trailers), and equipment used and to be used during the course of construction of any building that may hereafter be constructed upon the Building Area, provided that such use does not unreasonably interfere with the normal use of the Common Area, and provided further that such use is restricted to the parcel or portion of the Agency Parking Area of the party doing the construction.

i.    The display, storage and sale of Christmas trees, and related activities, during the Christmas season, provided however, such use is restricted to the immediate vicinity of those portions of Parcels B-1(a) and B-3 identified, respectively, on Exhibit "A" as "Garden Shop" and "O.S.A."  Nothing herein shall be deemed to allow such use on Parcel B-1(a) or B-3 without the permission of the owner of that parcel.

4.5. The easements hereinafter granted in Sections 4.6 through 4.10 shall in each instance run for the period of the duration of the effectiveness of this Agreement as provided for in Section 14.1. and shall be appurtenant to each designated parcel of the grantee of such easement and in each instance shall be non-exclusive and for the use and benefit, in common with grantor and others, of such grantee, its heirs, executors, administrators, successors, assigns, tenants, and subtenants.

4.6. E,G & S does hereby grant to the other parties to this Agreement an easement appurtenant to each of their respective parcels for the purposes

-16-

and with the restrictions stated in Section 4.2. over, across, upon, in,

under and through the Common Area of Parcels B-1(a), B-1(b) and B-1(c) and

E,G & S's respective portions of the Agency Parking Area.

4.7. Clark does hereby grant to the other parties to this Agreement an

easement appurtenant to each of their respective parcels for the purposes

and with the restrictions stated in Section 4.2. over, across, upon, in,

under and through the Common Area of Parcel B-3 and Clark's respective

portion of the Agency Parking Area.

4.8. The owner of Parcel B-3 shall grant to the other parties to this

Agreement an easement appurtenant to each of their respective parcels for

the purposes and with the restrictions stated in Section 4.2. over, across,

upon, in, under and through the Common Area of Parcel B-3 and that owner's

respective portion of the Agency Parking Area.

4.9. The owner of Parcel B-4 shall grant to the other parties to this

Agreement an easement appurtenant to each of their respective parcels for

the purposes and with the restrictions stated in Section 4.2. over, across,

upon, in, under and through the Common Area of Parcel B-4 and that owner's

respective portion of the Agency Parking Area.

4.10. The owner of each parcel shall grant, across the Common Area of

such owner's parcel and such owner's portions of the Agency Parking Area,

to the owner of another parcel in the Shopping Center such non-exclusive,

underground (except for those items permitted by Section 4.2.c. to be

above ground) utility easements, including but not limited to, telephone,

electric, gas, water, fire loop and sewer, as requested to serve the request-

ing owner's parcel, if the requested easement is located where it will not

significantly hinder or impede the other uses of any portion of the Common

Area or the Building Area (and especially the building entrances) of the

owner of whom such easement is requested.  Each such easement shall contain

a condition and covenant that the grantee shall repair the surface upon

exercise of any of the rights allowed within that utility easement.

-17-

1    4.11.  The owner of each parcel and each party hereto shall join in a

2    non-exclusive and non-appurtenant easement to the Los Angeles County Flood

3    Control District for vehicular and pedestrian ingress and egress along the

4    western boundary of the Shopping Center from the point of egress and

5    ingress to the flood control channel as shown on Exhibit "A" to the southern

6    boundary of the site and to Broadway Avenue; and in a non-exclusive and

7    non-appurtenant easement to the County of Los Angeles for use by the

8    County and the County Sheriff's Department on Parcel B-9, as shown on

9    Exhibit "A", for vehicular and pedestrian ingress and egress along the

10   western boundary of the Shopping Center from the existing Sheriff's Sub-

11   station both north to Las Tunas Drive and south to Broadway Avenue, all as

12   shown on the attached Exhibit "A".  The owners of Parcels B-3 and B-4 may

13   reserve a right of encroachment into said easements for the purposes of

14   loading and unloading and other common area purposes that do not prevent a

15   reasonable flow of vehicular traffic.  The owner of Parcel B-3 shall grant

16   temporary easements across that portion of the Common Area south of the

17   Building Area of Parcel B-3 and continuing to the nearest driveway on

18   Broadway Avenue.  These temporary easements shall be in favor of the

19   grantees and for the purposes described above.  The easements shall cease

20   when the easements depicted on Exhibit "A" are created.  All of the easements

21   to be granted according to this Section 4.11 shall be for the personal

22   benefit of the grantees only and shall not run with their lands.

23   4.12.  Each party to this Agreement does hereby grant, to the owner of

24   property contiguous to the property of the granting party, non-exclusive

25   easements appurtenant to the grantees' respective parcels and adjacent to

26   the common boundary or boundaries as follows:  an easement not in excess of

27   three (3) feet for roof overhangs and subsurface building footings provided

28   they do not unreasonably interfere with the use of the parcel of the granting

29   party; and another easement for encroachments not in excess of six (6)

30

31

32

-18-

1   inches for walls and foundations of buildings provided such encroachment do

2   not unreasonably interfere with the parcel of the granting party.

3                    Section 5.  Common Area Improvements

4       5.1. Each party, prior to the occupancy of any building erected upon

5   the Building Area of such party's parcel, shall grade that parcel in

6   accordance with the rough grading plan mentioned in Section 1.3.a.iv.;

7   shall landscape the Common Area of that parcel and such party's portion(s)

8   of the Agency Parking Area (but only as required by the D.D.A.) in accordance

9   with the landscaping plan referred to in Section 1.3.a.iv.; shall install

10  utilities in accordance with the plans referred to in Section 1.3.a.iv.;

11  and shall improve or cause to be improved as herein specified all portions

12  of the Common Area of that parcel.

13      5.2. All sidewalks adjacent to the Building Area shall be of concrete

14  construction.  All areas for vehicular use shall be paved with a suitable

15  base and surfaced with a heavy duty bituminous or asphaltic wearing surface,

16  and the service driveway shown on Exhibit "A" shall be paved with heavy-

17  duty A.C. (asphaltic concrete) paving.

18      5.3. No fence, division, rail or obstruction of any type or kind shall

19  ever be placed, kept, permitted or maintained between the properties of any

20  owners of any portions of the Shopping Center, or between any subsequent

21  division thereof, or upon or along any of the common property lines of any

22  parcel thereof, excepting within the confines of the Building Area; provided

23  that fences may be erected during the activities permitted by Sections 4.4.g.

24  and 4.4.h. to protect the Building Area, materials, equipment, construction

25  offices, and the public if such fence does not unreasonbly interfere with

26  the normal use of the Common Area; and provided further that fences may be

27  temporarily erected during the activities permitted by Section 4.4.i.

28      5.4. Without the written consent of each owner of each parcel in the

29  Shopping Center, no charge, fee, toll, levy or expense shall ever be

30  required, laid, assessed, or made to or received from any business guest,

31

32

                                    -19-

1    invitee, licensee, visitor, customer or patron of any of said mercantile,

2    business and professional establishments.  The cost and expense of the

3    operation, management, maintenance and repair of the Common Area shall be

4    borne and discharged only as provided for in this Agreement.  However, any

5    owner may require any tenant of such owner to pay a fee or charge for the

6    management, maintenance, repair or operation of the Common Area.

7        5.5. The Common Area layout shall not be altered from that as shown on

8    the attached Exhibit "A" without the prior written consent of each owner of

9    each parcel within the Shopping Center.

10       5.6. Any portion of the Building Area of each parcel of the Shopping

11   Center that is not used by its owner for purposes related to business

12   activities shall, at the sole cost and expense of such owner, be paved and

13   striped prior to when the Shopping Center is generally opened for business,

14   unless construction of the building(s) is in progress.  Such areas shall be

15   used as Common Area parking until construction of the building(s) is commenced.

16   In the event that the parcel is not so kept in such a condition, then, and

17   in such event, the Operator shall have the right to place said Building

18   Area in such a condition at the sole cost and expense of the owner of the

19   parcel on which such work is performed.

20       5.7. In the event that any time during the term hereof, any building

21   or buildings within the Shopping Center shall be damaged or destroyed, by

22   fire, the elements or any other casualty, the owner thereof at such owner's

23   sole expense, shall promptly and with due diligence repair, rebuild or

24   restore the same consistent with the terms and conditions herein contained.

25   Or such owner may, at its option (except as set forth in the following

26   sentence), elect to raze any building so damaged or destroyed and pave the

27   area formerly occupied by said buildings so as to provide additional

28   parking facilities and Common Area facilities, said area is to be paved,

29   marked, drained and maintained in the same manner as other Common Areas in

30   the Shopping Center.  During the first eighteen (18) years of this Agreement,

31

32

-20-

1    the owner of any building damaged or destroyed by any casualty shall not

2    have the option described above, to raze the building and pave the area

3    as additional parking area, and such owner must rebuild, _if_ the following

4    conditions are met:

5        a.    The casualty loss was insured and the insurance funds are

6        or will be available for the reconstruction; and

7        b.    In the event the building was leased, it is not the case

8        that a tenant of the building damaged or destroyed by such casualty

9        has exercised any right under the terms of the lease (between the

10       owner and tenant) to cancel the lease on account of such damage or

11       destruction.   The owner of the area(s) formerly occupied by said

12       building or buildings, at any time after razing the damaged structures

13       and paving the building area, may construct new buildings.   Such

14       construction shall be done in the manner required by Sections 3.2.

15       and 3.3.

16    5.8. The improvement or use, or improvement and use, of any portion

17    of the Building Area for parking or service shall not be construed as a

18    permanent inclusion thereof within the Common Area as herein defined,

19    and such portions may at any time thereafter be improved with buildings

20    and appurtenances as herein provided.

21        Section 6.   Common Area Operation and Maintenance

22    6.1. The owner of Parcel B-1(a) shall, subject to the terms and

23    conditions hereinbelow set forth, be the "Operator".   The Operator shall

24    operate and maintain, or cause to be operated and maintained, those

25    portions of the Common Area and Agency Parking Area of the Shopping

26    Center that are devoted to one or more of the uses permitted by Subsection

27    4.2.a., 4.2.b., 4.2.d., 4.2.f., 4.2.i., 4.2.j.   Such operation and maintenance

28    shall, subject to Section 6.4., include, but not be limited to:

29        a.    Maintaining, replacing and repairing the surfaces in a

30        level, smooth and evenly covered condition with that type of surfacing

31

32

-21-

1    material originally installed or such substitute as shall in all

2    respects be equal in quality, use and durability;

3        b.   Maintaining said Common Areas and Agency Parking Area in

4    good order and repair and in an adequate, sightly and serviceable

5    condition, said maintenance to include, without limitation, keeping

6    the same reasonably free and clear of foreign objects, papers, debris,

7    obstructions, standing water, snow and ice; and to insure the foregoing,

8    the Common Area and Agency Parking Area shall be thoroughly cleaned

9    not less than once weekly, and more often if necessary, and snow

10    removed properly on every occasion where it impedes the use of the

11    Common Area or Agency Parking Area.

12        c.   Placing, keeping in repair, repainting annually, and

13    replacing when necessary all appropriate directional signs, markers

14    and lines; and operating, keeping in repair and replacing when

15    necessary such artificial lighting facilities as shall be reasonably

16    required;

17        d.   Maintaining and repairing any perimeter walls in a good

18    condition and state of repair and replacing same when necessary; and

19        e.   Maintaining all landscaped areas, making such replacements

20    of shrubs and other landscaping as is necessary, and keeping said

21    areas at all times adequately weeded and watered.

22        f.   Lighting of Common Areas and Agency Parking Area during

23    business hours and reasonable periods prior and subsequent thereto at

24    a minimum of one and one-half (1-1/2) foot candles measured at ground

25    level for each square foot of parking area, except as required by law

26    or ordinance.  Notwithstanding the foregoing, the owner of each

27    parcel shall be required to maintain the loading dock(s) adjacent to

28    (and behind) the Building Area of that parcel.  Such maintenance shall

29    include, without limitation, keeping the loading dock free and clear of

30    foreign objects, debris and paper.

31

32

-22-

6.2. As a part of said operation and maintenance, the Operator shall obtain and maintain general public liability insurance, insuring the Operator and all owners of the Shopping Center and major tenants of building space within the Shopping Center, as their respective interests may appear, provided that the Operator has been notified in writing of such interest, against claims for personal injury, death or property damage occurring in, upon or about the Common Area or Agency Parking Area. Such insurance shall be written with an insuror licensed to do business within the State of California, County of Los Angeles. The limits of liability of all such insurance shall not be less than Five Hundred Thousand and No/100 Dollars ($500,000.00) for injury or death to any one person, One Million and No/100 Dollars ($1,000,000.00) for injury or death to more than one person in one occurrence, and Two Hundred Fifty Thousand and No/100 ($250,000.00) with respect to damage to property. If higher limits of liability are required by the sublease of the Agency Parking Area, the Operator shall provide for them. If the sublease of the Agency Parking Area requires the Agency or the City to be named as an additional insured, the Operator shall so provide. Upon the written request of any person having an insurable interest hereunder, the Operator shall cause to be issued proper certificates of insurance.

6.3. The Operator shall expend only the monies reasonably necessary for such operation and maintenance in order to keep the Common Area and Agency Parking Area in good repair and clean condition, as required by this Agreement and the sublease for the Agency Parking Area, and to operate the same on a non-profit basis to the end that the expense in connection therewith will be kept at a minimum. Because the Operator of the Shopping Center is expected to receive only reasonable compensation for overhead and is not expected to operate the Shopping Center in such a manner as to derive a reasonable profit, the Operator shall not be responsible or liable for minor errors, whether of omission or commission, or mistakes in judgment. The Operator shall be liable only for its gross negligence or willful

-23-

1    misconduct.  The other parties to this Agreement hereby waive and release

2    the Operator from any liability or responsibility for ordinary negligence

3    in the performance of the Operator's duties under this Agreement.

4        6.4. The Operator's authority to expend monies for such operation and

5    maintenance of the Common Area and Agency Parking Area, except for those

6    actions required of Operator by Sections 4.3, 5.6 and 6.3, is limited to

7    single capital expenditures and maintenance expenses less than two thousand

8    and no/100 dollars ($2,000.00) each.  For purposes of computing the cost of

9    any periodical maintenance expense, the relevant figure shall be the

10   amount of such expense for a three (3) month period.  For capital expendi-

11   tures or maintenance expenses so computed equal to or in excess of two

12   thousand and no/100 dollars ($2,000.00), the Operator shall follow the

13   following procedure.  The Operator shall inform each and every owner of any

14   portion of the Common Area of the nature of the expense in excess of two

15   thousand and no/100 dollars ($2,000.00) and an estimate of the range of the

16   costs for such expense.  The estimate shall also include a set management

17   fee to be charged by the Operator for overseeing the contract for such

18   capital expenditure or maintenance expense.  The Operator shall have no

19   authority to proceed with the capital expenditure or maintenance expense

20   without the express written authorization of each other owner of any

21   portion of the Common Area.  If the Operator has not received the written

22   approval of each and every owner of any portion of the Common Area within

23   fifteen (15) days after notice of the nature and estimate of such capital

24   expenditure or maintenance expenses equal to or in excess of two thousand

25   and no/100 dollars ($2,000.00), each owner, including the Operator, shall

26   proceed at its own expense to improve, operate or maintain its portion of

27   the Common Area with respect to said capital expenditure or maintenance

28   expense equal to or in excess of two thousand and no/100 dollars ($2,000.00).

29       6.5. The Operator shall, from time to time, but not more often than

30   once each calendar month, send to each and every owner of any portion of

31

32

-24-

the Common Area a written statement of the total cost and expenses, including

management fees, of operation and maintenance of the Common Area and the

Agency Parking Area.  The Operator shall charge a management fee of ten per

cent (10%) of all maintenance expenses and capital expenditures less than

$2,000.00 each for the preceding period; such management fee of ten per

cent (10%) shall not be applicable to any contract with a shopping center

management firm that fulfills the general obligations of the Operator or to

any contract for which a set management fee is established in accordance

with Section 6.5.  Within thirty (30) days after the receipt thereof, each

and every such owner shall pay to the Operator the fractions of the total

amount of such costs and expenses hereinafter described.  Each owner or its

authorized representative shall have the right to examine the records of

cost and expenses in connection therewith at reasonable business hours

(upon reasonable advance notice) and without unreasonable frequency.

6.6. As an alternative to the provisions in the foregoing paragraph,

the Operator may, at its option, modify the method of reimbursement of the

Common Area expense to the extent that an estimated total cost of the

operation, management and maintenance of the Common Area and Agency Parking

Area shall be furnished each owner at the beginning of each calendar year,

which estimated cost shall not be more than the ordinary expenses for the

preceding calendar year. Such estimated cost shall also exclude any extra-

ordinary expenses for the preceding calendar year, but may include any

known extraordinary expenses for the calendar year for which the assessment

is being made.  Each owner or its authorized representative shall have the

right to examine the records of cost and expenses in connection therewith

at reasonable business hours (upon reasonable advance notice) and without

unreasonable frequency.

The amount of estimate shall become the "Common Area Assessment"

and one-twelfth (1/12) of said amount shall become due and payable on the

-25-

first day of each calendar month throughout the remainder of the year.  All
assessment funds received by the Operator or its agent shall be received IN
TRUST and used only for the purposes of paying the cost of operating the
Common Area and Agency Parking Area.  However, the Operator or its agent
may commingle such assessment funds with any other funds of the Operator
provided that Operator keeps separate ledgers to account for such assessment
funds held in trust and commingled.  The Operator shall submit an annual
report of expenses within sixty (60) days after the expiration of each
calendar year hereof, and if there be any deficiency between any amounts
expended and the amounts collected, then each owner shall pay its propor-
tionate share thereof within thirty (30) days after receipt of said annual
report from Operator.  In the event that on December 31 of any calendar
year any funds not expended or obligated as provided above shall remain in
the hands of the Operator, such remaining funds shall be applied as a
credit and in reduction of the Common Area Assessment for the ensuing
calendar year.  It is understood and agreed that Operator is not obligated
to institute this method of using an Assessment.

6.7. Based upon the ratio of floor space permitted hereunder to be
built upon the Building Area of each parcel of the Shopping Center, the
fraction of the total amount of said cost and expenses to be paid by the
owner of each parcel shall be as follows:

| Parcel Numbers | Maximum Building Area (Square Feet) | Percentage |
|---|---|---|
| Parcel B-1(a) | 119,065 | 47.3% |
| Parcel B-1(b) | 27,144 | 10.8% |
| Parcel B-1(c) | 16,000 | 06.4% |
| Parcel B-2 | 25,740 | 10.2% |
| Parcel B-3 | 41,690 | 16.6% |
| Parcel B-4 | 22,025 | 08.7% |
| TOTAL: | 251,664 | 100% |

In the event certain maintenance costs or expenses are incurred
prior to substantial completion of the Common Area within the parcel(s) of

-26-

one or more owners, including Parcels B-3 and B-4, the square feet of

permissible floor space for that parcel shall be excluded from the above

computations and the percentages shall be recomputed for the period of time

during which such Common Areas are not substantially completed.

6.8. If any of said cost is not so paid by the owner within such

thirty (30) day period, the same shall be deemed delinquent, and the amount

thereof shall bear interest at the rate of ten per cent (10%) per annum

until paid. Any and all delinquent amounts with said interest shall be a

lien or charge upon all of the property of such owner within the Shopping

Center subject and junior, however, to the lien or charge of any bonafide

first mortgagee or first deed of trust upon the same property or any part

thereof at any time given or made.

6.9. Notwithstanding any preceding provisions of this Section 6 that

may be to the contrary:

a.    In the event the owner of Parcel B-1(a) (if it is not then

the Operator) or the owner of Parcel B-1(b) or the owner of Parcel B-

1(c) or the owner of Parcel B-2 or the owner of Parcel B-3 or the

owner of Parcel B-4 notifies the Operator that said owner desires to

assume the duties, obligations, rights and remedies of the Operator

respecting the maintenance and operation of (1) the Common Area within

said owner's parcel(s) and (2) that owner's portion(s) of the Agency

Parking Area, such owner shall have the right to do so following

service of ninety (90) days written notice on said Operator.

b.    The owners of all of the parcels other than any owned by the

Operator may, by written notice signed by each such owner, remove the

Operator for cause on five (5) days written notice.

c.    The Operator at any time may resign from the responsibilities

of Operator by giving thirty (30) days prior written notice to the

owners of each of the parcels depicted on Exhibit "A" and refunding to

said owners any advance Common Area Assessment funds then held in

trust and not expended or earned at that time by the Operator.

-27-

d.   In the event that at any time in the future there is not an Operator for any reason including the two foregoing provisions, the owners of each of the parcels depicted on Exhibit "A" may by unanimous written agreement appoint one of such owners or any other entity as the new Operator.

6.10.   In any event, at such times as an Operator ceases in a manner permitted by Section 6.9 to have an obligation to perform the duties described herein (having refunded to owners any advance Common Area Assessment funds held in trust and not at that time expended or earned by Operator), said Operator shall cease to have any liability or responsibility for any acts, events or circumstances occurring subsequent to and not as a result of its performance or non-performance of its duties while Operator.

6.11.   During any period of time that the owner of any parcel of the Shopping Center has the obligation to maintain its own parcel because of exercise of the right of certain owners under Section 6.9.a. or because of the failure of the Operator to fully and faithfully observe and perform and discharge each and every duty and obligation with respect to any owner's parcel, or when no person or entity is obligated to maintain the entire Common Area and Agency Parking Area, the owner of each parcel of the Shopping Center shall have the obligation to maintain its own parcel(s) and its portion(s) of the Agency Parking Area in accordance with the standards set forth herein.   The owner of each parcel shall be required to maintain the loading dock(s) within that parcel, as set forth in Section 6.1.   When all owners do not give the Operator authority for any maintenance expense or capital expenditures, each owner, with respect to such maintenance or expenditure, shall have the obligation to maintain its parcel(s) and its portion(s) of the Agency Parking Area in accordance with the standards set forth herein.

6.12.   If the owner of a parcel is required to maintain the Common Areas of its parcel and its portion of the Agency Parking Area because of

-28-

1    the failure of the Operator to fully and faithfully observe and perform and

2    discharge each and every duty and obligation with respect thereto, that

3    owner shall be entitled to a credit against money due on either Section 6.4

4    or Section 6.5.

5        6.13.  In all cases, if the parcel or portion of the Agency Parking

6    Area of any owner is not maintained in the manner required by this Agreement

7    and the sublease for the Agency Parking Area, any other owner of a parcel

8    in the Shopping Center may give written notice of demand for performance of

9    the standards imposed by this Agreement and if the owner to which the

10    notice is given does not perform within ten (10) days, the owner or owners

11    giving such written notice of demand may hire the labor and materials

12    necessary to discharge the obligations of this Agreement imposed upon the

13    owner to which the notice is given.  Any amount so expended shall be a lien

14    or charge upon all of the real property within the Shopping Center of such

15    owner to whom the demand was made, such lien or charge, however, being

16    subject and junior to the lien or charge of any bonafide first mortgage or

17    first deed of trust upon the same property or any part thereof.

18        6.14.  Upon the written consent of each of the owners of a portion of

19    the Common Area, the standards, terms, conditions, and obligations imposed

20    by Section 6 may be altered, amended, or superseded.

21        6.15.  The Operator may at any time and from time to time promulgate

22    reasonable and non-discriminatory rules and regulations for the use of the

23    Common Area or Agency Parking Area, which rules may prohibit employees from

24    parking in the Common Area and Agency Parking Area except in areas designated

25    by the Operator as "Employee Parking" areas.  The Operator shall not designate

26    any portion of any parcel for employee parking of employees other than

27    employees of the occupant of such designated parcel (without the consent of

28    the owner of the designated parcel).

29        6.16.  Each occupant of a parcel within the Shopping Center shall

30    exercise its best efforts to prevent its employees from parking on another

31    parcel if requested by an owner or major tenant of that parcel.

32

-29-

1    6.17.    The occupants of that portion of Parcel B-1(a) identified

2    on Exhibit "A" as "Offices, Two Stories" shall park only in that portion

3    of the Common Area within Parcel B-1(a) and west of the Building Areas.

4                    Section 7.  Exclusives and Restrictions

5    7.1. The occupant of Parcel B-1(b) shall have the exclusive right

6    within the entire Shopping Center with the exception of Parcel B-1(a) to

7    sell, for off premises consumption, fresh or frozen meat, poultry, fish and

8    produce; such restriction shall not exclude the operation of a restaurant

9    or take-out food operation or a Hickory Farm operation.

10    7.2. The occupant of Parcel B-2 shall have the exclusive right within

11    the entire Shopping Center with the exception of Parcel B-1(a) to sell

12    products that require the services of a licensed pharmacist.

13    7.3. The occupant of Parcel B-3 shall have the exclusive right within

14    the entire Shopping Center with the exception of Parcel B-1(a) to operate

15    as a home improvement center.

16    7.4. In no event shall any exclusive herein apply in any way whatsoever

17    to the owner or occupants of Parcel B-1(a).

18    7.5. If the occupant of any parcel having an exclusive right to sell

19    within this Agreement shall cease, for a period of one (1) year (after

20    originally opening for business) to conduct the business to which such

21    occupant has an exclusive right, then the restriction of that occupant

22    shall lapse and have no further force or effect.

23    7.6  In the event the occupant of Parcel B-1(b) consents to the operation

24    of a certain business or type of business within the Shopping Center that

25    might otherwise be prohibited by the exclusive of Section 7.1, that consent

26    shall not be construed as a general consent but shall be limited to the

27    specific business or operation to which the consent is granted.

28    7.7  In the event the type of exclusive granted herein to the occupants

29    of Parcels B-1(b), B-2 and B-3  shall ever be held in criminal, civil, or

30    administrative prosecution, case or proceedings, or if a settlement is

31

32

-30-

1   reached or a plea other than not guilty is made to the effect that such a

2   restriction or exclusive is violative of any anti-trust law or anti-noncompe-

3   titive law or regulation issued by the FTC or any other entity having

4   jurisdiction, including federal, state, regional and local governmental

5   entities, the exclusives granted herein shall become null and void and an

6   amendment shall be signed by the owners of each parcel within the Shopping

7   Center, acknowledged before a notary public, and recorded to the effect

8   that such restriction and exclusive is null and void.   In the event of any

9   regulation issued or law, ordinance or statute passed by any entity having

10  or claiming jurisdiction to the effect that such restriction or exclusive

11  is unlawful, proscribed, or void, the restrictions and exclusives granted

12  herein shall become null and void unless the occupant of Parcel B-1(b) in

13  the case of the exclusive granted in Section 7.1 or the occupant of Parcel

14  B-2 in the case of the exclusive granted in Section 7.2 or the occupant of

15  Parcel B-3 in the case of exclusive granted in Section 7.3 shall commence

16  an action for declaratory or injunctive relief to the effect that such

17  regulation, law, statute or ordinance is unenforceable, the exclusives

18  granted herein shall become null and void and an amendment shall be signed

19  by the owner of each parcel within the Shopping Center, acknowledged before

20  a notary public, and recorded to the effect that such restriction and

21  exclusive is null and void.   Such action must be commenced by the occupant

22  of Parcel B-1(b) or the occupant of Parcel B-2 or the occupant of Parcel B-

23  3 within sixty (60) days after the promulgation of the regulation, statute,

24  ordinance or law.

25              Section 8.   Taxes and Assessments

26          The respective fee owners of each portion of the Shopping Center

27  and each sublessee of each portion of the sublease of Agency Parking Area

28  shall pay or cause to be paid, prior to delinquency, all personal property

29  taxes, real estate taxes (including taxes on possessory interests), and

30  assessments relating to their land and improvements and personal property

31  thereon or the ownership thereof.

32

-31-

<u>Section 9.  Fire Insurance</u>

Each owner shall carry and maintain, during the entire term hereof, at such owner's sole cost and expense, a policy or policies of fire insurance with standard form extended coverage endorsement to the extent of at least eighty per cent (80%) of the full insurable value of the improvements located on that owner's parcel and that owner's portion of the Agency Parking Area.  Said policy or policies of insurance shall be issued by companies having not less than a policyholder's rating of "A" and a financial rating of "AAA" in Best's Insurance Reports - Fire and Casualty.  Certificates thereof shall be shown or tendered to the other owners of parcels in the Shopping Center or major tenants upon written request.  The owner of each parcel must obtain from its insurance companies a waiver of the right of recovery and subrogation against the owners of the remaining parcels in the Shopping Center and their respective tenants.  All such fire insurance certificates and policies must bear endorsements to the effect that the owner of another parcel or major tenant of such parcel so requesting in writing shall be notified not less than ten (10) days in advance of any modification or cancellation of such insurance.

Each owner hereby disclaims any right or interest in the fire insurance proceeds of any other owner or tenant within the Shopping Center and agrees to execute a waiver and release of such proceeds if called upon to do so by another owner or major tenant.  The insurance required by this section may be provided under blanket policies.

<u>Section 10.  Mechanics Liens</u>

Each owner agrees that it will pay or cause to be paid all cost for work done by it or caused to be done by it on the Common Areas of its respective parcel and its portion of the Agency Parking Area, and that each owner will keep its parcel and its portion of the Agency Parking Area free and clear of all mechanics liens and other liens on account of work done for the owner or persons claiming under the owner.  Each owner may bond and

-32-

1  contest the validity or the amount of such lien, but such owner will

2  immediately pay any final judgment rendered, with all proper costs and

3  charges, and will have the lien released at its expense. Each owner agrees

4  to and shall indemnify and save each other owner free and harmless against

5  liability, loss, damage, cost, attorneys' fees and all other expenses on

6  account of claims of liens of laborers or materialmen or others for work

7  performed or materials or supplies furnished for the owner or persons

8  claiming thereunder for construction in the Common Area or Agency Parking

9  Area.

10              Section 11.  Extent of Agreement and Enforcement

11        11.1.  Each and all of the foregoing covenants, conditions and

12  restrictions:

13        a.    Shall apply to and bind the parties hereto as the owners of

14  the Shopping Center, and each and all of the owners of any and all

15  portions of the Shopping Center and each and all of their respective

16  heirs, successors, assigns, grantees, mortgagees, tenants and subtenants;

17  and the grantees, mortgagees, tenants and subtenants of assigns,

18  grantees, successors and heirs.

19        b.    Are hereby imposed pursuant to a general plan for the

20  improvement and use of the Shopping Center and are designated for the

21  mutual benefit of said owners, tenants and occupants of any and all

22  portions thereof; and

23        c.    Shall obligate, inure to, and pass with each and every

24  portion of the Shopping Center, and shall remain in full force and

25  effect as hereinafter provided.

26        d.    In the event of the assignment, transfer or conveyance of

27  the whole of the interest of any person in and to the parcel in which

28  such person has an interest, without retaining any beneficial interest

29  other than under the terms of a deed of trust or mortgage, or without

30  simultaneously acquiring a new interest by way of leasehold, life

31

32

-33-

1    estate, or other possessory interest, then the powers, rights and

2    interest conferred on such person will be deemed assigned, transferred

3    or conveyed to such transferee, assignee, or grantee, and the obligations

4    will be deemed assumed by such transferee, assignee or grantee with

5    the interest so acquired; and the duties, obligations and rights of

6    the person so transferring the interest shall be discharged.

7        e.   Shall apply to and bind the parties hereto and each and all

8    of the persons enumerated in Section 11.1.a. with respect to any

9    interest any one of them may hereafter acquire in Parcels B-6, B-7, or

10    B-8 as shown on Exhibit "A", and the maximum building area for any of

11    such parcels shall be not greater than twenty-eight per cent (28%) of

12    any such after acquired parcel.

13        f.   Shall apply to and bind the parties hereto and each and all

14    of the persons enumerated in Section 11.1.a. with respect to any

15    interest any one of them may hereafter acquire in the Agency Parking

16    Area; and such portions of the Agency Parking Area so acquired shall

17    become a part of the Common Area.  Thereafter, all provisions of this

18    Agreement affecting the Common Areas shall apply to such acquired

19    portions of the Agency Parking Area, and the provisions of this

20    Agreement affecting the Agency Parking Area shall cease to apply to

21    such acquired portions of the Agency Parking Area.

22        g.   Shall apply to, benefit, or bind the owner of Parcel B-3

23    or anyone claiming thereunder, if and only if the then existing owner

24    agrees to be bound by this Agreement and to subject Parcel B-3 to

25    the covenants and restrictions of this Agreement and further agrees

26    to grant the easements hereinafter described.

27        h.   Shall apply to, benefit, or bind the owner of Parcel B-4 or

28    anyone claiming thereunder, if and only if the then existing owner

29    agrees to be bound by this Agreement and to subject Parcel B-4 to the

30    covenants and restrictions of this Agreement and further agrees to

31    grant the easements hereinafter described.

32

-34-

1        11.2.   The parties hereto covenant with each other that the parcels

2    heretofore described shall be deemed to include any and all right, title

3    and interest in that portion of the street, roadway or highway abutting or

4    abounding each of said Shopping Center parcels now or hereafter owned by

5    all persons or other entities who may own said Shopping Center parcels or

6    any portion thereof or any leasehold estate or any security interest

7    therein and their respective heirs, successors, assigns, grantees, mortgagees,

8    tenants or subtenants thereof.  Accordingly, such right, title and interest

9    shall be in all respects subject and subordinate to the covenants, conditions

10   and restrictions established by and the easements granted in this Agreement,

11   and each party agrees to execute all necessary documents to establish such

12   subordination.

13       11.3.  Breach of any of the covenants or restrictions contained in

14   this Agreement shall not defeat nor render invalid the lien of any mortgage

15   or deed of trust made in good faith and for value as to the Shopping Center

16   or any part thereof; but all of the foregoing provisions, restrictions and

17   covenants shall be binding and effective against any owner of said Shopping

18   Center, or any part thereof, whose title thereto is acquired by foreclosure,

19   trustee's sale, or otherwise.

20       11.4.  Any person or persons owning or holding any portion of the

21   Shopping Center may prosecute any proceedings at law or in equity against

22   any person or entity violating, or attempting to violate, any of the

23   covenants, conditions and restrictions herein and either prevent it or him

24   or them from doing so and recover damages from or on account of each

25   violation.

26       11.5.  This Agreement shall create privity of contract and estate with

27   and among all owners and grantees of all or any part of the said Shopping

28   Center and their respective heirs, executors, administrators, successors

29   and assigns.  In the event of a breach, or attempted or threatened breach,

30   by an owner or occupant of any part of said Shopping Center of any of the

31

32

1   terms, covenants and conditions hereof, any other owner or a major tenant

2   of the Shopping Center shall be entitled forthwith to full and adequate

3   relief by injunction and all such other available legal and equitable

4   remedies from the consequences from such breach.  Only an owner of the

5   Shopping Center or a major tenant shall be entitled to enforce any provision

6   of this Agreement.  Any provision in any deed, lease, assignment, conveyance

7   or contract made in violation of this Agreement shall be void and may be

8   set aside upon petition of one or more of the owner of the Shopping Center.

9   All costs and expenses of such suit or proceedings including attorneys'

10  fees, as hereinafter provided, shall be assessed against the defaulting

11  owner or occupant and shall constitute a lien against the real property of

12  that owner or occupant until paid, effective upon recording notice thereof

13  in the Office of the County Recorder of the county in which the Shopping

14  Center is located, but any such lien shall be subordinate to any bonafide

15  mortgage or deed of trust covering any portion of the Shopping Center, and

16  any purchase at the foreclosure of trustee's sale (as well as any grantee

17  of a deed in lieu of foreclosure or trustee's sale) under any such mortgage

18  or deed of trust shall take title free from any such lien, but otherwise

19  subject to the provisions hereof.  The specified remedies to which any

20  person entitled to enforce this Agreement may resort under the terms of

21  this Agreement are cumulative and are not intended to be exclusive of any

22  other remedies or means of redress to which any person entitled to enforce

23  this Agreement may be lawfully entitled in case of any breach or threatened

24  breach of any provision of this Agreement.  Failure to insist in any one or

25  more cases upon the strict performance of any of the covenants of this

26  Agreement or to exercise any remedy herein contained shall not be construed

27  as a waive or a relinquishment for the future of such covenant or remedy.

28      11.6.    In the event that suit is brought for the enforcement of this

29  Agreement or as the result of any alleged or threatened breach hereof, the

30

31

32

-36-

1      11.7.   All of the provisions of this Agreement shall be covenants

2    running with the land pursuant to applicable law, including, but not limited

3    to Section 1468 of the Civil Code of the State of California.  It is

4    expressly agreed that each covenant to do or refrain from doing some act on

5    the Shopping Center (described in Exhibit "A" hereto) or any part thereof

6    with respect to each covenantor (a) is for the benefit of the land of each

7    covenantee, as that land is described in Exhibits "A" and "B"; (b) runs

8    with both the land owned by the covenantor and the land owned by each

9    covenantee; and (c) shall benefit or be binding upon such successive

10    owner, during his ownership, of any portion of the land affected hereby and

11    each person having an interest therein derived through any owner of the

12    land affected hereby.

13      11.8.   This Agreement supersedes any and all other agreements, either

14    oral or in writing, between the parties hereto with respect to the subject

15    matter hereof and contains all of the covenants and agreements between the

16    parties with respect to said matter.  Each party to this Agreement

17    acknowledges that no representations, inducements, promises, or agreements,

18    orally or otherwise, have been made by any party, or anyone acting on behalf

19    of any party, which are not embodied herein, and that no other agreement,

20    statement, or promise not contained in this Agreement shall be valid or

21    binding.

22                 Section 12.  Condemnation

23      12.1  In the event of condemnation by any duly constituted authority

24    for a public or quasi-public use of all or any part of the Shopping Center,

25    that portion of the award attributable to the value of any land within the

26    Common Area so taken shall be payable only to the owner in fee thereof and

27    no claim thereon shall be made by any other owners of any portion of the

28    Shopping Center; provided, however, all other owners of the Shopping Center

29    may file collateral claims with the condemning authority over and above the

30    value of the land of the area to be taken; provided, further, however, that

31    the owner of the fee of each portion of the area so condemned shall promptly

32    repair and restore the remaining portion of the area still owned by such

1    owner as near as practicable to the condition of same immediately prior to

2    such condemnation and except to the extent that the proceeds of such award

3    are insufficient to pay the cost of such restoration and repair.  As an

4    alternative to promptly repairing and restoring the remaining portion of

5    the area still owned by such owner, such owner may, at its option, proceed

6    in the same manner as set forth in the case of fire damage in Section 5.7.

7    No contribution from any other owner shall be required by the term of this

8    Agreement.

9        12.2    In the event of condemnation by any duly constituted authority

10    for a public or quasi-public use of all or any part of the Shopping Center,

11    that portion of the award attributable to the value of any land within the

12    Agency Parking Area so taken shall be payable only to the sublessee thereof

13    under the lease of the Agency Parking Area and no claim thereon shall be

14    made by any other owner of any portion of the Shopping Center: provided,

15    however, all other owners of the Shopping Center may file collateral claims

16    with the condemning authority over and above the value of the sublessee's

17    interest in the land of the area to be taken; provided, further, however,

18    that the sublessee of each portion of the area so condemned shall promptly

19    repair and restore the remaining portion of the area still sublessed by such

20    sublessee as near as practicable to the condition of same immediately prior

21    to such condemnation and except to the extent that the proceeds of such

22    award are insufficient to pay the cost of such restroation and repair.

23        12.3    Section 12.2 affects only the rights of each sublessee of the

24    Agency Parking Area with respect to other sublessees.  The sublease of the

25    Agency Parking Area shall determine the rights of each sublessee with

26    respect to the City and the Agency.

27                    Section 13.  Miscellaneous

28        13.1.  Definitions:

29        a.    The term "mortgagee", whenever used herein, shall be

30    construed to include beneficiaries and trustees under deeds of trust.

31        b.    The term "persons", whenever used herein, shall be construed

32    to include corporations, partnerships, individuals, and associations,

-38-

1    whether incorporated or not.

2        c.    Whenever the term "parties" is used herein, it shall mean

3    and include the parties hereto and their respective heirs, successors,

4    assigns, grantees, mortgagees, tenants and subtenants and the grantees,

5    mortgagees, tenants and subtenants of assigns, grantees, successors

6    and heirs of any one of them.

7        d.    Whenever the term "assigns" is used herein, it shall mean

8    those to whom property within the Shopping Center shall have been

9    transferred, whether immediately or remotely, and whether by conveyance,

10    devise, dissent, or act of law.

11        e.    Whenever the term "major tenant" is used herein, it shall

12    mean any tenant leasing more than 25,000 square feet in the Shopping

13    Center.

14        f.    The term "Bonds" means the Agency's parking lease revenue

15    bonds issued for the acquisition of the property within the Agency

16    Parking Area and for the construction of the parking facilities.

17        g.    The term "sublease of the Agency Parking Area" means the

18    sublease described in Subsection b.iii. of Recital No. 2.

19        h.    The term "City" means the City of Temple City.

20    13.2.    Whenever the authority to delegate is permitted herein, there

21    shall be permitted only one delegation of each such authority at any one

22    time, and such delegation shall be effective only upon written notice to

23    each of the parties to this Agreement and to the Operator.

24    13.3.    Formal notices, demands and communications among the parties to

25    this Agreement shall be sufficiently given only upon actual receipt or if

26    dispatched by registered or certified mail, return receipt requested,

27    postage prepaid, addressed to the principal offices of each of the parties

28    hereto as follows:

29                    Eltinge, Graziadio & Sampson Development Co.
                    Attention: D. Earl Ellis
30                    1840 West Imperial Highway
                    Los Angeles, California  90047
31

32

A. D. Clark, Inc.
Attention: R. P. Brombach
12901 West Jefferson Boulevard
Los Angeles, California  90066

Notices, demands and communications shall be deemed effectively given upon actual receipt or in the case of registered or certified mail as set forth herein, on the second day after mailing.  Written statements and billings pursuant to Section 1.6, 6.5 or 6.6 shall be sufficiently given upon ordinary mail, postage prepaid, addressed as set forth above.  The person and the place to which notices are to be mailed may be changed by any party by written notice to the other.  Any person which becomes a party to this Agreement subsequent to its execution may provide for notice to be given to that person by giving written notice to each of the other parties.

13.4.  Invalidation of any one of the covenants, conditions, restrictions or other provisions herein contained by judgment or court order shall in no way affect any of the other covenants, conditions, restrictions or provisions hereof, and the same shall remain in full force and effect.

13.5.  The liability of E,G & S under this Agreement is and shall be limited to the assets of the partnership.  The other parties to this Agreement hereby waive all rights to proceed against any of the individual partners or their assets other than their interest in the partnership of Eltinge, Graziadio & Sampson Development Co.

13.6.  The captions heading the various sections of this Agreement are for convenience and identification only, and shall not be deemed to limit or define the contents of the respective sections.

13.7.  The provisions of this Agreement shall not be deemed to constitute a dedication for public use or create any rights in the general public.

Section 14.  Term and Termination

14.1.  The covenants, conditions and restriction contained in this Agreement shall run with the land and be binding upon each and all of the owners of any part thereof and upon all persons claiming under them, and the same shall continue to endure and terminate at Midnight on December 31, 2055.

-40-

1      14.2.  This Agreement may be cancelled, changed, modified or amended

2    in whole or in part, unless otherwise stated herein, only by a written and

3    recorded Agreement executed by (a) the then record fee owners of, and the

4    beneficiaries of, recorded first trust deeds or mortgagees encumbering not

5    less than ninety per cent (90%) of the land area of the Shopping Center

6    parcels; and (b) K mart, so long as it has a leasehold interest in Parcel

7    B-1(a).

8      14.3.  Any party to this Agreement terminating its D.D.A. with the

9    Agency shall be entitled to give notice of such termination to the other

10    parties, and by giving such notice shall incur no liability under this

11    Agreement after the effective date of such notice.

12      14.4.  This Agreement is executed, including acknowledgments for each

13    party before a notary public, as of the date hereof.  This Agreement is

14    effective upon execution of the parties hereto.  However, each portion of

15    the land described in Exhibit "B" shall be bound by this Agreement only as

16    it is acquired by one of the parties to this Agreement.

17      a.  This Agreement shall be recorded immediately after any one

18      of the parties to this Agreement has been deeded any portion of its

19      respective parcel(s) of the property comprising the Shopping Center.

20      All executed copies of this Agreement shall be deposited with Title

21      Insurance and Trust Company, which is hereby instructed by each party

22      to (1) attach Exhibit "B" to all copies of this Agreement, provided

23      that Exhibit "B" shall be in accordance with this Agreement, the

24      boundary survey referred to above in Section 1.3.a.i., and the D.D.A.

25      and (2) record one copy of this Agreement in the Office of the County

26      Recorder of Los Angeles immediately after transfer of any portion of

27      the Shopping Center property to any of the parties to this Agreement

28      and (3) deliver one copy to each party.

29      b.  Thereafter, each conveyance by the Agency or the City (under

30      the lease of the Agency Parking Area) to one of the parties hereto

31      shall recite that the conveyance is "subject to the Construction,

32      Operation and Reciprocal Easement Agreement recorded in the Office of

1    the Los Angeles County Recorder at _____

2    _____" (which data is to be completed by Title Insurance and

3    Trust Co., the City and the Agency).  Each grantee shall sign and

4    acknowledge each such deed for the purpose of binding the conveyed

5    property with the covenants, terms and conditions of this Agreement.

6            c.    Each party to this Agreement agrees to sign and acknowledge

7    a document in recordable form for the purpose of re-executing this

8    Agreement after each owner has acquired its parcel(s) and respective

9    portion(s) of the Agency Parking Area.  Such document shall bind all

10    of the Shopping Center to the covenants, terms and conditions of this

11    Agreement as covenants running with the land in accordance with the

12    Section 1468 of the California Civil Code.

13                    Section 15. Special Provision

14    15.1.  The parties hereto recognize that the primary intended use for

15    Parcel B-3 is a home improvement center.  The parties also recognize that

16    the Agency has been and is negotiating with home improvement centers that

17    may prefer to build on Parcel B-4.  In the event the Agency sells, leases,

18    or transfers Parcel B-4 to a buyer, lessee, or transferee that desires to

19    build a home improvement center on Parcel B-4, and provided such buyer,

20    lessee or transferee has entered into this Agreement with the parties

21    hereto and has paid the prorata Expenses to E,G & S (per Section 1.6),

22    the parties hereto agree that:

23            a.    Exhibit "A" of this Agreement shall be amended to provide

24    that Parcel B-4 shall have a maximum building area of 40,000 square

25    feet (plus "O.S.A." as provided in Section 3.3.a.) and Parcel B-3 shall

26    have a maximum building area of 22,025 square feet.

27            b.    The Common Area and the respective portion of the Agency

28    Parking Area for both Parcel B-3 and Parcel B-4 shall be adjusted

29    accordingly.

30            c.    The other provisions of this Reciprocal Easement Agreement

31    shall be amended accordingly.

32

-42-

15.2.   This provision and any amendment in accordance with this provision shall be binding on the successors of the parties hereto and the tenants and subtenants of the parties and their successors.

15.3.   The provisions of this Section do not constitute in any way a restriction on the use of Parcel B-3 or Parcel B-4.

IN WITNESS WHEREOF, THIS CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT for the Shopping Center bounded by Las Tunas, Rosemead, Broadway and Eaton Wash, Temple City, California, is executed as of the day and year first above written.

ELTINGE, GRAZIADIO & SAMPSON
DEVELOPMENT CO., a California Partnership

A. D. CLARK, INC., a California Corporation

-43-

J. Earl Ellis, Esquire
Post Office Box 92959
Los Angeles, California 90009

RECORDED IN OFFICIAL RECORDS
OF LOS ANGELES COUNTY, CA
11 MIN. 2 P.M. DEC 31 1975
PAST
Recorder's Office

FIRST MODIFICATION

CONSTRUCTION, OPERATION AND RECIPROCAL

EASEMENT AGREEMENT

FEE $ 57  M

## RECITALS:

DEE: 3
10-8-75
10-25-75
12-5-75
Temple City,
California

A.    This First Modification to Construction, Operation
and Reciprocal Easement Agreement is entered into this 8th
day of October, 1975, by Eltinge, Graziadio & Sampson
Development Co., a California general partnership, hereinafter
referred to as "E,G&S"; and A. D. Clark, Inc., a California
corporation, hereinafter referred to as "Clark".

B.    E,G&S and Clark have previously entered into a
Construction, Operation and Reciprocal Easement Agreement
("REA") dated as of the first day of August 1974 and affecting
certain real property generally bounded by Las Tunas Drive
on the north, Broadway Avenue on the south, North Rosemead
Boulevard on the east, and the Eaton Wash Control Channel on
the west, in the City of Temple City, County of Los Angeles,
State of California.  Said Construction, Operation and
Reciprocal Easement Agreement is attached hereto, and the
said real property is generally delineated on the Plot Plan
attached and marked Exhibit "A" and is more fully described
on Exhibit "B" hereto, which description, in the event of any
conflict between Exhibit "A" and "B", shall be controlling.

C.    The Agency has acquired and has conveyed Parcels
B-1(a) and B-1(b) to E,G&S.  The Agency has acquired Parcels
B-2 and B-3 and is in the process of acquiring Parcel B-4.

D.    The Agency has approved the REA except for certain
matters in Section 15.



DOCUMENTARY TRANSFER TAX $ _____
X COMPUTED ON FULL VALUE OF PROPERTY CONVEYED
— OR COMPUTED ON FULL VALUE LESS LIENS AND
ENCUMBRANCES REMAINING AT TIME OF SALE.
_____
Signature of Declarant or Agent determining tax. Firm Name
Title Insurance and Trust Company

-1-

MODIFICATIONS TO REA

BK06923PG604

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, E,G&S and Clark hereby adopt the foregoing recitals, reaffirm the REA attached hereto and incorporated herein, and adopt the following modifications to the REA.

RECITAL 1 of the REA is hereby amended to refer to Exhibit "B" attached hereto and by this reference made a part hereof. The last sentence is amended to read:

Said real property is hereinafter sometimes referred to as the "Shopping Center", but that term does not include the Agency Parking Area [described in Recital 2(b)], which is also delineated on Exhibit "A".

RECITAL 2 of the REA, subsection (2), is hereby amended to refer to the Operation Agreement with respect to the Agency Parking Areas, rather than a sublease. All references in the REA to "Agency Parking Areas" shall be deemed to refer to the "Parking Facilities" under the Operation Agreement.

Wherever the verb "sublet" occurs in the REA, it shall be construed to read "make available."

Wherever the noun "sublease" or the noun "lease" is used in connection with the parking facilities, each shall be construed to refer to the Operation Agreement.

RECITALS 3, 4, and 5 of the REA are hereby amended in accordance with RECITAL C of this First Modification.

RECITAL 6 of the REA is hereby amended to read as follows:

Parcel B-3 shall be entitled to the benefits of this Agreement only if Parcel B-3 is bound by this Agreement and only if the then existing owner has taken title to Parcel B-3 with actual or constructive notice of the covenants, restrictions and easements herein created.

RECITAL 7 of the REA is hereby amended to read as follows:

Parcel B-4 shall be entitled to the benefits of this Agreement only if Parcel B-4 is bound by this Agreement and only if the then existing owner has taken title to Parcel B-4 with actual or constructive notice of the covenants, restrictions and easements herein created.

-2-

SECTION 1 of the REA is amended s  that line 15 reads "in accordance with this Agreement."

D6923 PG 605

SECTION 1.3 of the REA is hereby amended to acknowledge that E,G&S has completed its responsibilities under that section.

SECTION 1.5 of the REA is hereby amended by adding:

> E,G&S shall install the utilities in accordance with the utility plans prepared by Seaboard Engineering Co. and approved by the Agency, identified as Sheets No. SD-3, SD-4, P-1 (latest revisions) for Kresge Store No. 3127.

SECTION 1.7 of the REA is added and shall read as follows:

The parties hereto agree to reimburse E,G&S for their pro rata share of "Expense for Installation of Utilities" (as defined below) incurred by E,G&S in performance of the obligation of E,G&S to install the utilities. The pro rata share of each party shall be in the percentages set forth below. If any party, after commencement of the original construction by that party, builds a total building area greater than the square footage set forth below (if allowable under the REA), then the percentages and pro rata shares shall be readjusted and appropriate reimbursements made. Each party shall reimburse E,G&S upon receipt of a final statement from E,G&S indicating that all work has been performed and paid by E,G&S and the pro rata share of the respective party. Reimbursements not paid within thirty (30) days after receipt of such final statement shall bear interest at the rate of ten percent (10%). The statement from E,G&S for the work performed shall contain photographic copies of subcontractor's billings in the amount of the contractual obligation as submitted to E,G&S. The term "cost" as used herein with respect to the installation of utilities by E,G&S means the actual total amount of the fees of all contractors, subcontractors, material suppliers, public utilities and water company for installation of the utilities in accordance with said utility plans. All parties agree that the Expense for Installation of Utilities of E,G&S is equal to all such costs plus fifteen percent (15%) of such costs for overhead, general conditions and general contractor's profit.

In the event that amendments to the utility plans become necessary or desirable, E,G&S shall inform the parties to this agreement of such changes and any additional costs that will result from such changes. Unless E,G&S actually receives, within three (3) working days thereafter written notice to the contrary from one of the parties to this Agreement, such changes in the utility plans and additional costs shall be considered approved by each of the parties. In the event one of the parties gives written notice of disapproval within the three (3) day period, then the matter shall be submitted to Seaboard Engineering for a determination of whether or not such changes are desirable for the overall utility plan. The decision of Seaboard Engineering shall be final in this regard, and E,G&S shall proceed accordingly.

The percentages for each parcel are as follows:

| Parcel Numbers | Building Area (Square Feet) | Percentage |
|---|---|---|
| Parcel B-1(a) | 104,865 | 52.40% |
| Parcel B-1(b) | 27,144 | 13.56% |
| Parcel B-1(c) | 16,000 | 7.99% |
| Parcel B-2 | 25,740 | 12.86% |
| Parcel B-3 | 26,400 | 13.19% |
| Parcel B-4 | --- | --- |
| TOTAL: | 200,149 | 100% |

DEC 5 1975

-3-

Section 1.8 of the REA is added and shall read as follows:

The parties hereto agree to dedicate the utilities to the appropriate public utility companies and governmental entities on terms and conditions negotiated by E,G&S with the public utility companies, and appropriate governmental entities.

SECTION 3.1.a. of the REA is hereby added as follows:

No building shall be constructed or placed on any part of the Shopping Center unless it includes a fire sprinkler system that is sufficient to meet the standards of the applicable building code for unlimited square footage.

SECTION 3.2.a. of the REA is hereby amended to read as follows:

The Building Area for Parcel B-1(a) includes the area of approximately 5,365 square feet identified on Exhibit "A" as "Garden Shop." The Building Area for Parcel B-3 and for Parcel B-4 includes any Outside Sales Area ("O.S.A.").

SECTION 4.1 of the REA is amended by adding the following clause at the end of the second sentence:

, but is not presently part of the Shopping Center (although it may become part of the Shopping Center in the future under Section 11.1.f.).

SECTION 4.4 of the REA is amended by adding the following clause prior to the semi-colon at the end of the introductory paragraph on page 14:

, none of which shall be included in computing the square footage of buildings or Building Area on that owner's parcel.

SECTION 4.11 is hereby amended by deleting "both north to Las Tunas Drive and" from line 11 of page 18.

SECTION 5.1 of the REA, with respect to installation of utilities in accordance with the plans referred to in Section 1.3.a.iv, is hereby amended in accordance with the amendment to Section 1.5 contained in this Modification.

SECTION 7.3 of the REA is hereby deleted.

SECTION 9 of the REA is amended by changing the word "insurable" in the fourth line of said Section 9 to read "replacement".



-4- C.C.

DEC 4 1975

SECTION 11.6 of the REA is hereby amended in its entirety to read as follows:

11.6.  In the event that suit is brought for the enforcement of this Agreement or as the result of any alleged or threatened breach thereof, the prevailing party or parties in such suit shall be entitled to be paid reasonable attorneys' fees by the losing party or parties, and any judgment or decree rendered shall include an award thereof.

SECTION 12.3 of the REA is hereby amended in its entirety to read as follows:

12.3.  Section 12.2. affects only the rights of each Operator and Additional Operator (as those terms are defined in the Operation Agreement) of the Agency Parking Area with respect to the other Operators and Additional Operators.  The Operation Agreement itself with respect to the Agency Parking Area shall determine the rights of each Operator and Additional Operator with respect to the City and the Agency.

SECTION 13.1 of the REA, subsection e, is hereby amended to read as follows:

e.  Whenever the term "major tenant" is used herein, it shall mean any tenant leasing more than 25,000 square feet of building space in the Shopping Center.

SECTION 13.3 of the REA is hereby amended in the following particulars only, to require that all such formal notices, demands and communications be sent to each of the parties hereto as follows:

```
Eltinge, Graziadio & Sampson Development Co.
Attn:  D. Earl Ellis
9920 La Cienega Boulevard     ) street address
Inglewood, California 90301   )
Post Office Box 92959         ) mailing address
Los Angeles, California 90009 )

A. D. Clark, Inc.
Attn: R. P. Brombach
12901 West Jefferson Boulevard
Los Angeles, California 90066
```

SECTION 14.4 of the REA, subsection a, is hereby amended in its entirety to read as follows:

a.  This Agreement shall be recorded immediately after it is signed by each of the parties hereto.

SECTION 15 of the REA is hereby rewritten in its entirety to read as follows:

15.1.  Provided that the Agency has (1) acquired all of the total area of Parcel B-4, (2) paved the thirty foot (30') driveway (described below) across the



DEC 4  1975

BK06923PG608

westerly end of Parcel B-4 with heavy-duty ACP, and (3) granted to the owner of Parcels B-1(a), B-1(b) and B-2 and their successors and assigns, and the visitors, permitees, licensees, and invitees of all of them, an easement for ingress and egress along said driveway, the Agency may allocate between Parcel B-3 and Parcel B-4, the total square footage of 63,715 square feet (plus an "O.S.A." as provided in Section 3.3.a, not to exceed 2,000 square feet).

The Agency may also (upon satisaction of the three conditions in the preceding paragraph) designate the building areas of Parcels B-3 and B-4, within the following perimeters:

     a.   The easterly line of the building areas shall not exceed (shall not be east of) the easterly building line of Parcel B-3 as shown on Exhibit "A".

     b.   The depth of the building area on Parcel B-3 shall be no greater than two hundred feet (200') and shall in no event interfere with the thirty foot (30') driveway along the westerly portion of Parcel B-3 as shown on Exhibit "A".

     c.   The width of the building area on Parcel B-3 may be the full width of Parcel B-3.

     d.   The depth of the building area on Parcel B-4 shall not interfere with a thirty foot (30') driveway along the westerly side of Parcel B-4 as an extention of said driveway behind Parcel B-3, out to a curb cut on Broadway Avenue.

     e.   The width of the building area on Parcel B-4 may be the full width of Parcel B-4 provided that there is full compliance with local building codes and ordinances.

     f.   The square footage of the designated building areas for either Parcel 3 or B-4 separately, shall never exceed forty thousand square feet (40,000') plus an O.S.A. as provided in Section 3.3.a, not to exceed 2,000 square feet.

     g.   The total square footage of the building areas of Parcels B-3 and B-4 shall not exceed 63,715 square feet plus an O.S.A. not to exceed 2,000 square feet.

     h.   In the event that the Agency designates one combined building area for a single building on Parcels B-3 and B-4, then only perimeters a, b, d and g shall apply, and the total square footage on that single building area shall not exceed 63,715 square feet plus the O.S.A. not to exceed 2,000 square feet.

The Agency shall so designate the square footage and building areas of Parcels B-3 and B-4 in formal notices to the parties hereto.  Thereafter, the parties hereto and the Agency and any successor or assign of the parties hereto shall enter into a modification of this Agreement in recordable form, setting forth the new building areas and maximum allowable square footage of Parcels B-3 and B-4, consistent with this Section 15 and this Agreement.  In this regard, the Building Areas as depicted on Exhibit "A" are not controlling.



DEC 4   1975

-6- EE

BK D6923 PG 609

15.2.   This provision and any amendment in accordance with this provision shall be binding on the successors of the parties hereto and the tenants and subtenants of the parties and their successors.

15.3.   The provisions of this Section do not constitute in any way a restriction on the use of Parcel B-3 or Parcel B-4.

ELTINGE, GRAZIADIO & SAMPSON DEVELOPMENT CO.

By

By

A. D. CLARK, INC.

By

By

---

TO 1946 CA (8-74)

(Partnership)

TITLE INSURANCE AND TRUST

A TICOR COMPANY

STATE OF CALIFORNIA

COUNTY OF  Los Angeles  } SS.

On  December 4, 1975  before me, the undersigned, a Notary Public in and for said State, personally appeared  George M. Eltinge and James K. Sampson  known to me to be  two  of the partners of the partnership that executed the within instrument, and acknowledged to me that such partnership executed the same.

WITNESS my hand and official seal.

Signature

OFFICIAL SEAL
MARIE SUITT
NOTARY PUBLIC CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires April 15, 1977

(This area for official notarial seal)

---

TO 449 C

(Corporation)

STATE OF CALIFORNIA

COUNTY OF  LOS ANGELES  } SS.

On  DECEMBER 5, 1975  before me, the undersigned, a Notary Public in and for said State, personally appeared  A. D. CLARK  known to me to be the  vice president  President, and  RICHARD P. BROMBACH  known to me to be the persons who executed the within Instrument, known to me to be the persons who executed the within Instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

Signature

Grant E. Alleman

Name (Typed or Printed) GRANT E. ALLEMAN

OFFICIAL SEAL
GRANT E. ALLEMAN
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
My Commission Expires Nov. 26, 1977
12901 W. Jefferson Blvd., L.A., CA 90066

DEC 4  1975

-7-

BK D6923 PG 618

EXHIBIT "B"

TO THE MODIFICATION OF CONSTRUCTION, OPERATION AND

RECIPROCAL EASEMENT AGREEMENT

PARCEL B-1(a)

Parcels 1 and 2, in the City of Temple City, in the County
of Los Angeles, State of California, as shown on Parcel Map
No. 6145 filed in Book 62, pages 51 and 52 of Parcel Maps in
the Office of the County Recorder of said County.

PARCEL B-1(b)

Parcel 3, in the City of Temple City, in the County of Los
Angeles, State of California, as shown on Parcel Map No. 6145
filed in Book 62, pages 51 and 52 of Parcel Maps in the Office
of the County Recorder of said County.

PARCEL B-2

Parcel 4, in the City of Temple City, in the County of Los
Angeles, State of California, as shown on Parcel Map No. 6145
filed in Book 62, pages 51 and 52 of Parcel Maps in the Office
of the County Recorder of said County.

PARCEL B-3

Parcel 5, in the City of Temple City, in the County of Los
Angeles, State of California, as shown on Parcel Map No. 6145
filed in Book 62, pages 51 and 52 of Parcel Maps in the Office
of the County Recorder of said County.

PARCEL B-4

Lot 6 of Tract No. 3523 in the City of Temple City, County
of Los Angeles, State of California, as per map recorded in
Book 40, page 52, of Maps in the Office of the County Recorder
of said County.

RECORDED AS DOCUMENT NO. 71-4111 ON 12/29/77 IN THE OFFICE OF
THE LOS ANGELES COUNTY RECORDER.

SECOND MODIFICATION

CONSTRUCTION, OPERATION AND RECIPROCAL

EASEMENT AGREEMENT

## RECITALS:

A.   This Second Modification to the Construction, Operation
and Reciprocal Easement Agreement is entered into as of this
25th day of February, 1977, by Eltinge, Graziadio & Sampson
Development Co., a California general partnership (hereinafter
referred to as "E,G,&S"); A.D. Clark, Inc., a California corporation,
(hereinafter referred to as "Clark"); Colonial Properties Company,
an Illinois limited partnership, (hereinafter referred to as
"Colonial"); Albertson's Inc., a Delaware corporation (hereinafter
referred to as "Albertson's"); T. C. Associates, a California Limited
Partnership (hereinafter referred to as "Associates"); Temple
City Holding Corporation, a California corporation (hereinafter
referred to "Holding Co."); and Vornado, Inc. a Delaware
corporation, (hereinafter referred to as "Vornado").

B.   E,G, & S and Clark have previously entered into a
Construction, Operation and Reciprocal Easement Agreement (REA)
dated as of the first day of August 1974 and affecting certain
real property generally bounded by Las Tunas Drive on the north,
Broadway Avenue on the south, North Rosemead Boulevard on the
east and Eaton Wash Control Channel on the west, in the City of
Temple City, County of Los Angeles, State of California, which REA
was recorded in the office of the County Recorder of Los Angeles
County on December 31, 1975 as Instrument No. 5877 in Book D6923
page 603 et seq.

-1-

JUL 18 1977

C.   The REA has been amended by a First Modification thereto dated as of October 8, 1975 between E, G & S and Clark, which was recorded concurrent with the REA as part of the REA.

D.   Temple City Community Redevelopment Agency ("Agency") has approved the REA and the First Modification thereto.

E.   E,G & S has conveyed title to Parcel B-1(b) to Colonial and Albertson's is the tenant of Colonial.

F.   The parties to the REA desire to further amend and modify the REA to provide for the addition to the REA of new parties acquiring Parcel B-3 and Parcel B-4 from the Agency; Holding Co. is acquiring Parcel B-4 from Agency and is leasing Parcel B-4 to Vornado; Associates is acquiring Parcel B-3 from Agency.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, E,G & S, Clark, Colonial, Albertson's, Associates, Holding Co. and Vornado hereby adopt the foregoing recitals and adopt the following modifications to the REA:

1.   The First Modification of the REA amending Recital 2 of the REA is amended to refer to subsection (b) of Recital 2 of the REA rather than subsection (2) as erroneously referenced in the First Modification.

2.   Exhibit B to the First Modification to the REA is amended as to Parcel B-3 and Parcel B-4 to read:

"PARCEL B-3

Parcel 5, in the City of Temple City, in the County of
Los Angeles, State of California, as shown on Parcel
Map No. 6145 filed in Book 62, pages 51 and 52 of Parcel
Maps in the Office of the County Recorder of said County,
excepting therefrom the southerly 41.22 feet.

-2-

JUL 18 1977

PARCEL B-4

Lot 6 of Tract No. 3523 in the City of Temple City, County
of Los Angeles, State of California, as per map recorded in
Book 40, page 52, of Maps, in the Office of the County
Recorder of said County, together with the southerly
41.22 feet of Parcel 5 in the City of Temple City, in
the County of Los Angeles, State of California, as
shown on Parcel Map No. 6145 filed in Book 62, pages
51 and 52 of Parcel Maps in the office of the County
Recorder of said County."

3.   Recital 1 of the REA, as amended by Recital 1 of the

First Modification to the REA, is further amended to substitute

and replace Exhibit A, Plot Plan attached to the REA, with

Exhibit A "Revised Area Map" as attached to this Second

Modification.   The Exhibit A attached to this Second Modification

identifies the Parcels by the designations used in the REA of

Parcels B-1(a), B-1(b), B-1(c), B-2, B-3 and B-4.   Said Exhibit

A also shows the Parcels by separate lot numbering 1 through 14,

which are inserted for the convenience of the parties to the REA.

4.   Section 3.3 subsection (a) is amended in its entirety

to read:

"The Building Area for Parcel B-1(a) includes

the area of approximately 5,365 square feet identified

on Exhibit A as "Garden Shop".   The building area

for Parcel B-4 includes the area of approximately

2,000 square feet identified on Exhibit A as 'O.S.A.'."

5.   Section 4.2 subsection (g) i and ii are amended

in their entirety to read:

"The City of Temple City has approved three pylon

signs for the entire Shopping Center at locations

approximately as indicated on Exhibit A to this

Second Modification.

-3-

JUL 18 1977

One such pylon sign at the northerly end of the Agency Parking Area shall be located on Parcel B-1(a) for the sole benefit of the occupant of that parcel at such time as the owner or lessee thereof elects to install such pylon sign.

One such sign at the middle of the Agency Parking Area shall be for the joint use of the occupants of the buildings on Parcels B-1(b) and B-2.

One such sign at the southerly end of the Agency Parking Area shall be for the joint use of the major occupants of Parcels B-3 and B-4."

6.    Section 4.4 subsection (i) is hereby amended in its entirety to read:

"i.    The display, storage and sale of Christmas trees, and related activities, during the Christmas season, provided, however, such use is restricted to the immediate vicinity of those portions of Parcels B-1(a) and B-4 identified, respectively, on Exhibit A to the Second Modification as 'Garden Shop' and 'O.S.A.'.  Nothing herein shall be deemed to allow such use on Parcel B-1(a) and B-4 without the permission of the owner of that respective parcel."

7.    Section 4.6 is hereby amended to add the following sentence:

"E,G & S does hereby grant to Holding Co. as the purchaser of Parcel B-4 from the Agency and to Associates as purchaser of Parcel B-3 from the

-4-

JUL 18 1977

Agency an easement appurtenant to each of their respective

Parcels for the purposes and with the restrictions

stated in Section 4.2 over, across, upon, in, under

and through the Common Area of Parcels B-1(a), B-1(c)

and E,G & S's respective portions of the Agency Parking

Area."

8.  Section 4.7 is hereby amended to add the following

sentence:

"Clark does hereby grant to Holding Co. as the

purchaser of Parcel B-4 from the Agency and to Associates

as the purchaser of Parcel B-3 from the Agency an easement

appurtenant to each of their respective Parcels for the

purposes and with the restrictions stated in Section 4.2

over, across, upon, in, under, and through the Common

Area of Parcel B-2 and Clark's respective portions of

the Agency Parking Area."

9.  Section 4.8 is hereby amended to add the following

sentence:

"Associates as the purchaser of Parcel B-3 from

the Agency hereby grants the easements referred to in

Section 4.8 of the REA to the other parties to this

REA including but not limited to Holding Co. as owner

of Parcel B-4."

10.  Section 4.9 is hereby amended to add the following

sentence:

"Holding Co. as the purchaser of Parcel B-4 from

the Agency and Vornado as Lessee of Parcel B-4 hereby

JUL 18 1977

grant the easements referred to in Section 4.9 of the
REA to the other parties to the REA including but not
limited to Associates as owner of Parcel B-3".

11.  Section 4.11 is hereby amended in its entirety to
read:

"The owners of each parcel and each party hereto
shall join in a non-exclusive and appurtenant easement
to the Los Angeles County Flood Control District for
vehicular and pedestrian ingress and egress along the
western boundary of the Shopping Center from the point
of egress and ingress to the flood control channel as
shown on Exhibit  A  to the Second Modification to the
southern boundary of the Shopping Center and to Broadway
Agency; and in a non-exclusive and appurtenant easement
to the County of Los Angeles for use by the County and
the County Sheriff's Department on Parcel B-9, as shown
on Exhibit A, for vehicular and pedestrian ingress and
egress along the thirty foot (30') access easement along
the westerly portion of the Shopping Center Common Area
from the existing Sheriff's Substation south to Broadway
Avenue, all as shown on the attached Exhibit A.  The
owners of such parcels may reserve a right of encroachment
into said easements for the purposes of loading and
unloading and other Common Area purposes that do not
prevent a reasonable flow of vehicular traffic.  The
easements to be granted according to this Section 4.11
to the Los Angeles County  Flood Control District shall

JUL 18 1977

be appurtenant to the Los Angeles County Flood Control District Channel.  The easement to be granted to the County of Los Angeles for ingress and egress shall be appurtenant to the Parcel B-9 shown on Exhibit A to the Second Modification, but if Parcel B-9 is no longer used by the County Sheriff's Department, (1) the easement shall be limited to vehicular delivery and service use for Parcel B-9 and (2) the easement shall terminate unless the owner of Parcel B-9 reasonably restricts the use of the easement and actively prohibits use of the easement by invitees of Parcel B-9 for parking on Parcel B-1(a)."

12.   Section 4.13 is hereby added to the REA to read as follows:

"Colonial and Albertson's hereby grants to Holding Co. and to Associates an easement appurtenant to each of their respective parcels for the purposes and with the restrictions stated in Section 4.2 over, across, in, under and through the Common Area of Parcel B-1(b) and Colonial's and Albertson's respective share of the Agency Parking Area."

13.   Section 5.5 is hereby added to the REA to read as follows:

"The Common Area Layout as shown on Exhibit A to the Second Modification is hereby consented to by each party to the REA including those modifications for Parcels B-3 and B-4 shown thereon."

-7-

JUL 18 1977

14.  Section 6.11 is hereby amended by adding the following paragraph:

"The insurance described in Section 6.2 hereof required of an owner (other than Operator) by this Section 6.11 may be carried by any plan of self-insurance from time to time maintained by such owner or that owner's tenant or subtenant on condition that the self-insurer has a current net worth of One Hundred Million Dollars ($100,000,000.00) or more. Any company so self-insuring shall furnish, to any Party to the REA requesting the same, evidence of such net worth. The annual report of such self-insurer shall be sufficient evidence of its current net worth."

15.  Section 6.7 is hereby amended in its entirety to read as follows:

"Based upon the ratio of floor space permitted hereunder to be built upon the Building Area of each parcel of Shopping Center, the fraction of the total amount of said cost and expenses to be paid by the owner of each parcel shall be as follows:

| Parcel Numbers | Maximum Building Area (Square Feet) | Percentage |
|---|---|---|
| Parcel B-1(a) | 119,065 | 46.93% |
| Parcel B-1(b) | 27,144 | 10.70% |
| Parcel B-1(c) | 16,000 | 6.31% |
| Parcel B-2 | 25,740 | 10.15% |
| Parcel B-3 | 23,715 | 9.35% |
| Parcel B-4 | 42,000 | 16.56% |
| TOTAL | 253,664 | 100% |

In the event certain maintenance costs or expenses are incurred prior to substantial completion of the Common

-8-

SEP 2 3 1977

Area within the parcel(s) of one or more owners, including

Parcels B-3 and B-4, the square feet of permissible floor

space for that parcel shall be excluded from the above

computations and the percentages shall be recomputed for

the period of time during which such Common Areas are not

substantially completed."

16.    Section 7.3 which was deleted by the first amendment

is hereby reinserted in the REA to read as follows:

"7.3.    The occupant of Parcel B-4 shall have the

exclusive right within the entire Shopping Center with the

exception of Parcel B-1(a) to operate as a home improvement

center.    The exclusive of a home improvement center will not

disallow the sale of any items normally carried by a home

improvement center, but the exclusive will extend to those

businesses normally conducting themselves, or generally thought

of, as home improvement centers."

17.    Section 9 is hereby amended by adding the following

paragraph:

"The insurance described in Section 9 hereof

required of an owner (other than Operator) by this

Section 9 may be carried by any plan of self-insurance

from time to time maintained by such owner or that

owner's tenant or subtenant on condition that the self-

insurer has a current net worth of One Hundred Million

Dollars ($100,000,000.00) or more.    Any company so

self-insuring shall furnish, to any Party to the REA

requesting the same, evidence of such net worth.    The

-9-

SEP 2 3 1977

annual report of such self-insurer shall be sufficient

evidence of its current net worth."

18.   Section 11.1 subsection (g) is hereby amended in its

entirety to read:

THIS REA

"Shall apply to benefit and bind the owner of

Parcel B-3 and everyone claiming under such owner.

Associates as the purchaser of Parcel B-3 agrees to grant

the easements referred to in this REA not already granted

by this Second Modification."

19.   Section 11.1 subsection (h) is hereby amended in

its entirety to read:

THIS REA

"Shall apply to benefit and bind the owner of

Parcel B-4 and everyone claiming under such owner.

Holding Co., as the purchaser of Parcel B-4, agrees

to grant the easements referred to in this REA not

already granted by this Second Modification."

20.   Section 11.5 is hereby amended (at page 36, line 5)

to insert after the words "Shopping Center" the word "or

any portion thereof", so that the sentence beginning at line

4 and ending at line 6 shall read:

"Only an owner of the Shopping Center, or any portion

thereof, or a major tenant of each Parcel within the

Shopping Center shall be entitled to enforce any provision

of this Agreement."

21.   Section 12.2 is hereby amended to add at the second

line thereof after the words "Shopping Center" the words "or

Agency Parking Area."

-10-                                    SEP 28 1977

22.    Section 13.3 is hereby amended in the following particular only to require that all such formal notices, demands and communications be sent to each of the parties to the REA as modified by the First and Second Modification as follows:

          Eltinge, Graziadio & Sampson Development Co., Attn: D. Earl Ellis
          9920 LaCienega Boulevard, Inglewood, California 90301 (Street address)
          Post Office Box 92959, Los Angeles, California 90009 (Mailing address)

          A. D. Clark, Inc., Attn: R.P. Brombach
          12901 West Jefferson Boulevard
          Los Angeles, California 90066

          Albertson's, Inc., Attn: Legal Department
          Post Office Box 20
          Boise, Idaho 83726

          T.C. Associates, care of and attention: Thomas H. Allison
          Union Bank Tower, Suite 214
          Torrance, California 90503

          Temple City Holding Corporation
          c/o Builders Emporium (Attn: Legal Department)
          12500 East Slauson Avenue
          Whittier, California 90606

          Vornado, Inc.
          c/o Builders Emporium (Attn: Legal Department)
          12500 East Slauson Avenue
          Whittier, California 90606

Copy of notices to Vornado, Inc. or Holding Co. to:

          Zissu, Lore, Halper & Barron
          425 Park Avenue
          New York, New York 10022

23.    Section 14.2, clause (b), of the REA is hereby amended to read: "(b) K mart Corporation, so long as it or a subsidiary has a leasehold interest in Parcel B-1(a)."

24.    Section 15.1 of the REA is hereby amended in its entirety to read as follows:

          "The Agency has designated the square footage and

-11-

building areas of Parcels B-3 and B-4 in formal
notices to the parties hereto.  The new building areas
and maximum allowable square footage of Parcels B-3
and B-4, consistent with Section 15 and this Agreement
are as follows:

a.  The easterly line of the building areas shall
not exceed (shall not be east of) the easterly building
lines as shown on Exhibit A to this Second Modification.

b.  The depth of the building area on Parcel
B-3 shall be no greater than one hundred fifty feet
(150') and shall in no event interfere with the thirty
foot (30') driveway along the westerly portion of Parcel
B-3 as shown on Exhibit "A".

c.  The width of the building area on Parcel
B-3 may be the full width of Parcel B-3, i.e., two
hundred twenty feet (220').

d.  The total square footage of the building
area of Parcel B-3 shall not exceed 23,715 square feet.

e.  The depth of the building area on Parcel B-4
shall not interfere with a thirty foot (30') driveway
along the westerly side of Parcel B-4 as an extension
of said driveway behind Parcel B-3, out to a curb cut on
Broadway Avenue.

f.  The width of the building area on Parcel B-4
may be the full width of Parcel B-4 provided that there
is full compliance with local building codes and ordinances.

g.  The square footage of the designated building
areas for Parcel B-4 shall not exceed forty thousand square

JUL 18 1977

feet (40,000 sq. ft.) plus an O.S.A. not to exceed two thousand square feet (2,000 sq. ft.).  Any portion of the building area not utilized for building may be used for O.S.A. so long as the total of building area and O.S.A. does not exceed forty-two thousand square feet (42,000 sq. ft.).

ELTINGE, GRAZIADIO & SAMPSON
DEVELOPMENT COMPANY

By: _____

By: _____

A.D. CLARK, INC.

By: _____

By: _____

ALBERTSON'S, INC.

By: _____
SENIOR VICE PRESIDENT

By: _____
Secretary

COLONIAL PROPERTIES COMPANY

By: /s/WELLS P. HARDESTY

By: _____

T.C. ASSOCIATES

By: _____
David Miller, General Partner

VORNADO, INC.

By: _____
Gary E. Holschman, Vice President

By: _____
Alan G. Novodor
Assistant Secretary

-13-

JUL 18 1977

TEMPLE CITY HOLDING CORPORATION

By: _Gary E. Mabschman_
Vice President

By: _Alan G. Novodor_
Alan G. Novodor
~~Assistant~~ Secretary

APPROVED:

TOMPKINS & PARRINGTON

By: _Thomas E. Parrington_
Thomas E. Parrington

-14-

JUL 1 8 1977

K-MART CORPORATION, formerly known as S. S. KRESGE COMPANY, as
Lessee of a portion of Parcel B-1(a), hereby approves the
foregoing Second Modification pursuant to section 14.2 of the
REA.

K-MART CORPORATION

By: _____ VICE PRESIDENT
    J. P. JOHNSON

By _____ ASSISTANT SECRETARY
   C. E. LOTZAR JR.

STATE OF Michigan )
                  ) ss.
COUNTY OF Oakland )

On September 12, 1977, before me, the undersigned,
a Notary Public in and for said State personally appeared

____J. P. JOHNSON____ and ____C. E. LOTZAR JR.____ ,

known to me to be the ___VICE PRESIDENT___ and ___ASSISTANT SECRETARY___ ,

respectively, of K-Mart Corporation, the corporation that executed
the within instrument on behalf of the corporation therein named,
and acknowledged to me that such cofporation executed the within
instrument pursuant to its by-laws or a resolution of its board
of directors.

WITNESS my hand and official seal.

_____
Notary Public

PATRICIA A. HEWELT
Notary Public, Macomb County, Mich.
My Commission Expires Sept. 14, 1980
Acting In Oakland County

-15-

JUL 18 1977

STATE OF IDAHO )
              ) ss.
COUNTY OF ADA )

On this _23rd_ day of _DECEMBER_, 1977, before me, the undersigned, a Notary Public in and for said State, personally appeared _DAVID L. Wolf_ and _Minnie O. Armstrong_, known to me to be the _Senior Vice President_ and _Secretary_, respectively of ALBERTSON'S, INC., the corporation that executed the foregoing instrument, and acknowledged to me that said instrument is the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and an oath stated that they are authorized to execute the said instrument and that the seal affixed is the corporate seal of said corporation.

WITNESS my hand and official seal.

Notary Public                    Kristine A. Waldram
My Commission Expires            Boise, Idaho
February 1, 1981

_Kristine A Waldram_
                                 Notary Public

STATE OF _California_ )
                      ) ss.
COUNTY OF _Los Angeles_ )

On _October 10_, 1977, before me, the undersigned, a Notary Public, personally appeared _James K. Sampson_ and _George L. Graziadio_, known to me to be two of the partners of Eltinge, Graziadio & Sampson Development Co., the partnership that executed this instrument and acknowledged that such partnership executed the same.

WITNESS my hand and official seal.

OFFICIAL SEAL
JANET SQUIRE
NOTARY PUBLIC CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires June 6, 1981

_Janet Squire_
                                 Notary Public

STATE OF ILLINOIS )
                  ) ss.
COUNTY OF COOK )

On _December 20_, 1977, before me, the undersigned, a Notary Public, personally appeared _WELLS P. HARDESTY_ and _____, known to me to be two of the partners of Colonial Properties Company, the partnership that executed this instrument and acknowledged that such partnership executed the same.

WITNESS my hand and official seal.

/s/Dorceen J. Haley
Notary Public
Commission Expires 12/19/78

STATE OF CALIFORNIA        )
                          ) ss.
COUNTY OF _Los A geles_   )

On _December 16_, 1977, before me, the undersigned, a
Notary Public in and for said State, personally appeared
_Gary E. Hutschman_ and _Alan S. Novodor_, known to me to
be the _Vice President_ and _Asst. Secretary_ of the corporation that
executed the within Instrument, known to me to be the persons
who executed the within Instrument on behalf of Temple City
Holding Corporation and acknowledged to me that such corporation
executed the within instrument pursuant to its by-laws or a
resolution of its board of directors.

WITNESS my hand and official seal.

```
OFFICIAL SEAL
NORMA N. SINER
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Commission Expires Jan. 23, 1978
12500 E. Slauson Ave., Whittier, CA. 90606
```

_Norma N. Siner_
_____
Notary Public

STATE OF CALIFORNIA        )
                          ) ss.
COUNTY OF                  )

On _Nov. 4_, 1977, before me, the undersigned, a
Notary Public in and for said State, personally appeared
_A.D. Clark_ and _R.P. Brombach_, known
to me to be the _President_ and _Vice President_, of the
corporation that executed the within Instrument, known to me
to be the persons who executed the within Instrument on behalf
of A.D. Clark, Inc. and acknowledged to me that such corporation
executed the within instrument pursuant to its by-laws or a
resolution of its board of directors.

WITNESS my hand and official seal.

```
OFFICIAL SEAL
GRANT E. ALLEMAN
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Commission Expires Nov. 26, 1977
12901 W. Jefferson Blvd., L.A., CA 90066
```

_Grant E. Alleman_
_____
Notary Public

STATE OF CALIFORNIA        )
                          ) ss.
COUNTY OF                  )

On _December 14, 1977_, 1977, before me, the undersigned,
a Notary Public in and for said State, personally appeared DAVID
MILLER, known to me to be the general partner of T. C. Associates,
the partnership that executed the within instrument and acknowledged
to me that he executed the same for and on behalf of said
partnership and that said partnership executed the same.

WITNESS my hand and official seal.

_George Dragicevich_
_____
Notary Public

```
OFFICIAL SEAL
GEORGE DRAGICEVICH
NOTARY PUBLIC CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires October 23, 1979
```

-17-

JUL 18 1977

# EXHIBIT 5

OPTION
MAINTENANCE AND MANAGEMENT AGREEMENT
COVENANTS

DEB:2
12-3-75

Temple City,
Calif.

THIS AGREEMENT is made as of October 1, 1975, by and
between (1) The Temple City Community Redevelopment Agency
"the "Agency"), a public body corporate and politic, and
(2) Eltinge, Graziadio & Sampson Development Co. ("EGS"),
A.D. Clark, Inc. ("Clark") and Albertsons, Inc. ("Albertsons"),
all hereinafter referred to collectively as the "Operators"
unless the context indicates otherwise.

RECITALS

A.    The Agency is implementing a Redevelopment Plan (the
"Redevelopment Plan") in the City of Temple City, adopted
by the City Council Ordinance No. 72-350 on May 16, 1972,
pursuant to the California Community Redevelopment Law (Health
and Safety Code Sections 33000 et seq.) for a redevelopment
project designated the Rosemead Boulevard Redevelopment Project
(the "Project"); and

B.    The Agency has entered into a Disposition and
Development Agreement dated on or about April 27, 1974, with
EGS (as the Developer) and into a First Amendment thereto
("First Amendment") dated on or about December 3, 1974,
(the Disposition and Development Agreement and the First
Amendment being hereinafter collectively referred to as the
"EGS DDA"), for the sale of certain land hereinafter referred
to as "Parcel 1, Parcel 2, Parcel 3, Parcel 12, and Parcel 13"
as described and shown on Exhibit "A" attached hereto and
made a part hereof, to EGS for development thereon of commercial
buildings and facilities; and

C.    The Agency has entered into a Disposition and
Development Agreement (the "Clark DDA"), dated on or about
December 3, 1974, with Clark (as the Developer) for the sale
of certain land hereinafter referred to as "Parcel 4" (as
described and shown on Exhibit "A") to Clark for development
thereon of a commercial building and facilities; and

-1-

D.    The Agency presently owns Parcel 5 and is acquiring and has the right to acquire Parcel 6, as such parcels are described and shown on Exhibit "A".

E.    The Agency is negotiating for the sale of Parcels 5 and 6 to other developer entities (such developer entities being hereinafter sometimes individually referred to as "Additional Operator") for the development thereon of commercial buildings and facilities; and

F.    EGS has entered into a Contract of Sale (the "Contract of Sale") dated September 5, 1975 with Albertsons for the sale of Parcel 3 by EGS to Albertsons on which Albertsons will build and develop a commercial building and facilities; and

G.    The Agency, EGS and Albertsons have or will have entered into an agreement dated September 25, 1975 (the "Tri-Party Agreement") concerning their respective rights and duties with respect to Parcel 3; and

H.    EGS and Clark have entered into a Construction, Operation and Reciprocal Easement Agreement dated on or about August 1, 1974 (hereinafter referred to as the "REA") providing for the construction, operation and maintenance of the shopping center (the "Shopping Center") to be developed on Parcels 1, 2, 3, 4, 5, 6, 12 and 13; and

I.    Pursuant to the EGS DDA and the Clark DDA, the Agency is acquiring certain parcels of land hereinafter referred to as "Parcel 7, Parcel 8, Parcel 9, Parcel 10, Parcel 11, and Parcel 14" (as described and shown on Exhibit "A"), is constructing thereon offstreet parking facilities of approximately 870 spaces and has entered into a Lease dated on or about December 1, 1974, of said parcels of land and said parking facilities (said parcels and facilities being hereinafter collectively referred to as the "Parking Facilities") with the City of Temple City (the "City"); and

J.    The Operators have, or will have, entered into an Agreement for Operation and Maintenance of Parking Facilities,

dated as of November 1, 1975, with the City (the "Operation Agreement"). The Operation Agreement requires the Operators to maintain, manage and operate their respective portions of the Parking Facilities during the term of the Operation Agreement.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

PART I

OPTION

Upon the termination of the earlier of (1) the Term of the Operation Agreement or (2) payment of the Bonds (as such terms are described in the Operation Agreement) and thereafter during and upon the termination of the Extended Term (as defined in subsection D of Section 1 of Part II hereof), the Agency hereby grants to each Operator separately and individually, and the successors and assigns of each, an option to purchase its portion(s) of the Parking Facilities, as defined in Exhibit "B", on the following terms and conditions:

1.    The Term of the Operation Agreement and Extended Term of this Agreement shall not have been terminated by reason of breach or default hereunder by the Operator, its successors or assigns;

2.    The purchase price for the portion of the Parking Facilities shall be the fair market value of that portion as of the date the option is exercised. The fair market value of each portion of the Parking Facilities shall be based upon its use as a parking lot for which no charge for the use thereof may or can be made; and subject to all other conditions, covenants, restrictions and easements existing as of the date of the option is exercised; and without consideration for the fact that the Operator or its successors and assigns, owns property adjoining such portion of the Parking Facilities or that such portion would be more valuable to the Operator than it would be to some other party not owning adjacent property. The amount of the payments (and

credits) made by the Operator to the City during the Term of the Operation Agreement shall be credited against the purchase price so determined.

3.    The purchase price shall be determined by agreement of the Agency and the Operator, if possible.  If agreement cannot be reached within thirty (30) days after exercise of the option, then the purchase price shall be determined by agreement of a real estate appraiser promptly selected by the Agency and a real estate appraiser promptly selected by the Operator.  If the appointed real estate appraisers cannot agree as to the purchase price within thirty (30) days, the two appraisers shall promptly appoint a third appraiser of their joint choosing.  The purchase price shall be the arithmetic average of the three appraisals.  Each appraiser shall be a qualified member of the American Institute of Real Estate Appraisers, or such other recognized national association or institute of real estate appraisers; and each appraiser shall have had extensive experience in appraisal of commercial properties in California similar to the Shopping Center.  The Agency and the Operator shall pay the cost of the appraiser selected by it, and each shall pay one-half of the cost of the third appraiser.

4.    The Operator shall deliver to the City, as part of the escrow for purchase of that Operator's portion of the Parking Facilities, a promissory note in the then total of the unpaid amount of the payments to be made by that Operator under subsection A of Section 5 of the Operation Agreement, including interest at 7.9179%, with payments to be made under the promissory note in monthly amounts equal to such monthly payments under subsection A of Section 5 of the Operation Agreement.  The promissory note shall be complete satisfaction and performance of the Operator's responsibilities under subsection A of Section 5 of the Operation Agreement.

5.    The option shall be exercised by written notice given by the Operator to the Agency.  If the option has not been exercised prior to the date of termination of the

-4-

Extended Term, the option shall lapse and the right to purchase set forth herein shall be of no further force or effect.

6.   The Agency shall sign, acknowledge and record a document setting forth the Option of each Operator and making reference to the terms and conditions of the Options set forth in this Agreement.

PART II

MAINTENANCE AND OPERATION AGREEMENT

Section 1.   Maintenance and Management of Parking Facilities; Term.

A.   After the expiration of the Term of the Operation Agreement,

(1)   On the terms and conditions hereinafter set forth, the Agency shall make Parcel 11 of the Parking Facilities available to EGS, and EGS agrees to manage and operate that portion of the Parking Facilities identified as Parcel 11 on Exhibit "A".

(2)   On the terms and conditions hereinafter set forth, the Agency shall make Parcel 14 of the Parking Facilities available to EGS, and EGS agrees to manage and operate that portion of the Parking Facilities identified as Parcel 14 on Exhibit "A".   The obligation of EGS for Parcels 11 and 14 are separate and distinct and are not interrelated or interdependent.

(3)   On the terms and conditions hereinafter set forth, the Agency shall make Parcel 9 of the Parking Facilities available to Clark, and Clark agrees to manage and operate that portion of the Parking Facilities identified as Parcel 9 on Exhibit "A".

(4)   On the terms and conditions hereinafter set forth, the Agency shall make Parcel 10 of the Parking Facilities available to Albertsons, and Albertsons agrees to manage and operate that portion of the Parking Facilities identified as Parcel 10 on Exhibit "A".

B.    After the expiration of the Term of the Operation
Agreement, the Agency hereby agrees to manage and operate
that portion of the Parking Facilities identified as Parcel 8
on Exhibit "A" until such time as: (i) Parcel 5 is conveyed
by the Agency to a developer entity for the development of
improvements thereon as a part of the Shopping Center; (ii)
such developer entity becomes a party to the REA and this
Agreement; (iii) the construction of improvements on Parcel 5
is completed; and (iv) such developer entity shall takeover
the management and operation of Parcel 8.   The Agency hereby
further agrees to manage and operate that portion of the
Parking Facilities identified as Parcel 7 on Exhibit "A"
until such time as: (i) Parcel 6 is conveyed by the Agency
to a developer entity for the development of improvements
thereon as a part of the Shopping Center; (ii) such developer
entity becomes a party to the REA and this Agreement; (iii)
the construction of improvements on Parcel 6 is completed;
and (iv) such developer entity shall takover the management
and operation of Parcel 7.

C.    This Agreement is subject to the terms and conditions
hereinafter set forth.   Each obligation in this Agreement
shall apply only to that portion of the Parking Facilities
operated and managed by that Operator (or the Agency with
respect to the management and operation of Parcels 7 and 8)
and described in Exhibit "B" under the respective name of
that entity.

D.    The term of this Agreement is hereinafter referred
to as the "Extended Term" and shall commence upon the termination
of the Term of the Operation Agreement.   The Extended Term
ends on December 31, 2055, or, with respect to each individual
portion of the Parking Facilities, upon purchase of that
portion of the Parking Facilities by the Operator having the
option to purchase.

Section 2.   Warranty.   The Agency represents and warrants
that the Agency has the authority to enter into this Agreement

and to provide the Parking Facilities to the Operators.  The
Agency represents and warrants that the Parking Facilities
shall be available to the Operators for the uses provided in
subsection A of Section 4.  No member, official or employee
of the Agency shall be personally liable to the City, Agency,
any Operator, any Additional Operator, or any successor in
interest thereto, in the event of any default or breach by
the Agency under this Agreement or for any amount of money
which may be due and payable hereunder.

Section 3.  Takeover of Management and Operation of
Parcels 7 and 8.

During the Extended Term, in the event the City has not
transferred the managment and operation of Parcels 7 and 8
to Additional Operators as set forth in Section 3 of the
Operation Agreement, the Agency shall have the right to make
Parcels 7 and 8 of the Parking Facilities available to the
developer entities that purchase Parcel 5 or 6 and construct
improvements thereon as a part of the Shopping Center (such
developer entities being herein before and hereinafter
individually sometimes referred to as the "Additional Operator"),
and to cause the Additional Operators to agree to take over
the management and operation of Parcel 7 or 8 of the Parking
Facilities according to the terms and conditions set forth
in this Agreement; provided that each of the conditions
precedent set forth in Section 3 of the Operation Agreement
has been satisfied with respect to each such Additional
Operator.

Upon completion of construction of improvements on
Parcel 5 or Parcel 6, the Agency shall make available to the
Additional Operator(s) and shall require the Additional
Operator(s) to accept and take over of Parcel 8 (with respect
to the construction of improvements on Parcel 5) and Parcel 7
(with respect to the construction of improvements on Parcel 6).
Thereafter the Agency shall be relieved of the duty and
obligation to manage and operate Parcel 7 or 8, and the

Additional Operator shall takeover and be solely responsible for the management and operation of such Parcel.

Whenever the term "Operator" is used herein, it shall refer to and include each Additional Operator unless the context clearly indicates otherwise.

Section 4.   Use; Covenant of Parking Availability.

A.   Use.   Each Operator and the Agency shall use, manage and operate its portion(s) of the Parking Facilities hereunder to provide public parking on a non-exclusive basis for members of the general public partronizing the Shopping Center and other office and commercial buildings and facilities within the three square block area of Las Tunas, Rosemead, Broadway and Eaton Wash ("Parcel B of the Project") and for the following purposes as are compatible therewith:

(1)   The Parking of passenger vehicles and pedestrian and vehicular traffic, ingress and egress, pedestrian and vehicular movement to and from adjacent streets and between mercantile business and professional establishments within the Shopping Center for the Operators and their respective successors and assigns and the tenants, subtenants, concession-aires, employees, customers, visitors, licensees and invitees of any one of them, the ingress and delivery of all delivery and service trucks and vehicles for the delivery of goods, wares, merchandise and the rendition of services for owners, lessees and occupants of the commercial facilities within the Shopping Center; and the parking of the automobiles of the employees of the occupants of any commercial facility within the Shopping Center.

(2)   As permitted under Section 7 of the Lease, the installation, maintenance and operation of public utility services for any commercial facility within the Shopping Center and the landscaped areas.   In addition, and without limiting the generality of the foregoing, the Operators will be entitled to install, maintain and operate public utilities, water, sewers and drainage for commercial facilities within the Shopping Center and the landscaped areas of the Parking

-8-

Facilities.  The Agency specifically agrees to grant and to
consent to easements and to join with the Operators or any
one or some of them, in granting to each public utility
company, water company, and any other entity entitled thereto
an appropriate easement for installation, mainenance, repair,
replacement, measuring, gauging, and all incidental purposes
of such utility, water and sewer services, in the form and
in the content normally required by such public utility,
water company or other entity entitled thereto.  Reference
is hereby made to Seaboard Engineering Company's utility
plans for K mart Store 3127, Sheet Numbers SD-3, SD-4 and P-1.

(3)  Subject to all applicable laws and regulations
and Section 7 of the Lease, the construction, maintenance,
repair, replacement and reconstruction of pylon signs and
other free standing signs, with appropriate underground
electrical services, provided, however, the Operator shall
be entitled to construct, maintain, repair, replace and
reconstruct pylon signs where indicated on Exhibit "A" as
long as the size, color and lighting of the signs are in
conformance with the City's sign ordinance generally in
effect at the time of construction of such signs.  The Agency
agrees to cooperate fully to allow the Operators to construct
such pylon signs, with appropriate underground electrical
services, during construction of the Parking Facilities.
Subject to the approval of the Agency during construction, the
Operators shall also be entitled to place and construct such
advertising or identification signs as allowed by each
Operator for its occupants, contractors, subcontractors and
material suppliers.  Nothing herein shall be deemed to allow
signs to be placed on any portion of the Parking Facilities
without the permission of the Operator having the option to
purchase that portion of the Parking Facilities.

(4)  As permitted under Section 7 of the Lease,
the construction, maintenance, repair, replacement, rearrangement
and reconstruction of parking sites and stalls, sidewalks,
ramps, driveways, lanes, curbs, customer traffic control

areas, signals, traffic islands, traffic and parking light facilities, and landscaping areas; the temporary erection of ladders, scaffolding and store front barricades during periods of construction, reconstruction, remodeling or repair of buildings and building appurtenances, upon the condition that such construction, reconstruction, remodeling or repair is diligently performed and that such ladders, scaffolding and barricades are thereafter promptly removed; and the temporary storage of construction materials, construction offices (including trailers), and equipment used or to be used during the course of construction of any building that may hereafter be constructed upon the Shopping Center, provided that such use does not unreasonably interfere with the common use of the Parking Facilities. Nothing herein shall be deemed to allow such uses on any portion of the Parking Facilities without the permission of the Operator having the option to purchase that portion of the Parking Facilities.

B.   Covenant of Parking Availability. The Agency covenants, that so long as the Parking Facilities are in existence and this Agreement is in effect, the Parking Facilities shall be available, as public parking on a non-exclusive basis for members of the general public patronizing the Shopping Center. This covenant is subject to any laws, regulations or rules of any governmental authority other than the City (or any political division or agency thereof) or the Agency, which rules or regulations may hereafter restrict or impose conditions upon the use and operation of the Parking Facilities. The Agency further covenants and agrees that it shall not permit any person or entity, other than the general public patronizing the Shopping Center and other office and commercial buildings within Parcel B of the Project, to use the Parking Facilities.

C.   EPA Permit. During the Term and any Extended Term, the Agency shall make the EPA permit available to the Operators. After the expiration of the Term of the Operation

Agreement and the Extended Term, the Agency shall deliver the original EPA permit to the Operator as that term is defined in Section 601 of the REA.

Section 5. Payments.

A. Taxes. During the Extended Term of this Agreement, each Operator agrees to and shall promptly pay and discharge with respect to only its portion(s) of the Parking Facilities:

(1) Ad valorem taxes levied upon and assessed against the Parking Facilities or the possessory interests of the Operators in the Parking Facilities, and any and all taxes, assessments, fees, excises, charges and levies by state, federal or other governmental entity imposed upon the Parking Facilities.

(a) Special Assessment Districts. In the event the Agency consents to the formation of any special assessment (or improvement or betterment) district, without the express written consent and approval of the Operators, and each of them, the Operator shall have no liability for any taxes or assessments resulting from such special assessment (or improvement or betterment) district, and the Agency shall promptly pay and discharge such taxes and assessments. In the event that a special assessment district (or improvement or betterment district) is formed without the Agency's consent or with the consent of the Agency and all Operators, then the Operators shall promptly pay and discharge such taxes and assessments, but may do so on an installment basis to the full extent permitted.

(b) In the event of any such tax or assessment upon or against the Parking Facilities or the Agency's interest therein, the Agency shall promptly notify the Operators of same.

(c) Any Operator may contest the legal validity or amount of any such taxes or assessments for which the Operators are responsible under this Agreement, and may institute such proceedings as the Operator considers

-11-

necessary or desirable. The Agency shall cooperate fully in such contests and shall allow the contest to be conducted in the Agency's name if so desired by the contesting Operator, provided that the contesting Operators shall prevent any liens from being foreclosed on the Parking Facilities.

(i)    If any Operator contests any such tax or assessment, such Operator may withhold or defer payment or pay under protest, but shall protect the Agency and the Parking Facilities from foreclosures of any lien, by adequate surety bond or other appropriate security if necessary.

(2)    Insurance premiums (if any) that the Agency purchases because of any failure by any Operator to purchase and maintain insurance required by the provisions of subsection A of Section 10 of this Agreement.

(3)    All costs and expenses that the Agency may incur in consequence of or because of any default by any Operator under this Agreement, including reasonable attorneys' fees and costs of suit or action at law to enforce the terms and conditions of this Agreement.

The obligations of each Operator with respect to each of the foreoing and following obligations is limited to that Operator's portion(s) of the Parking Facilities. In the case of costs, expenses or taxes applying or relating to all of the Parking Facilities, each Operator's share shall be determined according to the percentages set forth in subsection A(1) of Section 5 of the Operation Agreement. In the case of costs, expenses or taxes applying or relating to more than one portion of the Parking Facilities but less than all of the Parking Facilities, each Operator's share shall be determined according to the ratios of the applicable percentages for their portions as such percentages are set forth in subsection A(1) of Section 5 of the Operation Agreement.

Each portion of each of the foregoing obligations shall be paid on or before the payment date to which the same applies or relates.

Section 6.    Repair, Maintenance and Operation.

A. Except for repair or restoration of the Parking Facilities to be made by the Agency pursuant to this Agreement, each Operator shall (at its own expense) repair, maintain, and operate during the term of this Agreement, its portion(s) of the Parking Facilities in good order, condition and repair and shall pay all costs and expenses of operating the same as non-exclusive public parking facilities for members of the public patronizing the Shopping Center, office buildings and other facilities of Parcel B of the Project (including the costs of all utilities and all charges, taxes and assessments of every nature whatsoever).

In the event any Operator fails to perform the maintenance, repair and operation of its portion of the Parking Facilities as provided herein, the Agency shall notify the defaulting Operator and the other Operators, in writing, of such failure to perform, specifying the respects in which it considers that defaulting Operator's performance to be unsatisfactory. Upon the failure of that defaulting Operator to improve or to commence and diligently proceed to improve such performance within 15 days after such written notice, the other Operators (upon written notice to the Agency) shall collectively or individually have the right to enter that portion of the Parking Facilities and undertake (or cause to be undertaken) such maintenance, repair, and operational activities in the manner provided in the REA. If the other Operators, collectively or individually, do not takeover such maintenance, repair and operational activities, the Agency shall have the right to enter that portion of the Parking Facilities and undertake (or cause to be undertaken) such maintenance, repair and operational activities. In such events, that defaulting Operator shall promptly upon demand reimburse the Agency and the performing Operator(s) for all reasonable costs and expenses incurred by the Agency or said performing Operator(s) for such maintenance, repair and operational services. The

-13-

Agency agrees to keep the Parking Facilities free and clear of all liens and encumbrances during the Extended Term of the Agreement.

B.    It is understood and agreed that the Agency shall be under no obligation to pay any cost or expense of any kind or character in connection with or related to the repair, management, operation or maintenance of the Parking Facilities.  Notwithstanding anything herein to the contrary, the Agency shall be responsible for all costs and expenses of every kind to repair and maintain Parcels 7 and 8 of the Parking Facilities in good order, condition, and repair, and the Agency shall pay all costs and expenses in operating the same (including the cost of all utilities and all charges, taxes and assessments of every nature whatsoever), for which the Agency is responsible until the responsibilities with respect to Parcels 7 and 8 are respectively assumed in their entirety by the Additional Operators.  It is understood and agreed that the Operators (other than Additional Operators) shall be under no obligation to pay any cost or expense of any kind or character in connection with or related to the repair, management, operation or maintenance of Parcels 7 and 8 of the Parking Facilities.

The Agency agrees to and shall promptly pay and discharge any and all levies and assessments for state, federal, or other governmental parking regulation fees, excises, taxes or charges (if any) and for ad valorem taxes (if any) levied upon or assessed against Parcels 7 and 8 of the Parking Facilities or the Operators with respect thereto until the responsibilities with respect to the payment and discharge of such levies, assessments, and taxes are respectively assumed in their entirety by the Additional Operators.  Each portion of the foregoing shall be paid on or before the payment date to which the same applies or relates.

In the event the Agency fails to perform the maintenance, repair, and operation of Parcels 7 and 8 of the Parking Facilities as provided herein, the Operators shall notify

-14-

the Agency in writing of such failure to perform, specifying the respects in which such performance is considered to be unsatisfactory.  Upon the failure of the Agency to improve or to commence and diligently proceed to improve such performance within 15 days after such notice, the Operators shall, collectively or individually, have the right to enter Parcels 7 and 8 of the Parking Facilities and undertake (or cause to be undertaken) such maintenance, repair and operational activities.  In such event, the Agency shall promptly upon demand reimburse the performing Operator(s) for all reasonable costs and expenses incurred by the performing Operator(s) for such maintenance, repair and operational services.  In the event the Agency fails to promptly reimburse the performing Operator(s) that Operator or the Operators may collect the amount of all such reasonable costs and expenses from the Agency, plus interest at the highest lawful rate on such obligations.  Reasonable costs and expenses incurred by the performing Operator or Operators include reasonable attorneys' fees and cost of suit or action at law or equity to enforce the terms and conditions of this Agreement.

The standards of maintenance required under this Agreement are set forth in Exhibit "C" attached hereto and by this reference made a part hereof.

Section 7.  No Charge for Parking.

A.  By the Operator.  During the Extended Term of this Agreement, the Operators shall not impose or permit the imposition of any charge for the use of the Parking Facilities without the Agency's consent.  The provisions of this Section shall not apply to charges of any kind whatsoever imposed by any governmental authority on the Agency, the City, the Operators, or the users of the Parking Facilities as part of a parking management program, transportation control plan, or other governmental regulation or parking, and the Operators may charge and collect from the users of the Parking Facilities a sufficient amount to recover all or part of such charges and the cost of collecting and administrating all activities

in connection therewith.  The Operators and Additional
Operators may charge and collect the payments and expenses
incurred under this Agreement from tenants of the Shopping
Center and from parties to the REA.

B.   By the Agency.  Without the written consent of the
Operators, the Agency shall not impose or have the right to
impose any charge for the use of the Parking Facilities.

C.   By Successors of Agency.  No successor or assign
of the Agency shall impose or have the right to impose any
charge whatsoever for the use of the Parking Facilities.

Section 8.   Additions and Improvements.

A.   By the Agency.  Without the written consent of the
Operators, the Agency shall have no right during the term of
this Agreement to make any additions to or improvements to
the Parking Facilities, to attach fixtures, structures, or
signs or to place any personal property on or in the Parking
Facilities unless expressly provided in this Agreement.

B.   By the Operator.  With the prior written approval
of the Agency, the Operators and Additional Operators during
the term of this Agreement may, at their own cost and expense,
make or permit to be made, any addition to or improvements
to the Parking Facilities which do not impair the utility
thereof for use as public parking facilities, to attach
fixtures, structures or signs thereto, and place any personal
property on or in the Parking Facilities, provided the
utility and use of the Parking Facilities as public parking
facilities is not unreasonably interfered with.  Title to
all such personal property or to fixtures which may be
removed without damage to the Parking Facilities shall
remain in the Operators, the Additional Operators, or in
such person as may be legally entitled thereto.  (Nothing
herein shall be deemed to allow any fixtures, structures or
signs or any personal property to be placed on any portion
of the Parking Facilities without the permission of the
Operator having the option to purchase that portion of the
Parking Facilities.)

Section 9.  Policies and Rules.  The Operators and
Additional Operators may establish and maintain such general
policies, rules and regulations for the repair, management,
maintenance and operation, and use of the Parking Facilities
consistent with the provisions of this Agreement, the Lease,
and the REA and, as may be necessary, the Redevelopment
Plan, provided that such policies, rules and regulations
have been submitted to and approved by the Agency prior to
their implementation.

Section 10.  Insurance.

A.  Obligations of Operators.  During the Extended
Term of this Agreement, each Operator, at its own cost and
expense shall, with respect to its portion(s) of the Parking
Facilities:

(1)  Keep or cause to be kept a policy or policies
of insurance against loss or damage to the Parking Facilities
resulting from fire, lightning, vandalism, malicious mischief,
riot and civil commotion, and such perils ordinarily included
in "extended coverage" policies of fire insurance.  Such
insurance shall be maintained in an amount not less than the
full insurable value of the Parking Facilities (as defined
below in subsection B of this Section 10, subject to deductible
conditions of not to exceed $10,000 for any one loss; and

(2)  Maintain or cause to be maintained public
liability insurance against claims for bodily injury or
death, or damage to property occurring upon, in or about the
Parking Facilities, such insurance to afford protection in
amounts not less than $500,000 with respect to bodily injury
or death to any one person, not less than $1,000,000 with
respect to bodily injury or death to any number of persons
in any one accident, and not less than $250,000 with respect
to the property damage liability insurance.

B.  Definition of Term "Full Insurable Value".  The
term "full insurable value" as used in this Section 10 shall
mean the actual replacement cost, using the items of value
set forth above (including the cost of restoring the surface

-17-

grounds but excluding the cost of restoring trees, plants
and shrubs), less physical depreciation. Said "full insurable
value" shall be determined from time to time but not less
frequently than once in every 36 months.

C.    General Provisions.  All insurance provided under
subsection A of this Section 10 shall be for the benefit of
the Operators, each Operator's mortgagee (as defined in
subsection A(6) of Section 21), Agency, and City, as named
insureds, during the Term of this Agreement.  All insurance
provided under subsection A of this Section 10 shall be
periodically reviewed by the parties to this Agreement for
the purpose of mutually increasing or decreasing the minimum
limits of such insurance, from time to time, to amounts
which may be reasonable and customary for similar facilities
of like size and operation.

All insurance provided under subsection B of this
Section 10 shall be for the benefit of the Operators and the
Agency as named insureds, during the Extended Term.

All insurance herein provided for under this Section 10
shall be effected under policies issued by insurers of
recognized responsibility and licensed or permitted to do
business in the State of California.

Each Operator may effect for its own account any insurance
not required under this Agreement.  The Operators may provide
any insurance required or permitted under this Agreement by
blanket insurance policies covering the Parking Facilities
and any other location or locations of any Operator.

All policies and certificates issued by the respective
insurers for insurance shall provide that such policies or
certificates shall not be cancelled or materially changed
without at least thirty (30) days prior written notice to
each party to this Agreement.  Appropriate evidence of
payment of premiums for all such insurance shall be deposited
with each party to this Agreement; and, at least ten (10)
days prior to expiration dates of expiring policies or

contracts, copies of renewal or new policies or contracts or certificates shall be deposited with each party to this Agreement.

E.  _Proceeds of Insurance_:  All proceeds of insurance shall be paid as follows:

(1)  All proceeds from fire and extended coverage insurance maintained by the Operators under subsection A of Section 10 shall be paid to the Operator whose portion of the Parking Facilities is damaged or destroyed, to restore, repair or rebuild the Parking Facilities as required by subsection C of Section 11.  Such insurance proceeds shall be held in trust by those Operators for that purpose and that purpose alone except as provided in subsections (a) and (b) immediately following:

(a)  To the extent that such proceeds of insurance exceed the cost of restoration, repair or rebuilding the damaged portion of the Parking Facilities, then such proceeds shall be payable to all of the Operator(s) providing such insurance.

(b)  During the Extended Term, in the event that such restoration, repair or rebuilding does not occur, then the entire amount of such proceeds shall be payable to the Agency.

(2)  With respect to insurance proceeds from public liability insurance maintained by the Operators under subsection A of Section 10, such proceeds shall be paid to the claimant or the party or parties that have been subrogated to such claimant's cause of action.

_Section 11_.  _Damage to Parking Facilities_.  Damage to or destruction of the Parking Facilities by fire or other casualty or event during the Extended Term so that the Parking Facilities become wholly or partially unusable shall be governed by Section 11 of Part II of this Agreement.

A.  In the event of damage to, or destruction of, any portion of the Parking Facilities from any cause against which the Operators are not required to insure, the Agency

shall, unless the Operators have given their prior written consent to the contrary, restore, repair and rebuild the damaged and destroyed portions of the Parking Facilities, provided that the following conditions precedent are met:

(1)  With respect to the damaged or destroyed portion(s) of the Parking Facilities, there is no default, as defined by Section 20 hereof, by the Operator(s) (whose portion(s) are damaged or destroyed) existing as of or following the date of said damage or destruction.

(2)  There are sufficient funds available to the Agency to so restore, repair or rebuild such portions of the Parking Facilities; or, if bonds must be issued by the Agency in order to generate sufficient funds, such bonds can be lawfully issued and sold in accordance with generally accepted standards of feasibility not more restrictive than those applied to the Bonds issued to provide funds to acquire and construct the Parking Facilities.  The Agency shall use best efforts to issue such bonds.

(3)  In the event all or part of the improvements in the Shopping Center are also damaged or destroyed, then at least one of the Operators must undertake to repair and rebuild the damaged or destroyed portion of its Shopping Center improvements.  In such event, however, the obligations of the Agency under this Section 11 shall be limited to (i) restoring, repairing, and rebuilding that part of the Parking Facilities operated by those Operator(s) undertaking to repair and rebuild the damaged or destroyed portion of their Shopping Center improvements or whose Shopping Center improvements are undamaged and undestroyed; and (ii) restoring, rebuilding and repairing driveways and driving aisles (if owned by the Agency) as are reasonably convenient or necessary for customer ingress and egress to those parcels of land owned by the Operator(s) undertaking to repair and rebuilding their improvements or whose improvements are undamaged and undestroyed.

In the event the foregoing provisions precedent are not all met, the Agency may, at its sole option, proceed to

restore, rebuild and repair the damaged or destroyed portion(s).

This Agreement will remain in effect as to such portion of the Parking Facilities restored, repaired, or rebuilt. (The Agency and the Operators hereby expressly waive any law, ordinance, statute or regulation terminating or providing for termination of a contract upon destruction or damage of the subject matter.)

In the event that the Agency issues bonds or incurs indebtedness in order to obtain funds for the repair or rebuilding of the damaged or destroyed portions of the Parking Facilities managed and operated by the Operator(s) undertaking to repair and rebuild the damaged or destroyed portion of their improvements or by the Operator(s) whose improvements are undamaged and undestroyed (collectively hereinafter referred to as "Such Portions of the Parking Facilities"), the Operators of Such Portions of the Parking Facilities shall first enter into binding assurances satisfactory to the Agency that payments by such Operators shall be sufficient to amortize and pay off the unpaid portion of the direct total original cost of construction of the Parking Facilities and the direct total cost to restore, repair and rebuilding Such Portions of the Parking Facilities.

B.   In the event of damage to, or destruction of, any portion of the Parking Facilities from any cause against which the Operators are not required to insure and (1) if the Agency is unable to issue bonds or otherwise incur indebtedness in order to obtain funds for the repair, restoration or rebuilding of the Parking Facilities after exercise of their best efforts, or (2) if the Operators and the Agency agree that such bonds are not likely to be issued and sold in accordance with generally accepted standards of feasibility not more restrictive than those applied to the Bonds, or (3) if the conditions precedent are not satisfied and the Agency decides not to repair, restore or rebuild the damaged or destroyed portions, then the Operators and each of them may,

at their sole and absolute discretion, undertake to repair
or rebuild its portion(s) of the Parking Facilities.  In the
event one or more of the Operators undertakes to repair or
rebuild that Operator's portion of the Parking Facilities,
the ~~City~~ *Agency* shall turn over to those Operators any insurance
proceeds resulting from such destruction or damage of that
portion of the Parking Facilities.

    C.   <u>Restoration, Repair, or Rebuilding by Operator</u>.
In the event or damage or destruction of any portion of the
Parking Facilities from any cause required to be insured
against by the Operators pursuant to subsection A of Section 10
hereof, the respective Operator shall either (1) undertake
to restore, repair or rebuild its portion of the Parking
Facilities so damaged or destroyed or (2) shall exercise its
option to purchase and shall purchase its portion of the
Parking Facilities.

    <u>Section 12</u>.  <u>Assignment</u>.

    This Agreement and any interest of an Operator herein
may, be mortgaged, pledged, assigned or transferred by that
Operator with respect to that portion of the Parking Facilities
adjacent to the parcel owned by that Operator, by voluntary
act or otherwise, without the prior written consent of the
Agency, but only if the party to which the mortgage, pledge,
assignment or transfer is made acquires a similar interest
in that adjacent parcel owned by that Operator.

    Any other mortgage, pledge, assignment, transfer or
sale shall require the prior written consent of the Agency.

    In the event that an Operator or Additional Operator
shall assign or transfer its interest under this Agreement
to any entity to whom or which that Operator also transfers
or sells its adjacent Parcel in the Shopping Center, that
Operator shall be thereafter discharged from all liability
for the performance of the covenants and conditions to be
performed with respect to that portion of the Parking Facilities
in which that Operator has assigned or transferred its
interest under this Agreement.

The Agency agrees, upon written request of any Operator, to state in writing to that Operator and to any third party to whom that Operator might mortgage, pledge, assign, transfer or sell its interest and assign its duties and rights under this Agreement, that the requesting Operator is in full compliance with this Agreement and has fully performed all obligations to be performed by that Operator as of the date of such written statement.  In the event that the Operator is not in full compliance with this Agreement or has not fully performed all obligations to be performed by that Operator to the date of such written statement, the Agency shall briefly describe in what particulars the Operator is not in full compliance or has not fully performed its obligations. The Agency shall make its written response to such request by any Operator within ten (10) days after formal written request is made.

Section 13. Eminent Domain.  During the Extended Term, if the whole of the Parking Facilities or any portion thereof shall be taken under the power of eminent domain or sold to any governmental agency threatening to exercise the power of eminent domain, the provisions of Section 13 of Part II of this Agreement and paragraph 36 of Part III of this Agreement shall govern.

A.    The Operators and those claiming under or through them shall be entitled to any damages against the condemning agency, which damages may be lawfully claimed by the Operators or such persons by reason of damage to or taking of property rights of the Operator, or such persons, including without limitation their interest under this Agreement, and under any easements, options or covenants in favor of the Operators, with respect to the Parking Facilities and related Parcels.

B.    If the whole of the Parking Facilities, or so much thereof as to render the remainder unusable for the purposes set forth in subsection A of Section 4 shall be taken under the power of eminent domain or sold to any governmental agency threatening to exercise the power of eminent domain,

-23-

then this Agreement may be terminated by any Operator with respect to its portion(s) of the Parking Facilities. In the event this Agreement is so terminated, the award made for the taking or damaging of the Parking Facilities, or the proceeds received from any sale thereof, shall be paid to the Agency and each Operator in accordance with their respective rights thereto.

C.    If less than the whole of the Parking Facilities shall be so taken or sold and the remainder is sufficient for the Shopping Center, then this Agreement hereunder shall continue in full force and effect as to such remainder and the parties hereto waive the benefit of any law to the contrary; provided, however, that in the event the improvements on Parcel 1 area leased by EGS, (or its successors and assigns) and the tenant of EGS has the right under its lease with EGS to terminate said lease as a result of such taking or sale, and such tenant does so terminate said lease, then this Agreement may be terminate by EGS with respect to Parcel 14 of the Parking Facilities.

D.    Whether or not the remainder after a partial taking or sale is insufficient for the purposes set forth in subsection A of Section 4 shall be determined by the parties in light of all of the relevant circumstances and in light of the commercial parking requirements of the occupants of the Shopping Center. In the event this Agreement does continue in full force and effect as to such remainder, the payments to be made pursuant to Section 5 of this Agreement for each portion of the Parking Facilities shall be in an amount equal to the payment for that portion of the Parking Facilities divided by the total square footage of that portion and multiplied by the square footage of the remainder of that portion of the Parking Facilities after such taking or sale.

E.    Provided that this Agreement shall continue to remain in effect, any award made in eminent domain proceedings

-24-

to the Agency for the taking or damaging of the Parking Facilities in whole or in part, or any proceeds received from the sale thereof, shall be paid to the Agency and shall be used by the Agency to repair and reconstruct the remainder of the Parking Facilities, or to construct replacement facilities for the portion so taken.  To the extent that such award of sale proceeds may exceed the cost of such repair, reconstruction, or construction (or in the event that such repair, reconstruction or construction does not occur), then the excess of such award or sale proceeds (or the award or sale proceeds) shall be payable: (i) first to the Agency to retire the Bonds or any other outstanding securities or other debts or liability incurred with respect to such repair, reconstruction, or construction as may have been undertaken under subsection A of Section 11; and (ii) second to each Operator and the Agency in accordance with their respective rights in and to the remainder of the excess of such award or sale proceeds.

Section 14.  Voluntary Termination.  Surrender.

A.    Voluntary Termination.  Subject to the written consent of the parties hereto, this Agreement may be mutually terminated or the terms and provisions hereof may be modified. Any modification that affects only that Operator and the Agency need be signed only by that Operator and the Agency.

B.    Surrender Upon Termination.  Upon the termination of this Agreement, the Operators agree that they shall surrender the Parking Facilities to the Agency in good order and condition and in a state of repair that is consistent with prudent use and conscientious maintenance except for reasonable wear and tear and for damage or destruction the Agency is required to repair or rebuild.

Section 15.  Liens.

A.    The Operators agree to pay, when due, all sums of money that may become due for any labor, services, materials, supplies or equipment furnished to or for the Operators in, upon or about the Parking Facilities and that may be secured

by mechanics', materialmen's or other liens against the
Parking Facilities and/or against the interests of the
Agency therein, and will cause each such lien to be fully
discharged and released at the time the performance of any
obligation secured by such lien matures or becomes due;
provided, however, that if the Operators desire to contest
any such lien, they may do so providing that if any such
lien shall be reduced to final judgment and such judgment or
such process as may be issued for the enforcement thereof is
not promptly stayed, or if so stayed and said stay thereafter
expires, then and in such event the Operators shall forthwith
pay and discharge said judgment.

B.    During such time as the Agency shall manage and
operate Parcel 7 or 8 of the Parking Facilities, the Agency
agrees to pay when due, all sums of money that may become
due for any labor, services, materials, supplies or equipment
furnished to or for the Agency in, upon or about Parcel 7 or
8 of the Parking Facilities and that may be secured by
mechanics' or materialmen's or other liens against the
Parking Facilities and will cause each such lien to be fully
discharged and released at the time the performance of any
obligation secured by such lien matures or becomes due; with
respect to the entire Parking Facilities, the Agency agrees
to pay when due, all sums of money who may become due for
any labor, services, materials, supplies or equipment furnished
to or for the Agency in, upon or about the Parking Facilities
and that may be secured by mechanics' or materialmen's or
other liens against the Parking Facilities, and will cause
each such lien to be fully discharged and released at the
time the performance of any obligation is secured by such
lien matures or become due; provided, however, that if the
Agency desires to contest any such lien, it may do so providing
that if any such lien shall be reduced to final judgment and
such process as may be issued for the enforcement thereof is
not promptly stayed, or if so stayed and said stay thereafter

expires, then and in such event the Agency shall forthwith pay and discharge said judgment.

Section 16. _Quiet Enjoyment_. Whenever the consent or approval of the City is required by this Agreement, such consent or approval shall not be unreasonably withheld. The Agency covenants and agrees that the Operators, by keeping and performing the covenants and agreements herein contained, shall at all times during the Extended Term peaceably and quietly enjoy the use of the Parking Facilities for the purposes set forth in subsection A of Section 4, without suit, trouble or hindrance. The Agency agrees to amend this Agreement in any particulars reasonably requested by the mortgagee (as defined in subsection B(6) of Section 21), provided such requested amendments are not inconsistent with the Lease or the Redevelopment Plan

Section 17. _Law Governing_. This Agreement shall be governed by the laws of the State of California, subject to the waivers, exclusions and provisions herein contained.

Section 18. _Notices_. All notices, statements, demands, requests, consents, approvals, authorizations, offers, agreements, appointments or designations hereunder by any party to another shall be in writing and shall be sufficiently given and served upon the other party, if actually delivered by personal service or by United States registered or certified mail, return receipt requested, postage prepaid and addressed as follows:

    Agency:      Temple City Community Redevelopment Agency
                 5938 North Kauffman Avenue
                 Temple City, California 91780
                 Attention: Karl Koski, Executive Director

    Operators:   Eltinge, Graziadio & Sampson Development Co.
                 Post Office Box 92959
                 Los Angeles, California  90009
                 Attention: D. Earl Ellis

                 Albertsons, Inc.
                 Post Office Box 20
                 Boise, Idaho 83726
                 Attention: Contract Department

                 A. D. Clark, Inc.
                 12901 West Jefferson Boulevard
                 Los Angeles, California 90066
                 Attention: R. P. Brombach

-27-

DEC 3 1975

or to such other address as any party shall later designate
for such purpose by written notice to the other parties.

Section 19.    Waiver.    The waiver by any party of any
breach of any other party of any term, covenants or condition
hereof shall not operate as a waiver of any subsequent
breach of the same or any other term, covenant or condition
hereof.

Section 20.    Default by Operator.

A.    In the event that:

(1)    Any Operator shall fail to make any payment
hereunder within ten (10) days from the date such payment is
due; or

(2)    Any Operator shall fail to observe or perform
any such other terms, covenants and conditions contained
herein for a period of thirty (30) days after written notice
thereof to said Operator; or

(3)    Any Operator's or any Additional Operator's
interest in this Agreement or any part hereof shall be
assigned in violation of Section 12; or

(4)    Any Operator shall file any petition or
institute any proceedings wherein or whereby said Operator
asks or seeks or prays to be adjudicated a bankrupt, or to
be discharged from any or all of its debts or obligations,
or offers to its creditors to effect a composition or extension
of time to pay its debts, or asks, seeks or prays for a
reorganization or to effect a plan or reorganization, or for
a readjustment of its debts, or for any other similar relief,
provided, however, that there shall be no default under this
Agreement as long as the obligations of such Operator or any
Additional Operator are being performed; then and in any of
such events, said Operator shall be deemed to be in default
hereunder.

If the Operator should, after notice of such
default, fails to remedy any default or commence the correction
thereof with all reasonable dispatch, in not exceeding ten
(10) days (with respect to failure to make any payment
hereunder) or in not exceeding thirty (30) days (with respect

-28-

to the failure to observe or perform any other term, covenant, or condition contained herein), then the Agency shall have the right, at its option, without any further demand or notice, but subject to Sections 20 and 21:

(a)  To terminate this Agreement with respect to the defaulting Operator and to re-enter its portion of the Parking Facilities and eject said Operator therefrom, in which case this Agreement shall terminate as to said Operator and said Operator shall have no further claim hereunder; or

(b)  To continue this Agreement with respect to the defaulting Operator in effect for so long as it does not terminate said Operator's right to possession, in which case the Agency may enforce all of its rights and remedies hereunder, including the right to recover the payment and other charges required to be paid by said Operator as they become due.

B.   In the event the Agency terminates this Agreement with respect to the defaulting Operator as hereinbefore provided, the Agency shall be entitled to recover as damages all of the following:

(1)  The worth at the time of the award of any unpaid payments or other charges which had been earned at the time of termination;

(2)  The worth at the time of the award of the amount by which the unpaid payments and other charges which would have been earned after termination until the time of the award exceeds the amount of the loss of such payments and other charges that the defaulting Operator proves could have been reasonably avoided;

(3)  The worth at the time of the award of the amount by which the unpaid payments and other charges for the balance of the term after the time of the award exceeds the amount of the loss of such payments and other charges that the defaulting Operator proves could have been reasonably avoided;

(4)  Any other amount necessary to compensate the Agency for the detriment proximately caused by said Operator's failure to perform its obligations under this Agreement or

-29-

which in the ordinary course of things would be likely to
result therefrom.

The foregoing remedies of the Agency are in addition to
and not exclusive of any other remedy of the Agency.  Any
such re-entry shall be allowed by the defaulting Operator
without hindrance and the Agency shall not be liable in
damages for such re-entry or be guilty of trespass.

C.    Notwithstanding subsection B of Section 6, in the
event this Agreement is terminated with respect to such
defaulting Operator, until such time there is a Replacement
Operator who assumes each and every obligation of the defaulting
Operator with respect to its portion of the Parking Facilities,
the Agency shall repair, maintain and operate that portion
of the Parking Facilities as required by all of the terms of
this Agreement.

Section 21.    Rights of Others to Cure Default of Operator.

A.    By Parties to the REA; Tenants of Defaulting Operator.

(1)  The Agency shall, upon serving any Operator
with any notice of default under this Agreement, simultaneously
serve a copy of said notice upon each of the other Operators
at the address designated in or pursuant to Section 18
hereof, and upon each of the tenants of the defaulting
Operator at the last address designated by such tenants.
Each of the other Operators, and each of the tenants of the
defaulting Operator, shall thereupon have fifteen (15) days
more time than is given to the defaulting Operator to cure
any such default or to commence the correction thereof in
accordance with the terms of this Agreement, and the Agency
shall accept such performance by or at the instigation of
the other Operators and Additional Operators, or such tenants,
as if the same had been done by the defaulting Operator.

(2)  Anything herein contained notwithstanding, if
any event or events of default shall occur which, under the
provisions of this Agreement, shall entitle the Agency to
terminate this Agreement with respect to such defaulting
Operator, the Agency shall give each of the other Operators

-30-

and each of the tenants of the defaulting Operator written notice of the Agency's election to terminate this Agreement with respect to such defaulting Operator, and if, before the expiration of fifteen (15) days from the date of service of said termination notice, the other Operators, such tenants, or any of them:

(a)   Shall have paid to the proper governmental authority all taxes and assessments that may then be due, including any and all delinquency payments, late charges and interest;

(b)   Shall have made all payments of insurance premiums on policies required under this Agreement;

(c)   Shall have made such other payments of money as required in this Agreement which are then in default;

(d)   Shall have fully complied within the time period specified in this Agreement as extended hereby for such compliance, or shall have taken or proceeded to take all reasonably practicable steps to the satisfaction of the Agency in order to remedy such event or events of default;

(e)   And has diligently proceeded to perform all the other requirements of this Agreement (if any) which are then in default; then in such event the Agency shall not be entitled to terminate the defaulting Operator's interest under this Agreement and no notice of termination therefor given shall result in a cancellation of such interest under this Agreement or shall be of any further force or effect.

Nothing is this subsection A(2) of Section 21 shall be deemed or construed to imply that any Operator has a duty to cure any default of another Operator, and nothing herein shall be construed or deemed to in any way abridge or diminish the responsibility of the City and the Agency under subsection B of this Section 21.

B.   By Operator's Mortgagee.

(1)   The Agency shall, upon serving any Operator with any notice of default under this Agreement, simultaneously

serve a copy of said notice upon any mortgagee or secured lender (as defined in subsection (6) herein) of the defaulting Operator requesting said notice, at the last address designated by said mortgagee or lender.  Unless the other Operators, or the tenants of the defaulting Operator, or any of them, shall first have cured any such default or shall have commenced the correction thereof as provided in subsection A of this Section 21, said mortgagee or secured lender shall thereupon have thirty (30) more days time than is given to the other Operator and such tenant under subsection A of this Section 21 to cure any such default or commence the correction thereof in accordance with the terms of this Agreement, and the Agency shall accept such performance by or at the instigation of said mortgagee or secured lender as if the same had been done by the defaulting Operator.

(2)  Anything herein contained notwithstanding, while such mortgagee or secured lender remains unsatisfied or of record, if an event or events of default shall occur, which under any provision of this Agreement shall entitle Agency to terminate the defaulting Operator's interest under this Agreement with respect to a portion of the Parking Facilities, and if within thirty (30) days after the date of service of said notice, such mortgagee or secured lender shall have complied, or shall have engaged in the work of complying, with all of the other requirements of this Agreement within the time limits prescribed herein, if any are then in default; then in such event, Agency shall not be entitled to terminate such defaulting Operator's interest under this Agreement and any notice of termination theretofore given shall be void and of no effect.

(3)  If the Agency shall elect to terminate an Operator's interest under this Agreement with respect to a portion of the Parking Facilities by reason of any default of any Operator, such mortgagee or secured lender shall not only have and be subrogated to any and all rights of the

defaulting Operator with respect to curing such default, but shall also have the right to postpone and extend the specified date for the termination of this Agreement as fixed by the Agency in its notice of termination, for a period of not more than six (6) months; provided such mortgagee or secured lender shall cure or caused to be cured any then existing money defaults and comply with and perform all of the other terms, conditions and provisions of this Agreement on the defaulting Operator's part to be complied with and performed; and if no further defaults shall occur hereunder during such extended period, and the mortgagee or secured lender shall forthwith take steps to acquire the defaulting Operator's interest herein, the time of said mortgagee or secured lender to comply with the provisions of this Section shall be extended for such period as shall be necessary to complete such steps with due diligence and continuity, provided that during any such extensions no further default by that Operator or by said mortgagee or secured lender shall be permitted to continue hereunder.

(4)   The Agency agrees that, in the event of termination of an Operator's interest under this Agreement, the Agency will acknowledge the holder of any mortgage or trust deed or its nominee (the mortgagee or trustee) as the substitute operator with all of the rights and obligations of the defaulting Operator hereunder for the remainder of the term, (effective as of the date of such termination) upon the terms, provisions, covenants and agreements as herein contained and subject only to the same conditions of title as this Agreement is subject on the date of the execution hereof, and to the rights, if any, of any parties then in possession of any part of the Parking Facilities, provided:

(a)   Said mortgagee shall make written request upon the Agency for such substitution within thirty (30) days after the date of such termination, and such written request is accompanied by payment to the Agency of sums then due to the Agency under this Agreement.

DEC 1975

-33-

(b)   Said mortgagee shall pay to the Agency, at such time of substitution, any and all sums which would at the time of such substitution be due under this Agreement but for such termination, and in addition thereto any reasonable expenses, including reasonable legal and attorneys' fees to which the Agency shall have been subjected by reason of such default.

(c)   Said mortgagee or its nominee shall perform and observe all covenants herein contained the defaulting Operator's part to be performed, and shall further remedy any other conditions that prior the defaulting Operator was obligated to perform under this terms of this Agreement.

(d)   The substitute Operator under such substitution shall have the same right, title and interest in and to the improvements in the Shopping Center as the original, defaulting Operator had under this Agreement.

(5)   The Agency agrees, within ten (10) day after the request in writing by any Operator, or such mortgagee or secured lender of any Operator, to furnish the party requesting same with a written statement duly acknowledged of the fact that this Agreement is in full force and effect and that there are no defaults hereunder by the Operator if such is the fact.  If any defaults then exist, the Agency agrees that in such statement it will specify the particular default or defaults that the Agency claims to exist.

(6)   As used in this Section 21, all reference to a "mortgage" shall be deemed to include a Deed of Trust and sale-leaseback financing, and all reference to the "holder" of a mortgagee or to a "mortgagee" shall be deemed to include (i) the beneficiary under a Deed of Trust, and (ii) sale-leaseback equity purchasers and their lenders or mortgagees. "Mortgage" and "mortgagee" and "secured lender", as such terms are defined above, refer to those entities having a mortgage or security interest in one or more of Parcels 1, 2, 3, 4, 5, and 6.

Section 22. (There is no Section 22 under this Agreement).

Section 23. <u>Nondiscrimination</u>. The Operators covenant by and for themselves, administrators and assigns, and all persons claiming under or through them, and this Agreement is made and accepted upon and subject to the following conditions:

That there shall be no discrimination against or segregation of any person or group of persons, on account of sex, race, color, creed, national origin, or ancestry, in the assignment, transfer, use or enjoyment of the Parking Facilities, nor shall the Operators themselves, or any person claiming under or through them, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of assignees or transférees under this Agreement.

Section 24. <u>Indemnification</u>. The Agency shall not be liable at any time for any loss, damage, or injury to the property or person of any person whomsoever at any time occasioned by or arising out of any act or omission of the Operators, or of anyone holding under the Operators, of the occupancy or use of the Parking Facilities (or any part thereof) by or under the Operators, or directly or indirectly from any state or condition of the Parking Facilities or any part thereof during the term of this Agreement except for the intentional or negligent acts or omissions of the Agency.

Notwithstanding anything to the contrary under this Agreement, and irrespective of any insurance carried by the Operators for the benefit of the Agency, the Operators agree to protect, defend, indemnify and hold the Agency and the Parking Facilities harmless from any and all damages or liabilities of whatsoever nature caused by the Operators on, or their use and of, the Parking Facilities. This indemnity shall not apply to any portion of the Parking Facilities, the repair, maintenance and operation of which are the responsibility of the Agency.

Section 25.  Authority.  The Agency hereby delegates to its Executive Director, all authority convenient or necessary to sign, administer, grant consents and approvals, and enforce this Agreement.

Section 26.  Validity.  If any one or more of the terms, provisions, promises, covenants, or conditions of this Agreement shall to any extent be adjudged invalid, unenforceable, void or voidable for any reason whatsoever by a court of competent jurisdiction, each and all of the remaining terms, provisions, promises, covenants, conditions and option provisions of this Agreement shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law.

If for any reason this Agreement shall be held by a court of competent jurisdiction, void, voidable, or unenforceable by the parties hereto, or if for any reason it is held by such court that the covenants and conditions of the Operators hereunder is unenforceable for the full term hereunder, then and in such event for and in consideration of the right of the Operators to possess, occupy and use their portion(s) of the Parking Facilities, which right in such event is hereby granted, this Agreement shall thereupon become, and shall be deemed to be, an agreement from year to year under which the obligations herein specified will be performed by each Operator on an annual basis.

Section 27.  Miscellaneous.

A.   Headings.  The table of contents of this Agreement and the captions of the various sections and subsections of this Agreement are for convenience and ease of reference only and do not define, limit, augment or describe the scope, content or intent of this Agreement or any part or any parts of this Agreement.

B.   Gender.  The neuter gender includes the feminine and masculine, the masculine includes the feminine and neuter, and the feminine includes the neuter, and each includes corporation, partnership or other legal entity where the context so requires.

-36-

C.    Singular and Plural.    The singular number includes the plural whenever the context so requires.

Section 28.    Binding Effect.    This Agreement, and the terms, provisions, promises, covenants, conditions and option provisions hereof, shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

This Agreement shall not be effective or binding until there has been attached to each counterpart a certified copy of the resolution of the Agency, approving and adopting and agreeing to the terms and conditions of this Agreement.

Section 29.    Recognition Agreement.    The Agency agrees to immediately enter into an agreement with EGS and S. S. Kresge Co. in the form and substance of the Recognition Agreement attached hereto as Exhibit "D", or such other form as may be reasonably requested by S. S. Kresge Company.

PART III

COVENANTS

30.    Construction of Parking Facilities by Agency.

A.    The Agency shall pay all costs of acquiring the properties within the area of the Parking Facilities and of constructing or causing the construction of the surface Parking Facilities (with the exception of certain landscaping costs to be borne by the Operators), all as provided in Attachment No. 4 (Revised Scope of Development) to the First Amendment to the EGS DDA.

B.    The Agency represents and warrants that the Parking Facilities shall be available to the Operators for the uses provided in subsection A of Section 4 of the Operation Agreement, during the Term of the Operation Agreement and during the Extended Term.

C.    Upon completion of the Parking Facilities by the Agency, the Agency shall assign to the Operators all guarantees from contractors, subcontractors, consultants and materialmen who contributed to the design or construction of the Parking Facilities.

D.    The Agency covenants that at such time as EGS has completed the construction of its improvements on Parcel 1 and Albertsons has completed the construction of its improvements on Parcel 3, the Parking Facilities (except for that portion of the Parking Facilities within Lot 8 of Tract Map 3623, per Map recorded in Book 40, page 52) shall be completed.

31.    <u>Consent to Operation Agreement</u>.

A.    The Agency hereby consents to the Operation Agreement between the City and the Operators and to all subsequent modifications consistent with the Lease.

B.    In the event the Lease terminates prior to the Term of the Operation Agreement, the Agency and the Operators hereby agree and covenant that the Agency shall takeover the rights and obligations of the City in and under the Operation Agreement and that the terms, provisions, covenants and agreements contained in the Operation Agreement shall continue in full force and effect.  (However, no such takeover by the Agency shall discharge any obligation of the City under the Operation Agreement.)

C.    Unless and until the Operators are notified in writing by the Agency of the termination for any reason of the City's rights or obligations under the Lease between the City and the Agency, no Operator, prior to receiving such written notice from the Agency, shall be obligated to make any payments to the Agency in accordance with the Operation Agreement, and all sums paid by any Operator to the City under the Operation Agreement prior to such written notification shall constitute full and complete acquittance of that Operator's obligation to make payments under the Operation Agreement for and during the period preceding the date of such termination of the City's rights or obligations under the said Lease between the City and the Agency.

32.    <u>EGS DDA; Clark DDA</u>.  This Agreement (Parts I, II and III) supersedes and amends Sections 225, 226, 227 and 228 of the First Amendment of the EGS DDA and Sections 729, 730, 731 and 732 of the Clark DDA.

33.   Taxes.  During the Term of the Operation Agreement,

A.    The Agency, without the express written consent and approval of the Operators and each of them, shall not consent to the formation of a special assessment (or improvement or betterment) district that includes all or part of the Parking Facilities.  In the event the Agency does consent to the formation of such special assessment (or improvement or betterment) district without the express written consent and approval of the Operators, then the Agency shall promptly pay and discharge all taxes and assessments arising from such special assessment district (in installment payments as permitted).

B.    The Agency shall cooperate fully in any contest of taxes or assessments for which the Operators are responsible under the Operation Agreement, and the Agency shall allow the contest to be conducted in the Agency's name if so desired by the contesting Operator.

34.   Insurance Under Operation Agreement.  The Operators agree that in addition to their obligation to the City under Section 10 of the Operation Agreement and subsection C of Section 11 of the Operation Agreement, that each and every obligation of the Operators to the City is also an obligation in favor of the Agency, on the same terms and conditions as in the Operation Agreement.  The obligations of the City to maintain insurance under subsection B of Section 10 of the Operation Agreement and to repair, rebuild and restore damage or destruction to the Parking Facilities under subsection A of Section 11 of the Operation Agreement are also the obligations of the Agency, and if the City does not perform those obligations, the Operators may, and shall be entitled to, require such obligations to be performed by the Agency, on the same terms and conditions.  The covenants in this Paragraph 5 are in accordance with, and full compliance with, Sections 8 and 9 of the Lease between the City and the Agency.

35.  <u>Damage to Parking Facilities</u>.  In the event of damage or destruction of the Parking Facilities during the Term of the Operation Agreement, from a cause against which the Operators are not required to insure under the Operation Agreement, the Agency shall use its best efforts to issue bonds to provide funds to restore, repair or rebuild such portions of the Parking Facilities, on the same terms and conditions as set forth in Section 11 of the Operation Agreement with respect to the obligations of the City under such Operation Agreement.  The Agency shall cooperate with those Operators who undertake to repair or rebuild the damaged or destroyed portions of the Parking Facilities in accordance with said subsection B of Section 11 of the Operation Agreement.

The Agency understands and agrees that the City has agreed in the Operation Agreement to withhold the City's consent with respect to the Agency's option under Section 9(b) of the Lease unless all of the Operators have previously given their written consent to the City's granting of such consent.  The Agency agrees that it will not proceed under the option in Section 9(b) of the Lease unless the City's consent has been given with the prior written consent of all of the Operators.

36.  <u>Eminent Domain</u>.

A.  During the Term of the Operation Agreement and the Extended Term of Part II of this Agreement, the Agency agrees with the Operators and each of them that, without the prior written consent of the Operators, the Agency shall never agree to sell the Parking Facilities or any portion thereof to any governmental agency threatening to exercise the power of eminent domain, but that the Agency shall resist such threat by requiring such governmental agency so threatening to exercise the power of eminent domain to prove that the proposed use by such threatening governmental agency is more necessary than the current use of the Parking Facilities.

B.    During the Term of the Operation Agreement
and the Extended Term of Part II of this Agreement, the
Agency further agrees that in the event any governmental
agency shall threaten to exercise the power of eminent
domain with respect to a portion of the Parking Facilities
and if the proposed use is proven to be more necessary than
the current one of the Parking Facilities, then the Agency,
without the prior written consent of all of the Operators,
shall never sell to such governmental agency threatening to
exercise the power of eminent domain, more of the Parking
Facilities than that portion over which such governmental
agency threatens to exercise the power of eminent domain,
unless the remaining portion of the Parking Facilities would
be insufficient for parking purposes under the test and
standards set forth in subsection D of Section 13 of the
Operation Agreement.

C.    During the Term of the Operation Agreement,
if the amount of any award given in eminent domain proceedings
and/or proceeds received from the sale to any governmental
agency threatening to exercise the power of eminent domain
is in excess of the amount necessary to retire the Bonds,
such award and proceeds shall be paid to the Operators in
proportion to the amount of damage or taking of their
portion(s) of the Parking Facilities.

37.    Quiet Enjoyment.

A.    With respect to the quiet enjoyment of the
Parking Facilities, the Agency has made the following determinations:

(1)    The development of Parcels 1, 2, 3, 4,
5, 6, 12 and 13 (as such Parcels are defined and shown on
Exhibit "A") in accordance with the provisions of the EGS
DDA, the Clark DDA, and the REA, is an integral part of the
Redevelopment Plan and is in the vital and best interests of
the City and the Agency and is in accord with the public
purposes and provisions of the applicable state and local
laws and requirements.

(2)   The development of the Parcels 1, 2, 3,
4, 5, 6, 12 and 13, in accordance with the provisions of the
EGS DDA, the Clark DDA and the REA, will be of public benefit
to the residents of the City of Temple City by providing a
commercial shopping center furnishing needed goods and
services and by providing jobs for the community.

(3)   The maintenance of adequate on-site
parking facilities is crucial to the development and successful
operation of Parcels 1, 2, 3, 4, 5, 6, 12 and 13.  The
Operators are willing to undertake the development of Parcels
1, 2, 3, 4, 5, 6, 12 and 13 only if there is assurance that
adequate parking will be provided and will continue to be
provided, available within the Parking Facilities to Parcels 1,
2, 3, 4, 5, 6, 12 and 13.

(4)   Providing for the maintenance of adequate
on-site parking facilities in the Parking Facilities for
Parcels 1, 2, 3, 4, 5, 6, 12 and 13  is in the public interest
because it will permit the public to enjoy full access to
and use of the goods and services offered in the Shopping
Center while simultaneously preventing congestion and related
traffic and street parking problems that would be created if
the Shopping Center did not have adequate on-site parking.

(5)   Parking Facilities for the Shopping
Center as proposed pursuant to the EGS DDA, and the Clark
DDA, and the REA, are adequate for the successful operation
of the Shopping Center and avoidance of congestion in connection
with such operation.  Any significant use of such facilities
for purposes unrelated to the uses of the Parking Facilities
as set forth in subsection A of Section 4 of the Operation
Agreement might endanger the successful operation of the
Shopping Center and lead to congestion, both of which would
be to the public detriment.

(6)   As a condition to undertaking the obligations
of the Operators set forth in the EGS DDA, the Clark DDA,
the Operation Agreement and this Agreement, the Operators,

have required assurance that uses will not be made of portions of the Shopping Center and adjacent properties within the Project area that would or might encroach upon or interfere with the uses of the Parking Facilities as set forth in subsection A of Section 4 of the Operation Agreement or which would cause such Parking Facilities to be inadequate for the operation of the Shopping Center.

  B. With respect to the quiet enjoyment of the Parking Facilities and based upon and by reason of such determinations, the Agency covenants, warrants and agrees as follows:

   (1) The Agency shall not permit any new development on Parcels B-6, B-7, B-8 and B-9 (as such Parcels are defined and shown on Exhibit "A") or on any other parcel in the rest of the Project area (excluding Parcels 1, 2, 3, 4, 5, 6, 12 and 13), unless any such parcel provides on-site parking which is sufficient for such complete support of the use permitted on such parcel. The determination of whether or not such on-site parking is sufficient for such complete support in any particular case shall be a matter for determination by the Agency in its reasonable discretion; provided that any parcel providing a parking area greater than 2.5 times the improved area in the parcel shall be conclusively deemed to be sufficient, and further provided that any parcel providing a parking area less than that required by any general zoning ordinance in force (irrespective of variance, exemption or other exception) shall be conclusively deemed to be insufficient.

  38. <u>Subdivision Map</u>. The Agency agrees to prepare, process and record a Final Map or Parcel Map in accordance with the Subdivision Map Act, with separate and distinct parcels for Parcels 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14.

  39. <u>Covenants Concerning Parcels 5 and 6</u>. The Agency agrees to record, immediately with respect to Parcel 5, and as soon as title is acquired with respect to Parcel 6, covenants affecting Parcels 5 and 6 as follows:

-43-

A.   The covenant shall be in a form and with sufficient content to run with the land in accordance with California Civil Code Section 1468.

B.   The covenants will require that Parcels 5 and 6 shall be subject to the terms and conditions of the REA and shall be used, maintained and improved in accordance with said REA.

C.   The covenants will be in favor of EGS, Albertsons, and Clark and will benefit Parcels 1, 2, 3, and 4.

40.   Development Costs.  The Agency shall require the purchaser, transferee or lessee of Parcel 5 and of Parcel 6 to reimburse EGS for each purchaser's, lessee's or transferee's portion of the costs and expenses as set forth in Sections 1.7 and 1.8 of the REA.

41.  Easements Across Parcels 5 and 6.  The Agency shall grant the following easement to the Operators, and each of them, as easements appurtenant to Parcels 1, 2, 3, and 4:  An easement for a driveway, ingress and egress, thirty feet (30') wide, across the western portions of Parcels 5 and 6 (as such easement is shown on Exhibit "A") out to a driveway in Broadway Avenue).  This easement shall be for the benefit of each of the Operators, and their visitors, licensees, customers and invitees.

42.   Covenants of the Agency.  The Agency covenants and agrees:  The Agency shall demolish and remove all existing buildings and street improvements, recompact and rough grade Parcel 5.  Thereafter the Agency shall pave the area west of the Building Area (as shown on Exhibit "A") of Parcel 5 and shall also pave the easement across the western portions of Parcels 5 and 6.  The Agency shall pave the above easements with heavy-duty A.C.P. in order to provide adequate ingress and egress for the delivery trucks to the buildings to be erected on Parcels 1, 2, 3, and 4.

The Agency shall either pave or treat the Building Area of Parcel 5 and maintain it in a weedfree manner, free of

debris in any manner that will prevent dust.  The Agency
shall maintain said easements and shall also build and
maintain a fence or wall along the northern and eastern
boundaries of Parcel 6, unless such parcel has been conveyed
to a purchaser, lessee or transferee for development in
accordance with this Agreement and the REA.  All such work
shall be done at no expense to the other parties to this
Agreement.  Such work shall not preclude any later sale or
development of Parcel 5 or Parcel 6.

43.  <u>Utility Easements</u>.  The Agency agrees to consent
to and to grant all easements necessary or reasonable for
the installation, maintenance and operation of public utilities,
sewer, water and drainage for the commercial facilities to
be constructed on Parcels 1, 2, 3, 4, 5, 6, 12 and 13 and
the landscaped areas of the Parking Facilities, provided
that such easements shall not substantially interfere with
the use of the Parking Facilities for public parking purposes.  The
Agency specifically agrees to grant and to consent to
the grant of easements and to join with the Operators, or
any one or some of them, in granting to each public utility
company, water company, or any other entity entitled thereto,
an appropriate easement for installation, maintenance,
repair, replacement, measuring, gauging and all incidental
and ancillary purposes for such utility, sewer, water, and
drainage services, in the form and in the content reasonably
required by such public utility, water company or other
entity entitled thereto.  This covenant and agreement of the
Agency is effective immediately and applies to Parcels 5, 6,
7, 8, 9, 10, 11, and 14.

44.  <u>Easements and Covenants for Parking, Ingress
and Egress</u>.

A.  The Agency shall immediately grant easements for
vehicular and pedestrian ingress and egress to each Operator
across that Operator's portion(s) of the Parking Facilities
to or towards Rosemead Boulevard, Broadway Avenue, and Las

DEC 3 1975

-45-

Texas Drive.  The easements in favor of each Operator shall be coexistant and coterminous with the driving aisles over that Operator's portion(s) of the Parking Facilities, and in no event shall these easements cross or burden any Operator's portion of the Parking Facilities in favor of anyone other than the Operator who has an option to purchase that portion of the Parking Facilities.  Such easements shall be at points not within the striped parking areas or landscaped areas, and such easements shall be appurtenant to each Operator's parcel or parcels within the Shopping Center and shall be unlimited in duration.

B.   The Agency shall also create recorded covenants devoting each portion of the Parking Facilities and the land comprising a component thereof to use as a parking lot only. The covenants shall run with the land and shall be in favor of the Operators managing and operating that portion of the Parking Facilities.  Such covenants shall be unlimited in duration.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and attested by their proper officers thereunto duly authorized, and their official seals by be hereto affixed, as of the day and year first above written.

TEMPLE CITY COMMUNITY REDEVELOPMENT AGENCY

By _____
Executive Director

ELTINGE, GRAZIADIO & SAMPSON
DEVELOPMENT CO.

By _____

By _____

A. D. CLARK, INC.

By _____

By _____

ALBERTSON'S, INC.

By _____
SR VICE PRESIDENT

By _____
SECRETARY

-46-

Eltinge, Graziadio & Sampson Development Co.
Parcel 14 as shown on Exhibit "A".  Metes and
bounds legal description is to be furnished
by Seaboard Engineering Co.

Eltinge, Graziadio & Sampson Development Co.
Parcel 11 as shown on Exhibit "A".  Metes and
bounds legal description is to be furnished
by Seaboard Engineering Co.

Albertsons, Inc.
Parcel 10 as shown on Exhibit "A".  Metes and
bounds legal description is to be furnished
by Seaboard Engineering Co.

A. D. Clark, Inc.
Parcel 9 as shown on Exhibit "A".  Metes and
bounds legal description is to be furnished
by Seaboard Engineering Co.

Additional Operators
Parcels 7 and 8 as shown on Exhibit "A".
Metes and bounds legal description is to be
furnished by Seaboard Engineering Co.

EXHIBIT "B"

STANDARDS OF MAINTENANCE

1.    Maintaining, replacing and repairing the surfaces
of the Parking Facilities in a level, smooth and evenly
covered conditions with the type of surfacing material
originally installed or such substitute as shall in all
respects be equal in quality, use and durability;

2.    Maintaining the Parking Facilities in good order
and repair and in an adequate, sightly and serviceable
condition, said maintenance to include, without limitation,
keeping the same reasonably free and clear of foreign objects,
papers, debris, obstructions, standing water, snow and ice;
and to insure the foregoing, the Parking Facilities shall be
thoroughly cleaned not less than once weekly, and more often
if necessary, and snow removed properly on every occasion
where it impedes the use of the Parking Facilities.

3.    Placing, keeping in repair, repainting and replacing
when necessary all appropriate directional signs, markers
and lines; and operating, keeping in repair and replacing
when necessary such artificial lighting facilities as shall
be reasonably required;

4.    Maintaining and repairing any perimeter walls in a
good condition and state of repair and replacing same when
necessary;

5.    Maintaining all landscaped areas, making such
replacements of shrubs and other landscaping as is reasonably
necessary to maintain adequate landscaping under all relevant
circumstances, and keeping said areas at all times adequately
weeded and watered; and

6.    Lighting Parking Facilities during business hours
and reasonable periods prior and subsequent thereto at a
minimum of one and one-half (1-1/2) foot candles measured at
ground level for each square foot of parking area, except as
required by law or ordinance.

EXHIBIT "C"

RECOGNITION AGREEMENT

       This Agreement dated as of _____ by the
Temple City Community Redevelopment Agency hereinafter
referred to as "Agency"; Eltinge, Graziadio & Sampson
Development Co., hereinafter referred to as "Operator", and
the S. S. Kresge Company, hereinafter referred to as "Kresge."

       W I T N E S S E T H :

       Whereas, the Agency and the Operator have entered into
that certain Option, Maintenance and Management Agreement
Covenants, hereinafter called the "Agency Agreement", dated
as of October 1, 1975, which Agency Agreement affects the
following described property, hereinafter referred to as
"Parking Facilities", in the City of Temple City, County of
Los Angeles:

       SEE EXHIBIT "X" ATTACHED

and

       Wheras, Operator, as landlord, granted to Kresge, as
tenant, certain rights in Parcel 14 of the Parking Facilities,
by virtue of the Lease and Lease Agreement dated March 11,
1974, as amended, hereinafter referred to collectively as
the "Kresge Lease", which Kresge Lease is for a primary term
(as defined in said Kresge Lease) of twenty-five (25) years
plus ten (10) options to extend the term for five (5) additional
years each; and

       Whereas, it is the desire and intention of the parties
hereto to confirm and recognize the status of Agency and
Kresge concerning said Parcel 14 in the event of (1) termination
of Operator's rights concerning Parcel 14 under the Agency
Agreement for any reason or (2) any surrender or transfer by
Operator to Agency of the rights of Operator under the
Agency Agreement, whether such surrender or transfer is
voluntary, involuntary or by operation of law.

EXHIBIT "D"

-1-

Now therefore, in consideration of the mutual promises and other good and sufficient consideration, receipt of which is hereby acknowledged, it is hereby agreed as follows:

1.    In the event of (1) termination of the Operator's rights concerning Parcel 14 under the Agency Agreement for any reason or (2) any surrender or transfer by Operator under said Agency Agreement to City of the rights of Operator under the Agency Agreement, whether such surrender or transfer is voluntary, involuntary, or by operation of law, Tenant agrees:

(a)  To make a full and complete attornment to Agency so as to establish direct privity between Agency and Kresge, and

(b)  That all obligations of Operator under said Agency Agreement shall continue in full force and effect and be enforceable against Kresge by Agency upon the principle of attornment, and in such event Agency agrees that it will recognize and accept the rights of Kresge under the Agency Agreement, all with the same force and effect as if the Agency Agreement had originally been made and entered into by and between Agency and Kresge as an operator.

2.    Nothing herein contained shall impose any obligation upon Kresge to perform any of the obligations of the Operator under the Agency Agreement unless and until there shall first have occurred and been effected termination or surrender or transfer (to Agency) under the Agency Agreement and until attornment by Kresge to Agency has been made, and provided further that anything in this Recognition Agreement to the contrary notwithstanding, this attornment and recognition shall not be effective unless and until Kresge shall have entered into possession of the Parking Facilities, and accepted the same, and provided further that the obligations of Kresge to Agency shall not be greater, financially or otherwise, than the obligation of Operator to Agency under the said Agency Agreement.

3.   Notwithstanding anything to the contrary herein contained, it is understood and agree that unless and until Kresge is notified in writing by Operator, as landlord under said Kresge lease, or by Agency of the happening of the event of (1) termination of the Agency Agreement or (2) any surrender to Agency of the rights of the Operator under the Agency Agreement, Kresge, prior to receiving such written notification from Operator or Agency, shall not be obligated to make any payments to Agency under the Agency Agreement, and all rent paid by Kresge to Operator under the Kresge lease prior to such notification shall constitute full and complete acquittance of Kresge's obligation to make payments under the Agency Agreement for and during the period preceding the date of such termination or surrender or transfer (to Agency) of the Agency Agreement.

4.   This Agreement may be signed in counterparts, and when signed by the Operator, Kresge, and Agency, shall become binding and effective.

5.   This Agreement shall be binding upon and shall inure to the benefit of the successors, heirs and assigns of the parties hereto.

"OPERATOR"

ELTINGE, GRAZIADIO & SAMPSON DEVELOPMENT CO.

By _____

By _____

"KRESGE"

S. S. KRESGE COMPANY

By _____

By _____

TEMPLE CITY COMMUNITY REDEVELOPMENT AGENCY

By _____

Attest: _____

-3-

FIRST AMENDMENT TO OPTION, MAINTENANCE

AND MANAGEMENT AGREEMENT, COVENANTS

The "Option, Maintenance and Management Agreement, Covenants"

Agreement dated as of October 1, 1975 among Temple City Community

Redevelopment Agency (Agency), Eltinge, Graziadio & Sampson Development

Co. (EGS), A. D. Clark, Inc. (Clark) and Albertson's, Inc. (Albertson's)

is hereby amended in the following particulars:

1. The first unnumbered paragraph of Part I at page 3 is
hereby amended to read as follows:

"Upon the termination of the earlier of (1) the Term
of the Operation Agreement or (2) payment of the Bonds (as
such terms are described in the Operation Agreement) and
for ten (10) years thereafter during the Extended Term (as
defined in subsection D of Section 1 of Part II hereof), the
Agency hereby grants to each Operator separately and individually,
and the successors and assigns of each, an option to purchase
its portion(s) of the Parking Facilities, as defined in
Exhibit "B", on the following terms and conditions."

2. Paragraph 5 of Part I at pages 4 and 5, is hereby amended
in its entirety to read:

"The Option shall be exercised by written notice given
by the Operator to the Agency within ten (10) years after the
commencement of the Extended Term. If the option has not been
exercised by 11:59 p.m. (Pacific Time) of the tenth (10th)
anniversary date of the commencement of the Extended Term,
the Option shall lapse and the right to purchase set forth
herein shall be of no further force or effect."

3. A new paragraph 7 of Part I at page 5, is hereby added to
read:

"The purchase price as determined pursuant to paragraph 3
shall be paid in cash through an escrow to be established by
each Operator and the Agency after deducting from the purchase
price that portion of the purchase price represented by the
promissory note referred to in paragraph 4 and any credit
allowed pursuant to paragraph 2."

-1-

4.    Part II, Section 4.B., at page 10, is hereby amended at the last sentence thereof by adding the words "During the Extended Term" to the beginning of that sentence.

5.    The word "City" is hereby deleted and replaced by the word "Agency" at the following places:

(a)    The tenth and fourteenth lines of subsection A(3) of Section 4, page 9.

(b)    The tenth line of the second paragraph of subsection A of Section 6, page 13.

(c)    Subsection B of Section 11, the fifth line from the top of page 22.

EGS, Clark, Albertson's and the Agency all confirm the interlineations made to the original Option, Maintenance and Management Agreement, Covenants with respect to the foregoing changes.

6.    EGS, Albertson's, Clark and the Agency hereby ratify the following handwritten changes made to the Exhibit "A":

Deletion of the printed line beginning at the numeral "3" that identifies Parcel 3 and going to the western boundary of Parcel 11 and the addition of the handwritten line in red from the same numeral "3" to the western boundary of Parcel 10.

Deletion of the printed beginning at the numeral "4" that identifies Parcel 4 and going to the western boundary of Parcel 10 and the addition of the handwritten line in red from the same numeral "4" to the western boundary of Parcel 9.

Deletion of the printed line beginning at the numbaral "5" that identifies Parcel 5 and going to the western boundary of Parcel 9 and the addition of the handwritten line in red from the same numeral "5" to the western boundary of Parcel 8.

7.    Except as modified herein, said Option, Maintenance and Management Agreement, Covenants remains in full force and effect.  The First Amendment is binding on the successors and assigns of each of the parties.  This First Amendment shall be effective as of the date it is executed by the Agency.

-2-

DATED: _June 17, 1976_                    TEMPLE CITY COMMUNITY
                                          REDEVELOPMENT AGENCY

                                          By _____

                   JAN 2 0 1976
DATED: _____              ELTINGE, GRAZIADIO & SAMPSON
                                          DEVELOPMENT CO.

                                          By _____

                                          By _____

DATED: _____              A. D. CLARK, INC.

                                          By _____

                                          By _____

DATED: _June 11, 1976_                    ALBERTSON'S, INC.

                                          By _____
                                             _SENIOR VICE PRESIDENT_

                                          By _____
                                                        _SECRETARY_



Signature page to First Amendment to Option, Maintenance and
Management Agreement, Covenants Agreement dated as of October 1, 1975.

SECOND AMENDMENT TO OPTION, MAINTENANCE AND

MANAGEMENT AGREEMENT, COVENANTS

DEE:1
3-8-76

Temple City,
CA

The "Option, Maintenance and Management Agreement,
Covenants" Agreement dated as of October 1, 1975 between
Temple City Community Redevelopment Agency (Agency) on the
one hand and Eltinge, Graziadio & Sampson Development Co.
(EGS), A.D. Clark, Inc. (Clark) and Albertson's, Inc. (Albertson's)
on the other hand, previously amended by the First Amendment
also dated as of October 1, 1975 and signed by EGS on January 26,
1976, is hereby amended in the following particulars:

1.   Exhibit "E" is hereby added for the purpose of
identifying the Parking Facilities by a metes and bounds
legal description of the entire perimeter of said Parking
Facilities.  In the event of any discrepancy or conflict
between the identification of Parcels 7, 8, 9, 10, 11 and 14
on Exhibit "A" and the legal description attached hereto as
Exhibit "E" and made a part hereof, the legal description in
Exhibit "E" shall be controlling.  Exhibit "E" is dated 2-25-76
and was prepared by Seaboard Engineering Co. as part of Job
No. 8639 and is identified as "Parking Lot Lease Area, Temple
City Shopping Center, Amended Legal Description."

2.   Exhibit B-1 is hereby added for the purpose of
furnishing the metes and bounds legal description of Parcel 14.
In the event of any discrepancy or conflict between the
identification of Parcel 14 on Exhibit "B" and the legal
description attached hereto as Exhibit "B-1" and made a part
hereof, the legal description in Exhibit "B-1" shall be
controlling.  Exhibit "B-1" was prepared by Seaboard Engineering
Co. on 2-3-76 as part of Job No. 8639 and is identified as
"K mart Store No. 3127, Temple City, Parcel 14 - Parking
Lot, Legal Description."

3.    Except as modified herein and in the First Amendment,
said "Option, Maintenance and Management Agreement, Covenants"
Agreement remains in full force and effect.   This Second
Amendment is binding on the successors and assigns of each
of the parties.


DATED: _March 3, 1976_                    TEMPLE CITY COMMUNITY
                                          REDEVELOPMENT AGENCY

                                          By _Karl L. Korb_

DATED: ___MAR 8  1976___

                                          ELTINGE, GRAZIADIO & SAMPSON
                                          DEVELOPMENT CO.

                                          By _____

                                          By _____

DATED: ___MAY 6 - 1976___

                                          A. D. CLARK, INC.

                                          By _____

                                          By _____

DATED: _March 22, 1976_

                                          ALBERTSON'S, INC.

                                          By _____
                                               SENIOR VICE PRESIDENT
                                          By _____
                                                       SECRETARY


                                          COLONIAL PROPERTIES COMPANY

                                          By _____
                                              A GENERAL PARTNER


Signature page to Second Amendment to Option, Maintenance and
Management Agreement, Covenants dated March 8, 1976.


-2-

# SEABOARD PARKING COMPANY

| | | | |
|---|---|---|---|
| Parking lot lease area | JOB NO. 8639 | | SHEET NO. 1/1 |
| Temple City Shopping Center | DESIGNED BY | | DATE 2-25-76 |
| Amended legal description | APPROVED | | |

Those portions of Lots 7, 8, 9, 10, 23, 24, 25, 26, 39, 40 and 42, all of Tract No. 3623 in the City of Temple City, County of Los Angeles, State of California, as per map filed in Book 40, Page 52 of Maps, Records of Los Angeles County, and those portions of Wedgewood Street vacated by Resolution No. 76-1525, recorded as Document No. 2221   on Feb. 19, 1976 and Live Oak Street, vacated by Resolution No. 76-1524 , recorded as Document No. 2222   on Feb. 19, 1976 both Official Records of Los Angeles County, described as follows:

Beginning at the Northeasterly corner of Parcel 1, Parcel Map No. 6145, as per map filed in Book 62, Pages 51 and 52 of Parcel Maps, Records of Los Angeles County, said point being on the Southerly line of Las Tunas Drive, 134.00 feet wide, as shown on said Parcel Map and described in the Final Decree of Condemnation in the Superior Court of Los Angeles County Case No. 269622, a certified copy thereof recorded in Book 12289, Page 277 of Official Records of said County, said Southerly line being on a curve concave Northerly and having a radius of 1612.00 feet, a radial line to said point of beginning bears South 0° 16' 37" East; thence Easterly along said Southerly line an arc length of 150.25 feet through a central angle of 5° 20' 25" to the East line of said Lot 42, a radial line to said point bears South 5° 37' 02" East; thence leaving said Southerly line along said East line of said Lot 42, South 0° 09' 18" West 208.84 feet to the Southeast corner thereof; thence along the North line of said Lot 40, North 89° 59' 52" East 130.04 feet to the West line of Rosemead Blvd., 100.00 feet wide, as shown on Filed Map No. 11264 in the Office of the County Engineer of said County; thence along said West line of Rosemead Blvd. South 0° 09' 00" West 341.43 feet; thence leaving said West line North 89° 48' 49" West 192.49 feet; thence South 0° 11' 11" West 140.00 feet; thence South 89° 48' 49" East 193.20 feet to said aforementioned West line of Rosemead Blvd.; thence along said West line South 1° 06' 45" East 322.61 feet to the South line of the parcel described in said Resolution No. 76-1525  ; thence leaving said West line of Rosemead Blvd. along said South line South 89° 59' 30" West 137.84 feet; thence South 0° 09' 18" West 198.26 feet; thence South 89° 59' 30" East 142.22 feet to said aforementioned West line of Rosemead Blvd.; thence along said West line South 1° 06' 45" East 170.13 feet; thence leaving said West line of Rosemead Blvd. North 89° 23' 45" West 146.35 feet to the East line of said Lot 7; thence along said East line of said Lot 7 South 0° 09' 18" West 145.64 feet to the Northerly line of the Southerly 10.00 feet of said Lot 7, said point being on the North line of Broadway, 80.00 feet wide; thence along said North line North 89° 23' 45" West 149.49 feet to the West line of said Lot 7; thence leaving said North line of Broadway along the West line of said Lot 7 and the East line of said Parcel Map No. 6145 North 0° 09' 00" East 1515.97 feet to the Southerly line of said Las Tunas Drive and point of beginning.

EXHIBIT "E"

SEABOARD ENGINEERING CO., PANY

| K-Mart Store No. 3127, Temple City | JOB NO. 8639 | SHEET NO. 1 of 1 |
| Parcel 14 - Parking lot | DESIGNED BY | DATE 2-3-76 |
| Legal description | APPROVED | |

That portion of Lots 25, 26, and 39 through 42 of Tract 3623 in the
City of Temple City, County of Los Angeles, State of California, as per
map recorded in Book 40, Page 52 of Maps in the Office of the County
Recorder, together with that portion of Live Oak Avenue vacated by
Resolution No. 76-1524, recorded as Document No. 2222 on February 19,
1976, Official Records of said County, described as follows:

Beginning at a point on the West line of said Lot 42, said point being
the Northeast corner, Parcel Map 6145, as per map recorded in Book 62,
Pages 51 and 52 of Parcel Maps, Records of said County, said point also
being on the Southerly line of Las Tunas Drive, 134.00 feet wide, as
described in the Final Decree of Condemnation in the Superior Court of
Los Angeles County Case No. 269622, a certified copy thereof recorded
in Book 12289, Page 277 of Official Records of said County, said South-
erly line being on a curve concave Northerly and having a radius of
1812.00 feet, a radial line to said point of beginning bears South
0° 16' 37" East, as shown on said Parcel Map 6145; thence Easterly along
said Southerly line of Las Tunas Drive an arc length of 150.25 feet
through a central angle of 5° 20' 25" to the Easterly line of said Lot
42, a radial line to said point bears South 5° 37' 02" East; thence
along the Easterly line of said Lot 42 South 0° 09' 18" West 208.84
feet to the Southeasterly corner thereof; thence along the Northerly
line of said Lot 40 North 89° 59' 52" East 130.04 feet to the Westerly
line of the Easterly 20.00 feet of said Lot 40, said point being on
the Westerly line of Rosemead Boulevard, 100.00 feet wide, as shown on
Filed Map No. 11264 on file in the office of the County Engineer of said
County; thence along said Westerly line of Rosemead Boulevard South
0° 09' 00" West 341.43 feet; thence leaving said Westerly line North
89° 48' 49" West 192.49 feet; thence South 0° 11' 11" West 140.00 feet;
thence South 89° 48' 49" East 193.20 feet to said afore-mentioned
Westerly line of Rosemead Boulevard; thence along said Westerly line
South 1° 06' 45" East 33.27 feet; thence leaving said Westerly line
North 89° 48' 49" West 243.95 feet; thence North 0° 11' 11" East
141.36 feet; thence North 89° 48' 49" West 37.49 feet to the Westerly
line of said Lot 26, also being the Easterly line of said Parcel Map
6145; thence along said Easterly line North 0° 09' 00" East 573.53 feet
to the Northeast corner thereof and to the point of beginning.

Containing 142,333 square feet or 3.268 acres, more or less.

EXHIBIT "B-1"

FEB 27 1976

THIRD AMENDMENT TO OPTION, MAINTENANCE AND
MANAGEMENT AGREEMENT, COVENANTS

The "Option, Maintenance and Management Agreement, Covenants"
Agreement dated as of October 1, 1975 between Temple City Community
Redevelopment Agency (Agency), Eltinge, Graziadio & Sampson
Development Co. (EGS), A. D. Clark, Inc. (Clark), and Albertson's,
Inc. (Albertson's), previously amended by the First Amendment also
dated as of October 1, 1975, and signed by EGS on January 26, 1976,
and by the Second Amendment signed by all parties and last signed
by the Agency on March 22, 1976, is hereby amended in the following
particulars:

1.   Pursuant to Section 3 of Part II, the Agency has sold Parcel
5 to T.C. Associates ("Associates"), and has sold Parcel 6 to Temple
City Holding Corporation ("Holding Co.") and Holding Co. is leasing
Parcel 6 to Vornado, Inc. ("Vornado").  Holding Co. is hereby added
as a party to the Agreement and shall have all rights, duties and
benefits of the operation and management of Parcel 7 of the Agency
Parking Facilities as an Additional Operator.  Associates is hereby
added as a party to the Agreement and shall have all rights, duties
and benefits of the operation and management of Parcel 8 of the Agency
Parking Facilities as an Additional Operator.

2.   Section 4.A(3) of Part II is hereby amended to provide that
the location of the permitted pylon signs shall be where indicated
on Exhibit A on the Second Modification to the Construction, Operation
and Reciprocal Easement Agreement (REA) between EGS, Albertson's,
Clark, Associates and Holding Co. dated as of February 25, 1977. Exhibit
A of the Option, Maintenance, and Management Agreement, Covenants
inadvertently omitted the sign locations.

JUL 18 1977

-1-

3.    Section 6.B of Part II is hereby amended to provide with respect to Section 6.B that: (1) Associates agrees to assume all of Agency's responsibilities to repair, operate and maintain Parcel 8 in their entirety upon the completion of improvements upon Parcel 5 as evidenced by the Agency's issuance to Associates of a Certificate of Completion; (2) Holding Co. agrees to assume all of Agency's obligations to repair, operate, and maintain Parcel 7 in their entirety upon completion of improvements upon Parcel 6 as evidenced by the Agency's issuance to Holding Co. of a Certificate of Completion; (3) Agency shall have no further obligations to the other Operators with respect to the repair, operation or maintenance of Parcel 8 upon completion by Associates of the improvements on Parcel 5; and (4) Agency shall have no further obligations to the other Operators with respect to the repair, operation, or maintenance of Parcel 7 upon the completion by Holding Co. of the improvements on Parcel 6.

4.    Section 18 of Part II is hereby amended to add the names and addresses of the Additional Operators as follows:

> T.C. Associates, care of and attention
> Thomas H. Allison
> Union Bank Tower, Suite 214
> Torrance, California 90503
>
> Temple City Holding Company
> c/o Builders Emporium (Attn: Legal Department)
> 12500 East Slauson Avenue
> Whittier, California 90606
>
> Vornado, Inc.
> c/o Builders Emporium (Attn: Legal Department)
> 12500 East Slauson Avenue
> Whittier, California 90606

Copy of any notices to Vornado or to Holding Co. to:

> Zissu, Lore, Halper & Barron
> 425 Park Avenue
> New York, New York  10022

-2-

JUL 18 1977

5.   Section 29 of Part II is hereby amended to add the following paragraph:

"The Agency agrees to enter into agreements with Temple City Holding Company and Vornado and with EGS and any subsidiary of K mart Corporation ("K mart") in the form and substance of the Recognition Agreement attached hereto as Exhibit F or such other form as may reasonably be requested by Vornado or by K mart."

6.   Section 36 of Part III is hereby amended to add paragraphs D and E to read as follows:

"D.   If during the term of the Operation Agreement and the Extended Term of Part II of this Agreement, less than the whole of the Parking Facilities shall be taken and a portion of the Parking Facilities is taken which does not render the remainder of the Parking Facilities unusable for the purposes set forth in subsection A of Section 4 of Part I, but which does render the portion adjoining the Operator's Parcel unusable for purposes of providing parking reasonably necessary for the continued use of such Operator's Parcel, such Operator may terminate this Agreement as to its interest therein.

"E.   For purposes of any eminent domain proceeding which may be brought during the term of the Operation Agreement, or during the Extended Term of Part II of this Agreement, Operators and those claiming under and through them shall be entitled to claim severance damages against the condemning agency to each Operator's Parcel based on the argument that each Operator's interest in their respective portions of the Parking Facilities by way of easements, covenants, or options create a larger parcel which is damaged by reason of the taking of such Operator's interest in the Parking Facilities.  The

-3-

Agency shall not be entitled to share in any portion of any condemnation award which is determined to be for severance damages to the adjoining Operator's Parcel."

7.   Except as modified herein and in the First and Second Amendment said "Option, Maintenance and Management Agreement, Covenants" Agreement remains in full force and effect.  This Third Amendment is binding on the successors and assigns of each of the parties.

8.   The date of this Third Amendment shall be the date executed by the Agency.

Dated: _DEC. 16, 1977_

TEMPLE CITY COMMUNITY
REDEVELOPMENT AGENCY

By: _____

Dated: ____OCT 07 1977____

ELTINGE, GRAZIADIO & SAMPSON
DEVELOPMENT CO.

By: _____

By: _____

Dated: _____

A. D. CLARK, INC.

By: _____

By: _____

Dated: ____12/23/77____

ALBERTSON'S, INC.

By: _____
     SENIOR VICE PRESIDENT

By: _____
     Secretary

Dated: ____12-4-77____

T. C. ASSOCIATES

By: _____
David Miller, General Partner

-4-

JUL 18 1977

DATED: _____          TEMPLE CITY HOLDING COMPANY

                                         By _____
                                         Gary E. Hubschman, Vice President

                                         By _____
                                         Alan G. Novodor, Secretary

DATED: _____


APPROVED:

TOMPKINS & PARRINGTON

By: _____
        Thomas E. Parrington


APPROVED:
K-MART CORPORATION, formerly known as
S. S. KRESGE COMPANY

By _____
J. P. Johnson                    VICE PRESIDENT

By _____
C. E. Lotzar, Jr.            ASSISTANT SECRETARY

APPROVED:

COLONIAL PROPERTIES COMPANY

By  /s/Wells P. Hardesty_____

By _____


APPROVED:

VORNADO, INC.

By _____
Gary E. Hubschman, Senior Vice President

By _____
Alan G. Novodor, Assistant Secretary

                                              --5--

RECOGNITION AGREEMENT

This Agreement dated as of _____, 1977, by the

Temple City Community Redevelopment Agency hereinafter referred to

as "Agency"; Temple City Holding Company, hereinafter referred to as

"Additional Operator", and Vornado, Inc., hereinafter referred to as

"Tenant".

W I T N E S S E T H:

Whereas, the Agency and the Additional Operator have entered

into that certain Option, Maintenance and Management Agreement,

Covenants, hereinafter called the "Agency Agreement", dated as of

October 1, 1975, as amended, which Agency Agreement affects the

following described property, hereinafter referred to as "Parking

Facilities", in the City of Temple City, County of Los Angeles:

SEE EXHIBIT "X" ATTACHED

and

Whereas, Additional Operator, as landlord, granted to Tenant,

certain rights in Parcel 7 of the Parking Facilities, by virtue of

the Lease and Lease Agreement dated_____, herein-

after referred to collectively as the "Tenant Lease", which Tenant

Lease is for a primary term (as defined in said Tenant Lease) of

_____years plus_____options to extend the term

for_____additional years each; and

Whereas, it is the desire and intention of the parties hereto

to confirm and recognize the status of Agency and Tenant concerning

said Parcel 7 in the event of (1) termination of Additional Operator's

rights concerning Parcel 7 under the Agency Agreement for any reason

or (2) any surrender or transfer by Additional Operator to Agency of

the rights of Additional Operator under the Agency Agreement, whether

Exhibit "F"

such surrender or transfer is voluntary, involuntary or by
operation of law.

Now, therefore, in consideration of the mutual promises and
other good and sufficient consideration, receipt of which is hereby
acknowledged, it is hereby agreed as follows:

1.  In the event of (1) termination of Additional Operator's
rights concerning Parcel 7 under the Agency Agreement for any reason
or (2) any surrender or transfer by Additional Operator under said
Agency Agreement to Agency of the rights of Additional Operator under
said Agency Agreement, whether such surrender or transfer is volun-
tary, involuntary, or by operation of law, Tenant agrees:

(a)  To make a full and complete attornment to Agency
so as to establish direct privity between Agency and Tenant, and

(b)  That all obligations of Additional Operator under said
Agency Agreement shall continue in full force and effect and be
enforceable against Tenant by Agency upon the principle of attorn-
ment, and in such event Agency agrees that it will recognize and
accept the rights of Tenant under the Agency Agreement, all with
the same force and effect as if the Agency Agreement had origin-
ally been made and entered into by and between Agency and Tenant
as the Additional Operator.

2.  Nothing herein contained shall impose any obligation upon
Tenant to perform any of the obligations of the Additional Operator
under the Agency Agreement unless and until there shall first have
occurred and been effected termination or surrender or transfer (to
Agency) under the Agency Agreement and until attornment by Tenant

-2-

FFB 1 8 1977

to Agency has been made, and provided further that anything in this Recognition Agreement to the contrary notwithstanding, this attornment and recognition shall not be effective unless and until Tenant shall have entered into possession of the Parking Facilities, and accepted the same, and provided further that the obligations of Tenant to Agency shall not be greater, financially or otherwise, than the obligation of Additional Operator to Agency under the said Agency Agreement.

3.    Notwithstanding anything to the contrary herein contained it is understood and agreed that unless and until Tenant is notified in writing by Additional Operator, as landlord under said Tenant Lease, or by Agency of the happening of the event of (1) termination of the Agency Agreement or (2) any surrender to Agency of the rights of Additional Operator under the Agency Agreement, Tenant, prior to receiving such written notification from Additional Operator or Agency, shall not be obligated to make any payments to Agency under the Agency Agreement, and all rent paid by Tenant to Additional Operator under the Tenant Lease prior to such notification shall constitute full and complete accquittance of Tenant's obligation to make payments under the Agency Agreement for and during the period preceding the date of such termination or surrender or transfer (to Agency) of the Agency Agreement.

4.    This Agreement may be signed in counterparts, and when signed by the Additional Operator, Tenant, and Agency, shall become binding and effective.

-3-

FEB 18 1977

5.  This Agreement shall be binding upon and shall inure to the benefit of the successors, heirs and assigns of the parties hereto.

TEMPLE CITY COMMUNITY REDEVELOPMENT AGENCY

By _____

"ADDITIONAL OPERATOR"

TEMPLE CITY HOLDING COMPANY

By _____

Gary E. Hubschman, Vice-President

By _____

Staw B. Novodor, Secretary

"TENANT"

VORNADO, INC.

By _____

Gary E. Hubschman, Senior Vice-President

By _____

Staw B. Novodor, Assistant Secretary

-4-

# EXHIBIT 6

AGREEMENT FOR
OPERATION AND MAINTENANCE
OF PARKING FACILITIES

DEE:2
12-3-75

Temple City,
Calif.

THIS AGREEMENT is made as of November 1, 1975, by and
between (1) the City of Temple City (the "City"), a municipal
corporation duly organized and existing under the laws of
the State of California, and (2) Eltinge, Graziadio & Sampson
Development Co. ("EGS"), A. D. Clark, Inc. ("Clark") and
Albertsons, Inc. ("Albertsons"), (EGS, Clark and Albertsons
being hereinafter referred to collectively as the "Operators"
unless the context indicates otherwise).

W I T N E S S E T H:

WHEREAS, EGS is the owner of certain land hereinafter
referred to as "Parcel 1, Parcel 2, and Parcel 3," as described
and shown on Exhibit "A", attached hereto and made a part
hereof; and

WHEREAS, Clark is purchasing certain land hereinafter
referred to as "Parcel 4" (as described and shown on Exhibit "A");
and

WHEREAS, EGS has entered into a Contract of Sale (the
"Albertsons Contract of Sale") dated September 5, 1975 with
Albertsons for the sale of Parcel 3 by EGS to Albertsons; and

WHEREAS, the Temple City Community Redevelopment Agency
(the "Agency") is acquiring certain parcels of land hereinafter
referred to as Parcel 7, Parcel 8, Parcel 9, Parcel 10,
Parcel 11 and Parcel 14; (as described and shown on Exhibit "A");
is constructing thereon offstreet parking facilities of
approximately 870 spaces; and has entered into a Lease dated
as of December 1, 1974, for lease of said parcels of land and
said parking facilities to the City. Said parcels and facilities
being hereinafter collectively referred to as the "Parking
Facilities". Said Lease is hereinafter referred to as the
"Lease"; and

-1-

DEC 4  1975

WHEREAS, EGS and Clark have entered into a Construction, Operation and Reciprocal Easement Agreement dated on or about August 1, 1974 (hereinafter referred to as the "REA") providing for the construction, operation and maintenance of the shopping center (the "Shopping Center") to be developed on Parcels 1, 2, 3, 4, 5, and 6; and

WHEREAS, the City, and the Operators desire to enter into this Agreement for the purpose of providing for the operation and maintenance of the Parking Facilities and to permit the Operators the right to use certain portions of the Parking Facilities.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

Section 1.  Operation and Management of Parking Facilities; Term.

A.   On the terms and conditions hereinafter set forth, the City shall make Parcel 11 of the Parking Facilities available to EGS, and EGS agrees to manage and operate that portion of the Parking Facilities identified as Parcel 11 on Exhibit "A".

On the terms and conditions hereinafter set forth, the City shall make Parcel 14 of the Parking Facilities available to EGS, and EGS agrees to manage and operate that portion of the Parking Facilities identified as Parcel 14 on Exhibit "A".  The obligation of EGS for Parcels 11 and 14 are separate and distinct and are not interrelated or interdependent.

The City shall make Parcel 9 of the Parking Facilities available to Clark, and Clark agrees to manage and operate that portion of the Parking Facilities identified as Parcel 9 on Exhibit "A".

The City shall make Parcel 10 of the Parking Facilities available to Albertsons, and Albertsons agrees to manage and operate that portion of the Parking Facilities identified as Parcel 10 on Exhibit "A".

B.    The City hereby agrees to manage and operate that portion of the Parking Facilities identified as Parcel 8 on Exhibit "A" until such time as: (i) Parcel 5 is conveyed by the Agency to a developer entity for the development of improvements thereon as a part of the Shopping Center; (ii) such developer entity becomes a party to the REA and this Agreement; (iii) the construction of improvements on Parcel 5 is completed; and (iv) such developer entity shall takeover the management and operation of Parcel 8.    The City hereby further agrees to manage and operate that portion of the Parking Facilities identified as Parcel 7 on Exhibit "A" until such time as: (i) Parcel 6 is conveyed by the Agency to a developer entity for the development of improvements thereon as a part of the Shopping Center; (ii) such developer entity becomes a party to the REA and this Agreement; (iii) the construction of improvements on Parcel 6 is completed; and (iv) such developer entity shall takeover the management and operation of Parcel 7.

C.    This Agreement is subject to the terms and conditions hereinafter set forth.    Each obligation in this Agreement shall apply only to that portion of the Parking Facilities operated and managed by that Operator (or the City with respect to the management and operation of Parcels 7 and 8) and described in Exhibit "C" under the respective name of that entity.

D.    _Term_.    The Term of this Agreement shall commence on the date of commencement of payments under subsection A of Section 5 and shall terminate on the earlier of (i) December 1, 1999, or (ii) upon the payment of all principal and interest, together with any premiums, on the revenue bonds (the "Bonds") issued as contemplated by Section 2 of the Lease so that any and all security devices executed in connection with such Bonds have been discharged, unless extended or sooner terminated as provided herein.

Section 2.  Warranties.  The City represents and warrants
that the City has the authority to enter into this Agreement
and to provide the Parking Facilities to the Operators.  The
City represents and warrants that the Parking Facilities
shall be available to the Operators for the uses provided in
subsection A of Section 4.  No member, official or employee of
the City shall be personally liable to the City, Agency, any
Operator, any Additional Operator, or any successor in interest
thereto, in the event of any default or breach by the City
under this Agreement or for any amount of money which may
be due and payable hereunder.

Section 3.  Takeover of Management and Operation of
Parcels 7 and 8.

The City shall have the right to make Parcels 7 and 8
of the Parking Facilities available to the developer entities
that purchase Parcel 5 and Parcel 6 and construct improvements
thereon as a part of the Shopping Center (such developer
entities being herein before and hereinafter individually
sometimes referred to as the "Additional Operator"), and to
cause the Additional Operators to agree to take over the
management and operation of Parcels 7 and 8 of the Parking
Facilities according to the terms and conditions set forth
in this Agreement; provided that each of the following
conditions precedent has been satisfied with respect to each
such Additional Operator:

(1)  Each Additional Operator shall have first
entered into the REA and shall have paid its pro rata share
of expenses for Parcel 5 or 6 (as the case may be), all as
set forth in Sections 1.6 and 1.7 of the REA and First
Modification hereto; and

(2)  The terms and conditions of the agreement by
which the Additional Operator will be purchasing and developing
Parcel 5 or Parcel 6 (as the case may be) shall limit development
on Parcels 5 and 6 as set forth in Section 15 of the First
Modification of the REA and shall provide for construction
and maintenance of on-site parking on all non-building areas

(to the extent that such construction and maintenance is required under the REA), and such on-site parking and its associated driveways shall be compatible in all respects to the then existing parking and driveways on the Shopping Center.

Upon completion of construction of improvements on Parcel 5 or Parcel 6, the City shall make available to the Additional Operator(s) and shall require the Additional Operator(s) to accept and take over of Parcel 8 (with respect to the construction of improvements on Parcel 5) and Parcel 7 (with respect to the construction of improvements on Parcel 6). Thereafter the City shall be relieved of the duty and obligation to manage and operate Parcel 7 or 8, and the Additional Operator shall takeover and be solely responsible for the management and operation of such Parcel. Concurrently therewith, the Additional Operator(s) shall commence to pay to the City the payments specified in Section 5 hereof with respect to the Parcel for which the Additional Operator has taken over the management and operation.

Whenever the term "Operator" is used herein, it shall refer to and include each Additional Operator unless the context clearly indicates otherwise.

Section 4.    Use; Covenant of Parking Availability.

A.    Use.    Each Operator and the City shall use, manage and operate its portion(s) of the Parking Facilities hereunder to provide public parking on a non-exclusive basis for members of the general public patronizing the Shopping Center and other office and commercial buildings and facilities within the three square block area of Las Tunas, Rosemead, Broadway and Eaton Wash and for the following purposes as are compatible therewith:

(1)    The parking of passenger vehicles and pedestrian and vehicular traffic, ingress and egress, pedestrian and vehicular movement to and from adjacent streets and between mercantile business and professional establishments within

the Shopping Center for the Operators and their respective
successors and assigns and the tenants, subtenants, concession-
aires, employees, customers, visitors, licensees and invitees
of any one of them, the ingress and delivery of all delivery
and service trucks and vehicles for the delivery of goods,
wares, merchandise and the rendition of services for owners,
lessees and occupants of the commercial facilities within
the Shopping Center; and the parking of the automobiles of
the employees of the occupants of any commercial facility
within the Shopping Center.

(2)  As permitted under Section 7 of the Lease,
the installation, maintenance and operation of public utility
services for any commercial facility within the Shopping
Center and the landscaped areas.  In addition, and without
limiting the generality of the foregoing, the Operators will
be entitled, upon prior written approval of the City, to
install, maintain and operate public utilities, water,
sewers and drainage for commercial facilities within the
Shopping Center and the landscaped areas of the Parking
Facilities, provided such utilities, water, sewers, and
drainage shall not impair the use of the Parking Facilities
for public parking purposes.  The City specifically agrees
to grant and to consent to easements and to join with the
Operators or any one or some of them, in granting to each
public utility company, water company, and any other entity
entitled thereto an appropriate easement for installation,
mainenance, repair, replacement, measuring, gauging, and all
incidental purposes of such utility, water and sewer services,
in the form and in the content normally required by such
public utility, water company or other entity entitled
thereto.  Reference is hereby made to Seaboard Engineering
Company's utility plans for K mart Store 3127, Sheet Numbers
SD-3, SD-3A, SD-4 and P-1.

(3)  Subject to all applicable laws and regulations
and Section 7 of the Lease, the construction, maintenance,
repair, replacement and reconstruction of pylon signs and
free standing signs, with appropriate underground electrical

services, provided, however, the Operator shall be entitled

to construct, maintain, repair, replace and reconstruct

pylon signs where indicated on Exhibit "A" as long as the

size, color and lighting of the signs are in conformance

with the City's sign ordinance generally in effect at the

time of construction of such signs.  The City agrees to

cooperate fully to allow the Operators to construct such

pylon signs, with appropriate underground electrical services,

during construction of the Parking Facilities.  Subject to

the prior written approval of the City, the Operators shall

also be entitled to place, construct, and maintain such

advertising or identification signs as allowed by each

Operator for its occupants, contractors, subcontractors and

material suppliers.  Nothing herein shall be deemed to allow

signs to be placed on any portion of the Parking Facilities

without the permission of the Operator having the option to

purchase that portion of the Parking Facilities.

    (4)  As permitted under Section 7 of the Lease and

with the prior written approval of the City, the construction,

maintenance, repair, replacement, rearrangement and reconstruction

of parking sites and stalls, sidewalks, ramps, driveways,

lanes, curbs, customer traffic control areas, signals,

traffic islands, traffic and parking light facilities, and

landscaping areas; the temporary erection of ladders, scaffolding

and store front barricades during periods of construction,

reconstruction, remodeling or repair of buildings and building

appurtenances, upon the condition that such construction,

reconstruction, remodeling or repair is diligently performed

and that such ladders, scaffolding and barricades are thereafter

promptly removed; and the temporary storage of construction

materials, construction offices (including trailers), and

equipment used or to be used during the course of construction

of any building that may hereafter be constructed upon the

Shopping Center, provided that such use does not unreasonably

interfere with the use of the Parking Facilities for public

parking purposes.  Approval is hereby given for all reasonable

DEC 5   1975

or customary maintenance, repair and replacement of parking
sites and stalls, sidewalks, ramps, driveways, lanes, curbs,
customer traffic control areas, signals, traffic and parking
light facilities, and landscaping areas.  Nothing herein
shall be deemed to allow such uses on any portion of the
Parking Facilities without the permission of the Operator
having the option to purchase that portion of the Parking
Facilities.

    B.    <u>Covenant of Parking Availability</u>.  The City covenants
that the City shall fully and completely enforce all the
covenants, warranties and obligations of the Agency, including
but not limited to acquisition of the necessary Parcels and
construction of the Parking Facilities, as set forth in
the Lease and Agency Resolution No. CRA 74-20.  The City
also covenants, that so long as the Parking Facilities are
in existence and this Agreement is in effect, the Parking
Facilities shall be available, as public parking on a non-
exclusive basis for the uses specified in subsection A of
Section 4.  This covenant is subject to any laws, regulations
or rules of any governmental authority other than the City
(or any political division or agency thereof) or the Agency,
which rules or regulations may hereafter restrict or impose
conditions upon the use and operation of the Parking Facilities.
The City agrees that it shall not sublease any portion of
the Parking Facilities to any one whatsoever other than the
Operator whose responsibility it is to operate, manage and
repair that portion of the Parking Facilities.  The City
shall enforce, to the full extent of its police powers,
reasonable maximum limits on continuous use of the Parking
Facilities by any one user, in order to maximize parking
availability and turnover.  The maximum hourly limit on
continuous use shall be no longer than three (3) hours.  The
City shall not enter into any lease or operation agreement
or any oral or written agreement, plan or understanding with
any person, corporation, partnership or other business entity
or any governmental or public agency or entity concerning the
use or operation of the Parking Facilities, without the prior

written consent of all the Operators.

C.    Adequate Parking for Other Developments.    The City
further covenants that the City shall not permit new development
on any parcel of land adjacent to the Parking Facilities
(except for Parcels 1, 2, 3, 4, 5, 6, 12 and 13) unless each
such parcel of land adjacent to the Parking Facilities is
developed so that sufficient on-site parking is provided for
the complete parking support of the use permitted on such
property or parcel.    The determination of whether or not
such on-site parking is sufficient for such complete support
in each particular case shall be a matter for determination
by the City in its reasonable discretion; provided that any
parcel or property providing a parking area greater than 2.5
times the building floor area on that particular parcel or
piece of property shall be conclusively deemed to be sufficient,
and provided further that any parcel providing a parking
area less than that required by any general, citywide zoning
ordinance then in force, without consideration and irrespective
of any variance, exemption or other exception, shall be
conclusively deemed to be insufficient.

D.    Notwithstanding the provisions of subsection A of
Section 5 of this Operation Agreement, no payment shall be due
thereunder for any period during which the covenants of
subsection B and C of this Section 4 are not met, and any
payment which would otherwise have been due during the period
that any such condition remains unsatisfied shall be totally
and completely forgiven, and shall be credited toward the
total payment obligation of the Operators as if actually paid.

Section 5.    Payments to City During Term of the Agreement.

A.    Payments During Term.    During the Term of this
Agreement, each Operator agrees to pay, and shall pay, the
City the total sum, subject to subsections (5) and (6), equal
to the total direct cost of construction of that Operator's
portion(s) of the Parking Facilities (exclusive of land
acquisition, relocation, and demolition costs) plus interest
at the rate of 7.9179 per cent per annum, all as more fully
set forth in this subsection A of Section 5.    At such time

-9-

as the Parking Facilities are substantially completed, the total direct cost of construction of the Parking Facilities shall be determined and verified by the Agency. The City and the Operators shall then agree upon the amount so determined to be the total cost of such construction. In accordance with this procedure, the Operators shall be submitted sufficient documentation and proof of the total cost of such construction. The total direct cost of such construction is defined as all sums paid by the Agency to contractors, subcontractors, materialmen, and to consulting architect, engineer and supervisor (not in the direct employ of the City) for construction of the Parking Facilities in accordance with this Agreement.

(1) Each Operator and each Additional Operator shall be responsible for, and shall pay, its allocated portion of the total direct cost of construction of the Parking Facilities according to the percentage that the square footage of its respective portion of the Parking Facilities bears to the total square footage of the Parking Facilities. In this regard:

(a) EGS (as the Operator of Parcel 11 of the Parking Facilities) shall be responsible for, and shall pay, an amount equivalent to 42.35 per cent of the total cost of construction of the Parking Facilities;

(b) EGS (as the Operator of Parcel 14 of the Parking Facilities) shall be responsible for, and shall pay, an amount equivalent to 3.17 per cent of the total cost of construction of the Parking Facilities;

(c) Albertsons (as the Operator of Parcel 10 of the Parking Facilities) shall be responsible for, and shall pay, an amount equivalent to 17.53 per cent of the total cost of construction of the Parking Facilities;

(d) Clark (as the Operator of Parcel 9 of the Parking Facilities) shall be responsible for, and shall

pay, an amount equivalent to 11.40 per cent of the total cost of construction of the Parking Facilities; and

(e)  The Additional Operators of Parcels 7 and 8 of the Parking Facilities shall be responsible for, and shall pay, a total amount equivalent to 25.55 per cent of the total cost of construction of the Parking Facilities.

(2)  Each Operator's (and each Additional Operator's) payment for its respective allocated portion of the total cost of construction of the Parking Facilities shall be calculated in equal annual installments to be paid from the date of commencement of such payment (as set forth hereinbelow) to the date of termination of the Term, together with simple interest at the rate of 7.9179 per cent per annum.  For the purpose of calculating such annual installments, the date of termination of the Term is deemed to be December 1, 1999.

(3)  The equal annual installments to be paid to the City by each Operator and each Additional Operator for its respective allocated portion of the total cost of construction of the Parking Facilities shall be in turn paid in equal monthly installments in advance on the first day of each calendar month from the date of commencement of such monthly installment (as set forth hereinbelow) to the date of termination of the Term or payment in full, whichever is later.  In the event that such date of commencement shall be other than the first day of a calendar month, the amount to be paid on such date shall be prorated on a daily basis (based upon a 30-day month).

(4)  The dates on which each Operator and each Additional Operator shall commence to pay its respective allocated portion of the total cost of construction of the Parking Facilities are as follows:

(a)  With respect to EGS (as the Operator of Parcels 11 and 14 of the Parking Facilities), on April 15, 1977 or the date on which the improvements constructed on Parcel 1 are opened for business, whichever is the earlier date;

(b)  With respect to Albertsons (as the Operator of Parcel 11 of the Parking Facilities), on April 15, 1977 or the date on which the improvements constructed on Parcel 3 are opened for business, whichever is the earlier date;

(c)  With respect to Clark (as the Operator of Parcel 9 of the Parking Facilities), on April 15, 1977 or the date on which the improvements constructed on Parcel 4 are opened for business, whichever is the earlier date;

(d)  With respect to the Additional Operator of Parcel 8 of the Parking Facilities, on the date of completion of construction of the improvements on Parcel 5; and

(e)  With respect to the Additional Operator of Parcel 7 of the Parking Facilities, on the date of completion of construction of the improvements of Parcel 6.

(5)  In the event that all of any Operator's portion(s) of the Parking Facilities are not substantially completed and available to that Operator as of the date of commencement of the payment of its respective allocated portion of the total cost of construction of the Parking Facilities, then the amount to be paid by that Operator during such time as the entire Parking Facilities are incomplete or unavailable, the payments that would otherwise be payable under subsections A(1) and A(4) of this Section 5 shall be reduced in proportion to the part of the portion(s) of the Parking Facilities incomplete or unavailable on the last day of the previous month, including the day before the first day of the Term.  These reductions, if any, in the payments by some or all Operators (and Additional Operators) are not recoverable by the City.  For the purpose of this subsection A(5), Parcels 11 and 14 shall be considered as one unit.

B.  <u>Additional Payments</u>.  During the term of this Agreement, as an additional obligation hereunder, each Operator and each Additional Operator agrees to and shall promptly pay and discharge, with respect to only its portion(s) of the Parking Facilities, each of the following:

(1)   Ad valorem taxes levied upon and assessed against the Parking Facilities or the possessory interests of the Operators in the Parking Facilities, and any and all taxes, assessments, fees, excises, charges and levies by state, federal or other governmental entity imposed upon the Parking Facilities.

(a)   <u>Special Assessment Districts</u>.  In the event the City consents to the formation of such special assessment (or improvement or betterment) district, without the express written consent and approval of the Operators, and each of them, the Operator shall have no liability for any taxes or assessments resulting from such special assessment (or improvement or betterment) district, and the City shall promptly pay and discharge such taxes and assessments.  In the event that a special assessment district (or improvement or betterment district) is formed without the City's consent or with the consent of the City and all Operators, then the Operators shall promptly pay and discharge such taxes and assessments, but may do so on an installment basis to the full extent permitted.  In the event such district is formed by the City, then the Operator shall promptly pay and discharge such taxes and assessments (in installment payments as permitted), but may deduct the amount of such taxes and assessments from the payments to be made under subsection A of Section 5 as a credit against such sums.

(b)   In the event of any such tax or assessment upon or against the Parking Facilities or the City's or the Agency's interest therein, the City shall promptly notify the Operators of same.

(c)   Any Operator may contest the legal validity or amount of any such taxes or assessments for which the Operators are responsible under this Agreement, and may institute such proceedings as the Operator consider necessary or desirable.  The City shall cooperate fully in such contests and shall allow the contest to be conducted in

the City's name if so desired by the contesting Operator, provided that the contesting Operators shall prevent any liens from being foreclosed on the Parking Facilities.

(i) If any Operator contests any such tax or assessment, such Operator may withhold or defer payment or pay under protest, but shall protect the City, and the Parking Facilities from foreclosures of any lien, by adequate surety bond or other appropriate security if necessary.

(2) Insurance premiums (if any) that the City purchases because of any failure by any Operator to purchase and maintain insurance required by the provisions of subsection A of Section 10 of this Agreement.

(3) All costs and expenses that the City may incur in consequence of or because of any default by any Operator under this Agreement, including reasonable attorneys' fees and costs of suit or action at law to enforce the terms and conditions of this Agreement.

The obligations of each Operator with respect to each of the foreoing and following obligations is limited to that Operator's portion(s) of the Parking Facilities. In the case of costs, expenses or taxes applying or relating to all of the Parking Facilities, each Operator's share shall be determined according to the percentages set forth in subsection A(1) of Section 5 of the Operation Agreement. In the case of costs, expenses or taxes applying or relating to more than one portion of the Parking Facilities but less than all of the Parking Facilities, each Operator's share shall be determined according to the ratios of the applicable percentages for their portions as such percentages are set forth in subsection A(1) of Section 5 of the Operation Agreement.

Each portion of each of the foregoing obligations shall be paid on or before the payment date to which the same applies or relates.

<u>Section 6</u>.    <u>Repair, Maintenance and Operation</u>.

A. Provided that the Parking Facilities have been built
in substantial compliance with the plans and specifications
and in a good and workmanlike manner, and except for repair
or restoration of the Parking Facilities to be made by the
Agency pursuant to Section 9 of the Lease or by the City
pursuant to this Agreement, each Operator shall (at its own
expense) repair, maintain, and operate during the term of
this Agreement, its portion(s) of the Parking Facilities in
good order, condition and repair and shall pay all costs and
expenses of operating the same as non-exclusive public
parking facilities for members of the public patronizing the
Shopping Center, office buildings and other facilities of
Parcel B of the Project (including the costs of all utilities).
In the event any Operator fails to perform the maintenance,
repair and operation of its portion of the Parking Facilities
as provided herein, the City shall notify the defaulting
Operator and the other Operators, in writing, of such
failure to perform, specifying the respects in which it
considers that defaulting Operator's performance to be
unsatisfactory.  Upon the failure of that defaulting Operator
to improve or to commence and diligently proceed to improve
such performance within 15 days after such written notice,
the other Operators (upon written notice to the City) shall
collectively or individually have the right to enter that
portion of the Parking Facilities and undertake (or cause to
be undertaken) such maintenance, repair, and operational
activities.  If  the other Operators, collectively or
individually, do not takeover such maintenance, repair and
operational activities, the City shall have the right to
enter that portion of the Parking Facilities and undertake
(or cause to be undertaken) such maintenance, repair and
operational activities.  In such events, that defaulting
Operator shall promptly upon demand reimburse the City and
the performing Operator(s) for all reasonable costs and

expenses incurred by the City or said performing Operator(s) for such maintenance, repair and operational services.  The City agrees to keep the Parking Facilities free and clear of all liens and encumbrances.

B.    It is understood and agreed that the City shall be under no obligation to pay any cost or expense of any kind or character in connection with or related to the repair, management, operation or maintenance of the Parking Facilities, except for repairs and maintenance arising out of the City's or the Agency's failure to build and construct the Parking Facilities in a good and workmanlike and in substantial compliance with the plans and specifications therefor. Notwithstanding anything herein to the contrary, the City shall be responsible for all costs and expenses of every kind to repair and maintain Parcels 7 and 8 of the Parking Facilities in good order, condition, and repair, and the City shall pay all costs and expenses in operating the same (including the cost of all utilities and all public charges, taxes and assessments of every nature whatsoever), for which the City is responsible until the responsibilities with respect to Parcels 7 and 8 are respectively assumed in their entirety by the Additional Operators. It is understood and agreed that the Operators (other than Additional Operators) shall be under no obligation to pay any cost or expense of any kind or character in connection with or related to the repair, management, operation or maintenance of Parcels 7 and 8 of the Parking Facilities.

The City agrees to and shall promptly pay and discharge any and all levies and assessments for state, federal, or other governmental parking regulation fees, excises, taxes or charges (if any) and for ad valorem taxes (if any) levied upon or assessed against Parcels 7 and 8 of the Parking Facilities or the Operators with respect thereto until the responsibilities with respect to the payment and discharge

of such levies, assessments, and taxes are respectively
assumed in their entirety by the Additional Operators.  Each
portion of the foregoing shall be paid on or before the
payment date to which the same applies or relates.  In the
event of the City's failure to pay, the amount of such taxes
and assessments may be deducted by the Operators from any
payments otherwise due under the terms of this Agreement and
shall constitute a full credit for such payments.

In the event the City fails to perform the maintenance,
repair, and operation of Parcels 7 and 8 of the Parking
Facilities as provided herein, the Operators shall notify
the City in writing of such failure to perform, specifying
the respects in which such performance is considered to be
unsatisfactory.  Upon the failure of the City to improve or
to commence and diligently proceed to improve such performance
within 150 days after such notice, the Operators shall,
collectively or individually have the right to enter Parcels
7 and 8 of the Parking Facilities and undertake (or cause to
be undertaken) such maintenance, repair and operational
activities.  In such event, the City shall promptly upon
demand reimburse the performing Operator(s) for all reasonable
costs and expenses incurred by the performing Operator(s)
for such maintenance, repair and operational services.  In
the event the City fails to promptly reimburse the performing
Operators), that Operator or the Operators may deduct the
amount of all such reasonable costs and expenses from the
amounts otherwise due under subsection A of Section 5 by
that Operator or the Operators to the City as a full and
complete credit for such payments.  Reasonable costs and
expenses incurred by the performing Operator or Operators
include reasonable attorneys' fees and cost of suit or
action at law or equity to enforce the terms and conditions
of this Agreement.

C.    The standards of maintenance required under this Agreement are set forth in Exhibit "C" attached hereto and by this reference made a part hereof.

Section 7.    No Charge for Parking.

A.    By the Operator.    During the Term of this Agreement, the Operators shall not impose or permit the imposition of any charge for the use of the Parking Facilities without the City's consent. The provisions of this Section shall not apply to charges of any kind whatsoever imposed by any governmental authority on the Agency, the City, the Operators, or the users of the Parking Facilities as part of a parking management program, transportation control plan, or other governmental regulation of parking, and the Operators may charge and collect from the users of the Parking Facilities a sufficient amount to recover all or part of such charges and the cost of collecting and administrating all activities in connection therewith.    The Operators and Additional Operators may charge and collect the payments and expenses incurred under this Agreement from tenants of the Shopping Center and from parties to the REA.

B.    By the City.    Without the written consent of the Operators, the City shall not impose or have the right to impose any charge for the use of the Parking Facilities except for the payments specified in subsection A of Section 5 of this Agreement.

C.    By Successors of City.    No successor or assign of the City shall impose or have the right to impose any charge whatsoever for the use of the Parking Facilities.

Section 8.    Additions and Improvements.

A.    By the City.    Without the written consent of the Operators, the City shall have no right during the term of this Agreement to make any additions to or improvements to the Parking Facilities, to attach fixtures, structures, or signs or to place any personal property on or in the Parking Facilities unless expressly provided in this Agreement.

B.    By the Operator.  With the prior written approval of the City, the Operators and Additional Operators during the term of this Agreement may, at their own cost and expense, make or permit to be made, any addition to or improvements to the Parking Facilities which do not impair the utility thereof for use as public parking facilities; to attach fixtures, structures or signs thereto; and place any personal property on or in the Parking Facilities, provided the utility and use of the Parking Facilities as public parking facilities is not unreasonably interfered with.  Title to all such personal property or to fixtures which may be removed without damage to the Parking Facilities shall remain in the Operators, the Additional Operators, or in such person as may be legally entitled thereto.  (Nothing herein shall be deemed to allow any fixtures, structures or signs or any personal property to be placed on any portion of the Parking Facilities without the permission of the Operator having the option to purchase that portion of the Parking Facilities.)

Section 9.  Policies and Rules.  The Operators and Additional Operators may establish and maintain, with the assistance of the City, such general policies, rules and regulations for the repair, management, maintenance and operation, and use of the Parking Facilities consistent with the provisions of this Agreement, the Lease, and the REA and, as may be necessary, the Redevelopment Plan, provided that such policies, rules and regulations have been submitted to and approved by the City prior to their implementation.

Section 10.  Insurance.

A.    Obligations of Operators.  During the term of this Agreement, each Operator, at its own cost and expense shall, with respect to its portion(s) of the Parking Facilities:

(1)  Keep or cause to be kept a policy or policies of insurance against loss or damage to the Parking Facilties resulting from fire, lightning, vandalism, malicious mischief, riot and civil commotion, and such perils ordinarily included in "extended coverage" policies of fire insurance.  Such

-19-

insurance shall be maintained in an amount not less than the full insurable value of the Parking Facilities (as defined below in subsection C of this Section 10, subject to deductible conditions of not to exceed $10,000 for any one loss; and

(2)   Maintain or cause to be maintained public liability insurance against claims for bodily injury or death, or damage to property occurring upon, in or about the Parking Facilities, such insurance to afford protection in amounts not less than $500,000 with respect to bodily injury or death to any one person, not less than $1,000,000 with respect to bodily injury or death to any number of persons in any one accident, and not less than $250,000 with respect to the property damage liability insurance.

B.   <u>Obligations of City</u>.  During the Term of this Agreement only, the City, without cost or expense to the Operators, shall:

(1)   Keep, or cause to be kept, the Parking Facilities insured by earthquake insurance (if such insurance is obtainable on the open market from reputable insurance companies) against loss or damage by earthquake in an amount not less than the full insurable value of the Parking Facilities (as defined below in subsection C of this Section 10) with deductible conditions of not to exceed five per cent (5%) of the face amount of the policy for any one loss;

(2)   Maintain use and occupancy or business interruption or rental income insurance against the perils of earthquake and fire, lightning, vandalism and malicious mischief and such other perils ordinarily included in "extended coverage" fire insurance policies, in an amount equal to not less than twelve (12) months' rent under the Lease.  The City, at its option, may elect that the insurance under this subsection B shall be maintained by the Operators.  In such event, the Operators may deduct the amount of premiums paid by the Operators from the payments due to the City pursuant to subsection A of Section 5 of this Agreement.  In the

event that the cost of such insurance exceeds the amount of
such payments payable to the City, the City shall reimburse
the Operators and the Additional Operators for the amount of
such excess. At any time during the Term of this Agreement,
the City may rescind its election and maintain said insurance
itself, upon ten (10) days prior written notice to Operators
and Additional Operators. The City shall promptly pay Operators
and Additional Operators for all penalties and damages, if any,
caused by termination of their insurance policy or policies
upon City's election to maintain said insurance.

C.    Definition of Term "Full Insurable Value". The
term "full insurable value" as used in this Section 10 shall
mean the actual replacement cost, using the items of value
set forth above (including the cost of restoring the surface
grounds but excluding the cost of restoring trees, plants
and shrubs), less physical depreciation. Said "full insurable
value" shall be determined from time to time but not less
frequently than once in every 36 months.

D.    General Provisions. All insurance provided under
subsection A of this Section 10 shall be for the benefit of
the Operators, each Operator's mortgagee (as defined in
subsection A(6) of Section 21), Agency, and City, as named
insureds, during the Term of this Agreement. All insurance
provided under subsection A of this Section 10 shall be
periodically reviewed by the parties to this Agreement for
the purpose of mutually increasing or decreasing the minimum
limits of such insurance, from time to time, to amounts
which may be reasonable and customary for similar facilities
of like size and operation.

All insurance provided under subsection B(1) of this
Section 10 shall be for the benefit of the Operators, each
Operator's mortgagee, Agency, and the City, as named insureds,
during the Term.

All insurance herein provided for under this Section 10
shall be effected under policies issued by insurers of
recognized responsibility and licensed or permitted to do
business in the State of California.

Each Operator may effect for its own account any insurance not required under this Agreement. The Operators may provide any insurance required or permitted under this Agreement by blanket insurance policies covering the Parking Facilities and any other location or locations of any Operator.

All policies and certificates issued by the respective insurers for insurance shall provide that such policies or certificates shall not be cancelled or materially changed without at least thirty (30) days prior written notice to each party to this Agreement. Appropriate evidence of payment of premiums for all such insurance shall be deposited with each party to this Agreement; and, at least ten (10) days prior to expiration dates of expiring policies or contracts, copies of renewal or new policies or contracts or certificates shall be deposited with each party to this Agreement.

E.    Proceeds of Insurance:  All proceeds of insurance (including the insurance maintained pursuant to subsection B(2) of this Section 10) shall be paid as follows:

(1)  All proceeds from fire and extended coverage insurance maintained by the Operators under subsection A(1) of Section 10 shall be paid to the Operators entitled thereto to restore, repair or rebuild the Parking Facilities as required by subsection C of Section 11. The City shall immediately endorse, and shall cause the Agency to endorse, the insurance payments to those Operators whose portions of the Parking Facilities are damaged, so that the latter may rebuild, restore and repair their damaged portion(s) of the Parking Facilities. Such insurance proceeds shall be held in trust by those Operators for that purpose and that purpose alone except as provided in subsections (a) and (b) immediately following:

(a)  To the extent that such proceeds of insurance exceed the cost of restoration, repair or rebuilding the damaged portion of the Parking Facilities, then such proceeds

shall be payable to the Operators entitled thereto.

(b)   During the Term, in the event that such restoration, repair or rebuilding does not occur, then such proceeds shall be payable to the City for distribution to the Agency in accordance with Section 9 of the Lease.

(2)   With respect to insurance proceeds from public liability insurance maintained by the Operators under subsection A(2) of Section 10, such proceeds shall be paid to the claimant or the party or parties that have been subrogated to such claimant's cause of action.

(3)   All proceeds of insurance with respect to earthquake insurance maintained by the City under subsection B(2) of Section 10, with respect to loss or damage to the Parking Facilities caused by earthquake, shall be paid to the City for restoration, repair and rebuilding of the damaged portion of the Parking Facilities as required by subsection A of Section 11, except as set forth in subsections (a) and (b) hereof.   The Operators shall immediately endorse the insurance payments to the City so that the City may restore, rebuild and repair the damaged portion(s) of the Parking Facilities. Such insurance proceeds shall be held in trust by the City for that purpose and that purpose alone, except as provided in subsections (a) and (b):

(a)   To the extent that such insurance proceeds exceed the cost of restoration, repair or rebuilding the damaged portion(s) of the Parking Facilities, then such proceeds shall be paid to the City.

(b)   In the event that such restoration, repair or rebuilding does not occur, then such proceeds shall be paid to the City for distribution to the Agency in accordance with Section 9 of this Lease.

(4)   All proceeds of insurance with respect to rent interruption insurance maintained under subsection B(2) of Section 10 shall be paid to the City in lieu of, and as a

credit against, payments that would otherwise be made by the
Operators under subsection A of Section 5.  In the event
that for any reason whatsoever the City does not maintain
such rent interruption insurance as required by subsection B(2)
of Section 10, the Operators shall be entitled to a credit
against the payments that would otherwise be made under
subsection A of Section 5, in the amount and amounts that
would be derived from such rent interruption insurance had
it been maintained as required.

Section 11.  Damage to Parking Facilities. Any event of
damage to or destruction of the Parking Facilities by fire
or other casualty or event so that the Parking Facilities
become wholly or partially unusable shall be governed by
Section 9 of the Lease, and the term "Leased Premises" as
used in the Lease shall be understood to refer to the Parking
Facilities under this Agreement.  With respect to Section 9
of the Lease, insofar as it may pertain to this Agreement,
the City and the Operators agree as follows:

A.    In the event of damage to, or destruction of, any
portion of the Parking Facilities from any cause against
which the Operators are not required to insure, the City
shall, unless the Operators have given their prior written
consent to the contrary, withhold the City's consent under
Section 9(b) of the Lease, provided that the following
conditions precedent are met:

(1)  With respect to the damaged or destroyed
portion(s) of the Parking Facilities, there is no default,
as defined by Section 20 hereof, by the Operator(s) (whose
portion(s) are damaged or destroyed) existing as of or
following the date of said damage or destruction.

(2)  There are sufficient funds available to
either the Agency or the City (or an agency of the City)
to so restore, repair or rebuild such portions of the Parking
Facilities; or, if bonds must be issued by any of the foregoing
entities in order to generate sufficient funds, such bonds

can be lawfully issued and sold in accordance with generally
accepted standards of feasibility not more restrictive than
those applied to the Bonds issued to provide funds to acquire
and construct the Parking Facilities (the City shall use
best efforts to issue such bonds); or, in the alternative,
subsection B of this Section 11 applies.

(3)   In the event all or part of the improvements
in the Shopping Center also damaged or destroyed, then at
least one of the Operators or Additional Operators must
undertake to repair and rebuild the damaged or destroyed
portion of its Shopping Center improvements.  In such event,
however, the obligations of the City under this Section 11 shall
be limited to (i) restoring, repairing, and rebuilding that
part of the Parking Facilities immediately adjacent to and
south of (plus an extension fifty feet (50') north of and
another extension fifty feet (50') south of) each parcel of
land owned by the Operator(s) undertaking to repair and rebuild
the damaged or destroyed portion of their Shopping Center
improvements or whose Shopping Center improvements are
undamaged and undestroyed; and (ii) restoring, rebuilding and
repairing driveways and driving aisles as are reasonably
convenient for necessary for customer ingress and egress to
those parcels of land owned by the Operator(s) undertaking
to repair and rebuilding their improvements or whose improvements
are undamaged and undestroyed.

In the event the foregoing provisions precedent are not
all met, the City may give or withhold its consent under
Section 9(b) of the Lease in its own discretion.

This Agreement will remain in effect as to such portion
of the Parking Facilities restored, repaired, or rebuilt.
(The City and the Operators hereby expressly waive any
law, ordinance, statute or regulation terminating or providing
for termination of a contract upon destruction or damage of
the subject matter.)

In the event that the Agency or the City issues bonds or incurs indebtedness (except between the Agency and the City) in order to obtain funds for the repair or rebuilding of the damaged or destroyed portions of the Parking Facilities managed and operated by the Operator(s) undertaking to repair and rebuild the damaged or destroyed portion of their improvements or by the Operator(s) whose improvements are undamaged and undestroyed (collectively hereinafter referred to as "Such Portions of the Parking Facilities"), the Operators of Such Portions of the Parking Facilities shall first enter into binding assurances satisfactory to the City that payments by such Operators shall be sufficient to amortize and pay off the unpaid portion of the direct total original cost of construction of the Parking Facilities and the direct total cost to restore, repair and rebuilding Such Portions of the Parking Facilities.

B.   In the event of damage to  or destruction of any portion of the Parking Facilities from any cause against which the Operators are not required to insure and if the City and the Agency are unable to issue bonds or otherwise incur indebtedness in order to obtain funds for the repair or rebuilding of the Parking Facilities after exercise of their best efforts, or if the Operators and the City agree that such bonds are not likely to be issued and sold in accordance with generally accepted standards of feasibility not more restrictive then those applied to the Bonds, then the Operators and each of them shall have the following option: with respect to its portion(s) of the Parking Facilities, each may undertake to repair or rebuild the Parking Facilities or that Operator's portion(s) thereof under such terms and conditions, including the abatement of payments, as the City may have consented to. In the event one or more of the Operators undertakes to repair or rebuild the damaged or destroyed Parking Facilities or that Operator's portion thereof, the City shall turn over to those Operator(s) any insurance proceeds resulting from such destruction or damage (other than business [rent] interruption insurance).  The Operators hereby agree among

-26-

themselves that all such insurance proceeds shall be paid to those Operators undertaking to repair or rebuild the damaged or destroyed portions of said buildings in the Shopping Center on such Operators' parcels and shall be divided among or between the Operators in proportion to the amount of damage or destruction to their portion(s) of the Parking Facilities.  Any excess of insurance proceeds not needed to repair, rebuild or restore such damaged or destroyed portions of the Parking Facilities shall be paid to the City.

C.    In the event of damage or destruction of any portion of the Parking Facilities from any cause required to be insured against by the Operators pursuant to subsection A of Section 10 hereof, the respective Operator shall undertake to restore, repair or rebuild its portion of the Parking Facilities so damaged or destroyed.

D.    <u>Abatement of Payments to be Made During the Term of this Agreement</u>.  In the event of partial damage to, or destruction of, any portion(s) of the Parking Facilities, so that the usable part of that portion of the Parking Facilities is insufficient (under the standard of subsection D of Section 13) for the purposes set forth in subsection A of Section 4, the payments to be made pursuant to subsection A of Section 5 of this Agreement shall cease until the usable part of that portion of the Parking Facilities are sufficient for the purposes set forth in subsection A of Section 4. All insurance proceeds received by the City pursuant to rent interruption insurance, or an amount that would be payable under such rent interruption insurance in the event the City fails to provide for such insurance as required by subsection D(2) of Section 10, shall be credited against the payments to be made pursuant to subsection A of Section 5 by the Operators whose portions of the Parking Facilities are insufficient under the above definition.

Section 12.    Assignment.

Neither this Agreement nor any interest of any Operator shall be mortgaged, pledged, assigned or transferred by any such Operator by voluntary act or by operation of law or otherwise, without the consent of the City (which consent the City agrees not to unreasonably withhold).  Notwithstanding the foregoing, an Operator or Additional Operator may make any mortgage, pledge, assignment or transfer required for any reasonable and customary method of construction or permanent financing of its portion of the Shopping Center improvements, without the City's consent; provided that no additional obligation or burden is imposed on the City as a result thereof; and provided, further, that all rights acquired under any such mortgage, pledge, assignment, or transfer shall be subject to each and all of the covenants, conditions and restrictions set forth in this Agreement, and to all rights and interests of the City herein.

Consent and approval of the City is hereby given to any and all mortgages, pledges, assignments, sales or transfers by any Operator or its successor in interest, by voluntary act or otherwise, if that Operator or its successor in interest has substantially completed the improvements on the parcel of that Operator adjacent to the portion of the Parking Facilities so mortgaged, pledged, assigned, transferred or sold, but only if the party to which the mortgage, pledge, assignment, transfer or sale is made acquires a similar interest in that adjacent parcel owned by that Operator or its successor in interest.

In the event that an Operator or Additional Operator shall assign or transfer its interest under this Agreement, or with the consent of the City, whether given in this Agreement or subsequently, that Operator or Additional Operator shall be thereafter discharged from all liability for the performance of the covenants and conditions to be

DEC 3  1975

performed with respect to that portion of the Parking Facilities in which that Operator or Additional Operator has assigned or transferred its interest under this Agreement.

The City agrees, upon written request of any Operator, to state in writing to that Operator and any third party to whom that Operator might mortgage, pledge, assign, transfer or sell its interest and assign its duties and rights under this Agreement, a written statement that (1) the requesting Operator has substantially completed such improvements on its parcel in the Shopping Center adjacent to that portion of the Parking Facilities maintained and operated by that Operator and (2) that Operator has fully performed all of its obligations under this Agreement to the time of such statement.  In the event that such improvements are not substantially completed or that said Operator is in full compliance with its obligations under this Agreement, the City shall briefly describe in what particulars the improvements are not substantially completed or the particulars of that Operator's non-compliance with its obligations under this Agreement.  The City shall make its written response to such request by any Operator within ten (10) days after formal written request is made.  The City further agrees that upon the issuance of a Certificate of Completion by the Agency with respect to construction of improvements on that Operator's parcel in the Shopping Center, that such Certificate of Completion shall be conclusive evidence that the improvements on that parcel have been substantially completed.

Section 13.  Eminent Domain.  During the Term, if the whole of the Parking Facilities or any portion thereof shall be taken under the power of eminent domain or sold to any governmental agency threatening to exercise the power of eminent domain, the provisions of Section 12 of the Lease shall govern, and the term "Leased Premises" as used in the Lease shall be understood to refer to the Parking Facilities

under this Agreement.  Pursuant to Section 12 of the Lease,
insofar as it may pertain under this Agreement, the City and
the Operators agree as follows:

A.    The Operators and those claiming under or through
them shall be entitled to any damages against the condemning
agency, which damages may be lawfully claimed by the Operators
or such persons by reason of damage to or taking of property
rights of the Operator, or such persons, including without
limitation their interest under this Agreement, and under
any easements, options or covenants in favor of the Operators,
with respect to the Parking Facilities and related Parcels.

B.    If the whole of the Parking Facilities, or so much
thereof as to render the remainder unusable for the purposes
set forth in subsection A of Section 4 shall be taken under
the power of eminent domain or sold to any governmental
agency threatening to exercise the power of eminent domain,
then this Agreement may be terminated by any Operator with
respect to its portion(s) of the Parking Facilities.  In the
event this Agreement is so terminated, the award made for
the taking or damaging of the Parking Facilities, or the
proceeds received from any sale thereof, shall be paid to
and shall be used by the Agency to retire the Bonds.

C.    If less than the whole of the Parking Facilities
shall be so taken or sold and the remainder is sufficient
for the Shopping Center, then this Agreement hereunder shall
continue in full force and effect as to such remainder and
the parties hereto waive the benefit of any law to the
contrary; provided, however, that in the event the improvements
on Parcel 1 area leased by EGS (or its successors and assigns)
and the tenant of EGS has the right under its lease with EGS
to terminate said lease as a result of such taking or sale
and such tenant does so terminate said lease, then this
Agreement may be terminate by EGS with respect to Parcel 14
of the Parking Facilities.

D.    Whether or not the remainder after a partial taking or sale is insufficient for the purposes set forth in subsection A of Section 4 shall be determined by the parties in light of all of the relevant circumstances and in light of the commercial parking requirements of the occupants of the Shopping Center.  In the event this Agreement does continue in full force and effect as to such remainder, the payments to be made pursuant to Section 5 of this Agreement for each portion of the Parking Facilities shall be in an amount equal to the payment for that portion of the Parking Facilities divided by the total square footage of that portion and multiplied by the square footage of the remainder of that portion of the Parking Facilities after such taking or sale.

E.    Provided that this Agreement and the Lease shall continue to remain in effect, any award made in eminent domain proceedings to the City or the Agency for the taking or damaging of the Parking Facilities in whole or in part, or any proceeds received from the sale thereof, shall be paid to the Agency and shall be used by the Agency to repair and reconstruct the remainder of the Parking Facilities, or to construct replacement facilities for the portion so taken.  To the extent that such award of sale proceeds may exceed the cost of such repair, reconstruction, or construction (or in the event that such repair, reconstruction or construction does not occur), then the excess of such award or sale proceeds (or the award or sale proceeds) shall be payable: (i) first to the Agency to retire the Bonds or any other outstanding securities or other debts or liability incurred with respect to such repair, reconstruction, or construction as may have been undertaken under subsection A of Section 11; and (ii) second to each Operator and the Agency in accordance with their respective rights in and to the remainder of the excess of such award or sale proceeds.

F.    Except to the extent provided in subsections A, B, and E above, the Operators and Additional Operations shall have no interest in or thereto and shall not be entitled to any part of such award or sale of the Parking Facilities.

Section 14.    Voluntary Termination.    Surrender.

A.    Voluntary Termination.    Subject to the written consent of the parties hereto, this Agreement may be mutually terminated or the terms and provisions hereof may be modified. Any modification that directly affects only a particular Operator and the City is effective when signed by that Operator and the City.

B.    Surrender Upon Termination.    Upon the termination of this Agreement, the Operators agree that they shall surrender the Parking Facilities to the City in good order and condition and in a state of repair that is consistent with prudent use and conscientious maintenance except for reasonable wear and tear and for damage or destruction the City or the Agency is required to repair or rebuild.

Section 15.    Liens.

A.    The Operators agree to pay, when due, all sums of money that may become due for any labor, services, materials, supplies or equipment furnished to or for the Operators in, upon or about the Parking Facilities and that may be secured by mechanics', materialmen's or other liens against the Parking Facilities and/or against the interests of the City or Agency therein, and will cause each such lien to be fully discharged and released at the time the performance of any obligation secured by such lien matures or becomes due; provided, however, that if the Operators desire to contest any such lien, they may do so providing that if any such lien shall be reduced to final judgment and such judgment or such process as may be issued for the enforcement thereof is not promptly stayed, or if so stayed and said stay thereafter expires, then and in such event the Operators shall forthwith pay and discharge said judgment.

B.    During such time as the City shall manage and
operate Parcel 7 or 8 of the Parking Facilities, the City
agrees to pay when due, all sums of money that may become
due for any labor, services, materials, supplies or equipment
furnished to or for the City in, upon or about Parcel 7 or
8 of the Parking Facilities and that may be secured by
mechanics' or materialmen's or other liens against the
Parking Facilities and will cause each such lien to be fully
discharged and released at the time the performance of any
obligation secured by such lien matures or becomes due; with
respect to the entire Parking Facilities, the City agrees to
pay when due, all sums of money who may become due for any
labor, services, materials, supplies or equipment furnished
to or for the City in, upon or about the Parking Facilities
and that may be secured by mechanics' or materialmen's or
other liens against the Parking Facilities, and will cause
each such lien to be fully discharged and released at the
time the performance of any obligation is secured by such
lien matures or become due; provided, however, that if the
City desires to contest any such lien, it may do so providing
that if any such lien shall be reduced to final judgment and
such process as may be issued for the enforcement thereof is
not promptly stayed, or if so stayed and said stay thereafter
expires, then and in such event the City shall forthwith pay
and discharge said judgment.

Section 16.    Consents.  Whenever the consent or approval
of the City is required by this Agreement, such consent or
approval shall not be unreasonably withheld.  The City
covenants and agrees that the Operators, by keeping and
performing the covenants and agreements herein contained,
shall at all times during the term hereof peaceably
and quietly enjoy the use of the Parking Facilities for
the purposes set forth in subsection A of Section 4, without
suit, trouble or hindrance.  The City agrees to amend this

DEC 3  1975

Agreement in any particulars reasonably requested by the mortgagee (as defined in subsection B(6) of Section 21), provided such requested amendments are not inconsistent with the Lease or the Redevelopment Plan.

Section 17.   Law Governing.   This Agreement shall be governed by the laws of the State of California, subject to the waivers, exclusions and provisions herein contained.

Section 18.   Notices.   All notices, statements, demands, requests, consents, approvals, authorizations, offers, agreements, appointments or designations hereunder by any party to another shall be in writing and shall be sufficiently given and served upon the other party, if actually delivered or when sent by United States registered or certified mail, return receipt requested, postage prepaid and addressed as follows:

City:

City of Temple City
5938 North Kauffman Avenue
Temple City, California 91780
Attention: Karl Koski, City Manager

Operators:

Eltinge, Graziadio & Sampson Development Co.
Post Office Box 92959
Los Angeles, California 90009
Attention: D. Earl Ellis

Albertsons, Inc.
Post Office Box 20
Boise, Idaho 83726
Attention: Contract Department

A. D. Clark, Inc.
12901 West Jefferson Boulevard
Los Angeles, California 90066
Attention: R. P. Brombach

or to such other address as any party shall later designate for such purpose by written notice to the other parties.

Section 19.   Waiver.   The waiver by any party of any breach of any other party of any term, covenants or condition hereof shall not operate as a waiver of any subsequent breach of the same or any other term, covenant or condition hereof.

Section 20.   Default by Operator.

A.    In the event that:

(1)   Any Operator shall fail to make any payment
hereunder within ten (10) days from the date such payment is
due; or

(2)   Any Operator shall fail to observe or perform
any such other terms, covenants and conditions contained
herein for a period of thirty (30) days after written notice
thereof to said Operator; or

(3)   Any Operator's or any Additional Operator's
interest in this Agreement or any part hereof shall be
assigned in violation of Section 12; or

(4)   Any Operator shall file any petition or
institute any proceedings wherein or whereby said Operator
asks or seeks or prays to be adjudicated a bankrupt, or to
be discharged from any or all of its debts or obligations,
or offers to its creditors to effect a composition or extension
of time to pay its debts, or asks, seeks or prays for a
reorganization or to effect a plan or reorganization, or for
a readjustment of its debts, or for any other similar relief,
provided, however, that there shall be no default under this
Agreement as long as the obligations of such Operator or any
Additional Operator are being performed; then and in any of
such events, said Operator shall be deemed to be in default
hereunder.

If the Operator should, after notice of such
default, fails to remedy any default or commence the correction
thereof with all reasonable dispatch, in not exceeding ten
(10) days (with respect to failure to make any payment
hereunder) or in not exceeding thirty (30) days (with respect
to the failure to observe or perform any other term, covenant,
or condition contained herein), then the City shall have the
right, at its option, without any further demand or notice,
but subject to Sections 20 and 21:

(a)   To terminate this Agreement with respect
to the defaulting Operator and to re-enter its portion of

the Parking Facilities and eject said Operator therefrom, in which case this Agreement shall terminate as to said Operator and said Operator shall have no further claim hereunder; or

       (b)  To continue this Agreement with respect to the defaulting Operator in effect for so long as it does not terminate said Operator's right to possession, in which case the City may enforce all of its rights and remedies hereunder, including the right to recover the payment and other charges required to be paid by said Operator as they become due.

    B.    In the event the City terminates this Agreement with respect to the defaulting Operator as hereinbefore provided, the City shall be entitled to recover as damages all of the following:

       (1)  The worth at the time of the award of any unpaid payments or other charges which had been earned at the time of termination;

       (2)  The worth at the time of the award of the amount by which the unpaid payments and other charges which would have been earned after termination until the time of the award exceeds the amount of the loss of such payments and other charges that the defaulting Operator proves could have been reasonably avoided;

       (3)  The worth at the time of the award of the amount by which the unpaid payments and other charges for the balance of the term after the time of the award exceeds the amount of the loss of such payments and other charges that the defaulting Operator proves could have been reasonably avoided;

       (4)  Any other amount necessary to compensate the City for the detriment proximately caused by said Operator's failure to perform its obligations under this Agreement or which in the ordinary course of things would be likely to result therefrom.

The foregoing remedies of the City are in addition to and not exclusive of any other remedy of the City. Any such re-entry shall be allowed by the defaulting Operator without hindrance and the City shall not be liable in damages for such re-entry or be guilty of trespass.

C.    Notwithstanding subsection B of Section 6, in the event this Agreement is terminated with respect to such defaulting Operator, until such time there is a Replacement Operator who assumes each and every obligation of the defaulting Operator with respect to its portion of the Parking Facilities, the City shall repair, maintain and operate that portion of the Parking Facilities as required by all of the terms of this Agreement.

Section 21.    Rights of Others to Cure Default of Operator.

A.    By Parties to the REA; Tenants of Defaulting Operator.

(1)    The City shall, upon serving any Operator with any notice of default under this Agreement, simultaneously serve a copy of said notice upon each of the other Operators at the address designated in or pursuant to Section 18 hereof, and upon each of the tenants of the defaulting Operator at the last address designated by such tenants. Each of the other Operators, and each of the tenants of the defaulting Operator, shall threupon have fifteen (15) days more time than is given to the defaulting Operator to cure any such default or to commence the correction thereof in accordance with the terms of this Agreement, and the City shall accept such performance by or at the instigation of the other Operators and Additional Operators, or such tenants, as if the same had been done by the defaulting Operator.

(2)    Anything herein contained notwithstanding, if any event or events of default shall occur which, under the provisions of this Agreement, shall entitle the City to terminate this Agreement with respect to such defaulting Operator, the City shall give each of the other Operators and each of the tenants of the defaulting Operator written

notice of the City's election to terminate this Agreement with respect to such defaulting Operator, and if, before the expiration of fifteen (15) days from the date of service of said termination notice, the other Operators, such tenants, or any of them:

(a)  Shall have paid to the City all payments due pursuant to Section 5 of this Agreement plus interest thereon at eight per cent (8%) from the due date;

(b)  Shall have paid to the proper governmental authority all taxes and assessments that may then be due, including any and all delinquency payments, late charges and interest;

(c)  Shall have made all payments of insurance premiums on policies required under this Agreement;

(d)  Shall have made such other payments of money as required in this Agreement which are then in default;

(e)  Shall have fully complied within the time period specified in this Agreement as extended hereby for such compliance, or shall have taken or proceeded to take all reasonably practicable steps to the satisfaction of the City in order to remedy such event or events of default;

(f)  And has diligently proceeded to perform all the other requirements of this Agreement (if any) which are then in default; then in such event the City shall not be entitled to terminate the defaulting Operator's interest under this Agreement and no notice of termination therefor given shall result in a cancellation of such interest under this Agreement or shall be of any further force or effect.

Nothing is this subsection A(2) of Section 21 shall be deemed or construed to imply that any Operator has a duty to cure any default of another Operator, and nothing herein shall be construed or deemed to in any way abridge or diminish the responsibility of the City under subsection B of this Section 21.

B.    By Operator's Mortgagee.

(1)    The City shall, upon serving any Operator
with any notice of default under this Agreement, simultaneously
serve a copy of said notice upon any mortgagee or secured
lender (as defined in subsection (6) herein) of the defaulting
Operator requesting said notice, at the last address designated
by said mortgagee or lender.  Unless the other Operators, or
the tenants of the defaulting Operator, or any of them,
shall first have cured any such default or shall have commenced
the correction thereof as provided in subsection A of this
Section 21, said mortgagee or secured lender shall thereupon
have thirty (30) more days time than is given to the other
Operator and such tenant under subsection A of this Section 21
to cure any such default or commence the correction thereof
in accordance with the terms of this Agreement, and the City
shall accept such performance by or at the instigation of
said mortgagee or secured lender as if the same had been
done by the defaulting Operator.

(2)    Anything herein contained notwithstanding,
while such mortgagee or secured lender remains unsatisfied
or of record, if an event or events of default shall occur,
which under any provision of this Agreement shall entitle
City to terminate the defaulting Operator's interest under
this Agreement with respect to a portion of the Parking
Facilities, and if within thirty (30) days after the date of
service of said notice, such mortgagee or secured lender;

(a)    Shall have paid to City or Agency all
payment provided for in Section 5 hereof and all other
payments herein provided for, and then in default; and

(b)    Shall have complied, or shall have
engaged in the work of complying, with all of the other
requirements of this Agreement within the time limits prescribed
herein, if any are then in default; then in such event, City
shall not be entitled to terminate such defaulting Operator's

interest under this Agreement and any notice of termination
theretofore given shall be void and of no effect.

(3)   If the City shall elect to terminate an
Operator's interest under this Agreement with respect to a
portion of the Parking Facilities by reason of any default
of any Operator, such mortgagee or secured lender shall not
only have and be subrogated to any and all rights of the
defaulting Operator with respect to curing such default, but
shall also have the right to postpone and extend the specified
date for the termination of this Agreement as fixed by the
City in its notice of termination, for a period of not more
than six (6) months; provided such mortgagee or secured
lender shall cure or caused to be cured any then existing
money defaults and meanwhile pay the payments provided in
Section 5 of this Agreement and comply with and perform all
of the other terms, conditions and provisions of this Agreement
on the defaulting Operator's part to be complied with and
performed; and if no further defaults shall occur hereunder
during such extended period, and the mortgagee or secured
lender shall forthwith take steps to acquire the defaulting
Operator's interest herein, the time of said mortgagee or
secured lender to comply with the provisions of this Section
shall be extended for such period as shall be necessary to
complete such steps with due diligence and continuity,
provided that during any such extensions no further default
by that Operator or by said mortgagee or secured lender
shall be permitted to continue hereunder.

(4)   The City agrees that, in the event of termination
of an Operator's interest under this Agreement by reason of
any default by an Operator other than for non-payment of the
payment provided in Section 5 hereof or any other payments
herein provided for, the City will acknowledge the holder of
any mortgage or trust deed or its nominee (the mortgagee or
trustee) as the substitute operator with all of the rights

and obligations of the defaulting Operator hereunder for the remainder of the term, (effective as of the date of such termination) upon the terms, provisions, covenants and agreements as herein contained and subject only to the same conditions of title as this Agreement is subject on the date of the execution hereof, and to the rights, if any, of any parties then in possession of any part of the Parking Facilities, provided:

(a)  Said mortgagee shall make written request upon the City for such substitution within thirty (30) days after the date of such termination, and such written request is accompanied by payment to the City of sums then due to the City under this Agreement.

(b)  Said mortgagee shall pay to the City, at such time of substitution, any and all sums which would at the time of such substitution be due under this Agreement but for such termination, and in addition thereto any reasonable expenses, including reasonable legal and attorneys' fees to which the City shall have been subjected by reason of such default.

(c)  Said mortgagee or its nominee shall perform and observe all covenants herein contained the defaulting Operator's part to be performed, and shall further remedy any other conditions that prior the defaulting Operator was obligated to perform under this terms of this Agreement.

(d)  The substitute Operator under such substitution shall have the same right, title and interest in and to the improvements in the Shopping Center as the original, defaulting Operator had under this Agreement.

(5)  The City agrees, within ten (10) day after the request in writing by any Operator, or such mortgagee or secured lender of any Operator, to furnish the party requesting same with a written statement duly acknowledged of the fact that this Agreement is in full force and effect and that

there are no defaults hereunder by the Operator if such is
the fact.  If any defaults then exist, the City agrees that
in such statement it will specify the particular default or
defaults that the City claims to exist.

(6)  As used in this Section 21, all reference to
a "mortgage" shall be deemed to include a Deed of Trust and
sale-leaseback financing, and all reference to the "holder"
of a mortgagee or to a "mortgagee" shall be deemed to include
(i) the beneficiary under a Deed of Trust, and (ii) sale-
leaseback equity purchasers and their lenders or mortgagees.
"Mortgage" and "mortgagee" and "secured lender", as such
terms are defined above, refer to those entities having a
mortgage or security interest in one or more of Parcels 1,
2, 3, 4, 5, and 6.

Section 22.  Right of Agency to Cure Default of City.

Notwithstanding anything herein to the contrary, the
Agency shall have the right to cure any default of the City
under the Lease or under this Agreement and thereby prevent
the Lease or this Agreement from terminating.  In such
event, the Agency shall be recognized under this Agreement
as the successor to the City, and this Agreement shall
remain in full force and effect and binding upon the Operators.

Section 23.  Nondiscrimination.  The Operators covenant
by and for themselves, administrators and assigns, and all
persons claiming under or through them, and this Agreement
is made and accepted upon and subject to the following
conditions:

That there shall be no discrimination against or segregation
of any person or group of persons, on account of sex, race,
color, creed, national origin, or ancestry, in the assignment,
transfer, use or enjoyment of the Parking Facilities, nor
shall the Operators themselves, or any person claiming under
or through them, establish or permit any such practice or
practices of discrimination or segregation with reference to

the selection, location, number, use or occupancy of assignees or transferees under this Agreement.

Section 24.   Indemnification.   The City and the Agency shall not be liable at any time for any loss, damage, or injury to the property or person of any person whomsoever at any time occasioned by or arising out of any act or omission of the Operators, or of anyone holding under the Operators, for the occupancy or use of the Parking Facilities (or any part thereof) by or under the Operators, or directly or indirectly from any state or condition of the Parking Facilities or any part thereof during the term of this Agreement except for the intentional or negligent acts or omissions of the City.

Notwithstanding anything to the contrary under this Agreement, and irrespective of any insurance carried by the Operators for the benefit of the City and Agency, the Operators agree to protect, defend, indemnify and hold the City and the Agency and the Parking Facilities harmless from any and all damages or liabilities of whatsoever nature caused by the Operators on, or their use and of, the Parking Facilities. This indemnity shall not apply to any portion of the Parking Facilities, the repair, maintenance and operation of which are the responsibility of the City.

Section 25. Authority.   The City hereby delegates to its City Manager, all authority convenient or necessary to sign, administer, give consents and approvals, and enforce this Agreement.

Section 26.   Validity.   If any one or more of the terms, provisions, promises, covenants, or conditions of this Agreement shall to any extent be adjudged invalid, unenforceable, void or voidable for any reason whatsoever by a court of competent jurisdiction, each and all of the remaining terms, provisions, promises, covenants, conditions and option provisions of this Agreement shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law.

If for any reason this Agreement shall be held by a court of competent jurisdiction, void, voidable, or unenforceable by the parties hereto, or if for any reason it is held by such court that the covenants and conditions of the Operators hereunder, including the covenant to make all payments hereunder, is unenforceable for the full term hereunder, then and in such event for and in consideration of the right of the Operators to possess, occupy and use their portion(s) of the Parking Facilities, which right in such event is hereby granted, this Agreement shall thereupon become, and shall be deemed to be, an agreement from year to year under which the annual payments herein specified will be paid by each Operator in equal monthly installments.

Section 27. Miscellaneous.

A.   Headings.   The table of contents of this Agreement and the captions of the various sections and subsections of this Agreement are for convenience and ease of reference only and do not define, limit, augment or describe the scope, content or intent of this Agreement or any part or any parts of this Agreement.

B.   Gender.   The neuter gender includes the feminine and masculine, the masculine includes the feminine and neuter, and the feminine includes the neuter, and each includes corporation, partnership or other legal entity where the context so requires.

C.   Singular and Plural.   The singular number includes the plural whenever the context so requires.

Section 28. Binding Effect.   This Agreement, and the terms, provisions, promises, covenants, conditions and option provisions hereof, shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

This Agreement shall not be effective or binding until there has been attached to each counterpart a certified copy of the resolution of the City Council of the City, approving and adopting and agreeing to the terms and conditions of this Agreement.

Section 29.    Recognition Agreement.    The City agrees to
immediately enter into an agreement with EGS and S. S. Kresge
Co. in the form and substance of the Recognition Agreement
attached hereto as Exhibit "D", or such other form as may
be reasonably requested by S. S. Kresge Company.

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be executed and attested by their proper officers
thereunto duly authorized, and their official seals by be
hereto affixed, as of the day and year first above written.

CITY OF TEMPLE CITY

By _____
        Mayor

ATTEST:

_____
City Clerk


ELTINGE, GRAZIADIO & SAMPSON
DEVELOPMENT CO.

By _____

By _____

A. D. CLARK, INC.

By _____

By _____

ALBERTSON'S, INC.

By _____
        Senior Vice President

By _____
        Secretary

-45-

Eltinge, Graziadio & Sampson Development Co.
Parcel 14 as shown on Exhibit "A".  Metes and
bounds legal description is to be furnished
by Seaboard Engineering Co.

Eltinge, Graziadio & Sampson Development Co.
Parcel 11 as shown on Exhibit "A".  Metes and
bounds legal description is to be furnished
by Seaboard Engineering Co.

Albertsons, Inc.
Parcel 10 as shown on Exhibit "A".  Metes and
bounds legal description is to be furnished
by Seaboard Engineering Co.

A. D. Clark, Inc.
Parcel 9 as shown on Exhibit "A".  Metes and
bounds legal description is to be furnished
by Seaboard Engineering Co.

Additional Operators
Parcels 7 and 8 as shown on Exhibit "A".
Metes and bounds legal description is to be
furnished by Seaboard Engineering Co.

EXHIBIT "B"

<u>STANDARDS OF MAINTENANCE</u>

1.    Maintaining, replacing and repairing the surfaces of the Parking Facilities in a level, smooth and evenly covered conditions with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality, use and durability;

2.    Maintaining the Parking Facilities in good order and repair and in an adequate, sightly and serviceable condition, said maintenance to include, without limitation, keeping the same reasonably free and clear of foreign objects, papers, debris, obstructions, standing water, snow and ice; and to insure the foregoing, the Parking Facilities shall be thoroughly cleaned not less than once weekly, and more often if necessary, and snow removed properly on every occasion where it impedes the use of the Parking Facilities.

3.    Placing, keeping in repair, repainting and replacing when necessary all appropriate directional signs, markers and lines; and operating, keeping in repair and replacing when necessary such artificial lighting facilities as shall be reasonably required;

4.    Maintaining and repairing any perimeter walls in a good condition and state of repair and replacing same when necessary;

5.    Maintaining all landscaped areas, making such replacements of shrubs and other landscaping as is reasonably necessary to maintain adequate landscaping under all relevant circumstances, and keeping said areas at all times adequately weeded and watered; and

6.    Lighting Parking Facilities during business hours and reasonable periods prior and subsequent thereto at a minimum of one and one-half (1-1/2) foot candles measured at ground level for each square foot of parking area, except as required by law or ordinance.

EXHIBIT "C"

<u>RECOGNITION AGREEMENT</u>

This Agreement dated as of _____ by the
City of Temple City hereinafter referred to as "City";
Eltinge, Graziadio & Sampson Development Co., hereinafter
referred to as "Operator", and the S. S. Kresge Company,
hereinafter referred to as "Kresge."

<u>W I T N E S S E T H</u> :

Whereas, the City and the Operator have entered into
that certain Agreement for Operation and Maintenance of
Parking Facilities, hereinafter called the "Operation
Agreement", dated as of November 1, 1975, which Operation
Agreement is for a term of approximately twenty-five (25)
years and affects the following described property, hereinafter
referred to as "Parking Facilities", in the City of Temple
City, County of Los Angeles:

SEE EXHIBIT "X" ATTACHED

and

Wheras, Operator, as landlord, granted to Kresge, as
tenant, certain rights in Parcel 14 of the Parking Facilities,
by virtue of the Lease and Lease Agreement dated March 11, 1974,
as amended, hereinafter referred to collectively as the
"Kresge Lease", which Kresge Lease is for a primary term
(as defined in said Kresge Lease) of twenty-five (25) years
plus ten (10) options to extend the term for five (5) additional
years each; and

Whereas, it is the desire and intention of the parties
hereto to confirm and recognize the status of City and Kresge
concerning said Parcel 14 in the event of (1) termination
of Operator's rights concerning Parcel 14 under the Operation
Agreement for any reason or (2) any surrender or transfer
by Operator to City of the rights of Operator under the
Operation Agreement, whether such surrender or transfer is
voluntary, involuntary or by operation of law.

EXHIBIT "D"

-1-

Now therefore, in consideration of the mutual promises and other good and sufficient consideration, receipt of which is hereby acknowledged, it is hereby agreed as follows:

1.    In the event of (1) termination of the Operator's rights concerning Parcel 14 under the Operation Agreement for any reason or (2) any surrender or transfer by Operator under said Operation Agreement to City of the rights of Operator under the Operation Agreement, whether such surrender or transfer is voluntary, involuntary, or by operation of law, Tenant agrees:

(a)    To make a full and complete attornment to City so as to establish direct privity between City and Kresge, and

(b)    That all obligations of Operator under said Operation Agreement shall continue in full force and effect and be enforceable against Kresge by City upon the principle of attornment, and in such event City agrees that it will recognize and accept the rights of Kresge under the Operation Agreement, all with the same force and effect as if the Operation Agreement had originally been made and entered into by and between City and Kresge as an operator.

2.    Nothing herein contained shall impose any obligation upon Kresge to perform any of the obligations of the Operator under the Operation Agreement unless and until there shall first have occurred and been effected termination or surrender or transfer (to City) under the Operation Agreement and until attornment by Kresge to City has been made, and provided further that anything in this Recognition Agreement to the contrary notwithstanding, this attornment and recognition shall not be effective unless and until Kresge shall have entered into possession of the Parking Facilities, and accepted the same, and provided further that the obligations of Kresge to City shall not be greater, financially or otherwise, than the obligation of Operator to City under the said Operation Agreement.

3.    Notwithstanding anything to the contrary herein contained, it is understood and agree that unless and until Kresge is notified in writing by Operator, as landlord under said Kresge lease, or by City of the happening of the event of (1) termination of the Operation Agreement or (2) any surrender to City of the rights of the Operator under the Operation Agreement, Kresge, prior to receiving such written notification from Operator or City, shall not be obligated to make any payments to City under the Operation Agreement, and all rent paid by Kresge to Operator under the Kresge lease prior to such notification shall constitute full and complete acquittance of Kresge's obligation to make payments under the Operation Agreement for and during the period preceding the date of such termination or surrender or transfer (to City) of the Operation Agreement.

4.    This Agreement may be signed in counterparts, and when signed by the Operator, Kresge, and City, shall become binding and effective.

5.    This Agreement shall be binding upon and shall inure to the benefit of the successors, heirs and assigns of the parties hereto.

"OPERATOR"

ELTINGE, GRAZIADIO & SAMPSON DEVELOPMENT CO.

By _____

By _____

"KRESGE"

S. S. KRESGE COMPANY

By _____

By _____

CITY OF TEMPLE CITY

By _____

Attest: _____

-3-