**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:                                                        :          Chapter 11
                                                              :
SEARS HOLDINGS CORPORATION, et al                             :          Case No. 18-23538 (RDD)
                                                              :
        Debtors.[1]                                           :          (Jointly Administered)
                                                              :
---------------------------------------------------------------x

## OBJECTION TO NOTICE OF ASSUMPTION AND ASSIGNMENT
## OF ADDITIONAL DESIGNATABLE LEASES

Ravenswood Station, LLC ("Ravenswood" or "Landlord"), by its undersigned counsel,

hereby files this objection, joinder and reservation of rights (the "Objection") with regard to the

Notice of Assumption and Assignment of Additional Designatable Leases (Docket No. 3298)

(the "Assumption Notice").  In support of its Objection, Ravenswood respectfully states as

follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

9808625

## BACKGROUND

1.        Pursuant to that certain lease dated November 19, 2012 (the "Lease"),

Ravenswood is the landlord to Sears, Roebuck and Co. (the "Debtor") for the premises (the

"Store") located in the shopping center (the "Center") situated at the northeast corner of

Lawrence Avenue and North Wolcott Avenue in Chicago, Illinois which property is commonly

known as 1800 W. Lawrence Avenue (the "Property").  The Store is known as Store 2936.  A

copy of the Lease is attached hereto as **Exhibit A**. Other tenants in the Center include L.A.

Fitness International, LLC and Roundy's Supermarkets, Inc.

2.        On December 3, 2013, a Memorandum of Lease was filed with respect to the

Store which refers parties to the Lease for a "complete statement of the rights, privileges and

obligations created under and by said instrument and of the terms, covenants and conditions

contained therein, reference is hereby made to the Lease." *See* Sears Memorandum of Lease at ¶

2.  A copy of the Sears Memorandum of Lease is attached hereto as **Exhibit B.**

3.        On November 1, 2018, the Debtors filed a Motion for Approval of Global

Bidding Procedures (the "Motion") [ECF No. 429].  In the Motion, the Debtors sought

approval of procedures for a sale of its assets, including the assumption and assignment of

leases.    4.        On February 8, 2019, the Court entered the Order (I) Approving the Asset

Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the

Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing

the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection

Therewith and (IV) Granting Related Relief (the "Sale Order") [ECF No. 2507], approving the

Buyer as the successful bidder at the auction.

9808625

5.      On April 2, 2019, this Court entered its *Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief* (the "Assumption and Assignment Order") [ECF No. 3008].

6.      At paragraph 26, the Assumption and Assignment Order provides, in part:

> To the extent that the Debtors or any other party seek to assume and assign any real estate leases to which a Debtor is a party free and clear of any interests, covenants, or rights applicable to such real estate assets that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "Restrictive Covenants"), the applicable Designated Lease Notice shall describe the Restrictive Covenant that the party is seeking to extinguish or otherwise diminish and any non-Debtor counterparty to a Restrictive Covenant will have fourteen (14) calendar days from the filing and service of the Designated Lease Notice to file and serve an objection thereto . . .

Assumption and Assignment Order at ¶ 26.

7.      On April 19, 2019, the Debtors filed the Assumption Notice.  The Assumption Notice provides:

> In accordance with the Sale Order and the Assumption and Assignment Order, Buyer has designated for assumption and assignment certain Additional Assigned Agreements, which are listed on **Exhibit 1** hereto (the "Additional Designatable Leases"). The Buyer, or an affiliated entity, shall be the relevant Assignee for each Additional Designatable Lease.

Assumption Notice at ¶ 13.

8.      The Lease is contained on Exhibit 1 and is, therefore, an Additional Designatable Lease.

9.      The Assumption Notice also provides:

> In accordance with paragraph 59 of the Sale Order and paragraph 26 of the Assumption and Assignment Order, Buyer intends to designate the Additional Designatable Leases for assumption and assignment free and clear of any interests, covenants, or rights applicable to such real estate leases to the extent the same limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "Restrictive Covenants") that are executory and do not run with the

3

land. Counterparties to the Additional Designatable Leases shall file and serve any objections with respect to the immediately preceding sentence

Assumption Notice at ¶ 18.

10.     The Assumption Notice also provides for a $0 cure amount with respect to the Lease.

## OBJECTION

**The Lease Must Be Assumed and Assigned in Full, Including the Restrictive Covenants, the Requirements for the Assumption of a Shopping Center Lease Must Be Met, and the Cure Cost Must Be Paid in Full Upon Assumption**

11.     In the Motion and Assumption Notice, the Debtor is seeking to assume and assign the Lease but seeks to do so without the restrictive covenants, without complying with the protections provided to landlords of debtors in shopping centers, and without paying the full cure amount.  As is set forth below, Section 365 of Bankruptcy Code requires that (i) the Lease be assigned with its restrictive covenants, (ii) Landlord must be provided with adequate assurance of future performance in accordance with those restrictions and (iii) the Lease must be fully cured in full before it can be assumed or assigned.

**The Restrictive Covenants Cannot
Be Stripped From the Lease**

12.     When an executory contract is assumed, it must be assumed *cum onere*.  *In re Leslie Fay Companies, Inc.*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994) ("[i]f an executory contract is assumed, it is said to be assumed *cum onere*, with all of its benefits and burdens"); *see also In re Kopel*, 232 B.R. 57, 63 (Bankr. E.D.N.Y. 1999) ("It is axiomatic that an executory contract generally must be assumed *cum onere*.").

13.     In the Assumption Notice, the Debtor indicates:

Buyer intends to designate the Additional Designatable Leases for assumption and assignment free and clear of any interests, covenants,

4

or rights applicable to such real estate leases to the extent the same limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "Restrictive Covenants") that are executory and do not run with the land. Counterparties to the Additional Designatable Leases shall file and serve any objections with respect to the immediately preceding sentence (a "Restrictive Covenant Objection") in accordance with Amended Case Management Procedures so as to be filed and received no later than the Objection Deadline.

*See* Assumption Notice at ¶ 18.

14.     The Assumption and Assignment Order requires the Debtor to describe the Restrictive Covenant they seek to extinguish or diminish. Assumption and Assignment Order at ¶ 26. The Debtor has not described the restrictive covenants, if any, that it seeks to strip from the Lease, although the Lease may contain certain non-executory restrictions, including use restrictions, which the Debtor may believe constitute "Restrictive Covenants."  *See* Lease at 4.1 and Exhibits C and D.

15.     Not only are these "Restrictive Covenants" part of the Lease which must be assumed *cum onere*, but evidence of the leases containing these restrictions were recorded with Cook County Recorder of Deeds.  *See e.g.* Memorandum of Lease for L.A. Fitness attached hereto as **Exhibit C** and Memorandum of Lease for Sears (Exhibit B)**.**  Accordingly, the restrictions run with the land and cannot be stripped from the Lease. *See In re Oyster Bay Cove Ltd.*, 196 B.R. 251, 255-259 (Bankr. E.D.N.Y. 1996).

16.     Any assumption of the Lease should be conditioned upon its assumption *cum onere*.

**The Assumption Requirements, Including Adequate Assurance,
for Shopping Centers Must Be Met**

9808625

17.     Section 365(b)(3) mandates that adequate assurance for premises in shopping

centers requires "that the assumption of such lease is subject to **all** the provisions thereof,

including (but not limited to) provisions such as a radius, location, use, or exclusivity provision,

and will not breach any such provision contained in any other lease . . ."  11 U.S.C.

§365(b)(3)(C) (emphasis added).  Here, the Debtor is seeking assume the Lease in direct

contravention of section 365(b)(3)(C).

18.     The Store is located in a shopping center, as that term is used in section

365(b)(3) of the Bankruptcy Code.  *See In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1086-87 (3d

Cir. 1990).

19.     Because the Store is located in a shopping center, section 365(b)(3) requires

adequate assurance of future performance to include:

> (3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of
> subsection (f), adequate assurance of future performance of a lease of real property in
> a shopping center includes adequate assurance—
>
> (A) of the source of rent and other consideration due under such lease, and in the case
> of an assignment, that the financial condition and operating performance of the
> proposed assignee and its guarantors, if any, shall be similar to the financial condition
> and operating performance of the debtor and its guarantors, if any, as of the time the
> debtor became the lessee under the lease;
>
> (B) that any percentage rent due under such lease will not decline substantially;
>
> (C) that assumption or assignment of such lease is subject to all the provisions
> thereof, including (but not limited to) provisions such as a radius, location, use, or
> exclusivity provision, and will not breach any such provision contained in any other
> lease, financing agreement, or master agreement relating to such shopping center; and
>
> (D) that assumption or assignment of such lease will not disrupt any tenant mix or
> balance in such shopping center.

11 U.S.C. §365(b)(3).

9808625

20.     The Debtor has not shown that it can meet the requirements of section 365(b)(3).  Nor has its putative assignee shown that it can meet the requirements of section 365(b)(3).  Instead, the Debtor has indicated, in a blanket statement, that all Restrictive Covenants are to be stripped from the Lease.  Such blanket statement violates the terms of the Bankruptcy Code and the Debtor's own order.  *See* 11 U.S.C. § 365; *see also*, Assumption and Assignment Order at ¶ 26.

21.     In direct contravention of section 365(b)(3)(C) and (D), the Debtor is seeking to remove the express restrictions and prohibitions are an essential part of the bargain on which the Lease is based.  The use restrictions in the Lease preserve the essential character and intended tenant mix of the shopping center in which Store 2936 is located and are expressly protected by the Bankruptcy Code under section 365(b)(3).  11 U.S.C. § 365(d)(3).  The Debtor's attempt to strip these use restrictions and use prohibitions from the Lease directly violates the Bankruptcy Code and such request should be overruled.

22.     Any assumption of the Lease should be conditioned on the provision of adequate assurance which includes maintaining the restrictions and use prohibitions found in the Lease and which are protected by section 365(b)(3).

**The Proposed Cure Amount is Incorrect**

23.     In the Assumption Notice, the Debtor has scheduled the cure amount with respect to the Lease as $0.  Such amount is incorrect.

24.     Pursuant to sections 3.2.1 and 7.1.2, among other sections, the Debtor is required to pay its proportionate share of the Common Area Maintenance Costs (or CAM) and Insurance Premiums (each as defined in the Lease). The Debtor's share equates to approximately 7.70% of such costs.  The Debtor has not paid the full amount required under the lease for these

7

9808625

and other costs, thus a default under the Lease exists and is continuing.  Pursuant to Section 365(B)(1)(a) of the Bankruptcy Code, this default must be cured prior to assumption of the Lease and the Lease must be assumed prior to any assignment under Section 365(f)(2)(A) of the Bankruptcy Code.

25.    On April 4, 2019, Landlord filed a proof of claim in the amount of $3,505.14. The proof of claim included solely amounts due prepetition.

26.    The amounts due under the lease fluctuate post-petition as expenses are accrued and paid by Landlord (if they are paid).  Based on a reconciliation done as of May 2, 2019, Landlord is owed $24,286.33 from the Debtor to cure under the Lease. A summary of the amount owed to cure under the Lease is annexed hereto as **Exhibit D**.

27.    The Lease obligates the Debtor to make other payments which may have accrued or may accrue between today's date and the date of any assignment. All such amounts are necessarily part of any cure under the Lease. Examples of these obligations include, but are in no way limited to, items like taxes and indemnification. Taxes continue to accrue on the premises. The Debtor is responsible for payment of their proportionate share of the taxes on the shopping center and any taxes that accrue against personal property or fixtures at the store. *See* Lease at § 7.3, 7.31.  The Lease also obligates the Debtor to indemnify Landlord in the event a claim is made against Landlord based on an incident in the store or arising from the action of the Debtor's employees or contractors. *See* Lease at § 8.11.  An incident may have occurred at the store for which a claim has not yet been made. All accrued and all accruing amounts are part of a cure and Landlord is entitled to have all those payments made (to the extent known) and all those accruing obligations assumed by any assignee.

8

28.     The Debtor should not be authorized to assume and assign the Lease without payment or adequate assurance of the full cure amount and Landlord reserves its rights to adjust the cure claim as appropriate.

## JOINDER

29.     Landlord hereby joins, adopts and incorporates any objections filed by other landlords to the extent not inconsistent herewith.

## RESERVATION OF RIGHTS

30.     This Objection is without prejudice to other and additional cure claim amounts that (a) may exist and/or may become known at a future date and (b) will accrue on an ongoing basis between the filing of this Objection and any subsequent assumption of the Lease. Landlord reserves its right to amend or supplement this Objection and to contest the assumption, assignment, or rejection of the Lease on any basis and reserves the right to seek treatment as an administrative priority claim for amounts owed under the Lease, under Section 503(b) of the Bankruptcy Code or otherwise.

**WHEREFORE,** Landlord respectfully requests that this Court:

A.  Sustain its objection;

B.  Deny the assumption and/or assignment of the Lease until Landlord is provided with adequate assurance of future performance;

C.  Condition any assignment of the Lease on compliance with all covenants, rights and obligations thereunder;

D.  Condition any assumption of the Lease on the payment and assumption of all amounts necessary to cure monetary defaults thereunder, fix that cure amount as

9808625

of May 2, 2019 at $24,286.33 and allow Landlord to amend such amount if the

Lease is not assumed on May 3, 2019; and

E.   Grant such other and further relief as the Court may deem equitable and

appropriate.

Dated: May 3, 2019
New York, New York

**MINTZ & GOLD, LLP**

By: /s/Andrew R. Gottesman, Esq.
Andrew R. Gottesman, Esq.
Abbye L. Lawrence, Esq.
600 Third Avenue, 25th Floor
New York, NY 10016
Telephone: (212) 696-4848
E-mail: gottesman@mintzandgold.com


*Counsel to Ravenswood Station, LLC*

**MUCH SHELIST, P.C.**

By: /s/ Jeffrey Gansberg, Esq.
Jeffrey M. Schwartz, Esq.
Jeffrey Gansberg, Esq.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606
Telephone: (312) 521-2649
Email: jgansberg@muchshelist.com

*Counsel to Ravenswood Station, LLC*

9808625

# **<u>EXHIBIT A</u>**

# LEASE AGREEMENT

This Lease Agreement (this "Lease") is made and entered into as of the 14th day of November, 2012 by and between:

Landlord:        RAVENSWOOD STATION, LLC

C/O CHITOWN-EB/EP JV LLC
5215 OLD ORCHARD ROAD, SUITE 130
SKOKIE, ILLINOIS 60077

an Illinois limited liability company referred to below as the "Landlord"; and

Tenant:        SEARS, ROEBUCK AND CO.
ATTN: VICE PRESIDENT REAL ESTATE
3333 BEVERLY ROAD, DEPT. 824 RE
HOFFMAN ESTATES, ILLINOIS 60179

a New York corporation referred to below as the "Tenant";

for the lease of that certain floor area within that certain shopping center (the "Center"), as more specifically described herein, to be situated on the real property located at the northeast corner of Lawrence Avenue and North Wolcott Avenue, Chicago, Illinois referred to below as the "Premises".

WITNESSETH:

WHEREAS, the Landlord is the owner of the Center; and

WHEREAS, Tenant desires to lease the Premises which will be known as "Sears Auto Center" from Landlord for use as an automotive service and retail store and Landlord agrees to demise the Premises on the following terms and conditions.

NOW, THEREFORE, for and in consideration of the foregoing recitals and representations and the following terms, conditions and performance of the provisions of this Lease, the Landlord and Tenant agree and covenant as follows:

SECTION ONE

## 1.1.    PREMISES LEASED

The Landlord demises and lets to the Tenant, and the Tenant leases from the Landlord, on the terms and conditions set forth in this Lease, the portion of the Center with approximately 10,603 square feet of floor area on real estate owned by Landlord and located at the northeast corner of Lawrence Avenue and North Wolcott Avenue, Chicago, Illinois, and as more specifically depicted on Exhibit A which is attached hereto, all referred to as the "Premises".

1.2.    CONSTRUCTION

"Landlord's Work" and "Tenant's Work" (each as defined in Exhibit B which is attached hereto), will be accomplished pursuant to parameters and requirements set forth on Exhibit B.

## SECTION TWO

2.1.    LEASE TERM

2.1.1    This Lease shall be effective for a term of ninety nine (99) years (the "Term") beginning on the earlier of (i) the day on which Tenant first opens the Premises for business with the public; or (ii) ninety (90) days following delivery of the Premises to Tenant in the condition required by the terms of this Lease (the "Commencement Date").

## SECTION THREE

3.1.    MINIMUM RENT

Tenant agrees to pay to Landlord as minimum rent ("Minimum Rent") for the Premises an amount equal to One Dollar ($1.00) for each year of the Term.    Landlord acknowledges and agrees that Tenant has pre-paid Landlord all of the Minimum Rent for the entire Term.

3.2.    ADDITIONAL RENT

3.2.1    Tenant shall pay Tenant's proportionate share of Taxes (hereinafter defined), Common Area Costs (hereinafter defined) and Insurance Premiums (hereinafter defined) as Additional Rent.    Tenant's proportionate share shall be the percentage equal to a fraction, the numerator of which shall be the floor area in the Premises and the denominator of which shall be the total floor area in the Center, and which as of the date hereof shall equal approximately 7.70% (the "Proportionate Share").    For purposes of this Lease, "Additional Rent" shall mean all amounts required or provided to be paid by Tenant under this Lease, and the failure to pay the same shall be treated in all events as the failure to pay rent.    Additional Rent shall include all amounts due to Landlord by Tenant under this Lease other than Minimum Rent. The Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance Premiums as required to be paid in accordance with the provisions of this Lease, shall be due and payable upon the Commencement Date and a like installment shall be due and payable without notice on or before the first day of each calendar month during the Term after the calendar month following the Commencement Date occurs (except that if the Commencement Date falls other than on the first day of a calendar month, the payment for the first month shall be prorated). The covenant of Tenant to pay all rents hereunder is and shall be deemed a separate and independent covenant and Tenant shall have no right of deduction or offset whatsoever. In the event of nonpayment of rent, breach of covenant or failure of a condition, Landlord shall have all the rights and remedies as provided for in this Lease.

## SECTION FOUR

4.1.    USE OF PREMISES

Tenant covenants and agrees that the Premises may be used and occupied for (i) the operation of an automobile center to service automobiles, (ii) retail sale of household

CHI 62168760v8

appliances and automobile parts and related goods and services, (iii) the use of computer kiosks for the sale of merchandise related to the uses and/or products allowed under (i) and (ii) above through the internet and other electronic means and for any other lawful purpose, without first obtaining the prior written consent of Landlord. Tenant, at all times, shall fully and promptly comply with all laws, ordinances, orders, and regulations of any lawful authority having jurisdiction of the Premises including, but not limited to, those that relate to the cleanliness, safety, occupation, and the use of the Premises and the nature, character, and manner of operation of the business conducted in or at the Premises. Tenant agrees to limit its use and storage of toxic or hazardous materials on the Premises to only those required for the operation of an automobile service center and related uses and to comply with the requirements of all environmental laws of the United States and the State of Illinois. In no event shall Tenant use the Premises for any use granted exclusively to another tenant of the Center described on Exhibit C hereto ("Exclusives"), or any prohibited use listed on Exhibit D hereto ("Prohibited Uses").

SECTION FIVE

5.1.   CARE OF PREMISES

5.1.1      Repairs by Landlord.  At Landlord's sole cost and expense, Landlord will maintain, repair and replace all structural components of the Premises (including, but not limited to, the foundation, bearing walls and roof structure), the exterior walls, floor slab (and, to the extent repair is required due to the condition of the slab or conditions under the slab, the floor coverings), roof membrane, gutters, downspouts and canopies of the Premises, all plumbing, wiring and other utility facilities within or under the floor slab of the Premises, all plumbing, wiring and other utility facilities serving the Premises up to their points of connection with the meter for such utilities serving the Premises, such portions of the Premises required to be maintained by Landlord under Section 5.1.2, and the Common Areas, as necessary to keep the same in good order, condition and repair, ordinary wear and tear and damage by casualty excepted and otherwise keep the roof free of leaks.  In addition, Landlord shall, at the sole cost and expense of Tenant, service the HVAC in the Premises as requested by Tenant but in no event less than two (2) times each year of the Term.  If the performance of any repair required to be made by Landlord pursuant to this Lease precludes the normal operation of Tenant's business from all or any portion of the Premises and Tenant notifies Landlord of such preclusion, then (a) Additional Rent will equitably abate during the performance of such repair in proportion to the nature and extent of the interference with Tenant's normal operation; and (b) if Tenant is precluded from operating its business from ten (10%) or more of the Premises for more than 90 days after Tenant gives Landlord such notice concerning such preclusion, Tenant may terminate this Lease by notice given to Landlord prior to the completion of such repair. Tenant shall reimburse Landlord for one hundred percent (100%) of the reasonable cost of any repair made by Landlord pursuant to this Section 5.1.1 to any portion of the Center, not including any interior portion of the Premises, which exclusively benefits the Premises or Tenant and which is incurred in connection with the repair of storefront and glass exclusive to the Premises; exterior doors and rolling doors exclusive to the Premises; HVAC equipment and distribution exclusive to the Premises; interior furniture, fixtures, equipment and improvements; all SEARS related signage, power to signs and control for signs; and electrical, telecommunication and plumbing services within the Premises which only serve the Premises. The reimbursement due hereunder, if any, shall be deemed to be Additional Rent and shall be due within thirty (30) days following written notice thereof, which notice may, but need not, be a monthly statement or invoice for Additional Rent.

3

5.1.2     Repairs by Tenant.  Tenant shall, at its sole cost and expense, except as provided in Section 5.1.1 hereof, make all needed maintenance, repairs and replacements to the Premises, including, but not limited to, (i) the heating, ventilating, and air conditioning systems serving the Premises; (ii) the exterior and interior portion of all doors, windows, window frames, plate glass, door closures and other hardware, door frames and store fronts; (iii) all plumbing and sewage facilities within the Premises;(iv) all fixtures within the Premises; (v) all electrical systems serving the Premises and located therein; (vi) all sprinkler systems and central station reporting systems within the Premises; (vii) all interior walls, floors and ceilings; (viii) any of Tenant's improvements; (ix) all repairs, replacements or alterations required within the Premises by any governmental authority or insurance rating organization; and (x) all necessary repairs and replacements of Tenant's trade fixtures required for the proper conduct and operation of Tenant's business.

5.1.3     Alterations.  Landlord further acknowledges and agrees that Tenant can make any non-structural improvements or alterations to Premises without the prior written consent of Landlord, provided, Tenant shall be responsible for the cost of any such additions, renovations or other construction and operations relating to such improvements or alterations, and shall provide Landlord with as-built plans upon completion of any improvement or alteration. No alteration of the Premises shall expand the size of the Premises nor materially adversely interfere with the operations of any other tenant in the Center.

SECTION SIX

6.1.    RESTRICTION AGAINST ASSIGNMENT AND SUBLETTING

Tenant shall be permitted to assign or transfer this Lease or any estate, interest, or sublet the Premises or any part or parts of the Premises or permit the use of the same or any part by anyone other than Tenant, its successors and affiliated companies without obtaining the prior written consent of Landlord provided such assignee or transferee shall be subject to comply with any restrictions or exclusive use provisions in any lease encumbering the Center excluding any restriction or exclusive use provisions regarding the use permitted hereunder. Landlord shall have the right to assign its interest in this Lease at any time without the consent of Tenant.  In the event that Landlord does assign its interest in this Lease to a third party, Landlord shall give written notice of the assignment to Tenant at which point, Tenant shall make lease payments provided for under this Lease in accordance with the written notice tendered to Tenant by Landlord.  Tenant shall provide notice to Landlord of any assignment or sublease promptly following such occurrence.  At Landlord's request, each sublessee shall execute a non-disturbance and attornment agreement in a form reasonably acceptable to Landlord and subtenant.

SECTION SEVEN

7.1.    COMMON AREAS

7.1.1     Right to Use Common Areas.  Subject to Landlord's rights under this Lease, Tenant, and its licensees, concessionaires, employees, invitees and customers for purposes of this Section 7.1.1, shall have the non-exclusive right to use the Common Areas, as constituted from time to time, in common with Landlord, other tenants of the Center and other persons entitled to use the same.  Tenant shall not unreasonably interfere with the rights of other persons to use the Common Areas. Landlord may temporarily close parts of the Common Areas for such periods of time as may be necessary for (i) temporary use as a work area in

4

connection with the construction of buildings or other improvements as may be necessary for repairs or alterations in or to the Common Areas, (ii) security reasons, or (iii) doing and performing such other acts as in the use of good business judgment Landlord shall determine to be appropriate for the Center, provided however, that (a) Landlord shall use best efforts not to unduly interfere with or unduly disrupt Tenant's business; (b) Landlord shall not obstruct or close the Center's entrance or access from the Premises to and from the public right-of-way; and (c) Landlord provides Tenant with prior written notice of such temporary closure which such notice states an estimate for the period of time in which the closure will continue.

7.1.2    Common Area Costs.  Tenant agrees to pay as Additional Rent, from the Commencement Date and throughout the Term of this Lease, Tenant's Proportionate Share of the actual cost of routine maintenance expenditures limited to actual cash expenditures (without administrative charges or management fees) undertaken to repair and maintain the Center, which may include, costs incurred with landscaping, day porter services, snow removal, sweeping, maintaining the asphalt, re-striping any parking areas, removal of graffiti, security, lighting for the parking lot, irrigation, maintenance of pylons, payroll for employees performing maintenance at the Center and signage, and not including costs incurred pursuant to Section 5.1.1, major replacements or capital costs undertaken to improve and add value to the Center, costs associated with underground utility repairs, downspouts, sewers, HVAC, costs specifically allocated to other tenants at the Center, expenses for the removal and replacement of all of the asphalt at the Center, payroll for employees of any property manager of the Center, any leasing expenses, property insurance, costs related to fire protection or damage, trash removal and any costs or expenses incurred in connection with any office or other administrative charges related to the management of the Center; the foregoing being collectively referred to as "Common Area Costs".

7.1.3    Payments of Common Area Costs.    Commencing with the Commencement Date, Tenant shall make monthly payments to Landlord based upon Landlord's estimated annual cost of Common Area Costs based on prior year's actual expense plus reasonable increase/decrease as needed except for the first year of the Term which shall be based upon Landlord's estimated annual cost of Common Area Costs which equals $10.00 per rentable square foot.  Within one hundred twenty (120) days after the close of each calendar year, Landlord will furnish Tenant a statement of Common Area Costs for such year, such statement to be prepared in accordance with generally accepted accounting practices. Adjustments due either party shall be paid thirty (30) days after delivery of such statement.

7.1.4    Right to Inspect Books.    Within thirty (30) days after notice from Tenant, Landlord will deliver to Tenant, for inspection at the offices of Landlord or the property manager of the Center, copies of all relevant data and copies of invoices supporting or explaining the amounts shown on any billing received by Tenant from Landlord for Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance Premiums.    Tenant will promptly deliver to Landlord a copy of the report issued as a result of such inspection or audit. In the event the report discloses any overpayment or underpayment of Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance Premiums due, the party owing such sums will reimburse the other party for all such sums owing within thirty (30) days after its receipt of the inspection or audit report.  If any inspection or audit report reveals an overstatement of Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance Premiums in any invoice received by Tenant from Landlord of more than [five percent (5%)], then Landlord will immediately pay to Tenant (a) the costs and expenses of the inspection or audit and (b) interest at four percent (4%) on the overcharge included in each payment made by Tenant of Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance Premiums from the date

5

each such payment was made by Tenant until the date reimbursed to Tenant by Landlord. In the event Landlord fails to deliver any reasonable back-up information requested by Tenant for inspection or fails to permit Tenant or Tenant's auditors to audit or copy Landlord's books and records pertaining to Common Area Costs, Taxes and Insurance Premiums in accordance with this Section, and such failure continues for 30 days after notice thereof from Tenant, in addition to all other remedies available to Tenant under this Lease, at law or in equity, Tenant may elect to suspend all payments of Tenant's Proportionate Share of Common Area Costs, Taxes, and Insurance Premiums, as applicable, until Landlord provides such back-up information or permits such copying or auditing.

7.1.5    Water/Sewer Charges. In the event Tenant is not billed directly by the appropriate authority for water consumed on the Premises and/or for sewer rents or charges, Tenant shall pay as Additional Rent the bill rendered by Landlord, which bill shall be based upon Tenant's Proportionate Share. In the event Landlord determines that it is not appropriate to base the water or sewer bills on Tenant's Proportionate Share due to the nature of Tenants' business activities, Landlord shall provide Tenant with the most recent water and sewer bill together with Landlord's calculation of the amount Tenant shall pay for water and sewer pursuant to this Section 7.1.5, and, provided Tenant agrees with such calculation, Tenant shall pay Landlord the amount due within thirty (30) days of its receipt of such bill and calculation.

7.1.6    Definition of Common Areas. As used in this Lease, "Common Areas" shall mean all sewer lines, water mains, mechanical equipment, pipes, ducts, conduit, wires and all other facilities furnished, made available or maintained by Landlord and others on or in the Center for the common and joint use and benefit of the Center, the Tenant and other lessees and owners of other property within the Center, their customers and invitees, including, without limitation, elevators, escalators, stairways, pedestrian sidewalks, parking areas, driveways access drives, and roads within or serving the Center, courts and ramps, landscaped areas, retaining walls, retention and detention ponds, perimeter walls and fences, bus stops, lighting facilities, utility facilities, and other areas and improvements, as the same from time to time exist at the Center.

7.2.    INSURANCE.

7.2.1    Tenant's Insurance. Tenant shall procure and keep insurance in force during the term of this Lease and any extension or holdover period from one or more insurance companies with a rating of A- VII or better from A. M. Best Company that shall name Landlord as an additional insured and shall deliver each certificate to Landlord that provide coverage as follows: Tenant shall procure, and maintain, at its own expense, one or more policies of public comprehensive general liability insurance in the amount of Two Million ($2,000,000.00) Dollars for injuries and damages resulting to one person and Five Million ($5,000,000.00) Dollars for injuries damages resulting from one incident. Tenant may reserve the right to self insure for such liability provided that Tenant maintains a minimum tangible net worth of Two Hundred Fifty Million ($250,000,000.00) Dollars or more, and provides evidence of same to Landlord not less often than annually which such evidence may be Tenant's public filings regarding same; provided, however, that Tenant, if self insured, hereby agrees to indemnify and pay any claims made against Landlord, whether by settlement or judgment, arising from or relating in any way to the Premises and to provide a defense to Landlord, including attorneys' fees and all litigation costs, at no expense to Landlord. Tenant shall procure and maintain, at its own expense, one or more policies of all risk property damage insurance coverage insuring against fire, wind and other such hazards in an amount equal to the full guaranteed replacement cost to rebuild and restore the building and improvements on the Premises.

6

7.2.2     Landlord's Insurance.

    7.2.2.1     Property Insurance.     From the date on which Landlord commences Landlord's Work until the end of the Term, Landlord will maintain special form (formerly known as all risk) property insurance (not excluding from coverage perils normally included within the definitions of extended coverage, vandalism and malicious mischief, earthquake and flood) insuring the buildings and other structures (including all improvements, alterations, additions and changes thereto) which are located within the Center, including, without limitation, the building in which the Premises is located, in the amount of one hundred percent (100%) of the replacement cost (excluding excavations and foundations), with endorsements for contingent liability from operation of building laws, increased cost of construction, and demolition costs which may be necessary to comply with building laws. The insurance required hereby will be written by a company authorized to do business in the state of the location of the Premises and will permit or include a waiver of subrogation in favor of Tenant consistent with the provisions hereof. Landlord will be responsible for determining the amount of property insurance to be maintained, but such coverage will be on an agreed value basis to eliminate the effects of co-insurance.  Landlord will provide to Tenant a certificate evidencing such coverage.

    7.2.2.2     Liability Insurance.     From the date on which Landlord commences Landlord's Work until the end of the Term, Landlord will also maintain commercial general liability insurance on an occurrence basis against claims on account of bodily injury, death or property damage incurred upon any part of the Common Areas.  Such insurance policy will name Tenant as an additional insured, have combined single limits of not less than $5,000,000 per occurrence and include contractual liability coverage.  The insurance required hereby will be written by a company authorized to do business in the state of the location of the Premises.  Landlord will provide to Tenant a certificate evidencing such coverage.

    7.2.2.3     Proceeds from Property Insurance.     The proceeds of Landlord's property insurance in case of loss or damage will be applied on account of the obligation of Landlord to repair and restore the damaged or destroyed buildings and improvements in accordance with Section 10.1.

    7.2.3     Insurance Premiums. Tenant will reimburse Landlord, as Additional Rent, Tenant's Proportionate Share of Landlord's costs of the insurance premiums for the insurance required to be maintained by Landlord pursuant to Sections 7.2.2 ("Insurance Premiums"). Tenant's Proportionate Share of the Insurance Premiums will be an amount equal to the product of (i) all Insurance Premiums, multiplied by (ii) a fraction having as its numerator

7

the total floor area of the Premises and as its denominator the total floor area of all buildings covered by the insurance policies for which the Insurance Premiums apply. Landlord will maintain the insurance required by this Lease and pay the Insurance Premiums on or before such Insurance Premiums are due. All Insurance Premiums will be prorated for any partial years.

### 7.3.    TAXES

Tenant shall pay, prior to delinquency, all taxes coming due during or after the Term of this Lease against Tenant's interest in this Lease, as well as all taxes levied against personal property, fixtures and Tenant's improvements in the Premises. If such taxes for which Tenant is liable are levied against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of any such items and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is liable hereunder.

7.3.1    Tenant's Proportionate Share. Tenant agrees to pay as Additional Rent, Tenant's Proportionate Share of the Taxes assessed against the Center. The term "Taxes" for the purpose of the Lease shall include the following by way of illustration, but not limitation:   real estate taxes, general assessments (including interest payable with any installments); any other such taxes, charges and assessments which are payable with respect to the buildings and any improvements, and all other real property located in the Center, fees or assessments for any governmental services to the Center; and any gross receipts tax and/or any tax which shall be levied in addition to or in lieu of real estate, possessory interest or personal property taxes under this Lease; and any fees, expenses or costs incurred by Landlord in protesting or consulting with regard to protesting any assessments, levies or the tax rate. Tenant shall make monthly payments to Landlord in addition to any other payments required under this Lease, based upon the estimated cost of the Taxes, payable in advance, but subject to adjustment after receipt of the actual tax bills by Landlord. Landlord shall have no liability for interest on any such monthly estimated deposit (or any other deposit required by this Lease). Tenant's Proportionate Share of the Taxes payable hereunder for the first and last lease years of the Term shall be prorated on the basis of a 365-day year, with Tenant's obligation to commence as of the Commencement Date. Notwithstanding anything to the contrary contained herein, the term "Taxes" shall not include any special assessments assessed by any private or governmental body or agency.    Nothing herein contained shall require Tenant to pay corporation, franchise, income, estate, gift and inheritance taxes which may be levied or assessed against Landlord, fee owner, or their successor in title. Landlord will pay or cause to be paid to the appropriate governmental authorities, prior to delinquency, all taxes, assessments, levies or related charges due and payable to such authorities with respect to all portions of the Center owned by Landlord and shall apply the Proportionate Share of the Taxes paid by Tenant in accordance with this 7.3.1 to such payment.

SECTION EIGHT

### 8.1.    INDEMNIFICATION

8.1.1    Tenant's Indemnity.    Subject to Section 7.2.2, Tenant agrees to indemnify, defend and hold Landlord and Landlord's shareholders, officers, directors, partners, members, managers and employees harmless from and against any and all claims, actions, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) allegedly or actually (i) arising from or out of any accident or occurrence on the

8

*CHI 62168760v8*

Premises or any part thereof, or (ii) occasioned by any act or omission of Tenant or Tenant's employees, agents, contractors, subtenants, licensees or concessionaires, except to the extent that any of the same arise from or out of the negligence or willful misconduct of Landlord or Landlord's employees, agents or contractors and are not covered by the commercial general liability insurance maintained by Tenant pursuant to Section 7.2.1.

8.1.2    Landlord's Indemnity.  Subject to Section 7.2.1, Landlord agrees to indemnify, defend and hold Tenant and Tenant's shareholders, officers, directors, partners, members, managers, employees, subtenants, licensees and concessionaires harmless from and against any and all claims, actions, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) allegedly or actually (i) arising from or out of any accident or occurrence on the Common Areas or any part thereof, or (ii) occasioned by any act or omission of Landlord or Landlord's employees, agents or contractors, except to the extent that any of the same arise from or out of the negligence or willful misconduct of Tenant or Tenant's employees, agents, contractors, subtenants, licensees or concessionaires and are not covered by the commercial general liability insurance maintained by Landlord pursuant to Section 7.2.2.

SECTION NINE

9.1.    EMINENT DOMAIN

9.1.1    Taking of Premises.  If a part of the Premises shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain, then the Term of this Lease shall cease on the part so taken from the date possession of the part taken and the rent shall be paid up to that day. In the event that a portion of the Premises is taken, such that Tenant reasonably determines Tenant cannot operate at the remaining portion of the Premises, Tenant shall have the right either to cancel this Lease and declare the same null and void or to continue in possession of the remainder of the Premises under the terms of this Lease, except that the rent shall be reduced in proportion to the amount of the Premises taken.

9.1.2    Taking of Common Areas.  If any portion of the Common Areas or other area in the Center (other than the Premises) shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain, this Lease shall not terminate and Tenant shall not be entitled to any part of the award made for such taking except as permitted under Section 9.2 of this Agreement.  Notwithstanding the foregoing, in the event that the Common Area remaining following any such taking is less than ninety percent (90%) of the Common Area prior to such taking, Tenant shall receive an abatement of all Additional Rent due and payable under this Lease until such time as Landlord provides adequate replacement parking area and access to and from a public right-of-way in such locations as reasonably approved by Tenant.

9.2.    RIGHT TO AWARD. In the event of any taking pursuant to this Section 9, whether partial or total, Tenant will have the right to claim and recover from the condemning authority an award in an amount equal to the actual provable damage to Tenant.

SECTION TEN

10.1.    DAMAGE BY FIRE OR OTHER CASUALTY

9

10.1.1    Casualty.  Tenant shall immediately give written notice to Landlord of any damage caused to the Premises by fire or other casualty.  In the event that the Premises and/or the Center shall be damaged or destroyed by fire or other casualty, Landlord shall proceed with reasonable diligence and at its sole cost and expense to rebuild and repair the Premises, provided Landlord's sole obligation shall be to perform restoration of the exterior shell of the Premises (and all such other work that was part of the initial Landlord's Work) to the extent insurance proceeds are available to pay for such restoration.  Notwithstanding the foregoing, Landlord shall not be required to rebuild the Center (including the Premises) if, in accordance with the provisions of each of the leases encumbering the Center except this Lease, Landlord is not obligated to and determines it does not desire to rebuild the Center.  In the event that Landlord determines not to rebuild the Center (including the Premises) pursuant to this Section 10.1.1, Landlord shall thereafter provide written notice to Tenant confirming such decision within thirty (30) days of the date of such casualty, and Tenant may elect to rebuild the Premises, such election being at the sole discretion of Tenant. In the event Tenant elects to rebuild the Premises, Landlord shall promptly assign and deliver to Tenant all of its insurance proceeds and claims necessary to rebuild the Premises to Tenant and shall cooperate with Tenant to effectuate such assignment and receipt of proceeds from Landlord's insurer and Landlord's lender, if any.  In addition, Landlord shall take all necessary action to ensure that no third party has the right to interfere with the distribution of any insurance proceeds or the assignment of insurance claims to Tenant as required under this Section 10.1.1. Upon substantial completion of any such rebuilding by Tenant of the Premises, Tenant's obligation to pay Additional Rent hereunder shall be abated in full for the remainder of the Term of this Lease.  Nothing herein shall be deemed to limit the rights accruing to Landlord in the event of damage or destruction by casualty or impose any obligations or duties on Landlord in connection therewith, except as specifically set forth herein.  Tenant shall repair and restore Tenant's betterments, trade fixtures, equipment, inventory and other installations and personal property of Tenant in, on or about the Premises.

10.1.2    Abatement.  If pursuant to Section 10.1.1, the Premises are to be restored, Tenant shall, unless such damage is the result of the negligence or willful misconduct of Tenant, or its agents, employees, or invitees, be entitled to a proportionate abatement in the Additional Rent from the date of such damage, such reduction to be based on the extent to which the damage and the making of such repairs shall interfere with the use and occupancy by Tenant of the Premises.  Landlord shall not be required to repair any damage by fire or other cause, or to make any repairs or replacements of merchandise, fixtures, Tenant's improvements or other property which was situated within the Premises, other than as stated in Section 10.1.1. As soon as is reasonably possible after restoration of the Premises pursuant to the provisions of this Article 10 and, if applicable, redelivery of the Premises to Tenant, Tenant shall, at its own expense, restore and reinstall its betterments, trade fixtures, equipment, inventory and other installations and personal property necessary to reopen the Premises for business in a manner and to at least a condition equal to that prior to the damage or destruction thereof.

10.1.3    Removal of Personal Property.  In the event of damage to the Center or Premises by any peril covered by the provisions of this Article 10, Tenant shall upon notice from Landlord, remove forthwith, at its sole cost and expense, such portion of the property belonging to Tenant or its licensees (excluding all lifts and the equipment related thereto), from such portion of the Premises as Landlord shall reasonably request and Landlord shall not be responsible for securing the Premises prior to such removal.

10.1.4    Mutual Waiver of Subrogation.  Landlord and Tenant hereby mutually waive their respective rights of recovery against each other for any loss insured by fire,

10

extended coverage and other property insurance policies existing for the benefit of the respective parties. Each party shall apply to its insurer to obtain waivers of subrogation against the other party and shall secure any special endorsements if required by its insurer to comply with this provision.

## SECTION ELEVEN

### 11.1.  RIGHT TO MORTGAGE

As of this date there is no current mortgage on the Premises, however, Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any mortgage or mortgages subsequently placed upon Landlord's interest in the Premises. In furtherance of this, Tenant agrees to execute a subordination, attornment and non-disturbance agreement upon the request of Landlord in the form attached hereto as Exhibit E ("SNDA").

## SECTION TWELVE

### 12.1.  EVENTS OF DEFAULT

12.1.1    Tenant's Default. In the event Tenant shall fail or omit to make payment of the rent or any other item specified in this Lease that Tenant is required to make for ten (10) days or more after the same becomes due and owing, breaches any of the covenants provided in this Lease and fails to fully and promptly perform any act required of it in the performance of this Lease, or abandons the Premises, Tenant shall be in default. Unless a monetary default is cured within ten (10) days after written notice of such default is delivered to Tenant or unless a non-monetary default is cured within thirty (30) days or, while acting with all due diligence to satisfy and complete such non-monetary cure within an additional period of no more than ninety (90) days, Landlord, at its option, may immediately terminate this Lease and all of the rights of Tenant under this Lease, and then Landlord shall have the right to enter the Premises and remove all persons and property from the Premises, or Landlord may, without terminating this Lease, enter into the Premises as the agent of Tenant and re-let the Premises with or without any furniture, fixtures or property of Tenant, or make any repairs, changes, alterations or additions in or to the Premises that may be necessary or convenient, all for the account of Tenant. The re-letting for the Tenant shall be for whatever rent and upon whatever terms as shall be reasonably satisfactory to the Landlord, and Landlord shall credit the proceeds, after paying all the costs and expenses of the re-entry, repairs, changes, alterations and additions and the expenses of such re-letting, to the unpaid rent and other amounts falling due under this Lease during the remainder of the Term; and Tenant shall remain liable to Landlord for the balance. The foregoing rights reserved to Landlord are in addition to its rights to sue for past due rents and charges due under the Lease. Legal proceedings may be commenced by Landlord for collection of past due rents or charges due under this Lease ten (10) days after notice of the default is delivered to Tenant. Tenant agrees to pay, in addition to the past rents and charges, interest on the past due sums in the amount of eight percent (8%) per annum plus reasonable attorney's fees, interest and all court costs and expenses incurred by Landlord in the process of collection.

12.1.2    Landlord's Default.  In the event Landlord fails to perform on or before the required date for performance any obligation set forth in this Lease to be performed by Landlord, and such failure continues for 30 days after receipt by Landlord of notice from

11

Tenant (or such additional period, if any, as may be reasonably required to cure the failure if the failure reasonably cannot be cured within a 30-day period, provided Landlord commences to cure within thirty (30) days after receipt of notice and thereafter diligently pursues such cure to completion), Tenant may (a) terminate this Lease, (b) obtain such remedy or relief as may be available at law or in equity, or (c) perform such obligations on behalf of Landlord. Notwithstanding the foregoing, if the Premises are in need of emergency repair and Landlord fails to perform the same immediately upon notice from Tenant (which notice, notwithstanding the provisions hereof, may be given verbally to Landlord or Landlord's managing agent for the Center), Tenant may proceed to make such repairs as are reasonably necessary to protect persons or property. In the event Tenant performs any of such obligations of Landlord pursuant to the preceding sentence or clause (c) above, Landlord will, on demand, reimburse Tenant for Tenant's expenses incurred thereby. If Landlord fails to reimburse Tenant for such expenses within 30 days from Tenant's demand therefor, Tenant may deduct the amount of such expenses, plus interest thereon at an interest rate equal to eight percent (8%) from the date incurred until the date so offset, from the next accruing amounts of Minimum Rent or Additional Rent due under this Lease. No deduction from Minimum Rent, Additional Rent or reimbursement by Tenant in accordance with this Section 12.1.2 will constitute a default or breach by Tenant under this Lease.

## SECTION THIRTEEN

### 13.1.  COVENANT OF TITLE AND QUIET POSSESSION

Landlord covenants that it has the right to make this Lease for the Term specified above in this Lease, and that Tenant may have possession of the Premises and use of the Common Areas, subject to the terms and conditions of this Lease, free from all encumbrances, liens or defects in the title for the full Term of this Lease. Landlord further covenants that it does not know of any restrictive covenants, zoning or other ordinances or regulations which will prevent Tenant from conducting its usual business in the Premises.

## SECTION FOURTEEN

### 14.1.  HOLDING OVER

In the event Tenant remains in possession of the Premises after the expiration of this Lease, and without the execution of a new lease, it shall be deemed to be occupying the premises as a Tenant from month to month, and all conditions of this Lease will remain unchanged, except that the Minimum Rent will be increased to one hundred fifty percent (150%) of the then fair market rent.

## SECTION FIFTEEN

### 15.1.  PROPER NOTICES

Unless Landlord or Tenant has given written notice of different address, all notices or demands required or permitted under this Lease shall be deemed to be properly served if sent by (i) first class certified mail, return receipt requested, with postage prepaid, (ii) overnight express delivery or (iii) personal messenger to the address for Landlord and for Tenant, as set forth on the first page of this Lease above, together with a copy to their respective counsel:

12

As to Landlord's counsel at:        Pachter, Gregory & Raffaldini, P.C.
                                    790 Estate Drive, Suite 150
                                    Deerfield, Illinois  60015
                                    Attn:  Larry H. Pachter

As to Tenant's counsel at:          Greenberg Traurig, LLP
                                    77 West Wacker Drive
                                    Suite 3100
                                    Chicago, IL  60601
                                    Attn:  Jason M. Toon

If a party or its counsel has given written notice of a different address, then, in that event, such notice or demand shall be served at such address or to the last address so designated by either party or its counsel.

## SECTION SIXTEEN

16.1.  WAIVER

The failure of Landlord to insist upon strict performance of any of the covenants or conditions of this Lease or to exercise any option conferred in this Lease in any one or more instances shall not be construed as a waiver or relinquishment of any such covenants, conditions, or options, but the same shall be and remain in full force and effect. The subsequent acceptance of rent due under this Lease by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's knowledge of the preceding breach at the time of acceptance of the rent.  No covenant, term or conditions of this Lease shall be deemed to have been waived by Landlord, unless such a waiver is in writing by Landlord.

## SECTION SEVENTEEN

17.1.  ACCORD AND SATISFACTION

No payment by Tenant or receipt by Landlord of a lesser amount than the minimum monthly rent or any other charge or fee stipulated in this Lease shall be deemed to be other than on account of the earliest stipulated rent, fee or other charge, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed as creating an accord and satisfaction, and Landlord may accept such a check or payment without prejudice to Landlord's right to recover the balance of the rent, fee or charge or pursue any other remedy provided for in this Lease.

## SECTION EIGHTEEN

18.1.  ENTIRE AGREEMENT

This Lease and the attached exhibits, if any, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between Landlord and Tenant other than those set forth in this Lease.  Except as otherwise provided in this Lease, no subsequent alteration,

13

CHI 62168760v8

amendment, change or addition to this Lease shall bind Landlord or Tenant unless reduced to writing and signed by them.

## SECTION NINETEEN

19.1.  PARTIAL INVALIDITY

If any term, covenant or condition of this Lease, or the application of any such term, covenant or condition to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such a term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected and each term, covenant, or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

## SECTION TWENTY

20.1.  GOVERNING LAW

This Lease shall be interpreted under and governed by the laws of the State of Illinois.

## SECTION TWENTY-ONE

21.1.  SIGNAGE

Tenant will have the exclusive right to install on the outside walls of the Premises signs of such color, size, type, or design as may be deemed desirable by Tenant, provided that any such signs are in compliance with all applicable law and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.  Landlord hereby approves of Tenant's signage which is depicted on Schedule 21.1 which is attached hereto and made a part hereof ("Approved Signage"). Tenant will be responsible for the fabrication, installation and maintenance of its signs.  If Landlord erects or allows to be erected any pylon or monument signs identifying any other occupants of the Center, Tenant will have the right to mount a sign panel thereon of the same relative size as the largest sign panel permitted by any other tenant. During the Term, Tenant will not be required to remove its signs unless required to do so by applicable laws enacted subsequent to the date hereof.  Tenant may at any time remodel or replace the sign fascia to conform with Tenant's then standard signage.  Tenant will have the right to install temporary banner signs (such as "Future Home of [one of Tenant's tradenames]," "Opening [Date]," or "Now Open" signs), on the Premises, subject to Landlord's review and approval which shall not be unreasonably withheld, conditioned or delayed.  Tenant will have the right to affix window or door appliques and other treatments commonly used at Tenant's store locations, including, without limitation, those identifying Tenant's hours of operation or the credit cards accepted by Tenant.  Tenant will remove all signs and appliques at the termination of this Lease, and will repair any damage caused by such removal.

## SECTION TWENTY-TWO

22.1.  WAIVER OF JURY TRIAL.  The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises

14

and/or any claim or injury or damage.  In the event Landlord commences any proceedings for nonpayment of any rent, Tenant will not interpose any counterclaim of whatever nature or description in any such proceedings.  This shall not, however, be construed as a waiver of the Tenant's right to assert such claims in any separate action or actions brought by the Tenant.

SECTION TWENTY-THREE
MISCELLANEOUS

23.1.  RELATIONSHIP OF PARTIES.  The amount of money provided to be paid Landlord will in no event be deemed to make Landlord a partner or an associate of Tenant in the conduct of Tenant's business, nor will either party be liable for any debts incurred by the other party in the conduct of the other party's business.  The relationship between the parties is for the entire Term that of landlord and tenant.

23.2.  HEIRS, SUCCESSORS AND ASSIGNS.  This Lease and the covenants and agreements herein contained will be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

23.3.  RULES OF CONSTRUCTION.  This Lease will be construed with equal weight for the rights of both parties, the terms hereof having been determined by fair negotiation with due consideration for the rights and requirements of both parties.

23.4.  MATERIALITY OF COVENANTS.  Every covenant contained in this Lease will be construed to be material, whether or not the covenant expressly so provides.

23.5.  SEVERABILITY.  If any term or provision of this Lease is found to be invalid, illegal or unenforceable, the remaining terms and provisions hereof will not be affected thereby; and each term and provision hereof will be valid and enforceable to the fullest extent permitted by any applicable laws.

23.6.  ENTIRE AGREEMENT; AMENDMENT.  This Lease contains the entire agreement between Landlord and Tenant with respect to the subject matter of this Lease and may be amended or modified only by subsequent written agreement duly signed by both parties hereto.    Except for those warranties, representations, contingencies, conditions and/or agreements set forth in this Lease, no warranties, representations, contingencies, conditions, and/or agreements have been made by Landlord or Tenant, one to the other or between them, with respect to the subject matter of this Lease.  Landlord and Tenant acknowledge that the provisions of this Lease have been negotiated and agreed to between Landlord and Tenant and that this Lease reflects the agreement and understanding of each party.  No action, verbal statement or written statement by any employee, agent or representative of either party to this Lease (other than an amendment signed by both parties) will be construed to amend or modify this Lease nor to diminish or discharge any of the rights and obligations of either party hereunder.

23.7.  GENDER, NUMBER.  Pronouns in this Lease importing any specific gender will be interpreted to refer to corporations, partnerships, men and women, as the identity of the parties referred to may require.  Pronouns, verbs and/or other words in this Lease importing the singular number will be interpreted as plural words, as the identity of the parties or objects referred to may require.

15

23.8.   HEADINGS.  The captions, section numbers and paragraph numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, amplify, limit, construe or describe the scope or interest of any section of this Lease.

23.9.   SECTION NUMBERS.  All references to section numbers contained in this Lease are to the sections of this Lease, unless expressly provided to the contrary.

23.10.  CONFIDENTIALITY OF LEASE TERMS.  Landlord will treat the monetary and operating terms and conditions of this Lease as confidential and will not divulge same to any person other than any existing or prospective mortgagee of the Shopping Center or any prospective purchaser of Landlord's interest in this Lease or as required by Laws.  Landlord will not furnish copies of all or any part of this Lease to a person other than to a party described in the preceding sentence.

23.11.  BROKERS.  Landlord and Tenant each warrant to the other that it has not dealt with any broker or agent in connection with this Lease.  Landlord and Tenant each agree to indemnify the other against all costs, expenses, legal fees and other liability for commissions or other compensation claimed by any other broker or agent by reason of the act or agreement of the indemnifying party.  The provisions of this Section 23.11 shall survive the expiration or earlier termination of this Lease.

23.12.  MEMORANDUM OF LEASE.  Promptly upon written request from Tenant, Landlord and Tenant will execute a Memorandum of Lease in the form agreed to by Landlord and Tenant for recording purposes.  Upon such execution, Landlord shall deliver such Memorandum of Lease to be recorded at the Cook County Recorder's Office at its sole cost and expense.

23.13.  COMMENCEMENT AGREEMENT.  Landlord and Tenant agree to sign on or before the 60th day following the Commencement Date, a Commencement Date Agreement in the form agreed to by Landlord and Tenant setting forth the Commencement Date of the Term, the Tenant's Proportionate Share, and the floor area of the Premises.  Such Commencement Date Agreement will thereafter be conclusive of such information.

23.14.  LAWS. All alterations, additions, repairs, or other work completed to the Premises or the Center by Landlord pursuant to the terms of this Lease must be made in accordance with all common law, statutes, ordinances, rules, rulings, regulations, orders and interpretations of any governmental authority having jurisdiction.

(CONTINUED ON PAGE SEVENTEEN FOR SIGNATURES)

16

*CHI 62168760v8*

IN WITNESS WHEREOF, the Landlord and the Tenant have executed this Lease, signed by their respective officers, as of the date and year first written above.

LANDLORD:

RAVENSWOOD STATION, LLC, an Illinois limited liability company

By: CHITOWN-EB/EP JV, LLC, a Delaware limited liability company, its manager

By:_____
Name: Tim Barrett
Its: Manager

TENANT:

SEARS, ROEBUCK AND CO., a New York corporation

By:_____
Name:_____
Its:_____

17

CHI 62168760v8

IN WITNESS WHEREOF, the Landlord and the Tenant have executed this Lease, signed by their respective officers, as of the date and year first written above.

LANDLORD:

RAVENSWOOD STATION, LLC, an Illinois limited liability company

By: CHITOWN-EB/EP JV, LLC, a Delaware
    limited liability company, its manager

By:_____
   Name:  Tim Barrett
   Its:  Manager

TENANT:

SEARS, ROEBUCK AND CO., a New York corporation

By:_____
Name:_____James B. Terrell_____
Its:_____Vice President Real Estate____

17

CHI 62168760v8

## EXHIBIT A

### PREMISES AND CENTER

LOT 7 IN PLOTKE AND GROSBY'S SUBDIVISION OF THE WEST 250 FEET OF THE SOUTH 1/2 OF BLOCK 1 IN NORTH RAVENSWOOD BEING A SUBDIVISION OF THE SOUTHWEST 1/4 OF THE SOUTHEAST 1/4 (EXCEPT THE CHICAGO NORTH WESTERN RAILROAD RIGHT OF WAY),

AND ALSO

THE SOUTH 1/2 OF OF BLOCK 1, (EXCEPT THE WEST 250 FEET) IN NORTH RAVENSWOOD, IN NORTH RAVENSWOOD, A SUBDIVISION OF THE SOUTHWEST 1/4 OF THE SOUTHEAST 1/4, LYING WEST OF THE CHICAGO AND NORTHWESTERN RAILWAY IN SECTION 7, TOWNSHIP 40 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Exhibit A-1

*CHI 62168760v8*

EXHIBIT B

CONSTRUCTION

1.      Definitions.  For purposes of this Lease: (a) "**Landlord's Work**" means all work to be performed by Landlord pursuant to Article 4 of this Exhibit B; (b) "**Tenant's Work**" means all work to be performed by Tenant pursuant to Article 5 of this Exhibit B; and (c) "**Projected Delivery Date**" means September 15, 2013.

2.      Permits.  If any building or other permits or licenses are required for the completion of Landlord's Work,  Landlord will use commercially reasonable efforts to procure the same, at Landlord's sole cost and expense. Tenant will use commercially reasonable efforts to procure, at Tenant's sole cost and expense, all building and other permits or licenses required for the construction and occupancy of Tenant's Work and all permits or licenses required for the installation of all signs to be installed by Tenant pursuant to Section 21.1 of the Lease (collectively, the "**Permits**"). Landlord agrees to fully cooperate and assist Tenant in obtaining all required Permits, and in obtaining an unconditional certificate of occupancy for the Premises. If Tenant is unable to obtain all Permits required for the performance of Tenant's Work or the installation of such signs by the Delivery Date, then Tenant may terminate this Lease by notice given to Landlord at any time prior to the date on which Tenant obtains all of such Permits (and in the event of such termination, Tenant will be released from all liability under the Lease).

3.      Plan Preparation and Approval.

3.1     Landlord's Work Plans.  If any portion of Landlord's Work requires plans and specifications, Landlord will use commercially reasonable efforts, at its sole cost and expense, to cause licensed architects and engineers selected by Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant), two sets of Landlord's working plans and specifications ("**Preliminary Plans**").  The Preliminary Plans for Landlord's Work will be reviewed by Tenant or its representatives for approval prior to commencement of construction. After receipt of the Preliminary Plans for Landlord's Work, Tenant, within 10 business days of proper submission of same, will inform Landlord of any required revisions or corrections thereto and, within 10 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Tenant's final approval.  All subsequent submissions and revisions/approvals will be made within 10 business days.  If within 10 business days after delivery, Tenant fails to respond to any Preliminary Plans for Landlord's Work or any revisions thereto, and if such failure to respond continues for more than 5 business days after Landlord delivers notice of such failure to Tenant, then Tenant will be deemed to have approved the Preliminary Plans as delivered.  If within 10 business days after delivery, Landlord fails to respond to any written request delivered by Tenant to Landlord for revisions to any Preliminary Plans for Landlord's Work previously submitted by Landlord to Tenant, and if such failure to respond continues for more than 5 business days after Tenant delivers notice of such failure to Landlord, then Landlord will be deemed to have approved the revisions to the Preliminary Plans as requested by Tenant.  Upon approval (or deemed approval), the Preliminary Plans for Landlord's Work will become the final construction documents ("**Final Plans**") for Landlord's Work.  No alterations will be made to the Final Plans for Landlord's Work without the prior written consent of Tenant.

Exhibit B-1

3.2    Tenant's Work Plans.    Tenant, at Tenant's cost and expense, will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for Tenant's Work.    The Preliminary Plans for Tenant's Work will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that the Tenant's Work called for by the Preliminary Plans comply with the requirements of Article 5 below and local Laws and are compatible with Landlord's Work.    After receipt of the Preliminary Plans for Tenant's Work, Landlord, within 15 days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 10 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval.    All subsequent submissions and revisions/approvals will be made within 10 business days.    Upon approval, the Preliminary Plans for Tenant's Work will become the Final Plans for Tenant's Work.    No alterations that would affect the compliance of Tenant's Work with the requirements of applicable Laws, or the compatibility of Tenant's Work with Landlord's Work will be made to the Final Plans for Tenant's Work without the prior written consent of Landlord.

4.    Construction of Landlord's Work.    Landlord agrees, at its sole cost and expense, to perform all of the work set forth in the Final Plans (if any) and to deliver the Premises to Tenant in the following condition:

a.    The Premises will be structurally sound.

b.    The Premises will be free from asbestos-containing materials and other Hazardous Materials.

c.    The roof will be water tight, good working order and Landlord will warranty the roof for the Initial Term of the Lease.

d.    The Premises will be delivered in broom clean condition with all of the previous tenant's improvements demolished and removed and all of the tenant's fixtures removed.

e.    The Landlord will separate all the utilities and warrant that the utilities serving the Premises are in good working order and the sizes are sufficient for Tenant's use.

f.    The floor of the Premises will be in a smooth, ready to accept Tenant's flooring.

g.    The Landlord will construct the demising walls.

h.    The Premises shall be completed as more particularly depicted on Exhibit B-1 which is attached hereto and made a part hereof.

All of the work referred to in this Article 4 is collectively referred to as the "**Landlord's Work**").    Landlord's Work will be performed in accordance with the terms of the Lease and in compliance with applicable Laws.

Exhibit B-2

*CHI 62168760v6*

5.      Construction of Tenant's Work.  Tenant will, at its sole cost (subject to payment of the Allowance), perform all work (other than Landlord's Work) necessary to prepare the Premises for Tenant's occupancy ("**Tenant's Work**"). All of Tenant's Work will be installed in accordance with the terms of the Lease and in compliance with applicable Laws.

6.      Allowance.  Landlord agrees to pay Tenant an allowance, to be applied to the cost of designing and performing Tenant's Work and the other costs described below, equal to $341,257.00 ("**Allowance**").  Landlord will pay the amount of the Allowance to Tenant in progress payments after the Delivery Date.  Such progress payments will be made not later than 45 days after receipt by Landlord from Tenant of copies of Tenant's invoices from its architect, engineer or contractor, lien waivers from Tenant's general contractor, together with a certificate from Tenant indicating that the work to which such invoices relate has been substantially completed and/or the materials to which such invoices relate have been installed in, or delivered to, the Premises. All of such invoices, lien waivers, affidavits and certificates shall be reasonably acceptable to Landlord's title insurance company. Such progress payments will be made payable to Tenant and will be for the amount of the submitted invoices, less a ten percent (10%) retainage. The total of all such progress payments will in no event exceed the amount of the Allowance.  If the amount of the Allowance exceeds the total cost incurred by Tenant in designing and performing Tenant's Work, Tenant may use the balance of the Allowance, at Tenant's option (i) to pay for costs incurred by Tenant for obtaining and installing Tenant's fixtures, furnishings and equipment in the Premises; or (ii) as a credit against the first accruing amounts of Additional Rent due under this Lease. Landlord's failure to make any payments of the Allowance to Tenant when due in accordance with the foregoing provisions, if such failure continues for more than 10 days after notice thereof is given by Tenant to Landlord, will entitle Tenant, in addition to any other rights or remedies available to Tenant under the Lease. If the projected cost of Tenant's Work exceeds the amount of the Allowance, Tenant shall make arrangements with Landlord's title insurance company reasonably satisfactory to Landlord to deposit the excess costs or otherwise provide security for the payment thereof.

7.      Construction Timing and Completion.

7.1      Inspection and Cooperation.  During the progress of construction of Landlord's Work, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of observing the construction.  Such entry by Tenant prior to the Delivery Date will (a) be under all of the terms and conditions of this Lease, except no Rent will be payable, and (b) not be construed as an acceptance of Landlord's Work by Tenant. Landlord and Tenant will reasonably cooperate (and will cause their respective contractors to reasonably cooperate) in the scheduling, conduct and coordination of their respective work.

7.2      Concealed Conditions.  Should Tenant or its agents or contractors encounter concealed or unknown conditions during the performance of Tenant's Work either (a) below the surface of the ground (including, without limitation, variable fill, asphalt, organic material, abandoned utility lines, garbage or debris or abandoned underground storage tanks and piping related thereto), or (b) in the building shell of the Premises, Landlord will remove or correct (and to the extent applicable, dispose of in accordance with Environmental Laws) such concealed or unknown conditions, at its sole cost and expense, and in accordance with Laws.  Landlord will perform such removal or correction within 10

Exhibit B-3

days of receipt of notice from Tenant of the existence of such conditions and Landlord will further, within such period, restore the affected area(s) of the Premises to the condition which such area(s) should have been in, so as to render the area(s) useable for Tenant's Work.   If concealed or unknown conditions are encountered and must be removed or corrected, the Delivery Date will be deemed extended by one day for each day of delay caused by the removal or correction of such conditions.   [Standard non-hazardous "Chicago Fill" existing on the site may remain if acceptable to the engineer of record.]

7.3    Outside Dates.    Landlord will diligently pursue and complete Landlord's Work in order to achieve the Projected Delivery Date. If the Delivery Date does not occur by the Projected Delivery Date, then Tenant will be entitled to a credit against the first accruing amounts of Rent due under this Lease in an amount equal to one day's Base Rent (calculated based on a 30-day month) for each day from the Projected Delivery Date until the Delivery Date. Both parties acknowledge that if the Delivery Date does not occur by Projected Delivery Date, Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by Tenant, including, but not limited to, lost sales, lost profits, and additional costs incurred for storage, rescheduling, payroll, inventory, advertising and carrying costs.

7.5    Mutual Indemnities.    Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in performance of Landlord's Work.   Subject to Landlord's payment to Tenant of the Allowance, Tenant will indemnify and hold Landlord harmless from all claims, demands, losses, damages, and expenses arising out of Tenant's operations and the operations of Tenant's contractor or contractors and any subcontractors, laborers or materialmen in performance of Tenant's Work.

CHI 62168760v8

EXHIBIT B-1



Exhibit B-1

EXHIBIT C

EXCLUSIVE USES

A.    Tenant shall have the exclusive right in the Shopping Center to operate a retail grocery supermarket which may include a liquor department ("**Tenant's Exclusive Use**"). Anything contained in this Lease to the contrary notwithstanding, Landlord shall not lease any space in the Shopping Center for use, or permit any occupant to use any space in the Shopping Center, as a retail grocery supermarket, packaged liquor store, or for the sale of any food products including, but not limited to, groceries, meats, produce, frozen foods, dairy products, fruit, liquor, beer, wine, soda, bakery goods, delicatessen items, tobacco products. Notwithstanding the foregoing, however, Landlord shall have the right to lease space in the Shopping Center to (i) a full line drug store (i.e. CVS, Walgreens, etc.) including package liquor sales, (ii) a tenant who may use an "incidental" portion of its Leased Premises for the sale of food products, (ii) to restaurants (whether sit down, carry out or otherwise) and other tenants who sell food and/or alcoholic beverages to be consumed primarily within their Leased Premises, and (iii) to other tenants who may use an "incidental" portion of its Leased Premises for the sale of ice cream, candy, nuts, popcorn, pretzels, so-called health and natural foods, donuts, cookies and sandwiches. Landlord shall insert a provision in each lease of space in the Shopping Center notifying each tenant of the foregoing restrictions. For purposes of the foregoing restriction, the term "incidental" shall mean the lesser of (i) ten percent (10%) of the total number of rentable square feet within a tenant's Leased Premises or (ii) 1,000 square feet.

Notwithstanding anything to the contrary contained herein, in the event that Tenant goes dark (such that at least 20,000 square feet of the Leased Premises cease to be operated as a grocery supermarket) for a period of 180 days (which is not the result of damage, destruction or remodeling), the exclusive rights granted to Tenant in this Section 30A shall immediately terminate, and such termination shall not be deemed to be a default by Landlord nor will it relieve Tenant from the performance of any of its obligations under this Lease. If at any time during the Term Tenant ceases the sale of liquor, beer, or wine at the Leased Premises ("Former Exclusive Product"), the exclusive rights granted to Tenant in this Section 30A will terminate as to the Former Exclusive Products which are no longer being sold by Tenant. Notwithstanding the foregoing, if Landlord intends to permit another tenant to sell any Former Exclusive Product, Landlord will so notify Tenant in writing. If Tenant notifies Landlord in writing within seven (7) business days following Landlord's notice that Tenant intends to commence the sale of the Former Exclusive Product within thirty (30) days following the date of Landlord's notice, and commences the sale of the Former Exclusive Product within such thirty (30) day period (if an application is pending for the sale/use of alcohol, then such 30 day period shall be extended to allow the application process to conclude), Tenant will again have the exclusive right to sell the Former Exclusive Product until such time as Tenant ceases the sale of the Former Exclusive Product, and Landlord will not permit the other tenant to sell the Former Exclusive Product at its leased premises. If Tenant does not respond to Landlord's notice within seven (7) business days following Landlord's notice, or if Tenant responds that it does not intend to sell the Former

Exhibit C-1

CHI 62168760v8

Exclusive Product, or if Tenant does not begin to sell the Former Exclusive Product within the thirty (30) day period following the date of Landlord's notice, or if Tenant begins to sell the Former Exclusive Product and subsequently ceases the sale of the Former Exclusive Product, Landlord will have the right to permit the other tenant, on an exclusive basis, to sell the Former Exclusive Products at its leased premises, and Tenant's right to sell such Former Exclusive Product will terminate and not be subject to reinstatement.

       B.     Landlord may grant other present or future tenants leasing space in the Shopping Center an exclusive right to conduct any particular type of business or to sell any particular products to the exclusion of any other tenants in the Shopping Center (each, an "Exclusive Use"), subject to the following conditions:

       (1)    No Exclusive Use shall apply to any portion of the Leased Premises being operated as a grocery supermarket (so long as at least 20,000 square feet of the Leased Premises are being used as a grocery supermarket).

       (2)    In the event that any portion of the Leased Premises is used, sublet, or assigned for another use permitted by this Lease ("Non-Grocery Use"), no Exclusive Use granted to a tenant by Landlord shall prohibit the Non-Grocery Use so long as the user, subtenant or assignee occupies at least 15,000 square feet of the Leased Premises. However, in the event that Landlord grants an Exclusive Use to a tenant occupying 10,000 square feet or more in the Shopping Center, such Exclusive Use may prohibit the Non-Grocery Use in any portion of the Leased Premises not being operated as a grocery supermarket.

       Notwithstanding anything to the contrary in this Lease, so long as Tenant is operating as a health club and fitness facility in the Premises, Landlord will not allow any other fitness related operation (including, without limitation, health club, aerobics, yoga, Pilates, dance studio offering fitness-oriented classes such as Zumba, spinning/cycling, circuit training, personal training, basketball, boxing, cardiovascular or jazzercise operations) to operate in the Project. Tenant shall not be deemed to have ceased operating its business if it closes or ceases operations on account of remodeling, repairs or condemnation or in connection with an assignment or sublease of the Premises. The foregoing shall not, however, preclude Landlord from permitting another Project tenant to engage in the retail sale of fitness equipment for off-premises use or the operation of any of the Ancillary Uses. If any governmental license(s) or permit(s) shall be required for the proper and lawful conduct of Tenant's business or other activity carried on in the Premises, or if a failure to procure such a license or permit might or would in any way adversely affect Landlord or the Premises, then Tenant, at Tenant's expense, shall duly procure and thereafter maintain such license(s) or permit(s) and submit the same for inspection by Landlord upon request. Tenant, at Tenant's expense, shall at all times materially comply with the requirements of such license(s) or permit(s).

Exhibit C-2

*CHI 62168760v8*

EXHIBIT D

PROHIBITED USES

21.    PROHIBITED USES. Landlord agrees that during the Term of this Lease Landlord shall not permit any portion of the Shopping Center to be used for any of the following purposes: a nuisance; use causing loud noises or offensive odors; any facility storing or selling gasoline or diesel fuel in or from tanks; used clothing or thrift store or liquidation outlet; massage parlor (unless in connection with a spa or health club); adult book shop or adult movie house; mortuary or funeral parlor; coin operated laundry; night club; cinema or theater; skating rink; carnival; game arcade; church; medical office, hospital, sports bar, offices, schools, or any other use inconsistent with the operation of a high quality retail shopping center ("Prohibited Uses"). Tenant agrees that it will not use the Leased Premises for any of the Prohibited Uses.

Tenant acknowledges that Landlord may rent space in the Shopping Center to an on-site dry-cleaner using environmentally approved technology; a health club or spa; an upscale bowling alley; a restaurant or a drug store selling alcoholic beverages or packaged liquor; or subject to Section 30A below, a store selling liquor, beer and wine if at any time Tenant ceases selling liquor, beer or wine, respectively, at the Leased Premises.

8.4    PROJECT USES. Landlord covenants and agrees that the Project shall be constructed, leased, operated, maintained and managed as a first-rate retail center and that no premises (and no portion of any premises) in the Project shall be used or occupied for any of the following: any unlawful use; funeral establishment; used car lot; auction or bankruptcy sale (except those which are lawful and bona fide); pawn shop; thrift store; shooting gallery; refinery; adult bookstore or facility selling, renting or displaying pornographic or adult books, magazines, literature, films, pictures, videotapes, video discs or other adult paraphernalia or merchandise of any kind (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), provided that sale, rental or display of such items as an incidental part of a permitted business (as used above, the term "incidental" means, with respect to any national or regional video store chain, any sale or rental of such materials, and with respect to other tenants, the sale of such materials from not more than ten percent (10%) of the sales area of such

Exhibit D-1

business and so as to constitute less than ten percent (10%) of the gross sales of such business) shall be permitted; massage parlor; tattoo parlor/shop; unemployment agency; government office/government uses open to the public; food stamp center; check cashing/pay day loan business; school; call center/phone bank; office; medical office/clinic; hospital; park and ride; sports bar; amusement park; dance hall; cocktail lounge or bar (except as an incident to a permitted restaurant), disco or night club; bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business; second-hand store (provided, however, the foregoing restriction shall not prohibit antique shops or stores selling high quality used merchandise such as *Play it Again Sports* and *Game Stop*); auction house or flea market; any restaurant (excluding within Mariano's); or any other use that could materially and adversely affect parking for the Premises and/or the Project. Tenant shall not use the Premises or allow the Premises to be used for any of the foregoing prohibited uses. To the extent any portion of the Project is within the control of a third-party (through lease, ground lease or fee-conveyed parcel), Landlord will use its best efforts to cause such third-party to maintain the foregoing quality of the Project.

Exhibit D-2

CHI 62168760v8

EXHIBIT E

FORM OF SNDA

Prepared by and after recording
return to:

Sears, Roebuck and Co.
3333 Beverly Road, Dept. 824 RE
Hoffman Estates, IL 60179
Attn: Vice President of Real Estate          [This space reserved for recording purposes]

## SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT

THIS SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT (this "**Agreement**") is made and entered into as of the _____ day of _____, 201__, by and between _____ ("**Lender**"), **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Tenant**"), and _____, a _____ **[entity]** ("**Landlord**").

## RECITALS

Landlord is the owner of certain real property, legally described on Exhibit "A", attached hereto and made a part hereof (the "**Landlord Parcel**"), which is located in the _____ (the "**Shopping Center**") in the City of _____, County of _____ and State of _____.

By the **[Lease]** dated _____, _____, between **[Landlord OR (_____ as predecessor-in-interest to Landlord)]** and Tenant, as amended by _____ (collectively, the "**Lease**"), the Tenant has leased from Landlord a portion of the Landlord Parcel and the improvements thereon (the "**Premises**"), together with various easements and rights over the Landlord Parcel and the Shopping Center.

Lender is the holder of a mortgage or beneficiary under a deed of trust on the Landlord Parcel, given to the Lender by Landlord dated as of _____, _____, recorded on _____, _____, in the Office of the Recorder of Deeds [Registrar of Titles] of _____ County, _____, in Book _____ at Page _____, as Document No. _____ (collectively referred to herein with any other documents evidencing or securing the debt secured by the mortgage as the "**Mortgage**").

The loan terms require Landlord to cause Tenant to subordinate the Lease and its interest in the Premises to the lien of the Mortgage and that Tenant attorn to Lender.

In return for Tenant's agreement to subordinate and attorn on the terms and conditions set forth herein, Tenant requires recognition of and consent to the Lease terms by Lender and to be assured of continued occupancy of the Premises under the terms of the Lease in the event either Lender or a Successor to Lender (as defined herein) succeeds to the rights of Landlord under the Lease pursuant to the terms of the Mortgage.

*CHI 62168760v8*

**NOW, THEREFORE**, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

The Recitals paragraphs set forth above are hereby incorporated into this Agreement.

Lender hereby consents to the Lease.

The Lease is and shall be subject and subordinate to the lien of the Mortgage and to all renewals, replacements and extensions of the Mortgage to the full extent of the principal sum secured thereby and interest thereon.  Notwithstanding anything herein to the contrary, any purchase option, right of first refusal, right of first offer or other right of purchase Tenant has or may have under the terms of the Lease, and Tenant's rights under the provisions of the Lease regarding insurance proceeds, casualty and eminent domain are not subordinated to the Mortgage and Lender recognizes and accepts those rights.

In the event that Lender shall commence an action to foreclose the Mortgage or to obtain a receiver of the Premises, or shall foreclose the Mortgage by advertisement, entry and sale according to any procedure available under the laws of the state where the Landlord Parcel is located, Tenant shall not be joined as a party defendant in any such action or proceeding and Tenant shall not be disturbed in its possession of the Premises, provided Tenant is not in default under the Lease beyond any applicable cure period.

In the event that Lender or any bona-fide purchaser (at a foreclosure sale or other proceedings brought to enforce the Mortgage), subsequent owner (receiving title by deed in lieu of foreclosure), successor, or assign (including, without limitation, a successor or assign from Lender in its capacity as the holder of the indebtedness secured by the Mortgage, such purchaser, subsequent owner, successor or assign referred to as "Successor") shall acquire the Premises upon foreclosure, or by deed in lieu of foreclosure, or by any other means:

Lender or its Successor shall recognize and accept the rights of Tenant and shall thereafter assume the obligations of Landlord under the Lease; and

Tenant shall be deemed to have made a full and complete attornment to Lender or its Successor as the landlord under the Lease so as to establish direct privity between the Lender or its Successor and Tenant; and

All rights and obligations of Tenant under the Lease shall continue in full force and effect and be enforceable by and against Tenant respectively with the same force and effect as if the Lease had originally been made and entered into directly by and between Lender or its Successor (as the case may be) as the landlord thereunder, and Tenant and, in the event the Lease shall automatically terminate pursuant to applicable law, Lender or its Successor (as the case may be) and Tenant shall, upon the request of Tenant, immediately enter into a new lease on the exact same terms and conditions of the Lease.

Nothing herein contained shall impose any obligations upon either Lender or its Successor to perform any of the obligations of Landlord under the Lease, unless and until Lender or its Successor shall become either the owner or mortgagee in possession of the Premises or shall otherwise become entitled to the use and benefit of the rents and profits therefrom.

*CHI 62168760v8*

Any notice required or desired to be given under this Agreement shall be in writing and (a) given by certified or registered mail, return receipt requested, postage prepaid, or (b) sent by reputable overnight air courier service (i.e., Federal Express, Airborne, etc.) with guaranteed overnight delivery; in each instance addressed to the party as provided below. Notices shall be deemed given when actually received by the recipient, receipt thereof is refused by the recipient, or the impossibility of delivery due to the failure to provide a new address as required herein. All notices hereunder shall be addressed as follows:

| If to Lender: | _____ |
| | _____ |
| | _____ |
| If to Tenant: | Sears, Roebuck and Co. |
| | 3333 Beverly Road |
| | Hoffman Estates, Illinois 60179 |
| | Attn:    Vice President - Real Estate |
| | Department 824RE |

Either party, at any time and from time to time (by providing notice to the other party in the manner set forth above), may designate a different address or person, or both, to whom such notice may be sent. Notice of change in address or person shall be effective 10 days after written notice of such change has been sent to Tenant in accordance with the terms of this Paragraph.

This Agreement shall be binding upon and inure to the benefit of Lender, its Successor, Landlord and Tenant and their respective legal representatives, successors, administrators and assigns.

Landlord or Lender or its Successor shall give written notice to Tenant of the reconveyance or other release of the Mortgage within thirty (30) days of the date the reconveyance or other release is recorded.

This Agreement and the lien of the Mortgage shall not apply to any personalty, real property, fixtures or equipment owned or leased by Tenant which is now or hereafter placed on or installed in the Premises, and Tenant shall have the full right to remove said personalty, real property, fixtures and equipment at the expiration of the Lease term.

This Agreement constitutes the entire agreement of the parties hereto concerning its subject matter and may not be modified except in writing signed by the parties hereto.

The provisions of this Agreement are valid and enforceable only upon execution by Landlord and Lender of an unmodified counterpart hereof and delivering a fully signed original to Tenant by _____, _____[insert date 30 days following delivery].

{Remainder of Page Intentionally Left Blank; Signature Pages Immediately Follow}

*CHI 62168760v8*

IN WITNESS WHEREOF, this Subordination, Attornment and Non-Disturbance Agreement has been signed and sealed on the day and year first above set forth.

Lender:

_____

By:_____
Name:_____
Title:_____

Tenant:

SEARS, ROEBUCK AND CO.,
a New York Corporation

By:_____
Name:_____
Title:_____

Landlord:

_____

By:_____
Name:_____
Title:_____

LENDER NOTARY:


STATE OF _____ )
                          ) SS:
COUNTY OF _____ )


      **THE** undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that _____ personally known to me to be the _____ of _____, a _____, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that in such capacity he/she signed and delivered the said instrument pursuant to authority duly given to him/her by said _____.

      **GIVEN** under my hand and seal this _____ day of _____, 201____.


_____
Notary Public


My Commission Expires: _____

*CHI 62168760v8*

TENANT NOTARY:

STATE OF ILLINOIS  )
                   ) SS:
COUNTY OF COOK  )

      **THE** undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that _____, personally known to me to be the _____ of **SEARS, ROEBUCK AND CO.**, a New York corporation, appeared before me this day in person and acknowledged under oath that in such capacity he/she signed and delivered the said instrument pursuant to authority duly given to him/her by said corporation.

      **GIVEN** under my hand and seal this _____ day of _____, 201____.


_____
Notary Public

My Commission Expires: _____

*CHI 62168760v8*

LANDLORD NOTARY:

STATE OF _____ )
                          ) SS:
COUNTY OF _____ )

        **THE** undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that _____ known to me to be the _____ of _____, a _____, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that in such capacity he/she signed and delivered the said instrument pursuant to authority duly given to him/her by said _____.

        **GIVEN** under my hand and seal this _____ day of _____, 201___.


_____
Notary Public

My Commission Expires:

EXHIBIT "A"

LEGAL DESCRIPTION – LANDLORD PARCEL

CHI 62168760v8

SCHEDULE 21.1

APPROVED SIGNAGE

See attached.



Ravenswood Station – Sign Package

Barrett & Marc, Real Estate | The Taxmont Corporation | Sierra LLC | Sears Roebuck & Co. | Antunovich Associates - Architects | Daley and Georgia, Ltd.

Chicago, IL | May 31, 2012





Ravenswood Station – Sign Package



Ravenswood Station – Sign Package

Bennett & Hincks · Real Estate  |  The Habman Corporation  |  Sterna US  |  Sears Roebuck & Co.  |  Antunovich Associates · Architects  |  Daley and George, Ltd.

Chicago, IL  |  May 31, 2012



Ravenswood Station – Sign Package

Barnett & Wurtz, Real Estate | The Taxman Corporation | Sierra US | Sears Roebuck & Co. | Antunovich Associates - Architects | Oxley and George, Ltd.

Chicago, IL | May 31, 2012

## **EXHIBIT B**

Date: 12/03/2013 12:28 PM Pg: 1 of 6
Cook County Recorder of Deeds
*RHSP:$9.00 RPRF:$1.00 FEES Applied

PREPARED BY AND
WHEN RECORDED, MAIL TO:

Jason M. Toon, Esq.
Greenberg Traurig, LLP
77 W. Wacker Drive, Suite 3100
Chicago, Illinois 60601

ncs- 643544
1 of 1   Jm Img

Above Space for Recorder's Use

## MEMORANDUM OF LEASE

This **MEMORANDUM OF LEASE** (this "Memorandum") is made and entered into as of this *1st* day of *November,* 2013, by and between RAVENSWOOD STATION, LLC, a Illinois limited liability company, of c/o Chitown-EB/EP JV LLC, 5215 Old Orchard Road, Suite 130, Skokie, Illinois 60077 ("Landlord"), and SEARS, ROEBUCK AND CO., a New York corporation, of 3333 Beverly Road, Dept. 824 RE, Hoffman Estates, Illinois 60179 (Attn: Vice President of Real Estate) ("Tenant").

WHEREAS, this Memorandum is executed in connection with that certain Lease Agreement dated as of November 19, 2012, by and between Landlord and Tenant (the "Lease"); and

WHEREAS, Landlord leases to Tenant, and Tenant leases from Landlord certain premises consisting of approximately 10,603 square feet of space in the project situated upon the real property located at the northeast corner of Lawrence Avenue and North Wolcott Avenue, in the County of Cook, City of Chicago, State of Illinois, described in Exhibit "A" attached hereto (the "Project").

NOW THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1.    The term of the Lease is ninety-nine (99) years, commencing on the Commencement Date (as defined in the Lease) and shall terminate at midnight on the day preceding the ninety-ninth (99th) anniversary of the Commencement Date.

2.    The parties hereto incorporate by reference herein all the terms, covenants and conditions contained in the Lease and agree to observe, conform to and comply with such terms, covenants and conditions on the part of each of them to be observed and performed thereunder. All capitalized terms appearing herein which are not defined herein shall have the same

I

meanings ascribed to them in the Lease. For a complete statement of the rights, privileges and obligations created under and by said instrument and of the terms, covenants and conditions contained therein, reference is hereby made to the Lease.

3.      This Memorandum may be executed in one or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument.

*[Remainder of Page Left Intentionally Blank]*

2

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Memorandum of Lease as of the date and year first above written.

LANDLORD:

RAVENSWOOD STATION, LLC, an
Illinois limited liability company

By: CHITOWN-EB/EP JV, LLC, a
Delaware limited liability company, its
General Manager

By: _____
Timothy W. Barrett, a Manager

STATE OF ILLINOIS     )
                      )SS
COUNTY OF Du Page     )

I, Gilda Piermattei _____, a Notary Public in and for the County and State aforesaid, DO HEREBY CERTIFY that Timothy W. Barrett, personally known to me to be a manager of Chitown-EB-EP JV, LLC, a Delaware limited liability company, the General Manager of Ravenswood Station, LLC, an Illinois limited liability company, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that, as such manager, he signed and delivered such instrument, as his free and voluntary act and deed, and as the free and voluntary act and deed of such company, for the uses and purposes therein set forth.

Given under my hand and official seal this 24th day of October _____, 2013.

_____
Notary Public

My Commission Expires: _____

OFFICIAL SEAL
GILDA PIERMATTEI
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/08/14

TENANT:

SEARS, ROEBUCK AND CO., a New York corporation

By: _____

Name: _____
James B. Terrell

Its: _____
Vice President Real Estate

**STATE OF ILLINOIS** )
 )SS
**COUNTY OF COOK** )

I, _GWEN A. SANDSTROM_____, a Notary Public in and for the County and State aforesaid, DO HEREBY CERTIFY that _JAMES B TERRELL_, personally known to me to be the same person whose name is subscribed to the foregoing instrument, as _Vice President - Real Estate_ of Sears, Roebuck and Co., a New York corporation, appeared before me this day in person and acknowledged that, as such manager, he signed and delivered such instrument, as his free and voluntary act and deed, and as the free and voluntary act and deed of such corporation, for the uses and purposes therein set forth.

Given under my hand and official seal this _1ST_ day of _November_____, 2013.

_____
Notary Public

My Commission Expires: _7-26-2015_____

GWEN A. SANDSTROM
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
July 26, 2015

## CONSENT OF LANDLORD'S LENDER

ASSOCIATED BANK, NATIONAL ASSOCIATION, a national banking association, holder of a certain: (i) Construction Mortgage dated as of November 16, 2012, and recorded in the Recorder's Office of Cook County, in the State of Illinois, on November 20, 2012 as Document No. <u>1232539118</u> (as amended from time to time); and (ii) Collateral Assignment of Rents and Leases dated as of November 16, 2012, and recorded in the Recorder's Office of Cook County, in the State of Illinois, on November 20, 2012 as Document No. <u>1232539119</u> (as amended from time to time), consents to the execution and recording of this Memorandum of Lease, and agrees that said security instruments are subject thereto.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be signed by its duly authorized officer on its behalf.

ASSOCIATED BANK, NATIONAL ASSOCIATION,
a national banking association

By: _____
Name: ___Edward U. Notz, Jr.___
Title: ___Senior Vice President___
Associated Bank, N.A.

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF _Cook_     )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that ___Edward U. Notz___, personally known to me to be an authorized officer of ASSOCIATED BANK, NATIONAL ASSOCIATION, a national banking association (the "Bank"), and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he/she signed and delivered said instrument pursuant to authority given by the Bank as his/her own free and voluntary act, and as the free and voluntary act and deed of the Bank, for the uses and purposes therein set forth.

Given under my hand and official seal as of __29th October__, 2013.

_____    SEAL
Notary Public

My Commission Expires: __2-5-2015__

"OFFICIAL SEAL"
Mara Gelgot
Notary Public, State of Illinois
My Commission Expires 02-05-2015

Exhibit A

## Project

LOT 7 IN PLOTKE AND GROSBY'S SUBDIVISION OF THE WEST 250 FEET OF THE
SOUTH 1/2 OF BLOCK 1 IN NORTH RAVENSWOOD, BEING A SUBDIVISION OF THE
SOUTHWEST 1/4 OF THE SOUTHEAST 1/4 (EXCEPT THE CHICAGO NORTH WESTERN
RAILROAD RIGHT-OF-WAY),

ALSO

THE SOUTH 1/2 OF BLOCK 1, (EXCEPT THE WEST 250 FEET) IN NORTH
RAVENSWOOD, A SUBDIVISION OF THE SOUTHWEST 1/4 OF THE SOUTHEAST 1/4,
LYING WEST OF THE CHICAGO AND NORTHWESTERN RAILWAY IN SECTION 7,
TOWNSHIP 40 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN
COOK COUNTY, ILLINOIS.

**PERM TAX# 14-07-418-013-0000**

# EXHIBIT C

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

Doc#:   1202445009 Fee: $96.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 01/24/2012 09:30 AM Pg:  1 of 11

L.A. Fitness International, LLC
2600 Michelson Drive, Suite 300
Irvine, CA  92612-1550
Attn:  Lease Administrator

_____

(space above this line for Recorder's use only)

## MEMORANDUM OF LEASE

This Memorandum of Lease (this "Memorandum") is dated as of January 17, 2012 and made effective as of January 17, 2012, by and between RAVENSWOOD STATION, LLC, an Illinois limited liability company ("Landlord") and L.A. FITNESS INTERNATIONAL, LLC, a California limited liability company ("Tenant"), with reference to the following facts:

Landlord and Tenant entered into that certain Lease dated as of January 13, 2012 (the "Lease") for certain premises (the "Premises") located in the project commonly known as "Ravenswood Station" in the City of Chicago, County of Cook, and State of Illinois (the "Project"), as legally described on Exhibit A attached hereto and made a part hereof.  The Premises is within a to-be-constructed building containing or to contain approximately 36,904 square feet of Floor Area, approximately within the area shown on the site plan attached hereto as Exhibit B (the "Site Plan") and incorporated herein by this reference.

NOW, THEREFORE, for and in consideration of the foregoing, Landlord and Tenant hereby agree as follows:

1.      Agreement to Lease.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with the right to the use of the Common Area pursuant to the Lease, at the rental and upon and subject to all of the terms and conditions set forth in the Lease, which Lease is incorporated herein by this reference.   Capitalized terms used in this Memorandum which are not otherwise defined shall have the meanings set forth in the Lease.  In the event of any inconsistency between the terms and conditions of this Memorandum and the terms and conditions of the Lease, the terms and conditions of the Lease shall govern and control.

2.      Term.  Subject to the terms and conditions contained in the Lease, the Premises is leased for a Primary Term which is to begin upon the Delivery Date and expire on the expiration of fifteen (15) Lease Years following the Rent Commencement Date, together with options to extend the term of the Lease for three (3) separate, consecutive five (5) year periods.

3.      Additional Provisions.   The Lease contains, among other provisions, the following specific provisions:

a)  Permitted and Exclusive Uses:   The "Primary Uses" of the Premises shall be for the operation of a health club and fitness facility which may include, without limitation, weight

1

and aerobic training, exercise dancing, yoga, Pilates, Zumba, racquetball/squash, personal training, aerobics, health and fitness related programs, free weights, spinning/cycling, circuit training, boxing, basketball, swimming pool, swim lessons, racquetball/squash lessons, sauna and whirlpool facilities. As part of the health club and fitness facility operated within the Premises, Tenant may use portions of the Premises for uses ancillary to a health club and fitness facility (hereinafter, the "Ancillary Uses"), including, but not limited to, a health club and fitness facility related pro shop selling apparel and other fitness related items, physical therapy center, spa services, sports medicine, weight loss and nutritional advising, therapeutic massage, chiropractic care, tanning salon, juice bar, vitamin and nutritional supplement sales, ATM machines located inside the Premises, vending machines located inside the Premises, child care facility for members, and food and beverage service (including the sale of healthy and/or natural foods), as well as the sale of exercise and/or health related videos and/or DVDs and other related electronic media items. Landlord represents, warrants and covenants to Tenant that Tenant's operation of business from the Premises for the Primary Uses does not and will not violate any agreements respecting exclusive use rights or restrictions on use within the Project or any portion thereof. Notwithstanding anything to the contrary in the Lease, in no event shall the Premises be used in violation of the applicable restrictions, if any, set forth on Exhibit J. Tenant shall have the right throughout the Term to operate the Premises, or any portion thereof, for uses permitted under the Lease. Notwithstanding anything to the contrary in the Lease, so long as Tenant is operating as a health club and fitness facility in the Premises, Landlord will not allow any other fitness related operation (including, without limitation, health club, aerobics, yoga, Pilates, dance studio offering fitness-oriented classes such as Zumba, spinning/cycling, circuit training, personal training, basketball, boxing, cardiovascular or jazzercise operations) to operate in the Project. Tenant shall not be deemed to have ceased operating its business if it closes or ceases operations on account of remodeling, repairs or condemnation or in connection with an assignment or sublease of the Premises.

b) Parking Spaces:  Throughout the Term, (i) the Common Area parking will contain sufficient striped parking to satisfy all applicable governmental and private codes, rules, regulations and restrictions, of which not less than three hundred sixty (360) standard nine foot (9') wide parking spaces will be located in Tenant's Area of Control, and (ii) all of the parking in the Common Area will be available for use by Tenant, its customers, guests, invitees, licensees, permitted subtenants, employees, suppliers and agents (the "Tenant Invitees") on a non-exclusive basis.  In no event shall Landlord charge Tenant or any of the Tenant Invitees for parking in the Project or place time limits on parking in the Project; provided, however, if Landlord elects to use a parking validation system in the Project, (1) Landlord at its sole cost shall provide two and one-half (2.5) hour parking validation for each visit by each of Tenant's customers, guests and invitees without limitation, and (2) in no event shall there be any parking charges for Tenant's employees, licensees, permitted subtenants, suppliers and agents during Tenant's operating hours.

c) Prohibited Project Uses:  Landlord covenants and agrees that the Project shall be constructed, leased, operated, maintained and managed as a first-rate retail center and that no premises (and no portion of any premises) in the Project shall be used or occupied for any of the following: any unlawful use; funeral establishment; used car lot; auction or bankruptcy sale (except those which are lawful and bona fide); pawn shop; thrift store; shooting gallery;

2

refinery; adult bookstore or facility selling, renting or displaying pornographic or adult books, magazines, literature, films, pictures, videotapes, video discs or other adult paraphernalia or merchandise of any kind (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), provided that sale, rental or display of such items as an incidental part of a permitted business (as used above, the term "incidental" means, with respect to any national or regional video store chain, any sale or rental of such materials, and with respect to other tenants, the sale of such materials from not more than ten percent (10%) of the sales area of such business and so as to constitute less than ten percent (10%) of the gross sales of such business) shall be permitted; massage parlor; tattoo parlor/shop; unemployment agency; government office/government uses open to the public; food stamp center; check cashing/pay day loan business; school; call center/phone bank; office; medical office/clinic; hospital; park and ride; sports bar; amusement park; dance hall; cocktail lounge or bar (except as an incident to a permitted restaurant), disco or night club; bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business; second-hand store (provided, however, the foregoing restriction shall not prohibit antique shops or stores selling high quality used merchandise such as *Play it Again Sports* and *Game Stop*); auction house or flea market; any restaurant (excluding within Mariano's); or any other use that could materially and adversely affect parking for the Premises and/or the Project. To the extent any portion of the Project is within the control of a third-party (through lease, ground lease or fee-conveyed parcel), Landlord will use its best efforts to cause such third-party to maintain the foregoing quality of the Project.

d) <u>Signs</u>: Tenant is entitled to, and Landlord approves the size, location, dimension and color of Tenant's permanent Building signage as set forth in <u>Exhibit G</u> of the Lease, and agrees to use diligent and commercially reasonable efforts to obtain approvals for such signs from the Governmental Authorities as part of the Required Project Entitlements. As depicted in <u>Exhibit G</u> and replacements thereof as provided below, Tenant shall be entitled to install Tenant's permanent prototypical Building signage on the North, South and East sides of the Building with maximum visibility to Lawrence Avenue and Ravenswood Avenue and to the maximum size approved by Governmental Authorities. Tenant may change such permanent Building signage provided Tenant maintains the same location and dimensions of Tenant's signage set forth in <u>Exhibit G</u>, and is in accordance with Landlord's sign criteria set forth in <u>Exhibit F</u> of the Lease. Tenant is entitled to the use of the monument signage structure depicted on <u>Exhibit H</u> of the Lease. Additionally, Landlord shall use best professional efforts to obtain consent by Mariano's to include Tenant on the planned Project rotunda architectural Building feature, above or below the Mariano's signage as depicted in <u>Exhibit H</u>. Tenant's signage contemplated by the immediately preceding sentence shall be no smaller than the largest signage granted to another comparable-sized anchor tenant in the Project. Subject to Applicable Laws, Tenant is further entitled to the exclusive use of the front and back sides of any future Project pylon/monument signage structure(s) of a size and height equal to the greater of (1) a proportionate share based on premises area of other tenants in the Project, or (2) sign panels of a size no smaller than those offered to other tenants of the Project occupying premises of the same or smaller size as the Premises. Landlord agrees to install directional signage to the Premises (however, Tenant will provide such directional signage) upon the Project escalators as well as inside the parking structure in which some of the

parking spaces described above are located, on each of the parking levels. In addition, Landlord shall install parking lot directional signage with Tenant's trade name which identifies traffic circulation into and within the parking areas, Tenant's parking spaces, the entrance points to the Premises, and the locations of elevators, stairs and escalators. Further, from and after the Effective Date, Landlord shall appropriately include the Premises with Tenant's trade name on all common maps, directories and/or directional aids for the Project situated in the Common Area (including Common Area elevators and stairs) and erected and maintained by Landlord and on which the locations of one or more other retail tenants' premises are noted, each of which listings shall be on terms and conditions no less favorable and of a size no smaller than those offered to other tenants of the Project occupying premises of the same or smaller size as the Premises. Notwithstanding anything to the contrary contained herein, during the Term, Landlord shall not materially and adversely alter the position, location, dimensions or prominence (relative to other tenants) of Tenant's signage in the Project. Landlord grants Tenant the right to affix to the front of the Premises "pre-opening" and "grand-opening" banners during the pre-sale and grand-opening periods and promotional banners at any time and from time to time during the Term of the Lease, so long as such banners are prepared professionally (not hand-lettered) and comply with Applicable Laws.

4.      Covenants Running with the Land.  The covenants of Landlord set forth in the Lease shall run with the land of the Project in accordance with the provisions of applicable law.

4

IN WITNESS WHEREOF, each of the parties hereto has executed this instrument as of the date first above written.

Witnesses:

Print Name: Jill Parra

Print Name: CHRIS BUCKLION

**TENANT:**

L.A. FITNESS INTERNATIONAL, LLC,
a California limited liability company

By:

William B. Horner
Senior Vice President
Chief Real Estate Officer

Witnesses:

Print Name: EUGENE J. PORTO

Print Name: Jill Riematter

**LANDLORD:**

RAVENSWOOD STATION, LLC,
an Illinois limited liability company

By: CHITOWN-EB/EP JV, LLC,
    a Delaware limited liability company,
    its manager

By:
Print Name: Tim Barrett
Print Title: Manager

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF ORANGE       )

On January *13*, 2012, before me, ___*Karina Blanco*___, Notary Public, personally appeared WILLIAM B. HORNER, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the forgoing paragraph is true and correct.

WITNESS my hand and official seal.

KARINA BLANCO
Commission # 1929736
Notary Public - California
Orange County
My Comm. Expires Apr 20, 2015

_____
Signature of Notary Public

STATE OF *Illinois*    )
                       ) ss.
COUNTY OF *DuPage*     )

On January *17*, 2012, before me, *Gilda Piermatter*, Notary Public, personally appeared Tim Barrett, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature of Notary Public

OFFICIAL SEAL
GILDA PIERMATTEI
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/08/14

## EXHIBIT A TO MEMORANDUM OF LEASE

## PROJECT LEGAL DESCRIPTION

LOT 7   IN PLOTKE AND GROSBY'S SUBDIVISION OF THE WEST 250 FEET OF THE SOUTH 1/2
OF BLOCK 1 IN NORTH RAVENSWOOD BEING A SUBDIVISION OF THE SOUTHWEST 1/4 OF THE
SOUTHEAST 1/4 (EXCEPT THE CHICAGO NORTH WESTERN RAILROAD RIGHT OF WAY),

AND ALSO

THE SOUTH 1/2 OF OF BLOCK 1, (EXCEPT THE WEST 250 FEET) IN NORTH RAVENSWOOD, IN
NORTH RAVENSWOOD, A SUBDIVISION OF THE SOUTHWEST 1/4 OF THE SOUTHEAST 1/4, LYING
WEST OF THE CHICAGO AND NORTHWESTERN RAILWAY IN  SECTION 7, TOWNSHIP 40 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN. 14-07-418-013-0000

## EXHIBIT B TO MEMORANDUM OF LEASE

### SITE PLAN

[See Attached]



Ravenswood Station  |  LA FITNESS

Barrett & Porto, Real Estate  |  The Taxman Company  |  Sierra US  |  Sears Roebuck & Co.  |  Autumovich Associates - Architects  |  Daley and George, Ltd.

Exhibit B.1

Chicago, IL  |  January 13, 2012

157
PARKING
SPACES

18'-0" ALLEY

GREEN
ROOF
AND
MECHANICAL

GREEN
ROOF
AND
MECHANICAL

PARKING RAMP TO ROOF

MARIANO'S
GROCERY
74,000

CHICAGO & NORTH-WESTERN RAILWAY

UP FROM
STREET LEVEL

UP TO PARKING
LEVEL

DN TO
STREET LEVEL

UP TO PARKING
LEVEL

UP FROM
GROCERY

WEST LAWRENCE AVENUE

LEFT TURN LANE

LEFT TURN LANE

LEFT TURN

Exhibit B.2 | January 13, 2012

Chicago, IL

Ravenswood Station | LA FITNESS

Barret & Porto, Real Estate | Sierra US | The Taxman Company | Sears Roebuck & Co. | Antunovich Associates - Architects | Daley and George, Ltd.



Ravenswood Station | LA FITNESS

Barnett & Perin, Real Estate | The Taxman Company | Sierra US | Sears Roebuck & Co. | Antunovich Associates - Architects | Daley and George, Ltd.

Exhibit B.3

Chicago, IL | January 13, 2012

# **EXHIBIT D**

**Sears, Roebuck and Co. (ravsears)**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ravensw | Sears, Roebuck and Co. | water | 10/3/2018 | 10/2018 | 32.18 | 0.00 | 0.00 | 0.00 | 32.18 | 0.00 | 32.18 |
| ravensw | Sears, Roebuck and Co. | water | 10/31/2018 | 10/2018 | 22.91 | 0.00 | 0.00 | 0.00 | 22.91 | 0.00 | 22.91 |
| ravensw | Sears, Roebuck and Co. | water | 10/31/2018 | 10/2018 | 35.00 | 0.00 | 0.00 | 0.00 | 35.00 | 0.00 | 35.00 |
| ravensw | Sears, Roebuck and Co. | water | 2/8/2019 | 02/2019 | 18.33 | 0.00 | 0.00 | 0.00 | 18.33 | 0.00 | 18.33 |
| ravensw | Sears, Roebuck and Co. | water | 2/8/2019 | 02/2019 | 35.00 | 0.00 | 0.00 | 0.00 | 35.00 | 0.00 | 35.00 |
| ravensw | Sears, Roebuck and Co. | CAM Rec 2018 | 3/5/2019 | 03/2019 | 4,314.12 | 0.00 | 0.00 | 4,314.12 | 0.00 | 0.00 | 4,314.12 |
| ravensw | Sears, Roebuck and Co. | Ins Rec 2018 | 3/5/2019 | 03/2019 | 143.64 | 0.00 | 0.00 | 0.00 | 143.64 | 0.00 | 143.64 |
| ravensw | Sears, Roebuck and Co. | water | 3/14/2019 | 03/2019 | 19.19 | 0.00 | 0.00 | 19.19 | 0.00 | 0.00 | 19.19 |
| ravensw | Sears, Roebuck and Co. | water | 3/14/2019 | 03/2019 | 35.00 | 0.00 | 0.00 | 0.00 | 35.00 | 0.00 | 35.00 |
| ravensw | Sears, Roebuck and Co. | RET April | 4/1/2019 | 04/2019 | 9,760.99 | 0.00 | 9,760.99 | 0.00 | 0.00 | 0.00 | 9,760.99 |
| ravensw | Sears, Roebuck and Co. | water | 4/4/2019 | 04/2019 | 19.19 | 0.00 | 0.00 | 19.19 | 0.00 | 0.00 | 19.19 |
| ravensw | Sears, Roebuck and Co. | water | 4/4/2019 | 04/2019 | 35.00 | 0.00 | 35.00 | 0.00 | 0.00 | 0.00 | 35.00 |
| ravensw | Sears, Roebuck and Co. | CAM May | 5/1/2019 | 05/2019 | 2,270.00 | 2,270.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,270.00 |
| ravensw | Sears, Roebuck and Co. | Ins May | 5/1/2019 | 05/2019 | 319.18 | 319.18 | 0.00 | 0.00 | 0.00 | 0.00 | 319.18 |
| ravensw | Sears, Roebuck and Co. | RET May | 5/1/2019 | 05/2019 | 9,760.99 | 9,760.99 | 0.00 | 0.00 | 0.00 | 0.00 | 9,760.99 |
| | Sears, Roebuck and Co. | | | | 26,820.72 | 12,350.17 | 9,815.18 | 4,511.95 | 143.42 | 0.00 | 26,820.72 |

*[handwritten annotations:]*

rec'd 5/2/19

(2589.18)
24,231.54
54.79
24,286.33

billed 5/2/19 water

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of the foregoing instrument has been served via electronic mail and/or first-class mail, postage pre-paid on this 3rd day of May 2019 upon the parties listed below, and electronically via ECF notification upon all parties requesting service via ECF notification:

Sears Holdings Management Corporation
Attn: Rob Riecker (rob.riechker@searshc.com)
Attn: Luke Valentino (luke.valentino@searshc.com)
Attn: Mohsin Meghji (mmeghji@miiipartners.com)
Attn: General Counsel (counsel@searshc.com)
3333 Beverly Road
Hoffman Estates, IL 60179

Weil, Gotshal & Manges LLP
Attn: Ray C. Schrock (ray.schrock@weil.com)
Attn: Jacqueline Marcus (jacqueline.marcus@weil.com)
Attn: Garret A. Fail (garrett.fail@weil.com)
Attn: Sunny Singh
(sunny.singh@weil.com)
767 Fifth Avenue
New York, NY 10153

Lazard Fréres & Co., LLC
Attn: Brandon Aebersold and Levi Quaintance
(project.blue.rx@lazard.com)
30 Rockefeller Plaza
New York, NY 10112

Bank of America, N.A.
c/o Skadden, Arps, Slate, Meagher
& Flom LLP
Attn: Paul D. Leake (Paul.Leake@skadden.com)
Attn: Shana A. Elberg (Shana.Elberg@skadden.com)
Attn: George R. Howard (George.Howard@skadden.com)
4 Times Square
New York, NY 10036

Bank of America, N.A.
c/o Berkeley Research group, LLC
2200 Powell Street, Suite 1200
Emeryville, CA 94608


Wells Fargo Bank, National Association c/o
Choate, Hall & Stewart LLP
Attn: Kevin J. Simard (ksimard@choate.com)
Attn: Jonathan D. Marshall (jmarshall@choate.com)
Two International Place
Boston, MA 02110

Akin Gump Strauss Hauer & Feld LLP
Attn: Philip C. Dublin (pdublin@akingump.com)
Attn: Ira S. Dizengoff (idizengoff@akingump.com)
Attn: Abid Qureshi (aqureshi@akingump.com)
Attn: Sara L. Brauner (sbrauner@akingump.com)
One Bryant Park
New York, NY 10036

Transform Holdco LLC c/o ESL Partners, Inc.
Attn: Kunal S. Kamlani (kunal@eslinvest.com)
Attn: Harold Talisman (harold@eslinvest.com)
1170 Kane Concourse, Suite 200
Bay Harbor Islands, FL 33154


Cleary Gottlieb Steen & Hamilton LLP
Attn: Christopher E. Austin (caustin@cgsh.com)
Attn: Benet J. O'Reilly (boreilly@cgsh.com)
Attn: Sean A. O'Neal (soneal@cgsh.com)
One Liberty Plaza
New York, NY 10006

Office of the United States Trustee
Attn: Paul Schwartzberg (paul.schwartzberg@usdoj.gov)
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014


/s/ Andrew R. Gottesman
Andrew R. Gottesman