# **EXHIBIT A**

Annexed Ground Lease

*911 — E*

## GROUND LEASE

THIS GROUND LEASE (this "Lease") is made and entered into as of December _3_, 1998, by and between MIDAMCO, an Ohio limited partnership ("Landlord"), and SEARS, ROEBUCK AND CO., a New York corporation ("Tenant").

### Recitals

A.   Landlord is the owner of certain real property designated as the "Entire Tract" in the site plan attached hereto as Exhibit "A" and incorporated herein by this reference (the "Site Plan").

B.   Landlord has leased a certain parcel (the "Penney Site") in the Entire Tract to J.C. Penney Company, Inc., has leased a certain storeroom (the "Elder-Beerman Site") in the Entire Tract to The Elder-Beerman Stores Corp. and has leased a certain storeroom (the "Hills Site") in the Entire Tract to Hills Stores Co.

C.   Landlord wishes to lease to Tenant and Tenant wishes to lease from Landlord the Premises (as hereinafter defined), which constitutes a portion of the Entire Tract.

D.   The Entire Tract is the site of a retail shopping development (the "Shopping Center") known as Miami Valley Centre Mall, which includes, or will include, a department store on the Penney Site (the "Penney Store"), a department store on the Elder-Beerman Site (the "Elder-Beerman Store"), a department store on the Hills Site (the "Hills Store"), a department store (the "Tenant's Store Building") with an attached Sears Auto Center (the "Tenant's TBA") on the Premises and a hotel (the "Hotel"). After construction of Tenant's Store Building and Tenant's TBA, the Shopping Center will contain approximately 457,000 square feet of Gross Leasable Area (as hereinafter defined).

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

1.   Definitions

"Appraised Value of the Leasehold Estate" is defined in Section 13(d) hereof.

"Book Value" is defined in Section 13(c) hereof.

"Building Pad" is defined in Section 6(a) hereof.

"Cessation of Operation" is defined in Section 13(a) hereof.

"Commencement Date" is defined in Section 4(a) hereof.

"Common Areas" means all portions of the Entire Tract (both interior and exterior) that may from time to time be available for the general non-exclusive

use, convenience and benefit of Tenant, and other owners, tenants and occupants of the Entire Tract, including, without limitation, the interior mall (the "Mall"), truck ramps, fire corridors, service corridors, loading facilities and docks, automobile parking areas, access roads, sidewalks, traffic lanes, bus stations, taxi stations, parcel pickup areas, entrances and exits from and to public roads, landscaping, restrooms and utility facilities.

"Design Criteria" means Sears Design Criteria for New Retail Store Construction dated June 2, 1998 with Addendum No. 1.

"Entire Tract" is defined in the recitals of this Lease.

"Gross Leasable Area" means the total number of square feet of floor space covered and enclosed within a particular store or building on the Entire Tract, whether rented or rentable, measured to the outside of the exterior walls of the store or building, to the center line of party walls and to the exterior of walls abutting exit or service corridors, but not including Common Areas, exterior open truck docks, outdoor sales areas, garden shop areas, mall offices or enclosures used exclusively for mechanical equipment or non-structural mezzanines.

"Hazardous Material" means petroleum products, asbestos, and any other hazardous or toxic substance, material or waste, that is or becomes regulated by any local, state or federal governmental authority.

"Landlord's Mortgage" means that certain Open End Purchase Money Mortgage, Security Agreement and Assignment of Leases and Rents dated December 9, 1993 by and between Landlord, as mortgagor, and Pohio Holding, Inc. and Rivohio Holding, Inc., as mortgagee.

"Landlord's Mortgagee" means "Mortgagee" as defined in Landlord's Mortgage.

"Lease Year" shall mean any period of 12 consecutive months during the Term that begins on the first day of the first full calendar month after the Opening Date or on any anniversary of such date.

"Leasehold Encumbrance" is defined in Section 17 hereof.

"Leasehold Estate" means all of Tenant's right, title and interest in the Premises and under this Lease.

"Leasehold Lender" is defined in Section 17 hereof.

"Major Store" means the Penney Store, the Elder-Beerman Store, the Hills Store, Tenant's Store or a qualified replacement for the Penney Store, the Elder-Beerman Store or the Hills Store. A "qualified replacement" for the Penney Store or the Elder-Beerman Store means any other retail department store of quality at least equivalent to that of the Penney Store or the Elder-Beerman Store as of the date hereof and having not less than 40,000 square feet of Gross Leasable Area. A "qualified replacement" for the Hills Store means any store that would be a qualified replacement for the Penney Store or the Elder-Beerman Store or any nationally recognized discount retail store of quality at least equivalent to that of

2

the Hills Store as of the date hereof and having not less than 40,000 square feet of Gross Leasable Area.

"Mall Tenants" means tenants of retail space (other than kiosks) on the Entire Tract, other than tenants operating Major Stores.

"Net Sales" means gross retail sales of merchandise made by Tenant from the Premises and deducting or excluding (as the case may be):

(i)     All returns and other cancellations, and allowances;

(ii)    Rental charges, including, but not limited to, charges for or pursuant to rentals of automobiles, tools and other merchandise and equipment;

(iii)   Charges to customers for or pursuant to services, deluxing, delivery, installation or inspection;

(iv)   Amounts, debits or charges of, for or pursuant to maintenance or service agreements (currently known as "Maintenance Agreements"), or for replacement or repair parts of merchandise furnished without additional charge in connection with repairs or replacements pursuant to warranties, guaranties, good will adjustments or Maintenance Agreements;

(v)    All sales ordered through the use of or from Tenant catalogs or filled through Tenant catalog channels regardless of the place of order, payment or delivery (currently known as "Division 200 Sales");

(vi)   Finance charges or other amounts in excess of Tenant's (or its concessionaires' or licensees') cash sales price charged on, for or pursuant to sales made on credit or under a time payment or layaway plan;

(vii)  The amount of sales, use, excise, retailers occupation or other similar taxes, imposed in a specific amount or percentage upon, or determined by, the amount of sales, or sale, made from the Premises;

(viii) Sales of departments, divisions or offices not located in the Premises, even though administratively controlled therefrom;

(ix)   Amounts received for or in connection with the making of personal loans and the rendering of other financial services, and premiums, proceeds, commissions, payments and other amounts received, collected or charged for or in connection with the sale of policies of insurance or investment fund shares and other securities, whether or not sold on or from the Premises;

(x)    Contract sales, regardless of whether Tenant maintains an office, showroom or samples for the merchandise, or whether made on or from the Premises;

(xi)   Receipts from vending or weighing machines, amusement devices

and public telephones;

(xii)   Receipts from sales of tickets for admission to entertainment, sporting or other similar events, from sales of licenses issued by governmental agencies and from collection of utility bills and check cashing, gifts and prizes;

(xiii)  Receipts from the operation of eating facilities primarily available for employee use and not generally open to the public;

(xiv)   Receipts from the sale of merchandise or gift certificates and purchase coupons; however, the sale of merchandise made by Tenant from the Premises, paid for with gift certificates or purchase coupons is included in Net Sales, unless otherwise excluded:

(xv)    Fees for building and like permits in connection with sales of merchandise or services;

(xvi)   Amounts credited on the purchase price of merchandise by reason of merchandise traded in, or employee or other discounts;

(xvii)  Unclaimed funds and property;

(xviii) Sales made by Tenant's subtenants, concessionaires and licensees;

(xix)   Commercial sales of truck tires;

(xx)    The amount of all governmentally required levies for parking if passed on to customers; and

(xxi)   Commissions or amounts received in conjunction with the sale, leasing or financing of real estate.

"Notice of Intent" is defined in Section 13(b) hereof.

"Opening Date" means the date on which Tenant opens its business in Tenant's Store Building to the public.

"Partial Lease Year" means the period, if any, commencing with the Opening Date and continuing through the last day before the first Lease Year of the Term and the portion of the Term, if any, after the last Lease Year of the Term.

"Penney Store" is defined in the recitals of this Lease.

"Percentage Rent" is defined in Section 8(b) hereof.

"Percentage Rent Breakpoint" means, for any Lease Year or Partial Lease Year, the product of (i) $20,000,000 and (ii) a fraction, the numerator of which is the number of days in such Lease Year or Partial Lease Year on which Tenant operated its business in Tenant's Store Building, and the denominator of which is the number of days in such Lease Year or, in the case of a Partial Lease Year, 365.

"Premises" is defined in Section 2 hereof.

"Prime Rate" means the rate of interest announced from time to time by The First National Bank of Chicago (or if The First National Bank of Chicago is not in

existence, the largest bank headquartered in the City of Chicago, Illinois, measured in terms of net worth) as its "prime rate".

"Qualified Appraiser" means an individual who is a member of the American Institute of Real Estate Appraisers, has no conflict of interest and has at least five years' experience in the appraisal of leasehold interests and regional shopping centers.

"Real Estate Taxes" means ad valorem real property taxes and does not include any special assessments whether relating to initial improvements of the Premises for Tenant's occupancy or any other work or improvement and does not include any estate, gift, inheritance, succession, franchise, income or excess profits taxes which may be payable by Landlord or Landlord's legal representative, successors or assigns and any tax that might become due on account of ownership of property other than the Premises that might become a lien on the Premises or collectable out of the same; provided, however, that if, at any time during the Term, in lieu of or as a substitute for Real Estate Taxes levied, assessed or imposed as of the date of this Lease, there shall be levied, assessed or imposed: (i) a tax on rents received from real property or (ii) a license fee measured by rents received from real property or (iii) a tax or license fee otherwise measured or based in whole or in part upon ownership of or income from real property, then such tax or license fee levied, assessed or imposed on the Rent or the Premises shall be considered Real Estate Taxes provided that such tax or license fee is levied, assessed or imposed generally on real property owners as such and only to the extent that such tax or license fee would be payable by Landlord if the Premises were the only real property of Landlord and income from the Premises were the sole income of Landlord.

"Recapture Date" is defined in Section 13(e) hereof.

"Recapture Notice" is defined in Section 13(e) hereof.

"Shopping Center" is defined in the recitals of this Lease.

"Site Criteria" means Sears Construction Standards - Company Owned - Developer Responsibilities - Minimum Site Requirements dated April 3, 1998.

"Site Plan" is defined in the recitals of this Lease.

"Tenant's CAM Contribution" means, with respect to each Lease Year during the first five Lease Years of the Term, $0.55 per square foot of Gross Leasable Area in Tenant's Store Building and Tenant's TBA and means, with respect to each Lease Year during each successive five-Lease Year period, the lesser of: (i) an amount that is $0.05 per square foot of Gross Leasable Area in Tenant's Store Building and Tenant's TBA greater than the Tenant's CAM Contribution for the preceding five-Lease Year period; or (ii) $1 per square foot of Gross Leasable Area in Tenant's Store Building and Tenant's TBA.

"Tenant's Hazardous Material" means Hazardous Material brought or released (or permitted to be brought or released) onto the Premises by Tenant, its agents, contractors or employees.

"Tenant's Improvement" means any building or other permanent improvement installed, affixed or attached in or to the Premises (including, without limitation, plumbing fixtures or equipment, heating, ventilating or air conditioning equipment, floor coverings affixed to the floors and paneling, tile or other similar materials affixed to the walls or ceilings), but does not include Tenant's inventory or stock in trade, such trade fixtures, electrical fixtures or other property that, under the terms hereof, may be removed by Tenant upon termination or expiration of the Term or any fixtures or other improvements installed by or at the expense of Landlord.

"Tenant's Operating Covenant" is defined in Section 12(a) hereof.

"Tenant's Pro Rata Share" means a fraction, the numerator of which is the Gross Leasable Area of Tenant's Improvements and the denominator of which is the total Gross Leasable Area in the Shopping Center.

"Tenant's Store Building" is defined in the recitals of this Lease.

"Tenant's TBA" is defined in the recitals of this Lease.

"Term" is defined in Section 4(a) hereof.

"Turnover Date" means the date on which Landlord tenders to Tenant the Building Pad, completed in accordance with the requirements of the Site Criteria and this Lease, except for minor punch list items, and delivers actual possession of the Premises to Tenant in accordance with the terms of Section 9 hereof.

"Valuation Date" is defined in Section 13(c) hereof.

2.     Lease of Premises. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the land situated in the City of Piqua, County of Miami, State of Ohio, more particularly described on Exhibit "B" attached hereto and by this reference incorporated herein (the "Premises"), together with all rights, appurtenances, servitudes, charges, easements, rights of ingress, parking, loading, unloading, licenses and hereditaments thereto. Landlord further grants to Tenant during the Term a non-exclusive easement for parking the vehicles of Tenant, its customers, employees and business invitees, and for access, use, ingress and egress for vehicles and pedestrians in common with the other tenants and occupants of the Entire Tract and their respective customers, employees and business invitees, over the Common Areas, including, without limitation, all parking areas, alleys, roadways, sidewalks, walkways, landscaped areas and surface water drainage systems and for use of parking lot lighting, all as shown on the Site Plan.

3.     Use. The Premises may be used by Tenant for the sale, servicing and storing of merchandise, all other items or services normally sold in Sears stores and Sears Auto Centers, and all other lawful retail uses for so long as the Shopping Center is primarily retail and thereafter for any lawful use that is compatible with the use of the remainder of the Shopping Center at such time; provided, however, that Tenant shall not use the Premises for any purpose that would effect a breach of

the covenants of Landlord described in Exhibit "C" attached hereto and by this reference incorporated herein for so long as such covenants are in effect and enforceable against Landlord. Tenant shall comply with all federal, state and local governmental laws, rules, regulations and ordinances applicable to Tenant's use of the Premises.

4.    Term and Options                                              _10/20/99_

(a)    Initial Term.  The initial term of this Lease shall be 20 years and shall commence on the date (the "Commencement Date") that is the earlier of (i) the Opening Date or (ii) the date that is 18 months after the Turnover Date. As used herein, "Term" and "Term of this Lease" refer to such initial term and to any extension thereof as hereinafter provided. Upon the request of either party to this Lease, Landlord and Tenant shall enter into a supplemental agreement setting forth the Commencement Date.

(b)    Options to Extend.  Landlord grants to Tenant five consecutive options to extend the Term for periods of five years each. Each option can be exercised by Tenant giving Landlord notice of the exercise thereof at least one year prior to the expiration of the then-existing Term; provided, however, that if Tenant shall fail to give such notice within such one-year time limit, Tenant's right to exercise its option shall nevertheless continue until 30 days after Landlord shall have given Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of such 30-day period. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any of the options set forth in this Section 4(b) through inadvertent failure to give notice thereof within the time limits prescribed.

5.    Title and Survey.  Promptly after the date hereof, Landlord shall deliver to Tenant: (a) an ALTA 1970 Form B Owner's Policy of title insurance with a leasehold policy conversion endorsement, if available, or, if such an endorsement is not available, an ALTA 1970 Form B leasehold policy of title insurance insuring the Leasehold Estate, issued by Transnation Title Insurance Company or Ohio Bar Title Insurance Company (the "Title Company") at Landlord's sole cost and expense in the amount of $1,000,000, providing for insurance over the general exceptions, a zoning endorsement (stating that Tenant's TBA operations are permitted uses at the Premises), an access endorsement and an endorsement stating that the Premises are contiguous with the balance of the Entire Tract, and subject only to: (i) the matters listed on Exhibit "D-1" attached hereto and by this reference incorporated herein, with respect to the Premises; and (ii) the matters listed on Exhibit "D-2" attached hereto and by this reference incorporated herein, with respect to the rest of the Leasehold Estate; (b) a survey of the Premises dated after the date hereof and certified to the Title Company and Tenant as having been prepared in accordance with ALTA Standards and showing the location of all utility easements and the location of all utility lines on the Premises or servicing the

Premises; and (c) copies of all recorded documents disclosed in the title policy.

6.    Construction by Landlord

   (a)    Building Pad.  On or before January 15, 1999, Landlord shall complete the building pad for Tenant's Store Building and Tenant's TBA (the "Building Pad") in accordance with the Site Criteria.  The Building Pad shall be constructed by Landlord in such a manner so that: (i) Tenant has vehicular access to the Building Pad for its construction vehicles; (ii) the Building Pad complies with the Site Criteria, including, without limitation, the elevation and location; and (iii) all temporary utility facilities and construction areas for Tenant's construction of Tenant's Store Building are in place as required in the Site Criteria and fully usable for Tenant's construction of Tenant's Store Building.

   (b)    On-Site and Off-Site Improvements.  Landlord shall perform all on-site and off-site improvements to the Entire Tract, including the Premises, as necessary for Tenant to construct Tenant's Store Building and to operate its store therein, including, but not limited to, Mall connections to Tenant's Store Building, all surveying and engineering work, all work necessary to bring all utility lines to within five feet of the Building Pad in accordance with the Site Criteria, any required modifications to perimeter streets and access roads, parking lot paving and parking lot lighting, landscaping and curbing and irrigation systems; provided, however, that Tenant will install any sidewalks and landscaping located between sidewalks and Tenant's Store Building.  Landlord shall complete all such work at its sole cost and expense on or before September 15, 1999.

   (c)    Future Development.  Except as otherwise provided in Section 11(h) hereof, Landlord shall not construct or permit the construction of any improvements on the Entire Tract without the written approval of Tenant, which approval shall not unreasonably be withheld or delayed; provided, however, that Tenant's consent shall not be required for proposed future improvements identified on the Site Plan or for the installation of directional signage, lighting, planters, exterior kiosks shown on the Site Plan, lift stations, utility boxes or other similar utility equipment in the Common Area that do not impair access to or visibility of the Premises.

   (d)    Relocation of Easements.  On or before the Turnover Date, Landlord shall cause the easements listed on Exhibit "D-1" hereto that are marked with an asterisk to be released of record and any utilities within such easements to be removed, to the extent that such easements and utilities are within the Premises.  Landlord shall indemnify Tenant against any liability and hold Tenant harmless from any claim or loss arising from Landlord's failure to perform such obligations on or before the Turnover Date.

(e)  Outside Date for Turnover.  If the Turnover Date shall not have occurred on or before October 30, 2000, then the Term shall not thereafter commence, the lease hereunder shall terminate and Landlord and Tenant shall have no further obligations or liabilities hereunder other than liabilities that may have arisen before such date.

7.  Construction of Tenant's Store Building and Tenant's TBA

(a)  Construction.  After the Turnover Date, Tenant shall have the exclusive right of access to the Premises and shall commence construction of Tenant's Store Building containing approximately 90,500 square feet of Gross Leasable Area and the Tenant's TBA containing approximately 9,881 square feet of Gross Leasable Area.  Tenant will use its best efforts to complete such construction on or before the first anniversary of the Turnover Date.

(b)  Construction Staging Areas.  Landlord shall grant to Tenant the right to use areas of the Entire Tract designated by Landlord and suitable to Tenant's reasonable construction requirements as construction staging areas.  Tenant shall not, and shall not permit its contractors to, place construction equipment or vehicles on the Entire Tract other than in such areas.

(c)  Construction Requirements.  Tenant's construction shall be performed in a good and workmanlike manner and shall include properly integrating Tenant's Store Building and Tenant's TBA with the portion of the Shopping Center to be constructed by Landlord.    Such construction shall be conducted in compliance with all laws, rules, regulations, codes and ordinances of all governmental authorities and similar organizations or agencies having jurisdiction over the Shopping Center, and shall be completed in accordance with the Design Criteria.  Tenant's construction shall be conducted at Tenant's sole cost and expense and in such a manner as will minimize any disruption to the operations of the Shopping Center.  Tenant shall be responsible for all damage to the Shopping Center and Landlord's construction caused by Tenant's construction activities.  Landlord and its agents shall be permitted to enter upon the Building Pad to inspect Tenant's construction provided that Landlord shall not interfere with Tenant's work.    Upon the completion of Tenant's construction, Tenant shall (i) clear the Premises and all adjoining areas of all waste materials, debris and construction equipment, and put the sidewalks and adjoining areas in good condition, and (ii) furnish Landlord with "as built" drawings of Tenant's Store Building and Tenant's TBA.

(d)  Coordination with Landlord's Construction.  Landlord shall provide for the coordination of the activities of Landlord's own forces and of each separate contractor with the construction to be performed by Tenant.

Tenant shall cooperate with Landlord in scheduling and performing Tenant's construction to avoid conflict, delay in, or interference with, Tenant's work and the work of Landlord (whether in connection with the construction referred to in Section 6 hereof or the portion of the Shopping Center to be constructed by Landlord). Tenant shall participate with the other contractors and Landlord in reviewing their construction schedules when directed to do so.

(e)    Alterations.  Tenant shall not make modifications or alterations to the exterior of Tenant's Improvements except with the written consent of Landlord, which shall not unreasonably be withheld; provided, however, that Landlord's consent shall not be required if such modifications or alterations are consistent with Tenant's building standards for similar Tenant stores in Ohio.

8.    Rent

(a)    Fixed Rent.  Tenant shall pay Landlord, as fixed rent hereunder, $1 per Lease Year.  Fixed rent for each Lease Year shall be due and payable in advance on or before the first day of such Lease Year; provided, however, that Tenant may pay fixed rent for the entire Term of this Lease in advance.

(b)    Percentage Rent.  Tenant shall pay Landlord percentage rent with respect to each Lease Year or Partial Lease Year during the Term of this Lease. Such rent ("Percentage Rent") shall be in an amount equal to 1% of the amount, if any, by which Net Sales made during such Lease Year or Partial Lease Year exceeds the Percentage Rent Breakpoint for such Lease Year or Partial Lease Year.  Percentage Rent for any Lease Year or Partial Lease Year shall be due and payable on the day that is 60 days after the last day of such Lease Year or Partial Lease Year without demand and, except as otherwise provided in this Lease, without set off or deduction.

(c)    Payment.  Landlord will, from time to time, designate some one person, firm or corporation to receive rent payments.  Rent will be made payable to Landlord and mailed to the following address:

> Suite 1100 Eaton Center
> 1111 Superior Avenue
> Cleveland, Ohio 44114

until the address is changed by notice from Landlord.  Landlord's Federal Employer Identification Number is 34-6627493.

(d)    Net Sales Statement.  Not later than 60 days after the last day of each

Lease Year or Partial Lease Year, Tenant shall submit a written statement to Landlord setting forth the Net Sales made during such Lease Year or Partial Lease Year. Each such statement shall be certified as true and correct by a financial officer of Tenant.

(e)    <u>Maintenance of Records</u>.  Tenant agrees that it will keep in its principal accounting office true and accurate records in accordance with usual accounting practices and sufficiently detailed so as to permit an accurate audit of Net Sales in accordance with generally accepted auditing standards, showing all sales made in, upon or from the Premises in accordance with this Section 9(e) and that Landlord and its duly authorized agents may, from time to time and at reasonable times during Tenant's business hours, upon 30 days' notice to Tenant, examine and audit such records or other pertinent documents to the extent, only, that they relate to Net Sales from the Premises for the purposes of verifying the statements required to be submitted by Tenant to Landlord pursuant to Section 9(d) hereof.  Tenant's books and records with respect to Net Sales for each Lease Year or Partial Lease Year shall be kept for at least three years after the delivery of the statement to Landlord of Tenant's Net Sales for such period, and if Landlord shall inspect and/or audit Tenant's statement for such period, such books, records and evidence shall continue to be kept until such inspection and/or audit shall have been concluded (provided, that Landlord shall use diligent efforts to conclude such inspection and/or audit within a reasonable period of time). Landlord's right to commence such an audit with respect to any Lease Year or Partial Lease Year shall expire three years after the receipt by Landlord of Tenant's statement of Net Sales for such Lease Year or Partial Lease Year.  If it is determined by any such audit that any statement previously delivered to Landlord by Tenant was not accurate, an adjustment shall be made, and one party shall pay to the other upon demand such sum as may be necessary so that the correct amount of Percentage Rent shall have been paid by Tenant to Landlord, together with interest on such sum at the Prime Rate from the date on which such Percentage Rent was originally due and payable.  If Landlord makes an audit for any period, and if the Net Sales shown by Tenant's statement for such period are found to be understated by 2% or more, Tenant shall pay to Landlord the reasonable cost of such audit.

9.    <u>Premises Free From Tenancies</u>.  On the Turnover Date Landlord shall deliver actual possession of the Premises to Tenant free of all tenancies and occupancies and zoned to permit the operation of a retail store and an automobile service center of the sizes allowed pursuant to this Lease, including: the sale and servicing of merchandise; the filling of orders; the storage and sale, at retail, of all merchandise and services normally offered by Tenant at a typical retail store of the size located on the Premises, including, but not limited to, operation of an automobile service center, selling and installing tires, batteries,

mufflers and other motor vehicle accessories and other automobile services and the repair and servicing of appliances and tools. If the Premises are not so zoned on the Turnover Date and Landlord, on such date or at any time thereafter, is not diligently pursuing such zoning then Tenant may terminate this Lease upon notice to Landlord.

10.    Landlord's Representations and Warranties. Landlord represents and warrants to Tenant that, as of the date of this Lease:

   (a)    Landlord as Owner. Landlord is the owner of the Entire Tract. Except for consents, if any, that might be required by the terms of Landlord's Mortgage or the leases of the Penney Site, the Elder-Beerman Site or the Hills Site, the execution and performance by Landlord of this Lease do not require any consents under, or violate any, contract, mortgage, lease, operating agreement or any other written or oral agreement to which Landlord is a party or to which the Entire Tract or any portion thereof is subject.

   (b)    Landlord's Authority. Landlord has the full right and lawful authority to enter into and perform its obligations under this Lease.

   (c)    Encumbrances. Landlord has not created and has no actual knowledge, after reasonable diligence, of any easements, restrictions, mortgages and other liens, encumbrances or defects in title: (i) affecting the Premises, other than the matters listed in Exhibit "D-1" hereto; and (ii) affecting the rest of the Leasehold Estate, other than the matters listed in Exhibit "D-2" hereto.

   (d)    Compliance with Laws. The Premises are in full compliance with all applicable laws, regulations and ordinances.

   (e)    Due Diligence. The reports and test results listed in Exhibit "E" attached hereto and by this reference incorporated herein are all environmental reports and environmental test results for the Entire Tract that are within Landlord's possession or control or within the possession or control of Landlord's agents, employees, contractors or attorneys.

11.    Certain Covenants of Landlord

   (a)    Parking. Landlord shall not charge for the use of any parking spaces on the Entire Premises except as may be required by law. Landlord shall not change the location or configuration of any parking spaces as shown on the Site Plan except as may be required by law. Landlord shall provide sufficient surface parking about the Premises and on the Entire Tract to provide not less than 4.5 parking spaces (having a width of not less than nine feet) per 1,000 square feet of Gross Leasable Area in the Shopping

Center and about the Premises in accordance with the Site Criteria.

(b)    <u>Operation of Mall Property</u>.  Landlord shall provide lighting in the parking areas on the Entire Tract and provide heating, air conditioning and lighting for and maintain the Shopping Center during periods when Tenant and any other Major Store are open for business and for one hour after such business hours, but said lighting and operation shall not be required after 11:00 p.m.

(c)    <u>Governmental Approvals</u>.  Except for building and sign permits, Landlord shall obtain all necessary consents, permits and approvals of governmental authorities, including Site Plan approval and zoning approvals for the construction and commencement of operation of Tenant's Store Building and Tenant's TBA on the Premises.  Landlord shall file all environmental impact reports and all other necessary documents as required to permit commencement of operation of Tenant's businesses on the Premises.  If Landlord does not obtain all such consents, permits and approvals by the Turnover Date, then Tenant may terminate this Lease by giving notice to Landlord of such termination.

(d)    <u>Third Party Consents and Approvals</u>.  Landlord shall use reasonable efforts to obtain all necessary consents and approvals of parties other than governmental authorities for the Site Plan, the construction to be performed by Landlord hereunder, the construction of Tenant's Store Building and Tenant's TBA and all other transactions contemplated hereunder.  If Landlord does not obtain any required consent or approval from Landlord's Mortgagee, then Landlord (i) shall indemnify Tenant against any liability to and hold Tenant harmless from any claim asserted by Landlord's Mortgagee arising from Landlord's Mortgagee not granting such consent or approval and (ii) shall reimburse Tenant for costs of construction and of fixturing Tenant's Store Building and otherwise preparing the Premises for Tenant's business operations and for costs of closing and removing Tenant's merchandise and other property if Tenant is restrained from initially opening or operating a retail department store in Tenant's Store Building on account of an injunction or other order of a court issued on the basis of such consent or approval not having been granted.    At any time after such date, Tenant may demand such reimbursement by giving notice of such demand to Landlord.  Thirty days after such notice is given:  (i) such reimbursement shall be due and payable; and (ii) the lease created hereby shall terminate and Landlord and Tenant shall have no further obligations or liabilities hereunder other than such reimbursement and any other liabilities that may have arisen before such termination.

(e)    <u>Preferred Mall Tenancies</u>.  Landlord shall require that Mall Tenants conducting any business within 100 feet of any of Tenant's interior

entrances to the Shopping Center shall conduct no category of business other than a category: (a) permitted to be operated by such Mall Tenant under its lease or other occupancy agreement as in effect on the date of this Lease; or (b) listed on Exhibit "F" attached hereto and by this reference incorporated herein.

(f)  <u>Kiosks</u>. Landlord shall not permit the placement or operation of any kiosk or other vending facility of any type within 100 feet of Tenant's interior entrance to the Shopping Center except as designated on the Site Plan. No such kiosk or vending facility designated in the Site Plan shall be more than eight feet tall or occupy more than 150 square feet of floor area.

(g)  <u>Quiet Enjoyment</u>. Tenant, upon paying Rent and performing Tenant's other obligations under this Lease, shall peaceably and quietly have, hold and enjoy the Premises for the Term, subject to the matters listed on Exhibit "D-1" hereof and subject to rights, if any, of the lessees under the leases of the Penney Site, the Elder-Beerman Site or the Hills Site as a result of such lessees having withheld consents, if any, that might be required by the terms of such leases for the performance of this Lease, as against Landlord and any person claiming by, through or under Landlord or claiming title paramount to that of Landlord.

(h)  <u>Development of Outparcels</u>. Landlord shall not develop or, except for rights previously granted with respect to the portions of the Entire Tract known as Inlots 7686 and 7687, permit development of outparcels on the Entire Tract or on Inlots 6931, 6932, 6933, 6934, 6935, 6936, 6937, 6938, 6939, 6940, 6941, 6942, 6943, 6944 or 6945, if acquired by Landlord or any affiliate of Landlord at any time hereafter, without Tenant's prior written consent; provided, however, that Tenant's consent shall not be required for improvements on outparcels identified on the Site Plan that (i) are one-level structures; (ii) have parking capacity on the outparcel adequate to support the intended use; and (iii) are comparable to outparcel developments at other similar shopping centers in Ohio.

12.  <u>Tenant's Operating Covenant</u>

(a)  <u>Term of Covenant</u>. Tenant shall, from and after the Opening Date and for ten years thereafter, continuously operate or cause to be operated on the Premises a retail department store under the name "Sears" or such other name as Tenant is using in the majority of its like retail department stores in Ohio ("Tenant's Operating Covenant").

(b)  <u>Mall Shops</u>. If, during any time that Tenant's Operating Covenant is in effect or that Tenant is obligated to operate under the terms of Section 23(b) hereof, at least 60% of Gross Leasable Area in the Shopping Center is not occupied by Mall Tenants with retail businesses in continuous

operation, reasonably evenly distributed in size and type of business throughout the Mall, and, in type and quality, comparable to retail shops in other comparable shopping centers in Ohio, then Tenant may give Landlord notice of such condition. If such condition exists 12 months after such notice is given or at anytime thereafter, then Tenant's Operating Covenant, or Tenant's obligation under Section 23(b) hereof, as the case may be, shall thereupon terminate.

(c)   Major Stores. If, during any time that Tenant's Operating Covenant is in effect or that Tenant is obligated to operate under the terms of Section 23(b) hereof, less than three Major Stores (other than Tenant's Store) are in continuous operation, Tenant may give Landlord notice of such condition. If, within 12 months after such notice is given, tenants or prospective tenants are not contractually obligated to Landlord to continuously operate at least three Major Stores (other than Tenant's Store) within 18 months after such notice is given or if, within 18 months after such notice is given, at least three Major Stores (other than Tenant's Store) are not in continuous operation, then Tenant's Operating Covenant, or Tenant's obligation under Section 23(b) hereof, as the case may be, shall thereupon terminate.

(d)   Enforcement of Covenant. Tenant's Operating Covenant will be personal to Landlord and not assignable, except to a successor to Landlord who acquires title to the Shopping Center or to a mortgagee in possession of the Shopping Center. Tenant's Operating Covenant, and its obligation to operate under the terms of Section 23(b) hereof, is conditioned upon Landlord not entering into an agreement with a third party under which such third party has the right to enforce Tenant's Operating Covenant or such obligation.

(e)   Continuous Operation. For purposes of this Section 12 and Sections 13 and 23(b) hereof, to "continuously operate" means to keep Tenant's retail department store open to the public for business during business hours that are comparable to the hours of operation of a majority of department stores operated by Tenant in Ohio, with no interruptions except for periods of reconstruction, renovation, repair or alteration and such other reasonable interruptions as may be incidental to the conduct of its business.

(f)   Opening Date. Tenant shall open Tenant's Store Building and Tenant's TBA to the public for business not later than 18 months after the Turnover Date.

13.   Landlord's Right of Recapture

(a)   Termination by Landlord. If, at any time after the expiration or termination

of Tenant's Operating Covenant, Tenant ceases to continuously operate a retail department store on the Premises for a period of 180 days (a "Cessation of Operation"), then, subject to Section 13(g) hereof, Landlord may elect to terminate the Term of this Lease in accordance with the provisions of this Section 13.

(b)   Notice by Landlord. At any time that Landlord may elect to terminate the Term of this Lease, Landlord may give Tenant a notice of its intent to do so (a "Notice of Intent"). Such Notice of Intent also shall identify a Qualified Appraiser.

(c)   Book Value. Within 30 days after Tenant has received a Notice of Intent, Tenant shall deliver to Landlord a certificate stating the value of the Leasehold Estate on the books of Tenant (giving effect to depreciation and amortization) as of the date (the "Valuation Date") on which the Notice of Intent was received (the "Book Value").

(d)   Appraised Value.

(i)   Qualified Appraisers. Within ten days after receiving a Notice of Intent, Tenant, by notice to Landlord, may designate a Qualified Appraiser. Each designated Qualified Appraiser, or, if Tenant does not duly designate a Qualified Appraiser, the Qualified Appraiser designated by Landlord, shall conduct an appraisal of the Leasehold Estate and report to Landlord and Tenant its determination of the fair market value of the Leasehold Estate as of the Valuation Date within 90 days after Landlord gave the Notice of Intent. If Tenant does not duly designate a Qualified Appraiser, the "Appraised Value of the Leasehold Estate" shall be the fair market value of the Leasehold Estate as determined by Landlord's Qualified Appraiser. If Tenant has duly designated a Qualified Appraiser, then, subject to Section 13(d)(ii) hereof, the "Appraised Value of the Leasehold Estate" shall be the average of the fair market values of the Leasehold Estate as determined by each Qualified Appraiser.

(ii)   Third Appraiser. If the fair market values of the Leasehold Estate as determined by the Qualified Appraisers designated by Landlord and Tenant differ by more than 10% of either such value, then such Qualified Appraisers shall appoint a third Qualified Appraiser. If such Qualified Appraisers fail to make such appointment within five days after it is determined that their appraisals differ by more than such amount, then, at the request of Landlord or Tenant, the third Qualified Appraiser shall be appointed by the president of the American Institute of Real Estate Appraisers. Landlord and Tenant shall equally share the costs of the third Qualified Appraiser. The

third Qualified Appraiser shall conduct an appraisal of the Leasehold Estate and report to Landlord and Tenant its determination of the fair market value of the Leasehold Estate as of the Valuation Date within 30 days after being appointed. The "Appraised Value of the Leasehold Estate" shall be the average of the two fair market values of the Leasehold Estate determined by the Qualified Appraisers that are least different from each other.

(e)     Recapture Notice.  Not more than 30 days after the Appraised Value of the Leasehold Estate has been determined as provided in Section 13(d) hereof, Landlord may give Tenant a notice (a "Recapture Notice") specifying a date (the "Recapture Date"), which shall be not less than 30 and not more than 60 days after such determination has been made.  If Landlord does not give a Recapture Notice with respect to a Cessation of Operation within the time permitted under this Section 13(e), then any Notice of Intent previously given with respect to such Cessation of Operation will be deemed ineffective; provided, however, that Landlord's ability to thereafter give a Notice of Intent on account of the same Cessation of Operation shall not be impaired; provided, however, that such subsequent Notice of Intent shall not be given less than 12 months after the prior Notice of Intent.

(f)     Payment and Termination.  On the Recapture Date, Landlord shall pay to Tenant an amount that is equal to the greater of (i) the Appraised Value of the Leasehold Estate and (ii) the Book Value.  Upon the making of such payment, the Term of this Lease shall terminate.

(g)     Exceptions.   If, at any time after a Cessation of Operation, Tenant resumes such operation before Landlord has given a Notice of Intent with respect to such Cessation of Operation, then Landlord may not terminate the Term of this Lease on account of such Cessation of Operation.  If, before Landlord gives a Notice of Intent with respect to such Cessation of Operation, Tenant gives Landlord notice that Tenant, or Tenant's assignee, shall resume such operation within 90 days after Tenant gives such notice, then Landlord may not give a Notice of Intent during such time and, if Tenant or Tenant's assignee resumes such operation within such time, then Landlord may not terminate the Term of this Lease on account of such Cessation of Operation.

14.     Tenant's Store Operations

(a)     Tenant's Discretion.  Subject to the provisions of Section 3 hereof, the number and types of departments to be operated in Tenant's Store Building and the Tenant's TBA, the particular contents, wares and merchandise to be offered for sale, the services to be rendered, the methods and extent of merchandising and storage thereof, and the

18-23538-shl    Doc 3600-1    Filed 05/03/19    Entered 05/03/19 16:40:02    Exhibit A
Pg 19 of 50

manner of operating Tenant's Store Building and the Tenant's TBA in every respect whatsoever shall be within the sole and absolute discretion of Tenant, so long as such operation is consistent with the majority of Tenant's retail stores in Ohio.

(b)  Licensees, Subtenants, Concessionaires.  Tenant may operate Tenant's Store Building in whole or in part by licensees, subtenants or concessionaires; provided, however, that the appearance to the public shall be that of a major retail store building consistent with the appearance of the majority of Tenant's comparable major retail stores being operated by Tenant in regional shopping centers in Ohio.

(c)  No Restrictions Outside the Shopping Center.  Nothing contained herein shall be deemed to impose any radius or other restriction on the activities of Tenant outside of the Shopping Center.

(d)  Tenant's Store Hours.  Tenant will set its own hours and days of operations of the Store in Tenant's Store Building; provided, however, that such times of operation shall conform to the times of operation at comparable major retail stores operated by Tenant in regional shopping centers in Ohio.

(e)  Signs

(i)  Pre-Opening.  Subject to compliance with applicable laws, before the Opening Date Tenant may place and maintain temporary signs at Tenant's interior entrances to the Shopping Center and outside Tenant's Store Building to announce Tenant's opening.  Tenant shall remove such signs on or promptly after Opening Date.

(ii)  After Opening.  Subject to compliance with applicable laws, Tenant may install and maintain signage on the Premises consistent with signage at Sears stores similar to Tenant's Store.  Tenant shall make a reasonable effort to conform to Landlord's sign criteria.

(f)  Credit Kiosk.  Before the Opening Date Tenant may place and maintain a kiosk in the vicinity of Tenant's primary interior entrance to the Shopping Center for distributing and processing Tenant's credit card applications. Tenant shall remove such kiosk on or promptly after the Opening Date.

15.  Landlord's Right of Entry.  Tenant shall permit Landlord and the agents and employees of Landlord to enter into and upon the Premises at reasonable times and with ten days' advance notice for the purpose of inspecting the same.  If Tenant has not exercised an option to renew, Tenant shall permit Landlord and its agents and employees, at any reasonable time upon reasonable notice during

the last 12 months before the expiration of the Term in order to exhibit the Premises to prospective tenants at reasonable hours, provided that Landlord does not unreasonably interfere with Tenant's operations in exercising its rights under this Section 15.

16. Assignment and Subletting. Before the expiration or termination of Tenant's Operating Covenant, Tenant shall not assign this Lease or sublease more than 25% of the Gross Leasable Area of Tenant's Store Building, except to an affiliate of Tenant or to an entity that acquires a majority of Tenant's stores located in Ohio, without the prior written consent of Landlord.

17. Encumbrance of Tenant's Leasehold Interest. Tenant may, without Landlord's consent, grant a lien on or a security interest in its leasehold interest in the Premises, its right, title and interest in this Lease and in any and all buildings and improvements thereon (a "Leasehold Encumbrance"), as security for any indebtedness or obligation of Tenant provided that the grantee of such Leasehold Encumbrance is an institutional lender (a "Leasehold Lender"). If a Leasehold Lender shall have given Landlord notice of the creation of a Leasehold Encumbrance, Landlord shall give to such Leasehold Lender a copy of each notice of any claimed default by Tenant at the same time and whenever any such notice is given to Tenant, addressed to such Leasehold Lender at the address last furnished to Landlord. Such Leasehold Lender shall thereupon have a period of 30 days more, after service of such notice upon it, for remedying the default or causing the same to be remedied, than is given Tenant after service of such notice upon it. Such Leasehold Lender, in case Tenant shall be in default hereunder, shall, within such period and otherwise as herein provided, have the right to remedy such default, or cause the same to be remedied. Landlord will accept performance by the Leasehold Lender of any covenant, condition or agreement on Tenant's part to be performed hereunder with the same force and effect as though performed by Tenant. If the Leasehold Lender cannot reasonably take the action required to cure the default without being in possession of the Premises, the time of Leasehold Lender to cure the default shall be deemed extended to include the period of time required by such Leasehold Lender to obtain such possession with due diligence; provided, however, that during such period all other obligations of Tenant under this Lease, including the payment of rent and other sums required to be paid by Tenant, are being duly performed. No Leasehold Lender shall become liable under the provisions of this Lease, unless and until such time as it becomes, and then only for as long as it remains, the owner of the Leasehold Estate.

18. Real Estate Taxes and Assessments

    (a)    Creation of Separate Tax Parcel. Landlord shall use reasonable efforts to cause the Premises (including Tenant's Improvements) to be assessed for Real Estate Taxes as a separate tax parcel on or before the

Commencement Date.

(b)     Taxes with Separate Tax Parcel. Tenant shall pay Real Estate Taxes on the Premises (including Tenant's Improvements) for any period after the Turnover Date during which the Premises constitute a separate tax parcel. Tenant may contest any such Real Estate Taxes so long as such consent shall operate to prevent the collection of such Real Estate Taxes or other realization thereon and the sale or forfeiture of the Premises in satisfaction thereof, and, if permitted under applicable law, may withhold payment pending resolution of such contest.  If the separate tax parcel does not include a parking field and the Common Areas outside of the enclosed areas of the Shopping Center constitute one or more separate tax parcels, then Tenant shall reimburse Landlord for a portion of the Real Estate Taxes on such portion of the Common Areas in an amount equal to the product of (i) such Real Estate Taxes and (ii) Tenant's Pro Rata Share.

(c)     Taxes without Separate Tax Parcel. Landlord shall pay Real Estate Taxes levied on the Premises (or any real property that includes the Premises) and Tenant's Improvements with respect to any period during which the Premises are not assessed for Real Estate Taxes separately from all other property.

(d)     Reimbursement by Tenant. Tenant shall reimburse Landlord for a portion of Real Estate Taxes paid by Landlord pursuant to Section 18(c) hereof levied with respect to the period after the Turnover Date.  Such reimbursement shall be in an amount equal to the product of (i) such Real Estate Taxes and (ii) Tenant's Pro Rata Share.  Tenant shall pay any reimbursement due under Section 18(b) hereof or under this Section 18(d) within 30 days after receiving evidence of payment of such Real Estate Taxes by Landlord.

(e)     Disposition of Rebates. Tenant shall be entitled to receive its pro rata share of any rebates awarded to Landlord on account of any taxes paid by Landlord for which Landlord has been reimbursed by Tenant.  Landlord will, on the request of Tenant, execute any receipts, assignments or other acquittances that may be necessary to secure the recovery of any such rebates, and will pay over to Tenant any such rebates that may be received by Landlord.

(f)     Indemnity by Landlord. Landlord shall indemnify Tenant against and hold Tenant harmless from any assessments levied on the Premises and any other taxes or impositions except for Real Estate Taxes payable by Tenant hereunder.

(g)    Indemnity by Tenant.  Tenant shall indemnify Landlord against and hold Landlord harmless from any Real Estate Taxes payable by Tenant hereunder.

19.    Marketing Fund.    Tenant may at its option, at any time join the existing merchants' association or marketing fund.

20.    Common Area Maintenance

(a)    Landlord's Obligations.  Landlord will, or will cause a third party to, sweep, clean, operate, maintain, repair, replace and provide a security service for the Common Areas and keep the Common Areas in a first-class condition consistent with the majority of other regional shopping centers located in Ohio according to the following standards:

(i)    all hard-surfaced portions of the Common Areas and improvements shall be swept at intervals sufficient to maintain the same in a clean condition before the retail stores within the Entire Tract open for daily business with the public;

(ii)    all sidewalks shall be swept and washed at intervals sufficient to maintain the same in a clean condition, and all surface waters shall be promptly removed;

(iii)    all public trash and rubbish containers located in the Common Areas for the use of the public shall be emptied daily, and shall be washed at intervals sufficient to maintain the same in a clean condition;

(iv)    all landscaping shall be properly maintained, including irrigation, removal of weeds and foreign matter, and trimming, removal and replacement of dead plant materials, however, Tenant shall be responsible for performing the foregoing work, at Tenant's expense, with respect to landscaping on the Premises located between Tenant's Store Building and the curb immediately adjacent to Tenant's Store Building;

(v)    all hard-surfaced markings shall be inspected at regular intervals and promptly repainted as they become unsightly or indistinct from wear and tear or other cause;

(vi)    all sewer catch basins shall be cleaned on a schedule sufficient to maintain all sewer lines in a free flowing condition; and all

mechanical equipment which is part of storm and sanitary sewer facilities shall be regularly inspected and kept in proper working order;

(vii)    all asphalt paving shall be inspected at regular intervals and maintained in a good condition;

(viii)    all surface utility facilities servicing the Common Areas, including, but not by way of limitation, hose bibs, standpipes, sprinklers and domestic water lines shall be inspected at regular intervals and promptly repaired or replaced, as the occasion may require, or upon the occurrence of any defect or malfunctions;

(ix)    all common utility facility amenities, benches and institutional, directional, traffic and other signs shall be inspected at regular intervals and maintained in a clean and attractive condition; and

(x)    all lamps on lighting standards or otherwise on the Common Areas shall be inspected at regular intervals, and all lamps shall be promptly replaced when no longer properly functioning.

(b)    <u>Performance by Tenant</u>.  If Landlord fails to perform Landlord's obligations set out in Section 20(a) hereof within 30 days after receiving notice from Tenant demanding such performance or, if such failure is of a character as to require more than 30 days to cure and Landlord fails to use reasonable diligence in curing such failure, then Tenant may perform all or any portion of such obligations and shall be entitled to be reimbursed by Landlord for Tenant's reasonable cost and expense of such performance, together with interest at the Prime Rate, accruing from the date Tenant incurs such cost or expense until the date reimbursed by Landlord. If Tenant's cost, expense and such interest are not paid within 30 days after Tenant gives Landlord notice demanding such reimbursement (accompanied by invoices or paid receipts substantiating Tenant's expenses), then, Tenant may deduct such amount from any amounts payable under Section 20(c) hereof by Tenant to Landlord, until paid in full.

(c)    <u>Tenant's CAM Contribution</u>. Tenant shall pay Tenant's CAM Contribution for each Lease Year to Landlord in equal monthly payments, which shall be due and payable on or before the first day of each month of such Lease Year.

21.    <u>Disposition of New Improvements</u>.  Tenant's Improvements shall be the property of Tenant subject to the provisions of Section 33 hereof.

22.    Repairs and Maintenance of Improvements.  Except for damage or destruction caused by fire or other catastrophe, Tenant shall, throughout the Term of this Lease, at its own cost, and without any expense to Landlord, keep and maintain the Premises, including all buildings and improvements of every kind which may be constructed thereon, and all appurtenances thereto, including sidewalks adjacent thereto, in a good condition and state of repair.  Landlord shall not be obligated to make any repairs, replacements or renewals of any kind, nature or description whatsoever to the Premises or any buildings or improvements thereon.  Tenant shall also comply with and abide by all federal, state, county, municipal statutes, ordinances, laws and governmental regulations affecting the Premises, the improvements thereon or any activity or condition on or in the Premises.

23.    Damage and Destruction of Shopping Center

(a)    Required Restoration.  Except as otherwise provided in this Section 23, if the buildings or other improvements on the Shopping Center (excluding Tenant's Improvements and the Hotel), or any part thereof, are damaged or destroyed by fire or other catastrophe, then Landlord will rebuild, repair or replace all such buildings leased and occupied at the time of such casualty and the Common Areas, so that there will be on the Shopping Center an enclosed, air-conditioned mall and other improvements constituting an architecturally complete unit.  If the Hotel is damaged or destroyed by fire or other catastrophe, then Landlord will either rebuild the Hotel, replace the Hotel with another building for a use compatible with the Shopping Center, clear the Hotel site and leave it in a sightly condition or convert the Hotel site to paved and striped parking.

(b)    Elective Restoration.  If the buildings or other improvements on the Shopping Center (excluding Tenant's Improvements), or any part thereof, are damaged or destroyed at any time after the first seven years of the Term and the cost to Landlord of repairing or restoring the Shopping Center to its original condition equals or exceeds 35% of the replacement cost of all the buildings on the Shopping Center (excluding Tenant's Improvements), Landlord may elect not to rebuild or repair the damaged or destroyed improvements by giving notice of Landlord's election to Tenant within 120 days of the casualty.  However, if Landlord elects not to rebuild or repair, Tenant may, within 120 days of its receipt of such notice from Landlord, terminate this Lease effective at any specified date within two years after receipt of such notice.  In the alternative, Tenant may, within such 120-day period, require Landlord to rebuild and repair or replace all the store buildings leased and occupied at the time of the casualty and the Common Areas, so that there will be on the Shopping Center an enclosed air-conditioned mall and other improvements constituting an architecturally complete unit provided that: (i) Tenant

exercises an option to renew under Section 4(b) hereof within such 120-day period; and (ii) not less than two Major Stores, other than Tenant, shall be open and operating after the completion of such restoration (such Major Stores need not be obligated to operate). If Tenant requires restoration under this Section 23(b), then Tenant shall, for a period of three years commencing upon completion of such restoration, continuously operate or cause to be operated on the Premises a retail department store under such name as Tenant is using in the majority of its like retail department stores in Ohio.

(c)    Construction Requirements.    Any building or other improvements that Landlord is required to rebuild or repair pursuant to this Lease will be rebuilt and ready for occupancy within 18 months from the time of the loss or destruction.  Work, repair or reconstruction, once started by Landlord, will be carried through continuously and diligently to conclusion.

(d)    Exceptions to Landlord's Obligation

(i)    Nothing contained in this Section 23 will require Landlord to rebuild a Major Store building if Landlord is not required to do so under the terms of Landlord's lease with the Major Store.

(ii)    Landlord shall be obligated to restore under this Section 23 only if Tenant, its assignees or sublessees have operated for business at some time during the 30-day period immediately preceding such destruction or damage, unless Tenant, its assignees or sublessees ceased operating during such 30-day period due to a default by Landlord under the terms of this Lease, in which event Landlord shall still have the obligation to restore.

(iii)    Landlord shall not be obligated to rebuild or repair under this Section 23 with respect to damage or destruction if (A) at the time of such damage or destruction, Landlord has insurance coverage in effect that satisfies the requirements of Landlord's Mortgage and Section 29(d) hereof and (B) Landlord's Mortgagee does not, and under the terms of Landlord's Mortgage is not required to, make the proceeds of such insurance available for such rebuilding or repair.

(e)    Site Clearance.  If any buildings are not required to be rebuilt pursuant to this Section 23, the properties will be cleared and left in a sightly condition and landscaped or paved for parking.

24.    Damage and Destruction of Improvements

(a)     <u>Required Restoration</u>.  Except as otherwise provided in Section 24(b) hereof, if Tenant's Improvements are damaged or destroyed by fire or other catastrophe, then Tenant shall rebuild and restore Tenant's Improvements within 18 months after such damage or destruction occurs. Unless otherwise approved by Landlord, which approval shall not unreasonably be withheld, such rebuilding and restoration shall be consistent with Tenant's building standards for similar Tenant stores in Ohio.

(b)     <u>Elective Restoration</u>.  If more than 35% of the Gross Leasable Area of Tenant's Store Building is damaged or destroyed by fire or other catastrophe more than seven years after the Commencement Date or after a termination of Tenant's Operating Covenant, then Tenant may give Landlord notice, within 180 days after such damage or destruction occurs, stating whether Tenant elects to rebuild and restore Tenant's Improvements.  If Tenant gives notice that it elects to rebuild and restore, then Tenant shall complete such rebuilding and restoration promptly after such notice is given.  Such rebuilding and restoration shall be consistent with Tenant's building standards for similar Tenant stores in Ohio.  If Tenant gives notice that it does not elect to rebuild and restore, or fails to give such notice within such 180-day period, then the Term of this Lease shall terminate 60 days after such notice is given or, if such notice is not given within such 180-day period, 60 days after such 180-day period expires.

(c)     <u>Construction Requirements</u>.  Work, repair or reconstruction, once started by Tenant, will be carried through continuously and diligently to conclusion.

(d)     <u>Tenant's Lease Obligations</u>.  Except as provided in Section 24(b) hereof, the damage, destruction or partial destruction of any building or other improvement which is part of the Premises shall not release Tenant from its obligations under this Lease.

25.    <u>Utilities</u>.  Tenant shall contract in its own name and fully and promptly pay for all water, sewer, gas, heat, light, power, telephone service and other public utilities of every kind that Tenant desires to be furnished to the Premises throughout the Term and Landlord shall have no responsibility of any kind for any thereof.

26.    <u>Liens</u>

(a)     <u>Tenant's Duty to Keep Premises Free of Liens</u>.  Tenant shall keep all of the Premises, and every part thereof, and all buildings and other improvements at any time located thereon, free and clear of any and all mechanics', materialmen's and other liens for or arising out of or in connection with work or labor done, services performed or materials or

appliances used or furnished for or in connection with any operations of Tenant, any alteration, improvement or repairs or additions that Tenant may make or permit or cause to be made, or any work or construction, by, for or permitted by Tenant on or about the Premises, or any obligations of any kind incurred by Tenant, and promptly and fully pay and discharge any and all claims on which any such lien may or could be based. No work done by Tenant on or about the Premises, whether in the nature of construction, alteration or repair shall be deemed to be for the immediate use and benefit of Landlord so that no mechanic's or other lien shall be allowed against the estate of Landlord in the Premises or the Shopping Center.

(b)     Landlord's Duty to Keep Premises Free of Liens. Landlord shall keep the Premises, and every part thereof, and all buildings and other improvements at any time located thereon, free and clear of any and all mechanics', materialmen's and other liens for or arising out of or in connection with work or labor done, services performed or materials or appliances used or furnished for or in connection with any operations of Landlord, any alteration, improvement or repairs or additions that Landlord may make or permit or cause to be made, or any work or construction, by, for or permitted by Landlord on or about the Entire Tract, or any obligations of any kind incurred by Landlord, and promptly and fully pay and discharge any and all claims on which any such lien may or could be based.

(c)     Contesting Liens. If Tenant desires to contest any such lien, it shall notify Landlord of its intention to do so within 60 days after Tenant receives notice from Landlord of such lien. In such case, Tenant shall not be in default hereunder until 60 days after the final determination of the validity thereof, within which time Tenant shall satisfy and discharge such lien to the extent held valid; but the satisfaction and discharge of any such lien shall not, in any case, be delayed until execution is had on any judgment rendered thereon, any such delay shall be a default of Tenant hereunder. In the event of any such contest, Tenant shall protect and indemnify Landlord against all loss, expense and damage resulting therefrom.

(d)     Landlord's Mortgage. Anything in this Section 26 to the contrary notwithstanding, Tenant shall bond or discharge any lien against the Premises if and to the extent necessary to preclude the occurrence of a default under Section 2.01 of Landlord's Mortgage.

27.   Indemnification

(a)     Landlord's Indemnity and Defense Obligations.

(i)     Landlord waives any right of contribution and shall indemnify

Tenant, its directors, officers, employees and agents against, and hold Tenant, its directors, officers, employees and agents harmless from, all claims, actions, losses, damages, costs, expenses and liabilities (except those caused by the willful misconduct or negligent acts or omissions of Tenant, its agents, contractors or employees), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Entire Tract (excluding the Premises) or caused by the willful misconduct or negligent acts of Landlord, its agents, contractors or employees, including injury to or death of, or loss of or damage to any property of, Tenant, its directors, officers, employees, agents, invitees, licensees or others.

(ii)    Landlord shall defend Tenant, its directors, officers, employees and agents against any and all claims and actions described in Section 27(a)(i) hereof.

(b)    <u>Tenant's Indemnity and Defense Obligations</u>

(i)    Tenant waives any right of contribution and shall indemnify Landlord, its constituent partners, and its and their directors, officers, employees and agents against, and hold Landlord, its constituent partners, and its and their directors, officers, employees and agents harmless from, all claims, actions, losses, damages, costs, expenses (including, but not limited to, attorneys' fees) and liabilities (except those caused by the willful misconduct or negligent acts or omissions of Landlord, its agents, contractors or employees), arising out of actual or alleged injury to or death of any person or loss of or damage to property in or upon the Premises or caused by the willful misconduct or negligent acts of Tenant, its agents, contractors or employees, including injury to or death of, or loss of or damage to any property of, Landlord, its directors, officers, employees, agents, invitees, invitees, licensees or others.

(ii)    Tenant shall defend Landlord, its constituent partners, and its and their directors, officers, employees and agents against any and all claims and actions described in Section 27(b)(i) hereof.

28.    <u>Tenant's Insurance</u>.  Subject to Tenant's right to self-insure, Tenant shall pay for and maintain, during the Term of this Lease, the following policies of insurance covering the Premises, which insurance shall be obtained from insurers rated "A-VIII" or better by Best's Insurance Reports or its equivalent:

(a)    Workers' Compensation Insurance covering all costs, benefits and liabilities under State Workers' Compensation and similar laws for employees of Tenant and Employer's Liability Insurance, with limits of $500,000 per accident or disease and $500,000 aggregate by disease.

(b)    Commercial General Liability Insurance covering Tenant's operations at the Premises, including, but not limited to, coverage for premises/operations, products/completed operations, contractual and personal/advertising injury liabilities with combined single limits of $5,000,000 per occurrence, for bodily injury and property damage, including Landlord and its managing agent as additional insureds (as defined in ISO 20 26 11 85).

(c)    "All-Risk" Property Insurance upon all buildings, building improvements, personal property owned by Tenant and improvements on the Premises owned by Tenant, including, but not limited to, those perils generally covered on a Causes of Loss - Special Form, including fire, extended coverage, windstorm, vandalism, malicious mischief, and sprinkler leakage coverage in the amount of 90% of full replacement cost, including Landlord as an additional insured, as its interest may appear.

Subject to Tenant's right to self-insure, Tenant shall pay for and maintain, during the construction of Tenant's Store Building and Tenant's TBA, a policy of builder's risk insurance on Tenant's Store Building and Tenant's TBA in an amount equal to the full replacement cost of such improvements, including Landlord as an additional insured, as its interest may appear.

Anything contained herein to the contrary notwithstanding, Tenant has the right to self-insure any of Tenant's insurance obligations under this Lease provided that Tenant has a net worth of at least $100,000,000.

No insurance policy obtained by Tenant to satisfy the requirements of this Section 28 shall be subject to cancellation or material change without at least 30 days' prior written notice to Landlord. The insurance provided by such insurance policy shall be deemed primary insurance with respect to the Premises, and any insurance provided by or on behalf of Landlord shall be in excess of any insurance provided by such policy. Tenant shall furnish Landlord, or cause to be furnished to Landlord, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates evidencing the polices required to be maintained hereunder (or, in the event Tenant has elected to self-insure, a statement that Tenant has elected to self-insure and evidence of the amount of Tenant's net worth).

29.    Landlord's Insurance. Landlord shall pay for and maintain, from the date of this Lease through the end of the Term, the following policies of insurance covering the Entire Tract, which insurance shall be obtained from insurers rated "A-/VIII" or better as defined in the then-current edition of Best's Insurance Reports (or the equivalent thereof if Best's Insurance Reports is no longer published):

(a)    If Landlord has employees working on the Entire Tract, Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Landlord, and Employer's Liability Insurance with limits of $500,000 per accident or disease and $500,000 aggregate by disease. In

addition, Landlord shall require that all contractors hired by Landlord maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and will require all subcontractors to maintain such insurance and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss, injury, damage or liability that Tenant may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

(b)   Commercial General Liability Insurance covering Landlord's operations on the Entire Tract with coverage for premises/operations, products/completed operations, contractual and personal/advertising injury liabilities with combined single limits of $5,000,000 per occurrence for bodily injury and property damage, including Tenant as an additional insured (as defined in ISO Form CG 20 26 11 85 or its equivalent).

(c)   If Landlord uses leased or owned motor vehicles on the Entire Tract, Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of liability of $3,000,000 per occurrence for bodily injury and property damage.

(d)   "All-Risk" property insurance with commercially reasonable deductibles upon all buildings, building improvements and personal property owned by Landlord and all alterations on the Entire Tract (other than Tenant's Improvements and personal property owned by Tenant), including but not limited to, those perils generally covered by Causes of Loss - Special Form, including fire, extended coverage, wind storm, vandalism, malicious mischief, sprinkler leakage, flood and earthquake coverage in the amount of 90% of the full replacement cost and with ordinance and law coverage.

The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies.

No insurance policy obtained by Landlord to satisfy the requirements of this Section 29 shall be subject to cancellation or material change without at least 30 days' prior written notice to Tenant. The coverage provided by such insurance policy shall be deemed primary insurance as to the Entire Tract (other than the Premises) and any insurance provided by or on behalf of Tenant shall be in excess of any insurance provided by such policy. Landlord shall furnish Tenant, or cause to be furnished to Tenant, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates evidencing the insurance required to be maintained hereunder. Landlord may carry all insurance required hereunder under one or more blanket policies.

30.   Waivers of Subrogation.   Any other provisions herein to the contrary notwithstanding, Landlord and Tenant each releases the other and, on behalf of its insurers, waives its entire right to recovery against the other for loss or damage to the waiving party and its property located on the Entire Tract to the extent that the loss or damage is customarily insurable by a Special Form property insurance policy. Landlord and Tenant agree to furnish to each

insurance company that has or will issue Special Form policies on their respective portions of the Entire Tract notice of the terms of the mutual waivers contained herein and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers contained herein.

31.   Defaults

(a)   Non-Payment of Rent.  If Tenant defaults in the payment of rent or any other amount payable to Landlord hereunder and fails to cure the default within 30 days of its receipt of notice of default by Tenant, Landlord may bring suit to recover rent due and unpaid after the 30-day period. Landlord's suing to recover rent shall not waive or affect any other right or remedy that Landlord may have at law or in equity.

(b)   Failure to Meet Other Obligations.  If Tenant is in default in performing any of the terms or provisions of this Lease, other than the provisions for the payment of rent or any other amount payable to Landlord hereunder, receives notice of the default from Landlord, and fails to cure the default within 30 days after receipt of such notice by Tenant or, if such default is of a character as to require more than 30 days to cure and Tenant fails to use reasonable diligence in curing the default after receipt of such notice, then Landlord, in addition to any other remedies that Landlord may have, may cure the default and the full amount so expended by Landlord plus interest at the Prime Rate will immediately be owing by Tenant.

(c)   Landlord's Default.  If Landlord is in default in performing any of the terms or provisions of this Lease, receives notice of such default from Tenant, and fails to cure such default within 30 days after receipt of such notice or, if such default is of a character as to require more than 30 days to cure and Landlord fails to use reasonable diligence in curing such default after receipt of such notice, then Tenant, in addition to any other remedies that Tenant may have, may cure such default, at the expense of Landlord, and may deduct from all amounts payable by Tenant under this Lease all sums expended by Tenant in connection therewith, plus interest at the Prime Rate, until Tenant is reimbursed in full.

(d)   Equity Proceedings.   If any of the covenants, conditions or other provisions of this Lease are breached, Landlord or Tenant shall have the right to obtain an injunction or other appropriate judicial relief against the other.

(e)   Tenant's Performance of Landlord's Obligations.  If, at any time, Tenant (i) in good faith takes the position that Landlord has failed to perform its obligations under this Lease; (ii) undertakes to cure such failure on the part of Landlord to perform such obligations; and (iii) withholds rent and/or other charges to the extent permitted under the terms of this Lease after Tenant cures a default of Landlord in order to receive reimbursement for the funds expended in undertaking such cure, then, in such event, Landlord shall not have the right to terminate this Lease or to evict Tenant

for the non-payment of rent or other charges nor shall Landlord have the right to commence a proceeding for forcible entry and detainer or other similar action to recover possession of the Premises from Tenant for such non-payment until such dispute is resolved.  In the event that a court of competent jurisdiction rules that Tenant did not have the right to withhold rent or other payments to Landlord under the terms of this Lease, then, upon the issuance of such a judgment, Tenant shall pay to Landlord the amount so withheld plus interest at the Prime Rate.

32.    Effect of Eminent Domain

    (a)    Effect of Total Condemnation.  If the entire Premises shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority, then the Term of this Lease shall terminate and expire as of the date of such taking, and Landlord and Tenant shall thereupon be released from any liability thereafter accruing hereunder.

    (b)    Effect of Partial Condemnation.  If a portion of the Premises shall be so appropriated or taken and the remainder of the Premises shall not be suitable for the use then being made of the Premises by Tenant, or if the remainder of the Premises is not one undivided parcel of property, Tenant shall have the right to terminate this Lease as of the date of such taking on giving to Landlord notice of such termination within 45 days after Landlord has given Tenant notice of such appropriation or taking.  If Tenant does not exercise such right of termination, then this Lease shall continue in full force and effect as to the part not taken, and the rent shall be proportionately, on a square footage basis, adjusted.

33.    Disposition of Improvements at End of Term.  Upon expiration or termination of the Term, Landlord shall become the owner of Tenant's Improvements.

34.    Hazardous Materials

    (a)    Landlord's Representations and Warranties.  Landlord hereby represents and warrants to Tenant, to the best of Landlord's knowledge, that no Hazardous Material has been used, disposed of or is located on or in either the buildings constructed, if any, in the Entire Tract or the soil and ground water on or under the Entire Tract and that there are no underground storage tanks on or under the Entire Tract except as may be disclosed in the materials listed in Exhibit "D" attached hereto.

    (b)    Landlord's Covenants

        (i)    Landlord shall comply with all orders, rulings or other requirements concerning Hazardous Material (other than Tenant's Hazardous Material) of any court, governmental body or agency having jurisdiction over the Entire Tract, including, without limitation, any requirement to perform repair, cleanup or detoxification work or prepare any closure or other plans, and shall diligently pursue to completion all such work.  Landlord shall pay all costs and

expenses of such compliance and performance except for costs and expenses relating to Tenant's Hazardous Material.

(ii)    Landlord waives any right of contribution and shall indemnify Tenant, its directors, officers, employees and agents against, and hold Tenant, its directors, officers, employees and agents harmless from, any and all claims, actions and liabilities arising from (a) Hazardous Material brought or released (or permitted to be brought or released) onto the Entire Tract by Landlord, its agents, contractors or employees or (b) the breach of any representation, warranty or covenant contained in this Section 34, and all costs and expenses, including attorneys' fees, paid or incurred by Tenant in defending or otherwise responding to, such claims, actions and liabilities.

(iii)    To the extent economically justifiable, Landlord shall diligently pursue any responsible parties in connection with the performance of any cleanup, repair, detoxification or other remedial action with respect to Hazardous Material to which Landlord is not obligated to take any action.

(c)    <u>Tenant's Covenants</u>.  Tenant hereby covenants to Landlord as follows:

(i)    Tenant shall comply with all orders, rulings or other requirements concerning Tenant's Hazardous Material of any court, governmental body or agency having jurisdiction over the Entire Tract, including, without limitation, performance of any repair, cleanup or detoxification work and the preparation of any closure or other plans, and shall diligently pursue to completion all such work and shall pay all costs and expenses of such compliance and performance.

(ii)    Tenant waives any right of contribution and shall indemnify Landlord, it constituent partners and its and their officers, employees and agents against, and hold Landlord, its constituent partners and its and their directors, officers, employees and agents harmless from, any and all claims, actions and liabilities arising from Tenant's Hazardous Material and all costs and expenses, including attorneys' fees, paid or incurred by Landlord in defending or otherwise responding to, such claims, actions and liabilities.

35.    <u>Notices</u>.  Notices shall be in writing and shall be deemed given:  (a) two business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (b) one business day after being deposited with a reputable overnight express carrier (e.g. Federal Express, Airborne, Express Mail, UPS) for guaranteed next business day delivery, or (c) upon receipt if personally delivered.  Notices shall be addressed as follows:

Tenant-                    Sears, Roebuck and Co.
                           3333 Beverly Road
                           Department 824RE
                           Hoffman Estates, Illinois 60179
                           Attn: Vice President - Real Estate

Copy to:                   Sears, Roebuck and Co.
                           3333 Beverly Road
                           Department 766X
                           Hoffman Estates, Illinois 60179
                           Attn: Assistant General Counsel-Real Estate

For Real                   Sears, Roebuck and Co.
Estate Tax                 Real Estate Taxes
Invoices:                  Department 768TAX
                           3333 Beverly Road
                           Hoffman Estates, Illinois 60179

For Rent and               Sears, Roebuck and Co.
Other Real                 Real Estate Payments
Estate Invoices:           Department 824RE
                           3333 Beverly Road
                           Hoffman Estates, Illinois 60179

With a copy                Sears Store Manager
to:                        Sears, Roebuck and Co.

Landlord-                  Midamco
                           c/o The Mid-America Management
                               Corporation
                           1111 Superior Street
                           Cleveland, Ohio 44114

With a copy to:            Berick, Pearlman & Mills
                           1111 Superior Avenue
                           Cleveland, Ohio 44114
                           Attention:  Gary S. Desberg

or to any other address furnished in writing by any of the foregoing.  However, any change of addresses furnished shall comply with the notice requirements of this Section 35 and shall include a complete outline of all current addresses to be used for all parties.

36.    <u>Waiver</u>.  No provision of this Lease will be deemed waived by either party unless expressly waived in writing signed by the waiving party.  No waiver shall be implied by delay or any other act or omission of either party.  No waiver by either party of any provision of this Lease shall be deemed a waiver of such provision

with respect to any subsequent matter relating to such provision, and consent respecting any action by a party shall not constitute a waiver of the requirement for obtaining such party's consent respecting any subsequent action. Acceptance of rent by Landlord shall not constitute a waiver of any breach by Tenant of any term or provision of this Lease. No acceptance of a lesser amount than the rent herein stipulated shall be deemed a waiver of Landlord's right to receive the full amount due, nor shall any endorsement or statement on any check or payment or any letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the full amount due.

37.   <u>Effect of Tenant's Holding Over</u>.  Any holding over after the expiration of the Term of this Lease shall be construed to be a tenancy from month to month, at the monthly rental required to be paid by Tenant for the period immediately prior to such expiration and shall otherwise be on the terms and conditions herein specified, so far as applicable, except that the Percentage Rent Breakpoint shall be $10,000,000.

38.   <u>Memorandum of Lease and Transfer and Recording Taxes</u>.  Upon execution of this Lease, a memorandum of this Lease in the form of Exhibit "G" attached hereto and by this reference incorporated herein shall be executed by both parties and Landlord shall record such memorandum.  Landlord will pay all transfer and recording taxes, charges and assessments levied, assessed or incurred upon execution, delivery or recordation of this Lease or such memorandum, as they become due.

39.   <u>Successors and Assigns</u>.  The covenants and conditions herein contained shall, subject to the provisions as to assignment, transfer and subletting, be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

40.   <u>Time of the Essence</u>.  Time is of the essence of this Lease, and of each and every covenant, term, condition and provision hereof.

41.   <u>Broker</u>.  Landlord and Tenant represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Lease except for Landlord's brokers, Reisenfeld & Company and The Mid-America Management Corporation.  Each party hereto shall indemnify, defend and hold the other party harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker with whom the indemnifying party has dealt.

42.   <u>Captions</u>.  The captions used in this Lease are for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

43.   <u>Redelivery of Premises</u>.  Tenant shall, at the expiration or sooner termination of the Term of this Lease, peaceably and quietly quit and surrender to Landlord the Premises in broom clean condition subject to the other provisions of this Lease. If, at the expiration or sooner termination of the Term of this Lease, Tenant's

Improvements have been damaged or destroyed by fire or other catastrophe and Tenant is not obligated to rebuild or restore Tenant's Improvements, then Tenant shall clear Tenant's Improvements from the Premises and leave the Premises in a clean, orderly and sightly condition.

44.  Remedies Cumulative.  All remedies conferred on Landlord and Tenant shall be deemed cumulative and no one exclusive of the other, or of any other remedy conferred by law.

45.  Governing Law.  This Lease shall be interpreted and construed under the laws of the State of Ohio.

46.  No Partnership.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant and neither the method of computation of rent nor any other provision contained in this Lease or any acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

47.  Severability.  Any provision or provisions of this Lease that are or become a legal or legally void shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions of this Lease shall nevertheless remain in full force and effect.

48.  Authority.  Each party hereto represents and warrants to the other that it has all requisite corporate or partnership authority, as the case may be, to enter into and perform this Lease.

49.  Subordination, Non-disturbance and Attornment Agreement.  If Landlord grants to any institutional lender (a "Mortgagee") a mortgage or deed of trust covering all or any portion of the Premises, Tenant shall, upon request of Landlord and such Mortgagee enter into an agreement with Landlord and such Mortgagee substantially in the form of Exhibit "H" attached hereto and by this reference incorporated herein.

50.  Estoppel Certificates.  Tenant shall, within 30 days after receipt of a written request from Landlord, provide an estoppel certificate substantially in the form of Exhibit "I" attached hereto and by this reference incorporated herein, for the use of a current or prospective Mortgagee or a prospective purchaser of Landlord's interest in the Entire Tract.

51.  Attorneys' Fees.  If, at any time during the Term, Landlord or Tenant shall institute any action or proceeding against the other relating to this Lease, then the party that does not prevail in such action or proceeding shall reimburse the prevailing party for its reasonable expenses paid or incurred in connection with such action or proceeding, including attorneys' fees, court costs and disbursements.

52.  Construction. Each party hereto has participated in the preparation of this Lease and it should be interpreted without reference to any rule of construction requiring

that it be construed against the drafter.

53.   Survival of Indemnities.   Each obligation of either party to this Lease to indemnify, defend or hold the other party harmless from any claim or liability shall survive the expiration or termination of the Term of this Lease.

54.   Delays.   If either party hereto shall be delayed or hindered in or prevented from the performance of any of its obligations under this Lease by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, insurrection, war, materially adverse weather conditions or other reason of a like nature not the fault of such party, then the period for the performance of such obligation shall be extended for a period equivalent to the period of such delay.   The provisions of this Section 54 shall not apply to any obligation to pay money.

55.   Limitation on Recourse to Landlord.   Tenant shall look solely to (i) Landlord's interest in the Entire Tract and the improvements thereon and the Shopping Center ("Landlord's Interest"), (ii) the proceeds of sale receivable from any execution of any judgments against Landlord's Interest, (iii) any consideration receivable by Landlord from the sale or other disposition of all or any part of Landlord's Interest, which consideration shall be deemed to include any non-refundable assets at any time held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, (iv) rents and other income from the Entire Tract receivable by Landlord (including funds misapplied by Landlord), (v) Landlord's share of any condemnation award in respect of the Entire Tract or the proceeds payable from any casualty insurance required to be maintained by Landlord hereunder, and (vi) amounts due and payable to Landlord under this Lease for the enforcement of any judgment, order or other remedy under or in connection with this Lease and shall not have recourse to Landlord personally for any such judgment, order or other remedy or any deficiency after execution thereof; provided, however, that nothing herein shall limit Tenant's rights to obtain injunctive or other equitable relief.   Except for matters with respect to which Landlord may be personally liable hereunder, no other properties or assets of Landlord or its partners shall be subject to levy, execution or other enforcement procedures for the satisfaction of any judgment (or other judicial process) arising out of this Lease.   Anything in this Section 55 to the contrary notwithstanding, Landlord shall be personally liable for fraud and for fraudulent misapplication (i) of proceeds paid under any insurance policies maintained pursuant to the provisions hereof or (ii) of proceeds or awards resulting from any taking of the Premises or any transfer in lieu thereof.   Upon transfer by Landlord of its entire interest in the Premises to a transferee who expressly assumes all of Landlord's obligations under this Lease, Landlord shall be released from liability for any matters hereunder arising after such transfer.

IN WITNESS WHEREOF, the parties have caused this Lease to be duly executed and delivered as of the day and year first above written.

**MIDAMCO**

Witnesses:

By:    The Mid-America Management
       Corporation, as its general partner

By: _____
    WILLIAM H. STAEBLER  / 2 - 3 - 9 8
    CHIEF OPERATING
    OFFICER

STATE OF OHIO

COUNTY OF _Cuyahoga_

On this _3_ day of _December_, 1998, before me, a notary public, personally appeared _William H Staebler_, who, being duly sworn, stated that [he/she] is _Chief Operating Officer_ of The Mid-America Management Corporation, general partner of Midamco, and acknowledged that [he/she] executed and delivered the foregoing Lease on behalf of such corporation as the voluntary act and deed, duly authorized by its board of directors.

_____
JUDITH REVAK
Notary Public, State of Ohio Cuya Cty.
My Commission Expires June 25, 2000

**SEARS, ROEBUCK AND CO.**

Witnesses:

By: _Ronald P Douglass_

**Ronald P. Douglass**
**Vice President**
**Real Estate**

R. E. DIRECTOR
LEGAL

Exhibits:

Exhibit "A"    Site Plan
Exhibit "B"    Description of Premises
Exhibit "C"    Existing Exclusive Use Covenants
Exhibit "D-1"  Certain Encumbrances Affecting Premises

s:\dpursel\piqua\Ground Lease10.doc

Exhibit "D-2"  Certain Encumbrances Affecting Entire Tract
Exhibit "E"    Environmental Reports and Test Results
Exhibit "F"    Preferred Mall Tenancies
Exhibit "G"    Form of Memorandum of Lease
Exhibit "H"    Form of Non-Disturbance Agreement
Exhibit "I"    Estoppel Certificate

FOR EXHIBITS, SEE LEASE FILE

LEASE SUPPLEMENT

**THIS LEASE SUPPLEMENT ("Supplement")** is made as of October 20, 1999 by and between MIDAMCO, an Ohio limited partnership (**"Landlord"**), and **SEARS, ROEBUCK AND CO.**, a New York corporation (**"Tenant"**).

**WHEREAS**, Landlord and Tenant entered into a Lease dated as of December 3, 1998 (the "Lease"), for property in the City of Piqua, County of Miami, State of Ohio, more specifically described in the Lease (the "Premises"); and

**WHEREAS**, Section 4(a) of the Lease provides that Landlord and Tenant shall specify the Commencement Date of the Lease by supplemental agreement; and

**WHEREAS**, Section 4(a) of the Lease provides that the Commencement Date shall be the earlier of (i) the Opening Date or (ii) the date that is 18 months after the Turnover Date; and

**WHEREAS**, under Section 8 of the Lease rent shall begin to accrue from, and the initial rental payment shall be due to Landlord, on the Commencement Date.

**NOW, THEREFORE**, Landlord and Tenant agree to supplement the Lease as follows:

1. The Turnover Date is January 4, 1999.

2. Tenant opened for business on October 20, 1999.

3. The Commencement Date of the Lease is October 20, 1999.

4. The Term of the Lease is October 20, 1999, through October 19, 2019.

5. The initial payment of rent is (was) due on October 20, 1999.

6. The Lease, except as herein supplemented, is in all other respects fully ratified and confirmed.

7. Except as otherwise defined herein, all capitalized terms used in this Supplement shall have the meaning ascribed to such terms in the Lease.

8. Landlord represents and warrants that Landlord has full right, power and authority to enter into this Supplement.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Supplement to be duly executed and delivered as of the day and year first above written.

MIDAMCO

By:  The Mid-America Management
     Corporation, as its general partner

By: _____  11·8·99

WILLIAM H. STAEBLER
Chief Operating Officer
Mid-America Management Corporation

SEARS, ROEBUCK AND CO.

By: _____

Charles H. May II
Sr. Real Estate Director

R. E. MANAGER
LEGAL

## FIRST AMENDMENT TO GROUND LEASE

THIS FIRST AMENDMENT TO GROUND LEASE (this "Amendment") is made and entered into as of the 20th day of October, 2000, by and between MIDAMCO, an Ohio limited partnership ("Landlord") and SEARS, ROEBUCK AND CO., a New York corporation ("Tenant").

### R E C I T A L S:

A.    Landlord and Tenant entered into that certain Ground Lease dated as of December 3, 1998 (the "Lease"), pursuant to which Landlord leased to Tenant the Premises (this and all other capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lease) which constitutes a portion of certain real property commonly known as the Miami Valley Centre Mall, Piqua, Ohio.

B.    Pursuant to Section 2 of the Lease, the Premises is more particularly described on Exhibit B to the Lease.

C.    After the Lease was executed and a memorandum of the same was filed in the real estate records of Miami County, Ohio, it was discovered that the legal description set forth on Exhibit B contained certain engineering and/or surveying errors. The surveyor which prepared the legal description of the Premises has corrected these errors.

D.    Landlord and Tenant desire to enter into this Amendment in order to correct the legal description of the Premises set forth in the Lease.

### A G R E E M E N T S:

NOW, THEREFORE, in consideration of the foregoing Recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Exhibit B to the Lease hereby is deleted in its entirety and is replaced with "Exhibit B - Amended" attached to this Amendment and made a part hereof.

2.    Except as modified herein, all of the terms, covenants and conditions of the Lease shall remain unmodified and in full force and effect.

3.    This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

4.    This Amendment may be executed in any number of counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Amendment on the day and year first above written.

Signed and acknowledged
in the presence of:

Print Name: *SHARI SETHMAN*

Print Name: LINDA VAIL

Print Name: Mary J. Pechous

Print Name: Sonia Larsen

MIDAMCO
By:    The Mid-America Management
       Corporation, its general partner

By: _____

Its: *President*

SEARS, ROEBUCK AND CO.

By: _____
       Ronald P. Douglass
Its:    Vice President
       Real Estate

R.E. DIRECTOR
CW
LEGAL
TPP

STATE OF ILLINOIS        )
                         ) SS:
COUNTY OF COOK           )


I, the undersigned, a Notary Public, in and for the County and State aforesaid, do hereby certify, that RONALD P. DOUGLASS personally known to me to be the VICE PRESIDENT REAL ESTATE of **SEARS ROEBUCK AND CO.**, a New York corporation, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that, as such VICE PRESIDENT REAL ESTATE, he signed and delivered the said instrument pursuant to authority duly given to him by said corporation.

Given under my hand and seal this _1st_ day of _November_ , 2000.


_Brenda L. Martin_
Notary Public

"OFFICIAL SEAL"
BRENDA L. MARTIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6/14/2003

My Commission Expires:
June 14, 2003

STATE OF OHIO          )
                             ) SS:
COUNTY OF CUYAHOGA )

      BE IT REMEMBERED, that on this _____ day of _____, 2000, before me, the subscriber, a Notary Public, personally appeared the above-named MIDAMCO, an Ohio limited partnership, by _____ the _____ of The Mid-America Management Corporation, its general partner, who acknowledged to me that he signed said instrument as such _____, and that the signing of the same was his free act and deed, as such _____ and on behalf of MIDAMCO, for the uses and purposes therein set forth.

      IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the official seal of my office at _____, Ohio, on the day and year last above written.

                                        Notary Public

My commission expires: _____.

                                      RAPHAEL J. OMERZA, Attorney at Law
                                      Notary Public, State of Ohio
                            My commission has no expiration date.
                                   Section 147.03 O.R.C

STATE OF _____ )
                         ) SS:
COUNTY OF _____ )

      BE IT REMEMBERED, that on this _____ day _____, 1998, before me, the subscribed, a Notary Public and for said County and State, personally appeared the above-named Sears, Roebuck and Co., a New York corporation, by _____, its _____, who acknowledged to me that he/she signed said instrument as such _____, and that the signing of the same was his/her free act and deed, as such officer, for and on behalf of said corporation, for the uses and purposes therein set forth.

      IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the official seal of my office at _____, _____, on the day and year last above written.

                                        Notary Public

My commission expires: _____.

EXHIBIT B-1 AMENDED

LEASE AREA LEGAL
FOR
MID-AMERICA MANAGEMENT
SEARS RETAIL STORE
MIAMI VALLEY MALL
PIQUA, OHIO

SITUATED IN THE CITY OF PIQUA, MIAMI COUNTY, OHIO AND BEING A PART OF INLOT NUMBER 7689 AS SHOWN ON THE REPLAT OF INLOTS 6918, 6919, 6920, 6930, 6950 AND PART OF OUTLOT 279 RECORDED IN PLAT BOOK VOLUME 14, PAGE 147, 147-A AND 147-B, BEING MORE FULLY DESCRIBED AS FOLLOWS,

COMMENCING AT A PK NAIL AT THE INTERSECTION OF THE CENTERLINE OF GARBRY ROAD AND THE EASTERLY RIGHT OF WAY OF THE CHESSIE SYSTEM RAILROAD, THE SOUTHWEST CORNER OF SAID INLOT 7689 AND THE PRINCIPLE PLACE OF BEGINNING FOR THE TRACT HEREIN DESCRIBED:

THENCE N 14DEG 15MIN 21SEC W, 313.16 FEET ON AND ALONG THE EASTERLY RIGHT OF WAY OF SAID RAILROAD;

THENCE N 75DEG 44MIN 39SEC E 735.35 FEET TO THE PRINCIPLE PLACE OF BEGINNING FOR THE TRACT HEREIN TO BE DESCRIBED:

THENCE N 09DEG 35MIN 54SEC W 7.81 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE LEFT HAVING A RADIUS OF 55.50 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 47.38 FEET THROUGH A DELTA ANGLE OF 48DEG 55MIN 04SEC TO THE BEGINNING OF A REVERSE CURVE TO THE RIGHT HAVING A RADIUS OF 14.50 FEET; THE AFORESAID ARC BEING SUBTENDED BY A CHORD BEARING N 34DEG 03MIN 26SEC W 45.96 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 12.38 FEET THROUGH A DELTA ANGLE OF 48DEG 55MIN 04SEC TO THE BEGINNING OF A TANGENT LINE, THE ARC BEING SUBTENDED BY A CHORD BEARING N 34DEG 03MIN 26SEC W 12.01 FEET;

THENCE N 09DEG 35MIN 54SEC W 2.37 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE RIGHT HAVING A RADIUS OF 19.50 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 20.42 FEET THROUGH A DELTA ANGLE OF 60DEG 00MIN 24SEC TO THE BEGINNING OF A TANGENT LINE, SAID ARC BEING SUBTENDED BY A CHORD BEARING N 20DEG 24MIN 18SEC E 19.50 FEET;

THENCE N 50DEG 24MIN 30SEC E 4.61 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE LEFT HAVING A RADIUS OF 20.50 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 21.47 FEET THROUGH A DELTA ANGLE OF 60DEG 00MIN 24SEC TO THE BEGINNING OF A TANGENT LINE, SAID ARC BEING SUBTENDED BY A CHORD BEARING N 20DEG 24MIN 18SEC E 20.50 FEET;

THENCE N 09DEG 35MIN 54SEC W 108.99 FEET;

THENCE N 80DEG 24MIN 06SEC E 10.29 FEET;

THENCE N 09DEG 35MIN 54SEC W 149.06 FEET;

THENCE N 80DEG 24MIN 06SEC E 211.50 FEET;

THENCE N 09DEG 35MIN 54SEC W 0.47 FEET;

THENCE N 80DEG 24MIN 06SEC E 148.00 FEET TO THE BEGINNING OF A NON-TANGENT CURVE TO THE RIGHT HAVING A RADIUS OF 19.50 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 7.12 FEET THROUGH A DELTA ANGLE OF 20DEG 55MIN 08SEC TO THE BEGINNING OF A REVERSE CURVE TO THE LEFT HAVING A RADIUS OF 129.50 FEET, AFORESAID ARC BEING SUBTENDED BY A CHORD BEARING S 13DEG 10MIN 24SEC W 7.08 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 75.11 FEET THROUGH A DELTA ANGLE OF 33DEG 13MIN 52SEC TO THE BEGINNING OF A TANGENT LINE, SAID ARC BEING SUBTENDED BY A CHORD BEARING S 07DEG 01MIN 02SEC W 74.06 FEET;

THENCE S 09DEG 35MIN 54SEC E 255.85 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE RIGHT HAVING A RADIUS OF 19.50 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 30.63 FEET THROUGH A DELTA ANGLE OF 90DEG 00MIN 00SEC TO THE BEGINNING OF A TANGENT LINE, SAID ARC BEING SUBTENDED BY A CHORD BEARING S 35DEG 24MIN 06SEC W 27.58 FEET;

THENCE S 80DEG 24MIN 06SEC W 4.08 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE RIGHT HAVING A RADIUS OF 2.00 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 3.14 FEET THROUGH A DELTA ANGLE OF 90DEG 00MIN 00SEC TO THE BEGINNING OF A TANGENT LINE, SAID ARC BEING SUBTENDED BY A CHORD BEARING N 54DEG 35MIN 54SEC W 2.83 FEET.

THENCE N 09DEG 35MIN 54SEC W 17.99 FEET;

THENCE S 80DEG 24MIN 06SEC W 61.00 FEET;

THENCE S 09DEG 35MIN 54SEC E 26.06 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE RIGHT HAVING A RADIUS OF 4.50 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 7.07 FEET THROUGH A DELTA ANGLE OF 90DEG 00MIN 00SEC TO THE BEGINNING OF A TANGENT LINE, SAID ARC BEING SUBTENDED BY A CHORD BEARING S 35DEG 24MIN 06SEC W 6.36 FEET;

THENCE S 80DEG 24MIN 06SEC W 79.92 FEET;

THENCE N 09DEG 35MIN 54SEC W 15.00 FEET;

THENCE S 80DEG 24MIN 06SEC W 96.75 FEET;

THENCE N 09DEG 35MIN 54SEC W 49.03 FEET;

THENCE S 80DEG 24MIN 06SEC W 15.00 FEET;

THENCE S 09DEG 35MIN 54SEC E 50.03 FEET;

THENCE S 80DEG 24MIN 06SEC W 0.68 FEET;

THENCE N 09DEG 35MIN 54SEC W 10.67 FEET;

THENCE S 80DEG 24MIN 06SEC W 48.14 FEET;

THENCE S 09DEG 35MIN 54SEC E 17.67 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE RIGHT HAVING A RADIUS OF 5.50 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 8.64 FEET THROUGH A DELTA ANGLE OF 90DEG 00MIN 00SEC TO THE BEGINNING OF A TANGENT LINE, SAID ARC BEING SUBTENDED BY A CHORD BEARING S 35DEG 24MIN 06SEC W 7.78 FEET;

THENCE S 80DEG 24MIN 06SEC W 5.30 FEET TO THE BEGINNING OF A TANGENT CURVE TO THE RIGHT HAVING A RADIUS OF 3.50 FEET;

THENCE ON AND ALONG SAID CURVE AN ARC DISTANCE OF 5.50 FEET THROUGH A DELTA ANGLE OF 90DEG 00MIN 00SEC TO THE BEGINNING OF A TANGENT LINE AND THE PLACE OF BEGINNING ENCLOSING AN AREA OF 2.7506 ACRES (119,814.59 SQUARE FEET) OF LAND, MORE OR LESS.

THE BEARINGS REFERRED TO HEREIN ARE BASED UPON AN ASSUMED MERIDIAN
AND ARE USED ONLY FOR THE PURPOSES OF ANGULAR MEASUREMENT.

THIS LEGAL DESCRIPTION IS BASED UPON A SURVEY PERFORMED BY RICHARD
KLOCKNER SURVEYOR NO. 4370 DURING OCTOBER 1987, AND RESURVEYED IN
DEC 1988 AND NOV 1993 BY POGGEMEYER DESIGN GROUP INCORPORATED
UNDER THE SUPERVISION OF ROBERT A. SANFORD, PS # 5425.

REV: December 2, 1999
November 23, 1999
P:\PDG\CLIENTS\9901\343\SEARS LSE
RAS