WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                     :

In re                            :        **Chapter 11**
                                       :

**SEARS HOLDINGS CORPORATION, *et al.*,**   :        **Case No. 18-23538 (RDD)**
                                       :

                  **Debtors.[1]**          :        **(Jointly Administered)**
                                       :

---------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**DEBTORS' MOTION FOR AUTHORIZATION AND
APPROVAL OF (I) SETTLEMENT BETWEEN DEBTORS AND
THE CHUBB COMPANIES, (II) DEBTORS' ENTRY INTO THE
TRANSACTION DOCUMENTS, AND (III) RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation ("**Sears Holdings**") and its debtor affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and

together with their non-Debtor affiliates, the "**Company**"), respectfully represent as follows in

support of this motion (the "**Motion**"):

## Background

1.      Beginning on October 15, 2018 (the "**Commencement Date**") and

continuing thereafter, each of the Debtors commenced with this Court a voluntary case under

chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are

authorized to continue to operate their business and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On October 24, 2018, the United States Trustee for Region 2 appointed an

official committee of unsecured creditors (the "**Creditors' Committee**").  No trustee or examiner

has been appointed in these chapter 11 cases.

3.      The Debtors' chapter 11 cases are being jointly administered for procedural

purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**").

4.      On February 8, 2019, the Bankruptcy Court entered the *Order (I) Approving

the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of

the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III)

Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in*

*Connection Therewith and (IV) Granting Related Relief* (the "**Sale Order**") (ECF No. 2507), pursuant to which the Debtors sold substantially all of their assets to Transform Holdco LLC ("**Transform**").

5.      The sale to Transform (the "**Sale Transaction**") closed on February 11, 2019.  Pursuant to the Asset Purchase Agreement, dated as of January 17, 2019 (as amended, the "**APA**"), the Debtors are required to transfer the KCD Notes (as defined in the APA) from Sears Reinsurance Company Ltd. ("**Sears Re**") to Transform in consideration for, among other things, Transform's assumption of any liabilities owed by Sears Re in relation to certain warranties and protection agreements (the "**PA Liabilities**"). *See* APA, §§ 2.1(r), 2.3(e).  The transfer of the KCD Notes is subject to approval of the Bermuda Monetary Authority ("**BMA**"). *See* APA, § 2.8(e).

6.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn on October 15, 2018 (the "**Riecker Declaration**") (ECF No. 3).[2]

**Jurisdiction**

7.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

### Relief Requested

8.      By this Motion, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), the Debtors request (A) authorization to (i) enter into a settlement (the "**Settlement**") between the Debtors and ACE American Insurance Company (together with its affiliates and successors, the "**Chubb Companies**") and (ii)(a) enter into that certain binder (as amended, modified, or supplemented from time to time, and including any exhibit or addenda thereto, the "**Binder**"), substantially in the form attached hereto as **Exhibit A** (subject to approval of the Company and the Chubb Companies); (b) enter into that certain master agreement (as amended, modified, or supplemented from time to time, and including any exhibit or addenda thereto, the "**Master Agreement**"), substantially in the attached hereto as **Exhibit B** (subject to approval of the Company and the Chubb Companies); and (c) purchase that certain contractual indemnity policy described in the Binder (as renewed, amended, modified, endorsed or supplemented from time to time, and including any exhibit or addenda thereto, the "**CIP**" and, together with the Binder, the Master Agreement, and all documents and agreements included within the definition of "Transaction Documents" in the Binder, the "**Transaction Documents**") and (B) authority to perform all obligations under the Transaction Documents and take any actions necessary to consummate the transaction contemplated by the Settlement, including the termination and commutation of the SRC Deductible Buyback Policies (as defined in the Master Agreement) and the transfer of claims handling services from Sedgwick Claims Management Services, Inc. ("**Sedgwick**") to ESIS, Inc. ("**ESIS**").[3]

---

[3] This Motion seeks authority to transfer the claims handling services. If after such transfer, the Debtors seek to reject any agreements that they may have with Sedgwick, the Debtors will comply with the procedures set forth in the *Order Authorizing Debtors to Establish Procedures for Rejection of Executory Contracts* (ECF No. 3044) with respect thereto.

9.      A proposed form of order granting the relief requested herein (the "**Proposed Order**") is attached hereto as **Exhibit C**.

## Factual Section

### A.    The Policies and the Sears Re Agreements

10.      Prior to the Commencement Date, the Chubb Companies issued various insurance policies including certain workers' compensation insurance policies to certain Debtors as named insureds (such workers' compensation policies, the "**Referenced Policies**").  At that time, the Chubb Companies and the Debtors also entered into certain written agreements in connection with the Referenced Policies.

11.      Prior to the Commencement Date, the Chubb Companies and Sears Re, a non-debtor affiliate of the Debtors, entered into certain reinsurance agreements (the "**Sears Re Agreements**")[4]  pursuant to which (i) the Chubb Companies ceded to Sears Re, and Sears Re assumed, certain losses, liabilities, costs and expenses in respect of the Sears Policies (as defined in the Master Agreement), and (ii) Sears Re ceded to the Chubb Companies, and the Chubb Companies assumed, certain losses, liabilities, costs and expenses in respect of the Sears Re Deductible Buyback Policies (as defined in the Master Agreement).

12.      Consequently, Sears Re and Chubb currently have the ultimate liability for the amounts that may be payable under the Sears Policies.

13.      In connection with obtaining the BMA's approval of the transfer of the KCD Notes as contemplated by section 2.8 of the APA, the Debtors and Transform believe it is

---

[4] For the avoidance of doubt, the Sears Re Agreements include: (a) that certain Excess of Loss Reinsurance Agreement between Sears Reinsurance Company Ltd. as ceding company and the ACE American Insurance Company as assuming company effective as of April 30, 2009 (as amended); (b) that certain Excess of Loss Reinsurance Agreement between Sears Reinsurance Company Ltd. as ceding company and ACE American Insurance Company as assuming company effective as of August 1, 2010 (as amended); and (c) that certain Reinsurance Agreement between ACE American Insurance Company as ceding company and Sears Reinsurance Company Ltd. as assuming company effective as of June 16, 2008 (as amended).

necessary to provide for a satisfactory resolution of Sears Re's insurance obligations, such as obligations relating to the Sears Policies.

14.    The Debtors, Sears Re, and the Chubb Companies have agreed, subject to approval by this Court, to a settlement that eliminates Sears Re's liability under the Sears Policies and resolves certain claims between and among them (collectively, the "**Subject Claims**"), and to enter into certain documents and transactions related to the Referenced Policies, the Sears Re Agreements, and certain other agreements, as set forth in more detail in the Master Agreement (the "**Transaction**").   Effectuation of the Settlement will result in approximately $36 million in liabilities being removed from Sears Re's balance sheet; the Debtors believe that the Settlement will be viewed favorably by the BMA and facilitate approval of the transfer of the KCD Notes.

## B.    Terms of the Settlement

15.    The significant terms of the Settlement are as follows:[5]

(a)    Insured.  Sears Holdings Corporation and/or Kmart Holding Corporation

(b)    Insurer.  Indemnity Insurance Company of North America

(c)    Program Effective Date.  March 31, 2019

(d)    Premium.  (i) Under the WC Commutation Agreement, Chubb will agree to pay **$36,512,560** to Sears Re in exchange for Sears Re's agreement to fully and finally release Chubb from any and all further obligations under the WC Reinsurance Agreements; (ii) under the GL Commutation Agreement, Sears Re will agree to pay **$50,000** to Chubb in exchange for Chubb's agreement to fully and finally release Sears Re from any and all further obligations under the GL Reinsurance Agreements; (iii) under the Buyback Commutation Agreement, Sears Re will agree to pay **$36,462,560** to the Insured in exchange for the Insured's agreement to fully and finally release Sears Re from any and all further obligations under the Sears Re Deductible Buyback Policies; and (iv) in consideration of the issuance of the CIP by the Insurer to the Insured, the Insured will pay **$36,462,560** to the Insurer.

---

[5] The following description of the terms of the Transaction Documents is intended solely to give the Court and interested parties an overview of the significant terms of the Transaction Documents. The Court and interested parties should refer to the Transaction Documents for the complete and detailed terms thereof. For this paragraph only, any capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Transaction Documents.

The payments contemplated in items (i) through (iv) above shall be referred to herein, collectively, as the "**Transaction Payment**."

(e)     <u>Payments and Offsets</u>.  (i) The respective payments to be made by Chubb to Sears Re, by Sears Re to Chubb, by Sears Re to the Insured, and by the Insured to the Insurer pursuant to the Transaction Documents shall be deemed to be and shall be made immediately and contemporaneously on the Program Transaction Date; (ii) Chubb will offset the amount of the WC Reinsurance Commutation Fee which it is obligated to pay to Sears Re against the amount of the CIP Premium which the Insured is obligated to pay to Chubb, as the Insurer, and against the amount of the GL Reinsurance Commutation Fee that Sears Re is to pay to Chubb; and (iii) on and after the Program Transaction Date, Chubb, as the Insurer, shall indefeasibly retain the CIP Premium as consideration for the issuance of the CIP.

(f)     <u>Covered Losses</u>.  Subject to the terms and conditions of the CIP, the Insurer will reimburse Chubb directly on behalf of the Insured for amounts paid within the applicable Per Occurrence Limit in respect of: (i) the Insured's deductible reimbursement obligations under the Referenced Policies and (ii) the Insured's additional premium payment obligations in respect of Loss and ALAE arising under any retrospectively-rated Referenced Policy issued.

(g)     <u>Per Occurrence Limit</u>.  With respect to the Referenced Policies, the CIP will cover, on an each and every occurrence basis, Covered Losses from first dollar of loss up to the applicable Per Occurrence Limit.

(h)     <u>ALAE Treatment</u>.  Allocated Loss Adjustment Expenses reimbursed by the Insurer in respect of Referenced Policies will erode the applicable Per Occurrence Limit.

(i)     <u>Claims Handling</u>.  Sedgwick is currently the claims administrators for claims arising under the Referenced Policies.

The Insured shall transfer the claims administration of claims arising under the Referenced Policies from Sedgwick to ESIS within forty-five (45) days after the Program Transaction Date. The CIP will cover, and the Insurer will be responsible for and pay, all claims administration costs payable to ESIS in respect of the Program.

The Binder does not include or cover any claims administration costs payable to Sedgwick in respect of the Referenced Policies.  The Insured will be responsible for, and they will pay, all claims administration costs and fees due to Sedgwick.  The Insured will indemnify and reimburse the Insurer for any such costs and fees which the Insurer pays to Sedgwick.

(j)    <u>Release by the Debtors</u>.  As of the Program Transaction Date, the Insured shall grant to Chubb the following releases (collectively, the "**Insured Parties' Releases**"):

   (i)    Except for the obligations of the Insurer Parties (as defined below) as set forth in (i) the Sears Policies and (ii) the Transaction Documents, and in consideration of the covenants, promises and agreements contained herein, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Insured, for itself and on behalf of each of its debtor and non-debtor affiliates and the agents, employees, representatives, officers, attorneys, shareholders, directors, parents, subsidiaries, affiliates, assigns, trustees, successors and predecessors in interest of each of the foregoing (collectively, the "**Insured Parties**"), waives, releases, acquits and forever discharges Chubb and its agents, employees, representatives, officers, attorneys, shareholders, directors, parents, subsidiaries, affiliates (other than the Insurer), assigns, successors and predecessors in interest (collectively, the "**Insurer Parties**") from any and all claims (including, but not limited to, any and all claims pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and 550), counterclaims, rights, demands, obligations, causes of action, actions, costs, damages, losses, liabilities, and attorneys' fees, either asserted or unasserted, known or unknown, fixed or contingent, liquidated or unliquidated, matured or unmatured, foreseen or unforeseen, which exist or may exist, that any of the Insured Parties has or may have against any or all of the Insurer Parties from the beginning of time through the Program Transaction Date related to the Sears Policies.

   (ii)    With respect to the matters released herein, the Insured, for itself and the other Insured Parties, expressly waives any and all rights under § 1542 of the Civil Code of the State of California, which provides as follows:  ***A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.***

(k)    <u>Releases by the Insurer Parties</u>.  As of the Program Transaction Date, the Insurer Parties shall grant to the Insured Parties, the following releases (collectively, the "**Insurer Parties' Releases**"):

   (i)    Except for any duty of cooperation in the Sears Policies, and in consideration of the covenants, promises and agreements contained herein, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Insurer Parties, waive, release, acquit and forever discharge the

Insured Parties from any and all claims, counterclaims, rights, demands, obligations, causes of action, actions, costs, damages, losses, liabilities, and attorneys' fees, either asserted or unasserted, known or unknown, fixed or contingent, liquidated or unliquidated, matured or unmatured, foreseen or unforeseen, which exist or may exist, that any of the Insurer Parties has or may have against any or all of the Insured Parties from the beginning of time through the Program Transaction Date related to the Sears Policies.

(ii)    With respect to the matters released herein, the Insurer Parties, expressly waives any and all rights under § 1542 of the Civil Code of the State of California, which provides as follows:  *A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.*

(l)    Sears Re is granting certain releases with respect to the Sears Re Agreements (the "**SRC Releases**").

(m)    <u>Termination of the SRC Deductible Buyback Policies</u>.  The SRC Deductible Buyback Policies and the interests and obligations of the Debtors and Sears Re therein shall be terminated.

## The Requested Relief Should Be Granted

16.    The Settlement is in the best interests of the Debtors and their estates and should be approved.  Bankruptcy Rule 9019(a) provides that on motion and after notice and a hearing, "the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  In granting a motion pursuant to Bankruptcy Rule 9019(a), a Court must find that the proposed settlement is fair and equitable and is in the best interests of the debtor's estate.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re 47-49 Charles St., Inc.*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

17.    Although a court must "evaluate . . . all . . . factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *TMT Trailer Ferry*, 390 U.S. at 424, a

court need not conduct a "mini-trial" of the merits of the claims being settled, *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993), or conduct a full independent investigation. *See In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991). "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact . . . . The court need only canvas the settlement to determine whether it is within the accepted range of reasonableness." *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (internal citations omitted).

18.     Relying on the guiding language of *TMT Trailer Ferry*, courts in this Circuit have set forth the following factors to be considered in evaluating the reasonableness of settlement:

(a)     the probability of success in litigation, with due consideration for the uncertainty in fact and law;

(b)     the difficulties of collecting any litigated judgment;

(c)     the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay;

(d)     the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement;

(e)     the competence and experience of counsel who support the settlement;

(f)     the relative benefits to be received by members of any affected class;

(g)     the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and

(h)     the debtor's informed judgment that the settlement is fair and reasonable.

19.     Many of the foregoing factors are inapplicable, given that no litigation is pending among the parties to the Settlement. Nevertheless, the Settlement is fair, falls within the range of reasonableness, is consistent with the objectives of chapter 11, and should be approved.

A.    **The Settlement Provides Substantial**
      **Benefits to the Debtors in These Chapter 11 Cases**

20.    Consideration of the *TMT Trailer Ferry* factors weighs in favor of approval of the Settlement.  Critically, the Settlement ensures that the Debtors and Sears Re can comply with their respective obligations in the APA.

21.    In addition, the Settlement represents a fair compromise that is an appropriate exercise of business judgment and is in the best interests of the Debtors, their estates, and all parties in interest.  Notably, the net effect of the Settlement does not impose any additional payment obligations on the Debtors and, although the insurance liabilities of Sears Re will be reduced substantially, the Debtors will retain the same aggregate amount of insurance.  Moreover, the Settlement substitutes the Insurer, a more creditworthy entity than Sears Re, as the party that is ultimately liable for the commuted insurance obligations.  In addition, the CIP eliminates aggregate limits that currently apply under the reinsurance agreements to be commuted as part of the proposed Transaction.   The terms and conditions of the Settlement were reached after arm's length negotiations between, among others, the Debtors, the Insurer, Transform, the Chubb Companies, and Sears Re.  The Subject Claims that are being settled are complex and multifaceted, and the Settlement provides a simple resolution of the respective parties' claims that is fair and equitable to all parties.

22.    Further, because the proposed Transaction Payment does not result in or require any cash or other assets to be actually paid or actually transferred between the three parties to the Settlement, the settlement is effectively cash neutral to the Debtors.  The CIP effectively transfers all of the financial obligations associated with the Referenced Policies from the Debtors/Sears Re to the Chubb Companies and the Insurer, and will resolve all of the claims of the Chubb Companies against the Debtors/Sears Re with respect to the Referenced Policies.  In

addition, the Settlement is expected to facilitate BMA's approval of the transfer of the KCD Notes and the concomitant assumption of the PA Liabilities by Transform; however, the Settlement is not conditioned upon such approval and assumption.

23.    The Insured Parties' Releases are a critical part of the Settlement, from the Insurer's point of view.  The Debtors have been advised that the Insurer would not have agreed to issue the Binder and the CIP without the Insured Parties' Releases.

24.    In light of the importance of the Settlement to the Sale Transaction, and the benefits the Debtors will receive from the Transaction, the Debtors submit that the Settlement is fair and reasonable for all parties and, therefore, the Settlement including the Insured Parties' Releases and SRC Releases provided for in the Transaction Documents should be approved and binding.

## B.    **Entry into the Transaction Documents and Related Relief Should Be Approved**

25.    Ample authority exists for approval of the Transaction Documents under section 363 of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve the use of property outside the ordinary course of business, the Court must "find from the evidence presented before [it] at the hearing a good business reason to grant such an application."  *In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Borders Grp., Inc.*, 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011) ("[A] debtor often satisfies the business judgment standard if 'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'") (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)); *In re MF Glob. Ltd.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) ("The business judgment of a trustee is entitled to great deference.").  If "the debtor articulates a

reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).  Courts in this District consistently have declined to interfere with corporate decisions absent a showing a bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions are attributable to any "rational business purpose." *Integrated*, 147 B.R. at 656 (quoting *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 436 (S.D.N.Y. 1988)).

26.     Further, limited relief from the automatic stay, to the extent it is applicable to the Transaction Payment, is appropriate under the circumstances.

27.     Section 362(a) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).  Relief from the stay pursuant to section 362(d) of the Bankruptcy Code, is appropriate, to ensure that Sears Holdings, Sears Re, the Chubb Companies, and the Insurer are able to effectuate the Settlement in the cash free manner contemplated by the Transaction Documents.

28.     The Debtors' decision to enter into the Transaction Documents and to take all other actions necessary to consummate the Transaction, including the termination and commutation of the SRC Deductible Buyback Policies, the transfer of claims handling services, the granting of the Insured Parties' Releases and the effectuation of the Transaction Payment easily satisfies the business judgment standard.  Executing the Transaction Documents, terminating and

commuting the SRC Deductible Buyback Policies, and transferring the claims handling services are all integral to the Settlement, which will facilitate the Debtors' and Sears Re's compliance with their respective obligations in the Sale Transaction.  Accordingly, the Debtors submit that the requested relief is an appropriate exercise of their business judgment, will benefit the Debtors' estates, and should be approved.

## Notice

29.     Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405) (the "**Amended Case Management Order**").  The Debtors respectfully submit that no further notice is required.

30.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order and such other and further relief as is just.

Dated:  May 3, 2019
        New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

## Exhibit A

**Binder**

# Chubb Alternative Risk Solutions

*This Binder ("Binder") sets out the terms and conditions of a proposed loss portfolio transfer of Workers' Compensation deductible reimbursement obligations, and, as set forth herein, is a summary of the coverage to be provided pursuant to such transaction. This is an offer to provide coverage, subject to the satisfaction of the conditions precedent contained herein, and this offer will automatically expire on May 7, 2019 (unless withdrawn earlier) if this Binder is not executed by the parties on or prior to such date. This Binder supersedes and replaces any and all prior Binders, Indications or Term Sheets relating to the Policy (as defined below). This Binder may be accepted by the Insured by the Insured's signature of this Binder and delivery of it to the Insurer on or before May 7, 2019.*

| | |
|---|---|
| **Insured:** | **Sears Holdings Corporation**<br>**Kmart Holding Corporation**<br>**3333 Beverly Road, E3-237A**<br>**Hoffman Estates, Illinois 60179** |
| **Insurer:** | Indemnity Insurance Company of North America |
| **Program Effective Date:** | March 31, 2019 |
| **Program Transaction Date:** | The Program Transaction Date will be date upon which the Order (as defined below) shall have become the Final Order (as defined below). This Binder shall be of no further force and effect and shall be void *ab initio*, if the Program Transaction Date does not occur on or before June 15, 2019 unless the Insurer, in its sole discretion, agrees to a later date by written notice to the Insured. |
| **Referenced Policies:** | Those certain Workers' Compensation policies issued by ACE American Insurance Company and/or any of its affiliates (collectively and with all affiliates, predecessors and successors thereof, "Chubb") to the Insured with effective dates from and including (a) March 4, 2002 through March 19, 2003; (b) April 1, 2005 through March 31, 2007; and, (c) August 1, 2010 through July 31, 2011.<br><br>The Referenced Policies are listed in Appendix 1. |
| **Form:** | The Contractual Indemnity Policy ("CIP") issued by the Insurer will incorporate all of the terms and conditions of this Binder. |
| **Premium:** | <u>**$36,462,560.**</u><br><br>In consideration of the issuance of the CIP by the Insurer to the Insured, the Insured will pay to the Insurer the Premium.  No coverage will be provided if the Premium is not paid in full. |
| **Covered Losses:** | Subject to the terms, conditions and limits herein, the Insurer will reimburse Chubb directly on behalf of the Insured for amounts paid within the applicable Per Occurrence Limit in respect of: (i) the Insured's deductible reimbursement obligations under the Referenced Policies and (ii) the Insured's additional premium payment obligations in respect of Loss and Allocated Loss Adjustment Expenses ("ALAE") arising under any retrospectively-rated Referenced Policy issued.<br><br>Payments will be based upon information supplied to the Insurer from Sedgwick (as defined below) or ESIS (as defined below), as applicable, and verified by the Insurer.  Payments will be made by the Insurer in respect of Covered Losses |

1

Chubb does not offer accounting, tax or legal advice regarding the treatment of the proposed program. The Insured should conduct an independent evaluation of the information contained herein and consult with its own accounting, tax, legal advisors and any other relevant specialists before considering this transaction.

**Chubb Alternative Risk Solutions**

based on amounts actually paid on and after the Program Effective Date, and will not be made based on estimated incurred amounts. No coverage will be provided for Covered Losses paid by or on behalf of the Insured prior to the Program Effective Date.

| | |
|---|---|
| **Aggregate Limit of Liability:** | The CIP will not have an aggregate limit. |

**Per Occurrence Limit**:

With respect to the Referenced Policies, the CIP will cover, on an each and every occurrence basis, Covered Losses from first dollar of loss up to the applicable Per Occurrence Limit, as set forth in Appendix 2.

The Per Occurrence Limit will apply based upon all amounts paid under the Referenced Policies from first dollar in respect of losses and ALAE, regardless of whether such losses and ALAE are Covered Losses or are paid on, before or after the Program Effective Date. The Per Occurrence Limit will apply based on the claimant's date of injury as reported by Sedgwick or ESIS, as applicable, and verified by the Insurer.

**ALAE Treatment:**

ALAE reimbursed by the Insurer in respect of Referenced Policies will erode the applicable Per Occurrence Limit as set out in Appendix 2.

**Claims Handling:**

Sedgwick Claims Management Services, Inc. ("Sedgwick") is currently the claims administrators for claims arising under the Referenced Policies.

The Insurer will require the Insured to, and the Insured agrees that it will, transfer the claims administration of claims arising under the Referenced Policies from Sedgwick to ESIS, Inc. ("ESIS") within forty five (45) days after the Program Transaction Date. The CIP will cover, and the Insurer will be responsible for and pay, all claims administration costs payable to ESIS in respect of the Program.

Following such transfer to ESIS, the Insurer will assume sole control of the administration of claim services for claims arising under the Referenced Policies, including but not limited to authority to settle and/or defend any and all such claims and authority to set reserves for such claims, and the Insurer will adhere to its best practices in handling such claims.

This Binder does not include or cover any claims administration costs payable to Sedgwick in respect of the Referenced Policies. The Insured will be responsible for, and they will pay, all claims administration costs and fees due to Sedgwick in respect of the Program. The Insured will indemnify and reimburse the Insurer for any such costs and fees which the Insurer pays to Sedgwick in respect of the Program.

**Other Terms and Conditions:**

1.     The transaction described herein is subject to and expressly conditioned upon execution of the following agreements:

   (i)     a master agreement between Chubb, the Insured and Sears Reinsurance Company Ltd. ("SRC") (the "Master Agreement");

2

Chubb does not offer accounting, tax or legal advice regarding the treatment of the proposed program. The Insured should conduct an independent evaluation of the information contained herein and consult with its own accounting, tax, legal advisors and any other relevant specialists before considering this transaction.

**Chubb Alternative Risk Solutions**

(ii)     a commutation agreement between Chubb and SRC (the "WC Commutation Agreement") that applies to certain reinsurance agreements related to workers' compensation coverage (the "WC Reinsurance Agreements");

(iii)    a commutation agreement between SRC and Chubb ("the GL Commutation Agreement") that applies the reinsurance agreements related to certain general liability coverage; and

(iv)     a Deductible Buyback Policies Commutation Agreement between SRC and the Insured ("Buyback Commutation Agreement") that applies to certain Deductible Buyback Policies previously issued by SRC (the "SRC Deductible Buyback Policies").

The Master Agreement, the WC Commutation Agreement, the GL Commutation Agreement and the Buyback Commutation Agreement, are collectively referred to herein as the "Transaction Documents".

2.    The Insured and the Insurer agree that:

(i)     the respective payments to be made by Chubb to SRC, by SRC to Chubb, by SRC to the Insured, and by the Insured to the Insurer pursuant to the Transaction Documents shall be deemed to be and shall be made immediately and contemporaneously on the Program Transaction Date; and

(ii)    Chubb may fully and completely offset the amount of the WC Reinsurance Commutation Fee which it is obligated to pay to SRC against the amount of the CIP Premium which the Insured is obligated to pay to Chubb, as the Insurer, and against the amount of the GL Reinsurance Commutation Fee that SRC is to pay to Chubb; and

(iii)   on and after the Program Transaction Date, Chubb, as the Insurer, may indefeasibly retain the CIP Premium as consideration for the issuance of the CIP.

3.    In addition, the transaction described herein is subject to and expressly conditioned upon acceptable documentation and the entry of an order (the "Order") of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the jointly administered chapter 11 bankruptcy case of SEARS HOLDING CORPORATION and its affiliated debtors that are insureds under the Referenced Policies following an appropriate motion and notice.  The Order (a) shall (i) be in form and substance acceptable to Chubb in all respects, (ii) approve the transaction and each of the Transaction Documents in all respects including any transfer of claims handling services, (iii) authorize the Insured to enter into the Transaction Documents to which it is a party, (iv) authorize Chubb to retain the Premium for the Policy as set out in this Binder including authorizing setoff to the extent applicable and (v) release the Insurer and Chubb as set forth herein and (b) must become final, without any appeal or modification thereof, and all applicable appeal periods having expired (the "Final Order").  Receipt of the Final Order shall be a condition precedent to the commencement of any coverage obligations of the Insurer under the CIP.  Additionally, the Insured agrees to allow the Insurer to review and approve all motions, proposed Orders and other documentation requesting the entry and approval of the Order and all exhibits thereto prior to the filing of such documents with the Bankruptcy Court.

4.    As of the Program Transaction Date, the Insured shall grant to Chubb the following releases:

Except for the obligations of the Insurer Parties (as defined below) as set forth in (i) the Sears Policies (as defined in the Master Agreement) and (ii) the Transaction Documents, and in consideration of the covenants, promises and agreements contained herein, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Insured, for itself and on behalf of each of its debtor and non-debtor affiliates and the agents, employees, representatives, officers, attorneys, shareholders, directors, parents, subsidiaries, affiliates, assigns, trustees, successors and predecessors in interest of each of the foregoing (collectively, the "Insured Parties"), waives, releases, acquits and forever discharges Chubb and  its agents, employees, representatives, officers, attorneys, shareholders, directors,

3

Chubb does not offer accounting, tax or legal advice regarding the treatment of the proposed program. The Insured should conduct an independent evaluation of the information contained herein and consult with its own accounting, tax, legal advisors and any other relevant specialists before considering this transaction.

**Chubb Alternative Risk Solutions**

parents, subsidiaries, affiliates (other than the Insurer), assigns, successors and predecessors in interest (collectively, the "Insurer Parties") from any and all claims (including, but not limited to, any and all claims pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and 550), counterclaims, rights, demands, obligations, causes of action, actions, costs, damages, losses, liabilities, and attorneys' fees, either asserted or unasserted, known or unknown, fixed or contingent, liquidated or unliquidated, matured or unmatured, foreseen or unforeseen, which exist or may exist, that any of the Insured Parties has or may have against any or all of the Insurer Parties from the beginning of time through the Program Transaction Date related to the Sears Policies.

With respect to the matters released herein, the Insured, for itself and the other Insured Parties, expressly waives any and all rights under § 1542 of the Civil Code of the State of California, which provides as follows:  ***A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party***

5.      As of the Program Transaction Date, the Insurer Parties shall grant to the Insured Parties, the following releases:

Except for any duty of cooperation in the Sears Policies, and in consideration of the covenants, promises and agreements contained herein, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Insurer Parties, waive, release, acquit and forever discharge the Insured Parties from any and all claims, counterclaims, rights, demands, obligations, causes of action, actions, costs, damages, losses, liabilities, and attorneys' fees, either asserted or unasserted, known or unknown, fixed or contingent, liquidated or unliquidated, matured or unmatured, foreseen or unforeseen, which exist or may exist, that any of the Insurer Parties has or may have against any or all of the Insured Parties from the beginning of time through the Program Transaction Date related to the Sears Policies (as defined in the Master Agreement).

With respect to the matters released herein, the Insurer Parties, expressly waives any and all rights under § 1542 of the Civil Code of the State of California, which provides as follows:  ***A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.***

6.      This Binder is based on loss information valued as of December 31, 2018, as summarized in Appendix 3 and the Insured will be required to represent that, to the best of its knowledge, the loss information summarized in Appendix 3 is an accurate representation of the Insured's loss experience as of December 31, 2018.

7.      This Binder assumes, and the CIP will provide, that the Insurer will be entitled to all recoveries and claim reimbursements received in respect of losses and ALAE paid by the Insurer under the CIP, including but not limited to subrogation recoveries, and that all such amounts will be applied under the CIP.

8.      The Premium includes premium taxes payable by the Insurer with respect to the Premium payable for the CIP.

9.      The Premium includes $250,000 of brokerage commission payable to directly to Aon Risk Solutions by the Insurer on behalf of the Insured.

[Signature page follows]

4

Chubb does not offer accounting, tax or legal advice regarding the treatment of the proposed program. The Insured should conduct an independent evaluation of the information contained herein and consult with its own accounting, tax, legal advisors and any other relevant specialists before considering this transaction.
DM3\5752004.1

**Chubb Alternative Risk Solutions**

SEARS HOLDINGS CORPORATION

By:_____
    Name:
    Title:

KMART HOLDING CORPORATION

By:_____
    Name:
    Title:


INDEMNITY INSURANCE COMPANY OF NORTH AMERICA

By:_____
    Name:
    Title:

Chubb does not offer accounting, tax or legal advice regarding the treatment of the proposed program. The Insured should conduct an independent evaluation of the information contained herein and consult with its own accounting, tax, legal advisors and any other relevant specialists before considering this transaction.

DM3\5752004.1

**Chubb Alternative Risk Solutions**

**<u>Appendix 1</u>**

**Referenced Policies**

| Policy Number | Inception Date | Expiration Date |
|---|---|---|
| WLR C4313226 A | 03/04/2002 | 03/19/2003 |
| SCF C4313284 2 | 03/04/2002 | 03/19/2003 |
| WLR C4418700 0 | 04/01/2005 | 03/31/2006 |
| WLR C4418701 2 | 04/01/2005 | 03/31/2006 |
| SCF C4418702 4 | 04/01/2005 | 03/31/2006 |
| WLR C4416727 A | 05/01/2005 | 03/31/2006 |
| SCFC4418714 0 | 05/01/2005 | 03/31/2006 |
| WLR C4434085 9 | 04/01/2006 | 03/31/2007 |
| WLR C4434086 0 | 04/01/2006 | 03/31/2007 |
| SCF C4434087 2 | 04/01/2006 | 03/31/2007 |
| WLR C4 613821 1 | 08/01/2010 | 07/31/2011 |
| WLR C4 613817 A | 08/01/2010 | 07/31/2011 |
| SCF C4 613825 9 | 08/01/2010 | 07/31/2011 |
| WCU C4 613829 6 | 08/01/2010 | 07/31/2011 |

6

Chubb does not offer accounting, tax or legal advice regarding the treatment of the proposed program. The
Insured should conduct an independent evaluation of the information contained herein and consult with its own
accounting, tax, legal advisors and any other relevant specialists before considering this transaction.
DM3\5752004.1

**Chubb Alternative Risk Solutions**

**Appendix 2**

**Per Occurrence Limit**

| Policy Number | Inception Date | Expiration Date | Per Occurrence Limit | ALAE Treatment |
|---|---|---|---|---|
| WLR C4313226 A | 3/4/2002 | 3/19/2003 | $1,000,000 | Erodes |
| SCF C4313284 2 | 3/4/2002 | 3/19/2003 | $1,000,000 | Erodes |
| WLR C4418700 0 | 4/1/2005 | 3/31/2006 | $5,000,000 | Erodes |
| WLR C4418701 2 | 4/1/2005 | 3/31/2006 | $5,000,000 | Erodes |
| SCF C4418702 4 | 4/1/2005 | 3/31/2006 | $5,000,000 | Erodes |
| WLR C4416727 A | 5/1/2005 | 4/31/2006 | $5,000,000 | Erodes |
| SCFC4418714 0 | 5/1/2005 | 4/31/2006 | $5,000,000 | Erodes |
| WLR C4434085 9 | 4/1/2006 | 3/31/2007 | $5,000,000 | Erodes |
| WLR C4434086 0 | 4/1/2006 | 3/31/2007 | $5,000,000 | Erodes |
| SCF C4434087 2 | 4/1/2006 | 3/31/2007 | $5,000,000 | Erodes |
| WLR C4 613821 1 | 8/1/2010 | 7/31/2011 | $1,000,000 | Erodes |
| WLR C4 613817 A | 8/1/2010 | 7/31/2011 | $1,000,000 | Erodes |
| SCF C4 613825 9 | 8/1/2010 | 7/31/2011 | $1,000,000 | Erodes |
| WCU C4 613829 6 | 8/1/2010 | 7/31/2011 | $1,000,000 | Erodes |

7

Chubb does not offer accounting, tax or legal advice regarding the treatment of the proposed program. The Insured should conduct an independent evaluation of the information contained herein and consult with its own accounting, tax, legal advisors and any other relevant specialists before considering this transaction.
DM3\5752004.1

**Chubb Alternative Risk Solutions**

### Appendix 3

Loss Data limited to the Per Occurrence Limit
Excluding Closed Claims with $0
Valued as of 12/31/2018

| Workers' Compensation | | | | | | |
|---|---|---|---|---|---|---|
| **Effective Date** | **Expiration Date** | **Paid Loss** | **Reported Loss** | **Case Reserve** | **Open Counts** | **Reported Counts** |
| 03/04/02 | 03/19/03 | $29,890,706 | $31,015,998 | $1,125,292 | 11 | 3,383 |
| 04/01/05 | 03/31/06 | $90,637,885 | $97,427,951 | $6,790,066 | 38 | 11,324 |
| 04/01/06 | 03/31/07 | $91,700,720 | $95,878,273 | $4,177,553 | 36 | 12,423 |
| 08/01/10 | 07/31/11 | $81,053,964 | $85,375,261 | $4,321,296 | 48 | 9,376 |
| | **Total:** | **$293,283,275** | **$309,697,482** | **$16,414,208** | **133** | **36,506** |

8

Chubb does not offer accounting, tax or legal advice regarding the treatment of the proposed program. The Insured should conduct an independent evaluation of the information contained herein and consult with its own accounting, tax, legal advisors and any other relevant specialists before considering this transaction.
DM3\5752004.1

**Chubb Alternative Risk Solutions**

<u>**US FATCA COMPLIANCE NOTIFICATION**</u>

The U.S. Foreign Account Tax Compliance Act, commonly known as "FATCA", became the law in the U.S. in March of 2010 and becomes effective July 1, 2014.  Pursuant to FATCA, brokers, producers, agents and/or clients may need to obtain withholding certificates, such as Forms W-8 or W-9, from insurance companies.  For information on how to obtain the applicable withholding certificate from ACE U.S. insurance companies, please go to http://www.acegroup.com/us-en/businesses/foreign-account-tax-compliance-act-fatca.aspx

Chubb does not offer accounting, tax or legal advice regarding the treatment of the proposed program. The Insured should conduct an independent evaluation of the information contained herein and consult with its own accounting, tax, legal advisors and any other relevant specialists before considering this transaction.
DM3\5752004.1

**Exhibit B**

**Master Agreement**

## MASTER AGREEMENT

**THIS MASTER AGREEMENT** (the "Agreement") is made and entered into by and among:

Sears Reinsurance Company Ltd., a stock insurance corporation organized and existing under the laws of Bermuda ("SRC"); and

Sears Holdings Corporation, a stock corporation organized and existing under the laws of the State of Delaware ("Sears Holdings"); and

Kmart Holding Corporation, a stock corporation organized and existing under the laws of the State of Delaware ("Kmart Holdings", and collectively with Sears Holdings, "Sears"); and

ACE American Insurance Company, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania (together its affiliates and predecessors, "Chubb");

with SRC, Sears, and Chubb, each a "Party" and collectively, the "Parties",

and is effective as of _____, 2019 (the "Effective Date").

## BACKGROUND

**A.**        Chubb and SRC have previously entered into certain reinsurance agreements identified on Schedule 1 (the "SRC Agreements"), pursuant to which (i) Chubb ceded to SRC, and SRC assumed, certain losses, liabilities, costs and expenses in respect of the Sears Policies (as defined herein), and (ii) SRC ceded to Chubb, and Chubb assumed, certain losses, liabilities, costs and expenses in respect of the SRC Deductible Buyback Policies (as herein defined);

**B.**        Chubb has issued to Sears, and/or certain of their subsidiaries (collectively the "Sears Insureds" and each, a "Sears Insured") those insurance policies that are reinsured under the SRC Agreements including (i) those certain policies of workers' compensation and employers' liability insurance with effective dates (a) from March 4, 2002 up to and including March 19, 2003; (b) from April 1, 2005 up to and including March 31, 2007; and (c) from August 1, 2010 up to and including July 31, 2011, including but not limited to those insurance policies identified on Schedule 2 (the "WC Policies"); and (ii) those certain policies of general liability insurance issued in the United States with effective dates from August 1, 2008 up to and including December 31, 2018, including but not limited to those insurance policies identified on Schedule 3 (the "GL Policies", and collectively with the WC Policies, the "Sears Policies");

**C.**        Sears and SRC have previously entered into those certain policies of contractual liability insurance with effective dates (i) from March 4, 2002 up to and including March 19, 2003; (ii) from April 1, 2005 up to and including March 31, 2007; and (iii) from August 1, 2010 up to and including July 31, 2011, including but not limited to those insurance policies identified on Schedule 4 (the "SRC Deductible Buyback Policies")

**D.**        Chubb and Sears have previously entered into that certain (i) Collateral Agreement effective as of April 1, 2006, as amended and (ii) Collateral and Payment Agreement effective as of August 1, 2017, as amended (collectively and including all amendments thereto, the "Collateral Agreement");

**E.**        Chubb and SRC wish to fully terminate and commute the SRC Agreements and their respective interests therein and liabilities and obligations thereunder pursuant to the terms of this Agreement and the Commutation and Release Agreements attached hereto as Exhibit A (the "Reinsurance Commutation Agreements");

**F.**     Sears and SRC wish to terminate and commute certain interests, liabilities and obligations under the SRC Deductible Buyback Policies pursuant to the terms of this Agreement and the Commutation and Release Agreement attached hereto as Exhibit B (the "Deductible Buyback Policies Commutation Agreement");

**G.**     Sears  wishes to purchase a new Deductible Reimbursement Policy from Chubb in respect of those certain deductible reimbursement and other obligations arising under the WC Policies (the "New Deductible Buyback Policy") and will purchase the New Deductible Reimbursement Policy by entering into that certain Binder dated _____, 2019 (the "Binder", and together with the New Deductible Reimbursement Policy, the Reinsurance Commutation Agreements, the Deductible Buyback Policies Commutation Agreement, and this Agreement, collectively, the "Transaction Agreements"); and

**H.**     Chubb is willing to enter into the Transaction Agreements subject to the terms and conditions contained in this Agreement.

**NOW**, **THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.     Sears and SRC Obligations

(A)     On or before the Closing Date:

(i)     SRC will enter into the Reinsurance Commutation Agreements pursuant to which, as of the Closing Date, SRC and ACE American Insurance Company will be obligated to pay the respective Commutation Payments to each other as described in and pursuant to those Agreements (the "Commutation Payments").

(ii)     Sears and SRC will enter into the Deductible Buyback Policies Commutation Agreement pursuant to which, as of the Closing Date, SRC will be obligated to pay to Sears the Release Payment described in and pursuant to such Agreement (the "Release Payment").

(iii)     As security for the Insured's Obligation (as that term is defined in the Collateral Agreement), arising under and relating to this Agreement, the Collateral Agreement, the WC Policies, including but not limited to the deductible obligations (collectively, the "Sears Obligations"), Sears will enter into the Binder for the purchase, effective as of the Closing Date, of the New Deductible Buyback Policy, and will be obligated to pay to Chubb the full amount of the insurance premiums due under and in respect of such policy (the "New Deductible Buyback Policy Premium").

(B)     Sears and SRC will each execute all documents and take all other commercially reasonable actions as are necessary or appropriate or reasonably requested by Chubb to effectuate the foregoing.

2.     Chubb Obligations.

(A)     On or before the Closing Date, Chubb will enter into the Reinsurance Commutation Agreements, pursuant to which, among other things, Chubb will be obligated to pay its respective Commutation Payment.

(B)     On or before the Closing Date, Chubb will enter into the Binder, and upon receipt in full of the New Deductible Buyback Policy Premium, will be obligated to, issue the New Deductible Buyback Policy within thirty (30) days after the Closing Date.

(C)     On the Closing Date, the release of obligations and liabilities set forth in the Reinsurance Commutation Agreements will become effective.

(D)    With respect to the transactions described or contemplated in the Transaction Agreements, Chubb will pay a commission of $250,000 to Aon Risk Solutions in respect of the the New Deductible Buyback Policy within thirty (30) days after the Closing Date.

3.    <u>Payments and Offsets.</u>

(A)    The Parties all agree and acknowledge that:

(i)    the completion of each transaction described herein is subject and expressly conditioned upon the execution of all of the Transaction Agreements,

(ii)    the respective  payments to be made by Chubb to SRC, by SRC to Chubb, by SRC to Sears and by Sears to Chubb pursuant to the Transaction Agreements shall be deemed to be and shall be made immediately and contemporaneously on the Closing Date;

(iii)    Chubb may fully and completely offset the amount of the Commutation Payment which it is obligated to pay to SRC against the amount of the New Deductible Buyback Policy Premium which Sears is obligated to pay to Chubb; and

(iv)    on and after the Closing Date, Chubb may indefeasibly retain and the New Deductible Buyback Policy Premium as consideration for the  issuance of the New Deductible Buyback Policy.

4.    <u>Bankruptcy Approval Conditions.</u>   The transaction described herein is subject to and expressly conditioned upon acceptable documentation and the entry of an order (the "Order") of the United  States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the jointly administered chapter 11 bankruptcy case (the "Case") of SEARS HOLDING CORPORATION and its affiliated debtors that are insureds under the Referenced Policies following an appropriate motion and notice.  The Order (a) shall (i) be in form and substance reasonably acceptable to Chubb in all respects, (ii) approve the transaction and each of the Transaction Agreements in all respects including any transfer of claims handling services, (iii) authorize Sears to enter into the Transaction Agreements to which it is a party, (iv) authorize Chubb to retain the New Deductible Buyback Policy Premium including authorizing setoff to the extent applicable, and (v) release Chubb as set forth in the Binder, (b) must become final, without any appeal or modification thereof, and all applicable appeal periods having expired (the "Final Order") and (c) the Parties agree that they shall not seek to alter that Final Order by any other order entered in the Case. Receipt of the Final Order shall be a condition precedent to the commencement of any coverage obligations of Chubb under the Transaction Agreements.  Additionally, Sears agrees to allow Chubb to review and approve all motions, proposed Orders and other documentation requesting the entry and approval of the Order and all exhibits thereto prior to the filing of such documents with the Bankruptcy Court.

5.    <u>Closing Date and Conditions to Closing.</u>

The closing of the transactions provided for in this Agreement will be the date upon which the Order (as defined below) shall have become the Final Order (as defined above) (the "Closing Date") or such other date as is mutually agreed upon in writing by the Parties.

6.    <u>Certain Sears and SRC Representations.</u>   Subject to paragraph 4 hereof, Sears and SRC each hereby represents and warrant to Chubb that each has all requisite power and authority to enter into this Agreement (including the forms of endorsements and agreements attached hereto and thereto) on behalf of themselves and the Sears Insureds, and that this Agreement, when duly executed and delivered by Sears and SRC is a valid and binding obligation of Sears, SRC and the Sears Insureds, enforceable against them, their successors and permitted assigns, in accordance with their terms.  This representation, and those contained elsewhere in this Agreement, is material to this Agreement and relied upon by Chubb in entering into this Agreement and the Transaction Agreements.

7.     Amendment.  Neither this Agreement nor any provision hereof may be amended, changed, waived, discharged or terminated except by a written instrument signed by the Party against whom enforcement of such amendment, change, waiver, discharge or termination is sought.

8.     Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns including, but not limited to, any chapter 7 trustee appointed in the bankruptcy case of Sears.  Neither this Agreement nor any right hereunder may be assigned by any Party without the prior written consent of the other Parties, which consent will not be unreasonably withheld.

9.     Waiver.  The failure or refusal by any Party to exercise any rights granted hereunder will not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no oral communication will be asserted as a waiver of any such rights hereunder unless such communication is confirmed in a writing plainly expressing an intent to waive such rights and signed by the Party against whom such waiver is asserted.

10.     Counterparts/Facsimile.  This Agreement may be executed in any number of counterparts each of which when so executed and delivered will constitute an original, but such counterparts together will constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by facsimile transmission will constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile will be deemed to be their original signatures for all purposes.

11.     Third Party Beneficiaries.  This Agreement will not be deemed to give any right or remedy to any third party whatsoever.

12.     Entire Agreement.  This Agreement supersedes all prior agreements between the Parties with respect to such subject matter other than the Transaction Agreements, and, together with the other Transaction Agreements, constitutes the entire agreement between the Parties with respect to the subject matter hereof.  In the event of any inconsistency between this Agreement and any other Transaction Agreement, the terms of this Agreement will control.

13.     Additional Representations.   On the Effective Date, each of the Parties individually, represents to the other that: (a) it is a corporation in good standing in its place of domicile; (b) subject, in the case of Sears to paragraph 4,  (i) it has all requisite power and authority to enter into this Agreement, and to perform its obligations hereunder; (ii) the execution and delivery by it of this Agreement, and the performance by it of its obligations under this Agreement, have been duly authorized by all necessary corporate action; (iii) this Agreement, when duly executed and delivered by it, and subject to the due execution and delivery hereof by the other Party, will be a valid and binding obligation of it, enforceable against it, its successors and permitted assigns, in accordance with its terms; (iv) the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby in accordance with the respective terms and conditions hereof will not (1) violate any provisions of its Articles of Incorporation, Bylaws or other organizational documents, (2) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, any governmental or regulatory body, foreign or domestic, binding upon it as of the date hereof, or (3) violate any agreement, contract, obligation, promise or undertaking that is legally binding and to which it is a party or by which it may be bound; and (v) the signatory hereto on behalf of it is duly authorized and legally empowered to enter into this Agreement.

14.     Governing Law.  This Agreement will in all respects be interpreted, enforced and governed by the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of laws thereof.

15.     Notices.   Any and all notices, requests, approvals, authorizations, consents, instructions, designations and other communications that are required or permitted to be given pursuant to this Agreement will be in writing and may be given either by personal delivery, first class prepaid post (airmail if to another country) or overnight delivery by internationally recognized overnight courier, or to such other address as such Party may have notified in accordance with the terms of this Section 15 as being its address for notification for the purposes of this Agreement:

|            |                                     |
|------------|-------------------------------------|
| If to ACE  | ACE American Insurance Company      |
|            | 436 Walnut Street                   |
|            | Philadelphia, PA 19106              |
|            | Attention: Paul Bech, Esquire       |
| If to Sears| Weil, Gotshal & Manges LLP          |
|            | 767 Fifth Avenue                    |
|            | New York, New York 10153            |
|            | Attention: Jacqueline Marcus        |
| If to SRC: | Sears Reinsurance Company Ltd.      |
|            | Power House 7 Par-la-Ville Road     |
|            | Hamilton HM 11, Bermuda             |

Any notice or communication to any person will be deemed to be received by that person:

(A)     upon personal delivery; or

(B)     upon receipt if sent by mail or courier.

16.     <u>Section References</u>.  Unless otherwise stated specifically, references herein to Sections shall be to Sections of this Agreement.

17.     <u>Headings</u>.  Descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the first day and year written above.

SEARS HOLDINGS CORPORATION on behalf of itself and the other Sears Insureds

By:_____
    Name:
    Title:

KMART HOLDING CORPORATION

By:_____
    Name:
    Title:

SEARS REINSURANCE COMPANY, LTD.

By:_____
    Name:
    Title:

ACE AMERICAN INSURANCE COMPANY

By:_____
    Name:
    Title:

**EXHIBIT A**

**REINSURANCE COMMUTATION AGREEMENTS**

## COMMUTATION AND RELEASE AGREEMENT

**THIS COMMUTATION AND RELEASE AGREEMENT** (the "Commutation Agreement") is made and entered into by and between Sears Reinsurance Company Ltd., a company organized and existing under the laws of Bermuda (the "Company") and ACE American Insurance Company, a stock insurance company domiciled in Pennsylvania (the "Reinsurer", and together with the Company, collectively, the "Parties"), as of the Closing Date (as defined in the Master Agreement made and entered into by and among the Company, Sears Holdings Corporation, Kmart Holding Corporation and the Reinsurer effective as of _____, 2019) (the "Master Agreement") (the "Effective Date").

## BACKGROUND

A.        The Parties have previously entered into (i) that certain Excess of Loss Reinsurance Agreement between the Company as ceding insurer and the Reinsurer as assuming reinsurer, effective as of April 30, 2009 (as amended to the date of this Commutation Agreement) and (ii) that certain Excess of Loss Reinsurance Agreement between the Company as ceding insurer and the Reinsurer as assuming reinsurer, effective as of August 1, 2010 (as amended to the date of this Commutation Agreement, and collectively, the "Reinsurance Agreements"); and

B.        The Parties wish to fully and finally terminate the Reinsurance Agreements and commute any and all liabilities and obligations of the Reinsurer arising thereunder, as set forth herein; and

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.        Effective upon receipt by the Company of the Commutation Payment, the Reinsurance Agreements are terminated and of no further force or effect, and all of the Parties' interests, liabilities and obligations arising thereunder are hereby commuted and terminated.

2.        As consideration for the covenants contained herein, and in full and final settlement of all of the Reinsurer's obligations and liabilities under the Reinsurance Agreements, the Reinsurer shall pay to the Company the sum of Thirty-Six Million Five Hundred Twelve Thousand Five Hundred Sixty Dollars (US$36,512,560) (the "Commutation Payment") by wire transfer of immediately available non-reversible federal funds to a wire transfer address specified in writing by the Company.  The Parties agree and acknowledge that the amount of the Commutation Payment is equal to sum of the Commutation Values determined pursuant to each Reinsurance Agreement as of the Closing Date.

3.        Effective upon receipt by the Company of the Commutation Payment, the Company, on its own behalf and on behalf of its present and former directors, partners, principals, officers, employees, agents, receivers, trustees, attorneys, predecessors, successors, successors in interest, parents, subsidiaries, affiliates, divisions, assigns, representatives, heirs, executors, associates and administrators (collectively, the "Company Parties") does hereby acknowledge full and complete satisfaction of, and does hereby fully, finally and forever settle, release, discharge, and acquit the Reinsurer and any of its present and former directors, partners, principals, officers, employees, agents, receivers, trustees, attorneys, predecessors, successors, successors in interest, parents, subsidiaries, affiliates, divisions, assigns, representatives, heirs, executors, associates and administrators and each of them (collectively, the "Reinsurer Parties") from and with respect to any and all claims, demands, suits, obligations, costs, damages, losses, return premiums, claims for sums of money, contracts, controversies, agreements, judgments and demands whatsoever, rights, liabilities, actions and causes of action of any nature,  known or unknown, suspected or unsuspected, fixed or contingent in law, contract, tort or equity including, without limitation, any rights of subrogation, contribution or indemnification (collectively, "Claims and Losses") that the Company Parties now have, claim to have or in the future may have against the Reinsurer Parties under, arising out of, as a result of, or in respect of, the terms, provisions, endorsements, addenda or conditions of the Reinsurance Agreements or the performance or lack of performance thereof (collectively, the "Released Claims").

1

4.

      a.      The receipt by the Company of the Commutation Payment from the Reinsurer as set forth in Paragraph 2 is a condition precedent to the effectiveness of this Commutation Agreement.

      b.      Except for the condition precedent set forth in 4(a) hereof, the Parties hereby waive satisfaction of any and all other conditions precedent to the effectiveness of the commutation of each of the Reinsurance Agreements as set out in Subparagraph (1) of Paragraph D. Commutation of Article 9 REINSURANCE PREMIUM; COMMUTATION, of each of the Reinsurance Agreements, including but not limited to any prior notice or interest rate conditions set out therein.

5.      The Company and the Reinsurer hereby agree to execute promptly any and all supplemental agreements, releases, affidavits, waivers and other documents of any nature or kind that the other party may reasonably require in order to implement the provisions or objectives of this Commutation Agreement.

6.      The Parties each acknowledge, represent and warrant that each has not assigned, sold, transferred, or otherwise disposed of any of Claims and Losses which are being released hereby.

7.      This Commutation Agreement or any uncertainty or ambiguity herein shall not be construed against any one party or several parties but shall be construed as if the Parties jointly prepared this Commutation Agreement.

8.      In consideration of the mutual covenants and agreements contained herein, each Party hereto does hereby agree that this Commutation Agreement, and each and every provision hereof, is and shall be enforceable by and between them according to its terms, and each Party does hereby agree that it shall not, directly or indirectly, contest the validity or enforceability hereof.

9.      Each of the Parties understands, represents and warrants that each has read, fully understands and knowingly and voluntarily accepts the terms thereof.

10.      This Commutation Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall be deemed one and the same instrument.  The exchange of copies of this Commutation Agreement and of signature pages by facsimile or electronic pdf or similar file transmission shall constitute effective execution and delivery of this Commutation Agreement as to the Parties and may be used in lieu of the original Commutation Agreement for all purposes.  Signatures of the Parties transmitted by facsimile or electronic pdf or similar file shall be deemed to be their original signatures for all purposes.

11.      This Commutation Agreement may not be amended or modified except in a writing duly signed by the Parties.

12.      Each person signing this Commutation Agreement hereby expressly warrants that he or she has express authority to bind his or her principal and signs this Commutation Agreement in such representative capacity on behalf of his or her principal.

13.      The entire agreement of the Parties relating to the subject matter of this Commutation Agreement is contained herein and in the Master Agreement.  No promises, inducements, or considerations have been offered and accepted or given except as set forth herein or in the Master Agreement. This Commutation Agreement and the Master Agreement supersede any prior oral or written agreement concerning the subject matter hereof and supersede and replace all prior negotiations, statements and representations except as contained herein and therein.

14.      This Commutation Agreement shall be binding on the Parties and their respective successors, assigns, liquidators, rehabilitators, receivers and trustees.

15.      The Company acknowledges that:

      (i)      it may have sustained damages, expenses and losses in connection with the Released Claims which are presently unknown or not suspected and that such damages, expenses and losses, if any, may give rise to additional damages, expenses and losses in the future which are not now anticipated by it; and

    (ii)          that this Commutation Agreement has been negotiated and agreed upon despite this realization and, being fully advised, it expressly waives any and all rights it may have under any statute or common law principle which would limit the effect of the foregoing release to those claims actually known or suspected to exist at the time of the effectiveness of the foregoing release, including any statute providing the following or similar language:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release  and that, if known, by him or her, would have materially affected his or her settlement with the debtor or released party.

16.      It is the intention of the Company that, notwithstanding the possibility that the Company or its counsel discover or gain a more complete understanding of the facts, events or law which, if presently known or  fully understand, would have affected the foregoing release, this Commutation Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth herein, without regard to the subsequent discovery or existence of different or additional facts, events or law.

17. The transaction described and the payments provided for herein are subject to and expressly conditioned upon execution of the following agreements:

    (i)          the Master Agreement;
    (ii)          a commutation agreement between Sears Holdings Corporation, Kmart Holding Corporation and the Company that applies to certain deductible buyback policies;
    (iii)        a commutation agreement between the Company and ACE American Insurance Company and/or any of its affiliates (collectively and with all affiliates, predecessors and successors thereof, "Chubb") that applies to the reinsurance agreements related to certain general liability coverage; and
    (iv)       a contractual indemnity policy between Sears Holdings Corporation, Kmart Holding Corporation, Chubb and the Indemnity Insurance Company of North America.

18.      This Commutation Agreement will in all respects be interpreted, enforced and governed by the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of laws thereof.

IN WITNESS WHEREOF, the Parties have entered into this Commutation Agreement as of the Effective Date.

SEARS REINSURANCE COMPANY LTD.

By: _____

Name: _____

Title: _____


ACE AMERICAN INSURANCE COMPANY

By: _____

Name:_____

Title: _____

## COMMUTATION AND RELEASE AGREEMENT

**THIS COMMUTATION AND RELEASE AGREEMENT** (the "Commutation Agreement") is made and entered into by and between ACE American Insurance Company, a stock insurance company domiciled in Pennsylvania and its affiliated property and casualty insurers (the "Company") and Sears Reinsurance Company Ltd., a company organized and existing under the laws of Bermuda (the "Reinsurer"), and together with the Company, collectively, the "Parties"), as of the Closing Date (as defined in the Master Agreement made and entered into by and among the Company, Sears Holdings Corporation, Kmart Holding Corporation and the Reinsurer effective as of _____, 2019) (the "Master Agreement") (the "Effective Date").

## BACKGROUND

A.      The Parties have previously entered into that certain Reinsurance Agreement between the Company as ceding insurer and the Reinsurer as assuming reinsurer, effective as of June 16, 2008 (as amended to the date of this Commutation Agreement, the "Reinsurance Agreement"); and

B.      The Parties wish to fully and finally terminate the Reinsurance Agreement and commute any and all liabilities and obligations of the Reinsurer arising thereunder, as set forth herein; and

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.      Effective upon receipt by the Company of the Commutation Payment, the Reinsurance Agreement is terminated and of no further force or effect, and all of the Parties' interests, liabilities and obligations arising thereunder are hereby commuted and terminated.

2.      As consideration for the covenants contained herein, and in full and final settlement of the Reinsurer's obligations and liabilities under the Reinsurance Agreement, the Reinsurer shall pay to the Company the sum of Fifty Thousand Dollars (US$50,000) (the "Commutation Payment") by wire transfer of immediately available non-reversible federal funds to a wire transfer address specified in writing by the Company.

3.      Effective upon receipt by the Company of the Commutation Payment, the Company , on its own behalf and on behalf of its present and former directors, partners, principals, officers, employees, agents, receivers, trustees, attorneys, predecessors, successors, successors in interest, parents, subsidiaries, affiliates, divisions, assigns, representatives, heirs, executors, associates and administrators (the "Company Parties") does hereby acknowledge full and complete satisfaction of, and does hereby fully, finally and forever settle, release, discharge, and acquit the Reinsurer and any of its present and former directors, partners, principals, officers, employees, agents, receivers, trustees, attorneys, predecessors, successors, successors in interest, parents, subsidiaries, affiliates, divisions, assigns, representatives, heirs, executors, associates and administrators and each of them (the "Reinsurer Parties") from and with respect to any and all claims, demands, suits, obligations, costs, damages, losses, return premiums, claims for sums of money, contracts, controversies, agreements, judgments and demands whatsoever, rights, liabilities, actions and causes of action of any nature,  known or unknown, suspected or unsuspected, fixed or contingent in law, contract, tort or equity including, without limitation, any rights of subrogation, contribution or indemnification (collectively, "Claims and Losses") that the Company Parties now have, claim to have or in the future may have against the Reinsurer Parties under, arising out of, as a result of, or in respect of, the terms, provisions, endorsements, addenda or conditions of the Reinsurance Agreement or the performance or lack of performance thereof (the "Released Claims").

4.      The receipt by the Company of the Commutation Payment from the Reinsurer as set forth in Paragraph 2 is a condition precedent to the effectiveness of this Commutation Agreement.

5.      The Company and the Reinsurer hereby agree to execute promptly any and all supplemental agreements, releases, affidavits, waivers and other documents of any nature or kind that the other party may reasonably require in order to implement the provisions or objectives of this Commutation Agreement.

1

6.      The Parties each acknowledge, represent and warrant that each has not assigned, sold, transferred, or otherwise disposed of any of Claims and Losses which are being released hereby.

7.      This Commutation Agreement or any uncertainty or ambiguity herein shall not be construed against any one party or several parties but shall be construed as if the Parties jointly prepared this Commutation Agreement.

8.      In consideration of the mutual covenants and agreements contained herein, each Party hereto does hereby agree that this Commutation Agreement, and each and every provision hereof, is and shall be enforceable by and between them according to its terms, and each Party does hereby agree that it shall not, directly or indirectly, contest the validity or enforceability hereof.

9.      Each of the Parties understands, represents and warrants that each has read, fully understands and knowingly and voluntarily accepts the terms thereof.

10.     This Commutation Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall be deemed one and the same instrument.  The exchange of copies of this Commutation Agreement and of signature pages by facsimile or electronic pdf or similar file transmission shall constitute effective execution and delivery of this Commutation Agreement as to the Parties and may be used in lieu of the original Commutation Agreement for all purposes.  Signatures of the Parties transmitted by facsimile or electronic pdf or similar file shall be deemed to be their original signatures for all purposes.

11.     This Commutation Agreement may not be amended or modified except in a writing duly signed by the Parties.

12.     Each person signing this Commutation Agreement hereby expressly warrants that he or she has express authority to bind his or her principal and signs this Commutation Agreement in such representative capacity on behalf of his or her principal.

13.     The entire agreement of the Parties relating to the subject matter of this Commutation Agreement is contained herein and in the Master Agreement.  No promises, inducements, or considerations have been offered and accepted or given except as set forth herein or in the Master Agreement. This Commutation Agreement and the Master Agreement supersede any prior oral or written agreement concerning the subject matter hereof and supersede and replace all prior negotiations, statements and representations except as contained herein and therein.

14.     This Commutation Agreement shall be binding on the Parties and their respective successors, assigns, liquidators, rehabilitators, receivers and trustees.

15.     The Company acknowledge that:

(i)      it may have sustained damages, expenses and losses in connection with the Released Claims which are presently unknown or not suspected and that such damages, expenses and losses, if any, may give rise to additional damages, expenses and losses in the future which are not now anticipated by it; and

(ii)     that this Commutation Agreement has been negotiated and agreed upon despite this realization and, being fully advised, it expressly waives any and all rights it may have under any statute or common law principle which would limit the effect of the foregoing release to those claims actually known or suspected to exist at the time of the effectiveness of the foregoing release, including any statute providing the following or similar language:

        A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known, by him or her, would have materially affected his or her settlement with the debtor or releasing party.

2

16.    It is the intention of the Company that, notwithstanding the possibility that the Company or its counsel discover or gain a more complete understanding of the facts, events or law which, if presently known or fully understand, would have affected the foregoing release, this Commutation Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth herein, without regard to the subsequent discovery or existence of different or additional facts, events or law.

17.    The transaction described and the payments provided for herein are subject to and expressly conditioned upon execution of the following agreements:

(i)    the Master Agreement;

(ii)    a commutation agreement between ACE American Insurance Company and/or any of its affiliates (collectively and with all affiliates, predecessors and successors thereof, "Chubb") and the Reinsurer that applies to certain reinsurance agreements related to workers' compensation coverage;

(iii)    a commutation agreement between Sears Holdings Corporation, Kmart Holding Corporation and the Reinsurer that applies to certain deductible buyback policies; and

(iv)    a contractual indemnity policy between Sears Holdings Corporation, Kmart Holding Corporation, Chubb and the Indemnity Insurance Company of North America.

18.    This Commutation Agreement will in all respects be interpreted, enforced and governed by the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of laws thereof.

3

IN WITNESS WHEREOF, the Parties have entered into this Commutation Agreement as of the Effective Date.

SEARS REINSURANCE COMPANY LTD.

By: _____

Name: _____

Title: _____


ACE AMERICAN INSURANCE COMPANY

By: _____

Name:_____

Title: _____

DM3\5752007.1

**EXHIBIT B**

**DEDUCTIBLE BUYBACK POLICIES COMMUTATION AGREEMENT**

## COMMUTATION AND RELEASE AGREEMENT

**THIS COMMUTATION AND RELEASE AGREEMENT** (the "Commutation Agreement") is made and entered into by and between Sears Holdings Corporation, a stock corporation organized and existing under the laws of the State of Delaware ("Sears Holdings"), Kmart Holding Corporation, a stock corporation organized and existing under the laws of the State of Delaware ("Kmart Holdings", and collectively with Sears Holdings, "Sears")  and Sears Reinsurance Company Ltd., a company organized and existing under the laws of Bermuda ("SRC" and together with Sears, collectively, the "Parties"), as of the Closing Date (as defined in the Master Agreement made and entered in to SRC, Sears Holdings, Kmart Holdings and ACE American Insurance Company, effective as of ____, 2019 (the "Master Agreement")) (the "Effective Date").

## BACKGROUND

A.    The Parties have previously entered into those certain policies of contractual liability insurance with effective dates (i) from March 4, 2002 up to and including March 19, 2003; (ii) from April 1, 2005 up to and including March 31, 2007; and (iii) from August 1, 2010 up to and including July 31, 2011, including but not limited to those insurance policies identified on Schedule 4 (the "SRC Deductible Buyback Policies"); and

B.    The Parties wish to fully and finally terminate certain obligations under the SRC Deductible Buyback Policies and commute certain liabilities and obligations of the Parties arising thereunder, as set forth herein; and

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.    Effective upon receipt by Sears of the Commutation Payment, SRC's obligations with respect to $36,462,560 (the "Commutation Amount") under the SRC Deductible Buyback Policies are terminated and of no further force or effect, and all of the Parties' interests, liabilities and obligations arising thereunder are hereby commuted and terminated. For the avoidance of doubt, the SRC Deductible Buyback Policies shall remain in effect following the Effective Date and SRC shall remain liable under the SRC Deductible Buyback Policies for any obligations in excess of the Commutation Amount.

2.    As consideration for the covenants contained herein, and in full and final settlement of SRC's obligations and liabilities under the SRC Deductible Buyback Policies with respect to the Commutation Amount, SRC shall pay to Sears the sum of Thirty-Six Million Four Hundred Sixty Two Thousand Five Hundred Sixty Dollars (US $36,462,560) (the "Commutation Payment") by wire transfer of immediately available non-reversible federal funds to a wire transfer address specified in writing by Sears.

3.    Effective upon receipt by Sears of the Commutation Payment, each of Sears Holdings and Kmart Holdings, on its own behalf and on behalf of its present and former directors, partners, principals, officers, employees, agents, receivers, trustees, attorneys, predecessors, successors, successors in interest, parents, subsidiaries, affiliates, divisions, assigns, representatives, heirs, executors, associates and administrators (collectively, the "Sears Parties") does hereby acknowledge full and complete satisfaction of, and does hereby fully, finally and forever settle, release, discharge, and acquit SRC and any of its present and former directors, partners, principals, officers, employees, agents, receivers, trustees, attorneys, predecessors, successors, successors in interest, parents, subsidiaries, affiliates, divisions, assigns, representatives, heirs, executors, associates and administrators and each of them (collectively, the "SRC Parties") from and with respect to any and all claims, demands, suits, obligations, costs, damages, losses, return premiums, claims for sums of money, contracts, controversies, agreements, judgments and demands whatsoever, rights, liabilities, actions and causes of action of any nature,  known or unknown, suspected or unsuspected, fixed or contingent in law, contract, tort or equity including, without limitation, any rights of subrogation, contribution or indemnification up to and solely to the extent of the Commutation Amount (collectively, "Claims and Losses") that the Sears Parties now have, claim to have or in the future may have against the SRC Parties under, arising out of, as a result of, or in respect of, the terms, provisions, endorsements, addenda or conditions of the SRC Deductible Buyback Policies or the performance or lack of performance thereof (collectively, the "Released Claims").

4.

      a.      The receipt by Sears of the Commutation Payment from SRC as set forth in Paragraph 2 is a condition precedent to the effectiveness of this Commutation Agreement.

      b.      Except for the condition precedent set forth in 4(a) hereof, the Parties hereby waive satisfaction of any and all other conditions precedent to the effectiveness of the commutation of obligations under each of the SRC Deductible Buyback Policies as set out in Schedule 4 to the Master Agreement in an amount, in the aggregate under all of the SRC Deductible Buyback Policies, of up to the Commutation Amount, including but not limited to any prior notice or interest rate conditions set out therein.

5.      Sears and SRC hereby agree to execute promptly any and all supplemental agreements, releases, affidavits, waivers and other documents of any nature or kind that the other party may reasonably require in order to implement the provisions or objectives of this Commutation Agreement.

6.      The Parties each acknowledge, represent and warrant that each has not assigned, sold, transferred, or otherwise disposed of any of Claims and Losses which are being released hereby.

7.      This Commutation Agreement or any uncertainty or ambiguity herein shall not be construed against any one party or several parties but shall be construed as if the Parties jointly prepared this Commutation Agreement.

8.      In consideration of the mutual covenants and agreements contained herein, each Party hereto does hereby agree that this Commutation Agreement, and each and every provision hereof, is and shall be enforceable by and between them according to its terms, and each Party does hereby agree that it shall not, directly or indirectly, contest the validity or enforceability hereof.

9.      Each of the Parties understands, represents and warrants that each has read, fully understands and knowingly and voluntarily accepts the terms thereof.

10.      This Commutation Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall be deemed one and the same instrument.  The exchange of copies of this Commutation Agreement and of signature pages by facsimile or electronic pdf or similar file transmission shall constitute effective execution and delivery of this Commutation Agreement as to the Parties and may be used in lieu of the original Commutation Agreement for all purposes.  Signatures of the Parties transmitted by facsimile or electronic pdf or similar file shall be deemed to be their original signatures for all purposes.

11.      This Commutation Agreement may not be amended or modified except in a writing duly signed by the Parties.

12.      Each person signing this Commutation Agreement hereby expressly warrants that he or she has express authority to bind his or her principal and signs this Commutation Agreement in such representative capacity on behalf of his or her principal.

13.      The entire agreement of the Parties relating to the subject matter of this Commutation Agreement is contained herein and the Master Agreement.  No promises, inducements, or considerations have been offered and accepted or given except as set forth herein or in the Master Agreement. This Commutation Agreement and the Master Agreement supersede any prior oral or written agreement concerning the subject matter hereof and supersede and replace all prior negotiations, statements and representations except as contained herein and therein.

14.      This Commutation Agreement shall be binding on the Parties and their respective successors, assigns, liquidators, rehabilitators, receivers and trustees.

15.      Each of Sears Holdings and Kmart Holdings acknowledges that:

      (i)      it may have sustained damages, expenses and losses in connection with the Released Claims which are presently unknown or not suspected and that such damages, expenses and losses, if any, may give rise to additional damages, expenses and losses in the future which are not now anticipated by it; and

(ii)     that this Commutation Agreement has been negotiated and agreed upon despite this realization and, being fully advised, it expressly waives any and all rights it may have under any statute or common law principle which would limit the effect of the foregoing release to those claims actually known or suspected to exist at the time of the effectiveness of the foregoing release, including any statute providing the following or similar language:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release  and that, if known, by him or her, would have materially affected his or her settlement with the debtor or released party.

16.     It is the intention of Sears that, notwithstanding the possibility that Sears or its counsel discover or gain a more complete understanding of the facts, events or law which, if presently known or  fully understand, would have affected the foregoing release, this Commutation Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth herein, without regard to the subsequent discovery or existence of different or additional facts, events or law.

17.     The transaction described and the payments provided for herein are subject to and expressly conditioned upon execution of the following agreements:
(i)      the Master Agreement;
(ii)     a commutation agreement between ACE American Insurance Company and/or any of its affiliates (collectively and with all affiliates, predecessors and successors thereof, "Chubb"), and SRC that applies to certain reinsurance agreements related to workers' compensation coverage;
(iii)    a commutation agreement between SRC and Chubb that applies the reinsurance agreements related to certain general liability coverage; and
(iv)     a contractual indemnity policy between Sears, Chubb and the Indemnity Insurance Company of North America.

18.     This Commutation Agreement will in all respects be interpreted, enforced and governed by the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of laws thereof.

IN WITNESS WHEREOF, the Parties have entered into this Commutation Agreement as of the Effective Date.

SEARS REINSURANCE COMPANY LTD.

By: _____

Name: _____

Title: _____


SEARS HOLDINGS CORPORATION

By: _____

Name:_____

Title: _____

KMART HOLDING CORPORATION

By: _____

Name:_____

Title: _____

## SCHEDULE 1

## SRC AGREEMENTS

1.    **Excess of Loss Reinsurance Agreement between Sears Reinsurance Company Ltd. as ceding company and the ACE American Insurance Company as assuming company effective as of April 30, 2009 (as amended to the date of this Commutation Agreement)**

2.    **Excess of Loss Reinsurance Agreement between Sears Reinsurance Company Ltd. as ceding company and ACE American Insurance Company as assuming company effective as of August 1, 2010 (as amended to the date of this Commutation Agreement)**

3.    **Reinsurance Agreement between ACE American Insurance Company as ceding company and Sears Reinsurance Company Ltd. as assuming company effective as of June 16, 2008 (as amended to the date of this Commutation Agreement)**

**SCHEDULE 2**

**WC POLICIES**

| Policy Number | Inception Date | Expiration Date |
|---|---|---|
| WLR C4313226 A | 03/04/2002 | 03/19/2003 |
| SCF C4313284 2 | 03/04/2002 | 03/19/2003 |
| WLR C4418700 0 | 04/01/2005 | 03/31/2006 |
| WLR C4418701 2 | 04/01/2005 | 03/31/2006 |
| SCF C4418702 4 | 04/01/2005 | 03/31/2006 |
| WLR C4416727 A | 05/01/2005 | 03/31/2006 |
| SCFC4418714 0 | 05/01/2005 | 03/31/2006 |
| WLR C4434085 9 | 04/01/2006 | 04/01/2007 |
| WLR C4434086 0 | 04/01/2006 | 04/01/2007 |
| SCF C4434087 2 | 04/01/2006 | 04/01/2007 |
| WLR C4 613821 1 | 08/01/2010 | 07/31/2011 |
| WLR C4 613817 A | 08/01/2010 | 07/31/2011 |
| SCF C4 613825 9 | 08/01/2010 | 07/31/2011 |
| WCU C4 613829 6 | 08/01/2010 | 07/31/2011 |

DM3\5752003.1

**SCHEDULE 3**

**GL POLICIES**

| Policy Number | Inception Date | Expiration Date |
|---|---|---|
| CGO G25528748 | 08/01/2008 | 08/01/2009 |
| CGO G2552875A | 08/01/2009 | 08/01/2010 |
| CGO G25528736 | 08/01/2010 | 08/01/2011 |
| CGOG25530986 | 08/01/2011 | 08/01/2012 |
| CGOG27011883 | 08/01/2012 | 08/01/2013 |
| CGOG27011895 | 08/01/2012 | 08/01/2013 |
| CGOG27022339 | 08/01/2013 | 08/01/2014 |
| CGOG27022340 | 08/01/2013 | 08/01/2014 |
| CGOG27334155 | 08/01/2014 | 08/01/2015 |
| CGOG27334167 | 08/01/2014 | 08/01/2015 |
| CGO G2739744A | 08/01/2015 | 08/01/2016 |
| CGO G27397451 | 08/01/2015 | 08/01/2016 |
| CGO G27853870 | 08/01/2016 | 08/01/2017 |
| CGO G27853912 | 08/01/2016 | 08/01/2017 |
| CGO G27867078 | 08/01/2017 | 08/01/2018 |
| CGO G71097778 | 08/01/2018 | 12/31/2018 |

**SCHEDULE 4**

**SRC DEDUCTIBLE BUYBACK POLICIES**

Workers Compensation SIR Loss Portfolio Insurance Policy issued by Sears Reinsurance Company Ltd to Kmart Holding Corporation, with Policy No. l-20007-00 (2005), for coverage of obligations arising under Workers' Compensation Insurance Policy Number C43l3226A issued by Pacific Employers Insurance Company for the policy period from March 4, 2002 to March 19, 2003.

Multi Line Primary Casualty Retention Coverage issued by Sears Reinsurance Company Ltd to Sears Holdings Corporation for the policy period April 1, 2005 to April 1, 2006, with Policy No. l-20006-00 (2005).

Multi Line Primary Casualty Retention Coverage issued by Sears Reinsurance Company Ltd to Sears Holdings Corporation for the policy period April 1, 2006 to April 1, 2007, with Policy No. 1-20006-00 (2006).

Multi Line Primary Casualty Retention Coverage Policy No: 1M20006MOO {2010)

**<u>Exhibit C</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------- x
                                                              :
In re                                                         :      Chapter 11
                                                              :
SEARS HOLDINGS CORPORATION, et al.                            :      Case No. 18-23538 (RDD)
                                                              :
        Debtors.¹                                             :      (Joint Administration)
                                                              :
------------------------------------------------------------- x
```

### ORDER AUTHORIZING AND APPROVING
### (I) SETTLEMENT BETWEEN DEBTORS AND
### THE CHUBB COMPANIES, (II) DEBTORS' ENTRY INTO THE
### TRANSACTION DOCUMENTS, AND (III) RELATED RELIEF

Upon the Motion, dated May __, 2019 (ECF No. [__]) (the "**Motion**")² for entry of an order granting (A) authorization to enter into and approval of (i) the Settlement and (ii) the Transaction Documents, and (B) authority to perform all obligations under the Transaction Documents and take any actions necessary to consummate the transaction contemplated by the

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

² Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion and/or the Transaction Documents, as applicable.

Settlement, as more fully set forth in the Motion; and the Court having jurisdiction to decide the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the

*Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the relief requested in the Motion having been provided in accordance

with the Amended Case Management Order; and such notice having been adequate and appropriate

under the circumstances, and it appearing that no other or further notice need be provided; and the

Court having held a hearing to consider the relief requested in the Motion on May ____, 2019 (the

"**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the

Court; and the Court having determined that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein and that the relief requested is in the best interests

of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation

and sufficient cause appearing therefor,

       **IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted.

2.      Pursuant to Bankruptcy Rule 9019, the Settlement is approved.

3.      The Insured Parties' Releases and the SRC Releases are integral and necessary to

the purchase and issuance of the CIP, supported by reasonable consideration, permitted by the

Bankruptcy Code, and shall be effective immediately and automatically and have full force and

effect upon the Chubb Companies' issuance of the CIP:

4.      The Debtors are authorized to terminate and commute the SRC Deductible Buyback Policies and their respective interests therein and liabilities and obligations thereunder pursuant to the Deductible Buyback Policies Commutation Agreement.

5.      The Debtors are authorized to take any actions necessary to transfer any claims handling services from Sedgwick to ESIS as contemplated by the Transaction Documents.

6.      The Debtors are authorized, pursuant to sections 105, 362 and 363 of the Bankruptcy Code, to enter into the Transaction Documents, to execute and deliver all related documents and agreements or amendments thereto and to perform its obligations hereunder and thereunder, including the payment of all amounts due thereunder, including effectuation of the Transaction Payment, in the ordinary course without notice, hearing or further order of the Court.

7.      The Debtors, Sears Re, and the Chubb Companies are hereby authorized, to the extent such authorization is required, to effectuate the Transaction Payment, including, if necessary, any setoff related thereto in payment of the CIP Premium, and, if and to the extent necessary, the automatic stay of section 362(a) of the Bankruptcy Code is hereby lifted to permit same.

8.      The Chubb Companies may enforce their rights and remedies under the Transaction Documents without further order of the Court, and for this purpose, the automatic stay pursuant to section 362(a) of the Bankruptcy Code (if and to the extent applicable) is hereby lifted.

9.      In accordance with the terms of the Transaction Documents, neither the Debtors nor Sears Re shall owe any further financial obligations to the Chubb Companies with respect to the Sears Policies.

10.     This Order shall be immediately effective and enforceable upon its entry and the

fourteen-day stay set forth in Rules 4001(a)(3) and 6004(h) of the Bankruptcy Rules shall be, and

hereby is, waived.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order.

12.     The Court shall retain jurisdiction to hear and determine all matters arising from or

related to the implementation, interpretation, and/or enforcement of this Order.


Dated: _____, 2019
          White Plains, New York


                                        _____
                                        THE HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE