Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    March 21, 2019

17                    10:23 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: JUSTIN

Page 2

1    HEARING re Notice of Agenda : Notice of Agenda of Matters

2    Scheduled for Hearing on March 21, 2019 at 10:00 a.m.

3    (document #2926)

4

5    HEARING re Motion to Compel Payment of Post-Petition Rent

6    and Related Lease Obligations Pursuant to 11 U.S.C. §§

7    105(a), 363(e), 365(d)(3) and 503(b)(l)(A) and to Pay All

8    Subsequent Amounts Owed On a Timely Basis filed by Robert L.

9    LeHane on behalf of Trustees of the Estate of Bernice Pauahi

10   Bishop (document #2414)

11

12   HEARING re Objection of Transform Holdco, LLC (document

13   #2832)

14

15   HEARING re Motion of Debtors for Order Shortening Notice

16   with Respect to Motion of Debtors for Order (A) Enforcing

17   Asset Purchase Agreement and Automatic Stay Against

18   Transform Holdco LLC and (B) Compelling Turnover of Estate

19   Property (related document(s)2796) (document #2798)

20

21   HEARING re Debtors Motion to (A) Enforce Asset Purchase

22   Agreement and Automatic Stay Against Transform Holdco LLC

23   and (B) Compel Turnover of Estate Property, and (II)

24   Response to Transform Holdco LLCs Motion to Assign Matter to

25   Mediation (related document(s)2766) (document #2796)

Page 3

1    HEARING re Transform Holdco LLCs Motion to Assign Matter to

2    Mediation, with Notice of Motion and Proposed Order

3    (document #2766) Debtors' Response (document #2796)

4

5    HEARING re Official Committee of Unsecured Creditors

6    Response (document #2808) (Response of Helen Andrews Inc.,

7    Mien Co., Ltd., Samii Solutions, Shanghai Fochier, Strong

8    Progress garment Factory Company Ltd (document #2835)

9

10   HEARING re Notice of Rejection of Certain Unexpired Leases

11   of Nonresidential Real Property and Abandonment of Property

12   in Connection Therewith filed by Jacqueline Marcus on behalf

13   of Sears Holdings Corporation (document #2695)

14

15   HEARING re Steel 1111, LLC's Limited Objection (document

16   #2786) Debtors' Reply ( document #2887)

17

18   HEARING re Motion to Compel the Debtor to (i) Disclose

19   Status of Insurance Claim; (ii) Deposit Any Insurance

20   Proceed Into Separate Account to be Used Exclusively to

21   Repair the Insured Demised Premises; and (iii)

22   Alternatively, Find the Automatic Stay Inapplicable to the

23   Insurance Proceeds filed by Sonia E. Colon on behalf of

24   Santa Rosa Mall, LLC. document # 1240)

25

1    HEARING re Debtors' Objection to Motion for Entry of Order

2    Compelling Debtor to Disclose Status of Insurance Claim and

3    Deposit Any Insurance Proceeds into Separate Account (Santa

4    Rosa Mall, Puerto Rico) (related document(s)1240) (document

5    #2512)  Reply filed by Santa Rosa Mall, Puerto Rico

6    (document #2828)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4        Attorneys for the Debtor

 5        767 Fifth Avenue

 6        New York, NY 10153

 7

 8   BY:  SUNNY SINGH

 9        RAY C. SCHROCK

10        CANDACE M. ARTHUR

11        JARED R. FRIEDMANN

12

13   WEIL, GOTSHAL & MANGES LLP

14        Attorneys for the Debtor

15        200 Crescent Court, Suite 300

16        Dallas, TX 75201

17

18   BY:  PAUL R. GENENDER

19

20   KELLEY DRYE & WARREN LLP

21        Attorneys for Kamehameha Schools

22        101 Park Avenue

23        New York, NY 10178

24

25   BY:  ROBERT L. LEHANE
```

Page 6

1    CLEARY GOTTLIEB STEEN & HAMILTON LLP

2         Attorneys for Transform Holdco LLC

3         One Liberty Plaza

4         New York, NY 10006

5

6    BY:  LEWIS J. LIMAN

7         ABENA MAINOO

8         LUKE A. BAREFOOT

9

10   PENSION BENEFIT GUARANTY CORPORATION

11        1200 K Street NW

12        Washington, DC 20005

13

14   BY:  MICHAEL I. BAIRD

15

16   AKIN GUMP STRAUSS HAUER & FELD LLP

17        Attorneys for Official Committee of Unsecured Creditors

18        One Bryant Park

19        New York, NY 10036

20

21   BY:  PHILIP C. DUBLIN

22        JOSEPH L. SORKIN

23        SARA L. BRAUNER

24        IRA DIZENGOFF

25

Page 7

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3        201 Varick Street, Suite 1006

4        New York, NY 10014

5

6   BY:   RICHARD C. MORRISSEY (TELEPHONICALLY)

7

8   SONIA COLON LAW OFFICES, PA

9        Attorney for Santa Rosa Mall, LLC

10       2215 Hillcrest Street

11       Orlando, FL 32862

12

13  BY:   SONIA E. COLON

14

15  ALSO PRESENT TELEPHONICALLY:

16

17  PAUL E. HARNER

18  COLLEEN MAKER

19  ARLENE R. ALVES

20  SAM N. ASHURAEY

21  ALIX BROZMAN

22  STEVEN H. CHURCH

23  SARA COELHO

24  ANDREW DIAZ

25  WILLIAM P. FENNELL

Page 8

```
 1    ROBERT E. FIZGERALD

 2    DEBORAH L. FLETCHER

 3    EDWARD M. FOX

 4    KIMBERLY B. GIANIS

 5    IVAN M. GOLD

 6    RONALD E. GOLD

 7    TAYLOR B. HARRISON

 8    PATRICK HEALY

 9    CATHERINE HEITZENRATER

10    VLADIMIR JELISAVCIC

11    RUSSELL R. JOHNSON, III

12    KELLY E. KLEIST

13    MATTHEW KOCH

14    STEVEN KOSSON

15    ZACHARY D. LANIER

16    STEPHANIE C. LIEB

17    TERESA LII

18    MICHAEL G. LINN

19    CATHERINE LOTEMPIO

20    KATHERINE E. MASSEY

21    STEPHEN MILLER

22    MICHAEL MTTELMAN

23    BRYAN OBERG

24    LAWRENCE PARK

25    RICHARD PEDONE
```

1    HARRIS PHILLIPS

2    BRIAN A. RAYNOR

3    RITA MARIE RITROVATO

4    LILLIAN A. RIZZO

5    JASON B. SANJANA

6    JOHN F. SAUL STEPHEN B. SELBST

7    PETER B. SIROKA

8    FREDRIC SOSNICK

9    CHRIS STAUBLE

10   DAVID WANDER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 10

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Please be seated.
 3              THE COURT:  Okay.  Good morning.  In re Sears
 4     Holdings Corporation, et al.
 5              MR. SINGH:  Good morning, Your Honor.  Sunny
 6     Singh, Weil Gotshal, on behalf of the Debtors joined by my
 7     partners, Ray Schrock, Jared Friedman, and Paul Genender.
 8     Your Honor, we did file an amended agenda this morning that
 9     reflected another matter that had been resolved that was
10     previously on the agenda.  And so we are trying to narrow
11     down what contested matters to report.
12              Your Honor, we also have before we get into the
13     agenda an update on the plan process that I can walk Your
14     Honor through as well as an update on the contested matter
15     with Transform, that's on the agenda today.  Before I get to
16     that, just in the interest of efficiency, the first matter
17     that's on the agenda is technically adjourned, but Mr.
18     Lehane did want to make some remarks.  Perhaps, I let him do
19     that and then we can get into the other items for this
20     morning.
21              THE COURT:  I'm sorry.  Maybe I don't have -- what
22     I have the notice of second amended agenda.
23              MR. SINGH:  Yes, Judge, that's the one --
24              THE COURT:  But the first matter is this --
25              MR. SINGH:  Uncontested Trustee of Estate of --
```

Page 11

1               THE COURT:  Okay.  Fine.  Bernice Bishop.

2               MR. SINGH:  That's right.

3               THE COURT:  I got it.

4               MR. SINGH:  It's technically adjourned, but I

5    think Mr. Lehane wanted to make some comments.

6               THE COURT:  Okay.  That's fine.

7               MR. SINGH:  I'll let him just do that.

8               MR. LEHANE:  Thank you very much, Mr. Singh.  Good

9    morning, Your Honor.

10              THE COURT:  Good morning.

11              MR. LEHANE:  Robert Lehane, Kelley Drye & Warren,

12   on behalf of the Trustees of the Estate of Bernice Pauahi

13   Bishop which does business as the Kamehameha Schools, owner

14   of the Windward Mall in Kaneohe, Hawaii.

15              THE COURT:  Okay.

16              MR. LEHANE:  Your Honor, we appreciate that Sears

17   and its counsel have worked with us to provide some interim

18   adequate protection.  Your Honor, the issue at hand is a

19   significant shortfall in the rent.  As of today, it's

20   approximately $1.2 million.

21              We realize that this is a relatively minor amount

22   in the scheme of the case, but the Trustees of this estate

23   have a fiduciary duty to the Schools of Kamehameha to

24   maximize the value of their real estate.  And given the

25   shortfall, we worked with Sears to try to get some adequate

1    protection.

2              What Sears has agreed to is to escrow $500,000 in

3    the interim during this adjournment.  We certainly

4    appreciate that.  We did want to just respond to the

5    objection that had been filed by Transform Holdco which

6    indicated that this was a premature attempt to force them to

7    make a decision early.  To the contrary, this significant

8    issue was no news to Sears or ESL and what we would like to

9    see is businesspeople focus on this issue.

10              The last thing that the Trustees of the estate

11   want to do is to have to litigate issues of rent and cure

12   inadequate assurance before Your Honor.  And we hope that we

13   can focus with businesspeople, with ESL Transform Holdco,

14   and Sears to resolve these issues in advance of the April

15   12th deadline for them to make their decisions to assume or

16   reject and/or a hearing on this on April 18th.

17              THE COURT:  Okay.  That's fine.

18              MR. LEHANE:  We did receive proof of the $500,000

19   being escrowed.

20              THE COURT:  Okay.

21              MR. LEHANE:  Thank you very much, Your Honor.

22              THE COURT:  Very well.

23              MR. SINGH:  Thank you, Judge.  And I can confirm

24   we'll work with Mr. Lehane and his clients to try to get

25   that resolved.

Page 13

1           THE COURT:  Okay.

2           MR. SINGH:  So, Your Honor, just before I jump

3   into the agenda just on the update on the plan process for

4   the Court.  And I'm sure the counsel for the Creditors

5   Committee may want to be heard.

6           So, Your Honor, we've been working since we were

7   last before you on the Chapter 11 plan, we have been meeting

8   with the advisors for the Creditors Committee including most

9   recently as of yesterday.  We've also met with other

10  constituents, including conferences with the PVGC, with

11  Cyrus on plan-related issues.

12          A draft of the Chapter 11 plan has been circulated

13  to the parties.  They're reviewing including the Creditors

14  Committee, and we're working through -- you know, we're

15  awaiting comments on working through those issues with those

16  parties.

17          Your Honor, the other update there is both the

18  Debtors and the UCC have been very focused, as everyone

19  frankly has been throughout these cases on administrative

20  claims, and the diligence on those items is ongoing.  It's

21  not -- the work is not done yet, but that is the important

22  focus of the parties.

23          Obviously, the disputes with ESL including the

24  ones that are before you today will impact that analysis as

25  one of the main reasons and we'll get into that during oral

1    argument that we're looking for expedited resolution of this

2    dispute.

3            THE COURT:  So let me just make -- so you have a

4    team that's focusing on 503(b)(9) claims and on cure claims?

5            MR. SINGH:  Yes, Judge.  Well, cure claims are --

6    we're focused on them but that's --

7            THE COURT:  They're two separate tasks.  I didn't

8    mean to lump them together.

9            MR. SINGH:  Yes, exactly.  Cure claims, the

10   primary responsibility is really with Transform because they

11   picked that up as part of the APA.  We're obviously involved

12   and working on those issues, and then we are primarily

13   involved on the 503(b)(9).  As Your Honor knows, you set the

14   bar.  I think that includes the 503(b)(9) claims to be

15   asserted.

16           THE COURT:  Right.

17           MR. SINGH:  A review of those claims has already

18   begun, at least the ones that are filing as they're coming

19   in just sort of to at least, you know, clear out some of the

20   (indiscernible), you know dupes, et cetera, and starting to

21   look at the legal assertions there.

22           THE COURT:  Okay.  And is the committee

23   comfortable with that process as it's unfolding?

24           MR. DIZENGOFF:  Yeah.

25           THE COURT:  I mean the 503(b)(9) process.

1          MR. DIZENGOFF:  Yeah.  Your Honor?  I think you're

2     done.

3          THE COURT:  Go ahead.

4          MR. SINGH:  Yeah.

5          MR. DIZENGOFF:  Okay.  So just a couple of

6     comments to add.

7          THE COURT:  If you can state your name for the

8     record.

9          MR. DIZENGOFF:  I'm sorry.  Ira Dizengoff, Akin

10    Gump Strauss, Hauer, & Feld on behalf of the Official

11    Creditors Committee.  So as Mr. Singh said, he's accurate.

12    We're processing it.  We have concerns about the admin

13    claims, and that's another way -- that's reconciliation

14    that's going to be ongoing.  In addition to that from the

15    Transform Holdco side and others in the capital structure,

16    there's a deluge of 507(b) claims that also weigh on the

17    ability for us to confirm the plan or pursue a plan.

18          These are serious issues that cause concern on our

19    part.  We're hopeful we can wade through that, and there's

20    actually a pot of money that's left and we can actually

21    pursue the plan.  If not, we'll have to talk about what the

22    alternatives might be.  Our hope is that we can all get

23    comfortable that this is something we can pursue and we can

24    go down the path of a plan.

25          But the reconciliation, we met yesterday.  We've

1    met a couple of times before.  There's a lot of hard work

2    that goes into it, but it's just premature because we don't

3    have enough clarity yet to understand whether we have enough

4    money to actually pay those claims.

5                  THE COURT:  Okay.  And the 507(b) separate and

6    apart from the 503(b)(9) --

7                  MR. DIZENGOFF:  Yeah.

8                  THE COURT:  -- are what other than professionals?

9                  MR. DIZENGOFF:  They're inadequate protection

10   claims --

11                 THE COURT:  Okay.

12                 MR. DIZENGOFF:  -- that have been asserted -- I

13   mean I don't have a dollar number yet.

14                 THE COURT:  All right.  Oh, okay.

15                 MR. DIZENGOFF:  But they've been asserted.

16                 THE COURT:  So it's just the -- I've got it.

17                 MR. DIZENGOFF:  Yeah.

18                 THE COURT:  Thank you.  Okay.  So that should be a

19   fairly closed universe, though, I would think.

20                 MR. DIZENGOFF:  It's a closed universe, but it's

21   big numbers --

22                 THE COURT:  Yeah.

23                 MR. DIZENGOFF:  -- that have been alleged.

24                 THE COURT:  Right.  Okay.

25                 MR. SINGH:  Your Honor, primarily that's as part

1    of the asset purchase agreement, there's the ESL.  507(b)

2    became a part of it, which was, you know, the $50 million

3    cap as Your Honor may recall --

4              THE COURT:  Okay.

5              MR. SINGH:  -- plus there's also Cyrus is another

6    creditor who we've met with that has a 507(b) claim

7    asserted.

8              THE COURT:  Okay.

9              MR. SINGH:  So, Your Honor, with that, just an

10   update on where we are today unless you have any other

11   questions on the plan process.

12             THE COURT:  Well, the -- I saw the order submitted

13   I think yesterday afternoon on the fee examiner.

14             MR. SINGH:  Yes.

15             THE COURT:  Since there were no objections, I

16   gather the parties have agreed on the form of the order.

17             MR. SINGH:  Yes, Your Honor.  We have.  And I

18   think Mr. Schwartzberg is on the phone.

19             THE COURT:  Okay.

20             MR. MORRISSEY:  Actually, it's Richard Morrissey,

21   Your Honor, for the U.S. Trustee.  We're still tweaking the

22   order a little bit just for clarification.  But no one

23   objected to the motion, and so we're working on final

24   changes to the language.

25             THE COURT:  All right.  So I guess that should

Page 18

1   delete what was submitted yesterday and just wait for the

2   final version of that order?

3            MR. MORRISSEY:  Yes, Your Honor.

4            THE COURT:  Okay.  That's fine.  I just want to

5   make one comment on that.  Under the Bankruptcy Code, I

6   guess this is a tautology, but professionals are entitled to

7   be paid what they're owed under Section 330 of the Code.

8   Fee examiners in a large case can serve a legitimate purpose

9   in reviewing voluminous time entries both to catch almost

10  inevitable typos, double entries, things like that which

11  professionals obviously are not supposed to permit but in

12  large applications, they creep in sometimes.

13           They're also worthwhile in detecting questionable

14  entries or entries that aren't clear.  And ultimately, in

15  terms of judgment as to whether time should have been spent

16  on some matter by a particular professional or not.  I've

17  never had a problem with any of that.

18           What I do have a problem with is if any examiner

19  takes the position that, well, we just have to have X

20  percent reduced.  That, I think, is truly inappropriate.

21  And if someone takes that position, it should be reported to

22  me, okay.  It may be that as part of resolving this case,

23  parties will agree to cross reductions, but I don't know

24  anyone should be strong-armed.

25           MR. SINGH:  Thank you, Your Honor.

Page 19

```
 1                 THE COURT:  Okay.

 2                 MR. SINGH:  Okay.  So, Your Honor, with respect to

 3    -- moving on to the contested matters in the agenda, I do

 4    have an update for the Court that we did provide to chambers

 5    yesterday --

 6                 THE COURT:  Okay.

 7                 MR. SINGH:  -- of what is still open.  We do have

 8    interim resolution on some of the issues.  And so if I can

 9    just review those with the Court.  So, Your Honor, with

10    respect to the Debtor's motion to enforce the asset purchase

11    agreement and automatic stay, there's really three issues

12    that were remaining.  It's the cash in transit, the prorated

13    rent, as well as the credit card receivables issue that

14    we've highlighted.

15                 THE COURT:  Right.

16                 MR. SINGH:  So, Your Honor, with respect to the

17    cash in transit, we sought approximately $18.5 million.

18    That number is moving.  It's gone up a little bit.  We did

19    meet with Transform yesterday and did all agree that there

20    would be some offsets there depending on checks that were

21    cut by the estate for vendor payments pre-closing that

22    cleared post-closing.  So there does need to be a

23    reconciliation.

24                 And so what we've agreed, Your Honor, for the time

25    being is that Transform will transfer $3 million in
```

Page 20

1   respective cash in transit by Tuesday, March 26th.  They

2   will also provide us the data and supporting documentation

3   so we can reconcile those amounts and any offsets.  And then

4   hopefully by April 3rd, Your Honor, Transform will then

5   agree to pay any amounts that are in dispute that we owed an

6   excess of the three million.  Of course, all parties' rights

7   are reserved should we not be able to agree on that.

8           THE COURT:  Okay.  So an important part of that

9   was that transparency on the data which I guess clearly the

10  Debtors were complaining about?

11          MR. SINGH:  Yes.  And so that's why that's part of

12  the resolution.  They've agreed to provide it to us by no

13  later than Tuesday so we can take a look at that and

14  hopefully within the next week or so but again no later than

15  April 3rd, come to some agreement --

16          THE COURT:  Okay.

17          MR. SINGH:  -- amongst the parties on what else is

18  owed.

19          THE COURT:  Okay.

20          MR. SINGH:  Your Honor, in addition, there's the

21  next issue is the pro ration issue pursuant to Section 9.11

22  of the APA.  The Debtors in their motion request $16.2

23  million which reflects the pro-rated post-close rent for the

24  month of February 2019.  Transform has asserted that there's

25  offsets on that pro ration against that amount that need to

Page 21

1    be reconciled.  So what we've agreed is that Transform will

2    transfer $5 million in respect of the pro ration again by

3    Tuesday, March 26th, and they will also produce by that time

4    the data, the backup documents so that parties can reconcile

5    that amount.

6           And, again by April 3rd, Transform will then

7    transfer any excess that's agreed to be owed in respect to

8    the pro ration.  And of course, all parties' rights being

9    reserved if we can't come to an agreement on those issues.

10          THE COURT:  Okay.

11          MR. SINGH:  Your Honor, so that really just leaves

12   open for today two issues.  One is in the Debtor's motion to

13   enforce as to credit card receivables argument that we have

14   with Transform.  And, Your Honor, we think that's just an

15   issue of contract interpretation that my partner Jared

16   Friedman will address with the Court and that Transform's

17   motion to compel mediation which is also on for today and

18   going forward.

19          THE COURT:  Okay.

20          MR. SINGH:  So, Your Honor, unless you have any

21   questions, just one housekeeping matter before I turn the

22   podium over to Mr. Friedman.  We did file -- the Debtors did

23   file a motion to shorten notice with respect to the motion

24   to enforce.  It did not prejudice any parties because we

25   gave the allotted seven days to respond.  We did file our

1    reply yesterday, but technically, Your Honor, we do have an

2    order pending with respect to that.

3               THE COURT:  Okay.  Well, I'll grant that motion,

4    but in so granting it, that shouldn't be construed as a

5    ruling on whether the motion should be treated as an

6    adversary proceeding --

7               MR. SINGH:  Certainly, Your Honor.

8               THE COURT:  -- or not or that an adversary

9    proceeding be required or not.

10              MR. SINGH:  Certainly, Your Honor. Thank you.

11              THE COURT:  Okay.

12              MR. SINGH:  So, Your Honor, I'm going to turn the

13   podium over to Mr. Friedman to address the remaining

14   portions of the motion to enforce for today.

15              THE COURT:  Okay.

16              MR. FRIEDMAN:  Good morning, Your Honor.  Jared

17   Friedman from Weil Gotshal on behalf of Debtors.

18              THE COURT:  Good morning.

19              MR. FRIEDMAN:  I'm going to address you this

20   morning, this $14.6 million credit card receivable from pre-

21   closing transactions that we assert belongs to Debtors under

22   the APA and that we assert has been held by Transform Co in

23   violation of the automatic stay, the sale order, and they're

24   without basis under the APA.

25              The buyer argues that the Debtors are not entitled

Page 23

1     to this $14.6 million pre-closing transaction credit card

2     proceeds because Debtors included $35 million of credit card

3     receivables that are currently held by credit card

4     processors in these so-called reserve accounts in what we

5     delivered to the buyer at closing.

6              Now, there is no dispute that these reserve

7     accounts that were delivered at closing are made up of funds

8     that were collected by the credit card processor from

9     individuals shopping at Sears stores, buying inventory from

10    Sears, using their credit card to pay for those, for that

11    inventory.  Monies then went over to the credit card

12    processor which was then owed to at the time Sears as the

13    Debtors.

14             Under the APA, credit card receivables are defined

15    as one of the definitions in 1.1. as, "Each account or

16    payment, intangible" -- each as defined in the UCC,

17    "together with all income, payments, and proceeds thereof"

18    -- and here's the key, "owed by a credit card payment

19    processor or issuer of credit cards to a seller resulting

20    from charges by a customer of the seller on credit cards

21    processed by such processor."

22             THE COURT:  In the ordinary course.

23             MR. FRIEDMAN:  In the ordinary course, exactly.

24    So the agreements in the ordinary course do in fact allow

25    under certain circumstances for these credit card

Page 24

1    receivables to be held back for some period of time.  But

2    when they're held back, that doesn't in any way mean that

3    they're no longer owed to the seller, to the Debtors in this

4    case.  And, again, as I said, there's no dispute that that's

5    how these "reserve funds" were funded through these credit

6    card receivables.

7            The buyer's argument is that rather than these

8    being credit card receivables, once the decision is made to

9    hold them back, suddenly they're no longer credit card

10   receivables.  Instead, they're something else.  And the

11   question is under the APA, is there some provision that

12   suggests that there's something else?

13           Now, certainly, if in the definition we just

14   looked at of credit card accounts receivable, it said it's

15   these types of credit card receivables that come in when the

16   purchase is made at the Sears store, provided however, if

17   there's a holdback, it no longer is a credit card accounts

18   receivable.  That language, of course, is not in the APA.

19   That's not what was negotiated.

20           Instead, Transform is arguing that we should look

21   to Section 2.10 of the APA which defines a bunch of specific

22   types of other security.  It's got security deposits,

23   letters of credit, escrow deposits, letters of credit, a

24   whole bunch of things that these receivables clearly are

25   not.  It also has some catch-all language like "other

1   assets."  Well, other assets can be virtually everything

2   from, you know, the pencils on the desks to anything else.

3           THE COURT:  Can we go through this language --

4           MR. FRIEDMAN:  Sure.

5           THE COURT:  -- a little more specifically in 2.1?

6           MR. FRIEDMAN:  So 2.10, Your Honor --

7           THE COURT:  It says these are parts of the assets

8   that are being transferred, is that correct?

9           MR. FRIEDMAN:  Correct.

10          THE COURT:  "Any and all rights of sellers even to

11  any restricted cash, security deposits, letters of credit,

12  escrow deposits, and cash collateral, including cash

13  collateral given to obtain or maintain letters of credit and

14  cash drawn or paid on letters of credit, utility deposits,

15  performance payment or surety bonds, credits allowance,

16  prepaid rent, or other assets, charges, setoffs, prepaid

17  expenses, other prepaid items, and other security,

18  collectively security deposits."

19          So I'm assuming that the buyer contends that these

20  funds in the so-called reserve accounts or on reserve are

21  either restricted cash, escrow deposit, or cash collateral?

22          MR. FRIEDMAN:  I think their argument was --

23          THE COURT:  And what is your response to that?

24          MR. FRIEDMAN:  I don't think it's any of those.

25  And I think that their argument really is largely that it's

Page 26

1    other assets are just security general, that they're

2    focusing instead on these general terms and saying that the

3    -- I don't know there's any doubt that before there was a

4    determination to hold back these funds, that they were

5    credit card receivables.  They clearly fall in that

6    definition.  The question is did something happen the moment

7    that the credit card processor said we're not going to

8    distribute them in three days.  Instead, as we're permitted

9    to under the agreement, we're going to hold back and wait to

10   distribute these until you demonstrate further

11   creditworthiness to us.

12              THE COURT:  You meaning who, the buyer or Sears?

13              MR. FRIEDMAN:  This is all pre-closing.

14              THE COURT:  Oh, so this was --

15              MR. FRIEDMAN:  So at this point it's Sears and

16   Debtors.

17              THE COURT:  So this is Sears.  So one of my

18   problems in resolving this issue today, is that the

19   declaration that the buyer has provided in support of its

20   contractual position, that quotes from and refers to the

21   credit card agreements that was provided to chambers until

22   late yesterday afternoon, was redacted and the agreements

23   were not attached.  So the reason I got on the bench today

24   late was I was trying to parse through the motion to seal,

25   which under my chambers rules includes the requirement to

Page 27

1      provide the unredacted agreements.

2              But no one is really focused on those actual

3      provisions except yesterday afternoon, to some extent, but

4      the contention, I believe, is that those provisions

5      constitute a security agreement that actually gives the

6      credit card issuers the right to withhold the money and

7      treat it as collateral.  But the record is really pretty

8      sketchy on that as far as today is concerned.

9              MR. FRIEDMANN:  And Your Honor, we would suggest

10     that because the terms of the APA itself are not ambiguous,

11     that declaration and all of its redacted documents really

12     are parol evidence --

13             THE COURT:  Well, but --

14             MR. FRIEDMANN:  --that need to be looked at --

15             THE COURT:  This is not to interpret the agreement

16     in the sense that someone is trying to tell me what this

17     paragraph means.  I can read what the paragraph means, and

18     both sides agree that under Delaware law that I apply the

19     plain meaning rule.  I view this agreement as setting forth

20     some specific terms, the ones I mentioned, that might fit;

21     i.e., restricted cash, escrow deposits and cash collateral.

22             And then it has a general phrase or other assets

23     and other security.  So I view it as basically collateral.

24     That's how it's defined, security deposits, referring to

25     collateral.  And I would be looking at the credit card

Page 28

1   agreements to see if they create that type of relationship.

2   I don't think you all dispute, for example, but if you

3   posted collateral to secure a reimbursement obligation under

4   a letter of credit, that that would be transferred to the

5   buyer subject to the cap and the reallocation mechanism.

6           MR. FRIEDMANN:  A hundred percent, that's right,

7   Your Honor.

8           THE COURT:  So --

9           MR. FRIEDMANN:  The point here is, though, that

10   that's not what happened and what did happen --

11           THE COURT:  No, but --

12           MR. FRIEDMANN:  -- is not in dispute.

13           THE COURT:  But it seems to me that the underlying

14   credit card agreements that govern this, to me, very

15   amorphous concept of a reserve is central to that.  I mean,

16   I can read a -- as you all have and there's no dispute over

17   it -- a pledge of cash to secure a letter of credit,

18   reimbursement obligation.  I can review a cash collateral

19   agreement to secure whatever, you know, some performance

20   obligation related to collecting on the cash.

21           But similarly, I need to, I think, make sure I

22   have all of these agreements and give you all a chance to

23   comment on them before I rule on what they actually create.

24   And I'll just note that just focusing on the largest one

25   this morning and how it was characterized in the -- I think

1      it's pronounced Hede, H-E-D-E, declaration?

2              MR. FRIEDMANN:  Yes.

3              THE COURT:  It seemed to be somewhat

4      mischaracterized.  It refers to a right to create a letter

5      of credit as a condition, which the Debtors didn't do, but

6      then it refers elsewhere to, we're just going to pull money

7      back, but I don't know if they have a right to do that.

8      It's just not clear to me.

9              MR. FRIEDMANN:  Okay.  I think our -- the point

10     we're trying to make this morning, Your Honor, is that 2.10

11     is a general provision in the agreement --

12             THE COURT:  Right.

13             MR. FRIEDMANN:  -- to cover a whole bunch of

14     things that would've been transferred.  Here, we're not

15     dealing with something that has to fall under 2.10 because

16     we have very specific funds that are detailed, frankly in

17     excruciating detail, when that definition of credit card

18     accounts receivable was drafted talking about specifically

19     these types of funds, that these are the types of funds that

20     are owed to the Debtor, which they still are owed.

21             These still were owed at the time of the closing,

22     these are still funds that were owed to the Debtor,

23     resulting from charges from a customer or seller and there's

24     nothing in the provision in the definition of credit card

25     accounts to say, well, that suggests that at some point, if

Page 30

1    it's moved from one account to another or if there's some

2    operation of contract that doesn't allow it to be

3    distributed right away, that that any way takes away from

4    them being credit card accounts receivable.

5           They still meet this definition to a tee, which is

6    why we suggested you don't need to get into figuring out

7    whether or not there's something in those agreements that

8    allows them to squeeze this under the definition of 2.10.

9    We don't need to go there.  We've got a clear definition.

10          THE COURT:  Well, what if you had complied --

11   well, I guess they would've gotten a letter of credit for

12   someone else, so I guess that doesn't work.  But what if you

13   had actually agreed and entered into a cash collateral

14   agreement with a credit card issuer, which is certainly

15   conceivable to me, that we will secure your payment -- any

16   refunds that we owe you down the road with the cash

17   collateral?

18          MR. FRIEDMANN:  And I think the point here --

19          THE COURT:  Then you have -- these two provisions

20   are conflicting with each other, aren't they?  Because this

21   says any and all.

22          MR. FRIEDMANN:  Well, you have a --

23          THE COURT:  When I say "this," I mean --

24          MR. FRIEDMANN:  -- general catch-all --

25          THE COURT:  -- 2.10.

1            MR. FRIEDMANN:  Right.  You have a general catch-

2    all provision conflicting with a very specific provision and

3    rule of contract construct interpretation require us to give

4    credence to the specific definition that these clearly fall

5    under rather than being concerned that, well, it also could

6    fall under some general catch-all, because things always

7    fall under general catch-alls.

8            In this circumstance, the parties negotiated a

9    specific definition of credit card receivables and did not

10   include any type of provision that suggested that credit

11   card accounts receivable stop becoming credit card account

12   receivables at any point.

13           THE COURT:  Except, perhaps, in 2.10.

14           MR. FRIEDMANN:  But that's not -- they could have

15   written that.  That could've been negotiated.  They could

16   have said, provided, however, in the event that any of these

17   credit card account receivables are retained or are held

18   back or are put into a reserve account, then they become

19   security as defined in 2.10.  We're hearing -- that's a

20   novel argument being made now that it falls under there, but

21   that's not what the parties negotiated and that's not what's

22   reflected in the plain language of the APA.

23           You have to read between the lines to suggest that

24   there is that link, that when this became -- when these

25   credit card account receivables were put into a reserve

1   account, then suddenly they get shifted over to fall under

2   2.10.  That's nowhere in this agreement.

3            THE COURT:  What is your interpretation of the

4   last clause in the definition of credit cards accounts

5   receivable --

6            MR. FRIEDMANN:  I assume you're referring to the

7   in each case --

8            THE COURT:  -- in 101?

9            MR. FRIEDMANN:  -- in the ordinary course of

10  business?

11           THE COURT:  Right.  Exactly.  In each case, in the

12  ordinary course of its business.

13           MR. FRIEDMANN:  Our interpretation of that is that

14  the -- to the extent that these credit card accounts

15  receivable were not being paid out immediately or within

16  three days or four days, whatever it happens to be under the

17  particular agreement, they were being retained for some

18  period of time, a longer period of time, pursuant to that

19  agreement in the ordinary course of business, as defined by

20  the parties in that agreement.  They anticipated --

21           THE COURT:  Couldn't that cover the reserve cash,

22  then, because it's not being paid out every three days?

23           MR. FRIEDMANN:  I'm sorry.

24           THE COURT:  Wouldn't that cover the reserved cash,

25  the reserved amount, because it's not being paid out every

1   three days?  Or is it a wheel of cash where it's paid out

2   every three days and there's a new reserve every three days?

3           MR. FRIEDMANN:  My understanding -- and I'm not an

4   expert on these agreements, either -- is that there are

5   different provisions of the different agreements in terms of

6   how things are paid out and there's always some funds

7   reserved because you can have people who -- the same person

8   who bought a lawn mower one week on a credit card comes to

9   return it the next week and all of a sudden, there needs to

10  be money to pay back a customer.

11          THE COURT:  Don't we have to go through the

12  agreements, then, to see how it's in the ordinary course or

13  not in the ordinary course?

14          MR. FRIEDMANN:  I don't know that we do, because

15  no matter what, there's still credit card accounts

16  receivable.  They always are --

17          THE COURT:  No, but then it has this -- this has

18  this clause at the clause at the end, in each case in the

19  ordinary course of business.

20          MR. FRIEDMANN:  There's no -- but the thing is,

21  the buyer here is not suggesting that outside of the

22  ordinary course of business these receivables were used for

23  some type of security.  To the extent that they're --

24          THE COURT:  I don't know.  I think that's what

25  they are suggesting, is that these credit card companies

Page 34

1    sent noticed to Sears and said we're going to reserve the

2    money.  Or somebody.

3              MR. FRIEDMANN:  Under the terms of their

4    agreements that they -- in the ordinary course, they were

5    permitted to do this, not --

6              THE COURT:  No, but that -- see, again, I got -- I

7    don't know if I have all the agreements, A.  B, I got them

8    yesterday afternoon after I was in this room with a 300-

9    item, 65-page agenda with about 250 Chapter 13 Debtors, and

10   then I went off to teach my law school class.  So I had a

11   little bit of time this morning to look over the agreements

12   and the language in at least some of the agreements seemed

13   to be conflicting with the buyer's interpretation of them

14   and I'm just not ready to rule on it.

15             It just seems to me that either side could be

16   right at this point on what those agreements mean and how

17   they fit into these two definitional provisions.  I'm not

18   talking about taking parol evidence or anything like that.

19   I'm just seeing how the contract with the credit card

20   issuers fit into this language.

21             MR. FRIEDMANN:  And, Your Honor, I'm not an expert

22   on these agreements yet, either, because I got them around

23   the same time you did.

24             THE COURT:  Okay.

25             MR. FRIEDMANN:  If it would be helpful to the

Page 35

1    Court -- obviously we're not suggesting that we think

2    there's anything in these agreements that change the meaning

3    of the APA or that any way change the fact that we believe

4    that we're entitled to this $14.6 million, if it would be

5    helpful to the Court for the parties to separately brief for

6    you the --

7            THE COURT:  Well, I just --

8            MR. FRIEDMANN:  -- APA part of those agreements --

9            THE COURT:  I want to make sure I have --

10           MR. FRIEDMANN:  -- we'd be happy to do that.

11           THE COURT:  I'm sorry to talk over you.  I'd just

12   like to get a full set and make sure I have a full set and I

13   don't know if I need more briefing.  It may be that I just

14   want -- need to hear you all again.

15           MR. FRIEDMANN:  No, I --

16           THE COURT:  Then maybe when people focus on them,

17   they'll see an answer here, too, which is quite possible.

18           MR. FRIEDMANN:  We'd be happy to do either.  Thank

19   you, Your Honor.

20           THE COURT:  Okay. I mean, among other things, your

21   argument that the specific governs over the general here, is

22   made more clearly now than in the papers and neither I nor

23   my clerks went through and looked at this agreement to see

24   whether that's really how this agreement works.  Now I'm

25   talking about the APA.  I mean, that's usually the case but

Page 36

1    these two -- I mean, one provision says any, so that's why

2    the ordinary course language, I think, is important in the

3    other one because I'm not sure how specific it really is,

4    given that language.

5            Now, you may say that what the card payment

6    processers have done here in respect of these so-called

7    reserves, which I don't think they actually -- well, I

8    didn't get through all three of the agreements.  But the

9    first one doesn't actually use the reserve term, I think.

10            MR. FRIEDMANN:  That's correct.

11            THE COURT: So I don't know whether this is out of

12    the ordinary course or on -- and here's another issue.  The

13    definition means owed, right?  So even if the credit card

14    company is acting outside of its rights and just holding it,

15    I would assume it's owed because they're not acting within

16    their rights.  But maybe they are acting within their

17    rights, and if they are, maybe it's ordinary course, in

18    which case maybe you are owed the money.

19            MR. FRIEDMANN:  Yeah, I don't see any way in which

20    we're not owed the money, whether --

21            THE COURT:  Well, I know you don't, but --

22            MR. FRIEDMANN:  -- security.  What I'm saying, the

23    money -- it's not like the get to keep the money.

24            THE COURT:  No, but -- I'm sorry.  Owed the money

25    by the buyer.

Page 37

1            MR. FRIEDMANN:  Right.

2            THE COURT:  Not by the credit card --

3            MR. FRIEDMANN:  Yeah.

4            THE COURT:  You definitely are owed the money some

5    day by the credit card company.

6            MR. FRIEDMANN:  And that's our --

7            THE COURT:  As anyone who posts a security deposit

8    is owed money --

9            MR. FRIEDMANN:  Right.

10           THE COURT:  -- eventually, unless they do the

11   thing that the deposit secures.  Which, by the way, these

12   agreements, at least the one I read most carefully, the one

13   where the most money is owed, doesn't really say what it

14   secures.

15           It just says we're going to hold it.  Maybe

16   there's some other provision that says, oh, this is -- we're

17   securing X, whatever that is.  The declaration says it's

18   securing refunds, you know, the obligation of Sears to

19   refund money that, I guess at some point, gets refunded in

20   these relationships.  But anyway, just to me, I'm just not

21   ready to rule on that issue.

22           MR. FRIEDMAN:  Thank you.  We're happy to come

23   back and -- once we've all (indiscernible) these agreements

24   and address the questions for you.

25           THE COURT:  All right.  I'm happy to hear from the

Page 38

1    buyer too.  But I haven't addressed the one issue that the

2    buyer weighs in addition to the merits, which is the

3    applicability of Rule 7001 here, which states that, in

4    7001.1, a proceeding to recover money or property other than

5    a proceeding to compel the debtor to delivery property to

6    the trustee, is to be dealt with in an adversary proceeding.

7    Many courts have held that that rule applies to turnover

8    actions.  Even though the rule doesn't say turnover,

9    turnover includes recovering, arguably, money.

10            On the other hand, neither side has cited this

11   case, but to me it appears to be controlling.  The Second

12   Circuit, in Weber, W-E-B-E-R v. SEFCU, In re Weber, 719 F3rd

13   72, Second Circuit 2013, well after the promulgation of Rule

14   7001, says that where a party is violating the automatic

15   stay under 362(a)(3), by withholding property of the estate,

16   a debtor does not have to go through an adversary proceeding

17   to recover it.  You may have to go through an adversary

18   proceeding to obtain damages for breach of the automatic

19   stay, but you don't have to go through an adversary

20   proceeding.

21            The Court goes even further.  That some additional

22   act by the debtor is required before the creditor is

23   obligated to surrender the property is not the case.  That's

24   actually the majority view, but it doesn't really matter,

25   it's the Second Circuit's view.

1            Now, there is no dispute in that case that the car

2    was the debtor's property.  But other courts have put a

3    gloss on it, and the Second Circuit quotes the Eight Circuit

4    in saying, "If persons who could make ...," and here's the

5    key phrase, "... no substantial adverse claim to a debtor's

6    property in their possession, could without cost to

7    themselves, compel the debtor or his trustee to bring suit

8    as a prerequisite to returning the property.  The powers of

9    a bankruptcy court to collect the estate for the benefit of

10   creditors would be vastly reduced," and, therefore, we're

11   going to require it.  So, no substantial adverse claim.

12           I can't imagine that you wouldn't have a gloss

13   like that because, obviously, to the extent there is a

14   substantial adverse claim, I can't imagine that you wouldn't

15   have a gloss like that because, obviously, to the extent

16   there is a substantial adverse claim the party may be taking

17   the risk, who's making that claim, that they're in violation

18   of the stay and may ultimately be liable for substantial

19   damages caused by violating the stay.  But at some point, if

20   there is a substantial adverse claim, you need to determine

21   that claim in the context of an adversary proceeding.

22   You're saying there's no, this is a no-brainer: there's no

23   substantial adverse claim.  That may be the case.

24           Even if there were a substantial adverse claim, I

25   don't think that the Second Circuit would say, even if you

1    did have to have an adversary proceeding, that you're

2    relieved from breaching the automatic stay.  And that's

3    important, and I think the buyer should understand this.

4    That means that, in addition, if it loses here, ultimately,

5    in addition to which paying over the money, it may well be

6    liable on top of that for breaking the automatic stay,

7    including for your cost in enforcing the stay and any other

8    consequential damages.  That's the important thing to keep

9    in mind.  It may make sense, therefore, to return the money

10   to the debtor recognizing that it's not going to be used

11   until this issue is determined one way or the other.

12            MR. FRIEDMAN:  Thank you, Your Honor.

13            MR. LIMAN:  Good morning, Your Honor.

14            THE COURT:  Good morning.

15            MR. LIMAN:  Lewis Liman from Clearly Gottlieb for

16   Transform.  Let me, again, (indiscernible) the procedural

17   points.  And obviously, will take into mind Your Honor's

18   words at the very end.  With respect to the procedural

19   point, the point that we had tried to make in our papers was

20   that with respect to the motion to turn over, that was

21   subject to Rule 7001.  We did not cite the Second Circuit

22   case.  I was not aware of the Second Circuit case, but --

23            THE COURT:  You guys don't deal with people with

24   cars, that's why.

25            MR. LIMAN:  We did, Your Honor, take the position

Page 41

1    that, as the Second Circuit said, that if there was a

2    substantial claim there would be an evidentiary hearing

3    required.

4            THE COURT:  That's fair.

5            MR. LIMAN:  And that is what the series of cases,

6    frankly, that the Debtors cite with respect to violations to

7    the automatic stay.  They're all cases --

8            THE COURT:  They just say there's no substantial

9    claim, that it's clear from the face of the documents.

10           MR. LIMAN:  Your Honor, as you know, this is one

11   of a series of claims that we've got against the Debtor.  I

12   can go through those in a moment, but from our perspective,

13   we've got a $13.7 million claim against the Debtor arising

14   from this issue.

15           THE COURT:  But set off violates the automatic

16   stay too, so you can't say that we're not paying what you

17   owe because we're owed money too.  That's a violation of the

18   stay also.

19           MR. LIMAN:  I understand that Your Honor.  And

20   that's not what we're doing.

21           THE COURT:  Well, it sounded like what you were

22   just telling me, so I just wanted to make clear you

23   understood that.

24           MR. LIMAN:  It's not what we're doing.  What I was

25   trying to say, Your Honor, was that the issue that arises to

Page 42

```
 1    Your Honor with respect to credit card reserves, can cut

 2    depending on how Your Honor decides it in favor of the

 3    Debtors or can cut in favor of the buyers, depending on how

 4    Your Honor resolves that issue.  I want to make just a

 5    couple of points with respect to --

 6              THE COURT:  But again -- I'm sorry to interrupt

 7    you but I really want to make sure you all understand this.

 8    If you all lose that issue you will clearly have violated

 9    the automatic stay, and unlike one circuit, which I think

10    now is reconsidering it in a subsequent ruling, good faith

11    is not a defense to violation of the automatic stay.  It may

12    be a defense to punitive damages -- it is, probably, a

13    defense to punitive damages -- but not to consequential

14    damages.  So, you may end up paying the cost of litigating

15    this not only for your client, but the Debtors, and any

16    direct damages that result from it if you lose.

17              MR. LIMAN:  Your Honor, I have an apology to make

18    which is with respect to the declarations that were

19    submitted yesterday.  As Your Honor knows, we informed the

20    Court, we have to give notice to the credit card companies.

21    This matter proceeded on an expedited basis.

22              THE COURT:  I understand.  That's fine.

23              MR. LIMAN:  We tried to get them to Your Honor as

24    quickly as possible.

25              THE COURT:  That's fine.
```

1              MR. LIMAN:  I want to just make a couple of points

2       with respect to law and to, frankly, sit down with respect

3       to this issue because I think we can give you briefing on it

4       if Your Honor desires.  We agree that the relevant question

5       is the character of this amorphous concept called reserves

6       in the hands of the Debtor at the moment of the closing.

7       That is the relevant question:  What is it, what was the

8       character at the time that it was being sold?

9              We also agree that the contract distinguishes

10      between accounts payable and security.  From our

11      perspective, just to answer Your Honor's question, these

12      reserves could fit within a number of different categories

13      under 2.1(o) including cash collateral, and including

14      security; including, frankly, prepaid items, any number of

15      different ideas.

16              THE COURT:  Is there a security agreement?

17              MR. LIMAN:  There's not a formal security

18      agreement.  Your Honor has the agreements in front of you.

19      They do make clear that the funds that were on deposit with

20      the card companies were to protect them against default.

21      That's the language with respect to --

22              THE COURT:  It would be useful to get a sense from

23      the parties as to whether this would count as collateral

24      under applicable law. It didn't bleep out at me when I

25      skimmed the agreement.  It looked like they may have just

Page 44

1    had contract rights to withhold money.

2            MR. LIMAN:  Your Honor, under the --

3            THE COURT:  I'm not sure they even had that.

4            MR. LIMAN:  Under the accelerated briefing process

5    we were under, as we pointed out in our papers, we did not

6    have an opportunity to put in all of the different

7    arguments.

8            THE COURT:  That's right.  I appreciate that.

9            MR. LIMAN:  I do think it's important to address

10   the issues raised with respect to whether these were owed,

11   whether they were in the ordinary course, and whether they

12   were owed in respect of credit card payments, because I

13   think, frankly, the evidence that the Debtors have submitted

14   makes it quite clear that at the moment of closing, they

15   were not owed, number one.

16           THE COURT:  Where does the moment of closing come

17   in?  I mean if they're owed in the ordinary course -- I

18   don't know how this works, but if it's just a rule of cash,

19   it may fit into the definition.

20           MR. LIMAN:  Well, Your Honor, if these are a sum

21   of moneys that are held, that are constantly being

22   replenished, that sum of money, the millions of dollars is

23   not money that the Debtor had a right to obtain when it

24   closed, and frankly, under the terms of agreement, was not

25   clear whether the Debtor would ever be able to recover those

Page 45

1    moneys.  They were also not owed in the ordinary course.

2    And if they were returned it would not be as a result of the

3    credit card charges, but as a result of satisfying the

4    various trigger conditions.

5              THE COURT:  They're in the credit card -- the

6    trigger conditions, you mean in the credit card agreement?

7              MR. LIMAN:  Correct, Your Honor.  The card

8    companies had a right to hold onto these moneys until those

9    trigger conditions, financial conditions were satisfied or

10   until, frankly, we stopped charging with accepting American

11   Express cards or Discover cards, or the like.

12             THE COURT:  I guess that -- I understand the

13   parties' respective positions, I just don't know whether

14   that's the case.  And you could read this to say they are

15   owed, they're just not payable until, in the ordinary course

16   they become payable.  But again, you all have been

17   reasonably clear at laying out your arguments.  I just can't

18   decide it today because I don't know the relationship based

19   on the agreements with the credit card companies.

20             MR. LIMAN:  I do think it is important just to

21   read the contract as a whole, and in context.

22             THE COURT:  You're talking about the APA now?

23             MR. LIMAN:  I am, not the credit card agreements,

24   which we gave you.  And I think reading them in context and

25   as a whole, the function of 10.9 is very clearly to provide

Page 46

1    the collateral necessary to support the ABL.  That's why

2    10.9 is part of the conditions of closing.  There are other

3    provisions within the contract that refer to certain

4    amounts.

5             THE COURT:  I love that argument.  Of course,

6    that's not in the agreement itself, but I did have a

7    question.  When you say the collateral necessary to support

8    the ABL, what do you mean by that?

9             MR. LIMAN:  Your Honor, one of the items that the

10   parties discussed leading up to the presentation of the APA

11   to you for approval was whether they transform the buyer

12   after it purchased the assets would be able to have the

13   financing in place to continue to run the business.  That in

14   fact was a condition of closing of the -- that the buyer had

15   to satisfy.

16            In connection with that, the buyer needed a

17   certain amount of collateral that the banks would accept.

18   That was the function of 10.9.

19            THE COURT:  Walk me through that.  2.10 provides

20   for the transfer of cash that's securing obligations of

21   Sears.

22            MR. LIMAN:  In connection with the contracts that

23   are acquired.

24            THE COURT:  Right.  So that's already been pledged

25   to someone else.  So I don't see how that fits into 10.9.

Page 47

```
 1    How can you say that that collateral that someone else has a

 2    lien on becomes the buyer's asset to pledge to its lender?

 3             MR. LIMAN:  Your Honor, that's exactly one-hundred

 4    percent the point.

 5             THE COURT:  Okay.

 6             MR. LIMAN:  That is the point.  Cash that is on

 7    deposit, however it's funded, with a counterparty, a credit

 8    card company --

 9             THE COURT:  Right.

10             MR. LIMAN:  -- to provide protection against the

11    risk of default cannot be used as collateral with the banks.

12    Has no value to the banks.  Collateral to the credit card

13    companies can't be collateral to the banks.  And it is for

14    that reason, Your Honor, that the items that are in 10.9 of

15    the defined items specified as pharmacy receivables, ordered

16    inventory, and accounts -- credit card accounts receivables.

17    The reserves in the parol evidence is quite clear, and it's

18    frankly probably not even parol evidence.

19             THE COURT:  So you're saying that the definition

20    credit card receivables is just used in 10.9?

21             MR. LIMAN:  It's used in two places.  It's used in

22    2.1 -- maybe three places.  2.1(d) gives the seller the

23    right to the accounts receivable.  It defines accounts

24    receivable to include, among other things, credit card

25    receivables.  1.1 defines credit card accounts receivables.
```

Page 48

1    10.9, which is the collateral provision, picks up those

2    items in 2.1 that can be used as collateral with the ABL

3    banks.  It picks up the credit card accounts receivables,

4    the pharmacy receivables, but it does not pick up cash

5    collateral, prepaid items, security deposits, other

6    security.

7              THE COURT:  So let me understand your argument.

8    You're saying that those would be assets that stay with the

9    seller, but they don't fit into the allocation mechanism in

10    10.9?

11              MR. LIMAN:  No, not -- I don't think that's quite

12    my argument.  My argument is that there are two categories

13    of items under 2.1, two relevant categories under 2.1 that

14    the buyer purchased.  The buyer purchased the cash

15    collateral, the security deposits, the security, and the

16    prepaid items and restricted cash in connection with the

17    contracts and other acquired assets that it was assuming.

18    That's what is in 2.10.

19              THE COURT:  Right.

20              MR. LIMAN:  Under 2.1(d), we purchased a separate

21    category of items.  And that refers, among other things, to

22    all acquired receivables.  If you're looking for what

23    acquired receivables are, go to 1.1.  And acquired

24    receivables are defined to include the credit card accounts

25    receivables, the pharmacy receivables, and the warranty

1    receivables.

2            THE COURT:  Right.  So you would buy those.

3            MR. LIMAN:  We'd buy all of those (indiscernible).

4            THE COURT:  And then 10.9 has this crediting

5    mechanism if it's above the billion six.

6            MR. LIMAN:  10.9 gives us the minimum amount of

7    the -- of certain of the acquired receivables and the

8    inventory, that which is necessary to satisfy the ABL.

9            THE COURT:  Okay, I understand it now.  All right.

10   I thought somehow you were arguing that -- I understand it

11   now.

12           MR. LIMAN:  If I was arguing the other thing, I

13   may have been arguing incorrectly.

14           THE COURT:  I misunderstood.

15           MR. LIMAN:  Your Honor, with respect to the

16   process from here, we do have some thoughts with respect to

17   that.  We've given you I think the relevant contracts.  We

18   can make sure we've given you all of the relevant contracts.

19   We do think that there is some relevant evidence, both with

20   respect to the meaning of the contract to the extent that

21   there is any ambiguity.  For our perspective, we think the

22   contract is clear and there is no ambiguity and that we'd

23   win.  But we think that there is relevant parol evidence,

24   powerful parol evidence that the seller until the last

25   minute also understood that the reserves were not credit

Page 50

1    card accounts receivable.

2              THE COURT:  I don't think we should get into that

3    until I conclude that there is an ambiguity.

4              MR. LIMAN:  And so we would be prepared, and Your

5    Honor knows we had suggested this item for mediation.

6    Thinking about the Court's schedule, frankly, as a large

7    creditor ourselves of the estate, thinking about minimizing

8    expenses.  But we're prepared to proceed whatever way the

9    Court would like us to proceed and to give you the evidence

10   and to give you further briefing with respect to some of

11   these definitional items.

12             THE COURT:  Let me ask, what is the -- this I more

13   for the Debtors.  What is the Debtor's immediate need or

14   timing need for this money?

15             MR. SINGH:  Your Honor, Sunny Singh on behalf of

16   the Debtors. This issue really goes to the plan and all of

17   the disputes with respect to ESL because they're going to

18   affect -- as Your Honor will recall, there's sort of the

19   amounts that the assumed liabilities go to ESL and all of

20   the disputes that are being raised are going to affect what

21   Mr. Dizengoff (indiscernible) presenting to court earlier

22   about the administrative claims solvency analysis and the

23   plan process.  So that's why, Your Honor, this speedy

24   resolution and why we think mediation doesn't make a lot of

25   sense.  The issues are before Your Honor.  You know, I think

Page 51

1   the only thing left now with this dispute is to give you the

2   agreements and address those issues.  And that's really what

3   it comes down to.  We don't think it makes sense to brief --

4           THE COURT:  That's a separate --

5           MR. SINGH:  Yeah.

6           THE COURT:  Right now we're just talking about a

7   little under $15 million.

8           MR. SINGH:  That's right, Judge.

9           THE COURT:  Is the Debtor's receipt of $15 million

10  within the next week, you know, King Richard III, for

11  whatever nail --

12          MR. SINGH:  No, no, no.  It's not as if we don't

13  get the $15 million, we've got a serious problem.

14          THE COURT:  Okay, all right.

15          MR. SINGH:  There is cash.  You know, there's the

16  wind-down account that has close to $90 million.  But there

17  is -- that issue is not -- it's not an immediate one-week

18  issue, but it goes to the larger plan issues.

19          THE COURT:  Right.  But there are all these other

20  disputes that --

21          MR. SINGH:  That all go --

22          THE COURT:  -- that it appears the parties are

23  focused on and --

24          MR. SINGH:  That's fair.  That's correct.

25          THE COURT:  -- resolve in, you know, at least now

Page 52

1    a transparent way.

2              MR. SINGH:   That's correct.

3              THE COURT:   Okay.   Let me say two things.   First,

4    I really think the buyer would be well-advised to turn the

5    money over to the Debtor so it's not violating the automatic

6    stay.   And then agreeing on some sort of adequate protection

7    mechanism so that it won't be lost in case it wins.

8              Secondly, I've given you all I think a fair amount

9    to think about, at least to how I'm thinking about it.   I

10   doubt that's anything more than a mediator would tell you.

11   And I think you should go and look at the contracts and the

12   points I've been raising with you and see if you can't

13   resolve this.

14             I am going to be out most of the first week of

15   April.   So I could give you a hearing date, you know, next

16   Thursday or probably the second week of April.   And that

17   would be a hearing I would expect you all would have -- or

18   maybe wait until the April 18th date.   But I would think

19   that hearing would clearly focus on the plain meaning of the

20   agreements and the context of the -- with the context of the

21   credit card agreements.   And perhaps, although it would only

22   be this much a designated factual issue, if there is one.

23   But I think one can go with the plain meaning of the

24   contract here.   So I'm skeptical that we would need any

25   evidence.

1           So just to repeat then, my inclination, unless --

2    and what Mr. Singh told me suggests the opposite.  Unless

3    this -- you know, getting this money in and spending it is

4    critical for the Debtors, I recommend you put this on for

5    the 18th and brief it by the 11th and try to resolve it with

6    some of the -- paying attention to some of the ways I would

7    be -- I think I've given you a pretty good signal on how I

8    would be looking at these issues.

9           MR. SINGH:  Your honor, we're fine with April

10   18th.

11          THE COURT:  Okay.  And again, I would strongly

12   advise the buyer to turn the money over so that they aren't

13   in violation of the stay.

14          MR. LIMAN:  Yeah, I think the concern on our part

15   is you identified as the adequate protection.

16          THE COURT:  Well, you can -- that's what the

17   Second Circuit said.

18          MR. SINGH:  Your Honor, we can ask --

19          THE COURT:  You can request for that.  You can

20   request that.  You know, but --

21          MR. SINGH:  We'd be happy to stipulate to

22   (indiscernible).

23          MR. LIMAN:  We may have to have a discussion about

24   that.

25          Your Honor, would you like me to address the

Page 54

1    motion to mediate or --

2            THE COURT:  Look, I think you're doing a pretty

3    good job of resolving it on your own, all these issues.  The

4    one thing that concerned me was the suggestion, frankly,

5    that both parties were making, although the Debtor was

6    making it more strongly, that the process -- the information

7    process was not as transparent as it needed to be.  A

8    mediator couldn't mediate without that same transparency

9    anyway.  So I'm telling you to be transparent on the

10   reconciliation process and anything else that's affecting

11   these issues.  And you all have a contract.  Just live up to

12   it, both sides.  I think it's too early for a mediation, in

13   other words.

14           On the other hand, if either party of the contract

15   believes that someone is hiding the ball, they should let me

16   know right away, and I'll stop that.

17           MR. LIMAN:  Your Honor, our concern had been that

18   we sent a letter identifying the contract issues, and it was

19   unanswered for ten days, which is the reason why with -- in

20   this circumstance we're --

21           THE COURT:  It seems like the parties are pretty

22   well focused on these things at this point.  And maybe

23   people are waiting for reconciliation documents before they

24   answer it.  So I think the parties are well represented

25   here.  And it's probably more productive to go as far as you

1    all can on these issues.  And if there's some dispute that

2    you can't resolve, then I'll decide whether it should be

3    mediated or I should just decide it.

4            MR. LIMAN:  Just in the interest of transparency,

5    we do have rather substantial monetary claims against the

6    estate for breaches of the APA and ways in which I believe

7    that we were substantially shortchanged.

8            THE COURT:  Those are probably the ones I should

9    decide.  I mean, you know.

10            MR. LIMAN:  And those may -- if we can't resolve

11    those through discussions, they may need to be initiated by

12    some form of contested proceeding with -- permitting Your

13    Honor to decide the --

14            THE COURT:  That's fine.  I've done that before,

15    as Mr. Dizengoff may remember with Carl Icahn and others.

16            MR. LIMAN:  Quite happy to have Your Honor do that

17    if we are not able to reach resolution.  Thank you, Your

18    Honor.

19            THE COURT:  Thanks.  So I'm not going to -- I'm

20    just going to carry the mediation motion.  I think the

21    issues to be mediated have morphed just in the time since it

22    was filed.  So I'm not denying it, I'm just going to carry

23    it.  And if a party thinks that one or more issues should be

24    brought to my attention as to whether they should be

25    mediated or not, you are free to do that.

1           MR. SINGH:  Thank you, Judge.  Your Honor, I think

2    that -- Sunny Singh for the Debtors.  I think that actually

3    leads to item number five on the agenda.

4           THE COURT:  Which is what?

5           MR. SINGH:  Which is a notice of rejection that

6    Debtors filed --

7           THE COURT:  Oh, okay.  I thought you were talking

8    about mediation still.

9           MR. SINGH:  Oh, no, no, no.  I'm sorry, Judge.

10   I'm sorry.  No, mediation -- now that Your Honor has carried

11   the mediation, we're up to item five, which is our notice of

12   rejection to --

13          THE COURT:  Can I just say one more thing about

14   the procedure here?  I mean, it's well-established, and I

15   hate to note this because I have the greatest respect for

16   the people that do the bankruptcy rules, including Judge

17   Bernstein, who is on the committee and has been for a long

18   time.  But it's well established that if there is a conflict

19   between the code and the rules, the code governs.  And, you

20   know, the Second Circuit has spoken on that issue as far as

21   the adversary proceeding points.  So I feel comfortable

22   dealing with the issues that we just now ended for today

23   through this process.

24          Okay, I'm sorry.  So go back to item five.

25          MR. SINGH:  Yeah.  I'm going to actually turn --

Page 57

1   we do have one objection, a limited objection, by Steel 1111

2   that's pending.  And I'm going to turn the podium over to my

3   colleague, Candace Arthur, to address this in the next

4   motion, Your Honor.

5           MS. ARTHUR:  Good morning, Your Honor. For the

6   record, Candace Arthur, Weil, Gotshal & Manges on behalf of

7   Sears Holdings Corporation and its affiliated debtors.

8           Your Honor, as Mr. Singh noted, the item before

9   the Court today is with respect to our lease rejection

10  notice that we filed on February 26th, 2019.  Specifically

11  it is relates to Store 1004, located at 1111 Franklin Avenue

12  in Garden City, New York.

13          The Debtors determined, Your Honor, in their

14  business judgement, that the lease was not necessary or

15  beneficial to the Debtor's businesses.  Further, we

16  determined that there is no current opportunity to assume an

17  assignment lease, and (indiscernible) value will be realized

18  by any such transaction.

19          The landlord did file a limited objection to lease

20  rejection notice, and that was filed on March 8th, ECF 2786.

21  I'd like to note that Paragraph 8 of the objection does

22  state that the landlord has no objection to the Debtor's

23  rejection of the lease in and of itself as an exercise of

24  the Debtor's business judgement.

25          Accordingly, Your Honor, we are here before you

Page 58

1    today solely with respect to the rejection date.  As you may

2    recall from the hearing that we had in November in

3    connection with another similarly-situated landlord, the

4    rejection order that we would propose to submit only

5    provides a proposed rejection date that the Debtors are

6    setting forth, and the actual rejection date is not fixed.

7    As a result, the landlord would be able to contest the

8    Debtor's rejection date to the extent that it determined it

9    still wanted to do so.

10          You know, that being said, Your Honor, the

11   landlord of the lease premises has moved before the court

12   requesting that the rejection of the lease be effective to

13   an unknown time in the future when a third-party licensee

14   ceases to occupy certain parking spaces of the property.  We

15   respectfully request that the court deny the landlord's

16   request.  Winthrop licensee is the licensee of the property.

17   And I would like to note for your court that the Debtors did

18   not actually notice Winthrop in connection with the lease

19   rejection notice, although Winthrop is aware of the Debtor's

20   decision with respect to the property due to communications

21   with Winthrop.  They were not served the lease rejection

22   notice itself.

23          THE COURT:  Who wasn't served with it?

24          MS. ARTHUR:  The licensee, Winthrop.  Winthrop

25   Hospital, yes.

1              THE COURT:  The hospital that's using the parking

2       lot.

3              MS. ARTHUR:  Yes.  Your Honor, the way that we

4       view the objection and the lease itself is that we comply

5       with lease rejection procedures.  We notify the landlord

6       that we do not want this property anymore.  They are able to

7       come in and they can re-let the premises.

8              We unequivocally sent a surrender notice to the

9       landlord doing the same, providing the lockbox information.

10      And at this point and this juncture, any postponement of the

11      effective date of rejection of the lease will compel the

12      Debtors to compensate the landlord for property it's not

13      using.  It will be at the Debtor's estate's expense, and

14      it's for a delay that the Debtors made every effort to

15      avoid.  And it would force the Debtors to potentially incur

16      unnecessary administrative expenses.

17             This Court has held numerous times that the

18      appropriate rejection date is the date in which a debtor

19      surrenders possession and tell a landlord that it can let

20      the premises.  That is what we did in this case.  This court

21      has also noted in its prior matters, specifically A&P, that

22      post-rejection it would be the landlord's burden to evict a

23      subtenant that happens to be remaining on the premises.  And

24      not to parse between subtenant versus licensee, but, Your

25      Honor, we do believe that our rejection of the lease does in

Page 60

1   fact take away any rights that Winthrop would have to remain

2   on the premises to the extent that they still desire to do

3   so.

4           The landlord is free to negotiate with Winthrop to

5   the extent that they would like to keep Winthrop on and

6   enter into a separate agreement with Winthrop as well.

7           But, you know, as stated in our papers, we are of

8   the position that equity weighs in favor of the Debtors and

9   dismissing the landlords, what we would consider a grab for

10  administrative priority payments based upon a third party's

11  use of parking spaces.  I would --

12          THE COURT:  So what was the agreement between the

13  Debtor and Winthrop?

14          MS. ARTHUR:  That we would allow them to use 550

15  parking spaces.

16          THE COURT:  Okay.  And that was a lease agreement

17  or --

18          MS. ARTHUR:  It was a license agreement.

19          THE COURT:  It was made with a license.  But it

20  was to use land?

21          MS. ARTHUR:  It was, Your Honor.

22          THE COURT:  Okay.  Was there any attornment or

23  acknowledgement by the landlord of that agreement?

24          MS. ARTHUR:  Your Honor, I'm not aware of whether

25  or not there was an attornment agreement.  I do know --

Page 61

1          THE COURT:  I mean, did they give any rights to --

2    did the landlord give any rights, separate -- do we know

3    whether the landlord gave any rights to Winthrop?

4          MS. ARTHUR:  We do not know if Steel 1111, the

5    current landlord, if they did so.  We do know that the

6    Winthrop license agreement was in place before Steel, as

7    successor landlord, took possession of the property.  So we

8    do believe that they were aware of Winthrop's existence and

9    aware of the license agreement, but there wasn't a formal

10   attornment agreement that I'm -- I can present to the Court

11   today.

12         THE COURT:  Okay.  Is counsel for Steel here?

13         CLERK:  Yes.

14         THE COURT:  Okay.

15         MR. STEIN:  Good morning, Your Honor.  For the

16   record, Matthew Stein, Kasowitz, Benson, Torres on behalf of

17   Steel 1111.

18         Just to set the factual predicate here.  I think

19   there are four facts that make this a little -- this case a

20   little unique from most of these disputes that are before

21   Your Honor.  One, Sears is still holding itself out to be --

22   holding it out -- holding itself out to Winthrop as the

23   sublandlord, or as the licensor.  Steel -- Sears is still

24   collecting rent and it's still benefiting from the

25   possession of the premises.

1          THE COURT:  How is -- is that acknowledged?

2          MR. STEIN:  That was something that we put in our

3     papers that was not responded to in the reply brief.

4          MS. ARTHUR:  Your Honor, we are aware that the

5     Winthrop did inadvertently deposit it's March rent into an

6     account that the (indiscernible) actually has control of at

7     the moment.  Of course we fully intend to turn over any

8     amount that Winthrop did in fact put into the account

9     (indiscernible) and we will work with (indiscernible).  We

10    have no intention of keeping the funds.

11         THE COURT:  Okay.

12         MR. STEIN:  Second, I don't think it was

13    inadvertent because there's no privity between Steel and the

14    licensee.  The license agreement is strictly between Sears

15    and Winthrop and Winthrop would have no reason to pay those

16    numbers directly to --

17         THE COURT:  Well, there's no attornment agreement

18    or any acknowledgement of the subtenancy?

19         MR. STEIN:  I know that Steel is aware that

20    Winthrop is in -- is occupying these 550 parking spaces, but

21    I'm not aware of any formal acknowledgement where Steel

22    would have the same rights as the licensor while -- as part

23    of that license agreement.

24         THE COURT:  Okay.  So the landlord could evict

25    them?

1           MR. STEIN:  I'm not -- the landlord -- look, I

2     acknowledge that.  And I was before Your Honor in A&P and

3     that rejection of the overlease results in the termination

4     of a sublease or a sublicense.  But let me get to the third

5     issue as to why that's a problem.

6           The Debtors provided no notice of its rejection of

7     the prime lease to Winthrop.  And counsel noted that

8     Winthrop is aware, but I've seen no indication how Winthrop

9     was made aware, or even in fact that Winthrop was aware.  I

10    think that leads to why the fact that Winthrop paid the

11    March rent to Sears.

12          THE COURT:  Does it matter?

13          MR. STEIN:  I think it does.

14          THE COURT:  I mean, what standing would they have

15    to object?

16          MR. STEIN:  What standing would Winthrop have?

17          THE COURT:  Yeah.

18          MR. STEIN:  I think they were a proper noticed

19    party under the procedures order that Your Honor entered.

20          THE COURT:  But there --

21          MR. STEIN:  Well, but here's the problem.  The

22    problem is that Your Honor enters an order that Winthrop did

23    not have the ability to come here and contest.  It could

24    collaterally attack that order if we go to enforce eviction

25    rights in state court.

Page 64

1              THE COURT:  What --

2              MR. STEIN:  So I think --

3              THE COURT:  I'm sorry.  Let's assume for the

4    moment that instead of rejecting the lease the sublandlord

5    tenant materially breached the lease, right, their subtenant

6    under New York law doesn't have the right to hold the

7    primary landlord in place because it didn't get notice of

8    the breach.

9              I mean, the Second Circuit just ruled, two days

10   ago, that parties that don't have an economic interest in

11   the relief that's being sought don't have standing to

12   contest it.  And that -- they've held that repeatedly.  I

13   just don't see where the subtenant would have standing here.

14   What -- it's obvious that the answer to any objection they

15   raised would be this is solely between the landlord and the

16   tenant.

17             MR. STEIN:  I think, though, that the Debtors'

18   procedures orders provided that any party affected would --

19             THE COURT:  Directly affected.  They're not

20   directly --

21             MR. STEIN:  They are directly affected --

22             THE COURT:  No, because they --

23             MR. STEIN:  - because it results in the

24   termination of the license.

25             THE COURT:  Shareholders are directly affected,

Page 65

1    too, when they're wiped out.  But if they have no equity

2    then they don't have standing.  The Second Circuit --

3              MR. STEIN:  We have --

4              THE COURT:  -- has held that repeatedly.  If a

5    debtor has no equity in property, an individual debtor, they

6    can't contest the sale of the property, even if they're

7    living in it.  So the words "directly affected" is

8    important, when it says directly.

9              MR. STEIN:  I don't have the specific language in

10   front of me, so I --

11             THE COURT:  Anyway, they haven't complained.

12             MR. STEIN:  Winthrop hasn't complained because I'm

13   sure they got -- they received as to that their subject --

14   that their license has automatically terminated.

15             THE COURT:  Well, I was just told that they did

16   have notice.

17             MR. STEIN:  I'm -- I haven't seen any proof of

18   that.  It's -- they certainly were not listed as a noticed

19   party on the affidavit of service of the notice of rejection

20   where the Debtor said they were -- they would give notice to

21   all parties.

22             THE COURT:  Okay.

23             MS. ARTHUR:  Your Honor, as I noted, to the extent

24   that Sears has any of the -- any rent that Winthrop may have

25   deposited into this account, we fully intend to turn over.

1          It's a New York lease, New York license agreement

2    as well.  I think Your Honor correctly noted the law as it -

3    - with respect to the treatment of leases in New York.

4    Additionally, you know, this is a dark store, it went

5    through the GOB process.  It's not a secret as to what Sears

6    intends to do with respect to that property and as it

7    relates to Winthrop specifically.

8          In fact, you know, Winthrop's using the parking

9    spaces.  The landlord sent us a correspondence with a

10   laundry list of maintenance-related requests that they want

11   to do, including, you know, snow removal and all these other

12   things that Sears would have been -- that Sears was handling

13   in connection with the property.  So to, you know, to paint

14   the picture that Winthrop is in any way in the dark as to

15   the proceedings and as to Sears' intention with the

16   property, I don't think that's true.

17          THE COURT:  I thought you told me that they were

18   aware of it now?

19          MS. ARTHUR:  Not formally.  We didn't serve a

20   formal notice, Your Honor, but --

21          THE COURT:  No, but I thought you said they were

22   aware.

23          MS. ARTHUR:  They were -- yes, they are aware of

24   Sears' position with respect to the property and they

25   rejecting the lease that Sears has with Steel 1111.

Page 67

1       THE COURT:  Okay.  Has the landlord made any

2    effort to evict Winthrop?

3       MR. STEIN:  Not yet, Your Honor.

4       THE COURT:  Okay.  Has it given it any notice?

5       MR. STEIN:  I don't believe any communications

6    have occurred.  I know that the communications to date have

7    resolved around Steel maintaining the garage, which under

8    the license agreement had been Sears' responsibility.  I

9    know that Steel has been working directly with Winthrop to

10   make sure that those conditions are resolved.  But no notice

11   has been made -- no notice -- Steel has not notified

12   Winthrop of the rejection notice that was sent to Steel by

13   the Debtors.

14       THE COURT:  Okay.  Okay.  Oh, there is one -- the

15   motion says that the Debtor hasn't turned over the keys.

16   Are there keys, as opposed to an access code and a lockbox?

17       MR. STEIN:  There was a lockbox.  And it came to

18   my attention, after we filed the objection, that notice was

19   provided to one individual at Steel.  Notice was not

20   provided, though, to the notice parties in the underlying

21   lease agreement, but notice was provided to a Steel

22   employee.

23       THE COURT:  Okay.  But Steel has the codes and --

24       MR. STEIN:  Steel has the codes now.  Yes, sir.

25       THE COURT:  Okay.  All right.  Okay.  Thanks.

Page 68

1          Okay.  I have before me an objection by Steel.

2    You can sit down.  You don't have to --

3          MS. ARTHUR:  Thank you.

4          THE COURT:  Steel 1111, LLC to the Debtors, notice

5    of rejection of the lease for Store Number 1004 which is

6    located in Garden City, New York.  The basis for the

7    objection is with respect to the rejection date in the

8    notice of rejection as would then be incorporated in the

9    order, which derives from the terms of the order, which is

10   providing the date rejection date be the date under the

11   November 16, 2018 order by which the Court established these

12   rejection procedures and provided therein for the rejection

13   date under how to procedures to be the date when the Debtor

14   surrenders the property, by providing notice of such

15   surrender and the turnover of, as applicable, keys, codes or

16   lockbox entry information.

17         It appears to be acknowledged today that in fact

18   Sears did that on February 26th, 2019, which is the

19   rejection date under this rejection notice and the order.

20   And that's memorialized in an email that's attached to the

21   Debtors' response to the limited objection by Steel 1111.

22         The other basis for the objection is that I should

23   not treat the lease as rejected as of that date,

24   notwithstanding the lease procedures and the order proposed

25   in compliance with those lease procedures, because a

Page 69

1    subtenant or licensee, Winthrop Hospital, continues to use a

2    portion of the parking lot for the shopping center,

3    notwithstanding the rejection of the head lease with Steel

4    1111.

5           The former landlord contends that, in essence, the

6    burden of delivering an effective surrender of the property

7    includes the Debtor obtaining the eviction of the subtenant

8    hospital.

9           I disagree with that argument.  The case law, I

10   believe, is clear in the Southern District of New York and

11   in the Second Circuit, generally, that the rejection of a

12   lease and the Debtors' required compliance with Section

13   365(d)(4) of the bankruptcy code, which requires that the

14   Debtor in Possession, in respect of a rejected lease, "shall

15   immediately surrender that nonresidential real property to

16   the lessor," means that upon rejection and a surrender, as

17   laid out in the rejection procedures, the sublandlord, in

18   this case Sears, has no remaining ongoing obligations to the

19   head landlord.  And, moreover, the termination -- I'm sorry,

20   the rejection of the lease results in the termination of

21   ongoing responsibilities to the subtenant.

22          And I discussed this issue at length in In Re: The

23   Great Atlantic & Pacific Tea Company in 544 B.R. 43 (Bankr.

24   S.D.N.Y., 2016).  See also Subculture, LLC v. Rogers

25   Investments, In Re: Culture Project, 571 B.R. 555, 559

Page 70

1    (Bankr. S.D.N.Y., 2017), where that Court stated that, "a

2    subtenant may have rights under nonbankruptcy law following

3    a rejection of the main lease, either through agreements

4    with the landlord or by operation of state law, but that

5    section 365(h) itself does not provide the subtenant with a

6    possessory right following a rejection of the prime lease."

7    That has long been the holding, as I said, in the Southern

8    District and elsewhere in the circuit.  See In Re: Child

9    World, Inc. 142 B.R. 87, 89 (Bankr. S.D.N.Y., 1992).  "When

10   a prime lease fails so does the sublease."  In Re: Dial-A-

11   Tire, Inc., 78 B.R. 13, 16 (Bankr. W.D.N.Y., 1987), where

12   the court found that rejection of a lease, "must result in

13   the sublease being deemed rejected as well."  And In Re:

14   Elmhurst Transmission Corp., 60 B.R. 9, 10 (Bankr. E.D.N.Y.,

15   1996) where the court found that subtenants do not have

16   standing in the bankruptcy court after rejection of the

17   Debtor's lease, they head lease, that is.

18          As discussed in the A&P case, the provision of

19   section 365(d)(4) and 365(h) may seem to conflict with each

20   other, but it is clear, given the language of 365(d)(4)

21   requiring there be surrender as opposed to requiring

22   displacement of any subtenant, that 365(d)(4) takes

23   precedence over any obligation of the 365(h) to permit a

24   subtenant to remain in place on a rejected lease.

25          The movant, or the landlord has cited a case from

Page 71

1    Delaware, In Re: Amicus Wind Down Corp., 2012 Bankr. Lexis,

2    662 (Bankr. D. Del., February 24, 2012), for the contrary

3    proposition.  And it is true that in that case the

4    bankruptcy judge required the debtor/tenant/sublandlord to

5    bear the burden of evicting the subtenant as part of the

6    rejection of the lease.  However, in that case, as noted in

7    the A&P, the lease rejection order required delivery of

8    possession of the property to the head landlord, or the

9    overlandlord, not merely surrender of the Debtors' interests

10   in the property.

11          And moreover, I believe it's inconsistent with the

12   case law in this district, which puts the burden on the

13   overlandlord to obtain the removal of the subtenant after

14   the Debtor has truly surrendered the property to the

15   landlord.  That's also appropriate because there may well be

16   agreements between the landlord and the subtenant, or a

17   course of dealing between the landlord and the subtenant

18   that the Debtor may have nothing to do with.

19          And ultimately, because Congress gave the specific

20   right to Debtor tenants to reject leases to avoid the

21   ongoing cost of continuing to occupy the property.  Clearly

22   surrender is inconsistent with retaining any benefits from

23   the sublease, but the Debtor here has represented that any

24   payments made to it by the subtenant, the Winthrop Hospital,

25   will be turned over to the landlord, which is appropriate.

1          I will, on that record, deny the limited objection

2    and provide that the rejection will be effective as of the

3    surrender on February 26th.

4          MS. ARTHUR:  Thank you, Your Honor.

5          THE COURT:  Okay.

6          MS. ARTHUR:  The next, and then the last item on

7    the agenda is the motion of Santa Rose Mall.  I cede the

8    podium to counsel.

9          THE COURT:  Okay.

10         MS. COLON:  Good morning, Your Honor.  Sonia Colon

11   for Santa Rosa Mall, LLC.

12         THE COURT:  Good morning.

13         MR. CHICO-BORRIS:  Good morning, Your Honor.  On

14   behalf of Santa Rosa Mall, I am Gustavo Chico.

15         THE COURT:  Okay.  Good morning.

16         MS. COLON:  Judge, before we begin, we have copies

17   of certain documents.  Some of those documents were marked

18   as confident.  We have confirmed with Ms. Arthur, we're

19   going to be producing a copy just to chambers and to her.

20   We have admitted certain of the documents and I want to

21   clarify why.

22         The first three documents were already produced on

23   the record and attached to the motion.  The second sets of

24   the documents are the ones that are the confidentials that

25   we are needing to record, which is 4, 5, 6 and 7.  And the

Page 73

1   other documents are dating six to four years before the

2   Hurricane Maria.  This is an insurance related to Hurricane

3   Maria, if you need us to produce it, but it's not related to

4   the contrary.  In any event, they take, by reference, the

5   lease agreement and incorporated therein, and the other

6   documents were copies and it was a duplicate of the first

7   three documents.  But we have a copy for Your Honor --

8            THE COURT:  Okay.  And --

9            MS. COLON:  -- if you need.

10           THE COURT:  -- what are the ones you're handing up

11  to me?  What are those documents?

12           MS. COLON:  This is -- and for the first three

13  documents are certificates of insurance that were already

14  submitted with Docket Number 2828.  The next --

15           THE COURT:  No, I'm just -- what are the new ones?

16  I'm sorry I wasn't clear.

17           MS. COLON:  The next four documents will make

18  sense during the hearing because they refer to the contract

19  of insurance upon which the Debtors' motion is based under

20  opposition to our motion.  And it says it also contains

21  their claim to the insurance policy and certain agreements

22  thereof, that they refer in their motion, that there was --

23           THE COURT:  Okay.

24           MS. COLON:  -- claims for Santa Rosa and there was

25  an agreement for the claims for Santa Rose.

1              THE COURT:  Okay.  So do they include the

2       insurance policy itself?

3              MS. COLON:  Yes.

4              THE COURT:  Okay.  Fine.  So you can hand those

5       up.  Because the Debtor has a copy?

6              MS. ARTHUR:  I do not.

7              MS. COLON:  Yes, I'll give her a copy right now.

8              THE COURT:  Okay.  You can just hand them to me.

9       Thanks.

10             MS. COLON:  With regards to the language of the

11      insurance agreement, the inter-relationship of the insurance

12      agreement and the agreement, we have briefed those on the

13      record, Your Honor, but I'm going to leave my co-counsel,

14      Gustavo Chico, to go into those because it involves a lot of

15      insurance law.  So he will be briefing the Court on those.

16             THE COURT:  Okay.

17             MR. CHICO-BORRIS:  Good morning, Your Honor.  We

18      have submitted motions at Docket 1240, the opposition is at

19      2512 and our response -- our response is at 2828.

20             THE COURT:  Right.  I will read those.

21             MR. CHICO-BORRIS:  So, Your Honor, this is a

22      shopping center in Puerto Rico.  It was severely damaged by

23      Hurricane Maria in September 20th, 2017.  To give you a

24      background on the shopping center, this is about a 500,000

25      square feet shopping center.  Sears leased about 220 square

1    feet of that --

2              THE COURT:  Two hundred and twenty thousand?

3              MR. CHICO-BORRIS:  Two hundred-twenty thousand.

4    Sorry.  Of that mall.  It's an anchor store.  People go to

5    that mal because of Sears.  Two of the four main entrances

6    to the mall are through Sears.

7              So in the lease agreement, back in 1965, the

8    parties agreed how they were going to handle the insurance.

9    Section 6.02(a) requires Sears to have -- to include, in any

10   insurance policy, for windstorm, like Hurricane Maria, a

11   loss/pay clause for the insurance.  And it also required

12   Sears to provide proof of insurance to the landlord.  So we

13   moved the court to declare that because Santa Rosa was

14   supposed to be a loss payee under the insurance policy, it

15   is a third party beneficiary.  And so the insurance, the

16   proceeds that would generally be part of the bankruptcy

17   estate, because they were purchased for Santa Rosa, as the

18   loss payee, bypass the bankruptcy estate and we moved the

19   court to declare that those insurance proceeds, for

20   Hurricane Maria damages, are not part of the bankruptcy

21   estate.

22             Sears' contention, in its opposition at 2512, is

23   essentially that they are part of the bankruptcy estate.

24   And we find out, for the first time, that Santa Rosa was not

25   included as a loss payee in the insurance policy, even

Page 76

1    though we have submitted evidence to the court that for that

2    particular insurance policy for that particular year that

3    Hurricane Maria hit Puerto Rico, the certificate of

4    insurance provided, expressly includes Santa Rosa as a loss

5    payee.

6            So in our response, we briefed the Court that

7    there are alternative ways of dealing with the fact that

8    Sears, even if true, did not include Santa Rosa as a loss

9    payee.  The Court can reform the insurance policy or the

10   Court may alternatively create an equitable lien over those

11   funds.

12           But the importance and why we're pressing for

13   those insurance proceeds is that the lease itself required

14   these funds to be put into a separate account and the reason

15   for that was, as detailed in section 6.03 of the lease

16   agreement, is that Sears had the duty to expeditiously

17   repair the damages.  And if Sears did not expeditiously

18   repair the damages then the landlord, with those separate

19   funds that had to be allocated separately, may take over and

20   repair, because inasmuch as Sears is not opened, it's still

21   a tenant at that shopping center.

22           The traffic flow for people, the customers that

23   go are decreasing significantly and, in addition, Sears is

24   not paying percentage rent and, in addition, other tenants

25   have co-tenancy clauses that are expressly dependent on

Page 77

1    Sears' presence at the demised properties.

2            So, that's why timing and expeditiously repairing

3    is essential in this lease agreement.

4            THE COURT: So, the issue is though, as I

5    understand it, although I haven't gotten until just now, the

6    insurance policy itself does not name the landlord as a loss

7    payee or beneficiary, right?

8            MR. CHICO-BORRIS:  Correct.

9            THE COURT:  Okay.

10           MR. CHICO-BORRIS:  The insurance policy is not

11   attached to the -- it's not in the docket, but yes.

12           THE COURT: In fact, the motion actually sought to

13   see it to determine their landlord's rights.

14           MR. CHICO-BORRIS:  Right, but in addition to that

15   we also moved the Court to consider the -- Sears requests

16   the Court to only look at the insurance policy as

17   determinative and we move the Court to not limit itself by

18   the four corners of the insurance policy, but to the

19   agreement leading up to the purchase of that insurance,

20   which is essential and expressed in that Sears had to obtain

21   a loss payee.

22           THE COURT:  Right.  But Sears' response is that's

23   simply an agreement, like many agreements, that Sears has

24   breached.

25           MR. CHICO-BORRIS:  Even if breached, we contend

Page 78

1   that the insurance proceeds... Right now Sears contends, but

2   we don't know what's going to happen with that contract.  It

3   may be assumed or it may not, but as we stand here today we

4   don't know that.  If it's assumed it may be cured.  If it's

5   not -- even if it's not then still those funds have to be

6   deposited and we move the Court to clear that because of the

7   language in the lease agreement and because it was meant to

8   be purchased with landlord as the loss payee, those funds

9   should be declared not part of the bankruptcy estate and

10  then given to Santa Rosa to fix the demised property.

11           THE COURT:  On the basis of reformation or

12  equitable lien.

13           MR. CHICO-BORRIS:  We also -- if the Court reviews

14  the insurance policy, we invite the Court to review the

15  whole insurance, because there are provisions in the

16  insurance policy that afford the correction of any mistakes.

17           THE COURT:  What provisions?

18           MR. CHICO-BORRIS:  Well, I don't want to get into

19  the spec -- well, but if the Court takes a look at it.

20           MS. COLON:  It's my understanding it's Section --

21           MR. CHICO-BORRIS:  It's Section 37.

22           MS. COLON:  37.

23           MR. CHICO-BORRIS:  Affords rights of reformation

24  and corrections.

25           THE COURT:  I'm sorry, so the insurance policy

Page 79

1   itself is tab 4?  I'm sorry, I'm just trying to make sure I

2   understand which...

3              MS. COLON:  The insurance policy is tab 4.  That's

4   the contract with the insurance.

5              THE COURT:  But that's the errors and omission

6   section, right, which goes to the insured's right of

7   recovery.

8              MR. CHICO-BORRIS:  Right.

9              THE COURT:  That's not really a basis for

10  reformation, right?  Reformation is separate.

11             MR. CHICO-BORRIS:  Right.  What I'm proposing to -

12  - what I mean with that section is that if Sears now claims

13  that it made a mistake in not including Santa Rosa as a loss

14  payee under the terms of the lease agreement for any reason,

15  it may be corrected.  That's my position.  Sears may

16  instruct the insurance company we made a mistake, this was

17  supposed to be like this.

18             THE COURT:  But Sears' position is that now that

19  it's a Debtor-in-possession it owes a duty to all its

20  creditors and can't do that voluntarily.

21             MR. CHICO-BORRIS:  Yes, I believe so.

22             THE COURT:  Okay.

23             MS. COLON:  Another issue, Your Honor, Sears'

24  position is that they're only -- that it is not included in

25  the endorsement.  In fact, there's only eight endorsements

Page 80

1    in this policy and none covered any loss payees, any

2    insurance for any landlords in the United States are covered

3    in these eight endorsements, which is very limited in scope,

4    which is surprising that nothing includes any landlord as a

5    loss payee having represented landlords in the past.

6              So, there is language also that ARN will have each

7    of the certificates.  They are basing themselves in a

8    specific language in the certificate of insurance that was

9    provided to our client.  Sears, pursuant to the lease

10   agreement, was the one that provided those certificates of

11   insurance to Santa Rosa and Santa Rosa relied on those

12   certificates of insurance that it was covered year after

13   year.

14             THE COURT:  Are you saying that maybe there's some

15   other rider or policy or something that would cover

16   landlords and that's why ARN would provide the certificate?

17             MS. COLON:  ARN is entitled to provide under the

18   policy it's entitled to get --

19             THE COURT:  Have you taken discovery yet?

20             MS. COLON:  We tried to do subpoenas, Your Honor,

21   on ARN directly and it's been very, very difficult.

22             THE COURT:  And -- okay.

23             MS. COLON:  The only documents that we have been

24   able to provide is through Ms. (Indiscernible) and she has -

25   - sorry, I couldn't find here -- and she has -- and through

1    subpoenas and discovery and these are the only documents

2    that we have obtained so far and she has reached out to ARN.

3              THE COURT:  Have you taken discovery of Sears yet?

4              MS. COLON:  These are the documents that we

5    obtained from Sears.

6              THE COURT:  No, I know.  But was that through a

7    subpoena or did they just volunteer that?

8              MS. COLON:  No, we had to subpoena them in the end

9    because we had been trying to obtain the documents for some

10   time.

11             THE COURT:  All right.  Okay, well I -- I haven't

12   heard yet from Sears' counsel on this, but I had two

13   reactions to this.  The arguments that you're relying on at

14   this point were raised because you didn't really have the

15   documents on March 13th and there are new arguments.

16   There's reformation and an equitable lien, which hasn't --

17   no one's had a chance to respond to that.  And having

18   earlier said that I believe Rule 7001 doesn't apply to a

19   breach of the automatic stay action brought by a Debtor, you

20   might think that I don't think highly of Rule 7001.  But I

21   think if you're actually seeking to impose an equitable lien

22   or reform an agreement, you need to move by adversary

23   proceeding because you're looking for a declaratory

24   judgment.

25             In addition, you did actually have some time,

Page 82

1   although this came in on the 13th, to research those two

2   issues.  Obviously this hasn't been briefed so I'm not going

3   to rule on this today.  I'm going to give the parties a

4   chance to look at it.  But, it would appear to me that under

5   the law of Puerto Rico, which I think would be the

6   controlling law here under New York Choice of Law

7   Principles, because the injury happened in Puerto Rico.

8           MS. COLON:  And the real estate is located there.

9           THE COURT:  I'll give you a quote. The doctrine of

10  equitable liens is not enforced in Puerto Rico.  "In Puerto

11  Rico, just as in the State of Louisiana, no legal existence

12  is recognized to implied liens created by presumptions such

13  as equitable liens", Rodriguez v. Solivellas & Co., 49

14  P.R.R. 618 (1936).  See also (indiscernible) v. Superior

15  Court, 96 P.R.R 246-249, P.R. 1968.

16          That's just what we found.  Maybe you have other

17  cases that would go to the contrary.  And then the issue

18  reformation requires mutual mistake.  I think that would

19  require an evidentiary hearing.  You know, that's why I'm

20  saying we need to have an adversary proceeding.

21          So, I don't think I'm in a position to rule on

22  this today.  As the Debtor said, it may become moot because

23  this may be a store that ends up being assumed and assigned

24  to the buyer in which case the contract, the lease would

25  have to be cured, which would include performance.  If

Page 83

1   there's insurance to cover it, it's a valuable store, you

2   might be arguing about nothing.

3           So, my inclination is to adjourn this so that the

4   parties can develop the proper evidentiary record and for

5   you to complete your discovery or Aon, for example.

6           MS. COLON:  I understand as to that point, but one

7   issue regarding the order which they (indiscernible) since

8   there is a sale order and this may be precipitated.  One

9   item and that we stated when we reserved our rights during

10   the sale motion.  (Indiscernible) cannot sell something

11   which is not yours.  Those were the exact words.

12           And one important thing is that the order says

13   that the buyer will cure before closing any monetary or

14   undisputed or unmonetary undisputed cure costs.  The fact

15   is, even though we file a motion for how much the

16   approximately cure costs were going forward, they have

17   estimated it from $60 million to $30,000 and then...

18           THE COURT:  Okay, but that's the type of thing you

19   call can negotiate.  In other words, that doesn't pertain to

20   the insurance.  Obviously, to assume the lease they've got

21   to fix up the store and you've produced to me an insurance

22   policy.  There is an insurance policy that covers this

23   store, so the insurer will be paying for it if they assume

24   the lease.

25           MS. COLON:  (indiscernible) information and belief

Page 84

1    they already paid -- the insurance already paid.

2            THE COURT:  Well --

3            MS. COLON:  And those funds are separate.  They

4    should be used for the repairs of the store since we

5    continue suffering damages on a daily basis.

6            THE COURT:  That's if you win.  I'm saying that --

7    look, I wasn't doing anything more than suggesting that,

8    while I understand that your client wants the money now, one

9    benefit, although it's not necessary to have this benefit

10   because I don't think it's proceeding or teed up for a

11   decision today anyway, but one benefit of carrying this so

12   that a proper record can be established is that you will

13   know whether the lease is to be assumed or not, in which

14   case this becomes moot because the money is going to be used

15   anyway no matter who wins to fix up the store.

16           MS. COLON:  The second consideration, the other

17   consideration is that once that appears on April 12, if it

18   happens, there have the estimation instead it will take six

19   months or seven months to repair the store and after losing

20   574 days the store going dark, we lose six more months or

21   seven months in --

22           THE COURT:  Well, that would happen if you got the

23   money today anyway, right?  It takes that long to fix it up

24   no matter who is fixing it up.

25           MS. COLON:  We'll start right away.  We'll try to

Page 85

1    start.

2              THE COURT:  I'm assuming they would too because

3    they want to open it up and sell to, you know, sell tools

4    and clothes and stuff.

5              MS. COLON:  That's not the situation.  We want to

6    stop the damage that is happened to the mall at large.

7              THE COURT:  Okay.

8              MS. COLON:  Okay.

9              THE COURT:  But it's a mall that has an empty

10   store in it and it's not assumed so it doesn't really -- to

11   me it's not very practical to say that it'll take six months

12   because it probably would take six months anyway and you

13   would have a tenant.  Okay.

14             MS. ARTHUR:  Thank you, Your Honor.  We're okay,

15   of course, with the adjournment.  I would just like to note

16   though for purposes of teeing up the equitable lien and

17   reformation issues that were raised in the reply, would that

18   be taking the position that the proceeds of the insurance

19   policy, those proceeds are in fact property of the Debtor's

20   estate?  I would assume given the arguments that --

21             THE COURT:  That's what I assume, subject to

22   reformation, in which case they wouldn't be.  But something

23   has to happen before they're taken out of the estate.

24             MS. ARTHUR:  I believe that's the last item on the

25   agenda, Your Honor.

Page 86

1                THE COURT:  Okay, so what I'd like is for the

2      lawyers to discuss the schedule for this and that would

3      include a discovery schedule and probably I would need a

4      separate day, as opposed to an omnibus day, to have a trial

5      on it.  Although you may be able to reduce the issues.  If

6      the citations I gave you are still binding, then it would

7      only be -- it would be on equitable lien, it would just be

8      on reformation, for example.

9                But they are discreet bankruptcy issues pertaining

10     to the reformation obviously, which haven't been briefed at

11     all yet.  So, I think you ought to discuss the timing of

12     this, whether either side contemplates some form of

13     dispositive motion first on those two potential causes of

14     action or whether you want to go right to a trial.  Thank

15     you.

16

17                (Whereupon these proceedings were concluded at

18     12:19 PM)

19

20

21

22

23

24

25

Page 87

1                     C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya                    Digitally signed by Sonya Ledanski
                               Hyde
      Ledanski Hyde            DN: cn=Sonya Ledanski Hyde, o, ou,
                               email=digital1@veritext.com, c=US
7                              Date: 2019.03.22 16:31:17 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  March 22, 2019