# Exhibit A

*( Original first Lease )*

**Parties**

THIS LEASE made and entered into as of this 18th day of December , 19 64 , between PATTON AVENUE DEVELOPMENT CORPORATION,

a North Carolina corporation having its principal office at P. O. Box 1747, Greensboro, North Carolina. 27402 (herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having its principal office at 2727 Second Avenue, Detroit, Michigan 48232 (herein referred to as "Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**

1. Landlord does demise unto Tenant and Tenant does take from Landlord for the term hereinafter provided, and any extension thereof, the following property: a completed store unit to be constructed, as hereinafter specified, by Landlord at its expense on part of the land described in Exhibit "A", attached hereto and made a part hereof, situated in the City of Asheville , County of Buncombe ; State of North Carolina , said store unit to be a part of the Commercial Development known as K-MART PLAZA - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - to be in the location outlined in red on Exhibit "B", attached hereto and made a part hereof, and to be of the following dimensions:

Tenant's store unit shall contain approximately one hundred five thousand one hundred forty-nine (105,149) square feet, consisting of the following rooms:

   (a) Main storeroom: 340 feet in width by 220 feet in depth - - - - - - - = 74,800 square feet

   (b) Food super market: 120 feet in width by 185 feet in depth - - - - - - = 22,200 square feet

   (c) Free standing automobile center: 60 feet in width by 121 feet 2½ inches in depth plus extension 17 feet 11½ inches in width by 48 feet 9 3/4 inches in depth - - - - - - - = 8,149 square feet

Said completed store unit, together with the licenses, rights, privileges and easements set forth in Article 9 hereof, shall be hereinafter collectively referred to as the "demised premises".

**Term**

2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that term is defined in Article 10 hereof, and shall terminate upon such date as shall be twenty - - - - ( 20 ) years from the last day of the month in which said date of occupancy by Tenant shall occur; provided, however, the term of this lease may be extended as provided in Article 12 hereof. The phrase "lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant to said Article 12.

**Annual Minimum Rental**

3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall designate in writing from time to time, an annual minimum rental of ONE HUNDRED THIRTY-SIX THOUSAND SEVEN HUNDRED - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - DOLLARS ($136,700.00 - - ), unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of each month, in advance, commencing upon the first day of the lease term; provided, however, in the event the first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

1

(10/22/64)

**Additional Rental**

4. In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which its "gross sales", as hereinafter defined, shall exceed the sum of FIVE MILLION FOUR HUNDRED THIRTY-FIVE THOUSAND — — — — — — — — — — — — — — — — — — — DOLLARS ($5,435,000.00 ) Tenant shall pay to Landlord as additional rental an amount which shall be:

one — — — — — — — — — — — — per cent ( 1 %) of gross sales exceeding FIVE MILLION FOUR HUNDRED THIRTY-FIVE THOUSAND — — — — — — — — DOLLARS ($5,435,000.00 ) and not exceeding————————————————————————————

DOLLARS ($         ), and

              per cent (     %) of gross sales exceeding

DOLLARS ($     ) and not exceeding

DOLLARS ($     ), and

              per cent (     %) of gross sales in excess of

DOLLARS ($         );

The foregoing dollar amount or amounts shall hereinafter be referred to as the "minimum basis of sales".

Said additional rental shall be paid on or before the twenty-first (21st) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall, on or before the twenty-first (21st) day following the end of each lease year or "lesser period", deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then said minimum basis of sales shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening its store unit for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 11 shall have been fulfilled, or an opening for business under Article 10 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales in said store unit annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant, or any occupant, in said store unit whether wholesale or retail, cash or credit (including merchandise ordered on the store unit premises and delivered from another place), except that the following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said store unit, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not

2

**Additional Rental (Cont'd)**

collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise tax, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided, further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c) Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d) Service and interest charges for time payment accounts and charge accounts; and

(e) All sales of merchandise or services made by any supermarket grocery store, which shall occupy any portion or portions of said store unit, provided that the aggregate area of said portion or portions shall not exceed twenty-two thousand two hundred ( 22,200 ) square feet of floor area.

The term "store unit" as utilized in this Article shall include trucks, trailers or vans from which sales are made directly to the public from anywhere on the "common facilities" areas as hereinafter defined.

**New Building by Landlord**

5. Said store unit shall be completed and delivered to Tenant promptly and with due diligence, giving consideration to scarcity of materials, strikes, lockouts, fire or other casualty, governmental restrictions and regulations, and construction delays; and Landlord warrants that a general contract for construction of said store unit and the buildings and improvements referred to in Article 11 hereof shall be let, rough site grading shall be completed and foundations and footings commenced for Tenant's store unit and other buildings, if any, specified in Article 11 hereof not later than    June 1, 1965
If for any reason whatever Landlord shall fail to comply fully with this warranty, Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said store unit shall not have been completed and the lease term shall not have commenced prior to June 1, 1966        , then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

**Plans and Specifications**

6. Said store unit shall be constructed by Landlord, at its sole cost and expense, in accordance with working plans and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially conform to the requirements of Tenant's typical store plans and specifications Set No. D-1152 consisting of sheets D-1b, D-2b, D-3 thru D-11, DE-1b, DE-2b, DE-3b, DE-4, DM-1b, DM-2 thru DM-5 all dated May 1, 1964 as are the corresponding specifications except for Pages 1 and 2 of the Hardware Schedule that have minor revisions through September 1, 1964. Supplemental Sheets include D-1b-S1, D-8A, DE-1b-S1, DM-1b-S1 all dated November 11, 1964 and Sheet D-6-S dated November 10, 1964. Plans and specifications for the food super market Set No. DF-1152 include sheets DFA-1a, DFE-1a, DFE-2a, DFM-1a and DFM-2a all dated November 8, 1963 as are the corresponding specifications. Plans and specifications for the free standing automobile cent Set No. ASC-1152 include sheets 1a thru 6a, E1a thru E5a and N1a thru N4a, all dated December 4, 1964, as are the corresponding specifications. Costs of constructing the food super market are to be divided between Landlord and Tenant as outlined in letter dated December 2, 1964 and entitled "Division of Responsibilities for Food Market." Receipt of the above is hereby acknowledged by Landlord.

Receipt of the above is hereby acknowledged by Landlord. Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

(a) Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on a store layout drawing which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b) Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

(8/3/64)

**Plans and Specifications (Cont'd)**

Said working plans and specifications shall be submitted to Tenant for approval prior to commencement of construction and such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working plans and specifications Tenant shall, in writing, inform Landlord of all exceptions or objections thereto, and Landlord shall revise said working plans and specifications to satisfy any such exceptions or objections and resubmit them for Tenant's approval after any such revision. In the event Tenant shall not so object in writing within said sixty (60) days, said working plans and specifications shall be approved and accepted for the purposes hereof.

Said typical store plans and specifications, store layout drawing and working plans and specifications, as approved by Tenant, shall be a part of this lease.

**Guarantee of Materials**

7. Landlord shall unconditionally guarantee all work performed by Landlord, or at its expense, in the construction of Tenant's store unit against defective workmanship and materials either for the period of one (1) year from the date of completion of said store unit or for the period of any guarantee therefor given Landlord, whichever period shall be the longer.

**Advance Possession for Fixturing**

8. For a period of four (4) weeks prior to completion of said store unit by Landlord, Tenant shall have the privilege, rent free, of entering its store unit for installing storage bins, storing merchandise, and other purposes not creating unreasonable interference with the work of Landlord. Such entry shall not be construed as acceptance of the store unit under the provisions of this lease, or as a waiver of any of the provisions hereof.

**Parking and Other Common Areas**

9. Prior to the date of commencement of the lease term, Landlord shall construct (as hereinafter provided) the sidewalks, service drives, parking aisles, driveways, streets and parking areas (all of which shall be hereinafter sometimes referred to as the "common facilities") substantially as shown on Exhibit "B". The aggregate area provided for the parking of automobiles shall, during the lease term, be either in the ratio of ~~four (4)~~ square feet of parking area for each square foot of floor area contained in buildings in said Commercial Development or sufficient to accommodate not less than eight hundred – – – – – – – – ( 800 ) automobiles on basis of arrangement depicted on Tenant's typical store plans, whichever shall be the greater. All sidewalks shall be of concrete construction, and all service drives, parking aisles, driveways, streets and parking areas shall be graded, levelled and paved with concrete or asphalt, and marked for the orderly distribution of automobiles. Landlord covenants, represents and warrants that, during the lease term, there shall be adequate sidewalks, driveways and roadways for automotive and pedestrian ingress and egress to and from the Commercial Development and adjacent public streets and highways. Landlord shall make no charge of any kind or nature for the use of said common facilities or any additions thereto. All of said common facilities shall be constructed in a workmanlike manner and shall, during the lease term, be maintained by Landlord, at its sole cost and expense, in good order and repair and in an adequate, sightly and serviceable condition. Said maintenance shall include, without limitation, keeping the same reasonably free and clear of foreign objects, papers, debris, obstructions, standing water, snow and ice, and supplying illumination during Tenant's business hours, and a reasonable period prior and subsequent thereto, to a minimum of one and one-half (1½) foot candles measured at ground level, for each square foot of common facilities. To assure the foregoing the Landlord shall cause the common facilities to be thoroughly cleaned not less than once weekly, and more often if necessary, and snow to be promptly removed on every occasion where it impedes the use of said facilities.

During the lease term, Landlord shall maintain a paved driveway at the rear of Tenant's store unit in order to provide convenient ingress and egress from the delivery or service entrance of said store unit to adjacent public streets and highways for the purpose of receiving and delivering merchandise and otherwise servicing said store unit. Said driveway shall be of sufficient width so as to permit the passage, unloading and, if necessary, the turning around of trailer trucks and other commercial vehicles.

The term "common areas", as used in this lease, shall include the following: (a) said common facilities indicated on Exhibit "B" and those which shall at any time and from time to time be contained in said Commercial Development or any future enlargement thereof, (b) areas within the Commercial Development which shall be open to the public generally, such as rest rooms and other facilities, if any, and (c) all other areas (except those areas which shall be occupied from time to time by building structures) included within the confines of the land described in Exhibit "A" or any enlargement of said Commercial Development.

During the lease term, Landlord shall keep Tenant insured against all statutory and common law liabilities for damages on account of injuries to property or person, including death, sustained by any person or persons while within said common areas, in a policy or policies in the amount of One Hundred Thousand Dollars ($100,000) with respect to injury to any one person and in the amount of Three Hundred Thousand Dollars ($300,000) with respect to any one accident or disaster, and in the amount of Twenty-five Thousand Dollars ($25,000) with respect to damage to property; and Landlord shall also indemnify and save Tenant harmless against any such liability. Any such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

4

(7/20/64)

**Parking and Other Common Areas (Cont'd)**

Landlord hereby gives and grants unto Tenant, its agents, employees, customers and invitees the full licenses, rights, privileges and easements to use said common areas, in common with Landlord and other tenants of the land described in said Exhibit "A", and their respective agents, employees, customers and invitees. No persons other than those described in the preceding sentence of this paragraph shall be permitted to park upon or exercise any other rights over any of the parking areas of said Commercial Development. In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now, or at any future time located beyond the limits of the land described in Exhibit "A", utilize said parking areas for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

Tenant may, at its election, from time to time, utilize portions of the common areas for carnival or circus type shows, rides and entertainment, outdoor shows, home shows, automobile shows or such other uses which in Tenant's judgment tend to attract the public. Tenant shall give Landlord notification of such intended use a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against injuries to property or person, including death, sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.

**Store Opening**

10. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open its said store unit for business, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) said store unit shall be completed in accordance with said working plans and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 11 with respect to said Commercial Development shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between September 1st and the last day of February, the lease term shall not commence until March 1, unless Tenant shall elect to open its store unit for business prior thereto. Tenant shall have the option to open its said store unit for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 10, and in the event of the exercise of such option, Landlord shall complete said store unit as expeditiously as possible; provided, however, if Landlord shall have failed to complete said store unit according to the said working plans and specifications within ninety (90) days after such opening of Tenant's store unit for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct or remedy in all or part, any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

**Landlord's Representations and Warranties**

11. Landlord represents and warrants that it shall, prior to commencement of the lease term, complete said Commercial Development substantially in accordance with the plan shown on said Exhibit "B". Said Commercial Development shall be completed substantially in accordance with said plan when the following representations and warranties have been fulfilled:

(a) Completion of said common facilities (including a service drive at the rear of said store unit) in accordance with the provisions of Article 9 hereof;

(b) Any buildings or other structures shall be erected or constructed only within the confines of the building site or sites (or future building sites) shown on said Exhibit "B" and upon no other part of the land described in said Exhibit "A". The land described in said Exhibit "A" shall consist of not less than   twelve - - - - - - - ( 12 ) acres;

(c) Completion of buildings comprised of not less than ( )
individual store units having an aggregate of not less than
( )
square feet of gross rentable floor area and not less than
( )
lineal feet of store frontages, all relatively located as shown on said Exhibit "B". Tenant's store unit, the number of square feet of gross rentable floor area therein and the lineal feet of store frontage thereof shall be included in the foregoing totals;

(d) Store premises (excluding Tenant's store unit) having an aggregate of ( )
square feet of gross floor area shall be leased and open for business; provided, however, included in said store premises required to be leased and open for business shall be store premises occupied by the tenants hereinafter set forth in this Article, each of which tenants shall, so long as each shall be in occupancy of any store premises in said Commercial Development, occupy store premises which shall be in the relative location shown on Exhibit "B" and shall be of the dimensions hereinafter set forth:

5

(7/20/64)

**Landlord's Representations and Warranties (Cont'd)**

Notwithstanding the provisions of Article 10 or any other provision of this lease, the lease term shall not commence and said annual minimum rental, and other charges payable under this lease, shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open its store for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one per cent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental as set forth in Articles 3 and 4 hereof.

In the event Landlord's said representations and warranties shall not be fulfilled within twelve (12) months after such date as Tenant shall open its said store unit for business, Tenant may notify Landlord in writing thereof and Landlord shall have ninety (90) days within which to fulfill said representations and warranties. If said representations and warranties shall not have been fulfilled within said ninety (90) day period, Tenant thereafter shall have the option of terminating this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Option to Extend Lease**

12. (a) Tenant shall have the option to extend the term of this lease for an additional period of five — — — — — — ( 5 ) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to expiration of the term hereof.

(b) If Tenant shall have exercised the foregoing option, it shall have the option further to extend the term of this lease for an additional period of five — — — — — ( 5 ) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such extended term.

(c) If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five — — — — — — ( 5 ) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the end of such further extended term.

(d) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months from the expiration of the term of this lease, or any extension thereof.

6

(1/20/64)

**Option for Additional Space**

13. Upon the written request of Tenant at any time after the third (3rd) lease year, Landlord shall, at its sole expense, enlarge the ground floor area of said store unit to an amount specified by Tenant not to exceed thirty thousand – – – – – – – – – – – – – – – – – – – (30,000) square feet. If at the time of such request by Tenant, there shall remain less than fifteen (15) years of the original term of this lease, said term shall be automatically extended so as to expire fifteen (15) years following the first day of the month during which such addition to said store unit shall be completed as hereinafter specified and possession thereof shall be tendered to Tenant. Said addition shall be constructed in accordance with working plans and specifications prepared by Landlord which shall as nearly as practicable conform to Tenant's typical store plans and specifications described in Article 6 hereof, and shall be located where specified by Tenant within the confines of the area on Exhibit "B" designated as "Optional Expansion". Landlord shall do all work necessary to integrate the additional space with the initial store unit. Landlord shall proceed promptly and complete said addition with reasonable dispatch, subject to delays due to conditions beyond Landlord's control. Upon such completion of said addition and the tender of the possession thereof to Tenant, said minimum rental and minimum basis of sales shall be increased in the proportion in which the total gross floor area shall be increased thereby, and all the terms and provisions of this lease applicable to said store unit shall be applicable to such addition.

**Repairs**

14. Tenant shall make and pay for all replacement of plate glass and all nonstructural repairs and replacements to the interior of Tenant's store unit which it deems necessary to keep the premises in a good state of repair, but in no event shall Tenant be obligated to make repairs and replacements which Landlord shall be required to make under any provision of this lease or which shall be necessitated by Landlord's negligence, default or failure to repair. Landlord shall make and pay for all repairs and replacements (except those which Tenant shall be specifically obligated to make under the provisions of this Article and those due to Tenant's negligence) to said store unit which shall be necessary to maintain the same in a safe, dry and tenantable condition, and in good order and repair. Notwithstanding anything to the contrary herein contained, Tenant shall not be required to make any repairs or replacements (or be liable for the cost thereof) which shall be necessitated by any damage or destruction with respect to which Landlord shall be insured or against which Landlord shall be required by the terms of this lease to insure, but Landlord shall make all such repairs or replacements.

In the event said store unit or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the building or its contents may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Five Hundred Dollars ($500.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations and Additional Construction**

15. Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its store unit as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to plans and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural strength of the building will not be impaired by such work. The term, "structural changes", as used herein, shall not include moving of stud partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

Tenant may, at its own expense, at any time erect or construct additional buildings or structures on any portion of the "common facilities" areas as defined in Article 9 and depicted on Exhibit "B"; provided, however, gross sales made in or from said additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, Tenant shall reimburse Landlord for any real estate taxes imposed on said additions or new construction, which taxes are solely attributable thereto, and Tenant shall reimburse Landlord for any increase in insurance premiums attributable thereto. Tenant shall also be solely responsible for exterior repairs thereto, except those necessitated by fire or casualty for which Landlord is obligated to insure. In the event Tenant constructs any such additions or new construction, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, nor shall the floor area thereof be utilized in any computation with respect to required ratio of building area to parking area under said Article 9, and the number of parking spaces required thereunder shall be reduced by the number of spaces covered by such additional buildings or structures.

7

(11/3/64)

**Utilities**

16. Tenant shall promptly pay for all public utilities rendered or furnished to Tenant's store unit during the lease term, including water, gas and electricity, provided separate meters shall be installed for Tenant. Landlord covenants, represents and warrants that, during the lease term, said store unit shall at all times be connected to electric, water and gas lines of an adequate source of supply, and to storm and sanitary sewer systems of adequate capacity.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition during the full term of this lease or any extension and at its sole expense. Sewer charges or sewer taxes, regardless of the manner billed or assessed, shall be paid by Landlord.

**Governmental Regulations**

17. Tenant shall observe and comply with all rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said store unit, including the making of nonstructural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes including, but not limited to the erection of a fire escape or exit, installation of a sprinkler system or other fire preventive device of a structural nature, or (b) require nonstructural changes which would have been required irrespective of the nature of the tenancy, then, in either such event, the same shall be complied with by Landlord at its sole expense.

**Landlord's Covenant**

18. Landlord covenants, represents and warrants that, within the confines of the area of the Commercial Development described in Exhibit "A" now or in the future owned or controlled, directly or indirectly, by Landlord, Landlord's principal owners, stockholders, directors or officers, or their assignees or vendees, no premises (other than Tenant's store unit) shall be leased, rented, used or occupied for any purposes whatsoever without Tenant's prior written consent, which may be witheld or granted at Tenant's sole discretion and further, that in addition no premises so owned or controlled outside the confines of the area of the Commercial Development but within a four (4) mile radius thereof, shall be leased, rented, used or occupied for the operation of a variety store, department store, junior department store, cut-rate store or discount store. This covenant shall run with the land commencing with the date of execution of this lease and shall continue until such date as shall be the last day of the lease term or extension or renewal thereof; provided, however, this covenant shall cease and determine and be of no further force or effect in the event that either (a) subsequent to the commencement of the lease term, said store unit shall cease to be used for the operation of a cut-rate store or discount store or any store managed by Tenant for a period of six (6) consecutive months, excluding temporary interruptions of said operation because of causes beyond Tenant's control, or (b) said date of occupancy described in Article 10 hereof shall not occur prior to such date as shall be seven (7) years from the date of the execution of this lease.

**Fire**

19. From and after the date on which Tenant shall be privileged to enter upon demised premises for the purposes specified in Article 8 hereof, Landlord shall insure the Commercial Development, including Tenant's store unit, against damage or destruction by fire and other casualties insured under a standard extended coverage endorsement. Said insurance shall be in an amount equal to not less than eighty per cent (80%) of the insurable value of the permanent improvements thereof. All policies with respect to said Commercial Development shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof, so endorsed, shall be promptly delivered to Tenant upon written request therefor. Irrespective of the cause thereof, Tenant shall not be liable for any loss or damage to the Commercial Development or in or about the demised premises resulting from fire, explosion or any other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting said store unit shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding Five Thousand Dollars ($5000.00), then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 12 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and, upon the exercise of any such option (other than the option set forth in subparagraph (d) of Article 12) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the permanent improvements constituting said store unit as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

(7/20, 64)

**Fire (Cont'd)**

During any period commencing upon the date of any such damage or destruction and ending upon the date of completion of the repairs, rebuilding and restoration required herein, the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of the store unit which shall be untenantable shall bear to the whole.

In the event that, at any time during the lease term except the last two (2) years thereof, any other building or buildings of said Commercial Development shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, during such period of time (including the last two (2) years of the lease term) that either (a) twenty per cent (20%) or more of the gross rentable floor area (as set forth in subparagraph (c) of Article 11) of the Commercial Development shall be so rendered untenantable, or (b) any of the stores of tenants specifically required to be open for business prior to Tenant's opening its store unit for business (as set forth in subparagraph (d) of Article 11) shall not be open for business because of such damage or destruction, then the annual minimum rental for such period of time shall be abated, whether or not Tenant's store unit shall be damaged or destroyed and during such period Tenant shall pay monthly in arrears one per cent (1%) of its gross sales.    (Continued on Rider, Page 1.)

**Eminent Domain**

20.  In the event all of Tenant's store unit shall be expropriated by public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived of the physical possession thereof.

In the event that less than the whole, but more than ten per cent (10%) of Tenant's store unit shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's store unit, if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the store unit which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said store unit as nearly as practicable to a complete unit of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and minimum basis of sales shall be reduced in the proportion the ground floor area of the part of Tenant's store unit so expropriated shall bear to the total ground floor area of said store unit prior to such expropriation.

Without limiting the foregoing, in the event that more than ten per cent (10%) of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date possession of the land shall be taken by such authority, by giving notice to Landlord of such election within ninety (90) days thereafter; provided, however, said termination by Tenant shall be null and void if, within ninety (90) days following the date possession of said land shall be so taken, Landlord shall substitute equivalent and similarly improved lands contiguous and properly integrated with the remainder of the Commercial Development. Notwithstanding any other provision of this lease, in the event that more than ten per cent (10%) of the aggregate number of square feet of ground floor area in the buildings in the Commercial Development shall be expropriated by public or quasi-public authority, Tenant may terminate this lease at any time following notice of such expropriation. Any such termination shall be effective as of the date of notice to Landlord. Landlord shall immediately notify Tenant of any notice of any such proposed expropriation.

and as a result thereof the number of parking spaces in the common areas shall be reduced to less than 600

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's store unit, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its store unit, Landlord shall assign to Tenant so much of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

or the Landlord shall proceed to double-deck such portion of the parking facilitie as may be necessary to provide at least six hundred (600) parking spaces, the plan and specifications for such double-decking to be subject to Tenant's approval.

**Assignment and Subletting**

21. The premises hereby demised shall not be used for any unlawful purpose, and the Tenant may assign this lease or sublet the whole or any part of said demised premises, but if it does so without Landlord's consent, it shall remain liable and responsible under this lease.

**Signs**

22. Tenant shall have the option to erect at its sole cost and expense, within the confines of the Commercial Development, one or two pylon-type signs. Any such sign (a) shall be of such height and other dimensions as Tenant shall determine, (b) shall bear such legend or inscription advertising Tenant's store as Tenant shall determine, and (c) shall be located upon such sites, other than sites reserved by Landlord for buildings, as Tenant shall determine. Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.

Landlord shall not permit any other advertising signs, billboards or posters to be displayed on any portion of the premises described in Exhibit "A" hereof, excepting flat wall signs which may be placed on other stores, if any, now depicted on Exhibit "B" or in the future erected on "future building areas" as depicted thereon, providing such signs shall be utilized solely for the purpose of advertising the names of the respective tenants thereof.

Landlord shall not, without Tenant's written consent, at any time utilize the exterior of Tenant's store unit, or the space above it, for sign display purposes.

**Ingress and Egress to Commercial Development**

23. Landlord warrants as a consideration for this lease it will initially provide and maintain for the period of this lease and any extension thereof, ingress and egress facilities to public highways in the number and substantially the locations depicted on Exhibit "B", subject to unavoidable temporary closings or relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**

24. If the rent reserved in this lease, or any part thereof, shall remain unpaid for a period of thirty (30) days or if Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of said nonpayment or other default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter said store unit by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said store unit at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said store unit and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

25. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**

26. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

10

(7/20/84)

**Covenant of Title (Cont'd)**

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple in the land described in Exhibit "A" free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof) with exceptions, if any, listed and attached hereto as Exhibit "C".

Landlord shall, without expense to Tenant, and within thirty (30) days after written request by Tenant, furnish (a) a certification by an attorney acceptable to Tenant that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A", (b) a survey by licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Sub-ordination**

27. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**

· 28. During the lease term, Tenant and its assignees and sublessees shall indemnify and save Landlord harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of its store unit, except those which shall result, in whole or in part, and directly or indirectly, from the default or negligence of Landlord.

**Tenant's Right to Cure Landlord's Defaults**

29. In the event Landlord shall neglect to pay when due any taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, pay said taxes, assessments, principal, interest or other charges and cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of six per cent (6%) per annum, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall, in the event it shall notify Landlord to correct any default, give a similar notice to such holder, and such holder shall be granted sixty (60) days after notice thereof to correct or remedy such default.

**Condition of Premises at Termination**

30. At the expiration or earlier termination of the lease term, Tenant shall surrender its store unit, together with alterations, additions and improvements then a part of said store unit, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty or occurrence excepted. All furniture and trade fixtures installed in said store unit at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option, the property specified in said notice shall be the property of Landlord.

**Holding Over**

31. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of said store unit after the expiration of the lease term, it shall so remain as a tenant from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

**Notices**

32. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Detroit, Michigan, or to any subsequent address which Tenant shall designate for such purpose.

11

(7/20/64)

**Captions and Definitions**

33.  Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provisions thereof. The necessary grammatical changes which shall be required to make the provisions of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**

34.  The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memorandum of Lease**

35.  The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

For Article 36 see Rider.

IN WITNESS WHEREOF, the parties hereto have executed these presents in triplicate and affixed their seals hereto as of the day and year first above written.

WITNESSES:

PATTON AVENUE DEVELOPMENT CORPORATION

By: _Lawrence T. Hoyle_ President

Attest: _T. C. Hoyle, Jr._ Secretary

S. S. KRESGE COMPANY

J. K. Tewel

By: _John B. Hollister_ Vice-President

Agnes Krausman

Attest: _John C. Cook,_ Assistant Secretary

APPROVED

12

(7/20/64)

EXHIBIT "A" ATTACHED TO AND MADE A PART OF
THE LEASE ENTERED INTO DECEMBER 18, 1964
BETWEEN PATTON AVENUE DEVELOPMENT CORPORATION,
LANDLORD, AND S. S. KRESGE COMPANY, TENANT.

Located in the City of Asheville, Buncombe County, North Carolina:

## TRACT ONE

BEGINNING at a concrete monument in the northern margin of the right-of-way line of dual U. S. Highways #19-23, known as Patton Avenue, at the southeast corner of the lands of Wachovia Bank and Trust Company and running thence with the line of said Bank, N. 12° 52' W. 227 feet to a concrete monument; thence S. 89° 45' W. 119.3 feet to a concrete monument in the right-of-way line of Louisiana Avenue; thence N. 36° 57' W. 221.5 feet to an iron in the eastern margin of Louisiana Avenue; thence with the eastern margin of Louisiana Avenue, N. 28° 51' W. 63.5 feet to an iron pipe, the Joyner corner; thence with Joyner, S. 81° 17' E. 234.57 feet to an iron pipe; thence still with Joyner, N. 3° 7' E. 161.69 feet to a concrete monument, the Joyner northeast corner; thence with Joyner, N. 78° 27' W. 353.92 feet to an iron in the eastern margin of Louisiana Avenue; thence with the eastern margin of Louisiana Avenue, N. 19° 26' W. 87.85 feet; thence still with said Avenue, N. 5° 22' W. 100 feet; thence S. 86° 10' 30" E. 114.09 feet to an iron pipe; thence N. 7° 20' E. 52.86 feet, corner with Hargus; thence with Hargus, S. 76° 10' 30" E. 124.63 feet; thence N. 7° 34' 30" E. 93.99 feet; thence N. 5° 50' E. 181.17 feet; thence S. 70° 45' E. 312 feet to an iron; thence N. 37° 24' E. 148.93 feet to an iron; thence S. 70° 11' E. 573.02 feet to an iron in Hawkins Lane; thence with Hawkins Lane, S. 27° 56' W. 386.4 feet to a concrete monument; thence N. 82° 15' W. 113.79 feet to an iron; thence S. 32° 53' 30" W. 193.5 feet to a concrete monument; thence S. 23° 27' W. 165.86 feet to a concrete monument; thence S. 85° 57' 30" E. 17.59 feet to a dogwood tree; thence S. 20° 50' 30" E. 290.35 feet to an existing spike in the northern margin of Patton Avenue; thence with the northern margin of Patton Avenue, S. 85° 26' 30" W. 350.45 feet to a concrete monument; thence still with the northern margin of Patton Avenue, S. 87° 34' W. 25 feet to the point of beginning. Subject, however, to right-of-way for the widening of Hawkins Lane and the right-of-way for the widening of Louisiana Avenue, and together with and subject to rights of ingress, egress, and regress in, over and through that tract of land fronting 50 feet on Patton Avenue and running N. 12° 59' W. 35 feet, the center

line of which is the first call in the foregoing description.

## TRACT TWO

A leasehold interest in and to: BEGINNING at an iron pipe in the eastern margin of Louisiana Avenue, Wells' northwest corner, and running thence with the Wells' line, S. 81° 17' E. 234.57 feet to an iron in the line of the land of G-K, Inc.; thence with said line, N. 3° 7' E. 161.69 feet to a monument at a 24 inch pin, corner with Shelton; thence with the Shelton line, N. 78° 27' W. 353.92 feet to an iron pipe in the eastern margin of Louisiana Avenue; thence with the eastern margin of Louisiana Avenue, S. 19° 26' E. 12.15 feet and S. 28° 51' E. 211.64 feet to the point of beginning.

Consisting of approximately 12 acres, and being as more particularly shown on survey dated October 19, 1964 prepared by Hollowell, Borum and Associates, Greensboro, North Carolina.

THIS RIDER CONSISTING OF ONE PAGE IS ATTACHED
TO AND FORMS A PART OF THE LEASE ENTERED INTO
DECEMBER 18, 1964 BETWEEN PATTON AVENUE DEVELOP-
MENT CORPORATION, LANDLORD, AND S. S. KRESGE
COMPANY, TENANT.

FIRE
(Cont'd. from
Article 19,
Page 9 of
printed lease)

19.   In the event that any other building or buildings of said Commercial

Development shall be damaged or destroyed by fire, the elements or any other

casualty, the Landlord shall, at its expense, promptly and with due diligence

either repair, rebuild and restore the same as nearly as practicable to the

condition existing just prior to such damage or destruction, or, in the

alternative, Landlord shall raze such damaged or destroyed building or buildings

and pave the land thereunder for additional parking facilities in the manner

required in Article 9 hereof.

GASOLINE
STATION

36.   For a period of two (2) years from the commencement of the lease

term, the Tenant shall have an option to require Landlord to construct facilities

for the storage and sale of gasoline and related products for automobiles, such

facilities to be situated on the parking areas shown on Exhibit "B" attached

hereto in a location selected by Tenant.  Said option shall be exercised by

Tenant by mailing a written notice to Landlord on or before the last day of said

two (2) year period.

In the event Tenant so exercises said option, Landlord shall prepare

working plans and specifications satisfactory to Tenant for the construction of

said facilities.  After the Tenant has approved said working plans and specifi-

cations, Landlord shall proceed with the construction of said facilities and,

upon completion thereof, Landlord shall tender said facilities to Tenant.  All

work contemplated hereunder shall be completed without undue delay and in accord-

ance with any building codes, rules, regulations, ordinances and statutes

governing such construction.

Tenant shall pay to Landlord a gross rental for said facilities to

be mutually agreed upon prior to commencement of construction; said rent to

commence upon the date said facilities are completed in accordance with the

terms and provisions of this lease and possession thereof tendered to Tenant.

If at the time said facilities are tendered to Tenant there shall remain less

than fifteen (15) years of the original term of this lease, said term shall be

deemed automatically extended so as to expire fifteen (15) years following the

last day of the month during which said facilities shall have been completed

and tendered to Tenant in accordance herewith.

ACKNOWLEDGMENTS

STATE OF *N. C.* } SS:
COUNTY OF *Guilford*

I do hereby certify that on this 28th day of *Dec.*, 1964, before me, *Betty Jean Jeffreys*, a Notary Public in and for the County and State aforesaid, residing therein and duly commissioned, personally appeared *Laurence T. Mayle* and *J. C. Mayle, Jr.*, known to me to be the President and Secretary of *Patton Avenue Development Corporation* who, being by me duly sworn, did depose and say that they reside in *Guilford Co., N. C.*, respectively; that they are the President and Secretary respectively of *Patton Avenue Development Corporation* the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires *June 28, 1966*  *Betty Jean Jeffreys*
Notary Public

STATE OF MICHIGAN } SS:
COUNTY OF WAYNE

I do hereby certify that on this 31st day of December, 19 64, before me, Jean Currie, a Notary Public in and for the County and State aforesaid, residing therein and duly commissioned, personally appeared John B. Hollister and John C. Cook known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by me duly sworn, did depose and say that they reside in Detroit, Michigan and Grosse Pointe, Michigan respectively; that they are the Vice President and Assistant Secretary respectively of S. S. Kresge Company, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires *March 18, 1966*  *Jean Currie*
Notary Public

13

CODE No. 920-40—100—Only—8/64—3064/64K—X26—Printed in U.S.A.

# Exhibit B

## AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE, made and entered into this 27th day of
August, 1965, between PATTON AVENUE DEVELOPMENT CORPORATION, a North Carolina
corporation having its principal office at Post Office Box 1747, Greensboro,
North Carolina, 27402, herein referred to as "Landlord", and S. S. KRESGE COMPANY,
a Michigan corporation having its principal office at 2727 Second Avenue, Detroit,
Michigan, 48232, herein referred to as "Tenant";

WITNESSETH:

WHEREAS, Landlord and Tenant entered into a certain lease agreement
dated December 18, 1964 relative to a certain tract or parcel of land in the
City of Asheville, County of Buncombe, State of North Carolina, in a Commercial
Development known as K-mart Plaza, a memorandum of which was duly recorded in
the Office of the Register of Deeds of Buncombe County, North Carolina, on
March 22, 1965, in Book 918, at Page 279; and

WHEREAS, it is the desire of the parties hereto that said lease be
amended.

NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00) by
each of the parties paid to the other, the receipt of which is hereby acknowledged,
the parties hereto do hereby covenant and agree, each with the other, as follows:

1. Article 18 of said lease dated December 18, 1964 is hereby
amended to provide that anything in said Article 18 to the contrary notwithstand-
ing, Tenant shall not cancel said lease, abate rentals, or otherwise credit or
offset damages against rentals for default of Landlord in the performance of any
covenant of said lease, either affirmatively or negatively, which act or omission
relates to property beyond the limitation of the real estate described in Exhibit
"A" attached to said lease; provided, however, nothing herein contained shall be
construed as a waiver of rights in personam against the Landlord nor remedies
by way of injunctive relief against the Landlord. Wherever the word "Landlord"
is used herein, it is intended that this shall also include the Landlord's
principal owners, stockholders, directors, officers and their assignees or
vendees.

2. Article 20 of said lease dated December 18, 1964 as aforesaid is



1.

hereby amended by adding the following sentence at the end of the fifth

paragraph of said Article 20:

"The determination of that portion of any condemnation award to

which the Tenant is entitled under this Article 20 shall be

subject to approval by the holder of a properly recorded first

mortgage against the demised premises, which approval shall not

be unreasonably withheld, and no distribution of any condemnation

award shall be made to the Tenant under this Article until such

approval shall be obtained."

3.   Articles 13, 19 and 36 of said lease dated December 18, 1964

are amended by adding a new sentence at the end of each Article as follows:

"Provided the holder of a properly recorded first mortgage shall

have notified Tenant in writing that it is the holder of such

lien on the demised premises and shall so request, Tenant shall,

in the event it requires any action under this Article, give a

similar notice to such holder and such holder shall be granted 60

days after receipt thereof to commence the action required by such

notice."

Except as said lease agreement dated December 18, 1964 is expressly

amended hereby, each and every of the terms and conditions thereof are hereby

ratified, approved and confirmed.

IN WITNESS WHEREOF, the parties hereto have executed these presents

in triplicate and affixed their seals hereto as of the day and year first above

written.

WITNESSES:

PATTON AVENUE DEVELOPMENT CORPORATION

By _____
                                    President

Attest: _____
                                    Secretary

S. S. KRESGE COMPANY

By _____
John B. Hollister,        Vice President

Attest: _____
John C. Cook,        Assistant Secretary

_____
J. K. Tewel

_____
Agnes Krausman

APPROVED

2.

STATE OF NORTH CAROLINA)
COUNTY OF GUILFORD      )  ss:

     I do hereby certify that on this    7th  day of   October    , 1965,
before me,      Sue Hobbs              , a Notary Public in and for the County
and State aforesaid, residing therein and duly commissioned, personally
appeared   Lawrence T. Hoyle         and    T. C. Hoyle, Jr.                   ,
known to me to be the President and Secretary of PATTON AVENUE DEVELOPMENT
CORPORATION, who, being by me duly sworn, did depose and say that they reside in
     Greensboro, Guilford County, North Carolina                      ,
respectively; that they are the President and Secretary respectively of PATTON
AVENUE DEVELOPMENT CORPORATION, the corporation described in and which executed
the foregoing instrument; that they know the seal of said corporation; that the
seal affixed to said instrument is the corporate seal of said corporation; that,
on behalf of said corporation and by order of its Board of Directors, they signed,
sealed and delivered said instrument for the uses and purposes therein set forth,
as its and their free and voluntary act; and that they signed their names thereto
by like order.

     In Witness Whereof, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

                                _____
                                       Notary Public

My commission expires:__August 10, 1967___

3.

STATE OF MICHIGAN) ss:
COUNTY OF WAYNE  )

       I do hereby certify that on this   1st   day of October   , 1965,

before me,    Lovisa Jenckes        , a Notary Public in and for the

County and State aforesaid, residing therein and duly commissioned, personally

appeared    John B. Hollister    and    John C. Cook    ,

known to me to be the Vice President and Assistant Secretary of S. S. KRESGE

COMPANY, who, being by me duly sworn, did depose and say that they reside in

   Detroit, Michigan    and    Grosse Pointe, Michigan

respectively; that they are the Vice President and Assistant Secretary respect-

ively of S. S. KRESGE COMPANY, the corporation described in and which executed

the foregoing instrument; that they know the seal of said corporation; that the

seal affixed to said instrument is the corporate seal of said corporation; that

on behalf of said corporation and by order of its Board of Directors, they

signed, sealed and delivered said instrument for the uses and purposes therein

set forth, as its and their free and voluntary act; and that they signed their

names thereto by like order.

       In Witness Whereof, I have hereunto set my hand and affixed my

official seal the day and year in this certificate first above written.

                                     _Lovisa Jenckes_
                                 Lovisa Jenckes,    Notary Public

My commission expires  December 4, 1967

4.

# Exhibit C

NORTH CAROLINA

BUNCOMBE COUNTY

        THIS DEED, Made this the ___1___ day of __February__,

1966, by and between PATTON AVENUE DEVELOPMENT CORPORATION, a North

Carolina corporation with its principal place of business in Guilford

County, North Carolina, hereinafter called Grantor, and G-K, INC., a

North Carolina corporation with its principal place of business in

Guilford County, North Carolina, hereinafter called Grantee.

W I T N E S S E T H :

       That the Grantor, for and in consideration of the sum of Ten

($10.00) Dollars and other good and valuable considerations to it in

hand paid by the Grantee, the receipt whereof is hereby acknowledged,

has given, granted, bargained, sold and conveyed, and by these presents

does give, grant, bargain, sell, convey and confirm unto the Grantee,

its successors and assigns, premises in the City of Asheville, Buncombe

County, North Carolina, described as follows:

       TRACT ONE:   BEGINNING at a concrete monument in the
northern margin of the right-of-way line
of dual U. S. Highways #19-23, known as Patton Avenue,
at the southeast corner of the lands of Wachovia Bank
and Trust Company and running thence with the line of
said Bank, North 12° 52' West 227 feet to a concrete
monument; thence South 89° 45' West 119.3 feet to a
concrete monument in the right-of-way line of Louisiana
Avenue; thence North 36° 57' West 221.5 feet to an iron
in the eastern margin of Louisiana Avenue; thence with
the eastern margin of Louisiana Avenue, North 28° 51'
West 63.5 feet to an iron pipe; the Joyner corner;
thence with Joyner, South 81° 17' East 234.57 feet to
an iron pipe; thence still with Joyner, North 3° 7'
East 161.69 feet to a concrete monument, the Joyner
northeast corner; thence with Joyner, North 78° 27'
West 353.92 feet to an iron in the eastern margin of
Louisiana Avenue; thence with the eastern margin of
Louisiana Avenue, North 19° 26' West 87.85 feet; thence
still with said Avenue, North 5° 22' West 100 feet;
thence South 86° 10' 30" East 114.09 feet to an iron
pipe; thence North 7° 20' East 52.86 feet, corner with
Hargus; thence with Hargus, South 76° 10' 30" East
124.63 feet; thence North 7° 34' 30" East 93.99 feet;

6

thence North 5° 50' East 181.17 feet; thence South
70° 45' East 312 feet to an iron; thence North 37°
24' East 148.93 feet to an iron; thence South 70°
11' East 573.02 feet to an iron in Hawkins Lane;
thence with Hawkins Lane, South 27° 56' West 386.4
feet to a concrete monument; thence North 82° 15'
West 113.79 feet to an iron; thence South 32° 53'
30" West 193.5 feet to a concrete monument; thence
South 23° 27' West 165.86 feet to a concrete monu-
ment; thence South 85° 57' 30" East 17.59 feet to
a dogwood tree; thence South 20° 50' 30" East 290.35
feet to an existing spike in the northern margin of
Patton Avenue; thence with the northern margin of
Patton Avenue, South 85° 26' 30" West 350.45 feet
to a concrete monument; thence still with the
northern margin of Patton Avenue, South 87° 34' West
25 feet to the point of Beginning. Subject, however,
to right of way for the widening of Hawkins Lane and
the right of way for the widening of Louisiana Avenue,
and together with and subject to rights of ingress,
egress, and regress in, over and through that tract
of land fronting 50 feet on Patton Avenue and running
North 12° 59' West 35 feet, the center line of which
is the first call in the foregoing description.

TRACT TWO:   All of the right, title and interest of
grantor (being a leasehold interest) in
the following described tract or parcel of land:
BEGINNING at an iron pipe in the eastern margin of
Louisiana Avenue, Wells' northwest corner, and running
thence with the Wells' line, South 81° 17' East 234.57
feet to an iron in the line of the land of G-K, Inc.;
thence with said line, North 3° 7' East 161.69 feet
to a monument at a 24-inch pin, corner with Shelton;
thence with the Shelton line, North 78° 27' West 353.92
feet to an iron pipe in the eastern margin of Louisiana
Avenue; thence with the eastern margin of Louisiana
Avenue, South 19° 26' East 12.15 feet and South 28° 51'
East 211.64 feet to the point of Beginning.

There is also transferred hereby all of the rights of
Patton Avenue Development Corporation, as lessee, in
that certain lease agreement between Patton Avenue
Development Corporation and Edeson C. Joyner, dated
October 1, 1964, and recorded in Book 911, Page 402,
as same has been amended, and this conveyance is made
subject to the terms of a certain lease agreement
between Patton Avenue Development Corporation and S. S.
Kresge Company, dated December 18, 1964, as same has
been amended, and grantor does hereby assign and set
over to grantee all of its rights as landlord in said
lease. This conveyance is further made subject to the
mortgage deed of trust in favor of The Penn Mutual Life
Insurance Company and the assignment of rents executed
by Patton Avenue Development Corporation in connection
therewith, and to 1966 ad valorem taxes.

TO HAVE AND TO HOLD the above-described premises, with all the

appurtenances thereunto belonging or in any wise appertaining, unto the

Grantee, its successors and assigns forever.

-2-

7

And the Grantor covenants that it is seized of said premises in fee and has the right to convey the same in fee simple; that said premises are free from incumbrances (with the exceptions above stated, if any); and that it will warrant and defend the said title to the same against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, the Grantor has caused this deed to be executed by its duly authorized officers and its seal to be hereunto affixed, the day and year first above written.

[SEAL]

PATTON AVENUE DEVELOPMENT CORPORATION

BY: Lawrence J. Hoyle
President

ATTEST:

Asst Secretary

---

NORTH CAROLINA - BUNCOMBE COUNTY

I, GLEN B. SPARROW, a Notary Public, do hereby certify that EDWARD I. GREENE personally appeared before me this day and acknowledged that he is the Asst Secretary of PATTON AVENUE DEVELOPMENT CORPORATION, a corporation, and that by authority duly given, and as the act of the corporation, the foregoing instrument was signed in its name by its President, sealed with its corporate seal and attested by him as its Asst Secretary.

WITNESS my hand and official seal this the 1st day of February, 1966.

NOTARY PUBLIC

My Commission Expires:

May 23, 1967

[SEAL - NOTARY PUBLIC]

Register of Deeds

-3-

Book: 935 Page: 5 Seq: 3

# Exhibit D

NORTH CAROLINA

BUNCOMBE COUNTY

THIS DEED, Made this the ___1___ day of ~~February,~~,
1966, by and between G-K, INC., a North Carolina corporation with its
principal place of business in Guilford County, North Carolina, herein-
after called Grantor, and MARTIN BRUCE and wife, SYLVIA BRUCE, of
Nassau County, New York, hereinafter called Grantees.

W I T N E S S E T H :

That the Grantor, for and in consideration of the sum of Ten
($10.00) Dollars and other good and valuable considerations to it in
hand paid by the Grantees, the receipt whereof is hereby acknowledged,
has given, granted, bargained, sold and conveyed, and by these presents
does give, grant, bargain, sell, convey and confirm unto Martin Bruce and
wife, Sylvia, Bruce, their heirs and assigns, as tenants in common and
not as tenants by the entireties, premises in the City of Asheville,
Buncombe County, North Carolina, described as follows:

> TRACT ONE: BEGINNING at a concrete monument in the
> northern margin of the right-of-way line
> of dual U. S. Highways #19-23, known as Patton Avenue,
> at the southeast corner of the lands of Wachovia Bank
> and Trust Company and running thence with the line of
> said Bank, North 12° 52' West 227 feet to a concrete
> monument; thence South 89° 45' West 119.3 feet to a
> concrete monument in the right-of-way line of Louisiana
> Avenue; thence North 36° 57' West 221.5 feet to an iron
> in the eastern margin of Louisiana Avenue; thence with
> the eastern margin of Louisiana Avenue, North 28° 51'
> West 63.5 feet to an iron pipe; the Joyner corner;
> thence with Joyner, South 81° 17' East 234.57 feet to
> an iron pipe; thence still with Joyner, North 3° 7'
> East 161.69 feet to a concrete monument, the Joyner
> northeast corner; thence with Joyner, North 78° 27'
> West 353.92 feet to an iron in the eastern margin of
> Louisiana Avenue; thence with the eastern margin of
> Louisiana Avenue, North 19° 26' West 87.85 feet; thence
> still with said Avenue, North 5° 22' West 100 feet;
> thence South 86° 10' 30" East 114.09 feet to an iron
> pipe; thence North 7° 20' East 52.86 feet, corner with
> Hargus; thence with Hargus, South 76° 10' 30" East
> 124.63 feet; thence North 7° 34' 30" East 93.99 feet;

thence North 5° 50' East 181.17 feet; thence South
70° 45' East 312 feet to an iron; thence North 37°
24' East 148.93 feet to an iron; thence South 70°
11' East 573.02 feet to an iron in Hawkins Lane;
thence with Hawkins Lane, South 27° 56' West 386.4
feet to a concrete monument; thence North 82° 15'
West 113.79 feet to an iron; thence South 32° 53'
30" West 193.5 feet to a concrete monument; thence
South 23° 27' West 165.86 feet to a concrete monu-
ment; thence South 85° 57' 30" East 17.59 feet to
a dogwood tree; thence South 20° 50' 30" East 290.35
feet to an existing spike in the northern margin of
Patton Avenue; thence with the northern margin of
Patton Avenue, South 85° 26' 30" West 350.45 feet
to a concrete monument; thence still with the
northern margin of Patton Avenue, South 87° 34' West
25 feet to the point of Beginning.  Subject, however,
to right of way for the widening of Hawkins Lane and
the right of way for the widening of Louisiana Avenue,
and together with and subject to rights of ingress,
egress, and regress in, over and through that tract
of land fronting 50 feet on Patton Avenue and running
North 12° 59' West 35 feet, the center line of which
is the first call in the foregoing description.
Together with all rights conferred upon grantor herein
by a certain right of way agreement executed by the
Trustees of Temple Baptist Church recorded in Book 912,
Page 431, which shall be an appurtenance to the above-
described land.

TRACT TWO:   All of the right, title and interest of
            grantor (being a leasehold interest) in
the following described tract or parcel of land:
BEGINNING at an iron pipe in the eastern margin of
Louisiana Avenue, Wells' northwest corner, and running
thence with the Wells' line, South 81° 17' East 234.57
feet to an iron in the line of the land of G-K, Inc.;
thence with said line, North 3° 7' East 161.69 feet to
a monument at a 24-inch pin, corner with Shelton; thence
with the Shelton line, North 78° 27' West 353.92 feet
to an iron pipe in the eastern margin of Louisiana
Avenue; thence with the eastern margin of Louisiana
Avenue, South 19° 26' East 12.15 feet and South 28° 51'
East 211.64 feet to the point of Beginning.

There is also transferred hereby all of the rights of
G-K, Inc. (such rights having been transferred to it
by Patton Avenue Development Corporation), as lessee,
in that certain lease agreement between Patton Avenue
Development Corporation and Edeson C. Joyner dated
October 1, 1964, and recorded in Book 911, Page 402,
as same has been amended, and this conveyance is made
subject to the terms of a certain lease agreement
between Patton Avenue Development Corporation and S. S.
Kresge Company, dated December 18, 1964, as same has
been amended, and grantor does hereby assign and set
over to grantees all of its rights as landlord in said
lease.  This conveyance is further made subject to the
mortgage deed of trust in favor of The Penn Mutual Life

-2-

Insurance Company and the assignment of rents executed
by Patton Avenue Development Corporation in connection
therewith; to 1966 ad valorem taxes, and to public
utility easements of record.

TO HAVE AND TO HOLD the above-described premises, with all the
appurtenances thereunto belonging or in any wise appertaining, unto the
Grantees, their heirs and assigns forever, as tenants in common and not
as tenants by the entireties.

And the Grantor covenants that it is seized of said premises
in fee and has the right to convey the same in fee simple; that said
premises are free from incumbrances (with the exceptions above stated,
if any); and that it will warrant and defend the said title to the same
against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, the Grantor has caused this deed to be
executed by its duly authorized officers and its seal to be hereunto
affixed, the day and year first above written.

323-6

G-K, INC.

BY: Lawrence J Hoyle
President

ATTEST:

Edward J Greene
Asst Secretary



-3-

4

NORTH CAROLINA

GUILFORD COUNTY

     I, ____GWEN B. SPARROW_____, a Notary Public,

do hereby certify that ____EDWARD I. GREENE_____personally appeared

before me this day and acknowledged that he is the ___*Asst*___Secretary

of G-K, INC., a corporation, and that by authority duly given, and as

the act of the corporation, the foregoing instrument was signed in its

name by its _____President, sealed with its corporate seal and

attested by him as its ___*Asst*___Secretary.

     WITNESS my hand and official seal this the __1st__ day of

__February_____, 1966.

                _Gwen B. Sparrow_
                      NOTARY PUBLIC

My Commission Expires:

__May 23, 1967__

NORTH CAROLINA, BUNCOMBE COUNTY

The foregoing Certificate of _____

_____, a Notary Public or

of the County and State designated, duly authenticated
by his Notarial Seal thereto attached is adjudged to be
correct. Let the instrument and the certificates be
registered:

This _1st_ day ___Feb___ 1966

_____
Deputy Clerk

Registered _Feb 1 1966 at 3:20 pm_
_William E. Diggers_ By
         Register of Deeds _Mack L. Graham_
                         _Dep._

-4-

# Exhibit E

INDEX

| ARTICLE 1 | Premises |
|---|---|
| ARTICLE 2 | Definitions |
| ARTICLE 3 | Term |
| ARTICLE 4 | Rent |
| ARTICLE 5 | Payment of Taxes, Assessments, Etc. (Impositions) |
| ARTICLE 6 | Tenant's Personal Property |
| ARTICLE 7 | Use |
| ARTICLE 8 | Maintenance and Repairs |
| ARTICLE 9 | Tenant's Obligation to Construct Addition |
| ARTICLE 10 | Alterations |
| ARTICLE 11 | Compliance with Certificate of Occupancy Laws, Ordinances, Requirements of Public Authorities |
| ARTICLE 12 | Mechanics' Liens |
| ARTICLE 13 | Assignment, Subletting and Mortgaging |
| ARTICLE 14 | Insurance |
| ARTICLE 15 | Damage or Destruction |
| ARTICLE 16 | Condemnation |
| ARTICLE 17 | Default Provisions |
| ARTICLE 18 | Landlord's Right to Perform - Cumulative Remedies - Waivers - Tenant's Right to Cure Landlord's Default - Tenant's Deposits - Attornment - Miscellaneous |
| ARTICLE 19 | Excavation |
| ARTICLE 20 | Renewal Terms |
| ARTICLE 21 | Arbitration |

ARTICLE 22             Mortgages of the Fee

ARTICLE 23             Compliance with Fee Mortgage

ARTICLE 24             Surrender at End of Term

ARTICLE 25             Quiet Enjoyment

ARTICLE 26             Waiver of Trial by Jury

ARTICLE 27             Notices

ARTICLE 28             Covenants Binding

ARTICLE 29             Short Form Lease

ARTICLE 30             Broker

AGREEMENT made this 1st day of February, 1966, between MARTIN BRUCE and SYLVIA BRUCE of 9 Lake Road, Lake Success, New York, hereinafter referred to as "Landlord," and PATTON PLAZA ASSOCIATES, a partnership consisting of ROBERT SIEGEL of 40 Schenck Avenue, Great Neck, New York, and BERNARD L. NUSSINOW, of 24 Elm Street, Woodbury, New York, hereinafter referred to as "Tenant."

IN CONSIDERATION of the mutual promises, conditions and terms herein, the parties hereby agree as follows:

## ARTICLE 1

### Premises

The Landlord does hereby demise and lease to Tenant, and Tenant does hereby hire and take from Landlord the premises located at Patton Avenue and Louisiana Avenue, Asheville, North Carolina, and described in Schedule "A" attached hereto and made a part hereof. Said premises are hired and leased subject to the following:

(a) Any state of facts an accurate survey may show, including any changes in street lines now or hereafter to be made;

(b) Covenants, restrictions, reservations, easements, declarations, conditions, rights of way, agreements and consents of record;

(c) Party walls and party wall agreements, if any;

(d) Existing leases, contracts, agreements, including surveys and maintenance and union contracts, if any, the obligations of which Tenant hereby assumes and indemnifies Landlord from any claims or damages in connection therewith;

(e) Possible lack of title to any land, lying in the bed of any street upon which the premises fronts or abuts;

(f) Rights, if any, acquired by any utility company or municipality to maintain and operate lines, wires, cables, conduits, pipes, poles, distribution boxes, in, over and upon said premises;

(g)  Unpaid installments of any assessments due
     and/or accruing after the date hereof;

(h)  Liens and encumbrances of record;

(i)  Easements arising out of agreements and/or
     implication;

(j)  Unpaid taxes, sewer rent, water frontage and
     meter charges, building purpose charges, if
     any, and other municipal levies relating to the
     premises, fixed or unfixed;

(k)  Any state of facts a personal inspection would
     show;

(l)  Violations of local, municipal or state ordinances,
     orders or requirements; including lack of a per-
     manent certificate of occupancy;

(m) Building and zoning regulations, conditions and
     ordinances and amendments thereof;

(n)  Variations between record lines and fences and
     retaining walls, if any;

(o)  Encroachments of window sills, pipes, stoops,
     areas, cellar steps, trim, cornices, retaining
     walls, walks, coal chutes, cellar doors, sidewalk
     elevator, fences, fire escapes, projections, stone
     pilasters, tunnels, porticos, awnings, canopies, if
     any, upon, over or under any street or highway,
     or adjoining property;

(p)  Any and all consents by the present or any former
     owner of the premises for the erection or maintenance

11.

of any structure on, under or above any street
on which said premises may abut;

(q) Any and all rights of laws of municipal and other
governmental authorities and others to require the
removal of any vaults, coal chutes, tunnels,
ramps or other projections which may be beyond
the building lines;

(r) Condition of the premises and personalty as of
the closing of title;

(s) State of facts and title shown in Policy binder
of American Title Insurance Company of
current date, respecting the Demised Premises.

TO HAVE AND TO HOLD unto the Tenant, its successors and
permitted assigns for the term of this Lease as defined in Subdivision (d)
of Section 2.01.

1c

## ARTICLE 2

### Definitions

SECTION 2.01. The terms defined in this Article shall, for all purposes of this Lease and all agreements supplemental thereto, have the meaning herein specified unless the context otherwise requires.

(a) "Demised Land" shall mean the parcel of land described in Section 1.01.

(b) "Demised Premises" shall mean the Demised Land and the Building as defined in subsection (c) of this Article.

(c) "Buildings" shall mean and include the structure erected upon the Demised Land, all equipment, machinery, building fixtures, furniture, furnishings and appurtenances therein and thereto and all personal property of every kind and description, affixed or attached to, or used in connection therewith owned by Landlord (other than the property which may be removed by Tenant or Undertenant as permitted by the provisions of this Lease) and any and all other buildings, improvements and structures, equipment, machinery, building fixtures, furniture, furnishings, appurtenances and personal property (except as aforesaid) at any time placed upon the Demised Land, and any and all renewals and replacements thereof, additions thereto and substitutes therefor.

(d) "Term of this Lease" shall mean the initial
term and any and all renewals effected under
the provisions hereof.

(e) "Impositions" shall mean all taxes, assess-
ments, charges, rates and rents, charges for
public utilities, excises, levies, license and
permit fees and other charges, general and
special, ordinary and extraordinary, foreseen
and unforeseen, of any kind and nature whatso-
ever, which shall or may during the Term of
this Lease be assessed, levied, charged, con-
firmed or imposed upon or become payable out
of or become a lien on the Demised Premises or
any part thereof or the appurtenances thereto,
and such franchises, licenses and permits as
may be appurtenant to the use of the Demised
Premises, this transaction, or any documents to
which the Tenant is a party, creating or trans-
ferring an interest or an estate in the Demised
Premises; but shall not include any municipal,
state or Federal income taxes, assessed against
the Landlord, or any municipal, state or Federal
capital levy, estate, succession, inheritance, or
transfer taxes of the Landlord, or any franchise
taxes imposed upon any corporate owner of the fee
of the Demised Premises or any income, profits,
or revenue tax, assessment or charge imposed

upon the rent received as such by the Landlord under this Lease; provided, however, that if at any time during the Term of this Lease, the present method of taxation or assessment shall be so changed that there shall be substituted for the whole or any part of the taxes, assessments, levies, Impositions, or charges, now or here- after levied, assessed, or imposed on real es- tate and the improvements, a capital tax or other tax imposed on the rents received by the Landlord from said real estate or the rents reserved herein, or any part thereof, then all such capital taxes or other taxes shall, to the extent that they are so substituted, be deemed to be included within the term "Impositions" and to the extent that such capital tax would be payable if the Demised Prem- ises were the only property of the Landlord sub- ject thereto.

(f)  "Unavoidable Delays" shall mean delays due to strikes, lockouts, acts of God, inability to obtain labor, materials, government restrictions, enemy action, civil commotion, fire, unavoidable casualty or other similar causes beyond the control of the Tenant.

(g)  "Lending Institution" shall mean any national bank; state bank, savings bank; savings and loan associa- tion; life insurance company; corporate trustee;



health, welfare, educational or community

labor union fund, or eleemosynary organization

which is entitled to exemption from income tax

under the Internal Revenue Code.



ARTICLE 3

Term

SECTION 3.01.   The initial term of this [...]
period of thirty (30) years and shall commence on February [...]
shall terminate on January 31, 1996.

## ARTICLE 4

### Rent

SECTION 4.01. Tenant covenants and agrees to pay dur the Term of this Lease "basic annual rent" of One Hundred Eighte Thousand Six Hundred Twenty ($118,620.00) Dollars per annum, payable i equal monthly installments of Nine Thousand Eight Hundred Eighty-fi e ($9,885.00) Dollars, in advance on the first day of each month commencing on the first day of the Term of this Lease.

SECTION 4.02. Impositions and all costs, payments and charges which Tenant under any of the provisions of this Lease assumes or agrees to pay shall be deemed additional rent, and, in the event of nonpayment, Landlord shall have all the rights and remedies herein provided for in case of non-payment of rent.

SECTION 4.03. Tenant shall pay all Impositions provided for in Section 5.01 hereof, in the manner provided in Article 5 of this Lease, except that all Impositions for the fiscal year or tax year in which the initial term commences shall be apportioned as of the initial term rental commencement date.

SECTION 4.04. All costs, payments and charges which Tenant under any of the provisions of this Lease assumes or agrees to pay, shall be paid in the manner provided therefor in the particular Article, section or subsection of this Lease pertaining thereto.

SECTION 4.05. All payments of basic rent, additional rent, and other payments required to be made to Landlord, shall be in lawful money of the United States of America and shall be paid to Landlord at the address designated by Landlord in writing.

SECTION 4.06. This Lease shall be deemed and construed to

4a

be a net lease, and Tenant shall pay the Landlord absolutely net throughout

the Term of this Lease, basic rent, additional rent, and other payments

hereunder, free of any charges, assessments, Impositions or deductions

of any kind and without abatement, deduction or set-off other than those

herein expressly provided for, and under no circumstances or conditions

whether now existing or hereafter arising or whether beyond the present

contemplation of the parties, shall the Landlord be expected or required to

make any payment of any kind whatsoever or be under any obligation or

liability hereunder except as herein otherwise expressly set forth.

# ARTICLE 5

## Payment of Taxes, Assessments, Etc.

### (Impositions)

SECTION 5.01.  As additional rental during the initial term and
any renewal term hereunder, Tenant will pay or cause to be paid as and
when the same becomes due, all Impositions as defined in subsection (e) of
Section 2.01 hereof.

All Impositions for the fiscal year or tax year in the intial
term, wherein the rental commencement date takes place, as well as during
the year in which the Term of this Lease expires, shall be apportioned so
that Tenant shall pay its proportionate share of the Impositions which are
payable in the year in which the rental commencement date takes place and
in the year in which the term expires.

SECTION 5.02.  Tenant may, if it shall so desire, contest the
validity or amount of any such Imposition, in which event, Tenant may defer
the payment thereof during the pendency of such contest; provided that within
fifteen (15) days after the same shall have become due, Tenant shall have
deposited with the Landlord an amount sufficient to pay such contested item,
together with interest and penalties thereof (as reasonably estimated by
Landlord) which amount the Landlord shall apply to the payment of such item
when the amount thereof shall be finally fixed and determined and the Land-
lord shall receive instructions to that effect in writing from the Tenant.  In
lieu of cash deposited, Tenant may deliver to Landlord other security satis-
factory in form and negotiability to the Landlord.  Nothing herein contained,
however, shall be so construed as to allow such items to remain unpaid for
such length of time as shall permit the Demised Premises, or any part

5a

thereof, or the lien thereon created by such item to be sold by governmental or municipal authority for the non-payment of the same; and if at any time in the judgment of Landlord it shall become necessary or proper to do so, Landlord may apply the said monies so deposited with it, or so much thereof as may be required, to prevent the sale of the Demised Premises or any part thereof, or the lien created thereon by such item.  If the amount so deposited as aforesaid shall exceed the amount of such payment, the excess shall be paid to the Tenant, or in case there shall be any deficiency, the amount of such deficiency shall be forthwith deposited by Tenant with the Landlord, and if not so deposited, shall be payable as additional rent on demand, or at the option of the Landlord, with the next installment or any subsequent installments of basic rent hereby reserved and thereafter be-coming due and shall be collectible as rent.

SECTION 5.03.  The certificate, bill or statement issued or given by the appropriate officials authorized or designated by law to issue or give the same or to receive payment of any Imposition shall be prima facie evidence for all purposes of the existence, non-payment or amount of such Imposition.

SECTION 5.04.  Tenant may, if it shall so desire, endeavor at any time or times to obtain a lowering of the assessed valuation upon the Demised Premises for any tax year during the Term of this Lease for the purpose of reducing taxes thereon and, in such event, Landlord will, at the request of the Tenant and without expense to Landlord, co-operate with Tenant in effecting such a reduction.  Tenant shall be authorized to collect any tax refund payable as a result of any proceeding Tenant may institute for that purpose and any such tax refund shall be the property of Tenant to

the extent to which it may be based on a payment made by Tenant, subject,

however, to an apportionment between the Landlord and Tenant with respect

to taxes paid in the year in which the Term of this Lease ends, after deduct-

ing from such refund the cost and expenses, including legal fees, incurred

in connection with obtaining such refund.

SECTION 5.05.  Landlord shall not be required to join in any

action or proceeding referred to in Section 5.02 or Section 5.04 hereof

unless required by law or any rule or regulation in order to make such ac-

tion or proceeding effective, in which event, any such action or proceeding

may be taken by Tenant in the name of, but without expense to, Landlord.

Landlord, however, will co-operate to the extent necessary and supply such

data and execute such documents required for the purpose of obtaining a

decision thereon either through litigation, settlement, or otherwise.

## ARTICLE 6

### Tenant's Personal Property

SECTION 6.01.  Tenant shall maintain and keep the furniture, furnishings, fixtures and equipment and all other articles of personal property herein leased, or any personal property substituted therefor or any addition or any replacement thereto during the term hereof, in good physical condition and repair, and Tenant shall from time to time renew and replace the same to the end that at all times there shall be similar quantities and qualities of the same or similar items as herein leased and all of the terms of this Lease in connection with the representations and remedies of Landlord hereunder shall be applicable hereto.  At the election of the Landlord, an annual inventory of the furniture, furnishings, fixtures, equipment and all other articles of personal property shall be taken by the Landlord and Tenant or their agents or local representatives.  It is agreed that in lieu of the Landlord and Tenant making an inspection of the personalty as provided for herein, that upon the election of the Landlord, the Tenant shall submit to the Landlord a sworn statement that the quantity of the furnishings, furniture and equipment is not less than that in the Demised Premises at the time of the making of this Lease, or at last subsequent inventory.

SECTION 6.02.  Subject to the provisions of Article 9 hereof, the Tenant covenants that all of the furniture, furnishings and fixtures forming a part of or used in connection with the operation of the Demised Premises are the property of the Landlord, except the property of all occupying subtenants, and all replacements, additions and substitutions of the foregoing furniture, furnishings and fixtures made by the Tenant during the term hereof or any renewal term, shall become the property of the Landlord immediately upon installation.  The Tenant shall not remove or permit the removal from the Demised Premises of any of the

6a

property leased or any replacement or substitutions thereto made by the

Tenant, or any additions made hereto by Tenant during the Term of this

Lease, provided, however, that Tenant shall have the right, subject to the

terms of any mortgage to which this Lease is subject and subordinate, to

remove any of the personal property herein leased or any of the substitutions,

replacements or additions thereto, made by Tenant at any time and from

time to time, during the term hereof and any time during the term hereof and

any renewal term, on the condition that Tenant immediately replace said

personal property with personal property of similar quality and utility and

with an unencumbered equity, of at least equivalent value to the property

being replaced, title to which shall vest in Landlord immediately. Upon

demand, at any time and from time to time, Tenant shall execute and deliver

to Landlord bills of sale with affidavit of title to any and all personal prop-

erty placed by Tenant in the Demised Premises as aforesaid.

SECTION 6.03. Tenant shall not purchase any replacements or

additions of furniture, furnishings and equipment for the Demised Premises

upon conditional bills of sale or chattel mortgage.

6b

## ARTICLE 7

### Use

SECTION 7.01.  Tenant shall use and occupy the Demised
Premises as a shopping center and for such purposes as may be incidental
and accessory thereto, but are not detrimental to such main purpose.   Ten-
ant further covenants not to use or suffer said premises to be used at any
time for any dishonorable or immoral purposes.

7

## ARTICLE 8

### Maintenance and Repairs

SECTION 8.01.  Landlord shall not be required to furnish any service or facilities or to make any repairs or alterations in or to the Demised Premises, throughout the Term of this Lease, the Tenant hereby assuming the full and sole responsibility for the construction, operation, repair, replacement, maintenance and management of the entire Demised Premises.  Without limiting the foregoing the Tenant covenants at its own cost and expense to make any and all repairs or replacements, ordinary or extraordinary, structural or otherwise, seen or unforeseen, necessary to keep in good physical order and condition the Building or Buildings on the Demised Premises now standing, or hereafter erected, inside and outside, including, but not limited to, repairs to and replacements of foundations, walls, roofs, floors, ceilings, fire escapes, vaults, sidewalks, water and sewer connections, gas pipes, wires, conduits for electricity, fences and retaining walls.

## ARTICLE 9

### Tenant's Obligation to Construct Addition

SECTION 9.01.  Tenant covenants at its sole cost and expense
to erect and construct an addition to the existing K-Mart Building of at
least Forty Thousand (40,000) square feet, suitable for use as retail stores
of the same general design and quality of construction as said existing
Building to which said addition shall be annexed.

The construction of said addition shall be commenced on or before
August 1, 1967, and diligently prosecuted to completion, subject to
Unavoidable Delays as defined.  Tenant covenants to complete the con-
struction of said addition ready for occupancy of Tenants on or before
January 31, 1968.  In the event of Unavoidable Delays, Tenant's time to
complete the addition shall be extended an equal number of days as
elapsed during said Unavoidable Delay or Delays.

SECTION 9.02.  Before commencing construction of said
addition, Tenant shall deliver to Landlord:

(a)  The written consent of the holder of the fee mortgage to which
this Lease shall then be subordinate if the same be required under the
terms of said mortgage;

(b)  Copies of all required governmental permits and authorizations;

(c)  Copies of policies of insurance covering Workmen's Compensation-
covering all persons employed in the work, Comprehensive Public
Liability Insurance (including owned and non-owned vehicles)-covering
contractor, Protective Public Liability (including owned and non-owned
vehicles)-covering contractor, Tenant and Landlord, Property damage-

covering contractor, Protective Property Damage-covering co      :tor,

Tenant and Landlord, Automobile Property Damage (including    :d and

non-owned vehicles)-covering contractor, all of said insurance    imits no

less than the amounts provided in Article 14 of this Lease;

(d)  An executed counterpart of a contract between Tenant    i a

reputable and responsible general contractor containing a provis. n waiving

said general contractor's right to lien the Demised Premises, and provid-

ing for the completion of such addition for a fixed amount;

(e)  Surety company performance and payment bonds guarantying com-

pletion by the contractor enforceable by the Tenant or the Landlord as the

Tenant's assignee conditioned solely on the payment of the contract amount;

(f)  An assignment of said contract between Tenant and its general con-

tractor duly executed and acknowledged by Tenant by its terms to be effec-

tive upon termination of this Lease prior to the complete performance of

such contract.  Such assignment shall also include the benefit of payments

made on account of said contract including payments made prior to the

effective date of said assignment.

SECTION 9.03.  The addition to the existing Building to be

constructed by Tenant pursuant to the Terms of this Article shall be and

remain the property of the Tenant and shall not be deemed to be part of the

Demised Premises so long as Tenant is not in default of any of the terms or

conditions of this Lease.

In the event, however, that this Lease is terminated, or the Demised

Premises are repossessed by the Landlord by or as a result of Tenant's de-

fault of any of the terms or conditions of this Lease, said Building as defined

herein to include equipment, machinery, fixtures and appurtenances therein

and thereto and all personal property of the Tenant of any kind or description

affixed or attached to, or used in connection therewith shall be made and
remain the property of the Landlord, and title thereto in such event shall
pass to the Landlord without the necessity for the execution of any further
documents, and Landlord shall be entitled to recover possession thereof
together with possession of the Demised Land.

The Buildings as defined herein shall be and remain free and clear
of all liens and encumbrances, and the Landlord's right to repossess same
as part of the Demised Premises in the event of Tenant's default shall in
no way be impaired by the Tenant. Nothing contained herein shall be con-
strued to prevent the Tenant from mortgaging or assigning its leasehold and
the Building together therewith, pursuant to Article 13, provided the lease-
hold and the Building shall be and remain inseparable from one another and
subject to the terms and conditions hereof.

SECTION 9.04. Tenant acknowledges that Landlord has entered
into this Lease under the terms and conditions hereof relying upon Tenant's
covenant to fully and faithfully perform Tenant's obligations under this
Article, as well as all other obligations of Tenant under this Lease. The
parties agree that Tenant's failure to complete the addition to the existing
Building in accordance with the requirements of this Article would cause
substantial damage to Landlord in amounts difficult of immediate
determination. Landlord and Tenant hereby stipulate that Landlord's
liquidated damages for Tenant's failure to complete the addition in
accordance with Tenant's obligations under this Article and within
the time limitations fixed thereby shall be and are hereby fixed in the amount
of One Hundred Thousand ($100,000.00) Dollars which Tenant hereby
covenants and agrees to pay as additional rent.

9c

Upon payment by the Tenant to Landlord of said stipulated and liqui-
dated damages of One Hundred Thousand ($100,000.00) Dollars, the basic
annual rent shall thereafter be reduced by Eight Thousand Five Hundred
and Fifty ($8,550.00) Dollars, which reduction shall be apportioned on the
per diem basis to the date of payment of said stipulated and liquidated
damages.

9d

# ARTICLE 10

## Alterations

SECTION 10.01.  Tenant shall have the right to make changes or alterations to the Building on the Demised Premises without the consent of the Landlord, provided however, that no consent of the Landlord shall be required in the event that the change or alteration involves a cost not in excess of Ten Thousand ($10,000.00) Dollars provided further

(a)  That no change or alteration shall at any time be made, which shall impair the structural soundness or diminish the value of the Building on the Demised Premises, and

(b)  That no change or alteration shall be undertaken until Tenant shall have procured and delivered to Landlord the written consent of the holder of the fee mortgage to which this Lease is subordinate, if the same be required under the terms of the mortgage and

(c)  No change or alteration shall be undertaken until Tenant shall have procured and paid for all required governmental permits and authorizations, and

(d)  That all work done in connection with any change or alteration shall be done in a good and workmanlike manner and in compliance with all local laws and regulations and with the orders, rules and regulations of the Board of Fire Underwriters, or any other body now or hereafter constituted exercising similar functions and Tenant shall procure certificates of occupancy or other certificates if required by law, and

(e)  Copies of policies of insurance covering Workmen's Compensation covering all persons employed in the work, Comprehensive Public

10a

Liability Insurance (including owned and non-owned vehicles)-covering contractor, Protective Public Liability (including owned and non-owned vehicles)-covering contractor, Tenant and Landlord, Property damage-covering contractor, Protective Property Damage-covering contractor, Tenant and Landlord, Automobile Property Damage-(including owned and non-owned vehicles)-covering contractor, all of said insurance in limits no less than the amounts provided in Article 14 of this Lease.

(f) In the case of an alteration, change or addition involving a cost in excess of Ten Thousand ($10,000.00) Dollars, the Landlord may reasonably require, as a condition to its consent, a cash deposit in the amount of one hundred ten (110%) per cent of the estimated cost of said alteration, change or addition or, as an alternative to said cash deposit, a surety company payment bond in the same amount, together with a contract with a reputable and responsible builder in form assignable by Tenant to Landlord, providing for the completion of such alteration, change or addition for a fixed amount, which amount shall be no greater than said estimated cost, accompanied by:

1. An assignment of the contract so furnished, duly executed and acknowledged by Tenant, by its terms to be effective upon any termination of this Lease or the termination of any renewal, or upon Landlord's re-entry upon the premises following a default by Tenant and notices as herein provided, prior to the complete performance of such contract; such assignment shall also include the benefit of all payments made on account of said contract including payments made prior to the effective date of such assignment.

10b

ARTICLE 11

Compliance with Certificate of Occupancy Laws,

Ordinances, Requirements of Public Authorities,

SECTION 11.01.   Tenant shall not use or occupy the Demised
Premises nor permit anything to be done in or on the Demised Premises,
in whole or in part, in a manner which would in any way violate any
Certificate of Occupancy affecting the Demised Premises, or make void
or voidable any insurance then in force with respect thereto, and
shall not use or occupy or permit the Demised Premises to be used
or occupied in a manner which may violate any present or future laws,
regulations, ordinances, or requirements of the federal, state or
municipal governments, or of any departments, subdivisions, bureaus
or offices thereof, or of any other governmental, public or quasi-
public authorities now existing or hereafter created, having juris-
diction in the premises; provided, however, that Tenant may, in good
faith (and wherever necessary in the name of, but without expense to
Landlord) and after having secured the Landlord to its reasonable
satisfaction by cash or by a surety company bond in an amount, in a
company and in substance satisfactory to the Landlord, against loss
or damage, contest the validity of any such laws, regulations,
ordinances or requirements, and, pending the determination of such
contest may postpone compliance therewith, except that Tenant shall
not so postpone compliance therewith as to subject the Landlord to any
fine or penalty or to prosecution for a crime, or to cause the
Demised Premises or any part thereof to be condemned or to be
vacated, or to cause a breach or default in any of the provisions of
the fee mortgage to which this Lease is subject and subordinate,
unless said mortgagee agrees in writing to said postponement.

11

ARTICLE 12

Mechanics' Liens

SECTION 12.01.   Tenant will not create or permit to be created or
to remain and will discharge or bond any lien, encumbrances or charge
levied on account of any mechanics', or materialman's lien,
which might be or become a lien, encumbrance or charge upon the
Demised Premises, whether or not the work, labor and services or
materials furnished were performed or supplied prior to the commence-
ment of the term hereof.

SECTION 12.02.   If any such lien at any time be filed against
the Demised Premises Tenant within thirty (30) days after notice of
the filing thereof, or such shorter period as may be required by the
holder of any fee mortgage to which this Lease is subject and subordi-
nate, will cause the same to be discharged of record by payment,
deposit, bond, order of a court of competent jurisdiction or otherwise.
If Tenant shall fail to cause such lien to be discharged within the
period aforesaid then in addition to any other right or remedy
Landlord, without being obligated to do so may discharge the same
either by paying the amount claimed to be due or by procuring the
discharge of such lien by deposit or by bonding proceeding and in such
event Landlord shall be entitled, if Landlord elects, to compel the
prosecution of an action for the foreclosure of such lien by the lienor
and to pay the amount of the judgment in favor of the lienor with
interest, costs, and allowances.   Any amount so paid by Landlord and all
costs, expenses incurred by Landlord in connection therewith,

12a

together with interest thereon at the rate of six per cent (6%) per annum

from the respective dates of Landlord's making of the payment or

incurring of the cost and expense shall constitute additional rent payable

by Tenant under this Lease and shall be paid by Tenant to Landlord on

demand.   Nothing herein contained shall obligate the Tenant to pay

or discharge any lien created by Landlord.

SECTION 12.03.   Nothing in this Lease contained shall be

deemed or construed in any way as constituting the consent, request or

approval of Landlord, express or implied, by inference or otherwise to

anyone for the performance of any labor or services, the furnishing of

any materials for any improvement, alteration or repair of the Demised

Premises or any part thereof, nor as giving Tenant any right, power or

authority to contract for or permit the rendering of any services or

labor or the furnishing of any materials that would give rise to the

filing of any lien against the Demised Premises or any part thereof.

ARTICLE 13

Assignment, Subletting and Mortgaging

SECTION 13.01.   The Tenant or its successive assignees, may assign,
pledge, mortgage or transfer all of this Lease or its leasehold, together
with the addition to the existing Building as constructed by Tenant and re-
maining its property pursuant to Article 9 hereof, as inseparable from said
leasehold, or sublet all of the Demised Premises, without the consent of the
Landlord, provided, however, that the Tenant in so doing does not encumber
the Landlord's title to the Demised Premises.

Each assignee shall assume this Lease and shall be liable for the pay-
ment of the basic rent, Impositions and all costs, payments and charges
which Tenant under any of the provisions of this Lease assumes or agrees to
pay, and for the due performance of all the terms, covenants, conditions,
and agreements herein contained on Tenant's part to be performed for the
Term of this Lease so long as said assignee is the holder of said Lease.
No assignment shall be valid unless the assignee shall deliver to Landlord
an instrument in recordable form, or a counterpart thereof, which contains
a covenant of assumption by the assignee, as aforesaid, and a signed coun-
terpart of such assignment is delivered to the Landlord.   Upon any valid
assignment, the then assignor shall be deemed released and discharged
from further obligations under this Lease, and shall be liable only for rent
then due but unpaid and such defaults of which Tenant shall have been given
previous written notice, provided the assignee assumes all of the
obligations of the then assignor and all of the obligations of the Tenant un-
der this Lease.

It is specifically understood and agreed that neither party shall en-
force nor seek to enforce, any personal liability against any of the principals

13a

of the other party, the remedies of each party for collection of any claims to be limited to the entity which constitutes the then Landlord or the then Tenant.

SECTION 13.02.  Subject to the provisions of any fee mortgage to which this Lease may be subject and subordinate, if Tenant or Tenant's successors or assigns shall mortgage this leasehold in accordance with the foregoing provisions and to a Lending Institution as herein defined, and shall furnish Landlord with written notice thereof together with a duplicate original of the mortgage instrument within ten (10) days after the execution and delivery thereof, Landlord agrees that so long as any such leasehold mortgage shall remain unsatisfied of record, the following provisions shall apply:

(a)  There shall be no cancellation, surrender, acceptance of surrender, or modification of this Lease, without the prior consent in writing of the Leasehold Mortgagee;

(b)  Landlord shall, upon serving the Tenant any notice of default or any other notice under the provisions of or with respect to this Lease, simultaneously serve a copy of such notice upon the holder of such leasehold mortgage and no notice of such default shall be deemed to have been duly given unless and until a copy thereof has been served upon the Leasehold Mortgagee.  The Leasehold Mortgagee shall thereupon have ten (10) days more time than is given to the Tenant to remedy or cause to be remedied the defaults complained of, and Landlord shall accept such performance by or at the instigation of such Leasehold Mortgagee as if the same had been done by the Tenant;

(c)  For the purpose of this Article, no default on the part of the Tenant, in the performance of work to be performed, or acts to be done, or conditions to be remedied, shall be deemed to exist, if steps shall in

13b

good faith have been commenced promptly to rectify the same, and shall be prosecuted to completion with diligence and continuity;

(d) Anything herein contained notwithstanding, while such leasehold mortgage remains unsatisfied of record, if an event or events of default shall occur, which under any provision of this Lease shall occur, which under any provision of this Lease shall entitle Landlord to terminate this Lease, and if before the expiration of ten (10) days of the date of service of termination of said notice, such Leasehold Mortgagee shall have paid to Landlord all rent and additional rent and other payments herein provided for, and then in default, and shall have complied or shall engage in the work of complying with all of the other requirements of this Lease, if any, are then in default, then in such event Landlord shall not be entitled to terminate this Lease and any notice of termination theretofore given shall be void and of no effect;

(e) Landlord agrees that the name of the Leasehold Mortgagee may be added to the "Loss Payable Endorsement" of any and all insurance policies required to be carried by the Tenant hereunder and that (subject to the provisions of prior mortgages affecting the fee) Landlord will make all insurance and/or condemnation proceeds to which Tenant may be entitled hereunder, for purposes of restoration of the premises, available jointly to the Tenant and such Leasehold Mortgagee;

(g) In the event Tenant fails or neglects to exercise any of the renewal options contained in Article 20 of this Lease within the time limitations set forth therein, Landlord shall send the Leasehold Mortgagee the notice required to be sent under Article 20, and the Leasehold Mortgagee may exercise said option or options on behalf of Tenant.

13c

SECTION 13.03.   Tenant may sublet any part of the Demised Premises to an occupying subtenant without the written consent of the Landlord provided:

(a)   The annual rent payable by such subtenant shall be no less than the then market rental value thereof, and in any event no less than One and 50/100 ($1.50) Dollars per square foot, without monetary concessions of any kind.

(b)   The Term of said Lease shall be no more than ten (10) years.

(c)   Such sublease shall contain the following provision:

Tenant understands that the landlord herein is the tenant under a ground or underlying lease of the Demised Premises and that this lease is subject and subordinate to such underlying lease and any extensions or modifications thereof.   Tenant covenants and agrees that if by reason of any default upon the part of the landlord as tenant under such underlying lease, the latter is terminated by summary proceedings, voluntary agreement or through foreclosure by any fee or leasehold mortgagee, or otherwise, the Tenant herein will attorn to and recognize the Landlord under such underlying lease or to the purchaser at foreclosure sale in any such foreclosure proceeding, as the case may be, as Tenant's landlord under this lease. ~~unless the landlord under such underlying lease or the mortgagee in any such foreclosure proceeding shall elect in connection therewith, to terminate this lease~~ The Tenant further agrees to execute and deliver at any time upon request of the landlord or of any person, firm or corporation which shall succeed to the interest of the landlord as tenant under such underlying lease, any instrument to evidence such attornment.   The Tenant waives the provisions of any law now or hereafter in effect which may give Tenant any right of election to terminate this lease or to surrender possession of the premises demised hereby in the event any proceeding is brought by the Landlord under such underlying lease to terminate such underlying lease or in the event that any proceeding is brought by any mortgagee to foreclose any such mortgage.   Tenant further covenants and agrees that upon demand of any fee or leasehold mortgagee of the demised premises or, of any receiver in proceedings brought to foreclose any such mortgage to pay to the mortgagee or to such receiver as the case may be, all rent becoming due hereunder after such demand.

SECTION 13.04.   Subject to the terms and conditions of any fee mortgage to which this Lease is subject and subordinate, Landlord agrees that so long as such subtenant continues to pay the rent and observes and complies with the other terms, covenants, and conditions in such

13d

sublease provided, and shall not be in default under such sublease, Land-lord shall not abrogate or diminish any rights of such subtenant under such sublease, nor disturb such subtenant's right to possession and use and enjoyment of such sublease premises in the exercise by Landlord of Landlord's rights against Tenant.

SECTION 13.05. The Landlord shall, without charge and at any time, and from time to time, but not more frequently than once in any period of twelve calendar months, or in the event of a proposed bona fide sale, assignment or transfer of this Lease within thirty (30) days, at the request by Tenant, certify by written instrument duly executed, acknowledged, and delivered, whether the Tenant has or has not, as the case may be faithfully and fully made all payments then due to Landlord, and whether Landlord knows or does not know, as the case may be, of any default by Tenant in the performance by Tenant of all covenants, con-ditions and agreements on Tenant's part to be performed.

SECTION 13.06. Tenant shall, on demand, execute, acknowledge, and deliver to the Landlord, or any mortgagee, without charge, a duly executed recordable certificate certifying that the Lease is valid and existing and in full force and effect, and that neither the Tenant nor the Landlord at the time are in default under any of the terms of this Lease, if same be the fact.

SECTION 13.07. Subject to the prior rights of the holder of any mortgage to which this lease is or may be subordinate, Landlord here-by assigns to Tenant all the right, title and interest of the Landlord in and to all leases now in effect covering the demised premises, including the right to receive and collect the rents and profits therefrom, and Tenant assumes the performance of all of the obligations of the Landlord

13e

under all of such leases, and agrees to indemnify and hold the Landlord free and harmless against any claims of any tenants arising out of or relating to the said leases and the making thereof except for acts after the date hereof of the within named Landlord, its successors or assigns and their respective agents, servants or employees.

SECTION 13.08.   As additional security to the Landlord under this lease, the Tenant does hereby assign to Landlord, subject to any prior assignment that may be made to any holders of any mortgage or mortgages to which this lease is or may be subject and subordinate all the right, title and interest of the Tenant in and to all leases now in effect and hereafter covering all space now leased, or hereafter leased to the subtenants of the premises, including the right to receive and collect the rents and profits under all leases now or hereafter existing.   The assignment so made by the Tenant to the Landlord in this section is conditional only, and shall not become operative, absolute or in effect unless and until a default has occurred on the part of the Tenant as in this lease provided, and such default has not been cured, as in this lease permitted or not waived.   The Tenant shall not without the prior written consent of the Landlord with respect to any lease now in existence or any renewal or extension thereof of any space demised to any tenant, accept prepayment of rent prior to its due date in excess of one (1) month.

SECTION 13.09.   Tenant agrees to furnish Landlord with either a photostatic copy, or a copy certified to by Tenant as a true copy hereof of all subleases within thirty (30) days after the execution thereof.

SECTION 13.10.   Notwithstanding anything contained in this Lease, Tenant will not without the prior written consent of the Landlord, which

13f

Landlord covenants shall not be unreasonably withheld, and without the prior written consent of the holder of any mortgage to which this Lease is subordinate when required, in each instance obtained, enter into any agreement affecting any present or future occupancy lease which would reduce the rent, shorten the term, permit cancellation or surrender thereof (unless such cancellation or surrender takes place simultaneously with a new occupancy lease with a tenant of equal or better financial status and for a term and upon rentals not less favorable than the lease being cancelled or surrendered, provided such cancellation or surrender aforesaid is not in violation of the provisions of any mortgage to which this Lease is subordinate), or impair or threaten to impair the value thereof as security for the payment of the mortgage debt then due and owing to the holder of any mortgage to which this Lease is subordinate or accept prepayment of more than one month's rent payable thereunder.

SECTION 13.11.  Notwithstanding anything herein contained, any and all securities or deposits deposited by any subtenant shall be retained by Tenant, and Tenant guarantees the application thereof in accordance with and pursuant to the terms and provisions of the applicable subleases, and Tenant holds Landlord harmless in connection with any claim arising out of or in connection with same.  Upon any assignment of this lease, or a subletting of the premises, as an entirety, said Tenant prior thereto and as a condition to a valid assignment, subletting or conveyance, shall furnish to Landlord a verified statement of all deposits or securities deposited by any subtenant and thereupon Tenant shall turn over said securities or deposits to the assignee or sublessee of this lease, and in such event the Tenant shall be deemed released from all liability in con-

13g

nection with the said securities.

SECTION 13.12.   Tenant acknowledges that Landlord has not received any securities under any subleases in effect at the date hereof.

13h

## ARTICLE 14

### Insurance

SECTION 14.01. From and after the date of the commencement
of the Term of this Lease, Tenant shall, at Tenant's cost and expense
keep and maintain policies of:

(a) Fire and Lightning, with Extended Coverage and Vandalism and
Malicious Mischief endorsements attached, covering the Building
in amounts at all times sufficient to prevent the Landlord or Tenant from
becoming a co-insurer under the terms of the applicable policies, and in
no event less than the amount required by the holders of any first mortgage to
which this Lease may be subordinate, and no less than ninety (90%) per
cent of the ten full insurable value of the Building. Included in the coverage
of said policy shall be furniture, furnishings, fixtures, and equipment
constituting part of the Building as defined herein, together with
additions, substitutions, and replacements thereof. The term "full
insurable value" shall mean actual replacement value (exclusive of cost
of excavation, foundations and footings.) Such "full insurable value"
shall be determined from time to time (but not more frequently than once
in any thirty-six (36) calendar months) at the request of Landlord by one
of the insurers, or, at the option of Tenant, by an appraiser, engineer,
architect or contractor approved in writing the Landlord (which approval
shall not be unreasonably withheld) and paid by Tenant. In the event of
any change in the co-insurance requirements applicable to the Demised
Premises by the New York Fire Insurance Rating Organization or any similar
body, or by statute, the policies shall comply with such changes. The insurance

shall also contain a replacement clause, if the same may be obtained for a reasonable increased premium.

(b)  Fire and Lightning, with Extended Coverage Endorsement attached, covering the Rental Value of the Demised Premises in an amount equal to the total of one (1) year's gross rent of the Demised Premises and one (1) year's impositions, insurance premiums and mortgage amortization and interest payments for which the Tenant is responsible to pay under the Terms of this Lease.

(c)  Comprehensive General Liability including Elevator Liability and Garage Keepers Legal Liability, if a garage is maintained on the premises, extended by the "Occurrence" and Personal Injury Endorsements, subject to liability limits of $500,000.00 ~~$1,000,000.00~~ per person and $1,000,000.00 per occurrence for Personal Injury and $1,000,000.00 per accident and $25,000.00 aggregate for Property Damage.

(d)  Boiler and Machinery covering all Steam Boilers or other types of Fired and Unfired Pressure Vessels, Air Conditioning Systems, etc., in use in the leased premises, subject to a limit of $1,000,000.00 per accident, and extended to also provide Use and Occupancy Coverage with adequate amounts of monthly indemnity for loss of gross rental income due to the occurrence of an insured peril.

(e)  Comprehensive Glass Coverage on any large exposures of plate glass in the Demised Premises, except the K-Mart premises.

(f)  Water Damage Insurance, subject to a limit of $100,000.00 per accident and Water Damage Legal Liability Insurance, subject to a liability limit of $100,000.00 per accident.

(g)  If a Sprinkler System is in use in the leased premises, Sprinkler

Leakage Insurance, subject to a limit of $100,000.00 per accident and Sprinkler Leakage Liability Insurance, subject to a liability limit of $100,000.00 per accident.

(h) War Damage Insurance, when obtainable and if required by the Landlord in an amount at least equal to eighty (80%) per cent of the "full insurable value" of the Demised Premises.

(i) Other insurance and in such amounts as may from time to time be reasonably required by Landlord against insurable hazards which, from time to time, are commonly insured against in the case of premises similarly situated, due regard being given to the nature of improvements on the Demised Premises and consturction, use and occupancy, and if by reason of changed economic conditions the insurance amounts referred to in this Lease shall become inadequate, Tenant shall increase the amounts of such insurance carried;

All premiums on all policies of insurance referred to in this Lease shall be paid by the Tenant as "additional rent" at least ten (10) days prior to the due date for the payment of such premiums.  The originals of all such policies shall be delivered to the Landlord, except when such originals are required to be held by the holder of the fee mortgage to which this Lease may be subordinate, in which case, copies or certificates of insurance shall be sent to the Landlord.

All policies of insurance shall not be pledged or encumbered and are to be written for a period of at least one (1) year in advance, provided that if the policies be of a longer term, Tenant may pay premiums under such policies to the insurance company in no less than in equal annual installments over the term of said policies.  All insurance shall be written

14.

by such responsible companies as are reasonably acceptable to the Land-lord and in any event acceptable to the holder of any fee mortgage on the Demised Premises to which this Lease is or may be subject and subordinate, and the original policies shall be at all times held by Landlord or, when required by the holder of any such fee mortgage to be held by such mortgagee, copies or certificates of such policies shall be delivered by Tenant to Landlord.

All insurance policies required by this Article shall be carried in favor of Landlord and Tenant, as their respective interests may appear, and, in the case of insurance against damage to the Demised Premises by fire or other casualty, shall also include the interest of any holder of any fee mortgage to which this Lease is or may be subject and subordinate. The proceeds of fire insurance or other casualty insurance policy as may be carried pursuant to the subsections hereof, shall be payable pursuant to the provisions of Article 15 hereof, subject, however, at all times to the terms and requirements of any fee mortgage to which this Lease is or may be subject and subordinate. Rent insurance proceeds are hereby assigned to Landlord to be held by Landlord as security for the payment of rent, im-positions, insurance premiums, mortgage amortization and interest and addi-tional rent until restoration of the Demised Premises by Tenant. Tenant shall observe and comply with the requirements of all policies at any time in force with respect to the Demised Premises. Each policy of insurance or certificate therefor required to be supplied by Tenant pursuant to this Lease shall contain an agreement by the insurer that such policies shall not be cancelled without at least ten (10) days' prior written notice to the Landlord or any mortgagee to whom a loss thereunder may be payable. Tenant shall

14d

not take out separate insurance concurrent in form or contributing in the
event of loss with that required by this Lease, unless the Landlord is included
therein with the insured loss payable as in this Lease provided.  Tenant
shall immediately notify Landlord of the taking out of any such separate in-
surance and shall cause the same to be delivered as in this Lease herein-
before required.

14e

ARTICLE 15

Damage or Destruction

SECTION 15.01.  If, at any time during the Term of this
Lease, the Demised Premises or any part thereof shall be damaged or
destroyed by fire or other casualty of any kind or nature, ordinary or
extraordinary, foreseen or unforeseen (~~and if this Lease shall not have been~~
~~cancelled as in Section 15.02 provided~~), Tenant, at its sole cost and ex-
pense, and whether or not the insurance proceeds, if any, shall be sufficient
for the purpose, shall proceed with reasonable diligence (subject to a rea-
sonable time allowance for the purpose of adjusting such loss and to Un-
avoidable Delays) to repair, alter, restore, replace or rebuild the same as
nearly as possible to its value, condition and character immediately prior
to such damage or destruction, subject to such changes or alterations as the
Tenant may propose, provided that the Landlord approves same in accord-
ance with the provisions of Article 10. Such repairs, alterations, restora-
tion, replacement or rebuilding, including such changes and alterations as
aforementioned and including temporary repairs or the protection of other
property pending the completion of any thereof, are sometimes referred to
in this Article as the "Work."

SECTION 15.02.  Subject to the terms of any fee mortgage to
which this Lease is or may be subject and subordinate, which shall prevail,
Landlord agrees to pay over to Tenant, from time to time, upon the follow-
ing terms, any monies which may be received by Landlord as a consequence
of such damage or destruction from the policies of insurance provided for in
Article 14, but in no event to any extent or in any sum exceeding the amount
actually collected by the Landlord upon the loss; provided, however, that

15a

the Landlord before paying or causing the payment of such monies to the
Tenant shall be entitled to reimburse itself therefrom to the extent, if any,
of the necessary and proper expenses paid or incurred by Landlord in the
collection of such monies.  Landlord shall pay or cause to be paid to Tenant
as hereinafter provided, the aforesaid insurance proceeds for the purpose
of repairs or restorations of the Demised Premises.  Prior to the making
of any repair Tenant shall furnish Landlord with an estimate of cost of any
such Work prepared by a licensed architect approved by the Landlord, which
approval will not be unreasonably withheld, and such insurance proceeds
received by the Landlord shall be paid to Tenant from time to time thereafter
in installments as the making of such Work progresses upon application to be
submitted by the Tenant showing the cost of labor and materials incorporated
in such Work, or incorporated therein since the last previous application
and paid for by the Tenant.  If any mechanic's lien is filed against the
Demised Premises the Tenant shall not be entitled to receive any further
installment until such lien is satisfied or otherwise discharged.  The amount
of any installment to be paid to Tenant shall be such proportion of the total
insurance monies received by Landlord as the cost of labor and materials
theretofore incorporated by Tenant in such Work, or incorporated therein
since the payment of the last previous installment bears to the total estimated
cost of such Work less twenty (20%) per cent on the installment to be paid.
Upon completion of and payment for such Work by Tenant the insurance
proceeds then being retained by Landlord shall be paid over to Tenant.

In the event of any loss, damage or destruction and the cost of repairs
to the premises exceeds Ten Thousand ($10,000.00) Dollars in the aggregate
the Tenant agrees at least ten (10) days before the commencement of any

15b

Work or any demolition of any building or buildings, now or hereafter

erected upon the Demised Premises or before the commencement of any

Work necessary to repair and restore any building, now or hereafter

erected on the Demised Premises, which shall be partially or wholly

damaged or destroyed by fire or other casualty, risk or hazard, or before

the commencement of any Work necessary to repair, alter or renew any

building now or hereafter erected on the premises, or any part thereof,

that the Tenant shall furnish to the Landlord the following:

(a) complete plans and specifications for the demolition, construction,

repair, replacing, renewing or altering of said building and improve-

ments, as the case may be, prepared by an architect whose qualifications

shall meet with the reasonable satisfaction of Landlord and which plans

and specifications shall meet with the reasonable approval of the Land-

lord together with the approval thereof by any governmental board,

bureau or body then exercising jurisdiction, with regard to such Work,

plans and specifications, which plans and specifications shall be and

become the sole and absolute property of Landlord in the event that for

any reason this Lease and any renewals thereof shall for any reason

terminate;

(b) a fixed sum contract in assignable form made with a reputable

and responsible builder, providing for the erection, completion and

terms of payment for all Work, labor and materials necessary to

construct and complete the new building and improvements depicted in

said plans and specifications; and

(c) an assignment of the contract so furnished, duly executed and

acknowledged by Tenant, by its terms to be effective upon any termina-

15c

tion of this Lease or the termination of any renewal, or upon Landlord's

re-entry upon the premises following a default by Tenant and notices as

herein provided, prior to the complete performance of such contract;

such assignment shall also include the benefit of all payments made on

account of said contract including payments made prior to the effective

date of such assignment;

(d) such repairs or restorations shall be made in accordance with

such plans and specifications and any applicable law, statute, ordinance,

regulation or requirement, federal, state, county or municipal;

(e) during the course of any alterations, restoration or reconstruction

of the Demised Premises, the Tenant will carry for the protection of the

Landlord protective liability, workmen's compensation and property

damage insurance in such amounts as may from time to time be reasonably

required by the Landlord, and such other insurance as is required under

Article 9.02 hereof.

(f) Notwithstanding anything herein contained, the Tenant shall comply

with any requirements imposed by the holder of any fee mortgage to

which this Lease is or may be subject and subordinate.

In the event of any loss, damage or destruction to the premises

by fire or other casualty of any kind or nature, ordinary or extraordinary,

the Tenant, at its sole cost and expense, shall adjust, negotiate, compromise

and/or litigate all claims resulting therefrom against the insurance company

subject to the provisions of any fee mortgage to which this Lease is subject

and subordinate, provided, however, that the Tenant shall not settle any

loss with the insurance carrier for any damage exceeding a cost of repair

or restoration of ~~Five Thousand ($5,000.00)~~ Ten Thousand ($10,000.00) Dollars, without consent of Land-

lord, which consent shall not be unreasonably withheld.

15d

SECTION 15.03.  In no event shall Tenant be entitled to any abatement, allowance, reduction or suspension of rent because part or all of the Demised Premises shall be untenantable owing to the partial or total destruction thereof, and anything herein to the contrary, no such damage or destruction shall affect in any way the obligation of Tenant to pay the rent, additional rent and other charges herein reserved or required to be paid, nor release Tenant of or from any obligation imposed upon Tenant under this Lease.  Section 227 of the Real Property Law of the State of New York and its equivalent provisions in any other state's laws are hereby waived by Tenant.

SECTION 15.04.  In the event that the holder of any mortgage to which this Lease is or shall be subject and subordinate, shall elect to apply any insurance proceeds paid by the insurers, in reduction of the principal of such mortgage, then Landlord shall have a period of ninety days thereafter within which to replace the amount so applied by such mortgagee, through refinancing or otherwise.  In the event that Landlord does not so replace said amount within said period of ninety days then Tenant shall have the right to obtain a commitment for refinancing of the leasehold and/or fee of the Demised Premises, the proceeds of which, after payment of all origination costs and amounts required to satisfy prior liens, will equal or exceed the amount originally required to be replaced by Landlord, as aforesaid.  Provided said commitment is obtained from a Lending Institution, as defined herein, and the required payments of interest and amortization to be made on said proposed mortgage do not exceed the payments required under the then existing mortgage, Landlord shall execute all instruments and do all things necessary in order to close said proposed mortgage.  Upon said mortgage closing, the proceeds thereof

156

necessary to replace the amount previously applied by a prior mortgagee in
reduction of principal, shall be paid over and applied for repairs and
reconstruction in accordance with the provisions of this Article 15 and the
balance shall be the property of the Landlord. Nothing in this Section 15.04
shall alter or diminish Tenant's complete obligation to repair, alter, install,
replace and rebuild as provided in Section 15.01.

SECTION 15.05. In the event the holder of any mortgage to
which this Lease is or shall be subject and subordinate shall apply insurance
proceeds in reduction of the principal of such mortgage, Tenant shall pro-
ceed to reconstruct, but shall not be required to deliver a cash deposit or
unqualified completion bond until such amounts are replaced by refinancing.

## ARTICLE 16

### Condemnation

SECTION 16.01. If, at any time during the Term of this Lease, or of any renewal hereof, title to the whole or substantially all of the Demised Premises shall be taken in condemnation proceedings or by any right of eminent domain, this Lease shall terminate and expire on the date of such taking and the rent and additional rent reserved shall be apportioned and paid to the date of such taking.

In the event of such taking of all or substantially all of the Demised Premises after commencement of this term, the award or awards shall be apportioned between the Landlord and Tenant as follows:

(1) There shall be first paid to Landlord any and all reasonable fees and expenses incurred in collecting the award or awards;

(2) There shall be next paid to the Landlord the sum of One Million Five Hundred Thousand ($1,500,000.00) Dollars, out of which Landlord shall pay any principal balance of any fee mortgage to which this Lease shall then be subject and subordinate;

(3) There shall be next paid to Tenant, after payment of the foregoing amounts, the amount equal to the original the sum of the leasehold mortgage, which Tenant shall have placed against its leasehold simultaneously with or immediately following completion of the addition to be constructed by Tenant at Tenant's cost and expense pursuant to Article 9 hereof;

(4) The balance of any award or awards as aforesaid shall be divided between the Landlord and Tenant as follows:

Tenant shall receive a sum equal to 50 per cent of such balance reduced by 1/99th for each year that has elapsed from the date hereof to the date of taking, and the remainder of the reward shall be paid over to Landlord;

l̃áo

(5) In the event of a condemnation as provided herein, the Tenant hereby waives all claim for any value of its leasehold or Lease and the right to a separate award.

SECTION 16.02.  In the event of any taking in condemnation of less than the whole or substantially all of the Demised Premises, the Term of this Lease and its provisions shall not be reduced or affected in any way, and the parties shall be entitled to receive such award or awards as their respective interests in the Demised Premises shall entitle them.  In the event that said proceedings shall not result in separate awards to Landlord and Tenant, the single award in such case shall be divided between Landlord and Tenant in accordance with arbitration to be held pursuant to Article 21 hereof.

SECTION 16.03.  Tenant shall have the right to appear and participate in any condemnation proceedings by counsel of Tenant's own choice and at Tenant's own separate expense.

SECTION 16.04.  In the event of any taking in condemnation of less than the whole or substantially all of the Demised Premises but resulting in a partial demolition of any Building on the Demised Land, Tenant shall, at its sole cost and expense, restore the remaining part of such Building to substantially its former condition to the extent that the same shall be feasible and so as to constitute a complete Building.

SECTION 16.05.  If, at any time during the Term of this Lease, the whole or part of the Demised Premises shall be taken in condemnation proceedings or by any right of eminent domain for a temporary use or occupancy, the Term of this Lease shall not be reduced or affected in any way and tenant shall continue to pay in full the basic rent, additional rent and other charges herein provided for, in the manner and at the times herein

16b

specified.  In the event of any such taking as in this Section 16.05 referred

to, Tenant shall be entitled to appear, claim, prove and receive the entire

award for such taking including the cost of restoration of the Demised Prem-

ises.  In the event that the award payable to the Tenant for use and occu-

pancy shall be for a period which includes all or part of the Term not then

renewed, the portion of the award applicable to the term not then renewed,

shall belong to Tenant only if such term shall be renewed by Tenant, pur-

suant to the Terms of this Lease, but if such term shall not be renewed,

Landlord shall be entitled to that portion of the award representing the term

not renewed when the time for exercise of the option of renewal shall have

expired.

SECTION 16.06.  The portion of the award in such temporary

taking received by Tenant for restoration of the Demised Premises shall be

retained by the Tenant only on condition that the Tenant shall, without undue

delay, obtain, repossess and proceed to restore the same as nearly as may

be reasonably possible to the condition in which the Demised Premises were

immediately prior to such taking, with such changes and alterations as Ten-

ant may elect to make.

16c

ARTICLE 17

Default Provisions

SECTION 17.01.  (a)  Whenever Tenant shall default in the payment of any installment of rent or of any other sum payable by Tenant to Landlord herein, or of any Imposition required to be paid by Tenant, when and as the same shall become due and payable and such default shall continue for a period of five (5) days; or

(b)  Whenever Tenant shall do or permit anything to be done, whether by action or inaction, contrary to any covenant or agreement on the part of Tenant herein contained or contrary to any of the covenants, agreements, terms or provisions of this Lease, or shall fail in the keeping or performance of any of the covenants, agreements, terms or provisions contained in this Lease (which on the part or behalf of Tenant are to be kept or performed other than those referred to in the foregoing subsection (a) of this section), and Tenant shall fail to commence to take steps to remedy the same within twenty (20) days after Landlord shall have given to Tenant written notice specifying the same, or having so commenced shall thereafter fail to proceed diligently to remedy the same; or

(c)  Whenever at any time during the Term hereby demised or any renewal, there shall be filed by Tenant in possession, in any court pursuant to any statute either of the United States or any state, a petition in bankruptcy or insolvency or for reorganization, or for the appointment of a receiver or trustee of all or a portion of Tenant's property, or if the Tenant in possession makes an assignment for the benefit of creditors or petition for entry into an arrangement; or

(d)  Whenever at any time during the term hereby demised or any renewal, there shall be filed against Tenant in possession in any court

17a

pursuant to any statute either of the United States or of any state, a petition

in bankruptcy or insolvency or for reorganization or for appointment of re-

ceiver or trustee of all or a portion of Tenant's property, and if within

ninety (90) days after the commencement of any such proceeding against

said Tenant the same shall not have been dismissed; or

(e) The Demised Premises shall be abandoned by the Tenant or

shall become vacant for more than thirty (30) days during the term; or

(f) an execution or attachment shall be issued against the

Tenant in possession and such execution or attachment shall not be vacated

or removed by court order, bonding or otherwise, within a period of sixty

(60) days after the issuance thereof;

then regardless of and notwithstanding the fact that Landlord has or may

have some other remedy under this Lease or by virtue hereof, or in law or

in equity, Landlord may give to Tenant a notice of intention to end the Term

of this Lease specifying a date not less than five (5) days thereafter and,

unless the default complained of is cured within said five-day period, this

Lease and the term and estate hereby granted shall expire and terminate

upon the day so specified in the notice as fully and completely and with the

same force and effect as if the day so specified were the date hereinbefore

fixed for the expiration of the Term of this Lease and all rights of Tenant un-

der this Lease shall expire and terminate, but Tenant shall remain liable

for damages as hereinafter provided.

SECTION 17.02.  Upon any such termination or expiration of

this Lease, Tenant shall peaceably quit and surrender the Demised Prem-

ises to Landlord, and Landlord may without further notice enter upon, re-

enter, possess and repossess itself thereof, by force, summary proceedings,

ejectment or otherwise, and may dispossess and remove Tenant and all

other persons and property from the Demised Premises and may have, hold

and enjoy the Demised Premises and the right to receive all rental and other

income of and from the same.

SECTION 17.03.   Tenant in the event of the expiration or ter-

mination of this Lease or of re-entry by Landlord, under any of the pro-

visions of this Article 17 or pursuant to law, by reason of default hereunder

on the part of the Tenant, shall pay to Landlord, as damages at the election

of Landlord, either:

(a)  a sum which at the time of such termination of this Lease or

at the time of any such re-entry by Landlord, as the case may be, repre-

sents the excess, if any, of

(i)   the aggregate rent which would have been

payable by Tenant for the period commencing with

such earlier termination of this Lease or the date

of any such re-entry, as the case may be, and ending

with the date of expiration of the Term of this Lease

had this Lease not so terminated or had Landlord

not so re-entered the premises, over

(ii)  the aggregate rental value of the premises

for the same period, or

(b)  sums equal to the rent which would have been payable by

Tenant had this Lease not so terminated, or had Landlord not so re-entered

the premises, payable upon the rent days specified herein following such

termination or such re-entry and until the date of expiration of the Term of

this Lease, provided, however, that if Landlord shall relet the premises

during the said period, which Landlord shall use its best efforts to do so,

17c

by actively offering the same for rent in order to mitigate damages, Land-
lord shall credit Tenant with the net rents, if any, received by Landlord
from such reletting, such rents to be determined by first deducting from the
gross rents as and when received by Landlord from such reletting the ex-
penses incurred or paid by Landlord in terminating this Lease or of re-
entering the premises and of securing possession thereof as well as the ex-
penses of reletting, including altering and preparing the premises for new
tenants, brokers' commission, and all other expenses properly chargeable
against the premises and the rental therefrom; but in no event shall Tenant
be entitled to receive any excess of such net rents over the sums payable by
Tenant to Landlord hereunder.

Suit or suits for the recovery of such damages, or any install-
ments thereof, may be brought by Landlord from time to time at Landlord's
election, and nothing contained herein shall be deemed to require Landlord
to postpone suit until the date when the Term of this Lease would have ex-
pired if it had not been terminated under the provisions of this Article 17 or
under any provisions of law, or had Landlord not re-entered the premises.

Nothing herein contained shall be construed as limiting or pre-
cluding the recovery by Landlord against Tenant of any damages to which
Landlord may lawfully be entitled in any case other than those particularly
provided for above.

SECTION 17.04.  Tenant hereby expressly waives the service of
any notice of intention to re-enter provided for in any statute, or of the in-
stitution of legal proceedings to that end, and Tenant waives for and on be-
half of itself and all persons claiming through or under said Tenant, includ-
ing any assignee or creditor of Tenant, any and all right of redemption or
re-entry or re-possession or to restore the operation of this Lease in case

174

Tenant shall be dispossessed by summary proceedings, by a judgment or by

a warrant of any court or judge or in any case of re-entry or re-possession

by Landlord or in case of any expiration or termination of this Lease.

SECTION 17.05.  The words "enter", "entry", "re-enter" or

"re-entry" are not restricted to their technical legal meaning.

SECTION 17.06.  If this Lease shall be terminated as provided

in this Article 17 or by summary proceedings, Landlord shall be entitled to

retain and set off against its damages any monies being held as deposits, and

all insurance policies shall continue until their expiration date unless sur-

rendered and cancelled by the Landlord; in the event said insurance policies

are surrendered and cancelled by the Landlord, the Landlord shall be en-

titled to retain and set off against its damages any refund and/or return

premiums and Tenant waives all right or claim to same.

17-

## ARTICLE 18

Landlord's Right to Perform - Cumulative Remedies -
Waivers - Tenant's Right to Cure Landlord's Default -
Tenant's Deposits - Attornment - Miscellaneous

SECTION 18.01.  If Tenant shall fail to pay any Imposition or
make any other payment required to be made under this Lease or shall de-
fault in the performance of any other covenant, agreement, term, provision,
or condition herein contained, Landlord, without being under any obligation
to do so and without thereby waiving such default, may make such payment
and/or remedy such other default for the account and at the expense of Ten-
ant, immediately and without notice in the case of emergency, or in any
other case only provided Tenant shall fail to make such payment or remedy
such default with reasonable dispatch after Landlord shall have notified
Tenant in writing of such default.  Bills for any expense incurred by Land-
lord in connection therewith may be sent by Landlord to Tenant monthly, or
immediately, at the Landlord's option, and shall be due and payable in ac-
cordance with the terms of said bills and if not paid when due the amount
thereon shall immediately become due and payable as additional rent under
this Lease, and when paid by Tenant to Landlord shall constitute Tenant's
cure of such default.

SECTION 18.02.  Landlord may restrain any breach or threat-
ened breach of any covenant, agreement, term, provision or condition herein
contained, but the mention herein of any particular remedy shall not pre-
clude Landlord from any other remedy Landlord might have, either in law
or in equity.  The failure of Landlord to insist upon the strict performance
of any one of the covenants, agreements, terms, provisions or conditions of
this Lease or to exercise any right, remedy or election herein contained or
permitted by law shall not constitute or be construed as a waiver or re-
linquishment for the future of such covenant, agreement, term, provision,

condition, right, remedy or election, but the same shall continue and re-
main in full force and effect.  Any right or remedy of Landlord in this Lease
specified or any other right or remedy that Landlord may have at law, in
equity or otherwise upon breach of any covenant, agreement, term, provi-
sion or condition in this Lease, contained upon the part of Tenant to be
performed, shall be distinct, separate and cumulative rights and remedies
and no one of them, whether exercised by Landlord or not, shall be deemed
to be in exclusion of any other.  No covenant, agreement, term, provision
or condition of this Lease shall be deemed to have been waived by Landlord
unless such waiver be in writing, signed by Landlord or Landlord's agent
duly authorized in writing.  Consent of Landlord to any act or matter must
be in writing and shall apply only with respect to the particular act or mat-
ter to which such consent is given and shall not relieve Tenant from the ob-
ligation wherever required under this Lease to obtain the consent of Land-
lord to any other act or matter.  Receipt or acceptance of rent by Landlord
shall not be deemed to be a waiver of any default under the covenants,
agreements, terms, provisions and conditions of this Lease, or of any
right which Landlord may be entitled to exercise under this Lease.

SECTION 18.03.  If the Landlord commences any action or pro-
ceedings against the Tenant prior to any default being remedied by Tenant,
all sums paid by the Landlord for expenses of any such action or proceeding
including reasonable counsel fees, shall be paid by Tenant to Landlord on
demand and may be collectible by the Landlord as rent hereunder.

SECTION 18.04.  The Tenant shall and will indemnify and save
harmless the Landlord of and from any and all liability, loss, damage or
expense, causes of action, suits, claims and judgments, including reason-
able legal expenses in connection with defending against any such action,

18b

suit or claim (whether or not such action, suit or claim is covered by in-
surance) arising from injury to persons or property of any and every nature,
or from loss of life sustained in or about the said Demised Premises and
the Buildings and improvements, thereof, or in or upon the sidewalks, vaults,
or streets in front of or appurtenant thereto by any person or persons what-
ever, and for any matter or thing growing out of the occupation of the De-
mised Premises, or any part thereof, or arising or growing out of the use,
occupation, management or possession of the Demised Premises, or of any
Building thereon, or any part thereof, or of the vaults, or sidewalks adja-
cent thereto, occasioned by the Tenant, its agents, employees or occupants
of any part of the Demised Premises, or by their agents, or employees,
respectively, or which may be occasioned by any person or thing whatsoever
or which may be caused by the operations of any municipal or governmental
authorities or of any of their departments, bureaus, etc., in the construc-
tion of any public work.

      The Landlord shall not be liable for any personal injuries or
damage to the Tenant or its officers, agents and employees or to any other
persons or to any occupant of any part of the Demised Premises, or for any
injury or damage to any goods, wares, merchandise or property of the Ten-
ant or of any occupant of any part of the said Demised Premises, irrespec-
tive of how the same may be caused, whether from action of the elements or
acts of negligence of the owner or occupants of the adjacent properties.

      SECTION 18.05.  The Tenant accepts the Buildings, improve-
ments, and personalty on the Demised Premises in their present condition
and without any representation or warranty by the Landlord as to the condition
of said Buildings or as to the use or occupancy which may be made thereof,
and the Landlord shall not be responsible for any latent defect or change of

18c

condition in the Buildings and personalty and the rent hereunder shall in no

case be withheld or diminished on account of any defect in the Buildings, nor

for any damage occurring thereto, nor because of the existence of any vio-

lations in any Municipal Departments.

SECTION 18.06. (a) Tenant shall permit Landlord or the hold-

ers of any mortgages affecting the Demised Premises to which this Lease is

subordinate, or its or their agents, to enter the Demised Premises at all

reasonable times during usual business hours for the purpose of inspection

of both the Demised Premises and the equipment, furniture and furnishings

therein; and

(b) Tenant shall permit Landlord or its agents to enter the

Demised Premises at all reasonable times for the purpose of making any

necessary repairs to the Demised Premises and performing any necessary

work therein that may be required by reason of Tenant's failure to make any

such repairs or perform any such work or to commence the same. Nothing

herein shall imply any duty upon the Landlord to do any such work which

under any provision of this Lease Tenant may be required to perform, and

the performance thereof by Landlord shall not constitute a waiver of Tenant's

default in failing to perform the same. In case of the neglect or default of

the Tenant in making any such repairs after notice as provided under this

Lease, the Landlord may do so during the term hereby granted or after its

expiration and all the costs and expenses consequent thereon with interest

thereon shall be repaid by the Tenant to the Landlord as additional rent. The

receipted bills of the mechanics or contractors employed by the Landlord

showing the payment by the Landlord for the making of such repairs, altera-

tions or improvements shall be prima facie evidence of the reasonableness

of such charges therefor, and that the same have been paid by the Landlord,

and when paid by Tenant to Landlord shall constitute Tenant's cure of such

default.

18-1

Landlord shall not in any event be liable for inconvenience, annoyance, disturbance, loss of business or other damage to Tenant by reason of making such repairs or the performance of any such work in the Demises Premises, or on account of bringing materials, supplies and equipment into or through the Demised Premises during the course thereof, and the obligations of Tenant under this Lease shall not thereby be affected in any manner whatsoever.

SECTION 18.07. Landlord shall have the right to enter the Demised Premises at all reasonable times during usual business hours for the purpose of showing the same to prospective purchasers thereof, and at any time within twenty-four (24) months prior to the expiration of the Term of this Lease (unless Tenant shall have given written notice of its election to renew this Lease as provided in this Lease) or within twenty-four (24) months prior to the expiration of any renewal term of this Lease (unless Tenant, if entitled to renew this Lease as provided in this Lease, shall have given Landlord a written notice of its election so to renew this Lease as therein provided), for the purpose of showing the same to prospective tenants.

SECTION 18.08. If at any time during the Term of this Lease or of any renewal hereof any proceedings are instituted or orders made for the widening or other enlargement of any street or highway contiguous to the Demised Premises, requiring removal of any projection or encroachment on, under or above any such street or highway, or any changes or alterations upon the Demised Premises, or in the sidewalks, curbs, gutters, vaults or appurtenances, Tenant, at Tenant's own cost and expense, will promptly comply with such requirements, and on Tenant's failure to do so, Landlord, after notice as provided under this Lease, may comply with the same, and add the amount expended therefor, and any interest, fines, penalties, architects' fees, counsel fees or other expenses incurred by Landlord

18-

in such compliance or by the failure of Tenant so to comply, as additional
rent to any installment of net rent thereafter due.

SECTION 18.09. ~~Tenant shall furnish to Landlord two duplicate~~
~~to Landlord a copy of Tenant's operating statement covering the Demised~~
~~Premises or that part thereof occupied by or under Tenant has statements~~
~~as certified by an Independent public accountant.~~ Tenant shall also fur-
nish to Landlord within ~~ninety~~ sixty (60) days after the end of its fiscal year a
written statement of operations of the Demised Premises for the preceding
fiscal year setting forth in detail the income and expenses relating to the
operations of the Demised Premises and the names of any subtenants with
the terms and conditions of their respective tenancies. Said statements shall
be certified to as true and correct by Tenant or its certified public account-
ant. Tenant shall, upon request from any holder of a mortgage to which this
Lease is subject and subordinate, furnish said mortgagee at any time and
from time to time, with the foregoing information and statements. Upon
written request by the Landlord the Tenant shall from time to time make
available for inspection by the Landlord, or its designee, during reasonable
business hours, the subleases covering the various portions of the Demised
Premises, such subleases to be made available for such inspection when and
as requested as aforesaid, either at the Demised Premises or at such other
place in the City of New York, State of New York, as Tenant may designate
by notice to the Landlord after such request for inspection is made.

SECTION 18.10. The Landlord shall not be required to furnish
any service to the Demised Premises, including, but not limited to, heat,
water, help and power, and shall not be liable for any failure of water sup-
ply or electric current or of any service by any utility, nor for injury or
damage to person (including death) or property caused by or resulting from
steam, gas, electricity, water, rain or snow which may flow or leak from
any part of the Demised Premises, or from any pipes, appliances or plumb-

18f

ing works of the same, or from the street or subsurface or from any other place, nor from interference with light or other incorporeal hereditaments or easements, however caused, except if due to the affirmative acts of the Landlord. The Tenant agrees to pay all charges for gas, electricity, water, light, heat, power and/or other services used or charges imposed in or about or supplied to said Building, and shall indemnify the Landlord against any and all liability on such account.

SECTION 18.11.   The term "Landlord" as used in this Lease means only the Landlord for the time being of the land and Building which constitute the Demised Premises (or of the fee if Landlord be the fee owner) so that in the event of any sale or transfer of said leasehold interest (or of the fee if Landlord be the fee owner), the said Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, at any such sale, that the purchaser has assumed and agreed to carry out any and all covenants and obligations of Landlord hereunder.

SECTION 18.12.   If any term or provision of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 18.13.   Whenever in this Lease agreement, any words of obligation or duty are used, such words or expressions shall have the

18g

same force and effect as though made in the form of covenants.

SECTION 18.14. It is expressly understood and agreed by and between the parties hereto that this Lease sets forth all the promises, agreements and conditions, inducements and understandings between Landlord and Tenant relative to the Demised Premises and that there are no promises, agreements, conditions, understandings, inducements, warranties or representations, oral or written, expressed or implied, between them other than as herein set forth and this Lease shall not be modified in any manner except by an instrument in writing executed by the parties.

SECTION 18.15. In order to insure the payment of Impositions as provided in Article 5 hereof, insurance premiums, as provided in Article 14 hereof, and interest and amortization on mortgages payable by Tenant, if any, under any of the provisions hereof, the Tenant agrees to pay to the Landlord a sum equal to 1/12th of the annual Impositions, insurance premiums and interest and amortization as aforesaid, on the 1st day of each and every month. At the commencement of the Term of this Lease the Tenant shall pay to Landlord such additional amounts as may be required, in addition to the regularly monthly installments, to provide the Landlord with funds sufficient to pay each particular Imposition, insurance premium and interest and amortization payment at least thirty (30) days prior to the respective due dates thereof. If at any time during the Term of this Lease, the respective funds on hand are insufficient for the payment of any Imposition, insurance premium or interest and amortization payment on a date thirty (30) days prior to the due date thereof, Tenant shall forthwith make a deposit equal to any such deficiency. It is the intention of the parties that the Tenant shall deposit with the Landlord the necessary funds so that the Landlord at all times during the Term of this Lease shall have on hand

18h

sufficient deposits covering each of the several items for the respective

accrued periods pertaining thereto, so that the deposits for one shall not be

used for the payment of another.

SECTION 18.16. In the event Tenant is in default under this

Lease, or the Lease has been terminated, prior to its normal expiration

date as a result of Tenant's default, then Landlord and not Tenant shall be

entitled to all monies deposited under Section 18.15 hereof, and to all

monies which may be payable as a result of any proceeding for the reduction

of taxes.

SECTION 18.17. The parties stipulate and it is their intention

that this Lease shall be construed in accordance with the laws of the State

of New York.

SECTION 18.18. Tenant acknowledges that Landlord is not

now the fee owner of Tract 2 described in Exhibit "A" annexed hereto and

that to such extent, Tenant hereunder is a subtenant of that part of the

Demised Premises.

SECTION 18.19. In the event that Landlord elects not to exer-

cise Landlord's option to purchase said Tract 2 pursuant to the terms of

Landlord's lease thereof, Landlord shall give Tenant notice thereof at least

thirty (30) days prior to the deadline for giving sixty (60) days prior notice

under the terms of said option. Upon such notice being given by Landlord to

Tenant, Tenant shall exercise said option, at Tenant's cost and expense,

and cause title to said Tract 2 to be conveyed to Landlord hereunder. Upon

Tenant's compliance with the foregoing and conveyance of Tract 2 to Land-

lord, the basic annual rent, payable hereunder, shall be reduced in the amount

of Two Thousand Four Hundred ($2,400.00) dollars per annum apportioned

to the date of such conveyance.

~~entitled to an option to renew of the Twenty Thousand ($20,000.00) Dollars~~ ~~option price paid by Tenant to the present owner of Tract 2 out of the~~ ~~proceeds the new bond issue of bob for quarterly pay done by defendant following~~ ~~such various occurrence~~

SECTION 18.20.  Landlord shall keep all deposits made by Tenant in a separate bank account specifically maintained by Landlord for this Lease.  Landlord shall on Tenant's written request exhibit copies of all statements and cancelled checks with respect to said account.

SECTION 18.21.  In the event that Landlord shall at any time fail to pay any installment of principal or interest or any other sum payable under the fee mortgage now encumbering the Demised Premises, or Impositions or insurance of which ample deposits have been made by Tenant, Tenant shall have the right, but not before the last five (5) days of the period, at the expiration of which the failure to make such payment would constitute a default or commence a penalty period to pay any such principal, interest, insurance premium, or Imposition, and to deduct the amount of such payment from the next succeeding installment or installments of basic annual rent, which shall become due and payable.  Tenant shall give Landlord Twenty-four (24) hours notice before making such payment.

ARTICLE 19

Excavation

SECTION 19.01.  In the event that an excavation should be made
for building or other purposes upon land adjacent to the Demised Premises,
or should be authorized to be made, Tenant shall, if necessary, afford to
the person or persons causing or authorized to cause such excavation, li-
cense to enter upon the Demised Premises for the purpose of doing such
work as shall reasonably be necessary to protect or preserve the wall or
walls of the Building, or the Building, from injury or damage and to support
them by proper foundations, pinning and/or underpinning.

# ARTICLE 20

## Renewal Terms

SECTION 20.01.   The Tenant shall have the option, if this
Lease shall at the time of the exercise thereof be in full force and effect
and if the Tenant shall not then be in default in fulfilling any of its terms,
covenants and conditions on the part of the Tenant to be performed, of re-
newing this Lease for three (3) additional renewal terms of twenty-three
(23) years each, provided that in each instance this Lease shall, at the
time of the exercise of said option, be in full force and effect, and the Ten-
ant shall not be in default in fulfilling any of its terms, covenants and con-
ditions on the part of the Tenant to be performed.   Each renewal option
shall be exercised by the Tenant giving to the Landlord notice of intention
to renew not less than twelve (12) months nor more than eighteen (18)
months prior to the expiration of the next preceding term.   Each of said
renewal terms shall be upon the same agreements, terms, covenants and
conditions, including rent, as are provided for herein for the intial term
(unless changed or modified by written mutual agreement).   Any termina-
tion of this Lease shall terminate any right of renewal hereunder.

SECTION 20.02.   In the event Tenant fails to exercise any of
the foregoing renewal options within the time limits above stated, Landlord
shall, at least twenty (20) days before such time expires, give written
notice thereof to Tenant, and if Landlord fails to do so, the time so limited
for the exercise of Tenant's option shall be deemed extended for twenty (20)
days after Landlord shall later give such notice.

20

ARTICLE 21

Arbitration

SECTION 21.01. In any case in which it is expressly provided by the provisions of this Lease, and only in such cases, that any matter shall be determined by arbitration, such matter shall be settled by arbitration as follows:

The same shall be settled and determined by arbitration in accordance with the rules then obtaining and before the American Arbitration Association in the City of New York. A judgment so awarded or rendered on such arbitration shall be conclusive and binding upon the parties, successors and assigns, and may be rendered as a final judgment in any court having jurisdiction thereof.

Notwithstanding the foregoing, the Landlord reserves the right to have every dispute of whatsoever nature which may arise out of or in connection with this Lease, the breach, making or interpretation thereof, not expressly provided to be subject to arbitration, to be determined by arbitration as aforesaid, and upon Landlord exercising its option, Tenant agrees to and shall submit to such arbitration. In the event that Tenant fails to submit to arbitration, Tenant shall be deemed in default under this Lease, and Landlord may proceed to terminate this Lease upon five (5) days written notice to the Tenant to such effect, and at the end of said five (5) day period, this Lease shall be deemed terminated and at an end, and all right of occupancy hereunder on the part of Tenant shall cease and terminate with the same force and effect as though the term originally reserved herein had expired.

## ARTICLE 22

## Mortgages of the Fee

SECTION 22.01. This Lease is subject and subordinate to any
mortgage or mortgages of the fee of the Demised Premises which Landlord
may obtain, providing:

(a) Such mortgage or mortgages shall contain provisions pro-
viding in substance that so long as Tenant continues to pay the rent and
observe and comply with the other terms, covenants and conditions in this
Lease reserved and shall not be in default under this Lease, the mortgagee
shall not abrogate or diminish any rights of tenants under this Lease, nor
disturb Tenant's right to possession and use and enjoyment of the Demised
Premises in any foreclosure proceeding or in the exercise by such mort-
gagee of any other of its rights under such mortgage.

(b) All cost and expense in connection with the making or place-
ment of said mortgage or mortgages shall be borne exclusively by the
Landlord.

The proceeds of said mortgage or mortgages shall be and re-
main the property of Landlord. The Tenant hereby covenants to execute,
acknowledge and deliver all necessary or convenient documents to evidence
same, and to evidence the subordination of the Tenant's interest in this
leasehold to such mortgage or mortgages.

All improvements, equipment, machinery, fixtures, furniture,
furnishings, appurtenances and other property of the Tenant installed or
placed on or in the Demised Premises at any time prior to or during the
Term of this Lease are and shall be immediately subject and subordinate
to any mortgage to which this Lease is or shall be subject and subordinate.

22a

SECTION 22.02. The subordination of this Lease to a mortgage or mortgages of the fee of the Demised Premises provided for in this Lease shall be automatic and self-operating and no separate instrument of sub-ordination shall be necessary thereto. However, without limiting such automatic and self-operative subordinations, Tenant shall/ on demand, at *without expense to Tenant,* any time or times execute, acknowledge and deliver to Landlord, without any *by Tenant,* charge to Landlord/ any and all instruments that may be necessary or convenient to subordinate this Lease, and all rights hereunder to the lien of any such mortgage or mortgages and each renewal, modification, spreading, consolidation, replacement or extension thereof, and if Tenant shall fail at any time to do so, the Landlord is hereby authorized to execute, acknowledge and deliver same as the attorney-in-fact of Tenant in Tenant's name, place and stead, which authority is hereby made irrevocable during the Term of this Lease and any renewals thereof.

22h

ARTICLE 23

Compliance with Fee Mortgage

SECTION 23.01. Tenant agrees that it will perform all duties
and obligations which the mortgagor under any mortgage now or hereafter
a lien upon the Demised Premises and to which this Lease is or may be
subject and subordinate, may be required by the terms thereof to perform,
and Tenant agrees to satisfy the aforesaid mortgage obligations at or prior
to ten (10) days before the last day allowed to the mortgagor under the terms
of any such mortgage to perform such duty or obligation without suffering
the risk of foreclosure or the exercise of any other right or remedy by the
mortgagee. Tenant further agrees that Tenant will not do, suffer or permit
to be done any act, condition, status, happening or occurrence which may
be prohibited under the terms of any such present or future mortgage or
mortgages to which this Lease is or may be subject and subordinate except
that, notwithstanding anything hereinabove stated, Tenant shall not be re-
quired to pay or to see to the payment of any principal or interest that may
be reserved under the terms of any such mortgage or mortgages except as
may be otherwise specifically required by other provisions of this Lease.

SECTION 23.02. In the event that Tenant defaults under, or
fails to carry out and abide by, the foregoing duties and obligations, Land-
lord, at its option, shall have the right forthwith after the time within which
Tenant should have performed and carried out the same, to do and carry
out and perform the obligation which Tenant should have done, performed
or carried out, and, if necessary, to enter the premises for the purpose of
doing so, and Landlord may enter or break into the premises, using as
much force as may be necessary; and the costs and expenses incurred by
Landlord in doing, carrying out and performing the said duties and

obligations shall become due and payable as additional rent hereunder, to-
gether with interest at the rate of 6 per cent per annum.

## ARTICLE 24

### Surrender at End of Term

SECTION 24.01.   The Tenant shall surrender and deliver up the

Buildings and premises and the sidewalk, vaults and streets in front of or

appurtenant to said premises, and also all pipes, plumbing, electric wires,

boilers and steam heating plant, and all machinery, together with all furni-

ture, furnishings, fixtures and equipment, at the expiration of the Term of

this Lease or sooner termination of the term, in good repair and condition,

broom clean and free of Tenant's property, to which end the Tenant herein

specifically contracts, under penalty of forfeiture, that the Tenant will at

all times not only keep any Building on the said Demised Premises, sidewalks,

vaults and streets, together with all furniture, furnishings, fixtures and

equipment in good repair, inside and outside, but will from time to time, if

necessary, renew the same to the end that delivery of the aforesaid Building

and said sidewalk, vault and streets and all pipes, plumbing, electric wires

boilers and steam heating plant, elevators and machinery, together with

all furniture, furnishings, fixtures and equipment may be at the expiration

of this Lease in good repair and condition, reasonable wear and tear thereto

excepted.

24

## ARTICLE 25

### Quiet Enjoyment

SECTION 25.01.  The Landlord covenants that if and so long as Tenant keeps and performs each and every covenant, agreement, term, provision and condition herein contained on the part and on behalf of Tenant to be kept and performed, Tenant shall quietly enjoy the Demised Premises without hindrance or molestation by Landlord, subject to covenants, agreements, terms, provisions and conditions of this Lease.

## ARTICLE 26

### Waiver of Trial by Jury

SECTION 26.01.   The parties hereto waive a trial by jury of any and all issues arising in any action or proceeding between them or their successors or assigns under or connected with this Lease or any of its provisions or any negotiations therewith or the Tenant's use or occupation of the Demised Premises.

ARTICLE 27

Notices

SECTION 27.01.  Any notice or demand required to be given by
the terms and provisions of this Lease or by any law or governmental regu-
lation either by Landlord to Tenant or by Tenant to Landlord shall be in
writing.  Unless otherwise required by such law or regulation, except as
may be specifically provided in any section of this Lease to be otherwise
given, such notice or demand shall be given and shall be deemed to have
been served and given by Landlord and received by Tenant, when Landlord
shall have deposited such notice or demand by registered mail, return re-
ceipt requested, enclosed in a securely closed postpaid wrapper in a United
States Government General or Branch Post Office, addressed to Tenant at
777 Northern Boulevard, Great Neck, New York.  Such notice or demand
shall be given and shall be deemed to have been served and given by Tenant
and received by Landlord when Tenant shall have deposited such notice or
demand by registered mail, return receipt requested, enclosed in a securely
closed postpaid wrapper in a United States Government General or Branch
Post Office, addressed to Landlord at 9 Lake Road, Lake Success, New
York.  Either party may by notice as aforesaid, designate a different ad-
dress or addresses for notice or demands to it.

SECTION 27.02.  In the event more than one person, firm or
corporation shall, during the Term of this Lease become the tenants of
said leased premises (including the present Tenant), notice by Landlord to
any one of such tenants shall be notice or payment to all, and Landlord may
act on notice from any one of such tenants of said premises and, in case of
conflicting notices, may recognize any one of them as authority and disre-
gard the others; provided, however, that Landlord may treat any notice in

27.1

the case of several owners as of no effect unless signed by all.

## ARTICLE 28

### Covenants Binding

SECTION 28.01.  The covenants, agreements, terms, provisions and conditions of this Lease shall be binding upon and inure to the benefit of the heirs, administrators and assigns of the Landlord, except as otherwise provided herein and the successors and assigns of the Tenant.

## ARTICLE 29

### Short Form Lease

SECTION 29.01.  In the event that the Landlord and Tenant shall execute and deliver a short form of lease for the purpose of recording, said short form of lease shall not in any circumstances be deemed to modify or change any of the provisions of this Lease, which shall in all instances prevail.

29

## ARTICLE 30

### Broker

SECTION 30.01.  The parties agree that no broker brought about this transaction, and Tenant hereby represents to Landlord that no broker introduced him to the parties or property involved herein.

IN WITNESS WHEREOF, the Landlord and Tenant have respec-

tively signed and sealed these presents the day and year first above written.

IN PRESENCE OF:

_____          Martin Bruce _____ Landlord

_____          Sylvia Bruce _____ Landlord

_____          Robert Siegel _____ Tenant

_____          Bernard L. Nussbow _____ Tenant

STATE OF NORTH CAROLINA )
                         ) ss.:
COUNTY OF                )

On this 1st day of February, 1966, before me personally appeared ROBERT SIEGEL and BERNARD L. NUSSINOW, to me known and known to me to be the individuals described in and who executed the foregoing Lease, and they thereupon each duly acknowledged to me that they executed the same.

_Gwen B. Sparrow_
Notary Public
My Commission Expires: May 23, 1967

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Asheville, County of Buncombe, North Carolina:

TRACT ONE:

BEGINNING at a concrete monument in the northern margin of the right-of-way line of dual U. S. Highways #19-23, known as Patton Avenue, at the southeast corner of the lands of Wachovia Bank and Trust Company and running thence with the line of said Bank, North 12° 52' West 227 feet to a concrete monument; thence South 89° 45' West 119.3 feet to a concrete monument in the right-of-way line of Louisiana Avenue; thence North 36° 57' West 221.5 feet to an iron in the eastern margin of Louisiana Avenue; thence with the eastern margin of Louisiana Avenue, North 28° 51' West 63.5 feet to an iron pipe; the Joyner corner; thence with Joyner, South 81° 17' East 234.57 feet to an iron pipe; thence still with Joyner, North 3° 7' East 161.69 feet to a concrete monument, the Joyner northeast corner; thence with Joyner, North 78° 27' West 353.92 feet to an iron in the eastern margin of Louisiana Avenue; thence with the eastern margin of Louisiana Avenue, North 19° 26' West 87.85 feet; thence still with said Avenue, North 5° 22' West 100 feet; thence South 86° 10' 30" East 114.09 feet to an iron pipe; thence North 7° 20' East 52.86 feet, corner with Hargus; thence with Hargus, South 76° 10' 30" East 124.63 feet; thence North 7° 34' 30" East 93.99 feet; thence North 5° 50' East 181.17 feet; thence South 70° 45'. East 312 feet to an iron; thence North 37° 24' East 148.93 feet to an iron; thence South 70° 11' East 573.02 feet to an iron in Hawkins Lane; thence with Hawkins Lane, South 27° 56' West 386.4 feet to a concrete monument; thence North 82° 15' West 113.79 feet to an iron; thence South 32° 53' 30" West 193.5 feet to a concrete monument; thence South 23° 27' West 165.86 feet to a concrete monument; thence South 85° 57' 30" East 17.59 feet to a dogwood tree; thence South 20° 50' 30" East 290.35 feet to an existing spike in the northern margin of Patton Avenue; thence with the northern margin of Patton Avenue, South 85° 26' 30" West 350.45 feet to a concrete monument; thence still with the northern margin of Patton Avenue, South 87° 34' West 25 feet to the point of Beginning. Subject, however, to right of way for the widening of Hawkins Lane and the right of way for the widening of Louisiana Avenue, and together with and subject to rights of ingress, egress, and regress, in, over and through that tract of land fronting 50 feet on Patton Avenue and running North 12° 59' West 35 feet, the center line of which is the first call in the foregoing description.

Schedule A

TRACT TWO:

BEGINNING at an iron pipe in the eastern margin of
Louisiana Avenue, Wells' northwest corner, and running
thence with the Wells' line, South 81° 17' East 234.57 feet to
an iron in the line of the land of G-K, Inc.; thence with said
line, North 3° 7' East 161.69 feet to a monument at a 24-inch
pin, corner with Shelton; thence with the Shelton line, North
78° 27' West 353.92 feet to an iron pipe in the eastern margin
of Louisiana Avenue; thence with the eastern margin of Louisi-
ana Avenue, South 19° 26' East 12.15 feet and South 28° 51'
East 211.64 feet to the point of Beginning.

# Exhibit F

487

*Asheville*

## ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS that:

BERNARD L. NUSSINOW and ROBERT SIEGEL, co-partners doing business as Patton Plaza Associates, a partnership having an office at 777 Northern Boulevard, Great Neck, New York (hereafter called the "ASSIGNORS"), for Ten ($10) Dollars and other valuable consideration to the Assignors in hand paid by NINETEENTH ASHEVILLE CORP., a North Carolina corporation having an office at 511 Fifth Avenue, New York, New York (hereafter called the "ASSIGNEE"), the receipt whereof is hereby acknowledged,

HEREBY SELL, ASSIGN AND TRANSFER unto the Assignee that certain Indenture of Lease, and the leasehold estate created thereby, dated February 1, 1966, made by Morton Bruce and Sylvia Bruce, as lessor, and the Assignors, as lessee (a memorandum of which was recorded in the Buncombe County, North Carolina, Registry on Ϝⁱᵇᵉ⁰ᵘ₁ ₁, 1966 in Book 930 , page 619 ), as amended by agreement between said Morton Bruce and Sylvia Bruce and the Assignors, dated Aₙⁱⁱᵇᵘₑ 5 , 1969, covering the following described property:

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Asheville, County of Buncombe, North Carolina:

TRACT ONE:

BEGINNING at a concrete monument in the northern margin of the right-of-way line of dual U. S. Highways #19-23, known as Patton Avenue, at the southeast corner of the lands of Wachovia Bank and Trust Company and running thence with the line of said Bank, North 12°52' West 227 feet to a concrete monument; thence South 89°45' West 119.3 feet to a concrete monument in the right-of-way line of Louisiana Avenue; thence North 36°57' West 221.5 feet to an iron in the eastern margin of Louisiana Avenue; thence with the eastern margin of Louisiana Avenue, North 28°51' West 63.5 feet to an iron pipe; the Joyner corner; thence with Joyner, South 81°17' East 234.57 feet to an iron pipe; thence still with Joyner, North 3°7' East 161.69 feet to a concrete monument, the Joyner northeast corner; thence with Joyner, North 78°27' West 353.92 feet to an iron in the eastern margin of Louisiana Avenue;

thence with the eastern margin of Louisiana Avenue,
North 19°26' West 87.85 feet; thence still with said
Avenue, North 5°22' West 100 feet; thence South
86°10'30" East 114.09 feet to an iron pipe; thence
North 7°20' East 52.86 feet, corner with Hargus;
thence with Hargus, South 76°10'30" East 124.63 feet;
thence North 7°34'30" East 93.99feet; thence North
5°50' East 181.17 feet; thence South 70°45' East
312 feet to an iron; thence North 37°24' East 148.93
feet to an iron; thence South 70°11' East 573.02
feet to an iron in Hawkins Lane; thence with Hawkins
Lane, South 27°56' West 386.4 feet to a concrete
monument; thence North 82°15' West 113.79 feet to an
iron; thence South 32°53'30" West 193.5 feet to a
concrete monument; thence South 23°27' West 165.86
feet to a concrete monument; thence South 85°57'30"
East 17.59 feet to a dogwood tree; thence South
20°50'30" East 290.35 feet to an existing spike in
the northern margin of Patton Avenue; thence with the
northern margin of Patton Avenue, South 85°26'30" West
350.45 feet to a concrete monument; thence still with
the northern margin of Patton Avenue, South 87°34'
West 25 feet to the point of Beginning. Subject,
however, to right of way for the widening of Hawkins.
Lane; and the right of way for the widening of
Louisiana Avenue, and together with and subject to
rights of ingress, egress, and regress, in, over and
through that tract of land fronting 50 feet on
Patton Avenue and running North 12°59' West 35 feet,
the center line of which is the first call in the
foregoing description.

TRACT TWO:

BEGINNING at an iron pipe in the eastern margin
of Louisiana Avenue, Wells' northwest corner, and
running thence with the Wells' line, South 81°17'
East 234.57 feet to an iron in the line of the land
of G-K, Inc.; thence with said line, North 3°7' East
161.69 feet to a monument at a 24-inch pin, corner
with Shelton; thence with the Shelton line, North
78°27' West 353.92 feet to an iron pipe in the eastern
margin of Louisiana Avenue; thence with the eastern
margin of Louisiana Avenue, South 19°26' East 12.15
feet and South 28°51' East 211.64 feet to the point
of Beginning.

and all of the right, title and interest of the Assignors

as lessee in and to the same and in and to any buildings

and improvements thereon with the appurtenances,

TO HAVE AND TO HOLD the same unto the Assignee, its

successors and assigns, from the date of these presents for

-2-

489

all of the rest of the years mentioned in said Indenture of Lease, as amended,

SUBJECT, HOWEVER, to the rents, covenants, terms, conditions and provisions mentioned and contained in said Indenture of Lease, as amended.

AND the Assignee hereby assumes the performance of all of the terms, covenants, conditions and agreements contained in the aforesaid Indenture of Lease, hereby assigned to it; and hereby assumes said Indenture of Lease, the obligations of the Assignors thereunder and all of the obligations of the tenant thereunder, and shall be liable for the payment of the basic rent, Impositions and all costs and payments and charges which tenant under any of the provisions thereof assumes or agrees to pay and for the due performance of all of the terms, covenants, conditions and agreements thereof contained on tenant's part to be performed for the term of said Indenture of Lease, so long as said Assignee is the holder thereof.

IN WITNESS WHEREOF, the Assignors and the Assignee have duly executed this instrument this 6th day of November, 1969.

PATTON PLAZA ASSOCIATES

By _____
     Bernard L. Nussinow

By _____
     Robert Siegel
                    Co-Partners

NINETEENTH ASHEVILLE CORP.

By _____
     Harold W. Schulkind, Vice-Pres.

-3-

489

490

STATE OF NEW YORK    )
                     :ss.:
COUNTY OF NEW YORK   )

On this 6th day of November, 1969 before me personally came Bernard L. Nussinow and Robert Siegel, to me known to be co-partners of the firm of Patton Plaza Associates and the individuals who executed the foregoing instrument and they acknowledged to me that they executed the foregoing instrument individually and for and in behalf of said firm.

*[signature]*

MELVYN ALTMAN
Notary Public, State of New York
No. 31-0005575
Qualified in New York County
Commission Expires March 30, 1971

STATE OF NEW YORK    )
                     :ss.:
COUNTY OF NEW YORK   )

On this 6th day of November, 1969 before me personally came Harold W. Schulkind, to me known, who, being duly sworn, did depose and say that he resides at 142-05 Roosevelt Avenue, Flushing, N. Y.; that he is the vice-president of Nineteenth Asheville Corp., the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal, and that it was so affixed by order of the board of directors of said corporation, and that he signed his name thereto by like order.

*[signature]*

MELVYN ALTMAN
Notary Public, State of New York
No. 31-0005575
Qualified in New York County
Commission Expires March 30, 1971

State of North Carolina, County of Buncombe *Melvyn L. Altman*
Each of the foregoing certificates, namely of ........................................................
a notary or Notaries public of the State and County designated is certified to be correct.
This .... 7 .... day of .... *November* .............................. 19. 69 ....
WILLIAM E. DIGGES
Register of Deeds, Buncombe County
By: *Marie L. Graham*, Deputy

Filed for registration on the .... 7 .... day of .... *November* .............................. 19. 69 .... at .... 1:08 p .... M.
WILLIAM E. DIGGES
Register of Deeds, Buncombe County
By: *Marie L. Graham*, Deputy

057

# Exhibit G

BOOK 1133 PAGE 376

## ASSIGNMENT

REGISTERED

KNOW ALL MEN BY THESE PRESENTS that:

NINETEENTH ASHEVILLE CORP., a North Carolina corporation

having an office at 1133 Avenue of the Americas, New York, New York

(hereafter called the "ASSIGNOR") for Ten ($10.00) Dollars and

other valuable consideration to the Assignor in hand paid by

ASHEVILLE K-M ASSOCIATES, a North Carolina Limited Partnership c/o

Paul Green, 501 Madison Avenue, New York, New York   (hereafter

called the "ASSIGNEE") the receipt whereof is hereby acknowledged,

HEREBY SELL, ASSIGN AND TRANSFER unto the Assignee that certain

Indenture of Lease and all amendments thereto and the leasehold

estate created thereby, dated February 1, 1966 made by Martin Bruce

and Sylvia Bruce, as Lessor and Patton Plaza Associates, as Lessee,

a memorandum of which was recorded in the Buncombe County, North

Carolina, Registry on February 1, 1966 in Book 934, page 649 and

which said lease was subsequently assigned by Patton Plaza Associates

to Nineteenth Asheville Corp. on November 6, 1969, which was recorded

in the Buncombe County, North Carolina Registry on November 7, 1969

in Book 1009, page 487 covering the following described property:

All that certain plot, piece of parcel of land with the

buildings and improvements thereon erected, situate, lying and

being in the City of Asheville, County of Buncombe, North Carolina

as more particularly described on Exhibit "A" annexed hereto and

made a part hereof.

BOOK 1133 PAGE 377

and all of the rights, title and interest of the Assignor as Lessee in and to the same and in and to any buildings and improvements thereon with the appurtenances,

TO HAVE AND TO HOLD the same unto the Assignee, its successors and assigns, from the date of these presents for all of the rest of the years mentioned in said Indenture of Lease, as amended,

SUBJECT, HOWEVER, to the rents, covenants, terms, conditions and provisions mentioned and contained in said Indenture of Lease, as amended and all matters of record.

AND the Assignee hereby assumes the performance of all of the terms, covenants, conditions and agreements contained in the aforesaid Indenture of Lease, hereby assigned to it; and hereby assumes said Indenture of Lease, the obligations of the Assignor thereunder and all of the obligations of the tenant thereunder, and shall be liable for the payment of the basic rent, Impositions and all costs and payments and charges which tenant under any of the provisions thereof assumes or agrees to pay and for the due performance of all of the terms, covenants, conditions and agreements thereof contained on tenant's part to be performed for the term of said Indenture of Lease, so long as said Assignee is the holder thereof.

IN WITNESS WHEREOF, the Assignor and the Assignee have duly executed this instrument this 17th day of December, 1975.

, 721- NINETEENTH ASHEVILLE CORP.

by _____
Harold W. Schulkind, Vice Pres.

by _____
Robert Goldberg, Secretary

THIS INSTRUMENT WAS PREPARED BY
HAROLD W. SCHULKIND
ATTORNEY AT LAW
1133 AVENUE OF THE AMERICAS
N. Y., N. Y. 10036    (212) 997-1250

, 21-1 ASHEVILLE K-M ASSOCIATES

by _____
Paul Green, General Partner

-2-

BOOK 1133 PAGE 378

STATE OF NEW YORK )
                    ) ss.
COUNTY OF NEW YORK )

      On the 17th day of December 1975 before me personally
came HAROLD W. SCHULKIND and ROBERT GOLDBERG, to me known,
who being by me duly sworn, did depose and say that they
are the Vice President and Secretary of NINETEENTH ASHEVILLE
CORP., the corporation described in and which executed the
foregoing instrument; that they know the seal of said cor-
poration; that the seal affixed to said instrument is such
corporate seal; and that it was so affixed by order of the
Board of Directors of said corporation; and that they signed
their names thereto by like order.

                            Notary Public

                            JULIE BLANKE
                    Notary Public, State of New York
                    No. 41-0313050
                    Qualified in Queens County
                    Commission Expires March 30, 1977

STATE OF NEW YORK )
                    ) ss.
COUNTY OF NEW YORK )

      On the 17th day of December 1975 before me personally
came PAUL GREEN to me known and by me being duly sworn, did
depose and say that he is a General Partner of ASHEVILLE K-M
ASSOCIATES and that he signed his name to the foregoing instrument
for and on behalf of and with the authority of said ASHEVILLE
K-M ASSOCIATES for the uses and purposes therein mentioned.

                            Notary Public

      HAROLD W. SCHULKIND
      Notary Public, State of New York
      No. 41-3538300
      Qualified in Queens County
      Commission Expires March 30, 1977

                      MARY E. COTTER
                    Commissioner of Deeds
                    City of New York No. 1-1247
                    Certificate filed in New York County
                    Commission Expires Sept. 1, 1977

State of North Carolina, County of Buncombe   Harold W. Schulkind + Julie Blanke
Each of the foregoing certificates, namely of................................................................
a notary or Notaries public of the State and County designated is certified to be correct.
This........23........day of............December................, 19..75....
                              WILLIAM E. DIGGES
                              Register of Deeds, Buncombe County
                              By: Mac E. Parham................, Deputy

Filed for registration on the..23..day of............December................, 19..75....at........11:07....A....M.
                              WILLIAM E. DIGGES
                              Register of Deeds, Buncombe County
                              By: Mac E. Parham................, Deputy

BOOK 1133 PAGE 379

        All that certain plot, piece or parcel of land
with the buildings and improvements thereon erected, situate,
lying and be'ng in the City of Asheville, County of Buncombe,
North Carolina:

        TRACT ONE:  BEGINNING at a concrete monument in
the northern margin of the right of way line of dual U.S. Highways
#19-23, known as Patton Avenue, at the southeast corner of the
lands of Wachovia Bank and Trust Company and running thence
with the line of said Bank, N 12-52 W 227 feet to a concrete
monument;  thence S 89-45 W 119.3 feet to a concrete monument
in the right of way line of Louisiana Avenue;  thence N 36-57
W 221.5 feet to an iron in the eastern margin of Louisiana
Avenue;  thence with the eastern margin of Louisiana Avenue
N 28-51 W 63.5 feet to an iron pipe;  the Joyner corner;  thence
with Joyner S 81-17 E 234.57 feet to an iron pipe;  thence still
with Joyner N 3-7 E 161.69 feet to a concrete monument, the
Joyner northeast corner;  thence with Joyner N 78-27 W 353.92
feet to an iron in the eastern margin of Louisiana Avenue;
thence with the eastern Margin of Louisiana Avenue N 19-26 W
87.85 feet;  thence still with said Avenue N 5-22 W 100 feet;
thence S 86-10-30 E 114.09 feet to an iron pipe;  thence N
7-20 E 52.86 feet, corner with Hargus;  thence with Hargus S
76-10-30 E 124.63 feet;  thence N 7-34-30 E 93.99 feet;  thence
N 5-50 E 181.17 feet;  thence S 70-45 E 312 feet to an iron;
thence N 37-24 E 148.93 feet to an iron;  thence S 70-11 E
573.02 feet to an iron in Hawkins Lane;  thence with Hawkins
Lane S 27-56 W 386.4 feet to a concrete monument;  thence N
82-15 W 113.79 feet to an iron;  thence S 32-53-30 W 193.5
feet to a concrete monument;  thence S 23-27 W 165.86 feet to
a concrete monument;  thence S 85-57-30 E 17.59 feet to a dogwood
tree;  thence S 20-50-30 E 290.35 feet to an existing spike in
the northern margin of Patton Avenue;  thence with the northern
margin of Patton Avenue S 85-26-30 W 350.45 feet to a concrete
monument;  thence still with the northern margin of Patton
Avenue S 87-34 W 25 feet to the point of Beginning.  Subject,
however, to right of way for the widening of Hawkins Lane and
the right of way for the widening of Louisiana Avenue.

        TRACT TWO:  BEGINNING at an iron pipe in the
eastern margin of Louisiana Avenue, Wells' northwest corner,
and running thence with the Wells' line, S 81-17 E 234.57 feet
to an iron in the Line of the land of G-E, Inc.:  thence
with said line N 3-7 E 161.69 feet to a monument at a 24 inch
pin, corner with Shelton;  thence with the Shelton Line N
78-27 W 353.92 feet to an iron pipe in the eastern margin of
Louisiana Avenue;  thence with the eastern margin of Louisiana
Avenue S 19-26 E 12.15 feet and S 28-51 E 211.44 feet to the
point of Beginning.


                EXHIBIT "A"

# Exhibit H

## ASSIGNMENT OF LEASES

NINETEENTH ASHEVILLE CORP., having an office at 1133 Avenue of the Americas, 19th floor, New York, New York 10036, hereinafter called the "ASSIGNOR", for and in consideration of the sum of Ten ($10) dollars, and other good and valuable considerations to it in hand paid by ASHEVILLE K-M ASSOCIATES, a North Carolina limited partnership, having an office c/o Paul Green, Esq., 501 Madison Avenue, New York, New York 10022, hereinafter called the "ASSIGNEE", the receipt of which is hereby acknowledged, does hereby transfer, sell, assign and set over unto the said Assignee, the leases described in Exhibit B annexed hereto and made part hereof.

These leases pertain to the premises with the buildings and improvements thereon erected, more particularly described in Exhibit A annexed hereto and made a part hereof.

To have and to hold unto said Assignee, its successors and assigns forever.

In making this assignment, the Assignor does hereby represent and warrant to the Assignee, the following:

1. That such leases, as amended, are in full force and effect.
2. That there are no defaults on the part of the lessor or the lessees.
3. That none of the future rentals have been prepaid.

EXECUTED THIS 23ʳᵈ day of December, 1975, New York, New York.

NINETEENTH ASHEVILLE CORP.

By _____
Harold W. Schulkind, Vice Pres.

By _____
Robert Goldberg, Secretary

STATE OF NEW YORK   )
                    )   SS.
COUNTY OF NEW YORK  )


On the 23ʳᵈ day of December, 1975, before me personally came the above-named NINETEENTH ASHEVILLE CORP, the Assignor of the foregoing instrument, by Harold W. Schulkind, a Vice President, and Robert Goldberg, Secretary, of said corporation, who, being first duly sworn, acknowledged to me that they executed same on behalf of said corporation.

_____
Notary Public

JULIE BLANKE
Notary Public, State of New York
No. 41-0313060
Qualified in Queens County
Commission Expires March 30, 1977

All that certain plot, piece or parcel of land
with the buildings and improvements thereon erected, situate,
lying and being in the City of Asheville, County of Buncombe,
North Carolina:

TRACT ONE: BEGINNING at a concrete monument in
the northern margin of the right of way line of dual U.S. Highways
#19-23, known as Patton Avenue, at the southeast corner of the
lands of Wachovia Bank and Trust Company and running thence
with the line of said Bank, N 12-52 W 227 feet to a concrete
monument; thence S 89-45 W 119.3 feet to a concrete monument
in the right of way line of Louisiana Avenue; thence N 36-57
W 221.5 feet to an iron in the eastern margin of Louisiana
Avenue; thence with the eastern margin of Louisiana Avenue
N 28-51 W 63.5 feet to an iron pipe; the Joyner corner; thence
with Joyner S 81-17 E 234.57 feet to an iron pipe; thence still
with Joyner N 3-7 E 161.69 feet to a concrete monument, the
Joyner northeast corner; thence with Joyner N 78-27 W 353.92
feet to an iron in the eastern margin of Louisiana Avenue;
thence with the eastern Margin of Louisiana Avenue N 19-26 W
87.85 feet; thence still with said Avenue N 5-22 W 100 feet;
thence S 86-10-30 E 114.09 feet to an iron pipe; thence N
7-20 E 52.86 feet, corner with Hargus; thence with Hargus S
76-10-30 E 124.63 feet; thence N 7-34-30 E 93.99 feet; thence
N 5-50 E 181.17 feet; thence S 70-45 E 312 feet to an iron; ,
thence N 37-24 E 148.93 feet to an iron; thence S 70-11 E
573.02 feet to an iron in Hawkins Lane; thence with Hawkins
Lane S 27-56 W 386.4 feet to a concrete monument; thence N
82-15 W 113.79 feet to an iron; thence S 32-53-30 W 193.5
feet to a concrete monument; thence S 23-27 W 165.86 feet to
a concrete monument; thence S 85-57-30 E 17.59 feet to a dogwood
tree; thence S 20-50-30 E 290.35 feet to an existing spike in
the northern margin of Patton Avenue; thence with the northern
margin of Patton Avenue S 85-26-30 W 350.45 feet to a concrete
monument; thence still with the northern margin of Patton
Avenue S 87-34 W 25 feet to the point of Beginning. Subject,
however, to right of way for the widening of Hawkins Lane and
the right of way for the widening of Louisiana Avenue.

TRACT TWO: BEGINNING at an iron pipe in the
eastern margin of Louisiana Avenue, Wells' northwest corner,
and running thence with the Wells' line, S 81-17 E 234.57 feet
to an iron in the line of the land of G-E, Inc.; thence
with said line N 3-7 E 161.69 feet to a monument at a 24 inch
pin, corner with Shelton; thence with the Shelton line N
78-27 W 353.92 feet to an iron pipe in the eastern margin of
Louisiana Avenue; thence with the eastern margin of Louisiana
Avenue S 19-26 E 12.15 feet and S 28-51 E 211.44 feet to the
point of Beginning.

EXHIBIT "A"

1.  Lease dated December 18,1964 from Patton Avenue Development
    Corporation to S. S. Kresge (memorandum of lease recorded
    in Book 918, page 279).

2.  Lease dated May 6, 1966 from Patton Plaza Associates to
    Bancroft Realty Company (Eckerd's Drugs,Inc.)

3.  Lease dated June 11, 1972 from Nineteenth Asheville Corp. to
    Piece Goods Shops, Inc. of North Carolina.

4.  Lease dated February 12, 1974 from Nineteenth Asheville Corp.
    to Blazer Financial Services, Inc.

EXHIBIT   "B"

# Exhibit I

BOOK 1135 PAGE 162

BOOK 1134 PAGE 498    MEMORANDUM OF LEASE

Register of Deeds
Buncombe County, N. C.

THIS INDENTURE made the 23rd day of December 1974 1973 JAN 1975 Between

ASHEVILLE K-M ASSOCIATES, a North Carolina limited partnership,

having an office c/o Paul Green, Esq., 501 Madison Avenue, New

York, New York 10022, hereinafter referred to as "Landlord"

and NINETEENTH ASHEVILLE CORP., having an office at 1133 Avenue

of the Americas, 19th floor, New York, New York 10036, herein-

after referred to as "Tenant".

W I T N E S S E T H:

Landlord hereby demises and leases to Tenant, and Tenant

hereby hires and takes from Landlord the following described

premises.

> All that certain plot of land with the buildings
> thereon situate lying and being in the County of
> Buncombe, State of North Carolina, bounded and de-
> scribed as more particularly set forth in Exhibit
> A, attached hereto and hereby made a part hereof.

Together with all right, title and interest of the Land-

lord, if any, in and to any land lying in the bed of any

street in front of said premises to the center line thereof.

Together with all attachments, fittings, electric wiring,

plumbing, and all other improvements and appurtenances belonging

to Landlord which are affixed to the building and inseparable

therefrom without substantial damage to the demised premises.

All the property above described and buildings thereon,

or referred to, together with all replacements, additions, improve-

ments, and betterments of said property belonging to Landlord,

are hereinafter collectively referred to as "demised premises".

Together with the leases thereof and the rent and additional

rent due or to become due thereunder and all of the Landlord's

rights, title and interest therein and thereto, and Landlord

BOOK 1135 PAGE 163
BOOK 1134 PAGE 439

shall execute and deliver in recordable form, assignments,

without recourse, of the foregoing leases, as to which leases

the Tenant hereby undertakes, agrees and assumes to perform

each and every term, covenant and condition thereof on the

part of the Landlord to be performed.

Subject, however, to the items set forth on Exhibit B

annexed hereto and made a part hereof.

TO HAVE AND TO HOLD the demised premises from the date

hereof unless sooner terminated as herein provided and for

such additional terms as to which the Tenant shall exercise

its option and right of renewal.

The Tenant is hereby given and granted the irrevocable

and absolute right to renew and extend this lease for 3

successive renewal terms of ~~five (5)~~ 2-3 years each.  If the S.S.

Kresge Company lease or any other sublease of the entire demised

premises is extended by any means beyond the second renewal

period of this lease and if the Tenant shall have theretofore

exercised its option to renewal of the second renewal term,

then the Tenant shall have a further option to renew and

extend this lease for an additional term of five (5) years

commencing upon the expiration of the second renewal term.

Each of said renewal terms shall be on the same terms and

conditions and the option and right shall be exercised by the

Tenant by written notice to the Landlord no less than four (4)

months prior to the expiration of the initial term and there-

after no less than four (4) months before the expiration of

each renewal term.  Unless otherwise required by the text of a

provision of this lease, the word "term" shall mean the

aggregate of the initial term and all renewal terms for which

-2-

BOOK 1135 PAGE 164
BOOK 1134 PAGE 440

the Tenant shall extend this lease. The initial term and the
renewal terms shall each terminate as of the last day of the
last month thereof and rent shall be payable in advance on the
first day of each month.

In the event that at final termination of this lease,
either by the expiration of the initial or renewal term with-
out the exercise by the tenant of its option to renew or upon
the expiration of the final renewal term and upon such termina-
tion, any subtenant shall not have paid its net percentage rent
(as defined in Article 2(c) of the Lease) for its immediately
preceding lease year, which is the annual period on which the
computation of the net percentage rent is based, and for the
period of the then current lease year during which the termina-
tion of this lease shall occur, then and in that event the Land-
lord shall, upon receipt of the percentage rent, for the imme-
diately preceding lease year, deduct therefrom 50% and pay the
balance of the net percentage rent to the Tenant and upon receipt
of the net percentage rent for the then current lease year
apportion the same between the Landlord and the Tenant by apply-
ing a fraction which shall consist of the number of days of the
current lease year of the subtenant included to the date of
termination of this Lease and the denominator is 360 and deduct
from the resulting amount 50% and pay the balance forthwith to
the Tenant, provided that Tenant is not in default under the
terms of this Lease and Landlord has given notice, if required.

The rent and terms and conditions of this lease are more
particularly set forth in that certain Lease dated December
1975 by and between Landlord and the Tenant all of which are
hereby incorporated herein and made a part hereof as though

-3-

BOOK 1135 PAGE 165
BOOK 1134 PAGE 441

more fully set forth at length.  Said lease includes reciprocal

rights of first refusal between the Landlord and the Tenant.

WITNESS The hands and seals of the parties this 23ᵈ day

of December, 1975.

ASHEVILLE K-M ASSOCIATES, Landlord

By _____
      Paul Green, General Partner

NINETEENTH ASHEVILLE CORP.

By _____
      Harold W. Schulkind, Vice Pres.

By _____
      Robert Goldberg, Secretary

-4-

BOOK 1135 PAGE 166
~~BOOK 1134 PAGE 442~~

STATE OF NEW YORK )
                   ) SS.
COUNTY OF NEW YORK )

    BE IT REMEMBERED, That on this 23rd day of December, 1975,

before me the subscriber, a Notary Public in and for said county,

personally came the above named NINETEENTH ASHEVILLE CORP., the

Tenant, in the foregoing Memorandum of Lease, by Harold W. Schulkind,

a Vice President, and Robert Goldberg, Secretary, of said corpora-

tion, who acknowledged the signing of the same to be their voluntary

act and deed for and as the act and deed of said Corporation, for

the uses and purposes therein mentioned.

                                    *Julie Blanke*
                                    JULIE BLANKE
                              Notary Public, State of New York
                                    No. 41-0313060
                               Qualified in Queens County
                          Commission Expires March 30, 1977

STATE OF NEW YORK )
                   ) SS.
COUNTY OF NEW YORK )


    BE IT REMEMBERED, That on this 23rd day of December, 1975,

before me the subscriber, a Notary Public in and for said county,

personally came the above named ASHEVILLE K-M ASSOCIATES, the

Tenant, in the foregoing Memorandum of Lease, by Paul Green,

a general partner, who acknowledged the signing of the same to

be his voluntary act and deed for and as the act and deed of

said partnership, for the uses and purposes therein mentioned.

                                    *Julie Blanke*
Re                                  JULIE BLANKE
Registered January 23, 1976 at 3 PM  Notary Public, State of New York
William E. Digges                         No. 41-0313060
Register of Deeds  Mace L. Parlem    Qualified in Queens County
                                    Commission Expires March 30, 1977

**State of North Carolina, County of Buncombe**   *Julie Blanke*
    Each of the foregoing certificates, namely of.................................
a notary or Notaries public of the State and County designated is certified to be correct.
    This........13........day of..............January............, 19.76.
                              WILLIAM E. DIGGES
                              Register of Deeds, Buncombe County
                              By: Mace L. Parlem............Deputy
Filed for registration on the 13 day of..........January........, 19......at 9:49 o'clock M.
                              WILLIAM E. DIGGES
                              Register of Deeds, Buncombe County,
                              By: Mace L. Parlem............Deputy

BOOK 1135 PAGE 167
BOOK 1134 PAGE 443

        All that certain plot, piece or parcel of land
with the buildings and improvements thereon erected, situate,
lying and being in the City of Asheville, County of Buncombe,
North Carolina:

        TRACT ONE:  BEGINNING at a concrete monument in
the northern margin of the right of way line of dual U.S. Highways
#19-23, known as Patton Avenue, at the southeast corner of the
lands of Wachovia Bank and Trust Company and running thence
with the line of said Bank, N 12-52 W 227 feet to a concrete
monument;  thence S 89-45 W 119.3 feet to a concrete monument
in the right of way line of Louisiana Avenue;  thence N 36-57
W 221.5 feet to an iron in the eastern margin of Louisiana
Avenue;  thence with the eastern margin of Louisiana Avenue
N 28-51 W 63.5 feet to an iron pipe;  the Joyner corner;  thence
with Joyner S 81-17 E 234.57 feet to an iron pipe;  thence still
with Joyner N 3-7 E 161.69 feet to a concrete monument, the
Joyner northeast corner;  thence with Joyner N 78-27 W 353.92
feet to an iron in the eastern margin of Louisiana Avenue;
thence with the eastern Margin of Louisiana Avenue N 19-26 W
87.85 feet;  thence still with said Avenue N 5-22 W 100 feet;
thence S 86-10-30 E 114.09 feet to an iron pipe;  thence N
7-20 E 52.86 feet, corner with Hargus;  thence with Hargus S
76-10-30 E 124.63 feet;  thence N 7-34-30 E 93.99 feet;  thence
N 5-50 E 181.17 feet;  thence S 70-45 E 312 feet to an iron;
thence N 37-24 E 148.93 feet to an iron;  thence S 70-11 E
573.02 feet to an iron in Hawkins Lane;  thence with Hawkins
Lane S 27-56 W 386.4 feet to a concrete monument;  thence N
82-15 W 113.79 feet to an iron;  thence S 32-53-30 W 193.5
feet to a concrete monument;  thence S 23-27 W 165.86 feet to
a concrete monument;  thence S 85-57-30 E 17.59 feet to a dogwood
tree;  thence S 20-50-30 E 290.35 feet to an existing spike in
the northern margin of Patton Avenue;  thence with the northern
margin of Patton Avenue S 85-26-30 W 350.45 feet to a concrete
monument;  thence still with the northern margin of Patton
Avenue S 87-34 W 25 feet to the point of Beginning.  Subject,
however, to right of way for the widening of Hawkins Lane and
the right of way for the widening of Louisiana Avenue.

        TRACT TWO:  BEGINNING at an iron pipe in the
eastern margin of Louisiana Avenue, Wells' northwest corner,
and running thence with the Wells' line, S 81-17 E 234.57 feet
to an iron in the line of the land of G-K, Inc.;  thence
with said line N 3-7 E 161.69 feet to a monument at a 24 inch
pin, corner with Shelton;  thence with the Shelton line N
78-27 W 353.92 feet to an iron pipe in the eastern margin of
Louisiana Avenue;  thence with the eastern margin of Louisiana
Avenue S 19-26 E 12.15 feet and S 28-51 E 211.44 feet to the
point of Beginning.

EXHIBIT "A"

BOOK 1135 PAGE 168
BOOK 1134 PAGE 444

Deed of Trust held by John F. Shuford as Trustee for
the Penn Mutual Life Insurance Company dated January 27, 1966
in the original amount of $1,275,000.00 recorded in Deed of
Trust Book 697 page 91 Buncombe County Registry.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXX

     Lease dated December 18,1964 from Patton Avenue Development
Corporation to S. S. Kresge (memorandum of lease recorded
in Book 918, page 279).

     Lease dated May 6, 1966 from Patton Plaza Associates to
Bancroft Realty Company (Eckerd's Drugs,Inc.)

     Lease dated June 11, 1972 from Nineteenth Asheville Corp. to
Piece Goods Shops, Inc. of North Carolina.

     Lease dated February 12, 1974 from Nineteenth Asheville Corp.
to Blazer Financial Services, Inc.

     Taxes subsequent to those for the year 1975.

     Rights of parties in possession, encroachments, overlaps,
overhangs, unrecorded easements, deficiency in quantity
of ground, or any matters not of record, which would be
disclosed by an accurate survey and inspection of the
premises.

     Easements to Southern Bell Telephone and Telegraph Company
of record in Book 559, Page 460; Deed Book 667, Page 517;
Deed Book 670, Page 50; Deed Book 708, Page 382; Carolina
Power and Light Company, Deed Book 621, Page 135.

     Easement to Wachovia Bank and Trust Company as set forth
in Deed Book 894, Page 457, Buncombe County Registry,
affecting Tract One.

     Terms, covenants and conditions of that certain lease and
amendments thereto from Edison C. Joyner and wife, Dovie
R. Joyner, to Patton Avenue Development Corporation, dated
October 1, 1964, and recorded in Deed Book 911, Page 402,
and as amended by Lease Amendments dated March 18,1965,
recorded in Deed Book 918, Page 285; dated May 21, 1965,
recorded in Deed Book 929, Page 193; and dated August 14,
1965, recorded in Deed Book 929, Page 275, Buncombe County
Registry, affecting Tract Two.

     Rights of others in and to the use of drainage easements
and roadway easements as contained in Book 1085, Page 359.

     Restrictions appearing of record in Book 1085, Page 359.

     Title to that portion of the property within the bounds
of Hawkins Lane and Louisiana Avenue.

EXHIBIT "B"