# EXHIBIT A

2013 ONCA 722 (CanLII)

COURT OF APPEAL FOR ONTARIO

CITATION: Western Larch Limited v. Di Poce Management Limited,
2013 ONCA 722
DATE: 20131129
DOCKET: C56453

Gillese, Tulloch and Lauwers JJ.A.

BETWEEN

Western Larch Limited and Donald A. MacIver

Plaintiffs (Appellants)

and

Di Poce Management Limited, John Di Poce, Eastern Hemlock Limited, George Frankfort, Large Tooth Aspen Limited, Carmine Guglietti, Red Alder Limited, The Estate of Giovanni Guglietti, Fincourt Inc., Fincourt Partnership, Alpa Lumber Inc., and Alpa Partnership

Defendants (Respondents)

Terrence O'Sullivan and Shaun Laubman, for the appellants

Peter H. Griffin and Matthew B. Lerner, for the respondents

Heard: April 24, 2013

On appeal from the judgment of Justice D. M. Brown of the Superior Court of Justice, dated December 11, 2012, with reasons reported at 2012 ONSC 7014.

**Lauwers J.A.:**

[1]    The motion judge, sitting as a judge on the Commercial List, granted partial summary judgment in a commercial dispute about the exercise of a shotgun buy-sell provision in a partnership agreement.  He ruled that although the respondents' buy-sell offer did not comply perfectly with the shotgun buy-sell

provision, it was nonetheless valid and enforceable. He directed a trial on the appellants' claims for damages for three breaches of contract.

[2]    For the reasons set out below, I would dismiss the appeal.

**Overview**

[3]    The respondent Alpa Partnership operated through the respondent Alpa Lumber Inc. and some 89 corporations and partnerships. It was in the business of manufacturing and distributing wood products for the low-rise residential building industry in Ontario.

[4]    According to the Statement of Claim, Alpa Partnership was established in 1978 as the result of a leveraged buyout of Reed Lumber Co. Donald MacIver was the president and CEO of the parent company, Reed Paper Ltd. He joined the partnership, and was "responsible for the creation of Alpa's corporate and tax structure as well as its partnership documentation". After overseeing the restructuring of the partnership from 1986 to 1988, he continued to have primary responsibility for its financial and corporate affairs and, until June 14, 2010, was its Chairman and Secretary-Treasurer. Relations between the partner shareholders and Mr. MacIver deteriorated over time.

[5]    The core business arrangement was the 1997 Amended Restated Partnership Agreement (the "PA"). The partner corporations, and their associated partner shareholders were, respectively: Di Poce Management Limited (John Di

2013 ONCA 722 (CanLII)

2013 ONCA 722 (CanLII)

Poce); Western Larch Limited (Mr. MacIver); Large Tooth Aspen Limited (Carmine Guglietti); Red Alder Limited (the late Giovanni Guglietti); and Eastern Hemlock Limited (George Frankfort).

[6]    In these reasons, the term "respondents" refers to the named respondents other than Red Alder Limited, and the Guglietti Estate, since the motion judge dismissed the action against Red Alder Limited and the Guglietti Estate, and that dismissal was not appealed,.

[7]    For the purpose of this appeal, there were two relevant avenues by which a partner could be required to exit from the partnership under the PA: by the death of a shareholder partner, largely governed by Article 8; and, through the operation of the shotgun buy-sell provision, largely governed by Article 6.

[8]    Giovanni Guglietti's death on September 4, 2009 triggered the partners' obligation under Article 8 to buy out Red Alder's interest. The partner shareholders, other than Mr. MacIver, wanted Red Alder to continue as a partner.

[9]    As a result of Mr. MacIver's opposition, the other partner shareholders adopted a two-pronged strategy. The first prong was that on December 11, 2009, Di Poce Management, Eastern Hemlock and Large Tooth Aspen agreed with Red Alder to bring it back into a restructured partnership, conditional upon the successful execution of the second prong, which was the buy-out of Western Larch by the other partners. On December 15, 2009, Di Poce Management,

Page:  4

Eastern Hemlock and Large Tooth Aspen delivered their shotgun buy-sell offer to Western Larch.

[10]   The buy-sell offer contained two alternatives, either one of which could have been accepted by the appellants. The alternatives differed in their treatment of debt. Under s. 6.11(a) of the PA, the partnership is obliged to repay its debt to the exiting partner "in full on closing". Alternative 2 would have repaid the partnership's debt to Western Larch on closing as required by the PA. Alternative 1 provided instead for the repayment of half of the debt on closing, with the balance to be paid over four years together with interest. The buy-sell offer also provided that if the appellants did not choose between the alternatives, and did not elect to reverse the buy-sell offer, they would be deemed to have chosen Alternative 1.

[11]   Mr. MacIver did not complain about the valuation of the partnership used in calculating the purchase and sale prices, or about the form of the buy-sell offer, when he was presented with it.   Instead, he and Western Larch, tried to secure financing so that they could reverse the offer, and buy out the interests of the respondents.   Their efforts were not successful.

[12]   Mr. MacIver and Western Larch then attacked the validity of the buy-sell offer by issuing the Statement of Claim dated February 12, 2010. In early May 2010, they moved unsuccessfully for an interim and interlocutory injunction to

2013 ONCA 722 (CanLII)

restrain the respondents from implementing or attempting to implement the buy-sell offer: see 2010 ONSC 3046, Cumming J.

[13]    The forced acquisition of the appellants' interest in the partnership was carried out in accordance with Alternative 1 in the buy-sell offer, and closed on June 14, 2010. The appellants were paid about $33 million, including an amount on account of the partnership's debt to Western Larch to be paid over four years together with interest.

[14]    The respondents moved for summary judgment to dismiss the action. Partial summary judgment was granted, by D.M. Brown J. (the motion judge), for the reasons reported at 2012 ONSC 7014.  This appeal is from his judgment.

**The Standard of Review**

[15]    The standard of review on this appeal is correctness, since it involves the interpretation of a contract, with due deference to be paid to the motion judge on those determinations in which the facts dominate: *The Plan Group v. Bell Canada*, 2009 ONCA 548, 96 O.R. (3d) 81, at paras. 19-20, 27; *Zeubear Investments Ltd. v. Magi Seal Corporation*, 2010 ONCA 825, 103 O.R. (3d) 578, at para. 22. This court has, on numerous occasions, paid deference to experienced Commercial List judges in contractual interpretation. For example, in *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205, 85 O.R. (3d) 254, at para. 47, Blair J.A. said:

2013 ONCA 722 (CanLII)

> Matters involving the factual matrix underlying a contract are matters of fact, or at least matters of mixed fact and law. A judge is owed considerable deference in her assessment of such matters. Here, the experienced Commercial List judge was exercising a function common to that role - the interpretation of a commercial contract…

[16]    See also *Treat America Limited v. Nestlé Canada Inc.*, 2011 ONCA 560, at para. 15, Blair J.A.; *BTR Global Opportunity Trading Limited v. RBC Dexia Investor Services Trust*, 2011 ONCA 518 at para. 3, among others. These decisions recognize, as Farley J. observed, in *771225 Ontario Inc. v. Bramco Holdings Co.*, [1992] O.J. No. 1772, that "judges available to sit in the List are some of those who have experience, expertise and an interest by aptitude and inclination in "corporate/commercial matters", of a complex or intricate nature". The Commercial List is a specialized court for the purpose of situating the decision on the spectrum of deference required by *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235.

**The Decision under Appeal**

[17]    The appellants argued that the law required the buy-sell offer to comply strictly with Article 6 of the PA, the shotgun buy-sell provision. The motion judge accepted this as a correct statement of the law.

[18]    The appellants took the position that the buy-sell offer did not comply strictly with the shotgun buy-sell provision in the PA and was therefore invalid;

2013 ONCA 722 (CanLII)

they alleged that there were numerous deficiencies, so that it was not open to the respondents to enforce it. A non-compliant shotgun buy-sell offer is an ordinary, and therefore, prima facie, legally valid, offer to buy or to sell, but it lacks enforceability for shotgun purposes. Thus, one party is not able to force another party to close on the terms of the offer. I observe that the motion judge and the parties use the language of "validity" in this limited sense of shotgun enforceability, and I will use it the same way.

[19]   The motion judge adopted the approach of categorizing the different elements of the shotgun buy-sell provision. He referred to some terms, at para. 123, as "categories of contractual provisions [that] deal with the issue of the formation of a binding agreement of purchase or sale", while he characterized other terms as dealing "not with the making of a binding agreement, but its performance." He explained his approach, at para. 124:

> The plaintiffs contend, in effect, that the breach of any Article 6 term invalidates an offer. I do not agree. The breach of those categories of contractual terms dealing with the making of an offer would invalidate an offer, but the breach of terms falling in the performance categories would give rise to a claim for breach of a binding agreement of purchase or sale, not a claim that the binding agreement was invalid.

[20]   Consistent with that approach, the motion judge found, at para. 201, that the buy-sell offer as a whole was valid, and that there was no genuine issue

2013 ONCA 722 (CanLII)

requiring a trial with respect to the plaintiffs' claims concerning the validity of the offer.

[21]    The appellants' chief complaint was that the valuation used by the offerors was not based on the fair market value of the partnership.  Their case, at bottom, is about the amount that the respondents must pay in order to buy out their interest in the partnership. The appellants' "strict compliance" attack on the buy-sell offer is their chosen weapon in seeking the court's assistance to reopen the issue of the partnership's value, which is essential in establishing damages. The appellants quantify the prize in this fight at "not less than $79 million", largely being the asserted difference in the value of their interest in the partnership, measured as between the specified value in the buy-sell offer, and the appellants' own estimate of fair market value.

[22]    The motion judge found, at para. 145, that there was no requirement in the PA for the valuation in the buy-sell offer to be at fair market value, and that "the Offer complied with the specification of value requirements contained in s. 6.2(a) of the Agreement."

[23]    The appellants made five additional complaints. The first was that the buy-sell offer built in the partnership's obligation to buy out Red Alder. As a result, the specified formula in s. 6.2 of the PA for calculating the respective shares was not met.   The motion judge rejected this complaint on the basis that the partnership

2013 ONCA 722 (CanLII)

was obliged, under Article 8 of the PA, to buy out Red Alder on Mr. Guglietti's death. The effect was to increase Western Larch's partnership share to 16.75 per cent, but, as the motion judge pointed out, at para. 158, "Article 8 required Western Larch to pay for that increased share; it was not a gift."

[24]   The motion judge concluded that, since the PA permitted a buy-sell offer to be made at any time, it was only reasonable that this would include a period after a partner shareholder's death and before the Partnership's obligations in respect of that death were worked out. Although there was a timing difference concerning payments due under Article 8 and Article 6, the motion judge decided, at para. 161, that the deduction of the entire Red Alder obligation in calculating the purchase price was "commercially reasonable".

[25]   The appellants' second additional complaint, referred to at para. 165 of the reasons, concerned the form of the promissory note delivered on closing, in particular, the inclusion of language providing that "[t]his Promissory Note shall not be negotiable or assignable by the holder without the prior written consent of the undersigned". The motion judge dismissed this complaint, at para. 166, on the basis that s. 6.5(2) of the PA did not preclude the inclusion of additional terms, but, in fact, it contemplated that possibility.   He noted that the objection to the included language was only brought forward by the appellants one hour before the closing, although they had had the closing material for ten days. The motion judge called this a "high risk strategy". He held, at para. 167, that:

Page:   10

2013 ONCA 722 (CanLII)

> For the vendor to sit back, to rebuff invitations to comment on the draft closing documentation, and then to spring comments on the purchasers an hour before closing was unreasonable commercial conduct and provided Western Larch with no legitimate basis upon which to complain about the contents of the proffered promissory note.

[26]   The appellants' third additional complaint was about the inclusion of an incorrect debt adjustment figure in the buy-sell offer. In mid-January 2010, the offerors sent a letter to the appellants providing the correct figure for closing. The motion judge found that it was proper for an estimated debt figure to have been used when the offer was made since the actual indebtedness had to be finalized as part of the closing arrangements. He found, at para. 182, that "nothing in the Agreement prohibited the making of adjustments on the closing of a buy-sell offer." The motion judge concluded, at para. 183, that the appellants would have received the amount to which they were contractually entitled on closing, so that there was "no air of commercial reality to this objection by Western Larch."

[27]   The appellants' fourth additional complaint concerned the termination date of Western Larch's allocation of net earnings. The PA required that entitlement to end on April 14, 2010. The offer provided, however, that the net earnings were to be calculated at the end of the prior month, on March 31, 2010. The appellants argued that this two week difference was yet another fatal failure to comply that

Page:   11

rendered the buy-sell offer invalid. The motion judge found that this provision in the offer was inconsistent with the PA, but held that it did not render the offer unenforceable.   He stated, at para. 192: "Non-compliance with that performance requirement would not invalidate an offer, but non-compliance could give rise to a claim for any shortfall in net earnings for the period between the delivery of an offer and closing." The motion judge found that the appellants could be entitled to damages for the two-week difference and directed a trial of that issue.

[28]   The appellants' fifth additional complaint was that the buy-sell offer completely eliminated Western Larch's interest in the partnership, contrary to the terms of a separate Acknowledgment letter that was signed by the partners contemporaneously with the execution of the PA. The Acknowledgment provided:

> [I]f either Di Poce Management Limited or Western Larch Limited dispose of their interest in the Partnership for any reason, it will be allowed to retain a .001% interest in the earnings of the Partnership (to a maximum of $1000 per annum) for the next 30 years.

[29]   The appellants argued that they would suffer detrimental tax treatment as a result of the buy-sell offer's failure to provide a continuing nominal interest in the partnership. The motion judge found that the offer was deficient in failing to give effect to the Acknowledgment.   He also found, at para. 200, that the appellants had failed to bring this omission to the attention of the respondents. Although the tax advantage may have been somewhat attenuated by recent

2013 ONCA 722 (CanLII)

*Income Tax Act* amendments, the motion judge was not in a position to quantify the damage and directed a trial of that issue. He noted that this complaint could not affect the validity of the buy-sell offer since it was not an element of the shotgun buy-sell provision in the PA.

[30]    Having identified three breaches by the respondents arising out of their imposition of Alternative 1 on the appellants, the motion judge, at para. 202, set three issues for trial:

> a/ the claim that Western Larch suffered damage as a result of the closing taking place on the basis that Western Larch was not paid in full on closing the indebtedness owed to it by the Partnership;
>
> b/ the claim by Western Larch for additional net earnings pursuant to section 6.9 of the Agreement; and,
>
> c/ the claim by Western Larch that on closing it should have received the narrowly defined earnings interest described in the Acknowledgement and whether any damages resulted from that omission.

[31]    The motion judge granted summary judgment in favour of the respondents on the rest of the issues and dismissed the claims asserted in related paragraphs of the Amended Statement of Claim.

[32]    For completeness, I note that the appellants do not appeal the dismissal of the following claims: that the shotgun buy-sell provision could not be triggered unless "a partner became mentally unstable and erratic", at paras. 125-135; for various breaches of fiduciary duty, at paras. 205-246; and for oppression under

2013 ONCA 722 (CanLII)

Page:  13

s. 248 of the *Ontario Business Corporations Act,* R.S.O. 1990, c. B-16, at paras. 247-256.

**The Positions of the Parties on this Appeal**

[33]    The appellants press their argument that "strict compliance" means "strict compliance," and that the motion judge erred in letting the respondents off the "strict compliance" hook. They assert that this court's approval of the motion judge's approach would undermine the certainty required in this important area of commercial law. The appellants argue that any one of the deficiencies they identified in the buy-sell offer should have been sufficient to render the buy-sell agreement unenforceable. They also argue that the respondents should not have been permitted to force Alternative 1 on them at the closing, since it was not compliant with the PA.

[34]    Mr. MacIver accepts that there is no prospect of re-assembling the partnership.  As the motion judge noted, at para. 3: "[T]he plaintiffs recognize that it would impossible for them to return as a partner of ALPA Partnership." The appellants seek damages.

[35]    The motion judge set the measure of damages on the basis that only Alternative 2 in the buy-sell agreement was enforceable. The appellants, however, seek damages on a different basis. They assert in the Amended Statement of Claim that they are entitled to $79 million more than the amounts

2013 ONCA 722 (CanLII)

2013 ONCA 722 (CanLII)

already paid to them by the respondents, largely on the basis that the partnership valuation should have been at fair market value.

[36]   The appellants ask this court to reinstate the following paragraphs of the Amended Statement of Claim, which express well the scope of their ambition on this appeal: para. 1(a) – for a declaration that the buy-sell offer was invalid and of no force and effect; para. (t) – for a declaration that the valuation of Alpa must be based on "an independent valuation of Alpa"; para. (u) – for an order requiring the defendants to buy the plaintiffs' interest in Alpa at that value; and the portion of para. 1(n) that seeks "damages for breach of contract in connection with the removal of the Plaintiffs from the Alpa Partnership and related entities".

[37]   The respondents rely on the motion judge's the reasons and ask that the appeal be dismissed.

**The Issues**

[38]   I address the following issues in turn:

1.    Did the inclusion of Alternative 1 render the buy-sell offer unenforceable?

2.    Did the respondents' purported imposition of Alternative 1 on the appellants render the buy-sell offer unenforceable?

3.    Did the motion judge err in setting the measure of damages for breaches of the shotgun buy-sell provision?

2013 ONCA 722 (CanLII)

**Analysis**

[39]    Before considering the specific issues raised in this appeal, I make some general observations about shotgun buy-sell provisions and the court's approach to their interpretation and enforcement.

[40]    Unanimous shareholder agreements, partnership agreements, and joint venture agreements often contain what is commonly known as a "shotgun buy-sell provision". This is a mechanism for involuntarily expelling one or more of the parties from a business venture, which will continue without the exiting party's participation. Expulsion is a remedy available where, for example, the participants no longer get along, as in this case.

[41]    Shotgun buy-sell provisions generally share the following features. The offeror party triggers the provision by putting a shotgun buy-sell offer to the offeree party. The offeror offers to buy the offeree's interest in the business venture, or to sell its own interest to the offeree. The offer specifies a value. The offeree must decide whether to buy out the offeror, or to sell its interest to the offeror, at the determined price. Depending on the size of the respective interests, the amounts paid to buy, on the one hand, and to sell, on the other hand, may be quite different, although they are to be based on the specified value. The offeree must make the choice by a certain date. If the offeree does not respond by choosing, then the offeror may force the purchase on the offeree, and require closing on the terms set out in the offer.  Not all of these features are

Page:   16

2013 ONCA 722 (CanLII)

always present and close attention must be paid to the specific contractual language of the shotgun buy-sell provision in order to ensure that an offer is compliant.

[42]   Because the operation of such a provision involuntarily expels a party from what is usually a viable business venture, it is seen to be a draconian remedy: *Laschuk v. Poon*, [1993] 7 Alta. L.R. (3d) 422 (Q.B.). This has led courts to require a shotgun buy-sell offer to comply "strictly" with the shotgun buy-sell provision in the authorizing agreement, to be enforceable.  In *Zeubear*, O'Connor A.C.J.O., stated, at para. 24:

> In this case, the court is confronted with the interpretation of a buy-sell provision in a commercial contract. I agree with the observation of the Alberta Court of Appeal in *942925 Alberta Ltd. v. Thompson* (2008), 47 B.L.R. (4th) 1, at para. 21 that "a shareholder must strictly comply with the terms of a shotgun clause in order to obtain its benefit".

[43]   In *Trimac Ltd. v. C-I-L Inc.* (1987), 52 Alta. L.R. (2d) 263; 1987 CarswellAlta 113 (Q.B.), in response to a shotgun buy-sell offer, C-I-L purported to elect to purchase the interest of Trimac.  In its purported acceptance letter C-I-L stated: "On closing C-I-L will therefore pay to Trimac $91 million, in return for the Trimac shares in Tricil, or such other sum as, by that time, has been determined by the Supreme Court of Ontario to be the amount payable for such shares"  The court found, at para. 35, that C-I-L "overplayed its hand" because, in seeking to buy for

less, as noted at para. 30, its offer "equivocated". As a result, C-I-L's acceptance did not meet the standard required by the buy-sell provision in the agreement. Trimac therefore successfully bought out C-I-L based on its clean offer. Virtue J. stated, at para. 29: "<u>A shotgun buy-sell is strong medicine.  One takes it strictly in accordance with the prescription or not at all</u>" (emphasis added).   The decision was upheld at (1987), 53 Alta. L.R. (2d) 97; 1987 CarswellAlta 142 (C.A.).

[44]    The members of this partnership are sophisticated and experienced business people who operated a successful and complex business for many years under a comprehensive PA. It appears that they have been assisted throughout by legal and other advisors. The PA contemplates the event of a falling out among the partners, since it contains a shotgun buy-sell provision, which was described, by the two experienced Commercial List judges who heard the injunction motion and the summary judgment motion, as well-drafted and carefully designed.

[45]    Two design features in this shotgun buy-sell provision are notable, in my view. First, the partners could have included, but did not, a provision requiring the valuation specified in a buy-sell offer to be at the partnership's fair market value, as in *Hargreaves v. Charbonneau*, [2003] O.J. No. 4268 (S.C.). Second, the partners could have included a provision, but did not, prohibiting partners from combining to oust another partner, as the shareholders did in *942925 Alberta Ltd. v. Thompson*,  2008 ABCA 81.

2013 ONCA 722 (CanLII)

[46]    It seems to me that the court should be reluctant to rescue a party who later regrets contractual arrangements that were carefully designed and accepted. The court's task is to consider whether compliance with the shotgun buy-sell provision is sufficiently strict, given the vagaries and complexities of commercial arrangements and commercial life, which the parties have plainly accounted for in their contractual arrangements. Strict compliance is not perfect compliance.

[47]    I agree with the motion judge's exposition, at paras. 109-111, of the relevant principles of contract law, and I will not repeat them here. In my view, in deciding whether the respondents' shotgun buy-sell offer met the strict compliance test, the commercially reasonable expectations of these sophisticated parties in this factual context must be considered.

## 1.    Did the inclusion of Alternative 1 render the buy-sell offer unenforceable?

[48]    The motion judge found that Alternative 2 in the buy-sell offer complies with the shotgun buy-sell provision in the PA. The appellants concede that it is compliant, if none of their other challenges succeed.

[49]    It was open to the offerors to include an alternative in the buy-sell offer even if an alternative offer was not contemplated by the PA, for the appellants' consideration. There was no unfairness in doing so. Had the appellants accepted Alternative 1, then there would effectively have been an agreement to amend the

Page:   19

PA along the lines of the accepted offer. In my opinion, the buy-sell offer was valid and enforceable, since it contained the compliant Alternative 2, which the appellants were free to accept or to reverse. The mere inclusion of Alternative 1 did not invalidate the buy-sell agreement or render it unenforceable.

[50]   The appellants made the five additional complaints referred to above. In my view, none of them was capable of rendering unenforceable the buy-sell offer, nor do they have that effect cumulatively. Considered in context, these additional complaints were minor, and, in my view, the motion judge's disposition of them, by ordering a trial to determine liability and damages, if any, was correct.

## 2.    Did the respondents' purported imposition of Alternative 1 on the appellants render the buy-sell offer unenforceable?

[51]   I observe that, by granting partial summary judgment and ordering the trial of the three issues as to damages, the motion judge effectively compelled the respondents to perform in conformance with Alternative 2, and not with Alternative 1.

[52]   The court will not enforce a shotgun buy-sell offer, such as Alternative 1, that is not strictly compliant with a shotgun buy-sell provision. It will enforce a compliant shotgun buy-sell offer, such as Alternative 2. This accords with the commercially reasonable expectations of the parties.

[53]   Consistent with its purpose in the PA, the shotgun buy-sell provision, as reflected in the buy-sell offer, put the obligation squarely on the appellants to

2013 ONCA 722 (CanLII)

make a decision – either accept and complete the offer to sell their interest in the partnership to the offerors, or reverse the offer and buy the interests of the offerors. They could have done so on the basis of compliant Alternative 2. The appellants did neither. The consequence of not making the decision was clearly spelled out in the offer; they would be deemed to have selected Alternative 1. The closing proceeded on the basis of Alternative 1 using powers of attorney.

[54]   The motion judge found that the inclusion of the provision forcing the closing based on the non-compliant Alternative 1 did not invalidate the buy-sell offer and render it unenforceable. (It will be recalled that Alternative 1 was not compliant with the shotgun buy-sell provision in the PA because it did not require repayment of the partnership's debt to Western Larch "in full on closing".)   The motion judge's logic, laid out at paras. 175-176, was that the debt repayment obligation arose under section 6.11(a) of the PA as part of the "Closing Arrangements". Obligations on closing, he noted, do not arise unless there is first a binding contract. He concluded at para. 175:

> If a binding contract exists, one party may default on closing obligations, but that does not mean there never was a binding contract. Such a default would give rise to a claim for damages for breach of some closing obligation.

[55]   The motion judge analogized to *Zeubear*, in footnote 110 and the associated text, and found that it was open to Western Larch to insist that the

2013 ONCA 722 (CanLII)

closing take place in accordance with section 6.11(a) of the PA, despite the terms of Alternative 1 in the buy-sell offer.

[56]   The motion judge was unable to determine whether there was any appreciable financial difference between Alternative 1 and Alternative 2, given that Alternative 1 provided for the payment of interest on the balance of unpaid debt. He found that Alternative 1's non-compliance gave rise to a claim for damages.

[57]   In *Zeubear*, this court required the offeror to comply with the mandatory terms of the shotgun buy-sell provision even though the buy-sell offer purported to offer different terms. At issue in *Zeubear* was whether a buy-sell offer could require the amount payable for the shares to be paid in full on closing, even though the shotgun buy-sell provision in the unanimous shareholders agreement imposed a term that the buyer would pay at least 50 per cent of the purchase price in cash on closing with the balance in a promissory note. This court found, at para. 39, that the mandatory terms of the shareholders' agreement overrode the contrary terms of the buy-sell offer, and noted, at para. 38, that requiring the parties to perform in accordance with the mandatory terms of the shotgun buy-sell provision was the "commercially reasonable" result. The court required the parties to stick with the deal they made.

2013 ONCA 722 (CanLII)

[58]   In my view, since Alternative 1 was non-compliant, the respondent offerors could not compel that alternative to be chosen by the appellants. The respondents could only have required the appellants to sell in accordance with Alternative 2.

[59]   The appellants rely on cases where courts have found that the buy-sell offer is not enforceable because the offerors tried to add conditions to the offer that were not contemplated by the shotgun buy-sell provision, such as: a noncompetition clause: *Hargreaves*, at paras. 21-22; a release from guarantees: *Oakley v. McDougall*, 1986 CarswellBC 1500 (S.C.), at paras. 17-19, varied, 14 B.C.L.R. (2d) 128; a release addressed to the offerors: *360246 B.C. Ltd. v. Evmo Holdings Ltd.*, [1993] B.C.J. No. 2068 (S.C.), at paras. 16-18; and, a discount of the purchase price reflecting the payment of loans and indebtedness to be addressed separately on closing: *Gazo v. Gazo*, [2008] O.J. No. 449 (S.C.), at paras. 17-20. Nor is an equivocal acceptance enforceable: *Trimac Ltd. v. C-I-L Inc.*, at paras. 30-34, in which the offeree proposed that the venture's value be set by the court. Plainly, the fact that a buy-sell offer's provisions are reciprocal is not sufficient to make it valid.

[60]   In my opinion, however, none of these cases are applicable to the present case, since the respondents did not make the buy-sell offer conditional on a matter that was not provided for in the shotgun buy-sell provision in the PA, nor was the buy-sell offer equivocal.

2013 ONCA 722 (CanLII)

[61]    The appellants argue that by purporting to force the closing in line with Alternative 1, the respondents did secure an advantage that was not contemplated by the shotgun buy-sell provision in the PA - the effective expulsion of the appellants in a non-compliant manner. I disagree. The expulsion was accomplished by the operation of the shotgun buy-sell provision and the enforcement of Alternative 2. As the motion judge found, in view of the minor deficiencies, compliance is best effected, and the breaches of the shotgun buy-sell provision are best addressed, through damages. I agree.

[62]    Nothing in these reasons should be taken as affirming the motion judge's approach of categorizing the elements of the shotgun buy-sell into "formation" terms that affect validity, and "performance" terms that lead only to damages. It is not clear to me that this approach will always produce the right outcome, although it did on the facts of this case. Sometimes actual performance will be of overriding importance and the availability of a damages claim for a performance breach would be very cold comfort. An exiting party has no control over the business after departure, and recent times provide examples of even very large businesses disappearing quickly, along with their ability to pay damages. That is not an issue in this case, however, since the appellants seek damages.

[63]    The motion judge fully and carefully considered the evidentiary record, and boiled down the evidence. At the end of that exhaustive exercise the motion judge found only three damage claims that warranted a trial. I agree with the

motion judge that the elements of non-compliance were, in this particular factual context, commercially insignificant, and can be fully and fairly remedied by damages.

[64]   In my opinion, the buy-sell offer is sufficiently compliant with the shotgun buy-sell provision in the PA to meet the strict compliance standard. As I have said, strict compliance is not perfect compliance. Neither the law, nor the requirements of commercial certainty in this area, requires perfect compliance.

[65]   In summary,

- To be enforceable, a shotgun buy-sell offer must comply strictly with the shotgun buy-sell provision in the authorizing agreement (above, at para. 42).

- Strict compliance is not perfect compliance (above, at para. 46).

- In deciding whether a shotgun buy-sell offer meets the strict compliance test, the commercially reasonable expectations of the parties in the factual context must be considered. Much will depend on the language of the authorizing agreement and the shotgun buy-sell provision (above, at para. 47).

- The inclusion of an alternative in a shotgun buy-sell offer that does not comply strictly with the shotgun buy-sell provision in the authorizing agreement does not affect the enforceability of the

2013 ONCA 722 (CanLII)

buy-sell offer, provided that a compliant alternative is also included (above, at para. 49).

- The court will not enforce the alternative that is not strictly compliant with a shotgun buy-sell provision. It will enforce the compliant alternative shotgun buy-sell offer (above, at paras. 52, 58).

- The court will find compliance to be sufficiently strict, and will enforce a shotgun buy-sell offer containing elements of non-compliance that are, in the particular factual context, commercially insignificant, and which can be fully and fairly remedied by damages (above, at paras. 63-64).

### 3.    Did the motion judge err in setting the measure of damages for breaches of the shotgun buy-sell provision?

[66]    As noted, the valuation used by the respondents on which the buy-sell offer was based, was $258,871,780.00. The appellants' most significant financial complaint is that the value selected by the respondents "was not the fair market value of the Partnership", and they argue that it should have been.

[67]    Did the motion judge err in setting the measure of damages on the basis that the parties are bound by Alternative 2? Or, as the appellants contend, should it be on another basis altogether?

Page:  26

[68]   The motion judge made an apposite comment in dismissing the appellants' oppression claim, at para. 257, that, in my opinion, applies to the measure of damages:

> [T]here was no reasonable basis for an expectation by the plaintiffs that they would be bought out only at "fair value". They had agreed to a shotgun buy-sell mechanism which permitted the making of an offer to them at "a value", and entitled them to reverse the offer at that value. Those contractual provisions bench-marked the reasonable expectations of all partners with respect to the value which they reasonably could expect when delivered a buy-sell offer.

[69]   The motion judge found, at para. 145, that there was no requirement in the PA for the valuation in the buy-sell offer to be at fair market value, and that "the Offer complied with the specification of value requirements contained in section 6.2(a) of the Agreement." He did so on the basis that self-interest is "the essence of the internal discipline of a shotgun buy-sell provision."

[70]   As Cumming J. explained, at para. 30 of his decision refusing the appellants' injunction motion:

> In my view of the Partnership Agreement, the Buy-Sell provisions serve to function in the manner of a classic so-called "shotgun" provision. Fairness is assured by the reciprocal Sell Offer mirroring the Buy Offer. The self-interest of the Offering Defendants tends to guarantee a price that reflects a market value. The Offeror Defendants know that they may be bought out at the same price they offer for the Offeree Plaintiffs' shares. The price offered by the Offeror Defendants is

2013 ONCA 722 (CanLII)

2013 ONCA 722 (CanLII)

thus self-regulated. The specified valuation for the Alpa Partnership of $258,871,780 set forth in the Buy-Sell Offer has no grounding in terms of a so-called "fair market value" somehow determined by an objective formula.

[71]    Blair J.A made the pithy observation in *Aronowicz v. Emtwo Properties Inc.*, 2010 ONCA 96, 98 O.R. (3d) 641, at para. 50, that:

> A shotgun buy/sell provision is the quintessential corporate mechanism for the exercise of shareholder self-interest. Carefully drafted, it provides a delicate balance for the preservation of the parties' individual rights by ensuring that the pulling of the trigger generates the best and highest price in exchange for the involuntary termination of the shareholders' relationship.

[72]    Mr. MacIver would have been happy to buy out the rest of the partnership at the specified value in the buy-sell offer, but he was not so happy to sell at that price.  His conduct in first seeking to complete the agreement does not form the basis of any estoppel, but it does show how a shotgun buy-sell provision operates in the real world.

[73]    It is trite law that for breach of contract, "the "normal" measure of damages [is] based on the value of the promised performance": S.M. Waddams, *The Law of Contracts*, 6th ed. (Aurora: Canada Law Book Inc., 2010) at p. 548. See also *Gottlieb v. Adam* (1994), 21 O.R. (3d) 248 (Gen. Div.); [1994] O.J. No. 2636, at para. 33, Spence J.

[74]    The context for the application of this principle in this case was captured by the motion judge's trenchant observation, at para. 257, that the shotgun buy-sell provision in the PA "bench-marked the reasonable expectations of all partners with respect to the value which they reasonably could expect when delivered a buy-sell offer."

[75]    If the appellants had succeeded in their injunction application, then it is fair to assume that the respondents would immediately have issued a new, fully compliant offer. That offer might well have been at a lower value than the first offer because the respondents would have learned of the appellants' vulnerability from their inability to raise the funds to reverse the first offer.

[76]    The appellants appear to take the view that a declaration that the buy-sell offer was invalid would leave the court free to adopt a measure of damages based on the partnership's fair market value. It is difficult to see how that result could be reached, when it was never contemplated by the PA.

[77]    The commercially reasonable outcome of such a declaration would ordinarily be to permit the parties to begin again, consistent with their agreement, with the distinct possibility that someone might be worse off.

2013 ONCA 722 (CanLII)

[78]    In my opinion, the motion judge did not err in fixing the applicable measure of damages as the appellants' full compliance with Alternative 2. This measure reflects the commercially reasonable expectations of these parties in the context of a triggered shotgun buy-sell offer under their PA.

**Disposition**

[79]    For these reasons, I would dismiss the appeal with costs to the respondents in the agreed amount of $20,000, all-inclusive.

Released:   November 29, 2013 "EEG"

"P. Lauwers  J.A."

"I agree E.E. Gillese  J.A."

"I agree M. Tulloch  J.A."