# <u>EXHIBIT C</u>

**Sun Indalex Finance, LLC**    *Appellant*

*v.*

**United Steelworkers, Keith Carruthers, Leon Kozierok, Richard Benson, John Faveri, Ken Waldron, John (Jack) W. Rooney, Bertram McBride, Max Degen, Eugene D'Iorio, Neil Fraser, Richard Smith, Robert Leckie and Fred Granville**    *Respondents*

- and -

**George L. Miller, the Chapter 7 Trustee of the Bankruptcy Estates of the U.S. Indalex Debtors**    *Appellant*

*v.*

**United Steelworkers, Keith Carruthers, Leon Kozierok, Richard Benson, John Faveri, Ken Waldron, John (Jack) W. Rooney, Bertram McBride, Max Degen, Eugene D'Iorio, Neil Fraser, Richard Smith, Robert Leckie and Fred Granville**    *Respondents*

- and -

**FTI Consulting Canada ULC, in its capacity as court-appointed monitor of Indalex Limited, on behalf of Indalex Limited**    *Appellant*

*v.*

**United Steelworkers, Keith Carruthers, Leon Kozierok, Richard Benson, John Faveri, Ken Waldron, John (Jack) W. Rooney, Bertram McBride, Max Degen, Eugene D'Iorio, Neil Fraser, Richard Smith, Robert Leckie and Fred Granville**    *Respondents*

- and -

**United Steelworkers**    *Appellant*

**Sun Indalex Finance, LLC**    *Appelante*

*c.*

**Syndicat des Métallos, Keith Carruthers, Leon Kozierok, Richard Benson, John Faveri, Ken Waldron, John (Jack) W. Rooney, Bertram McBride, Max Degen, Eugene D'Iorio, Neil Fraser, Richard Smith, Robert Leckie et Fred Granville**    *Intimés*

- et -

**George L. Miller, syndic de faillite des débitrices Indalex É.-U., nommé en vertu du chapitre 7**    *Appelant*

*c.*

**Syndicat des Métallos, Keith Carruthers, Leon Kozierok, Richard Benson, John Faveri, Ken Waldron, John (Jack) W. Rooney, Bertram McBride, Max Degen, Eugene D'Iorio, Neil Fraser, Richard Smith, Robert Leckie et Fred Granville**    *Intimés*

- et -

**FTI Consulting Canada ULC, en sa qualité de contrôleur d'Indalex Limited désigné par le tribunal, au nom d'Indalex Limited**    *Appelante*

*c.*

**Syndicat des Métallos, Keith Carruthers, Leon Kozierok, Richard Benson, John Faveri, Ken Waldron, John (Jack) W. Rooney, Bertram McBride, Max Degen, Eugene D'Iorio, Neil Fraser, Richard Smith, Robert Leckie et Fred Granville**    *Intimés*

- et -

**Syndicat des Métallos**    *Appelant*

| | |
|---|---|
| *v.* | *c.* |
| **Morneau Shepell Ltd. (formerly known as Morneau Sobeco Limited Partnership) and Superintendent of Financial Services** *Respondents* | **Morneau Shepell Ltd. (anciennement connue sous le nom de Morneau Sobeco, société en commandite) et Surintendant des services financiers** *Intimés* |
| and | et |
| **Superintendent of Financial Services, Insolvency Institute of Canada, Canadian Labour Congress, Canadian Federation of Pensioners, Canadian Association of Insolvency and Restructuring Professionals and Canadian Bankers Association** *Interveners* | **Surintendant des services financiers, Institut d'insolvabilité du Canada, Congrès du travail du Canada, Fédération canadienne des retraités, Association canadienne des professionnels de l'insolvabilité et de la réorganisation et Association des banquiers canadiens** *Intervenants* |

INDEXED AS: SUN INDALEX FINANCE, LLC *v.* UNITED STEELWORKERS

RÉPERTORIÉ : SUN INDALEX FINANCE, LLC *c.* SYNDICAT DES MÉTALLOS

**2013 SCC 6**

**2013 CSC 6**

File No.: 34308.

Nᵒ du greffe : 34308.

2012: June 5; 2013: February 1.

2012 : 5 juin; 2013 : 1ᵉʳ février.

Present: McLachlin C.J. and LeBel, Deschamps, Abella, Rothstein, Cromwell and Moldaver JJ.

Présents : La juge en chef McLachlin et les juges LeBel, Deschamps, Abella, Rothstein, Cromwell et Moldaver.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Pensions — Bankruptcy and Insolvency — Priorities — Company who was both employer and administrator of pension plans seeking protection from creditors under Companies' Creditors Arrangement Act ("CCAA") — Pension funds not having sufficient assets to fulfill pension promises made to plan members — Company entering into debtor in possession ("DIP") financing allowing it to continue to operate — CCAA court granting priority to DIP lenders — Proceeds of sale of business insufficient to pay back DIP lenders — Whether pension wind-up deficiencies subject to deemed trust — If so, whether deemed trust superseded by CCAA priority by virtue of doctrine of federal paramountcy — Pension Benefits Act, R.S.O. 1990, c. P.8, ss. 57(3), (4), 75(1)(a), (b) — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.*

*Pensions — Faillite et insolvabilité — Priorités — Société à la fois employeur et administrateur de régimes de retraite ayant demandé la protection contre ses créanciers en application de la Loi sur les arrangements avec les créanciers des compagnies (« LACC ») — Actif des caisses de retraite insuffisant pour verser les prestations promises aux participants des régimes — Financement obtenu par la société à titre de débiteur-exploitant (« DE ») lui ayant permis de poursuivre ses activités — Tribunal chargé d'appliquer la LACC ayant accordé priorité aux prêteurs DE — Insuffisance du produit de la vente pour rembourser les prêteurs DE — Les déficits de liquidation des régimes de retraite sont-ils visés par la fiducie réputée? — Dans l'affirmative, la prépondérance fédérale fait-elle en sorte que la priorité issue de l'application de la LACC a préséance sur la fiducie réputée? — Loi sur les régimes de retraite, L.R.O. 1990, ch. P.8, art. 57(3), (4), 75(1)a), b) — Loi sur les arrangements avec les créanciers des compagnies, L.R.C. 1985, ch. C-36.*

*Pensions — Trusts — Company who was both employer and administrator of pension plans seeking protection from creditors under CCAA — Pension funds not having sufficient assets to fulfill pension promises made to plan members — Whether pension wind-up deficiencies subject to deemed trust — Whether company as plan administrator breached fiduciary duties — Whether pension plan members are entitled to constructive trust.*

*Civil Procedure — Costs — Appeals — Standard of review — Whether Court of Appeal erred in costs endorsement concerning one party.*

Indalex Limited ("Indalex"), the sponsor and administrator of two employee pension plans, one for salaried employees and the other for executive employees, became insolvent. Indalex sought protection from its creditors under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). The salaried plan was being wound up when the *CCAA* proceedings began. The executive plan had been closed but not wound up. Both plans had wind-up deficiencies.

In a series of court-sanctioned steps, the company was authorized to enter into debtor in possession ("DIP") financing in order to allow it to continue to operate. The *CCAA* court granted the DIP lenders, a syndicate of pre-filing senior secured creditors, priority over the claims of all other creditors. Repayment of these amounts was guaranteed by Indalex U.S.

Ultimately, with the approval of the *CCAA* court, Indalex sold its business but the purchaser did not assume pension liabilities. The proceeds of the sale were not sufficient to pay back the DIP lenders and so Indalex U.S., as guarantor, paid the shortfall and stepped into the shoes of the DIP lenders in terms of priority. The *CCAA* court authorized a payment in accordance with the priority but ordered an amount be held in reserve, leaving the plan members' arguments on their rights to the proceeds of the sale open for determination later.

The plan members challenged the priority granted in the *CCAA* proceedings. They claimed that they had priority in the amount of the wind-up deficiency by virtue of a statutory deemed trust under s. 57(4) of the *Pension Benefits Act*, R.S.O. 1990, c. P.8 ("*PBA*"), and a constructive trust arising from Indalex's alleged breaches

*Pensions — Fiducies — Société à la fois employeur et administrateur de régimes de retraite ayant demandé la protection contre ses créanciers en application de la LACC — Actif des caisses de retraite insuffisant pour verser les prestations promises aux participants des régimes — Les déficits de liquidation des régimes de retraite sont-ils visés par la fiducie réputée? — La société a-t-elle manqué à ses obligations fiduciaires d'administrateur des régimes? — Les participants des régimes de retraite ont-ils droit à une fiducie par interprétation?*

*Procédure civile — Dépens — Appels — Norme de contrôle — La décision de la Cour d'appel sur les dépens d'une partie est-elle erronée?*

Indalex Limited (« Indalex »), le promoteur et l'administrateur de deux régimes de retraite, l'un pour les salariés, l'autre pour les cadres, est devenue insolvable. Elle a demandé la protection contre ses créanciers sous le régime de la *Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C-36 (« *LACC* »). Le régime des salariés était en cours de liquidation lorsque la procédure fondée sur la *LACC* a été engagée. Le régime des cadres n'acceptait plus de participants, mais il n'était pas liquidé. Les deux régimes accusaient un déficit de liquidation.

Une série de mesures avalisées par le tribunal a permis à la société d'obtenir un financement de débiteur-exploitant (« DE ») et de poursuivre ses activités. Le tribunal chargé de l'application de la *LACC* a accordé aux prêteurs DE, un consortium composé de créanciers qui bénéficiaient d'une garantie de premier rang avant le début de la procédure, une priorité sur tous les autres créanciers. Le remboursement des sommes empruntées était garanti par Indalex É.-U.

Finalement, sur approbation du tribunal appliquant la *LACC*, Indalex a vendu son entreprise, mais l'acquéreur n'a pas repris à son compte les engagements de retraite. Le produit de la vente n'étant pas suffisant pour rembourser les prêteurs DE, Indalex É.-U., à titre de caution, a payé la différence et a acquis de ce fait la créance prioritaire des prêteurs DE. Le tribunal a autorisé le paiement conformément à l'ordre de priorité, mais il a également ordonné la retenue de fonds en réserve, remettant à plus tard l'examen de l'argumentation des participants relative à leur droit au produit de la vente.

Les participants des régimes ont contesté la priorité accordée dans le cadre de la procédure fondée sur la *LACC*. Ils ont fait valoir qu'ils avaient priorité pour le montant du déficit de liquidation en raison de la fiducie réputée créée par le par. 57(4) de la *Loi sur les régimes de retraite*, L.R.O. 1990, ch. P.8 (« *LRR* »), et de la fiducie

of fiduciary duty as administrator of the pension funds. The judge at first instance dismissed the plan members' motions concluding that the deemed trust did not apply to wind-up deficiencies. He held that, with respect to the wind-up deficiency, the plan members were unsecured creditors. The Court of Appeal reversed this ruling and held that the pension plan wind-up deficiencies were subject to deemed and constructive trusts which had priority over the DIP financing priority and over other secured creditors. In addition, the Court of Appeal rejected a claim brought by the United Steelworkers, which represented some members of the salaried plan, seeking payment of its costs from the latter's pension fund.

*Held* (LeBel and Abella JJ. dissenting): The Sun Indalex Finance, George L. Miller and FTI Consulting appeals should be allowed.

*Held*: The United Steelworkers appeal should be dismissed.

(1) *Statutory Deemed Trust*

*Per* Deschamps and Moldaver JJ.: It is common ground that the contributions provided for in s. 75(1)(a) of the *PBA* are covered by the deemed trust contemplated by s. 57(4) of the *PBA*. The only question is whether this statutory deemed trust also applies to the wind-up deficiency payments required by s. 75(1)(b). The response to this question as it relates to the salaried employees is affirmative in view of the provision's wording, context and purpose. The situation is different with respect to the executive plan as s. 57(4) provides that the wind-up deemed trust comes into existence only when the plan is wound up.

The wind-up deemed trust provision (s. 57(4) *PBA*) does not place an express limit on the "employer contributions accrued to the date of the wind up but not yet due". Section 75(1)(a) explicitly refers to "an amount equal to the total of all payments" that have *accrued*, even those that were not yet due as of the date of the wind up, whereas s. 75(1)(b) contemplates an "amount" that is calculated on the basis of the value of assets and of liabilities that have *accrued* when the plan is wound up. Since both the amount with respect to payments (s. 75(1)(a)) and the one ascertained by subtracting the assets from the liabilities accrued as of the date of the wind up (s. 75(1)(b)) are to be paid upon wind up as employer contributions, they are both included in the ordinary meaning of the words of

par interprétation résultant de manquements allégués d'Indalex à son obligation fiduciaire d'administrateur des régimes. En première instance, le juge a rejeté les motions des participants, concluant que la fiducie réputée ne s'appliquait pas aux déficits de liquidation. Il a conclu que, pour ce qui était du déficit de liquidation, les participants étaient des créanciers chirographaires. La Cour d'appel a infirmé la décision et statué que les déficits de liquidation des régimes de retraite faisaient l'objet d'une fiducie réputée et d'une fiducie par interprétation qui prenaient rang avant la créance des prêteurs DE bénéficiant d'une priorité et celles des autres créanciers garantis. En outre, elle a rejeté la prétention du Syndicat des Métallos, qui représentait quelques-uns des participants du régime des salariés, à savoir qu'il avait droit au paiement de ses dépens par prélèvement sur la caisse de retraite des salariés.

*Arrêt* (les juges LeBel et Abella sont dissidents) : Les pourvois interjetés par Sun Indalex Finance, George L. Miller et FTI Consulting sont accueillis.

*Arrêt* : Le pourvoi interjeté par le Syndicat des Métallos est rejeté.

(1) *La fiducie réputée d'origine législative*

*Les* juges Deschamps et Moldaver : Il est bien établi que la fiducie réputée créée par le par. 57(4) de la *LRR* s'applique aux cotisations visées à l'al. 75(1)a) de la *LRR*. La seule question est de savoir si cette fiducie réputée d'origine législative s'applique aussi aux paiements au titre du déficit de liquidation exigés par l'al. 75(1)b). Dans le cas des salariés, la réponse est oui, compte tenu du texte, du contexte et de l'objet par. 57(4). Il n'en va pas de même pour le régime des cadres étant donné que cette disposition prévoit que la fiducie réputée en cas de liquidation ne prend naissance qu'à la liquidation du régime.

Le paragraphe 57(4) de la *LRR*, qui crée la fiducie réputée en cas de liquidation, ne comporte aucune limite expresse aux « cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues ». L'alinéa 75(1)a) prévoit expressément que l'employeur verse « un montant égal au total de tous les paiements » *accumulés*, même s'ils ne sont pas encore dus à la date de la liquidation, tandis que l'al. 75(1)b) parle d'un « montant » calculé à partir de la valeur de l'actif et du passif *accumulés*, lorsque le régime est liquidé. Puisque le montant des paiements (al. 75(1)a)) et le montant établi en soustrayant l'actif du passif accumulé à la date de la liquidation (al. 75(1)b)) doivent tous les deux être versés à la liquidation à titre de cotisations de l'employeur, ils entrent tous les deux dans le sens ordinaire des mots

s. 57(4) of the *PBA*: "amount of money equal to employer contributions accrued to the date of the wind up but not yet due under the plan or regulations".

The time when the calculation is actually made is not relevant as long as the liabilities are assessed as of the date of the wind up. The fact that the precise amount of the contribution is not determined as of the time of the wind up does not make it a contingent contribution that cannot have accrued for accounting purposes. As a result, the words "contributions accrued" can encompass the contributions mandated by s. 75(1)(b) of the *PBA*.

It can be seen from the legislative history that the protection has expanded from (1) only the service contributions that were due, to (2) amounts payable calculated as if the plan had been wound up, to (3) amounts that were due and had accrued upon wind up but excluding the wind-up deficiency payments, to (4) all amounts due and accrued upon wind up. Therefore, the legislative history leads to the conclusion that adopting a narrow interpretation that would dissociate the employer's payment provided for in s. 75(1)(b) of the *PBA* from the one provided for in s. 75(1)(a) would be contrary to the Ontario legislature's trend toward broadening the protection.

The deemed trust provision is a remedial one. Its purpose is to protect the interests of plan members. The remedial purpose favours an approach that includes all wind-up payments in the value of the deemed trust. In this case, the Court of Appeal correctly held with respect to the salaried plan, that Indalex was deemed to hold in trust the amount necessary to satisfy the wind-up deficiency.

*Per* LeBel and Abella JJ.: There is agreement with the reasons of Deschamps J. on the statutory deemed trust issue.

*Per* McLachlin C.J. and Rothstein and Cromwell JJ.: Given that there can be no deemed trust for the executive plan because that plan had not been wound up at the relevant date, the main issue in connection with the salaried plan boils down to the narrow statutory interpretative question of whether the wind-up deficiency provided for in s. 75(1)(b) is "accrued to the date of the wind up" as required by s. 57(4) of the *PBA*.

When the term "accrued" is used in relation to a sum of money, it will generally refer to an amount that is at the present time either quantified or exactly quantifiable

employés au par. 57(4) de la *LRR* : « montant égal aux cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues aux termes du régime ou des règlements ».

La date où s'effectue le calcul est sans importance du moment que le passif est évalué à la date de la liquidation. Le fait que le montant précis des cotisations n'est pas établi au moment de la liquidation ne confère pas aux cotisations un caractère éventuel qui ferait en sorte qu'elles ne seraient pas accumulées d'un point de vue comptable. On peut donc considérer que le passif « accumulé » englobe les cotisations exigées à l'al. 75(1)b) de la *LRR*.

L'historique législatif montre que la protection, qui couvrait d'abord (1) uniquement les cotisations dues, s'est étendue (2) aux montants payables calculés comme s'il y avait liquidation du régime, (3) puis aux montants dus ou accumulés à la liquidation, à l'exclusion des paiements au titre du déficit de liquidation (4) et, enfin, à tous les montants dus ou accumulés à la liquidation. L'historique législatif mène donc à la conclusion qu'une interprétation étroite qui dissocierait le paiement requis de l'employeur par l'al. 75(1)b) de la *LRR* de celui exigé à l'al. 75(1)a) irait à l'encontre de la tendance du législateur ontarien à offrir une protection de plus en plus étendue.

La disposition qui crée une fiducie réputée a une vocation réparatrice. Elle vise à protéger les intérêts des participants. Cette fin réparatrice favorise une interprétation qui inclut tous les paiements à la liquidation dans la valeur de la fiducie réputée. En l'espèce, c'est à bon droit que la Cour d'appel a jugé qu'Indalex était réputée détenir en fiducie le montant nécessaire pour combler le déficit de liquidation du régime des salariés.

*Les* juges LeBel et Abella : Il y a accord avec les motifs de la juge Deschamps sur la question de la fiducie réputée d'origine législative.

*La* juge en chef McLachlin et les juges Rothstein et Cromwell : Étant donné qu'il ne peut y avoir de fiducie réputée au bénéfice du régime des cadres, celui-ci n'ayant pas été liquidé à la date considérée, il s'agit donc essentiellement — pour ce qui concerne le régime des salariés — d'interpréter une disposition de la loi et de déterminer si le déficit de liquidation décrit à l'al. 75(1)b) est « accumul[é] à la date de la liquidation » comme l'exige le par. 57(4) de la *LRR*.

Lorsque le terme « accumulé » [et plus encore son équivalent anglais « *accrued* »] est employé de pair avec une somme, il renvoie généralement à un élément

but which may or may not be due. In the present case, s. 57(4) uses the word "accrued" in contrast to the word "due". Given the ordinary meaning of the word "accrued", the wind-up deficiency cannot be said to have "accrued" to the date of wind up. The extent of the wind-up deficiency depends on employee rights that arise only upon wind up and with respect to which employees make elections only after wind up. The wind-up deficiency therefore is neither ascertained nor ascertainable on the date fixed for wind up.

The broader statutory context reinforces the view according to which the most plausible grammatical and ordinary sense of the words "accrued to the date of wind up" is that the amounts referred to are precisely ascertained immediately before the effective date of the plan's wind up. Moreover, the legislative evolution and history of the provisions at issue show that the legislature never intended to include the wind-up deficiency in a statutory deemed trust. Rather, they reinforce the legislative intent to *exclude* from the deemed trust liabilities that arise only *on* the date of wind up.

The legislation differentiates between two types of employer liability relevant to this case. The first is the contributions required to cover current service costs and any other payments that are either due or have accrued on a daily basis up to the relevant time. These are the payments referred to in the current s. 75(1)(a), that is, payments due or accrued but not paid. The second relates to additional contributions required when a plan is wound up which I have referred to as the wind-up deficiency. These payments are addressed in s. 75(1)(b). The legislative history and evolution show that the deemed trusts under s. 57(3) and (4) were intended to apply only to the former amounts and that it was never the intention that there should be a deemed trust or a lien with respect to an employer's potential future liabilities that arise once the plan is wound up.

In this case, the s. 57(4) deemed trust does not apply to the wind-up deficiency. This conclusion to exclude the wind-up deficiency from the deemed trust is consistent with the broader purposes of the legislation. The legislature has created trusts over contributions that were due or accrued to the date of the wind up in order to protect, to some degree, the rights of pension plan beneficiaries and employees from the claims of the employer's other creditors. However, there is also good reason to think that the legislature had in mind other competing objectives in not extending the deemed

dont la valeur est actuellement mesurée ou mesurable, mais qui peut ou non être dû. Dans la présente affaire, au par. 57(4), le terme « accumulées » [« *accrued* »] est utilisé par opposition à « dues ». Suivant le sens ordinaire du mot « accumulé », on ne peut considérer que le déficit l'était à la date de la liquidation. Le montant du déficit de liquidation dépend de droits qui ne prennent naissance qu'à la liquidation et à l'égard desquels les employés ne font des choix qu'après la liquidation. Le déficit de liquidation n'est donc ni déterminé ni déterminable à la date de liquidation prévue.

Le contexte législatif général appuie la thèse que, suivant leur sens ordinaire et grammatical le plus plausible, les mots « accumulées à la date de la liquidation » renvoient aux sommes déterminées de façon précise immédiatement avant la date de prise d'effet de la liquidation du régime. Qui plus est, il appert de l'évolution et de l'historique des dispositions en cause que le législateur n'a jamais voulu que le déficit de liquidation fasse l'objet d'une fiducie réputée d'origine législative. Ils confirment en fait l'intention du législateur d'*exclure* du champ d'application de la fiducie réputée les obligations qui naissent seulement *à la* date même de la liquidation.

La loi établit une distinction entre deux types d'obligation de l'employeur qui sont pertinents en l'espèce. Il y a d'une part les cotisations requises pour acquitter le coût du service courant et d'autres paiements qui sont dus ou qui sont accumulés sur une base quotidienne jusqu'à la date considérée. Il s'agit des paiements prévus à l'actuel al. 75(1)a), à savoir ceux qui sont dus ou accumulés, mais qui n'ont pas été versés. D'autre part, il y a les cotisations supplémentaires exigées lorsque le régime est liquidé (le déficit de liquidation). Ces paiements font l'objet de l'al. 75(1)b). Il appert de l'évolution et de l'historique législatifs que les fiducies réputées des par. 57(3) et (4) devaient seulement englober les cotisations du premier type et que le législateur n'a jamais voulu que les obligations ultérieures éventuelles de l'employeur qui naissent une fois le régime liquidé fassent l'objet d'une fiducie réputée ou d'un privilège.

En l'espèce, la fiducie réputée du par. 57(4) ne vise pas le déficit de liquidation. Pareille exclusion est conforme aux objectifs généraux de la loi. Le législateur a créé des fiducies à l'égard de cotisations qui étaient dues ou accumulées à la date de la liquidation afin de protéger, dans une certaine mesure, les droits des bénéficiaires d'un régime de retraite et ceux des employés contre les réclamations des autres créanciers de l'employeur. Or, il y a de bonnes raisons de penser que c'est en raison d'autres objectifs concurrents que le législateur s'est abstenu d'accroître la portée de la fiducie réputée et d'y

trust to the wind-up deficiency. While the protection of pension plans is an important objective, it is not for this Court to decide the extent to which that objective will be pursued and at what cost to other interests. The decision as to the level of protection that should be provided to pension beneficiaries under the *PBA* is one to be left to the Ontario legislature.

### (2) *Priority Ranking*

*Per* Deschamps and Moldaver JJ.: A statutory deemed trust under provincial legislation such as the *PBA* continues to apply in federally-regulated *CCAA* proceedings, subject to the doctrine of federal paramountcy. In this case, granting priority to the DIP lenders subordinates the claims of other stakeholders, including the plan members. This court-ordered priority based on the *CCAA* has the same effect as a statutory priority. The federal and provincial laws are inconsistent, as they give rise to different, and conflicting, orders of priority. As a result of the application of the doctrine of federal paramountcy, the DIP charge supersedes the deemed trust.

*Per* McLachlin C.J. and Rothstein and Cromwell JJ.: Although there is disagreement with Deschamps J. in connection with the scope of the s. 57(4) deemed trust, it is agreed that if there was a deemed trust in this case, it would be superseded by the DIP loan because of the operation of the doctrine of federal paramountcy.

*Per* LeBel and Abella JJ.: There is agreement with the reasons of Deschamps J. on the priority ranking issue as determined by operation of the doctrine of federal paramountcy.

### (3) *Constructive Trust as a Remedy for Breach of Fiduciary Duties*

*Per* McLachlin C.J. and Rothstein and Cromwell JJ.: It cannot be the case that a conflict of interests arises simply because an employer, exercising its management powers in the best interests of the corporation, does something that has the potential to affect the beneficiaries of the corporation's pension plan. This conclusion flows inevitably from the statutory context. The existence of apparent conflicts that are inherent in the two roles of employer and pension plan administrator being performed by the same party cannot be a breach of fiduciary duty because those conflicts are specifically authorized by the statute which permits one party to play both roles. Rather, a situation of conflict of interest occurs

inclure le déficit de liquidation. La protection des régimes de retraite constitue certes un objectif important, mais il n'appartient pas à la Cour de décider de la mesure dans laquelle cet objectif sera poursuivi ou d'autres intérêts en souffriront. Il appartient à l'Assemblée législative de l'Ontario de décider du degré de protection qu'il convient d'accorder aux bénéficiaires d'un régime de retraite sous le régime de la *LRR*.

### (2) *Priorité de rang*

*Les* juges Deschamps et Moldaver : Une fiducie réputée établie par une loi provinciale comme la *LRR* continue de s'appliquer dans les instances régies par la *LACC*, relevant de la compétence fédérale, sous réserve de la doctrine de la prépondérance fédérale. En l'espèce, accorder priorité aux prêteurs DE relègue à un rang inférieur les créances des autres intéressés, notamment les participants. Cette priorité d'origine judiciaire fondée sur la *LACC* a le même effet qu'une priorité d'origine législative. Les dispositions fédérales et provinciales sont inconciliables, car elles produisent des ordres de priorité différents et conflictuels. L'application de la doctrine de la prépondérance fédérale donne à la charge DE priorité sur la fiducie réputée.

*La* juge en chef McLachlin et les juges Rothstein et Cromwell : Malgré le désaccord avec la juge Deschamps sur la portée de la fiducie réputée du par. 57(4), si une fiducie est réputée exister en l'espèce, la créance DE prend rang avant elle en application de la doctrine de la prépondérance fédérale.

*Les* juges LeBel et Abella : Il y a accord avec les motifs de la juge Deschamps sur la priorité de rang déterminée par application du principe de la prépondérance fédérale.

### (3) *La fiducie par interprétation comme réparation du manquement à l'obligation fiduciaire*

*La* juge en chef McLachlin et les juges Rothstein et Cromwell : Il ne saurait y avoir conflit d'intérêts uniquement parce que l'employeur, dans l'exercice de son pouvoir de gérer la société au mieux des intérêts de celle-ci, prend une mesure susceptible d'avoir une incidence sur les bénéficiaires du régime de retraite qu'il administre. Telle est la conclusion qui découle nécessairement du contexte législatif. L'existence de conflits apparents qui sont inhérents à la double fonction d'employeur et d'administrateur de régime exercée par une même personne ne peut constituer un manquement à l'obligation fiduciaire, car ces conflits sont expressément autorisés par la loi, laquelle permet à une personne

when there is a substantial risk that the employer-administrator's representation of the plan beneficiaries would be materially and adversely affected by the employer-administrator's duties to the corporation.

Seeking an initial order protecting the corporation from actions by its creditors did not, on its own, give rise to any conflict of interest or duty on the part of Indalex. Likewise, failure to give notice of the initial *CCAA* proceedings was not a breach of fiduciary duty to avoid conflicts of interest in this case. Indalex's decision to act as an employer-administrator cannot give the plan members any greater benefit than they would have if their plan was managed by a third party administrator.

It was at the point of seeking and obtaining the DIP orders without notice to the plan beneficiaries and seeking and obtaining the sale approval order that Indalex's interests as a corporation came into conflict with its duties as a pension plan administrator. However, the difficulty that arose here was not the existence of the conflict itself, but Indalex's failure to take steps so that the plans' beneficiaries would have the opportunity to have their interests protected in the *CCAA* proceedings as if the plans were administered by an independent administrator. In short, the difficulty was not the existence of the conflict, but the failure to address it.

An employer-administrator who finds itself in a conflict must bring the conflict to the attention of the *CCAA* judge. It is not enough to include the beneficiaries in the list of creditors; the judge must be made aware that the debtor, as an administrator of the plan is, or may be, in a conflict of interest. Accordingly, Indalex breached its fiduciary duty by failing to take steps to ensure that the pension plans had the opportunity to be as fully represented in those proceedings as if there had been an independent plan administrator, particularly when it sought the DIP financing approval, the sale approval and a motion to voluntarily enter into bankruptcy.

Regardless of this breach, a remedial constructive trust is only appropriate if the wrongdoer's acts give rise to an identifiable asset which it would be unjust for the wrongdoer (or sometimes a third party) to retain. There is no evidence to support the contention that Indalex's failure to meaningfully address conflicts of interest that arose during the *CCAA* proceedings resulted in any such asset. Furthermore, to impose a constructive trust in

d'exercer les deux fonctions. Il y a en fait conflit d'intérêts lorsqu'il existe un risque important que les obligations de l'employeur-administrateur envers la société nuisent de façon appréciable à la défense des intérêts des bénéficiaires d'un régime.

À elle seule, la demande initiale de protection de la société contre ses créanciers ne plaçait pas Indalex en situation de conflit d'intérêts ou d'obligations. De même, l'omission de donner avis de la demande initiale présentée sur le fondement de la *LACC* ne constituait pas un manquement à l'obligation fiduciaire d'éviter tout conflit d'intérêts. La décision d'Indalex d'agir à titre d'employeur-administrateur ne peut conférer aux participants plus d'avantages que si l'administration de leurs régimes avait été confiée à un tiers indépendant.

C'est lors de la demande et de l'obtention des ordonnances DE sans préavis aux bénéficiaires des régimes, ainsi que de la demande et de l'obtention de l'approbation de la vente que les intérêts commerciaux d'Indalex sont entrés en conflit avec ses obligations d'administrateur des régimes de retraite. Cependant, la difficulté résidait en l'espèce non pas dans l'existence du conflit, mais bien dans l'omission d'Indalex de prendre quelque mesure afin que les bénéficiaires des régimes aient la possibilité de veiller à la protection de leurs intérêts dans le cadre de la procédure fondée sur la *LACC* comme si l'administrateur des régimes avait été indépendant. En résumé, le manquement ne tenait pas à l'existence du conflit, mais plutôt à l'omission de prendre les mesures qu'elle commandait.

L'employeur-administrateur qui se trouve en situation de conflit doit en informer le juge saisi sur le fondement de la *LACC*. Il ne suffit pas d'inscrire les bénéficiaires sur la liste des créanciers; le juge doit être informé que le débiteur, en sa qualité d'administrateur de régime, est en conflit d'intérêts ou susceptible de l'être. En conséquence, Indalex a manqué à son obligation fiduciaire en omettant de faire ce qu'il fallait pour que les bénéficiaires des régimes puissent être dûment représentés dans le cadre de cette procédure comme si l'administrateur des régimes avait été indépendant, en particulier lorsqu'elle a demandé l'approbation du financement DE et de la vente, puis présenté une motion en vue de faire faillite.

Indépendamment de ce manquement, l'imposition d'une fiducie par interprétation ne constitue une réparation appropriée que si un actif déterminable résulte des actes de l'auteur du manquement et qu'il serait injuste que ce dernier ou, parfois, un tiers, conserve cet actif. Aucun élément de preuve n'appuie la prétention qu'un tel actif a résulté de l'omission d'Indalex de pallier véritablement les conflits d'intérêts auxquels a donné lieu

response to a breach of fiduciary duty to ensure for the pension plans some procedural protections that they in fact took advantage of in any case is an unjust response in all of the circumstances.

*Per* Deschamps and Moldaver JJ.: A corporate employer that chooses to act as plan administrator accepts the fiduciary obligations attached to that function. Since the directors of a corporation also have a fiduciary duty to the corporation, the corporate employer must be prepared to resolve conflicts where they arise. An employer acting as a plan administrator is not permitted to disregard its fiduciary obligations to plan members and favour the competing interests of the corporation on the basis that it is wearing a "corporate hat". What is important is to consider the consequences of the decision, not its nature.

In the instant case, Indalex's fiduciary obligations as plan administrator did in fact conflict with management decisions that needed to be taken in the best interests of the corporation. Specifically, in seeking to have a court approve a form of financing by which one creditor was granted priority over all other creditors, Indalex was asking the *CCAA* court to override the plan members' priority. The corporation's interest was to seek the best possible avenue to survive in an insolvency context. The pursuit of this interest was not compatible with the plan administrator's duty to the plan members to ensure that all contributions were paid into the funds. In the context of this case, the plan administrator's duty to the plan members meant, in particular, that it should at least have given them the opportunity to present their arguments. This duty meant, at the very least, that they were entitled to reasonable notice of the DIP financing motion. The terms of that motion, presented without appropriate notice, conflicted with the interests of the plan members.

As for the constructive trust remedy, it is settled law that proprietary remedies are generally awarded only with respect to property that is directly related to a wrong or that can be traced to such property. There is agreement with Cromwell J. that this condition was not met in the case at bar and his reasoning on this issue is adopted. Moreover, it was unreasonable for the Court of Appeal to reorder the priorities in this case.

la procédure fondée sur la *LACC*. Qui plus est, imposer une fiducie par interprétation par suite du manquement à l'obligation fiduciaire de veiller à ce que les bénéficiaires des régimes jouissent de garanties procédurales, alors qu'ils en ont joui dans les faits, se révèle inéquitable au vu de l'ensemble des circonstances.

*Les* juges Deschamps et Moldaver : L'employeur constitué en société qui décide d'agir en qualité d'administrateur d'un régime accepte les obligations fiduciaires inhérentes à cette fonction. Puisque les administrateurs d'une société ont aussi une obligation fiduciaire envers la société, l'employeur doit être prêt à résoudre les conflits lorsqu'ils surgissent. L'employeur qui administre un régime de retraite n'est pas autorisé à négliger ses obligations fiduciaires envers les participants au régime et à favoriser les intérêts concurrents de la société sous prétexte qu'il porte le « chapeau » de dirigeant de la société. Ce sont les conséquences d'une décision, et non sa nature qui doivent être prises en compte.

En l'espèce, il y avait bien conflit entre les obligations fiduciaires qui incombaient à Indalex en sa qualité d'administratrice des régimes et les décisions de gestion qu'elle devait prendre dans le meilleur intérêt de la société. Plus précisément, en demandant au tribunal d'autoriser une forme de financement selon laquelle un créancier se verrait accorder priorité sur tous les autres, Indalex demandait au tribunal chargé d'appliquer la *LACC* de faire échec à la priorité dont bénéficiaient les participants. L'intérêt de la société consistait à rechercher la meilleure façon de survivre dans un contexte d'insolvabilité. La poursuite de cet intérêt était incompatible avec le devoir de l'administrateur des régimes envers les participants de veiller à ce que toutes les cotisations soient versées aux caisses de retraite. En l'occurrence, ce devoir de l'administrateur des régimes impliquait, plus particulièrement, qu'il donne à tout le moins aux participants la possibilité d'exposer leurs arguments. Cela signifiait, au minimum, que les participants avaient droit à un avis raisonnable de la motion en autorisation du financement DE. La teneur de cette motion, présentée sans avis convenable, allait à l'encontre des intérêts des participants.

En ce qui concerne la fiducie par interprétation, il est établi en droit qu'une réparation de la nature d'un droit de propriété n'est généralement accordée qu'à l'égard d'un bien ayant un lien direct avec un acte fautif ou d'un bien qui peut être rattaché à un tel bien. Il y a accord avec le juge Cromwell sur le fait que cette condition n'était pas remplie en l'espèce et il a été souscrit à ses motifs sur cette question. En outre, il était déraisonnable pour la Cour d'appel de modifier l'ordre de priorité.

SUN INDALEX FINANCE *v.* UNITED STEELWORKERS

*Per* LeBel and Abella JJ. (dissenting): A fiduciary relationship is a relationship, grounded in fact and law, between a vulnerable beneficiary and a fiduciary who holds and may exercise power over the beneficiary in situations recognized by law. It follows that before entering into an analysis of the fiduciary duties of an employer as administrator of a pension plan under the *PBA*, it is necessary to consider the position and characteristics of the pension beneficiaries. In the present case, the beneficiaries were in a very vulnerable position relative to Indalex.

Nothing in the *PBA* allows that the employer *qua* administrator will be held to a lower standard or will be subject to duties and obligations that are less stringent than those of an independent administrator. The employer is under no obligation to assume the burdens of administering the pension plans that it has agreed to set up or that are the legacy of previous decisions. However, if it decides to do so, a fiduciary relationship is created with the expectation that the employer will be able to avoid or resolve the conflicts of interest that might arise.

Indalex was in a conflict of interest from the moment it started to contemplate putting itself under the protection of the *CCAA* and proposing an arrangement to its creditors. From the corporate perspective, one could hardly find fault with such a decision. It was a business decision. But the trouble is that at the same time, Indalex was a fiduciary in relation to the members and retirees of its pension plans. The solution was not to place its function as administrator and its associated fiduciary duties in abeyance. Rather, it had to abandon this role and diligently transfer its function as manager to an independent administrator.

In the present case, the employer not only neglected its obligations towards the beneficiaries, but actually took a course of action that was actively inimical to their interests. The seriousness of these breaches amply justified the decision of the Court of Appeal to impose a constructive trust.

### (4) *Costs in United Steelworkers Appeal*

*Per* McLachlin C.J. and Rothstein and Cromwell JJ.: There is no basis to interfere with the Court of Appeal's costs endorsement as it relates to United Steelworkers in this case. The litigation undertaken here raised novel points of law with all of the uncertainty and risk inherent in such an undertaking. The Court of Appeal in essence decided that the United Steelworkers, representing only 7 of 169 members of the salaried plan, should not without consultation be

*Les* juges LeBel et Abella (dissidents) : Une relation fiduciaire s'entend de la relation factuelle et juridique entre un bénéficiaire vulnérable et un fiduciaire qui détient et peut exercer un pouvoir sur le bénéficiaire dans les situations prévues par la loi. Par conséquent, avant d'analyser les obligations fiduciaires de l'employeur à titre d'administrateur d'un régime de retraite visé par la *LRR*, il faut examiner la situation et les caractéristiques des bénéficiaires du régime. En l'espèce, les bénéficiaires se trouvaient dans une position de grande vulnérabilité par rapport à Indalex.

Rien dans la *LRR* ne permet de conclure que l'employeur, en sa qualité d'administrateur, serait assujetti à une norme moindre ou assumerait des fonctions et des obligations moins strictes qu'un administrateur indépendant. L'employeur n'est pas tenu d'assumer le fardeau de l'administration des régimes de retraite qu'il a convenu d'établir ou qui sont le fruit de décisions antérieures. Par contre, s'il choisit de l'assumer, une relation fiduciaire prend naissance et l'on s'attend à ce que l'employeur soit capable d'éviter ou de régler les conflits d'intérêts susceptibles d'intervenir.

Indalex se trouvait en situation de conflit d'intérêts dès qu'elle a envisagé de demander la protection de la *LACC* et de proposer un arrangement à ses créanciers. Du point de vue de l'entreprise, on ne pourrait guère trouver à redire à cette décision. Il s'agissait d'une décision d'affaires. Cependant, Indalex jouait en même temps le rôle de fiduciaire à l'égard des participants aux régimes et des retraités, et c'est là où le bât blesse. La solution consistait non pas à mettre en veilleuse sa fonction d'administrateur avec les obligations fiduciaires en découlant, mais à y renoncer et à la transférer avec diligence à un administrateur indépendant.

En l'occurrence, l'employeur a non seulement manqué à ses obligations envers les bénéficiaires, mais adopté en fait une démarche qui allait à l'encontre de leurs intérêts. La gravité de ces manquements justifiait amplement la décision de la Cour d'appel d'imposer une fiducie par interprétation.

### (4) *Dépens dans le pourvoi du Syndicat des Métallos*

*La* juge en chef McLachlin et les juges Rothstein et Cromwell : Il n'y a en l'espèce aucune raison de revenir sur la décision de la Cour d'appel relative aux dépens en ce qui concerne le Syndicat des Métallos. L'instance engagée portait sur des points de droit nouveaux, son issue était incertaine et les demandeurs couraient le risque d'être déboutés. La Cour d'appel a opiné essentiellement que, représentant seulement 7 des 169 participants du régime des salariés, le syndicat ne devait pas être en

able to in effect impose the risks of that litigation on all of the plan members, the vast majority of whom were not union members. There is no error in principle in the Court of Appeal's refusal to order the United Steelworkers costs to be paid out of the pension fund, particularly in light of the disposition of the appeal to this Court.

*Per* Deschamps and Moldaver JJ.: There is agreement with the reasons of Cromwell J. on the issue of costs in the United Steelworkers appeal.

*Per* LeBel and Abella JJ.: There is agreement with the reasons of Cromwell J. on the issue of costs in the United Steelworkers appeal.

**Cases Cited**

By Deschamps J.

**Referred to:** *Husky Oil Operations Ltd. v. Minister of National Revenue*, [1995] 3 S.C.R. 453; *Hydro-Electric Power Commission of Ontario v. Albright* (1922), 64 S.C.R. 306; *Canadian Pacific Ltd. v. M.N.R.* (1998), 41 O.R. (3d) 606; *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, [2010] 3 S.C.R. 379; *Crystalline Investments Ltd. v. Domgroup Ltd.*, 2004 SCC 3, [2004] 1 S.C.R. 60; *Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3; *Attorney General of Canada v. Law Society of British Columbia*, [1982] 2 S.C.R. 307; *Burke v. Hudson's Bay Co.*, 2010 SCC 34, [2010] 2 S.C.R. 273; *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558.

By Cromwell J.

**Referred to:** *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, [2010] 3 S.C.R. 379; *Bell ExpressVu Limited Partnership v. Rex*, 2002 SCC 42, [2002] 2 S.C.R. 559; *Ryan v. Moore*, 2005 SCC 38, [2005] 2 S.C.R. 53; *Hydro-Electric Power Commission of Ontario v. Albright* (1922), 64 S.C.R. 306; *Canadian Pacific Ltd. v. M.N.R.* (1998), 41 O.R. (3d) 606; *Canada (Canadian Human Rights Commission) v. Canada (Attorney General)*, 2011 SCC 53, [2011] 3 S.C.R. 471; *Monsanto Canada Inc. v. Ontario (Superintendent of Financial Services)*, 2004 SCC 54, [2004] 3 S.C.R. 152; *Burke v. Hudson's Bay Co.*, 2010 SCC 34, [2010] 2 S.C.R. 273, aff'g 2008 ONCA 394, 67 C.C.P.B. 1; *Alberta v. Elder Advocates of Alberta Society*, 2011 SCC 24, [2011] 2 S.C.R. 261; *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574; *Sharbern Holding Inc. v. Vancouver Airport Centre Ltd.*, 2011 SCC 23, [2011] 2 S.C.R. 175; *Galambos*

mesure, dans les faits, d'imposer à tous les participants du régime, dont la plupart n'en étaient pas membres, les risques inhérents au litige sans les consulter. Il n'y a aucune erreur de principe dans le refus de la Cour d'appel d'ordonner que les dépens du syndicat soient payés à partir de la caisse de retraite, étant donné surtout l'issue du pourvoi devant notre Cour.

*Les* juges Deschamps et Moldaver : Il y a accord avec les motifs du juge Cromwell sur la question des dépens dans l'appel interjeté par le Syndicat des Métallos.

*Les* juges LeBel et Abella : Il y a accord avec les motifs du juge Cromwell sur la question des dépens dans l'appel interjeté par le Syndicat des Métallos.

**Jurisprudence**

Citée par la juge Deschamps

**Arrêts mentionnés :** *Husky Oil Operations Ltd. c. Ministre du Revenu national*, [1995] 3 R.C.S. 453; *Hydro-Electric Power Commission of Ontario c. Albright* (1922), 64 R.C.S. 306; *Canadian Pacific Ltd. c. M.N.R.* (1998), 41 O.R. (3d) 606; *Century Services Inc. c. Canada (Procureur général)*, 2010 CSC 60, [2010] 3 R.C.S. 379; *Crystalline Investments Ltd. c. Domgroup Ltd.*, 2004 CSC 3, [2004] 1 R.C.S. 60; *Banque canadienne de l'Ouest c. Alberta*, 2007 CSC 22, [2007] 2 R.C.S. 3; *Procureur général du Canada c. Law Society of British Columbia*, [1982] 2 R.C.S. 307; *Burke c. Cie de la Baie d'Hudson*, 2010 CSC 34, [2010] 2 R.C.S. 273; *Société d'assurance-dépôts du Canada c. Banque Commerciale du Canada*, [1992] 3 R.C.S. 558.

Citée par le juge Cromwell

**Arrêts mentionnés :** *Century Services Inc. c. Canada (Procureur général)*, 2010 CSC 60, [2010] 3 R.C.S. 379; *Bell ExpressVu Limited Partnership c. Rex*, 2002 CSC 42, [2002] 2 R.C.S. 559; *Ryan c. Moore*, 2005 CSC 38, [2005] 2 R.C.S. 53; *Hydro-Electric Power Commission of Ontario c. Albright* (1922), 64 R.C.S. 306; *Canadian Pacific Ltd. c. M.N.R.* (1998), 41 O.R. (3d) 606; *Canada (Commission canadienne des droits de la personne) c. Canada (Procureur général)*, 2011 CSC 53, [2011] 3 R.C.S. 471; *Monsanto Canada Inc. c. Ontario (Surintendant des services financiers)*, 2004 CSC 54, [2004] 3 R.C.S. 152; *Burke c. Cie de la Baie d'Hudson*, 2010 CSC 34, [2010] 2 R.C.S. 273, conf. 2008 ONCA 394, 67 C.C.P.B. 1; *Alberta c. Elder Advocates of Alberta Society*, 2011 CSC 24, [2011] 2 R.C.S. 261; *Lac Minerals Ltd. c. International Corona Resources Ltd.*, [1989] 2 R.C.S. 574; *Sharbern Holding Inc. c. Vancouver Airport Centre Ltd.*, 2011 CSC 23, [2011] 2 R.C.S. 175;

18-23538-shl    Doc 3920-3    Filed 05/17/19    Entered 05/17/19 11:35:37    Exhibit C
Pg 13 of 131

282    SUN INDALEX FINANCE *v.* UNITED STEELWORKERS    [2013] 1 S.C.R.

*v. Perez*, 2009 SCC 48, [2009] 3 S.C.R. 247; *K.L.B. v. British Columbia*, 2003 SCC 51, [2003] 2 S.C.R. 403; *Strother v. 3464920 Canada Inc.*, 2007 SCC 24, [2007] 2 S.C.R. 177; *BCE Inc. v. 1976 Debentureholders*, 2008 SCC 69, [2008] 3 S.C.R. 560; *R. v. Neil*, 2002 SCC 70, [2002] 3 S.C.R. 631; *Elan Corp. v. Comiskey* (1990), 41 O.A.C. 282; *Algoma Steel Inc., Re* (2001), 25 C.B.R. (4th) 194; *Marine Drive Properties Ltd., Re*, 2009 BCSC 145, 52 C.B.R. (5th) 47; *Timminco Ltd., Re*, 2012 ONSC 506, 85 C.B.R. (5th) 169; *AbitibiBowater inc. (Arrangement relatif à)*, 2009 QCCS 6459 (CanLII); *First Leaside Wealth Management Inc. (Re)*, 2012 ONSC 1299 (CanLII); *Nortel Networks Corp., Re* (2009), 75 C.C.P.B. 206; *Royal Oak Mines Inc., Re* (1999), 6 C.B.R. (4th) 314; *Donkin v. Bugoy*, [1985] 2 S.C.R. 85; *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217; *Peter v. Beblow*, [1993] 1 S.C.R. 980; *Nolan v. Kerry (Canada) Inc.*, 2009 SCC 39, [2009] 2 S.C.R. 678; *Hamilton v. Open Window Bakery Ltd.*, 2004 SCC 9, [2004] 1 S.C.R. 303.

By LeBel J. (dissenting)

*Galambos v. Perez*, 2009 SCC 48, [2009] 3 S.C.R. 247; *Alberta v. Elder Advocates of Alberta Society*, 2011 SCC 24, [2011] 2 S.C.R. 261; *Royal Oak Mines Inc., Re* (1999), 7 C.B.R. (4th) 293; *Canson Enterprises Ltd. v. Boughton & Co.*, [1991] 3 S.C.R. 534; *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217.

**Statutes and Regulations Cited**

*Act to amend the Bankruptcy and Insolvency Act, the Companies' Creditors Arrangement Act, the Wage Earner Protection Program Act and chapter 47 of the Statutes of Canada, 2005*, S.C. 2007, c. 36.

*Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47, s. 128.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3.

Bill C-501, *An Act to amend the Bankruptcy and Insolvency Act and other Acts (pension protection)*, 3rd Sess., 40th Parl., March 24, 2010 (as am. by the Standing Committee on Industry, Science and Technology, March 1, 2011).

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44, s. 122(1)(*a*).

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, ss. 2 "secured creditor", 11.

*Pension Benefits Act*, R.S.O. 1980, c. 373, ss. 21(2), 23, 32.

*Galambos c. Perez*, 2009 CSC 48, [2009] 3 R.C.S. 247; *K.L.B. c. Colombie-Britannique*, 2003 CSC 51, [2003] 2 R.C.S. 403; *Strother c. 3464920 Canada Inc.*, 2007 CSC 24, [2007] 2 R.C.S. 177; *BCE Inc. c. Détenteurs de débentures de 1976*, 2008 CSC 69, [2008] 3 R.C.S. 560; *R. c. Neil*, 2002 CSC 70, [2002] 3 R.C.S. 631; *Elan Corp. c. Comiskey* (1990), 41 O.A.C. 282; *Algoma Steel Inc., Re* (2001), 25 C.B.R. (4th) 194; *Marine Drive Properties Ltd., Re*, 2009 BCSC 145, 52 C.B.R. (5th) 47; *Timminco Ltd., Re*, 2012 ONSC 506, 85 C.B.R. (5th) 169; *AbitibiBowater inc. (Arrangement relatif à)*, 2009 QCCS 6459 (CanLII); *First Leaside Wealth Management Inc. (Re)*, 2012 ONSC 1299 (CanLII); *Nortel Networks Corp., Re* (2009), 75 C.C.P.B. 206; *Royal Oak Mines Inc., Re* (1999), 6 C.B.R. (4th) 314; *Donkin c. Bugoy*, [1985] 2 R.C.S. 85; *Soulos c. Korkontzilas*, [1997] 2 R.C.S. 217; *Peter c. Beblow*, [1993] 1 R.C.S. 980; *Nolan c. Kerry (Canada) Inc.*, 2009 CSC 39, [2009] 2 R.C.S. 678; *Hamilton c. Open Window Bakery Ltd.*, 2004 CSC 9, [2004] 1 R.C.S. 303.

Citée par le juge LeBel (dissident)

*Galambos c. Perez*, 2009 CSC 48, [2009] 3 R.C.S. 247; *Alberta c. Elder Advocates of Alberta Society*, 2011 CSC 24, [2011] 2 R.C.S. 261; *Royal Oak Mines Inc., Re* (1999), 7 C.B.R. (4th) 293; *Canson Enterprises Ltd. c. Boughton & Co.*, [1991] 3 R.C.S. 534; *Soulos c. Korkontzilas*, [1997] 2 R.C.S. 217.

**Lois et règlements cités**

*Loi canadienne sur les sociétés par actions*, L.R.C. 1985, ch. C-44, art. 122(1)*a*).

*Loi de 1987 sur les régimes de retraite*, L.O. 1987, ch. 35, art. 58, 59, 75(1), 76(1).

*Loi de 2010 modifiant la Loi sur les régimes de retraite*, L.O. 2010, ch. 9, art. 52(5).

*Loi de 2010 sur la pérennité des prestations de retraite*, L.O. 2010, ch. 24, art. 21(2).

*Loi édictant la Loi sur le Programme de protection des salariés et modifiant la Loi sur la faillite et l'insolvabilité, la Loi sur les arrangements avec les créanciers des compagnies et d'autres lois en conséquence*, L.C. 2005, ch. 47, art. 128.

*Loi modifiant la Loi sur la faillite et l'insolvabilité, la Loi sur les arrangements avec les créanciers des compagnies, la Loi sur le Programme de protection des salariés et le chapitre 47 des Lois du Canada (2005)*, L.C. 2007, ch. 36.

*Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B-3.

*Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C-36, art. 2 « créancier garanti », 11.

*Pension Benefits Act*, R.S.O. 1990, c. P.8, ss. 1(1) "administrator", "wind up", 8(1)(a), 9, 10(1)12, 12, 19, 20, 22, 25, 26, 42, 56, 57, 58, 59, 68, 69, 70, 73, 74, 75.

*Pension Benefits Act, 1965*, S.O. 1965, c. 96, s. 22(2).

*Pension Benefits Act, 1987*, S.O. 1987, c. 35, ss. 58, 59, 75(1), 76(1).

*Pension Benefits Amendment Act, 1973*, S.O. 1973, c. 113, s. 23*a*.

*Pension Benefits Amendment Act, 1980*, S.O. 1980, c. 80.

*Pension Benefits Amendment Act, 1983*, S.O. 1983, c. 2, ss. 21, 23, 32.

*Pension Benefits Amendment Act, 2010*, S.O. 2010, c. 9, s. 52(5).

*Personal Property Security Act*, R.S.O. 1990, c. P.10, s. 30(7).

R.R.O. 1990, Reg. 909, ss. 4(4)3, 5(1)(b), (e), 14, 29, 31.

*Securing Pension Benefits Now and for the Future Act, 2010*, S.O. 2010, c. 24, s. 21(2).

*Loi sur les régimes de retraite*, L.R.O. 1990, ch. P.8, art. 1(1) « administrateur », « liquidation », 8(1)a), 9, 10(1)12, 12, 19, 20, 22, 25, 26, 42, 56, 57, 58, 59, 68, 69, 70, 73, 74, 75.

*Loi sur les sûretés mobilières*, L.R.O. 1990, ch. P.10, art. 30(7).

*Pension Benefits Act*, R.S.O. 1980, ch. 373, art. 21(2), 23, 32.

*Pension Benefits Act, 1965*, S.O. 1965, ch. 96, art. 22(2).

*Pension Benefits Amendment Act, 1973*, S.O. 1973, ch. 113, art. 23*a*.

*Pension Benefits Amendment Act, 1980*, S.O. 1980, ch. 80.

*Pension Benefits Amendment Act, 1983*, S.O. 1983, ch. 2, art. 21, 23, 32.

Projet de loi C-501, *Loi modifiant la Loi sur la faillite et l'insolvabilité et d'autres lois (protection des prestations)*, 3ᵉ sess., 40ᵉ lég., 24 mars 2010 (tel que mod. par le Comité permanent de l'industrie, des sciences et de la technologie, 1ᵉʳ mars 2011).

R.R.O. 1990, règl. 909, art. 4(4)3, 5(1)b), e), 14, 29, 31.

## Authors Cited

Arnold, Brian J. *Timing and Income Taxation: The Principles of Income Measurement for Tax Purposes*. Toronto: Canadian Tax Foundation, 1983.

*Black's Law Dictionary*, 9th ed. St. Paul, Minn.: Thomson Reuters, 2009, "accrued liability".

Canada. Senate. Standing Senate Committee on Banking, Trade and Commerce. *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*. Ottawa: Senate of Canada, 2003.

Canadian Institute of Chartered Accountants. *CICA Handbook — Accounting*, Part II, *Accounting Standards for Private Enterprises*. Toronto: The Institute, 2012.

Driedger, Elmer A. *Construction of Statutes*, 2nd ed. Toronto: Butterworths, 1983.

Dukelow, Daphne A. *The Dictionary of Canadian Law*, 4th ed. Toronto: Carswell, 2011, "accrued liability".

Hogg, Peter W., Joanne E. Magee and Jinyan Li. *Principles of Canadian Income Tax Law*, 7th ed. Toronto: Carswell, 2010.

Jackson, Georgina R., and Janis Sarra. "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2007*. Toronto: Thomson Carswell, 2008, 41.

## Doctrine et autres documents cités

Arnold, Brian J. *Timing and Income Taxation : The Principles of Income Measurement for Tax Purposes*. Toronto : Association canadienne d'études fiscales, 1983.

*Black's Law Dictionary*, 9th ed. St. Paul, Minn. : Thomson Reuters, 2009, « accrued liability ».

Canada. Sénat. Comité sénatorial permanent des banques et du commerce. *Les débiteurs et les créanciers doivent se partager le fardeau : Examen de la Loi sur la faillite et l'insolvabilité et de la Loi sur les arrangements avec les créanciers des compagnies*. Ottawa : Sénat du Canada, 2003.

Driedger, Elmer A. *Construction of Statutes*, 2nd ed. Toronto : Butterworths, 1983.

Dukelow, Daphne A. *The Dictionary of Canadian Law*, 4th ed. Toronto : Carswell, 2011, « accrued liability ».

Hogg, Peter W., Joanne E. Magee and Jinyan Li. *Principles of Canadian Income Tax Law*, 7th ed. Toronto : Carswell, 2010.

Institut canadien des comptables agréés. *Manuel de l'ICCA — Comptabilité*, partie II, *Normes comptables pour les entreprises à capital fermé*. Toronto : L'Institut, 2012.

Jackson, Georgina R., and Janis Sarra. « Selecting the Judicial Tool to get the Job Done : An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters », in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2007*. Toronto : Thomson Carswell, 2008, 41.

Kaplan, Ari N. *Pension Law*. Toronto: Irwin Law, 2006.

Ontario. Legislative Assembly. *Legislature of Ontario Debates: Official Report (Hansard)*, No. 99, 2nd Sess., 32nd Parl., July 7, 1982, p. 3568.

Sarra, Janis P. *Rescue! The Companies' Creditors Arrangement Act*. Toronto: Thomson Carswell, 2007.

*The Mercer Pension Manual*, vol. 1, by William M. Mercer Limited. Toronto: Carswell, 1994 (loose-leaf updated November 2009, release 6).

*Waters' Law of Trusts in Canada*, 3rd ed. by Donovan W. M. Waters, Mark R. Gillen and Lionel D. Smith, eds. Toronto: Thomson Carswell, 2005.

Kaplan, Ari N. *Pension Law*. Toronto : Irwin Law, 2006.

Ontario. Assemblée législative. *Legislature of Ontario Debates : Official Report (Hansard)*, No. 99, 2nd Sess., 32nd Parl., July 7, 1982, p. 3568.

Sarra, Janis P. *Rescue! The Companies' Creditors Arrangement Act*. Toronto : Thomson Carswell, 2007.

*The Mercer Pension Manual*, vol. 1, by William M. Mercer Limited. Toronto : Carswell, 1994 (loose-leaf updated November 2009, release 6).

*Waters' Law of Trusts in Canada*, 3rd ed. by Donovan W. M. Waters, Mark R. Gillen and Lionel D. Smith, eds. Toronto : Thomson Carswell, 2005.

APPEALS from a judgment of the Ontario Court of Appeal (MacPherson, Gillese and Juriansz JJ.A.), 2011 ONCA 265, 104 O.R. (3d) 641, 276 O.A.C. 347, 331 D.L.R. (4th) 352, 75 C.B.R. (5th) 19, 89 C.C.P.B. 39, 17 P.P.S.A.C. (3d) 194, [2011] O.J. No. 1621 (QL), 2011 CarswellOnt 2458, setting aside a decision of Campbell J., 2010 ONSC 1114, 79 C.C.P.B. 301, [2010] O.J. No. 974 (QL), 2010 CarswellOnt 893. Appeals allowed, LeBel and Abella JJ. dissenting.

APPEAL from a judgment of the Ontario Court of Appeal (MacPherson, Gillese and Juriansz JJ.A.), 2011 ONCA 578, 81 C.B.R. (5th) 165, 92 C.C.P.B. 277, [2011] O.J. No. 3959 (QL), 2011 CarswellOnt 9077. Appeal dismissed.

*Benjamin Zarnett*, *Frederick L. Myers*, *Brian F. Empey* and *Peter Kolla*, for the appellant Sun Indalex Finance, LLC.

*Harvey G. Chaiton* and *George Benchetrit*, for the appellant George L. Miller, the Chapter 7 Trustee of the Bankruptcy Estates of the U.S. Indalex Debtors.

*David R. Byers*, *Ashley John Taylor* and *Nicholas Peter McHaffie*, for the appellant FTI Consulting Canada ULC, in its capacity as court-appointed monitor of Indalex Limited, on behalf of Indalex Limited.

*Darrell L. Brown*, for the appellant/respondent the United Steelworkers.

*Andrew J. Hatnay* and *Demetrios Yiokaris*, for the respondents Keith Carruthers, et al.

POURVOIS contre un arrêt de la Cour d'appel de l'Ontario (les juges MacPherson, Gillese et Juriansz), 2011 ONCA 265, 104 O.R. (3d) 641, 276 O.A.C. 347, 331 D.L.R. (4th) 352, 75 C.B.R. (5th) 19, 89 C.C.P.B. 39, 17 P.P.S.A.C. (3d) 194, [2011] O.J. No. 1621 (QL), 2011 CarswellOnt 2458, qui a infirmé une décision du juge Campbell, 2010 ONSC 1114, 79 C.C.P.B. 301, [2010] O.J. No. 974 (QL), 2010 CarswellOnt 893. Pourvois accueillis, les juges LeBel et Abella sont dissidents.

POURVOI contre un arrêt de la Cour d'appel de l'Ontario (les juges MacPherson, Gillese et Juriansz), 2011 ONCA 578, 81 C.B.R. (5th) 165, 92 C.C.P.B. 277, [2011] O.J. No. 3959 (QL), 2011 CarswellOnt 9077. Pourvoi rejeté.

*Benjamin Zarnett*, *Frederick L. Myers*, *Brian F. Empey* et *Peter Kolla*, pour l'appelante Sun Indalex Finance, LLC.

*Harvey G. Chaiton* et *George Benchetrit*, pour l'appelant George L. Miller, syndic de faillite des débitrices Indalex É.-U., nommé en vertu du chapitre 7.

*David R. Byers*, *Ashley John Taylor* et *Nicholas Peter McHaffie*, pour l'appelante FTI Consulting Canada ULC, en sa qualité de contrôleur d'Indalex Limited désigné par le tribunal, au nom d'Indalex Limited.

*Darrell L. Brown*, pour l'appelant/intimé le Syndicat des Métallos.

*Andrew J. Hatnay* et *Demetrios Yiokaris*, pour les intimés Keith Carruthers, et autres.

[2013] 1 R.C.S.        SUN INDALEX FINANCE *c.* SYNDICAT DES MÉTALLOS   *La juge Deschamps*        285

*Hugh O'Reilly* and *Amanda Darrach*, for the respondent Morneau Shepell Ltd. (formerly known as Morneau Sobeco Limited Partnership).

*Mark Bailey*, *Leonard Marsello* and *William MacLarkey*, for the respondent/intervener the Superintendent of Financial Services.

*Robert I. Thornton* and *D. J. Miller*, for the intervener the Insolvency Institute of Canada.

*Steven Barrett* and *Ethan Poskanzer*, for the intervener the Canadian Labour Congress.

*Kenneth T. Rosenberg*, *Andrew K. Lokan* and *Massimo Starnino*, for the intervener the Canadian Federation of Pensioners.

*Éric Vallières*, *Alexandre Forest* and *Yoine Goldstein*, for the intervener the Canadian Association of Insolvency and Restructuring Professionals.

*Mahmud Jamal*, *Jeremy Dacks* and *Tony Devir*, for the intervener the Canadian Bankers Association.

The judgment of Deschamps and Moldaver JJ. was delivered by

[1]   DESCHAMPS J. — Insolvency can trigger catastrophic consequences. Often, large claims of ordinary creditors are left unpaid. In insolvency situations, the promise of defined benefits made to employees during their employment is put at risk. These appeals illustrate the materialization of such a risk. Although the employer in this case breached a fiduciary duty, the harm suffered by the pension plans' beneficiaries results not from that breach, but from the employer's insolvency. For the following reasons, I would allow the appeals of the appellants Sun Indalex Finance, LLC; George L. Miller, Indalex U.S.'s trustee in bankruptcy; and FTI Consulting Canada ULC.

*Hugh O'Reilly* et *Amanda Darrach*, pour l'intimée Morneau Shepell Ltd. (anciennement connue sous le nom de Morneau Sobeco, société en commandite).

*Mark Bailey*, *Leonard Marsello* et *William MacLarkey*, pour l'intimé/intervenant le Surintendant des services financiers.

*Robert I. Thornton* et *D. J. Miller*, pour l'intervenant l'Institut d'insolvabilité du Canada.

*Steven Barrett* et *Ethan Poskanzer*, pour l'intervenant le Congrès du travail du Canada.

*Kenneth T. Rosenberg*, *Andrew K. Lokan* et *Massimo Starnino*, pour l'intervenante la Fédération canadienne des retraités.

*Éric Vallières*, *Alexandre Forest* et *Yoine Goldstein*, pour l'intervenante l'Association canadienne des professionnels de l'insolvabilité et de la réorganisation.

*Mahmud Jamal*, *Jeremy Dacks* et *Tony Devir*, pour l'intervenante l'Association des banquiers canadiens.

Version française du jugement des juges Deschamps et Moldaver rendu par

[1]   LA JUGE DESCHAMPS — L'insolvabilité peut entraîner des conséquences catastrophiques. Les créanciers ordinaires sont souvent laissés impayés. En situation d'insolvabilité, les prestations déterminées promises aux employés pendant leur emploi sont mises en péril. Les présents pourvois illustrent ce qui peut se produire lorsque ce péril se matérialise. Bien que l'employeur en l'espèce ait manqué à son obligation fiduciaire envers les participants aux régimes de retraite, le préjudice qu'ils subissent ne résulte pas de son manquement, mais de son insolvabilité. Pour les motifs qui suivent, je suis d'avis d'accueillir les appels de Sun Indalex Finance, LLC; George L. Miller, syndic de faillite d'Indalex É.-U.; et FTI Consulting Canada ULC.

18-23538-shl    Doc 3920-3    Filed 05/17/19    Entered 05/17/19 11:35:37    Exhibit C
Pg 17 of 131

286          SUN INDALEX FINANCE *v.* UNITED STEELWORKERS   *Deschamps J.*          [2013] 1 S.C.R.

[2]   To improve the prospect of pensioners receiving their full benefits after a pension plan is wound up, the Ontario legislature has protected contributions to the pension fund that have accrued but are not yet due at the time of the wind up by providing for a deemed trust that supersedes all other provincial priorities over certain assets of the plan sponsor (s. 57(4) of the *Pension Benefits Act*, R.S.O. 1990, c. P.8 ("*PBA*"), and s. 30(7) of the *Personal Property Security Act*, R.S.O. 1990, c. P.10 ("*PPSA*")). The parties disagree on the scope of the deemed trust. In my view, the relevant provisions and the context lead to the conclusion that it extends to contributions the employer must make to ensure that the pension fund is sufficient to cover liabilities upon wind up. In the instant case, however, the deemed trust is superseded by the security granted to the creditor that loaned money to the employer, Indalex Limited ("Indalex"), during the insolvency proceedings. In addition, although the employer, as plan administrator, may have put itself in a position of conflict of interest by failing to give the plan's members proper notice of a motion requesting financing of its operations during a restructuring process, there was no realistic possibility that, had the members received notice and had the *CCAA* court found that they were secured creditors, it would have ordered the priorities differently. Consequently, it would not be appropriate to order an equitable remedy such as the constructive trust ordered by the Court of Appeal.

I. <u>Facts</u>

[3]   Indalex is a wholly owned Canadian subsidiary of a U.S. company, Indalex Holding Corp. ("Indalex U.S."). Indalex and its related companies formed a corporate group (the "Indalex Group") that manufactured aluminum extrusions. The U.S. and Canadian operations were closely linked.

[2]   Pour améliorer les chances des retraités de recevoir toutes les prestations auxquelles ils ont droit après la liquidation d'un régime de retraite, le législateur ontarien a pourvu à la protection des cotisations accumulées, mais qui ne sont pas encore dues, à la date de la liquidation, au moyen d'une fiducie réputée grevant certains biens des promoteurs des régimes et qui a préséance sur toutes les autres priorités établies par une loi provinciale (par. 57(4) de la *Loi sur les régimes de retraite*, L.R.O. 1990, ch. P.8 (« *LRR* »), et par. 30(7) de la *Loi sur les sûretés mobilières*, L.R.O. 1990, ch. P.10 (« *LSM* »)). Les parties ne s'entendent pas sur la portée de la fiducie réputée. Les dispositions pertinentes et le contexte mènent selon moi à la conclusion qu'elle englobe les cotisations que doit verser l'employeur afin que la caisse de retraite puisse couvrir le passif du régime à la liquidation. En l'espèce, toutefois, la sûreté accordée au créancier ayant prêté des fonds à l'employeur, Indalex Limited (« Indalex »), pendant l'instance en matière d'insolvabilité a priorité sur la fiducie réputée. En outre, bien que l'employeur ait pu se placer en conflit d'intérêts en tant qu'administrateur du régime, en ne donnant pas dûment avis aux participants d'une motion en vue de financer l'exploitation de l'entreprise pendant la restructuration, il n'est pas réaliste de penser que le tribunal chargé d'appliquer la *Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C-36 (« *LACC* »), aurait établi un ordre de priorité différent si les participants avaient été avisés et si le tribunal avait conclu qu'ils étaient des créanciers garantis. Par conséquent, il n'y a pas lieu d'accorder une réparation en equity, telle que la fiducie par interprétation imposée par la Cour d'appel.

I. <u>Les faits</u>

[3]   Indalex est une filiale canadienne en propriété exclusive de la société américaine Indalex Holding Corp. (« Indalex É.-U. »). Indalex et ses sociétés affiliées formaient un groupe (le « Groupe Indalex ») qui fabriquait des extrusions d'aluminium. Les activités des sociétés aux États-Unis et au Canada étaient étroitement liées.

[4]   In 2009, a combination of high commodity prices and the economic recession's impact on the end-user market for aluminum extrusions plunged the Indalex Group into insolvency. On March 20, 2009, Indalex U.S. filed for Chapter 11 bankruptcy protection in Delaware. On April 3, 2009, Indalex applied for a stay under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"), and Morawetz J. granted the stay in an initial order. He also appointed FTI Consulting Canada ULC (the "Monitor") to act as monitor.

[5]   At that time, Indalex was the administrator of two registered pension plans. One was for its salaried employees (the "Salaried Plan"), the other for its executives (the "Executive Plan"). Members of the Salaried Plan included seven employees for whom the United Steelworkers ("USW") acted as bargaining agent. The Salaried Plan was in the process of being wound up when the *CCAA* proceedings began. The effective date of the wind up was December 31, 2006. The Executive Plan had been closed but not wound up. Overall, the deficiencies of the pension plans' funds concern 49 persons (members of the Salaried Plan and the Executive Plan are referred to collectively as the "Plan Members").

[6]   Pursuant to the initial order made by Morawetz J. on April 3, 2009, Indalex obtained protection under the *CCAA*. Both plans faced funding deficiencies when Indalex filed for the *CCAA* stay. The wind-up deficiency of the Salaried Plan was estimated at $1.8 million as of December 31, 2008. The funding deficiency of the Executive Plan was estimated at $3.0 million on a wind-up basis as of January 1, 2008.

[7]   From the beginning of the insolvency proceedings, the Indalex Group's reorganization strategy was to sell both Indalex and Indalex U.S. as a going concern while they were under *CCAA* and Chapter 11 protection. To this end, Indalex and Indalex U.S. sought to enter into a common agreement for debtor-in-possession ("DIP") financing under which the two companies

[4]   En 2009, le prix élevé des produits de base et les effets de la récession sur le marché des utilisateurs finaux des extrusions d'aluminium ont entraîné l'insolvabilité du Groupe Indalex. Le 20 mars 2009, Indalex É.-U. s'est placée sous la protection du chapitre 11, au Delaware. Le 3 avril 2009, Indalex a demandé une suspension sous le régime de la *LACC*. Le même jour, le juge Morawetz a rendu une ordonnance initiale lui accordant cette suspension et il a désigné FTI Consulting Canada ULC (le « contrôleur ») comme contrôleur.

[5]   Indalex administrait alors deux régimes de retraite enregistrés, l'un à l'intention des salariés (le « régime des salariés »), et l'autre à l'intention des cadres (le « régime des cadres »). Le régime des salariés comptait sept participants dont l'agent négociateur était le Syndicat des Métallos (le « Syndicat »). Ce régime était en cours de liquidation lorsque les procédures sous le régime de la *LACC* ont été engagées. La date de prise d'effet de la liquidation était le 31 décembre 2006. Le régime des cadres n'acceptait plus de participant, mais il n'était pas liquidé. En tout, les déficits des caisses de retraite touchent 49 personnes (les participants au régime des salariés et au régime des cadres sont collectivement appelés les « participants »).

[6]   L'ordonnance initiale prononcée par le juge Morawetz, le 3 avril 2009, a accordé à Indalex la protection de la *LACC*. Les deux régimes de retraite accusaient un déficit de capitalisation au moment où Indalex a demandé la suspension des procédures en vertu de la *LACC*. Le déficit de liquidation du régime des salariés, au 31 décembre 2008, était estimé à 1,8 million de dollars. Quant au régime des cadres, sa sous-capitalisation suivant une approche de liquidation était estimée à 3 millions de dollars au 1er janvier 2008.

[7]   Dès le début de la procédure d'insolvabilité, la stratégie de réorganisation poursuivie par le Groupe Indalex consistait à vendre Indalex et Indalex É.-U. comme entreprises en exploitation pendant qu'elles jouissaient de la protection de la *LACC* et du chapitre 11. À cette fin, Indalex et Indalex É.-U. voulaient conclure un accord de financement de débiteur-exploitant (« DE »)

288    SUN INDALEX FINANCE *v.* UNITED STEELWORKERS    *Deschamps J.*    [2013] 1 S.C.R.

could draw from joint credit facilities and would guarantee each other's liabilities.

[8]    Indalex's financial distress threatened the interests of all the Plan Members. If the re-organization failed and Indalex were liquidated under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*"), they would not have recovered any of their claims against Indalex for the underfunded pension liabilities, because the priority created by the provincial statute would not be recognized under the federal legislation: *Husky Oil Operations Ltd. v. Minister of National Revenue*, [1995] 3 S.C.R. 453. Although the priority was not rendered ineffective by the *CCAA*, the Plan Members' position was uncertain.

[9]    The Indalex Group solicited terms from a variety of possible DIP lenders. In the end, it negotiated an agreement with a syndicate consisting of the pre-filing senior secured creditors. On April 8, 2009, the *CCAA* court issued an Amended and Restated Initial Order ("Amended Initial Order") authorizing Indalex to borrow US$24.4 million from the DIP lenders and grant them priority over all other creditors ("DIP charge") in that amount. In his endorsement of the order, Morawetz J. made a finding that Indalex would be unable to achieve a going-concern solution without DIP financing. Such financing was necessary to support Indalex's business until the sale could be completed.

[10]    The Plan Members did not participate in the initial proceedings. The initial stay had been granted *ex parte*. The *CCAA* judge ordered Indalex to serve a copy of the stay order on every creditor owed $5,000 or more within 10 days of the initial order of April 3. As of April 8, when the motion to amend the initial order was heard, none of the Executive Plan's members had been served with that order; nor did any of them receive notice of the motion to amend it. The USW did receive short notice, but chose not to attend. Morawetz J. authorized Indalex to proceed on the basis of an abridged time for

conjoint aux termes duquel elles pourraient bénéficier de facilités de crédit communes et chaque société garantirait les obligations de l'autre.

[8]    Les problèmes financiers d'Indalex menaçaient les intérêts de tous les participants. Si la réorganisation échouait et si Indalex était liquidée en application de la *Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B-3 (« *LFI* »), ils ne recouvreraient aucune de leurs créances sur Indalex au titre de la sous-capitalisation des régimes de retraite, parce que la législation fédérale ne permettrait pas que la priorité de rang établie par la loi provinciale soit reconnue : *Husky Oil Operations Ltd. c. Ministre du Revenu national*, [1995] 3 R.C.S. 453. La *LACC* ne rendait pas la priorité de rang des participants inopérante, mais leur position était incertaine.

[9]    Le Groupe Indalex a demandé des offres à divers prêteurs DE et a fini par conclure une entente avec un consortium composé des créanciers qui bénéficiaient d'une garantie de premier rang avant le début de la procédure. Le 8 avril 2009, le tribunal chargé d'appliquer la *LACC* a rendu une ordonnance modifiée et reformulée (l'« ordonnance initiale modifiée ») autorisant Indalex à emprunter 24,4 millions de dollars américains aux prêteurs DE et à leur octroyer une priorité pour le même montant sur tous les autres créanciers (la « charge DE »). Dans les motifs qu'il a déposés au soutien de l'ordonnance, le juge Morawetz a conclu qu'Indalex n'aurait pas pu trouver de solution qui assurait la continuité de l'exploitation sans ce financement DE. Celui-ci était nécessaire pour financer les activités de l'entreprise jusqu'à sa vente.

[10]    Les participants n'étaient pas parties à la procédure initiale. La suspension initiale avait été accordée *ex parte*. Le juge chargé de l'application de la *LACC* avait ordonné à Indalex de faire signifier une copie de l'ordonnance de suspension à chaque créancier ayant une créance minimale de 5 000 $ dans les 10 jours suivant l'ordonnance initiale du 3 avril. Le 8 avril, lors de l'audition de la motion visant la modification de l'ordonnance initiale, aucun des participants au régime des cadres n'avait reçu signification de cette ordonnance ni de l'avis de motion visant sa modification. Le Syndicat

service. The Plan Members were given notice of all subsequent proceedings. None of the Plan Members appealed the Amended Initial Order to contest the DIP charge.

[11]    On June 12, 2009, Indalex applied for authorization to increase the DIP loan amount to US$29.5 million. At the hearing, the Executive Plan's members initially opposed the motion, seeking to reserve their rights. After it was confirmed that the motion was merely to increase the amount of the DIP charge (without changing the terms of the loan), they withdrew their opposition and the court granted the motion.

[12]    On April 22, 2009, the court extended the stay of proceedings and approved a marketing process for the sale of Indalex's assets. The Plan Members did not oppose the application to approve the marketing process. Under the approved bidding procedure, the Indalex Group solicited a wide variety of potential buyers.

[13]    Indalex received a bid from SAPA Holding AB ("SAPA"). It was for approximately US$30 million, and SAPA did not assume responsibility for the pension plans' wind-up deficiencies. According to the Monitor's estimate, the liquidation value of Indalex's assets was US$44.7 million. Indalex brought an application for an order approving a bidding procedure for a competitive auction and deeming SAPA's bid to be a qualifying bid. The Executive Plan's members opposed the application, expressing concern that the pension liabilities would not be assumed. Morawetz J. nevertheless issued the order on July 2, 2009; in it, he approved the bidding procedure for sale, noting that the Executive Plan's members could raise their objections at the time of approval of the final bid.

a reçu un préavis écourté, mais a décidé de ne pas se présenter. Le juge Morawetz a autorisé Indalex à procéder même si le délai de signification avait été écourté. Les participants ont reçu avis de toutes les procédures subséquentes. Aucun des participants n'a interjeté appel de l'ordonnance initiale modifiée pour contester la charge DE.

[11]    Le 12 juin 2009, Indalex a demandé l'autorisation de porter l'emprunt DE à 29,5 millions de dollars américains. À l'audience, les participants au régime des cadres se sont d'abord opposés à la motion en demandant que leurs droits soient réservés. Après confirmation que la motion avait pour unique but d'augmenter le montant de la charge DE (sans modifier les modalités du prêt), ils ont retiré leur opposition et le tribunal a accueilli la motion.

[12]    Le 22 avril 2009, le tribunal a prorogé la suspension et approuvé un processus de mise en vente de l'actif d'Indalex. Les participants ne se sont pas opposés à la demande d'approbation du processus de mise en vente. Conformément au processus approuvé de vente par soumission, le Groupe Indalex a sollicité un vaste éventail d'acheteurs potentiels.

[13]    Indalex a reçu une soumission de SAPA Holding AB (« SAPA »). Cette soumission s'élevait à environ 30 millions de dollars américains et SAPA ne prenait pas en charge les déficits de liquidation des régimes de retraite. Le contrôleur estimait la valeur de liquidation de l'actif d'Indalex à 44,7 millions de dollars américains. Indalex a demandé une ordonnance approuvant un processus de soumission pour adjudication sur offres concurrentes et déclarant que la soumission de SAPA était réputée acceptable. Les participants au régime des cadres ont contesté cette demande parce qu'ils s'inquiétaient du fait que le passif du régime de retraite ne serait pas pris en charge. Le 2 juillet 2009, le juge Morawetz a néanmoins rendu une ordonnance approuvant le processus de mise en vente par soumission, en soulignant que les participants au régime des cadres pourraient faire valoir leurs objections au moment de l'homologation de la soumission définitive.

18-23538-shl   Doc 3920-3   Filed 05/17/19   Entered 05/17/19 11:35:37   Exhibit C
Pg 21 of 131

290   SUN INDALEX FINANCE *v.* UNITED STEELWORKERS   *Deschamps J.*   [2013] 1 S.C.R.

[14]   The bidding procedure did not trigger any competing bids. On July 20, 2009, Indalex and Indalex U.S. brought motions before their respective courts to approve the sale of substantially all their assets under the terms of SAPA's bid. Indalex also moved for approval of an interim distribution of the sale proceeds to the DIP lenders. The Plan Members opposed Indalex's motion. First, they argued that it was estimated that a forced liquidation would produce greater proceeds than SAPA's bid. Second, they contended that their claims had priority over that of the DIP lenders because the unfunded pension liabilities were subject to a statutory deemed trust under the *PBA*. They also contended that Indalex had breached its fiduciary obligations by failing to meet its obligations as a plan administrator throughout the insolvency proceedings.

[15]   The court dismissed the Plan Members' first objection, holding that there was no evidence supporting the argument that a forced liquidation would be more beneficial to suppliers, customers and the 950 employees. It approved the sale on July 20, 2009. The order in which it did so directed the Monitor to make a distribution to the DIP lenders. With respect to the second objection, however, Campbell J. ordered the Monitor to hold a reserve in an amount to be determined by the Monitor, leaving the Plan Members' arguments based on their right to the proceeds of the sale open for determination at a later date.

[16]   The sale to SAPA closed on July 31, 2009. The Monitor collected $30.9 million in proceeds. It distributed US$17 million to the DIP lenders, paid certain fees, withheld a portion to cover various costs and retained $6.75 million in reserve pending determination of the Plan Members' rights. At the closing, Indalex owed US$27 million to the DIP lenders. The payment of US$17 million left a US$10 million shortfall in the amount owed to these lenders. The DIP lenders called on Indalex U.S. to cover this shortfall under the guarantee

[14]   Le processus de mise en vente par soumission n'a pas permis d'obtenir des soumissions concurrentes. Le 20 juillet 2009, Indalex et Indalex É.-U. ont chacune demandé au tribunal dont elles relevaient d'approuver la vente d'essentiellement tous leurs éléments d'actif aux conditions stipulées dans l'offre de SAPA. Indalex a également demandé l'approbation d'une distribution provisoire du produit de la vente aux prêteurs DE. Les participants ont contesté la motion d'Indalex. Ils ont fait valoir, premièrement, que le produit estimatif d'une liquidation forcée serait supérieur à l'offre de SAPA et, deuxièmement, que leur créance avait priorité sur celles des prêteurs DE, parce que le passif non capitalisé au titre des pensions était protégé par une fiducie réputée en vertu de la *LRR*. Ils ont aussi soutenu qu'Indalex avait manqué à ses obligations fiduciaires en ne s'acquittant pas des obligations qui lui incombaient en qualité d'administrateur des régimes de retraite du début à la fin des procédures en matière d'insolvabilité.

[15]   Le tribunal a écarté la première objection des participants, estimant qu'aucun élément de preuve n'étayait leur prétention que la liquidation forcée serait plus avantageuse pour les fournisseurs, les clients et les 950 employés. Il a approuvé la vente le 20 juillet 2009. Cette ordonnance donnait instruction au contrôleur de procéder à une distribution aux prêteurs DE. Au sujet de la deuxième objection, toutefois, le juge Campbell a ordonné au contrôleur de retenir un fonds de réserve dont le contrôleur déterminerait lui-même le montant, réservant pour plus tard l'examen de l'argumentation des participants fondée sur leur droit au produit de la vente.

[16]   La vente à SAPA s'est conclue le 31 juillet 2009, et le contrôleur a recueilli 30,9 millions de dollars comme produit de la vente. Il a distribué 17 millions de dollars américains aux prêteurs DE, acquitté certains frais, retenu des fonds pour couvrir diverses dépenses et réservé 6,75 millions de dollars en attendant la décision relative aux droits des participants. À la date de la vente, Indalex devait 27 millions de dollars américains aux prêteurs DE, de sorte qu'une créance de 10 millions de dollars américains subsistait après le versement des

contained in the DIP lending agreement. Indalex U.S. paid the amount of the shortfall. Since Indalex U.S. was, as a term of the guarantee, subrogated to the DIP lenders' priority, it became the highest ranking creditor of Indalex, with a claim for US$10 million.

[17]    Following the sale of Indalex's assets, its directors resigned. Indalex U.S., a part of Indalex Group, took over the management of Indalex, whose assets were limited to the sale proceeds held by the Monitor. A Unanimous Shareholder Declaration was executed on August 12, 2009; in it, Mr. Keith Cooper was appointed to manage Indalex's affairs. Mr. Cooper was an employee of FTI Consulting Inc.

[18]    In accordance with the right reserved by the court on July 20, 2009, the Plan Members brought motions on August 28, 2009 for a declaration that a deemed trust equal in amount to the unfunded pension liability was enforceable against the proceeds of the sale. They contended that they had priority over the secured creditors pursuant to s. 57(4) of the *PBA* and s. 30(7) of the *PPSA*. Indalex, in turn, brought a motion for an assignment in bankruptcy to secure the priority regime it argued for in opposing the Plan Members' motions.

[19]    On October 14, 2009, while judgment was pending, Indalex U.S. converted the Chapter 11 restructuring proceeding in the U.S. into a Chapter 7 liquidation proceeding. On November 5, 2009, the Superintendent of Financial Services ("Superintendent") appointed the actuarial firm of Morneau Sobeco Limited Partnership ("Morneau") to replace Indalex as administrator of the plans.

[20]    On February 18, 2010, Campbell J. dismissed the Plan Members' motions, concluding that the deemed trust did not apply to the wind-up deficiencies, because the associated payments were not "due" or "accruing due" as of the date of the wind up. He found that the Executive Plan did

17 millions. Se prévalant de la garantie consentie dans l'accord de financement DE, les prêteurs DE ont demandé à Indalex É.-U. de payer la différence, ce qu'elle a fait. Comme la garantie prévoyait la subrogation d'Indalex É.-U. aux droits de priorité des prêteurs DE, Indalex É.-U. est devenue créancière de premier rang d'Indalex pour la somme de 10 millions de dollars américains.

[17]    Le conseil d'administration d'Indalex a démissionné après la vente de l'actif de la société. Indalex É.-U., qui faisait partie du Groupe Indalex, a repris la gestion d'Indalex, dont l'actif se limitait au produit de la vente détenu par le contrôleur. Une convention unanime d'actionnaires nommant M. Keith Cooper comme gestionnaire des affaires d'Indalex a été signée le 12 août 2009. M. Cooper était un employé de FTI Consulting Inc.

[18]    Les participants ont exercé le droit que leur avait réservé le tribunal le 20 juillet 2009 et ont présenté des motions, le 28 août 2009, en vue d'obtenir un jugement déclaratoire portant que le produit de la vente était grevé d'une fiducie réputée d'un montant équivalent au passif non capitalisé au titre des pensions. Ils ont soutenu que les par. 57(4) de la *LRR* et 30(7) de la *LSM* leur donnaient préséance sur les créanciers garantis. Indalex a présenté une motion pour faire cession de ses biens en faillite afin de bénéficier de la priorité de rang qu'elle invoquait pour contester les motions des participants.

[19]    Le 14 octobre 2009, avant le prononcé du jugement, Indalex É.-U. a transformé l'instance en réorganisation fondée sur le chapitre 11 en instance en liquidation fondée sur le chapitre 7. Le 5 novembre 2009, le surintendant des services financiers (le « surintendant ») a nommé le cabinet d'actuaires Morneau Sobeco, société en commandite (« Morneau »), pour remplacer Indalex comme administrateur des régimes.

[20]    Le 18 février 2010, le juge Campbell a rejeté les motions des participants, concluant que la fiducie réputée ne s'appliquait pas aux déficits de liquidation parce que les paiements afférents n'étaient pas [TRADUCTION] « échus » ou « à échoir » à la date de la liquidation. Selon lui, le régime de

not have a wind-up deficiency, since it had not yet been wound up. He thus found it unnecessary to rule on Indalex's motion for an assignment in bankruptcy (2010 ONSC 1114, 79 C.C.P.B. 301). The Plan Members appealed the dismissal of their motions.

[21] The Ontario Court of Appeal allowed the Plan Members' appeals. It found that the deemed trust created by s. 57(4) of the *PBA* applies to all amounts due with respect to plan wind-up deficiencies. Although the court noted that it was likely that no deemed trust existed for the Executive Plan on the plain meaning of the provision, it declined to address this question, because it found that the Executive Plan's members had a claim arising from Indalex's breach of its fiduciary obligations in failing to adequately protect the Plan Members' interests (2011 ONCA 265, 104 O.R. (3d) 641).

[22] The Court of Appeal concluded that a constructive trust was an appropriate remedy for Indalex's breach of its fiduciary obligations. The court was of the view that this remedy did not harm the DIP lenders, but affected only Indalex U.S. It imposed a constructive trust over the reserved fund in favour of the Plan Members. Turning to the question of distribution, it also found that the deemed trust had priority over the DIP charge because the issue of federal paramountcy had not been raised when the Amended Initial Order was issued, and that Indalex had stated that it intended to comply with any deemed trust requirements. The Court of Appeal found that there was nothing in the record to suggest that not applying the paramountcy doctrine would frustrate Indalex's ability to restructure.

[23] The Court of Appeal ordered the Monitor to make a distribution from the reserve fund in order to pay the amount of each plan's deficiency. It also issued a costs endorsement that approved payment of the costs of the Executive Plan's members from that plan's fund, but declined to order the payment of costs to the USW from the fund of the Salaried Plan (2011 ONCA 578, 81 C.B.R. (5th) 165).

retraite des cadres n'étant pas encore liquidé, on ne pouvait parler de déficit de liquidation. Il était donc inutile de statuer sur la motion d'Indalex visant à faire cession de ses biens (2010 ONSC 1114, 79 C.C.P.B. 301). Les participants ont interjeté appel du rejet de leurs motions.

[21] La Cour d'appel de l'Ontario a accueilli les appels des participants, estimant que la fiducie réputée créée au par. 57(4) de la *LRR* s'appliquait à toutes les sommes dues au titre des déficits de liquidation des régimes. Signalant que, selon le sens ordinaire de cette disposition, aucune fiducie réputée ne s'appliquerait au régime des cadres, elle a néanmoins refusé de trancher la question parce que les participants à ce régime pouvaient faire valoir une réclamation contre Indalex pour manquement à son obligation fiduciaire de protéger adéquatement leurs intérêts (2011 ONCA 265, 104 O.R. (3d) 641).

[22] La Cour d'appel a jugé qu'une fiducie par interprétation était une réparation appropriée pour le manquement d'Indalex à ses obligations fiduciaires. Selon elle, cette réparation ne causait pas préjudice aux prêteurs DE et n'avait d'effet que sur Indalex É.-U. Elle a donc imposé une fiducie par interprétation grevant le fonds de réserve au profit des participants. Au sujet de la distribution, elle a aussi jugé que la fiducie réputée avait priorité sur la charge DE parce que la question de la prépondérance fédérale n'avait pas été invoquée lorsque l'ordonnance initiale modifiée avait été rendue et qu'Indalex avait déclaré qu'elle allait se conformer à toutes les exigences d'une fiducie réputée. Elle a conclu que rien au dossier n'indiquait que le fait de ne pas appliquer la doctrine de la prépondérance fédérale compromettrait la capacité de restructuration d'Indalex.

[23] La Cour d'appel a ordonné au contrôleur de combler le déficit de chacun des deux régimes par prélèvement sur le fonds de réserve. Dans sa décision relative à l'adjudication des dépens, elle a également approuvé le paiement des dépens des participants au régime des cadres sur leur caisse de retraite, mais elle a refusé d'ordonner que les dépens du Syndicat soient acquittés sur la caisse de retraite du régime des salariés (2011 ONCA 578, 81 C.B.R. (5th) 165).

[24]   The Monitor, together with Sun Indalex, a secured creditor of Indalex U.S., and George L. Miller, Indalex U.S.'s trustee in bankruptcy, appeals the Court of Appeal's order. Both the Superintendent and Morneau support the Plan Members' position as respondents. A number of stakeholders are also participating in the appeals to this Court. In addition, USW appeals the costs endorsement. As I agree with my colleague Cromwell J. on the appeal from the costs endorsement, I will not deal with it in these reasons.

## II.   Issues

[25]   The appeals raise four issues:

1.   Does the deemed trust provided for in s. 57(4) of the *PBA* apply to wind-up deficiencies?

2.   If so, does the deemed trust supersede the DIP charge?

3.   Did Indalex have any fiduciary obligations to the Plan Members when making decisions in the context of the insolvency proceedings?

4.   Did the Court of Appeal properly exercise its discretion in imposing a constructive trust to remedy the breaches of fiduciary duties?

## III.   Analysis

A. *Does the Deemed Trust Provided for in Section 57(4) of the PBA Apply to Wind-up Deficiencies?*

[26]   The first issue is whether the statutory deemed trust provided for in s. 57(4) of the *PBA* extends to wind-up deficiencies. This question is one of statutory interpretation, which requires examination of both the wording and context of the relevant provisions of the *PBA*. Section 57(4) of the *PBA* affords protection to members of a pension plan with respect to their employer's contributions upon wind up of the plan. The provision reads:

[24]   Le contrôleur, ainsi que Sun Indalex, créancière garantie d'Indalex É.-U., et George L. Miller, syndic de faillite d'Indalex É.-U., interjettent tous trois appel de l'ordonnance de la Cour d'appel. Le surintendant et Morneau appuient la position des participants en tant qu'intimés au pourvoi. D'autres intéressés prennent également part aux pourvois devant notre Cour. Le Syndicat se pourvoit en outre contre l'adjudication des dépens, mais je n'aborderai pas cette question, car je partage l'opinion du juge Cromwell à ce sujet.

## II.   Les questions en litige

[25]   Les pourvois soulèvent quatre questions :

1.   La fiducie réputée établie par le par. 57(4) de la *LRR* s'applique-t-elle aux déficits de liquidation?

2.   Le cas échéant, cette fiducie réputée a-t-elle préséance sur la charge DE?

3.   Indalex avait-elle des obligations fiduciaires envers les participants en ce qui concerne les décisions prises dans le contexte des procédures en matière d'insolvabilité?

4.   La Cour d'appel a-t-elle exercé son pouvoir discrétionnaire correctement en imposant une fiducie par interprétation à titre de réparation pour les manquements aux obligations fiduciaires?

## III.   Analyse

A. *La fiducie réputée établie par le par. 57(4) de la LRR s'applique-t-elle aux déficits de liquidation?*

[26]   Il faut d'abord déterminer si la fiducie réputée établie au par. 57(4) de la *LRR* s'applique aux déficits de liquidation. Il s'agit d'une question d'interprétation législative qui exige l'examen du texte et du contexte des dispositions pertinentes de la *LRR*. Le paragraphe 57(4) de la *LRR* accorde aux participants à un régime de retraite une protection applicable aux cotisations de leur employeur en cas de liquidation du régime :

**57.** . . .

(4) Where a pension plan is wound up in whole or in part, an employer who is required to pay contributions to the pension fund shall be deemed to hold in trust for the beneficiaries of the pension plan an amount of money equal to employer contributions accrued to the date of the wind up but not yet due under the plan or regulations.

[27]    The most obvious interpretation is that where a plan is wound up, this provision protects all contributions that have accrued but are not yet due. The words used appear to include the contribution the employer is to make where a plan being wound up is in a deficit position. This quite straightforward interpretation, which is consistent with both the historical broadening of the protection and the remedial purpose of the provision, is being challenged on the basis of a narrow definition of the word "accrued". I do not find that this argument justifies limiting the protection afforded to plan members by the Ontario legislature.

[28]    The *PBA* sets out the rules for the operation of funded contributory defined benefit pension plans in Ontario. In an ongoing plan, an employer must pay into a fund all contributions it withholds from its employees' salaries. In addition, while the plan is ongoing, the employer must make two kinds of payments. One relates to current service contributions — the employer's own regular contributions to the pension fund as required by the plan. The other ensures that the fund is sufficient to meet the plan's liabilities. The employees' interest in having the contributions made while the plan is ongoing is protected by a deemed trust provided for in s. 57(3) of the *PBA*.

[29]    The *PBA* also establishes a comprehensive scheme for winding up a pension plan. Section 75(1)(a) imposes on the employer the obligation to "pay" an amount equal to the total of all "payments" that are due or that have accrued and have not been paid into the fund. In addition, s. 75(1)(b) sets out a formula for calculating the amount that must be

**57.** . . .

(4) Si un régime de retraite est liquidé en totalité ou en partie, l'employeur qui est tenu de cotiser à la caisse de retraite est réputé détenir en fiducie pour le compte des bénéficiaires du régime de retraite un montant égal aux cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues aux termes du régime ou des règlements.

[27]    Selon l'interprétation la plus évidente, toutes les cotisations accumulées, mais non encore dues, lorsqu'un régime est liquidé sont protégées. Ce libellé semble inclure les cotisations qu'un employeur est tenu de verser lorsque la caisse de retraite est déficitaire au moment de la liquidation. Pour contester cette interprétation plutôt simple, qui concorde à la fois avec l'élargissement constant de la protection accordée au fil du temps et avec l'objectif réparateur de cette disposition, on invoque une définition étroite du mot « accumulé ». À mon avis, cet argument ne justifie pas la restriction de la protection accordée aux participants par le législateur ontarien.

[28]    La *LRR* énonce les règles de fonctionnement des régimes de retraite contributifs capitalisés à prestations déterminées en Ontario. Pendant toute la durée d'un régime, l'employeur doit verser à la caisse de retraite toutes les cotisations qu'il retient sur la rémunération des employés. Tant que le régime demeure en vigueur, il est en outre tenu à deux types de paiements. L'un se rapporte aux cotisations pour service courant — les cotisations que l'employeur doit verser régulièrement à la caisse de retraite suivant les modalités du régime — et l'autre, au maintien d'une caisse de retraite suffisante pour couvrir le passif au titre des pensions. Le droit des employés au versement des cotisations pendant que le régime est en vigueur est protégé par la fiducie réputée instituée au par. 57(3) de la *LRR*.

[29]    La *LRR* établit également un régime complet régissant la liquidation d'un régime de retraite. L'alinéa 75(1)a) oblige l'employeur à « verse[r] » un montant égal au total de tous les « paiements » dus ou accumulés qui n'ont pas été versés dans la caisse de retraite, et l'al. 75(1)b) établit la formule servant à calculer le montant du paiement

paid to ensure that the fund is sufficient to cover all liabilities upon wind up. Within six months after the effective date of the wind up, the plan administrator must file a wind-up report that lists the plan's assets and liabilities as of the date of the wind up. If the wind-up report shows an actuarial deficit, the employer must make wind-up deficiency payments. Consequently, s. 75(1)(a) and (b) jointly determine the amount of the contributions owed when a plan is wound up.

[30]   It is common ground that the contributions provided for in s. 75(1)(a) are covered by the wind-up deemed trust. The only question is whether it also applies to the deficiency payments required by s. 75(1)(b). I would answer this question in the affirmative in view of the provision's wording, context and purpose.

[31]   It is readily apparent that the wind-up deemed trust provision (s. 57(4) *PBA*) does not place an express limit on the "employer contributions accrued to the date of the wind up but not yet due", and I find no reason to exclude contributions paid under s. 75(1)(b). Section 75(1)(a) explicitly refers to "an amount equal to the total of all payments" that have *accrued*, even those that were not yet due as of the date of the wind up, whereas s. 75(1)(b) contemplates an "amount" that is calculated on the basis of the value of assets and of liabilities that have *accrued* when the plan is wound up. Section 75(1) reads as follows:

**75.** (1) Where a pension plan is wound up, the employer shall pay into the pension fund,

(a)   an <u>amount equal to the total of all payments</u> that, under this Act, the regulations and the pension plan, are due or that have <u>accrued</u> and that have not been paid into the pension fund; and

(b)   an <u>amount</u> equal to the amount by which,

(i)   the <u>value of the pension benefits</u> under the pension plan that would be guaranteed by the Guarantee Fund under this Act and the regulations if the Superintendent declares

à effectuer pour que la caisse de retraite puisse couvrir la totalité du passif à la liquidation. Dans les six mois suivant la date de prise d'effet de la liquidation, l'administrateur du régime doit déposer un rapport de liquidation faisant état de l'actif et du passif du régime à la date de la liquidation. Si le rapport révèle l'existence d'un déficit actuariel, l'employeur doit effectuer des paiements au titre du déficit de liquidation. Par conséquent, les al. 75(1)a) et b) établissent le montant des cotisations dues lors de la liquidation d'un régime.

[30]   Il est bien établi que la fiducie réputée en cas de liquidation s'applique aux cotisations visées à l'al. 75(1)a). La seule question à trancher est de savoir si elle s'applique aussi aux paiements au titre du déficit exigés par l'al. 75(1)b). J'y répondrais par l'affirmative, compte tenu du texte, du contexte et de l'objet de cette disposition.

[31]   Il est évident que le par. 57(4) de la *LRR* qui crée la fiducie réputée en cas de liquidation ne comporte aucune limite expresse aux « cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues » et je ne vois rien qui justifie d'exclure les cotisations prévues à l'al. 75(1)b). L'alinéa 75(1)a) prévoit expressément que l'employeur verse « un montant égal au total de tous les paiements » *accumulés*, même s'ils ne sont pas encore dus à la date de la liquidation, tandis que l'al. 75(1)b) parle d'un « montant » calculé à partir de la valeur de l'actif et du passif *accumulés*, lorsque le régime est liquidé. Voici le texte du par. 75(1) :

**75.** (1) Si un régime de retraite est liquidé, l'employeur verse à la caisse de retraite :

a)   d'une part, <u>un montant égal au total de tous les paiements</u> qui, en vertu de la présente loi, des règlements et du régime de retraite, sont dus ou <u>accumulés</u>, et qui n'ont pas été versés à la caisse de retraite;

b)   d'autre part, un <u>montant</u> égal au montant dont :

(i)   la <u>valeur des prestations de retraite</u> aux termes du régime de retraite qui seraient garanties par le Fonds de garantie en vertu de la présente loi et des règlements si le

that the Guarantee Fund applies to the pension plan,

(ii) the <u>value of the pension benefits accrued</u> with respect to employment in Ontario vested under the pension plan, and

(iii) the <u>value of benefits accrued</u> with respect to employment in Ontario resulting from the application of subsection 39 (3) (50 per cent rule) and section 74,

<u>exceed the value of the assets</u> of the pension fund <u>allocated as prescribed for payment of pension benefits accrued</u> with respect to employment in Ontario.

[32]    Since both the amount with respect to payments (s. 75(1)(a)) and the one ascertained by subtracting the assets from the liabilities accrued as of the date of the wind up (s. 75(1)(b)) are to be paid upon wind up as employer contributions, they are both included in the ordinary meaning of the words of s. 57(4) of the *PBA*: ". . . amount of money equal to employer contributions accrued to the date of the wind up but not yet due under the plan or regulations". As I mentioned above, this reasoning is challenged in respect of s. 75(1)(b), not of s. 75(1)(a).

[33]    The appellant Sun Indalex argues that since the deficiency is not finally quantified until well after the effective date of the wind up, the liability of the employer cannot be said to have accrued. The Monitor adds that the payments the employer must make to satisfy its wind-up obligations may change over the five-year period within which s. 31 of the *PBA* Regulations, R.R.O. 1990, Reg. 909, requires that they be made. These parties illustrate their argument by referring to what occurred to the Salaried Plan's fund in the case at bar. In 2007-8, Indalex paid down the vast majority of the $1.6 million wind-up deficiency associated with the Salaried Plan as estimated in 2006. By the end of 2008, however, this deficiency had risen back up to $1.8 million as a result of a decline in the fund's asset value. According to this argument, the amount could not have accrued as of the date of the wind up, because it could not be calculated with certainty.

surintendant déclare que le Fonds de garantie s'applique au régime de retraite,

(ii) la <u>valeur des prestations de retraite accumulées</u> à l'égard de l'emploi en Ontario et acquises aux termes du régime de retraite,

(iii) la <u>valeur des prestations accumulées</u> à l'égard de l'emploi en Ontario et qui résultent de l'application du paragraphe 39 (3) (règle des 50 pour cent) et de l'article 74,

<u>dépassent la valeur de l'actif</u> de la caisse de retraite <u>attribué, comme cela est prescrit, pour le paiement de prestations de retraite accumulées</u> à l'égard de l'emploi en Ontario.

[32]    Puisque le montant des paiements (al. 75(1)a)) et le montant établi en soustrayant l'actif du passif accumulé à la date de la liquidation (al. 75(1)b)) doivent tous les deux être versés à la liquidation à titre de cotisations de l'employeur, ils entrent tous les deux dans le sens ordinaire des mots employés au par. 57(4) de la *LRR* : « . . . montant égal aux cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues aux termes du régime ou des règlements ». Comme je l'ai mentionné, ce raisonnement est contesté en ce qui concerne l'al. 75(1)b), mais non l'al. 75(1)a).

[33]    L'appelante Sun Indalex avance que, puisque le montant définitif du déficit n'est établi que longtemps après la date de prise d'effet de la liquidation, on ne peut parler de passif accumulé relativement à cette obligation de l'employeur. Le contrôleur souligne en outre que les paiements qu'un employeur doit effectuer pour honorer ses obligations à la liquidation peuvent changer au cours des cinq ans sur lesquels ils peuvent s'échelonner aux termes de l'art. 31 du règlement général pris en application de la *LRR*, R.R.O. 1990, règl. 909. Pour illustrer leur argument, ces parties donnent l'exemple de ce qui s'est produit dans le cas du régime des salariés. En 2007-8, Indalex a comblé la majeure partie du déficit du régime des salariés, qui était estimé à 1,6 million de dollars en 2006. Toutefois, à la fin de 2008, la diminution de la valeur de l'actif de la caisse de retraite avait fait remonter le déficit de liquidation à 1,8 million de dollars. Selon cet argument, il ne peut s'agir d'un montant accumulé à la date de la liquidation, parce qu'il ne pouvait pas être établi avec certitude.

[34]   Unlike my colleague Cromwell J., I find this argument unconvincing. I instead agree with the Court of Appeal on this point. The wind-up deemed trust concerns "employer contributions accrued to the date of the wind up but not yet due under the plan or regulations". Since the employees cease to accumulate entitlements when the plan is wound up, the entitlements that are used to calculate the contributions have all been accumulated before the wind-up date. Thus the liabilities of the employer are complete — have accrued — before the wind up. The distinction between my approach and the one Cromwell J. takes is that he requires that it be possible to perform the calculation before the date of the wind up, whereas I am of the view that the time when the calculation is actually made is not relevant as long as the liabilities are assessed as of the date of the wind up. The date at which the liabilities are *reported* or the employer's *option* to spread its contributions as allowed by the regulations does not change the legal nature of the contributions.

[35]   In *Hydro-Electric Power Commission of Ontario v. Albright* (1922), 64 S.C.R. 306, Duff J. considered the meaning of the word "accrued" in interpreting the scope of a covenant. He found that

the word "accrued" according to well recognized usage has, as applied to rights or liabilities the meaning simply of completely constituted — and it may have this meaning although it appears from the context that the right completely constituted or the liability completely constituted is one which is only exercisable or enforceable *in futuro* — a debt for example which is *debitum in praesenti solvendum in futuro*. [Emphasis added; pp. 312-13.]

[36]   Thus, a contribution has "accrued" when the liabilities are completely constituted, even if the payment itself will not fall due until a later date. If this principle is applied to the facts of this case, the liabilities related to contributions to the fund allocated for payment of the pension benefits contemplated in s. 75(1)(b) are completely

[34]   Contrairement à mon collègue le juge Cromwell, j'estime que cet argument n'est pas convaincant. Je souscris plutôt à l'opinion de la Cour d'appel sur ce point. La fiducie réputée s'applique aux « cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues aux termes du régime ou des règlements ». Puisque les employés cessent d'accumuler des droits lorsque le régime est liquidé, les droits qui servent au calcul des cotisations ont tous été accumulés avant la date de la liquidation. Par conséquent, le passif correspondant aux obligations de l'employeur existe en entier — est accumulé — avant la liquidation. La différence entre le raisonnement que j'applique et celui du juge Cromwell réside dans le fait que le sien exige que le calcul puisse s'établir avant la date de la liquidation, tandis que je suis d'avis que la date où s'effectue le calcul est sans importance du moment que le passif est évalué à la date de la liquidation. Ni la date à laquelle le passif est *déclaré* ni l'*option* de l'employeur d'étaler ses cotisations comme le permet le règlement ne changent la nature juridique des cotisations.

[35]   Dans *Hydro-Electric Power Commission of Ontario c. Albright* (1922), 64 R.C.S. 306, le juge Duff a examiné le sens du mot « *accrued* », l'équivalent anglais du mot « accumulé », pour interpréter la portée d'un covenant et il a tiré la conclusion suivante :

[TRADUCTION] . . . suivant l'usage établi, le mot « accumulé », appliqué à un droit ou une obligation, signifie simplement entièrement constitué — et il peut avoir ce sens bien que le contexte indique que l'exercice de ce droit entièrement constitué ou l'exécution forcée de cette obligation entièrement constituée ne seront possibles que dans l'avenir — une dette, par exemple, qui est *debitum in praesenti solvendum in futuro*. [Je souligne; p. 312-313.]

[36]   Ainsi, une cotisation est « accumulée » lorsque le passif est entièrement constitué, même si le paiement lui-même ne devient exigible que plus tard. Cela signifie en l'espèce que le passif au titre des cotisations à la caisse destinée au paiement des prestations de retraite visées à l'al. 75(1)b) est entièrement constitué lorsque la liquidation

constituted at the time of the wind up, because no pension entitlements arise after that date. In other words, no new liabilities accrue at the time of or after the wind up. Even the portion of the contributions that is related to the elections plan members may make upon wind up has "accrued to the date of the wind up", because it is based on rights employees earned before the wind-up date.

[37]    The fact that the precise amount of the contribution is not determined as of the time of the wind up does not make it a contingent contribution that cannot have accrued for accounting purposes (*Canadian Pacific Ltd. v. M.N.R.* (1998), 41 O.R. (3d) 606 (C.A.), at p. 621). The use of the word "accrued" does not limit liabilities to amounts that can be determined with precision. As a result, the words "contributions accrued" can encompass the contributions mandated by s. 75(1)(b) of the *PBA*.

[38]    The legislative history supports my conclusion that wind-up deficiency contributions are protected by the deemed trust provision. The Ontario legislature has consistently expanded the protection afforded in respect of pension plan contributions. I cannot therefore accept an interpretation that would represent a drawback from the protection extended to employees. I will not reproduce the relevant provisions, since my colleague Cromwell J. quotes them.

[39]    The original statute provided solely for the employer's obligation to pay all amounts required to be paid to meet the test for solvency (*The Pension Benefits Act, 1965*, S.O. 1965, c. 96, s. 22(2)), but the legislature subsequently afforded employees the protection of a deemed trust on the employer's assets in an amount equal to the sums withheld from employees as contributions and sums due from the employer as service contributions (s. 23*a*, added by *The Pension Benefits Amendment Act, 1973*, S.O. 1973, c. 113, s. 6). In a later version, it protected not only contributions that were due, but also those that had accrued, with the amounts being calculated as if the plan had been wound up (*The Pension Benefits Amendment Act, 1980*, S.O. 1980, c. 80).

a lieu, parce qu'aucun droit au titre de la pension ne prend naissance après cette date. Autrement dit, aucun passif ne s'accumule pendant ni après la liquidation. Même la portion des cotisations afférente aux options que les participants peuvent exercer lorsqu'il y a liquidation est « accumulé[e] à la date de la liquidation » parce qu'elle est fondée sur des droits que les employés ont acquis avant la date de la liquidation.

[37]    Le fait que le montant précis des cotisations n'est pas établi au moment de la liquidation ne confère pas aux cotisations un caractère éventuel qui ferait en sorte qu'elles ne seraient pas accumulées d'un point de vue comptable (*Canadian Pacific Ltd. c. M.N.R.* (1998), 41 O.R. (3d) 606 (C.A.), p. 621). L'emploi du mot « accumulé » ne limite pas le passif aux seuls montants qui peuvent être établis avec précision. On peut donc considérer que le passif « accumulé » englobe les cotisations exigées à l'al. 75(1)b) de la *LRR*.

[38]    L'historique législatif étaye ma conclusion que la disposition établissant une fiducie réputée en cas de liquidation s'applique aux cotisations au titre du déficit de liquidation. Le législateur ontarien a systématiquement élargi la protection applicable aux cotisations aux régimes de retraite. Je ne puis donc retenir une interprétation qui ferait régresser la protection accordée aux employés. Mon collègue le juge Cromwell ayant cité les dispositions législatives pertinentes, je ne les reproduirai pas ici.

[39]    La loi initiale obligeait seulement l'employeur à effectuer les paiements nécessaires pour établir la solvabilité selon la norme applicable (*The Pension Benefits Act, 1965*, S.O. 1965, ch. 96, par. 22(2)), mais le législateur a par la suite protégé les employés au moyen d'une fiducie réputée grevant les biens de l'employeur d'un montant égal aux sommes retenues en tant que cotisations des employés et aux sommes dues par l'employeur (al. 23*a*, ajouté par *The Pension Benefits Amendment Act, 1973*, S.O. 1973, ch. 113, art. 6). Dans une version subséquente, ce ne furent pas que les cotisations exigibles, mais également celles qui étaient accumulées qui ont été protégées, et le calcul s'en effectuait comme s'il y avait liquidation (*The Pension Benefits Amendment Act, 1980*, S.O. 1980, ch. 80).

[40]   Whereas *all* employer contributions were originally covered by a single provision, the legislature crafted a separate provision in 1980 that specifically imposed on the employer the obligation to fund the wind-up deficiency. At the time, it was clear from the words used in the provision that the amount related to the wind-up deficiency was excluded from the deemed trust protection (*The Pension Benefits Amendment Act, 1980*). In 1983, the legislature made a distinction between the deemed trust for ongoing employer contributions and the one for certain payments to be made upon wind up (ss. 23(4)(a) and 23(4)(b), added by *Pension Benefits Amendment Act, 1983*, S.O. 1983, c. 2, s. 3). In that version, the wind-up deficiency payments were still excluded from the deemed trust. However, the legislature once again made changes to the protection in 1987. The 1987 version is, in substance, the one that applies in the case at bar. In the *Pension Benefits Act, 1987*, S.O. 1987, c. 35, a specific wind-up deemed trust was maintained, but the wind-up deficiency payments were no longer excluded from it, because the limitation that had been imposed until then with respect to payments that were due or had accrued while the plan was ongoing had been eliminated. My comments to the effect that the previous versions excluded the wind-up deficiency payments do not therefore apply to the 1987 statute, since it was materially different.

[41]   Whereas it is clear from the 1983 amendments that the deemed trust provided for in s. 23(4)(b) was intended to include only current service costs and special payments, this is less clear from the subsequent versions of the *PBA*. To give meaning to the 1987 amendment, I have to conclude that the words refer to a deemed trust in respect of *all* "employer contributions accrued to the date of the wind up but not yet due under the plan or regulations".

[42]   The employer's liability upon wind up is now set out in a single section which elegantly parallels the wind-up deemed trust provision. It can be seen from the legislative history that the protection has expanded from (1) only the service contributions

[40]   Alors que *toutes* les cotisations de l'employeur étaient au départ régies par une seule disposition, le législateur a édicté, en 1980, une disposition distincte imposant expressément à l'employeur une obligation de capitalisation du déficit de liquidation. Il ressortait alors du libellé employé que le montant relatif au déficit à la liquidation était exclu de la protection conférée par la fiducie réputée (*The Pension Benefits Amendment Act, 1980*). En 1983, le législateur a établi une distinction entre la fiducie réputée applicable aux cotisations de l'employeur lorsque le régime est en vigueur et celle applicable à certains paiements en cas de liquidation du régime (al. 23(4)a) et 23(4)b), ajoutés par la *Pension Benefits Amendment Act, 1983*, S.O. 1983, ch. 2, art. 3). Dans cette version, les paiements au titre du déficit de liquidation étaient toujours exclus de la fiducie réputée. En 1987, toutefois, le législateur a modifié encore une fois la protection, et c'est cette version qui régit, pour l'essentiel, la présente espèce. La *Loi de 1987 sur les régimes de retraite*, L.O. 1987, ch. 35, crée toujours une fiducie réputée distincte en cas de liquidation, mais cette fiducie n'exclut plus les paiements au titre du déficit pour la limitation imposée jusqu'alors concernant les paiements dus ou accumulés pendant l'existence du régime a été abolie. Mes commentaires selon lesquels le libellé des anciennes versions excluait les paiements au titre du déficit de liquidation ne s'appliquent donc pas à la loi de 1987, parce que celle-ci est substantiellement différente.

[41]   Alors qu'il ressort clairement des modifications faites en 1983 que la fiducie réputée créée par l'al. 23(4)b) ne visait que les coûts afférents au service courant et les paiements spéciaux, cela n'est pas aussi clair dans les versions subséquentes de la *LRR*. Pour donner un sens aux modifications apportées en 1987, il faut conclure que leur libellé renvoie à une fiducie réputée couvrant *toutes* les « cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues aux termes du régime ou des règlements ».

[42]   La responsabilité de l'employeur à la liquidation est maintenant établie dans un article unique qui fait élégamment écho à celui qui crée la fiducie réputée à la liquidation. L'historique législatif montre que la protection, qui couvrait d'abord (1)

that were due, to (2) amounts payable calculated as if the plan had been wound up, to (3) amounts that were due and had accrued upon wind up but excluding the wind-up deficiency payments, to (4) all amounts due and accrued upon wind up.

[43]    Therefore, in my view, the legislative history leads to the conclusion that adopting a narrow interpretation that would dissociate the employer's payment provided for in s. 75(1)(b) of the *PBA* from the one provided for in s. 75(1)(a) would be contrary to the Ontario legislature's trend toward broadening the protection. Since the provision respecting wind-up payments sets out the amounts that are owed upon wind up, I see no historical, legal or logical reason to conclude that the wind-up deemed trust provision does not encompass all of them.

[44]    Thus, I am of the view that the words and context of s. 57(4) lend themselves easily to an interpretation that includes the wind-up deficiency payments, and I find additional support for this in the purpose of the provision. The deemed trust provision is a remedial one. Its purpose is to protect the interests of plan members. This purpose militates against adopting the limited scope proposed by Indalex and some of the interveners. In the case of competing priorities between creditors, the remedial purpose favours an approach that includes all wind-up payments in the value of the deemed trust in order to achieve a broad protection.

[45]    In sum, the relevant provisions, the legislative history and the purpose are all consistent with inclusion of the wind-up deficiency in the protection afforded to members with respect to employer contributions upon the wind up of their pension plan. I therefore find that the Court of Appeal correctly held with respect to the Salaried Plan, which had been wound up as of December 31, 2006, that Indalex was deemed to hold in trust the amount necessary to satisfy the wind-up deficiency.

[46]    The situation is different with respect to the Executive Plan. Unlike s. 57(3), which provides that

uniquement les cotisations dues, s'est étendue (2) aux montants payables calculés comme s'il y avait liquidation du régime, (3) puis aux montants dus ou accumulés à la liquidation, à l'exclusion des paiements au titre du déficit de liquidation (4) et, enfin, à tous les montants dus ou accumulés à la liquidation.

[43]    Selon moi, l'historique législatif mène donc à la conclusion qu'une interprétation étroite qui dissocierait le paiement requis de l'employeur par l'al. 75(1)b) de la *LRR* de celui exigé à l'al. 75(1)a) irait à l'encontre de la tendance du législateur ontarien à offrir une protection de plus en plus étendue. Puisque la disposition régissant les paiements à la liquidation décrit les montants qui sont alors dus, je ne vois aucune raison historique, juridique ou logique de conclure que la disposition établissant une fiducie réputée en cas de liquidation ne les englobe pas tous.

[44]    J'estime donc que le texte et le contexte du par. 57(4) se prêtent facilement à une interprétation qui englobe les paiements au titre du déficit de liquidation, et l'objet de cette disposition me conforte dans cette opinion. La disposition qui crée une fiducie réputée a une vocation réparatrice. Elle vise à protéger les intérêts des participants. Cet objet milite contre l'adoption de la portée limitée que proposent Indalex et certains des intervenants. En présence de priorités concurrentes entre créanciers, cette fin réparatrice favorise une interprétation qui inclut tous les paiements à la liquidation dans la valeur de la fiducie réputée pour que les participants bénéficient d'une vaste protection.

[45]    En résumé, le texte, l'historique législatif et l'objet des dispositions pertinentes concordent tous avec l'inclusion du déficit de liquidation dans la protection offerte aux participants à l'égard des cotisations de l'employeur à la liquidation des régimes. Je suis donc d'avis que la Cour d'appel a jugé à bon droit qu'Indalex était réputée détenir en fiducie le montant nécessaire pour combler le déficit de liquidation du régime des salariés dont la liquidation avait pris effet le 31 décembre 2006.

[46]    Il n'en va pas de même pour le régime des cadres. Contrairement au par. 57(3), selon lequel

the deemed trust protecting employer contributions exists while a plan is ongoing, s. 57(4) provides that the wind-up deemed trust comes into existence only when the plan is wound up. This is a choice made by the Ontario legislature. I would not interfere with it. Thus, the deemed trust entitlement arises only once the condition precedent of the plan being wound up has been fulfilled. This is true even if it is certain that the plan will be wound up in the future. At the time of the sale, the Executive Plan was in the process of being, but had not yet been, wound up. Consequently, the deemed trust provision does not apply to the employer's wind-up deficiency payments in respect of that plan.

[47]    The Court of Appeal declined to decide whether a deemed trust arose in relation to the Executive Plan, stating that it was unnecessary to decide this issue. However, the court expressed concern that a reasoning that deprived the Executive Plan's members of the benefit of a deemed trust would mean that a company under *CCAA* protection could avoid the priority of the *PBA* deemed trust simply by not winding up an underfunded pension plan. The fear was that Indalex could have relied on its own inaction to avoid the consequences that flow from a wind up. I am not convinced that the Court of Appeal's concern has any impact on the question whether a deemed trust exists, and I doubt that an employer could avoid the consequences of such a security interest simply by refusing to wind up a pension plan. The Superintendent may take a number of steps, including ordering the wind up of a pension plan under s. 69(1) of the *PBA* in a variety of circumstances (see s. 69(1)(d) *PBA*). The Superintendent did not choose to order that the plan be wound up in this case.

## B.  *Does the Deemed Trust Supersede the DIP Charge?*

[48]    The finding that the interests of the Salaried Plan's members in all the employer's wind-up contributions to the Salaried Plan are protected by a

la fiducie réputée protégeant les cotisations de l'employeur existe pendant que le régime est en vigueur, le par. 57(4) prévoit que la fiducie réputée en cas de liquidation ne prend naissance qu'à la liquidation du régime. C'est ce que le législateur ontarien a décidé, et je n'interviendrai pas dans cette décision. Les droits résultant de la fiducie réputée ne prennent donc naissance que lorsque se réalise la condition préalable, c'est-à-dire lors de la liquidation du régime, et cela, même s'il est certain que le régime sera liquidé plus tard. Au moment de la vente, le régime des cadres était en voie de liquidation, mais non liquidé. La disposition relative à la fiducie réputée ne s'applique donc pas aux cotisations de l'employeur au titre du déficit de liquidation de ce régime.

[47]    La Cour d'appel, ne s'est pas prononcée sur l'existence d'une fiducie réputée à l'égard du régime des cadres, affirmant qu'il n'était pas nécessaire de trancher cette question. Elle a cependant exprimé des réserves au sujet d'un raisonnement qui empêcherait les participants au régime des cadres de bénéficier d'une fiducie réputée, ce qui ferait en sorte qu'une société placée sous la protection de la *LACC* pourrait éviter la priorité établie par la *LRR* à l'égard de la fiducie réputée en s'abstenant simplement de liquider un régime de retraite sous-capitalisé. Indalex aurait ainsi pu tabler sur sa propre inaction pour échapper aux conséquences d'une liquidation. Je ne suis pas convaincue que la crainte exprimée par la Cour d'appel ait une incidence sur la question de savoir si une fiducie réputée existe, et je doute que le simple refus de liquider un régime de retraite puisse permettre à un employeur d'échapper aux conséquences d'une telle sûreté. Le surintendant peut intervenir de diverses façons, notamment en ordonnant la liquidation du régime en application du par. 69(1) de la *LRR* dans diverses circonstances (voir l'al. 69(1)d) de la *LRR*). Le surintendant n'a pas choisi, en l'espèce, d'ordonner la liquidation.

## B.  *La fiducie réputée a-t-elle préséance sur la charge DE?*

[48]    La conclusion qu'une fiducie réputée protège les droits des participants au régime des salariés à l'égard de toutes les cotisations que l'employeur

deemed trust does not mean that part of the money reserved by the Monitor from the sale proceeds must be remitted to the Salaried Plan's fund. This will be the case only if the provincial priorities provided for in s. 30(7) of the *PPSA* ensure that the claim of the Salaried Plan's members has priority over the DIP charge. Section 30(7) reads as follows:

**30.** . . . .

(7) A security interest in an account or inventory and its proceeds is subordinate to the interest of a person who is the beneficiary of a deemed trust arising under the *Employment Standards Act* or under the *Pension Benefits Act*.

The effect of s. 30(7) is to enable the Salaried Plan's members to recover from the reserve fund, insofar as it relates to an account or inventory and its proceeds in Ontario, ahead of all other secured creditors.

[49]    The Appellants argue that any provincial deemed trust is subordinate to the DIP charge authorized by the *CCAA* order. They put forward two central arguments to support their contention. First, they submit that the *PBA* deemed trust does not apply in *CCAA* proceedings because the relevant priorities are those of the federal insolvency scheme, which do not include provincial deemed trusts. Second, they argue that by virtue of the doctrine of federal paramountcy the DIP charge supersedes the *PBA* deemed trust.

[50]    The Appellants' first argument would expand the holding of *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, [2010] 3 S.C.R. 379, so as to apply federal bankruptcy priorities to *CCAA* proceedings, with the effect that claims would be treated similarly under the *CCAA* and the *BIA*. In *Century Services*, the Court noted that there are points at which the two schemes converge:

doit verser au régime de retraite des salariés à la liquidation ne signifie pas qu'une partie des sommes retenues par le contrôleur sur le produit de la vente doit être versée à la caisse de retraite des salariés. Ce sera le cas seulement si la priorité de rang accordée par la province aux participants au régime des salariés, au par. 30(7) de la *LSM*, fait en sorte que leur réclamation a préséance sur la charge DE. Le paragraphe 30(7) prévoit ce qui suit :

**30.** . . . .

(7) La sûreté sur un compte ou un stock et le produit de ceux-ci est subordonnée à l'intérêt du bénéficiaire d'une fiducie réputée telle aux termes de la *Loi sur les normes d'emploi* ou de la *Loi sur les régimes de retraite*.

Le paragraphe 30(7) a pour effet de permettre aux participants au régime des salariés de recouvrer leur créance sur le fonds de réserve, dans la mesure où il se rapporte à un compte ou un stock ou au produit de ceux-ci en Ontario, par préséance sur tous les autres créanciers garantis.

[49]    Les appelants avancent que toute fiducie réputée d'origine provinciale est subordonnée à la charge DE autorisée par l'ordonnance fondée sur la *LACC*. Ils invoquent deux arguments principaux à cet égard. Premièrement, la fiducie réputée créée par la *LRR* ne s'appliquerait pas dans une instance relevant de la *LACC* parce que les priorités applicables sont celles qui sont établies par le régime fédéral en matière d'insolvabilité et que les fiducies réputées d'origine provinciale n'en font pas partie. Deuxièmement, ils plaident que, selon la doctrine de la prépondérance fédérale, la charge DE a préséance sur la fiducie réputée créée par la *LRR*.

[50]    Le premier argument des appelants élargirait la portée de l'arrêt *Century Services Inc. c. Canada (Procureur général)*, 2010 CSC 60, [2010] 3 R.C.S. 379, de façon que les priorités fédérales en matière de faillite s'appliquent aux instances fondées sur la *LACC*, ce qui ferait que les créances seraient traitées de façon identique sous le régime de la *LACC* et de la *LFI*. Dans *Century Services*, la Cour a indiqué qu'il existe des points de convergence entre les deux régimes :

Another point of convergence of the *CCAA* and the *BIA* relates to priorities. Because the *CCAA* is silent about what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a *CCAA* reorganization is ultimately unsuccessful. [para. 23]

[51]  In order to avoid a race to liquidation under the *BIA*, courts will favour an interpretation of the *CCAA* that affords creditors analogous entitlements. Yet this does not mean that courts may read bankruptcy priorities into the *CCAA* at will. Provincial legislation defines the priorities to which creditors are entitled until that legislation is ousted by Parliament. Parliament did not expressly apply all bankruptcy priorities either to *CCAA* proceedings or to proposals under the *BIA*. Although the creditors of a corporation that is attempting to reorganize may bargain in the shadow of their bankruptcy entitlements, those entitlements remain only shadows until bankruptcy occurs. At the outset of the insolvency proceedings, Indalex opted for a process governed by the *CCAA*, leaving no doubt that although it wanted to protect its employees' jobs, it would not survive as their employer. This was not a case in which a failed arrangement forced a company into liquidation under the *BIA*. Indalex achieved the goal it was pursuing. It chose to sell its assets under the *CCAA*, not the *BIA*.

[52]  The provincial deemed trust under the *PBA* continues to apply in *CCAA* proceedings, subject to the doctrine of federal paramountcy (*Crystalline Investments Ltd. v. Domgroup Ltd.*, 2004 SCC 3, [2004] 1 S.C.R. 60, at para. 43). The Court of Appeal therefore did not err in finding that at the end of a *CCAA* liquidation proceeding, priorities may be determined by the *PPSA*'s scheme rather than the federal scheme set out in the *BIA*.

Un autre point de convergence entre la *LACC* et la *LFI* concerne les priorités. Comme la *LACC* ne précise pas ce qui arrive en cas d'échec de la réorganisation, la *LFI* fournit la norme de référence pour ce qui se produira dans une telle situation. [par. 23]

[51]  Pour éviter de précipiter une liquidation sous le régime de la *LFI*, les tribunaux privilégieront une interprétation de la *LACC* qui confère des droits analogues aux créanciers. Il ne s'ensuit toutefois pas pour autant que les tribunaux peuvent à leur gré inclure par interprétation dans la *LACC* les priorités applicables en matière de faillite. Les priorités dont bénéficient les créanciers sont définies par la législation provinciale, à moins que ces droits soient écartés par une loi fédérale. Le législateur fédéral n'a pas expressément édicté que toutes les priorités établies en matière de faillite s'appliquent aux instances relevant de la *LACC* ou aux propositions régies par la *LFI*. Bien que les créanciers d'une société tentant de se réorganiser puissent, dans leurs négociations, tenir compte des droits qu'ils pourraient exercer en cas de faillite, ces droits ne constituent rien de plus qu'une considération tant que la faillite n'est pas survenue. Au début des procédures en matière d'insolvabilité, Indalex a choisi un processus régi par la *LACC*, ne laissant aucun doute sur le fait que, bien qu'elle cherchât à protéger les emplois, elle ne demeurerait pas leur employeur. Nous ne sommes pas en présence d'un cas où l'échec d'un arrangement a entraîné la liquidation d'une société sous le régime de la *LFI*. Indalex a atteint l'objectif qu'elle poursuivait. Elle a choisi de vendre son actif sous le régime de la *LACC*, et non sous celui de la *LFI*.

[52]  La fiducie réputée créée par la *LRR* continue de s'appliquer dans les instances relevant de la *LACC*, sous réserve de la doctrine de la prépondérance fédérale (*Crystalline Investments Ltd. c. Domgroup Ltd.*, 2004 CSC 3, [2004] 1 R.C.S. 60, par. 43). La Cour d'appel a donc jugé à bon droit que, à l'issue d'un processus de liquidation relevant de la *LACC*, les priorités peuvent être établies selon le régime prévu dans la *LSM*, plutôt que selon le régime fédéral établi dans la *LFI*.

[53]   The Appellants' second argument is that an order granting priority to the plan's members on the basis of the deemed trust provided for by the Ontario legislature would be unconstitutional in that it would conflict with the order granting priority to the DIP lenders that was made under the *CCAA*. They argue that the doctrine of paramountcy resolves this conflict, as it would render the provincial law inoperative to the extent that it is incompatible with the federal law.

[54]   There is a preliminary question that must be addressed before determining whether the doctrine of paramountcy applies in this context. This question arises because the Court of Appeal found that although the *CCAA* court had the power to authorize a DIP charge that would supersede the deemed trust, the order in this case did not have such an effect because paramountcy had not been invoked. As a result, the priority of the deemed trust over secured creditors by virtue of s. 30(7) of the *PPSA* remained in effect, and the Plan Members' claim ranked in priority to the claim of the DIP lenders established in the *CCAA* order.

[55]   With respect, I cannot accept this approach to the doctrine of federal paramountcy. This doctrine resolves conflicts in the application of overlapping valid provincial and federal legislation (*Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3, at paras. 32 and 69). Paramountcy is a question of law. As a result, subject to the application of the rules on the admissibility of new evidence, it can be raised even if it was not invoked in an initial proceeding.

[56]   A party relying on paramountcy must "demonstrate that the federal and provincial laws are in fact incompatible by establishing either that it is impossible to comply with both laws or that to apply the provincial law would frustrate the purpose of the federal law" (*Canadian Western Bank*, at para. 75). This Court has in fact applied the doctrine of paramountcy in the area of bankruptcy and insolvency to come to the conclusion that a

[53]   Selon le deuxième argument des appelants, une ordonnance accordant priorité aux participants en raison de la fiducie réputée créée par le législateur ontarien serait inconstitutionnelle, parce qu'elle entrerait en conflit avec l'ordonnance fondée sur la *LACC* qui donne priorité à la charge DE. La doctrine de la prépondérance fédérale résoudrait ce conflit, en rendant la loi provinciale inopérante dans la mesure de son incompatibilité avec la loi fédérale.

[54]   Pour statuer sur l'applicabilité de la doctrine de la prépondérance fédérale dans le présent contexte, il faut d'abord trancher une question préliminaire. Cette question découle de la conclusion de la Cour d'appel selon laquelle, bien que le tribunal fût habilité à autoriser une charge DE ayant priorité de rang sur la fiducie réputée, l'ordonnance du tribunal en l'espèce n'avait pas eu cet effet parce que la doctrine de la prépondérance fédérale n'avait pas été invoquée. Il s'ensuivait que la priorité de rang de la fiducie réputée sur les créanciers garantis établie au par. 30(7) de la *LSM* demeurait applicable et que la créance des participants avait préséance sur celle des prêteurs DE découlant de l'ordonnance rendue sous le régime de la *LACC*.

[55]   Avec égards, je ne puis souscrire à cette conception de la doctrine de la prépondérance fédérale. Cette doctrine résout les conflits d'application entre des lois provinciales et fédérales validement adoptées qui empiètent l'une sur l'autre (*Banque canadienne de l'Ouest c. Alberta*, 2007 CSC 22, [2007] 2 R.C.S. 3, par. 32 et 69). La prépondérance est une question de droit, si bien que, sous réserve de l'application des règles régissant l'admissibilité de nouveaux éléments de preuve, elle peut être soulevée même si elle n'a pas été invoquée dans une procédure initiale.

[56]   La partie qui invoque la prépondérance fédérale doit « démontrer une incompatibilité réelle entre les législations provinciale et fédérale, en établissant, soit qu'il est impossible de se conformer aux deux législations, soit que l'application de la loi provinciale empêcherait la réalisation du but de la législation fédérale » (*Banque canadienne de l'Ouest*, par. 75). Notre Cour a déjà appliqué la doctrine de la prépondérance au domaine de la

provincial legislature cannot, through measures such as a deemed trust, affect priorities granted under federal legislation (*Husky Oil*).

[57]   None of the parties question the validity of either the federal provision that enables a *CCAA* court to make an order authorizing a DIP charge or the provincial provision that establishes the priority of the deemed trust. However, in considering whether the *CCAA* court has, in exercising its discretion to assess a claim, validly affected a provincial priority, the reviewing court should remind itself of the rule of interpretation stated in *Attorney General of Canada v. Law Society of British Columbia*, [1982] 2 S.C.R. 307 (at p. 356), and reproduced in *Canadian Western Bank* (at para. 75):

When a federal statute can be properly interpreted so as not to interfere with a provincial statute, such an interpretation is to be applied in preference to another applicable construction which would bring about a conflict between the two statutes.

[58]   In the instant case, the *CCAA* judge, in authorizing the DIP charge, did not consider the fact that the Salaried Plan's members had a claim that was protected by a deemed trust, nor did he explicitly note that ordinary creditors, such as the Executive Plan's members, had not received notice of the DIP loan motion. However, he did consider factors that were relevant to the remedial objective of the *CCAA* and found that Indalex had in fact demonstrated that the *CCAA*'s purpose would be frustrated without the DIP charge. It will be helpful to quote the reasons he gave on April 17, 2009 in authorizing the DIP charge ((2009), 52 C.B.R. (5th) 61):

(a)   the Applicants are in need of the additional financing in order to support operations during the period of a going concern restructuring;

faillite et de l'insolvabilité, et elle a conclu que des mesures législatives provinciales, comme la création d'une fiducie réputée, ne peuvent porter atteinte à des priorités établies par le législateur fédéral (*Husky Oil*).

[57]   Ni la validité de la disposition fédérale habilitant le tribunal chargé d'appliquer la *LACC* à rendre une ordonnance autorisant une charge DE, ni celle de la disposition provinciale créant la priorité de rang de la fiducie réputée ne sont contestées. Toutefois, lorsqu'elle examine la validité de l'atteinte portée à une priorité d'origine provinciale par le tribunal chargé d'appliquer la *LACC* dans l'exercice de son pouvoir discrétionnaire d'évaluer une réclamation, la cour siégeant en révision ne doit pas perdre de vue la règle d'interprétation formulée dans *Procureur général du Canada c. Law Society of British Columbia*, [1982] 2 R.C.S. 307 (p. 356), et reproduite dans *Banque canadienne de l'Ouest* (par. 75) :

Chaque fois qu'on peut légitimement interpréter une loi fédérale de manière qu'elle n'entre pas en conflit avec une loi provinciale, il faut appliquer cette interprétation de préférence à toute autre qui entraînerait un conflit.

[58]   En l'espèce, le juge qui a autorisé la charge DE sous le régime de la *LACC* n'a pas pris en compte le fait que les participants au régime des salariés avaient une créance protégée par une fiducie réputée, et il n'a pas non plus mentionné expressément que les créanciers ordinaires, tels les participants au régime des cadres, n'avaient pas reçu avis de la motion en autorisation du prêt DE. Il a toutefois examiné des facteurs se rapportant à la fin réparatrice de la *LACC* et conclu qu'Indalex avait effectivement démontré que la réalisation des objets de la *LACC* serait compromise en l'absence de la charge DE. Je crois utile de citer les motifs qu'il a exprimés à l'appui de sa décision d'autoriser la charge DE le 17 avril 2009 ((2009), 52 C.B.R. (5th) 61) :

[TRADUCTION]

a)   les requérantes ont besoin de fonds supplémentaires pour soutenir l'exploitation pendant leur période de restructuration sur la base de la continuité;

(b) there is a benefit to the breathing space that would be afforded by the DIP Financing that will permit the Applicants to identify a going concern solution;

(c) there is no other alternative available to the Applicants for a going concern solution;

(d) a stand-alone solution is impractical given the integrated nature of the business of Indalex Canada and Indalex U.S.;

(e) given the collateral base of Indalex U.S., the Monitor is satisfied that it is unlikely that the Post-Filing Guarantee with respect to the U.S. Additional Advances will ever be called and the Monitor is also satisfied that the benefits to stakeholders far outweighs the risk associated with this aspect of the Post-Filing Guarantee;

(f) the benefit to stakeholders and creditors of the DIP Financing outweighs any potential prejudice to unsecured creditors that may arise as a result of the granting of super-priority secured financing against the assets of the Applicants;

(g) the Pre-Filing Security has been reviewed by counsel to the Monitor and it appears that the unsecured creditors of the Canadian debtors will be in no worse position as a result of the Post-Filing Guarantee than they were otherwise, prior to the CCAA filing, as a result of the limitation of the Canadian guarantee set forth in the draft Amended and Restated Initial Order . . . ; and

(h) the balancing of the prejudice weighs in favour of the approval of the DIP Financing. [para. 9]

[59]  Given that there was no alternative for a going-concern solution, it is difficult to accept the Court of Appeal's sweeping intimation that the DIP lenders would have accepted that their claim ranked below claims resulting from the deemed trust. There is no evidence in the record that gives credence to this suggestion. Not only is it contradicted by the *CCAA* judge's findings of fact, but case after case has shown that "the priming of the DIP facility is a key aspect of the debtor's ability to attempt a workout" (J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), at p. 97). The harsh reality is that lending is governed by the commercial imperatives of the

b) la marge de manœuvre que le financement DE procurerait aux requérantes aurait l'avantage de leur permettre de trouver une solution préservant la continuité de leur exploitation;

c) les requérantes ne disposent d'aucune autre solution permettant la continuité de l'exploitation;

d) vu le degré d'intégration de l'exploitation d'Indalex Canada et d'Indalex É.-U., une solution indépendante est irréaliste;

e) vu les biens fournis en garantie par Indalex É.-U., le contrôleur juge peu probable qu'il faille réaliser la garantie postérieure au début de l'instance consentie à l'égard des avances supplémentaires aux É.-U. et il est convaincu que les avantages pour les intéressés dépassent de beaucoup le risque associé à cet aspect de la garantie;

f) les avantages du financement DE pour les intéressés et les créanciers l'emportent sur tout préjudice que pourrait causer aux créanciers non garantis l'octroi d'un financement garanti par une superpriorité grevant l'actif des requérantes;

g) l'avocat du contrôleur a examiné la garantie antérieure au début de l'instance, et il appert que la garantie postérieure au début de l'instance ne placera pas les créanciers non garantis des débiteurs canadiens dans une situation pire que celle où ils se trouvaient avant l'introduction de l'instance fondée sur la *LACC*, en raison des restrictions applicables à la garantie canadienne établies dans le projet d'ordonnance initiale modifiée et reformulée . . .

h) la prépondérance des inconvénients favorise l'approbation du financement DE. [par. 9]

[59]  Étant donné qu'il n'existait aucune autre solution pour préserver la continuité de l'exploitation, il est difficile d'accepter l'insinuation sans nuance de la Cour d'appel que les prêteurs DE auraient accepté que leur réclamation soit subordonnée à celles fondées sur la fiducie réputée. Rien dans la preuve présentée n'accrédite un tel scénario. Non seulement les conclusions de fait du juge chargé d'appliquer la *LACC* le contredisent, mais il a été démontré maintes et maintes fois que [TRADUCTION] « la priorité accordée au financement DE constitue un élément clé de la capacité du débiteur de tenter de conclure un arrangement » (J. P. Sarra, *Rescue! The Companies' Creditors*

lenders, not by the interests of the plan members or the policy considerations that lead provincial governments to legislate in favour of pension fund beneficiaries. The reasons given by Morawetz J. in response to the first attempt of the Executive Plan's members to reserve their rights on June 12, 2009 are instructive. He indicated that any uncertainty as to whether the lenders would withhold advances or whether they would have priority if advances were made did "not represent a positive development". He found that, in the absence of any alternative, the relief sought was "necessary and appropriate" (2009 CanLII 37906, at paras. 7-8).

[60]   In this case, compliance with the provincial law necessarily entails defiance of the order made under federal law. On the one hand, s. 30(7) of the *PPSA* required a part of the proceeds from the sale related to assets described in the provincial statute to be paid to the plan's administrator before other secured creditors were paid. On the other hand, the Amended Initial Order provided that the DIP charge ranked in priority to "all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise" (para. 45). Granting priority to the DIP lenders subordinates the claims of other stakeholders, including the Plan Members. This court-ordered priority based on the *CCAA* has the same effect as a statutory priority. The federal and provincial laws are inconsistent, as they give rise to different, and conflicting, orders of priority. As a result of the application of the doctrine of federal paramountcy, the DIP charge supersedes the deemed trust.

C.  *Did Indalex Have Fiduciary Obligations to the Plan Members?*

[61]   The fact that the DIP financing charge supersedes the deemed trust or that the interests of the Executive Plan's members are not protected by the deemed trust does not mean that Plan Members have no right to receive money out of the reserve

*Arrangement Act* (2007), p. 97). La dure réalité est que l'octroi de prêts est régi par les impératifs commerciaux des prêteurs, et non par les intérêts des participants ou par les considérations de politique générale qui ont incité les législateurs provinciaux à protéger les bénéficiaires de caisses de retraite. Les motifs exposés par le juge Morawetz lorsque, le 12 juin 2009, les participants au régime des cadres ont demandé pour la première fois que leurs droits soient réservés sont révélateurs. Selon lui, toute incertitude quant à savoir si les prêteurs refuseraient de consentir des avances ou s'ils auraient priorité dans le cas où des avances seraient consenties [TRADUCTION] « n'améliorerait pas la situation ». Il a conclu qu'en l'absence de solution de rechange la réparation demandée était « nécessaire et appropriée » (2009 CanLII 37906, par. 7-8).

[60]   En l'occurrence, le respect du droit provincial implique nécessairement le non-respect de l'ordonnance rendue en vertu du droit fédéral. D'un côté, le par. 30(7) de la *LSM* exige qu'une partie du produit de la vente lié aux biens décrits dans la loi provinciale soit versée à l'administrateur du régime de retraite par priorité sur les paiements aux autres créanciers garantis. D'un autre côté, l'ordonnance initiale modifiée accorde à la charge DE priorité sur [TRADUCTION] « toutes les autres sûretés, y compris les fiducies, privilèges, charges et grèvements, d'origine législative ou autre » (par. 45). Accorder priorité aux prêteurs DE relègue à un rang inférieur les créances des autres intéressés, notamment les participants. Cette priorité d'origine judiciaire fondée sur la *LACC* a le même effet qu'une priorité d'origine législative. Les dispositions fédérales et provinciales sont inconciliables, car elles produisent des ordres de priorité différents et conflictuels. L'application de la doctrine de la prépondérance fédérale donne à la charge DE priorité sur la fiducie réputée.

C.  *Indalex avait-elle des obligations fiduciaires envers les participants?*

[61]   Le fait que la charge DE ait préséance sur la fiducie réputée ou que les intérêts des participants au régime des cadres ne soient pas protégés par la fiducie réputée ne signifient pas que les participants n'ont pas le droit de recevoir un montant prélevé

fund. What remains to be considered is whether an equitable remedy, which could override all priorities, can and should be granted for a breach by Indalex of a fiduciary duty.

[62]   The first stage of a fiduciary duty analysis is to determine whether and when fiduciary obligations arise. The Court has recognized that there are circumstances in which a pension plan administrator has fiduciary obligations to plan members both at common law and under statute (*Burke v. Hudson's Bay Co.*, 2010 SCC 34, [2010] 2 S.C.R. 273, at para. 41). It is clear that the indicia of a fiduciary relationship attach in this case between the Plan Members and Indalex as plan administrator. Sun Indalex and the Monitor do not dispute this proposition.

[63]   However, Sun Indalex and the Monitor argue that the employer has a fiduciary duty only when it acts as plan administrator — when it is wearing its administrator's "hat". They contend that, outside the plan administration context, when directors make decisions in the best interests of the corporation, the employer is wearing solely its "corporate hat". On this view, decisions made by the employer in its corporate capacity are not burdened by the corporation's fiduciary obligations to its pension plan members and, consequently, cannot be found to conflict with plan members' interests. This is not the correct approach to take in determining the scope of the fiduciary obligations of an employer acting as plan administrator.

[64]   Only persons or entities authorized by the *PBA* can act as plan administrators (ss. 1(1) and 8(1)(a)). The employer is one of them. A corporate employer that chooses to act as plan administrator accepts the fiduciary obligations attached to that function. Since the directors of a corporation also have a fiduciary duty to the corporation, the fact that the corporate employer can act as administrator

sur le fonds de réserve. Il faut encore examiner s'il est possible et s'il y a lieu d'imposer une réparation en equity — pouvant avoir préséance sur toutes les priorités — pour manquement par Indalex à une obligation fiduciaire.

[62]   La première étape de l'analyse relative à une obligation fiduciaire consiste à déterminer si de telles obligations existent et dans quel contexte elles s'appliquent. La Cour a reconnu que, dans certaines circonstances, l'administrateur d'un régime de retraite a des obligations fiduciaires envers les participants en vertu tant de la common law que de la législation (*Burke c. Cie de la Baie d'Hudson*, 2010 CSC 34, [2010] 2 R.C.S. 273, par. 41). Il est clair que la relation entre les participants et Indalex, en sa qualité d'administrateur des régimes, présente les caractéristiques d'une relation fiduciaire. Ni Sun Indalex ni le contrôleur ne le contestent.

[63]   Sun Indalex et le contrôleur font cependant valoir que l'employeur n'est tenu à une obligation fiduciaire que lorsqu'il agit en qualité d'administrateur des régimes — lorsqu'il porte son « chapeau » d'administrateur des régimes. Hors du contexte de l'administration des régimes, lorsque le conseil d'administration prend des décisions dans l'intérêt supérieur de la société, il porte uniquement son « chapeau » de gestionnaire de la société. Selon cette optique, les décisions de l'employeur concernant la gestion de l'entreprise ne sont pas assujetties aux obligations fiduciaires de la société envers les participants à son régime de retraite et, par conséquent, ne peuvent entrer en conflit avec les intérêts des participants. Je ne puis accepter cette interprétation lorsqu'il s'agit de déterminer la portée des obligations fiduciaires qui incombent à un employeur en sa qualité d'administrateur d'un régime de retraite.

[64]   Seules peuvent administrer un régime de retraite les personnes ou entités qui y sont autorisées par la *LRR* (par. 1(1) et al. 8(1)a)). L'employeur fait partie de ces personnes ou entités. L'employeur constitué en société qui décide d'agir en qualité d'administrateur d'un régime accepte les obligations fiduciaires inhérentes à cette fonction. Puisque les administrateurs d'une société ont aussi une

of a pension plan means that s. 8(1)(a) of the *PBA* is based on the assumption that not all decisions taken by directors in managing a corporation will result in conflict with the corporation's duties to the plan's members. However, the corporate employer must be prepared to resolve conflicts where they arise. Reorganization proceedings place considerable burdens on any debtor, but these burdens do not release an employer that acts as plan administrator from its fiduciary obligations.

[65]  Section 22(4) of the *PBA* explicitly provides that a plan administrator must not permit its own interest to conflict with its duties in respect of the pension fund. Thus, where an employer's own interests do not converge with those of the plan's members, it must ask itself whether there is a potential conflict and, if so, what can be done to resolve the conflict. Where interests do conflict, I do not find the two hats metaphor helpful. The solution is not to determine whether a given decision can be classified as being related to either the management of the corporation or the administration of the pension plan. The employer may well take a sound management decision, and yet do something that harms the interests of the plan's members. An employer acting as a plan administrator is not permitted to disregard its fiduciary obligations to plan members and favour the competing interests of the corporation on the basis that it is wearing a "corporate hat". What is important is to consider the consequences of the decision, not its nature.

[66]  When the interests the employer seeks to advance on behalf of the corporation conflict with interests the employer has a duty to preserve as plan administrator, a solution must be found to ensure that the plan members' interests are taken care of. This may mean that the corporation puts the members on notice, or that it finds a replacement administrator, appoints representative counsel or

obligation fiduciaire envers la société, le fait que l'employeur puisse agir en qualité d'administrateur d'un régime de retraite signifie que l'al. 8(1)a) de la *LRR* repose sur la prémisse que les décisions de gestion de l'entreprise prises par les administrateurs n'engendreront pas toujours un conflit avec les obligations de la société envers les participants au régime de retraite. L'employeur doit toutefois être prêt à résoudre les conflits lorsqu'ils surgissent. Une procédure de réorganisation impose inévitablement un poids à un débiteur, mais ce fardeau ne libère pas l'employeur qui agit en qualité d'administrateur d'un régime de retraite de ses obligations fiduciaires.

[65]  Le paragraphe 22(4) de la *LRR* interdit expressément à l'administrateur d'un régime de permettre que son intérêt entre en conflit avec ses obligations à l'égard du régime de retraite. Par conséquent, l'employeur dont le propre intérêt ne coïncide pas avec celui des participants au régime doit se demander si cette divergence d'intérêts peut susciter un conflit et, le cas échéant, ce qu'il faut faire pour le résoudre. Lorsqu'il y a effectivement conflit, la métaphore des deux « chapeaux » n'est selon moi d'aucun secours. La solution ne consiste pas à déterminer si une décision peut être classifiée comme se rattachant à la gestion de la société ou à l'administration du régime de retraite. L'employeur peut très bien prendre une décision judicieuse concernant la gestion de la société et, néanmoins, porter préjudice aux intérêts des participants au régime. L'employeur qui administre un régime de retraite n'est pas autorisé à négliger ses obligations fiduciaires envers les participants au régime et à favoriser les intérêts concurrents de la société sous prétexte qu'il porte le « chapeau » de dirigeant de la société. Ce sont les conséquences d'une décision, et non sa nature qui doivent être prises en compte.

[66]  Lorsque les intérêts de la société que l'employeur tente de servir se heurtent à ceux que l'employeur a le devoir de protéger en qualité d'administrateur du régime, il faut trouver une façon de veiller sur les intérêts des participants. Cela peut vouloir dire que la société les tiendra informés, qu'elle trouvera un administrateur substitut pour le régime, qu'elle nommera un avocat

finds some other means to resolve the conflict. The solution has to fit the problem, and the same solution may not be appropriate in every case.

[67]   In the instant case, Indalex's fiduciary obligations as plan administrator did in fact conflict with management decisions that needed to be taken in the best interests of the corporation. Indalex had a number of responsibilities as plan administrator. For example, s. 56(1) of the *PBA* required it to ensure that contributions were paid when due. Section 56(2) required that it notify the Superintendent if contributions were not paid when due. It was also up to Indalex under s. 59 to commence proceedings to obtain payment of contributions that were due but not paid. Indalex, as an employer, paid all the contributions that were due. However, its insolvency put contributions that had accrued to the date of the wind up at risk. In an insolvency context, the administrator's claim for contributions that have accrued is a provable claim.

[68]   In the context of this case, the fact that Indalex, as plan administrator, might have to claim accrued contributions from itself means that it would have to simultaneously adopt conflicting positions on whether contributions had accrued as of the date of liquidation and whether a deemed trust had arisen in respect of wind-up deficiencies. This is indicative of a clear conflict between Indalex's interests and those of the Plan Members. As soon as it saw, or ought to have seen, a potential for conflict, Indalex should have taken steps to ensure that the interests of the Plan Members were protected. It did not do so. On the contrary, it contested the position the Plan Members advanced. At the very least, Indalex breached its duty to avoid conflicts of interest (s. 22(4) *PBA*).

[69]   Since the Plan Members seek an equitable remedy, it is important to identify the point at

pour représenter les participants ou qu'elle résoudra le conflit par un autre moyen. La solution doit être adaptée au problème, et une solution donnée ne vaudra pas nécessairement pour tous les cas.

[67]   En l'espèce, il y avait bien conflit entre les obligations fiduciaires qui incombaient à Indalex en sa qualité d'administrateur des régimes et les décisions de gestion qu'elle devait prendre dans le meilleur intérêt de la société. Indalex avait certaines responsabilités en sa qualité d'administrateur des régimes. Par exemple, le par. 56(1) de la *LRR* l'obligeait à veiller à ce que les cotisations soient payées à leur date d'exigibilité et, si elles ne l'étaient pas, le par. 56(2) exigeait qu'elle en avise le surintendant. Il incombait également à Indalex, aux termes de l'art. 59, d'introduire une instance devant un tribunal compétent pour obtenir le paiement des cotisations dues, mais impayées. Indalex, en tant qu'employeur, a acquitté toutes les cotisations dues. Son insolvabilité compromettait toutefois le paiement des cotisations accumulées à la date de la liquidation. En cas d'insolvabilité, la créance de l'administrateur d'un régime à l'égard des cotisations accumulées constitue une réclamation prouvable.

[68]   Dans le contexte de la présente affaire, le fait qu'Indalex pouvait, en sa qualité d'administrateur des régimes de retraite, avoir à se réclamer à elle-même les cotisations accumulées l'amènerait à devoir adopter simultanément des positions opposées quant à savoir si des cotisations s'étaient accumulées à la date de la liquidation et si les déficits de capitalisation étaient protégés par une fiducie réputée. Cet exemple démontre qu'il existait manifestement un conflit entre les intérêts d'Indalex et ceux des participants. Indalex aurait dû prendre des mesures pour assurer la protection des intérêts des participants dès qu'elle a constaté, ou qu'elle aurait dû constater, l'existence d'un conflit potentiel. Elle ne l'a pas fait. Elle a, au contraire, contesté la position défendue par les participants. Elle a donc, à tout le moins, manqué à son obligation d'éviter les conflits d'intérêts (par. 22(4) *LRR*).

[69]   Comme les participants demandent une réparation en equity, il importe d'établir à quel moment

which Indalex should have moved to ensure that their interests were safeguarded. Before doing so, I would stress that factual contexts are needed to analyse conflicts between interests, and that it is neither necessary nor useful to attempt to map out all the situations in which conflicts may arise.

[70]   As I mentioned above, insolvency puts the employer's contributions at risk. This does not mean that the decision to commence insolvency proceedings entails on its own a breach of a fiduciary obligation. The commencement of insolvency proceedings in this case on April 3, 2009 in an emergency situation was explained by Timothy R. J. Stubbs, the then-president of Indalex. The company was in default to its lender, it faced legal proceedings for unpaid bills, it had received a termination notice effective April 6 from its insurers, and suppliers had stopped supplying on credit. These circumstances called for urgent action by Indalex lest a creditor start bankruptcy proceedings and in so doing jeopardize ongoing operations and jobs. Several facts lead me to conclude that the stay sought in this case did not, in and of itself, put Indalex in a conflict of interest.

[71]   First, a stay operates only to freeze the parties' rights. In most cases, stays are obtained *ex parte*. One of the reasons for refraining from giving notice of the initial stay motion is to avert a situation in which creditors race to court to secure benefits that they would not enjoy in insolvency. Subjecting as many creditors as possible to a single process is seen as a way to treat all of them more equitably. In this context, plan members are placed on the same footing as the other creditors and have no special entitlement to notice. Second, one of the conclusions of the order Indalex sought was that it was to be served on all creditors, with a few exceptions, within 10 days. The notice allowed any interested party to apply to vary the order. Third, Indalex was permitted to pay all pension benefits. Although the order excluded special solvency payments, no ruling was made at that point on the

Indalex aurait dû prendre des mesures pour veiller à ce que leurs intérêts soient protégés. Soulignons au préalable que l'analyse d'un conflit d'intérêts doit s'appuyer sur un contexte factuel et qu'il n'est ni nécessaire ni utile de tenter de décrire toutes les situations dans lesquelles un conflit est susceptible de surgir.

[70]   L'insolvabilité, comme je l'ai déjà mentionné, met en péril les cotisations de l'employeur. Cela ne signifie pas pour autant que la seule décision d'engager une procédure en matière d'insolvabilité constitue un manquement à une obligation fiduciaire. Le président d'Indalex à l'époque, M. Timothy R. J. Stubbs, a expliqué pourquoi une procédure en matière d'insolvabilité avait été engagée, le 3 avril 2009, dans une situation d'urgence. La dette d'Indalex envers son prêteur était en souffrance, la société s'exposait à des poursuites pour factures impayées, elle avait reçu un avis de résiliation de son assureur qui prenait effet le 6 avril et ses fournisseurs ne lui faisaient plus crédit. Indalex devait donc agir de toute urgence, avant qu'un créancier n'entame une procédure de mise en faillite, ce qui aurait compromis la poursuite de l'exploitation de l'entreprise et le maintien des emplois. Plusieurs raisons m'amènent à conclure que la suspension demandée en l'espèce n'a pas en elle-même placé Indalex en conflit d'intérêts.

[71]   Premièrement, la suspension ne fait que figer les droits des parties. La plupart du temps, elle s'obtient *ex parte*. C'est notamment pour éviter que les créanciers se ruent devant les tribunaux pour tenter d'obtenir des avantages que les procédures en matière d'insolvabilité ne leur procureraient pas qu'on s'abstient de donner avis de la motion initiale en suspension. Il semble plus équitable d'appliquer un processus unique au plus grand nombre possible de créanciers. Dans ce contexte, les participants sont sur le même pied que les autres créanciers, et ils ne bénéficient d'aucun droit spécial de recevoir un avis. Deuxièmement, l'une des conclusions de l'ordonnance demandée par Indalex exigeait que, sous réserve de quelques exceptions, tous les créanciers reçoivent signification de l'ordonnance dans un délai de 10 jours. L'avis permettait à tout intéressé de demander une modification de l'ordonnance.

merits of the creditors' competing claims, and a stay gave the Plan Members the possibility of presenting their arguments on the deemed trust rather than losing it altogether as a result of a bankruptcy proceeding, which was the alternative.

[72]    Whereas the stay itself did not put Indalex in a conflict of interest, the proceedings that followed had adverse consequences. On April 8, 2009, Indalex brought a motion to amend and restate the initial order in order to apply for DIP financing. This motion had been foreseen. Mr. Stubbs had mentioned in the affidavit he signed in support of the initial order that the lenders had agreed to extend their financing, but that Indalex would be in need of authorization in order to secure financing to continue its operations. However, the initial order had not yet been served on the Plan Members as of April 8. Short notice of the motion was given to the USW rather than to all the individual Plan Members, but the USW did not appear. The Plan Members were quite simply not represented on the motion to amend the initial stay order requesting authorization to grant the DIP charge.

[73]    In seeking to have a court approve a form of financing by which one creditor was granted priority over all other creditors, Indalex was asking the *CCAA* court to override the Plan Members' priority. This was a case in which Indalex's directors permitted the corporation's best interests to be put ahead of those of the Plan Members. The directors may have fulfilled their fiduciary duty to Indalex, but they placed Indalex in the position of failing to fulfil its obligations as plan administrator. The corporation's interest was to seek the best possible avenue to survive in an insolvency context. The pursuit of this interest was not compatible with the plan administrator's duty to the Plan Members to ensure that all contributions were paid into the funds. In the context of this case, the plan administrator's duty to the Plan Members meant, in particular, that it should at least have given them the opportunity to present their arguments. This duty

Troisièmement, Indalex était autorisée à verser toutes les prestations de retraite. Même si l'ordonnance excluait les paiements spéciaux de solvabilité, elle ne réglait pas les droits concurrents des créanciers, et la suspension permettait aux participants de présenter leurs arguments au sujet de la fiducie réputée, alors qu'ils en auraient tout simplement perdu le bénéfice dans le contexte d'une faillite, qui était la solution de rechange.

[72]    Bien que la suspension en elle-même n'ait pas placé Indalex en situation de conflit d'intérêts, les procédures qui ont suivi ont eu des conséquences négatives. Le 8 avril 2009, Indalex a déposé une motion en modification et reformulation de l'ordonnance initiale pour demander un financement DE. Cette motion avait été prévue. M. Stubbs avait mentionné dans son affidavit à l'appui de la demande d'ordonnance initiale que les prêteurs avaient consenti au financement, mais qu'Indalex devrait être autorisée à obtenir le financement pour poursuivre ses activités. Toutefois, le 8 avril, l'ordonnance initiale n'avait pas encore été signifiée aux participants. Un court préavis avait été donné au Syndicat, plutôt qu'à chacun des participants, mais le Syndicat n'a pas comparu. Les participants n'étaient tout simplement pas représentés lors de l'examen de la motion en modification de l'ordonnance initiale de suspension et en autorisation d'accorder la charge DE.

[73]    En demandant au tribunal d'autoriser une forme de financement selon laquelle un créancier se verrait accorder priorité sur tous les autres, Indalex demandait au tribunal chargé d'appliquer la *LACC* de faire échec à la priorité dont bénéficiaient les participants. Il s'agit d'un cas où les administrateurs d'Indalex ont permis que les intérêts de la société l'emportent sur ceux des participants. Ce faisant, ils ont peut-être rempli leurs obligations fiduciaires envers Indalex, mais ils ont fait en sorte qu'Indalex a manqué à ses obligations en tant qu'administrateur des régimes. L'intérêt de la société consistait à rechercher la meilleure façon de survivre dans un contexte d'insolvabilité. La poursuite de cet intérêt était incompatible avec le devoir de l'administrateur des régimes envers les participants de veiller à ce que toutes les cotisations soient versées aux caisses de retraite. En l'occurrence, ce devoir de l'administrateur des régimes impliquait, plus

meant, at the very least, that they were entitled to reasonable notice of the DIP financing motion. The terms of that motion, presented without appropriate notice, conflicted with the interests of the Plan Members. Because Indalex supported the motion asking that a priority be granted to its lender, it could not at the same time argue for a priority based on the deemed trust.

[74]    The Court of Appeal found a number of other breaches. I agree with Cromwell J. that none of the subsequent proceedings had a negative impact on the Plan Members' rights. The events that occurred, in particular the second DIP financing motion and the sale process, were predictable and, in a way, typical of reorganizations. Notice was given in all cases. The Plan Members were represented by able counsel. More importantly, the court ordered that funds be reserved and that a full hearing be held to argue the issues.

[75]    The Monitor and George L. Miller, Indalex U.S.'s trustee in bankruptcy, argue that the Plan Members should have appealed the Amended Initial Order authorizing the DIP charge, and were precluded from subsequently arguing that their claim ranked in priority to that of the DIP lenders. They take the position that the collateral attack doctrine bars the Plan Members from challenging the DIP financing order. This argument is not convincing. The Plan Members did not receive notice of the motion to approve the DIP financing. Counsel for the Executive Plan's members presented the argument of that plan's members at the first opportunity and repeated it each time he had an occasion to do so. The only time he withdrew their opposition was at the hearing of the motion for authorization to increase the DIP loan amount after being told that the only purpose of the motion was to increase the amount of the authorized loan. The *CCAA* judge set a hearing date for the very purpose of presenting the arguments that Indalex, as plan administrator, could have presented when it requested the amendment to the initial order.

particulièrement, qu'il donne à tout le moins aux participants la possibilité d'exposer leurs arguments. Cela signifiait, au minimum, que les participants avaient droit à un avis raisonnable de la motion en autorisation du financement DE. La teneur de cette motion, présentée sans avis convenable, allait à l'encontre des intérêts des participants. Étant donné qu'Indalex soutenait la motion visant l'octroi d'une priorité à son prêteur, elle ne pouvait pas simultanément défendre l'existence d'une priorité fondée sur la fiducie réputée.

[74]    La Cour d'appel a constaté d'autres manquements. Je partage l'opinion du juge Cromwell qu'aucune des procédures subséquentes n'a porté atteinte aux droits des participants. La suite des événements, notamment la deuxième motion en approbation du financement DE et le processus de vente, était prévisible et, à cet égard, typique des réorganisations. Dans tous les cas, des avis ont été donnés. Les participants ont été représentés par des avocats compétents. Fait plus important, le tribunal a ordonné que des fonds soient réservés et qu'une audience soit tenue pour que les questions en litige soient pleinement débattues.

[75]    Le contrôleur et George L. Miller, le syndic de faillite d'Indalex É.-U., soutiennent que les participants auraient dû interjeter appel de l'ordonnance initiale modifiée autorisant la charge DE et qu'ils ne devaient pas être admis à prétendre plus tard que leur créance avait priorité sur celle des prêteurs DE. Ils plaident que la règle interdisant les contestations indirectes empêche les participants de contester l'ordonnance autorisant le financement DE. Cet argument n'est pas convaincant. Les participants n'ont pas reçu avis de la motion demandant au tribunal d'autoriser le financement DE. L'avocat des participants au régime des cadres a défendu leur position dès qu'il a pu le faire et l'a réitérée chaque fois qu'il en a eu l'occasion. À l'audition de la motion visant l'augmentation du prêt DE, il n'a retiré leur opposition que lorsqu'on lui a dit que son seul objet était d'augmenter le montant du prêt autorisé. Le juge chargé d'appliquer la *LACC* a fixé une date d'audience expressément pour la présentation des arguments qu'Indalex aurait pu faire valoir, en qualité d'administrateur des régimes, lorsqu'elle a demandé la modification de l'ordonnance initiale.

It cannot now be argued, therefore, that the Plan Members are barred from defending their interests by the collateral attack doctrine.

### D. *Would an Equitable Remedy Be Appropriate in the Circumstances?*

[76]   The definition of "secured creditor" in s. 2 of the *CCAA* includes a trust in respect of the debtor's property. The Amended Initial Order (at para. 45) provided that the DIP lenders' claims ranked in priority to all trusts, "statutory or otherwise". Indalex U.S. was subrogated to the DIP lenders' claim by operation of the guarantee in the DIP lending agreement.

[77]   Counsel for the Executive Plan's members argues that the doctrine of equitable subordination should apply to subordinate Indalex U.S.'s subrogated claim to those of the Plan Members. This Court discussed the doctrine of equitable subordination in *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558, but did not endorse it, leaving it for future determination (p. 609). I do not need to endorse it here either. Suffice to say that there is no evidence that the lenders committed a wrong or that they engaged in inequitable conduct, and no party has contested the validity of Indalex U.S.'s payment of the US$10 million shortfall.

[78]   This leaves the constructive trust remedy ordered by the Court of Appeal. It is settled law that proprietary remedies are generally awarded only with respect to property that is directly related to a wrong or that can be traced to such property. I agree with my colleague Cromwell J. that this condition is not met in the case at bar. I adopt his reasoning on this issue.

[79]   Moreover, I am of the view that it was unreasonable for the Court of Appeal to reorder the priorities in this case. The breach of fiduciary duty identified in this case is, in substance, the lack of notice. Since the Plan Members were allowed to fully argue their case at a hearing specifically held

### D. *Y a-t-il lieu d'accorder une réparation en equity en l'espèce?*

[76]  La définition d'un « créancier garanti » à l'art. 2 de la *LACC* inclut la fiducie relative aux biens du débiteur. L'ordonnance initiale modifiée donne à la créance des prêteurs DE priorité sur toute fiducie [TRADUCTION] « d'origine législative ou autre » (par. 45). Indalex É.-U. a été subrogée aux prêteurs DE en conséquence de la garantie consentie dans la convention de prêt DE.

[77]  L'avocat des participants au régime des cadres soutient que, selon le principe de la subordination reconnue en equity, la créance d'Indalex É.-U. fondée sur la subrogation est subordonnée à celle des participants. Dans *Société d'assurance-dépôt du Canada c. Banque Commerciale du Canada*, [1992] 3 R.C.S. 558, notre Cour a examiné le principe de la subordination reconnue en equity. Elle ne l'a toutefois pas entériné, reportant l'examen de cette question à un autre moment (p. 609). Je n'ai pas non plus besoin de l'entériner ici. Il suffit de mentionner que la preuve ne révèle aucune inconduite ni injustice de la part des prêteurs, et qu'aucune partie ne conteste la validité du paiement, par Indalex É.-U., des 10 millions de dollars américains manquants.

[78]  Reste donc la fiducie par interprétation imposée par la Cour d'appel. Il est bien établi en droit qu'une réparation de la nature d'un droit de propriété n'est généralement accordée qu'à l'égard d'un bien ayant un lien direct avec un acte fautif ou d'un bien qui peut être rattaché à un tel bien. Je partage l'avis de mon collègue le juge Cromwell que cette condition n'est pas remplie en l'espèce et je souscris à ses motifs sur ce point.

[79]  En outre, je considère qu'il était déraisonnable pour la Cour d'appel de modifier l'ordre de priorité. Le manquement à l'obligation fiduciaire constaté en l'espèce consiste essentiellement en l'absence d'avis. Puisque les participants ont été autorisés à présenter leurs arguments lors d'une

to adjudicate their rights, the *CCAA* court was in a position to fully appreciate the parties' positions.

[80]  It is difficult to see what gains the Plan Members would have secured had they received notice of the motion that resulted in the Amended Initial Order. The *CCAA* judge made it clear, and his finding is supported by logic, that there was no alternative to the DIP loan that would allow for the sale of the assets on a going-concern basis. The Plan Members presented no evidence to the contrary. They rely on conjecture alone. The Plan Members invoke other cases in which notice was given to plan members and in which the members were able to fully argue their positions. However, in none of those cases were plan members able to secure any additional benefits. Furthermore, the Plan Members were allowed to fully argue their case. As a result, even though Indalex breached its fiduciary duty to notify the Plan Members of the motion that resulted in the Amended Initial Order, their claim remains subordinate to that of Indalex U.S.

## IV. Conclusion

[81]  There are good reasons for giving special protection to members of pension plans in insolvency proceedings. Parliament considered doing so before enacting the most recent amendments to the *CCAA*, but chose not to (*An Act to amend the Bankruptcy and Insolvency Act, the Companies' Creditors Arrangement Act, the Wage Earner Protection Program Act and chapter 47 of the Statutes of Canada, 2005*, S.C. 2007, c. 36, in force September 18, 2009, SI/2009-68; see also Bill C-501, *An Act to amend the Bankruptcy and Insolvency Act and other Acts (pension protection)*, 3rd Sess., 40th Parl., March 24, 2010 (subsequently amended by the Standing Committee on Industry, Science and Technology, March 1, 2011)). A report of the Standing Senate Committee on Banking, Trade and Commerce gave the following reasons for this choice:

audience spécialement tenue pour statuer sur leurs droits, le tribunal chargé d'appliquer la *LACC* était pleinement en mesure d'évaluer la position des parties.

[80]  De plus, je vois difficilement comment les participants auraient pu améliorer leur position même s'ils avaient reçu avis de la motion en modification de l'ordonnance initiale. Le juge chargé d'appliquer la *LACC* a clairement indiqué que la seule solution permettant la vente de l'actif en tant qu'entreprise en exploitation était le financement DE — et la logique appuie cette conclusion. Les participants n'ont présenté aucune preuve contraire. Leur argumentation est uniquement fondée sur des conjectures. Ils invoquent d'autres affaires où des participants à des régimes ont reçu un avis et ont pu défendre pleinement leur position. Or, dans aucun des exemples qu'ils citent, les intéressés n'ont pu obtenir d'avantages additionnels. Qui plus est, les participants en l'espèce ont pu faire valoir pleinement leur position. Par conséquent, bien qu'Indalex ait manqué à son obligation fiduciaire d'informer les participants de la motion en modification de l'ordonnance initiale, leur créance demeure subordonnée à celle d'Indalex É.-U.

## IV. Conclusion

[81]  Il existe des raisons valables d'accorder une protection spéciale aux participants à un régime de retraite lors de procédures en matière d'insolvabilité. Le législateur a envisagé la possibilité de leur accorder cette protection lorsqu'il a édicté les modifications les plus récentes à la *LACC*, mais il a décidé de s'en abstenir (*Loi modifiant la Loi sur la faillite et l'insolvabilité, la Loi sur les arrangements avec les créanciers des compagnies, la Loi sur le Programme de protection des salariés et le chapitre 47 des Lois du Canada (2005)*, L.C. 2007, ch. 36, entrée en vigueur le 18 septembre 2009, TR/2009-68; voir aussi le projet de loi C-501, *Loi modifiant la Loi sur la faillite et l'insolvabilité et d'autres lois (protection des prestations)*, 3e sess., 40e lég., 24 mars 2010 (modifié par la suite par le Comité permanent de l'industrie, des sciences et de la technologie, 1er mars 2011)). Un rapport du Comité sénatorial permanent des banques et du commerce a expliqué ainsi le choix fait par le législateur :

Although the Committee recognizes the vulnerability of current pensioners, we do not believe that changes to the BIA regarding pension claims should be made at this time. Current pensioners can also access retirement benefits from the Canada/Quebec Pension Plan, and the Old Age Security and Guaranteed Income Supplement programs, and may have private savings and Registered Retirement Savings Plans that can provide income for them in retirement. The desire expressed by some of our witnesses for greater protection for pensioners and for employees currently participating in an occupational pension plan must be balanced against the interests of others. As we noted earlier, insolvency – at its essence – is characterized by insufficient assets to satisfy everyone, and choices must be made.

The Committee believes that granting the pension protection sought by some of the witnesses would be sufficiently unfair to other stakeholders that we cannot recommend the changes requested. For example, we feel that super priority status could unnecessarily reduce the moneys available for distribution to creditors. In turn, credit availability and the cost of credit could be negatively affected, and all those seeking credit in Canada would be disadvantaged.

(*Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act* (2003), at p. 98; see also p. 88.)

[82]   In an insolvency process, a *CCAA* court must consider the employer's fiduciary obligations to plan members as their plan administrator. It must grant a remedy where appropriate. However, courts should not use equity to do what they wish Parliament had done through legislation.

[83]   In view of the fact that the Plan Members were successful on the deemed trust and fiduciary duty issues, I would not order costs against them either in the Court of Appeal or in this Court.

[84]   I would therefore allow the main appeals without costs in this Court, set aside the orders

Conscients de la vulnérabilité des actuels retraités, nous n'estimons toutefois pas qu'il faudrait modifier pour le moment les dispositions de la LFI concernant les créances liées à des retraites. Actuellement les retraités peuvent recevoir des prestations des Régimes de pensions du Canada et de rentes du Québec, de la Sécurité de la vieillesse et du Supplément de revenu garanti et disposent souvent d'économies personnelles et de REER pouvant leur assurer un revenu à la retraite. Il faut trouver un juste équilibre entre, d'une part, le souhait exprimé par certains de nos témoins de mieux protéger les retraités et les actuels cotisants à un régime de retraite professionnel et, d'autre part, les intérêts des autres. Nous le répétons, l'insolvabilité se caractérise de par sa nature même par des actifs insuffisants pour répondre aux besoins de chacun, et il faut faire des choix.

Le Comité estime que, si l'on accordait la protection qu'ont demandée certains témoins, cela serait tellement injuste pour les autres intervenants qu'il ne peut le recommander. Par exemple, nous estimons qu'une superpriorité ou un fonds pourraient indûment réduire les fonds à répartir entre les créanciers. La disponibilité et le coût du crédit pourraient être touchés, de même que, par ricochet, tous les demandeurs de crédit au Canada.

(*Les débiteurs et les créanciers doivent se partager le fardeau : Examen de la Loi sur la faillite et l'insolvabilité et de la Loi sur les arrangements avec les créanciers des compagnies* (2003), p. 109-110; voir aussi p. 98.)

[82]   Dans une procédure en matière d'insolvabilité, le tribunal chargé d'appliquer la *LACC* doit prendre en compte les obligations fiduciaires de l'employeur envers les participants en sa qualité d'administrateur de leurs régimes de retraite. Il doit accorder une réparation lorsque cette mesure est indiquée. Cependant, le tribunal ne doit pas utiliser l'equity pour accomplir ce qu'il aurait souhaité que le législateur fît.

[83]   Les participants ayant obtenu gain de cause sur les questions de la fiducie réputée et des obligations fiduciaires, je suis d'avis de ne les condamner aux dépens ni devant la Cour d'appel, ni devant notre Cour.

[84]   Je suis donc d'avis d'accueillir les pourvois principaux sans dépens devant notre Cour, d'annuler

made by the Court of Appeal, except with respect to orders contained in paras. 9 and 10 of the judgment of the Court of Appeal in the former executive members' appeal and restore the orders of Campbell J. dated February 18, 2010. I would dismiss USW's costs appeal without costs.

The reasons of McLachlin C.J. and Rothstein and Cromwell JJ. were delivered by

CROMWELL J. —

## I. Introduction

[85]   When a business becomes insolvent, many interests are at risk. Creditors may not be able to recover their debts, investors may lose their investments and employees may lose their jobs. If the business is the sponsor of an employee pension plan, the benefits promised by the plan are not immune from that risk. The circumstances leading to these appeals show how that risk can materialize. Pension plans and creditors find themselves in a zero-sum game with not enough money to go around. At a very general level, this case raises the issue of how the law balances the interests of pension plan beneficiaries with those of other creditors.

[86]   Indalex Limited, the sponsor and administrator of employee pension plans, became insolvent and sought protection from its creditors under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). Although all current contributions were up to date, the company's pension plans did not have sufficient assets to fulfill the pension promises made to their members. In a series of court-sanctioned steps, which were judged to be in the best interests of all stakeholders, the company borrowed a great deal of money to allow it to continue to operate. The parties injecting the operating money were given a super priority over the claims by other creditors. When the business was sold, thereby preserving hundreds of

les ordonnances rendues par la Cour d'appel, à l'exception de celles figurant aux par. 9 et 10 du jugement de la Cour d'appel concernant l'appel des anciens cadres, et de rétablir les ordonnances du juge Campbell datées du 18 février 2010. Je suis d'avis de rejeter sans dépens le pourvoi du Syndicat des Métallos sur la question des dépens.

Version française des motifs de la juge en chef McLachlin et des juges Rothstein et Cromwell rendus par

LE JUGE CROMWELL —

## I. Introduction

[85]   L'insolvabilité d'une entreprise met en péril de nombreux intérêts. Le créancier pourrait ne pas recouvrer sont dû, l'investisseur, perdre la somme investie et l'employé, se retrouver sans emploi. Lorsque l'entreprise est le promoteur du régime de retraite de ses employés, les prestations promises par le régime ne sont pas à l'abri du risque couru. Les faits à l'origine des présents pourvois illustrent la concrétisation de ce risque. Régimes de retraite et créanciers se retrouvent dans une situation où, à cause de l'insuffisance de l'actif, les uns sauvent leur mise, les autres non. De manière très générale, le présent pourvoi soulève la question de savoir de quelle manière le droit pondère les intérêts des bénéficiaires d'un régime de retraite et ceux d'autres créanciers.

[86]   Devenue insolvable, Indalex Limited, le promoteur et l'administrateur des régimes de retraite des salariés, a demandé la protection contre ses créanciers en application de la *Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C-36 (« *LACC* »). Toutes les cotisations pour service courant avaient alors été perçues, mais l'actif des régimes de retraite de la société ne permettait pas de verser aux participants les prestations de retraite promises. La société a pris une série de mesures, avalisées par le tribunal et jugées servir au mieux les intérêts de tous les intéressés, dont l'emprunt d'importantes sommes pour la poursuite de ses activités. Les personnes qui ont alors injecté les sommes nécessaires ont

jobs, there was a shortfall between the sale proceeds and the debt. The pension plan beneficiaries thus found themselves in a dispute about the priority of their claims. The appellant, Sun Indalex Finance, LLC, claimed it had priority by virtue of the super priority granted in the *CCAA* proceedings. The trustee in bankruptcy of the U.S. Debtors (George L. Miller) and the Monitor (FTI Consulting) joined in the appeal. The plan beneficiaries claimed that they had priority by virtue of a statutory deemed trust under the *Pension Benefits Act*, R.S.O. 1990, c. P.8 ("*PBA*"), and a constructive trust arising from the company's alleged breaches of fiduciary duty.

[87]    The Ontario Court of Appeal sided with the plan beneficiaries and Sun Indalex, the trustee in bankruptcy and the Monitor all appeal. The specific legal points in issue are:

A.  Did the Court of Appeal err in finding that the statutory deemed trust provided for in s. 57(4) of the *PBA* applied to the salaried plan's wind-up deficiency?

B.  Did the Court of Appeal err in finding that Indalex breached the fiduciary duties it owed to the pension plan beneficiaries as the plans' administrator and in imposing a constructive trust as a remedy?

C.  Did the Court of Appeal err in concluding that the super priority granted in the *CCAA* proceedings did not have priority by virtue of the doctrine of federal paramountcy?

D.  Did the Court of Appeal err in its cost endorsement respecting the United Steelworkers ("USW")?

[88]    My view is that the deemed trust does not apply to the disputed funds, and even if it did, the super priority would override it. I conclude that

obtenu une superpriorité sur toutes les réclamations des autres créanciers. La vente de l'entreprise a permis la préservation de centaines d'emplois, mais le produit touché était inférieur à la dette. Le rang des réclamations des bénéficiaires des régimes de retraite a dès lors fait l'objet d'un litige. L'appelante, Sun Indalex Finance, LLC, a soutenu que sa créance avait préséance sur toutes les autres du fait de la superpriorité obtenue dans le cadre de la procédure fondée sur la *LACC*. Le syndic de faillite des débitrices américaines (George L. Miller) et le contrôleur (FTI Consulting) se sont constitués parties appelantes. Les bénéficiaires des régimes de retraite ont fait valoir qu'ils avaient priorité en raison de la fiducie qui est réputée exister suivant la *Loi sur les régimes de retraite*, L.R.O. 1990, ch. P.8 (« *LRR* ») et de la fiducie par interprétation qui résultait des manquements allégués de la société à ses obligations fiduciaires.

[87]    La Cour d'appel de l'Ontario a donné raison aux bénéficiaires des régimes de retraite, et Sun Indalex, le syndic de faillite et le contrôleur se pourvoient aujourd'hui devant notre Cour. Voici les points de droit précis qui sont en litige :

A.  La Cour d'appel a-t-elle eu tort de conclure que la fiducie réputée du par. 57(4) de la *LRR* s'appliquait au déficit de liquidation du régime des salariés?

B.  A-t-elle eu tort de conclure qu'Indalex avait manqué à ses obligations fiduciaires envers les bénéficiaires en tant qu'administrateur des régimes de retraite et d'imposer une fiducie par interprétation à titre de réparation?

C.  A-t-elle eu tort de conclure que la superpriorité accordée dans le cadre de la procédure fondée sur la *LACC* ne conférait pas de préséance par application de la prépondérance fédérale?

D.  Sa décision sur les dépens du Syndicat des Métallos (le « Syndicat ») est-elle entachée d'une erreur?

[88]    J'estime que la fiducie réputée ne vise pas les fonds en cause et, même si elle les visait, la superpriorité l'emporterait sur elle. Je conclus que la

the corporation failed in its duty to the plan beneficiaries as their administrator and that the beneficiaries ought to have been afforded more procedural protections in the *CCAA* proceedings. However, I also conclude that the Court of Appeal erred in using the equitable remedy of a constructive trust to defeat the super priority ordered by the *CCAA* judge. I would therefore allow the main appeals.

## II.  Facts and Proceedings Below

### A.  *Overview*

[89]   These appeals concern claims by pension fund members for amounts owed to them by the plans' sponsor and administrator which became insolvent.

[90]   Indalex Limited is the parent company of three non-operating Canadian companies. I will refer to both Indalex Limited individually and to the group of companies collectively as "Indalex", unless the context requires further clarity. Indalex Limited is the wholly owned subsidiary of its U.S. parent, Indalex Holding Corp. which owned and conducted related operations in the U.S. through its U.S. subsidiaries which I will refer to as the "U.S. debtors".

[91]   In late March and early April of 2009, Indalex and the U.S. debtors were insolvent and sought protection from their creditors, the former under the Canadian *CCAA*, and the latter under the United States Bankruptcy Code, 11 U.S.C., Chapter 11. The dispute giving rise to these appeals concern the priority granted to lenders in the *CCAA* process for funds advanced to Indalex and whether that priority overrides the claims of two of Indalex's pension plans for funds owed to them.

[92]   Indalex was the sponsor and administrator of two registered pension plans relevant to these proceedings, one for salaried employees and

société a manqué à ses obligations d'administrateur des régimes et que les bénéficiaires auraient dû obtenir de meilleures garanties procédurales dans le cadre de la procédure fondée sur la *LACC*. Cependant, j'estime que la Cour d'appel a eu tort de recourir à la fiducie par interprétation — une réparation en equity — pour écarter la superpriorité accordée par le tribunal saisi sur le fondement de la *LACC*. Je suis donc d'avis d'accueillir les principaux pourvois.

## II.  Faits et jugements dont appel

### A.  *Aperçu*

[89]   Les présents pourvois ont pour objet les sommes que les participants des régimes de retraite réclament au promoteur et administrateur des régimes, lequel est devenu insolvable.

[90]   Indalex Limited est la société mère de trois sociétés canadiennes inactives. Dans les présents motifs, Indalex Limited s'entend de la société à titre individuel, et « Indalex » du groupe de sociétés collectivement, sauf lorsque le contexte commande plus de précision. Indalex Limited est la filiale à cent pour cent de sa société mère américaine, Indalex Holding Corp., qui possédait et exploitait des entreprises connexes aux États-Unis par l'intermédiaire de ses filiales américaines (ci-après, les « débitrices américaines »).

[91]   Fin mars et début avril 2009, Indalex et les débitrices américaines sont devenues insolvables et ont demandé la protection contre leurs créanciers en application de la *LACC*, dans le cas d'Indalex, et du *United States Bankruptcy Code*, 11 U.S.C., chap. 11, dans le cas des débitrices américaines. Le litige à l'origine des pourvois porte sur la priorité accordée aux prêteurs dans le cadre de la procédure fondée sur la *LACC* en contrepartie des fonds avancés à Indalex et sur la question de savoir si cette priorité vaut à l'égard des réclamations de deux des régimes de retraite d'Indalex quant aux sommes qui leur sont dues.

[92]   Indalex était le promoteur et l'administrateur de deux régimes enregistrés de retraite touchés par cette procédure, l'un pour les salariés, l'autre pour

320    SUN INDALEX FINANCE *v.* UNITED STEELWORKERS   *Cromwell J.*   [2013] 1 S.C.R.

the other for executive employees. At the time of seeking *CCAA* protection, the salaried plan was being wound up (with a wind-up date of December 31, 2006) and was estimated to have a wind-up deficiency (as of the end of 2007) of roughly $2.252 million. The executive plan, while it was not being wound up, had been closed to new members since 2005. It was estimated to have a deficiency of roughly $2.996 million on wind up. At the time the *CCAA* proceedings were started, all regular current service contributions had been made to both plans.

[93]  Shortly after Indalex received *CCAA* protection, the *CCAA* judge authorized the company to enter into debtor in possession ("DIP") financing in order to allow it to continue to operate. The court granted the DIP lenders, a syndicate of banks, a "super priority" over "all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise": initial order, at para. 35 (Joint A.R., vol. I, at pp. 123-24). Repayment of these amounts was guaranteed by the U.S. debtors.

[94]  Ultimately, with the approval of the *CCAA* court, Indalex sold its business; the purchaser did not assume pension liabilities. A reserve fund was established by the *CCAA* Monitor to answer any outstanding claims. The proceeds of the sale were not sufficient to pay back the DIP lenders and so the U.S. debtors, as guarantors, paid the shortfall and stepped into the shoes of the DIP lenders in terms of priority.

[95]  The appellant Sun Indalex is a pre-*CCAA* secured creditor of both Indalex and the U.S. debtors. It claims the reserve fund on the basis that the US$10.75 million paid by the guarantors would otherwise have been available to Sun Indalex as a secured creditor of the U.S. debtors in the U.S. bankruptcy proceedings. The respondent plan beneficiaries claim the reserve fund on the basis that

les cadres. Au moment où la protection a été demandée sous le régime de la *LACC*, le régime des salariés était en cours de liquidation — celle-ci devant avoir lieu le 31 décembre 2006 —, et on estimait qu'il en résulterait un déficit (fin 2007) d'environ 2,252 millions de dollars. Le régime des cadres, qui n'était pas en voie de liquidation, n'admettait plus de nouveaux participants depuis 2005. On estimait que son déficit de liquidation s'élèverait à environ 2,996 millions de dollars. Au moment d'engager la procédure fondée sur la *LACC*, toutes les cotisations normales pour service courant avaient été versées aux deux régimes.

[93]  Peu de temps après qu'Indalex eut obtenu la protection prévue par la *LACC*, le juge saisi l'a autorisée à obtenir un financement à titre de débiteur-exploitant (« DE ») afin qu'elle puisse poursuivre ses activités. Le tribunal a alors accordé aux prêteurs DE, un groupe de banques, une sûreté ayant priorité sur [TRADUCTION] « toutes les autres sûretés, y compris les fiducies, privilèges, charges et grèvements, d'origine législative ou autre » (ordonnance initiale, par. 35 (d.a. conjoint, vol. I, p. 123-124)). Les débitrices américaines garantissaient le remboursement de ces sommes.

[94]  Finalement, sur approbation du tribunal saisi sur le fondement de la *LACC*, Indalex a vendu son entreprise, mais l'acquéreur n'a pas repris à son compte les engagements de retraite. Le contrôleur nommé en vertu de la *LACC* a établi un fonds de réserve pour donner suite aux réclamations formulées dans l'éventualité où il y serait fait droit. Le produit de la vente n'étant pas suffisant pour rembourser les prêteurs DE, les débitrices américaines, qui s'étaient portées cautions, ont payé la différence et acquis de ce fait la créance prioritaire des prêteurs DE.

[95]  L'appelante, Sun Indalex, était un créancier garanti d'Indalex et des débitrices américaines avant l'entrée en jeu de la *LACC*. Elle prétend avoir droit à l'attribution du fonds de réserve au motif que, à titre de créancier garanti des débitrices américaines dans le cadre de la procédure de faillite engagée aux États-Unis, n'eût été leur versement, elle aurait pu toucher les 10,75 millions de dollars

they have a wind-up deficiency which is covered by a deemed trust created by s. 57(4) of the *PBA*. This deemed trust includes "an amount of money equal to employer contributions <u>accrued to the date of the wind up but not yet due</u> under the plan or regulations" (s. 57(4)). They also claim the reserve fund on the basis of a constructive trust arising from Indalex's failure to live up to its fiduciary duties as plan administrator.

[96]    The reserve fund is not sufficient to pay back both Sun Indalex and the pension plans and so the main question on the main appeals is which of the creditors is entitled to priority for their respective claims.

[97]    The judge at first instance rejected the plan beneficiaries' deemed trust arguments and held that, with respect to the wind-up deficiency, the plan beneficiaries were unsecured creditors, ranking behind those benefitting from the "super priority" and secured creditors (2010 ONSC 1114, 79 C.C.P.B. 301). The Court of Appeal reversed this ruling and held that pension plan deficiencies were subject to deemed and constructive trusts which had priority over the DIP financing and over other secured creditors (2011 ONCA 265, 104 O.R. (3d) 641). Sun Indalex, the trustee in bankruptcy and the Monitor appeal.

**B.**  *Indalex's CCAA Proceedings*

(1)  <u>The Initial Order (Joint A.R., vol. I, at p. 112)</u>

[98]    As noted earlier, Indalex was in financial trouble and, on April 3, 2009, sought and obtained protection from its creditors under the *CCAA*. The order (which I will refer to as the initial order) also contained directions for service on creditors and

américains payés par elles à titre de cautions. Les bénéficiaires des régimes de retraite intimés prétendent que le fonds de réserve leur revient puisque leur déficit de liquidation est protégé par la fiducie réputée du par. 57(4) de la *LRR*. Cette fiducie réputée est constituée d'« un montant égal aux cotisations de l'employeur <u>qui sont accumulées [en anglais, « *accrued* »]</u> à la date de la liquidation, mais <u>qui ne sont pas encore dues</u> aux termes du régime ou des règlements » (par. 57(4)). Ils invoquent également à l'appui de leur prétention l'existence d'une fiducie par interprétation découlant de l'omission d'Indalex de s'acquitter de ses obligations fiduciaires en tant qu'administrateur des régimes.

[96]    Les sommes contenues dans le fonds de réserve ne permettent pas de rembourser à la fois Sun Indalex et les régimes de retraite. La principale question que soulèvent les principaux pourvois est donc celle de savoir quel créancier a priorité.

[97]    Le juge de première instance a rejeté la thèse de la fiducie réputée avancée par les bénéficiaires des régimes et conclu que, pour ce qui concerne le déficit de liquidation, les bénéficiaires des régimes de retraite sont des créanciers chirographaires prenant rang après les créanciers bénéficiant d'une superpriorité et les créanciers garantis (2010 ONSC 1114, 79 C.C.P.B. 301). La Cour d'appel de l'Ontario a infirmé cette décision et conclu que les déficits des régimes de retraite faisaient l'objet d'une fiducie réputée et d'une fiducie par interprétation qui prenaient rang avant les prêteurs DE et les autres créanciers garantis (2011 ONCA 265, 104 O.R. (3d) 641). Sun Indalex, le syndic de faillite et le contrôleur se pourvoient aujourd'hui en appel.

**B.**  *La procédure engagée par Indalex sous le régime de la LACC*

(1)  <u>L'ordonnance initiale (d.a. conjoint, vol. I, p. 112)</u>

[98]    Comme je l'indique précédemment, Indalex connaissait des difficultés financières et, le 3 avril 2009, elle a obtenu d'être protégée contre ses créanciers en application de la *LACC*. L'ordonnance (appelée ci-après « ordonnance initiale »)

others: paras. 39-41. The order also contained a so-called "comeback clause" allowing any interested party to apply for a variation of the order, provided that that party served notice on any other party likely to be affected by any such variation: para. 46. It is common ground that the plan beneficiaries did not receive notice of the application for the initial order but the *CCAA* court nevertheless approved the method of and time for service. Full particulars of the deficiencies in the pension plans were before the court in the motion material and the initial order addressed payment of the employer's current service pension contributions.

comportait entre autres des directives pour la signification aux créanciers et aux autres parties (par. 39-41). Elle prévoyait également que toute partie intéressée pouvait demander sa modification, à condition de signifier un avis à toute autre partie susceptible d'être touchée par la mesure (par. 46). Les parties reconnaissent que l'avis relatif à la demande présentée en vue d'obtenir l'ordonnance initiale n'a pas été signifié aux bénéficiaires des régimes de retraite, mais le tribunal saisi sous le régime de la *LACC* a néanmoins approuvé le mode et le délai de signification. Toutes les données sur les déficits des régimes de retraite figuraient dans les documents présentés au tribunal à l'appui de la demande, et l'ordonnance initiale faisait mention du paiement aux régimes des cotisations pour service courant de l'employeur.

(2)    The DIP Order (Joint A.R., vol. I, at p. 129)

(2)    L'ordonnance relative au financement DE (d.a. conjoint, vol. I, p. 129)

[99]   On April 8, 2009, in what I will refer to as the DIP order, the *CCAA* judge, Morawetz J., authorized Indalex to borrow funds pursuant to a DIP credit agreement. The judge ordered among many other things, the following:

[99]   Le 8 avril 2009, dans cette ordonnance appelée ci-après « ordonnance DE », le juge saisi en application de la *LACC* — le juge Morawetz — a autorisé Indalex à obtenir un financement DE. Il a notamment ordonné ce qui suit :

–   He approved abridged notice: para. 1;

–   l'abrègement du délai d'avis (par. 1);

–   He allowed Indalex to continue making current service contributions to the pension plans, but not special payments: paras. 7(a) and 9(b);

–   la faculté d'Indalex de continuer de verser aux régimes de retraite les cotisations pour service courant, à l'exclusion de tout paiement spécial (al. 7a) et 9b));

–   He barred all proceedings against Indalex, except by consent of Indalex and the Monitor or leave of the court, until May 1, 2009: para. 15;

–   la mise à l'abri d'Indalex contre toute procédure, sauf consentement d'Indalex ou du contrôleur ou autorisation du tribunal, jusqu'au 1er mai 2009 (par. 15);

–   He granted the DIP lenders a so-called super priority:

–   l'octroi aux prêteurs DE de ce qu'on appelle une superpriorité :

THIS COURT ORDERS that each of the Administration Charge, the Directors' Charge and the DIP Lenders Charge (all as constituted and defined herein) shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise

[TRADUCTION] LA COUR ORDONNE que chacune des charges relatives à l'administration, aux administrateurs et aux prêteurs DE (constituées et définies aux présentes) grève les biens, et que toutes aient priorité sur toutes les autres sûretés, y compris les fiducies, privilèges, charges et grèvements, d'origine législative

(collectively, "Encumbrances") in favour of any Person. [Emphasis added; para. 45.]

– He required Indalex to send notice of the order to all known creditors, other than employees and creditors to which Indalex owed less than $5,000 and stated that Indalex and the Monitor were "at liberty" to serve the Initial Order to interested parties: paras. 49-50.

[100]    In his endorsement for the DIP order, Morawetz J. found that "there is no other alternative available to the Applicants [Indalex] for a going concern solution" and that DIP financing was necessary: (2009), 52 C.B.R. (5th) 61 (Ont. S.C.J.), at para. 9(c). He noted that the Monitor in its report was of the view that approval of the DIP agreement was both necessary and in the best interests of Indalex and its stakeholders, including its creditors, employees, suppliers and customers: paras. 14-16.

[101]    The USW, which represented some of the members of the salaried plan, was served with notice of the motion that led to the DIP order, but did not appear. Morawetz J. specifically ordered as follows with regard to service:

THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof. [DIP order, at para. 1]

### (3)    The DIP Extension Order (Joint A.R., vol. I, at p. 156)

[102]    On June 12, 2009, Morawetz J. heard and granted an application by Indalex to allow them to borrow approximately $5 million more from the DIP lenders, thus raising the allowed total to US$29.5 million.

[103]    Counsel for the former executives received the motion material the night before. Counsel for

*ou autre* (collectivement les « grèvements »), détenus par quiconque. [Je souligne; par. 45.]

– l'obligation d'Indalex de donner avis de l'ordonnance initiale à tous les créanciers connus, autres que les employés et les créanciers auxquels Indalex devait moins de 5 000 $, et la « faculté » qu'ont Indalex et le contrôleur de signifier l'ordonnance initiale aux parties intéressées (par. 49-50).

[100]    Dans ses motifs à l'appui de l'ordonnance DE, le juge Morawetz conclut que [TRADUCTION] « les requérantes [Indalex] ne disposent d'aucune autre solution permettant la continuité de l'exploitation » et que le financement DE s'impose ((2009), 52 C.B.R. (5th) 61 (C.S.J. Ont.), al. 9c)). Il signale que, dans son rapport, le contrôleur tient l'approbation de l'accord de financement pour nécessaire et conforme à l'intérêt supérieur d'Indalex et des intéressés, dont ses créanciers, ses employés, ses fournisseurs et ses clients (par. 14-16).

[101]    Un avis de la motion qui a mené à l'ordonnance DE a été signifié au Syndicat représentant certains des participants des régimes des salariés, mais celui-ci n'a pas comparu. Le juge Morawetz ordonne expressément ce qui suit au sujet de la signification :

[TRADUCTION] LA COUR ORDONNE l'abrègement du délai imparti pour signifier l'avis et le dossier de demande, de sorte que la demande puisse être régulièrement entendue ce jour même, et elle dispense la demanderesse de la signification de tout autre document s'y rapportant. [Ordonnance DE, par. 1]

### (3)    L'ordonnance modifiant l'ordonnance DE (d.a. conjoint, vol. I, p. 156)

[102]    Le 12 juin 2009, le juge Morawetz a accueilli après audition la demande présentée par Indalex en vue d'être autorisée à emprunter une nouvelle tranche d'environ 5 000 000 $ aux prêteurs DE, ce qui portait l'emprunt total approuvé à 29 500 000 $ US.

[103]    L'avocat des anciens cadres a reçu les documents relatifs à l'instance la veille de l'audience.

USW was also served with notice. At the motion, the former executives (along with second priority secured noteholders) sought to "reserve their rights with respect to the relief sought": 2009 CanLII 37906 (Ont. S.C.J.), at para. 4. Morawetz J. wrote that any "reservation of rights" would create uncertainty for the DIP lenders with regard to priority, and may prevent them from extending further advances. Moreover, the parties had presented no alternative to increased DIP financing, which was both "necessary and appropriate" and would, it was to be hoped, "improve the position of the stakeholders": paras. 5-9.

(4)   The Bidding Order ((2009), 79 C.C.P.B. 101 (Ont. S.C.J.))

[104]   On July 2, 2009, Indalex brought a motion for approval of proposed bidding procedures for Indalex's assets. Morawetz J. decided that a stalking horse bid by SAPA Holding AB ("SAPA") for Indalex's assets could count as a qualifying bid. Counsel on behalf of the members of the executive plan appeared, with the concern that "their position and views have not been considered in this process": para. 8. In his decision, Morawetz J. decided that these arguments could be dealt with later, at a sale approval motion: para. 10. The judge said:

The position facing the retirees is unfortunate. The retirees are currently not receiving what they bargained for. However, reality cannot be ignored and the nature of the Applicants' insolvency is such that there are insufficient assets to meet its liabilities. The retirees are not alone in this respect. The objective of these proceedings is to achieve the best possible outcome for the stakeholders. [Emphasis added; para. 9.]

L'avocat du Syndicat a également reçu signification d'un avis. À l'audition de la demande, les anciens cadres (ainsi que les détenteurs de billets garantis de deuxième rang) ont demandé que [TRADUCTION] « leurs droits soient réservés quant à la réparation demandée » (2009 CanLII 37906 (C.S.J. Ont.), par. 4). Le juge Morawetz a opiné que toute [TRADUCTION] « réserve de droits » créerait de l'incertitude chez les prêteurs relativement au rang prioritaire de leur créance et pourrait inciter ces derniers à refuser d'avancer des fonds supplémentaires. En outre, les parties n'avaient proposé aucun autre mode d'accroissement du financement DE, lequel était à la fois [TRADUCTION] « nécessaire et opportun » et devait permettre, du moins l'espérait-on, « d'améliorer la situation des intéressés » (par. 5-9).

(4)   L'ordonnance relative à la vente par soumission ((2009), 79 C.C.P.B. 101 (C.S.J. Ont.))

[104]   Le 2 juillet 2009, Indalex a demandé l'approbation de la procédure projetée de vente par soumission de l'actif d'Indalex. Le juge Morawetz a jugé que l'offre-paravent de SAPA Holding AB (« SAPA ») pouvait être tenue pour valable. L'avocat des participants du régime des cadres a fait valoir que [TRADUCTION] « ni la situation ni le point de vue de ses clients n'avaient été pris en compte dans le cadre de la procédure » (par. 8). Le juge Morawetz a statué que ces éléments pourraient être examinés ultérieurement, lorsque l'approbation de la vente serait demandée (par. 10). Voici ce qu'il dit :

[TRADUCTION] La situation des retraités est malheureuse. À l'heure actuelle, ils ne touchent pas ce qu'ils ont obtenu à l'issue de négociations. Or, la réalité demeure incontournable et la nature de l'insolvabilité des demanderesses fait en sorte que l'actif ne permet pas d'acquitter le passif. Les retraités ne sont pas les seuls à subir un préjudice. La présente instance vise à obtenir le meilleur résultat possible pour les intéressés. [Je souligne; par. 9.]

(5)    The Sale Approval Order (Joint A.R., vol. I, at p. 166)

[105]    On July 20, 2009, Indalex brought two motions before Campbell J.

[106]    The first motion sought approval for the sale of Indalex's assets as a going concern to SAPA. SAPA was not to assume any pension liabilities. Campbell J. granted an order approving this sale.

[107]    The second motion sought approval for an interim distribution of the sale proceeds to the DIP lenders. Counsel on behalf of the executive plan members and the USW, representing some of the salaried employees, objected to the planned distribution of the sale proceeds on grounds that a statutory deemed trust applied to the deficiencies in their plans and that Indalex had breached fiduciary duties that it owed to them. Campbell J. ordered the Monitor to pay the DIP agent from the sale proceeds, but also ordered the Monitor to set up a reserve fund in an amount sufficient to answer, among other things, the claims of the plan beneficiaries pending resolution of those matters. Campbell J. ordered that the U.S. debtors be subrogated to the DIP lenders to the extent that the U.S. debtors were required under the guarantee to satisfy the DIP lenders' claims: para. 14.

(6)    The Sale and Distribution of Funds

[108]    SAPA bought Indalex's assets on July 31, 2009. Taking the reserve fund into account, the sale did not produce sufficient funds to repay the DIP lenders in full and so the U.S. debtors paid US$10,751,247 as guarantor to the DIP lenders: C.A. reasons, at para. 65.

(7)    The Order Under Appeal

[109]    On August 28, 2009, Campbell J. heard claims by the USW (appearing on behalf of some members of the salaried plan) and counsel appearing on behalf of the executive plan members that the

(5)    L'ordonnance d'approbation de la vente (d.a. conjoint, vol. I, p. 166)

[105]    Le 20 juillet 2009, Indalex a saisi le juge Campbell de deux motions.

[106]    Dans la première, Indalex demandait au tribunal d'approuver la vente à SAPA de son actif d'entreprise en exploitation, l'acquéreur ne reprenant à son compte aucun des engagements de retraite. Le juge Campbell a approuvé la vente.

[107]    Dans la deuxième motion, Indalex a demandé au tribunal d'approuver la distribution provisoire du produit de la vente aux prêteurs DE. L'avocat des participants du régime des cadres et le Syndicat, qui représentait certains des salariés, se sont opposés à cette distribution au motif qu'une fiducie d'origine législative protégeait les déficits de leurs régimes et qu'Indalex avait manqué à ses obligations fiduciaires envers eux. Le juge Campbell a ordonné au contrôleur de payer l'agent administratif des prêteurs DE par prélèvement sur le produit de la vente, mais également d'établir un fonds de réserve suffisant pour donner suite, entre autres choses, aux réclamations des bénéficiaires des régimes dans l'éventualité où il y serait fait droit. Il a ordonné que les débitrices américaines soient subrogées dans les droits des prêteurs DE jusqu'à concurrence du montant qu'elles avaient dû leur verser aux termes de la garantie (par. 14).

(6)    La vente et la distribution des fonds

[108]    SAPA a acheté l'actif d'Indalex le 31 juillet 2009. Compte tenu du fonds de réserve, la vente n'a pas généré de fonds suffisants pour rembourser intégralement les prêteurs DE, de sorte que les débitrices américaines ont versé à titre de cautions 10 751 247 $ US à ces derniers (motifs de la C.A., par. 65).

(7)    L'ordonnance visée par l'appel

[109]    Le 28 août 2009, le juge Campbell a entendu la thèse du Syndicat (qui représentait certains des participants du régime des salariés) et de l'avocat des participants du régime des cadres, à savoir que

wind-up deficiency was subject to a deemed trust. He rejected these claims in a written decision on February 18, 2010. He decided that the s. 57(4) *PBA* deemed trust did not apply to wind-up deficiencies. The executive plan had not been wound up, and therefore there was no wind-up deficiency to be the subject of the deemed trust. As for the salaried plan, Campbell J. held that the wind-up deficiency was not an obligation that had "accrued to the date of the wind up" and as a result did not fall within the terms of the s. 57(4) deemed trust.

[110]    Indalex had asked for the stay granted under the initial order to be lifted so that it could assign itself into bankruptcy. Because he did not find a deemed trust, Campbell J. did not feel that he needed to decide on the motion to lift the stay.

### (8)   The Decision of the Ontario Court of Appeal

[111]    The Ontario Court of Appeal allowed an appeal from the decision of Campbell J.

[112]    Writing for a unanimous panel, Gillese J.A. decided that the s. 57(4) deemed trust is applicable to wind-up deficiencies. She took the view that s. 57(4)'s reference to "employer contributions accrued to the date of the wind up but not yet due" included all amounts that the employer owed on the wind-up of its pension plan: para. 101. In particular, she concluded that the deemed trust applied to the wind-up deficiency in the salaried plan. Gillese J.A. declined, however, to decide whether the deemed trust also applied to deficiencies in the executive plan, which had not been wound up by the relevant date: paras. 110-12. A decision on this latter point was unnecessary given her finding on the applicability of a constructive trust in this case.

[113]    Gillese J.A. found that the super priority provided for in the DIP order did not trump the

le déficit de liquidation était réputé détenu en fiducie. Dans une décision motivée par écrit datée du 18 février 2010, il rejette cette prétention et conclut que la fiducie réputée du par. 57(4) de la *LRR* ne vise pas le déficit de liquidation. Le régime des cadres n'ayant pas été liquidé, il n'y avait donc pas de déficit de liquidation susceptible de faire l'objet d'une fiducie réputée. S'agissant du régime des salariés, le juge Campbell conclut que le déficit de liquidation n'équivaut pas à des cotisations qui sont « accumulées à la date de la liquidation », de sorte qu'il n'est pas réputé détenu en fiducie suivant le par. 57(4).

[110]    Indalex a demandé la levée de la suspension accordée dans l'ordonnance initiale afin de pouvoir faire cession de ses biens. Ne concluant pas à l'existence d'une fiducie réputée, le juge Campbell ne juge pas nécessaire de statuer sur la demande visant à faire lever la suspension.

### (8)   L'arrêt de la Cour d'appel de l'Ontario

[111]    La Cour d'appel de l'Ontario accueille l'appel interjeté contre la décision du juge Campbell.

[112]    Au nom d'une formation unanime, la juge Gillese estime que la fiducie réputée du par. 57(4) s'applique au déficit de liquidation. Les « cotisations de l'employeur qui sont accumulées [en anglais, « *accrued* »] à la date de la liquidation, mais qui ne sont pas encore dues » dont fait mention cette disposition englobent selon elle toutes les sommes que l'employeur devait au moment de la liquidation de son régime de retraite (par. 101). Plus particulièrement, elle conclut que la fiducie réputée du par. 57(4) s'applique au déficit de liquidation du régime des salariés. Elle refuse cependant de se prononcer sur l'application de la fiducie réputée au déficit du régime des cadres, lequel n'était pas liquidé à la date considérée (par. 110-112), ce qui n'était pas nécessaire puisqu'elle conclut à l'applicabilité de la fiducie par interprétation dans ce cas.

[113]    La juge Gillese conclut que la superpriorité accordée dans l'ordonnance DE ne prime pas la

deemed trust over the salaried plan's wind-up deficiency. Morawetz J. had not "invoked" the issue of paramountcy or made an explicit finding that the requirements of federal law required that the provincially created deemed trust must be overridden: paras. 178-79. Gillese J.A. also took the view that this Court's decision in *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, [2010] 3 S.C.R. 379, did not mean that provincially created priorities that would be ineffective under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*"), were also ineffective under the *CCAA*: paras. 185-96. The deemed trust therefore ranked ahead of the DIP security.

[114]    In addition to her findings regarding deemed trusts, Gillese J.A. granted the plan beneficiaries a constructive trust over the amount of the reserve fund on the ground that Indalex, as pension plan administrator, had breached fiduciary duties that it owed to the plan beneficiaries during the *CCAA* proceedings.

[115]    She held that as a plan administrator who was also an employer, Indalex had fiduciary duties both to the plan beneficiaries and to the corporation: para. 129. In her view, Indalex was subject to both sets of duties throughout the *CCAA* proceedings and it had breached its duties to the plan beneficiaries in several ways. While Indalex had the right to initiate *CCAA* proceedings, this action made the plan beneficiaries vulnerable and therefore triggered its fiduciary obligations as plan administrator: paras. 132-33. Gillese J.A. enumerated the many ways in which she thought Indalex subsequently failed as plan administrator: it did nothing in the *CCAA* proceedings to fund the deficit in the underfunded plans; it applied for *CCAA* protection without notice to the beneficiaries; it obtained DIP financing on the condition that DIP lenders be granted a super priority over "statutory trusts"; it obtained this financing without notice to the plan beneficiaries; it sold its assets knowing the purchaser was not taking over the plans; and it attempted to enter into voluntary bankruptcy, which would defeat any deemed trust claims the beneficiaries might have asserted:

fiducie qui est réputée exister à l'égard du déficit de liquidation du régime des salariés. Le juge Morawetz n'a pas [TRADUCTION] « invoqué » la prépondérance fédérale ni conclu expressément que le droit fédéral écartait la fiducie réputée de droit provincial (par. 178-179). La juge Gillese opine également que, dans l'arrêt *Century Services Inc. c. Canada (Procureur général)*, 2010 CSC 60, [2010] 3 R.C.S. 379, notre Cour ne statue pas que l'ordre de priorité établi par la province qui est sans effet aux fins de la *Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B-3 (« *LFI* »), ne s'applique pas non plus pour les besoins de la *LACC* (par. 185-196). La fiducie réputée prend donc rang avant la sûreté DE.

[114]    Outre ses conclusions sur la fiducie réputée, la juge Gillese tranche que le fonds de réserve fait l'objet d'une fiducie par interprétation car, dans son rôle d'administrateur des régimes de retraite, Indalex a manqué à ses obligations fiduciaires envers les bénéficiaires dans le cadre de la procédure fondée sur la *LACC*.

[115]    Elle conclut qu'à titre d'administrateur de régime qui était également employeur, Indalex avait des obligations fiduciaires tant envers les bénéficiaires des régimes qu'envers la société (par. 129). À son avis, Indalex était tenue de respecter ses obligations envers les premiers et la seconde tout au long de la procédure fondée sur la *LACC* et elle a manqué à ses obligations envers les bénéficiaires des régimes de différentes manières. Indalex avait certes le droit d'engager une procédure sous le régime de la *LACC*, mais une telle mesure rendait les bénéficiaires des régimes vulnérables, ce qui lui imposait donc des obligations fiduciaires en tant qu'administrateur des régimes (par. 132-133). La juge Gillese impute à Indalex de nombreuses erreurs subséquentes commises dans l'administration des régimes : Indalex n'a pris aucune mesure dans le cadre de la procédure fondée sur la *LACC* pour renflouer les régimes sous-capitalisés; elle a demandé la protection de la *LACC* sans en informer les bénéficiaires au préalable; elle a obtenu du financement DE en accordant à la créance des prêteurs une superpriorité sur toute « fiducie d'origine législative »; elle a obtenu ce financement sans en

18-23538-shl    Doc 3920-3    Filed 05/17/19    Entered 05/17/19 11:35:37    Exhibit C
Pg 59 of 131

328        SUN INDALEX FINANCE  *v.*  UNITED STEELWORKERS    *Cromwell J.*        [2013] 1 S.C.R.

para. 139. Gillese J.A. also noted that throughout the *CCAA* proceedings Indalex was in a conflict of interest because it was acting for both the corporation and the beneficiaries.

[116]    Indalex's failure to live up to its fiduciary duties meant that the plan beneficiaries were entitled to a constructive trust over the amount of the reserve fund: para. 204. Since the beneficiaries had been wronged by Indalex, and the U.S. debtors were not, with respect to Indalex, an "arm's length innocent third party" the appropriate response was to grant the beneficiaries a constructive trust: para. 204. Her conclusion on this point applied equally to the salaried and executive plans.

## III. Analysis

A. *First Issue: Did the Court of Appeal Err in Finding That the Deemed Statutory Trust Provided for in Section 57(4) of the PBA Applied to the Salaried Plan's Wind-up Deficiency?*

### (1)    Introduction

[117]    The main issue addressed here concerns whether the statutory deemed trust provided for in s. 57(4) of the *PBA* applies to wind-up deficiencies, the payment of which is provided for in s. 75(1)(b).

[118]    The deemed trust created by s. 57(4) applies to "employer contributions accrued to the date of the wind up but not yet due under the plan or regulations". Thus, to be subject to the deemed trust, the pension plan must be wound up and the amounts in question must meet three requirements. They must be (1) "employer contributions", (2) "accrued to the date of the wind up" and (3) "not yet due". A wind-up deficiency arises "[w]here a pension plan is wound up": s. 75(1). I agree with my colleagues that there can be no deemed trust

informer au préalable les bénéficiaires des régimes; elle a vendu son actif tout en sachant que l'acquéreur ne reprendrait à son compte aucun de ses engagements de retraite; elle a tenté de faire cession volontaire de ses biens, ce qui aurait fait échec aux prétentions des bénéficiaires relatives à la fiducie réputée (par. 139). La juge Gillese relève également que tout au long de la procédure fondée sur la *LACC*, Indalex était en conflit d'intérêts, car elle représentait à la fois la société et les bénéficiaires.

[116]    Va l'omission d'Indalex de s'acquitter de ses obligations fiduciaires, le fonds de réserve fait l'objet d'une fiducie par interprétation (par. 204). De plus, comme les bénéficiaires ont été lésés par Indalex, et que les débitrices américaines ne sont pas des [TRADUCTION] « tiers sans lien de dépendance » avec Indalex, la solution qui s'impose est de reconnaître l'existence d'une fiducie par interprétation en faveur des bénéficiaires (par. 204). Sa conclusion sur ce point vaut à la fois pour le régime des salariés et pour celui des cadres.

## III. Analyse

A. *Première question en litige : La Cour d'appel a-t-elle tort de conclure que la fiducie réputée du par. 57(4) de la LRR s'applique au déficit de liquidation du régime des salariés?*

### (1)    Introduction

[117]    Le principal point considéré en l'espèce est l'application ou l'inapplication de la fiducie réputée du par. 57(4) de la *LRR* au déficit de liquidation, dont l'al. 75(1)b) prévoit le paiement.

[118]    La fiducie réputée du par. 57(4) vise les « cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues aux termes du régime ou des règlements ». Pour qu'il y ait fiducie réputée, le régime de retraite doit donc être liquidé et les sommes en question doivent remplir trois conditions. Il doit s'agir de (1) « cotisations de l'employeur », (2) « qui sont accumulées à la date de la liquidation », (3) « mais qui ne sont pas encore dues ». Il y a déficit de liquidation « [lorsqu']un régime de retraite est liquidé »

for the executive plan, because that plan had not been wound up at the relevant date. What follows, therefore, is relevant only to the salaried plan.

[119]    The wind-up deficiency payments are "employer contributions" which are "not yet due" as of the date of wind up within the meaning of the *PBA*. The main issue before us, therefore, boils down to the narrow interpretative question of whether the wind-up deficiency described in s. 75(1)(b) is "accrued to the date of the wind up".

[120]    Campbell J. at first instance found that it was not, while the Court of Appeal reached the opposite conclusion. In essence, the Court of Appeal reasoned that the deemed trust in s. 57(4) "applies to all employer contributions that are required to be made pursuant to s. 75", that is, to "all amounts owed by the employer on the wind-up of its pension plan": para. 101.

[121]    I respectfully disagree with the Court of Appeal's conclusion for three main reasons. First, the most plausible grammatical and ordinary sense of the words "accrued to the date of the wind up" is that the amounts referred to are precisely ascertained immediately before the effective date of the plan's wind up. The wind up deficiency only arises upon wind up and it is neither ascertained nor ascertainable on the date fixed for wind up. Second, the broader statutory context reinforces this view: the language of the deemed trusts in s. 57(3) and (4) is virtually exactly repeated in s. 75(1)(a), suggesting that both deemed trusts refer to the liability on wind up referred to in s. 75(1)(a) and not to the further and distinct wind-up deficiency liability created under s. 75(1)(b). Finally, the legislative evolution and history of these provisions show, in my view, that the legislature never intended to include the wind-up deficiency in a statutory deemed trust.

(par. 75(1)). Je conviens avec mes collègues qu'il ne peut y avoir de fiducie réputée au bénéfice du régime des cadres, car celui-ci n'avait pas encore été liquidé à la date considérée. Par conséquent, les motifs qui suivent ne valent que pour le régime des salariés.

[119]    Les versements effectués pour combler le déficit de liquidation constituent des « cotisations de l'employeur [. . .] qui ne sont pas encore dues » au moment de la liquidation au sens de la *LRR*. Il s'agit donc essentiellement d'interpréter une disposition de la loi et de déterminer seulement si le déficit de liquidation décrit à l'al. 75(1)b) est « accumul[é] à la date de la liquidation ».

[120]    En première instance, le juge Campbell conclut qu'il ne l'est pas, alors que la Cour d'appel arrive à la conclusion contraire. La Cour d'appel estime essentiellement que la fiducie réputée du par. 57(4) [TRADUCTION] « vise toutes les cotisations de l'employeur qui sont exigibles suivant l'art. 75 », à savoir « toute somme due par l'employeur à la liquidation de son régime de retraite » (par. 101).

[121]    Sauf le respect qui lui est dû, je suis en désaccord avec la Cour d'appel pour trois raisons principales. Premièrement, suivant son sens ordinaire et grammatical le plus plausible, l'expression « accumulées à la date de la liquidation » renvoie aux sommes déterminées de façon précise immédiatement avant la date de prise d'effet de la liquidation du régime. Le déficit de liquidation n'est constaté qu'à l'issue de la liquidation, et il n'est ni déterminé ni déterminable à la date de liquidation prévue. Deuxièmement, le contexte législatif général me conforte dans ce point de vue. Le texte des par. 57(3) et (4) qui dispose qu'il y a fiducie réputée est repris presque en tous points à l'al. 75(1)a), ce qui permet de conclure que, dans les deux cas de fiducie réputée, le législateur renvoie à l'obligation qui existe à la liquidation suivant l'al. 75(1)a) et non à celle, supplémentaire et distincte, qui est liée au déficit de liquidation et qui découle de l'al. 75(1)b). Enfin, il appert à mon sens de l'évolution et de l'historique de ces dispositions que le législateur n'a jamais voulu que le déficit de liquidation fasse l'objet d'une fiducie réputée d'origine législative.

18-23538-shl    Doc 3920-3    Filed 05/17/19    Entered 05/17/19 11:35:37    Exhibit C
Pg 61 of 131

330          SUN INDALEX FINANCE  v.  UNITED STEELWORKERS  *Cromwell J.*          [2013] 1 S.C.R.

[122]    Before turning to the precise interpretative issue, it will be helpful to provide some context about the employer's wind-up obligations and the deemed trust provisions that are the subject of this dispute.

(2)    Employer Obligations on Wind Up

[123]    A "wind up" means that the plan is terminated and the plan assets are distributed: see *PBA*, s. 1(1), definition of "wind up". The employer's liability on wind-up consists of two main components. The first is provided for in s. 75(1)(a) and includes "an amount equal to the total of all payments that, under this Act, the regulations and the pension plan, are due or that have accrued and that have not been paid into the pension fund". This liability applies to contributions that were due as at the wind-up date but does *not* include payments required by s. 75(1)(b) that arise as a result of the wind up: A. N. Kaplan, *Pension Law* (2006), at pp. 541-42. This second liability is known as the wind-up deficiency amount. The employer must pay all additional sums to the extent that the assets of the pension fund are insufficient to cover the value of all immediately vested and accelerated benefits and grow-in benefits: Kaplan, at p. 542. Without going into detail, there are certain statutory benefits that may arise only on wind up, such as certain benefit enhancements and the potential for acceleration of pension entitlements. Thus, wind up will usually result in additional employer liabilities over and above those arising from the obligation to pay all benefits provided for in the plan itself: see, e.g., ss. 73-74; Kaplan, at p. 542. As the Court of Appeal concluded, the payments provided for under s. 75(1)(a) are those which the employer had to make while the plan was ongoing, while s. 75(1)(b) refers to the employer's obligation to make up for any wind-up deficiency: paras. 90-91.

[124]    For convenience, the provision as it then stood is set out here.

**75.** (1) Where a pension plan is wound up in whole or in part, the employer shall pay into the pension fund,

[122]    Avant d'interpréter le libellé en cause, il vaut la peine de situer dans leur contexte les obligations de l'employeur en cas de liquidation, ainsi que les dispositions sur la fiducie réputée qui font l'objet du présent litige.

(2)    Les obligations de l'employeur à la liquidation

[123]    La « liquidation » s'entend de la cessation d'un régime et de la répartition de son actif (voir la définition de « liquidation » au par. 1(1) de la *LRR*). L'obligation de l'employeur comporte alors deux volets principaux. Premièrement, suivant l'al. 75(1)a), son obligation correspond au versement d'« un montant égal au total de tous les paiements qui, en vertu de la présente loi, des règlements et du régime de retraite, sont dus ou accumulés et qui n'ont pas été versés à la caisse de retraite ». Sont visées les cotisations dues à la date de la liquidation, mais *non* les paiements exigés à l'al. 75(1)b) par suite de la liquidation (A. N. Kaplan, *Pension Law* (2006), p. 541-542). La seconde obligation vise le déficit de liquidation. L'employeur est tenu de verser toute somme supplémentaire requise du fait que la valeur de l'actif du régime de retraite est inférieure à celle de la totalité des droits à pension acquis de manière immédiate, accélérée ou réputée (Kaplan, p. 542). Sans entrer dans le détail, certains droits d'origine législative ne naissent qu'en cas de liquidation, tels certains enrichissements des prestations et la possibilité d'accélérer l'acquisition du droit à pension. La liquidation fait donc à l'employeur d'autres obligations en sus de celle de verser toutes les prestations prévues par le régime lui-même (voir, p. ex., art. 73-74; Kaplan, p. 542). Ainsi que le conclut la Cour d'appel, les paiements visés à l'al. 75(1)a) sont ceux que l'employeur devait verser pendant l'application du régime, tandis que l'al. 75(1)b) renvoie à son obligation de combler tout déficit de liquidation (par. 90-91).

[124]    Pour faciliter sa consultation, voici le libellé qui s'appliquait au moment considéré :

**75.** (1) Si un régime de retraite est liquidé en totalité ou en partie, l'employeur verse à la caisse de retraite :

(a)   an amount equal to the total of all payments that, under this Act, the regulations and the pension plan, are due or that have accrued and that have not been paid into the pension fund; and

(b)   an amount equal to the amount by which,

   (i)   the value of the pension benefits under the pension plan that would be guaranteed by the Guarantee Fund under this Act and the regulations if the Superintendent declares that the Guarantee Fund applies to the pension plan,

   (ii)   the value of the pension benefits accrued with respect to employment in Ontario vested under the pension plan, and

   (iii)   the value of benefits accrued with respect to employment in Ontario resulting from the application of subsection 39 (3) (50 per cent rule) and section 74,

exceed the value of the assets of the pension fund allocated as prescribed for payment of pension benefits accrued with respect to employment in Ontario.

[125]   While a wind up is effective as of a fixed date, a wind up is nonetheless best thought of not simply as a moment or a single event, but as a process. It begins by a triggering event and continues until all of the plan assets have been distributed. To oversimplify somewhat, the wind-up process involves the following components.

[126]   The assets and liabilities of the plan as of the wind-up date must be determined. As noted earlier, the precise extent of the liability, while *fixed as of that date*, will not be ascertained or ascertainable *on that date*. The extent of the liability may depend on choices open to plan beneficiaries under the plan and on the exercise by them of certain statutory rights beyond the options that would otherwise have been available under the plan itself. The plan members must be notified of the wind-up and have their entitlements and options set out for them and given an opportunity to make their choices. The plan administrator must file a wind-up report which includes a statement of the plan's assets and liabilities, the benefits payable under the

a)   d'une part, un montant égal au total de tous les paiements qui, en vertu de la présente loi, des règlements et du régime de retraite, sont dus ou accumulés, et qui n'ont pas été versés à la caisse de retraite;

b)   d'autre part, un montant égal au montant dont :

   (i)   la valeur des prestations de retraite aux termes du régime de retraite qui seraient garanties par le Fonds de garantie en vertu de la présente loi et des règlements si le surintendant déclare que le Fonds de garantie s'applique au régime de retraite,

   (ii)   la valeur des prestations de retraite accumulées à l'égard de l'emploi en Ontario et acquises aux termes du régime de retraite,

   (iii)   la valeur des prestations accumulées [en anglais, « *accrued* »] à l'égard de l'emploi en Ontario et qui résultent de l'application du paragraphe 39 (3) (règle des 50 pour cent) et de l'article 74,

dépassent la valeur de l'actif de la caisse de retraite attribué, comme cela est prescrit, pour le paiement de prestations de retraite accumulées à l'égard de l'emploi en Ontario.

[125]   Bien que la liquidation prenne effet à une date déterminée, il s'agit d'un processus, et non d'un moment ou d'une étape en particulier. Un événement la déclenche et elle se poursuit jusqu'à la répartition de la totalité de l'actif du régime. Au risque de trop simplifier, voici quelles sont les étapes du processus de liquidation.

[126]   L'actif et le passif du régime existant à la date de la liquidation doivent être établis. Rappelons que la valeur exacte du passif, bien que *circonscrite à cette date*, n'est ni déterminée ni déterminable *cette date-là*. La valeur du passif peut dépendre des choix qui s'offrent aux bénéficiaires dans le cadre du régime, ainsi que de l'exercice par ces derniers de certains droits légaux et de la levée des options que prévoit le régime. Les participants du régime doivent être avisés de la liquidation, ainsi que de leurs droits et de leurs options, et ils doivent avoir la possibilité d'effectuer leurs choix. L'administrateur du régime doit déposer un rapport de liquidation qui fait état de l'actif et du passif du régime, des prestations payables en application du régime et du

terms of the plan, and the method of allocating and distributing the assets including the priorities for the payment of benefits: *PBA*, s. 70(1), and R.R.O. 1990, Reg. 909, s. 29 (the "*PBA* Regulations").

[127]    Benefits to members may take the form of "cash refunds, immediate or deferred annuities, transfers to registered retirement saving plans, . . . . In principle, the value of these benefits is the present value of the benefits accrued to the date of plan termination": *The Mercer Pension Manual* (loose-leaf), vol. 1, at p. 10-41. That present value is an actuarial calculation performed on the basis of various assumptions including assumptions about investment return, mortality and so forth.

[128]    If, when the assets and liabilities are calculated, the assets are insufficient to satisfy the liabilities, the employer (i.e. the plan sponsor) must make up for any wind-up deficiency: *PBA*, s. 75(1)(b). An employer can elect to space these payments out over the course of five years: *PBA* Regulations, s. 31(2). Because these payments are based on the extent to which there is a deficit between assets in the pension plan and the benefits owed to beneficiaries, their amount varies with the market and other assumed elements of the calculation over the course of the permitted five years.

[129]    To take the salaried plan as an example, at the time of wind-up, all regular current service contributions had been made: C.A. reasons, at para. 33. The wind-up deficiency was initially estimated to be $1,655,200. Indalex made special wind-up payments of $709,013 in 2007 and $875,313 in 2008, but as of December 31, 2008, the wind-up deficiency was $1,795,600 — i.e. higher than it had been two years before, notwithstanding that payments of roughly $1.6 million had been made: C.A. reasons, at para. 32. Indalex made another payment of $601,000 in April 2009: C.A. reasons, at para. 32.

mode d'attribution et de répartition de l'actif, y compris les priorités de paiement des prestations (*LRR*, par. 70(1), et R.R.O. 1990, règl. 909, art. 29 (le « règlement de la *LRR* »)).

[127]    Les prestations versées aux participants peuvent revêtir la forme de [TRADUCTION] « remboursements en espèces, de rentes immédiates ou différées, de transferts dans un régime enregistré d'épargne-retraite, [. . .]. La valeur de ces prestations correspond en principe à la valeur actuelle des prestations accumulées à la date de cessation du régime » (*The Mercer Pension Manual* (feuilles mobiles), vol. 1, p. 10-41). La valeur actuelle est obtenue au moyen d'un calcul actuariel qui tient compte de différentes hypothèses, notamment quant au rendement et à l'espérance de vie.

[128]    Lorsque, après avoir calculé l'actif et le passif, le premier est inférieur au second, l'employeur (à savoir le promoteur du régime) comble le déficit de liquidation (*LRR*, al. 75(1)b)). Il peut étaler les versements sur une période de cinq ans (règlement de la *LRR*, par. 31(2)). Puisque le montant de ces versements tient à la différence entre l'actif du régime de retraite et les prestations dues aux bénéficiaires, il varie en fonction du marché et d'autres variables considérées dans le calcul sur la période autorisée de cinq ans.

[129]    Dans le cas du régime des salariés, par exemple, toutes les cotisations normales pour service courant avaient été versées au moment de la liquidation (motifs de la C.A., par. 33). Le déficit de liquidation a été estimé au départ à 1 655 200 $. Indalex a effectué des paiements spéciaux de 709 013 $ en 2007, puis de 875 313 $ en 2008. Or, le 31 décembre 2008, le déficit de liquidation s'établissait à 1 795 600 $, de sorte qu'il s'était accru au cours des deux ans écoulés, malgré les quelque 1,6 million de dollars versés (motifs de la C.A., par. 32). Indalex a versé en sus 601 000 $ en avril 2009 (motifs de la C.A., par. 32).

### (3)    The Deemed Trust Provisions

[130]    The *PBA* contains provisions whose purpose is to exempt money owing to a pension plan, and which is held or owing by the employer, from being seized or attached by the employer's other creditors: Kaplan, at p. 395. This is accomplished by creating a "deemed trust" with respect to certain pension contributions such that these amounts are held by the employer in trust for the employees or pension beneficiaries.

[131]    There are two deemed trusts that we must examine here, one relating to employer contributions that are *due but have not been paid* and another relating to employer contributions *accrued but not due*. This second deemed trust is the one in issue here, but it is important to understand how the two fit together.

[132]    The deemed trust relating to employer contributions "due and not paid" is found in s. 57(3). The *PBA* and *PBA* Regulations contain many provisions relating to contributions required by employers, the due dates for which are specified. Briefly, the required contributions are these.

[133]    When a pension is ongoing, employers need to make regular current service cost contributions. These are made monthly, within 30 days after the month to which they relate: *PBA* Regulations, s. 4(4)3. There are also special payments, which relate to deficiencies between a pension plan's assets and liabilities. There are "going-concern" deficiencies and "solvency" deficiencies, the distinction between which is unimportant for the purposes of these appeals. A plan administrator must regularly file actuarial reports, which may disclose deficiencies: *PBA* Regulations, s. 14. Where there is a going-concern deficiency the employer must make equal monthly payments over a 15-year period to rectify it: *PBA* Regulations, s. 5(1)(b). Where there is a solvency deficiency, the employer must make equal monthly payments over a five-year period to rectify it: *PBA* Regulations,

### (3)    Les dispositions relatives à la fiducie réputée

[130]    La *LRR* renferme des dispositions visant à soustraire à la saisie par les autres créanciers de l'employeur les sommes dues à un régime de retraite que détient ou que doit l'employeur (Kaplan, p. 395). Ainsi, certaines cotisations au régime de retraite sont dont « réputées » détenues « en fiducie » par l'employeur pour le compte des employés ou des bénéficiaires du régime de retraite.

[131]    Deux fiducies réputées doivent être examinées en l'espèce, l'une visant les cotisations de l'employeur qui sont *dues, mais impayées*, l'autre les cotisations de l'employeur qui sont *accumulées, mais qui ne sont pas dues*. Cette seconde fiducie réputée est celle qui nous intéresse dans le présent pourvoi, mais il importe de comprendre la complémentarité des deux fiducies réputées.

[132]    La fiducie dont sont réputées faire l'objet les cotisations de l'employeur qui sont « dues et impayées » est créé au par. 57(3). La *LRR* et le règlement de la *LRR* renferment de nombreuses dispositions sur les cotisations de l'employeur et le moment de leur exigibilité. Voici quelles sont, en résumé, les cotisations exigées.

[133]    Pendant la durée du régime de retraite, l'employeur verse chaque mois les cotisations normales pour service courant dans les 30 jours qui suivent le mois pour lequel elles sont exigibles (règlement de la *LRR*, par. 4(4)3). Des paiements spéciaux sont également effectués pour combler un déficit entre l'actif et le passif du régime. Il peut y avoir « déficit à long terme » et « déficit de solvabilité », mais la distinction entre les deux n'importe pas pour les besoins des présents pourvois. L'administrateur du régime dépose périodiquement un rapport actuariel, lequel est susceptible de révéler un déficit (règlement de la *LRR*, art. 14). Pour combler un déficit à long terme, l'employeur effectue des versements mensuels égaux sur une période de 15 ans (règlement de la *LRR*, al. 5(1)b)). Dans le cas d'un déficit de solvabilité, l'employeur effectue des versements

s. 5(1)(e). Once these regular or special payments become due but have not been paid, they are subject to the s. 57(3) deemed trust.

[134]    I turn next to the s. 57(4) deemed trust, which gives rise to the question before us. The subsection provides that "[w]here a pension plan is wound up . . ., an employer who is required to pay contributions to the pension fund shall be deemed to hold in trust for the beneficiaries of the pension plan an amount of money equal to employer contributions accrued to the date of the wind up but not yet due under the plan or regulations".

[135]    When a pension plan is wound up there will be an interrupted monthly payment period, which is sometimes referred to as the stub period. During this stub period regular and special liabilities will have accrued but not yet become due. Section 58(1) provides that money that an employer is required to pay "accrues on a daily basis". Because the amounts referred to in s. 57(4) are not yet due, they are not covered by the s. 57(3) deemed trust, which applies only to payments that are *due*. The two provisions, then, operate in tandem to create a trust over an employer's unfulfilled obligations, which are "due and not paid" as well as those which have "accrued to the date of the wind up but [are] not yet due".

(4)    The Interpretative Approach

[136]    The issue we confront is one of statutory interpretation and the well-settled approach is that "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament": E. A. Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87; *Bell ExpressVu Limited Partnership v. Rex*, 2002 SCC 42, [2002] 2 S.C.R. 559, at para. 26. Taking this approach it is clear to me that the

mensuels égaux pendant cinq ans (règlement de la *LRR*, al. 5(1)e)). Dès que ces versements normaux ou spéciaux sont dus, mais impayés, ils sont réputés faire l'objet de la fiducie créée au par. 57(3).

[134]    Je passe maintenant à la fiducie réputée du par. 57(4), celle sur laquelle nous sommes appelés à nous prononcer en l'espèce. Suivant cette disposition, « [s]i un régime de retraite est liquidé [. . .], l'employeur qui est tenu de cotiser à la caisse de retraite est réputé détenir en fiducie pour le compte des bénéficiaires du régime de retraite un montant égal aux cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues aux termes du régime ou des règlements ».

[135]    Lorsqu'un régime de retraite est liquidé, il y a interruption des versements mensuels (intervalle appelé parfois « période tampon »). Au cours de cette période, des dettes ordinaires ou spéciales ont été contractées sans qu'elles soient immédiatement payables. Le paragraphe 58(1) dispose que l'argent qu'un employeur est tenu de verser « s'accumule sur une base quotidienne ». Puisque les sommes mentionnées au par. 57(4) ne sont pas encore dues, elles ne font pas l'objet de la fiducie dont l'existence est réputée au par. 57(3), laquelle ne vise que les paiements qui sont *dus*. Les deux dispositions s'appliquent donc de concert pour créer une fiducie à l'égard des obligations non exécutées de l'employeur qui sont « dues et impayées », ainsi qu'à l'égard des obligations qui ont pour objet des cotisations « accumulées à la date de la liquidation, mais qui ne sont pas encore dues ».

(4)    La méthode d'interprétation

[136]    Nous sommes aux prises avec l'interprétation de dispositions législatives et, suivant le principe bien établi, [TRADUCTION] « il faut lire les termes d'une loi dans leur contexte global en suivant le sens ordinaire et grammatical qui s'harmonise avec l'esprit de la loi, l'objet de la loi et l'intention du législateur » (E. A. Driedger, *Construction of Statutes* (2e éd. 1983), p. 87; *Bell ExpressVu Limited Partnership c. Rex*, 2002 CSC 42, [2002] 2 R.C.S. 559, par. 26). Dès lors, il ne fait aucun

sponsor's obligation to pay a wind-up deficiency is not covered by the statutory deemed trust provided for in s. 57(4) of the *PBA*. In my view, the deficiency neither "accrued", nor did it arise within the period referred to by the words "to the date of the wind up".

(a)  *Grammatical and Ordinary Sense of the Words "Accrued" and "to the Date of the Wind Up"*

[137]    The Court of Appeal failed to take sufficient account of the ordinary and grammatical meaning of the text of the provisions. It held that "the deemed trust in s. 57(4) applies to all employer contributions that are required to be made pursuant to s. 75": para. 101 (emphasis added). However, the plain words of the section show that this conclusion is erroneous. Section 75(1)(a) refers to liability for employer contributions that "are due . . . and that have not been paid". These amounts are thus *not* included in the s. 57(4) deemed trust, because it addresses only amounts that have "accrued to the date of the wind up but [are] not yet due". Amounts "due" are covered by the s. 57(3) deemed trust and not, as the Court of Appeal concluded by the deemed trust created by s. 57(4). The Court of Appeal therefore erred in finding, in effect, that amounts which "are due" could be included in a deemed trust covering amounts "not yet due".

[138]    In my view, the most plausible grammatical and ordinary sense of the phrase "accrued to the date of the wind up" in s. 57(4) is that it refers to the sums that are ascertained immediately before the effective wind-up date of the plan.

[139]    In the context of s. 57(4), the grammatical and ordinary sense of the term "accrued" is that the amount of the obligation is "fully constituted" and "ascertained" although it may not yet be payable. The amount of the wind-up deficiency is not fully constituted or ascertained (or even ascertainable) before or even on the date fixed for wind up and therefore cannot fall under s. 57(4).

doute que l'obligation du promoteur de combler un déficit de liquidation échappe à la fiducie réputée du par. 57(4) de la *LRR*. À mon avis, le déficit n'est pas « accumulé » [« *accrued* », en anglais] et n'est pas survenu pendant la période à laquelle renvoie l'expression « à la date de la liquidation ».

a)  *Le sens ordinaire et grammatical des termes « accumulées » [« accrued », en anglais] et « à la date de la liquidation »*

[137]    La Cour d'appel ne tient pas suffisamment compte du sens ordinaire et grammatical du libellé des dispositions en cause. Elle conclut que [TRADUCTION] « la fiducie réputée du par. 57(4) vise toutes les cotisations que l'employeur est tenu de verser suivant l'art. 75 » (par. 101 (je souligne)). Or, il ressort du libellé explicite de cette dernière disposition qu'il s'agit d'une conclusion erronée. L'alinéa 75(1)a) établit l'obligation de l'employeur à l'égard des paiements qui « sont dus [. . .] et qui n'ont pas été versés ». Ces paiements *ne* font donc *pas* l'objet de la fiducie réputée du par. 57(4), car celle-ci ne vise que les cotisations qui sont « accumulées à la date de la liquidation, mais qui ne sont pas encore dues ». Les cotisations « dues » sont réputées détenues en fiducie suivant le par. 57(3), et non le par. 57(4) comme le conclut la Cour d'appel. Cette dernière estime en effet à tort que les cotisations qui « sont dues » peuvent être réputées détenues en fiducie comme celles qui « ne sont pas encore dues ».

[138]    À mon avis, suivant son sens ordinaire et grammatical le plus plausible, l'expression « accumulées à la date de la liquidation » employée au par. 57(4) renvoie aux sommes déterminées immédiatement avant la date de prise d'effet de la liquidation du régime.

[139]    Dans le contexte du par. 57(4), le sens ordinaire et grammatical d'« accumulées » veut que l'obligation soit « entièrement constituée » et que son montant soit « déterminé», même si elle peut ne pas être encore payable. Le déficit de liquidation n'est pas entièrement constitué ni son montant déterminé (ou déterminable) avant la date prévue pour la liquidation, ou le jour même, et ne peut donc pas être visé au par. 57(4).

[140]   Of course, the meaning of the word "accrued" may vary with context. In general, when the term "accrued" is used in relation to legal rights, its common meaning is that the right has become fully constituted even though the monetary implications of its enforcement are not yet known or knowable. Thus, we speak of the "accrual" of a cause of action in tort when all of the elements of the cause of action come into existence, even though the extent of the damage may well not be known or knowable at that time: see, e.g., *Ryan v. Moore*, 2005 SCC 38, [2005] 2 S.C.R. 53. However, when the term is used in relation to a sum of money, it will generally refer to an amount that is at the present time either quantified or exactly quantifiable but which may or may not be due.

[141]   In some contexts, a liability is said to accrue when it becomes due. An accrued liability is said to be "properly chargeable" or "owing on a given day" or "completely constituted": see, e.g., *Black's Law Dictionary* (9th ed. 2009), at p. 997, "accrued liability"; D. A. Dukelow, *The Dictionary of Canadian Law* (4th ed. 2011), at p. 13, "accrued liability"; *Hydro-Electric Power Commission of Ontario v. Albright* (1922), 64 S.C.R. 306, at p. 312.

[142]   In other contexts, an amount which has accrued may not yet be due. For example, we speak of "accrued interest" meaning a precise, quantified amount of interest that has been earned but may not yet be payable. The term "accrual" is used in the same way in "accrual accounting". In accrual method accounting, "transactions that give rise to revenue or costs are recognized in the accounts when they are earned and incurred respectively": B. J. Arnold, *Timing and Income Taxation: The Principles of Income Measurement for Tax Purposes* (1983), at p. 44. Revenue is earned when the recipient "substantially completes performance of everything he or she is required to do as long as the amount due is ascertainable and there is no uncertainty about its collection": P. W. Hogg, J. E. Magee and J. Li, *Principles of Canadian Income Tax Law* (7th ed. 2010), at s. 6.5(b); see

[140]   Certes, le sens du terme « accumulées » [et plus encore celui de son équivalent anglais « *accrued* »] peut varier selon le contexte. En général, lorsque ce terme est employé de pair avec des droits légaux, son sens courant veut que le droit soit entièrement constitué, même si les répercussions financières de son exécution ne sont pas encore connues et ne peuvent l'être. Ainsi, en responsabilité délictuelle, on parle d'accumulation (au sens d'acquisition ou de naissance) de la cause d'action lorsque tous ses éléments sont réunis, même lorsque l'étendue du préjudice n'est pas encore connue ou ne peut l'être (voir, p. ex., *Ryan c. Moore*, 2005 CSC 38, [2005] 2 R.C.S. 53). Toutefois, lorsque le terme qualifie une somme, il renvoie généralement à un élément dont la valeur est actuellement mesurée ou mesurable, mais qui peut ou non être dû.

[141]   Dans certains contextes, il y a accumulation [en anglais, « *accrual* »] lorsque l'obligation vient à échéance. On dit du passif accumulé qu'il est [TRADUCTION] « dûment imputable » ou « exigible à une date prévue », ou encore, « entièrement constitué » (voir, p. ex., la définition d'« *accrued liability* » [passif accumulé] dans le *Black's Law Dictionary* (9e éd. 2009), p. 997; D. A. Dukelow, *The Dictionary of Canadian Law* (4e éd. 2011), p. 13; *Hydro-Electric Power Commission of Ontario c. Albright* (1922), 64 R.C.S. 306, p. 312).

[142]   Dans d'autres cas, la somme qui s'est accumulée [en anglais, « *accrued* »] peut ne pas être encore exigible. Par exemple, on parle d'« intérêts accumulés » [« *accrued interest* »] au sens du montant précis des intérêts qui sont courus, mais qui ne sont pas encore exigibles. En anglais, *accrual* est utilisé dans le même sens dans l'expression « *accrual accounting* » (en français, « comptabilité d'exercice »). Suivant cette méthode, les [TRADUCTION] « opérations qui génèrent des revenus ou occasionnent des dépenses sont comptabilisées lorsque les revenus sont gagnés ou que les dépenses sont engagées » (B. J. Arnold, *Timing and Income Taxation : The Principles of Income Measurement for Tax Purposes* (1983), p. 44). Le revenu est gagné lorsque le bénéficiaire [TRADUCTION] « a essentiellement accompli tout ce qu'il devait accomplir, à condition que la somme

also Canadian Institute of Chartered Accountants, *CICA Handbook — Accounting*, Part II, s. 1000, at paras. 41-44. In this context, the amount must be ascertained at the time of accrual.

[143]    The *Hydro-Electric Power Commission* case offers a helpful definition of the word "accrued" in this sense. On a sale of shares, the vendor undertook to provide on completion "a sum estimated by him to be equal to sinking fund payments [on the bonds and debentures] <u>which shall have accrued but shall not be due</u> at the time for completion": p. 344 (emphasis added). The bonds and debentures required the company to pay on July 1 of each year a fixed sum for each electrical horsepower sold and paid for during the preceding calendar year. A dispute arose as to what amounts were payable in this respect on completion. Duff J. held that in this context accrued meant "completely constituted", referring to this as a "well recognized usage": p. 312. He went on:

Where . . . a lump sum is made payable on a specified date and where, having regard to the purposes of the payment or to the terms of the instrument, this sum must be considered to be made up of an accumulation of sums in respect of which the right to receive payment is completely constituted before the date fixed for payment, then it is quite within the settled usage of lawyers to describe each of such accumulated parts as a sum accrued or accrued due before the date of payment. [p. 316]

Thus, at every point at which a liability to pay a fixed sum arose under the terms of the contract, that liability accrued. It was fully constituted even though not yet due because the obligation to make the payment was in the future. In reaching this conclusion, Duff J. noted that the bonds and debentures used the word "accrued" in contrast to

due puisse être déterminée et que sa perception ne fasse l'objet d'aucune incertitude » (P. W. Hogg, J. E. Magee et J. Li, *Principles of Canadian Income Tax Law* (7ᵉ éd. 2010), al. 6.5b); voir également le manuel de l'Institut canadien des comptables agréés, *Manuel de l'ICCA — Comptabilité*, partie II, ch. 1000, par. 41-44). La somme en cause doit alors être déterminée au moment où le droit de la toucher est acquis [« *accrued* »].

[143]    Dans l'arrêt *Hydro-Electric Power Commission*, la Cour, qui se prononçait uniquement sur le terme anglais « *accrued* », opine opportunément que ce terme se définit ainsi. Lors de la vente d'actions, le vendeur s'était engagé à remettre, une fois l'opération conclue, [TRADUCTION] « une somme équivalant selon lui aux sommes versées au fonds d'amortissement [des obligations et des débentures] <u>qui sont alors accumulées [*accrued*], mais qui ne sont pas exigibles</u> » (p. 344 (je souligne)). Suivant les conditions des obligations et des débentures, la société était tenue de payer, le 1ᵉʳ juillet de chaque année, un montant déterminé pour chacun des chevaux-vapeur électriques vendus et payés au cours de l'année civile précédente. Le litige portait sur le montant des sommes payables à ce titre une fois la vente conclue. Le juge Duff statue que, dans ce contexte, et selon un [TRADUCTION] « usage largement reconnu », le mot « *accrued* » renvoie au droit ou à l'obligation « entièrement constitué » (p. 312). Il ajoute :

[TRADUCTION] Lorsqu'une somme forfaitaire doit être versée à une date déterminée et que, vu l'objet du paiement ou les clauses du contrat, la somme en question doit être considérée comme résultant de l'accumulation de sommes pour lesquelles le droit au paiement est entièrement constitué avant la date de paiement convenue, il est tout à fait conforme à l'usage des avocats qui consiste à voir dans chacun de ces éléments accumulés une somme « *accrued* » ou devenue exigible avant la date du paiement. [p. 316]

Par conséquent, chaque fois que naissait, suivant le contrat, l'obligation de verser une somme précise, le droit à l'exécution de cette obligation était acquis (ou « *accrued* »). Le droit était entièrement constitué, même s'il n'y avait pas encore exigibilité, car l'obligation d'effectuer le versement naissait ultérieurement. Pour arriver à cette conclusion, le

18-23538-shl    Doc 3920-3    Filed 05/17/19    Entered 05/17/19 11:35:37    Exhibit C
Pg 69 of 131

338        SUN INDALEX FINANCE  *v.*  UNITED STEELWORKERS    *Cromwell J.*        [2013] 1 S.C.R.

"due" and that this strengthened the interpretation of "accrued" as an obligation fully constituted but not yet payable. Similarly in s. 57(4), the word "accrued" is used in contrast to the word "due".

[144]    Given my understanding of the ordinary meaning of the word "accrued", I must respectfully disagree with my colleague, Justice Deschamps' position that the wind-up deficiency can be said to have "accrued" to the date of wind up. In her view, "[s]ince the employees cease to accumulate entitlements when the plan is wound up, the entitlements that are used to calculate the contributions have all been accumulated before the wind-up date" (para. 34) and "no new liabilities accrue at the time of or after the wind up" (para. 36). My colleague maintains that "[t]he fact that the precise amount of the contribution is not determined as of the time of the wind up does not make it a contingent contribution that cannot have accrued for accounting purposes" (para. 37, referring to *Canadian Pacific Ltd. v. M.N.R.* (1998), 41 O.R. (3d) 606 (C.A.)).

[145]    I cannot agree that no new liability accrues on or after the wind up. As discussed in more detail earlier, the wind-up deficiency in s. 75(1)(b) is made up of the difference between the plan's assets and liabilities calculated as of the date of wind up. On wind up, the *PBA* accords statutory entitlements and protections to employees that would not otherwise be available: Kaplan, at p. 532. Wind up therefore gives rise to new liabilities. In particular, on wind up, and only on wind up, plan beneficiaries are entitled, under s. 74, to make elections regarding the payment of their benefits. The plan's liabilities cannot be determined until those elections are made. Contrary to what my colleague Justice Deschamps suggests, the extent of the wind-up deficiency depends on employee rights that arise only upon wind up and with respect to which employees make elections only after wind up.

juge Duff fait remarquer que le terme « *accrued* » (par opposition à « *due* ») est employé dans les obligations et les débentures, ce qui confirme l'interprétation selon laquelle « *accrued* » renvoie à une obligation entièrement constituée, mais dont l'exécution n'est pas encore exigible. De même, au par. 57(4), le terme « accumulées » [« *accrued* »] est utilisé par opposition à « dues ».

[144]    Selon ce que j'estime être le sens ordinaire du mot « accumulé » (en anglais, « *accrued* ») et sauf le respect que je porte à la juge Deschamps, je ne crois pas que l'on puisse considérer que le déficit de liquidation était « accumulé » à la date de la liquidation. De l'avis de ma collègue, « [p]uisque les employés cessent d'accumuler des droits lorsque le régime est liquidé, les droits qui servent au calcul des cotisations ont tous été accumulés avant la date de la liquidation » (par. 34) et « aucun passif ne s'accumule pendant ni après la liquidation » (par. 36). Pour elle, « [l]e fait que le montant précis des cotisations n'est pas établi au moment de la liquidation ne confère pas aux cotisations un caractère éventuel qui ferait en sorte qu'elles ne seraient pas accumulées d'un point de vue comptable » (par. 37, citant *Canadian Pacific Ltd. c. M.N.R.* (1998), 41 O.R. (3d) 606 (C.A.)).

[145]    Je ne saurais convenir qu'aucune obligation ne s'accumule pendant ou après la liquidation. Comme je le précise précédemment, le déficit de liquidation s'entend à l'al. 75(1)b) de la différence entre l'actif du régime et son passif calculé à la date de la liquidation. En cas de liquidation, la *LRR* confère aux employés des droits et des garanties dont ils ne bénéficieraient pas en d'autres circonstances (Kaplan, p. 532). La liquidation impose donc des obligations nouvelles à l'employeur. Plus particulièrement, en cas de liquidation, et seulement dans ce cas, l'art. 74 permet aux bénéficiaires de faire des choix quant au paiement de leurs prestations. Le passif du régime ne peut être établi avant ces choix. Contrairement à ce que laisse entendre ma collègue la juge Deschamps, le montant du déficit de liquidation dépend de droits qui ne prennent naissance qu'à la liquidation et à l'égard desquels les employés ne font des choix qu'après la liquidation.

[146]    Moreover, the wind-up deficiency will vary after wind up because the amount of money necessary to provide for the payment of the plan sponsor's liabilities will vary with the market. Section 31 of the *PBA* Regulations allows s. 75 payments to be spaced out over the course of five years. As we have seen, the amount of the wind-up deficiency will fluctuate over this period (I set out earlier how this amount in fact fluctuated markedly in the case of the salaried plan in issue here). Thus, while estimates are periodically made and reported after the wind up to determine how much the employer needs to pay, the precise amount of the wind-up deficiency is not ascertained or ascertainable on the date of the wind up.

[147]    I turn next to the ordinary and grammatical sense of the words "to the date of the wind up" in s. 57(4). In my view, these words indicate that only those contributions that accrue before the date of wind up, and not those amounts the liability for which arises only on the day of wind up — that is, the wind-up deficiency — are included.

[148]    Where the legislature intends to include the date of wind up, it has used suitable language to effect that purpose. For example, the English version of a provision amending the *PBA* in 2010 (c. 24, s. 21(2)), s. 68(2)(c), indicates which trade unions are entitled to notice of the wind up:

**68.** . . .

(2) If the employer or the administrator, as the case may be, intends to wind up the pension plan, the administrator shall give written notice of the intended wind up to,

.    .    .

(c)    each trade union that represents members of the pension plan or that, <u>on the date of the wind up</u>, represented the members, former members or retired members of the pension plan;

[146]    En outre, le déficit de liquidation diffère après la liquidation puisque la somme à verser pour acquitter les obligations du promoteur du régime dépend du marché. L'article 31 du règlement de la *LRR* permet de répartir sur cinq ans les versements exigés à l'art. 75. Rappelons que le montant du déficit de liquidation fluctuera au cours de cette période (j'ai déjà fait état de la manière dont il a considérablement varié dans le cas du régime des salariés visé en l'espèce). C'est pourquoi, malgré les estimations effectuées périodiquement après la liquidation pour déterminer le montant que l'employeur doit verser, le montant du déficit de liquidation n'est ni déterminé ni déterminable à la date de la liquidation.

[147]    J'examine maintenant le sens ordinaire et grammatical des mots « à la date de la liquidation » (en anglais, « *to the date of the wind up* ») employés au par. 57(4). À mon avis, cette expression fait en sorte que seules sont visées les cotisations accumulées avant la date de la liquidation, et non les sommes qui font l'objet d'une obligation qui ne prend naissance que le jour de la liquidation (en anglais, « *on the date of the wind up* ») et qui correspondent au déficit de liquidation.

[148]    Si l'intention du législateur avait été d'englober la date de la liquidation, il aurait employé le libellé voulu. Par exemple, l'al. 68(2)c) de la *LRR*, modifié en 2010 (ch. 24, par. 21(2)), précise dans sa version anglaise quels syndicats doivent recevoir avis de la liquidation :

**68.** . . .

(2) *If the employer or the administrator, as the case may be, intends to wind up the pension plan, the administrator shall give written notice of the intended wind up to,*

.    .    .

(c)    *each trade union that represents members of the pension plan or that, <u>on the date of the wind up</u>* [à la date de la liquidation]*, represented the members, former members or retired members of the pension plan*;

In contrast to the phrase "to the date of wind up", "on the date of wind up" clearly includes the date of wind up. (The French version does not indicate a different intention.) Similarly, s. 70(6), which formed part of the *PBA* until 2012 (rep. S.O. 2010, c. 9, s. 52(5)), read as follows:

**70.** . . .

(6) On the partial wind up of a pension plan, members, former members and other persons entitled to benefits under the pension plan shall have rights and benefits that are not less than the rights and benefits they would have on a full wind up of the pension plan <u>on the effective date of the partial wind up</u>.

The words "on the effective date of the partial wind up" indicate that the members are entitled to those benefits from the date of the partial wind up, in the sense that members can claim their benefits beginning on the date of the wind up itself. This is how the legislature expresses itself when it wants to speak of a period of time including a specific date. By comparison, "to the date of the wind up" is devoid of language that would include the actual date of wind up. This conclusion is further supported by the structure of the *PBA* and its legislative history and evolution, to which I will turn shortly.

[149]    To sum up with respect to the ordinary and grammatical meaning of the phrase "accrued to the date of the wind up", the most plausible ordinary and grammatical meaning is that such amounts are fully constituted and precisely ascertained immediately before the date fixed as the date of wind up. Thus, according to the ordinary and grammatical meaning of the words, the wind-up deficiency obligation set out in s. 75(1)(b) has not "<u>accrued</u> to the date of the wind up" as required by s. 57(4). Moreover, the liability for the wind-up deficiency arises where a pension plan is wound up (s. 75(1)(b)) and so it cannot be a liability that "accrued <u>to the date of the wind up</u>" (s. 57(4)).

Contrairement à la formule « *to the date of wind up* », l'expression « *on the date of wind up* » englobe clairement la date de la liquidation. (La version française ne se prête pas à une autre interprétation.) De même, le par. 70(6), qui figurait dans la *LRR* jusqu'en 2012 (abr. L.O. 2010, ch. 9, par. 52(5)), énonce ce qui suit :

**70.** . . .

(6) À la liquidation partielle d'un régime de retraite, les participants, les anciens participants et les autres personnes qui ont droit à des prestations en vertu du régime de retraite ont des droits et prestations qui ne sont pas inférieurs aux droits et prestations qu'ils auraient à la liquidation totale du régime de retraite <u>à la date de prise d'effet de la liquidation partielle [*on the effective date of the partial wind up*]</u>.

Il appert de l'expression anglaise « *on the effective date of the partial wind up* » que les participants ont droit aux prestations à compter de la date de la liquidation partielle, c'est-à-dire qu'ils peuvent les réclamer à compter de la liquidation elle-même. Le législateur s'exprime ainsi lorsqu'il veut qu'une période englobe une date précise. À l'opposé, lorsqu'il dit en anglais « *to the date of the wind up* » (en français, « à la date de la liquidation »), il n'entend pas englober la date où survient la liquidation. Cette conclusion prend en outre appui sur l'architecture de la *LRR*, ainsi que sur son évolution et son historique. J'y reviendrai brièvement.

[149]    Bref, le sens ordinaire et grammatical le plus plausible d'« accumulées à la date [*to the date*] de la liquidation » veut que soient visées les sommes entièrement constituées et déterminées immédiatement avant la date prévue de liquidation. Ainsi, l'obligation liée au déficit de liquidation visé à l'al. 75(1)(b)) n'est donc pas « <u>accumul[é]</u> à la date [*to the date*] de la liquidation » comme l'exige le par. 57(4). De plus, comme cette obligation naît lorsque le régime de retraite est liquidé (al. 75(1)(b)), son objet ne peut donc pas être « accumul[é] <u>à la date de la liquidation</u> » (par. 57(4)).

(b)  *The Scheme of the Act*

[150]    As discussed earlier, s. 57 establishes deemed trusts over funds which must be contributed to a pension plan, including the one in s. 57(4), which is at issue here. It is helpful to consider these deemed trusts in the context of the obligations to pay funds which give rise to them. Specifically, the relationship between the deemed trust provisions in s. 57(3) and (4), on one hand, and s. 75(1), which sets out liabilities on wind up on the other. According to my colleague Justice Deschamps, s. 75(1) "elegantly parallels the wind-up deemed trust provision" (para. 42) such that the deemed trusts must include the wind-up deficiency. I disagree. In my view, the deemed trusts parallel only s. 75(1)(a), which does not relate to the wind-up deficiency. The correspondence between the deemed trusts and s. 75(1)(a), and the absence of any correspondence with s. 75(1)(b), makes it clear that the wind-up deficiency is not covered by the deemed trust provisions.

[151]    I would recall here the difference between the deemed trusts created by s. 57(3) and (4). While a plan is ongoing, there may be payments which the employer is required to, but has failed to make. The s. 57(3) trust applies to these payments because they are "<u>due and not paid</u>". When a plan is wound up, however, there will be payments that are outstanding in the sense that they are fully constituted, but not yet due. This occurs with respect to the so-called stub period referred to earlier. During this stub period, regular and special liabilities will accrue on a daily basis, as provided for in s. 58(1), but may not be due at the time of wind up. While s. 57(3) cannot apply to these payments because they are not yet due, the deemed trust under s. 57(4) applies to these payments because liability for them has "accrued to the date of the wind up" and they are "<u>not yet due</u>".

[152]    The important point is how these two deemed trust provisions relate to the wind-up liabilities as described in ss. 75(1)(a) and 75(1)(b).

b)  *Le régime de la Loi*

[150]    Je le répète, l'art. 57 dispose que les sommes dues à un régime de retraite sont réputées détenues en fiducie. La disposition applicable en l'espèce est le par. 57(4). Il est utile de se pencher sur ces fiducies réputées en liaison avec les obligations de versement qui les font naître. Plus précisément, il s'agit de considérer la relation entre, d'une part, les fiducies dont l'existence est réputée aux par. 57(3) et (4) et, d'autre part, le par. 75(1), qui prescrit certains versements à la liquidation. Selon ma collègue la juge Deschamps, le libellé du par. 75(1) « fait élégamment écho à celui qui crée la fiducie réputée à la liquidation » (par. 42), de sorte que la fiducie réputée doit englober le déficit de liquidation. Je ne suis pas d'accord. À mon avis, la fiducie réputée ne fait écho qu'à l'al. 75(1)a), lequel ne porte pas sur le déficit de liquidation. Il ressort de la correspondance existant entre les fiducies créées et l'al. 75(1)a), et de l'absence d'une telle correspondance avec l'al. 75(1)b) que le déficit de liquidation ne fait pas l'objet d'une fiducie réputée.

[151]    Je rappelle la différence entre les fiducies réputées des par. 57(3) et (4). Pendant la durée du régime, l'employeur peut omettre d'effectuer les versements auxquels il est tenu. La fiducie créée au par. 57(3) vise ces versements, car il s'agit de sommes « <u>dues et impayées</u> ». Cependant, lorsque le régime est liquidé, des versements demeurent en suspens en ce sens que le droit y afférent est entièrement constitué, mais que les sommes en cause ne sont pas encore dues. La situation se présente pendant la période tampon mentionnée précédemment où les paiements normaux et spéciaux s'accumulent chaque jour conformément au par. 58(1), mais peuvent ne pas être dus au moment de la liquidation. Bien que le par. 57(3) ne puisse s'appliquer à ces paiements parce qu'ils ne sont pas encore dus, la fiducie créée au par. 57(4) les englobe, car l'obligation s'y rapportant s'est « accumulé[e] à la date de la liquidation », mais les sommes en question ne sont « <u>pas encore dues</u> ».

[152]    L'élément important réside dans le rapport entre ces deux dispositions créant une fiducie et les versements exigés aux al. 75(1)a) et 75(1)b) en cas

The two paragraphs refer to sums of money that are different in kind: while s. 75(1)(a) refers to liabilities that accrue before wind up and that are created elsewhere in the Act, s. 75(1)(b) creates a completely new liability that comes into existence only once the plan is wound up. There is no dispute, as I understand it, that these two paragraphs refer to different liabilities and that it is the liability described in s. 75(1)(b) that is the wind-up deficiency in issue here. The parties do not dispute that s. 75(1)(a) does *not* include wind-up deficiency payments.

[153]   It is striking how closely the text of s. 75(1)(a) — which does not relate to the wind-up deficiency — tracks the language of the deemed trust provisions in s. 57(3) and (4). As noted, s. 57(3) deals with "employer contributions due and not paid", while s. 57(4) deals with "employer contributions accrued to the date of the wind up but not yet due". Section 75(1)(a) includes both of these types of employer contributions. It refers to "payments that . . . are due . . . and that have not been paid" (i.e. subject to the deemed trust under s. 57(3)) or that have "accrued and that have not been paid" (i.e. subject to the deemed trust under s. 57(4) to the extent that these payments accrued to the date of wind up). This very close tracking of the language between s. 57(3) and (4) on the one hand and s. 75(1)(a) on the other, and the absence of any correspondence between the language of these deemed trust provisions with s. 75(1)(b), suggests that the s. 57(3) and (4) deemed trusts refer to the liability described in s. 75(1)(a) and not to the wind-up deficiency created by s. 75(1)(b). It is difficult to understand why, if the intention had been for s. 57(4) to capture the wind-up deficiency liability under s. 75(1)(b), the legislature would have so closely tracked the language of s. 75(1)(a) alone in creating the deemed trusts. Thus, in my respectful view, the elegant parallel to which my colleague, Justice Deschamps refers exists only between the deemed trust and s. 75(1)(a), and not between the deemed trust and the wind-up deficiency.

de liquidation. Ces deux alinéas visent des sommes de nature différente. L'alinéa 75(1)a) renvoie au passif accumulé avant la liquidation et qui résulte de l'application d'autres dispositions de la Loi, alors que l'al. 75(1)b) crée un passif entièrement nouveau qui naît seulement une fois le régime liquidé. Nul ne conteste, pour autant que je sache, que les deux alinéas renvoient à des passifs différents et que le déficit de liquidation visé en l'espèce correspond à l'obligation prévue à l'al. 75(1)b). Les parties ne contestent pas que l'al. 75(1)a) *ne* vise *pas* les paiements visant à combler le déficit de liquidation.

[153]   Il est frappant de constater à quel point le libellé de l'al. 75(1)a) — qui ne porte pas sur le déficit de liquidation — s'apparente à celui des par. 57(3) et (4), qui créent des fiducies. Le paragraphe 57(3) vise les « cotisations de l'employeur qui sont dues et impayées », alors que le par. 57(4) a pour objet les « cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues ». Les deux types de cotisations de l'employeur entrent dans le champ d'application de l'al. 75(1)a), lequel renvoie aux « paiements qui [. . .] sont dus [. . .] et qui n'ont pas été versés » (qui sont donc réputés détenus en fiducie suivant le par. 57(3)) ou qui sont « accumulés, et qui n'ont pas été versés » (qui sont donc réputés détenus en fiducie suivant le par. 57(4), dans la mesure où ils sont accumulés à la date de la liquidation). La grande ressemblance du libellé des par. 57(3) et (4), d'une part, et du texte de l'al. 75(1)a), d'autre part, et l'absence de toute correspondance entre le libellé de ces dispositions créant une fiducie et le texte de l'al. 75(1)b) donnent à penser que l'objet des fiducies dont l'existence est réputée aux par. 57(3) et (4) s'entend de l'obligation faite à l'al. 75(1)a), et non du déficit de liquidation visé à l'al. 75(1)b). On comprend difficilement que le législateur, s'il a voulu que l'obligation de combler le déficit de liquidation visé à l'al. 75(1)b) bénéficie de l'application du par. 57(4), ait repris le seul libellé de l'al. 75(1)a) pour créer les fiducies. En toute déférence, si comme le dit ma collègue la juge Deschamps, des libellés se font élégamment écho, ce sont ceux de la fiducie réputée et de l'al. 75(1)a), et non ceux de la fiducie réputée et du déficit de liquidation.

[154]  I conclude that the scheme of the *PBA* reinforces my conclusion that the ordinary grammatical sense of the words in s. 57(4) does not extend to the wind-up deficiency provided for in s. 75(1)(b).

(c)  *Legislative History and Evolution*

[155]  Legislative history and evolution may form an important part of the overall context within which a provision should be interpreted. Legislative evolution refers to the various formulations of the provision while legislative history refers to evidence about the provision's conception, preparation and enactment: see, e.g., *Canada (Canadian Human Rights Commission) v. Canada (Attorney General)*, 2011 SCC 53, [2011] 3 S.C.R. 471, at para. 43.

[156]  Both the legislative evolution and history of the *PBA* show that it was never the legislature's intention to include the wind-up deficiency in the deemed trust. The evolution and history of the *PBA* are rather intricate and sometimes difficult to follow so I will review them briefly here before delving into a more detailed analysis.

[157]  The deemed trust was first introduced into the *PBA* in 1973. At that time, it covered employee contributions held by the employer and employer contributions that were due but not paid. In 1980, the *PBA* was amended so that the deemed trust was expanded to include employer contributions whether they were due or not. Also, new provisions were added allowing for employee elections and requiring additional payments by the employer where a plan was wound up. The 1980 amendments gave rise to confusion on two fronts: first, it was unclear whether the payments that were required on wind up were subject to the deemed trust; second, it was unclear whether a lien over some employer contributions covered the same amount as the deemed trust. In 1983, both these points were clarified. The sections were reworded and rearranged to make it clear that the wind-up deficiency was distinct from the amounts covered by the deemed trust, and that the lien and the

[154]  L'architecture de la *LRR* me conforte dans l'opinion que le sens ordinaire et grammatical des termes qui y sont employés n'emporte pas l'application du par. 57(4) au déficit de liquidation visé à l'al. 75(1)b).

c)  *L'évolution et l'historique législatifs*

[155]  L'évolution et l'historique législatifs peuvent constituer un élément important du contexte global dans lequel une disposition législative doit être interprétée. L'évolution législative s'entend des diverses formulations successives du texte de loi, alors que l'historique législatif s'entend des éléments touchant à sa conception, à son élaboration et à son adoption (voir, p. ex., *Canada (Commission canadienne des droits de la personne) c. Canada (Procureur général)*, 2011 CSC 53, [2011] 3 R.C.S. 471, par. 43).

[156]  Il appert tant de l'évolution de la *LRR* que de son historique que le législateur n'a jamais voulu que le déficit de liquidation fasse l'objet de la fiducie réputée. L'évolution et l'historique de la *LRR* étant plutôt complexes et parfois difficiles à suivre, je les examine brièvement avant de me livrer à une analyse plus approfondie.

[157]  La fiducie réputée a fait son apparition dans la *LRR* en 1973. À cette époque, elle visait les cotisations des salariés que détenait l'employeur et les cotisations de l'employeur qui étaient dues, mais impayées. En 1980, la *LRR* a été modifiée de sorte que la fiducie réputée englobe toutes les cotisations de l'employeur, qu'elles soient dues ou non. En outre, de nouvelles dispositions permettaient aux salariés de faire des choix et exigeaient des versements supplémentaires de l'employeur lorsque le régime était liquidé. La réforme de 1980 a créé de l'incertitude sous deux rapports. Premièrement, on se demandait si les versements requis à la liquidation faisaient l'objet de la fiducie réputée et, deuxièmement, si certaines cotisations de l'employeur faisaient l'objet d'un privilège à raison du montant visé par la fiducie réputée. En 1983, ces deux points ont été clarifiés. Les articles ont été remaniés et leur libellé reformulé afin de préciser que le déficit de liquidation était distinct des

deemed trust covered the same amount. A statement by the responsible Minister in 1982 confirms that *the deemed trusts were never intended to cover the wind-up deficiency*.

[158]    My colleague, Justice Deschamps maintains that this history suggests an evolution in the intention of the legislature from protecting "only the service contributions that were due . . . to all amounts due and accrued upon wind up" (para. 42). I respectfully disagree. In my view, the history and evolution of the *PBA* leading up to and including 1983 show that the legislature never intended to include the wind-up deficiency in the deemed trust. Moreover, legislative evolution after 1983 confirms that this intention did not change.

### (i)    *The Pension Benefits Amendment Act, 1973*, S.O. 1973, c. 113

[159]    So far as I can determine, statutory deemed trusts were first introduced into the *PBA* by *The Pension Benefits Amendment Act, 1973*, S.O. 1973, c. 113, s. 6. Those amendments created deemed trusts over two amounts: employee pension contributions received by employers (s. 23*a*(1), similar to the deemed trust in the current s. 57(1)) and employer contributions that had fallen due under the plan (s. 23*a*(3), similar to the current s. 57(3) deemed trust for employer contributions "due and not paid"). The full text of these provisions and those referred to below, up to the current version of the 1990 Act, are found in the Appendix.

### (ii)    *The Pension Benefits Amendment Act, 1980*, S.O. 1980, c. 80

[160]    Ontario undertook significant pension reform leading to *The Pension Benefits Amendment Act, 1980*, S.O. 1980, c. 80; see Kaplan, at pp. 54-56. I will concentrate on the deemed trust provisions and how they related to the liabilities on

sommes réputées détenues en fiducie, et que le privilège et la fiducie réputée portaient sur un même montant. En 1982, le ministre responsable a confirmé que *la fiducie réputée n'a jamais été censée s'appliquer au déficit de liquidation*.

[158]    Pour ma collègue la juge Deschamps, cet historique reflèterait l'évolution de l'intention du législateur que d'abord la protection couvre d'abord « uniquement les cotisations dues [puis s'étende à tous] les montants dus ou accumulés à la liquidation » (par. 42). Soit dit en tout respect, je ne suis pas d'accord. À mon avis, l'historique et l'évolution de la *LRR* jusqu'en 1983 inclusivement montrent que le législateur n'a jamais voulu que le déficit de liquidation fasse l'objet de la fiducie réputée. Qui plus est, il appert de l'évolution de la *LLR* postérieure à 1983 que cette intention demeure inchangée.

### (i)    *The Pension Benefits Amendment Act, 1973*, S.O. 1973, ch. 113

[159]    Aussi loin que je puisse remonter, la fiducie réputée a vu le jour dans la *LRR* par suite de l'adoption de la *Pension Benefits Amendment Act, 1973*, S.O. 1973, ch. 113, art. 6. L'existence d'une fiducie a été réputée à l'égard, d'une part, des cotisations des salariés au régime de retraite touchées par les employeurs (par. 23*a*(1), ce qui s'apparente à la fiducie prévue au par. 57(1) actuel) et, d'autre part, des cotisations de l'employeur devenues exigibles aux termes du régime (par. 23*a*(3), ce qui s'apparente aux cotisations de l'employeur « qui sont dues et impayées » et qui sont réputées détenues en fiducie en application du par. 57(3) actuel). Le texte intégral de ces dispositions et de celles mentionnées ci-après, jusqu'à la version actuelle datant de 1990, figure en annexe.

### (ii)    *The Pension Benefits Amendment Act, 1980*, S.O. 1980, ch. 80

[160]    L'Ontario a entrepris une réforme majeure des régimes de retraite qui a débouché sur l'adoption de la *Pension Benefits Amendment Act, 1980*, S.O. 1980, ch. 80 (voir Kaplan, p. 54-56). Je m'attacherai aux dispositions sur la fiducie réputée et à

wind up and, for ease of reference, I will refer to the sections as they were renumbered in the 1980 consolidation: R.S.O. 1980, c. 373. The 1980 legislation expanded the deemed trust relating to employer contributions. Although far from clear, the new provisions appear to have created a deemed trust and lien over the employer contributions whether otherwise payable or not and calculated as if the plan had been wound up on the relevant date.

[161]   It was unclear after the reforms of 1980 whether the deemed trust applied to all employer contributions that arose on wind up. According to s. 23(4), on any given date, the trust extended to an amount to be determined "as if the plan had been wound up on that date". However, the provisions of the 1980 version of the Act did not explicitly state what such a calculation would include. Under s. 21(2) of the 1980 statute, the employer was obligated to pay on wind up "all amounts that would otherwise have been required to be paid to meet the tests for solvency . . . , up to the date of such termination or winding up". Under s. 32, however, the employer had to make a payment on wind up that was to be "[i]n addition" to that due under s. 21(2). Whether the legislature intended that the trust should cover this latter payment was left unclear.

[162]   It was also unclear whether the lien applied to a different amount than was subject to the deemed trust. According to s. 23(3), "the members have a lien upon the assets of the employer in such amount that in the ordinary course of business would be entered into the books of account whether so entered or not". This comes in the middle of two portions of the provision which explicitly refer to the deemed trust, but it is not clear whether the legislature intended to refer to the same amount throughout the provision.

leur interaction avec le passif issu de la liquidation. Pour faciliter la consultation, je renvoie aux dispositions selon leur nouvelle numérotation datant de la refonte de 1980 (R.S.O. 1980, ch. 373). La loi de 1980 a accru la portée de la fiducie réputée quant aux cotisations de l'employeur. Même si elles ne sont pas du tout claires, les nouvelles dispositions semblent faire en sorte que les cotisations de l'employeur, qu'elles soient exigibles ou non, dont le montant est établi comme si le régime avait été liquidé à la date considérée, fassent l'objet d'une fiducie réputée et d'un privilège.

[161]   Après la réforme de 1980, l'incertitude persistait quant à savoir si la fiducie réputée visait toutes les cotisations exigibles de l'employeur une fois le régime liquidé. Suivant le par. 23(4), était détenu en fiducie, à une date donnée, un montant devant être déterminé [TRADUCTION] « comme si le régime avait été liquidé à cette date ». Or, les dispositions de 1980 ne précisaient pas expressément les éléments à inclure dans ce calcul. Aux termes du par. 21(2) de la loi de 1980, à la liquidation, l'employeur était tenu de verser « les sommes dont le versement aurait été par ailleurs requis pour satisfaire aux critères de solvabilité [. . .] jusqu'à la date de la cessation ou de la liquidation du régime ». L'article 32 disposait cependant que, à la liquidation, l'employeur effectuait un versement « [e]n plus » de celui exigé au par. 21(2). Restait à savoir si l'intention du législateur était que ce dernier paiement soit détenu en fiducie.

[162]   Il n'était pas clair non plus que l'objet du privilège était le même que celui de la fiducie réputée. Suivant le par. 23(3), [TRADUCTION] « les participants ont un privilège sur l'actif de l'employeur à raison du montant qui, dans le cours normal des affaires, serait consigné dans les livres de comptes, qu'il y soit consigné ou non ». Ce passage figure entre deux parties de la disposition qui renvoient expressément à la fiducie réputée, mais l'intention du législateur demeure incertaine quant à savoir si c'est le même montant qui est visé chaque fois.

(iii)  *The Pension Benefits Amendment Act, 1983*, S.O. 1983, c. 2

[163]    The 1983 amendments substantially clarified the scope of the deemed trust and lien for employer contributions. They make clear that neither the deemed trust nor the lien applied to the wind-up deficiency; the responsible Minister confirmed that this was the intention of the amendments.

[164]    The new provision was amended by s. 3 of the 1983 amendments and is found in s. 23(4) which provided:

**23.** . . .

(4) An employer who is required by a pension plan to contribute to the pension plan shall be deemed to hold in trust for the members of the pension plan an amount of money equal to the total of,

(a)    all moneys that the employer is required to pay into the pension plan to meet,

(i)    the current service cost, and

(ii)    the special payments prescribed by the regulations,

that are due under the pension plan or the regulations and have not been paid into the pension plan; and

(b)    where the pension plan is terminated or wound up, any other money that the employer is liable to pay under clause 21 (2) (a).

Section 21(2)(a) provides that on wind up, the employers must pay an amount equal to *the current service cost and the special payments* that "have accrued to and including the date of the termination winding up but, under the terms of the pension plan or the regulations, are not due on that date"; the provision adds that these amounts shall be deemed to accrue on a daily basis. These provisions make it clear that the s. 23(4) deemed trust applies only to the special payments and current service costs that have accrued, on a daily basis, up to and including

(iii)  *The Pension Benefits Amendment Act, 1983*, S.O. 1983, ch. 2

[163]    Les modifications de 1983 ont considérablement précisé la portée de la fiducie réputée et du privilège et elles ont circonscrit les cotisations de l'employeur qui en faisaient l'objet. Il en ressort que ni la fiducie réputée ni le privilège n'ont pour objet le déficit de liquidation; le ministre responsable a confirmé que telle était l'intention du législateur en apportant les modifications.

[164]    La nouvelle disposition a été modifiée par l'art. 3 de la loi de 1983 pour devenir le par. 23(4), lequel disposait dès lors ce qui suit :

[TRADUCTION]

**23.** . . .

(4) L'employeur qui, dans le cadre d'un régime de retraite, est tenu de cotiser à ce régime est réputé détenir en fiducie pour le compte des participants du régime une somme égale au total

(a)    de toutes les sommes que l'employeur est tenu de verser au régime pour acquitter

(i)    le coût du service courant et

(ii)    les paiements spéciaux prescrits par règlement,

qui sont dus aux termes du régime ou du règlement, et qui n'ont pas été versés;

(b)    lors de la cessation ou de la liquidation du régime, toute autre somme que l'employeur est tenu de payer en vertu de l'alinéa 21 (2) a).

Suivant l'alinéa 21(2)a), l'employeur est tenu, lors de la liquidation, de verser un montant égal au *coût du service courant et aux paiements spéciaux* qui [TRADUCTION] « sont accumulés à la date de la cessation ou de la liquidation, celle-ci comprise, mais qui, suivant les conditions du régime et le libellé du règlement, ne sont pas encore dus ». La disposition prévoit en outre que ces postes sont réputés s'accumuler sur une base quotidienne. Il est donc clair, suivant le par. 23(4), que seuls sont détenus en fiducie les paiements spéciaux et le coût

the date of wind up. The deemed trust clearly does not extend to the wind-up deficiency.

[165]    The provision referring to the additional payments required on wind up also makes clear that those payments are not within the scope of the deemed trust. These additional liabilities were described by s. 32, a provision very similar to s. 75(1)(b). These amounts are first, the amount guaranteed by the Guarantee Fund and, second, the value of pension benefits vested under the plan that exceed the value of the assets of the plan. Section 32(2) specifies that these amounts *are* "in addition to the amounts that the employer is liable to pay under subsection 21 (2)" (which are the payments comparable to the current s. 75(1)(a) payments) and that *only the latter* fall within the deemed trust. The inevitable conclusion is that, in 1983, the wind-up deficiency was not included in the scope of the deemed trust.

[166]    The 1983 amendments also clarified the scope of the lien. They indicated that the scope of the lien was identical to the scope of the deemed trust. Section 23(5) specified that the lien extended only to the amounts that were deemed to be held in trust under s. 23(4) (i.e. the *current service costs and special payments that had accrued to and including the date of the wind up but are not yet due*).

[167]    This makes two things clear: that the lien covers the same amounts as the deemed trust, and that neither covers the wind-up deficiency.

[168]    A brief, but significant piece of legislative history seems to me to dispel any possible doubt. In speaking at first reading of the 1983 amendments, the Minister responsible, the Honourable Robert Elgie said this:

    The first group of today's amendments makes up the housekeeping changes needed for us to do what we set out to do in late 1980; that is, to guarantee pension benefits following the windup of a defined pension

du service courant qui sont accumulés, sur une base quotidienne, jusqu'à la date de la liquidation, celle-ci comprise. Le déficit de liquidation ne fait manifestement pas l'objet de la fiducie réputée.

[165]    La disposition relative au versement supplémentaire exigé à la liquidation établit aussi clairement que ce versement n'est pas réputé détenu en fiducie. Le montant de ce versement supplémentaire est précisé à l'art. 32, dont le libellé est très semblable à celui de l'al. 75(1)b). Il s'agit premièrement de la somme garantie par le Fonds de garantie et, deuxièmement, de l'excédent des prestations de retraite acquises en vertu du régime sur l'actif du régime. Le paragraphe 32(2) dispose que le versement exigé de l'employeur *s'ajoute* à celui exigé au par. 21(2) (lequel s'apparente à celui que vise l'actuel al. 75(1)a) et donc que *seul ce dernier* est réputé détenu en fiducie. Force est de conclure que, en 1983, le déficit de liquidation échappait à la fiducie réputée.

[166]    Les modifications de 1983 ont également clarifié la portée du privilège en précisant qu'elle était identique à celle de la fiducie réputée. Le paragraphe 23(5) précisait que le privilège ne valait que pour les sommes réputées détenues en fiducie suivant le par. 23(4) (à savoir le *coût du service courant et les paiements spéciaux accumulés à la date de la liquidation, celle-ci comprise, mais qui ne sont pas encore dus*).

[167]    Deux choses sont donc claires. L'objet du privilège et de la fiducie réputée est le même et il exclut le déficit de liquidation.

[168]    L'historique législatif renferme un passage bref mais important qui me paraît dissiper tout doute éventuel à cet égard. Lors de la première lecture du projet de modification de 1983, le ministre responsable, l'honorable Robert Elgie, a déclaré ce qui suit :

    [TRADUCTION] La première série de modifications examinée aujourd'hui apporte les changements administratifs nécessaires pour atteindre l'objectif que nous avons fixé vers la fin de 1980,

benefit plan. These amendments will clarify the ways in which we can attain that goal.

In Bill 214 [i.e. the 1980 amendments] the employees were given a lien on the employer's assets for employee contributions to a pension plan collected by the employer, as well as accrued employer contributions. . . .

Unfortunately, this protection has resulted in different legal interpretations on the extent of the lien. An argument has been advanced that the amount of the lien includes an employer's potential future liability on the windup of a pension plan. This was never intended and is not necessary to provide the required protection. The amendment to section 23 clarifies the intent of Bill 214. [Emphasis added.]

(Ontario (Hansard), No. 99, 2nd Sess., 32nd Parl., July 7, 1982, p. 3568)

The 1983 amendments made the scope of the lien correspond precisely to the scope of the deemed trust over the employer's accrued contributions. It is thus clear from this statement that it was never the legislative intention that either should apply to "an employer's potential future liability" on wind up (i.e. the wind-up deficiency). In 1983, there is therefore, in my view, virtually irrefutable evidence of legislative intent to do exactly the opposite of what the Court of Appeal held in this case had been done.

[169]    Subsequent legislative evolution shows no change in this legislative intent. In fact, subsequent amendments demonstrate a clear legislative intent to exclude from the deemed trust employer liabilities that arise only upon wind up of the plan.

(iv)  *Pension Benefits Act, 1987*, S.O. 1987, c. 35

[170]    Amendments to the *PBA* in 1987 resulted in it being substantially in its current form. With those amendments, the extent of the deemed trusts was further clarified. The provision in the 1983

version of the Act combined within a single subsection a deemed trust for employer contributions that were due and not paid (s. 23(4)(a)) and employer contributions that had accrued to and including the date of wind up but which were not yet due (s. 23(4)(b), referring to s. 21(2)(a)). In the 1987 amendments, these two trusts were each given their own subsection and their scope was further clarified. Moreover, after the 1987 revision, one no longer had to refer to a separate provision (formerly s. 21(2)(a)) to determine the scope of the trust covering payments that were accrued but not yet due. Thus, while the substance of the provisions did not change in 1987, their form was simplified.

[171]    The new s. 58(3) (which is exactly the same as the current s. 57(3)) replaced the former s. 23(4)(a). This created a trust for employer contributions due and not paid. Section 58(4) (which is exactly the same as s. 57(4) as it stood at the time) replaced the former s. 23(4)(b) and part of s. 21(2)(a) and created a trust that arises on wind up and covers "employer contributions accrued to the date of the wind up but not yet due".

[172]    The 1987 amendment also shows that the legislature adverted to the difference between "to the date of the wind up" and "to and including" the date of wind up and chose the former. This is reflected in a small but significant change in the wording of the relevant provisions. The former provision, s. 23(4)(b), by referring to s. 21(2)(a) captured current service costs and special payments that "have accrued to and including the date of the termination or winding up." The new version in s. 58(4) deletes the words "and including", putting the section in its present form. This deletion, to my way of thinking, reinforces the legislative intent to *exclude* from the deemed trust liabilities that arise only *on* the date of wind up. Respectfully, the legislative record does not support Deschamps J.'s view that there was a legislative evolution towards a more expanded deemed trust. Quite the opposite.

un même paragraphe créait une fiducie réputée pour les cotisations de l'employeur qui étaient dues mais impayées (al. 23(4)a)) et une autre pour les cotisations de l'employeur qui étaient accumulées jusqu'à la date de la liquidation, celle-ci comprise, mais qui n'étaient pas encore dues (al. 23(4)b), qui renvoyait à l'al. 21(2)a)). Dès 1987, les deux fiducies ont fait l'objet de paragraphes distincts et leur portée a été davantage circonscrite. En outre, après la réforme de 1987, il n'était plus nécessaire de renvoyer à une autre disposition (l'ancien al. 21(2)a)) pour déterminer la portée de la fiducie créée pour les paiements accumulés, mais non encore dus. Par conséquent, si le fond des dispositions n'a pas été modifié en 1987, leur forme a été simplifiée.

[171]    Le nouveau par. 58(3) (identique au par. 57(3) actuel) a remplacé l'ancien al. 23(4)a), lequel créait une fiducie pour les cotisations de l'employeur dues mais impayées. Le paragraphe 58(4) (identique au par. 57(4) actuel) a remplacé l'ancien al. 23(4)b) et, en partie, l'al. 21(2)a), et dispose que, dès la liquidation, les « cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues » sont détenues en fiducie.

[172]    La modification de 1987 montre également que le législateur était conscient de la différence entre « à la date de la liquidation » et « à la date [de la liquidation], celle-ci comprise » et qu'il a choisi la première formule. C'est ce qui appert d'un changement léger, mais important, apporté au libellé des dispositions en cause. L'ancienne disposition, l'al. 23(4)b), par son renvoi à l'al. 21(2)a), englobait le coût du service courant et les paiements spéciaux [TRADUCTION] « accumulés à la date de cessation ou de liquidation, celle-ci comprise ». Dans la nouvelle disposition, le par. 58(4), les mots « celle-ci comprise » sont supprimés pour donner le libellé actuel. À mon sens, cette suppression appuie l'intention du législateur d'*exclure* du champ d'application de la fiducie réputée les obligations qui naissent seulement *à la* date même de la liquidation. En toute déférence, l'historique législatif n'étaye pas le point de vue de ma collègue la juge Deschamps selon lequel il y aurait eu, au fil de l'évolution législative, accroissement de la portée de la fiducie réputée. C'est plutôt le contraire.

[173]    To sum up, I draw the following conclusions from this review of the legislative evolution and history. The legislation differentiates between two types of employer liability relevant to this case. The first is the contributions required to cover current service costs and any other payments that are either due or have accrued on a daily basis up to the relevant time. These are the payments referred to in the current s. 75(1)(a), that is, payments due or accrued but not paid. The second relates to additional contributions required when a plan is wound up which I have referred to as the wind-up deficiency. These payments are addressed in s. 75(1)(b). The legislative history and evolution show that the deemed trusts under s. 57(3) and (4) were intended to apply only to the former amounts and that it was never the intention that there should be a deemed trust or a lien with respect to an employer's potential future liabilities that arise once the plan is wound up.

(d)  *The Purpose of the Legislation*

[174]    Excluding the wind-up deficiency from the deemed trust is consistent with the broader purposes of the legislation. Pension legislation aims at important protective purposes. These protective purposes, however, are not pursued at all costs and are clearly intended to be balanced with other important interests within the context of a carefully calibrated scheme: *Monsanto Canada Inc. v. Ontario (Superintendent of Financial Services)*, 2004 SCC 54, [2004] 3 S.C.R. 152, at paras. 13-14.

[175]    In this instance, the legislature has created trusts over contributions that were due or accrued to the date of the wind up in order to protect, to some degree, the rights of pension plan beneficiaries and employees from the claims of the employer's other creditors. However, there is also good reason to think that the legislature had in mind other competing objectives in not extending the deemed trust to the wind-up deficiency.

[173]    En résumé, voici ce que je conclus de l'évolution et de l'historique législatifs. La loi établit une distinction entre deux types d'obligation de l'employeur qui sont pertinents en l'espèce. Il y a d'une part les cotisations requises pour acquitter le coût du service courant et d'autres paiements qui sont dus ou qui sont accumulés sur une base quotidienne jusqu'à la date considérée. Il s'agit des paiements prévus à l'actuel al. 75(1)a), à savoir les paiements qui sont dus ou accumulés, mais qui n'ont pas été versés. Et d'autre part, il y a les cotisations supplémentaires exigées lorsque le régime est liquidé (ou, comme j'y renvoie précédemment, le déficit de liquidation). Ces paiements font l'objet de l'al. 75(1)b). Il appert de l'évolution et de l'historique législatifs que les fiducies réputées des par. 57(3) et (4) devaient seulement englober les cotisations du premier type et que le législateur n'a jamais voulu que les obligations ultérieures de l'employeur qui naissent une fois le régime liquidé fassent l'objet d'une fiducie réputée ou d'un privilège.

d)  *L'objet de la loi*

[174]    L'exclusion du déficit de liquidation de la fiducie réputée est conforme aux objectifs généraux de la loi. Les dispositions sur les régimes de retraite ont une importante vocation de protection. Or, le législateur n'entend pas atteindre son objectif de protection à n'importe quel prix, son intention étant clairement de le mettre en balance avec d'autres intérêts importants dans le cadre d'un régime soigneusement conçu (*Monsanto Canada Inc. c. Ontario (Surintendant des services financiers)*, 2004 CSC 54, [2004] 3 R.C.S. 152, par. 13-14).

[175]    Dans le cas qui nous intéresse, le législateur a créé des fiducies à l'égard des cotisations qui sont dues ou accumulées à la date de la liquidation afin de protéger, dans une certaine mesure, les droits des bénéficiaires d'un régime de retraite et ceux des employés contre les réclamations des autres créanciers de l'employeur. Or, il y a de bonnes raisons de penser que c'est en raison d'autres objectifs concurrents que le législateur s'est abstenu d'accroître la portée de la fiducie réputée et d'y inclure le déficit de liquidation.

[176]    First, if there were to be a deemed trust over all employer liabilities that arise when a plan is wound up, much simpler and clearer words could readily be found to achieve that objective.

[177]    Second, extending the deemed trust protections to the wind-up deficiency might well be viewed as counter-productive in the greater scheme of things. A deemed trust of that nature might give rise to considerable uncertainty on the part of other creditors and potential lenders. This uncertainty might not only complicate creditors' rights, but it might also affect the availability of funds from lenders. The wind-up liability is potentially large and, while the business is ongoing, the extent of the liability is unknown and unknowable for up to five years. Its amount may, as the facts of this case disclose, fluctuate dramatically during this time. A liability of this nature could make it very difficult to assess the creditworthiness of a borrower and make an appropriate apportionment of payment among creditors extremely difficult.

[178]    While I agree that the protection of pension plans is an important objective, it is not for this Court to decide the extent to which that objective will be pursued and at what cost to other interests. In her conclusion, Justice Deschamps notes that although the protection of pension plans is a worthy objective, courts should not use the law of equity to re-arrange the priorities that Parliament has established under the *CCAA*. This is a matter of policy where courts must defer to legislatures (reasons of Justice Deschamps, at para. 82). In my view, my colleague's comments on this point are equally applicable to the policy decisions reflected in the text of the *PBA*. The decision as to the level of protection that should be provided to pension beneficiaries is one to be left to the Ontario legislature. Faced with the language in the *PBA*, I would be slow to infer that the broader protective purpose, with all its potential disadvantages, was intended.

[176]    Premièrement, si le législateur avait voulu créer une fiducie applicable à la totalité des obligations de l'employeur qui découlent de la liquidation d'un régime, il lui aurait été aisé de s'exprimer beaucoup plus simplement et clairement.

[177]    Deuxièmement, si on considère la situation avec un certain recul, il pourrait fort bien être néfaste de protéger le déficit de liquidation au moyen de la fiducie réputée. Il pourrait en effet en résulter une grande incertitude pour les autres créanciers et prêteurs éventuels, une incertitude qui pourrait non seulement compliquer l'exercice des droits des créanciers, mais aussi compromettre l'accès d'une entreprise en difficulté aux fonds des prêteurs. L'ampleur des obligations à la liquidation peut être considérable et, lorsque l'entreprise demeure en exploitation, on ne peut savoir quelle sera cette ampleur sur une période de cinq ans. Le quantum de ces obligations peut, comme le montrent les faits de la présente espèce, fluctuer radicalement pendant cet intervalle. De telles obligations peuvent rendre très difficile l'évaluation de la solvabilité de l'emprunteur et plus difficile encore la juste répartition des paiements entre les créanciers.

[178]    Je conviens certes que la protection des régimes de retraite constitue un objectif important, mais il n'appartient pas à la Cour de décider de la mesure dans laquelle cet objectif sera poursuivi ou d'autres intérêts en souffriront. Dans sa conclusion, la juge Deschamps souligne que même si la protection des régimes de retraite constitue un objectif valable, les tribunaux ne doivent pas recourir à l'equity pour modifier les priorités du législateur qui sous-tendent la *LACC*. Il s'agit d'une question de politique générale, et les tribunaux doivent déférer à la décision du législateur (motifs de la juge Deschamps, par. 82). À mon avis, les propos de ma collègue sur ce point valent également pour les décisions de politique générale qui sous-tendent le texte de la *LRR*. Il appartient à l'Assemblée législative de l'Ontario de décider du degré de protection qu'il convient d'accorder aux bénéficiaires d'un régime de retraite. Au vu du

In short, the interpretation I would adopt is consistent with a balanced approach to protection of benefits which the legislature intended.

[179]   For these reasons, I am of the respectful view that the Court of Appeal erred in finding that the s. 57(4) deemed trust applied to the wind-up deficiency.

B. *Second Issue: Did the Court of Appeal Err in Finding That Indalex Breached the Fiduciary Duties it Owed to the Pension Beneficiaries as the Plans' Administrator and in Imposing a Constructive Trust as a Remedy?*

(1)  Introduction

[180]   The Court of Appeal found that during the *CCAA* proceedings Indalex breached its fiduciary obligations as administrator of the pension plans: para. 116. As a remedy, it imposed a remedial constructive trust over the reserve fund, effectively giving the plan beneficiaries recovery of 100 cents on the dollar in priority to all other creditors, including creditors entitled to the super priority ordered by the *CCAA* court.

[181]   The breaches identified by the Court of Appeal fall into three categories. First, Indalex breached the prohibition against a fiduciary being in a position of conflict of interest because its interests in dealing with its insolvency conflicted with its duties as plan administrator to act in the best interests of the plans' members and beneficiaries: para. 142. According to the Court of Appeal, the simple fact that Indalex found itself in this position of conflict of interest was, of itself, a breach of its fiduciary duty as plan administrator. Second, Indalex breached its fiduciary duty by applying, without notice to the plans' beneficiaries, for *CCAA* protection: para. 139. Third, Indalex

libellé de la *LRR*, j'hésite à inférer que le législateur a voulu conférer une vaste protection avec tous les inconvénients que cela pouvait comporter. En somme, l'interprétation que je préconise s'accorde avec l'approche équilibrée du législateur dans la protection du droit à des prestations.

[179]   C'est pourquoi j'estime que la Cour d'appel a tort de conclure que la fiducie réputée du par. 57(4) vise le déficit de liquidation.

B. *Deuxième question en litige : La Cour d'appel a-t-elle tort de conclure qu'Indalex a manqué à ses obligations fiduciaires envers les bénéficiaires en tant qu'administrateur des régimes de retraite et d'imposer une fiducie par interprétation à titre de réparation?*

(1)  Introduction

[180]   La Cour d'appel conclut que, dans le cadre de la procédure fondée sur la *LACC*, Indalex a manqué à ses obligations fiduciaires d'administrateur des régimes de retraite (par. 116). En guise de réparation, elle impose une fiducie par interprétation à l'égard du fonds de réserve et permet ainsi aux bénéficiaires des régimes de retraite de recouvrer l'intégralité de leur créance de préférence à tous les autres créanciers, notamment ceux auxquels le tribunal a accordé une superpriorité sous le régime de la *LACC*.

[181]   Les manquements relevés par la Cour d'appel sont de trois ordres. D'abord, Indalex n'a pas respecté l'interdiction faite au fiduciaire de se trouver en conflit d'intérêts car, dans le cadre de la procédure fondée sur la *LACC*, ses intérêts d'entreprise insolvable s'opposaient à son obligation d'administrateur d'agir au mieux des intérêts des participants et des bénéficiaires des régimes (par. 142). Selon la Cour d'appel, ce conflit d'intérêts constituait à lui seul un manquement d'Indalex à ses obligations fiduciaires d'administrateur des régimes. Deuxièmement, Indalex a manqué à ses obligations fiduciaires en demandant, sans en informer au préalable les

breached its fiduciary duty by seeking and/or obtaining various relief in the *CCAA* proceedings including the "super priority" in favour of the DIP lenders, approval of the sale of the business knowing that no payment would be made to the underfunded plans over the statutory deemed trusts and seeking to be put into bankruptcy with the intention of defeating the deemed trust claims: para. 139. As a remedy for these breaches of fiduciary duty the court imposed a constructive trust.

[182]    In my view, the Court of Appeal took much too expansive a view of the fiduciary duties owed by Indalex as plan administrator and found breaches where there were none. As I see it, the only breach of fiduciary duty committed by Indalex occurred when, upon insolvency, Indalex's corporate interests were in obvious conflict with its fiduciary duty as plan administrator to ensure that all contributions were made to the plans when due. The breach was not in failing to avoid this conflict — the conflict itself was unavoidable. Its breach was in failing to address the conflict to ensure that the plan beneficiaries had the opportunity to have representation in the *CCAA* proceedings as if there were independent plan administrators. I also conclude that a remedial constructive trust is not available as a remedy for this breach.

[183]    This part of the appeals requires us to answer two questions which I will address in turn:

(i)    What fiduciary duties did Indalex have in its role as plan administrator and did it breach them?

(ii)    If so, was imposition of a constructive trust an appropriate remedy?

bénéficiaires des régimes, la protection offerte par la *LACC* (par. 139). Troisièmement, Indalex a manqué à ses obligations fiduciaires en sollicitant puis en obtenant diverses mesures dans le cadre de la procédure fondée sur la *LACC*, dont la « super-priorité » de la créance des prêteurs DE, l'approbation de la vente de l'entreprise alors qu'elle savait que nul versement ne serait fait aux régimes sous-capitalisés en sus des sommes protégées par les fiducies réputées d'origine législative, et en demandant sa mise en faillite dans l'intention de faire échec aux prétentions relatives à la fiducie réputée (par. 139). En guise de réparation de ces manquements à l'obligation fiduciaire, la cour a imposé une fiducie par interprétation.

[182]    À mon sens, la Cour d'appel confère une portée excessive aux obligations fiduciaires d'Indalex en tant qu'administrateur des régimes et elle relève des manquements qui n'en sont pas. Indalex a seulement manqué à son obligation fiduciaire lorsque, une fois devenue insolvable, ses intérêts sont clairement entrés en conflit avec son obligation fiduciaire d'administrateur d'assurer le versement aux régimes de toutes les cotisations devenues exigibles. Son manquement réside dans l'omission non pas d'éviter ce conflit, qui était en soi inévitable, mais de pallier le problème en veillant à ce que les bénéficiaires des régimes puissent être représentés dans le cadre de la procédure fondée sur la *LACC* comme si l'administrateur des régimes avait été indépendant. Je conclus également que la fiducie par interprétation ne saurait être accordée à titre de réparation pour ce manquement.

[183]    Ce volet des pourvois commande de répondre à deux questions que j'examine successivement :

(i)    Quelles étaient les obligations fiduciaires d'Indalex en tant qu'administrateur des régimes de retraite, et y a-t-il eu manquement à ces obligations?

(ii)    Dans l'affirmative, l'imposition d'une fiducie par interprétation constituait-elle une réparation appropriée?

(2)  <u>What Fiduciary Duties Did Indalex Have in its Role as Plan Administrator and Did it Breach Those Duties?</u>

(a)  *Legal Principles*

[184]    The appellants do not dispute that Indalex, in its role of administrator of the plans, had fiduciary duties to the members of the plan and that when it is acting in that role it can only act in the interests of the plans' beneficiaries. It is not necessary for present purposes to decide whether a pension plan administrator is a *per se* or *ad hoc* fiduciary, although it must surely be rare that a pension plan administrator would not have fiduciary duties in carrying out that role: *Burke v. Hudson's Bay Co.*, 2010 SCC 34, [2010] 2 S.C.R. 273, at para. 41, aff'g 2008 ONCA 394, 67 C.C.P.B. 1, at para. 55.

[185]    However, the conclusion that Indalex as plan administrator had fiduciary duties to the plan beneficiaries is the beginning, not the end of the inquiry. This is because fiduciary duties do not exist at large, but arise from and relate to the specific legal interests at stake: *Alberta v. Elder Advocates of Alberta Society*, 2011 SCC 24, [2011] 2 S.C.R. 261, at para. 31. As La Forest J. put it in *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574:

The obligation imposed [on a fiduciary] <u>may vary in its specific substance depending on the relationship</u> . . . . [N]ot every legal claim arising out of a relationship with fiduciary incidents will give rise to a claim for breach of fiduciary duty. . . .

.  .  .

<u>It is only in relation to breaches of the specific obligations imposed because the relationship is one characterized as fiduciary that a claim for breach of fiduciary duty can be founded.</u> . . . [Emphasis added; pp. 646-47.]

[186]    The nature and scope of the fiduciary duty must, therefore, be assessed in the legal framework governing the relationship out of which the

(2)  <u>Quelles étaient les obligations fiduciaires d'Indalex en tant qu'administrateur des régimes de retraite, et y a-t-il eu manquement à ces obligations?</u>

a)  *Principes juridiques*

[184]    Les appelants ne contestent pas que, en tant qu'administrateur des régimes de retraite, Indalex avait des obligations fiduciaires envers les participants et que, à ce titre, elle ne pouvaient agir que dans l'intérêt des bénéficiaires des régimes. Point n'est besoin, aux fins du pourvoi, de déterminer si l'administrateur d'un régime de retraite est fiduciaire en soi ou *ad hoc*, bien qu'il soit assurément rare qu'un tel administrateur n'ait pas d'obligations fiduciaires dans l'exercice de cette fonction (*Burke c. Cie de la Baie d'Hudson*, 2010 CSC 34, [2010] 2 R.C.S. 273, par. 41, conf. 2008 ONCA 394, 67 C.C.P.B. 1, par. 55).

[185]    Or, la conclusion portant que, à titre d'administrateur des régimes, Indalex avait des obligations fiduciaires envers les bénéficiaires marque le début de l'examen, et non sa fin, car les obligations fiduciaires n'existent pas en général, mais découlent des intérêts juridiques qui sont précisément en jeu et s'y rattachent (*Alberta c. Elder Advocates of Alberta Society*, 2011 CSC 24, [2011] 2 R.C.S. 261, par. 31). Comme l'affirme le juge La Forest dans *Lac Minerals Ltd. c. International Corona Resources Ltd.*, [1989] 2 R.C.S. 574 :

La nature particulière de cette obligation [du fiduciaire] <u>peut varier selon les rapports concernés</u> [. . .] [C]e ne sont pas tous les droits découlant de rapports présentant des caractéristiques fiduciaires qui justifient une demande pour manquement à une obligation fiduciaire. . .

.  .  .

<u>La prétention qu'il y a manquement à une obligation fiduciaire ne peut se fonder que sur le manquement aux obligations particulières qui découlent des rapports dits fiduciaires.</u> . . [Je souligne; p. 646-647.]

[186]    Il convient donc d'apprécier la nature et la portée de l'obligation fiduciaire dans le cadre juridique applicable à la relation dont est issue cette

fiduciary duty arises: see, e.g., *Sharbern Holding Inc. v. Vancouver Airport Centre Ltd.*, 2011 SCC 23, [2011] 2 S.C.R. 175, at para. 141; *Galambos v. Perez*, 2009 SCC 48, [2009] 3 S.C.R. 247, at paras. 36-37; *K.L.B. v. British Columbia*, 2003 SCC 51, [2003] 2 S.C.R. 403, at para. 41. So, for example, as a general rule, a fiduciary has a duty of loyalty including the duty to avoid conflicts of interest: see, e.g., *Strother v. 3464920 Canada Inc.*, 2007 SCC 24, [2007] 2 S.C.R. 177, at para. 35; *Lac Minerals*, at pp. 646-47. However, this general rule may have to be modified in light of the legal framework within which a particular fiduciary duty must be exercised. In my respectful view, this is such a case.

(b)    *The Legal Framework of Indalex's Dual Role as a Plan Administrator and Employer*

[187]    In order to define the nature and scope of Indalex's role and fiduciary obligations as a plan administrator, we must examine the legal framework within which the administrator functions. This framework is established primarily by the plan documents and the relevant provisions of the *PBA*. It is to these sources, first and foremost, that we look in order to shape the specific fiduciary duties owed in this context.

[188]    Turning first to the plan documents, I take the salaried plan as an example. Under it, the company is appointed the plan administrator: art. 13.01. The term "Company" is defined to mean Indalex Limited and any reference in the plan to actions taken or discretion to be exercised by the Company means Indalex acting through the board of directors or any person authorized by the board for the purposes of the plan: art. 2.09. Article 13.01 provides that the "Management Committee of the Board of Directors of the Company will appoint a Pension and Benefits Committee to act on behalf of the Company in its capacity as administrator of the Plan. The Pension and Benefits Committee will decide conclusively all matters relating to the operation, interpretation and application of the Plan".

obligation (voir, p. ex., *Sharbern Holding Inc. c. Vancouver Airport Centre Ltd.*, 2011 CSC 23, [2011] 2 R.C.S. 175, par. 141; *Galambos c. Perez*, 2009 CSC 48, [2009] 3 R.C.S. 247, par. 36-37; *K.L.B. c. Colombie-Britannique*, 2003 CSC 51, [2003] 2 R.C.S. 403, par. 41). À titre d'exemple, la règle générale veut que le fiduciaire ait un devoir de loyauté doublé d'une obligation d'éviter tout conflit d'intérêts (voir, p. ex., *3464920 Canada Inc.*, 2007 CSC 24, [2007] 2 R.C.S. 177, par. 35; *Lac Minerals*, p. 646-647). Toutefois, il peut se révéler nécessaire d'adapter cette règle générale au cadre juridique dans lequel doit être exercée une obligation fiduciaire en particulier. Tel est, à mon humble avis, le cas en l'espèce.

b)    *Le cadre juridique de la double fonction d'Indalex à titre d'administrateur de régime et d'employeur*

[187]    Pour déterminer la nature et la portée de la fonction et des obligations fiduciaires d'Indalex en tant qu'administrateur des régimes, nous devons considérer le cadre juridique dans lequel évolue l'administrateur. Ce cadre juridique découle principalement des documents constitutifs des régimes de retraite et des dispositions pertinentes de la *LRR*, des sources qui doivent être examinées avant toutes autres pour déterminer les obligations fiduciaires spécifiques qui incombent à l'administrateur dans ce contexte.

[188]    En ce qui concerne d'abord les documents constitutifs des régimes de retraite, considérons ceux relatifs au régime des salariés. Ils confient à la société l'administration du régime (art. 13.01). Le terme « société » s'entend d'Indalex Limited, et toute mention par le régime d'une mesure prise ou d'un pouvoir discrétionnaire exercé par la société suppose qu'Indalex agit par l'entremise du conseil d'administration ou d'une personne autorisée par celui-ci aux fins du régime (art. 2.09). Suivant l'art. 13.01, le [TRADUCTION] « comité de gestion du conseil d'administration de la société nomme un comité de retraite et de prestations pour agir au nom de la société dans l'exercice de sa fonction d'administrateur du régime. Le comité de retraite et de prestations se prononce de manière définitive

Thus, the Pension and Benefits Committee is to act on behalf of the company and by virtue of art. 2.09 its acts are considered those of the company. Article 13.02 sets out the duties of the Pension and Benefits Committee which include the "performance of all administrative functions not performed by the Funding Agent, the Actuary or any group annuity contract issuer": art. 13.02(1).

[189]    The plan administrator also has statutory powers and duties by virtue of the *PBA*. Section 22 lists the general duties of plan administrators, three of which are particularly relevant to these appeals:

   **22.** (1) [Care, diligence and skill] The administrator of a pension plan shall exercise the care, diligence and skill in the administration and investment of the pension fund that a person of ordinary prudence would exercise in dealing with the property of another person.

   (2) [Special knowledge and skill] The administrator of a pension plan shall use in the administration of the pension plan and in the administration and investment of the pension fund all relevant knowledge and skill that the administrator possesses or, by reason of the administrator's profession, business or calling, ought to possess.

.    .    .

   (4) [Conflict of interest] An administrator or, if the administrator is a pension committee or a board of trustees, a member of the committee or board that is the administrator of a pension plan shall not knowingly permit the administrator's interest to conflict with the administrator's duties and powers in respect of the pension fund.

[190]    Not surprisingly, the powers and duties conferred on the administrator by the legislation are administrative in nature. For the most part they pertain to the internal management of the pension fund and to the relationship among the pension administrator, the beneficiaries, and the Superintendent of Financial Services ("Superintendent"). The list includes: applying

sur toute question relative au fonctionnement, à l'interprétation et à l'application du régime ». Le comité de retraite et de prestations a donc pour mandat d'agir pour le compte de la société et, suivant l'art. 2.09, ses actes sont assimilés à ceux de la société. L'article 13.02 énonce les fonctions du comité, dont l'exercice de toute fonction administrative qui ne relève pas du gestionnaire de la caisse, de l'actuaire ou de l'émetteur de tout contrat de rente collective (par. 13.02(1)).

[189]    La *LRR* attribue également pouvoirs et obligations à l'administrateur d'un régime. L'article 22 énumère les obligations générales faites à l'administrateur, dont trois importent particulièrement dans les présents pourvois :

   **22.** (1) [Soin, diligence et compétence] L'administrateur d'un régime de retraite apporte à l'administration et au placement des fonds de la caisse de retraite le soin, la diligence et la compétence qu'une personne d'une prudence normale exercerait relativement à la gestion des biens d'autrui.

   (2) [Connaissances et compétences particulières] L'administrateur d'un régime de retraite apporte à l'administration du régime de retraite et à l'administration et au placement des fonds de la caisse de retraite toutes les connaissances et compétences pertinentes que l'administrateur possède ou devrait posséder en raison de sa profession, de ses affaires ou de sa vocation.

.    .    .

   (4)  [Conflit d'intérêts] L'administrateur, ou si l'administrateur est un comité de retraite ou un conseil de fiduciaires, un membre du comité ou du conseil qui est l'administrateur du régime de retraite ne permet pas sciemment que son intérêt entre en conflit avec ses attributions à l'égard du régime de retraite.

[190]    Il n'est pas étonnant que les pouvoirs et les obligations légaux de l'administrateur soient de nature administrative. La plupart ont trait à la gestion interne de la caisse de retraite et à la relation entre l'administrateur du régime de retraite, les bénéficiaires et le surintendant des services financiers (le « surintendant »). Mentionnons la demande au surintendant d'enregistrer le régime ou de le

to the Superintendent for registration of the plan and any amendments to it as well as filing annual information returns: ss. 9, 12 and 20 of the *PBA*; providing beneficiaries and eligible potential beneficiaries with information and documents: s. 10(1)12 and 25; ensuring that the plan is administered in accordance with the *PBA* and its regulations and plan documents: s. 19; notifying beneficiaries of proposed amendments to the plan that would reduce benefits: s. 26; paying commuted value for pensions: s. 42; and filing wind-up reports if the plan is terminated: s. 70.

[191]   Of special relevance for this case are two additional provisions. Under s. 56, the administrator has a duty to ensure that pension payments are made when due and to notify the Superintendent if they are not and, under s. 59, the administrator has the authority to commence court proceedings when pension payments are not made.

[192]   The fiduciary duties that employer-administrators owe to plan beneficiaries relate to the statutory and other tasks described above; these are the "specific legal interests" with respect to which the employer-administrator's fiduciary duties attach.

[193]   Another important aspect of the legal context for Indalex's fiduciary duties as a plan administrator is that it was acting in the dual role of an employer-administrator. This dual role is expressly permitted under s. 8(1)(a) of the *PBA*, but this provision creates a situation where a single entity potentially owes two sets of fiduciary duties (one to the corporation and the other to the plan members).

[194]   This was the case for Indalex. As an employer-administrator, Indalex acted through its board of directors and so it was that body which owed fiduciary duties to the plan members. The board of directors also owed a fiduciary duty to the company to act in its best interests: *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, s. 122(1)(a); *BCE Inc. v. 1976 Debentureholders*,

modifier, et le dépôt de la déclaration annuelle (art. 9, 12 et 20 de la *LRR*), la transmission aux bénéficiaires et aux bénéficiaires éventuels admissibles de renseignements et de documents (par. 10(1)12 et art. 25), l'observation de la *LRR* et de son règlement d'application, ainsi que des documents constitutifs du régime (art. 19), l'envoi aux bénéficiaires d'un avis relatif à une modification projetée qui réduirait les prestations (art. 26), le paiement de la valeur de rachat d'une pension différée (art. 42) et le dépôt d'un rapport de liquidation advenant la cessation du régime (art. 70).

[191]   Deux autres dispositions importent particulièrement en l'espèce. L'article 56 dispose que l'administrateur a l'obligation de veiller à ce que les cotisations soient versées à la date d'exigibilité et d'en informer le surintendant lorsqu'elles ne l'ont pas été; l'art. 59 habilite l'administrateur à engager une instance judiciaire en cas de défaut de paiement.

[192]   Les obligations fiduciaires de l'employeur-administrateur envers les bénéficiaires d'un régime ont trait aux attributions légales et autres susmentionnées; il s'agit des « intérêts juridiques particuliers » auxquels se rattachent les obligations fiduciaires de l'employeur-administrateur.

[193]   Un autre aspect important du contexte juridique dans lequel s'inscrivent les obligations fiduciaires d'Indalex à titre d'administrateur des régimes tient à sa double fonction d'employeur et d'administrateur. L'alinéa 8(1)a) de la *LRR* autorise expressément ce double rôle, mais il crée une situation où une même entité peut devoir s'acquitter de deux ensembles distincts d'obligations fiduciaires (les unes envers la société, les autres envers les participants du régime de retraite).

[194]   Telle était la situation d'Indalex. À titre d'employeur-administrateur, Indalex agissait par l'entremise de son conseil d'administration, de sorte que ce dernier avait des obligations fiduciaires envers les participants des régimes. Le conseil d'administration avait également l'obligation fiduciaire d'agir au mieux des intérêts de la société (*Loi canadienne sur les sociétés par actions*, L.R.C.

2008 SCC 69, [2008] 3 S.C.R. 560, at para. 36. In deciding what is in the best interests of the corporation, a board may look to the interests of shareholders, employees, creditors and others. But where those interests are not aligned or may conflict, it is for the directors, acting lawfully and through the exercise of business judgment, to decide what is in the overall best interests of the corporation. Thus, the board of Indalex, as an employer-administrator, could not always act exclusively in the interests of the plan beneficiaries; it also owed duties to Indalex as a corporation.

### (c)  *Breaches of Fiduciary Duty*

[195]    Against the background of these legal principles, I turn to consider the Court of Appeal's findings in relation to Indalex's breach of its fiduciary duties as administrator of the plans. As noted, they fall into three categories: being in a conflict of interest position; taking steps to reduce pension obligations in the *CCAA* proceedings; and seeking bankruptcy status.

### (i)   Conflict of Interest

[196]    The questions here are first what constitutes a conflict of interest or duty between Indalex as business decision-maker and Indalex as plan administrator and what must be done when a conflict arises?

[197]    The Court of Appeal in effect concluded that a conflict of interest arises whenever Indalex makes business decisions that have "the potential to affect the Plans beneficiaries' rights" (para. 132) and that whenever such a conflict of interest arose, the employer-administrator was immediately in breach of its fiduciary duties to the plan members. Respectfully, this position puts the matter far too broadly. It cannot be the case that a conflict

1985, ch. C-44, al. 122(1)*a*); *BCE Inc. c. Détenteurs de débentures de 1976*, 2008 CSC 69, [2008] 3 R.C.S. 560, par. 36). Pour déterminer ce qui est au mieux des intérêts de l'entreprise, le conseil d'administration peut considérer les intérêts des actionnaires, des employés, des créanciers et d'autres personnes. Or, lorsque ces intérêts ne sont pas concordants ou peuvent entrer en conflit, il appartient aux administrateurs, dans le respect de la loi et dans l'exercice de son appréciation commerciale, de déterminer ce qui sert au mieux les intérêts de la société. Par conséquent, le conseil d'administration d'Indalex, en tant qu'employeur-administrateur, ne pouvait pas toujours agir dans le seul intérêt des bénéficiaires des régimes, mais devait aussi s'acquitter de ses obligations envers la société Indalex.

### c)  *Manquements à l'obligation fiduciaire*

[195]    Au vu de ces principes juridiques, j'examine les conclusions de la Cour d'appel concernant les manquements d'Indalex à ses obligations fiduciaires à titre d'administrateur des régimes. Je le répète, ces manquements sont de trois ordres : l'existence du conflit d'intérêts, les mesures prises dans le cadre de la procédure fondée sur la *LACC* pour réduire ses obligations vis-à-vis des régimes de retraite et la demande présentée en vue de faire faillite.

### (i)   Conflit d'intérêts

[196]    Il faut d'abord se demander en quoi consiste, dans le cas d'Indalex, un conflit d'intérêts ou d'obligations entre sa fonction de décideur commercial et celle d'administrateur de régime, et quelles mesures elle doit alors prendre?

[197]    La Cour d'appel conclut en fait qu'il y a conflit d'intérêts dès qu'Indalex prend une décision de nature commerciale [TRADUCTION] « susceptible d'avoir une incidence sur les droits des bénéficiaires des régimes » (par. 132) et qu'il y a alors manquement immédiat de l'employeur-administrateur à ses obligations fiduciaires envers les participants des régimes de retraite. En toute déférence, il s'agit d'une interprétation beaucoup

arises simply because the employer, exercising its management powers in the best interests of the corporation, does something that has the potential to affect the plan beneficiaries.

[198]   This conclusion flows inevitably from the statutory context. The existence of apparent conflicts that are inherent in the two roles being performed by the same party cannot be a breach of fiduciary duty because those conflicts are specifically authorized by the statute which permits one party to play both roles. As noted earlier, the *PBA* specifically permits employers to act as plan administrators (s. 8(1)(a)). Moreover, the broader business interests of the employer corporation and the interests of pension beneficiaries in getting the promised benefits are almost always at least potentially in conflict. Every important business decision has the potential to put at risk the solvency of the corporation and therefore its ability to live up to its pension obligations. The employer, within the limits set out in the plan documents and the legislation generally, has the authority to amend the plan unilaterally and even to terminate it. These steps may well not serve the best interests of plan beneficiaries.

[199]   Similarly, the simple existence of the sort of conflicts of interest identified by the Court of Appeal — those inherent in the employer's exercise of business judgment — cannot of themselves be a breach of the administrator's fiduciary duty. Once again, that conclusion is inconsistent with the statutory scheme that expressly permits an employer to act as plan administrator.

[200]   How, then, should we identify conflicts of interest in this context?

[201]   In *R. v. Neil*, 2002 SCC 70, [2002] 3 S.C.R. 631, Binnie J. referred to the *Restatement Third, The Law Governing Lawyers* (2000), at § 121, to explain when a conflict of interest occurs in the

trop extensive. On ne saurait dire qu'il y a conflit d'intérêts uniquement parce que l'employeur, dans l'exercice de son pouvoir de gérer la société au mieux des intérêts de celle-ci, prend une mesure susceptible d'avoir une incidence sur les bénéficiaires des régimes.

[198]   Telle est la conclusion qui découle nécessairement du contexte législatif. L'existence de conflits apparents qui sont inhérents à la double fonction exercée par une même personne ne peut constituer un manquement à l'obligation fiduciaire, car ces conflits sont expressément autorisés par la loi, laquelle permet à une personne d'exercer les deux fonctions. Rappelons que la *LRR* permet expressément à l'employeur d'administrer un régime (al. 8(1)a)). En outre, les intérêts commerciaux de la société-employeur en général et les intérêts des bénéficiaires d'un régime de retraite liés à l'obtention des prestations promises risquent presque toujours d'entrer en conflit. Toute décision commerciale importante est susceptible de nuire à la solvabilité de la société et, partant, à sa capacité de respecter ses obligations à l'égard du régime. Sous réserve des limites prévues par les documents constitutifs du régime de retraite et de la loi en général, l'employeur peut modifier unilatéralement le régime, voire y mettre fin, des mesures qui peuvent fort bien ne pas cadrer avec les intérêts des bénéficiaires du régime.

[199]   De même, les conflits d'intérêts relevés par la Cour d'appel — ceux inhérents à l'appréciation commerciale de l'employeur — ne peuvent emporter à eux seuls le manquement à l'obligation fiduciaire de l'administrateur. Là encore, c'est ce qui appert du régime législatif, qui permet expressément à l'employeur d'administrer un régime.

[200]   Comment devons-nous donc déterminer s'il y a conflit d'intérêts dans ce contexte?

[201]   Dans *R. c. Neil*, 2002 CSC 70, [2002] 3 R.C.S. 631, le juge Binnie renvoie au *Restatement Third, The Law Governing Lawyers* (2000), § 121, pour expliquer à quelles conditions il y a conflit

context of the lawyer-client relationship: para. 31. In my view, the same general principle, adapted to the circumstances, applies with respect to employer-administrators. Thus, a situation of conflict of interest occurs when there is a substantial risk that the employer-administrator's representation of the plan beneficiaries would be materially and adversely affected by the employer-administrator's duties to the corporation. I would recall here, however, that the employer-administrator's obligation to represent the plan beneficiaries extends only to those tasks and duties that I have described above.

[202]    In light of the foregoing, I am of the view that the Court of Appeal erred when it found, in effect, that a conflict of interest arose whenever Indalex was making decisions that "had the potential to affect the Plans beneficiaries' rights": para. 132. The Court of Appeal expressed both the potential for conflict of interest or duty and the fiduciary duty of the plan administrator much too broadly.

(ii)    Steps in the *CCAA* Proceedings to Reduce Pension Obligations and Notice of Them

[203]    The Court of Appeal found that Indalex breached its fiduciary duty simply by commencing *CCAA* proceedings knowing that the plans were underfunded and by failing to give the plan beneficiaries notice of the proceedings: para. 139. As I understand the court's reasons, the decision to commence *CCAA* proceedings was solely the responsibility of the corporation and not part of the administration of the pension plan: para. 131. The difficulty which the Court of Appeal saw arose from the potential of the *CCAA* proceedings to result in a reduction of the corporation's pension obligations to the prejudice of the beneficiaries: paras. 131-32.

[204]    I respectfully disagree. Like Justice Deschamps, I find that seeking an initial order protecting the corporation from actions by its creditors did not, on its own, give rise to any conflict of interest or duty on the part of Indalex (reasons of Justice Deschamps, at para. 72).

d'intérêts dans le cadre de la relation entre l'avocat et son client (par. 31). À mon avis, le même principe général, adapté aux circonstances, vaut pour l'employeur-administrateur. Il y a donc conflit d'intérêts lorsqu'il existe un risque important que les obligations de l'employeur-administrateur envers la société nuisent de façon appréciable à la défense des intérêts des bénéficiaires d'un régime. Je rappelle cependant que l'obligation de l'employeur-administrateur de représenter les bénéficiaires d'un régime ne s'entend que des attributions et des fonctions énoncées précédemment.

[202]    J'estime dès lors que la Cour d'appel a tort de conclure qu'il y avait conflit d'intérêts aussitôt qu'Indalex prenait une décision [TRADUCTION] « susceptible d'avoir une incidence sur les droits des bénéficiaires des régimes » (par. 132). Elle interprète de manière beaucoup trop extensive la notion de conflit éventuel d'intérêts ou d'obligations et celle d'obligation fiduciaire de l'administrateur d'un régime.

(ii)    Mesures prises par Indalex dans le cadre de la procédure fondée sur la *LACC* afin de réduire ses obligations vis-à-vis des régimes de retraite et avis de ces mesures

[203]    Pour la Cour d'appel, Indalex a manqué à son obligation fiduciaire du seul fait qu'elle a engagé une procédure en application de la *LACC* tout en sachant que les régimes étaient sous-capitalisés, et ce, sans en informer au préalable les bénéficiaires des régimes (par. 139). Si j'interprète bien ses motifs, la décision d'entreprendre cette démarche relevait uniquement de l'administration de la société, et non de l'administration des régimes de retraite (par. 131). La difficulté résidait selon elle dans le risque que la procédure réduise les obligations de la société vis-à-vis des régimes de retraite au détriment des bénéficiaires (par. 131-132).

[204]    En toute déférence, je ne suis pas d'accord. Comme ma collègue la juge Deschamps, j'estime que, à elle-seule, la mesure initiale visant à protéger la société contre ses créanciers ne plaçait pas Indalex en situation de conflit d'intérêts ou d'obligations (motifs de la juge Deschamps, par. 72).

[205]    First, it is important to remember that the purpose of *CCAA* proceedings is not to disadvantage creditors but rather to try to provide a constructive solution for all stakeholders when a company has become insolvent. As my colleague, Deschamps J. observed in *Century Services*, at para. 15:

. . . the purpose of the *CCAA* . . . is to permit the debtor to continue to carry on business and, where possible, avoid the social and economic costs of liquidating its assets.

In the same decision, at para. 59, Deschamps J. also quoted with approval the following passage from the reasons of Doherty J.A. in *Elan Corp. v. Comiskey* (1990), 41 O.A.C. 282, at para. 57 (dissenting):

The legislation is remedial in the purest sense in that it provides a means whereby the devastating social and economic effects of bankruptcy or creditor initiated termination of ongoing business operations can be avoided while a court-supervised attempt to reorganize the financial affairs of the debtor company is made.

For this reason, I would be very reluctant to find that, simply by virtue of embarking on *CCAA* proceedings, an employer-administrator breaches its duties to plan members.

[206]    Second, the facts of this case do not support the contention that the interests of the plan beneficiaries and the employer were in conflict with respect to the decision to seek *CCAA* protection. It cannot seriously be suggested that some other course would have protected more fully the rights of the plan beneficiaries. The Court of Appeal did not suggest an alternative to seeking *CCAA* protection from creditors, nor did any of the parties. Indalex was in serious financial difficulty and its options were limited: either make a proposal to its creditors (under the *CCAA* or under the *BIA*), or go bankrupt. Moreover, the plan administrator's duty and authority do not extend to ensuring the solvency of the corporation and an independent administrator could not reasonably expect to be

[205]    Premièrement, il importe de rappeler que la procédure de la *LACC* n'a pas pour objet de défavoriser les créanciers, mais bien de trouver une solution à l'insolvabilité d'une société qui soit constructive pour tous les intéressés. Comme le fait remarquer ma collègue la juge Deschamps dans *Century Services*, au par. 15 :

. . . la *LACC* [. . .] a pour objectif de permettre au débiteur de continuer d'exercer ses activités et, dans les cas où cela est possible, d'éviter les coûts sociaux et économiques liés à la liquidation de son actif.

Dans le même arrêt (par. 59), elle cite également en l'approuvant l'extrait suivant des motifs du juge Doherty, dissident, dans *Elan Corp. c. Comiskey* (1990), 41 O.A.C. 282, par. 57 :

[TRADUCTION] La loi est réparatrice au sens le plus pur du terme, en ce qu'elle fournit un moyen d'éviter les effets dévastateurs, — tant sur le plan social qu'économique — de la faillite ou de l'arrêt des activités d'une entreprise, à l'initiati[ve] des créanciers, pendant que des efforts sont déployés, sous la surveillance du tribunal, en vue de réorganiser la situation financière de la compagnie débitrice.

C'est pourquoi j'incline très peu à conclure que l'employeur-administrateur manque à ses obligations envers les participants des régimes de retraite du seul fait qu'il engage une procédure sur le fondement de la *LACC*.

[206]    Deuxièmement, les faits de la présente affaire n'appuient pas la prétention selon laquelle les intérêts de l'employeur s'opposaient à ceux des bénéficiaires des régimes quant à la décision de se prévaloir ou non de la protection de la *LACC*. On ne saurait sérieusement soutenir qu'une autre mesure aurait protégé davantage les droits des bénéficiaires des régimes. Ni la Cour d'appel ni les parties n'avancent quelque autre solution qui eût été préférable à la protection contre les créanciers demandée sous le régime de la *LACC*. Indalex éprouvait de graves difficultés financières et ses options étaient limitées : elle pouvait présenter une proposition à ses créanciers (suivant la *LACC* ou la *LFI*) ou faire faillite. Qui plus est, les attributions de l'administrateur des régimes

18-23538-shl    Doc 3920-3    Filed 05/17/19    Entered 05/17/19 11:35:37    Exhibit C
Pg 93 of 131

362          SUN INDALEX FINANCE  *v.*  UNITED STEELWORKERS    *Cromwell J.*          [2013] 1 S.C.R.

consulted about the plan sponsor's decision to seek *CCAA* protection. Finally, the application for *CCAA* proceedings did not reduce pension obligations other than to temporarily relieve the corporation of making special payments and it was the only step with any prospect of the pension funds obtaining from the insolvent corporation the money that would become due. There was thus no conflict of duty or interest between the administrator and the employer when protective action was taken for the purpose of preserving the *status quo* for the benefit of all stakeholders.

[207]    The Court of Appeal also found that it was a breach of fiduciary duty not to give the plan beneficiaries notice of the initial application for *CCAA* protection. Again, here, I must join Deschamps J. in disagreeing with the Court of Appeal's conclusion. Section 11(1) of the *CCAA*, as it stood at the time of the proceedings, provided that parties could commence *CCAA* proceedings without giving notice to interested persons:

**11.** (1) Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

[208]    This provision was renumbered but not substantially changed when the Act was amended in September of 2009 (S.C. 2005, c. 47, s. 128, in force Sept. 18, 2009, SI/2009-68). Although it is not appropriate in every case, *CCAA* courts have discretion to make initial orders on an *ex parte* basis. This may be an appropriate — even necessary — step in order to prevent "creditors from moving to realize on their claims, essentially a 'stampede to the assets' once creditors learn of the debtor's financial distress": J. P. Sarra, *Rescue! The Companies' Creditors Arrangement*

n'englobaient pas le fait d'assurer la solvabilité de la société, et un administrateur indépendant n'aurait pu raisonnablement s'attendre à être consulté relativement à la décision du promoteur des régimes de se prévaloir de la protection de la *LACC*. Enfin, la demande présentée sur le fondement de la *LACC* n'a pas réduit les obligations de l'employeur vis-à-vis des régimes de retraite, si ce n'est temporairement quant à l'obligation d'effectuer des paiements spéciaux, et c'était la seule mesure susceptible de permettre aux régimes de retraite d'obtenir de la société insolvable les sommes qui leur étaient dues. L'administrateur-employeur ne s'est donc pas trouvé en conflit d'intérêts ou d'obligations lorsqu'il a demandé protection afin de demeurer en exploitation au bénéfice de tous les intéressés.

[207]    La Cour d'appel conclut en outre que la société a manqué à son obligation fiduciaire en omettant de donner aux bénéficiaires des régimes un avis de sa demande initiale de protection sous le régime de la *LACC*. Je me range encore une fois à l'opinion de ma collègue la juge Deschamps, qui exprime son désaccord avec cette conclusion. Dans sa version en vigueur au moment de la procédure, le par. 11(1) de la *LACC* disposait qu'une partie pouvait engager une procédure sous le régime de la *LACC* sans en donner avis aux intéressés :

**11.** (1) Malgré toute disposition de la *Loi sur la faillite et l'insolvabilité* ou de la *Loi sur les liquidations*, chaque fois qu'une demande est faite sous le régime de la présente loi à l'égard d'une compagnie, le tribunal, sur demande d'un intéressé, peut, sous réserve des autres dispositions de la présente loi et avec ou sans avis, rendre l'ordonnance prévue au présent article.

[208]    Malgré la nouvelle numérotation issue des modifications apportées à la Loi en septembre 2009 (L.C. 2005, ch. 47, art. 128, entrée en vigueur le 18 septembre 2009, TR/2009-68), la disposition est foncièrement demeurée la même. Le tribunal saisi en vertu de la *LACC* dispose du pouvoir discrétionnaire de rendre une ordonnance initiale *ex parte*. L'exercice de ce pouvoir n'est pas toujours indiqué, mais il peut l'être, voire se révéler nécessaire, afin d'empêcher [TRADUCTION] « les créanciers de réaliser leurs créances en se ruant littéralement sur l'actif dès qu'ils sont informés des difficultés

*Act* (2007), at p. 55 ("*Rescue!*"); see also *Algoma Steel Inc., Re* (2001), 25 C.B.R. (4th) 194, at para. 7. The respondents did not challenge Morawetz J.'s decision to exercise his discretion to make an *ex parte* order in this case.

[209]    This is not to say, however, that *ex parte* initial orders will always be required or acceptable. Without attempting to be exhaustive or to express any final view on these issues, I simply note that there have been at least three ways in which courts have mitigated the possible negative effect on creditors of making orders without notice to potentially affected parties. First, courts have been reluctant to grant *ex parte* orders where the situation of the debtor company is not urgent. In *Rescue!*, Janis P. Sarra explains that courts are increasingly expecting applicants to have given notice before applying for a stay under the *CCAA*: p. 55. An example is *Marine Drive Properties Ltd., Re*, 2009 BCSC 145, 52 C.B.R. (5th) 47, a case in which Butler J. held that "[i]nitial applications in *CCAA* proceedings should not be brought without notice merely because it is an application under that Act. The material before the court must be sufficient to indicate an emergent situation": para. 27. Second, courts have included "come-back" clauses in their initial orders so that parties could return to court at a later date to seek to set aside some or all of the order: *Rescue!*, at p. 55. Note that such a clause was included in the initial order by Morawetz J.: para. 46. Finally, courts have limited their initial orders to the issues that need to be resolved immediately and have left other issues to be resolved after all interested parties have been given notice. Thus, in *Timminco Ltd., Re*, 2012 ONSC 506, 85 C.B.R. (5th) 169, Morawetz J. limited the initial *CCAA* order so that priorities were only granted over the party that had been given notice. The discussion of suspending special payments or granting creditors priority over pension beneficiaries was left to a later date, after the parties that would be affected had been given notice. A similar approach was taken in the case of *AbitibiBowater inc. (Arrangement relatif à)*, 2009 QCCS 6459 (CanLII). In his initial *CCAA* order, Gascon J. put off the decision regarding the

financières du débiteur » (J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), p. 55 (« *Rescue!* »); voir également *Algoma Steel Inc., Re* (2001), 25 C.B.R. (4th) 194, par. 7). Les intimés ne contestent pas l'exercice par le juge Morawetz de son pouvoir discrétionnaire de rendre une ordonnance *ex parte* en l'espèce.

[209]    Il ne s'ensuit cependant pas qu'il est toujours nécessaire ou acceptable de rendre une ordonnance initiale *ex parte*. Sans prétendre à l'exhaustivité ni vouloir trancher définitivement la question, je fais simplement remarquer l'existence d'au moins trois cas de figure où les tribunaux atténuent l'effet négatif que pourrait avoir sur les créanciers l'ordonnance rendue sans préavis aux parties susceptibles d'être touchées. Premièrement, lorsque la situation de la société débitrice n'est pas urgente, les tribunaux se montrent réticents à accorder une ordonnance *ex parte*. Dans *Rescue!*, Janis P. Sarra explique que les tribunaux s'attendent de plus en plus à ce que, avant de solliciter une suspension sous le régime de la *LACC*, la demanderesse informe les intéressés au préalable de son intention (p. 55). Par exemple, dans *Marine Drive Properties Ltd., Re*, 2009 BCSC 145, 52 C.B.R. (5th) 47, le juge Butler opine que, [TRADUCTION] « [d]ans le cadre d'une procédure fondée sur la *LACC*, une demande initiale ne saurait être présentée sans préavis pour le seul motif que cette loi s'applique. Les éléments présentés doivent permettre au tribunal de conclure à l'existence d'une situation d'urgence » (par. 27). Deuxièmement, dans l'ordonnance initiale, les tribunaux précisent que les parties peuvent présenter une nouvelle demande afin d'obtenir l'annulation de l'ordonnance en tout ou en partie (*Rescue!*, p. 55). Soulignons que l'ordonnance initiale du juge Morawetz confère cette faculté (par. 46). Enfin, les tribunaux ne rendent une ordonnance initiale qu'à l'égard des questions qui doivent être tranchées sans délai et ils diffèrent le règlement des autres jusqu'à ce que tous les intéressés aient reçu avis de la demande. Ainsi, dans *Timminco Ltd., Re*, 2012 ONSC 506, 85 C.B.R. (5th) 169, le juge Morawetz circonscrit l'ordonnance initiale rendue en application de la *LACC* de telle sorte qu'une priorité n'est accordée qu'aux parties auxquelles un avis de la demande a été

suspension of past service contributions or special payments to the pension plans in question until the parties likely to be affected could be advised of the applicant's request: para. 7.

donné. La décision de suspendre ou non les paiements spéciaux ou d'octroyer ou non aux créanciers une priorité sur les bénéficiaires des régimes de retraite est reportée à une date ultérieure, soit jusqu'à ce que les parties susceptibles d'être touchées aient été avisées. Le tribunal adopte une démarche apparentée dans l'affaire *AbitibiBowater inc. (Arrangement relatif à)*, 2009 QCCS 6459 (CanLII). Dans son ordonnance initiale fondée sur la *LACC*, le juge Gascon reporte la décision de suspendre ou non le versement des cotisations pour service antérieur ou des paiements spéciaux aux régimes de retraite en cause jusqu'à ce que les parties susceptibles d'être touchées reçoivent avis de la demande (par. 7).

[210]    Failure to give notice of the initial *CCAA* proceedings was not a breach of fiduciary duty in this case. Indalex's decision to act as an employer-administrator cannot give the plan beneficiaries any greater benefit than they would have if their plan was managed by a third party administrator. Had there been a third party administrator in this case, Indalex would not have been under an obligation to tell the administrator that it was planning to enter *CCAA* proceedings. The respondents are asking this Court to give the advantage of Indalex's knowledge as employer to Indalex as the plan administrator in circumstances where the employer would have been unlikely to disclose the information itself. I am not prepared to blur the line between employers and administrators in this way.

[210]    En l'espèce, l'omission de donner avis de la demande initiale présentée sur le fondement de la *LACC* ne constituait pas un manquement à l'obligation fiduciaire. La décision d'Indalex d'agir à titre d'employeur-administrateur ne peut conférer aux bénéficiaires des régimes plus d'avantages que si l'administration de leurs régimes avait été confiée à un tiers indépendant. Dans ce dernier cas, Indalex n'aurait pas été tenue de révéler à ce tiers son intention d'engager une procédure sous le régime de la *LACC*. Les intimés demandent à notre Cour d'attribuer à Indalex, l'administrateur, l'avantage que détient Indalex, l'employeur, grâce à sa connaissance de certaines données, dans des circonstances où l'employeur n'aurait vraisemblablement pas communiqué ces données. Je ne suis pas disposé à brouiller ainsi la distinction entre la fonction d'employeur et celle d'administrateur.

[211]    I conclude that Indalex did not breach its fiduciary duty by commencing *CCAA* proceedings or by not giving notice to the plan beneficiaries of its intention to seek the initial *CCAA* order.

[211]    Je conclus qu'Indalex n'a pas manqué à son obligation fiduciaire en engageant la procédure fondée sur la *LACC* ou en omettant d'informer les bénéficiaires des régimes de son intention d'obtenir une ordonnance initiale fondée sur la *LACC*.

[212]    I turn next to the Court of Appeal's conclusion that seeking and obtaining the DIP orders without notice to the plan beneficiaries and seeking and obtaining the sale approval order constituted breaches of fiduciary duty.

[212]    Je me penche maintenant sur la conclusion de la Cour d'appel selon laquelle la demande et l'obtention des ordonnances DE sans préavis aux bénéficiaires des régimes, ainsi que la demande et l'obtention de l'approbation de la vente constituaient des manquements à l'obligation fiduciaire.

[213]    To begin, I agree with the Court of Appeal that "just because the initial decision to commence *CCAA* proceedings is solely a corporate one . . . does not mean that all subsequent decisions made during the proceedings are also solely corporate ones": para. 132. It was at this point that Indalex's interests as a corporation came into conflict with its duties as a pension plan administrator.

[214]    The DIP orders could easily have the effect of making it impossible for Indalex to satisfy its funding obligations to the plan beneficiaries. When Indalex, through the exercise of business judgment, sought *CCAA* orders that would or might have this effect, it was in conflict with its duty as plan administrator to ensure that all contributions were paid when due.

[215]    I do not think, however, that the simple existence of this conflict of interest and duty, on its own, was a breach of fiduciary duty in these circumstances. As discussed earlier, the *PBA* expressly permits an employer to be a pension administrator and the statutory provisions about conflict of interest must be understood and applied in light of that fact. Moreover, an independent plan administrator would have no decision-making role with respect to the conduct of *CCAA* proceedings. So in my view, the difficulty that arose here was not the existence of the conflict itself, but Indalex's failure to take steps so that the plan beneficiaries would have the opportunity to have their interests protected in the *CCAA* proceedings as if the plans were administered by an independent administrator. In short, the difficulty was not the existence of the conflict, but the failure to address it.

[216]    Despite Indalex's failure to address its conflict of interest, the plan beneficiaries, through their own efforts, were represented at subsequent steps in the *CCAA* proceedings. The effect of Indalex's

[213]    D'abord, je conviens avec la Cour d'appel que [TRADUCTION] « même si la décision initiale d'engager une procédure sous le régime de la *LACC* est de nature strictement commerciale [. . .], toutes les décisions ultérieures prises pendant l'instance ne le sont pas pour autant » (par. 132). C'est à cette étape que les intérêts commerciaux d'Indalex sont entrés en conflit avec ses obligations d'administrateur des régimes de retraite.

[214]    Les ordonnances DE auraient fort bien pu faire en sorte qu'Indalex ne puisse plus s'acquitter de ses obligations de capitalisation vis-à-vis des bénéficiaires des régimes. Lorsque, à l'issue de son appréciation commerciale et sur le fondement de la *LACC*, Indalex a sollicité des ordonnances qui auraient eu ou auraient pu avoir une telle conséquence, elle était en conflit avec son obligation d'administrateur des régimes de veiller au versement de toutes les cotisations dès leur exigibilité.

[215]    Je ne crois cependant pas que la seule existence de ce conflit d'intérêts et d'obligations constituait en soi un manquement à l'obligation fiduciaire dans les circonstances. Je le rappelle, la *LRR* autorise expressément l'employeur à administrer un régime, et les dispositions législatives relatives au conflit d'intérêts doivent être interprétées et appliquées en conséquence. En outre, un administrateur indépendant n'aurait eu aucun rôle décisionnel à jouer dans le déroulement de la procédure fondée sur la *LACC*. À mon sens, la difficulté résidait en l'espèce non pas dans l'existence du conflit, mais bien dans l'omission d'Indalex de prendre quelque mesure afin que les bénéficiaires des régimes aient la possibilité de veiller à la protection de leurs intérêts dans le cadre de la procédure fondée sur la *LACC* comme si l'administrateur des régimes avait été indépendant. En résumé, le manquement ne tenait pas à l'existence du conflit, mais plutôt à l'omission de prendre les mesures qu'elle commandait.

[216]    Malgré l'omission d'Indalex de pallier le conflit d'intérêts, les bénéficiaires des régimes ont eux-mêmes pris des mesures pour être représentés aux étapes ultérieures de l'instance fondée sur la

breach was therefore mitigated, a point which I will discuss in greater detail when I turn to the issue of the constructive trust.

[217]   Nevertheless, for the purposes of providing some guidance for future *CCAA* proceedings, I take this opportunity to briefly address what an employer-administrator can do to respond to these sorts of conflicts. First and foremost, an employer-administrator who finds itself in a conflict must bring the conflict to the attention of the *CCAA* judge. It is not enough to include the beneficiaries in the list of creditors; the judge must be made aware that the debtor, as an administrator of the plan is, or may be, in a conflict of interest.

[218]   Given their expertise and their knowledge of particular cases, *CCAA* judges are well placed to decide how best to ensure that the interests of the plan beneficiaries are fully represented in the context of "real-time" litigation under the *CCAA*. Knowing of the conflict, a *CCAA* judge might consider it appropriate to appoint an independent administrator or independent counsel as *amicus curiae* on terms appropriate to the particular case. Indeed, there have been cases in which representative counsel have been appointed to represent tort claimants, clients, pensioners and non-unionized employees in *CCAA* proceedings on terms determined by the judge: *Rescue!*, at p. 278; see, e.g., *First Leaside Wealth Management Inc. (Re)*, 2012 ONSC 1299 (CanLII); *Nortel Networks Corp., Re* (2009), 75 C.C.P.B. 206 (Ont. S.C.J.). In other circumstances, a *CCAA* judge might find that it is feasible to give notice directly to the pension beneficiaries. In my view, notice, though desirable, may not always be feasible and decisions on such matters should be left to the judicial discretion of the *CCAA* judge. Alternatively, the judge might consider limiting draws on the DIP facility until notice can be given to the beneficiaries: *Royal Oak Mines Inc., Re* (1999), 6 C.B.R. (4th) 314 (Ont. Ct. J. (Gen. Div.)), at para. 24. Ultimately, the appropriate response or combination of responses should be left to the discretion of the *CCAA* judge in a particular case.

*LACC*. Les conséquences du manquement d'Indalex ont ainsi été atténuées; je reviendrai plus en détail sur ce point au moment de me pencher sur la fiducie par interprétation.

[217]   Néanmoins, aux fins du bon déroulement de toute procédure susceptible d'être engagée ultérieurement en application de la *LACC*, je saisis l'occasion d'offrir des repères en examinant brièvement les mesures que l'employeur-administrateur pourrait prendre pour pallier un tel conflit. Avant toute chose, l'employeur-administrateur qui se trouve en situation de conflit doit en informer le juge saisi sur le fondement de la *LACC*. Il ne suffit pas d'inscrire les bénéficiaires sur la liste des créanciers; le juge doit être informé que le débiteur, en sa qualité d'administrateur de régime, est en conflit d'intérêts ou susceptible de l'être.

[218]   Étant donné son expertise et ses connaissances dans ce domaine, le juge saisi en vertu de la *LACC* est bien placé pour déterminer la meilleure façon de faire en sorte que les bénéficiaires d'un régime soient dûment représentés au moment même où se déroule la procédure fondée sur la *LACC*. Informé de l'existence du conflit, le juge peut juger opportun de nommer, aux conditions qui lui paraissent indiquées, un administrateur ou un avocat indépendant à titre d'*amicus curiae*. Il est en effet arrivé qu'un juge nomme un avocat — et détermine les conditions de son mandat — pour représenter dans une instance fondée sur la *LACC* des personnes ayant intenté une action en responsabilité délictuelle, des clients, des pensionnés et des employés non syndiqués (*Rescue!*, p. 278; voir, p. ex., *First Leaside Wealth Management Inc. (Re)*, 2012 ONSC 1299 (CanLII); *Nortel Networks Corp., Re* (2009), 75 C.C.P.B. 206 (C.S.J. Ont.)). Dans d'autres cas, le juge peut estimer qu'il est possible de donner avis aux bénéficiaires du régime sans recourir à quelque intermédiaire. À mon sens, la transmission d'un avis, même si elle est souhaitable, peut ne pas toujours être réaliste, et la décision s'y rapportant devrait relever du pouvoir discrétionnaire du juge. En revanche, le juge peut décider de limiter les prélèvements sur le financement DE jusqu'à ce que les bénéficiaires aient reçu un avis (*Royal Oak Mines Inc., Re* (1999), 6 C.B.R. (4th) 314 (C.J. Ont.

The point, as well expressed by the Court of Appeal, is that the insolvent corporation which is also a pension plan administrator cannot "simply ignore its obligations as the Plans' administrator once it decided to seek *CCAA* protection": para. 132.

[219]    I conclude that the Court of Appeal erred in finding that Indalex breached its fiduciary duties as plan administrator by taking the various steps it did in the *CCAA* proceedings. However, I agree with the Court of Appeal that it breached its fiduciary duty by failing to take steps to ensure that the plan beneficiaries had the opportunity to be as fully represented in those proceedings as if there had been an independent plan administrator.

(iii)  The Bankruptcy Motion

[220]    Indalex also applied to lift the *CCAA* stay so that it could file an assignment into bankruptcy. As Campbell J. put it, this was done "to ensure the priority regime [it] urged as the basis for resisting the deemed trust": para. 52. The Court of Appeal concluded that this was a breach of Indalex's fiduciary duties because the motion was brought "with the intention of defeating the deemed trust claims and ensuring that the Reserve Fund was transferred to [the U.S. debtors]": para. 139. I respectfully disagree.

[221]    It was certainly open to Indalex as an employer to bring a motion to voluntarily enter into bankruptcy. A pension plan administrator has no responsibility or authority in relation to that step. The problem here is not that the motion was brought, but that Indalex failed to meaningfully address the conflict between its corporate interests and its duties as plan administrator.

(Div. gén.)), par. 24). En définitive, il appartient au juge d'exercer son pouvoir discrétionnaire et d'arrêter la ou les mesures appropriées. Comme l'exprime bien la Cour d'appel, ce qu'il faut se rappeler c'est que l'entreprise insolvable qui est également administrateur de régime ne peut [TRADUCTION] « simplement ignorer les obligations qui lui incombent en tant qu'administrateur des régimes une fois qu'elle a décidé de se prévaloir de la protection de la *LACC* » (par. 132).

[219]    J'estime que la Cour d'appel conclut à tort qu'Indalex a manqué à ses obligations fiduciaires d'administrateur des régimes en prenant diverses mesures dans le cadre de la procédure fondée sur la *LACC*. Je conviens cependant avec elle qu'Indalex a manqué à son obligation fiduciaire en omettant de faire ce qu'il fallait pour que les bénéficiaires des régimes puissent être dûment représentés dans le cadre de cette procédure comme si l'administrateur des régimes avait été indépendant.

(iii)  La motion présentée en vue de faire faillite

[220]    Indalex a aussi demandé la levée de la suspension accordée sur le fondement de la *LACC* afin qu'elle puisse faire cession de ses biens. Comme le dit le juge Campbell, cette démarche [TRADUCTION] « visait à donner effet à l'ordre de priorité qu'Indalex faisait valoir à l'encontre de la fiducie réputée » (par. 52). La Cour d'appel conclut qu'il s'agit d'un manquement aux obligations fiduciaires d'Indalex, car la motion a été présentée [TRADUCTION] « afin de faire échec aux prétentions relatives à la fiducie réputée et d'obtenir le transfert du fonds de réserve aux [débitrices américaines] » (par. 139). En toute déférence, je ne suis pas d'accord.

[221]    Il était certainement loisible à Indalex, l'employeur, de présenter une motion en vue de faire cession volontaire de ses biens. L'administrateur d'un régime de retraite n'a ni obligation, ni pouvoir à cet égard. Le problème en l'espèce tient non pas à la présentation de la motion, mais plutôt à ce qu'Indalex a omis de s'attaquer véritablement au problème du conflit entre ses intérêts commerciaux et ses obligations d'administrateur des régimes.

[222]    To sum up, I conclude that Indalex did not breach any fiduciary duty by undertaking *CCAA* proceedings or seeking the relief that it did. The breach arose from Indalex's failure to ensure that its pension plan beneficiaries had the opportunity to have their interests effectively represented in the insolvency proceedings, particularly when Indalex sought the DIP financing approval, the sale approval and the motion for bankruptcy.

### (3)  *Was Imposing a Constructive Trust Appropriate in This Case?*

[223]    The next issue is whether a remedial constructive trust is, as the Court of Appeal concluded, an appropriate remedy in response to the breach of fiduciary duty.

[224]    The Court of Appeal exercised its discretion to impose a constructive trust and its exercise of this discretion is entitled to deference. Only if the discretion has been exercised on the basis of an erroneous principle should the order be overturned on appeal: *Donkin v. Bugoy*, [1985] 2 S.C.R. 85, cited in *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217, at para. 54, by Sopinka J. (dissenting, but not on this point). In my respectful view, the Court of Appeal's erroneous conclusions about the scope of a plan administrator's fiduciary duties require us to examine the constructive trust issue anew. Moreover, the Court of Appeal, in my respectful opinion, erred in principle in finding that the asset in this case resulted from the breach of fiduciary duty such that it would be unjust for the party in breach to retain it.

[225]    As noted earlier, the Court of Appeal imposed a constructive trust in favour of the plan beneficiaries with respect to funds retained in the reserve fund equal to the total amount of the wind-up deficiency for both plans. In other words, upon insolvency of Indalex, the plan beneficiaries received 100 cents on the dollar as a result of a judicially imposed trust taking priority over

[222]    En résumé, j'estime qu'Indalex n'a pas manqué à une obligation fiduciaire lorsqu'elle a engagé la procédure fondée sur la *LACC* ou demandé la mesure en cause. Il y a eu manquement parce qu'Indalex n'a pas fait en sorte que les intérêts des bénéficiaires des régimes de retraite soient effectivement défendus dans le cadre de la procédure liée à son insolvabilité, en particulier lorsqu'elle a demandé l'approbation du financement DE et de la vente, puis présenté une motion en vue de faire faillite.

### (3)  *Convenait-il en l'espèce d'imposer une fiducie par interprétation?*

[223]    La question qui se pose ensuite est celle de savoir si, comme le conclut la Cour d'appel, l'imposition d'une fiducie par interprétation constitue une réparation adéquate du manquement à l'obligation fiduciaire.

[224]    La Cour d'appel exerce son pouvoir discrétionnaire d'imposer une fiducie par interprétation, et cet exercice commande la déférence. Une telle mesure ne peut être infirmée en appel que si l'exercice du pouvoir discrétionnaire s'appuie sur un principe erroné (*Donkin c. Bugoy*, [1985] 2 R.C.S. 85, cité dans *Soulos c. Korkontzilas*, [1997] 2 R.C.S. 217, par. 54, le juge Sopinka (dissident, mais pas sur ce point)). En toute déférence, les conclusions erronées de la Cour d'appel sur la portée des obligations fiduciaires de l'administrateur du régime nous obligent à revoir les conditions de l'imposition d'une fiducie par interprétation. Qui plus est, la Cour d'appel commet selon moi une erreur de principe lorsqu'elle conclut que l'actif convoité résulte du manquement à l'obligation fiduciaire, de sorte qu'il serait injuste que la partie fautive se l'approprie.

[225]    Comme je le mentionne précédemment, la Cour d'appel statue que le fonds de réserve fait l'objet d'une fiducie par interprétation à l'intention des bénéficiaires des régimes à raison d'un montant égal au déficit de liquidation global des deux régimes. En d'autres termes, une fois Indalex devenue insolvable, les bénéficiaires des régimes avaient droit au paiement de l'intégralité de leurs créances

secured creditors, and indeed over other unsecured creditors, assuming there was no deemed trust for the executive plan.

[226]    I have explained earlier why I take a different view than did the Court of Appeal of Indalex's breach of fiduciary duty. In light of what I conclude was the breach which could give rise to a remedy, my view is that the constructive trust cannot properly be imposed in this case and the Court of Appeal erred in principle in exercising its discretion to impose this remedy.

[227]    I part company with the Court of Appeal with respect to several aspects of its constructive trust analysis; it is far from clear to me that any of the conditions for imposing a constructive trust were present here. However, I will only address one of them in detail. As I will explain, a remedial constructive trust for a breach of fiduciary duty is only appropriate if the wrongdoer's acts give rise to an identifiable asset which it would be unjust for the wrongdoer (or sometimes a third party) to retain. In my view, Indalex's failure to meaningfully address conflicts of interest that arose during the *CCAA* proceedings did not result in any such asset.

[228]    As the Court of Appeal recognized, the governing authority concerning the remedial constructive trust outside the domain of unjust enrichment is *Soulos*. In *Soulos*, McLachlin J. (as she then was) wrote that a constructive trust may be an appropriate remedy for breach of fiduciary duty: paras. 19-45. She laid out four requirements that should generally be satisfied before a constructive trust will be imposed: para. 45. Although, in *Soulos*, McLachlin J. was careful to indicate that these are conditions that "generally" must be present, all parties in this case accept that these four conditions must be present before a remedial constructive trust may be ordered for

grâce à l'imposition judiciaire d'une fiducie prenant rang avant les créances garanties, ainsi que les créances chirographaires, à supposer que le régime des cadres n'ait bénéficié d'aucune fiducie réputée.

[226]    J'expose précédemment les raisons pour lesquelles je diffère d'opinion avec la Cour d'appel en ce qui concerne le manquement à l'obligation fiduciaire d'Indalex. Vu mes conclusions sur la nature du manquement susceptible de donner droit à réparation, je crois que la fiducie par interprétation ne saurait être imposée en l'espèce et que la Cour d'appel commet une erreur de principe en exerçant son pouvoir discrétionnaire d'accorder cette réparation.

[227]    Je suis en désaccord avec la Cour d'appel sur plusieurs points au sujet de la fiducie par interprétation; il ne me paraît pas du tout évident que l'une ou l'autre des conditions auxquelles une telle fiducie peut être imposée est remplie en l'espèce. Je n'examine cependant en détail que l'un de ces points. Comme je l'explique ci-après, l'imposition d'une fiducie par interprétation par suite d'un manquement à une obligation fiduciaire ne constitue une réparation appropriée que si un actif déterminable résulte des actes de l'auteur du manquement et qu'il serait injuste que ce dernier ou, parfois, un tiers, conserve cet actif. Or, selon moi, un tel actif n'a pas résulté de l'omission d'Indalex de pallier véritablement les conflits d'intérêts auxquels donnait lieu la procédure fondée sur la *LACC*.

[228]    La Cour d'appel reconnaît que, sauf lorsqu'il est question d'enrichissement sans cause, l'arrêt *Soulos* s'applique en matière de fiducie par interprétation imposée en guise de réparation. Aux paragraphes 19-45 de cet arrêt, la juge McLachlin (maintenant Juge en chef) écrit qu'une fiducie par interprétation peut constituer une réparation appropriée du manquement à l'obligation fiduciaire. Au paragraphe 45, elle énonce quatre conditions qui doivent généralement être réunies pour qu'une fiducie par interprétation puisse être imposée. Même si, dans *Soulos*, la juge McLachlin précise bien qu'il s'agit de conditions qui doivent « généralement » être réunies, toutes les parties au

breach of fiduciary duty. The four conditions are these:

(1) The defendant must have been under an equitable obligation, that is, an obligation of the type that courts of equity have enforced, in relation to the activities giving rise to the assets in his hands;

(2) The assets in the hands of the defendant must be shown to have resulted from deemed or actual agency activities of the defendant in breach of his equitable obligation to the plaintiff;

(3) The plaintiff must show a legitimate reason for seeking a proprietary remedy, either personal or related to the need to ensure that others like the defendant remain faithful to their duties and;

(4) There must be no factors which would render imposition of a constructive trust unjust in all the circumstances of the case; e.g., the interests of intervening creditors must be protected. [para. 45]

[229]    My concern is with respect to the second requirement, that is, whether the breach resulted in an asset in the hands of Indalex. A constructive trust arises when the law imposes upon a party an obligation to hold specific property for another: D. W. M. Waters, M. R. Gillen and L. D. Smith, *Waters' Law of Trusts in Canada* (3rd ed. 2005), at p. 454 ("*Waters*"). The purpose of imposing a constructive trust as a remedy for a breach of duty or unjust enrichment is to prevent parties "from retaining property which in 'good conscience' they should not be permitted to retain": *Soulos*, at para. 17. It follows, therefore, that while the remedial constructive trust may be appropriate in a variety of situations, the wrongdoer's conduct toward the plaintiff must generally have given rise to assets in the hands of the wrongdoer (or of a third party in some situations) which cannot in justice and good conscience be retained. That cannot be said here.

pourvoi conviennent qu'elles doivent toutes être respectées pour que le tribunal puisse imposer une fiducie par interprétation à titre de réparation par suite d'un manquement à une obligation fiduciaire. Ces quatre conditions sont les suivantes :

(1) le défendeur doit avoir été assujetti à une obligation en *equity*, c'est-à-dire une obligation du type de celles dont les tribunaux d'*equity* ont assuré le respect, relativement aux actes qui ont conduit à la possession des biens [ou de l'actif];

(2) il faut démontrer que la possession des biens [ou de l'actif] par le défendeur résulte des actes qu'il a ou est réputé avoir accomplis à titre de mandataire, en violation de l'obligation que l'*equity* lui imposait à l'égard du demandeur;

(3) le demandeur doit établir qu'il a un motif légitime de solliciter une réparation fondée sur la propriété, soit personnel soit lié à la nécessité de veiller à ce que d'autres personnes comme le défendeur s'acquittent de leurs obligations;

(4) il ne doit pas exister de facteurs qui rendraient injuste l'imposition d'une fiducie par interprétation eu égard à l'ensemble des circonstances de l'affaire; par exemple, les intérêts des créanciers intervenants doivent être protégés. [par. 45]

[229]    Je doute que la deuxième condition — la possession des biens (ou de l'actif) par Indalex résultant du manquement à ses obligations — soit remplie. Il y a fiducie par interprétation lorsque la loi impose à une personne de détenir un bien précis pour autrui (D. W. M. Waters, M. R. Gillen et L. D. Smith, *Waters' Law of Trusts in Canada* (3ᵉ éd. 2005), p. 454 (« *Waters* »)). Lorsqu'une telle réparation est accordée par suite d'un manquement à une obligation ou d'un enrichissement sans cause, elle vise à « empêcher [les personnes] de conserver des biens qu'en toute "conscience" elles ne devraient pas être autorisées à garder » (*Soulos*, par. 17). Il s'ensuit donc que la fiducie par interprétation peut certes constituer une réparation convenable dans divers cas, mais que la possession des biens doit généralement résulter des actes de la partie fautive (parfois, d'un tiers) vis-à-vis du demandeur, cette partie ou ce tiers fautif ne pouvant alors en toute justice et conscience garder les biens. Ce n'est pas le cas en l'espèce.

[230]    The Court of Appeal held that this second condition was present because "[t]he assets [i.e. the reserve fund monies] are directly connected to the process in which Indalex committed its breaches of fiduciary obligation": para. 204. Respectfully, this conclusion is based on incorrect legal principles. To satisfy this second condition, it must be shown that the breach *resulted in* the assets being in Indalex's hands, not simply, as the Court of Appeal thought, that there was a "connection" between the assets and "the process" in which Indalex breached its fiduciary duty. Recall that in *Soulos* itself, *the defendant's acquisition of the disputed property was a direct result of his breach of his duty of loyalty* to the plaintiff: para. 48. This is not our case. As the Court observed, in the context of an unjust enrichment claim in *Peter v. Beblow*, [1993] 1 S.C.R. 980, at p. 995:

. . . for a constructive trust to arise, the plaintiff must establish a direct link to the property which is the subject of the trust by reason of the plaintiff's contribution.

[231]    While cases of breach of fiduciary duty are different in important ways from cases of unjust enrichment, La Forest J. (with Lamer J. concurring on this point) applied a similar standard for proprietary relief in *Lac Minerals*, a case in which wrongdoing was the basis for the constructive trust: p. 678, quoted in *Waters*, at p. 471. His comments demonstrate the high standard to be met in order for a constructive trust to be awarded:

The constructive trust awards a right in property, but that right can only arise once a right to relief has been established. In the vast majority of cases a constructive trust will not be the appropriate remedy. . . . [A] constructive trust should only be awarded if there is reason to grant to the plaintiff the additional rights that flow from recognition of a right of property. [p. 678]

[232]    The relevant breach in this case was the failure of Indalex to meaningfully address the conflicts of interest that arose in the course of the

[230]    La Cour d'appel conclut que cette deuxième condition est respectée car [TRADUCTION] « [l]'actif [les sommes constituant le fonds de réserve] est directement lié à la procédure dans le cadre de laquelle Indalex a manqué à son obligation fiduciaire » (par. 204). À mon humble avis, cette conclusion s'appuie sur des principes de droit erronés. Pour satisfaire à la deuxième condition, il faut démontrer que la possession de l'actif par Indalex *résulte* du manquement à son obligation, et non seulement, comme le croit la Cour d'appel, qu'il y a un « lien » entre l'actif et la « procédure » dans le cadre de laquelle Indalex a manqué à ses obligations fiduciaires. Rappelons que, dans *Soulos*, *l'acquisition par le défendeur de l'immeuble en cause était la conséquence directe du manquement à son devoir de loyauté* envers le demandeur (par. 48). Telle n'est pas la situation en l'espèce. Comme le dit notre Cour dans l'arrêt *Peter c. Beblow*, [1993] 1 R.C.S. 980, p. 995, dans le contexte d'une allégation d'enrichissement sans cause,

pour qu'il y ait fiducie par interprétation, le demandeur doit établir qu'il a, du fait de sa contribution, un lien direct avec le bien qui se trouve grevé d'une fiducie.

[231]    Même si le manquement à l'obligation fiduciaire diffère grandement de l'enrichissement sans cause, dans l'arrêt *Lac Minerals*, le juge La Forest (avec l'accord du juge Lamer sur ce point) applique un critère semblable à une réparation liée au droit de propriété. Dans cette affaire, la fiducie par interprétation faisait suite à un acte fautif (p. 678, cité dans *Waters*, p. 471). Les remarques du juge La Forest confirment le caractère strict de la norme applicable à l'imposition judiciaire d'une fiducie par interprétation :

La fiducie par interprétation confère un droit de propriété, mais ce droit ne peut exister que si un droit à une réparation a déjà été établi. Dans la grande majorité des cas, la fiducie par interprétation ne sera pas la réparation appropriée. [. . .] [I]l n'y a lieu de conférer une fiducie par interprétation qu'en présence d'un motif pour accorder au demandeur les droits supplémentaires découlant de la reconnaissance d'un droit de propriété. [p. 678]

[232]    Le manquement intervenu en l'espèce consiste dans l'omission d'Indalex de pallier véritablement les conflits d'intérêts qu'a fait naître la

18-23538-shl    Doc 3920-3    Filed 05/17/19    Entered 05/17/19 11:35:37    Exhibit C
Pg 103 of 131

372          SUN INDALEX FINANCE  *v.*  UNITED STEELWORKERS   *Cromwell J.*          [2013] 1 S.C.R.

*CCAA* proceedings. (The breach that arose with respect to the bankruptcy motion is irrelevant because that motion was not addressed and therefore could not have given rise to the assets.) The "assets" in issue here are the funds in the reserve fund which were retained from the proceeds of the sale of Indalex as a going concern. Indalex's breach in this case did not give rise to the funds which were retained by the Monitor in the reserve fund.

[233]    Where does the respondents' claim of a procedural breach take them? Taking their position at its highest, it would be that the DIP approval proceedings and the sale would not have been approved. This position, however, is fatally flawed. Turning first to the DIP approval, there is no evidence to support the view that, had Indalex addressed its conflict in the DIP approval process, the DIP financing would have been rejected or granted on different terms. The *CCAA* judge, being fully aware of the pension situation, ruled that the DIP financing was "required", that there was "no other alternative available to the Applicants for a going concern solution", and that "the benefit to stakeholders and creditors of the DIP Financing outweighs any potential prejudice to unsecured creditors that may arise as a result of the granting of super-priority secured financing": endorsement of Morawetz J., April 8, 2009, at paras. 6 and 9. In effect, the respondents are claiming funds which arose only because of the process to which they now object. Taking into account that there was an absence of any evidence that more favourable financing terms were available, that the judge's decision was made with full knowledge of the plan beneficiaries' claims, and that he found that the DIP financing was necessary, the respondents' contention is not only speculative, it also directly contradicts the conclusions of the *CCAA* judge.

[234]    Turning next to the sale approval and the approval of the distribution of the assets, it is clear that the plan beneficiaries had independent representation but that this did not change the result.

procédure fondée la *LACC*. (Le manquement qui aurait découlé de la motion présentée en vue de faire faillite n'a pas à être considéré puisque la motion n'a été examinée et ne peut donc pas avoir permis l'entrée en possession de l'actif.) L'actif en cause correspond au fonds de réserve constitué par prélèvement sur le produit de la vente de l'entreprise en exploitation d'Indalex. Ce manquement d'Indalex n'est pas à l'origine des fonds que le contrôleur a conservés en constituant le fonds de réserve.

[233]    Quelle peut être l'issue de l'allégation des intimés selon laquelle il y a eu manquement aux exigences de procédure? Suivant la plus favorable, ni le financement DE ni la vente n'auraient été approuvés. Or, cette thèse est irrémédiablement viciée. Premièrement, en ce qui concerne la procédure d'approbation du financement DE, aucun élément de preuve n'établit que si Indalex avait pallié ses conflits dans le cadre de cette procédure, le financement aurait été refusé ou autorisé à d'autres conditions. Parfaitement informé de la situation des régimes de retraite, le juge saisi sur le fondement de la *LACC* estime que le financement DE [TRADUCTION] « s'impose », que « les requérantes ne disposent d'aucune autre solution permettant la continuité de l'exploitation » et que « les avantages du financement DE pour les intéressés et les créanciers l'emportent sur tout préjudice que pourrait causer aux créanciers non garantis l'octroi d'un financement garanti par une superpriorité » (motifs du juge Morawetz, 8 avril 2009, par. 6 et 9). En fait, les intimés réclament des fonds qui ont été obtenus uniquement grâce à la procédure qu'ils contestent aujourd'hui. Vu l'absence d'éléments de preuve voulant que des modalités de financement plus avantageuses aient pu être obtenues, et comme le juge est bien conscient de l'existence des réclamations des bénéficiaires des régimes et qu'il conclut que le financement DE s'impose, la prétention des intimés est non seulement conjecturelle, mais va aussi directement à l'encontre des conclusions du juge.

[234]    En ce qui concerne l'approbation de la vente et de la répartition de l'actif, il est clair que les bénéficiaires des régimes ont été représentés de manière indépendante, mais que cette mesure n'a

Although, perhaps with little thanks to Indalex, the interests of both plans were fully and ably represented before Campbell J. at the sale approval and interim distribution motions in July of 2009.

[235]    The executive plan retirees, through able counsel, objected to the sale on the basis that the liquidation values set out in the Monitor's seventh report would provide greater return for unsecured creditors. The motions judge dismissed this objection "on the basis that there was no clear evidence to support the proposition and in any event the transaction as approved did preserve value for suppliers, customers and preserve approximately 950 jobs": trial reasons of Campbell J., at para. 13 (emphasis added). Both the executive plan retirees and the USW, which represented some members of the salaried plan, objected to the proposed distribution of the sale proceeds. In response to this objection, it was agreed that those objections would be heard promptly and that the Monitor would retain sufficient funds to satisfy the pensioners' claims if they were upheld: trial reasons of Campbell J., at paras. 14-16.

[236]    There is no evidence to support the contention that Indalex's breach of its fiduciary duty as pension administrator resulted in the assets retained in the reserve fund. I therefore conclude that the Court of Appeal erred in law in finding that the second condition for imposing a constructive trust — i.e. that the assets in the defendant's hands must be shown to have resulted from the defendant's breaches of duty to the plaintiff — had been established.

[237]    I would add only two further comments with respect to the constructive trust. A major concern of the Court of Appeal was that unless a constructive trust were imposed, the reserve funds would end up in the hands of other Indalex entities which were not operating at arm's length from Indalex. The U.S. debtors claimed the reserve fund

rien changé au résultat. En juillet 2009, devant le juge Campbell, pendant toute l'audition des motions visant l'approbation de la vente et la répartition provisoire du produit de la vente, les intérêts des deux régimes ont bel et bien été défendus, même si Indalex n'y a peut-être pas été pour grand-chose.

[235]    Par l'entremise d'un avocat compétent, les retraités du régime des cadres se sont opposés à la vente en arguant que, selon le septième rapport du contrôleur, les valeurs de liquidation permettaient aux créanciers chirographaires de recouvrer plus d'argent. Le juge saisi des motions a rejeté leur opposition [TRADUCTION] « au motif qu'aucun élément de preuve n'appuyait clairement cette prétention et que, de toute façon, l'opération approuvée garantissait la valeur de l'actif pour les fournisseurs et les clients, et préservait environ 950 emplois » (motifs du juge Campbell en première instance, par. 13 (je souligne)). Les retraités du régime des cadres et le Syndicat, qui représentait certains participants du régime des salariés, a contesté la répartition projetée du produit de la vente. Il a dès lors été convenu que le juge entendrait leurs arguments au plus tôt et que le contrôleur conserverait des fonds suffisants pour donner suite aux prétentions des retraités dans le cas où il y serait fait droit (motifs du juge Campbell en première instance, par. 14-16).

[236]    Aucun élément de preuve n'appuie la prétention que l'actif constituant le fonds de réserve découle du manquement d'Indalex à son obligation fiduciaire en tant qu'administrateur de régime. Je suis donc d'avis que la Cour d'appel a erré en droit en concluant que la deuxième condition à remplir pour qu'une fiducie par interprétation puisse être imposée — démontrer que la possession des biens par le défendeur résulte des manquements à ses obligations envers le demandeur — a été remplie.

[237]    Voici deux autres remarques au sujet de la fiducie par interprétation. L'une des préoccupations principales de la Cour d'appel est que, à défaut d'une telle fiducie par interprétation, le fonds de réserve se retrouve en la possession de sociétés ayant un lien de dépendance avec Indalex. Les débitrices américaines ont réclamé l'octroi du fonds

because it had paid on its guarantee of the DIP loans and thereby stepped into the shoes of the DIP lender with respect to priority. Sun Indalex claims in the U.S. bankruptcy proceedings as a secured creditor of the U.S. debtors. The Court of Appeal put its concern this way: "To permit Sun Indalex to recover on behalf of [the U.S. debtors] would be to effectively permit the party who breached its fiduciary obligations to take the benefit of those breaches, to the detriment of those to whom the fiduciary obligations were owed": para. 199.

[238]    There are two difficulties with this approach, in my respectful view. The U.S. debtors paid real money to honour their guarantees. Moreover, unless there is a legal basis for ignoring the separate corporate personality of separate corporate entities, those separate corporate existences must be respected. Neither the parties nor the Court of Appeal advanced such a reason.

[239]    Finally, I would note that imposing a constructive trust was wholly disproportionate to Indalex's breach of fiduciary duty. Its breach — the failure to meaningfully address the conflicts of interest that arose during the *CCAA* process — had no adverse impact on the plan beneficiaries in the sale approval process which gave rise to the "asset" in issue. Their interests were fully represented and carefully considered before the sale was approved and the funds distributed. The sale was nonetheless judged to be in the best interests of the corporation, all things considered. In my respectful view, imposing a $6.75 million penalty on the other creditors as a remedial response to this breach is so grossly disproportionate to the breach as to be unreasonable.

[240]    A judicially ordered constructive trust, imposed long after the fact, is a remedy that tends to destabilize the certainty which is essential for

de réserve en faisant valoir les sommes versées en exécution de leur garantie des prêts DE et qu'elles étaient par conséquent subrogées aux droits des créanciers DE et bénéficiaient de la priorité accordée à ces derniers. Sun Indalex a présenté une réclamation dans le cadre de la procédure de faillite intentée aux É.-U. à titre de créancier garanti des débitrices américaines. La Cour d'appel formule sa réticence comme suit : [TRADUCTION] « Permettre à Sun Indalex de recouvrer des sommes pour le compte [des débitrices américaines] équivaudrait à autoriser le débiteur d'obligations fiduciaires à tirer profit de manquements à celles-ci, et ce, au détriment des créanciers de ces obligations » (par. 199).

[238]    À mon humble avis, cette approche comporte deux failles. Les débitrices américaines ont dû véritablement débourser de l'argent pour honorer leurs garanties. De plus, à moins qu'un fondement juridique permette de faire abstraction de la personnalité morale distincte de chacune des entreprises, leur existence distincte doit être respectée. Ni les parties ni la Cour d'appel n'ont avancé un tel fondement.

[239]    Enfin, il convient de signaler que l'imposition d'une fiducie par interprétation est une mesure totalement disproportionnée au manquement d'Indalex à son obligation fiduciaire. Ce manquement — l'omission de pallier véritablement les conflits d'intérêts nés à l'occasion de la procédure fondée sur la *LACC* — n'a pas eu d'incidence défavorable sur les bénéficiaires des régimes par suite de la procédure d'approbation de la vente dont a résulté la possession des « biens » en cause. Les intérêts des régimes ont été dûment défendus avant que la vente ne soit approuvée et les fonds répartis. Tout compte fait, le tribunal a néanmoins estimé que la vente était dans le meilleur intérêt de l'entreprise. À mon humble avis, priver les autres créanciers de 6,75 millions de dollars pour réparer ce manquement est disproportionné au point d'être déraisonnable.

[240]    L'imposition judiciaire d'une fiducie par interprétation longtemps après les faits à titre de réparation risque de nuire à la certitude qui est

commercial affairs and which is particularly important in financing a workout for an insolvent corporation. To impose a constructive trust in response to a breach of fiduciary duty to ensure for the plan beneficiaries some procedural protections that they in fact took advantage of in any case is an unjust response in all of the circumstances.

[241]    I conclude that a constructive trust is not an appropriate remedy in this case and that the Court of Appeal erred in principle by imposing it.

C.  *Third Issue: Did the Court of Appeal Err in Concluding That the Super Priority Granted in the CCAA Proceedings Did Not Have Priority by Virtue of the Doctrine of Federal Paramountcy?*

[242]    Although I disagree with my colleague Justice Deschamps with respect to the scope of the s. 57(4) deemed trust, I agree that if there was a deemed trust in this case, it would be superseded by the DIP loan because of the operation of the doctrine of federal paramountcy: paras. 48-60.

D.  *Fourth Issue: Did the Court of Appeal Err in its Cost Endorsement Respecting the USW?*

(1)  Introduction

[243]    The disposition of costs in the Court of Appeal was somewhat complex. Although the costs appeal relates only to the costs of the USW, it is necessary in order to understand their position to set out the costs order below in full.

[244]    With respect to the costs of the appeal to the Court of Appeal, no order was made for or against the Monitor due to its prior agreement with the former executives and the USW. However, the court ordered that the former executives and the USW, as successful parties, were each entitled to

essentielle à l'activité commerciale et qui est particulièrement importante lorsqu'il s'agit de financer le sauvetage d'une entreprise insolvable. Imposer une fiducie par interprétation par suite du manquement à l'obligation fiduciaire de veiller à ce que les bénéficiaires des régimes de retraite jouissent de garanties procédurales, alors qu'ils en ont bénéficié dans les faits, se révèle inéquitable au vu de l'ensemble des circonstances.

[241]    Je conclus que la fiducie par interprétation ne constitue pas une réparation appropriée en l'espèce et que la Cour d'appel a tort, sur le plan des principes, de l'imposer.

C.  *Troisième question en litige : La Cour d'appel a-t-elle tort de conclure que la superpriorité accordée dans le cadre de la procédure fondée sur la LACC ne confère pas de préséance par application de la prépondérance fédérale?*

[242]    Bien que je ne sois pas d'accord avec ma collègue la juge Deschamps en ce qui concerne la portée de la fiducie réputée du par. 57(4), je conviens que si une fiducie est réputée exister en l'espèce, la créance DE prend rang avant elle en application de la doctrine de la prépondérance fédérale (par. 48-60).

D.  *Quatrième question en litige : La décision de la Cour d'appel sur les dépens du Syndicat est-elle entachée d'une erreur?*

(1)  Introduction

[243]    L'adjudication des dépens en Cour d'appel s'est révélée assez complexe. Bien que le volet du présent pourvoi relatif aux dépens ne vise que ceux adjugés au Syndicat, il convient de revoir en détail l'ordonnance du tribunal inférieur sur les dépens afin de bien saisir les prétentions de cette partie.

[244]    Pour ce qui concerne les dépens en Cour d'appel, il n'y a pas d'adjudication favorable ou défavorable au contrôleur étant donné l'entente préalable conclue avec les anciens cadres et le Syndicat. La Cour d'appel ordonne toutefois que les anciens cadres et le Syndicat, qui ont gain de

costs on a partial indemnity basis fixed at $40,000 inclusive of taxes and disbursements from Sun Indalex and the U.S. Trustee, payable jointly and severally: costs endorsement, 2011 ONCA 578, 81 C.B.R. (5th) 165, at para. 7.

[245]    Morneau Shepell Ltd., the Superintendent, and the former executives reached an agreement with respect to legal fees and disbursements and the Court of Appeal approved that agreement. The former executives received full indemnity legal fees and disbursements in the amount of $269,913.78 to be paid from the executive plan attributable to each of the 14 former executives' accrued pension benefits, allocated among the 14 former executives in relation to their pension entitlement from the executive plan. In other words, the costs would not be borne by the other three members of the executive plan who did not participate in the proceedings: C.A. costs endorsement, at para. 2. The costs of the appeal payable by Sun Indalex and the U.S. Trustee were to be paid into the fund of the executive plan and allocated among the 14 former executives in relation to their pension entitlement from the executive plan.

[246]    USW sought an order for payment of its costs from the fund of the salaried plan. However, the Court of Appeal declined to make such an order because the USW was in a "materially different position" than that of the former executives: costs endorsement, at para. 3. The latter were beneficiaries to the pension fund (14 of the 17 members of the plan), and they consented to the payment of costs from their individual benefit entitlements. Those who had not consented would not be affected by the payment. In contrast, the USW was the bargaining agent (not the beneficiary) for only 7 of the 169 beneficiaries of the salaried plan, none of whom was given notice of, or consented to, the payment of legal costs from the salaried plan. Moreover, the USW sought and seeks an order that its costs be paid out of the fund. This request is significantly different than the order made in favour of the former executives. The former executives explicitly ensured that their choice to pursue the litigation would not put at risk the pension benefits of those members who did not retain counsel even though of course those members would benefit in the

cause, se voient adjuger sur la base de l'indemnisation partielle des dépens de 40 000 $, frais et débours compris, payables solidairement par Sun Indalex et le syndic américain (décision relative aux dépens, 2011 ONCA 578, 81 C.B.R. (5th) 165, par. 7).

[245]    Le surintendant, Morneau Shepell Ltd., et les anciens cadres ont conclu une entente en ce qui concerne les honoraires et les débours, et la Cour d'appel l'a approuvée. Les anciens cadres ont obtenu, sur la base d'une indemnisation complète, la somme de 269 913,78 $ pour les honoraires et les débours, payable par prélèvement sur la caisse de retraite des cadres correspondant aux prestations de retraite accumulées respectivement par les 14 anciens cadres, puis répartie entre ces derniers selon leurs droits respectifs à pension aux termes du régime. En d'autres termes, les dépens ne devaient pas être supportés par les trois membres du régime des cadres qui n'ont pas pris part à l'instance (décision de la C.A. relative aux dépens, par. 2). Les dépens de l'appel payables par Sun Indalex et le syndic américain devaient être versés à la caisse du régime des cadres puis répartis entre les 14 anciens cadres selon leurs droits à pension suivant leur régime.

[246]    Le Syndicat a demandé le paiement de ses dépens à partir de la caisse du régime des salariés. La Cour d'appel a cependant rejeté la demande au motif que le Syndicat se trouvait dans une [TRADUCTION] « situation fondamentalement différente » de celle des anciens cadres (décision relative aux dépens, par. 3). Ces derniers étaient bénéficiaires de la caisse de retraite (14 des 17 participants au régime), ils avaient consenti au paiement des dépens à partir de leurs droits respectifs à des prestations et ceux qui n'avaient pas consenti à ce prélèvement n'étaient pas tenus à ce paiement. En revanche, le Syndicat était l'agent négociateur (et non le bénéficiaire) de seulement 7 des 169 participants du régime des salariés, dont aucun n'avait été avisé du paiement des frais de justice par prélèvement sur leur régime, ou y avait consenti. En outre, le Syndicat a demandé et demande toujours que ses dépens soient payés à partir de la caisse de retraite, ce qui diffère sensiblement de l'ordonnance rendue en faveur des anciens cadres. Ces derniers ont expressément fait en sorte que leur décision d'engager l'instance

event the litigation was successful. The USW is not proposing to insulate the 162 members whom it does not represent from the risk of litigation; it seeks an order requiring all members to share the risk of the litigation even though it represents only 7 of the 169. The proposition advanced by the USW was thus materially different from that advanced on behalf of the executive plan and approved by the court.

### (2)   Standard of Review

[247]    In *Nolan v. Kerry (Canada) Inc.*, 2009 SCC 39, [2009] 2 S.C.R. 678, Rothstein J. held that "costs awards are quintessentially discretionary": para. 126. Discretionary costs decisions should only be set aside on appeal if the court below "has made an error in principle or if the costs award is plainly wrong": *Hamilton v. Open Window Bakery Ltd.*, 2004 SCC 9, [2004] 1 S.C.R. 303, at para. 27.

### (3)   Analysis

[248]    I do not see any basis to interfere with the Court of Appeal's costs endorsement in this case. In my view, the USW's submissions are largely based on an inaccurate reading of the Court of Appeal's costs endorsement. Contrary to what the USW submits, the Court of Appeal did *not* require the consent of plan beneficiaries as a prerequisite to ordering payment of costs from the fund. Nor is it correct to suggest that the costs endorsement would "restrict recovery of beneficiary costs to instances when there is a surplus in the pension trust fund" or "preclude financing of beneficiary action when a fund is in deficit": USW factum, at paras. 71 and 76. Nor would I read the Court of Appeal's brief costs endorsement as laying down a rule that a union representing pension beneficiaries cannot recover costs from the fund because the union itself is not a beneficiary.

ne compromette pas les prestations de retraite des participants qui n'avaient pas retenu les services d'un avocat, même s'ils auraient évidemment tiré avantage d'un dénouement favorable au régime des cadres. Le Syndicat n'entend pas mettre les 162 participants qu'il ne représente pas à l'abri du risque lié à la poursuite. Il demande que tous les participants partagent ce risque même s'ils ne représentent que 7 d'entre eux. La démarche du Syndicat était donc substantiellement différente de celle des anciens cadres et que la cour a approuvée.

### (2)   Norme de contrôle

[247]    Dans *Nolan c. Kerry (Canada) Inc.*, 2009 CSC 39, [2009] 2 R.C.S. 678, le juge Rothstein statue que « l'adjudication des dépens est un exemple typique d'une décision discrétionnaire » (par. 126). L'attribution discrétionnaire de dépens ne doit donc être annulée en appel que si le tribunal inférieur « a commis une erreur de principe ou si cette attribution est nettement erronée » (*Hamilton c. Open Window Bakery Ltd.*, 2004 CSC 9, [2004] 1 R.C.S. 303, par. 27).

### (3)   Analyse

[248]    Je ne vois en l'espèce aucune raison de revenir sur la décision de la Cour d'appel quant aux dépens. À mon avis, les prétentions du Syndicat reposent en grande partie sur une interprétation erronée de la décision de la Cour d'appel à cet égard. Contrairement à ce que fait valoir le Syndicat, la Cour d'appel *ne* tient *pas* le consentement des bénéficiaires du régime pour une condition préalable au paiement des dépens à partir de la caisse de retraite. Il est aussi erroné de laisser entendre que la décision relative aux dépens fait en sorte que [TRADUCTION] « les bénéficiaires ne peuvent être indemnisés des dépens que lorsqu'il existe un surplus dans la caisse de retraite en fiducie » ou qu'ils ne peuvent « financer l'exercice d'un recours lorsque la caisse est déficitaire » (mémoire du Syndicat, par. 71 et 76). Je ne considère pas non plus que, dans sa brève décision, la Cour d'appel établit la règle qu'un syndicat représentant les bénéficiaires d'une caisse de retraite ne peut être indemnisé de ses dépens par la caisse de retraite parce qu'il n'est pas lui-même bénéficiaire.

18-23538-shl    Doc 3920-3    Filed 05/17/19    Entered 05/17/19 11:35:37    Exhibit C
Pg 109 of 131

378          SUN INDALEX FINANCE  *v.*  UNITED STEELWORKERS    *Cromwell J.*          [2013] 1 S.C.R.

[249]    The premise of the USW's appeal appears to be that it was entitled to costs because it met what it refers to in its submissions as the Costs Payment Test and that if the executive plan members got their costs out of their pension fund, the union should get its costs out of the salaried employees' pension fund. Respectfully, I do not accept the validity of either premise.

[250]    The decision whether to award costs from the pension fund remains a discretionary matter. In *Nolan*, Rothstein J. surveyed the various factors that courts have taken into account when deciding whether to award a litigant its costs out of a pension trust. The first broad inquiry considered in *Nolan* was into whether the litigation concerned the due administration of the trust. In connection with this inquiry, courts have considered the following factors: (1) whether the litigation was primarily about the construction of the plan documents; (2) whether it clarified a problematic area of the law; (3) whether it was the only means of clarifying the parties' rights; (4) whether the claim alleged maladministration; and (5) whether the litigation had no effect on other beneficiaries of the trust fund: *Nolan*, at para. 126.

[251]    The second broad inquiry discussed in *Nolan* was whether the litigation was ultimately adversarial: para. 127. The following factors have been considered: (1) whether the litigation included allegations by an unsuccessful party of a breach of fiduciary duty; (2) whether the litigation only benefited a class of members and would impose costs on other members if successful; and (3) whether the litigation had any merit.

[252]    I do not think that it is correct to elevate these two inquiries (which constitute the Costs Payment Test articulated by the USW) to a test for entitlement to costs in the pension context. The factors set out in *Nolan* and other cases cited therein are best understood as highly relevant

[249]    La thèse du Syndicat paraît avoir pour prémisses le droit qu'il aurait au paiement des dépens parce qu'il satisfait au critère qu'il formule à cet égard dans son mémoire et, puisque les participants du régime des cadres ont obtenu le paiement de leurs dépens à partir de leur caisse de retraite, le droit du Syndicat au paiement de ses dépens par prélèvement sur la caisse de retraite des salariés. J'estime néanmoins que ces prémisses ne sont pas valables.

[250]    La décision d'ordonner le paiement de dépens à partir d'une caisse de retraite demeure discrétionnaire. Dans *Nolan*, le juge Rothstein considère les différentes questions que se posent les tribunaux pour décider d'adjuger ou non à une partie des dépens qui seront payés par prélèvement sur une fiducie de retraite. Dans *Nolan*, la première considération générale était celle de savoir si l'objet du litige est la bonne administration de la fiducie. Pour se prononcer, les tribunaux se sont posé les questions suivantes : (1) le litige concerne-t-il essentiellement l'interprétation des documents constitutifs du régime; (2) vise-t-il à clarifier un aspect problématique du droit applicable; (3) constitue-t-il le seul moyen de préciser les droits des parties; (4) la mauvaise administration est-elle alléguée; (5) y a-t-il absence d'incidence sur les autres bénéficiaires de la fiducie? (*Nolan*, par. 126).

[251]    La deuxième considération générale examinée au par. 127 de l'arrêt *Nolan* est celle de savoir si le litige a été de nature contradictoire, ce qui soulève les questions suivantes : (1) la partie déboutée alléguait-elle le manquement à l'obligation fiduciaire; (2) le litige ne servait-il que les intérêts d'une catégorie de participants, et si les demandeurs avaient eu gain de cause, des dépens auraient-ils été imposés à d'autres participants; (3) le litige avait-il quelque fondement?

[252]    Je ne crois pas qu'il convienne de faire des deux considérations retenues dans *Nolan* (lesquelles constituent le critère applicable au paiement des dépens que formule le Syndicat) le critère qui permet de déterminer le droit à l'adjudication des dépens dans le contexte des régimes de retraite.

considerations guiding the exercise of judicial discretion with respect to costs.

[253]    The litigation undertaken here raised novel points of law with all of the uncertainty and risk inherent in such an undertaking. The Court of Appeal in essence decided that the USW, representing only 7 of 169 members of the plan, should not without consultation be able to in effect impose the risks of that litigation on all of the plan members, the vast majority of whom were not union members. Whatever arguments might be raised against the Court of Appeal's decision in light of the success of the litigation and the sharing by all plan members of the benefits, the failure of the litigation seems to me to leave no basis to impose the cost consequences of taking that risk on all of the plan members of an already underfunded plan.

[254]    The second premise of the USW appeal appears to be that if the executive plan members have their costs paid out of the fund, so too should the salaried plan members. Respectfully, however, this is not an accurate statement of the order made with respect to the executive plan.

[255]    The Court of Appeal's order with respect to the executive plan meant that only the pension fund attributable to those members of the plan who actually supported the litigation — the vast majority I would add — would contribute to the costs of the litigation even though all members of the plan would benefit in the case of success. As the Court of Appeal noted:

The individual represented Retirees, who comprise 14 of 17 members of the Executive Plan, have consented to the payment of costs from their individual benefit entitlements. Those who have not consented will not be affected by the payment. [Costs endorsement, at para. 3]

Il est préférable de voir dans les facteurs énoncés dans *Nolan* — et dans la jurisprudence qui y est citée — des considérations de grande importance qui orientent les tribunaux dans l'exercice de leur pouvoir discrétionnaire en matière de dépens.

[253]    Comme l'instance engagée en l'espèce portait sur des points de droit nouveaux, son issue était incertaine et les demandeurs couraient le risque d'être déboutés. La Cour d'appel opine essentiellement que le Syndicat, qui représentait seulement 7 des 169 participants du régime, ne devait pas être en mesure, dans les faits, d'imposer à tous les participants du régime, dont la plupart n'étaient pas membres du Syndicat, les risques inhérents au litige sans les consulter. Quels que puissent être les arguments invoqués à l'encontre de la décision de la Cour d'appel à la lumière de l'issue favorable du recours et du partage par tous les participants du régime des gains obtenus, l'échec du recours ne saurait justifier que tous les participants d'un régime déjà sous-capitalisé subissent les conséquences pécuniaires du risque couru.

[254]    Suivant la seconde prémisse de la prétention du Syndicat, si les participants du régime des cadres obtiennent paiement de leurs dépens à partir de leur caisse de retraite, les participants du régime des salariés devraient l'obtenir également. Or, telle n'est pas la teneur exacte de l'ordonnance de la Cour d'appel relative au régime des cadres.

[255]    Suivant cette ordonnance, seule la partie de la caisse de retraite attribuable aux participants qui ont pris part au recours — la grande majorité d'entre eux, faut-il le préciser — contribue au paiement des dépens même si tous les participants du régime tirent avantage du dénouement favorable. La Cour d'appel signale d'ailleurs ce qui suit :

[TRADUCTION] Les retraités représentés par avocat, soit 14 des 17 participants du régime des cadres, ont consenti au paiement des dépens à partir de leurs droits respectifs à des prestations, et ceux qui n'ont pas consenti à ce prélèvement ne seront pas tenus au paiement. [Décision relative aux dépens, par. 3]

18-23538-shl    Doc 3920-3    Filed 05/17/19    Entered 05/17/19 11:35:37    Exhibit C
Pg 111 of 131

380    SUN INDALEX FINANCE  v.  UNITED STEELWORKERS    *Cromwell J.*    [2013] 1 S.C.R.

[256]    The Court of Appeal therefore approved an agreement as to costs which did not put at further risk the pension funds available to satisfy the pension entitlements of those who did not support the litigation. Thus, the Court of Appeal did not apply what the USW refers to as the Costs Payment Test to the executive plan because the costs order was the product of agreement and did not order payment of costs out of the fund as a whole.

[257]    In the case of the USW request, there was no such agreement and no such limitation of risk to the supporters of the litigation.

[258]    I see no error in principle in the Court of Appeal's refusal to order the USW costs to be paid out of the pension fund, particularly in light of the disposition of the appeal to this Court. I would dismiss the USW costs appeal but without costs.

IV.  Disposition

[259]    I would allow the Sun Indalex, FTI Consulting and George L. Miller appeals and, except as noted below, I would set aside the orders of the Ontario Court of Appeal and restore the February 18, 2010 orders of Campbell J.

[260]    With respect to costs, I would set aside the Court of Appeal's orders with respect to the costs of the appeals before that court and order that all parties bear their own costs in the Court of Appeal and in this Court.

[261]    I would not disturb paras. 9 and 10 of the order of the Court of Appeal in the former executives' appeal so that the full indemnity legal fees and disbursements of the former executives in the amount of $269,913.78 shall be paid from the fund of the executive plan attributable to each of the 14 former executives' accrued pension benefits, and

[256]    La Cour d'appel approuve donc un accord sur les dépens qui n'expose pas à un risque supplémentaire les fonds constituant les caisses de retraite et devant permettre le versement des prestations auxquelles ont droit ceux qui n'appuient pas l'exercice du recours. Par conséquent, elle n'applique pas au régime des cadres le critère qui, selon le Syndicat, vaudrait pour le paiement des dépens, car l'ordonnance relative aux dépens découle d'un accord et elle ne prévoit pas le paiement des dépens par prélèvement sur la caisse de retraite dans sa globalité.

[257]    S'agissant de la demande du Syndicat, nul accord n'est intervenu au même effet, et ce n'était pas seulement les participants derrière le recours qui s'exposaient au risque lié à l'issue de celui-ci.

[258]    Je ne vois aucune erreur de principe dans le refus de la Cour d'appel d'ordonner que les dépens du Syndicat soient payés à partir de la caisse de retraite, étant donné surtout l'issue du pourvoi devant notre Cour. Je suis d'avis de rejeter sans frais le pourvoi du Syndicat relatif aux dépens.

IV.  Dispositif

[259]    Je suis d'avis d'accueillir les pourvois de Sun Indalex, de FTI Consulting et de George L. Miller, d'annuler les ordonnances de la Cour d'appel de l'Ontario et de rétablir celles rendues par le juge Campbell le 18 février 2010, sauf dans la mesure précisée ci-après.

[260]    En ce qui concerne les dépens, je suis d'avis d'annuler les ordonnances de la Cour d'appel sur les dépens afférents aux appels interjetés devant elle et d'ordonner que chacune des parties paie ses propres dépens devant la Cour d'appel et devant notre Cour.

[261]    Je suis d'avis de ne pas modifier les par. 9 et 10 de l'ordonnance de la Cour d'appel rendue concernant l'appel des anciens cadres, de sorte que les débours et honoraires de ces derniers, établis sur la base de l'indemnisation complète, qui totalisent 269 913,78 $, soient payés par prélèvement sur la partie de la caisse de retraite du régime des cadres

specifically such amounts shall be allocated among the 14 former executives in relation to their pension entitlement from the executive plan and will not be borne by the other three members of the executive plan.

[262]    I would dismiss the USW costs appeal, but without costs.

The reasons of LeBel and Abella JJ. were delivered by

LeBel J. (dissenting) —

I.  Introduction

[263]    The members of two pension plans set up by Indalex Limited ("Indalex") stand to lose half or more of their pension benefits as a consequence of the insolvency of their employer and of the arrangement approved by the Ontario Superior Court of Justice under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). The Court of Appeal for Ontario found that the members were entitled to a remedy. For different and partly conflicting reasons, my colleagues Justices Deschamps and Cromwell would hold that no remedy is available to them. With all due respect for their opinions, I would conclude, like the Court of Appeal, that the remedy of a constructive trust is open to them and should be imposed in the circumstances of this case, for the following reasons.

[264]    I do not intend to summarize the facts of this case, which were outlined by my colleagues. I will address these facts as needed in the course of my reasons. Before moving to my areas of disagreement with my colleagues, I will briefly indicate where and to what extent I agree with them on the relevant legal issues.

[265]    Like my colleagues, I conclude that no deemed trust could arise under s. 57(4) of the *Pension Benefits Act*, R.S.O. 1990, c. P.8 ("*PBA*"), in the case of the Executive Plan because this plan had not been wound up when the *CCAA*

correspondant aux prestations de retraite accumulées respectivement par les 14 anciens cadres; plus particulièrement, les dépens seront répartis entre les 14 anciens cadres en fonction de leurs droits respectifs à pension aux termes du régime et ne seront pas supportés par les trois autres participants.

[262]    Je suis d'avis de rejeter sans frais le pourvoi interjeté par le Syndicat relativement aux dépens.

Version française des motifs des juges LeBel et Abella rendus par

Le juge LeBel (dissident) —

I.  Introduction

[263]    Les participants à deux régimes de retraite établis par Indalex Limited (« Indalex ») risquent de perdre au moins la moitié de leurs prestations de retraite du fait de l'insolvabilité de leur employeur et de l'arrangement homologué par la Cour supérieure de justice de l'Ontario en application de la *Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C-36 (« *LACC* »). La Cour d'appel de l'Ontario a jugé que ces participants avaient droit à une réparation. Mes collègues, les juges Deschamps et Cromwell, arrivent à la conclusion contraire, pour des motifs différents et en partie contradictoires. Avec égard pour leur opinion, et à l'instar de la Cour d'appel, je suis d'avis que la fiducie par interprétation peut s'appliquer en l'espèce et devrait être imposée, pour les motifs qui suivent.

[264]    Je ne résumerai pas les faits de l'affaire, mes collègues les ayant déjà exposés. Je m'y reporterai au besoin dans mes motifs. Cependant, avant d'expliquer mes divergences d'opinions avec mes collègues, j'indiquerai brièvement les questions de droit sur lesquelles je souscris, en totalité ou en partie, à leurs motifs.

[265]    À l'instar de mes collègues, je conclus que le régime des cadres ne pouvait être protégé par aucune fiducie réputée résultant de l'application du par. 57(4) de la *Loi sur les régimes de retraite*, L.R.O. 1990, ch. P.8 (« *LRR* »), puisque ce régime

proceedings were initiated. In the case of the Salaried Employees Plan, I agree with Deschamps J. that a deemed trust arises in respect of the wind-up deficiency. But, like her, I accept that the debtor-in-possession ("DIP") super priority prevails by reason of the application of the federal paramountcy doctrine. I also agree that the costs appeal of the United Steelworkers should be dismissed.

[266]    But, with respect for the opinions of my colleagues, I take a different view of the nature and extent of the fiduciary duties of an employer who elects to act as administrator of a pension plan governed by the *PBA*. This dual status does not entitle the employer to greater leniency in the determination and exercise of its fiduciary duties or excuse wrongful actions. On the contrary, as we shall see below, I conclude that Indalex not only neglected its obligations towards the beneficiaries, but actually took a course of action that was actively inimical to their interests. The seriousness of these breaches amply justified the decision of the Court of Appeal to impose a constructive trust. To that extent, I propose to uphold the opinion of Gillese J.A. and the judgment of the Court of Appeal (2011 ONCA 265, 104 O.R. (3d) 641).

## II.  The Employer as Administrator of a Pension Plan: Its Fiduciary Duties

[267]    Before entering into an analysis of the obligations of an employer as administrator of a pension plan under the *PBA*, it is necessary to consider the position of the beneficiaries. Who are they? At what stage are they in their lives? What are their vulnerabilities? A fiduciary relationship is a relationship, grounded in fact and law, between a vulnerable beneficiary and a fiduciary who holds and may exercise power over the beneficiary in situations recognized by law. Any analysis of such a relationship requires careful consideration of the characteristics of the beneficiary. It ought not stop at the level of a theoretical and detached approach that fails to address how, very concretely,

n'avait pas été liquidé lorsque la procédure fondée sur la *LACC* a été enclenchée. Comme la juge Deschamps, je conclus à l'existence d'une fiducie réputée dans le cas du déficit de liquidation du régime des salariés. Je reconnais toutefois aussi que la priorité de la créance des prêteurs au débiteur-exploitant (« DE ») sur toutes les autres l'emporte, par application du principe de la prépondérance fédérale. Je conviens également qu'il faut rejeter l'appel interjeté par le Syndicat des Métallos sur la question des dépens.

[266]    Toutefois, malgré le respect que je porte à mes collègues, je conçois différemment d'eux la nature et la portée des obligations fiduciaires de l'employeur qui choisit d'administrer un régime de retraite régi par la *LRR*. Sa double fonction n'autorise pas l'employeur à faire preuve de laxisme dans la définition et l'exercice de ses obligations fiduciaires, ni ne justifie ses actes répréhensibles. Au contraire, comme je l'expliquerai, j'estime qu'Indalex a non seulement manqué à ses obligations envers les bénéficiaires, mais adopté en fait une démarche qui allait à l'encontre de leurs intérêts. La gravité de ces manquements justifiait amplement la décision de la Cour d'appel d'imposer une fiducie par interprétation. Dans cette mesure, je suis d'avis de confirmer les motifs de la juge Gillese et le jugement de la Cour d'appel (2011 ONCA 265, 104 O.R. (3d) 641).

## II.  Les obligations fiduciaires de l'employeur en sa qualité d'administrateur d'un régime de retraite

[267]    Avant d'analyser les obligations de l'employeur à titre d'administrateur d'un régime de retraite visé par la *LRR*, il faut examiner la situation des bénéficiaires. Qui sont-ils? À quelle période de leur vie en sont-ils? En quoi consistent leurs points vulnérables? Une relation fiduciaire s'entend de la relation factuelle et juridique entre un bénéficiaire vulnérable et un fiduciaire qui détient et peut exercer un pouvoir sur le bénéficiaire dans les situations prévues par la loi. L'analyse d'une telle relation nécessite un examen attentif des caractéristiques du bénéficiaire. Il ne faut pas s'en tenir à une perspective théorique et détachée, en négligeant de voir, très concrètement, comment la

this relationship works or can be twisted, perverted or abused, as was the situation in this case.

[268]    The beneficiaries were in a very vulnerable position relative to Indalex. They did not enjoy the protection that the existence of an independent administrator might have given them. They had no say and no input in the management of the plans. The information about the plans and their situation came from Indalex in its dual role as employer and manager of the plans. Their particular vulnerability arose from their relationship with Indalex, acting both as their employer and as the administrator of their retirement plans. Their vulnerability was substantially a consequence of that specific relationship (*Galambos v. Perez*, 2009 SCC 48, [2009] 3 S.C.R. 247, at para. 68, *per* Cromwell J.). The nature of this relationship had very practical consequences on their interests. For example, as Gillese J.A. noted in her reasons (at para. 40) the consequences of the decisions made in the course of management of the plan and during the *CCAA* proceedings signify that the members of the Executive Plan stand to lose one-half to two-thirds of their retirement benefits, unless additional money is somehow paid into the plan. These losses of benefits are, in all probability, permanent in the case of the beneficiaries who have already retired or who are close to retirement. They deeply affect their lives and expectations. For most of them, what is lost is lost for good. No arrangement will allow them to get a start on a new life. We should not view the situation of the beneficiaries as regrettable but unavoidable collateral damage arising out of the ebbs and tides of the economy. In my view, the law should give the members some protection, as the Court of Appeal intended when it imposed a constructive trust.

[269]    Indalex was in a conflict of interest from the moment it started to contemplate putting itself under the protection of the *CCAA* and proposing an arrangement to its creditors. From the corporate perspective, one could hardly find fault with such a decision. It was a business decision. But the trouble is that at the same time, Indalex was a

relation fonctionne et comment il est possible de la fausser, de la faire dévier ou d'en abuser, comme ce fut le cas en l'espèce.

[268]    Les bénéficiaires se trouvaient dans une position de grande vulnérabilité par rapport à Indalex. Ils ne jouissaient pas de la protection que l'existence d'un administrateur indépendant aurait pu leur assurer. Ils n'avaient pas la possibilité de donner leur avis ni de participer aux décisions à l'égard de la gestion des régimes. Toute l'information sur les régimes et sur leur situation leur provenait d'Indalex, à titre à la fois d'employeur et d'administrateur. Leur vulnérabilité particulière découlait essentiellement de leur relation avec Indalex, qui assumait cette double fonction (*Galambos c. Perez*, 2009 CSC 48, [2009] 3 R.C.S. 247, par. 68, le juge Cromwell). La nature de cette relation a entraîné des conséquences très concrètes sur leurs intérêts. Par exemple, comme le signale la juge Gillese dans ses motifs (par. 40), les décisions prises au fil de la gestion du régime des cadres et pendant la procédure fondée sur la *LACC* risquent de faire perdre aux participants entre la moitié et les deux tiers de leurs prestations, à moins d'une injection de fonds. Dans le cas des bénéficiaires retraités ou en fin de carrière, il s'agit probablement de pertes permanentes. Leur vie et leurs attentes s'en trouvent profondément affectées. Pour la plupart d'entre eux, ces pertes sont irrémédiables; aucun arrangement ne leur permettra d'entamer une nouvelle étape de leur vie. Nous ne devons pas considérer la situation des bénéficiaires comme une conséquence indirecte regrettable, mais inévitable, des fluctuations de l'économie. À mon avis, la loi devrait offrir une certaine protection aux bénéficiaires, et c'est ce que la Cour d'appel a tenté de faire en imposant la fiducie par interprétation.

[269]    Indalex se trouvait en situation de conflit d'intérêts dès qu'elle a envisagé de demander la protection de la *LACC* et de proposer un arrangement à ses créanciers. Du point de vue de l'entreprise, on ne pourrait guère trouver à redire à cette décision. Il s'agissait d'une décision d'affaires. Cependant, Indalex jouait en même temps le rôle de fiduciaire à

fiduciary in relation to the members and retirees of its pension plans. The "two hats" analogy offers no defence to Indalex. It could not switch off the fiduciary relationship at will when it conflicted with its business obligations or decisions. Throughout the arrangement process and until it was replaced by an independent administrator (Morneau Shepell Ltd.) it remained a fiduciary.

[270]    It is true that the *PBA* allows an employer to act as an administrator of a pension plan in Ontario. In such cases, the legislature accepts that conflicts of interest may arise. But, in my opinion, nothing in the *PBA* allows that the employer *qua* administrator will be held to a lower standard or will be subject to duties and obligations that are less stringent than those of an independent administrator. The employer remains a fiduciary under the statute and at common law (*PBA*, s. 22(4)). The employer is under no obligation to assume the burdens of administering the pension plans that it has agreed to set up or that are the legacy of previous decisions. However, if it decides to do so, a fiduciary relationship is created with the expectation that the employer will be able to avoid or resolve the conflicts of interest that might arise. If this proves to be impossible, the employer is still "seized" with fiduciary duties, and cannot ignore them out of hand.

[271]    Once Indalex had considered the *CCAA* process and decided to proceed in that manner, it should have been obvious that such a move would trigger conflicts of interest with the beneficiaries of the pension plans and that these conflicts would become untenable, as per the terms of s. 22(4) of the *PBA*. Given the nature of its obligations as administrator and fiduciary, it was impossible to wear the "two hats". Indalex had to discharge its corporate duties, but at the same time it had to address its fiduciary obligations to the members and beneficiaries of the plans. I do not fault it for applying under the *CCAA*, but rather for not relinquishing its position as administrator of the plans at the time of the application. It even retained

l'égard des participants aux régimes et des retraités, et c'est là où le bât blesse. L'analogie avec les « deux chapeaux » ne constitue pas un moyen de défense pour Indalex. Elle ne pouvait pas mettre la relation fiduciaire de côté à sa guise lorsque cette relation entrait en conflit avec ses obligations ou ses décisions d'affaires. Tout au long de la procédure intentée sous le régime de la *LACC* et jusqu'à la nomination d'un administrateur indépendant (Morneau Shepell Ltd.) qui s'est substitué à elle, elle demeurait une fiduciaire.

[270]    Certes, la *LRR* autorise un employeur à agir à titre d'administrateur d'un régime de retraite en Ontario. Le législateur admet dans ces cas la possibilité d'un conflit d'intérêts. Néanmoins, à mon avis, rien dans la *LRR* ne permet de conclure que l'employeur, en sa qualité d'administrateur, serait assujetti à une norme moindre ou assumerait des fonctions et des obligations moins strictes qu'un administrateur indépendant. Il demeure un fiduciaire aux termes de la loi et en common law (*LRR*, par. 22(4)). L'employeur n'est pas tenu d'assumer le fardeau de l'administration des régimes de retraite qu'il a convenu d'établir ou qui sont le fruit de décisions antérieures. Par contre, s'il choisit de l'assumer, une relation fiduciaire prend naissance et l'on s'attend à ce que l'employeur soit capable d'éviter ou de régler les conflits d'intérêts susceptibles d'intervenir. Lorsque cela se révèle impossible, l'employeur demeure soumis à ses obligations fiduciaires et ne peut s'en débarrasser sommairement.

[271]    Dès qu'Indalex a envisagé la possibilité d'engager une procédure fondée sur la *LACC* et a opté pour cette solution, il aurait dû lui paraître évident que sa décision engendrerait des conflits avec les intérêts des bénéficiaires des régimes de retraite, en contravention au par. 22(4) de la *LRR*, et que la situation deviendrait insoutenable. Compte tenu de la nature des obligations qui lui incombaient à titre d'administrateur et de fiduciaire, Indalex ne pouvait plus coiffer « deux chapeaux ». Indalex avait le devoir de protéger les intérêts de la société, mais elle devait aussi s'acquitter de ses obligations fiduciaires envers les participants et bénéficiaires des régimes. Je ne lui reproche pas d'avoir présenté une demande sous le régime de la

this position once it engaged in the arrangement process. Other conflicts and breaches of fiduciary duties and of fundamental rules of procedural equity in the Superior Court flowed from this first decision. Moreover, Indalex maintained a strongly adversarial attitude towards the interest of the beneficiaries throughout the arrangement process, while it was still, at least in form, the administrator of the plans.

[272]    The option given to employers to act as administrators of pension plans under the *PBA* does not constitute a licence to breach the fiduciary duties that flow from this function. It should not be viewed as an invitation for the courts to whitewash the consequences of such breaches. The option is predicated on the ability of the employer-administrator to avoid the conflicts of interests that cause these breaches. An employer deciding to assume the position of administrator cannot claim to be in the same situation as the Crown when it discharges fiduciary obligations towards certain groups in society under the Constitution or the law. For those cases, the Crown assumes those duties because it is obligated to do so by virtue of its role, not because it chooses to do so. In such circumstances, the Crown must often balance conflicting interests and obligations to the broader society in the discharge of those fiduciary duties (*Alberta v. Elder Advocates of Alberta Society*, 2011 SCC 24, [2011] 2 S.C.R. 261, at paras. 37-38). If Indalex found itself in a situation where it had to balance conflicting interests and obligations, as it essentially argues, it could not retain the position of administrator that it had willingly assumed. The solution was not to place its function as administrator and its associated fiduciary duties in abeyance. Rather, it had to abandon this role and diligently transfer its function as manager to an independent administrator.

[273]    Indalex could apply for protection under the *CCAA*. But, in so doing, it needed to make arrangements to avoid conflicts of interests. As nothing was done, the members of the plans were

*LACC*, mais plutôt de ne pas avoir alors renoncé à administrer les régimes. Elle a même continué à les administrer pendant la procédure en vue de conclure un arrangement. D'autres conflits d'intérêts et manquements à ses obligations fiduciaires ainsi qu'aux règles fondamentales d'équité procédurale devant la Cour supérieure ont découlé de cette décision initiale. Qui plus est, Indalex a conservé tout au long de cette procédure une attitude fortement contraire aux intérêts des bénéficiaires, malgré le fait qu'elle administrait toujours les régimes, à tout le moins théoriquement.

[272]    Si la *LRR* offre à l'employeur le choix d'agir à titre d'administrateur d'un régime de retraite, elle ne l'autorise pas à manquer aux obligations fiduciaires qui découlent de cette fonction et il ne faudrait pas conclure qu'elle invite les tribunaux à escamoter les conséquences de tels manquements. Cette faculté de choisir présuppose la capacité de l'employeur-administrateur d'éviter les conflits d'intérêts qui entraînent de tels manquements. L'employeur qui choisit d'agir à titre d'administrateur ne saurait prétendre se trouver dans la même situation que l'État qui s'acquitte des obligations fiduciaires que lui impose la Constitution ou la loi à l'égard de certains groupes de la société. Ces obligations incombent à l'État, non pas par choix, mais en raison de son rôle. Dans ces circonstances, l'État est souvent appelé à concilier des intérêts opposés avec ses obligations envers la société en général (*Alberta c. Elder Advocates of Alberta Society*, 2011 CSC 24, [2011] 2 R.C.S. 261, par. 37-38) en s'acquittant de ses obligations fiduciaires. Si Indalex devait concilier des intérêts et des obligations contradictoires, comme elle le prétend, elle ne pouvait pas conserver la fonction d'administrateur qu'elle avait assumée de son plein gré. La solution consistait non pas à mettre en veilleuse sa fonction d'administrateur avec les obligations fiduciaires en découlant, mais à y renoncer et à la transférer avec diligence à un administrateur indépendant.

[273]    Il était loisible à Indalex de demander la protection de la *LACC*. Toutefois, il lui fallait dans ce cas prendre des mesures pour éviter les conflits d'intérêts. Son inaction a forcé les

left to play catch up as best they could when the process that put in place the DIP financing and its super priority was initiated. The process had been launched in such a way that it took significant time before the beneficiaries could effectively participate in the process. In practice, the United Steelworkers union, which represented only a small group of the members of the Salaried Employees Plan, acted for them after the start of the procedures. The members of the Executive Plan hired counsel who appeared for them. But, throughout, there were problems with notices, delays and the ability to participate in the process. Indeed, during the *CCAA* proceedings, the Monitor and Indalex seemed to have been more concerned about keeping the members of the plans out of the process rather than ensuring that their voices could be heard. Two paragraphs of the submissions to this Court by Morneau Shepell Ltd., the subsequently appointed administrator of the plan, aptly sums up the behaviour of Indalex and the Monitor towards the beneficiaries, whose representations were always deemed to be either premature or late:

When counsel for the Retirees again appeared at a motion to approve the bidding procedure, his objections were considered premature:

In my view, the issues raised by the retirees do not have any impact on the Bidding Procedures. The issues can be raised by the retirees on any application to approve a transaction — but that is for another day.

Only when counsel appeared at the sale approval motion, as directed by the motions judge, were the concerns of the pension plan beneficiaries heard. At that time, the Appellants complain, the beneficiaries were too late and their motion constituted a collateral attack on the original DIP Order. However, it cannot be the case that stakeholder groups are too early, until they are too late. [R.F., at paras. 54-55]

[274]    I must also mention the failed attempt to assign Indalex in bankruptcy once the sale of its

participants aux régimes à se débrouiller de leur mieux pour rattraper le train en marche une fois que le processus de financement DE assorti d'une priorité sur toutes les autres créances avait été mis en branle. Compte tenu de la manière dont ce processus a été engagé, un délai considérable s'est écoulé avant que les bénéficiaires puissent y participer réellement. Dans les faits, le Syndicat des Métallos, qui ne représentait qu'un petit nombre de bénéficiaires du régime des salariés, a agi en leur nom après le début du processus. Pour leur part, les participants au régime des cadres ont retenu les services d'un avocat. Cependant, du début à la fin, ils se sont heurtés à des difficultés concernant les avis, les délais et leur capacité de participer au processus. En effet, tout au long de la procédure intentée sous le régime de la *LACC*, le contrôleur et Indalex semblent s'être souciés davantage d'écarter les participants aux régimes que de veiller à ce qu'ils puissent être entendus. Le passage suivant des arguments présentés devant notre Cour par Morneau Shepell Ltd., l'administrateur ultérieur du régime, résume bien la conduite d'Indalex et du contrôleur à l'égard des bénéficiaires, dont les observations ne semblaient jamais tomber à point :

[TRADUCTION] Lorsque l'avocat représentant les retraités a comparu à nouveau à l'audience sur la motion en approbation du processus de vente par soumission, ses objections ont été considérées comme prématurées :

À mon avis, les questions soulevées par les retraités n'ont aucune incidence sur le processus de vente par soumission. Les retraités pourront soulever ces questions lorsqu'une motion en homologation d'une opération sera présentée — ce qui n'est pas le cas maintenant.

Ce n'est que lorsque l'avocat a comparu relativement à la motion en homologation de la vente, conformément aux directives du juge des requêtes, que les préoccupations des bénéficiaires du régime de retraite ont finalement été entendues. À ce moment-là, selon les appelants, l'intervention des bénéficiaires arrivait trop tard et constituait une contestation indirecte de l'ordonnance DE initiale. Or, il ne peut pas être toujours soit trop tôt soit trop tard pour les groupes intéressés. [m.i., par. 54-55]

[274]    Je ne saurais passer sous silence la tentative ratée d'Indalex de faire cession de ses biens

business had been approved. One of the purposes of this action was essentially to harm the interests of the members of the plans. At the time, Indalex was still wearing its two hats, at least from a legal perspective. But its duties as a fiduciary were clearly not at the forefront of its concerns. There were constant conflicts of interest throughout the process. Indalex did not attempt to resolve them; it brushed them aside. In so acting, it breached its duties as a fiduciary and its statutory obligations under s. 22(4) *PBA*.

## III.  Procedural Fairness in *CCAA* Proceedings

[275]    The manner in which this matter was conducted in the Superior Court was, at least partially, the result of Indalex disregarding its fiduciary duties. The procedural issues that arose in that court did not assist in mitigating the consequences of these breaches. It is true that, in the end, the beneficiaries obtained, or were given, some information pertaining to the proceedings and that counsel appeared on their behalf at various stages of the proceedings. However, the basic problem is that the proceedings were not conducted according to the spirit and principles of the Canadian system of civil justice.

[276]    I accept that those procedures are often urgent. The situation of a debtor requires quick and efficient action. The turtle-like pace of some civil litigation would not meet the needs of the application of the *CCAA*. However, the conduct of proceedings under this statute is not solely an administrative process. It is also a judicial process conducted according to the tenets of the adversarial system. The fundamentals of such a system must not be ignored. All interested parties are entitled to a fair procedure that allows their voices to be raised and heard. It is not an answer to these concerns to say that nothing else could be done, that no other solution would have been better, that, in substance, hearing the members would have been a waste of time. In all branches of procedure whether in administrative law, criminal law or civil action, the rights to be informed and to be heard in some

en faillite après l'homologation de la vente de l'entreprise. Cette manoeuvre visait entre autres à nuire aux intérêts des participants aux régimes. À l'époque, Indalex cumulait toujours ses deux fonctions, du moins sur le plan juridique. Cependant, ses obligations fiduciaires ne se trouvaient de toute évidence pas au centre de ses préoccupations. Les conflits d'intérêts se sont multipliés au cours de la procédure. Au lieu d'essayer de les régler, Indalex les a balayés du revers de la main. Elle a ainsi manqué à ses obligations fiduciaires et aux prescriptions du par. 22(4) de la *LRR*.

## III.  L'équité procédurale dans une procédure intentée sous le régime de la *LACC*

[275]    La manière dont l'instance s'est déroulée devant la Cour supérieure résultait, du moins en partie, du non-respect par Indalex de ses obligations fiduciaires. Les points de procédure soulevés devant la cour n'ont pas permis d'atténuer les conséquences de ces manquements. Certes, les bénéficiaires ont finalement obtenu ou reçu certains renseignements concernant la procédure et ils ont pu être représentés par un avocat à diverses étapes, mais l'esprit et les principes du système canadien de justice civile n'ont pas été respectés, et c'est là le problème fondamental.

[276]    Je reconnais que, souvent, le temps presse dans ce genre de procédure. La situation d'un débiteur nécessite la prise de mesures rapides et efficaces. Un litige qui s'éternise, comme certaines actions civiles, ne saurait convenir pour l'application de la *LACC*. Toutefois, la procédure prévue par cette loi n'est pas de nature purement administrative. Il s'agit également d'un processus judiciaire, assujetti à ce titre aux principes du système contradictoire. Les règles fondamentales de ce système ne sauraient être bafouées. Toutes les parties intéressées ont droit à une procédure équitable qui leur permet d'exprimer leur point de vue et d'être entendues. Il ne suffit pas à cet égard de répondre que rien d'autre ne pouvait être tenté, qu'il n'existait pas de solution meilleure ou, essentiellement, qu'entendre les participants aurait constitué une perte de temps. Dans toute procédure,

way remain fundamental principles of justice. Those principles retain their place in the *CCAA*, as some authors and judges have emphasized (J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), at pp. 55-56; *Royal Oak Mines Inc., Re* (1999), 7 C.B.R. (4th) 293 (Ont. C.J. (Gen. Div.)), at para. 5, *per* Farley J.). This was not done in this case, as my colleagues admit, while they downplay the consequences of these procedural flaws and breaches.

## IV.  Imposing a Constructive Trust

[277]    In this context, I see no error in the decision of the Court of Appeal to impose a constructive trust (paras. 200-207). It was a fair decision that met the requirements of justice, under the principles set out by our Court in *Canson Enterprises Ltd. v. Boughton & Co.*, [1991] 3 S.C.R. 534, and in *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217. The remedy of a constructive trust was justified in order to correct the wrong caused by Indalex (*Soulos*, at para. 36, *per* McLachlin J. (as she then was)). The facts of the situation met the four conditions that generally justify the imposition of a constructive trust (*Soulos*, at para. 45), as determined by Justice Gillese in her reasons, at paras. 203-4: (1) the defendant was under an equitable obligation in relation to the activities giving rise to the assets in his or her hands; (2) the assets in the hands of the defendant were shown to have resulted from deemed or actual agency activities of the defendant in breach of his or her equitable obligation to the plaintiff; (3) the plaintiff has shown a legitimate reason for seeking a proprietary remedy, either personal or related to the need to ensure that others like the defendants remain faithful to their duties; and (4) there are no factors which would render imposition of a constructive trust unjust in all the circumstances of the case, such as the protection of the interests of intervening creditors.

que ce soit en droit administratif, pénal ou civil, le droit d'être informé et celui d'être entendu d'une manière ou d'une autre demeurent des principes fondamentaux de la justice. Ils demeurent applicables sous le régime de la *LACC*, comme le font remarquer certains auteurs et juges (J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), p. 55-56; *Royal Oak Mines Inc., Re* (1999), 7 C.B.R. (4th) 293 (C.J. Ont. (Div. gén.)), par. 5 (le juge Farley). Ces principes n'ont pas été respectés en l'espèce, et mes collègues le reconnaissent, mais minimisent les conséquences de tels manquements et vices de procédure.

## IV.  Imposition d'une fiducie par interprétation

[277]    Dans les circonstances, la décision de la Cour d'appel d'imposer une fiducie par interprétation ne me paraît pas erronée (par. 200-207). Il s'agit d'une décision équitable conforme aux exigences de la justice, selon les principes énoncés par notre Cour dans les arrêts *Canson Enterprises Ltd. c. Boughton & Co.*, [1991] 3 R.C.S. 534, et *Soulos c. Korkontzilas*, [1997] 2 R.C.S. 217. Pareille réparation pour le tort causé par Indalex est fondée (*Soulos*, par. 36, la juge McLachlin (maintenant Juge en chef)). Les faits de l'espèce respectent les quatre conditions qui justifient généralement l'imposition d'une fiducie par interprétation (*Soulos*, par. 45), comme le constate la juge Gillese aux par. 203-204 de ses motifs : (1) le défendeur était assujetti à une obligation en equity relativement aux actes qui ont conduit à la possession des biens; (2) il a été démontré que la possession des biens par le défendeur résultait des actes qu'il a ou est réputé avoir accomplis à titre de mandataire, en violation de l'obligation que l'equity lui imposait à l'égard du demandeur; (3) le demandeur a établi qu'il a un motif légitime de solliciter une réparation fondée sur la propriété, soit personnel soit lié à la nécessité de veiller à ce que d'autres personnes comme le défendeur s'acquittent de leurs obligations; (4) il n'existe pas de facteurs qui rendraient injuste l'imposition d'une fiducie par interprétation eu égard à l'ensemble des circonstances de l'affaire, comme la protection des intérêts des créanciers intervenants.

[278]    In crafting such a remedy, the Court of Appeal was relying on the inherent powers of the courts to craft equitable remedies, not only in respect of procedural issues, but also of substantive questions. Section 9 of the *CCAA* is broadly drafted and does not deprive courts of their power to fill in gaps in the law when this is necessary in order to grant justice to the parties (G. R. Jackson and J. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in J. P. Sarra, ed., *Annual Review of Insolvency Law, 2007* (2008), 41, at pp. 78-79).

[279]    The imposition of the trust did not disregard the different corporate personalities of Indalex and Indalex U.S. It properly acknowledged the close relationship between the two companies, the second in effect controlling the first. This relationship could and needed to be taken into consideration in order to determine whether a constructive trust was a proper remedy.

[280]    For these reasons, I would uphold the imposition of a constructive trust and I would dismiss the appeal with costs to the respondents.

### APPENDIX

*The Pension Benefits Amendment Act, 1973*, S.O. 1973, c. 113

**6.** The said Act is amended by adding thereto the following sections:

23*a*.—(1) Any sum received by an employer from an employee pursuant to an arrangement for the payment of such sum by the employer into a pension plan as the employee's contribution thereto shall be deemed to be held by the employer in trust for payment of the same after his receipt thereof into the pension plan as the employee's contribution thereto and the employer shall not appropriate or convert any part thereof to his own use or to any use not authorized by the trust.

[278]    En imposant pareille réparation, la Cour d'appel a exercé la compétence inhérente des tribunaux de concevoir une réparation en equity en réponse non seulement à une question de procédure, mais également à une question de fond. L'article 9 de la *LACC* est formulé en termes généraux et n'a pas pour effet de priver le tribunal du pouvoir de combler au besoin les lacunes du droit pour rendre justice aux parties (G. R. Jackson et J. Sarra, « Selecting the Judicial Tool to get the Job Done : An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters », dans J. P. Sarra, dir., *Annual Review of Insolvency Law, 2007* (2008), 41, p. 78-79).

[279]    En imposant la fiducie, la Cour n'a pas négligé le fait qu'Indalex et Indalex É.-U. constituent des personnes morales distinctes. Elle a tenu compte à juste titre de leurs rapports étroits, la seconde contrôlant dans les faits la première. Il était possible, voire nécessaire, de prendre ces rapports en compte pour déterminer si la fiducie par interprétation constituait une réparation adéquate en l'espèce.

[280]    Pour les motifs qui précèdent, je suis d'avis de confirmer la fiducie par interprétation et de rejeter l'appel avec dépens en faveur des intimés.

### ANNEXE

*The Pension Benefits Amendment Act, 1973*, S.O. 1973, ch. 113

[TRADUCTION]

**6.** La même loi est modifiée par l'adjonction de ce qui suit :

23*a*.—(1) Toute somme qu'un employeur reçoit d'un employé conformément à une entente relative à son versement par l'employeur à titre de cotisation salariale est réputée détenue en fiducie par l'employeur en vue de son versement, après qu'il l'a reçue, au régime de retraite à titre de cotisation salariale, et l'employeur ne peut s'en approprier quelque partie ni la transformer à son usage personnel ou à un autre usage non autorisé par la fiducie.

(2) For the purposes of subsection 1, any sum withheld by an employer, whether by payroll deduction or otherwise, from moneys payable to an employee shall be deemed to be a sum received by the employer from the employee.

(3) <u>Any sum required to be paid into a pension plan by an employer as the employer's contribution to the plan shall, when due under the plan</u>, be deemed to be held by the employer in trust for payment of the same into the plan in accordance with the plan and this Act and the regulations as the employer's contribution and the employer shall not appropriate or convert any part of the amount required to be paid to the fund to his own use or to any use not authorized by the terms of the pension plan.

*Pension Benefits Act*, R.S.O. 1980, c. 373

**21.** . . .

(2) Upon the termination or winding up of a pension plan filed for registration as required by section 17, the employer is liable to pay all amounts that would otherwise have been required to be paid to meet the tests for solvency prescribed by the regulations, up to the date of such termination or winding up, to the insurer, administrator or trustee of the pension plan.

.    .    .

**23.**—(1) Where a sum is received by an employer from an employee under an arrangement for the payment of the sum by the employer into a pension plan as the employee's contribution thereto, the employer shall be deemed to hold the sum in trust for the employee until the sum is paid into the pension plan whether or not the sum has in fact been kept separate and apart by the employer and the employee has a lien upon the assets of the employer for such amount that in the ordinary course of business would be entered in books of account whether so entered or not.

.    .    .

(3) Where an employer is required to make contributions to a pension plan, he shall be deemed to hold in trust for the members of the plan an amount calculated in accordance with subsection (4), whether or not,

(2) Pour les besoins du paragraphe 1, la somme qu'un employeur prélève sur une somme payable à l'employé, notamment par retenue salariale, est réputée constituer une somme que l'employeur reçoit de l'employé.

(3) <u>Toute somme qu'un employeur doit verser à un régime de retraite à titre de cotisation patronale et qui est exigible aux termes du régime</u> est réputée détenue en fiducie par l'employeur en vue de son versement au régime de retraite conformément à celui-ci, à la présente loi et au règlement, et l'employeur ne peut s'approprier ni transformer à son usage personnel ou à tout autre usage non autorisé par le régime quelque partie du montant qui doit être versé à la caisse.

*Pension Benefits Act*, R.S.O. 1980, ch. 373

[TRADUCTION]

**21.** . . .

(2) À la cessation ou à la liquidation d'un régime de retraite déposé en vue de son agrément en vertu de l'article 17, l'employeur est tenu de verser à l'assureur, à l'administrateur ou au fiduciaire du régime de retraite les sommes dont le versement aurait été par ailleurs exigible pour satisfaire aux critères de solvabilité, et ce, jusqu'à la date de la cessation ou de la liquidation du régime.

.    .    .

**23.**—(1) L'employeur qui reçoit une somme d'un employé conformément à une entente relative à son versement par l'employeur à un régime de retraite à titre de cotisation salariale est réputé la détenir en fiducie jusqu'à son versement au régime de retraite, et ce, qu'il l'ait conservée séparément ou non, et l'employé a un privilège sur l'actif de l'employeur à raison du montant qui, dans le cours normal des affaires, serait consigné dans les livres de compte, qu'il y soit consigné ou non.

.    .    .

(3) L'employeur qui est tenu de cotiser à un régime de retraite est réputé détenir en fiducie pour le compte des participants au régime une somme dont le montant est calculé conformément au paragraphe (4), et ce,

(*a*) the employer contributions are payable into the plan under the terms of the plan or this Act; or

(*b*) the amount has been kept separate and apart by the employer,

and the members have a lien upon the assets of the employer in such amount that in the ordinary course of business would be entered into the books of account whether so entered or not.

(4) For the purpose of determining the amount deemed to be held in trust under subsection (3) on a specific date, the calculation shall be made as if the plan had been wound up on that date.

.    .    .

**32.** In addition to any amounts the employer is liable to pay under subsection 21 (2), where a defined benefit pension plan is terminated or wound up or the plan is amended so that it is no longer a defined benefit pension plan, the employer is liable to the plan for the difference between,

(*a*) the value of the assets of the plan; and

(*b*) the value of pension benefits guaranteed under subsection 31 (1) and any other pension benefit vested under the terms of the plan,

and the employer shall make payments to the insurer, trustee or administrator of the pension plan to fund the amount owing in such manner as is prescribed by regulation.

*Pension Benefits Amendment Act, 1983*, S.O. 1983, c. 2

**2. Subsection 21 (2) of the said Act is repealed and the following substituted therefor:**

(2) Upon the termination or winding up of a registered pension plan, the employer of employees covered by the pension plan shall pay to the administrator, insurer or trustee of the pension plan,

(a) an amount equal to,

---

*a*) que la cotisation de l'employeur soit payable ou non aux termes du régime ou de la présente Loi et

*b*) que l'employeur l'ait conservée séparément ou non,

et les participants ont un privilège sur l'actif de l'employeur à raison du montant qui, dans le cours normal des affaires, serait consigné dans des livres de compte, qu'il y soit consigné ou non.

(4) Aux fins de déterminer le montant qui est réputé détenu en fiducie en application du paragraphe (3) à une date précise, le calcul est effectué comme si le régime avait été liquidé à cette date.

.    .    .

**32.** En plus des sommes que l'employeur est tenu de payer en application du paragraphe 21 (2), lors de la cessation ou de la liquidation d'un régime de retraite à prestations déterminées ou lorsqu'une modification fait en sorte qu'un régime n'est plus un régime de retraite à prestations déterminées, l'employeur est tenu de combler la différence entre

*a*) la valeur de l'actif du régime et

*b*) la valeur des prestations de retraite garanties suivant le paragraphe 31 (1) et de toutes autres prestations de retraite auxquelles le droit est acquis aux termes du régime,

et l'employeur verse à l'assureur, au fiduciaire ou à l'administrateur du régime de retraite les sommes ainsi requises de la manière prévue par règlement.

*Pension Benefits Amendment Act, 1983*, S.O. 1983, ch. 2

[TRADUCTION]

**2. Le paragraphe 21 (2) de la même loi est abrogé et remplacé par ce qui suit :**

(2) Lors de la cessation ou de la liquidation d'un régime de retraite enregistré, l'employeur dont les employés bénéficient du régime verse à l'administrateur, à l'assureur ou au fiduciaire du régime

a) une somme dont le montant est égal

(i)    the current service cost, and

(ii)    the special payments prescribed by the regulations,

that have accrued to and including the date of the termination or winding up but, under the terms of the pension plan or the regulations, are not due on that date; and

(b)    all other payments that, by the terms of the pension plan or the regulations, are due from the employer to the pension plan but have not been paid at the date of the termination or winding up.

(2a) For the purposes of clause (2) (a), the current service cost and special payments shall be deemed to accrue on a daily basis.

**3. Section 23 of the said Act is repealed and the following substituted therefor:**

**23.**—(1) Where an employer receives money from an employee under an arrangement that the employer will pay the money into a pension plan as the employee's contribution to the pension plan, the employer shall be deemed to hold the money in trust for the employee until the employer pays the money into the pension plan.

(2) For the purposes of subsection (1), money withheld by an employer, whether by payroll deduction or otherwise, from moneys payable to an employee shall be deemed to be money received by the employer from the employee.

(3) The administrator or trustee of the pension plan has a lien and charge upon the assets of the employer in an amount equal to the amount that is deemed to be held in trust under subsection (1).

(4) An employer who is required by a pension plan to contribute to the pension plan shall be deemed to hold in trust for the members of the pension plan an amount of money equal to the total of,

(a)    all moneys that the employer is required to pay into the pension plan to meet,

(i)    the current service cost, and

(ii)    the special payments prescribed by the regulations,

that are due under the pension plan or the regulations and have not been paid into the pension plan; and

(i)    au coût du service courant et

(ii)    aux paiements spéciaux prescrits par règlement,

qui sont accumulés à la date de la cessation ou de la liquidation, celle-ci comprise, mais qui, suivant les conditions du régime et le libellé du règlement, ne sont pas encore dus;

b)    toute autre somme qui, aux termes du régime de retraite ou du règlement, est due par l'employeur au régime de retraite, mais qui n'a pas été versée à la date de la cessation ou de la liquidation.

(2a) Pour les besoins de l'alinéa (2) a), le coût du service courant et les paiements spéciaux sont réputés s'accumuler sur une base quotidienne.

**3. L'article 23 de la même loi est abrogé et remplacé par ce qui suit :**

**23.**—(1) L'employeur qui reçoit de l'argent d'un employé en vertu d'un arrangement précisant que l'employeur versera cet argent à un régime de retraite en tant que cotisation de l'employé aux termes du régime de retraite est réputé détenir cet argent en fiducie pour l'employé jusqu'à ce que l'employeur verse cet argent au régime de retraite.

(2) Pour l'application du paragraphe (1), toute retenue à la source ou autre somme prélevée par l'employeur est réputée constituer de l'argent que l'employeur reçoit de l'employé.

(3) L'administrateur ou le fiduciaire du régime de retraite a un privilège sur l'actif de l'employeur à raison d'un montant égal à la somme réputée détenue en fiducie suivant le paragraphe (1).

(4) L'employeur qui, dans le cadre d'un régime de retraite, est tenu de cotiser à ce régime est réputé détenir en fiducie pour le compte des participants du régime une somme égale au total

a)    de toutes les sommes que l'employeur est tenu de verser au régime pour acquitter

(i)    le coût du service courant et

(ii)    les paiements spéciaux prescrits par règlement,

qui sont dus aux termes du régime ou du règlement, et qui n'ont pas été versés;

(b) where the pension plan is terminated or wound up, any other money that the employer is <u>liable to pay under clause 21 (2) (a)</u>.

(5) The administrator or trustee of the pension plan has a <u>lien and charge</u> upon the assets of the employer <u>in an amount equal to the amount that is deemed to be held in trust under subsection (4)</u>.

(6) Subsections (1) and (4) apply whether or not the moneys mentioned in those subsections are kept separate and apart from other money.

. . .

**8. Sections 32 and 33 of the said Act are repealed and the following substituted therefor:**

**32.**—(1) The employer of employees who are members of a defined benefit pension plan that the employer is bound by or to which the employer is a party and that is partly or wholly wound up shall pay to the administrator, insurer or trustee of the plan <u>an amount of money equal to the amount by which the value of the pension benefits guaranteed by section 31 plus the value of the pension benefits vested under the defined benefit pension plan exceeds the value of the assets of the plan allocated in accordance with the regulations for payment of pension benefits accrued with respect to service in Ontario</u>.

(2) The amount that the employer is required to pay under subsection (1) <u>is in addition to</u> the amounts that the employer is liable to pay under subsection 21 (2).

(3) The employer shall pay the amount required under subsection (1) to the administrator, insurer or trustee of the defined benefit pension plan in the manner prescribed by the regulations.

*Pension Benefits Act, 1987*, S.O. 1987, c. 35

**58.**—(1) Where an employer receives money from an employee under an arrangement that the employer will pay the money into a pension fund as the employee's contribution under the pension plan, the employer shall be deemed to hold the money in trust for the employee until the employer pays the money into the pension fund.

. . .

b) lors de la cessation ou de la liquidation du régime, toute autre somme que l'employeur <u>est tenu de payer en vertu de l'alinéa 21 (2) a)</u>.

(5) L'administrateur ou le fiduciaire du régime de retraite a un <u>privilège</u> sur l'actif de l'employeur <u>à raison d'un montant égal à celui de la somme qui est réputée détenue en fiducie suivant le paragraphe (4)</u>.

(6) Les paragraphes (1) et (4) s'appliquent que les sommes mentionnées soient conservées séparément ou non.

. . .

**8. Les articles 32 et 33 de la même loi sont abrogés et remplacés par ce qui suit :**

**32.**—(1) L'employeur dont les employés participent à un régime de retraite à prestations déterminées par lequel il est lié ou auquel il est partie et qui fait l'objet d'une liquidation partielle ou totale est tenu de verser à l'administrateur, à l'assureur ou au fiduciaire du régime <u>un montant égal à l'excédent de la valeur des prestations de retraite garanties par l'article 31 et de la valeur des prestations de retraite acquises suivant le régime de retraite à prestations déterminées sur la valeur de l'actif du régime établie conformément au règlement applicable au paiement des prestations de retraite accumulées eu égard aux états de services en Ontario</u>.

(2) Le versement que l'employeur est tenu d'effectuer suivant le paragraphe (1) <u>s'ajoute</u> à celui exigé au paragraphe 21 (2).

(3) L'employeur verse à l'assureur, au fiduciaire ou à l'administrateur du régime de retraite à prestations déterminées, de la manière prescrite par règlement, toute somme dont le versement est exigé au paragraphe (1).

*Loi de 1987 sur les regimes de retraite*, L.O. 1987, ch. 35

**58.** (1) L'employeur qui reçoit de l'argent d'un employé en vertu d'un arrangement précisant que l'employeur versera cet argent à une caisse de retraite en tant que cotisation de l'employé aux termes du régime de retraite, est réputé détenir cet argent en fiducie pour l'employé jusqu'à ce que l'employeur verse cet argent à la caisse de retraite.

. . .

(3) An employer who is required to pay contributions to a pension fund shall be deemed to hold in trust for the beneficiaries of the pension plan an amount of money equal to the employer contributions due and not paid into the pension fund.

(4) Where a pension plan is wound up in whole or in part, an employer who is required to pay contributions to the pension fund shall be deemed to hold in trust for the beneficiaries of the pension plan an amount of money equal to employer contributions accrued to the date of the wind up but not yet due under the plan or regulations.

.    .    .

**59.**—(1) Money that an employer is required to pay into a pension fund accrues on a daily basis.

(2) Interest on contributions shall be calculated and credited at a rate not less than the prescribed rates and in accordance with prescribed requirements.

.    .    .

**75.**—(1) A member in Ontario of a pension plan whose combination of age plus years of continuous employment or membership in the pension plan equals at least fifty-five, at the effective date of the wind up of the pension plan in whole or in part, has the right to receive,

(a)  a pension in accordance with the terms of the pension plan, if, under the pension plan, the member is eligible for immediate payment of the pension benefit;

(b)  a pension in accordance with the terms of the pension plan, beginning at the earlier of,

(i)  the normal retirement date under the pension plan, or

(ii)  the date on which the member would be entitled to an unreduced pension under the pension plan if the pension plan were not wound up and if the member's membership continued to that date; or

(c)  a reduced pension in the amount payable under the terms of the pension plan beginning on the date on which the member would be entitled to

(3) L'employeur qui est tenu de cotiser à une caisse de retraite est réputé détenir en fiducie pour le compte des bénéficiaires du régime de retraite un montant égal aux cotisations de l'employeur qui sont dues et impayées à la caisse de retraite.

(4) Si un régime de retraite est liquidé en totalité ou en partie, l'employeur qui est tenu de cotiser à la caisse de retraite est réputé détenir en fiducie pour le compte des bénéficiaires du régime de retraite un montant égal aux cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues aux termes du régime ou des règlements.

.    .    .

**59.** (1) L'intérêt sur l'argent qu'un employeur est tenu de verser à une caisse de retraite s'accumule sur une base quotidienne.

(2) L'intérêt sur les cotisations est calculé et crédité à des taux qui ne sont pas inférieurs aux taux prescrits et conformément aux exigences prescrites.

.    .    .

**75.** (1) En Ontario, un participant à un régime de retraite dont le total de l'âge plus le nombre d'années d'emploi continu ou d'affiliation continue est d'au moins cinquante-cinq, à la date de prise d'effet de la liquidation totale ou partielle, a droit à l'une des pensions suivantes :

a)  une pension conforme aux conditions du régime de retraite si, aux termes du régime de retraite, le participant est admissible au paiement immédiat d'une prestation de retraite;

b)  une pension conforme aux conditions du régime de retraite, commençant à la plus antérieure des dates suivantes :

(i)  la date normale de retraite prévue par le régime de retraite,

(ii)  la date à laquelle le participant aurait droit à une pension non réduite aux termes du régime de retraite si celui-ci n'était pas liquidé et que l'affiliation du participant avait continué jusqu'à cette date;

c)  une pension réduite dont le montant correspond à celui à verser aux termes du régime de retraite commençant à la date à laquelle le participant

the reduced pension under the pension plan if the pension plan were not wound up and if the member's membership continued to that date.

.   .   .

**76.**—(1) Where a pension plan is wound up in whole or in part, the employer shall pay into the pension fund,

(a) an amount equal to the total of all payments that, under this Act, the regulations and the pension plan, are due or that have accrued and that have not been paid into the pension fund; and

(b) an amount equal to the amount by which,

   (i) the value of the pension benefits under the pension plan that would be guaranteed by the Guarantee Fund under this Act and the regulations if the Commission declares that the Guarantee Fund applies to the pension plan,

   (ii) the value of the pension benefits accrued with respect to employment in Ontario vested under the pension plan, and

   (iii) the value of benefits accrued with respect to employment in Ontario resulting from the application of subsection 40 (3) (50 per cent rule) and section 75,

   exceed the value of the assets of the pension fund allocated as prescribed for payment of pension benefits accrued with respect to employment in Ontario.

*Pension Benefits Act*, R.S.O. 1990, c. P.8

**57.** (1) [Trust property] Where an employer receives money from an employee under an arrangement that the employer will pay the money into a pension fund as the employee's contribution under the pension plan, the employer shall be deemed to hold the money in trust for the employee until the employer pays the money into the pension fund.

(2) [Money withheld] For the purposes of subsection (1), money withheld by an employer, whether by payroll deduction or otherwise, from money payable to an employee shall be deemed to be money received by the employer from the employee.

aurait droit à la pension réduite en vertu du régime de retraite si celui-ci n'était pas liquidé et que l'affiliation du participant avait continué jusqu'à cette date.

.   .   .

**76.** (1) Si un régime de retraite est liquidé en totalité ou en partie, l'employeur verse à la caisse de retraite :

a) d'une part, un montant égal au total de tous les paiements qui, en vertu de la présente loi, des règlements et du régime de retraite, sont dus ou accumulés, et qui n'ont pas été versés à la caisse de retraite;

b) d'autre part, un montant égal au montant dont :

   (i) la valeur des prestations de retraite aux termes du régime de retraite qui seraient garanties par le Fonds de garantie en vertu de la présente loi et des règlements si la Commission déclare que le Fonds de garantie s'applique au régime de retraite,

   (ii) la valeur des prestations de retraite accumulées à l'égard de l'emploi en Ontario et acquises aux termes du régime de retraite,

   (iii) la valeur des prestations accumulées à l'égard de l'emploi en Ontario et qui résultent de l'application du paragraphe 40 (3) (règle des 50 pour cent),

   dépassent la valeur de l'actif de la caisse de retraite attribué, comme cela est prescrit, pour le paiement de prestations de retraite accumulées à l'égard de l'emploi en Ontario.

*Loi sur les régimes de retraite*, L.R.O. 1990, ch. P.8

**57.** (1) [Bien en fiducie] L'employeur qui reçoit de l'argent d'un employé en vertu d'un arrangement précisant que l'employeur versera cet argent à une caisse de retraite en tant que cotisation de l'employé aux termes du régime de retraite, est réputé détenir cet argent en fiducie pour l'employé jusqu'à ce que l'employeur verse cet argent à la caisse de retraite.

(2) [Sommes retenues] Pour l'application du paragraphe (1), l'argent retenu des sommes payables à l'employé par l'employeur, que ce soit par retenues salariales ou autrement, est réputé être de l'argent que l'employeur a reçu de l'employé.

(3) [Accrued contributions] An employer who is required to pay contributions to a pension fund shall be deemed to hold in trust for the beneficiaries of the pension plan an amount of money equal to the employer contributions due and not paid into the pension fund.

(4) [Wind up] Where a pension plan is wound up in whole or in part, an employer who is required to pay contributions to the pension fund shall be deemed to hold in trust for the beneficiaries of the pension plan an amount of money equal to employer contributions accrued to the date of the wind up but not yet due under the plan or regulations.

. . .

**58.** (1) [Accrual] Money that an employer is required to pay into a pension fund accrues on a daily basis.

(2) [Interest] Interest on contributions shall be calculated and credited at a rate not less than the prescribed rates and in accordance with prescribed requirements.

. . .

**74.** (1) [Activating events] This section applies if a person ceases to be a member of a pension plan on the effective date of one of the following activating events:

1. The wind up of a pension plan, if the effective date of the wind up is on or after April 1, 1987.

2. The employer's termination of the member's employment, if the effective date of the termination is on or after July 1, 2012. However, this paragraph does not apply if the termination occurs in any of the circumstances described in subsection (1.1).

3. The occurrence of such other events as may be prescribed in such circumstances as may be specified by regulation.

(1.1) [Same, termination of employment] Termination of employment is not an activating event if the termination is a result of wilful misconduct, disobedience or wilful neglect of duty by the member that is not trivial and has not been condoned by the employer or if the termination occurs in such other circumstances as may be prescribed.

(3) [Cotisations accumulées] L'employeur qui est tenu de cotiser à une caisse de retraite est réputé détenir en fiducie pour le compte des bénéficiaires du régime de retraite un montant égal aux cotisations de l'employeur qui sont dues et impayées à la caisse de retraite.

(4) [Liquidation] Si un régime de retraite est liquidé en totalité ou en partie, l'employeur qui est tenu de cotiser à la caisse de retraite est réputé détenir en fiducie pour le compte des bénéficiaires du régime de retraite un montant égal aux cotisations de l'employeur qui sont accumulées à la date de la liquidation, mais qui ne sont pas encore dues aux termes du régime ou des règlements.

. . .

**58.** (1) [Accumulation] L'argent qu'un employeur est tenu de verser à une caisse de retraite s'accumule sur une base quotidienne.

(2) [Intérêt] L'intérêt sur les cotisations est calculé et crédité à des taux qui ne sont pas inférieurs aux taux prescrits et conformément aux exigences prescrites.

. . .

**74.** (1) [Événements déclencheurs] Le présent article s'applique si une personne cesse d'être un participant à la date de prise d'effet de l'un des événements déclencheurs suivants :

1. La liquidation du régime de retraite, si sa date de prise d'effet tombe le 1er avril 1987 ou après cette date.

2. La cessation, par l'employeur, de l'emploi d'un participant, si sa date de prise d'effet tombe le 1er juillet 2012 ou après cette date, la présente disposition ne s'appliquant toutefois pas si la cessation se produit dans les circonstances visées au paragraphe (1.1).

3. L'arrivée d'autres événements prescrits dans les circonstances prescrites par règlement.

(1.1) [Idem : cessation d'emploi] La cessation de l'emploi n'est pas un événement déclencheur si elle résulte d'un acte d'inconduite délibérée, d'indiscipline ou de négligence volontaire du participant qui n'est pas frivole et que l'employeur n'a pas toléré, ou qu'elle se produit dans les autres circonstances prescrites.

(1.2) [Exceptions, election by certain pension plans] This section does not apply with respect to a jointly sponsored pension plan or a multi-employer pension plan while an election made under section 74.1 for the plan and its members is in effect.

(1.3) [Benefit] A member in Ontario of a pension plan whose combination of age plus years of continuous employment or membership in the pension plan equals at least 55 on the effective date of the activating event has the right to receive,

(a) a pension in accordance with the terms of the pension plan, if, under the pension plan, the member is eligible for immediate payment of the pension benefit;

(b) a pension in accordance with the terms of the pension plan, beginning at the earlier of,

(i) the normal retirement date under the pension plan, or

(ii) the date on which the member would be entitled to an unreduced pension under the pension plan if the activating event had not occurred and if the member's membership continued to that date; or

(c) a reduced pension in the amount payable under the terms of the pension plan beginning on the date on which the member would be entitled to the reduced pension under the pension plan if the activating event had not occurred and if the member's membership continued to that date.

(2) [Part year] In determining the combination of age plus employment or membership, one-twelfth credit shall be given for each month of age and for each month of continuous employment or membership on the effective date of the activating event.

(3) [Member for 10 years] Bridging benefits offered under the pension plan to which a member would be entitled if the activating event had not occurred and if his or her membership were continued shall be included in calculating the pension benefit under subsection (1.3) of a person who has at least 10 years of continuous employment with the employer or has been a member of the pension plan for at least 10 years.

(1.2) [Exceptions : choix fait par certains régimes de retraite] Le présent article ne s'applique pas à l'égard d'un régime de retraite conjoint ou d'un régime de retraite interentreprises tant qu'un choix fait en vertu de l'article 74.1 pour le régime et les participants est en vigueur.

(1.3) [Prestation] En Ontario, un participant à un régime de retraite dont le total de l'âge plus le nombre d'années d'emploi continu ou d'affiliation continue est d'au moins 55, à la date de prise d'effet de l'événement déclencheur, a droit à l'une des pensions suivantes :

a) une pension conforme aux conditions du régime de retraite si, aux termes de celui-ci, il est admissible au paiement immédiat d'une prestation de retraite;

b) une pension conforme aux conditions du régime de retraite, commençant à la première des dates suivantes :

(i) la date normale de retraite prévue par le régime de retraite,

(ii) la date à laquelle il aurait droit à une pension non réduite aux termes du régime de retraite si l'événement déclencheur ne s'était pas produit et que son affiliation avait continué jusqu'à cette date;

c) une pension réduite dont le montant correspond à celui à verser aux termes du régime de retraite commençant à la date à laquelle il aurait droit à la pension réduite en vertu du régime de retraite si l'événement déclencheur ne s'était pas produit et que son affiliation avait continué jusqu'à cette date.

(2) [Partie d'année] Pour déterminer le total de l'âge plus l'emploi ou l'affiliation, un crédit d'un douzième est accordé pour chaque mois d'âge et pour chaque mois d'emploi ou d'affiliation continus à la date de prise d'effet de l'événement déclencheur.

(3) [Participant pendant 10 ans] Les prestations de raccordement offertes aux termes du régime de retraite auxquelles un participant aurait droit si l'événement déclencheur ne s'était pas produit et que l'affiliation du participant continuait, sont incluses dans le calcul de la prestation de retraite prévue au paragraphe (1.3) dans le cas d'une personne qui a accumulé au moins 10 années d'emploi continu chez l'employeur ou qui est un participant depuis au moins 10 ans.

(4) [Prorated bridging benefit] For the purposes of subsection (3), if the bridging benefit offered under the pension plan is not related to periods of employment or membership in the pension plan, the bridging benefit shall be prorated by the ratio that the member's actual period of employment bears to the period of employment that the member would have to the earliest date on which the member would be entitled to payment of pension benefits and a full bridging benefit under the pension plan if the activating event had not occurred.

(5) [Notice of termination of employment] Membership in a pension plan that is wound up includes the period of notice of termination of employment required under Part XV of the *Employment Standards Act, 2000*.

(6) [Application of subs. (5)] Subsection (5) does not apply for the purpose of calculating the amount of a pension benefit of a member who is required to make contributions to the pension fund unless the member makes the contributions in respect of the period of notice of termination of employment.

(7) [Consent of employer] For the purposes of this section, where the consent of an employer is an eligibility requirement for entitlement to receive an ancillary benefit, the employer shall be deemed to have given the consent.

(7.1) [Consent of administrator, jointly sponsored pension plans] For the purposes of this section, where the consent of the administrator of a jointly sponsored pension plan is an eligibility requirement for entitlement to receive an ancillary benefit, the administrator shall be deemed to have given the consent.

(8) [Use in calculating pension benefit] A benefit described in clause (1.3) (a), (b) or (c) for which a member has met all eligibility requirements under this section shall be included in calculating the member's pension benefit or the commuted value of the pension benefit.

.    .    .

**75.** (1) [Liability of employer on wind up] Where a pension plan is wound up, the employer shall pay into the pension fund,

(a)    an amount equal to the total of all payments that, under this Act, the regulations and the pension

(4) [Prestation de raccordement distribuée proportionnellement] Pour l'application du paragraphe (3), si la prestation de raccordement offerte aux termes du régime de retraite ne se rapporte pas à des périodes d'emploi ou d'affiliation au régime de retraite, la prestation de raccordement est distribuée selon le rapport qui existe entre la période réelle d'emploi du participant à la période d'emploi que le participant aurait faite à la première date à laquelle le membre aurait droit au paiement de prestations de retraite et d'une pleine prestation de raccordement aux termes du régime de retraite si l'événement déclencheur ne s'était pas produit.

(5) [Avis de licenciement] L'affiliation à un régime de retraite qui est liquidé inclut la période de préavis de licenciement exigé en vertu de la partie XV de la *Loi de 2000 sur les normes d'emploi*.

(6) [Champ d'application du par. (5)] Le paragraphe (5) ne s'applique pas afin de calculer le montant de la prestation de retraite d'un participant qui est tenu de cotiser à la caisse de retraite, à moins que le participant verse les cotisations à l'égard de la période de préavis de licenciement.

(7) [Consentement de l'employeur] Pour l'application du présent article, si le consentement de l'employeur est une condition d'admissibilité au droit de recevoir une prestation accessoire, l'employeur est réputé avoir donné son consentement.

(7.1) [Consentement de l'administrateur : régimes de retraite conjoints] Pour l'application du présent article, si le consentement de l'administrateur d'un régime de retraite conjoint est une condition d'admissibilité au droit de recevoir une prestation accessoire, l'administrateur est réputé avoir donné son consentement.

(8) [Calcul de la prestation de retraite] La prestation mentionnée à l'alinéa (1.3) a), b) ou c) à l'égard de laquelle un participant a rempli toutes les conditions d'admissibilité prévues au présent article est incluse dans le calcul de la prestation de retraite du participant ou de sa valeur de rachat.

.    .    .

**75.** (1) [Responsabilité de l'employeur à la liquidation] Si un régime de retraite est liquidé, l'employeur verse à la caisse de retraite :

a)    d'une part, un montant égal au total de tous les paiements qui, en vertu de la présente loi, des

plan, are due or that have accrued and that have not been paid into the pension fund; and

(b) an amount equal to the amount by which,

   (i) the value of the pension benefits under the pension plan that would be guaranteed by the Guarantee Fund under this Act and the regulations if the Superintendent declares that the Guarantee Fund applies to the pension plan,

   (ii) the value of the pension benefits accrued with respect to employment in Ontario vested under the pension plan, and

   (iii) the value of benefits accrued with respect to employment in Ontario resulting from the application of subsection 39 (3) (50 per cent rule) and section 74,

exceed the value of the assets of the pension fund allocated as prescribed for payment of pension benefits accrued with respect to employment in Ontario.

*Appeals of Sun Indalex Finance, George L. Miller and FTI Consulting allowed,* LEBEL *and* ABELLA JJ. *dissenting. Appeal of USW dismissed.*

Solicitors for the appellant Sun Indalex Finance, LLC: *Goodmans, Toronto.*

Solicitors for the appellant George L. Miller, the Chapter 7 Trustee of the Bankruptcy Estates of the U.S. Indalex Debtors: *Chaitons, Toronto.*

Solicitors for the appellant FTI Consulting Canada ULC, in its capacity as court-appointed monitor of Indalex Limited, on behalf of Indalex Limited: *Stikeman Elliott, Toronto.*

Solicitors for the appellant/respondent United Steelworkers: *Sack Goldblatt Mitchell, Toronto.*

Solicitors for the respondents Keith Carruthers, et al.: *Koskie Minsky, Toronto.*

Solicitors for the respondent Morneau Shepell Ltd. (formerly known as Morneau Sobeco Limited

règlements et du régime de retraite, sont dus ou accumulés, et qui n'ont pas été versés à la caisse de retraite;

b) d'autre part, un montant égal au montant dont :

   (i) la valeur des prestations de retraite aux termes du régime de retraite qui seraient garanties par le Fonds de garantie en vertu de la présente loi et des règlements si le surintendant déclare que le Fonds de garantie s'applique au régime de retraite,

   (ii) la valeur des prestations de retraite accumulées à l'égard de l'emploi en Ontario et acquises aux termes du régime de retraite,

   (iii) la valeur des prestations accumulées à l'égard de l'emploi en Ontario et qui résultent de l'application du paragraphe 39 (3) (règle des 50 pour cent) et de l'article 74,

dépassent la valeur de l'actif de la caisse de retraite attribué, comme cela est prescrit, pour le paiement de prestations de retraite accumulées à l'égard de l'emploi en Ontario.

*Pourvois de Sun Indalex Finance, George L. Miller et FTI Consulting accueillis, les juges* LEBEL *et* ABELLA *sont dissidents. Pourvoi du Syndicat des Métallos rejeté.*

Procureurs de l'appelante Sun Indalex Finance, LLC : *Goodmans, Toronto.*

Procureurs de l'appelant George L. Miller, syndic de faillite des débitrices Indalex É.-U., nommé en vertu du chapitre 7 : *Chaitons, Toronto.*

Procureurs de l'appelante FTI Consulting Canada ULC, en sa qualité de contrôleur d'Indalex Limited désigné par le tribunal, au nom d'Indalex Limited : *Stikeman Elliott, Toronto.*

Procureurs de l'appelant/intimé le Syndicat des Métallos : *Sack Goldblatt Mitchell, Toronto.*

Procureurs des intimés Keith Carruthers, et autres : *Koskie Minsky, Toronto.*

Procureurs de l'intimée Morneau Shepell Ltd. (anciennement connue sous le nom de Morneau

*Partnership): Cavalluzzo Hayes Shilton McIntyre & Cornish, Toronto.*

*Solicitor for the respondent/intervener the Superintendent of Financial Services: Attorney General of Ontario, Toronto.*

*Solicitors for the intervener the Insolvency Institute of Canada: Thornton Grout Finnigan, Toronto.*

*Solicitors for the intervener the Canadian Labour Congress: Sack Goldblatt Mitchell, Toronto.*

*Solicitors for the intervener the Canadian Federation of Pensioners: Paliare, Roland, Rosenberg, Rothstein, Toronto.*

*Solicitors for the intervener the Canadian Association of Insolvency and Restructuring Professionals: McMillan, Montréal.*

*Solicitors for the intervener the Canadian Bankers Association: Osler, Hoskin & Harcourt, Toronto.*

*Sobeco, société en commandite) : Cavalluzzo Hayes Shilton McIntyre & Cornish, Toronto.*

*Procureur de l'intimé/intervenant le Surintendant des services financiers : Procureur général de l'Ontario, Toronto.*

*Procureurs de l'intervenant l'Institut d'insolvabilité du Canada : Thornton Grout Finnigan, Toronto.*

*Procureurs de l'intervenant le Congrès du travail du Canada : Sack Goldblatt Mitchell, Toronto.*

*Procureurs de l'intervenante la Fédération canadienne des retraités : Paliare, Roland, Rosenberg, Rothstein, Toronto.*

*Procureurs de l'intervenante l'Association canadienne des professionnels de l'insolvabilité et de la réorganisation : McMillan, Montréal.*

*Procureurs de l'intervenante l'Association des banquiers canadiens : Osler, Hoskin & Harcourt, Toronto.*