David W. Dykhouse (dwdykhouse@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Tel: (212) 336-2000
Fax: 9212) 336-2222

Thomas J. Flynn (tflynn@larkinhoffman.com)
LARKIN HOFFMAN DALY & LINDGREN, LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, Minnesota 55437-1060
Tel: (952) 835-3800
Fax: (952) 896-3333

*Attorneys for MOAC Mall Holdings LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 18-23538 (RDD) |
| SEARS HOLDINGS CORPORATION, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |

**MOAC MALL HOLDINGS LLC'S THIRD SUPPLEMENTAL AND AMENDED**

**OBJECTIONS TO DEBTOR'S NOTICE OF ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

MOAC Mall Holdings LLC ("MOAC"), by and through its undersigned counsel, hereby submits this supplemental objection (the "Objection") to the Notice of Assumption and Assignment of Additional Designatable Leases (Doc. No. 3298) in response to the Debtor's Response and Reservation of Rights with Respect to Objections to Cure Amounts and/or Assumption and Assignment of Designatable Leases (Doc. No. 3651) and Transform Holdco LLC's Omnibus Reply in Support of Assumption and Assignment of Designated Leases (Doc. No. 3654), which raise new issues, and in support hereof states as follows:

Preliminary Statement

1. On October 15, 2018, Sears Holding Corporation and its affiliated Debtor entities (collectively, the "Debtor") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the U.S. Bankruptcy Court for the Southern District of New York.

2. MOAC is the owner of property, a mall in Bloomington, MN, more popularly known as Mall of America®. (Declaration of Rich Hoge, dated May 17, 2019 ("Decl."), ¶ 1.) Sears is an anchor tenant in that building, under lease identified in the Debtor's motion with Store No. 1722 (the "MOAC Lease" (Decl., Ex. A.)). MOAC is empathetic to the plight bemoaned in Transform Holdco LLC's omnibus reply. (*See, e.g.*, Doc. No. 3651 at 2.) Mall of America is also an American icon which boasts over 520 stores, employs approximately 13,000–15,000 people, and generates over $2 billion in economic impact to Minnesota each year. (Decl., ¶ 5.) The success of Mall of America depends upon its anchor tenants. (*Id.*)

3. Debtor has ceased operations at Mall of America, and the store has gone dark. (Decl., ¶ 16.)

Procedural History

4. This supplemental objection incorporates and reiterates the objections stated in MOAC's prior objections (Doc. Nos. 2199, 3501).[2]

5. The Debtor and Transform Holdco LLC (the "Buyer" or "Transform") each filed subsequent responses (Doc. Nos. 3651, 3654) to landlord objections, including MOAC's prior objections. These responses raise new issues and purported facts. The Debtor deferred to Transform to provide any evidence of adequate assurance, and Transform has failed in this regard.

6. Accordingly, MOAC now supplements its prior objections to explain how the Debtor and the Buyer have still failed to satisfy their obligations under Section 365 of the Bankruptcy Code. (A) The Debtor and Buyer bear the burden of providing the heightened adequate assurance required for shopping centers. (B) There can be no reasonable dispute that Mall of America is a shopping center. (C) Transform failed to provide adequate assurance that the assignee's financial condition *and* operating performance are similar to that of the Debtor as of May 30, 1991. (D) Transform failed to prove adequate assurance that the assumption and assignment will be subject to the lease provision requiring one-year notice before going dark. (E) Transform also failed to prove that the assumption and assignment will not disrupt tenant mix or balance in the shopping center. Each of these supplemental points is discussed in turn.

---

[2] Rather than simply repeat the prior statements of fact and objections, this supplementation focuses on the relevant and salient facts and objections warranting supplementation.

DISCUSSION

A.  The Debtors and Proposed Assignee Bear the Heightened Shopping-Center Burden Demonstrating Adequate Assurance of Future Performance.

7.  MOAC objects to any proposed assumption and assignment of its Mall of America lease, unless and until the Debtors provide adequate assurance of future performance as to the Buyer and/or any other proposed assignee (at this time, Transform Leaseco, LLC, has been designated as the assignee). The Debtor must demonstrate such assignee's ability to comply with all requirements of Section 365, including, but not limited to, Sections 365(b)(3) and (d)-(f) of the Bankruptcy Code. Absent such a showing, the Bankruptcy Code requires denial of the proposed assumption and assignment.

8.  Under Section 365(f)(2) of the Bankruptcy Code, in order to assign a lease under Section 365, adequate assurance of future performance by the assignee must be provided. The Debtor, and/or the proposed assignee, bears the burden on adequate assurance issues. *See, e.g.*, *In re Bygraph, Inc,.* 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986). *See also In re Lafayette Radio Electronics Corp.*, 12 B.R. 302, 312 (Bankr. E.D.N.Y. 1991).

9.  In addition, because, as explained in the next section, Mall of America so plainly constitutes a shopping center, the Debtor must meet specific requirements of adequate assurance under Section 365(b)(3) of the Bankruptcy Code, which are intended to "protect the rights of lessors and the centers other tenants." (*See, e.g.*, *In re Joshua Slocum,* 922 F.2d 1081, 1086 (3rd Cir. 1990).) The Third Circuit explained Congress's recognition of the need to protect from the unique effects a change in one tenant can have on other tenants and the shopping center as a whole:

> Congress recognized that unlike the usual situation where a lease assignment affects only the lessor, an assignment of a shopping

> center lease to an outside party can have a significant detrimental
> impact on others, in particular, the center's other tenants.

*Id.* (citing S. Rep. Nos. 98–70, 98th Cong. 1st Sess. (1983)). The nature of the proposed tenant's business and its affect on tenant mix is an important consideration and "may be as important to the lessor as the actual promised rental payments." *Id.* at 1091 (quoting H.R. Rep. No. 595, 95th Cong., 1st Session 348–49). The very term "anchor tenant" acknowledges the key role such a tenant plays in the success of a shopping center. In other words, in exchange for taking away a landlord's contractual ability to regulate and ensure a stable tenant mix, the Code builds in its own protections.

B.  <u>Transform's Apparent Objection to Classification of Mall of America as a Shopping Center Strains Credulity.</u>

10. As noted in MOAC's second supplemental objection, the obvious nature of the MOAC Lease as a shopping center lease warrants the presumption that the Debtor takes no issue with this fact. (Doc. No. 3501, ¶ 4 n.2.)

11. Rather than even attempt to satisfy the rigorous adequate assurance requirements for shopping centers, Transform simply makes a blanket statement that landlords, including MOAC, fail to qualify their leases as shopping-center leases. (Doc. No. 3654, ¶ 49.)

12. As explained by the Third Circuit, "the mall *is* the archetypal 'shopping center.'" *In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1086 (3d Cir. 1990) (emphasis in original). Mall of America *is* the archetypal mall. This fact is so universally known that it practically warrants judicial notice. *See Colonnade Catering Cor. v.U.S.*, 397 U.S. 72, 78 (1970) ("[T]his practice [of liquor storage] is so universal it can be judicially noticed."); *Peyroux v. Howard*, 32 U.S. 324, 342 (1833) ("Yet it cannot be doubted, that there are many facts . . . of such public notoriety, and

the knowledge of which is to be derived from other sources than parol proof, which the court may judicially notice.").

13.     Even so, the MOAC Lease easily meets the criteria generally considered in case-by-case assessments for shopping-center qualification, including "combination of leases, whether all leases are held by single landlord, presence of common parking area, existence of master lease, and contiguity of stores." *Androse Assocs. of Allaire, LLC v. A&P (In re A&P)*, 472 B.R. 666, 677 (Bankr. S.D.N.Y. 2012); *L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.)*, 209 F.3d 291, 299 (3d. Cir. 2000); *see also In re Ames Dept. Stores, Inc.*, 348 B.R. 91, 95 (Bankr. S.D.N.Y. 2006) (listing fourteen factors indicating shopping center status).

14.     At 5.6 million square feet, Mall of America is the largest mall in the United States by total floor area, the largest retail and entertainment complex in North America, and one of the largest malls in the world—attracting more than 40 million visitors each year. (Decl., ¶ 6.) Built as an enclosed mall shopping center, Mall of America opened on August 11, 1992 with 330 stores. (*Id.*) Today, Mall of America holds more than 520 stores within one contiguous, enclosed complex. (*Id.*) Mall of America offers a wide array of common parking options and amenities, including open parking, ramp parking with open-stall indicators, reserved premium parking, and valet parking—in addition to light rail and other transit stops.

15.     MOAC and its affiliated entities hold all of the combination of hundreds of store leases in Mall of America. (Decl., ¶ 8.) Many of the leases include provisions that depend on the number and presence of anchor tenants. (Decl., ¶¶ 8, 14.) *See In re Ames Dept. Stores, Inc.*, 348 B.R. at 95 (including anchor-tenant provisions as a factor indicating shopping-center status). The ownership of Mall of America, which is covered by a reciprocal easement and operating agreement, by MOAC and its affiliates stands in the place of a master lease. (Decl., ¶ 8.) The MOAC Lease, signed in advance and anticipation of the opening of Mall of America, explicitly

states that the property was being "developed for an Enclosed Mall Shopping Center known as Mall of America." (Decl., Ex. A, Part 1.1.)

16. The leasing of spaces to commercial retail distributors of goods is another factor indicating shopping-center status. *In re Ames Dept. Stores, Inc.*, 348 B.R. at 95. Supplemented by a wide array of food and entertainment options, Mall of America offers its guests hundreds of retail stores in which to shop. Sears was an anchor retail tenant of Mall of America from the mall's opening until Sears went dark in the three-floor space as a part of this bankruptcy. (Decl., ¶ 7.

17. Joint trash service also indicates shopping-center status. *In re Ames Dept. Stores, Inc.*, 348 B.R. at 95. Mall of America exemplifies the best, sustainable practices in its joint trash services. Mall of America recycles more than 60% of its waste—averaging 32,000 tons per year. (Decl., ¶ 9.) Mall of America separates and recycles more than 2,400 tons of food waste to a local hog farm annually. (*Id.*) Mall of America converts the fat from restaurant fryers in to more than 4,000 pounds of biodiesel per month. (*Id.*)

18. Other relevant shopping-center indicators include common hours and joint advertising. *In re Ames Dept. Stores, Inc.*, 348 B.R. at 95. Mall of America posts regular retail hours of 10:00 a.m. to 9:30 p.m. Monday through Saturday and 11:00 a.m. to 7:00 p.m. Sunday. (Decl., ¶ 10.) In addition to a common website promoting the shopping, entertainment, and food options at Mall of America, Mall of America jointly advertises through all major advertising media, including television, print, and even social media. (*Id.*)

19. Meeting nearly every single factor considered by courts in determining shopping-center status, Mall of America epitomizes the shopping center to such a degree that to question whether the MOAC Lease qualifies for shopping-center protections arguably raises Rule 11

implications. Indeed, to question Mall of America's classification as a shopping center is to question the very concept of the shopping center.

C.  <u>Debtor and Transform Fail to Prove Adequate Assurance of Financial Condition and Operating Performance as Compared to That of Sears on May 30, 1991.</u>

20.  Debtor and Transform fail to provide the required adequate assurance that the financial condition and *operating performance* of the relevant assignee are similar to that of Sears on May 30, 1991.

21.  Section 365(b)(3)(A) requires the Debtor and assignee to prove adequate assurance:

> of the source of the rent and other consideration due under such lease and, in case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, <u>as of the time the debtor became lessee under the lease</u>. [emphasis added.]

This provision requires more than just adequate assurance of rent. It requires adequate assurance of all other consideration due under the lease. It also requires assurance of *both* financial condition *and operating performance* of the assignee. Recognizing that shopping-center landlords enter into leases based on the financial condition and operating performance of the tenant-to-be, the Code requires that the new tenant's financial condition and operating performance be similar to the debtor *as of the time it became the lessee*.

22.  In this case, MOAC's predecessor-in-interest entered into the lease with Sears on May 30, 1991.[3] (Decl., ¶ 11.) At that time, Sears had a solid history of retail sales appropriate for an anchor department store of the most ambitious shopping center venture in the United States.

---

[3] Mall of America Company subsequently assigned its interests in the MOAC Lease, among other interests, to MOAC. (Decl., ¶ 13.)

(*Id.*) In these pre-internet days, department stores, like Sears, were the go-to destination for a wide array of shopper needs (household goods, clothing, tools, appliances, and more). (*Id.*) With this financial condition and operating performance in mind, MOAC entered into a very favorable lease with Sears, so Sears could function as a draw of customers to Mall of America and provide reciprocal benefit to the mall's other tenants and the mall as a whole. (*Id.*)

23.     Proof of adequate assurance under Section 365(b)(3)(A) necessarily requires evidence of the financial condition and operating performance of Sears on May 30, 1991 to which to compare the assignee's position. No evidence whatsoever has been put forth or given to MOAC regarding these facts. The Debtors and Transform have wholly failed to do this.

24.     Transform has provided minimal financial information about the financial condition of the assignee and no information comparing the assignee's financial condition to the condition of Sears on May 30, 1991. (Decl., ¶ 15.) Transform does claim that the financial condition is so tenuous that denying assumption and assignment "would end any hope" of Transform's success. (Doc. No. 3654 at 2.) Transform also briefly discusses the assignee's operating performance of a "smaller footprint" of 425 go-forward stores, which again are apparently insufficient for Transform's success without the assumption and assignment of additional non-store equity leases. (*See e.g.*, Doc. No. 3654, ¶ 29.) However, Transform discusses this only in relation to the ability of the assignee to pay rent—apparently improperly assuming rent payments are the only relevant consideration. Transform provides no information comparing the assignee's operating performance to that of Sears on May 30, 1991—except acknowledging that the performance is *not similar*—its footprint is *smaller*. More importantly, the operating performance of the assignee's go-forward stores is *irrelevant* because the MOAC Lease is not for one of these locations. Transform has provided no information about the identity

of, much less the operating performance of, any tenant to actually fill the space subject to the lease. (Decl., ¶ 15.)

D.      Debtor and Transform Fail to Prove Adequate Assurance of Lease Compliance.

25.     Debtor and Transform fail to prove adequate assurance that, once the lease is assigned, the assignee will comply with the lease term requiring one-year notice before the third floor goes dark.

26.     Section 365(b)(3)(C) requires the Debtor and assignee to prove adequate assurance:

> that the assumption or assignment of such lease is subject to all provisions thereof, including, but not limited to, provisions such as radius, location, use, or exclusivity provisions, and will not breach any such provision contained in any other lease, financing agreements or master agreement relating to such shopping center.

In other words, while the Code permits some suspension of some lease requirements which might otherwise prevent assignment, a lease must be assumed in its entirety. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531 (1984); *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000); *In re MF Glop. Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D. N.Y. 2012). Debtor and Transform must, therefore, prove adequate assurance that the assignee will comply with all provisions of the lease.

27.     In addition to other relevant provisions, for which there is also a failure of adequate assurance of performance, the MOAC Lease includes an option for the third floor of the leased space. (Decl., Ex. B.) In particular, this option requires any tenant to give one year's notice prior to shutting down operations (a/k/a "going dark"). (Decl. Ex. B, ¶ 1.) The space is currently dark, and no such notice has been given. (Decl., ¶ 16.) Any new assignee would be required to comply with this requirement, among the other lease requirements. Transform

provides no evidence whatsoever that the assignee and any tenant would comply with this requirement.

E.    Debtor and Transform Fail to Prove Adequate Assurance of Tenant Mix.

28. By failing to provide any information about the actual tenants for the leased premises or any real assurance that there even would be tenants, Debtor and Transform fail to provide adequate assurance that the assignment will not disrupt Mall of America's tenant mix.

29. Section 365(b)(3)(D) requires the Debtor and assignee to prove adequate assurance:

> that assumption or assignment of such lease will not disrupt any tenant mix or balance in the shopping center.

This completely separate adequate assurance requirement is in addition to and independent of any such requirements in Section § 365(b)(3)(C). In other words, regardless of any lease provisions regarding tenant mix, tenant mix or balance may not be disrupted by assignment.

30. A bankruptcy court in *In re Rickel Home Centers, Inc.* considered whether the adequate assurance requirement of Section 365(b)(3)(D) was met regarding a shopping center lease that contained no go-dark prohibition, in addition to other considerations. 240 B.R. 826 (Bankr. D. Del. 1998), *appeal dismissed*, 209 F.3d 291 (2000), *cert. denied*, 531 U.S. 873 (2000). Acknowledging that the location was temporarily vacant due to the bankruptcy, the court found that adequate assurance was provided due to several factors not present here. *Id.* at 834–35. The assignee, in that case, *was* a retail distributor and provided evidence that it would occupy and operate in much of the space within six months. *Id.* at 835. The assignee also provided evidence that it had strong incentive and would, in fact, seek to sublet the space within a reasonable period of time. *Id.* The court also noted that the assignee represented to the court that it intended to seek tenants which would complement the shopping center's tenant mix and meet

with the landlord's approval. *Id.* at 834 n.5. Accordingly, the court concluded that it "has no reason to believe that [the assignee] would allow the portion of the [space] not used by [the assignee] to remain dark for an unreasonable period of time." *Id.* at 835 (noting that the landlord would be preserved recourse should the sublet efforts become unreasonable).

31. Transfer provides none of these assurances. Not only does the assignee not plan to operate any retail operation in even a portion of the MOAC Leased premises, Transfer provides no evidence of *any* proposed tenant for this space. (Decl., ¶ 17.) Accordingly, Transfer provides no evidence assuring that the leased premises will be filled, much less in a reasonable period of time, with a tenant that does not disrupt the tenant mix or balance in Mall of America—i.e. that is appropriate for an anchor space in one of the world's premier shopping centers. (*Id.*) Because the assignee will not operate a store in the space and, thus, share a vested interest in the mall's tenant mix (Decl., ¶ 18.) and because of the extremely favorable lease terms, evidence is also lacking that the assignee has any real incentive to fill the space with an appropriate tenant in a reasonable time. The proposed assignment also provides no recourse to MOAC should the assignee fail, within a reasonable time subsequent to the assignment, to actually provide a return to the previously-existing tenant mix.

## Joinder and Reservation of Rights

32. MOAC maintains all previously identified objections in their entirety. MOAC reserves the right to make such other and further objections as may be appropriate as additional documentation and information is provided by the Debtor. MOAC specifically reserves all rights, remedies, and positions with respects to any proposed assignee including the right (i) to object to any proposed use or change use of any and all of the premises once such assignee has been identified and (ii) to amend or update any cure amounts in connection therewith. MOAC hereby

joins in the objections filed by Debtor's other landlords and the official committee of unsecured creditors, to the extent such objections are consistent herewith.

## Conclusion

Wherefore, MOAC respectfully request that the Court (i) deny the assumption and assignment of the MOAC Lease, unless and until the issues identified herein are addressed, and fully satisfied, and (ii) grant such further relief as the court deems just and proper.

Dated:  May 17, 2019	Respectfully submitted,

 /e/ Thomas J. Flynn
Thomas J. Flynn (30570)
Larkin Hoffman Daly & Lindgren, Ltd.
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota  55437-1060
(952) 835-3800
tflynn@larkinhoffman.com

Admitted *pro hac vice* on December 26, 2018

Dated:  May 17, 2019	 /e/ David W. Dykhouse
David W. Dykhouse
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336-2000
mdwdykhouse@pbwt.com

*Attorneys for MOAC Mall Holdings LLC*

4847-2144-4759, v. 1