**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 18-23538 (RDD) |
|  | ) |  |
| SEARS HOLDINGS CORPORATION, *et al.*, | ) | (Jointly Administered) |
|  | ) |  |
| Debtors.[1] | ) |  |

### DECLARATION OF RICH HOGE SUPPORTING
### MOAC MALL HOLDINGS LLC'S THIRD SUPPLEMENTAL AND AMENDED
### OBJECTIONS TO DEBTOR'S NOTICE OF ASSUMPTION AND
### ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES

I, Rich Hoge, declare:

1.      I am Executive Vice President – Operations of MOAC Mall Holdings LLC

("MOAC"), a landlord of Debtor Sears, Roebuck and Co. ("Tenant") with respect to retail

premises located at a mall in Bloomington, MN, more popularly known as Mall of America®.,

which, upon information and belief is, designated by Tenant as Sears Store No. 1722 (the lease,

herein referred to as the "MOAC Lease").

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

2.     In this capacity, I am familiar with MOAC's documents and business records, and I (and those working under my direction) have been personally involved in various capacities in connection with the operations of and leasing at Mall of America.

3.     This declaration is submitted in support of the concurrently filed MOAC Mall Holdings LLC's Third Supplemental and Amended Objections to Debtor's Notice of Assumption and Assignment of Additional Designatable Leases (the "Objection") in these chapter 11 cases with respect to the proposed assumption and assignment of certain leases, including the MOAC Lease, to Transform Leaseco, LLC, upon information and belief, an affiliate of Transform Holdco LLC (the "Buyer" or "Transform"), an affiliate of ESL Investments, Inc.

4.     As a consequence of my position, I (and those working under my direction) have access to and am one of the custodians of records of MOAC as those books, records, and files relate to the use and occupancy of retail premises at Mall of America. If called upon to testify in this proceeding, as to the matters set forth in this declaration, I could and would competently testify thereto, since the facts set forth herein are personally known to me to be true, except as to matters stated to be upon information and belief, which matters I believe to be true.

5.     Mall of America is also an American icon which boasts over 520 stores, employs approximately 13,000–15,000 people, and generates over $2 billion in economic impact to Minnesota each year. The success of Mall of America depends upon its anchor tenants.

6.     At 5.6 million square feet, Mall of America, on information and belief, is the largest mall in the United States by total floor area, the largest retail and entertainment complex in North America, and one of the largest malls in the world—attracting more than 40 million visitors each year. Built as an enclosed mall shopping center, Mall of America opened on August 11, 1992 with 330 stores. Today, Mall of America holds more than 520 stores, including

hundreds of retail stores, within one contiguous, enclosed complex. A list and map of these stores can be found on Mall of America's website https://www.mallofamerica.com/directory. Mall of America offers a wide array of common parking options and amenities, including open parking, ramp parking with open-stall indicators, reserved premium parking, and valet parking—in addition to light rail and other transit stops. Information about parking, including the number of currently available spaces, can be found at https://mallofamerica.com/parking.

7.      Sears was an anchor retail tenant of Mall of America from the mall's opening until Sears went dark in the three-floor space as a part of this bankruptcy. Other current anchor tenants include Macy's and Nordstrom.

8.      MOAC and its affiliates hold all of the combination of hundreds of store leases in Mall of America. Many of the leases include provisions that depend on the number and presence of anchor tenants. MOAC and its affiliates own the property comprising Mall of America, which is subject to a reciprocal easement and operating agreement, and lease to store tenants directly.

9.      Trash services at Mall of America are handled jointly. Mall of America recycles more than 60% of its waste—averaging 32,000 tons per year. Mall of America separates and recycles more than 2,400 tons of food waste to a local hog farm annually. Mall of America converts the fat from restaurant fryers in to more than 4,000 pounds of biodiesel per month.

10.      Mall of America posts regular retail hours of 10:00 a.m. to 9:30 p.m. Monday through Saturday and 11:00 a.m. to 7:00 p.m. Sunday. In addition to a common website promoting the shopping, entertainment, and food options at Mall of America, Mall of America jointly advertises through all major advertising media, including television, print, and even social media.

11.      MOAC's predecessor-in-interest Mall of America Company entered into the MOAC Lease with Sears on May 30, 1991. [A true and correct copy of the Lease, Construction

and Operation Agreement is attached as **Exhibit A**.] At that time, on information and belief,

Sears had a solid history of retail sales appropriate for an anchor department store of the most

ambitious shopping center venture in the United States. In those pre-internet days, on

information and belief, department stores, like Sears, were the go-to destination for a wide array

of shopper needs (household goods, clothing, tools, appliances, and more). With this financial

condition and operating performance in mind, MOAC entered into a very favorable lease with

Sears, so Sears could function as a draw of customers to the Mall of America and provide

reciprocal benefit to the mall's other tenants and the mall as a whole.

12.     Mall of America Company and Sears also entered into an option to lease the third

floor of the leased premises on May 30, 1991. [A true and correct copy of the Agreement to

Grant Option to Lease is attached as **Exhibit B**.] In particular, this addendum requires any tenant

to give one year's notice prior to shutting down operations (a/k/a "going dark").

13.     On January 20, 1994, Mall of America Company and Sears supplemented the

MOAC Lease providing for the term of the lease to continue through to August 31, 2022, with an

option to renew. Mall of America Company subsequently assigned its rights in the MOAC Lease

and other interests to MOAC.

14.     The MOAC Lease is subject to reciprocal easement and operating agreement,

which also includes Macy's California, Inc. and Nordstrom, Inc. [See Exhibit A, Part 1.1.] Other

retail tenant leases include provisions that are dependent upon the presence of anchor tenants in

Mall of America—such as changes in rent depending upon the number of anchor tenants in

operation.

15.     To my knowledge MOAC has received minimal financial information about the

financial condition of the assignee and no information comparing the assignee's financial

condition to the condition of Sears on May 30, 1991. To my knowledge, MOAC has received no

information comparing the assignee's operating performance to that of Sears on May 30, 1991—except an acknowledgment that the performance is not similar—its store footprint is smaller. To my knowledge, MOAC has received no formal information about the identity of, much less the operating performance of, any tenant to actually fill the space subject to the lease.

16.    The entire leased premise is currently dark, and no 1-year notice was given prior to it going dark. To my knowledge, MOAC has received no evidence that the assignee or any tenant would provide a year's notice prior to the third floor going dark.

17.    On information and belief, the assignee does not plan to operate any retail operation in even a portion of the MOAC leased premises and, thus, does not appear to be committed to the success of Mall of America or maintaining an appropriate tenant mix in the mall. Other than unsubstantiated rumors, to my knowledge, MOAC has received no information regarding any proposed tenant for this space. Accordingly, to my knowledge, MOAC has received no evidence assuring that the leased premises will be filled, much less in a reasonable period of time, with a tenant that does not disrupt the tenant mix or balance in Mall of America—i.e. that is appropriate for an anchor space in one of the world's premier shopping centers.

18.    Neither Buyer nor the assignee have, to my knowledge, proposed to invest significant sums in the leased premises through remodeling, restoration, or other capital improvements that would demonstrate a long-term commitment to the leased premises.

[remainder of page intentionally left blank]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 17, 2019

**XXXXXXXX**
**Bloomington, Minnesota**

_____
Rich Hoge
Executive Vice President - Operations

4822-0060-6615, v. 1

# **EXHIBIT A**

030368

TABLE OF CONTENTS

TO

LEASE, CONSTRUCTION AND OPERATION AGREEMENT

BY AND BETWEEN

SEARS, ROEBUCK AND CO.

AND

MALL OF AMERICA COMPANY

ARTICLE 1
DEMISE . . . . . . . . . . . . . . . . . . . . . . . . 1
   1.1   Grant and Demise . . . . . . . . . . . . . 1
   1.2   Quiet Enjoyment . . . . . . . . . . . . . . 2
   1.3   Leasehold Estate . . . . . . . . . . . . . 2
   1.4   Shopping Center Tract . . . . . . . . . . . 3
   1.5   Title to Improvements . . . . . . . . . . . 3

ARTICLE 2
INDUCEMENTS . . . . . . . . . . . . . . . . . . . . . 4
   2.1   Power and Authority . . . . . . . . . . . . 4
   2.2   Landlord's Tract and the Leased Premises . . . . 4
      (A)   Title . . . . . . . . . . . . . . . . 4
      (B)   Paramount Interests . . . . . . . . . . 4
      (C)   Plot Plan . . . . . . . . . . . . . . 5
   2.3   . . . . . . . . . . . . . . . . . . . . . 5
      (A)   Permits and Approvals . . . . . . . . . 5
      (B)   Access . . . . . . . . . . . . . . . 5
      (C)   Utility Facilities . . . . . . . . . . 5
      (D)   Zoning and Subdivision . . . . . . . . 5

ARTICLE 3
TERM . . . . . . . . . . . . . . . . . . . . . . . . 6
   3.1   Term . . . . . . . . . . . . . . . . . . . 6
   3.2   Extensions of the Lease: Holdover . . . . . . 7
   3.3   Tenant's Obligation to Open . . . . . . . . 9

ARTICLE 4
USES . . . . . . . . . . . . . . . . . . . . . . . . 9
   4.1   Use of Leased Premises . . . . . . . . . . 9
   4.2   Ancillary Uses . . . . . . . . . . . . . . 10
   4.3   Operating Covenant . . . . . . . . . . . . 10
   4.4   Option to Lease Third Floor of Tenant Building . 11

ARTICLE 5
EASEMENTS . . . . . . . . . . . . . . . . . . . . 11

ARTICLE 6
ASSIGNMENT AND RELATED RIGHTS . . . . . . . . . . . . 12
   6.1   General Rights . . . . . . . . . . . . . . 12
   6.2   Leasehold Mortgage . . . . . . . . . . . . 12
   6.3   Sale by Tenant to Landlord . . . . . . . . 15

ARTICLE 7
SITE IMPROVEMENTS . . . . . . . . . . . . . . . . . . 18
   7.1   Generally . . . . . . . . . . . . . . . . 18
   7.2   Development and Requirements . . . . . . . 18
   7.3   Building Pad . . . . . . . . . . . . . . . 18

ARTICLE 8
LANDLORD'S CONSTRUCTION . . . . . . . . . . . . . . . 18
   8.1   Construction . . . . . . . . . . . . . . . 18

ARTICLE 9
  TENANT'S CONSTRUCTION  . . . . . . . . . . . . . . . . . . . .  19
    9.1    INCORPORATION OF REA PROVISIONS  . . . . . . . .  19
    9.2    Building Pad  . . . . . . . . . . . . . . . . . .  20
    9.3    Construction . . . . . . . . . . . . . . . . . .  20
    9.4    Associated Improvements  . . . . . . . . . . . .  20

ARTICLE 10
  CONSTRUCTION REQUIREMENTS AND STANDARDS  . . . . . . . . .  22

ARTICLE 11
  SHOPPING CENTER MANAGEMENT  . . . . . . . . . . . . . . . .  22

ARTICLE 12
[INTENTIONALLY OMITTED]

ARTICLE 13
  COMPLIANCE WITH LAW  . . . . . . . . . . . . . . . . . . .  23

ARTICLE 14
  MAINTENANCE  . . . . . . . . . . . . . . . . . . . . . . .  23
    14.1   Maintenance of the Leased Premises  . . . . . .  23
    14.2   Alterations  . . . . . . . . . . . . . . . . . .  23

ARTICLE 15
  INDEMNITY  . . . . . . . . . . . . . . . . . . . . . . . .  24

ARTICLE 16
  INSURANCE  . . . . . . . . . . . . . . . . . . . . . . . .  25

ARTICLE 17
  LIENS  . . . . . . . . . . . . . . . . . . . . . . . . . .  25

ARTICLE 18
  DAMAGE OR DESTRUCTION  . . . . . . . . . . . . . . . . . .  25

ARTICLE 19
  CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . .  26
    19.1   Generally . . . . . . . . . . . . . . . . . . .  26
    19.2   Apportionment  . . . . . . . . . . . . . . . . .  26

ARTICLE 20
  PAYMENTS . . . . . . . . . . . . . . . . . . . . . . . . .  27
    20.1   Place of Payments and Payee  . . . . . . . . . .  27
    20.2   Abatement and Excuse upon Damage or Destruction or
           Condemnation . . . . . . . . . . . . . . . . . .  27

ARTICLE 21
  RENT . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
    21.1   Rent . . . . . . . . . . . . . . . . . . . . . .  28

ARTICLE 22
  TENANT'S COMMON AREA PAYMENTS  . . . . . . . . . . . . . .  28
    22.1   Common Area Payments . . . . . . . . . . . . . .  28

ARTICLE 23
  TAXES  . . . . . . . . . . . . . . . . . . . . . . . . . .  29
    23.1   Definitions  . . . . . . . . . . . . . . . . . .  29
    23.2   Property Tax Apportionment . . . . . . . . . . .  30
    23.3   Payment of Property Taxes  . . . . . . . . . . .  32
    23.4   Contest  . . . . . . . . . . . . . . . . . . . .  33

ARTICLE 24
  MERCHANTS ASSOCIATION OR PROMOTIONAL FUND  . . . . . . . .  35

ARTICLE 25
  UTILITIES  . . . . . . . . . . . . . . . . . . . . . . . .  36
    25.1   General Services . . . . . . . . . . . . . . . .  36
    25.2   Special Charges  . . . . . . . . . . . . . . . .  37

ARTICLE 26
   NOTICE AND PROCESS . . . . . . . . . . . . . . . . . . . 38
       26.1   Notices . . . . . . . . . . . . . . . . . 38
       26.2   Process . . . . . . . . . . . . . . . . . 40

ARTICLE 27
   UNAVOIDABLE DELAYS . . . . . . . . . . . . . . . . . . . 40

ARTICLE 28
   DEFAULTS . . . . . . . . . . . . . . . . . . . . . . . 41
       28.1   Default by Tenant . . . . . . . . . . . . 41
       28.2   Default and Self-help . . . . . . . . . . 42
       28.3   Other Remedies . . . . . . . . . . . . . 43

ARTICLE 29
   GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . 43
       29.1   Costs . . . . . . . . . . . . . . . . . . 43
       29.2   Duration of Performance . . . . . . . . . 44
       29.3   Approvals . . . . . . . . . . . . . . . . 44
       29.4   Governing Law . . . . . . . . . . . . . . 44
       29.5   Counterparts . . . . . . . . . . . . . . 44
       29.6   Document Organization . . . . . . . . . . 45
       29.7   Recordation . . . . . . . . . . . . . . . 45
       29.8   Parties . . . . . . . . . . . . . . . . . 45
       29.9   Entire Agreement . . . . . . . . . . . . 45
       29.10  Limited Liability of Landlord and Exculpation of
            Partners . . . . . . . . . . . . . . . . 45

ARTICLE 30
   GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . 47
       30.1   Definitions . . . . . . . . . . . . . . . 47

**EXHIBITS TO**
**LEASE, CONSTRUCTION AND OPERATION AGREEMENT**
**BY AND BETWEEN**
**SEARS, ROEBUCK AND CO.**
**AND**
**MALL OF AMERICA COMPANY**

| Exhibit | Description |
|---------|-------------|
| "A" | Tenant's Tract |
| "B" | Plot Plan |
| "C" | Landlord's Tract |
| "D" | Permitted Exceptions |
| "E" | Site Work Plans |

<u>LEASE, CONSTRUCTION AND OPERATION AGREEMENT</u>

THIS LEASE, CONSTRUCTION AND OPERATION AGREEMENT ("Lease"), comprising a demise of certain premises, together with grants of certain rights with respect thereto and over other premises, is made as of the 30th day of ___May___, 1991 by and between SEARS, ROEBUCK AND CO., a New York corporation, having its current principal offices and place of business at the Sears Tower in the State of Illinois (herein "Tenant") and MALL OF AMERICA COMPANY, a Minnesota general partnership (herein "Landlord"). Landlord and Tenant hereby agree as follows:

ARTICLE 1

DEMISE

1.1  <u>Grant and Demise</u>

Landlord does hereby lease and demise to Tenant and Tenant does hereby take and accept from Landlord certain premises described in Exhibit A and depicted on Exhibit B (the "Tenant's Tract"), same being part of a tract of land to be developed for an Enclosed Mall Shopping Center known as Mall of America (said Enclosed Mall Shopping Center being sometimes hereinafter called "Enclosed Mall Shopping Center" and said Tenant's Tract leased together with the Tenant Building and other improvements to be constructed on such Tenant's Tract pursuant to the terms of this Lease, being hereinafter called "the Leased Premises"), TOGETHER WITH all rights, appurtenances, servitudes, charges, encumbrances, restrictions, easements, rights of ingress, egress, parking, loading and unloading, licenses and hereditaments, granted herein and belonging or appertaining to the Leased Premises and TOGETHER WITH all rights, easements, servitudes, charges, encumbrances, restrictions and privileges herein created on, over, in, running with and binding all of the land described by bearings and distances in Exhibit C as Landlord's Tract which is depicted on Exhibit B as Landlord's Tract, and the buildings and other improvements existent or hereafter erected thereon [all of which

land together with such buildings and other improvements is herein referred to as "Landlord's Tract"]. The term "Landlord's Tract" refers to all lands, buildings and other improvements outside the Leased Premises but within the Shopping Center Tract whether or not Landlord is the fee owner thereof and irrespective of any transfer of ownership thereof by Landlord. Exhibit B is a plan establishing the initial layout of the Shopping Center Tract Site and showing, inter alia, the areas devoted to Common Areas and Permissible Building Areas. Landlord shall be entitled to develop and construct all or any part of the Enclosed Mall Shopping Center, and any other phases thereof, at any time, subject to the terms and provisions of that certain Amended and Restated Reciprocal Easement and Operating Agreement (the "REA") dated as of the date hereof, by and among Landlord, Tenant, Macy's California, Inc. ("Macy's") and Nordstrom, Inc. ("Nordstrom"). Tenant confirms and agrees that Landlord's obligations under this Lease shall be subject to the terms and provisions of the REA, notwithstanding anything herein to the contrary.

1.2   Quiet Enjoyment

Landlord covenants to Tenant that, throughout the Term, Tenant shall and may peaceably and quietly have, hold and enjoy the Leased Premises and all rights, easements, appurtenances and privileges belonging to or in any way appertaining thereto without hindrance or molestation by anyone lawfully claiming any right therein by, through or under Landlord, subject, however, to the terms hereof, applicable laws, ordinances, codes and regulations and the Permitted Exceptions set forth in Exhibit D hereto. Said covenant shall not however limit or preclude Landlord from terminating this Lease or otherwise pursuing remedies available to Landlord in the former case if Tenant's default entitles Landlord to terminate this Lease by reason of a specific provision of this Lease or in law or in the latter case, if Tenant's default entitles Landlord to pursue other remedies by reason of a specific provision of this Lease or under law.

1.3   Leasehold Estate

The said Lease and demise of the Leased Premises includes and is subject to the covenants, agreements and promises of each party contained in this Lease, all of which form an integral part of Tenant's leasehold estate and shall be presumed in law as having vested as of the date of this Lease irrespective of how such may be otherwise denominated. So long as this Lease shall be in effect or Tenant's leasehold estate shall exist [whichever be the longer period of time], all such covenants, agreements and promises are and shall continue to be easements, servitudes, charges and/or encumbrances appurtenant to and upon and covenants benefitting and running with the Leased Premises and Landlord's Tract, and shall bind Landlord's Tract and the Leased Premises and shall be affirmatively enforceable for the benefit of the Leased Premises and Tenant, its successors and assigns against Landlord's Tract, and, subject to the provisions of Paragraph 29.10 hereof, Landlord, its successors and assigns and for the benefit of Landlord's Tract and Landlord, its successors and assigns, against the Leased Premises and Tenant, its successors and assigns.

1.4   Shopping Center Tract

The Shopping Center Tract means and consists of the Leased Premises and Landlord's Tract.   The Shopping Center Tract is described in Exhibit A and is depicted on Exhibit B.

1.5   Title to Improvements

Beginning with the date of this Lease title to and ownership of all buildings and other improvements located within or forming a part of the Leased Premises shall at all times be and remain in Tenant (or an Affiliate of it) or any successor tenant permitted herein (or leasehold Mortgagee after foreclosure or deed in lieu thereof or permitted assignee of, or purchaser from any of them) throughout the Term or so long as Tenant's leasehold estate shall exist, whichever be the longer period of time.   Upon the termination of Tenant's leasehold estate, whether by expiration of the Term hereof or otherwise, Tenant hereby covenants and agrees that title to, and   ownership of, all buildings and other improvements located within or forming a part of the Leased

Premises, and the right to possess and use the same, shall automatically pass to and be vested in Landlord without payment or consideration of any kind free and clear of all rights of Tenant's Leasehold Mortgagee and all other parties.  Although the provisions of the preceding sentence are intended to be self-executing, Tenant hereby agrees, upon such expiration of the Term or termination of Tenant's leasehold estate, to execute any further deed, bill of sale or document reasonably requested by Landlord to confirm Landlord's title to said buildings and other improvements and Tenant's grant and conveyance thereof to Landlord pursuant to this subsection.

## ARTICLE 2
### INDUCEMENTS

Among the inducements made by Landlord to Tenant to enter into this Lease and as continuing covenants made by Landlord to Tenant, Landlord represents and covenants to Tenant:

2.1 <u>Power and Authority</u>

that Landlord has full power and authority to execute, acknowledge and deliver this Lease and to grant the estate and all the interests, rights and privileges granted to Tenant hereby; and

2.2 <u>Landlord's Tract and the Leased Premises</u>

as to Landlord's Tract and the Leased Premises and all appurtenances thereto:

(A) <u>Title</u>

that Landlord owns good and marketable fee simple title thereto free and clear of all liens and other encumbrances except for all matters listed in Exhibit "D" as therein stated or provided for herein;

(B) <u>Paramount Interests</u>

that, except as listed in Exhibit "D", there are, and shall be, no covenants, agreements, promises, liens, limitations, restrictions or other encumbrances which now or hereafter limit or conflict with any party's right, title, interest, or obligations under this Lease, or which, if foreclosed, would discharge or

93013-8.81

terminate this Lease or would cause any holder of paramount title or interest in all or any part of the Shopping Center Tract to have a right to discharge or terminate this Lease or Tenant's leasehold estate other than pursuant to the terms hereof;

(C)  Plot Plan

that the Shopping Center Tract shall be improved as of Tenant's Opening Date and shall thereafter be used, in conformity with this Lease.

2.3  as to the Shopping Center Tract and all appurtenances thereto:

(A)  Permits and Approvals

that Landlord shall have secured and shall comply with all necessary governmental permits and other approvals relating to or required for the work, construction or other work required of or permitted to Landlord by reason of this Lease and for the opening and use of the Shopping Center Tract (excluding the department store tracts) as the Enclosed Mall Shopping Center contemplated by this Lease;

(B)  Access

that there is at least one (1) public street to which the Leased Premises, by easement for the term of this Lease or otherwise, shall have access as of right;

(C)  Utility Facilities

that all necessary permanent utility facilities for the Leased Premises and Landlord's Tract [including, without limitation, separate sanitary and storm sewers, electric, gas, telephone and water (general and fire protection)] shall be underground, and shall be brought and connected by Landlord into the Leased Premises as specified in Articles 7 and 9 for use by Tenant at least four (4) months prior to Tenant's Opening Date without restriction (other than by reason of physical capacity) on the right of use thereof for the use and operation of the Tenant Building;

(D)  Zoning and Subdivision

(1)  that the Shopping Center Tract (excluding tracts of department stores other than Tenant) shall be, on the date Tenant

93013-9.81

would commence construction if the Shopping Center Tract is zoned as provided herein, zoned to permit as of right all the uses and operations to be performed thereon pursuant to the rights and privileges and the obligations, respectively, of Landlord and Tenant as contemplated by this Lease and that, in particular, the Leased Premises are so zoned to permit as of right the use of the Tenant Building for the use and operation of a department store in the Tenant Building;

(2)  that Landlord shall use reasonable efforts to the end that the lot constituting the Leased Premises is lawfully and finally subdivided and enrolled separately on the applicable official tax rolls and maps.

## ARTICLE 3

### TERM

3.1  Term

(A)  The term of this Lease (herein "Term") shall commence on the date of this Lease and the initial period of the Term shall endure for THIRTY (30) YEARS after the date that a Sears department store is first opened in fact for business to the public in the Tenant Building (herein "Tenant's Opening Date"), unless said initial period of the Term shall be sooner terminated as provided herein.  If, however, Tenant's Opening Date shall fall on a day other than the first day of a month, then the initial period of the Term shall endure for the unexpired portion of such month plus THIRTY (30) YEARS beginning with the first of the month next ensuing.  Tenant will pay Rent, and other sums then due from Tenant to Landlord under this Lease, prorated on a daily basis for the unexpired portion of such month to and inclusive of the last day of said month.

(B)  The precise commencement and ending dates of the initial period of the Term and the commencement and ending dates of the first Lease Year shall be set forth in one separate recordable instrument executed by the parties hereto within thirty (30) days after Tenant's Opening Date.  The phrase "Lease Year" means the

93013-10.81

period of twelve (12) consecutive months commencing on the first day of the said THIRTY (30) YEAR period and each successive period of twelve (12) consecutive months following thereafter except that the first (1st) Lease Year shall contain those number of days additionally which fall between Tenant's Opening Date and the last day of the calendar month in which said date occurs, including said last day. In the event that prior to expiration of any Lease Year this Lease is terminated, then such Lease Year shall end on the date this Lease terminates as if such date were set forth herein as the stated expiration date of the Term. In such case, Rent and other sums then due from Tenant to Landlord under this Lease for the month in which this Lease terminates shall be prorated on a daily basis to the date in such month when this Lease terminates.

(C) At the end of the Term of the Lease, Tenant shall return the Leased Premises to Landlord by surrendering possession thereof to Landlord. Within thirty (30) days after such surrender of possession, Tenant may remove any of its personal property, inventory and trade fixtures from the Leased Premises, and Landlord shall provide access to Tenant for such purpose. Any of Tenant's property which is located at the Leased Premises which is not removed within such thirty (30) day period shall be deemed to have been abandoned and shall become the property of Landlord. At the time of such return, the Leased Premises shall be in the condition and state of repair required by the terms of this Lease, ordinary wear and tear excepted. Notwithstanding anything to the contrary contained herein, upon expiration or earlier termination of the Term hereof, title to the Tenant Building shall pass to and be vested in Landlord as provided in Paragraph 1.5 hereof.

3.2    <u>Extensions of the Lease: Holdover</u>

(A) Tenant may successively extend this Lease upon the same terms and conditions as herein contained for SEVEN (7) separate and consecutive periods of TEN (10) YEARS each beginning after the expiration of the initial period of the Term, or any extension thereof, by giving Landlord notice of the extension elected by

031391/S0495/SEARSLSE.CLN                    7

Tenant not less than TWELVE (12) MONTHS prior to the first day of the extended or further extended Term. Nothing contained in the foregoing provisions shall preclude or limit Landlord from terminating this Lease or otherwise pursuing other remedies available to Landlord if Tenant is in default of this Lease.

If Tenant shall fail to give any such notice within the aforesaid time limitation, Tenant's right to exercise any option shall nevertheless continue thereafter until thirty (30) days after Landlord shall give Tenant notice of Landlord's election to terminate such option and Tenant may exercise such option at any time until the expiration of said thirty (30) day period. Tenant shall not, however, under any of the above circumstances, be obligated or required to exercise any of the above described options nor shall such exercise extend the Term of this Lease beyond the date to which it would have been extended had Tenant timely given notice of such election pursuant to this Paragraph 3.2.

It is the intention of the parties hereto to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any of the options set forth through inadvertent failure to give notice of the exercise thereof within the time limits prescribed. Accordingly, if Tenant shall fail to give notice to Landlord of Tenant's election to extend the Term for any option period, and if Landlord shall fail to give notice to Tenant of Landlord's election to terminate Tenant's right to extend this Lease under any option then applicable thereto, then and so long as such event shall occur, the Term of this Lease shall be automatically extended, from month to month, upon all of the applicable terms and conditions (including but not limited to Rent and other charges) which were in effect for the Term of this Lease prior to such month-to-month extension, subject to Tenant's rights under the aforesaid options and Landlord's rights to place the thirty (30) day time limit on any such options by a notice of the nature above provided. Notwithstanding the foregoing, Tenant shall have the right (exercisable by notice at least thirty (30) days in advance to

031391/S0495/SEARSLSE.CLN                    8

93013-12.81

Landlord) to have the Term end on (i) the date on which it would expire but for the provisions of the second paragraph of this Paragraph 3.2 and the foregoing provisions of this paragraph or (ii) at the end of the said thirty (30) day notice period, whichever is later.

(B)  Any holding over by Tenant with the consent of Landlord after the expiration of the Term hereof or any extensions thereof shall constitute a tenancy from month to month at the same rent and other charges and upon all other applicable terms and conditions as herein contained terminable on thirty (30) days' written notice.

3.3  <u>Tenant's Obligation to Open</u>

INCORPORATION OF REA PROVISIONS.  The provisions of Article VIII-C of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA, throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

<u>ARTICLE 4</u>

USES

4.1  <u>Use of Leased Premises</u>

(A)  The Leased Premises shall be used during and after the Sears Major Operating Period (as defined in the REA) for the uses and purposes described in Paragraph 4.3 and for no other uses and purposes.  No portion of the Leased Premises shall be used or operated during the Major Operating Period for uses and purposes which are not in furtherance of the operation of the Sears department store, and no other uses or purposes.

(B)  Landlord shall not at any time have any right to regulate or otherwise limit the manner, or hours or days, of the operation of business upon the Leased Premises (including advertising), or the number of Tenant's so-called divisions therein or the

allocation between sales Floor Area and Floor Area used for other
purposes so long as during the Major Operating Period changes in
such number or allocation do not result in a default of Tenant's
Operating Covenant under Paragraph 4.3, such matters being within
the sole discretion of Tenant.

4.2  <u>Ancillary Uses</u>

INCORPORATION OF REA PROVISIONS.  The provisions of Article
XXI-D of the REA are by this reference incorporated into this Lease
with such changes in the use of terms identifying the Parties and
their respective Tracts as are necessary in the context of the
Lease, and shall be binding upon and shall inure to the benefit of
Landlord and Tenant in the manner and to the extent set forth in
the REA throughout the Term of the Lease, regardless of whether the
REA terminates prior to the expiration or termination of this
Lease.

4.3  <u>Operating Covenant</u>

INCORPORATION OF REA PROVISIONS.  The provisions of Articles
XXII-A and XXII-C of the REA are by this reference incorporated
into this Lease with such changes in the use of terms identifying
the Parties and their respective Tracts as are necessary in the
context of the Lease, and shall be binding upon and shall inure to
the benefit of Landlord and Tenant in the manner and to the extent
set forth in the REA throughout the Term of the Lease, regardless
of whether the REA terminates prior to the expiration or
termination of this Lease.  Notwithstanding anything in the REA to
the contrary, in the event Landlord fails to correct any of the
conditions described in Article XXII-C(1)(x), (y) or (z) of the REA
within the one (1) year period following written notice of such
condition from Tenant pursuant to Article XXII-C of the REA, then,
as an alternative to the termination of its Operating Covenant as
permitted by Article XXII-C of the REA, Tenant may elect by written
notice to Landlord, to continue to operate its Store, and in such
event Tenant shall be entitled to discontinue its Common Area
payments to Landlord under Article 22 of this Lease until such time
as Landlord has cured such condition.  In the event Tenant notifies

93013-14.81

Landlord of its election to continue to operate its Store pursuant hereto, then, notwithstanding any failure of Landlord to cure such condition, Tenant shall continue to operate its Store throughout the entire duration of the Major Operating Period (as defined in the REA).

4.4   Option to Lease Third Floor of Tenant Building

(1) Tenant covenants to Landlord that If at any time after the Major Operating Period of Sears (as defined in the REA) Tenant, its successors or assigns, shall cease to operate at least twenty thousand (20,000) square feet of Floor Area (as defined in the REA) on the third floor of the Tenant Building for purposes then permitted by the REA, then Tenant, its successors and assigns, shall grant to Minntertainment Company, a Minnesota general partnership ("Minntertainment"), an affiliate of Landlord, or, at the option of Minntertainment, an affiliate of Minntertainment, their successors and assigns, the exclusive and irrevocable first right and option (but not the obligation) to lease said third floor of the Tenant Building from Tenant, its successors and assigns, in accordance with the terms set forth in that certain Agreement to Grant Option To Lease, dated as of the date hereof by and between Tenant and Minntertainment ("Option Agreement").   Any default by Tenant under the Option Agreement shall constitute a default by Tenant under this Lease.

## ARTICLE 5

### EASEMENTS

INCORPORATION OF REA PROVISIONS.   The provisions of Articles III and IV of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

### ARTICLE 6

### ASSIGNMENT AND RELATED RIGHTS

6.1  <u>General Rights</u>

INCORPORATION OF REA PROVISIONS.  The provisions of Article XXV of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.  Subject to the provisions of Article XXV of the REA, Tenant shall have the right, subject to the provisions of Article XXII-C of the REA, during the term hereof, to sublease that portion of the Tenant's Building which is in excess of Tenant's minimum Floor Area specified in Article IX-A of the REA without Landlord's consent. Tenant shall have the right at any time, without the consent of Landlord, to grant subleases, licenses or concessions for the sale of merchandise and services in or from portions of the Tenant's Building as a part of Tenant's usual conduct of business within the premises, subject to the provisions of Article XXII-C of the REA.

6.2  <u>Leasehold Mortgage</u>

(A)  Commencing from and after the Opening Date (as defined in the REA), subject to the provisions of Article XXV of the REA, Tenant shall have the exclusive right, without Landlord's consent, to mortgage, pledge or otherwise encumber (or transfer for bona fide financing purposes, general or special, to a lender regulated under federal or state law as a lending institution or to an Affiliate of Tenant) Tenant's leasehold estate, including, without limitation, Tenant's title and ownership of the improvements upon the Leased Premises which are initially reserved in Sears, Roebuck and Co. as Tenant (or an Affiliate of it) hereunder (herein "Leasehold Mortgage").  The holder of such mortgage, pledge or encumbrance, or the transferee under the aforesaid financing arrangement, is herein "Leasehold Mortgagee".  The denomination of

031391/S0495/SEARSLSE.CLN                12

such holder or transferee as Leasehold Mortgagee shall in no way limit the type of financing arrangements made by Tenant, such denomination being solely for convenient reference. If a Leasehold Mortgagee or Tenant shall give Landlord notice of the creation of a Leasehold Mortgage and shall deliver to Landlord a counterpart of such Leasehold Mortgage, then at the same time and whenever Landlord gives Tenant a notice of default under this Lease, Landlord shall give such Leasehold Mortgagee a copy of the same notice it gives Tenant at the address for such Leasehold Mortgagee or Tenant and no notice shall be deemed effective against Tenant unless and until such copy of notice shall also have been so given to the Leasehold Mortgagee. Landlord will accept performance by such Leasehold Mortgagee of the obligations on Tenant's part to be performed under this Lease as though performed by Tenant. Landlord agrees not to terminate this Lease (1) if there is a default by Tenant either which is for nonpayment of money or which is curable by the payment of money and a Leasehold Mortgagee shall make payment thereon within fifteen (15) days after Tenant is required to make payment in order to cure such default or (2) if in the case of any other type of default by Tenant, which default is curable by Leasehold Mortgagee, Leasehold Mortgagee shall have cured or in good faith commenced the curing thereof and prosecuted such curing to completion as and within the times allowed under this Lease to Tenant therefor. If, however, Leasehold Mortgagee needs to obtain possession in order to cure such latter type of default, then the time needed by the Leasehold Mortgagee to cure such type of default shall be deemed extended to include the period of time required by such Leasehold Mortgagee to obtain possession of the Leased Premises provided: (1) it acts promptly to do so and obtains possession thereafter within thirty (30) days, (2) throughout such time Tenant or Leasehold Mortgagee pays as due all Rent and all other sums due from Tenant to Landlord under this Lease and (3) throughout such time all other obligations of Tenant under this Lease are performed by Tenant or Leasehold Mortgagee. If there be a default by Tenant under the Leasehold Mortgage permitting

Leasehold Mortgagee to assume Tenant's leasehold estate and the status of Tenant and Tenant's obligations hereunder, Leasehold Mortgagee, or its designee, may do so at its election and shall thereupon have all the title, interests, rights and obligations of Tenant, including, without limitation, the obligations of Tenant pursuant to Article XXII-C of the REA, except that the department store required to be operated under Paragraph 4.3 shall not be required to be a Sears department store.  No Leasehold Mortgagee shall become liable under this Lease unless and until it assumes Tenant's leasehold estate and the status of Tenant and all of Tenant's obligations hereunder by a Leasehold Mortgagee of Tenant or a person claiming by or through either.

(B)  Upon termination of this Lease and extinguishment of all rights of Tenant hereunder, Landlord shall give notice thereof to any Leasehold Mortgagee at the address of it last furnished to Landlord by the Leasehold Mortgagee or Tenant.  Landlord shall upon written request of such Leasehold Mortgagee made within thirty (30) days after Leasehold Mortgagee receives Landlord's notice of termination and so long as no default exists in the payment of any sums required under this Lease to be paid or in the performance of anything herein required to be performed, promptly upon execution and delivery by such Leasehold Mortgagee execute and deliver a new lease of the Leased Premises to such Leasehold Mortgagee for the remainder of the Term, upon the same terms and conditions as are stated in this Lease and as amended prior to such termination excluding, however, any matters which have been fully performed or are otherwise no longer executory.  All Rent and other charges due from Tenant to Landlord under this Lease to the commencement date of the new lease shall, however, as a condition of delivery of such new lease by Landlord to Leasehold Mortgagee, or its designee, have been paid to Landlord when due prior to the time of delivery of such new lease together with all expenses, including reasonable counsel fees incurred by Landlord in connection with enforcement of the lease or the preparation, execution and delivery of such new lease.

### 6.3   Sale by Tenant to Landlord

(A)   In the event that at any time and from time to time after the expiration of the Sears Operating Period, and until the Term expires Tenant decides to cease, and ceases to operate, a store in the Tenant Building and further determines to sell, exchange or otherwise transfer its interest in the Leased Premises, Tenant shall, by giving Landlord notice, first offer to Landlord the right to purchase the same (1) at the price offered to Tenant pursuant to a bona fide offer in a good faith, arms length transaction with a prospective purchaser-assignee unrelated to Tenant and on the same terms and conditions offered to Tenant or (2) if no such offer has been made to Tenant, at a price equal to the fair market value of Tenant's leasehold estate including the value of its improvements. The fair market value thereof shall be determined by averaging the amounts determined to be said fair market value by two (2) independent MAI appraisers, one of which shall be selected by Landlord and the other by Tenant.   Each such appraiser shall have at least ten (10) years' experience in shopping center valuations, and shall be unrelated to any party hereto.   In the event there is a difference of more than ten percent (10%) between the valuations of said appraisers, they shall select a third mutually satisfactory independent MAI appraiser (with at least ten (10) years' experience in shopping center valuations and unrelated to any party hereto) who shall submit the amount determined by him or her to be the aforesaid fair market value and the average of each of the three (3) amounts shall constitute the fair market value hereunder.   In no event shall the period from selection of the first appraiser through the conclusion of a determination of fair market value exceed ninety (90) days.   Each party shall select its appraiser within ten (10) days after Tenant gives Landlord the aforesaid notice of offer and give the other party notice of the identity of the appraiser.   Each of the parties shall simultaneously after submission to it of its appraiser's report, exchange reports within thirty (30) days after the reports of each party's appraiser have been submitted to the selecting party.   Each party shall

immediately give the other party notice of its receipt of its own appraiser's report.   In the event a third appraiser must be selected, he or she shall be selected within twenty (20) days after the date of the aforesaid exchange of reports and the third appraiser shall submit his or her report to each of the parties within thirty (30) days after selection.

(B)   The following procedures shall govern the parties with respect to said potential purchase by Landlord:

(1)   within forty-five (45) days after Tenant gives Landlord notice of the offer in the case of an offer described in Paragraph 6.3(A)(1), or within forty-five (45) days after Landlord's receipt of the final appraisal in the case of an offer described in Paragraph 6.3(A)(2), Landlord shall either reject same or accept same by giving Tenant notice of its election;

(2)   within thirty (30) days after Landlord gives Tenant such notice of acceptance, the parties shall enter into a legally binding agreement of purchase of Tenant's aforesaid interest, including a specification of the date of settlement thereon.   If Landlord fails to give Tenant a required notice of acceptance or rejection within the time specified herein therefor, Landlord shall be presumed to have rejected Tenant's offer.   Any time period specified herein may be waived or extended by written agreement between Landlord and Tenant.   In the event of any rejection or presumed rejection, Tenant shall be entitled to sell, exchange or otherwise transfer its aforesaid interest, free of the provisions of this Paragraph 6.3 (except that the provisions hereof shall remain applicable to any further offers of purchase or assignment made to Tenant).

(C)   None of the foregoing provisions of this Paragraph 6.3 shall be applicable to:

(1)   a transfer to an Affiliate of Tenant;

(2)   a   transfer   pursuant   to   reorganization, consolidation, merger or liquidation or the transfer of all or substantially all of the assets of Tenant; and

(3) a transfer pursuant to a bona fide financing arrangement with any lender.

The foregoing provisions of this Paragraph 6.3 shall remain binding upon any transferees of or through Tenant pursuant to the preceding Paragraph 6.3(C)(1), (2) and (3), and shall be binding upon any transferees pursuant to a power of sale in a Mortgage or a transfer pursuant to or in lieu of foreclosure proceedings. Tenant may request, and Landlord shall furnish, a written statement that a transfer under the above provisions of this Paragraph 6.3(C) is acknowledged by Landlord as being a transfer hereunder.

(D) In the event Landlord accepts Tenant's offer to sell such interest, the title to the improvements conveyed by Tenant shall be good and marketable, but free and clear of all liens and encumbrances including, without limitation, the Leasehold Mortgage (other than any such which the third party offeror does not requires to be satisfied or released prior to closing thereunder) except for (1) any such that shall have been provided for or created by this Lease, including without limitation, the matters appearing in Exhibit D, and (2) rights, liens and encumbrances as to which both Landlord and Tenant had given prior written approval. Unless otherwise specified in the offer by Tenant or the third party offeror, the following shall be included among the terms of any transfer under this Paragraph 6.3: (i) any real estate transfer taxes and recordation taxes shall be equally shared; (ii) any real estate taxes, charges for public utility services, including water and sewer charges shall be apportioned to the date of settlement; (iii) upon closing, Tenant shall deliver to Landlord any and all advance deposits, whether by way of security or otherwise; (iv) all other sums paid in advance or payable by Tenant and other occupants of the Leased Premises shall likewise be apportioned on a daily basis to the date of settlement. The sale of Tenant's interest hereunder and the improvements owned by Tenant to Landlord shall constitute a termination of this Lease and Landlord and Tenant at closing shall execute a recordable instrument terminating this Lease as of such date.

## ARTICLE 7

### SITE IMPROVEMENTS

7.1  Generally

INCORPORATION OF REA PROVISIONS.  The provisions of Article V
of the REA are by this reference incorporated into this Lease with
such changes in the use of terms identifying the Parties and their
respective Tracts as are necessary in the context of the Lease, and
shall be binding upon and shall inure to the benefit of Landlord
and Tenant in the manner and to the extent set forth in the REA
throughout the Term of the Lease, regardless of whether the REA
terminates prior to the expiration or termination of this Lease.

7.2  Development and Requirements

Landlord shall perform in accordance with this Lease all of
the Site Work which is the subject of the final working drawings
and specifications listed in Exhibit "E" as such may be revised
with the mutual consent of Landlord and Tenant (the "Site Work
Plans").  All such Site Work shall be commenced within thirty (30)
days after the date of this Lease and shall be completed as
follows:

7.3  Building Pad

The building pad for the Tenant Building (herein "Building
Pad") has been completed (including, without limitation, graded,
compacted and equipped with temporary utilities) in accordance with
the Site Work Plans and has been delivered to, and accepted by,
Tenant.

## ARTICLE 8

### LANDLORD'S CONSTRUCTION

8.1  Construction

INCORPORATION OF REA PROVISIONS.  The provisions of Articles
VI and VII of the REA are by this reference incorporated into this
Lease with such changes in the use of terms identifying the Parties
and their respective Tracts as are necessary in the context of the
Lease, and shall be binding upon and shall inure to the benefit of
Landlord and Tenant in the manner and to the extent set forth in

031391/S0495/SEARSLSE.CLN              18

93013-22.81

the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.  Tenant hereby recognizes and acknowledges that pursuant to that certain Subordination, Non-Disturbance and Attornment Agreement dated October 30, 1990 by and between The Mitsubishi Bank, Limited, The Mitsui Trust and Banking Company, Limited, Teachers Insurance and Annuity Association of America and The Chuo Trust & Banking Co., Ltd. (collectively, the "Mortgagee"), Macy's and Landlord, and that certain Subordination, Non-Disturbance and Attornment Agreement dated October 30, 1990 by and between Mortgagee, Landlord and Nordstrom, in the event of any act or omission by Landlord which would constitute an event of default under Landlord's mortgage to Mortgagee or the note secured thereby, and any cure period with respect to such default has expired, Mortgagee shall send written notice of such act or omission to Macy's and Nordstrom, and effective as of the date which is sixty (60) days after receipt of such notice, Landlord shall be deemed to have failed to meet a deadline described in the "Critical Construction Milestones" attached as Exhibit "G" to the REA unless and until (a) such event of default has been cured or waived and Mortgagee has notified Macy's and Nordstrom that such cure has been effected or such default has been waived, or (b) Mortgagee has committed to Macy's and Nordstrom to complete the construction of the Shopping Center in accordance with the terms of the respective leases of Macy's and Nordstrom or in accordance with a schedule which is satisfactory to Macy's and Nordstrom.

## ARTICLE 9

### TENANT'S CONSTRUCTION

9.1  INCORPORATION OF REA PROVISIONS.  The provisions of Article VIII of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in

93013-23.81

the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

9.2   Building Pad

Tenant shall be obligated to accept the Building Pad if:

(1)   Tenant has vehicular access to the Building Pad;

(2)   the Building Pad is tendered in a condition complying with the Site Work Plans, especially as to location and elevation;

(3)   all temporary utility facilities and construction areas for Tenant's construction are in place as herein required and fully usable for Tenant's construction upon connection thereto; and

(4)   the other improvements comprising the Site Work have commenced, and are timely proceeding substantially to be completed so that they will be available for their intended use on or before the Opening Date (as defined in the REA).

9.3   Construction

Within thirty (30) days after Tenant has accepted the Building Pad pursuant to Paragraph 9.2, Tenant shall commence construction of the Tenant Building, which shall be a three (3) level structure consisting of approximately one hundred eighty-eight thousand (188,000) gross square feet. Tenant shall have construction of the Tenant Building substantially complete on or before the Opening Date (as defined in the REA).

9.4   Associated Improvements

As an integral part of the construction of the Tenant Building (the plans and specifications of which shall be subject to Landlord's prior reasonable approval), Tenant agrees:

(1)   to install: (a) all loading docks and aprons therefor, (b) the area shown as "Parcel Pick-Up Area" on Exhibit "B", including without limitation, all surface paving, sidewalks, landscaping and curbs located thereon and (c) except as otherwise noted in the Site Work Plans, all sidewalks and landscaping between the curbs of the ground surface Parking Area and the outside walls of the Tenant Building as shown on Exhibit B and in all events,

Landlord shall have improved such exterior Common Area (including curbs) to join with the above improvements of Tenant prior to Tenant's work;

(2)    to connect the utility facilities for the Tenant Building to the several utility lines therefor which shall have been brought by Landlord to each of various points as required by Article 7.

(3)    Tenant covenants and agrees with Landlord to construct the Tenant Building on the Leased Premises (subject to the provisions of that certain Reimbursement Agreement dated as of the date hereof by and between Landlord and Tenant [the "Reimbursement Agreement"]) in accordance with plans and specifications which comply with the above provisions, together with the site improvements on the Leased Premises required or elected to be performed by Tenant as are shown on Tenant's plans. Tenant shall be required, as part of the site Improvements to be constructed by Tenant, to construct pedestrian bridges (with plans and specifications submitted for review to Landlord) in the locations shown upon Exhibit "B" connecting the Tenant Building to the adjoining parking deck, at Tenant's cost, and upon completion of the bridges Landlord shall reimburse Tenant in an aggregate amount equal to the aggregate hard third party costs of doing the construction, plus design and engineering costs, which would have been incurred had the Tenant's pedestrian bridges been constructed of the same material and in the same manner of construction and design as the pedestrian bridges constructed by Landlord connecting Parking Areas to the Enclosed Mall; provided, however, that in no event shall the amount reimbursed to Tenant by Landlord exceed the sum of Five Hundred Thousand Dollars ($500,000.00) (such amount to be in addition to the amounts set forth in the Reimbursement Agreement). Notwithstanding anything to the contrary in this Lease contained, Landlord shall be obligated to keep, maintain, repair and replace, if necessary, the pedestrian bridges constructed by Tenant in the same way as Landlord is required under this Lease to maintain pedestrian bridges constructed by Landlord; PROVIDED,

HOWEVER, that Tenant shall make and perform only those repairs and replacements resulting from defects in construction, or design defects resulting from any change to the basic pedestrian bridge design of Landlord. Upon completion of construction, the bridges shall be the property of Landlord and, except as otherwise provided in this Lease, be deemed Common Area.

All such improvements (including, without limitation, initial construction, alteration, repair or restoration) shall be of first-class workmanship and materials.

## ARTICLE 10

### CONSTRUCTION REQUIREMENTS AND STANDARDS

INCORPORATION OF REA PROVISIONS. The provisions of Article X of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

## ARTICLE 11

### SHOPPING CENTER MANAGEMENT

INCORPORATION OF REA PROVISIONS. The provisions of Articles IX and XI of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

## ARTICLE 12

### [INTENTIONALLY OMITTED]

### ARTICLE 13

#### COMPLIANCE WITH LAW

#### INCORPORATION OF REA PROVISIONS.

The provisions of Article XXX-U of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

### ARTICLE 14

#### MAINTENANCE

#### 14.1 <u>Maintenance of the Leased Premises</u>

<u>INCORPORATION OF REA PROVISIONS</u>.  The provisions of Article XIV-A of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.  Notwithstanding anything herein to the contrary, Tenant shall maintain, or cause to be maintained, the Tenant Building, the machinery and equipment therein, their systems and any other improvements made, or machinery and equipment and their systems installed.  Landlord shall have no obligation to maintain or do or pay for any work or materials upon or with respect to the Tenant Building.

#### 14.2 <u>Alterations</u>

So long as no default hereunder is created thereby, Tenant shall have the right, without Landlord's consent, to make such nonstructural and structural alterations and improvements and, except as otherwise prohibited in this Lease, to install such

93013-27.81

electric, trade and other fixtures, equipment or devices in the Leased Premises as Tenant deems desirable for the use thereof and any such alterations, improvements, fixtures, equipment and devices [even if forming a part of or attached to the Leased Premises and whether installed or done prior to or after Tenant's Opening Date (as defined in the REA)] may at any time and from time to time thereafter be removed by Tenant and Tenant shall promptly repair any damage caused by such removal. Tenant may leave any such alterations, improvements, equipment or devices or signs on the Leased Premises at the end of the Term but may at the end of the Term remove its movable trade fixtures and Tenant shall promptly repair any damage caused by such removal. Tenant shall have no obligation upon the expiration of the Term, or upon sooner termination thereof, to deliver the Leased Premises to Landlord in any condition other than that condition in which the Leased Premises then exist, i.e., then "as-is" condition and broom clean (except for conditions involving maintenance under Article 14 for which Landlord has given Tenant notice of default remaining uncured at the time in question and except for conditions which are the subject of Article 18) and Tenant agrees not to remove any lighting, electrical, cooling, heating, ventilating or plumbing systems or other equipment or systems which form an integral part of the building systems of the Tenant Building. Notwithstanding anything herein to the contrary, Tenant shall have no right whatsoever, at any time during or after the Term hereof, to remove the Tenant Building.

## ARTICLE 15

### INDEMNITY

INCORPORATION OF REA PROVISIONS. The provisions of Articles XII-A AND XII-B of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set

forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

## ARTICLE 16

### INSURANCE

INCORPORATION OF REA PROVISIONS.  The provisions of Articles XII-C through XII-G and Article XIII of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.  Notwithstanding anything in the REA to the contrary, all insurance carried by Landlord and Tenant pursuant to the REA shall be carried with insurance companies having an A-IX rating or better in the most recently published A.M. Bests Rating Guide; provided, however, that such requirement shall not apply to any party which elects to self-insure pursuant to the REA.

## ARTICLE 17

### LIENS

INCORPORATION OF REA PROVISIONS.  The provisions of Articles X-F AND X-G of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

## ARTICLE 18

### DAMAGE OR DESTRUCTION

INCORPORATION OF REA PROVISIONS.  The provisions of Article XIV of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and

their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

ARTICLE 19

CONDEMNATION

### 19.1 Generally

INCORPORATION OF REA PROVISIONS.  The provisions of Article XVII of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

### 19.2 Apportionment

If there is a condemnation solely of the Leased Premises, then the damages therefor sustained by Tenant to Tenant's leasehold interest as determined by the legally constituted body empowered by law to make a condemnation award or a court of competent jurisdiction if a party appeals the determinations of the foregoing empowered body (the "Authority") shall be the award of Tenant hereunder and the damages therefor sustained by Landlord to its Landlord's interest as determined by the Authority shall be the award of Landlord hereunder.  If there is a condemnation of a portion of the Shopping Center Tract and such portion contains neither the Leased Premises nor any of Tenant's easement rights created by the REA over the Parking Area designated as "Sears Parking Area" on Exhibit B, then for the purposes of this Lease, except in the case of an access condemnation, Tenant shall have no right to any portion of the condemnation award but the foregoing shall not relieve Landlord of the obligations contained in this Article 19 to have such award used and applied as herein provided. If there is a condemnation of a portion of the Shopping Center

Tract and such portion contains all or a part of the Leased Premises and/or all or a part of Tenant's easement rights created by the REA over the Parking Area designated as the "Sears Parking Area" on Exhibit B and if the Authority makes an award to Tenant for the damages sustained therefor by Tenant, then the so awarded damages therefor sustained by Tenant to its leasehold interest and/or such easement rights shall be the condemnation award of Tenant hereunder and if the Authority makes an award to Landlord for the damages therefor sustained by Landlord to its Landlord's interest shall be the condemnation award of Landlord hereunder. If, however, the Authority does not separately assess and assign to Landlord and Tenant their respective awards for the damages therefor sustained by Landlord and Tenant, then the condemnation award shall be allocated between Landlord and Tenant based upon the fair market value of their respective interests. Notwithstanding anything herein to the contrary, if Landlord replaces the Parking Area pursuant to Article XVII(D)(2) and (3) of the REA, then the provisions thereof shall supercede the provisions hereof.

### ARTICLE 20

#### PAYMENTS

20.1 Place of Payments and Payee

All sums due from Tenant to Landlord under this Lease shall be made payable to MALL OF AMERICA COMPANY and may be mailed to:

> MALL OF AMERICA COMPANY
> Merchants Plaza, Suite 1500E
> 115 West Washington Street
> Post Office Box 7033
> Indianapolis, IN 46207

or shall be payable to any other one person or entity or mailed to any other one address of which Landlord shall give Tenant notice at least thirty (30) days in advance of the due date of any such payment.

20.2 Abatement and Excuse upon Damage or Destruction or Condemnation

No damage or destruction of or with respect to the Leased Premises or the Shopping Center Tract and no condemnation of or with respect to the Leased Premises or the Shopping Center Tract shall result in any excuse to or for Tenant not to pay any and all

payments when the same come due under the terms hereof nor any abatement of any such payments whatsoever, and Tenant shall remain fully obligated to make all payments as they become due.

### ARTICLE 21

#### RENT

21.1 <u>Rent</u>

Commencing on Tenant's Opening Date (as defined in the REA), Tenant covenants and agrees to pay to Landlord the fixed rent ("Rent") in the amount of Ten Dollars ($10.00) for each Lease Year during the Term hereof, including any extension period as provided in Article 3 hereof.  Rent shall be paid in advance of the first day of each Lease Year, and will not be in default until the fifteenth day after the date for payment.  Concurrently with the execution hereof, Tenant is paying to Landlord the sum of Three Hundred Dollars ($300.00) in payment of Rent for the first thirty (30) Lease Years of the Term hereof.  Landlord hereby acknowledges receipt of such sum.

### ARTICLE 22

#### TENANT'S COMMON AREA PAYMENTS

22.1 <u>Common Area Payments</u>

(A)  During the first through, and including, the fifth Lease Year, Tenant shall pay to Landlord per Lease Year the sum of $1.10 per square foot of Floor Area in the Tenant Building, in equal monthly installments, as Tenant's annual contribution to the maintenance and insurance of the Common Areas.  Tenant shall increase its annual contribution every five (5) years (commencing with the sixth Lease Year) by twenty cents ($.20) per Lease Year per square foot of Floor Area in the Tenant Building.

(B)  Notwithstanding anything in this Article 22 to the contrary, Tenant's obligation to make the common area payments described in paragraph (A) hereof shall not commence until the first time that Landlord Mall Stores occupying at least Five Hundred Thousand (500,000) square feet of Floor Area are open or are ready to open concurrently with Tenant.

ARTICLE 23

TAXES

23.1 Definitions

(A)   "Tenant's Property Taxes" means

(1)   ad valorem real estate taxes assessed against or imposed upon and levied against or upon the Leased Premises by a Taxing Authority,

(2)   assessments or taxes imposed by a Taxing Authority upon the Leased Premises for general public improvements, benefits or purposes and

(3)   assessments or taxes in the nature of betterment assessments which are specifically imposed by a Taxing Authority upon the Leased Premises for public improvements specifically benefitting the Leased Premises but excluded from Tenant's Property Taxes are any assessment or other charge, other than real estate taxes, by a Taxing Authority imposed upon, assessed against and levied upon or against the Leased Premises or any other part of the Shopping Center Tract, or the entire Shopping Center Tract, if the work for which such assessment is imposed or assessed and levied commences prior to Tenant's Opening Date and is work necessary to the operation of the Enclosed Mall Shopping Center.

(B)   "Landlord's Property Taxes" means

(1)   ad valorem real estate taxes assessed against or imposed upon and levied against or imposed upon and levied against or upon the Tax Lot by a Taxing Authority,

(2)   assessments or taxes imposed by a Taxing Authority upon the Tax Lot for general public improvements, benefits or purposes and

(3)   assessments or taxes which are specifically imposed by a Taxing Authority upon the Tax Lot for public improvements specifically benefitting the Tax Lot [excluding, however, in all cases Tenant's Property Taxes if such Taxes are paid or hereunder are to be paid directly by Tenant to the Taxing Authority].

(C)   INCORPORATION OF REA PROVISIONS.   The provisions of Article XXIII-B of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context

of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

(D)  "Taxing Authority" means a governmental or other public body authorized by law to assess or impose and levy taxes for which there is a lien, by reason of such taxes, upon land and/or improvements within the Tax Lot.

(E)  "Tax Year" means the twelve (12) month period constituting the fiscal year of the Taxing Authority.

(F)  "Tax Lot" means a part of the Shopping Center Tract which is separately enrolled upon the official tax rolls and maps of the official assessor for the Taxing Authority and independently assessed from all other lands and improvements outside the Shopping Center Tract.

23.2 Property Tax Apportionment

(A)  In the event the Leased Premises are not for any reason, or cease to be, enrolled as described in Paragraph 2.3(D)(2), then, subject to Paragraphs 23.3, 23.4, and 23.5, Tenant's Property Taxes shall be determined as follows:

(1)  Tenant's Property Taxes for the land of the Leased Premises shall be the amount resulting from multiplying the valuation of the land of the Leased Premises (if separately valued) by the tax rate of the Taxing Authority applicable thereto for the Tax Year in question;

(2)  Tenant's Property Taxes for the buildings and other improvements upon the Leased Premises shall be the amount resulting from multiplying the above assessor's valuation of the buildings and other improvements upon the Leased Premises (if separately valued) by the tax rate of the Taxing Authority applicable thereto for the Tax Year in question, EXCEPT that if such assessor's valuation covers land, buildings and other improvements of the Leased Premises as a unit and the tax rate of the Taxing Authority for the Tax Year in question is the same for land and for buildings and other improvements, then Tenant's Property Taxes shall be determined by multiplying such unified valuation by such uniform

tax rate and further if one valuation of such assessor is available but the other is not, then the provisions of Paragraph 23.2(B) shall govern as to and only as to the unavailable valuation. In all instances herein "assessor's valuation" means assessed value.

(B)    In the event the land of and the improvements on the Leased Premises are not for any reason, or cease to be, enrolled as described in Paragraph 2.3(D)(2), and to the extent the assessor's valuation mentioned in Paragraph 23.2(A) is not available, then Tenant's Property Taxes shall be determined as follows:

Tenant's Property Taxes for the land of and the buildings and other improvements upon the Leased Premises shall be the amount resulting at any time hereafter from multiplying Landlord's Property Taxes for all buildings and other improvements then within the Tax Lot therefor (excluding all Common Area Property Taxes) by a fraction, the numerator of which shall be the gross square footage of buildings upon the Leased Premises at that same time and the denominator of which shall be the gross square footage of the buildings then existent within the Tax Lot therefor and such gross square footage includes the entire square foot area of all floors, levels, basements of all buildings upon the Tax Lot and includes all levels of the Enclosed Mall thereon.    Notwithstanding the foregoing, Tenant shall not be liable for an increases nor benefit by any decreases in Property Taxes resulting from construction or other work outside the Leased Premises and any such increases or decreases shall be excluded from Tenant's Property Taxes hereunder.

(C)    Whether or not the Leased Premises are separately enrolled as described in Paragraph 2.3(D) (2), commencing upon the execution of this Lease, Tenant shall be obligated to pay Tenant's Property Taxes and Tenant's Pro Rata Share of Common Area Property Taxes and shall pay same to Landlord when due as provided in Paragraph 23.3. Tenant's Pro Rata Share of Common Area Property Taxes shall be the amount resulting at any time hereafter from multiplying the Common Area Property Taxes by a fraction, the numerator of which shall be the gross square footage of all buildings upon the Leased Premises at the same time and the denominator of which shall be the gross square footage of the buildings then existent within the Shopping Center Tract including

the Family Entertainment Center but excluding the Enclosed Mall but such gross square footage includes the entire square foot area of all floors, levels and basements of all buildings other than the Enclosed Mall upon the Shopping Center Tract.

(D)   The amount of Tenant's Property Taxes and its Pro Rata Share of Common Area Property Taxes under this Paragraph 23.2 shall be calculated subject to the following:

(1)   Tenant shall not be obligated to pay any interest or penalties incurred by Landlord in connection with the payment of Landlord's Property Taxes so long as Tenant pays Landlord the amounts required to be paid by Tenant hereunder within twenty (20) days after Tenant's receipt of Landlord's billing therefor;

(2)   Tenant shall be entitled to any statutory or other credit, abatement and the like in regard to its share of Landlord's Property Taxes;

(3)   the amounts of Landlord's Property Taxes, and thus Tenant's Property Taxes, shall be based upon official valuations or assessments which reflect full and complete construction and utilization of all the improvements on the Shopping Center Tract shown on Exhibit B as the Enclosed Mall Shopping Center contemplated by this Lease and no other improvements.

23.3   Payment of Property Taxes

(A)   Landlord shall pay on or before the due date thereof all of Landlord's Property Taxes to the applicable Taxing Authority. So long as the Leased Premises are enrolled as provided in Paragraph 2.3(D)(2), Tenant shall pay Tenant's Property Taxes to the applicable Taxing Authority on or before the due date thereof.

(B)   The following provisions shall apply to Tenant's payment of its Pro Rata Share of Tenant's Property Taxes if the Leased Premises are not for any reason or cease to be enrolled as aforesaid. Landlord shall submit to Tenant the Taxing Authority's bill, together with a statement showing in reasonable detail the basis for Landlord's calculation therefrom of Tenant's Property Taxes and the amount due therefor. Such statement shall be strictly in accordance with the provisions of this Article 23. Such bill, together with the statement conforming herewith, shall be delivered to Tenant and Tenant shall pay Landlord the amount of

such Property Taxes within twenty (20) days after such delivery to Tenant.

23.4 <u>Contest</u>

(A)   <u>By Tenant</u>. (i) If Tenant desires to contest Tenant's Property Taxes or any assessment upon the Leased Premises (collectively "Impositions") part or all of which is required to be paid by Tenant pursuant to the provisions hereof, it shall notify Landlord of its intention to do so at least ten (10) days before delinquency thereof. If Impositions on the Leased Premises or Tenant's Building or other improvements thereon are assessed against Landlord, either separately or as part of the larger parcel, Tenant, provided that there is and continues to be no imminent danger of the Leased Premises or the Shopping Center being sold at judicial sale by reason of non-payment of the contested Impositions, may at its sole cost contest such Impositions, either in its own name or in the name of Landlord.  Landlord agrees to notify Tenant promptly after receipt by Landlord from the taxing authority of any change in assessment which includes the Parking Area, the Leased Premises or  Tenant's Building or other improvements thereon. After Tenant notifies Landlord of its intent to contest any Impositions, Landlord shall not pay such Imposition so long as Tenant is not in default as hereinafter defined in this Subsection (i) and complies with all requirements of this Subsection (i) and of the taxing authorities with respect to such contest.  If Tenant contests any such Imposition in the manner and within the time permitted by law and as aforesaid, it shall not be in default by reason of its failure to pay such Impositions unless it fails, within ten (10) days after the final determination of the validity thereof, to pay and discharge so much of such Imposition as is required to be paid by Tenant hereunder together with all penalties, interest and costs in connection with such contest.  The payment of any Imposition, together with penalties, interest and costs shall not in any case be delayed beyond the date ten (10) days prior to the date Landlord would be precluded from preventing the sale of, or the foreclosure of any lien against, the whole or any part of the Shopping Center by the payment thereof.  In the event of any such contest, Tenant shall protect and indemnify

Landlord and the Shopping Center against all loss, cost, expense and damage resulting therefrom. At the request of Tenant, Landlord shall cooperate in any such contest by Tenant. Any out-of-pocket expenses, including counsel fees, incurred by Landlord at Tenant's request as a result of such participation, shall be paid by Tenant; PROVIDED, HOWEVER, that if such contest results in a reduction of the amount of Impositions paid by Landlord, for other than the Leased Premises, Landlord shall reimburse Tenant for Landlord's fair share of the aggregate cost and expense of the contest, including reasonable counsel fees (but in no case more than the refund received by Landlord pursuant to the following sentence). Any refunds shall be shared on the same "fair share" basis that expenses are reimbursed.

(ii) Promptly following Landlord's request, Tenant shall obtain and deliver to Landlord, to the extent the same are obtainable, receipts for or reasonable evidences of payment of any Impositions required to be paid by Tenant under the provisions of this Article 23.

(B) By Landlord. If Landlord desires to contest Landlord's Property Taxes or any assessment (collectively, "Impositions") on any portion of the Shopping Center Tract or upon the buildings or improvements thereon (other than an Imposition solely on the Leased Premises), it shall notify Tenant of its intention to do so at least ten (10) days prior to filing the protest and in any event not less than ten (10) days before delinquency thereof. After such notice is given, Landlord shall not be obligated to pay such Imposition for so long as the conditions set forth in this paragraph (B) regarding such non-payment remain satisfied and Landlord complies with all requirements of the taxing authorities with respect to such contest and there is no imminent danger of the Leased Premises or any portion of the Shopping Center Tract being sold a judicial sale by reason of nonpayment of the contested Imposition. If Landlord contests any such Imposition in the manner and within the time permitted by law, Landlord shall not be in default by reason of its failure to pay such Imposition unless it fails, within ten (10) days after the final determination thereof, to pay and discharge such Imposition as is required to be paid by

Landlord and all penalties, interest and costs in connection therewith; but the payment of any such Imposition, together with penalties, interest and costs, shall not in any case be delayed beyond the date ten (10) days prior to the date Tenant would be precluded from preventing the sale of, or the foreclosure of any lien paramount to this Lease against, the whole or any part of the Shopping Center by the payment thereof. In the event of any such contest, Landlord shall protect and indemnify Tenant against all loss, cost, expense and damage resulting therefrom. At the request of Landlord, Tenant shall cooperate in any such contest by Landlord. Any out-of-pocket expenses, including counsel fees, incurred by Tenant at Landlord's request as a result of such participation shall be paid by Landlord; PROVIDED, HOWEVER, that if such contest results in a reduction in the amount of Impositions payable by Tenant, Tenant shall reimburse Landlord for Tenant's fair share of the aggregate cost and expense of the contest, including reasonable counsel feels (but in no case more than the refund received by Tenant pursuant to the following sentence). Any refunds shall be shared on the same "fair share" basis that expenses are reimbursed.

(C) INCORPORATION OF REA PROVISIONS. The provisions of Article XXIII-C of the REA with respect to the contesting of taxes assessed against the Parking Structure (as defined in the REA) are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the REA terminates prior to the expiration or termination of this Lease.

<u>ARTICLE 24</u>

MERCHANTS ASSOCIATION OR PROMOTIONAL FUND

Tenant will become a member and shall make a contribution to the Shopping Center Merchants Association or Promotional Fund for a period of two (2) Lease Years after Tenant opens for business, and Tenant will pay dues during that period in the amount of five

cents ($.05) per square foot of Floor Area in the Tenant Building per Lease Year, payable in advance at the beginning of each such Lease Year upon receipt of invoice therefor.  Subsequent to that two (2) year period, any decision to continue membership in the Merchants Association or to continue to make a contribution to the Promotional Fund, or to discontinue membership in the Merchants Association or to discontinue its contribution to the Promotional Fund, and any agreement as to the dues or contribution to be paid by Tenant if Tenant elects to continue as a member of the Merchants Association or to contribute to the Promotional Fund, will be made solely by Tenant.

ARTICLE 25

UTILITIES

25.1 <u>General Services</u>

(A)  Tenant shall be responsible for the payment of the expense of using utility and other service desired or required by Tenant for the conduct of its business at the Leased Premises, for the security and other protection thereof and for the construction, reconstruction, restoration, maintenance and other work required of it or permitted to it by this Lease.

(B)  Landlord may elect to supply the electricity required by Tenant and, in such event, Tenant, at the direction of Landlord, may contract directly with Landlord, with Minntertainment Company, a Minnesota general partnership, or with an affiliate of Minntertainment Company, to supply such electricity to Tenant. Tenant shall accept and use the electricity tendered by such entity, and pay therefor (as additional rent if supplied by Landlord) at the rates filed by Northern States Power with the Public Utilities Commissioner of Minnesota and in effect from time to time covering such services, but if no rates are on file covering said services, then at the rates which would be charged if the electricity were bought by Tenant from any municipality or any public service corporation then selling electricity in the area. Landlord will use its reasonable best efforts to utilize procedures and practices in supplying electrical energy service to Tenant which will have the same degree of reliability and response time that would be available to Tenant had Tenant elected to obtain its electrical service directly from Northern States Power Company. Notwithstanding the foregoing, Landlord reserves the right to terminate providing the above electrical energy to Tenant upon thirty (30) days' notice to Tenant so long as Landlord has made

arrangements with the local public electrical utility company to provide replacement electrical energy service to Tenant.

(C)  Payment for any and all electricity used by Tenant and furnished by Landlord shall be made monthly and within ten (10) days of the presentation by Landlord to Tenant of bills therefor.

(D)  Landlord shall not be liable in damages or otherwise should the furnishing of any services by it to the demised premises be interrupted by fire, accident, riot, strike, act of God, or the making of necessary repairs or improvements or other causes beyond the control of Landlord.

(E)  It is understood and agreed that Landlord is not a public utility and that the furnishing of any such services shall not constitute Landlord a public utility.  It is agreed, however, that if the furnishing of any such service by Landlord should be determined to be a public utility service and rates therefor should be fixed or approved by public authority having jurisdiction, then such rates for any such service shall supersede the provisions of this Lease with respect to the determination of charges to be paid by Tenant for such service and Tenant shall pay therefor at such rates.

(F)  Except for Tenant's obligations to pay Tenant's Common Area Payments, Tenant shall have no responsibility for the payment of the expense for the use of utility and other service required by Landlord for the operation by Landlord of the Enclosed Mall Shopping Center (other than the Leased Premises) or Common Area, for the security or other protection thereof and for the construction, reconstruction, restoration, maintenance and other work required of Landlord or permitted to it by this Lease, which Landlord shall pay when due.

25.2 Special Charges

INCORPORATION OF REA PROVISIONS.  The provisions of Article XXIII-D of the REA are by this reference incorporated into this Lease with such changes in the use of terms identifying the Parties and their respective Tracts as are necessary in the context of the Lease, and shall be binding upon and shall inure to the benefit of Landlord and Tenant in the manner and to the extent set forth in the REA throughout the Term of the Lease, regardless of whether the

REA terminates prior to the expiration or termination of this Lease.

### ARTICLE 26

### NOTICE AND PROCESS

26.1 <u>Notices</u>

(A) All notices given pursuant to or in connection herewith shall be given in writing and shall be effective if given as follows:

(1) if given to Tenant by mailing to Tenant by registered or certified mail, postage prepaid, return receipt requested, addressed:

(a) in the case of the original, to:

Sears, Roebuck and Co.
Attention: National Manager
              Real Estate
Department 824RE (BSC 36-36)
Sears Tower
Chicago, IL 60684

(b) with copy, to:

Sears, Roebuck and Co.
Attention: Assistant General Counsel
              Real Estate
Department 766 (BSC 45-27)
Sears Tower
Chicago, IL 60684

(2) if given to Landlord, by mailing to Landlord, by registered or certified mail, return receipt requested, postage prepaid, addressed to:

(a) in the case of the original, to:

MALL OF AMERICA COMPANY
Attention: Herbert Simon
One Merchants Plaza
Post Office Box 7033
Indianapolis, IN 46207

(b) with a copy, to:

Philip D. Pecar, Esq.
Dann Pecar Newman Talesnick & Kleiman, P.C.
One American Square
Box 82008
Indianapolis, IN 46282

(c) with an additional copy, to:

JV Minnesota One, Inc.
Senior Vice President,
Mortgage and Real Estate
c/o Teachers Insurance and Annuity
  Association of America
730 Third Avenue
New York, New York  10017

(3)  if given to a mortgagee by mailing registered or certified mail, return receipt requested, postage prepaid, addressed to such mortgagee to the place of which Tenant or its leasehold mortgagee, and Landlord or its mortgagee, shall have given the other party notice (but nothing contained in this Lease shall obligate Tenant or Landlord to give to such mortgagee or leasehold mortgagee any notice other than a notice of default).

(B)  Either party and any such mortgagee may furnish to the other at any time a notice substituting a single address and/or a single person or entity for each of the entities or persons described above. The term "written request" shall not mean notice but shall mean a request made in writing, or orally made and confirmed in writing, which is either hand delivered or sent by regular mail, postage prepaid, or via telegram. Any such request shall be deemed made no later than the date sent.

(C)  If the Leased Premises or Landlord's Tract are encumbered by the lien or liens of one (1) or more mortgages, then any notice of a default on a party's part under this Lease required or permitted to be given by the other party and given by one party to the other shall at the same time be given to such mortgagee provided the other party or its mortgagee has given the one party the notice required of Paragraph 26.1(A) (3), and the time limits which commence from the date of the giving of notice of default shall run from the date of the giving of notice to such mortgagee or the other party, whichever be later.

(D)  If Sears, Roebuck and Co. is still bound on this Lease and if a person other than Sears, Roebuck and Co. (or an Affiliate of it) be occupying all or substantially all of the Tenant Building and if Sears, Roebuck and Co. has given Landlord notice of the identity of the person or entity in occupancy and the notice address for such person or entity, then any notice of a default on Tenant's part under this Lease required or permitted to be given by Landlord and given by Landlord to Tenant shall at the same time be given to such other person or entity and the time limits which commence from the date of the giving of such notice shall run from the date of the giving of such notice to Sears, Roebuck and Co. (or

an Affiliate of it) or such other person or entity, whichever be
later.

26.2 <u>Process</u>

Tenant agrees that the officials identified in Paragraph
26.1(A)(1)(b) and Landlord hereby agrees that the entities
identified in Paragraph 26.1(A) (2) (or any successor individual of
which Landlord or Tenant shall give notice to the other) are
authorized to accept service of process for Landlord or Tenant.
Service upon all such entities shall irrebuttably constitute
service of process for the purpose of personal jurisdiction over
Landlord or Tenant, as the case may be, for all matters arising out
of or relating to this Lease and for each trustee, partner or joint
venturer of Landlord if Landlord be a trust, partnership or joint
venture. These designations shall, however, not be exclusive, and
Landlord and Tenant shall have such rights as are available to them
under law for personal, <u>in rem</u> jurisdiction or other jurisdiction
of a court by service upon any other individual or by any other
means of effecting jurisdiction of a court over Landlord. Landlord
or Tenant may from time to time substitute any other individual in
lieu of the one designated above by giving the other notice of the
name and address of such substitute.

## ARTICLE 27

### UNAVOIDABLE DELAYS

INCORPORATION OF REA PROVISIONS. The provisions of Article
XVI of the REA are by this reference incorporated into this Lease
with such changes in the use of terms identifying the Parties and
their respective Tracts as are necessary in the context of the
Lease, and shall be binding upon and shall inure to the benefit of
Landlord and Tenant in the manner and to the extent set forth in
the REA throughout the Term of the Lease, regardless of whether the
REA terminates prior to the expiration or termination of this
Lease.

## ARTICLE 28

### DEFAULTS

#### 28.1 Default by Tenant

(A)  The following shall be considered for all purposes to be the only defaults under and breaches of this Lease for which Landlord may terminate this Lease: (1) any failure of Tenant to pay the Rent when due hereunder which failure continues for thirty (30) days after Landlord gives Tenant notice thereof and continues further for ten (10) days after Landlord gives Tenant a second notice thereof, and (2) no department store satisfying the requirements of Paragraph 4.3 is being operated in the Tenant Building and such condition is a default of the provisions of Paragraph 4.3, which condition continues for thirty (30) days after Landlord gives Tenant notice thereof.  In the event of any such default, Landlord, in addition to all other rights or remedies it may have, in law or equity, shall have the right thereupon or at any time thereafter to terminate this Lease by giving notice to Tenant stating the date upon which such termination shall be effective and shall have the right, either before or after any such termination, to re-enter and take possession of the Leased Premises, remove all persons and property from the Leased Premises and store such property at Tenant's expense, all without resort to legal process and without being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby.

(B)  If Landlord re-enters as above provided, or if it takes possession pursuant to legal proceedings or otherwise, it may either terminate this Lease or it may, from time to time, without terminating this Lease, make such alterations and repairs as it deems advisable to relet the Leased Premises, and relet the Lease Premises or any part thereof for such Term or Terms (which may extend beyond the Lease Term) and at such rentals and upon such other terms and conditions as Landlord in its sole discretion deems advisable; upon each such reletting, all rental received by Landlord therefrom shall be applied, first, to any indebtedness other than Rent due hereunder from Tenant to Landlord; second, to pay any costs and expenses of reletting, including brokers' and attorneys' fees and costs of alterations and repairs; third, to

Rent due hereunder, and the residue, if any, shall be held by Landlord and applied in payment of future Rent as it becomes due hereunder; provided, however, that in no event shall Tenant be entitled to any excess of the residue over the amounts due hereunder.   No act or proceeding by Landlord hereunder shall constitute or be deemed to constitute a waiver of rights against Tenant, including, without limitation, a waiver of rights to damages.

If rentals received from such reletting during any month are less than that to be paid during that month by Tenant hereunder, Tenant shall immediately pay any such deficiency to Landlord.   No re-entry or taking possession of the Leased Premises by Landlord shall be construed as an election to terminate this Lease unless Landlord gives Tenant notice of such termination.

Notwithstanding any such reletting without termination, Landlord may at any time thereafter terminate this Lease for any prior breach or default.   If Landlord terminates this Lease for any breach, in addition to any other remedies it may have, it may recover from Tenant all damages incurred by reason of such breach or default, including all costs of retaking the Leased Premises and including the excess, if any, of the total Rent and charges reserved in this Lease for the remainder of the Lease Term over the then reasonable rental value of the Leased Premises for the remainder of the Lease Term, all of which shall be immediately due and payable by Tenant to Landlord.

(C)   If Landlord commences any proceedings for nonpayment of Rent, Tenant will not interpose any counterclaims of any nature or description in such proceedings.   This shall not, however, be construed as a waiver of Tenant's right to assert such claims in a separate action brought by Tenant.   The covenant to pay Rent hereunder is an independent covenant and Tenant shall have no right to hold back, offset or fail to pay any such amounts for default by Landlord or any other reason whatsoever.

28.2 Default and Self-help

(A)   A party shall in no event be charged with default in any of its obligations hereunder (other than a payment obligation) unless and until said party shall have failed to perform such

obligations within thirty (30) days (or such otherwise prescribed time or if none prescribed, such additional time as is reasonably required to correct any such default, if such party is proceeding with due diligence to cure the same) after one party gives the other party notice specifically describing such failure.

(B)  In the event of a default under Article 14 by a party which is not cured within such thirty (30) day (or longer) period referred to in Paragraph 28.2(A) [or within forty eight (48) hours after oral notice in the case of an emergency], the other party may exercise the self-help rights described at Article XXIX-A of the REA.

28.3 <u>Other Remedies</u>

In the event of any breach of any of the covenants, agreements, provisions, terms or conditions contained in this Lease, Landlord or Tenant shall have all rights and remedies available at law or in equity except as otherwise expressly provided herein, including but not limited to the right to obtain an injunction or other appropriate judicial relief against the other.  No failure by Landlord or Tenant to insist upon the performance or the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver or assumption thereof by the other party, and no acceptance, use or occupancy of the Leased Premises or Common Area shall constitute a waiver or assumption by Tenant of any duty or obligation of Landlord with respect thereto.  The grant or reservation herein or the exercise of any right or remedy, or of any supplementary or alternative rights or remedies, shall not affect or prejudice any other rights or remedies which Landlord or Tenant may have under this Lease or under law.

ARTICLE 29

GENERAL PROVISIONS

29.1 <u>Costs</u>

Whenever this Lease requires or permits a party to perform or fulfill a covenant, condition or other provision of this Lease, then the cost thereof shall be borne by such party except (1) when

such performance or fulfillment is herein expressly to be made at the other party's cost or expense, or (2) when a party, being permitted hereunder to do so, cures the other party's default in which case the cost thereof shall be that of the defaulting party, or (3) when a party is expressly to contribute or pay all or a part of the cost or expense of such performance or fulfillment by another party but in such case only to the extent stated in this Lease.  If a party fails to make a payment to the other when same is due, Interest shall accrue and shall be payable thereon to and inclusive of the date of payment.

### 29.2 Duration of Performance

(A)  Whenever this Lease requires a party to perform or fulfill a covenant, condition or other provision of this Lease, then such performance or fulfillment shall be required to be done with reasonable promptness, except where specific dates or ascertainable time periods therefor are expressly stated in this Lease as to a particular covenant, or condition or other provision;

(B)  Whenever the phrase "the Term" appears in this Lease, it shall include any extensions thereof elected by Tenant.  The use of the phrase "including any extensions thereof" or like phraseology shall in no way derogate from the meaning of the first sentence of this Paragraph 29.2(B).

### 29.3 Approvals

Unless a party is expressly required to give the other a notice of approval or disapproval (which shall be governed by Paragraph 26.1), all approvals or disapprovals and other communications between the parties shall be written and shall be sufficiently given if mailed by regular mail and postage prepaid or if hand delivered or given by telegram to the address to which a notice is required to be sent.  All consents, judgments, approvals, decisions and the like shall not be unreasonably delayed or withheld except for such matters as are expressly "to the sole satisfaction of" or "in the sole discretion of".

### 29.4 Governing Law

This Lease shall be construed, interpreted and applied in accordance with the laws of the State of Minnesota.

### 29.5 Counterparts

This Lease may be executed in several counterparts, each of which shall be deemed an original for all purposes.

### 29.6 Document Organization

Any index, table of contents, captions or arrangement of Articles of this Lease are for convenient reference and ease of reading only and in no way define, limit or describe the scope or intent of any covenant or condition of this Lease. All capitalized words and their capitalized grammatical equivalents are words and phrases of definition or special meaning.

### 29.7 Recordation

It is intended that a Memorandum of this Lease shall be executed and acknowledged by the parties so that it shall be in a form suitable for recordation in its entirety. Landlord shall file such Memorandum of Lease for recordation in full within seven (7) days after the date of this Lease. Promptly after return of the recorded counterpart of such Memorandum of Lease from the official charged under law with the responsibility to record such Memorandum of Lease, Landlord shall deliver to Tenant such recorded counterpart.

### 29.8 Parties

This Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, trustees, successors, assigns and grantees.

### 29.9 Entire Agreement

All exhibits of this Lease form a part of this Lease and all other agreements, documents and other papers to which this Lease refers shall form a part of this Lease as if fully set forth herein. The Lease so constituted represents the entire agreement of the parties and supersedes all prior oral and written negotiations, understandings and agreements. No covenant or condition of this Lease shall be modified, rescinded or waived except by a writing specifically so doing signed by the empowered officials of Landlord and Tenant.

### 29.10 Limited Liability of Landlord and Exculpation of Partners.

Notwithstanding anything contained in this Lease to the contrary, if Landlord shall fail to perform or pay any covenant or obligation on its part to be performed or paid hereunder, and as a consequence

thereof Tenant shall recover a money judgment against Landlord, such judgment shall be enforced against and satisfied out of (subject to the rights of any mortgagee whose lien predates the filing of a notice of lis pendens or notice of pendency of such action which results in such judgment) only (i) the proceeds of sale produced upon execution of such judgment and levy thereon against Landlord's interest in the Landlord's Tract and the improvements thereon, (ii) the rents, issues or other income receivable from the Landlord's Tract and the improvements thereon received by Landlord after a default together with any rents collected by Landlord which are then in advance of the date due, (iii) the consideration received by Landlord from the sale of all or any part of Landlord's interest in the Landlord's Tract and Improvements thereon made after such failure of performance (which consideration shall be deemed to include any assets at any time held by Landlord to the extent that the value of same does not exceed the proceeds of such sale), (iv) any casualty insurance proceeds or condemnation award payable to Landlord as the result of any casualty to or condemnation of all or any portion of the Landlord's Tract and the improvements thereon, which proceeds are not to be used for the reconstruction or rehabilitation of the improvements; provided, however, that if Landlord self-insures, then such casualty insurance proceeds shall be equal to the proceeds Landlord would have received had Landlord not elected to self-insure; and (v) any public liability insurance proceeds payable to Landlord as the result of the liability to Tenant which Tenant is seeking to enforce; provided, however, that if Landlord self-insures, then such public liability insurance proceeds shall be equal to the proceeds Landlord would have received had Landlord not elected to self-insure. Neither Landlord its successors and assigns, nor any of the partners, general or limited, in the limited partnership referred to herein as "Landlord", nor any partner, shareholder or joint venturer in any successors or assigns shall be personally liable to Tenant, its successors and assigns, or to any other party, for the performance or payment of any covenant, obligation, liability or indebtedness of Landlord hereunder or for any judgment thereon.  Tenant shall not seek

specific performance of any covenant or obligation by or against Landlord or any partner in the Landlord partnership hereunder, except to the extent that the same can be enforced in rem against the Landlord's Tract and improvements thereon and satisfied from the property specified in clauses (i), (ii), (iii) and (iv) above. It is expressly understood and agreed that nothing in this Lease contained shall be construed as creating any personal liability whatsoever against the Landlord or the partners in the Landlord partnership.

Tenant, its successors and assigns, and any other owner or holder of any claim or action against Landlord under this Lease, or any indebtedness, obligation or liability of Landlord accruing hereunder, shall look solely to Landlord's interest in the Landlord's Tract and any improvements thereon and proceeds therefrom, as aforesaid, for the payment and satisfaction of any such claim, action, indebtedness, obligation or liability, as aforesaid. The provisions of this Paragraph 29.10 are not intended to relieve Landlord from the performance of any of its obligations hereunder, but rather to limit Landlord's liability as aforesaid, and to relieve and release the partners in the Landlord partnership, successors and assigns as Landlord and partners, shareholders and venturers in any successor or assign, from any such liability whatsoever, as aforesaid; nor shall any of the provisions of this Paragraph 29.10 be deemed to limit or otherwise affect Tenant's right to obtain injunctive relief or other equitable relief necessary to enforce other rights specifically granted to Tenant in this Lease (with the exception of specific performance, which is limited as hereinabove provided). The provisions of this Paragraph 29.10 also shall inure to the benefit of Landlord's successors and assigns.

ARTICLE 30

GLOSSARY

30.1 Definitions

The following words and phrases shall have only the meanings ascribed to them in this Paragraph 30.1:

(A)   "Affiliate" means any person or entity which controls or is controlled by a party or is controlled by or control the same person or entity which then controls a party.  The word "control" includes ownership of stock, shares or interest having the right to exercise more than fifty percent (50%) of the total combined voting power of (1) all classes of stock of a corporation, or (2) all shares of a trust or (3) all interests in a partnership or joint venture.   In no event shall Landlord and Tenant be deemed an Affiliate of the other, or a joint venture or partnership.

(B)   The phrase "commence construction" means the placement of footings and foundations for a building pursuant to a duly granted building permit for the entire building of which such footings and foundations are a part.

(C)   The phrase "Common Area" shall have the meaning set forth in Article I-D of the REA.

(D)   The phrase "department store" shall have the meaning set forth in Article I-F of the REA.

(E)   The phrase "Enclosed Mall" shall have the meaning set forth in Article I-J of the REA.

(F)   The phrase "Floor Area" shall have the meaning set forth in Article I-K of the REA.

(G)   The phrases "gross building area", or "gross square footage" as applied to a building, mean the area, whether or not leased or leasable, bounded by the exterior faces of the exterior walls of a building or the center line of any perimeter common wall of building.

(H)   The word "Interest" means a rate of interest equal to ONE PERCENT (1%) above the announced prime rate of interest of the CITIBANK, N.A., New York, New York and in the event there ceases to be an announced prime rate of interest of the CITIBANK, N.A., New York, New York, then interest shall be the judgment rate of interest under the laws of the State of Minnesota.

(I)   The word "invitee" means any person or entity, and their motor vehicles, invited expressly or impliedly upon the Shopping Center Tract by an Occupant in connection with an Occupant's use of Floor Area upon the Shopping Center Tract or for related business

purpose.    The word "invitee" includes employees, agents and independent contractors of an Occupant or of Landlord.

(J)    The word "Landlord" means the entity named in this Lease as Landlord until another person or entity succeeds at the time in question to the estate and interests thereof as they from time to time may be in which case such other person shall be Landlord under this Lease and shall be responsible for the performance and fulfillment of such covenants and other provisions hereof as remain to be performed by Landlord or are on Landlord's part to be fulfilled but no mortgagee or purchaser at foreclosure sale who becomes Landlord shall be liable for any defaults occurring prior to the time it became Landlord.    In the event of Landlord transferring the fee of the Shopping Center Tract and leasing the same back (or leasing and subleasing back) in the same transaction, both the transferor and the transferee shall be Landlord under this Lease until Tenant receives a declaration executed by both transferor and transferee identifying at least one (1) of them as Landlord under this Lease.    Any such transaction and the fee of the Shopping Center Tract shall be in all events subject to this Lease and the rights and remedies of Tenant hereunder.

(K)    The word "Occupant" shall have the meaning set forth in Article I-S of the REA.

(L)    The phrase "Parking Area" shall have the same meaning as "Automobile Parking Area" as set forth in Article I-B of the REA.

(M)    The phrase "Perimeter Sidewalks" shall have the meaning set forth in Article I-Y of the REA.

(N)    "Permissible Building Areas" shall have the meaning set forth in Article I-X of the REA.

(O)    "Plans" means any documents of a design nature by which any construction, reconstruction, restoration, maintenance or other work is to be performed.

(P)    The phrase "Ring Road" means the roadway and its entrances and exits shown on Exhibit B and denominated Ring Road. The Ring Road is intended to provide and be adequate for access to the various part of the Shopping Center Tract from abutting public

or private roads for both automobiles and commercial motor vehicles.

(Q) The phrase "Tenant Building" means the building containing not less than 120,000 square feet of Floor Area and not more than 200,000 square feet of Floor Area, marked "Sears Department Store" on Exhibit B attached hereto, to be constructed on three (3) levels by Tenant, subject to the provisions of the Reimbursement Agreement, upon and as part of the "Leased Premises" as provided herein.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed in several counterparts as of the day and date first above written.

LANDLORD:
MALL OF AMERICA COMPANY,
a Minnesota general
partnership

By:  SI-MINN DEVELOPERS
     LIMITED PARTNERSHIP,
     General Partner

     By:  SI-MINN, INC.
          General Partner

          By: _____
               Herbert Simon, President

IN WITNESS WHEREOF, Landlord and Tenant have caused this
Lease to be executed in several counterparts as of the day and
date first above written.

ATTEST:

TENANT:
SEARS, ROEBUCK AND CO.,
a New York corporation

By: _____

Title: __National Manager_____
      Real Estate Planning Group

By: _____

Title: _____Assistant Secretary___

**EXHIBITS TO
LEASE, CONSTRUCTION AND OPERATION AGREEMENT
BY AND BETWEEN
SEARS, ROEBUCK AND CO.
AND
MALL OF AMERICA COMPANY**

| <u>Exhibit</u> | <u>Description</u> |
|---|---|
| "A" | Tenant's Tract |
| "B" | Plot Plan |
| "C" | Landlord's Tract |
| "D" | Permitted Exceptions |
| "E" | Site Work Plans |

Exhibit "A"

"Tenant's Tract" is described as follows:

All that part of LOT 1, BLOCK 1, MALL OF AMERICA, according to the
recorded plat thereof, recorded on June 16, 1988, as Document No.
1937920, in the office of the Registrar of Titles, Hennepin County,
Minnesota, described as follows:

Commencing at the most easterly corner in the northerly line of
said LOT 1; thence S89°57'08"W (Basis of Bearings-Hennepin County
Coordinate System), along the northerly line of said LOT 1 for
949.59 feet to an angle point in said northerly line; thence
S39°14'14"E, for 593.30 feet; thence N45°00'00"E for 74.25 feet
to the POINT OF BEGINNING.

Thence S45°00'00"E for 95.46 feet;
Thence N90°00'00"E for 109.38 feet:
Thence Northeasterly 41.89 feet along the arc of a curve, concave
to the southeast, to a point tangent, said arc having a radius of
118.50 feet, and a central angle of 20°15'16" and being subtended
by a chord that bears S34°52'22"W 41.67 feet;
Thence N45°00'00"E for 86.53 feet to a point of curve to the left;
Thence Northerly 156.29 feet along the arc of said curve to a point
tangent, said arc having a radius of 99.50 feet, and a central
angle of 90°00'00" and being subtended by a chord that bears
S00°00'00"W 140.71 feet;
Thence N45°00'00"W for 70.43 feet to a point of curve to the right;
Thence Northwesterly 74.73 feet along the arc of said curve to a
point of reverse curve, said arc having a radius of 118.50 feet,
and a central angle of 36°08'03" and being subtended by a chord
that bears S26°55'58"E 73.50 feet;
Thence Northwesterly 119.98 feet along the arc of said reverse
curve to a point tangent, said arc having a radius of 54.50 feet,
and a central angle of 126°08'03" and being subtended by a chord
that bears S71°55'58"E 97.18 feet;
Thence S45°00'00"W for 238.08 feet to a point of curve to the
right;
Thence Southwesterly 46.26 along the arc of said curve, said arc
having a radius of 118.50 feet, and a central angle of 22°21'58"
and being subtended by a chord that bears S56°10'59"W 45.96 feet;
Thence S45°00'00"E for 169.88 feet to the POINT OF BEGINNING.

## EXHIBIT "C"

"Landlord's Tract" is described as follows:

Lot 1, Block 1, MALL OF AMERICA, according to the plat thereof recorded on June 16, 1988 as Document No. 1937920 in the office of the Registrar of Titles, Hennepin County, Minnesota, excepting therefrom all those parts of Lot 1, Block 1, MALL OF AMERICA, according to said plat, described as follows:

1.  That certain area depicted as "FUTURE HOTEL SITE AND PARKING" on Exhibit "B" attached to the LEASE, CONSTRUCTION AND OPERATION AGREEMENT by and between MALL OF AMERICA COMPANY and SEARS, ROEBUCK AND CO.

051891/S0495/SearsExh.C

93013-59.81

A.L.T.A. COMMITMENT
CHICAGO TITLE INSURANCE COMPANY
SCHEDULE A

C.T. File No.:   C 2408338

RE: Sears - Mall of America

Effective Date   February 25, 1991   at 7:00 AM

1.  Owner's Policy to be Issued:  Leasehold Owner's
    Proposed Insured:

    Sears

    Amount $0.00
           To Be Determined

    Loan Policy to be Issued:
    Proposed Insured:

    Amount

2.  The estate or Interest in the land described or referred to in this commitment and covered herein is a fee simple
    and title thereto is at the effective date hereto vested in:

    Mall of America Company, a Minnesota General Partnership

3.  The land referred to in the Commitment is described as follows:

                    See Schedule A Legal Description continued.

Note:  If there are any questions concerning the content of this commitment, please
contact Jim Weston at 312-630-2105.

Note:  If there are any questions concerning the closing of this transaction, please
contact the appropriate closing office.

Exhibit "D"
Page 1 of 8

93013-60.81

C.T. File No.:  C  2408338

All that part of Lot 1, Block 1, MALL OF AMERICA, according to the plat thereof on file or of record in the office of the Registrar of Titles, Hennepin County, Minnesota, described as follows:

Commencing at the most easterly corner in the northerly line of said LOT 1; thence South 89° 57' 08" West (Basis of Bearings-Hennepin County Coordinate System), along the northerly line of said LOT 1 for 949.59 feet to an angle point in said northerly line; thence South 46° 59' 55" East, for 420.67 feet to the POINT OF BEGINNING;

Thence South 45° 00' 00" East for 265.34 feet;
Thence North 90° 00' 00" East for 109.38 feet;
Thence Northeasterly 41.89 feet along the arc of a curve, concave to the southeast, to a point tangent, said arc having a radius of 118.50 feet, and a central angle of 20° 15' 15" and being subtended by a chord that bears South 34° 52' 22" West 41.67 feet;
Thence North 45° 00' 00" East for 86.53 feet to a point of curve to the left;
Thence Northerly 156.29 feet along the arc of said curve to a point tangent, said arc having a radius of 99.50 feet, and a central angle of 90° 00' 00" and being subtended by a chord that bears South 00° 00' 00" West 140.71 feet;
Thence North 45° 00' 00" West for 70.43 feet to a point of curve to the right;
Thence Northwesterly 74.73 feet along the arc of said curve to a point of reverse curve, said arc having a radius of 118.50 feet, and a central angle of 36° 08' 03" and being subtended by a chord that bears South 26° 55' 58" East 73.50 feet;
Thence Northwesterly 119.98 feet along the arc of said reverse curve to a point tangent, said arc having a radius of 54.50 feet, and a central angle of 126° 08' 03" and being subtended by a chord that bears South 71° 55' 58" East 97.18 feet;
Thence South 45° 00' 00" West for 238.08 feet to a point of curve to the right;
Thence Southwesterly 46.26 feet along the arc of said curve to the POINT OF BEGINNING, said arc having a radius of 118.50 feet, and a central angle of 22° 21' 58" and being subtended by a chord that bears South 56° 10' 59" West 45.967 feet.

Torrens Certificate Number: 725081 (Includes additional land)

Exhibit "D"
Page 2 of 8

93013-61.81

SCHEDULE B

C.T. File No.:  C  2408338

2

Upon payment of the full consideration to, or for the account of, the grantors or mortgagors, and recording of the deeds and/or mortgages, the form and execution of which is satisfactory to the company, the policy or policies will be issued containing exceptions in Schedule B thereof to the following matters (unless the same are disposed of to the satisfaction of the Company):

A    1. If an owner's policy is to be issued, the mortgage encumbrance, if any, created as part of the purchase transaction.

B    2. Defects, liens, encumbrances, adverse claims or other matters, if any created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this commitment.

C    3. Rights or claims of parties in possession not shown by the public records.

D    4. Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

E    5. Easements or claims of easements not shown by the public records.

F    6. Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by public records.

G    7. Taxes or special assessments which are not shown as existing liens by the public records.

H    8. General and special taxes and assessments as hereafter listed, if any (all amounts shown being exclusive of interest, penalties, and costs):

A) Real estate taxes payable in 1991 are $1,678,388.97 and are unpaid.
Property Identification No. - unavailable
Includes additional land
Special assessments certified to said taxes are $290,398.80

B) Pending special assessments, if any.

C) Levied assessments for:

| PROJECT | PRINCIPAL BALANCE DUE |
|---|---|
| 1.  Heavyduty Surf, Proj. No. 11620 | $ 37,120.00 |
| 2.  Storm Sewer, Proj. No. 11621 | 137,636.35 |
| 3.  San Sewer Lat Conn, Proj. No. 11623 | 264,218.89 |
| 4.  Water Lat Conn, Proj. No. 11624 | 237,221.16 |
| 5.  Curb & Gutter, Proj. No. 11626 | 16,820.00 |
| 6.  HD Surfacing, Proj. No. 11925 | 410,100.64 |
| 7.  Storm Sewer, Proj. No. 11927 | 5,585.46 |
| 8.  Water Lateral, Proj. No. 11940 | 46,278.30 |
| 9.  Curb & Gutter, Proj. No. 11949 | 50,314.50 |
| 10. Traffic Signal, Proj. No. 11951 | 378,961.08 |

I    9. Rights or claims of tenants in possession under unrecorded leases.

J    10. We require that standard form of affidavit, or affidavits, be furnished us at closing.

TEL No.       612 829 2685 Mar 10.91  1:01 P.04

*Exhibit "D"*
*Page 3 of 8*

93013-62.81

EXCEPTIONS CONTINUED

3

C.T. File No.: C 2408338

K    11. Mortgage dated October 31, 1990, filed November 2, 1990 as Document No. 2134524 from Mall of America Company and Minntertainment Company to The Mitsubishi Bank, Limited; The Mitsui Trust and Banking Company, Limited; The Chuo Trust & Banking Co. Ltd; and Teachers Insurance and Annuity Association of America in the face amount of $625,000,000.00.

L    12. Collateral Assignment of Leases and Rents dated October 31, 1990, filed November 2, 1990 as Document No. 2134525 from Mall of America Company and Minntertainment Company to The Mitsubishi Bank, Limited; The Mitsui Trust and Banking Company, Limited; The Chuo Trust & Banking Co. Ltd; and Teachers Insurance and Annuity Association of America.

M    13. Collateral Assignment of Restated Contract dated October 31, 1990, filed November 2, 1990 as Document No. 2134526 from Mall of America Company and Minntertainment Company to The Mitsubishi Bank, Limited; The Mitsui Trust and Banking Company, Limited; The Chuo Trust & Banking Co. Ltd; and Teachers Insurance and Annuity Association of America.

N    14. Purchaser's affidavit for Torrens property must be brought to closing for all deeds to be filed.

O    15. An easement for Public Utilities and Drainage as disclosed by the Plat of Subdivision.
     Recorded:  June 16, 1988
     Document:  1937920
     Affects:   A 10 foot strip of land contiguous with the entire
                perimeter of the land, as shown on Plat of Survey
                86-286-A dated October 10, 1990 by Sunde Land Surveying,
                Inc.

P    16. An easement for the purposes stated herein.
     In favor of:  City of Bloomington
     For         :  Sidewalk and bikeway purposes
     Recorded    :  June 16, 1988
     Document    :  1937922
     Affects     :  A 20 foot strip of land contiguous with the entire
                    perimeter of the land, as shown on Plat of Survey
                    86-286-A dated October 10, 1990 by Sunde Land Surveying,
                    Inc.

Q    17. An easement for the purposes stated herein.
     In favor of:  City of Bloomington
     For         :  Installation, repair, etc. of utilities and traffic equipment
     Recorded    :  June 16, 1988
     Document    :  1937921
     Affects     :  That part of the land lying Northerly of a line drawn 10
                    feet Southerly of the parallel with the Northerly line
                    of said land and its Easterly and Westerly prolongations,
                    as shown on Plat of Survey 86-286-A dated October 10,
                    1990 by Sunde Land Surveying, Inc.

     Said easement grants two certain temporary easements for construction purposes as specifically described therein and as shown on Plat of Survey 86-286-A dated October 10, 1990 by Sunde Land Surveying, Inc., which shall expire on or before December 1, 1990.

TEL No.                    612 829 2685 Mar 10,91 1:01 P.05

Exhibit "D"
Page 4 of 8

93013-63.81

4

C.T. File No.:  C 2408338

R   18. The easement recorded June 16, 1988 as Document No. 1937921 also conveys to the City of Bloomington the right of access to and from Trunk Highway No. 77 along that part of the Southerly, Southwesterly, Westerly, Northwesterly and Northerly lines of the land specifically described therein.

S   19. The following appears as a recital on the Certificate of Title for the land:

"Subject to a drainage easement and a highway easement for County Road No. 1 in favor of the County of Hennepin as contained in instrument recorded in the Office of the County Recorder as Document No. 4496856, a portion of said highway easement having been vacated pursuant to Document Nos. 1828245 and 1828246, see Order Document No. 1925906, Files of the Registrar of Titles."

We note that the second and third drainage easements granted by Document No. 4496856 continue to affect the land and are shown on Plat of Survey 86-286-A dated October 10, 1990 by Sunde Land Surveying, Inc.

T   20. The following appears as a memorial on the Certificate of Title for the land:

County Highway Plat filed July 17, 1986 as Document No. 1739505 in favor of the County of Hennepin, Hennepin County State Aid Highway Number 1, Plat 64 as directed by Resolution Document No. 979240.

U   21. Rights of parties entitled to possession under unrecorded leases, as tenants only, as disclosed by certified rent roll dated__ _____by_____.

V   22. Unrecorded Surface Ring Road Agreement dated June 26, 1990 between Mall of America Company and the City of Bloomington

W   23. Restated Contract for Purchase and Private Development of Land dated May 31, 1988 among the City of Bloomington, The Port Authority of the City of Bloomington and Mall of America Company, a memorandum of which was filed November 10, 1988 as Document No. 1973314.  Unrecorded first and second modifications of said contract dated May 10, 1990 and August 13, 1990, respectively.

NOTE:  Pursuant to the deeds from the Port Authority of the City of Bloomington to Mall of America company filed November 10, 1988 as Document No. 1973315 the aforesaid Contract contains certain provisions granting or reserving reversionary rights unto the grantor

X   24. An unrecorded ground lease and management agreement affecting the land, executed by and between the following parties for the term and upon the terms, covenants and conditions therein provided.
      Lessor  :  Mall of America Company
      Lessee  :  The Port Authority of the City of Bloomington
      Dated   :  April 11, 1989
      Term    :  April 11, 1989 through January 1, 2012

Unrecorded Amendment No. One to said ground lease and management agreement dated May 25, 1990.

Y   25. A lease affecting the land, evidenced by Short Form Lease Agreement excuted by and between the following parties for the term and upon the terms, covenants and conditions therein provided.
      Lessor  :  Mall of America Company

TEL No.          612 829 2685 Mar 10,91  1:02 P.06

Exhibit "D"
Page 5 of 8

93013-64.81

5

C.T. File No.:  C 2408338

Lessee    :  Minntertainment Company
Dated     :  October 31, 1990
Term      :  Commencing October 31, 1990 and ending as provided therein.
Recorded:  November 2, 1990
Document:  2134519

z    26. A lease affecting the land, evidenced by Memorandum of Lease executed by and
        between the following parties for the term and upon the terms, covenants and
        condtions therein provided.
        Lessor   :  Mall of America Company
        Lessee   :  Nordstrom, Inc.
        Dated    :  October 12, 1990
        Term     :  Commencing October 12, 1990 and ending on the Expiration
                    Date of the Intial Term as defined therein.
        Recorded:  November 2, 1990
        Document:  2134520

        Memorandum of Amended and Restated Lease dated October 30, 1990, filed December
        4, 1990 as Document No. 2140708 granting seven separate options to renew for
        ten years each and granting easements, rights, powers and privileges over all
        of Lot 1, Block 1.

AA   27. A lease affecting the land, as evidenced by Sort Form Leases, excuted by and
        between the following parties for the term and upon the terms, covenants and
        conditions therein provided.
        Lessor   :  Mall of America Company
        Lessee   :  Federated Department Stores, Inc.
        Dated    :  October 18, 1990
        Term     :  Commencing September 13, 1989 and ending on the Expiration
                    Date of Initial Term, as defined therein.
        Recorded:  November 2, 1990
        Document:  2134521

        NOTE:  Unrecorded First and Second Amendments dated August 31, 1990 and October
        5, 1990, respectively.

        NOTE:  Lessee has five successive options to extend the term of the lease for
        10 years each.

        NOTE:  When ascertained, said lease's Commencement Date and Expiration Date of
        the Initial Term must be evidenced of record by a proper instrument.

AB   28. A lease affecting the land, as evidenced by Memorandum of Lease, executed by
        and between the following parties, for the term and upon the terms, covenants
        and conditions therein provided.
        Lessor   :  Mall of America Company
        Lessee   :  Macy's California, Inc.
        Dated    :  October 19, 1990
        Term     :  Commencing and ending as therein provided
        Recorded:  November 2, 1990
        Document:  2134522

        Memorandum of Amended and Restated Lease dated October 30, 1990, filed December
        4, 1990 as Document No. 2140709 granting twelve separate options to renew for
        five years each and granting easements, rights, powers and privileges over all
        of Lot 1, Block 1.

20.'P  :03:1  JA6M 2685 829 219         .oN JƎT

Exhibit "D"
Page 6 of 8

93013-65.81

EXCEPTIONS CONTINUED

6

C.T. File No.:  C 2408338

AC    29. Declaration of Restriction (covenant not to build) executed by Mall of America
          Company dated October 31, 1990 and filed November 2, 1990 as Document No.
          2134523.

AD    30. Terms and Conditions of an Agreement dated October 10, 1990, filed November 2,
          1990 as Document No. 2134527 between City of Bloomington, Minnesota, The Port
          Authority of the City of Bloomington and The Mitsubishi Bank, Limited as
          co-lender and as agent.

AE    31. Terms and Conditions of an Agreement dated October 31, 1990, filed November 2,
          1990 as Document No. 2134528 between The Mitsubishi Bank, Limited; The Mitsui
          Trust and Banking Company, Limited; The Chuo Trust & Banking Co., Ltd.;
          Teachers Insurance and Annuity Association of America and Minntertainment
          Company.

AF    32. Terms and Conditions of an Agreement dated October 12, 1990, filed November 2,
          1990 as Document No. 2134529 among The Mitsubishi Bank, Limited; The Mitsui
          Trust and Banking Company, Limited; The Chuo Trust & Banking Co. Ltd; and
          Teachers Insurance and Annuity Association of America; and Nordstrom, Inc.; and
          Mall of America Company.

AG    33. Terms and Conditions of an Agreement dated October 18, 1990, filed November 2,
          1990 as Document No. 2134530 between The Mitsubishi Bank, Limited; The Mitsui
          Trust and Banking Company, Limited; The Chuo Trust & Banking Co. Ltd; and
          Teachers Insurance and Annuity Association of America and Federated Department
          Stores, Inc.

AH    34. Terms and Conditions of an Agreement dated October 31, 1990, filed November 2,
          1990 as Document No. 2134531 among The Mitsubishi Bank, Limited; The Mitsui
          Trust and Banking Company, Limited; The Chuo Trust & Banking Co. Ltd; and
          Teachers Insurance and Annuity Association of America and Macy's California,
          Inc. and Mall of America Company.

AI    35. Terms and Conditions of Reciprocal Easement and Operating Agreement dated
          October 30, 1990, filed December 4, 1990 as Document No. 2140703.

AJ    36. Terms and Conditions of a Subordination Agreement and Consent filed December 4,
          1990 as Document No. 2140704 wherein Teachers Insurance and Annuity Association
          of America subordinates its interest in and to the Reciprocal Easement and
          Operating Agreement.

AK    37. Terms and Conditions of a Subordination Agreement and Consent filed December 4,
          1990 as Document No. 2140705 wherein The Mitsui Trust and Banking Company
          Limited subordinates its interest in and to the Reciprocal Easement and
          Operating Agreement.

AL    38. Terms and Conditions of Subordination Agreement and Consent filed December 4,
          1990 as Document No. 2140706 wherein The Chuo Trust & Banking Co., Ltd.,
          subordinates its interest in and to the Reciprocal Easement and Operating
          Agreement.

AM    39. Terms and Conditions of Subordination Agreement and Consent filed December 4,
          1990 as Document No. 2140707 wherein The Mitsubishi Bank, Limited subordinates
          its interest in and to the Reciprocal Easement and Operating Agreement.

TEL No.                    612 829 2685 Mar 10.91  1:03 P.08

Exhibit "D"
Page 7 of 8

93013-66.81

C.T. File No.: C 2408338

AN  40. Terms and Conditions of a Subordination, Non-Disturbance and Attornment
        Agreement dated October 30, 1990, filed December 4, 1990 as Document No.
        2140710 among The Mitsubishi Bank, Limited; The Mitsui Trust and Banking
        Company, Limited; The Chuo Trust & Banking Co. Ltd; and Teachers Insurance and
        Annuity Association of America ; Nordstroms, Inc., and Mall of America Company.

AO  41. Terms and Conditions of a Subordination, Non-Disturbance and Attornment
        Agreement dated October 30, 1990, filed December 4, 1990 as Document No.
        2140711 among The Mitsubishi Bank, Limited; The Mitsui Trust and Banking
        Company, Limited; The Chuo Trust & Banking Co. Ltd; and Teachers Insurance and
        Annuity Association of America ; Macy's California, Inc; and Mall of America
        Company.

AP  42. Mechanics Lien dated January 31, 1991, filed February 1, 1991 as Document No.
        2152600 in favor of JMS Contracting, Inc., a Minnesota corporation in the
        amount of $49,783.79.

AQ  43. Mechanics Lien dated January 31, 1991, filed February 1, 1991 as Document No.
        2152602 in favor of Metro Surveyors, Inc., a Minnesota Corporation in the
        amount of $1,755.50.

AR  44. Mechanics Lien dated January 31, 1991, filed February 1, 1991 as Document No.
        2152604 in favor of Arthur J. Thell, a Minnesota proprietorship in the amount
        of $2,551.55.

AT  45. A well certificate or well statement will be required for all deeds to be
        recorded.

AS  46. Note: The following is not a part of Schedule B, and is shown for information
        only.  This will not be included on the final policy.

        Please be advised that the Tax Reform Act of 1986 requires that the following
        information be provided at closing:

        A)  Seller's Tax Identification Number or Social Security Number.

        B)  Seller's full address after the closing.

Exhibit "D"
Page 8 of 8

93013-67.81

## SITE WORK PLANS

1.00    SITE DATA AND DEVELOPMENT PLANS - Developer shall furnish to Sears two sets of all specifications and prints of each of the drawings and revisions thereof as indicated below as well as all other plans required by other portions of these Technical Specifications. Drawings shall be preferably at a scale of one inch equals fifty feet (1" = 50') and in no case smaller than one inch equals one hundred feet (1" = 100').

1.01    Topographic Plat of the Center, shall contain the following information in accordance with these minimum requirements:

a.    The starting benchmark (point of beginning) and other key benchmarks referenced to USGS Datum and/or local municipal datum, with a minimum of one (1) permanent benchmark set adjacent to the center.

b.    Contour lines drawn at two (2) feet intervals. In flat terrain (slopes less than 37) contours shall be drawn at one (1) foot intervals.

c.    Outboundary lines showing monuments, bearings, distances and radii.

d.    The location of pertinent natural physical features such as trees, undergrowth and prominent rock outcroppings.

e.    Existing buildings or obstructions on the property and on neighboring property within 100 feet, area dimensions and appropriate heights shall be noted for line of sight studies.

f.    Rights-of-way and dimensions of all existing and proposed streets and sidewalks within the area of the Center and, unless otherwise specified by Sears, within the area at least 200 feet beyond each boundary line and to a sufficient distance to show adjacent major streets, highways, ramps, and access roads.

g.    Existing surface and subsurface utilities, including sanitary sewers (show flow lines, size and type of material), storm drains, manholes, catch basins, high voltage transmission towers and/or lines, electric power lines, telephone poles (show pole numbers and indicate transformer cans), telephone lines and street lamp posts.

1.02    Outboundary Survey of the Center - (including a complete metes and bounds description of the Center), which shall detail the following information with these minimum requirements:

EXHIBIT "E"
Page 1 of 14 Pages

030791/s0495/LseExh.E

93013-68.81

a.  All angles and bearings shall be to the nearest second and all distances to .01 feet, with minimum error of closure at 1:5000.

b.  One magnetic bearing shall be shown on the survey and if an adopted bearing is used for field work, the adopted line shall be shown.

c.  All boundaries shall be tied to known or record monuments with property corners referenced to offset points if possible. On curved boundary lines, the arc lengths, deltas and radii shall be noted.

d.  All monuments shall be identified as "found", set", or "reset" and described (for example, "iron pipe").

e.  All adjacent streets and major streets, highways, ramps and access roads in the area shall be identified and any private streets shall be so noted. The record width of each street shall be placed adjacent to the street name and any restrictions on access to the Center shall be noted. Restrictions on setbacks required, if any, for building lines of new construction.

f.  All record easements (including utilities) shall be indicated with dimensions, bearings, their purpose, and all restrictions posed by the easement and referenced to the corresponding deed, book and page of recording.

1.03  Soil Boring Plan - Developer shall furnish SEARS with a report of a Soils and Foundation investigation of the SEARS pad area(s). The report shall include boring results from at least seven (7) test borings taken within the SEARS pad areas as located by SEARS or SEARS' architects. Corrosivity tests shall be a part of the soils engineering report.

Developer shall also test the soil for hazardous wastes, materials and the like, and shall furnish Sears with a comprehensive analysis of all such substances found. That analysis shall include, but not be limited to, an identification of those substances, as well as their quantity and location on the site.

Developer will also be required to indemnify and hold SEARS harmless from and against any and all claims, losses, expenses and the like arising out of the presence of hazardous substances on the SEARS parcel, either above or below the surface. This will include substances present at the time the soil is tested by the Developer, as well as those which are transported onto the land at a later date, either on or below the surface, by the Developer, those acting at his direction, or

EXHIBIT "E"
Page 2 of 14 Pages

by natural forces such as flowing or seeping water.

1.04    Staging Area and Construction Road Plan — Showing the planned location of the construction road and the designated staging areas, which shall be subject to review and approval by SEARS.

1.05    Temporary Utilities Plan — with reference to location and size and type of material for power, telephone, water, drainage, sediment or retention basins, construction access roads, construction yards and any other like items.

1.06    Permanent Utilities Plan — with reference to location and size and type of material for storm drainage, sanitary sewers, water, natural gas, electric distribution, telephone and cable television. Indicate outlet invert levels of sewers and catch basins.

1.07    Site Grading Plan — showing existing and new contours drawn at two (2) foot intervals, except in flat terrain (overall slopes less than 3%) contours shall be drawn at one (1) foot intervals. All grading plans shall show initial and new contours referenced to a benchmark or benchmarks. If contours are overlaid on a reference grid, the initial and final elevation of selected grid corners shall be noted. All buildings, improvements, roads and highways, including those adjacent to the Center, whether existing or proposed, shall be shown. The new and initial grades at corners of the building pads and new grades within the limits of the building pad, also curb, gutter, flow line and other pertinent spot elevations, new and/or existing, shall be indicated.

1.08    Paving and Parking Plan — detailing all curbs, retaining walls, berms, striping, parking stall striping (see par. 10.03 this section), signalization, traffic and directional signing, light standards and other parking lot obstructions. Areas for heavy duty paving and concrete aprons in loading areas shall be indicated.

1.09    Site Lighting Plan — shall show the height and location of light poles, fixtures and type of fixture shieldings as well as all other details of complete lighting arrangement including the wiring of all lights on SEARS Parcel. Submittal shall include photometric curves, fixture catalog cuts, base details, luminare assembly and other information needed to evaluate the lighting plan, see paragraph 10.04 of this section for requirements.

1.10    Landscaping and Irrigation Plan — showing the lines and hose bibbs to be installed.

2.00    SEARS CONTRACT LIMIT PLAN — SEARS ARCHITECT shall prepare the "SEARS Contract Limit Plan" which will define the limit of SEARS site responsibility, establish all grades

EXHIBIT "E"
Page 3 of 14 Pages

030791/s0495/LseExh.E

93013-70.81

within that line including each pad and finished floor elevation, locations and elevations as required for all incoming utilities, location of staging area and temporary utilities. The SEARS mall entrance line, outline of SEARS buildings and fenced areas, yard and truck dock drainage locations and the quantity of backfill required. This plan shall become an exhibit to the REA. In the event of inconsistencies, the "SEARS Contract Limit Plan" shall prevail.

3.00     <u>SEARS BUILDING PAD AREA(S)</u> - (by the developer) shall extend to the contract limit line as specified on SEARS Contract Limit Plan. The pad, including that portion of the upper level Truck Court and Outdoor Sales Area which may have slab on grade, shall be graded to eight (8) inches below the finished floor, unless specified differently on SEARS Contract Limit Plan. Pad shall be completed and delivered to Sears 6 weeks before initiation of construction.

       3.01     <u>ROCK/UNSUITABLE SUB-SOIL</u> - In situations where rock is present on the Sears building pad, the Landlord/Developer is responsible to remove all rocks within 36" below the level of the pad elevation. If there is unstable or unusual conditions in or surrounding the SEARS building pad the Landlord/Developer shall <u>notify</u> SEARS of that condition and stabilize or rectify the unwanted conditions as necessary.

4.00     <u>GRADING</u> - (by the developer) the subgrades for SEARS pad shall be verified and certified by an independent licensed surveyor and the certification delivered to SEARS. All grading shall be accomplished per approved drawings as indicated in paragraphs 2.00 and 3.00 above and as required by the following:

       4.01     <u>Excavated Material</u> - shall be stockpiled and used for backfill if the Soil's Engineering Report indicates it is suitable. Quantity and location of the stock pile to be as specified by SEARS ARCHITECT. SEARS will backfill against its own buildings and its own retaining walls. Developer must formally qualify suitable soil for backfill usage.

       4.02     <u>Top Soil</u> - excavated during grading of the center and if a Landscape Architect determines it is suitable for use after review of soils analysis shall be stockpiled and made available for use during final landscaping operations. Landscaping around SEARS building inside perimeter sidewalks.

       4.03     <u>Side Slopes</u> - shall be set at such minimum ratios and such precautions shall be taken (for example, sodding and other planting for stabilization) to preserve the integrity of the slopes as the independent soils engineer shall recommend. Excavation for lower level building walls adjacent to upper level parking areas shall be at a 1 to 2 slope, with the toe of slope five (5) feet outside of wall face, unless specified otherwise on SEARS Contract

EXHIBIT "E"<br>Page 4 of 14 Pages

Limit Plan.  Depending on characteristic of soil, a 1 to 1 slope will be acceptable.

4.04    <u>Compaction</u> - Building pad area(s) shall be compacted to not less than ninety-five (95) percent Modified Proctor for cohesion-less soil material and ninety (90) percent Modified Proctor for cohesive soil material in accordance with ASTM-D-1557-70. All compacted areas shall be verified by an independent professional soils engineer testing laboratory engaged by Developer and a certificate addressed to both the Developer and SEARS indicating compliance with these specifications together with all test data upon which such certification is based shall be furnished to SEARS.  Pad area(s) shall be prepared by Developer to allow for normal earth excavation for all SEARS footings, utility lines, pits, auto lifts, tanks, oil separators, acid neutralizing tanks and other facilities.

4.05    <u>Earth Stabilization and/or Replacement</u> - shall be performed as necessary so that the subsoil at normal footing depth in all building pad area(s) shall have a uniform bearing capacity (dead load plus live load) of 3500 (min) pounds per square foot with a total settlement not to exceed one (1) inch and differential settlements not to exceed three-eights (3/8) inch within twenty-four (24) feet.  If the bearing capacity is less or settlement is greater than herein required and earth stabilization and/or replacement by the Developer is not effective to correct such deficiency, Developer shall compensate Sears for any increase in building footing and foundation costs over and above conventional spread footings at normal depth. All previous construction shall be removed to normal footing depth or deep enough to insure uniform settlement, whichever is greater. All utility lines except those required by SEARS shall be removed from the pad area(s).

4.06    <u>Temporary Sediment Basins</u> - During construction, Developer shall comply with all environmental regulations such as providing temporary sediment basins as needed to prevent silting downstream of the Center.

4.07    <u>Flood Prevention</u> - Site shall be designed to provide an overland flow capacity to prevent flooding of SEARS lower level in the event the site storm sewer systems are overloaded or not functioning.

4.08    <u>Site Landscaping</u> - outside "SEARS Contract Limit".  Developer shall landscape all grade changes.  Finished grades in landscaped areas shall be a maximum slope of two (2) horizontal to one (1) vertical.  Precautions shall be taken to preserve the integrity of all slopes.

EXHIBIT "E"
Page 5 of 14 Pages

All landscape drawings shall be forwarded to SEARS and its architect for review before the landscape contract is awarded. Special coordination is required to prevent the trees from obstructing the line of sight of the signage.

Retaining walls, guard rails and berms required at grade changes and receiving areas resulting from site layout are to be Developer's responsibility.

5.00    CONSTRUCTION ROAD AND STAGING AREA (by the developer) - A temporary hard surface, minimum 16 feet wide, construction road connecting to an existing highway adjacent to the Center shall be constructed and maintained in good condition throughout the construction process to provide access to the designated parking and staging areas and to the locations of two (2) of the SEARS exterior walls. These locations should be on opposite sides of the pad and not to the SEARS wall location abutting the Mall. A staging area for workers parking, material storage and contractors' trailers and sheds shall be provided, adjacent to SEARS pad area(s), location as agreed to by SEARS. Staging area shall be at least 28,000 square feet in area, with both the construction road and staging areas constructed with not less than six (6) inch stone bases with a binder course, and completed two (2) weeks before the start of building construction. No relocation of staging area can be required by Developer during the construction period of the SEARS facility. EXCEPTION in final phase of construction, Developer can request moving of construction trailer only to permit any final paving to be accomplished,

6.00    TEMPORARY UTILITIES (by the developer) - Developer shall provide temporary utilities listed below to a location agreeable to SEARS and in accordance with these requirements. SEARS shall pay, or cause its contractors to pay, on the basis of metered use, for the operating costs of the utility services.

6.01    Storm Drainage - Temporary ditches or other means as necessary to divert surface storm water runoff from building pads and staging areas, with temporary drainage facilities shall be maintained by Developer prior to the start of construction by SEARS and until permanent storm sewers have been completed and made operational, Developer to provide temporary storm drainage accessible to SEARS roof leaders.

6.02    Water - As a minimum service, a two (2) inch line at a pressure suitable for use without the need for pumping shall be available to SEARS staging area before the start of construction by Sears.

6.03    Electricity - Developer shall arrange to have three (3) phase 480v, one and three quarter (1 3/4) watts per square foot of building area, service brought to a pole within the designated staging area(s) as located by SPARS. SEARS contractor will be responsible

EXHIBIT "E"
Page 6 of 14 Pages

for picking up their power from the pole with three phase-four wire and terminating in a weather proof and rain proof fused disconnect switch.   Power for trailer hook-up and for construction as stated above shall be available before the start of construction by SEARS.

6.04    <u>Telephone</u> - Developer to provide eight (8) temporary phone lines to SEARS staging area before the start of construction by SEARS.

7.00    <u>TEMPORARY SIGN</u> - Developer shall prepare and erect a temporary sign which shall indicate the names of all Majors in a prominent position

8.00    <u>PERMANENT UTILITIES</u> - All Utility Facilities shall be brought to within five (5) feet of building wall, unless specified differently on SEARS Contract Limit Plan, of each SEARS building by Developer.   Said Utility Facilities shall be furnished in accordance with the following requirements and at an elevation and location as specified by SEARS in the Contract Limits Plan:

Developer shall provide all the necessary preliminary coordination with the various utility companies to assure adequate service to the Center. Sanitary Sewer Lines, storm sewer lines and other utility lines, conduits, ducts or systems shall not be constructed or maintained above the ground level of the Center.

8.01    <u>Public Sanitary</u> - sewer service shall be provided at points of entry.   Minimum size of pipe shall be 6 inches.

8.02    <u>Storm Sewer</u> - services shall be provided for six (6) to eight (8) points of entry into the Sears buildings, at least two (2) per each perimeter exposure.

8.03    <u>Storm Sewer and Sanitary Sewer</u> - line inverts shall be sufficiently deep so as to receive all building outflow by gravity including yard drains in any truck dock wells.

8.04    <u>Storm Drainage System and Water Retention Basin</u> - shall be a closed conduit system and shall include lateral connections for building roof drainage, all pertinent inlet and outlet structures, rip-rap and bank protection, with an overall design based on the following:

a.    A minimum regional 25 years storm frequency with a 30 minute time of concentration.

b.    Discharge velocities shall be low enough so as to prevent damage downstream.

*c.    A minimum of 18 inch freeboard shall be maintained between building floor elevation and the water surface resulting from a 100 year frequency storm.

d.    Conduit capacity shall be as to develop

EXHIBIT "E"
Page 7 of 14 Pages

030791/s0495/LseExh.E

93013-74.81

no ponding from a 25 year frequency storm.

e.    A hydraulic analysis shall be prepared by a registered civil engineer and shall be submitted to SEARS for review and approval.

f.    Water Retention - Should ordinances mandate that Sears provide rain water retention basins, these water retention basins are to be the sole responsibility and cost of the landlord/developer, including the land area where the retention basin is located.

8.05    <u>Domestic Water</u> - As a minimum, at said point of entry, one service connection from a water line, with a shut-off valve, that shall be a minimum of four (4) inches in diameter.

8.06    <u>Electrical Service</u> - Cables of the sizes and in the quantity deemed necessary for SEARS and the utility company furnishing primary electricity in conduits and ducts and connected to pad mounted transformer or transformer placed in underground vault, in a manner satisfactory to SEARS and said utility company. Separate transformers shall be provided for each Major.

8.07    <u>Cable TV</u> - Cables of the sizes and quantity deemed necessary by SEARS to a point designated, if cable TV is available.

8.08    <u>Telephone</u> - Duct, conduit and manhole structures of the sizes and in the quantity deemed necessary by SEARS and the utility company furnishing the telephone service and terminating at said point of entry. If telephone is fed from mall, it must be underground.

8.09    <u>Natural Gas</u> - Wherever available, the Developer shall cause natural gas line(s) to be installed by the Gas Utility Company. Developer shall provide pipe(s) of adequate size to supply SEARS needs terminated in the Sears building(s) at a location designated by SEARS.

8.10    <u>Actual Connections With Stubbed Out Utilities</u> - At points of connections will be made by SEARS contractor and permits for these connections obtained by SEARS. Permit fees for building connection will be Sears responsibility unless fees are contribution to cost of public system improvement or extension thereof to Major's building in which event same will be Developer's responsibility.

8.11    <u>Utilities Shall Be Available At The Time As Stated Below</u> -

EXHIBIT "E"
Page 8 of 14 Pages

030791/s0495/LseExh.E

a.    Sanitary and storm sewers, water, and natural gas shall be available eight (8) months before store opening.

b.    Electricity, cable T.V. and telephone shall be available eight (8) months before store opening.

8.12    <u>All Utilities</u> - shall be located so as not to interfere with Sears future expansion.

9.00    <u>FIRE PROTECTION SYSTEM</u> - All fire protection systems in the Center shall be designated and installed in accordance with the standards of the National Fire Protection Association, Booklet Nos. 13 and -24,. or other nationally recognized standards agreeable to the Majors and also to SEARS and Schirmer Engineering Corp., in addition to any other applicable governmental requirements.   All systems shall meet Industrial Risk Insurance, Underwriters requirements for a "highly protected risk classification." Minimum design standards are as follows:

9.01    <u>Water Flow and Fire Loop</u> - At least 1500 GPM at grade level (50 PSIG residual for one-story buildings, 60 PSIG residual for two-story buildings, 65 PSIG residual for three-story buildings; minimum 25 PSIG residual at roof levels in any event) minimum eight (8") inch diameter pipe loop, with sectional valve control and fire hydrants at intervals not in excess of 300 feet, shall be provided.

9.02    <u>Fire Hydrants</u> - in addition to the ones required in paragraph 9.01 above, shall be located opposite each exterior store entrance or as may be required by the local Fire Marshall and Public Health and Safety Offices.

9.03    <u>Underground Water Mains</u> - shall be of a sufficient size to adequately supply both fire protection and domestic demands simultaneously, but in no case they shall be less than ten (10) inches in diameter.   All underground vaults and required piping and equipment will be the responsibility of the Developer (Landlord).

9.04    <u>Valved Stub-Outs</u> - The Developer shall provide eight (8) inch diameter pipe loop <u>valved</u> stub-outs, either one or two as determined by Sears, to within five (5) feet of SEARS building wall at locations and elevations stipulated by SEARS.

9.05    <u>Detector Checks and Water Meter Requirements</u> - shall be established jointly by SEARS and the serving utility company.

10.00    <u>PARKING AREAS</u> (by the developer) Parking spaces as required are to be provided and maintained as indicated by the Parking Module shown on the Site Plan.   Open parking lots shall be designed according to the minimum requirements stated herein.

EXHIBIT "E"
Page 9 of 14 Pages

030891/s0495/LseExh.E

93013-76.81

10.01    <u>Allowable Slopes in Parking Areas</u> - shall not exceed maximum and 1-1/2% minimum, unless otherwise approved by SEARS. Paving within ten (10) feet of catch basins shall be of uniform slope. Retaining walls or embankments forming a break in grade, shall be approved by SEARS.

10.02    <u>Automobile Parking Stalls</u> - Perpendicular width dimension between center lines or between midpoints parallel lines of adjacent stall stripes shall not be less than nine (9) feet; Minimum width of an aisle plus the depth of parking stalls on each side and measured perpendicular to the aisle shall be as follows:

    For 65 degree parking - 54 feet
    For 90 degree parking - 60 feet
    For 60 degree parking - 55 feet

10.03    <u>Stall Striping</u> - Stalls shall be separated by using parallel lines four (4) inches in width so that the distance between the edges of the inner lines is eight (8) feet and eight (8) inches. Striping shall be one (1) coat of paint, alkyd base synthetic resin, in a color known as "Traffic White". If seal coat is used, it shall be compatible with striping paint compound. Detail of striping shall be shown on paving and parking plan as indicated in Section 1B, Paragraph 1.08. Numbering of parking stall shall be as indicated on SEARS site plan.

10.04    <u>Parking Lot Lighting</u> - (by the developer) minimum design standards are as follows:

    a.    Minimum illumination required, as measured 30 inches above the adjacent ground, shall be 0.75 footcandles minimum maintained throughout the entire parking area and one and one-half (1.5) footcandles average maintained to include Sears Perimeter Sidewalk. One (1) luminaire on poles selected by the parties shall be circuited for security lighting purposes. Approximately 255 of the total luminaires shall be used for this purpose. Types and control of parking lot lights shall be subject to review and approval by SEARS. Drawings as required in Section 1B, Paragraph 1.09 shall indicate all the items required above.

    b.    Developers shall recommend the height and location of light poles, fixtures and types of fixture shielding so as to provide maximum lighting at enclosed-mall, SEARS main building and auxiliary building entrances or exits and building inside corners, while minimizing the off-site effect (i.e. glare) on residences and highways. SEARS parking illumination

EXHIBIT "E"
Page 10 of 14 Pages

030791/s0495/LseExh.E

93013-77.81

level will not be lower than other parking areas in the Center.

10.05    <u>Construction Limitations</u> - No building shall be constructed in the sight line of SEARS building from the shopping center external ring road and main access roads without the prior written consent of SEARS.

10.06    [INTENTIONALLY DELETED]

10.07    <u>Customer Merchandise Pick-up Area</u> - Drive-in service operation which requires approximately 20 parking spaces. Layout location and number to be indicated in the Sears Contract Limit Plan.

11.00    <u>SITE PAVING, SIDEWALKS, AND CURBS</u> (by the developer) - shall be designated and provided according to the minimum standards stated herein.

11.01    <u>Pavement Design</u> - shall be based on a "Design Period" of twenty (20) years and shall consider such variables as required by local Bearing Ratio of the soil, the anticipated traffic volume and the vehicle mix (i.e., automobiles, single-axle trucks and double-axle trucks). For asphalt paving design guidelines refer to the Asphalt Institute Manual series MS-I and MS-I5, Chapter III. For concrete paving guidelines refer to concrete "Pavement Design for Roads and Streets Carrying all Classes of Traffic" by Portland Cement Association. The surface of parking areas and access roads shall be paved according to design with an asphaltic wearing surface over a suitable base material. All pavement design shall be subject to review and approval by SEARS and shall conform to the recommendations of the soils engineer.

11.02    <u>Paving Classification</u> - In connection with the foregoing, all areas to be paved in the Center are classified as: <u>Heavy duty paving</u> for all ring roads and main driveways, truck loading zones, truck thoroughfares, and access to entrances and exits of Auto Centers. <u>Light duty paving</u> for automobile parking aisles and stalls.

11.03    <u>Curbs</u> - to be provided at entrances, access roads and other areas as required for suitable drainage, shall be six (6) inch curbs with integral 18 inch gutters, however, next to sidewalks and buildings when drainage is not a factor, a straight six (6) inches above the finished paving curbs (without gutter) shall be provided. Parking lot islands and landscape enclosures shall be vertical barrier type curb and all integral type curbs and gutters and verticle barrier type curbs shall be concrete. Asphalt curbs will be permitted at the outer perimeter curb of the Ring Road and with approval of the Major's only. Curbs shall be depressed for handicapped access and customer merchandise pick-up areas.

EXHIBIT "E"
Page 11 of 14 Pages

030791/s0495/LseExh.E

12.00    TRAFFIC SIGNALS (by the developer) - The location of
traffic signals shall be determined in coordination with
governing agencies and SEARS and be subject to their
approval.  For each such approved signal, the Developer
shall have a Traffic Signal Design Plan prepared by a
licensed engineer, which plan shall be subject to review
and approval by SEARS prior to final submission to the
appropriate public agencies with whose requirements the
plan shall conform.  The plan shall show as a minimum,
the geometrics of the entrance/exit, the location of
standards, signal heads, controller, power source,
detectors and conduit as well as the suggested signal
phasing and a wiring diagram, and shall otherwise be in
sufficient detail to permit obtaining bids for the
installation of the signal.

13.00    TRAFFIC CONTROL SIGNS AND PAVEMENT STRIPING (by the
developer) - All traffic control signs such as STOP,
YIELD, NO PARKING, ETC., shall be SKOTCHLITE or
equivalent reflectorized material, and control signs,
pavement striping, and pavement signing shall conform to
state standards even if not otherwise applicable.
Location of the signs shall be indicated on drawings
submitted for all Major's and SEARS approval.

14.00    RETAINING WALLS AND EMBANKMENTS - Where retaining walls
and/or embankments are required adjacent to one or more
sides of a SEARS building, they shall be constructed as
part of site work and at developer's expense.  Retaining
walls which are necessary for and part of SEARS depressed
dock facilities will be SEARS responsibility only for the
retaining wall portion required for the depressed area of
dock.  Retaining and other subterranean walls -that are
an integral part of the SEARS structure shall also be
excluded from the developers responsibility except that
developer's independent soils engineer's report shall
provide recommendations for design, construction, and
treatment of such walls.

    14.01    Embankments - At the heal and the toe of the
slopes, a curb, or low wall shall be provided
for erosion control.  All embankments shall be
landscaped.

    14.02    Retaining Walls - The type, quality and
finished appearance of retaining walls shall
be coordinated with nearby building exteriors.
Construction of such walls shall follow
recommendations contained in the Soils Report
prepared by an independent soils engineer.

    14.03    Backfill Materials (by the developer) - A
sufficient amount for the backfill of
retaining walls, including SEARS retaining
walls and subterranean structures shall be
stockpiled on the site. This material shall be
tested and certified by an independent soils
engineer as suitable for such a backfill and
compaction.

15.00    ENCLOSED HALL  - These items, as outlined below, shall
apply to any enclosed malls and mall buildings.

    15.01    Review of Drawings - SEARS shall have the
right to review and approve all interior and
exterior plans for any malls, including

                    EXHIBIT "E"
                 Page 12 of 14 Pages

030791/s0495/LseExh.E

without limitation, ornamental structures, landscaping, finishes, lighting, seating arrangement and the courts at each Major's building entrances.

a.    Mall and SEARS Court design and coloration will be submitted to SEARS for review and approval. Design and size of SEARS Court to be equal to courts at other Majors.

b.    Developer to provide and install flashing to reglet in SEARS building at SEARS wall abutting the Mall.

c.    Developer to provide and install expansion joint and coverplate at SEARS mall entrance, and any flooring material required between expansion joint and SEARS mall doors.

d.    Mall roof structure shall not drain onto SEARS roof.

15.02    <u>Expansion Joints</u> - Developer shall install continuous combination seismic/expansion joints through the enclosed malls and mall buildings at the connection with SEARS building, and all plans for all such joints, including structural information, shall be subject to review and approval by SEARS and shall be coordinated by the Project Architect. Developer shall provide flashing at the adjoining parapet wall between SEARS and the mall. Provide seismic design expansion joints only where required by local codes.

15.03    <u>The Temperature</u> in any enclosed mall shall be maintained at 76 degrees dry bulb and 557 relative humidity during the cooling cycle (with outside conditions as indicated in the ASHRAE Handbook 2.57 Design Dry Bulb and Mean Coincident Wet Bulb for this area) and 70 degrees dry bulb during the heating- cycle (with outside conditions as shown in the ASHRAE Handbook for this area).

15.04    <u>Automatic Fire Detection</u> - The heating, ventilating and air conditioning systems for the mall building shall be arranged to create a negative pressure condition with respect to each major building upon automatic detection of fire within the mall's zone.

15.05    <u>Heating, Ventilation and Air Conditioning</u> - Developer and SEARS shall design and maintain their respective heating, ventilating, and air conditioning systems so as to minimize the interchange of air between SEARS building and the enclosed mall during normal operations.

15.06    <u>Sears Mall Entrances:</u>

a.    SEARS Front at the Mall entrances should not be less than the other majors Mall

030791/s0495/LseExh.E

93013-80.81

Fronts and not less than 50 feet wide by 14 feet high.

b.   The minimum distance from SEARS Mall entrances to any obstruction in the Mall court shall be 100 -feet. Interior landscaping and decor should be coordinated with SEARS Architect. SEARS sign visibility should not be blocked from Mall courts.

c.   Entrances to the shopping center courts shall not be located ne>t to the SEARS building.

d.   Within a radius of 150 feet of the SEARS Main Building entrances to the enclosed Mall, the developer will maintain a balanced and diversified grouping of stores selling primarily merchandise approved by SEARS. Theaters, food operation, and Financial Institutions should not be installed within the 200 foot radius from SEARS Mall entrances.

e.   Minimum walking path-fronting SEARS Mall entrance in second floor shall be. not less than 26 feet.

f.   SEARS floor to floor standard height is 18 feet 0 inches. Shopping center court's floor level shall meet SEARS floor levels without the center floor sloping towards the SEARS Building.

16 .00   <u>Contract Limit Line Drawings Check List:</u>  (Cont'd.)

19.  Show finished pad elevations (both levels)  _____

20.  Clearly define locations and cross sections of pad grade changes in plan and section  _____

21.  Show location of TBA (hold parking number spaces 1 to 5 x number of TBA bays)  _____

22.  Show location of sidewalk, truck court and quick service drains  _____

23.  Show locations and utilities for oil interceptor and acid neutralizer.  _____

24.  Indicate berm, retaining walls, and safety guardrails required. Define responsibility in line with R.E.A.  _____

EXHIBIT "E"
Page 14 of 14 Pages

# **EXHIBIT B**

<u>AGREEMENT TO GRANT OPTION TO LEASE</u>

THIS AGREEMENT TO GRANT OPTION TO LEASE ("Agreement") is made and entered into as of the 30th day of May _____, 1991, by and between Sears, Roebuck and Co., a New York corporation ("Sears") and Minntertainment Company, a Minnesota general partnership ("Minntertainment").

W I T N E S S E T H:

WHEREAS, Sears and Mall of America Company, a Minnesota general partnership ("MOAC"), an affiliate of Minntertainment, have entered into that certain Lease, Construction and Operation Agreement ("Lease") dated as of the date hereof, a Memorandum of which was recorded on _____, 1991 as Document No. _____ in the Office of the Registrar of Title, Hennepin County, Minnesota, pursuant to which Sears is leasing from MOAC that certain parcel of land in Bloomington, Minnesota, more particularly described in Exhibit "A" attached hereto, upon which Sears shall construct and operate a three (3)-level retail facility (the "Sears Building") as part of the enclosed mall regional shopping center (the "Shopping Center") which MOAC was developing upon the land more particularly described in Exhibit "B" attached hereto; and

WHEREAS, Sears, MOAC, Nordstrom, Inc., a Washington corporation, and Macy's California, Inc., a Delaware corporation, have entered into that certain Amended and Restated Reciprocal Easement and Operating Agreement ("REA") dated as of the date hereof and recorded on _____, 1991, as Document No. _____ in the Office of the Registrar of Title, Hennepin County, Minnesota, pursuant to which the parties agree to certain provisions for the integrated use and development of the Shopping Center; and

WHEREAS, Sears covenanted to MOAC in the Lease that, upon certain conditions, Sears shall grant to Minntertainment or an affiliate of Minntertainment, their successors and assigns, the exclusive and irrevocable first right and option to lease the third floor of the Sears Building from Sears.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    <u>Option to Lease Third Floor of Sears Building</u>.  If at any time after the Major Operating Period of Sears (as defined in the REA) Sears, its successors or assigns, shall cease to operate at least twenty thousand (20,000) square feet of Floor Area (as defined in the REA) on the third floor of the Sears Building for purposes then permitted by the REA, then Minntertainment or, at the option of Minntertainment, an affiliate of Minntertainment, their successors and assigns, shall have the exclusive and irrevocable first right and option (but not the obligation) to lease said third floor of the Sears Building from Sears, its successors and assigns, for the remainder of the term of the Lease, in accordance with the terms set forth herein (Minntertainment, or its affiliate, whichever shall exercise such option, shall hereinafter be referred to as the "Third Floor Lessee").  In the event Sears intends to cease such operation of at least twenty thousand (20,000) square feet of Floor Area on the third floor of the Sears Building, Sears shall give written notice of such election to Minntertainment, at the address set forth below, at least one (1) year prior to such cessation of operation thereof.  The Third Floor Lessee's right and option to lease the third floor of the Sears Building from Sears may be exercised by the Third Floor Lessee within two (2) years

030791/s0495/option.agt

10017-1.7

after Minntertainment has received such written notice from Sears, by giving written notice to Sears of such exercise. This option shall run with the land and be binding upon Sears and Sears' successors, assigns and mortgagees. In the event Sears has assigned and subleased back the Sears Building, the Third Floor Lessee's right and option to lease the third floor of the Sears Building shall be limited to the right and option to sub-sublease said property from Sears, its successors and assigns, to the extent permitted by such leaseback and subject to the conditions on sub-subleasing imposed in such subleaseback; provided, however, that Sears covenants, warrants and represents to Minntertainment that any such leaseback will include the right to sub-sublease and will permit Sears, its successors and assigns, to sub-sublease the third floor of the Sears Building as called for herein. If the Third Floor Lessee elects to exercise its right and option to lease the third floor of the Sears Building from Sears, the Third Floor Lessee shall give written notice of such exercise to Sears within the time hereinabove provided and in the manner provided for giving notices under this Agreement. If the Third Floor Lessee exercises its right and option to lease the third floor of the Sears Building from Sears, the terms and provisions of such lease from Sears to the Third Floor Lessee shall be substantially similar to the terms and provisions of the Lease; provided, however, that the financial terms of such lease from Sears to the Third Floor Lessee shall be as set forth in Paragraph 2 hereof.

2.   Rent.  The rent to be paid by the Third Floor Lessee to Sears under such lease shall be equal to the sum of (a) the total of all real estate taxes, utilities, Common Area Payments and Merchants' Association/Promotional Fund charges which Sears is obligated to pay under the terms of the Lease, multiplied by a fraction, the numerator of which is the number of square feet of gross leasable area on the third floor of the Sears Building and the denominator of which is the total number of square feet of gross leasable area on all floors of the Sears Building plus (b) the net amount equal to fifty percent (50%) of any minimum and percentage rent which the Third Floor Lessee actually receives from the subtenant of the third floor of the Sears Building, after the Third Floor Lessee has been fully reimbursed from its receipt of such minimum and percentage rent for all hard and soft costs incurred by the Third Floor Lessee in securing a subtenant for said third floor, together with Interest thereon (as defined in the Lease) from the date each of such costs were incurred.

3.   Notices.  All notices given pursuant to or in connection herewith shall be given in writing and shall be effective if given as follows:

a.   if given to Sears, by mailing to Sears by registered or certified mail, postage prepaid, return receipt requested, addressed:

(1)   in the case of the original, to:

Sears, Roebuck and Co.
Attention:  National Manager
               Real Estate
Department 824RE (BSC 36-36)
Sears Tower
Chicago, Illinois  60684

(2)   with a copy to:

Sears, Roebuck and Co.
Attention:  Assistant General Counsel
               Real Estate
Department 766 (BSC 45-27)
Sears Tower

Chicago, Illinois  60684

    b.  if  given  to  Minntertainment,  by  mailing  to Minntertainment,  by  registered  or  certified  mail,  return receipt requested, postage prepaid, addressed to:

    (1)  in the case of the original, to:

        Minntertainment Company
        Attention:  Herbert Simon
        One Merchants Plaza
        Post Office Box 7033
        Indianapolis, Indiana  46207

    (2)  with a copy to:

        Philip D. Pecar, Esquire
        Dann Pecar Newman Talesnick & Kleiman, P.C.
        One American Square
        Box 82008
        Indianapolis, Indiana  46282

    4.  <u>Governing Law</u>.  This  Lease  shall  be  construed, interpreted and applied in accordance with the laws of the State of Minnesota.

    5.  <u>Counterparts</u>.  This  Lease  may  be  executed  in  several counterparts, each of which shall be deemed an original for all purposes.

    6.  <u>Parties</u>.  This Lease shall bind and inure to the benefit of Sears and Minntertainment and their respective heirs, executors, administrators, trustees, successors, assigns and grantees.

030791/s0495/option.agt

3

10017-3.7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SEARS, ROEBUCK AND CO.,
a New York corporation

By: _____
National Manager

Title: Real Estate Planning Group

STATE OF _____ILLINOIS__ )
                         ) SS:
COUNTY OF ___COOK_____   )

On this __14th___ day of __March_____, 1991, before me personally appeared __Ronald B. Ruth_____, to me known to be the National Manager of Sears, Roebuck and Co., the corporation that Real Estate Planning Group executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated: ___3/14/91____

_____
NOTARY PUBLIC in and for the
State      of      __ILLINOIS___,
residing at
__Chicago, IL_____

My appointment expires:
__10-22-91__

" OFFICIAL SEAL "
LILLIAN H. GUNNAR
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/22/91

R. E. DIRECTOR

LEGAL

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

MINNTERTAINMENT COMPANY,
a Minnesota general partnership

By:  SI-MINN DEVELOPERS LIMITED
     PARTNERSHIP, General Partner

          By:  SI-MINN, INC.,
               General Partner

               By: _____
                      Herbert Simon

               Title: President


STATE OF INDIANA         )
                         ) SS:
COUNTY OF MARION         )

     On this 13th day of March, 1991, before me personally appeared Herbert Simon, to me known to be the __ President of SI-MINN, INC., an Indiana corporation, as general partner of SI-MINN DEVELOPERS LIMITED PARTNERSHIP, an Indiana limited partnership, as general partner of Minntertainment Company, a Minnesota general partnership, the general partnership which executed the foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said general partnership, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

     In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year first above written.

Dated: ___3/13/91___

          JUDY STATOM, Notary Public
          County of Residence: Marion
          Expiration Date: 10-15-92

_____
NOTARY PUBLIC in and for the
State of _____,
residing at
_____

My appointment expires:

_____


This instrument was prepared by:  Michael J. Gabovitch, attorney-at-law, One American Square, Box 82008, Indianapolis, Indiana 46282.

Exhibit "A"

All that part of LOT 1, BLOCK 1, MALL OF AMERICA, according to the recorded plat thereof, recorded on June 16, 1988, as Document No. 1937920, in the office of the Registrar of Titles, Hennepin County, Minnesota, described as follows:

Commencing at the most easterly corner in the northerly line of said LOT 1; thence S89°57'08"W (Basis of Bearings-Hennepin County Coordinate System), along the northerly line of said LOT 1 for 949.59 feet to an angle point in said northerly line; thence S39°14'14"E, for 593.30 feet; thence N45°00'00"E for 74.25 feet to the POINT OF BEGINNING.

Thence S45°00'00"E for 95.46 feet;
Thence N90°00'00"E for 109.38 feet:
Thence Northeasterly 41.89 feet along the arc of a curve, concave to the southeast, to a point tangent, said arc having a radius of 118.50 feet, and a central angle of 20°15'16" and being subtended by a chord that bears S34°52'22"W 41.67 feet;
Thence N45°00'00"E for 86.53 feet to a point of curve to the left;
Thence Northerly 156.29 feet along the arc of said curve to a point tangent, said arc having a radius of 99.50 feet, and a central angle of 90°00'00" and being subtended by a chord that bears S00°00'00"W 140.71 feet;
Thence N45°00'00"W for 70.43 feet to a point of curve to the right;
Thence Northwesterly 74.73 feet along the arc of said curve to a point of reverse curve, said arc having a radius of 118.50 feet, and a central angle of 36°08'03" and being subtended by a chord that bears S26°55'58"E 73.50 feet;
Thence Northwesterly 119.98 feet along the arc of said reverse curve to a point tangent, said arc having a radius of 54.50 feet, and a central angle of 126°08'03" and being subtended by a chord that bears S71°55'58"E 97.18 feet;
Thence S45°00'00"W for 238.08 feet to a point of curve to the right;
Thence Southwesterly 46.26 along the arc of said curve, said arc having a radius of 118.50 feet, and a central angle of 22°21'58" and being subtended by a chord that bears S56°10'59"W 45.96 feet;
Thence S45°00'00"E for 169.88 feet to the POINT OF BEGINNING.

EXHIBIT "B"

Lot 1, Block 1, Mall of America, according to the plat thereof
recorded on June 16, 1988 as Document No. 1937920 in the
office of the Registrar of Titles, Hennepin County, Minnesota.