WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

------------------------------------------------------------ x

## NOTICE OF HEARING ON
## DEBTORS' MOTION FOR AUTHORITY TO ASSUME
## UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Authority to Assume Unexpired Leases of Nonresidential Real Property*, dated April 26, 2019 (ECF No. 3376) and the annexed supplement hereto (collectively, the "**Motion**"), of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**), for entry of an order (i) authorizing the assumption and assignment of unexpired nonresidential leases, and (ii) granting related relief, all as more fully set forth in the Motion, will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on **May 21, 2019 at 10:00 a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

Dated: May 17, 2019
      New York, New York

                    */s/* Jacqueline Marcus
                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York  10153
                    Telephone:  (212) 310-8000
                    Facsimile:  (212) 310-8007
                    Ray C. Schrock, P.C.
                    Jacqueline Marcus
                    Garrett A. Fail
                    Sunny Singh

                    *Attorneys for Debtors*
                    *and Debtors in Possession*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                 :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[2] | : | **(Jointly Administered)** |
| | : | |

----------------------------------------------------------------x

## SUPPLEMENT TO DEBTORS' MOTION FOR AUTHORITY
## TO ASSUME UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), supplement the *Debtors' Motion for Authority to Assume Unexpired Leases of Nonresidential Real Property*, dated April 26, 2019 (ECF No. 3376) (the "**Initial Motion**" and, this supplement, the "**Supplement**"), for authorization to assume and assign three unexpired nonresidential real property leases for property located in Riverside, California as follows:[3]

### Introduction

1.    The Debtors filed the Initial Motion on April 26, 2019, seeking authorization, pursuant to section 365 of the Bankruptcy Code, to assume the following unexpired nonresidential real property leases: (i) the Lease; (ii) the Ground Lease; and (iii) the Sublease (collectively, the "**Riverside Leases**").

2.    In the Initial Motion, the Debtors stated their intent to assign the Riverside Leases to a third party for consideration prior to the date of confirmation of their chapter 11 plan. At that time, the Debtors did not have a committed party that was willing to take an assignment of the Riverside Leases.

3.    On May 3, 2019, the Debtors and Brixton Capital AL, LLC, a Delaware limited liability company ("**Brixton**"), entered into a lease sale agreement, pursuant to which the Debtors agreed to assign the Riverside Leases to Brixton in exchange for payment of one million dollars ($1,000,000) ("**Brixton Initial Offer**").

---

[3] Capitalized terms that are used but not otherwise defined here have the meanings ascribed to them in the Motion. Interested parties should refer to the Motion for background information regarding these chapter 11 cases and the Debtors' business, as well as additional information concerning the Riverside Leases.

4.    On the same day, the Landlord filed the *Objection of 7200 Arlington Associates LLC to the Debtors' Motion for Authority to Assume Unexpired Leases of Nonresidential Real Property* (ECF No. 3595) (the "**Objection**").

5.    To allow time to resolve the Objection and prevent the Riverside Leases from being deemed rejected under section 365(d)(4) of the Bankruptcy Code, on May 8, 2019, the Debtors and the Landlord entered into the *Stipulation, Agreement, and Order Between Debtors and Landlord Extending Time to Assume or Reject Nonresidential Real Property Lease* (ECF No. 3735) (the "**365(d)(4) Stipulation**"), which was so ordered by the Bankruptcy Court on May 13, 2019 (ECF No. 3816).  The 365(d)(4) Stipulation extended the deadline by which the Debtors could assume the Riverside Leases through and including the earlier of May 31, 2019 and the date of the entry of an order confirming a chapter 11 plan for the Debtors.

6.    When the Landlord was made aware of the Brixton Initial Offer, it offered to pay the Debtors $1.1 million for the Riverside Leases.  Subsequently, the Landlord and Brixton consensually agreed to participate in an auction for the Riverside Leases to be conducted by the Debtors on May 16, 2019 (the "**Riverside Auction**").  Being that the Brixton Initial Offer was instrumental in re-engaging the Landlord's interest, the Debtors agreed that, if Brixton's bid was not the winning bid in the Riverside Auction, the Debtors would seek authorization to pay Brixton's attorneys' fees in the amount of thirty thousand dollars ($30,000.00) (the "**Brixton Fees**"), and Brixton, in turn, agreed to bid at least $1,130,000.00 at the Riverside Auction.

7.    On May 16, 2019, the Debtors completed the Riverside Auction, and the the Landlord submitted the higher and better bid for the Riverside Leases (the "**Landlord's Bid**").  The Landlord's Bid, was comprised of: (i) a cash purchase price in the amount of one

3

million, two hundred and sixty-five thousand dollars ($1,265,000); and (ii) waiver of any and all cure amounts owed under the Riverside Leases.

8.      The terms and conditions of the Landlord's Bid, pursuant to the Riverside Auction, have been memorialized in an assignment and assumption agreement (the "**Assignment Agreement**"), dated May 16, 2019, a copy of which is annexed hereto as **Exhibit A**.

### Relief Requested

9.      By this Supplement, the Debtors seek entry of an order approving the assumption and assignment of the Riverside Leases to the Landlord's designee pursuant to section 365 of the Bankruptcy Code.

10.     Accordingly, a revised form of proposed order granting the relief requested is annexed hereto as **Exhibit B** (the "**Revised Proposed Order**").  A redline of the Revised Proposed Order marked against the version filed with the Initial Motion is annexed hereto as **Exhibit C**.

### Assumption and Assignment of the Riverside Leases
### Is a Sound Exercise of the Debtors' Business Judgment

11.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any . . . unexpired lease of the debtor."  11 U.S.C. § 365(a).  Courts defer to a debtor's business judgment in assuming an unexpired lease.  *See, e.g.*, *COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 376 (2d Cir. 2008) (noting that a "deferential standard [is] applied to debtors' business judgments as to whether to assume or reject executory contracts"); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (stating that a debtor may assume or reject an unexpired lease under section 365(a) of the Bankruptcy Code in the exercise of its "business judgment").  A debtor's decision to assume or reject an unexpired lease or executory contract is a

4

proper exercise of its business judgment if it is "rational" and does not "demonstrate bad faith or whim or caprice." *In re Old Carco LLC*, 406 B.R. 180, 196 (Bankr. S.D.N.Y. 2009).

12.    It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

13.    The assumption and assignment of the Riverside Leases from the Debtors to the Landlord's designee represents a sound exercise of the Debtors' business judgment and should be approved. The funds to be paid by the Landlord under the Assignment Agreement will be deposited into the Wind-Down Account established pursuant to the Final DIP ABL Order (ECF No. 955). Assumption and assignment to the Landlord not only generates funds for the Debtors and their estates, but will also eliminate any claims for rejection damages. Moreover, the proposed assumption and assignment doesn't require the Debtors to pay any cure costs. Even after payment of the Brixton Fees, the Debtors will realize more than $1.2 million in profit, as a result of the transaction. In view of the foregoing, the assumption and assignment of the

Riverside Leases is in the best interests of the Debtors, their estates, and creditors, plainly represents an exercise of sound business judgment, and should be approved.

### The Requirements of Section 365 Are Satisfied

14.     Pursuant to section 365(b) of the Bankruptcy Code, for a debtor to assume an executory contract or unexpired lease, the debtor must cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults,  11 U.S.C. § 365(b)(1)(A), and provide adequate assurance of future performance,  11 U.S.C. § 365(b)(1)(C).  Given the Landlord's agreement to waive payment of any and all cure amounts under the Riverside Leases, as well as the requirement for the Debtors to provide adequate assurance, section 365(b) is satisfied.

### The Payment of The Brixton Fees is Justified Under Section 363

15.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may use property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1).  Courts in this district use the "business judgment test" when determining whether use of the debtors' estate property outside of the ordinary course of business should be approved.   Specifically, the "business judgment test" provides that a business decision by the Debtors will not be second-guessed when the following elements are present: (i) a business decision, (ii) disinterestedness, (iii) due care, (iv) good faith, and (v) no abuse of discretion or waste of corporate assets. *See, e.g.*, *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).  Here, the payment of the Brixton Fees is a proper exercise of the Debtors' business judgment because: (i) it was a business decision, (ii) both parties to the transaction were disinterested, (iii) due care and good faith was taken when agreeing to payment of the fee, and (iv) there was no abuse of discretion or waste of corporate assets.  All of the elements above are

6

met as evidenced by the bidding process and the increase in Brixton's bid from $1,000,000 to $1,130,000, which in itself help facilitate a more competitive bidding process. Accordingly, the payment of Brixton's Fees is justified.

### Notice

16.     The Debtors have served notice of the Motion and will serve this Motion Supplement in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered November 1, 2018 (ECF No. 405). Given that the terms outlined in the Initial Motion have improved as a result of recent developments and that the Creditors' Committee and its advisors have been kept apprised of such developments, the Debtors respectfully submit that no further notice is required.

17.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Revised Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated:  May 17, 2019
          New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

## Exhibit A

**Assignment Agreement**

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "*Assignment*") is made as of May 16, 2019 (the "*Effective Date*"), by and among **KMART CORPORATION**, a Michigan corporation ("*Assignor*"), 13011 Brookhurst, LLC, a Wyoming limited liability company and 6224 Vermont, LLC a Wyoming limited liability company, collectively doing business as 7200 Arlington Associates ("*Landlord*") and 7200 Arlington Partners LLC, a California limited liability company ("*Assignee*").

## RECITALS:

A.      Assignor is the tenant under that certain Lease dated October 16, 1972 ("*Original Lease*"), a memorandum of which was recorded in the Official Records for Riverside County, California on May 24, 1973, as document number 67686, and pursuant to which, 7200 Arlington Associates LLC, as successor-in-interest to George R. Smith ("*Landlord*"), leases to Assignor certain real property located in the City of Riverside, County of Riverside, State of California as described and set forth in the Lease (the "*Leased Property*"). The Original Lease was amended by that certain Agreement Regarding First Lease Amendment dated May 29, 1973 ("*First Amendment*"). The Original Lease, as amended by the First Amendment, and as it may be further amended and restated from time to time, shall hereinafter be referred to as the lease ("*Lease*"). A copy of the Lease is attached hereto as **Exhibit A** and made a part hereof.

B.      Assignor is also the landlord under that certain ground lease by and between Assignor and Great American Chicken Corp., Inc., a California corporation, as successor-in-interest to KFC National Management Company, a Delaware corporation, dated May 29, 1986, as amended by that certain First Amendment to Ground Lease dated September 4, 1987, and by that certain Second Amendment to Ground Lease dated May 22, 2018, and as it may be further amended and restated from time to time (collectively, the "*KFC Ground Lease*") for the premises located at 6221 Van Buren Blvd, Riverside, California, and as more particularly described in the KFC Ground Lease (the "*Ground Leased Property*"). A copy of the KFC Ground Lease is attached hereto as **Exhibit B**.

C.      Assignor is also the sublandlord under that certain sublease by and between Assignor and Riverside Complete Automotive Repair, Inc., a California corporation, as successor-in-interest to KFC National Management Company, a Delaware corporation dated September 21, 2010 (the "*Riverside Automotive Sublease*", and together with the Lease and KFC Ground Lease, individually and collectively, the "*Assigned Leases*") for the premises located at 6221 Van Buren Blvd, Riverside, California, and as more particularly described in the Riverside Automotive Sublease (the "*Riverside Automotive Subleased Property*"). A copy of the Riverside Automotive Sublease is attached hereto as **Exhibit C**. The Leased Property, the Ground Leased Property, and the Riverside Automotive Subleased Property, together with all improvements located thereon and all easements, parking and loading rights, rights of ingress and egress, and appurtenances appertaining thereto, is hereinafter referred to collectively as the property ("*Property*").

D.      Assignor desires to assign all of its right, title and interest under the Assigned Leases to Assignee, and Assignee desires to assume and perform Assignor's obligations under the Assigned Leases after the Assignment Effective Date (as defined below), subject to the terms and conditions set forth below.

E.      Subject to the results of the Auction (as defined herein), Assignor, Assignee and Landlord will enter into that certain Stipulation, Agreement and Order to Assume and Assign Unexpired Nonresidential Property Lease for the premises known as 7200 Arlington Ave, Riverside, CA 92503, and 6221 Van Buren Blvd, Riverside, California, (the "*Stipulation*").

F.      Assignee is acquiring the Assigned Leases on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Auction**: Assignee shall participate in an auction for the Property on May 16, 2019 (the "*Auction*"). Notwithstanding anything to the contrary set forth herein, if the Assignee is not the winning bidder at the Auction, this Assignment shall automatically terminate and Assignee shall be refunded its Earnest Money Deposit.

2.      **Assignment and Assumption**.    Effective as of the date the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") so-orders the Stipulation (the "*Assignment Effective Date*"), Assignor hereby assigns, transfers, conveys, and delivers to Assignee all of Assignor's estate, rights, title and interests as tenant of the leasehold estate described under the Assigned Leases, and Assignee hereby accepts the assignment, transfer, conveyance, and delivery of Assignor's estate, rights, title and interest in, to and under such leasehold estates and assumes all duties and obligations to be performed by the Assignor and all liabilities of the Assignor arising out of or accruing with respect to the Assigned Leases.

3.      **Payment of Purchase Price**.    Assignee shall, within five (5) business days of the Assignment Effective Date (the "*Closing Date*"), deliver the purchase price for the Assigned Leases in the amount as determined at the Auction (the "*Purchase Price*") in immediately available funds wired to the account specified by Assignor (the "*Closing*"), less any amount deposited by Assignee as per Section 4 below. Notwithstanding the foregoing, in no event shall the Purchase Price be less than One Million One Hundred Thousand and 00/100 Dollars ($1,100,000).

4.      **Earnest Money Deposit.**    On the Effective Date, Assignee shall deposit with Chicago Title Insurance Company, 10 South LaSalle Street, Suite 3100, Chicago, Illinois 60603 Attention: Cheri L. Sutton, Telephone: (312) 223-2958, Fax: (312) 223-5801, Email: Cheri.Sutton@ctt.com ("*Escrow Agent*") the sum of One Hundred Ten Thousand and No/100 Dollars ($110,000.00) United States currency (the "*Earnest Money Deposit*") by means of a certified check, cashier's check or wire transfer, to be held by the Escrow Agent in an interest bearing account in accordance with the terms of the strict joint order escrow instructions executed by the Parties attached hereto as **Exhibit D** and incorporated into this Assignment by

reference (the "***Earnest Money Escrow Instructions***") and also the terms and conditions of this Assignment.  Any escrow fees as set forth in the Earnest Money Escrow Instructions will be paid by Assignee.  Assignee may elect to direct the Escrow Agent to invest the Earnest Money Deposit on its behalf in compliance with the Escrow Agent's standard investment instructions, and Assignee agrees that it shall be solely responsible for any investment fees charged by the Escrow Agent.  Subject to the terms and conditions as otherwise set forth in this Assignment, any and all interest accrued on the Earnest Money Deposit shall be paid to Assignee at Closing.  The Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Assignee agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, no later than 11:00 am (Chicago time) on the Closing Date, by wire transfer of immediately available funds.  If Assignee shall fail to deposit the Earnest Money Deposit on the Effective Date, Seller may terminate this Assignment, in which case this Assignment shall be null and void ab initio and neither party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Assignment.

5.    **As Is, Where Is**.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS ASSIGNMENT, THE PROPERTY IS BEING ASSIGNED TO ASSIGNEE, AND ASSIGNEE AGREES TO ACCEPT THE PROPERTY, IN "AS-IS," "WHERE-IS" AND "WITH ALL FAULTS" CONDITION ON THE ASSIGNMENT EFFECTIVE DATE. ASSIGNOR HAS NOT MADE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO ASSIGNEE, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER WHATSOEVER, EXCEPT AS EXPRESSLY SET FORTH HEREIN.

6.    **Brokerage Indemnities**.  Assignor and Assignee acknowledge that Retail Insites (the "***Broker***") has been retained by Assignor in connection with the Property and the Assigned Leases, and Assignor hereby agrees that Assignor shall pay to the Broker the total brokerage commission due and payable to the Broker.  Except as described in the preceding sentence, Assignor and Assignee hereby represent and warrant, each to the other, that they have not dealt with, any broker, finder or any other person, firm, corporation or other legal entity so as to create any legal right or claim of whatsoever kind or nature for a commission or similar fee or compensation with respect to the Property or this Assignment.  Assignor and Assignee hereby indemnify each other against, and agree to defend and hold each other harmless from, any liability or claim (and all expenses, including attorneys' fees, incurred in defending any such claim or in enforcing this indemnity) for a real estate brokerage commission or similar fee or compensation arising out of or in any way connected with any claimed dealings with the indemnitor and relating to this Assignment.  The provisions of this Section shall survive the expiration or sooner termination of the Assigned Leases.

7.    **No Modifications**.  Except as expressly set forth in this Assignment, to Assignor's knowledge, the Riverside Automotive Sublease and KFC Ground Lease are not modified, and remain in full force and effect, in accordance with their terms.

8.    **Authority**.  Subject to the Bankruptcy Court's approval of the Stipulation, each party represents and warrants to the other that it has full power and lawful authority to enter into

and perform its obligations under this Assignment, that the person or persons signing on its behalf has been duly authorized to do so, and that the execution, delivery and performance by such party will not be in violation of any material agreement or restriction by which such party is bound or affected.

9. **Conflict** The assumption and assignment of the Assigned Leases (including Assignor's rights, title, interests and obligations thereunder), made hereunder are made in accordance with and subject to the Stipulation, which is incorporated herein by reference. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Stipulation, the terms and conditions of the Stipulation shall govern, supersede, and prevail. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants, and obligations of the parties contained in the Stipulation or the survival thereof.

10. **Further Assurances**. Each of the parties, without additional consideration, shall execute and deliver all such further documents and do such other things as the other party may reasonably request to give full effect to this Assignment, including, without limitation, any other form of assignment agreement required in order to record this Assignment in the appropriate public records of the county in which the Property is located.

11. **Counterparts**. This Assignment may be executed in any number of counterparts. All counterparts so executed shall constitute one contract, binding on all parties, even though all parties are not signatory to the same counterpart.

12. **Release of Assignor**. For valuable consideration, and the mutual covenants and agreements contained herein, Landlord and Assignee do hereby fully, forever and irrevocably release, discharge and acquit Assignor, and its respective past and present affiliates, and the respective past and present officers, directors, shareholders, agents, and employees of each and all of the foregoing entities, and its and their respective successors, heirs, and assigns, and any other person or entity now, previously, or hereafter affiliated with any or all of the foregoing entities, of and from any and all rights, claims, demands, obligations liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, debts, sums of money, accounts, compensations, contracts, controversies, promises, damages, costs, losses and expenses of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether heretofore or now existing, or that could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, claimed or unclaimed, whether based on contract, tort, breach of any duty, or other legal or equitable theory of recovery, each as though fully set forth herein at length, arising out of the Assigned Leases. Notwithstanding the above, Assignee does not waive or release Assignor from any indemnification obligations arising from third party claims asserted with respect to or arising from Assignor's use and occupancy of the Leased Property prior to the Effective Date for which Assignor had a duty to indemnify Assignee pursuant to the Assigned Leases, and which expressly survive the Effective Date (but only to the extent that such claims are covered by Assignor's insurance policies, if any, and on the condition that Assignee only seeks recovery from the insurer and only up to the insured amount).

13.    **Release of Assignee**. For valuable consideration, and the mutual covenants and agreements contained herein, Assignor does hereby fully, forever and irrevocably release, discharge and acquit Assignee and Landlord, and their respective past and present affiliates, and the respective past and present officers, directors, shareholders, agents, and employees of each and all of the foregoing entities, and its and their respective successors, heirs, and assigns, and any other person or entity now, previously, or hereafter affiliated with any or all of the foregoing entities, of and from any and all rights, claims, demands, obligations liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, debts, sums of money, accounts, compensations, contracts, controversies, promises, damages, costs, losses and expenses of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether heretofore or now existing, or that could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, claimed or unclaimed, whether based on contract, tort, breach of any duty, or other legal or equitable theory of recovery, each as though fully set forth herein at length, arising out of the Assigned Leases.

14.    As further consideration for these releases, the parties hereto, for themselves and their successors and assigns, hereby agree, represent and warrant that the matters released herein are not limited to matters that are known or disclosed, and the parties hereby waive any and all rights and benefits that they now have, or in the future may have, conferred upon it by virtue of the provisions of Section 1542 of the Civil Code of the State of California (or any other statute or common law principles of similar effect), which Section provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

In this connection, the parties hereby agree, represent and warrant that they realize and acknowledge that factual matters now unknown to them may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses, and expenses that are presently unknown, unanticipated, and unsuspected, and the parties further agree, represent and warrant that these releases have been negotiated and agreed upon in light of that realization and that, except as expressly limited above, it nevertheless hereby intends to release, discharge, and acquit the released parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses, and expenses.

[signatures to follow]

Sincerely,

**KMART CORPORATION,**
a Michigan corporation

By: _____
    Name: Jane S. Borden
    Title: President – Real Estate

**[Signature Page to Side Letter]**

EXECUTED as of the date first above written.

**ASSIGNOR:**

**KMART CORPORATION**,
a Michigan corporation

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

**7200 Arlington Partners LLC**
a California limited liability company

By: _____
Name:  Arturo Sneider
Title:   Manager

**<u>LANDLORD</u>**:

**13011 Brookhurst, LLC**
a Wyoming limited liability company

By: _____
Name:  Arturo Sneider
Title:   Manager

**6224 Vermont, LLC**
a Wyoming limited liability company

By: _____
Name:  Arturo Sneider
Title:   Manager

# **EXHIBIT A**

## **LEASE**

**Parties**

THIS LEASE made and entered into as of this 16TH day of OCTOBER , 19 7?
between GEORGE R. SMITH

a MARRIED MAN ~~corporation~~ having its principal office at 435 NORTH OAKHURST
DRIVE, BEVERLY HILLS, CALIFORNIA 90210
(herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having
its principal office at ~~2727 Second Avenue, Detroit, Michigan 48232~~ (herein referred to as "Tenant"),
3100 WEST BIG BEAVER ROAD, TROY, MICHIGAN 48084
WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth,
Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised
Premises**

1. Landlord does demise unto Tenant and Tenant does take from Landlord for the term here-
inafter provided, and any extension thereof, the following property: Tenant's completed building
~~or buildings~~ (designated K mart ~~and K mart Food~~), together with site improvements to be con-
structed, as hereinafter specified, by Landlord at its expense on the land comprising not less than
TEN AND 41/100TH ( 10.41 ) acres described in Exhibit "A", attached hereto and made a part
hereof, situated in the CITY of RIVERSIDE , County of RIVERSIDE , State
of CALIFORNIA , said building or buildings to be in the locations depicted on Exhibit "B",
attached hereto and made a part hereof, and of the following dimensions:

K MART DEPARTMENT STORE 450' x 210' = 94,500 SQ. FT.

TOTAL                = 94,500 SQ. FT.

PLUS OUTDOOR GARDEN SHOP 65' x 93'6"

Said completed buildings and site improvements, together with the licenses, rights, privileges and
easements set forth in Article 9 hereof, shall be hereinafter collectively referred to as the "demised
premises".

**Term**

2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that
term is defined in Article 10 hereof, and shall terminate upon such date as shall be TWENTY-FIVE
( 25 ) years from the last day of the month in which said date of occupancy by Tenant shall occur;
provided, however, the term of this lease may be extended as provided in Article 12 hereof. The phrase
"lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant
to said Article 12.

**Annual
Minimum
Rental**

3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall desig-
nate in writing from time to time, an annual minimum rental of TWO HUNDRED TWENTY-THREE
THOUSAND SEVEN HUNDRED-------------------------- DOLLARS ($ 223,700.00 ),
unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of
each month, in advance, commencing upon the first day of the lease term; provided, however, in the
event the first day of the lease term shall not be the first day of a calendar month, then the rental for
such month shall be prorated upon a daily basis.

3/13/67

**Additional Rental**

4. In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which its "gross sales", as hereinafter defined, shall exceed the sum of EIGHT MILLION SEVEN HUNDRED FIFTY THOUSAND----------------------------------- DOLLARS ($ 8,750,000.00    ) Tenant shall pay to Landlord as additional rental an amount which shall be:    ONE    per cent (1  %) of gross sales exceeding EIGHT MILLION SEVEN HUNDRED FIFTY THOUSAND ----------------------------------------------------- DOLLARS ($ 8,750,000.00    ), UP TO BUT NOT IN EXCESS OF THIRTEEN MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($13,250,000.00); AND TENANT SHALL PAY TO LAND-LORD AS ADDITIONAL RENTAL AN AMOUNT EQUAL TO FIVE-TENTHS OF ONE PERCENT (.5%) OF GROSS SALES FOR SUCH LEASE YEAR EXCEEDING THIRTEEN MILLION TWO HUNDRED FIFTY ~~The foregoing dollar amount or amounts shall hereinafter be referred to as the "minimum basis of sales".~~ THOUSAND DOLLARS ($13,250,000.00) UP TO BUT NOT IN EXCESS OF SEVENTEEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($17,500,000.00).

Said additional rental shall be paid on or before the twenty-first (21st) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall, on or before the twenty-first (21st) day following the end of each lease year or "lesser period", deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then said minimum basis of sales shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 11 shall have been fulfilled, or an opening for business under Article 10 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A", except that the following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise tax, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided, further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

8/24/65

**Additional
Rental
(cont'd)**

(c)  Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d)  Service and interest charges for time payment accounts and charge accounts;

~~(e)  All sales of merchandise or services made by any supermarket grocery store, which shall~~ occupy any portion or portions of demised ~~premises, provided~~ that the aggregate area of said portion or ~~portions shall not~~ exceed ~~(          ) square feet of floor area.~~

(E)  (F)  All sales of automotive gasoline or diesel fuel.

**New Build-
ing by
Landlord**

5.  Tenant's said buildings and site improvements shall be completed and delivered to Tenant promptly and with due diligence, giving consideration to scarcity of materials, strikes, lockouts, fire or other casualty, governmental restrictions and regulations, and construction delays; and Landlord warrants that a general contract for construction of said buildings and improvements referred to in Article 11 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than   JANUARY 1, 1973   . If for any reason whatever Landlord shall fail to comply fully with this warranty, Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with Tenant's typical plans and specifications and possession thereof tendered to Tenant prior to   SEPTEMBER 1, 1973   , then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

**Plans and
Speci-
cations**

6.  Tenant's said buildings and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with working plans and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store plans and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No.  1975.

CONTAINING SUCH ADDITIONS, CHANGES, AND MODIFICATIONS AS ARE MORE PARTICULAR-LY SET FORTH IN THAT CERTAIN LETTER DATED FEBRUARY 22, 1972 WRITTEN BY MR. JAMES A. KILGORE, MANAGER, DESIGN DIVISION, CONSTRUCTION DEPARTMENT, TO MR. GEORGE R. SMITH, 435 NORTH OAKHURST DRIVE, BEVERLY HILLS, CALIFORNIA 90210, COPY OF WHICH IS ATTACHED HERETO AND MARKED AS EXHIBIT "C".

Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

(a)  Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on a store layout drawing which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b)  Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

7/22/71

**Plans and Specifications (cont'd)**

Said working plans and specifications shall be submitted to Tenant for approval prior to commencement of construction and such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working plans and specifications Tenant shall, in writing, inform Landlord of required revisions or corrections thereto, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working plans and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical plans and specifications, store layout drawing and working plans and specifications, as approved by Tenant, shall constitute a part of this lease.

**Guarantee of Materials**

7. Landlord shall unconditionally guarantee all work performed by Landlord, or at its expense, in the construction of Tenant's buildings and site improvements against defective workmanship and materials either for the period of one (1) year from the date of completion thereof or for the period of any guarantee therefor given Landlord, whichever period shall be the longer.

**Advance Possession for Fixturing**

8. For a period of four (4) weeks prior to completion of Tenant's buildings by Landlord, Tenant shall have the privilege, rent free, of entering said buildings for installing storage bins, storing merchandise, and other purposes not creating unreasonable interference with the work of Landlord. Such entry shall not be construed as an acceptance thereof by Tenant under the provisions of this lease, or as a waiver of any of the provisions hereof.

**Parking and Other Common Areas**

9. Prior to the date of commencement of the lease term, Landlord shall construct (as hereinafter provided) the sidewalks, service drives, parking aisles, driveways, streets and parking areas (all of which shall be hereinafter sometimes referred to as the "common facilities") substantially as shown on Exhibit "B". The aggregate area provided for the parking of automobiles shall, during the lease term, be ~~either in the ratio of~~_____(___)~~square feet of parking area for each~~ ~~square foot of gross floor area contained in buildings at any time located on site depicted on Exhibit~~ ~~"B" or~~ sufficient to accommodate not less than EIGHT HUNDRED FIFTY --- ( 850 ) automobiles on basis of arrangement depicted on Tenant's typical plans, whichever shall be the greater. All sidewalks shall be of concrete construction, and all service drives, parking aisles, driveways, streets and parking areas shall be graded, levelled and paved with concrete or asphalt, and properly marked with painted lines to be repainted annually, for the orderly distribution of automobiles. Landlord covenants, represents and warrants that, during the lease term, there shall be adequate sidewalks, driveways and roadways for automotive and pedestrian ingress and egress to and from Tenant's buildings and adjacent public streets and highways. Landlord shall make no charge of any kind or nature for the use of said common facilities or any additions thereto. All of said common facilities, including any signs owned by Landlord, shall be constructed in a workmanlike manner and shall, during the lease term, be maintained by Landlord, at its sole cost and expense, in good order and repair and in an adequate, sightly and serviceable condition. Said maintenance shall include, without limitation, keeping the same reasonably free and clear of foreign objects, papers, debris, obstructions, standing water, snow and ice, and supplying illumination during Tenant's business hours, and a reasonable period prior and subsequent thereto, to a minimum of one and one-half (1½) foot candles measured at ground level, for each square foot of common facilities. To assure the foregoing the Landlord shall cause the common facilities to be thoroughly cleaned not less than once weekly, and more often if necessary, and snow to be promptly removed on every occasion where it impedes the use of said facilities.

During the lease term, Landlord shall maintain paved driveways at the rear of Tenant's buildings in order to provide convenient ingress and egress from the delivery or service entrances to adjacent public streets and highways for the purpose of receiving and delivering merchandise and otherwise servicing said buildings. Said driveways shall be of sufficient width so as to permit the passage, unloading and, if necessary, the turning around of trailer trucks and other commercial vehicles.

The term "common areas", as used in this lease, shall include the following: (a) said common facilities indicated on Exhibit "B" and those which shall at any time and from time to time be contained within the site depicted on Exhibit "B" or any future enlargement thereof, (b) areas within the said site which shall be open to the public generally, such as rest rooms and other facilities, if any, and (c) all other areas (except those areas which shall be occupied from time to time by building structures) included within the confines of the land described in Exhibit "A" or any enlargement of said site. Landlord will maintain said "common areas" and the property, if any, between the demised premises and any street or roadway serving demised premises in a reasonably clean and sightly condition and will mow and weed not less than once weekly when necessary.

During the lease term, Landlord shall keep Tenant insured against all statutory and common law liabilities for damages on account of injuries to property or person, including death, sustained by any person or persons while within said common areas, in a policy or policies in the amount of Two Hundred Fifty Thousand Dollars ($250,000) with respect to injury to any one person and in the amount of One Million Dollars ($1,000,000) with respect to any one accident or disaster, and in the amount of One Hundred Thousand Dollars ($100,000) with respect to damage to property; and Landlord shall also indemnify and save Tenant harmless against any such liability. Any such policies shall bear endorse-

4

9/12/69

**Parking and Other Common Areas (cont'd)**

ments to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

Landlord hereby gives and grants unto Tenant, including Tenant's agents, employees, customers, licensees and invitees the full licenses, rights, privileges and easements to use said common areas, in common with Landlord and other tenants, if any, of the land described in said Exhibit "A", and their respective agents, employees, customers, licensees and invitees. No persons other than those described in the preceding sentence of this paragraph shall be permitted to park upon or exercise any other rights over any of the parking areas of said site. In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now, or at any future time located beyond the limits of the land described in Exhibit "A", utilize said parking areas for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, ~~including the erection of fences or other barricades.~~

~~Tenant may, at its election, from time to time, utilize portions of the common areas for carnival~~ or circus type shows and entertainment, outdoor shows, home shows, automobile shows or such other uses which in Tenant's judgment tend to attract the public. Tenant shall give Landlord notification of such intended use a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against injuries to property or person, including death, sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included ~~as part of "gross sales" under Article 4 hereof.~~

**Store Opening**

10. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's buildings and site improvements shall be completed in accordance with said working plans and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 11 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 10, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working plans and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct or remedy in all or part, any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

**Landlord's Representations and Warranties**

11. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common facilities in accordance with the provisions of Article 9 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B".

LANDLORD SHALL USE ITS BEST EFFORTS TO COMPLETE AND HAVE OPEN CONCURRENTLY WITH TENANT'S BUILDING A SUPERMARKET SUBSTANTIALLY IN ACCORDANCE WITH THE SITE PLAN DEPICTED ON SAID EXHIBIT "B". IN THE EVENT SAID SUPERMARKET IS NOT COMPLETED AT THE TIME OF THE K MART OPENING LANDLORD SHALL, AT HIS SOLE COST AND EXPENSE, PAVE, STRIPE AND LIGHT THE AREA RESERVED FOR THE SUPERMARKET AND SAID AREA WILL BE USED AS COMMON AREA PARKING UNTIL THE BUILDING IS CONSTRUCTED.

LANDLORD COVENANTS AND WARRANTS THAT AT NO TIME DURING THE TERM OR ANY EXTENSION THEREOF, WILL ANY BUILDING OF MORE THAN ONE (1) STORY BE BUILT IN ANY OF THE BUILDING AREAS AS DEPICTED ON EXHIBIT "B", EXCEPT TENANT'S BUILDING. LANDLORD FURTHER COVENANTS AND WARRANTS THAT NO LANDLORD BUILDING WILL BE USED FOR ANY PURPOSE WHICH MAY CREATE A GREATER BURDEN ON THE PARKING LOT THAN DOES THE USE OF SUCH BUILDING AS A SUPERMARKET.

9/1/71

**Landlord's Representations and Warranties (cont'd)**

Notwithstanding the provisions of Article 10 or any other provision of this lease, the lease term shall not commence and said annual minimum rental, and other charges payable under this lease, shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided further, in lieu thereof, Tenant shall pay monthly in arrears one per cent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental as set forth in Articles 3 and 4 hereof.

In the event Landlord's said representations and warranties shall not be fulfilled within twelve (12) months after such date as Tenant shall open for business, Tenant may notify Landlord in writing thereof and Landlord shall have ninety (90) days within which to fulfill said representations and warranties. If said representations and warranties shall not have been fulfilled within said ninety (90) day period, Tenant thereafter shall have the option of terminating this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Option to Extend Lease**

12. —(a)  Tenant shall have the option to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to expiration of the term hereof.

(b)  If Tenant shall have exercised the foregoing option, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such extended term.

(c)  If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such further extended term.

(d)  If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such further extended term.

(e)  If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such further extended term.

(f)  Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease, or any extension thereof.  (SEE ATTACHED RIDER FOR ARTICLE 12)

**First Refusal to Purchase Option**

13. Anything in this lease contained to the contrary notwithstanding, and without in any manner affecting or limiting any of the rights, privileges, options or estates granted to Tenant under this lease, it is agreed that if the Landlord, at any time during the term of this lease or any extension thereof, receives one or more bona fide offers from third parties to purchase the demised premises, or property of which the demised premises are a part, and if any such offer is acceptable to the Landlord, then Landlord agrees to notify Tenant in writing, giving the name and address of the offeror, and the price, terms and conditions of such offer, and Tenant shall have thirty (30) days from and after the receipt of such notice from Landlord in which to elect to purchase the property for the consideration and on the terms and conditions contained in the bona fide offer. If Tenant does not elect to purchase said property and Landlord sells the property, the purchaser shall take the property, subject to and burdened with all the terms, provisions and conditions of this lease, including this Article 13, and the rights of the Tenant under this lease as against the new owner shall not be lessened or diminished by reason of the change of ownership. Tenant's failure at any time to exercise its option under this Article 13 shall not affect this lease or the continuance of Tenant's rights and options under this Article 13 or any other article.

EXCEPTING THE FIRST LEASE YEAR

4/2/70

**Repairs**

14. Tenant shall make and pay for all replacement of plate glass and all nonstructural repairs and replacements to the interior of Tenant's buildings which it deems necessary to keep the premises in a good state of repair, but in no event shall Tenant be obligated to make repairs and replacements which Landlord shall be required to make under any provision of this lease or which shall be necessitated by Landlord's negligence, default or failure to repair. Landlord shall make and pay for all repairs and replacements (except those which Tenant shall be specifically obligated to make under the provisions of this Article and those due to Tenant's negligence) to said buildings which shall be necessary to maintain the same in a safe, dry and tenantable condition, and in good order and repair. Notwithstanding anything to the contrary herein contained, Tenant shall not be required to make any repairs or replacements (or be liable for the cost thereof) which shall be necessitated by any damage or destruction with respect to which Landlord shall be insured or against which Landlord shall be required by the terms of this lease to insure, but Landlord shall make all such repairs or replacements.

**TWO THOUSAND DOLLARS ($2000.00)**

In the event buildings or improvements constituting demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed ~~One Thousand Dollars ($1000.00)~~ in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations and Additional Construction**

15. Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to plans and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural strength of the building will not be impaired by such work. The term, "structural changes", as used herein, shall not include moving of stud partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

**DESCRIBED IN PARCEL "A", EXHIBIT "A"**

Tenant may, at its own expense, at any time erect or construct additional buildings or structures on any portion of the "common facilities" areas as defined in Article 9 and depicted on Exhibit "B"; provided, however, gross sales made in or from said additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, Tenant shall reimburse Landlord for any real estate taxes imposed on said additions or new construction, which taxes are solely attributable thereto, and Tenant shall reimburse Landlord for any increase in insurance premiums attributable thereto. Tenant shall also be solely responsible for exterior and interior repairs thereto, except those necessitated by fire or casualty for which Landlord is obligated to insure. In the event Tenant constructs any such additions or new construction, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, nor shall the floor area thereof be utilized in any computation with respect to required ratio of building area to parking area under said Article 9, and the number of parking spaces required thereunder shall be reduced by the number of spaces covered by such additional buildings or structures.

**Utilities**

16. Tenant shall promptly pay for all public utilities rendered or furnished to Tenant's buildings during the lease term, including water, gas and electricity, provided separate meters shall be installed for Tenant. Landlord covenants, represents and warrants that, during the lease term, said buildings shall at all times be connected to electric, water and gas lines of an adequate source of supply, and to storm and sanitary sewer systems of adequate capacity.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition during the full term of this lease or any extension and at its sole expense. Sewer charges or sewer taxes, regardless of the manner billed or assessed, shall be paid by Landlord EXCEPT SEWERAGE CHARGES BASED ON WATER CONSUMPTION SHALL BE PAID BY TENANT.

**Governmental Regulations**

17. Tenant shall observe and comply with all rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said buildings, including the making of nonstructural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes including, but not limited to the erection of a fire escape or exit, installation of a sprinkler system or other fire preventive device of a structural nature, or (b) require nonstructural changes which would have been required irrespective of the nature of the tenancy, then, in either such event, the same shall be complied with by Landlord at its sole expense.

7

9/10/70

**Landlord's Covenant**

18. Landlord covenants, represents and warrants that, within the confines of the land described in Exhibit "A" now or in the future owned or controlled, directly or indirectly, by Landlord, Landlord's principal owners, stockholders, directors or officers, or their assignees or vendees, no premises (other than Tenant's buildings) shall be leased, rented, used or occupied for any purposes whatsoever without Tenant's prior written consent, which may be withheld or granted at Tenant's sole discretion and further, that in addition no premises so owned or controlled outside the confines of said area but within a four (4) mile radius thereof, shall be leased, rented, used or occupied for the operation of a variety store, department store, junior department store, cut-rate store, discount store, a store selling tires, batteries and auto accessories, a restaurant, drive-in restaurant, supermarket or a drug store. This covenant shall run with the land commencing with the date of execution of this lease and shall continue until such date as shall be the last day of the lease term or extension or renewal thereof; provided, however, this covenant shall cease and determine and be of no further force or effect in the event that either (a) subsequent to the commencement of the lease term, Tenant's buildings shall cease to be used for the operation of any store managed by Tenant for a period of six (6) consecutive months, excluding temporary interruptions of said operation because of causes beyond Tenant's control, or (b) said date of occupancy described in Article 10 hereof shall not occur prior to such date as shall be seven (7) years from the date of this lease.

**Fire**

19. From and after the date on which Tenant shall be privileged to enter upon demised premises for the purposes specified in Article 8 hereof, Landlord shall insure the buildings depicted on Exhibit "B", including Tenant's buildings, against damage or destruction by fire and other casualties insured under a standard extended coverage endorsement. Said insurance shall be in an amount equal to not less than eighty per cent (80%) of the insurable value of the permanent improvements thereof. All such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof, so endorsed, shall be promptly delivered to Tenant upon written request therefor. Irrespective of the cause thereof, Tenant shall not be liable for any loss or damage to said buildings resulting from fire, explosion or any other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding Twenty-five Thousand Dollars ($25,000.00), then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 12 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and, upon the exercise of any such option (other than the option set forth in subparagraph (f) of Article 12) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the said permanent improvements as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

ONE HUNDRED
THOUSAND
DOLLARS
($100,000.00)

During any period commencing upon the date of any such damage or destruction and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's building rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

In the event that, at any time during the lease term except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, during such period of time (including the last two (2) years of the lease term) that either (a) twenty per cent (20%) or more of the gross rentable floor area of said buildings shall be so rendered

8

2/1/71



**Fire (cont'd)**

untenantable, or (b) any of the stores of tenants specifically required to be open for business prior to Tenant's opening for business (by terms of Article 11) shall not be open for business because of such damage or destruction, then the annual minimum rental for such period of time shall be abated, whether or not Tenant's buildings shall be damaged or destroyed and during such period Tenant shall pay monthly in arrears one per cent (1%) of its gross sales.

**Eminent Domain**

20. In the event all of Tenant's buildings shall be expropriated by public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived of the physical possession thereof.

In the event that less than the whole, but more than ten per cent (10%) of Tenant's buildings shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and minimum basis of sales shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

**ENTIRE SHOPPING CENTER**

Without limiting the foregoing, in the event that more than ten per cent (10%) of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date possession of the land shall be taken by such authority, by giving notice to Landlord of such election within ninety (90) days thereafter; provided, however, said termination by Tenant shall be null and void if, within ninety (90) days following the date possession of said land shall be so taken, Landlord shall substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". Notwithstanding any other provision of this lease, in the event that more than ten per cent (10%) of the aggregate number of square feet of ground floor area in the buildings located on said site shall be expropriated by public or quasi-public authority, Tenant may terminate this lease at any time following notice of such expropriation. Any such termination shall be effective as of the date of notice to Landlord. Landlord shall immediately notify Tenant of any notice of any such proposed expropriation.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant so much of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

**Assignment and Subletting**

21. The premises hereby demised shall not be used for any unlawful purpose. Tenant may assign this lease or sublet the whole or any part of said demised premises, but if it does so without Landlord's consent, it shall remain liable and responsible under this lease.

**Signs**

22. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing, directly or indirectly,



**Signs (cont'd)**

contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

**Parcel "A",**

Tenant shall have the option to erect at its sole cost and expense upon any portion of the premises described in Exhibit "A", one or two pylon-type signs. Any such sign shall be of such height and other dimensions as Tenant shall determine and shall bear such legend or inscription advertising Tenant's store as Tenant shall determine. Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.

Landlord shall not permit any other advertising signs, billboards or posters to be displayed on any portion of the premises described in Exhibit "A" hereof, excepting flat wall signs which may be placed on stores, if any, now depicted on Exhibit "B" or in the future erected on "future building areas" as depicted thereon, providing such signs shall be utilized solely for the purpose of advertising the names of the respective tenants thereof.

Landlord shall not, without Tenant's written consent, at any time utilize the exterior of Tenant's buildings, or the space above, for sign display purposes.

**Ingress and Egress**

23. Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain for the period of this lease and any extension thereof, ingress and egress facilities to public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**

24. If the rent reserved in this lease, or any part thereof, shall remain unpaid for a period of thirty (30) days or if Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of said nonpayment or other default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

25. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**

26. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

LANDLORD HAS THE RIGHT TO ALLOW WALL SIGNS AND PYLON SIGNS FOR THE OTHER TENANTS AS SHOWN ON EXHIBIT "B", PROVIDED, SUCH SIGNS SHALL BE UTILIZED SOLELY FOR THE PURPOSE OF ADVERTISING THE NAME OF THE RESPECTIVE TENANTS HERETO, AND THAT SUCH SIGNS SHALL NOT BE LOCATED ON THE PROPERTY DESCRIBED IN EXHIBIT "A", PARCEL "A".

10

12/31/69

**Covenant
of Title
(cont'd.)**

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple in the land described in Exhibit "A" free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof) with exceptions as follows:    NONE

A COPY OF AN
ATA TYPE POL-
ICY OF TITLE
INSURANCE
SHOWING

Landlord shall, without expense to Tenant, and within thirty (30) days after written request by Tenant, furnish (a) ~~a certification by an attorney acceptable to Tenant that~~ Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A", (b) a survey by licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage
Sub-
ordination**

27. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant
Indemnifies
Landlord**

28. During the lease term, Tenant and its assignees and sublessees shall indemnify and save Landlord harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of its buildings, except those which shall result, in whole or in part, and directly or indirectly, from the default or negligence of Landlord.

**Tenant's
Right to
Cure
Landlord's
Defaults**

29. In the event Landlord shall neglect to pay when due any taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, (two (2) days with respect to defaults under Article 9 hereof) pay said taxes, assessments, principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of six per cent (6%) per annum, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall, (with respect to taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate) in the event it shall notify Landlord to correct any default, give a similar notice to such holder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition
of
Premises at
Termina-
tion**

30. At the expiration or earlier termination of the lease term, Tenant shall surrender demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty or occurrence excepted. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time

5/24/65

**Condition of Premises at Termination (cont'd.)**

to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option, the property specified in said notice shall be the property of Landlord.

**Holding Over**

31. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of demised premises after the expiration of the lease term, it shall so remain as a tenant from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

**Notices**

**TROY**

32. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in ~~Detroit~~, Michigan, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be date on which such notice is deposited in a post office of the United States Post Office Department.

**Captions and Definitions**

33. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provisions thereof. The necessary grammatical changes which shall be required to make the provisions of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**

34. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memorandum of Lease**

35. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.   (SEE ARTICLE 36 AND 37 ATTACHED)

IN WITNESS WHEREOF, the parties hereto have executed these presents in duplicate and affixed their seals hereto as of the day and year first above written.

WITNESSES:

_ReVay Ballinger_
RE VAY BILLINGS

By:_George R. Smith_
GEORGE  R. SMITH  ~~President~~

_E. Jett, Jr._
E. JETT, JR.

Attest:_____

Secretary

APPR'D.

S. S. KRESGE COMPANY

By:_Roger E. Davis_
Roger E. Davis        Vice President

_D. P. Marinello_

Attest:_C. F. Stimpson_
C. F. Stimpson    Assistant Secretary

12

5/24/65

## ACKNOWLEDGMENTS

STATE OF _____ }
COUNTY OF _____ } SS:

(Individual)

STATE OF CALIFORNIA }
COUNTY OF **Los Angeles** } SS.

On __October 16, 1972__ before me, the undersigned, a Notary Public in and for said State, personally appeared __George R. Smith__

_____

_____, known to me to be the person _____ whose name **is** subscribed to the within instrument and acknowledged that **he** executed the same.

WITNESS my hand and official seal.

Signature _Ora ReVay Billings_

Name (Typed or Printed) _____

OFFICIAL SEAL
ORA REVAY BILLINGS
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Commission Expires Apr. 7, 1974

(This area for official notarial seal)

STATE OF MICHIGAN }
COUNTY OF WAYNE } SS:

I do hereby certify that on this **27th** day of **November**, **1972**, before me, **Beatrice L. McGaw**, a Notary Public in and for the County and State aforesaid, residing therein and duly commissioned, personally appeared **ROGER E. DAVIS** and **C. F. STIMPSON**, known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by me duly sworn, did depose and say that they reside in **Birmingham, Michigan** and **Berkley, Michigan** respectively; that they are the Vice President and Assistant Secretary respectively of S. S. Kresge Company, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires: __November 22, 1975__   _Beatrice L. McGaw_

Notary Public
Acting in the County of Oakland

BEATRICE L. McGAW
Notary Public, Wayne County, Mich.
My Commission Expires Nov. 22, 1975

REAL ESTATE
TAXES:

36. TENANT SHALL PAY AND DISCHARGE ALL AD VALOREM REAL ESTATE TAXES AND ASSESSMENTS WHICH SHALL BE LEVIED AGAINST THE TAXABLE PREMISES DURING THE LEASE TERM, EXCLUDING THEREFROM PAYMENT OF ASSESSMENTS WHICH ARE INCURRED OR LEVIED AS A RESULT OF LANDLORD'S ACTIVITY IN DEVELOPING THE DEMISED PREMISES FOR TENANT'S OCCUPANCY.

TO THE EXTENT PERMITTED BY LAW, TENANT MAY PAY ANY SUCH ASSESSMENTS IN ANNUAL INSTALLMENTS. IN THE EVENT ANY SUCH ASSESSMENT SHALL BE PAYABLE IN A LUMP SUM OR ON AN INSTALLMENT BASIS, TENANT SHALL HAVE THE SOLE RIGHT TO ELECT THE BASIS OF PAYMENT. IF TENANT SHALL ELECT TO PAY SUCH ASSESSMENT ON THE INSTALLMENT BASIS, THEN TENANT SHALL PAY ONLY THOSE INSTALLMENTS WHICH SHALL BECOME DUE AND PAYABLE DURING THE LEASE TERM. ANY SUCH INSTALLMENTS DUE AND PAYABLE IN THE YEARS IN WHICH THIS LEASE COMMENCES AND TERMINATES SHALL BE PRORATED PROPORTIONATELY.

TENANT SHALL NOT BE CHARGEABLE WITH NOR BE OBLIGATED TO PAY ANY TAX OF ANY KIND WHATSOEVER WHICH MAY BE IMPOSED ON THE LANDLORD, THE RENTS PAYABLE HEREUNDER OR THE DEMISED PREMISES EXCEPT THE AD VALOREM REAL ESTATE TAXES AND ASSESSMENTS MENTIONED IN THE FIRST PARAGRAPH OF THIS ARTICLE 36.

THE AMOUNT, IF ANY, BY WHICH THE AD VALOREM REAL ESTATE TAXES AND ASSESSMENTS PAYABLE HEREUNDER EXCEED FORTY-THREE THOUSAND DOLLARS($43,000) DURING ANY LEASE YEAR, SHALL BE HEREINAFTER REFERRED TO AS AN "EXCESS TAX PAYMENT". ALL EXCESS TAX PAYMENTS SHALL BE DEDUCTIBLE BY TENANT FROM ADDITIONAL RENTALS, AS DEFINED IN ARTICLE 4, DUE AND PAYABLE FOR SUCH LEASE YEAR. IN THE EVENT THE EXCESS TAX PAYMENT FOR ANY LEASE YEAR EXCEEDS SAID ADDITIONAL RENTAL DUE AND PAYABLE DURING THE SAME LEASE YEAR, THE AMOUNT BY WHICH SAID EXCESS TAX PAYMENT EXCEEDS SAID ADDITIONAL RENTAL SHALL BE CARRIED FORWARD AND BE DEDUCTIBLE FROM ADDITIONAL RENTALS DUE AND PAYABLE FOR SUCCEEDING LEASE YEARS ON A CUMULATIVE BASIS.

THE TAXABLE PREMISES, AS DEFINED BELOW, SHALL BE SEPARATELY ASSESSED FROM ANY CONTIGUOUS LANDS AND FROM ANY ADDITIONAL LANDS AND IMPROVEMENTS INCORPORATED INTO THE DEMISED PREMISES IN THE FUTURE.

IN THE EVENT TENANT CONSTRUCTS, AS PROVIDED IN ARTICLE 15 HEREOF, ADDITIONAL BUILDINGS OR STRUCTURES ON ANY PORTION OF THE LAND DESCRIBED IN EXHIBIT "A", SAID ADDITIONAL BUILDINGS OR STRUCTURES SHALL BE EXCLUDED FROM THE TAXABLE PREMISES. SAID ADDITIONAL BUILDINGS OR OTHER STRUCTURES SHALL BE SEPARATELY ASSESSED AND ALL AD VALOREM TAXES AND ASSESSMENTS LEVIED THEREON SHALL NOT BE DEDUCTIBLE FROM ADDITIONAL RENTALS AS PROVIDED HEREIN.

THE TENANT SHALL HAVE THE RIGHT TO PARTICIPATE IN ALL NEGOTIATIONS OF TAX ASSESSMENTS. TENANT SHALL HAVE THE RIGHT TO CONTEST THE VALIDITY OR THE AMOUNT OF ANY TAX OR ASSESSMENT LEVIED AGAINST THE TAXABLE PREMISES BY SUCH APPELLATE OR OTHER PROCEEDINGS AS MAY BE APPROPRIATE IN THE JURISDICTION, AND MAY DEFER PAYMENT OF SUCH OBLIGATIONS, PAY SAME UNDER PROTEST, OR TAKE SUCH OTHER STEPS AS TENANT MAY DEEM APPROPRIATE; PROVIDED, HOWEVER, TENANT SHALL TAKE NO ACTION WHICH WILL CAUSE OR ALLOW THE INSTITUTION OF ANY FORECLOSURE PROCEEDINGS OR SIMILAR ACTION AGAINST THE DEMISED PREMISES. LANDLORD SHALL COOPERATE IN THE INSTITUTION AND PROSECUTION OF ANY SUCH PROCEEDINGS INITIATED BY THE TENANT AND WILL EXECUTE ANY DOCUMENTS REQUIRED THEREFOR.

SHOULD THE LANDLORD INSTITUTE PROCEEDINGS TO CONTEST THE VALIDITY OR THE AMOUNT OF ANY TAX OR ASSESSMENT LEVIED AGAINST THE TAXABLE PREMISES, THE TENANT WILL COOPERATE IN SUCH PROCEEDINGS.

SHOULD ANY OF THE PROCEEDINGS REFERRED TO IN THE PRECEDING TWO PARAGRAPHS OF THIS ARTICLE 36 RESULT IN REDUCING THE TOTAL ANNUAL REAL ESTATE TAX AND ASSESSMENT LIABILITY AGAINST THE TAXABLE PREMISES, THE TENANT SHALL BE ENTITLED TO RECEIVE ALL REFUNDS PAID BY THE TAXING AUTHORITIES.

ARTICLE 36

REAL ESTATE
TAXES
(CONT'D)      AFTER PAYMENT OF ALL OF LANDLORD'S AND TENANT'S EXPENSES INCURRED IN ANY
SUCH PROCEEDINGS IN WHICH A REFUND IS PAID, THE TENANT SHALL PAY TO THE
LANDLORD EITHER THE BALANCE OF SUCH REFUND OR, ALTERNATIVELY, TENANT SHALL
PAY TO THE LANDLORD THAT PART OF THE EXCESS TAX PAYMENT WHICH MAY HAVE
BEEN DEDUCTED FROM ADDITIONAL RENT IN THE TAX YEAR FOR WHICH THE REFUND
WAS GRANTED, WHICHEVER AMOUNT SHALL BE THE LESSER. ANY BALANCE OF SAID
REFUND REMAINING AFTER SUCH PAYMENT TO LANDLORD SHALL BELONG TO THE
TENANT. IF NO REFUND SHALL BE SECURED IN ANY GIVEN PROCEEDING, THE PARTY
INSTITUTING THE PROCEEDING SHALL BEAR THE ENTIRE COST.

THE TERM "TAXABLE PREMISES", AS USED IN THIS LEASE, SHALL BE THAT
CERTAIN LAND DESCRIBED IN EXHIBIT "A", PARCEL "A", TOGETHER WITH SUCH
BUILDINGS AND OTHER IMPROVEMENTS REQUIRED BY TENANT TO BE CONSTRUCTED
THEREON BY LANDLORD UNDER THE TERMS OF THIS LEASE.

ARTICLE 36

ATTORNEYS'
FEES

      37.   IN THE EVENT THAT EITHER PARTY TO THIS LEASE IS IN DEFAULT
AS TO ANY TERM, CONDITION OR REPRESENTATION OR WARRANTY OF THIS LEASE,
AND SUCH DEFAULT IS NOT CORRECTED BY THE PARTY IN DEFAULT WITHIN A
REASONABLE PERIOD OF TIME AFTER THE RECEIPT OF WRITTEN NOTICE OF SUCH
DEFAULT, THE PARTY OFFENDED BY SUCH DEFAULT SHALL BE REIMBURSED BY THE
DEFAULTING PARTY FOR ATTORNEY FEES INCURRED IN CAUSING THE CORRECTION OF
SUCH DEFAULT OR IN THE PROSECUTION OF A CAUSE OF ACTION FOR AFFIRMATIVE
RELIEF OR DAMAGES, IN ADDITION TO ANY OTHER DAMAGES CAUSED BY SUCH
DEFAULT.

ARTICLE 37

12. (A) TENANT SHALL HAVE THE OPTION TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO EXPIRATION OF THE TERM HEREOF.

(B) IF TENANT SHALL HAVE EXERCISED THE FOREGOING OPTION, IT SHALL HAVE THE OPTION FURTHER TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF SUCH EXTENDED TERM.

(C) IF TENANT SHALL HAVE EXERCISED THE FOREGOING OPTIONS, IT SHALL HAVE THE OPTION FURTHER TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF SUCH FURTHER EXTENDED TERM.

(D) IF TENANT SHALL HAVE EXERCISED THE FOREGOING OPTIONS, IT SHALL HAVE THE OPTION FURTHER TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF SUCH FURTHER EXTENDED TERM.

(E) IF TENANT SHALL HAVE EXERCISED THE FOREGOING OPTIONS, IT SHALL HAVE THE OPTION FURTHER TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF SUCH FURTHER EXTENDED TERM.

(F) IF TENANT SHALL HAVE EXERCISED THE FOREGOING OPTIONS, IT SHALL HAVE THE OPTION FURTHER TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF SUCH FURTHER EXTENDED TERM.

(G) IF TENANT SHALL HAVE EXERCISED THE FOREGOING OPTIONS, IT SHALL HAVE THE OPTION FURTHER TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF SUCH FURTHER EXTENDED TERM.

(H) IF TENANT SHALL HAVE EXERCISED THE FOREGOING OPTIONS, IT SHALL HAVE THE OPTION FURTHER TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF SUCH FURTHER EXTENDED TERM.

(I) IF TENANT SHALL HAVE EXERCISED THE FOREGOING OPTIONS, IT SHALL HAVE THE OPTION FURTHER TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF SUCH FURTHER EXTENDED TERM.

(J) IF TENANT SHALL HAVE EXERCISED THE FOREGOING OPTIONS, IT SHALL HAVE THE OPTION FURTHER TO EXTEND THE TERM OF THIS LEASE FOR AN ADDITIONAL PERIOD OF FIVE (5) YEARS UPON THE SAME TERMS AND CONDITIONS OF THIS LEASE, WHICH OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF SUCH FURTHER EXTENDED TERM.

(K) REGARDLESS OF THE EXERCISE OR NONEXERCISE BY TENANT OF ANY OR ALL OF THE FOREGOING OPTIONS, TENANT SHALL HAVE, UNLESS THE LAST DAY OF THE LEASE TERM SHALL BE JANUARY 31 OF ANY YEAR, THE OPTION TO EXTEND (OR FURTHER EXTEND, AS THE CASE MAY BE) THE TERM OF THIS LEASE FOR SUCH PERIOD OF TIME AS SHALL CAUSE THE LAST DAY OF THE TERM OF THIS LEASE TO BE THE JANUARY 31 NEXT SUCCEEDING THE DATE UPON WHICH THE TERM OF THIS LEASE WOULD EXPIRE BUT FOR THE EXERCISE OF THIS OPTION. THIS OPTION SHALL BE EXERCISED BY NOTICE TO LANDLORD NOT LESS THAN SIX (6) MONTHS PRIOR TO THE EXPIRATION OF THE TERM OF THIS LEASE, OR ANY EXTENSION THEREOF.



## LEGAL DESCRIPTION

### S. S. KRESGE DEMISED PREMISES

### PARCEL A

ALL THAT PORTION OF BLOCK 1 AND THOSE PORTIONS OF LOTS 3 AND 4 IN BLOCK 3 AND THAT PORTION OF BIXLER AVENUE (SIERRA AVENUE) OF THE LANDS OF THE RIVERSIDE LAND AND IRRIGATING COMPANY, AS SHOWN BY MAP ON FILE IN BOOK 1 OF MAPS, AT PAGE 70 THEREOF, RECORDS OF SAN BERNARDINO COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF PARCEL 1, AS SHOWN BY PARCEL MAP RECORDED IN BOOK 4 OF PARCEL MAPS, AT PAGE 24 THEREOF, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA;

THENCE NORTH 89°33'20" EAST, A DISTANCE OF 185.00 FEET;

THENCE NORTH 00°20'40" EAST, A DISTANCE OF 145.00 FEET TO THE NORTHEAST CORNER OF SAID PARCEL 1;

THENCE NORTH 89°33'20" EAST ALONG THE NORTH LINE OF PARCEL 3, AS SHOWN ON SAID PARCEL MAP, A DISTANCE OF 562.82 FEET TO A POINT THEREIN, SAID POINT BEING THE BEGINNING OF A TANGENT CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 12.00 FEET;

THENCE SOUTHEASTERLY ALONG SAID CURVE, TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 90°00'00", AN ARC DISTANCE OF 18.85 FEET TO THE END THEREOF;

THENCE SOUTH 00°26'40" EAST, A DISTANCE OF 679.60 FEET;

THENCE SOUTH 55°40'25" WEST, A DISTANCE OF 215.65 FEET TO A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY 5.00 FEET, MEASURED AT RIGHT ANGLES, FROM THE SOUTH-WESTERLY LINE OF SAID LOT 3;

THENCE NORTH 34°16'20" WEST ALONG SAID PARALLEL LINE, A DISTANCE OF 369.07 FEET TO A POINT IN SAID CENTERLINE OF BIXLER AVENUE (SIERRA AVENUE);

THENCE SOUTH 55°40'25" WEST ALONG SAID CENTERLINE, A DISTANCE OF 104.60 FEET TO A POINT THEREIN;

THENCE NORTH 89°39'20" WEST, A DISTANCE OF 296.22 FEET TO A POINT IN THE WEST LINE OF PARCEL 2, AS SHOWN ON SAID PARCEL MAP;

THENCE NORTH 00°20'40" EAST ALONG SAID WEST LINE, A DISTANCE OF 414.51 FEET TO THE POINT OF BEGINNING.

CONTAINING 10.413 ACRES.

## ENTIRE SHOPPING CENTER

## LEGAL DESCRIPTION

### RECIPROCAL PARKING AND EASEMENT FOR INGRESS AND EGRESS

#### PARCEL B

ALL THAT PORTION OF BLOCK 1 AND THOSE PORTIONS OF LOTS 3 AND 4 IN BLOCK 3 AND THAT PORTION OF BIXLER AVENUE (SIERRA AVENUE) OF THE LANDS OF THE RIVERSIDE LAND AND IRRIGATING COMPANY, AS SHOWN BY MAP ON FILE IN BOOK 1 OF MAPS, AT PAGE 70 THEREOF, RECORDS OF SAN BERNARDINO COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF PARCEL 1, AS SHOWN BY PARCEL MAP RECORDED IN BOOK 4 OF PARCEL MAPS, AT PAGE 24 THEREOF, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA;

THENCE NORTH 89°33'20" EAST, A DISTANCE OF 185.00 FEET;

THENCE NORTH 00°20'40" EAST, A DISTANCE OF 145.00 FEET TO THE NORTHEAST CORNER OF SAID PARCEL 1;

THENCE NORTH 89°33'20" EAST ALONG THE NORTH LINE OF PARCEL 3, AS SHOWN ON SAID PARCEL MAP, A DISTANCE OF 562.82 FEET TO A POINT THEREIN, SAID POINT BEING THE BEGINNING OF A TANGENT CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 12.00 FEET;

THENCE SOUTHEASTERLY ALONG SAID CURVE, TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 90°00'00", AN ARC DISTANCE OF 18.85 FEET TO THE END THEREOF;

THENCE SOUTH 00°26'40" EAST, A DISTANCE OF 679.60 FEET;

THENCE SOUTH 55°40'25" WEST, A DISTANCE OF 667.38 FEET TO A POINT IN A CURVE IN THE NORTHEASTERLY RIGHT OF WAY LINE OF JACKSON STREET CONVEYED TO THE CITY OF RIVERSIDE BY DEED RECORDED SEPTEMBER 21, 1951, IN BOOK 2548 OF OFFICIAL RECORDS, AT PAGE 401 THEREOF, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, SAID CURVE BEING CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 294.15 FEET, THE RADIAL LINE AT SAID POINT BEARS NORTH 41°13'36" EAST;

THENCE NORTHWESTERLY ALONG SAID NORTHEASTERLY RIGHT OF WAY LINE AND ALONG SAID CURVE, TO THE LEFT, THROUGH A CENTRAL ANGLE OF 09°44'21", AN ARC DISTANCE OF 50.00 FEET TO A POINT THEREIN, THE RADIAL LINE AT SAID POINT BEARS NORTH 31°29'15" EAST;

THENCE NORTH 00°20'40" EAST, A DISTANCE OF 207.51 FEET;

THENCE NORTH 89°39'20" WEST, A DISTANCE OF 180.00 FEET TO A POINT IN THE EASTERLY LINE OF VAN BUREN BOULEVARD CONVEYED TO THE CITY OF RIVERSIDE BY SAID DEED RECORDED AS AFORESAID, SAID POINT IS HEREINAFTER REFERRED TO AS POINT "A";

THENCE NORTH 00°20'40" EAST ALONG SAID EASTERLY LINE AND THE NORTHERLY PROLONGATION THEREOF, A DISTANCE OF 678.84 FEET TO THE POINT OF BEGINNING.

CONTAINING 14.749 ACRES.

RESERVING THEREFROM AN EASEMENT FOR MUTUAL DRIVEWAY PURPOSES OVER THAT PORTION THEREOF, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT POINT "A" HEREINBEFORE REFERRED TO:
THENCE NORTH 00°20'40" EAST, A DISTANCE OF 100.00 FEET;
THENCE SOUTH 44°39'20" EAST, A DISTANCE OF 85.19 FEET;
THENCE SOUTH 00°20'40" WEST, A DISTANCE OF 39.76 FEET;

THENCE NORTH 89°39'20" WEST, A DISTANCE OF 60.00 FEET TO THE POINT OF BEGINNING.

EXHIBIT "A"



S.E.C. VAN BUREN BLVD & ARLINGTON AVE
RIVERSIDE, CALIFORNIA

N

NEW STREET

S0°26'40"E        675.60'

SERVICE        DOCK        DRIVE

K MART

94,500±

IMPROVED
PARKING
TOTAL: 1000 CARS

L.L.
FOOD MARKET
29,400±

L.L.
BLDG
9,000±

NOT
INCLUDED

PYLON SIGN

VAN BUREN BOULEVARD

TWO TRAVEL LANES & ONE PARKING LANE EACH WAY
EXISTING MEDIAN - NO BREAKS

EXIST. TRAFFIC LIGHT        LEFT TURN        LEFT TURN        EXIST. TRAFFIC LIGHT

ARLINGTON AVENUE

JACKSON ST.

SCALE:
100 FEET TO 1 INCH
0    50'   100'        200'

EXHIBIT B
11/17/72



# S. S. KRESGE COMPANY

### GENERAL OFFICES
2727 SECOND AVENUE
DETROIT, MICHIGAN 48232
AREA CODE 313 PHONE 965-7300

February 22, 1972

Mr. George R. Smith
435 North Oakhurst Drive
Beverly Hills, California  90210

Reference:  K mart #      — Riverside, California
            SEC Arlington Avenue and Van Buren Blvd.

Dear Mr. Smith:

At the request of Mr. Ralph E. Davis of our Real Estate Department, we are
forwarding to you two (2) sets of Typical Plans and Outline Specifications
identified with the set number 1975, covering our minimum requirements for
the construction of a K mart.

The Typical K mart Store plans and specifications consist of the following:
     450' x 210' K mart plans all dated June 1, 1971

| | | | |
|---|---|---|---|
| A1a | A10a | 4E1a | 4M1a |
| 4A2a | A11a | 4E2a | M2b |
| 4A3a | A12b | 4E3a | M3b |
| 4A4 | A13a | E4c | M4b |
| 4A5a | A14a | E5c | M5a |
| A6c | A15a | E6a | M6b |
| A7a | A16b | E7a | M7a |
| A8a | A17a | | M8a |
| A9b | A18a | | |

Plus Drawing No. HVAC-2 dated June 1, 1971 which shall be used as a
supplement to Drawing No. M3b.

    K mart Pylon Sign drawing NS-18 dated January 16, 1970.

    Outline Specifications dated through June 1, 1971.

These plans and specifications describe a 450' wide x 210' deep K mart
containing 94,500 square feet, with an attached Food Market to the left.
Inasmuch as the Food Market operator will be a co-tenant and the Food
Market is not contiguous to the K mart no Food Market criteria will be
forthcoming from this office. We are including a Preliminary Layout
1975, dated 2-14-72, for this size store. This drawing also indicates
any required modifications to the Typicals for this specific location.

Kresge   •   Jupiter   •   K mart   •   Holly, Inc.   •   K mart Enterprises, Inc.

EXHIBIT "C"

Mr. George R. Smith             - 2 -        February 22, 1972
Re:  #    - Riverside, California

**SECONDARY**

The Landlord shall provide a ~~primary~~ transformer and ~~primary~~ electric service
with power factor correction to 97% under all load conditions.  Transformer
shall be located where shown on layout.

Due to the additional width (61'-0") Garden Shop, the type "W" fixtures in
the Garden Shop shall be 250 W mounted on 15'-0" fence posts and not as
indicated on drawings 4E2a and E4c.  Type "F" canopy lighting shall be
extended to handle additional width.

Firm gas, if available, is acceptable for space heating, domestic hot water
heaters and cooking equipment.

At this location, the following modifications may be made:

1. Gas fired duct furnaces may be used in the Main Mechanical Equipment
   Room to serve the main heating system.  NOTE:  Follow floor plan and
   details for 450'-0" x 210'-0" K mart as shown on drawing No. HVAC-2.
   Drawing No. HVAC-2 is a supplementary drawing to be used in conjunction
   with drawing No. M3b.
2. Front vestibule may be deleted.
3. Supply registers "G" at front salesroom where shown on drawing 4M1a may
   be deleted.  We do require three (3) ceiling supply air registers "M"
   at main entrance doors.
4. An electric duct heater (thermostatically controlled) may be substituted
   for hot water booster coil #1 where shown on drawing 4M1a.  Electric
   duct heater shall handle a minimum of 1880 cfm with output capacity of
   40KW.

Provide one (1) meter for each utility to the K mart.

When a Gross Lease applies, the parking lot lighting, sidewalk (under canopy)
lighting and service drive lighting shall be on Landlord's separate meter
and separate electric service.

All stock rooms, both upper and lower levels, shall be air conditioned.  See
drawing 4M1a which shows dotted lines to main stock areas, Auto Center stock
room and layaway and stock over offices.

Air conditioning for the main system shall require the use of three (3) open
compressors and the required remote air cooled condensers to limit maximum
condensing temperature to 120 degrees F.  All systems shall be of equal capacity.

We do require the 100% outside air through the roof, H-O-V-C selector switch,
7 day time clock, automatic dampers, etc., as outlined in temperature controls
section of sepcifications.

Landlord's engineer shall consult the telephone company relative to proper
facilities, including conduit, to handle the telephone installation.

Mr. George R. Smith                    - 3 -                    February 22, 1972
Re: ₿        - Riverside, California


All public utilities for the Food Market area including the sprinkler system
shall be separate and completely independent from K mart.

These sets of Typical plans and specifications are to be used only as a
guide for the preparation of complete working drawings and specifications.
If, at the time this project is formalized, modifications which affect elec-
trical or plumbing underfloor locations have occured additional information
covering such modifications will then be furnished.

                                        Very truly yours,


                                        James A. Kilgore, A.I.A.
                                        Manager, Design Division
                                        Construction Department

JAK:jr
cc: Mr. W. J. Mottershaw
    Mr. A. D. Kerkau
    Mr. R. E. Davis, W. R. O.
    Public Utilities

October 17, 1972

Mr. George R. Smith
345 North Oakhurst Drive
Beverly Hills, California  90210

Re:  K mart #3106 - Riverside, CA
     Arlington Ave. and Van Buren Blvd.

Dear Mr. Smith:

Since the issuance of the typical criteria documents for a K mart store
at the above referenced location, it has been determined that certain
modifications will be made in the Auto Service Center.

These modifications consist of eliminating the lift valve consoles and
changing the size and type of the Auto Service overhead doors.

The Sound Center adjacent to the Auto Service Center has also been modi-
fied to include the cashier and service windows.

We are enclosing herewith, two (2) sets of drawings numbered ASC-A1,
ASC-A2, ASC-E1, ASC-E2, ASC-M1 dated June 1, 1972, which supplement
drawings No. A10a, A11a, E6a, E7a and M7a dated June 1, 1971 of the
original criteria.

Also enclosed are two (2) copies of specifications for the overhead doors.

Since the development of the contract documents is probably underway,
may we suggest that you transmit this information to your Architect
without undue delay for incorporation into the working drawings and
specifications.

Very truly yours,


James A. Kilgore, A.I.A.
Manager, Design Division
Construction Department

JAK:crd
cc:  Mr. W. J. Mottershaw
     Mr. A. D. Kerkau
     Mr. N. S. Simmons
     Mr. R. E. Davis


EXHIBIT "C"

FIRST AMENDMENT TO LEASE

Dated as of February 1, 1973


THIS FIRST AMENDMENT TO LEASE is executed as of the __29th__ day

of ~~February~~ May , 1973, by and between George R. Smith, a married man,

having his principal office at 435 North Oakhurst Drive, Beverly Hills,

California 90210, as Landlord, and S. S. KRESGE COMPANY, a Michigan

corporation, having its principal office at 3100 West Big Beaver Road,

Troy, Michigan 48084, as Tenant, with respect to a Lease dated as of

October 16, 1972, with respect to certain real property described on

Exhibit A attached hereto.

Tenant acknowledges that Landlord intends to obtain or has obtained

an interim loan and permanent amortizing loan to be secured by a first

Deed of Trust on the demised premises as described in Article 1 of the

Lease and upon all appurtenances (including parking and other easements)

thereto. Tenant also acknowledges that Landlord has obtained a final

survey accurately depicting that certain real property described on

Exhibit A attached hereto. In order to facilitate and induce the obtaining

of financing and to accurately depict that certain real property described

on Exhibit A attached hereto, and for other good and valuable consideration,

it is agreed that the Lease dated October 16, 1972 by and between Landlord

and Tenant is hereby amended as follows:

1. That particular Exhibit A and Exhibit B included within the Lease

dated October 16, 1972 is hereby deleted, and in its place the particular

Exhibit A and Exhibit B attached hereto to this Lease Amendment is hereby

incorporated into this Lease agreement.

2. Article 21 from the Lease dated October 16, 1972 is hereby

deleted, and in its place the following language is substituted: "The

premises hereby demised shall not be used for any unlawful purpose. Tenant

may assign this Lease or sublet the whole or any part of said demised

premises, but if it does so without the consent of Landlord and the holder

of a first mortgage on the demised premises, then Tenant shall remain

liable and responsible under this Lease."

3.  The second paragraph of Article 26 of the Lease is hereby
deleted in its entirety, and in its place the following language is
substituted; "Landlord further covenants, represents, and warrants that
it is seized of an indefeasible estate in fee simple in the land described
in Exhibit "A" free and clear of any liens, encumbrances, restrictions
and violations (or claims or notices thereof) excepting herefrom necessary
storm drain and public utility easements."

4.  Article 27 of the Lease is hereby deleted in its entirety,
and in its place the following language is substituted; "This Lease is
and will remain prior to all mortgages or trust deeds now existing on the
demised premises or hereafter made, and Tenant will not subordinate this
Lease to any mortgage or trust deed without procuring the written consent
of Landlord and the holder of any first mortgage or trust deed on the
demised premises.  Notwithstanding any default by the mortgagor with respect
to said mortgage or any foreclosure thereof, Tenant's possession and right
of use under this Lease in and to the demised premises shall not be
disturbed by such mortgagee unless and until Tenant shall breach any of
the provisions hereof in this Lease or Tenant's right to possession
hereunder shall have been terminated in accordance with the provisions of
this Lease."

Except as expressly amended herein, all other terms, conditions,
and provisions of said Lease dated October 16, 1972 shall remain in full
force and effect.

IN WITNESS WHEREOF, the parties hereto have set their hands as of the
date first above written.

By _George R. Smith_

George R. Smith, a married man

"Landlord"

S. S. KRESGE COMPANY, a Michigan corporation

By _____

J. V. Johnson, Vice President

By _____

Beatrice L. McGaw, Assistant Secretary

"Tenant"

APPROVED

_M_

## LEGAL DESCRIPTION

### S. S. KRESGE DEMISED PREMISES

### PARCEL A

Parcel 2 of Parcel Map on file in Book 7 of Parcel Maps, at page 22 thereof, Records of Riverside County, California, more particularly described as follows:

Beginning at the most southerly corner of said Parcel 2;

Thence North 55° 40' 25" East, a distance of 215.65 feet;

Thence North 00° 26' 40" West, a distance of 108.60 feet to a point hereinafter designated as Point "A";

Thence continuing North 00° 26' 40" West, a distance of 571.00 feet to the beginning of a tangent curve, concave to the southwest, having a radius of 12.00 feet;

Thence northwesterly along said curve, to the left, through a central angle of 90° 00' 00", an arc distance of 18.85 feet to the end thereof, said point is hereinafter designated as Point "B";

Thence South 89° 33' 20" West, a distance of 288.00 feet to a point hereinafter designated as Point "C";

Thence continuing South 89° 33' 20" West, a distance of 30.00 feet to a point hereinafter designated as Point "D";

Thence continuing South 89° 33' 20" West, a distance of 234.82 feet to a point hereinafter designated as Point "E";

Thence continuing South 89° 33' 20" West, a distance of 5.00 feet to a point hereinafter designated as Point "F";

Thence continuing South 89° 33' 20" West, a distance of 5.00 feet;

Thence South 00° 20' 40" West, a distance of 145.00 feet;

Thence South 89° 33' 20" West, a distance of 120.40 feet to a point hereinafter designated as Point "G";

Thence continuing South 89° 33' 20" West, a distance of 64.60 feet;

Thence South 00° 20' 40" West, a distance of 414.51 feet;

Thence South 89° 39' 20" East, a distance of 296.22 feet;

Thence North 55° 40' 25" East, a distance of 104.60 feet;

EXHIBIT A

Thence South 34° 16' 20" East, a distance of 369.07 feet to the point of beginning.

The last sixteen courses and distances follow the boundary line of said Parcel 2.

Reserving therefrom an easement for sanitary sewer facilities and storm drain facilities, over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "A";

Thence South 89° 33' 20" West, a distance of 278.20 feet;

Thence South 34° 16' 20" East, a distance of 19.26 feet;

Thence North 89° 33' 20"East, a distance of 267.48 feet;

Thence North 00° 26' 40" West, a distance of 16.00 feet to the point of beginning.

Also reserving therefrom an easement for public utilities facilities, over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "B";

Thence South 00° 26' 40" East, a distance of 685.21 feet;

Thence South 55° 40 25" West, a distance of 164.24 feet;

Thence South 34° 16' 20" East, a distance of 12.00 feet;

Thence North 55° 40' 25" East, a distance of 170.65 feet;

Thence North 00° 26' 40" West, a distance of 679.60 feet to the beginning of a tangent curve, concave to the southwest, having a radius of 12.00 feet;

Thence northwesterly along said curve, to the left, through a central angle of 90° 00' 00", an arc distance of 18.85 feet to the end thereof and the point of beginning;

Also reserving therefrom an easement for water line facilities, over that portion thereof more particularly described as follows:

A strip of land 20.00 feet wide, lying 10.00 feet on each side of the following described centerline:

Beginning at said point hereinbefore designated as Point "C";

Thence South 00° 26' 40" East, a distance of 460.53 feet;

Thence South 55° 40' 25" West, a distance of 90.07 feet to a point in the southerly line of said Parcel 2 of Parcel Map recorded in Book 7 of Parcel Maps, at page 22 thereof, described hereinbefore;

EXHIBIT A

The sidelines of said strip of land shall be prolonged or shortened so as to terminate northerly in the north line of said Parcel 2, and southerly in said southerly line of Parcel 2.

Also reserving therefrom an easement for water line facilities, over that portion thereof more particularly described as follows:

A strip of land 15.00 feet in width, lying 10.00 feet easterly and southeasterly, and 5.00 feet westerly and northwesterly of the following described reference line:

Commencing at said point hereinbefore designated as Point "C";

Thence South 89° 33' 20" West, a distance of 10.00 feet;

Thence South 00° 26' 40" East, a distance of 355.93 feet to the true point of beginning;

Thence South 89° 33' 20" West, a distance of 3.33 feet;

Thence South 00° 26' 40" East, a distance of 183.11 feet;

Thence South 55° 43' 40" West, a distance of 35.29 feet to a point in the southerly line of said Parcel 2.

Excepting therefrom the portion thereof lying within any easement reserved hereinabove.

Also reserving therefrom a temporary construction easement for water line facilities, over that portion thereof more particularly described as follows:

A strip of land 40.00 feet in width, lying 20.00 feet on each side of the following described centerline:

Beginning at said point hereinbefore designated as Point "D";

Thence South 00° 26' 40" East a distance of 468.64 feet;

The sidelines of said strip of land shall be prolonged or shortened so as to terminate northerly in the north line of said Parcel 2 described hereinbefore, and southerly in a line having a bearing of North 55° 40' 25" East.

Also reserving therefrom an easement for storm drain facilities, over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "E";

Thence South 00° 20' 40" West, a distance of 220.87 feet;

Thence South 40° 34' 42" East, a distance of 172.99 feet to the beginning of a non-tangent curve, concave to the northeast, having a radius of 300.00 feet, the radial line at said point bears South 49° 25' 18" West;

EXHIBIT A

Thence northerly along said curve, to the right, through a central angle of 40° 55' 22", an arc distance of 214.27 feet to the end thereof;

Thence North 00° 20' 40" East, a distance of 155.62 feet;

Thence South 89° 33' 20" West, a distance of 40.00 feet to the point of beginning.

Also reserving therefrom an easement for drainage facilities, over that portion thereof more particularly described as follows:

A strip of land 10.00 feet in width, lying 5.00 feet on each side of the following described centerline:

Beginning at said point hereinbefore designated as Point "F";

Thence South 00° 20' 40" West, a distance of 163.26 feet;

Thence South 56° 00' 00" West, a distance of 34.13 feet;

The sidelines of said strip of land shall be prolonged or shortened so as to terminate northerly in said north line of Parcel 2 described hereinbefore, and southerly in a line having a bearing of North 40° 34' 42" West;

Also reserving therefrom an easement for storm drain, sewer, gas line, water line, underground electric, and underground telephone line facilities, over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "G";

Thence North 89° 33' 20" East, a distance of 65.40 feet;

Thence South 40° 34' 42" East, a distance of 454.41 feet;

Thence South 34° 16' 20" East, a distance of 354.32 feet;

Thence South 55° 40' 25" West, a distance of 45.00 feet;

Thence North 34° 16' 20" West, a distance of 369.07 feet;

Thence South 55° 40' 25" West, a distance of 6.93 feet;

Thence North 40° 34' 42" West, a distance of 476.24 feet to the point of beginning.

Containing 10.413 acres.

ENTIRE SHOPPING CENTER

LEGAL DESCRIPTION

RECIPROCAL PARKING AND EASEMENT FOR INGRESS AND EGRESS

PARCEL B

Parcels 1 and 2 of Parcel Map recorded in Book 7 of Parcel Maps, at page 22 thereof, Records of Riverside County, California, and Parcel 1 of Parcel Map recorded in Book 7 of Parcel Maps, at page 23 thereof, Records of Riverside County, California, more particularly described as follows:

Beginning at the most southerly corner of said Parcel 2;

Thence North 55° 40' 25" East, a distance of 215.65 feet;

Thence North 00° 26' 40" West, a distance of 108.60 feet to a point hereinafter designated as Point "A";

Thence continuing North 00° 26' 40" West, a distance of 571.00 feet to the beginning of a tangent curve, concave to the southwest, having a radius of 12.00 feet;

Thence northwesterly along said curve, to the left, through a central angle of 90° 00' 00", an arc distance of 18.85 feet to the end thereof, said point is hereinafter designated as Point "B";

Thence South 89° 33' 20" West, a distance of 288.00 feet to a point hereinafter designated as Point "C";

Thence continuing South 89° 33' 20" West, a distance of 30.00 feet to a point hereinafter designated as Point "D";

Thence continuing South 89° 33' 20" West, a distance of 234.82 feet to a point hereinafter designated as Point "E";

Thence continuing South 89° 33' 20"West, a distance of 5.00 feet to a point hereinafter designated as Point "F";

Thence continuing South 89° 33' 20" West, a distance of 5.00 feet;

Thence South 00° 20' 40" West, a distance of 145.00 feet;

Thence South 89° 33' 20"West, a distance of 120.40 feet to a point hereinafter designated as Point "G";

Thence continuing South 89° 33' 20" West, a distance of 64.60 feet;

Thence South 00° 20' 40" West, a distance of 678.84 feet to a point hereinafter designated as Point "H";

EXHIBIT A

Thence South 89° 39' 20" East, a distance of 180.00 feet;

Thence South 00° 20' 40" West, a distance of 207.51 feet to a point in a curve, concave, to the southwest, having a radius of 294.15 feet, the radial line at said point bears North 31° 29' 15" East;

Thence southeasterly along said curve, to the right, through a central angle of 07° 18' 41", an arc distance of 37.54 feet to a point hereinafter designated as Point "I", the radial line at said point bears North 38° 47' 56" East;

Thence continuing southeasterly along said curve, to the right, through a central angle of 02° 25' 40", an arc distance of 12.46 feet to a point therein, the radial line at said point bears North 41° 13' 36" East;

Thence North 55° 40' 25" East, a distance of 451.73 feet to the point of beginning;

The last eighteen courses and distances follow the boundary lines of said Parcels 1 and 2 of Parcel Map recorded in Book 7 of Parcel Maps, at page 22 thereof, Records of Riverside County, California, and Parcel 1 of Parcel Map recorded in Book 7 of Parcel Maps, at page 23 thereof, Records of Riverside County, California.

Reserving therefrom an easement for sanitary sewer facilities and storm drain facilities, over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "A";

Thence South 89° 33' 20" West, a distance of 278.20 feet;

Thence South 34° 16' 20" East, a distance of 19.26 feet;

Thence North 89° 33' 20" East, a distance of 267.48 feet;

Thence North 00° 26' 40" West, a distance of 16.00 feet to the point of beginning.

Also reserving therefrom an easement for public utilities facilities, over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "B";

Thence South 00° 26' 40" East, a distance of 685.21 feet;

Thence South 55° 40' 25" West, a distance of 164.24 feet;

Thence South 34° 16' 20" East, a distance of 12.00 feet;

Thence North 55° 40' 25" East, a distance of 170.65 feet;

Thence North 00° 26' 40" West, a distance of 679.60 feet to the beginning of a tangent curve, concave to the southwest, having a radius of 12.00 feet;

EXHIBIT A

Thence northwesterly along said curve, to the left, through a central angle of 90° 00' 00", an arc distance of 18.85 feet to the end thereof and the point of beginning;

Also reserving therefrom an easement for water line facilities, over that portion thereof more particularly described as follows:

A strip of land 20.00 feet wide, lying 10.00 feet on each side of the following described centerline:

Beginning at said point hereinbefore designated as Point "C";

Thence South 00° 26' 40" East, a distance of 460.53 feet;

Thence South 55° 40' 25" West, a distance of 566.75 feet to a point in the westerly line of said Parcel 1 of Parcel Map recorded in Book 7 of Parcel Maps, at page 23 thereof, described hereinbefore;

The sidelines of said strip of land shall be prolonged or shortened so as to terminate northerly in the north line of said Parcel 2 of Parcel Map recorded in Book 7 of Parcel Maps, at page 22 thereof described hereinbefore, and westerly in said westerly line of Parcel 1.

Also reserving therefrom a temporary construction easement for water line facilities, over that portion thereof more particularly described as follows:

A strip of land 40.00 feet in width, lying 20.00 feet on each side of the following described centerline:

Beginning at said point hereinbefore designated as Point "D";

Thence South 00° 26' 40" East, a distance of 468.64 feet;

The sidelines of said strip of land shall be prolonged or shortened so as to terminate northerly in the north line of said Parcel 2 described hereinbefore, and southerly in a line having a bearing of North 55° 40' 25" East.

Also reserving therefrom an easement for storm drain facilities, over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "E";

Thence South 00° 20' 40" West, a distance of 220.87 feet;

Thence South 40° 34' 42" East, a distance of 172.99 feet to the beginning of a non-tangent curve, concave to the northeast, having a radius of 300.00 feet, the radial line at said point bears South 49° 25' 18" West;

Thence northerly along said curve, to the right, through a central angle of 40° 55' 22", an arc distance of 214.27 feet to the end thereof;

EXHIBIT A

Beginning at Point "J" hereinbefore described;

Thence North 55° 40' 25" East, a distance of 237.89 feet.

Excepting therefrom the portion thereof lying within any easement reserved hereinabove.

Containing 14.749 acres.

Thence South 34° 16' 20" East, a distance of 12.00 feet;

Thence South 55° 40' 25" West, a distance of 446.73 feet to a point in said curve having a radius of 294.51 feet, the radial line at said point bears North 41° 13' 36" East;

Thence northwesterly along said curve, to the left, through a central angle of 02° 25' 40", an arc distance of 12.46 feet to the point of beginning.

Also reserving therefrom an easement for water line facilities, over that portion thereof more particularly described as follows:

A strip of land 15.00 feet in width, lying 10.00 feet easterly and south-easterly, and 5.00 feet westerly and northwesterly of the following described reference line:

Commencing at said point hereinbefore designated as Point "C";

Thence South 89° 33' 20" West, a distance of 10.00 feet;

Thence South 00° 26' 40" East, a distance of 355.93 feet to the true point of beginning;

Thence South 89° 33' 20" West, a distance of 3.33 feet;

Thence South 00° 26' 40" East, a distance of 183.11 feet;

Thence South 55° 43' 40" West, a distance of 49.17 feet;

Thence South 00° 26' 40" East, a distance of 77.55 feet;

Thence South 55° 40' 25" West, a distance of 279.02 feet;

Thence South 00° 20' 40" West, a distance of 196.98 feet to a point hereinafter referred to as Point "J";

Thence continuing South 00° 20' 40" West, a distance of 40.44 feet to a point in the southwesterly line of Parcel 1, as shown on said Parcel Map recorded in Book 7 of Parcel Maps, at page 23 thereof;

The sidelines of said strip of land shall be prolonged or shortened so as to terminate in said southwesterly line of Parcel 1.

Excepting therefrom the portion thereof lying within any easement reserved hereinabove;

Also reserving therefrom an easement for water line facilities, over that portion thereof more particularly described as follows:

A strip of land 15.00 feet in width, lying 5.00 feet southeasterly and 10.00 feet northwesterly of the following described reference line:

EXHIBIT A

Thence North 00° 20' 40" East, a distance of 155.62 feet;

Thence South 89° 33' 20" West, a distance of 40.00 feet to the point of beginning.

Also reserving therefrom an easement for drainage facilities, over that portion thereof more particularly described as follows:

A strip of land 10.00 feet in width, lying 5.00 feet on each side of the following described centerline:

Beginning at said point hereinbefore designated as Point "F";

Thence South 00° 20' 40" West, a distance of 163.26 feet;

Thence South 56° 00' 00" West, a distance of 34.13 feet;

The sidelines of said strip of land shall be prolonged or shortened so as to terminate northerly in said north line of Parcel 2 described hereinbefore, and southerly in a line having a bearing of North 40° 34' 42" West;

Also reserving therefrom an easement for storm drain, sewer, gas line, water line, underground electric, and underground telephone line facilities, over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "G";

Thence North 89° 33' 20"East, a distance of 65.40 feet;

Thence South 40° 34' 42" East, a distance of 454.41 feet;

Thence South 34° 16' 20" East, a distance of 354.32 feet;

Thence South 55° 40' 25" West, a distance of 50.00 feet;

Thence North 34° 16' 20" West, a distance of 351.61 feet;

Thence North 40° 34' 42" West, a distance of 493.81 feet to the point of beginning.

Also reserving therefrom an easement for mutual driveway purposes over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "H";

Thence North 00° 20' 40" East, a distance of 100.00 feet;

Thence South 44° 39' 20" East, a distance of 85.19 feet;

Thence South 00° 20' 40" West, a distance of 39.76 feet;

Thence North 89° 39' 20" West, a distance of 60.00 feet to the point of beginning.

Also reserving therefrom an easement for public utilities facilities, over that portion thereof more particularly described as follows:

Beginning at said point hereinbefore designated as Point "I";

Thence North 55° 40' 25" East, a distance of 450.11 feet;

EXHIBIT A



S.E.C. VAN BUREN BLVD. & ARLINGTON AVE.
RIVERSIDE, CALIFORNIA

K MART
94,500 ±

L.L. FOOD MARKET
29,400 ±

L.L. BLDG.
9,000

IMPROVED
TOT. 1000 CARS

NOT INCLUDED

PEGASUS DRIVE

ARLINGTON AVENUE

VAN BUREN BOULEVARD

JACKSON ST.

SCALE
100 FEET TO 1 INCH
0   50'   100'   200'

LEGEND:
SANITARY, STORM & DRAINAGE EASEMENTS.
WATER LINE EASEMENTS.
UTILITIES EASEMENT

EXHIBIT B
11/17/72
REV. 4/27/73

## __EXHIBIT B__

**KFC GROUND LEASE**



## GROUND LEASE

**Parties**

THIS GROUND LEASE made and entered into as of this 22nd day of May, 1986, by and between KFC NATIONAL MANAGEMENT COMPANY, a Delaware corporation, having its principal office at P. O. Box 32070, 1441 Gardiner Lane, Louisville, Kentucky 40232, (herein referred to as "Tenant"), and K MART CORPORATION, a Michigan Corporation, having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084, (herein referred to as "Landlord"),

WITNESSETH: that in consideration of the rents, covenants and conditions hereinafter set forth, Landlord and Tenant do hereby covenant, promise and agree as hereinafter set forth.

**Demised Premises**

1. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, the premises situated in the City of Riverside, County of Riverside, State of California, as is more particularly described on Exhibit "A" attached hereto and made a part hereof, together with the non-exclusive right to use in common with others the parking areas and driveways from time to time located on the property described on Exhibit "B" and subject to the non-exclusive right of others to use in common with Tenant the parking areas and driveways from time to time located on the Demised Premises. The property described on Exhibit "A" and depicted on Exhibit "C," together with and subject to the aforedescribed easements, are hereinafter referred to as the "Demised Premises".

**Master Lease**

2. (a) Landlord's interest in the Demised Premises is that of a lessee under a certain lease dated October 16, 1972, a memorandum of which is recorded in the records of the County of Riverside, State of California. Landlord and Tenant recognize and agree that the interest granted to Tenant hereunder arises from said lease (hereinafter referred to as "Master Lease") and that Tenant's right, title and interest in and to the Demised Premises arising from this Ground Lease is and shall remain subject to the provisions and terms of said Master Lease.

(b) Landlord covenants that it has the full and unrestricted right to execute this Ground Lease and lease the Demised Premises to Tenant, subject only to (i) the Master Lease, (ii) all taxes, assessments, easements, agreements and other matters affecting the Demised Premises whether of record or not and (iii) all applicable zoning rules, restrictions, regulations, resolutions, and ordinances and building restrictions and governmental regulations now or hereinafter in effect.

**Term**

3. (a) The term of this lease (hereinafter referred to as "Primary Term") shall commence upon the "date of occupancy by Tenant", as said term is hereinafter defined, and shall terminate upon such date as shall be fifteen (15) years from the last day of the month in which said date of occupancy by Tenant shall occur.

The term "date of occupancy by Tenant" as use herein shall be the first to occur of the following two (2) dates: (i) the date upon which Tenant shall open its store for business, or (ii) the date which shall be ninety (90) days (plus a period of time equal to any delays in the construction of Tenant's building that are due to conditions beyond Tenant's control) following the obtaining of all permits, licenses, variances and approvals outlined in Article 7, hereof.

(b) Tenant shall have the right, subject to the terms and conditions herein and provided there is no event of default hereunder, to extend the term of this Ground Lease for three (3) successive periods of five (5) years each (hereinafter referred to as "Extended Term"). Each Extended Term shall

-1-

commence on the day immediately succeeding the expiration date of the next preceding term. If Tenant shall elect to extend the term of this Ground Lease, it shall do so by giving Landlord not less than ninety (90) days written notice prior to the expiration of the Primary Term or Extended Term, as the case may be.

(c) If Tenant fails to give any notice electing to extend the term of this Ground Lease, this Ground Lease shall automatically terminate of the end of the then term of this Ground Lease and Tenant shall have no further option to extend this Ground Lease. If Tenant does not exercise any such option in a timely manner, then Landlord shall have the right during the remainder of the term of this Ground Lease to advertise the availability of the Demised Premises for sale or reletting and to erect upon the Demised Premises signs indicating such availability; provided, however, that such signs shall not unreasonably interfere with the use of the Demised Premises by Tenant.

**Annual Rental**

4. (a) Tenant shall, during the Primary Term, and any extension thereof, pay to Landlord, at such place as Landlord shall designate, in writing, from time to time, the annual rental, as hereinafter designated, in equal monthly installments, on the first day of each and every month, in advance, commencing upon the first day of the lease term; provided, however, if the first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated on a daily basis.

The rental payable by Tenant to Landlord shall be as follows:

(i)    Lease years one (1) thru five (5) — FORTY TWO THOUSAND FIVE HUNDRED FORTY DOLLARS ($42,540) per annum;

(ii)   Lease years six (6) thru ten (10) — FORTY EIGHT THOUSAND NINE HUNDRED TWENTY ONE DOLLARS ($48,921) per annum; and

(iii)  Lease years eleven (11) thru fifteen (15) — FIFTY SIX THOUSAND TWO HUNDRED FIFTY NINE AND 15/100 DOLLARS ($56,259.15) per annum.

During any Extended Term, the rental payable by Tenant to Landlord shall be as follows:

(i)    First Extended Term — SIXTY FOUR THOUSAND SIX HUNDRED NINETY EIGHT AND 02/100 DOLLARS ($64,698.02) per annum;

(ii)   Second Extended Term — SEVENTY FOUR THOUSAND FOUR HUNDRED TWO AND 72/100 DOLLARS ($74,402.72) per annum; and

(iii)  Third Extended Term — EIGHTY FIVE THOUSAND FIVE HUNDRED SIXTY THREE AND 13/100 DOLLARS ($85,563.13) per annum.

(b) If any installment of rent, as hereinabove provided, shall not be paid within fifteen (15) days after receipt of written notification from Landlord that such payment is due, Tenant shall pay to Landlord, upon demand, interest at the rate of ten (10%) percent per annum on the amount of such installment from the due date thereof until paid. Notwithstanding anything herein contained to the contrary, Tenant shall pay all rent when due, without notice or demand.

**Taxes (Impositions)**

5. (a) Throughout the Primary Term and Extended Term of this Ground Lease, Tenant shall pay or cause to be paid, as and when same shall become due, all Impositions as defined in Subsection (b) of this Article 5, except that:
(i) all Impositions for the fiscal year or tax year in which the term of this Ground Lease shall commence or terminate shall be prorated to the date of occupancy by Tenant on a daily basis using the "due date" method of computation;

-2-



(ii) where any assessment is permitted by law to be paid in installments, Tenant may pay such assessment in installments as and when each such installment shall become due; and

(iii) all special assessments levied or assessed against the Demised Premises prior to the commencement of construction on Tenant's building and improvements shall be the responsibility of Landlord.

(b) The term "Impositions" shall mean all real property taxes, assessments, use and occupancy taxes, fees in lieu of taxes, water and sewer charges, rates and rents, charges for public utilities, excises, license and permit fees and other charges, real and personal, general and special, ordinary and extraordinary, foreseen and unforseeable, of any kind and nature whatsoever, which shall or may during the term of this Ground Lease be assessed, levied, charged, confirmed, or imposed upon or become payable out of or become a lien on the Demised Premises or any part thereof, the appurtenances thereto or the rent and income received by or for the account of Tenant from any subtenants or for any use or occupation of the Demised Premises, and such franchise fees, fees for licenses and permits as shall be appurtenant to the use of the Demised Premises, this transaction or any documents to which Tenant is a party, creating or transferring an interest or estate in the Demised Premises, but shall not include any municipal, state, or federal income taxes assessed against Landlord, or any municipal, state, or federal levy, estate, succession, inheritance, or transfer tax of Landlord, or any franchise taxes imposed upon any corporate owner of the Demised Premises, or any part thereof, or any income, profit or revenue tax, assessment or charge imposed upon the rent received as such by Landlord under this Ground Lease, provided, however, that if at any time during the term of this lease, the present method of taxation or assessment shall be so changed that there shall be substituted for the whole or any part of the taxes, assessments, levies, impositions or charges now or hereafter levied, assessed or imposed on real estate and the improvements thereon, a capital levy or other tax levied, assessed and/or imposed on the rents received by Landlord from said real estate or the rents received herein or any part thereof, then all such capital levies or other taxes shall, to the extent that they are so substituted, be deemed to be included within the term "Impositions". ~~if requested by Landlord~~



(c) Tenant shall pay all such Impositions directly to the taxing authority and shall exhibit and deliver to Landlord/photostatic copies of the receipted bills or other evidence satisfactory to Landlord showing such payment promptly after such receipt shall have been received by Tenant and, in any event, within thirty (30) days after such payment. Within ten (10) days after receipt by Tenant of any real estate tax bill relating to the Demised Premises or any part thereof, Tenant shall deliver to Landlord a copy of such real estate tax bill.

(d) Tenant may, if it shall so desire, contest the validity or amount of any such Imposition, in which event, Tenant may defer the payment thereof during the pendency of such contest; provided, that within fifteen (15) days after the same shall become due, Tenant shall have deposited with a bank or trust company acceptable to Landlord, an amount sufficient to pay such contested item together with the interest and penalties thereon (as reasonably estimated by Landlord), which amount said bank or trust company shall apply to the payment of such item when the amount thereof shall be finally fixed and determined. Landlord will at the request of Tenant, cooperate with Tenant in contesting such assessments, but at no expense to Landlord, and in the event Landlord is required by Law to join in any action or proceeding taken by Tenant to contest such assessment, Tenant shall hold Landlord harmless from all reasonable costs, expenses, claims, losses or damages arising out of such action or proceeding.

(e) In furtherance of the preceding, Tenant shall diligently pursue and use its best efforts to secure separate tax assessment of the Demised Premises. If Tenant is successful in receiving such separate assessment, the

-3-

foregoing provisions of this Article 5 shall be in effect. If the taxes assessed upon the Demised Premises are not separated from the remainder of the shopping center, Tenant shall pay to Landlord all taxes attributable to Tenant's structure and improvements and to the personal property used by Tenant in the operation of its business, and, a proportionate amount of the taxes attributable to the land described on Exhibit "B". Such proportionate share shall be in the ratio that the acreage of the Demised Premises, as described on Exhibit "A", bears to the acreage of the shopping center, as described on Exhibit "B".

In the event such separate assessment is unobtainable, Landlord shall notify Tenant, in writing, as to the amount of impositions Tenant shall be required to pay in accordance with the foregoing provisions of this Article 5. Such written notification shall be forwarded to Tenant not later than twenty (20) days prior to the date such Impositions are due and such written notification shall be accompanied by a copy of the tax bill and such information as may be required to show how Tenant's portion of such Impositions was calculated.

(f) In the event Landlord and Tenant cannot agree as to the proper portion of the assessment attributable to the Demised Premises, such question shall be submitted to a board of appraisers, two in number, one named by Landlord and one named by Tenant, each of whom shall be a qualified member of the American Institute of Real Estate Appraisers, or any successor of such institute, or if such organization or successor shall no longer be in existence, a national association or institute of appraisers. Each appraiser so appointed shall be instructed to determine independently the portion of the assessment attributable to the Demised Premises within fifty (50) days after their appointment. If only one appraiser shall have been so appointed, or if two appraisers shall have been so appointed, or if two appraisers shall have been so appointed but only one such appraiser shall have made such determination within fifty (50) days after such appointment, then the determination of such appraiser shall be final and binding upon the parties. If two appraisers shall have been appointed and shall have made their determinations within the respective requisite periods set forth above and if the difference between the amounts so determined shall not exceed 10% of the lesser of such amounts, then the portion of the assessment attributable to the Demised Premises shall be an amount equal to 50% of the sum of the amount so determined. If the difference between the amounts so determined shall exceed 10% of the lesser of such amounts, then such two appraisers shall have twenty (20) days to appoint a third appraiser, but if such appraisers fail to do so, then either party may request the American Arbitration Association or any successor organization thereto to appoint an appraiser within twenty (20) days of such request, and both parties shall be bound by the appointment so made within such twenty (20) day period. If no such appraiser shall have been appointed within such twenty (20) days, either Landlord or Tenant may apply to any court having jurisdiction to have such appointment made by such court. The determination of the appraiser which differs most in terms of dollar amount from the determinations of the other two appraisers shall be excluded and 50% of the sum of the remaining two determinations shall be final and binding upon Landlord and Tenant. This provision for determination hereunder shall be final and binding upon the parties except as otherwise provided by applicable law.

Title Report, 6.    (a)  Within thirty (30) days after the execution of this Ground Lease
Title Insur-  Tenant shall order, at Tenant's sole cost and expense, a preliminary title
ance, Survey  report or other evidence of title satisfactory to Tenant (a copy of which shall be sent to Landlord).  Said report or evidence of title shall show the legal description of the Demised Premises (said legal description to be initialed by both parties hereto and attached to this Ground Lease as Exhibit "A") and any easements, encumbrances or other matters affecting the leasehold estate of Landlord.

-4-

(b) Within thirty (30) days after the execution of this Ground Lease, Tenant shall also order, at Tenant's sole cost and expense, a survey of said Demised Premises (a copy of which shall be sent to Landlord) by a duly licensed surveyor which shall show the location, area boundaries, and dimensions of the Demised Premises to be in conformity with the foregoing recitals, their relative locations with respect to streets or highways, the location of easements or reservations, and that there are no encroachments of any improvements adjoining the Demised Premises.

(c) If such title report, evidence of title and/or survey shall disclose that the leasehold estate is not vested in Landlord or that there exists, in the sole opinion of Tenant any unsuitable easement or encumbrances, Tenant shall have the right to terminate this Ground Lease and declare same null and void and of no force and effect, provided, however, said option to terminate shall be exercised by Tenant in writing not more that sixty (60) days after receipt of said title report, evidence of title and/or survey. In the event Tenant shall fail to exercise its right to cancel within said sixty (60) day period, as hereinbefore provided, this Ground Lease shall continue in full force and effect; provided, however, Tenant shall be allowed a reasonable time to remove the aforesaid restrictions on the title. If Tenant has diligently sought to remove said easements, restrictions and encumbrances, and same shall not be removed within sixty (60) days, Tenant shall be allowed to terminate the Ground Lease by written notice to Landlord.

**Permits, Licenses Variances and Approvals**    7. Landlord acknowledges and agrees that this Ground Lease is contingent upon Tenant obtaining, at Tenant's sole cost and expense, all necessary permits, licenses, variances, and approvals pertaining to the building, occupancy, signs, curb cuts, driveways, zoning, environmental controls, and any other governmental permits, which in Tenant's judgement, are necessary to permit Tenant to construct and operate upon the Demised Premises. The obligations of Tenant under the terms of this Ground Lease shall be conditioned upon all said permits, licenses, variances and approvals being validly and irrevocably granted on terms and conditions satisfactory to Tenant and no longer subject to appeal. Landlord agrees to execute any applications or other documents requested by Tenant in order to obtain said permits, licenses, variances and approvals, so long as the execution of said applications or documents will not cause Landlord to be in violation of any term, condition, or covenant of the Master Lease and at Tenant's sole cost and expense. Tenant shall indemnify and hold Landlord harmless from all claims, liabilities and expenses arising from its execution of such applications and documents. Tenant shall proceed diligently to secure said permits, licenses, variances and approvals. In the event any of the aforesaid permits, licenses, variances or approvals have not been obtained within one hundred eighty (180) days following the execution of this Ground Lease, then this Ground Lease shall, at Tenant's or Landlord's option, be void and both parties hereto shall be relieved from any and all obligations and/or liabilities hereunder, and all deposits and payments made shall be refunded to Tenant.

**Topographical Surveys, Engineering Studies, Soil Test and Borings**    8. At any time following the execution of this Ground Lease, Tenant may enter upon the Demised Premises to make such topographic surveys, perform such engineering studies and to procure such soil tests and borings as Tenant shall deem appropriate. In the event such surveys, studies and tests and borings should indicate conditions not satisfactory for Tenant's intended construction or use, Tenant shall have the option of cancelling this Ground Lease by so notifying Landlord in writing of its intention within one hundred eighty (180) days of the execution of this Ground Lease. Tenant covenants and agrees that it will, at its sole cost and expense, restore the Demised Premises to its original condition following completion of such surveys, studies and tests and borings. Tenant further covenants that such surveys, studies and tests and borings will be completed in a manner that will cause the least possible interference with Landlord's business.

-5-




**Construction**    9.    (a)  Tenant covenants and agrees that any building, structure or other improvement constructed on the Demised Premises, or any portion thereof, shall be constructed without cost or expense to Landlord and, in accordance with the requirements of all laws, ordinances, codes, orders, rules and regulations of all governmental authorities having jurisdiction over the Demised Premises.  Such construction shall be performed in a manner that will not unreasonably interfere with Landlord's business and use of the property described on Exhibit "B".  Throughout the duration of this Ground Lease, Tenant agrees that all installation, buildings, structures and improvements that may be erected on the Demised Premises by Tenant, including, but not limited to all plumbing, electrical, heating, air conditioning and ventilation equipment and systems, and all other equipment, will be installed, operated and maintained in accordance with the law and within the regulations and requirements of any and all governmental authorities, agencies or departments having jurisdiction thereof, without cost or expense to Landlord.

(b)  Prior to commencing construction of any building or improvements, Tenant, its subcontractor or agent, without cost to Landlord, shall obtain Builder's Risk Insurance covering such building and improvements to the full extent of the insurable value thereof and Worker's Compensation Insurance covering all persons employed in connection with such construction and with respect to whom death or bodily injury claims could be asserted against Landlord, Tenant and/or the Demised Premises, and general liability insurance for the mutual benefit of Landlord, Tenant and the Demised Premises with limits of not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) in the event of bodily injury or death to one (1) person and not less than ONE MILLION DOLLARS ($1,000,000.00) in the event of bodily injury or death to any number of persons in any one accident, and with limits of not less than ONE HUNDRED THOUSAND DOLLARS ($100,000.00) for damages or injury to property. Said policies shall be maintained by Tenant, at Tenant's sole cost and expense, at all times when any such construction is in progress.  All such insurance shall be affected under standard form policies with a financially responsible insurance company or companies.  Such policy or policies shall name Landlord and Tenant and any other parties in interest designated by Landlord and Tenant as insured and shall contain a clause that the insurer will not cancel or change the insurance prior to completion of construction without first giving Landlord thirty (30) days prior written notice.  Tenant shall promptly furnish to Landlord such evidence as Landlord may require that the foregoing insurance is in full force and effect and that the premiums therefore have been paid.  In addition to the foregoing, Tenant shall indemnify and hold Landlord harmless from all losses, claims, damages, liabilities and expenses arising from Tenant's construction of improvements upon the Demised Premises.

(c)  All initial construction shall be conducted in accordance with plans and specifications prepared by an architect or engineer selected by Tenant; it being understood and agreed by both parties hereto that Tenant intends to construct a building and related improvements that are similar to other such structures and improvements previously constructed by Tenant in the state in which the Demised Premises lies.  In the event Tenant shall elect to construct a building and related improvements that are substantially different from other such structures and improvements previously constructed by Tenant in the state in which the Demised Premises lies, Tenant shall notify Landlord and shall submit to Landlord for its prior review and approval (said approval not to be unreasonably withheld), detailed plans and specifications that shall have been prepared and approved in writing by an architect or engineer.  Prior to commencing initial construction, Tenant shall submit to Landlord, for Landlord's approval (said approval not to be unreasonably withheld), two (2) copies of a final site, grading and utility plan.  Said site, grading and utility plan shall show the location of any and all proposed improvements to be made by Tenant upon the Demised Premises and

-6-



a layout of the parking and drives to service said Demised Premises. Landlord shall have fourteen (14) days after receipt of said final site, grading and utility plan and detailed plans and specifications (if required) to approve or disapprove same.

Notwithstanding anything herein contained to the contrary, no building or other structure to be constructed by Tenant or to be caused to be constructed by Tenant on any portion of the Demised Premises shall exceed one (1) story or twenty four (24) feet in height whichever is smaller, not including Tenant's standard building cupola, and shall contain no more than three thousand (3,000) square feet.

(d) The cost of such construction shall be paid for by Tenant so that the Demised Premises shall at all times be free of liens for labor and materials supplied or claimed to have been supplied thereto and Tenant shall at all times indemnify Landlord, the Demised Premises and the property described on Exhibit "B" (and the owners and occupants thereof) against all such liens or claims which may ripen into liens, and against all reasonable attorneys fees and other reasonable costs and expenses growing out of or incurred by reason of or with respect to construction done by or for Tenant. Should Tenant fail to fully discharge any such lien or claim, or in the alternative fail to post a bond sufficient to discharge such lien or claim within ten (10) days after written request therefor by Landlord, then Landlord, at its option, may pay the same or any part thereof and shall be the sole judge of the legality of such lien or claim and the sufficiency of any bond; provided, however Tenant shall have the right to contest any payment made by Landlord on its behalf. All amounts so paid by Landlord, together with interest thereon at the rate of ten (10%) percent per annum from the time of payment until repayment, shall be repaid by Tenant as if the same were additional rent.

(e) Tenant covenants and agrees, at its sole cost and expense, to restore any common parking area and striping located on the property described on Exhibit "B" which may be disturbed because of Tenant's activities in erecting any improvements or structures on the Demised Premises.

**Parking and Common Areas**
10. Landlord and Tenant hereby give and grant unto one another and their respective employees, customers, licenses and invitees, full licenses, rights, privileges and easements to use the common areas existing, from time to time on each party's respective property described on Exhibit "A" and "B" in common with the other party and any other tenants, if any,m of the property described on Exhibit "A" and "B" and their respective agents, employees, customers, licenses and invitees. No person other than those described in the preceding sentence of this Article shall be permitted to park upon or exercise any other rights over and any of the parking areas of either property.

**Maintenance Repair and Alterations**
11. (a) Tenant covenants and agrees, at its sole cost and expense, at all times during the term of this Ground Lease, and any extensions and renewals thereof, to maintain and keep in good order, condition and repair (including replacement of parts and equipment, if necessary) the building and/or improvements from time to time located upon the Demised Premises, whether said repairs shall be structural or non-structural; including, without limitation, repairs to foundations, roof, outer walls, lighting and landscaping, and Tenant shall keep and maintain the parking areas, service drives, driveways and pedestrian walks on the Demised Premises in good order, repair and condition, and shall keep the same free and clear from rubbish, ice and snow, striped and landscaped, adequately drained and free of chuckholes. If Tenant neglects to commence or complete repairs promptly or adequately, Landlord shall notify Tenant in writing. If said repairs are not commenced by Tenant within ten (10) days following receipt of said written notice, Landlord may, but shall not be required, to make and complete such repairs and Tenant shall pay the reasonable cost thereof to Landlord upon

-7-

demand together with interest thereon at the rate of ten (10%) percent per annum from the time of Landlord's payment until repayment. Notwithstanding anything herein contained to the contrary, Landlord shall have no obligation whatsoever for the maintenance, repair or replacement of any part of the Demised Premises.

(b)  In addition to the foregoing, Tenant hereby agrees to pay to Landlord, on a quarterly basis, Tenant's proportionate share of Landlord's costs to clean and illuminate the parking and common areas located upon the property described on Exhibit "B".  Such proportionate share shall be calculated upon the basis that the square footage of Tenant's building bears to the total square footage of all of the buildings located upon the property described on said Exhibit "B".  Landlord shall submit to Tenant, at the end of each quarter, a statement as to the amount Tenant shall be required to pay under the terms hereof.  Such statement shall contain such information as may be required by Tenant to show how Tenant's proportionate share of such costs was calculated.  Unless disputed, Tenant shall pay such proportionate share of such costs to Landlord within fifteen (15) days after receipt of said statement.  Tenant shall have the right to dispute any such statement and examine Landlord's records pertaining thereto within thirty (30) days following receipt of said statement.  Any such expenses incurred during a period that shall be less than a quarter shall be prorated on a daily basis.

(c)  Tenant shall have the right to make, at its sole cost and expense, additions, alterations and changes (hereinafter referred to as "alterations") in or to the building and improvements from time to time located on the Demised Premises, provided Tenant shall not then be in default in the performance of any of Tenant's covenants or agreements in this Lease, and subject to the following conditions:

(i)  no structural alterations shall be commenced except after twenty (20) days prior written notice to Landlord;

(ii)  no alterations of any kind shall be made without prior written consent of Landlord (said consent not to be unreasonably withheld) which would tend to reduce or impair the value or usefulness of the Demised Premises or any part thereof;

(iii)  no alterations shall be undertaken until Tenant shall have procured and paid for, so far as the same may be required, from time to time, all permits and authorizations of all municipal departments and governmental subdivisions having jurisdiction;

(iv)  any alteration involving in the aggregate an estimated cost of more than FIFTY THOUSAND DOLLARS ($50,000.00) shall be conducted under the supervision of an architect or engineer selected by Tenant and approved in writing by Landlord (which approval shall not be unreasonably withheld), unless such alteration shall be part of a system wide change and performed in accordance with plans and specifications available to Landlord.  Then and in that event, Landlord's prior written approval shall not be required, unless a structural change is necessitated.  No such structural alteration shall be made, except in accordance with detailed plans and specifications and cost estimates prepared and approved in writing by such architect or engineer and approved in writing by Landlord (which approval shall not be unreasonably withheld); provided, however, no alteration of any nature shall cause the building or structure to exceed the height and square footage limitations imposed by Article 9 of this Ground Lease;

(v)  any alteration shall be made promptly, subject to unavoidable delays, and in a good and workmanlike manner and in compliance with all applicable permits and authorizations and building and zoning laws and with all other laws, ordinances, orders, rules, regulations and

-8-

requirements, of all federal, state and municipal governments, departments, commissions, boards and officers, and in accordance with the orders, rules and regulations of the National Board of Fire Underwriters, the local Board of Fire Underwriters or any other body or bodies hereafter exercising similar functions;

(vi)   the cost of any such alteration shall be paid so that the Demised Premises and the property described on Exhibit "B" shall at all times be free of liens for labor and materials supplied or claimed to have been supplied to the Demised Premises and Tenant shall indemnify Landlord against all reasonable attorneys fees and other reasonable costs and expenses growing out of or incurred by reason of or with respect to the alterations done by or for Tenant.   Should Tenant fail to fully discharge any such lien or claim, or in the alternative fail to post a bond sufficient to discharge such lien or claim within ten (10) days after written request therefor by Landlord, then Landlord, at its option, may pay the same or any part thereof and shall be the full judge of the legality of such lien or claim and the sufficiency of any bond; provided, however, Tenant shall have the right to contest any payment made by Landlord on its behalf.   All amounts paid by Landlord, together with interest thereon at the rate of ten (10%) percent per annum from the time of payment until repayment, shall be repaid by Tenant as if the same were additional rent;

(vii)   Tenant and Tenant's subcontractors and agents, shall obtain Worker's Compensation, Builder's Risk and liability insurance in the same amounts and form required by the construction requirements of Article 9(b) hereof; and

(viii)   Tenant shall have the right, from time to time, to install such other or additional equipment on the Demised Premises as Tenant may deem necessary for the conducting of Tenant's business.

Insurance   12.   (a)   Tenant shall, during the entire term of this Ground Lease and any extension thereof, keep in full force and effect a policy of public liability and property damage insurance insuring the Demised Premises against any and all claims for personal injury, including property damage in, on or about the Demised Premises in which the limits of public liability shall not be less than FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) per person and ONE MILLION DOLLARS ($1,000,000.00) per accident and in which the limit of property damage liability shall not be less than ONE HUNDRED THOUSAND DOLLARS ($100,000.00).   Such insurance shall be carried with a financially responsible insurance company or companies and may be carried under a policy or policies covering other liabilities and locations of Tenant.   Such policy shall name Landlord and Tenant and any other parties in interest designated by Landlord and Tenant as insured and shall contain a clause that the insurer will not cancel or change the insurance without first giving Landlord thirty (30) days prior written notice.   From time to time, Tenant shall furnish to Landlord such evidence as Landlord may require that the foregoing insurance is in full force and effect and that the premiums therefor have been paid, and all renewal policies shall be delivered to Landlord no less than thirty (30) days prior to the date of expiration of the then existing policy.   In addition to the foregoing, Tenant shall indemnify and hold Landlord harmless from any and all losses, claims, damages, liabilities and expenses arising in any manner from Tenant's use and operation of the Demised Premises.   For the purposes of this Ground Lease,a certificate of insurance shall be deemed satisfactory for the hereinabove requirements.

(b)   Tenant shall also keep the building and all other improvements located on the Demised Premises insured against loss or damage by fire, windstorm, hail, explosion, damage from aircraft and vehicles and smoke damage and such other risks as are from time to time covered under "Extended

–9–

Coverage" endorsements and special extended coverage endorsements commonly known as "All Risks" endorsements in an amount sufficient to prevent Landlord or Tenant from being a co-insurer of any partial loss but in any event in an amount equal to the full replacement value thereof (exclusive of the cost of excavation, foundations and footings). Such insurance shall be carried with a financially responsible insurance company or companies and may be carried under a policy or policies covering other property owned or controlled by Tenant provided such policy or policies allocate to the Demised Premises an amount that shall not be less than the amount of insurance required to be carried by Tenant with respect to the first sentence of this Paragraph 12 (b). Tenant shall furnish to Landlord such evidence as Landlord may reasonably require that the foregoing insurance is in full force and effect and that the premiums therefor have been paid, and all renewal policies shall be delivered to Landlord not less than thirty (30) days prior to the date of expiration of the then existing policy. Tenant agrees that such policies shall contain a provision that the same may not be cancelled without at least thirty (30) days prior written notice being given by the insurer to Landlord. All moneys collected from such insurance shall be applied on account of the obligation of Tenant to repair and/or rebuild the improvements on the Demised Premises pursuant to Article 14 of this Ground Lease.

(c) In case Tenant shall at any time fail, neglect or refuse to proceed to insure such building and improvements and to keep the same insured as provided in this Article 12, Landlord may, at its election, procure or renew such insurance, and any amounts paid therefor by Landlord shall be due at the next rent day after such payment, with interest at the rate of ten (10%) percent per annum, from the date of payment until repayment.

(d) Tenant shall cause its insurance carrier to review the fire insurance carried by Tenant on the Demised Premises on a three (3) year basis so that such insurance is maintained in the amount of the then full replacement value of the building and improvements (exclusive of the cost of excavation, foundations and footings) upon said premises. A copy of such report shall be delivered to Landlord within thirty (30) days after the end of each lease year. Upon failure of Tenant to deliver such report to Landlord, Landlord shall have the right to cause its own insurance carrier to make such review, at Tenant's expense, and Tenant agrees to be bound thereby.

(e) Tenant releases Landlord and any officer, agent, employee or representative of Landlord from any liability whatsoever hereafter arising from loss or damage to the Demised Premises caused by fire or other peril covered by any policy of fire or extended coverage insurance payable to Tenant at the time of such loss or damage; except such damage or loss as a result of Landlord's act.

(f) The policies of insurance provided hereunder any also name any mortgagee, upon its request, as an insured as its interest may appear, by standard mortgagee clause, if obtainable, provided that such mortgagee shall agree that the proceeds of such insurance shall be applied in accordance with this Ground Lease.

**Indemnification**   13. Tenant will defend, indemnify and save Landlord, the Demised Premises and the property described on Exhibit "B" (and the owners and occupants thereof) harmless from and against any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in, upon or at the Demised Premises, or use, occupation, possession or management of the Demised Premises, unless same shall result as of or on account of negligence on the part of Landlord. In case Landlord shall, without fault on its part, be made a party to any litigation commenced by or against Tenant, then Tenant shall protect, defend and hold Landlord harmless and shall pay all costs, expenses and reasonable attorney fees and expenses incurred or paid by Landlord in connection with such litigation.

-10-

**Damage and
Destruction**

14. (a) In the event the building to be located on the Demised shall be damaged or destroyed by fire or any other casualty (including any casualty for which insurance coverage was not obtained or obtainable) as to become partially or totally untenantable, Tenant shall proceed with all reasonable dispatch to repair or rebuild the building and the improvements on the Demised Premises as nearly as possible to the value, condition, and character immediately prior to such damage or destruction, subject to such changes or alterations as Tenant may elect to make in conformity with the provisions of Article 11 (b) hereof. Upon completion of the repair or restoration of the Demised Premises, Tenant shall deliver to Landlord a copy of the certificate of occupancy for said premises Notwithstanding the requirement of Tenant to repair or rebuild, as set forth in the immediate preceding paragraph, then Tenant, if it so elects, in the alternative, may raze the building and clear the site, in which event the building will be completely removed and the site will be left in its original condition.

(b) If Tenant shall elect to repair or rebuild, all insurance proceeds paid to Tenant on account of such damage or destruction under the policies of insurance provided for in Article 12 hereof, less the cost, if any, incurred in the adjustment of the loss and the collection thereof shall be applied to the payment of the repairs and restoration to the extent necessary. Landlord shall be entitled to participate, at its expense, in any proceeding, action, prosecution or negotiation relating to the adjustment of any insurance proceeds.

If the insurance proceeds received by or for the account of Tenant shall be insufficient to pay the entire cost of such repairs and restoration, Tenant shall supply the amount of any such deficiency and shall first apply the same to the payment of the cost of such repairs and restoration before calling for the disbursement of any insurance proceeds.

Under no circumstances shall Landlord be obligated to make any payment or contribution towards the cost of such repairs and restoration.

(c) There shall be no abatement of rent during the period of repair and rebuilding of the Demised Premises or if Tenant shall elect to raze the building and clear the site, and this Ground Lease shall remain in full force and effect for the remainder of its term. Landlord shall have no claim for any insurance proceeds payable hereunder, said proceeds payable in full to Tenant.

**Eminent
Domain**

15. (a) If the whole or substantially all of the Demised Premises shall be taken by any public authority under the power of eminent domain then the term of this Ground Lease shall cease as of the day possession shall be taken by such public authority and the rent shall be paid up to that day of possession. All such rent paid in advance and pertaining to a period beyond the date of possession shall be proportionately refunded by Landlord. For purposes of this Article 15, "substantially all" of the Demised Premises shall be deemed to have been taken if the remaining property cannot be practically used by Tenant for the purposes permitted by this Ground Lease.

In the event of a taking of the whole or substantially all of the Demised Premises, so long as no default by Tenant hereunder shall have occurred and be continuing;

(i) The Landlord under the Master Lease shall be entitled to any award or awards made in connection with such taking for the value of its fee ownership of the Demised Premises.

(ii) Tenant shall be entitled to any award or awards in connection with such taking of the building and improvements erected on the Demised Premises by the Tenant and

-11-

(iii)  Landlord shall be entitled to receive the award for the taking of its interest in the Demised Premises.

(b)  In the event of a taking of less than the whole or less than substantially all of the Demised Premises, the term of this Ground Lease shall not be reduced or affected in any way, provided, however, the rental payable by Tenant shall be reduced proportionately, and, so long as no default by Tenant hereunder shall have occurred and be continuing,

(i)  The Landlord under the Master Lease shall be entitled to any award or awards made in connection with such taking for the value of its fee ownership of the Demised Premises.

(ii)  Tenant shall be entitled to any award or awards which shall be made for the purpose of the repair and restoration of Tenant's building as set forth in Paragraph (c) hereof, to the extent required for such restoration and

(iii)  Landlord shall be entitled to receive the award for the reduction of its interest in the Demised Premises and the rental income therefrom in connection with such taking.

(c)  In the event of a taking that does not result in a termination of this Ground Lease, Tenant, at its sole cost and expense, shall proceed with reasonable diligence to repair, alter and restore the remaining portion of Tenant's building to substantially its former condition to the extent that the same may be feasible, subject to such changes or alterations as Tenant may elect to make in conformity with Article 11 (b) hereof. Upon completion of the repair or restoration of the Demised Premises aned improvements, Tenant shall deliver to Landlord a copy of the certificate of occupancy for the Demised Premises and improvements.

(d)  Landlord shall be entitled to participate, at its expense, in any condemnation proceeding, action, negotiation, prosecution or adjustment relating to the Demised Premises.

Utilities   16.  (a)  Tenant agrees to pay, when due, all charges for water, sewer, gas, electricity or public utilities (hereinafter collectively referred to as "utilities") incurred by Tenant in connection with its use of the Demised Premises during the term of this Ground Lease and any extension thereof.

(b)  It is understood and agreed to by the parties hereto that Tenant's use and enjoyment of the Demised Premises is contingent upon there being available for tap-in and use at said Demised Premises, all utilities, in sufficient quantities to adequately meet the needs of Tenant. Landlord, hereby makes no representation or warranty that such utilities are available and Tenant agrees that any extension of said utilities to the Demised Premises shall be at its sole cost and expense. Notwithstanding anything herein contained to the contrary, Tenant shall, at its sole option, within one hundred twenty (120) days following the execution of the Ground Lease, have the right to cancel this Ground Lease if said utilities are unavailable for tap-in, are not available in sufficient quantities for Tenant's use or the cost of extending the utilities to the Demised Premises shall exceed FIVE THOUSAND DOLLARS ($5,000.00); provided, however, Tenant shall restore the Demised Premises to its original condition just prior to the execution of this Ground Lease.

(c)  Tenant shall pay any "tap in" fee or other charges for the installation of or connection to oil, gas, electricity, water, telephone, sanitary sewer, storm or drainage sewer, and any and all other utilities as Tenant may require for its intended use of the Demised Premises.

-12-



(d) Tenant shall, at Tenant's sole cost and expense, repair and restore any portion of the property described on Exhibit "B" which may be damaged or disturbed as a result of Tenant's installation of, maintenance of, connection to or extension of any utility located on or beyond the property described on Exhibit "B". Tenant further agrees that in the event it is necessary to disturb said property described on Exhibit "B", it will conduct all or will cause all work to be conducted in a manner that will cause the least possible interference with the businesses being conducted on the property described on Exhibit "B".

**Signs**

17. Tenant shall not cause or permit any exterior signs or exterior lighting to be installed on the Demised Premises without the prior written approval of the Landlord (said approval not to be unreasonably withheld) and of all governmental authorities having jurisdiction, and all such signs shall be installed and maintained in good condition and repair at Tenant's sole cost and expense.

**Use and Operation of Premises**

18. Tenant shall use and occupy the Demised Premises during the continuance of this Ground Lease solely for the purpose of the operation of a Kentucky, Fried Chicken restaurant or any other restaurant use which may be owned or affiliated with Tenant, and for no other purpose or purposes without the prior written consent of Landlord (said consent not to be unreasonably withheld); provided, however, Tenant shall not engage in the sale of breakfast bakery items or items normally sold in donut and coffee shop establishments. Tenant agrees to conduct its business in a high-class and reputable manner. Nothing contained herein shall obligate Tenant to continually operate a business in the premises.

Tenant shall promptly comply with all laws and ordinances and lawful orders and regulations affecting the premises hereby leased and the cleanliness, safety, occupancy and use of same.

Tenant shall keep the Demised Premises orderly, neat, safe and clean and free from rubbish and dirt at all times, shall store all merchandise, supplies and equipment within the building or other structures located, from time to time, on the Demised Premises and shall store all trash and garbage outside said building in a dumpster within a brick enclosure adjacent to said building. Tenant shall not burn any trash or garbage at any time in or about the building.

**Assignment and Sub-letting**

19. Tenant agrees not to assign or in any manner transfer this Ground Lease or any estate or interest therein without the prior written consent of Landlord, and agrees not to sublet said premises or any part or parts thereof or allow anyone to come in with, through or under it without like consent. Consent by Landlord to one or more subletting of said Demised Premises shall not constitute a waiver of Landlord's rights under this Article. Anything herein to the contrary notwithstanding, the making of any assignment or subletting, in whole or in part, shall not operate to relieve Tenant from its obligations under this Ground Lease.

**Default**

20. (a) In the event Tenant shall (i) fail to pay any rent or other sum due hereunder within fifteen (15) days after receipt of written notification by Landlord that such payment is due; or (ii) fail to perform any other terms, conditions or covenants of this Ground Lease for more than thirty (30) days following receipt of Landlord's written notification; or (iii) abandon the Demised Premises; or (iv) breach any obligation under this Ground Lease which cannot be cured, then, and in any event, Landlord may, at Landlord's option and without limiting Landlord in the exercise of any right or remedy Landlord shall have on account of such default, and without further demand or notice:

(i) terminate this Ground Lease, eject all parties in possession thereof therefrom and repossess and enjoy said premises together with all improvements thereto, and all rights of Tenant hereunder shall expire and terminate, or

-13-



(ii) re-enter the Demised Premises by summary proceedings, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable on such terms and for such purposes as Landlord in its sole discretion may determine (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of the Demised Premises. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date hereinbefore provided for the payment of rent.

(b) If any default by Tenant (except the non-payment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be necessary to remedy such default before this Ground Lease can be terminated or other remedy enforced by Landlord, so long as Tenant shall be diligently proceeding to cure such default. Except for the legal remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

(c) Failure by Landlord to insist upon the strict performance of any provision hereof or to exercise any option, right, power or remedy contained herein shall not constitute a waiver or relinquishment thereof for the future. Receipt by Landlord of any rental or other sum payable hereunder with knowledge of the breach of any provision hereof shall not constitute a waiver of such breach, and no waiver by Landlord of any provision hereof shall be deemed to have been made unless made in writing. Landlord shall be entitled to injunctive relief in case of the violation, or attempted or threatened violation, of any provisions hereof, or to a decree compelling performance of any provisions hereof.

(d) If Tenant shall be in default in the performance of any of its obligations hereunder, Tenant shall pay to Landlord, on demand, all expenses incurred by Landlord as a result thereof, including its reasonable attorneys' fees and expenses. If Landlord shall be made a party to any litigation commenced against Tenant and Tenant, at its expense, shall fail to provide Landlord with counsel approved by Landlord, Tenant shall pay all costs and reasonable attorneys' fees incurred by Landlord in connection with such litigation.

**Bankruptcy** 21. If a petition of bankruptcy or reorganization shall be filed by or against Tenant or if Tenant shall become bankrupt, or if Tenant shall make a general assignment for the benefit of its creditors; or if in any proceeding based upon the insolvency of Tenant, a receiver or trustee of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then, and in any event, Landlord may terminate this Ground Lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, reorganization, an assignment for the benefit of creditors or the appointment of a receiver or trustee shall affect this Ground Lease or permit its termination so long as all of the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Quiet Possession** 22. Tenant, upon paying the rent herein provided and performing all and singular the covenants and conditions of this Ground Lease on its part to be performed, and so long as no default has occurred and is continuing, shall and may peaceably and quietly have, hold and enjoy the Demised Premises during the term hereof without hindrance or molestation, subject to the covenants, agreements, terms, provisions and conditions of this Ground Lease and the Master Lease.

-14-

**Title to**
**Buildings,**
**Fixtures and**
**Equipment**

23.  (a) All trade fixtures and equipment shall remain and continue to be the property of Tenant and may be replaced at anytime and from time to time during the term of this Ground Lease and may be removed at the expiration or termination of this Ground Lease; provided the removal of such is completed within thirty (30) days after the expiration of this Ground Lease and does not damage or affect the structural integrity of the building. If the removal of such trade fixtures or equipment is not completed within said thirty (30) days, Tenant shall deliver to Landlord a bill of sale of such trade fixtures and equipment.

(b) Title to the building and all other improvements on the Demised Premises and any repairs, alterations, additions and improvements to said building or improvements shall be vested in and remain in Tenant at all times during the term of this Ground Lease. Upon the expiration or earlier termination of this Ground Lease, as herein provided, the building and improvements shall pass to and become vested in Landlord. Tenant shall execute such quit-claim deed, bill of sale or assignment as may be necessary to transfer such title to Landlord.

**Financing**

24.  Tenant shall have the right at any time and from time to time to grant a security interest in any goods and personal property owned by Tenant and installed or kept on the Demised Premises. Landlord consents to such security interest and disclaims any interest of any kind in such goods and property, so long as Tenant shall not be in default of any covenants or terms hereunder. Landlord agrees that it will within twenty (20) days following written request by Tenant confirm the foregoing.

It is understood and agreed that in no event shall the terms of this Article 24 be construed as a granting or giving of any agreement by Landlord or the Landlord under the Master Lease to subordinate or subject its interest in these Demised Premises to a lien of such financing.

**Default by**
**Landlord**

25.  If Landlord shall breach any material warranty of a serious nature so as to prevent Tenant from operating its business at the Demised Premises or fail to perform or commence to perform any covenant required to be performed by Landlord under the terms of this Ground Lease and such breach or failure shall continue for a period of thirty (30) days after receipt by Landlord of written notice thereof from Tenant, or if such breach or failure shall be of such a nature that same cannot be reasonably cured or remedied within said thirty (30) day period and if Landlord shall not in good faith have commenced the curing or remedying of such breach or failure within such thirty (30) day period and shall not thereafter diligently proceed therewith to completion under the terms of this Ground Lease then Tenant may:  (i) cure any default or breach of warranty of Landlord hereunder or perform any covenants which Landlord has failed to perform or (ii) declare this Ground Lease to be terminated, in which event Tenant shall have no further liability hereunder. Any sums reasonably extended by the Tenant in curing such default or breach of warranty or in performing such covenants shall be paid by Landlord to Tenant immediately upon demand and shall bear interest at the rate of ten (10%) percent from the date of payment until repayment.

**Non Waiver**

26.  Tenant agrees that any waiver by Landlord of the performance of any one of the conditions of this Ground Lease shall not be deemed to constitute a waiver of the right of Landlord to proceed against Tenant upon any subsequent breach of the same or other conditions of this Ground Lease.

**Attorney's**
**Fees**

27.  In the event either party hereto is compelled to file suit to enforce the terms of this Ground Lease, the party prevailing in such litigation, in addition to all other relief granted by the Court, shall be entitled to the payment by the losing party of all reasonable expenses, court costs and reasonable attorneys' fees incurred by the prevailing party in such litigation.

-15-

Landlord's    28. Upon reasonable notice, Tenant shall permit Landlord and/or its
Right to     authorized representatives to inspect the Demised Premises during normal
Inspect      business hours so long as said inspection does not unreasonably interfere
with the operation of Tenant's business.

Surrender    29. (a) Tenant shall upon expiration of the demised term, or any earlier
termination of this Ground Lease, surrender to Landlord the Demised Premises,
including, without limitation, all appurtenances thereunder, and all
alterations, improvements and other additions which may be made or installed
by Tenant, in good condition, reasonable wear and tear excepted. Any
personal property not subject to the interest of Landlord and not removed
within thirty (30) days of the termination of this Ground Lease shall become
the property of Landlord.

(b) Subject to the provisions of Article 11 hereof, Tenant shall also
have the right, at Tenant's sole cost and expense, to make changes in the
appearance of the improvements located on the Demised Premises, so as to
alter the appearance from the appearance of Tenant's standard building;
provided, however, such changes do not alter or affect the structural
integrity of the building or diminish the value of the improvements.

Entire      30. This Ground Lease and the Exhibits, attached hereto and forming a part
Agreement   hereof, set forth all the covenants, promises, agreements, conditions and
understandings between Landlord and Tenant concerning the Demised Premises
and there are no covenants, promises, agreements, conditions or
understandings, either oral or written, between them other than are herein
set forth. No alterations, amendments, changes or additions to this Ground
Lease shall be binding upon Landlord or Tenant unless reduced to writing and
signed by each party.

Notices     31. Any notice, demand request, or other instrument which may be or is
required to be given under this Ground Lease shall be sent by United States
certified mail, return receipt requested, postage prepaid and shall, if
intended for Landlord, be addressed to:

           (i) K mart Corporation
              Vice President
              Real Estate Development
              3100 West Big Beaver Road
              Troy, Michigan 48084

    and, if intended for Tenant, be addressed to:

           (ii) KFC National Management Company
              P. O. Box 32070
              1441 Gardiner Lane
              Louisville, Kentucky 40232

    or at such other place or places as Landlord and Tenant may designate
from time to time by written notice.

Recording    32. Tenant shall not record this Ground Lease. Landlord and Tenant shall,
however, upon the request of either, enter into a short form memorandum of
this Ground Lease; and, if there is a mortgagee, Landlord shall obtain a
Non-Disturbance and Attornment Agreement from such mortgagee, in suitable
form, for recording under the laws of the State where the Demised Premises
are located. If Landlord is unable to obtain said Non-Disturbance and
Attornment Agreement, through its best efforts, Tenant shall have the option
of waiving this requirement or of cancelling this Agreement.

Estoppel    33. Landlord and Tenant will, from time to time, upon twenty (20) days prior
Certificates written request by the other, cause to be executed, acknowledged and
delivered a certificate stating that this Ground Lease is unmodified and in

-16-

full effect (or, if there have been modifications, that this Ground Lease is in full effect as modified and setting forth such modifications) and the then amount of rental and other sums payable hereunder have been paid, and either stating that to the knowledge of the signor of such certificate no default exists hereunder or specifying each such default of which the signor has knowledge.

**Mortgage Subordination**   34. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this Ground Lease to any first mortgage upon the Demised Premises; provided, however, such subordination shall be upon the express condition that the validity of this Ground Lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this Ground Lease in and to the Demised Premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions in this Ground Lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this Ground Lease.

**Net Lease Obligations Unconditional**   35. This Ground Lease is a net lease and, except as otherwise expressly provided herein, any present or future law to the contrary notwithstanding, shall not terminate, nor shall Tenant be entitled to any abatement, reduction, setoff, counterclaim, defense or deduction with respect to any rental or other sum payable hereunder, nor shall the obligations of Tenant hereunder be affected in any way by reason of: any damage to or destruction of any improvement to the Demised Premises; any taking of any part of the Demised Premises by condemnation or otherwise; any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoinment of the Demised Premises, or any interference with such use, occupancy or enjoinment by any person; any eviction by paramount title or otherwise; any default by Tenant hereunder or under any other agreement; the impossibility or illegality of performance by any of the parties hereto; any action of any governmental authority; or any other cause whether similar or dissimilar to the foregoing. It is the intention of the parties hereto that the rental and other sums payable hereunder shall be paid by Tenant as absolutely net sums, without dimunition for any reason, except as otherwise expressly provided herein. The parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated pursuant to an express provision of this Ground Lease.

**Nontermin- ability**   36. Tenant shall remain obligated under this Ground Lease in accordance with its terms and, except as otherwise expressly provided herein, shall not take any action to terminate, rescind or avoid this Ground Lease, notwithstanding any damage to, or condemnation of, any portion of the Demised Premises or any improvements thereon, or the lawful or unlawful prohibition or interference with the use of the Demised Premises, or any bankruptcy, insolvency, reorganization, liquidation, dissolution or other proceeding affecting Landlord or any assignee of Landlord or any action with respect to this Ground Lease which may be taken by any trustee, receiver or liquidator or by any court. Tenant waives all rights to terminate or surrender this Ground Lease, or to any setoff, reduction, abatement or deferment of rental or other sums payable hereunder, except as otherwise expressly provided herein.

**Separability**   37. Each provision hereof shall be separate and independent and the breach of any such provision by Landlord shall not discharge or relieve Tenant from its obligations to perform each and every covenant to be performed by Tenant hereunder. If any provision hereof or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remaining provisions hereof, or the application of such provisions to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforceable to the extent permitted by law, and in place of such

-17-


invalid, illegal or unenforceable term or provision there shall be substituted a like, but valid, enforceable and legal provision which comports to the findings of the court so holding and more nearly accomplishes the original intention of the parties.

**Effective Date**    38. The effective date of this lease shall be that date upon which all parties hereto have executed the document and a fully executed Ground Lease has been delivered to Tenant.

**Consent**    39. It is understood and agreed that the Ground Lease shall be contingent upon Tenant, Landlord and Landlord's Landlord entering into a Non-Disturbance, Consent and Attornment Agreement substantially in the form attached hereto as Exhibit "D" and also contingent upon Tenant, Landlord's Landlord and Landlord's LANDLORD'S Mortgagee or mortgagees entering into a Non-Disturbance and Attornment Agreement substantially in the form attached hereby as Exhibit "E". If for any reason whatsoever, said agreement shall not be executed within thirty (30) days of the date of this Ground Lease, then said Ground Lease shall terminate and both parties hereto shall be released of any further obligations thereto.

**Marginal Notes**    40. The marginal notes in this Ground Lease are for reference only and shall not to any extent have the effect of modifying, amending or changing the provisions of this Ground Lease.

**Governing Law**    41. The Ground Lease shall be governed by and interpreted under the laws of the State in which the Demised Premises are located.

**Successors**    42. The covenants, conditions and agreements of this Ground Lease shall be binding upon and shall inure to the benefit of the heirs, representatives, successors and assigns of the parties hereto.

**Landlord's Consent**    43. In all instances where Landlord is required by this Ground Lease to give its consent, such consent shall not be unreasonably withheld, denied or delayed. If Landlord shall not respond to Tenant's request within fifteen (15) days following such request (unless a longer time period is hereinbefore specified) by Tenant is received by Landlord, such consent shall deem to have been granted by Landlord.

**Tenant's Approval**    44. Tenant's obligation to perform under this Ground Lease shall be subject to Tenant receiving full authorizations from its senior management and the Board of Directors of KFC Corporation. Should such authorization not be granted with sixty (60) days of the date of this Ground Lease, Tenant and Landlord shall be released hereunder and all deposits, if any, refunded to Tenant.



IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed as of the date and year first above written.

WITNESSES:

_Janine O. Pruaire_

_Barbara A. Evans_

_W. Emmick III_

_Diane M. Shires_

TENANT
KFC National Management Company

By:   William R. Espinosa
Its:  Vice President, September 18, 1985

Attest:
By:   Robert S. Frey
Its:  Assistant Secretary

LANDLORD
K mart Corporation, a Michigan corporation

By:  M. L. SKILES
Its: Vice President

Attest:
By:  C. E. Leach, Jr.
Its: Asst. Secretary

9525M

4-378-A

STATE OF KENTUCKY } SS:

COUNTY OF JEFFERSON }

I, __Brenda K. Fizer_____ , a notary public in and for the State and County aforesaid, do hereby certify that __William R. Espinosa_____ __Vice President_____ , and __Robert S. Frey_____ , __Assistant Secretary_____ , of **KFC NATIONAL MANAGEMENT COMPANY**, a Delaware corporation, who are personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed, and delivered the said instrument as their free and voluntary act and as the free and voluntary act of said corporation for the uses and purposes therein set forth.

Given under my hand and notarial seal this __18th__ day of __September__ , 19__85__ .

_Brenda K. Fizer_
**Notary Public , State at Large, Kentucky**
My Commission expires April 3, 1989.

(ACKNOWLEDGEMENT — INDIVIDUAL):

STATE OF _____ } SS:

COUNTY OF _____ }

I, _____ , a notary public in and for the State and County aforesaid, do hereby certify that _____ and _____ of _____ , who are (is) personally known to me to be the same person(s) whose name(s) are (is) subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they (he) signed, sealed, and delivered the said instrument as their (his) free and voluntary act for the uses and purposes therein set forth.

Given under my hand and notarial seal this _____ day of _____ , 19_____ .

_____
**Notary Public**

(ACKNOWLEDGEMENT — CORPORATE):

STATE OF __MICHIGAN_____ } SS:

COUNTY OF __OAKLAND_____ }

I, __Susan M. Dolkowski_____ , a notary public in and for the State and County aforesaid, do hereby certify that __M. L. Skiles_____ , __Vice President_____ and __C. E. Lotzar, Jr_____ , __Asst Secretary_____ , of __K mart Corporation_____ , a __Michigan_____ corporation, who are personally known to me to be the persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed, and delivered the said instrument as their free and voluntary act and as the free and voluntary act of said corporation for the uses and purposes therein set forth.

Given under my hand and notarial seal this __28th__ day of __May__ , 19__86__ .

_Susan M. Dolkowski_
**Notary Public** — Acting in Oakland County
SUSAN M. DOLKOWSKI
Notary Public, Macomb County, Mich.
My Commission expires June 1, 1988.

EXHIBIT "A"

TO BE APPROVED AND ADDED IN AT A LATER DATE

LEGAL DESCRIPTION

## S. S. KRESGE DEMISED PREMISES

### PARCEL A

ALL THAT PORTION OF BLOCK 1 AND THOSE PORTIONS OF LOTS 3 AND 4 IN BLOCK 3 AND
THAT PORTION OF BIXLER AVENUE (SIERRA AVENUE) OF THE LANDS OF THE RIVERSIDE
LAND AND IRRIGATING COMPANY, AS SHOWN BY MAP ON FILE IN BOOK 1 OF MAPS, AT
PAGE 70 THEREOF, RECORDS OF SAN BERNARDINO COUNTY, CALIFORNIA, MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF PARCEL 1, AS SHOWN BY PARCEL MAP RECORDED
IN BOOK 4 OF PARCEL MAPS, AT PAGE 24 THEREOF, RECORDS OF RIVERSIDE COUNTY,
CALIFORNIA;

THENCE NORTH 89°33'20" EAST, A DISTANCE OF 195.00 FEET;

THENCE NORTH 00°20'40" EAST, A DISTANCE OF 145.00 FEET TO THE NORTHEAST CORNER
OF SAID PARCEL 1;

THENCE NORTH 89°33'20" EAST ALONG THE NORTH LINE OF PARCEL 3, AS SHOWN ON SAID
PARCEL MAP, A DISTANCE OF 562.82 FEET TO A POINT THEREIN, SAID POINT BEING THE
BEGINNING OF A TANGENT CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 12.00
FEET;

THENCE SOUTHEASTERLY ALONG SAID CURVE, TO THE RIGHT, THROUGH A CENTRAL ANGLE OF
90°00'00", AN ARC DISTANCE OF 18.85 FEET TO THE END THEREOF;

THENCE SOUTH 00°26'40" EAST, A DISTANCE OF 679.60 FEET;

THENCE SOUTH 55°40'25" WEST, A DISTANCE OF 215.65 FEET TO A LINE PARALLEL WITH
AND DISTANT SOUTHWESTERLY 5.00 FEET, MEASURED AT RIGHT ANGLES, FROM THE SOUTH-
WESTERLY LINE OF SAID LOT 3;

THENCE NORTH 34°19'20" WEST ALONG SAID PARALLEL LINE, A DISTANCE OF 369.07 FEET
TO A POINT IN SAID CENTERLINE OF BIXLER AVENUE (SIERRA AVENUE);

THENCE SOUTH 55°40'25" WEST ALONG SAID CENTERLINE, A DISTANCE OF 104.60 FEET TO
A POINT THEREIN;

THENCE NORTH 89°39'20" WEST, A DISTANCE OF 296.22 FEET TO A POINT IN THE WEST LINE
OF PARCEL 2, AS SHOWN ON SAID PARCEL MAP;

THENCE NORTH 00°20'40" EAST ALONG SAID WEST LINE, A DISTANCE OF 414.51 FEET TO
THE POINT OF BEGINNING.

CONTAINING 10.413 ACRES.



EXHIBIT C

# FIRST AMENDMENT TO GROUND LEASE

THIS FIRST AMENDMENT TO GROUND LEASE made and entered into as of this 4th day of September, 1987, by and between KFC NATIONAL MANAGEMENT COMPANY, having its principle office at P.O. Box 32070, 1441 Gardiner Lane, Louisville, Kentucky 40232 (herein referred to as "Tenant"), and K MART CORPORATION, a Michigan Corporation, having its principle office at 3100 West Big Beaver Road, Troy, Michigan 48084, (herein referred to as "Landlord").

## W I T N E S S E T H:

WHEREAS, Tenant has entered into a Ground Lease on May 29, 1986 with Landlord, to lease a certain parcel of land situated in the City of Riverside, County of Riverside, State of California.

WHEREAS, Paragraph 7 of said Ground Lease entitled Permits, Licenses, Variances and Approvals allows 180 days to obtain said permits.

WHEREAS, Tenant and Landlord now desire to amend Paragraph 7.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1.  Paragraph 7 of the Ground Lease is hereby amended as follows:

    (i) Tenant shall have from the execution of this Amendment an additional 120 days to obtain all necessary permits, licenses, variances, and approvals necessary to construct and operate on the Demised Premises.

2.  Except as herein specifically amended, all of the covenants, agreements, restrictions, rights, privileges and obligations of the parties in the Ground Lease shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly executed this First Amendment to Ground Lease as of the day and year first above written.

WITNESSES:

K MART CORPORATION, a Michigan Corporation: (LANDLORD):

_Patricia A Briskey_

By: M. L. SKILES
Its: Vice President

_Bellie L. Duke_

Attest:
By:
Its: Assistant Secretary

-1-

KFC NATIONAL MANAGEMENT COMPANY
(TENANT):

_Barbara A. Evans_
Barbara A. Evans

By:    Scott Conner
Its:   Vice President, September 4, 1987

_Melinda C. Henry_
Melinda C. Henry

Attest:
By:    Robert S. Frey
Its:   Assistant Secretary

8367N

-2-

ACKNOWLEDGMENTS

STATE OF KENTUCKY        )
COUNTY OF  JEFFERSON     )ss:

    I do hereby certify that on this   4th       day of September, 1987 ,
before me,        Brenda K. Fizer              , a Notary Public in and
for the County and State aforesaid, and duly commissioned, personally appeared
    Scott Conner                                                 and
    Robert S. Frey                          , known to me to be the
Vice  President and ~~Secretary~~ Assistant Secretary of KFC National Management Company
                                                      ,
who, being by me duly sworn, did depose and say that they reside in  Kentucky
                    Vice          Assistant
respectively; that they are the/President and/Secretary respectively of
   KFC National Management Company                                    ,
the corporation described in and which executed the foregoing instrument; that
they know the seal of said corporation; that the seal affixed to said
instrument is the corporate seal of said corporation; that, on behalf of said
corporation and by order of its board of directors, they signed, sealed and
delivered said instrument for the uses and purposes therein set forth, as its
and their free and voluntary act; and that they signed their names thereto by
like order.

    In Witness Whereof, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

My commission expires: April 3, 1989

State at Large, Kentucky Notary Public

Brenda K. Fizer


STATE OF MICHIGAN)
COUNTY OF OAKLAND)ss:

    I do hereby certify that on this 28th day of August , 1987,
before me, Patricia A. Briskey                  , a Notary
Public in and for the County and State aforesaid, and duly commissioned,
personally appeared  M.L.Skiles                     and
    C.E. Lotzar             , known to me to be the
Vice President and Assistant Secretary of K mart Corporation, who, being by me
duly sworn, did depose and say that they reside in  Rochester
    and Birmingham
respectively; that they are the Vice President and Assistant Secretary
respectively of K mart Corporation, the corporation described in and which
executed the foregoing instrument; that they know the seal of said
corporation; that the seal affixed to said instrument is the corporate seal of
said corporation; that, on behalf of said corporation and by order of its
board of directors, they signed, sealed and delivered said instrument for the
uses and purposes therein set forth, as its and their free and voluntary act;
and that they signed their names thereto by like order.

    In Witness Whereof, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

My commission expires:_____

Patricia A. Brisley

Notary Public

PATRICIA A. BRISKEY
Notary Public, Oakland County, Mich.
My Commission Expires August 22, 1990

0950N-1

## SECOND AMENDMENT TO GROUND LEASE
### *(Riverside, CA K#3106)*

**THIS SECOND AMENDMENT TO GROUND LEASE** (this "**Amendment**") is made as of this ___ day of May, 2018 (the "**Effective Date**") between **KMART CORPORATION**, a Michigan corporation ("**Landlord**") and **GREAT AMERICAN CHICKEN CORP., INC.**, a California corporation ("**Tenant**"), as successor-in-interest to KFC National Management Company, a Delaware corporation.

### RECITALS:

**WHEREAS**, Landlord and Tenant are parties to that certain Ground Lease dated May 29, 1986, and as amended by that certain First Amendment to Ground Lease dated September 4, 1987 (the "**Lease**"), for premises located at 6221 Van Buren Blvd, Riverside, California, as more particularly described in the Lease (the "**Premises**"); and

**WHEREAS**, the current Term of the Lease expired on January 31, 2018. Landlord and Tenant have continued to conduct business from February 1, 2018 up to and including the Effective Date, under the same terms and conditions of the Lease; and

**WHEREAS**, Landlord and Tenant desire to amend the Lease, as more particularly set forth herein.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements contained herein, the parties agree as follows:

1. **Incorporation of Recitals**. All recitals stated above form a material part of this Amendment and are incorporated and made a part of this Amendment as if fully rewritten and restated at length herein.

2. **Capitalized Terms.** All capitalized terms used but not otherwise defined herein shall have those meanings ascribed to them in the Lease.

3. **Term**. The Term of the Lease is hereby extended for an additional five (5) year term commencing on February 1, 2018, and continuing to and including January 31, 2023 (the "**Extension Term**") upon *the same terms and conditions as contained in the Lease, except as hereinafter provided.*

4. **Annual Rent.** Landlord and Tenant agree that the Annual Rent for the Extension Term shall be as follows and payable in accordance with the terms of the Lease.

| Extension Term | Annual Rent |
|---|---|
| February 1, 2018 – January 31, 2019 | $88,130.01 |
| February 1, 2019 – January 31, 2020 | $90,773.91 |
| February 1, 2020 – January 31, 2021 | $93,497.13 |
| February 1, 2021 – January 31, 2022 | $96,302.04 |
| February 1, 2022 – January 31, 2023 | $99,191.10 |

5. **Miscellaneous**

   a. Continuance of Lease. The legally enforceable provisions in the Lease, as amended hereby, shall be deemed to be continuing and in full force and effect and this Amendment is not intended to be a new contract between the parties. In the event of any conflict or inconsistency between the terms of this Amendment and the terms of the Lease, the terms of this Amendment

shall be deemed operative and any conflicting or inconsistent terms contained in the Lease shall be deemed null and void.

b. Successors and Assigns. This Amendment shall be binding upon, and shall inure to the benefit of, the successors and assigns of the parties hereto.

c. Entire Agreement. This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements with respect to the matters set forth herein. In case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control.

d. Time is of the Essence. Time is of the essence for this Amendment and the Lease and each provision hereof.

e. No Presumption Against Drafter. This Amendment shall be construed without regard to any presumption or any other rule requiring construction against the party drafting a document. The parties acknowledge that this Amendment is the result of negotiations between the parties, and in construing any ambiguity hereunder no presumption shall be made in favor of either party.

f. Landlord's Authority. Landlord represents and warrants that Landlord has the full right, power and authority to enter into this Amendment and does not need the consent of any party, including the holder of any mortgage on the Premises.

g. Severability. If any provision of this Amendment or the application thereof to any person or circumstances is or shall be deemed illegal, invalid, or unenforceable, the remaining provisions hereof shall remain in full force and effect and this Amendment shall be interpreted as if such illegal, invalid, or unenforceable provision did not exist herein.

h. Counterpart Signatures. This Amendment may be executed in any number of counterpart originals, each of which, when taken together, shall be deemed to be one and the same instrument. Executed copies of this Amendment may be delivered between the parties via facsimile or electronic mail and such shall be deemed effective and binding upon the parties the same as if such document was an original.

*{Remainder of Page Intentionally Left Blank; Signature Page(s) to Follow}*

**IN WITNESS WHEREOF,** the parties have executed this Second Amendment to Ground Lease as of the day and year first above written.

LANDLORD:

**KMART CORPORATION,**
a Michigan corporation

By: _____
Name: JoAnn Catanese
Title: Divisional Vice President, Real Estate

TENANT:

**GREAT AMERICAN CHICKEN CORP., INC.,**
a Delaware limited liability company California Corporation

By: _____
Name: Shaoul Levy
Title: President

**<u>EXHIBIT C</u>**

<u>SUBLEASE</u>

KMART CORPORATION, a Michigan corporation, as Sublandlord,

and

RIVERSIDE'S COMPLETE AUTOMOTIVE REPAIR INC., a California corporation ,as
Subtenant

KMART NO. 3106

*7200 Arlington Dr..
Riverside, CA 92503*

## SUBLEASE - TABLE OF CONTENTS

ARTICLE I        GRANT AND TERM ...................................................................4

    Section 1.1    Demised Premises.................................................. 4
    Section 1.2    Lease Term.............................................................. 4
    Section 1.4    Tenant Takes As Is ................................................. 5

ARTICLE II       RENT, TAXES AND INSURANCE ......................................6

    Section 2.1    Rent, Place of Payment.......................................... 6
    Section 2.3    Percentage Rent ..................................................... 7
    Section 2.4    Gross Sales Defined .............................................. 8
    Section 2.5    Radius Restriction................................................... 8
    Section 2.10 Additional Rent........................................................ 9

ARTICLE III      RECORDS AND REPORTS...............................................9

    Section 3.1    Reports by Tenant................................................... 9
    Section 3.2    Tenant's Records ................................................... 9
    Section 3.3    Landlord's Right to Audit .......................................10

ARTICLE IV       OPERATION AND MAINTENANCE OF COMMON AREAS..........................10

    Section 4.1    Common Areas ......................................................10
    Section 4.3    Landlord's Use of Common Areas ........................11

ARTICLE V        USE OF DEMISED PREMISES .....................................11

    Section 5.1    Use of Demised Premises.....................................11
    Section 5.2    Care of Demised Premises ...................................12
    Section 5.3    Change of Name ....................................................13
    Section 5.4    Storage, Office Space ...........................................13
    Section 5.5    Tenant's Obligation to Light Display Windows ...........................13

ARTICLE VI       UTILITY SERVICES..........................................................13

    Section 6.1    Landlord's Obligation to Install Utility Services and Option to Supply Such
                Services...................................................................13
    Section 6.2    Tenant's Obligation for Payment ...........................13

ARTICLE VII      MAINTENANCE OF DEMISED PREMISES ...................................14

    Section 7.1    Landlord's Obligations for Repair and Maintenance ...................14
    Section 7.2    Tenant's Obligations for Repair and Maintenance ...................14
    Section 7.3    Abuse of Plumbing, Walls .....................................16
    Section 7.4    Surrender of Demised Premises ...........................16

ARTICLE VIII     SIGNS...............................................................................16

    Section 8.1    Signs......................................................................16

ARTICLE IX       FIXTURES AND ALTERATIONS .................................17

    Section 9.1    Tenant's Fixtures and Alterations ........................17
    Section 9.2    Landlord's Changes and Additions ......................21

ARTICLE X        INSURANCE AND INDEMNITY ...................................21

Section 10.1 Indemnification..........................................................................21
Section 10.2 Increase in Fire Insurance Premium..........................................22
Section 10.3 Tenant's Obligation to Carry Property, Commercial General Liability and Workers' Compensation Insurance ......................................................22
Section 10.4 Non-Liability And Waiver ...........................................................24

ARTICLE XI      RECEIVING, DELIVERY AND TENANT PARKING.......................................25

Section 11.1 Receiving and Delivery of Tenant's Merchandise and Disposition of Refuse 25
Section 11.2 Tenant and Employee Parking ..................................................25

ARTICLE XII      ASSIGNMENT AND SUBLETTING.................................................25

Section 12.1 Assignment and Subletting.........................................................25
Section 12.2 By Landlord.................................................................................26

ARTICLE XIII      ACCESS TO DEMISED PREMISES ...........................................26

Section 13.1 Right of Entry by Landlord..........................................................26
Section 13.2 Landlord's Right to Exhibit Demised Premises ...........................26

ARTICLE XIV      EMINENT DOMAIN.................................................................26

Section 14.1 Total Condemnation....................................................................27
Section 14.2 Partial Condemnation..................................................................27
Section 14.3 Landlord's and Tenant's Damages ............................................27

ARTICLE XV      DESTRUCTION OR DAMAGE TO DEMISED PREMISES...........................27

Section 15.1 Reconstruction of Damaged Premises .......................................28
Section 15.2 Waiver of Subrogation.................................................................28

ARTICLE XVI      DEFAULT OF THE TENANT....................................................28

Section 16.1 Default and Remedies.................................................................28
Section 16.2 No Waiver...................................................................................30
Section 16.3 Termination Damages.................................................................31
Section 16.4 Termination of Possession .........................................................31
Section 16.5 Additional Damages ...................................................................31
Section 16.6 Reletting......................................................................................31
Section 16.7 Joint and Several Liability............................................................32
Section 16.8 Percentage Rental Damages ......................................................32
Section 16.9 Tenant's Property........................................................................32
Section 16.10     Legal Expenses ....................................................................33
Section 16.11     Waiver of Rights of Redemption...........................................33
Section 16.12     Tenant's Failure to Operate Continuously ...........................33

ARTICLE XVII      EXCULPATION......................................................................34

Section 17.1 Exculpation .................................................................................34

ARTICLE XVIII      HOLDING OVER, SUCCESSORS .........................................34

Section 18.1 Holding Over...............................................................................34
Section 18.2 Successors .................................................................................34

ARTICLE XIX      SECURITY DEPOSIT ...............................................................35

Section 19.1 Security Deposit ...................................................................35

ARTICLE XX        MISCELLANEOUS ........................................................36

Section 20.1 Non-Waiver ...........................................................................36
Section 20.2 Subordination ........................................................................36
Section 20.3 Notices ..................................................................................36
Section 20.4 No Partnership .......................................................................36
Section 20.6 Gender ...................................................................................36
Section 20.7 Estoppel and other Certificates .............................................37
Section 20.8 Accord and Satisfaction.........................................................38
Section 20.9 Captions and Section Numbers.............................................38
Section 20.10    Partial Invalidity ...............................................................38
Section 20.11    No Option...........................................................................38
Section 20.12    Recording ..........................................................................38
Section 20.13    Liens .................................................................................38
Section 20.14    Broker's Commissions ......................................................39
Section 20.15    Force Majeure ...................................................................39
Section 20.16    Entire Agreement ..............................................................39
Section 20.17    Late Charges and Interest.................................................39
Section 20.18    Cumulative Remedies .......................................................40
Section 20.19    Rules and Regulations ......................................................40
Section 20.20    Time...................................................................................40
Section 20.21    Attornment ........................................................................40
Section 20.22    Merchants Association ......................................................40
Section 20.23    Waiver of Trial by Jury; Injunction ...................................41
Section 20.24    Kmart Marks......................................................................41
Section 20.25    Media Releases .................................................................42
Section 20.26    Reservation of Landlord's Rights in Bankruptcy .............42
Section 20.27    Attachments ......................................................................42
Section 20.28    Governing Law ..................................................................42
Section 20.29    Authority.............................................................................43
Section 20.30    Waiver of Warranties.........................................................43
Section 20.31    Guaranty ...........................................................................43
Section 20.32    Landlord's Lien..................................................................43
Section 20.32    Relocation .........................................................................44

ARTICLE XXI        HAZARDOUS MATERIALS..........................................44

Section 21.1 Hazardous Materials .............................................................44
Section 21.2 Environmental Covenants and Indemnification......................45

ARTICLE XXII EARLY TERMINATION ...........................................................45

Section 22.1 Termination Right...................................................................45
Section 22.2 Termination Fee.....................................................................46

## BASIC SUBLEASE PROVISIONS

This Sublease (this "Sublease"), entered into this _21 st_ day of _September_ , 2010 (the "Effective Date"), by and between KMART CORPORATION, a Michigan corporation or its assigns, (hereinafter "Sublandlord "), and the Subtenant hereinafter named.

Definitions and Certain Basic Provisions.

|  |  |  |
|---|---|---|
| (a) | Sublandlord: | Kmart Corporation, a Michigan Corporation |
| (b) | Sublandlord's address: | 3333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Attention: Vice President - Real Estate |
| (c) | Subtenant: | Riverside's Complete Automotive Repair, Inc., a California corporation |
| (d) | Subtenant's mailing address: | 10939 Sunset Meadow Dr.<br>Riverside, CA 92505<br>(951) 359-5231 |
| (e) | Subtenant's trade name: | Riverside's Complete Automotive Repair |
| (f) | Subtenant's address (or location) in Shopping Center: | |
| | | 7200 Arlington Drive.<br>Riverside, CA 92503 |

(g)    Demised Premises:  Approximately (4,485) square feet in the Building (computed from measurements to the exterior of outside walls of the building and to the center of interior walls as conclusively determined by Sublandlord's architect or design professional), such premises being shown and outlined on the plan attached hereto as Exhibit B, and being part of the Shopping Center situated upon the property described in Exhibit A attached hereto.  "Shopping Center" shall refer to the property described in Exhibit A, together with such additions and other changes as Sublandlord may from time to time designate as included within the Shopping Center.

(h)    Sublease Term:  Commencing on the Commencement Date as defined in Section 1.2 and ending the sooner to occur of (i) if Sublandlord extends the term of the Master Lease, sixty (60) months thereafter; or (ii) in the event that Sublandlord elects not to extend the Master Lease, August 31, 2013.

(i)    Delivery Date: _10 / 1 / 10_ .

---

(j)    <u>Permitted Use</u>:  Solely for use as an automotive repair and service center.  No other use shall be permitted without Sublandlord's prior written consent.

(k)    <u>Base Rent</u> (payable in advance, without demand or setoff):

| **Period** | **Per Square Foot/yr** | **Annually** | **Monthly** |
|---|---|---|---|
| **Initial Term** | | | |
| Month 1 | $0.00 | $0.00 | $0.00 |
| Months 2 – 12 | $6.69 | $30,004.65 | $2,500.39 |
| Months 13 - 24 | $6.88 | $30,856.80 | $2,571.40 |
| Months 25 – 60 | $7.09 | $31,798.65 | $2,649.89 |

(l)    <u>Rent Commencement Date</u>:  11-1-10

(m)    <u>Percentage Rent</u>: (1%) of Gross Sales in excess of $700,000.00

(n)    <u>Initial Estimated Common Area Maintenance Charge per month</u>:  None

(o)    <u>Initial Estimated Insurance Escrow Payment per month</u>: None

(p)    <u>Initial Estimated Tax Escrow Payment per month</u>:  None

(p-1)    <u>Management Fee</u>: 2.5% of the effective Base Rent

(q)    <u>Security Deposit</u>: $5,000.78

(r)    <u>Marketing Charge</u>: None

(s)    <u>Subtenant's Proportionate Share</u>:  The percentage represented by fraction, the numerator of which shall be the number of square feet of rentable area in the Demised Premises and the denominator of which shall be the number of square feet of rentable area in the Shopping Center, provided that Sublandlord may exclude from such denominator, as applicable, rentable square footage in the Shopping Center for which the tenants or other occupants thereof are directly responsible for Common Area maintenance, taxes and/or insurance.

Subtenant's Proportionate Share is equal to approximately 4.6%

(t)    <u>Extension Options</u>:  Provided that Subtenant is not in default beyond any applicable notice and cure periods and has not assigned or sublet any portion of the Demised Premises in the twelve (12) month period before the then current Sublease Term (as may be extended in accordance with the terms and provisions of this applicable Section of this Sublease), Subtenant shall have the right to extend the Term of this Sublease for one (1) Renewal Term of five (5) years  per

Renewal Term, as provided for in this Sublease, and as further set forth in Section 1.3.

(u)     <u>Master Lease</u>:  This Sublease is subject and subordinate to any existing Master Lease (defined in <u>Section 1.1</u> below) that affects Sublandlord or the Demised Premises.

(v)     Guarantors: Vaughn Gedeon

Each of the foregoing definitions and "<u>Basic Sublease Provisions</u>" (herein so called) shall be construed in conjunction with and limited by references thereto in other provisions of this Sublease.

## SUBLEASE AGREEMENT

This SUBLEASE is made and entered into as of the Effective Date, by and between the Sublandlord and Subtenant described in the Basic Sublease Provisions above.

WITNESSETH:

ARTICLE I

GRANT AND TERM

Section 1.1    <u>Demised Premises</u>. In consideration of the obligation of Subtenant to pay Rent and other charges as herein provided and in consideration of the other terms, covenants and conditions hereof, Sublandlord hereby demises and leases to Subtenant, and Subtenant hereby takes from Sublandlord, the Demised Premises TO HAVE AND TO HOLD the Demised Premises for the Sublease Term, all upon the terms and conditions set forth in this Sublease. Sublandlord may increase, reduce or change the number, dimensions or locations of the walks, buildings and parking areas within the Shopping Center (in any manner whatsoever) as Sublandlord shall in its sole discretion deem proper and Sublandlord reserves the right to make alterations or additions to, and to build additional stories on the building in which the Demised Premises are contained and to modify or add buildings and/or floors adjoining the same or elsewhere in the Shopping Center.

The exterior walls and roof of the Demised Premises and the area beneath the Demised Premises are not demised hereunder, and the use thereof, together with the right to install, maintain, use, repair, and replace pipes, ducts, conduits, wires and structural elements leading through the Demised Premises among other items (as stated elsewhere in this Sublease) are hereby reserved solely unto Sublandlord.

Subtenant takes and leases the Demised Premises expressly subject to the provisions of any restrictions, easements, operating agreements, declarations, any mortgage, indenture, permitted exceptions, other agreements, and matters of record against the Shopping Center of which the Demised Premises is a part. Sublandlord represents, however, that in the event the Shopping Center premises, or any portion wherein the Demised Premises is a part, is sold and leased back to Sublandlord, Sublandlord's interest will derive from a sublease (the "<u>Master Lease</u>"); and in such event, this Sublease between Subtenant and Sublandlord shall be subject to any such Master Lease, even if the effective date of such Master Lease is subsequent to this Sublease between Sublandlord and Subtenant. Furthermore, Subtenant's interest in the Demised Premises shall also be subject to and subordinate to any existing or subsequent mortgage and/or financing in any form on the Demised Premises and/or Shopping Center and/or any portion thereof, even if the same shall be modified, replaced, amended, renewed, extended, consolidated or supplemented from time to time.

Section 1.2    <u>Sublease Term</u>. The Sublease Term shall commence upon Sublandlord's delivery of possession to Subtenant (hereinafter the "<u>Commencement Date</u>"), and shall expire on the date that is the sooner to occur of (i) if Sublandlord extends the term of the Master Lease,

sixty (60) months thereafter; or (ii) in the event that Sublandlord elects not to extend the Master Lease, August 31, 2013. As soon as commercially reasonable after the last party to this Sublease executes this Sublease, the parties shall fill out, execute and deliver the Commencement Letter in substantially the same form attached hereto as Exhibit E, which Commencement Letter shall set forth the Commencement Date and the date on which the Sublease Term shall expire. Subtenant and Sublandlord acknowledge that the Sublease Term shall be subject to Sublandlord electing, in its sole and absolute discretion, to extend the term of the Master Lease. Notwithstanding any of the foregoing, if Sublandlord and Subtenant have not agreed upon terms to which Subtenant may renew this Sublease at least sixty (60) days prior to the termination of the Sublease Term, Sublandlord may market the Demised Premises to other potential subtenants.

Section 1.3    Option to Extend Sublease Term.  Provided that Sublandlord is still in possession of the Demised Premises pursuant to the Master Lease, Subtenant may, at its option, extend the Sublease Term for one (1) period of five (5) years, by giving written notice of such extension to Sublandlord at least 180 days, but no more than 270 days prior to the expiration of the then current Sublease Term (as may be extended in accordance with the terms and provisions of this Section).  No exercise of any option herein granted shall be effective if at the time such option is exercised (i) Subtenant is in default under this Sublease, beyond any applicable notice and cure periods, or (ii) Subtenant has assigned or subleased any portion of the Demised Premises during the last twelve (12) months of the original Sublease Term. Any extended term of this Sublease (each, a "Renewal Term") shall be on the same terms and conditions as contained in this Sublease except that the Base Rent shall be as follows:

| Renewal Term | Per Square Foot/yr | Annually | Monthly |
|---|---|---|---|
| Months 1 – 12 | $7.09 | $31,798.65 | $2,649.89 |
| Months 13 – 48 | $7.30 | $32,740.50 | $2,728.38 |
| Months 49 - 60 | $7.52 | $33,727.20 | $2,810.60 |

Section 1.4    Subtenant Takes "As Is".  Sublandlord shall have no obligation to perform any work within the Demised Premises or improve the Demised Premises in any way, and Subtenant acknowledges and accepts the Demised Premises in its "AS-IS, WHERE IS, WITH ALL FAULTS" condition. Subtenant agrees to accept possession of the Demised Premises and to proceed with due diligence to perform all work necessary to operating the Demised Premises for the Permitted Use ("Subtenant's Work"), all of such work to be performed in compliance with Exhibit C and otherwise approved by Sublandlord, and to install its fixtures, furniture and equipment.  In the event of any dispute as to work performed or required to be performed by Subtenant, the certificate of Sublandlord's architect or engineer shall be conclusive.  By initiating any of Subtenant's Work in the Demised Premises, Subtenant shall be deemed to have accepted the same and to have acknowledged that the same fully comply with Sublandlord's covenants and obligations hereunder.  Subtenant further agrees that, if requested by Sublandlord, Subtenant will furnish Sublandlord with a written statement that Subtenant has accepted the Demised Premises and that Sublandlord has fully complied with Sublandlord's covenants and obligations hereunder.  Subtenant agrees to furnish to Sublandlord a Certificate of Occupancy from applicable local authorities within a reasonable time following the Commencement Date.

Section 1.5 <u>Opening for Business in the Demised Premises</u>. Subtenant agrees to open the Demised Premises to the public on or about the Commencement Date. Occupancy of the Demised Premises by Subtenant prior to the Commencement Date shall be subject to all of the terms and provisions of this Sublease.

THE DEMISED PREMISES ARE NOW READY FOR OCCUPANCY BY SUBTENANT AND, BY EXECUTION OF THIS SUBLEASE, SUBTENANT ACKNOWLEDGES AND AGREES THAT IT HAS INSPECTED AND SHALL ACCEPT THE DEMISED PREMISES, THE COMMON AREAS AND THE SHOPPING CENTER ON THE COMMENCEMENT DATE IN THEIR THEN "AS IS" AND "WHERE IS" PHYSICAL AND ENVIRONMENTAL CONDITION. SUBTENANT ACKNOWLEDGES AND AGREES THAT NEITHER LANDLORD NOR ITS AGENTS OR EMPLOYEES HAS MADE ANY EXPRESS WARRANTY OR REPRESENTATION REGARDING THE PHYSICAL CONDITION OF OR ANY ENVIRONMENTAL CONDITION ON THE DEMISED PREMISES OR THE SHOPPING CENTER, THE QUALITY OF MATERIAL OR WORKMANSHIP OF THE DEMISED PREMISES, LATENT OR PATENT, OR THE FITNESS OF THE DEMISED PREMISES FOR ANY PARTICULAR USE OR PURPOSE, AND THAT NO SUCH REPRESENTATION OR WARRANTY SHALL BE IMPLIED BY LAW, IT BEING AGREED THAT ALL SUCH RISKS ARE TO BE BORNE BY SUBTENANT.

Section 1.6    <u>Subtenant's Work</u>.  *Subtenant shall at its sole cost and expense perform the construction obligations with respect to the Demised Premises described in this Sublease, including those obligations set forth in* <u>Section 1.4</u> *herein and* <u>Exhibit C</u> *attached hereto, which obligations shall include, but not be limited to, fixturing, stocking and staffing the Demised Premises in order for Subtenant to open for business in the Demised Premises to the general public.* Subtenant shall use its best diligent efforts to complete any such work, and any delay in the completion of such work by Subtenant shall not delay the Commencement Date.  Within sixty (60) days following the Commencement Date, Subtenant shall deliver to Sublandlord a certificate executed by an officer of Subtenant certifying the actual third party costs, if any, incurred by Subtenant in the performance of the Subtenant's Work that constitute the installation of fixtures, improvements and appurtenances attached to or built into the Demised Premises (exclusive of movable business and trade fixtures, machinery, equipment, furnishings and other articles of personal property owned by Subtenant), substantiated by bills, receipts and other proofs of costs thereof (herein "<u>Subtenant's Work Cost Certificate</u>").

ARTICLE II

RENT, TAXES AND INSURANCE

Section 2.1    <u>Rent, Place of Payment</u>. Subtenant shall pay to Sublandlord during the Sublease Term hereof for the Demised Premises, at the times designated, all of the amounts designated herein as Base Rent, Additional Rent, and any other amount, money or charge required to be paid pursuant to the terms of this Sublease whether or not the same may be designated by any such label or term (collectively, the "<u>Rent</u>"). All amounts required to be paid

by Subtenant under this Sublease shall, unless otherwise specifically stated, be paid without any prior demand therefore and without any deduction, abatement or set-off whatsoever at Sublandlord's address set forth in the Basic Sublease Provisions of this Sublease or such other place as the Sublandlord may designate. Should Sublandlord, in any one or more instances, accept any payment that is late, such acceptance shall not be deemed a waiver of any of Sublandlord's rights or any of Subtenant's obligations including, but not limited to, the obligation to pay all amounts due under this Sublease on or before the date designated herein for payment thereof.

Section 2.2    Base Rent. Subtenant shall pay in advance to Sublandlord for the original Sublease Term of this Sublease, and any Renewal Terms, the Base Rent set forth in the Basic Sublease Terms above or as determined for any Renewal Term in accordance with Section 1.3 above, if applicable. Subtenant's obligation to pay Base Rent shall begin on the first of Thirty (30) days following the Commencement Date of this Sublease (the "Rent Commencement Date"). From the Rent Commencement Date, all Base Rent, unless otherwise provided, shall be paid in monthly installments, in advance on or before the first day of each calendar month during the Sublease Term (as may be extended in accordance with the terms and conditions of this Sublease).

In the event Subtenant exercises any available option to extend the Sublease Term as provided in Section 1.3 above, if any, Subtenant shall pay Base Rent and Additional Rent in advance to Sublandlord for the Renewal Term with Base Rent determined as provided for in Section 1.3 above, and Additional Rent determined by Sublandlord's cost for such triple-net items.

As used herein, the term "Sublease Year" shall mean the twelve (12) consecutive calendar months commencing with the Commencement Date and each succeeding anniversary of such date thereafter. Any Rent or other Subtenant payment due hereunder which is based on an annual (twelve months) charge shall be prorated to reflect any fractional Sublease Year. If the Commencement Date is not on the first day of a calendar month, then the first payment of Rent for the period between the Commencement Date and the first day of the first full calendar month shall be prorated on a daily basis for such period prior to the first full calendar month and shall be due and payable on the Rent Commencement Date, as hereinafter defined. During the period following Sublandlord's notice to Subtenant that the Demised Premises are Ready for Occupancy and prior to the Rent Commencement Date, all of the provisions of this Sublease shall be binding upon Subtenant (other than the duty to pay Base Rent), including but not limited to, construction, hold harmless, alterations and additions, property and liability insurance, liens, real estate taxes and common area maintenance.

Section 2.3    Percentage Rent. In addition to Base Rent and Additional Rent, Subtenant shall pay Percentage Rent to Sublandlord during the entire Sublease Term (as may be extended). The Percentage Rent shall be payable monthly as specified in clause (l) of the Basic Sublease Provisions. In the event that the total of the monthly payments of Percentage Rent for any calendar year is not equal to the annual Percentage Rent computed on the amount of Gross Sales (defined in Section 2.4 below) for such calendar year in excess of the annualized Breakpoint in accordance with the specified rate or rates, then Subtenant shall pay to Sublandlord any

deficiency or Sublandlord shall refund to Subtenant any overpayment, as the case may be, within sixty (60) days after the end of such Sublease Year. In no event shall the Rent to be paid by Subtenant and retained by Sublandlord for any Sublease Year be less than the annual Base Rent and Additional Rent herein specified.

Section 2.4    Gross Sales Defined. The term "Gross Sales" as used herein shall mean the total amount in dollars of the actual sales price, whether for cash or otherwise, of all sales of merchandise, service and other receipts whatsoever of all business conducted in or from the Demised Premises, including mail or telephone orders placed, received or filled at the Demised Premises, and including all deposits not refunded to customers, orders taken and paid for in the Demised Premises, although said orders may be filled elsewhere, and sales or service by Subtenant and any sublessee, assignee, concessionaire or licensee or otherwise in the Demised Premises; provided, however, that nothing herein shall prevent Sublandlord from requiring an additional or different percentage rental as a condition to approval of any sublessee, assignee, concessionaire or licensee of Subtenant hereunder. Gross Sales shall also include (i) sales from vending machines, pay telephones and video games at the Demised Premises, except that Gross Sales shall include only the net amount received by Subtenant in the event of vending machines installed by other than Subtenant, its subtenant(s), assignee(s), concessionaire(s) or licensee(s) and (ii) rent or fees received by the Subtenant from any subtenant, assignee, licensee or other occupant of the Demised Premises (but only if any such subtenant, assignee, licensee or other occupant does not have sales or services which are included in Gross Sales). No deduction shall be allowed for uncollected or uncollectible credit accounts.

Gross Sales shall not include, (i) any sums collected and paid out for any sales or excise tax imposed by any duly constituted governmental authority, (ii) the exchange of merchandise between the stores of Subtenant, if any, where such exchanges of goods or merchandise are made solely for the convenient operation of the business of Subtenant and not for the purpose of consummating a sale which has theretofore been made at, in, from or upon the Demised Premises, and/or for the purpose of depriving Sublandlord of the benefit of a sale which otherwise would be made at, in, from or upon the Demised Premises, (iii) the amount of returns to shippers or manufacturers, (iv) the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the customer and accepted by Subtenant, or (v) the sale of fixtures after their use in the conduct of business in the Demised Premises.

Section 2.5    Radius Restriction. Subtenant acknowledges that Subtenant's monetary contribution to Sublandlord (in the form of rentals) and Subtenant's general contribution to commerce within the Shopping Center (also important in Sublandlord's determination to execute this Sublease with Subtenant) will be substantially reduced if, during the Sublease Term, either Subtenant or any person, firm or corporation, directly or indirectly controlling, controlled by or under common control with Subtenant shall directly or indirectly operate, manage, conduct or have any interest in any competing or substantially similar establishment within commercial proximity of the Shopping Center. Accordingly, Subtenant agrees that during the Sublease Term (as may be extended) neither Subtenant nor any person, firm or corporation, directly or indirectly controlling, controlled by or under common control with Subtenant (and also, in the event Subtenant is a corporation, if any officer or director thereof or shareholder owning more than ten

percent (10%) of the outstanding stock thereof, or parent, subsidiary or related or affiliated corporation) shall directly or indirectly operate, manage, conduct or have any interest in any competing or substantially similar commercial establishment within four (4) miles of the Shopping Center.

      Section 2.6    <u>Intentionally Deleted</u>.

      Section 2.7    <u>Intentionally Deleted</u>.

      Section 2.8    <u>Intentionally Deleted</u>.

      Section 2.9    <u>Intentionally Deleted</u>.

      Section 2.10    <u>Additional Rent</u>.  The Subtenant shall also pay, as Additional Rent, any other money and charges required to be paid pursuant to the terms of this Sublease, whether or not the same may be designated "<u>Additional Rent</u>".  If such amounts or charges are not paid at the time provided in this Sublease, such amounts shall be collectible as Additional Rent with the next installment of Rent thereafter falling due hereunder, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of the Sublandlord.  All such payments shall be made by Subtenant to Sublandlord at the place where the Base Rent is payable, and without any deductions, abatement or set off whatsoever.

ARTICLE III

RECORDS AND REPORTS

      Section 3.1    <u>Reports by Subtenant</u>.  Within fifteen (15) days after the end of each three (3) calendar months, or any portion thereof, or at the time Sublandlord shall request, as applicable, during the Sublease Term, Subtenant shall furnish to Sublandlord a statement signed and verified by Subtenant (or by an authorized officer if Subtenant be a corporation) of the Subtenant's Gross Sales during such three (3) month period or portion thereof.  Within sixty (60) days after the close of each Sublease Year, Subtenant shall deliver to Sublandlord a statement of Gross Sales for each such Sublease Year showing the Gross Sales made during such Sublease Year, certified by a duly qualified officer of Subtenant as being true, complete and correct, and signed by an independent certified public accountant employed by Subtenant, to the effect that nothing came to their attention during their review of the schedules supporting Subtenant's computation of Gross Sales in accordance with the terms and conditions of this Sublease which would cause them to believe such computation was inaccurate or that any Gross Sales were not included therein.  Subtenant shall deliver the statements referred to herein to Sublandlord at the same address where Rent is then being paid.

      Section 3.2    <u>Subtenant's Records</u>.  Subtenant shall keep in the Demised Premises or in some other location within the metropolitan area in which the Demised Premises are located, a permanent, accurate and complete set of books and records, in accordance with generally accepted accounting methods and principles, of all sales of merchandise and services and all

DET02\356689.4
ID\ATP - 100243/0999

revenue derived from any business conducted in the Demised Premises, whether included in Gross Sales or not, during each day of the Sublease Term hereof, together with all supporting records. Subtenant further agrees that it and its subtenants shall keep, retain and preserve these records for at least two (2) years after the expiration of each Sublease Year.

Section 3.3   Sublandlord's Right to Audit. Sublandlord shall have the right, after five (5) days' written notice, to have its employees, mortgagees or outside auditors conduct a special audit of Subtenant's and its subtenant's books and records pertaining to sales, services, and business conducted on, in or from the Demised Premises.   If such audit shall disclose a discrepancy of more than one percent (1%) of Gross Sales, Subtenant shall promptly pay to Sublandlord upon demand, the cost incurred by Sublandlord in conducting (or having conducted) such audit, in addition to the deficiency in Percentage Rent, which amount shall be payable in any event. If such discrepancy is more than three percent (3%) of Gross Sales, or if Subtenant shall fail to permit inspection and/or audit of its records, Sublandlord shall have the further remedy by not less than ten (10) days' notice to Subtenant to declare this Sublease terminated on account of Subtenant's failure to properly report its Gross Sales, and Subtenant shall pay to Sublandlord as liquidated damages, and not as a penalty, an amount equal to the cost of such audit plus reasonable attorneys' fees expended by Sublandlord in terminating the Sublease as provided for above and recovering such liquidated damages. Sublandlord shall have the right to audit Subtenant's books and records for a period of two (2) years after the close of each Sublease Year.

ARTICLE IV

OPERATION AND MAINTENANCE OF COMMON AREAS

Section 4.1   Common Areas. The "Common Area" is the part of the Shopping Center designated by Sublandlord from time to time for the non-exclusive, common use of all tenants, including, among other facilities, parking areas, sidewalks, landscaping, curbs, loading areas, private streets and alleys, lighting facilities, hallways, malls, restrooms, and other areas and improvements provided by Sublandlord for the common use of all tenants, all of which shall be subject to Sublandlord's sole management and control and shall be operated and maintained in such manner as Sublandlord, in its discretion, shall determine.   Subtenant and its employees, customers, subtenants, licensees and concessionaires shall have the non-exclusive right and license to use the Common Area as constituted from time to time, such use to be in common with Sublandlord, other tenants of the Shopping Center and other persons permitted by Sublandlord to use the same. Subtenant and its employees, customers, subtenants, licensees and concessionaires shall have the non-exclusive right and license to use the Common Area as constituted from time to time, such use to be in common with Sublandlord, other tenants of the Shopping Center and other persons permitted by Sublandlord to use the same, and subject to such reasonable rules and regulations governing use as Sublandlord may from time to time prescribe, including the designation of specific areas within the Shopping Center or in reasonable proximity thereto in which automobiles owned by Subtenants, its employees, subtenants, licensees and concessionaires shall be parked.   Sublandlord shall at all times have the right to change such rules and regulations or to promulgate other rules and regulations in such manner as may be deemed advisable for safety, care or cleanliness of the Shopping Center and for preservation of

good order therein, all of which rules and regulations, changes and amendments will be forwarded to Subtenant in writing and shall be carried out and observed by Subtenant. Subtenant shall further be responsible for the compliance with such rules and regulations by the employees, servants, agents, visitors and invitees of Subtenant. Sublandlord may temporarily close any part of the Common Area for such periods of time as may be necessary to prevent the public from obtaining prescriptive rights or to make repairs or alterations without incurring any liability from Subtenant for such temporary closure.

Section 4.2    Intentionally Deleted.

Section 4.3    Sublandlord's Use of Common Areas.    Sublandlord reserves the right, from time to time, to utilize portions of the common areas for carnival type shows, rides and entertainment, outdoor shows, displays, automobile and other product shows, the leasing of kiosks, or such other uses which in Sublandlord's judgment tend to attract the public. Further, Sublandlord reserves the right to utilize the lighting standards and other areas in the parking lot for advertising purposes.

ARTICLE V

USE OF DEMISED PREMISES

Section 5.1    Use of Demised Premises.    Subtenant shall use and occupy the Demised Premises during the continuance of this Sublease solely for the purpose as set forth in the Basic Sublease Provisions above, and for no other purposes without the written consent of Sublandlord, which consent may be withheld in Sublandlord's sole discretion.    If any governmental license or permit shall be required for the proper and lawful conduct of Subtenant's business or other activity carried on in the Demised Premises or if a failure to procure such a license or permit might or would, in any way, affect Sublandlord or the Shopping Center, then Subtenant, at Subtenant's expense, shall duly procure and thereafter maintain such license or permit and submit the same for inspection by Sublandlord. Subtenant, at Subtenant's expense, shall at all times comply with the requirements of each such license or permit. Subtenant shall continuously operate one hundred percent (100%) of the Demised Premises during the entire Sublease Term for the purpose stated in this Sublease, conducting Subtenant's business diligently, energetically, and in a high class and reputable manner.    Subtenant shall maintain on the Demised Premises a substantial stock of goods, wares and merchandise and equipment adequate to assure the continuous, successful operation of Subtenant's business. Subtenant shall keep the Demised Premises open and available for business activity therein during all usual days and hours for such type business in the vicinity so long as same does not conflict with the Shopping Center hours of operation hereinafter stated or such periods and hours as may be set by the Sublandlord at its option during the Sublease Term (as may be extended). Subtenant shall include the address and identity of its business activity in the Demised Premises in all advertisements made by Subtenant in which the address and identity of any other local business activity of like character conducted by Subtenant shall be mentioned, and Subtenant shall concentrate its efforts to operate its business in the Demised Premises and shall not divert elsewhere any trade, commerce or business which ordinarily would be transacted by Subtenant in or from the Demised Premises.    Subtenant shall not engage in any of the Prohibited and

Kmart # 3106 – Riverside, CA                                          11                                          Kmart Sublease 8/10
Riverside's Complete Auto Repair

DET02\356689.4
ID\ATP - 100243/0999

Exclusive Uses listed on Exhibit F, attached hereto and made a part hereof for all purposes. Furthermore, Subtenant shall not do any act tending to injure the reputation of the Shopping Center as determined by Sublandlord or to increase the cost of Sublandlord's insurance or that results in a substantial increase in Taxes for the portion (or the entire) of the Shopping Center of which the Demised Premises are a part.

Subtenant will be required to maintain normal business operations pursuant to the following schedule:

| | |
|---|---|
| Monday | 8:00 a.m. to 6:00 p.m. (Other Hours Optional) |
| Tuesday | 8:00 a.m. to 6:00 p.m. (Other Hours Optional) |
| Wednesday | 8:00 a.m. to 6:00 p.m. (Other Hours Optional) |
| Thursday | 8:00 a.m. to 6:00 p.m. (Other Hours Optional) |
| Friday | 8:00 a.m. to 6:00 p.m. (Other Hours Optional) |
| Saturday | 8:00 a.m. to 6:00 p.m. (Other Hours Optional) |
| Sunday | Closed |

Section 5.2    Care of Demised Premises.  In addition to the covenants, conditions and obligations of Subtenant contained elsewhere in this Sublease, Subtenant shall at all times operate its business in a lawful manner and in compliance with all applicable laws, statutes, ordinances, regulations, codes and orders.  Subtenant shall not use the Common Areas for its own business purposes or solicit business in the Common Areas.  Subtenant shall not conduct within the Demised Premises any "going out of business", "lost sublease", fire, auction or bankruptcy sales or operate within the Demised Premises a "wholesale" or "factory outlet" store, a cooperative store, a "second hand" store, a "surplus" store or a store commonly referred to as "discount house".  Subtenant shall not advertise that it sells products or services at "discount", "cut-price" or "cut-rate" prices.  Subtenant shall not permit any objectionable or unpleasant odors to emanate from the Demised Premises, nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Demised Premises or where the same can be seen or heard from outside the building or in the Common Area, nor place an antenna, awning or other projection on the exterior of the Demised Premises; nor solicit business or distribute leaflets or other advertising material in the Common Area; nor take any other action which in the exclusive judgment of Sublandlord would constitute a nuisance or would disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective premises, nor do anything which would tend to injure the reputation of the Shopping Center.

Subtenant shall take good care of the Demised Premises and keep the same free from waste at all times.  Subtenant shall keep the Premises and sidewalks, service-ways and loading areas adjacent to the Premises neat, clean and free from dirt, rubbish, insects and pests at all times, and shall store all trash and garbage within the Premises, arranging for the regular pickup of such trash and garbage at Subtenant's expense.  Subtenant will store all trash and garbage within the area designated by Sublandlord for such trash pickup and removal and only in receptacles of the size, design and color from time to time prescribed by Sublandlord.  Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas from time to time prescribed by Sublandlord.  Sublandlord may, at its sole option, arrange for collection of all trash and garbage and bill Subtenant for Subtenant's Proportionate Share

thereof. Should Sublandlord exercise such election, Subtenant's Proportionate Share of the cost thereof will be computed by Sublandlord based upon Sublandlord's reasonable estimate of Subtenant's usage of the dumpster taking into account the size of the dumpster and Subtenant's use of the dumpster. In the event of Subtenant's failure to pay said charges within ten (10) days after being billed therefore, and interest shall accrue on all unpaid amounts at the Default Rate (defined in <u>Section 16.1</u> below) until such sums are paid in full. Subtenant shall not operate an incinerator or burn trash or garbage within the Shopping Center.

Section 5.3    <u>Change of Name</u>. Subtenant's advertised name, as used by Subtenant for identification of the business operated in the Demised Premises, shall be as set forth in the Basic Leas Provisions above. Subtenant shall not change such advertised name of the business operated in the Demised Premises without the written consent of the Sublandlord, which shall not be unreasonably withheld.

Section 5.4    <u>Storage, Office Space</u>. Subtenant shall store and/or stock in the Demised Premises only such goods, wares and merchandise as Subtenant intends to offer for sale at retail, at, in, from or upon the Demised Premises. Subtenant shall use for office, clerical or other non-retail purposes only such space in the Demised Premises as is from time to time reasonably required for Subtenant's business in the Demised Premises not to exceed five percent (5%) of the floor area of the Demised Premises.

Section 5.5    <u>Subtenant's Obligation to Light Display Windows</u>. If requested by Sublandlord, Subtenant shall keep the display windows in the Demised Premises well lighted from dusk until 11:00 p.m., or such other reasonable time as determined by Sublandlord, during each and every day of the Sublease Term.

ARTICLE VI

UTILITY SERVICES

Section 6.1    <u>Sublandlord's Obligation to Install Utility Services and Option to Supply Such Services</u>. Sublandlord shall cause to be installed the necessary mains and conduits in order that water and sewer facilities and electricity may be available to the Demised Premises. Sublandlord is not obligated to supply facilities to make gas available to the Demised Premises. If Subtenant shall use water, gas and/or electricity for any purpose in the Demised Premises and Sublandlord shall elect to supply the water, gas and/or electricity directly, Subtenant shall accept and use the same as tendered by Sublandlord and pay therefor at the applicable rates filed with the proper regulating authority and in effect from time to time covering such services.

Section 6.2    <u>Subtenant's Obligation for Payment</u>. Subtenant shall be solely responsible for and promptly pay all charges, when due, for water, gas, electricity, heat, sewer, and any other utility used upon or furnished to the Demised Premises, including but not limited to Subtenant's Proportionate Share of such amounts as Sublandlord has expended for service tap-in fees, metering fees and other fees of a similar nature pertaining to the Demised Premises.

Payment for any and all water, gas and electricity used by Subtenant, if furnished by

Sublandlord, shall be made monthly and within ten (10) days of the presentation by Sublandlord to Subtenant of bills therefor. Sublandlord shall have the right to cut off and discontinue, without notice to Subtenant, said water, gas and electricity, or any other service (regardless of whether or not furnished by Sublandlord) whenever and during any period for which bills for the same or Rent or any other obligations under this Sublease are not promptly paid by Subtenant.

The obligation of Subtenant to pay for such utilities as provided in this Sublease shall commence as of the date on which possession of the Demised Premises is delivered to Subtenant, notwithstanding any other provision of this Sublease.

ARTICLE VII

MAINTENANCE OF DEMISED PREMISES

Section 7.1    Sublandlord's Obligations for Repair and Maintenance. Sublandlord, after receiving written notice from the Subtenant and having reasonable opportunity thereafter to obtain the necessary workmen therefor, shall keep in good order and repair the foundation, roof and outer walls of the Demised Premises but not the exterior entrances, doors, door frames, closure devices, window glass, window casings or moldings, window frames, windows or any of the hardware or appliances or appurtenances of said entrances, doors or window casings, window frames and windows, or any attachment thereto or attachments to the Demised Premises used in connection therewith; provided, however, that Sublandlord shall not be called on to make any repairs to areas for which Sublandlord is responsible if the repairs are made necessary by the act, negligence or omission of Subtenant, its subtenants, assignees, concessionaires or their respective agents, employees, invitees or licensees, and the Subtenant shall make all repairs resulting therefrom. Sublandlord's obligation with respect to repairs to and maintenance of the Demised Premises shall be only as expressly set forth in this Section. Sublandlord's obligation hereunder is limited to repairs specified in this Section 7.1 only, and Sublandlord shall have no liability for any damages or injury arising out of any condition or occurrence causing a need for such repairs

Section 7.2    Subtenant's Obligations for Repair and Maintenance. Subtenant shall at its own expense at all times take good care of and keep the Demised Premises and every part thereof that is not expressly Sublandlord's obligations under Section 7.1 above, including, but without limitation, exterior entrances, doors, door frames, closure devices, window glass, window casings or moldings, window frames, windows or any of the hardware or appliances or appurtenances of said entrances, doors or window casings, window frames and windows, or any attachment thereto or attachments to the Demised Premises used in connection therewith, fixtures, hardware, equipment and appurtenances thereof (including lighting, sprinkling, heating, plumbing, and air conditioning systems, in good order, condition and repair, and Subtenant shall replace such systems, accessories, appurtenances and related equipment as necessary (including reasonably periodic interior painting and replacement of floor coverings as determined by Sublandlord ). If Subtenant refuses or neglects to repair and maintain the Demised Premises as required under this Sublease, and to the satisfaction of the Sublandlord, Sublandlord may make any such repairs and perform any such maintenance without liability to Subtenant for any loss or damage that may accrue to Subtenant's merchandise, fixtures, or other property or to Subtenant's

business by reason thereof, and upon completion thereof Subtenant shall pay as Additional Rent, upon presentation of bill therefor, Sublandlord's costs for making such repairs and maintenance plus twenty percent (20%) thereof for overhead, together with interest accruing on all unpaid amounts at the Default Rate from the date of demand therefor until paid in full. Subtenant further covenants that throughout the Sublease Term, it shall at its own expense: (1) make all repairs, replacements and maintenance in and about the Demised Premises necessary to preserve them in good order and condition (except those explicitly stated to be the responsibility of Sublandlord in this Sublease), which repairs and replacements shall be at least equal in quality to the original work and to promptly pay the expenses of such repairs and replacements; (2) suffer no waste or injury to the Demised Premises; (3) give prompt notice to the Sublandlord of any damage that may occur to the Demised Premises; (4) keep and maintain the Demised Premises in clean, sanitary and safe condition in accordance with the laws of the state wherein the Demised Premises is located and in accordance with all directions, rules and regulations of the health officer, fire marshal, building inspector, or other proper officials of the governmental agencies having jurisdiction and to execute and comply with all laws, rules, orders, ordinances and regulations at any time issued or in force, applicable to the Demised Premises or to the Subtenant's use and occupancy thereof of the municipal, city, county, state and federal governments and each and every department, bureau and official thereof and of the Board of Fire Underwriters having jurisdiction thereof, including installation and maintenance of fire extinguishers and other fire protection devices as may be required from time to time by any agency having jurisdiction thereof or the insurance underwriters insuring the building in which the Demised Premises are located.

Subtenant agrees to keep the plate glass (if any) insured with a responsible insurance company in the name of the Sublandlord and to deliver the policy or policies to Sublandlord, and upon its failure to do so, Sublandlord may place such insurance and charge the same to the Subtenant; provided, however, the failure on the part of the Sublandlord to place such insurance does not release the Subtenant of liability for any damage to any plate glass.

Maintenance of the air conditioning and heating equipment exclusively serving the Demised Premises shall be solely the responsibility of Subtenant throughout the entire Sublease Term. Subtenant shall, at its own cost and expense, enter into a regularly scheduled preventive maintenance/service contract with a maintenance contractor for servicing all water heaters, heating and air conditioning systems and equipment within the Demised Premises. Sublandlord must approve the maintenance contractor and the service contract in advance in Sublandlord's sole discretion. The service contract must include all services suggested by the equipment manufacturer within the operation/maintenance manual and must become effective (and a copy thereof delivered to Sublandlord) within thirty (30) days of the date Subtenant takes possession of the Demised Premises. Subtenant shall, within thirty (30) days after the end of the calendar year, furnish proof to Sublandlord that all such systems and equipment are being serviced in accordance with the maintenance/service contract. Within the thirty (30) day period preceding move out by Subtenant, Subtenant shall have the systems and equipment checked and serviced to insure proper functioning and shall furnish Sublandlord satisfactory proof thereof upon request.

At Sublandlord's option, to protect heating and air conditioning ("HVAC") equipment, Sublandlord may enter into a service contract covering Subtenant's HVAC equipment, along with equipment of other tenants in the shopping center, and periodic replacement of filters or other replaceable parts. If Sublandlord enters such a service contract, the cost of such service will be included in Common Area maintenance expense and will be payable by tenants in the Shopping Center (including Subtenant as to its Proportionate Share).

Section 7.3    Abuse of Plumbing, Walls. The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and Subtenant shall not permit or suffer any foreign substance of any kind to be thrown therein, and the cost of repair or replacement necessitated by any breakage, stoppage, or damage (whether on or off the Demised Premises) resulting from a violation of this provision shall be borne by Subtenant.    The Subtenant, its employees or agents, shall not alter or deface any walls, ceilings, partitions, floors, wood, stone, or iron work without the Sublandlord's prior written consent, which may be withheld in Sublandlord's sole discretion.

Section 7.4    Surrender of Demised Premises. At the expiration of the tenancy hereby created, Subtenant shall surrender the Demised Premises in the same condition as the Demised Premises were in upon delivery of possession thereof to Subtenant, reasonable wear and tear excepted, and shall surrender all keys for the Demised Premises to Sublandlord at the place then fixed for the payment of Rent and shall inform Sublandlord of all combinations on locks, safes and vaults, if any, located in the Demised Premises.    Subtenant shall fully comply with the provisions of Article IX of this Sublease prior to surrendering the Demised Premises to Sublandlord.    Subtenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the term of this Sublease.    Subtenant shall further leave the Demised Premises in a broom clean condition with all trash and debris removed from the Shopping Center and shall remove all of Subtenant's signs from both the interior and exterior of the Demised Premises in such a manner so as to not cause damage to the walls or other areas. Furthermore, Subtenant agrees to indemnify Sublandlord and hold it harmless against any loss, liability or damage resulting from Subtenant's failure to complete such work or for any damage to the Demised Premises beyond normal wear and tear.

ARTICLE VIII

SIGNS

Section 8.1    Signs. Subtenant shall not erect or install any exterior signs, exterior or interior window or door signs or advertising media, or window or door lettering or placards without the prior written consent of Sublandlord. Subtenant shall not install any exterior lighting or plumbing fixtures, shades or awnings, or any exterior decorations or painting, or build any fences or make any changes to the storefront without the previous written consent of Sublandlord.

Subtenant shall maintain signage in accordance with the criteria described in Exhibit D which is attached and incorporated herein, and in a location approved by Sublandlord in its sole

discretion. Sublandlord's review and approval of Subtenant's sign design and/or package shall *not imply that the design and/or legal requirements have been met and Subtenant warrants that it* will rely solely upon its own employees, agents, contractors, and consultants in connection with such compliance. Subtenant shall be solely responsible for complying with all legal requirements and for obtaining all permits and any violations thereof, and shall indemnify and hold Sublandlord harmless for any violations of any such legal requirements or any damage or other losses caused by Subtenant's pursuit and installation of its sign.

## ARTICLE IX

## FIXTURES AND ALTERATIONS

Section 9.1    <u>Subtenant's Fixtures and Alterations</u>. Except for any initial improvements or alterations to the Demised Premises made in accordance with <u>Exhibit C</u> or as hereinafter provided, which are necessary or desirable to use the Demised Premises for the Permitted Use ("<u>Alterations</u>"), Subtenant shall not modify or alter the exterior of the Demised Premises nor make any structural alterations to the Demised Premises.

(a)    <u>Alteration of the Demised Premise Premises</u>.

Subject to the provisions of this <u>Section 9.1</u>, Subtenant shall be responsible, at its sole cost, to perform all approved Alterations. Anything herein to the contrary notwithstanding, even if necessary for the Permitted Use, Subtenant shall not construct or install any addition to or antenna on or roof projection from the Demised Premises, nor shall Subtenant construct or install any building or structure in any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises, nor shall it make any structural alteration to the Demised Premises, or any alterations to any structural component of the Demised Premises.

Notwithstanding the foregoing, Subtenant shall not make or commence to make any Alterations, including any initial improvements set forth in Exhibit C, prior to satisfying the following conditions:

(i)    Subtenant obtains Sublandlord's prior written unconditional consent to complete and detailed plans and specifications therefor (which, in the case of Alterations costing in excess of $25,000.00, shall be signed and sealed by Subtenant's registered architect and/or engineer), which consent by Sublandlord shall be granted or withheld in its sole and unfettered discretion. ;

(ii)    Subtenant obtains the prior written consent of the Master Landlord or, if applicable under the Master Lease, any other third parties required by the Master Lease (collectively, the "<u>Master Lease Approvals</u>") to make any such Alterations and Subtenant presents evidence to Sublandlord of such Master Lease Approvals along with Subtenant's plans and specifications as defined in Section 9.1(d);

(iii)    Subtenant delivers to Sublandlord a bond, payable to Sublandlord, securing performance of and payment for such Alterations, in the amount equal to one hundred ten percent (110%) of the estimated cost to complete such Alterations, which provides that it cannot be cancelled without Sublandlord's prior written consent;

(iv)    Subtenant complies with all of the provisions of this Sublease;

(v)    in all cases, the value of each of the Demised Premises, any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises, is not diminished by such Alterations; and

(vi)    *the installation of the Alterations in the Demised Premises shall not* result in an increase in Sublandlord's insurance cost for the Shopping Center, nor shall such Alterations materially increase the Taxes assessed against the Shopping Center.

In the event that any Alterations, whether or not consented to by Sublandlord, serve to void Sublandlord or any landlord under any applicable Master Lease's roof warranty, if any, Subtenant shall be solely responsible for all costs and expenses associated therewith and Subtenant shall indemnify, defend and hold harmless Sublandlord of and from any and all loss, cost, liability and/or expense, including attorneys' fees and costs, which may be incurred by Sublandlord on account thereof.

In the event that Sublandlord elects to assist Subtenant in obtaining any Master Lease Approvals, such assistance shall in no way be deemed to relieve Subtenant of the duty to obtain such Master Lease Approvals as provided herein. Notwithstanding such assistance from Sublandlord, Subtenant shall indemnify, defend and hold harmless Sublandlord of and from any and all loss, cost, liability and/or expense, including attorneys' fees and costs, which may be incurred by Sublandlord as a result of Subtenant's Alterations.

In the event that Subtenant proceeds with the Alterations without obtaining Sublandlord's approval and the Master Lease Approvals required by this Section, Subtenant agrees to indemnify, defend and save Sublandlord harmless from and against any and all claims, actions, damages, liability and expense, including attorneys' fees, as a result of Subtenant's failure to obtain either Sublandlord's approval or the Master Lease Approvals.

(b)    Alteration Plans.

All Alterations shall be done in the same manner and follow the same procedures contained in Exhibit C hereto as if such Alterations were the original Subtenant's Work.

(c)    Restrictions on Alterations.

After receiving Sublandlord's approval for any Alterations, Subtenant shall:

(i)    not perform any work on such Alterations between November 1 and December 31 of any year, except for Alterations wholly within the interior of the Demised

Premises, not requiring any staging or work to be held outside or visible from any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises;

(ii)    construct such Alterations expeditiously and in a good and workmanlike manner, with new materials and in strict compliance with applicable legal requirements, the provisions of this Sublease and the approved plans and specifications;

(iii)    confine all machinery, equipment, tools, materials, supplies and debris for such Alterations within the interior of the Demised Premises, and stage all work on such Alterations either within the interior of the Demised Premises or from a staging area adjacent to the Demised Premises as far as possible from any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises, if any; such staging area to be approved by Sublandlord prior to commencing work;

(iv)    not unreasonably interfere in any manner with the operation or use of any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises or interfere with, hinder or prevent access to and from any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises, if any;

(v)    not cut, breach or otherwise affect any portion of any property or buildings owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises, if any, or the Common Areas whatsoever or in any manner the roof or structural components of any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises and the other buildings on any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises, if any, and shall repair and restore any damage to or effect on any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises, if any, and the Common Areas, caused directly or indirectly by such Alterations; and

(vi)    be solely responsible for and covenant to pay before due any utilities used on or for any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises to commence and complete such Alterations, including any temporary utilities or services brought to any property or building owned by Sublandlord (or the Shopping Center, as the case may be) excluding the Demised Premises, regardless of when such cost shall be incurred.

(d)    Deliveries Required Prior to Commencement of Alterations.

Prior to commencing any Alterations, in addition to satisfying the requirements of Section 9.1(a), Subtenant shall deliver to Sublandlord a copy of all governmental and private permits and approvals required therefor (including, without limitation, evidence of payment of any so-called impact fees) and written notice of the date for commencement of such Alterations. Upon completion of any Alterations, Subtenant shall deliver to Sublandlord complete and

detailed as-built plans and specifications therefor. All submissions to Sublandlord pursuant to this Section 9.1 shall be delivered to Sublandlord's Construction Department, Design Division, marked "Attention: Criteria Administrator."

In no event shall Subtenant shall commence any work on the Alterations until detailed plans and specifications for such work are submitted by Subtenant within the time requirements of Exhibits C and D to Sublandlord and are approved in writing by Sublandlord, in its sole discretion, with Sublandlord reserving the right to inspect during and after Subtenant's Alterations. Sublandlord's consent and review of Subtenant's plans and specifications and inspection of Subtenant's Alterations shall not imply that Sublandlord has ascertained that such use, plans and specifications, and that the Alterations comply with the requirements of any local, state or federal law, rule or regulation; and Subtenant warrants that it will rely solely upon its own employees, agents, contractors, and consultants in connection with such compliance. No preliminary or conditional approval from Sublandlord, verbal or otherwise, shall be effective prior to Sublandlord's delivery to Subtenant of its final written unconditional approval as provided herein and Subtenant acknowledges it shall not rely on any such preliminary or conditional approval. Sublandlord shall have no responsibility or liability whatsoever for any loss of, or damage to, any improvements, fixtures or other equipment so installed or left upon the Demised Premises.

All Alterations, decorations, additions, improvements and fixtures, other than trade fixtures, which shall be made or installed by the Subtenant upon the Demised Premises and which in any manner are attached to the floors, walls or ceilings, shall remain the property of the Subtenant for the Sublease Term; provided, however, that such alterations, decorations, additions, improvements and fixtures shall not be removed from the Demised Premises without the prior consent in writing from the Sublandlord. Additionally, if any Alterations, decorations, improvements and/or fixtures are removed from the Demised Premises with the consent of Sublandlord during the Sublease Term (as may be extended), such removed alterations, decorations, improvements and/or fixtures shall be replaced with items of equal quality and value and such removal shall not damage the Demised Premises or any other area of the Shopping Center.

Upon the termination or expiration of this Sublease the Subtenant shall at its own expense remove any such Alterations, decorations, additions, improvements and fixtures as the Sublandlord has designated in writing for removal, and the Subtenant shall restore the Demised Premises as provided in Article VII of this Sublease. In the event the Subtenant fails to remove such Alterations, decorations, additions, improvements and fixtures designated for removal by the Sublandlord and so restore the Demised Premises, then upon the expiration of this Sublease, the Sublandlord shall have the right to remove any such Alterations, decorations, additions, improvements and fixtures at the expense of the Subtenant, and the Subtenant shall, upon demand, reimburse the Sublandlord for the cost of removing and storing of same and for restoring the Demised Premises to such condition, and interest shall accrue on all unpaid costs of such removal and restoration at the Default Rate until such cost has been paid in full by Subtenant. Subtenant shall leave upon and surrender the Demised Premises, without disturbance or molestation or injury, such of the Alterations, decorations, additions, improvements and fixtures that the Sublandlord designates for retention by the Sublandlord, and such items shall

automatically become the property of the Sublandlord without any obligation for Sublandlord to make payment to the Subtenant therefor. Any linoleum or other floor covering of similar character which may be cemented or otherwise adhesively affixed to the floor of the Demised Premises shall upon expiration of the Sublease Term be and become the property of the Sublandlord. However, in the event Subtenant alters the floor surface or attaches or cements any material or substance to the floor which serves Subtenant's trade use, but is "non-standard" for other potential tenants, such as, but not limited to, a "pebbled floor", Subtenant shall, at Subtenant's expense remove and repair the floor to its original condition, excepting reasonable wear and tear, upon Sublandlord's request. Subtenant shall indemnify and hold Sublandlord harmless for the costs incurred by Sublandlord in fulfilling any of Subtenant's obligations under this paragraph that were not carried out in full accordance with the requirements hereof at the end of the Sublease Term or its earlier termination. The terms of this provision shall survive the termination and expiration of this Sublease.

Section 9.2    Sublandlord's Changes and Additions.    Sublandlord hereby reserves the right at any time, and from time to time, to make alterations or additions to, and to build additional stories on the building in which the Demised Premises are located and to build adjoining the same. Sublandlord also reserves the right at any time, and from time to time, to demolish or construct other buildings and improvements in the Shopping Center, and to enlarge the Shopping Center, and to make alterations therein or additions thereto, and to build additional stories on any building or buildings within the Shopping Center, and to build adjoining thereto and to construct decks or elevated parking facilities and free-standing, single story buildings within the parking lot areas of the Shopping Center. Sublandlord reserves the right to relocate, at any time, the various buildings, parking areas and other Common Areas shown on Exhibit B; Subtenant acknowledges that the said Exhibit B creates no easement rights in Common Areas shown thereon, but only the non-exclusive license to use said areas in common with all other tenants and occupants of the Shopping Center, and to such others to whom Sublandlord has granted, or may hereafter grant rights to use the same, as said Common Areas may exist from time to time during the Sublease Term.

ARTICLE X

INSURANCE AND INDEMNITY

Section 10.1    Indemnification.    Except to the extent caused by Sublandlord's act, omission or negligence, Subtenant shall indemnify, defend, with counsel reasonably acceptable to Subtenant, Sublandlord and Master Landlord, as applicable, and hold harmless, their respective successors and assigns, from and against any and all damages (including, without limitation, personal injury, property and natural resource damages), claims, demands, liabilities, actions, fines, penalties, costs or expenses, including, without limitation, attorneys' and consultants' fees, suffered or incurred by Sublandlord and/or Master Landlord (or their respective successors and assigns) arising from or out of, pertaining to or involving this Sublease or the use, control, maintenance, repair, alteration, construction or occupancy on, of or to the Demised Premises, the Kmart Premises, the Shopping Center (if applicable) or the Common Areas, or the adjoining streets and sidewalks, by Subtenant, its successors, assigns and Subtenants and their employees, agents, customers and invitees, including, without limitation: (i)

Kmart # 3106 – Riverside, CA                              21                              Kmart Sublease 8/10.
Riverside's Complete Auto Repair

any failure by Subtenant to perform any of the agreements, terms, covenants or conditions of this Sublease on Subtenant's part to be performed; (ii) the release or potential release on or off the Demised Premises of any Hazardous Material caused, exacerbated or precipitated by Subtenant or its employees, agents, contractors, customers, invitees, successors or assigns, including, without limitation, any study, remediation or monitoring costs; (iii) the violation or alleged violation of any Environmental Law by Subtenant; (iv) the transportation, storage, disposal, treatment, recycling or reuse of Hazardous Materials generated by Subtenant, or its employees, agents or contractors; (v) any claim by or through any customer of Subtenant or any other person (including any governmental entity) not a party to this Sublease; and/or (vi) any claims by or through Subtenant (including, without limitation, any products liability claims). If, in any litigation, Subtenant shall fail to provide Sublandlord and/or Master Landlord with counsel reasonably approved by Sublandlord and/or Master Landlord, as applicable, as required in this Section 10.1, Subtenant covenants and agrees to pay all reasonable costs and attorneys' fees incurred by Sublandlord and Master Landlord in connection with such litigation. The obligations of Subtenant as set forth in this Section 10.1 shall survive the expiration and/or termination of this Sublease.

Section 10.2    <u>Increase in Fire Insurance Premium</u>. Subtenant shall not carry any stock of goods, store or use any Hazardous Substances (except for small amounts normally found in ordinary cleaning products and otherwise in accordance with all applicable laws governing Hazardous Substances) or do anything in or about the Demised Premises which will in any way tend to increase the insurance rates on said premises or the building of which they are a part. Subtenant shall pay as Additional Rent the entire amount of any increase in premiums for insurance against loss by fire that may be charged during the Sublease Term on the amount of insurance at any time carried by Sublandlord on said premises and/or the building of which they are a part, resulting from the business carried on in the Demised Premises by Subtenant or any Hazardous Substances kept in the Demised Premises that are in violation of any applicable law, whether or not Sublandlord has consented to the same. The obligations of Subtenant under this Section are in addition to its obligations contained elsewhere in this Sublease concerning insurance.

Section 10.3    <u>Subtenant's Obligation to Carry Property, Commercial General Liability and Workers' Compensation Insurance</u>. Subtenant shall maintain, at its own expense, from the date of delivery of possession to it of the Demised Premises through the expiration of the Sublease Term, insurance of the following character:

(i)    Insurance against fire, vandalism, malicious mischief and such other perils as are from time to time included in a standard extended coverage endorsement, insuring Subtenant's merchandise, trade fixtures, furnishings, windows, plate glass, equipment and all items of personal property of Subtenant located on or within the Demised Premises, in an amount not less than the full amount of the actual replacement cost thereof;

(ii)    Commercial general liability insurance and commercial umbrella liability insurance against claims for bodily injury, death, property damage or other loss occurring on, in or about the Demised Premises and adjoining sidewalks and passageways, or arising from the acts of Subtenant or its agents, employees or invitees on, in or about the Shopping Center, such

DET02\356689.4
ID\ATP - 100243/0999

insurance to afford protection to Sublandlord and such other parties as Sublandlord shall designate, with a limit of not less than $3,000,000.00 for the bodily injury or death of any one person or incident and $1,000,000.00 for property damage. If such commercial general liability insurance contains a general aggregate limit, it shall apply separately to the Demised Premises;

(iii)   workers' compensation insurance evidenced by Subtenant on a state basis (with respect to the state in which the subleased premises are located) and by a certificate of insurance on a "statutory basis" with minimum limits of "employers liability" coverage of $500,000.00 per occurrence;

(iv)   at any time when Subtenant's Work or other Alterations are made, builder's risk insurance (in completed value non-reporting form) in the amount of the full replacement cost of the improvements in the subleased premises;

(v)   automobile liability/garage liability insurance evidenced by a certificate of insurance that provides coverage at a minimum limit of $1,000,000 per occurrence; and

(vi)   all risk coverage on Subtenant's personal property and improvements with a deductible of less than $10,000.00

All insurance policies required hereunder shall be issued by companies of recognized financial standing, duly licensed to do business under the laws of the state wherein the Demised Premises are located, and given an "A" rating by Best's Insurance Guide (or any higher rating required by any master landlord or Sublandlord's mortgagee), and shall name Sublandlord and any other parties in interest designated by Sublandlord as additional named insureds, including a mortgagee clause in favor of any mortgagee of the Demised Premises or the Shopping Center or any portion thereof. Each such policy shall (i) contain an agreement by the insurer that it will not cancel or materially modify such policy except after thirty (30) days prior written notice to Sublandlord (ii) state that such policies not be invalidated or the proceeds not payable by or due to any act or neglect of Subtenant or the additional insureds, occupancy or use of the Demised Premises for purposes more hazardous than permitted by such policy, any foreclosure or other proceedings relating to the Demised Premises or change in title to or ownership of the Demised Premises, or part thereof; (iii) be evidenced by a certificate that contains the following qualifying statement: "Coverage evidenced by this certificate shall be considered primary over any and all other insurance", and shall not require the additional insureds to pay any portion of any loss (i.e., non-contributory) and shall not require Subtenant to pay any portion of any loss, damage or claim prior to payment by the insurer; and (iv) meet all applicable legal requirements. Subtenant shall deliver to Sublandlord, upon delivery of possession of the Demised Premises, the original or duplicate policies or certificates of the insurers, evidencing all the insurance which is required to be maintained by Subtenant hereunder and Subtenant shall, within thirty (30) days prior to the expiration of any such insurance, deliver other original or duplicate policies or other certificates of the insurers evidencing the renewal of such insurance. Should Subtenant fail to effect, maintain or renew any insurance provided for in this Section, or to pay the premium therefor, or to deliver to Sublandlord any of such policies or certificates, then and in any of said events Sublandlord may, at its option but without obligation so to do, procure such insurance. Any sums expended by Sublandlord to procure such insurance shall be Additional Rent hereunder and

shall be paid by Subtenant immediately after delivery to Subtenant of a statement therefor together with interest accrued on all unpaid cost expended by Sublandlord at the Default Rate from the date of such expenditure until such amounts are paid in full.

On or before each Sublease Year of this Sublease, Subtenant shall provide to Sublandlord a certificate of insurance evidencing the insurance coverage required in this Sublease and showing as additional insureds, Sublandlord and its subsidiaries and affiliates, any master landlord, and any other parties in interest as Sublandlord may designate, and showing the coverages as primary over any and all other coverages applicable. Such certificates shall be provided to Kmart Corporation, Insurance Compliance, P.O. Box 12010, Hemet, CA 92546-8010.

Section 10.4   A.   Non-Liability And Waiver. Sublandlord and Sublandlord's agents and employees shall not be liable to Subtenant or any other person or entity whomsoever for any injury to person or damage to property caused by the Demised Premises or other portions of the Shopping Center becoming out of repair or damaged or by defect in or failure of equipment, pipes or wiring, or broken glass, or by the backing up of drains or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Demised Premises, nor shall Sublandlord be liable to Subtenant or any other person or entity whomsoever for any loss or damage that may be occasioned by or through the acts or omissions of other tenants of the Shopping Center or of any other persons or entities whomsoever, excepting only duly authorized employees and agents of Sublandlord. Furthermore, Sublandlord shall not be responsible for lost or stolen personal property, equipment, money or jewelry from the Demised Premises or from the public areas of the Shopping Center, regardless of whether such loss occurs when the area is locked against entry. Sublandlord shall not be liable to Subtenant or Subtenant's employees, customers or invitees for any damages or losses caused by theft, burglary, assault, vandalism or other crimes. Sublandlord shall have no obligation to provide security service for the Demised Premises, however, Subtenant may elect to provide its own security systems and services and secure Subtenant's own insurance in excess of the amounts and types required elsewhere in this Sublease, to protect against the above occurrences if Subtenant desires additional protection or coverage for such risks (for example, business interruption insurance). Subtenant shall give Sublandlord prompt notice of any criminal or suspicious conduct within or about the Demised Premises or the Shopping Center, and/or any personal injury or property damage caused thereby.

B.   Sublandlord shall not be under any responsibility or liability in any way whatsoever for the quality, quantity, impairment, interruption, stoppage, or other interference with service involving water, heat, gas, electric current for light and power, telephone, or any other service of whatsoever kind or nature.

Sublandlord shall not be liable for any damage to property of Subtenant or of others located on the Demised Premises, nor for the loss of or damage to any property of Subtenant or of others by theft, burglary or otherwise. Sublandlord shall not be liable for any injury or damage to persons or property resulting from (but not limited to) fire, explosion, falling plaster, steam, gas, electricity, water, rain, snow or leaks from any part of the Demised Premises, or from the pipes, appliances or plumbing works, or by dampness or by any other cause of whatsoever nature. Sublandlord shall not be liable for any such damage caused by other tenants or persons in the Demised Premises, occupants of adjacent property, of the Shopping Center, or the public,

or caused by operations in construction of any private, public or quasi-public work. All property of Subtenant kept or stored on the Demised Premises shall be so kept or stored at the risk of Subtenant only and Subtenant shall hold Sublandlord harmless from any claims arising out of damage to the same, including subrogation claims by Subtenant's insurance carriers.

## ARTICLE XI

## RECEIVING, DELIVERY AND SUBTENANT PARKING

Section 11.1    Receiving and Delivery of Subtenant's Merchandise and Disposition of Refuse. All receiving and delivery of goods and merchandise and all removal of merchandise, supplies, equipment, garbage and refuse shall be made only by way of the rear of the Demised Premises or at any other location designated by Sublandlord, and only at such time designated for such purpose by Sublandlord.

Section 11.2    Subtenant and Employee Parking. Notwithstanding any other provision of this Sublease, Subtenant and its employees shall park their automobiles only in areas specifically designated for that purpose from time to time by Sublandlord. Subtenant shall, within five (5) days after written notice from Sublandlord, furnish to Sublandlord the automobile license numbers assigned to its automobiles and the automobiles of all of its employees. Subtenant shall be responsible for its employees and any violation hereof by its employees. In the event that Subtenant or its employees fail to park their automobiles in designated parking areas, then Sublandlord may, at its option, charge the Subtenant and Subtenant shall pay to Sublandlord as Additional Rent Ten ($10.00) Dollars per day per automobile parked in any area other than those designated for Subtenant and employee parking.

## ARTICLE XII

## ASSIGNMENT AND SUBLETTING

Section 12.1    Assignment and Subletting. Subtenant shall not sell, assign, hypothecate, pledge, or in any manner transfer this Sublease or any estate or interest therein by operation of law or otherwise, nor sublet the Demised Premises or any part thereof, nor allow anyone to conduct business at, upon or from the Demised Premises, without the prior written consent of Sublandlord. Consent by Sublandlord to one or more assignments of this Sublease or to one or more sublettings of the Demised Premises or the collection of rent by Sublandlord from any subtenant or assignee of Subtenant shall not constitute a waiver hereof or operate to exhaust any of the Sublandlord's rights under this Article. The sale, issuance, or transfer of any voting capital stock of Subtenant or Subtenant's guarantor, if any (if Subtenant or Subtenant's guarantor, if any, be a non-public corporation the stock of which is not traded on any exchange or over the counter), which directly or indirectly results in a change in the voting control of Subtenant or Subtenant's guarantor, if any, shall be deemed to be an assignment of this Sublease within the meaning of this Section. Any such transfer, either voluntarily or involuntarily or by operation of law or otherwise, without the consent of Sublandlord shall, at Sublandlord's option, terminate this Sublease, in addition to any remedies it may have under Article XVI of this Sublease or at law, and any purported such transfer shall be null and void. If the Subtenant's

interest in and to this Sublease is assigned, the Subtenant's liability for performance of any terms, conditions, covenants and agreements contained herein to be performed by Subtenant shall remain in full force and effect, notwithstanding the fact that Sublandlord may have consented to such assignment. Sublandlord has entered into this Sublease with Subtenant in order to obtain for the benefit of the entire Shopping Center the unique attraction of Subtenant's trade name and the unique merchandising mix and product line associated with Subtenant's business, and the foregoing prohibition on assignment or subletting or the like is expressly agreed to by the Subtenant as an inducement to Sublandlord to sublease to Subtenant.

If Subtenant's interest in and to this Sublease is transferred in accordance with the terms and conditions listed above, the Percentage Rent payable by Subtenant's transferee hereunder shall continue to be computed as provided in <u>Section 2.3</u> hereof, but in no event shall such Percentage Rent payable to such transferee be less than the average Percentage Rent paid by Subtenant to Sublandlord for the two Lease Years preceding Subtenant's transfer of interest in and to this Sublease

Section 12.2    <u>By Sublandlord</u>. Sublandlord shall have the right to transfer, assign and convey in whole or in part, any and all rights, obligations and interests of Sublandlord under this Sublease. Thereafter, Sublandlord shall have no further liability under this Sublease.

## ARTICLE XIII

## ACCESS TO DEMISED PREMISES

Section 13.1    <u>Right of Entry by Sublandlord</u>. Sublandlord shall have the right to enter upon the Demised Premises at all reasonable hours for the purpose of inspecting the same, or of making repairs, additions or alterations to the Demised Premises or any property owned or controlled by Sublandlord, without the same constituting an eviction (constructive or otherwise) of Subtenant in whole or in part, and such entry, repair and/or alteration shall not give rise to any rights of abatement of setoff of Rent by reason of loss or interruption of business of Subtenant, or otherwise. Notwithstanding the foregoing, Sublandlord shall use commercially reasonable efforts not to unreasonably interfere with Subtenant's business in the Demised Premises.

Section 13.2    <u>Sublandlord's Right to Exhibit Demised Premises</u>. For a period commencing one hundred eighty (180) days prior to the expiration of the Sublease Term (as may be extended as provided for herein), Sublandlord may have reasonable access to the Demised Premises for the purpose of exhibiting the same to prospective tenants. Additionally, at any time during the Sublease Term (as may be extended), upon reasonable prior notice, Sublandlord may have access to the Demised Premises in relation to any loan, refinancing or sale of all or any part of the Shopping Center.

## ARTICLE XIV

## EMINENT DOMAIN

Section 14.1    <u>Total Condemnation</u>. If the whole of the Demised Premises shall be taken by any public authority under the power of eminent domain then the Sublease Term shall cease as of the day possession shall be taken by such public authority and the Rent shall be paid up to that day with a proportionate refund by Sublandlord of such Rent as may have been paid in advance for a period subsequent to the date of the taking.

Section 14.2    <u>Partial Condemnation</u>. If less than the whole, but more than thirty-five percent (35%) of the Demised Premises are taken under the power of eminent domain, Sublandlord and Subtenant shall each have the right to terminate this Sublease upon ten (10) days prior written notice to the other and in such event, such termination shall be effective upon the day possession of the Demised Premises shall be acquired for public use. Such notice shall be given within thirty (30) days after such taking. In the event (i) neither party hereto shall elect to terminate this Sublease or (ii) less than thirty-five percent (35%) of the Demised Premises are so taken, the Sublease Term shall cease only on the part so taken as of the day possession shall be taken by such public authority and Subtenant shall pay Rent up to that day, with appropriate refund by Sublandlord of such Rent as may have been paid in advance for a period subsequent to the date of the taking, and thereafter all the terms herein provided shall continue in effect, except that the Base Rent shall be reduced in proportion to the amount of the Demised Premises taken and the breakpoint above which Percentage Rent is computed and payable shall likewise be proportionately reduced and Sublandlord shall, at its own cost and expense, make all necessary repairs or alterations to the basic building as originally installed by Sublandlord, so as to constitute the remaining Demised Premises a complete architectural unit.

If more than twenty percent (20%)of the building in which the Demised Premises are located or more than ten percent (10%) of the Common Area shall be taken under power of eminent domain, Sublandlord may, by written notice to Subtenant delivered within thirty (30) days after the date of surrendering possession to the public authority, terminate this Sublease.

Notwithstanding the foregoing, if the Master Lease (if any) terminates as a result of condemnation or taking by eminent domain, this Sublease shall also simultaneously terminate.

Section 14.3    <u>Sublandlord's and Subtenant's Damages</u>. All damages awarded for such taking under the power of eminent domain, whether for the whole or a part of the Demised Premises, shall belong to and be the property of Sublandlord whether such damages shall be awarded as compensation for diminution in value to the leasehold or to the fee of the Demised Premises; provided, however, that Sublandlord shall not be entitled to any separate and additional award made to Subtenant for loss of business, or for depreciation to, and cost of removal of, stock and trade fixtures; provided, however, that any award or other recovery by Subtenant shall not, in any way, reduce or otherwise impede any award or recovery of Sublandlord for its interest in the Shopping Center or the Demised Premises.

ARTICLE XV

DESTRUCTION OR DAMAGE TO DEMISED PREMISES

Section 15.1    <u>Reconstruction of Damaged Demised Premises</u>.  In the event the Demised Premises shall be partially or totally destroyed by fire or other casualty insured under the Property ` carried by Sublandlord so as to become partially or totally untenantable, then the damage to the Demised Premises shall be promptly repaired, to the extent of any proceeds received from such insurance, unless Sublandlord shall elect not to rebuild as hereinafter provided.  If Sublandlord elects to cause such repairs to be made, the obligation of Sublandlord hereunder shall be limited to the Sublandlord's Work covered by <u>Exhibit C</u> hereof.  In no event shall Sublandlord be required to repair or replace Subtenant's merchandise, trade fixtures, furnishings or equipment.  If more than thirty-five percent (35%) of the floor area of the building in which the Demised Premises are located shall be damaged or destroyed by fire or other casualty, or if during the last three (3) years of the Sublease Term (as may be extended) more than twenty-five percent (25%) percent of the Demised Premises or of the floor area of the building in which the Demised Premises are located shall be damaged or destroyed by fire or other casualty, then Sublandlord may elect either that the building and/or Demised Premises, as the case may be, be repaired or rebuilt or, at its sole option, terminate this Sublease by giving written notice to Subtenant of its election to so terminate, such notice to be given within ninety (90) days after the occurrence of such damage or destruction.  If Sublandlord elects to repair or rebuild the Demised Premises, it shall, within ninety (90) days after the occurrence of such damage or destruction give Subtenant notice of its intention to repair or rebuild the Demised Premises and then proceed to repair or rebuild same with reasonable dispatch, subject, however, to delays of the type referred to in <u>Section 20.15</u> of this Sublease.  If Sublandlord is required or elects to repair or rebuild the Demised Premises as herein provided, Subtenant shall repair or replace its merchandise, trade fixtures, furnishings and equipment in a manner and to at least a condition equal to that prior to its damage or destruction, and if closed, promptly reopen for business.

Section 15.2    <u>Waiver of Subrogation</u>.  Each party does hereby remise, release and discharge the other party hereto and any officer, agent, employee or representative of such party, of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance, permitting the foregoing release of liability and waiving the insurer's right of subrogation, is carried by such party at the time of such loss, damage or injury to the extent of recovery by such party under such insurance.

Each insurance policy required to be carried by Sublandlord or Subtenant under this Sublease shall include a clause or endorsement permitting this waiver of liability and contain a waiver of subrogation by the insurer.

ARTICLE XVI

DEFAULT OF THE SUBTENANT

Section 16.1    <u>Default and Remedies</u>.  In the event any one or more of the following events occur:

(i)     Subtenant shall fail to pay any installment of Rent when due, or any other charge required to be paid by Subtenant as and when due, and such failure shall continue for a period of five (5) days;

(ii)    Subtenant shall fail to comply with any term, provision or covenant of this Sublease, other than those expressly addressed within clause (i) above, and shall not cure such failure within ten (10) days after written notice thereof to Subtenant;

(iii)   Subtenant or any guarantor of Subtenant's obligations under this Sublease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors;

(iv)    Subtenant or any guarantor of Subtenant's obligations under this Sublease shall file a petition under any section or chapter of the Federal Bankruptcy Code, as amended, or under any similar law or statute of the United States or any State thereof; or Subtenant or any guarantor of Subtenant's obligations under this Sublease shall be adjudged bankrupt or insolvent in proceedings filed against Subtenant or any guarantor of Subtenant's obligations under this Sublease;

(v)     A receiver or Trustee shall be appointed for all of the Demised Premises or for all or substantially all of the assets of Subtenant or any guarantor of Subtenant's obligations under this Sublease;

(vi)    Subtenant shall desert or vacate any portion of the Demised Premises;

(vii)   Subtenant shall do or permit to be done anything which creates a lien upon the Demised Premises and fails to remove such lien promptly (but in no event more than 20 days following attachment of such lien or claim of lien);

(viii)  Subtenant shall assign this Sublease or sublet any portion of the Demised Premises in violation of the provisions of this Sublease;

(ix)    The business operated by Subtenant shall be closed by an applicable governmental agency for failure to pay any State sales tax as required or for any other reason; or

(x)     Subtenant shall fail to comply with any terms or conditions of any other contract or agreement by and between Sublandlord and Subtenant which relate to the Demised Premises,

then Sublandlord, in addition to any other rights or remedies it may have at law or in equity, shall have the following rights and remedies:

(a)      terminate this Sublease in which event Subtenant shall immediately surrender the Demised Premises to Sublandlord, and if Subtenant fails to do so, Sublandlord may, without prejudice to any other remedy which Sublandlord may have for possession or arrearages in Rent, enter upon and take possession of the Demised Premises and expel or remove Subtenant and any other person who may be occupying the Demised Premises or any part thereof, by any legal means, without being liable for prosecution or any claim of damages therefore;

(b)      enter upon and take possession of the Demised Premises and expel or remove Subtenant and any other person who may be occupying the Demised Premises or any part thereof, by any legal means, without being liable for prosecution or any claim for damages therefor with or without having terminated the Sublease;

(c)      do whatever Subtenant is obligated to do under the terms of this Sublease (and enter upon the Demised Premises in connection therewith if necessary) without being liable for prosecution or any claim for damages therefor, and Subtenant agrees to reimburse Sublandlord on demand for any expenses which Sublandlord may incur in thus effecting compliance with Subtenant's obligations under this Sublease, plus interest thereon at the lesser of the highest rate permitted by law or eighteen percent (18%) per annum (the lesser rate, the "Default Rate"), and Subtenant further agrees that Sublandlord shall not be liable for any damages resulting to Subtenant from such action; and/or

(d)      exclude Subtenant from the Demised Premises by changing all door locks and other security devices located thereon and thereafter Sublandlord or its agent shall place a written notice on Subtenant's front door stating the name and address or telephone number of the individual from whom a new key may be obtained and that such key may only be obtained during the hours stated. Sublandlord shall, however, have absolutely no obligation to furnish a new key unless and until Subtenant (i) cures all existing defaults and (ii) delivers to Sublandlord a sum of money determined by Sublandlord in its sole discretion which shall be added to and become a part of the security deposit of Subtenant hereunder. Sublandlord and Subtenant intend that this sub-paragraph expressly supersedes any conflicting provisions contained in any applicable provision of state law, or any successor statute to the extent permitted by applicable law.

Section 16.2  No Waiver.  Exercise by Sublandlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Demised Premises by Subtenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Sublandlord and Subtenant. No such alteration of locks or other security devices and no removal or other exercise of dominion by Sublandlord over the property of Subtenant or others at the Demised Premises shall be deemed unauthorized or constitute a conversion, Subtenant hereby consenting, after any event of default, to the aforesaid exercise of dominion over Subtenant's property within the Demised Premises. All claims for damages by reason of such re-entry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration

proceedings or other legal process. Subtenant agrees that any re-entry by Sublandlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings or without the necessity for any legal proceedings, as Sublandlord may elect, and Sublandlord shall not be liable in trespass or otherwise.

Section 16.3    Termination Damages.    In the event Sublandlord elects to terminate the Sublease in accordance with Section 16.1 above, then notwithstanding such termination, Subtenant shall be liable for and shall pay to Sublandlord at the address specified for notice to Sublandlord herein the sum of all Rent and other amounts payable to Sublandlord pursuant to the terms of this Sublease which have accrued to date of such termination, plus, as damages, an amount equal to the net present value of the positive difference between (i) total Rent (Base Rent, Percentage Rent and Additional Rent) reserved by this Sublease for the remaining portion of the Sublease Term (had such term not been terminated by Sublandlord prior to the date of expiration) less (ii) the net amounts Subtenant proves Sublandlord would have received during such remaining portion of the Sublease Term through reletting of the Demised Premises. For purposes hereof, "net present value" shall be determined using a discount rate equal to four percent (4%) per annum.

Section 16.4    Termination of Possession.    In the event that Sublandlord elects to repossess the Demised Premises without terminating the Sublease, then Subtenant shall be liable for and shall pay to Sublandlord at the address specified for notice to Sublandlord herein all rental and other amounts payable to Sublandlord pursuant to the terms of this Sublease which have accrued to the date of such repossession, plus total Rent (Base Rent, Percentage Rent and Additional Rent) required to be paid by Subtenant to Sublandlord during the remainder of the Sublease Term, diminished by any net sums thereafter received by Sublandlord through reletting the Demised Premises during said period (after deducting expenses incurred by Sublandlord in accordance with this Article XVI). In no event shall Subtenant be entitled to any excess of any rental obtained by reletting over and above the rental herein reserved. Actions to collect amounts due by Subtenant to Sublandlord as provided in this Section may be brought from time to time, on one or more occasions, without the necessity of Sublandlord's waiting until expiration of the Sublease Term.

Section 16.5    Additional Damages.    In the case of any of the defaults described in Section 16.1 above, Subtenant shall also be liable for and shall pay to Sublandlord, in addition to any sum provided to be paid above, broker's fees incurred by Sublandlord in connection with reletting the whole or any part of the Demised Premises; the costs of removing and storing Subtenant's or other occupant's property; the cost of repairing, altering, remodeling or otherwise putting the Demised Premises into condition acceptable to a new subtenant or tenants, and all reasonable expenses incurred by Sublandlord in enforcing or defending Sublandlord's rights and/or remedies including reasonable attorneys' fees.

Section 16.6    Reletting.    Sublandlord may, but need not, relet the Demised Premises or any part thereof for such Rent and upon such terms as Sublandlord, in its sole discretion, shall determine (including the right to relet the Demised Premises for a greater or lesser term than that

remaining under this Sublease, the right to relet the Demised Premises as a part of a larger area, and the right to change the character or use of the Demised Premises). If Sublandlord elects to relet the Demised Premises, it shall only be required to use the same efforts it then uses to sublease other space or properties which it owns or manages; provided, however that Sublandlord shall not be required to give any preference or priority to the showing or leasing of the Demised Premises over any other space that Sublandlord may be leasing or have available and may place a suitable prospective subtenant in any such available space regardless of when such alternative space becomes available; provided, further, the Sublandlord shall not be required to observe any instruction given by Subtenant about such reletting or accept any subtenant offered by Subtenant unless such offered subtenant has a credit worthiness acceptable to Sublandlord, leases the entire Demised Premises, agrees to use the Demised Premises in a manner consistent with the Sublease and leases the Demised Premises at the same rent, for no more than the current Sublease Term and on the same terms and conditions as in this Sublease without any expenditure by Sublandlord for subtenant improvements or broker's commissions. In any such case, Sublandlord may, but shall not be required to, make repairs, alterations and additions in or to the Demised Premises and redecorate the same to the extent Sublandlord deems necessary or desirable.

Section 16.7    Joint and Several Liability.    In the event Subtenant is comprised of more than one person and/or entity, all such persons and/or entities shall be jointly and severally liable for all of the obligations and liabilities of Subtenant under this Sublease.

Section 16.8    Percentage Rental Damages.    For the purpose of computing the amount of Subtenant's liability for Percentage Rental after default, the periodic Percentage Rental for which Subtenant shall be liable after termination of Subtenant's right to possession shall be the greatest amount Subtenant was obligated to pay as Percentage Rental during any full Percentage Rental payment period before such termination. Subtenant will also pay a pro rata part of such periodic Percentage Rental based upon the length of time between the previous payment of Percentage Rental and the date of termination; and upon such termination Subtenant will be obligated to submit to Sublandlord a statement accurately showing Gross Sales made since submission of its last previous statement, together with such additional supporting financial records as Sublandlord may require. The terms and conditions relating to Percentage Rental, if any, payable by Subtenant hereunder are included solely for the purpose of providing for the payment of rental in excess of the Base Rent, and providing for a method whereby such Additional Rent is to be measured, ascertained and paid, and shall be cumulative with and not in limitation of all other remedies provided for Sublandlord herein.

Section 16.9    Subtenant's Property.    In the event that Sublandlord shall have taken possession of the Demised Premises pursuant to the authority herein granted, then Sublandlord shall have the right to keep in place and use all of the furniture, fixtures and equipment at the Demised Premises, including that which is owned by or Leased to Subtenant at all times prior to any foreclosure thereon by Sublandlord or repossession thereof by any lessor thereof or third party having a lien thereon. Sublandlord shall also have the right to remove from the Demised Premises (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process and without being liable for prosecution or any claim for damages therefore) all or

Kmart # 3106 – Riverside, CA                                    32                                    Kmart Sublease 8/10
Riverside's Complete Auto Repair

DET02\356689.4
ID\ATP - 100243/0999

any portion of such furniture, fixtures, equipment and other property located thereon and place same in storage at any place within the county in which the Demised Premises is located; and in such event, Subtenant shall be liable to Sublandlord for costs incurred by Sublandlord in connection with such removal and storage and shall indemnify and hold Sublandlord harmless from all loss, damage, cost, expense and liability in connection with such removal and storage. Sublandlord shall also have the right to relinquish possession of all or any portion of such furniture, fixtures, equipment and other property to any person ("Claimant") claiming to be entitled to possession thereof who presents to Sublandlord a copy of any instrument represented to Sublandlord by Claimant to have been executed by Subtenant (or any predecessor of Subtenant) granting Claimant the right under various circumstances to take possession of such furniture, fixtures, equipment or other property, without the necessity on the part of Sublandlord to inquire into the authenticity of said instrument and without the necessity of Sublandlord's making any nature of investigation or inquiry as to the validity of the factual or legal basis upon which Claimant purports to act; and Subtenant agrees to indemnify and hold Sublandlord harmless from all cost, expense, loss, damage and liability incident to Sublandlord's relinquishment of possession of all or any portion of such furniture, fixtures, equipment or other property to Claimant.

Section 16.10 Legal Expenses. If suit shall be brought for recovery of possession of the Demised Premises, for the recovery of Rent or any other amount due under the provisions of this Sublease, or because of the breach of any other covenant herein contained on the part of Subtenant to be kept and performed, and a breach shall be established, Subtenant shall pay to Sublandlord all expenses incurred therefor, including reasonable attorneys' fees.

Section 16.11 Waiver of Rights of Redemption. Subtenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Subtenant being evicted or dispossessed for any cause, or in the event of Sublandlord obtaining possession of the Demised Premises, by reason of the violation by Subtenant of any of the covenants or conditions of this Sublease, or otherwise.

Section 16.12 Subtenant's Failure to Operate Continuously. The parties covenant and agree that because of the difficulty or impossibility of determining Sublandlord's damages by way of loss of the anticipated Percentage Rent, if any, from the Subtenant or other tenants or occupants in the Shopping Center, or by way of loss of value in the property because of adverse publicity or appearances by Subtenant's action, should Subtenant at any time during the term:

(a)     vacate, abandon, or desert the Demised Premises; or

(b)     cease operating its business therein for any reason other than damage or destruction as provided in Article XV,

then, in any such event, if Sublandlord elects not to terminate this Sublease as set forth in this Article, then, in addition to any other rights and remedies available to Sublandlord under the terms of this Sublease, Subtenant shall pay to Sublandlord (in addition to Base Rent, Additional Rent and all other charges due under this Sublease) an amount equal to one-thirtieth ($1/30^{th}$) of

the monthly installment of the Base Rent then due for each day the Demised Premises and Subtenant's business therein are not continuously and uninterruptedly operated by Subtenant.

## ARTICLE XVII

## EXCULPATION

Section 17.1   Exculpation.   Anything in this Sublease to the contrary notwithstanding, Subtenant agrees that it shall look solely to the estate and property of the Sublandlord in the land and buildings comprising the Shopping Center of which the Demised Premises are a part or in the underlying Sublease, as the case may be, subject to prior rights of any mortgagee of the premises or underlying lessor, for the collection of any judgment (or other judicial process) requiring the payment of money by Sublandlord in the event of any default or breach by Sublandlord with respect to any of the terms, covenants and conditions of this Sublease, and no other assets of the Sublandlord shall be subject to levy, garnishment, attachment, execution or other procedures for the satisfaction of Subtenant's remedies. In the event the Sublandlord named on this Sublease transfers this Sublease, except as collateral security for a loan, upon such transfer such Sublandlord will be released from all liability and obligations hereunder, provided that the Transferee assumes the obligations of this Sublease thereafter accruing.

## ARTICLE XVIII

## HOLDING OVER, SUCCESSORS

Section 18.1   Holding Over.   Any holding over after the expiration of the Sublease Term (as may be extended) hereof with or without the consent of the Sublandlord, shall be construed to be a tenancy-at-will at double the Base Rent herein specified for said period of holdover plus double the annual Percentage Rent for Percentage Rent as payable hereunder for the Sublease Year immediately preceding, or the entire portion of the Sublease Term, if less than one full Sublease Year, and shall otherwise be on the same terms and conditions herein specified so far as applicable on a prorated basis for each day Subtenant holds over in the Demised Premises beyond the expiration of the Sublease Term (as may be extended) on a daily basis. In the event Subtenant remains in possession of the Demised Premises after the expiration of the Sublease Term without Sublandlord's consent, Subtenant shall also indemnify Sublandlord for and against all damages sustained by Sublandlord resulting from retention of possession by Subtenant, including without limitation the loss of any proposed subsequent subtenant for any portion of the Demised Premises, and other consequential damages.

Section 18.2   Successors.   Except as otherwise expressly provided in this Sublease, all rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors, and assigns of the said parties; and if there shall be more than one Subtenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefit of any assignee of Subtenant unless the assignment to such assignee has been approved by Sublandlord in writing as provided in the Assignment and Subletting Section hereof.

## ARTICLE XIX

### SECURITY DEPOSIT

Section 19.1    Security Deposit.    Subtenant shall deposit with Sublandlord a certified check in the amount as set forth on the Basic Sublease Provisions.  Said deposit shall be held by Sublandlord without liability for interest as security for the faithful performance by Subtenant of all the terms and provisions of this Sublease by Subtenant to be observed and performed.  The security deposit shall not be mortgaged, assigned, transferred or encumbered by Subtenant, and any such act on the part of the Subtenant shall be without force and effect and shall not be binding upon Sublandlord.  If any of the rents herein reserved or any other sum payable by Subtenant to Sublandlord shall be overdue and unpaid or should Sublandlord make payments on behalf of the Subtenant, or Subtenant shall fail to perform any of the provisions or terms of this Sublease, the Sublandlord may, at its option and without prejudice to any other remedy which Sublandlord may have on account thereof expressly granted in this Sublease or at law or in equity, appropriate and apply said entire deposit or so much thereof as may be necessary to compensate Sublandlord  toward the payment of Base Rent, Percentage Rent or Additional Rent or loss or damage sustained by Sublandlord  due to such breach by Subtenant, and Subtenant shall forthwith upon demand restore said security to the original sum deposited.  Should Subtenant duly comply with all of said terms and provisions of this Sublease and promptly pay all of the rentals as they fall due and all other sums payable by Subtenant to Sublandlord, then said deposit shall be returned in full to Subtenant at the end of the Sublease Term but in no event is the said security to be returned until the Subtenant has vacated the Demised Premises and delivered possession satisfactorily to the Sublandlord and left a valid forwarding address for Sublandlord to deliver any amount of the security deposit remaining after Subtenant vacates the Demised Premises.  Sublandlord's right to the possession of the Demised Premises for non-payment of Rent or for any other reason shall not in any event be affected by reason of the fact that the Sublandlord holds this security.  In the event of bankruptcy or other credit-debtor proceedings against Subtenant, all securities shall be deemed to be applied first to the payment of Rent and other charges due Sublandlord for all periods prior to the filing of such proceedings. The Sublandlord shall not be obliged to keep the said security as a separate fund, but may mix the said security with its own funds.  In the event of a sale of the Demised Premises or sublease of the land on which it stands subject to this Sublease, the Sublandlord shall have the right, at its option, to transfer this security to the vendee or lessor and the Sublandlord shall thereupon be considered released by the Subtenant from all liability for the return of such security and the Subtenant shall look solely to the new Sublandlord for the return of said security. In the event of any rightful and permitted assignment of this Sublease by Subtenant, the said security deposit shall be deemed to be held by Sublandlord as a deposit made by the assignee and Sublandlord shall have no further liability with respect to the return of said security deposit to the assignor. Any mortgagee of Sublandlord shall be relieved and released from any obligation to return such security in the event such mortgagee comes into possession of the Demised Premises and/or the Shopping Center by reason of foreclosure of its security interest or any proceeding in lieu thereof.

### ARTICLE XX

MISCELLANEOUS

Section 20.1    <u>Non-Waiver</u>.  The failure of the Sublandlord to insist, in any one or more instances, upon a strict performance of any of the covenants of this Sublease, or to exercise any option herein contained, shall not be construed as a waiver or a relinquishment for the future of such covenant or option, but the same shall continue and remain in full force and effect.  The receipt by the Sublandlord of Rent, with knowledge of the breach of any covenant hereof, shall not be deemed a waiver of such breach and no waiver by the Sublandlord of any provision hereof shall be deemed to have been made unless expressed in writing and signed by the Sublandlord.

Section 20.2    <u>Subordination</u>.  This Sublease shall be subject and subordinate at all times to any lien of any mortgage or mortgages now on or hereafter placed on the Demised Premises or the Shopping Center or any part thereof including the Demised Premises, and to all advances made or hereafter to be made upon the security thereof, and also subject and subordinate to any sublease or other arrangement or right to possession under which Sublandlord is, or may hereafter be, in control of the Demised Premises or the Shopping Center or any part thereof.  The Subtenant shall execute and deliver such further instrument or instruments subordinating this Sublease to the lien of any such mortgage or mortgages or underlying sublease or leases as shall be desired by any mortgagee or proposed mortgagee or lessor or proposed lessor, and the Subtenant hereby irrevocably appoints the Sublandlord as the attorney-in-fact of the Subtenant to execute and deliver any such instrument or instruments for and in the name of the Subtenant.  Subtenant also agrees that any mortgagee or trustee may elect to have this Sublease a prior lien to its mortgage or deed of trust, and in the event of such election and upon notification by such mortgagee or trustee to Subtenant to that effect, this Sublease shall be deemed prior in lien to the said mortgage or deed of trust, whether this Sublease is dated prior to or subsequent to the date of said mortgage or deed of trust.

Section 20.3    <u>Notices</u>.  Any notice, demand, request or other instrument which is required to be given under this Sublease shall be delivered in person or sent by United States Certified, Registered Mail, return receipt requested, postage prepaid or Express Mail, and shall be addressed (a) if to the Sublandlord, at the address set forth in the Basic Sublease Provisions; and (b) if to Subtenant, at the Demised Premises.  Either party may designate such other address as shall be given by written notice, provided, however, that in all events any notice to Subtenant addressed to the Demised Premises shall be deemed served as of the date of mailing.  Notice *need be sent to only one Subtenant or Sublandlord where Subtenant or Sublandlord consists of more than one person or party.*

Section 20.4    <u>No Partnership</u>.  Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of Rent, nor any other provision contained herein, nor any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than the relationship of Sublandlord and Subtenant.

Section 20.5    <u>Gender</u>.  In this Sublease the use of gender references is not intended to be a limitation, and the use of a particular gender shall be interpreted to include the other of

Kmart # 3106 – Riverside, CA
Riverside's Complete Auto Repair

36

Kmart Sublease 8/10

DET02\356689.4
ID\ATP - 100243/0999

masculine, feminine and neuter where the situation so demands; similarly, the use of the singular shall be interpreted to include the plural where the situation so demands, and vice versa; and references to "heirs, devisees, executors and administrators" also includes "successors and assigns" where the situation so demands, and vice versa.

Section 20.6    Estoppel and other Certificates.  Subtenant shall furnish Sublandlord, upon request at any time after Subtenant has opened its doors for business in the Demised Premises, a letter and/or Estoppel Certificate addressed to the mortgagee or proposed mortgagee or financial institution or such other party designated by Sublandlord, providing the following information:

1)      that the Demised Premises have been satisfactorily completed as of the date of such letter and that Subtenant has accepted possession, subject to the terms of the Sublease;

2)      the Commencement Date of the Sublease and the expiration date of the Sublease;

3)      the Rent Commencement Date of the Sublease;

4)      that Subtenant has opened for business within the Demised Premises;

5)      that Subtenant has no claim, set-off or recoupment against Sublandlord  (and if Subtenant does have such a claim it shall be stated in specific detail); and

6)      such other information as Sublandlord  shall request.

Upon failure of Subtenant to provide Sublandlord at the request of such mortgagee or financial institution a letter or certificate as above described Sublandlord shall have the right, in addition to its other remedies, to cancel this Sublease and Subtenant shall remain liable to the Sublandlord for any damages sustained by the Sublandlord as a result of such failure by Subtenant.

In addition Subtenant agrees to furnish from time to time when requested by Sublandlord, the holder of any deed of trust or mortgage or the lessor under any ground sublease covering all or any part of the Shopping Center or the improvements therein or the Demised Premises or any interest of Sublandlord therein, an updated complete set of financial statements, a certificate signed by Subtenant confirming and containing such factual certifications and representations deemed appropriate by Sublandlord, the holder of any deed of trust or mortgage or the lessor under any ground sublease covering all or any part of the Shopping Center or the improvements therein or the Demised Premises, and Subtenant shall, within five (5) days following receipt of such request for updated financial statements and said certificate from Sublandlord, return a fully executed copy thereof to Sublandlord.  In the event Subtenant shall fail to return a fully executed copy of such request for updated financial statements and certificate to Sublandlord within the foregoing five-day period, then Subtenant shall be deemed to have approved and confirmed all of the terms, certifications and representations contained in such certificate and any such third parties may rely upon Subtenant's deemed approval of such terms.  Subtenant hereby irrevocably appoints Sublandlord as attorney-in-fact for the Subtenant with full power and authority to execute and deliver in the name of Subtenant such certificate if Subtenant fails to deliver the

same within such five-day period and such certificate as signed by Sublandlord shall be fully binding on Subtenant.

Section 20.7    Accord and Satisfaction.    No payment by Subtenant or receipt by Sublandlord of a lesser amount than the monthly Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Sublandlord may accept such check or payment without prejudice to Sublandlord's right to recover the balance of such Rent or pursue any other remedy provided in this Sublease or at law.

Section 20.8    Captions and Section Numbers.    The captions, section numbers, article numbers and index appearing in this Sublease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such sections or articles of this Sublease nor in any way affect this Sublease.

Section 20.9    Partial Invalidity.    If any term, covenant or condition of this Sublease or the application thereof to any person or circumstance shall, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Sublease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Sublease shall be valid and be enforced to the fullest extent permitted by law.

Section 20.10    No Option.    The submission of this Sublease for examination does not constitute a reservation of or option for the Demised Premises, and this Sublease becomes effective as a Sublease only upon execution and delivery thereof by Sublandlord and Subtenant.

Section 20.11    Recording.    Subtenant shall not record this Sublease without the written consent of Sublandlord. Sublandlord and Subtenant shall each, at the request of the other, execute a short form sublease in recordable form, containing such information as shall be satisfactory to Sublandlord, which short form sublease may be recorded; provided, however, Subtenant shall not record any such short form sublease or any other reference to this Sublease until the Sublease Term has commenced.

Section 20.12    Liens.    The Subtenant shall have no power to do any act or make any contract which may create or be the foundation for any lien, mortgage or other encumbrance upon the estate of the Sublandlord or of any interest of the Sublandlord in the Demised Premises, or upon or in the building or buildings or improvements thereon or hereafter erected or placed thereon, it being agreed that should the Subtenant cause any improvements, alterations or repairs to be made to the Demised Premises, or material furnished or labor performed therein, or thereon, neither the Sublandlord nor the Demised Premises nor any improvements shall under any circumstances be liable for the payment of any expense incurred or for the value of any work done or material furnished to the Demised Premises or any part thereof. All such improvements, alterations, repairs, materials and labor shall be done at the Subtenant's expense and the Subtenant shall be solely and wholly responsible to contractors, laborers and materialmen

Kmart # 3106 – Riverside, CA                                38                          Kmart Sublease 8/10
Riverside's Complete Auto Repair

DET02\356689.4
ID\ATP - 100243/0999

furnishing labor and material to said premises and building or buildings and improvements or any part thereof and all such laborers, materialmen and contractors are hereby charged with notice that they must look solely and wholly to the Subtenant and the Subtenant's interest in the Demised Premises to secure the payment of any bills for work done and materials furnished.

In the event a mechanic's lien shall be filed against the Demised Premises or Subtenant's interest therein or against the Shopping Center or any part thereof as the result of any repairs, fixturing, alterations or other work undertaken by the Subtenant, Subtenant shall, within ten (10) days after receiving notice of such lien, discharge such lien either by payment of the indebtedness due or by filing a bond (as provided by statute) as security therefor. In the event Subtenant shall fail to discharge such lien, Sublandlord may, but shall not be obligated to, in addition to its remedies as provided in Section 16.1 of this Sublease, have the right to procure such discharge by filing such bond and Subtenant shall pay the cost of such bond to Sublandlord as Additional Rent upon the first day that Rent shall be due thereafter.

Section 20.13 Broker's Commissions. Subtenant represents and warrants that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Sublease and agrees to indemnify Sublandlord against and hold it harmless from all liabilities arising from any such claim, including the cost of reasonable attorney fees.

Section 20.14 Force Majeure. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing the work or doing acts required under the Sublease Term, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that such delay and extended period shall in no event exceed ninety (90) days. The party entitled to such extension hereunder shall give written notice as soon as possible to the other party hereto of its claim of right to such extension and the reason(s) therefor. The provisions of this Section shall not operate to excuse Subtenant from the prompt payment of Rent or any other payments required by the terms of this Sublease or the obligations of Subtenant to surrender the Demised Premises pursuant to this Sublease.

Section 20.15 Entire Agreement. This Sublease and the Exhibits, Riders and/or Addenda, if any are attached and signed by the parties, set forth the entire agreement between the parties. Any prior conversations or writings are merged herein and extinguished. No subsequent amendment to this Sublease shall be binding upon Sublandlord or Subtenant unless reduced to writing and signed by both parties.

Section 20.16 Late Charges and Interest. Any sums to be paid by Subtenant to Sublandlord and paid after the date same are due shall bear interest at the Default Rate, from the date same initially became due through the date of full payment of such indebtedness. The payment of such interest shall not excuse or cure any default of Subtenant under the Sublease.

Subtenant acknowledges that any late payment by Subtenant to Sublandlord of Rent or

Kmart # 3106 – Riverside, CA                                    39                              Kmart Sublease 8/10
Riverside's Complete Auto Repair

DET02\356689.4
ID\ATP - 100243/0999

other charges payable by Subtenant under this Sublease or late reporting of Gross Sales as required in this Sublease will cause Sublandlord to incur costs not contemplated by this Sublease, the exact amount of such costs being extremely difficult and impracticable to determine.    Such costs include, without limitation, processing and accounting charges. Therefore, if any installment of Rent or other charges due from Subtenant is not received by Sublandlord when due, then Subtenant shall reimburse to Sublandlord an additional sum of any costs incurred, including attorney fees.   The parties agree that the charges do not constitute a late penalty as set forth above since the charges shall be reimbursement of the costs incurred by Sublandlord rather than a late fee penalty.   Failure to pay such late charge upon demand therefore shall be an event of default hereunder.   Provision for such late charge shall be in addition to all other rights and remedies available to Sublandlord hereunder or at law or in equity and shall not be construed as liquidated damages or limiting Sublandlord's remedies in any manner.

Acceptance of any late charges or reimbursement of costs shall not constitute a waiver of Subtenant's default with respect to the overdue Rent or other charges or requirement to report Gross Sales nor prevent Sublandlord from exercising any of the other rights and remedies available to Sublandlord.

Section 20.17 <u>Cumulative Remedies</u>.   Each and every one of the rights, remedies and benefits provided by this Sublease to Sublandlord shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by law.

Section 20.18 <u>Rules and Regulations</u>.   Sublandlord reserves the right to promulgate rules and regulations from time to time pertaining to the Demised Premises and the Shopping Center. All such rules and regulations shall apply substantially uniformly to all of Sublandlord's tenants in the Shopping Center.   Subtenant agrees to comply with and observe all such rules and regulations.   Failure by Subtenant to keep and observe such rules and regulations shall constitute a breach of this Sublease as if same were contained herein as covenants of Subtenant.

Section 20.19 <u>Time</u>.   Time of performance by Subtenant of its obligations under this Sublease is of the essence.

Section 20.20 <u>Attornment</u>.   In the event of the sale or assignment (except as collateral security for a loan) of Sublandlord's interest under this Sublease, Subtenant shall attorn to the purchaser or assignee and recognize such purchaser or assignee as Sublandlord under this Sublease, and in such event Sublandlord shall be released from all obligations and liabilities arising as Sublandlord under this Sublease.

Section 20.21 <u>Merchants Association</u>.    The Sublandlord may create a merchants association comprised of merchants doing business in the Shopping Center and such other parties, if any, as shall be permitted to join the merchants association.   The bylaws, charter, rules and regulations of such association will be in substantially the same form as those which are used by other merchants association in shopping centers of comparable size and quality and approved by the parties hereto.

Should Sublandlord create such association, or if such an association exists at the time Subtenant takes possession of the Demised Premises, Subtenant agrees to become a member and to remain a member so long as it is doing business at the Demised Premises. Subtenant agrees to pay minimum dues to said association in the initial amount to be determined payable in advance on the first day of each month. Said minimum dues shall be subject to annual adjustments as approved by a majority vote of the members of the association, or as provided in the bylaws of the association.

Sublandlord reserves the right to create a promotional fund instead of a merchants association, which promotional fund shall be managed and controlled by Sublandlord. Sublandlord shall use such promotional fund to provide promotional services for the benefit of the Shopping Center. Sublandlord agrees that Subtenant shall have the right, upon written request, to audit the books and records of any such promotional fund. At the option of Sublandlord, the minimum dues payable by Subtenant for the promotional fund may be increased annually, effective at the commencement of each Sublease Year after the first, by an amount equal: (i) to the annual percentage increase in the Consumer Price Index (CPI) published in the second month preceding the commencement of each such Sublease Year over and above the CPI index for the same month in the previous year, or (ii) by the amount of 10%. Each subsequent increase shall be applied to the then current minimum dues.

Subtenant will, during the Sublease Term, to the fullest extent possible, participate in all coordinated advertising and promotion programs outlined by Sublandlord under either the promotional fund or under the auspices of the merchants association.

The failure of any other Subtenant in the Shopping Center to contribute to the promotional fund or become a member of the merchants association shall in no way release Subtenant from Subtenant's obligations hereunder.

Subtenant further acknowledges that Sublandlord retains the right to discontinue the activities of any merchants association established at any time and, at Sublandlord's option, substitute a promotional fund.

**SECTION 20.22    WAIVER OF TRIAL BY JURY; INJUNCTION. SUBLANDLORD AND SUBTENANT EACH HEREBY WAIVE TRIAL BY JURY OF ANY DISPUTE ARISING UNDER THIS SUBLEASE. IN ADDITION TO ALL OTHER REMEDIES, SUBLANDLORD IS ENTITLED TO THE RESTRAINT BY INJUNCTION OF ALL VIOLATIONS BY SUBTENANT, WHETHER ACTUAL, ATTEMPTED OR THREATENED, OF ANY COVENANT, CONDITION OR PROVISION OF THIS SUBLEASE.**

Section 20.23 <u>Kmart Marks</u>. Subtenant agrees that it shall conduct its sales and services within the Demised Premises solely under the name as set forth within <u>Section 5.2</u> of the Sublease. Subtenant acknowledges Kmart Corporation's (Kmart's) exclusive right, title, and interest in and to all trademarks, trade names, service marks, logos, program and event names, identifications and other proprietary rights and privileges including the marks, "Kmart", "Big Kmart", and "Super Kmart Center" (the "Kmart Marks"). This Sublease and their various

provisions are not a license or assignment of any right, title or interest in the Kmart Marks by Sublandlord to Subtenant. Subtenant shall not in any manner represent that it has any ownership in the Kmart Marks and shall not do or cause to be done anything impairing Sublandlord's exclusive right, title, and interest in the Kmart Marks. Subtenant shall not use, print or duplicate the Kmart Marks without the prior written approval of Sublandlord, which approval may be withheld for any reason, and upon termination hereof, Subtenant shall immediately cease all previously permitted use of the Kmart Marks, if any. Subtenant shall not assign or attempt to assign any rights with regard to the Kmart Marks which may arise hereunder; any such attempted assignment shall be void. In no event shall Subtenant have authority to act or contract on behalf of Sublandlord.

Section 20.24 <u>Media Releases</u>.    Without the prior written consent of Sublandlord, which Sublandlord may withhold for any reason, Subtenant must not issue, circulate or otherwise release to any third party any (i) press or other media release; (ii) marketing or promotional materials, or (iii) other public disclosure of, about or relating to Sublandlord and/ or this Sublease.

Section 20.25 <u>Reservation of Sublandlord's Rights in Bankruptcy</u>. This Sublease is not intended, nor shall be construed, as Sublandlord's assumption of the Master Lease or the shopping center leases, nor should the same be relied upon, it being the intention of the parties that this Sublease merely accommodates Subtenant and permits Subtenant's tenancy within the Demised Premises and is not intended to create a post petition contract which cannot be subsequently rejected pursuant to the Bankruptcy Code. The Sublandlord reserves all rights to assume or reject the Master Lease and this Sublease.

Section 20.26 <u>Attachments</u>.    Attached hereto and incorporated herein by reference are the following:

> Exhibit "A" – Subleased Premises;
> Exhibit "B" – Site Plan;
> Exhibit "C" – Construction Work;
> Exhibit "D" – Sign Design Criteria;
> Exhibit "E" – Commencement Letter;
> Exhibit "F" – Guaranty;
> Exhibit "G" – Prohibited and Exclusive Uses

Section 20.27 <u>Governing Law</u>. The laws of the state in which the Demised Premises is located shall govern the interpretation, validity, performance and enforcement of this Sublease. If any provision of this Sublease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Sublease shall not be affected thereby, and it is also the intention of the parties to this Sublease that in lieu of each clause or provision of this Sublease that is illegal, invalid or unenforceable, there will be added as a part of this Sublease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable. It is the intent of Sublandlord and Subtenant to conform strictly to all applicable state and federal usury laws. All agreements between Sublandlord and Subtenant, whether now existing or hereafter arising and whether

Kmart # 3106 – Riverside, CA                                                42                             Kmart Sublease 8/10
Riverside's Complete Auto Repair

DET02\356689.4
ID\ATP - 100243/0999

written or oral, are hereby expressly limited so that in no contingency or event whatsoever shall the amount contracted for, charged or received by Sublandlord for the use, forbearance or retention of money hereunder or otherwise exceed the maximum amount which Sublandlord is legally entitled to contract for, charge or collect under the applicable state or federal law.  If, from any circumstance whatsoever, fulfillment of any provision hereof at the time performance of such provision shall be due shall involve transcending the limit of validity prescribed by law, then the obligation to be fulfilled shall be automatically reduced to the limit of such validity, and if from any such circumstance Sublandlord shall ever receive as interest or otherwise an amount in excess of the maximum that can be legally collected, then such amount which would be excessive interest shall be applied to the reduction of Rent hereunder, and if such amount which would be excessive interest exceeds such Rent, then such additional amount shall be refunded to Subtenant.

Section 20.28  Authority.  The person(s) executing this Sublease on behalf of Subtenant hereby represent and warrant to Sublandlord that such execution has been duly authorized by all requisite action of Subtenant so that upon such execution this Sublease will be binding upon and enforceable against Subtenant in accordance with its terms.  Subtenant agrees to furnish to Sublandlord from time to time upon request such written proof of such authorization as Sublandlord may reasonably request.

Section 20.29  Waiver of Warranties.  Subtenant hereby waives the benefit of all implied warranties, with respect to the Demised Premises including, without limitation, any implied warranty that the Demised Premises are suitable for any particular purpose.

Section 20.30  Guaranty.  If a Guarantor(s) is identified in the Basic Lease Provisions to this Sublease, the parties hereto acknowledge that in order to induce Sublandlord to enter into this Sublease with Subtenant, Guarantor has agreed to personally guaranty the payment and other obligations of Subtenant under this Sublease pursuant to the terms and conditions of a lease guaranty substantially in the form attached hereto as Exhibit F to be executed concurrently with this Sublease.

Section 20.31  Sublandlord's Lien.    SUBLANDLORD SHALL HAVE AND SUBTENANT HEREBY GRANTS TO SUBLANDLORD A CONTINUING SECURITY INTEREST FOR ALL RENT AND OTHER SUMS OF MONEY BECOMING DUE HEREUNDER FROM SUBTENANT, UPON ALL GOODS, WARES, EQUIPMENT, FIXTURES, FURNITURE, INVENTORY, ACCOUNTS, CONTRACT RIGHTS, CHATTEL PAPER AND OTHER PERSONAL PROPERTY OF SUBTENANT SITUATED ON THE DEMISED PREMISES, WHICH IS LOCATED AT 7200 ARLINGTON AVE, RIVERSIDE, CA 92503 AND SUCH PROPERTY SHALL NOT BE REMOVED THEREFROM WITHOUT THE CONSENT OF SUBLANDLORD UNTIL ALL ARREARAGES IN RENT AS WELL AS ANY AND ALL OTHER SUMS OF MONEY THEN DUE TO SUBLANDLORD HEREUNDER SHALL FIRST HAVE BEEN PAID AND DISCHARGED.  PRODUCTS OF COLLATERAL ARE ALSO COVERED.  IN THE EVENT OF A DEFAULT UNDER THIS SUBLEASE, SUBLANDLORD SHALL HAVE, IN ADDITION TO ANY OTHER REMEDIES PROVIDED HEREIN OR BY LAW, ALL RIGHTS AND REMEDIES UNDER THE UNIFORM COMMERCIAL CODE, INCLUDING WITHOUT LIMITATION THE

RIGHT TO SELL THE PROPERTY DESCRIBED IN THIS PARAGRAPH AT PUBLIC OR PRIVATE SALE UPON FIVE (5) DAYS' NOTICE TO SUBTENANT. SUBTENANT HEREBY AGREES TO EXECUTE SUCH OTHER INSTRUMENTS NECESSARY OR DESIRABLE IN SUBLANDLORD'S DISCRETION TO PERFECT THE SECURITY INTEREST HEREBY CREATED. ANY STATUTORY LIEN FOR RENT IS NOT HEREBY WAIVED, THE EXPRESS CONTRACTUAL LIEN HEREIN GRANTED BEING IN ADDITION AND SUPPLEMENTARY THERETO. SUBLANDLORD AND SUBTENANT AGREE THAT THIS SUBLEASE AND SECURITY AGREEMENT SERVES AS A FINANCING STATEMENT AND THAT A COPY OR PHOTOGRAPHIC OR OTHER REPRODUCTION OF THIS PORTION OF THIS SUBLEASE MAY BE FILED OF RECORD BY SUBLANDLORD AND HAVE THE SAME FORCE AND EFFECT AS THE ORIGINAL. THIS SECURITY AGREEMENT AND FINANCING STATEMENT ALSO COVERS FIXTURES LOCATED AT THE DEMISED PREMISES DESCRIBED ELSEWHERE IN THIS SUBLEASE, AND MAY BE FILED FOR RECORD IN THE APPROPRIATE OFFICIAL AND/OR REAL ESTATE RECORDS OF THE COUNTY IN WHICH THE DEMISED PREMISES ARE LOCATED. SUBTENANT WARRANTS THAT THE COLLATERAL SUBJECT TO THE SECURITY INTEREST GRANTED HEREIN IS NOT PURCHASED OR USED BY SUBTENANT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.

Section 20.32 <u>Relocation</u>.    Intentionally deleted.

ARTICLE XXI

HAZARDOUS MATERIALS

Section 21.1 <u>Hazardous Materials</u>. The term "<u>Hazardous Substances</u>," as used in this Sublease shall mean pollutants, contaminants, toxic or hazardous wastes, or any other substances, the removal of which is required, or the use of which is restricted, prohibited or penalized by any "<u>Environmental Law</u>," which term shall mean any federal, state or local law or ordinance relating to pollution or protection of the environment. Subtenant hereby agrees that (i) no activity will be conducted on the Demised Premises that will produce any Hazardous Substance, except for such activities that are part of the ordinary course of Subtenant's business activities (the "<u>Permitted Activities</u>"), provided said Permitted Activities are conducted in accordance with all Environmental Laws and have been approved in advance in writing by Sublandlord; (ii) the Demised Premises will not be used in any manner for the storage of any Hazardous Substances except for the temporary storage of such materials that are used in the ordinary course of Subtenant's business (the "<u>Permitted Materials</u>") provided such Permitted Materials are properly stored in a manner and location meeting all Environmental Laws and approved in advance in writing by Sublandlord; (iii) no portion of the Demised Premises will be used as a landfill or a dump; (iv) Subtenant will not install any underground tanks of any type; (v) Subtenant will not allow any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute, a public or private nuisance; and (vi) Subtenant will not permit any Hazardous Substances to be brought onto the Demised Premises, except for the Permitted Materials described above, and if so brought or found located thereon, the same shall be immediately removed, with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Environmental Laws. Subtenant agrees

to indemnify and hold Sublandlord harmless from all claims, demands, actions, liabilities, costs, expenses, damages and obligations of any nature arising from the contamination of the Shopping Center with Hazardous Substance or as a result of the use or occupancy of the Demised Premises by Subtenant. The foregoing indemnification shall survive the termination or expiration of this Sublease.

Section 21.2   Environmental Covenants and Indemnification. Subtenant represents and covenants that it shall comply in all material respects with Environmental Law relating to the Demised Premises including obtaining required air permits, and shall notify Sublandlord promptly and provide copies to Sublandlord of any order, notice, permit application or other communication received by Subtenant with respect to the Demised Premises from any governmental agency in connection with the alleged violation of any such Environmental Law.

Subtenant further represents that to the best of its knowledge, it is not aware of any Hazardous Substance (as such are or may be defined under any applicable Environmental Law) which shall or may be used, released, generated, stored, treated, drained, or disposed of from, on, or about the Demised Premises or Shopping Center in violation of any applicable Environmental Law. Subtenant covenants and agrees that it, its employees, agents, representatives, assigns, or successors shall not use, release, generate, store, treat, drain, or dispose of any Hazardous Substance(s) upon, from, or about the Demised Premises or Shopping Center not in accordance with the Environmental Laws.

Subtenant shall indemnify, defend and hold Sublandlord and any master landlord harmless from and against all loss, liability, damage, fine, penalty, cost and expense, whatsoever, including attorneys' fees, hereafter incurred by Sublandlord or the master landlord, if any, as a result of Subtenant's violation of any applicable Environmental Law relating to the Demised Premises or Shopping Center. Indemnification under this Section shall survive the expiration or termination of this Sublease.

## ARTICLE XXII

## EARLY TERMINATION

Section 22.1   Termination Right. Sublandlord shall have the right, in its sole and absolute discretion, to terminate this Sublease in accordance with the provisions hereof. If Sublandlord elects, in its sole and absolute discretion, to terminate this Sublease, then Sublandlord shall provide Subtenant with at least three hundred sixty-five (365) days' prior written notice ("Termination Notice"), and this Sublease shall terminate upon the earlier of (i) the date (no sooner than 180 days after delivery by Sublandlord of the Termination Notice) designated by Sublandlord; and (ii) the date Subtenant completely vacates the Demised Premises in the condition required hereunder ("Early Termination Date"). If Sublandlord so elects to terminate this Sublease by sending a Termination Notice pursuant to the provisions of this Section 22.1, then Subtenant shall surrender the Demised Premises and every part thereof to Sublandlord in the condition required hereunder by no later than the Early Termination Date (and in case of Subtenant's failure to do so, Sublandlord shall be entitled to damages and compensation in accordance with the provisions hereof, and may remove Subtenant from such

Demised Premises by summary proceedings or otherwise as Sublandlord shall deem advisable), and Subtenant shall be required to continue to pay Basic Rent and Additional Rent after receipt of the Termination Notice through and including the Early Termination Date (subject to the provisions of Section 22.2 below).

Section 22.2    Termination Fee.    If Sublandlord so elects to terminate this Sublease pursuant to Section 22.1, and provided Subtenant shall have timely vacated and surrendered the Demised Premises to Sublandlord on or prior to the Early Termination Date in accordance with the terms and provisions of this Sublease, and no monetary default under this Sublease shall exist on the date such Termination Notice shall be given or on any date thereafter up to and including the Early Termination Date, then Sublandlord, as Subtenant's sole compensation for such early termination of this Sublease, shall pay to Subtenant within forty-five (45) days following the Early Termination Date, an amount equal to the sum of (i) an amount equal to the Basic Rent payable hereunder with respect to the two (2) months immediately preceding the Early Termination Date, plus (ii) the Unamortized Subtenant's Work Payment Amount (as hereinafter defined), minus, if a monetary default by Subtenant exists, the amount of any monetary default existing at the time of Sublandlord's payment to Subtenant. The "Unamortized Subtenant's Work Payment Amount" shall mean an amount equal to the product obtained by multiplying:

(1)    the costs incurred by Subtenant in the performance of the Subtenant's Work for the Demised Premises that constitutes the installation of fixtures, improvements and appurtenances attached to or built into the Demised Premises (exclusive of movable business and trade fixtures, machinery, equipment, furnishings and other articles of personal property owned by Subtenant) as substantiated by bills, receipts and other proofs of cost timely delivered to Sublandlord as part of the Subtenant's Work Cost Certificate; by

(2)    a fraction, the numerator of which is equal to the number of months in the period from the Early Termination Date to the expiration date of Sublease Term and the denominator of which is equal to the number of months in the period from the Commencement Date to the expiration date of the Sublease Term.

In no event shall Sublandlord be responsible to pay Subtenant for any damages or any other form of compensation on account of Sublandlord's early termination of this Sublease. Notwithstanding anything to the contrary contained in this Sublease, in no event shall Subtenant have the right to remain in possession of the Demised Premises beyond the Early Termination Date.

[Signature page follows.]

IN WITNESS WHEREOF, Sublandlord and Subtenant have signed their names and affixed their seals on the day and year first above written.

**SUBLANDLORD:**

KMART CORPORATION, a Michigan corporation

By: _____

Name: i James B. Terrell

Its: VP Real Estate

Date: 9/21/10

**SUBTENANT:**

RIVERSIDE'S COMPLETE AUTOMOTIVE REPAIR, INC., a California corporation

By: _____

Name: Vaughn Gedeon

Title: OWNER

Date: 9/22/10

## EXHIBIT "A"

### SUBLEASED PREMISES

<u>Master Lease</u>:  That certain Lease, as may have been amended and assigned, dated October 16, 1972 by and between George R. Smith, a married man, as landlord and Kmart Corporation, formerly known as S.S. Kresge Company, as tenant.

<u>Kmart Premises</u>:  That certain land and improvements leased to Sublandlord under the Master Lease, such land and improvements having a local address of 7200 Arlington Drive, Riverside CA 92503.

<u>Demised Premises</u>:

Approximately 4,485 square feet of space situated in, adjacent to or in close proximity to the Kmart Premises further described as follows:

[See attached]

Kmart # 3106 – Riverside, CA
Riverside's Complete Auto Repair

Exhibit A

Kmart Sublease 8/10

DET02\356689.4
ID\ATP - 100243/0999

ALL THAT PORTION OF BLOCK 1 AND THOSE PORTIONS OF LOTS 3 AND 4 IN BLOCK 3 AND THAT PORTION OF BIXLER AVENUE (SIERRA AVENUE) OF THE LANDS OF THE RIVERSIDE LAND AND IRRIGATING COMPANY, AS SHOWN BY MAP ON FILE IN BOOK 1 OF MAPS, AT PAGE 70 THEREOF, RECORDS OF SAN BERNARDINO COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF PARCEL 1, AS SHOWN BY PARCEL MAP RECORDED IN BOOK 4 OF PARCEL MAPS, AT PAGE 24 THEREOF, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA;

THENCE NORTH 89°33'20" EAST, A DISTANCE OF 185.00 FEET;

THENCE NORTH 00°20'40" EAST, A DISTANCE OF 145.00 FEET TO THE NORTHEAST CORNER OF SAID PARCEL 1;

THENCE NORTH 89°33'20" EAST ALONG THE NORTH LINE OF PARCEL 3, AS SHOWN ON SAID PARCEL MAP, A DISTANCE OF 562.82 FEET TO A POINT THEREIN, SAID POINT BEING THE BEGINNING OF A TANGENT CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 12.00 FEET;

THENCE SOUTHEASTERLY ALONG SAID CURVE, TO THE RIGHT, THROUGH A CENTRAL ANGLE OF 90°00'00", AN ARC DISTANCE OF 18.85 FEET TO THE END THEREOF;

THENCE SOUTH 00°26'40" EAST, A DISTANCE OF 679.60 FEET;

THENCE SOUTH 55°40'25" WEST, A DISTANCE OF 215.65 FEET TO A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY 5.00 FEET, MEASURED AT RIGHT ANGLES, FROM THE SOUTH-WESTERLY LINE OF SAID LOT 3;

THENCE NORTH 34°16'20" WEST ALONG SAID PARALLEL LINE, A DISTANCE OF 369.07 FEET TO A POINT IN SAID CENTERLINE OF BIXLER AVENUE (SIERRA AVENUE);

THENCE SOUTH 55°40'25" WEST ALONG SAID CENTERLINE, A DISTANCE OF 104.60 FEET TO A POINT THEREIN;

THENCE NORTH 89°39'20" WEST, A DISTANCE OF 296.22 FEET TO A POINT IN THE WEST LINE OF PARCEL 2, AS SHOWN ON SAID PARCEL MAP;

THENCE NORTH 00°20'40" EAST ALONG SAID WEST LINE, A DISTANCE OF 414.51 FEET TO THE POINT OF BEGINNING.

CONTAINING 10.413 ACRES.

Kmart # 3106 – Riverside, CA
Riverside's Complete Auto Repair

Exhibit A

Kmart Sublease 8/10

DET02\356689.4
ID\ATP · 100243/0999

# EXHIBIT "B"

## SITE PLAN

[see attached]

Kmart # 3106 – Riverside, CA
Riverside's Complete Auto Repair

Exhibit B

Kmart Sublease 8/10

DET02\356689.4
ID\ATP - 100243/0999



Kmart # 3106 – Riverside, CA
Riverside's Complete Auto Repair

**Exhibit B**

Kmart Sublease 8/10

DET02\356689.4
ID\ATP - 100243/0999

# EXHIBIT "C"

## CONSTRUCTION WORK

### *DIVISION I - SUBTENANT'S WORK*

**All provisions of this Exhibit C are expressly subject to the provisions in the Sublease above governing any work complete by Sublandlord, any of Subtenant's Work or Alterations. In the event of a conflict between the provisions of this Exhibit C and the provisions of the Sublease mentioned above, the terms, conditions and provisions of the Sublease shall govern.**

### *(Minimum Requirements)*

*Subtenant acknowledges that the Demised Premises are accepted "AS IS". This work will be performed by Subtenant at the Subtenant's own cost and expense in accordance with Subtenant's Plans and Specifications previously approved in writing by Sublandlord. Subtenant's contractor(s) shall secure and pay for all necessary permits, Certificate of Occupancy and/or fees required by public authorities and/or utility companies with respect to Subtenant's work.*

A.    *General Requirements*

    *1.    All work installed by Subtenant shall be coordinated with and completed so as not to interfere with Sublandlord's construction schedule, business operations, nor any other subtenant's or subtenant's activities.*

    *2.    All contractors employed by either Sublandlord or Subtenant shall allow other contractors, even of the same trade, to work on the Demised Premises without interference.*

    *3.    Subtenant and Subtenant's contractors shall provide all insurances required by the Sublandlord, prior to the start of any construction work within the Demised Premises. Sublandlord, Kmart Corporation, shall be named as an additional insured.*

    *4.    Subtenant shall, at all times, keep the Demised Premises and the surrounding area free from accumulations of waste materials and/or rubbish caused by his employees or workers. The Subtenant or his contractor shall provide dumpsters and maintenance of said dumpsters during the construction period.*

B.    *Interior Partitions*

    *All partitions will be furnished and installed by Subtenant.*

C.    *Interior Finishes*

Kmart # 3106 – Riverside, CA
Riverside's Complete Auto Repair

DET02\356689.4
ID\ATP - 100243/0999

Exhibit C - 1

Kmart Sublease 8/10

*All wallboard, trim, painting, staining, enameling and any wall coverings or decor shall be provided and installed by Subtenant.*

D.    <u>*Flooring*</u>

*Intentionally Deleted.*

E.    <u>*Cabinets, Shelving, Counters, etc.*</u>

*Cabinets, shelving, counters, etc., are to be furnished and installed complete by Subtenant, including connections to utilities.*

F.    <u>*Plumbing*</u>

*Any plumbing facilities in excess of existing facilities provided by Sublandlord, such as kitchen equipment, toilet facilities, janitor's sink, hose bibbs, laboratory sinks, special fixturing or outlets, will be provided and installed and connected by Subtenant. Subtenant will provide fire extinguishers as required by building code and insurance underwriters; see also "H".*

G.    <u>*Heating, Cooling and Ventilating*</u>

*Exhaust air vent systems as required for hoods, etc., including outlets or connections thereto will be provided by Subtenant. Heating and cooling required will be by Subtenant. All vents and hoods shall comply with local governing agencies. Subtenant will submit HVAC unit manufacturer, data and shop drawings for Sublandlord approval. Upon approval, maintenance brochures and 5-year warranty (HVAC unit - 1 year and compressor - 4 year) shall be forwarded to Sublandlord.*

H.    <u>*Fire Protection - Sprinklers*</u>

*Subtenant shall pay for and supply any items required in excess of the existing sprinkler system. Subtenant will provide a sprinkler layout and calculations for Governing Authorities and Sublandlord's approval. If the Subtenant is required to have a dry chemical fire extinguisher system, it shall be provided, installed and maintained by Subtenant; see also "F".*

I.    <u>*Electrical - Power and Lighting*</u>

*Subtenant will furnish and install the electrical work in excess of that provided by Sublandlord. Such items may include, but not limited to, lighting, special outlets, high voltage outlets, exit light, telephone, communication and music systems, burglar alarms and/or warning systems, emergency generator, Subtenant's store signs and controlling time clocks. If Subtenant furnished its own light fixtures, the same will be installed at the Subtenant's expense including the cost of additional outlets.*

J.    *Storefronts*

*Changes to the storefront design shall only be initiated upon approval of Sublandlord.*

K.    *Subtenant/Subtenant Signs - (See Exhibit "D")*

*Subtenant shall furnish, install and connect all identification signs at locations provided at the canopy or building fascia at Subtenant's expense. All outside signs shall be submitted to Sublandlord for approval before installation.*

*Canopy or building fascia sign design, lighting and sign copy color shall be subject to Sublandlord's approval. Said sign shall be in conformance with the detailed sign criteria, as prepared by Sublandlord's architect and attached as Exhibit "D". Prior to fabrication, three (3) copies of sign detail and copy must be submitted to Sublandlord for Sublandlord's approval.*

L.    *Roof Openings*

*Except as provided by Sublandlord/Lessor, pursuant to J above, Subtenant will furnish all curbs, lintels, flashings, counter flashings, pipes, ducts, vent caps, air inlets, exhaust hoods, louvers, etc., as necessary for Subtenant's equipment requiring openings through roof and/or exterior walls. Any cutting, patching, or flashing of the roof for Subtenant's equipment must be performed by the Sublandlord's roofing contractor responsible for the roof guarantee. All such work will be done at the Subtenant's expense.*

## *DIVISION II - CONSTRUCTION PROCEDURES*

A.    *Upon execution of the Sublease the Subtenant will have thirty (30) working days to provide to the Sublandlord, a Preliminary Floor Plan and Storefront Elevation for review and preliminary approval.*

*When submitting Construction Plans and Specifications (preliminary or completed) Subtenant shall send five (5) sets of prints and specifications.*

*The approval of said "Preliminary Floor Plan and Storefront Elevation" will require fifteen (15) working days.*

B.    *Subtenant can elect to contract with an "outside" architect of its choosing for the preparation of the "Construction Plans and Specifications". The "outside" architect shall prepare detailed construction drawings for the Demised Premises, incorporating the improvements desired by Subtenant (to the extent such improvements are acceptable to Subtenant). Such drawings will be forwarded to the Subtenant for its approval.*

Kmart # 3106 – Riverside, CA
Riverside's Complete Auto Repair
Exhibit C - 3
Kmart Sublease 8/10

DET02\356689.4
ID\ATP - 100243/0999

C.   *All contractors engaged by Subtenant as permitted by the Sublandlord shall be bondable, licensed contractors, possessing good labor relations capable of performing quality workmanship and working in harmony with any contractor hired by Sublandlord.  All work shall be coordinated with the general project work.*

D.   *Construction shall comply in all respects with applicable Federal, State, County, Township and City Statutes, ordinances, regulations, laws and codes.*

E.   *Subtenant shall not permit any mechanic's liens to attach to the Demised Premises or the shopping center development in which the Demised Premises are located on account of any labor or materials furnished or supplied to the Demised Premises in connection with Subtenant's work.  In the event that such a lien is attached, Subtenant shall forthwith cause the same to be discharged or in lieu thereof furnish a bond for the benefit of Sublandlord issued by a duly licensed surety company authorized to do business in the State wherein the Demised Premises is located, acceptable to Sublandlord, which by its terms indemnifies and holds the Sublandlord harmless from the effects of such lien.*

F.   *Sublandlord, Sublandlord's agent, an independent contractor, or an authorized utility company as the case may be, shall have the right, subject to Sublandlord's written approval, to run utility lines, pipes, conduits or duct work, where necessary or desirable, through attic space, or other parts of the Demised Premises and to repair, alter, replace or remove the same, all in a manner which does not interfere unnecessarily with Subtenant's use thereof.*

G.   *Construction Coordinator:*

   *Assistant Manager of Design Division*
   *Kmart Corporation*
   *3333 Beverly Road; BC – 113C*
   *Hoffman Estates, IL 60179*
   *(847) 286-6474*

H.   *Real Estate Coordination:*

   *Shopping Centers Asset Manager*
   *Real Estate Department*
   *Kmart Corporation*
   *3333 Beverly Road; BC – 113C*
   *Hoffman Estates, IL 60179*
   *(847) 286-6474*
   *(847)286-2286 (fax)*

## EXHIBIT "D"

## SIGN DESIGN CRITERIA

NO SIGN INSTALLATION IS TO COMMENCE UNTIL WRITTEN APPROVAL IS RECEIVED FROM THE REAL ESTATE DEPARTMENT OF KMART CORPORATION.

REQUIREMENTS FOR SUBMITTAL OF SUBTENANT SIGNING PROPOSALS:

Building Sign:

    1)    Complete written description of subtenant's sign to include:

        Colors
        Construction
        Method of illumination
        Dimensioned scale drawing showing exact size and location of sign on building
        Section and details of sign
        Detail showing attachment to building
        Amperage and voltage requirements (assume 480 volt)

    2)    Color photograph of subtenant's storefront, minimum of 3" x 5".

    3)    Color photograph of the front of the entire building including Kmart and subtenant's Demised Premises, minimum of 3" x 5".

Pylon Sign (if applicable):

    1)    Complete written description of subtenant's sign to include:

        Colors
        Construction
        Method of illumination
        Dimensioned scale drawing
        Section and details of sign
        Detail showing attachment to pylon
        Amperage and voltage requirements (assume 480 volt)

    2)    Color photograph of Kmart pylon with:

        Overall height dimension
        Height dimension of letter K panel

    3)    Site plan indicating location of Kmart pylon.

NOTE: Subtenants proposing the installation of an individual pylon sign must indicate the proposed location of the new sign on the site plan.

## SUBTENANT BUILDING SIGN DESIGN CRITERIA:

A.    Length

    (1)    May not exceed 50% of the building width.

    (2)    Length may vary in the instance of a lengthy name or because the building architecture may justify a larger or smaller sign for aesthetic reasons.

    (3)    Shall comply with local sign ordinances.

B.    Height

    (1)    May not exceed 5'-0".
    (2)    Shall comply with local sign ordinances.

C.    Location

    (1)    Should always be on the (front) building facade.
    (2)    Sign must be located to comply with local sign ordinances.
    (3)    May not project above roof and/or parapet.

D.    Construction

    (1)    Internally illuminated plastic faced letters.
    (2)    Individual internally illuminated plastic faced cabinet letters.
    (3)    One single internally illuminated plastic faced cabinet sign.
    (4)    Absolutely no exposed conduits, wiring, neon tubing, or spotlighted signing.
    (5)    All wiring shall be "UL" rated.
    (6)    Moving or blinking lights will not be approved.

E.    Maintenance

    (1)    When an existing sign is removed for the installation of a new sign, it is the responsibility of the subtenant to restore the building facade in the event any damage is incurred. This includes repairing chips, cracks and holes and repainting faded areas to match existing color.

NOTE:

Kmart # 3106 – Riverside, CA
Riverside's Complete Auto Repair

           Exhibit D - 2

Kmart Sublease 8/10

DET02\356689.4
ID\ATP - 100243/0999

All signing outlined above is subject to the written approval of Kmart's Design Division. Subtenant must also obtain the approval of the appropriate governmental agencies and conform to all applicable regulatory codes.

Subtenant must submit sign drawings of all proposed signing for each location.

Absolutely no reader boards or attraction boards will be approved for installation on the building.

The entire installation must be done in a neat and workmanlike fashion; the quality and workmanship shall be equivalent to that of Kmart Corporation.

SUBTENANT CORPORATE LOGO BUILDING SIGN DESIGN CRITERIA:

A.   Corporate Logo Approval

   (1)   Permitted only when absolutely pertinent to the subtenant's identity.

B.   Size

   (1)   Should not exceed 5'-0" x 8'-0".

C.   Location
   (1)   Approximately 5'-0" to 10'-0" from building end.
   (2)   Should be at least 12'-0" above sidewalk.

D.   Construction and Maintenance

   (1)   All construction and maintenance guidelines for building signs shall apply to corporate logo signs.

NOTE:

Absolutely no reader boards or attraction boards will be approved for installation on the building.

All signing outlined above is subject to the approval of Kmart's Design Division. Subtenant must also obtain the approval of the appropriate governmental agencies and conform to all applicable regulatory codes.

Subtenant must submit sign drawings of all proposed signing for each location.

The entire installation must be done in a neat and workmanlike fashion; the quality and workmanship shall be equivalent to that of Kmart Corporation.

SUBTENANT PYLON SIGN PANEL DESIGN CRITERIA (IF APPLICABLE):

Kmart # 3106 – Riverside, CA                    Exhibit D - 3                    Kmart Sublease 8/10
Riverside's Complete Auto Repair

DET02\356689.4
ID\ATP - 100243/0999

A.    Size

    (1)    Shall not be larger in width than the clear space between column supports and a maximum height of 6'-0".

B.    Location

    (1)    Installed a minimum of 5'-0" below the Kmart panel.

C.    Design

    (1)    Simple and straightforward, in keeping with the Kmart signing.

D.    Construction

    (1)    Sign must be double-faced and internally illuminated.
    (2)    Moving or blinking lights will not be approved.

E.    Absolutely no reader boards will be approved for installation on the Kmart pylon.

F.    Maintenance

    (1)    We will expect any damage incurred to the Kmart pylon during the installation or removal of any signs to be repaired by the subtenant/subtenant.  This includes removal of any existing reader boards.

G.    Fees

    (1)    A one-time fee for the use of the Kmart pylon must be negotiated with the Real Estate Department at Kmart Corporation International Headquarters, Troy, Michigan, 48084.

    (2)    The subtenant will be responsible for the cost of all electricity consumed by its sign.

NOTE:

All dimensions above are based on a sign installation on a standard Kmart pylon.  In the event Kmart Corporation installs a pylon smaller than the standard pylon, all dimensions above will be proportionately reduced.

All signing outlined above is subject to the approval of Kmart's Design Division.  Subtenant must also obtain the approval of the appropriate governmental agencies and conform to all applicable regulatory codes.

Subtenant must submit sign drawings of all proposed signing for each location.

The entire installation must be done in a neat and workmanlike fashion; the quality and workmanship shall be equivalent to that of Kmart Corporation.

THE ABOVE CRITERIA ARE SUBJECT TO REVISION AT THE SOLE DISCRETION OF KMART CORPORATION.

Kmart # 3106 – Riverside, CA
Riverside's Complete Auto Repair

Exhibit D - 5

Kmart Sublease 8/10

DET02\356689.4
ID\ATP - 100243/0999

## EXHIBIT "E"

## COMMENCEMENT LETTER

_____ , 20__

Vaughn Gedeon
10939 Sunset Meadow Dr.
Riverside, CA 92505

RE:    Kmart No. 3106

Dear Mr. Gedeon:

You have entered into a Sublease with Kmart Corporation for premises at the referenced location.  This letter will outline procedures regarding payments and clarify questions you may have relative to administration of the Sublease.

The commencement date of your Sublease is _____ , 20__.

The expiration date of your initial Sublease Term is _____ .

Unless otherwise noted, your liability for all payments is effective as of the Commencement Date.

BASE RENT: $2,500.39 per month commencing _____ .

If your Sublease provides for periodic rent increases, it is your responsibility to initiate the required change at the proper time.

PERCENTAGE RENT: (1%) Percent of Gross Sales in excess of $700,000.00

LATE PENALTY:  Please note that a late fee as set forth in your Sublease will be charged on all late payments.  Therefore, it is necessary that your payments are received on or before the first of each calendar month.

UTILITIES: You will be responsible for your proportionate share of utility costs.

**IT IS IMPERATIVE THAT YOU MAKE ARRANGEMENTS WITH THE APPROPRIATE UTILITY COMPANIES TO ESTABLISH ACCOUNTS IN YOUR NAME, AS KMART CORPORATION WILL ARRANGE FINAL READINGS TO CLOSE OUR ACCOUNT ON THE RENT COMMENCEMENT DATE.**

Kmart # 3106 – Riverside, CA                    Exhibit E - 1                    Kmart Sublease 8/10
Riverside's Complete Auto Repair

DET02\356689.4
ID\ATP - 100243/0999

ESCROW PAYMENTS: Your initial escrow rates have been based on estimated costs. At the end of each Sublease Year, scheduled payments will be reconciled with actual costs and you will be invoiced for any additional amount owed or issued a refund, whichever is applicable. New escrow rates are established annually based on costs over the previous year. Occasionally an escrow rate is adjusted during the year if it appears that costs will significantly exceed your scheduled payments.

SUMMARY OF MONTHLY PAYMENTS:

| | |
|---|---|
| Base Rent | $ 2,500.39 |
| Estimated Real Estate Taxes | $     0.00 |
| Estimated CAM | $     0.00 |
| Estimated Building Fire/GL Ins. | $     0.00 |
| Management Fee | $   62.50 |
| ESTIMATED TOTAL MONTHLY PAYMENT | $ 2,562.89 |

ADDRESS FOR PAYMENTS: After the Rent Commencement Date, Rent and escrow payments are due, in advance, on the first day of each month. Payment for invoiced items is due ten (10) days following the date of the invoice. Checks must be payable to "**Kmart Corporation**" and should be mailed to the address below in time to be received on or before the date they are due.

Kmart # 3106
c/o Kmart Corporation
12664 Collections Center Drive
Chicago, Illinois 60693
Attn: Accounts Receivable, Real Estate

Please identify your payments with the Kmart location number No. 3106, your Employers Identification No. _____, and a notation of what you are paying, i.e. rent, utilities, etc.

NOTE: The street address in Hoffman Estates, Illinois, should be used for all correspondence going to Kmart Corporation. All correspondence must include the Kmart location number No. 3106 and the city and state wherein your Demised Premises is located.

ADDRESS FOR CORRESPONDENCE:
Shopping Centers Asset Manager
Real Estate Department
Kmart Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
(847-286-6474)
(Fax No. 847-286-2286)

Unless otherwise advised, we will mail all correspondence, invoices and statements to the address used on this letter. If you would like us to use an alternate address, please advise the writer, with a carbon copy to Kmart Corporation, Shopping Centers Asset Manager.

<u>PROOF OF INSURANCE</u>: You are required to provide proof of insurance as referred to in your Sublease.

<u>MAINTENANCE AND REPAIRS</u>: Requests for maintenance and repairs, other than those for which you are responsible, are to be directed to the property management company of the Shopping Center.

This letter is not intended to modify the captioned Sublease. In the event of an error or discrepancy between the Sublease and this letter, the Sublease will prevail.

Sincerely,

Kmart Corporation

By: _____

cc:    Vendor Payment Department
       Real Estate Accounting
       Shopping Centers Asset Manager, Real Estate Department
       Facilities Management
       Risk Management

                              By:    _____
                              Name:  _____

**EXHIBIT "F"**

**SUBLEASE GUARANTY**

FOR VALUE RECEIVED, and as an inducement to Kmart Corporation, a Michigan corporation ("Sublandlord") to enter into a certain lease dated as of _____ _____, 2010 (as it may hereafter be further amended, the "Sublease") with Riverside's Complete Automotive Repair, Inc., a California corporation, ("Subtenant"), the undersigned (collectively, the "Guarantor"), Vaughn Gedeon, whose address is 10939 Sunset Meadow Dr., Riverside, CA 92505, unconditionally and irrevocably undertakes and guarantees to Sublandlord, its successors and assigns, the payment and performance of all obligations of Subtenant under the Sublease (the "Liabilities"), including the full payment, when due, of all rent, including without limitation, Base Rent and Additional Rent. This Guaranty is absolute, independent and continuing under all circumstances, and is a guaranty of payment and performance, not of collection.

1.    REPRESENTATIONS. Guarantor hereby represents and warrants to Sublandlord that:

(a)    the financial statements of Guarantor furnished to Sublandlord in connection with this Guaranty (i) are true and correct in all material respects, (ii) have been prepared in accordance with generally accepted accounting principles consistently applied, and (iii) present fairly the financial condition of Guarantor as of the respective dates thereof, and that no material adverse change has occurred in the financial condition of Guarantor since such dates;

(b)    Guarantor has no knowledge of any material fact concerning Subtenant or its financial condition which has not been disclosed to Sublandlord and might adversely affect Sublandlord's decision to enter into the Sublease;

(c)    Guarantor is not in default under any agreement, the effect of which could materially adversely affect performance of its obligations under this Guaranty; and

(d)    There are no actions, suits or proceedings pending or, to the best of its knowledge, threatened against the Guarantor before any court or any other governmental authority of any kind which could materially adversely affect performance of its obligations under this Guaranty.

2.    WAIVERS. Guarantor hereby expressly waives:

(a)    any notice of nonpayment, nonperformance or nonobservance, or proof of notice or demand;

(b)    all diligence in collection of any of the Liabilities or any obligation hereunder;

(c)    the benefit of all appraisement, valuation, marshalling, forbearance, stay, extension, redemption, homestead, exemption and moratorium laws now or hereafter in effect;

(d)    any rights against Subtenant arising because of Guarantor's payment of any Liabilities, by way of subrogation of the rights of Sublandlord or otherwise;

(e)    any obligation Sublandlord may have to disclose to Guarantor any facts Sublandlord now or hereafter may know or have reasonably available to it regarding Subtenant or its financial condition;

(f)    all defenses of suretyship; and

(g)    any defense based on the negligence of Sublandlord in administering the Sublease, or taking or failing to take any action in connection therewith.

3.    <u>COVENANTS AND AGREEMENTS</u>. Guarantor covenants and agrees that:

(a)    in the event of a default by Subtenant under the Sublease, Sublandlord may proceed against Guarantor before, after or simultaneously with proceeding against Subtenant;

(b)    this Guaranty shall be absolute and unconditional and shall not be terminated, affected or impaired in any manner by reason of: (i) Sublandlord's assertion against Subtenant of any of the rights or remedies reserved to Sublandlord under the Sublease; (ii) the release of Subtenant from any of the Liabilities by operation of law or otherwise; (iii) the commencement of summary or other proceedings against Subtenant; (iv) Sublandlord's failure to enforce any of its rights against Subtenant; (v) the granting by Sublandlord of any extensions of time to Subtenant; (vi) any amendment, addition, assignment, sublease, transfer, renewal, extension or other modification of the Sublease, whether or not Guarantor shall have knowledge or have been notified of or agreed or consented thereto; (vii) the cessation of Subtenant's liability for any cause whatsoever; or (viii) any disability or defense of any kind now existing of Guarantor with respect to any provision of this Guaranty;

(c)    Guarantor shall be bound by all the provisions, terms, conditions, restrictions and limitations contained in the Sublease which are to be observed or performed by Subtenant thereunder, the same as if Guarantor were named as the Subtenant therein;

(d)    Guarantor shall not sell, lease, transfer, convey or assign any of its assets if such action will have a material adverse effect on Guarantor's business or financial condition.

(e)    If at any time any part of any payment previously applied by Sublandlord to any of the Liabilities is rescinded or returned by Sublandlord for any reason, including the insolvency, bankruptcy or reorganization of Subtenant, such Liabilities shall be deemed to have continued in existence to the extent that such payment is rescinded or returned, and this Guaranty shall be reinstated as to such Liabilities;

(f)    Guarantor hereby subordinates, and shall cause any entity which Guarantor directly or indirectly controls to subordinate, any claims or liens of Guarantor or such affiliate against Subtenant of any kind to all of the Liabilities; and

(g)    If the Sublease is disaffirmed by a Trustee in Bankruptcy for Subtenant, Guarantor shall, at the election of Sublandlord, either assume the Sublease and perform all of the covenants, terms and conditions of Subtenant thereunder, or enter into a new lease for the remaining Sublease Term, which said new lease shall be in form and substance identical to the Sublease.

4.    <u>MISCELLANEOUS</u>.

(a)    Sublandlord's failure to insist in any one or more instances upon strict performance or observance of any of the terms of the Sublease or to exercise any rights therein shall not be construed to be a waiver for the future of such term or right but the same shall remain in full force and effect.

(b)    If Sublandlord takes action to enforce this Guaranty, Guarantor shall pay to Sublandlord upon demand all costs, including reasonable attorneys' fees, incurred by Sublandlord in connection therewith, together with interest thereon computed at the rate of 18% per annum from the date paid by Sublandlord until the date repaid in full.

(c)    All of Guarantor's obligations hereunder shall be binding upon Guarantor's successors and assigns. For purposes of this Guaranty, the word "Subtenant" shall also include the successors and assigns of Subtenant. Each immediate and successive assignee or transferee of any interest in any of the Liabilities and this Guaranty shall, to the extent of such interest, be entitled to the benefits of this Guaranty.

(d)    This Guaranty shall be construed in accordance with the laws of the State of California, the state in which the demised premises described in the Sublease is situated (the "<u>Premises</u>"). Guarantor irrevocably (i) agrees that any suit, action or other legal proceeding relating to this Guaranty may be brought any state court located in the county in which the Premises is situated, or in any federal court located in the federal district in which the Premises is situated, at Sublandlord's option; (ii) consents to the jurisdiction of each such court in any such suit, action or proceeding; (iii) waives any objection which Guarantor may have to the laying of venue in any such suit, action or proceeding in either such court; and (iv) agrees to join Sublandlord in any petition for removal to either such court. Guarantor hereby irrevocably appoints _____ _____ as its authorized agent ("<u>Agent</u>") in the State of California to accept on its behalf service of process for purposes of any such suit, action or proceeding. Sublandlord may obtain personal jurisdiction and perfect service of process through the Agent or by any other means now or hereafter permitted by applicable law.

(e)    **GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS THAT GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION WITH THIS GUARANTY, OR ANY OTHER STATEMENTS OR ACTIONS OF SUBLANDLORD. GUARANTOR ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR SUBLANDLORD TO ENTER INTO THE LEASE.**

       (f)      All capitalized terms used in this Guaranty shall have the same meanings as are given to such terms in the Sublease, unless otherwise specifically defined in this Guaranty. Neuter terms shall also refer, where applicable, to the feminine gender and the masculine gender; the singular reference shall also include the plural of any word if the context so requires.

[Signature page follows.]

IN WITNESS WHEREOF, this Guaranty is executed as of the _____ day of
_____, 20___.

**GUARANTOR:**

By:    _____
       [EXHIBIT – DO NOT SIGN]

Home Address:_____

       _____

       _____

Home Phone:(__)_____

Date of Birth:_____
(optional)

Social Security No:_____

Drivers License No:_____

**ACKNOWLEDGMENT(S)**

**STATE OF**          )
                      ) SS
**COUNTY OF**         )

On _____, 20___, before me, a Notary Public, personally appeared Vaughn
Gedeon, and known to me to be the individual(s) described in and who executed the foregoing
instrument, and duly acknowledged that he/she/they executed the same.

_____    My commission expires:_____
 Notary Public

### EXHIBIT "G"

### PROHIBITED AND EXCLUSIVE USES

Prohibited Uses

    1.    A discount department or general merchandise store;

    2.    A supermarket or grocery store;

    3.    A delicatessen or bakery or the sale of any food for on- or off-premises consumption, including, without limitation, meats, dairy items, baked goods, confections, deli sandwiches, pizza, or coffee or other beverages;

    4.    A pharmacy or drug store or supplying the services of a licensed pharmacist;

    5.    The sale of beer, wine or other alcoholic beverages for off-premises consumption;

    6.    The sale of shoes;

    7.    Any office use, except for management and personnel offices which are strictly incidental to the Permitted Use;

    8.    Any inside or outside playground, play area or recreational facility, including without limitation, laser tag or similar activities (except as strictly incidental to the operation of a "fast-food" restaurant), or any carnival, amusement park or circus;

    9.    A flea market or pawn shop;

    10.    A banquet hall, auditorium or other place of public assembly;

    11.    A library or reading room (except as incidental to the sale at retail of books), a training or educational facility, or any facility catering primarily to students or trainees rather than customers;

    12.    Any entertainment facility, including, without limitation, a discotheque or dance hall, any establishment offering live entertainment of any kind, and a theatre, cinema or playhouse;

    13.    A gymnasium, sport or health club or spa;

    14.    A mortuary, funeral home or crematorium;

    15.    Living quarters, sleeping apartment or lodging rooms;

    16.    Any use involving the long term (over 24 hours) parking of motor vehicles;

    17.    Any use which is a public or private nuisance;

    18.    Any use which produces: (A) noise or sound that is objectionable due to intermittence, high frequency, shrillness or loudness, (B) obnoxious odors, (C) noxious, toxic, caustic or corrosive fumes, fuel or gas, (D) dust, dirt or fly ash in excessive quantities, or (E) fire, explosion or other damaging or dangerous hazard;

    19.    A warehouse or storage facility, except for storage of inventory which is strictly incidental to the Permitted Use;

    20.    Gas station, auto service or repair center (other than as may be part of the Permitted Use), or any use involving the operation of an above or below ground storage tank or the use or sale on or in the Demised Premises or the Kmart Premises of toxic, hazardous or explosive substances (other than as may be part of the Permitted Use, but only so long as such

DET02\356689.4
ID\ATP - 100243/0999

substances are handled, stored, sold and/or disposed of in strict accordance with Environmental Laws);

21.    Any assembling, manufacturing, industrial, distilling, refining, smelting, agriculture or mining operation;

22.    Junk yard or dump;

23.    Dry cleaner or laundromat;

24.    A massage parlor, or the sale, rental or display of "adult" or pornographic materials, including, without limitation, magazines, books, movies, videos, and photographs, or any pornographic display of any nature;

25.    A casino, gaming hall, off-track betting facility, or other gambling operation or facility;

26.    A "head shop" or other business selling drug paraphernalia; or

27.    Hydraulic lifts.

Exclusive Uses

None

DET02\356689.4
ID\ATP - 100243/0999

**Exhibit D**

# CHICAGO TITLE AND TRUST COMPANY

**10 S. LASALLE, STE 3100, CHICAGO, IL 60603**

Refer to: Krystina Cozzie/Ruby Rodriguez
Phone no.: 312-223-3366/312-223-2125
krystina.cozzie@ctt.com / ruby.rodriguez@ctt.com

STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)

ESCROW TRUST NO:                              DATE:

To: Chicago Title and Trust Company          Escrow Trustee: Ruby Rodriguez/Krystina Cozzie

Customer Identification:

Seller:

Purchaser:

Property Address:

Project Reference:

Proposed Disbursement Date:

Deposits:

1. The sum of $   by        CHECK/WIRE              Representing:  INITIAL EARNEST MONEY

2. The sum of $          by        CHECK/WIRE            Representing:  (Additional)

***PLEASE NOTE: Uncertified checks are held for ten business days after date of deposit. No funds can be dispensed before 10 business days limit expires. To avoid delays, use Cashier's or Certified checks or wire transfer.***

Funds:

( ) WILL    ( X ) WILL NOT BE INVESTED
NOTE: If funds are to be invested, an investment package will be sent.  Please complete and return to Escrow Trustee as soon as possible in order to begin accruing interest.

Delivery of Deposits:

The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

Billing Instructions:

Escrow trust fee will be deducted as follows: $300 escrow fee. If the transaction closes in the Chicago Title Loop office, the escrow fee will be waived. Any overnight delivery or wire fee will be $35.

The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title and Trust Company will impose an administrative maintenance fee equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed.

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable

Page 1

within 30 days from the billing date. Chicago Title and Trust Company, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at Chicago Title.

<u>Standard Provisions</u>:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Further, even with appropriate instructions to invest Escrow Deposits, Escrow Trustee may commingle the Escrow Deposits with other funds in a trust account in order to facilitate placing the Escrow Deposits into a segregated interest bearing account and to disburse the Escrow Deposits once they have been removed from such segregated interest bearing account as required by the terms of this Agreement.  Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the

undersigned, for themselves, their heirs, personal representatives, successors, and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Disputes/Circumstance not contemplated:

If any dispute arises with respect to the disbursement of any funds on deposit or if circumstances arise that were not contemplated or described in the original escrow agreement, and Escrow Agent is unsure as to its duties as a result, Escrow Agent may continue to hold said funds until either in receipt of a joint order from the parties or a court order directing payment. In such instance, Escrow Agent may elect to commence an action in interpleader and in conjunction therewith remit the Escrow Deposit to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Escrow Agent for any action taken by it in good faith in the execution of its duties hereunder. The parties further agree that the cost of any such action shall be deducted from the Escrow Deposit prior to disbursement to the parties**.**

Disclaimer Re: Validity of Documentation:

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is

fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person.  Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

For Seller:                                                    For Purchaser:

Name:                                                         Name: :

Legal Representative:                                         Legal Representative:

Name:                                                         Name:

Address:                                                      Address:
Phone:
                                                              Phone:
Fax:
Email:                                                        Fax:
Signature:                                                    Email:

                                                              Signature:

Accepted: Chicago Title and Trust Company, as Escrow Trustee

By:                                                           Date:

**\*Upon receipt of the funds, the escrow agreement becomes effective.**

## **Exhibit B**

## **Revised Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

In re                                    :
                                         :          **Chapter 11**
SEARS HOLDINGS CORPORATION, *et al.*,    :
                                         :          **Case No. 18-23538 (RDD)**
                                         :
Debtors.[1]                              :          **(Jointly Administered)**
---------------------------------------------------------- x

### ORDER PURSUANT TO SECTIONS 363, 365(a), 365(f), AND 365(k) OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY

Upon the motion, dated April 26, 2019 (ECF No. 3376), (the "**Initial Motion**")[2] of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 365(a) and 365(f) of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an order authorizing the Debtors to assume and assign certain unexpired nonresidential real property leases identified on **Exhibit 1** hereto (the "**Riverside Leases**"); and 7200 Arlington Associates

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion and Supplement.

LLC (the "**Landlord**") having filed an objection to the Initial Motion, dated May 3, 2019 (ECF No. 3595) (the "**Objection**"); and the Debtors having filed a supplement to the Initial Motion, dated May 17, 2019 (ECF No. _____) (the "**Supplement**" and, collectively with the Initial Motion, the "**Motion**") that reflects an agreement with the Landlord for the assumption of the Riverside Leases by the Debtors and assignment of the Riverside Leases to the Landlord's designee; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Motion having been provided in accordance with the Amended Case Management Order; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      The Objection is hereby deemed resolved.

3.      The assumption of the Riverside Leases by the Debtors and assignment of the Riverside Leases to 7200 Arlington Partner LLC, or another designee of Landlord (the "**Assignee**") in accordance with the Assignment and Assumption Agreement annexed to the

2

Supplement as **Exhibit A** (the "**Assignment Agreement**") is authorized and approved pursuant to section 365(a) of the Bankruptcy Code.

4.      Pursuant to the Assignment Agreement, within five (5) business days of the date of the entry of this Order, the Assignee shall pay to the Debtors in cash, the balance of the purchase price owing pursuant to the Assignment Agreement in the amount of one million, one hundred and fifty-five thousand dollars ($1,155,000.00), which remaining balance is the total purchase price of one million, two hundred and sixty-five thousand dollars ($1,265,000.00) in cash, less one hundred ten thousand dollars ($110,000.00) previously paid by the Landlord to the Debtors as an earnest money deposit.

5.      The Landlord hereby waives any and all cure amounts owed under the Riverside Leases.

6.      Following the payment of the amount provided for in paragraph 4 of this Order, the Landlord or the Assignee shall have no further claims against the Debtors for any amounts owed under the Riverside Leases, whether prior or subsequent to the Commencement Date, under section 365 of the Bankruptcy Code or otherwise; provided, however, Assignee does not waive or release Debtors from any indemnification obligations arising from third party claims asserted with respect to or arising from Debtors' use and occupancy of the Leased Premises prior to the effective date of the assignment (the "**Effective Date**") for which Debtors had a duty to indemnify Assignee pursuant to the Riverside Leases, and which expressly survive the Effective Date (but only to the extent that such claims are covered by Debtors' insurance policies, if any, and on the condition that Assignee only seeks recovery from the insurer and only up to the insured amount).

3

7.       Pursuant to section 363(b) of the Bankruptcy Code, within five (5) business days after the closing under the Assignment Agreement, the Debtors are authorized and directed to pay Brixton thirty thousand dollars ($30,000) for attorneys' fees incurred in relation to the Riverside Leases.

8.       Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

9.       The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: May __, 2019
         White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

WEIL:\97038484\7\73217.0004

**<u>Exhibit 1</u>**

**Riverside Leases**

WEIL:\97038484\7\73217.0004

| Unexpired Lease | Counterparty | Property Address | Description of Unexpired Lease |
|---|---|---|---|
| 1.  Lease | 7200 Arlington Associates LLC | 7200 Arlington Ave, Riverside, CA 92503 | Lease dated October 16, 1972 between George R. Smith, as predecessor in interest to 7200 Arlington Associates, as landlord, and K-Mart Corporation, as tenant, as same may have been modified, amended, and/or extended. |
| 2.  Ground Lease | Great American Chicken Corp., Inc. | 6221 Van Buren Blvd, Riverside, CA 92503 | Ground Lease dated May 29, 1986 between K-Mart Corporation, as sublandlord, and KFC National Management Company, as predecessor in interest to Great American Chicken Corp., Inc., as subtenant, as same may have been modified, amended, and/or extended. |
| 3.  Sublease | Riverside's Complete Automotive Repair Inc. | 7200 Arlington Dr., Riverside, CA 92503 | Sublease dated September 21, 2010 between K-Mart Corporation, as sublandlord, and Riverside's Complete Automotive Repair Inc., as subtenant, as same may have been modified, amended, and/or extended. |

## **Exhibit C**

## **Redline of Proposed Order**

WEIL:\97038484\7\73217.0004

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

In re                                          :
                                               :         **Chapter 11**
                                               :
SEARS HOLDINGS CORPORATION, *et al.*,          :
                                               :         **Case No. 18-23538 (RDD)**
                                               :
Debtors.[1]                                    :         **(Jointly Administered)**
                                               :
-------------------------------------------------------- x

**ORDER PURSUANT TO SECTIONS 363, 365(a), 365(f), AND 365(k)
OF
THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO ASSUME
AND ASSIGN UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY**

Upon the motion ("*, dated April 26, 2019 (ECF No. 3376), (the "**Initial Motion**")[2] of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion and Supplement.

sections 365(a) and 365(f) of title 11 of the United States Code (the "**Bankruptcy Code**"), for

entry of an order authorizing the Debtors to assume and assign certain unexpired nonresidential

real property leases identified on **Exhibit 1** hereto (the "**Riverside Leases**"), all as more fully set

forth in the Motion; and 7200 Arlington Associates LLC (the "**Landlord**") having filed an

objection to the Initial Motion, dated May 3, 2019 (ECF No. 3595) (the "**Objection**"); and the

Debtors having filed a supplement to the Initial Motion, dated May 17, 2019 (ECF No. _____)

(the "**Supplement**" and, collectively with the Initial Motion, the "**Motion**") that reflects an

agreement with the Landlord for the assumption of the Riverside Leases by the Debtors and

assignment of the Riverside Leases to the Landlord's designee; and the Court having jurisdiction

to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and

1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska,

C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the relief requested in the Motion having been provided

in accordance with the Amended Case Management Order; and such notice having been adequate

and appropriate under the circumstances, and it appearing that no other or further notice need be

provided; and the Court having found and determined that the relief sought in the Motion is in

the best interests of the Debtors, their estates, their creditors, and all parties in interest, and that

the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      The Objection is hereby deemed resolved.

WEIL:\97040469\1\73217.0004WEIL:\97040469\2\73217.0004

3.    2. The assumption of the Riverside Leases by the Debtors and assignment of the Riverside Leases to 7200 Arlington Partner LLC, or another designee of Landlord (the "**Assignee**") in accordance with the Assignment and Assumption Agreement annexed to the Supplement as **Exhibit A** (the "**Assignment Agreement**") is authorized and approved pursuant to section 365(a) of the Bankruptcy Code.

3. Within three (3) business days of the date hereof, the Debtors shall pay to the applicable Counterparty the Cure Amount set forth on **Exhibit 1**, or in an amount otherwise agreed to by the Debtors and the applicable Counterparty, which payment shall constitute full and final satisfaction of any and all defaults under the Riverside Leases, whether monetary or non-monetary.

4.    Pursuant to the Assignment Agreement, within five (5) business days of the date of the entry of this Order, the Assignee shall pay to the Debtors in cash, the balance of the purchase price owing pursuant to the Assignment Agreement in the amount of one million, one hundred and fifty-five thousand dollars ($1,155,000.00), which remaining balance is the total purchase price of one million, two hundred and sixty-five thousand dollars ($1,265,000.00) in cash, less one hundred ten thousand dollars ($110,000.00) previously paid by the Landlord to the Debtors as an earnest money deposit.

5.    The Landlord hereby waives any and all cure amounts owed under the Riverside Leases.

6.    4. Following the payment of the Cure Aamount , the non-debtor party to the Riverside Leases shall be forever barred, estopped, and permanently enjoined from assertingprovided for in paragraph 4 of this Order, the Landlord or the Assignee shall have no further claims against the Debtors, their successors or assigns, or the property of any of them,

3

any default existing for any amounts owed under the Riverside Leases as of the date hereof, whether prior or subsequent to the Commencement Date, under section 365 of the Bankruptcy Code or otherwise; provided, however, Assignee does not waive or release Debtors from any indemnification obligations arising from third party claims asserted with respect to or arising from Debtors' use and occupancy of the Leased Premises prior to the effective date of the assignment (the "**Effective Date**") for which Debtors had a duty to indemnify Assignee pursuant to the Riverside Leases, and which expressly survive the Effective Date (but only to the extent that such claims are covered by Debtors' insurance policies, if any, and on the condition that Assignee only seeks recovery from the insurer and only up to the insured amount).

5. Any and all anti-assignment provisions in the Riverside Leases, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.

7.    6. Notwithstanding any and all assignment or anti-assignment provisions in the Riverside Leases, including but not limited to the Landlord Consent Provision,  pPursuant to section 3653(kb) of the Bankruptcy Code, the Debtors shall be relieved of any and all liability, known or unknown, under thewithin five (5) business days after the closing under the Assignment Agreement, the Debtors are authorized and directed to pay Brixton thirty thousand dollars ($30,000) for attorneys' fees incurred in relation to the Riverside Leases and the Debtors shall not be required to satisfy any liabilities under the Riverside Leases after assignment of such Riverside Leases.

8.    7. Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

4

8. Upon successful marketing of the Riverside Leases, the Debtors shall serve the Counterparties and file with the Court a notice of the assignment (the "**Assignment Notice**") to an assignee (the "**Assignee**").  Any Counterparty seeking to object to adequate assurance of future performance must (a) file a written objection in compliance with the Bankruptcy Rules and the Local Rules with the Court (an "**Objection**"), so that such objection is filed no later than eight (8) calendar days after the later of the date on which (i) the Assignment Notice is filed with the Court and (ii) evidence of adequate assurance of future performance is served on the Counterparties (the "**Objection Deadline**"), and (b) serve the Objection (by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Assignee on or before the Objection Deadline.  In the event that no objection is filed prior to the Objection Deadline, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Assignment Notice, which order may be entered without further notice or opportunity to be heard.  If an Objection is timely filed and served with respect to the Assignment Notice, or to the extent that it remains unresolved, such Objection shall be set for a hearing (the "**Hearing**") before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York Courtroom 118, 300 Quarropas Street, White Plains, New York 10601-4140 on a date to be announced.

9. Nothing in this Order, shall impair, prejudice, waive or otherwise adversely affect the rights of the Debtors and their estates, subject to compliance with the notice provisions set forth in paragraph 7, unless otherwise agreed to by the parties, to assign any of the assumed Riverside Leases pursuant to, and in accordance with, the requirements of section 365 of the Bankruptcy Code.

WEIL:\97040469\1\73217.0004WEIL:\97040469\2\73217.0004

10. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

9.    11. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: May _____, 2019
        White Plains, New York

        _____
        THE HONORABLE ROBERT D. DRAIN
        UNITED STATES BANKRUPTCY JUDGE

WEIL:\97040469\1\73217.0004WEIL:\97040469\2\73217.0004