Patrick Collins
Veronique A. Urban
FARRELL FRITZ, P.C.
400 RXR Plaza
Uniondale, New York 11556
Tel:   (516) 227-0700
Fax:   (516) 227-0777

*Attorneys for Midwood Management Corp., as agent*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:                                                : Chapter 11
                                                      :
SEARS HOLDINGS CORPORATION, *et al.*,                 : Case No. 18-23538 (RDD)
                                                      : (Jointly Administered)
                                        Debtors.      :
----------------------------------------------------------------x

### SUPPLEMENTAL OBJECTION OF MIDWOOD MANAGEMENT CORP. TO ASSUMPTION AND ASSIGNMENT OF LEASE

Midwood Management Corp., as agent for Expressway Plaza I, LLC and Farmingville Associates Phase 1, LLC as tenants in common ("Landlord"), hereby submits this supplemental objection (the "Supplemental Objection") in response to the *Notice of Assumption and Assignment of Additional Designatable Leases* [ECF. 3298] (the "Lease Designation Notice") filed by Transform Holdco, LLC (the "Buyer").

1.  On January 18, 2019, the Debtors filed their *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* [ECF No. 1731] (the "Notice of Cure Costs and Potential Assumption and Assignment"). In the Notice of Cure Costs and Potential Assumption and Assignment, the Debtors indicate they may seek to assume their lease (the "Lease") with Landlord for the premises at 2280 North Ocean Avenue, Farmingville, NY (the "Premises") and assign the Lease to the Buyer in connection with the Global Asset Sale Transaction. The Notice of Cure Costs and Potential

Assumption and Assignment indicates a cure amount of $0 for the Lease.

2.  On January 25, 2018, Landlord filed its objection [ECF. No. 1957, the "<u>Initial Landlord Objection</u>"] to the Notice of Cure Costs and Potential Assumption and Assignment. In Landlord's Initial Objection, Landlord asserts, among other things, that (i) the Lease cannot be assumed because it has terminated and (ii) numerous monetary and nonmonetary defaults existed under the Lease, the monetary value of which exceeded $1,692,134.14, and which must be cured as a condition to assumption of the Lease. As explained below, none of the defaults listed in Landlord's Initial Objection have been cured and the Landlord maintains its position that the Lease terminated.

3.  On April 19, 2019, the Buyer filed its *Notice of Assumption and Assignment of Additional Designatable Leases* [ECF No. 3298, the "<u>Notice of Designation</u>"]. The Notice of Designation identifies the Lease as a lease designated by Buyer for assumption by the Debtor and assignment to Buyer or an affiliate of Buyer.

4.  Landlord and Buyer executed a stipulation, which has been so-ordered by the Court [ECF. No. 3824], in which those parties have agreed that the issues to be determined by the Court in connection with the Debtors' proposed assumption of the Lease and assignment of the Lease to the Buyer, and Landlord's objection thereto, are:

    (1) any defaults to be cured and amounts required to be paid as Cure Amounts under the Lease prior to assumption and assignment of the Lease to the Buyer; and

    (2) whether the Lease has been terminated pursuant to its terms and therefore cannot be assumed.

**SUPPLEMENTAL OBJECTION**

**A.  None of the Defaults Referenced in the Initial Objection Have Been Cured**

5.  All of the defaults and events of default cited by Landlord in Landlord's Initial

Objection continue as Debtors have taken no steps whatsoever to cure or even ameliorate such defaults.

6. The Debtors have not paid the arrears of Additional Rent due under the Lease arising from Debtors' failure to reimburse Landlord for the Emergency Work carried out by the Landlord at the Premises in the amount of $215,426.88 nor any of the interest accruing on the unpaid Additional Rent at the rate of 18% per year from the date of default, amounting to $51,791 as of the date of this Supplemental Objection. As noted in Landlord's Initial Objection, Debtor Kmart Corporation's ("Kmart") failure to pay these amounts has resulted in termination of the Lease following Landlord's service of the Notice of Default and Fifteen (15) Day Notice to Cure and then the Lease Termination Note.

7. The Debtors have also neglected to make any of the repairs to the Premises, at an estimated cost of at least $1,439,790.00, needed to cure the present default existing under the Lease arising from Debtors' failure to keep the Premises in good and tenantable condition and repair as set forth in the Notice of Default and Thirty (30) Day Notice to Cure. Prior to the Petition Date, the engineer retained by Landlord issued a report of the results of the Structural Condition Survey, indicating numerous material physical deficiencies existed at the Premises, recommending numerous specific actions be taken within six months to address these deficiencies and estimating that those repairs would cost approximately $1,439,790.00. A copy of the Structural Condition Survey was attached to the Notice of Default and Thirty (30) Day Notice to Cure, attached as Exhibit "A" to the Zerykier Declaration submitted with Landlord's Initial Objection. The recommended repairs, summarized on page 3 of the report, are as follows:

| ITEM | ESTIMATED COST |
|---|---:|
| Repairs of cracking & deterioration in CMU façade | $2,700 |
| Painting (Exterior) CMU Façade | $40,245 |
| Painting (Interior) CMU front wall portion | $6,000 |
| Misc. Repairs | $15,000 |
| Roof leak repairs and replacement of water stained acoustic panels | $2,500 |
| Structural evaluation of Fire Water Piping | $2,400 |
| Bollard Repairs (Allowance) | $1,800 |
| Exterior Door Repairs (Allowance) | $3,000 |
| Storm Drain Structure Repairs (Allowance) | $15,000 |
| Curbing Replacement | $242,445 |
| Asphalt Milling & Repave | $624,000 |
| Seal Coat & Striping | $41,600 |
| Concrete Pad (Trash compactor and Trailer) | $51,000 |
| Rooftop HVAC units (3 Ton AAON unit from 1993) | $12,000 |
| Rooftop HVAC units (7 Ton AAON unit from 1993) | $21,000 |
| Rooftop HVAC units (15 Ton AAON unit from 1993) | $364,000 |
| Traffic Parking Signage Repairs (Allowance) | $1,050 |

Kmart never responded to the Notice of Default and Thirty (30) Day Opportunity to Cure and, based on the observations of Landlord's property manager who regularly visits the Premises, Kmart has never undertaken any of the repairs noted in the Titan Engineers report even though Titan Engineers recommended such repairs be made within six months of the report, which is dated May 17, 2018, as revised on August 29, 2018. Supplemental Declaration of Peter Pollani, annexed hereto as Exhibit "A" (the "Pollani Declaration"), ¶¶ 13-15.

8. Kmart has also failed to cure the Failure to Report Gross Sales Report as it still has not delivered to Landlord a statement of its gross sales for the Prior Lease Year ending October 31, 2018 nor has it paid any Percentage Rent owing for the Prior Lease Year.

9. Similarly, Kmart has not taken any steps to indemnify Landlord, Landlord's predecessor in interest and Midwood as Landlord's agent, against the Third Party Claims identified in Landlord's Initial Objection. Landlord is continuing to suffer pecuniary loss on account of Kmart's failure to indemnify because Landlord's insurance carrier is taking the Third Party Claims

4

into account when determining the applicable premiums charged to Landlord for the Premises.

B.  **Additional Defaults Have Arisen Under the Lease**

10. Since the time the Debtors filed their Notice of Cure Costs and Potential Assumption and Assignment, the Debtors have committed further acts of neglect of their obligation to maintain the parking lot for the Premises. Article 15 of the Lease requires Kmart to "keep the entire Demised Premises in good and tenantable condition and repair, including any necessary maintenance repairs and replacements to roof, structural and non-structural, interior and exterior portions of the Demised Premises, and plumbing, electrical and other systems located in and servicing the Demised Premises." As noted in Landlord's Initial Objection, Kmart assumed the obligation to maintain certain portions of the Common Area, including the parking lot and drive lanes surrounding the building on the Premises at which Kmart operates its store.

11. Notwithstanding such obligations and that Kmart's prepetition failure to maintain the Premises, including the parking lot, was one of the defaults noted in Landlord's Initial Objection, the condition of the parking lot continues to deteriorate with no repairs or maintenance undertaken by Kmart. Pollani Declaration, ¶ 16. Through an email, dated April 19, 2019, from Peter Pollani of Midwood to Bradley Pukas of Sears Holding Corporation and other representatives of Kmart, Landlord notified Kmart of potholes, storm drain damage, torn-down road signs and debris in the parking lot abutting the Premises (the "Additional Parking Lot Damage"). To date, Kmart has taken no steps to address these hazardous conditions and no one at Kmart has even bothered to respond to Mr. Pollani's message. *Id.*, at ¶ 16.

12. Landlord estimates the cost to repair the Additional Parking Lot Damage is $5,125, broken down as follows:

> Pothole Repair - $500
> Stop Sign Replacement - $325

5

        Repair of damaged/leaning signage- $300
        Repair of storm drain- $2,500
        Clean up of debris- $1,500

*Id.*, at ¶ 17.

13.     Landlord acknowledges the charges asserted in Landlord's Initial Objection include the estimated cost to replace the parking lot abutting the Premises. Replacement of the parking lot would presumably eliminate the Additional Parking Lot Damage. However, the Additional Parking Lot Damages do not duplicate charges asserted in the Initial Objection because repairs to address the Additional Damages are needed immediately. Even if Kmart undertakes to replace the parking lot, it would need to repair the Additional Parking Lot Damages now in advance of when the parking lot is replaced. *Id.*, at ¶ 18.

14.     Landlord continues to incur attorneys' fees and expenses addressing Kmart's numerous defaults under the Lease. As of April 30, 2019, Landlord has incurred about $120,000 of attorneys' fees and expenses in connection with enforcement of its rights under the Lease on account of Kmart's defaults thereunder. Landlord is entitled to recover these fees and expenses from the Debtors, as the defaulting party, pursuant to Article 25(F) of the Lease. The Debtors cannot assume the Lease unless they reimburse the Landlord for these fees, as well as the $4,859.72 of consulting fees paid to obtain the Structural Condition Survey of the Premises, to compensate the Landlord for its pecuniary losses arising from the Debtors' defaults under the Lease.

**C.**     **Incorporation of Arguments Asserted in Motion to Determine Automatic Stay Inapplicable Bearing on Issue of Lease Termination**

15.     On November 29, 2018, Landlord filed its *Motion to Confirm Termination or Absence of Stay Motion for Order Declaring Automatic Stay Inapplicable to Non-Residential Real Property Lease* [ECF No. 932] (the "Motion to Declare Automatic Stay Inapplicable") in these chapter 11 cases. In the Motion, Landlord sought an order of this Court declaring the automatic

6

stay of Section 362(a) of the Bankruptcy Code inapplicable to actions to be undertaken by Landlord to recover the Premises from Kmart following termination of the Lease. The Debtors objected to the Motion to Declare Automatic Stay Inapplicable [ECF No. 2497] and separately submitted the Declaration of Bradley Pukas in support of their objection [ECF No. 2571]. Landlord submitted a reply in further support of the Motion [ECF No. 2578].

16. The Court conducted a hearing on the Motion to Declare Stay Inapplicable on February 14, 2019. The Court denied the Motion to Declare Automatic Stay Inapplicable, holding that the exception to the automatic stay provided under Section 362(b)(10) of the Bankruptcy Code did not apply to the circumstances surrounding the manner in which Landlord asserts the Lease was terminated. Notably, however, the Court's order denying the Motion to Declare Automatic Stay Inapplicable [ECF No. 2649] provides that "denial of the Motion is without prejudice to the parties' rights to seek a determination by the Court whether the Lease is terminated other than by its stated term (i.e., as a result of a default by the Debtor party thereto), and all rights of the Debtors and Midwood Management regarding the issue of whether the Lease is so terminated are preserved."

17. Because some of the facts and arguments presented in the Motion to Determine Automatic Stay Inapplicable bear on the issue of whether the Lease has terminated and therefore cannot be assumed, Landlord now presents those facts and arguments below for the Court's consideration.

D. **Kmart Failed to Reimburse Landlord for the Emergency Work.**

18. Since March 2017, Landlord raised concerns with Kmart about the condition of the common areas of the Expressway Plaza parking lot for which Kmart was responsible for maintaining. For instance, numerous potholes Landlord brought to Kmart's attention in early

March 2017 were not addressed by Kmart until on or about April 10, 2017. Supplemental Declaration of Peter Pollani at ¶ 4.

19. On April 7, 2017, an inspector from the Town of Brookhaven (the hamlet of Farmingville lies within the Town of Brookhaven), whom Landlord had invited to Expressway Plaza to inspect an ongoing construction project to build out space for a new tenant, commented to Landlord's representative on the poor condition of the parking lot and indicated that, unless repaired, the potholes and curb damage could hinder Landlord's ability to obtain certificates of occupancy for incoming tenants. Landlord forwarded a report of that conversation to Kmart by email that same day and requested prompt action in lieu of sending Kmart a formal notice of default. However, as of May 16, 2017, the curbs had not been repaired and potholes had reappeared. *Id.*, ¶ 5.

20. In the Fall of 2017, Landlord, was nearing completion of another construction project at Expressway Plaza to build out space for an incoming tenant. In connection with that construction project, Midwood arranged for a visit to the construction site from an inspector from the Town of Brookhaven in late October or early November 2017. Upon arriving at Expressway Plaza, the inspector remarked to Landlord's representative that the road surface of the drive lanes leading to the Kmart Premises were in very bad shape and needed to be repaired quickly. *Id.*, at ¶¶ 6-7.

21. Mindful of an inability to properly apply asphalt once the air temperature dropped too low and of Landlord's experiences with Kmart earlier that year when Kmart moved very slowly to required address parking lot repairs, Landlord obtained its own quotes from paving contractors for the work needed to repair the drive lanes. *Id.*, at ¶ 8.

22. Landlord met again with the Town of Brookhaven inspector, who told Landlord the

parking lot drive lanes needed to be re-paved immediately. Upon inspecting the drive lanes itself, Landlord agreed with his assessment. The inspector said that the many other areas of the Kmart parking lot needed to be addressed as well, but it was concluded that most of the additional work could wait until spring because those areas did not experience a heavy amount of traffic. The inspector said the town would not issue a certificate of occupancy for the incoming tenant until the drive lanes were repaired and added that he would not permit asphalt to be poured once the temperature dropped below a specified lowest acceptable level, which was expected to occur within a matter of a couple of weeks. *Id.*, at ¶ 9.

23. Landlord served on Kmart the notice, dated November 8, 2017, informing Kmart it was in default of its obligation to maintain the parking lot and that Landlord was exercising its rights under Article 25(F) of the Lease to perform emergency repair work to the parking lot and drive lanes (the "Emergency Work") at Kmart's cost and expense.[1]

24. Representatives of Landlord and Kmart communicated by telephone and email after Kmart received the November 8, 2017 notice. Landlord sent Kmart numerous photographs showing portions of the extensive damage to the parking lot drive lanes, quotes from a paving contractor and identified the specific Town of Brookhaven inspector demanding the drive lanes be re-paved immediately. *Id.*, at ¶ 11 and Exhibit "2" to the Pollani Declaration (copies of emails exchanged between Peter Pollani of Midwood and Bradley Pukas of Sears Holdings Corporation, which were annexed to Debtors' Objection to the Motion to Declare Automatic Stay Inapplicable). The next morning after receiving the information Mr. Pollani provided, Mr. Pukas sent an email message (dated November 20, 2017) informing Mr. Pollani that further review of the Landlord's

---

[3] A copy of this notice is annexed as Exhibit "3" to the Brown Declaration submitted with Landlord's Initial Objection.

maintenance requests was underway by Kmart's facilities team and that they would likely have questions. Mr. Pukas further stated that his "feeling" was that there was nothing that warranted an "emergency repair." Mr. Pukas indicated he would "need documentation from the municipality confirming their mandate of this work to be completed immediately." Either before or after Mr. Pukas sent his November 20, 2018 email message, Mr. Pollani told him over the phone the Town of Brookhaven's practice was to not reduce to writing demands such as its demand that the parking lot drive lanes be re-paved immediately. *Id*.

25. Landlord had numerous subsequent communications with Kmart, primarily with the Kmart personnel present at the Expressway Plaza Premises, to coordinate the Emergency Work. However, Landlord did not receive any subsequent communications from Mr. Pukas, or anyone else at or on behalf of Kmart, questioning the need for the Emergency Work or whether Kmart would be responsible for reimbursing Landlord for the expenses it incurred to perform the Emergency Work.

26. Having heard no actual objection or response of any kind from Kmart regarding the Emergency Work Landlord arranged to be performed, and after accounting for Kmart's proportionate share for certain portions of the parking lot that were not Kmart's sole responsibility (a lengthy process complicated by the introduction of new tenants to Expressway Plaza and Kmart's questioning of its proportionate share of the real property taxes assessed on the Property), Landlord sent to Kmart, to the attention of the persons at Kmart to whom Landlord had sent prior invoices for additional rent without incident, two invoices on April 4, 2018 (the "Initial Invoices") and one invoice on April 26, 2018 (the "Third Invoice", and together with the Initial Invoice, the "Invoices") in the total amount of $215,426.88 for Kmart's share of the costs incurred by Landlord

to perform the emergency work. *See* Declaration of Julie Davidov (the "<u>Davidov Declaration</u>"),[2] annexed hereto as Exhibit "B", ¶ 4; *Pollani Declaration*, ¶ 12. Kmart did not pay or otherwise respond to the Invoices. *Davidov Declaration*, ¶ 5; *Pollani Declaration*, ¶ 12.

27. On May 8, 2018, Landlord sent a follow up message to Kmart querying whether the payment had been mailed to the Landlord on the Initial Invoices and requesting that they "advise ASAP". *Davidov Declaration*, ¶ 6. On that same date, Franck Moyo, a financial analyst in the real estate department at Sears Holdings Corporation, responded that the invoices were assigned to one of the Debtors' analysts for review and that the analyst would contact Landlord if she had any questions. *Davidov Declaration*, ¶ 7.

28. Landlord followed up again on May 30, 2018 on the Initial Invoices and on June 6, 2018 regarding all of the Invoices. Landlord received no response to either inquiry. *Davidov Declaration*, ¶¶ 8-9.

29. When Landlord inquired yet again on June 19, 2018 about when the Initial Invoices would be paid, Mr. Moyo of Sears Holdings Corporation responded that payment had been sent for the real estate taxes. However, Landlord promptly responded to Mr. Moyo that its inquiries pertained not to payment of the real estate taxes but to the payment of open invoices relating to the Emergency Work. Mr. Moyo did not further respond to Landlord. *Davidov Declaration*, ¶ 11. Landlord sent further inquiries on June 26, 2018 and July 11, 2018 requesting an update. No response was received by Landlord to these inquiries. *Davidov Declaration*, ¶ 12.

30. Ten months after having notified Kmart of the Emergency Work and having still received no express objection to the nature, scope or cost of the Emergency Work, and having received no response to Landlord's repeated requests for payment of the Invoices, Landlord,

---

[2] A copy of the Davidov Declaration, which was originally submitted in connection with Landlord's reply for the Motion to Declare Automatic Stay Inapplicable, is annexed hereto as Exhibit "B".

11

FF\8398892.3

pursuant to its rights under Article 25 of the Lease, sent to Kmart a "Notice of Default and Fifteen (15) Day Notice to Cure" (the "Notice of Default")[3] on September 12, 2018. Even at this late date, Kmart still had an opportunity to cure the default and avoid termination of the Lease by reimbursing Landlord for the cost of the Emergency Work.

31.  Yet, Kmart did not respond at all to the Notice of Default; not even to object, request more time to investigate or offer to pay what it perceived as the correct amount for the Emergency Work. Having received no response to the Notice of Default, the Landlord, exercising its rights pursuant to Article 25 of the Lease, sent to Kmart the Lease Termination Notice on October 11, 2018 as indicated in the Motion.[4]

32.  In short, (a) Landlord timely notified the Debtors under the circumstances of the Emergency Work to be performed in the parking lot of the Premises, (b) Landlord provided the Debtors with supporting documentation for the Emergency Work, including photos and a detailed proposal of costs associated with the repairs to be performed; (c) Kmart's representative informed the Landlord that, although he had a "feeling" the work did not constitute emergency work, he would review the information and would contact Landlord if they had any questions, (d) such correspondence from Kmart to the Landlord was the last substantive communication it had with the Landlord on the subject; (e) five months after the Emergency Work was performed, the Debtors still had not raised any questions or objections as to the nature, scope or cost of the Emergency Work and so Landlord sent invoices for payment to the Debtors for the first time on April 4, 2018; (f) Landlord repeatedly requested payment on account of such invoices during the period between April 4, 2018 and September 12, 2018; (g) Landlord properly served Debtors with a Notice of

---

[3] A copy of the Notice of Default is annexed as Exhibit "A" to the Zerykier Declaration submitted with the Motion.

[4] A copy of the Lease Termination Notice is annexed as Exhibit "B" to the Zerykier Declaration submitted with the Motion.

FF\8398892.3

Default on September 12, 2018, informing Kmart that, unless Kmart cured the default by issuing a payment on the Invoices within fifteen (15) days from service of the notice, the Landlord would serve Kmart with a notice of election to end the term of the Lease at the expiration of ten (10) days from the date of service of such notice; (h) Kmart failed to cure the default; and (i) Landlord properly served Debtors with a Ten (10) Day Notice of Lease Termination on October 11, 2018.

D.   **Kmart Breached the Lease and is Barred by the Account Stated Doctrine from Contesting the Invoices**

33.   Kmart breached the Lease by failing to maintain the parking lot drive lanes as it had agreed to do. The photographs sent in November 2017 and before the Emergency Work was undertaken by Mr. Pollani of Midwood to Mr. Pukas of Sears Holdings Corporation, and which are annexed to the Pollani Declaration, show the damaged pavement in the drive lanes. The damage was so severe that a Town of Brookhaven inspector told Midwood the drive lanes needed to be re-paved immediately. Given (i) the demand from the Town of Brookhaven for immediate action, (ii) the imminent onset of winter during which paving could not be performed and (iii) Kmart's poor track record in making required parking lot repairs, Landlord's declaration of an emergency pursuant to Section 25.F of the Lease as provided in the November 8, 2017 notice was appropriate and Landlord was entitled to cure the breach by hiring its own contractor to re-pave the parking lot drive lanes. Debtors' assertion that no emergency work was required is belied by the facts. Kmart, the party in possession of the Premises, was the party in the best position to monitor the condition of the parking lot drive lanes and to maintain them before they became so damaged that a town inspector noticed the condition and required immediate repairs. For this reason, the Debtors' complaint that Kmart was given inadequate notice of the need to re-pave the drive lanes should be disregarded.

34.   Under Section 25.F of the Lease, Kmart was required to reimburse Landlord with

13

interest on demand for the amount Landlord paid have the drive lanes repaired. Landlord properly sent Kmart the Invoices for this amount.

35. The Debtors are barred by the account stated doctrine from contesting at this juncture the validity of the Invoices sent by the Landlord for the cost of the Emergency Work. "An account stated is an agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and the balance due, if any, in favor of one party or another." *Shea & Gould v Burr*, 194 AD2d 369, 370 (1st Dept 1993), *quoting Chisholm-Ryder Co. v Sommer & Sommer*, 70 AD2d 429, 431 (4th Dept 1979). "In the case of an existing indebtedness, the agreement may be implied as well as express." *Chisholm-Ryder Co.*, 70 AD2d at 431 (citation omitted). The agreement "may be either express or implied from circumstances, and evidence of such assent may be found when one party presents an account to another which the latter retains without making objection within a reasonable time." *Little v. McClain*, 134 A.D. 197 (2d Dept 1909). *See also Chisholm-Ryder Co.,* 70 AD2d at 431 ("Silence is deemed acquiescence and warrants enforcement of the implied agreement to pay."); *In re Rockefeller Center Properties,* 266 B.R. 52, 57 (S.D.N.Y. 2001) *(*"An account stated may be implied if the party receiving the statement keeps it for a reasonable time without objecting to or questioning the correctness of the account"). The account stated doctrine has been applied in the landlord-tenant context. *See Rockefeller Center Properties*, 266 B.R. at 57-60 (applying account stated doctrine to bar tenant from disputing accuracy of rent escalation statements sent by landlord that tenant retained for long periods of time without objection).

36. Landlord first sent to the Debtors a detailed proposal of costs for the Emergency Work on November 19, 2017. Though Mr. Pukas claimed he had a "feeling" the work did not constitute emergency repair, he nonetheless did not object to the cost proposal nor did Kmart obtain

14

other quotes for the work to be completed. Landlord never received any objection from Kmart that the cost for the work was too high or that the work did not need to be performed.

37. On April 4, 2018, five months after Landlord sent the detailed proposal to the Debtors, and after the work was completed, Landlord sent the Invoices to the Debtors for payment. The Debtors ignored the request and again did not notify Landlord that they objected to the costs detailed in the Invoices. In light of Kmart's retention of the Invoices for many months without objection, Mr. Pukas' equivocal statements in his November 20, 2017 email message to Mr. Pollani are insufficient to prevent the creation of an account stated with respect to the Invoices. *See Little v. McClain*, 134 A.D. at 919 ("While it is true that, when one disclaims all liability upon an account rendered, he is not bound to examine the items of an account or be taken to have assented to them if he does not object, this disclaimer must be something more than a mental operation on the part of the person receiving the account. If he is to receive the benefit of this rule, he must express his disclaimer of any liability . . . .") (internal citations omitted).

38. Despite Landlord's repeated request for payment or an update on the situation, Kmart retained the Invoices without objection or communication for over ten months. Courts have routinely held that a defendant's retention of invoices for a period of even five months without objection entitles plaintiff to judgment as a matter of law on a cause of action for account stated. *Spectra Audio Research, Inc. v. 60-86 Madison Ave. District Mgmt. Ass'n, Inc.*, 267 A.D.2d 23, 24 (1st Dept 1999) ("Summary judgment on the cause of action for an account stated was also properly granted based upon defendant's acceptance and retention of plaintiff's monthly rent bills, without objection, for five months." *See also Morrison, Cohen, Singer and Weinstein, LLP v. Waters*, 13 AD 3d 51, 52 (1st Dept 2004) ("In the instant case, plaintiff's invoices were retained without any objection for a sufficient length of time [seven months] as a matter of law to establish

defendant's liability on the account stated cause of action.")

39.     In this case, (i) Landlord undertook the emergency repairs needed at the Premises; (ii) the Landlord properly and repeatedly rendered the Invoices to the Debtors requesting payment of such Invoices; (iii) Kmart to date still has never objected to the costs undertaken by Landlord for the Emergency Work; and (iv) the Invoices remain unpaid.  While Mr. Pukas of Sears Holding Corporation mildly questioned whether the work needed to be performed on an emergency basis, Kmart never disputed that the work was necessary or that the costs incurred by Landlord for the Emergency Work were any different than the costs Kmart would have incurred had it performed the work itself.

40.     Kmart's failure to pay the Invoices sent by Kmart for the cost of the Emergency Work is an Event of Default under Section 25.A(i) of the Lease, which Kmart was required to cure within 15 days after Landlord gave Kmart notice of the Event of Default via the Notice of Default served on September 12, 2018.  As explained in Landlord's Initial Objection, when the Event of Default was not cured within the 15-day period, the Lease terminated on October 23, 2018 on account of the conditional limitation provision of the Lease and Landlord's service of the Lease Termination Notice.

41.     Kmart took no steps before the Petition Date to contest the Notice of Default and did not seek nor obtain a *Yellowstone* injunction against termination of the Lease.  The import of Kmart's failure to cure the Event of Default or obtain a *Yellowstone* injunction prior to Landlord's service of the Termination Notice is that Kmart does not have the opportunity to cure the Event of Default now.  If this Court determines Kmart breached the Lease by its failure to pay the Invoices for the cost of the Emergency Work, it must conclude that the Lease has been terminated in accordance with its terms.  *See In re Artisanal 2015, LLC*, 2017 WL 5125545, * 10 (Bankr.

S.D.N.Y., November 3, 2017) (explaining that debtor tenant's failure to obtain *Yellowstone* injunction means that if debtor is found to have breached its lease, then the lease terminated in accordance with the conditional limitation provision and debtor has no opportunity cure in bankruptcy case ) (citing *See First Nat'l Stores, Inc. v. Yellowstone Shopping Ctr., Inc.,* 21 N.Y.2d, 630, 637, 237 N.E.2d 868, 290 N.Y.S.2d 721 (1968) ("Here, the lease had been terminated in strict accordance with its terms. The tenant did not obtain a temporary restraining order until after the landlord acted. . . . Once the Appellate Division determined that the tenant had in fact defaulted by not installing the sprinkler system, the conclusion had to be drawn that the lease was terminated in accordance with its terms.") and *La Lanterna, Inc. v. Fareri Enterprises, Inc.,* 37 A.D.3d 420, 423-24 (App. Div. 2d Dep't 2007) (tenant's failure to obtain a *Yellowstone* injunction means that if it is determined that the tenant breached lease, it will not have preserved right to cure default)).

42.     When, as occurred here, the term of a lease expires because of a conditional limitation, the landlord is entitled to maintain a summary holdover proceeding under Section 711(1) of the New York Real Property Actions and Proceedings Law to remove the tenant. *Perrotta v. Western Regional Off-Track Betting Corp.*, 98 A.D.2d 1, 469 N.Y.S.2d 504 (4th Dep't 1983); 2 J. Rasch, *New York Landlord and Tenant* § 30.6 (5th ed. 2017-18)). In such a proceeding, as opposed to a nonpayment proceeding brought under Section 711(2) of the New York Real Property Actions and Proceedings Law, a belated tender of unpaid rent by the tenant is not a defense because the lease has already expired. *See* Practical Law Company, "Landlord's Rights and Remedies (Commercial Lease) (NY)" (2019) ("In a holdover case, there is no right for a commercial tenant to cure a default after the lease has been terminated by the landlord.") Thus, even if Kmart were now able and willing to pay the Additional Rent due under the Lease arising from Debtors' failure to reimburse Landlord for the Emergency Work and the interest that has

17

accrued on the Additional Rent, Kmart cannot cure the default because the Lease has expired and Kmart does not have the right under New York law to revive the Lease.

## JOINDER AND RESERVATION OF RIGHTS

43. Paragraph 18 of the Notice of Cure Costs and Potential Assumption and Assignment provides that Buyer "intends to designate the [Lease] for assumption and assignment free and clear" of the Restrictive Covenants (as defined therein), but fails to identify the Restrictive Covenants that the Buyer is seeking to extinguish or diminish. In any event, Landlord objects to the assignment of the Lease free and clear of any Restrictive Covenants; any transfer of the Lease must be subject to, and cannot be free and clear of, applicable Restrictive Covenants. Accordingly, Landlord hereby submits a "Restrictive Covenant Objection" (as defined in the Notice of Cure Costs and Potential Assumption and Assignment).

44. Landlord hereby joins in the adequate assurance of future performance objections filed by other landlords with respect to the foregoing filings by the Buyer, and demands to receive in connection with any assignment of the Lease, the same forms of adequate assurance extended to the landlords objecting to the form of adequate assurance of future performance proposed by the Debtors and Buyer.

45. In addition to the foregoing specific objections, Landlord expressly reserves its rights to supplement this Objection or to make additional objections as Landlord determines is appropriate, including on the basis that additional defaults are discovered under the Lease.

[Remainder of page intentionally left blank.]

WHEREFORE, Landlord requests that the Court sustain its Initial Objection and this Supplemental Objection and grant such further relief as it deems fair and appropriate.

Dated: Uniondale, New York
      May 20, 2019

                         By:    /s/ *Patrick Collins*
                                  Patrick Collins
                                  Veronique A. Urban
                                  400 RXR Plaza
                                  Uniondale, New York 11556
                                  Tel:    (516) 227-0700
                                  Fax:   (516) 227-0777

                                  *Attorneys for Midwood Management Corp., as agent for Expressway Plaza I, LLC and Farmingville Associates Phase 1, LLC as tenants in common*

19

FF\8398892.3