**Hearing Date and Time: May 29, 2019 at 1:30 p.m. (Prevailing Eastern Time)**
**Objection Date and Time: May 22, 2019 at 4:00 p.m. (Prevailing Eastern Time)**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Chelsey Rosenbloom
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for ESL Investments Inc. and certain of its affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                   :

**In re**                            :          **Chapter 11**
                                   :

**SEARS HOLDINGS CORPORATION,** *et al.*,  :          **Case No. 18-23538 (RDD)**
                                   :

**Debtors.**[1]                    :          **(Jointly Administered)**
                                   :

------------------------------------------------------------x

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR-Rover De Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**OBJECTION OF ESL INVESTMENTS, INC. TO
DISCLOSURE STATEMENT FOR JOINT CHAPTER 11
PLAN OF SEARS HOLDINGS CORPORATION AND ITS AFFILIATED DEBTORS**

ESL Investments, Inc. and certain of its affiliated entities (including JPP, LLC and JPP II,

LLC (collectively, "ESL")) in their capacities as creditors of Sears Holdings Corporation and

certain of its affiliates (collectively, "Sears" and with respect to its Chapter 11 affiliates, the

"Debtors"), by its undersigned counsel, hereby submit this objection (the "Objection") pursuant to

section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy

Code") to the approval of the Debtors' proposed disclosure statement (the "Disclosure Statement")

[Docket No. 3895] for the *Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its*

*Affiliated Debtors* (the "Plan") [Docket No. 3894], dated as of May 16, 2019, and the

accompanying *Motion for an Order (I) Approving Disclosure Statement; (II) Establishing Notice*

*and Objection procedures for Confirmation of the Plan; (III) Approving Solicitation Packages and*

*Procedures for Distribution Thereof; (IV) Approving the Forms of Ballots and Establishing*

*Procedures for Voting on the Plan; and (V) Granting Related Relief* [Docket No. 3277], dated as

of April 17, 2019.[2]  In support of this Objection, ESL respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Disclosure Statement does not provide adequate information under Section

1125 of the Bankruptcy Code.   As a result, it deprives ESL—and other creditors—of the

opportunity to make an informed decision as to whether to vote to accept or reject the Plan.

2.      ESL has attempted to resolve various disclosure-related objections through several

rounds of comments on the Plan and Disclosure Statement, but the Debtors have not accepted all

necessary comments.  While ESL believes that substantive corrections to the Disclosure Statement

---

[2]      Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the
Plan or Disclosure Statement, as applicable.

are required in order to meet the threshold requirement of providing "adequate information" in accordance with the Bankruptcy Code, at a minimum, the Disclosure Statement must make clear that there are disputes over the issues raised in this Objection.[3]

3.       First, the Disclosure Statement incorrectly describes the proper recovery sources for the ESL 507(b) Priority Claims by purporting to deny the ESL 507(b) Priority Claims any recoveries from the Other Assets and the Credit Bid Release Consideration, which ESL believes violates the priority scheme of the Bankruptcy Code and contravenes treatment previously approved by this Court in the Sale Order.  To the extent this error is not corrected, the Disclosure Statement should describe ESL's views on this issue.

4.       Second, the Disclosure Statement misstates the recovery that the ESL Unsecured Claims are entitled to by denying the ESL Unsecured Claims recoveries from the Credit Bid Release Consideration.  Again, neither the Bankruptcy Code nor the Sale Order supports the Debtors' approach.  The Disclosure Statement should be revised to correct this misstatement or at least acknowledge a dispute with ESL on this issue.

5.       Third, the Disclosure Statement lacks necessary facts to allow voting creditors to discern the implications of the settlement between the PBGC and the Debtors (the "PBGC Settlement") as the Disclosure Statement omits sufficient rationale for (i) the preferential treatment of the Allowed PBGC Unsecured Claims, which will receive the first $97.5 million (or, if substantive consolidation is not approved, $80 million) of proceeds from certain causes of action recovered by the Liquidating Trust, at the expense of the General Unsecured Claims and the ESL

---

[3]       ESL has continued to provide comments to the Debtors on the Plan and Disclosure Statement on a timeline close to the deadline to the Disclosure Statement.  To the extent that any aspect of this Objection has been addressed by incorporation of ESL's comments in a subsequently filed version of the Disclosure Statement, this Objection shall be withdrawn solely as to those aspects that are, in ESL's discretion, adequately addressed.  Further, ESL has separately provided to the Debtors additional clarifying changes to the Plan and the Disclosure Statement, which are not raised in this Objection because of their non-substantive nature.

3

Unsecured Claims and (ii) alleged benefits of the PBGC Settlement to the Debtors' estates and creditor recoveries, including support for the validity of the alleged $143 million administrative claim held by KCD.

6.      Fourth, the Disclosure Statement fails to carry the burden of demonstrating that substantive consolidation is permissible in these cases and instead relies on a flimsy argument that substantive consolidation should be judged by a lesser "reasonable basis" standard because it is part of a settlement with a single creditor, the PBGC, that was granted disproportionately better treatment in exchange for its support for the Plan.  The Disclosure Statement should be revised to reflect the proper standard, which clearly provides that substantive consolidation can be pursued only when it benefits all creditors and not solely based on a settlement with a single creditor.

7.      Fifth, the Disclosure Statement does not provide any backup for the Debtors' calculation of the Administrative Expense Claims or the assets available to satisfy those claims, and fails to inform creditors that the Debtors and the estates may be administratively insolvent.

8.      Sixth, contrary to the agreement reached in the Asset Purchase Agreement and approved by this Court in the Sale Order, the Disclosure Statement incorrectly implies that all ESL Claims are subject to disallowance, which could lead creditors to incorrectly value their recoveries in reliance on the belief that ESL's claims will be disallowed.

9.      Seventh, the Disclosure Statement does not provide adequate information regarding ESL's view of the Subcommittee's investigation and related complaint, which information is necessary to allow creditors to more accurately assess the probabilities of success of the Subcommittee's complaint.

10.     Eighth, the Disclosure Statement fails to properly describe the various disputes between the Debtors and Transform with regards to the Asset Purchase Agreement.

11.    <u>Finally</u>, the Disclosure Statement fails to adequately describe the intended tax treatment of the Intercompany Claims, as set forth in the Asset Purchase Agreement and Sale Order.

12.    While the Disclosure Statement describes a Plan that is unconfirmable for several reasons, including treatment of the ESL 507(b) Priority Claims in a manner that violates the priority scheme of the Bankruptcy Code, unfair discrimination against the ESL Unsecured Claims and General Unsecured Claims, and impermissible substantive consolidation, ESL acknowledges that the focus of the Disclosure Statement Hearing is on adequacy of the Disclosure Statement. Therefore, ESL has refrained from making Plan confirmation objections at this stage and reserves its rights to supplement this Objection and, absent appropriate revisions to the Plan, will object to these and potentially other issues in the context of proposed Plan confirmation.

13.    Accordingly, the Disclosure Statement should not be approved absent implementation of certain modifications as further described below.

## <u>BACKGROUND</u>

14.    On April 17, 2019, the Debtors filed the proposed disclosure statement (the "<u>Original Disclosure Statement</u>") [Docket No. 3276] for the *Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (the "<u>Original Plan</u>") [Docket No. 3275] with the Bankruptcy Court.

15.    Subsequently, on May 9, 2019, the Debtors filed the *Notice of Adjournment of Disclosure Statement Hearing* [Docket No. 3770], which extended the deadline for objecting to the Disclosure Statement to May 20, 2019 at 4:00 p.m. (Eastern Time) and extended the date of the Disclosure Statement hearing to May 29, 2019 at 1:30 p.m. (Eastern Time).

16.     On May 16, 2019, the Debtors filed the Plan and Disclosure Statement with the Bankruptcy Court as well as the *Notice of Adjournment of Disclosure Statement Objection Deadline* [Docket No. 3899] extending the deadline to object to the Disclosure Statement until May 22, 2019 at 4:00 p.m. (Eastern Time).

17.     In an effort to reach a consensual resolution, ESL has been in contact with the Debtors and has provided numerous comments to the Plan and Disclosure Statement.  The Plan and Disclosure Statement address many of ESL's concerns with the Original Plan and Original Disclosure Statement, but a number of issues remain unresolved as further described in this Objection.

## ARGUMENT

18.     A disclosure statement must contain "adequate information," which is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor [typical of holders of claims and interests] of the relevant class to make an informed judgment about the plan." See 11 U.S.C. § 1125(a)(1); see also Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869, 873 (2d Cir. 1991) (holding that section 1125(b) "requires Chapter 11 petitioners to file a mandatory disclosure statement listing all 'adequate information' which would enable holders of claims to take an informed position on a proposed reorganization plan").

19.     While what constitutes "adequate information" is assessed on a case-by-case basis, a disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan."  In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 981

6

(Bankr. N.D.N.Y. 1988); see also In re Quigley Co., Inc., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). Even if the adequate information floor is satisfied, any additional information included must be "accurate" and "not misleading." See In re Adelphia Communications Corp., 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006).

20.     For the reasons further described below, the Disclosure Statement contains inadequate or inaccurate information that will prevent ESL and other creditors from fully assessing the extent to which the Plan will impact them. Thus, the Disclosure Statement should not be approved in its current form and should be revised to provide adequate disclosure.

### A.    The Disclosure Statement Does Not Adequately Disclose the Recovery Sources for the ESL 507(b) Priority Claims

21.     The Plan and Disclosure Statement at best fail to accurately describe, and at worst limit without basis, the sources of recovery available to the ESL 507(b) Priority Claims. While ESL acknowledges that it agreed to forfeit recoveries from the Specified Causes of Action and to establish an upper limit of priority recoveries from the Other Causes of Action, ESL never agreed to any other differing treatment of its 507(b) claims as compared to other 507(b) claims.

22.     Under the Plan, holders of Allowed Other 507(b) Priority Claims (which specifically exclude ESL's claims under section 507(b) of the Bankruptcy Code) are entitled to recovery from the proceeds of the Total Assets. Plan at 20. The Total Assets include (i) Other Causes of Action, (ii) Other Assets, (iii) the Credit Bid Release Consideration and (iv) the Specified Causes of Action. Plan at 15. In contrast, holders of Allowed ESL 507(b) Claims are permitted to recover solely from the Other Causes of Action up to the ESL 507(b) Cap. Plan at 20.

23.     In connection with the sale transaction, ESL (as defined in the Asset Purchase Agreement) agreed only to forego recovery from a limited universe of claims, which claims are

now defined in the Plan as the "Specified Causes of Action." Asset Purchase Agreement, Section

9.13(c). Additionally, ESL agreed to cap its section 507(b) recoveries from the Other Causes of

Action in the amount of $50 million, with any amounts that would have resulted in distributions

from the Other Causes of Action in excess of the $50 million cap treated as unsecured claims.

Asset Purchase Agreement, Section 9.13(c). In relevant part the Asset Purchase Agreement

provides:

> After giving effect to the credit bid set forth in Section 3.1(b), ESL shall be entitled
> to assert any deficiency Claims, Claims arising under Section 507(b) of the
> Bankruptcy Code, or other Claims and causes of action that it may have against the
> Debtors and their estates in the Chapter 11 Cases, provided that (i) no Claims or
> causes of action of ESL shall have recourse to, or any other right of recovery from,
> any Claims or causes of action of the Debtors or their estates related to Lands' End,
> Inc., the "spin-off" (as such term is defined in the Information Statement of Lands'
> End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth
> Properties, L.P, the "Transaction" (as that term is defined in the registration
> statement on Form S- 11 filed by Seritage Growth Properties, which registration
> statement became effective on June 9, 2015), any Claim or cause of action
> involving any intentional misconduct by ESL, or the proceeds of any of the
> foregoing, *(ii) any ESL Claims arising under Section 507(b) of the Bankruptcy
> Code shall be entitled to distributions of not more than $50 million from the
> proceeds of any Claims or causes of action of the Debtors or their estates other
> than the Claims and causes of action described in the preceding clause (c)(i);
> provided that, in the event that, in the absence of this clause (c)(ii), any such
> proceeds to the Debtors or their estates would have resulted in distributions in
> respect of such ESL Claims in excess of $50 million, the right to receive such
> distributions in excess of $50 million shall be treated as an unsecured claim and
> receive pro rata recoveries with general unsecured claims other than the Claims
> and causes of action described in the preceding clause (c)(i)* . . . .

Asset Purchase Agreement, Section 9.13(c) (emphasis added).

24.     This exact language was expressly approved by the Bankruptcy Court in the Sale

Order. Sale Order, ¶ 7(c).

25.     With the exception of waiving recoveries from the Specified Causes of Action and

agreeing to a ceiling solely as to the priority recoveries from the Other Causes of Action, ESL did

not agree to any other limitation on the ESL 507(b) Priority Claims' right to recovery. However,

8

the Plan does not grant recoveries from the Other Assets or the Credit Bid Release Consideration

to the ESL 507(b) Priority Claims despite the fact such sources are available to provide recoveries

to the Other 507(b) Priority Claims.

26.    It is clear from the Asset Purchase Agreement (and the Sale Order, which expressly

and specifically approved these provisions) that the ESL 507(b) Cap applies to amounts "*from the

proceeds of any Claims or causes of action of the Debtors or their estates other than the [Specified

Causes of Action]."*   Asset Purchase Agreement, Section 9.13(c) (emphasis added).   The agreed

cap in no way restricts ESL's ability to recover from any source other than the Other Causes of

Action.   If the cap was intended to apply to assets other than the Other Causes of Action, there

would have been no reason to include the language "from the proceeds of any Claims or other

causes of action of the Debtors or their estates" to qualify the agreed-upon cap.

27.    Without regard for the agreement reached between the parties, the Plan provides

recoveries from the Other Assets and the Credit Bid Release Consideration to holders of Other

507(b) Priority Claims, but not to holders of the ESL 507(b) Priority Claims.   By denying the ESL

507(b) Priority Claim's right to recover from the Other Assets and the Credit Bid Release

Consideration, the Plan denies ESL's recovery to a much larger set of assets and claims than was

agreed upon in the Asset Purchase Agreement and the Sale Order.[4]

28.    The Disclosure Statement and the correlating provisions in the Plan should be

modified to reflect that the ESL 507(b) Priority Claims are entitled to recovery from the Other

Assets and the Credit Bid Release Consideration.   ESL proposes to correct the sections of the Plan

---

[4]    In the version of the Plan and Disclosure Statement initially filed with the Bankruptcy Court, the Debtors
permitted ESL 507(b) Priority Claims to recover from the Other Assets indicating that their initial reading of the
controlling language was aligned with ESL's reading.   Subsequently, the Plan was revised to further restrict ESL's
recovery sources, but no reason for the detrimental change was provided to ESL.

9

and Disclosure Statement describing the treatment of the ESL 507(b) Priority Claims as set forth

below:

> Unless otherwise agreed by the holder of such Claims, to the extent any ESL
> 507(b) Priority Claims are Allowed, ESL shall receive, from the Debtors or the
> Liquidating Trust, as applicable, and, in full and final satisfaction, settlement,
> release, and discharge of such Allowed ESL 507(b) Priority Claims, payment in
> Cash from (a) Net Proceeds of Other Causes of Action up to the ESL 507(b) Cap,
> with any remaining Allowed ESL 507(b) Priority Claims that would have resulted
> in Distributions from the Net Proceeds of Other Causes of Action treated as ESL
> Unsecured Claims, (b) Net Proceeds of Other Assets and (c) the Credit Bid
> Release Consideration; provided, that, for the avoidance of doubt, any Allowed
> ESL 507(b) Priority Claim that would have resulted from the Net Proceeds of
> Other Causes of Action in excess of the ESL 507(b) Cap shall be treated as an
> ESL Unsecured Claim without duplication in respect of any deficiency claim
> allocable to the subject debt instrument for which the ESL 507(b) Priority Claim
> was Allowed.

29.    At a minimum, if the Debtors dispute the proper treatment of the ESL 507(b)

Priority Claims, the Disclosure Statement should add a description of the Debtors' legal and factual

basis for their proposed the treatment of the ESL 507(b) Priority Claims and inform creditors that

ESL could prevail on this dispute at Plan confirmation, which could adversely affect the recoveries

of other creditors and potentially render the Plan unconfirmable due to administrative insolvency.

Approval of the Disclosure Statement in the absence of either of the above suggested corrections

will result in an inadequate disclosure of the potential recoveries due to the ESL 507(b) Priority

Claims.

30.    Additionally, the Disclosure Statement indicates that the estimated administrative

expense claims do not include any 507(b) claims, giving creditors no insight into the magnitude

of claims of a priority class of claims likely to impact their recoveries.  In fact, the Disclosure

Statement leaves creditors with no guidance that holders of 507(b) claims were granted valid and

perfected liens, let alone which assets are the collateral for those liens.   In addition to including a

description of the 507(b) claims established pursuant to this Court's prior orders and the adequate

protection liens provided, in order to provide more complete disclosure to creditors regarding the

scope of the 507(b) claims, ESL proposes the below disclosure be incorporated Section IV.T of

the Disclosure Statement:

> While the Debtors' estimates of Administrative Expense Claims do not include
> any amounts on account of claims entitled to priority under section 507(b) of the
> Bankruptcy Code, the amount of 507(b) claims could be substantial and may
> impact the Debtors' ability to demonstrate administrative solvency.  For example,
> at the Sale Hearing, Transform suggested that its adequate protection claims could
> be $700-900 million.  Pursuant to the Final DIP ABL Order and the Final Junior
> DIP Order, ESL received claims pursuant to section 507(b) of the Bankruptcy
> Code to the extent of diminution in value of its interest in the collateral securing
> the Prepetition FILO Term Loan, the Stand-Alone L/C Facility, the Second Lien
> Credit Facility, and the Second Lien PIK Notes, respectively.  The Final DIP ABL
> Order and the Final Junior DIP Order also provide ESL with valid and perfected
> adequate protection liens  in respect of its positions for these debt instruments,
> which liens are secured by (a) in the case of the Prepetition FILO Term Loan and
> the Stand-Alone L/C Facility, all assets securing the DIP ABL Facility and (b) in
> the case of the Second Lien Credit Facility and the Second Lien PIK Notes, all
> assets securing the DIP ABL Facility that are owned by the entities obligated on
> the underlying second lien debt.  Subsequently, pursuant to the Sale Order, each
> of ESL's secured claims were deemed allowed for all purposes in the amounts set
> forth on Schedule G to the Asset Purchase Agreement.

**B.    The Disclosure Statement Inadequately Describes Recovery for ESL
Unsecured Claims**

31.    The Disclosure Statement fails to adequately describe the recoveries to which the

ESL Unsecured Claims are entitled.  The Plan deprives the ESL Unsecured Claims of the proceeds

of the Credit Bid Release Consideration, which is provided to PBGC Claims and General

Unsecured Claims.  Nothing in the Asset Purchase Agreement or the Sale Order provides that ESL

waived its rights to recover from the Credit Bid Release Consideration on account of its unsecured

claims.  Accordingly, at current, the Disclosure Statement inaccurately describes the recovery

available to the ESL Unsecured Claims and fails to disclose that there is a dispute over the proper

treatment of the ESL Unsecured Claims, which impacts creditors' ability to anticipate their

recoveries.

11

32.    To correct this fatal defect, the definition of General Unsecured Trust Recovery in the Plan should be revised as follows:

> *"**General Unsecured Trust Recovery**"* means (a) Net Proceeds of General Assets, after payment in full satisfaction of all Allowed Other Secured Claims, ESL 507(b) Priority Claims (subject to the ESL 507(b) Cap), Other 507(b) Priority Claims, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims (or maintenance of amounts in the Disputed Claim Reserve on account of any of the foregoing claims that are Disputed), and the PBGC Liquidating Trust Priority Interest; ~~and~~ (b) proceeds of the Wind Down Account, subject to the full satisfaction of all Allowed Administrative Expense Claims, Priority Non-Tax Claims, and Priority Tax Claims (or maintenance in the Disputed Claim Reserve on account of any of the foregoing Claims that are Disputed)~~;~~ and (c) the Credit Bid Release Consideration, subject to payment in full satisfaction of all Allowed Administrative Expense Claims, Priority Tax Claims, Other 507(b) Priority Claims, Priority Non-Tax Claims, Other Secured Claims (or maintenance in the Disputed Claim Reserve Account(s) on account of any of the foregoing Claims that are Disputed), and the PBGC Liquidating Priority Trust Interest.

And, for completeness, the definition of "Specified Unsecured Recovery" in the Plan should be revised as follows:

> *"**Specified Unsecured Recovery**"* means Net Proceeds of the Specified Causes of Action ~~and the Credit Bid Release Consideration~~, subject to payment in full satisfaction of all Allowed Administrative Expense Claims, Priority Tax Claims, Other 507(b) Priority Claims, Priority Non-Tax Claims, Other Secured Claims (or maintenance in the Disputed Claim Reserve on account of any of the foregoing Claims that are Disputed), and the PBGC Liquidating Trust Priority Interest.

33.    If the Debtors insist on excluding the ESL Unsecured Claims from recoveries from the Credit Bid Consideration, the Disclosure Statement should, at the very least, disclose that ESL disputes the treatment of the ESL Unsecured Claims, which could impact the recoveries for other claimholders if ESL prevails on its arguments at Plan confirmation.  Absent the foregoing proposed revisions, or at a minimum disclosure of the dispute, the Disclosure Statement should not be approved.

C.    **The Disclosure Statement Does Not Contain Adequate Information Regarding the PBGC Settlement**

34.    Without input from other creditors or approval from the Bankruptcy Court, the Debtors and the PBGC apparently reached agreement on the terms of a settlement on February 6, 2019 as to the disputes between the Debtors and the PBGC, the barebones framework of which is memorialized in the PBGC Term Sheet [Docket No. 2529].  To date, no copy of the Settlement Agreement has been filed with the Bankruptcy Court or provided to ESL.

35.    The limited disclosures regarding the PBGC Settlement in the Disclosure Statement and the PBGC Term Sheet reveal that in exchange for PBGC agreeing to accept the Plan and serve as the single impaired consenting class, the Debtors granted the PBGC a secured right to the first $97.5 million (or if the substantive consolidation settlement is not approved, $80 million) of Net Proceeds of Specified Causes of Action and Other Causes of Action.

36.    Section IV.U of the Disclosure Statement claims that the PBGC Settlement is favorable to the Debtors' estates "[b]ecause KCD has very few creditors besides the PBGC and Sears Re, [and] the PBGC Settlement effectively ensures that KCD will not file an Administrative Expense Claim against the Debtors, thereby eliminating a potential $143 million administrative claim."  Disclosure Statement at 52.  This explanation has three significant defects.  First, the Disclosure Statement does not explain why and how the PBGC is able to cause KCD to take any action with regards to the alleged Administrative Expense Claim.  Second, the Disclosure Statement appears to suggest that the potential $143 million claim held by KCD is legitimate and is likely to be an allowed Administrative Expense Claim.  However, the validity of this purported $143 million claim has not been proven and is subject to substantial doubt for reasons the Debtors know but have not disclosed.  Third, the Disclosure Statement lacks justification to support the disparate treatment among the Debtors' unsecured claims including why the PBGC Claims should

13

be entitled to preferential treatment in the form of the first $97.5 million (or if the substantive consolidation settlement is not approved, $80 million) of Net Proceeds of Specified Causes of Action and Other Causes of Action.[5]

37.    The Debtors' rationale for PBGC Claim's favorable treatment is that the PBGC Settlement was necessary to "avoid[] the costly, time consuming and wasteful litigation that could have [arisen] out of the Royalty Payments and KCD's potential Administrative Expense Claim." Disclosure Statement at 52.  However, as discussed above, the Debtors provide no analysis of the validity of the potential $143 million administrative claim or the PBGC's capacity to cause KCD to take (or refrain from taking) any actions.  This plainly disproportionate and unjustified favorable treatment of the PBGC Claims is impermissible and must be corrected in the Disclosure Statement.

38.    Because of these three deficiencies, creditors, including ESL, cannot properly evaluate whether the PBGC Settlement actually benefits the Debtors' estates and creditor recoveries or the extent of such benefits.

39.    The Disclosure Statement also does not reveal that if—as Transform believes—certain provisions of the PBGC Settlement breached the terms of the Asset Purchase Agreement, that breach would give rise to damages that would be classified as Administrative Expense Claims. Without this crucial information, creditors may mistakenly believe that the PBGC Settlement only reduced the Debtors' administrative expense burdens and could not create further burdens to the Debtors' estates.

40.    Exacerbating the impact of the skeletal description of the PBGC Settlement in the Disclosure Statement, the Plan and the Disclosure Statement do not provide any indication to

---

[5]    As noted above, ESL understands that it would not be entitled to recover from the proceeds of Specified Causes of Action.

creditors as to when the PBGC Settlement Agreement will be filed with the Bankruptcy Court. There is no reason for such delay in filing an agreement that was reached in early February 2019, other than to compromise the ability of creditors to fully review and challenge the agreement and evaluate its terms.

41.     The Disclosure Statement must elaborate on the terms and consequences of the PBGC Settlement so that creditors can better understand its implications and cast an intelligent vote.  At the very least, the PBGC Settlement Agreement must be filed with the court no less than thirty calendar days prior to the deadline to object to the Plan to permit creditors an opportunity to evaluate its impact.  ESL has requested a copy of the PBGC Settlement Agreement on this timeline but the Debtors have inexplicably rejected these requests.

### D.       The Disclosure Statement Fails to Describe the Applicable Standard for Substantive Consolidation

42.     The Plan contemplates substantive consolidation, which impacts recoveries for all creditors.  However, rather than attempting to comply with the test set forth in In re Augie/ Restivo Baking Co., 860 F.2d 515 (2d Cir. 1988) —a standard the Plan would have no hope of meeting— the Plan hides behind a settlement with a single creditor in order to invoke a much lower threshold for approval.  In re Iridium Operating LLC, 478 F.3d 452 (2007) applies the Rule 9019 standard to pre-plan settlements that violate the absolute priority rule, but does not comment on settlements that mandate substantive consolidation for all creditors based on an agreement with a single creditor.  While the In re Iridium Operating LLC standard may govern the approval of the settlement with the PBGC, it does not vitiate the Debtors' obligations under In re Augie/Restivo Baking Co.  The Disclosure Statement only notes in passing that "the Debtors considered whether the Augie/Restivo standard could be satisfied to evaluate the merits and risks of substantive consolidation of the Debtors." Disclosure Statement at 54-55. As explained in Augie/Restivo,

15

"[t]he sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors." In re Augie/Restivo Baking Co., 860 F.2d at 518.  While ESL acknowledges that certain of these issues may be addressed more fully in the context of proposed confirmation of the Plan, it is clear that substantive consolidation is not beneficial for all creditors and does not ensure equal treatment.  As a single example of the harsh results caused by substantive consolidation, ESL, like other second lien creditors, has a number of guarantee claims against various Debtor entities which are not entitled to any distributions under the Plan.  Plan at 25-26.  Accordingly, the Disclosure Statement must be revised to set forth a demonstration of how the Plan complies with the Augie/Restivo standard.[6]

### E.    The Disclosure Statement Does Not Contain Adequate Information to Assess Administrative Solvency

43.    The Disclosure Statement indicates that the Debtors estimate their combined assets to exceed Administrative Expense Claims by a mere $32 million.  Disclosure Statement at 50-51.  However, that small buffer does not appear to account for any 507(b) claims or any Administrative Expense Claims that may be asserted by Transform for breaches of the Asset Purchase Agreement by the Debtors.  Furthermore, in reaching the $32 million delta, the Debtors appear to rely on Transform absorbing "up to $270 million of these liabilities."  Disclosure Statement at 50.  The Disclosure Statement glosses over the fact that under the Asset Purchase Agreement, Transform is not responsible for assuming these liabilities in the event that the Debtors failed to deliver specific assets in specific amounts described in the Asset Purchase Agreement.  Because of these shortfalls, Transform believes it has no obligation to assume $43 million in Severance Reimbursement

---

[6]        ESL acknowledges that the Disclosure Statement describes a toggle mechanism under which the Plan will revert to a liquidation plan for each debtor if the Substantive Consolidation Settlement is not approved.  However, even the toggle mechanism does not save the flaws of the Plan.  As noted below, even if the Plan is a liquidation plan for each debtor, the Disclosure Statement does not adequately disclose that the Plan may not provide for the payment in full of administrative expense claims as required by the Bankruptcy Code.

16

Obligations (as defined in the Asset Purchase Agreement) or $139 million in Assumed 503(b)(9) Liabilities (as defined in the Asset Purchase Agreement). Nor does it have an obligation with respect to $166 million in Other Payables (as defined in the Asset Purchase Agreement) with respect to items other than Ordered Inventory (as defined in the Asset Purchase Agreement) as discussed briefly at the Sale Hearing. Transform has not agreed to absorb these amounts and in light of the small margin of error in the Debtors' administrative insolvency analysis, it appears that the Plan will not provide for the payment in full of all Administrative Expense Claims after these additional adjustments are made. In addition to ESL asserting ESL 507(b) Priority Claims which could exceed hundreds of millions of dollars, Transform intends to assert Administrative Expense Claims for the Debtors' breaches of the Asset Purchase Agreement, each of which will further impact the assessment of the Debtors' administrative insolvency.

44.    The Disclosure Statement does not explain how the Debtors concluded that there is an "agreement by Transform to absorb up to $270 million of [Administrative Expense Claim] liabilities" and "$52 million in cash and inventory currently being withheld by Transform Holdco." Disclosure Statement at 50. The Debtors provided no basis for the $270 million number. It is unclear, what, if any shortfall amounts, the Debtors assumed will be deducted from Transform's obligations to pay Administrative Expense Claims. It is also unclear if the $52 million referenced is a subset of the $57.5 million that the Debtors alleged in its Motion to Enforce [Docket No. 2796] that Transform had withheld, and if so, how the Debtors reached the $52 million number.

45.    In order to provide creditors with adequate information, the Disclosure Statement must explain how the Debtors calculated the $270 million and $52 million figures referenced above and inform creditors that the Debtors' administrative insolvency analysis may be impacted by the ongoing disputes regarding the Asset Purchase Agreement and reconciliations of the

17

Aggregate DIP Shortfall Amount, Specified Receivables Shortfall Amount, Warranty Receivables Shortfall Amount and Prepaid Inventory Shortfall Amount as well as additional administrative claim amounts that will likely be asserted as further described in Section II.A. hereof.

46.    In addition, the Disclosure Statement should disclose that potential damages arising from the breaches of the Asset Purchase Agreement by the Debtors as alleged by Transform could further compromise the Debtors' administrative solvency.    While the Disclosure Statement mentions that the Debtor's estimate of Administrative Expense Claims does not include those that may be asserted by Transform, the Disclosure Statement does not explicitly inform creditors that these amounts may render the Debtors administratively insolvent.    This information is crucial for creditors seeking to assess the viability of the proposed plan.

**F.    The Disclosure Statement Implies ESL's Secured Claims are Subject to Questions of Allowance**

47.    Footnote 8 of the Debtors' Disclosure Statement indicates that recoveries on account of the ESL Unsecured Claims are "subject to objection(s) pursuant to section 502(d) and setoff for unpaid amounts due to the Debtors".    Disclosure Statement at 8, fn. 8.    This ignores the agreement reached between the parties under the Asset Purchase Agreement.    Pursuant to the Asset Purchase Agreement, the Debtors covenanted that they would not seek to "disallow, subordinate, recharacterize, avoid, challenge, dispute or collaterally attack the ESL Claims".    Asset Purchase Agreement, Section 9.13(a)(ii).    The ESL Claims include each of ESL's claims identified in Exhibit G to the Asset Purchase Agreement.    The ESL Claims were each "deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the credit bid set forth in Section 3.1(b) [of the Asset Purchase Agreement]".    Asset Purchase Agreement, Section 9.13(b).    This exact language is reflected in the Sale Order.    Sale Order, ¶ 7(b).    An action pursuant to 502(d), seeking disallowance, clearly falls

18

within the confines of an action challenging allowance.[7]  Accordingly, any deficiency claim on account of the ESL Claims, which have already been allowed by order of this Court, is immune from any claims or causes of action pursuant to section 502(d).  Consequently, those claims cannot be subject to setoff, which by definition would undermine the agreement between the parties.  In fact, at the Sale Hearing, counsel to the Restructuring Subcommittee and counsel to the unsecured creditors committee each acknowledged that the Credit Bid Release included in the Asset Purchase Agreement incorporated a release of 502(d) claims.  Hr'g Tr. 125:16, Feb. 7, 2019 ("[I]n light of all of ESL's claims being allowed, what is fundamentally problematic from our perspective with the release, the credit bid, and the consideration for those two things is that *with the 502(d) remedy given up* . . . .") (emphasis added).  Only ESL's unsecured claims that are not deficiency claims on account of its already allowed secured claims could potentially be subject to 502(d) actions.  Accordingly, the Disclosure Statement should not be approved prior to limiting footnote 8 to apply only to ESL's unsecured claims, but not its deficiency claims.  ESL proposes the below language be included as revised footnote 8:

> The ESL Unsecured Claims that constitute 2018 Unsecured SHC PIK Notes Claims are Ssubject to objection(s s) pursuant to section 502(d) and setoff for unpaid amounts due to the Debtors.  For the avoidance of doubt, each of the ESL Claims (as defined in the Asset Purchase Agreement) has been deemed allowed for all purposes in the amounts set forth on Exhibit G to the Asset Purchase Agreement.  Therefore, no deficiency claims on account of the ESL Claims are subject to 502(d) objections or setoff.

48.    Additionally, to accurately reflect this revision, the below new definitions must be incorporated into the Plan:

> "***2018 Unsecured SHC PIK Notes***" means the notes issued under the 2018 Unsecured SHC PIK Notes Indenture.

---

[7]    While not dispositive in and of itself, ESL notes that the title to Section 502 of the Bankruptcy Code is "Allowance of Claims or Interests" further supporting the notion that a 502(d) action would be a challenge to allowance.

"*2018 Unsecured SHC PIK Notes Claims*" means all Claims arising under, derived from, or in connection with the 2018 Unsecured SHC PIK Notes and/or the 2018 Unsecured SHC PIK Notes Indenture.

"*2018 Unsecured SHC PIK Notes Indenture*" means that certain Supplemental Indenture, dated as of March 20, 2018 (as amended, supplemented or otherwise modified prior to the date hereof) to that certain Indenture, dated as of November 21, 2014 (as amended, supplemented, or otherwise modified prior to the date hereof) between Sears Holdings Corporation and Computershare Trust Company, N.A., as trustee.

**G.      The Disclosure Statement Lacks Adequate Information Regarding the Restructuring Subcommittee Investigations**

49.      The Disclosure Statement highlights that the Subcommitee filed an adversary complaint following its investigation into prepetition related party transactions.  Disclosure Statement at 37.  However, the Disclosure Statement contains no information regarding the defendants' view of the complaint.  Nor does it provide an explanation as to why the Related Party Transaction Committee, which approved each of the challenged transactions, are not named in the adversary complaint.

50.      Additionally, the Disclosure Statement should be amended to describe why the Related Party Transaction Committee, which approved the challenged transactions, are not named defendants.  To the extent that the Debtors have determined that the Related Party Transaction Committee, which was well advised by Weil Gotshal & Manges LLP and Centerview Partners for many years, did not engage in any wrongful conduct, that is obviously relevant information for creditors evaluating whether to accept or reject the Plan which purports to rely on recoveries from litigation challenging such transactions.  And for the reasons described above, actions pursuant to 502(d) cannot be initiated in respect of ESL's secured claims.  Accordingly, the below sentence must be deleted from Section M. 2 of the Disclosure Statement:

> Pending resolution of the adversary complaint, the Debtors or the Liquidating Trustee, as applicable, intend to object to ESL's claims pursuant to section 502(d) of the Bankruptcy Code.

51.    Accordingly, ESL proposes that Section IV.M.2 of the Disclosure Statement be revised as follows:

> ~~Pending resolution of~~ESL has informed the Debtors that it denies the allegations in the adversary complaint~~, the Debtors or the Liquidating Trustee, as applicable, intend to object to ESL's claims pursuant to section 502(d) of the Bankruptcy Code.~~ and firmly believes that the allegations are baseless.  As ESL has repeated throughout the Chapter 11 Cases, ESL believes that it provided the Debtors with financing on an arm's length basis, regularly including other stockholders or third parties, with the review and approval of a committee of independent directors counseled by independent, experienced financial and legal advisors.  ESL also participated on a pro rata basis with other stockholders in transactions in which the Debtors disposed of non-core businesses made available on the same terms to all Sears stockholders.  ESL believes that it has many defenses to the claims and that those claims are defective in numerous respects, including (without limitation) that many of the claims set forth in the complaint are time-barred, the Debtors were solvent at the time of each such transaction (demonstrated by, among other things, the fact that Sears received solvency opinions from an independent expert, Sears' market capitalization exceeded $4 billion at the time of the Lands' End spin-off, and Sears' market capitalization was about $3 billion around the time of the Seritage Transaction),  that reasonably equivalent value was provided to the Debtors in the Seritage Transaction and that any underlying claims with respect to the Seritage Transaction were released as part of the 2015 settlement of a shareholder derivative lawsuit related to the transaction.

**H.    The Disclosure Statement Does Not Contain Adequate Information Regarding the Post-Closing Disputes with Transform**

52.    As this Court is well aware, following the closing of the Sale Transaction, Transform and the Debtors have had several disputes relating to the enforcement of the Asset Purchase Agreement, including the Debtors' potential breach of certain provisions of the Asset Purchase Agreement.

53.    On March 6, 2019, Transform filed its Motion to Mediate suggesting that the disputes between the parties be resolved through mediation.  The Disclosure Statement incorrectly characterizes the Motion to Mediate as arguing in part that the Debtors breached the Asset Purchase Agreement by "(iv)  requesting the return of certain credit card accounts receivable reserves, totaling approximately $14.6 million in pre-Closing credit-card transaction proceeds that

had, after Closing, been swept into bank accounts transferred to the Buyer along with the rest of

the Debtors' cash-management system, delivered to the Buyer during the Sale Closing." No such

funds had been swept into bank accounts transferred to Transform and Transform's Motion to

Mediate does not allege as such. Accordingly, the portion of Section IV. Q of the Disclosure

Statement which describes the Buyer's Motion to Mediate should be revised as below:

> In relevant part, the Motion to Mediate asserted that the Debtors had breached
> their obligations under the Asset Purchase Agreement by: (i) failing to manage
> accounts payable in accordance with their pre-petition cash management policies
> and practices in the ordinary course of business; (ii) failing to order inventory in
> the ordinary course of business; (iii) mischaracterizing certain accounts
> receivables, with a book value of $255 million; (iv) requesting the return of
> ~~certain~~the alleged excess credit card accounts receivable, held as reserves by
> various credit card payment processors, which Transform argued were not credit
> card accounts receivable, totaling approximately $14.6 million in pre-Closing
> credit-card transaction proceeds that ~~had, after Closing, been swept into bank
> accounts transferred to the Buyer along with the rest of the Debtors' cash-
> management system,~~were included in the calculation of assets delivered to the
> Buyer during the Sale Closing under Section 10.9 of the Asset Purchase
> Agreement; and (v) failing to deliver the full amount of warranty receivables
> required under the Asset Purchase Agreement.

Additionally, other descriptions of the dispute must be revised to accurately portray both sides of

the disputes as below. Accordingly, the appropriate sentences in Section IV.Q of the Disclosure

Statement should be revised as below:

> The parties were not, however, able to reach any agreement concerning the claim
> regarding the alleged $14.6 million excess credit card accounts receivable. Also
> on March 20, 2019, Transform filed a number of agreements between Sears and
> various credit-card payment processors (the "***Processing Agreements***") which,
> Transform contended, were relevant to whether it was obligated to turn over the
> $14.6 million excess credit card accounts receivable to the Debtors.

> During the hearing, the Bankruptcy Court ruled that, under the Asset Purchase
> Agreement, the Debtors were entitled to retain the $14.6 million excess credit-
> card accounts receivable as "Excluded Assets." but denied the Debtors' Motion
> on its argument that Transform violated the automatic stay. On May 8, 2019, the
> Bankruptcy Court entered the *Order Enforcing Asset Purchase Agreement
> Against Transform Holdco LLC* (ECF No. 3742).

22

54.    Furthermore, the Disclosure Statement acknowledges that the Debtors and Transform have an ongoing dispute regarding Transform's allegation that the Debtors failed to deliver title to all of the Debtors' real property located the Village of Hoffman Estates, Illinois. However, the Disclosure Statement fails to include the most recent event in this dispute. Accordingly, the paragraph of Section IV.Q of the Disclosure Statement describing the dispute over Hoffman Estates should be revised to add the below sentence:

> The Debtors responded to Transform's response on May 17, 2019.

55.    Similarly, the portion of the Section IV.Q of the Disclosure Statement describing setoffs under the Asset Purchase Agreement must be revised as below:

> In the interim, the Debtors continue to confer with Transform, counsel for Transform, and Transform's financial advisors concerning the Debtors' claim that Transform's continuedhas failured to turn over millions of dollars in Estate property, including February rent proration and cash in transit, on the basis of what are in the Debtors' view inappropriate "setoffs." The Debtors believe that the setoffs violate the automatic stay, *see* 11 U.S.C. § 362; it is the Debtors' understanding that Transform believes the setoffs are proper under the Asset Purchase Agreement. The Debtors and Transform also continue to confer on Transform's claim that the Debtors owe Transform millions of dollars for obligations of the Debtors that Transform satisfied on the Debtors' behalf, including over $108 million in accounts payable.

56.    Finally, Section IV.Q of the Disclosure Statement should be updated to add the following disclosure regarding Transform's ongoing disputes with the Debtors under the Asset Purchase Agreement.

> On May 20, 2019, Transform sent a letter to the Debtors summarizing the ongoing disputes under the APA and offering to meet to resolve these issues. The letter states that Transform believes that (i) the Debtors have caused a Prepaid Inventory Shortfall Amount (as defined in the Asset Purchase Agreement) of $72 million and further consequential damages, (ii) the Debtors have caused a Specified Receivables Shortfall Amount (as defined in the Asset Purchase Agreement) in excess of $150 million, (iii) the Debtors have failed to deliver 13 of 16 parcels of land that make up the Hoffman Estates, (iv) the Debtors entered into a settlement with the PBGC that contravenes provisions of the Asset Purchase Agreement, (v) the Debtors violated the Asset Purchase Agreement by

23

asking Transform to assume Other Payables and payment obligations not related to Ordered Inventory, (vi) the Debtors inflated the amount of Other Payables and payment obligations owed by Transform under the Asset Purchase Agreement, and (vii) Transform is entitled to the portion of the Adequate Assurance Deposit to certain Utility Providers pursuant to the *Order Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers* [Docket No. 431] and approximately $2.5 million in entitlement to a tax credit ordered to be disbursed under the Court's *Order Directing Partial Turnover of EDA Funds to Debtors and Reserving Balance Pending Court Order* [Docket No. 3678], as well as any further proceeds from Debtors' litigation over the tax credit.

**I.     The Disclosure Statement Inadequately Describes the Treatment of Intercompany Claims**

57.     The Disclosure Statement states that "[o]n the Effective Date, except as provided in Section 5.1(b)(iii) of the Plan, all Intercompany Claims shall be cancelled and Holders of Intercompany Claims shall not receive any Distributions on account of such Intercompany Claims."  Disclosure Statement at 8, 62.  This language is inconsistent with the Debtors' agreements in the Asset Purchase Agreement and fails to adequately provide for the treatment of the Intercompany Claims as is necessary to secure and preserve the intended tax treatment of the transactions contemplated by the Asset Purchase Agreement.

58.     As set forth in the Asset Purchase Agreement, each of the Debtors and Transform desired and intended that the transactions set forth in the Asset Purchase Agreement, together with the Plan, would (unless Transform elected otherwise pursuant to the Asset Purchase Agreement) constitute one or more plans of reorganization under section 368(a)(1)(G) of the Internal Revenue Code of 1986, as amended (the "Code").  In order to be treated as a plan of reorganization under section 368(a)(1)(G) of the Code, a transaction must satisfy certain requirements, including that the company subject to the reorganization make certain distributions to holders of such company's stock or securities.  Thus, even though the Intercompany Claims ultimately will be extinguished under the Plan, the mechanics by which the claims are extinguished bear on the tax treatment of

24

the transactions set forth in the Asset Purchase Agreement and approved in the Sale Order.  See Asset Purchase Agreement, Section 2.12(a).

59.    In this regard, Section 9.2(a) of the Asset Purchase Agreement specifically states that "Buyer shall provide to the Sellers detailed instructions as to steps to take (or not take) in order to secure and preserve the qualification of any of the transactions set forth in this Agreement as a Tax Reorganization . . . including with respect to (i) repayment, cancellation or settlement of, or other actions with respect to, intercompany accounts after the approval of the Bankruptcy Plan and on or before the Closing Date . . ." Asset Purchase Agreement, Section 9.2(a).

60.    Accordingly, ESL proposes to revise Section V.C.6(b) of the Disclosure Statement (and the corresponding section of the summary in Section I.C in the Disclosure Statement) as set forth below:

> On the Effective Date, except as provided in Section 5.1(b)(iii) of the Plan, all Intercompany Claims shall be cancelled and Holders of Intercompany Claims shall not receive any Distributions, no separate distributions shall be made under the Plan on account of such Intercompany Claims, and such Claims shall be extinguished by distribution, contribution, or otherwise, in the discretion of the Debtors and in accordance with Section 9.2(a) of the Asset Purchase Agreement.

61.    Debtors have not yet agreed to include this language in the Disclosure Statement despite Debtors' obligations under Section 9.2(a) of the Asset Purchase Agreement.  Indeed, Debtors' obligation to take actions as instructed by Buyer in order to ensure that certain of the transactions contemplated in the Asset Purchase Agreement would be treated as reorganizations for U.S. federal income tax purposes was expressly approved by the Bankruptcy Court in the Sale Order.  Sale Order, ¶ 11(b).

62.    The foregoing proposed revision does not change the overall result that the Intercompany Claims will be extinguished under the Plan.  It is neutral to Debtors and to any and all holders of the Allowed Claims.  Nonetheless, the proposed revision would contribute

importantly to the intended tax treatment of the transactions set forth in the Asset Purchase Agreement and Sale Order. Absent its inclusion, the Disclosure Statement should not be approved.

## CONCLUSION AND RESERVATION OF RIGHTS

63.    ESL reserves its rights to supplement this Objection upon the filing of any supplements or amendments to the Disclosure Statement or Plan by the Debtors and in filing this Objection, ESL does not admit to the accuracy of any other statements contained in the Disclosure Statement. ESL reserves its rights to raise any and all objections to (i) approval of the Disclosure Statement and solicitation procedures for the Plan and (ii) confirmation of the Plan. ESL further reserves its rights to vote on the Plan and to take any other action permitted or required under the Bankruptcy Code and other applicable law.

64.    For all of the foregoing reasons, ESL respectfully requests that the Court require the Debtors to modify the Disclosure Statement and the Plan as set forth herein, or, in the alternative, grant such other relief as the Court deems appropriate.

Dated:  New York, New York
        May 22, 2019

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: */s/ Sean A. O'Neal*
    Sean A. O'Neal
    Luke A. Barefoot
    Chelsey Rosenbloom
    One Liberty Plaza
    New York, NY 10006
    Telephone: (212) 225-2000
    Fax: (212) 225-3999

    *Attorneys for ESL Investments, Inc. and certain of its affiliates*