Edward M. Fox
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Phone: 212-218-5500
Fax: 212-218-5526
Email: emfox@seyfarth.com

*Attorneys for Wilmington Trust, National Association,
as indenture trustee and collateral agent*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 18-23538 (RDD) |
| SEARS HOLDINGS CORPORATION, *et al.,* | ) |
| | ) (Jointly Administered) |
| Debtors.[1] | ) |

## OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE AND COLLATERAL AGENT, TO DEBTORS' MOTION FOR APPROVAL OF DISCLOSURE STATEMENT

Wilmington Trust, National Association, as indenture trustee and collateral agent

("Wilmington Trust") by and through its undersigned counsel, hereby files this *Objection of*

*Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent, to Debtors'*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365) (collectively, the "Debtors"). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

*Motion for Approval of Disclosure Statement (the "Objection") in opposition to Debtors' Motion for An Order (I) Approving Disclosure Statement; (II) Establishing Notice and Objection Procedures for Confirmation of the Plan; (III) Approving Solicitation Packages and Procedures for Distribution Thereof; (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan; and (V) Granting Related Relief*[2] [Dkt. No. 3277], and in support thereof state as follows:

## BACKGROUND

### The 2010 Notes

1.      Pursuant to an indenture dated as of October 12, 2010 (as amended from time to time, the "2010 Indenture") between Sears Holdings Corporation ("Sears"), the Guarantors Party thereto (the "Guarantors") and Wells Fargo Bank, National Association ("Wells Fargo"), as trustee and collateral agent, Sears issued the 6-5/8 Senior Secured Notes due 2018 (the "Second Lien Notes").

2.      Pursuant to an Instrument of Resignation, Appointment, and Acceptance dated as of June 25, 2014, by and among Sears, Wilmington Trust and Wells Fargo, Wilmington Trust became the successor indenture trustee (the "Prepetition Second Lien Notes Trustee") with respect to the Second Lien Notes.

### The Security Agreement

3.      Pursuant to the Amended and Restated Security Agreement dated as of March 20, 2018, (the "Security Agreement") among Sears, the Guarantors and Wilmington Trust, as collateral agent (the "Prepetition Second Lien Collateral Agent"), the Prepetition Second Lien

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Amended Plan (as hereinafter defined), the Amended Disclosure Statement (as hereinafter defined) or the Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief (the "Final DIP Order") [Dkt. No. 955].

Collateral Agent holds a security interest in the Collateral (as defined in the Security Agreement),[3] including Cash Collateral (as defined in 11 U.S.C. § 363(a)), to secure repayment of (i) the fees and expenses of the Second Lien Collateral Agent, (ii) the fees and expenses of the Second Lien Credit Facility Agent and the Second Lien Trustees, (iii) the Second Lien Credit Facility Claims, and the Second Lien PIK Notes, and (iv) the Second Lien Notes.

### The Bankruptcy Filing

4.      On October 15, 2018, each of the Debtors filed voluntary petitions for relief under Chapter 11 of title 11, U.S.C. in the United States Bankruptcy Court for the Southern District of New York, (the "Bankruptcy Court").

5.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[3] Section 2.1 of the Security Agreement states:

2.1  Collateral; Grant of Security Interest.  Each Grantor hereby grants to the Collateral Agent for the equal and ratable benefit of the Secured Parties a security interest in all of the following property now owned, or at any time hereafter acquired, by such Grantor or in which such Grantor now has, or at any time in the future may acquire, any right, title or interest (collectively, the "Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of such Grantor's Secured Obligations:

(a)  all Credit Card Accounts Receivable;

(b)  all Inventory;

(c)  all Chattel paper relating to Credit Card Accounts Receivable;

(d)  all Instruments relating to Credit Card Accounts Receivable;

(e)  all Documents relating to any Inventory;

(f)  all books and records pertaining to the Collateral; and

(g)  to the extent not otherwise included, all Proceeds, insurance claim, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

39358915v.1

## Use of Cash Collateral and Adequate Protection

6.      On November 30, 2018, pursuant to the Debtors' Motion for Authority to

(A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to

Prepetition Secured Parties; and (D) Schedule Second Interim Hearing and Final Hearing, dated

October 15, 2018 [Dkt. No. 7] (the "DIP Financing Motion"), the Bankruptcy Court entered the

Final DIP Order.

7.      As adequate protection of the interest of the Prepetition Second Lien Credit

Parties, the "Prepetition Second Lien Collateral Agent, on behalf of itself and the other

Prepetition Second Lien Credit Parties," was granted "a valid and perfected replacement and

additional security interest in, and liens on . . . all DIP ABL Collateral owned by the Prepetition

Second Lien Loan Parties," Final DIP Order ¶17(d). "DIP ABL Collateral" is defined to mean

"Prepetition ABL Collateral and all other assets of the DIP ABL Loan Parties, whether now

owned or hereafter acquired, and all proceeds thereof, including all deposit accounts, securities

accounts, cash and cash equivalents of the DIP ABL Loan Parties . . . ." Final DIP Order ¶13.

8.      In addition, as additional "adequate protection of the interests of the Prepetition

Second Lien Credit Parties in the Prepetition Second Lien Collateral, including any Cash

Collateral, the Prepetition Second Lien Collateral Agent . . . was granted an allowed

administrative claim against the Prepetition Second Lien Loan Parties' estates under section

503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the

Bankruptcy Code to the extent of any Second Lien Diminution in value . . . to the extent that the

Prepetition Second Lien Adequate Protection Liens are insufficient to protect the Prepetition

Second Lien Credit Parties' interests in the Prepetition Second Lien Collateral." Final DIP Order

¶ 18(d).

39358915v.1

### The Plan and Disclosure Statement

9.       On April 17, 2019, the Debtors filed their Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors (the "Plan") [Dkt. No. 3275].

10.      On April 17, 2019, the Debtors also filed their Disclosure Statement for the Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors in Support of the Plan (the "Disclosure Statement") [Dkt. No. 3276].

11.      On May 3, 2019, the Debtors filed a *Notice of Filing of Exhibits to the Disclosure Statement for Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* [Dkt. No. 3618], which included a Recovery Analysis as Exhibit C to the Disclosure Statement and a Liquidation Analysis (the "Liquidation Analysis") as Exhibit D to the Disclosure Statement.

12.      On May 16, 2019, the Debtors filed their Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors (the "Amended Plan") [Dkt. 3896].

13.      On May 16, 2019, the Debtors also filed their Disclosure Statement for Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors (the "Amended Disclosure Statement") [Dkt. No. 3896], which included an amended Liquidation Analysis (the "Amended Liquidation Analysis") as Exhibit C thereto.

### OBJECTION

**I.      THE DISCLOSURE STATEMENT FAILS TO CONTAIN ADEQUATE INFORMATION**

**A.      Adequate Information**

14.      Section 1125(b) of the Bankruptcy Code requires the proponent of a plan to provide a disclosure statement containing "adequate information." In turn, "adequate information" is defined as:

39358915v.1

> Information of a kind, and in sufficient detail, as far as is
> reasonably practicable in light of the nature and history of the
> debtor and the condition of the debtor's books and records . . . that
> would enable such a hypothetical investor of the relevant class to
> make an informed judgment about the plan. . . .

11 U.S.C. § 1125(a)(1).

15.     Full and fair disclosure is the foundation of chapter 11, and the adequacy of

information contained in the disclosure statement is of paramount importance. *See, e.g.*, In re

Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994) ("[o]f prime importance in the

reorganization process is the principle of disclosure"); Oneida Motor Freight, Inc. v. United

Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988) ("[t]he importance of full disclosure is underlaid

by the reliance placed upon the disclosure statement by the creditors and the court. Given this

reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the

Code standard of 'adequate information'"); In re Galerie Des Monnaies, Ltd., 55 B.R. 253, 259

(Bankr. S.D.N.Y. 1985) ("preparing and filing of a disclosure statement is a most important step

in the reorganization of a Chapter 11 debtor").

16.     A disclosure statement must "contain simple and clear language delineating the

consequences of the proposed plan on [creditors'] claims and the possible Code alternatives so

that [creditors] can intelligently accept or reject the Plan." In re Copy Crafters Quickprint, Inc.,

92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988); *see also* In re Ferretti, 128 B.R. 16, 19 (Bankr.

D.N.H. 1991) (disclosure statement must "clearly and succinctly inform the average unsecured

creditor what it is going to get, when it is going to get it, and what contingencies there are to

getting its distribution"). In particular, a disclosure statement must provide enough information

for parties in interest to understand the financial ramifications of the plan based on the particular

facts and circumstances of the case at hand. *See, e.g.*, In re McLean Indus., Inc., 87 B.R. 830,

834-35 (Bankr. S.D.N.Y. 1987); In re Ionosphere Clubs, Inc., 179 B.R. 24, 29 (S.D.N.Y. 1995).

6

17.    A plan proponent has an obligation in the first instance – namely, with the filing
of the disclosure statement – to set forth information sufficient to allow parties in interest to
make informed decisions about the plan. For the reasons set forth below, the Amended
Disclosure Statement fails to meet the requirements of section 1125 of the Bankruptcy Code.

**B.    Replacement Liens and Superpriority Claims**

18.    The Amended Disclosure Statement, like the Disclosure Statement before it,
provides no information concerning the Interim DIP ABL Order and the Final DIP ABL Order as
they relate to the use of the Collateral, including Cash Collateral, and to the grant of
(i) replacement liens on all of the assets of the Prepetition Second Lien Loan Parties,[4] including
the proceeds of Causes of Action, and (ii) superpriority claims, as adequate protection of the
interests of the Prepetition Second Lien Credit Parties.

19.    The Debtors must explain in detail to the holders of Second Lien Debt what liens
and claims they were provided under the Final DIP Order, and the value of those liens and
claims.  Moreover, the Debtors must explain to the Prepetition Second Lien Credit Parties why
the Debtors believe that, despite the grant of replacement liens in all of the assets of the
Prepetition Second Lien Loan Parties, including the proceeds of Causes of Action, the Debtors
nevertheless treat them as unsecured creditors in Class 4 under the Amended Plan, and why the
Debtors believe the superpriority claims granted to them as adequate protection also have no
value.

20.    Section IV. D. of the Amended Disclosure Statement should be amended to
include this information, which is important to holders of Second Lien Debt who are being asked
to vote on the Amended Plan as unsecured creditors.  Section V. A. of the Amended Disclosure

---

[1] If the Debtors' estates are substantively consolidated, the replacement liens and superpriority claims will extend to
the assets of all of the Debtors.

7

Statement should also be amended to include this information with respect to the superpriority claims.

### C.    Voting by Second Lien Debt

21.    Section 3.7 of the Amended Plan now provides that holders of Second Lien Debt Claims will receive the same treatment as holders of Other Secured Claims in Class 2 "to the extent such Claim is Secured," According to Section V. B. 7. of the Amended Disclosure Statement, Claims in Class 2 are unimpaired and not entitled to vote on the Amended Plan.

22.    The Amended Disclosure Statement fails to explain the source of the cash the Debtors will use to make the cash payments to holders of Other Secured Claims which, the Debtors assert, will cause the Other Secured Claims to be unimpaired.  Moreover, the Amended Disclosure Statement fails to explain how the Amended Plan satisfies the requirements of 11 U.S.C. § 1124(1) or (2) with respect to the secured portion of the Second Lien Debt.

### D.    Substantive Consolidation

23.    The Debtors assert in Section V. D. 1. of the Amended Disclosure Statement that the Amended Plan, which results in the substantive consolidation of the Debtors, contains a settlement of substantive consolidation, not actual substantive consolidation.[5]

24.    The Debtors fail to explain why they are entering into a settlement with the PBGC providing for substantive consolidation, however, when they originally reached a settlement with the PBGC that prohibited substantive consolidation.[6]  The Debtors also fail to explain how they were able to propose the Plan, which did not provide for substantive consolidation, but now claim they must do the opposite.  Further, the Debtors must explain how they would be able to

---

[5] The Debtors are attempting to achieve substantive consolidation under the standard for approval of settlements rather than under the much higher standard for substantive consolidation.

[6] In fact, there was no dispute between the Debtors and the PBGC concerning substantive consolidation until the Debtors decided to create one.

8

revert to not substantively consolidating the Debtors if the PBGC settlement is not approved,

given that they argue now that substantive consolidation is justified.

25.    To justify their substantive consolidation "settlement," the Debtors assert that an

analysis of intercompany claims would delay recoveries and be expensive, but they fail to

provide any analysis which shows that the analysis would cost more than the $17.5 million the

Debtors have agreed to pay the PBGC for this "settlement," or that preparing the analysis would

take longer than the litigation which funds the Amended Plan would take to result in significant

recoveries.

26.    Moreover, the Debtors state that

> While the Debtors' accounting systems identifies (sic) the entities
> to which intercompany payables are due or for which
> intercompany receivables are due in the ordinary course, the
> millions of entries are netted automatically by the accounting
> system and are not summarized by the Debtor.

Amended Disclosure Statement, Section IV. V. The Debtors do not provide any explanation why

the automatic netting is not reliable or, consequently, why a forensic examination of the

accounting system is even necessary.

27.    The Debtors also fail to explain the necessary scope of any such forensic

examination, such as whether it would have to extend back to the creation of Sears Roebuck and

Co. in 1893, to the merger of Kmart Corporation and Sears, Roebuck and Co. in 2005, or to

some more recent date.

28.    Further, the Debtors fail to explain why the PBGC should receive an increased

recovery as a result of substantive consolidation, while other creditors with guaranty claims

against multiple Debtors, such as the holders of Second Lien Debt, do not.

9

39358915v.1

29.     Lastly, the Amended Disclosure Statement should show the difference in recoveries by creditor class, both with and without substantive consolidation, so creditors can assess the effect this so called "settlement" has on their respective recoveries.

**E.**     **The Amended Liquidation Analysis May Not Be Approved**

30.     The Debtors attach the Amended Liquidation Analysis as Exhibit C to the Amended Disclosure Statement.  Pursuant to the Debtors' assumptions, the Amended Liquidation Analysis shows a $105 million reduction in creditor recoveries in the event of conversion of these cases to a chapter 7 liquidation.  The assumptions have no basis in fact, however, and the liquidation analysis should not be included in its current form in the Amended Disclosure Statement.

31.     First, the Debtors assert that

> gross recoveries on Avoidance and Litigation Actions are presumed to be 25% less in a chapter 7 scenario as compared to a chapter 11 scenario because the Debtors assume that there is a higher likelihood of settlement and pressure to expedite recoveries in a chapter 7 scenario.

Amended Disclosure Statement, Exhibit C, III. 6.  The Debtors provide no empirical or other evidence to support their assumption, however, and on that basis alone, it should not be permitted.

32.     Moreover, the Debtors own Amended Plan provides that

> The Liquidating Trustee, . . ., shall, in an **expeditious** but orderly manner, liquidate and convert to Cash the assets of the Liquidation Trust, make timely distributions and not unduly prolong the duration of the Liquidation Trust.

Amended Plan, Article VI 6.6 (b).  [Emphasis added.]  Consequently, there is no reason for the Debtors to assume there is any more time pressure on a Chapter 7 Trustee than on the Liquidating Trustee.  Moreover, as a fiduciary, a chapter 7 trustee has at least the same, if not

10

greater, fiduciary duty than the Liquidating Trustee to maximize the value of the Estates' Avoidance and Litigation Actions.

33.    Lastly, the Debtors fail to explain that a Chapter 7 Trustee would be required to obtain court approval of any settlement and creditors would be able to object if they believe the settlements are not reasonable.  In contrast, the Amended Plan permits the Liquidating Trustee to settle claims without court approval and with no opportunity for creditors to object.

34.    Next, the Debtors assume that post-conversion professional fees would be $30 million higher in a chapter 7 because the Liquidation Analysis

> assumes that the Trustee would retain its own professionals to assist in the liquidation and wind down of the Debtors' Estates.

Amended Disclosure Statement, Exhibit C. III. 3.  There is no basis for this assumption by the Debtors, however, and it should not be permitted.

35.    Moreover, the Amended Plan permits the Liquidating Trustee to

> retain professionals to assist in performing its duties under the Plan, subject to approval of the Liquidating Trust Board;

Amended Plan, Article VI. 6.6(b)(vi).  Consequently, there is no reason to believe that a Chapter 7 Trustee is any more likely to cause the estate to incur greater professional fees in a chapter 7 liquidation than the Liquidating Trustee will incur in a chapter 11, particularly if they both retain counsel on a contingency basis, in which event the fees would be the same.  Moreover, payment of a Chapter 7 Trustee's professionals will be subject to court approval, with an opportunity for creditors to object, while payment of the Liquidating Trustee's professional will not.

36.    Under the Amended Plan, a Liquidating Trustee will be appointed along with a Liquidating Trust Board.  Amended Plan, Article VI. 6.6 (a).  This Liquidating Trustee and the Liquidating Trust Board will also have to "get up to speed on the Debtors and their Estates, including on various litigation claims."  Amended Disclosure Statement, Exhibit C. III. 3.

11

37.      Finally, the Debtors assume that a Chapter 7 Trustee will be paid 3% of distributed proceeds for total fees of $7 million, while the Liquidating Trustee and the Liquidating Trust Board will, apparently, work for free.

38.      In fact, 11 U.S.C. § 326(a) provides that the court may award the Chapter 7 Trustee "reasonable compensation not to exceed 3 percent," [emphasis added].  Any Liquidating Trustee will insist on being paid at least as much, if not more.

39.      Accordingly, there is no basis for the Debtors to assert that conversion of this case to a chapter 7 will cost more than keeping it in chapter 11, and they should be prohibited from making such assumptions in their Liquidation Analysis.

**F.      Specific Objections**

40.      In addition to the foregoing objections, the following provisions of the Amended Disclosure Statement must be amended as indicated.

41.      Amended Disclosure Statement, Section I. D. Summary of Plan Releases and Exculpation Provisions and Section V. J. 9. Releases.  The Amended Disclosure Statement should specify what Preserved Causes of Action may exist against the Specified Directors and Officers, particularly to the extent such Preserved Causes of Action arose prior to the Commencement Date.

42.      Amended Disclosure Statement Section II. E. 1. (c).  The credit bid under the Second Lien Credit Facility was for $433,450,000, not $361.2 million.

43.      Amended Disclosure Statement Section II. E. 1. (e).  The Second Lien Notes not only "were scheduled to mature" on October 15, 2018, they did mature on October 15, 2018, although they remain unpaid.

12

### G.    Proposed Form of Order

44.    In paragraph 48 of the Motion, the Debtors request that a class that casts no votes to accept or reject the Amended Plan, but that contains holders entitled to vote, be deemed to have voted to accept the Amended Plan.  This request violates 11 U.S.C. § 1126(c). Consequently, decretal paragraph 18 of the Debtors' proposed order approving the Amended Disclosure Statement cannot be approved and should be deleted from the proposed order.

### H.    Ballots

45.    Master Ballot, Annex A.  The "6.625% Second Lien Notes 10/15/2018" and the "6.625% Second Lien Notes 10/5/2020 (Reg. S)" should be referred to as the 6-5/8% Senior Secured Notes due 2018.

46.    Beneficial Owner Ballot, Annex A.  The "6.625% Second Lien Notes 10/15/2018" and the "6.625% Second Lien Notes 10/5/2020 (Reg. S)" should be referred to as the 6-5/8% Senior Secured Notes due 2018.

## II.    THE DEBTORS' PROPOSED BALLOTING AND SOLICITATION PROCEDURES CONCERNING HOLDERS OF SECOND LIEN NOTES SHOULD NOT BE APPROVED

### A.    Holders of Second Lien Notes Must Be Allowed to Separately Vote Their Claims in Class 2 and Class 4

47.    The Beneficial Holder Ballot provides:

> Since the Plan consists of separate Chapter 11 Plans for each of the Debtors, your vote in Item 2 above will be applied to each applicable Debtor and in all applicable classes in the same manner as indicated in Item 2.

Beneficial Holder Ballot at 12.

48.    Fed. R. Bankr. P. 3018(d) provides:

> "Acceptance or Rejection by Partially Secured Creditor.  A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim shall be entitled to accept or reject a plan in both capacities."

13

Similarly, 11 U.S.C. § 1126(a) provides: "The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." Accordingly, the solicitation and balloting procedures must allow for separate voting in Class 2 and Class 4 by holders of Second Lien Notes.

49.    Administrative convenience is not a valid basis for denying Holders of Second Lien Debt with Claims in both Class 2 and Class 4 the right to vote their claims separately. "The expression of acceptance or rejection of a plan is not a meaningless exercise and the right to vote should not be abrogated in interest of expediency." *In re Jeppson*, 66 B.R. 269, 294 (Bankr. D. Utah 1986).

50.    Accordingly, the proposed voting procedures must be amended to allow the alleged partially secured holders of Second Lien Debt to separately accept or reject the Plan as creditors in both Class 2 and Class 4, as required by Bankruptcy Rule 3018(d) and 11 U.S.C. § 1126(a).

**B.    Holders of Second Lien Notes Must Be Allowed To Vote Their Claims Separately Against The Issuer and Each Guarantor**

51.    Although the Amended Plan purports to be a single plan for all of the Debtors, the Amended Disclosure Statement provides that the Amended Plan "shall constitute a separate chapter 11 plan of liquidation for each Debtor" in the event the PBGC Settlement Agreement is not approved. Amended Disclosure Statement, VIII. A. 9. Yet the Beneficial Holder Ballot requires the Holders of Second Lien Debt to vote their claims against each applicable Debtor in the same manner.

52.    The Motion provides no basis, and the Amended Disclosure Statement provides no explanation, for this limitation on the right of holders of Second Lien Notes to vote on the

Amended Plan with respect to Sears and each Guarantor, despite the fact that the Amended Plan may constitute a separate plan of reorganization for each of the Debtors.

53.    11 U.S.C. § 1126(a) provides that "the holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." Further, Fed. R. Bankr. P. 3018(a) provides that "[a] plan may be accepted or rejected in accordance with § 1126 of the Code . . . ."

54.    The failure to permit holders of Second Lien Notes to vote to accept or reject each Debtor's separate plan violates 11 U.S.C. § 1126(a), which allows the holder of a claim to vote to accept or reject a plan. *See* In re Northwest Timberline Enterprises, Inc., In re Construction and Real Estate Information Services, Inc., 348 B.R. 412 (Bankr. N.D. TX 2006) ("the Court notes, once again, that these cases are not consolidated so there would have to be separate ballot tallies for each Debtor." *Id.* at 435, n. 36.)

55.    Wilmington Trust has no objection to the use by the Debtors of a single ballot for holders of Second Lien Notes with respect to Sears and each Guarantor, rather than separate ballots, *see* In re CCS Medical, Inc., 210 Bankr. Lexis 5187 (Bankr. D. Del.) February 9, 2010. Nor does Wilmington Trust object if the single ballot also provides for "straight ticket" voting with respect to all applicable Debtors. However, holders of Second Lien Debt, who hold claims against Sears and each Guarantor, must be permitted to vote to accept or reject the Plan with respect to each such Debtor and may not be required to vote the same way with respect to every Debtor against which they hold a claim.

56.    Accordingly, the forms of Beneficial Holder Ballot and Master Ballot should be modified to permit a holder of Second Lien Notes to vote to accept or reject the Amended Plan with respect to each Debtor against which such holder holds a claim.

15

39358915v.1

## RIGHTS RESERVED

57.    Wilmington Trust reserves all rights to assert any objection it may have with respect to the Amended Plan in connection with the proposed confirmation of the Amended Plan.

## CONCLUSION

58.    For the foregoing reasons, Wilmington Trust requests that approval of the Disclosure Statement be denied.

Dated: New York, New York
     May 22, 2019

                    SEYFARTH SHAW LLP

                    By:    */s/ Edward M. Fox*
                         Edward M. Fox
                    *Attorneys for Wilmington Trust, National Association, as indenture trustee and collateral agent*
                    620 Eighth Avenue
                    New York, NY 10018
                    Direct Dial:  (212) 218-4646
                    Direct Fax:  (917) 344-1339
                    Email:  emfox@seyfarth.com

39358915v.1