Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Craig M. Price
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel to Cyrus Capital Partners, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SEARS HOLDINGS CORPORATION, *et al.*, | : | Case No. 18-23538 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | Re: Docket No. 3277 |

## CYRUS CAPITAL PARTNERS, L.P.'S OBJECTION
## TO DEBTORS' DISCLOSURE STATEMENT

Cyrus Capital Partners, L.P. ("Cyrus") respectfully submits this objection ("Objection") to the above-captioned Debtors' *Motion for an Order (I) Approving Disclosure Statement; (II) Establishing Notice and Objection Procedures for Confirmation of the Plan; (III) Approving Solicitation Packages and Procedures for Distribution Thereof; (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan; and (V) Granting Related Relief* (the "DS Motion") [Docket No. 3277], filed on April 17, 2019.[1]

---

[1] Terms not otherwise defined herein shall have the meanings ascribed to them in the DS Motion.

**BACKGROUND**

A. **Cyrus Is a Significant Creditor of the Debtors' Estates with Significant Prepetition Claims, Adequate Protection Rights and Superpriority Administrative Expense Claims.**

1. Cyrus is a significant creditor of the Debtors' estates, holding material positions in: (i) second lien debt instruments issued and guaranteed by various Debtors; (ii) five series of SRAC-issued unsecured notes; (iii) the SRAC 7.00%/12.00% PIK – Toggle Notes due 2028; and (iv) certain SRAC-issued unsecured Medium Term Notes of various interest rates and maturities (collectively, the "Cyrus Prepetition Claims"). In the aggregate, the Cyrus Prepetition Claims exceed $635 million, of which nearly $370 million is guaranteed by one or more Debtors and therefore impacted by the Debtors newly proposed Substantive Consolidation Settlement.

2. In addition to the Cyrus Prepetition Claims, Cyrus and other second lien lenders (collectively, the "Second Lien Lenders"), were granted liens on certain collateral, including cash collateral, under the Final DIP Order[2] to adequately protect the Second Lien Lenders from any diminution in value of their prepetition collateral (the "Prepetition Second Lien Facilities Adequate Protection Claims," as defined in the Final DIP Order). That collateral included substantially all of the assets (with certain specified exclusions) of each of the DIP ABL Loan Parties, *including* the proceeds of avoidance actions and litigation claims (collectively, the "AP Lien Collateral"). As a result, the Prepetition Second Lien Facilities Adequate Protection Claims arising under the Final DIP Order in favor of the Second Lien Lenders are postpetition, secured claims to the extent of the value of the AP Lien Collateral (the "Secured AP Claims").

---

[2] *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (the "Final DIP Order") [Docket No. 955].

3.      Further, to the extent the Prepetition Second Lien Facilities Adequate Protection Claims exceed the value of the AP Lien Collateral, the Second Lien Lenders were also granted post-petition section 507(b) superpriority claims (the "Section 507(b) Claims") to compensate for the "failed" adequate protection.

4.      As described in more detail below, the Disclosure Statement does not contain adequate information regarding, and the Plan does not properly respect the validity and priority of, the Cyrus Prepetition Claims, the Secured AP Claims or the Section 507(b) Claims.

**B.      The Plan Ignores, and the Disclosure Statement Does Not Describe, Previous Court Orders That Were Expressly Designed to Prevent the Debtors from Disregarding Intercompany Rights and Obligations in the Manner Now Proposed in the Plan.**

5.      In addition to the adequate protection provisions described above, the Final DIP Order also contemplated protections for the various lenders, including the Second Lien Lenders, against intercompany "mischief" by the Debtors. Specifically, paragraph 39 of the Final DIP Order requires that:

> The Debtors shall establish reasonable procedures (reasonably acceptable to the Creditors' Committee, the DIP ABL Agents, and the Prepetition Second Lien Credit Parties) to trace cash proceeds from the sale of inventory of the Debtors and to track liabilities and payables of the Debtors, including shared services and professional fees and costs (collectively, the "Allocable Costs"), on an entity by entity basis, including without limitation between obligors and non-obligors under the Prepetition Second Lien Obligations, and to report the same to the Creditors' Committee, the DIP ABL Agents and the Prepetition Second Lien Credit Parties on a monthly basis. At the time of repayment or treatment of the Postpetition Intercompany Obligations pursuant to a chapter 11 plan or otherwise, the Debtors, the Creditors' Committee, the DIP ABL Agents and the Prepetition Second Lien Credit Parties agree to cooperate in good faith to propose and adopt a fair and reasonable allocation of all Allocable Costs on an entity by entity basis.

6.      To date, the Debtors have failed to satisfy this allocation requirement, and they apparently now intend to completely disregard the Court's order fully and finally in the Plan by grouping all prepetition and postpetition claims together and then essentially eliminating them for distribution purposes – thus gutting paragraph 39 of the Final DIP Order altogether, without regard

for the protections the Court was led to believe it was granting. The Court should not permit the Debtors to so casually cast aside requirements carefully crafted by the parties, specifically built into the Final DIP Order and approved by the Court at a critical juncture in these cases.

7. The Debtors propose likewise to completely ignore the express terms of yet *another* final order entered in these cases that was designed to preserve intercompany rights and claims for the benefit of creditors. Specifically, the *Order Authorizing Debtors to Sell Medium Term Notes* (the "MTN Sale Order") [Docket No. 826] provides that:

> In light of the fact that the sale of the MTNs and the deposit of the proceeds into the Winddown Account may affect the assets and liabilities of the respective Debtors, in connection with the chapter 11 plan process, the Debtors, the Creditors' Committee, and the DIP ABL Agents and the Prepetition ABL Agents … will agree upon a true-up mechanism to ensure that no Debtor's estate or creditors is adversely affected as a result of the sale of the MTNs, the deposit of the proceeds therefrom, subject to paragraph 4 hereof, into the Winddown Account or the use of such proceeds in accordance with this Order, which true-up mechanism will be subject to approval by the Court. In the event that the foregoing parties cannot agree upon a true-up mechanism, any dispute will be resolved by the Court.

MTN Sale Order, ¶ 4.

8. The concept of a "true-up" mechanism was specifically included in the MTN Sale Order because the sale of the MTNs would result in large claims against the estates that could prove to be inappropriately dilutive to SRAC creditors (like Cyrus). The Plan as proposed does not incorporate the mechanism required by the MTN Sale Order – and in fact by proposing to disregard intercompany rights and obligations, tramples the very protections the Court presumably thought it was preserving in the MTN Sale Order.

## ARGUMENT

A.  **The Disclosure Statement Fails to Properly Address the AP Lien Collateral, the Secured AP Claims and the Section 507(b) Claims.**

9. The Debtors filed the DS Motion on April 17, 2019 to, among other things, approve a disclosure statement under section 1125 of the Bankruptcy Code related to the *Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* ("Initial Plan") [Docket No. 3275]. The Debtors filed an amended plan (the "Plan") and amended disclosure statement (the "Disclosure Statement") on May 16, 2019 [Docket No. 3896].

10. The Disclosure Statement contains no discussion or description of the adequate protection that was granted to the Second Lien Lenders, nor does it advise interested parties that substantially all of the assets that are proposed as sources of funding for Plan distributions (excluding the Wind Down Reserve and the Carve Out Account but including the proceeds of avoidance actions and other litigation claims) are encumbered to secure the Secured AP Claims.

11. With respect to the AP Lien Collateral, the Disclosure Statement contains no meaningful discussion or description of those assets, where they reside, how much they are worth or the fact that they are encumbered to secure the Secured AP Claims. There is a similar void of information regarding the Secured AP Claims, their potential magnitude and how their existence may impact any recoveries to other creditors. In effect, the Disclosure Statement completely ignores the AP Lien Collateral and the Secured AP Claims, notwithstanding the fact that the Secured AP Claims stand between unsecured creditors and any potential recoveries they might realize under the Plan.

12. Unlike the AP Lien Collateral and the Secured AP Claims, Cyrus' Section 507(b) Claims actually are specifically referenced in the Plan and Disclosure Statement as an "Other 507(b) Priority Claim," which is defined as "a superpriority claim under section 507(b) of the

Bankruptcy Code and the DIP Order asserted by the holder of such Claim (other than by ESL Parties), against the Debtors to the extent such Other 507(b) Priority Claim is Allowed, excluding any ESL 507(b) Priority Claim." Amended Plan § 1.96.  The Plan further also expressly excludes Other 507(b) Priority Claims from the definition of Administrative Expense Claim.  Plan § 1.11 (emphasis added).

13. Given that the Other 507(b) Priority Claims have "superpriority" and therefore rank ahead of "regular" Administrative Expense Claims, the Debtors are correct to define them separately.  Remarkably, however, the Debtors then appear to invert the priorities of the respective claims in terms of treatment.

14. With respect to Administrative Expense Claims, section 2.1(a) of the Plan provides for the payment of such claims in full and in cash.

15. For Other 507(b) Priority Claims, however, rather than providing for payment in full and in cash, section 2.5 of the Plan provides that:

> Unless otherwise agreed by the holders of such Claims, to the extent any Other 507(b) Priority Claims are Allowed, each holder of such Allowed 507(b) Priority Claim shall receive, from the Debtors or Liquidating Trust, as applicable, and, in full and final satisfaction, settlement, release, and discharge of such Allowed Other 507(b) Priority Claims, payment in full in Cash from the Net Proceeds of Total Assets on the latest of (i) the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Other 507(b) Priority Claim becomes an Allowed Other 507(b) Priority Claim, and (iii) the next Distribution Date after such Other 507(b) Priority Claim becomes an Allowed Other 507(b) Priority Claim.
>
> Holders of Allowed Other 507(b) Priority Claims shall be entitled to superpriority administrative expense priority status (a) on a pro rata basis with Allowed ESL 507(b) Priority Claims (solely with respect to the Net Proceeds of General Assets), (b) otherwise senior to all other Administrative Expense Claims and payment pursuant to the Plan prior to the payment of any other Administrative Expense Claims other than Fee Claims (provided, that, Distributions to administrative and junior Claims may be made if an adequate Disputed Claim Reserve is maintained for disputed Other 507(b) Priority Claims).
>
> Notwithstanding the foregoing, in accordance with the DIP Order, the Other 507(b) Priority Claims shall not be entitled to any Cash proceeds of the Wind Down Account.

Plan § 2.5.

16. This convoluted treatment suffers from two fundamental flaws:

- The Debtors do not identify whether or how Net Proceeds from Total Assets – which likely will consist primarily of litigation recoveries that are uncertain and will likely only be available far off in the future – will be available to satisfy (or reserve for) Other 507(b) Priority Claims on the Effective Date, as required under Bankruptcy Code section 1129(a)(9); and

- This treatment would permit the Debtors to pay Fee Claims ahead of Other 507(b) Priority Claims, despite the fact that their relative rankings are exactly the opposite.

**B.    The Debtors' Plan Is Fatally Flawed.**

17. Cyrus also objects to the DS Motion because the Debtors' Plan is fatally flawed and patently unconfirmable on its face. Section 1129(a)(9)(A) of the Bankruptcy Code requires that, unless agreed otherwise, each holder of an administrative expense claim receive cash equal to the allowed amount of such claim prior to any subordinate creditor receiving a recovery. See In re Lehman Brothers Holdings Inc., 508 B.R. 283, 290 (S.D.N.Y. 2014), citing In re Mid Region Petrol., Inc., 1 F.3d 1130, 1132 (10th Cir. 1993) ("Administrative expenses are specially favored post-petition claims, given priority in asset distribution over most other claims against the bankruptcy estate."); 11 U.S.C. § 1129(a)(1) ("The court shall confirm a plan only if ... [t]he plan complies with the applicable provisions of this title."); see also id. at § 1129(a)(9) (providing that administrative expense claims be paid in full, in cash, on the effective date of the plan unless "the holder of [such a] claim has agreed to different treatment").

18. The Plan fails to provide for payment in full and in cash of the Other 507(b) Claims as a condition to confirmation and prior to making distributions to subordinate creditors on account of Fee Claims in clear violation of the absolute priority rule. As such, the Plan as proposed violates the Bankruptcy Code and is unconfirmable.

**C.      The Disclosure Statement Fails to Contain "Adequate Information."**

19.     The DS Motion should also be denied because, as currently proposed, the Disclosure Statement lacks "adequate information" regarding: (a) the AP Lien Collateral, Secured AP Claims and Other 507(b) Claims, and (b) the proposed "Substantive Consolidation Settlement" that the Debtors only recently shoe-horned into the Plan and Disclosure Statement and the violence that does to prior final Court orders entered earlier in these cases.

20.     Section 1125 of the Bankruptcy Code requires that a disclosure statement contain "adequate information" as is "reasonably practicable" given the debtor's circumstances to "enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a). Adequate information "is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties." See In re Copy Crafters Quickprint, Inc., 92 B.R. at 979, citing H.R.Rep. No. 595, 95th Cong., 1st Sess., 224, 408–409. Approval should be withheld if, among other things, "it does not contain such information so that all creditors and equity shareholders can make an intelligent and informed decision as to whether to accept or reject the plan." See e.g., In re Unichem Corp., 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987).

21.     Here, the Debtors have provided creditors with no information whatsoever regarding the extent or value of the AP Lien Collateral or the existence and priority of the Secured AP Claims and Other 507(b) Claims – despite the fact that such liens and claims embodied in those items stand in front of not only unsecured creditors but also administrative claimants, and that the failure to satisfy those claims in full will prevent both confirmation of the Plan and any distributions to subordinate creditors.

22. Similarly, the Debtors have provided creditors with no information whatsoever to understand the newly conceived "Substantive Consolidation Settlement" that shows up for the first time in the May 16, 2019 versions of the Plan and Disclosure Statement. Notably, prior versions of the Plan and Disclosure Statement had expressly stated that the Plan did NOT propose substantive consolidation, so this about-face clearly should come with some explanation – but it does not.

23. In this District, substantive consolidation carries a heavy burden which requires a showing either that: (i) creditors to have dealt with the debtor entities as a single economic unit without relying on the debtors' separateness in extending credit or (ii) the affairs of the debtors to be so entangled that consolidation will benefit all creditors. See In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988). Neither of those factors are present in this instance.

24. Ignoring these legal requirements, and without further explanation, the Plan now provides that Allowed PBGC Unsecured Claims will receive the first $97.5 million of proceeds from certain causes of action recovered by the Liquidating Trust, or, if substantive consolidation is not approved, such claims will receive $80 million.

25. The Debtors do not even attempt to explain how they have suddenly concluded that the facts now justify substantive consolidation – a determination that is both extremely fact-intensive and an extraordinary outcome under relevant case law. Instead, it appears that the Debtors' decision to pursue substantive consolidation is simply a spur of the moment decision made in the course of settlement discussions with the PBGC. But the Debtors do not have the latitude to "wheel and deal" substantive consolidation under the guise of a "settlement" where they do not even bother to explain what is being settled, by whom and for what consideration.

26. This is especially true when the Court has on two prior occasions in these cases entered orders that contain provisions specifically designed to respect the corporate separateness of the various Debtors. As described above, the Final DIP Order expressly requires the Debtors to trace cash proceeds from the sale of inventory and track liabilities and payables of the various Debtors, on an entity by entity basis. The Debtors have failed to do so – and now under the Plan propose to fail to do so *forever*.

27. Similarly, the MTN Sale Order requires that "in connection with the chapter 11 plan process, the Debtors, the Creditors' Committee, and the DIP ABL Agents and the Prepetition ABL Agents … will agree upon a true-up mechanism to ensure that no Debtor's estate or creditors is adversely affected as a result of the sale of the MTNs, the deposit of the proceeds therefrom, subject to paragraph 4 hereof, into the Wind Down Account or the use of such proceeds in accordance with this Order, which true-up mechanism will be subject to approval by the Court." MTN Sale Order, ¶ 4. The Debtors convinced the Court to enter the MTN Order by including this promise, but now seek to cast it aside. The Debtors should not be allowed to shirk these obligations that they specifically agreed to during these cases.

28. Finally, the Disclosure Statement contains insufficient information regarding the PBGC Settlement that is built into the Plan – and in particular the very recent modifications to that settlement that have resulted in the Debtors proposing to increase the priority portion of the claim being granted to the PBGC by more than 20%, apparently in order to obtain the PBGC's acquiescence to the Debtors' newly proposed Substantive Consolidation Settlement. Cyrus reserved the right to conduct discovery regarding the PBGC Settlement and challenge the propriety of that settlement as a confirmation issue.

WHEREFORE, for the reasons set forth in the Objection, Cyrus respectfully requests that this Court: (i) enter an order denying the DS Motion; and (ii) granting such other and further relief as is just and appropriate under the circumstances.

Dated: May 22, 2019
New York, New York

**MILBANK LLP**

By: /s/ Craig M. Price
Eric R. Reimer
Thomas R. Kreller
Robert J. Liubicic
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Craig M. Price
Matthew R. Koch
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel to Cyrus Capital Partners, L.P.*