AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Ira S. Dizengoff
Philip C. Dublin
Sara L. Brauner
Zachary D. Lanier

*Counsel to the Official Committee of
Unsecured Creditors of Sears Holdings Corporation, et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

| | | |
|---|---|---|
| **In re** | : | Chapter 11 |
| | : | |
| **SEARS HOLDINGS CORPORATION, et al.,** | : | Case No. 18-23538 (RDD) |
| | : | |
| **Debtors.[1]** | : | (Jointly Administered) |

------------------------------------------------------------------

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' MOTION FOR AN ORDER (I) APPROVING DISCLOSURE
STATEMENT; (II) ESTABLISHING NOTICE AND OBJECTION PROCEDURES
FOR CONFIRMATION OF THE PLAN; (III) APPROVING SOLICITATION
PACKAGES AND PROCEDURES FOR DISTRIBUTION THEREOF; (IV)
APPROVING FORMS OF BALLOTS AND ESTABLISHING PROCEDURES
FOR VOTING ON THE PLAN; AND (V) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365) ); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..............................................................................................1

OBJECTION................................................................................................................14

I.    The Amended Disclosure Statement Should Not Be Approved Because the Amended Plan Is Patently Unconfirmable............................................................14

    A.    There Is No Basis in Law or Fact to Support Approval of the Substantive Consolidation Settlement ........................................................16

    B.    The Debtors Cannot Demonstrate that the Amended Plan Pays All Administrative Claimants in Full.................................................................24

        1.    The Amended Plan's Proposed Treatment of Administrative Creditors Is Inconsistent with Bankruptcy Code Section 1129(a)(9)........................................................................................25

        2.    The Transform APA Disputes Inhibit the Debtors' Ability To Prove that They Will Be Able To Pay Holders of Administrative Expense Claims in Full .........................................28

        3.    The Debtors' Solvency Analysis Fails to Account for Additional Contingencies and Numerous Risk Factors that Further Inhibit the Debtors' Ability To Demonstrate that They Are Administratively Solvent ...............................................32

    C.    The Amended Plan Has Not Been Proposed in Good Faith and Violates Multiple Bankruptcy Code Provisions.........................................34

    D.    The PBGC Settlement Violates the Bankruptcy Code..............................39

        1.    The UBL Claim Is Overstated ......................................................41

        2.    There Is No Basis for PBGC To Have a Priority Claim ...............43

        3.    Separate Classification of the PBGC Claims Is Improper.............48

    E.    The Releases for Current Officers and Directors Render the Amended Plan Unconfirmable..................................................................49

    F.    The Amended Plan Is Not in the Best Interests of Creditors ....................52

        1.    The Debtors Rely on Flawed, Results-Oriented Assumptions in their Liquidation Analysis....................................53

        2.    To the Extent the Plan Toggles to the Deconsolidated Scenario, the Debtors Improperly Inflate Recoveries....................59

II.    The Amended Disclosure Statement Fails To Provide Adequate Information on Numerous Key Issues ................................................................61

    A.    Additional Disclosure Regarding the Substantive Consolidation Settlement and Related Plan Provisions Is Required................................63

    B.    Additional Disclosure Related to the Deconsolidated Scenario Is Required If the Substantive Consolidation Settlement Is Denied..............67

III.    The Solicitation Materials Should Include a Letter from the Creditors'
Committee.............................................................................................................69

RESERVATION OF RIGHTS ...............................................................................................69

CONCLUSION.......................................................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp.*
*(In re Adelphia Commc'ns Corp.),*
361 B.R. 337 (S.D.N.Y. 2007) ............................................................................. 53

*In re Am. Capital Equip., LLC,*
688 F.3d 145 (3d Cir. 2012) ................................................................................. 25

*In re Babayoff,*
445 B.R. 64 (Bankr. E.D.N.Y. 2011) ................................................................... 58

*In re Balco Equities Ltd., Inc.,*
323 B.R. 85 (Bankr. S.D.N.Y. 2005) .................................................................... 37

*Barnhart v. Peabody Coal Co.,*
537 U.S. 149 (2003) ............................................................................................. 45

*In re Bearingpoint, Inc.,*
No. 09-10691 (REG), 2009 Bankr. LEXIS 5045
(Bankr. S.D.N.Y. Dec. 22, 2009) ........................................................................ 37

*Boston Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship),*
21 F.3d 477 (2d Cir. 1994) ............................................................................ 40, 48

*In re Breitburn Energy Partners LP,*
582 B.R. 321 (Bankr. S.D.N.Y. 2018) .................................................................. 40

*In re Brous,*
370 B.R. 563 (Bankr. S.D.N.Y. 2007) .................................................................. 55

*In re Buttonwood Partners, Ltd.,*
111 B.R. 57 (Bankr. S.D.N.Y. 1990) .................................................................... 41

*In re Butts,*
281 B.R. 176 (Bankr. W.D.N.Y. 2002) ................................................................. 55

*Cal. Pub. Emps' Ret. Sys. v. WorldCom, Inc.,*
368 F.3d 86 (2d Cir. 2004) ................................................................................... 45

*Cartalemi v. Karta Corp. (In re Karta Corp.),*
342 B.R. 45 (S.D.N.Y. 2006) ............................................................................... 49

*In re Cenargo Intern., PLC,*
294 B.R. 571 (Bankr. S.D.N.Y. 2003) .................................................................. 18

*Chemical Bank New York Trust Co. v. Kheel*,
    369 F.2d 845 (2d Cir. 1966)..................................................................................16, 21

*Commodities Futures Trading Comm. v. Weintraub*,
    471 U.S. 343 (1985)..................................................................................................50

*Cruz v. T.D. Bank, N.A.*,
    855 F. Supp.2d 157 (S.D.N.Y. 2012),
    *aff'd and remanded,* 742 F.3d 520 (2d Cir. 2013) ..................................................45

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (In re Merrill Lynch & Co.
    Research Reports Sec. Litig.)*,
    375 B.R. 719 (S.D.N.Y. 2007)..................................................................................37

*Deutsche Bank AG v. Metromedia Fiber Network, Inc.
     (In re Metromedia Fiber Network, Inc.)*,
    416 F.3d 136 (2d Cir. 2005)......................................................................................51

*In re Dow Corning Corp.*,
    255 B.R. 445 (E.D. Mich. 2000), *aff'd in part, remanded in part,*
    280 F.3d 648 (6th Cir. 2002) ....................................................................................52

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992).......................................................................52

*Duncan v. Walker*,
    533 U.S. 167 (2001)..................................................................................................45

*In re EBHI Holdings, Inc.*,
    No. 09-12099 (MFW), 2010 Bankr. LEXIS 3062
     (Bankr. D. Del. Mar. 18, 2010)...............................................................................37

*In re Ellis*,
    No. 10-16998-RLM-7A, 2014 Bankr. LEXIS 1952
     (Bankr. S.D. Ind. Apr. 30, 2014) ............................................................................37

*Fairfield Exec. Assocs. V. Hyperion Credit Capital Partners, L.P.
     (In re Fairfield Exec. Assocs.)*,
    161 B.R 595 (D. N.J. 1993) ......................................................................................48

*In re Featherworks Corp.*,
    25 B.R. 634 (Bankr. E.D.N.Y. 1982).........................................................................44

*See Fed. Deposit Ins. Corp. v. Hogan (In the Matter of Gulfco Inv. Corp.)*,
    593 F.2d 921 (10th Cir. 1979) ..................................................................................18

*In re Filex, Inc.*,
    116 B.R. 37 (Bankr. S.D.N.Y. 1990)..........................................................................15

*In re First State Bancorp.*,
    No. 7-11-11916 JA, 2013 Bankr. LEXIS 873 (Bankr. D.N.M. Mar. 6, 2013) .......................36

*Flora Mir Candy Corp. v. R.S. Dickson & Co.*,
    432 F.2d 1060 (2d Cir. 1970) ...............................................................................................24

*Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G. (In re Galerie Des
    Monnaies, Ltd.)*,
    55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986)
    and *aff'd*, No. 86 Civ. 397 (JMW), 1986 WL 6230 (S.D.N.Y. May 27, 1986) .....................62

*In re GMG Capital Partners III, L.P.*,
    503 B.R. 596 (Bankr. S.D.N.Y. 2014) ..................................................................................48

*In re Hoosier Hi-Reach, Inc.*,
    64 B.R. 34 (Bankr . S.D. Ind.1986) ......................................................................................53

*Intelligent Digital Sys., LLC v. Beazley Ins. Co., Inc.*,
    207 F. Supp. 3d 242 (E.D.N.Y. 2016) ..................................................................................51

*In re I.R.C.C., Inc.,*
    105 B.R. 237 (Bankr. S.D.N.Y. 1989) ..................................................................................22

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC
    (In re Charter Commc'ns)*,
    419 B.R. 221 .........................................................................................................................49

*Kane v. Johns–Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988) .................................................................................................34

*Kunica v. St. Jean Financial, Inc.*,
    233 B.R. 46 (S.D.N.Y. 1999) ...............................................................................................62

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*,
    329 B.R. 491 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007) ......................................52

*In re Malek*,
    35 B.R. 443 (Bankr. E.D. Mich. 1983) .................................................................................66

*Mayflower Hat Co.*,
    65 F.2d 330 (2d Cir. 1933) ...................................................................................................36

*In re Nanvarok Seven, Inc*.,
    148 B.R. 86 (Bankr. D.C. 1992) ...........................................................................................36

*Nordberg v. Murphy (In re Chase & Sanborn Corp.)*,
    55 B.R. 451 (Bankr. S.D. Fla. 1985) ....................................................................................21

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988)................................................................................62

*In re Owens Corning*,
   419 F.3d 195, 216 (3d Cir. 2005), *cert. denied*, 547 U.S. 1123 (2006).............................17, 21

*Pan Am Corp. v. Delta Air Lines*,
   175 B.R. 438 (Bankr. S.D.N.Y. 1994)................................................................25

*In re Payne*,
   512 B.R. 421 (Bankr. E.D.N.Y. 2014)................................................................37

*PBGC v. CF&I Fabricators of Utah, Inc. (In re CFI Fabricators of Utah, Inc.)*,
   150 F.3d 1293 (10th Cir. 1998) .........................................................................47

*PBGC v. Sunarhauserman (In re Sunhauserman, Inc.)*,
   126 F.3d 811 (6th Cir. 1997) ............................................................................47

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture*
   *(In re Greystone III Joint Venture)*,
   995 F.2d 1274 (5th Cir. 1991) ..........................................................................48

*In re Phoenix Petroleum Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) ...............................................................15

*In re Poage*,
   92 B.R. 659 (Bankr. N.D. Tex. 1988)...............................................................36

*Quarles v. U.S. Trustee*,
   194 B.R. 94 (W.D. Va. 1996) ...........................................................................25

*In re Quigley Co.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007)..............................................................14

*In re Quigley Co., Inc.*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010).........................................................34, 55

*In re Radco Props., Inc.*,
   402 B.R. 666 (Bankr. E.D.N.C. 2009)...............................................................62

*In re Radford Enters., Inc.*,
   31 B.R. 213 (Bankr. N.D. Ohio 1983)...............................................................36

*Raleigh v. Ill. Dep't of Rev. (In re Stoker)*,
   530 U.S. 15 (2000)............................................................................................41

*Rambo v. Chase Manhattan Mortg. Corp. (In re Rambo)*,
   297 B.R. 418 (Bankr. E.D. Pa. 2003) ...............................................................37

*In re Refco Inc.*,
No. 05-60006 (RDD), 2006 Bankr. LEXIS 4914
(Bankr. S.D.N.Y. Dec. 14, 2006)................................................................37

*In re Refco Inc.*,
No. 05-60006 (RDD) (Bankr. S.D.N.Y. Dec. 18, 2009) ........................................55

*S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*,
252 B.R. 373 (E.D.Tex. 2000) ................................................................53

*In re Scott Cable Commc'ns, Inc.*,
227 B.R. 596 (Bankr. D. Conn. 1998) ................................................................25

*Sherman v. Harbin (In re Harbin)*,
486 F.3d 510 (9th Cir. 2007) ................................................................25

*Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*,
575 F.3d 199 (2d Cir. 2009) ................................................................45

*In re Smith*,
357 B.R. 60 (Bankr. M.D.N.C. 2006)................................................................53

*State St. Bank & Trust Co. v. Salovaara*,
326 F.3d 130 (2d Cir. 2003) ................................................................45

*Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re
Lernout & Hauspie Speech Prods. N.V.)*,
308 B.R. 672 (D. Del. 2004) ................................................................35

*In re Teligent, Inc.*,
282 B.R. 765 (Bankr. S.D.N.Y. 2002) ................................................................28

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ................................................................45

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.
(In re Augie/Restivo Baking Co., Ltd.)*,
860 F.2d 515 (2d Cir. 1988) ................................................................16, 21, 22, 24

*U.S. v. Novak*,
476 F.3d 1041 (9th Cir. 2007) ................................................................45

*In re Washington Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ................................................................50

*In re Woodbridge Grp. of Companies, LLC*,
592 B.R. 761 (Bankr. D. Del.) (2018) ................................................................18

*In re Woodbrook Assocs.*,
  19 F.3d 312 (7th Cir. 1994) ..................................................................58

*In re World Imports, Ltd.*,
  862 F.3d 338 (3d Cir. 2017)..................................................................32

*In re WorldCom, Inc.*,
  No. 02-13533 (AJG), 2003 WL 23861928
  (Bankr. S.D.N.Y. Oct. 31, 2003) .........................................................41

**Statutes**

11 U.S.C. § 524(e) ....................................................................................51

11 U.S.C. § 702(b) ...................................................................................36

11 U.S.C. § 1122 ..................................................................................39, 40

11 U.S.C. § 1123(a)(4)..........................................................................39, 40

11 U.S.C. § 1125(a)(1) ..............................................................................61

11 U.S.C. § 1129(a)(3).....................................................................8, 15, 34, 35

11 U.S.C. § 1129(a)(9)...................................................................... *passim*

29 U.S.C. § 1301(a)(18).............................................................................43

29 U.S.C. § 1306(a)(7)...............................................................................44

29 U.S.C. § 1341(c)(2)(B) ..........................................................................44

29 U.S.C. § 1342......................................................................................44

29 U.S.C. § 1362(b)(1)...............................................................................42

**Other Authorities**

26 C.F.R. § 301.7701-4(d)..........................................................................54

29 C.F.R. § 4044.41 ..................................................................................42

29 C.F.R. § 4044.52 ..................................................................................42

ERISA 4044 Annuities, *available at* https://www.pbgc.gov/prac/interest/ida ............42

Pension Benefit Guaranty Corporation, PBGC Statement on Sears Bankruptcy
  Filing, *available at* https://www.pbgc.gov/news/press/releases/pbgc-
  statement-on-sears-bankruptcy-filing .....................................................42

The Official Committee of Unsecured Creditors (the "Creditors' Committee")[2] of Sears

Holdings Corporation and its affiliated debtors and debtors in possession (collectively, the

"Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by and through its

undersigned counsel, hereby files this objection (the "Objection") to the *Debtors' Motion for an*

*Order (I) Approving Disclosure Statement; (II) Establishing Notice and Objection Procedures*

*for Confirmation of the Plan; (III) Approving Solicitation Packages and Procedures for*

*Distribution Thereof; (IV) Approving the Forms of Ballots and Establishing Procedures for*

*Voting on the Plan; and (V) Granting Related Relief* [ECF No. 3277] (the "Disclosure Statement

Motion").  In support of this Objection, the Creditors' Committee respectfully states as follows.

## PRELIMINARY STATEMENT

1.    Confirmation of a liquidating plan following a 363 sale generally should be a

quick, uncontentious matter.  With no operating businesses or going concern value to distribute,

a liquidating plan serves merely as a vehicle to distribute residual assets in accordance with the

priority scheme of the Bankruptcy Code.  The Debtors acknowledge as much in the Amended

Disclosure Statement[3] by stating that the proposed plan "contemplates a Wind Down of the

---

[2] The Creditors' Committee currently comprises: (i) Apex Tool Group, LLC; (ii) Brixmor Operating Partnership, L.P.; (iii) Computershare Trust Company, N.A., as indenture trustee; (iv) Oswaldo Cruz; (v) Pension Benefit Guaranty Corporation; (vi) Simon Property Group L.P.; (vii) The Bank of New York Mellon Trust Company, N.A., as indenture trustee; and (viii) Winiadaewoo Electronics America, Inc.

[3] On May 16, 2019, the Debtors filed the *Disclosure Statement for Amended Joint Chapter 11 Plan of Sears Holdings Corporations and Its Affiliated Debtors*] [ECF No. 3895] (the "Amended Disclosure Statement") and the *Amended Joint Chapter 11 Plan of Sears Holdings Corporations and Its Affiliated Debtors* [ECF No. 3894] (the "Amended Plan").  The Amended Plan implements certain modifications to the initial plan filed by the Debtors on April 17, 2019 [ECF No. 3275] (the "Initial Plan") and the related disclosure statement [ECF No. 3276] (the "Initial Disclosure Statement"), including providing for a "toggle" for the substantive consolidation of the Debtors' estates for voting and distribution purposes whereas the Initial Plan constituted a separate chapter 11 plan for each Debtor. Attached as an exhibit to the Amended Disclosure Statement was a revised liquidation analysis (the "Amended Liquidation Analysis"), which reflected certain modifications to the initial liquidation analysis that was filed on May 3, 2019 [ECF No. 3618] (the "Initial Liquidation Analysis"), *available at* https://restructuring.primeclerk.com/sears/Home-DownloadPDF?id1=MTc3Nzk5&id2=0.  Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to such terms in the Amended Plan or the Amended Disclosure Statement, as applicable.

remaining assets of the Debtors' estates—primarily litigation claims—and a distribution to creditors in accordance with the absolute priority rule and certain settlements." Amended Disclosure Statement at 2. Unfortunately, the Creditors' Committee's expectation of a swift, consensual liquidating plan following the sale of substantially all of the Debtors' assets to Transform has not materialized.

2.    As is apparent from the terms of the Amended Plan, the Debtors continue to proceed with blind focus toward confirmation of a chapter 11 plan without regard for whether their desired outcome is in the best interests of creditors or even feasible. As a result, the Debtors have proposed a liquidating plan that, among other infirmities, (i) is patently unconfirmable, (ii) prejudices the prosecution of the Preserved Causes of Action (which are the primary remaining assets of the Debtors' estates and the sole source of recovery for unsecured creditors), (iii) prevents unsecured creditors from selecting the fiduciaries that will be responsible for determining their recoveries, (iv) provides inappropriate priority treatment for the claims of Pension Benefit Guaranty Corporation ("PBGC") and (v) fails to satisfy the best interests of creditors test. The Debtors' determination to seek approval of the Amended Disclosure Statement and solicit votes on the Amended Plan in its current form—rather than attempt to progress these Chapter 11 Cases to conclusion on a consensual basis with the Creditors' Committee and the Debtors' other constituencies—is premature at best and, regrettably, likely to result in a contested and costly confirmation process.

3.    *First*, the Amended Plan compounds the problems that were present in the Initial Plan (which are discussed herein) through the proposed substantive consolidation of the Debtors' estates under the guise of a modified settlement with PBGC (the "Substantive Consolidation

Settlement").[4]  There is no legal basis for the Substantive Consolidation Settlement.  Indeed, the Initial Plan, while flawed, was not a substantive consolidation plan and, therefore, the Debtors were able to project recoveries on a Debtor-by-Debtor basis.  The Amended Plan now provides for a "toggle" with the Debtors proposing to substantively consolidate all of their estates if the Court approves the Substantive Consolidation Settlement or proposing that the Amended Plan, with certain modifications, reverts to a separate plan for each Debtor if the Court does not approve the proposed substantive consolidation.

4.    The Debtors attempt to justify the implementation of substantive consolidation based on the cost that would be incurred to reconcile their prepetition Intercompany Claims and the time and effort required to complete such reconciliation.  This is a red herring.  Based on information provided by the Debtors to the Creditors' Committee, it is unlikely that prepetition Intercompany Claims would have any impact on creditor recoveries and, therefore, any costs spent to reconcile such claims would be a waste of deteriorating estate resources.  The prepetition Intercompany Claims analysis and the impact thereof on creditor recoveries is informed by the material postpetition Intercompany Claims among the various Debtors.

5.    Based on information provided by the Debtors to the Creditors' Committee, Kmart Corporation ("Kmart") is one of the few potentially administratively solvent Debtors with significant assets for distribution and is owed on a net basis hundreds of millions of dollars from other Debtors on account of postpetition Intercompany Claims.  Under the DIP Order, postpetition Intercompany Claims are secured by, among other things, avoidance action proceeds.  By the Debtors' own analysis, the Debtors that have postpetition intercompany

---

[4] To the extent the Substantive Consolidation Settlement is not approved by the Court, the Amended Plan toggles back to a deconsolidated plan substantially similar to the Initial Plan (the "Deconsolidated Scenario").  *See* Amended Plan § 5.1(b).  As a result, creditors are being asked to vote on two materially different plans, with inadequate disclosure of the effects of either on their recoveries.

obligations to Kmart are unlikely to have sufficient funds to satisfy such postpetition

Intercompany Claims.  As a result, only one Debtor—Kmart—is expected to have any material

assets to distribute to unsecured creditors.

6.      Similarly, with respect to prepetition Intercompany Claims, the Debtors' books

and records (which remain unreconciled) suggest that Kmart does not have any prepetition

intercompany obligations on a net basis for known counterparties.  Even if, however, Kmart is

determined to have prepetition intercompany payables, any recovery other Debtors may receive

from Kmart on account thereof ultimately are likely to end up being allocated back to Kmart due

to the sizeable postpetition (and secured) Intercompany Claims that Kmart holds against other

Debtor entities.  As a result, any stated inability to reconcile prepetition Intercompany Claims

cannot serve as the sole rationale for substantively consolidating the Debtors' estates.  This is

particularly true where the effect of substantive consolidation would be to cause recoveries that

rightfully belong to Kmart's third party unsecured creditors and any other administratively

solvent Debtors' creditors to be used to pay administrative expenses and provide recoveries to

unsecured creditors at other, administratively insolvent Debtors.  Alternatives to substantive

consolidation—such as the settlement, subordination, recharacterization or waiver of prepetition

Intercompany Claims—would do far less harm to creditors.

7.      As the Court recalls, in connection with the Sale Transaction, the Debtors settled

PBGC's objection thereto.  Pursuant to the proposed settlement with PBGC, the Debtors agreed,

among other things, to (x) not seek to substantively consolidate the Debtors' estates, (y) give

PBGC preferential treatment under a proposed deconsolidated liquidating chapter 11 plan in the

form of an $80 million priority interest in proceeds of the Preserved Causes of Action and (z)

provide PBGC with an $800 million allowed unsecured claim against each Debtor.  The Debtors

did not seek approval of this settlement in connection with the Sale Transaction or at any other time, choosing instead to bake such settlement into the Initial Plan. As the settlement with PBGC was not approved in connection with the Sale Transaction, all parties' rights to oppose such settlement, including the priority treatment of PBGC and the amount of PBGC's unsecured claim have been preserved.[5] As discussed in detail herein, the Creditors' Committee has numerous objections to the PBGC Settlement, which have now been exacerbated by the Amended Plan. Indeed, to maintain PBGC's supportive vote for the Amended Plan and the proposed substantive consolidation, the Debtors agreed to increase PBGC's unjustified preferential priority interest in the Preserved Causes of Action by over 20% from $80 million to $97.5 million. The original $80 million priority granted to PBGC under the Initial Plan already lacked justification, as PBGC is merely an unsecured creditor like all other unsecured creditors. The further increase in the amount of such claim contemplated by the Amended Plan is nothing more than a transparent value transfer (indeed, an attempt to buy a vote) intended to mitigate the negative effects of substantive consolidation on PBGC's recoveries and, thereby, maintain PBGC's affirmative vote for the Amended Plan.

8.    *Second*, the Amended Plan fails to provide for the payment of administrative claims in full and in cash on the Effective Date, as required by Bankruptcy Code section 1129(a)(9). While the Amended Plan provides that holders of Administrative Expense Claims eventually may be paid in full, it qualifies this treatment by explaining that such payment (or any portion thereof) may come from the Net Proceeds of Total Assets (*i.e.*, a vague and indefinite set of assets comprising primarily preserved litigation claims) at some later, indeterminate point in

---

[5] *See* Feb. 7 Hr'g Tr. 19:19-21:20 (counsel for the Debtors stating that the PBGC Settlement "is not up for approval today" and the Court confirming that the Debtors will be seeking approval of the settlement "reasonably promptly . . . or maybe . . . in the context of seeking approval of a plan.").

time.  Amended Plan § 2.1(a)(x)-(y).  The Amended Plan also portends that certain holders of

Administrative Expense Claims may be required to seek payment from Transform, rather than

the Debtors.  Neither the Amended Plan nor the Amended Disclosure Statement, however,

identifies which holders may be subject to this requirement.  This treatment runs afoul of both

Bankruptcy Code section 1129(a)(9), which requires that the Debtors pay their administrative

expenses in full on the Effective Date, and express provisions of the Sale Order, which provide

that third parties do not have the right to seek payment from Transform on account of obligations

owed by the Debtors.  *See* 11 U.S.C. § 1129(a)(9); Amended Plan § 2.1(b); Sale Order ¶ 28 ("For

the avoidance of doubt, [Transform's] agreement to pay Assumed 503(b)(9) Claims, Specified

Payables or any other administrative or priority claim of the [Debtors] pursuant to the terms of

the Asset Purchase Agreement is a general unsecured contractual obligation of [Transform] owed

solely to the [Debtors].").[6]

9.    Moreover, to the extent the Substantive Consolidation Settlement is not approved,

the Deconsolidated Scenario contemplates that certain administratively insolvent Debtors will

borrow funds from potentially administratively solvent Debtors to fund administrative expenses

through intercompany loans to be made on or about the Effective Date ("Intercompany Loans").

*See* Amended Plan § 5.1(b).  While this construct may not seem objectionable on its face, there is

no assurance that the "borrowing" Debtors will ever receive proceeds from litigation sufficient to

repay the "lending" Debtors.  Moreover, this construct would result in the subordination of

---

[6] As the Court is aware, the schedules to the Asset Purchase Agreement do not include a list of the specific liabilities assumed by Transform.  Instead, they simply set forth an aggregate dollar amount of liabilities to be "assumed" by category, in each case subject to potential adjustment.  As the Court also is aware and as discussed herein, numerous disputes have arisen in connection with the sale of the Debtors' assets to Transform, and Transform has asserted that it has no remaining liability for any "assumed" liabilities.  *See generally Transform Holdco LLC's Motion to Assign Matter to Mediation* [ECF No. 2766] (the "Mediation Motion"); Amended Disclosure Statement IV.Q (stating that Transform disputes all or some of the amounts to be assumed).

postpetition Intercompany Claims to third party administrative expenses in contravention of the

DIP Order and thereby would effect another inappropriate transfer of value from administratively

solvent Debtors that have positive postpetition intercompany balances to other administratively

insolvent Debtors with outstanding postpetition intercompany payables without any expectation

of repayment.  Indeed, the Debtors' own analysis projects the impairment of Intercompany

Loans, which shortfall will be borne by the unsecured creditors of "lending" Debtors (*i.e.*,

Kmart).  *See* Initial Liquidation Analysis III.8(b) (stating, for example, that Sears Roebuck and

Co. ("Roebuck") may require up to $51 million in Intercompany Loans, yet showing that

Roebuck has no remaining assets to repay such loans even after receipt of proceeds from

litigation).

10.    *Third*, as a result of (i) the ongoing post-closing disputes with Transform (the

"Transform APA Disputes") regarding the extent of Transform's obligations to the Debtors

under the Asset Purchase Agreement and (ii) the substantial risks associated with various other

contingencies for which the Debtors necessarily must assume favorable outcomes, including,

among others, the reconciliation of claims allowed under Bankruptcy Code section 503(b)(9)

("503(b)(9) Claims") and the extent of allowed claims under Bankruptcy Code section 507(b)

("507(b) Claims"), there is a significant risk of the Debtors' administrative insolvency on both an

individualized and a consolidated basis.  In fact, the Amended Plan is premised upon the Debtors

winning every single one of the Transform APA Disputes—losing any one of the material

Transform APA Disputes could render the Debtors administratively insolvent (on an

individualized or consolidated basis).  The Debtors' failure to set an initial bar date with respect

to Administrative Expense Claims (other than 503(b)(9) Claims) and to account for the costs

associated with litigating disputes with respect to each of the foregoing types of Administrative

Expense Claims further compounds concerns of administrative insolvency. Therefore, even if the Debtors' assumptions are accurate with respect to known claims (for which the Creditors' Committee has significant reservations), such assumptions may prove woefully inadequate.

11.    *Fourth*, the Amended Plan fails to comply with the good faith requirement of Bankruptcy Code section 1129(a)(3) as a result of, among other things, the Debtors' efforts to prevent the Creditors' Committee from controlling the composition of the Liquidating Trust Board and the selection of the Liquidating Trustee—the parties that will be responsible for prosecution of post-Effective Date estate causes of action, including the Specified Causes of the Action, for the benefit of unsecured creditors. Amended Plan § 6.5. Contrary to overwhelming precedent in this District and others, the Debtors steadfastly have refused to permit the Creditors' Committee to appoint the majority of the members of the Liquidating Trust Board and the Liquidating Trustee. In support of their unwavering position, the Debtors have offered no justification other than the oft-repeated refrain that members of the Restructuring Subcommittee are intimately familiar with the facts giving rise to the Specified Causes of Action. Such knowledge, however, is insufficient to justify the Debtors selecting a majority of the fiduciaries that will control unsecured creditor recoveries. There is no legitimate explanation for the Debtors or their advisors—none of which have a beneficial interest in or economic incentives with respect to the successful pursuit of the Preserved Causes of Action—controlling the governance of the Liquidating Trust. Indeed, the Creditors' Committee is concerned about potential conflicts of interest in light of, among other things, the Board's approval of the Amended Plan, which may provide for releases of parties that approved or facilitated the very transactions that are the subject of the complaint filed by the Restructuring Subcommittee on behalf of the Debtors against ESL and affiliated parties.

12.     Consistent with customary practice in similar cases and the rights to which unsecured creditors would be entitled if the Debtors' remaining assets were to be liquidated in chapter 7, unsecured creditors (through the Creditors' Committee) should have the right to select the fiduciaries that will prosecute the causes of action to be transferred to the Liquidating Trust, reconcile the over $80 billion in claims asserted against the estates and bear the responsibility of maximizing unsecured creditor recoveries.  The Committee has no objection to, and, in fact, has encouraged a three member Liquidating Trust Board that includes one member of the Restructuring Subcommittee or a five member Liquidating Trust Board that includes both members of the Restructuring Subcommittee (in each case to obtain the benefit of such member's historical knowledge); however, the Debtors have refused to acquiesce to either of these reasonable proposals, each of which clearly satisfies the Debtors' purported justification for having Restructuring Subcommittee members on the Liquidating Trust Board.

13.     *Fifth*, the Amended Plan violates applicable provisions of the Bankruptcy Code by proposing releases (for no consideration) for current and former officers and directors who were intimately involved in the approval of, among other things, the Seritage Transaction, the Lands' End spin-off and the myriad financing transactions that are the subject of the litigation commenced by the Debtors.  There is no factual or legal basis to justify these releases (or, in fact, any releases in connection with a liquidating chapter 11 plan), particularly where such releases could jeopardize access to the Debtors' D&O Policies and related proceeds.

14.     *Sixth*, as highlighted above, the Amended Plan's classification and treatment of the PBGC Claims violate applicable provisions of the Bankruptcy Code.  Under the guise of a settlement, the Debtors classify the PBGC Claims separately for the sole purpose of manufacturing an impaired accepting class where one might not otherwise exist.  The Debtors

9

have provided no justification for this separate classification, which amounts to impermissible gerrymandering. Further, the settlement with PBGC results in disparate treatment of other similarly situated creditors by granting the PBGC a priority interest to the first $97.5 million of proceeds recovered by the Liquidating Trust on account of Preserved Causes of Action, $17.5 million of which is provided for no reason other than PBGC's consenting to a modification of its original settlement, which contemplated a deconsolidated plan and an $80 million priority interest in favor of PBGC (to which PBGC would remain entitled in the Deconsolidated Scenario). There is no legal basis, nor have the Debtors attempted to articulate one, for granting an unsecured creditor a priority interest to the proceeds of Preserved Causes of Action, and the proposed Substantive Consolidation Settlement only heightens such impropriety.

15.     *Seventh*, the Amended Plan does not satisfy the "best interests of creditors" test codified in Bankruptcy Code section 1129(a)(7). In both the Initial and Amended Liquidation Analysis, the Debtors rely on unsupportable assumptions regarding the downside risk creditors would face in a chapter 7 and artificially inflate the costs associated with conversion. As set forth herein, conversion to chapter 7 most likely would result in creditors—including PBGC— receiving distributions in excess of those contemplated under the Amended Plan, curtailing the administrative expense burn attendant to the Chapter 11 Cases and minimizing the unfair prejudice against creditors of administratively solvent Debtors. Most significantly, a chapter 7 trustee could use the cash remaining in the Debtors' estates to prosecute the valuable Preserved Causes of Action for the benefit of all of the Debtors' creditors and reconcile outstanding claims, thereby increasing the ultimate distributable value available for all stakeholders. By contrast, pursuant to the terms of the Amended Plan, the Liquidating Trust is charged with carrying out these duties, but provided with woefully insufficient—if any—funding to do so. While pursuing

and obtaining confirmation of a chapter 11 plan often is the preferred course to conclude a chapter 11 case, here the path to maximize stakeholder recoveries appears to be through chapter 7.

16.     In addition to describing a plan that is patently unconfirmable, the Amended Disclosure Statement fails to provide certain basic information necessary for creditors to make an informed decision regarding whether to accept or reject the Amended Plan.  Accordingly, to the extent the Court is inclined to allow the Debtors to move forward with solicitation, the Amended Disclosure Statement must be modified to provide additional disclosure regarding the following items, among others:

- the basis for the substantive consolidation of the Debtors' estates in light of the significant harm inflicted upon the creditors of certain Debtors, including Kmart;

- an analysis of the impact on creditor recoveries if prepetition Intercompany Claims were subordinated, recharacterized, settled or otherwise waived as opposed to the treatment currently contemplated by the Substantive Consolidation Settlement;

- the extent of the postpetition Intercompany Claims that remain due and owing by the applicable Debtors and the ability of such Debtors to satisfy such postpetition Intercompany Claims;

- a recovery analysis that compares each of the Substantive Consolidation Settlement and the Deconsolidated Scenario to chapter 7 (including on a deconsolidated basis) so creditors can better understand the impact substantive consolidation versus deconsolidation would have on their recoveries under each of the Amended Plan's "toggles" and if the Chapter 11 Cases were converted to chapter 7;

- the Debtors' ability to pay administrative claims in full, in cash, on the Effective Date;

- the facts underlying each of the Transform APA Disputes and an explanation of how the resolution of each dispute could affect administrative solvency and creditor recoveries;

11

- why Transform's obligations with respect to assumed liabilities under the Asset Purchase Agreement apparently have been reduced from an aggregate $347 million to $270 million;

- how the Debtors are able to forecast administrative solvency when no Administrative Expense Claims bar date has been set, the Transform APA Disputes remain unresolved and factual and legal disputes exist with respect to the allowance and quantification of 503(b)(9) Claims and 507(b) Claims;

- why, notwithstanding overwhelming precedent to the contrary and the circumstances of these cases, the Debtors refuse to permit the Creditors' Committee to select the majority of the members of the Liquidation Trust Board and the Liquidating Trustee;

- how the Liquidating Trust will be funded in light of the fact that the Debtors' own analysis (the "Administrative Expense Tracker")[7] indicates that, even assuming favorable outcomes on each of the Transform APA Disputes, the Liquidating Trust will have limited cash to fund its activities—and whether this funding will be sufficient for the Liquidating Trust to: (i) prosecute the Preserved Causes of Action (which are factually and legally complex, span nearly a decade and will be defended by well-funded adversaries); (ii) enforce any judgment entered in connection therewith; (iii) reconcile over $80 billion in filed proofs of claim; (iv) litigate valuation issues; and (v) perform any of its other duties set forth in the yet to be filed Liquidating Trust Agreement;

- the factual and legal bases for granting PBGC, an unsecured creditor, a priority claim secured against the proceeds of Preserved Causes of Action and, relatedly, the rationale for separately classifying PBGC from other unsecured creditors and the extent to which this gerrymandering is permitted by the Bankruptcy Code;

- a quantification of claims asserted by the PBGC and the Debtors' analysis thereof to justify the treatment of the PBGC Claims;

- the factual and legal basis for the purposed intercompany claims settlement that resulted in the proposed Substantive Consolidation Settlement and how such settlements impacted PBGC as compared to other creditors, particularly Kmart's creditors;

- to the extent the Substantive Consolidation Settlement is denied and the Amended Plan toggles to the Deconsolidated Scenario, the factual and legal

---

[7] Critically, the Disclosure Statement does not contemplate that the Administrative Expense Tracker, or the information contained therein, will be made available to creditors in advance of soliciting or seeking confirmation of the Plan.  A copy of the latest Administrative Expense Tracker is attached hereto as **Exhibit A**.

bases to support the use of the Intercompany Loans to fund administrative expenses and the likelihood that all such Intercompany Loans will be repaid;

- the bases for the Debtors' apparent manipulation of estimated claims and costs in connection with conversion of the Chapter 11 Cases to chapter 7 in order to make it appear that creditors would do better under the Amended Plan than upon a conversion;

- the extent of the Debtors' potential liabilities associated with the postpetition termination of retiree benefits under the Amended Plan, whether such liabilities will be entitled to administrative expense status, whether a retiree committee is required to be appointed under Bankruptcy Code section 1114, the expected costs of an 1114 committee, the expected duration to negotiate with an 1114 committee and the extent of the Debtors' potential liabilities associated with the postpetition termination of retiree benefits if the Chapter 11 Cases were converted to chapter 7 and the priority of any such liabilities;

- the factual and legal bases for granting releases to current and former officers and directors that were, among other things, involved in the transactions challenged by the complaint recently filed by the Restructuring Subcommittee on behalf of the Debtors and the benefits and consideration provided to the Debtors' estates in respect of such releases; and

- the nature of any estate causes of action that are preserved pursuant to the Sale Order (including the identity of the Debtor plaintiffs), the probability that such causes of action will be pursued and/or result in a recovery for creditors, the costs associated with prosecution of such claims and, to the extent applicable, an explanation for why such claims were not brought in the Restructuring Subcommittee's Complaint.[8]

17.    Upon information and belief, the Debtors will argue that solicitation of the Amended Plan will not be an overly expensive exercise.  According to the Debtors, there is no downside to seeking votes on the Amended Plan at this time and that doing so may provide momentum to resolve the ongoing disputes between the Debtors and their constituencies.  This view is misguided.  The only effect of soliciting a patently unconfirmable plan, which impairs administrative claims and severely prejudices unsecured creditors, will be to mire the Debtors in

---

[8] See Complaint, *Sears Holdings Corp. v. Lampert (In re Sears Holdings Corp.)*, Adv. No. 19-08250 (April 18, 2019) (Bankr. S.D.N.Y. April 18, 2019) (the "Complaint").

expensive litigation (likely with numerous parties) that will consume substantial value rightfully

belonging to unsecured creditors.

18.     Accordingly, for the foregoing reasons and as set forth herein, the Creditors'

Committee is compelled to request that the approval of the Amended Disclosure Statement be

denied at this time.  However, to the extent this Court determines to approve the Amended

Disclosure Statement, the Creditors' Committee respectfully requests that such approval be

conditioned upon—and solicitation should be delayed pending—(i) the establishment of an

initial administrative claims bar date and (ii) resolution of numerous open issues that will impact

the Debtors' administrative solvency (such as the estimation of the allowed amount of 507(b)

Claims, the allowance of 503(b)(9) Claims and the resolution of the Transform APA Disputes)

and the fair treatment of unsecured creditors, including the governance and funding for the

Liquidating Trust.  Such a conditional approval will ensure that the Debtors' ever-dwindling

resources are not wasted on solicitation and preparing for a premature—if not entirely futile—

confirmation battle.  In connection with such a delayed approval and in light of the Debtors'

steadfast refusal to compromise with the Creditors' Committee, the Creditors' Committee would

be amenable to Court-ordered mediation on certain plan-related issues, to the extent such issues

are capable of remedy based on the facts and applicable law, in an effort to minimize the costs

associated with solicitation and a contested confirmation.

## **OBJECTION**

## I.    **The Amended Disclosure Statement Should Not Be Approved Because the Amended Plan Is Patently Unconfirmable**

19.     Courts routinely hold that if a plan is unconfirmable as a matter of law, the related

disclosure statement should not be approved.  *In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr.

S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the

disclosure itself must be denied as solicitation of the vote would be futile"); *In re Filex, Inc.*, 116 B.R. 37, 40-41 (Bankr. S.D.N.Y. 1990) (stating that "this court will not approve a disclosure statement for an admittedly unconfirmable plan").

20.     This principle is grounded in the recognition that bankruptcy courts have a paramount obligation to guard against unnecessary expenditures and waste of estate assets. *See In re Phx. Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible', the court should exercise its discretion to refuse to consider the adequacy of disclosures . . . because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed.") (citations omitted).

21.     Here, the Debtors seek approval of a disclosure statement for a plan of liquidation that (i) proposes substantive consolidation of the Debtors' estates without satisfying the applicable legal standards and otherwise inflicts significant harm on certain creditors, (ii) fails to pay all administrative creditors in full on the Effective Date in violation of Bankruptcy Code section 1129(a)(9) under either the Substantive Consolidation Settlement or the Deconsolidated Scenario, (iii) evidences a lack of good faith under Bankruptcy Code section 1129(a)(3) by, among other things, unfairly prejudicing the rights of third party unsecured creditors, (iv) provides unjustified releases to non-debtor parties for no consideration, (v) results in disparate treatment to unsecured creditors through the PBGC Settlement, and (vi) fails to satisfy the "best interests of creditors" test under Bankruptcy Code section 1129(a)(7) (under either the Substantive Consolidation Settlement or the Deconsolidated Scenario).  While the Committee appreciates that approval of a disclosure statement is often a mere formality, based on the unusual facts of these cases, approval of the Disclosure Statement at this time would result in

materially increased administrative expenses that the Debtors' estates can ill-afford in

furtherance of a chapter 11 plan that cannot be confirmed.  For each of these reasons, the

Amended Plan is patently unconfirmable, and the Court should deny approval of the Amended

Disclosure Statement.

> **A.  There Is No Basis in Law or Fact to Support Approval of the Substantive Consolidation Settlement**

22.    The Debtors amended the Initial Plan to implement the Substantive Consolidation

Settlement, which provides for the substantive consolidation of the Debtors' estates for voting

and distribution purposes.  *See* Amended Plan § 5.1; Amended Disclosure Statement IV.U

(describing the Substantive Consolidation Settlement).  The original settlement with PBGC

prohibited the Debtors from pursuing a substantively consolidated plan.  *See* Initial Disclosure

Statement IV.O; *Notice of Filing of Settlement Term Sheet with Pension benefit Guaranty*

*Corporation*, dated February 8, 2019 [ECF No. 2529] (the underlying settlement, the "Original

PBGC Settlement").  According to the Debtors, in connection with effectuating a deconsolidated

plan as they had agreed to do, "there would be significant difficulties and enormous costs that

would be borne by the Estates in order to disentangle prepetition Intercompany Claims on a

Debtor-by-Debtor basis."  Amended Disclosure Statement IV.U; *see, e.g.*, *Union Sav. Bank v.*

*Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518

(quoting *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966))

(holding that substantive consolidation is appropriate only when (i) "creditors dealt with the

entities as a single economic unit and did not rely on their separate identity in extending credit"

or (ii) "the affairs of the debtors are so entangled that consolidation would benefit all creditors.").

As a purported solution to this entanglement, the Debtors agreed to provide PBGC with an even

greater preferential interest in the Liquidating Trust of $97.5 million (an increase of $17.5

16

million over the originally contemplated $80 million priority) in addition to an $800 million general unsecured claim in a transparent attempt to temper the impact substantive consolidation would have on PBGC's, but no other creditor's, recoveries and purchase PBGC's continued support of the Debtors' plan.  The Amended Plan, however, implements an unnecessary remedy and severely harms unsecured creditors, primarily at Kmart.

23.      The primary benefit of substantive consolidation for the Debtors in the instant case is that it purports to solve for (though does not assure a solution for) the Debtors' inability to confirm a plan at the 31 administratively insolvent Debtor entities.[9]  *See* Initial Liquidation Analysis (showing 31 administratively insolvent entities after the receipt of litigation and preference actions).[10]  Payment of administrative creditors at administratively insolvent Debtors, however, cannot support an inequitable transfer of value from unsecured creditors.  *See In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005), *cert. denied*, 547 U.S. 1123 (2006) (labeling the attempt to substantively consolidate estates as an improper "stratagem to 'deem' separate resources reallocated to [the principal debtor] to strip the [b]anks of rights under the Bankruptcy Code, favor other creditors and yet trump possible plan objections by the [b]anks.").

24.      The Debtors attempt to ground the Substantive Consolidation Settlement in their inability to reconcile Intercompany Claims, but this justification cannot withstand scrutiny. Based on available information, the reconciliation of prepetition Intercompany Claims in these Chapter 11 Cases is unlikely to have an impact on creditor recoveries and, as a result, any costs

---

[9] As set forth further herein, the Creditors' Committee does not agree with the Debtors' analysis of their administrative solvency and does not believe that, even on a consolidated basis, that the Debtors will be able to satisfy the requirements of Bankruptcy Code section 1129(a)(9).

[10] Based on an analysis provided by the Debtors to the Creditors' Committee dated as of April 19, 2019, 44 of 53 Debtors were shown to be administratively insolvent as of the projected Effective Date prior to the receipt of litigation and preference proceeds.

saved through substantive consolidation are costs that would not need to be expended in the first instance.  Indeed, postpetition Intercompany Claims, which are secured (including by avoidance action proceeds) pursuant to the DIP Order, would consume value that otherwise may have been obtained as a result of prepetition Intercompany Claims.[11]

25.    The table below illustrates the effect that the postpetition Intercompany Claim balances have on the allocation of recoveries.  Based on the Debtors' Initial Liquidation Analysis, the Debtors allocated cash proceeds and unrealized value from litigation to Sears Holdings Corporation ("Holdings"), Roebuck and Kmart in the "approximate proportional amount recovered from litigation:  10% to 60% for Holdings, 30% to 80% for Roebuck, and 6% to 20% for Kmart."  *See* Initial Liquidation Analysis III.6.[12]  The value that the Debtors project will flow to each of these estates, however, is subject to significant postpetition Intercompany Claims, which claims have a dramatic impact on the ultimate distribution of litigation proceeds. The column furthest to the left lists certain key Debtor entities with significant intercompany

---

[11] It is unclear how the Debtors can seek to extinguish such claims through substantive consolidation.  *See* Cash Management Order ¶ 9; DIP Order ¶ 39.  Courts have held that substantive consolidation cannot be used to extinguish intercompany liens absent compelling circumstances like fraud.  *See Fed. Deposit Ins. Corp. v. Hogan (In the Matter of Gulfco Inv. Corp.)*, 593 F.2d 921, 927 (10th Cir. 1979) ("Criteria such as administrative convenience, expediency and accounting difficulties are not adequate to warrant treatment of a secured creditor as an unsecured creditor. Nor is the awareness by the creditor of the existence of related corporations sufficient to destroy the creditor's security absent circumstances like fraud."); *In re Woodbridge Grp. of Companies, LLC*, 592 B.R. 761, 764, 771-74 (Bankr. D. Del.) (2018) (finding that *Gulfco* did not preclude approval of partial substantive consolidation that extinguished intercompany liens on real property because, unlike in *Gulfco*, (i) the intercompany liens in Woodbridge arose "out of a massive, multi-year fraudulent [Ponzi] scheme" under which "security interests purportedly granted to [certain debtors were] avoidable as actual or constructive fraudulent transfers" and (ii) the partial substantive consolidation was "not merely an administrative convenience [and there were] complex multi-layered issues involving the intercompany liens that the parties ha[d] carefully and vigorously negotiated."); *In re Cenargo Intern., PLC*, 294 B.R. 571, 586 n.15 (Bankr. S.D.N.Y. 2003) (citing *Gulfco* for the proposition that "substantive consolidation cannot be used to destroy otherwise valid security interests," but not deciding the issue because substantive consolidation was not before the court).

[12] The Creditors' Committee is continuing to evaluate whether certain other Debtors not named as plaintiffs in the Complaint also may have significant causes of action that were preserved under section 9.13 of the Asset Purchase Agreement.  These actions may include, among others, (i) breach of fiduciary duty claims against officers and directors at certain Debtor subsidiaries, (ii) aiding and abetting breach of fiduciary duty of officers and directors at certain Debtor subsidiaries and (iii) fraudulent conveyance and recovery of related payments with respect to the financing transactions.  The existence of these other potential estate causes of action further calls into question the appropriateness of substantive consolidation.

payables, with each subsequent column showing for each of Holdings, Roebuck, Kmart and

other Debtors the (i) balance of postpetition Intercompany Claims owed to such Debtor(s), (ii)

the amount of shortfall (*i.e.*, the extent to which the paying Debtor cannot satisfy the postpetition

Intercompany Claim), if any and (iii) the corresponding percentage recovery on such postpetition

Intercompany Claims.  All intercompany balances are shown on a gross basis.

*$ in millions*

| | Receiving Entity | | | | | | | | | | | | | | |
| | Sears Holdings Corporation | | | Sears, Roebuck and Co. | | | Kmart Corporation | | | Other Debtors | | | Total | | |
| Intercompany Activity | Balance[1] | Shortfall | Recovery | Balance[1] | Shortfall | Recovery | Balance[1] | Shortfall | Recovery | Balance[1] | Shortfall | Recovery | Balance[1] | Shortfall | Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Sears Holdings Corporation | | | | $ 633 | $ 80 | 87.3% | $ 38 | $ 5 | 87.3% | $ 61 | $ 8 | 87.3% | $ 732 | $ 93 | 87.3% |
| 2 Sears, Roebuck and Co. | 587 | 139 | 76.3% | | | | 743 | 176 | 76.3% | 1,218 | 288 | 76.3% | 2,548 | 603 | 76.3% |
| 3 Kmart Corporation | 70 | - | 100.0% | 75 | - | 100.0% | | | | 422 | - | 100.0% | 567 | - | 100.0% |
| 4 Innovel Solutions, Inc. | 4 | 1 | 70.1% | 14 | 4 | 70.1% | 112 | 33 | 70.1% | 136 | 41 | 70.1% | 265 | 79 | 70.1% |
| 5 Sears Holdings Management Corporation | 14 | 5 | 67.5% | 974 | 317 | 67.5% | 50 | 16 | 67.5% | 175 | 57 | 67.5% | 1,213 | 394 | 67.5% |
| 6 Sears Roebuck Acceptance Corp. | - | - | - | 453 | 81 | 82.2% | - | - | - | 0 | 0 | 82.2% | 453 | 81 | 82.2% |
| Other Debtors | 39 | 16 | 59.2% | 256 | 127 | 50.4% | 112 | 60 | 46.7% | 300 | 120 | 60.2% | 708 | 323 | 54.4% |
| Total | 714 | 161 | 77.5% | 2,405 | 608 | 74.7% | 1,056 | 290 | 72.5% | 2,312 | 513 | 77.8% | 6,487 | 1,572 | 75.8% |

Of the three Debtor entities with value, prior to intercompany assets, Kmart Corporation is the only Debtor able to satisfy its post petition intercompany payables.

26.    As shown above, Kmart is the only entity with significant assets that is able to

satisfy in full its intercompany payables, *i.e.*, the $70 million owed to Holdings, the $75 million

owed to Roebuck and the $422 million owed to all other Debtors for a total of $567 million.[13]

All other Debtors shown in the above table are unable to satisfy their postpetition intercompany

obligations, even after taking into account Kmart's satisfaction of its postpetition intercompany

obligations and expected litigation proceeds.  By way of an example, Roebuck owes Kmart $743

million on a gross postpetition basis, but can only satisfy approximately 76% of that amount

even after Kmart satisfied its $75 million postpetition payable to Roebuck, leaving Kmart with

an unsatisfied intercompany payable from Roebuck of $176 million.  In addition, Kmart also has

unsatisfied intercompany payables from Holdings ($5 million), Innovel Solutions, Inc. ($33

million), Sears Holdings Management Corporation ($16 million) and all other Debtors on a

consolidated basis ($60 million).  Thus, on an aggregate net basis, Kmart is owed an additional

---

[13] Given that a vast majority of the Debtors' distributable value sits with Holdings, Roebuck and Kmart, the table above does not include Kmart of Washington LLC, Sears Insurance Services LLC and Kmart Stores of Illinois, although such entities also are able to satisfy their postpetition Intercompany Claims in full.

$290 million from the other Debtors on a postpetition basis that can never be satisfied, even after

taking into account expected litigation proceeds.  Therefore, any additional proceeds received in

excess of the Debtors' estimated $334 million in distributable proceeds in the Amended

Liquidation Analysis would be payable to Kmart up until its $290 million shortfall is satisfied.[14]

Any such funds, however, likely still would be insufficient to satisfy Kmart's postpetition

intercompany receivables.  After accounting for the postpetition Intercompany Claims that can

be satisfied, Kmart is entitled to approximately 89% of the estates' total distributable value.[15]

See Initial Liquidation Analysis at 5 ("Post-petition Intercompany Claims have a significant

impact on entity level recoveries and result in approximately $278 million of $314 million in

total Asset value allocated to Kmart Corporation in the chapter 11 scenario.").

27.    Based on available information, the size of Kmart's postpetition intercompany

deficiency claim similarly renders the prepetition intercompany balances irrelevant.  Indeed,

upon information and belief, reconciliation of the Debtors' prepetition Intercompany Claims

likely would reveal that Kmart also is a net creditor at substantially all of the other Debtors with

assets on a prepetition basis.  Even if, however, the Debtors' final reconciliation showed that

Kmart owed other Debtors amounts on a prepetition basis, those prepetition Intercompany

Claims only would be entitled to a *pro rata* recovery with other unsecured claims at Kmart.

Because Kmart is the beneficiary of postpetition Intercompany Claims, recovery by other

Debtors on prepetition intercompany claims against Kmart ultimately result in value remitted

back to Kmart by such Debtors to satisfy, in part, their postpetition Intercompany Claims.

---

[14] The Creditors' Committee believes that the Debtors' estimate of $334 million in total distributable proceeds may be low and that the Preserved Causes of Action may have greater value than such estimate.

[15] The remaining 11% of value resides at Kmart of Washington LLC, Sears Insurance Services LLC and Kmart Stores of Illinois.

28.     Where Kmart is one of the only Debtors with material assets and Kmart is a net

creditor to the other Debtors on both a pre- and postpetition basis, the Debtors' ostensible

justification for substantive consolidation—inability to reconcile prepetition intercompany

claims—rings hollow.  Indeed, based on the magnitude of harm to Kmart creditors under the

Substantive Consolidation Settlement, they would lose less value if they offered to fund the

reconciliation of prepetition Intercompany Claims than they would as a result of substantive

consolidation.  Where Intercompany Claims simply could be subordinated or otherwise settled

with virtually no impact on recoveries, there is no justification for providing PBGC with an even

larger priority claim and transferring the recoveries that rightfully belong to Kmart creditors

primarily to administrative creditors at other Debtors and PBGC.[16]  That the Debtors did not

chose the more equitable path is highly questionable and raises the unanswered question of the

Debtors' motivation for the Substantive Consolidation Settlement.

29.     The harmful and inequitable transfer of value among creditors underlies courts'

reluctance to endorse substantive consolidation.  The Second Circuit has required that the

equitable remedy of substantive consolidation "be used sparingly" because of the "dangers of

forcing creditors of one debtor to share equally with creditors of a less solvent debtor."  *Union

Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d

515, 518 (quoting *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir.

1966); *see also In re Owens Corning*, 419 F.3d at 210-11 (holding that substantive consolidation

was possible only under "compelling circumstances").  The Debtors rely exclusively on the

reasoning that their "affairs . . . are so entangled that consolidation would benefit all creditors,"

---

[16] Indeed, it may be more appropriate for prepetition Intercompany Claims to be equitably subordinated to the claims of unaffiliated creditors, *see*, *e.g.*, *In re Chase & Sanborn Corp.*, 55 B.R. 451 (Bankr. S.D. Fla. 1985), or otherwise settled or waived.

*Augie/Restivo*, 860 F.2d at 518, essentially an economic efficiency rationale for substantive

consolidation, to justify the Amended Plan.  Yet even accepting the Debtors' premise that the

entanglement of their prepetition Intercompany Claims is relevant (which it appears not to be),

they have failed to show that the consolidation of their assets and claims would fulfill the stated

purpose of ensuring "equitable treatment of all creditors."  *Id*. at 518; *see also In re I.R.C.C.,*

*Inc.*, 105 B.R. 237, 242 (Bankr. S.D.N.Y. 1989) ("The critical issue is whether the same trustee

in bankruptcy of each entity may pool their assets for the benefit of all their creditors

collectively. . . .").  Rather, the Substantive Consolidation Settlement has the opposite effect.

30.    The table below illustrates the impact of substantive consolidation on creditors

compared to the Initial Plan, which contemplated a separate chapter 11 plan for each Debtor

(with the unjustifiable preferred treatment for PBGC in both scenarios) and use of Intercompany

Loans to ensure the satisfaction of all third-party administrative expenses at each Debtor.

*$ in millions*

|  | 1 | 2 |
|---|---|---|
| *Structure* | *Ch. 11 Decon* | *Ch. 11 Subcon* |
| *PBGC Priority Claim* | *$80M* | *$97.5M* |
| *PBGC GUC* | *$800M* | *$800M* |
| *Post-Petition I/C Claims* | *Yes* | *No* |
| *Post-Emergence I/C Loans* | *Yes* | *No* |
| *507(b) Claims* | *$0* | *$0* |

**Recovery (%)**

| | | |
|---|---|---|
| Administrative, Priority, and Secured | | |
| Kmart Corporation | 100.0% | 100.0% |
| Kmart Stores of Illinois, LLC | 100.0% | 100.0% |
| Kmart of Washington, LLC | 100.0% | 100.0% |
| Sears Insurance Services, LLC | 100.0% | 100.0% |
| Sears, Roebuck and Co. | 100.0% | 100.0% |
| Sears Holding Corporation | 100.0% | 100.0% |
| Other 47 Debtors | 100.0% | 100.0% |
| PBGC [1] | 11.5% | 8.3% |
| ESL | 1.8% | 0.8% |
| Other Unsecureds | | |
| Kmart Corporation | 9.8% | 2.5% |
| Kmart Stores of Illinois, LLC | 0.3% | 2.5% |
| Kmart of Washington, LLC | 0.0% | 2.5% |
| Sears Insurance Services, LLC | na | 2.5% |
| Sears, Roebuck and Co. | – | 2.5% |
| Sears Holding Corporation | – | 2.5% |
| Other 47 Debtors | – | 2.5% |

1. PBGC recovery percentages are calculated assuming a $1.419B claim.

31.     Scenario 1 represents the Debtors' deconsolidated Initial Plan[17] and Scenario 2

represents the Debtors' substantively consolidated Amended Plan.  As shown above, under

Scenario 1, third party unsecured creditors at Kmart would receive recoveries of approximately

---

[17] Notwithstanding the fact that the Amended Plan is a "toggle" plan, providing for either substantive consolidation or deconsolidation, the Amended Liquidation Analysis does not include a comparison of substantive consolidation to deconsolidation.  Accordingly, Scenario 1 reflects the amounts set forth in the Debtors' Initial Liquidation Analysis with the following adjustments to make Scenario 1 comparable to the Debtors' Amended Liquidation Analysis (*i.e.*, Scenario 2): (i) cash at the expected Effective Date in July 2019 was adjusted to $116 million and (ii) the aggregate ESL and General Unsecured Claims were adjusted to $1.8 billion and $3.9 billion, respectively.  In addition, recoveries in Scenario 1 were corrected to account for the Intercompany Loans that are contemplated under the Deconsolidated Scenario (and which the Debtors did not show in their Initial Liquidation Analysis).  Because the Debtors' ESL and General Unsecured Claims were provided on a consolidated basis, claims were allocated in a deconsolidated scenario *pro rata* based on the claims estimates listed in the Initial Liquidation Analysis.

9.8% even with Kmart subordinating its postpetition Intercompany Claims to, and subsidizing the payment of, the other Debtors' administrative expenses through Intercompany Loans that are not repaid. Under Scenario 2—the Amended Plan with substantive consolidation—those same creditors at Kmart would see their recoveries reduced by nearly 75%. Accordingly, the recovery that rightfully belongs to Kmart creditors instead goes to fund administrative claimants and unsecured creditors at the other administratively insolvent Debtors.

32.     The Debtors may view substantive consolidation as a means to avoid the reconciliation of their prepetition Intercompany Claims and a solution to their inability to confirm a plan at a vast majority of the Debtors because of those entities admitted administrative insolvency, but the Debtors' proposed fix does not withstand scrutiny where its implementation would be "at the cost of sacrificing the rights" of creditors and the fact that the Debtors actually have proposed—and continue to propose—through the "toggle" in the Amended Plan, a deconsolidated plan of liquidation. *Augie/Restivo*, 860 F.2d at 521 (quoting *Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060, 1062 (2d Cir. 1970)). In view of the inequitable effects of the Debtors' Substantive Consolidation Settlement and the Debtors' inability to satisfy the requisite standard given the availability of viable alternatives to their stated justification (*i.e.*, the equitable subordination or settlement of Intercompany Claims), the Court should not approve the settlement.

**B.    The Debtors Cannot Demonstrate that the Amended Plan Pays All Administrative Claimants in Full**

33.     The Amended Plan cannot be confirmed until the Debtors demonstrate their ability to satisfy the unambiguous requirement that, on the Effective Date, holders of administrative claims "receive on account of such claim[s] cash equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9). The Amended Plan does not provide for such treatment,

and creditors can take no comfort in the Debtors' assurances of administrative solvency (which,

if achievable at all, can only occur under the Substantive Consolidation Settlement and with the

proceeds from litigation and preference actions). *See e.g.*, *Quarles v. U.S. Trustee*, 194 B.R. 94,

97 (W.D. Va. 1996) (stating that a debtor's premise "that outcomes in pending litigation favorable to

him will cure his financial ills is pure speculation" and concluding that the debtor did not have a

reasonable likelihood of effectuating a reorganization); *In re Am. Capital Equip., LLC*, 688 F.3d 145,

156 (3d Cir. 2012) ("A plan will not be feasible if its success hinges on future litigation that is

uncertain and speculative, because success in such cases is only possible, not reasonably likely.")

(quoting *Sherman v. Harbin (In re Harbin)*, 486 F.3d 510, 519 (9th Cir. 2007)). To the contrary,

even a cursory examination of the Debtors' projections reveals the precariousness of their

financial position. Even with the proposed subordination or elimination of postpetition

Intercompany Claims, numerous unresolved and highly contested issues will affect, and

potentially erode, each of the sources of cash the Debtors forecast will be available for payment

of administrative claims. As a result, the proposed treatment of administrative claims renders the

Amended Plan unconfirmable as a matter of law.

### 1.    The Amended Plan's Proposed Treatment of Administrative Creditors Is Inconsistent with Bankruptcy Code Section 1129(a)(9)

34.    The Amended Plan fails to satisfy the clear-cut requirement that a chapter 11 plan

pay all allowed administrative claims in full, in cash on the Effective Date. *See Pan Am Corp. v.*

*Delta Air Lines*, 175 B.R. 438, 483 (Bankr. S.D.N.Y. 1994) (referring to Bankruptcy Code

section 1129(a)(9) as the "administrative solvency" requirement and stating that "[b]y itself,

administrative insolvency would have prevented confirmation of the Joint Plan."); *In re Scott*

*Cable Commc'ns, Inc.*, 227 B.R. 596, 600 (Bankr. D. Conn. 1998) ("The code's confirmation

scheme elevates allowed administrative claims to a dominant priority such that unless the holders

agree to a different treatment, a plan cannot be confirmed without full payment of those claims even if there are no estate assets to pay them.").

35.    Under the Amended Plan, Administrative Expense Claims, projected to be approximately $472 million (excluding any 507(b) Claims), are to receive distributions, first, from the Wind-Down Account.[18]  *See* Amended Plan § 2.1(a)(x); Amended Disclosure Statement IV.T.  As of the filing of the Amended Disclosure Statement, the cash available in the Wind-Down Account was approximately $69 million—far short of the Debtors' estimate of total Administrative Expense Claims.  *See* Amended Disclosure Statement I.B.  Thus, most Administrative Expense Claims must be satisfied from the Net Proceeds of Total Assets.  *See* Amended Plan § 2.1(a)(y).  Total Assets includes some cash, but most of the value of the Total Assets comprises unliquidated assets and causes of action that will be transferred to the Liquidating Trust as of the Effective Date.  *See* Amended Plan § 1.158.[19]

36.    Further, the Amended Plan suggests that holders of certain Administrative Expense Claims may need to look to Transform, rather than the Debtors, for payment of their claims.  Specifically, holders of 503(b)(9) Claims or Administrative Expense Claims arising under Other Payables (as defined in the Asset Purchase Agreement) shall be paid, first, "by or on behalf of the Debtors on or after the date that Transform pays the amounts owed pursuant" to the Asset Purchase Agreement.  *See* Amended Plan § 2.1(b)(i)-(ii).  Under the Sale Order, however,

---

[18] The Debtors' estimate of projected Administrative Expense Claims also includes professional fees, for which there is a separate professional fee Carve Out Account funded in the amount of $54 million as of the filing of the Amended Disclosure Statement.  *See* Amended Disclosure Statement IV.T.

[19] Under the Deconsolidated Scenario, the Debtors that cannot satisfy their administrative claims on the Effective Date will receive an Intercompany Loan from another Debtor in order to satisfy such claims.  *See* Amended Plan § 5.1(b).  In the Debtors' Initial Liquidation Analysis, the Debtors projected that, even after litigation proceeds are realized, 31 Debtors will require an Intercompany Loan to satisfy administrative claims with an uncertain ability to repay such Intercompany Loans, to the prejudice of unsecured creditors at the lending Debtors.

Transform's only obligation is to reimburse the Debtors (and not the specific holders of any Administrative Expense Claims), and Transform's failure to do so would result only in a general unsecured claim in favor of the Debtors against Transform.  *See* Sale Order ¶ 28.  Nonetheless, and despite Transform's efforts to sidestep its reimbursement obligations,[20] the Debtors assume—as they must to demonstrate any hope of administrative solvency—that Transform honors it obligations, including paying up to $139 million on account of 503(b)(9) Claims, up to $166 million on account of Other Payables and $42 million on account of severance obligations.  *See* Amended Disclosure Statement I.B. ("[U]p to approximately $347 million of Administrative Expense Claims are the responsibility of [Transform]."); *see also* Asset Purchase Agreement § 2.3(k)(iv)-(v).[21]  The Amended Disclosure Statement, however, is silent regarding the apparent timeline for resolution of these disputes, which are unlikely to be resolved in the near term and not without expensive litigation.[22]

37.    The Debtors' attempt to shift responsibility to Transform leaves holders of Administrative Expense Claims in the dark regarding which payor—the Debtors or Transform—is responsible for their claims.  For example, Transform agreed to assume up to $166 million of certain Administrative Expense Claims (referred to as "Other Payables" in the Asset Purchase Agreement).  *See* Asset Purchase Agreement § 2.3(k)(v).  In the Asset Purchase Agreement,

---

[20] In a footnote in the Amended Disclosure Statement, the Debtors blandly state that "[Transform] has disputed all or some of these amounts."  Amended Disclosure Statement I.B.

[21] Upon information and belief, the Debtors expect that Transform's obligations to the Debtors under the Asset Purchase Agreement will be reduced from $347 million to $270 million due to various shortfalls discussed *infra*.  Notably, however, the Debtors fail to inform creditors in either the Plan or the Disclosure Statement why Transform's obligations have been reduced by $77 million.

[22] Upon information and belief, the Debtors intend to seek further relief from the Court in order to resolve the Transform APA Disputes; however, as of the date of filing this Objection, the Debtors have not disclosed publicly when they intend to do so and the expected timeline to resolve such disputes (including any appeals).  Without clarity on these issues, the Debtors should not solicit or incur the costs of seeking confirmation of the Amended Plan.

"Other Payables" is defined as "the accounts payable set forth" on a schedule to the Asset

Purchase Agreement, which schedule includes an annex with a single line item stating that

assumed accounts payable are equal to $166 million.  *See* Asset Purchase Agreement § 1.1.  No

detail has been provided as to what specific payables the Other Payables comprise.[23]  Moreover,

upon the occurrence of certain shortfalls (as discussed *infra*), Transform may, in its sole

discretion, reduce its assumed liabilities, such as Other Payables.  Asset Purchase Agreement §

2.3(k)(vi).

  38. The Debtors cannot draft around the strict requirements that an administrative or

priority creditor receive payment in full in cash on the Effective Date.  Accordingly, the

Amended Plan's treatment of administrative claims fails to satisfy the requirements of

Bankruptcy Code section 1129 and cannot be confirmed.  *See, e.g.*, *In re Teligent, Inc.*, 282 B.R.

765, 722 (Bankr. S.D.N.Y. 2002) (noting, when a debtor tried to pay administrative claimants

less than full payment, that any administrative creditors solicited by the debtors could prevent

confirmation by refusing the different treatment and demanding payment in full).

  **2.** **The Transform APA Disputes Inhibit the Debtors' Ability To Prove that They Will Be Able To Pay Holders of Administrative Expense Claims in Full**

  39. In addition to the Amended Plan's failure to provide treatment to Administrative

Expense Claims consistent with the requirements of Bankruptcy Code section 1129(a)(9), it is

unclear whether the Debtors will ever be able to prove their administrative solvency in light of

---

[23] Indeed, as is clear from recent filings with the Court, creditors continue to receive evasive and unsatisfying answers from both the Debtors and Transform as to who is liable for their claims.  *See, e.g.*, *Reply by Gokaldas Exports Ltd. to Debtors' Omnibus Objection to Vendors' Motions for Allowance and Payment of Administrative Expense Claims* [ECF No. 3918] (stating that the vendor is a "victim of a contractual dispute between the Debtors and the Buyer" after having been told by the Debtors that Transform is responsible for its claim and, in turn, Transform informing it that the Debtors are responsible, and noting that the "schedule [in the Asset Purchase Agreement] provided no notice to any creditors as to whether their particular claims were to be considered 'Other Payables.'").

the Transform APA Disputes.  In fact, without favorable resolution of the numerous material

issues between the Debtors and Transform, the Debtors have no means to satisfy their

administrative claims on the Effective Date, even on a consolidated basis.[24]

40.    The Debtors fail to disclose the significant risks associated with how these

disputes may be resolved and Transform's willingness to honor its contractual obligations to the

Debtors (or its financial wherewithal to do so).  The magnitude of the Transform APA Disputes

and their direct impact on the Debtors' ability to satisfy Bankruptcy Code section 1129(a)(9)

require that the disputes be resolved prior to expending resources to solicit and seek confirmation

of the Amended Plan.  Indeed, absent favorable resolution on substantially all of the following

items that Transform disputes, the Amended Plan will be unconfirmable.

- **The Amount of Other Payables for which Transform Is Responsible**:
  Currently, Transform refuses to pay approximately $66 million of such
  amounts, which would be used to satisfy a portion of the Debtors' estimated
  $180 million in postpetition accounts payable.  *See* Mediation Motion ¶¶ 19-
  20; Amended Disclosure Statement IV.T.

- **The Size of the Prepaid Inventory Shortfall**:[25]  Although the Debtors
  acknowledge a shortfall of $55 million,[26] Transform has asserted the shortfall
  to be at least $97 million.  *See* Mediation Motion ¶¶ 21-22; *Declaration of
  Katherine R. Lynch in Support of Transform Holdco LLC's Motion to Assign
  Matter to Mediation* [ECF No. 2767] (the "Lynch Declaration"), Exs. A, D.
  Under the Asset Purchase Agreement, the amount of the shortfall reduces,
  first, the amount of Severance Reimbursement Obligations (as defined in the

---

[24] As of May 11, 2019, the Debtors estimated that Administrative Expense Claims, excluding any 507(b) Claims,
totaled approximately $472 million.  *See* Amended Disclosure Statement IV.T.  The Debtors believe they will, at
some point, have $504 million available to satisfy those claims, yet almost two-thirds of such amount depends upon
Transform honoring its agreement to satisfy "$270 million of those liabilities (subject to reduction in accordance
with the Asset Purchase Agreement)" and turn over "$52 million in cash and inventory currently being withheld by
Transform."  *Id*.

[25] "Prepaid Inventory Shortfall Amount" means "an amount equal to $147,000,000 less the amount of the Prepaid
Inventory as of the Closing Date; provided, that if the Warranty Receivables Shortfall Amount is a negative number,
the Prepaid Inventory Shortfall Amount shall be reduced by the absolute value of the Warranty Receivables
Amount."  Asset Purchase Agreement § 1.1.

[26] This amount represents $63 million in Prepaid Inventory Shortfall offset by an estimated $8 million in excess
Warranty Receivables, which remains disputed by Transform.

Asset Purchase Agreement) and, second, the amount of assumed 503(b)(9) Claims.[27]  *See* Asset Purchase Agreement § 2.3(k)(ix).

- ***The Amount of Specified Receivables Delivered to Transform***:[28]  Transform estimates a Specified Receivables Shortfall Amount[29] of at least $120 million. *See* Lynch Decl., Ex. A.  If correct, this shortfall, reduces, first, the amount of Severance Reimbursement Obligations and, second, the amount of assumed 503(b)(9) Claims.[30]  *See* Asset Purchase Agreement § 2.3(k)(vii).

- ***The Amount of Warranty Receivables Delivered to Transform***:[31] Transform estimates a Warranty Receivables Shortfall Amount[32] of $1.3 million.  If correct, this shortfall reduces, first, the amount of Severance Reimbursement Obligations (as defined in the Asset Purchase Agreement) and, second, the amount of assumed 503(b)(9) Claims.  *See* Asset Purchase Agreement § 2.3(k)(viii).

- The amount of cash available as of the Closing and whether an Aggregate DIP Shortfall (as defined in the Asset Purchase Agreement) that would further reduce the amount of assumed liabilities.

41.     Taken together, Transform's obligations to assume various liabilities of the Debtors could be offset completely, thereby eliminating the $270 million that the Debtors assume Transform will pay.[33]

---

[27] In their Administrative Expense Tracker, the Debtors include a downside scenario showing a ███████████ ███████ of the difference between the Debtors' and Transform's estimates of the Prepaid Inventory Shortfall amount.

[28] "<u>Specified Receivables</u>" means certain accounts receivable set forth in a schedule to the Asset Purchase Agreement.  *Id.*

[29] "<u>Specified Receivables Shortfall Amount</u>" means "an amount equal to $255,200,000 less the amount of the Specified Receivables delivered to Buyer at Closing."  *Id.*

[30] In their Administrative Expense Tracker, the Debtors include a downside scenario showing a ███████ ███████ related to the Specified Receivables Shortfall dispute.

[31] "<u>Warranty Receivables</u>" means certain accounts receivable set forth in a schedule to the Asset Purchase Agreement.  *Id.*

[32] "<u>Warranty Receivables Shortfall Amount</u>" means "an amount equal to $53,600,000 less the amount of the Warranty Receivables deliver to Buyer at Closing; <u>provided</u>, that if the Prepaid Inventory Shortfall Amount is a negative number, the Warranty Receivables Shortfall Amount shall be reduced by the absolute value of the Prepaid Inventory Shortfall Amount."  *Id.*

[33] Transform also has asserted that the Debtors "failed to deliver title to all of the Debtors' real property in the Village of Hoffman Estates, Illinois."  *See* Amended Disclosure Statement IV.Q.  There is no further disclosure regarding the impact this dispute could have if the issue is decided adversely against the Debtors.

42.     Equally concerning, Transform continues to withhold approximately $52 million that the Debtors believe is immediately due and owing to them.  Upon information and belief, the amounts in dispute currently include up to: (i) $15 million relating to credit card receivables from pre-Closing activity; (ii) $20 million relating to cash in transit at the Closing; (iii) $11 million in pro-rated rent; and (iv) $6 million in excess inventory delivered to Transform at Closing.  *See generally Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* [ECF No. 2796] ¶¶ 16-17, 19.

43.     Based on its conduct to date, Transform appears willing to litigate each of these disputes to its conclusion.  Moreover, as the primary target of the estates' claims and causes of action and the controlling shareholder of Transform, ESL undoubtedly is incentivized to seek as many concessions as possible from the Debtors and engage the Debtors in costly litigation that will erode the estates' resources or force the Debtors to compromise on the valuable Preserved Causes of Action in a manner favorable to ESL.  The Transform APA Disputes have existed for nearly three months and the date on which Transform becomes obligated to pay is closely approaching,[34] but little progress on a majority of the open issues has been made and administrative expenses associated therewith increasing daily.[35]

44.     To be clear, the Creditors' Committee opposes Transform's transparent reneging of its obligations under the Asset Purchase Agreement and begrudges the undue costs it has

---

[34] Under the Asset Purchase Agreement, Transform is not required to make any payments with respect to assumed 503(b)(9) Claims until the earlier of 120 days following Closing (*i.e.*, June 11, 2019) or confirmation of a chapter 11 plan.  *See* Asset Purchase Agreement § 2.3(k)(ii).

[35] As of the date of the filing of this Objection, $225 million (or $175 million, in light of the Debtors' apparent acknowledgement of a $55 million Prepaid Inventory Shortfall) remains unpaid by Transform in respect of the Transform APA Disputes.

forced the Debtors' estates to incur to date with respect thereto. The Debtors cannot ignore, however, the fact that creditors—particularly unsecured creditors—bear the entire risk of the Debtors' disputes with Transform. Therefore, so long as Transform's unwillingness to honor all of its obligations overhangs the Debtors' ability to pay their administrative creditors, soliciting the Amended Plan and preparing for a costly contested confirmation hearing is a wasteful, premature and, potentially, futile exercise.

> **3.    The Debtors' Solvency Analysis Fails to Account for Additional Contingencies and Numerous Risk Factors that Further Inhibit the Debtors' Ability To Demonstrate that They Are Administratively Solvent**

45.    In addition to the Transform APA Disputes, a number of other contingencies, any one of which would solidify the Debtors' administratively insolvency, threaten the Debtors' precarious financial position. These include, among other things:

- ***Allowance of 503(b)(9) Claims***: The Debtors forecast $181 million of allowed 503(b)(9) Claims. *See* Amended Disclosure Statement IV.T. The Debtors also assume that the $181 million of estimated allowed 503(b)(9) Claims is reduced by $139 million, representing Transform's obligations under the Asset Purchase Agreement. As noted above, however, Transform disputes its obligation to pay these amounts. In fact, upon information and belief, Transform has asserted that it may not be liable for any of the $139 million that remains to be paid on account of 503(b)(9) Claims. Over 2,500 proofs of claims alleging 503(b)(9) Claims were filed as of May 2, 2019, totaling $1.3 billion. The Debtors have done an initial review of the filed claims and have eliminated all but $204 million. Although the Debtors have indicated that they expect this number to decrease as more substantial diligence is undertaken, they have not yet determined with certainty that 503(b)(9) Claims will be $181 million or less, as forecasted. Finally, upon information and belief, the Debtors are calculating some or all 503(b)(9) Claims by assuming that the Debtors "received" such goods at the point of origin, rather than when the Debtors were in physical possession of the goods. If the Debtors' assumption, which has been challenged in other jurisdictions, is incorrect, the Debtors' liability for 503(b)(9) Claims could increase significantly—another risk that is entirely undisclosed. *See In re World Imports, Ltd.*, 862 F.3d 338 (3d Cir. 2017) (holding that the meaning of "received" under Bankruptcy Code section 503(b)(9) requires physical possession of the goods).

- *Allowance of 507(b) Claims*:  Holders of Second Lien Debt continue to assert sizable 507(b) Claims.  Cyrus, for example, has asserted a 507(b) Claim of at least $60 million based on the aggregate diminution of value of the collateral securing the Second Lien Debt through the closing of the Sale Transaction.  *See* Apr. 18 Hr'g. Tr. 96:18-101:17.  The allowance of such 507(b) Claims must be determined as part of the analysis of whether each of the Debtors will have the ability to satisfy administrative expenses.

- *Retiree Benefits*:  Upon information and belief, the Debtors are not including any potential administrative expense claims that may be asserted by retirees notwithstanding that there is an open issue regarding the extent of the Debtors' potential liabilities for retiree benefits, the extent of such liabilities and the priority that is to be afforded any such claims.  *See, e.g.*, Amended Disclosure Statement IV.L; *Secretary of Labor's Limited Objection to the Disclosure Statement for Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [ECF No. 3759].  Moreover, there is the issue of whether a retiree committee needs to be appointed under section 1114, which appointment will only increase the expenses that must be incurred by the estates in connection therewith and for which the Debtors fail to account.  *See, e.g.*, *In re A.C.E. Elevator Co.*, 347 B.R. 473, 484-86 (RDD) (Bankr. S.D.N.Y. 2006); *In re Delphi*, 2009 WL 637315, at *8 (Bankr. S.D.N.Y. Mar. 10, 2009) ("I view the [section 1114] burden to be so serious . . . that I should exercise my authority under [section] 1114(d) to appoint a committee of retirees to act as a representative . . .).

- *Calder Litigation*:  The Debtors forecast proceeds of $4 million ███████ ███████████ from the settlement of pending state court litigation relating to a sculpture created by the late Alexander Calder, which previously was installed in the Willis Tower in Chicago.  *See Motion of 233 S. Wacker LLC for Relief from the Automatic Stay*, dated February 1, 2019 [ECF No. 2326].  The likelihood that the Debtors, in fact, realize these proceeds is unclear.

- *Hoffman Estates Tax Credit*:  ████████████████████████ ██████████ representing special tax allocation funds (the "EDA Funds") the Debtors receive pursuant to Illinois state law.  The Debtors' receipt of the EDA Funds has been stalled due to litigation commenced by the Community Unit School District 300 (the "School District") against the Debtors.  This Court recently entered an order granting the School District's motion for abstention [ECF No. 3362], leaving the Illinois state courts to determine whether the Debtors are entitled to all or a portion of the EDA Funds.  The issue before the Illinois courts is one of first impression.  While the Debtors could be successful, they also could end up with no EDA Funds, which the Debtors do not account for appropriately.  This litigation, the expected duration thereof, costs associated therewith and the risk attendant thereto similarly are entirely undisclosed.

- ***Professional Fees***: The Debtors have budgeted $28 million in professional fees from May 19, 2019 through October 2019. However, in March 2019 alone, professional fees were estimated to have been $18 million, suggesting that $28 million is far from adequate to operate these cases through the Effective Date.[36]

46.    The foregoing risks are further compounded by the fact that the Debtors have yet to establish a bar date with respect to Administrative Expense Claims (other than 503(b)(9) Claims). The Debtors' estimates are based entirely on their own books and records, and while claims may come in lower than what is reflected therein, without a bar date in place, there is no means to verify the Debtors' estimates. Absent resolution of these issues, among others, the Debtors' cannot demonstrate that the Amended Plan is confirmable.

**C.    The Amended Plan Has Not Been Proposed in Good Faith and Violates Multiple Bankruptcy Code Provisions**

47.    Bankruptcy Code section 1129(a)(3) requires that in order for a court to confirm a plan, the plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The term "good faith" is not defined in the Bankruptcy Code. Courts have interpreted this requirement to mean there exists "a 'reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code. . . . Thus, for purposes of determining good faith under [Bankruptcy Code] section 1129(a)(3), the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Quigley Co., Inc.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) (citations omitted); *see also Kane v. Johns–Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) ("good faith requires that a plan be proposed with honesty and good intentions and with a basis for expecting that

---

[36] The Debtors have budgeted $48 million in professional fees from May 19, 2019 through October 2019. Of this $48 million, $19 million reflects incurred fees scheduled to be paid out the week ending May 18, 2019, leaving a balance of $28 million to cover remaining professional expenses through October 2019.

reorganization can be effected") (internal citations omitted); *Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re Learnout & Hauspie Speech Prods. N.V.)*, 308 B.R. 672, 675 (D. Del. 2004) (interpreting the "good faith" requirement to mean "alternatively that (1) the plan be consistent with the objectives of the Bankruptcy Code; (2) the plan be proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; or (3) there was fundamental fairness in dealing with creditors") (citations omitted).

48.    In order to satisfy the good faith requirement of the Bankruptcy Code and ensure fundamental fairness to unsecured creditors, material modifications to the Amended Plan are necessary.  These modifications include:

- Consistent with Bankruptcy Code sections 1129(a)(3) and 1123(a)(7), the Creditors' Committee must be authorized to select the majority of the members of the Liquidating Trust Board, who, in turn shall select the Liquidating Trustee.  This modification will ensure that unsecured creditors control prosecution of litigation that should inure primarily (if not solely) to their benefit; and

- the Liquidating Trust must be funded adequately to (i) prosecute the Preserved Causes of Action, including the litigation of complex valuation issues and the enforcement of any judgment entered in connection therewith; (ii) reconcile over $80 billion in filed proofs of claim; and (iii) perform any of its other duties set forth in the yet to be filed Liquidating Trust Agreement.

The Debtors' unwillingness to accede to these requests—despite repeated and unequivocal statements by the Creditors' Committee that it will not support any plan that does not contain such provisions—is bewildering.

49.    It is standard practice for the beneficiaries of a liquidating or litigation trust to control its governance, and the Debtors have yet to articulate any legitimate rationale for why these Chapter 11 Cases are different.[37]  Indeed, the control exercised by unsecured creditors over

---

[37] Attached hereto as **Exhibit B** is a survey of cases in the last ten years in which litigation or liquidation trusts were established.  Based on the Creditors' Committee's review, debtors—as opposed to creditor beneficiaries—did not

a liquidating or litigation trust in chapter 11 is analogous to the right of unsecured creditors to elect a trustee in chapter 7. *See* 11 U.S.C. § 702(b) (providing that unsecured creditors that hold at least 20% of certain eligible claims, excluding claims insiders or other holders with materially adverse interests, entitled to distributions have the right to request election of a permanent chapter 7 trustee). As courts have recognized, the purpose of Bankruptcy Code section 702 is allow general unsecured creditors "to provide for the administration of the chapter 7 estate by a trustee of their own choosing." *See, e.g.*, *In re Nanvarok Seven, Inc*., 148 B.R. 86, 87 (Bankr. D.C. 1992) ("As a general rule, the choice of the unsecured creditors should be recognized and upheld by the court unless the selection was contrary to law, or it appears that the trustee so elected has interests that conflict with those of the general creditors of the estate.") (citing *In re Mayflower Hat Co.*, 65 F.2d 330, 331 (2d Cir. 1933)). Indeed, "property of the debtor's estate is held in trust for" unsecured creditors and, therefore, that such creditors should be permitted to supervise the collection and liquidation of the estates' assets. *In re Poage*, 92 B.R. 659, 662 (Bankr. N.D. Tex. 1988); *In re Radford Enterprises, Inc.*, 31 B.R. 213, 215 (Bankr. N.D. Ohio 1983) (Bankruptcy Code section 702 allows "creditors, the group most adversely affected by the filing of the bankruptcy petition, to decide who will perform the liquidation. Such an election may serve to bolster the creditors' trust and confidence that the estate is being liquidated in the most efficient and beneficial manner possible.").

50.    This is entirely consistent with the articulated view that a chapter 7 trustee's primary role is to liquidate estate property for the benefit of unsecured creditors. *In re First State*

---

appoint a majority of the board members in any of the cases surveyed. In fact, there was only one case, *In re Brookstone Holdings Corp.* (where the plan was proposed jointly by the debtors and the creditors' committee), in which the plan provided for the debtors to appoint the members of the board jointly with the creditor beneficiaries. Significantly, in *Brookstone*, each of the initial members of the trust board were the members of the creditors' committee.

*Bancorp.*, No. 7-11-11916 JA, 2013 Bankr. LEXIS 873, at *22-23 (Bankr. D.N.M. Mar. 6,

2013); *Rambo v. Chase Manhattan Mortg. Corp. (In re Rambo)*, 297 B.R. 418, 433 (Bankr. E.D.

Pa. 2003).   Moreover, while a chapter 7 trustee is a fiduciary obligated to treat all parties fairly, a

chapter 7 trustee's primary duty is to the estate's unsecured creditors.   *Dabit v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc. (In re Merrill Lynch & Co. Research Reports Sec. Litig.)*, 375 B.R.

719, 727 (S.D.N.Y. 2007) (citing *In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 98 (Bankr.

S.D.N.Y. 2005)); *In re Payne*, 512 B.R. 421, 427 (Bankr. E.D.N.Y. 2014); *see also In re Ellis*,

No. 10-16998 (RLM), 2014 Bankr. LEXIS 1952, at *2 (Bankr. S.D. Ind. Apr. 30, 2014) (stating

that a "chapter 7 trustee represents the interests of the unsecured creditors").

51.    The Creditors' Committee's selection of the majority of the members of the

Liquidation Trust Board likewise is consistent with the provisions of Bankruptcy Code section

1123(a)(7), which requires that a chapter 11 plan "contain only provisions that are consistent

with the interests of creditors . . . and with public policy with respect to the manner of selection

of any officer, director, or trustee under the plan and any successor or such officer, director or

trustee."   *See In re Bearingpoint, Inc.*, No. 09-10691 (REG), 2009 Bankr. LEXIS 5045, at *14-

15 (Bankr. S.D.N.Y. Dec. 22, 2009) (finding that, as the liquidating trust will be overseen by an

advisory board comprising two members of the creditors' committee, the plan satisfies

Bankruptcy Code section 1123(a)(7)); *In re EBHI Holdings, Inc.*, No. 09-12099 (MFW), 2010

Bankr. LEXIS 3062, at *10-11 (Bankr. D. Del. Mar. 18, 2010) (finding that "[t]he Liquidating

Trust Committee that oversees the Liquidating Trustee will be comprised of members appointed

by the Creditors' Committee.   The Plan therefore complies with section 1123(a)(7) of the

Bankruptcy Code,  as appropriate for a liquidating plan, in a manner consistent with the interests

of creditors and equity security holders and public policy."); *In re Refco Inc.*, No. 05-60006

(RDD), 2006 Bankr. LEXIS 4914, at *17-18 (Bankr. S.D.N.Y. Dec. 14, 2006) (finding that

appointment of the plan administrator by the official creditors' committees satisfied Bankruptcy

Code section 1123(a)(7)).

52.    As the primary (if not sole) beneficiaries of the Preserved Causes of Action, and

consistent with the weight of authority set forth herein, unsecured creditors should control the

governance of the Liquidating Trust.  In an effort to resolve this critical issue of governance, the

Creditors' Committee has proposed that the Liquidating Trust comprise either: (i) three

members, with two appointed by the Creditors' Committee and one member appointed by the

Debtors; or (ii) five members, with three members appointed by the Creditors' Committee and

two members appointed by the Debtors.  To date, however, the Debtors have been unwilling to

accept this compromise.

53.    Upon information and belief, the Debtors will contend that the Creditors'

Committee should not control a majority of the Liquidating Trust Board because the members of

the Restructuring Subcommittee are intimately familiar with the facts giving rise to the Specified

Causes of Action.  This view does not withstand scrutiny.  First, the Debtors' current directors

have no beneficial interest in or economic incentive with respect to the successful pursuit of the

preserved litigation, and their knowledge regarding facts underlying certain of those actions is

insufficient to justify the Debtors selecting the parties that will control unsecured creditor

recoveries.  Second, the Restructuring Subcommittee has created, if not an actual conflict of

interest, the appearance of such a conflict.  Specifically, certain of the Debtors' directors and

officers, who were involved in the approval of prepetition transactions underlying the Specified

Causes of Action and will be subject to investigation and potential liability in connection with

the prosecution of such actions, remain on the Debtors' board or have developed relationships

with the members of Restructuring Subcommittee.  As discussed further *infra*, the Debtors may

be seeking to release current members of the Board and former officers of the Debtors by

declining to name such individuals in the Complaint and not otherwise committing to name such

individuals in the Plan Supplement.  This decision has the effect of releasing potentially culpable

parties for no consideration and may preclude full access to the Debtors' D&O Policies and

related proceeds with respect to such parties.  Absent confirmation that such parties will be

named in the Plan Supplement or justification otherwise (neither of which the Amended

Disclosure Statement provides), the release provisions of the Amended Plan do not withstand

scrutiny.

54.      The Debtors' efforts to control the governance of the Liquidating Trust under the

guise of institutional knowledge are improper and should not be countenanced by this Court.

Indeed, absent the modifications detailed herein, the Amended Plan strips unsecured creditors of

their fundamental rights under the Bankruptcy Code.

### D.    The PBGC Settlement Violates the Bankruptcy Code

55.      The PBGC Settlement, which entitles PBGC to a significant priority claim despite

its status as an unsecured creditor, amounts to unfair discrimination against similarly situated

creditors and is another basis upon which the Amended Plan has not been proposed in good faith.

11 U.S.C. §§ 1122, 1123(a)(4)  The Amended Plan cannot be confirmed so long as this disparate

treatment exists.

56.      Under the terms of the PBGC Settlement, PBGC and the Debtors agreed to the

termination of the Debtors' pension plans (the "Pension Plans") effective January 31, 2019, and

entered into a trusteeship agreement appointing PBGC as the trustee of the Pension Plans.

Amended Disclosure Statement IV.U.  In addition, PBGC agreed to reduce its asserted unsecured

claim for Unfunded Benefit Liabilities ("UBL") from $1.4 billion to $800 million and received

an allowed unsecured claim in satisfaction of such amount (the "UBL Claim"). *Id.* In addition, the Debtors also agreed to give PBGC a secured interest or other priority right to the first $97.5 million of proceeds received by the estates from the Preserved Causes of action (an increase of 20% from the $80 million priority interest contemplated by the Original PBGC Settlement). Neither the Original PBGC Settlement, the Initial Disclosure Statement nor the Amended Disclosure Statement offers (i) an explanation for the magnitude of the asserted UBL Claim or the reduction thereto, (ii) any legitimate legal justification for granting PBGC a priority interest in the Preserved Causes of Action (let alone the subsequent increase in the amount of such) or (iii) a rationale for classifying PBGC Claims separately from all other unsecured creditors.

57.     Without providing any justification and in contravention of applicable precedent, the Debtors classify the PBGC Claims separately from other unsecured creditors to ensure that the Amended Plan has the support of an impaired accepting class. *See* 11 U.S.C. § 1122; *see also In re Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477 (2d Cir. 1994) ("similar claims may not be separately classified solely to engineer an assenting impaired class"). Compounding this improper classification, and in violation of Bankruptcy Code section 1129(a)(4), the Debtors provide PBGC with priority trust interests entitling PBGC to materially better recoveries than other, similarly situated unsecured creditors. *Cf.* 11 U.S.C. § 1123(a)(4) (requiring that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."); *see also In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018) ("Equality of treatment requires that all class members receive equal value and pay the same consideration in exchange for their distributions."). Such treatment is improper.

58.     Moreover, in light of the numerous deficiencies in the Amended Plan that detrimentally impact unsecured creditors (not least, substantive consolidation), it is likely that the class of general unsecured claims votes to reject the Amended Plan.  In that event, the Debtors must be prepared to demonstrate how the PBGC Settlement satisfies Bankruptcy Code section 1129(b).  The Second Circuit has adopted the following four-part test to determine whether a plan discriminates unfairly against certain creditors that have voted to reject a plan: "(1) there is a reasonable basis for discriminating, (2) the debtor cannot consummate the plan without the discrimination, (3) the discrimination is proposed in good faith, and (4) the degree of discrimination is in direct proportion to its rationale."  *In re WorldCom, Inc.*, No 02-12533 (AJG) 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990)).  The Debtors cannot demonstrate that the Amended Plan satisfies these factors in light of the PBGC Settlement and the corresponding treatment of PBGC Claims.

### 1.     The UBL Claim Is Overstated

59.     As part of the PBGC Settlement, PBGC agreed to have its UBL Claim allowed in the amount of $800 million, after initially asserting a claim of $1.4 billion.  Neither the PBGC nor the Debtors, however, have disclosed the calculation behind the $1.4 billion estimate rendering it impossible to determine the benefit received from the allowance of such claim at $800 million.

60.     Courts generally hold that UBL claims are calculated using PBGC's termination interest rates in effect on the date a pension plan is terminated, rather than with a reasonable prudent investor rate.  *See e.g.*, *Raleigh v. Ill. Dep't of Rev. (In re Stoker)*, 530 U.S. 15 (2000) (agreeing unanimously with the State of Illinois that absent a contrary provision in the Bankruptcy Code, bankruptcy courts must apply substantive non-bankruptcy law and holding

that when the substantive law creating a tax obligation puts the burden of proof on a taxpayer, the burden of proof on the tax claim in bankruptcy court remains where the substantive law put it (in this case, on the trustee in bankruptcy).  It is unclear what rate was used to calculate the UBL Claim for purposes of the PBGC Settlement.

61.   On or shortly after the Petition Date, PBGC stated publicly that the two Pension Plans had combined underfunding of about $1.5 billion.  *See, e.g.*, PBGC Statement on Sears Bankruptcy Filing, *available at* https://www.pbgc.gov/news/press/releases/pbgc-statement-on-sears-bankruptcy-filing (the "PBGC Statement").  At the time of the PBGC Statement, the interest rate for determining liabilities for purposes of calculating unfunded liabilities in a distress termination was 2.84%.  *See* ERISA 4044 Annuities, *available at* https://www.pbgc.gov/prac/interest/ida.  By the Plan Termination Date, however, this interest rate had increased to 3.09%.  *Id.* [38]  A 25 basis point increase in interest rates would decrease significantly the liabilities under the Pension Plans and, therefore, the amount of PBGC's UBL Claim.

62.   Additionally, after the PBGC Statement, $250 million was released from the escrow account established under the PPPFA and contributed to the Pension Plans.  It is unclear whether the $250 million was included as a plan asset in the UBL Claim calculation.  Neither the Debtors nor PBGC provides any information regarding whether those contributions were included as Pension Plan assets at the time of the above-referenced PBGC Statement.  If not included, those contributions would have increased the Pension Plan assets at the time of the

---

[38] The rate applied to calculate the amount of PBGC's UBL Claim should be the PBGC interest rate in effect on January 31, 2019 (the "Plan Termination Date").  29 U.S.C. § 1362(b)(1), 29 C.F.R. §§ 4044.41, 4044.52.  The PBGC Settlement does not state whether the interest rate used in estimating PBGC's UBL Claim was .0284 (the rate in effect for termination dates of October 1, 2018 through December 31, 2018) or .0309 (the rate in effect for pension plan termination dates from January 1, 2019 through March 31, 2019).  *See* 29 C.F.R. 4044.52, Appendix B (termination interest rates by date of termination).

termination, thereby further decreasing PBGC's UBL Claim (as the amount of such claim is the

value of the benefit liabilities under the plan as of the Plan Termination Date over the current

value of the assets of the plan as of the Plan Termination Date).  29 U.S.C. § 1301(a)(18).

**2.    There Is No Basis for PBGC To Have a Priority Claim**

63.    The Debtors provide no basis for granting PBGC a priority claim to the proceeds

of the Preserved Causes of Action.  Instead, the Debtors reference several agreements that it

reached with PBGC, none of which constitute a valid basis for granting a preferred claim to an

unsecured creditor.  The Debtors cite to, for example, (i) PBGC's agreement not to assert $375

million in termination premiums (*i.e.*, payments owed by the sponsors of defined benefit single-

employer pension plans to PBGC on an annual basis and following termination of a pension

plan), (ii) PBGC's agreement to take all reasonably requested actions by the Debtors to ensure

that any claims of KCD IP, LLC ("KCD") against the Debtors are waived in total and (iii)

PBGC's agreement to waive the assertion of any administrative or superpriority administrative

expense claim.  *See* Amended Disclosure Statement II.E.2, IV.U.  To add to the confusion, the

Debtors' Initial Liquidation Analysis assumed that the PBGC Settlement would not be

effectuated in the chapter 7 scenario, but does not even mention that PBGC might assert

termination premiums—calling into question the Debtors' view regarding the validity of such

premiums.  *See* Initial Liquidation Analysis III.8(g) (noting only that PBGC would assert the full

amount of its $1.4 billion claim at each Debtor in a chapter 7 scenario).  Instead, the Initial

Liquidation Analysis stated that PBGC has asserted a lien against each of Sears Re and KCD

(*i.e.*, non-Debtor entities), which, in turn, according to the Debtors, somehow would be entitled

to priority under Bankruptcy Code section 507(a)(8) against each of the Debtors.  *Id.*  The

Debtors do not offer a justification for PBGC's entitlement to a priority claim because there is

none.  The grant to PBGC a further enhanced priority claim of $97.5 million—a transparent

43

attempt to lessen the impact substantive consolidation would have on PBGC (at the expense of other unsecured creditors) and maintain PBGC's support for the Amended Plan—cannot be anything other than improper vote buying.  *See In re Featherworks Corp.*, 25 B.R. 634, 641 (Bankr. E.D.N.Y. 1982) ("[I]f any creditor receives some special consideration peculiar to him, his vote is no longer disinterested and unbiased and the Code's built-in controls are neutralized.").

64.    First, PBGC's alleged entitlement to a priority claim in respect of the purported $375 million in termination premiums does not withstand scrutiny based on the facts of these Chapter 11 Cases.  The Debtors' liquidation is the proximate cause of the termination of the Pension Plans.  Indeed, notwithstanding the Debtors' financial difficulties in recent years, and ultimate commencement of these Chapter 11 Cases, it was not until the Debtors entered into the Asset Purchase Agreement and formalized their plans to liquidate their estates that PBGC took steps to terminate the Pension Plans.  Under applicable law, termination premiums are due when (i) PBGC initiates the termination or (ii) when the plan sponsor reorganizes, but not when a plan sponsor liquidates.  *See* 29 U.S.C. § 1306(a)(7).[39]  Here, where both the Debtors and PBGC initiated termination, the Liquidation Termination (under which termination premiums to PBGC are expressly excluded) should control, thereby precluding any entitlement to a termination premium.  Any contrary outcome would allow PBGC to circumvent—and thus render

---

[39] Under ERISA section 4041(c)(2)(B), an underfunded single-employer pension plan may be terminated under clause (i) (termination due to liquidation in bankruptcy) (a "Liquidation Termination"), clause (ii) (termination due to reorganization in bankruptcy) (a "Reorganization Termination") or clause (iii) (termination outside of bankruptcy to allow sponsor to continue in business) ("Ongoing Business Termination").  29 U.S.C. § 1341(c)(2)(B). Alternatively, under ERISA section 4042, PBGC may initiate termination to avoid an unreasonable risk of long-term loss to the PBGC, participants or beneficiaries (a "PBGC Termination").  29 U.S.C. § 1342.  In turn, ERISA section 4006(a)(7) provides that upon a Reorganization Termination, an Ongoing Business Termination or a PBGC Termination, PBGC shall be entitled to a premium at a rate equal to $1,250 multiplied by the number of individuals who were participants in the plan immediately before the termination date with respect to each applicable 12-month period, but provides no such premiums for a Liquidation Termination.  29 U.S.C. § 1306(a)(7).

meaningless—the statute's clear prohibition on the award of termination premiums in connection with a Liquidation Termination.

65.    Moreover, any attempted interpretation of ERISA that supports PBGC's entitlement to termination premiums in a liquidation is contrary to the basic canon of statutory interpretation that statutory provisions should not be rendered superfluous. *State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003) (citing *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) (noting that it is well-established that courts should "avoid statutory interpretations that render provisions superfluous."); *Cal. Pub. Emps. Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 106 (2d Cir. 2004) ("Statutes should be construed, if possible, to give effect to every clause and word") (citations omitted); *U.S. v. Novak*, 476 F.3d 1041, 1048-49 (9th Cir. 2007) (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)) (applying the surplusage canon to avoid "possible statutory interpretations that result in superfluous language" while interpreting ERISA's anti-alienation provision).[40]

66.    Second, the Debtors also rely on the PBGC's commitment to take all reasonable actions requested by the Debtors to prevent KCD from asserting its alleged $146 administrative claims against the Debtors ($144 million against Roebuck and $2 million against Kmart). *See Objection and Reservation of Rights of Pension Benefit Guaranty Corporation to Debtors'*

---

[40] In addition, the statutory canon of *expressio unius est exclusio alterius*, meaning "the mention of one thing implies the exclusion of the other," militates against PBGC's entitlement to termination premiums here. *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 221 (2d Cir. 2009) (citations omitted). Courts apply *expressio unius* "when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (citation and internal quotation marks omitted). *Expressio unius* "prevents expanding an enumerated list of items or exceptions." *Cruz v. T.D. Bank, N.A.*, 855 F. Supp. 2d 157, 171 (S.D.N.Y. 2012), *aff'd and remanded*, 742 F.3d. 520 (2d Cir. 2013). Here, clauses (i), (ii) and (iii) of ERISA section 4041(c)(2)(B) comprise a series of alternatives for the termination of a single-employer pension plan. Congress enumerated clauses (ii) and (iii), thereby specifically excluding clause (i) from the list of terminations meriting a premium under ERISA section 4006(a)(7). Interpreting ERISA to expand the award of termination premiums to a Liquidation Termination would contradict not only the doctrine of *expressio unius*, but also the unambiguous Congressional intent.

*Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* [ECF No. 2007] (the "PBGC Cure Objection") (stating that, upon information and belief, KCD had "accrued at least $86 million in administrative expense claims, which figure should continue to grow") ¶ 5; Amended Disclosure Statement IV.U ("PBGC had taken the position that KCD had an Administrative Expense Claim for both the Minimum Royalty and the Actual Royalty [in] an aggregate amount [] in excess of $146 million."). As noted *supra*, in connection with the PBGC Settlement, PBGC agreed to take all reasonable actions requested by the Debtors to cause KCD to waive the potential administrative expense claims against Roebuck and Kmart. *See* Initial Liquidation Analysis III.8(f). According to the Debtors, because PBGC is KCD's primary creditor, PBGC's agreement to take such actions ensures that KCD will not file an administrative expense claim against these Debtors. *See* Amended Disclosure Statement IV.U. The Debtors, however, obtained no actual benefit from this agreement by PBGC. As the Debtors' Initial Liquidation Analysis showed, $144 million of $146 million of KCD's potential administrative expense claims would be assertable against Roebuck, an administratively insolvent entity that would not be able to satisfy its considerable secured postpetition intercompany obligations to Kmart. *See* Initial Liquidation Analysis at 9. Therefore, the most KCD could hope to realize would be the remaining $2 million assertable against Kmart. After accounting for cost of prosecuting the claim and adjusting for the risk that the claim is not allowed, it is doubtful that KCD would have pursued such a claim even without PBGC's efforts to prevent it from doing so. Simply put, PBGC's agreement to support the waiver of a non-Debtor's Administrative Expense Claim cannot serve as the basis of a priority claim in favor of PBGC.

67.    Third, PBGC's lack of entitlement to a priority interest is reinforced by recent

precedent from numerous jurisdictions holding that PBGC is entitled to a priority claim only to

the extent that such claim is based on work performed by a debtor's employees during the

pendency of the bankruptcy.  *See e.g.*, *PBGC v. CF&I Fabricators of Utah, Inc. (In re CFI*

*Fabricators of Utah, Inc.)*, 150 F.3d 1293 (10th Cir. 1998) (affirming the district court's decision

and holding that: (1) PBGC's rights and powers under ERISA do not give it priority over the

other unsecured creditors of a debtor's estate; (2) PBGC's claim for unpaid contributions was not

entitled to administrative priority; and (3) nothing in ERISA implies a carry-over into the realm

of bankruptcy to allow PBGC to set its own valuation methodology for its unfunded benefit

liabilities claim, or the priority of its claim for unpaid contributions); *PBGC v. Sunarhauserman*

*(In re Sunarhauserman, Inc.)*, 126 F.3d 811 (6th Cir. 1997) (affirming the district court's holding

that PBGC's claim in bankruptcy for unpaid minimum funding contributions was entitled to

priority only to the extent that it was based on work performed by the debtor's employees during

bankruptcy (*i.e.*, the "normal cost," adjusted to reflect any declines or increases in workforce)

and that because priority is limited to the portion of the claim directly related to benefits actually

earned by the debtor's employees during bankruptcy, the priority amount is appropriately

reduced to reflect actual reductions in workforce).  Here, the Pension Plans are frozen, and no

benefits have accrued for years.

68.    In view of the foregoing, no postpetition termination premiums (which, on

information and belief, appear to be the basis of PBGC's priority treatment) are owed by the

Debtors to PBGC.  Moreover, to the extent PBGC asserts a right to a priority claim on any other

basis, such priority is unwarranted because none of the UBL Claims relate to employee benefits

accrued after the Petition Date.  Finally, the Debtors have not offered—and there does not appear

47

to be—any legitimate basis whatsoever for the recent increase in PBGC's priority interest in connection with the Substantive Consolidation Settlement.  As such, any priority entitlement afforded to the PBGC Claims results in disparate treatment as between PBGC and the Debtors' other unsecured creditors.

### 3.    Separate Classification of the PBGC Claims Is Improper

69.    Under the guise of a settlement, the Debtors classify the PBGC Claims separately for the sole purpose of manufacturing an impaired accepting class where one might not otherwise exist.  Indeed, presumably recognizing the detrimental impact numerous provisions of the Amended Plan may have on unsecured creditors, the Debtors have classified PBGC's unsecured claims separately from other unsecured claims to ensure that the Debtors are able to satisfy the requirements of Bankruptcy Code section 1129(a)(10).  Absent appropriate justification, which the Debtors have not (and cannot) provide, this separate classification amounts to impermissible gerrymandering.  *See In re Boston Post Rd. Ltd. P'ship*, 21 F.3d at 482 (agreeing with the views expressed by numerous other circuits that "similar claims may not be separately classified solely to engineer an assenting impaired class"); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture*), 995 F.2d 1274, 1279 (5th Cir. 1991) ("[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan"); *In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 602 (Bankr. S.D.N.Y. 2014) ("Although the classification standards are flexible, GMG cannot separately classify Athenian's unsecured claim for the sole purpose of obtaining an impaired accepting class that includes all of the other unsecured claims.") (citations omitted); *Fairfield Exec. Assocs. v. Hyperion Credit Capital Partners, L.P. (In re Fairfield Exec. Assocs.)*, 161 B.R 595, 600 (D. N.J. 1993) ("If a debtor had complete discretion with respect to classification of claims, the confirmation requirements would be seriously undermined if a debtor could gerrymander classes.

A debtor could . . . secure approval by an arbitrarily designed class of impaired claims even

though the overwhelming sentiment of the impaired creditors was that the proposed

reorganization of the debtor would not serve any legitimate purpose.") (citations omitted).

Accordingly, the Amended Plan does not satisfy applicable provisions of the Bankruptcy Code.

###    E.    The Releases for Current Officers and Directors Render the Amended Plan Unconfirmable

70.    The proposed release provisions in the Amended Plan violate applicable sections

of the Bankruptcy Code and are detrimental to creditors. *See* Amended Plan §§ 11.9, 11.11; *see*

*JP-Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*,

419 B.R. 221, 257-61 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan,

courts consider whether such releases are in the best interest of the estate.").  Specifically, the

Amended Plan offers a direct release for all current and former directors and officers of the

Debtors (other than the ESL Parties) unless any such officer or director (i) is named in any action

commenced on behalf of the Debtors or their estates prior to the Confirmation Hearing or (ii) is

identified as a defendant or potential defendant in the Plan Supplement.  Amended Plan § 1.117.

In support of this broad release, the Amended Disclosure Statement merely provides that the

"Debtors believe that the Debtor Releases constitute a sound exercise of the Debtors' business

judgment and are an essential component of the Plan."  Amended Disclosure Statement X.C.2.

Indeed, the Amended Disclosure Statement offers no support at all for the Debtors' release of the

Released Parties, and there is no explanation of what is being compromised and settled or what

consideration was provided in connection with the release.  Simply put, there is no reasonable

basis to grant releases to non-Debtors, especially when the Debtors are liquidating and not

reorganizing.  *See, e.g.*, *Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 54-55

(S.D.N.Y. 2006) (finding that non-debtor release provisions were "important" to the debtor's

plan and could not be excised from the plan because (i) the released parties agreed to make a substantial financial contribution to fund the plan only if they would be released from the claims at issue, (ii) if the releases were not approved, the released parties would not fund the plan and (iii) without funding, the proposed plan would fail); *see also In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (noting that, among other things, substantial contributions to the plan by the non-debtor and the necessity of the release to the reorganization, were relevant factors to consider in approving debtor releases) (citations omitted).

71.    Upon information and belief, it appears that the Debtors are unwilling to pursue claims against certain directors and officers despite their involvement in and/or approval of the transactions that are subject to attack.  *See* Complaint (declining to name members of the Debtors' Restructuring Committee as defendants).[41]  Unless and until such parties are identified in the Plan Supplement, the Plan will result in their release—and thereby forego potential recoveries (including insurance proceeds) for unsecured creditors—is detrimental to creditors and entirely unsupported by the facts of these chapter 11 cases.  *See Commodities Futures Trading Comm. v. Weintraub*, 471 U.S. 343, 352-53 (1985) (stating that a debtor in possession "has the duty to maximize the value of the estate . . . in seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors.").[42]  Moreover, with the Debtors continuing to exert undue control over the governance of the Liquidating Trust, even if the unnamed officers

---

[41] On May 15, 2019, the Creditors' Committee made a demand on the Debtors to amend the Complaint to include certain additional defendants and causes of action and, in connection therewith, shared an amended version of the Complaint implementing these changes.  To date, the Debtors have refused to file an amended version of the Complaint consistent with the Creditors' Committee's revisions.  The Creditors' Committee reserves all rights with respect to such demand.

[42] To the extent the Debtors intend to name such parties in the Plan Supplement, the Amended Disclosure Statement must be modified to specify such intent, but specifying such intent alone is insufficient.

and directors are listed in the Plan Supplement, there is no certainty that the viable and valuable

claims against the officers and directors will ever be pursued.

72.     In seeking to limit liability of insiders without justification, the Debtors attempt to

minimize this free release to certain culpable parties, including current Board members, by

purporting to permit recovery against the Debtors' insurance policies.  *See* Amended Plan §

11.11.  The inclusion of these directors and officers in the definition of Released Party, however,

may entirely preclude the Liquidating Trust from recovering against the Debtors' D&O Policies,

which are indemnity policies.  *See, e.g.*, *Intelligent Digital Sys., LLC v. Beazley Ins. Co., Inc.*,

207 F. Supp. 3d 242, 246 (E.D.N.Y. 2016) (explaining that "'[s]ince an insurer's obligation to

indemnify extends only to those damages the insured is legally obligated to pay, it naturally

follows that a release discharging an insured from all liability relieves the insurer from the duty

of indemnification because it effectively eliminates any factual or legal grounds on which the

duty to indemnify may be based'") (citations omitted).  The Creditors' Committee has raised this

concern with the Debtors on a number of occasions, but, to date, the Debtors have steadfastly

refused to modify the Amended Plan to remove the releases and likewise ensure access to their

D&O Policies.

73.     Moreover, the Amended Plan begs the question of why any non-Debtor parties

are receiving releases at all when the Debtors are liquidating and will not be receiving a

discharge under Bankruptcy Code section 1141.  *See* 11 U.S.C. § 524(e) ("Except as provided in

subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of

any other entity on, or the property of any other entity for, such debt."); *see also Deutsche Bank*

*AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136,

141-42 (2d Cir. 2005) (noting that non-debtor releases are "proper only in rare cases" and

explaining that "[c]ourts have approved non-debtor releases when: the estate received substantial consideration; the enjoined claims were 'channeled' to a settlement fund rather than extinguished; the enjoined claims would indirectly impact the debtor's reorganization 'by way of indemnity or contribution'; and the plan otherwise provided for the full payment of the enjoined claims . . . ") (citations omitted).  The Debtors have failed to provide any explanation as to why, for no consideration, their directors and officers—some of whom were involved directly in approval of suspect prepetition transactions—are entitled to releases.  Absent compelling justification for proposed releases, the inclusion of these releases renders the Amended Plan patently unconfirmable.

**F.    The Amended Plan Is Not in the Best Interests of Creditors**

74.    The "best interests of creditors test" embodied in Bankruptcy Code section 1129(a)(7) "involves a hypothetical application of chapter 7 to a chapter 11 plan."  *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 500 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007) ("A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a hypothetical [c]hapter 7 distribution to those classes.") (citation and internal quotation marks omitted).  This test requires that each holder of a claim either: (i) accept the chapter 11 plan; or (ii) receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were to be liquidated under chapter 7.  *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992).  The proponent of a plan bears the burden of demonstrating compliance with Bankruptcy Code section 1129(a)(7), and the court must find by a preponderance of the evidence that the plan is in the best interest of creditors.  *See In re Dow Corning Corp.*, 255 B.R. 445, 499 (E.D. Mich. 2000), *aff'd in part, remanded in part*,

280 F.3d 648 (6th Cir. 2002); *S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*, 252 B.R.

373, 391 n. 79 (E.D.Tex. 2000); *see also ACC Bondholder Grp. V. Adelphia Commc'ns Corp.*

*(In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 364 (S.D.N.Y. 2007) ("If even one dissenting

member of an impaired class would get less under the Amended Plan than in a hypothetical

liquidation, the fact that the class as a whole approved the Amended Plan is immaterial.

Consequently, section 1129(a)(7) is one of the strongest protections individual creditors have in

chapter 11.") (citations omitted).

> **1.    The Debtors Rely on Flawed, Results-Oriented Assumptions in their
> Liquidation Analysis**

75.    The Debtors' Amended Liquidation Analysis does not accurately reflect the

relative benefit to creditors if the Debtors were to convert the Chapter 11 Cases to a chapter 7

liquidation.  As an initial matter, the Debtors' Amended Plan effects a liquidation that is, in most

critical respects, substantively indistinguishable from a chapter 7.  Accordingly, to satisfy their

burden under the best interests of creditors test, the Debtors improperly rely on unjustified

assumptions that purport to increase the costs of chapter 7 and reduce the value of the Preserved

Causes of Action while declining to account for the significant benefits that conversion to

chapter 7 may provide.  *See In re Smith*, 357 B.R. 60, 67-68 (Bankr. M.D.N.C. 2006) (noting that

to satisfy Bankruptcy Code section 1129(a)(7)  that "there must be a liquidation analysis of some

type that is based on evidence and not mere assumptions or assertions."); *S. Pac. Transp. Co.*,

252 B.R. at 391 n. 79 ("A judgment about whether [section] 1129(a)(7) is met must be based on

evidence, not assumptions."); *In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34, 38 (Bankr. S.D.

Ind.1986) ("The burden imposed by 1129(a)(7) must be met with evidence, not assumptions.").

Indeed, once these faulty assumptions are corrected, the evidence suggests that individual

creditors will retain less under the Debtors' Amended Plan than they would under a hypothetical

chapter 7.

76.     To demonstrate that the Amended Plan satisfies the best interests of creditors test,

the Debtors must correct the following faulty assumptions or provide adequate evidence to

justify such assumptions:

- *Value of the Total Assets*:  The Debtors make the blanket assumption that the "gross recoveries on Avoidance and Litigation Actions are presumed to be 25% less ($58 million) in a chapter 7 scenario," as compared to the Amended Plan, because there is a "higher likelihood of settlement and pressure to expedite recoveries" in chapter 7.  *See* Amended Liquidation Analysis III.6. There is no evidence for this assumption and, in fact, the opposite conclusion is more appropriate.[43]  To confirm their Amended Plan, the Debtors essentially must use all of their cash to fund payments to administrative creditors, which as detailed *supra*, will leave the Liquidating Trust with scant (if any) resources to carry out its duties.  In contrast, converting these cases to chapter 7 would enable the $87 million[44] of cash currently available in the Debtors' estates to be used to (i) fund prosecution of the valuable Preserved Causes of Action for the benefit of all creditors[45] and (ii) reconcile the more than $80 billion in filed proofs of claim and Administrative Expense Claims that have been or will be asserted.  Moreover, in chapter 7, the Debtors' estates would retain all claims and causes of action.  As drafted, however, the Amended Plan, releases certain directors and officers that were directly involved in approval of the prepetition transactions underlying the Specified Causes of Action.  This proposed release is value-destructive, not least because it may preclude the Liquidating Trust's ability to collect against the D&O Policies.  The Debtors improperly fail to account for this value that creditors are foregoing under the

---

[43] Indeed, the Debtors omit that a liquidating trust would be subject to similar, if not greater, pressures to make timely distributions. *See, e.g.*, 26 C.F.R. § 301.7701-4(d) ("However, if the liquidation is unreasonably prolonged . . . that the declared purpose of liquidation can be said to be lost or abandoned, the status of the organization will no longer be that of a liquidating trust.").

[44] The $87 million comprises (i) the amount in the Wind Down Account plus (ii) other cash accounts, exclusive of the professional fee Carve Out Account.

[45] Prosecution of the Preserved Causes of Action will require robust funding, not a shoestring budget or a contingency arrangement.  The litigation claims are factually and legally complex, and the conduct giving rise to such claims goes back nearly a decade.  Indeed, litigation of such claims will require the review of millions of pages of documents and depositions of dozens of witnesses, including many who have yet to be interviewed in Rule 2004 discovery.  Substantial expert discovery will be required as well, including expert witnesses on valuation, experts on real estate, experts on intellectual property and likely more.  The numerous defendants in the litigation each will be represented by independent counsel who will mount vigorous defenses.  Requiring the plaintiff(s) to proceed on a highly limited budget or on a contingency basis, as it appears the Liquidating Trustee must do, may hinder its ability to pursue the claims by depriving them of essential resources to complete fulsome discovery and prosecute the strongest possible case.

Amended Plan, but that would be available in chapter 7. *See, e.g.*, *In re Quigley Co.*, 437 B.R. at 145-146 ("Here, the derivative claims [that creditors] would retain in a hypothetical [] chapter 7 case satisfy the definition of "property," they have "value," and although they are unliquidated and disputed, they are neither speculative nor incapable of estimation. Furthermore, they presently exist and would exist at the time of any date selected for valuation in a hypothetical [] chapter 7.").

- **Trustee Fees**:  The Debtors overestimate the additional costs of chapter 7 by assuming that there is no discount on the maximum chapter 7 trustee fee of 3%.  *See* Amended Liquidation Analysis III.2.  There is no justification for this assumption.  Bankruptcy Code section 326 sets forth the maximum compensation for a trustee, but such amount likely would be negotiated to a lower rate here.  *See, e.g.*, *In re Brous*, 370 B.R. 563, 568 (Bankr. S.D.N.Y. 2007) ("By its terms, [Bankruptcy Code section] 326(a) sets a maximum limit, but does not create right to or standard for awarding compensation.") (citations and internal quotations omitted); *In re Butts*, 281 B.R. 176, 178 (Bankr. W.D.N.Y. 2002) ("The computation in [Bankruptcy Code section 326(a)] is a limitation on compensation, not a mandate for minimum commissions.").[46]

- **Trustee Professional Fees**:  The Debtors assume that the chapter 7 trustee's professionals will incur $30 million in incremental fees above and beyond what the Liquidating Trust would incur.  *See* Amended Liquidation Analysis III.3.  Remarkably, the Debtors appear to assume that the professionals retained by the chapter 7 trustee would be unable to use the work product of the Debtors' and Creditors' Committee's professionals.  Contrary to the Debtors' assertions, there is a significant likelihood that at least certain of the professionals hired by a chapter 7 trustee would be those that have been involved in the Chapter 11 Cases and the investigation of the Specified Causes of Action.  *See id.* at III.3 ("[I]t is assumed that the trustee's primary legal, accounting, consulting, and other support would be provided by new professionals.").  Regardless, any work product prepared by the Debtors' professionals belongs to the estates and would be transferred to the chapter 7 trustee and it is unclear (and undisclosed) how any prior analysis would

---

[46] This Court previously approved a dramatically reduced chapter 7 trustee fee of $9.1 million where the statutory maximum of 3% potentially would have exceeded $130 million.  *See Order (i) Granting Amended Application for Final Allowance of Statutory Commissions for Albert Togut, as Chapter 7 Trustee, (ii) Authorizing a Further Interim Distribution to the Reorganized Refco Debtors on Account of the Other Allowed Claim, and (iii) Approving Related Matters* [ECF No. 1226], *In re Refco, LLC*, No. 05-60134 (RDD) (Bankr. S.D.N.Y. Dec. 18, 2009); *Application for Final Allowance of Statutory Commission for Albert Togut, as Chapter 7 Trustee* [ECF No. 1195], *Refco*, No. 05-60134 (RDD) (Bankr. S.D.N.Y. Nov. 20, 2009).  Specifically, in *Refco*, this Court found that the reduced chapter 7 trustee fee was "reasonable compensation under sections 326 and 330 of the Bankruptcy Code[.]" *Id.* ¶ 1.

change.  Therefore, it simply is incorrect that there would be $30 million of additional professional fees incurred.

77.     The table below reflects four scenarios to illustrate the relative benefits of a chapter 7 liquidation after correcting for the Debtors' results-oriented assumptions.[47]  Scenario 1 represents the Initial Plan, as adjusted for the changes in the Debtors' Amended Liquidation Analysis, and Scenario 2 represents the Amended Plan.  Scenario 3 represents a deconsolidated liquidation under chapter 7, in which the PBGC only has its asserted $1.4 billion unsecured claim, but no priority claim.  Scenario 4 represents a deconsolidated liquidation under chapter 7, in which the original PBGC Settlement stays in effect (*i.e.*, an $800 million unsecured claim and an $80 million priority claim).  Each of the chapter 7 scenarios (Scenarios 3 and 4) corrects certain of the assumptions outlined above.  Specifically, in the chapter 7 scenarios below: (i) there is no assumed 25% discount on proceeds from the Preserved Causes of Action;[48] and (ii) post-conversion professional fees are assumed to be $10 million, rather than $40 million, so as to be consistent with the Debtors' assumptions for the Liquidating Trust's professional fees (though the Creditors' Committee expects professionals fees for the Liquidating Trust and a chapter 7 trustee may both be greater than $10 million).  Moreover, the Liquidating Trust likely would

---

[47] As noted *supra*, notwithstanding the fact that the Amended Plan is a "toggle" plan, providing for either substantive consolidation or deconsolidation, the Amended Liquidation Analysis does not include a comparison of substantive consolidation to deconsolidation.  Accordingly, Scenario 1 reflects the amounts set forth in the Debtors' Initial Liquidation Analysis with the following adjustments to make Scenario 1 comparable to the Debtors' Amended Liquidation Analysis (*i.e.*, Scenario 2): (i) cash at the expected Effective Date in July 2019 was adjusted to $116 million and (ii) the aggregate ESL and General Unsecured Claims were adjusted to $1.8 billion and $3.9 billion, respectively.  In addition, recoveries in Scenario 1 were corrected to account for the Intercompany Loans that are contemplated under the Deconsolidated Scenario (and which the Debtors did not show in their Initial Liquidation Analysis).  Because the Debtors' ESL and General Unsecured Claims were provided on a consolidated basis, claims were allocated in a deconsolidated scenario *pro rata* based on the claims estimates listed in the Initial Liquidation Analysis.  The Creditors' Committee reserves all rights with respect to the allowance of ESL's unsecured claims and intends to object to such claims in the near term.

[48] The chapter 7 trustee fee is increased accordingly from $7 million to $10 million; however, as noted above, this amount may be subject to reduction.

require greater professional contingency-based fees and/or third party funding that would reduce, potentially materially, net recoveries from the Preserved Causes of Action.

*$ in millions*

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| *Structure* | *Ch. 11 Decon* | *Ch. 11 Subcon* | *Ch. 7 Decon* | *Ch. 7 Decon* |
| *PBGC Priority Claim* | *$80M* | *$97.5M* | *$0M* | *$80M* |
| *PBGC GUC* | *$800M* | *$800M* | *$1.4B* | *$800M* |
| *Post-Petition I/C Claims* | *Yes* | *No* | *Yes* | *Yes* |
| *Post-Emergence I/C Loans* | *Yes* | *No* | *No* | *No* |
| *507(b) Claims* | *$0* | *$0* | *$0* | *$0* |
| **Recovery (%)** | | | | |
| <u>Administrative, Priority, and Secured</u> | | | | |
| Kmart Corporation | 100.0% | 100.0% | 100.0% | 100.0% |
| Kmart Stores of Illinois, LLC | 100.0% | 100.0% | 100.0% | 100.0% |
| Kmart of Washington, LLC | 100.0% | 100.0% | 100.0% | 100.0% |
| Sears Insurance Services, LLC | 100.0% | 100.0% | 100.0% | 100.0% |
| Sears, Roebuck and Co. | 100.0% | 100.0% | – | – |
| Sears Holding Corporation | 100.0% | 100.0% | – | – |
| Other 47 Debtors | 100.0% | 100.0% | 0.6% | 0.6% |
| PBGC [1] | 11.5% | 8.3% | 13.6% | 13.6% |
| ESL | 1.8% | 0.8% | 2.7% | 2.4% |
| <u>Other Unsecureds</u> | | | | |
| Kmart Corporation | 9.8% | 2.5% | 11.6% | 13.1% |
| Kmart Stores of Illinois, LLC | 0.3% | 2.5% | 0.9% | 0.4% |
| Kmart of Washington, LLC | 0.0% | 2.5% | 0.1% | 0.0% |
| Sears Insurance Services, LLC | na | 2.5% | na | na |
| Sears, Roebuck and Co. | – | 2.5% | – | – |
| Sears Holding Corporation | – | 2.5% | – | – |
| Other 47 Debtors | – | 2.5% | – | – |

1. PBGC recovery percentages are calculated assuming a $1.419B claim.

78.    Once these assumptions are corrected, the inability of the Amended Plan to meet the best interests of creditors test is apparent.  Most dramatically, Kmart unsecured creditors are dramatically worse off under the Amended Plan.  Even as between the Initial Plan and Scenario 3 or Scenario 4, Kmart unsecured creditors would have their recoveries increased by approximately 19% to 34%, respectively.

79.    Moreover, the costs of the Chapter 11 Cases continue to be exorbitant.  Even following the completion of the sale to Transform, the Debtors spent an average of $18 million on professional fees per month in March and April.  For example, as discussed *supra*, the Department of Labor contends that certain retiree benefits are entitled to administrative expense

status and requests that a retiree committee be appointed.  Under chapter 7, the administrative

expense priority provided for in Bankruptcy Code section 1114(e) does not apply and therefore

the incremental costs associated with the appointment of an 1114 committee would be

unnecessary.  *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 521 (Bankr. S.D.N.Y. 1991) ("No

court has held that [section] 1114 is applicable to a [c]hapter 7 case regardless of the

circumstances.  Therefore, only while a debtor is in [c]hapter 11 are those [section] 1114

mandated benefit payments administrative expenses.  Once a [c]hapter 11 case is converted to a

case under Chapter 7, retiree benefits are no longer mandated and can only be considered under

the well established distributive scheme of the non-[c]hapter 11 chapters.").  The Debtors'

Amended Liquidation Analysis does not account for these differences.

> 80.    In sum, the chapter 7 trustee will be under no obligation to pay administrative

expense claims immediately or in full with respect to administratively insolvent Debtors.

Instead, the chapter 7 trustee can use the approximately $87 million in cash the Debtors currently

have on hand to resolve open issues, including, the Transform APA Disputes, reconciliation of

503(b)(9) Claims 507(b) Claims and prosecution of the valuable Preserved Causes of action.

After accounting for the numerous flaws in the Debtors' liquidation analysis, it appears that the

interests of creditors may well be better served in chapter 7.  *See, e.g.*, *In re Babayoff*, 445 B.R.

64, 77-78 (Bankr. E.D.N.Y. 2011); *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994)

("The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is

pointless.").  Accordingly, not only do the Debtors fail to justify the implementation of

substantive consolidation, but the Amended Plan results in even worse recoveries for certain

creditors and cannot satisfy the best interests of creditors test.

### 2.    To the Extent the Plan Toggles to the Deconsolidated Scenario, the Debtors Improperly Inflate Recoveries

81.      In the Amended Disclosure Statement, the Debtors only provide projected recoveries for the various types of creditors based on the assumption that either the Amended Plan (with the Substantive Consolidation Settlement) will be approved or that the Debtors' estates will be substantively consolidated in chapter 7.  The Debtors completely ignore the "toggle" feature in the Amended Plan that may result in the approval of the Amended Plan under the Deconsolidated Scenario or the conversion of the Chapter 11 Cases to chapter 7 and subsequent distributions to creditors on a non-consolidated basis.  Indeed, notwithstanding this "toggle" feature, the Debtors fail to provide projected recoveries under the Deconsolidated Scenario or chapter 7 deconsolidation, even though the Initial Liquidation Analysis provided exactly that disclosure (though with certain inappropriate assumption as described *supra*), which, with appropriate adjustments, still would be applicable to the Deconsolidated Scenario under the Amended Plan.  For example, the Initial Liquidation Analysis inflated recoveries under the Deconsolidated Scenario by not accounting for the Intercompany Loans that will be necessary to fund distributions to administrative creditors at each Debtor.  *See* Initial Liquidation Analysis III.6 ("Distributable Proceeds in the Chapter 11 scenario does not include the impact of [I]ntercompany [L]oans permitted under Section 5.3 of the Plan.").  As noted above, the Amended Plan provides that, in the Deconsolidated Scenario, if a particular Debtor has insufficient assets to satisfy Allowed Administrative Expense Claims, Allowed ESL 507(b) Claims or Allowed Other 507(b) Claims, the Debtors with sufficient assets may make an Intercompany Loan to the applicable Debtor on or about the Effective Date to allow such Debtor to satisfy the Claims.  Amended Plan § 5.1(b).  Any such Intercompany Loan would be secured by the "proceeds of Preserved Causes of Action of the borrowing Debtor."  *Id*.  Accordingly, a

borrowing Debtor must be a potential plaintiff in one of the Preserved Causes of Action and

prosecute such causes of action successfully in order to repay the Intercompany Loan.  Absent

sufficient proceeds from these actions, the borrowing Debtors will never be able to repay the

Intercompany Loan, unfairly prejudicing the third party creditors at the lending Debtor.

82.    The Debtors' own analysis confirms this risk.  The Debtors' Initial Liquidation

Analysis shows that 31 Debtor entities will require Intercompany Loans to satisfy administrative

claims, yet those Debtor entities will be unable to repay the Intercompany Loans, even after the

realization of proceeds from the Preserved Causes of Action.  For example, the Debtors projected

that Roebuck will realize an aggregate $141 million of "Total Assets" (*i.e.*, proceeds of

Preserved Causes of Action and all other remaining assets).[49]  Initial Liquidation Analysis at

9.  This $141 million, however, is subject to substantial postpetition Intercompany Claims.  After

accounting for the impact of those postpetition Intercompany Claims, Roebuck is left with $0 in

total distributable assets, but $49 million in third-party unpaid administrative

claims.  *Id.*  Accordingly, the Debtors state that Roebuck may require up to $51 million in

Intercompany Loans from administratively solvent Debtors (such as Kmart) to pay such claims,

which loans Roebuck will never have the assets or ability to repay.  *Id.* at III.8(b).  Moreover,

these Intercompany Loans are used solely to pay third-party administrative expense and priority

creditors.  No portion of the Intercompany Loan is allocated to the remaining balance on the

postpetition Intercompany Claims at the borrowing Debtor, which claims are entitled to

administrative priority and, under the DIP Order and in contrast to third party administrative

expense claims, are secured by the applicable Debtors' assets.  Upon information and belief,

Roebuck still owes hundreds of millions in postpetition Intercompany Claims that cannot be paid

---

[49] In the Amended Liquidation Analysis, the Debtors have adjusted the $141 million of "Total Assets" to $149 million.

back, resulting in even further harm to the third-party unsecured creditors at the lending

Debtors.  The Debtors' analysis accounts for neither the Intercompany Loans nor the unpaid

balances on the postpetition Intercompany Claims.  As such, the Initial Liquidation Analysis fails

to account for the adverse impact that this wholly impermissible construct will have on creditor

recoveries at the lending Debtors and, thereby, improperly inflates the recoveries at the lending

Debtor when compared to a chapter 7 scenario.  In stark contrast, conversion to chapter 7 would

eliminate the need for the Debtors' Intercompany Loan construct and would ensure that

unsecured creditors of administratively solvent Debtors are not adversely impacted.

83.     The Creditors' Committee recognizes the Debtors' desire to move quickly

towards confirmation and to exit chapter 11, and in most circumstances, the Creditors'

Committee would support this path.  The circumstances of these cases, however, render such a

path imprudent, if not illogical.  The Debtors' objective should be the preservation and

maximization of their remaining assets (whether through prosecution of a confirmable plan, if

possible, or conversion to chapter 7), rather than the blind pursuit of a patently unconfirmable

plan.  Accordingly, the Debtors' request for approval of the Amended Disclosure Statement at

this juncture should be denied.

## II.    The Amended Disclosure Statement Fails To Provide Adequate Information on Numerous Key Issues

84.     Bankruptcy Code section 1125 defines "adequate information" as "information of

a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history

of the debtor and the condition of the debtor's books and records . . . that would enable a

hypothetical reasonable investor typical of holders of claims or interests of the relevant class to

make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).  Creditors and this Court

alike must rely on the Amended Disclosure Statement to assist them in making informed

judgments about the Amended Plan.  Accordingly, the Amended Disclosure Statement must

provide sufficient information to enable such judgments.  *Kunica v. St. Jean Financial, Inc.*, 233

B.R. 46, 52 (S.D.N.Y. 1999) ("'The importance of full disclosure is underlaid by the reliance

placed upon the disclosure statement by the creditors and the court.'")  *Galerie Des Monnaies of*

*Geneva, Ltd. v. Deutsche Bank, A.G. (In re Galerie Des Monnaies, Ltd.)*, 55 B.R. 253, 259

(Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986) and *aff'd,* No. 86 Civ. 397 (JMW),

1986 WL 6230 (S.D.N.Y. May 27, 1986) ("The preparing and filing of a disclosure statement is

a most important step in the reorganization of a Chapter 11 debtor.  It is relied on by both the

creditors of the debtor before they vote on the plan of reorganization, and by the bankruptcy

court before approving it.") (citations omitted).  Indeed, it is impossible to "overemphasize the

debtor's obligation to provide sufficient data to satisfy the Bankruptcy Code standard of

'adequate information.'"  *Kunica*, 233 B.R. at 52 (quoting *Oneida*, 848 F.2d at 417).

85.    As drafted, the Amended Disclosure Statement is woefully inadequate and fails to

provide creditors—or this Court—with the information necessary to evaluate the Amended Plan.

Ironically, the Disclosure Statement Motion itself highlights these myriad deficiencies.  The

Debtors contend that the "bottom-line requirement" for approval of a disclosure statement is that

it "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is

going to get it and what contingencies there are to getting its distribution."  *See* Disclosure

Statement Motion ¶ 15 (citing *In re Radco Props., Inc.*, 402 B.R. 666, 683 (Bankr. E.D.N.C.

2009)) (internal quotation marks omitted).  The Amended Disclosure Statement, however,

provides little clarity as to any of these essential questions.

86.    In addition to addressing the gating question of the Debtors' administrative

solvency—on which the Amended Disclosure Statement provides woefully inadequate

information (on either a consolidated or deconsolidated basis)—the Debtors' must provide

additional disclosure regarding, among other things: (i) the Debtors' legal and factual

justifications for the Substantive Consolidation Settlement and related provisions of the

Amended Plan; and (ii) the projected recoveries for creditors in the Deconsolidated Scenario and

upon conversion to chapter 7 in a deconsolidated scenario, which disclosure is entirely absent

from the Amended Disclosure Statement.

A.    **Additional Disclosure Regarding the Substantive Consolidation Settlement and Related Plan Provisions Is Required**

87.    The Debtors fail to provide adequate disclosure on the terms of the Amended

Plan. Most significantly, the Debtors must explain the basis for seeking substantive

consolidation when it appears that (i) numerous creditors will be harmed (and, indeed, Kmart

creditors would do materially better under the Deconsolidated Scenario or in chapter 7) and (ii)

prepetition Intercompany Claims are unlikely to affect creditor recoveries. Specifically, the

Debtors must provide an adequate justification for the substantive consolidation of their estates

and how the Amended Plan satisfies the requisite standards when it appears that the

reconciliation of prepetition Intercompany Claims will have minimal, if any, effect on creditor

recoveries. Relatedly, the Debtors must explain why alternatives to substantive consolidation—

such as the settlement or waiver of prepetition Intercompany Claims—would not result in a more

equitable outcome. In connection therewith, the Debtors must provide an explanation of the

justification for increasing PBGC's priority interest from $80 million to $97.5 million for no

apparent consideration, other than PBGC's consent to the substantive consolidation of the

Debtors' estates under the Amended Plan, particularly where unsecured creditors are subsidizing

further PBGC's recovery.

63

88.     In addition the foregoing, the Debtors must provide additional information

regarding the following provisions of the Amended Plan.

- ***Transform APA Disputes***:  In view of the significant risks associated with the outcome of the Transform APA Disputes, the Debtors must provide a transparent explanation of each such dispute and the impact those disputes could have on the Debtors' ability to confirm the Amended Plan.  Specifically, the Amended Disclosure Statement must accurately and fairly explain the key disputes with Transform, the risks attendant thereto and the effect an adverse outcome on that those disputes could have on the Debtors' ability to confirm the Amended Plan and creditor recoveries.  In addition, the Debtors must also explain why Transform's obligations with respect to assumed liabilities under the Asset Purchase Agreement apparently have been reduced from an aggregate $347 million to $270 million.

- ***All Other Unresolved Contingencies that Impact Administrative Solvency***: The Debtors must disclose all other unresolved contingencies upon which their administrative solvency analysis is based and why the Debtors' estimates are justified, including, (i) the bases for the Debtors' estimate of 503(b)(9) Claims and 507(b) Claims, (ii) the likelihood the Debtors will realize the EDA Funds, (iii) the budgeted professional fees from now through the expected closing of the Chapter 11 Cases and (iv) the potential liability for retiree benefits and whether a retiree committee will be appointed and estimated costs associated therewith.

- ***Liquidating Trust Funding***:  The Debtors must explain with specificity how much funding will be available for the Liquidating Trust and the basis upon which such funding is sufficient for the Liquidating Trustee to perform its duties, including the prosecution of the Preserved Causes of Action and, if required, the reconciliation of Intercompany Claims.  The Debtors also must explain why conversion to chapter 7 would not be a superior alternative to maximize the value of the estates to the extent such funding is unavailable, expensive to obtain or insufficient.  Additional information also should be provided as to the potential impact on litigation proceeds occasioned by the need to obtain litigation funding and illustrative rates for such financing.

- ***PBGC Settlement***:  The Debtors must provide a thorough justification for the PBGC Settlement, including a quantification of claims asserted by the PBGC, the Debtors' analysis thereof and the legal bases for granting PBGC, an unsecured creditor, a preferred claim secured against the proceeds of Preserved Causes of Action (including the increased amount of the PBGC priority claim under the Amended Plan for no additional consideration). Finally, the Debtors must explain how separately classifying PBGC from other unsecured creditors is permitted under the Bankruptcy Code.

- *Administrative Expense Claims Reconciliation*:  The Debtors must provide an adequate justification for their ability to satisfy Administrative Expense Claims despite the lack of an administrative bar date (other than with respect to 503(b)(9) Claims) and an explanation for how such claims against the Debtors' estates will be reconciled by the Effective Date.  For example, over 2,000 proofs of claim asserting 503(b)(9) Claims have been filed.  *See, e.g.*, *Debtors' Omnibus Objection to Vendors' Motions for Allowance and Payment of Administrative Expense Claims* [ECF No. 3883].  Without a meaningful and thorough analysis of, among other things: (i) how the filed Administrative Expense Claims compare to the Debtors' books and records; (ii) the sources of consideration available to satisfy those claims; and (iii) how the all filed claims will be reconciled appropriately, the Amended Disclosure Statement fails to provide adequate information.

- *Funding for Post-Effective Date Claims Reconciliation*:  The Debtors estimate that it will take the Liquidating Trustee at least 12 to 18 months to reconcile the 18,380 proofs of claim, in amounts totaling $80 billion, filed against the Debtors as of the Bar Date.  *See* Amended Liquidation Analysis III.5.  The Debtors must provide adequate information on how the Liquidating Trust will fund this reconciliation process.

- *Plan Alternatives*:  The Debtors must include a meaningful and accurate evaluation of the alternatives to the Amended Plan, including, most significantly, conversion to chapter 7 and the benefits and risks attendant thereto.  As discussed *supra*, the Amended Liquidation Analysis filed in support of the Amended Plan fails to do so because it is based upon several materially flawed assumptions with respect to the costs of chapter 7 and reflects projected recoveries under the Amended Plan that fail to take into account the minimal, if any, funding for the Liquidating Trust and the additional costs that may be incurred by professional contingency fees and for litigation funding.  In addition, the Debtors must justify the following assumptions, in contrasting the Amended Plan with the chapter 7 scenario:

  - Chapter 7 Trustee Process:  The Debtors assume without explanation that it will take a chapter 7 trustee three to six months to familiarize itself with the Debtors' estates and related matters before beginning pursuit of remaining assets.  *See* Amended Liquidation Analysis III.4.  Next, the Debtors assume that the trustee would require an additional 12 to 18 months to reconcile claims and initiate litigation.  *Id.* III.5.  None of these assumptions are justified and, moreover, the Liquidating Trust also would have to perform such actions.

  - Amount of 507(b) Claims in Chapter 7:  The Debtors assume— without explanation—that any 507(b) Claims would be materially higher in chapter 7.  *See* Amended Liquidation Analysis III.7(a).  There is no basis for why any 507(b) Claims would differ in magnitude under the chapter 7 scenario.

- o <u>Non-Consolidated Distributions</u>:  The Debtors assume that a chapter 7 trustee also would seek the substantive consolidation of the estates.  *See* Amended Liquidation Analysis III.3 ("The Liquidation Analysis assumes that the Trustee would execute the same settlement of disputes relating to whether the Debtors should be substantively consolidated, for the same reasons why such settlement is proposed in the chapter 11 scenario.").  The failure to include disclosure of the projected recoveries under a deconsolidated chapter 7 leaves creditors without adequate information regarding the alternatives to the Amended Plan.  The Debtors must supplement the Amended Disclosure Statement with such information.

- ***Postpetition Intercompany Claims***:  The Amended Plan ignores the DIP Order and Cash Management Order, which provide postpetition Intercompany Claims with administrative expense priority and security interests, including liens on the proceeds of the Preserved Causes of Action.  The Debtors should disclose the factual and legal bases for ignoring these provisions, which result in the transfer of value among Debtors, and the impact thereof on creditor recoveries.

- ***Releases***:  The Debtors must disclose the factual and legal bases for granting releases to current and former officers and directors and the benefits and consideration provided to the Debtors' estates in respect of such releases.

- ***Preserved Causes of Action***:  The Debtors must disclose the nature of any causes of action that are being preserved, the probability that such causes of action will result in a recovery for creditors and the costs associated with such prosecution.  *See In re Malek,* 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983) (all pending or contemplated litigation of whatever nature must be described in detail).  Indeed, given the Debtors' failure to list each cause of action with specificity, it is impossible to determine which Debtor's estate is entitled to the proceeds of such causes of action and, thus, the impact on creditor recoveries.

- ***Compensation for Liquidating Trustee and Liquidating Trust Board***:  The Debtors must disclose the expected compensation for the Liquidating Trustee and the members of the Liquidating Trust Board.

- ***Selection of Liquidating Trust Board and Liquidating Trustee***:  The Debtors must disclose the identity of or, alternatively, the timing for the selection of, the members of the Liquidating Trust Board and the Liquidating Trustee.  This information will be critical for creditors to evaluate the extent to which they will have control over the prosecution of the Preserved Causes of Action.

### B.    Additional Disclosure Related to the Deconsolidated Scenario Is Required If the Substantive Consolidation Settlement Is Denied

89.    The Amended Plan contemplates that the Debtors will toggle to the

Deconsolidated Scenario in the event the Court declines to approve the Substantive

Consolidation Settlement.  Notwithstanding this toggle feature, the Amended Plan does not

provide *any* disclosure regarding the projected creditor recoveries in the Deconsolidated

Scenario as compared to the Substantive Consolidation Settlement, including the type of

information that was contained in the Initial Liquidation Analysis.  Accordingly, the Debtors

must provide additional disclosure regarding the following features.

- *Liquidation Analysis*:  The Debtors have failed to provide a liquidation analysis that analyzes the Deconsolidated Scenario as compared to either (i) the Substantive Consolidation Settlement or (ii) conversion to chapter 7.  Both such analyses must be included in the Amended Disclosure Statement in order to enable creditors to evaluate appropriately the relative impacts of each on their potential recoveries.

- *The Provision of Intercompany Loans*:  The Deconsolidated Scenario requires Intercompany Loans to enable administratively insolvent Debtors to pay their Administrative Expense Claims through the receipt of loans from administratively solvent Debtors.  Such loans will be repaid with the proceeds of the Preserved Causes of Action flowing to the borrowing Debtors.  *See* Amended Plan § 5.1(b).  In their Initial Liquidation Analysis, the Debtors explained that only two Debtors may require intercompany loans, but the Debtors' own recovery analysis indicates that 31 of the 53 Debtors are administratively insolvent even after taking into account litigation proceeds. *See* Initial Liquidation Analysis III.8(b).  Thus, to confirm a plan based on the Deconsolidated Scenario, the Debtors may need to effect up to 31 Intercompany Loans on or about the Effective Date from the remaining administratively solvent Debtor(s).  Accordingly, in order for the Debtors' creditors to evaluate the Deconsolidated Scenario, the Amended Disclosure Statement must provide (i) a complete list of the Debtors that would require Intercompany Loans, (ii) how the Intercompany Loans will be repaid, (iii) the legal basis of the Intercompany Loans, (iv) the impact that the Intercompany Loans will have on creditors at the lender Debtors including with respect to the best interests of creditors test at each Debtor and (v) how the Intercompany Loan effectively could result in the subordination of the postpetition Intercompany Claims to third party administrative expenses in contravention of the DIP Order.

- ***The Treatment of Intercompany Claims***:  The Amended Disclosure
  Statement must be modified to (i) justify the Debtors' proposed treatment of
  prepetition Intercompany Claims in the Deconsolidated Scenario, and (ii)
  provide disclosure regarding the assumptions underlying the Debtors'
  reconciliation of postpetition Intercompany Claims and the impact those
  claims would have on third party recoveries.  Specifically, the Amended Plan
  contemplates that in the Deconsolidated Scenario, Intercompany Claims will
  receive their Pro Rata share of the General Unsecured Liquidating Trust
  Interests and the Specified Unsecured Liquidating Trust Interests along with
  third party creditors, but also provides that prepetition Intercompany Claims
  "shall be determined and Allowed or Disallowed by the Liquidating Trustee
  subject to approval by the Liquidating Trust Board."  Amended Plan §§
  5.1(b), 8.1(b).  The Amended Disclosure Statement must be modified to
  explain how the Debtors intend to provide Liquidating Trust Interests to
  holders of prepetition Intercompany Claims before such claims are reconciled
  and how the reconciliation of such claims will impact the distribution of value
  to creditors at of each of the Debtors.  Accordingly, the Debtors must disclose
  (x) the expected cost of the intercompany reconciliation and (y) how the
  reconciliation is expected to impact recoveries in light of the postpetition
  Intercompany Claims that must be satisfied first.  Indeed, as noted herein,
  the Amended Plan ignores the DIP Order and Cash Management Order, which
  provide postpetition Intercompany Claims with the benefit of administrative
  expense priority and security interests, including liens on the proceeds of the
  Preserved Causes of Action.

- ***MTN Notes***:  In connection with approval of the Debtors' sale of certain
  medium-term notes (the "MTN Notes" and such sale, the "MTN Sale"), this
  Court required the Debtors to establish a true-up mechanism to ensure that no
  Debtor's estate or its creditors is adversely affected as a result of MTN Sale,
  the deposit of proceeds therefrom or the use of such proceeds.  The true-up
  mechanism must be subject to Court approval to the extent the Creditors'
  Committee and the Debtors cannot agree.  See *Order Authorizing Debtors to
  Sell Medium Term Notes* [ECF No. 826].  Accordingly, the Amended
  Disclosure Statement must provide adequate disclosure regarding how the
  Debtors intend to comply with this obligation.

90.     In short, the Amended Disclosure Statement fails to provide adequate information

under Bankruptcy Code section 1125 because it omits critical information.  Without complete

and accurate information about the foregoing topics, creditors cannot fairly assess whether to

accept or reject the Amended Plan.  As such, the Amended Disclosure Statement cannot be

approved and must be supplemented to address the deficiencies described herein.

III.    **The Solicitation Materials Should Include a Letter from the Creditors' Committee**

91.    Given all of the plan-related issues addressed herein, in the event that the Court is inclined to approve the Amended Disclosure Statement and permit solicitation to proceed, it is appropriate for the Debtors to be required to include a letter from the Creditors' Committee regarding its views on the Amended Plan as part of the solicitation materials.  The letter that the Creditors' Committee proposes to enclose with the solicitation materials will provide a plain English explanation regarding a number of the confirmation-related issues that the Creditors' Committee has identified with Plan based on the current status of the Creditors' Committee's review and analysis thereof and contains the Creditors' Committee's recommendation that unsecured creditors vote to reject the Plan.  A form of the letter will be provided to the Court in advance of any contemplated solicitation.

## RESERVATION OF RIGHTS

92.    This Objection is submitted without prejudice to, and with a full reservation of, the Creditors' Committee's rights to object to confirmation of the Amended Plan on any basis, or to supplement this Objection in writing or at the hearing thereon including, without limitation, in the event the Debtors amend or otherwise modify the Amended Disclosure Statement and/or the Amended Plan.

[*Remainder of page left blank intentionally*.]

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, the Creditors' Committee respectfully requests that this Court: (i) deny approval of the Amended Disclosure Statement at this juncture and, to the extent the Court deems it appropriate, order mediation of the plan-related issues discussed herein; or, alternatively, to the extent this Court determines approval of the Amended Disclosure Statement is warranted, condition such approval on—and delay solicitation of the Amended Plan pending resolution of, among other things, numerous open issues that will impact the Debtors' administrative solvency (such as the estimation of the allowed amount of 507(b) Claims, the allowance of 503(b)(9) Claims and the resolution of the Transform APA Disputes) and the fair treatment of unsecured creditors, including the governance and funding for the Liquidating Trust; and (ii) grant the Creditors' Committee such other relief as the Court deems just, proper and equitable.

New York, New York
Dated:  May 22, 2019

AKIN GUMP STRAUSS HAUER & FELD LLP

/s/  *Ira S. Dizengoff*
Ira S. Dizengoff
Philip C. Dublin
Sara L. Brauner
Zachary D. Lanier
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
E-mail: idizengoff@akingump.com
            pdublin@akingump.com
            sbrauner@akingump.com
            zlanier@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al.*

**<u>Exhibit A</u>**

Administrative Expense Tracker

PRIVILEGED AND HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; DRAFT MATERIALS FOR DISCUSSION PURPOSES

# Admin Solvency Tracker

*Under the closing estimates, the Company is projecting an ~$6mm administrative surplus; the Company has identified ~$32mm of potential mitigating items that provide additional cushion*

Sears Holdings Corporation
Administrative Solvency Tracker
Dated: 5/17/2019

| | Line Item | Admin & Other Priority Claims (Uses of Value) Actual | Forecast | Total | Transform Liabilities | Base Case | Base Case w/ Mitigating Items — Mitigating Items | Mitigated Scenario | Downside Case — Downside Risk | Downside Scenario | Solvency Impact — Delta vs. Prior Week |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Admin Claims** | | | | | | | | | | |
| (1) | 503(b)9 | $ — | $ 181 | $ 181 | (139) | $ (42) | $ — | $ (37) | $ — | $ (42) | $ — |
| (2) | Accounts Payable | — | 180 | 180 | (166) | (14) | — | (14) | — | (14) | — |
| (3) | Accrued Payroll | $42 | — | 42 | — | (42) | — | (42) | — | (42) | — |
| (4) | 506 Expense | 20 | — | 26 | — | (26) | — | (26) | — | (26) | — |
| (5) | Accrued Sales Tax | 20 | — | 20 | (20) | (20) | — | (20) | — | (20) | — |
| (6) | Severance, WARN, and EE Claims | 10 | 10 | 20 | — | — | — | — | — | — | — |
| (7) | Franchise Taxes | 0 | 3 | 3 | — | (3) | — | (3) | — | (3) | (3) |
| (8) | Net TSA | — | 1 | 1 | — | (1) | — | (1) | — | (1) | (1) |
| (9) | US Trustee Fees | 2 | 1 | 3 | — | (3) | — | (3) | — | (3) | (3) |
| (10) | Board Fees | 0 | 1 | 2 | — | (2) | — | (2) | — | (2) | (2) |
| (11) | RemainCo Winddown Costs | 48 | 45 | 93 | — | (93) | — | (93) | — | (93) | (6) |
| (12) | Professional Fees | 54 | — | 54 | — | (54) | — | (54) | — | (54) | 8 |
| | **Total** | 203 | 445 | 649 | (210) | (379) | — | (374) | (67) | (446) | 5 |
| | **Assets** | | | | | | | | | | |
| (16) | Professional Fee Carve-Out Account | $ 54 | $ — | 54 | — | $ 54 | $ — | 54 | $ — | 54 | $ — |
| (17) | MTN Notes | 81 | — | 81 | — | 81 | — | 81 | — | 81 | (8) |
| (18) | U-HAUL | 7 | — | 7 | — | 7 | — | 7 | — | 7 | — |
| (19) | SHP Security Deposit | 5 | — | 5 | — | 5 | — | 5 | — | 5 | — |
| (20) | GOB Inventory Gross | 59 | 9 | 68 | — | 68 | — | 68 | — | 68 | — |
| (21) | ESL Payment at Close | 35 | — | 35 | — | 35 | — | 35 | — | 35 | — |
| (22) | Cash in Stores | 9 | — | 9 | — | 9 | — | 9 | — | 9 | — |
| (23) | Utility Deposit | — | 10 | 10 | — | 10 | — | 10 | — | 10 | — |
| (24) | Cash in Transit at Close | 12 | 20 | 32 | — | 32 | — | 32 | — | 32 | 0 |
| (25) | Credit Card Receivables | — | 15 | 15 | — | 15 | — | 15 | — | 15 | — |
| (26) | Israel Cash | 3 | — | 3 | — | 3 | — | 3 | — | 3 | — |
| (27) | Pro-Rated Rent | 5 | 11 | 16 | — | 16 | — | 16 | — | 16 | — |
| (28) | Specified Receivables | — | — | — | — | — | 17 | 17 | — | — | (7) |
| | **Total** | 290 | 95 | 384 | — | 384 | 28 | 412 | (10) | 374 | (7) |
| (34) | Other Proceeds | | | | | | | | | | |
| (35) | Avoidance Actions | | | | | | | | | | |
| | **Total** | $ — | | $ 384 | | $ 6 | $ 32 | 38 | (77) | (71) | (2) |
| | **Solvency / (Gap)** | $ 87 | | | | $ 6 | | | | | |





1

PRIVILEGED AND HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; DRAFT MATERIALS FOR DISCUSSION PURPOSES

# Admin Solvency Tracker (cont'd)

**Notes:**

(1)  Reflects latest estimate of $181mm of 503(b)(9) claims with potential for reduction of $5mm through claims reconciliation

(2)  Revised to reflect latest estimate of 2/10/19 closing AP of $180mm

(3)  All accrued payroll liabilities have been satisfied

(4)  GOB Expense reflects GOB Payroll and GOB Rent; all GOB expenses from week 9 – week 11 assumed to be severance

(5)  All accrued sales tax liabilities as of close have been satisfied, however the estate will still owe residual sales taxes on GOB activity post-close

(6)  Assumes Transform will pay severance per APA; all GOB expenses from week 9 – week 11 assumed to be severance

(7)  Franchise tax estimates provided by Company and reflect franchise tax payments in jurisdictions that assess franchise taxes

(8)  Net cost of transition service agreements

(9)  Reflects fees payable to the U.S. Trustee

(10) Fees payable to board members in consideration for services

(11) Costs to wind down remainder of estate

(12) Updated to reflect latest professional fee caneout estimate

(13)

(14)

(15)

(16) Updated to reflect latest professional fee caneout estimate

(17) Net proceeds from MTN note sale, cash held in wind down account

(18) Net proceeds earmarked for wind down account from sale of unencumbered properties to U-HAUL, cash held in wind down account

(19) Refund of SHIP deposit by Service.com, cash held in wind down account

(20) The estate has realized $59mm of gross recovery and expect an additional $9mm as part of cash reconciliation

(21) Credit bid release payment by ESL of $35mm

(22) Post-close payment by ESL of $9mm for cash in stores which was paid the week of close

(23) Assumes return of $10mm utility deposit to estate

(24) Includes $12mm of cash in regional banks and $20mm of cash in transit currently being withheld by Transform

(25) Represents $15mm of excess credit card receivables from pre-close activity currently being withheld by Transform

(26) Cash in transit payment of $3mm from Transform related to transfer of cash from Israeli subsidiary

(27) Rent proration payment as a result of occupancy expense proration; currently being withheld by Transform

(28) Assumes 50% collection of excess book value of Specified Receivables of $34mm as potential mitigating item

(29)

(30)

(31)

(32)

(33)

(34) Various other vendor proceeds

(35) Preference firms still conducting diligence related to potential preference recoveries





PRIVILEGED AND HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; DRAFT MATERIALS FOR DISCUSSION PURPOSES

# Weekly Cash Flow Budget – Base Case



**CASH RECEIPTS**
- Wind GOB Inflows
- Cash In Transit Proceeds
- Cash from Israel
- Credit Card Receivables
- Cash In Stores
- ESL Closing Proceeds
- TSA Proceeds
- SHIP Deposit
- Utility Deposit
- Pro-Rated Rent
- ESL Severance Assumption[1]
- ESL 503(b)(9) Assumption
- Other Receipts
- **Total GNDCo Receipts**

**CASH DISBURSEMENTS**
- GNDCo Accrued Payroll & Benefits
- Taxes
- GOB Operating Costs[1]
- Professional Fee Carve Out Funding[2]
- Post-Petition Payables
- 503(b)(9) Claims
- TSA Disbursements
- Franchise Tax
- Severance & WARN
- US Trustee Fees
- Board Fees
- **Total GNDCo Disbursements**

**PASS-THROUGH RECEIPTS**
- New Go Payroll Remittance
- New Co Licensing Remittance
- **Total Pass-Through Receipts**

**PASS-THROUGH DISBURSEMENTS**
- New Go Payroll
- Licensing Payments For New Go
- **Total Pass-Through Disbursements**

**Net Cash Flow**

**Beginning Available Cash**
**Change In Available Cash**
**Ending Available Cash**

**ENDING CASH BALANCES**
- GNDCo Operating Accounts
- Consignment Accounts
- Wind-Down Account
- Professional Fee Carve Out Account
- **Total Cash**





(1) All GOB expenses from week 9 – week 11 are assumed to be severance (2-weeks after the final store closure)
   −$85mm of total funding represents −$88mm of total accrual from February 2019 – October 2019 less −$10mm of accruals for the 1st week of February less
   −$2mm Lizard accrual plus −$9mm under funded balance for week ending 2/9
(2)

3

PRIVILEGED AND HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; DRAFT MATERIALS FOR DISCUSSION PURPOSES

# Professional Fee Details

| Period: | Feb-19 [1] Total | Mar-19 Total | Apr-19 Total | May-19 Total (a) | Jun-19 Total | Jul-19 Total | Aug-19 Total | Sep-19 Total | Oct-19 Total | Feb-Oct Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Estate Professionals** | | | | | | | | | | |
| Weil, Gotshal & Manges | 8,650,000 | 4,300,000 | 5,150,000 | 3,200,000 | 1,500,000 | 1,500,000 | 1,250,000 | 1,250,000 | 1,250,000 | 28,050,000 |
| M-III Advisory Partners | 2,666,667 | 2,500,000 | 3,000,000 | (1,250,000) | 750,000 | 750,000 | 750,000 | 750,000 | 750,000 | 10,666,667 |
| Lazard | 200,000 | 200,000 | 200,000 | (1,713,605) | 200,000 | - | - | - | - | (913,605) |
| Wachtell | 137,500 | 150,000 | - | (1,676,482) | - | - | - | - | - | (1,388,982) |
| McAndrews | - | - | 5,000 | - | - | 5,000 | 5,000 | 5,000 | 5,000 | 25,000 |
| A&G Realty Partners | 100,000 | - | - | - | - | - | - | - | - | 100,000 |
| JLL | 1,375,750 | 30,000 | 30,000 | 7,100 | - | - | - | - | - | 1,442,850 |
| D&T (BK) | 1,195,820 | 516,041 | 609,099 | 718,106 | 400,000 | - | - | - | - | 3,439,066 |
| D&T (Audit) | 315,000 | 2,270,201 | - | - | - | - | - | - | - | 2,585,201 |
| D&T (Tax) | 321,477 | 3,813,855 | 546,754 | 489,234 | 200,000 | - | - | - | - | 5,371,320 |
| Prime Clerk | 3,033,393 | 709,487 | 4,113,861 | 1,342,391 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 9,949,131 |
| Public Relations | 15,000 | - | - | - | - | - | - | - | - | 15,000 |
| Litigation Legal Fees | - | - | - | - | - | 1,900,000 | 1,900,000 | 1,900,000 | 1,900,000 | 7,600,000 |
| Total Estate Professionals | 18,010,606 | 14,489,584 | 13,654,714 | 1,116,743 | 3,200,000 | 4,305,000 | 4,055,000 | 4,055,000 | 4,055,000 | 66,941,647 |
| **Restructuring Comm. Prof.** | | | | | | | | | | |
| Paul Weiss | 2,097,977 | 1,046,554 | 1,184,859 | 1,328,482 | 1,500,000 | - | - | - | - | 7,157,872 |
| Evercore | 216,667 | 200,000 | 200,000 | 200,000 | 200,000 | - | - | - | - | 1,016,667 |
| Alvarez & Marsal | 190,000 | 3,000 | 504,000 | 76,000 | 200,000 | - | - | - | - | 973,000 |
| Young Conaway | 16,500 | 5,500 | 30,000 | 123,934 | - | - | - | - | - | 175,934 |
| Stout Risius Ross | 2,056 | 2,000 | 10,500 | 197,410 | - | - | - | - | - | 211,966 |
| Total Restr. Comm. Prof. | 2,523,200 | 1,257,054 | 1,929,359 | 1,925,826 | 1,900,000 | - | - | - | - | 9,535,439 |
| **Creditor Committee Prof.** | | | | | | | | | | |
| Akin Gump | 3,250,000 | 1,450,000 | 1,400,000 | 1,652,845 | 750,000 | - | - | - | - | 8,502,845 |
| Houlihan Lokey | 500,000 | 500,000 | 275,000 | 275,000 | 275,000 | - | - | - | - | 1,825,000 |
| FTI Consulting | 461,667 | 561,000 | 284,000 | 647,000 | 200,000 | - | - | - | - | 2,153,667 |
| Total Creditor Comm. Prof. | 4,211,667 | 2,511,000 | 1,969,000 | 2,574,845 | 1,225,000 | - | - | - | - | 12,481,511 |
| Prof. Accrual Bef. Success Fees [2] | 24,745,472 | 18,257,638 | 17,543,073 | 5,617,414 | 6,325,000 | 4,305,000 | 4,055,000 | 4,055,000 | 4,055,000 | 88,958,598 |
| Success Fee Accrual | 29,000,000 | - | - | (1,650,000) | - | - | - | - | - | 27,350,000 |
| Prof. Accrual Incl. Success Fees | 53,745,472 | 18,257,638 | 17,543,073 | 3,967,414 | 6,325,000 | 4,305,000 | 4,055,000 | 4,055,000 | 4,055,000 | 116,308,598 |

(a) May 2019 Total column is net of overaccrual releases

(1) Represents total accruals for February 2019
(2) See bridge to budget cash flow on page 3





**Exhibit B**

Survey of Liquidating and Litigation Trust Governance in Chapter 11 Plan

## Survey of Liquidating and Litigation Trust Governance in Chapter 11 Plans

The Creditors' Committee conducted a survey of cases in the last ten years in which litigation or liquidation trusts were established. Based on the Creditors' Committee's review, debtors—as opposed to creditor beneficiaries—did not appoint a majority of the board members in any of the cases surveyed. In fact, there was only one case. *In re Brookstone Holdings Corp.* (where the plan was proposed jointly by the debtors and the creditors' committee), in which the plan provided for the debtors to appoint the members of the board jointly with the creditor beneficiaries. Significantly, in *Brookstone*, each of the initial members of the trust board were the members of the creditors' committee. As detailed further below, the selection of the trustee often involved various parties, including beneficiary creditors, the debtors and/or the governing board of the trust.

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 1. | *In re Abensa Holding Inc.*, No. 16-10790 (KJC) (Bankr. D. Del.). Plan of reorganization confirmed on Dec. 15, 2016 [ECF No. 1042]. | Two liquidating trusts and one litigation trust | Creditors' committee selected each of the three trustees | N/A |
| 2. | *In re Abengoa Bioenergy US Holding LLC*, No. 16-41161 (KSS) (Bankr. E.D. Mo.). Liquidation plan confirmed on June 8, 2017 [ECF No. 1443]. | Liquidating trust | Creditors' committee | N/A |
| 3. | *In re ADPT DFW Holdings LLC*, No. 17-31432 (SGJ) (Bankr. N.D. Tex.). Plan of reorganization confirmed on Sept. 29, 2017 [ECF No. 822]. | Litigation trust | Creditors' committee, equity committee and certain other creditors | Three member board: creditors' committee, equity committee and certain other creditors selected one member each |
| 4. | *In re Advance Watch Company, Ltd.*, No. 15-12690 (MG) (Bankr. S.D.N.Y.). Liquidation plan confirmed on Jan. 25, 2016 [ECF No. 244]. | Liquidating trust | Creditors' committee | N/A |
| 5. | *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y.). Plan of reorganization confirmed on Mar. 29, 2019 [ECF No. 503]. | Litigation trust | Creditors' committee and certain unsecured noteholders | Three member board; members selected jointly by creditors' committee and certain unsecured noteholders (debtors permitted to appoint one non-voting member) |
| 6. | *In re AgFeed USA, LLC*, No. 13-11761 (BLS) (Bankr. D. Del.). Liquidation plan confirmed on Nov. 4, 2014 [ECF No. 1535]. | Liquidating trust | Documents unclear as to selection of initial trustee; beneficiaries could appoint successor trustee | Four member board: equity committee selected each member, in consultation with the debtors |
| 7. | *In re ALCO Stores, Inc.*, No. 14-34941 (SGJ) (Bankr. N.D. Tex.). Liquidation plan confirmed on June 4, 2015 [ECF No. 1190]. | Liquidating trust | Creditors' committee, in consultation with the debtors | Creditors' committee |
| 8. | *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del.). Liquidation plan confirmed on Jan. 27, 2016 [ECF No. 687]. | Litigation trust | Creditors' committee | Five member board; creditors' committee selected each member |

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 9. | *In re Amicus Wind Down Corp., f/k/a Friendly Ice Cream Corp.*, No. 11-13167 (KG) (Bankr. D. Del). Liquidation plan confirmed on June 5, 2012 [ECF No. 1123]. | Liquidating trust | Creditors' committee, with consent of the debtors | N/A |
| 10. | *In re Antioch Co.*, No. 08-35741 (GRH) (Bankr. S.D. Ohio). Plan of reorganization confirmed on Jan. 27, 2009 [ECF No. 319]. | Litigation trust | Debtors, in consultation with the prepetition secured agent | Board comprised of members of the creditors' committee and two additional members reasonably acceptable to debtors and creditors' committee |
| 11. | *In re AOG Entm't, Inc.*, No. 16-11090 (SMB) (Bankr. S.D.N.Y.). Plan of reorganization confirmed on Sept. 23, 2016 [ECF No. 436]. | Litigation trust | First lien lenders | Five member board; creditors' committee and certain other creditors selected one member each |
| 12. | *In re ASARCO LLC*, No. 05-21207 (AH) (Bankr. S.D. Tex.). Plan of reorganization confirmed on Aug. 30, 2009 [ECF No. 21207]. | Litigation trust | Asbestos claimants' committee and a representative for future asbestos claimants | Asbestos claimants' committee selected each member |
| 13. | *In re ASYST Tech., Inc.*, No. 09-43246 (WJL) (Bankr. N.D. Cal.). Liquidation plan confirmed on Feb. 18, 2010 [ECF No. 555]. | Liquidating trust | Debtors | Three member board; creditors' committee selected one member and representative of secured creditors selected two members |
| 14. | *In re Belle Foods, LLC*, No. 13-81963 (JAC) (Bank. N.D. Ala.). No plan approved.  GUC trust approved on Apr. 9, 2014 [ECF No. 1190]. | Liquidating trust | Liquidating trust board, with consent of the debtor | Three member board; creditors' committee selected each member |
| 15. | *In re BPZ Resources, Inc.*, No. 15-60016 (DRJ) (Bankr. S.D. Tex.). Liquidation plan confirmed on Nov. 12, 2015 [ECF No. 381]. | Liquidating trust | Creditors' committee, in consultation with the debtor | Three member board; creditors' committee selected each member |
| 16. | *In re Brookstone Holdings Corp.*, No. 18-11780 (BLS) (Bankr. D. Del.). Liquidation Plan confirmed on Mar. 20, 2019 [ECF No. 1138]. | Liquidating trust | Debtors and creditors' committee selected jointly | Five member board; comprised of members of the creditors' committee |
| 17. | *In re Capitol Bancorp Ltd.*, No. 12-58409 (MBM) (Bankr. E.D. Mich.). Liquidation plan confirmed on Jan. 29, 2014 [ECF No. 785]. | Liquidating trust | Liquidating trust board | Three member board; creditors' committee selected two members and debtors selected one member |
| 18. | *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex.). Plan of reorganization confirmed on Dec. 16, 2016 [ECF No. 1057]. | Liquidating trust | Creditors' committee, with consent of debtors and supporting creditors | N/A |
| 19. | *In re CDC Corporation*, No. 11-79079 (PWB) (Bankr. N.D. Ga.). Plan of reorganization confirmed on Sept. 6, 2012 [ECF No. 551]. | Liquidating trust | Debtor and equity committee selected jointly | Three member board; equity committee selected each member |

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 20. | *In re Centaur LLC*, No. 10-10799 (KJC) (Bankr. D. Del.). Plan of reorganization confirmed on Feb. 18, 2011 [ECF No. 1350]. | Litigation trust | Debtors, in consultation with prepetition first lien agent and creditors' committee | Three member board; creditors' committee and first lien agent each selected one member; documents unclear as to the third member |
| 21. | *In re Circuit City Stores, Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va.). Liquidation plan confirmed on Sept. 14, 2010 [ECF No. 8555]. | Liquidating trust | Liquidating oversight board | Creditors' committee |
| 22. | *In re Coach Am Group Holdings Corp.*, No. 12-10010 (KG) (Bankr. D. Del.). No plan approved. GUC trust approved on May 31, 2013 [ECF No. 1568]. | Liquidating trust | Documents unclear as to selection of initial trustee; creditors' committee could appoint successor trustee | N/A |
| 23. | *In re Coldwater Creek Inc.*, No. 14-10867 (BLS) (Bankr. D. Del.). Liquidation plan confirmed on Sept. 17, 2014 [ECF No. 981]. | Liquidating trust | Creditors' committee | Creditors' committee |
| 24. | *In re Color Star Growers of Colorado, Inc.*, No. 13-42959 (RFN) (Bankr. E.D. Tex.). Liquidation plan confirmed on Oct. 18, 2014 [ECF No. 530]. | Liquidating trust and litigation trust | Liquidating Trust: Documents unclear as to selection of initial trustee; liquidating trust board could appoint successor trustee  Litigation Trust: Certain lenders, with consent of creditors' committee | Liquidating Trust: Four member board; creditors' committee and three lenders selected a member each  Litigation Trust: Four member board; creditors' committee and three lenders selected a member each |
| 25. | *In re Crunchies Food Co., LLC*, No. 14-11776 (PC) (Bankr. C.D. Cal.) Liquidation plan confirmed on June 19, 2015 [ECF No. 275]. | Liquidating trust | Documents unclear as to selection of initial trustee; liquidating trust board could appoint successor trustee | Four member board; creditors' committee selected each member |
| 26. | *In re CS Mining, LLC*, No. 16-24818 (WTT) (Bankr. D. Utah). Liquidation plan confirmed on Apr. 6, 2018 [ECF No. 1281]. | Liquidating trust | Documents unclear as to selection of initial trustee; bankruptcy court or liquidating trust board chairperson could appoint successor trustee | Three member board; creditors' committee selected two members, in consultation with the debtor, and debtor selected third member |
| 27. | *In re Deel, LLC*, No. 10-11310 (BLS) (Bankr. D. Del.). Liquidation plan confirmed on June 16, 2011 [ECF No. 1515]. | Liquidating trust | Creditors' committee | Three member board; creditors' committee selected each member |

3

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 28. | *In re DBSI Inc.*, No. 08-12687 (PJW) (Bankr. D. Del.). Liquidation plan confirmed on Oct. 26, 2010 [ECF No. 5923]. | Liquidating trust and litigation trust | Liquidating trust: Documents unclear as to selection of initial trustee; liquidating trust board could appoint successor trustee<br><br>Litigation trust: Creditors' committee and chapter 11 trustee selected jointly | Three to seven member board selected by the creditors' committee; board oversaw both trusts |
| 29. | *In re Dewey & LeBoeuf LLP*, No. 12-12321 (MG) (Bankr. S.D.N.Y). Liquidation plan confirmed on Feb. 27, 2013 [ECF No. 1144]. | Two liquidating trusts | Liquidating trust: Creditors' committee, secured lenders and collateral agent, in consultation with the debtor<br><br>Secured lender trust: Secured lenders and collateral agent, in consultation with the debtor | Liquidating trust: Three member board; creditors' committee selected one member, collateral agent and secured lenders jointly selected one member and creditors' committee, collateral agent and secured lenders jointly selected third member, in consultation with the debtor<br><br>Secured lender trust: Secured lenders, in consultation with debtor |
| 30. | *In re DLH Master Land Holding, LLC*, No. 10-30561 (HDH) (Bankr. N.D. Tex.). Plan of reorganization confirmed on Nov. 22, 2011 [ECF No. 1254]. | Liquidating trust | Creditors' committee | Three member board; creditors' committee selected each member |
| 31. | *In re EBHI Holdings, Inc.*, No. 09-12099 (MFW) (Bankr. D. Del.). Liquidation plan confirmed on Mar. 18, 2010 [ECF No. 1450]. | Liquidation trust | Creditors' committee | Creditors' committee |
| 32. | *In re Erickson Inc.*, No. 16-34393 (HDH)  (Bankr. N.D. Tex.). Plan of reorganization confirmed on Mar. 22, 2017 [ECF No. 581]. | Litigation trust | DIP lenders | N/A |
| 33. | *In re Exide Techs.*, No. 13-11482 (KJC) (Bankr. D. Del.). Plan of reorganization confirmed on Mar. 27, 2015 [ECF No. 3423]. | Liquidating trust | Creditors' committee | Three member board; creditors' committee selected two members and secured noteholder committee selected one member |
| 34. | *In re Extended Stay Inc.*, No. 09-13764 (JMP) (Bankr. S.D.N.Y.). Plan of reorganization confirmed on July 20, 2010 [ECF No. 1172]. | Litigation trust | Creditors' committee and special servicer of mortgage loans | N/A |

4

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 35. | *In re F4H Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del.). Liquidation plan confirmed on July 28, 2014 [ECF No. 1137]. | Liquidating trust | Documents unclear as to selection of initial trustee; liquidating trust board could appoint successor trustee | Three member board; creditors' committee selected each member |
| 36. | *In re Fibertower Network Servs. Corp.*, No. 12-44027 (DML) (Bankr. N.D. Tex.). Plan of reorganization confirmed on Jan. 27, 2014 [ECF No. 1067]. | Litigation trust | Creditors' committee and ad hoc noteholder group | Three member board; creditors' committee selected one member and ad hoc noteholder group selected two members |
| 37. | *In re Filmed Entm't Inc.*, No. 15-12244 (SCC) (Bankr. S.D.N.Y.). Liquidation plan confirmed on Mar. 21, 2017 [ECF No. 312]. | Liquidating trust | Debtor and creditors' committee, jointly | N/A |
| 38. | *In re Fleetwood Enters., Inc.*, No. 09-14254 (MJ) (Bankr. C.D. Cal.). Liquidation plan confirmed on Aug. 6, 2010 [ECF No. 2436]. | Liquidating trust | Documents unclear as to selection of initial trustee; liquidating trust board or bankruptcy court could appoint successor | Three member board; creditors' committee selected two members and other creditor selected one member |
| 39. | *In re Fresh & Easy, LLC*, No. 15-12220 (BLS) (Bankr. D. Del.). Liquidating plan confirmed on April 27, 2017 [ECF No. 2143]. | Liquidating trust | Creditors' committee and debtor, jointly | Three member board; creditors' committee selected each member |
| 40. | *In re Gander Mountain Co.*, No. 17-30673 (MER) (Bankr. D. Minn.). Liquidation plan confirmed on Jan. 26, 2018 [ECF No. 1572]. | Liquidating trust | Creditors' committee, in consultation with debtors | Three member board; creditors' committee selected each member |
| 41. | *In re Gen. Wireless Operations Inc.*, No. 17-10506 (BLS) (Bankr. D. Del.). Plan of reorganization confirmed on Oct. 26, 2017 [ECF No. 1117]. | Litigation trust | Creditors' committee, as reasonably acceptable to certain lenders supporting the plan | Three member board; creditors' committee and two other creditors selected one member each |
| 42. | *In re Green Field Energy Servs., Inc.*, No. 13-12783 (KG) (Bankr. D. Del.). Liquidation plan confirmed on Apr. 23, 2014 [ECF No. 885]. | Liquidating trust | Creditors' committee and ad hoc noteholder group | Three member board; creditors' committee selected one member and secured notes indenture trustee selected two members |
| 43. | *In re GT Advanced Techs. Inc.*, No. 14-11916 (HJB) (Bankr. D.N.H.). Plan of reorganization confirmed on Mar. 8, 2016 [ECF No. 3310]. | Litigation trust | Supporting lenders, with consent of creditors' committee and debtors | N/A |
| 44. | *In re Hawaii Telecom. Commc'ns, Inc.*, No. 08-02005 (LK) (Bankr. D. Haw.). Plan of reorganization confirmed on Dec. 30, 2009 [ECF No. 1570]. | Litigation trust | Reorganized debtors and creditors' committee, jointly | Two to five member board; creditors' committee selected each member, with consent of the reorganized debtors |

5

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 45. | *In re Hercules Offshore, Inc.*, No. 16-11385 (KJC) (Bankr. D. Del.). Liquidation Plan confirmed on Nov. 15, 2016 [ECF No. 486]. | Liquidating trust | Lenders supporting the plan | Three member board; lenders supporting the plan selected each member |
| 46. | *In re HMP Servs Holdings Sub III, LLC*, No. 10-13618 (BLS) (Bankr. D. Del.). Liquidation plan confirmed on Mar. 10, 2011 [ECF No. 218]. | Litigation trust and liquidating trust | Litigation trustee selected by creditors' committee<br><br>Liquidating trustee selected by certain secured lender beneficiary, as reasonably acceptable to debtors and creditors' committee | N/A |
| 47. | *In re Idearc Inc.*, No. 09-31828 (BJH) (Bankr. N.D. Tex.). Plan of reorganization confirmed on Dec. 22, 2009 [ECF No. 1640]. | Litigation trust | Debtors, administrative agent and creditors' committee, collectively | Three member board; creditors' committee selected two members and administrative agent selected one member |
| 48. | *In re Kimball Hill, Inc.*, No. 08-10095 (TAB) (Bankr. N.D. Ill.). Liquidation pan confirmed on Mar. 12, 2009 [ECF No. 1118]. | Liquidating trust | Creditors' committee, with consent of the prepetition agent | Five member board; certain secured creditors selected three members and certain unsecured creditors selected two members |
| 49. | *In re La Paloma Generating Co., LLC*, No. 16-12700 (CSS) (Bankr. D. Del.). Liquidation plan confirmed on Nov. 6, 2017 [ECF No. 869]. | Liquidating trust | Debtors and holders of first lien claims, jointly | N/A |
| 50. | *In re LHI Liquidation Co. Inc.*, No. 13-14050 (MG) (Bankr. S.D.N.Y.). Liquidation Plan confirmed on July 22, 2014 [ECF No. 673]. | Litigation trust | Prepetition second lien lenders | Three member board; creditors' committee selected one member and certain prepetition second lien lenders selected two members |
| 51. | *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y.). Plan of reorganization confirmed on Apr. 23, 2010 [ECF No. 4418]. | Two litigation trusts | Creditors' committee | Two five member boards; creditors' committee selected each member |
| 52. | *In re Marbles Holdings, LLC*, No. 17-03309 (TAB) (Bankr. N.D. Ill.). Liquidation plan confirmed on Aug. 30, 2017 [ECF No. 390]. | Liquidating trust | Creditors' committee | N/A |
| 53. | *In re Maxus Energy Corp.*, No. 16-11501 (CSS) (Bankr. D. Del.). Liquidation plan confirmed on May 22, 2017 [ECF No. 1460]. | Liquidating trust | Creditors' committee | Five member board; DIP lender selected three members and creditors' committee selected two members |

6

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 54. | *In re Millenium Lab Holdings II, LLC*, No. 15-12284 (LSS) (Bankr. D. Del.). Plan of reorganization confirmed on Dec. 14, 2015 [ECF No. 195]. | Two litigation trusts | Litigation trust advisory boards selected respective trustees | Ad hoc group of prepetition lenders selected board members for both trusts |
| 55. | *In re Mission Coal Co., LLC*, No. 18-04177 (TOM) (Bankr. N.D. Ala.). Plan of reorganization confirmed on Apr. 15, 2019 [ECF No. 1324]. | Liquidating trust | Creditors' committee | Plan administrator (serving in similar capacity as trust board) selected jointly by debtors and certain lenders, in consultation with creditors' committee |
| 56. | *In re Miss. Phosphates Corp.*, No. 14-51667 (KMS) (Bankr. S.D. Miss.). Liquidation plan confirmed on Oct. 24, 2016 [ECF No. 1714]. | Liquidating trust | Documents unclear as to selection of initial trustee; beneficiaries, with government approval, could remove and appoint successor trustee | N/A |
| 57. | *In re MF Global Holdings Ltd.*, No. 11-15059 (MG) (Bankr. S.D.N.Y.). Liquidation plan confirmed on Apr. 5, 2013 [ECF No. 1288]. | Litigation trust | Director selection committee | Director selection committee (comprising three largest aggregate beneficial holders of certain unsecured claims) |
| 58. | *In re Motors Liquidation Co.*, No. 09-50026 (REG) (Bankr. S.D.N.Y.). Liquidation plan confirmed on Mar. 29, 2011 [ECF No. 9941]. | Liquidating trust | Creditors' committee with the consent of the debtors | Creditors' committee, with consent of the debtors |
| 59. | *In re MPF Holding US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex.). Liquidation plan confirmed on June 14, 2010 [ECF No. 401]. | Litigation trust | Creditors' committee | N/A |
| 60. | *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del.). Plan of reorganization confirmed on Dec. 14, 2012 [ECF No. 2945]. | Litigation trust | Documents unclear as to selection of initial trustee; litigation trust board could remove and appoint successor trustee | Five member board: creditors' committee selected two members and holders of second lien notes selected three members |
| 61. | *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y.). Plan of reorganization confirmed on Feb. 27, 2019 [ECF No. 1308]. | Litigation Trust | Trust board | Five member board: creditors committee selected one member and ad hoc group of unsecured noteholders selected four members |
| 62. | *In re O.W. Bunker Holding North America Inc.*, No. 14-51720 (JAM) (Bankr. D. Conn.). Liquidation plan confirmed on Dec. 15, 2015 [ECF No. 1279]. | Two liquidating trusts | Creditors' committee, debtors and a security agent | N/A |
| 63. | *In re Old Carco LLC (f/k/a Chrysler LLC)*, No. 09-50002 (AJG) (Bankr. S.D.N.Y.). Liquidation plan confirmed on Apr. 23, 2010 [ECF No. 6875]. | Liquidating trust | Debtors' primary creditor constituencies | Creditors' committee, with approval of first lien agent and government DIP lenders |

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 64. | *In re Oildexco, Inc.*, No. 17-12082 (KJC) (Bankr. D. Del.). Liquidation plan confirmed on Aug. 14, 2018 [ECF No. 970]. | Liquidating trust | Two trustees selected by the debtors, creditors' committee and second lien noteholders, collectively | Four member board; creditors' committee selected two members ad hoc group of second lien noteholders selected two members |
| 65. | *In re Osh 1 Liquidating Corp.*, No. 13-11565 (CSS) (Bankr. D. Del.). Liquidation plan confirmed on Dec. 20, 2013 [ECF No. 836]. | Two liquidating trusts | Creditors' committee selected GUC trust trustee<br><br>Documents unclear as to initial liquidating trust trustee, beneficiaries could remove and appoint successor trustee | N/A |
| 66. | *In re Pac. Drilling VIII Ltd.*, No. 17-13203 (MEW) (Bankr. S.D.N.Y.). Liquidation/reorganization plan confirmed on Jan. 30, 2019 [ECF No. 881]. | Liquidating trust | Debtors' largest unsecured creditor, in consultation with debtors | N/A |
| 67. | *In re Pallet Co. LLC*, No. 13-11459 (KG) (Bankr. D. Del.). Liquidation plan confirmed on Nov. 14, 2013 [ECF No. 678]. | Liquidating trust | Documents unclear as to selection of initial trustee; oversight board could remove and appoint successor trustee | Three member board; creditors' committee selected each member, as reasonably acceptable to debtors |
| 68. | *In re Paragon Offshore plc*, No. 16-10386 (CSS) (Bankr. D. Del). Plan of reorganization confirmed on June 7, 2017 [ECF No. 1614]. | Litigation trust | Litigation trust committee (selected by creditors' committee and other creditors) | Two member board; creditors' committee and/or other creditor beneficiaries selected each member |
| 69. | *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va.). Plan of reorganization confirmed on Oct. 9, 2015 [ECF No. 1615]. | Liquidating trust | Debtors, in consultation with representatives for creditors' committee, prepetition agents and DIP lenders | N/A |
| 70. | *In re Patriot Nat'l, Inc.*, No. 18-10189 (KG) (Bankr. D. Del.). Plan of reorganization confirmed on May 4, 2018 [ECF No. 705]. | Litigation trust | First lien agents, as reasonably acceptable to creditors' committee | Five member board; first lien agents and lenders selected two members, creditors' committee selected two members and final member selected by first lien agents and lenders, with consent of creditors' committee |
| 71. | *In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo.). Plan of reorganization confirmed on Mar. 17, 2017 [ECF No. 2763]. | Liquidating trust | Debtors, in consultation with creditors' committee | N/A |

8

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 72. | *In re Petters Co., Inc.*, No. 08-45257 (KHS) (Bankr. D. Minn.). Liquidation plan confirmed on Apr. 15, 2016 [ECF No. 3305]. | Liquidating trust and litigation trust | Chapter 11 trustee served as trustee for both trusts | Five member liquidating trust board; creditor plan proponents selected each member<br><br>Three member litigation trust board; holders of general unsecured claims selected two members and those two members selected the third member |
| 73. | *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del.). Plan of reorganization confirmed on Dec. 23, 2013 [ECF No. 197]. | Litigation trust | Consenting noteholders and shareholders | N/A |
| 74. | *In re Provident Royalties, LLC*, No. 09-33886 (HDH) (Bankr. N.D. Tex.). Liquidation plan confirmed on June 10, 2010 [ECF No. 860]. | Liquidating trust | Equity committee | Equity committee |
| 75. | *In re Quebecor World (USA) Inc.*, No. 08-10152 (JLG) (Bankr. S.D.N.Y.). Plan of reorganization confirmed on July 2, 2009 [ECF No. 1802]. | Litigation trust | Debtors, with approval of creditors' committee, ad hoc noteholder committee and syndicate agreement agent | Seven member board; creditors' committee selected one member, ad hoc noteholder committee selected four members and syndicate agreement agent selected two members |
| 76. | *In re Quicksilver Resources Inc.*, No. 15-10585 (LSS) (Bankr. D. Del.). Liquidation plan confirmed on Aug. 16, 2016 [ECF No. 1633]. | Liquidating trust | Debtors, in consultation with first lien agent, second lien agent, ad hoc group of second lienholders and creditors' committee | Three member board; second lien agent selected each member |
| 77. | *In re RCR Plumbing and Mechs., Inc.*, No. 11-41853 (WJ) (Bankr. C.D. Cal.). Plan of reorganization confirmed on Dec. 18, 2012 [ECF No. 1085]. | Liquidating trust | Creditors' committee | N/A |
| 78. | *In re Reachhold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr. Del.). Liquidation plan confirmed on Jan. 13, 2016 [ECF No. 1385]. | Liquidating trust | Creditors' committee, with approval of debtors | Three member board; creditors' committee selected each member |
| 79. | *In re Relativity Media, LLC*, No. 18-11358 (MEW) (Bankr. S.D.N.Y.). Liquidation plan confirmed on Jan. 31, 2019 [ECF No. 689]. | Liquidating trust | Creditors' committee, with consent of debtors | N/A |
| 80. | *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y.). Liquidation plan confirmed on Dec. 11, 2013 [ECF No. 6065]. | Liquidating trust | Liquidating trust board | Five member board; creditors' committee selected two members and certain other creditors selected three members |

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 81. | *In re Right Start Acquisition Co.*, No. 09-11132 (MT) (Bankr. C.D. Cal.). Liquidation plan confirmed on Dec. 13, 2010 [ECF No. 527]. | Two liquidating trusts | Creditors' committee selected trustees for both trusts | N/A |
| 82. | *In re Rhodes Companies, LLC*, No. 09-14814 (LBR) (Bankr. D. Nev.). Plan of reorganization confirmed on Mar. 12, 2010 [ECF No. 1053]. | Litigation trust | First lien steering committee, in consultation with first lien agent, second lien agent and creditors' committee | N/A |
| 83. | *In re RS Legacy Corp.*, No. 15-10197 (BLS) (Bankr. D. Del.). Liquidation plan confirmed on Oct. 2, 2015 [ECF No. 3067]. | Liquidating trust | Creditors' committee | Seven member board; creditors' committee selected each member |
| 84. | *In re Samson Resources Corp.*, No. 15-11934 (BLS) (Bankr. D. Del.). Plan of reorganization confirmed on Feb. 13, 2017 [ECF No. 2019]. | Litigation Trust | Creditors' Committee | N/A |
| 85. | *In re Savient Pharm., Inc.*, No. 13-12680 (MFW) (Bankr. D. Del.). Liquidation plan confirmed on May 19, 2014 [ECF No. 689]. | Liquidating trust | Creditors' committee | Creditors' committee |
| 86. | *In re Seal123, Inc.*, No.15-10081 (CSS) (Bankr. D. Del.). Liquidation plan confirmed on Oct. 30, 2015 [ECF No. 1111]. | Liquidating trust | Creditors' committee | Three member board: creditors' committee selected each member |
| 87. | *In re SemCrude L.P.*, No. 08-11525 (BLS) (Bankr. D. Del.). Plan of reorganization confirmed on Oct. 28, 2009 [ECF No. 6347]. | Litigation trust | Documents unclear as to selection of initial trustee; litigation trust board could remove and appoint successor trustee | Four or six member board; creditors' committee and lender steering committee selected equal number of members |
| 88. | *In re Seventy Seven Finance Inc.*, No. 16-11409 (LSS) (Bankr. D. Del.). Plan of reorganization confirmed on July 14, 2016 [ECF No. 192]. | Litigation Trust | Documents unclear as to selection of initial trustee; litigation trust board could appoint successor trustee | Three member board; senior unsecured noteholders selected each member |
| 89. | *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex.). Liquidation plan confirmed on Feb. 24, 2017 [ECF No. 506]. | Two liquidating trusts | Creditors' committee selected trustees for both trusts | N/A |
| 90. | *In re SRC Liquidation Co.*, No. 15-10541 (BLS) (Bankr. D. Del.). Liquidation plan confirmed on Nov. 19, 2015 [ECF No. 1331]. | Liquidating trust. | Creditors' committee | Creditors' committee |

10

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 91. | *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y.). Plan of reorganization confirmed on July 28, 2017 [ECF No. 3735]. | Litigation trust | Creditors' committee | Three member board; creditors' committee selected each member |
| 92. | *In re Think3 Inc.*, No. 11-11252 (HCM) (Bankr. W.D. Tex.). Plan of reorganization confirmed on July 3, 2012 [ECF No. 534]. | Litigation trust | Debtors | N/A |
| 93. | *In re Tousa, Inc.*, No. 08-10928 (JKO) (Bankr. S.D. Fla.), Liquidation plan confirmed on Aug. 9, 2013 [ECF No. 9464]. | Liquidating trust | Creditors' committee, first lien lenders and second lien lenders, as reasonably acceptable to debtors | Four member board; creditors' committee selected two members, first lien lenders selected one member and second lien lenders selected one member |
| 94. | *In re Tribune Co.*, No. 08-13141 (KJC) (Bankr. D. Del.). Plan of reorganization confirmed on July 23, 2012 [ECF No. 12074]. | Litigation trust | Litigation trust advisory board (as selected by creditors' committee and indenture trustees) | Three member board; creditors' committee selected one member and indenture trustees selected two members |
| 95. | *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y.). Plan of reorganization confirmed on Nov. 30, 2010 [ECF No. 19759]. | Litigation trust | Debtor and the United States in consultation with certain representatives of holders of tort claims and government environmental entities | Five member board; United States selected three members and other beneficiaries selected two members |
| 96. | *In re TSA WD Holdings, Inc.*, No. 16-10527 (MFW) (Bankr. D. Del.). Liquidation plan confirmed on Dec. 5, 2017 [ECF No. 3925]. | Liquidating trust | Documents unclear as to selection of initial trustee; bankruptcy court could appointment successor trustee | N/A |
| 97. | *In re Venoco, LLC*, No. 17-10828 (KG) (Bankr. D. Del.). Liquidation plan confirmed on May 23, 2010 [ECF No. 922]. | Liquidating trust | Debtors | N/A |
| 98. | *In re Wash. Mutual, Inc.*, No. 08-12229 (MFW) (Bankr. D. Del.). Plan of reorganization confirmed on Feb. 24, 2012 [ECF No. 9759]. | Liquidating trust | Documents unclear as to selection of initial trustee; trust board could appoint additional trustee(s) | Seven member board; creditors' committee selected three members, equity committee selected three members and one member was selected by the creditors' committee, with consent of the equity committee |
| 99. | *In re Westmoreland Coal Co.*, No. 18-35672 (DJR) (Bankr. S.D. Tex.) Liquidation plan confirmed on Mar. 2, 2019 [ECF No. 1561]. | Liquidating trust | Debtors and supporting lenders, in consultation with the creditors' committee | N/A |

11

| | Case Name and Confirmation Date | Type of Trust | Selection of Trustee | Selection of Trust Board |
|---|---|---|---|---|
| 100. | *In re Woodbridge Group of Companies, LLC*, No. 17-12560 (KJC) (Bankr. D. Del.). Liquidation plan confirmed on Oct. 26, 2018 [ECF No. 2903]. | Liquidating trust | Creditors' committee, secured noteholders' committee and equity committee, collectively | Five member board; creditors' committee selected three members and the other committees each selected one member |
| 101. | *In re ZCO Liquidating Corp.*, No. 13-13126 (PJW) (Bankr. D. Del.). Liquidation plan confirmed on July 30, 2014 [ECF No. 618]. | Liquidating trust | Liquidating trust advisory board | Two member board; creditors' committee selected one member and other beneficiaries selected one member |

12