**FOLEY & LARDNER LLP**
Katherine R. Catanese
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
kcatanese@foley.com

*Attorneys for Victor Reagan Family Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re : | Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.*, : | Case No. 18-23538 (RDD) |
| Debtors.[1] : | (Jointly Administered) |

**OBJECTION TO STIPULATION, AGREEMENT, AND ORDER AUTHORIZING DEBTOR TO ASSUME AND ASSIGN UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASE (3701 BROADWAY STREET, QUINCY, ILLINOIS)**
[Related Docket Number 3970]

Victor Reagan Family Trust ("*Landlord*") hereby files this *Objection ("Objection") to Stipulation, Agreement, and Order Authorizing Debtor to Assume and Assign Unexpired*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

1

18-23538-shl    Doc 4027    Filed 05/24/19    Entered 05/24/19 16:13:25    Main Document
                                    Pg 2 of 13

*Nonresidential Real Property Lease (3701 Broadway Street, Quincy, Illinios)* [Dkt. 3970] ("*Stipulation*") and respectfully represents the following:

## I.    BACKGROUND

**A.    Lease Parties**

1. Debtor Kmart Stores of Illinois LLC ("*Kmart*" or "*Sublessee*") is the former occupant of that certain store located at 3701 Broadway Street, Quincy, Illinois 62301-3721 (scheduled by the Debtors as Store Number 4433 at Docket Number 23 in the above-captioned jointly administered cases – herein referred to as the "*Quincy Store*").

2. Landlord is the owner of the real property upon which the Quincy Store is located.

3. Landlord leased by written agreement ("*Top Lease*") the subject real property to Certified Capital, LP (as successor in interest, herein referred to as "*Certified Capital*" or "*Lessee*"). Subsequently, with Landlord's consent, Lessee subleased by written agreement ("*Sublease*") a portion of such real property to Kmart.

4. Kmart, as Sublessee, operated the Quincy Store under the Sublease with Landlord's Lessee.

**B.    Kmart Rejected the Sublease**

5. On April 30, 2019, Kmart filed its *Notice of Rejection of Certain Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* [Dkt. 3449] ("*Rejection Notice*"). The Quincy Store is included in the Rejection Notice.

6. Per the Rejection Notice, and as specifically recited in accordance with the terms of the Court's "*Rejection Procedures Order*" [Dkt. 800] (as defined in the Rejection Notice), all leases identified in the Rejection Notice are deemed rejected effective as of the ***later*** of (i) service and filing of the Rejection Notice and (ii) the date the Debtors have surrendered the premises.

7. The Rejection Notice as filed and served on Landlord on April 30, 2019.

8. As recited by Kmart in the Stipulation, Kmart has not occupied the Quincy Store for more than four months. The Quincy Store is vacant and is not being properly maintained. The grass is overgrown, there are squatters on the parking lot, and trespassers continue to enter the premises for unauthorized uses.

9. Kmart has abandoned the Quincy Store and surrendered possession of the same. This conclusion is confirmed by Kmart's operative Rejection Date for the Quincy Store in the Rejection Notice. On page 9 of the Rejection Notice, Kmart lists April 30, 2019 (the same date the Rejection Notice was filed and served) as the effective rejection date for the Sublease.

10. The deadline to file objections or responses to the Rejection Notice was May 10, 2019 at 4:00 p.m. (Eastern Time).

11. There are no objections filed concerning the Quincy Store. Specifically, Certified Capital did not (and has not) filed any objections or responses to the Rejection Notice.

12. By operation of law, Kmart's Sublease of the Quincy Store was deemed rejected under 11 U.S.C. §365, effective as of April 30, 2019.

**C.    Certified Capital's Motivations to Revive the Sublease**

13. Not until May 21, 2019, more than 10 days after the deadline to respond to the Rejection Notice and after the Quincy Store Sublease had been deemed rejected, Kmart and Certified Capital filed the Stipulation attempting to revive the rejected Quincy Store Sublease and assign the same to Broadway and 36th GP ("*Broadway*")—an entity owned and controlled by the same persons as Certified Capital. *See* Dkt. 3970 at pp. 13, 17. The stated consideration to assign the Sublease to Broadway is $15,000.00. *See id.* at p. 6, ¶ F.

3

14. Essentially, Certified Capital (as Landlord's lessee and Sublessor to Kmart) is attempting to "sublease" the Quincy Store to itself in an effort to hold open the term of the Top Lease.

15. Paragraph C on page 6 of the Stipulation inaccurately states that the Sublease expires on November 30, 2046. Under the Sublease, the term must be renewed by written notice ("*Renewal Notice*") delivered from Kmart to Certified Capital every five (5) calendar years. In the event a Renewal Notice is not delivered, the term of the Sublease automatically expires. The current term of the Sublease expires on November 30, 2021, unless Kmart files a Renewal Notice prior to the expiration of the current 5-year renewal term.

16. Under the Top Lease between Landlord and Certified Capital (as lessee), the existence of the Top Lease is **coterminous** with the Sublease between Certified Capital (as sublessor) and Kmart (as sublessee). In the event the Sublease expires, the Top Lease also expires. The parties always intended for the Sublease and Top Lease to expire at the same time in the event Kmart ceased operating the Quincy Store.

17. With the Sublease rejected by Kmart, there will be no party to serve Certified Capital with a Renewal Notice prior to the November 30, 2021, termination date. Thus, by its attempt to buy Kmart's position in the Sublease, Certified Capital is attempting to unilaterally control its own sublessee's right to serve a Renewal Notice. The ultimate purpose is to keep the Top Lease alive through control of the renewal terms of the Sublease.

18. Certified Capital is motivated to retain the Top Lease because Certified Capital has been enjoying grossly under-market rental obligations since the Top Lease's 1970 execution. The monthly rental rate under the Top Lease has been $3,000 since 1970. The Top Lease contains no rental escalators or other provisions accounting for changes in market conditions or inflation.

4822-1106-8311.4

Thus, Certified Capital has continued paying $3,000 per month as Lessee, yet charging $9,987.59[2] per month from Kmart as Sublessee.

19. Certified Capital seeks to hold the Top Lease captive through unilateral renewals of the Sublease to itself until it can find a new, independent third party to pay the Sublease rent. It can only accomplish this maneuver by paying Kmart for an assignment of the Sublease. Indeed, the $15,000.00 payment is not a "cure" of any default under the Sublease. Certified Capital is buying Kmart's position in the Sublease to frustrate the intent of the Top Lease which would otherwise expire in 2021 as a result of Kmart's bankruptcy and rejection of the Sublease.

20. Kmart and its asset purchaser in the Bankruptcy Case ("*ESL*") (including their respective real estate and investment banking professionals) shopped the Quincy Store for months without any third party desire to assume the Sublease. After Kmart and ESL could not find any economic value for the Quincy Store, Kmart filed the Rejection Notice and included the Quincy Store. Thus, Kmart is incentivized to accept any sum for the proposed assignment because the Sublease is otherwise rejected, and Kmart would not receive any funds upon rejection.

21. With a small, one-time payment of $15,000.00 to Kmart, Certified Capital attempts to "end run" the terms of the Sublease with the ultimate goal of preserving its passive monthly profit as long as possible. This is contrary to the intent of the parties who agreed that the term of the Sublease and Lease should be coterminous based entirely on Kmart's occupation of the premises.

22. The Stipulation fails to disclose that Certified Capital and Broadway are owned and controlled by the same persons—the Libaw family (e.g., Evan Justin Libaw is the signatory party

---

[2] This is the amount of Sublease rent stated by Kmart in the Stipulation. Under the Sublease documents currently available to Landlord, the fixed annual rent under the Sublease is actually $239,702.00 payable in equal monthly installments of $19,975.17.

5

for Broadway under the Stipulation. Mr. Libaw, along with his brother, Jacob Libaw, are the principals in control of Certified Capital).

23. The Stipulation is devoid of any allegations or evidence of adequate assurance of future performance under the Sublease. Neither Kmart nor Certified Capital nor Broadway has offered any proof that Broadway promises to, and possesses the financial wherewithal to, continue performing Kmart's rental payments and related obligations under the Sublease. Broadway's performance under the Sublease directly impacts Certified Capital's ability to perform under the Top Lease with Landlord. Without any such evidence, the Sublease cannot be assigned.

## II.   OBJECTIONS

### A.   The Sublease Has Already Been Rejected.

24. Under Kmart's Rejection Notice and the Court's Rejection Procedures Order, the Sublease was deemed rejected under 11 U.S.C. § 365, effective as of April 30, 2019. Post-rejection, Kmart does not possess any interest subject to assumption and assignment under the Bankruptcy Code. *See, generally, In re Ciena Capital LLC*, No. 08-13783AJG, 2009 WL 2905759, at *5 (Bankr. S.D.N.Y. July 28, 2009). Thus, it is not possible to assume and assign the Sublease through the Stipulation. A rejected lease is treated as abandoned and not part of the bankruptcy estate. *See Stoltz v. Brattleboro Hous. Auth. (In re Stolz),* 315 F.3d 80, 85–86 n.1 (2d Cir. 2002); *In re Ciena Capital LLC*, No. 08-13783AJG, 2009 WL 2905759, at *5. Further, "a rejection is equivalent to electing not to assume a lease". *Id.* at *5. Because the lease is no longer part of the bankruptcy estate, the lease is no longer subject to assumption. *See id*. Nor is the lease further subject to bankruptcy law. *See id*. ("If a lease is rejected, it is treated as being breached immediately prior to the petition date, and the parties are left with whatever remedies are available outside of

bankruptcy law. . . . Rejection does not change the substantive rights of the parties to the contract or lease, but merely means that the bankruptcy estate itself will not become a party to it.").

25. Kmart proposed the lease rejection procedures set forth in the Court's Rejection Procedures Order. Kmart followed its own procedures and listed the Sublease as rejected under Section 365, effective as of April 30, 2019 (that date being the latter of (i) the date the Rejection Notice was filed and served; and (ii) the date Kmart surrendered the premises). No responses were filed to the Rejection Notice, and in compliance with its own procedures, Kmart is deemed to have rejected the Sublease on the date the Rejection Notice was filed.

26. The Landlord has detrimentally relied on the April 30, 2019 rejection date. Landlord is the property's owner and, thus, the only party with a long-term stake in its maintenance and care. Accordingly, Landlord has engaged a real estate broker and taken actions to prepare the Quincy Store and the surrounding premises for renovation or sale.

27. Since abandonment, the Quincy Store has fallen into a state of disrepair. The property will require a substantial monetary investment before the premises are ready for a new tenant. Landlord has already begun taking steps to prepare the property accordingly based on Kmart's April 30, 2019 rejection date. Landlord should be entitled to rely on the rejection date noticed by Kmart in compliance with the Court's Rejection Procedures Order.

28. Kmart should be required to follow the rejection procedures that it proposed. Kmart should not be allowed to come back, after the fact, for a fee of $15,000.00 to unilaterally "undo" the prior rejection. Kmart, as with any other party to this case, must be bound by the Court's Rejection Procedures Order. Kmart would not permit any other party to "undo" a rejected lease if that party failed to timely respond to the Rejection Notice. Indeed, Kmart would bind that party

7

to the lease's rejection date by operation of law, effective as of the date set forth in the Rejection Notice, after such party failed to timely respond. Kmart should be bound to its own standards.

**B.    No Evidence of Adequate Assurance of Future Performance.**

29.    Assuming that the Sublease has not been rejected, which Landlord disputes, the Sublease cannot be assumed and assigned because the Stipulation fails to prove adequate assurance of future performance. Section 365 governs the assumption and assignment of unexpired leases. In all cases, the debtor must cure any defaults, compensate the lessor for any pecuniary injury, and provide "adequate assurance of future performance." *See* 11 U.S.C. §§ 365(b)(1), 365(f)(2); *see also In re Martin Paint Stores*, 199 B.R. 258, 261–62 (Bankr. S.D.N.Y. 1996), aff'd sub nom; *S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57 (S.D.N.Y. 1997).

30.    Generally, adequate assurance is considered to be something less than an absolute guarantee. *See, e.g., In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999). The particular facts and circumstances of each case are evaluated and taken into consideration to determine what constitutes adequate assurance. *See id.* at 602; *In re Carlisle Homes, Inc.,* 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Accordingly, the facts and circumstances of the assumption and assignment of the subject lease must be evaluated to determine whether the landlord has been provided with adequate assurance of future performance as required by § 365(b)(1). *See In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009).

31.    At a minimum, the primary focus of adequate assurance concerns the assignee's ability to fulfill the financial obligations under the lease. *See In re Fifth Ave. Originals,* 32 B.R. 648, 653 (Bankr. S.D.N.Y. 1983); *In re Evelyn Byrnes, Inc.*, 32 B.R. at 829; *In re Brentano's, Inc.*,

8

29 B.R. 881, 883 (Bankr. S.D.N.Y. 1983); *In the Matter of U.L. Radio Corp.*, 19 B.R. 537, 542, 8 B.C.D. 1273, 6 C.B.C.2d 430 (Bankr. S.D.N.Y. 1982). Since the term "adequate assurance of future performance" is not subject to statutory definition, we turn to the legislative history of the Code to glean its intended meaning. That history reveals that the term was intended to be given a practical, pragmatic construction in light of the facts of each case. *In re Sapolin Paints, Inc.*, 5 B.R. 412, 420–21, 6 B.C.D. 776, 2 C.B.C.2d 854 (Bankr. E.D.N.Y. 1980). As designed by Congress, it does not mean absolute insurance that the debtor will thrive and make a profit. *In re Alipat, Inc.*, 36 B.R. 274, 278 (Bankr. E.D. Mo. 1984).

32. Regarding a lease covenant to pay rent, the test is simply whether it appears that the rent will be paid and other obligations thereunder met. *See In re Evelyn Byrnes, Inc.*, 32 B.R. at 829; *In re U.L. Radio Corp.*, 19 B.R. at 542. Moreover, in determining when the rent reserved in a lease will be paid, the statute itself indicates in addition to the source of payment, the extent and history of defaults and the record of making prior payments are of prime consideration. *In re Natco Indus., Inc.*, 54 B.R. 436, 440–41 (Bankr. S.D.N.Y. 1985).

33. Regarding real property leases in shopping centers, Congress expressly defined adequate assurance in Code section 365(b)(3), including adequate assurance:

> (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
>
> (B) that any percent rent due under such lease will not decline substantially;
>
> (C) that assumption or assignment of such lease will not breach substantially any provision such as radius, use, or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center; and
>
> (D) that assumption or assignment of such lease will not disrupt substantially any tenant mix or balance in such shopping center.

4822-1106-8311.4

*See* 11 U.S.C. 365(b)(3)(A)-(D); *see also In re Sun TV & Appliances, Inc.*, 234 B.R. 356, 363 (Bankr. D. Del. 1999).

34. Here, the Lease is in default as a result of the depreciated state of the premises. As set forth above, squatters are using the parking lot as a "used car" sales location with parked cars remaining on the premises for extended periods of time. There is no power to the property, and thus, no electricity to the inside of the Quincy Store or the closed Ruby Tuesday restaurant also located on the property. Trespassers are using the empty lot, sidewalks, and related outdoor facilities as a skateboard park, a location for food vendors, and for other unauthorized purposes. The grass is overgrown, and the property has generally fallen into a state of disrepair.

35. Kmart, Certified Capital and Broadway have failed to provide any assurances or evidence that the defaults will be cured or that Broadway is capable of performing all obligations under the Sublease. Broadway's performance under the Sublease directly impacts Certified Capital's performance to Landlord under the Top Lease. Without such evidence, the Sublease cannot be assigned to Broadway.

36. Adequate assurance is especially important in this case since Certified Capital and Broadway are controlled by the same persons. Is Landlord to assume that Certified Capital is going to "pay itself" monthly rentals under the Sublease? There is no legitimate business purpose for Certified Capital to buy the Sublease because the premises are not capable of producing revenue. The Quincy Store is in disrepair and will require a substantial capital investment before it is ready for a commercial tenant.

37. Post-assignment, Certified Capital will be responsible for both the Sublease rent and the Top Lease rent. Without a third party income stream from an operating tenant, the only reason Certified Capital would acquire the Sublease is to hold the Top Lease hostage and "buy

time" to find a new, real subtenant to pay the Sublease rent. As demonstrated by Kmart's marketing process for the Quincy Store, so far this has been a futile exercise. No arm's length third party has been willing to invest the funds required to restore the premises to market conditions in exchange for 5-year renewal periods under the Sublease. The Landlord owns the property and is ready, willing, and able (and, indeed, has already begun) to invest the time and resources required to restore the property.

38. The proposed assignment serves no legitimate business purpose. The Sublease remains in default, and there is no evidence of adequate assurance of future performance. Without such evidence, the Sublease cannot be assigned.

C.  **Proposed Assignment Is Not in Good Faith**

39. Assuming that the Sublease has not been rejected, which Landlord disputes, the proposed assignment to Broadway is not an arm's length transaction. Thus, it is ineligible for assumption and assignment under 11 U.S.C. §365. Before the Bankruptcy Court approves an assignment, the Bankruptcy Court should make findings that the proposed transaction (i) is at arm's length; (ii) in good faith; and (iii) does not involve any insiders. *See In re Golfsmith Int'l Holdings, Inc.,* Case No. 16-12033 (LSS), 2017 WL 5590197, *3–4 (Bankr. D. Del. April 10, 2017) (specifically requiring findings that the transaction was negotiated at arm's length, proposed in good faith and did not involve any insiders upon approving the assumption and assignment of leases and related sale transaction).

40. The Stipulation is not proposed in good faith and is not at arm's length because it involves insiders: Certified Capital is an insider under common control with Broadway—the proposed assignee. Moreover, the term of the Top Lease is tied to the Kmart Sublease. Without Kmart in the space, the original intent of the parties that the Top Lease and Sublease would

terminate in 2021 upon Kmart's departure can no longer be realized. The fact that the Libaw family controls both the prime tenant and the proposed assignee subtenant proves that the Libaws are simply trying to keep the Top Lease in place in order to take advantage of the sub-market lease terms, not to preserve the intent of the parties.

41. The Libaws (through their entities Certified Capital and Broadway) are attempting to abuse the bankruptcy laws to accomplish a purpose that is nothing short of an "end run" around the true intent of the Top Lease and Sublease. The purpose of the assignment clause in 11 U.S.C. 365 is to provide an alternative source to generate additional value to the debtor's bankruptcy estate, and in turn, increase the return to the debtor's creditors. Section 365 does not exist to serve the Libaws' purposes to extend the term of the grossly under-market Top Lease which would otherwise expire in 2021.

42. The Libaws seek to circumvent the intention of the parties that the survival of the Top Lease beyond 2021 depended on Kmart's occupancy of the property. Instead, the Libaws ask this Court to deprive the landowner of the value in its property and subject it to another 27 years on a sub-market deal. It should also be noted that the Landlord is entitled to 10% of any percentage rents due under the Kmart Sublease. By being able to sublease to a new operator, the Libaws will likely attempt to discontinue the percentage rent concept, which would even further dilute the original intent of the parties to the financial detriment of the Landlord.

43. For the reasons set forth above, Landlord objects to the proposed assumption and/or assignment of the Quincy Store Sublease to Broadway. This Court is a court of equity, and under the facts of this case, the Court should not approve the proposed assignment.

### III.    RESERVATION OF RIGHTS

44. Landlord reserves all rights to supplement and amend this Objection with additional briefing, authorities, evidence and any such supplements and amendments shall relate back to this timely filed Objection. Landlord reserves all rights to present any evidence, factual presentation, oral argument and/or legal authorities at any proceedings before the Court in support of the positions herein.

Dated: May 24, 2019
      New York, New York        Respectfully submitted,

**FOLEY & LARDNER LLP**
*/s/ Katherine R. Catanese*
Katherine R. Catanese
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
Email: kcatanese@foley.com

Thomas C. Scannell
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: tscannell@foley.com

*Attorneys for Victor Reagan Family Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Objection was served on May 24, 2019 (i) electronically via CM/ECF on all parties registered to receive electronic notice in these cases (including without limitation, Debtors via counsel of record); and (ii) via electronic mail and First Class Mail to Certified Capital, LP via counsel of record.

                                */s/ Katherine R. Catanese*
                                Katherine R. Catanese

4822-1106-8311.4