Proposed Hearing Date and Time:  June 20, 2019 at 10:00 AM (Eastern Time)
Proposed Objection Date and Time:  May 31, 2019 at 4:00 PM (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
In re                                    :
                                         :        Chapter 11
SEARS HOLDINGS CORPORATION, et al.,      :
                                         :        Case No. 18-23538 (RDD)
                                         :
                Debtors.¹                :        (Jointly Administered)
-----------------------------------------------------------x
```

## NOTICE OF THE DEBTORS' SUPPLEMENTAL
## <u>MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: SHC Holdings Corporation (0798) ("**SHC**"); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); SHC Operations LLC (4331); SHC, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); SHC Development Co. (6028); SHC Holdings Management Corporation (2148); SHC Home & Business Franchises, Inc. (6742); SHC Home Improvement Products, Inc. (8591); SHC Insurance Services, L.L.C. (7182); SHC Procurement Services, Inc. (2859); SHC Protection Company (1250); SHC Protection Company (PR) Inc. (4861); SHC Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a SHC, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); SHC Brands Business Unit Corporation (4658); SHC Holdings Publishing Company, LLC. (5554); SHC Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); SHC Brands, L.L.C. (4664); SHC Buying Services, Inc. (6533); Kmart.com LLC (9022); and SHC Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that a hearing on the annexed motion ("Motion") of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "Debtors"), for entry of an order (a) enforcing the Asset Purchase Agreement and the automatic stay against Transform Holdco LLC and (b) compelling Transform Holdco LLC to turnover Estate funds, as more fully set forth in the Motion, will be held before the Honorable Robert D. Drain, United States Bankruptcy Court Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 ("**Bankruptcy Court**"), on **June 20, 2019, at 10:00 a.m. (Eastern Time)** ("**Hearing**").

**PLEASE TAKE FURTHER NOTICE** that objections and responses ("**Objections**"), if any, to the Motion must be asserted in writing; conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York; set forth the name of the objecting party, the basis for the Objection, and the specific grounds thereof; be filed with the Bankruptcy Court in accordance with the terms set forth in the Motion; and be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405), so as to be so filed and received no later than **May 31, 2019, at 4:00 p.m. (Eastern Time)** ("**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if an Objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing and failure to appear may result in relief being granted or denied upon default.

2

Dated: May 24, 2019
     New York, New York

                                ***/s/ Sunny Singh***

                                WEIL, GOTSHAL & MANGES LLP
                                767 Fifth Avenue
                                New York, New York  10153
                                Telephone:  (212) 310-8000
                                Facsimile:  (212) 310-8007
                                Ray C. Schrock, P.C.
                                David J. Lender
                                Paul R. Genender
                                Jared R. Friedmann
                                Sunny Singh

                                *Attorneys for Debtors*
                                *and Debtors in Possession*

WEIL:\97041026\12\73217.0004

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
In re                                                            :
                                                                 :        **Chapter 11**
**SEARS HOLDINGS CORPORATION, *et al.*,**                        :
                                                                 :        **Case No. 18-23538 (RDD)**
                                                                 :
Debtors.[2]                                                      :        **(Jointly Administered)**
-----------------------------------------------------------------x

## DEBTORS' SUPPLEMENTAL MOTION TO ENFORCE
## THE ASSET PURCHASE AGREEMENT[3]

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: SHC Holdings Corporation (0798) ("**SHC**"); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); SHC Operations LLC (4331); SHC, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); SHC Development Co. (6028); SHC Holdings Management Corporation (2148); SHC Home & Business Franchises, Inc. (6742); SHC Home Improvement Products, Inc. (8591); SHC Insurance Services, L.L.C. (7182); SHC Procurement Services, Inc. (2859); SHC Protection Company (1250); SHC Protection Company (PR) Inc. (4861); SHC Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a SHC, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); SHC Brands Business Unit Corporation (4658); SHC Holdings Publishing Company, LLC. (5554); SHC Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); SHC Brands, L.L.C. (4664); SHC Buying Services, Inc. (6533); Kmart.com LLC (9022); and SHC Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[3] Capitalized terms used in this Supplemental Motion but not otherwise defined herein will have the meanings set forth in the *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to*

---

*Assign Matter to Mediation* (ECF No. 2796) ("**First Motion to Enforce**") or in the APA, as applicable.  The APA is attached as <u>Exhibit B</u> to the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "**Sale Order**").

### TABLE OF CONTENTS

I.      Summary of Relief Requested ........................................................................1

II.     Preliminary Statement...................................................................................1

III.    Background ...................................................................................................3

IV.     Argument and Authorities...............................................................................6

    A.     The Buyer Is Obligated to Assume Approximately $166 Million "Other
       Payables" and All Payment Obligations with Respect to Ordered
       Inventory. ...........................................................................................7

    B.     The Buyer Is Obligated to Assume Approximately $83 Million of
       Aggregate 503(b)(9) Claims. ................................................................9

    C.     The Buyer Continues to Withhold Cash-in-Transit, Rent Proration, and
       GOB Proceeds in Violation of the Automatic Stay. ...............................13

       1.      Cash-in-Transit, Rent Proration, and GOB Proceeds Defined. ..........13

       2.      The Debtors Have Been Attempting to Recover the Cash-in-
          Transit, Rent Proration, and GOB Proceeds For Many Months. ..........14

       3.      The Buyer's Continued Refusal to Turn Over the Cash-in-Transit,
          Rent Proration, and GOB Proceeds and Its Continued Refusal to
          Substantiate Its Possession of the Cash-in-Transit, Rent Proration,
          and GOB Proceeds Violates the Automatic Stay......................................17

    D.     The Court Should Enjoin the Buyer from Interfering, in Violation of the
       Automatic Stay, with the Debtors' Use and Enjoyment of Their Properties
       in the Village of Hoffman Estates, Illinois. ...........................................19

V.      Conclusion ...................................................................................................22

WEIL:\97041026\12\73217.0004

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Huatuco v. Satellite Healthcare*
   CV No. 8465-VCG, 2013 WL 6460898 (Del. Ch. Dec. 9, 2013), *aff'd*, 93
   A.3d 654 (Del. 2014) ............................................................................................5

*Interim Healthcare, Inc. v. Spherion Corp.*
   884 A.2d 513 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) ..................5

*LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*
   582 B.R. 46 (Bankr. S.D.N.Y. 2018), *amended on reconsideration on other
   grounds*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15,
   2018) ....................................................................................................................17

*Miller v. D&M Holdings US, Inc. (In re Dig. Networks N. Am., Inc.)*
   Case No. 15-11535 (KG), 2018 WL 3869599 (Bankr. D. Del. Aug. 13, 2018)................16, 17

*NACCO Indus., Inc. v. Applica Inc.*
   997 A.2d 1 (Del. Ch. 2009)....................................................................................5

*TWA Res. v. Complete Prod. Servs., Inc.*
   No. CIV. A. N11C-08-100 MMJ, 2013 WL 1304457 (Del. Super. Ct. Mar. 28,
   2013) ..............................................................................................................10, 11

*Weber v. SEFCU (In re Weber)*
   719 F.3d 72 (2d Cir. 2013).............................................................................15, 16, 21

**Statutes**

11 U.S.C. § 105 ....................................................................................................21

11 U.S.C. § 362 ...............................................................................................16, 20

11 U.S.C. § 541(a) ...............................................................................................16

11 U.S.C. § 542 ....................................................................................................16

WEIL:\97041026\12\73217.0004

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

## I.    Summary of Relief Requested

The Debtors file this Supplemental Motion to Enforce the Asset Purchase Agreement ("**APA**") and request that the Court enter an order: (i) compelling the Buyer to perform its obligations under Section 2.3—that is, to assume up to approximately $166 million Other Payables *and* all payment obligations with respect to Ordered Inventory; (ii) compelling the Buyer to assume $83,056,184 in 503(b)(9) claims as required by the APA; (iii) compelling the Buyer to turn over $35.1 million to the Debtors, representing the total amount of cash owed to the Debtors in respect of post-Closing cash-reconciliation amounts; (iv) enjoining the Buyer from taking any further actions to (a) exercise control over the thirteen lots in the Village of Hoffman Estates, Illinois development (the "**Hoffman Estates Development**") that the Debtors did not transfer to the Buyer under the APA or (b) interfere with the Debtors' use, enjoyment, or right to dispose of those thirteen lots; and (v) granting the Debtors such other and further relief, at law or in equity, to which they are entitled, including but not limited to their attorneys' fees incurred as a result of the Buyer's repeated and continuous violations of the automatic stay.

## II.    Preliminary Statement

1.     The APA is an extensively negotiated, fully integrated contract between two sophisticated parties with extensive oversight by other sophisticated parties in interest and approved by this Court.  Notwithstanding, in the more than three months since the parties executed the APA, the Buyer has engaged in one attempt after another to rewrite the APA's unambiguous terms to its advantage—that is, to try to litigate after-the-fact a better deal for itself than the deal for which it bargained.  The Debtors believe these are simply thinly-veiled attempts to stall from paying amounts that are due and owing to the Debtors' Estate.  The Buyer has, for example:

1

- denied that, under the APA, it assumed $166 million of Other Payables in addition to all payment obligations associated with Ordered Inventory, despite that the unambiguous terms of the APA (and this Court) say otherwise;

- denied that it is obligated to assume any 503(b)(9) claims based on calculating the amount of Prepaid Inventory and Accounts Receivable using newly minted accounting methods different from those that SHC itself used in the period up to and until the APA was executed, while failing to provide data that purportedly supports its 503(b)(9) calculations;

- withheld more than $35 million in Estate assets, claiming various reconciliations and setoffs but failing and refusing time and again—and despite the Debtors' repeated requests—to provide the data justifying those reconciliations and setoffs; and

- attempted to exercise control over and interfere with the Debtors' right to dispose of certain properties of the Estate located in the Hoffman Estates Development that are unrelated to the operation of the business and that the Buyer now claims without any basis that the Debtors were required to convey under the APA.

2.    Even with respect to matters already resolved by the Court, e.g., the Credit Card Accounts Receivable dispute, the Buyer continues to take unreasonable positions that frustrate the Estate's ability to recover its property and that further exacerbate the Estate's administrative expenses.  By way of example, the Buyer attempted to turn the process of drafting a proposed order (reflecting the Court's rulings in the Debtors' favor on the Credit Card Accounts Receivable dispute) into a motion for reconsideration by seeking to include language in the order inconsistent with the Court's ruling.  After that effort failed, the Buyer has interfered with the Debtors' ability to recover those receivables from the Credit Card Payment Processors by asserting a facially incorrect interpretation of the Court's order and threatening legal action against the Processors should they comply with the Court's order by transferring funds from their respective Reserve Accounts directly to the Debtors.

3.    The Debtors have been ready and willing to work in good faith to resolve any legitimate disputes, including with respect to any obligations paid by the Buyer that it did not assume under the APA.  But the Buyer has not cooperated and, simply put, the Debtors believe

WEIL:\97041026\12\73217.0004

that the most expeditious way to resolve these matters will be for the Court to rule on the contract interpretation issues. We are simply out of time. The Buyer has delayed providing information critical to the Debtors' assessment of the Buyer's position, all the while advancing ever more indefensible interpretations of unambiguous provisions of the APA to justify its conduct and delay the Debtors' recovery of its assets.

4.    The Buyer's relentless campaign to avoid its obligations under the plain language of the APA must come to an end—not only because it is without support in either fact or law, but also because it has become a cancer eating away at the Estate's limited resources and threatens to undermine the Debtors' plan (the "**Plan**") process. The Buyer may now wish it had negotiated different terms in the APA, but that does not excuse the Buyer from its obligations under that agreement, nor does it permit the Buyer to impose nonexistent obligations upon the Debtors while holding on to millions of dollars of the Debtors' cash on the basis of unsupported setoffs, or to interfere with the Debtors' rights to use, enjoy, and dispose of Estate property. Accordingly, the Debtors respectfully request that the Court schedule a hearing at the earliest available date, hear argument, and then compel the Buyer to comply with its obligations under the plain language of the APA to turn over the Estate property that it continues to hold without support in blatant violation of the automatic stay. The Debtors also seek damages for the Buyer's willful violation of the automatic stay.

## III.    <u>Background</u>

5.    The APA reflects a complex and delicate balance of assets delivered and liabilities assumed. ESL President Kunal Kamlani himself described this balance during his deposition taken in connection with these chapter 11 cases:

> During the discussions with respect to TransformCo's willingness to take over liabilities of the estate, the representatives of the estate provided us with their view on what their debt balances were going to be at closing and what their cash was

going to be at closing.  Rather than debate them on what the debt balances were going to be at closing, we agreed to just take their numbers [at] face value.  And so the context here is very, very important.  ***And the context was that we would take the liabilities they were asking us to take because they were showing us debt balances that would not allow them to satisfy those liabilities on their own,*** if in fact their debt balances turned out to be correct.  So in order to make sure that we entered a transaction that was fair for both sides, if their debt balances turned out to be correct, and we take the liabilities, no adjustment is needed.  However, we're not going to have the benefit of hindsight until after the closing date or at the closing date.  So if their debt balances are incorrect and they actually turn out to be lower than $1.2 billion, and we had known that X weeks ago, then we wouldn't have taken on the liabilities that they asked us to take because they would have had the cash to satisfy those liabilities on their own.  But they did not want to take that risk.  . . . ***We are in the business of taking risk.  So we were willing to take that risk*** with the caveat that if it turns out that you would have had the cash to satisfy those liabilities, then in fact we should have a credit because ***we would know that at the closing table*** when we don't know it now.

Kamlani Dep. 44:19–46:22, Jan. 23, 2019 (emphasis added), attached hereto as Exhibit B.  In short, the Buyer, who described itself as "in the business of taking risk," agreed to assume various liabilities in exchange for the delivery of various assets, on the basis that, should the Debtors deliver fewer assets than targeted by the APA or hold, at Closing, more cash than targeted by the APA, the Buyer would receive a reduction in those assumed liabilities.

6.    That balance is specifically reflected in a number of the APA's key provisions.  For example, the Buyer agreed to assume, among other liabilities, up to $43 million of Severance Reimbursement Obligations, up to $166 million of Other Payables, and up to $139 million of 503(b)(9) Claims.  APA §§ 2.3(k)(iii)–(v).  The APA then established various targets for the delivery of certain categories of the Debtors' assets: the Prepaid Inventory target was $147 million, the Specified Receivables target was $255.2 million, and the Warranty Receivables target was $53.6 million.  *Id.* § 1.1.  To the extent the Debtors failed to meet those targets—i.e., to the extent there were inventory or receivables "Shortfalls"—at Closing, the Buyer would receive a dollar-for-dollar reduction in assumed liabilities.  If there were Prepaid Inventory, Specified Receivables, or

4

Warranty Receivables Shortfalls, the Buyer would receive a dollar-for-dollar reduction in, first, Severance Reimbursement Obligations and, second, Assumed 503(b)(9) Claims. *Id.* §§ 1.1, 2.3(k)(vii)-(ix).

7.    The Buyer also agreed in the APA to (i) refinance the Debtors' obligations under the Senior DIP Credit Agreement with $850 million in cash to be funded with the proceeds of a new ABL facility and (ii) pay the Debtors, as part of the Sale Transaction purchase price, $350 million in cash toward the Debtors' obligations under the Junior DIP Credit Agreement— consideration totaling $1.2 billion. *See* APA §§ 2.3, 3.1, 3.5, 7.4, 8.5. To the extent, however, the aggregate DIP balance as of the Closing Date was less than $1.2 billion (net of any available cash) (the "**Aggregate DIP Shortfall Amount**"), the Buyer would receive a dollar-for-dollar reduction in, first, Severance Reimbursement Obligations; second, the $166 million Other Payables; and, third, Assumed 503(b)(9) Claims. *Id.* § 2.3(k)(vi).

8.    The Buyer's conduct in the days, weeks, and months after Closing has repudiated and disrupted the balance that the parties sought to (and did) achieve in negotiating the APA—the balance that is reflected in the unambiguous provisions of the APA, including those set forth above. That conduct includes but is not limited to the Buyer's improper withholding of over $35 million of Estate assets that it has refused (without any concrete basis) to turn over to the Debtors since Closing when it acquired the Debtors' cash-management system and took control of those assets. To justify its improper but continued possession, the Buyer gestures to an ever-growing list of setoffs which, like the heads of the mythical Hydra, multiply with each of the Debtors' attempts to address them.

9.    Instead of accepting the risk that Mr. Kamlani claimed the Buyer was "in the business of taking," the Buyer has persisted in advancing innumerable convoluted interpretations

of the APA and engaged in other improper tactics in an effort cast off that risk and thrust it upon the Debtors, all to the profound disadvantage of the Debtors' Estate. This Court should reject the Buyer's self-serving and disingenuous machinations once and for all, lest the Buyer's endless second-guessing and attempts at opportunistic revision consume the Estate and prevent confirmation of the Plan.

## IV.    **Argument and Authorities**

10.    Under Delaware law, sophisticated parties entering unambiguous agreements are bound by the terms of those agreements. *See Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 552 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) (parties cannot "escape the express language" of a contract where the contract was "highly negotiated" and the parties are "commercial giants of equal bargaining power") (internal quotations omitted); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 20 (Del. Ch. 2009) (refusing to imply contract terms where the contract was "bargained for and crafted by sophisticated parties"); *see Huatuco v. Satellite Healthcare*, CV No. 8465-VCG, 2013 WL 6460898, at *5 & n.29 (Del. Ch. Dec. 9, 2013), *aff'd*, 93 A.3d 654 (Del. 2014) ("Sophisticated parties entering unambiguous . . . agreements are presumed to understand the consequences of the language they have chosen, and are bound thereby, lest contract rights be subject to endless second-guessing and opportunistic revision.").

11.    The Buyer is indisputably a sophisticated party with knowledgeable and experienced lawyers and advisors, and the APA is indisputably a highly negotiated and fully integrated agreement. Accordingly, the Buyer cannot now avoid its obligations under the unambiguous terms of that agreement. Notwithstanding, the Buyer persists in a course of conduct that, among other things, contravenes the terms of the APA, flouts the contracting parties' reasonable expectations as memorialized in that agreement, jeopardizes the Debtors' ability to

WEIL:\97041026\12\73217.0004

timely confirm the Plan, and violates the automatic stay. Accordingly, the Debtors come to this Court seeking relief.

### A. The Buyer Is Obligated to Assume Approximately $166 Million "Other Payables" and All Payment Obligations with Respect to Ordered Inventory.

12.    The APA expressly obligates the Buyer to assume up to $166 million of "Other Payables **and** all payment obligations with respect to the Ordered Inventory . . . ." APA §§ 2.3(k) (emphasis added), 2.3(k)(v). The two categories of payables—Other Payables and payment obligations associated with Ordered Inventory—are (i) listed as separate obligations in Section 2.3 of the APA, APA §§ 2.3(k), 2.4(a); (ii) defined separately in the APA, *id.* at § 1.1; and (iii) set forth in separate schedules appended to the APA, *id.* at Schedules 1.1(f), (g).

13.    As explained above, to the extent there was an Aggregate DIP Shortfall Amount at Closing, the Buyer would receive a dollar-for-dollar reduction in, among other assumed liabilities, the $166 million of Other Payables. *Id.* § 2.3(k)(vi).[4] The Aggregate DIP Shortfall Amount at Closing was $243,249. Declaration of Christopher A. Good in Support of the Debtors' Supplemental Motion to Enforce the APA ("**Good Decl.**") ¶ 5. Accordingly, the Buyer is obligated under the APA to assume up to $165,756,751 of Other Payables.[5] APA § 2.3(k), (vi).

14.    Notwithstanding, the Buyer has, since Closing, failed and refused to fulfill its obligation to assume approximately $166 million of Other Payables, claiming despite the APA's unambiguous terms that it is only obligated to assume **one** obligation (up to $166 million in payment obligations with respect to Ordered Inventory) and not both.

---

[4] The Debtors understand that the Buyer has been paying Severance Reimbursement Obligations as they come due, so the Debtors' analysis applies the reduction against the 503(b)(9) Claims.

[5] $166,000,000 - $243,249 = $165,756,751.

15.     The Buyer's position in this regard is rather astounding given that the Court previously considered and summarily ruled upon this precise issue.  At the Sale Hearing, this Court rejected the Buyer's argument that it was only obligated to assume up to $166 million in payment obligations with respect to Ordered Inventory and not both $166 million of Other Payables **and** all payment obligations with respect to Ordered Inventory.  *See* Feb. 7, 2019 Hr'g Tr. at 924:14–22 ("[T]he [D]ebtors' interpretation of 2.3 would prevail in a proper litigation, namely, . . . the parties defined separately the concept of other payables from all payment obligations with respect to ordered inventory, which is the clause that precedes the words other payables in Section 2.3 K.").

16.     The Court likewise rejected the Buyer's untenable position that the APA capped its obligations with respect to ***Ordered Inventory*** at $166 million.  *See* Feb. 7, 2019 Hr'g Tr. 924:23– 925:7 ("[T]he parties clearly set forth in little roman v of subsection K that the cap of 166 million would apply only to other payables . . . .").  Section 2.3(k) of the APA clearly provides that the "Buyer's obligations with respect to the Other Payables shall not exceed $166,000,000 in the aggregate."  APA § 2.3(k)(v).

17.     At bottom, this dispute arises out of the Buyer's apparent "remorse" and its strained and misguided efforts to distort the unambiguous terms of the APA to its advantage and to the profound disadvantage of the Debtors.  For example, because of the Buyer's refusal to fulfill its obligations to assume approximately $166 million Other Payables, the Debtors have been inundated with hundreds of communications from vendors who, after failing to receive payment for their goods or services from the Buyer, are now looking to the Debtors for payment and have asserted related administrative claims in these chapter 11 cases.  Such difficulties interfere with the Debtors' ability to timely confirm the Plan and efficiently wind down the operations of the Estate.  Accordingly, the Court should compel the Buyer to perform its obligations under Section

8

2.3 and assume approximately $166 million of Other Payables and all payment obligations with respect to Ordered Inventory.

**B.    The Buyer Is Obligated to Assume Approximately $83 Million of Aggregate 503(b)(9) Claims.**

18.    The APA also explicitly obligates the Buyer to assume up to $139 million of 503(b)(9) Claims—that is, up to $139 million of "all Liabilities against any of the Debtors arising under section 503(b)(9) of the Bankruptcy Code." APA §§ 1.1, 2.3(k)(iv). As discussed above, the Buyer's obligation to assume up to $139 million of 503(b)(9) Claims may be reduced, *inter alia*, by a Prepaid Inventory Shortfall Amount, a Specified Receivable Shortfall Amount, or Warranty Receivables Shortfall Amount. *Id.* §§ 1.1, 2.3(k)(vii)–(ix).

19.    At Closing, the Debtors delivered $84,426,880 in Prepaid Inventory, resulting in a $62,573,124 Prepaid Inventory Shortfall Amount. Good Decl. ¶ 5. The Debtors delivered Warranty Receivables in excess of $60 million, resulting in an excess of approximately $6.6 million, or a Warranty Receivables Shortfall Amount of negative $6.6 million, which results in a credit that is applied to the reduction for any other shortfall amount. *See* APA § 1.1; Good Decl. ¶ 5. And the Debtors delivered Specified Receivables of approximately $292 million, resulting in an excess of $37 million, or—because there is no crediting mechanism for a Specified Receivables excess—a Specified Receivables Shortfall Amount of $0. *See* APA § 1.1; Good Decl. ¶ 5. Accordingly, under the unambiguous terms of the APA, the Buyer is obligated to assume $83,056,184 of 503(b)(9) Claims.[6] APA §§ 1.1, 2.3(k).

20.    Notwithstanding, the Buyer has, since Closing, maintained that it has no obligation to assume **any** 503(b)(9) Claims because, according to its calculations, there is (i) a $72 million

---

[6] ($139,000,000 - $62,573,124) + $6,629,308 = $83,056,184.

Prepaid Inventory Shortfall and (ii) more than $150 million Specified Receivables Shortfall, reducing the Buyer's 503(b)(9) Claim liabilities to nothing.  Good Decl. ¶ 6 & Exs. A, B.  The Debtors understand from the Buyer's financial advisor, Ernst & Young ("**E&Y**"), that the Buyer's calculation of the reduction in 503(b)(9) Claims is based upon its use of an accounting method different from the method that not only was used by SHC's accounting team to prepare the financial statements included in its annual and quarterly reports filed with the Securities and Exchange Commission ("**SEC**") in the period leading up to and until the Closing, but that also generated the financial data used by the parties during contract negotiations, ***including to set the APA's targets for Prepaid Inventory and Specified Receivables***.  *Id.* ¶ 7.

21.    This post-Closing modification to what had been the ordinary course of dealing frustrates the parties' reasonable expectations and undermines the delicate balance the APA achieved with respect to the parties' assumption of liabilities and delivery of assets.  In setting the Prepaid Inventory and Specified Receivables target amounts—$147 million and $255.2 million, respectively—the parties relied upon the information from the consolidated balance sheets that were generated using the Debtors' accepted accounting methodology and included in SHC's periodic reports to the SEC.  *Id.* ¶ 8.  The Debtors and their financial advisor reasonably relied upon that same methodology to calculate a $62,573,124 Prepaid Inventory Shortfall Amount and a $0 Specified Receivables Shortfall Amount.  *Id.*

22.    To be sure, the Buyer's financial advisor is entitled to use whatever accounting methods it deems appropriate in connection with its services provided to the Buyer going forward. But there is absolutely no justification—either in law or common sense—for the Buyer's financial advisor to calculate contractually defined inventory or receivables ***shortfalls*** using some new accounting methodology when the contractually defined inventory and receivables ***targets*** were

10

set using data generated by the method that the company had been using in the period leading up to and until the Closing, including in connection with SHC's periodic reports to the SEC.  Indeed, at the time the Debtors filed their petition, the parties employed this same accounting methodology. At the time the APA was signed, the parties employed this same historical accounting methodology.  And at the time the transaction closed, the parties employed this same accounting methodology.  **Only after Closing** did the Buyer advise the Debtors that it differed on its calculations of what the Debtors delivered at Closing, in part because it had unilaterally decided to calculate the Prepaid Inventory and Specified Receivables Shortfalls using a new accounting methodology—one that, incidentally, resulted in the Buyer receiving a several-million-dollar credit against the liabilities it would assume.

23.     Under these circumstances, the Court should honor the parties' reasonable expectations at the time they entered into the APA in determining the appropriate method for valuing the Prepaid Inventory and Specified Receivables Shortfall Amounts—and that method is clearly the method that SHC itself used in the period leading up to and until the Closing to value Prepaid Inventory and Specified Receivables, including in its SEC reports.  *See TWA Res. v. Complete Prod. Servs., Inc.*, No. CIV. A. N11C-08-100 MMJ, 2013 WL 1304457, at *6 (Del. Super. Ct. Mar. 28, 2013) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 447 (Del. 2005)).[7]  Otherwise, the Buyer would realize an arbitrary and unreasonable financial gain and frustrate the fruits of the bargain that the Debtors reasonably expected.

---

[7] Delaware courts will imply a covenant of good faith and fair dealing where the party asserting the implied covenant— in this case, the Debtors—proves that the other party has acted arbitrarily or unreasonably, as the Buyer has acted here, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.  *See TWA Res.*, 2013 WL 1304457, at *6 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010)).  The covenant "is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of an agreement, one side uses oppressive or underhanded tactics." *Id.* (quoting *Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000)).

24.     Additionally with respect to Specified Receivables, the Buyer advances the argument that, while it "fully recognized that [the Specified Receivables might] be difficult and costly to collect . . . and [that it] was prepared to bear that risk," it did not realize just ***how*** difficult and costly they would be to collect and protests that it was not, in fact, prepared to bear that risk. Feb. 25, 2019 Letter from S. O'Neal to R. Schrock at 4 (ECF No. 2767).

25.     Here, again, the Buyer is a sophisticated party wishing, after the fact, that it had made a different bargain and pretending, without credibility, to be naïve, inexperienced, and duped.  To start, through its control of SHC, the Buyer has deep familiarity, dating to the pre-petition period, with the receivables constituting the Specified Receivables.   Good Decl. ¶ 9. Second, the Buyer and its advisors had every opportunity to, and did, conduct due diligence on the Specified Receivables in the period before it agreed to the terms of the APA.  *Id.*  Third, on January 6, 2019, the Buyer's advisors received a presentation that delineated the line items that the parties ultimately included in Schedule 1.1(k), which showed an expected overall recovery of only forty-four percent.  *Id.* & Ex. C.

26.     Finally, as discussed above, the Specified Receivables delivered by the Debtors at Closing were valued in accordance with the practices employed by SHC in connection with its SEC filings.  *See id.* ¶ 8.  These were accounting methodologies employed first by SHC and then by the Debtors to calculate receivables and disclose them to investors, suppliers, and other users of their financial statements in the period leading up to the Closing and by the parties in calculating the Specified Receivables target amount.   *Id.*   Thus the Buyer's claim that its review of the Specified Receivables purportedly uncovered that some of the receivables "do not appear to be receivables at all," *see id.* ¶ 6 Ex. B, cannot be taken seriously.

27.     By using the financial data generated by one accounting methodology to set inventory and receivables targets and another methodology to evaluate whether the Debtors have met those targets, the Buyer disregards the reasonable expectations of the parties in an effort to get a better result than it is entitled to under the deal it struck.  Employing the accounting methodology used by the parties to set the APA's targets for Prepaid Inventory and Specified Receivables, the Prepaid Inventory Shortfall Amount is $62,573,124 and the Specified Receivables Shortfall Amount is $0.    Accordingly, after applying the $6.6 million credit for excess Warranty Receivables, the Court should compel the Buyer to assume $83,056,184 in 503(b)(9) Claims.  *See* APA §§ 1.1, 2.3(k).

### C.     The Buyer Continues to Withhold Cash-in-Transit, Rent Proration, and GOB Proceeds in Violation of the Automatic Stay.

28.     For more than three months now—and despite innumerable meetings, meet-and-confers, negotiations, letters, interim agreements, and requests—the Buyer has refused, in violation of the automatic stay, to turn over to the Debtors more than $35 million in Estate assets that are critical to the Debtors' ability to wind-down the operations of the Estate and confirm the Plan.  These assets comprise (i) $19.5 million cash-in-transit, (ii) $11.2 million February rent proration, and (iii) $4.4 million of GOB Store credit card proceeds.  Good Decl. ¶ 10.

### 1.     Cash-in-Transit, Rent Proration, and GOB Proceeds Defined.

29.     The Buyer possesses the $19.5 million cash-in-transit and $4.4 GOB Store credit card proceeds only by virtue of the fact that, just before Closing and as an accommodation to the Buyer (which had not developed its own cash-management system), the Debtors transferred their cash-management system, along with all of their bank accounts, to the Buyer (the "**Cash-Management System Accommodation**").  *See* Declaration of Mohsin Y. Meghji in Support of First Motion to Enforce (ECF No. 2797) ("**First Meghji Decl.**") ¶¶ 6–7.  The Debtors and the

Buyer knew that, as a consequence of the Cash-Management System Accommodation, certain Estate assets would flow into the bank accounts in the Buyer's control after the Closing Date. *Id.* ¶¶ 8–9. Accordingly, the Debtors, per the Buyer's request, agreed to work with E&Y to implement a post-Closing reconciliation process for cash and credit-card proceeds that were ultimately the property of the Debtors and the Debtors' Estates (the "**E&Y Memo**"). *Id.* ¶ 9. To date, however, the Buyer has not complied with the process outlined in the E&Y Memo and continues to withhold $19.5 million of cash-in-transit (the "**Cash-in-Transit**") and $4.4 million GOB Store credit card proceeds for transactions processed after February 14, 2019 (the "**GOB Proceeds**").

30.    In addition, the Buyer is withholding $11.2 million owed to the Debtors under the APA's rent-proration provision (the "**Rent Proration**"). *See* APA § 9.11. Because the Debtors had already paid rent for the full month of February as of the Closing Date, the APA entitles the Debtors to a prorated rent payment from the Buyer for February 2019 for the portion of the month after Closing during which the Debtors were no longer in possession of certain leased premises. First Meghji Decl. ¶ 17. This provision works in two parts: first, an initial proration payment to occur seven business days after the Closing Date and, second, a final proration to occur seventy-five days after the Closing Date. *See* APA ¶ 9.11. Ninety-three days after the initial proration payment became due, the Buyer has complied with neither.

### 2.    The Debtors Have Been Attempting to Recover the Cash-in-Transit, Rent Proration, and GOB Proceeds For Many Months.

31.    The Debtors first requested that the Buyer turn over the Estate assets in late February. Good Decl. ¶ 10. At that time, the Buyer demurred, claiming (in what has become an all-too-familiar refrain) that it needed more time to complete its reconciliation processes. *Id.*

32.     The Debtors first moved on these issues in their First Motion to Enforce.[8]  On the eve of the March 21, 2019 hearing concerning the issues raised in the Motion to Enforce, the Buyer and Debtors entered into an interim agreement (the "**Interim Agreement**"), tabling most of the issues in the interest of facilitating (i) the return of the Cash-in-Transit and Rent Proration and (ii) the production of documents and information that would allow the Debtors and their advisors to confirm the Buyer's calculations with respect to various purported reconciliations and setoffs.  *Id.* ¶ 11 & Ex. D.  While the Buyer made the initial $8 million payment required by the Interim Agreement, it failed ultimately to produce documents or information sufficient to allow the Debtors and their advisors to assess the Buyer's claimed reconciliations and setoffs.  The information deficiencies persisted throughout the month of April.

33.     On May 1, 2019, in another effort to resolve these issues without the need for Court intervention, the Debtors, in consultation with their financial advisor, provided the Buyer with a Diligence List of specific requests keyed to the various reconciliations and setoffs claimed by the Buyer.  *Id.* ¶ 12 & Ex. E.  Each specific request was designed to obtain only the information necessary to adequately confirm the respective reconciliation or calculation so that the issues may be resolved.  *Id.*  The information requested in the Diligence List did not exceed the scope of information that any experienced financial advisor (including those involved here) would request at the outset of its engagement.  *Id.*  The Buyer, however, has yet to provide a complete response to any of the requests in the Debtors' Diligence List, instead offering a litany of excuses in an attempt to justify its lack of transparency and continued delay.  Only recently has the Buyer made

---

[8] The First Motion to Enforce included, in its request for relief, approximately $3.7 million in GOB Store credit card proceeds for payments processed between Close and February 14, 2019.  On March 12, 2019, the Buyer remitted those proceeds to the Debtors.  The Buyer, however, has failed to remit the additional approximately $4.4 million of proceeds and has not provided any financial information concerning those proceeds.

any cognizable effort to comply with the Diligence List, albeit on an unacceptable and indeterminate timeline.

34.    Most troubling, the Buyer has yet to provide the complete list of Accounts Payable invoices (the "**AP Invoices**") which the Debtors' financial advisor first requested on March 7, 2019.  *Id.* ¶ 13 & Ex. F.  That list was again requested as part of the May 1 Diligence List, but as of May 20, the Buyer advised that no effort had been made to gather that information and doing so would likely take between three and four weeks.  The Debtors cannot fairly analyze any of the Buyer's purported reconciliations or calculations without this information that is crucial to confirm whether the Buyer is paying the liabilities it assumed under the APA (despite its assertion that it is not required to do so) and not attempting to improperly set off those liabilities against the Cash-in-Transit, Rent Proration, or GOB Proceeds it owes to the Buyer.  *Id.* ¶ 13.

35.    While the March 7 request was unavailing, had the Buyer at least directed its financial advisor to begin gathering this information when it received the Diligence List on May 1, the process, by the Buyer's measure, would be nearly complete, if not done.  Instead, the Buyer chose to allow the better part of May to pass while it questioned the Debtors' motives, justifications, relevance, and the relative burdens placed on the parties.  But it is the Buyer' burden to justify its failure to turn over Estate property; its inability to produce evidence supporting its withholding of such property for more than three months provides a more than sufficient basis to compel immediate turnover to the Debtors.[9]

---

[9] Section 542 provides "without qualification that anyone in possession of the property of the estate 'shall deliver' it" to the Debtor.  *Weber v. SEFCU (In re Weber)*, 719 F.3d 72, 81 (2d Cir. 2013).  This unequivocal rule necessarily obviates the need for a debtor to provide justifications for, or establish the relevance of, financial information concerning estate property being improperly withheld.  Second, any alleged "substantial burden" the Buyer would face in producing the information is self-imposed by its refusal to remit to the Estate the assets it continues to wrongfully possess and its failure to produce the materials that would demonstrate otherwise.  *See* Good Decl. ¶ 13 & Ex. G.

WEIL:\97041026\12\73217.0004

     **3.**    **The Buyer's Continued Refusal to Turn Over the Cash-in-Transit, Rent Proration, and GOB Proceeds and Its Continued Refusal to Substantiate Its Possession of the Cash-in-Transit, Rent Proration, and GOB Proceeds Violates the Automatic Stay.**

36.     The definition of "property of the estate" in the Bankruptcy Code is a vast concept that encompasses all "interests of the debtor in property" "wherever located and by whomever held." 11 U.S.C. § 541(a).  The automatic stay in § 362 of the Bankruptcy Code prohibits any act to obtain possession or control of such property.  *See* 11 U.S.C. § 362(a)(3).  The turnover provision in § 542 "provides without qualification" that an entity in possession, custody, or control of estate property "shall deliver to the [debtor], and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. § 542.  By design, then, the automatic stay is self-executing—no affirmative act of the Debtor is required to obtain return of the estate property.  *See In re Weber*, 719 F.3d at 79.

37.     Any debtor "injured by any willful violation of a stay provided by [section 362] *shall recover* actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  *Id.* at 76 (quoting 11 U.S.C. § 362(k)(1)) (alternations and emphasis in original).  *See, e.g.*, *Miller v. D&M Holdings US, Inc. (In re Dig. Networks N. Am., Inc.)*, Case No. 15-11535 (KG), 2018 WL 3869599, at *6 (Bankr. D. Del. Aug. 13, 2018).  Good faith is not a defense for a violation of the automatic stay.  *In re Weber*, 719 F.3d at 83.  If there is a legitimate dispute over the property at issue, however, there is no violation of the automatic stay.

38.     To find whether a bona fide dispute exists, the court "must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt."  *See, e.g.*, *In re Dig. Networks N. Am., Inc.*, 2018 WL 3869599, at *6 (finding, despite "operating with a dearth of information," that there was no bona fide dispute).  Merely claiming a dispute exists does

WEIL:\97041026\12\73217.0004

not make it so and, on that basis, does not extinguish the Debtors' right to relief under the automatic stay. *See LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*, 582 B.R. 46, 118 (Bankr. S.D.N.Y. 2018) (holding that "mere denial" of the movant's entitlement to turnover is insufficient to establish a bona fide dispute), *amended on reconsideration on other grounds*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018).

39.    For over three months now, the Buyer has adamantly ***claimed*** that ownership of the Cash-in-Transit, Rent Proration, and GOB Proceeds are disputed—but there is no legitimate or bona fide dispute here.    Meanwhile, the Debtors have repeatedly requested the financial information to measure the validity of those claims.  The Buyer has responded instead with a slow trickle of updated presentations containing only "preliminary conclusions" and incomplete calculations. *See* Good Decl. ¶ 10.

40.    The Buyer and its financial advisor have had more than sufficient time to collect and produce information to support their purported justifications for withholding Estate assets. The Buyer cannot claim an undue burden and continue to withhold the very information necessary to determine the status of that property.

41.    The Buyer has also had more than enough time to justify its Cash-in-Transit and GOB Proceeds reconciliations and Rent Proration calculations.  The Debtors have, for more than three months, remained patient and reasonable, hoping that the relief requested by this Motion would prove unnecessary.  The Buyer, however, has either refused or is simply unable to provide the information necessary to substantiate its claims.  Further, the Buyer's eleventh-hour and newfound professed willingness to provide the information is too late.  Thus, at this juncture the Court should order the Buyer to immediately turn over the approximately $35 million it holds in violation of the automatic stay.

WEIL:\97041026\12\73217.0004

D.    **The Court Should Enjoin the Buyer from Interfering, in Violation of the Automatic Stay, with the Debtors' Use and Enjoyment of Their Properties in the Village of Hoffman Estates, Illinois.**

42.    Section 2.1(c) of the APA provides that the Debtors were required to convey to the Buyer "Owned Real Property" on the Closing Date, and that "Owned Real Property" was defined, in relevant part, as "Operating Owned Property."  APA §§ 2.1(c), 1.1.  "Operating Owned Property" is defined, in turn, as "the real property described in Schedule 1.1(p), including, in each case, all of the right, title and interest of [the Debtors'] to all Improvements located therein and all easements and other rights and interests appurtenant thereto and any associated rights to parking." *Id.* § 1.1.

43.    At the Buyer's insistence, the list of Operating Owned Property that ultimately became Schedule 1.1(p) was prepared solely by the Buyer and provided to the Debtors on a "take it or leave it" basis.  Declaration of William C. Gallagher in Support of the Debtors' Supplemental Motion to Enforce the APA ("**Gallagher Decl.**") ¶ 5.  The parties then generated Schedule 1.1(p) by negotiating for the transfer of only those properties—as the plain language of the APA suggests—that were related to, and necessary for, Sears's ***operations***.  *See* APA §§ 2.1(c), 1.1.

44.    One of the Operating Owned Properties the Buyer included on Schedule 1.1(p) is Store No. 490 in Hoffman Estates, Illinois ("**Site 490**"), which is where Sears's corporate headquarters sits. *Id.* Schedule 1.1(p); Gallagher Decl. ¶ 7.

| 490 | Hoffman Est | IL |
|---|---|---|

45.    Site 490 comprises three of sixteen subdivided lots in the Hoffman Estates Development: lots 1A, 2, and 3.  Gallagher Decl. ¶ 8.  The other thirteen lots in the Hoffman Estates Development are unrelated to the operation of the company and therefore would not be "Operating Owned Properties."  *See id.*  In the period between the signing and Closing, the Debtors

19

delivered to the Buyer a set of deeds for the property acquired at Closing in Schedule 1.1(p).  *See id.* ¶ 6.  These deeds included deeds for Hoffman Estates Development lots 1A, 2, and 3, but not the other thirteen lots that were not identified on Schedule 1.1(p) and which the Debtors did not otherwise agree to convey to the Buyer.

46.    The Buyer approved those deeds and Closing occurred on February 11, 2019.  *See id.*  The Debtors then delivered the deeds and the Buyer recorded the conveyances on March 18, 2019.  *See id.* ¶¶ 6, 9.

47.    Yet, in what can only be characterized as a land grab of the sort the Debtors sought to avoid by the process outlined above, the Buyer now claims that the Debtors must deliver deed to the other thirteen undeveloped lots in Hoffman Estates (the "**Estate's Lots**") that have no nexus to SHC's operations and which were not conveyed to Buyer in the APA.

48.    The Buyer knew—or certainly should have known—that Site 490 comprised lots 1A, 2, and 3 ***and no other lots***.

- First, the only properties to be included on Schedule 1.1(p) were those, like 1A, 2, and 3, relating to Sears's operations.  *Id.* ¶ 8.

- Second, in preparing Schedule 1.1(p) the Buyer only referenced "Store 490," it did not include any of the Estate's Lots.  *Id.* ¶ 7.

- Third, Site 490 was clearly identified in the documents disclosed in the Intralinks database, including without limitation in surveys and title commitments, as only being subdivided lots 1A, 2, and 3.  *Id.* ¶ 10.  A DLA Piper ordered zoning report for Site 490, also included in Intralinks, was also only for lots 1A, 2 and 3.  *Id.*  By way of example, a Sears 490 survey in Intralinks as of December 7, 2018 clearly shows that other property in the Hoffman Estates Development outside of Lots 1A, 2 and 3, including the Estate's Lots, were not included in the properties to be conveyed to the Buyer.  *Id.* & Ex. C.

- Finally, the Buyer was intimately familiar with the Estate's Lots because SHC, the company it controlled, owned the properties—where its headquarters sat—for more than a decade pre-petition.  Gallagher Decl. ¶ 10.

20

49.    It made sense, therefore, that the parties included lots 1A, 2, and 3 on Schedule 1.1(p) *and no other lots*.

50.    Beyond never affirmatively seeking to include the Estate's Lots in the properties to be conveyed under the APA, *see id.*, the Buyer did not object to their exclusion (i) before signing the APA, (ii) when it reviewed the deeds to be transferred, or (iii) at Closing.  Indeed, on March 18, 2019, the Buyer recorded the deeds to lots 1A, 2, and 3 *and no other lots* with the Cook County Recorder of Deeds.  *Id.* ¶ 9 & Ex. A.  The same day, the Buyer paid a real estate transfer tax, or "stamp tax," as to lots 1A, 2, and 3 *and no other lots*.  *Id.* ¶ 9 & Ex. B.  Only after the deeds were recorded and taxes paid did the Buyer raise any objection to the deal it negotiated in the APA.  *Id.* ¶ 9.

51.    Worse, the Buyer has wrongfully sought to exercise control over the Estate's Lots and to interfere with the Debtors' use and enjoyment of the Estate's Lots, including the right to sell them to would-be purchasers.  *See id.* ¶ 11.  On March 26, the Buyer sent the Debtors a letter claiming that it is the true owner of the Estate's Lots (the "**March 26 Letter**").  *Id.* & Ex. D.  The March 26 Letter requested that the Debtors "promptly transfer title to each [of the Estate's Lots] that ha[ve] not been previously transferred to Buyer" and reserved all of the Buyer's "rights and remedies, including, but not limited to, relating to any action by [the Debtors] to transfer or otherwise encumber any" of the Estate's Lots.  *Id.* Ex. D.  This explicit and improper assertion of ownership and reservation of rights have placed a cloud on the title to the Estate's Lots, making it impossible for a potential purchaser to obtain financing and costing the Debtors potentially millions of dollars from the sale of such properties.  *See id.* ¶ 11.

52.    The Buyer's efforts to exercise control over Estate property and to interfere with the Debtors' use and enjoyment of Estate property clearly violate the automatic stay.  *See* 11 U.S.C.

21

§ 362 (staying any act to, among other things, exercise control over property of the estate).

Accordingly, the Court should exercise its inherent power under Section 105 of the Bankruptcy

Code to carry out the provisions of the Bankruptcy Code, including Section 362, and enter an order

enjoining the Buyer from taking any further acts: (a) to exercise control over the Estate's Lots in

the Hoffman Estates Development that the Debtors did not transfer to the Buyer under the APA;

and (b) to interfere with the Debtors' use and enjoyment of the Estate's Lots.  11 U.S.C. § 105; *see

also In re Weber*, 719 F.3d at 79 (holding that the automatic stay is "self-executing" and that

debtors are not required to initiate adversarial proceedings to return property to the estate).

## V.    <u>Conclusion</u>

53.    For all of the foregoing reasons, the Debtors respectfully request that the Court

grant their Motion to Enforce the Asset Purchase Agreement and enter an order:

(i)     compelling the Buyer to assume up to $165,757,000 in respect of Other
Payables;

(ii)    compelling the Buyer to assume all payment obligations with respect to
Ordered Inventory;

(iii)   compelling the Buyer to assume $83,056,184 in 503(b)(9) claims as
required by the APA;

(iv)    compelling the Buyer to turn over $35,008,521 to the Debtors, representing
the total amount of cash owed to the Debtors in respect of post-Closing
cash-reconciliation amounts;

(v)     enjoining the Buyer from taking any further acts (a) to exercise control over
the Estate's Lots in the Hoffman Estates Development that the Debtors did
not transfer to the Buyer under the APA and (b) to interfere with the
Debtors' use and enjoyment of the Estate's Lots; and

(vi)    granting the Debtors such other and further relief, at law or in equity, to
which they are entitled, including, but not limited to, their attorneys' fees
incurred as a result of the Buyer's repeated violations of the automatic stay.

WEIL:\97041026\12\73217.0004

Dated: May 24, 2019
      New York, New York

                       */s/ Sunny Singh*
                       WEIL, GOTSHAL & MANGES LLP
                       767 Fifth Avenue
                       New York, New York  10153
                       Telephone:  (212) 310-8000
                       Facsimile:  (212) 310-8007
                       Ray C. Schrock, P.C.
                       David J. Lender
                       Paul R. Genender
                       Jared R. Friedmann
                       Sunny Singh

                       *Attorneys for Debtors*
                       *and Debtors in Possession*

WEIL:\97041026\12\73217.0004

**<u>Exhibit A</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x

In re                                    :

                                         :        **Chapter 11**

**SEARS HOLDINGS CORPORATION,** *et al.*,  :

                                         :        **Case No. 18-23538 (RDD)**

                                         :

Debtors.[10]                             :        **(Jointly Administered)**

---------------------------------------- x


## ORDER GRANTING THE DEBTORS' SUPPLEMENTAL MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT


Upon the motion dated _____, 2019 (ECF No. _____), and supporting declarations (ECF

Nos. ____, ____) (collectively, the "**Supplemental Motion to Enforce**")[11] of Sears Holdings

Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (the "**Order**") enforcing the

---

[10] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[11] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Supplemental Motion to Enforce.

Asset Purchase Agreement ("**APA**"), Sale Order, and automatic stay and compelling turnover of Estate funds pursuant to sections 105, 362, 541, and 542 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"); and upon the objection (ECF No. ____) of Transform Holdco LLC ("**Transform**"), along with Transform's supporting declarations (ECF Nos. ____, ____) (collectively, the "**Objection**"), which was the sole objection to the Supplemental Motion to Enforce; and the Court having jurisdiction to consider the Supplemental Motion to Enforce and the relief requested therein in accordance with 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Supplemental Motion to Enforce and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief sought in the Supplemental Motion to Enforce and the opportunity for a hearing thereon having been provided in accordance with the Amended Case Management Order; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Supplemental Motion to Enforce on June 20, 2019 (the "**Hearing**"); and upon the record of the Hearing and all of the proceedings had before the Court; and, after due deliberation, the Court having determined that the legal and factual bases set forth in the Supplemental Motion to Enforce establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; now, therefor,

**ORDERED THAT:**

1.    The Supplemental Motion to Enforce is granted in its entirety;

2.      Pursuant to the unambiguous terms of the APA, Transform shall assume $165,757,000 in respect of Other Payables;

3.      Pursuant to the unambiguous terms of the APA, Transform shall assume all payment obligations with respect to Ordered Inventory;

4.      Pursuant to the unambiguous terms of the APA, Transform shall assume $83,056,184 in 503(b)(9) Claims;

5.      Pursuant to 11 U.S.C. § 362, Transform shall turn over $35,008,521 to the Debtors, representing the total amount of cash owed to the Debtors in respect of post-Closing cash-reconciliation amounts;

6.      Pursuant to 11 U.S.C. § 362, Transform is enjoined from taking any further acts to (a) to exercise control over the Estate's Lots in the Hoffman Estates Development that the Debtors did not transfer to the Buyer under the APA and (b) to interfere with the Debtors' use, enjoyment, and right to dispose of the Estate's Lots;

7.      Transform's (a) failure and refusal to turn over to the Debtors the $35,008,521 post-Closing cash-reconciliation amounts and (b) attempts to exercise control over the Estate's Lots in the Hoffman Estates Development and to interfere with the Debtors' use, enjoyment, and right to dispose of the Estate's Lots in the Hoffman Estates Development constitute willful violations of the automatic stay;

8.      Accordingly, the Debtors are entitled to recover damages under 11 U.S.C. § 362(k)(1), including costs and attorneys' fees; and

9.      Within seven (7) days of receipt of the Debtors' billing records, Transform shall pay the Debtors' costs and attorneys' fees incurred as a result of Transform's willful violations of the automatic stay.

3

10.     This Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019
      White Plains, New York


                    _____
                    THE HONORABLE ROBERT D. DRAIN
                    UNITED STATES BANKRUPTCY JUDGE

4

## **Exhibit B**

**Kunal Kamlani**
**January 23, 2019 Deposition Excerpt**

Page 1

1    UNITED STATES BANKRUPTCY COURT

     SOUTHERN DISTRICT OF NEW YORK

2    ----------------------------------x

3    In re:

4    SEARS HOLDINGS CORPORATION, et al.,

                    Debtor.

5

6                   Chapter 11

                    Case No. 18-23538 (RDD)

7

8    ----------------------------------x

9             ***HIGHLY CONFIDENTIAL***

10    30(b)(6) DEPOSITION OF ESL INVESTMENTS, INC.,

11        BY ITS CORPORATE REPRESENTATIVE

12                KUNAL KAMLANI

13            NEW YORK, NEW YORK

14        WEDNESDAY, JANUARY 23, 2019

15

16

17

18

19

20

21    Reported by:

22    MARK RICHMAN, CSR, RPR, CM

23    JOB NO:  154614

24

25

1

2

3           New York, New York

4           January 23, 2019

5           11:45 A.M.

6

7           30(b)(6) DEPOSITION of ESL INVESTMENTS,

8    INC. by its Corporate Representative KUNAL

9    KAMLANI, held at the offices of Akin Gump

10   Strauss Hauer & Feld LLP, One Bryant Park, New

11   York, New York, before MARK RICHMAN, a

12   Certified Shorthand Reporter, Registered

13   Professional Reporter and Notary Public of the

14   State of New York

15

16

17

18

19

20

21

22

23

24

25

1              KAMLANI (HIGHLY CONFIDENTIAL)

2      Q.    So what I'm trying to understand

3   is why do you draw a connection between

4   the proceeds coming into the estate to

5   pay down the first lien and the

6   assumption of the junior DIP on the one

7   hand, and liabilities on the other?

8      A.    So this transaction was not put

9   together in an hour or a day.  The final

10  transaction was a negotiation that took

11  a course over several days if not weeks

12  to land in a final spot.

13          Along the way in that negotiation

14  there was several discussions about

15  Transformco assuming the liabilities of

16  the estate.

17          The estate was concerned that --

18  let me rephrase.

19          During the discussions with

20  respect to TransformCo's willingness to

21  take over liabilities of the estate, the

22  representatives of the estate provided

23  us with their view on what their debt

24  balances were going to be at closing and

25  what their cash was going to be at

1          KAMLANI (HIGHLY CONFIDENTIAL)

2     closing.

3          Rather than debate them on what

4     the debt balances were going to be at

5     closing, we agreed to just take their

6     numbers for face value.

7          And so the context here is very,

8     very important.  And the context was

9     that we would take the liabilities that

10    they were asking us to take because they

11    were showing us debt balances that would

12    not allow them to satisfy those

13    liabilities on their own, if in fact

14    their debt balances turned out to be

15    correct.

16         So in order to make sure that we

17    entered into a transaction that was fair

18    for both sides, if their debt balances

19    turned out to be correct, and we take

20    the liabilities, no adjustment is

21    needed.

22         However, we're not going to have

23    the benefit of hindsight until after the

24    closing date or at the closing date.

25         So if their debt balances are

1          KAMLANI (HIGHLY CONFIDENTIAL)

2     incorrect and they actually turn out to

3     be lower than $1.2 billion, and had we

4     known that X-weeks ago, then we wouldn't

5     have taken on the liabilities that they

6     asked us to take because they would have

7     had the cash to satisfy those

8     liabilities on their own.  But they did

9     not want to take that risk.

10          The committee, as conveyed by the

11    advisors, is that they were extremely

12    risk averse to being in a position of

13    having liabilities that they could not

14    satisfy.

15          We are in the business of taking

16    risk.  So we were willing to take that

17    risk with the caveat that if it turns

18    out that you would have had the cash to

19    satisfy those liabilities, then in fact

20    we should have a credit because we would

21    know that at the closing table when we

22    don't know it now.

23     Q.    And at the time these

24    negotiations were taking place did you

25    have an understanding as to the