WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                            :
In re                                       :    Chapter 11
                                            :
SEARS HOLDINGS CORPORATION, et al.,         :    Case No. 18-23538 (RDD)
                                            :
                Debtors.                    :    (Jointly Administered)
                                            :
------------------------------------------------------------x
```

### DECLARATION OF CHRISTOPHER A. GOOD IN SUPPORT OF THE DEBTORS' SUPPLEMENTAL MOTION TO ENFORCE THE ASSET PURCHASE AGREEMENT

Pursuant to 28 U.S.C. § 1746, I, Christopher A. Good, hereby declare as follows:

1.     I submit this Declaration in support of the *Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* (ECF No. 4029) (the "**Motion**"), filed concurrently with this Declaration.[1]

---

[1] Capitalized terms used in this Motion but not otherwise defined herein will have the meanings set forth in the Motion or in the APA, as applicable. The APA is attached as <u>Exhibit B</u> to the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "**Sale Order**").

2.      I have been a Director at M-III Advisory Partners, LP ("**M-III**") for the past four years.  In October 2018, the Debtors retained M-III to provide the Debtors and their other professionals with financial advisory services in connection with the Debtors' evaluation and development of strategic alternatives to wind-down and liquidation.  I, along with several M-III colleagues, however, began working with Sears in April of 2016 to assist in financial forecasting and to pursue liquidity enhancing opportunities.  During this time, I led day-to-day management efforts of the M-III engagement team; working directly with Sears's senior management, including Eddie Lampert.

3.      Over the last three years while working closely with Sears and the Debtors, I have gained an extensive knowledge of the company's pre- and post-petition financial modeling and cash management system.  Specifically, I helped refine the daily cash flow forecasts and created the vendor level disbursements model, and assisted in the process of modeling strategic scenarios in both the daily cash flow forecast and the monthly financial model.  I also worked very closely with the accounting team responsible for preparing Sears's financial statements.  Inclusive of my tenure at M-III, I have nine years of experience in the financial industry, principally as an investment banker, private equity investor, and now a restructuring advisor.

4.      Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management, other members of the M-III team, and the Debtors' other advisors, and my review of relevant documents and/or my opinion based upon my experience.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, and/or opinion.

WEIL:\97034193\6\73217.0004

**Assets Delivered at Closing**

5.   At Closing, the Aggregate DIP Balance was $1,199,756,751, resulting in an Aggregate DIP Shortfall Amount of $243,249. The Debtors delivered $84,426,880 in Prepaid Inventory, resulting in a $62,573,124 Prepaid Inventory Shortfall Amount. The Debtors also delivered Warranty Receivables of $60,229,308, resulting in an excess of $6,629,308, or a Warranty Receivables Shortfall Amount of negative $6,629,308. Finally, the Debtors delivered Specified Receivables of $292,083,182, resulting in an excess of $36,883,182, or a Specified Receivables Shortfall Amount of $0.

6.   Since Closing, the Buyer and its advisors have maintained that the Buyer has no obligation to assume any 503(b)(9) Claims because there is (i) a $72 million Prepaid Inventory Shortfall and (ii) more than $150 million Specified Receivables Shortfall, reducing the Buyer's 503(b)(9) liabilities to nothing. *See* February 25, 2019 letter from Cleary to Weil; a true and correct copy of which is attached to this Declaration as **Exhibit A**; May 20, 2019 Letter from Cleary to Weil; a true and correct copy of which is attached to this Declaration as **Exhibit B**.

7.   M-III understands from E&Y that the Buyer's calculation of the amount and value of the Prepaid Inventory and Specified Receivables delivered at Closing, which was used to calculate their reduction of assumed 503(b)(9) Claims, is based upon its use of an accounting method different from the method (i) used by SHC's accounting team to prepare the financial statements included in its annual and quarterly reports filed with the Securities and Exchange Commission ("**SEC**") in the period leading up to and until the Closing; and, significantly, (ii) that generated the financial data used by the parties during contract negotiations, including to set the APA's targets for Prepaid Inventory and Specified Receivables.

3

8. In setting the Prepaid Inventory and Specified Receivables target amounts—$147 million and $255.2 million, respectively—the parties used the information underlying the consolidated balance sheets that were attached to SHC's periodic reporting to the SEC and that were audited on a regular basis. These were accounting methodologies employed first by SHC and then by the Debtors to calculate receivables and disclose them to investors, suppliers, and other users of their financial statements in the period leading up to the Closing and by the parties in calculating the Specified Receivables target amount. M-III and the Debtors then used the same methodology to calculate the value of those assets that were ultimately delivered to the Buyer at Closing that resulted in a $62,573,124 Prepaid Inventory Shortfall Amount and a $0 Specified Receivables Shortfall Amount.

9. The Buyer has deep familiarity, dating to the pre-petition period, with the receivables constituting the Specified Receivables. We gave the Buyer and its advisors every opportunity to, and they did, conduct due diligence on the Specified Receivables in the period before they agreed to the terms of the APA. On January 6, 2019, we presented to the Buyer's advisors a presentation that delineated the line items that were ultimately included in Schedule 1.1(k), which showed an expected overall recovery of only forty-four percent. *See* Remaining Value at SHC Estate in an ESL Transaction dated January 6, 2019; a true and correct copy of which is attached to this Declaration as **Exhibit C**.

**Cash-in-Transit and Rent Proration**

10. The Buyer is currently in possession of approximately $35 million in Estate assets. These assets comprise (i) $19.5 million cash-in-transit ("**Cash-in-Transit**"), (ii) $11.2 million for the February rent proration contemplated by Section 9.11 of the APA (the "**Rent Proration**"), and (iii) approximately $4.4 million in GOB Store credit card proceeds processed after February 15,

4

2019 (the "**GOB Proceeds**"). The Debtors first requested that the Buyer turn over the Estate assets in late February. At the time, the Buyer claimed that it needed more time to complete its reconciliation processes. However, more than three months later, the reconciliations provided by the Buyer to date have reflected only its preliminary conclusions and incomplete calculations.

11. On March 21, 2019, the Buyer and the Debtors entered into an interim agreement (the "**Interim Agreement**") in the interest of facilitating (i) the return of the Cash-in-Transit and Rent Proration and (ii) the production of documents and information that would allow M-III to confirm the Buyer's calculations with respect to various purported reconciliations and setoffs. *See* E-mail correspondence between Cleary and Weil on March 20, 2019; a true and correct copy of which is attached to this Declaration as **Exhibit D**.

12. On May 1, 2019, M-III prepared a list of specific requests keyed to the various reconciliations and setoffs claimed by the Buyer (the "**Diligence List**"). *See* Sears Estate Information Request List, dated May 1, 2019; a true and correct copy of which is attached to this Declaration as **Exhibit E**. Each specific request was designed to obtain only the information necessary to adequately confirm the respective reconciliation or calculation so that the issues may be resolved. The information requested in the Diligence List did not exceed the scope of information that any experienced financial advisor (including those involved here) would request at the outset of its engagement.

13. The Buyer has not provided the complete list of Accounts Payable invoices (the "**AP Invoices**") which the Debtors' financial advisor first requested on March 7, 2019. *See* E-mail correspondence between M-III and Sears employees from February 28 to March 7, 2019; a true and correct copy of which is attached to this Declaration as **Exhibit F**. M-III cannot fairly analyze the Buyer's purported reconciliations or calculations without this information, which is crucial to

5

confirm whether the Buyer is paying the liabilities it assumed under the APA and not attempting to improperly set off those liabilities against the Cash-in-Transit or Rent Proration it owes to the Debtors. The Buyer initially attempted to justify its refusal to provide the AP Invoices by claiming that preparing such information would take three to four weeks and impose a "substantial burden" on the Buyer's resources. *See* May 13, 2019 letter from Cleary to Weil; a true and correct copy of which is attached to this Declaration as **Exhibit G**.

## Conclusion

14.    For the reasons set forth herein and in the *Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement*, I believe that the Motion should be granted.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  May 24, 2019
    New York, New York

*/s/ Christopher A. Good*
Christopher A. Good
Director
M-III Advisory Partners, LP