**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SEARS HOLDINGS CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>(Jointly Administered) |
| TRANSFORM HOLDCO LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>SEARS HOLDINGS CORPORATION, *et al.*,<br><br>Defendants. | Adv. Proc. No. 19-_____ (RDD) |

## ADVERSARY COMPLAINT

Plaintiff Transform Holdco LLC (the "Buyer" or "Transform"), the buyer under a certain

Asset Purchase Agreement, dated as of January 17, 2019, by and among Sears Holdings

Corporation ("SHC" or "Sears"), each of SHC's subsidiaries party thereto (together with SHC, the

"Sellers," and all together with Transform, the "Parties"), and Transform (as may be amended,

restated, supplemented or modified from time to time, the "APA"),[1] by and through its attorneys,

Cleary Gottlieb Steen & Hamilton LLP, files this adversary complaint pursuant to 11 U.S.C. §

105, 28 U.S.C. § 2201, and Rule 7001 of the Federal Rules of Bankruptcy Procedure against the

---

[1]    The APA refers to the Asset Purchase Agreement filed as Ex. B to the *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief* [Docket No. 2507] (the "Sale Order"), as amended by the Amendment No. 1 to Asset Purchase Agreement filed as Ex. E to the *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement* [Docket No. 2599] (the "Notice of Filing of Amendment No. 1 to the APA").  All capitalized terms used but not defined herein shall have the meaning ascribed to them in the APA.

Sellers that are currently Debtors in this Chapter 11 proceeding (the "Defendants")[2] and alleges as follows:

## NATURE OF THE ACTION

1.      Transform brings this adversary complaint against Defendants to address a litany of breaches of contract and other wrongs in contravention of the APA and this Court's Sale Order authorizing the sale of substantially all of the Defendants' assets to Transform (the "Sale Transaction").  The Defendants' course of conduct has imposed undue liabilities on Transform and deprived it of bargained-for assets, funds, and other value.  Prompt resolution of the disputes raised in this Complaint is important not only to Transform but also to the administration of the estates as the Defendants seek to confirm a Chapter 11 plan.

2.      Transform's parent company, ESL Investments, Inc. ("ESL"), was Sears' largest shareholder and creditor prior to these bankruptcy proceedings, in large part due to its longstanding efforts to provide Sears with a path towards growth and success in a period of unprecedented upheaval for the retail sector in America.

---

[2]      The Defendants in this Adversary Proceeding are the following Debtors in this Chapter 11 proceeding (stated along with the last four digits of each Debtor's federal tax identification number): Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).

3.      Consistent with its more than 15-year commitment to Sears and Kmart, ESL from the outset of these Chapter 11 proceedings was the only bidder to submit a viable going-concern bid for substantially all of the Defendants' assets.  In doing so, ESL has expended tremendous resources in order to resurrect an American icon and keep in place tens of thousands of jobs that would have been lost had the Defendants pursued liquidation.

4.      Transform's final winning bid of $5.2 billion represented the only going-concern bid for substantially all of Sears' assets and reflected once again the unwavering commitment of its parent, ESL, to saving the storied retailer and tens of thousands of jobs.  Defendants selected Transform's bid as the highest and best, and the Court ruled that this sale was in the best interests of all stakeholders, including the Defendants' estates and their creditors.

5.      Through intensive negotiations between the Parties, the APA was structured to balance the Defendants' concerns about administrative solvency and certainty of meeting Closing conditions, with Transform's need for assurances that Sears would continue operating in the ordinary course pending the sale and deliver a going concern with the necessary assets and liquidity.  Among other items, Transform agreed to assume over $600 million in estate liabilities, subject to dollar-for-dollar reduction if certain assets were not delivered at Closing.

6.      Despite Transform's efforts throughout the sale process to negotiate a deal agreeable to the Defendants, and its steadfast commitment to preserving Sears as a going concern, the Defendants violated the APA beginning immediately after signing, in an attempt to unduly minimize value due to Transform, divert assets that Transform purchased to the Defendants' estates, and impose liabilities on Transform that it did not assume.  Among other violations, the Defendants have failed to deliver hundreds of millions of dollars of assets in the form and amount called for by the APA, which Transform obtained in exchange for assuming certain liabilities of

the estates; failed to transfer all the real property known as Hoffman Estates; breached their obligations to act in the Ordinary Course of business and inflicted damage on Transform by intentionally delaying payments to vendors; and continued their attempts to shift $166 million in accounts payable liabilities on Transform, despite contrary terms in the APA.[3]

7.      The Defendants' breaches and other misconduct have harmed Transform by depriving it of assets that it contracted to purchase under the APA and requiring Transform to take on unbargained-for liabilities.  Since before March 2019, Transform has attempted in good faith to resolve these issues with the Defendants, through requests to mediate the disputes and Transform's efforts to discuss the issues with the Defendants.  However, the Parties have been unable to resolve these issues.

8.      Transform therefore brings this Adversary Complaint to preserve and vindicate its serious claims against the Defendants, which have added importance and urgency in light of the possibility that Defendants may be unable to pay administrative claims and recent statements by Defendants incorrectly suggesting that Transform has assumed certain obligations to the estates' creditors in amounts not provided for by the APA.  Transform believes that prompt resolution of these matters is important and necessary at this time to allow the bankruptcy court and creditors to consider the Defendants' proposed Chapter 11 plan.[4]

## JURISDICTION AND VENUE

9.      On October 15, 2018 (the "Petition Date"), the Defendants filed the above-captioned bankruptcy case under Chapter 11 of the United States Code (the "Bankruptcy Code").

---

[3]      Although Transform disputes that it has any liability with respect to $166 million in Other Payables unrelated to Ordered Inventory, it has paid over $128 million in accounts payable owed by the Defendants to the Defendants' vendors.

[4]      Transform brings its claims by Adversary Complaint rather than motion primarily because, among other relief, its claims seek damages from the Defendants.  Transform's representatives are prepared to meet and confer to settle on a schedule that would permit the resolution of its claims prior to or as part of the Chapter 11 plan confirmation.

This adversary proceeding arises from and is related to this Chapter 11 proceeding currently pending in this Court.

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

11.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     This is an adversary proceeding brought pursuant to Rule 7001(1) and (9) of the Federal Rules of Bankruptcy Procedure.  This Court is authorized to issue declaratory relief pursuant to 28 U.S.C. § 2201.

## THE PARTIES

14.     Transform is a limited liability company established under the laws of the State of Delaware for the purpose of purchasing and operating the go-forward Sears and Kmart businesses as purchased from the Defendants pursuant to the APA and the Sale Order.

15.     Transform is a subsidiary of non-party ESL, which was Sears' largest shareholder and creditor as of the Petition Date.  ESL was founded in 1988 by non-party Edward S. Lampert. ESL purchased a controlling stake in Kmart in 2003, and Kmart and Sears merged in March 2005 to form SHC.  Following the merger, Lampert became Chairman of SHC's Board of Directors.  In February 2013, SHC's Board asked Lampert to become CEO, which Lampert remained until his resignation on the Petition Date.  Lampert resigned as Chairman and Director of SHC on February 12, 2019, following the consummation of the Sale Transaction.

16.     The Defendants are the Sellers under the APA that are currently Debtors in this Chapter 11 proceeding.  The Defendants operated a large retail business throughout forty-nine states, Guam, Puerto Rico, and the U.S. Virgin Islands.  Among other things, the Defendants sold products in the appliance, tool, lawn and garden, fitness equipment, and automotive repair and

maintenance sectors.  As of the Petition Date, the Defendants operated 687 department stores, mainly based in shopping malls, as well as big-box discount stores, under the brand names Sears and Kmart.

## **FACTUAL BACKGROUND**

17.     Pursuant to the Global Bidding Procedures Order [Docket No. 816] entered by the Bankruptcy Court, Transform submitted a definitive going concern bid on December 28, 2018 to acquire substantially all of Sears' assets in exchange for approximately $4.4 billion in total consideration.  Intensive negotiations between Transform and the Defendants ensued.

18.     Over the course of these negotiations, the Defendants, ESL, and their respective advisors presented several iterations of the go-forward business plan.

19.     On multiple occasions during the course of these negotiations, the Defendants and other stakeholders, including the Official Committee of Unsecured Creditors (the "UCC"), expressed concerns over the administrative solvency of the estates in the event of a going-concern sale.  To address these concerns, Transform agreed to assume certain liabilities of the estates, contingent on Defendants' agreement to provide a dollar-for-dollar reduction in such liabilities if the Defendants failed to deliver assets as described in the APA.

20.     Transform's offer to assume certain estate liabilities was reflected in a revised definitive bid submitted on January 9, 2019 (the "January 9 Bid").  The January 9 Bid increased the total consideration offered by Transform to over $5 billion.  The January 9 Bid also provided that Transform would assume up to $663 million in additional liabilities in return for certain assets, including an offer to assume $166 million of payment obligations with respect to goods ordered by Defendants.  The January 9 Bid was designated by the Defendants as a qualified bid under the court-approved bidding procedures.

21.    Subsequently, beginning on January 14, 2019, the Defendants held an auction for Sears' assets at which Transform's bid represented the only proposal to maintain Sears as a going-concern.    During the three-day auction, Transform and the Defendants engaged in often contentious negotiations.    On the final day of the auction, Transform again substantially improved its offer, offering to assume $120 million in liabilities consisting of the junior DIP rollover, to pay up to $19 million in transfer taxes, to assume up to $4 million in mechanics' liens, to pay up to $17 million in cash to purchase the cash that would be located in the stores following Closing, and to pay $35 million in cash and other good and valuable consideration.    The resulting final bid was valued at $5.2 billion.

22.    Transform's final bid was selected by the Defendants as the winning bid in the early morning hours of January 16, 2019 and memorialized in an Asset Purchase Agreement executed on the following day.    In the APA, Defendants agreed to deliver, among other items, a specified portfolio of accounts receivable identified on a schedule to the APA with a book value of $255.2 million ("Specified Receivables"), additional inventory to be received after closing with a book value of up to $166 million ("Ordered Inventory"), and prepaid inventory with a book value of at least $147 million ("Prepaid Inventory").    The Defendants and Transform promptly sought Court approval for the Sale Transaction.    The Court held a contested three-day hearing beginning on February 4, 2019 (the "Sale Hearing"), ultimately ruling on February 7, 2019 that the Sale Transaction was in the best interests of the estates and their creditors, and rejecting all objections to the Transaction.[5]    The next day, February 8, 2019, the Court issued a Sale Order authorizing the

---

[5]    Hr'g Tr. 236:21-25, Feb. 7, 2019 ("[T]he value in the ESL transaction . . . clearly exceeds the value to the Estate of a liquidation approached [sic], based on the foregoing analysis.")

Sale Transaction based expressly on the terms set forth in the APA.[6]  The Sale Transaction closed on February 11, 2019.

23.    **Defendants Failed to Deliver the Required Amount of Prepaid Inventory.**  As befits a transaction for the purchase of a retail business, the APA contains a number of important provisions with respect to inventory.  Particularly, in exchange for its purchase price, Transform obtained the right to receive the Pending Inventory (defined to include both Prepaid Inventory and Ordered Inventory).  The Defendants also agreed to conduct their business in the Ordinary Course with respect to the management of inventory in the anticipated short window between signing and Closing, thereby ensuring that the critical inventory that was received by Transform upon Closing would bear some proximate relationship to the inventory Defendants were managing in the period before Closing.  The Parties nonetheless recognized that there would be some fluctuations in the Ordinary Course and agreed that, to the extent that the Prepaid Inventory fell short of the amount specified in the APA, the amount of certain liabilities Transform was required to assume would be reduced by a corresponding amount.  Those provisions were critical to the transaction because inventory represents immediate value and is necessary to run a retail business, generates profit, and supports financing.  In the lead-up to Closing, and thereafter, however, Defendants violated these provisions.  Prior to Closing, and without consulting with Transform, they departed dramatically from the Ordinary Course.  Due at least in part to this conduct, Defendants failed to deliver almost half of the expected Prepaid Inventory.  Since Closing, Defendants have failed to agree to the adjustment that would be necessary to compensate Transform, in part, for that shortfall or to pay damages to Transform to compensate it for the injury Defendants inflicted.

---

[6]        *See* Sale Order at 2-3.

24.    **Defendants Failed to Deliver the Required Amount of Specified Receivables.**

The Defendants contracted in the APA to deliver a portfolio of specific "accounts receivable" at Closing—the "Specified Receivables" set forth in Annex 11 to the APA. The Defendants, however, failed to deliver anywhere near the amount of Specified Receivables contemplated to be delivered by the APA. First, Defendants purported to deliver as "accounts receivable" within the Specified Receivables accounts that were not receivables at all. Second, Defendants failed to deliver the portfolio of accounts receivable contemplated by Annex 11 and instead purported to deliver a different portfolio comprised of substitute "accounts receivable" of much lower—or no— value.

25.    **Transform Acquired the Adequate Assurance Deposit.** Under Section 2.1(o) of the APA, Transform acquired all Security Deposits—and in particular, all "utility deposits"—to the extent "related" to an Acquired Asset. Such deposits include all security deposits made pursuant to this Court's order [Docket No. 431] (the "Utility Order") to ensure the continued service of utilities during the bankruptcy (the "Adequate Assurance Deposit") to the extent such deposits relate to the properties acquired by Transform. The Defendants, however, have refused to recognize that, upon the deposit's release by the Utility Providers, Transform is entitled to the portion of the Adequate Assurance Deposit related to the assets acquired by Transform.

26.    **Transform Acquired All of Defendants' Real Property in Hoffman Estates.**

The Defendants agreed in the APA to deliver at Closing Sears' headquarters and land at Hoffman Estates, Illinois. Section 2.1 of the APA provides that, on the Closing Date, the Defendants would "sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered" to Transform, and Transform would "purchase, all right, title and interest of Sellers, in, to or under," substantially all of the Defendants' assets including "(c) all Owned Real Property,"

9

a term that was defined to include the Operating Owned Property described in Schedule 1.1(p) to the APA.[7] Hoffman Estates was included in "the real property described in Schedule 1.1(p), including, in each case, all of the right, title and interest of Seller and its Subsidiaries to all Improvements located thereon and all easements and other rights and interests appurtenant thereto and any associated rights to parking."[8] The complete Hoffman Estates property is listed in Schedule 1.1(p) ("Operating Owned Properties") as store number "490," located in the city of "Hoffman Est." in the state of "IL."[9] The APA does not contemplate, nor did any of the Parties ever suggest, dividing the parcels of land that comprise Hoffman Estates. The Defendants have nonetheless delivered only three of the 16 parcels of land that make up Hoffman Estates. The Defendants therefore have failed to meet their contractual obligation to deliver all component parts of Hoffman Estates to Transform.

27.    **Transform Acquired Defendants' Claims to the Hoffman Estates EDA Funds.**
At Closing, the Defendants had a claim against and were engaged in a dispute with the Village of Hoffman Estates (the "Village") and Community Unit School District 300 (the "School District") relating to the retention by the Village of funds based on an Economic Development Agreement by and between the Village of Hoffman Estates and Sears, Roebuck and Co., dated February 6, 1990 (the "EDA"), pursuant to the 1989 Illinois Economic Development Area and Tax Increment Allocation Act, 20 ILCS § 620 (the "EDA Act"). The EDA provided an economic incentive for Sears to relocate its headquarters from downtown Chicago to the Village by offering Sears annual subsidies to reimburse it for certain costs it incurred in developing its corporate headquarters and providing certain infrastructure improvements for the Village. Sears brought suit when the Village

---

[7]    APA § 2.1.

[8]    APA § 1.

[9]    APA Schedule 1.1(p).

failed to provide the contracted-for reimbursement.    On May 7, 2019, the Court ordered the Village to turn over $2,508,660.33 in reimbursements owed Sears, which were held in the EDA Fund, and to retain the balance of the $9,600,000 in that account pending resolution of the dispute. Under Section 2.1(p) of the APA, Transform acquired "any and all Actions or Claims . . . of Sellers as of the Closing" against "parties to other commercial relationships of the Business."  Any payment in response to Defendants' claims for reimbursement under the EDA plainly relates to an action or claim pending at Closing against a party to a commercial relationship of the Business— that is, the EDA between Sears, Roebuck and Co. and the Village of Hoffman Estates. Nonetheless, the Defendants refuse to transfer the $2,508,660.33 in EDA Funds to Transform.

28.    **Defendants Wrongly Assert Transform Is Responsible for Mechanics' Liens It Did Not Agree to Assume.**    Under Section 2.3(p) of the Amended APA, Transform only assumed liabilities for mechanics' liens that arose pre-Closing or were in connection with actions or obligations that arose pre-Closing that were identified in Section 2 of Schedule 6.5 to the APA.  Under Section 2.4 of the APA, Transform did not assume any additional liabilities not listed in Section 2.3.  Despite Defendants' assertions otherwise, any other pre-Closing mechanics' liens not listed in Section 2 of Schedule 6.5 are the Defendants' responsibility.

29.    **Defendants Caused Transform to Assume Payables Beyond Those It Agreed to Assume.**    Transform assumed $166 million in payables and payment obligations (the Other Payables) solely with respect to approximately $166 million in inventory to be purchased before, but not delivered until after, Closing (the Ordered Inventory).  Under Section 2.4 of the APA, all other liabilities of Defendants not assumed by Transform were to remain with Defendants. Defendants, however, have demanded that Transform satisfy payables of Defendants other than those related to the Ordered Inventory.  As a consequence, and in order to avoid further harm to

its vendors and business, Transform has been compelled to satisfy over $128 million of payables outstanding at Closing unrelated to Ordered Inventory that should have been borne by Defendants. Transform is entitled to reimbursement of the funds it has already paid.  In addition, absent a declaratory judgment of this Court, Transform will be required to pay countless millions more. Defendants have also grossly inflated the amount of payables outstanding at Closing by failing to make timely payments and through conduct outside the Ordinary Course in breach of their obligations under the APA.  Further, Transform's obligation, if any, to assume accounts payable is reduced by at least $19.6 million to account for Defendants' available cash at Closing, pursuant to Section 2.3(k)(vi).

30.    The Defendants' conduct, as detailed further below, has breached their obligations under the APA and the Sale Order, contravened their prior representations to Transform and this Court, and has otherwise wronged Transform.

31.    As a consequence of this conduct, Transform has been deprived of assets that it purchased under the APA, has been compelled to pay expenses that should have been borne by the Defendants, has suffered damages, and has otherwise been deprived of inventory and forced to divert resources away from its core businesses in the crucial period following its emergence from bankruptcy.

32.    Prior to filing this Adversary Complaint, Transform made efforts in good faith to resolve each of these disputes, to no avail.  Transform is thus required to seek the assistance of this Court.

**A.    Defendants Failed to Deliver the Required Amount of Prepaid Inventory.**

33.    As befits a transaction involving the purchase of a retail business, the APA contains numerous provisions regarding the management and sale of inventory.  Under Section 2.1(x),

Defendants agreed to sell to Transform and Transform agreed to purchase the Pending Inventory, a term defined to include both Prepaid Inventory and Ordered Inventory.

34.      Prepaid Inventory is defined in the APA as "all Inventory that has been paid for by Sellers prior to the Closing Date but as to which Sellers have not taken title or delivery as of the Closing Date."

35.      Ordered Inventory is defined in the APA as "Inventory (other than Prepaid Inventory) . . . that has been ordered by Sellers prior to the Closing Date but as to which Sellers have not taken title or delivery prior to the Closing Date." Pursuant to Schedule 1.1(f), Defendants agreed to sell Transform $166.5 million of Ordered Inventory.

36.      In addition, Defendants agreed to sell to Transform and Transform agreed to purchase the Acquired Inventory—defined as Inventory located on the Defendants' property as of the Closing Date—under Section 2.1(d) of the APA. Pursuant to Section 10.9 of the APA, Defendants were to deliver $1.553 billion of this "on the stock ledger" inventory at the Closing.

37.      These provisions were critical to the consummation of the transaction. In the period prior to signing, when Defendants expressed concerns regarding the administrative solvency of the estates after the Sale, Transform agreed to assume over $600 million worth of liabilities in exchange for the acquisition of additional assets, including in significant part the Ordered Inventory and Prepaid Inventory, subject to certain "dollar for dollar" reduction as provided in the APA.

38.      One of the key aspects of the APA was the amount of Prepaid Inventory that Defendants would have on order at Closing. Prior to Closing, the Defendants regularly paid certain of their vendors in advance for inventory. Such payment terms are referred to as "cash in advance" or "CIA" and the inventory purchased pursuant to those terms was known as "CIA Inventory,"

and referred to in the APA as Prepaid Inventory.  Several of the vendors that require CIA payment terms were appliance manufacturers on which the Defendants' (and now Transform's) businesses heavily relied, including Whirlpool, Samsung, and LG.[10]

39.     In a January 6, 2019 presentation to Transform's representatives, the Defendants represented that as of January 4, 2019, they had $147 million in Prepaid Inventory on order.  Based on this information, the APA and Sale Transaction were premised on Defendants delivering $147 million of Prepaid Inventory at Closing.

40.     Inventory represents immediate value.  It is also necessary to run a retail business, generates profit, and supports financing under Transform's lending facilities.  Thus, Transform's business model and liquidity analyses—which were shared with the Defendants and their representatives—contained critical assumptions based on the understanding that Defendants would deliver $147 million of Prepaid Inventory at Closing.  In particular, Transform's modelling assumed that it would receive $147 million in Prepaid Inventory between February and March, 2019, thereby reducing the cash outlays it otherwise would have had to make to purchase that inventory.  This is specifically reflected in the liquidity analysis shared by Transform with representatives of the Defendants and the UCC shortly before the Sale Hearing on February 3, 2019, which shows "Cash Savings from CIA Inventory" of $74 million in each of February and March 2019.

41.     To ensure that Defendants, in the few weeks between signing and Closing, continued to manage their inventory in a manner that would deliver to Transform the value and liquidity it had purchased, the Parties included in the APA several ordinary course covenants.  In

---

[10]     *See Declaration of Katherine R. Lynch in Support of Transform Holdco LLC's Motion to Assign Matter to Mediation* [Docket No. 2767] (the "Lynch Decl."), Ex. D (Letter from Weil to Cleary Gottlieb, dated March 6, 2019), at 11.

particular, Section 8.1(a) obligated the Defendants to "manag[e] Inventory in the Ordinary Course of Business, including with regard to Inventory in transit and Inventory located in distribution centers," and "not delay taking delivery of Inventory that would be Acquired Inventory on the Closing Date if delivery of such Inventory were managed in the Ordinary Course of Business prior to the Closing date."  Defendants were "permitted to reasonably manage the amount of Inventory *in consultation* with [Transform]" (emphasis added).  Pursuant to Section 8.6, Defendants were to "make all payments in respect of payables of the Business . . . arising from the date of this Agreement until the Closing Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business in . . . the Ordinary Course of Business."

42.     Moreover, in order to account for fluctuations in the amount of Prepaid Inventory that may occur in the Ordinary Course—such as due to seasonal fluctuations in the amount of inventory orders placed based on the business needs of the company—the APA included a mechanism by which if the amount of Prepaid Inventory delivered at Closing was less than $147 million, Transform's obligation to pay certain estate liabilities that it had assumed under the APA would be reduced by the amount of the shortfall.

43.     Thus, the "Prepaid Inventory Shortfall Amount" is defined as "an amount equal to $147,000,000 less the amount of the Prepaid Inventory as of the Closing Date," and Section 2.3(k)(ix) of the APA provides that "[i]n the event that the Prepaid Inventory Shortfall Amount is a positive number, [Transform's] obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar-for-dollar."

44.     Transform negotiated these provisions in good faith recognizing that the Defendants' continued operation of the business in the Ordinary Course would be essential in the transition phase between signing the APA and Closing.  Not days after signing the APA, however,

the Defendants violated it with respect to the management of inventory, and the Defendants have continued to violate the APA.

45.    The Defendants prepared daily cash forecasts detailing expected cash disbursements by the estates, including to vendors for merchandise.  On February 1, 2019, Defendants projected that they would pay vendors $158.2 million during the first full week of February (from February 4, 2019 to February 8, 2019)—*i.e.*, the last week prior to Closing on February 11, 2019.  However, as Transform learned,  just as the Court was considering and approving the Sale Transaction on February 7, 2019, Defendants suddenly and intentionally stopped paying millions of dollars of projected payments:  the Defendants dispersed only $56.5 million on vendor payments in the first full week of February—more than $100 million (or 65%) below their projections from only a few days earlier.

46.    In so doing, the Defendants acted outside the Ordinary Course of Business and intentionally failed to pay vendors on a timely basis.  Emails from the Defendants' employees from February 4 to 6, 2019 expressly state that the Defendants "are delaying certain payments contractually due on Feb 5th, Feb 6th, Feb 7th, by 3 business days."[11]  An email from February 8, 2019, the Friday before Closing, was even more explicit, stating that "[i]n order to maintain $850 1L outstanding balance, certain payments contractually due this week have been delayed until next week."[12]  The "$850 1L outstanding balance" refers to the closing condition under Section 10.10 of the APA that the "aggregate amount required to be paid to fully satisfy the existing indebtedness of Sellers under . . . the DIP Credit Agreement shall be no greater than $850,000,000."  Thus, the

---

[11]    *See* Lynch Decl., Ex. A (Letter from Cleary Gottlieb to Weil, dated February 25, 2019).

[12]    *Id.*

Defendants violated one term of the APA simply to attempt to satisfy another—the closing condition regarding the DIP.

47.    Many of the payables on which Defendants stopped payment were for inventory. Payments for Prepaid Inventory were at least $20 million lower in the week before Closing as compared to the prior week.

48.    Transform's analysis has determined that Defendants delivered only approximately $75 million in Prepaid Inventory to Transform.

49.    That shortfall created immediate damage to Transform.  Transform has been deprived of assets—and the benefits of those assets—that it contracted to purchase under the APA, that it would have sold for a profit.  The Prepaid Inventory that Defendants failed to deliver would have provided more than $10 million in EBITDA for Transform in the period following Closing. Transform has also been compelled to assume additional debt and associated interest expense in part to purchase additional inventory.  Moreover, the Defendants' failure to pay vendors in the Ordinary Course harmed Transform's relations with these vendors.

50.    The shortfall in delivery of Prepaid Inventory also created a Prepaid Inventory Shortfall amount of at least $72 million.  Pursuant to the APA, that amount reduces the Severance Reimbursement Obligations and Assumed 503(b)(9) Claims dollar for dollar.

51.    In correspondence and meetings with Defendants subsequent to the Closing, Transform has demanded that Defendants compensate Transform, recognize the Prepaid Inventory Shortfall and agree that Transform's obligations have been reduced by the Prepaid Inventory Shortfall.[13]  Defendants have refused to do so.[14]

---

[13]    *See* Lynch Decl., Ex. A (Letter from Cleary Gottlieb to Weil, dated February 25, 2019).

[14]    *See* Lynch Decl., Ex. D (Letter from Weil to Cleary Gottlieb, dated March 6, 2019) at 5.

52.     Pursuant to Section 2.3(k)(ix), Transform is entitled to a reduction of liabilities with respect to the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims in the amount of at least $72 million, and a declaration from this Court to that effect, as well as consequential damages.  Together with the reductions from the Specified Receivables Shortfall Amount, Transform's obligations to satisfy the Severance Reimbursement Obligations (estimated to be $20 million) and the Assumed 503(b)(9) Claims are reduced to $0.00.

**B.     Defendants Failed to Deliver the Required Amount of Specified Receivables.**

53.     In response to Transform's initial bid proposal, the Defendants required that Transform take on additional estate liabilities, including certain liabilities relating to severance and 503(b)(9) claims.  Transform agreed to do so in exchange for the Defendants delivering certain additional assets that were not contemplated to be included under Transform's initial proposal. Among these additional assets was a portfolio of accounts receivable, referred to as the "Specified Receivables," in specified categories and with a face amount of $255.2 million in the aggregate. Pursuant to Section 2.1(d) of the APA, the Defendants were obligated at Closing to deliver to Transform "all Acquired Receivables," which is defined to include the "Specified Receivables." Specified Receivables are defined in the APA as "the accounts receivable set forth on Schedule 1.1(k)."  Schedule 1.1(k) in turn refers to Annex 11, which describes a portfolio of receivables comprising over 30 categories.  With respect to each category of accounts receivable, Annex 11 lists a specific value and the total value of all categories totals $255.2 million.

54.     The APA thus explicitly and unambiguously provides that (1) Transform would receive a specific amount of accounts receivable, (2) that the portfolio would comprise specified categories and in specified amounts and (3) that these accounts receivable, together, would total $255.2 million.  The APA did not entitle Defendants to satisfy their obligations by delivering

something other than accounts receivable, nor did it permit Defendants to deliver receivables that were not Specified Receivables, including receivables that were in excess of the amounts contemplated for each category on Annex 11.

55.     A listing of purported accounts receivable was initially presented to Transform's representatives by the Defendants in a January 6, 2019 presentation.  The presentation also included the Defendants' estimate of potential recovery on each category of purported accounts receivable.  The Defendants' estimate of potential recovery ranged from 0% with respect to $30 million of items categorized as "All Other Receivables" to 80% or more with respect to an aggregate of $106.3 million of items in various categories, with the bulk of the remainder of items being allocated a 50% recovery value.

56.     Recognizing that Transform agreed to incur additional liabilities in exchange for these receivables, the APA also includes a mechanism by which if the total amount of Specified Receivables delivered at Closing was less than $255.2 million, Transform's obligations to pay certain estate liabilities that it had assumed under the APA would be reduced by the amount of the shortfall.  The "Specified Receivables Shortfall Amount" is defined as "an amount equal to $255,200,000 less the amount of the Specified Receivables delivered to Buyer at Closing," and Section 2.3(k)(vii) provides that "Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar" by the Specified Receivables Shortfall Amount.  Thus, the parties recognized that Defendants' obligation was not limited to delivering the receivables they happened to have on their books at the time of Closing. Defendants were required to deliver receivables of a specified category and in specified amounts.

57.     Defendants failed to deliver accounts receivable constituting Specified Receivables of the type and in the amount as agreed and have refused to make redress.

58.    First, Transform's analysis has determined that many of the receivables Defendants delivered do not appear to be accounts receivable at all.  For example, significant portions of the purported receivables in the accounts called "A/P Vendor Reclass Post" and "Return Merchandise Receivable" represent either already-received or outstanding Prepaid Inventory (*i.e.*, inventory "that has been paid for by Sellers prior to the Closing Date but as to which Sellers have not taken title or delivery as of the Closing Date"), a class of asset that Transform separately purchased from the Defendants under Section 2.1(x) of the APA.  When the Defendants would pay for Prepaid Inventory, they would establish a receivable balance as a means to track the amount of such inventory ultimately delivered by the vendor.  When the Defendants took title and delivery of such inventory and matched it with the receivable, the receivable would be eliminated.  It simply is not possible for the Defendants to deliver a "receivable" with respect to an asset—Prepaid Inventory— that they separately delivered to Transform pursuant to the APA.[15]  Specifically, the Defendants' receivable balance with respect to Prepaid Inventory became zero at the moment that they transferred such inventory to Transform at the Closing—they had no further receivable with respect to these assets available to transfer.

59.    Moreover, even it were possible for the Defendants to deliver the receivables relating to Prepaid Inventory they had already transferred to Transform (which it was not), a significant portion of these purported "receivables" no longer even constituted a claim against a third party.  Rather, they only represented an accounting entry with respect to Prepaid Inventory that had already been delivered and received by the Defendants, but which had not yet been reconciled against the "accounts receivable" balance reflected on their accounting system.

---

[15]      *See* APA § 2.1(x).

Accordingly, these accounts represent no actual claim against a third party and are not accounts receivable capable of being delivered to Transform.[16]

60.     Second, the Defendants failed to deliver the agreed portfolio of accounts receivable with a higher recovery value, delivering instead a different portfolio comprising receivables of a dramatically lower recovery value than the portfolio listed in Annex 11.

61.     Specifically, having convinced Transform to provide value through the assumption of liabilities for a specified portfolio of receivables with varied recovery expectations, the Defendants then delivered a greater amount of low-recovery receivables than agreed and a lesser amount of Specified Receivables with a higher recovery value.

62.     For example, Annex 11 contemplated that the Defendants would deliver $30.0 million of a category of receivables entitled "All Other Receivables."  Transform's ability to recover these receivables was understood to be limited, as the Defendants estimated them to have a 0% recovery value.  Instead of transferring $30 million of these receivables, the Defendants purported to deliver more than twice the agreed amount—$67.0 million of "All Other Receivables."

63.     In sum, the Defendants failed to deliver the agreed portfolio of Specified Receivables and instead have over-delivered certain lower-value categories of purported receivables rather than delivering the higher-quality and more valuable receivables that they were contractually obligated to deliver as part of the Specified Receivables portfolio.

---

[16]     *Accounts Receivable (AR)*, Investopedia (Apr. 18, 2019), https://www.investopedia.com/terms/a/accountsreceivable.asp ("The phrase [accounts receivable] refers to accounts a business has a right to receive because it has delivered a product or service."); *Account*, Black's Law Dictionary (10th ed. 2014) (defining "account receivable" as "[a]n account reflecting a balance owed by a debtor; a debt owed by a customer to an enterprise for goods or services"); *Accounts Receivable*, New Oxford American Dictionary (2015) ("Money owed to a company by its debtors.").

64.     Nothing in the APA permitted the Defendants to, at their election, substitute a different portfolio of receivables in lieu of the Specified Receivables.

65.     The APA and Annex 11 provide the exact amounts of receivables in specific categories the Defendants must provide, and the Defendants must adhere to these obligations.

66.     As a consequence of the Defendants' conduct, the amount of Specified Receivables actually delivered by the Defendants is estimated to be short by well in excess of an amount that, when added to the Prepaid Inventory Shortfall Amount, would reduce Transform's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Liabilities to $0.00. Pursuant to Section 2.3(k)(vii), Transform is entitled to a declaration from this Court to that effect.

67.     In correspondence and meetings with the Defendants subsequent to the Closing, Transform has demanded that Defendants recognize the Specified Receivables Shortfall and agree that Transform's obligations were reduced as a result of the shortfall.[17]  Defendants have refused to do so.[18]

### C.     Transform Acquired the Utility Deposits.

69.     Under the APA, Defendants agreed to sell Transform, at Closing, "all right, title and interest of Sellers, in, to or under all assets, properties and rights Related to the Business" including under Section 2.1(o), "any and all rights of Sellers in and to any . . . security deposits . . . escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit [and] *utility deposits* . . . to the extent related to any Acquired Asset."  APA §2.1 (emphasis added).  Section 2.1(o) was an essential element of the consideration that Transform bargained to purchase under the APA.

---

[17]     *See* Lynch Decl., Ex. A (Letter from Cleary Gottlieb to Weil, dated February 25, 2019).

[18]     *See* Lynch Decl., Ex. D (Letter from Weil to Cleary Gottlieb, dated March 6, 2019) at 5.

70.    Some of those "utility deposits" were established under the Utility Order. Specifically, on October 18, 2018, Defendants moved the Court requesting an order approving, *inter alia*, Defendants' proposed form of adequate assurance for the payment of utility providers, pursuant to sections 105(a) and 366 of the Bankruptcy Code.   In their motion, Defendants asserted that "[i]n the ordinary course of their business, the [Defendants] incur utility expenses in connection with the use of various utility services, including electricity, natural gas, water, sewage and telecommunications."[19]  Defendants further argued that "[p]reserving utility services on an uninterrupted basis is essential to the [Defendants'] ongoing operations" and that "any interruption in utility services . . . would seriously disrupt the [Defendants'] ability to continue operations and service their customers."[20]

71.    Following entry of the Utility Order, Defendants entered into the APA (subsequently incorporated into the Sale Order) pursuant to which Defendants sold to Transform all Security Deposits related to Acquired Assets.   Security Deposits includes "utility deposits." Specifically, the portion of the Adequate Assurance Deposit that secures the supply of utility services to assets acquired by Transform under the APA is an acquired Security Deposit pursuant to Section 2.1(o) of the APA.   First, it is indisputably a deposit securing the supply of utility services and therefore falls within the broad definition of Security Deposits under Section 2.1(o)— in fact, "utility deposits" are specifically included in the APA's definition of Security Deposit.

72.    Second, under Section 2.1(o), Transform acquired all Security Deposits "to the extent related to any Acquired Asset."   Under Sections 2.1(b) and 2.1(c) of the APA, Transform

---

[19]    *See Motion of Debtors Requestion Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utlity Service* [D.I. 196] ¶ 7.

[20]    *Id.* ¶ 9.

acquired a large number of retail locations (including Sears and K-Mart stores) and other properties as part of its going-concern acquisition of Defendants' retail business.

73.    The portion of the Adequate Assurance Deposit that secures the continued supply of utility services to these properties is "related" to those Acquired Assets as that term is defined and used in the APA.  That deposit ensures the ability of the business to enjoy utility services on an uninterrupted basis.   Likewise, it was plainly "used" and "intended for use" with those properties in that it secured the continued supply of utility services to those properties and would be used to pay for the services needed by those properties if the Defendants (and now Transform) defaulted on their payments to the Utility Providers.  Furthermore, it was used and intended for use "primarily in connection" with those properties, as the portion of the Adequate Assurance Deposit is specifically allocated to the services provided to specific properties.[21]  Even if once the deposit is in Transform's possession it ceases securing the provision of utilities, this is irrelevant; at Closing it was clearly a security deposit related to an Acquired Asset.

74.    Accordingly, the portion of the Adequate Assurance Deposit that secures the continued supply of utility services to the properties acquired by Transform under the APA is a Security Deposit related to an Acquired Asset, and was therefore duly purchased by Transform under Section 2.1(o) of the APA.

75.    Transform is therefore entitled to the amount of the Adequate Assurance Deposit that related to assets acquired by Transform.

---

[21]    *See Order (I) Approving Debtors' Proposed Form of Adequate Assuarnce of Pyament to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utlity Service* at ¶ 3.

### D.    Transform Acquired All of Defendants' Real Property in Hoffman Estates.

76.    The real property known as Hoffman Estates houses the development that is the headquarters for Sears, located in the village of Hoffman Estates, Illinois.  It is a large complex that includes Sears' corporate offices, parking lots, and other buildings, as well as undeveloped land.  The Sears property at Hoffman Estates comprises 16 parcels of land.

77.    Transform purchased the entirety of the Sears property at Hoffman Estates, along with all other Owned Real Property of the Defendants, at the Closing of the APA, but Defendants have failed to deliver that property to Transform.

78.    Specifically, Section 2.1 of the APA provides that, on the Closing Date, the Defendants would "sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered" to Transform, and Transform would "purchase, all right, title and interest of Sellers in, to or under," substantially all of the Defendants' assets including "(c) all Owned Real Property."

79.    Owned Real Property is defined in Article I of the APA as "the real property described in Schedule 1.1(p), including, in each case, all of the right, title and interest of Seller and its Subsidiaries to all Improvements located thereon and all easements and other rights and interests appurtenant thereto and any associated rights to parking."

80.    Hoffman Estates is one of the properties listed on Schedule 1.1(p) ("Operating Owned Properties").  The operative and clear language in Schedule 1.1(p) is the simple descriptive phrase "Hoffman Estates" followed by the language "Store 490."  That phrase includes all of the property Defendants owned at that location not otherwise separately identified.

81.    Thus, at Closing, Transform acquired title to each parcel to which the Defendants held title at Hoffman Estates.

82.     Following the Closing, Defendants failed to comply with their obligations under the APA to deliver deeds to all the parcels that comprise Hoffman Estates. To date, the Defendants have only delivered deeds to three of the 16 parcels of land that comprise the land owned by defendants at Hoffman Estates, and have refused to deliver the remainder of the deeds.

83.     By letter dated March 26, 2019, Transform informed the Defendants that they had failed to deliver full title to Hoffman Estates, and requested that the Defendants promptly transfer title to each parcel that previously had not been transferred to Transform pursuant to the terms of the APA.

84.     Defendants have based their refusal to deliver full title to the land on Hoffman Estates to Transform on a series of baseless assertions. Defendants have asserted that Transform did not purchase all of Hoffman Estates because Schedule 1.1(p) includes Hoffman Estates with an entry of 490 under a heading for store number. That argument is meritless. The reference to "490" does not limit the properties in Hoffman Estates purchased by Transform.

85.     The figure "490" corresponds with the entries on Defendants' sworn Statement of Assets and Liabilities where they described, under penalty of perjury, the property that Defendants owned or in which they had an interest. That document listed "490 Land" and "490 Office Building" in Hoffman Estates. It does not contain any other listing for the vacant land owned by Defendants at Hoffman Estates, thus reflecting that 490 Land includes all that vacant land. As with the contemporaneous Statements of Assets and Liabilities, the reference to "490" in Schedule 1.1(p) includes both the office building and the vacant land.[22]

---

[22]     *See* Schedules of Assets and Liabilities for Sears Holdings Management Corporation at 39, *In re Sears Holdings Corp.*, No. 18-23538-rdd (January 17, 2019) [Dkt. No. 1637]

86.    The Parties' agreement was that Transform would purchase the entirety of Defendants' property at Hoffman Estates.   In a January 6, 2019 presentation to Transform's representatives, the Defendants provided a preliminary schedule of real estate that would be excluded from the transaction.   No property at Hoffman Estates was listed in the schedule of 99 excluded properties.   Specifically, Defendants did not then list as an "excluded property" the vacant land that they are now claiming a right to retain.   In the course of the Parties' subsequent negotiations, neither party ever suggested that any property at Hoffman Estates would be excluded from the transaction.

87.    Notwithstanding the parties' agreement, at Closing, Defendants delivered to Transform a deed containing only three of the 16 Hoffman Estate lots (including some vacant lots but not all of them).   The Defendants' failure to deliver full title to Hoffman Estates is a material breach of their obligations under Section 2.1(c) of the APA and has caused Transform irreparable injury for which specific performance is the only adequate remedy.

88.    Indeed, the Defendants have agreed that a breach of any provision of the APA constitutes irreparable harm to Transform warranting specific performance.   Section 13.14 of the APA states:

> Specific Performance.  The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement by the breaching Party or Parties. If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at Law.

89.    The damages from the Defendants' failure to deliver full title to Hoffman Estates, which Transform purchased in its entirety at Closing, are material and difficult to calculate, and

therefore Transform is entitled to specific performance in the delivery of the entirety of the Defendants' real property in Hoffman Estates.

### E.    Transform Acquired Defendants' Claims to the Hoffman Estates EDA Funds.

90.    In 1989, the State of Illinois passed the EDA Act, and the following year Sears, Roebuck & Co. entered into an EDA with the Village of Hoffman Estates.  The EDA provided economic incentives for Sears to relocate its headquarters from downtown Chicago to the Village by offering Sears annual subsidies to reimburse it for certain costs it incurred in developing its corporate headquarters and providing certain infrastructure improvements for the Village.  That reimbursement is paid from property taxes collected by the Village but is based on Sears' agreement to relocate and the costs it incurred in development.

91.    On October 10, 2018, the School District filed an action in the Circuit Court of Cook County, State of Illinois, alleging that Sears failed to comply with certain conditions of the EDA, including the requirement that Sears maintain at least 4,250 qualifying jobs, and seeking declaratory, injunctive, and other relief.[23]  As a result of this pending action, the Village did not disburse the EDA Funds for 2017, and instead held $9,600,000 in a segregated account.  In connection with the Illinois Action, the Defendants are seeking an order that the Village disburse these EDA Funds to Sears.

92.    The Defendants also filed a turnover motion in this Court on February 28, 2019, requesting an order that the Village disburse the EDA Funds (the "Turnover Motion").[24]  On May 2, 2019, Transform noticed its assumption and assignment of the EDA with the Village.[25]  On May

---

[23]    *See Cmty Unit School Dist. 300 v. Hoffman Estates*, No. 2018 CH 12683 (Ill. Cir. Ct. filed Oct. 10, 2018) (the "Illinois Action").

[24]    *Motion of Debtors to Compel Turnover of Estate Property* [Docket No. 2715].

[25]    *Notice of Assumption and Assignment of Additional Executory Contracts* [Docket No. 3539].

6, 2019, the Court ordered the Village to disburse to Sears, Roebuck and Co. $2,508,660.33 of the EDA Funds, and to hold and retain the remainder of the funds pending the resolution of the Defendants' claims for payment of additional EDA Funds.[26]

93.    Under Section 2.1(p) of the APA, Transform acquired "any and all Actions or Claims . . . of Sellers as of the Closing that . . . are against vendors, counterparties to leases, licenses or other contracts, customers, Transferred Employees or *parties to other commercial relationships of the Business*" (emphasis added).

94.    "Action" is defined very broadly under the APA to include "any Claim, action, complaint, suit, litigation, arbitration, appeal, petition, inquiry, hearing, Order, decree, legal proceeding, investigation or other legal dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority."

95.    The APA's definition of "Claim" is even broader.  It includes "all rights to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or rights to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, in each case, of whatever kind or description against any Person."

96.    The Illinois Action and Turnover Motion are "Actions" and "Claims" of the Debtors related to their commercial relationship with the Village and the School District under the EDA.  Any payment of the disputed EDA Funds therefore relates to an Action or Claim as of the

---

[26]    *Order Directing Partial Turnover of EDA Funds to Debtors and Reserving Balance Pending Court Order* [D.I. 3678].

Closing against a party to a commercial relationship of the Business.  Nonetheless, the Defendants

refuse to transfer the $2,508,660.33 in acquired EDA Funds to Transform.

97.    As a result, the Defendants are wrongly attempting to retain assets that they sold to

Transform.

**F.    Defendants Wrongly Assert Transform Is Responsible for Mechanics' Liens It Did Not Agree to Assume.**

98.    The APA clearly apportions liability for mechanics' liens between Transform and

the Defendants, with Transform assuming liability for those liens specifically identified in Section

2 of Schedule 6.5 to the APA, and Defendants assuming liability for the rest.

99.    Section 2.3(p) of the Amended APA provides that Transform shall assume liability

for "the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5."  In turn,

Section 2 of Schedule 6.5 lists 36 specific mechanics' liens, identified by store number and address,

with details describing the nature and asserted dollar amount of the liens.

100.    Section 2.4 of the APA makes clear that Transform did not assume liability for any

additional mechanics' liens not listed in Schedule 6.5.  The first paragraph of Section 2.4 of the

APA states that Transform did not assume any of the Sellers' liabilities other than the "Assumed

Liabilities" listed in Section 2.3.

101.    In addition, Section 2.4 lists several illustrative examples of liabilities that

Transform did not assume.  Specifically, under Section 2.4(a), the Defendants agreed that "[n]one

of Buyer, any Affiliate of Buyer or any Assignee shall assume, be deemed to assume or become

obligated hereunder in any way to pay or perform . . . all Liabilities of the Seller or any of its

Subsidiaries arising out of the ownership of the Acquired Assets or operation of the Business or

the Acquired Assets prior to the Closing Date."  Thus, any mechanics' liens  other than those listed

in Schedule 6.5 expressly remain with the Defendants if they are related to any Acquired Asset,

including any Assigned Agreements (Section 2.1(a)), Acquired Lease Rights (Section 2.1(b)), Owned Real Property (Section 2.1(c)), and all equity interests in the properties owned by SRC O.P. LLC (the "Sparrow Properties") (Section 2.1(s)).

102.    Section 2.4(b) of the APA provides that "all Liabilities relating to the payment or performance of obligations arising solely out of facts or circumstances in existence prior to the Closing Date" related to Assigned Agreements remain the Defendants' responsibility. Assigned Agreements, as defined in the APA, include all Acquired Leases. Since any disputed mechanics' liens arose before Closing, the APA plainly states that any such mechanics' liens related to Acquired Leases are liabilities that remain with the Defendants.[27]

103.    Defendants therefore wrongly assert that Transform assumed liability for mechanics' liens other than those listed in Section 2 of Schedule 6.5.

## G.    Defendants Caused Transform to Assume Payables Beyond Those It Agreed to Assume.

### 1.    Transform Assumed Other Payables Only For Ordered Inventory.

104.    This claim relates to the interpretation of Transform's agreement to assume Defendants' liabilities for "Other Payables and all payment obligations with respect to the Ordered Inventory." APA § 2.3(k).

105.    During the course of the Parties' negotiations, Transform agreed to assume up to $166 million in certain liabilities (*i.e.*, Other Payables and payment obligations) with respect to certain inventory that the Parties expected to be delivered following Closing (*i.e.*, Ordered Inventory), in exchange for the right to receive this additional $166 million in inventory when it

---

[27]    Transform does not dispute that, as the assignee of each Acquired Lease, it may be required pursuant to the terms of each individual Acquired Lease to pay, discharge or bond over each mechanics' lien, but such payment or discharge does not relieve the Defendants' obligation to Transform with respect to each mechanics' lien as an Excluded Liability.

was delivered.  This arrangement reflected the Parties' intended framework for the APA to match

liabilities that Transform would assume with assets it would acquire.  Ordered Inventory is

inventory that Sears had ordered, but that (a) was not expected to be delivered until after Closing;

and (b) for which payment had not been made as of the Closing Date.  As to some of that Ordered

Inventory, Defendants had incurred a payable and as to others they would have a payment

obligation only on delivery.  As a result, Ordered Inventory was separate from the $1.553 billion

of "on the stock ledger" inventory expected at Closing pursuant to Section 10.9 of the APA as well

as Prepaid Inventory, which was defined as Inventory paid for by Sellers prior to the Closing Date

but as to which Sellers had not taken title or delivery as of the Closing Date.

106.    The Parties' agreement was reflected in Section 2.1(d) of the APA with respect to

Acquired Assets as well as Section 2.1(x), which gave Transform the right to receive the "Pending

Inventory" (defined to include the Ordered Inventory and the Prepaid Inventory), and Section

2.3(k) of the APA with respect to the Assumption of Liabilities.

107.    Under Section 2.1(d) of the APA, Sellers agreed to sell and transfer and Buyers

agreed to buy all Acquired Inventory, including Ordered Inventory, which was defined in Schedule

1.1(f) to have a value of $166 million.  Under Section 2.1(x), Transform received the right to

receive the Pending Inventory.

108.    Under Section 2.3(k) of the APA, Transform agreed to assume "Other Payables and

all payment obligations with respect to the Ordered Inventory" up to a cap of $166 million "in the

aggregate."

109.    The dispute between the Parties centers on whether—as Transform claims—the

language "with respect to the Ordered Inventory" modifies both "Other Payables" and "all

payment obligations" or whether—as Defendants claim—it modifies only "all payment

obligations" and that there is nothing that modifies "Other Payables."  At the Sale Hearing, before either Party had briefed the issue, the Court preliminarily observed that Defendants' interpretation appeared to have some merit, but that "[g]iven the procedural context of this matter, [the Court could] not conclude that issue, those two different interpretations, dispositively."  Hr'g Tr. 241:11-14, Feb. 7, 2019.  Under prevailing Second Circuit law, a decision on contract interpretation in the context of a summary proceeding is "[i]n no way . . . a formal ruling on the underlying disputed issues, and thus will receive no collateral estoppel effect."  *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993).

110.     Recognizing the Court's preliminary observation, Transform nonetheless respectfully submits that a full study of all the relevant language (not presented to the Court at the Sale Hearing) demonstrates that the language "with respect to the Ordered Inventory" modifies both "Other Payables" and "all payment obligations" and that Transform assumed a single liability to assume payables and payment obligations with respect to the Ordered Inventory.  That conclusion follows from the language of all the relevant provisions of the APA, read both in isolation and importantly together as an integrated whole.  To the extent there is ambiguity, it is also reflected in the drafting history and purpose of those provisions.

111.     Section 2.3 contains a long list of liabilities to be assumed by Transform.  Those liabilities are separated by commas or semi-colons and divided into various subsections until the penultimate and ultimate liability, which are separated by the word "and."   The relevant Section here, Section 2.3(k), is in the middle of that list.

112.     Thus, Section 2.3 begins with Section 2.3(a), which provides that Transform will assume "all Liabilities of the Seller or any of its Subsidiaries arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets on or after the Closing Date

that are Related to any Acquired Asset," continues on with other sections such as Sections 2.3(d), which provides that Transform will assume "Buyer's obligation to pay the Buyer Occupancy Costs," and Section 2.3(l), which provides that Transform will assume the "Assumed Property Tax Liabilities," and ends with Section 2.3(q), which pertains to any Backstopped Letter of Credit. Each of those subsections or the liabilities reflected in them is separated by a comma or semi-colon, except for liabilities under mechanics' liens (Section 2.3(p)) and any Backstopped Letter of Credit (Section 2.3(q)), which are separated by an "and."

113.    Section 2.3(k) is in the middle of that long list.  Its first sentence lists the sets of liabilities Transform will assume: "the Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, Other Payables and all payment obligations with respect to the Ordered Inventory."  In context, then, Section 2.3(k) refers to three sets of liabilities and not four:

a.    "the Severance Reimbursement Obligations,"

b.    "Assumed 503(b)(9) Liabilities," and

c.    "Other Payables and all payment obligations with respect to the Ordered Inventory."

114.    Under the rule of the last clear antecedent, "with respect to the Ordered Inventory" modifies both "Other Payables" and "all payment obligations."  Indeed, had the Parties intended "with respect to the Ordered Inventory" to modify only payment obligations, the parties would have put a comma between "Other Payables" and "all payment obligations" to separate the two.[28]

115.    That understanding is consistent with the intent of the Parties.  Payables and payment obligations represent distinct liabilities with respect to Ordered Inventory.  A "payable"

---

[28]    *Cf.* APA art. I ("'Citi Card Agreement' shall mean the . . . Restated Program Agreement . . . by and among [Sears], Sears Brands Business Unit Corporation, the Other Sears Parties, and Citibank, N.A."); *id.* § 8.3(d) ("Buyer shall . . . obtain all Consents required to permit the satisfaction of the conditions in Section 10.4, Section 10.5, Section 11.3, and Section 11.4").

with respect to Ordered Inventory represents a liability that was owed by Sellers at the time of

Closing (*i.e.*, inventory that was not paid for by Sellers but as to which Sellers had a current

obligation upon ordering).  A payment obligation, by contrast, refers to a future obligation to pay

upon delivery.  The Parties intended for Transform to assume both payables (those amounts that

were due at the time of Closing) and those amounts that would become due only upon delivery as

long as they fell below the specified contractual cap.

116.    That understanding is also supported by the use of the word "Other" to modify

"Payables."   That word, in common English, is used to "designat[e] the remaining one of two or

more" or of "a different character or quality."[29]  Its usage would make sense if "Other Payables"

was the third and last of the liabilities listed in Section 2.3(k) and was modified by "with respect

to the Ordered Inventory."  It would indicate that the "Other Payables" were payables related to

inventory but distinct from those payables that were Assumed 503(b)(9) Liabilities.  Whereas by

agreeing to assume 503(b)(9) liabilities Transform was agreeing to assume liabilities with respect

to "goods received by the debtor within 20 days" before the petition date, 11 U.S.C. 503(b)(9),

under the "Other Payables" clause, Transform was agreeing to assume liabilities (both current and

future) with respect to inventory that was ordered by Defendants but had not yet been received.  It

makes no sense if "Other Payables" is only in the middle of the list of liabilities in Section 2.3(k)

and does not have any modifier.  What are these payables "other" than if not to the Assumed

503(b)(9) Liabilities in the sense that they both relate to inventory?[30]

---

[29]    *Other*, The American Heritage Dictionary 880 (2d ed. 1976).

[30]    *See, e.g.*, APA §§ 2.1(f), 2.1(g), 2.1(o), 2.1(q), 2.2(f), 2.3(e), 2.4(c), 2.4(m), 2.5, 2.7(d); *see also* APA § 1.1 (definitions of of "acquired inventory," "action," "assigned agreements," "assignee," "assumed customer credits," "avoidance actions," "books and records," "confidential information," "consent," "contract," "improvements," "inventory value," "labeling and marketing materials," "lien," "person," "representative," "tax," and "tax return").

117.    Moreover, Transform's interpretation is further reinforced by examining not just the first sentence of Section 2.3(k)—as Defendants would want to—but by looking at the Section as a whole as the Court is required to do.  The full Section 2.3(k) reads as follows:

[T]he Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, Other Payables and all payment obligations with respect to the Ordered Inventory; provided, that:

(i) Buyer shall not be required to make any payments with respect to the Other Payables until the later of (1) the Closing Date and (2) the date that the applicable obligation thereunder becomes due in the Ordinary Course of Business;

(ii) Buyer shall not be required to make any payments with respect to Assumed 503(b)(9) Liabilities until the earlier of (1) the date that is 120 days following the Closing Date and (2) the date on which a chapter 11 plan of reorganization is confirmed by the Bankruptcy Court with respect to the Debtors;

(iii) Buyer's obligations with respect to the Severance Reimbursement Obligations shall not exceed $43,000,000 in the aggregate, and notwithstanding Section 2.3(k)(i), the timing of such reimbursement shall be made in accordance with Section 9.7(i);

(iv) Buyer's obligations with respect to the Assumed 503(b)(9) Claims shall not exceed $139,000,000 in the aggregate;

(v) Buyer's obligations with respect to the Other Payables shall not exceed $166,000,000 in the aggregate;

(vi) In the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP Shortfall Amount: first, the Severance Reimbursement Obligations, second, the Other Payables and third, the Assumed 503(b)(9) Claims.  The allocation of any reduction determined in accordance with the previous sentence of (A) the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims and (B) the amount of the Other Payables among any specific Other Payables shall be determined by Buyer in its sole discretion;

(vii) In the event that the Specified Receivables Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Specified Receivables Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Specified Receivables Shortfall Amount: first, the Severance Reimbursement Obligations and second, the Assumed 503(b)(9) Claims.  The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion;

(viii) In the event that the Warranty Receivables Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Warranty Receivables Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Warranty Receivables Shortfall Amount: first, the Severance Reimbursement Obligations and second, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion;

(ix) In the event that the Prepaid Inventory Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Prepaid Inventory Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Prepaid Inventory Shortfall Amount: first, the Severance Reimbursement Obligations and second, the Assumed 503(b)(9) Claims. The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion; and

(x) Notwithstanding anything to the contrary herein or in the Approval Order, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Specified Payables, or any other administrative or priority claim of the Sellers pursuant to the terms hereof is a general unsecured contractual obligation of the Buyer owed solely to the Sellers.

118.    Section 2.3(k) is distinctive, among all the provisions with respect to assumed liabilities contained in Section 2.3, in that it lists separate items all qualified by the same set of provisos that follow the first sentence. Note that the list of liabilities is followed by the language "provided, that:" and then contains ten separate provisos. Those provisos demonstrate that the first sentence of Section 2.3 and the Section as a whole refers only to three liabilities—corresponding to the first words of each of Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, and Other Payables and payment obligations with respect to Ordered Inventory (which sometimes went by the shorthand "Other Payables")—and not four. Indeed, had the parties intended Other Payables and "payment obligations" to describe two separate free-

standing items with only "payment obligations" to be modified by "Ordered Inventory," they would not have included "payment obligations" in Section 2.3(k) at all.

119.    Thus, for example, the first three clauses of Section 2.3(k) set forth the dates by which Transform must make payments in respect of the Liabilities described in Section 2.3(k).  It lists three liabilities with Other Payables as a shorthand for payables and payment obligations with respect to Ordered Inventory, and not four. The timing of Severance Reimbursement Obligations "shall be made in accordance with Section 9.7(i)."[31]  Buyer is not required to make "any payments with respect to Assumed 503(b)(9) Liabilities" until the earlier of 120 days after the Closing Date or confirmation date, whichever is earlier.  Payments "with respect to the Other Payables" are not due until the later of the Closing Date or the date "the applicable obligation thereunder becomes due in the Ordinary Course."  In context, the reference to "Other Payables" plainly picks up both "Payables" with respect to Ordered Inventory and payment obligations with respect to Ordered Inventory.  Otherwise, the parties would have left completely undefined Buyer's payment obligations with respect to the "payment obligations" in violation of all rules of contract interpretation.

120.    The following subsections of Section 2.3(k)—Sections 2.3(k)(iii), (iv), and (v)— each contain specific monetary caps limiting Transform's liability for the items listed in the opening section of 2.3(k).  Each of the Severance Reimbursement Obligations, the Assumed 503(b)(9) Claims, and a category called "Other Payables" is listed.  There is no separate category for "payment obligations" because "payment obligations" was not an independent liability.  The cap is one for payables and payment obligations with respect to the Ordered Inventory.

---

[31]    APA § 2.3(k)(iii).

121.    Finally, and importantly, one of the most important reasons that the liabilities in Section 2.3(k) are grouped together, and are not listed separately in separate subsections, is that they are each modified by the provisos relating to the reduction of those liabilities accounting to possible shortfalls in the delivery of assets Defendants were required to deliver under the APA. Notably, "payment obligations" is not identified as a standalone item that can be reduced by a shortfall in Defendants' satisfaction of their obligations under the APA as one would expect if it were an independent obligation that alone was modified by "with respect to the Ordered Inventory." Rather, it is grouped together with "Other Payables" because Transform agreed to assume only a single liability of payables and payment obligations with respect to the Ordered Inventory.

122.    Section 2.3(k)(vi) makes the point. That subsection describes the order in which "the Liabilities described in this clause (k)" can be reduced if the Aggregate DIP Shortfall Amount is a positive number. The order is that the Severance Reimbursement Obligations are first reduced, then "the Other Payables," and finally the Assumed 503(b)(9) Claims. The use of the definitive article "the" (before "Liabilities described") denotes that the subsection includes all of the liabilities described in clause (k), and not just some of them. It thus demonstrates that all of the words in the last clause of the first sentence of Section 2.3(k) beginning with "Other Payables" were identified to describe a single obligation and that it is that entire antecedent that is modified by "Ordered Inventory."

123.    Lastly, as amended, Section 2.3(k)(x) states that Buyer's agreement to pay Assumed 503(b)(9) Claims, Other Payables, or any other administrative or priority claim of Sellers is a contractual obligation owed solely to the Sellers. It again makes no reference to "all payment obligations."

39

124.    Other sections of the APA are consistent with this interpretation.  Section 2.4 lists "Excluded Liabilities," *i.e.* liabilities that Transform has not assumed.  Subsection 2.4(q) describes "the liabilities assumed in accordance with . . . 2.3(k)" as three and excludes them from the Excluded Liabilities:  "(Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities *and* Other Payables and the payment obligations with respect to the Ordered Inventory)" (emphasis added).  The use of the word "and" here makes clear the "with respect to the Ordered Inventory" as used in Section 2.3(k) modified the full clause "Other Payables and the payment obligations."  The only reason "and" was not used in Section 2.3(k) is because that subsection falls in the middle of a long list of liabilities where it would only be appropriate to use "and" to separate the last and second-to-last liability.

125.    It is no coincidence that the schedules reflecting Other Payables and Ordered Inventory both reflect values of approximately $166 million—they did and were intended to parallel one another, as Transform assumed $166 million in Other Payables as the payment obligation corresponding to $166.5 million in Ordered Inventory that would be delivered after Closing.  The APA provides that "Other Payables" shall mean the accounts payable set forth on Schedule 1.1(g) and Schedule 1.1(g) in turn refers to Annex 9, which is a one-row table listing $166 million in "Assumed Accounts Payable."  Ordered Inventory (an asset Transform is acquiring and not an obligation it is assuming) is defined under the APA as "Inventory (other than Prepaid Inventory) of the type set forth on Schedule 1.1(f) that has been ordered by [the Defendants] prior to the Closing Date but as to which [the Defendants] have not taken title or delivery prior to the Closing Date."  Schedule 1.1(f) of the APA is a three-row spreadsheet that shows how the Defendants arrived at approximately $166.5 million in Ordered Inventory.

126.    Finally, if there were ambiguity, the APA negotiations reflect the Parties' unambiguous intentions to tie together the concepts of Other Payables and payment obligations on the one hand and Ordered Inventory on the other.  That evidence would demonstrate that Transform agreed to assume the payables and payment obligations that Defendants were incurring in respect of inventory that was ordered but not yet delivered in exchange for the delivery of that Ordered Inventory.  No other Payables were discussed or agreed upon.

127.    Correspondence between representatives of Transform and Defendants clearly shows that $166 million in Other Payables was assumed solely in respect of Ordered Inventory. For example, on January 5, 2019, Cullen Murphy of Moelis & Co. ("Moelis")—Transform's financial advisor—asked  Defendants' representatives—M-III Partners ("M-III")—whether "the A/P associated with new goods ordered will be what we are actually assuming."  Christopher Good of M-III answered, "100% -- yes."

128.    This understanding was then memorialized in the January 9 Bid Letter where Transform offered to assume, in item 1.a, "[u]p to $166 million of payment obligations with respect to goods ordered by [Defendants] prior to the closing of the proposed transactions (but as to which goods Defendants have not yet taken delivery and title prior to closing)," *i.e.* "Ordered Inventory," in exchange for acquiring "[a]dditional inventory with a book value of up to $166 million with respect to which Buyer shall assume payment obligations as described in item 1.a. above (and as to which inventory [Defendants] have not yet taken delivery and title prior to closing)."  The language made clear that $166 million in assumed Other Payables was solely in consideration for $166 million in Ordered Inventory.

129.    The Defendants have failed to honor the proper meaning of Section 2.3(k).  They have declared that Transform bears the obligation to pay up to $166 million of payables owed by

the estates that is unrelated to Ordered Inventory and have repudiated Defendants' obligation to satisfy those payables.  As a result, and in order to continue in business, and under protest, Transform has been obligated to satisfy over $128 million of payables outstanding at Closing unrelated to Ordered Inventory.

130.    As a result, Transform has been compelled to shoulder payment obligations that under the APA and Sale Order should have been borne by the Defendants.

131.    In addition, absent a judicial declaration as to the meaning of Section 2.3(k), Transform will be faced with future demands to pay payables that are properly the obligation of the estates.

**2.     The Defendants Breached Their Obligations to Make Timely Payments and to Operate in the Ordinary Course.**

132.    Even if Transform had assumed the obligation to pay up to $166 million in accounts payable unrelated to Ordered Inventory (it did not), the Defendants fundamentally altered the terms of that agreement by greatly inflating the amount of accounts payable at the Closing through actions taken outside of the Ordinary Course of Business, in violation of the APA.

133.    As Closing approached, the Defendants significantly reduced their payments to vendors and purchase of inventory in order to meet their Closing obligations under the APA.  In so doing, the Defendants engaged in a course of conduct that breached their contractual obligation to make payments and manage inventory in the Ordinary Course pursuant to Sections 8.1 and 8.6 of the APA.

134.    Section 8.1(a) of the APA requires that "from the date hereof and prior to the Closing, . . . Sellers covenant and agree to . . . use commercially reasonable efforts to conduct their business in the Ordinary Course . . . , including . . . (C) managing Inventory in the Ordinary Course of Business."  The only qualification was that "Sellers shall be permitted to reasonably manage

the amount of Inventory in consultation with Buyer in order to satisfy the condition [with respect to collateral and DIP]."

135.    Section 8.6 of the APA requires that "[t]he Sellers shall make all payments in respect of payables of the Business (including rent payments and sales taxes) arising from the date of this Agreement until the Closing Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business."

136.    Section 1.1 defines Ordinary Course of Business as "the operation of the Business in the ordinary and usual course consistent with past practice as well as (and subject to) the Filing and all Orders entered in connection therewith."

137.    Given the clear language of the APA, the Defendants were obligated both to make payments on a timely basis and to act in the Ordinary Course by purchasing inventory and making payments as they normally would in the Ordinary Course.  Indeed, it was crucial for a successful sale that the Defendants make payments on a timely basis and operate in the Ordinary Course before Closing.  Leading up to the auction, Transform and its professionals worked to formulate a business model and liquidity analyses that ensured a viable going-concern emerged from the sales process.  The projections in these plans necessarily relied on figures from the Defendants' operations in the Ordinary Course and on the Defendants' representations that they would continue operating in the Ordinary Course prior to Closing and continue to make payments on a timely basis.  Defendants were well aware of Transform's models; the viability of the business plan was a critical aspect in the Defendants' decision to ultimately accept Transform's bid.  Given how critical the period after signing would be to the success of the company, Transform worked

immediately after signing to put its business plans in motion, again relying on the assumption that the Defendants continued to operate in the Ordinary Course as bargained for.

138.    Through January 2019, Defendants did in fact pay vendors on a timely basis and in the Ordinary Course.  For example, at the beginning of January, Defendants projected that their vendor payments for the month would be $468.4 million.  In fact, Defendants spent $467.1 million on vendor payments in January—a difference of less than 0.3% from their projections.  However, Defendants' conduct changed dramatically after signing, and as Closing neared.  On February 1, 2019, Defendants projected that their vendor payments for the first full week of February (from February 4, 2019 to February 8, 2019) would be $158.2 million.  Then Defendants suddenly and intentionally stopped paying millions of dollars of projected payments:  Defendants spent only $56.5 million on vendor payments in the first full week of February—more than $100 million (or 65%) below their projections from only a few days earlier.  In that same period, outstanding accounts payable rose dramatically from $83.4 million on February 1, 2019 to $150.6 million on February 8.

139.    The Defendants' conduct was intentional.  They failed to make timely payments. Emails from the Defendants' employees from February 4 to 6, 2019 expressly state that they "are delaying certain payments contractually due on Feb 5th, Feb 6th, Feb 7th, by 3 business days."[32] An email from February 8, 2019, the Friday before Closing, was even more explicit, stating that "[i]n order to maintain $850 1L outstanding balance, certain payments contractually due this week have been delayed until next week."[33]  The "$850 1L outstanding balance" refers to the Defendants' Closing obligation under Section 10.10 of the APA to ensure that the "aggregate

---

[32]      *See* Lynch Decl., Ex. A (Letter from Cleary Gottlieb to Weil, dated February 25, 2019), p. 11.

[33]      *Id.*, p. 32.

amount required to be paid to fully satisfy the existing indebtedness of Sellers under . . . the DIP Credit Agreement shall be no greater than $850,000,000." Thus, the Defendants were withholding payments not for any business reason, but simply to ensure that they did not have to make payments and that, as a result, the balance under the DIP Credit Agreement would not exceed $850,000,000. In a March 6, 2019 letter to Transform, Defendants conceded that they "agree with Buyer that Sellers were required under the APA to manage the accounts payable of the business in accordance with Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business."[34]

140.    The Defendants' failure to make payments to vendors and for inventory is a clear breach of their obligations under the APA to make payments on a timely basis and to operate the business in the Ordinary Course.    That is true even if the Defendants were correct in their misinterpretation of the APA that Other Payables are distinct from Ordered Inventory.    Under basic contract principles, the Ordinary Course covenants in Sections 8.1 and 8.6 of the APA complement the Other Payables obligation.    Even under Defendants' interpretation of the APA, Transform would have agreed to satisfy up to $166 million in payables *incurred in the Ordinary Course*. Nothing in Section 2.3(k) gave the Defendants license to artificially delay payment on obligations that had come due in the Ordinary Course in order to artificially decrease the balance under the DIP Credit Agreement, thereby artificially increasing the amount of payables that Transform would need to satisfy, even assuming that the Defendants were correct in their interpretation of Section 2.3(k).

141.    Transform is therefore entitled to declaratory judgment finding that any obligation to assume accounts payable is limited to those accounts payable incurred in the Ordinary Course,

---

[34]    *See* Lynch Decl., Ex. D (Letter from Weil to Cleary Gottlieb, dated March 6) at 5.

and to the extent that Transform has already paid beyond that limit, damages in an amount representing the amount of accounts payable Transform was forced to assume as a result of Defendants' failure to make timely payments and conduct outside the Ordinary Course.  Transform has demanded that Defendants recognize Transform's rights in this regard, but they have declined.

### 3.    Transform's Obligations (If Any) Are Reduced by Available Cash.

142.    Section 2.3(k)(vi) provides that, "[i]n the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP Shortfall Amount: *first*, the Severance Reimbursement Obligations, *second*, the Other Payables and *third*, the Assumed 503(b)(9) Claims."  The Aggregate DIP Shortfall Amount means "as of the Closing Date, an amount equal to $1,200,000,000 less the aggregate amounts required to be paid (net of any available cash) to fully satisfy  the existing indebtedness of Seller under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement."

143.    At Closing, Defendants had available cash of approximately $19.6 million.  This includes cash and checks that had been collected at Defendants' retail locations prior to Closing but that remained in transit to Defendants' main operating bank accounts at Bank of America as of the Closing (*e.g.*, because the cash and checks were still held in the retail locations, or were in armored vehicles bringing the cash and checks to the local banks used by the retail locations).  Based on reconciliation work performed by Transform's advisors, Defendants had over $22.5 million in cash-in-transit as of Closing.  In addition, upon information and belief, the Defendants held an additional $12 million in cash at regional banks that had yet to be wired to their principal operating accounts with Bank of America.

144.    Both the cash-in-transit and the amounts held in regional banks were "available cash" as of Closing.   In particular, guidance by the American Institute of Certified Public Accountants specifically provides that cash-in-transit should be treated as available cash.

Inquiry — Should the amount of checks that have been issued and are out of the control of the payor but which have not cleared the bank by the balance sheet date be reported as a reduction of cash?

Reply — Yes. A check is out of the payor's control after it has been mailed or delivered to the payee. **The balance sheet caption "cash" should represent an amount that is within the control of the reporting enterprise, namely, the amount of cash in banks plus the amount of cash and checks on hand and deposits in transit minus the amount of outstanding checks.** Cash is misrepresented if outstanding checks are classified as liabilities rather than a reduction of cash.[35]

145.    Prior to Closing, the Estate issued approximately $14.9 million in checks that did not clear as of the Closing date.  Approximately $12.5 million of these checks have cleared since Closing and have been paid by Transform.   Another $2.3 million are currently outstanding and will be paid by Transform to the extent they clear.

146.    Accordingly, the Defendants had available cash of at least $19.6 million as of Closing, representing the $34.5 million in cash-in-transit and cash held at regional banks, as reduced by the total amount of Estate-issued checks which had yet to clear as of the Closing date. Because the DIP and Junior DIP balances approximated $1.2 billion, the Aggregate DIP Shortfall Amount is at least $19.6 million.  Transform's obligations, if any, to assume Other Payables is reduced by at least that amount pursuant to Section 2.3(k)(vi).

147.    Transform has demanded that the Defendants recognize this reduction, but they have declined.  Transform is therefore entitled to declaratory judgment finding that any obligation to assume accounts payable is reduced by at least $19.6 million, and to the extent that Transform

---

[35]    AICPA Technical Practice Aids, TIS Section 1100.08 (emphasis added).

has already paid beyond that limit, damages in the amount representing the amount of accounts payable that it was forced to assume as a result of the Defendants' refusing to recognize this limitation.

## GROUNDS FOR RELIEF

### COUNT ONE
(Declaratory Judgment)

148.    Transform repeats and realleges each of the allegations asserted in paragraphs 1 through 147 above, as though fully set forth herein.

149.    This Court should declare that the Defendants delivered to Transform less of certain assets than required by the APA and that Transform is entitled to a reduction of liabilities in an amount corresponding with that shortfall pursuant to Section 2.3(k) of the APA.

150.    Pursuant to Section 2.3(k)(ix) of the APA, "[i]n the event that the Prepaid Inventory Shortfall Amount is a positive number, [Transform's] obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Prepaid Inventory Shortfall Amount . . . ."

151.    The Prepaid Inventory Shortfall amount is defined in the APA to mean "an amount equal to $147,000,000 less the amount of the Prepaid Inventory as of the Closing Date . . . ."  As detailed above, the estimated Prepaid Inventory on order at Closing was approximately $75 million, resulting in a Prepaid Inventory Shortfall Amount of at least $72 million.

152.    Pursuant to Section 2.3(k)(vii) of the APA, "[i]in the event that the Specified Receivables Shortfall Amount is a positive number, [Transform's] obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Specified Receivables Shortfall Amount . . . ."

153.    The Specified Receivables Shortfall Amount is defined in the APA to mean "an amount equal to $255,200,000 less the amount of the Specified Receivables delivered to [Transform] at Closing."  As detailed above, a substantial portion of the purported Specified Receivables delivered to Transform consists of over-deliveries of certain categories of receivables masking under-deliveries of others, as well as items that are not actually receivables.  In sum, the amount of Specified Receivables actually delivered by Defendants is estimated to be short by well in excess of an amount that, when added to the Prepaid Inventory Shortfall Amount, would reduce Transform's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Liabilities to $0.00.  Pursuant to Section 2.3(k)(vii), Transform is entitled to a declaration from this Court to that effect.

154.    Absent an order of this Court, Transform will be denied the benefit of its bargain to receive a reduction in the liabilities it assumed owing to the true amount of the Prepaid Inventory Shortfall Amount and the Specified Receivables Shortfall Amount.

155.    Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Transform is entitled to a judgment declaring that the Prepaid Inventory Shortfall Amount is $72 million and that when added to that amount, the Specified Receivables Shortfall Amount is an amount well in excess of the amount needed to reduce Transform's obligations to satisfy the Severance Reimbursement Obligations and the Assumed 503(b)(9) Liabilities to $0.00, in accordance with APA Section 2.3(k).

## COUNT TWO
(Declaratory Judgement)

156.    Transform repeats and realleges each and every allegation contained in paragraphs 1 through 155 of this Complaint, as though fully set forth herein.

157.    This Court should declare that Transform has purchased the portion of the Adequate Assurance Deposit relating to assets acquired by Transform under the APA.

158.    Section 2.1(o) of the APA provides that Transform has acquired "any and all rights of Sellers in and to any . . . security deposits, . . . escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit [and] utility deposits . . . to the extent related to [an] Acquired Asset."

159.    The Adequate Assurance Deposit is a Security Deposit as defined by the APA.

160.    The Adequate Assurance Deposit "relate[s] to any Acquired Asset" to the extent that it relates to properties purchased by Transform under the APA.

161.    The Defendants have purported to retain the right of the return of the Adequate Assurance Deposit in full.

162.    Absent an order of this Court, Transform will be denied the benefit of its bargain to receive all Security Deposits related to an Acquired Asset, including the portion of the Adequate Assurance Deposit relating to Acquired Assets under the APA.

163.    Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Transform is entitled to declaratory judgment finding that is has purchased the portion of the Adequate Assurance Deposit relating to Acquired Assets under the APA.

## COUNT THREE
(Specific Performance)

164.    Transform repeats and realleges each and every allegation contained in paragraphs 1 through 163 of this Complaint, as though fully set forth herein.

165.    Defendants and Transform entered into the APA as of January 17, 2019.  The APA is a valid, binding, and enforceable agreement between Defendants and Transform.

166.    Pursuant to Section 2.1 of the APA, on the Closing Date, the Defendants were obligated to "sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered . . . (c) all Owned Real Property" of Defendants to Transform on the Closing Date.  Transform had a reciprocal obligation under Section 2.1(c) to "purchase, all right, title and interest of [Defendants] in, to or under" the "Owned Real Property" of Defendants on the Closing Date.

167.    The real property known as Hoffman Estates falls within the category of Owned Real Property that the Defendants were required to sell, and Transform was required to purchase, on the Closing Date.

168.    Transform has performed its obligations under Section 2.1(c) of the APA, thereby acquiring title to each parcel to which the Defendants held title at Hoffman Estates at the Closing.

169.    However, the Defendants have breached their contractual obligations to deliver the deeds to all of the parcels that comprise the real property known as Hoffman Estates.  Instead, the Defendants have delivered deeds to only a subset of the relevant parcels at Hoffman Estates.

170.    The Defendants' breach of Section 2.1(c) of the APA has caused Transform irreparable injury and damages are difficult to calculate based on the Defendants' failure to deliver full title.

171.    Specific performance is the only adequate remedy for the Defendants' refusal to comply with their obligations to transfer title to all of the parcels at Hoffman Estates.

172.    Transform has a contractual remedy to specific performance pursuant to Section 13.14 of the APA.  Pursuant to the plain terms of the APA, there is no adequate remedy at law for the Defendants' breach of Section 2.1(c) of the APA.

173.    Accordingly, Transform seeks an order of specific performance requiring the Defendants to transfer title to each parcel that has not been previously transferred to Transform for the property known as Hoffman Estates pursuant to the terms of the APA.

## COUNT FOUR
(Breach of Contract)

174.    Transform repeats and realleges each and every allegation contained in paragraphs 1 through 173 of this Complaint, as though fully set forth herein.

175.    Defendants and Transform entered into the APA as of January 17, 2019.  The APA is a valid, binding, and enforceable agreement between Defendants and Transform.

176.    Defendants' actions have breached various provisions of the APA, including but not limited to Section 2.1(p).

177.    Pursuant to Section 2.1(p), Transform acquired "any and all Actions or Claims . . . of Sellers as of the Closing" against "parties to other commercial relationships of the Business."

178.    On May 6, 2019, the Court ordered the Village to disburse $2,508,660.33 in EDA Funds to the Defendants based on an Action or Claim against the Village.

179.    In refusing to turn over the $2,508,660.33 in EDA Funds, which were acquired by Transform under the APA, the Defendants have breached the terms of the APA.

180.     Transform is therefore entitled to damages in an amount equal to $2,508,660.33.

## COUNT FIVE
(Declaratory Judgment)

181.    Transform repeats and realleges each and every allegation asserted in paragraphs 1 through 180 above, as though fully set forth herein.

182.    This Court should declare that Transform has only assumed liability for the mechanics' liens specifically enumerated in the APA, and has assumed liability for no other mechanics' liens.

183.    Section 2.3(p) of the APA requires Transform to assume liability for the 36 mechanics' liens specifically identified in Section 2 of Schedule 6.5.

184.    Under Section 2.4 of the APA, all liabilities of the Defendants not assumed by Transform were to remain with the Defendants.

185.    Absent an order of this Court, Transform will be denied the benefit of its bargain.

186.    Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Transform is entitled to a judgment declaring that it only assumed liability for the mechanics' liens in Section 2 of Schedule 6.5 and that it did not assume liability for any other mechanics' liens.

### COUNT SIX
(Declaratory Judgment)

187.    Transform repeats and realleges each and every allegation contained in paragraphs 1 through 186 of this Complaint, as though fully set forth herein.

188.    This Court should declare that Transform has only assumed Other Payables with respect to Ordered Inventory.

189.    Section 2.3(k) of the APA requires Transform to assume, *inter alia*, "Other Payables and all payment obligations with respect to the Ordered Inventory."

190.    The plain language, structure of the APA, and intent of the Parties as illustrated over the course of their negotiations confirm that under Section 2.3(k), Transform assumed Other Payables solely with respect to Ordered Inventory.

191.    No clause in the APA requires Transform to assume Other Payables other than for Ordered Inventory.

192.    Under Section 2.4 of the APA, all liabilities of the Defendants not assumed by Transform were to remain with Defendants.

193.    Absent an order of this Court, Transform will be denied the benefit of its bargain to assume Other Payables solely with respect to Ordered Inventory.

194.    Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Transform is entitled to a judgment declaring that it only assumed Other Payables with respect to Ordered Inventory and that it is not required to pay other accounts payable not expressly assumed under the APA.

## COUNT SEVEN
### (Breach of Contract)

195.    Transform repeats and realleges each and every allegation contained in paragraphs 1 through 194 of this Complaint, as though fully set forth herein.

196.    Defendants and Transform entered into the APA as of January 17, 2019.  The APA is a valid, binding, and enforceable agreement between the Defendants and Transform.

197.    Defendants' actions have breached various provisions of the APA, including but not limited to Section 2.4.

198.    Pursuant to Section 2.4 of the APA, Defendants agreed that Transform shall not be "deemed to assume or become obligated hereunder in any way to pay or perform . . . Liabilities of the Sellers . . . Other than the Assumed Liabilities."

199.    Transform was not required to assume liabilities with respect to Other Payables beyond those incurred in connection with the Ordered Inventory.

200.    The Defendants materially breached the APA by failing to take ownership of payables not assumed by Transform under the contract.  As a result, Transform has been compelled

to shoulder payables that under the APA should have been borne by the Defendants in order to avoid further harm to its vendors and to Transform's business.

201.    Since Closing, Transform has paid over $128 million to satisfy payables unrelated to Ordered Inventory that were unsatisfied as of the Closing Date that should have been borne by the Defendants.

202.    Transform is therefore entitled to damages in the amount of $128 million.

## COUNT EIGHT
(Breach of Contract)

203.    Transform repeats and realleges each and every allegation contained in paragraphs 1 through 202 of this Complaint, as though fully set forth herein.

204.    Defendants and Transform entered into the APA as of January 17, 2019.  The APA is a valid, binding, and enforceable agreement between Defendants and Transform.

205.    Defendants' actions have breached various provisions of the APA, including but not limited to Sections 8.1(a) and 8.6.

206.    Section 8.1(a) of the APA requires that "from the date hereof and prior to the Closing, . . . Sellers covenant and agree to . . . use commercially reasonable efforts to conduct their business in the Ordinary Course . . . , including . . . (C) managing Inventory in the Ordinary Course of Business."

207.    Pursuant to Section 8.6, Defendants were to "make all payments in respect of payables of the Business . . . arising from the date of this Agreement until the Closing Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business in . . . the Ordinary Course of Business."

208.    As Closing approached, Defendants significantly reduced their payments to vendors and purchase of inventory in order to meet their Closing obligations under the APA.

209.    This in turn greatly increased the amount of outstanding accounts payable at the Closing, which Transform was then forced to assume to preserve its vendor relations.

210.    A significant portion of accounts payable assumed by Transform at the Closing existed as a result of Defendants' breach of their covenants to make timely payments and to act in the Ordinary Course.

211.    Defendants' breach likewise caused a significant decrease in Prepaid Inventory that Transform was to acquire under the APA.  This shortfall created immediate damage to Transform. Transform has been deprived of assets—and the benefits of those assets—that it contracted to purchase under the APA including the profits from that inventory.  Transform has also been compelled to assume additional debt and associated interest expense in part to purchase additional inventory.  Moreover, the Defendants' failure to pay vendors on a timely basis and in the Ordinary Course harmed Transform's relations with these vendors.

212.    Transform is therefore entitled to damages in an amount of to be determined at trial.

## COUNT NINE
(Declaratory Judgment)

213.    Transform repeats and realleges each and every allegation contained in paragraphs 1 through 212 of this Complaint, as though fully set forth herein.

214.    This Court should declare that any obligation Transform has to assume accounts payable shall be limited to the amount of accounts payable incurred in the Ordinary Course.

215.    Section 2.3(k) of the APA requires Transform to assume "Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, Other Payables and all payment obligations with respect to Ordered Inventory."

216.    Section 8.1(a) of the APA requires that "[f]rom the date hereof and prior to the Closing, . . . Sellers covenant and agree to . . . use commercially reasonable efforts to conduct their

business in the Ordinary Course . . . , including . . . (C) managing Inventory in the Ordinary Course of Business."

217.    Pursuant to Section 8.6, Defendants were to "make all payments in respect of payables of the Business . . . arising from the date of this Agreement until the Closing Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business in . . . the Ordinary Course of Business."

218.    As Closing approached, Defendants significantly reduced their payments to vendor and purchase of inventory in order to meet their Closing obligations under the APA.

219.    This in turn greatly increased the amount of outstanding accounts payable at the Closing.

220.    Absent an order of this Court, Transform will be denied the benefit of its bargain to only assume liabilities for accounts payable, if any, that were incurred in the Ordinary Course.

221.    Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Transform is entitled to declaratory judgment finding that its obligation to assume accounts payable, if any, is limited to the amount of accounts payable incurred in the Ordinary Course.

## COUNT TEN
(Unjust Enrichment)

222.    Transform repeats and realleges each and every allegation asserted in paragraphs 1 through 221 above, as though fully set forth herein.

223.    As a result of their conduct, Defendants have been unjustly enriched at Transform's expense.  Defendants unjustly enriched themselves, including by forcing Transform to assume payables not bargained for by (1) failing to acknowledge that Transform only assumed Other Payables with respect to Ordered inventory; or (2) in the alternative, by inflating the amount of accounts payable in existence at the Closing.  They thereby relieved themselves of claims that

would arise from those payables. Transform was then compelled to satisfy those payables, expending more than $128 million.

224. Transform has no adequate remedy at law.

225. As a matter of equity and good conscience, Defendants should not be permitted to retain these benefits they wrongfully obtained as a result of their inequitable conduct.

226. Therefore, Defendants are liable to Transform in an amount to be proved at trial, but in no event less than $128 million.

**COUNT ELEVEN**
(Breach of Implied Covenant of Good Faith and Fair Dealing)

227. Transform repeats and realleges each of the allegations set forth in paragraphs 1 through 226 of this Complaint, as though fully set forth herein.

228. In their dealings with Transform, Defendants breached the implied covenant of good faith and fair dealing by failing to retain and satisfy payables for which failure to pay would harm vendor relations vital to Transform's business.

229. Transform specifically negotiated that it would assume certain specific, enumerated liabilities with the understanding that the Defendants would assume other liabilities by making payments to their vendors and purchasing inventory in the Ordinary Course.

230. In the period leading up to Closing, the Defendants intentionally and outside the Ordinary Course deferred making certain payments and purchasing certain inventory. The Defendants abused the discretion conferred to them under the APA and acted unreasonably, requiring Transform to bear expenses post-Closing that should have been borne by the Defendants.

231. By failing to retain and satisfy these payables, the Defendants have deprived Transform of the benefit of its bargain and have subverted the APA. This failure constitutes a

breach of the implied covenant of good faith and fair dealing that inheres in the APA for which Transform is entitled to the award of damages.

232.    Transform has been damaged as a result of Defendants' breach in having to expend resources on obligations that should have been borne by Defendants, and seeks damages in an amount to be proved at trial, but in no event less than $128 million.

## COUNT TWELVE
### (Declaratory Judgment)

233.    Transform repeats and realleges each of the allegations set forth in paragraphs 1 through 232 of this Complaint, as though fully set forth herein.

234.    Under Section 2.3(k)(vi) of the APA, "[i]n the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP Shortfall Amount: *first*, the Severance Reimbursement Obligations, *second*, the Other Payables and *third*, the Assumed 503(b)(9) Claims."  The Aggregate DIP Shortfall Amount means "as of the Closing Date, an amount equal to $1,200,000,000 *less* the aggregate amounts required to be paid (net of any available cash) to full satisfy the existing indebtedness of Seller under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement."

235.    For the reasons alleged above, Transform's Severance Reimbursement Obligations have been reduced to zero.

236.    At Closing, the Defendants had available cash of at least $19.6 million.  Because the DIP and Junior DIP balances approximated $1.2 billion, the Aggregate DIP Shortfall Amount at Closing was at least $19.6 million.

237.    Accordingly, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Transform is entitled to declaratory judgment finding that Transform's obligation to assume Other Payables, if any, was reduced by at least $19.6 million due to the Aggregate DIP Shortfall Amount.

## COUNT THIRTEEN
(Breach of Contract)

238.    Transform repeats and realleges each of the allegations set forth in paragraphs 1 through 237 of this Complaint, as though fully set forth herein.

239.    Defendants and Transform entered into the APA as of January 17, 2019.  The APA is a valid, binding, and enforceable agreement between Defendants and Transform.

240.    Defendants' actions have breached various provisions of the APA, including but not limited to Section 2.4.

241.    Under Section 2.3(k)(vi), "[i]n the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP Shortfall Amount: *first*, the Severance Reimbursement Obligations, *second*, the Other Payables and *third*, the Assumed 503(b)(9) Claims."

242.    The Aggregate DIP Shortfall Amount means "as of the Closing Date, an amount equal to $1,200,000,000 *less* the aggregate amounts required to be paid (net of any available cash) to full satisfy the existing indebtedness of Seller under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement."

243.    Pursuant to Section 2.4 of the APA, Defendants agreed that Transform shall not be "deemed to assume or become obligated hereunder in any way to pay or perform . . . Liabilities of the Sellers . . . other than the Assumed Liabilities."

244.    The Defendants materially breached the APA by failing to reduce Other Payables by the Aggregate DIP Shortfall Amount, which equals at least $19.6 million.  As a result of this and other breaches of the APA, Transform has been compelled to satisfy payables not assumed by Transform under the APA that should have been borne by the Defendants in order to avoid further harm to its vendors and to Transform's business.

245.    Therefore, Defendants are liable to Transform in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Transform respectfully demands judgment against Defendants, jointly and severally, as follows:

(a)    Awarding Transform a judgment declaring that the Prepaid Inventory Shortfall Amount is $72 million and that when added to that amount, the Specified Receivables Shortfall Amount is an amount well in excess of the amount needed to reduce Transform's obligations to satisfy the Severance Reimbursement Obligations and the Assumed 503(b)(9) Liabilities to $0.00, in accordance with APA Section 2.3(k);

(b)    Awarding Transform a judgment declaring that it has purchased the Adequate Assurance Deposit to the extent relating to assets acquired by Transform under the APA;

(c)    Awarding Transform specific performance requiring the Defendants to transfer title to each parcel that has not been previously transferred to Transform for the property known as Hoffman Estates;

(d)    Awarding Transform a judgment declaring that Transform only assumed liability for the mechanics' liens in Section 2 of Schedule 6.5 of the APA, and that it did not assume liability for any other mechanics' liens;

(e)    Awarding Transform a judgment declaring that Transform only assumed Other Payables with respect to Ordered Inventory and that it is not required to pay other accounts payable

not expressly assumed under the APA;

(f)    Awarding Transform a judgment declaring its obligation to assume accounts payable, if any, is limited to accounts payable incurred in the Ordinary Course;

(g)    Awarding Transform a judgment declaring that Transform's obligation to assume Other Payables, if any, is decreased by at least $19.6 million due to the Aggregate DIP Shortfall Amount;

(h)    Awarding Transform compensatory damages in an amount to be determined at trial, but not less than $130 million;

(i)    Awarding Transform the legal fees and costs it has incurred in this action and otherwise enforcing its rights under the APA; and

(j)    Awarding Transform pre-judgement interest; and such other and further relief as this Court may deem just and proper.


Dated:  May 24, 2019            **CLEARY GOTTLIEB STEEN &**
      New York, New York        **HAMILTON LLP**

                                     */s/ Lewis J. Liman*
                                       Lewis J. Liman
                                       Sean A. O'Neal
                                       Luke A. Barefoot
                                       Abena A. Mainoo
                                       One Liberty Plaza
                                       New York, New York 10006
                                       Telephone:  (212) 225-2000
                                       Facsimile:  (212) 225-3999

                                       *Counsel for Transform Holdco LLC*