**Proposed Hearing Date and Time: July 11, 2019 at 10:00 AM (Eastern Time)**
**Proposed Objection Date and Time:  June 14, 2019 at 4:00 PM (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x
In re                                                 :
                                                      :          **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*,             :
                                                      :          **Case No. 18-23538 (RDD)**
                                                      :
Debtors.[1]                                           :          **(Jointly Administered)**
------------------------------------ x

## NOTICE OF THE DEBTORS' MOTION
## TO ESTIMATE CERTAIN 507(b) CLAIMS FOR RESERVE PURPOSES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com LLC (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that a hearing on the annexed motion ("**Motion**") of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**"), to estimate certain section 507(b) adequate protection claims in the maximum amount of zero dollars for reserve purposes, all as more fully described in the Motion, will be held before the Honorable Robert D. Drain, United States Bankruptcy Court Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 ("**Bankruptcy Court**"), on **July 11, 2019, at 10:00 a.m. (Eastern Time)** ("**Hearing**").

**PLEASE TAKE FURTHER NOTICE** that objections and responses ("**Objections**"), if any, to the Motion must be asserted in writing; conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York; set forth the name of the objecting party, the basis for the Objection, and the specific grounds thereof; be filed with the Bankruptcy Court in accordance with the terms set forth in the Motion; and be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405), so as to be so filed and received no later than **June 14, 2019, at 4:00 p.m. (Eastern Time)** ("**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if an Objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing and failure to appear may result in relief being granted or denied upon default.

WEIL:\97034450\13\73217.0004

Dated:  May 26, 2019

New York, New York

*/s/ Ray C. Schrock*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\97034450\13\73217.0004

**Proposed Hearing Date and Time:  July 11, 2019 at 10:00 AM (Eastern Time)**
**Proposed Objection Date and Time:  June 14, 2019 at 4:00 PM (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION, *et al*.,** | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

-------------------------------------------x

# THE DEBTORS' MOTION TO ESTIMATE CERTAIN 507(b) CLAIMS
## FOR RESERVE PURPOSES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com LLC (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 5

BACKGROUND ............................................................................................................ 5

    **A.**    Chapter 11 Case Background ............................................................... 5

    **B.**    Successful Sale of Substantially All of the Debtors' Assets .................. 6

    **C.**    Second-Lien Holders' Collateral and Adequate Protection .................. 8

    **D.**    507(b) Claims ...................................................................................... 9

    **E.**    Plan Confirmation and Timeline ......................................................... 9

RELIEF REQUESTED .................................................................................................. 10

ARGUMENTS AND AUTHORITIES ......................................................................... 10

    **A.**    The Value of Any 507(b) Claims Should be Estimated by the Court in
Summary Fashion Prior to Plan Confirmation .................................... 10

    **B.**    Any Diminution in Value is, at Best, Negligible and Subject to the
Second-Lien Holders' Burden ............................................................ 13

        **i.**    Valuation Methodologies ......................................................... 14

        **ii.**    Application to These Proceedings ............................................ 16

    **C.**    Any Negligible 507(b) Claim Value is Fully Negated by Significant
506(c) Surcharges .............................................................................. 17

    **D.**    The Equities Weigh Against Any Purported 507(b) Claims Recovery ... 22

NOTICE ........................................................................................................................ 24

CONCLUSION .............................................................................................................. 24

WEIL:\97034450\13\73217.0004

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Adelphia Bus. Solutions, Inc.*,
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) ...................................................................10

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ..................................................................10

*In re Aerogroup Int'l, Inc.*,
  Case No. 17-11962 (KJC), 2019 WL 1407007 (Bankr. D. Del. Mar. 26, 2019) .....................15

*Assocs. Comm. Corp. v. Rash*,
  520 U.S. 953 (1997) .......................................................................................14

*Bittner v. Borne Chem. Co.*,
  691 F.2d 134 (3d Cir. 1982) ............................................................................11

*In re Blackwood Assocs., L.P.*,
  153 F.3d 61 (2d Cir. 1998) ......................................................................13, 17

*In re Ceron*,
  412 B.R. 41 (Bankr. E.D.N.Y. 2009) ...................................................................19

*In re Chateaugay Corp.*,
  10 F.3d 944 (2d Cir. 1993) ............................................................................11

*In re Chemtura Corp.*,
  448 B.R. 635 (Bankr. S.D.N.Y. 2011) ............................................................10, 11

*In re Compton Impressions*,
  217 F.3d 1256 (9th Cir. 2000) .........................................................................19

*In re Debbie Reynolds Hotel & Casino, Inc.*,
  255 F.3d 1061 (9th Cir. 2001) .........................................................................17

*In re Domistyle, Inc.*,
  811 F.3d 691 (5th Cir. 2015) ...........................................................................21

*In re Felt Mfg. Co., Inc.*,
  402 B.R. 502 (Bankr. D.N.H. 2009) ...................................................................19

*In re Flagstaff Foodservice Corp.*,
  762 F.2d 10 (2d Cir. 1985) ............................................................................20

WEIL:\97034450\13\73217.0004

*In re Gallegos Research Grp., Corp.*,
   193 B.R. 577 (Bankr. D. Colo. 1995) ...................................................................13

*In re Granite Broad. Corp.*,
   385 B.R. 41 (S.D.N.Y. 2008) ...............................................................................10

*In re Heritage Highgate, Inc.*,
   679 F.3d 132 (3d Cir. 2012)...........................................................................14, 15

*Matter of Iberica Mfg., Inc.*,
   180 B.R. 707 (Bankr. D.P.R. 1995) ....................................................................19

*In re Ionosphere Clubs, Inc.*,
   105 B.R. 761 (Bankr. S.D.N.Y. 1989) ................................................................11

*In re Kohl*,
   421 B.R. 115 (Bankr. S.D.N.Y. 2009) ................................................................20

*In re Lane*,
   68 B.R. 609 (Bankr. D. Haw. 1986) ...................................................................11

*In re Lionel L.L.C.*,
   No. 04-17324, 2007 WL 2261539 (Bankr. S.D.N.Y. Aug. 3, 2007)......................11

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
   247 B.R. 38 (Bankr. S.D.N.Y. 2000) ...............................................................2, 13

*In re MacDonald*,
   128 B.R. 161 (Bankr. W.D. Tex. 1991) ..............................................................10

*In re McLean Industries, Inc.*,
   84 B.R. 340 (Bankr. S.D.N.Y. 1988) ..................................................................17

*In re Motors Liquidation Co.*,
   482 B.R. 485 (Bankr. S.D.N.Y. 2012) ................................................................14

*In re Residential Capital, LLC*,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013) ...........................................................13, 14

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016) ...........................................................14, 15

*In re Scopac*,
   624 F.3d 274 (5th Cir. 2010) ..............................................................................13

*In re Thomas McKinnon Secs., Inc.*,
   191 B.R. 976 (Bankr. S.D.N.Y. 1996) ................................................................11

iii

*In re Windsor Plumbing Supply Co., Inc.*,
170 B.R. 503 (Bankr. E.D.N.Y. 1994)..................................................................................11

**Statutes**

11 U.S.C. §§ 506, 507, and 510 ...........................................................................................8

28 U.S.C. §§ 157 and 1334 .................................................................................4, Page | 2

28 U.S.C. § 157(b) ..............................................................................................4, Page | 2

28 U.S.C. §§ 1408 and 1409 ..............................................................................4, Page | 2

United States Code title 11 chapter 11 section 502(c) ................................................ *passim*

Bankruptcy Code ...................................................................................................13, 17, 21

Bankruptcy Code section 363 .............................................................................................15

Bankruptcy Code section 503(b) ..........................................................................................1

Bankruptcy Code Section 506(a)(1) ...................................................................................14

Bankruptcy Code section 506(c)...............................................................................2, 3, 17, 21

Bankruptcy Code section 507(a) and (b) ..............................................................................1

Bankruptcy Code section 507(b) ..................................................................................... *passim*

Bankruptcy Code sections 1107(a) and 1108 ......................................................................5

WEIL:\97034450\13\73217.0004

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**"), file this motion to estimate the value of potential adequate protection claims arising under section 507(b) of the Bankruptcy Code and held by second-lien creditors for reserve purposes ("**Motion**"), and, in support, state the matters set forth below.

## **PRELIMINARY STATEMENT**

1.     The Debtors bring this Motion pursuant to section 502(c) of chapter 11 of title 11 of the United States Code (the " **Bankruptcy Code**") to ensure a prompt, effective confirmation ("**Confirmation**") of the proposed joint chapter 11 plan (as amended or supplemented, the "**Plan**"), the hearing for which is contemplated to occur on July 23, 2019.[1] This Motion addresses certain post-petition administrative claims granted by the Court pursuant to the Final DIP Order[2] under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code, to the extent of any second-lien diminution in value (the "**507(b) Claims**").  Cyrus Capital Partners, L.P. ("**Cyrus**"), ESL Investments, Inc. ("**ESL**"), and Wilmington Trust, N.A., as collateral agent of certain prepetition second-lien debt on its own behalf and on behalf of all other Prepetition Second Lien Credit Parties ("**Collateral Agent**,"

---

[1] *See Debtors' Motion for an Order (I) Approving Disclosure Statement; (II) Establishing Notice and Objection Procedures for Confirmation of the Plan; (III) Approving Solicitation Package and Procedures for Distribution Thereof; (IV) Approving Forms of Ballots and Establishing Procedures for Voting on the Plan; and (V) Granting Related Relief* (ECF No. 3277) (the "**Disclosure Statement Motion**").

[2] *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (ECF No. 955) ("**Final DIP Order**").

All capitalized terms used but not defined in this Motion shall have the meaning set forth in the Final DIP Order or the Declaration of William L. Transier (ECF No. 2341) ("**Transier Decl.**").

collectively with Cyrus and ESL, the "**Second-Lien Holders**")[3] contend these 507(b) Claims total approximately $201 million.  The Debtors completely disagree with this contention—because the 507(b) Claims total $0—and note at the outset that although the Debtors are bringing this Motion, the burden of proof to establish the 507(b) Claims, nevertheless, lies with the Second-Lien Holders, not the Debtors.

2.      The Debtors file this Motion to present the fundamental issues before the Court and to have the Court order a schedule in advance of the Debtors' Confirmation hearing. This Motion is not intended to be a full briefing of the Debtors' case in support of estimation, and the Debtors reserve the right to brief these matters in totality and present further evidence necessary in support of the relief pursuant to a schedule approved by the Court.  The Debtors file this Motion now to present a format for addressing these matters as the Debtors have attempted to agree upon a schedule with the Second-Lien Holders, but the parties have been unable to agree upon specific dates prior to filing this Motion.  The Debtors believe that with filing this Motion and a short scheduling conference with the Court, the parties will be directed toward a schedule that is fair for all concerned in advance of the Confirmation hearing.  The latest schedule proposed to the Second-Lien Holders is attached at "**Exhibit A**."   A proposed order approving the Debtors' briefing schedule is attached at "**Exhibit B**."

3.      To put the Motion into the proper context, estimation of the 507(b) Claims are significant, unresolved issues in these chapter 11 cases.  All Parties agree that estimation should be resolved before the Debtors' Confirmation hearing.  Also important, these disputes go hand-in-hand with significant disagreements between the Parties regarding the Debtors' current,

---

[3] The Second-Lien Holders and the Debtors are referred to, collectively, as the "**Parties**."

ongoing use of cash collateral.  The resolution of these potential claims will provide clarity to all stakeholders and pave an efficient path toward Confirmation without undue delay.

4.    As explained in this Motion, the Second-Lien Holders have benefited immensely from the Debtors' chapter 11 process and this process has enhanced, not reduced, the value of their claims.  Further, estimating the 507(b) Claims' value at zero dollars for reserve purposes now will resolve numerous disputes among the Parties and allow the Debtors to make timely distributions following Plan Confirmation without having to unnecessarily reserve an additional $201 million on account of unsupportable claims.  Accordingly, the Debtors have no choice but to file this Motion and set the record straight:  there are no 507(b) Claims.

5.    The Second-Lien Holders are not entitled to any recovery on their 507(b) Claims for at least two reasons.  **_First_**, the asserted 507(b) Claims are vastly overstated. Under the most conservative approach, there is, at best, a negligible second-lien diminution in value—an amount which is far outweighed by the section 506(c) surcharge applicable to the Second-Lien Holders, i.e., the necessary and reasonable administrative expenses incurred by the Debtors for the primary and direct benefit of the Second-Lien Holders.[4]  Put simply, once the Court applies a section 506(c) surcharge to any negligible second-lien diminution in value, there is no subsequent 507(b) Claim.

6.    **_Second_**, and relatedly, any purported recovery under section 507(b) would give Second-Lien Holders an improper windfall.  The value received by the Second-Lien Holders by virtue of the $433.5 million credit bid in the Sale (as defined below) provided the Second-Lien Holders with $433.5 million _more_ in recovery than they would have otherwise received if the

---

[4] For the avoidance of doubt, the Final DIP Order does not grant Second-Lien Holders a waiver of expenses arising under section 506(c) of the Bankruptcy Code.

WEIL:\97034450\13\73217.0004

Debtors had liquidated.[5]  Indeed, ESL was the primary beneficiary of the successful going concern

sale, which necessitated significant efforts and expenses incurred by the Debtors to preserve and

maximize the value of the very assets now in ESL's possession.[6]  As this Court recognized at the

April 18, 2019 hearing (the "**April 18 Hearing**"), "[ESL got] what it wanted.  So it's hard to argue

[it was] diminished."  Apr. 18, 2019 Hr'g Tr. ("**Hr'g Tr.**") at 97:13–14.  The remaining Second-

Lien Holders, including Cyrus and the Collateral Agent, likewise benefitted greatly from the

successful going concern sale, exchanging deeply subordinated and undersecured second-lien debt

("**Second-Lien Debt**") for a 100% recovery on account of their $433.5 million credit bid.  In short,

under the present circumstances, the Second-Lien Holders should not be entitled to recover on any

507(b) Claims related to the *very collateral purchased by ESL and Cyrus at 100 cents on the dollar

on account of their claims*, which together hold approximately 95% of the Second-Lien Debt.

7.    The Court may, in its discretion, efficiently estimate the value of the 507(b)

Claims in a summary proceeding for this very purpose.  As the Court also recognized at the April

18 Hearing, given that the sale of substantially all of the Debtors' assets closed in February 2019,

"[w]e actually have the facts."  Hr'g Tr. at 22:20–21.  The value of the collateral is self-evident in

the sale price, obviating the need for extensive discovery, dueling valuations, and an unnecessary

use of the Parties' time and the estates' limited resources, which the Debtors and their stakeholders

can ill afford.  As such, the estimation of the 507(b) Claims is a simple exercise that can and should

be done in a summary proceeding.  *See id.* at 22:8–13 and 22:19–20 ("[I]t's a lot easier to decide

at this point . . . that should be a much easier process.").

---

[5] To confirm, the Second-Lien Holders not only received a dollar-for-dollar recovery on their credit bid, they were also beneficiaries of the Sale (as defined below), essentially buying the company and its assets and receiving recoveries on account of other claims held in the cases.

[6] The Prepetition ABL Credit Parties who were paid in full as a result of the going concern sale were estimated to be over-secured as of the Petition Date.

8.      For all of the reasons set forth below, the Debtors respectfully request that the Court: (a) grant this Motion in its entirety; (b) estimate the 507(b) Claims' value to be zero dollars for reserve purposes only, ensuring efficient administration of the Debtors' estates in the best interests of all parties; and (c) grant such other and further relief to which the Debtors show themselves justly entitled.  In support of the Motion, the Debtors have contemporaneously filed the Declaration of Brian J. Griffith, dated May 26, 2019 (the "**Griffith Decl.**").

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.    Chapter 11 Case Background

10.     Beginning on October 15, 2018 (the "**Petition Date**"), and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.     On October 24, 2018, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "**UCC**").  No trustee or examiner has been appointed in these chapter 11 cases.

12.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

5

B.    **Successful Sale of Substantially All of the Debtors' Assets**

13.    Before filing these chapter 11 cases, and as of the Petition Date, the Debtors

contemplated, among other things, a going concern sale, recapitalization, reorganization, and

orderly wind-down.  Transier Decl. ¶ 15.  Although the Debtors and their advisors remained

*hopeful* that they could effectuate a successful going concern sale, all parties, including the

Debtors,[7] the senior debtor-in-possession lenders ("**DIP ABL Lenders**"), and the UCC,[8]

recognized that such sale was far from certain and would be extremely difficult to achieve.  *Id.*

¶¶ 17–18, 22–38; *see also* Griffith Decl. ¶ 5.

14.    Ultimately, after months of negotiations and as a result of a rigorous

process, the Debtors, in consultation with their advisors, determined that ESL's bid to purchase

substantially all of the Debtors' assets, including certain of the primary real estate, component

businesses, and other assets, constituted the highest or otherwise best value, preserved thousands

of jobs of dedicated employees, and maximized value for creditors.  Transier Decl. ¶¶ 34, 41.

ESL's bid at the January 14 auction was the only going concern bid for the Debtors' assets and

included a credit bid consisting of, among other things, $433.5 million of Second-Lien Debt.[9]

Griffith Decl. ¶ 6.  The remaining Second-Lien Holders, including Cyrus and the Collateral Agent,

while not bidders in the going concern sale, were participants in the credit bid, receiving a 100%

recovery on account of their respective, credit bid Second-Lien Debt.  *See id.* ¶ 8.  Further, Cyrus

---

[7] Indeed, many times during the sales and marketing process—after negotiating multiple variations of a going concern bid from ESL—the Debtors pivoted their focus to a proposed liquidation.  *See* Transier Decl. ¶¶ 21–31.

[8] *See Supplemental Objection of the Official Committee of Unsecured Creditors of Sears Holdings Corp., et al. to Debtors' Motion for Approval of Global Bidding Procedures* ¶ 2 (ECF No. 729) ("The sad truth is that the Debtors are unlikely to have a viable path to remain a going concern.").

[9] *See ESL's Omnibus Response in Support of the Going Concern Sale Transaction* ¶ 30 (ECF No. 2352) ("**ESL's Response**").

WEIL:\97034450\13\73217.0004

participated in the ESL bid and agreed to refinance its Junior DIP loan, totaling $350 million as part of the ESL bid, and also received equity in the new entity that purchased the Debtors' assets.

15.     The Second-Lien Holders' recovery is significant because, had the Debtors liquidated—as contemplated numerous times by the Debtors and their advisors—all Second-Lien Holders would have been unsecured, receiving only a few cents on the dollar, at the most, on a deficiency claim and a zero-dollar recovery as a secured creditor from their Collateral package. *See id.* ¶¶ 5, 8.  Simply put, ESL received exactly what it wanted in the Sale, and all Second-Lien Holders, including Cyrus and the Collateral Agent, recovered significantly more—roughly $433.5 million more—than they would have in a liquidation.  *Id.* ¶ 8.[10]

16.     On February 8, 2019, the Court entered an order approving the sale ("**Sale**") to Transform Holdco LLC ("**Transform**"), the entity formed by ESL for the purpose of effectuating the Sale.[11]  Three days later, on February 11 (the "**Sale Date**"), the Debtors closed the Sale pursuant to the asset purchase agreement with Transform (as amended from time to time, the "**APA**").  Transform purchased substantially all of the Debtors' assets pursuant to the APA for approximately $5.2 billion, which included the Second-Lien Holders' credit bid.[12]

17.     As detailed more fully below, in the lead up to the Sale—from the Petition Date to the Sale Date—the Debtors incurred significant administrative expenses totaling approximately $1.451 billion in their efforts to preserve the value of collateral held by ESL, Cyrus, and the other Second-Lien Holders (the "**Collateral**").  *See* Griffith Decl. ¶ 18.  These expenses—

---

[10] *See ESL's Response* ¶ 102 ("The total distributed value to creditors under the ESL Bid would be $4 billion, $406 million more than the creditors receive under the Debtors' liquidation analysis.").

[11] *Order (1) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "**Sale Order**").

[12] *Debtors' Omnibus Reply in Support of the Going Concern Sale Transaction* ¶ 50 (ECF No. 2328).

WEIL:\97034450\13\73217.0004

which included professional fees, employee compensation, critical vendor payments, and utility expenses—were incurred to preserve the Collateral's value while effectuating the contemplated Sale. *See id.* ¶ 23.

## C.    Second-Lien Holders' Collateral and Adequate Protection

18.    The Final DIP Order granted the Second-Lien Holders section 507(b) superpriority claims as adequate protection "to the extent of the aggregate net diminution in value of their interests in the [Collateral]." Final DIP Order § O(i), ¶ 18(d). The adequate protection liens were granted against the Prepetition ABL Collateral, which includes, but is not limited to: "inventory, credit card accounts receivables, pharmacy receivables, prescription lists, deposit accounts, cash and cash equivalents, and proceeds, insurance claims and supporting obligations of the foregoing, together with Cash Collateral." *Id.* § H(c). The Final DIP Order further provides that "the Prepetition Second Lien Facilities Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims." *Id.* ¶ 18(d).

19.    Cyrus and ESL collectively hold approximately 95% of the Second-Lien Debt. Griffith Decl. ¶ 10. More specifically, ESL holds 78.3% of Second-Lien Debt; Cyrus holds 16.1% of Second-Lien Debt; and the remaining Second-Lien Holders, including, but not limited to, the Collateral Agent, hold collectively 5.6% of the Second-Lien Debt. *Id.* Notably, the Final DIP Order did not disturb or otherwise affect the Bankruptcy Code's priority scheme or the Security Agreement, agreed to by all Second-Lien Holders, which subordinates all other Second-Lien Holders' claims to those of ESL and Cyrus.[13] In short, if there is no recovery available to

---

[13] *See Debtors' Objection to Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral* (ECF No. 3198) at Ex. B ("**Security Agreement**"), § 5.4; *see also* 11 U.S.C. §§ 506, 507, and 510.

ESL and Cyrus under section 507(b), there certainly is no recovery available to other Second-Lien

Holders.  *See* Security Agreement § 5.4.

20.    The Final DIP Order does not contain a waiver of any surcharge applicable

under section 506(c) of the Bankruptcy Code for any Second-Lien Holders.

**D.    507(b) Claims**

21.    While the APA provides that "it shall not be a condition to [Plan

Confirmation] that any ESL Claims arising under Section 507(b) of the Bankruptcy Code be paid

in full or in part," APA § 9.13(c), and none of the Second-Lien Holders have filed proofs of claims,

the Second-Lien Holders have, nevertheless, indicated that they intend to pursue 507(b) Claims

and assert that the Collateral has suffered a total diminution of value of $201 million.  Griffith

Decl. ¶¶ 11-12.  Specifically, Cyrus values its 507(b) Claims to be approximately $77 million (*id.*

¶ 11).  The Debtors expect from ESL a $50 million 507(b) Claim, the maximum allowable amount

pursuant to the APA (and, subsequently, the Plan), which caps ESL's 507(b) Claims at $50 million

from the Net Proceeds of Other Causes of Action (as defined in the Plan) (the "**ESL Cap**").  APA

§ 9.13; Plan § 2.4.

22.    The Debtors also expect that the Collateral Agent will attempt to pursue a

claim under section 507(b) arising since the Sale Date based on the Debtors' use of cash collateral

post-Sale in the amount of approximately $74 million.  Griffith Decl. ¶ 12.  Collectively, then, the

Second-Lien Holders' alleged claims are anticipated and believed to total at least $201 million.

*Id.* ¶¶ 11-12.

**E.    Plan Confirmation and Timeline**

23.    The Debtors have not had access to any substantial revenue streams since

the Sale, and the Debtors' Winddown Account necessarily has limited resources with which to

9

confirm the Plan.[14]  The Debtors' remaining obligations are minimal and, as represented in their recent filings, they contend that many such obligations belong to Transform under the APA's express terms.  Given this ongoing disagreement with Transform, the Debtors cannot estimate the universe of administrative claims with any real certainty.

24.  On April 17, 2019, the Debtors filed their Disclosure Statement and Plan (further amended on May 16, 2019).  Pursuant to the Disclosure Statement Motion, the Debtors have requested a July 23, 2019 Confirmation hearing and seek to emerge from chapter 11 as soon as possible—likely in a matter of weeks following Plan Confirmation—in order to effect an orderly winddown of their estates.

## RELIEF REQUESTED

25.  Because the Second-Lien Holders, as beneficiaries of the Sale, seek to recover substantial, improper, and inflated amounts under section 507(b) that ignore the realities of this case, well-settled valuation principles, and the extensive efforts and costs incurred by the Debtors to pursue a Sale that was primarily intended to (and ultimately did) benefit the Second-Lien Holders, the Debtors request that this Court estimate, for reserve purposes only, the 507(b) Claims at an amount equal to zero dollars pursuant to section 502(c) of the Bankruptcy Code.

## ARGUMENTS AND AUTHORITIES

**A.  The Value of Any 507(b) Claims Should be Estimated by the Court in Summary Fashion Prior to Plan Confirmation**

26.  Section 502(c) of the Bankruptcy Code allows the Court to estimate "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would

---

[14] *See* Final DIP Order ¶ 23 (explaining the Winddown Account is a segregated account designed to pay winddown expenses; it does not account for payment of 507(b) Claims generated by the Final DIP Order).

unduly delay the administration of the case." 11 U.S.C. § 502(c). This process facilitates a quick and efficient reorganization and includes, among other things, estimation of post-petition administrative claims. *See In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422–23 (Bankr. S.D.N.Y. 2003).[15]

27. Bankruptcy courts have broad discretion in estimating claims "so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization must be accomplished quickly and efficiently." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007); *see also, e.g.*, *In re Chemtura Corp.*, 448 B.R. 635, 649 (Bankr. S.D.N.Y. 2011) (explaining that, when estimating claims, the Court has broad discretion to shape the procedures "best suited" to the circumstances); *In re Granite Broad. Corp.*, 385 B.R. 41, 49 (S.D.N.Y. 2008) (same). Among other circumstances, bankruptcy courts may estimate claims in order "to avoid undue delay in the administration of bankruptcy proceedings." *In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir. 1993); *In re Ionosphere Clubs, Inc.*, 105 B.R. 761, 764–65 (Bankr. S.D.N.Y. 1989) (Section 502(c) acts as a "safety net" for claims that threaten to unduly delay the confirmation process.).

28. Estimation requires only "sufficient evidence on which to base a *reasonable estimate* of the claim." *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982) (emphasis added). In the Southern District of New York, courts frequently estimate claims "based on the probability of the success of various potential outcomes if decided on the merits." *In re Chemtura*, 448 B.R. at 669; *see In re Thomas McKinnon Secs., Inc.*, 191 B.R. 976, 989–90 (Bankr. S.D.N.Y. 1996). Such procedural flexibility allows courts to expediently estimate claims, often engaging in

---

[15] *See also In re MacDonald*, 128 B.R. 161, 164–65 (Bankr. W.D. Tex. 1991) ("Courts have . . . assumed that the estimation process in Section 502(c) may be equally employed for estimating post-petition claims, when necessary to avoid delaying the administration of the bankruptcy case (*especially when it comes to the confirmation process*)." (emphasis added) (internal citations omitted)).

"a mere review of pleadings, briefs, and a one-day hearing involving oral argument of counsel."
*In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994) (citing *In re Lane*, 68 B.R. 609, 613 (Bankr. D. Haw. 1986).

29.     Given the Court's familiarity with this case, the detailed information and analyses submitted by the Debtors in connection with this Motion, and the Court's obligation to make a "speedy and rough estimation," *In re Lionel L.L.C.*, No. 04-17324, 2007 WL 2261539, at *5 (Bankr. S.D.N.Y. Aug. 3, 2007) (quoting *In re Chateaugay Corp.*, 944 F.2d 997, 1006 (2d Cir. 1991)), the Debtors request that the Court estimate the 507(b) Claims based on the Parties' pleadings and oral arguments at a one-day summary proceeding.[16]  Notably, as explained below, the Debtors do not anticipate that the Parties will dispute, among other things, the amount of the first lien debt ("**First-Lien Debt**") or Second-Lien Debt, the Collateral available for recovery, or the Sale price.

30.     In light of what the Debtors project to be a significantly limited universe of factual disputes (if any), the Debtors proposed a briefing and discovery schedule to the Second-Lien Holders that they believed was reasonable and provided for sufficient time to brief the issues in advance of Plan Confirmation.[17]  The Second-Lien Holders initially offered to file a claims estimation motion first and subsequently changed course—weeks later—demanding that the Debtors file first and allow the various Second-Lien Holders to respond, collectively or individually.  One business day before filing this Motion, the Second-Lien Holders reversed course again, suggesting they file first with a postponed July 18 hearing date, which would delay

---

[16] *See In re Lane*, 68 B.R. 609, 613 (Bankr. D. Haw. 1986) (estimating claims after "review[ing] the numerous pleadings and briefs of the debtor and [the creditors]"); *Chemtura*, 448 B.R. at 650 (noting that "Bankruptcy Courts have employed a wide variety of methods to estimate claims . . . including . . . a review of pleadings and briefs followed by oral argument of counsel.").

[17] The UCC is in agreement with the Debtors' proposed briefing schedule.

WEIL:\97034450\13\73217.0004

resolution of these issues within one week of Confirmation.  Wishing to have these issues resolved expeditiously and sufficiently in advance of Plan Confirmation, the Debtors file the current Motion requesting that the Court, in its discretion, estimate the value of the 507(b) Claims in an efficient manner and propose a July 11 hearing.

31.    Unless estimated in summary fashion, the 507(b) Claims will unduly delay the Debtors' Plan Confirmation, which is scheduled to take place on July 23, 2019.  The only alternatives to 507(b) Claims estimation would be expensive and time-intensive claim allowance proceedings, discovery, or a Confirmation dispute.  Estimation prior to July 23, therefore, is the most expedient method by which the Debtors can evaluate their administrative expenses and avoid protracted proceedings or a Confirmation fight, either of which would further deplete the Debtors' limited resources to the detriment of all stakeholders.  Accordingly, for all of the foregoing reasons, the Debtors respectfully request the Court estimate the Second-Lien Holders' 507(b) Claims in summary fashion, based on the Parties' pleadings and oral arguments, at a one-day summary proceeding.

**B.**    **Any Diminution in Value is, at Best, Negligible and Subject to the Second-Lien Holders' Burden**

32.    The purpose of adequate protection (or 507(b) claims) is "to protect secured creditors against a diminution in the value of their collateral."  *In re Gallegos Research Grp., Corp.*, 193 B.R. 577, 585 (Bankr. D. Colo. 1995); *see also* Final DIP Order ¶ 18(d).  "In essence, § 507(b) means that a secured creditor has superpriority for a claim in the amount that the debtor's use of the collateral during the time of the stay diminished the value of the collateral, ***but only to***

WEIL:\97034450\13\73217.0004

*the extent such diminution is in excess of the adequate protection received*." *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2d Cir. 1998) (emphasis added); *see also* 11 U.S.C. § 507(b).[18]

33.     The Second-Lien Holders have the burden of proving the diminution in value. *In re Residential Capital, LLC*, 501 B.R. 549, 591 (Bankr. S.D.N.Y. 2013); *In re Scopac*, 624 F.3d 274, 284 (5th Cir. 2010). The Second-Lien Holders cannot meet this burden because, as shown below, they received far more in the Sale than they otherwise would have recovered in a liquidation scenario, including recovery on their $433.5 million credit bid, and, even assuming there has been some negligible diminution in value in their Collateral, such diminution is eclipsed by the applicable 506(c) surcharges. Griffith Decl. ¶ 17; Ex. A. For those reasons, the Debtors request that the Court value the Second-Lien Holders' 507(b) Claims at zero dollars for reserve purposes. This determination can and should be made as a matter of law since there are no material factual disputes related to the numbers at issue.

### i.    Valuation Methodologies

34.     To recover on an adequate protection claim, a secured creditor "must show that the aggregate value of [its] collateral diminished from the Petition Date to the Effective Date." *In re Residential Capital LLC*, 501 B.R. at 592. Courts look to Section 506(a)(1) of the Bankruptcy Code to value the collateral, which provides that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property" as of the moment

---

[18] *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 247 B.R. 38, 41 (Bankr. S.D.N.Y. 2000) ("'Superpriority' is not a word that appears in the Bankruptcy Code. It has been fashioned by courts and commentators to describe the enhanced status conferred upon a secured claim in the distribution of a bankrupt estate if the claim qualifies for § 507(b) treatment. A secured claim meeting § 507(b)'s prerequisites takes on the enviable nature of an administrative claim under § 507(a)(1), the highest priority the Bankruptcy Code recognizes; moreover, § 507(b) provides that a qualifying secured claim "shall have priority over every other claim" allowable under § 507(a)(1). Hence the entirely appropriate adjective 'super priority':  in the privileged world of administrative claims, the § 507(b)-anointed secured claim is primus inter pares.").

WEIL:\97034450\13\73217.0004

the debtor begins using the collateral. *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 199 (Bankr. S.D.N.Y. 2016); *see* 11 U.S.C. § 506(a)(1).

35.    There is no single, controlling valuation standard.   "[T]he valuation methodology varies on a case-by-case basis, and . . . courts should take into consideration the facts and competing interest of each case." *Sabine*, 555 B.R. at 199; *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012).   Under any scenario, however, the collateral must be valued in the hands of the Debtors, and "the proposed disposition or use of the collateral" by the Debtors is of "paramount" importance to the inquiry. *Heritage Highgate*, 679 F.3d at 141 (quoting *Assocs. Comm. Corp. v. Rash*, 520 U.S. 953, 994–96 (1997)); *see also In re Motors Liquidation Co.*, 482 B.R. 485, 492 (Bankr. S.D.N.Y. 2012) (noting that *Rash's* holding applies to Chapter 7, 11, and 13 bankruptcies).   This depends on "what is to be done with the property—whether it is to be liquidated, surrendered, or retained by the debtor." *Heritage Highgate*, 679 F.3d at 141.

36.    For example, in *Residential Capital*, the Court held that, because the parties intended to market and sell the properties as a going concern, a fair market valuation was appropriate.[19] 501 B.R. at 592, 594–95 (rejecting a liquidation valuation); *see also Rash*, 520 U.S. at 994–96 (rejecting a foreclosure valuation under a similar rationale).

37.    Further, while various desktop valuation methodologies exist, there is no better indication of value than the actual price achieved, as here, in an arm's-length transaction. *In re Aerogroup Int'l, Inc.*, Case No. 17-11962 (KJC), 2019 WL 1407007, at *14 (Bankr. D. Del.

---

[19] For purposes of this Motion (for which the Debtors do not bear the burden of proof), the Debtors analyze, in a preliminary and conservative fashion, any potential diminution in second-lien value using the fair market value of the Collateral at the Petition Date and Effective Date as done in *In re Residential Capital*.   The Debtors note, however, that there are materially different facts and circumstances in this case than in *In Residential Capital*, including that in this case there was no going-concern bid as of the entry of the Final DIP Order and the Debtors pivoted to a liquidation approach several times, thereby making a liquidation analysis more appropriate. *Cf.* 501 B.R. at 570–71 (where the debtors sought the use of cash collateral after they had numerous going concern offers in hand).   The Debtors, therefore, fully reserve their rights to modify and/or supplement the valuation methodology used in this Motion (including to use one based on liquidation value) prior to the proposed July 11 hearing.

Mar. 26, 2019) ("The auction result set the value of the collateral."). Importantly, other fair-market

or liquidation methodologies—including Net Orderly Liquidation Value ("**NOLV**")—are not

appropriate under circumstances when, as here, the Debtors contemplated a going concern sale as

of the Petition Date. *See Heritage Highgate*, 679 at 141; *Sabine*, 555 B.R. at 199.

### ii.    *Application to These Proceedings*

38.    At the Petition Date, the Debtors contemplated a going concern sale of their

assets. *See generally* DIP Motion (ECF No. 7). In the Final DIP Order, the Court found that the

use of cash collateral was "immediate and critical in order to, among other things, enable the

Debtors to continue operations and to administer and preserve the value of their estates." Final

DIP Order § C. While liquidation was certainly a real possibility, one of the Debtors' "immediate

objectives" related to their use of the collateral during the pendency of these cases was to maximize

value of their estates and "sell as a going concern pursuant to section 363 of the Bankruptcy Code,

or reorganize around, a reduced footprint of stores." *Id.* ¶ 2. Accordingly, although there was a

real possibility of a liquidation—which the Debtors prepared for by obtaining and considering

liquidator bids—and the Debtors contemplated pivoting toward liquidation numerous times based

on ESL's prior (and lower) bids, the Debtors have conservatively valued the Collateral based on

what Transform, a vehicle of ESL, ultimately paid for the assets. *See* Transier Decl. ¶¶ 17-18, 22-

38; Griffith Decl. ¶ 5. *See also In re Aerogroup Int'l, Inc.*, 2019 WL 1407007, at \*14.

39.    More specifically, the most appropriate (and yet conservative) methodology

to value any 507(b) Claims under these circumstances is the fair market value of the Collateral in

the hands of the Debtors at both the Petition Date and the Effective Date. That is precisely what

the Debtors have done here. Griffith Decl. ¶ 13. Taking many of Cyrus's assumptions as true,

including the total First-Lien Debt, Second-Lien Debt and total gross collateral, with all rights

reserved, the Debtors assessed the resulting value of the Second-Lien Holders' 507(b) Claims using this methodology.  *Id.*

40.    Accordingly, valuing the Collateral at 85%—an amount which reflects the value that was ultimately recovered on the Collateral at the Sale—at both the Petition Date and the Effective Date, the gross Collateral value was $2.287 billion at the Petition Date and $1.323 billion at the Effective Date.  Griffith Decl. ¶¶ 14-15; *see also id.* at Ex. A.  After the pay down of the First-Lien Debt and taking into account the Debtors' use of cash collateral post-Sale, the remaining diminution in value of the gross Second-Lien Holders' Collateral is, at the very most, $320 million. *Id.*  That gross amount can be broken down by creditor as follows:

| Second-Lien Holder | Portion of Second-Lien Debt | Resulting Amount |
|---|---|---|
| ESL | 78.3% | $50 million (pursuant to the ESL Cap) |
| Cyrus[20] | 16.1% | $51 million |
| Remaining Second-Lien Holders, including Collateral Agent | 5.6% | $18 million |
| | **Total** | $119 million |

*See id.* ¶¶ 10, 16 and 17.

## C.    Any Negligible 507(b) Claim Value is Fully Negated by Significant 506(c) Surcharges

41.    As noted immediately above, the absolute maximum amount of diminution in value of the Collateral, based on a conservative approach and taking many of Cyrus's assumptions as true, is approximately $320 million.  Griffith Decl. ¶ 15.  But even assuming the Second-Lien Holders can establish *any* 507(b) Claim value, such amount is subject to (and

---

[20] The Debtors take Cyrus's 16.1% as true for purposes of this calculation, reserving all rights related to the same, despite the fact that such percentage may improperly include certain make-wholes and accrued interest through the Sale Date.

WEIL:\97034450\13\73217.0004

ultimately eliminated by) applicable deductions made pursuant to 11 U.S.C. § 506(c) ("**506(c) Surcharges**").

42.     Section 506(c) of the Bankruptcy Code allows the Debtors to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." *See* 11 U.S.C. § 506(c).  Courts allow debtors to recover 506(c) Surcharges if, among other things, such expenses *were necessary, reasonable, and of direct and primary benefit to the secured creditor*.  *See In re McLean Industries, Inc.*, 84 B.R. 340, 350 (Bankr. S.D.N.Y. 1988).  Most importantly, 506(c) Surcharges can be deducted from asserted 507(b) adequate protection claims. *See Blackwood*, 153 F.3d at 68 (noting in a discussion of § 506(c) and § 507(b) that while the Bankruptcy Code "takes the concept of adequate protection very seriously," a secured creditor's interest can still be diminished "to the extent that the expense granted priority directly confers a benefit on the secured creditor").

43.     While 507(b) claims "protect[ ] and preserve[ ] the interests of secured creditors," *Blackwood*, 153 F.3d at 68, 506(c) Surcharges are "an assessment against a secured party's collateral" that "does not come out of the debtor's estate, but rather comes directly from the secured party's recovery."  *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1067 (9th Cir. 2001).  Because the Debtors can show that the 506(c) Surcharges in these proceedings were necessary, reasonable, and of direct and primary benefit to the Second-Lien Holders, the Debtors are entitled to deduct those expenses from any resulting 507(b) Claims' value.  *See Blackwood*, 153 F.3d at 68.

44.     The following expenses constitute reasonable and necessary 506(c) Surcharges and, as such, should be deducted from any purported 507(b) Claims' value:

| Fee | Amount (in millions) | Purpose/Use |
|---|---|---|
| Employee Payroll, Benefits and Taxes | $712 | Employee compensation |
| Rent, Occupancy Expenses, Property Taxes and Property Maintenance | $228 | Rent paid towards properties, including stores used to sell collateral |
| Logistics and Supply Chain Costs | $170 | Transportation and logistics involved in moving inventory |
| Professional Fees | $51 | Professional services rendered from Petition Date to Sale Date |
| DIP Interest and Financing Fees | $94 | DIP facility expenses associated with funding the bankruptcy |
| Critical Vendor Payments | $51 | Payments made to keep vendors shipping for the continuation of the Debtors' business |
| Utility and Telephone Expenses | $28 | Gas/electric and telephone expenses |
| Advertising Expenses | $33 | Advertising spent associated with asset sale |
| Employee Travel and Business Expenses | $38 | All employee travel |
| Equipment Expenses | $29 | All equipment, including fuel and truck maintenance and all distribution center equipment |
| Security Services, Fire Protection and Waste Services | $18 | Services applied to all properties |
| **Total**[21] | **$1.451 Billion** | |

45.    The foregoing expenses were calculated by including *only* those charges which were reasonable, necessary, and of direct and primary benefit to the Second-Lien Holders. Griffith Decl. ¶ 19.  More specifically, the applicable 506(c) Surcharges included the actual

---

[21] Notably, this amount *excludes* any expenses that did not directly benefit the Second-Lien Holders' Collateral.

WEIL:\97034450\13\73217.0004

expenses directly related to (and incurred to preserve) the Collateral paid through the Sale Date[22]

and did *not* include any expenses related to going-out-of-business ("**GOB**") store expenses.  *Id.*

46.    None of the 506(c) Surcharges were avoidable, *id.* ¶ 21; these expenses

were necessary for the preservation and disposition of the Collateral.  *Matter of Iberica Mfg., Inc.*,

180 B.R. 707, 713 (Bankr. D.P.R. 1995) ("Necessary expenses are those unavoidably incurred").

From professional services to simply keeping the lights on, the Debtors had no choice but to incur

the 506(c) Surcharges to preserve and ultimately dispose of the Collateral in a manner that would

(and did) maximize value for all stakeholders.  *See, e.g.*, *In re Felt Mfg. Co., Inc.*, 402 B.R. 502,

524 (Bankr. D.N.H. 2009) (hiring a turnaround management firm was "necessary" because "the

services were incurred to preserve the going concern value of the business and its assets, on which

the [creditor] had its entire lien").  Failing to incur any of these costs would have resulted in not

only a loss in the Collateral's value, but a complete inability for the Debtors to conduct the

ultimately successful Sale.  Griffith Decl. ¶ 23.

47.    These expenses were also reasonable.  *Id.* ¶ 22.  All of the 506(c) Surcharges

were in "sensible proportion" to the value received by the Second-Lien Holders.  *In re Ceron*, 412

B.R. 41, 52 (Bankr. E.D.N.Y. 2009) (reasonable expenses "should be in some sensible proportion

to the value of the benefit to be received"); *In re Compton Impressions*, 217 F.3d 1256, 1260 (9th

Cir. 2000) (internal citation omitted) (citing *In re Chicago Lutheran Hosp. Ass'n*, 89 B.R. 719,

727 (Bankr. N.D. Ill. 1988)) (measuring reasonableness against "the amount that the secured

creditor would have necessarily incurred through foreclosure and disposal of the property").  In

this case, each expense was well within the "normal range" for its category.  *See* Griffith Decl.

---

[22] The one exception to this includes professional fees, which were calculated using accrued balances through the Sale Date.  Griffith Decl. ¶ 19.

¶ 22; *see, e.g., Felt*, 402 B.R. at 524–27 (professional fees were reasonable as they did "not appear outside the normal range").  Further, because the Second-Lien Holders would have incurred the 506(c) Surcharges themselves if not for the Debtors' efforts to preserve the Collateral, the expenses incurred were both necessary and reasonable.  Griffith Decl. ¶ 21.

48.    Finally, and importantly, these expenses—all of which were incurred ***before*** the Sale—were to the direct and primary benefit of the Second-Lien Holders.  Griffith Decl. ¶ 23; *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) (citing *Brookfield Production Credit Ass'n. v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984)) (Debtors must show that 506(c) expenses were "primarily for the benefit of the creditor and that the creditor directly benefited from the expenditure."); *In re Kohl*, 421 B.R. 115, 123 (Bankr. S.D.N.Y. 2009) ("A secured creditor is interpreted as having received a benefit if the expense preserved the value of its collateral.").  ESL was, at all times, the only going concern bidder and had extensive transparency into the value of the Collateral (including the Second-Lien Holders' Collateral) it was purchasing.  Griffith Decl. ¶ 6.  Cyrus, the Collateral Agent, and the other Second-Lien Holders also significantly benefitted from that Sale by virtue of their participation in the credit bid.  *See* Hr'g Tr. 99:17-18 ("Court: I think [ESL and Cyrus are] fairly close to each other."); *see also* Griffith Decl. ¶ 8.

49.    There can be no reasonable dispute that each of the 506(c) Surcharges was incurred for the purpose of preserving the value of the Collateral.  Expenses associated with continuing the Debtors' business—*e.g.*, rent, utilities, and critical vendor payments—permitted the Debtors to preserve the Collateral's value until the Sale could occur.  Griffith Decl. ¶ 23.  Absent these and the other 506(c) Surcharges, the value would have irreversibly diminished leading up to the Sale.  *Id.*

50.      In sum, the reasonable and necessary 506(c) Surcharges that were intended to (and ultimately did) directly benefit the Second-Lien Holders total approximately $1.451 billion. When subtracted from the gross—at most—$320 million even arguably attributable to 507(b) Claims, there is a huge deficit and, therefore, no resulting value for 507(b) Claims.  *Id.* at Ex. A.

51.      This holds true for ***all*** Second-Lien Holders, including the Collateral Agent, whose purported 507(b) Claim arises ***after*** the Sale.  Even assuming the Collateral Agent is entitled to additional adequate protection beyond what it has already received for the Debtors' use of roughly $74 million in cash collateral after the Sale (it is not so entitled),[23] the pre-Sale 506(c) Surcharges completely dwarf any purported claims under section 507(b), leaving the same zero-dollar recovery.

**D.**      **The Equities Weigh Against Any Purported 507(b) Claims Recovery**

52.      Even if the Court were to find any merit or monetary value in the Second-Lien Holders' 507(b) Claims, the policy rationale behind Section 506(c) still does not warrant relief for the Second-Lien Holders.  The purpose behind section 506(c) is to "prevent unjust enrichment" and "a windfall to a secured creditor at the expense of the estate."  *In re Domistyle, Inc.*, 811 F.3d 691, 696 (5th Cir. 2015) ("A secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost.") (internal quotation marks and citations omitted).  *See also Objection of the Official Committee of Unsecured Creditors to Sale of Substantially All of The Debtors' Assets to ESL Investments, Inc.* (ECF No. 2309) ("**UCC Sale Objection**") ¶ 245 (noting that the Debtors' administrative expenses resulting

---

[23] *See generally, Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Cash Collateral, including Cash Collateral* (ECF No. 3050) at ¶ 30.

WEIL:\97034450\13\73217.0004

from the Sale Transaction "are a ***direct result of pursuing a going-concern option primarily for ESL's benefit***") (emphasis in original).

53.     Allowing the Second-Lien Holders to benefit from the Debtors' efforts in preserving their Collateral without paying their fair share in any of the associated costs would provide those secured creditors an end run around the equitable principles inherent in the Bankruptcy Code and, specifically, section 506(c).  This is especially true here, where all Second-Lien Holders were unsecured on the Petition Date with respect to their Second-Lien Debt, which meant the alternative to what they recovered on their credit bid would have been a zero-dollar recovery.  Griffith Decl. ¶ 8.  The effective purpose of the adequate protection mechanism in the Final DIP Order was, as this Court noted, "to protect for diminution of collateral in the process where ESL became the buyer of the company."  Hr'g Tr. 97:4–6; *see also* Final DIP Order ¶ 18(d).  On that score, ESL engaged with the Debtors in rigorous and often contentious arm's-length negotiations that led to the Sale.  *See* Griffith Decl. ¶ 6; *see also* ESL's Response ¶ 17.  Accordingly, it would be inequitable for ESL, in particular, to now collect additional consideration for a diminution in Collateral value—a diminution it was certainly aware of when it purchased those assets—without bearing its fair share of the administrative expenses and burdens incurred for its primary benefit.  Further, any other valuation methodology, including, but not limited to, NOLV, would inequitably (and illogically) allow the Second-Lien Holders to pay liquidation values for a going concern business.  *See* Griffith Decl. ¶ 14.  Such recovery is unsupportable by the facts of this case, equity, and controlling law.

54.     Finally, and for clarity, ***all*** Second-Lien Holders—not just ESL—benefitted from the Sale by receiving 100 cents on the dollar for their portion of the credit bid.  *Id.* ¶ 8.  A full payout could not have been achieved without a going concern sale, and the other Second-Lien

WEIL:\97034450\13\73217.0004

Holders, like ESL, needed the Debtors to continue operating their business to effectuate the Sale. *Id.* ¶ 21. Allowing any Second-Lien Holder to recover 507(b) Claims would result in those creditors inequitably and improperly receiving duplicative value for the same Collateral, i.e., a 100% payout *plus* the value of the administrative expenses spent to preserve the Collateral. The Court should not now allow the Second-Lien Holders to receive such an inequitable windfall at the expense of all other stakeholders.

## NOTICE

49.    No trustee has been appointed in these Chapter 11 Cases. Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405), including to the Second-Lien Holders.

50.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

## CONCLUSION

51.    For all of the reasons stated in this Motion, the Debtors respectfully request that the Court grant this Motion in its entirety, estimate the value of the 507(b) Claims at zero dollars for reserve purposes only, and grant the Debtors such other and further relief, at law or in equity, as it deems just and proper.

*[Remainder of Page Intentionally Left Blank.]*

Dated: May 26, 2019
      New York, New York

           */s/ Ray C. Schrock*
           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York  10153
           Telephone:  (212) 310-8000
           Facsimile:  (212) 310-8007
           Ray C. Schrock, P.C.
           David J. Lender
           Paul R. Genender
           Jared R. Friedmann
           Sunny Singh

           *Attorneys for Debtors*
           *and Debtors in Possession*

WEIL:\97034450\13\73217.0004

## **Exhibit A**

**Proposed Schedule**

WEIL:\97034450\13\73217.0004

| From: | Genender, Paul |
|---|---|
| To: | O"Neal, Sean A.; Schrock, Ray |
| Cc: | tkreller@milbank.com; Dizengoff, Ira; Hwangpo, Natasha; Fox, Edward (External); Barefoot, Luke A.; Reimer, Eric; Dublin, Philip; Friedmann, Jared; Singh, Sunny; Moloney, Thomas J. |
| Subject: | RE: Sears - Proposed 507(b) Briefing Schedule [confidential; subject to FRE 408] |
| Date: | Monday, May 20, 2019 2:20:55 PM |

Attached is the Debtors' counterproposal for a 507(b) schedule. Please let us know if agreeable. Thanks, Paul

Preliminary Comments:

1. If the Debtor is filing its motion first where, as here, it does not have the burden of proof, then there should not be simultaneous opening briefs 4 weeks after the Debtors files its motion on May 24.

2. We suggest the following as a compromise which affords 2Ls additional time from our initial proposal and the Debtors less time to reply to the 2Ls response and expert report(s).

3. We do not think pre-hearing briefs are needed but that issue can always be addressed with the Court and can be added so that they are submitted 2-3 days before the July 11 hearing if the Court deems that helpful.

   Proposed Schedule:

   Friday, May 24, 2019
   Filing deadline for Debtors' section 507(b) claims estimation motion
   The Debtors suggest that the parties meet and confer to attempt to agree on undisputed facts before this date
   The Parties shall be permitted to commence written discovery upon filing of the Debtors Motion and on agreed schedule

   Wednesday, June 12, 2019
   Filing deadline for second lien holders' response
   Filing deadline for second lien holders' expert report

   June 17-19, 2019
   Depositions of second lien holders' expert(s) (likely one day)

   Tuesday, June 25, 2019
   Filing deadline for Debtors' reply
   Filing deadline for Debtors' expert report

   June 28 or July 1
   Deposition of the Debtors' expert(s) (likely one day)

   Wednesday, July 3, 2019
   Submission of joint stipulated/undisputed facts

   Thursday, July 11, 2019
   Hearing date



**Paul R. Genender**
Partner
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201-6950
paul.genender@weil.com

+1 214 746 7877 Direct
+1 214 914 4162 Mobile
+1 214 746 7777 Fax

**<u>Exhibit B</u>**

**Proposed Order Approving Debtors' Briefing Schedule**

WEIL:\97034450\13\73217.0004

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

In re                                          :

                                               :          **Chapter 11**

**SEARS HOLDINGS CORPORATION,** *et al.,*      :

                                               :          **Case No. 18-23538 (RDD)**

                                               :

Debtors.[1]                                    :          **(Jointly Administered)**

------------------------------------ x

### <u>ORDER GRANTING THE DEBTORS' PROPOSED BRIEFING SCHEDULE</u>

Upon the Motion to Estimate Certain 507(b) Claims for Reserve Purposes dated _____,

2019 (ECF No. ____), (the "**Motion**")[2] of Sears Holdings Corporation and its debtor affiliates, as

debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"**Debtors**"), and the Debtors' proposed briefing scheduled contained in the same; and the Court

having determined that such relief is in the best interests of the Debtors, their estates, their

creditors, and all parties in interest; therefor, it is

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

**ORDERED** that the Parties shall adhere to the following briefing and discovery schedule in connection with the Debtors' Motion:

1. The Parties shall commence written discovery upon filing of the Debtors' Motion;

2. Any responses or objections to the Debtors' Motion ("**Objections**") shall be filed by no later than **4:00 p.m. ET on June 14, 2019**

3. All expert reports filed in support of any Objections shall be filed by no later than **June 14, 2019**, and any corresponding expert depositions shall commence between **June 17-19, 2019**;

4. Any replies in support of the Motion shall be filed by no later than **June 25, 2019**;

5. All expert reports filed in support of any replies shall be filed by no later than **June 25, 2019**, and any corresponding expert depositions shall commence between **June 28-July 1, 2019**;

6. The Parties shall submit any joint stipulated and/or disputed facts by no later than **July 3, 2019**; and

7. A hearing on the Motion, including any Objections or replies filed in response to the same, will be held at **10:00 a.m. ET on July 11, 2019**.


Dated: _____, 2019
          White Plains, New York


_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

WEIL:\97049475\2\73217.0004

## **Exhibit C**

**Proposed Order Granting Motion**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

In re                                          :

                                               :                **Chapter 11**

**SEARS HOLDINGS CORPORATION**, *et al.*,      :

                                               :                **Case No. 18-23538 (RDD)**

                                               :

Debtors.[1]                                    :                **(Jointly Administered)**

------------------------------------ x

### ORDER GRANTING THE DEBTORS' MOTION
### TO ESTIMATE CERTAIN 507(b) CLAIMS FOR RESERVE PURPOSES

Upon the motion dated _____, 2019 (ECF No. ____), (the "**Motion**")[2] of Sears Holdings

Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), for approval pursuant to section 502(c) of the

United States Code ("**Bankruptcy Code**") to estimate the maximum amount of 507(b) Claims

held by Second-Lien Holders for reserve purposes, all as more fully set forth in the Motion; and

the Court having jurisdiction to consider the Motion and the relief requested therein in accordance

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated

January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant

to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief sought in the Motion and

the opportunity for a hearing thereon having been provided in accordance with the Amended Case

Management Order; and such notice having been adequate and appropriate under the

circumstances, and it appearing that no other or further notice need be provided; and the Court

having held a hearing to consider the relief requested in the Motion on July 11, 2019 (the

"**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the

Court; and the Court having determined that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein and that such relief is in the best interests of the

Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and

sufficient cause appearing therefor, it is

     **ORDERED** that the Motion is granted; and it is further

     **ORDERED** that the Second-Lien Holders' 507(b) Claims are hereby estimated in the total

amount of zero dollars in their entirety for purposes of establishing reserves; and it is further

     **ORDERED** that this Court shall retain jurisdiction to hear and determine all matters arising

from or related to this Order.

Dated: _____, 2019
      White Plains, New York

                               _____

                               THE HONORABLE ROBERT D. DRAIN
                               UNITED STATES BANKRUPTCY JUDGE

WEIL:\97034450\13\73217.0004