WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                            :
                                                 :    **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*        :
                                                 :    **Case No. 18-23538 (RDD)**
                                                 :
           Debtors.                              :    **(Jointly Administered)**
------------------------------------------------------------x

**DECLARATION OF BRIAN J. GRIFFITH IN SUPPORT OF THE DEBTORS'
MOTION TO ESTIMATE CERTAIN 507(b) CLAIMS FOR RESERVE PURPOSES**

I, Brian J. Griffith, make this declaration under 28 U.S.C. § 1746:

1. I submit this declaration ("**Declaration**") in support of the *Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* ("**Motion**"), filed concurrently with this Declaration.[1]

2. I have been a Managing Director of M-III Advisory Partners, LP ("**M-III**") for the past five years. As Managing Director at M-III, I am responsible for leading deal teams where we are retained by either creditors or debtors. Assignments range from operational improvement to distressed situations both in and out of court. Depending on the assignment, deal

---

[1] All capitalized terms not otherwise defined in this Declaration shall have the meanings prescribed to them in the Motion.

**DECLARATION OF BRIAN J. GRIFFITH – Page 1**

responsibilities range from short-term profit improvement roles to multi-year turnaround advisory assignments in numerous industries, including: retail, financial services, real estate development, healthcare, energy, consumer products, manufacturing, automotive, and food services. Typical areas of focus on debtor engagements are treasury, cash forecasting, process improvement, cost reductions, development of strategic alternatives, and negotiations with creditors and parties-in-interest. Prior to my current role with M-III, I served in interim management roles, including as a chief financial officer and chief restructuring officer.

3. In October 2018, the Debtors[2] retained M-III to provide the Debtors and their other professionals with financial advisory services in connection with the Debtors' evaluation and development of strategic alternatives to wind-down and liquidation. Specifically, M-III has advised the Debtors regarding the value of, among other things, potential adequate protection claims held by Cyrus Capital Partners, L.P. ("**Cyrus**"), ESL Investments, Inc. ("**ESL**"), and Wilmington Trust, N.A., as collateral agent of certain prepetition second-lien debt on its own behalf and on behalf of all other Prepetition Second Lien Credit Parties ("**Collateral Agent**,"

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

collectively with Cyrus and ESL, the "**Second-Lien Holders**"), pursuant to section 507(b) of the Bankruptcy Code and as permitted by the Final DIP Order ("**507(b) Claims**"). M-III performed this analysis in connection with the Motion and the Second-Lien Holders' allegations regarding their purported, aggregate amount of 507(b) Claims.

4. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors; my discussions with other members of the M-III team and the Debtors' other advisors; my review of relevant documents; and my views based upon my experience. If called to testify, I would testify competently to each of the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of M-III for the Debtors.

### *Brief Background and Case Status*

5. The Debtors filed these chapter 11 cases on October 15, 2018 ("**Petition Date**"). Since the Petition Date, the Debtors intended to—but had serious concerns regarding their ability to—effectuate a going concern sale of substantially all of their assets ("**Sale**"). Indeed, the Debtors and their advisors contemplated liquidation numerous times between the Petition Date and the ultimately successful Sale.

6. Throughout the Sale process, ESL was the only going concern bidder and had extensive transparency into the value of the collateral (including the Second-Lien Holders' Collateral) it was purchasing. After months of negotiations, and as a result of a rigorous process, the Debtors accepted ESL's going concern bid at the January 14 auction, which included a credit bid consisting of, among other things, $433.5 million of Second-Lien Debt.

7. On February 11, 2019 ("**Sale Date**"), the Debtors closed the Sale to Transform Holdco LLC ("**Transform**"), the entity formed by ESL for the purpose of effectuating

the Sale, pursuant to the asset purchase agreement with Transform (as amended from time to time, the "**APA**") for approximately $5.2 billion.

8. All Second-Lien Holders, including, but not limited to, ESL, Cyrus, and the Collateral Agent, recovered significantly more in the Sale—roughly $433.5 million more—than they would have in a liquidation. Specifically, Second-Lien Holders, as participants in the credit bid, received a 100% recovery on account of their respective, credit bid Second-Lien Debt. Based on M-III's prior liquidation analyses, had the Debtors liquidated as of the Petition Date, the Second-Lien Holders would have received a few cents on the dollar, at the most, on a deficiency claim and a zero-dollar recovery as a secured creditor from their Collateral package.

9. The Debtors have requested a hearing on the proposed joint chapter 11 plan (as amended or supplemented, the "**Plan**") on July 23, 2019 ("**Confirmation**"). As they approach Confirmation, the Debtors and their advisors are evaluating certain post-petition administrative claims for purposes of, among other things, establishing necessary reserves. Because the 507(b) Claims are significant, unresolved issues in these chapter 11 cases, the Debtors have filed the current Motion in hopes to resolve such claims in advance of the Debtors' Confirmation.

### *Negligible Second-Lien Diminution in Value*

10. The Second-Lien Holders' respective portions of the Second-Lien Debt are as follows: ESL holds 78.3%; Cyrus holds 16.1%;[3] and the remaining Second-Lien Holders, including, but not limited to, the Collateral Agent, collectively hold 5.6% of the Second-Lien Debt. Simply put, Cyrus and ESL collectively hold approximately 95% of the Second-Lien Debt.

---

[3] The Debtors and their advisors take Cyrus's 16.1% as true for purposes of this calculation, reserving all rights related to the same, despite the fact that such percentage may improperly include certain make-wholes and accrued interest through the Sale Date.

11. None of the Second-Lien Holders, including ESL and Cyrus, have filed proofs of claims for their purported 507(b) Claims. Nevertheless, the Debtors understand that Cyrus values its 507(b) Claims at $77 million, and the Debtors suspect that ESL will assert 507(b) Claims up to its $50 million cap under the APA.

12. The Debtors also expect that the Collateral Agent will attempt to pursue a claim under section 507(b) arising since the Sale Date based on the Debtors' use of cash collateral post-Sale in the amount of approximately $74 million.

13. Taking many of Cyrus's assumptions as true, including the total First-Lien Debt, Second-Lien Debt and total gross collateral, with all rights reserved, the Debtors assessed the resulting value of the Second-Lien Holders' 507(b) Claims by assessing the fair market value of the Collateral in the hands of the Debtors at both the Petition Date and the Effective Date. Attached to this Declaration as **Exhibit A** is a true and correct copy of the Debtors' preliminary 507(b) Claims analysis (the "**Debtors' Valuation**").

14. As shown in the Debtors' Valuation, M-III valued the Collateral at 85%—an amount which reflects the value that was ultimately recovered on the Collateral at the Sale—at both the Petition Date and the Effective Date. Using any other valuation methodology would not reflect the reality of the Collateral's value captured by the Sale. For example, a Net Orderly Liquidation Value ("**NOLV**") of the Collateral would reflect a liquidation value for the Collateral, rather than the value actually realized by the going concern Sale.

15. Using the fair market value methodology explained above, the Collateral was $2.287 billion at the Petition Date and $1.323 billion at the Effective Date. *See* Ex. A. After the pay down of the First-Lien Debt and taking into account the Debtors' use of cash collateral

post-Sale, the remaining diminution in value of the gross Second-Lien Holders' Collateral is, at the very most, $320 million.

16. Applying this gross amount to Cyrus's portion of the Second-Lien Debt, or approximately 16.1%, results in (at most) a diminution in value totaling roughly $51 million. As detailed in the express terms of the APA and the Plan,[4] while ESL holds approximately 78.3% of Second-Lien Debt, ESL's potential 507(b) Claim is capped at $50 million. This leaves the remaining Second-Lien Holders, holding 507(b) Claims that are subordinated to Cyrus and ESL, with approximately 5.6% of the Second-Lien Debt, or $18 million, of the total diminution in value.

17. Thus, the aggregate total remaining diminution in value of the gross Second-Lien Holders' Collateral is, at the very most, under a conservative approach and taking into account ESL's $50 million cap, approximately $119 million. When subject to the applicable deductions made pursuant to 11 U.S.C. § 506(c) ("**506(c) Surcharges**"), however, any purported claims under 507(b) result in a zero-dollar recovery.

### *Significant 506(c) Surcharges*

18. The Debtors incurred significant administrative expenses totaling $1.451 billion in their efforts to preserve the value of the Second-Lien Holders' Collateral from the Petition Date to the Sale Date.

19. To calculate the applicable 506(c) Surcharges, M-III included only those charges which were reasonable, necessary, and of direct and primary benefit to the Second-Lien Holders. To do so, M-III included *only* the actual expenses directly related to (and incurred to preserve) the Collateral and paid through the Sale Date—other than professional fees, which were

---

[4] APA § 9.13; Plan § 2.4

based on accrued balances through the Sale Date.  As a second, conservative step, M-III removed any expenses related to going-out-of-business ("**GOB**") store expenses from this calculation.

20.   As shown in the Debtors' Valuation, this approach resulted in 506(c) Surcharges comprised of the following expenses:

| Fee | Amount (in millions) | Purpose/Use |
|---|---|---|
| Employee Payroll, Benefits and Taxes | $712 | Employee compensation |
| Rent, Occupancy Expenses, Property Taxes and Property Maintenance | $228 | Rent paid towards properties, including stores used to sell collateral |
| Logistics and Supply Chain Costs | $170 | Transportation and logistics involved in moving inventory |
| Professional Fees | $51 | Professional services rendered from Petition Date to Sale Date |
| DIP Interest and Financing Fees | $94 | DIP facility expenses associated with funding the bankruptcy |
| Critical Vendor Payments | $51 | Payments made to keep vendors shipping for the continuation of the Debtors' business |
| Utility and Telephone Expenses | $28 | Gas/electric and telephone expenses |
| Advertising Expenses | $33 | Advertising spent associated with asset sale |
| Employee Travel and Business Expenses | $38 | All employee travel |
| Equipment Expenses | $29 | All equipment, including fuel and truck maintenance and all distribution center equipment |
| Security Services, Fire Protection and Waste Services | $18 | Services applied to all properties |
| **Total** | | **$1.451 Billion** |

21.     The above-listed 506(c) Surcharges were necessary for the preservation and disposition of the Collateral and, therefore, were unavoidable. From professional services to simply keeping the lights on, the Debtors had no choice but to incur the 506(c) Surcharges to preserve and ultimately dispose of the Collateral in a manner that would (and did) maximize value for all stakeholders. Failing to incur any of these costs would have resulted in not only a loss in the Collateral's value, but a complete inability for the Debtors to conduct the ultimately successful Sale. Besides, the Second-Lien Holders would have incurred the 506(c) Surcharges themselves if not for the Debtors' efforts to preserve the Collateral.

22.     These expenses were also reasonable. Each expense was well within the "normal range" for its category. Based on my personal experience working with the Debtors, and given the focus on efficiencies throughout these chapter 11 cases, I believe these costs were both reasonable and necessary.

23.     All of the 506(c) Surcharges were to the direct and primary benefit of the Second-Lien Holders. Each of the 506(c) Surcharges was incurred for the purpose of preserving the value of the Collateral. Expenses associated with continuing the Debtors' business—*e.g.*, rent, utilities, and critical vendor payments—permitted the Debtors to preserve the Collateral's value until the Sale could occur. Absent these and the other 506(c) Surcharges, the Collateral's value would have irreversibly diminished leading up to the Sale, and the Debtors would have been unable to conduct the ultimately successful Sale.

### *Resulting 507(b) Claims' Value*

24.     After deducting the $1.451 billion 506(c) Surcharges from the total, recoverable $119 million diminution in value, there is no resulting value to Second-Lien Holders; meaning, any potential 507(b) Claims are worth zero dollars. *See* Ex. A.

Dated: May 26, 2019  By: /s/Brian J. Griffith
       New York, New York       Brian J. Griffith
                                                   Managing Director
                                                   M-III Advisory Partners, LP

**DECLARATION OF BRIAN J. GRIFFITH – Page 9**

# *EXHIBIT A*

## 507(b) Claim Calculation
*($ in millions)*

### 507(b) Claim Detail

| | Petition Date | Effective Date | Delta |
|---|---|---|---|
| ABL RCF | $836 | $732 | |
| ABL Term Loan | 571 | – | |
| Letters of Credit | 124 | 118 | |
| FILO Facility | 125 | 125 | |
| Standalone L/C Facility | 271 | 271 | |
| **Total 1L Debt** | **$1,927** | **$1,246** | **($681)** |
| (+) 2L Debt | $1,078 | $1,078 | |
| **Total 1L & 2L** | **$3,005** | **$2,324** | **($681)** |
| *Cyrus 2L Debt* | *$170* | *$170* | |
| | | | |
| Inventory Book Value | $2,691 | $1,557 | |
| Accounts Receivable Book Value | 70 | 107 | |
| **Total Gross Collateral** | **$2,761** | **$1,664** | **($1,097)** |
| | | | |
| Inventory Purchase Price as % of Book Value | 85.0% | 85.0% | |
| Net Inventory Recovery | $2,287 | $1,323 | |
| (+) Accounts Receivable | 70 | 107 | |
| **Total Eligible Collateral Proceeds** | **$2,357** | **$1,430** | **($927)** |
| (-) 1L Debt | ($1,927) | ($1,246) | |
| (-) Post-Close Cash Collateral | | ($74) | |
| **Remaining Collateral for 2L** | **$431** | **$110** | **($320)** |
| | | | |
| **2nd Lien Diminution in Value** | | | **$320** |
| *Cyrus Portion* | | | *$51* |
| *ESL Portion (Capped at $50mm)* | | | *50* |
| *Other Claimholders* | | | *18* |
| **Net 2nd Lien Diminution of Value Including ESL's Capped Claim** | | | **$119** |
| | | | |
| (-) 506(c) Charge | | | ($1,451) |
| **Net 507(b) after Surcharge** | | | **–** |

### Cyrus 507(b) Claim Size (before surcharge) Sensitivity

| | | | | | Ending NOLV | | | |
|---|---|---|---|---|---|---|---|---|
| | | 90.0% | 88.0% | 86.0% | 85.0% | 84.0% | 82.0% | 80.0% |
| Beginning NOLV | 90.0% | $59 | $64 | $69 | $72 | $74 | $79 | $84 |
| | 88.7% | 54 | 59 | 64 | **66** | 69 | 74 | 78 |
| | 88.0% | 51 | 56 | 61 | 63 | 66 | 71 | 76 |
| | 86.0% | 42 | 47 | 52 | 55 | 57 | 62 | 67 |
| | 85.0% | 38 | 43 | 48 | **51** | 53 | 58 | 63 |
| | 84.0% | 34 | 39 | 44 | 46 | 49 | 54 | 59 |
| | 82.0% | 26 | 30 | 35 | 38 | 40 | 45 | 50 |
| | 80.0% | 17 | 22 | 27 | 29 | 32 | 37 | 42 |

### 506(c) Surcharge Detail [1]

| | |
|---|---|
| Employee Payroll, Benefits and Taxes | $712 |
| Rent, Occupancy Expenses, Property Taxes and Property Maintenance | 228 |
| Logistics and Supply Chain Costs | 170 |
| Professional Fees | 51 |
| DIP Interest and Financing Fees | 94 |
| Critical Vendor Payments | 51 |
| Utility & Telephone Expenses | 28 |
| Advertising Expenses | 33 |
| Employee Travel and Business Expenses | 38 |
| Equipment Expenses (Fuel and Truck Maintenance) | 29 |
| Security Services, Fire Protection and Waste Services | 18 |
| **Total** | **$1,451** |

*(1) Professional fees based accrued balance through closing. Other expenses based on actuals paid through closing. Excludes GOB Expenses.*