WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                          :
**In re**                                 :        **Chapter 11**
                                          :
**SEARS HOLDINGS CORPORATION**, *et al.*, :        **Case No. 18-23538 (RDD)**
                                          :
        **Debtors.**[1]                   :        **(Jointly Administered)**
                                          :
-------------------------------------------------------------x

**DEBTORS' OMNIBUS REPLY**
**TO OBJECTIONS TO DEBTORS' DISCLOSURE**
**STATEMENT AND SOLICITATION AND VOTING PROCEDURES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, LLC (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................7

Modifications to the Plan and Disclosure Statement ...................................13

I.  Summary of Modifications to the Plan ...........................................13

II. Summary of Modifications to the Disclosure Statement .................15

The Court Should Overrule Objections and Approve the Disclosure Statement .........................16

I.  The Disclosure Statement Contains Adequate Information as Required by Section 1125 of Bankruptcy Code .........................................16

    A.  Adequate Information is Determined on a Case-by-Case Basis..........................16

    B.  The Disclosure Statement Contains Adequate Information .................................18

    C.  The Debtors' Disclosure Modifications Adequately Address the Disclosure-Related Objections ...........................................19

II. The Debtors' Plan is Confirmable and Confirmation Objections Should be Considered at Confirmation Hearing.......................................19

    A.  The Plan Settlement Does Not Render the Plan Patently Unconfirmable ...........22

        (i)  Terms of the Modified Plan Settlement...................................24

    B.  The Debtors will Demonstrate that the Plan Satisfies Section 1129(a)(9) of the Bankruptcy Code...........................................31

    C.  The Debtors Will Demonstrate at the Confirmation Hearing that the Plan Is Proposed in Good Faith ...........................................34

    D.  The Debtors will Demonstrate at the Confirmation Hearing that the Plan Does Not Discriminate Unfairly or Provide for Impermissible Unequal Treatment...........................................36

    E.  The Debtors will Demonstrate at the Confirmation Hearing that the Plan Satisfies the Best Interests Test ...........................................38

    F.  The Debtors Will Demonstrate that the Release Provisions in the Plan are Appropriate and Should be Approved at Confirmation ...........41

Conclusion .........................................................................................43

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337 (S.D.N.Y. 2007)............................................................................39

*In re Affiliated Foods, Inc.*,
  249 B.R. 770 (Bankr. W.D. Mo. 2000) ..............................................................39

*In re Apex Oil Co.*,
  118 B.R. 683 (Bankr. E.D. Mo. 1990) ...............................................................30

*Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*,
  383 B.R. 856 (E.D.N.Y. 2008) ...........................................................................17

*In re Cardinal Congregate I*,
  121 B.R. 760 (Bankr. S.D. Ohio 1990) ........................................................19, 22

*In re Cenargo Intern., PLC*,
  294 B.R. 571 (Bankr. S.D.N.Y. 2003) ...............................................................31

*In re Chassix Holdings, Inc.*,
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) .................................................................43

*In re Coldwater Creek Inc.*,
  No. 14-10867-BLS, 2014 WL 11429340 (Bankr. D. Del. Sep. 17, 2014)...........29

*Matter of Colin*,
  44 B.R. 806 (Bankr. S.D.N.Y. 1984) .................................................................21

*In re Copy Crafters Quickprint, Inc.*,
  92 B.R. 973 (Bankr. N.D.N.Y. 1988)..................................................................20

*In re Crowthers McCall Pattern, Inc.*,
  120 B.R. 279 (Bankr. S.D.N.Y. 1990) ...............................................................39

*In re Ellipso, Inc.*,
  No. 09-00148, 2012 WL 368281 (Bankr. D.D.C. Feb. 3, 2012) .........................21

*In re Enron Corp.*,
  Case No. 01-16034, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15,
  2004)...................................................................................................................37

*In re Enron Corp.*,
  No. 01-16034 AJG, 2004 WL 6075307 (Bankr. S.D.N.Y. July 15, 2004) ..........29

WEIL:\97050928\1\73217.0004

*In re Genco Shipping & Trading Ltd.*,
    513 B.R. 233 (Bankr. S.D.N.Y. 2014) ................................................................ 43

*In re Hoosier Hi-Reach, Inc.*,
    64 B.R. 34 (Bankr. S.D. Ind. 1986) .................................................................... 40

*In Fed. Deposit Ins. Corp. v. Hogan (In the Matter of Gulfco Inv. Corp.)*,
    593 F.2d 921 (10th Cir. 1979) ........................................................................... 30

*In re Kaiser Aluminum Corp.*,
    No. 02-10429(JKF), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006), *aff'd*,
    343 B.R. 88 (D. Del. 2006) ................................................................................ 38

*In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*,
    149 B.R. 306 (Bankr. E.D.N.Y. 1992) ............................................................... 38

*Lawski v. Frontier Ins. Grp., LLC (In re Frontier Ins. Grp., Inc.)*,
    585 B.R. 685 (Bankr. S.D.N.Y. 2018), *aff'd*, 598 B.R. 87 (S.D.N.Y. 2019) ......... 42

*In re Lionel LLC*,
    Case No. 04-17324, 2008 Bankr. LEXIS 1047 (Bankr. S.D.N.Y. Mar. 31,
    2008) .................................................................................................................. 39

*Momentum Mfg. Corp., v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994) .............................................................................. 17

*In re MPM Silicones*, *LLC*,
    Case No. 14-22503, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014),
    *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other
    grounds*, 874 F.3d 787 (2d Cir. 2019) ......................................................... 42, 43

*Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight,
    Inc.)*,
    848 F.2d 414 (3d Cir. 1988) .............................................................................. 17

*In re Phoenix Petroleum Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) ................................................................ 19

*In re Puff*,
    Case No. 10-01877, 2011 WL 2604759 (Bankr. N.D. Iowa June 30, 2011) .......... 17

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ............................................................... 20

*In re Resorts Int'l, Inc.*,
    145 B.R. 412 (Bankr. D.N.J. 1990) .................................................................... 30

*S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*,
  252 B.R. 373 (E.D.Tex. 2000) ............................................................................40

*In re Smith*,
  357 B.R. 60 (Bankr. M.D.N.C. 2006) ................................................................39

*In re Stanley Hotel, Inc.*,
  13 B.R. 926 (Bankr. D. Colo. 1981) ..................................................................18

*In re Stone & Webster, Inc.*,
  286 B.R. 532 (Bankr. D. Del. 2002) ..................................................................21

*In re SunEdison, Inc.*,
  576 B.R. 453 (Bankr. S.D.N.Y. 2017) ...............................................................43

*In re Texas Extrusion Corp.*,
  844 F.2d 1142 (5th Cir. 1988) ...........................................................................17

*In re U.S. Brass Corp.*,
  194 B.R. 420 (Bankr. E.D. Tex. 1996)...............................................................22

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking
  Co., Ltd.)*,
  860 F. 2d 515 (2d. Cir. 1988)............................................................................23

*In re Uno Rest. Holdings Corp.*,
  Case No. 10-10209 (MG), 2010 WL 3373959 (Bankr. S.D.N.Y. May 11,
  2010)...................................................................................................................16

*In re Watervillle Timeshare Group*,
  67 B.R. 412 (Bankr. D.N.H. 1986) ....................................................................21

*In re Winn-Dixie Stores, Inc.*,
  356 B.R. 239 (Bankr. M.D. Fla. 2006)...............................................................38

*In re Woodbridge Grp. of Companies, LLC*,
  592 B.R. 761 (Bankr. D. Del. 2018) ...........................................................29, 30

*In re WorldCom, Inc.*,
  No 02-12533 (AJG) 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 21, 2003)....................36, 37

**Statutes**

11 U.S.C. § 1125.......................................................................................................*passim*

11 U.S.C. § 1129.......................................................................................................*passim*

11 U.S.C. § 1141.................................................................................................15, 42

WEIL:\97050928\1\73217.0004

**Other Authorities**

H.R. Rep. No. 95-595 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963..........................................17

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby submit this omnibus reply ("**Reply**") to the objections and responses (collectively, the "**Objections**")[2] to the *Debtors' Motion for an Order (I) Approving Disclosure Statement; (II) Establishing Notice and Objection Procedures for Confirmation of the Plan; (III) Approving Solicitation Packages and Procedures for Distribution Thereof; (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan; and (V) Granting Related Relief* (ECF No. 3277) (the "**Motion**"),[3] seeking, among other things, approval of the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (as may be amended, modified, and/or supplemented, including as set forth herein, the "**Disclosure Statement**") (ECF No. 4042) filed in connection with the proposed *Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (as may be amended, modified, and/or supplemented, the "**Plan**") (ECF No. 4041), each as filed contemporaneously herewith.  In support of this Reply and in further support of the approval of the Disclosure Statement, the Debtors respectfully represent as follows:

---

[2] Objections were filed by the following parties:  Texas Taxing Authorities (ECF No. 3373); California Commercial Roofing Systems (ECF Nos. 3640 and 3641); the United States Trustee for Region 2 (the "**U.S. Trustee**") (ECF No. 3681) (the "**UST Objection**"); Leonard H. Gerson on behalf of U.S. Department of Labor (ECF No. 3759); Linda J. Gonyo (ECF No. 3767); Winners Industry Co., Ltd. (ECF No. 3769); Santa Rosa Mall, LLC (ECF No. 3771 and 3996); ESL Investments, Inc. ("**ESL**") (ECF No. 3988); Liberty Mutual Insurance Company (ECF No. 3989); Community Unit School District 300 (ECF No. 3992); FTI Consulting Canada Inc., the Honourable J. Douglas Cunningham, Q.C., and Morneau Shepell Ltd. (ECF No. 3994); Official Committee of Unsecured Creditors (the "**Creditors' Committee**" or "**Committee**") (ECF No. 3995) (the "**Committee Objection**"); Wilmington Trust, National Association ("**Wilmington Trust**") (ECF No. 3990) (the "**Wilmington Trust Objection**"); Cyrus Capital Partners, L.P. ("**Cyrus**") (ECF No. 3997) (the "**Cyrus Objection**"); Carl Ireland, Administrator of the Estate of James Garbe (ECF No. 4007); and Plus Mark LLC (ECF No. 4009).

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Plan or the Disclosure Statement, each as defined below.

WEIL:\97050928\1\73217.0004

### Preliminary Statement

1.       Only seven months after the commencement of these massive and complex chapter 11 cases, the Debtors are seeking authority to solicit and confirm a chapter 11 plan that is in the best interests of all creditors.  The Plan contemplates an orderly wind down of the Debtors' remaining assets following the sale of substantially all of the Debtors' assets (the "**Sale Transaction**") to Transform Holdco LLC ("**Transform**") and a distribution to creditors in accordance with the Plan Settlement.  As set forth more fully below, the Debtors believe that the proposed Plan Settlement is in the best interests of creditors and should be accepted.  The Plan Settlement is an efficient and fair resolution of various inter-estate and inter-creditor issues, including the characterization of pre- and post-petition intercompany balances, allocation of costs and expenses of administration among the Debtors, whether the liabilities and assets of the Debtors should be substantively consolidated for Distribution purposes, and issues specifically related to disputes between the Debtors and the PBGC.  With the modifications in the Plan Settlement described herein, the Debtors submit that the Plan Settlement and the Plan are in the best interests of their estates and will enhance and maximize distributions for all creditors.  Accordingly, the Court should approve the Disclosure Statement and allow solicitation to proceed.

2.       The Debtors seek to solicit votes on this Plan as they believe, as the sole fiduciary for all creditors in these cases, the Plan represents both the best path forward and is the necessary catalyst to end the chapter 11 cases.  Specifically, the Plan represents the culmination of good faith negotiations and coordination among the Debtors and their key stakeholders, including the PBGC—the largest creditor in these chapter 11 cases at every Debtor and a member of the Creditors' Committee.  Although the Committee spills over 80 pages of ink to attack the Plan, as explained below, none of the issues raised by the Committee are an impediment to approval of the

7

Disclosure Statement and solicitation of the Plan, *i.e.*, the Plan is not patently unconfirmable.[4]

Indeed, similar settlement constructs have been approved in this and other districts. *See, e.g. In re Lehman Brothers Holdings Inc.*, et al., No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 06, 2011); *In re The Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2012). The Debtors hope that the Creditors' Committee will work collaboratively with the Debtors going-forward in connection with confirmation, as it is in the best interests of the Creditors' Committee's constituents and far better than any alternative.

3.     Tellingly, of the hundreds of thousands of creditors, equity interest holders, and other parties in interest in these chapter 11 cases that were served with notice of the hearing to consider the adequacy of the Disclosure Statement and other relief sought in the Motion, only thirteen (13) parties filed an Objection to the Disclosure Statement.[5] *See Aff. of Service* (ECF No. 3349). The Objections can be grouped into two categories: (a) objections with respect to the adequacy of the disclosures set forth in the Disclosure Statement and/or the solicitation and tabulation procedures described in the Motion; and (b) objections to Plan confirmation. A summary of the Objections and the Debtors' responses is attached hereto as **Exhibit A** (the "**Objection Response Chart**").[6] As described more fully herein, the Debtors have incorporated modifications to the Disclosure Statement where appropriate in response to the

---

[4] It is unfortunate that over the single issue of controlling the post-Effective Date Liquidating Trust Board, the Creditors' Committee has filed an 80-page Objection to the Disclosure Statement, consisting almost entirely of plan confirmation objections, requiring the Debtors to waste limited estate resources preparing a response to each of the asserted objections. This is even more frustrating considering that the Committee has had a draft of the Debtors' chapter 11 plan for months and have never made a counter proposal on a plan construct.

[5] In addition, two (2) additional parties (the Texas Taxing Authorities and Liberty Mutual Insurance Company) filed objections or reservations of rights expressly with respect to confirmation of the Plan, and one (1) additional party (California Commercial Roofing Systems) filed responses that are neither a Plan nor Disclosure Statement objection.

[6] Any Objection not addressed in the body of this Reply is addressed in the Objection Response Chart.

WEIL:\97050928\1\73217.0004

Objections.  The Debtors submit that, with such changes, the Objections have been addressed, are without merit as to any remaining issues, or are Plan objections that should be addressed at confirmation.

4.    Pursuant to section 1125 of the Bankruptcy Code, the only question at hand is whether the Disclosure Statement enables a "hypothetical investor typical of the holders of claims or interest in the case" to cast an informed vote on the Plan.  11 U.S.C. § 1125(a)(1).  The Court is not required to consider specialized issues that a particular creditor may wish to raise with respect to a plan nor does it require that the disclosure statement satisfy the "adequate information" standard in relation to every single party in interest.

5.    The Debtors have worked diligently to try to address, to the extent practicable and appropriate, any Objections with respect to the adequacy of the Disclosure Statement and/or the solicitation and tabulation procedures.  Accordingly, the Debtors will file contemporaneously herewith the further revised and amended version of the Plan and the Disclosure Statement, which incorporate responsive disclosures and/or provisions, as applicable.  As detailed in the Objection Response Chart, the Debtors have addressed the Objections that relate to the adequacy of disclosure by including certain additional language in the Disclosure Statement and/or the Plan—even where the Debtors believe that the requested disclosure extends beyond the scope of "adequate disclosure" per section 1125.  As the Debtors have done, the Debtors will continue to work toward consensual resolution of all remaining disclosure-related Objections, where possible, in advance of the Disclosure Statement hearing.

6.    Accordingly, the Disclosure Statement, as amended, contains "adequate information" and unequivocally satisfies the requirements of section 1125 of the Bankruptcy Code and, therefore, any Objections relating to the adequacy of the information contained in the

WEIL:\97050928\1\73217.0004

Disclosure Statement should be overruled and the Disclosure Statement should be approved. The remaining Objections raise confirmation issues that are premature to consider at this time. Certain Objections, which are primarily raised by the Creditors' Committee, not only assert confirmation objections but also assert that the Plan is non-confirmable on its face—a high standard that none of the Objections, the Creditors' Committee's objection included, have met.

7.        First, these are all plan confirmation issues, raised while the Debtors maintain Plan exclusivity. Taking these issues on now is tantamount to wresting the Debtors of their Court-approved Plan exclusivity—which the Creditors' Committee did not oppose extending a mere three weeks ago. Taking these issues on now at the Disclosure Statement hearing also turns the patently unconfirmable standard on its head and requires that the Debtors justify soliciting a Plan. Questions regarding whether a Plan settlement is justified and should be approved, whether the Debtors' have adequate means to fund the Plan, whether the Plan was proposed in good faith, whether the Plan unfairly discriminates between similarly situated creditors, whether the Plan meets the best interests test, and the permissible scope of the release provisions contemplated by the Plan, among other issues, are properly addressed in the context of confirmation —after solicitation of creditors—and not at this time. The proposed settlement of inter-estate and inter-creditors issues including substantive consolidation is justified and supported with extensive disclosure and discussion in the Disclosure Statement, and now includes incremental recoveries (the "**Plan Settlement Premium**") for certain creditors of Kmart Corp., Kmart Stores of Illinois LLC ("**Kmart of Illinois**"), and Kmart of Washington LLC ("**Kmart of Washington**"), to address the book entry of assets at such entities under the Plan. In short, none of these issues meet the extremely high standard of proving that the Plan is "patently unconfirmable"—*i.e.*, that confirmation of a plan is "impossible."

WEIL:\97050928\1\73217.0004

8.      Further, given the unique nature and substantial amount and scope of the PBGC Claims—which are joint and several at every Debtor—and as a means to execute the PBGC Settlement, the PBGC Claims are validly separately classified from and treated differently than General Unsecured Claims.  The Committee's focus against the Plan Settlement on the basis that Kmart creditors are disproportionately harmed is puzzling.  The Creditors' Committee is a fiduciary and represents the interests of <u>all</u> unsecured creditors – not just those at Kmart. Indisputably, as demonstrated by the Liquidation Analysis and as will be further addressed at confirmation, unsecured creditors overall do better under the Plan than they would have in a chapter 7 liquidation or a chapter 11 pure non-consolidated plan, even prior to the Debtors' implementation of the Plan Settlement Premium.

9.      Moreover, the Debtors will demonstrate that the Plan treats administrative claimants in compliance with section 1129(a)(9) of the Bankruptcy Code, which is evidenced by the expanded disclosure in the Disclosure Statement including an updated Administrative Solvency Tracking Chart (defined herein).  Contrary to the Committee's surprising and illogical request to delay confirmation of these cases, the Debtors strongly believe that the plan confirmation process should—and given the limited resources in these cases, it must—run in parallel with dispute resolution processes that may affect the administrative expense claims pool. The Debtors believe that they will succeed in these disputes, including with respect to asserted 507(b) claims and enforcing the Asset Purchase Agreement with Transform.  Moreover, to the extent the Debtors were to ever need to ask administrative creditors for an accommodation, they are prepared to do that and the Plan allows for it.  Any delay in the plan solicitation and confirmation process will only prejudice the Debtors' creditors by delaying the process and

WEIL:\97050928\1\73217.0004

resulting in millions of dollars of unnecessary cash burn as compared to the relatively small cost of soliciting the Plan.

10.     The Creditors' Committee claims that the Debtors' Liquidating Trust Board composition violates section 1129(a)(3) of the Bankruptcy Code. This is not true. It is also clearly a confirmation issue, and the Debtors will be prepared to demonstrate that section 1129(a)(3) has been satisfied on the record with evidence at the Confirmation Hearing. The Debtors have tried to engage with the Creditors' Committee, offering solutions and compromises in a good faith attempt to come to a resolution on this matter. The Debtors have done their job in these cases. Their Directors have specific knowledge that is crucial to the administration of the Liquidating Trust. The Debtors have followed through with a sale that saved tens of thousands of jobs. The Debtors' Restructuring Subcommittee has filed a complaint. The Debtors have settled with the largest unsecured creditor. But the Creditors' Committee has fought the Debtors at every turn. Sears, simply, is not like every case, and the Debtors have considered this issue carefully and are steadfast on their belief about how the Liquidating Trust should be managed for <u>all</u> creditors. That the Debtors have not acquiesced to the Committee's inflexible demand for control of the Liquidating Trust Board does not amount to bad faith.

11.     Nevertheless, the Debtors have added language in the Disclosure Statement to address all issues raised by objecting parties, even where no language was provided after requesting the same from an objecting party. In particular, the Debtors have included disclosure in the Disclosure Statement regarding the Committee's objections to the Plan including a statement that the Committee does not support the Plan.[7]

---

[7] If the Committee has comments to this language in the Disclosure Statement, the Debtors will work with the Committee to revise the language.

WEIL:\97050928\1\73217.0004

12.     Contemporaneously herewith, the Restructuring Subcommittee has filed the *Response of the Restructuring Subcommittee to the Objections of ESL Investments, Inc. and the Official Committee of Unsecured Creditors and Affiliated Debtors* (the "**Subcommittee Reply**") (ECF No. 4039) to directly address certain of the objections raised by ESL and the Committee that fall within the Restructuring Subcommittee's mandate.

## Modifications to the Plan and Disclosure Statement

### I.    Summary of Modifications to the Plan

13.     At a high level, the Debtors have made certain revisions to the Plan, including, among other things, the following changes:

(a)    Plan Settlement.

- The Debtors believe the estates are "hopelessly entangled" and that vendors and trade creditors typically viewed the Debtors as a consolidated operation when extending credit or seeking payment prepetition—regardless of the particular "banner," store, or legal entity to which the creditor may have provided goods and services. In light of these and other considerations, the Debtors filed the *Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 3894) (the "**First Amended Plan**") to allow for a settlement of substantive consolidation with a toggle back-stop to a deconsolidated plan, should the settlement of substantive consolidation not be approved. In response to the objections of parties in interest arguing that certain creditors would be uniquely disadvantaged by such a settlement, the Debtors calculated a "Plan Settlement Premium" which would "bridge the gap" by providing incremental recoveries to the affected Kmart and guarantee creditors. Plan § 9.2.

- More specifically, a percentage of Total Assets amongst the Debtors will be available only for creditors of Kmart Corp., Kmart of Illinois, and Kmart of Washington. Of note, the PBGC will not participate in any distributions in excess of amounts the PBGC would have received under the Plan without the Plan Settlement Premium. Plan § 9.2(a)(viii).

- Importantly, the Debtors have clarified that the Plan constitutes a separate chapter 11 plan for each Debtor and votes will be solicited at each Debtor. Plan § 3.1, 3.3, Articles 4-8.

(b)     <u>Non-Consolidated Plan Alternative</u>.

- If the Plan Settlement is not approved, the Debtors have the flexibility to toggle into a deconsolidated plan with the PBGC's Liquidating Trust Priority Interest being reduced from $97.5 million to $80 million. In the Toggle Plan, the Debtors with insufficient Assets to pay third party claims and/or post-petition Intercompany Claims on the Effective Date, can borrow from another Debtor (with sufficient Assets) to make such payments and confirm a chapter 11 plan. Such Effective Date Intercompany Loans will be entitled to an automatically perfected first priority lien on the proceeds of Preserved Causes of Action of the borrowing Debtors and importantly, must be made with the PBGC's prior written consent and in consultation with the UCC. Plan § 9.2(d).

(c)     <u>Post-Effective Date Governance</u>.

- The Debtors in their business judgment have provided the composition of the Liquidating Trust Board – namely Alan Carr and William Transier (members of the Debtors' Restructuring Subcommittee) and a third member to be selected by the Creditors' Committee. Plan § 10.5(a).

- The Debtors have clarified removal procedures of Liquidation Trust Board members, such that holders of at least 50.1% in outstanding principal amount of Claims entitled to distributions from the Proceeds of the Specified Causes of Action would have the ability to remove member(s) of the Liquidating Trust Board for "Cause" upon ten (10) days' written notice to the Liquidating Trustee. Plan § 10.5(c).

- The Debtors have disclosed the Debtors' Chief Restructuring Officer, with an unmatched amount of institutional knowledge and experience as the Liquidating Trustee, who will report to the Liquidating Trust Board. Plan § 10.6(a).

(d)     <u>Insurance / Sureties</u>.

- In response to requested language, the Debtors have updated their Insurance Policies and Sureties sections. Plan § 13.4, 13.6.

(e)     <u>Releases</u>.

- At the request of the SEC, the Debtors have removed unaccredited investors as "Releasing Parties" under the third party release provision. Plan § 15.9(b).

14

- At the request of the U.S. Trustee, the Debtors have clarified that the releases are not intended to limit the liability of attorneys pursuant to the New York Rules of Professional Conduct.  Plan § 15.9(d).

- The Debtors have clarified that the Plan does not contemplate a discharge for the Debtors under section 1141 of the Bankruptcy Code. Plan § 17.12.

- The Debtors have modified the Plan to solicit Other Secured Creditors at each Debtor, thereby eliminating any release by holders of all Claims who are "presumed to accept" Plan § 15.9(b)(i).

## II.    Summary of Modifications to the Disclosure Statement

14.    The Debtors have amended the Disclosure Statement to include, among others, additional disclosure regarding:

(a)    The Plan Settlement and the PBGC Settlement.    Disclosure Statement, §§ IV.U. and IV.V.

(b)    Description of the Creditors' Committee's objection to the Plan. Disclosure Statement § IV.Z.

(c)    Quantification of the PBGC Claims.  Disclosure Statement, § IV.U.

(d)    Administrative claims filed against the Debtors and their ability to satisfy section 1129(a)(9) of the Bankruptcy Code. Disclosure Statement, § IV.T.

(e)    The nature, scope and treatment of the Debtors' postpetition intercompany claims. Disclosure Statement, Exhibit D.

(f)    The Debtors' disputes with certain parties, including with Transform and 507(b) Claimants, including the Debtors' view that there are no such valid claims as well as an incorporation by reference of the Supplemental Motion to Enforce and the 507(b) Estimation Motion. Disclosure Statement, § IV.Q, IV.W, IV.X, IV.Y.

(g)    The treatment of second lien parties' liens and claims under the DIP Order. Disclosure Statement, § IV.D.3.

(h)    The Debtors' proposed composition of the Liquidating Trust Board. Disclosure Statement, § V.I.5.

(i)    Recoveries in a deconsolidated chapter 11 scenario for Kmart creditors. Disclosure Statement, Exhibit E-2.

WEIL:\97050928\1\73217.0004

(j)     Recoveries under the Toggle Plan for all creditors. Disclosure Statement, Exhibit E-2.

(k)     A separate Liquidation Analysis for the Toggle Plan. Disclosure Statement, Exhibit E-2.

(l)     Modified Liquidation Analysis assumptions. Disclosure Statement, Exhibits   E-1, E-2.

(m)    Retiree benefits under the Plan. Disclosure Statement § IV.L.

## The Court Should Overrule Objections and Approve the Disclosure Statement

**I.     The Disclosure Statement Contains Adequate Information as Required by Section 1125 of Bankruptcy Code**

**A.     Adequate Information is Determined on a Case-by-Case Basis**

15.     Pursuant to section 1125 of the Bankruptcy Code, the proponent of a chapter 11 plan must provide holders of impaired claims and interests entitled to vote on a plan with "adequate information" regarding the plan.  Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1).

16.     This Court must determine whether the Disclosure Statement contains "adequate information" to enable a hypothetical investor and/or creditor to make an informed judgment regarding the Plan.  *See, e.g.*, *In re Uno Rest. Holdings Corp.*, Case No. 10-10209 (MG),

WEIL:\97050928\1\73217.0004

2010 WL 3373959, at *1–3 (Bankr. S.D.N.Y. May 11, 2010); *Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 865–66 (E.D.N.Y. 2008); *Momentum Mfg. Corp., v. Emp. Creditors Comm.* (*In re Momentum Mfg. Corp.*), 25 F.3d 1132, 1136 (2d Cir. 1994). Despite suggestions to the contrary in the Objections, "adequate information" as defined in section 1125 of the Bankruptcy Code does not require that the Disclosure Statement include information about every aspect of the Debtors' business or the Plan, voluminous financial documents, or admissions against interest, but rather is limited to "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would *enable such a hypothetical investor of the relevant class to make an informed judgment about the plan*." 11 U.S.C. § 1125(a)(1) (emphasis added).

17.    It is well-established that what constitutes adequate information is determined on a case-by-case basis. *See Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) (noting that the determination of what is adequate information is subjective and made on a case-by-case basis and is largely within the discretion of the bankruptcy court); *see also* H.R. Rep. No. 95-595, at 409 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963 ("Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case . . . . There will be a balancing of interests in each case."). Further, Courts have held that "even where 'a disclosure statement could have included more information, . . . a disclosure statement need not be perfect and may be approved if the information is reasonable in the circumstances.'" *In re Puff*, Case No. 10-01877, 2011 WL 2604759, at *5 (Bankr. N.D. Iowa June 30, 2011) (citing *In re Price Funeral*

17

*Home, Inc.*, Case No. 08-04816 (ATS), 2008 WL 5225845, at *2 (Bankr. E.D.N.C. Dec. 12, 2008)).

18.    In this inquiry, the Court is not required to consider specialized issues that a particular creditor may wish to raise with respect to a plan, nor does it require that the disclosure statement satisfy the "adequate information" standard in relation to all parties-in-interest or that a debtor explain why its plan of liquidation is superior to other, hypothetical plans. *See* 11 U.S.C. § 1125(a)(1) ("[A]dequate information need not include such information about any other possible or proposed plan . . . ."). Moreover, this determination does not require a plan proponent to clutter its disclosure statement with endless responses to the myriad discovery requests. *See, e.g.*, *In re Stanley Hotel, Inc.*, 13 B.R. 926, 933–34 (Bankr. D. Colo. 1981) ("[C]ompounding a disclosure statement for the sake of a lawyer's notion of completeness, or because some additional information might enhance one's understanding, may not always be necessary or desirable, and the length of a document should not be the test of its effectiveness.").

**B.    The Disclosure Statement Contains Adequate Information**

19.    The Disclosure Statement provides adequate information to make an informed decision about whether to accept or reject the Plan, as required by section 1125 of the Bankruptcy Code. The Disclosure Statement provides, among other things, a discussion of, the Debtors' assets and liabilities, the circumstances giving rise to these chapter 11 cases, an overview of the chapter 11 cases, the terms of the Plan and its treatment of the Debtors' creditors and equity interest holders, the terms of Plan settlements and compromises of certain claims under the Plan, a discussion of tax consequences of the Plan, the Liquidation Analysis, and the risks associated with the Debtors' proposed Plan, including the risk of non-confirmation and the risks related to possible objections to the Plan. Accordingly, the Disclosure Statement, as currently proposed, provides more than adequate information for creditors whose votes are being solicited to make an

18

informed decision about whether to accept or reject the Plan, as required by section 1125 of the Bankruptcy Code.

20.    As set forth below and in the Objection Response Chart, with respect to the disclosure-related Objections, the Debtors have gone above and beyond the requirements of 1125 of the Bankruptcy Code to incorporate modifications to the Disclosure Statement.

## C.    The Debtors' Disclosure Modifications Adequately Address the Disclosure-Related Objections

21.    As reflected in the Objection Response Chart, and as described in paragraph 14 above, the Debtors have made numerous changes to the Disclosure Statement to include additional disclosures addressing the Objections.

22.    The additional disclosures and modifications to be incorporated into the Disclosure Statement address the Objections regarding the adequacy of the Disclosure Statement, and any remaining objections to the adequacy of disclosure should be overruled. Accordingly, the Disclosure Statement as currently proposed provides more than adequate information for creditors entitled to vote to make an informed decision about whether to accept or reject the Plan, as required by section 1125 of the Bankruptcy Code.

## II.    The Debtors' Plan is Confirmable and Confirmation Objections Should be Considered at Confirmation Hearing

23.    The remaining Objections are not objections to the adequacy of the information provided in the Disclosure Statement; rather, they are objections to the Plan that should be deferred to the Confirmation Hearing and considered at that time. *See, e.g., In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("The question whether a plan meets requirements for confirmation is usually answered at confirmation hearings."); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) ("[T]he Court will not look

behind the disclosure statement to decide [confirmation] issues at the hearing on the adequacy of the disclosure statement.").

24.    The hearing to approve a disclosure statement is solely intended to determine whether the information provided is "adequate" under section 1125 of the Bankruptcy Code, thereby enabling voting constituents to make informed judgments about whether to accept or reject a plan. Disputes on confirmation-related issues are no bar to disclosure statement approval. Indeed, requiring adjudication on confirmation issues at this time would effectively convert any disclosure statement hearing into a confirmation hearing without the benefit of the evidentiary record necessary to determine confirmation issues. *See, e.g., In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting . . . ."); *see also In re Quigley Co.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving the debtor's disclosure statement despite noting that the debtor's parent's prepetition settlement with certain asbestos plaintiffs raised, *inter alia*, questions concerning good faith and vote designation after finding that such issues were "confirmation issues that require an evidentiary hearing").

25.    Courts have consistently held that challenges to the plan itself, including challenges to the approval of compromises and settlements embodied in the plan, the Debtors' administrative solvency, whether the plan was proposed in good faith, the classification of claims in the plan, whether the plan meets the best interests of creditors test, and the plan release and exculpation provisions are not proper disclosure objections but rather plan objections that should be addressed at confirmation. *See, e.g., In re Quigley Co.,* 377 B.R. at 119 (approving disclosure

statement and holding that plan-related issues, including the scope of third party releases, and questions concerning good faith, among others, are confirmation issues); *In re Ellipso, Inc.*, No. 09-00148, 2012 WL 368281, at *2 (Bankr. D.D.C. Feb. 3, 2012) (holding certain disclosure statement objections were confirmation issues "more appropriately dealt with at a confirmation hearing" including "(i) the contention that the classification of claims is improper; (ii) a claim that the Proponents do not have the means to fund the plan; (iii) an objection to the disclosure statement's admission that if [certain] claims are allowed, there will be nothing left to pay the other creditors; and (iv) allegations that the plan is being proposed in bad faith."); *In re Stone & Webster, Inc.*, 286 B.R. 532, 544 (Bankr. D. Del. 2002) (declining to rule whether substantive consolidation was warranted because "[t]he appropriate time to address it is at plan confirmation time if a substantive consolidation plan reaches that juncture in the case."); *In re Watervillle Timeshare Group*, 67 B.R. 412, 414 (Bankr. D.N.H. 1986) (approving the disclosure statement over objections to a settlement embodied in the plan and noting such conflict would be "a prime issue" for confirmation); *Matter of Colin*, 44 B.R. 806, 809 (Bankr. S.D.N.Y. 1984) (refusing to apply the best interests of creditors test under section 1129(a)(7) where confirmation of the proposed plan was not yet at issue in the case, observing that "[s]ince the 'best interests of creditors test' of § 1129(a)(7) only becomes applicable upon the casting of a negative vote against the plan, the committee's argument is premature"); Hr'g Tr. 27:22-24, *In re Tops Holding II Corporation*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. Sept. 27, 2018) ("**Tops Disclosure Statement Hr'g Tr.**") (noting that it was appropriate to reserve issues regarding third party releases to confirmation to determine whether there really is an issue); Hr'g Tr. 9:8-9, *In re Arcapita Bank B.S.C. (C),* Case No. 12-11076 (SHL) (Bankr. S.D.N.Y. Apr. 26, 2013) (ECF No. 1057) (noting at the disclosure statement hearing that: "There was a lot about third party releases, obviously.  And that's a plan

issue."); *In re New York City Off-Track Betting Corp.*, Case No. 09-17121 (MG) (ECF No. 234) (Bankr. S.D.N.Y. Dec. 1, 2010) (approving disclosure statement over objections on basis of subject matter jurisdiction to grant third party releases and propriety of third party release and exculpation provisions); Hr'g Tr. 126:14-16, *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. July 21, 2010) (noting at the disclosure statement hearing that: "[t]he propriety of a third-party release . . . is a confirmation issue").

26.     The very limited exception permitting the Court to hear plan confirmation issues at the disclosure statement stage is if an objecting party proves that the plan is patently unconfirmable such that as a matter of law the plan "is so fatally flawed that confirmation is impossible." *See In re Cardinal Congregate I,* 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990); accord *In re U.S. Brass Corp.*, 194 B.R. 420, 428 (Bankr. E.D. Tex. 1996). The Creditors' Committee and the other Movants have not come close to satisfying the burden to demonstrate that the Plan is patently unconfirmable, nor could they. Nevertheless, the Debtors will briefly address each of the confirmation objections to demonstrate that the Plan is not patently unconfirmable, but reserve the right to make any argument in support of the Plan at confirmation.

## A.     The Plan Settlement Does Not Render the Plan Patently Unconfirmable

27.     Certain of the Objections argue that the proposed Plan Settlement on issues such as substantive consolidation cannot (ever) be approved. Specifically, the Creditors' Committee asserts that a reconciliation of prepetition Intercompany Claims cannot serve as a rationale for substantive consolidation and assert that the settlement impermissibly "harms unsecured creditors, primarily at Kmart." *See* Committee Obj., ¶¶ 3-7, 22-32. The Creditors' Committee argues—without any basis or support—that a reconciliation of prepetition Intercompany Claims is unlikely to have an impact on creditor recoveries so any costs saved through the settlement would not need to be expended. *See* Committee Obj., ¶¶ 24-27. The

22

Committee also asserts (using incorrect numbers and assumptions) that the settlement impermissibly reduces Kmart creditors' recoveries from 9.8% to 2.5%, and that as a result such creditors would be better off funding the reconciliation of prepetition Intercompany Claims instead of allowing substantive consolidation. *See* Committee Obj., ¶¶ 28-31. The Committee concludes that the Plan does not meet the test for substantive consolidation set forth in *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F. 2d 515 (2d. Cir. 1988). *See* Committee Obj., ¶ 32. ESL and Wilmington Trust also argue that the Plan does not meet the *Augie/Restivo* standard, in part because guarantee claims are eliminated under the Plan without consideration.  ESL Obj., ¶ 42.

28.    First, and as noted above, whether a settlement embodied in the Plan is justified and should be approved as part of the Plan is a plan confirmation issue and should be deferred to the Confirmation Hearing, where the Debtors will present evidence and fully brief the issues after creditors have had an opportunity to consider and vote on the Plan Settlement.  Second, to address the perceived prejudice to certain creditors—namely holders of General Unsecured Claims and ESL Unsecured Claims at Kmart Corp. and holders of Guarantee Claims and ESL Unsecured Claims at Kmart Stores of Illinois LLC and Kmart of Washington LLC (together, the "**Affected Creditors**")—the Debtors have proposed the Plan Settlement Premium to such creditors pursuant to the Plan Settlement.  The proposed Plan Settlement Premium, including the Debtors' methodology for arriving at such figures, are set forth in the Disclosure Statement.  The Disclosure Statement also contains an expanded discussion of the Plan Settlement and the risks of substantive consolidation to the Debtors' estates.  All creditors should be given an opportunity to review the Disclosure Statement and make a determination on whether they want to vote in favor of the Plan.  Third, following the votes, the Debtors will be prepared to prove at the Confirmation

23

Hearing that the Plan Settlement is a fair and equitable resolution of the Debtors' chapter 11 cases and in the best interests of all creditors. Fourth, the Debtors' Plan also contains a non-consolidating Toggle Plan if the Court does not approve the Plan Settlement, thereby ensuring that resources are saved and a path toward emergence exists in all scenarios. The Debtors briefly discuss herein the modifications to the Plan Settlement and why they believe they will succeed in demonstrating that the settlement is fair and equitable and in the best interests of all creditors, subject to their rights to brief any issue at confirmation.

**(i)      Terms of the Modified Plan Settlement**

*i.      Recovery Adjustments for Impacted Creditors*

29.      To address the alleged prejudice to Kmart Corp. and other creditors, the Debtors have offered the Plan Settlement Premium to Affected Creditors. The Plan Settlement Premium is calculated by comparing recoveries of the Affected Creditors in a de-consolidated chapter 11 scenario and a chapter 11 scenario with the Plan Settlement (prior to any Plan Settlement Premium). The following table sets forth the assumptions made in both scenarios that incorporates the PBGC Settlement:

| | Chapter 11:<br>De-consolidated plans for Kmart and No PBGC Settlement<br>("Deconsolidated Chapter 11") | Debtors' Proposed Chapter 11 Plan:<br>Settlement of Substantive Consolidation and PBGC Settlement |
|---|---|---|
| **Assets** | Gross recoveries on account of litigation and preference actions will be 25% less | Debtors will benefit from maximum gross recoveries on account of litigation and preference actions |
| **Liabilities** | $30M of additional professional fees on account of substantive consolidation and inter-estate litigation | N/A |
| | No PBGC Settlement:<br>• $38M PBGC Priority Tax Claim;<br>• $1.5B PBGC General Unsecured Claim<br>• $2M KCD IP, LLC Administrative Expense Claim at Kmart Corp. | PBGC Settlement:<br>• $97.5M PBGC Liquidating Trust Priority Interest;<br>• $800M General Unsecured Claim<br>• No KCD IP, LLC Administrative Expense Claim at any Debtor |
| | Updated claim estimates. | Updated claim estimates. |

24

30.    The Debtors have added additional disclosure in the Disclosure Statement regarding the bases for the assumptions made in both scenarios, which the Debtors submit are reasonable. *First*, the Debtors believe that two of the three main litigation-plaintiffs Debtors Sears Holdings and Sears, Roebuck and Co. will not have sufficient distributable assets on the Effective Date to cover post-petition, secured intercompany payables to Kmart Corp.  Similarly, Sears Holdings and Sears, Roebuck and Co. will not have sufficient distributable assets on the Effective Date to pay third party Administrative Expense Claims, Priority Non-Tax Claims, or Priority Tax Claims (if any) and neither Debtor will be able to confirm a chapter 11 plan (absent an intercompany loan which the Creditors' Committee disputes).  Therefore, at least one, and potentially two, separate chapter 7 trustees may be appointed for the estates of two of the three main litigation-plaintiff chapter 11 estates.  In the Deconsolidated Chapter 11 scenario, the Sears Holdings and Sears, Roebuck and Co., and Kmart Corp. estates will have different and independent motives and each estate (and its corresponding representatives) will seek to maximize value for its own estate (to the detriment of others).  There will likely be little to no incentive to work as a collective in the various litigation actions.  Recoveries from D&O Policies will be limited (recoveries from ESL Parties will also not be limitless) and individual trustees may seek to settle claims on a faster timeline to extract value before such limits are reached.  As such, the Debtors have estimated a 25% haircut on gross recoveries on account of litigation and preference actions in a Deconsolidated Chapter 11 Scenario.

31.    *Second*, with two of the three main litigation plaintiffs potentially converting to a chapter 7 case, inter-estate litigation is likely to ensue as the estates litigate among other things, the issue of substantive consolidation.  Indeed, even without conversion to chapter 7 for any of the Debtors, significant inter-estate litigation will proceed as creditors of Sears, Roebuck

WEIL:\97050928\1\73217.0004

and Co., and Sears Holdings allege substantive consolidation and other theories to recover assets at Kmart Corp. As stated above, there are several factors that weigh in favor of substantive consolidation and certain estates may pursue litigation on the basis that the Estates are hopelessly entangled and were operated as a consolidation enterprise, with vendors and creditors viewing the Enterprise as a consolidated operation. To reiterate, the litigation of substantive consolidation issues will be complex, detailed, lengthy, and cost-prohibitive. Moreover, separate from substantive consolidation litigation, estates could also litigate over intercompany transactions— including the appropriateness of expense and cost allocations. As such, the Debtors have estimated $30 million of incremental professional fees that will be attributable to the Deconsolidated Chapter 11 scenario.

32.    *Third*, in the Deconsolidated Chapter 11 scenario, the estates do not benefit from the PBGC Settlement and the PBGC will assert their full claim at each Debtor. This assumption is made as certain parties in interest (including the Creditors' Committee) assert that creditors may be better off in a scenario without such settlement. As stated above, the PBGC filed proofs of claim in the aggregate amount of approximately $1.46 billion, with certain claims asserting priority treatment. In the Deconsolidated Chapter 11 scenario, the PBGC will swamp all general unsecured claim recoveries with their significant general unsecured claims at each and every Debtor. With regard to the portion of its claim for which the PBGC asserts priority treatment, the Debtors understand that the PBGC would need to be able to perfect the lien (after lifting the automatic stay) and therefore have estimated a 60% discount to the gross estimated claim to account for the litigation risk associated with such priority claim.

33.    *Fourth*, the Debtors are utilizing revised estimates on certain claim amounts for application to both scenarios—including General Unsecured Claims and ESL Unsecured

Claims.  The Debtors have revised these estimates to account for duplicative proofs of claims, satisfied claims, and results of a preliminary claims reconciliation.

34.    The Creditors' Committee's comparison of a deconsolidated chapter 11 plan and substantively consolidated chapter 11 plan, as reflected in ¶¶ 30-31 of the Committee Objection utilizes incorrect assumptions and, therefore, does not produce correct comparisons.  *See* Creditors' Committee Obj., ¶30-31.  Among other things, the Creditors' Committee increases the gross recoveries on account of litigation and preference actions in a deconsolidated chapter 11 scenario, which does not take into account inter-estate litigation that would occur.  Moreover, the Creditors' Committee does not allocate correctly the ESL and General Unsecured Claims across the Debtors.  Finally, the Creditors' Committee does not apply any risk of substantive consolidation, which the Debtors believe is both real and significant.

### ii.    *Proposed Plan Settlement Premiums*

35.    To address the risk that Affected Creditors could receive more in a realistic de-consolidated plan, pursuant to the Plan Settlement, the Debtors compared the recoveries of the Affected Creditors in each scenario, at the applicable Debtors, and calculated the delta between the recoveries.  *See In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2012) (holders of guaranteed landlord claims and pension withdrawal claims, that could be uniquely affected by implementing a substantively consolidated plan versus a deconsolidated plan structure, were provided with higher distributions).

36.    For example, Holders of General Unsecured Claims against Kmart Corp. recover 1.53% more in a chapter 11 deconsolidated scenario than in a chapter 11 substantively consolidated scenario.  To this "delta" or "difference", the Debtors applied an estimated 75% risk of substantive consolidation to arrive at the plan premium (the "**Plan Settlement Premium**").  Applying a 75% discount to the 1.53% "delta" produces a Plan Settlement Premium of 0.38% for

27

Kmart creditors.  The Plan Settlement also incorporates a Plan Settlement Premium of 0.07% for holders of guarantee claims against Kmart of Illinois and of 0.01% for holders of guarantee claims against Kmart of Washington, to account for incremental recoveries that guarantee creditors would have picked up on account of the guarantee claims at these Debtors, subject to a 75% risk of substantive consolidation under the Plan Settlement without any Plan Settlement Premium. The Debtors believe this is an accurate and appropriate calculation of the harm of substantive consolidation and subsequently the Plan Settlement Premium utilizing the correct set of assumptions.  The PBGC will not receive any recoveries on account of the Plan Settlement Premium in excess of what they would have received in a deconsolidated chapter 11 scenario.

37.    Wilmington Trust's assertion that the Debtors must prove that the Debtors must provide that the cost of analyzing intercompany claims must be greater than $17.5 million (the increased amount of the PBGC Liquidating Trust Priority Interest) is too simplistic and ignores all of the other issues associated with a straight non-consolidation plan, including the inter-estate litigation that would arise, the lack of coordination (and competing interests among the Debtors' estates) over litigation claims, the resulting reduced recoveries available and the significant delay of distributions.  Wilmington Trust Obj., ¶ 25.  Contrary to the Wilmington Trust's assertion, the $17.5 million increase of the PBGC Liquidating Trust Priority Interest is not simply an offset of the potential cost to fully investigate, analyze and summarize the prepetition Intercompany Claims.

38.    The Committee's inflammatory assertion that the PBGC Settlement is an attempt at "improper vote buying" is meritless.  *See* Committee Obj., ¶ 63.  Even if the Debtors took the Committee's incorrect assumptions at face value, the PBGC is still better off at the applicable Debtors.  The Committee assumes that the PBGC would have an 11.5% recovery in a

deconsolidated scenario and an 8.3% recovery in a substantive consolidation scenario.  At the Committee's assumed PBGC claim of $1.419 billion, and assuming an $80 million and $97.5 million PBGC Liquidating Trust Priority Interest in the deconsolidated and substantively consolidated scenarios, respectively, the PBGC would recover approximately $248 million in a deconsolidated scenario and only approximately $215 million in a substantive consolidation scenario.  Clearly, then, the PBGC is still worse off in a substantive consolidation scenario as compared to a deconsolidated scenario (and all other creditors are better off).  Therefore, the Debtors cannot be accused of "buying" the PBGC's vote – clearly a desperate and baseless attack by the Creditors' Committee.

39.      The Debtors will be prepared to demonstrate at confirmation that the Plan Settlement is a fair resolution in light of the legal and economic risks to parties in interest and in line with other plan settlements approved in this and other circuits.  *See In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2012) (approving the substantive consolidation settlement); *In re Lehman Brothers Holdings Inc.,* No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 6, 2011) (approving the global settlement, which incorporated a substantive consolidation settlement); *In re Enron Corp.*, No. 01-16034 AJG, 2004 WL 6075307, at *64 (Bankr. S.D.N.Y. July 15, 2004) (approving debtors' plan of reorganization on the basis that the terms of the settlement of substantive consolidation issues were supported by an assessment of the likelihood of successful litigation in light of the doctrine); *In re Coldwater Creek Inc.,* No. 14-10867-BLS, 2014 WL 11429340, at *11 (Bankr. D. Del. Sep. 17, 2014) (approving the substantive consolidation settlement provided for in debtors' plan because it was in the best interests of the debtors, their estates and claimholders); *In re Woodbridge Grp. of Companies, LLC*, 592 B.R. 761, 778 (Bankr. D. Del. 2018) (approving substantive consolidation as part of a

29

consensual plan settlement); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 418, 459 (Bankr. D.N.J. 1990) (confirming a plan based, in part, on a settlement of potential litigation claims relating to substantive consolidation of the debtors' estates); *In re Apex Oil Co.*, 118 B.R. 683, 688, 693 (Bankr. E.D. Mo. 1990) (confirming the debtors' plan in light of consensual settlement of substantive consolidation of the debtors' estates).

40.    With respect to the Committee's argument that "substantive consolidation cannot be used to extinguish intercompany liens absent compelling circumstances like fraud," the Committee cites cases that are inapplicable to the instant cases.    In *In re Gulfco Inv. Corp.*, the Court considered whether substantive consolidation may be used to eliminate the security of a creditor for the purpose of changing such creditor's status to an unsecured creditor. *See In Fed. Deposit Ins. Corp. v. Hogan (In the Matter of Gulfco Inv. Corp.)*, 593 F.2d 921, 926-7 (10th Cir. 1979).  The Plan does not purport to use substantive consolidation to unjustly change any creditor's status from secured to unsecured, and does not purport to classify the Intercompany Claims as unsecured Claims. This case is clearly inapplicable.  The Court in *In re Woodbridge Grp. of Companies, LLC*, approved a settlement embodied in a plan that resulted in the elimination of the Debtors' disputed intercompany liens, in part because the disputes related to fraud arising from a massive Ponzi scheme.  *See In re Woodbridge Grp. of Companies, LLC*, 592 B.R. 761, 773-774 (Bankr. D. Del.) (2018).  But, just because one case approved substantive consolidation and the elimination of intercompany liens because of the resulting complications relating to the existence of fraud, does not mean that fraud must exist in every instance where intercompany liens are settled.  Last, as noted in the Committee's Objection, *In re Cenargo Intern., PLC* does not relate to substantive consolidation (indeed, the case is about professional compensation) but merely cites to *Gulfco* in a footnote for the proposition that substantive consolidation cannot be used to destroy

otherwise valid security interests.  *See In re Cenargo Intern., PLC*, 294 B.R. 571, 586 n.15 (Bankr.

S.D.N.Y. 2003).

**B.      The Debtors will Demonstrate that the Plan Satisfies Section 1129(a)(9) of the Bankruptcy Code**

41.      The Creditors' Committee incorrectly asserts that the Debtors will not be

able to demonstrate their ability to comply with section 1129(a)(9) of the Bankruptcy Code at

confirmation.  The Debtors have been carefully tracking Administrative Expense Claims and the

available assets to pay such claims throughout these chapter 11 cases and have attached the weekly

administrative estates solvency schedule that the Debtors have been using to track assets and

administrative liabilities as **<u>Exhibit C</u>** to the Disclosure Statement (the "**Administrative Solvency**

**Tracking Chart**").    This Debtors' estimate of cash available on the Effective Date in the

Administrative Solvency Tracking Chart does not include the Debtors' expected proceeds from

litigation, preference, avoidance, and other claims, which the Debtors estimate will provide

significant additional proceeds for the estates to fund additional Claims as they become Allowed.

Contrary to the Committee's assertion, the Debtors are not relying on the proceeds of future

litigation claims to pay Administrative Expense Claims under the Plan, but instead they have

conservatively not taken such proceeds into account.

42.      The Committee also questions the Debtors' administrative solvency due to

the Debtors' disputes with Transform in enforcing the Asset Purchase Agreement, including how

the Debtors will guarantee payment for the Administrative Expense Claims that are the

responsibility of Transform pursuant to the Asset Purchase Agreement.  *See* Committee Obj., ¶ 36,

40.  The Creditors' Committee further asserts that the Debtors should not be permitted to proceed

with plan solicitation on parallel track with litigating the Debtors' Asset Purchase Agreement

disputes with Transform.  *See* Committee Obj., ¶ 17.  On May 24, 2019, the Debtors filed the

31

*Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement* (ECF No. 4029) (the "**Supplemental Motion to Enforce**"), which raises all of the outstanding issues with Transform and is scheduled to be heard on June 20, 2019, over a month prior to the Confirmation Hearing on July 23, 2019.[8]  In addition, on May 26, 2018, the Debtors filed *The Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* (ECF No. 4034) (the "**507(b) Estimation Motion**"), which is scheduled to be heard on July 11, 2019, also prior to the Confirmation Hearing.  This again turns the legal standard at the Disclosure Statement hearing on its head.  The Debtors believe that they will succeed in these disputes, including as against Transform regarding issues arising from the Sale Transaction, and with respect to alleged 507(b) Claims, and any delay in the plan solicitation and confirmation process will only prejudice the creditors by delaying the process and resulting in unnecessary cash burn, which currently amounts to approximately $16 million per month in professional fees alone.  In contrast, the cost of soliciting the Plan is approximately $2 million.  The Debtors' plan confirmation process should not be held up until after these disputes are resolved, further wasting the Debtors' time and estate resources.  The Debtors instead believe that the plan confirmation process will be the catalyst to resolve these issues, and the plan process and this dispute resolution must proceed in parallel to keep the confirmation process on track.

43.     As reflected in the modified Administrative Solvency Tracking Chart, the Debtors project that they will be able to satisfy Administrative Expense Claims in full.  Notably, the Administrative Solvency Tracking Chart does not reflect any litigation or preference recoveries.  Indeed, the Creditors' Committee projects greater recoveries for litigation claims than the Debtors' own estimates.  *See* Committee Obj., ¶ 26, FN 14.  Moreover, the Committee's

---

[8] On May 25, 2019, Transform filed an adversary complaint against the Debtors to address alleged disputes relating to the Asset Purchase Agreement (ECF No. 4033).

WEIL:\97050928\1\73217.0004

concerns about the Debtors' disputes underlying the Supplemental Motion to Enforce and the 507(b) Estimation Motion and the impact the outcome of those disputes will have on administrative solvency, will be addressed at confirmation. The disputes are now before the Court and projected to be resolved by confirmation. The Debtors believe they will be resolved in their favor. All of this is described in the Disclosure Statement. Moreover, section 1129(a)(9) of the Bankruptcy Code provides that "*except to the extent that the holder of a particular claim has agreed to a different treatment of such claim*" the plan must provide that such claimholders receive cash equal to the allowed amount of such claim on account of such claim on the effective date of the Plan. 11 U.S.C. § 1129(a)(9) (emphasis added). The Debtors' current estimate of Administrative Expense Claims does not yet reflect any negotiations of Administrative Expense Claims whereby, for example, the Debtors could offer an earlier payment in exchange for a reduction in claim amount. This will further reduce the Debtors' Administrative Expense Claim burden on the Effective Date and bolster the Debtors' administrative solvency.

44.    In addition, the Debtors must undertake a process to verify and reconcile Administrative Expense Claims after they are asserted, and as such, it is not likely that all Administrative Expense Claims will be Allowed on the Effective Date of the Plan. For example, as of May 23, 2019, over 2,500 503(b)(9) Claims had been asserted, and the Debtors' analysis and reconciliation of such Claims is ongoing and will continue to take time to resolve. Indeed, the Plan provides that holders of Allowed Administrative Expense Claims will receive Cash on the latest of (i) the Effective Date, (ii) thirty (30) days after the Claim becomes Allowed, and (iv) the next Distribution Date after such Claim becomes Allowed. *See* Plan § 2.1(a). Moreover, no distributions will be made to junior creditors ahead of Allowed Administrative Expense Claimants

33

without appropriate reserves being maintained for Administrative Expense Claims pending reconciliation.

### C.     The Debtors Will Demonstrate at the Confirmation Hearing that the Plan Is Proposed in Good Faith

45.     The Committee asserts that the Plan is not confirmable on its face because it does not satisfy the good faith standard set forth in section 1129(a)(3) of the Bankruptcy Code. *See* Committee Obj., ¶ 47-54. This objection is premised on the single, baseless assertion that the Creditors' Committee should control the Liquidating Trust Board and any suggestion to the contrary is evidence of bad faith. *See* Committee Obj., ¶ 48. The objection to good faith is easily disposed of for purposes of the Disclosure Statement hearing. First and foremost, as stated, any objection as to good faith should be deferred to confirmation, where the Court may consider evidence. Second, on the merits, the Debtors' are appointing the Liquidating Trust Board in their business judgment and will demonstrate that they satisfy the standard for such appointment pursuant to section 1129(a)(5) of the Bankruptcy Code at the Confirmation Hearing. In considering who is best suited to serve on the Liquidating Trust Board, the Debtors considered the appropriate representation of all stakeholders. The Liquidating Trust Board's duties, above all, is to oversee the implementation of the Plan, for the benefit of all stakeholders, not just general unsecured creditors. And the Committee's focus on Kmart creditors exclusively – as opposed to the fact that the Plan Settlement benefits all creditors – further reinforces the Debtors' position to control the Liquidating Trust Board. Although general unsecured creditors are significant stakeholders in these chapter 11 cases, the Debtors also have significant other creditors including administrative claimants.

46.     The Restructuring Committee and Restructuring Subcommittee believe that the most efficient governance structure for the Liquidating Trust, consistent with the interests of

34

creditors and public policy, is a three-member Liquidating Trust Board, comprising the two members of the Restructuring Subcommittee and one additional member selected from the members of the Creditors' Committee. The Creditors' Committee believes that the Creditors' Committee should control the number and identity of the Liquidating Trust Board members. Notably absent from the Creditors' Committee's objection is that the Debtors have proposed a compromise to the Creditors' Committee, under which a four-member Liquidating Trust Board would be appointed, comprising the two members of the Restructuring Subcommittee, one member chosen by the PBGC, and one other member selected from the members of the Creditors' Committee, with the expectation that any member of the Liquidating Trust Board designated by the PBGC or the Creditors' Committee will be a principal of the PBGC or a principal of a member currently serving on the Creditors' Committee, respectively. While the Creditors' Committee has not accepted this proposal, the Debtors remain willing to compromise on this basis. The Creditors' Committee is correct that they have made "repeated and unequivocal statements" that they must have complete control of the Liquidating Trust Board, despite the Debtors' best efforts to negotiate a fair compromise on the composition of the Liquidating Trust Board. *See* Committee Obj., ¶ 48. Since February, the Debtors, the Committee, and their respective advisors have exchanged communications on this issue and have engaged in discussions and meetings (including a meeting amongst principals) to negotiate in good faith and resolve the composition of the Liquidating Trust Board with the Creditors' Committee. The Creditors' Committee has refused to waiver from its demand to control the Liquidating Trust Board. The Subcommittee Reply provides additional support for the Debtors' proposed Liquidating Trust Board governance structure.

WEIL:\97050928\1\73217.0004

D.    **The Debtors will Demonstrate at the Confirmation Hearing that the Plan Does Not Discriminate Unfairly or Provide for Impermissible Unequal Treatment**

47.    The Creditors' Committee asserts another confirmation objection based on its premature allegation that the Plan unfairly discriminates among holders of general unsecured claims and impermissibly classifies the PBGC Claims separately.  *See* Committee Obj., ¶ 55-69. This objection is premised on the difference in treatment of the PBGC Claims from the General Unsecured Claims under the Plan.  As an initial matter, this again, is a confirmation objection that should be deferred to the Confirmation Hearing where the Court may consider the matter with an evidentiary record.  That this objection is premature is evident: the Debtors only have to prove that the Plan does not discriminate unfairly under section 1129(b) of the Bankruptcy Code *if a class of creditors votes to reject the Plan.  See* 11 U.S.C. § 1129(b); *In re WorldCom, Inc.*, No 02-12533 (AJG) 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 21, 2003) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (noting that section 1129(b) allows for confirmation of a plan where the plan has not been accepted by all impaired classes of claims so long as the Court determines that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to dissenting classes).  The Debtors have obviously not begun solicitation of the Plan and will not have to prove unfair discrimination if the General Unsecured Claimants in Class 4 vote to accept the Plan.  This objection clearly does not rise to the level of making the Plan patently unconfirmable on its face.

48.    Nevertheless, the objection is without basis because, even if Class 4 does not vote to accept the Plan, the Plan does not discriminate unfairly between the PBGC Claims and the General Unsecured Claims.  The Debtors will be prepared to prove at confirmation that the PBGC Claims are separately classified based upon the nature of the Claims—the PBGC Claims are joint and several and thus every Debtor entity is liable for the PBGC Claims.  This Plan

36

classification of general unsecured claims against the Debtors is valid and justified, because absent the PBGC and Plan Settlement, the PBGC would undoubtedly dwarf all recoveries for creditors because of the massive size of its claim at every Debtor. *See In re Worldcom Inc.*, Case No. 02-13533, 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. Oct. 31, 2003) ("In the course of satisfying the liabilities of the consolidated debtors from the common pool of assets, intercompany claims are eliminated and guaranties from co-debtors are disregarded.") (citations omitted); *see also Charter Commc'ns*, 419 B.R. at 264 (finding separate classification justified because of the members' "disparate legal rights[.]"). Thus, there are legitimate bases to classify these claims separately from other general unsecured claims against the Debtors.

49.    The Debtors will demonstrate at the Confirmation Hearing that the separate classification and disparate treatment is justified because the Plan classification scheme is also necessary to implement the Plan Settlement. Courts have approved separate classification and unequal treatment of similarly-situated creditors where a settlement with the separately classified class was necessary to implementation of the Plan. *See, e.g.*, Hr'g Tr. 44:24 – 26:17, *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 27, 2012) (approving separate classification of unsecured claims over accusations of improper gerrymandering and finding discrimination fair where pension claimholders group and landlord guaranty group received increased recoveries pursuant to substantive consolidation settlement, where such groups had "holdup value . . . based . . . on their legal position of having claims against more than one debtor" and cost of "unscramble[ing] the various subsidiaries" was prohibitive); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *92-98, 261-262 (Bankr. S.D.N.Y. July 15, 2004) (approving separate classification and treatment of intercompany and guarantee claims in plan in light of global settlement of issues including substantive consolidation embodied in the plan); *In*

37

*re Winn-Dixie Stores, Inc.*, 356 B.R. 239 (Bankr. M.D. Fla. 2006) (approving separate classification of general unsecured claims in order to implement settlement of substantive consolidation); *In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*, 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (allowing separate classification and finding discrimination fair where trade union received greater recovery than other general unsecured claimants pursuant to settlement and trade union's support of the plan was critical to the company's overall reorganization).   Accordingly, separately classifying the PBGC and providing for different treatment for a portion of the PBGC's claim is a sufficient justification and the Plan should be approved.

50.   The PBGC's unsecured claims have been classified separately from other general unsecured claims in other cases.   *See, e.g. In re Avaya Inc.*, Case No. 17-1189 (SMB), (Bankr. S.D.N.Y., Nov. 28, 2017) (ECF No. 1579) (confirming plan with separate classification of the PBGC's unsecured claims from other general unsecured claims); *In re Kaiser Aluminum Corp.*, No. 02-10429(JKF), 2006 WL 616243, at *6 (Bankr. D. Del. Feb. 6, 2006), *aff'd*, 343 B.R. 88 (D. Del. 2006) (classifying unsecured claims of the PBGC separately from other general unsecured claims "based on the fact that the PBGC [c]laims are allowed against each of the [reorganizing debtors] and are receiving the treatment negotiated in the [settlement agreement with the PBGC].").

### E.   The Debtors will Demonstrate at the Confirmation Hearing that the Plan Satisfies the Best Interests Test

51.   The Creditors' Committee asserts a confirmation objection that the Plan does not meet the best interests test under section 1129(a)(7) of the Bankruptcy Code, which requires that "each holder of a claim or interest of such class will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is

38

not less than the amount that such holder would receive if the debtor were liquidated under chapter 7 of this title on such date." 111 U.S.C. § 1129(a)(7); Committee Obj., ¶¶ 74-80. This objection is premised on the Committee's disagreement with the assumptions in the Debtors' Liquidation Analysis. Wilmington Trust also objects to the Debtors' Liquidation Analysis assumptions. *See* Wilmington Trust Obj., ¶ 30-39. These Objections, in addition to being properly deferred until the Confirmation Hearing, are without merit.

52.     The Debtors will prove at the Confirmation Hearing that the assumptions in the Liquidation Analysis are reasonable, as the standard requires. *See In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 366–67 (S.D.N.Y. 2007); *In re Lionel LLC,* Case No. 04-17324, 2008 Bankr. LEXIS 1047 at *18-19 (Bankr. S.D.N.Y. Mar. 31, 2008) (holding that the Debtor may satisfy the best interests test by showing, among other things, that the liquidation analysis was "based upon reasonable and sound assumptions" and a "reasonable estimate" of the debtors' chapter 7 liquidation value). Courts recognize that the assumptions underlying a liquidation analysis are often speculative and far from exact. *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (describing the valuation of a chapter 7 conversion as "not exact science" and noting that "the valuation of a hypothetical chapter 7 liquidation is, by nature, inherently speculative"); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297–98 (Bankr. S.D.N.Y. 1990) ("hypothetical and valuation evidence is often replete with assumptions and judgments."). The Debtors have expanded their justification for the assumptions in the Liquidation Analysis in the Disclosure Statement and in detail above. Such assumptions are reasonable and support the Liquidation Analysis which proves that the Plan meets the best interests test.

53.     Further, the cases the Committee cite to support its position are distinguishable. In *In re Smith*, 357 B.R. 60, 67-68 (Bankr. M.D.N.C. 2006), the Court found that,

39

where the Debtors offered no liquidation analysis of any kind, mere assumptions would not satisfy the test of section 1129(a)(7), which is clearly distinguishable from these cases where the Liquidation Analysis (for both the Plan Settlement and the Toggle Plan) has in fact been provided.[9] In *S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*, 252 B.R. 373, 391 n. 79 (E.D.Tex. 2000), the Court held that Debtors would not meet the best interests test without making an assumption of a 30% discount on the future distributions proposed under the Plan.  Here, even if the Debtors removed the assumption of a 25% discount on distributable proceeds under a chapter 7 liquidation, they would still meet the best interests test. Finally, the Committee cites to *In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34 (Bankr. S.D. Ind. 1986), where the Court found that the best interests test had not been satisfied because the Debtors assumed that, in the hypothetical chapter 7 scenario, the chapter 7 trustee would abandon pursuit of an action against one of the Debtors' largest unsecured creditors, but did not provide evidence for this assumption. The Court refused to speculate as to the future conduct of a hypothetical chapter 7 trustee without the support of evidence that suggested the trustee would abandon a potentially valuable claim.   This is distinguishable from these cases as the Debtors are not making any analogously unreasonable assumptions.

54.    In any case, the Debtors will meet the best interests test even if their assumptions are modified because the Plan effectively liquidates all assets but without the inevitable incremental costs of chapter 7.  If the Debtors transitioned to a chapter 7, there would always be the incremental cost of transitioning to chapter 7, retaining a chapter 7 trustee, counsel,

---

[9] Similarly in *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP), (Bankr. E.D. Va. Sep. 6, 2018) (ECF No. 4571), also a liquidating case, the Debtors argued that a liquidation analysis was unnecessary because the plans effectively liquidated all assets but without the incremental costs of chapter 7.  The Bankruptcy Court approved the disclosure statement without a liquidation analysis.

and advisors, and administering a chapter 7 process.  Even if the Committee disagrees with how

big that incremental cost should be, at least some incremental cost will always exist.

### F.    The Debtors Will Demonstrate that the Release Provisions in the Plan are Appropriate and Should be Approved at Confirmation

55.    As noted above, Objections that challenge the third party releases in the

Plan are confirmation objections that do not preclude approval of the Disclosure Statement.  The

Objections to third party releases do not remotely rise to the level of rendering the Plan non-

confirmable on its face and, in any event, they are not supported by the law or facts.  The Debtors

submit that the third party releases outlined in the Plan are appropriate, of limited scope, and

supported by ample case law.  The third party releases in the Plan do not apply, nor will there be

any attempt to impose them on any creditor rejecting or abstaining from voting who opts out of

the releases.

56.    The U.S. Trustee's assertion that the Plan improperly deems that each

holder of a claim or interest who is (i) presumed to accept the Plan[10] and (ii) votes to reject the

Plan or abstains from voting but who does not opt-out of the releases on their ballots is a classic

confirmation objection and should be deferred to the Confirmation Hearing.  UST Obj., 8-10.  This

objection should also be overruled on the merits.  First, third party releases can be approved

pursuant to section 1141(a) of the Bankruptcy Code, which provides that "[e]xcept as provided in

subsection (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor . . .

and any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the

plan and whether or not such creditor . . . has accepted the plan."  11 U.S.C. §1141(a).  As this

Court noted in *In re Tops Holding II Corporation*, Case No. 18-22279 (RDD), even if a creditor

---

[10] The Plan has been modified to give secured creditors an opportunity to vote and opt out of the releases if they reject or abstain from voting.

is not deemed to have consented to plan releases as a matter of contract law, section 1141(a) of the Bankruptcy Code binds creditors to a plan's provision – including third party releases contained therein – if creditors receive proper notice but fail to object to confirmation of the plan.  *See* Tops Disclosure Statement Hr'g Tr. at 33:25-34:8, 34:9-24, 35:6-13.  *See also Lawski v. Frontier Ins. Grp., LLC (In re Frontier Ins. Grp., Inc.)*, 585 B.R. 685, 693 (Bankr. S.D.N.Y. 2018),, *aff'd*, 598 B.R. 87 (S.D.N.Y. 2019); *In re MPM Silicones, LLC,* Case No. 14-22503, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014, at *32 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part on other grounds*, 874 F.3d 787 (2d Cir. 2019).

57.    Here, all voting creditors will receive comprehensive and detailed notice of the third-party releases, their impact on them and their rights, the opportunity and need to opt out, and their right to object to confirmation of the Plan.  *See* Disclosure Statement at 140-141, 150-153; Ballots.  Accordingly, if creditors entitled to vote on the Plan do not file objections to the third-party releases in the Plan, under the above authority, those provisions will be fully enforceable and binding on the Releasing Parties as specified in Section 11.9(b) of the Plan.

58.    Even if the third-party releases could not be approved pursuant to section 1141 of the Bankruptcy Code, the releases can be approved on a consensual basis.  This Court and several others in this District have approved third-party releases as consensual where, as here, parties entitled to vote on a Plan are provided with an "opt out" mechanism that includes proper notice of the consequences of not opting out.  *See, e.g.*, *In re Tops Holding II Corporation*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018) (ECF No. 765); Hr'g Tr. 94:13-17, 96:8-15, 140:20-22, *In re Cenveo, Inc.*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 16, 2018) (ECF No. 687) (approving third-party releases as consensual where abstaining or rejecting creditors were required to opt out of such releases); Hr'g Tr. 43:6-11, *In re 21st Century Oncology*

42

*Holdings, Inc.*, Case No. 17-22770 (RDD) (Bankr. S.D.N.Y. Jan. 9, 2018) (ECF No. 926)
(confirming plan and approving third-party releases on a consensual basis from creditors that
abstained from voting or voted to reject the plan but did not opt out of the releases on their ballot);
Hr'g Tr. 139:20-140:25, *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC)
(ECF No. 624) (Bankr. S.D.N.Y. July 25, 2017) (approving third-party releases on a consensual
basis by creditors that either rejected the plan, abstained from voting on the plan, or were deemed
to reject the plan and who did not opt out of the releases); *In re Genco Shipping & Trading Ltd.*,
513 B.R. 233, at 271 (Bankr. S.D.N.Y. 2014) ("First, the Court will permit releases with respect
to any affected party that consented to grant the releases or may be deemed to have done so through
its ability to 'check the box' on the Plan ballots.  That includes those parties who voted in favor of
the Plan and those who voted to reject the Plan but failed to opt out from granting the release
provisions.") (citations omitted).  *See also In re MPM Silicones, LLC*, 2014 WL 4436335, at *34.[11]

### Conclusion

59.    The Debtors have worked diligently to try to address, to the extent
practicable and appropriate, any Objections with respect to the adequacy of the Disclosure
Statement and/or the solicitation and tabulation procedures.    The Debtors have filed
contemporaneously herewith revised and amended versions of the Plan and the Disclosure
Statement, which incorporate responsive disclosures and/or provisions, as applicable.    The
Disclosure Statement, as currently proposed, provides more than adequate information for
creditors entitled to vote to make an informed decision about whether to accept or reject the Plan,

---

[11] *But see In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017) (finding that failure to object to or reject
the plan is insufficient to constitute consent to third-party releases for abstaining creditors); *In re Chassix Holdings,
Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) (holding that "inaction" by abstaining creditors was insufficient to
constitute consent to third-party releases).

WEIL:\97050928\1\73217.0004

as required by section 1125 of the Bankruptcy Code.  Further, none of the Objections raise any

issue that warrants a finding that the Plan is impossible to confirm as a matter of law.  Rather,

while there may be litigable issues relating to confirmation, those issues should be raised and

addressed at that time.  Accordingly, the Debtors respectfully request that the Court defer all such

objections until the Confirmation Hearing and approve the Disclosure Statement.  The Debtors

submit that such approval and the commencement of solicitation of the Plan is in the best interests

of the Debtors, their estates, and all parties in interest.


Dated: May 28, 2019
      New York, New York

                              /s/ Sunny Singh
                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone:  (212) 310-8000
                              Facsimile:  (212) 310-8007
                              Ray C. Schrock, P.C.
                              Jacqueline Marcus
                              Garrett A. Fail
                              Sunny Singh

                              *Attorneys for Debtors*
                              *and Debtors in Possession*

WEIL:\97050928\1\73217.0004

## **Exhibit A**

**Objection Response Chart**

**Objection Summary Chart**[1]

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| 1) Williamson County, Wharton County, Terry CAD, Taylor CAD, Midland CAD, Mexia I. S. D., Jasper County, Henderson County, Hays County, Harrison County, Harrison CAD, Guadalupe County, Erath County, Denton County, Coryell County, Comal County, City of Waco et al, Cherokee CAD, Cherokee County, Burnet CAD, Brown CAD, Brazos County, Bowie CAD, Bosque County, Bell TAD, Bastrop County, Anderson County<br><br>(ECF No. 3373) | a. Certain liens attached to property of the Debtors under Texas Tax Code Section 32.01 for the 2013-2019 tax years for value in the aggregate amount of $1,388,771.54. The Plan should stipulate when the assessed and estimated taxes will be paid. | a. This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. The Plan treats all tax claims in accordance with the Bankruptcy Code. |
| 2) California Commercial Roofing Systems ("**CCRF**")<br><br>(ECF No. 3640) | a. Asserts that Debtor Sears Holdings Management Corporation ("**SHMC**") owes CCRF approximately $23,631.90 under postpetition contracts as an administrative expense. The objection seeks to compel payment for outstanding post-petition invoices. | a. This is not a Disclosure Statement objection or a Plan Confirmation objection. |
| 3) CCRF<br><br>(ECF No. 3641) | a. Asserts that Debtor SHMC owes CCRF approximately $3,902.00 under postpetition contracts as an administrative expense. The objection seeks to compel payment for outstanding post-petition invoices. | a. This is not a Disclosure Statement objection or a Plan Confirmation objection. |
| 4) United States Trustee<br><br>(ECF No. 3681)<br><br>*Joined by* Santa Rosa Mall, LLC (ECF No. 3771) | a. The U.S. Trustee makes a number of objections to the releases contained in the Plan, and argues that they should not be approved as proposed, including that the Plan improperly deems that the Released Parties are released by each holder of a claim or interest who (1) are presumed to accept the Plan, and (2) vote to reject the Plan or abstain from voting on the Plan but do not opt-out of the releases on their ballots. | a. All of the U.S. Trustee's objections to the releases are confirmation objections rather than objections to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. The Debtors have set forth the bases for the releases in the Disclosure Statement, including that the third party releases in the Plan may become binding pursuant to section 1141(a) of the Bankruptcy Code. Parties who are given an opportunity to opt out and who do not opt out may be deemed to consent to such releases under applicable law. (*See* Disclosure |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Reply, the Objection, the Plan, or the Disclosure Statement, as applicable.

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | Additionally, the U.S. Trustee states that the Disclosure Statement should provide that the Plan cannot be confirmed with certain Third Party Releases in the Plan. | Statement, Section X.C.2; Reply, ¶¶55-58).  The Plan has also been modified such that Secured Claims will be permitted to vote and have an opportunity to opt out of the Third Party Releases.<br><br>The Disclosure Statement contains nearly three (3) pages of disclosure and justification regarding Third Party Releases.  (*See* Disclosure Statement, p. 151-54).  The Debtors will add a statement to the Disclosure Statement noting that the U.S. Trustee opposes the releases contained in the Plan.  No additional disclosure should be required.  Accordingly, the U.S. Trustee's objections to the releases should be overruled for purposes of approving the Disclosure Statement and should be deferred to the Confirmation Hearing with all rights reserved. |
| | b.  The Disclosure Statement should cite authority to release claims that have not arisen at the time of confirmation against the Liquidating Trustee and the Liquidating Trust Board, which do not presently exist. | b.  The Debtors will add the following disclosure to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section I.D, fn. 12):<br><br>"The Liquidating Trustee and Liquidating Trust Board are successors and assigns of the Debtors, and thus are 'Related Parties' as the term is defined in the Plan." |
| | c.  The Plan should not provide a release or injunction for the Debtors in violation of section 1141(d)(3) of the Bankruptcy Code. | c.  This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing.  Any issue regarding the scope of the releases and Plan injunction will be addressed by the Debtors at the time of Plan Confirmation.  There is ample authority to enjoin holders of claims and interests from pursuing claims or actions against the Debtors that are inconsistent with the Plan.  Further, including the Debtors in the injunction provision does not absolve the Debtor of valid claims or obligations to comply with the Plan.  Courts in the Second Circuit have approved similar plan injunctions in other liquidating plan cases.  *See In re Angelica Corporation*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. Aug. 31, 2017) (ECF No. 544) (approving injunction provision in liquidating plan that enjoined certain holders of claims and interests from pursuing claims against the |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | Debtors); *In re Chrysler LLC, et al.*, No. 09-50002 (AJG) (Bankr. S.D.N.Y. Apr., 23 2010) (ECF No. 6875) (same); *In re Lehman Brothers Holdings Inc.*, et al., No. 08-135555 (JMP) (Bankr. S.D.N.Y. Dec. 06, 2011) (ECF No. 23023) (same). |
| | d. The Disclosure Statement should explain why the Plan provides that recoveries by the Liquidating Trust against the Debtors' officers and directors is limited to available D&O Policies. | d. The Debtors will add the following disclosure to the Disclosure Statement to address the objection (*See* Disclosure Statement, Section I.D.):<br><br>"Ordinarily, the Debtors would provide complete releases for post-petition officers and directors in consideration of the post-petition services provided to the estate. In these circumstances, however, to ensure access to insurance proceeds in connection with any Estate Causes of Action against other officers and directors, including those named as defendants in the Subcommittee Adversary Complaint, the Debtors have limited recoveries by the Liquidating Trust against the Specified Officers and Directors to available D&O Policies for the benefit of all creditors  Additionally, the Plan will be revised so that this provision applies only to Estate Causes of Action."<br><br>Additionally, the Plan will be revised so that this provision applies only to Preserved Causes of Action. |
| | e. The Plan should contain a provision ensuring that the third party release does not release attorneys from obligation under Rule 1.8(h)(1) of the New York Rules of Professional Conduct. | e. The Debtors will add the following language to the Plan to address this objection (*See* Plan, Section 15.9(d)):<br><br>"Nothing in the Plan limits the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct." |
| 5) Leonard H. Gerson on behalf of U.S. Department of Labor, Employee Benefits Security Administration<br><br>(ECF No. 3759) | a. The Disclosure Statement should address how to Debtors plan to treat a certain Sears Retiree Group Life Insurance Plan (the "**Retiree Plan**"). | a. The Disclosure Statement was revised after this objection was filed to address this issue and the Disclosure Statement has been further revised to provide additional disclosure. *See* Disclosure Statement, Section IV. L. |
| | b. It is unclear whether the relevant Retiree Plan will be modified under the process mandated by section 1114 of | b. This is not a Disclosure Statement objection or a Plan Confirmation objection. The Disclosure Statement |

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | the Bankruptcy Code, or whether the Debtors intend to restore the Retiree Plan. | contains an explanation of the circumstances surrounding the termination of the Retiree Plan and the basis for why section 1114 of the Bankruptcy Code does not apply.  The Debtors have explained in the Disclosure Statement their justification in terminating the Retiree Plan without seeking Bankruptcy Court approval pursuant to section 1114 of the Bankruptcy Code, and do not intend to seek the appointment of a retiree committee pursuant to section 1114 of the Bankruptcy Code. |
| | c.  The Bankruptcy Court should appoint a retiree committee to determine whether certain employee rights to benefits have vested and protect the interests of the Debtors' retirees. | c.  This is not a Disclosure Statement objection or a Plan Confirmation objection.  Further, the Department of Labor does not have standing to request appointment of a committee, only employees do. |
| 6)  Linda J. Gonyo<br><br>(ECF No. 3767) | a.  The Disclosure Statement does not adequately define the "General Unsecured Liquidating Trust Interest" and the "Specified Unsecured Liquidating Trust Interest" including a description of the assets that will be transferred into the Liquidating Trust. | a.  The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section I.C.):<br><br>""*The Liquidating Trust Assets*" means from and after the Effective Date all assets of the Debtors that are not distributed on or prior to the Effective Date (including, for the avoidance of doubt, the Total Assets), which shall be described in the Liquidating Trust Agreement.<br><br>"*A General Unsecured Liquidating Trust Interest*" means a beneficial interest in the Liquidating Trust granted to holders of (a) Allowed General Unsecured Claims, (b) the Allowed PBGC Unsecured Claim, and the (c) ESL Unsecured Claim, which shall entitle such holders to the General Unsecured Trust Recovery in accordance with the Plan.<br><br>"*A Specified Unsecured Liquidating Trust Interest*" means non-certificated beneficial interests in the Liquidating Trust granted to holders of (a) Allowed General Unsecured Claims and (b) the Allowed PBGC Unsecured Claims, which shall entitle such holder to a *Pro Rata* share of the Specified Unsecured Recovery. For the avoidance of doubt, no Specified GUC |

4

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | Liquidating Trust Interests shall be granted to holders of Allowed ESL Unsecured Claims." <br><br> The General Unsecured Trust recovery will be derived from all assets of the Estates other than the Specified Causes of Action. The Specified Causes of Action are certain causes of Action against the ESL Parties. For the avoidance of doubt, ESL cannot recover from the Specified Causes of Action. |
| 7) Winners Industry Co., Ltd. <br><br> (ECF No. 3769) | a. The Disclosure Statement does not explain the method for calculating exposure to 503(b)(9) and 503(b)(1)(A) claims. | a. The Debtors will add the following language to the Disclosure Statement to address this objection. (*See* Disclosure Statement, Section IV.T): <br><br> "As of May 23, 2019, 2,591 Claims have been filed asserting priority treatment under section 503(b)(9) of the Bankruptcy Code, totaling approximately $1.33 billion. The Debtors have conducted a preliminary analysis of the filed claims which is ongoing. The Debtors' estimate that the ultimate allowed amount of section 503(b)(9) claims will be $181 million after taking into account and disallowing (i) duplicate claims, (ii) claims for goods which the Debtors never had possession, (iii) claims based on critical vendor payments, and (iv) reclassified claims." |
| | b. The Debtors do not disclose whether an escrow agent will be established under the Plan to fund any incremental administrative expense claims pending under the movant's *Motion for Allowance of Payment of Administrative Expense Claims* (ECF No. 1386). | b. The Debtors will not establish an escrow agent under the Plan for this purpose. |
| 8) Santa Rosa Mall, LLC <br><br> (ECF No. 3771, 3996) | a. The Disclosure statement should include information regarding the insurance policy that provides coverage for damage caused by hurricanes to the Movant's properties. | a. No additional disclosure is needed. "Adequate information" as defined in section 1125 of the Bankruptcy Code does not require that the Disclosure Statement include information about every aspect of the Debtors' business of the Plan, voluminous financial documents, or admissions against interest, but rather is limited to "information of a kind, and in sufficient detail, as far as is reasonably practicable." *See* Reply ¶¶ 15-17. The dispute with this Claimant has been pending for some time. The Movant is the only party to have an interest in such insurance proceeds and does |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | not need additional information on the applicable insurance policies, which it has already received. |
| 9) ESL Investments, Inc.<br><br>(ECF No. 3988)<br><br>(the "**ESL Objection**") | a. The Disclosure Statement and correlating Plan provisions should be modified to reflect that the ESL 507(b) Priority Claims are entitled to recovery from Other Assets and the Credit Bid Release Consideration. | a. The Debtors do not agree that ESL's 507(b) Priority Claim, if any, may be satisfied from Other Assets or the Credit Bid Release Consideration. To the extent that this dispute remains, it will be addressed at the Confirmation Hearing. The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section I.B. fn. 9):<br><br>"ESL disputes the treatment of the ESL 507(b) Priority Claims, which could impact the recoveries for other claimholders if ESL prevails on its argument at Plan confirmation. The Debtors disagree with ESL's assertion."<br><br>Further, this objection is addressed in the reply filed by the Restructuring Subcommittee (the "**Subcommittee Reply**"). |
| | b. The Disclosure Statement should indicate that holders of 507(b) claims were granted valid and perfected liens, and describe which assets are collateral for those liens. | b. The Debtors will add additional language to the Disclosure Statement describing the 507(b) claims to address this objection (*See* Disclosure Statement, Section IV.D.3.). |
| | c. The Disclosure Statement should indicate that 507(b) claims might not be $0 as the Debtors assume, which would impact administrative solvency. | c. The Debtors will the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.T):<br><br>"While the Debtors' estimates of Administrative Expense Claims do not include any amounts on account of Claims entitled to priority under section 507(b) of the Bankruptcy Code, ESL has asserted that the amount of 507(b) Claims could be substantial and may impact the Debtors' ability to demonstrate administrative solvency." |
| | d. The Disclosure Statement inaccurately describes the recovery available to the ESL Unsecured Claims because it does not include access by ESL to the Credit Bid Release Consideration. The Disclosure Statement | d. The Debtors do not agree that ESL's unsecured claims may recover from the Credit Bid Release |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | should disclose that there is an ongoing dispute over the proper treatment of the ESL Unsecured Claims. | Consideration.  This objection is addressed in the Subcommittee Reply.<br><br>The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section I.B., fn. 9):<br><br>"ESL disputes the treatment of the ESL Unsecured Claims, which could impact the recoveries for other claimholders if ESL prevails on its argument at Plan confirmation.  The Debtors disagree with ESL's assertion." |
| | e.   The Disclosure Statement should explain why and how the PBGC is able to cause KCD to take any action with regards to the alleged $143 million KCD Administrative Expense Claim. | e.   The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.U.):<br><br>"The PBGC Settlement resolves the Royalty Payments dispute by providing that the PBGC will take all reasonable actions requested by the Debtors to cause KCD to waive any alleged administrative expense claim against the Debtors.  Because KCD has very few creditors besides the PBGC and Sears Re, the PBGC Settlement effectively ensures that PBGC as the largest creditor or KCD will not direct KCD to file an Administrative Expense Claim against the Debtors, thereby eliminating a potential $146 million Administrative Expense Claim.  Further, KCD, as a manager-managed Delaware Limited Liability Company, a board of managers comprised of three managers, each appointed by the sole member (the "**KCD Board**").  Under KCD's organizational documents, the KCD Board has authority to bind KCD.  As required under the organizational documents, one of the members of the KCD Board is an independent manager (the "**Independent Manager**").  KCD may not take certain material actions without the affirmative vote of the Independent Manager.  The Independent Manager must consider only the interests of KCD, including its respective creditors including the PBGC, in acting or voting on certain material actions (the "**Independent Manager Duty**").  If the PBGC indicates its support for waiver of the KCD's alleged |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | $146 Administrative Expense Claim, the Debtors expect that the Independent Manager will do the same.<br><br>Pursuant to the PPPFA, the Independent Manager may only be an individual who is pre-approved under the PPPFA or otherwise consented-to in writing by the PBGC (the "**PBGC Consent Right**").  Accordingly, where the Independent Manager's vote is required, the PBGC can heavily weigh, via the Independent Manager Duty, the proposed course of action.  And, the PBGC can, via the PBGC Consent Right, prevent or approve the appointment of any given replacement Independent Manager. In this way, the PBGC can "cause" KCD to take a particular action, e.g., cause KCD to waive a potential Administrative Expense Claim." |
| | f.    The Disclosure Statement should explain the rationale for the Debtors doubting the validity of the KCD Administrative Expense Claim | f.    The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section II.E.1.(m)(i)):<br><br>"KCD instituted the Minimum Royalty in order to maintain coverage ratios as required by the KCD Indenture.  In accordance with the Kenmore® license agreement, Sears Roebuck historically paid a Minimum Royalty of approximately $27.4 million per month and Kmart Corp. historically paid a Minimum Royalty of approximately $343,000 per month.  In accordance with the DieHard® license agreement, Sears Roebuck historically paid a Minimum Royalty of approximately $1.37 million per month and Kmart Corp. historically paid a Minimum Royalty of approximately $150,000 per month.  Historically, amounts in excess of KCD IP's liabilities (primarily interest payments on the CD Notes) were "round-tripped" back to Sears Roebuck.<br><br>Since the Commencement Date, the Debtors have not made any Royalty Payments to KCD.  KCD could assert that all such accrued but unpaid Royalty Payments as postpetition administrative claims.  Parties in interest, however, could assert that only the Actual Royalty, rather than the Minimum Royalty payments, |

8

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | should be treated as administrative expenses. The Debtors believe this is a litigable issue; however, the Royalty Payments are required under the respective Kenmore® and DieHard® license agreements and any litigation is subject to risk." |
| | g. The Disclosure Statement should explain the rationale for the priority treatment of the Allowed PBGC Unsecured Claim. | g. The Disclosure Statement already discloses the rationale for the priority treatment of the Allowed PBGC Unsecured Claim in Section IV.U. The Debtors will add additional language to the Disclosure Statement expanding on the rationale for their treatment of the PBGC's claims. (*See* Disclosure Statement, Section IV.V). |
| | h. The Disclosure Statement should disclose that if certain provisions of the PBGC Settlement breached the terms of the Asset Purchase Agreement, that breach would give rise to damages classified as Administrative Expense Claims. | h. The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.U):<br><br>"Transform has also reserved its right to object to the PBGC Settlement (ECF No. 2940) and has identified certain provisions of the PBGC Settlement that it believes breaches the Asset Purchase Agreement. Transform believes that such breaches would give rise to damages that would be classified as Administrative Expense Claims." |
| | i. The Disclosure Statement should indicate when the PBGC Settlement Agreement will be filed with the Bankruptcy Court, which should be filed with the Court within thirty (30) calendar days prior to the Plan Objection Deadline at the latest. | i. The Debtors and PBGC have agreed to rely on the Plan as the operative document for the PBGC Settlement. Accordingly, the Debtors do not intend to file a separate settlement agreement. The Plan has been modified accordingly. |
| | j. The Disclosure Statement does not adequately demonstrate that substantive consolidation is permissible in these cases under the *Augie/Restivo* standard. | j. This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. The Debtors have added language to the Disclosure Statement addressing the risks of substantive consolidation and the benefits of the Plan Settlement. (*See* Disclosure Statement, Section IV.V). |

9

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | k. The Debtors' estimation of administrative solvency does not account for any 507(b) claims or Administrative Expense Claims that may be asserted by Transform for breaches of the Asset Purchase Agreement. | k. The Debtors have incorporated by reference the *Motion to Estimate Certain 507(B) Claims for Reserve Purposes* filed at ECF No. 4034 (the "**507(b) Estimation Motion**") into the Disclosure Statement to provide disclosure to parties in interest regarding the Debtors' position on this issue, namely, that the Debtors do not believe that there are any valid claims under section 507(b) of the Bankruptcy Code. The Disclosure Statement provides that ESL and Cyrus (among others) oppose the Debtors' view and believe 507(b) Claims could be substantial. *See* Disclosure Statement, Section IV.Y.). |
| | l. The Disclosure Statement should explain its assertion that there is an agreement by Transform to absorb up to $270 million of Administrative Expense Claim Liabilities, and that $52 million in cash is being withheld by Transform. | l. The $270 million figure is comprised of (i) $139 million of 503(b)(9) claims, (ii) $20 million in severance costs, (iii) $166 million in Accounts Payable, less $55 million from the Prepaid Inventory Shortfall. (*See* Disclosure Statement, Section IV.T). |
| | m. The Debtors should disclose that potential damages arising from alleged breaches of the Asset Purchase Agreement may impact the administrative solvency analysis. | m. The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.T):<br><br>"The Debtors' estimate of Administrative Expense Claims does not include any Administrative Expense Claims that may be asserted by Transform, including those arising from alleged breaches of the Asset Purchase Agreement. Transform asserts that such breaches may impact the administrative solvency analysis." |
| | n. Footnote 8 of the Disclosure Statement should be revised to reflect the agreement reached between the parties to the Asset Purchase agreement, specifically, that the Debtors would not seek to "disallow, subordinate, characterize, avoid, challenge, dispute, or collaterally attack the ESL Claims." APA, Section 9.13(a)(ii). | n. The Debtors have revised the relevant footnote in the Disclosure Statement, which now reads as follows:<br><br>"ESL Unsecured Claims are subject to objections pursuant to section 502(d) of the Bankruptcy Code and setoff for unpaid amounts due to the Debtors; provided, that, each of the ESL Claims (as defined in the Asset Purchase Agreement) in the amounts set forth on Exhibit G to the Asset Purchase Agreement, are not subject to section 502(d) objections or setoff." |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | o. In order to reflect the proposed changes to footnote 8, the Plan should incorporate new definitions of "2018 Unsecured SHC PIK Notes," "2018 Unsecured SHC PIK Notes Claims," and "2018 Unsecured SHC PIK Notes Indenture." | o. The Debtors have modified the Plan as follows to address this objection (*See* Plan, Article I, Section A): <br><br> "*2018 Unsecured SHC PIK Notes*" means the notes issued under the 2018 Unsecured SHC PIK Notes Indenture. <br><br> "*2018 Unsecured SHC PIK Notes Claims*" means all Claims arising under, derived from, or in connection with the 2018 Unsecured SHC PIK Notes and/or the 2018 Unsecured SHC PIK Notes Indenture. <br><br> "*2018 Unsecured SHC PIK Notes Indenture*" means that certain Supplemental Indenture, dated as of March 20, 2018 (as amended, supplemented or otherwise modified prior to the date hereof) to that certain Indenture, dated as of November 21, 2014 (as amended, supplemented, or otherwise modified prior to the date hereof) between Sears Holdings Corporation and Computershare Trust Company, N.A., as trustee. |
| | p. The Disclosure Statement should be amended to describe the defendant's view of the Restructuring Subcommittee's Complaint. | p. The Debtors will add the language proposed in paragraph 51 of the ESL Objection to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.M.2) |
| | q. The Disclosure Statement should be amended to describe why the Related Party Transaction Committee are not named defendants in the Complaint. | q. This objection is addressed in the Subcommittee Reply. |
| | r. The Disclosure Statement mischaracterizes the Motion to Mediate filed by Transform. | r. The Debtors will add revised language proposed in paragraph 53 of the ESL Objection to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.Q). |
| | s. The Disclosure Statement should include an update as to the ongoing dispute regarding the Debtors' real property located in the Village of Hoffman Estates, Illinois. | s. The Debtors will add revised language proposed in paragraph 54 of the ESL Objection to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.Q) |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | t. The Disclosure Statement should include additional disclosure regarding Transform's ongoing disputes with the Debtors under the Asset Purchase Agreement. | t. The Debtors will add revised language proposed in paragraph 56 of the ESL Objection to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.Q). |
| | u. The Disclosure Statement should more clearly describe the intended tax treatment of the Intercompany Claims as set forth in the Asset Purchase Agreement and Sale Order. | u. The Debtors will add the language proposed in paragraph 56 of the ESL Objection to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section V.H.6(b)). |
| 10) Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent<br><br>(ECF No. 3990) | a. The Disclosure Statement should describe the adequate protection liens and claims the Second Lien Debt holders were provided under the Final DIP Orders, and the value of those liens and claims. | a. The Debtors will add the following language and a chart showing the relative priorities of the various liens pursuant to the Final DIP Orders to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.D.3):<br><br>"Under the Final DIP ABL Order and pursuant to section 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Prepetition Second Lien Credit Parties (as defined in the Final DIP ABL Order) were granted a valid and perfected replacement and additional security interest in, and liens on, all DIP ABL Collateral owned by the Prepetition Second Lien Loan Parties to the extent of any Second Lien Diminution of Value (as each of the terms are defined in the Final DIP ABL Order) (the "***Prepetition Second Lien Adequate Protection Liens***").<br><br>Under the Final DIP ABL Order and pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the Prepetition Second Lien Credit Parties' interest in the Prepetition Second Lien Collateral, including any Cash Collateral, the Prepetition Second Lien Collateral Agent, on behalf of itself and other Prepetition Second Lien Credit Parties, was granted an allowed administrative claim against the Estates of the Prepetition Second Lien Loan Parties under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code to the extent of any Second Lien Diminution of Value (the "***Second Lien 507(b) Claims***") to the extent that the Prepetition Second Lien Adequate Protection Liens are insufficient to protect |

12

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | the interests of the Prepetition Second Lien Credit Parties in the Prepetition Second Lien Collateral (as each of the terms are defined in the Final DIP ABL Order). The Debtors believe that the Second Lien Claims were fully undersecured on the Commencement Date, and there has been negligible Second Lien Diminution of Value, which is completely eclipsed by the applicable surcharges under section 506(c) of the Bankruptcy Code. As such, the value of the Second Lien 507(b) Claims are zero." |
| | b. The Disclosure Statement should explain why the Debtors treat the Prepetition Second Lien Credit Parties as Class 4 – General Unsecured Creditors. | b. This is an incorrect reading of the Plan. Section 3.8 of the Plan says: "Holders of Claims arising under the Second Lien Debt shall receive (i) the same treatment as holders of Other Secured Claims as set forth in Section 4.2 of the Plan to the extent such Claim is Secured and/or (ii) treatment set forth in Section 4.4 of the Plan for General Unsecured Claims to the extent such Claim is unsecured, as determined in accordance with section 506(a) of the Bankruptcy Code." |
| | c. The Disclosure Statement should explain the source of the cash the Debtors will use to make the cash payments to holders of Other Secured Claims. | c. The Debtors do not believe there are any material Other Secured Claims because such claims were either undersecured on the Commencement Date or the secured collateral did not result in any material proceeds from the Sale Transaction. |
| | d. The Debtors should explain the rationale for entering into a settlement with the PBGC providing for substantive consolidation. | d. This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. The Debtors have added additional language to the Disclosure Statement expanding on the rationale for their treatment of the PBGC's claims. (*See* Disclosure Statement, Section IV.V). |
| | e. The Debtors must demonstrate that the settlement of substantive consolidation can be approved under the *Augie/Restivo* standard. | e. This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. The Debtors have added language to the Disclosure Statement addressing the risks of substantive consolidation and the benefits of |

13

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | the Plan Settlement.  (*See* Disclosure Statement, Section IV.V). |
| | f.  The Debtors should explain how they would be able to revert to a non-substantive consolidation if the PBGC settlement is not approved. | f.  The Debtors have clarified the Disclosure Statement and corresponding sections of the Plan to provide that all classes of Impaired Claims (other than those deemed to reject) will be solicited at each Debtor.  The Debtors have also included a recovery and hypothetical liquidation analysis for a Toggle Plan.  In addition, the Disclosure Statement will make clear that if the Plan Settlement is not approved, the Debtors intend to proceed with the Toggle Plan, including if necessary, in accordance with section 1129(b) of the Bankruptcy Code.  The Debtors will solicit every Class entitled to be solicited, and will modify the Voting Procedures to allow holders of the Second Lien Debt to vote at each Debtor. |
| | g.  The Debtors should provide analysis showing that the cost of analyzing intercompany claims in a non-substantive consolidation scenario would exceed the $17.5 million the Debtors have agreed to pay the PBGC for the settlement of substantive consolidation. | g.  The Debtors' decision to enter the PBGC settlement was not based solely on a dollar-for-dollar comparison to the cost of analyzing intercompany claims on a non-substantive consolidation scenario. The merits of the PBGC Settlement and the Plan Supplement are addressed in Section IV.V of the Disclosure Statement and in the Reply.  *See* Reply ¶ 27. |
| | h.  The Disclosure Statement should provide more disclosure regarding the difficulty of implementing the analysis of intercompany claims. | h.  The Debtors' justifications for the Plan Settlement, including a description of the difficulty of conducing prepetition intercompany analysis, are already addressed in the Disclosure Statement.  (*See* Disclosure Statement, Section IV.V).  Such disclosure is more than sufficient. |
| | i.  The Debtors should explain why the PBGC should receive an increased recovery as a result of substantive consolidation, while other creditors (such as the holders of Second Lien Debt) do not. | i.  This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing.  The Plan Settlement has now been amended to include a Plan Premium for certain guarantee claims.  The Disclosure Statement explains this modification and the rationale therefor. |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | j.  The Disclosure Statement should show the difference in recoveries by creditor class, both with and without substantive consolidation. | j.  The Debtors will include additional exhibits to the Disclosure Statement demonstrating the difference in recoveries by creditor class to demonstrate recoveries and a hypothetical liquidation in the Toggle Plan scenario.  (*See* Disclosure Statement, Exhibits E-1 and E-2). |
| | k.  The Debtors should support certain assumptions made in the liquidation analysis with evidence. | k.  This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing.  The Debtors have expanded explanations of the assumptions in the Liquidation Analysis.  To the extent Wilmington Trust wishes to further contest this objection, it should be heard at the Confirmation Hearing.  *See Reply* ¶¶ 51-54. |
| | l.  The Disclosure Statement should specify what Preserved Causes of Action may exist against the Specified Directors and Officers. | l.  There is no requirement to specify the Preserved Causes of Action. |
| | m.  In Section II. E. 1. (c) of the Disclosure Statement, the amount of the credit bid under the Second Lien Credit Facility should be corrected to $433,450,000 | m.  The Debtors will revise the Disclosure Statement to reflect this comment. |
| | n.  In Section II. E. 1. (e) should be changed to note that the Second Lien Notes *did* mature on October 15, 2018. | n.  The Debtors will revise the Disclosure Statement to reflect this comment. |
| | o.  Paragraph 18 of the Debtors' Proposed Order Approving the Disclosure Statement provides that a class casting no votes to accept or reject the Plan, but which contains holders entitled to vote, will be deemed to have voted to accept the Plan, in violation of 11 U.S.C. § 1126(c). | o.  The Debtors submit that such procedure has been approved in by this and other Courts in the Second Circuit and should similarly be approved here.  This and other Courts have held that Debtors may presume such non-voting classes to accept a Plan in other cases.  *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 260 (Bankr. S.D.N.Y. 2007) (finding that the presumption of acceptance will be upheld to the extent that presumption was "explicit and well-advertised," appearing in both the Plan and the Second Disclosure Statement); *In re Midway Gold US, Inc.*, 575 B.R. 475, 495 (Bankr. D. Colo. 2017) (same).  The Debtors have clearly advertised that a non-voting class which includes claim holders entitled to vote will be deemed to accept the Plan in the *Motion for an Order (I) Approving Disclosure Statement; (II) Establishing* |

15

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | *Notice and Objection Procedures for Confirmation of the Plan; (III) Approving Solicitation Packages and Procedures for Distribution Thereof; (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan; and (V) Granting Related Relief* (ECF No. 3277), and similar disclosure will be added to the Disclosure Statement. (*See* Disclosure Statement, Section IX.C.3). |
| | p. In the Ballots, the "6.625% Second Lien Notes 10/15/2018" and "6.625% Second Lien Notes 10/5/2020 (Reg. S)" should be referred to as the "6-5/8% Senior Secured Notes due 2018." | p. The Debtors will revise the Ballots to reflect this comment. |
| | q. The proposed voting procedures should be amended to allow the partially secured holders of Second Lien Debt to separately accept or reject the Plan as creditors in both Class 2 and Class 4. | q. The Debtors will revise the Voting Procedures to allow holders of Second Lien Debt to vote to accept or reject the Plan with respect to each debtor, and will make corresponding changes to the Ballots to address this objection. The Debtors do not concede, however, that any Second Lien Debt was secured on the Commencement Date. All rights of the Debtors to object to any asserted Secured Claims on account of Second Lien Debt are reserved. |
| 11) Community Unit School District 300 (ECF No. 3992) (the "**School District Objection**") | a. The Disclosure Statement should describe the extent and nature of the ongoing Illinois EDA Act dispute between the School District and the Debtors. | a. The Debtors will add revised language proposed in paragraph 15 of the Objection to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.W). |
| | b. The Disclosure Statement should clarify the differences in structure and operation of the Liquidating Trust(s) in the Plan Settlement vs. Toggle scenarios. | b. The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section I.B, fn. 4): "As more fully discussed in the Plan and Section VI.V below, if the Plan Settlement is not approved by the Bankruptcy Court, the Debtors will revert back to the Toggle Plan. Even if the Toggle Plan is implemented, the Liquidating Trustee will report to and take ultimate direction from the Liquidating Trust Board." |

16

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | c.   The Disclosure Statement should include additional information in the Liquidation Analysis regarding the various methodologies employed. | c.   The Debtors will add additional exhibits to the Disclosure Statement to address this objection (*See* Disclosure Statement, Exhibits E-1 and E-2). Additionally, Pursuant to the Plan Settlement, prepetition and postpetition Intercompany Claims will not be considered. |
| | d.   The Plan should not impair the implementation of the School District's ability to litigate against real estate or proceeds to which the School District may have a claim or lien. | d.   This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing.  (*See* Reply ¶ 6). |
| | e.   The Disclosure Statement should detail what, if any, investigation of prepetition conduct has been performed. | e.   This objection is addressed in the Subcommittee Reply. |
| 12)  FTI Consulting Canada Inc., in its capacity as court-appointed monitor for Sears Canada Inc. and certain of its affiliates, Moneau Shepell Ltd., in its capacity as administrator of the Sears Canada Inc. Registered Retirement Plan, and the Honorable J. Douglas Cunningham, Q.C., as court-appointed litigation trustee for Sears Canada Inc., and Counsel for the 1291079 Ontario Limited, as class representative for the potential class of all Sears Hometown Dealer Stores (the "**Canadian Plaintiffs**")<br><br>(ECF No. 3994) | a.   The Disclosure Statement should provide additional disclosure as to the alternate, non-settlement Plan that may be implemented through the Toggle Plan including: the terms of the Toggle Plan; classification and treatment of claims under the Toggle Plan; estimations of recoveries under the Toggle Plan; liquidation analysis for the Toggle Plan; the method by which creditors are to vote on the terms of the Toggle Plan versus the Plan; and the legal basis for the proposed "intercompany loans" and granting of security interests for such loans contemplated by the Toggle Plan. | a.   The Debtors will add a new subsection to the Disclosure Statement to address this objection (*See* Disclosure Statement describing the Toggle Plan, Section IV.V). |
| | b.   The Disclosure Statement should provide additional information regarding the Debtors' projected recoveries from the Avoidance and Litigation Actions. | b.   The Debtors are unaware of any requirement to include such information regarding projected recoveries from the Avoidance and Litigation Actions. |
| | c.   The Disclosure Statement should provide additional information regarding "book value" allocation of pre-conversion professional fees. | c.   The Debtors will add additional exhibits to the Disclosure Statement describing the allocation of professional fees to address this objection (*See* Disclosure Statement, Exhibits E-1 and E-2). |
| 13)  Cyrus Capital Partners, L.P.<br><br>(ECF No. 3997) | a.   The Disclosure Statement should include additional disclosure regarding the adequate protection that was granted to the Second Lien Lenders, including the Cyrus Prepetition Claims, the Secured AP Claims, and the Section 507(b) Claims, including a description of the | a.   The Debtors will add the language noted in 10.a above to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section V.D.3). |

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | collateral and value of such claims, and the potential impact on recoveries. | |
| | b.  The Disclosure Statement should advise interested parties that substantially all the assets proposed as sources of funding for Plan distributions are encumbered to secure the Secured Adequate Protection Claims. | b.  The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.D.3).<br><br>"Cyrus has indicated that it believes that substantially all of the funding for Plan Distributions are encumbered to secure Second Lien 507(b) Claims."<br><br>The Debtors disagree and do not believe there are any 507(b) Claims. |
| | c.  The terms of the Plan ignore the Final DIP Order and MTN Sale Order requirements for allocation and tracking of intercompany claims by grouping all pre-petition and post-petition claims together. | c.  This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing.  The Debtors have provided Cyrus with a breakdown of postpetition assets and liabilities on a monthly, entity by entity basis in compliance with paragraph 39 of the Final DIP Order. In addition, the Disclosure Statement now includes an Intercompany balance schedule, including the Debtors' cost allocations methodology (*See* Disclosure Statement, Exhibit D).  These amounts are not relevant under the Plan Settlement, as prepetition and postpetition Intercompany Claims are not considered in that scenario.  The Debtors do not believe that the MTN Sale Order allocation provision is relevant to the Plan. |
| | d.  The Disclosure Statement should identify whether or how Net Proceeds from Total Assets will be available to satisfy Other 507(b) Priority Claims on the Effective Date, as required under section 1129(a)(9) of the Bankruptcy Code. | d.  The Debtors will add the language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.Y).  As set forth in the 507(b) Estimation Motion, the Debtors do not believe that such claims have value. |
| | e.  The treatment of Other 507(b) Priority Claims in section 2.5 of the Plan impermissibly provides that the Debtors will pay Fee Claims ahead of Other 507(b) Priority Claims. | e.  This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing.  The Fee Claims are being paid out of the Carve-Out Account which is expressly set aside only for professional fee claims pursuant to the |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | terms of the Final DIP Orders. The Other 507(b) Priority Claims granted under the DIP Order are expressly prohibited from benefiting from the Carve-Out Account and the Carve-Out Account is senior to all claims pursuant to the Final DIP Order. In addition, to the extent the funds in the Carve Out Account are insufficient, the Final DIP Order provides that Carve Out Claims are senior to all other Claims (with limited exceptions not relevant here (*See* ¶¶ 15, 18, 21 of the Final DIP Order.) |
| | f.  The Disclosure statement should provide information regarding the extent and value of the Adequate Protection Lien Collateral. | f.  The Debtors have incorporated by reference the 507(b) Estimation Motion into the Disclosure Statement to provide disclosure to parties in interest regarding the Debtors' position on this issue, namely, that the Debtors do not believe that there are any valid claims under section 507(b) of the Bankruptcy Code. |
| | g.  The Disclosure Statement should provide creditors with information describing the Substantive Consolidation Settlement, and explain how the Substantive Consolidation Settlement meets the *Augie/Restivo* standard. | g.  This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. The Debtors have added language to the Disclosure Statement addressing the risks of substantive consolidation and the benefits of the Plan Settlement. (*See* Disclosure Statement, Section IV.V). |
| | h.  The Disclosure Statement should provide additional information regarding the PBGC Settlement, and the rationale for the increase in the priority portion of the PBGC claim. | h.  The Debtors will add language to the Disclosure Statement and the Reply to address this objection (*See* Disclosure Statement, Section IV.V; Reply ¶¶ 29-31). |
| 14) Liberty Mutual Insurance Company ("**Liberty**")<br><br>(ECF No. 3989) | a.  The Plan should include a provision describing the surety bond program of the Debtors' certain aspects of Liberty's continued rights of equitable subordination. | a.  This is an express Plan Confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. The Debtors have reflected the language requested by Liberty in the Plan to resolve this objection (*See* Plan, Section 13.6). |
| 15) The Relator Carl Ireland, Administrator of the Estate of James Garbe | a.  The Disclosure Statement should include additional disclosure setting forth the unique rights of the Mortgagees as set forth in the Sale Order. | a.  As discussed in the Carl Ireland Objection, the Debtors have agreed to add the language proposed in paragraph 7 of the Objection to the Disclosure Statement. |

19

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| (ECF No. 4007)<br><br>(the "**Carl Ireland Objection**") | b.  The Disclosure Statement and Plan do not accurately reflect the Mortgagees' rights with respect to their superpriority administrative claims. | b.  The Debtors will add the following language to the Disclosure Statement and Plan to address this objection (*See* Disclosure Statement, Section IV.O.1); *see* Plan, Section 1.75, 1.96, 2.5):<br><br>"The Sale Order contains language reflecting the Court's determination of the objection of Relator Carl Ireland, as Administrator of the Estate of James Garbe ("**Relator**").  Relator, as well as his co-mortgagee, the United States (the "**Mortgagees**") held a first mortgage on certain of the Debtors' real estate, and did not consent to the sale of such collateral.  The Sale Order provides that the Mortgagees "shall be entitled to a lien against the sale proceeds of the Property in the same order of priority as existing on the date of entry of this Sale Order and a superpriority administrative expense claim against the Debtors as adequate protection pursuant to sections 361, 363(e), and 507(b) of the Bankruptcy Code arising from the sale of such Property to satisfy any diminution of the value of such replacement lien post-Closing." |
| 16)  Unsecured Creditors' Committee (the "**UCC**")<br><br>(ECF No. 3995)<br><br>*Joined by* Plus Mark LLC (ECF No. 4009) | a.  The Committee asserts numerous objections related to settlement of substantive consolidation. | a.  This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing.  The Debtors have added language to the Disclosure Statement addressing this objection (*See* Disclosure Statement, Section IV.V); *See* Reply, Section II. A). The Debtors will demonstrate at Confirmation that the Plan Settlement should be approved. (*See* Reply ¶¶ 29-40.). |
|  | b.  The Debtors cannot demonstrate that the Amended Plan satisfies 1129(a)(9) of the Bankruptcy Code. | b.  This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing.  The Debtors believe they will be able to meet the requirements of section 1129(a)(9). (*See* Reply, ¶¶ 41-44.) |
|  | i.  Provision that provides that holders of Administrative Expense Claims may be required to seek payment of such claims from Transform, and no indication that Transform will do so, violates | i.  This is not a correct interpretation of the Plan.  The Debtors are not requiring any party to seek payment from ESL.  Creditors holding Administrative Expense Claims will either be paid |

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | section 1129(a)(9) of the Bankruptcy Code and the Sale Order; | by the Debtors or on their behalf from Transform, but such creditors continue to have a right to payment from the Debtors (*See* Plan, Article II, Section 2.1). |
| | ii.  The intercompany loan provision (i) provides no assurance that the "borrowing" Debtors will receive proceeds from litigation sufficient to repay the "lending" Debtors; and (ii) Impermissibly result in subordination of postpetition Intercompany Claims to third party administrative expenses. | ii.  The Debtors will only make these intercompany loans if, in the exercise of their business judgment, such loans make sense in light of the likelihood that the borrowing Debtor will be able to repay. Such loans will only be made in consultation with the Creditors' Committee and with the prior written consent of the PBGC.  There is no subordination of intercompany claims.  The Debtors have added the below language to the Plan to address this objection.  (*See* Plan section 9.2(e)):<br><br>"Further, in the Toggle Plan, (i) the PBGC Liquidating Trust Priority Interest shall be reduced from $97.5 million to $80.0 million, (ii) to the extent a particular Debtor has insufficient Assets to satisfy Allowed Administrative Expense Claims, Allowed ESL 507(b) Claims, Allowed Other 507(b) Claims, Allowed Priority Tax Claims, or Allowed Priority Non-Tax Claims, or post-petition Intercompany Claims, another Debtor with sufficient Assets may, in consultation with the Creditors' Committee and PBGC, make an intercompany loan to the applicable Debtor on or about the Effective Date to allow such Debtor to satisfy such Claims; such intercompany loan, together, with the Toggle Plan Intercompany Loan Interest Rate, shall be immediately repaid from and secured by an automatically perfected first priority lien on the proceeds of Preserved Causes of Action of the borrowing." |
| | iii.  The Disclosure Statement should describe the risks associated with the Debtors' disputes with Transform over the APA and how they may affect the Debtors' administrative solvency. | iii.  The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section VIII.A.10):<br><br>"**Risk that Debtors May Lose in Any of the Ongoing Disputes with Transform** |

21

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | As discussed in Section VI.Q herein, the Debtors are currently engaged in ongoing litigation with Transform.  Although the Debtors believe that they will succeed in the litigation, there is a risk that the Debtors may lose on some or all of the issues, which may have substantial impact on the Debtors' administrative solvency in that circumstance.  The Debtors may not have sufficient liquidity to satisfy all Allowed Administrative Expense Claims or Allowed Priority Claims, and the Debtors may be unable to satisfy administrative claims and confirm a chapter 11 plan." |
| | iv.   The Debtors should not solicit the Plan until the dispute with ESL is resolved. | iv.   The Debtors assert that they should proceed in parallel so as to not waste estate resources. |
| | v.   The Disclosure Statement should provide additional risk factors that further inhibit the Debtors' ability to demonstrate administrative solvency contingencies related to (i) allowance of 503(b)(9) claims, (ii) allowance of 507(b) claims, (iii) Retiree Benefits (iv) the Calder Litigation, (v) the Hoffman Estates Tax Credit, and (vi) Professional fees. | v.   The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section VIII.A.11): <br><br> "Failure to Satisfy Administrative Claims or Otherwise Agree to Alternative Treatment, and Other Factors that May Impact Administrative Solvency <br><br> To confirm a chapter 11 plan, section 1129(a)(9) of the Bankruptcy Code requires, among other things, that "except to the extent that the holder of a particular claim has agreed to a different treatment of such claim," claims entitled to administrative priority under 507(a)(2) or 507(a)(3) must be paid in full in order for a debtor to confirm a chapter 11 plan.  To the extent that a Debtor is unable to pay such claims in full or otherwise agree to treatment with the applicable holder, such Debtor may be unable to confirm a chapter 11 plan. Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of 503(b)(9) Claims, ongoing litigation, and professional fees, which may also impact the Debtors' ability to confirm a chapter 11 plan." |

22

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | vi. The Debtors should set an initial bar date regarding Administrative Expense Claims. | vi. The Debtors intend to fix an administrative bar date in the near term. There is no obligation to fix an administrative bar date as a precondition to solicitation of the Plan. Courts in this district have approved bar dates for administrative expense claims after the effective date of a chapter 11 plan in many cases. *See, e.g., In re Cenveo, Inc. et al.*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Sept. 7, 2018) (ECF No. 711) (approving the administrative expense claims bar date for two months after the effective date of the plan); *In re Gawker Media LLC, et al.*, Case No. 16-11700 (SMB) (Bankr. S.D.N.Y. Mar. 3, 2017) (ECF No. 825) (setting the administrative expense claims bar date for one month after the effective date of the plan); *In re Angelica Corporation*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. Sept. 26, 2017) (ECF No. 594) (same).. |
| | c. The Plan has not been proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code due to (i) the Debtors' maintaining control of Liquidating Trust Board; and (ii) Liquidating Trust is insufficiently funded. | c. This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. This objection is further addressed in the Reply (*See* Reply ¶¶ 45-46). |
| | d. Releases for current Officers and Directors render the Plan unconfirmable. | d. This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. Any issue regarding the scope of the releases and Plan injunction will be addressed by the Debtors at the time of Plan Confirmation. This objection is addressed in the Subcommittee Reply. |
| | e. The classification and treatment of PBGC Claims violates the Bankruptcy Code. | e. This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. This objection is further addressed in the Reply (*See* Reply ¶ 47-50). |
| | f. The Debtors should specifically disclose the calculation behind the PBGC's estimated $1.4 billion UBL claim. | f. The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section IV.U, fn. 17): |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | | "29 U.S.C. § 1301(a)(18) defines 'unfunded benefit liabilities' as: <br><br> 'the excess (if any) of – <br><br> (A) the value of the benefit liabilities under the plan (determined as of such date on the basis of assumptions prescribed by the corporation for purposes of section 1344 of this title), over <br><br> (B) the current value (as of such date) of the assets of the plan.' <br><br> In applying the above, the PBGC calculates the UBL Claims under the two applicable Sears plans as $931,400,000 and $462,000,000, respectively, totaling approximately $1,393,400,000. The PBGC asserts that this method of valuing the UBL Claim has been upheld by all five courts that have considered challenges to the UBL in the last 17 years." |
| | g.  The Plan is does not satisfy the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code and relies on unsupportable assumptions. | g.  This is a confirmation objection rather than an objection to the adequacy of the information in the Disclosure Statement, and should be deferred to the Confirmation Hearing. The Debtors will demonstrate at confirmation that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code. *See* Reply ¶¶ 51-54. The Debtors have also added additional disclosures in the Liquidation Analysis to support these assumptions. |
| | g.  The Debtors should provide a recovery analysis for the "toggle" scenario, and should provide projected recoveries under the deconsolidation scenario or chapter 7 deconsolidation. | g.  The Debtors will include recovery analyses in the Liquidation Analyses attached as exhibits to the Disclosure Statement to address this objection (*See* Disclosure Statement, Exhibits E-1 and E-2). |
| | h.  The Disclosure Statement fails to provide adequate information and should be modified to provide additional information regarding: | |
| | i.  The Debtors' ability to pay administrative claims in full, in cash, on the Effective Date, including | i.  The Debtors will add additional language to the Disclosure Statement to address this objection |

24

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | issues resulting from lack of bar date, Transform APA disputes, 503(b)(9) and 507(b) claims; | (*See* Disclosure Statement, Sections IV.T, Section VIII.A.10, VIII.A.11).<br><br>Additionally, the Debtors have incorporated by reference the 507(b) Estimation Motion into the Disclosure Statement to address this objection. |
| | ii.   The facts underlying each of the Transform APA Disputes and how the resolution of each dispute could affect administrative solvency; | ii.   The Debtors will add the language noted in 16.b.iii. above to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section VIII.A.10). |
| | iii.   Rationale for granting releases to current and former officers and directors and the benefits and consideration provided to the Debtors' estates in respect to such releases; | iii.   The objection incorrectly states that former officers and directors are receiving releases. Releases are only proposed to be provided to *postpetition* officers and directors.  The Debtors will add the following language to the Disclosure Statement to address this objection (*See* Disclosure Statement, Section X.C.2.(b)(iv)):<br><br>"The Debtor Releases are an important and integral part of the Plan and the Released Parties have made substantial contributions to these Chapter 11 Cases.  Specifically, the Released Parties made substantial and valuable contribution to the Debtors' Chapter 11 Cases through, among other things, managing the ordinary course of business of the Debtors during the Chapter 11 Cases, including, among other things, management and review of the Debtors' lease portfolio, the GOB process, and reporting requirements, negotiating and finalizing the DIP Financing, negotiating and closing the Sale Transaction with Transform for the sale of substantially all of the Debtors' assets, formulation and development of the Plan, facilitating the business transition process with Transform, and negotiating the PBGC Settlement. The Debtors also believe that the Third-Party Releases are narrowly tailored and appropriate in scope in exchange for the contributions made by the Released Parties." |

WEIL:\97050901\1\73219.0006

| Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|
| | iv.  The expected compensation for the Liquidating Trustee and the members of the Liquidating Trust Board; | iv.  The Liquidating Trustee is proposed to be Mr. Mohsin Meghji of M-III Partners L.P. ("**M-III**"). The final compensation of the Liquidating Trustee and Board will be reflected in the Plan Supplement. |
| | i.  The solicitation materials should include a letter from the Creditors' Committee. | h.  The Debtors will include a letter to the extent accurate and timely provided by the Creditors' Committee. |

26