# EXHIBIT 24



## GROUND SUBLEASE

**KMART CORPORATION, Sublandlord,**

and

**GCP Real XVI (Asheville), LLC, Subtenant
(d/b/a "Golden Corral Restaurant")**

**KMART NO. 4112—Asheville, NC**

*1001 Patton Avenue
Asheville, NC 28806*

BTM:508954v4

## GROUND SUBLEASE

**THIS GROUND SUBLEASE** (this "**Sublease**") is made and entered into as of this _____ day of _____, 2013 (the "**Effective Date**") by and between KMART CORPORATION, a Michigan corporation, or its assigns, ("**Sublandlord**"), and GCP REAL XVI (ASHEVILLE), LLC, a North Carolina limited liability company ("**Subtenant**").

### RECITALS

A.     Pursuant to the terms of that certain Sublease, dated December 18, 1964, by and between Patton Avenue Development Corporation, a North Carolina corporation, succeeded in interest by Nineteenth Asheville Properties, a New York partnership ("**Master Landlord**") and Sublandlord, as successor in interest to S.S.  Kresge Company (the "**Master Lease**"), Sublandlord controls a certain real property commonly known as 1001 Patton Avenue, Asheville, North Carolina, 28806, described in **Exhibit A** and depicted in **Exhibit A-1**, both made a part hereof by reference, which as used herein, shall be referred to as the "**Shopping Center**".

B.     Subtenant desires to lease from Sublandlord that certain pad site within the Shopping Center containing approximately 12,500 square feet of land which portion is the former Kmart auto center pad (the "**Building Area**"), as the site of a restaurant (the "**Restaurant**", as defined below), and the non-exclusive right to use in common with others the parking areas and driveways from time to time located on the Shopping Center and subject to the non-exclusive right of others to use in common with Subtenant the parking areas and driveways from time to time located on the premises (the "**Premises**").  The Premises is depicted on the site plan attached hereto as **Exhibit B** and made a part hereof (the "**Site Plan**", with the Premises depicted in cross hatch).  Subtenant shall construct and operate the Restaurant in accordance with the terms of the Master Lease and this Sublease.  Sublandlord is willing to lease the Premises to Subtenant upon the Terms and subject to the conditions set forth in this Sublease.

1.     **Certain Definitions and Certain Basic Provisions**

   (a)     "**Building Area**": has the meaning set forth in the Recitals.

   (b)     "**Common Areas**":  means all portions of the Shopping Center which may from time to time be available for the general non-exclusive use, convenience and benefit of Subtenant, other tenants, and occupants of the Shopping Center.  The Common Areas shall include, without limitation, the following, to the extent the same serve more than one occupant: paved service areas, sidewalks, ramps, roadways, driveways, curbs, curbcuts and all similar facilities and areas of the Shopping Center now or hereafter existing in the Shopping Center, including those shown on **Exhibit B**.  Notwithstanding the foregoing, in no event shall any of the Building Area be part of the Common Areas of the Shopping Center.

   (c)     "**Common Area Expenses**":  means all of Sublandlord's out-of-pocket expenses, in connection with the repair and maintenance of all drives and parking areas within the Shopping Center which shall include Insurance Costs, security, exterior lighting, snow removal, trash removal, real estate taxes and other similar costs;

provided, in no event shall Common Area Expenses include the expense of any service provided by Sublandlord to any other tenant, subtenant or occupant in the Shopping Center to the extent such service is not provided to Subtenant. As of the Effective Date, the Subtenant's Common Area Expenses shall be $2.08 psf, subject to annual adjustment to reflect changes in the underlying expense items.

(d)     **"Default Interest"** or **"Default Rate"**:  means that rate of interest that is, from time to time, six (6.0%) percentage points per annum in excess of the "prime rate" (the "Prime Rate") as published from time to time in the Money Rates Section of *The Wall Street Journal*, compounded monthly. Accordingly, as such Prime Rate changes from time to time, the "Default Interest" provided for herein shall likewise change; provided, however, that if the "Default Interest" rate calculation as above provided shall, at any time, exceed the maximum rate then permissible under law, such excess shall not be charged and instead the Default Rate shall, for so long as such condition continues, be equal to the maximum rate allowed by law.

(e)     **"Delivery Date"**:  means the date upon which Sublandlord, after completion of Sublandlord's Work (defined below) shall deliver or tender the Premises to Subtenant for its possession, as further detailed in **Section 7**.

(f)     **"Environmental Laws"**:  means all federal, state and local laws, statutes, ordinances, regulations, criteria, guidelines, rules, standards, rules of common law now or hereafter in effect, and in each case as amended, and any judicial or administrative order, consent decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources.

(g)     **"Exclusive Use"**:  has the meaning set forth in **Section 4(a)**.

(h)     **"Force Majeure"**:  means delays due to strikes, lockouts, labor troubles, inability to procure labor or materials or reasonable substitutes therefor, failure of power, fire or other casualty damage, war or civil disorder; provided, however, that force majeure shall not include delays resulting from changes in economic or market conditions, or financial or internal problems that can be satisfied by the payment of money.

(i)     **"Guarantor"**:  means GC Partners, Inc., a North Carolina corporation.

(j)     **"Hazardous Materials"**:  means any hazardous or toxic substance, chemical, material or waste, or any pollutant, contaminant or other substance, that is or becomes defined, listed, or regulated by Environmental Laws or by any local, state or federal governmental authority, including, without limitation, polychlorinated biphenyls, asbestos, radioactive materials and petroleum, crude oil or any fraction thereof.

(k)     **"Improvements"**:  means the improvements to be constructed by Subtenant pursuant hereto within the Building Area.

(l) **"Insurance Expenses"**: means the prorated portion of Sublandlord's insurance expense allocated to Subtenant in connection with: (i) any liability policy insuring the Shopping Center; (ii) any casualty policy with respect to the Premises and any improvements within the Premises; provided insurance expenses shall exclude all costs and expenses of any insurance policy insuring any other improvements in the Shopping Center. The self-insurance expense allocation is based upon Sublandlord's risk assessment across its real estate portfolio, and allocated on a square footage basis across its portfolio.

(m) **"Leasehold Estate"**: means Sublandlord's interest in the property pursuant to the Master Lease.

(n) **"Master Lease"**: has the meaning defined in the Recitals.

(o) **"NDA"**: means that certain Non-Disturbance Agreement, to be executed concurrent with this Sublease, by and among Master Landlord, Sublandlord and Subtenant concerning, among other things, the term of the Master Lease and the Term under this Sublease.

(p) **"Permitted Use"**: has the meaning set forth in **Section 4**.

(q) **"Premises"**: has the meaning defined in the Recitals, with such Premises being shown and outlined in cross hatch on the Site Plan attached hereto as **Exhibit B** and made a part hereof. Prior to the Delivery Date, the Subtenant shall obtain an ALTA survey of the Premises certified to Sublandlord and Subtenant, so that the parties can agree upon the exact size, location of the Building Area and the legal description, and, if needed, the parties shall memorialize same with revised **Exhibits A** and **B** to this Sublease.

(r) **"Prime Rate"**: is defined in the definition of Default Rate.

(s) **"Prohibited Uses"**: means the matters set forth in **Exhibit D**.

(t) **"Protected Area"**: means the area of space depicted at Exhibit, and as further described herein at Section 4.

(u) **"Real Estate Taxes"**: shall include all taxes, assessments and other governmental charges, general and special, ordinary and extraordinary, of any kind and nature whatsoever, including, but not limited to, assessments for public improvements or benefits, which shall, during the Term hereof, be laid, assessed, levied, imposed upon or become due and payable and Sublandlord's reasonable expense in obtaining any refund or reduction of Real Estate Taxes, subject only to the following:

(i) Franchise, estate, inheritance, succession, capital levy, transfer, federal and state income and excess profit taxes imposed upon Sublandlord shall be excluded; and

(ii)   If, at any time during the Term, a tax or excise on rents or other tax, however described, is levied or assessed against Sublandlord on account of the rent expressly reserved hereunder, as a substitute in whole or in part for taxes assessed or imposed on land and buildings or on land or buildings, such tax or excise on rents or other tax shall be included within the definition of Real Estate Taxes, but only to the extent of the amount thereof which is lawfully assessed or imposed as a direct result of Sublandlord's ownership of this Sublease or of the Rent accruing under this Sublease.

(v)   **"Recitals"**: The above Recitals are hereby incorporated into this Sublease as if fully set forth herein.

(w)   **"Rent Commencement Date"**: means the earlier of: (i) the date Subtenant opens its business to the public at the Premises or (ii) the date which shall be the first day of the fifteenth (15th) month after the Delivery Date, and shall mean the date on which Subtenant shall commence making Rent payments to Sublandlord.

(x)   **"Restaurant"**: shall mean a Golden Corral restaurant, similar in appearance and operation as Guarantor's other Golden Corral restaurants, or such other national or regional franchise concept restaurant as approved by Sublandlord under the terms hereof.

(y)   **"Restrictions"**: shall mean any and all: (i) restrictions and/or prohibited uses contained in leases between Sublandlord and any other tenant of the Shopping Center and listed on **Exhibit C**; (ii) any Construction, Operation and Reciprocal Easement Agreement or other similar document affecting the Shopping Center (collectively, the **"COREA"**); (iii) applicable governmental rules, regulations, codes and ordinances; (iv) all other covenants, conditions, and restrictions of record; and (v) and any matters that would be shown by an accurate land title survey of the Premises prepared in accordance with the latest standards approved by the American Land Title Association and the American Congress of Surveying and Mapping (**"ALTA/ACSM"**) of the Premises; provided, in no event shall any Restrictions prohibit the operation of a Restaurant.

(z)   **"Sublandlord's Work"**: shall mean the Sublandlord's Work as is defined in **Section 7** below.

(aa)   **"Subtenant's Hazardous Materials"**: means Hazardous Material on the Premises or Shopping Center brought onto or spread on the Premises or the Shopping Center by Subtenant or its employees, agents, invitees or contractors after the date hereof.

(bb)   **"Sublease Term"** or **"Term"** or **"Term of this Sublease"**: The Term shall commence upon the Delivery Date of the Premises by Sublandlord to Subtenant (the **"Commencement Date"**) and, provided that (1) Sublandlord has extended the term of the Master Lease for a sufficient term to accommodate such duration, or (2) Master Landlord has executed with Sublandlord and Subtenant, the NDA

(collectively the "**Sublease Term Conditions**"), and, unless extended as set forth below, or earlier terminated as permitted herein, shall expire on the date that is twenty (20) years from the Commencement Date (plus, if the Commencement Date does not occur on the first date of a calendar month, the number of days necessary to cause the Sublease Term to end on the last day of the month) (the "**Termination Date**"). Additionally, so long as no Event of Default shall then exist, and subject to the Sublease Term Conditions, Subtenant shall have the right to extend the Term upon not less than six (6) months' prior notice, for up to four (4) additional five (5) year periods.

(cc)   "**Sublease Year**": means a consecutive twelve (12) calendar month period during the Term. The first Sublease Year shall commence on the first day of the Term. If the Term begins on a day that is not the first day of a calendar month, then the first Sublease Year shall end on the last day of the twelfth full calendar month after the Commencement Date and shall consist of twelve (12) full calendar months and one partial month. If any Sublease Year consists of more or less than twelve (12) full calendar months, then any charges or payments due from Subtenant hereunder shall be prorated accordingly on a per diem basis.

(dd)   "**Subtenant's Proportionate Share**": The percentage represented by a fraction (currently 11.76%), the numerator of which shall be the number of square feet in the Building Area and the denominator of which shall be the number of square feet of rentable area in the Shopping Center, provided, in no event shall the denominator ever be less than 106,250.

(ee)   "**Termination Date**": has the meaning set forth in the definition of Sublease Term.

2.   **Granting Clause**

(a)   In consideration of the obligation of Subtenant to pay Rent as herein provided, and in consideration of the other terms, covenants and conditions hereof, Sublandlord hereby demises and leases to Subtenant, and Subtenant hereby takes from Sublandlord, the Premises, for the Sublease Term, upon the terms and conditions set forth in this Sublease. On the Delivery Date, subject to satisfactory completion of the Sublandlord's Work, Subtenant shall accept the Premises in its "AS IS" "WHERE IS" condition.

(b)   Subtenant along with its Sublease of the Premises receives the non-exclusive right to use, in common with others, the Common Areas of the Shopping Center, subject, however, to the terms and conditions of this Sublease, and to reasonable uniform rules and regulations for the use thereof, as prescribed from time to time by Sublandlord. Sublandlord retains a non-exclusive easement over the Common Areas existing on the Premises for the purposes of right of way, ingress and egress, and parking.

(c)   Sublandlord reserves the right, but not the obligation to, at all reasonable times, by itself or its duly authorized agents, employees and contractors to (i) go upon

and inspect the Premises and every part thereof, (ii) enforce or carry out the provisions of this Sublease, (iii) at its option, make repairs, alterations and additions to the Premises, and (iv) perform any defaulted obligation of Subtenant.

(d)  Sublandlord expressly reserves all rights in and with respect to the land hereby leased not inconsistent with Subtenant's use of the Premises as provided in this Sublease, including (without in any way limiting the generality of the foregoing) the rights of Sublandlord to grant, in Sublandlord's sole discretion, easements in the Common Areas to others for the purpose of installing, using, maintaining, renewing and replacing such overhead or underground water, gas, sewer and other pipe lines, and telephone, electric, power lines, cables and conduits.

## 3.   Sublease Term

The Sublease Term shall commence on the Commencement Date and shall expire on the Termination Date. Notwithstanding the date set for the commencement of the Term, all of the provisions of this Sublease, other than the payment of Rent, shall commence as of the date hereof.

## 4.   Use and Care of the Premises

(a)  Subtenant shall use the Premises for the development and operation of the Restaurant, in accordance with the Restrictions (the "**Permitted Use**"). Subtenant shall not change the use of the Premises from the Restaurant to another use without Sublandlord's and Master Landlord's consent. Subtenant's use of the Premises shall be subject to the Restrictions. No portion of the Shopping Center (including the Premises) shall be utilized for any of the Prohibited Uses. Additionally, during the Term, Subtenant shall have the Exclusive Use to operate within any portion of the Shopping Center controlled by Sublandlord a restaurant with a buffet (the "**Exclusive Use**").

(b)  Subtenant shall, at its sole cost and expense, comply promptly with all Restrictions, regulations, orders and requirements in effect during the Sublease Term or any part thereof, regulating or affecting the Premises and Improvements (defined below) or Subtenant's occupancy, operation or use of the Premises and Improvements. Subtenant shall, at its sole cost and expense, comply with all requirements of its policies of public liability, fire and other insurance at any time in force with respect to the Premises.

(c)  Subtenant shall be responsible for maintaining the Building Area in a good and functional condition.

(d)  Subject to the terms of the Master Lease: (1) all Common Areas shall at all times be subject to the exclusive control and management of Sublandlord; (2) Sublandlord shall have the right from time to time to change the area, level, location and arrangement of such parking areas and other facilities referred to above and make all rules and regulations pertaining to and necessary for the proper operation and maintenance of the common facilities; and (3) Subtenant

hereunder and any other subtenants and licensees shall comply with all reasonable rules and regulations made by Sublandlord pertaining to the operation and maintenance of said common facilities, including, but not limited to, such reasonable requirements pertaining to sanitation, handling of trash and debris, loading and unloading of trucks and other vehicles, and safety and security against fires, theft, vandalism, personal injury and other hazards. Sublandlord, upon gaining Master Landlord's consent, has the right to grant exclusive parking rights to portions of the Shopping Center (but excluding any portion of the Protected Area) to other tenants of the Shopping Center. Subject to the Master Lease, Sublandlord shall have the exclusive right at any and all times to close any portion of the Common Areas for the purpose of making repairs, changes or additions thereto and may change the size, area or arrangement of the parking areas or the lighting thereof within or adjacent to the existing areas and may enter into agreements with adjacent owners for cross-easements for parking, ingress or egress. Notwithstanding the foregoing, in no event shall Sublandlord be permitted to (i) make any change in the Common Areas which, in the exercise of commercially reasonable judgment, would have a material adverse impact on Subtenant's operation of the Premises (including, without limitation, an adverse impact on parking, access or utility availability) or (ii) any change to the Protected Area.

(e)   At all times throughout the Term, and without limitation of Subtenant's other obligations set forth in this Sublease, Subtenant shall:

(i)   Give to Sublandlord prompt written notice of any accident, fire damage or environmental condition occurring on or to the Premises.

(ii)   Subtenant shall not commit or permit any waste upon the Premises nor shall Subtenant perform any act or carry on any practice which may injure the Premises, any other space in the Shopping Center or any other tenant or occupant of the Shopping Center, or cause any offensive odor, noise or vibration, or constitute a nuisance or menace to any other occupant or other persons in the Shopping Center, and in no event shall any offensive noises be emitted from the Premises.

(iii)   Subtenant shall keep trash and refuse in covered trash receptacles located in the general areas shown on the Site Plan, which trash receptacles shall be kept within proper containers at all times, and in no event stored outside of such areas.

(iv)   Subtenant shall commence paying Rent as of the Rent Commencement Date. By no later than sixty (60) days after the Scheduled Completion Date (defined below in **Section 9**), and for the Term of this Lease including all Extension Terms, Subtenant shall continuously and uninterruptedly occupy and operate the Restaurant at the Premises in an efficient, professional and first-class manner, maintaining a full staff of trained and qualified employees.

(A)     Notwithstanding anything in this Sublease to the contrary, any time after the Scheduled Completion Date, Subtenant shall have the one (1) time right to cease operating in the Premises provided (i) no Event of Default (as defined herein) shall then exist, and (ii) Subtenant continues to perform all of Tenant's other obligations under this Lease, including, but not limited to, payment of Rent ("**Go Dark Right**").

(B)     If Subtenant:  (i) exercises its Go Dark Right but fails to perform all of Tenant's other obligations under this Sublease or (ii) without notice of exercising its Go Dark Right, Subtenant ceases to operate the Restaurant for a period of more than sixty-five (65) consecutive calendar days in any Sublease Year (exclusive of periods of closure relating to a substantial remodel requiring closure but accompanied by consistent construction/remodel work, or events of natural disaster, condemnation or casualty); then, subject to "Lender's Replacement Rights" (defined below in Section 54(i)):

    i.     Sublandlord, at Sublandlord's option, shall have the right to terminate this Sublease upon written notice to Subtenant, retain the Security Deposit, and seek all available remedies under this Sublease, at law or equity;

    ii.    upon such termination, Sublandlord may recapture possession of the Premises, including any Improvements, and the Premises and Improvements shall revert to Sublandlord, or at Sublandlord's option, Sublandlord may require Subtenant, at Subtenant's expense, to raze the Improvements and restore the Premises to a parking lot condition;

    iii.   Sublandlord shall then have the sole right to lease the Premises and the sole right to any rent income derived from the Premises; and

    iv.   in addition, upon such termination, neither party shall have any further rights or obligations accruing thereafter under this Sublease other than indemnifications and other obligations intended to survive such termination

(C)     If Subtenant exercises its Go Dark Right and continues to perform all of Tenant's other obligations under this Sublease then, subject to "**Lender's Replacement Rights**" (defined below in **Section 54(i)**), Sublandlord, at Sublandlord's option, shall have the right to (i) terminate this Sublease upon written notice to Subtenant and upon such termination, Sublandlord may recapture possession of the Premises, including any Improvements, and the Premises and Improvements shall revert to Sublandlord, or at Sublandlord's

option, Sublandlord may require Subtenant, at Subtenant's expense, to raze the Improvements and restore the Premises to a parking lot condition; (ii) Sublandlord shall then have the sole right to lease the Premises and the sole right to any rent income derived from the Premises; (iii) Sublandlord shall return to Subtenant its Security Deposit; and (iv) in addition, upon such termination, neither party shall have any further rights or obligations accruing thereafter under this Sublease other than indemnifications and other obligations intended to survive such termination.

(v)    Subtenant shall be liable to Sublandlord for any and all suits, damages, liabilities, losses (including loss or diminution of rents or profits), costs and expenses (including, without limitation, court costs and reasonable attorneys' fees) paid, suffered or incurred by Sublandlord as a result of Subtenant's failure to comply with its obligations under this subsection. Nothing contained in this subsection is intended to or shall restrict or limit any other remedies available under this Sublease, at law and in equity for Subtenant's failure to comply with its obligations hereunder

## 5.    Rent

(a)    Rent shall commence on the Rent Commencement Date.  The parties shall memorialize the Delivery Date, the Commencement Date, the Rent Commencement Date and the Expiration Date by executing a Supplemental Agreement in the form attached hereto as **Exhibit E** and made a part hereof within thirty (30) days after the Commencement Date.

(b)    "Base Rent", once commenced as set forth in **Section 8**, shall be as outlined below, and shall be payable monthly in advance, on the first day of each month of the Term without set off or deduction as follows:

| Initial Term: | | |
|---|---|---|
| Years | Monthly Payment | Annual Amount |
| 1-5 | $8,958.33 | $107,500.00 |
| 6-10 | $9,854.17 | $118,250.00 |
| 11-15 | $10,839.58 | $130,075.00 |
| 16-20 | $11,923.54 | $143,082.50 |
| Optional Terms: | | |
| 21-25 | $13,115.90 | $157,390.75 |
| 26-30 | $14,427.49 | $173,129.83 |
| 31-35 | $15,870.23 | $190,442.80 |
| 36-40 | $17,457.26 | $209,487.09 |

(c)    In the event that any partial month is involved in any Sublease Year, then Base Rent for that month shall be prorated.

(d)    In addition to base rent, Subtenant shall pay, as additional rent (herein sometimes called "**Additional Rent**"), all sums of money or charges of whatsoever kind or nature (including but not limited to the amounts required by **Section 5(f)** below), as shall be required to be paid by Subtenant directly to Sublandlord pursuant to the terms of this Sublease, whether or not the same is specifically designated herein as Additional Rent.  Whenever used in this Sublease, the term "**Rent**" means, collectively, the Base Rent and Additional Rent.

(e)    In the event any installment of Base Rent or Additional Rent shall be past due for more than ten (10) days, Subtenant shall pay to Sublandlord, as Additional Rent to cover Sublandlord's costs for collection and the loss of income, an amount equal to five percent (5%) of the amount.  Rent payments shall be sent to Sublandlord as follows:

> Kmart Corporation No. 4112
> c/o Sears Holdings Corporation
> 12664 Collections Center Dr.
> Chicago, IL 60693

(f)    For each year of the Term hereof, Subtenant shall pay to Sublandlord, as Additional Rent, a sum equal to Subtenant's Proportionate Share of (i) the Common Area Expenses and (ii) the Insurance Expenses, calculated as of the Effective Date to be $2.08 psf, and subject to annual adjustment to reflect changes in the underlying costs.

6.    **Security**

(a)    Upon execution of this Sublease, Subtenant shall pay to Sublandlord, an amount equivalent to two (2) months Base Rent which shall be retained by Sublandlord as a "**Security Deposit**".  The Security Deposit will be used to secure Subtenant's performance of this Sublease.  Sublandlord may commingle the Security Deposit with its own funds.  If Subtenant fails to pay Rent or otherwise commits a breach, Sublandlord may apply all or part of the Security Deposit to make the payment or cure the breach.  Sublandlord's rights under this section are in addition to any other rights or remedies Sublandlord may have under the terms of this Sublease or under local law.

(b)    As additional security for Subtenant's covenants and obligations under this Sublease, Sublandlord shall require execution by Guarantor of a Guaranty substantially in the form attached hereto as **Exhibit F**.

7.    **Conditions**

Each party, as specified below, agrees to diligently pursue satisfaction of all conditions set forth in this **Section 7** within the timeframes set forth below.

(a)    **Site Preparation / Sublandlord's Work.**

**(i)**   In accordance with the subsections below, and the provisions of Section 9 (*infra*), by no later than 90 days after the Effective Date (the "**Plans Period**"), Subtenant shall apply for, and shall thereafter diligently pursue, all Permits (defined below) needed for the Permitted Use at the Premises.

    **(i)**   "**Permits**" shall mean all permits and governmental approvals necessary to complete the construction of and operation of the Permitted Use.

    **(ii)**   Prior to delivering any proposed plans to any Permit issuing authority (each a "**Proposed Plan**"), Subtenant shall deliver to Sublandlord such Proposed Plan.

        a.   Subtenant must submit permit ready drawings to Sublandlord for review and comment as to design and work to be performed, such review to be in Sublandlord's sole discretion. Sublandlord shall be notified by Subtenant with a written copy of the documentation from the applicable Permit issuing authority once Subtenant has received said Permits (the "**Permit Notice**").

            i.   If any Restrictions, including without limitation the COREA, require consent from third-parties, Sublandlord shall use reasonable efforts to obtain such approvals, but in no event shall Sublandlord be required to expend any sums or incur any costs in obtaining such approval(s).

        b.   Within fourteen days of its receipt (the "**Proposed Plan Review Period**"), Sublandlord shall advise Subtenant whether it has any required exceptions to a Proposed Plan.

        c.   If a Sublandlord exception is mutually agreed to be material and will require an extension of the Plans Period, the parties shall memorialize this occurrence with the appropriate Amendment to this Sublease.

    **(iii)**   If Subtenant fails to (A) timely deliver all Proposed Plans so that the Proposed Plan Review Period falls within the Plans Period; or (B) obtain all Permits within the Plans Period, then (I) Subtenant may seek to extend the Plans Period, provided such request shall include payment to Sublandlord of a "**Plans Cure Per Diem**" of Two Hundred and No/100 Dollars ($200.00) per day for each day beyond the original Plans Period (or extended Plans Period, if previously extended as provided herein), or (II) Sublandlord may terminate this Lease and retain the Security Deposit.

    **(iv)**   If Subtenant timely submitted Proposed Plans to all Permit-issuing authorities, but:  (A) does not obtain the Permits prior to the expiration of the Permit Period; (B) Sublandlord fails to approve Subtenant's Proposed Plan which is material to the Permitted Use; or, (C) Subtenant is unable to obtain the Permits and/or Subtenant is unable to obtain all consents required in connection with the Restrictions, Subtenant shall have the right, upon written notice to Sublandlord, to terminate this Sublease and upon Sublandlord's receipt of such notice, Sublandlord shall return the Security

Deposit to Subtenant. Upon such termination, except for such obligations that specifically survive termination of this Sublease, all other obligations of the parties shall immediately terminate without expense to either party.

(v)   By no later than fourteen days after Subtenant obtains its Permits, Sublandlord shall commence, at its expense and in accordance with any applicable regulations, the following within the Premises: (A) demolition of existing building; (B) removal of the concrete slabs; (C) removal of hydraulic lifts; and (D) removal of the oil / water separator apparatus (collectively "**Sublandlord's Work**"). Sublandlord shall not be required or permitted to fill or compact the soil following completion of the Sublandlord's Work, such fill and compaction being part of the Subtenant's Work.

(ii)   During the course of and upon completion of the Sublandlord's Work, Sublandlord shall, at its expense, undertake an assessment of the environmental condition of the real property within the Premises in compliance with North Carolina law (the "**Standard for Assessment**") to allow the operation of the Restaurant.

A.   If the Standard for Assessment requires no further work beyond Sublandlord's Work, then Sublandlord shall tender the Premises to Subtenant immediately upon completion of the Sublandlord's Work, and Subtenant shall accept the Premises under the provisions of subsection (iii) below, "Acceptance of Premises";

B.   If the Standard for Assessment reveals staining, odors or other indicia suspected to be contamination of the Premises, then Sublandlord shall, at its expense, undertake appropriate sampling of the soil condition (the "**Soil Testing**"):

a.   If the Soil Testing results demonstrate a concentration of contaminants above any applicable state regulatory standards to permit construction or the Permitted Use, then Sublandlord:

i.   Shall report such results to the North Carolina Department of Environmental and Natural Resources ("**NCDENR**");

ii.   Shall, at Sublandlord's sole discretion, either:

(A)   Terminate this Sublease by written notice to Subtenant enclosing the return of Subtenant's Security Deposit, and upon which termination, except for such obligations that specifically survive termination of this Sublease, all other

obligations of the parties shall immediately terminate without expense to either party; or

(B)    Follow the NCDENR's directives to remediate the Premises to commercial / industrial standards for impacts of Sublandlord's operations at the Premises, and obtain a "Closure" or no further action letter from the NCDENR, or any other final disposition requiring no further remediation, which then permits Subtenant's construction at the Premises (collectively the "**Closure**"). Upon Sublandlord obtaining the Closure, then Sublandlord shall tender the Premises to Subtenant and Subtenant shall accept the Premises under the provisions of subsection (iii) below, "Acceptance of Premises", and Subtenant shall immediately commence construction of its "Improvements" (defined below) consistent with any NCDENR or other authority's directives for construction.

(C)    If, irrespective of obtaining a Closure, applicable regulations permit Subtenant to commence construction at the Premises, and, upon completion thereof, operate the Restaurant, then Subtenant shall commence construction of the "Improvements" (defined below) consistent with any NCDENR or other authority's directives for construction.

b.    In this process, Sublandlord reserves the right to challenge in good faith the NCDENR's findings or directives, and any such good faith challenge shall extend the timeframes detailed in this Article for an amount of time equal to the prosecution and completion of Sublandlord's good faith challenge;

(iii)    **Acceptance of Premises:**

A.    Except as provided in the preceding **subsection 7(a)(i) through (ii)**, Sublandlord shall not otherwise improve the Premises in any way.  Upon completion of the Sublandlord's Work and the procedures detailed in **subsection 7(a)(ii)(B)**, Sublandlord shall tender the Premises to Subtenant (the "**Delivery Date**").

B.    Upon Sublandlord's tender of the Premises to Subtenant in accordance with **subsection 7(a)(ii)(B)**:

a.  Subtenant acknowledges and agrees to accept the Premises in its then "AS-IS, WHERE IS, WITH ALL FAULTS" condition (**"Acceptance of Premises"**).

b.  The Premises shall be deemed to be **"Ready for Construction"**.

c.  Subtenant agrees to accept possession thereof and to proceed with construction of its "Improvements" (defined below) and to perform all work necessary to operate the Premises for the Permitted Use (**"Subtenant's Work"**, defined below), all of such work to be performed in compliance with **Section 9** or as otherwise approved by Sublandlord.

d.  By initiating any of Subtenant's Work in the Premises, Subtenant shall be deemed to have accepted the same and to have acknowledged that the same fully complies with Sublandlord's covenants and obligations hereunder.

e.  Subtenant further agrees that, if requested by Sublandlord, Subtenant will furnish Sublandlord with a written statement that Subtenant has accepted the Premises and that Sublandlord has fully complied with Sublandlord's covenants and obligations hereunder. Subtenant agrees to furnish to Sublandlord a Certificate of Occupancy from applicable local authorities within a reasonable time following the Commencement Date.

(iv)  **Tender and Possession:** Subject to the preceding subsection 7(a)(ii)B, Sublandlord agrees to tender the Premises on or before the thirtieth (30) month after the date of this Sublease (as subject to subsection 7(a)(ii)B, hereinafter the **"Outside Delivery Date"**. Unless Sublandlord defaults under this Sublease, then Subtenant shall not have the right to terminate this Sublease prior to the Outside Delivery Date. If Sublandlord has failed to tender the Premises to Subtenant by the Outside Delivery Date, then Subtenant shall have the right to terminate the Sublease by written notice delivered to Sublandlord on or before the tenth (10th) day after the Outside Delivery Date, and upon receipt of Subtenant's notice Sublandlord shall return Subtenant's Security Deposit.

(b)  **Approvals.** [NOTE: THESE ARE ACTION ITEMS, BECAUSE THEY MUST BE SIGNED CONCURRENT WITH SUBLEASE, THUS DELETED FROM EXECUTION VERSION]  The rights and obligations of Sublandlord and Subtenant under this Sublease are conditioned upon Sublandlord and Subtenant obtaining all necessary approvals from the Master Landlord to the Master Landlord NDA and, if deemed needed by Master Landlord, an Amendment to the Master Lease (collectively, the **"Approvals"**). Subtenant agrees that the Sublease

and its rights under the Sublease shall be subject to all the terms and conditions of the Master Lease, as amended, and the Master Landlord Non-Disturbance Agreement. If the Approvals have not been obtained prior to the end of the Subtenant's Due Diligence Period, then either party shall have the right to terminate the Sublease prior to all Approvals being obtained or, if agreed in writing by Sublandlord and Subtenant, the time for obtaining the Approvals may be extended. Subtenant shall be responsible for all costs and expenses incurred in connection with the obtaining of all of the Approvals.

8.  **Free Rent Period**. Subtenant shall have no obligation to pay Rent and/or Additional Rent, unless and until the occurrence of the Rent Commencement Date.

9.  **Construction of Improvements**

(a)  After satisfaction or waiver of all Conditions, Subtenant shall construct the Restaurant at the Premises. In connection with any construction of the Improvements, Subtenant shall also adequately screen the areas designated within the Premises for its dumpsters. In connection with any construction, Subtenant shall be solely responsible to construct all other improvements to the Premises necessary for the operation of the Restaurant (collectively with the Restaurant and other improvements, the **"Improvements"**). All Improvements shall be constructed within the Building Area.

(b)  During the construction of the Improvements, Subtenant shall have the exclusive use of the area within the Premises designated on the Site Plan as the "staging area" for the storage of its construction supplies and equipment. Subtenant shall be responsible at its sole cost and expense to secure all such materials during the construction.

(c)  Subtenant shall complete construction of the Improvements within fourteen (14) months after the Delivery Date (**"Scheduled Completion Date"**). If such construction is not completed by the Scheduled Completion Date, Sublandlord shall have the right to terminate this Sublease and take possession of and title to all of the Improvements sixty (60) days after Sublandlord provides written notice to Subtenant, provided Subtenant has not completed the Improvements within such sixty (60) day notice period. Further, if requested by Sublandlord, Subtenant shall promptly remove any partially completed structures and restore the Premises to a parking lot condition at Subtenant's sole cost and expense, or Sublandlord may perform, or arrange to have completed, such work and Subtenant shall pay Sublandlord the cost thereof plus twenty percent (20%) of such costs toward Sublandlord's cost in arranging and managing the completion thereof.

(d)  Subtenant shall submit to Sublandlord for review and comment: (1) its design development plans, drawings and specifications for the proposed Improvements (**"Subtenant's Initial Plans"**) and (2) its proposed construction staging schedule, as required under the terms of Section 7(a) for the initial Improvements, or at least

ninety (90) days prior to commencing construction of any later added Improvements.

(e)    Subtenant's Initial Plans shall include, without limitation, signage, landscaping, parking, traffic flow and ingress and egress, walkway modifications, and any other infrastructure plans.  Subtenant shall also submit to Sublandlord the Site Plan for the Premises, building design, and building design specifications and the construction phasing schedule for Sublandlord's general review.

(f)    Sublandlord's review of Subtenant's Initial Plans is not an evaluation of:  the quality of Subtenant's designs or methods, the quality, fitness, safety or soundness of the Improvements to be constructed; or compliance of Subtenant's Initial Plans or such Improvements with any applicable requirements of law.

(g)    The Subtenant's Initial Plans and Specifications, once reviewed and stamped "NO EXCEPTIONS NOTED" by Sublandlord, shall be referred to as **"Subtenant's Plans and Specifications"**.  Subtenant shall construct the Improvements in accordance with Subtenant's Plans and Specifications.  Subtenant shall submit any changes to Subtenant's Plans and Specifications to Sublandlord for Sublandlord's review and any other party having the right of consent over such changes prior to doing any such work.

(h)    Sublandlord shall have the right, in its sole discretion, to approve the location of Subtenant's construction entrances, which shall be located immediately adjacent to the Premises, and shall not interrupt the traffic flow within the Shopping Center.  Subtenant shall not materially interfere with the operation by Sublandlord of its store or with the operation of the Shopping Center while Subtenant is performing work to the Premises.  All construction will be performed by Subtenant in strict compliance with the terms of this Sublease.  No construction shall take place between November 1 of the year and January 5 of the next calendar year without Master Landlord's and Sublandlord's written consent upon Subtenant's 90 days' advance written request for such consent accompanied by delivery of Subtenant's plans and procedures that demonstrate that the Shopping Center's roadways, particularly ingress / egress drives, shall not be unreasonably obstructed.

(i)    All contractors and subcontractors hired by Subtenant to construct the Improvements shall maintain insurance coverage and amounts described in **Exhibit G** and with companies qualified and licensed to do business in the state in which the Premises are located and rated A-/VII or better by the then current edition of Bests Insurance Reports.

(j)    Work done by Subtenant at the Premises shall:  (i) be at Subtenant's sole cost and expense; (ii) be done in a good and workmanlike manner; (iii) be completed in compliance with all laws, ordinances, orders, rules, regulations and requirements applicable thereto; and, (iv) as to exterior work and site work, be performed only if Subtenant shall have given Sublandlord twenty (20) days prior written notice of any proposed work.

(k)     If any mechanic's, materialman's or other similar lien shall at any time be filed against the Premises or any other property owned or leased by Sublandlord on account of any work, labor or services performed or claimed to have been performed, or on account of any materials furnished or claimed to have been furnished, or related to any financing, security interest or encumbrance against the Improvements, the Premises, or any fixtures or personal property of Subtenant, for or at the direction of Subtenant or anyone holding or occupying the Premises through or under Subtenant, Subtenant shall, without cost or expense to Sublandlord, cause within twenty (20) days, the same to be either (i) discharged of record by payment, bond, order of a court of competent jurisdiction or otherwise; or (ii) contested, in which event any judgment or other process issued in such contest shall be paid or discharged before execution thereof.

(l)     Subtenant shall indemnify Sublandlord against and hold Sublandlord harmless from damage to adjacent properties or to the pavements, curbs, gutters, sidewalks, streets, shoulders and utility structures thereon resulting from or arising out of construction activities, and Subtenant agrees to keep pedestrian and road rights-of-way and drives clear of equipment and building materials of Subtenant and its contractors. Subtenant shall confine its construction activities to the staging area and to any off-site construction areas made available to Subtenant. Subtenant further agrees, to the fullest extent possible, to take whatever reasonable precautions are required in the excavation and in the movement of earth so as to prevent siltation and washing away of earth from the Premises and also to comply, at its expense, with all federal, state and county rules regarding sedimentation control.

(m)     During the course of construction, Sublandlord or its representatives may enter upon the Premises at all reasonable times, provided such entry does not unreasonably interfere with the progress of Subtenant's construction activities.

(n)     Within sixty (60) days following Subtenant completing construction of the Improvements, Subtenant shall provide Sublandlord with a set of "As-Built" drawings for the completed Premises (in CAD format).

(o)     At the end of the Sublease Term, Sublandlord shall have the right to require Subtenant at Subtenant's sole expense, to raze the Improvements, and restore the Premises to a parking lot, and if Sublandlord exercises such right, Subtenant shall raze the Improvements and restore the Premises to a parking lot within ninety (90) days following the end of the Term; provided, if Sublandlord does not notify Subtenant prior to one hundred twenty (120) days before the end of the Term of its election to require Subtenant to raze the Improvements and restore the Premises to a parking lot, then all Improvements as they exist upon conclusion of this Sublease shall then (and only then) become the property of Sublandlord and Subtenant shall have no further duties with respect thereto.

10.    **Signage**

(a)   Subtenant shall not place, alter, exhibit, inscribe, point, or affix any sign, awning, canopy, advertisement, notice or other lettering on any part of the Improvements without first obtaining the Sublandlord's and Master Landlord's written approval thereof; and Subtenant further agrees to maintain such sign, awning, canopy, decoration, advertising matter, lettering, etc., as may be approved in good condition and repair at all times, and repair all damage to the Premises that is caused by the installation, maintenance or removal of such signs, lettering, etc. All signs shall comply with the sign criteria provided in the Restrictions. All tenant signs shall, at Subtenant's cost, comply with applicable laws, codes, ordinances, rules and regulations. If directed by Sublandlord, Subtenant, at its sole cost, shall remove all signs upon the termination of the Sublease and will repair all damage caused by such removal.

(b)   Notwithstanding the preceding, Subtenant shall, at Subtenant's expense, be permitted to install its prototypical signage to the maximum allowable size permitted by law and the Restrictions, subject to necessary governmental approvals.

(c)   Additionally, Subtenant shall be permitted to install in its storefront, glass neon sign displays or other professionally rendered displays, subject to terms of the Restrictions.

(d)   Subtenant may only construct a monument sign within the Shopping Center upon prior written approval of Sublandlord and Master Landlord. Any such signage shall comply with the Restrictions.

11.   **Repairs and Maintenance of Premises**

(a)   Subtenant shall, at its cost and expense, keep and maintain the Building Area and all Improvements in good order and repair and in a safe condition, and the whole of the Building Area in a clean, sanitary and orderly condition.

(b)   Subtenant shall make any and all additions to or alterations or repairs in and about the Improvements which may be required by any governmental authority, and shall otherwise observe and comply with all public law, ordinance and regulations from time to time applicable to the Premises and the Improvements. Subtenant shall indemnify, defend and save harmless Sublandlord against all actions, claims and damages by reason of Subtenant's failure to comply with and perform the provisions of this **Section 11**.

(c)   On the last day of the Term or renewal period hereof, or on any sooner termination, Subtenant shall surrender the Premises to Sublandlord broom clean, in good condition and repair, subject to the provisions of **Section 9**.

(d)   Sublandlord agrees to keep the Shopping Center and all the improvements owned by Sublandlord or by Master Landlord and all facilities appurtenant thereto in a first class condition, in good order and repair and in a safe condition, and the whole of the Shopping Center in a clean, sanitary and orderly condition,

including, without limitation, paving, sweeping, and keeping the parking lot free from snow and ice, in a first class condition and timely repair and condition.

## 12. Expenses

Subtenant shall pay all costs and expenses in connection with the operation, ownership, lighting, security and maintenance of the Building Area and the Improvements during the Term, including any extensions; provided, however, Subtenant shall not be obligated to pay any amount due under any mortgage or deed of trust placed on the Premises by Sublandlord or any sums above Subtenant's Proportionate Share of expenses payable by Sublandlord to Master Landlord.

## 13. Insurance

Subtenant shall pay for and maintain, from the Delivery Date through the end of the Term, the following policies of insurance covering the Premises, which insurance shall be obtained from companies currently rated "A-/VII" or better as defined in the then current edition of Bests Insurance Reports (or the equivalent thereof if Bests Insurance Reports is no longer published):

(a)  Upon the opening of the Restaurant, Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Subtenant with a waiver of subrogation in favor of Sublandlord, and Employer's Liability Insurance with limits of $500,000.00 per accident or disease. In addition, Subtenant agrees to require that all contractors hired by Subtenant will maintain the same Workers' Compensation Insurance and Employer's Liability Insurance for such contractor's employees and will require all subcontractors to maintain such insurance and Subtenant agrees to indemnify, defend and hold Sublandlord harmless from any loss, injury, damage or liability which Sublandlord may suffer as a result of any such contractor or subcontractor failing to maintain such insurance.

(b)  Commercial General Liability Insurance covering Subtenant's operations on the Premises with coverage for premises/operations, products/completed operations, contractual liability, and personal/advertising injury liability with a minimum of $2,000,000.00 per occurrence and $4,000,000.00 in the aggregate for bodily injury or death; and not less than $1,000,000.00 in the aggregate for property damage, including Sublandlord as an additional insured.

(c)  Following completion of the Improvements, "All-Risk" Property Insurance upon all buildings, building improvements, personal property and alterations on the Premises, including, but not limited to, those perils generally covered on a Causes of Loss - Special Form, including fire, extended coverage, windstorm, vandalism, malicious mischief and sprinkler leakage. Notwithstanding the foregoing, Subtenant may elect to self-insure for any and all coverages listed in this Section so long as Subtenant at all times of self-insurance maintains a net worth of at least $100,000,000.00 and upon request, Subtenant shall supply Sublandlord with evidence thereof to Sublandlord's satisfaction.

(d)     Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of liability of $1,000,000.00 per occurrence for bodily injury and property damage.

(e)     If and at such time as the operation of the Restaurant include the sale of alcoholic beverages, Dram Shop/Liquor Liability Insurance that provides a minimum limit of the greater of (i) $1,000,000.00 per occurrence or (ii) the amount required by the state in which the Premises is located, with Sublandlord as an additional insured. In the event Subtenant fails to procure or maintain such insurance, then Subtenant shall immediately suspend sales of all liquor / alcoholic products and shall not resume such sales until such coverage has been reinstated in full force and effect.

The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies. At the end of each five (5) Lease Years of the initial Term, and at the beginning of each extension period, or upon Sublandlord demonstrating a legitimate business need to do so, Sublandlord shall review with Subtenant the coverages and limits of any or all of the policies required above and, at that time, shall cause such coverages and liability limits to be adjusted as reasonably agreed upon by Sublandlord and Subtenant in view of reasonable exposure anticipated over the remainder of the Term.

Each policy shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice to Sublandlord, and that the coverage provided by such insurance policy shall be deemed primary insurance, and that any insurance provided by or on behalf of Sublandlord shall be in excess of any insurance provided by such policy. Subtenant shall furnish Sublandlord, or cause to be furnished to Sublandlord, concurrently with the execution of this Lease, and prior to the inception of each successive policy period, insurance certificates (or if Subtenant has elected to self-insure for the coverages in this Section, then Subtenant shall submit a statement of self-insurance) and, upon request by Sublandlord, copies of such policies required to be maintained hereunder.

## 14.     Loss by Casualty

If the Improvements, or any part thereof, shall be damaged or destroyed by fire or other casualty, Subtenant's obligations under this Sublease shall not be affected and Subtenant shall continue to pay Rent and Subtenant shall within 365 days (subject to an extension necessitated by Sublandlord's building prohibition during the Holiday shopping season, if applicable, with such extension equal in duration of such prohibition) of the date of such casualty either: (i) rebuild and repair the Improvements to the condition such Improvements were in prior to the casualty or (ii) raze the remaining Improvements and restore the Premises to a parking lot. If Subtenant fails to do such work in a timely manner, then Sublandlord may terminate this Sublease by written notice to Subtenant. Provided that (y) Subtenant razes the Improvements and (z) Subtenant's obligations under this Sublease shall not be affected and Subtenant shall continue to pay Rent through the Term, then insurance proceeds payable in connection with any insurance policy covering the Improvements, shall be the sole and separate property of the Subtenant and neither Sublandlord nor its mortgagee nor Master Landlord shall be entitled to, or shall have any interest in, such proceeds or any part thereof.

15. **Indemnity**

    (a)    Sublandlord agrees to defend, indemnify and save harmless Subtenant and its agents, guests, servants and employees from and against any and all claims, liabilities, losses, costs, damages and expenses (including reasonable attorneys' fees) by or on behalf of any person, firm or corporation arising by reason of injury to person or property occurring on the Premises occasioned in whole by any act or omission on the part of Sublandlord or an employee (whether or not acting within the scope of employment) or agent or contractor of Sublandlord, or by reason of any unlawful use of the Premises by Sublandlord or any breach, violation or nonperformance of any covenant in this Sublease on the part of Sublandlord to be observed or performed. Sublandlord agrees to pay for all damage to the Premises as well as all damage to licensees or invitees thereof arising during the Term from the negligence or misconduct of Sublandlord and its agents, employees, licensees and invitees. Notwithstanding the foregoing, Sublandlord shall not be liable for any loss, damage, death or injury of any kind or character to (i) persons or property, arising from any use of the Improvements, or any part of the Premises, or caused by any defect in the Improvements, or (ii) caused by or arising from any negligent or wrongful act or omission of Subtenant, or any of its agents, employees, sublessees, licensees or invitees.

    (b)    Subtenant shall indemnify and hold harmless Sublandlord from and against any and all claims arising from Subtenant's use of the Premises and/or Subtenant's use of the remaining part of the Shopping Center or from the conduct of Subtenant's business, or from any activity, work or things done, permitted or suffered by Subtenant in or about the Premises or elsewhere, and shall further indemnify and hold harmless Sublandlord from and against any and all claims arising from any breach or default in the performance of any obligation on Subtenant's part to be performed under the terms of this Sublease, or arising from any negligence of Subtenant, or any of Subtenant's agents, contractors or employees, and from and against all costs, attorney's fees, expenses and liabilities incurred in the defense of any such claims or any action or proceeding brought thereon; and in case any action or proceeding be brought against Sublandlord by reason of any such claims, Subtenant, upon notice from Sublandlord, shall defend the same, at Subtenant's expense, by counsel satisfactory to Sublandlord. Subtenant, as a material part of the consideration to Sublandlord, hereby assumes all risk of damage to property or injury to persons, in, upon or about the Building Area arising from any cause, and Subtenant hereby waives all claims in respect thereof against Sublandlord.

16. **Real Estate Taxes**

    (a)    Each Party agrees to cooperate with seeking to have the Premises separately assessed for real estate tax purposes, and will join in any application, and provide all reasonably necessary information, which is reasonably necessary to make to the taxing authorities have the Building Area and the Improvements thereon separately assessed.

    **(i)** Such separate assessment may be in the form of either (y) a new parcel tax number, yielding a separate tax bill for the Premises or (z) specific value delineation, set forth in the taxing authority's records, whereby the real property taxes for the Premises are distinguished from the remainder of the Shopping Center.

    **(ii)** Tenant shall pay its expenses related to creating any separately assessed parcel for the Premises.

**(b)** The parties acknowledge that Real Estate Taxes may increase as a result of the development rights granted to Subtenant under this Lease.

    **(i)** Subtenant agrees that under no circumstances shall the obligation of Sublandlord for Real Estate Taxes relating to or imposed upon the Shopping Center be increased in any manner whatsoever as a result of this Sublease, any transfer of interest to or by the Subtenant or as a result of the construction of the Improvements and/or development and/or use of the Premises. Subtenant agrees that any increase in such Real Estate Taxes related to this Lease, any transfer of interest to or by the Subtenant, or any Improvements or construction or use on the Premises shall be the sole obligation of Subtenant and Subtenant shall promptly pay (as to the Premises) or reimburse Sublandlord (as to the balance of the Shopping Center) for all such increases in Real Estate Taxes upon receipt of the tax bill or Sublandlord's invoice, as applicable. Subtenant shall have the right to audit Sublandlord's books and records with respect to the increased Real Estate Taxes alleged under this subsection. Subtenant is entitled, at any reasonable time during regular business hours, after giving at least twenty (20) business days' notice to Sublandlord, to audit Sublandlord's books and records at the site of their location, using its own staff auditor or an independent auditor selected by Subtenant. The scope of the audit is limited to the determination of the accuracy of the increased Real Estate Taxes alleged owed by Subtenant under this subsection for the calendar year(s) at issue. Subtenant may make copies of the relevant books and records if requested by Subtenant, at Subtenant's expense.

    **(ii)** Sublandlord agrees that under no circumstances shall the obligation of Subtenant for Real Estate Taxes relating to or imposed upon the Premises be increased in any manner whatsoever as a result of improvements within the Shopping Center made by Sublandlord or another tenant using the Shopping Center. In the interest of clarity, this subsection does not apply to improvements made by the Sublandlord to the Shopping Center for the benefit of all users of the Shopping Center.

**(c)** From and after the Delivery Date:

    **(i)** If the Building Area and Improvements are separately assessed:

(A)     Sublandlord shall pay or cause to be paid:  (A) all Real Estate Taxes applicable to the Building Area and Improvements for any tax fiscal year ending prior to the Delivery Date or after the termination of this Sublease, and (B) in respect to any tax fiscal year occurring partially within and partially outside the Term, a pro rata share of the Real Estate Taxes applicable to the Building Area and Improvements allocable to the portion of such tax fiscal year prior to the Delivery Date or after the termination of this Sublease;

(B)     Subtenant, in the event of such separate assessment, shall pay or cause to be paid: (A) all Real Estate Taxes applicable to the Building Area and Improvements for any tax fiscal year occurring on or after the Delivery Date, and (B) in respect to any tax fiscal year occurring partially before and partially on or after the Delivery Date, a prorated share of the Real Estate Taxes applicable to the Building Area and Improvements allocable to the portion of such tax fiscal year occurring from and after the Delivery Date through and including the date of termination of this Sublease;

(C)     Each party shall deliver to the other a copy or copies of a receipted tax bill or bills showing payment of the Real Estate Taxes for the tax fiscal year last past, which such party is required to pay and discharge under the provisions of this Sublease within thirty (30) days after the other party shall have requested the same, or within thirty (30) days after the last day upon which such tax is due and payable without penalty, whichever is the latter date;

(D)     If Subtenant, in good faith, shall desire to contest the validity or amount of any Real Estate Taxes herein agreed to be paid by Subtenant, and shall notify Sublandlord of Subtenant's intention to contest the same, Subtenant shall not (unless applicable law shall require payment as a condition precedent to the contest or to stay enforcement of collection proceedings for such contested Real Estate Taxes) be required to pay, discharge or remove any lien for such Real Estate Taxes so long as Subtenant shall, in good faith, at Subtenant's own expense, diligently contest the same or the validity thereof by appropriate proceedings.   Such delay by Subtenant in paying the same until final determination of such disputed matter shall not be deemed a default in the conditions of this Sublease, provided Subtenant shall at all times effectually stay or prevent an official or judicial sale of said property for such non-payment under execution or otherwise, and pay any final judgment enforcing the Real Estate Taxes so contested, and thereafter promptly furnish Sublandlord evidence of satisfaction of such judgment; or

(ii)    If for any time after the Delivery Date, the Building Area and Improvements are not separately assessed but are included within an assessment of all or part of a larger tax parcel (the "**Tax Parcel**"):

    (A)    Sublandlord will pay or cause to be paid all Real Estate Taxes so assessed. Sublandlord will promptly, if it obtains or receives a statement setting forth the amount of said assessed valuations, furnish Subtenant such statement. Subtenant shall reimburse Sublandlord for:

        i.    any Real Estate Taxes applicable to the Building Area and Improvements (based on the Assessor's records) and so paid by Sublandlord for any tax fiscal year occurring wholly after the Delivery Date and prior to the termination of this Sublease, and

        ii.    a pro rata share of any Real Estate Taxes applicable to the Building Area and Improvements so paid by Sublandlord for each tax fiscal year occurring partially before and partially after the Delivery Date or partially before and partially after the termination of this Sublease, or

    (B)    If the Real Estate Taxes applicable to the Building Area and the Improvements are not ascertainable from the Assessor's records, then Subtenant shall pay to Sublandlord a pro rata share of the Real Estate Taxes and assessments for the Tax Parcel. Subtenant's pro rata share of the Real Estate Taxes against the Tax Parcel shall equal the sum of (x) the Real Estate Taxes and assessments allocable to the improvements located on the Tax Parcel multiplied by a fraction, the numerator of which is equal to the gross leasable area in the Improvements and the denominator of which is the gross leasable area in the improvements located on the Tax Parcel and (y) the Real Estate Taxes and assessments for the land in the Tax Parcel multiplied by a fraction of the numerator which shall be the number of square feet of land in the Building Area and the denominator of which shall be the number of square feet of land in the Tax Parcel.

    (C)    As soon as reasonably possible after Sublandlord shall have made a tax payment for which Sublandlord is to be reimbursed in part by Subtenant under the provisions hereof, Sublandlord shall submit to Subtenant a statement setting forth the amount of such tax payment and the share thereof which Sublandlord seeks to recover from Subtenant, and showing in reasonable detail how Sublandlord has arrived at the amount for which reimbursement is sought.

    (D)    With each such statement, Sublandlord shall submit to Subtenant a copy or copies of a receipted tax bill or bills showing payment of

the Real Estate Taxes with respect to which such statement is being rendered. Payment by Subtenant of the amount due Sublandlord for Subtenant's share of such tax payment shall be made within thirty (30) days after Subtenant shall have received such documents from Sublandlord.

## 17. Utilities

Subtenant shall, at its sole cost and expense, make all arrangements and pay for all utilities furnished to or used on the Building Area and Improvements. Subtenant shall, at Subtenant's cost, obtain separate meters for all utilities used by it at the Premises and shall pay the cost of such utilities directly to the provider of the utility service.

## 18. Default

(a)    The occurrence of any of the following shall constitute an event of default (an "**Event of Default**") by Subtenant hereunder:

(i)    The filing of a petition by or against Subtenant or Guarantor for adjudication as a bankrupt or insolvent, or for its reorganization or for the appointment of a receiver or trustee of Subtenant's property; an assignment by Subtenant for the benefit of creditors or the taking of possession of the property of Subtenant by any governmental officer or agency pursuant to statutory authority for the dissolution or liquidation of Subtenant;

(ii)    Failure of Subtenant to pay when due any installment of Rent hereunder or any other sum herein required to be paid by Subtenant, and the continuance of such nonpayment for ten (10) days following written notice; provided Sublandlord shall not be required to provide such notice more than twice in any twelve (12) month period;

(iii)    Subtenant assigns or sublets its interest hereunder except in compliance with **Section 24**; or

(iv)    Subtenant's failure to perform any other covenant or condition of this Sublease within thirty (30) days after written notice and demand from Sublandlord; provided, however, if such failure cannot be reasonably cured within such thirty (30) day period, no Event of Default shall be deemed to have occurred if, prior to the end of such thirty (30) day period, Subtenant shall have commenced such cure and shall thereafter diligently prosecute such cure to completion.

(b)    **Lender / Franchisor Notice.** Upon the occurrence of an Event of Default, Sublandlord shall first issue any required notice to Subtenant. If Subtenant fails to cure the Event of Default within the subject notice period, if any, then Sublandlord shall issue a written "**Lender / Franchisor Notice**" to both "**Lender**" (defined below) and "**Franchisor**" (defined below), and only to such Lender and

Franchisor as identified herein irrespective of any later assignments or other modifications (in which event, the Lender and /or the Franchisor shall be responsible for delivering such notice), delivered via certified mail.

"**Lender**" shall mean Subtenant's leasehold mortgagee as follows (name, address, "attention to" department:

_____[to be inserted] _____.

If Subtenant's financing is modified with a new "Lender", Subtenant shall notify Sublandlord, submit a proposed Sublease Amendment that is limited to identifying the new Lender (with all information for the new Lender as required herein), and deliver to Sublandlord such proposed Amendment accompanied by an "Amendment Review Fee" of Two Thousand and no/100 Dollars ($2,000.00) payable to Sublandlord.

"**Franchisor**" shall have the meaning assigned to that term in **Section 53**. Franchisor's address is _____[to be inserted]_____

_____ (or such other address as may be designated from time-to-time.

(i)      The Lender / Franchisor Notice shall identify Subtenant's failure to perform any obligation, covenant or condition of this Sublease and permit Lender or Franchisor to cure such default (a "**Lender / Franchisor Cure**"), which Lender / Franchisor Cure must be complete (A) within thirty (30) calendar days of the date of the Lender / Franchisor Notice for any non-monetary default, and (B) within ten (10) calendar days of the date of the Lender / Franchisor Notice for any monetary default (each a "**Lender / Franchisor Notice Period**"); provided, however, (i) if such failure cannot be reasonably cured within such specified Lender / Franchisor Notice Period and, (ii) if, prior to the end of such specified Lender / Franchisor Notice Period, Lender or Franchisor shall have commenced such cure and shall thereafter diligently prosecute such cure to completion, then such period shall be reasonably extended to permit such timely completion.

(c)    Upon the occurrence of an Event of Default, and after expiration of any applicable Lender / Franchisor Notice Period without a Lender / Franchisor Cure, Sublandlord shall have the right, then or at any time thereafter, and while such Event of Default shall continue, and in addition to and not in lieu of any other remedies, relief or rights available to Sublandlord at law or equity or contained in this Sublease, to do any of the following:

(i)      Sublandlord by itself or its authorized agents may cure the Event of Default and charge Subtenant for the costs of such cure, which charge shall be due and payable as Rent under this Sublease immediately upon written notice to Subtenant.

(ii)    Sublandlord may enforce every provision of the Sublease in accordance with its terms including, but not limited to, enforcement of the payment of Rent provisions by a suit or suits in equity or at law;

(iii)    Sublandlord may (A) apply all or part of the Security Deposit to the Event of Default of Subtenant and (B) exercise its rights under the Guaranty.

(iv)    Sublandlord shall have the right to terminate the Subtenant's right of possession of the Premises without terminating this Sublease and, therefore, to reenter the Premises to assume and take possession of the whole or any part thereof, and to remove all persons or personal property by direct or summary action, or in a different type of suit or proceeding, by force or otherwise, without being deemed liable of trespass or other actionable wrong by reason thereof, and without being liable for the damages therefor or in connection therewith, and, after demand made therefor, Subtenant or anyone in possession claiming under Subtenant shall be deemed guilty of unlawful detainer and subject to such summary judgment or other action as may be provided by law.    Additionally, Sublandlord may, with or without terminating the Sublease, relet the Premises as the agent for and in the name of the Subtenant, at any rental readily acceptable, applying the proceeds first to reimburse Sublandlord for all costs of enforcement of this Sublease including attorneys' fees and court costs, if any, second, to costs to re-rent the Premises including, but not limited to, tenant improvement costs and leasing commissions, third, to reimburse Sublandlord for Sublandlord's entire cost and expense in preparing the Premises for Subtenant's occupancy, fourth, to the payment of such Rent as same comes due, and, fifth, toward the fulfillment of the other covenants and agreements of Subtenant herein contained.    Subtenant shall not be entitled to any residual amount remaining after payment of all of the foregoing sums.    Subtenant hereby agrees that if Sublandlord shall recover or take possession of the Premises as aforesaid, and be unable to relet and rent the same so as to realize a sum equal to the Base Rent and Additional Rent hereby provided, Subtenant shall pay to Sublandlord any loss or difference of Base Rent and Additional Rent for the remainder of the Term.    Sublandlord may, but is not required to, assign this Sublease to Guarantor, if any, in the name of and on behalf of Subtenant or may enter into a new lease with Guarantor on the same terms as this Sublease or upon different terms.

(v)    Sublandlord, irrespective of the date on which its right of reentry shall have accrued or is exercised, shall have the right, whether for rent or possession or otherwise, to terminate this Sublease and the tenancy hereby created.    This right to terminate is exercisable by a written notice to Subtenant, which written notice may be part of a notice of default previously delivered to Subtenant, and, as such, may be conditioned upon the Event of Default, and is subject to the Lender / Franchisor provisions above in **subsection (b)**. The termination may be made effective as of the

Event of Default, or thereafter, and, if not otherwise specified, will be deemed to be effective immediately. Upon such termination, Sublandlord shall be entitled to and may take immediate possession of the Premises, any other notice or demand being hereby waived. Such termination does not, however, release Subtenant from liability for Rent then overdue or remaining under the Sublease but shall, if permitted by the laws of the state where the Premises are located, operate to accelerate the entire balance of the Base Rent and additional charges due over the entire lease Term (exclusive of unexercised renewal periods), which shall become immediately due and payable by Subtenant, along with all overdue Rent and charges.

(vi)   If Sublandlord terminates this Sublease as provided above:

(A)   Sublandlord shall be entitled to recover from Subtenant all damages (except for consequential damages) and other sums which Sublandlord is entitled to recover under any provision of this Sublease or at law or in equity or otherwise, including, but not limited to, all of the accrued Base Rent and Additional Rent for the period up to and including such Termination Date, as well as all other additional sums payable by Subtenant or for which Subtenant is liable or in respect of which Subtenant has agreed to indemnify Sublandlord under any of the provisions of this Sublease which may be then owing and unpaid and all costs and expenses, including without limitation, court costs and reasonable attorneys' fees incurred by Sublandlord in the enforcement of its rights and remedies hereunder and, in addition, any damages provable by Sublandlord as a matter of law including, without limitation, an amount equal to the then present value (using a discount rate of five percent (5%)) of the excess of the Base Rent and Additional Rent provided to be paid for the remainder of the Term over the fair market rental value of the Premises (determined at the date of termination of this Sublease by Sublandlord in Sublandlord's reasonable discretion) after deduction of all anticipated expenses of reletting.

(B)   In the alternative, Sublandlord shall have the right, at Sublandlord's option, from time to time, to recover from Subtenant, and Subtenant shall remain liable for all Base Rent, Additional Rent and other amounts due and owing under this Sublease, plus (1) damages equal to all other sums which would have accrued under this Sublease after the date of termination had it not been terminated, such damages to be due and payable as such sums would have become due, less (2) such amounts as Sublandlord may receive from reletting, if any, after first paying all costs of such reletting, including, without limitation, brokerage commissions and the costs of reasonable repairs, alterations,

additions and redecorations, and the expenses of re-entry. The net amounts of rent from any re-letting collected remaining after such expenses shall operate only as an off-setting credit against the amount due hereafter with any excess or residue belonging to Sublandlord solely. Should the fair market rental value of the Premises after deduction of all anticipated expenses of reletting exceed the Base Rent and Additional Rent provided to be paid by Subtenant for the remainder of the Term, Sublandlord shall not be obligated to pay to Subtenant any part of such excess or to credit any part of such excess against any other sums or damages for which Subtenant may be liable to Sublandlord.

(vii)    Subtenant shall reimburse and pay to Sublandlord all costs and expenses of Sublandlord in connection with Sublandlord's enforcement of its rights and remedies hereunder, including court costs and reasonable attorneys' fees all of which shall be deemed Additional Rent.

(viii)   If this Sublease is terminated as the result of an Event of Default at any time prior to construction of the Improvements or the fifth (5th) anniversary of the Effective Date, then Subtenant shall reimburse and pay to Sublandlord all costs and expenses of Sublandlord in connection with Sublandlord's preparation of the Premises for Subtenant's occupancy including, but not limited to, Sublandlord's Work all of which shall be deemed Additional Rent.

(ix)     Sublandlord shall have the right to pursue any and all other rights and remedies available at law and in equity.

(d)    Sublandlord shall use commercially reasonable efforts to mitigate the damages it suffers as a result of Subtenant's default under this Sublease; provided, however, that Subtenant agrees that (i) Sublandlord will have satisfied its obligation to mitigate damages if Sublandlord endeavors, in good faith, to re-lease the Premises, (ii) Sublandlord will not be required to give preference to the Premises over other vacant space in the Shopping Center or any other property owned or controlled by Sublandlord or any affiliates thereof, (iii) Sublandlord may reject any prospective tenant who, in Sublandlord's reasonable discretion, is disreputable, whose business does not enhance the Shopping Center, who does not have sufficient business experience, or who lacks the financial ability to perform the Subtenant's obligations under Sublandlord's then current form Sublease, (iv) under no circumstances shall Sublandlord be required or obligated to relet or attempt to relet the Premises for any period of time beyond the then applicable Termination Date, and (v) Sublandlord may reject any offer to lease the Premises at a rate which is less than the rate being charged for comparable space in the Shopping Center or on terms that are less favorable than those contained in this Sublease or which (in Sublandlord's reasonable discretion) is not in the best interests of the Shopping Center.

19. **Holding Over**

In the event Subtenant remains in possession of the Premises after expiration of the Term or termination of this Sublease without the consent of the Sublandlord, it shall be deemed to be occupying the Premises as a tenant at sufferance only at a monthly rental equal to one hundred twenty-five percent (125%) of the last Base Rent herein provided and otherwise subject to all the conditions, provisions and obligations of this Sublease insofar as the same are applicable to a tenancy at sufferance. In addition, Subtenant shall be liable to Sublandlord and Subtenant agrees to indemnify, defend and hold Sublandlord harmless from and against any damages, liabilities, losses or injuries suffered by Sublandlord as a result of Subtenant failing to surrender the Premises upon the expiration of the Term or the earlier termination of the Sublease and in the condition required under this Sublease.

20. **Quitclaim**

Upon the expiration of the Term or any earlier termination of this Sublease, all Improvements on the Premises shall become the property of Sublandlord. Subtenant may retain Subtenant's furniture, trade fixtures and equipment and any proprietary signs or marks; provided, however, that any such property not removed from the Premises within thirty (30) days after such expiration of the Term or termination of this Sublease shall be deemed abandoned by Subtenant and Sublandlord, shall have the right to dispose of such property in its sole and absolute discretion. Subtenant shall execute, acknowledge and deliver to Sublandlord a proper instrument in writing releasing and quitclaiming to Sublandlord all right, title and interest of Subtenant in and to the Premises and any buildings, structures or Improvements located thereon.

21. **Interest**

Unpaid rental and any other amounts due hereunder by either party, and remaining unpaid, shall bear interest at the Default Rate from the date such rental or other amount shall become due until fully paid.

22. **Assignment by Sublandlord**

Sublandlord shall promptly notify Subtenant in the event of any transfer or conveyance of title to the Premises, giving the name and address of the transferee (or of each transferee if more than one) and instructions regarding the manner in which Rent is to be paid and notices are to be served on the transferee(s). In the event of such a transfer, upon the assumption by such transferee of Sublandlord's duties and liabilities hereunder, Sublandlord (or the then grantor if Sublandlord shall have previously made such a transfer or conveyance) shall be automatically released of all liability as respects the performance of any and all obligations on the part of Sublandlord thereafter to be performed hereunder when Subtenant shall have been furnished the information called for in the first sentence of this paragraph, together with evidence that the aforementioned transfer or conveyance has been made.

23. **Subordination and Lender Notice**

(a)    This Sublease is and shall remain subject and subordinate to and may be assigned as security for any present or future mortgage or deed of trust which may now or

hereafter encumber the Premises and to and for all renewals, obligations, consolidations, replacements and extensions thereof; provided such subordination shall not limit or waive Subtenant's sole and exclusive right to receive and retain all casualty insurance proceeds as provided in this Sublease. This clause shall be self-operative and no further instrument shall be necessary to effect such subordination; provided, however, Subtenant shall execute and promptly deliver to Sublandlord any such certificate or certificates as Sublandlord may request evidencing the subordination of this Sublease or the assignment of this Sublease as security for any such mortgage or deed of trust so long as such certificate or certificates contain usual and customary non-disturbance and attornment provisions to protect the rights of the Subtenant for Subtenant's full and faithful performance of the terms of this Sublease; and provided further, at the time of any subsequent mortgage financing, Sublandlord shall be required to deliver a non-disturbance agreement satisfactory to Subtenant which provides, *inter alia*, that so long as Subtenant complies with its obligations hereunder, its occupancy of Premises under the terms hereby shall not be disturbed.

(b)     Subtenant expressly agrees that in the event that Subtenant contends that Sublandlord is in default under the terms and provisions of this Sublease, then Subtenant shall (in addition to notifying Sublandlord) notify each mortgagee or beneficiary under each trust deed or deed of trust then encumbering Sublandlord's leasehold estate (so long as the mortgagee or beneficiary in question shall have lodged with Subtenant a request for such notice and an address for the receipt thereof), and each such notice to a mortgagee or beneficiary shall provide that the mortgagee beneficiary receiving it shall have the right, within forty-five (45) days thereafter, to cure the alleged default before Subtenant shall exercise any default remedy involving a termination of this Sublease or withholding of rental payments. Notices under this provision shall be given in the same manner as notices required under this Sublease and shall be deemed delivered as therein provided.

## 24.   Assignment and Subletting by Subtenant

(a)     Except as otherwise set forth below, Subtenant shall not assign, sublet or permit occupancy by any party other than Subtenant of all or any part of the Premises without Sublandlord's and Master Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.   It shall not be unreasonable for Sublandlord or Master Landlord to withhold its consent to an assignment or sublease if the proposed use by such successor is substantially similar to the business of any other tenant of the Shopping Center, if such business would violate any Restriction, or if the proposed successor (or any proposed Replacement Guarantor) has a net worth less than that of Guarantor as same is presented at **Schedule 24(a)** [ATTACH GUARANTOR'S FINANCIALS—IF APPROVED BY SHC].   Consent to one subletting or assignment shall not be deemed consent to any subsequent subletting or assignment.   Upon Subtenant's request for Sublandlord's approval of an assignment of this Sublease or the subletting of the Premises, Subtenant shall pay

simultaneously to Sublandlord a nonrefundable administrative review fee in the amount of $5,000.00, which shall not impose any obligation whatsoever on Sublandlord to consent to the proposed assignment or subletting.

(b) No assignment or sublease to the Guarantor, to any bona fide transferee which controls, is controlled by, or is under common control with Subtenant, or which results from a merger or consolidation with Subtenant, or which acquires the assets of Subtenant as a going concern of the business that is being conducted at the Premises, shall be deemed an assignment or sublease under this Sublease (an "**Exempt Transfer**"). For purposes of the preceding sentence, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a company through the ownership of voting securities. Within fifteen (15) days following any transfer described in this Section, Subtenant shall provide Sublandlord with written notice of same.

(c) Notwithstanding any subletting, assignment or other transfer, Subtenant shall remain fully and primarily liable for the payment of all Base Rent, Additional Rent and any other charges due, or to become due, hereunder, and for the full performance of all of the terms, conditions and covenants to be kept and performed by Subtenant under this Sublease. If any assignee or sublessee commits an Event of Default under this Sublease, Sublandlord may proceed directly against Subtenant without pursuing any rights or remedies against any such assignee. Each assignee shall be conclusively deemed, without the necessity of any further agreement, and for the express benefit of Sublandlord, to have assumed all of the obligations of Subtenant thereafter accruing under this Sublease. Each assignee shall, upon the request of Sublandlord, execute and deliver to Sublandlord such documents as may be reasonably required by Sublandlord to further evidence the foregoing assumption and agreement. Each sublease shall be subject to the terms and conditions of this Sublease. Sublandlord may not consider the financial ability of the proposed assignee or sublessee, so long as the named Subtenant hereunder or any successor in interest under an Exempt Transfer remains liable for the obligations of tenant hereunder. No assignment, sublease or other transfer, other than an Exempt Transfer, shall be effective until Sublandlord receives notice of such transfer, together with a copy of the transfer document.

25. **Condemnation**

(a) If the Premises, or any portion thereof, are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "**Condemnation**"), this Sublease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs, but this provision for termination shall not affect division of the condemnation proceeds contemplated by **Section 25(b)**, and such division shall be made as if there were no such provision. If the portion of the Premises taken by such condemnation results in the Premises being no longer economically viable, Subtenant may, at Subtenant's option, to be exercised in writing only within thirty (30) days after Sublandlord shall have given Subtenant written notice

of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), notify Sublandlord in writing ("**Condemnation Termination Notice**") that Subtenant intends to terminate this Sublease in which case this Sublease shall be terminated one hundred eighty (180) days after such notice is given. Such termination shall not affect the division of the condemnation proceeds contemplated by this Section, and such division shall be made as if there were no such provision. If Subtenant does not terminate this Sublease in accordance with the foregoing, this Sublease shall remain in full force and effect as to the portion of the Premises remaining, except that the Rent shall be reduced in the proportion that the land area taken bears to the total land area of the Premises. In the event that this Sublease is not terminated by reason of such condemnation, Subtenant shall repair any damage to the Premises caused by such condemnation at Subtenant's cost.

(b)     Sublandlord and Subtenant shall each have the right to make a claim against the condemning authority for the amount of damages done to each of them by such condemnation. Any proceeds from condemnation or transfer in lieu thereof shall be allocated between Sublandlord and Subtenant in accordance with applicable law; provided, in all events, Subtenant shall be solely entitled to any proceeds related to any taking, whether on a permanent or temporary basis, of the Improvements.

## 26.     Notices

Notices shall be in writing and shall be deemed properly served: (a) two (2) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (b) one (1) business day after being deposited with a reputable overnight express carrier (*e.g.*, Federal Express, Airborne, Express Mail, UPS) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery, or (c) upon receipt if personally delivered. Notices shall be addressed as follows:

Sublandlord:         KMART CORPORATION
                     c/o 3333 Beverly Road
                     Department 824RE
                     Hoffman Estates, Illinois  60179
                     Attention: VP Real Estate

Copy to:             WARNER NORCROSS & JUDD LLP
                     900 Fifth Third Center
                     111 Lyons Street, NW
                     Grand Rapids, MI  49503-2487
                     Attention: Robert J. Nolan

Subtenant:          GCP REAL XVI (ASHEVILLE), LLC
c/o GC Partners, Inc.
3816 Forrestgate Drive
Winston-Salem, NC 27103
Attention: David Gronewoller

Copy to:          BLANCO TACKABERY & MATAMOROS, P.A.
110 S. Stratford Road, Suite 500
Winston-Salem, NC 27104
Attention: George E. Hollodick

or to any other address furnished in writing by any of the foregoing. However, any change of addresses furnished shall comply with the notice requirements of this Section and shall include a complete outline of all current addresses to be used for all parties.

## 27. Environmental Matters

(a) Subtenant shall comply with all environmental laws relating to Hazardous Materials (as hereinafter defined) affecting the Premises and the Shopping Center and the business conducted thereon by Subtenant. Without limiting the generality of the foregoing, except for Hazardous Materials customarily used in the ordinary course of operation of a restaurant, Subtenant shall not cause or permit any Hazardous Material to be brought upon, kept, or used in or about the Premises or the Shopping Center by itself or its agents, employees, contractors or invitees without the prior written consent of Sublandlord. Without limiting the foregoing, if the presence on the Premises or Shopping Center of any Hazardous Material caused by Subtenant results in any contamination of the Premises, the Shopping Center, and/or adjacent property, Subtenant shall promptly take all actions at its sole expense as are necessary to return the Premises, the Shopping Center, and/or adjacent property to the condition existing prior to the introduction of any such Hazardous Material to the Premises, the Shopping Center, and/or adjacent property; provided that Sublandlord's approval of such actions shall first be obtained, which approval shall not be unreasonably withheld so long as such actions are in accordance with all applicable laws and governmental requirements and would not potentially have any material adverse long-term or short-term effect on the Premises, the Shopping Center, and/or adjacent property.

(b) If the presence of Hazardous Materials on the Premises caused by Subtenant results in contamination of the Premises, the Shopping Center or any adjacent property, then Subtenant shall indemnify, defend and hold Sublandlord, its directors, officers, employees and agents and any successor to Sublandlord's interest in the Premises harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Shopping Center, damages arising from any adverse impact on occupying or marketing of the Shopping Center, and sums paid in settlement of claims, attorneys' fees, consultants' fees and experts' fees), and all foreseeable

and unforeseeable consequential damages, whether known or unknown, that might directly or indirectly, or in whole or in part, be caused by, arise out of, or be related to Subtenant's Hazardous Materials, which arise during or after the Term as a result of such contamination. This indemnification includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Materials present in the soil or ground water on or under the Premises, the Shopping Center, and/or adjacent property.

(c)   Sublandlord shall, at all times, comply with all Hazardous Materials laws in connection with Sublandlord's maintenance and management of the Common Areas and the Shopping Center generally. Sublandlord shall indemnify, defend, and hold harmless Subtenant, its directors, officers, employees and agents and any successor to Subtenant's interest in the Premises harmless, from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses, all claims, actions, liens, demands, costs, expenses, fines and judgments (including, without limitation, sums paid in settlement of claims, attorneys' fees, consultants' fees and experts' fees) and all foreseeable and unforeseeable consequential damages, whether known or unknown, that might directly or indirectly, or in whole or in part, be caused by, arise out of, or be related to Hazardous Materials brought on or resulting from or arising by reason of the following: (i) any spills or contamination of air, soil or water or otherwise by Hazardous Materials at or on the Premises or the Shopping Center or upon removal therefrom caused by Sublandlord, its agents, employees or contractors; and (ii) the violation of any Hazardous Materials laws caused to be brought on the Premises by Sublandlord, or its agents, employees or agents or contractors.

## 28.   Transfer Fees

Subtenant shall pay any and all transfer fees and/or transfer tax, if any, to any governmental entity due as a result of this Sublease.

## 29.   Rules and Regulations

Subtenant agrees to comply with reasonable uniformly enforced rules and regulations issued by Sublandlord governing the use of the Common Areas; provided Sublandlord has provided written notice thereof.

## 30.   Risk of Loss

Subtenant assumes all risk of damage or loss of any fixtures, equipment, merchandise or goods located in or about the Premises from any cause whatsoever and for all damage or loss that may arise from delivery, receipt, piling, stacking or handling the goods and merchandise of Subtenant, whether on the Premises or otherwise. Subtenant shall be liable for any new installation (subject to Sublandlord's consent which shall not be unreasonably withheld), maintenance, and payment of all costs associated with new or existing security systems, if any, in the Premises.

31.   **Subtenant's Personal Property Taxes**

Subtenant shall pay all taxes and assessments of every nature, kind and description, levied and assessed against Subtenant's fixtures, equipment, merchandise and goods stored in or about the Premises.

32.   **Recording**

Subtenant shall not record this Sublease or any short form of this Sublease. Sublandlord and Subtenant shall execute the Memorandum of Sublease attached hereto and made a part hereof as **Exhibit H;** and (b) Subtenant shall have the right to record such Memorandum of Sublease upon Sublandlord's execution of same. Any costs associated with recording such Memorandum of Sublease shall be paid by Subtenant. Subtenant shall deliver a memorandum of lease termination in recordable form to Sublandlord on the Termination Date. Such memorandum of lease termination shall state the date the Sublease terminated.

33.   **Relationship of Parties**

Nothing contained herein shall be deemed or constructed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship other than that of landlord and tenant.

34.   **Headings**

The captions used herein are for convenience only and do not limit or amplify the provisions hereof.

35.   **Implied Waivers**

One or more express waivers of any covenant, term or condition of this Sublease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

36.   **Quiet Enjoyment**

Sublandlord agrees that if Subtenant shall perform all of the covenants and agreements herein required to be performed by Subtenant, Subtenant shall, subject to the terms of this Sublease, at all times during the continuance of this Sublease, have the peaceable and quiet enjoyment and possession of the Premises.

### 37.    Brokers

Subtenant and Sublandlord warrant that neither has had any dealings with any broker or agent in connection with the negotiation or execution of this Sublease other than Jeffrey T. Nimmer of Kotis Properties, Inc. ("**Broker**"), whose commission shall be the responsibility of Subtenant.   Sublandlord agrees to indemnify, defend and hold Subtenant harmless from any claim for a commission or other compensation raised by any other broker claiming by or through Sublandlord.   Subtenant agrees to indemnify, defend and hold Sublandlord harmless from and against any claim for a commission or other compensation by any broker (including Broker) claiming by or through Subtenant.

### 38.    No Assumption

This Sublease is not intended, nor shall be construed, as Subtenant's assumption of the Master Lease or any of the Shopping Center leases, nor should the same be relied upon, it being the intention of the parties that this Sublease merely accommodates Subtenant and permits Subtenant's tenancy within the Premises.

### 39.    Subtenant's Estoppel

Upon Sublandlord's written request, Subtenant shall execute, acknowledge and deliver to Sublandlord a written statement addressed to Sublandlord and such lenders or other parties as Sublandlord may request certifying: (i) that none of the terms or provisions of this Sublease have been changed (or if they have been changed, stating how they have been changed); (ii) that this Sublease has not been canceled or terminated; (iii) the last date of payment of the Rent and other charges and the time period covered by such payment; (iv) that Sublandlord is not in default under this Sublease (or, if Sublandlord is claimed to be in default, stating why); and (v) such other information as Sublandlord may reasonably request as to this Sublease and its status. Subtenant shall deliver such statement to Sublandlord within thirty (30) days after Sublandlord's request.  Any such statement by Sublandlord may be given by Sublandlord to any prospective assignee or encumbrancer of the Sublandlord's leasehold interest, and such prospective assignee or encumbrancer may rely conclusively upon such statement as being true and correct.   If Subtenant does not deliver such statement to Sublandlord within such thirty (30) day period, Sublandlord, and any prospective assignee or encumbrancer, may conclusively presume and rely upon the following facts: (i) that the terms and provisions of this Sublease have not been changed, except as otherwise represented by Sublandlord; (ii) that this Sublease has not been canceled or terminated, except as otherwise represented by Sublandlord; (iii) that not more than one (1) month's Rent or other charges have been paid in advance; (iv) that Sublandlord is not in default under this Sublease; and (v) such other matters as Sublandlord shall reasonably request. In such event, Subtenant shall be estopped from denying the truth of such facts.

### 40.    Sublandlord's Estoppel

Upon Subtenant's written request, Sublandlord shall execute, acknowledge and deliver to Subtenant a written statement addressed to Subtenant and such lenders or other parties as Subtenant may request certifying: (i) that none of the terms or provisions of this Sublease have been changed (or if they have been changed, stating how they have been changed); (ii) that this Sublease has not been canceled or terminated; (iii) the last date of payment of the Rent and other

charges and the time period covered by such payment; and (iv) that to Sublandlord's knowledge Subtenant is not in default under this Sublease. In such event, Sublandlord shall be estopped from denying the truth of such facts.

**41.    Due Date**

In the event that any amounts are owed by Subtenant to Sublandlord hereunder, they shall be payable upon demand from and after the time they become due and, in all events, no later than the due date of the next monthly rental installment.

**42.    Governing Law**

The laws of the state in which the Premises are located shall govern the interpretation, validity, performance and enforcement of this Sublease. If any provision of this Sublease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Sublease shall not be affected thereby.

**43.    Media Releases**

Without the prior written consent of Sublandlord, not to be reasonably withheld, delayed or conditioned, Subtenant must not issue, circulate or otherwise release to any third party any press or other media release or other public disclosure of, about or relating to Sublandlord and/or this Sublease. Notwithstanding the foregoing, Subtenant is permitted to advertise and promote its business at the Premises.

**44.    Kmart Marks**

Subtenant acknowledges Kmart Corporation's ("**Kmart's**") exclusive right, title, and interest in and to all trademarks, trade names, service marks, logos, program and event names, identifications and other proprietary rights and privileges including the marks, "Kmart", "Big Kmart", and "Super Kmart Center" (the "**Kmart Marks**"). This Sublease and their various provisions are not a license or assignment of any right, title or interest in the Kmart Marks by Sublandlord to Subtenant. Subtenant shall not in any manner represent that it has any ownership in the Kmart Marks and shall not do or cause to be done anything impairing Sublandlord's exclusive right, title, and interest in the Kmart Marks. Subtenant shall not use, print or duplicate the Kmart Marks without the prior written approval of Sublandlord, which approval may be withheld for any reason, and upon termination hereof, Subtenant shall immediately cease all previously permitted use of the Kmart Marks, if any. Subtenant shall not assign or attempt to assign any rights with regard to the Kmart Marks which may arise hereunder; any such attempted assignment shall be void. In no event shall Subtenant have authority to act or contract on behalf of Sublandlord.

**45.    Successors and Assigns**

All rights, obligations and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several and respective heirs, executors, administrators, successors, sublessees and assigns of said parties, except to the extent otherwise provided in this Sublease, provided, however, that the liability of Sublandlord hereunder and any successor in

interest and title to the Premises shall be limited to his or its interest in the Shopping Center, and no other assets of the Sublandlord other than his or its interest in the Shopping Center shall be affected by reason of any liability which said Sublandlord or successor in interest may have under this Sublease. If there shall be more than one Subtenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein and the word "Subtenant" shall be deemed and taken to mean each and every person or party mentioned as a Subtenant herein, be the same one or more; and if there shall be more than one Subtenant, any notice required or permitted by the terms of this Sublease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof.

## 46.    Authorization

The parties executing this instrument on behalf of Sublandlord and Subtenant, respectively, represent that each has been duly authorized so to do by appropriate action taken by Sublandlord or Subtenant, as the case may be.

## 47.    Severability / Severance

In the event that any provision of this Sublease shall prove to be invalid or unenforceable under applicable law, the same shall not affect the validity or enforceability of any of the other provisions of this Sublease and such other provisions shall be applied just as though the invalid or unenforceable provision had not appeared in this Sublease.

## 48.    Entire Agreement

This instrument constitutes the entire agreement between the parties with respect to the subject matter hereof and may only be modified or amended by a written agreement duly executed by both parties.

## 49.    Inspection

Sublandlord and its authorized representatives may enter upon the Premises for the purpose of inspecting the same for a bona fide business purpose; provided Sublandlord shall not, except in the case of an emergency, unreasonably interfere with the conduct of Subtenant's business at the Premises. Sublandlord shall use its best efforts to contact the apparent person in authority on the Premises twenty-four (24) hours prior to any inspection except in case of emergencies. In any event, Subtenant agrees to cooperate reasonably when access to the Premises is requested by Sublandlord.

## 50.    Performance

With respect to the performance of all of Sublandlord's and Subtenant's obligations and rights under this Sublease, time is and shall be of the essence.

## 51.    Jury Waiver

SUBLANDLORD AND SUBTENANT WAIVE THEIR RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER OF

BTM:508954v4

THEM AGAINST THE OTHER, OR WITH RESPECT TO ANY ISSUE OR DEFENSE RAISED THEREIN, INCLUDING THE RIGHT TO AN ADVISORY JURY (EXCEPT FOR PERSONAL INJURY AND PROPERTY DAMAGE), ON ANY MATTERS WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH THIS SUBLEASE, THE RELATIONSHIP OF SUBLANDLORD AND SUBTENANT, SUBTENANT'S USE AND OCCUPANCY OF THE PREMISES INCLUDING SUMMARY PROCEEDING AND POSSESSION ACTIONS, ANY EMERGENCY STATUTORY OR OTHER STATUTORY REMEDY.

## 52. Rents from Real Property

Sublandlord and Subtenant hereby agree that it is their intent that all Rent and other charges payable to the Sublandlord under this Sublease shall qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code, as amended, (the "Code") and the Department of the U.S. Treasury Regulations promulgated thereunder (the "Regulations"). Should the Code or the Regulations, or interpretations thereof by the Internal Revenue Service contained in revenue rulings or other similar public pronouncements, be changed so that any Rent no longer so qualifies as "rent from real property" for purposes of Section 856(d) of the Code and Regulations, or any successor provision thereto, then the parties agree to execute such further instrument as may reasonably be required by the Sublandlord in order to give effect to the foregoing provisions of this Section.

## 53. Special Franchisor Provision

Subtenant intends to operate the Premises pursuant to a franchise agreement (the "Franchise Agreement") entered into with Golden Corral Franchising Systems, Inc. ("Franchisor"). Anything contained in this Sublease to the contrary notwithstanding, the following provisions shall control:

(a) The Permitted Use of the Premises during the term of the Franchise Agreement shall be limited solely to the operation of the business franchised under the Franchise Agreement. Any changes to the operation of the business franchised under the Franchise Agreement that give rise to Master Landlord's consent requirements under the Master Lease shall constitute a proposed Assignment and Subletting by Subtenant (Section 24 hereof) under this Sublease and is subject to the provisions of Section 24.

(b) Any sublease or assignment which may be permitted by Sublandlord under this Sublease shall be prohibited without Franchisor's written consent. Accordingly, Subtenant shall first obtain Franchisor's written consent prior to submitting to Sublandlord any such proposed Assignment and Subletting by Subtenant, which shall be subject to the provisions of this Sublease (**Section 24** hereof).

(c) Subject to (i) the signage provisions and restrictions set forth in this Sublease and (ii) Sublandlord's and Master Landlord's prior written approval of such marks / signage, Subtenant is granted the right to use such Proprietary Marks and signage as Franchisor may prescribe for the Permitted Use.

**(d)**     Franchisor is granted the right with prior notice to Sublandlord to enter the Premises to make any modifications necessary to protect the Proprietary Marks (including removal of Proprietary Marks, provided that the removal is done in a workman-like manner and the Premises is returned to the condition that existed prior to such work) and, subject to the Lender / Franchisor Cure provisions of **Section 18(b)** above, to cure any default of Subtenant under this Sublease. All entry and work performed by Franchisor shall be in accordance with all applicable laws and regulations and in accordance with all terms and provisions of this Sublease governing Subtenant Work and alterations of the Premises by Subtenant.

**(e)**     **Section 18(b)** above shall govern Franchisor's rights and options with respect to any Subtenant breach or default under this Sublease.

**(f)**     Upon Subtenant's default under this Sublease or under the Franchise Agreement, and subject to the provisions of **Section 18(b)** above, and provided that Franchisor timely cures such default:

    **(i)**     Franchisor shall, upon notice to Sublandlord, have a right of entry into the Premises;

    **(ii)**     Franchisor shall have the right to assume in writing the Sublease in Franchisor's own name and thereafter the right to assign the Sublease or sublet the entire Premises to a third party reasonably acceptable to Sublandlord which will operate on the premises a Golden Corral restaurant in accordance with the terms and provisions of this Sublease, provided that (A) such assignment or sublease shall constitute a proposed Assignment and Subletting by Subtenant under this Sublease and is subject to the provisions of **Section 24**, and (B) that such assignee / sublessee has a net worth at least equal to or greater than Guarantor's net worth as presented at **Schedule 24(a)** hereof; and,

    **(iii)**     Franchisor shall execute a Sublease Guaranty substantially in the form attached hereto as **Exhibit F** as a condition to any such assignment or subletting.

**(g)**     Franchisor shall indemnify and hold Sublandlord harmless from and against any claims or actions (including attorneys' fees) by Subtenant against Sublandlord in connection with Sublandlord's actions and compliance in accordance with the provisions of this Special Franchisor Provision.

## 54.   <u>Financing</u>

Notwithstanding anything to the contrary contained in this Sublease, Subtenant shall have the right to execute and deliver a leasehold mortgage to a mortgagee upon and subject to the following conditions:

    **(a)**     Within ten (10) business days following the execution of such leasehold mortgage, Subtenant shall give Sublandlord a true and complete copy of the note,

leasehold mortgage and other loan documents evidencing or securing such loan, together with the name and address of the mortgagee. Notwithstanding any contrary provision of this Sublease, Subtenant shall have no power or authority whatsoever to encumber Sublandlord's interest in the Premises in any manner.

(b)     The leasehold mortgagee shall be an institutional lender or, if not an institutional lender, a lender approved by Sublandlord, which approval shall not be unreasonably withheld, delayed or conditioned.

(c)     The leasehold mortgage and all rights acquired thereunder shall be subordinate in all regards to the rights and obligations created by this Sublease, and subject to each and all of the covenants, conditions, restrictions and provisions set forth in this Sublease and to all rights and interests of Sublandlord hereunder, *except* as expressly and exhaustively detailed at **Schedule 54(c)** attached hereto [SUBTENANT AND LENDER CREATE SCHEDULE FOR REVIEW PRIOR TO SIGNING]. In the event of any conflict between the provisions of this Sublease and any provisions of any leasehold mortgage, the provisions of this Sublease shall control. Any notice to such mortgagee provided for in this **Section 54** of Subtenant's default under this Sublease or of Sublandlord's election to terminate this Sublease may be given concurrently with or after Sublandlord's notice to Subtenant as provided in **Section 18(b).**

(d)     No leasehold mortgage shall encumber any interest in real property other than Subtenant's leasehold interest in the Premises or contain a cross-default provision or cross-collateralization provision with any other mortgage on property other than Subtenant's leasehold interest in the Premises.

(e)     The maturity date of the loan secured by the leasehold mortgage shall not extend beyond the Term of this Sublease.

(f)     Upon request by Sublandlord made no more frequently than twice in any consecutive twelve (12) month period, mortgagee shall certify, to the knowledge of the person delivering such certificate on behalf of mortgagee, in writing to Sublandlord whether any default on the part of Subtenant exists under the loan documents and the nature of any such default.

(g)     The mortgagee shall have served on Sublandlord a request for written notice from Sublandlord of any breach or default by Subtenant of this Sublease, which request shall set forth mortgagee's address for notices, and notwithstanding any contrary provisions herein, request or instructions, shall be subject to and governed by **Section 18(b)** hereof.

(h)     Upon Subtenant's default under this Sublease, Lender may cure Subtenant's default as provided for in this **Section 18(b)** hereof.

(i)     Upon Subtenant's failure to operate the Restaurant in accordance with **Section 4** hereof, Lender may seek to replace Subtenant's operation of the Premises with a Restaurant under the following terms and conditions: (A) such replacement shall

constitute a proposed Assignment and Subletting by Subtenant under this Sublease and is subject to the provisions of **Section 24**; (B) the proposed replacement user shall be a national or regional restaurant chain / concept; and (C) such replacement user shall have a net worth at least equal to or greater than Guarantor's net worth as presented at **Schedule 24(a)** hereof.

## 55.   Sublandlord Default

In the event Sublandlord fails to perform any of the covenants, conditions and agreements under this Sublease (except with respect to Sublandlord's Work) and such failure continues for a period of twenty (20) business days after Subtenant's notice to Sublandlord specifying the nature of such failure, then a **"Sublandlord Default"** shall have occurred; provided, however, that if such failure to perform is not susceptible to cure within twenty (20) business days, then a Sublandlord Default shall not have occurred until after a reasonable time for cure; provided, Sublandlord commences such cure within such twenty (20) business day period, and thereafter continuously prosecutes such cure until completion.   Upon the occurrence of a Sublandlord Default, Subtenant, in addition to any remedies now or hereafter allowed by law or in equity, shall have the following remedies only:

(a)     The right to recover damages as permitted by law;

(b)     Perform any obligation of Sublandlord and deduct the reasonable cost thereof against future installments of Rent; or

(c)     Obtain a court order for specific performance and/or injunctive relief.

None of the foregoing remedies shall affect or limit any right of indemnity which Subtenant is entitled under this Sublease.

## [SIGNATURE PAGE FOLLOWS]

## SIGNATURE PAGE
## GROUND SUBLEASE

      **IN WITNESS WHEREOF,** the parties hereto have executed this Sublease as of the day and year first above written.

ATTEST:

_____

SUBLANDLORD:

**KMART CORPORATION,**
a Michigan corporation

By:   _____
      James B. Terrell, Vice President Real Estate

ATTEST:

_____

SUBTENANT:

**GCP REAL XVI(ASHEVILLE), LLC,**
a North Carolina limited liability company

By:   _____
      David E. Gronewoller, Manager

147265.151097 9086586-2

## **Schedule of Exhibits**

| Exhibit A | Legal Description of Shopping Center |
|---|---|
| Exhibit A-1 | Depiction of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Restrictions |
| Exhibit D | Permitted Uses |
| Exhibit E | Supplemental Agreement |
| Exhibit F | Sublease Guaranty |
| Exhibit G | Contractor and Subcontractor Insurance Limits |
| Exhibit H | Memorandum of Sublease |

## EXHIBIT "A"

## LEGAL DESCRIPTION OF SHOPPING CENTER

Certain property located in the City of Asheville, Buncombe County, North Carolina:

### TRACT ONE

BEGINNING at a concrete monument in the northern margin of the right-of-way line of dual U.S. Highways #19-23, known as Patton Avenue, at the southeast corner of the lands of Wachovia Bank and Trust Company and running thence with the line of said Bank, N. 12° 52' W. 227 feet to a concrete monument; thence S. 89° 45' W. 119.3 feet to a concrete monument in the right-of-way line of Louisiana Avenue; thence N. 36° 57' W. 221.5 feet to an iron in the eastern margin of Louisiana Avenue; thence with the eastern margin of Louisiana Avenue, N. 28° 51' W. 63.5 feet to an iron pipe, the Joyner corner; thence with Joyner, S. 81° 17' E. 234.57 feet to an iron pipe; thence still with Joyner, N. 3° 7' E. 161.69 feet to a concrete monument, the Joyner northeast corner; thence with Joyner, N. 78° 27' W. 353.92 feet to an iron in the eastern margin of Louisiana Avenue; thence with the eastern margin of Louisiana Avenue, N. 19° 26' W. 87.85 feet; thence still with said Avenue, N. 5° 22' W. 100 feet; thence S. 86° 10' 30" E. 114.09 feet to an iron pipe; thence N. 7° 20' E. 52.86 feet, corner with Hargus; thence with Hargus, S. 76° 10' 30" E. 124.63 feet; thence N. 7° 34' 30" E. 93.99 feet; thence N. 5° 50' E. 181.17 feet; thence S. 70° 45' E 312 feet to an iron; thence N. 37° 24' E. 148.93 feet to an iron; thence S. 70° 11' E. 573.02 feet to an iron in Hawkins Lane; thence with Hawkins Lane, S. 27° 56' W. 386.4 feet to a concrete monument; thence N. 82° 15' W. 113.79 feet to an iron; thence S. 32° 53' 30" W. 193.5 feet to a concrete monument; thence S. 23° 27' W. 165.86 feet to a concrete monument; thence S. 85° 57' 30" E. 17.59 feet to a dogwood tree; thence S. 20° 50' 30" E. 290.35 feet to an existing spike in the northern margin of Patton Avenue; thence with the northern margin of Patton Avenue, S. 85° 26' 30" W. 350.45 feet to a concrete monument; thence still with the northern margin of Patton Avenue, S. 87° 34' W. 25 feet to the point of beginning. Subject, however, to right-of-way for the widening of Hawkins Lane and the right-of-way for the widening of Louisiana Avenue, and together with and subject to rights of ingress, egress, and regress in, over and through that tract of land fronting 50 feet on Patton Avenue and running N. 12° 59' W. 35 feet, the center line of which is the first call in the foregoing description.

### TRACT TWO

BEGINNING at an iron pipe in the eastern margin of Louisiana Avenue, Wells' northwest corner, and running thence with the Wells' line, S. 81° 17' E. 234.57 feet to an iron in the line of the land of G-K, Inc.; thence with said line, N. 3° 7' E. 161.69 feet to a monument at a 24 inch pin, corner with Shelton; thence with the Shelton line, N. 78° 27' W. 353.92 feet to an iron pipe in the eastern margin of Louisiana Avenue; thence with the eastern margin of Louisiana Avenue, S. 19° 26' E. 12.15 feet and S. 28° 51' E. 211.64 feet to the point of beginning.

BTM:508954v4

Tract One and Tract Two consist of a combined approximate 17.34 acres, according to Buncombe County tax records.

Tract One and Tract Two are together commonly known as:
    1001 Patton Avenue, Asheville, NC
    Parcel #9638-28-5358-00000

## EXHIBIT "A-1"

## SHOPPING CENTER DEPICTION

*[ATTACHED]*

## EXHIBIT "B"

## SITE PLAN

This site plan is presented solely for the purpose of identifying the approximate location of the Premises. Building sizes, site dimensions, access and parking areas, existing tenant locations and identities are subject to change at the Sublandlord's discretion, except as otherwise expressly restricted in the provisions of the Sublease.

## EXHIBIT "C"

## EXCLUSIVES PREVIOUSLY GRANTED AT K4112

1.  Hamburger Restaurant:  any restaurant business for which the entrée menu is comprised of 50% or more hamburger offerings;

2.  Hot Dog Restaurant:  any restaurant business for which the entrée menu is comprised of 50% or more hot dog offerings.

## EXHIBIT "D"
## PROHIBITED USES

1. funeral establishment;
2. automobile sale, leasing or display establishments and used car lots, including body repair facilities;
3. auction or bankruptcy sale;
4. pawn shop;
5. outdoor circus or other outdoor entertainment;
6. outdoor meetings;
7. bowling alley;
8. primarily pool or billiard establishment;
9. flea market or flea circus;
10. shooting gallery;
11. off-track betting;
12. refinery;
13. adult bookstore or facility selling or displaying pornographic books, literature, or videotapes (materials shall be considered "adult" or pornographic for such purposes if the same are not available for sale or rental to children under 18 years of age because such materials explicitly deal with or depict human sexuality);
14. any residential use, including but not limited to living quarters, sleeping apartments or lodging rooms;
15. theater;
16. auditorium;
17. meeting hall;
18. school or other place of public assembly;
19. gymnasium;
20. health or fitness club;
21. exercise or dance studio;
22. dance hall;
23. bar;
24. cocktail lounge (provided a bar operated in connection with the operation of a restaurant shall be permitted);
25. disco;
26. bingo or similar games of chance;
27. massage parlor;
28. video game or amusement arcade;
29. skating rink;
30. car wash;
31. car repair or car rental agency;
32. night club;
33. children's play or party facility;
34. roller rink;
35. second hand store;
36. auction house; or
37. movie theatre.

## EXHIBIT "E"

## SUPPLEMENTAL AGREEMENT

**THIS LEASE SUPPLEMENT** (this "**Supplement**") is made on _____, _____, between **Kmart Corporation**, a Michigan corporation ("**Sublandlord**") and **GCP Real XVI (Asheville), LLC**, a North Carolina limited liability company ("**Subtenant**").

### RECITALS:

A.  Sublandlord and Subtenant entered into a Sublease dated _____, _____ (the "**Sublease**"), for certain property in the City of _____, County of _____, State of _____, more specifically described in the Sublease (the "**Premises**").

B.  Section/Article/Paragraph _____ of the Sublease provides that Sublandlord and Subtenant shall specify the Commencement Date, Rent Commencement Date and Termination Date of the Sublease by supplemental agreement.

C.  Section/Article/Paragraph _____ of the Sublease provides that the Rent Commencement Date shall be the earlier of: (i) the date Subtenant opens its business to the public at the Premises or (ii) the date which shall be fourteen (14) months after the Delivery Date.

D.  Section/Article/Paragraph _____ of the Sublease provides that rent shall begin to accrue from, and the initial rental payment shall be due to Sublandlord, on the Rent Commencement Date.

**NOW, THEREFORE,** Sublandlord and Subtenant agree to supplement the Sublease as follows:

1.  Sublandlord delivered the Premises on _____, _____ (the "**Delivery Date**") which is also the date on which Subtenant accepted the Premises.

2.  Subtenant opened for business on _____, _____.

3.  The Term of the Sublease is _____, _____ (the "**Commencement Date**") through _____, _____ (the "**Termination Date**").

4.  The Rent Commencement Date of the Sublease is _____, _____.

5.  The initial payment of rent is (was) due on _____, _____.

6.  The Sublease, except as herein supplemented, is in all other respects fully ratified and confirmed.

7.  Except as otherwise defined herein, all capitalized terms used in this Supplement shall have the meaning ascribed to such terms in the Sublease.

*(End of Text; Signature Page Immediately Follows)*

BTM:508954v4

## SIGNATURE PAGE
## SUPPLEMENTAL AGREEMENT

IN WITNESS WHEREOF, Sublandlord and Subtenant have caused this Supplement to be executed:

**Sublandlord:**

**KMART CORPORATION**

By: _____
James B.  Terrell, Vice President Real Estate

**Subtenant:**

**GCP REAL XVI (ASHEVILLE), LLC**

By: _____
David E.  Gronewoller, Manager

## EXHIBIT "F"

## SUBLEASE GUARANTY

FOR VALUE RECEIVED, and as an inducement to Kmart Corporation, a Michigan corporation ("Sublandlord") to enter into a certain Ground Sublease dated as of _____, 2013 (as it may hereafter be further amended, the "Sublease") with GCP Real XVI (Asheville), LLC, a North Carolina limited liability company ("Subtenant"), the undersigned ("Guarantor"), GC Partners, Inc., with an address of 3816 Forrestgate Drive, Winston-Salem, NC 27103, unconditionally and irrevocably undertakes and guarantees to Sublandlord, its successors and assigns, the payment and performance of all obligations of Subtenant under the Sublease (the "Liabilities"), including the full payment, when due, of all rent, including without limitation, Base Rent and Additional Rent. This Guaranty is absolute, independent and continuing under all circumstances, and is a guaranty of payment and performance, not of collection.

1.    REPRESENTATIONS. Guarantor hereby represents and warrants to Sublandlord that:

(a)    The financial statements of Guarantor furnished to Sublandlord in connection with this Guaranty (i) are true and correct in all material respects, (ii) have been prepared in accordance with generally accepted accounting principles consistently applied, and (iii) present fairly the financial condition of Guarantor as of the respective dates thereof, and that no material adverse change has occurred in the financial condition of Guarantor since such dates;

(b)    Guarantor is not in default under any agreement, the effect of which could materially adversely affect performance of its obligations under this Guaranty; and

(c)    There are no actions, suits or proceedings pending or, to the best of its knowledge, threatened against the Guarantor before any court or any other governmental authority of any kind which could materially adversely affect performance of its obligations under this Guaranty.

2.    WAIVERS. Guarantor hereby expressly waives:

(a)    any notice of nonpayment, nonperformance or nonobservance, or proof of notice or demand;

(b)    all diligence in collection of any of the Liabilities or any obligation hereunder;

(c)    the benefit of all appraisement, valuation, marshaling, forbearance, stay, extension, redemption, homestead, exemption and moratorium laws now or hereafter in effect;

(d)    any rights against Subtenant arising because of Guarantor's payment of any Liabilities, by way of subrogation of the rights of Sublandlord or otherwise;

(e)    any obligation Sublandlord may have to disclose to Guarantor any facts Sublandlord now or hereafter may know or have reasonably available to it regarding Subtenant or its financial condition;

(f)    all defenses of suretyship; and

(g)    any defense based on the negligence of Sublandlord in administering the Sublease, or taking or failing to take any action in connection therewith.

3.    <u>COVENANTS AND AGREEMENTS</u>.  Guarantor covenants and agrees that:

(a)    Upon an Event of Default by Subtenant under the Sublease, Sublandlord may proceed against Guarantor before, after or simultaneously with proceeding against Subtenant;

(b)    This Guaranty shall be absolute and unconditional and shall not be terminated, affected or impaired in any manner by reason of: (i) Sublandlord's assertion against Subtenant of any of the rights or remedies reserved to Sublandlord under the Sublease; (ii) the release of Subtenant from any of the Liabilities by operation of law or otherwise; (iii) the commencement of summary or other proceedings against Subtenant; (iv) Sublandlord's failure to enforce any of its rights against Subtenant; (v) the granting by Sublandlord of any extensions of time to Subtenant; (vi) any amendment, addition, assignment, sublease, transfer, renewal, extension or other modification of the Sublease, whether or not Guarantor shall have knowledge or have been notified of or agreed or consented thereto; (vii) the cessation of Subtenant's liability for any cause whatsoever; or (viii) any disability or defense of any kind now existing of Guarantor with respect to any provision of this Guaranty;

(c)    Guarantor shall be bound by all the provisions, terms, conditions, restrictions and limitations contained in the Sublease which are to be observed or performed by Subtenant thereunder, the same as if Guarantor were named as the Subtenant therein;

(d)    If at any time any part of any payment previously applied by Sublandlord to any of the Liabilities is rescinded or returned by Sublandlord for any reason, including the insolvency, bankruptcy or reorganization of Subtenant, such Liabilities shall be deemed to have continued in existence to the extent that such payment is rescinded or returned, and this Guaranty shall be reinstated as to such Liabilities;

(e)    Guarantor hereby subordinates, and shall cause any entity which Guarantor directly or indirectly controls to subordinate, any claims or liens of Guarantor or such affiliate against Subtenant of any kind to all of the Liabilities; and

(f)    If the Sublease is disaffirmed by a Trustee in Bankruptcy for Subtenant, Guarantor shall, at the election of Sublandlord, either assume the Sublease and perform all of the covenants, terms and conditions of Subtenant thereunder, or enter into a new lease for the remaining Sublease Term, which said new lease shall be in form and substance identical to the Sublease.

4.    <u>MISCELLANEOUS.</u>

(a)    Sublandlord's failure to insist in any one or more instances upon strict performance or observance of any of the terms of the Sublease or to exercise any rights therein shall not be construed to be a waiver for the future of such term or right but the same shall remain in full force and effect.

(b)    If Sublandlord takes action to enforce this Guaranty, Guarantor shall pay to Sublandlord upon demand all costs, including reasonable attorneys' fees, incurred by Sublandlord in connection therewith, together with interest thereon computed at the Default Rate (as defined in the Sublease) from the date paid by Sublandlord until the date repaid in full.

(c)    All of Guarantor's obligations hereunder shall be binding upon Guarantor's successors and assigns. For purposes of this Guaranty, the word "Subtenant" shall also include the successors and assigns of Subtenant. Each immediate and successive assignee or transferee of any interest in any of the Liabilities and this Guaranty shall, to the extent of such interest, be entitled to the benefits of this Guaranty.

(d)    This Guaranty shall be construed in accordance with the laws of the State of North Carolina, the state in which the demised Premises described in the Sublease is situated (the "Premises"). Guarantor irrevocably (i) agrees that any suit, action or other legal proceeding relating to this Guaranty may be brought in any state court located in the county in which the Premises is situated, or in any federal court located in the federal district in which the Premises is situated, at Sublandlord's option; (ii) consents to the jurisdiction of each such court in any such suit, action or proceeding; (iii) waives any objection which Guarantor may have to the laying of venue in any such suit, action or proceeding in either such court; and (iv) agrees to join Sublandlord in any petition for removal to either such court.

(e)    **GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS THAT GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION WITH THIS GUARANTY, OR ANY OTHER STATEMENTS OR ACTIONS OF SUBLANDLORD. GUARANTOR ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR SUBLANDLORD TO ENTER INTO THE SUBLEASE.**

(f)    All capitalized terms used in this Guaranty shall have the same meanings as are given to such terms in the Sublease, unless otherwise specifically defined in this Guaranty. Neuter terms shall also refer, where applicable, to the feminine gender and the masculine gender; the singular reference shall also include the plural of any word if the context so requires.

**SEPARATE SIGNATURE PAGE FOLLOWS**

**SIGNATURE PAGE**
**SUBLEASE GUARANTY**

IN WITNESS WHEREOF, this Guaranty is executed as of the _____ day of
_____,2013.

**WITNESSES:**                                    **GUARANTOR:**

_____        GC Partners, Inc.


By _____
Name _____
Title _____



**ACNKOWLEDGEMENT(S)**

STATE OF                        )
                                )  SS:
COUNTY OF                       )

The undersigned, a Notary Public in and for the County and State aforesaid, does hereby
certify, that _____, personally known to me to be the
_____ of GC Partners, Inc., a North Carolina corporation, appeared before me
this day in person and acknowledged under oath that in such capacity he signed and delivered the
said instrument pursuant to authority duly given to him by said GC Partners, Inc.

GIVEN under my hand and seal this _____ day of _____, ____.


_____
Notary Public


My Commission Expires: _____

BTM:508954v4

## EXHIBIT "G"
## CONTRACTOR AND SUBCONTRACTOR INSURANCE LIMITS

Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Sublandlord, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Sublandlord as an additional insured.

Environmental Impairment or Pollution Liability Insurance, including clean-up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Sublandlord as an additional insured.

Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

BTM:508954v4

<u>**EXHIBIT "H"**</u>

<u>**MEMORANDUM OF SUBLEASE**</u>

THIS MEMORANDUM OF SUBLEASE (this **"Memorandum"**) is made and entered into as of _____, 2013 by and between **KMART CORPORATION**, a Michigan corporation, as sublandlord (**"Sublandlord"**), and **GCP REAL XVI (ASHEVILLE), LLC**, a North Carolina limited liability company (**"Subtenant"**).

**W I T N E S S E T H:**

For and in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are all hereby acknowledged, the parties hereto agree as follows:

**1.    Premises.** Subtenant and Sublandlord have entered into a certain Sublease dated _____, 2013 (the **"Sublease"**), pursuant to which Sublandlord has leased to Subtenant certain premises commonly known as 1001 Patton Avenue, Asheville, North Carolina, 28806 (the **"Premises"** as indicated on the Site Plan, attached hereto as **Exhibit "A"**) located in the City of Asheville, County of Buncombe, State of North Carolina, which parcel is legally described in **Exhibit "B"**, attached hereto and made a part hereof by this reference.

**2.    Term.** The Sublease provides for an initial term beginning on the Commencement Date (which is anticipated to occur on or about _____, 201__) as defined in the Sublease, and expiring twenty (20) years thereafter, together with four (4) additional five (5) year optional renewal terms.

**3.    Use.** Subtenant shall use the Leased Premises for a prepared food restaurant (the **"Permitted Use"**) and for no other purpose, without Sublandlord's prior written consent which shall not be unreasonably withheld, conditioned or delayed.

**4.    Entire Agreement/Conflicts.** This Memorandum is executed by the parties to the Sublease for the purpose of recordation in the records of the County of Buncombe, North Carolina, it being intended that this Memorandum shall be so recorded and shall give notice of and concern the Sublease which is incorporated herein by this reference. This Memorandum is not a complete summary of the Sublease, nor shall any provision of this Memorandum be used in

BTM:508954v4

interpreting the provisions of the Sublease.  In the event of any conflict between this Memorandum and the Sublease, the Sublease shall control.

5.      **Statement of Obligations and Rights**.  For a definitive statement of the obligations and rights of Sublandlord and Subtenant, reference must be made to the Sublease and any amendments thereto.  All defined (capitalized) terms not defined herein shall have the meaning ascribed thereto in the Sublease.

6.      **Notice to Parties.**  This Memorandum shall constitute notice to all parties of all amendments to the Sublease, if any, from time to time hereafter executed, without the necessity for recording further memoranda of such amendments.

<strong>SEPARATE SIGNATURE PAGES FOLLOW</strong>

BTM:508954v4

## SIGNATURE PAGE
## MEMORANDUM OF SUBLEASE

IN WITNESS WHEREOF, the parties hereto have caused this Memorandum of Sublease to be executed on the day, month and year first above written by the following authorized signatory.

### Subtenant:

### GCP REAL XVI (ASHEVILLE), LLC

By: _____

David E. Gronewoller, Manager

STATE OF _____ )
                                   ) SS:
COUNTY OF _____ )

The undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify, that Dave E. Gronewoller, personally known to me to be the Manager of GCP Real XVI (Asheville), LLC, a North Carolina limited liability company, appeared before me this day in person and acknowledged under oath that in such capacity he signed and delivered the said instrument pursuant to authority duly given to him/her by said GCP Real XVI (Asheville), LLC.

GIVEN under my hand and seal this _____ day of _____, ____.

_____
Notary Public

My Commission Expires: _____

## SEPARATE SIGNATURE PAGE
## MEMORANDUM OF SUBLEASE

**IN WITNESS WHEREOF,** the parties hereto have caused this Memorandum of Sublease to be executed on the day, month and year first above written by the following authorized signatory.

Sublandlord:

**KMART CORPORATION**

By: _____

James B. Terrell, Vice President Real Estate

STATE OF ILLINOIS          )
                                           ) SS:
COUNTY OF COOK          )

The undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify, that _____, personally known to me to be the Vice President Real Estate of **KMART CORPORATION**, a Michigan corporation, appeared before me this day in person and acknowledged under oath that in such capacity he signed and delivered the said instrument pursuant to authority duly given to him by said corporation.

**GIVEN** under my hand and seal this _____ day of _____, ____.

_____

Notary Public

My Commission Expires: _____

# EXHIBIT A

# EXHIBIT B

## <u>SCHEDULE 24(a)</u>

### <u>Guarantor's Financials</u>

## <u>SCHEDULE 54(c)</u>