**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

In re:                                                    :    Chapter 11
                                                          :
SEARS HOLDING CORPORATION, *et al.*,                      :    Case No. 18-23538 (RDD)
                                                          :
                                                          :    (Jointly Administered)
                                                          :
                              Debtors.[1]                 :    **RELATED DOC. NOS. 1774, 2281, 2507, 3008, 3298, 3421, 3868, 3870**

------------------------------------------------------------ x

---

## MEMORANDUM OF LAW IN SUPPORT OF THE BRUCE TRUSTS' (I) DESIGNATABLE CONTRACT ASSUMPTION AND ASSIGNMENT OBJECTION, AND (II) RESERVATION OF RIGHTS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

Page

SUMMARY OF FACTS................................................................................. 3

ARGUMENT ............................................................................................... 9

I.    The Buyer bears the burden of proving the existence of a lease
      capable of being assumed and assigned. ........................................... 9

II.   The Buyer has failed to prove the existence of an unexpired lease. .............. 10

      A.    The Ground Lease was for a term of years and did not convey
            away any fee owners' rights of control and disposition with
            respect to the Kmart Lease. ...................................................... 10

      B.    Article 13 did not empower the Ground Lease Tenant to
            extend the Kmart Lease for more than ten years without the
            fee owners' consent. ................................................................. 13

            1.    The Ground Lease unambiguously requires the fee
                  owner to consent to any lease or sublease that is longer
                  than ten years. ................................................................ 13

            2.    Alternatively, if the Ground Lease is ambiguous, then
                  the actions of Asheville K-M, NAP, and Kmart
                  demonstrate that the Fee Owners' interpretation of the
                  Ground Lease is correct. .................................................. 18

      C.    The Second Amendment was not authorized under the
            Sandwich Lease. ...................................................................... 19

            1.    The Buyer has failed to provide any proof of NAP's
                  interest in the Shopping Center in 1992, but at best
                  NAP was a subtenant under the Sandwich Lease. .................. 19

            2.    The Buyer has failed to prove that NAP complied with
                  the Sandwich Lease in Executing the Second
                  Amendment. .................................................................. 20

      D.    Kmart's right to possession was derived from an agreement
            with NAP and expired when the Ground and Sandwich Leases
            expired. .................................................................................. 21

      E.    Buyer has failed to prove that NAP was acting as an agent of
            the Fee Owners. ...................................................................... 22

      F.    Buyer has failed to prove that NAP had apparent authority to
            bind the Fee Owners. ............................................................... 23

      G.    Buyer has failed to prove equitable estoppel. .............................. 24

      H.    The Buyer has not produced evidence demonstrating that the
            Fee Owners or their predecessors in title ratified the Second
            and Third Amendments. ........................................................... 25

## TABLE OF CONTENTS
(continued)

Page

**III.    Alternatively, the Court should condition any assumption and assignment on the Buyer delivering a guarantee of performance acceptable to the Fee Owners and preserve all "Restrictive Covenants" in the Kmart Lease**................................................................. **26**

**CONCLUSION** ........................................................................................................ **27**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 130/40 Essex St. Dev. Corp.*,
   No. 03-40944, 2008 WL 4845639 (Bankr. S.D.N.Y. Oct. 22, 2008) .......................................9

*In re 8800 LLC*,
   No. 2:18-BK-17263-RK, 2019 WL 268577 (Bankr. C.D. Cal. Jan. 18, 2019) ........................9

*Artis v. Artis*,
   247 S.E. 2d 228 (N.C. 1948)................................................................................................11

*Barbee v. Johnson*,
   665 S.E.2d 92 (2008) ...........................................................................................................25

*Bell v. Alden Owners, Inc.*,
   199 B.R. 451 (S.D.N.Y. 1996)...............................................................................................9

*In re Benrus Watch Co., Inc.*,
   13 B.R. 331 (Bankr. S.D.N.Y. 1981) ....................................................................................9

*Butner v. United States*,
   440 U.S. 48 (1979)...............................................................................................................10

*C & H P'ship v. Shaw Indus. Grp., Inc.*,
   No. 1:04CV00323, 2006 WL 1229001 (M.D.N.C. May 4, 2006).........................................24

*Carolina Equip. & Parts Co. v. Anders*,
   144 S.E.2d 252 (N.C. 1965)................................................................................................25

*In re Covington's Will*,
   114 S.E.2d 257 (N.C. 1960) ................................................................................................24

*In re Crabb*,
   48 B.R. 165 (Bankr. D. Mass. 1985) ....................................................................................9

*Dailey v. Integon General Ins. Corp.*,
   331 S.E.2d 148 (N.C. Ct. App. 1985) ..................................................................................23

*DKH Corp. v. Rankin-Patterson Oil Co.*,
   506 S.E.2d 256 (N.C. Ct. App. 1998) ..................................................................................22

*E. Town Mkt., L.P. v. 550 Foods, LLC*,
   No. COA15-46, 2015 WL 4448455 (N.C. Ct. App. July 21, 2015) ..................................5, 21

iii

*Everett's Lake Corp. v. Dye*,
   821 S.E.2d 637 (N.C. Ct. App. 2018) ...................................................................10

*In re Exide Techs.*,
   607 F.3d 957 (3d Cir. 2010), *as amended* (June 24, 2010) ..................................9

*Glover v. First Union Nat. Bank of North Carolina*,
   428 S.E.2d 206 (N.C. Ct. App. 1993) ...................................................................11

*Green v. Freeman*,
   756 S.E.2d 368 (N.C. Ct. App. 2014) ...................................................................23

*In re Huffman*,
   171 B.R. 649 (Bankr. W.D. Mo. 1994)....................................................................9

*IO Moonwalkers, Inc. v. Banc of Am. Merch. Servs., LLC*,
   814 S.E.2d 583 (N.C. Ct. App.) ............................................................................25

*In re Joshua Slocum, Ltd.*,
   922 F.2d 1081 (3d Cir. 1990).................................................................................1

*In re Kong*,
   162 B.R. 86 (Bankr. E.D.N.Y. 1993) ....................................................................10

*Lovett v. Stone*,
   239 N.C. 206, 79 S.E.2d 479 (1954)......................................................................21

*Lynn v. Lynn*,
   689 S.E.2d 198 (N.C. Ct. App. 2010) ...................................................................18

*Marcoin, Inc. v. McDonald*,
   320 S.E.2d 892 (N.C. Ct. App. 1984) .............................................................11, 14

*In re Masterworks, Inc.*,
   94 B.R. 262 (Bankr. D. Conn. 1988) .....................................................................10

*Meroney v. Cherokee Lodge*,
   110 S.E. 89 (N.C. 1921).........................................................................................11

*Munn v. Haymount Rehab. & Nursing Ctr., Inc.*,
   704 S.E.2d 290 (N.C. Ct. App. 2010) ..............................................................22, 23

*Neal v. Craig Brown, Inc.*,
   356 S.E.2d 912 (N.C. Ct. App. 1987) ...................................................................21

*O & M Indus. v. Smith Eng'g Co.*,
   No. COA03–432–2, 2006 WL 2346390 (N.C. Ct. App. 2006) .............................24

*In re Oklahoma Trash Control, Inc.*,
   258 B.R. 461 (Bankr. N.D. Okla. 2001) ...............................................................9

*Outer Banks Contractors, Inc. v. Daniels & Daniels Const., Inc.*,
   433 S.E.2d 759 (N.C. Ct. App. 1993) ..................................................................22

*Oxendine v. Lewis*,
   114 S.E. 2d 706 (N.C. 1960) ...............................................................................11

*In re P.I.N.E., Inc.*,
   52 B.R. 463 (Bankr. W.D. Mich. 1985) .................................................................9

*Pet, Inc. v. University of North Carolina*,
   323 S.E.2d 745 (N.C. Ct. App. 1984) ..................................................................23

*In re Rachels Indus., Inc.*,
   109 B.R. 797 (Bankr. W.D. Tenn. 1990) ................................................................9

*In re S.A. Holding Co., LLC*,
   357 B.R. 51 (Bankr. D.N.J. 2006) .......................................................................10

*In re Stiletto Mfg., Inc.*,
   588 B.R. 762 (Bankr. E.D.N.C. 2018) ....................................................................9

*Stovall v. Stovall*,
   698 S.E.2d 680 (N.C. Ct. App. 2010) ..................................................................18

*Strader v. Sunstates Corp.*,
   500 S.E.2d 752 (N.C. Ct. App. 1998) ..................................................................11

*Triplett v. Williams*,
   63 S.E. 79 (N.C. 1908) ........................................................................................11

*In re W.A.S. Food Serv. Corp.*,
   49 B.R. 969 (Bankr. S.D.N.Y. 1985) ...............................................................9, 10

*Wal-Mart Stores, Inc. v. Ingles Mkts., Inc.*
   581 S.E.2d 111 (N.C. Ct. App. 2003) .............................................................11, 14

*Whetsell v. Jernigan*,
   229 S.E. 2d 183 (N.C. 1976) ...............................................................................11

*Williams v. S. Bell Tel. & Tel. Co.*,
   266 S.E.2d 700 (N.C. App. 1980) ........................................................................21

*Wright v. Allred*,
   37 S.E.2d 107 (N.C. 1946) ...................................................................................15

**Statutes**

11 U.S.C. § 365.........................................................................................................1, 9, 10

11 U.S.C. § 1107............................................................................................................9

**Other Authorities**

Alvin Arnold, *Real Estate Investor's Deskbook* § 9:1 (3d ed.) .............................................10, 11

*Webster's Real Estate Law in North Carolina* ...........................................................................11

Steven Bruce, as Trustee of the Steven Bruce Revocable Trust; Cara Bruce and Lou Cuida, as Trustees of the Cara Bruce Irrevocable Trust; and Allison Bruce and Lou Cuida, as Trustees of the Allison Bruce Irrevocable Trust (collectively the "Fee Owners"), by and through counsel, submit this memorandum of law in support of the *Bruce Trusts' (I) Designatable Contract Assumption and Assignment Objection, and (II) Reservation of Rights* [Doc. No. 3421] (the "Objection") and in reply to the initial response (the "Response") [Doc Nos. 3868, 3870] to the Objection filed by Transform Holdco LLC (the "Buyer"). In further support of the Objection, the Fee Owners state as follows:

### INTRODUCTION

The Fee Owners own nonresidential real estate located at 1001 Patton Avenue, Asheville, North Carolina (the "Shopping Center"). Until January of this year, Debtor Kmart Corporation ("Kmart") operated a retail store (no. 4112) ("Kmart Store 4112") in the Shopping Center.[2] Kmart (at the Buyer's request) now seeks to assume a lease for Kmart Store 4112 and assign it to the Buyer's affiliate. The Buyer does not intend to operate in the space and so presumably seeks to sell the lease to an unknown third party. However, as explained below, the lease at issue expired no later than January 31, 2019, and there is no lease capable of being assumed and assigned:

1.    The Buyer bears the burden of proving the existence of an assumable lease under state law but cannot meet this burden.

2.    The Buyer ignores basic tenets of real property law to argue that a subtenant of the Fee Owners had the power to impair their fee simple ownership interests by extending the Kmart Lease by a total of some forty years and beyond the expiration of the subtenant's term without the

---

[2] Kmart Store 4112 is located within a "shopping center" for purposes of section 365(b)(3) of the Bankruptcy Code. *See In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1086-87 (3d Cir. 1990).

then Fee Owners' consent.  The Fee Owners were not a party to the amendment upon which Buyer relies nor is there any evidence that they consented to it.

3.      The Buyer claims that the subtenant was authorized to impair the Fee Owners' ownership by virtue of the terms of a Ground Lease.  But, the Buyer's argument is based on a selective reading of the Ground Lease.  Reading the applicable Ground Lease Article as a whole, the parties to the Ground Lease intended to, and did, require Fee Owner consent to any demise of the premises for a term exceeding ten years.  Moreover, the Buyer does not adequately explain why the subtenant could exercise *any* rights granted to the Ground Lease Tenant.

4.      Should the Court determine the Ground Lease to be ambiguous, the Buyer's arguments are also contradicted by prior statements by Kmart as well as the subtenant who signed the lease amendment at issue.  In 2017, when the subtenant was negotiating a further amendment with Kmart, the subtenant sent Kmart a memo advising that any lease amendment "should recognize that the current leasehold interest of Kmart's Landlord expires on January 31, 2019 and that no representation is made that the terms of either its lease with Asheville K-M Associates [the Ground Lease Tenant] or the lease between Asheville K-M Associates and the fee owners will be extended beyond such date."

5.      The Buyer also cannot prove that the amendment at issue complied with the lease between the subtenant and the Ground Lease Tenant.  Article 7.2 of the subtenant's lease required the Ground Lease Tenant to consent if the subtenant sought to "modify, alter [or] amend . . . any sublease now or hereafter existing."  The lease clearly defined the Kmart Lease as falling within this provision, and the Buyer has failed to produce any evidence that the Ground Lease Tenant consented to the Second Amendment in writing.

6.      The Buyer raises various other theories (such as agency, apparent authority, ratification and equitable estoppel) to claim a right to continued possession of the Kmart Store. But, Buyer fails to present evidence of the essential elements of each theory. As a result, the Court should deny the request to assume and assign the expired Kmart Lease.

## SUMMARY OF FACTS

### *Overview of the Shopping Center's chain of title and leases*

In 1964, Patton Avenue Development Corporation ("PADC"), as landlord, and S. S. Kresge Company, as tenant, entered into a lease for "a completed store unit to be constructed" on Tracts One and Two, which together comprise the Shopping Center as described in Exhibit A to the lease (the "Kmart Lease").  *See* Bruce Declr. ¶ 4, Ex. 1.[3] At the time of execution, PADC was the fee owner of Tract One and a tenant under a ground lease of Tract Two. *See id*. ¶ 8.

The Kmart Lease was for an initial term of 20 years from the first date of occupancy and gave the tenant the option to extend the lease for three consecutive terms of five years each.  *See id*. ¶ 4, Ex. 1 art. 2, 12.  On March 22, 1965, a Memorandum of Lease for the Kmart Lease was filed with the Office of the Register of Deeds of Buncombe County, North Carolina (the "Registry").[4]  *See id*. ¶ 6, Ex. 2. As stated in the recorded Memorandum of Lease, the Kmart Lease expired no later than 35 years from the first day of occupancy by the tenant. *See id*. ¶ 6, Ex. 2 art. 2.

On February 1, 1966, PADC sold its fee simple interest in Tract I and leasehold interest in Tract II to G-K, Inc., which simultaneously conveyed those interests to Martin Bruce and his wife,

---

[3] With this Memorandum of Law, the Fee Owners have filed the *Declaration of Paul Bruce in Support of the Bruce Trusts' (I) Designatable Contract Assumption and Assignment Objection, and (II) Reservation of Rights* (the "Bruce Declaration"). The Bruce Declaration is cited as follows: "Bruce Declr. __."

[4] All references to recordation in this Memorandum of Law refer to recordation with the Registry.

Sylvia Bruce (together, the "Bruces").[5] *Id.* ¶¶ 9, 10, Ex. 4. That same day, the Bruces leased their interest in the Shopping Center to Patton Plaza Associates ("PPA") (the "Ground Lease"). *Id.* ¶ 11, Ex. 5. Record notice of the Ground Lease was recorded at Book 934, Page 649 (filed February 1, 1966) and re-recorded at Book 2601, Page 846 (filed October 5, 2001). *See id*. ¶ 12, Ex. 6.

By Assignment dated November 6, 1969, PPA assigned its interest in the Ground Lease to Nineteenth Asheville Corp. ("NAC"). *See id.* ¶ 14, Ex. 8. This Assignment was recorded at Book 1009, Page 487 (filed November 7, 1969). *See id.* ¶ 15. By Assignment dated December 17, 1975, NAC assigned its interest in the Ground Lease to Asheville K-M Associates ("Asheville K-M").[6] *See id.* ¶ 17, Ex. 11. This Assignment was recorded at Book 1133, Page 376 (filed December 23, 1975). *Id.* at 18. It is undisputed that from December 17, 1975 until the expiration of the Ground Lease on January 31, 2019, Asheville K-M was the tenant under the Ground Lease. *See id.* ¶¶ 17, 28, 43; Response ¶ 11.

When Asheville K-M became the Ground Lease Tenant,[7] it sublet the Shopping Center to NAC (the "Sandwich Lease"). *See* Bruce Declr. ¶ 19, Ex. 12.

Asheville K-M declined to extend the Ground Lease beyond January 31, 2019. *See id.* ¶ 43, Ex. 26. Accordingly, the Ground Lease expired on January 31, 2019 and is no longer of any force or effect. Because the Ground Lease expired on January 31, 2019, the Sandwich Lease also

---

[5] The Shopping Center was subsequently conveyed to the Martin Bruce Revocable Trust and Sylvia Bruce Revocable Trust. *See* Bruce Declr. ¶ 26, Exs. 17, 18. Ownership of the fee simple was further conveyed thereafter and is presently split among the Fee Owners as follows: (i) 25% in the Allison Bruce Irrevocable Trust, (ii) 25% in the Cara Bruce Irrevocable Trust, and 50% in the Steven Bruce Revocable Trust. *See id.* ¶ 30.

[6] On or about December 31, 1999, Asheville K-M Associates assigned its interest in the Ground Lease to Asheville K-M Associates, LLC, in connection with a partnership conversion. *See* Bruce Declr. ¶ 28, Ex. 20. For purposes of this Memorandum of Law, "Asheville K-M" will be used as shorthand for each of these entities.

[7] "Ground Lease Tenant" shall refer to whichever entity was the tenant under the Ground Lease at the applicable time.

expired on January 31, 2019. *See E. Town Mkt., L.P. v. 550 Foods, LLC,* No. COA15-46, 2015

WL 4448455, at * 7 (N.C. Ct. App. July 21, 2015); *see also* Bruce Declr. ¶ 37.

<u>*Significant terms of the Ground Lease*</u>

Article 1 of the Ground Lease, titled "Premises," states that the landlord "hereby demises

and leases to Tenant and Tenant does hereby hire and take from Landlord" the Shopping Center,

subject to several matters, "TO HAVE AND TO HOLD unto the Tenant, its successors and

permitted assigns **for the term of this Lease** as defined in Subdivision (d) of Section 2.01." Bruce

Declr. Ex. 5, art. 1 (emphasis added). Among the matters listed in Article 1(d) are "Existing Leases

. . . if any, the obligations of which Tenant hereby assumes and indemnifies Landlord from any

claims or damages in connection therewith." *Id.* art. 1(d).

Section 2.01 defines the "Demised Premises" as the real property that comprises the

Shopping Center together with the building thereon, fixtures and various personal property.

Section 2.01(d) states that "Term of this Lease" means "the initial term and any and all renewals

effected under the provisions thereof." *Id.* § 2.01(b). Section 3.01 states that the initial term shall

terminate on January 31, 1996.[8] *See id.* § 3.01. Article 20 provides the tenant with the option, if

the Lease remains in full force and effect and if the tenant is not in default, on proper notice to

renew "this Lease for three (3) additional renewal terms of twenty-three (23) years each." *Id.* art.

20.

Section 13.01 states that "[t]he Tenant or its successive assignees, may assign . . . or transfer

all of this Lease or its leasehold . . . or sublet all of the Demised Premises, without the consent of

Landlord, provided, however that the Tenant in so doing does not encumber the Landlord's title to

---

[8] This page of the recorded copy of the Ground Lease is difficult to read, but the First Amendment to the Ground Lease dated November 5, 1969 between the Bruces and PPA states that the initial term of "this Lease" is for a period of thirty years, beginning February 1, 1966 and ending January 31, 1996 unless sooner terminated. *See* Bruce Declr. Ex. 7.

the Demised Premises." *Id.* § 13.01. Section 13.01 then states that each assignee shall assume "this Lease" and its performance "for the Term of this Lease" so long as it is the holder of "said Lease." *Id.*

Section 13.03 allows the tenant to "sublet any part of the Demised Premises to an occupying subtenant without the written consent of Landlord" provided that three conditions are met. *Id.* § 13.03. The first is that the rent payable by such subtenant cannot be lower than market rent; the second is that the "[t]erm of said Lease shall be no more than ten (10) years;" and the third is that "such sublease" must contain a particular contractual provision. *See id.*

Finally, Section 24.01 provides that "[t]he Tenant shall surrender and deliver up the Buildings and premises" together with items such as furnishings, fixtures, and equipment "at the expiration of the Term of this Lease." *Id.* § 24.01.

*Significant terms of the Sandwich Lease*

Article 1 of the Sandwich Lease provides that Asheville K-M "demises and leases" to NAC the Shopping Center, including among other things, the "leases thereof and the rent and additional rent due or to become due thereunder and all of Landlord's rights, title and interest therein and thereto." Bruce Declr. Ex. 12, art. 1.1(c).[9] Like the Ground Lease, the demise of the leasehold premises was for a term of years. Article 2 together with Schedule 2.2 establish that the initial term of the Sandwich Lease expired (like the Ground Lease) on January 31, 1996. *See id.* art. 2 & sched. 2.2. Also like the Ground Lease, the Sandwich Lease was renewable three times with terms of 23 years each.

Article 1.2 makes the demise and lease subject to several matters, including "[r]ights of subtenants now in possession and the subleases and concession agreements now in existence,

---

[9] The Sandwich Lease states that the "demised premises" includes the Shopping Center, buildings, improvements and appurtenances belonging to landlord as well as the leases as described above. Bruce Declr. Ex.12, art. 1.1.

which are specified in Schedule 1.2(b) hereto." *Id.* art. 1.2. Schedule 1.2(b) to the Sandwich Lease

lists the Kmart Lease as the first such "sublease." *See id.* sched. 1.2(b).

Article 7 gives the tenant under the Sandwich Lease the right to sublet the whole or portions

of the Shopping Center subject to certain conditions. *See id.* art. 7. Article 7.2 of the Sandwich

Lease states that, "[n]otwithstanding the foregoing the Tenant shall not modify, alter, amend or

(except for non-payment or other default by a subtenant) terminate any sublease now or hereafter

existing or any extension thereof without the prior written consent of the Landlord which shall not

be unreasonably withheld." *Id.* art. 7.2.

The Addendum to the Sandwich Lease (which is expressly incorporated into the terms of

the Sandwich Lease by Article 53) states that "the Landlord's interest in the demised premises is

a leasehold interest consisting of Landlord's rights as Tenant" under the Ground Lease and that

the Sandwich Lease is "subject and subordinate" to the Ground Lease. *Id.*

Finally, Article 28 of the Sandwich Lease provides that the tenant shall surrender and

deliver the demised premises to the landlord at the end of the term of the lease. *Id.* art. 28.

### *The Kmart Lease Amendments*

Upon information and belief, there have been three alleged amendments to the Kmart Lease

since its original execution: an Amendment to Lease between the original parties dated August 27,

1965 (the "First Amendment"); a Second Amendment to Lease between Nineteenth Asheville

Partners ("NAP")[10] and Kmart dated March 3, 1992 (the "Second Amendment"); and a Third

Amendment to Lease between NAP and Kmart dated May 23, 2017 (the "Third Amendment").

---

[10] Kmart and the Buyer assert that NAP is a successor to NAC.

The Second Amendment, which was executed only by Kmart and NAP, states that the term of the Kmart Lease extends through November 30, 2012 and may be further extended at the option of the tenant for four additional terms of five years each. *See* Levander Declr. Ex. O.[11]

Neither the Fee Owners nor their predecessors in title to the Shopping Center are parties or signatories to the Second or Third Amendments.  None of the Amendments have been filed in the Registry nor has any notice of the Amendments been filed in the Registry.  The Buyer has not produced any evidence that either Kmart or NAP sent the then fee owners a copy of the Second Amendment in 1992, nor is there any evidence that the current Fee Owners received a copy prior to late 2017.[12]  Also, the Buyer has not produced any evidence that Asheville K-M consented to the terms of the Second Amendment.

Appendix 1 to this brief illustrates the chain of title to the fee simple and leasehold interests in the Shopping Center and shows on a single page that Kmart's right to possession ended with the expiration of the Ground Lease and the Sandwich Lease.[13]

As explained below, neither the Ground Lease nor any sublease or assignment of any interest in the Ground Lease empowered any entity to impair the fee simple ownership interests of any of the fee owners of the Shopping Center (including the Fee Owners) by extending the Kmart Lease by a total of some forty years and beyond the expiration of the Ground Lease without the fee owners' consent.

---

[11] With the Response, the Buyer filed a declaration (the "<u>Levander Declaration</u>") made by its counsel. Citations to the Levander Declaration will be formatted as follows: "Levander Declr. __."

[12] In fact, there is evidence to the contrary. *See* Bruce Declr. ¶ 35.

[13] Appendix A attached to the Buyer's brief does not accurately reflect the chain of title because, among other things, it equates the Ground Lease interests with fee simple ownership of the Shopping Center.

## ARGUMENT

**I.**    **The Buyer bears the burden of proving the existence of a lease capable of being assumed and assigned.**

Subject to certain exceptions, a trustee or debtor in possession may assume and assign "any . . . unexpired lease of the debtor." *See* 11 U.S.C. § 365(a), (f).[14]  The party moving under section 365 has the burden to prove "that the lease is one subject to assumption and that all requirements for assumption have been met." *In re 8800 LLC*, No. 2:18-BK-17263-RK, 2019 WL 268577, at *18 (Bankr. C.D. Cal. Jan. 18, 2019) (quoting *In re Rachels Indus., Inc.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990)) (internal quotation marks omitted); *In re Oklahoma Trash Control, Inc.*, 258 B.R. 461, 462 (Bankr. N.D. Okla. 2001) (same).

The law is clear that expired leases cannot be assumed or assigned nor can the bankruptcy court revive them: "[I]f the contract or lease has expired by its own terms or has been terminated prior to the commencement of the bankruptcy case, then there is nothing left for the [debtor] to assume. . . ." *In re 130/40 Essex St. Dev. Corp.*, No. 03-40944, 2008 WL 4845639, at *5–6 (Bankr. S.D.N.Y. Oct. 22, 2008) (quoting *In re Huffman*, 171 B.R. 649, 653 (Bankr. W.D. Mo. 1994)) (internal quotation marks omitted); *see Bell v. Alden Owners, Inc.*, 199 B.R. 451, 462–64 (S.D.N.Y. 1996); *In re W.A.S. Food Serv. Corp.*, 49 B.R. 969, 971 (Bankr. S.D.N.Y. 1985); *In re Benrus Watch Co., Inc.*, 13 B.R. 331, 334 (Bankr. S.D.N.Y. 1981); *accord In re Stiletto Mfg., Inc.*, 588 B.R. 762, 766 (Bankr. E.D.N.C. 2018) ("[S]ection 365 has no effect on an executory contract that, by its own terms, expires before the court has approved its assumption or rejection by the trustee or debtor in possession."); *In re P.I.N.E., Inc.*, 52 B.R. 463, 465 (Bankr. W.D. Mich. 1985); *In re Crabb*, 48 B.R. 165, 167–68 (Bankr. D. Mass. 1985). Therefore, the movant's burden under section 365 necessarily includes establishing that the lease is unexpired. *Cf.  In re Exide Techs.*,

---

[14] *See also* 11 U.S.C. § 1107.

607 F.3d 957, 962 (3d Cir. 2010), *as amended* (June 24, 2010); *In re S.A. Holding Co., LLC*, 357

B.R. 51, 56–59 (Bankr. D.N.J. 2006); *In re Masterworks, Inc.,* 94 B.R. 262, 265 (Bankr. D. Conn.

1988).

Whether a lease is unexpired for purposes of section 365 of the Bankruptcy Code must be

determined under applicable state law.  *In re Kong*, 162 B.R. 86, 91 (Bankr. E.D.N.Y. 1993); *In*

*re W.A.S. Food Serv. Corp.,* 49 B.R. at 971; *see generally Butner v. United States,* 440 U.S. 48, 55

(1979) ("Property interests are created and defined by state law.").

II.    <u>**The Buyer has failed to prove the existence of an unexpired lease.**</u>

    A.    **The Ground Lease was for a term of years and did not convey away any fee owners' rights of control and disposition with respect to the Kmart Lease.**

The Buyer turns fundamental real property principles on their heads by arguing that the

Ground Lease operated as an absolute and permanent conveyance of the fee owners' interests in

the Kmart Lease, which empowered the Ground Lease Tenant to extend the Kmart Lease for an

unlimited time beyond the expiration or other termination of the Ground Lease.  The Buyer's

construction, which they attempt to prop up by re-naming the document as a "Ground Lease and

Assignment," *see, e.g,* Response ¶ 10, cannot stand in the face of the language of the Ground Lease

as supported by the recorded Memorandum of the Ground Lease and subsequent recorded

Assignments of the Ground Lease.

Real property ownership "has been described as a 'bundle of sticks' whereby various

people/entities could own different rights in the same real estate." *Everett's Lake Corp. v. Dye*,

821 S.E.2d 637, 639 n. 1 (N.C. Ct. App. 2018) (citation omitted).  Examples of these rights include

possession, enjoyment, control, and disposition. *See* Alvin Arnold, *Real Estate Investor's*

*Deskbook* § 9:1 (3d ed.).  In the case of a leasehold, some of these rights are transferred to another

for the term of the lease, but upon "[t]he expiration of the lease term, the leasehold interest

terminates, and all the rights of the tenant revert to the landlord, who once again becomes the sole holder of the bundle of rights that make up ownership." *Id*. Here, the Buyer incorrectly argues that, in 1966, the fee owners contracted to convey the unlimited right to extend the Kmart Lease even if those extensions outlasted the Ground Lease and did so for no consideration beyond the ground rent to be paid for the term of the Ground Lease. This interpretation is not supported by the Ground Lease or North Carolina law.

Under North Carolina law, "[a] lease is a contract which contains both property rights and contractual rights." *Strader v. Sunstates Corp*., 500 S.E.2d 752, 756 (N.C. Ct. App. 1998) (citing Patrick K. Hetrick & James B. McLaughlin, Jr., *Webster's Real Estate Law in North Carolina* § 12–2 (4th ed. 1994)). The court's primary purpose when interpreting a contract is "to ascertain the intention of the parties." *Glover v. First Union Nat. Bank of North Carolina*, 428 S.E.2d 206, 209 (N.C. Ct. App. 1993). A contract "will be construed as whole with each part given an effect, but also being considered with reference to the other provisions of the contract." *Marcoin, Inc. v. McDonald*, 320 S.E.2d 892, 897 (N.C. Ct. App. 1984). When interpreting a contract, North Carolina courts "should reject that interpretation which plainly leads to injustice, and adopt that one which conforms more to the presumed meaning, because it does not produce unusual and unjust results." *Wal-Mart Stores, Inc. v. Ingles Mkts., Inc.* 581 S.E.2d 111, 115 (N.C. Ct. App. 2003) (quoting *Meroney v. Cherokee Lodge*, 110 S.E. 89, 92 (N.C. 1921)).

With respect to the conveyance of an interest in real property prior to January 1, 1968, North Carolina courts look principally to the granting clause and the habendum clause to determine what the grantor intended to convey. *See Whetsell v. Jernigan,* 229 S.E. 2d 183 (N.C. 1976); *Oxendine v. Lewis*, 114 S.E. 2d 706 (N.C. 1960); *Artis v. Artis,* 247 S.E. 2d 228 (N.C. 1948)*; Triplett v. Williams*, 63 S.E. 79 (N.C. 1908).

Applying these rules of contract construction, the key provisions of the Ground Lease establish that it granted a leasehold interest in the Shopping Center for a specified term of years and that the fee owners did not intend to convey the right to encumber their fee interest without limits. Specifically, the granting clause provides that the landlord "hereby demises and leases to Tenant and Tenant does hereby hire and take from Landlord" the Shopping Center. Bruce Declr. Ex. 5, art. 1. The habendum clause makes clear that the grant is only for a term of years: "TO HAVE AND TO HOLD unto the Tenant, its successors and permitted assigns **for the term of this Lease**." *Id.* (emphasis added). The remainder of the Ground Lease cannot be read in isolation of the granting and habendum clauses, which define the leasehold premises being conveyed and the fact that the conveyance is for only so long as the term of the lease.[15]

The recorded Memorandum of Lease for the Ground Lease does not even mention the assignment of the Kmart Lease.[16] Instead, it sets forth the legal description of the two parcels that comprise the Shopping Center and the initial term of thirty years. Bruce Declr. Ex. 6. In the Memorandum of Lease, the parties restated Section 12.03 in its entirety to provide record notice

---

[15] Several additional Ground Lease provisions are consistent with Fee Owners' reading because they prevent the Ground Lease Tenant from impairing a fee owner's title to the real property. For example, in Section 12.01, the tenant covenants not to create or permit the creation of any mechanic's or materialman's lien, and Section 12.03 states that nothing in the Ground Lease shall be construed as the fee owner giving consent or authority to anyone for the performance of labor or furnishing of materials or as giving the tenant any authority to contract for labor or materials so as to give rise to the filing of a lien against the Shopping Center. Bruce Declr. Ex. 5 §§ 12.01, 12.03. Section 13.01 states that "[t]he Tenant or its successive assignees, may assign . . or transfer all of this Lease or its leasehold . . . or sublet all of the Demised Premises, without the consent of Landlord, provided, however that the Tenant in so doing does not encumber the Landlord's title to the Demised Premises." *Id.* § 13.01.

[16] As a preliminary matter, the Buyer leads its arguments by misreading a definition in the First Amendment to the Kmart Lease to claim incorrectly that the original parties to the Kmart Lease changed the definition of "Landlord" for all purposes under the Kmart Lease and (apparently) any subsequent amendments. Response ¶ 2. Specifically, paragraph 1 of the First Amendment modifies Article 18 of the Kmart Lease to limit the tenant's rights in the event of a landlord default. Paragraph 1 then states, "Wherever the word 'Landlord' is used herein, it is intended that this shall also include the Landlord's principal owners, stockholders, directors, officers and their assignees or vendees." Bruce Declr. Ex. 3 ¶ 1. This reading is incorrect for two reasons. First, the use of the phrase "Wherever the word 'Landlord' is used herein" together with the placement of this sentence at the end of paragraph 1 clearly limits the rest of the sentence to the use of the word Landlord in paragraph 1 of the Amendment. Second, the reference to "assignees" is not the assignees of the Kmart Lease, but the assignees of the owners, stockholders, directors, and officers of the Landlord.

that the tenant was not authorized to contract for labor or services in such a way as to permit the

creation of a materialman's lien on the property. *Id.* at 2–3. Thus, the Memorandum of the Ground

Lease is consistent with a conveyance of a leasehold interest for a term of years, and nothing more.

The recorded assignments of the Ground Lease also make clear that the leasehold interest

being assigned is for a term of years. For example, the recorded assignment from PPA to NAC

states that PPA sells, assigns, and transfers "that certain Indenture of Lease, and the leasehold

estate created thereby . . .  TO HAVE AND TO HOLD . . . from the date [of the assignment] for

all the rest of years mentioned in said Indenture of Lease, as amended." Bruce Declr. Ex. 8. The

recorded assignment from NAC to Asheville K-M similarly states that it is an assignment of "that

certain Indenture of Lease and all amendments thereto and the leasehold estate created thereby . .

.  TO HAVE AND TO HOLD . . . from the date [of the assignment] for all the rest of years

mentioned in said Indenture of Lease, as amended." *Id.*, Ex. 11. Thus, the Ground Lease as

assigned to Asheville K-M granted the tenant a leasehold interest in the Shopping Center that was

limited to a term of years. The Ground Lease—and the leasehold interests that derive from it—

expired on January 31, 2019.  The Buyer's theory that the Ground Lease Tenant had the authority

to bind fee owners to an extension of the Kmart Lease without their consent is fundamentally

inconsistent with North Carolina law and the leasehold interest conveyed in the Ground Lease.

**B.      Article 13 did not empower the Ground Lease Tenant to extend the Kmart
          Lease for more than ten years without the fee owners' consent.**

1.      *The Ground Lease unambiguously requires the fee owner to consent to any
        lease or sublease that is longer than ten years.*

The Buyer relies on Article 13 of the Ground Lease to argue that NAP had the right to enter

into the Second Amendment with Kmart and bind the Fee Owners to a lease that extends past the

term of the Ground Lease.  As an initial matter, the Buyer does not explain why NAP had authority

to act at all under the Ground Lease in 1992 when it is undisputed that NAP was not the Ground

Lease Tenant in 1992. The Buyer's claim that the Kmart Lease has not expired fails for this reason alone.

However, even if NAP had the authority to act under the Ground Lease, Article 13 of the Ground Lease did not empower the Ground Lease Tenant to bind the Fee Owners to the Second Amendment. Specifically, the Buyer relies on the assignment language of section 13.07 and claims that the only restrictions on the Ground Lease Tenant's ability to contract with Kmart are found in section 13.10. The Buyer is wrong because reading Article 13 and the Ground Lease as a whole, it is clear that section 13.03 applied to the Second Amendment and the Second Amendment violated section 13.03.

In determining the meaning of any one section of Article 13, the Court should review the entirety of that Article and should read these provisions in the context of the Ground Lease as a whole. *See Marcoin*, 320 S.E.2d at 897. Further, contracts should be construed to be consistent with "reason and common sense." *Wal-Mart Stores*, 581 S.E.2d at 115 (concluding that, if contract provision at issue were "taken literally," it would be so expansive that it "cannot be read at face value.") Applying these rules of contract construction, section 13.03 applies to lease contracts executed by the Ground Lease Tenant whether they are leases or subleases.

Section 13.03 of the Ground Lease provides that the "Tenant may sublet any part of the Demised Premises to an **occupying subtenant** without the written consent of the Landlord" if three conditions are met. First, the rent paid by **"such subtenant"** must meet certain standards. Bruce Declr. Ex. 5, § 13.03(a). Second, "[t]he **Term of said Lease** shall be no more than ten (10) years." *Id.* § 13.03(b). Third, **"such sublease"** must contain a certain contractual provision. *Id.* § 13.03(c).

The Second Amendment is an agreement for which the Ground Lease Tenant was required to obtain written consent of the fee owner for it to bind the fee owner because it purported to extend the Kmart Lease for more than ten years.[17]  Moreover, it provided for Kmart to build an extension on the Kmart building that constituted new leasable space to be occupied by Kmart. The Second Amendment was indistinguishable from any other new lease or sublease because it involved the conveyance of a leasehold interest beyond that already in existence.  It is undisputed that the fee owners at the time of the Second Amendment did not consent in writing to the Second Amendment. *See* Bruce Declr. ¶ 34. As such, the Second Amendment violates Section 13.03 of the Ground Lease and is unenforceable as against the current Fee Owners.[18]

The Buyer argues that the Ground Lease "carefully distinguishes between existing leases, which include the Kmart Lease, and potential future subleases of the Ground Lease, as described in § 13.03." They further argue that the Kmart Lease was a "lease" and not a "sublease," and that, as a result, the Ground Lease Tenant was not required to obtain its landlord's consent to extend the Kmart Lease by more than ten years.  *See* Response ¶ 60. But after examining Article 13 and the entirety of the Ground Lease, it becomes abundantly clear that the Ground Lease does not "carefully distinguish" between existing leases and future subleases.  Instead, the Ground Lease repeatedly uses the terms lease and sublease interchangeably and without defining either term. Thus, whether the Kmart Second Amendment is a "lease" or a "sublease" is immaterial. The parties to the Ground Lease intended to, and did, require fee owner consent to any demise of the premises for a term exceeding ten years.

---

[17] The initial term of the Second Amendment was for ten years and six months.  In addition, North Carolina adds the initial term of a lease and all potential renewals for purposes of determining whether the statute of frauds applies. *See Wright v. Allred,* 37 S.E.2d 107, 108 (N.C. 1946). Thus, North Carolina courts would consider the Second Amendment to have a purported term of 40 years.

[18] Although it is not necessary for the Court to reach the issue, the Buyer has not submitted any proof to demonstrate that the rent payable to NAP under the Second Amendment conformed with Section 13.

Indeed, the Court need look no further than Section 13.03 for an example of the Ground Lease using the terms interchangeably. Section 13.03(b) states that "such Lease" shall be no more than ten years, while Subsection (c) requires "such sublease" to contain a certain provision. *Compare* Bruce Declr. Ex. 5, § 13.03(b), *with* § 13.03(c). Another example is found in Section 13.10. The Buyer claims that the only restrictions placed on the Ground Lease Tenant's power to modify the Kmart Lease are found in Section 13.10 because that section refers to "present occupancy leases." But Section 13.10 is <u>not</u> restricted to "present occupancy leases." It limits the ability to cancel, shorten, or reduce rent under "agreements affecting **any present or future occupancy lease**." *Id.* § 13.10 (emphasis added). Under the Buyer's construction of the Ground Lease, there could be no future occupancy "lease" because all such agreements would be "subleases." Moreover, Section 13.10 also states that it is permissible to cancel a "present or future occupancy lease" if it is to be replaced by a "new occupancy lease." *Id.* Under the Buyer's interpretation, this use of the term "lease" rather than "sublease" makes no sense. If, however, the Ground Lease—and Article 13 in particular—does not distinguish between occupying leases and occupying subleases, then Section 13.10 makes perfect sense.

The Ground Lease contains many examples where the Buyer's claim of a 'careful distinction' conflicts with the language and clear intent of the parties to the Ground Lease:

- Section 13.08 references assignment of rents and profits "under all leases now or hereafter existing" to secure the Ground Lease Tenant's obligation to pay rent. *See id.* § 13.08. However, under Buyer's interpretation, there would be no "leases" other than those existing at the time, which would render this collateral assignment far less valuable to the landlord.

- Section 13.12 states "Tenant acknowledges that Landlord has not received any securities under any subleases in effect at the date hereof." *See id.* § 13.12. Under the Buyer's interpretation, Section 13.12 is meaningless because there were no "subleases" in effect at the time of the execution of the Ground Lease—only the Kmart Lease was in effect.

- Section 18.09 requires the tenant to furnish reports concerning the operation of the Shopping Center, including "the names of any subtenants with the terms and conditions of their respective tenancies" and to provide that same information to landlord's mortgage lender upon request. *Id.* § 18.09. It makes no sense that landlord (or its mortgage lender) would seek periodic reporting concerning only smaller subtenants and not the anchor occupant of the Shopping Center.

There is no reason for the Court to look beyond the four corners of the Ground Lease to determine that the fee owners' consent was required for the Second Amendment to become effective against them.  After considering the Ground Lease as a whole, which the Court must do under North Carolina contract law, the Court should disregard the arbitrary and overly formalistic distinction that the Buyer has made between an extension of an existing lease and creation of a sublease. Both leaseholds were derived from the Ground Lease, and it would make little sense for the parties to have agreed to treat them differently.  Therefore, under the plain, unambiguous language of the Ground Lease, the Second Amendment cannot be enforced against the fee owners.[19]

---

[19] While the Buyer is correct that the Ground Lease was made subject to the then-existing Kmart Lease, that simply meant that fee owners could not interfere with the Kmart's (or its predecessor's) right of possession during the 35 year term of the Kmart Lease (which expired in 2001) or so long as the Ground Lease was in effect.

2. *Alternatively, if the Ground Lease is ambiguous, then the actions of Asheville K-M, NAP, and Kmart demonstrate that the Fee Owners' interpretation of the Ground Lease is correct.*

It is well established that, if a contract is ambiguous, then the court may review extrinsic evidence to determine its meaning. *See Stovall v. Stovall*, 698 S.E.2d 680, 684 (N.C. Ct. App. 2010). Whether ambiguity exists is a legal question for the court to decide. "In making this determination, words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible." *Id.* (quoting *Lynn v. Lynn*, 689 S.E.2d 198, 204–05 (N.C. Ct. App. 2010)). If the Court does not conclude that Article 13 unambiguously requires fee-owner consent, then alternatively the interchangeable or inconsistent use of the terms "lease" and "sublease" renders the Ground Lease ambiguous and extrinsic evidence may be used to determine its meaning.

When NAP was negotiating the Third Amendment, it prepared a memo to Kmart advising that any lease amendment "should recognize that the current leasehold interest of Kmart's Landlord [NAP] expires on January 31, 2019 and that no representation is made that the terms of either its lease with Asheville K-M Associates [the Sandwich Lease] or the lease between Asheville K-M Associates and the fee owners [the Ground Lease] will be extended beyond such date." Bruce Declaration ¶¶ 36, 37, Ex. 22. As the memo shows, NAP understood that any extension of the Kmart Lease necessarily depended on whether the Ground Lease and, in turn, the Sandwich Lease were renewed. More than that, the Third Amendment bifurcated the five-year renewal so that "Option 2.1" would end when the Ground Lease was set to expire on January 31, 2019 and, if Asheville K-M renewed the Ground Lease, then Kmart could exercise "Option 2.2," to extend for three more years. *See* Levander Declr. Ex. S ¶¶ 3–4.

Further, Kmart admitted that Fee Owner Consent was required for long term leases when it attempted to obtain Fee Owners' consent to a further sublease of a portion of the Shopping

Center. Specifically, Kmart sought Fee Owners' permission to execute a Ground Sublease with a third party to build a Golden Corral restaurant on the Shopping Center. *See* Bruce Declr. ¶¶ 40–41. Kmart's admission consisted both of the very fact that it sought permission and of the description of its leasehold interest as recited in documents that it either prepared or approved. For example, the proposed Non-Disturbance, Consent and Attornment Agreement, the terms of which Kmart approved, describe the Kmart Lease as a "sublease" from the Samuels as successor to NAP. *See id.* Ex. 25. Further, the draft Ground Sublease, which was prepared by Kmart, recites as follows: "Pursuant to the terms of that certain Sublease, dated December 18, 1964, by and between Patton Avenue Development Corporation, a North Carolina corporation, succeeded in interest by Nineteenth Asheville Properties, a New York partnership ('Master Landlord') and Sublandlord, as successor in interest to S.S. Kresge Company (the 'Master Lease')".[20]  Therefore, even Kmart understood that the Fee Owners' approval to bind Fee Owners to a lease beyond the term of the Ground Lease was necessary, and that in 2013, Kmart's right of possession arose out of its contract with NAP and not out of any direct lease with the Fee Owners.

### C.    The Second Amendment was not authorized under the Sandwich Lease.

1.    *The Buyer has failed to provide any proof of NAP's interest in the Shopping Center in 1992, but at best NAP was a subtenant under the Sandwich Lease.*

The Buyer asserts, but beyond repeating recitals from the Kmart Amendments, never explains why NAP was authorized to execute the Second Amendment under the Ground Lease at a time when NAP was not the tenant under the Ground Lease. *See* Response ¶¶ 11-16.  The Buyer acknowledges that the Second Amendment was executed in March 1992. *See* Response ¶ 13. But in 1992, Asheville K-M was the tenant under the Ground Lease and sublandlord under the

---

[20] Fee Owners disagree with the assertions in the recitals that Kmart in any way "controlled" the Shopping Center, but the Ground Sublease language is significant here because of its admission that Kmart's only contract was with NAP and that it occupied the shopping center as a subtenant.

Sandwich Lease.  According to the public records, the Sandwich Lease tenants were Walter R. Samuels and Marilyn Joy Samuels, who obtained their interests through a series of assignments starting with NAC. *See* Bruce Declr. ¶¶ 21–22, 24.[21]

The recitals to Kmart Amendments are not sufficient to prove that NAP succeeded to fee owner's position as landlord under the Kmart Lease or had the authority to bind fee owners to a lease term beyond the Ground Lease. The recitals do not identify the documents pursuant to which NAP "succeeded" to the fee owner's interest. *See* Response ¶¶ 11-16.  Moreover, the fee owners were not parties to any of the documents containing recitals upon which the Buyer relies. NAP's interest in the Shopping Center in 1992 was, at best, that of a subtenant pursuant to the Sandwich Lease. NAP was required to comply with the terms of the Sandwich Lease if it sought to modify any existing leases (or subleases) or execute any new leases affecting the Shopping Center.

2.    *The Buyer has failed to prove that NAP complied with the Sandwich Lease in Executing the Second Amendment.*

NAP did not comply with the Sandwich Lease when executing the Second Amendment. Article 1.2 and Schedule 1.2(b) of the Sandwich Lease together define and describe the Kmart Lease as a "sublease." *See* Bruce Declr. Ex. 12 art. 1.2 & sched. 1.2(b). Article 7 gives the tenant under the Sandwich Lease the right to sublet portions of the Shopping Center subject to certain conditions. *See id.* art. 7. Article 7.2 of the Sandwich Lease states that, "[n]otwithstanding the foregoing the Tenant shall not modify, alter, amend or (except for non-payment or other default by a subtenant) terminate any sublease now or hereafter existing or any extension thereof without the prior written consent of the Landlord which shall not be unreasonably withheld." *Id.* art. 7.2. The Buyer has failed to produce any evidence that Asheville K-M consented to the Second

---

[21] The Buyer asserts (but again has not produced any documents proving) that NAP succeeded to the interests of NAC.

Amendment in writing.  Thus, even if Buyer's novel reading of the Ground Lease were correct, the Second Amendment is still ineffective to bind any party other than NAP.

> **D.      Kmart's right to possession was derived from an agreement with NAP and expired when the Ground and Sandwich Leases expired.**

Under North Carolina law, the existence of a sublease (or a sub-sublease) is dependent on the underlying lease (or leases). Therefore, the "well-established rule is that 'the rights of a sublessee are measured by the rights of his sublessor, [ ] and termination of the original lease terminates any dependent sublease.'" *See E. Town Mkt., L.P. v. 550 Foods, LLC,* No. COA15-46, 2015 WL 4448455, at * 7 (N.C. Ct. App. July 21, 2015) (quoting *Neal v. Craig Brown, Inc.*, 356 S.E.2d 912, 915 (N.C. Ct. App. 1987)). This rule applies notwithstanding the sublease's renewal or extension options. *Neal*, 356 S.E.2d at 915.  *See also Williams v. S. Bell Tel. & Tel. Co.*, 266 S.E.2d 700, 702 (N.C. App. 1980)(holding that a life tenant could not grant an easement that lasted beyond the term of her estate and stating in part "[i]t is settled law that a grantor cannot convey to his grantee an estate of greater dignity than the one he has.") *citing  Lovett v. Stone*, 239 N.C. 206, 79 S.E.2d 479 (1954).

As explained above, and as previously admitted by Kmart, Kmart's interest in the Shopping Center arises out of the Second Amendment, which was an agreement between Kmart and NAP. NAP's rights in the Shopping Center were derived from the Sandwich Lease with Asheville K-M. Asheville K-M's rights in the Shopping Center consist solely of its tenancy under the Ground Lease. It is undisputed that both the Ground Lease and the Sandwich Lease expired on January 31, 2019 and were not renewed.  Thus, any interest of Kmart in the Shopping Center ended on January 31, 2019.  It currently maintains possession and control of the Kmart Store as a holdover month-to-month tenant over the objections of the Fee Owners. *See* Bruce Declr. ¶¶ 44–47.

### E.    Buyer has failed to prove that NAP was acting as an agent of the Fee Owners.

North Carolina law defines agency as "the relationship that arises from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. . . . The presence of a principal-agent relationship is a question of fact for the jury when the evidence tends to prove it; a question of law for the trial court if the facts lead to only one conclusion." *Outer Banks Contractors, Inc. v. Daniels & Daniels Const., Inc.*, 433 S.E.2d 759, 762 (N.C. Ct. App. 1993) (citations and internal quotation marks omitted).

In North Carolina, "'the element of control is the primary indicator of an agency relationship.' Therefore, when an entity cannot exert control or dominance over another's performance of a designated task, that entity cannot be characterized as a principal." *DKH Corp. v. Rankin-Patterson Oil Co.*, 506 S.E.2d 256, 259–60 (N.C. Ct. App. 1998) (citations omitted). The Buyer has produced no evidence that the Fee Owners or their predecessors-in-title exercised control over Asheville K-M or NAP.

There also is no evidence that the Fee Owners consented to NAP acting on their behalf.[22] *See Munn v. Haymount Rehab. & Nursing Ctr., Inc.*, 704 S.E.2d 290, 295 (N.C. Ct. App. 2010) ("[I]n establishing the existence of an actual agency relationship, the evidence must show that a principal actually consents to an agent acting on its behalf." (citation and internal quotation marks omitted)). The Buyer bears the burden of proving agency, and it has failed to do so.

---

[22] Section 13.07 of the Ground Lease does not grant NAP the authority to act on behalf of the Fee Owners because, among other reasons, NAP is not a party to the Ground Lease by assignment or otherwise. Likewise, the Buyer fails to explain how section 13.08 is relevant to its agency argument. That section provides that "Tenant" assigns to "Landlord" the tenant's interest in leases as additional security. *See* Bruce Declr. Ex. 5. And that section is only triggered if the tenant defaults. *See id.*

**F.    Buyer has failed to prove that NAP had apparent authority to bind the Fee Owners.**

The Buyer has produced no proof of apparent agency. "Apparent authority is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses." *Pet, Inc. v. University of North Carolina*, 323 S.E.2d 745, 750 (N.C. Ct. App. 1984) (citation, quotation marks, and ellipses omitted). There is no evidence that the Fee Owners represented to Kmart that NAP had authority to extend the Kmart Lease beyond the term of the Ground Lease or was the Fee Owners' agent. *See Green v. Freeman*, 756 S.E.2d 368, 374 (N.C. Ct. App. 2014) (no apparent authority where plaintiffs failed to introduce evidence that the alleged principal "ever made any representations to them, let alone any representations that [the alleged agent] had authority to act on her behalf"); *see also Dailey v. Integon General Ins. Corp.*, 331 S.E.2d 148, 156 (N.C. Ct. App. 1985) (noting that "the general rule is that neither the fact nor the extent of an agency relationship can be proved by the out-of-court statements of an alleged agent.").

Indeed, Kmart has not produced any evidence of any actions or statements by the Fee Owners or their predecessors-in-title at all. *See Munn*, 704 S.E.2d at 296 ("The scope of an agent's apparent authority is determined not by the agent's own representations but by the manifestations of authority which the principal accords to him." (citation and quotation marks omitted)). The Buyer cites the whereas clauses of the Second and Third Amendments to support its argument, but those are irrelevant because they came from the alleged agent and not the alleged principal, the Fee Owners. The Ground Lease is also irrelevant because neither Kmart nor NAP were parties to the Ground Lease.

### G.    Buyer has failed to prove equitable estoppel.

Buyer's equitable estoppel argument fails because it has not established any of the essential elements. Under North Carolina law, the Buyer must prove "[c]onduct which amounts to a false representation or concealment of material facts or at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert. . . ." *C & H P'ship v. Shaw Indus. Grp., Inc.*, No. 1:04CV00323, 2006 WL 1229001, at *4 (M.D.N.C. May 4, 2006) (quoting *In re Covington's Will*, 114 S.E.2d 257, 260 (N.C. 1960)) (emphasis added). In addition, the Buyer must prove the "intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon." *Id.* (quoting *In re Covington's Will*, 114 S.E.2d at 260) (emphasis added). Finally, the Buyer must show that "its position was changed prejudicially" in reasonable reliance on the Fee Owners' alleged conduct. *O & M Indus. v. Smith Eng'g Co.*, No. COA03–432–2, 2006 WL 2346390, at *3–5 (N.C. Ct. App. 2006).

The Buyer fails to point to any statements or conduct on the part of the Fee Owners of the Shopping Center. As explained below, the Fee Owners did not receive any increased rent on account of the agreement between NAP and Kmart. There is no evidence that the Fee Owners encouraged Kmart to expand their building. Moreover, to the extent that the Buyer points to the expansion of the building as a benefit to Fee Owners, Kmart enjoyed the benefit of the expanded building for some 27 years -- through the end of Ground Lease.  Kmart could well have determined that expanding the store premises for 27 years was worth the expenditure, and Buyer has not provided any evidence that the now aged expansion adds value to the Shopping Center.

Finally, the Buyer cannot prove that Kmart reasonably relied on any recitation contained in the Second Amendment or any representation by NAP that it could bind the Fee Owners beyond

the term of the Sandwich or Ground Lease. A title search of the documents recorded in the Registry in 1992 would have revealed to Kmart that NAP's interest in the Shopping Center was either nonexistent or limited to that of a subtenant.

**H.    The Buyer has not produced evidence demonstrating that the Fee Owners or their predecessors in title ratified the Second and Third Amendments.**

The Buyer's argument that the Fee Owners or their predecessors in title ratified the Second and Third Amendments is unavailing. The Buyer has the burden to prove:

> "(1) that at the time of the act relied upon, the principal had full knowledge of all material facts relative to the unauthorized transaction, and (2) that the principal had signified his assent or his intent to ratify by word or by conduct which was inconsistent with an intent not to ratify."

*IO Moonwalkers, Inc. v. Banc of Am. Merch. Servs., LLC*, 814 S.E.2d 583, 586 (N.C. Ct. App.) (quoting *Carolina Equip. & Parts Co. v. Anders*, 144 S.E.2d 252, 258 (N.C. 1965)); *Barbee v. Johnson*, 665 S.E.2d 92, 98 (2008) (same). The Buyer has failed to satisfy either of these elements.

First, there is no evidence in the record demonstrating that the prior fee owners of the Shopping Center knew anything about the Second Amendment, let alone "all material facts relative to the unauthorized transaction." *See, e.g., IO Moonwalkers, Inc.*, 814 S.E.2d at 586. And certainly the current Fee Owners were not privy to that information because only recently did they see copies of the **unrecorded** Amendments for the first time. *See* Bruce Declr. ¶ 35.

Second, the Buyer has not identified anything that the past or present Fee Owners said that shows that they assented to or intended to ratify the Amendments. Nor has the Buyer described conduct by those parties that was inconsistent with an intent not to ratify the Amendments. Indeed, shortly after learning about the Amendments in 2017, the Fee Owners informed Kmart that they were rejecting them as unauthorized. *See id.* ¶¶ 45 & 46, Exs. 29 & 30. That behavior is entirely consistent with an intent not to ratify the Amendments.

The Buyer automatically concludes—again without citing any evidence (other than the Amendments themselves)—that the Fee Owners benefited from the Second and Third Amendments. But the alleged increase in Kmart's rent did not affect the Fee Owners because, notwithstanding the Second Amendment, the monthly base rent required and received under the Ground Lease never changed. *See id.* ¶ 38, Ex. 23.  So any benefit to the Fee Owners was illusory.

Likewise, there is no evidence that the Fee Owners benefited from the expansion of Kmart Store 4112 or the requirement in the Second Amendment that Kmart pay certain real estate taxes. With respect to the latter, the Ground Lease was a true net lease, so if Kmart was not responsible for paying these taxes, then Asheville K-M would have been.  The fact that NAP and Kmart decided among themselves which would bear this cost had no impact on any fee owner.

Finally, the mere fact of Kmart's continued occupancy does not prove any of the Buyer's theories. Kmart's continued occupancy is entirely consistent with a sublease with the Sandwich Lease Tenant and does not establish that the fee owners of the Shopping Center assigned away their rights to control the Shopping Center following the expiration of the Ground Lease. Because the Buyer has not carried its burden to establish the foregoing elements, the Buyer's ratification argument must fail.

III.    **Alternatively, the Court should condition any assumption and assignment on the Buyer delivering a guarantee of performance acceptable to the Fee Owners and preserve all "Restrictive Covenants" in the Kmart Lease.**

In the Buyer's response, the Buyer explains that: Transform MidCo LLC offered objecting landlords a guarantee as further adequate assurance of the assignee's future performance, and that it does not intend to modify or remove Restrictive Covenants from the Kmart Lease. *See* Response ¶¶ 70, 74.[23] For the avoidance of doubt, however, and notwithstanding anything in this Objection,

---

[23] With respect to the Fee Owners' objection to the removal of Restrictive Covenants, the Buyer states as follows: "[T]he Bruce Trusts object to the assignment of the Kmart Lease free and clear of restrictive covenants, without

the Buyer should provide the Fee Owners and permit them to comment on a guarantee like the ones that the Buyer provided to other landlords. Moreover, if the Buyer is successful, the assumption and assignment order should provide that any Restrictive Covenants in the Kmart Lease remain binding on the assignee and its successors and assigns.

## CONCLUSION

For the reasons stated herein, the Fee Owners respectfully ask that the Court enter an order (i) denying the request to assume and assign the expired Kmart Lease or, in the alternative, conditioning assumption and assignment on the Buyer providing a guaranty of performance that shall be subject to the Fee Owners' review and comment, and providing that Restrictive Covenants in the Kmart Lease, if any, shall remain in full force and effect; and (ii) granting such other and further relief as this Court deems just and proper.

Dated:  May 30, 2019
      New York, New York

TROUTMAN SANDERS LLP

By: */s/ Brett D. Goodman*

    Brett D. Goodman
    Alissa K. Piccione
    875 Third Avenue
    New York, NY 10022
    Telephone: (212) 704-6000
    Brett.Goodman@troutman.com
    Alissa.Piccione@troutman.com

    Amy Pritchard Williams *(pro hac vice pending)*
    301 S. College Street, Suite 3400
    Charlotte, NC  28202
    Telephone: 704.998.4102
    amy.williams@troutman.com

    *Attorneys for Fee Owners*

---

referring to any specific restrictive covenants in the Lease they seek to retain. Objectors point to no specific restrictive covenants in the Kmart Lease to which they object. . . ." Response ¶ 74. Yet, by Order of this Court, the Buyer was required to identify which Restrictive Covenants it sought to assign free and clear of but never did. *See Order (I) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases and (II) Granting Related Relief* ¶ 26 [Doc. No. 3008].

# APPENDIX 1



Ground
Subtenant

Ground
Tenant

Fee
Owner

Kmart

[1] Predecessors in fee simple title to Bruce Trusts
[2] Subject to the term of Ground Lease and Sandwich Lease