**KERR LLP**
William B. Kerr, Esq.
40 Wall Street, 29th Floor
New York, New York 10005
Tel: (212) 423-0305
Fax: (212) 423-0304
wkerr@KerrLLP.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

-------------------------------------------------------------x

**COMM 2006-C8 SHAW AVENUE CLOVIS, LLC'S OBJECTION TO NOTICE OF
ASSUMPTION AND ASSIGNMENT OF ADDITIONAL DESIGNATABLE LEASES
AND OBJECTION TO PROPOSED CURE AMOUNT**

COMM 2006-C8 SHAW AVENUE CLOVIS, LLC ("**Landlord**"), a Delaware limited

liability company, by and through its undersigned counsel, hereby objects to the Notice of

Assumption and Assignment of Additional Designatable Leases [Docket No. 3298] filed by

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Transform Holdco LLC on April 19, 2019 (the "**Notice**"), inclusive of the cure amount listed therein for the subject lease.  In support of its objection, the Landlord states as follows:

1.      The Landlord is the ground lessee of real property located at Sierra Vista Mall, 1050 Shaw Avenue, Clovis, CA 93612 (the "**Premises**").  Landlord and Debtor Sears, Roebuck and Co. ("**Tenant**") are parties to that certain sublease dated October 15, 1998, as amended (the "**Lease**"), wherein Tenant leases space at the Premises (Sears Store #1098).

2.      The Lease is a lease "of real property in a shopping center" for purposes of 11 U.S.C. §365(b)(3).

3.      The Lease is listed in the Notice as an Additional Designatable Lease with the proposed assignee identified as Transform Operating Stores LLC.  The proposed cure amount for the Lease is listed as $0.00.

4.      The parties have endeavored to negotiate an amicable resolution of the assumption and assignment of the Lease.  On May 13, 2019, the Court approved a stipulation extending Landlord's deadline to object to the assumption and assignment of the Lease through May 24, 2019 [Docket No. 3811].  The parties have mutually agreed to extend the objection deadline further as they attempt to resolve this matter.

5.      The parties have agreed to language regarding the assignee's ongoing obligations to abide by restrictive covenants relating to the leased Premises.  Further, Landlord does not take issue with the assignee's adequate assurance of future performance under the Lease.  The sole remaining issue is the cure amount.

6.      Attached hereto are true and correct copies of the lease ledger and Lease.  The lease ledger shows that the current amount due and owing under the Lease is $159,416.56.  As reflected on the lease ledger, a portion of the amount due and owing relates to a true-up of rent

owed based on an adjustment of percentage rent during the Lease term.  The balance of the amount due and owing relates to Tenant's failure to pay any rent in May 2019 and full rent in April and June 2019.   On February 5, 2019, Landlord provided Tenant with a detailed explanation of the true-up calculation.  Due to the confidential nature of the percentage rent calculation, Landlord has not attached the February 5, 2019 correspondence hereto.

7.      Accordingly, Landlord hereby objects to the Notice and the proposed assignment of the Lease until such time as Tenant and/or the assignee cures all amounts due and owing under the Lease.

## CONCLUSION

**WHEREFORE**, Landlord respectfully requests that the Court deny the proposed assumption and assignment of the Lease until such time as he Tenant and/or assignee satisfies the cure amount set forth herein plus Landlord's reasonable attorney's fees in connection with the Lease assignment and grant Landlord such other and further relief as it deems just and appropriate.

Dated: June 6, 2019

/s/ William B. Kerr
William B. Kerr, Esq.
KERR LLP
40 Wall Street, 29th Floor
New York, New York 10005
Tel: (212) 423-0305
Fax: (212) 423-0304
wkerr@KerrLLP.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2019, a copy of the foregoing was served electronically or via First Class Mail (via First Class Mail without an annexed copy of the Lease[1]), postage prepaid upon all those identified on the below Service List as required by the Court's Amended Order Implementing Certain Notice and Case Management Procedures entered on November 1, 2018 (Docket No. 405) and the Supplement Notice of Assumption and Assignment and the service requirements established thereby.

## SERVICE LIST

## VIA FIRST CLASS MAIL, POSTAGE PREPAID OR E-MAIL

The Chambers of the Honorable Judge Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Room 248, White Plains, New York 10601

Debtors, c/o Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Rob Riecker (rob.riecker@searshc.com)
Luke Valentino (luke.valentino@searshc.com)
Mohsin Meghji (mmeghji@miiipartners.com)

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Ray C. Schrock, P.C. (ray.schrock@weil.com)
Jacqueline Marcus, Esq. (jacqueline.marcus@weil.com)
Garrett A. Fail, Esq. (garrett.fail@weil.com)
Sunny Singh, Esq. (sunny.singh@weil.com)

*Counsel to the Debtors*

The Office of the United States Trustee for Region 2
201 Varick Street, Suite 1006
New York, New York 10014
Attn: Paul Schwartzberg, Esq.

---

[1] The annexed Lease was not served in hard copy but will be provided upon request.

Lazard Frères & Co., LLC
30 Rockefeller Plaza
New York, New York 10112
Brandon Aebersold and Levi Quaintance (project.blue.rx@lazard.com)

*Debtors' Investment Banker*

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square, New York, NY 10036
Attn: Paul D. Leake, Esq. (Paul.Leake@skadden.com)
Shana A. Elberg, Esq. (Shana.Elberg@skadden.com)
George R. Howard, Esq. (George.Howard@skadden.com)

*Counsel to Bank of America, N.A.*

Davis Polk & Wardell
450 Lexington Avenue
New York, New York 10017
Attn: Marshall S. Huebner, Esq. and Eli J. Vonnegut, Esq;

*Counsel for Citibank, N.A.*

Cleary, Gottlieb, Steen & Hamilton One
Liberty Plaza, New York, NY, 10006
Sean A. O'Neal, Esq. (soneal@cgsh.com)
Andrew Weaver (aweaver@cgsh.com)
Rahul Mukhi (rmukhi@cgsh.com)
Jennifer Kennedy Park (jkpark@cgsh.com)

*Counsel to the Buyer and its affiliates*

Choate, Hall and Stewart LLP
Two International Place
Boston, MA 02110
Kevin J. Simard (ksimard@choate.com)
Jonathan D. Marshall (jmarshall@choate.com)

*Counsel to Wells Fargo Bank, National Association*

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park, New York, NY 10036
Philip C. Dublin, Esq. (pdublin@akingump.com)
Ira Dizengoff, Esq. (idizengoff@akingump.com)
Abid Qureshi (aqureshi@akingump.com)
Sara Lynne Brauner, Esq. (sbrauner@akingump.com)

*Counsel to the Official Committee of Unsecured Creditors*

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attn: Eric R. Wilson, Esq., Benjamin D. Feder, Esq. and T. Charlie Liu, Esq.

*Counsel for Computershare Trust Company, N.A.*

Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Attn: Edward M. Fox, Esq.

*Counsel for Wilmington Trust, National Association*

Carter Ledyard & Milburn LLP
2 Wall Street, New York, New York 10015
Attn: James Gadsden, Esq.

*Counsel for The Bank of New York Mellon Trust Company*

# Lease Ledger

|  | Lease Information | |
|---|---|---|
|  | **Date** | 05/23/2019 |
|  | **Lease Id** | t0001444 |
|  | **Property** | 731c |
|  | **Location** | SIERRA VISTA MALL |
|  | **Assigned Space(s)** | 1140 |
|  | **Customer** |  |
|  | **ICS Code** |  |
| **Sears 731-1140** | **Lease Type** | Retail Net |
| **Sears** | **Sales Category** | Department Store |
| **1140 Shaw Ave** |  |  |
| **Clovis , CA , 93612** |  |  |
|  | **Lease Area** | 116,642(NGLA) |
|  | **Monthly Rent** | 30562.83 |
|  | **Office Phone** |  |
|  | **Fax  No** |  |
|  | **E-Mail** |  |

| Date | Description | Charges | Payments | Balance |
|---|---|---:|---:|---:|
|  | Balance Forward |  |  | 0.51 |
| 01/01/18 | Common Area Maintenance (01/2018) | 5,832.10 |  | 5,832.61 |
| 01/01/18 | Marketing (01/2018) | 166.67 |  | 5,999.28 |
| 01/01/18 | Monthly Rent (01/2018) | 34,675.62 |  | 40,674.90 |
| 01/01/18 | Reverse Monthly Rent (01/2018) | (34,675.62) |  | 5,999.28 |
| 01/01/18 | Monthly Rent (01/2018) | 30,562.83 |  | 36,562.11 |
| 01/03/18 | Chk# 160592 - January 2018 payment |  | 40,674.34 | (4,112.23) |
| 02/01/18 | Common Area Maintenance (02/2018) | 5,832.10 |  | 1,719.87 |
| 02/01/18 | Marketing (02/2018) | 166.67 |  | 1,886.54 |
| 02/01/18 | Monthly Rent (02/2018) | 34,675.62 |  | 36,562.16 |
| 02/01/18 | Reverse Monthly Rent (02/2018) | (34,675.62) |  | 1,886.54 |
| 02/01/18 | Monthly Rent (02/2018) | 30,562.83 |  | 32,449.37 |
| 02/01/18 | 2017 Rent Reconciliation | (49,353.44) |  | (16,904.07) |
| 03/01/18 | Common Area Maintenance (03/2018) | 5,832.10 |  | (11,071.97) |
| 03/01/18 | Marketing (03/2018) | 166.67 |  | (10,905.30) |
| 03/01/18 | Monthly Rent (03/2018) | 34,675.62 |  | 23,770.32 |
| 03/01/18 | Reverse Monthly Rent (03/2018) | (34,675.62) |  | (10,905.30) |
| 03/01/18 | Monthly Rent (03/2018) | 30,562.83 |  | 19,657.53 |
| 03/06/18 | Chk# 163695 - March payment |  | 19,656.87 | 0.66 |
| 04/01/18 | Common Area Maintenance (04/2018) | 5,832.10 |  | 5,832.76 |
| 04/01/18 | Marketing (04/2018) | 166.67 |  | 5,999.43 |
| 04/01/18 | Monthly Rent (04/2018) | 30,562.83 |  | 36,562.26 |
| 04/03/18 | Chk# 165182 - April 2018 payment |  | 36,561.55 | 0.71 |
| 05/01/18 | Common Area Maintenance (05/2018) | 5,832.10 |  | 5,832.81 |
| 05/01/18 | Marketing (05/2018) | 166.67 |  | 5,999.48 |
| 05/01/18 | Monthly Rent (05/2018) | 30,562.83 |  | 36,562.31 |
| 05/04/18 | Chk# 166750 - May 2018 |  | 36,561.55 | 0.76 |
| 06/01/18 | Common Area Maintenance (06/2018) | 5,832.10 |  | 5,832.86 |
| 06/01/18 | Marketing (06/2018) | 166.67 |  | 5,999.53 |
| 06/01/18 | Monthly Rent (06/2018) | 30,562.83 |  | 36,562.36 |
| 06/05/18 | Chk# 168340 - June 2018 rent |  | 36,561.55 | 0.81 |
| 06/26/18 | Misc rent adj (06/2018) | (0.81) |  | 0.00 |
| 07/01/18 | Common Area Maintenance (07/2018) | 5,832.10 |  | 5,832.10 |

**Lease Ledger**

| Date | Description | Amount | Payment | Balance |
|---|---|---|---|---|
| 07/01/18 | Marketing (07/2018) | 166.67 | | 5,998.77 |
| 07/01/18 | Monthly Rent (07/2018) | 30,562.83 | | 36,561.60 |
| 07/03/18 | July CAM adj. | (0.05) | | 36,561.55 |
| 07/03/18 | Chk# 169819 - July 2018 payment | | 36,561.55 | 0.00 |
| 08/01/18 | Common Area Maintenance (08/2018) | 5,832.10 | | 5,832.10 |
| 08/01/18 | Marketing (08/2018) | 166.67 | | 5,998.77 |
| 08/01/18 | Monthly Rent (08/2018) | 30,562.83 | | 36,561.60 |
| 08/06/18 | Cam Adj 8/18 | (0.05) | | 36,561.55 |
| 08/06/18 | Chk# 171372 - august 2018 payment | | 36,561.55 | 0.00 |
| 09/01/18 | Common Area Maintenance (09/2018) | 5,832.10 | | 5,832.10 |
| 09/01/18 | Marketing (09/2018) | 166.67 | | 5,998.77 |
| 09/01/18 | Monthly Rent (09/2018) | 30,562.83 | | 36,561.60 |
| 09/05/18 | Chk# 172777 - September 2018 payment | | 36,561.55 | 0.05 |
| 09/06/18 | 9/18CAM Correction | (0.05) | | 0.00 |
| 10/01/18 | Common Area Maintenance (10/2018) | 5,832.10 | | 5,832.10 |
| 10/01/18 | Marketing (10/2018) | 166.67 | | 5,998.77 |
| 10/01/18 | Monthly Rent (10/2018) | 30,562.83 | | 36,561.60 |
| 10/05/18 | Chk# 174121 - October 2018 payment | | 36,561.55 | 0.05 |
| 11/01/18 | Common Area Maintenance (11/2018) | 5,832.10 | | 5,832.15 |
| 11/01/18 | Marketing (11/2018) | 166.67 | | 5,998.82 |
| 11/01/18 | Monthly Rent (11/2018) | 30,562.83 | | 36,561.65 |
| 11/06/18 | Chk# 180159 - November 2018 payment | | 36,561.55 | 0.10 |
| 11/12/18 | Adjust CAM billing Oct/Nov 18 | (0.10) | | 0.00 |
| 12/01/18 | Common Area Maintenance (12/2018) | 5,832.10 | | 5,832.10 |
| 12/01/18 | Marketing (12/2018) | 166.67 | | 5,998.77 |
| 12/01/18 | Monthly Rent (12/2018) | 30,562.83 | | 36,561.60 |
| 12/10/18 | Monthly CAM Adj | (0.05) | | 36,561.55 |
| 12/10/18 | Chk# 181150 - December 2018 payment | | 36,561.55 | 0.00 |
| 01/01/19 | Common Area Maintenance (01/2019) | 5,832.10 | | 5,832.10 |
| 01/01/19 | Marketing (01/2019) | 166.67 | | 5,998.77 |
| 01/01/19 | Monthly Rent (01/2019) | 30,562.83 | | 36,561.60 |
| 01/01/19 | Reverse Monthly Rent (01/2019) | (30,562.83) | | 5,998.77 |
| 01/01/19 | Monthly Rent (01/2019) | 30,051.87 | | 36,050.64 |
| 01/08/19 | 1/19 CAM Adj. | (0.05) | | 36,050.59 |
| 01/08/19 | Chk# 182168 - January 2019 payment | | 36,561.55 | (510.96) |
| 02/01/19 | Common Area Maintenance (02/2019) | 5,832.10 | | 5,321.14 |
| 02/01/19 | Marketing (02/2019) | 166.67 | | 5,487.81 |
| 02/01/19 | Monthly Rent (02/2019) | 30,562.83 | | 36,050.64 |
| 02/01/19 | Reverse Monthly Rent (02/2019) | (30,562.83) | | 5,487.81 |
| 02/01/19 | Monthly Rent (02/2019) | 30,051.87 | | 35,539.68 |
| 02/05/19 | Chk# 183080 - February 2019 payment | | 36,561.55 | (1,021.87) |
| 2/5/2019 | 2015 % In lieu True Up Rent | 41,123.15 | | 40,101.28 |
| 2/5/2019 | 2016 % In lieu True Up Rent | 39,946.31 | | 80,047.59 |
| 2/5/2019 | 2017 % In lieu True Up Rent | 35,208.38 | | 115,255.97 |
| 2/5/2019 | 2018 % In lieu True Up Rent | | 6,131.82 | 109,124.15 |
| 03/01/19 | Common Area Maintenance (03/2019) | 5,832.10 | | 114,956.25 |
| 03/01/19 | Marketing (03/2019) | 166.67 | | 115,122.92 |
| 03/01/19 | Monthly Rent (03/2019) | 30,562.83 | | 145,685.75 |
| 03/01/19 | Reverse Monthly Rent (03/2019) | (30,562.83) | | 115,122.92 |
| 03/01/19 | Monthly Rent (03/2019) | 30,051.87 | | 145,174.79 |

## Lease Ledger

| 03/05/19 | Chk# 183932 - March 2019 payment | | 36,050.59 | 109,124.20 |
|---|---|---|---|---|
| 04/01/19 | Common Area Maintenance (04/2019) | 5,832.10 | | 114,956.30 |
| 04/01/19 | Marketing (04/2019) | 166.67 | | 115,122.97 |
| 04/01/19 | Monthly Rent (04/2019) | 30,562.83 | | 145,685.80 |
| 04/01/19 | Reverse Monthly Rent (04/2019) | (30,562.83) | | 115,122.97 |
| 04/01/19 | Monthly Rent (04/2019) | 30,051.87 | | 145,174.84 |
| 04/08/19 | Chk# 184727 - aPRIL 2019 PAYMENT | | 24,499.46 | 120,675.38 |
| 05/01/19 | Common Area Maintenance (05/2019) | 5,832.10 | | 126,507.48 |
| 05/01/19 | Marketing (05/2019) | 166.67 | | 126,674.15 |
| 05/01/19 | Monthly Rent (05/2019) | 30,562.83 | | 157,236.98 |
| 06/01/19 | Common Area Maintenance (06/2019) | 5,832.10 | | 163,069.08 |
| 06/01/19 | Marketing (06/2019) | 166.67 | | 163,235.75 |
| 06/01/19 | Monthly Rent (06/2019) | 30,562.83 | | 193,798.58 |
| 06/03/19 | Chk# 186127 - Partial June rent | | 34,382.02 | 159,416.56 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 2,179.58 | 36,561.60 | 11,551.18 | 109,124.20 | 159,416.56 |

## TENANT CHANGE NOTICE

Date: 10/25/99              Submitted by:              Barbara Sindlinger

Faxed To Database on:    10/25/99

Mall Name:    Sierra Vista    Mall Number:    552
              Mall

Tenant's Name: Sears          MRI Space #:    Not assigned yet
               Department
               Store

## STATUS  CHANGE

### Opening | Closing

Date:        10/25/99     | Date:

Type:        New          | Type:

## ADDRESS CHANGES

*ATTACH THE TENANT'S WRITTEN NOTICE TO THIS FORM*

○ Billing Address ○ Legal Address  ○ Both

New Address:

Comments:

**SEARS**

Douglas W. Wa...
Vice President Real Estate – 824RE
Sears, Roebuck and Co.
3333 Beverly Road, B2-154B
Hoffman Estates, Illinois 60179
Facsimile:  (847) 286-3803
dwalrod@sears.com

**RECEIVED**

MAY 0 ᴏ 2003

SIERRA VISTA MALL

April 15, 2003

**VIA CERTIFIED MAIL**

**RETURN RECEIPT REQUESTED**

LANDVALUE MANAGEMENT LLC
1050 SHAW AVENUE SUITE 1075
CLOVIS,CA 93612

Re:    1098-1-A-Retail Store
       1140 SHAW AVE SIERRA VISTA MALL,CLOVIS,California

To Whom it May Concern:

        Pursuant to the terms of the governing document, you are hereby notified that effective immediately the following notice addresses are applicable:

Notices:
(Including Change of          Sears, Roebuck and Co.
Ownership or Change of        3333 Beverly Road
Address)                      Department 824RE
                              Hoffman Estates, Illinois 60179
                              Attn:  Vice President - Real Estate


Notices                       Sears, Roebuck and Co.
Copy to:                      3333 Beverly Road
                              Department 766X
                              Hoffman Estates, Illinois 60179
                              Attn:  Vice President - Law, Real Estate


April 15, 2003

Page 2 of 2

For Real                 Sears, Roebuck and Co.
Estate Tax               Real Estate Taxes
Payments:                Department 768TAX
                         3333 Beverly Road
                         Hoffman Estates, Illinois 60179


For Rent and             Sears, Roebuck and Co.
all Other Real           Dallas Accounting Center
Estate Payments:         Real Estate Expense Department
                         4849 Greenville Avenue
                         Suite 1000
                         Dallas, TX 75206


     Please update your records to reflect these new addresses.  **Also, for quick reference, please
include the unit number referenced above in all correspondence and invoices.**

     Very truly yours,

     SEARS, ROEBUCK AND CO.

     Douglas W. Walrod
     Vice President – Real Estate


cc:     Real Estate File

## LEASE SUPPLEMENT

   THIS LEASE SUPPLEMENT ("Supplement") is made on December _____, 1999, between **CEE RETAIL REALTY, INC.**, a California corporation ("Landlord") and **SEARS, ROEBUCK AND CO.**, a New York corporation ("Tenant").

   **WHEREAS**, Landlord and Tenant entered into a Sublease dated October 15, 1998, (the "Sublease"), for property commonly known as Sierra Vista Mall, located in the City of Clovis, County of Fresno, State of California, more specifically described in the Lease; and

   **WHEREAS**, Section IV. of the Lease provides that Landlord and Tenant shall specify the Commencement Date, the Delivery Date and the final floor area of Tenant's Store Building by supplemental agreement; and

   **WHEREAS**, Subsection IV.A. of the Lease provides that the Commencement Date shall be the date that Tenant opens its store in Tenant's Store Building for business to the public; and

   **WHEREAS**, Subsection VII.B. of the Lease provides that Tenant shall commence payment of Estimated Rent, as defined in the Lease, as of the Commencement Date based upon Tenant's estimated net sales for the Demised Premises.

   **NOW, THEREFORE**, Landlord and Tenant agree to supplement the Lease as follows:

1.    Tenant accepted the Demised Premises on June 23, 1999, which is the Delivery Date under the lease.

2.    Tenant opened for business in Tenant's Store Building on October 25, 1999, which is the Commencement Date under the Lease.

3.    The Term of the Lease is October 25, 1999, through October 31, 2014.

4.    The Floor Area of Tenant's Store Building is 116,642 square feet.

5.    Any notice addresses provided for in Section XXX of the Lease are hereby deleted in their entirety and replaced with the following:

Notices shall be addressed as follows:

   **TENANT:**                **SEARS, ROEBUCK AND CO.**
                              3333 Beverly Road
                              Hoffman Estates, Illinois 60179
                              Attn:   Vice President, Real Estate
                                      Department 824RE

1

S:\NKAROUZ\CALIFORN\LEASUP\1098.doc

COPY TO:                              **SEARS, ROEBUCK AND CO.**
                                      3333 Beverly Road
                                      Hoffman Estates, Illinois 60179
                                      Attn:    Assistant General Counsel, Real Estate
                                               Department 766X

**FOR REAL ESTATE**                   **SEARS, ROEBUCK AND CO.**
**TAX INVOICES:**                     Real Estate Taxes
                                      Department 768TAX
                                      3333 Beverly Road
                                      Hoffman Estates, Illinois 60179

**FOR RENT AND**                      **SEARS, ROEBUCK AND CO.**
**OTHER REAL ESTATE**                 Real Estate Payments
**INVOICES:**                         Department 824RE
                                      3333 Beverly Road
                                      Hoffman Estates, Illinois 60179

**WITH A COPY TO:**                   Sears Store Manager
                                      **SEARS, ROEBUCK AND CO.**

**NOTICES OTHER THAN OF**
**LANDLORD'S DEFAULT:**

**LANDLORD:**                         **CEE RETAIL REALTY, INC.**
                                      C/o Citicorp Real Estate, Inc.
                                      787 West 5th Street, 27th Floor
                                      Los Angeles, California 90071
                                      Attn:    Senior Asset Manager
                                               Sierra Vista Mall

**WITH COPIES TO:**                   **GENERAL GROWTH MANAGEMENT OF**
                                      **CALIFORNIA, INC.**
  21650 Oxnard Street                 ~~400 South Highway 169, Suite 800~~
    Ste 1500                          ~~Minneapolis, Minnesota 55426~~
  Woodland Hills, CA                  Attn:    Senior Vice President
      91367
                                      **GENERAL GROWTH MANAGEMENT, INC.**
                                      110 N. Wacker Drive
                                      Chicago, Illinois 60606
                                      Attn:    Vice President Department Stores

2

| | |
|---|---|
| **WITH COPIES TO:** | **SIERRA VISTA MALL** |
| | 1050 Shaw Avenue, Suite 1075 |
| | Clovis, California 93612 |
| | Attn:    General Manager |
| | |
| **NOTICES OF LANDLORD'S** | **GENERAL GROWTH MANAGEMENT, INC.** |
| **DEFAULT OR NOTICES** | ~~400 South Highway 169~~    110 N. Wacker Drive |
| **COMMENCING OR** | ~~Suite 800~~    Chicago, IL 60606 |
| **RELATING** | ~~Minneapolis, Minnesota 55426~~ |
| **TO ANY ACTION, SUIT OR** | Attn:    General Counsel |
| **PROCEEDING AGAINST** | |
| **LANDLORD:** | |
| | |
| **WITH COPIES TO:** | **CEE RETAIL REALTY, INC.** |
| | C/o Citicorp Real Estate, Inc. |
| | 787 West 5th Street, 27th Floor |
| | Los Angeles, California 90071 |
| | Attn:    Senior Asset Manager |
| | Sierra Vista Mall |
| | |
| | **CEE RETAIL REALTY, INC.** |
| | c/o Citicorp Real Estate, Inc. |
| | One Sansome Street, 28th Floor |
| | San Francisco, Califonria 94104 |
| | Attn:    Senior Asset Manager, West Coast Region |
| | |
| | **CITICORP REAL ESTATE, INC.** |
| | 599 Lexington Avenue |
| | New York, New York 10043 |
| | Attn:    General Counsel |
| | |
| | **GENERAL GROWTH MANAGEMENT, INC.** |
| | 110 N. Wacker Drive |
| | Chicago, Illinois 60606 |
| | Attn:    Vice President Department Stores |

6.    The Lease, except as herein supplemented, is in all other respects fully ratified and confirmed.

7.    Except as otherwise defined herein, all capitalized terms used in this Supplement shall have the meaning ascribed to such terms in the Lease.

8.    Landlord and Tenant represent and warrant to each other that each have full right, power and authority to enter into this Supplement.

3

S:\NKAROUZ\CALIFORN\LEASUP\1098.doc

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Supplement to be executed:

Landlord:

**CEE RETAIL REALTY, INC.**

By: _____

Printed Name: Shari L. Reed

Title: Vice President

Tenant:

**SEARS, ROEBUCK AND CO.**

By: _____

Ronald F. Douglass

Vice President

Real Estate

4

S:\NKAROUZ\CALIFORN\LEASUP\1098.doc

# CITY OF CLOVIS

## BUILDING DIVISION

### CERTIFICATE OF OCCUPANCY

This Certificate is issued pursuant to the requirements of Section 109 of the Uniform Building Code certifying that at the time of issuance this structure was in compliance with the various ordinances of the City of Clovis regulating building construction or use for the building as described below.

**TEMPORARY OCCUPANCY - EXPIRES JANUARY 22, 2000**

*Conditions per documents B.D.B. 102299-1, 2, 3.*

Permit Number: 98-1727

Construction Type: VNS

Business Name: Sears and Robuck Co.

Building Address: 1140 Shaw Avenue

Occupancy Group: M

Building Owner: Sear and Robuck Co.

Address: 333 Beverly Road
Hoffman Estates, IL 60179

By: _Steve Baker, Building Official_

Date: _October 22, 1999_

FILE

# SUBLEASE

# CLOVIS, CALIFORNIA

### by and between

## CEE RETAIL REALTY, INC.,

### A CALIFORNIA CORPORATION

### ("LANDLORD")

### and

## SEARS, ROEBUCK AND CO.

### A NEW YORK CORPORATION

### ("TENANT")

# TABLE OF CONTENTS

I. DEFINITIONS ............................................................... 2

II. DEMISED PREMISES/SEARS ACCESS AND PARKING AREA /SEARS
    CONTROL AREA ......................................................... 5

III. USE / RADIUS RESTRICTION ........................................... 6

IV. TERM / OPTIONS TO EXTEND ........................................... 7

V. OPENING DATE / LANDLORD'S ADDITIONAL WORK ................... 8

VI. LANDLORD'S WARRANTIES ............................................. 8

VII. RENT .................................................................... 11

VIII. TITLE / SURVEY ....................................................... 15

IX. CONSTRUCTION OF THE DEMISED PREMISES ......................... 15

X. REPAIRS .................................................................. 17

XI. COMMON AREA MAINTENANCE / KIOSKS ............................. 18

XII. MAINTENANCE CONTRIBUTION / INSURANCE COSTS ............... 18

XIII. LANDLORD'S ACCESS .................................................. 19

XIV. ASSIGNMENT / SUBLETTING; CONCESSIONS ......................... 19

XV. RIGHT TO ALTER OR IMPROVE / SIGNAGE ........................... 20

XVI. DAMAGE OR DESTRUCTION ........................................... 21

XVII. INSURANCE ........................................................... 24

XVIII. WAIVER OF SUBROGATION .......................................... 26

XIX. INDEMNITY ............................................................ 27

XX. REAL ESTATE TAXES ................................................... 28

XXI. DEFAULTS .............................................................. 30

XXII. UTILITIES ............................................................. 33

XXIII. HAZARDOUS MATERIALS ............................................ 33

XXIV. TENANT'S AND LANDLORD'S OPERATING COVENANTS ............. 37

XXV. PROMOTIONAL FUND .................................................. 39

XXVI. NOTICES TO GROUND LESSOR AND HOLDERS OF FIRST
     SECURITIES .......................................................... 39

XXVII. EFFECT OF EMINENT DOMAIN ...................................... 40

XXVIII. EASEMENTS ......................................................... 41

XXIX. SURRENDER OF POSSESSION ........................................ 41

# TABLE OF CONTENTS

XXX. NOTICES ................................................................ 41

XXXI. CHOICE OF LAW ...................................................... 43

XXXII. NO PARTNERSHIP .................................................... 44

XXXIII. PARTIAL INVALIDITY ............................................... 44

XXXIV. NO WAIVER .......................................................... 44

XXXV. RIGHTS CUMULATIVE ................................................ 44

XXXVI. RUNNING WITH THE LAND ......................................... 44

XXXVII. ESTOPPEL CERTIFICATE / SUBORDINATION,
    NON-DISTURBANCE AND   ATTORNMENT AGREEMENT .............. 44

XXXVIII. BENEFIT TO SUCCESSORS AND ASSIGNS .......................... 45

XXXIX. ATTORNEYS FEES .................................................... 45

XL. JOINT PREPARATION .................................................... 45

XLI. RECORDING ............................................................ 45

XLII. ENTIRE AGREEMENT .................................................. 46

XLIII. BROKER .............................................................. 46

XLIV. JURY WAIVER OR STATUTORY REMEDY. ............................ 46

XLV. COMPLIANCE WITH LAWS ............................................ 46

XLVI. NO DISCRIMINATION ................................................ 47

XLVII. JOINT AND SEVERAL LIABILITY .................................... 47

XLVIII. HEADINGS .......................................................... 47

XLIX. LIMITATION ON LANDLORD'S LIABILITY ........................... 47

L. COUNTERPARTS ......................................................... 48

## SUBLEASE

THIS SUBLEASE (this "Lease") is made and entered into as of this 15 day of October, 1998, by and between **CEE RETAIL REALTY, INC.,** a California corporation, **("Landlord")** and **SEARS, ROEBUCK AND CO.,** a New York corporation **("Tenant")**.

## RECITALS:

A.      Landlord is the successor in interest to the Original Ground Lessee, as defined herein, of a parcel of land and the improvements located thereon (the **"Ground Lease Parcel"**), as more particularly described in that certain Ground Lease dated May 30, 1979 a short form of which was recorded on September 4, 1979, in Book 7363, Page 975 of the Fresno County Official Records (the **"Ground Lease"**) by and between Carmel J. McGarry, Mary E. McGarry and Edmund J. McGarry (collectively, **"Ground Lessor"**) and B&H Clovis Associates **("Original Ground Lessee")**, and as legally described on **Exhibit "A"**, attached hereto and made a part hereof.

B.      Landlord is fee owner of a parcel of land and the improvements located thereon (the **"Fee Parcel"**) which is contiguous to the Ground Lease Parcel and marked on the Site Plan, attached hereto as **Exhibit "B"** and legally described on **Exhibit "C"**, attached hereto and made a part hereof.

C.      The Ground Lease Parcel and the Fee Parcel contain and are operated as a one-level Shopping Center known as the Sierra Vista Mall, containing three majors, two of which are attached to the Enclosed Mall (as defined below), several additional stores (the **"Non-Mall Stores"**), and certain Common Area, all pursuant to the REA (as hereinafter defined) located at the south east corner of Shaw Avenue and Clovis Boulevard, in the City of Clovis, County of Fresno, and State of California (the **"Entire Tract"**), which is shown on the Site Plan.   The Entire Tract is approximately 73 acres in size.

D.      The Shopping Center is currently comprised of approximately 463,868 square feet of floor area, including store buildings for the following parties (the **"Department Stores"**), operating at the Shopping Center at the locations as shown on the Site Plan:

> i)       Mervyn's
>
> ii)      Gottschalks, and
>
> iii)     Target

E.      The Entire Tract is currently subject to the terms and conditions of a Construction, Operation and Reciprocal Easement Agreement the **("REA")** by and between Landlord and the Department Stores, or their predecessors in interest (collectively, the **"REA Parties"**), dated March 16, 1988, and recorded April 7, 1988, as Doc. No. 88036839 in the Public Records of Fresno County, California.   The portion of the Entire Tract described in the REA as the "Developer Tract", which includes the Fee Parcel, is herein referred to as the **"Landlord Tract"**.

F.      Landlord desires to sublease to Tenant and Tenant desires to lease from Landlord a portion of the Landlord Tract sufficient in size to accommodate the Tenant's Store Building, as defined herein, in the area as shown on the Site Plan (the **"Sears Parcel"**). Landlord shall prepare the legal description of the Sears Parcel, subject to Tenant's approval, within thirty (30) days after the foundations for Tenant's Store Building have been poured.  On approval of the legal description of the Sears Parcel, it shall be attached hereto as **Exhibit "D"**, and made a part hereof.

G.      Landlord also grants to Tenant during the term of this Sublease an easement over a portion of the Landlord Tract adjacent to the Sears Parcel for the non-exclusive use of Tenant, its customers, employees and invitees for access to the Sears Parcel and for parking of automobiles, the **"Sears Access and Parking Area"**, as designated on the Site Plan.

H.      Pursuant to the terms and subject to the conditions of this Lease, Landlord agrees to build on the Sears Parcel, a one level retail store building attached to the Enclosed Mall, containing approximately 106,760 square feet of Floor Area with an attached auto center of an additional approximately 9,881 square feet of Floor Area (the **"Tenant's Store Building"**).  The actual Floor Area will be determined by Landlord's architect promptly after completion of construction of Tenant's Store Building and confirmed by the parties in the Lease Supplement.

I.      The parties acknowledge that the consent of the Department Stores may be required pursuant to the terms of the REA or  their respective leases or other agreements, for the subject Lease and the construction of the improvements described herein (the "Approvals").

**NOW, THEREFORE**, in consideration of the mutual covenants of this Lease, the parties agree as follows:

I.      <u>**DEFINITIONS**</u>

**Wherever used in** this Lease, the following words and phrases have the following meanings:

**"Appropriated"** or **"Appropriation"** shall mean any exercise of the power of eminent domain, whether by condemnation proceeding or otherwise, or any transfer of all or any part of the Landlord Tract or any interest therein made in avoidance, or under threat, of eminent domain.

**"Approvals"** shall have the meaning defined in Recital I., hereof.

**"Commencement Date"** shall have the meaning defined in Section IV.A, hereof.

**"Common Area"** shall have the meaning attributed in the REA.

**"Demised Premises"** shall have the meaning as defined in Section II. hereof.

**"Effective Date"** shall mean the date this Lease is simultaneously signed by Landlord and Tenant, or, if not so simultaneously signed by both parties, it shall be considered to be an offer made by the party first executing it to the other party. In such event, the "Effective Date" of this Lease shall be the date upon which it is signed, without amendment, by the party to whom the offer is made.

**"Fee Parcel"** shall have the meaning as defined at Recital B, hereof.

**"Enclosed Mall"** shall mean the enclosed, air-conditioned and heated mall located on the Entire Tract as defined at Recital C. hereof, as shown on **Exhibit "E"**, attached hereto and made a part hereof.

**"Entire Tract"** shall have the meaning as defined in Recital C., hereof.

**"Floor Area"** shall mean the total number of square feet of floor space covered and enclosed within buildings which are located on the Entire Tract as shown on the Site Plan or hereafter constructed, whether rented or rentable or not, measured to the outside of the exterior walls of the buildings, to the center line of party walls and to the exterior of walls abutting exit or service corridors, but not including exterior open truck docks, outdoor sales area, garden shop area, mall offices or enclosures used exclusively for mechanical equipment or non-structural mezzanines.

**"Force Majeure Delays"** shall mean the period of time equal to the number of days during which the performance of any act to be performed under this Lease is prevented or delayed by acts of God, fire, earthquake, floods, explosions, actions of the elements (excluding normal wind and rain), or strikes, orders of government or similar causes not within the reasonable control of such party. Financial inability of a party shall not be considered force majeure.

**"Ground Lease"** shall have the meaning as defined at Recital A., hereof.

**"Hazardous Material"** shall have the meaning as defined at Section XXIII.

**"Interest"** shall mean three percent (3%) in excess of the prime rate of interest as announced from time to time by First National Bank of Chicago, or if such bank is no longer in existence, another major bank headquartered in Chicago, Illinois, designated by mutual agreement of Landlord and Tenant, but in any event, not in excess of the maximum legal rate.

**"Landlord's Mortgagee"** shall mean a holder of a first mortgage, if any, recorded against the Landlord Tract or any portion thereof, of which Tenant has been advised by Notice.

**"Lease Year"** shall mean each consecutive twelve (12) calendar month period beginning with the Commencement Date, if that day is the first day of a calendar month. If the Commencement Date is not the first day of a calendar month, then the first Lease Year will commence on the first day of the next succeeding calendar month after the Commencement Date, and each Lease Year thereafter shall commence on the anniversary thereof.

**"Mall Tenants"** shall mean all occupants of retail space within the Enclosed Mall, other than Tenant and the Department Stores.

**"Net Sales"** shall have the meaning as defined in Section VII. hereof.

**"Notice"** or **"to Notify"** shall mean written notice complying with Section XXX. hereof.

**"Permitted Exceptions"** shall have the meaning as defined in Section VIII.D., hereof.

**"REA"** shall have the meaning as defined in Recital E., hereof.

**"REA Parties"** shall have the meaning as defined in Recital E., hereof.

**"Related Improvements"** shall have the meaning as defined in Section IX. hereof.

**"Rent"** shall have the meaning as defined in Section VII.K., hereof.

**"Retail Area"** shall have the meaning as defined in Section XII.A., hereof.

**"Rules and Regulations"** shall mean the rules and regulations related to the Entire Tract as provided in the REA, to the extent equally applied and enforced.

**"Sears Access and Parking Area"** shall have the meaning as defined in Recital G, hereof.

**"Sears Control Area"** shall have the meaning as defined in Section II.C., hereof.

**"Sears Parcel"** shall have the meaning as defined in Recital F., hereof.

**"Shopping Center"** shall mean the Entire Tract which is subject to the REA, and all improvements now or hereafter located on such land.

**"Site Plan"** shall have the meaning as defined in Recital B., hereof.

**"TBA"** shall mean the one-level tire, battery and automotive accessory building to be attached to the Tenant's Store Building, as shown on the Site Plan, and operated by Tenant at the Shopping Center pursuant to the terms of this Lease.

"**Tenant's Store Building**" shall have the meaning as defined at Recital H. and as provided at Section IX. of this Lease and shall include the TBA.

"**Term**" shall mean the term of this Lease, as defined in Section IV. hereof.

II.    **DEMISED PREMISES/SEARS ACCESS AND PARKING AREA/SEARS CONTROL AREA**

A.   Landlord leases to Tenant and Tenant takes from Landlord the Sears Parcel and the Tenant's Store Building to be constructed by Landlord on the Sears Parcel, together with the improvements now or hereafter constructed thereon as provided in this Lease (the "**Demised Premises**").

B.   Landlord further grants Tenant during the Term, subject to the Rules and Regulations, a non-exclusive, easement over the Common Areas, including the Sears Access and Parking Area, for their designated uses, including generally, for parking the vehicles of Tenant, its customers, employees and business invitees, and for access, use of, ingress and egress (as shown on the Site Plan) for vehicles and pedestrians in common with the other lessees and occupants of the Landlord Tract, over all parking areas, alleys, roadways, sidewalks, walkways, landscaped areas and surface water drainage systems and for use of parking lot lighting.

C.   Landlord acknowledges and agrees that Tenant has special concerns as to any Site Plan changes, approvals or development (collectively "**Changes**") in that part of the Entire Tract identified as the "**Sears Control Area**" on the Site Plan and that area within the Enclosed Mall and immediately outside of the entrance of Tenant's Store Building into the Enclosed Mall, as shown on **Exhibit "E"**.

1.   Landlord agrees that before making or allowing any Changes, including making any request or granting any consent or approval to the REA Parties, or otherwise related in any manner to Changes within the Sears Control Area, that Landlord shall first consult with Tenant and secure Tenant's written approval, which shall not be unreasonably withheld or delayed.

2.   Any request from Landlord for Tenant's written consent shall state a reasonable time frame within which Tenant must reply and, if such consent relates to a request for approval pursuant to the REA which would be deemed approved if not responded to within a particular period of time, then Tenant's consent shall be deemed given if Tenant does not respond within the time period provided for in Landlord's notice.

3.   Notwithstanding the foregoing, Tenant acknowledges that within the Sears Control Area at those areas designated on the Site Plan as Non-Mall Store Pad 4 and Non-Mall Store Pad 6 (the "**Pads**"), Landlord has the right to construct improvements as provided for in the REA. Landlord agrees that any development of the Pads a) will be substantially within the footprint of the Pads as currently shown on the Site Plan; b) will be no higher than 22' in height; and c) will not

permit any occupants of the improvements constructed on the Pads to use such improvements except as currently provided in the REA; provided, no occupant of such improvements shall be entitled to sell automotive batteries or tires, so long as Tenant shall be selling automobile batteries or tires in the TBA.

4. The parties agree that Tenant may arbitrarily deny approval of any newly proposed development or the location of additional pads within the Sears Control Area.

III.   **USE / RADIUS RESTRICTION**

A. Tenant may use the Demised Premises for the following uses:

1. during the term of Tenant's Operating Covenant, as a full line retail department store, subject to the provisions of Section XXIV.A., including, in the case of the TBA, for the retail sale, servicing and storage of tires, batteries, automotive accessories and all other items or services normally sold in Tenant's tire, battery and accessory stores in the State of California, and for no other uses; and

2. after the expiration or earlier termination of Tenant's Operating Covenant, for any lawful retail business, subject to the use provisions of the REA;

B. Except for such facilities in existence as of the Effective Date of this Lease:

1. Tenant shall not open or operate a retail department store within seven (7) miles of the main entrance of the Tenant's Store Building. Notwithstanding the foregoing, Tenant shall be entitled to relocate its existing retail department store from Manchester Mall within such seven mile radius if such opportunity becomes available; provided, the Percentage Rent provided for herein shall be adjusted so that the applicable percentages comprising Percentage Rent, as stated at Section VII.A., hereof, would be adjusted so as to generate a dollar amount equivalent to the Percentage Rent paid by Tenant to Landlord for the immediately preceding twelve month period. Under no circumstances, however, would the percentages comprising Percentage Rent ever be reduced below those currently stated at Section VII.A., hereof. As an example only, if in year five of this Lease, Tenant's Net Sales are $24,000,000.00, the resulting Percentage Rent would be $600,000.00 (at 2.5% of Net Sales). If at the start of the sixth Lease year Tenant relocates its retail store from Manchester Mall to an area less than seven miles from the main entrance of the Tenant's Store Building, and Net Sales for the sixth Lease year fall to $21,000,000.00, then the percentages comprising Percentage Rent would be:

a. increased from 2.5% to 2.86% on Net Sales up to $30,000,000.00, which would provide Percentage Rent of $600,000.00 based upon such reduced sales ($21,000,000.00 X .0286); and

b. increased from 2% to 2.288% on Net Sales over $30,000,000.00 and up to $40,000,000.00, based upon the incremental difference of 2.5% versus 2.86%; and

    c. increased from 1.5% to 1.716% on Net Sales over $40,000,000.00, based upon the incremental difference of 2.5% versus 2.86%.

    d. From the date of such adjustment and for the remainder of the Term of this Lease, Percentage Rent shall thereafter be defined based upon such adjusted percentages.

2. Tenant shall not operate a tire, battery and automotive accessory store (other than the TBA) within three (3) miles of the main entrance of the Tenant's Store Building; provided, this restriction shall not apply to such facilities owned, operated or franchised by Tenant under the names "NTB", "Western Auto", "Parts America" or such other name.

## IV.  <u>TERM / OPTIONS TO EXTEND</u>

A. The term (**"Term"**) of this Lease will be fifteen (15) Lease Years, commencing on the date Tenant opens Tenant's Store Building to the public for business (the **"Commencement Date"**). The parties shall specify the Commencement Date, the Delivery Date and the final floor area of Tenant's Store Building by Lease Supplement, in the form attached hereto as **Exhibit "F"**.

B. During the period beginning with the Effective Date of this Lease and ending with the Commencement Date (**"Interim Term"**), Tenant and Landlord shall have all rights and obligations as provided in this Lease, except that during the Interim Term no Estimated Rent or Percentage Rent shall be charged.

C. Tenant may extend the Term of this Lease on the same terms and conditions contained herein for six (6) additional periods of five (5) years each (each an **"Option Term"**), by giving Landlord Notice, not less than twelve (12) months prior to the end of the Term. Tenant acknowledges that in no event shall the Term of this Lease extend beyond the term of the Ground Lease, and Landlord shall have no obligation to exercise its options to extend the term of the Ground Lease. If Tenant shall fail to give any such Notice within such twelve-month time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant Notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said 30-day period. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any of the options set forth in this Subsection through inadvertent failure to give Notice thereof within the time limits prescribed. During any extension period, all Sections of this Lease shall be effective, and references to Term will incorporate the extensions.

D. Unless Landlord and Tenant otherwise agree in writing, any holding over by Tenant after the expiration of the Term will constitute a tenancy from month-to-month upon the same terms as in this Lease.

V.   **OPENING DATE / LANDLORD'S ADDITIONAL WORK**

A. Subject to the terms of this Lease and force majeure events:

1. If all Related Improvements have been completed, Tenant agrees to open for business in Tenant's Store Building by October 30, 1999, so long as Landlord delivers Tenant's Store Building to Tenant on or before July 22, 1999.

2. If Tenant's Store Building is delivered to Tenant after July 22, 1999, Tenant agrees to open Tenant's Store Building to the public within four (4) months after the date of delivery; provided all Related Improvements have been completed. Notwithstanding the foregoing, Tenant shall have no obligation to open for business in Tenant's Store Building between November 1 and March 15 (the **"Blackout Period"**).

3. If Tenant's Store Building has not been delivered to Tenant by July 1, 2000, then Tenant shall have the right to terminate this Lease by written notice to Landlord on or before August 1, 2000, without any obligation to Landlord.

B. In lieu of the $116,641.00 fixturing credit otherwise due from Landlord to Tenant, Landlord agrees to include in the construction of Tenant's Store Building, without cost to Tenant, the following elements, as incorporated in the 60% plan review recently conducted by the parties, a description of the plans so reviewed is contained at **Exhibit "G"**, attached hereto and made a part hereof:

1. Floor tile

2. Ceiling tile

3. Multiple washrooms, as shown on **Exhibit "K"**, and

4. Columned exterior entrances at each exterior entrance of Tenant's Store Building, as shown on **Exhibit "L"**.

5. The parties agree that the exterior tower element originally shown on Tenant's Plans, as defined herein, shall no longer be a part of the design of Tenant's Store Building.

VI.   **LANDLORD'S WARRANTIES**

A. Landlord represents and warrants that:

1. Landlord is currently the tenant under the Ground Lease; the Ground Lease has not been amended; Landlord will not amend the Ground Lease in a manner that materially adversely affects Tenant's rights or obligations under this Lease, shorten the term of the Ground Lease or allow the termination of the Ground Lease without Tenant's prior written consent, which shall not be unreasonably

withheld so long as Tenant's interest under this Lease would not be adversely affected. Landlord is currently fee owner of the Fee Parcel.

2. Subject to obtaining the Approvals, the provisions of this Lease do not violate any mortgage, lease, operating agreement or any other written or oral agreement to which Landlord is a party.

3. Subject to obtaining the Approvals and applicable building permits, Landlord has the full right and lawful authority to enter into and perform its obligations under this Lease for the full Term.

4. To Landlord's knowledge, there are no underground storage tanks under the Sears Parcel.

   Landlord will indemnify and hold harmless Tenant from and against all claims, causes of action, expenses, including attorneys' fees, or costs arising out of the inaccuracy of or breach of the foregoing warranties and representations.

B. Landlord covenants that:

1. Landlord shall use commercially reasonable efforts to secure an estoppel from the Ground Lessor, substantially in the form and with the content as attached in **Exhibit "H"** (the **"Ground Lease Estoppel"**).

2. Landlord shall construct Tenant's Store Building in compliance with the provisions of the REA.

3. Prior to the Effective Date, Landlord will furnish to Tenant an agreement of quiet possession or non-disturbance executed by Landlord's Mortgagee in the form attached hereto as **Exhibit "I"**.

4. Landlord will deliver actual possession of the Demised Premises to Tenant free of all tenancies, occupancies and mechanic's lien claims and shall not permit any liens or claims to attach to the Demised Premises during the Term; provided, however, that Landlord shall have the right to bond over any such mechanic's lien claims within thirty days after notice by Tenant and, in any event, prior to sale of the Landlord Tract or any portion thereof to satisfy a judgment on such mechanic's lien claims.

5. Subject to the provisions of this Lease, Tenant, upon paying the Rent and performing Tenant's other obligations under this Lease, shall at all times during the Term of this Lease have the right to peaceably and quietly have, hold and enjoy the Demised Premises.

6. As of the Delivery Date the Sears Parcel and the Tenant's Store Building will be in good condition and repair, and in full compliance with all applicable laws, regulations, building, zoning and health codes. As of the Commencement Date, the Related Improvements will be in good condition and repair, and, to Landlord's

knowledge, in full compliance with all applicable laws, regulations, building, zoning and health codes.

7.  Landlord shall use commercially reasonable efforts to obtain the Approvals and all necessary governmental consents, permits (other than permits related to any special uses of Tenant), approvals and zoning approvals for the construction and operation of Tenant's Store Building on the Sears Tract prior to the Commencement Date.

8.  If during the course of construction of Tenant's Store Building, Landlord becomes aware of any underground storage tanks under the Demised Premises, Landlord agrees, at Landlord's expense, to remove any such underground storage tanks prior to the Delivery Date. As of the Delivery Date, Tenant's Store Building will not contain any Hazardous Materials, except as specified in the Landlord's Plans and Specifications or as may be permitted under applicable laws.

9.  All utilities, including gas, electric, telephone, water, sanitary sewer and other utilities specified in the Plans and Specifications will, before the Commencement Date, be available to Tenant's Store Building and Landlord will not voluntarily take or permit any action to terminate or allow termination of such utilities, except as required by applicable laws.

10. The Landlord Tract, all improvements thereon and the Common Area, including the paved areas, and any parking and sidewalks, parking lot lighting and irrigation within the Common Area shall be maintained by Landlord in first-class condition and repair and usable for the purposes intended.

11. Unless required by law, Landlord shall not reduce or permit the reduction of the ratio of parking spaces to the number of square feet of Floor Area on the Entire Tract to less than 4.7 cars per 1,000 square feet of Floor Area on the Entire Tract, nor charge for any of the parking spaces, without the prior written consent of Tenant. The current parking configuration of the Entire Tract is shown in the Site Plan. Landlord agrees not to reconfigure or relocate any of the parking spaces in the Sears Control Area without Tenant's prior written consent, which consent may be unreasonably denied, unless required by applicable law.

12. Landlord shall operate and maintain the Landlord Tract and, to the extent it is the responsibility of Landlord, the Enclosed Mall, as a first-class shopping center.

13. Unless required by law, Landlord shall not make or permit any changes to the Landlord Tract which would, in Tenant's reasonable determination, materially and adversely affect Tenant's sight lines, visibility, access, ingress or egress, without Tenant's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, however, that the foregoing shall not be deemed to prohibit Landlord from constructing buildings in the approximate locations designated for future buildings on the Site Plan, subject to the provisions of Section II.C. of this Lease.

VII.   **RENT**

A. During the Term, Tenant shall pay to Landlord, in lieu of fixed rent for the Demised Premises, percentage rent (**"Percentage Rent"**) equal to:

    1.   two and one half percent (2.5%) on Net Sales, as defined herein, up to $30,000,000.00;

    2.   two percent (2%) on Net Sales over $30,000,000.00 and up to $40,000,000.00; and

    3.   one and one half percent (1.5%) on Net Sales over $40,000,000.00.

B. Percentage Rent shall be payable in estimated monthly installments (**"Estimated Rent"**) based upon Net Sales for the prior calendar year. Tenant agrees to commence payment of Estimated Rent of $522,551.68 annually ($43,545.97 per month) as of the Commencement Date based upon Tenant's estimated Net Sales for the Demised Premises.

C. For the first year of any exercised Option Term, Tenant shall pay Estimated Rent based on Net Sales during the immediately preceding calendar year. Upon completion of the first full calendar year of each Option Term, the parties shall compare the dollar value of Percentage Rent which would be payable by Tenant based upon actual Net Sales for such year using the applicable percentages set forth in Section VII.A. hereof with (i) the highest dollar value of Percentage Rent which was paid by Tenant for the three (3) full calendar years immediately preceding the first full calendar year of the applicable Option Term (the **"HDV"**) and (ii) the average dollar value of Percentage Rent paid by Tenant over the five (5) full calendar years immediately preceding the first full calendar year of the applicable Option Term (the **"ADV"**). If the dollar value of Percentage Rent for the first full calendar year of the Option Term, computed based on actual Net Sales, using the percentages set forth at Section VII.A., is less than the dollar value of Percentage Rent described in either of clauses (i) or (ii) above, then the applicable percentages for calculating Percentage Rent, as stated at Section VII.A. hereof, shall be adjusted so as to generate a dollar amount equal to the higher of the HDV or the ADV. As an example only, if Tenant's Net Sales for the first full calendar year of an Option Term shall be $23,000,000.00, generating Percentage Rent of $575,000.00 based on the percentages set forth in Section VII.A.; the HDV is $700,000.00; and the ADV is $645,000.00, then the percentages used to calculate Percentage Rent shall be adjusted effective as of the commencement of the first year of the applicable Option Term to achieve $700,000.00 of Percentage Rent, as follows:

    1.   increased from 2.5% to 3.04% on Net Sales up to $30,000,000.00;

    2.   increased from 2% to 2.43% on Net Sales over $30,000,000.00 and up to $40,000,000.00; and

    3.   increased from 1.5% to 1.83% on Net Sales over $40,.000,000.00.

If such an adjustment is made, then from the first day of the first year of the applicable Option Term and for the remainder of the then exercised Option Term, Percentage Rent shall be calculated based upon such adjusted percentages. Under no circumstances, however, will the percentages used to calculate Percentage Rent ever be reduced below these currently stated at Section VII.A. hereof.

D.  Within thirty (30) days after the end of each calendar year, Tenant will furnish to Landlord a statement of Tenant's Net Sales for the applicable calendar year. If the actual Percentage Rent due for the period is greater than or less than the Estimated Rent paid for that period by Tenant, the parties agree to submit the balance of Percentage Rent actually due to Landlord, or any overpayment of Estimated Rent due to Tenant, as applicable, to the other within thirty days after such determination of the actual Percentage Rent.

E.  If at any time during the Term of this Lease Tenant ceases conducting business in the Demised Premises, or, if at any time during the Term of this Lease the Tenant's Store Building is being primarily used for any use other than a retail department store (which term shall include a discount department store), then for the period thereafter and until such time as Tenant may again either commence operating in the Demised Premises, or primarily operate as a retail department store, as applicable, Tenant shall pay minimum rent determined on the basis of the average Percentage Rent paid by Tenant for the three calendar years immediately preceding such event, or such lesser period of time as may have expired from the Commencement Date to such date. Payment of said amount shall not, however, cure any default by Tenant under Tenant's Operating Covenant.

F.  "Net Sales" means gross retail sales of merchandise or services made from Tenant's Store Building and deducting or excluding (as the case may be):

1.  All returns and other cancellations, and allowances;

2.  Rental Charges, including but not limited to, charges for or pursuant to rentals of automobiles, tools and other merchandise and equipment;

3.  Charges to customers for or pursuant to off-site services, deluxing, delivery, installation or inspection by licensed business other than "Sears";

4.  Amounts, debits or charges of, for or pursuant to maintenance or service agreements (currently known as "Maintenance Agreements"), or for replacement or repair parts of merchandise furnished without additional charge in connection with repairs or replacements pursuant to warranties, guarantees, good will adjustments or Maintenance Agreements;

5.  All sales ordered through the use of or from Tenant's catalogs or filled through Tenant's catalog channels regardless of the place of order, payment or delivery (currently known as "Division 200 Sales");

6. Finance charges or other amounts in excess of Tenant's (or its concessionaires or licensees) cash sales price charged on, for or pursuant to sales made on credit or under a time payment or layaway plan;

7. The amount of all sales, use, excise, retailers occupation or other similar taxes, imposed in a specific amount of percentage upon, or determined by, the amount of sales, or sale, made from Tenant's Store Building;

8. Sales of departments, divisions or offices not located in Tenant's Store Building, even though administratively controlled therefrom;

9. Amounts received for or in connection with the making of personal loans and the rendering of other financial services, and premiums, proceeds, commissions, payments and other amounts received, collected or charged for or in connection with the sale of policies of insurance or investment fund shares and other securities, whether or not sold on or from the Tenant's Store Building;

10. Contract sales, regardless of whether Tenant maintains an office, showroom or samples for the merchandise, or whether made on or from the Tenant's Store Building. The phrase "contract sales" means sales of goods or merchandise made to persons or entities other than the general public and including, but not limited to, sales of merchandise made to industrial, commercial or institutional purchasers or to governmental or quasi-governmental bodies, and sales of goods manufactured to the purchaser's specifications whether or not installed by Tenant;

11. Receipts from vending or weighing machines, amusement devices and public telephones;

12. Receipts from sales of tickets for admission to entertainment, sporting or other similar events, from sales of licenses issued by governmental agencies and from collection of utility bills and check cashing, gifts and prizes;

13. Receipts from the operation of eating facilities primarily available for employee use and not generally open to the public;

14. Receipts from the sale of merchandise certificates or gift certificates and purchase coupons; however, the sale of merchandise made by Tenant from Tenant's Store Building, paid for with gift certificates or purchase coupons, is included in Net Sales, unless otherwise excluded;

15. Fees for building and like permits in connection with sales of merchandise or services;

16. Amounts credited on the purchase price of merchandise by reason of merchandise traded in, or employee or other discounts;

17. Unclaimed funds and property;

18. In addition to sales specifically excluded elsewhere in this Section, sales made by Tenant's subtenants, concessionaires and licensees occupying, in the aggregate, not more than 5,000 square feet of sales Floor Area in Tenant's Store Building.

Notwithstanding the foregoing, if Tenant's subtenants, concessionaires and licensees occupy in excess of 5,000 square feet of Floor Area in Tenant's Store Building, then the gross receipts from sales made by subtenants, concessionaires and licensees shall be included in Net Sales according to the following formula: the total Net Sales (not otherwise specifically excluded) made by all subtenants, concessionaires and licensees shall be multiplied by a fraction, the numerator of which is the floor area in Tenant's Store Building occupied by said subtenants, concessionaires and licensees in excess of 5,000 square feet, and the denominator of which is the Floor Area occupied by all subtenants, concessionaires and licensees in Tenant's Store Building;

19. Commercial sales of truck tires made through Sears Truck Tire Division;

20. The amount of all governmental required levies for parking if passed on to customers;

21. Commissions or amounts received in conjunction with the sale, leasing or financing of real estate.

G. If the Commencement Date is other than the first day of a calendar month, all Net Sales from the Commencement Date to the first day of the month next following shall be included in the calculation of Percentage Rent for the first calendar year. Landlord will have one (1) year following its receipt of Tenant's statement of Net Sales for the applicable calendar year within which to Notify Tenant of Landlord's dissatisfaction with Tenant's statement (the "**Audit Notice**") or else Landlord will be deemed to have accepted Tenant's statement for that calendar year as correct. If Landlord is dissatisfied with Tenant's statement of Net Sales, Landlord may, at Landlord's expense, cause an audit of Tenant's Net Sales for the applicable calendar year to be initiated within sixty (60) days after the giving of the Audit Notice, and continuously pursued thereafter. If Landlord fails to notify Tenant of the specific deficiencies claimed with regard to Tenant's statement of Net Sales within four (4) months after the Audit Notice, Tenant's statement of Net Sales will be deemed correct and conclusive. Time, wherever specified in this Section, is deemed to be of the essence.

H. Tenant makes no representation or warranty as to the amount of sales or mix of merchandise and services which it expects to make from Tenant's Store Building. The fact that Tenant has agreed to pay Percentage Rent shall not imply or otherwise be construed as an obligation by Tenant to be open and operating within the Demised Premises, and Tenant shall have no such obligation to operate except to the extent of Tenant's Operating Covenant, as defined herein.

I. Landlord will hold in confidence all sales figures and other information obtained from Tenant or upon the inspection and audit of Tenant's books and records; provided, Landlord may disclose such information to any existing or prospective mortgagee of the Landlord Tract, any prospective purchaser of Landlord's interest in the Landlord Tract or as may be in accordance with any court order.

J. Landlord will, from time to time, designate some one person, firm or corporation to receive payments of Estimated Rent and Percentage Rent. Payment of such rent will be made payable to and mailed to Landlord at the address provided for notices in this Lease, until the address is changed by Notice from Landlord. Landlord's FEIN is 22-3416941.

K. All sums of money required to be paid by Tenant to Landlord under this Lease shall be deemed additional rent (**"Additional Rent"**). Landlord shall have the same remedies for default in the payment of Additional Rent as for default in the payment of Percentage Rent. Percentage Rent and Additional Rent are collectively sometimes hereinafter referred to as **"Rent"** or **"rent"**. Rent shall be paid to Landlord, without deduction, recoupment or offset, except as expressly set forth in this Lease.

## VIII.   TITLE / SURVEY

A. Landlord has previously delivered to Tenant a copy of the most recent survey of the Landlord Tract.

B. Tenant may, at Tenant's expense, secure:

1. a commitment for an ALTA extended coverage Form B Leasehold Policy of title insurance on the Demised Premises (the **"Title Commitment"**) issued by a title company selected by Tenant (the **"Title Company"**), along with such endorsements from the Title Company as Tenant may require.

2. copies of all recorded documents affecting the Demised Premises and/or the Landlord Tract, as disclosed in the Title Commitment; and

3. a survey of the Sears Parcel (the **"Survey"**).

C. Tenant shall pay the premium for an ALTA extended coverage title policy and Tenant shall be obligated for any additional title charge to increase the amount of coverage and for any endorsements requested by Tenant (except charges or endorsements required for clearance of title matters).

D. Attached as **Exhibit "J"** are the Permitted Exceptions to title to the Sears Parcel.

## IX.   CONSTRUCTION OF THE DEMISED PREMISES

A. Landlord has received Tenant's "Design Criteria and Fixture Drawings - Clovis, CA" dated June 18, 1998 and preliminary plans and specifications (**"Tenant's Plans"**). The parties have approved the proposed floor plan for Tenant's Store Building, attached hereto as **Exhibit "K"**, and the elevations of Tenant's Store Building, attached hereto as **Exhibit "L"**. Landlord will promptly prepare its plans and specifications for Tenant's Store Building and related work in the Common Areas (**"Related Improvements"**) in accordance with Tenant's Plans and submit such plans and specifications for Tenant's approval. Tenant will promptly after the receipt of Landlord's plans and specifications, review them and furnish Landlord with its

comments. Tenant agrees not to unreasonably withhold its approval of Landlord's plans and specifications and further agrees, at no out-of-pocket costs to Tenant, to reasonably cooperate to resolve any objections to Landlord's plans and specifications raised by the REA Parties. Landlord's plans and specifications, as finally approved by Tenant, shall be referred to as **"Landlord's Plans and Specifications"** and will be incorporated herein by reference. When Tenant signifies its written approval of Landlord's Plans and Specifications, they will be initialed by each of the parties for identification and two (2) sets of Landlord's Plans and Specifications will be delivered to each party. Promptly upon final approval, Landlord shall, at its expense, commence and prosecute with diligence the construction of Tenant's Store Building and the Related Improvements in accordance with Landlord's Plans and Specifications. All work performed by or at the direction of Landlord pursuant to the Landlord's Plans and Specifications is hereinafter referred to as the **"Leasehold Improvements"**.

B.  In connection with the making of the Leasehold Improvements, the making of repairs or replacements, the curing of defects or the restoration of the Demised Premises pursuant to provisions of this Lease, Landlord will promptly adjust and settle any labor dispute to avoid unfavorable publicity and unnecessary delay, in a manner reasonably satisfactory to Tenant.

C.  Once Landlord has commenced construction of the Leasehold Improvements, Landlord shall diligently and continuously perform the construction to completion. Landlord will use all reasonable efforts to complete the Leasehold Improvements, except for minor punch list items, and to deliver the Tenant's Store Building to Tenant, ready for Tenant to commence installation of its fixtures, free and clear of all liens, encumbrances or possessory rights, on or before July 22, 1999 (the **"Delivery Date"** and complete the Related Improvements by October 30, 1999). If the Tenant's Store Building has not been so completed and delivered by July 1, 2000, Tenant may, until the Leasehold Improvements have been so completed and delivered to Tenant, terminate this Lease, without liability for any damage which Landlord may sustain, upon thirty (30) days Notice to Landlord.   The Delivery Date will be confirmed by the parties in the Lease Supplement, or if the parties are unable to agree upon such date, by the certificate of an architect or a firm of architects approved in writing by Tenant. Tenant agrees to accept possession of the Tenant's Store Building upon the date of completion, provided all Related Improvements shall be completed before Tenant shall have any obligation to open for business in Tenant's Store Building.

D.  Landlord and Tenant recognize that during the course of construction of the Leasehold Improvements, Tenant may desire to amend or revise Landlord's Plans and Specifications. Landlord gives Tenant the right to amend or revise Landlord's Plans and Specifications after they have been approved by Landlord and Tenant, provided the amending or revising does not increase the cost to Landlord of the Leasehold Improvements. Landlord may review any proposed revision or modification affecting the exterior appearance of Tenant's Store Building to insure that Tenant's Store Building, as modified, is architecturally harmonious with the remainder of the Shopping Center. Tenant shall pay any costs resulting from such revisions, provided

the costs are shown to be directly attributable to revisions or modifications directed and approved by Tenant and are not a result of a correction of Landlord's Plans. Any amendments or revisions proposed by Tenant will be submitted to Landlord's architect, who will obtain from the general contractor a cost price for the change which will be promptly submitted in writing to Tenant and Landlord. Work on the amendment or revision will not be commenced until a construction change order covering the work has been approved by Tenant's Vice President Construction or his authorized representative. Tenant shall not be responsible for construction change orders which have not been approved by Tenant's Vice President Construction.

E.  Within sixty (600) days after the Delivery Date, Landlord shall obtain from Landlord's architect and deliver to Tenant the architect's certification of the Floor Area of Tenant's Store Building, which shall be stated in the Lease Supplement, and a complete set of "as built" plans and specifications for the Leasehold Improvements, incorporating all changes made during the course of construction.

F.  In the event of any conflict between the provisions of this Section IX and those certain General Conditions - Leased Facilities, initialed by the parties, the provisions of said General Conditions shall govern.

X.  **REPAIRS**

A.  Tenant shall, at Tenant's expense during the Term:

1.  perform all interior maintenance, repairs and replacements to Tenant's Store Building, including any alterations and/or improvements made by Tenant, as provided at Section XV. of this Lease; and

2.  be responsible for repairs, replacements and maintenance of the HVAC system serving Tenant's Store Building; provided Landlord shall cooperate with Tenant in enforcing any warranties related to the HVAC system in Tenant's Store Building; and

3.  repair and maintain the sprinkler system within Tenant's Store Building; and

4.  be responsible for repairs and maintenance of the exterior walls and roof of Tenant's Store Building.

B.  Landlord shall, during the Term:

1.  cooperate with Tenant's efforts in enforcing any warranties held by Landlord with regard to Tenant's Store Building and any systems serving Tenant's Store Building; and

2.  perform all structural repairs and maintenance to Tenant's Store Building, but excluding any structural alterations and/or improvements made by Tenant as provided at Section XV. of this Lease; and

3.  repair and maintain any connections to the sprinkler systems serving Tenant's Store Building to the extent such connections are located outside of Tenant's Store

Building ; and repair and maintain all foundations, electrical wiring, plumbing, sewer systems and other utilities servicing the Tenant's Store Building, but located outside of Tenant's Store Building.

XI.   **COMMON AREA MAINTENANCE / KIOSKS**

A.  Landlord will, or will cause a third party to, sweep, clean, operate, insure, maintain, repair, replace and provide lighting, snow removal and security for the Common Areas of the Entire Tract, and keep the same in a first-class condition consistent with the majority of other regional shopping centers located in the State of California, in accordance with the standards specified in the REA, Sections 9.2 and 9.3.

B.  Landlord shall allow no kiosks within the Enclosed Mall, except in locations designated for kiosks on **Exhibit "E"**. Except for such kiosks in place as of the Effective Date of this Lease, no kiosk shall:

1.  exceed 9 feet in height and 280 square feet of Floor Area; and

2.  be located within 100 feet of the entrance of Tenant's Store Building into the Enclosed Mall.

XII.  **MAINTENANCE CONTRIBUTION / INSURANCE COSTS**

A.  Commencing with the later to occur of 1) the Commencement Date, and 2) the date on which tenants (excluding Department Stores) occupying at least 65% of the Floor Area of the retail space at the Enclosed Mall outlined in black on **Exhibit "E"** (the **"Retail Area"**) are open to the public and operating, and continuing thereafter throughout the Term (including any extensions thereof), Tenant agrees to pay as its sole obligation toward interior and exterior maintenance and insurance costs related to the Enclosed Mall, the Entire Tract and the Landlord Tract (other than insurance to be carried by Tenant or to be reimbursed to Landlord by Tenant, as provided in this Lease), the sum of $.30 per square foot of Floor Area of the Tenant's Store Building per year, payable monthly (if the Floor Area of Tenant's Store Building is 116,641 s.f., then 116,641 X $.30 = $34,992.30/12 = $2,916.03/month) (the "CAM Amount").

B.  During the Term, the CAM Amount shall increase every five (5) years after the Commencement Date (commencing with the 6th Lease Year), to an amount equal to the previously effective CAM Amount plus $.10 per square foot of Floor Area of the Tenant's Store Building per year (e.g., the first adjustment to the CAM Amount would be as follows if the floor area of Tenant's Store Building is 116,641: 116,641 X ($.30 + $.10) = $46,656.30/12 = $3,888.03/month).

C.  The CAM Amount set forth in this section shall be calculated on the basis of the square feet of Floor Area of Tenant's Store Building, as certified by Landlord's architect, as provided at Section IX.E.

D. Tenant shall pay the CAM Amount during the Term so long as Landlord (or some other party, pursuant to the terms of the REA) is performing maintenance of the Common Area as required in this Lease.

E. If the Enclosed Mall is not being operated and/or maintained for a period in excess of two months, Tenant shall have the right to audit Landlord's determination and computation of such costs attributable to such period, with Landlord's full cooperation, at reasonable times and on prior written notice to Landlord.

XIII. **LANDLORD'S ACCESS**

Landlord will have access to the Demised Premises during business hours to examine and exhibit it, provided Tenant has received prior Notice, but in so doing, Landlord will not unreasonably interfere with the conduct of Tenant's business. In addition, Landlord shall have the right to enter the Demised Premises to perform repairs and maintenance required of Landlord under this Lease, provided Tenant has received reasonable prior Notice. Such repairs and maintenance shall be performed as promptly as reasonably possible and so as to cause as little interference with the conduct of Tenant's business as reasonably possible (without any requirement that Landlord use overtime or premium time labor).

XIV. **ASSIGNMENT / SUBLETTING; CONCESSIONS**

A. During the effective term of Tenant's Operating Covenant, Tenant shall not assign this Lease or any interest hereunder, sublet all or any portion of the Demised Premises, or permit the Demised Premises or any part thereof to be utilized by anyone other than Tenant (whether as concessionaire, franchisee, licensee, permittee or otherwise), except as provided in Section XIV.E. below. Notwithstanding the foregoing, the original Tenant named herein may assign this Lease to any Tenant Affiliate (defined below), without Landlord's consent, but upon reasonable prior notice to Landlord, provided that the assignee shall continue to use the Demised Premises for the purposes set forth in Section III.A. of this Lease and for no other purpose. For purposes of this Lease, **"Tenant Affiliate"** shall mean any corporation or other entity which controls, is controlled by or is under common control with Tenant. The term **"control"** shall mean ownership of more than fifty percent (50%) of all of the voting stock of a corporation or more than fifty percent (50%) of all the legal and equitable interest in any other business entity.

B. Subject to Landlord's prior consent, which consent shall not be unreasonably withheld or delayed, Tenant may assign this Lease or sublet all or any portion of the Demised Premises after the earlier to occur of 1) fifteen (15) years after the Commencement Date, and 2) the expiration or earlier termination of Tenant's Operating Covenant. If Tenant so desires to assign this Lease or sublet the Demised Premises (other than to a Tenant Affiliate or as to less than ten percent (10%) of the Floor Area, in the aggregate, of Tenant's Store Building), then at least forty-five (45) days prior to the date when Tenant desires the assignment or subletting to become effective (the **"Transfer Date"**), Tenant shall give Landlord a notice (**"Tenant's Notice"**) which

shall include the following: the name, address and business of the proposed assignee or sublessee; audited financial statements of the proposed assignee or sublessee for the three (3) full fiscal years immediately preceding the Transfer Date; audited financial statements for each quarter of the current fiscal year (or, if audited statements are not available, such statements certified by the chief financial officer of the proposed assignee or sublessee); the Transfer Date and any proposed change in the use of the Demised Premises.

C.   If Landlord receives Tenant's Notice, Landlord shall have thirty (30) days within which to notify Tenant (**"Landlord's Notice"**) of its intention to terminate this Lease as of a date certain, but in no event earlier than 90 days or later than 120 days after the date of Landlord's Notice. If Landlord chooses to exercise such option to terminate the Lease, all of Tenant's obligations and duties under this Lease shall terminate as of the date of termination specified in Landlord's Notice, and all rent and other charges payable hereunder shall be prorated as of the termination date stated in Landlord's Notice; provided, however, Tenant shall have the right, by serving Notice upon Landlord within thirty (30) days following Landlord's Notice, to revoke its request to assign this Lease or sublet the Demised Premises and to thereby cause Landlord's Notice to be revoked and of no effect, in which event this Lease shall not be deemed terminated, and the assignment or subletting which was requested shall not be made.

D.   If Landlord does not so exercise the option to terminate the Lease within such 30 day period, Tenant may proceed with such proposed assignment or sublease, subject to Landlord's prior consent, which consent shall not be unreasonably withheld or delayed.

E.   Notwithstanding the foregoing, Tenant may, without Landlord's consent, have concessioned, licensed or subleased areas within the Demised Premises which are operated within Tenant's Store Building and are integrated into Tenant's operation of a department store under a single trade name in the remainder of Tenant's Store Building, both during and subsequent to the expiration or earlier termination of Tenant's Operating Covenant, but not to exceed 10% of the Floor Area of Tenant's Store Building, in the aggregate. Additionally, the original Tenant named herein may assign this Lease in conjunction with the sale or other transfer of Tenant's interest in the majority of Tenant's retail department stores in the State of California, without Landlord's prior consent, provided that the assignee shall assume in writing all of Tenant's obligations under this Lease.

F.   Any assignment in violation of the provisions of this Section XIV. shall be null and void.

XV.   **RIGHT TO ALTER OR IMPROVE / SIGNAGE**

A.   Tenant, its assignee or sublessee, may make any non-structural alterations and improvements or remodeling of interior portions of Tenant's Store Building and install fixtures and equipment in or about Tenant's Store Building without Landlord's consent. Any exterior alterations or any substantive interior structural alterations

costing more than $50,000 will be subject to the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. All alterations or improvements shall be performed in a good and workmanlike manner and in compliance with all applicable laws. Tenant shall keep the Demised Premises, Common Area and Landlord's Tract free from any liens arising out of any work performed, materials furnished or obligations incurred by Tenant.

B. Tenant may install such interior and exterior signage as are in compliance with applicable laws and consistent with the sign criteria attached hereto as **Exhibit "M"**, provided that the size of the exterior signage shall be the greater of 1) the exterior signage of the other Department Stores, and 2) the sign criteria. Tenant shall have the right to seek a sign variance, at Tenant's sole cost and expense. Tenant shall maintain, at Tenant's cost, any such signs. Landlord shall provide, at Landlord's sole cost, a sign panel for Tenant on the front (main north entrance) of the Mall, in size comparable to the building signs of the other Department Stores, subject to Tenant's reasonable approval, and on any pylon signs identifying the Mall.

C. All signs, fixtures and equipment installed by Tenant will remain the property of Tenant and may be, but shall not be required to be, removed by Tenant upon or before any termination of this Lease, provided Tenant repairs any damage caused by such removal.

XVI. **DAMAGE OR DESTRUCTION**

A. **Damage or Destruction of Demised Premises.** Except as set forth below, the damage, destruction or partial destruction of any building, or other improvement which is a part of the Demised Premises shall not allow for the termination of this Lease.

1. If Tenant's Store Building is damaged or destroyed during Tenant's Operating Covenant, then Landlord shall promptly, but in any event within eighteen (18) months from the date of such casualty, restore Tenant's Store Building; provided that if more than fifty (50%) percent of the Floor Area of Tenant's Store Building is damaged or destroyed within the last eighteen (18) months prior to the expiration of Tenant's Operating Covenant, then Landlord shall have no obligation to repair and/or restore the Demised Premises unless Tenant, within ninety (90) days of the damage or destruction, notifies Landlord in writing of Tenant's election to exercise its option to extend this Lease for the first Option Term. If Tenant so exercises the first Option Term under such circumstances, then Landlord shall restore the Demised Premises to substantially the same condition as existed immediately prior to the damage or destruction, in the manner provided at Subsection XVI.A.3., below .

2. If Tenant's Store Building is damaged or destroyed during the Term of this Lease,

but after the expiration of Tenant's Operating Covenant:

    a.  If less than fifty percent (50%) of the Floor Area of Tenant's Store Building is damaged, then Landlord shall promptly, but in any event within eighteen (18) months from the date of such casualty, restore Tenant's Store Building.

    b.  If more than fifty percent (50%) of the Floor Area of Tenant's Store Building is damaged, and

        1)  at least two (2) of the other Department Stores have either elected to rebuild or are open and operating at the Shopping Center, then Landlord shall promptly, but in any event within eighteen (18) months from the date of such casualty, restore Tenant's Store Building;

        2)  less than two (2) of the other Department Stores have either elected to rebuild or are open and operating at the Shopping Center, then either Landlord or Tenant may, on notice to the other, elect to terminate this Lease.

    c.  Notwithstanding the foregoing, if more than fifty (50%) percent of the Floor Area of Tenant's Store Building is damaged or destroyed within the last twelve (12) months prior to the expiration of the then effective Option Term, then Landlord shall have no obligation to repair and/or restore the Demised Premises unless Tenant, within ninety (90) days of the damage or destruction, notifies Landlord in writing of Tenant's election to exercise its next Option Term, if any additional Option Terms exist, to extend this Lease. If Tenant so exercises an Option Term under such circumstances, then Landlord shall restore the Demised Premises to substantially the same condition as existed immediately prior to the damage or destruction, in the manner provided at Subsection XVI.A.3., below.

  3.  For any casualty to Tenant's Store Building where Tenant does not elect to terminate this Lease or does not have the right to terminate this Lease:

    a.  Within ninety (90) days after the casualty, Landlord shall provide Tenant with a construction schedule indicating that such restoration will be completed within such eighteen month period. Landlord shall promptly clear any debris from the Demised Premises and commence the repair or restoration of the Tenant's Store Building within four (4) months of the date of the casualty. If Landlord has not commenced the repair or restoration of the Tenant's Store Building within four (4) months of the date of the casualty, or if the restoration cannot or will not be completed within eighteen months from the date of the casualty, Tenant may either i) terminate this Lease on thirty (30) days prior notice to Landlord and upon such termination, Tenant shall have no further obligations under this Lease, including without limitation, Tenant's Operating Covenant; provided, if such termination notice was based upon Landlord's failure to commence the repair or restoration within four (4) months of the date of the casualty, such termination will not become effective if, within such thirty (30) day period after Tenant's notice,

Landlord begins the necessary repairs and restoration; or ii) cause Tenant's Store Building to be repaired or restored, in which event Landlord will reimburse Tenant for all of its reasonable costs and expenses in so repairing or restoring Tenant's Store Building, plus Interest, plus ten (10%) percent of the total costs as a service fee. Landlord shall so reimburse Tenant within ninety (90) days after Tenant provides Landlord with an itemized statement of such costs and reasonable supporting detail.

b. To the extent commercially reasonable, Tenant shall, if within Tenant's Operating Covenant, continue to operate within that portion of Tenant's Store Building which was not destroyed, and Landlord shall use its commercially reasonable efforts to prevent any unreasonable interference with the conduct of Tenant's business during the course of restoration of Tenant's Store Building.

c. After Tenant's Store Building is fully restored and Landlord secures a certificate of occupancy (or the local equivalent), Tenant, at Tenant's expense, shall, if within Tenant's Operating Covenant, diligently restore fixtures in the damaged portion of Tenant's Store Building and re-open for business to the public. If upon the date of the casualty, Rent shall be payable pursuant to Section VII.E. of this Lease, Rent shall abate in proportion to the Floor Area of Tenant's Store Building which Tenant reasonably determines is not usable as a result of such casualty, commencing on the date of the casualty and continuing until the first to occur of (i) the date Tenant re-opens the damaged portion of Tenant's Store Building to the public or (ii) one hundred twenty (120) days following restoration of the damaged portion of Tenant's Store Building. As an example, if Tenant's Store Building contains 100,000 s.f. of Floor Area, and Tenant determines that 25,000 s.f. are unusable as a result of a casualty, then Tenant's rent under this Lease would be reduced by an amount equal to the then current rent times a fraction, the numerator of which shall be the unusable Floor Area, and the denominator of which shall be total Floor Area in Tenant's Store Building (25,000/100,000).

4. The proceeds of any insurance maintained by Tenant covering such damage or destruction to the Tenant's Store Building or the improvements on the Demised Premises, including any deductible amount under any applicable insurance policies, shall be made available to Landlord, or paid to Landlord by Tenant as to any deductibles, for such repairs and restoration, or, if Tenant elects to terminate this Lease, as provided herein, paid to Landlord. If Tenant elects to self-insure, then Tenant shall make available to Landlord for restoration on a timely basis, as restoration progresses, or promptly pay to Landlord, if Tenant elects to terminate this Lease, as provided herein, the full amount that would have been available for restoration or paid to Landlord if Tenant had obtained the insurance required pursuant to Section XVII.A.4. from a thirty party insurance carrier, with no deductible applicable to such policy. Notwithstanding anything to the contrary contained in this Section XVI, Landlord's obligation to repair or restore the

Demised Premises shall be limited to the amount of insurance proceeds and deductibles made available to or paid by Tenant to Landlord.

B. **Damage or Destruction to the Balance of the Shopping Center.**

1. If the buildings or other improvements on the Entire Tract (excluding Tenant's Store Building), or any part thereof, are damaged or destroyed during the Term of this Lease, and as often as any of these buildings or improvements during this period are destroyed or damaged by fire or other casualty, Landlord will rebuild, repair or replace all store buildings, Common Areas and improvements at the Mall to the extent required under the REA.

2. Nothing contained in this Section will require Landlord to rebuild a Department Store building if Landlord is not otherwise required to do so.

C. **General Provisions**

1. Subject to Force Majeure any building (other than Tenant's Store Building, which is governed by Section XVI.A., above) or other improvements which Landlord is required to rebuild or repair pursuant to this Lease will be rebuilt and ready for occupancy within eighteen (18) months from the time of the loss or destruction. Once started all work, repair or reconstruction shall be carried through continuously and diligently to conclusion.

2. Any buildings not required to be rebuilt by Landlord pursuant to this Section will be razed and cleared and left in a sightly condition and landscaped or paved for parking as would be appropriate.

XVII. **INSURANCE**

A. **Tenant's Insurance:** Subject to Tenant's right to self-insure, Tenant shall pay for and maintain, during the Term of this Lease, the following policies of insurance covering the Demised Premises, which insurance shall be obtained from companies rated "A-VII" or better by Bests Insurance Reports or its equivalent:

1. Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Tenant with a waiver of subrogation in favor of Landlord and Employer's Liability Insurance, with limits of not less than $500,000.00 per occurrence.

2. Commercial General Liability Insurance covering Tenant's operations at the Demised Premises, including, but not limited to, coverage for premises/operations, products/completed operations, contractual liability and personal/advertising injury with combined single limits of not less than $5,000,000.00 nor more than $10,000,000.00 combined single limits per occurrence, for death, bodily injury and property damage, including Landlord and Landlord's managing agent as additional insured.

3. If Tenant uses leased or owned motor vehicles on the Demised Premises or Sears Access and Parking Area, Motor Vehicle Liability Insurance with coverage for all

owned. non-owned and hired vehicles with combined single limits of liability of $3,000,000 per occurrence for bodily injury and property damage.

4. Special property insurance upon Tenant's Store Building and all improvements and/or all alterations on the Sears Parcel, including, but not limited to, those perils generally covered by Causes of Loss-Special Form, including fire, extended coverage, wind storm, vandalism, malicious mischief and sprinkler leakage, in the amount of one hundred percent (100%) of the full replacement cost, excluding the cost of footings and foundations, and with increased cost of construction and extra expense endorsements, and earthquake coverage in such amount as Landlord deems prudent and to the extent consistent with earthquake coverage typically maintained by other institutional landlords in retail shopping centers in the State of California.

5. Insurance on Tenant's fixtures, inventory and personal property.

B. Landlord's Insurance:  Landlord shall pay for and maintain, or cause to be maintained, from the date of this Lease through the end of the Term, the following policies of insurance covering the Entire Tract (but excluding the Demised Premises), which insurance shall be obtained from companies rated "A-/VII" or better as defined in the then current edition of Bests Insurance Reports (or the equivalent thereof if Bests Insurance Reports is no longer published):

1. If Landlord has employees, Workers' Compensation Insurance covering all costs, statutory benefits and liabilities under State Workers' Compensation and similar laws for employees of Landlord with a waiver of subrogation in favor of Tenant, and Employer's Liability Insurance with limits of not less than $500,000.00 per occurrence.

2. Commercial General Liability Insurance covering Landlord's operations on the Entire Tract with coverage for premises/operations, products/completed operations, contractual liability, builder's risk and personal/advertising injury liability with combined single limits of not less than $5,000,000.00 combined single limits for death, bodily injury and property damage, including Tenant as an additional insured (as defined in ISO Form CG 20 26 11 85 or its equivalent).

3. If Landlord uses leased or owned motor vehicles on the Entire Tract, Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of liability of $3,000,000 per occurrence for bodily injury and property damage.

4. Special property insurance upon all buildings, building improvements and personal property owned by Landlord (excluding Tenant's Store Building) and all alterations on the Landlord's Tract, including but not limited to, those perils generally covered by Causes of Loss-Special Form, including fire, extended coverage, wind storm, vandalism, malicious mischief and sprinkler leakage in the amount of one hundred percent (100%) of the full replacement cost, excluding the

cost of footings and foundations, and with increased cost of construction and extra expense endorsements.

C. Notwithstanding anything to the contrary contained herein, so long as the net worth of Tenant or Landlord, as applicable, equals or exceeds $150,000,000.00 and net current assets equal or exceed $75,000,000.00, then either party, as applicable shall have the right to self-insure any of it's insurance obligations under this Lease. In the event a party elects to self-insure any of such insurance obligations, then upon written request, such party shall provide the other with a statement that it has elected to self-insure. If either party elects to self-insure, the other party shall be entitled to all of the same rights and protections it would have had if the self-insuring party had obtained the coverage required pursuant to this Section XVII. from a third party insurance company, including, without limitation, the benefits of the waiver of subrogation contained in Section XVIII. below. In the event a party is not self-insuring for such risks as provided herein, such party shall furnish the other, concurrently with the execution of this Lease, and periodically (not to exceed one time per calendar year) with insurance certificates evidencing the coverages required herein and naming the other party and Landlord's Mortgagee, if any, as an additional insured on the Commercial General Liability policy. Each such certificate will expressly provide that it will not be subject to cancellation or material change without at least thirty (30) days prior notice to the other party. The parties shall promptly give the other a copy of any notice of non-renewal of such policy or policies it may receive. All policies required to be provided by Landlord or Tenant hereunder shall include an endorsement to show that such insurance carrier acknowledges the mutual waiver of subrogation contained in Section XVIII. below.

D. The specified limits of insurance to be provided by either Landlord or Tenant may be satisfied by any combination of primary or excess/umbrella liability insurance policies. At the end of each five (5) Lease Years of the initial Term, and at the beginning of each extension period, or upon Tenant's or Landlord's request, Landlord shall review with Tenant the coverages and limits of any or all of the policies required to be provided by either Landlord or Tenant above and, at that time, the parties shall cause such coverages and liability limits to be adjusted as reasonably agreed upon by Landlord and Tenant in view of reasonable exposure anticipated over the remainder of the Term.

## XVIII. **WAIVER OF SUBROGATION**

A. Notwithstanding any provision to the contrary, each party hereto waives any and every claim which arises or may arise in its favor and against the other party during the Term for any and all loss of or damage to any of its property located within or upon or constituting a part of its respective premises, and which loss or damage is or would be covered by the standard Special Property Insurance policies, whether or not actually covered.

B. This mutual waiver will be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of or damage to property of the parties.

C. Landlord and (if Tenant has not elected to self insure) Tenant agree to furnish to each insurance company which has or will issue policies of Special Property Insurance on the property in question, Notice of the terms of the mutual waivers and to have the insurance policies properly endorsed, if necessary, to acknowledge the subrogation waivers.

## XIX. INDEMNITY

A. Landlord will protect, defend, hold harmless and indemnify Tenant and the directors, officers and employees of Tenant, from and against any and all claims, actions, liabilities, losses and expenses (except such as result from the sole negligence of Tenant) relating to:

1. any and all losses or damages (including, without limitation, injury to or death of persons and damage to property) (i) allegedly or actually suffered by any person or persons as a result of Landlord's failure to make repairs or improvements to the Enclosed Mall or the Entire Tract (including the Demised Premises) which Landlord is obligated to make, or (ii) allegedly or actually arising out of or incidental to the work, services and activities of Landlord and any of its contractors and subcontractors, including, without limiting the foregoing, all acts and omissions of the partners, employees and agents of Landlord and its contractors and subcontractors in connection with any construction, repair or work performed pursuant to the provisions of this Lease, or (iii) allegedly or actually arising from or occasioned by the condition, use or occupancy of the Common Area of the Enclosed Mall and the Entire Tract by the customers, invitees, licensees, employees of Landlord, Tenant, Landlord's other tenants, owners and all other occupants of the Enclosed Mall.

2. any and all claims, liabilities, losses and expenses arising out of or related to any disruption in the conduct of Tenant's business at the Demised Premises related to the Approvals to be secured by Landlord, including, but not limited to a) lost profits from Tenant's Store Building, b) all costs incurred by Tenant in being prevented from opening in Tenant's Store Building within the time provided in this Lease, or in being required to close Tenant's Store Building to the public after opening, c) all costs incurred by Tenant in removing, relocating and storing its fixtures, inventory and equipment contained in, or received for incorporation into, Tenant's Store Building, d) salary and benefits for which Tenant may become liable to its employees as a result of such inability to open or the closing of Tenant's Store Building, e) all reasonable costs incurred by Tenant in locating and/or relocating, as applicable, to another retail location, and f) attorney's fees related to any of the above.   Landlord shall defend Tenant, its directors, officers, employees and agents, from and against all

claims arising out of or related to the Approvals to be secured by Landlord, through legal counsel reasonably acceptable to Tenant.

B.  Tenant will protect, defend, hold harmless and indemnify Landlord, and the directors, officers and employees of Landlord, from and against any and all claims, actions, liabilities, losses and expenses (except such as result from the sole negligence of Landlord) relating to any and all losses or damages (including, without limitation, injury to or death of persons and damage to property) (i) allegedly or actually suffered by any person or persons as a result of Tenant's failure to make repairs or improvements to the Demised Premises which Tenant is obligated to make or (ii) allegedly or actually arising out of or incidental to the work, services and activities of Tenant performed under these provisions, including, without limiting the foregoing, all acts and omissions of the officers, employees and agents of Tenant and its contractors and subcontractors in connection with any construction, repair or work performed pursuant to the provisions of this Lease or (iii) allegedly or actually arising from or occasioned by the use or occupancy of the Demised Premises.

## XX.   REAL ESTATE TAXES

A.  Landlord and Tenant agree that as of the Effective Date and during the Term of this Lease, Tenant will be responsible for all real estate taxes assessed against the Sears Parcel, the Tenant's Store Building  (the **"Tenant's Tax Parcel"**) and the Sears Access and Parking Area.

B.  Landlord agrees to use commercially reasonable efforts to secure a separate real estate tax parcel number for the Tenant's Tax Parcel.  Once such separate assessment is secured,  Tenant shall pay such real estate taxes (as defined below) for the Tenant's Tax Parcel directly to the taxing authority before delinquency.  In addition, Tenant shall reimburse Landlord for Tenant's prorata share, as defined below, of taxes on the Sears Access and Parking Area, as provided herein.

C.  Landlord shall furnish Tenant a copy of the real estate tax bill for the Landlord Tract and improvements which include any portion of the Tenant's Tax Parcel and/or the Tenant Access and Parking Area, marked "Paid in Full".  Tenant agrees to tender payment to the Landlord of Tenant's pro rata share, as defined below, within thirty (30) days after receipt by Tenant of such tax bill along with Landlord's statement and supporting data indicating Landlord's computation of Tenant's share of such bill for the applicable period.

1.  **"Real estate taxes"** shall include the gross amount of real estate taxes and assessments, excluding, however, a) Clovis Sierra Vista Assessment District, Series 1915, Bonds issued as of November 15, 1988 and identified as Permitted Exception #4 on **Exhibit "J"**, including any re-issuance and/or refinancing thereof, b)  any additional charges or penalties incurred by Landlord due to late payment of real estate taxes, and c) any discount earned by Landlord due to early payment of real estate taxes.

2. Tenant's **"pro rata share"** of real estate taxes shall be determined as follows:

   a) if Tenant's Tax Parcel has not been separately assessed, by multiplying the total of such tax bill by a fraction, the numerator of which is the Floor Area of Tenant's Store Building and the denominator of which is the total Floor Area within all improvements covered by such tax bill.

   b) from and after the date that Tenant's Tax Parcel is separately assessed, then Tenant's pro rata share shall relate only to real estate taxes for the land assessment (as determined from the tax assessment or the assessor's working papers) covering Tenant's Access and Parking Area, and shall not include any improvements; Tenant's pro rata share shall be determined by multiplying the total land assessment by a fraction, the numerator of which shall be the land area of Tenant's Access and Parking Area and the denominator of which shall be the total land area reflected in such bill.

   c) Tenant shall have the right, upon Notice to Landlord, to contest any tax computation of Landlord.

D. Landlord shall timely pay any assessments against the Landlord Tract, including the Sears Parcel, to the extent Tenant is not obligated to pay such amounts. On written request, Landlord shall provide Tenant with evidence of the payment of such assessments.

E. If Tenant deems the real estate tax rate or assessment to be excessive or illegal, Tenant shall have the right to contest the real estate tax, but only if Tenant's Tax Parcel is then separately assessed. Notwithstanding the foregoing, if at any time payment of the whole or any part of such tax bill should become necessary to prevent the foreclosure of a tax lien on Tenant's Store Building or the Landlord Tract, or any part thereof, or to prevent interference with Landlord's interest in Tenant's Store Building, then Tenant shall pay or cause to be paid its prorata share of the same, together with all penalties, in sufficient time to prevent the foreclosure of a tax lien or to prevent interference with Landlord's interest in Tenant's Store Building. Tenant shall pay all costs, expenses, attorneys' fees, penalties, interest and court costs incurred in such a contest; provided, if Tenant is successful in such a contest, the remission or refund shall be paid out: first, to Tenant for its reasonable costs, expenses and attorneys' fees; next to Tenant as a refund of any overpayment of real estate tax, penalties or interest paid by Tenant; finally, to any other party having a claim to such refund or remission.

F. Landlord shall promptly furnish to Tenant any notice related to a change or proposed change in the assessment of Tenant's Tax Parcel or Tenant's Access and Parking Area during the Term.

G. If Tenant deems the real estate tax rate or assessment to be excessive or illegal, and Tenant's Tax Parcel is not separately assessed, upon request by Tenant, Landlord shall exercise commercially reasonable efforts to contest the real estate tax rate or

assessment, provided that Landlord shall appeal only increases above the amount of real estate taxes and assessments for the tax year of 1996-97. If Landlord obtains a remission or a refund of all or part of any real estate tax for any tax year for which Tenant's pro rata share has been paid, Landlord will promptly refund to Tenant a proportionate share of the remission or refund, the proportionate share to be calculated after Landlord first deducts all costs, expenses, attorneys' fees, penalties, interest and court costs incurred in obtaining the remission or refund. Notwithstanding the foregoing, Tenant shall not be entitled to any amounts payable to Landlord pursuant to that certain Sierra Vista Mall Owner Participation Agreement dated as of July 20, 1998 by and among the Clovis Community Development Agency, the City of Clovis, and Landlord.

H. Landlord will pay and indemnify Tenant against the payment of all taxes, charges and assessments levied or assessed against the Landlord Tract, as the same become due. To the extent that taxes measured on the rentals hereunder are used in lieu of real estate taxes, the taxes will be considered real estate taxes.

I. Landlord represents and warrants that to the best of its knowledge, there are no special assessments or impact fees presently applicable to the Sears Parcel or Tenant's Store Building, except as disclosed in the Title Commitment.

J. Landlord agrees that if at any time during the term of the Lease it desires to contest the real estate property taxes and/or assessments attributable to all or any portion of the Landlord Tract or the improvements located thereon:

1. it shall not proffer or utilize in any such contest the Unitary Valuation and Allocation approach, or any similar theory of real estate tax valuation and assessment (the "UVA").

2. In the event that Landlord files and or takes any position in violation of the foregoing provision in any such real estate tax contest or other action involving or effecting the valuation of and/or real estate taxes attributable to the Landlord Tract, then Landlord agrees to pay, indemnify, protect and save and hold Tenant harmless from and against any and all increases in real estate taxes and/or assessments on the Demised Premises attributable to Landlord's contest or action, or application of the UVA to the Landlord Tract, and all liabilities, obligations, losses, damages, costs, penalties, expenses (including reasonable attorney's fees and expenses), causes of action, suits, claims, demands and judgments of any nature whatsoever arising as a result thereof.

## XXI.   DEFAULTS

A. The occurrence of any one or more of the following events shall constitute a default of Tenant under this Lease:

1. If Tenant fails to make any payment of Rent or any other monetary payment required of Tenant hereunder within the time provided, and thereafter fails to make such payment within thirty (30) days of its receipt of Notice from Landlord.

2.  If Tenant fails to perform any of the terms or provisions of this Lease to be performed by Tenant, other than the provisions for the payment of Rent or other monetary payments, and Tenant fails to cure such condition within thirty (30) days after receipt of Notice from Landlord; provided that, if the default is of a character as to require more than thirty (30) days to cure, Tenant shall not be in default so long as Tenant commences such cure within such thirty day period and thereafter diligently prosecutes the cure to completion.

B.  The Landlord shall be in default under this Lease if Landlord fails to perform any of the terms or provisions of this Lease to be performed by Landlord, or if an event of default exists under the Ground Lease, and Landlord fails to cure such condition within thirty (30) days after receipt of Notice from Tenant; provided that, if the default is of a character as to require more than thirty (30) days to cure (and as to a default under the Ground Lease, an additional period of time to cure is provided in the Ground Lease), Landlord shall not be in default so long as Landlord commences such cure within such thirty day period and thereafter diligently prosecutes the cure to completion.

C.  On the occurrence of a default under this Lease, Landlord and Tenant shall have the following remedies:

1.  For any monetary default by Tenant, or breach of Tenant's Operating Covenant, Landlord shall have the right to:

   a.  Declare this Lease at an end and re-enter the Demised Premises with process of law and take exclusive possession thereof, and thereupon Tenant shall have no further claim therein or hereunder, in which event Tenant shall pay Landlord a sum of money equal to the total of the following:

      1)  The worth at the time of award of the unpaid Rent which had been earned up to the time of termination;

      2)  The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

      3)  The worth at the time of award of the amount by which the unpaid Rent accruing for the balance of the Term after the time of award exceeds the amount of such rental loss for such period that Tenant proves could be reasonably avoided; and

      4)  Any other amount reasonably necessary to compensate Landlord for any and all damages proximately caused by Tenant's failure to perform its obligations under this Lease. Landlord agrees to use commercially reasonable efforts to mitigate its damages in such event.

   As used in subparagraphs C.1.a.1) and 2) above, the "worth at the time of award" is computed by allowing interest at the Interest rate. As used in subparagraph 3) above, the "worth at the time of award" is computed by

S:\GFILICE\CLOVIS4C.SAM    (SMALPED)    October 14, 1998    11:54 AM                *SEARS*                    **31**

discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco, California at the time of award plus one percent (1%).

    b.  Relet the Demised Premises prior to the time of award for default of this Lease by Tenant, and if Landlord proves that in reletting the Demised Premises it acted reasonably and in good faith to mitigate the damages, Landlord shall be entitled to recover damages computed under subparagraph C.1.a., 3) hereinabove.

       Landlord shall not be deemed to have terminated this Lease or Tenant's liability hereunder by an act of Landlord maintaining or preserving the Demised Premises, or seeking to relet the Demised Premises; or having a receiver appointed to protect Landlord's interest under this Lease, unless Landlord expressly notifies Tenant in writing that it elects to terminate this Lease.

2.  For any monetary default of Landlord, Tenant may offset such amounts due, plus interest, from Rent otherwise due to Landlord under the Lease.

3.  For any non-monetary default of either Landlord or Tenant, Landlord or Tenant, as the case may be, may, at its sole option, cure the default upon fourteen (14) days prior written notice to the other after the expiration of the applicable cure period. Unless such condition is then cured by the responsible party within such fourteen days, or the cure commenced within such time and thereafter diligently prosecuted to completion, then Landlord or Tenant, as the case may be, may, without obligation to do so, cure such condition and the reasonable expenditures in so curing such condition will be due within ten (10) days of demand, accompanied by reasonable evidence of such expenditures. If such party is not reimbursed within ten (10) days of written demand therefor, then said unpaid amount shall bear Interest on the unpaid balance at the Interest rate until paid in full.

D.  No failure by Landlord or Tenant to insist upon the strict performance of any term, covenant, agreement, provision or condition in the event of a default thereof, and no acceptance of full or partial Rent during the continuance of any such default, shall constitute a waiver of any such default or of such term, covenant, agreement, provision or condition. No term, covenant, agreement, provision or condition of this Lease to be performed or complied with by Landlord or Tenant, shall be waived except by written instrument executed by the other party, and no waiver of any default shall affect or alter this Lease, except as to that specific default, but each and every term, covenant, agreement, provision and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent default thereof.

E.  In the event of any default or threatened default by either party of any of the terms, covenants or agreements contained in this Lease, then the non-defaulting party shall 1) be entitled to enjoin such default or threatened default; and 2) have the right to

invoke any right and remedy allowed by law or in equity or by statute or otherwise as though re-entry, summary proceedings and other remedies were not provided for in this Lease; and 3) use commercially, reasonable efforts to mitigate its damages as a result of any such default.

F.   Each right and remedy provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

## XXII.  UTILITIES

A.   Landlord shall furnish the Tenant's Store Building with connections for all necessary utility services as of the Delivery Date, including, but not limited to water, gas, electricity, sanitary sewers, as provided in the Landlord's Plans and Specifications.

B.   From the Delivery Date Tenant agrees to pay for all utility services rendered or furnished to the Tenant's Store Building, including heat, water, gas, electricity, sewer rental, sewage treatment facilities and the like, together with all taxes levied or other charges made on such utilities and governmental charges based on utility consumption. Landlord shall not be liable for the quality, quantity, failure or interruption of such services to the Demised Premises, unless caused by Landlord, its licensees or agents.

## XXIII.  HAZARDOUS MATERIALS

Landlord and Tenant agree as follows with respect to the existence or use of **"Hazardous Material"** (as defined below), on the Entire Tract:

A.   **Landlord's Representations**.  Landlord hereby represents and warrants to Tenant, to the best of Landlord's knowledge, that, except as set forth in that certain report dated October 27, 1995 prepared by Hillmann Environmental Company, a copy of which has been furnished to Tenant, it is not aware that any Hazardous Material is being used, disposed of or is located on or under the Sears Tract or the soil and ground water on or under the Entire Tract in violation of applicable law, and that no Hazardous Material will be used in the construction by Landlord of Tenant's Store Building, except as specified in Landlord's Plans and Specifications or as may be permitted under applicable law.

B.   **Landlord's Covenants**.  Landlord hereby covenants to Tenant as follows:

1.   Landlord shall be responsible for all costs incurred in complying with any order, ruling or other requirement of any court or governmental body or agency having jurisdiction over the Entire Tract requiring Landlord to comply with any laws

which relate to Hazardous Material or which relate to Hazardous Material created, handled, placed, stored, used, transported or disposed of by Landlord, including, without limitation, the cost of any required or necessary repair, cleanup or detoxification and the preparation of any closure or other required plans, and Landlord shall diligently pursue to completion all such work required in connection with the same, excluding however any such costs relating to Hazardous Material on the Demised Premises established to have been brought onto the Demised Premises by Tenant or its employees, agents, or contractors, invitees or customers (**"Tenant's Hazardous Material"**), unless Tenant's Hazardous Material is released onto the Demised Premises or the remainder of the Entire Tract by reason of the negligence or fault of Landlord, its employees, agents, or contractors; and

2.  Landlord shall indemnify, defend and hold Tenant, its directors, officers, employees and agents and any successor to Tenant's interest in the Demised Premises harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys fees, consultant fees, and expert fees) which might directly or indirectly (but excluding consequential damages, including lost profits) or in whole or in part be caused by, arise out of, or be related to (a) Hazardous Material which was created, handled, placed, stored, used, transported or disposed of by Landlord or its employees, agents or contractors in violation of applicable laws, or (b) Hazardous Material with respect to which any court, governmental body or agency having jurisdiction over the Entire Tract holds Landlord responsible or otherwise requires Landlord to undertake any repair, cleanup, detoxification or other remedial action (excluding Tenant's Hazardous Material, unless Tenant's Hazardous Material was released onto the Demised Premises or the remainder of the Entire Tract by reason of the negligence or fault of Landlord, its employees, agents, or contractors), to the extent not removed or remediated within a reasonable period of time after Landlord becomes aware of such condition, or (c) the breach of any representation, warranty or covenant of Landlord contained in this Section.

3.  If as a result of any breach of any representation, warranty or covenant contained in this Section any agency having jurisdiction requires closure of a material portion of Tenant's Store Building or a cessation of Tenant's business operations at the Demised Premises, and such condition is not cured within ninety (90) days of notice to Landlord (excluding Tenant's Hazardous Material unless Tenant's Hazardous Material was released onto the Demised Premises or the remainder of the Landlord Tract by reason of the negligence or fault of Landlord, its employees, agents or contractors), Tenant has the right (without waiving any of its other remedies) to either (a) terminate this Lease at its sole election by written notice to Landlord, such termination to be effective as of the date of Tenant's written notice, or (b) have its Rent and any other charges payable by Tenant hereunder abated in proportion to the extent of interference with Tenant's business until such time as the Demised Premises and the Landlord Tract comply with all

laws and Landlord has cured its breach of any representation, warranty or covenant contained herein in a manner reasonably satisfactory to Tenant.

4. Landlord shall diligently pursue any responsible parties in connection with the performance of any cleanup, repair, detoxification or other remedial action with respect to Hazardous Material to which Landlord is not obligated to take any action.

C. **Tenant's Covenants.** Tenant hereby covenants to Landlord as follows:

1. Tenant shall be responsible for all costs incurred in complying with any order, ruling or other requirement of any court or governmental body having jurisdiction over the Sears Parcel requiring Tenant to comply with any laws which relate to Tenant's Hazardous Material including, without limitation, the cost of any required or necessary repair, cleanup or detoxification and the preparation of any closure or to other required plans, and Tenant shall diligently pursue to completion all such work required in connection with the same, excluding however any such costs relating to Hazardous Material on the Entire Tract established to have been caused directly either by use of the Entire Tract by the Landlord or Landlord's other tenants or Landlord's acts or omissions relating to the Demised Premises or Entire Tract, or use of the Entire Tract by any other third party; and

2. Tenant shall indemnify, defend and hold Landlord, its directors, officers, employees and agents and any successor to Landlord's interest in the Demised Premises harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, sums paid in settlement of claims, attorneys fees, consultant fees and expert fees) and all foreseeable and unforeseeable consequential damages, whether known or unknown, which might directly or indirectly or in whole or in part be caused by, arise out of, or be related to (a) Tenant's Hazardous Material, or (b) Hazardous Material with respect to which any court, governmental body or agency having jurisdiction over the Sears Tract holds Tenant responsible or otherwise requires Tenant to undertake any repair, cleanup, detoxification or other remedial action, excluding however Hazardous Material on the Entire Tract established to have been caused directly either by use of the Entire Tract by Landlord, or Landlord's employees, agents or contractors acts or omissions relating to the Entire Tract, or use of the Entire Tract by any co-tenant or third party, or (c) the breach of any representation, warranty or covenant of Tenant contained in this Section.

D. **Hazardous Materials.** As used herein, the term **"Hazardous Material"** means, without limitation:

1. Those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "pollutant," "contaminant," or "solid waste" in any of the Environmental Laws, as defined herein; and

2. Such other substances, materials, and wastes which are or become regulated under applicable federal, state or local law, or which are classified as hazardous or toxic under present or future Environmental Law or other federal, state or local laws or regulations; and

3. More specifically, but not by way of limitation, any substance designated pursuant to Section 311(b)(2)(A) of the Clean Water Act, as amended, (33 U.S.C. Section 466 et seq.); any element, compound, mixture, solution or substance designated pursuant to Section 102 of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, (42 U.S.C. 9601 et seq.); any hazardous waste having the characteristics identified under or listed pursuant to the Solid Waste Disposal Act, as amended, (42 U.S.C. 6921 et seq.) any toxic pollutant listed under Section 307 (a) of the Clean Water Act, as amended, (33 U.S.C. Section 44 et seq.); any hazardous air pollutant listed under Section 112 of the Clean Air Act, as amended, (42 U.S.C. 1857 et seq.); and any imminently hazardous chemical substance or mixture with respect to which the Administrator of the Environmental Protection Agency has taken action pursuant to Section 7 of the Toxic Substances Control Act, as amended, (15 U.S.C. 2601 et seq.) (all of the foregoing statutes and laws together with any and all laws relating to hazardous materials or toxic, dangerous or unhealthy substances or conditions or relating to the interaction of the use or ownership of property and the environment whether such laws are (a) criminal or civil, (b) federal, state or local (c) statutory, common law or administrative regulation, (d) currently in effect or enacted in the future, being sometimes hereinafter collectively referred to as **"Environmental Laws"**); and

4. The term hazardous materials, as used herein, also includes, but is not limited to polychlorinated bi-phenyls (**"PCBs"**), asbestos, asbestos containing materials, radon, urea, formaldehyde and related substances. petroleum products, asbestos, and any other hazardous or toxic substance, material or waste, which is or becomes regulated by any local government's authority, the State of California, or the United States government.

E. Additional Covenants, Warranties and Representations Regarding Asbestos Materials:

1. Landlord covenants, warrants and represents that no part of the walls, ceiling, structural steel, flooring, pipes or boilers in Tenant's Store Building will be wrapped, insulated, fireproofed or surfaced with any asbestos-containing materials in violation of applicable laws (hereinafter **"ACM"**).

2. During the Term hereof, if any testing or examination indicates the presence of ACM in Tenant's Store Building which was installed by Landlord in violation of applicable laws, then within thirty (30) days after Notice from Tenant to Landlord, Landlord, at its sole cost and expense, shall commence and thereafter diligently remove or abate same, and shall restore Tenant's Store Building to the condition it was in prior to such removal or abatement, but with new non-ACM wrapping,

insulation, fireproofing or surfacing. If within thirty (30) days after Landlord receives the Notice it has not commenced removal or abatement and restoration, or Landlord fails to diligently pursue such removal or abatement and restoration to completion, Tenant may either terminate this Lease upon thirty (30) days Notice to Landlord, or make all changes and alterations and hire any contractors and experts Tenant reasonably deems necessary to effect and supervise such removal or abatement and restoration of Tenant's Store Building, removal or abatement of ACM, and restoration, shall be performed in compliance with all applicable federal, state, county and municipal laws, rules, regulations and ordinances governing abatement, removal handling or disposal of ACM.

3. Landlord shall pay to Tenant all consequential damages (including lost profits) arising out of Landlord's breach of the covenants and warranties contained in this Subsection. Furthermore, if Tenant undertakes such removal or abatement and restoration from the Tenant's Store Building, Tenant shall be entitled to set-off against rent and other sums due or to become due hereunder, together with Interest, all costs and expense associated therewith, including, but not limited to, a) restoration, b) removal or abatement or disposal of ACM, c) air quality and materials testing, d) related consultants' and experts' fees and e) fines, fees or costs of any nature whatsoever charged or assessed by any governmental authority or agency regulating or supervising such removal or abatement or disposal of ACM.

4. In addition to any other remedy which Tenant may have under this Lease, at law or in equity, if Landlord breaches any of the covenants and warranties contained in this Subsection, Tenant shall be entitled to extend the Term hereof by a period equal to the time elapsed from the date of Tenant's initial Notice to Landlord to the date that the removal or abatement and restoration of ACM are completed starting with the date of Tenant's initial notice to Landlord through the date that the removal or abatement and restoration are completed, and all Rent and other charges payable hereunder shall abate, to the extent that such removal or abatement and restoration interferes with the conduct of Tenant's business, provided that Tenant has not elected to terminate this Lease.

## XXIV. TENANT'S AND LANDLORD'S OPERATING COVENANTS

A. Subject to the other provisions of this Lease:

1. Tenant will, from and after the opening for business in Tenant's Store Building and for the first fifteen (15) years of the Term after the opening date, continuously operate or cause to be operated in Tenant's Store Building (but excluding the TBA) a full line retail department store, under the name of "Sears" or another name as Sears will be operating under in the majority of its comparable retail department stores in the State of California ("**Tenant's Operating Covenant**") provided the following conditions are satisfied: (i) Landlord shall not be in default of Landlord's Operating Covenant, as defined below; (ii) Mall Tenants occupying at least sixty five percent (65%) of the Floor Area of the Retail Area shown on **Exhibit "E"** shall be open and operating; and (iii) two of the three

other Department Stores are open and operating a retail department store at the Shopping Center. Notwithstanding anything set forth hereinabove to the contrary, if at any time during the term of Tenant's Operating Covenant, any of the foregoing conditions are not satisfied, Landlord will have twelve (12) months after written notice from Tenant within which to cure such condition, or Tenant thereafter may terminate Tenant's Operating Covenant and/or, at Tenant's sole election, cease to operate; provided, however, that Tenant shall continue to pay Rent during the remainder of the Term at an amount equal to the average Percentage Rent paid by Tenant for the three Lease Years immediately preceding termination of Tenant's operations in Tenant's Store Building. If Tenant elects to terminate Tenant's Operating Covenant and ceases operations in Tenant's Store Building, Landlord shall thereafter have the right to terminate this Lease effective upon ninety (90) days written notice to Tenant; provided, if Tenant commits to restart operations in Tenant's Store Building in writing within such 90 day period, Landlord's notice of termination shall be null and of no effect. Tenant's Operating Covenant shall inure to the benefit of Landlord and Landlord's successors and assigns. The REA Parties, Mall Tenants, Non-Mall Tenants and other third parties are not intended to be third party beneficiaries of Tenant's Operating Covenant, and such third parties shall have no rights to enforce the same.

2.  So long as Tenant's Operating Covenant shall be in effect and the Tenant under this Lease shall be the original Tenant named herein, Tenant agrees to be open for business to the public in Tenant's Store Building during hours consistent with a majority of Tenant's full line retail department stores operating in the State of California. So long as Tenant's Operating Covenant shall be in effect but the Tenant under this Lease shall no longer be the original Tenant named herein, or a Tenant Affiliate, Tenant agrees to be open for business to the public in Tenant's Store Building during the hours that at least two of the other Department Stores are open for business.

3.  Subject to the provisions of this Lease, including, without limitation, Sections III. and XIV.E hereof, the number and types of departments to be operated in Tenant's Store Building, the particular contents, wares and merchandise to be offered for sale and the services to be rendered, the methods and extent of merchandising and storage thereof, and the manner of operating Tenant's Store Building in every respect whatsoever shall be within the sole and absolute discretion of Tenant.

4.  Subject to the limitations set forth in Section XIV.B., and Section XIV.E., Tenant may operate Tenant's Store Building in whole or in part by licensees, subtenants or concessionaires; provided, however, that during Tenant's Operating Covenant, the appearance to the public shall be that of a full line retail department store consistent with the appearance of the majority of Tenant's comparable retail department stores in regional shopping centers being operated in the State of California.

5.  A cessation of business by Tenant, by any Department Store or by any Mall Tenant shall not be deemed a cessation of business for the purposes of this Section XXIV if such cessation:

   a.  is occasioned by the making of repairs, alterations or renovations due to damage or destruction of the premises where such cessation of business occurs; or

   b.  is occasioned by an eminent domain taking; or

   c.  is caused by a condition which is less than three (3) consecutive months in duration.

B.  Throughout the Term of this Lease and so long as Tenant's Store Building is occupied and operating as provided in this Lease for retail department store purposes, Landlord shall use reasonable efforts to have leased and operating at least 65% of the Floor Area of the Retail Area, as identified on **Exhibit "E"**, for retail and other uses consistent with those found in regional shopping centers in California (**"Landlord's Operating Covenant"**).

## XXV.  PROMOTIONAL FUND

A.  If one exists or is established, Tenant agrees to contribute the sum of $2,000 per year to a fund for the promotion of the Mall and the benefit of the occupants of the Mall during each of the first three years after opening for business in Tenant's Store Building.

B.  Any decision by Tenant after the first three years after opening for business in Tenant's Store Building to continue as a member or participant of the Promotional Fund, or to discontinue membership, or to discontinue its contribution to the Promotional Fund, and any agreement as to the dues or contribution to be paid by Tenant if Tenant elects to be a member or to contribute to the Promotional Fund, will be made solely by Tenant's Store Manager. In no event shall Tenant ever be required to pay more than $2,000.00 per year.

## XXVI.  NOTICES TO GROUND LESSOR AND HOLDERS OF FIRST SECURITIES

A.  Tenant agrees to send notice contemporaneously with any notice of default which it serves upon Landlord to:

   1.  Ground Lessor; and

   2.  Landlord's Mortgagee.

B.  Ground Lessor or Landlord's Mortgagee will be permitted to cure the default not later than sixty (60) days after the date of Tenant's Notice; provided that in the case of a default which cannot with diligence be remedied within the sixty (60) day period, Ground Lessor or Landlord's Mortgagee will have an additional period (without extension of time to gain possession of the Demised Premises or otherwise obtain the legal right to cure such default) to remedy the default if Ground Lessor or Landlord's

Mortgagee has promptly commenced such curing and diligently pursues such curing to completion.

## XXVII. EFFECT OF EMINENT DOMAIN

A. **Total Condemnation.** In the event the entire Demised Premises or all of Tenant's Access and Parking Area shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority, this Lease shall terminate and expire as of the date of such taking, and Tenant shall thereupon be released from any liability thereafter accruing hereunder.

B. **Partial Condemnation.**

1. In the event that a portion of the Demised Premises or Tenant's Access and Parking Area shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority, except for a temporary taking which will not exceed one hundred twenty (120) days, then:

   a. if the remainder of the Demised Premises and Tenant's Store Building are or will be, after restoration, adequate for the operation of Tenant's business, in Tenant's reasonable determination, and Tenant's Access and Parking Area shall remain adequate to support Tenant's parking requirements, then Landlord shall promptly repair and/or restore those areas of the Demised Premises, Tenant's Store Building and Tenant's Access and Parking Area , as applicable, and this Lease shall remain in full force and effect.

   b. if, in Tenant's reasonable determination, the remainder of the Demised Premises and Tenant's Store Building would not be adequate for the operation of Tenant's business, and/or Tenant's Access and Parking Area would not be adequate to support Tenant's parking requirements, then at Tenant's option, this Lease shall terminate and expire as of the date of such taking, and Tenant shall thereupon be released from any further obligations or liability thereafter accruing under this Lease. In such event, Tenant shall notify Landlord of its election to terminate this Lease as of the date of a partial condemnation on written notice within forty-five (45) days after the effective date of such appropriation or taking.

2. In the event of a partial condemnation or a partial taking and Tenant does not so terminate this Lease and/or does not have the right to terminate this Lease, then this Lease shall continue in full force and effect as to the part not taken, and to the extent necessary, a) Landlord shall promptly restore and/or repair those areas of the Demised Premises impacted by such taking; and b) Landlord shall lease to Tenant such additional part of the Landlord Tract as necessary for the operation of Tenant's business in conformance with the provision of this Lease. Charges to be paid by Tenant during the remainder of the Term shall be adjusted proportionately, on a square footage basis.

C. **Condemnation Award**.

1. If Tenant does not elect or does not have the right to terminate this Lease as a result of a taking of the Demised Premises, the award for the Demised Premises shall be used first for the restoration of Tenant's Store Building and/or Tenant's Access and Parking Area to constitute the same as a complete architectural unit, to the extent practicable, and next to reimburse Tenant for any actual loss incurred as a result of the taking, and the balance shall be paid to Landlord.

2. If this Lease is terminated as a result of a taking, Tenant shall be entitled compensation from the award, to the extent so provided, for i) the unamortized value (on a straight line basis over 25 years or the remaining term of this Lease, whichever is less) of leasehold improvements made by Tenant, at its cost and expense, and not reimbursed by Landlord; ii) Tenant's moving costs, and iii) damage to or loss of Tenant's inventory, personal property and trade fixtures caused by the taking; and the balance of the award, including, without limitation, any compensation or damages with respect to Tenant's leasehold estate, shall be paid to Landlord.

## XXVIII. EASEMENTS

On the written request of Tenant during the Term, Landlord will execute any appropriate forms to grant or allow any standard easements benefiting or burdening the Sears Tract, the terms of which are acceptable to Landlord and Tenant.

## XXIX. SURRENDER OF POSSESSION

Tenant will surrender the Demised Premises to Landlord at the end of the Term in good condition and repair, except for normal wear and tear and condemnation. Tenant will have the right, but not the obligation, to remove from the Demised Premises all trade fixtures and equipment which were installed by Tenant. Tenant shall repair any damage caused by such removal.

## XXX. NOTICES

Notices shall be in writing and shall be deemed properly served (a) three (3) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (b) the next business day after being deposited with a reputable overnight express carrier (e.g., Federal Express, Airborne, Express Mail) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery or (c) upon receipt if personally delivered.

Notices shall be addressed as follows:

| | |
|---|---|
| **TENANT:** | **SEARS, ROEBUCK AND CO.**<br>Attn: Vice President, Real Estate<br>Department 824RE<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179 |
| **COPY TO:** | **SEARS, ROEBUCK AND CO.**<br>Attn: Assistant General Counsel, Real Estate<br>Department 766X<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179 |
| **FOR REAL ESTATE TAX INVOICES:** | **SEARS, ROEBUCK AND CO.**<br>Real Estate Taxes<br>Department 768TAX<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179 |
| **FOR RENT AND OTHER REAL ESTATE INVOICES:** | **SEARS, ROEBUCK AND CO.**<br>Real Estate Payments<br>Department 824RE<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179 |
| **WITH A COPY TO:** | Sears Store Manager<br>**SEARS, ROEBUCK AND CO.** |

**NOTICES OTHER THAN OF LANDLORD'S DEFAULT:**

| | |
|---|---|
| **LANDLORD:** | **General Growth Management of California, Inc.**<br>400 South Highway 169, Suite 800<br>Minneapolis, MN 55426<br>Attn: Senior Vice President |
| **WITH A COPIES TO:** | General Manager, Sierra Vista Mall<br>1050 Shaw Avenue, Suite 1075<br>Clovis, CA 93612 |

**CEE RETAIL REALTY, INC.**
c/o Citicorp Real Estate, Inc.
725 S. Figueroa Street, 3rd Floor
Los Angeles, California 90017
Attn: Asset Manager for Sierra Vista Mall

**NOTICES OF LANDLORD'S DEFAULT OR NOTICES COMMENCING OR RELATING TO ANY ACTION, SUIT OR PROCEEDING AGAINST LANDLORD:**

**General Growth Management, Inc.**
400 South Highway 169, Suite 800
Minneapolis, MN 55426
Attn: General Counsel

**WITH COPIES TO:**

**CEE RETAIL REALTY, INC.**
c/o Citicorp Real Estate, Inc.
725 S. Figueroa Street, 3rd Floor
Los Angeles, California 90017
Attn: Asset Manager for Sierra Vista Mall

**CEE RETAIL REALTY, INC.**
c/o Citicorp Real Estate, Inc.
One Sansome Street, 28th Floor
San Francisco, CA 94104
Attn: Senior Asset Manager, West Coast Region

**Citicorp Real Estate, Inc.**
599 Lexington Avenue
New York, New York 10043
Attn: General Counsel

or to any other address furnished in writing by any of the foregoing. Any Notices of change of address by Landlord to Tenant shall completely restate all addresses to which Tenant shall send Notices.

## XXXI. <u>CHOICE OF LAW</u>

This Lease will be governed by the law of the State of California.

XXXII. **NO PARTNERSHIP**

Nothing contained in this Lease will be construed to make the parties partners or joint venturers, or to render any party liable for the debts or obligations of the other.

XXXIII. **PARTIAL INVALIDITY**

Should any part, term or provision of this Lease be held illegal or in conflict with any law, the validity of the remaining provisions will not be affected.

XXXIV. **NO WAIVER**

The exercise by Landlord or Tenant of any right or remedy, or of any alternative rights or remedies, granted under this Lease to Landlord or Tenant, will not affect or prejudice any other rights or remedies that Landlord and Tenant may have. Any failure of Landlord or Tenant promptly to exercise the rights or pursue the remedies accruing hereunder by reason of any breach or default of the other will not operate as a wavier, but the respective rights and remedies will be available to each party at any time prior to the complete remedying of any breach or default by the other.

XXXV. **RIGHTS CUMULATIVE**

All rights, privileges and remedies afforded the parties by this Lease will be deemed cumulative and the exercise of any one of the remedies will not be deemed to be a waiver of any other rights, remedy or privilege.

XXXVI. **RUNNING WITH THE LAND**

All the covenants, agreements, conditions and restrictions in this Lease are covenants running with Landlord's ground leasehold interest in the land during the Term of this Lease, and shall inure to the benefit of and be enforceable by the parties hereto and their successors and assigns, including all subsequent ground lessees of the Landlord Tract, and to the holders of any mortgages or deeds of trust who have succeeded to the interests of the foregoing persons.

XXXVII. **ESTOPPEL CERTIFICATE / SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

A.  If at the Commencement Date or during the Term, the Demised Premises shall be, or becomes, subject to one or more mortgages, Landlord, or Landlord's Mortgagee, and Tenant, upon written request, shall execute a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") in the form attached hereto as **Exhibit "I"**. If a mortgage exists as of Commencement Date, Landlord shall provide an SNDA executed by Landlord's Mortgagee prior to the Commencement Date.

B.  Each party will, within thirty (30) days of written request from the other party, provide an estoppel certificate in the form attached hereto as **Exhibit "N"**, whereby each party will advise the other by certified or registered mail, and any prospective purchaser or mortgagee designated by Landlord, of the status of this Lease and, to the parties' knowledge, whether it is in full force and effect or in default. If the party receiving the request contends that the Lease is not in full force or is in default, it will specify the default.

## XXXVIII. BENEFIT TO SUCCESSORS AND ASSIGNS

This Lease will inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties. Nothing in this Lease, express or implied, is intended to confer upon any person, other than the parties and their successors and assigns, any rights or remedies under or by reason of this Lease.

## XXXIX. ATTORNEYS FEES

Landlord and Tenant hereby agree that in the event either party hereto retains an attorney for the purpose of enforcing any claims or demand arising out of or connected with this Lease, the obligations of either party contained herein or in connection with Tenant's use or occupancy of the Demised Premises, the prevailing party shall be entitled to recover from the losing party all of such party's costs and expenses incurred in connection with such action including, without limitation, reasonable attorney's fees at the administrative, trial or appellate levels, in such amount as the court shall award. The losing party shall also pay the attorneys' fees and costs incurred by the prevailing party in any post-judgment proceedings to collect and enforce the judgment. The covenant in the preceding sentence is separate and several and shall survive the merger of this provision into any judgment on this Lease.

## XL.   JOINT PREPARATION

This Lease has been drafted and prepared through the joint efforts of the parties and shall be construed accordingly.

## XLI.  RECORDING

Landlord and Tenant agree not to record this Lease. Landlord and Tenant shall enter into and execute a Memorandum of Lease in the form attached hereto as **Exhibit "O"** at the time this Lease is executed which Landlord shall record at Landlord's expense. Landlord will pay all transfer and recording taxes, charges and assessments levied, assessed or incurred upon execution, delivery or recordation of this Lease, as they become due. Upon the expiration or termination of this Lease, Tenant will execute, acknowledge and deliver a quitclaim deed, in form and content acceptable to Tenant, releasing its interest under this Lease and the Memorandum.

XLII. **ENTIRE AGREEMENT**

This Lease, the attached exhibits and the General Conditions and Tenant's Plans and Specifications referred to herein, constitute the entire agreement between Landlord and Tenant with respect to the Demised Premises. Neither this Lease nor any of its provisions may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the parties.

XLIII. **BROKER**

Landlord and Tenant represent to each other that neither has dealt with any broker in connection with the negotiation or execution of this Lease except General Growth, whose commissions/fees will be paid by Landlord. Each party shall indemnify and hold the other harmless from and against any loss, cost, expense or damage arising from any claim for commission or other compensation made by any broker arising out of the acts of such party.

XLIV. **JURY WAIVER**

LANDLORD AND TENANT HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR THEIR SUCCESSORS IN RESPECT OF ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE OR ANY EMERGENCY OR STATUTORY REMEDY.

XLV. **COMPLIANCE WITH LAWS**

A. Landlord's Obligation.  Landlord, at Landlord's expense, shall comply with all Legal Requirements relating to the portions of Tenant's Store Building and Sears Access and Parking Area which Landlord is obligated to maintain in accordance with Section X.B., and X.I.

B. Tenant's Obligations.  Except for the obligations of Landlord, Tenant, at Tenant's expense, shall comply with all Legal Requirements relating to the Demised Premises or the use or occupancy thereof.

C. For purposes of this Section, the term **"Legal Requirements"** shall mean all laws, statutes, codes, ordinances, rules, policies, regulations, permits, and requirements of all governmental agencies now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including, without limitation, Title III of the Americans With Disabilities Act of 1990 and all regulations promulgated thereunder.

## XLVI. **NO DISCRIMINATION**

Tenant and Landlord hereby covenant, respectively, and for their respective heirs, executors, administrators, and assigns, and all persons claiming under or through them, and this Lease is made and accepted upon and subject to the following conditions:

That there shall be no discrimination against or segregation of any person or group of persons, on account of race, color, creed, religion, sex, marital status, national origin, or ancestry in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the Landlord Tract, including the Demised Premises nor shall Landlord or Tenant, or any person claiming under or through Landlord or Tenant, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants, or vendees in the Landlord Tract, including the Demised Premises.

## XLVII. **JOINT AND SEVERAL LIABILITY**

If more than one individual or entity comprises Landlord or Tenant, the obligations hereunder imposed upon Landlord or Tenant shall be joint and several.

## XLVIII. **HEADINGS**

The Section headings are for convenience and are not part of this Lease.

## XLIX. **LIMITATION ON LANDLORD'S LIABILITY**

From and after the Commencement Date, if Landlord shall fail to perform any covenant or obligation on its part to be performed under this Lease, and as a consequence thereof, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of (a) the proceeds of sale produced upon execution of such judgment and levy thereon against Landlord's interest in the Landlord Tract and the improvements thereon, (b) the rents and other income from such property receivable by Landlord, and (c) the net consideration (which consideration shall be deemed to include any assets thereafter held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition) received by Landlord or other disposition of all or part of Landlord's interest in the Landlord Tract. The provisions of this Section are not intended to relieve Landlord of the performance of any of its obligations hereunder, but rather to limit Landlord's liability in the case of a recovery of a judgment against it. Nothing herein shall limit Tenant's right to seek specific performance of Landlord's obligations under this Lease or to avail itself of any other right or remedy which may be accorded to Tenant by law or under the terms of this Lease by reason of Landlord's failure to perform its obligations hereunder. Notwithstanding the foregoing, Landlord's liability shall not be limited in the event of fraud or intentional misrepresentation by Landlord or failure of Landlord to provide or maintain insurance as required at Section XVIII.B. of this Lease.

L.    **COUNTERPARTS**

This Lease may be executed in counterparts, each of which shall be deemed an original of this Lease, and all such counterparts taken together shall constitute one and the same instrument.  The signature of a party to this Lease on any counterpart may be removed and attached to any other counterpart.  Any counterpart to which is attached the signatures of all parties shall constitute an original of this Lease.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:

**CEE RETAIL REALTY, INC.**

ATTEST:

_____

By: _____
Its: _____

TENANT:

**SEARS, ROEBUCK AND CO.**

ATTEST:

_____
Assistant Secretary

_____
Ronald P. Douglass
Vice President, Real Estate

## EXHIBITS

**Exhibit "A"**   - Legal Description - Ground Lease Parcel
**Exhibit "B"**   - Site Plan
**Exhibit "C"**   - Legal Description - Fee Parcel
**Exhibit "D"**   - Legal Description - Sears Parcel
**Exhibit "E"**   - Enclosed Mall (Retail Area)
**Exhibit "F"**   - Lease Supplement
**Exhibit "G"**   - 60% Review Drawing List
**Exhibit "H"**   - Ground Lease Estoppel
**Exhibit "I"**   - Subordination, Non-Disturbance and Attornment Agreement
**Exhibit "J"**   - Permitted Exceptions
**Exhibit "K"**   - Floor Plan - Tenant's Store Building
**Exhibit "L"**   - Elevations - Tenant's Store Building
**Exhibit "M"**   - Sign Criteria
**Exhibit "N"**   - Estoppel
**Exhibit "O"**   - Memorandum of Lease

# EXHIBIT "A"

## LEGAL DESCRIPTION - GROUND LEASE PARCEL

## EXHIBIT "A"

Parcel A, B, C and D and that portion of Santa Ana Avenue vacated August 29, 1988 by
Resolution No. 88-114 and that portion of Shaw Avenue vacated February 21, 1989 by
resolution No. 89-25, that would pass by a conveyance of said land under Sections 831 and 1112
of the civil code, of Parcel Map No. 88-17, recorded in Book 51, Pages 7 and 8 of Parcel Maps,
Fresno County Records.

**EXHIBIT "B"**


**SITE PLAN**


Showing:

> Ground Lease Parcel  (Recital A)
> Fee Parcel  (Recital B)
> Entire Tract  (Outlined in black - Recital C)
> Location of Department Stores  (Recital D)
> Sears Parcel  (Recital F)
> Sears Access and Parking Area  (Recital G)
> Sears TBA (Section I - Definitions)
> Sears Control Area (Section II.C.)
> Non-Mall Store Pad 4 and
> Non-Mall Store Pad 6 (Section II.C.)



EXHIBIT - B

## EXHIBIT "C"

## LEGAL DESCRIPTION - FEE PARCEL

EXHIBIT "C"

Parcel A of Parcel Map No. 88-09 recorded in Book 50, Pages 97 and 98 of Parcel Maps, Fresno
County Records.

## EXHIBIT "D"

## LEGAL DESCRIPTION - SEARS PARCEL

To be added after date of this Lease as provided at Recital F, hereof.

## EXHIBIT  "E"


## ENCLOSED  MALL


Showing:

      Sears Control Area (within the Enclosed Mall - Section II.C.)
      Retail Area  (Section XII.A)

*"E"*



SIERRA VISTA MALL #552

GOTTSCHALK'S

K = Permanent Kiosk Locations

= Retail Area

Mall Entrance

SEARS Building

= Sears Control Area within Enclosed Mall

## EXHIBIT "F"

## LEASE SUPPLEMENT

THIS LEASE SUPPLEMENT ("**Supplement**") is made on _____, 19___, between _____, a _____ ("**Landlord**") and **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Tenant**").

WHEREAS, Landlord and Tenant entered into a Lease dated _____, 19___ (the "**Lease**"), for property in the City of Clovis, County of Fresno, State of California, more specifically described in the Lease; and

WHEREAS, Section IV. of the Lease provides that Landlord and Tenant shall specify the Commencement Date of the Lease by supplemental agreement; and

WHEREAS, Section IV.A. of the Lease provides that the Commencement Date shall be the date that Tenant opens its store in Tenant's Store Building for business to the public; and

WHEREAS, Section VII.B. of the Lease provides that Tenant shall commence payment of Estimated Rent, as defined in the Lease, as of the Commencement Date; and

WHEREAS, Section IX. of the Lease provides that the parties shall acknowledge both the Delivery Date, as defined in the Lease, and the Floor Area of Tenant's Store Building, in the Lease Supplement.

NOW, THEREFORE, Landlord and Tenant agree to supplement the Lease as follows:

1.     Tenant accepted the Demised Premises on _____, 19___, which is the Delivery Date under the Lease.

2.     Tenant opened for business in Tenant's Store Building on _____, 19___, which is the Commencement Date under the Lease.

3.     The Term of the Lease is _____, 19___, through _____, _____.

4.     The Floor Area of Tenant's Store Building is _____ square feet.

5.     The Lease, except as herein supplemented, is in all other respects fully ratified and confirmed.

· 7.     Except as otherwise defined herein, all capitalized terms used in this Supplement shall have the meaning ascribed to such terms in the Lease.

S:\GFILICE\CLOVIS4C.SAM   (SMALPED)   October 14, 1998   11:54 AM          _**SEARS**_

8.   Landlord represents and warrants that Landlord has full right, power and authority to enter into this Supplement.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Supplement to be executed:

Witness:                                    Landlord:

_____               _____

_____               By:_____
                                            Printed Name:_____
                                            Title:_____

Attest:

                                            Tenant:

                                            **SEARS, ROEBUCK AND CO.**

_____               By:_____
Assistant Secretary (for                         Ronald P. Douglass
Sears, Roebuck and Co.)         Its:              Vice President
                                                  Real Estate

STATE OF CALIFORNIA_____)
                                                          ) SS:
COUNTY OF _____)


On _____, 19 ___ the undersigned, a Notary Public, in and for said State
personally appeared _____, personally known to me (or - proved to me on the
basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

_____

WITNESS my hand and seal this _____ day of _____, 199__.


_____
Signature of Notary                       (Seal)


****************************************************

STATE OF ILLINOIS            )
                                          ) SS:
COUNTY OF COOK             )


     THE undersigned, a Notary Public, in and for the County and State aforesaid, does
hereby certify, that Ronald P. Douglass and _____
personally known to me to be the Vice President, Real Estate and Assistant Secretary of **SEARS,
ROEBUCK AND CO.**, a New York corporation, and personally known to me to be the same
persons whose names are subscribed to the foregoing instrument, appeared before me this day in
person and acknowledged under oath that as such Vice President, Real Estate and Assistant
Secretary they signed and delivered the said instrument pursuant to authority duly given to them
by said corporation.

     Given under my hand and seal this _____ day of _____, 199__.


                              _____
                                        Notary Public
My Commission Expires:


S:\GFILICE\CLOVIS4C.SAM   (SMALPED)   October 14, 1998   11:54 AM            *SEARS*

CLOVIS, CA

# EXHIBIT "G"

## 60% REVIEW DRAWING LIST

D3.F5

EXHIBIT "G"

## 60% REVIEW DRAWING LIST:

### ARCHITECTURAL  (Dated at 10/07/1998)

| | |
|---|---|
| T1 | Title Sheet-Index to Drawings, General Notes, Vicinity Map, Location Map |
| A1 | Site Plan / Hardscape |
| A2 | Floor Plan - North |
| A3 | Floor Plan - South |
| A4 | Floor Covering Plan - North |
| A5 | Floor Covering Plan - South |
| A6 | Reflected Ceiling Plan - North |
| A7 | Reflected Ceiling Plan - South |
| A8 | Roof Plan |
| A9 | Exterior Elevations |
| A10 | Building Sections |
| A11 | Wall Sections |
| A12 | Mall Entrance Blow-up & Details |
| A13 | Entry Blow-ups |
| A14 | Toilet Room Blow-ups & Interior Elevations |
| A15 | Finish Schedule, Door Schedule & Details |
| A16 | Typical Details |
| A17 | Typical Details |
| A18 | Typical Details |

### STRUCTURAL (Dated at 10/07/1998)

| | |
|---|---|
| S1 | General Notes And Typical Details |
| S2 | Partial Foundation And First Floor Plan - North |
| S3 | Partial Foundation And First Floor Plan - South |
| S4 | Partial Roof Framing Plan - North |
| S5 | Partial Roof Framing Plan - South |
| S6 | Section And Details |
| S7 | Section And Details |
| S8 | Section And Details |

G-1

**HVAC** (Dated at 10/01/1998)

M1.1   Mechanical Notes, Schedules, Abbreviations, Legend
M2.1   Mechanical Floor Plan - North
M2.2   Mechanical Floor Plan - South
M3.1   Mechanical Details

**PLUMBING** (Dated at 10/01/1998)

P1.1   Plumbing Notes, Schedules, Legend, Details
P2.1   Plumbing Floor Plan - Partial Floor Plans
P2.2   Plumbing Roof Plan, Details

**ELECTRICAL** (Dated at 10/07/1998)

E1.1   Symbols, Notes, Fixture Schedule
E3.1   Single Line Diagram & Load Calculation
E4.1   Lighting Plan - North
E4.2   Lighting Plan - South
E5.1   Power Plan - North
E5.2   Power Plan - South
E8.1   Roof Plan

G - 2

**FINISH LEGEND:**

E1    EXTERIOR INSULATION & FINISH SYSTEM
STO INDUSTRIES,
COLOR: VT70262 WHITE,
TEXTURE: STOLIT 1.0

E2    EXTERIOR INSULATION & FINISH SYSTEM
STO INDUSTRIES,
COLOR: VT70263 LIGHT BEIGE,
TEXTURE: STOLIT 1.0

E3    EXTERIOR INSULATION & FINISH SYSTEM
STO INDUSTRIES,
COLOR: VT70264 MEDIUM BEIGE,
TEXTURE: STOLIT 1.0

E4    EXTERIOR INSULATION & FINISH SYSTEM
STO INDUSTRIES,
COLOR: VT70265 DARK BEIGE,
TEXTURE: STOLIT 1.0

E5    PAINT
SHERWIN WILLIAMS
COLOR #1913
WEDDING WHITE

E6    PAINT
SHERWIN WILLIAMS
COLOR -- TO MATCH E2

E7    PAINT
SHERWIN WILLIAMS
COLOR -- TO MATCH E3

G-3

E8    PAINT
      SHERWIN WILLIAMS
      COLOR -- TO MATCH E4

E9    ALUMINUM ENTRY DOORS
      WHITE

E10   ALUMINUM STOREFRONT
      WHITE

E11   BRICK VENEER
      HIGGINS BRICK COMPANY
      STANDARD 2 1/4"x8"x1/2" VENEER
      RED - MOCHA FLASHED

E12   ALUCOBOND COMPOSITE PANELS
      ALUCOAT 500
      COLOR -- WHITE

E13   BRICK
      HIGGINS BRICK COMPANY
      STANDARD 2 1/4"x8"x3 3/4" VENEER
      RED - MOCHA FLASHED

## EXHIBIT "H"

## GROUND LEASE ESTOPPEL

D3.F5

EXHIBIT "H"

## GROUND LESSOR ESTOPPEL CERTIFICATE

This Estoppel Certificate (this "Certificate") dated as of *August 24*, 1998, is executed by Gary S. Dunn, as Trustee of the Carmel J. McGarry Trust dated October 23, 1989, Mary E. McGarry and Patrick Henry McGarry, as Executor of the Will of Edmund J. McGarry (collectively, "Landlord"), in favor of CEE Retail Realty, Inc., a California corporation ("CRRI") and Sears, Roebuck and Co., a New York corporation ("Sears").

### Recitals

A.    Pursuant to a certain Ground Lease dated as of May 30, 1979, a short form of which was recorded on September 4, 1979 as Document No. 103601 in the Official Records of Fresno County, (the "Ground Lease"), Carmel J. McGarry, Mary E. McGarry and Edmund J. McGarry (collectively, the "Original Lessor") leased to B&H Clovis Associates, a California general partnership ("B&H Clovis"), certain real property located in the County of Fresno, State of California, as more particularly described in the Ground Lease (the "Property").

B.    Landlord is the successor-in-interest to the Original Lessor, as the landlord under the Ground Lease; and CRRI is the successor-in-interest to B&H Clovis, as the tenant under the Ground Lease.

C.    CRRI and Sears are entering into a lease ("Sublease") for certain premises located on the Property and, in connection therewith, CRRI is required to request an estoppel certificate from Landlord pursuant to Section 17.1 of the Ground Lease.

In consideration of the foregoing, Landlord certifies, warrants and represents to CRRI and Sears as follows:

Section 1.  Tenant.  CRRI is the tenant of the Property under the Ground Lease.

Section 2.  Full Force of Lease.  As of the date of this Certificate, the Ground Lease is in full force and effect, has not been terminated, and is enforceable in accordance with its terms.

Section 3.  Complete Agreement.  The Ground Lease constitutes the complete agreement between Landlord and CRRI for the Property, and no amendments to the Ground Lease, either written or oral, currently exist.

Section 4.  Rent.  The fixed rent and other charges payable under the Ground Lease have been paid through the payment that was due on August 10, 1998.

Section 5.  No Defaults.  As of the date of this Certificate, there exist no defaults under the Lease by CRRI, and no event which with the passage of time or the giving of notice or both would constitute a default under the Lease by CRRI.

Section 6.  Recognition of Sublease.  In accordance with Article XXII of the Ground Lease, in the event that the Ground Lease is terminated by reason of any default of the Lessee thereunder, Landlord agrees to be bound by the terms of the Sublease so long as Sears shall

P:\wd51\51141\339a Sears Estoppel.doc
08/21/98          3:00 PM

H. 1

not be in default thereunder and shall pay to Landlord the rentals reserved under the Sublease and shall otherwise keep and perform the covenants and conditions on its part to be kept and performed as set forth in the Sublease; provided, however, that no term (or renewal or extension) of the Sublease shall be effective or bind Landlord for any period after September 30, 2038.

Landlord has executed this Certificate as of the date first written above.

The Carmel J. McGarry Trust
dated October 23, 1989

Dated: _8-24-98_, 1998          By: _Gary S. Dunn, Trustee_
                                    Gary S. Dunn, as Trustee

Dated: _8-25_, 1998             x _Mary E. McGarry_
                                    Mary E. McGarry

Dated: _8-28_, 1998             _Patrick Henry McGarry_
                                    Patrick Henry McGarry
                                    as Executor of the Will of
                                    Edmund J. McGarry

## EXHIBIT "I"

## SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT

THIS AGREEMENT is made and entered into as of the _____ day of
_____, 199_, by and between _____ ("Lender") and **SEARS,
ROEBUCK AND CO.**, 3333 Beverly Road, Hoffman Estates, Illinois 60179 ("Tenant").

## WITNESSETH:

WHEREAS, by the Lease dated _____, 19____, as amended by
_____ (collectively, the "Lease"), the Tenant has leased from
_____ ("Landlord") certain premises (the "Demised
Premises"), containing approximately _____ square feet located in the
_____ Shopping Center, which Shopping Center is legally
described on Exhibit "A" attached hereto and made a part hereof (the "Entire Tract"), together
with various easements and rights over the Entire Tract.

WHEREAS, Lender is the holder of a mortgage on the Demised Premises, given to the
Lender by Landlord dated as of _____, 19____, recorded on _____, 19___,
in the Office of the Recorder of Deeds [Registrar of Titles] of _____ County,
_____, in Book _____ at Page _____, as Document No.
_____ (collectively referred to herein with any other documents securing the debt
secured by the mortgage as the "Mortgage").

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and
other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the parties agree as follows:

A.  Lender hereby consents to the Lease.

B.  The Lease is and shall be subject and subordinate at all times to the lien of the
    Mortgage and to all renewals, replacements and extensions of the Mortgage.

C.  In the event that Lender shall commence an action to foreclose the Mortgage or to
    obtain a receiver of the Demised Premises, or shall foreclose the Mortgage by
    advertisement, entry and sale according to any procedure available under the laws of
    the state where the Entire Tract is located, Tenant shall not be joined as a party
    defendant in any such action or proceeding and Tenant shall not be disturbed in its
    possession of the Demised Premises, provided Tenant is not in default under the
    Lease past any applicable cure period.

D3.F5

D. In the event that Lender shall acquire the Demised Premises upon foreclosure, or by deed in lieu of foreclosure, or by any other means:

    1. Tenant shall be deemed to have made a full and complete attornment to Lender as the landlord under the Lease so as to establish direct privity between the Lender and Tenant; and

    2. All rights and obligations of Tenant under the Lease shall continue in full force and effect and be enforceable by and against Tenant respectively with the same force and effect as if the Lease had originally been made and entered into directly by and between Lender as the landlord thereunder, and Tenant; and

    3. Lender shall recognize and accept the rights of Tenant and shall thereafter assume the obligations of Landlord under the Lease.

E. Nothing herein contained shall impose any obligations upon Lender to perform any of the obligations of Landlord under the Lease, unless and until Lender shall become owner or mortgagee in possession of the Demised Premises.

F. Any notice required or desired to be given under this Agreement shall be in writing and shall be deemed given (a) upon receipt if delivered personally; (b) three (3) business days after being deposited into the U.S. mail if being sent by certified or registered mail, return receipt requested, postage prepaid; or (c) one (1) business day after being sent by reputable overnight air courier service (i.e., Federal Express, Airborne, etc.) with guaranteed overnight delivery, and addressed as follows:

**If to Lender:**

          _____
          _____
          _____
          _____
          _____

**If to Tenant:**

          **Sears, Roebuck and Co.**
          3333 Beverly Road
          Hoffman Estates, Illinois  60179
          Attention:  Ronald P. Douglass
                    Vice President, Real Estate
                    Department 824RE

**With a copy to:**

          **Sears, Roebuck and Co.**
          3333 Beverly Road
          Hoffman Estates, Illinois  60179
          Attention:  Assistant General Counsel
                    Real Estate, Department 766X

D3.F5

Either party, at any time and from time to time (by providing notice to the other party in the manner set forth above), may designate a different address or person, or both, to whom such notice may be sent.

G.   This Agreement shall be binding upon and inure to the benefit of any person or entity acquiring rights to the Demised Premises by virtue of the Mortgage, and the successors, administrators and assigns of the parties hereto.

H.   No personalty or trade fixtures of the Tenant are subject to the lien of the Mortgage.

I.   In accordance with Section XXVI. of the Lease, Tenant hereby confirms that it will contemporaneously give Lender notice of any defaults which it serves upon Landlord under the Lease.

**IN WITNESS WHEREOF**, this Subordination, Attornment and Non-Disturbance Agreement has been signed as of the day and year first above set forth.

Attest:                                    Lender:

_____

_____        By:_____
                                            Name:_____
                                            Title:_____

Attest:                                    Tenant:

                                            **SEARS, ROEBUCK AND CO.**

_____        By:_____
Assistant Secretary                          Ronald P. Douglass
                                            Vice President
                                            Real Estate

**Prepared by and return to when recorded:**

_____
Sears, Roebuck and Co.
Department 766X
3333 Beverly Road, B6-___B
Hoffman Estates, Illinois  60179

D3.F5

STATE OF CALIFORNIA      )
                         ) SS:
COUNTY OF _____)

On _____, 19 ___ the undersigned, a Notary Public, in and for said State
personally appeared _____, personally known to me (or - proved to me on the
basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and seal this _____ day of _____, 199__.

_____
Signature of Notary                    (Seal)

STATE OF ILLINOIS       )
                        ) SS:
COUNTY OF COOK          )


**THE** undersigned, a Notary Public, in and for the County and State aforesaid, does hereby certify, that Ronald P. Douglass and _____ personally known to me to be the Vice President, Real Estate and Assistant Secretary of **SEARS, ROEBUCK AND CO.**, a New York corporation, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that as such Vice President, Real Estate and Assistant Secretary they signed and delivered the said instrument pursuant to authority duly given to them by said corporation.

Given under my hand and seal this _____ day of _____, 199__.


_____

Notary Public

My Commission Expires:

_____

## EXHIBIT "J"

## PERMITTED EXCEPTIONS

Subject to the terms and conditions of the Lease, and to the extent provided herein, Tenant agrees to take the Premises subject to the following title matters; provided, Landlord at no out-of pocket expense to Landlord, will cooperate with Tenant in securing such reasonable endorsements from the Title Company as Tenant may require:

1.  Property taxes related to the Premises, No. 499-030-89, to the extent not yet due or payable.

2.  Supplemental taxes related to the Premises, Assessment No. 499-030-89, to the extent not yet due or payable.

3.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California.

4.  Assessment/Bond No. 35B, Series 1915, provided Tenant shall have no obligation with regard to the payment of same, as provided at Section XX.C. of the Lease.

5.  Fresno Metropolitan Flood Control District assessments, if any.

6.  Fresno Irrigation District assessments, if any.

7.  COREA dated April 7, 1988 between Landlord, as developer, and the Department Stores, recorded April 7,1988 as Doc. No. 88036839 (the "COREA").

8.  Matters contained in that certain Deed recorded January 29, 1943, as Document No. 3482.

9.  The following easements related to or affecting the Sears Parcel, provided Tenant shall have no obligation for the restoration of any part of the Sears Parcel entered onto by any grantee exercising its rights of use or maintenance pursuant to such easements:

    a.  Drilling and mining operations easement recorded January 29, 1943 as Doc. No. 3482.

    b.  The COREA;

    c.  Pacific Gas & Electric utility easement recorded June 24, 1988 as Doc. No. 88069132, and Notice of Final recorded February 16, 1990 as Doc. No. 90018699.

    d.  Pacific Bell utility easement recorded May 4, 1989 as Doc. No. 89047289.

    e.  City of Clovis, utility easement recorded May 12, 1989 as Doc. No. 89050240.

10. The terms and conditions of the following documents, provided Landlord agrees to indemnify and hold Tenant harmless for any costs related to a breach or action under such documents caused or created by Landlord, and any reverter, right of re-entry or

any right or power of termination of Tenant's interest in the Lease upon breach of any covenant, condition or restrictions referred to in any such document, which could adversely affect Tenant's interest in the Lease.

   a.  The COREA.

   b.  The location of the Sears Parcel in a project area of the Redevelopment Agency as disclosed by an instrument recorded by the Clovis Community Development Agency on July 27, 1982 as Doc. No. 62216 and the matters contained in the Agreement Affecting Real Property recorded April 7, 1988 as Doc. No. 88036838.

   c.  Agreement between Landlord and the City of Clovis recorded July 9, 1997 as Doc. No. 97086919.

   d.  The effects of the Ground Lease, a short form of which was recorded September 4, 1979 as Doc. No. 103601, subject to the Ground Lease Estoppel, as described in the Lease.

11. The following documents related to Landlord's prior mortgage against the Premises, subject to the terms of the SNDA to be recorded herewith:

   a.  Deed of Trust dated August 19, 1988 from B&H Clovis Associates to First American Title, as Trustee, recorded August 23, 1988 as Doc. No. 88091564.

   b.  Assignment of all moneys due or to become due as additional security for the Deed of Trust, recorded August 23, 1988 as Doc. No. 88091564, as assigned to Citicorp Real Estate, Inc. by assignment recorded August 23, 1988 as Doc. No. 88091565.

J - 2

## EXHIBIT "K"


## FLOOR PLAN



**EXHIBIT K**

## EXHIBIT "L"

## ELEVATION - TENANT'S STORE BUILDING



EXHIBIT 1

**EXHIBIT "M"**

**SIGN  CRITERIA**

EXHIBIT "M"



CLOVIS, CALIFORNIA

# EXTERIOR SIGN CRITERIA

## TABLE OF CONTENTS

|     |                                                          | Page |
|-----|----------------------------------------------------------|------|
| A.  | GENERAL REQUIREMENTS                                     | 1    |
| B.  | GENERAL SPECIFICATIONS                                   | 1    |
| C.  | LOCATION OF SIGNS                                        | 2    |
| D.  | DESIGN REQUIREMENTS                                      | 2    |
| E.  | CONSTRUCTION REQUIREMENTS                                | 2    |
| F.  | MISCELLANEOUS REQUIREMENTS                               | 3    |
| G.  | BUILDING SIGNS (on-building identification signs)        | 3    |
| H.  | THEATER SIGNS                                            | 4    |
| I.  | DEPARTMENT STORE SIGNS                                   | 5    |
| J.  | FREESTANDING SIGNS                                       | 6    |
| K.  | MONUMENT SIGNS                                           | 6    |
| L.  | CANOPY ENTRANCE SIGNS                                    | 7    |
| M.  | AWNING SIGNS                                             | 8    |
| N.  | INTERIOR SIGNS                                           | 9    |

M-1

## EXTERIOR SIGN CRITERIA

These criteria have been established for the purpose of ensuring an outstanding shopping center and for the mutual benefit of all Tenants. Conformance will be strictly enforced, and any installed nonconforming or unapproved signs must be brought into conformance at the expense of the Tenant.

A.  GENERAL REQUIREMENTS

1.  Tenant shall submit or cause to be submitted to the Project Architect for approval before fabrication one (1) copia of detailed drawings indicating the location, size, layout, design and color of the proposed signs, including all lettering and/or graphics.

2.  All permits for signs and their installation shall be obtained by Tenant or its representative.

3.  All signs shall be constructed and installed at Tenant's expense.

4.  Tenant shall be responsible for the fulfillment of all requirements of these criteria and shall submit samples of sign material if requested by the Project Architect.

5.  All exterior signs shall be subject to Sign Review Approval by the city of Clovis.

B.  GENERAL SPECIFICATIONS

1.  No animated, flashing or audible signs will be permitted except in the case of food court tenants per Landlord's approval.

2.  No exposed lamps or tubing will be permitted.

3.  All signs shall bear the Underwriters' Laboratory (U.L.) label, and their installation shall comply with local building and electrical codes.

4.  No exposed raceways, cross-overs or conduits will be permitted.

5.  All cabinets, conductors, transformers and other equipment shall be concealed.  Visible fasteners will be permitted.

6.  Electrical service to all signs shall be on Tenant's meter.

7.  Painted lettering will not be permitted, except as specified under Section F.2 of this Exhibit D.

8.  No signs otherwise prohibited under the sign regulations of the city of Clovis shall be permitted.

-1-

M-2

## C. LOCATION OF SIGNS

1. See Key Plan for Sign Locations at the end of this exhibit.

## D. DESIGN REQUIREMENTS

1. All Tenant store identification designs shall be subject to the approval of the Project Architect. Imaginative designs which depart from traditional methods and placement will be encouraged.

2. Wording of signs shall not include the product sold, except as part of Tenant's trade name or insignia.

## E. CONSTRUCTION REQUIREMENTS

1. All exterior signs, bolts, fastenings and clips shall be of enameling iron with porcelain enamel, finish, stainless steel, aluminum, brass or bronze. No black iron materials of any type will be permitted.

2. All exterior letters or signs exposed to the weather shall be mounted at least 3/4 inch from the building wall to permit proper dirt and water drainage.

3. All letters shall be fabricated using full-welded construction.

4. Location of all openings for conduit and sleeves in sign panels of building walls shall be indicated by sign contractor on drawings submitted to Project Architect.

5. All penetrations of the building structure required for sign installation shall be neatly sealed in a watertight manner.

6. No labels shall be permitted on the exposed surface of signs, except those required by local ordinance which shall be applied in an inconspicuous location.

7. Tenant's sign contractor shall repair any damage to any work caused by that work.

8. Tenant shall be fully responsible for operations of Tenant's sign contractors.

9. Threaded rods or anchor bolts shall be used to mount sign letters that are spaced out from background panel. Angle clips attached to letter sides will not be permitted.

-2-

M-3

## F.  MISCELLANEOUS REQUIREMENTS

1.   If Tenant has a non-customer door for receiving merchandise, it may have uniformly applied on said door in location as directed by the Project Architect, in 2-inch-high block letters, the Tenant's name and address.  Where more than one Tenant uses the same door, each name and address shall be applied.  Color of letters will be selected by the Project Architect.

2.   Except as provided herein, no advertising placards, banners, pennants, names, insignia, trademarks or other descriptive material shall be affixed or maintained on the glass panes and supports of the show windows and doors, or upon the exterior walls of the building or store-front.

## G.  ON-BUILDING IDENTIFICATION SIGNS

1.   Area Allowed for Frontages with Public Entrances.  Each business frontage having a public entrance shall be permitted on-building identification signs with the allowable area computed in accordance with the following matrix, except as otherwise specifically provided in paragraph 2 below.

| Building Entrance Setback From Property Line | Allowable Sign Area Formula | Maximum Allowable Sign Area | |
|---|---|---|---|
| | | Minor Tenants | Major Tenants |
| | | (Square Feet) | |
| Less than or equal to 150 ft to nearest street | One sq ft per lineal ft of lease space | 50 | 100 |
| More than 150 ft to nearest street property line | 1-1/2 sq ft per lineal ft of lease space | 75 | 150 |

2.   Area Allowed for Street Frontages Without Public Entrances.  Each business occupying the end of a building, having a street frontage without a public entrance, shall be permitted 1/2 square foot of sign area for each one foot of leased building frontage.  The minimum area shall be limited to 25 square feet.

3.   Minimum Sign Area.  Each commercial use which has direct pedestrian access through an exterior building wall that is visible from public right-of-way shall be allowed at least a 25 square feet of building sign area, regardless of building occupancy frontage.  Commercial uses having a sole access from the interior of any building or from an enclosed lobby or court shall not be allowed the minimum building wall sign area referred to in this section.

-3-

M-4

4.  Privilege Signs.  Where a number of commodities with different brand names or symbols are sold on the premises, up to one-fourth of the area of a business sign, or 25 square feet of sign area, whichever is the lesser, may be devoted to the advertising of one or more of these commodities by brand name or symbol as an accessory function of the business sign, provided such advertising is integrated with and a part of the remainder of the business sign.

5.  Under Canopy Signs.  Under canopy signs shall be allowed in commercial centers provided they do not exceed 6 square feet in sign area, nor extend lower than 7 feet above the area over which it is suspended; and they shall be mounted perpendicular to the building face.  Such signs shall identify only a business name or profession located in a business center. Only one such sign shall be displayed per frontage with a public entrance.

6.  Transfer of Sign Area.  When approved by the Director of Planning, sign area may be transferred in part or in whole from a frontage with a public entrance to one without a public entrance, provided that signs on a given frontage do not exceed the allowable area as computed above.  Elevation eligible for exterior signing is shown on the Key Plan for Sign Locations at the end of this exhibit.

7.  Temporary Signs.  Temporary signs shall be limited to banners, posters or pennants.  Such signs may be used in conjunction with an event or sale and shall be displayed for 14 days maximum, shall be limited to one such display four times a year, and shall not list individual product prices, with written notification given to the Director of Planning.

8.  Grand Opening Signs.  A-frame signs, one-frame signs and portable changeable-copy signs shall be limited to one grand opening and a maximum display time of 14 days per business, with written notification given to the Director of Planning.

H.  THEATER

1.  There are three (3) identification signs for United Artists theaters, formerly Pad Nine.  Each sign shall be a maximum of 24 feet in length with a maximum sign area of 150 square feet.  Each sign area shall include a changeable copy sign indicating movie listings.

2.  One (1) scripted identification sign for United Artists theaters placed above entrance of theater shall be a maximum of seventeen (17) feet in length with a maximum sign area of fifty (50) square feet.

-4-

M-5



QTY = (9) = 6'·4" x 24'·0" = 50 sf Ea.



QTY = (1) 2'·11½" x 17'·0" = 50 sf

M-6

## I. DEPARTMENT STORES

1. Major department stores (Gottschalks, Mervyns, Target) have identification signs on the buildings as shown on the approved plans. A transfer of sign area from otherwise permitted freestanding signs to on-building signs for the major department stores is allowed for total sign area, as follows.

### Gottschalks

a. Two signs at 268.75 square feet each, and one sign at 160 square feet at the general locations shown on the Key Plan for Sign Locations.



QTY = (2) - 5' X 53.9" = 268.75 SF EA
(1) - 4' X 40' = 160 SF



QTY = (3) - 4' x 44' = 176 SF EA



QTY = (3) - 5' X 33' = 162 SF EA



QTY = (1) - 2' X 18' = 36 SF

-5-

M-7

## FREESTANDING SIGNS

1.  **Tower Sign** - One tower sign, to be located at the northwest corner of the
    property adjacent to the intersection of Shaw & Clovis Avenues (see attached
    "Signage Site Plan" map).    The structure shall not exceed 41' (forty one) feet
    in height and shall have a footprint of approximately 12 feet wide x 8 feet deep.
    The signage shall consist of not more than 4 Mall identification signs totaling 150
    sq. ft. and two tenant sign boxes, each containing up to four tenant signs, not
    exceeding 104 sq. ft. total.

    Individual tenant sign designs shall be subject to the review and approval of the
    Planning Director.  See sign type "A" drawing (attached) for Tower Sign design,
    to be incorporated as a part of this program. The specific placement of the
    Tower Structure shall be subject to review and approval of the Planning
    Director.

2.  **Pylon Signs** - Up to Two Pylon signs, to be located as described on the
    attached "Signage Site Plan" map.  The structures shall not exceed 23'
    (twenty-three) feet in height and shall have a footprint of approximately 12 feet
    wide x 2 feet deep.  The signage shall consist of a Mall identification sign box
    on each side of the structure with up to two tenant signs on each side of the
    structure. Total sign area shall not exceed 160 sq. ft. ( or 80 sq. ft. per side).

    Individual tenant sign designs shall be subject to the review and approval of the
    Planning Director.  See sign type "B" drawing (attached) for Pylon Sign design,
    to be incorporated as a part of this program.  The specific placement of the Pylon
    Structures shall be subject to review and approval of the Planning Director.

## MONUMENT SIGNS

1.  **Monument Signs** - Up to two, type "C" monument signs, to be located as
    described on the attached "Signage Site Plan" map.  The structures shall not
    exceed 5'-6" (five feet, six inches) in height and shall have a maximum footprint
    of approximately 19 feet wide x 2 feet deep.  The signage shall consist of Mall
    identification sign text, impressioned into the sign monument, or other type of
    surface mounted sign, with external illumination on one side of the structure.
    Total sign area shall not exceed 52 sq. ft.

    See sign type "C" drawing (attached) for Monument Sign design, to be
    incorporated as a part of this program.  The specific placement of the monument
    Structures shall be subject to review and approval of the Planning Director.

2.  **Monument Signs** - One type "C2" monument sign, to be located as described on
    the attached "Signage Site Plan" map.  The structure shall not exceed 5'-6" (five

-6-

M-8

feet, six inches) in height and shall have a maximum footprint of approximately 17ft 6in. wide x 2 feet deep. The signage shall consist of a Mall identification sign on each side of the monument and up to two tenant signs. Signs will be surface mounted with internal back lighting or externally illuminated with flood lighting, on both sides of the structure. Total sign area shall not exceed 120 sq. ft.

See sign type "C2" drawing (attached) for Monument Sign design, to be incorporated as a part of this program. The specific placement of the monument structures shall be subject to review and approval of the Planning Director.

## CANOPY / ENTRANCE SIGNS

1.  Canopy Entrance Signs - Up to 5 signs, to be located as described on the attached "Signage Site Plan" map. The signs shall be affixed to the existing wooden canopy trellises covering each of five entries to the Mall. The signage shall consist of internally illuminated Mall identification signs. Signage text and graphics shall not exceed 14 ft. in length and shall be no more than 3ft. 9in. in height. Total sign area for five signs shall not exceed 265 sq. ft.

    Individual sign designs shall be subject to the review and approval of the Planning Director. See sign type "D" drawing (attached) for Canopy / Entrance Sign design, to be incorporated as a part of this program. The specific placement of the Pylon Structures shall be subject to review and approval of the Planning Director. Signage upgrade at Entrance canopies may include revised column shapes and materials as indicated on sign type "D" drawing. Column construction details to be subject to review and approval of Planning Director.

-7-

M-9

6. Awning signs not to exceed (1 square feet at the general
locations shown on the Key Plan for Sign Location.



AWNING

NOTE: ALL SIGNS ARE
TO BE "SILK-SCREENED"
ON CANVAS AWNING.

AWNING STYLE: STANDARD STATIONARY

M-10

## K.  INTERIOR SIGNS

Size, materials, color and organization of interior signs are not enforced under these regulations but shall fall under the discretion of the current commercial center owner.

-9-

$M-11$



M-12



SCALE: 1/4"=1'-0"
02-16-97

TOWER SIGN
FOR
SIERRA VISTA
MALL

CITICORP

M~13



M-14

IMPRESSIONED CONCRETE 3IN1 LETTERS

SIERRA VISTA

1'-0"
-12'-0"

C

SECTION A-A
THROUGH
BATTERED WALL

SURFACE MOUNTED W/ INTERNAL BACK LIGHTING
OR EXTERNAL FLOOD LIGHTING - EACH SIDE.

SIERRA VISTA | TENANT
| TENANT

5'-0"

17'-6"

C2

SECTION A-A
THROUGH
BATTERED WALL

SCALE: 1/4"=1'-0"
07-18-07

| C | MONUMENT SIGN FOR SIERRA VISTA MALL | CITY OF CLOVIS | CITICORP | LK |

M-15

INTERNALLY ILLUMINATED COPY &
GRAPHIC (PAINTED METAL CHANNEL)

NEW PAINTED METAL
RACEWAY / SUPPORT

SIERRA VISTA

EXISTING
CONCRETE
COLUMNS

NEW PAINTED COLUMNS W/ STUCCO
OR PAINT W/ CONCRETE BASE,
OVER EXISTING CONC. COLUMNS

SCALE: 1/4"=1'-0"
07-18-07

| D | ENTRANCE SIGN FOR SIERRA VISTA MALL | CITY OF CLOVIS | CITICORP | CONSTRUCTIVE ARCHITECTS |
|---|---|---|---|---|

M-16

## EXHIBIT "N"

## ESTOPPEL CERTIFICATE

DATE:_____

TO:    _____ ("Lender")

       _____

       _____

RE:    Lease dated _____ between _____ ("Landlord") and Sears, Roebuck
       and Co., a New York corporation, as Tenant ("Tenant"), covering certain premises (the
       "Demised Premises") located in the _____ Mall Shopping Center, _____,
       _____ County, _____.

       The undersigned, Sears, Roebuck and Co., as Tenant under the Lease, hereby certifies
that as of the date hereof:

1.     The Lease is in full force and effect and has not been supplemented, modified or amended
except as stated above.

2.     The term of the Lease commenced on _____ and will continue
until _____, subject to _____ rights as
provided in the Lease.

3.     No rent has been paid more than one month in advance of its due date.

4.     Tenant has not received nor has Tenant given any notice of default pursuant to the terms
of the Lease which has not been cured.

This Estoppel Certificate is given solely for the information of the party to whom it is addressed
and may not be relied upon by any other person or entity, including Landlord. This Estoppel
Certificate shall not create any liability in, or provide any right of action against Sears, Roebuck
and Co., its officers, directors, agents, employees and representatives, for any incorrect statement
of fact contained herein; however, any incorrect statement of fact shall estop Tenant from
asserting or making a claim against [Lender] which is inconsistent with the facts contained in this

Estoppel Certificate to the extent said [Lender] relied upon said statement of fact without knowledge of contrary facts.

SEARS, ROEBUCK AND CO.

By: _____

## Exhibit "O"

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (this **"Memorandum"**) is made this ____ day of
_____, 19__, by and between _____ (**"Landlord"**) and SEARS, ROEBUCK AND
CO., a New York corporation (**"Tenant"**).

## W I T N E S S E T H:

For and in consideration of the mutual covenants and agreements hereinafter set forth and
other good and valuable consideration, the receipt and sufficiency of which is hereby
acknowledged, Landlord and Tenant agree as follows:

1.    Landlord, as landlord, and Tenant, as tenant, have entered into a certain Sublease
dated as of _____, 1998 (hereinafter referred to as the **"Lease"**), pursuant to
which Landlord has a) subleased to Tenant a parcel of land and the improvements located
thereon which is legally described on **Exhibit "A"**, attached hereto and made a part hereof (the
**"Sears Parcel"**), which is part of a larger parcel of real estate which Landlord leases as tenant
(the **"Ground Lease Parcel"**), pursuant to that certain Ground Lease dated May 30, 1979, a
short form of which was recorded on September 4, 1979, in Book 7363, Page 975 of the Fresno
County Official Records, which is legally described on **Exhibit "B"**, attached hereto and made a
part hereof ; and b) granted to Tenant certain control rights (the **"Sears Control Area"**), as more
specifically stated in the Lease, over parts of the Ground Lease Parcel and over a parcel of real
estate owned by Landlord which is contiguous to the Ground Lease Parcel (the **"Fee Parcel"**), as
legally described on **Exhibit "C"**, attached hereto and made a part hereof. The Sears Control
Area is depicted on the Site Plan, attached hereto as **Exhibit "D"** and made a part hereof.

2.    The Ground Lease Parcel and the Fee Parcel contain and are operated as a
one-level Shopping Center known as the Sierra Vista Mall.

3.    The addresses of the parties to the Lease are as follows:

(a)    Landlord:

(b)    Tenant:     **SEARS, ROEBUCK AND CO.**
                   Attn:  Vice President, Real Estate
                   Department 824RE
                   3333 Beverly Road
                   Hoffman Estates, Illinois  60179

3.      The lease provides for an initial term of _____ (__) Lease Years beginning on the Commencement Date, as defined in the Lease.

4.      Tenant has the right to extend the Term of the Lease for ___ (__) successive periods of five (5) years each as more particularly set forth in the Lease.

5.      The Lease provides for certain easements running in favor of Tenant over portions of the Shopping Center, including, but not limited to, the Common Areas.

6.      This Memorandum is not a complete summary of the Lease, nor shall any provisions of this Memorandum be used in interpreting the provisions of the Lease.  In the event of any conflict between this Memorandum and the Lease, the Lease shall control.

7.      This Memorandum is being executed and delivered for recording in the official records of _____ County, _____.  The Lease sets forth the entire agreement of the parties and this Memorandum does not alter, amend or change the Lease in any way, but is executed solely for the purpose of recordation as aforesaid.

8.      This Memorandum shall constitute notice to all parties of all amendments to the Lease, if any, from time to time hereafter executed, without the necessity of recording further memoranda of such amendments.

9.      Capitalized terms used herein shall have the meanings assigned to such terms in the Lease unless otherwise set forth herein.

IN WITNESS WHEREOF, this Memorandum has been executed and delivered as a sealed instrument by the parties hereto on the day, month and year first above written.


LANDLORD:


Attest:


_____        By: _____

TENANT:

**SEARS, ROEBUCK AND CO.,**

Attest:

_____    By: _____
                                          Ronald P. Douglass
                                          Vice President, Real Estate

**Exhibits:**

**"A"**    - Legal Description - Sears Parcel
**"B"**    - Legal Description - Ground Lease Parcel
**"C"**    - Legal Description - Fee Parcel
**"D"**    - Site Plan (Sears Control Area)

STATE OF ILLINOIS   )
          ) SS:
COUNTY OF COOK   )

  On this ____th day of _____, 19__, before me personally came Ronald P. Douglass, personally known to me to be the person whose name is subscribed to the foregoing instrument, and, who, being duly sworn did depose and state that he is the Vice President, Real Estate, of Sears, Roebuck and Co., a New York corporation, and that he so signed and delivered the foregoing instrument as the voluntary act and deed of such corporation.

             _____
                Notary Public

My Commission Expires:_____

       ************************************************

STATE OF _____    )
          ) SS:
COUNTY OF _____  )

  On this ___th day of ___, 19__, before me personally came _____, personally known to me to be the person whose name is subscribed to the foregoing instrument, and, who, being duly sworn did depose and state that he is the _____ of _____, a _____ corporation, and that he so signed and delivered the foregoing instrument as the voluntary act and deed of such corporation.

             _____
                Notary Public

My Commission Expires:_____

**SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA**
**ADMINISTRATION - GENERAL CONDITIONS**

# General Conditions
# Leased Facilities

*Note: Current revisions are marked with a vertical bar on the left margin.*

This Design Criteria is for a Turnkey Project for the Demised Premises to be constructed by the landlord complete in every detail and in compliance with this Document ("Work").  To minimize the refurbishing expenses in existing buildings, Sears will inspect the <u>entire</u> building that houses the Demised Premises ("Building") and accept, except for latent defects and observed defects, the various portions as outlined on a written exhibit attached to lease.

Any deviations from this Design Criteria will be submitted in writing to Sears for internal coordination and approval prior to signing the lease for the Demised Premises ("Lease").  The approved list of deviations will be attached to the Lease.  At no time do the landlord drawings supersede landlord responsibility to comply with this Design Criteria.

This document also contains criteria for an automotive center and service center, which will be applicable in the facilities when those are indicated on Sears Fixture Plan.

I.  **GENERAL**

   A.  The Landlord shall retain licensed architectural and engineering services for the design and construction of the Demised Premises.  Plans shall be drawn to a scale of 1/8" = 1'-0".  Construction drawings and specifications shall be subject to the review and approval of Sears prior to the start of Work.  Variations or revisions must be approved, in writing, by Sears Department 824C.

   B.  Code Compliance - The Work shall be governed by all applicable local, city, state, and national laws and codes.  These authorities include, but are not limited to, the National Electric Code, The American Concrete Institute, National Fire Protection Association, and other authority or body having jurisdiction over the work.

   C.  Utilities - The Landlord shall furnish all utilities required for the Demised Premises including gas, water, electricity, cable TV *(or satelite dish at landlords sole option)*, storm and sanitary sewers, and telephone service, whether or not these utilities or services are available on-site or off-site.  Landlord will provide separate meters for all utilities.

   D.  Environmental Site Assessment - Landlord has provided to Sears a Phase I Environmental Site Assessment of the proposed Sears parcel, conducted in accordance with the American Society of Testing and Materials "Phase I Environmental Site Assessment Process" (ASTM Standard E 1527-94 or latest) by a reputable Environmental Consulting firm.

   E.  Landlord shall secure and pay all required fees for all permits, certificates of inspection, and other similar requirements of local agencies.

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

F. All new or remodeling work shall include new materials and shall conform to the plans and criteria provided.

G. Work shall be done by skilled, experienced workmen and mechanics in accordance with the best practices of their field, and shall be of first class quality workmanship.

H. Within *30 days* after the construction drawings are reviewed by Sears, the Landlord shall confirm and inform Sears of the Work completion date. Sears Department 824C will coordinate fixturing, merchandising, and opening based on the Landlord's committed date. Progress schedules shall be provided and filed with Sears Department 824C for Sears' information. The construction shall be completed according with the attached turnover areas and critical items schedule.

I. Landlord shall make the complete Demised Premises available to Sears fixturing personnel and other Sears' provided labor, as provided in the Lease. Turnover for Sears work shall be as defined in paragraph entitled "Progress Schedule and Revisions".

J. Landlord shall deliver the Demised Premises to Sears clean, free of any debris, finished and complete, ready for operation. Sears will be responsible for clean-up due to its fixturing personnel and other Sears provided labor.

K. Landlord shall obtain three copies of all certificates of inspection, certificate of occupancy, building permit, sewer connection permit, other permits, guarantees, equipment operation, maintenance instructions, and one copy of "As-Built" reproducible drawings and delivered to Sears Department 824C, at completion of the work.

L. Sears Furnished Equipment - Sears and/or Landlord will furnish and deliver to the Demised Premises equipment and materials listed below. Landlord is responsible for providing date needed (date of arrival) receiving, storing, and installing the material and equipment listed. Landlord shall provide all related utilities, mechanical, electrical, and cable work needed for the completeness of the system as required.

NOTE: All other equipment not listed below is to be furnished and installed by Landlord's contractor.

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

| SEARS Furnished Equipment | Furnished and Installed by SEARS | Furnished by SEARS, Installed by Source and Connected by Landlord | Furnished by SEARS, Installed and Connected by Landlord | Remarks |
|---|---|---|---|---|
| Trash Compactor | | X | | Shroud by General Contractor per equipment shop drawings. |
| TV & Radio Antenna | | | X | |
| Auto Lifts | X | | | Landlord is responsible to provide air line with a cut-off valve for each tank location, power for the lift operation and receptacles on columns. |
| Satellite Dish | X | | | Landlord to provide mast support. |
| Air Reels | | | X | Located on lift. Installed by Landlord. |
| Light Reels | | | X | |
| Tire Changer | | | X | |
| Wall Mounted Fans | | | X | |
| Conveyor | | X | | |
| Fire Extinguishers | X | | | |
| Lockers | X | | | |
| Vending Machines | X | | | |
| Display Mats | X | | | |
| Entrance Vestibule Mats | X | | | |
| Store Fixtures | X | | | |
| Remountable Partition System | X | | | |
| Sound System Rack | X | | | Landlord to provide wiring, speakers and baffles. Use conduit where teflon insulated wires are not allowed by local codes. |
| Carpeting | X | | | |
| Accent Tile on Tile and Tile on Platforms | X | | | Field tile by Landlord. |

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

| SEARS Furnished Equipment | Furnished and Installed by SEARS | Furnished by SEARS, Installed by Source and Connected by Landlord | Furnished by SEARS, Installed and Connected by Landlord | Remarks |
|---|---|---|---|---|
| Optical Sink Cabinets | | X | | Sink provided by Concessionaire. Plumbing by Landlord. |
| Exterior and Mall Signs | | X | | |
| Light Canopy Electric Tracks | | X | | Installed by Landlord. |
| Close Circuit TV | X | | | If plenum approved cable is not allowed the Landlord electrical contractor shall provide all the required conduit, J. boxes with fish wires. |
| Ceiling Mounted Clocks | | | X | Wiring by electrical contractor. |
| Key Drop | | | X | Installed by Landlord. |
| Baler | | X | | Electrical contractor to provide power source. |
| Beauty Salon Shampoo Sinks | | X | | |
| Service Center Lawn Mower Service Surface Mounted | | X | | Landlord to provide power. |
| Service Center Non-stoop Lift In Ground | | | X | Landlord to provide power. |
| Service Center Hoist Beam Lift and Trolley | | | X | |
| Exterior Door Pulls for Alum. Store Fronts | | | X | Provided by Sears and installed by Landlord. |
| Light Box | | | X | Provided by Sears and installed by Landlord. |
| Sears Plaque | | | X | Provided by Sears and installed by Landlord. |

**SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA**
**ADMINISTRATION - GENERAL CONDITIONS**

| SEARS Furnished Equipment | Furnished and Installed by SEARS | Furnished by SEARS, Installed by Source and Connected by Landlord | Furnished by SEARS, Installed and Connected by Landlord | Remarks |
|---|---|---|---|---|
| Air Compressor Service Center Auto Center | | | X | Contractor shall be an approved installer by air compressor manufacturer. Sears will provide manufacturer start-up. |
| Oil Water Separator | | | X | Sears will provide the manufacture testing startups. |
| Eye Wash | | | X | |

M. Guarantee - The Landlord shall guarantee all existent and new equipment *and materials provided by the landlord* installed in the Demised Premises against faulty material or workmanship for a period of one year from date of acceptance unless longer time is requested in other sections of this criteria, ordinary wear and tear and unusual abuse or neglect excepted.

N. Exterior Signs - Landlord's architect shall obtain and provide to Sears with the exterior sign regulations issued by the planning department. Sears will furnish and install identification illuminated signs on all building facades exposed to customer parking and roads and on the mall entrance in enclosed malls. Signs will consist of individual letter, white with bronze return, 8' tall letter for the exterior "Sears" signs and 3' tall letters for the mall entrance sign, *subject to local sign ordinance.*

In addition, Sears will provide directional illuminated signs: "AUTO CENTER"; "MERCHANDISE PICK-UP"; and "PARTS-SERVICE" when parts and service is housed in the same building. This directional signs will have letters not taller than 30", *subject to local sign ordinance.*

Sears shall have the right to determine size, type and location of signs; however, approval by the Landlord will be required, and Landlord's architect shall include them in the Architectural Building Elevation Drawings. Landlord's Architect shall review exterior sign plans for compliance with city ordinances and advise Sears or required changes. He shall submit to the planning department for review and approval at the same time that construction documents are submitted for permits. If exterior signs permit is rejected, architect shall make modifications as directed by Sears.

O. Temporary Sign -

The developer will install temporary billboard size signs facing the main thoroughfares. The size of the sign will be the largest acceptable to the local authorities and shall contain the following information only: "SEARS WILL OPEN HERE". Use the acceptable SEARS logo.

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

P. Construction Documents (drawings and specifications) shall be submitted to Sears for review and acceptance at least three (3) times during its development:  Preliminary, 60% progress and 100% progress.

Q. Protection of Persons and Property - During construction the landlord will provide *and maintain* fire extinguishers throughout all accessible areas.  Chemical extinguishers, water, and hose facilities shall be provided to commensurate with construction progress.

The contractor shall protect excavations, buildings, and property of the Owner and others at the job site against damage from rain water, ground water, and back up from sewers and drains.  He shall provide and maintain temporary drainage and pumping required to keep the excavations and buildings free of water.

R. Shop Drawings - During the course of the project the Owner shall provide Sears with "Approved" and/or "Approved as Noted" shop drawings for all major contracts for review. These shop drawings must have been approved and signed by the Owner's consultants prior to submitting them to SEARS.  SEARS does not want to be issued "Rejected" shop drawings. SEARS review will consist of a material and design review only and does not release the Owner from meeting the requirements of the lease agreement.  The Owner will be notified of any conflict SEARS discovers upon review of the approved shop drawings.  *Sears will provide a list of shop drawings which Sears wants to review.*

S. Progress Schedule, Sears Occupancy and Revisions

1. Progress Schedules - Prior to construction, the Landlord shall prepare a "Construction Progress Schedule".  This schedule, in graphic form, shall indicate the proposed dates of commencement and completion of each of the various subdivisions of work as related to the completion date as indicated in the attached turnover schedule.  This schedule shall be prepared in conjunction will all contractors.  This Progress Schedule shall be updated and submitted to Sears monthly.

2. Occupancy for Fixturing Operation - SEARS Fixturing Crew shall be permitted occupancy of the building, so that interior fixturing work may commence as follows:

a. Prior to the opening date for *the* store, SEARS will enter the building at 18 weeks before opening and will start the fixturing operations.  Fixturing will start at the loading dock and shipping-receiving areas, and will proceed through stock areas, hardline areas, softline areas and will finish at home fashions area.  Fixturing operation will be conducted by SEARS Fixturing Superintendent, who will employ labor under separate labor contracts.  Trades involved will consist of carpenters, laborers, painters, electricians, and carpet layers. All materials will be provided by SEARS. *Sears will reasonably cooperate to maintain labor harmony on job site.*  Under fixturing contract SEARS will install the items indicated below:

i. Carpet where shown on Sears flooring plan.

ii. Certain painting and vinyl wall covering applications in sales area.  Contract documents shall specifically identify areas painted under General Contract.

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

    iii.    SEARS demountable fixturing partitions and doors in this partition. Documents shall show these basic items dotted and identify as N.I.C.

    iv.    Storage shelving.

    v.    Display counters throughout the store.

    vi.    Appliances and furniture dividers.

    vii.    Electrical connections to display fixtures and cabinets from outlets installed by the landlord electrical contractor.

    viii.    Employee time clocks and bulletin boards.

    ix.    Fire extinguishers.

    x.    Lockers.

    xi.    Store fixtures , store equipment and fixture partitions.

3. Revisions and Extra Work (after approval of Landlord's 100% drawings and specifications) - SEARS reserves the right to make changes in the drawings and specifications as the work progresses. Bulletins, orders, field work orders, specifications of instructions such changes will be issued to the Owner whose responsibility it will be to distribute these immediately and to notify the field office and all contractors affected to take such measures as may be necessary to avoid errors in the work which may occur due to the use of superseded drawings. Work affected by changes proposed in any revised drawings or other documents issued to the Owner shall not be executed unless changes are accompanied by letter of authorization *from Sears* to proceed accordingly. In cases where instruction accompanying any issue of revised drawings or specifications requests estimates of cost involved, such estimates shall be prepared and submitted promptly in order not to unduly affect the progress of the work. *Authorized changes which result in an extension of time to the construction schedule shall also result in a day-for-day extension of deadline dates.* In cases where a revision is so imminent that the time required to issue a formal order would delay the progress of a project, a field work order shall be used. Appropriate field work order forms shall be issued by the Owner on the job. These forms shall completely describe the work and method of pricing, and shall be signed by the Owner and SEARS prior to starting the work. *Facsimile copies of authorizations are acceptable.*
Under no circumstances will SEARS approve payment for any other work  not authorized by a field work order or formal order described herein. The value of any change order increasing or decreasing the contract price shall be fixed on the basis of one of the following methods as may be determined by SEARS. In each particular case the contractor shall furnish to the Owner and SEARS the percentages he has applied for taxes and insurance, overhead, profit, supervision of subcontractors, etc.

    a.    Based on unitary prices that include all the cost of the work including labor rates, overhead and profit. In the case of add and deducts, the unitary prices will be applied to the net add or deduct per item.

    b.    Cost Analysis Basis - Total sum shall be based upon estimate prepared by the Owner which shall be submitted to SEARS for changes resulting in additions to or reductions in the work shall completely itemize and detail all costs. The gross hourly wage scale (the prevailing wage scale with fringe benefits added) for all workmen shall be used in

**SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA**
**ADMINISTRATION - GENERAL CONDITIONS**

determining payroll costs for revisions to the contract. The Owner shall be required to substantiate the *labor rates* used by furnishing a copy of what the bid was.

c. Cost Plus Accounting Basis - This accounting basis requires written authorization from SEARS to the Owner to proceed with work and to keep a record of the cost by presenting daily, to the Owner, the following substantiating records for approval:

   i. Material costs are to be substantiated by copies of material invoices paid to suppliers with daily tickets or receiving tickets attached and signed by the Owner to certify delivery and use. If materials are used out of the Contractor's stock and billed on draw tickets, prices must be substantiated.

   ii. Contractor's payroll costs are to be substantiated by daily time sheets which show the following: date, name of each employee, job classification, rate of pay, hours worked, and extended payroll costs identifying straight time from overtime. The time sheets must be approved and signed by Owner.

   iii. Subcontractor's costs are to be substantiated by copies of subcontractor's invoices approved by the Owner. If the subcontractor's work is performed on a time and material basis, the same substantiation for payroll and material charges as described above must be submitted and certified by the Owner. Upon completion of the work, a statement of cost, itemizing materials used, subcontractor's costs, and contractor's payroll costs with taxes and insurance, overhead, profit, supervision of subcontractors and premium payroll percentage added for processing. The statement of cost must be supported by a copy of the material invoices and the Contractor's time sheets which are approved and signed by the Owner.

   iv. The total general conditions, overhead and profit in change orders cannot exceed 25%, which includes all the work done by the general contractor, subcontractors, suppliers, and the Landlord. The general contractor general conditions, overhead and profit shall not exceed 15% for work done directly by him.

   v. *Sears shall provide payment for extra work when its complete and within 30 days of receipt of an invoice from landlord.*

   NOTE:    Changes or additions to Owner drawings and Specifications due to Codes and/or SEARS Construction Criteria compliance as well as Architectural Consulting Engineers, errors or omissions are not considered change orders and shall be corrected without charge to SEARS.

4. Definitions and Application of Payroll and Material Percentages:

   a. Taxes and insurance is defined as the percentage applicable to the total straight time payroll to cover State and Federal Unemployment Insurance, workmen's compensation, F.I.C.A., liability insurance, and other items related thereto.

   b. Overhead is defined as the percentage applicable to the total straight time payroll. It shall cover insurance other than that previously mentioned heretofore, licenses, salaries paid to Contractor's administrative officers, accounting and clerical employees, travel and car expense paid to Contractor's administrative officers, cost of

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

purchasing or renting all small tools and power tools necessary to perform the work, and any expense of the Contractor's main office or business overhead.

c. Profit - On payroll: Percentage applicable to total payroll costs only.

On materials: Percentage is to be applied to material costs to cover costs of ordering, warehousing, stockkeeping, transportation, etc.

d. Supervision of Subcontractors: Percentage applicable to subcontractor charges to cover Contractor's costs of administrating and supervising subcontractors assigned or as allowed in the contract.

e. Fringe Benefits are those contributions to trade unions which are now included in the trade agreement between the Union and the Industry, and which include such items as vacations, sick leave, retirement, etc. The amount of these benefits are to be added to the hourly base pay rate to determine the hourly wage scale, as indicated on the Labor Wage Schedule Form.

f. News Releases - It is understood that SEARS reserves the right of announcing and publicizing its projects through all news media, including newspapers, magazines, radio, television, house organs, trade journals, and newsletters. This applies to the initial announcement of the project, the release of details of the project, publicity on groundbreaking, release of the artist's rendering of the project. All conversations, confirmations, and statements to the news media will be conducted only by public relations representatives of SEARS or by those authorized by SEARS Public Relations Department.

II. **ARCHITECTURAL - ENGINEERING (when indicated means Landlord's Architect and/or Engineers.)**

NOTE: Sears review and acceptance of documents implies approval *of design only*. Landlord and his Architect and Engineers are fully responsible for the building design and construction according with all the codes and regulations applicable to the project and the Sears criteria.

A. Phase I Programming

During this phase the site has been chosen by the Landlord and SEARS has determined the size store that would handle this particular market. SEARS Store Planning Department prepares a 1:100 Building Footprint which is forwarded to the Owner for site layout. SEARS Real Estate and Construction Departments work with the Owner and his consultants on site development which includes location of SEARS store, traffic flow and utilities, etc., in relation to the total project.

Once the Owner and SEARS reach a mutual agreement on the overall site layout and SEARS prepares the store "Construction Adjacencies Plan". Then the Owner proceeds with the design development of SEARS store.

**SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA**
**ADMINISTRATION - GENERAL CONDITIONS**

    B.  Phase II Design

        Information supplied by SEARS. The following information will be provided by SEARS to the ARCHITECT.

    C.  Sears Construction Standards, turnover date, store fixture drawings, concession area layout, list of Sears furnished equipment.

        1.  Sears will supply information solely to set forth its construction requirements. No representations are made by Sears that the plans, specifications, or other materials herein comply with requirements, rules, or regulations of any governmental body. Sears does not present that they have been reviewed or approved by an architect or other professional.

        2.  Special Requirements to be incorporated in the work.

    D.  General Requirements - ARCHITECT shall provide and furnish complete professional services for the architectural, civil landscaping, fire protection, structural, compressed air system, plumbing, heating, vertical transportation, ventilation, refrigeration, electrical work, energy conservation controls and fire and burglar alarm system in connection with the project during the design and planning, and throughout the construction operations. Said services shall in no instance be performed or furnished by a contractor, material supplier or manufacturer's agent.

        1.  Conferences - The ARCHITECT shall hold or attend all conferences necessary to settle disputes, in a manner satisfactory to SEARS and Landlord.

        2.  Local Building Ordinances - The ARCHITECT shall be responsible for filing the required documents to secure approval of governmental authorities having jurisdiction over the design of the project. All meetings shall be documented by the ARCHITECT in writing and copies to all parties involved.

        3.  Drawings and Specifications - The ARCHITECT shall submit drawings, specifications, and other information required at various design phases for SEARS review and approval in a manner required by these STANDARDS at each project phase.

    E.  Design and Construction Document Preparation - The ARCHITECT shall prepare design studies and construction documents in a manner outlined in the following paragraphs.

        1.  Schematic Design Phase. Based on layouts and information furnished by SEARS, the ARCHITECT shall prepare schematic design studies leading to an acceptable solution for SEARS review. One (1) set of sepia shall be submitted to SEARS containing the information requested. Schematic design shall include, but not be limited to, items outlined below:

            a.  Site studies including curbs, sidewalks and planting areas.

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

    b.  Building Studies which shall include a single line layout of service areas, exit calculation and exit locations DOCUMENTED WITH THE LOCAL BUILDING OFFICIALS. It shall include stairway and vertical transportation systems and miscellaneous building facilities, other than fixtures and equipment. Include lines of sight from the shopping center ring road and adjacent roads.

    c.  Electrical Service - ARCHITECT and his consultants shall present to SEARS the parameters for the electrical service to the building. This shall primarily consist of power company requirements, such as available current, transformation, metering, primary feeder location and configuration, etc., and shall select the operating voltage and the size (current rating) of the service to the building.

    d.  Mechanical: A block plan shall be prepared showing how the Owner proposes to zone the building. Accompanying this plan shall be a preliminary set of design calculations for the air conditioning and heating systems. The design calculations shall contain a building block load and the proposed individual zone loads.

    e.  Material Selection - ARCHITECT shall furnish a board of proposed materials and color samples for SEARS review.

    f.  Code Requirements - ARCHITECT shall document with the local building officials exit requirement verification and submit such documentation to SEARS.

2.  Preliminary Design Phase - From the reviewed and accepted schematic design, ARCHITECT shall prepare preliminary design documents for SEARS review and acceptance. This submittal shall include, but shall not be limited to, items outlined below:

    a.  Typical wall sections, indicating materials and critical dimensions.

    b.  Architectural: At this point in time the Owner will submit to SEARS his preliminary 1/8" floor plan (one (1) set paper sepias and one (1) set blueprints). These plans are submitted to Department 824C for the preparation of the 1/8" SEARS Construction Plan. These preliminary plans should be coordinated with Sears block plan and the same numbers for column lines be used. The drawings should:

       i.  Indicate the exterior wall in relation to the columns.

       ii.  Indicate the interior column layout (a typical interior column and overall dimension should be shown).

       iii.  Indicate toilets (proper size and location).

       iv.  Indicate escalators and elevators where applicable.

       v.  Indicate stairs where applicable.

    c.  1/8" scale building sections and elevations indicating critical dimensions.

    d.  Structural drawings showing basic structural system and basic wall sections.

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

e.  Site drawings showing sidewalks, curbs, access for handicapped locations, landscaped areas indicating basic selections of the plants, utility stubouts, and site utility routing if required.

f.  Outlined Specifications covering all disciplines.

g.  Mechanical work - The ARCHITECT and his consultants shall submit to SEARS a complete set of heating and ventilation design calculations and a one line schematic of the primary air distribution system of the chosen system. The design calculations shall contain a block load and individual zone loads corresponding to the zones shown on the schematic. Also to be submitted at this time are the following items:

System heating capacity required

Equivalent full load hour per year (cooling)

Number of Degree Days (heating)

h.  Electrical work - ARCHITECT and his consultants shall present to SEARS the parameters for the basic electrical power system within the building. This shall primarily consist of:

   i.   Type and size of main switchgear, feeders, main distribution panels, low voltage transformation (when required), lighting and power panels, and their location.

   ii.  A single line diagram of the basic power system showing all panels.

i.  Rendering - ARCHITECT shall prepare and submit a color perspective (1) display and exhibition. Said rendering shall have a board size measuring exactly 24" X 36" with the actual color perspective drawing made to fit a mat opening having dimensions of 16" (5" matte at the bottom, 3" at the top) X 30" (3" matte on both sides). Submit to SEARS the original and two full size color photographic print of equal dimensions. No deviations will be permitted from these dimensions unless specifically approved or required by SEARS. ARCHITECT shall also provide twelve (12) color 8" X 10" photographic prints and one (1) 35 mm slide of the said drawing. Prior to proceeding with the rendering drawing, ARCHITECT shall submit minimum of two (2) rough sketches of the building views in perspective for SEARS selection, on which the finished rendering shall be based.

At this time, SEARS issues the 1/8" Construction Base Plan to the Owner which indicates the interior utility requirements of the store, but not the final merchandising. The Owner then proceeds to the preparation of the contract documents (working drawings and specifications).

3.  60% Construction Document Review - Upon the review and agreement of the Preliminary Design Phase requirements, ARCHITECT shall prepare and submit progress drawings at a point of approximately 60% completion of the Construction Documents and specifications for SEARS review. ARCHITECT will not be required to interrupt his preparation of the Construction Documents during this review. One (1) set of sepias and two (2) sets of written material shall be submitted to SEARS containing information

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

required. The information submitted shall consist of, but shall not be limited to, the items indicated below.

Site drawing, floor plan, wall sections, structural, roof plan, mechanical and electrical. Sears will provide concession drawings requirements at this time.

4. Construction Document 100% Review - ARCHITECT shall submit for SEARS review a complete set of Construction Documents FULLY COORDINATED AND CHECKED. Construction Documents shall include all drawings, specifications and other documents required to bid and to construct the project. One (1) set of sepias and one (1) set of prints of the complete drawings and two (2) sets of specifications and other written material containing the required information shall be submitted to SEARS. Landlord's architect and consultants shall incorporate in construction documents all the comments from Sears in order to comply with requirements indicated in Sears criteria and fixturing drawings. *Such changes shall be at no cost to Sears so long as they are not substantially different from criteria. Sears will approve or disapprove 100% drawings within seven days.*

F. Bidding Phase

1. It is entirely up to the Landlord as to the method of bidding or negotiating the project with the various contractors; however, we encourage the consideration and to include local, union and non union contractors in the bidders list.

2. Architect Services - Upon the written SEARS review of the construction documents, ARCHITECT and his consultant shall incorporate all corrections and modifications of the said documents required by this review. Building department plan check correction, if available at this time, should also be incorporated into the said documents. At the same time as construction documents are distributed, ARCHITECT shall furnish SEARS one (1) complete set of the Construction Documents and one (1) set of drawing sepias in addition to the number of sets required above. SEARS will review and request further revisions, if necessary, to fulfill the Construction Standards and once it is accomplished, SEARS Planning Supervisor will issue a letter of acceptance of documents to Landlord. ARCHITECT also shall perform the tasks indicated below:

   a. File documents as may be required by local or state authorities.

   b. Provide clarifications of the construction documents and issue addendum during the bidding period.

   c. At the time the architectural drawings are sent out for bid, the ARCHITECT shall prepare a table giving the gross size of the building and a breakdown of the areas such as: retail store, auto center, penthouse, and service center. Use appropriate form.

   d. Landlord or his architect should include in bid documents that the general contractor should obtain from Sears the final fixturing plan before any interiors work or outlets installation begins.

Leased General Conditions              13 of 17              10/15/98

# SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

### G.    Construction Phase

After award of Construction Contract or Letter of Intent, ARCHITECT shall furnish SEARS with two (2) sets of 50% reduced (1/16" = 1'-0") paper sepias (one to Field Project Manager and one to Planning Manager), one (1) set of prints and two (2) copies of Specifications. One set of DXF computer disc 100% documents. After completion of work, two (2) sets of "As-Built" construction documents (one blueline and one mylar reproducible) shall be supplied to the SEARS D/824C Project Manager.

1.    During this phase SEARS Project Manager will work closely with the Owner to coordinate SEARS requirements with the Owner's construction schedule. Because of the critical nature of SEARS opening date, the Owner is to provide SEARS with a project schedule prior to the start of construction. This schedule should comply with Sears turnover schedule attached at the end of this section.

2.    In early weeks of construction, the Owner shall submit to SEARS samples and/or mock-up of exterior materials for SEARS review. The Owner shall have all exterior materials submitted at the same time so they may be selected in combination and to limit unnecessary trips to the jobsite. Immediately after the exterior materials are reviewed, all interior materials that require long lead time, such as ceramic tile, toilet partitions, plastic laminate, etc., shall be submitted. SEARS will not accept substitutions for failure to submit the specified materials on time.

3.    At 42 weeks before *scheduled opening and before interior electrical work the Contractor will ask for Sears to issue a fixturing plan with the final location of electrical outlets and phone and data processing equipment.* Landlord should request from his contractor to follow Sears drawings and make an adjustment in electrical drawings. Should there be differences in quantities due to this drawing, the net difference will be credited or charged to Sears.

4.    *As soon as possible* after construction starts, the contractors shall submit a list containing the actual quantities and delivery dates of any SEARS furnished equipment.

5.    Shop Drawings - Equipment lists, samples of materials, all detailed shop drawings, elevators and escalators and other submissions by Contractors, shall be checked and approved by ARCHITECT for conformance with the design concept of the project and for all compliance with the Construction Documents or approved modifications thereof. Colors, patterns, and textures of paint, tile, and other finish materials shall be selected with the approval of SEARS. One (1) copy of the approved shop drawings is to be submitted to SEARS for record. One (1) copy will be retained by the ARCHITECT, one (1) copy will be kept at the job site during construction in a file cabinet properly separated by trades. Any field changes to the shop drawings shall be documented. Two (2) sets of sprinkler shop drawings, equipment brochures and hydraulic calculations shall be submitted to Mr. John Jablonski at Factory Mutual (FM) for review and approval prior to commencing sprinkler installation and provide six (6) sets of sprinkler shop drawings and equipment brochures to Schirmer Engineering Corporation for review and comment prior to commencing sprinkler installation. Sprinkler contractor shall also forward one (1) blueline print set of the latest construction drawings, including architectural, structural, electrical and mechanical drawings, Sears latest fixture plans and the sprinkler bid specifications. These construction documents shall be the latest information used by the

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

installing sprinkler contractor in preparing the sprinkler shop drawings. Sprinkler shop drawings will not be reviewed if the above mentioned construction documents were not enclosed with the sprinkler shop drawings. Forward the entire submittal to the attention of: Mr. Vinod Shastri, Schirmer Engineering Corporation, 707 Lake Cook Road, Deerfield, IL 60015-4997, (847) 272-3340.

6.  Revisions and As-Built Drawings - The ARCHITECT shall, during the construction of the Project, prepare and issue such revisions to the final working drawings and specifications as shall be required to keep all documents in accordance with approved shop drawings and Change Orders. At the completion of the Work, ARCHITECT shall obtain from Contractor the redline record copies and incorporate the changes. ARCHITECT will furnish Sears with one (1) complete set of mylar record drawings, one (1) set of bluelines of the Work as constructed, one tape from the scanned As-Built Drawings, which shall be furnished to Sears before final payment of Architect's fee. Specifications for scanning are as follows:

a.  DATA = Raster Data, 200 DPI in Cals CCITT-G4 untitled format.

b.  MEDIA = 3.5" 1.44 Megabyte Unix TAR or DOS Format floppy. 1/4" Track cartridge or 8mm tape unix TAR form. Q16-120 or Q16-150 Density.

c.  File names on media =     4 Digit Store Number plus 4 Digit Sequence Number.

    Example:     10441001.GP4
                 10441002.GP4
                 10441003.GP4

d.  ASCII Text File for Database formatted as follows:

| Store No. | Seq. No. | File Name | Drawing Name | Tube No. | Description |
|-----------|----------|-----------|--------------|----------|-------------|
| (5) | (4) | (8) | (8) | (5) | (40) |
| Example: | | | | | |
| 1,044 | 1,001 | 10,441,001 | A1 | 50,680 | Floor Plan |
| 1,044 | 1,002 | 10,441,002 | A2 | 50,680 | Lighting Plan |
| 1,044 | 1,003 | 10,441,003 | A3 | 50,680 | Elevations |

Note: Store number and tube number provided to Architect by Sears.

Sears Contacts: Image Memory Systems
              Mr. W. Woody Chambers      OH      513-890-5022

7.  Corrections - The ARCHITECT shall provide such additional architectural and engineering services as may be necessary to correct errors, omissions, or conflicts which may occur in the Construction Documents prepared by ARCHITECT.

Leased General Conditions          15 of 17          10/15/98

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
### ADMINISTRATION - GENERAL CONDITIONS

8.  As-Built Plot Plan - The ARCHITECT shall prepare an "asconstructed" reproducible plot plan of the property on a sheet 9-1/2" X 16" at a scale of 1" = 100'.  The plan shall show the location of the property with reference to the adjoining streets; the location of the buildings on the property; and all curb cuts and access to the parking area.  The plan shall also include a tabulation of the ground area covered by the buildings, gross area of the building or buildings to reflect the areas calculated under paragraph "Bidding Phase, Architect Services" herein before, and the parking areas and the number of cars they will accommodate (for that portion of the shopping center occupied by SEARS).

9.  Post Construction Phase - Before expiration of the twelve (12) month guarantee period, ARCHITECT shall arrange and coordinate with SEARS and his engineering consultants and conduct an on-site inspection of the project in order to insure that SEARS interest is safeguarded.  He shall prepare a list of deficiencies and shall instruct the General Contractor to correct such deficiencies.

10. The project then proceeds towards the arrival of SEARS Fixturing Crew (approximately 17 weeks prior to opening).  At this time, the building should be delivered to Sears as indicated in turnover schedule.

11. During the course of construction, SEARS Project Manager will conduct preliminary inspections.  The Owner will be notified of any variances to the plans and specifications.  These variances shall be corrected within reasonable time.

12. Final Inspection

    a.  Prior to SEARS conducting a final inspection, the Owner's consultants shall conduct their final inspection and notify SEARS by letter that the building is ready for a final inspection.

    b.  Architect shall provide the general contractor all the submittals required by building officials to obtain certificate of occupancy.

    c.  Architect and consultants shall inspect the building at substantial completion and prepare punchlist giving contractor reasonable time but before opening to complete punchlist.

    d.  Architect shall reinspect the building when punchlist is complete.

Leased General Conditions                    16 of 17                    10/15/98

## SEARS CONSTRUCTION CRITERIA - LEASED FACILITIES - CLOVIS, CA
## ADMINISTRATION - GENERAL CONDITIONS

13. Contractor shall take progress photographs, approved by Architect, to take a minimum of six (6) different photographs of the work, plus additional photographs of unusual conditions as requested by the Architect, on the first and fifteenth of the months during construction operations, and at the completion of the work. These photographs shall be taken at locations where directed by the Architect, and shall be 8" X 10" in size. One (1) print of each photograph shall be delivered to Architect, one to Owner, one to:

Sears, Roebuck and Company
Department 824C, A2-283B
3333 Beverly Road
Hoffman Estates, IL  60179

and one set delivered to Sears Project Manager. Photographs shall be identified with the project name and date. Also, the Sunday before the store opens, final photographs and slides of the store's architectural features and parking area shall be taken.

14. *Construction Representatives*

a. *Landlords Construction Representatives - Landlord has designated Robert Percival as its representative with respect to the matters set forth in this Work Letter, who until further notice to Tenant, shall have full authority and responsibility to act on behalf of Landlord as required under this Work Letter.*

b. *Tenants Construction representatives - Tenant has designated Gary Birdsell and Jim Griffin as its representatives with respect to the matters set forth in this Work Letter, who, until further notice to Landlord, shall have full authority and responsibility to act on behalf of Tenant as required under this Work Letter.*

Landlord and Tenant have agreed to these General Conditions.

LANDLORD:
CEE RETAIL REALTY, INC.

By: _____

Its: VICE PRESIDENT

TENANT:
SEARS, ROEBUCK AND CO.

_____
Ronald P. Douglass
Vice President, Real Estate

Leased General Conditions                    17 of 17                    10/15/98