FERRAIUOLI LLC
390 N. Orange Avenue
Suite 2300
Orlando, Florida 32801
Telephone: (407) 982-7310
Facsimile: (787) 766-7001
Email: scolon@ferraiuoli.com
Email: gchico@ferraiuoli.com

Counsel for *Santa Rosa Mall, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |
| SANTA ROSA MALL, LLC,<br>      Plaintiff,<br>  v.<br>SEARS HOLDINGS CORPORATION; and<br>SEARS, ROEBUCK DE PUERTO RICO, INC.<br>      Defendants. | Adversary Proceeding<br>Case No. 19-____ (RDD) |

**COMPLAINT[1]**

TO THE HONORABLE COURT:

COMES NOW Santa Rosa Mall, LLC ("Santa Rosa Mall" or "Plaintiff"), by and through its

undersigned counsel, and pursuant to Fed. R. Bankr. P. 7001, hereby alleges as follows:

Nature of Action

1.   This is an adversary proceeding by the Plaintiff for breach of contract, specific

performance, unjust enrichment, aiding and abetting fraudulent misrepresentation, and relief in the form of

---

[1] The Plaintiff's supporting papers and exhibits hereto contain Confidential Material, as defined in the *Amended Stipulated Protective Order* (the "*Amended Protective Order*", Docket No. 1084). The Complaint and its exhibits are being filed under seal in accordance with Paragraph 13 of the *Amended Protective Order*, Fed. R. Bankr. P. 9037(d), SDNY LBR 5005-2 and 9018-1, and the Chamber Rules of the Hon. Judge Robert D. Drain. See *Order* granting *Motion to File Under Seal* (Docket No. ____).

declaratory judgment.

<u>Jurisdiction and Venue</u>

2.      This adversary proceeding is commenced pursuant to Fed. R. Bankr. P. 7001(1), (2) and 7001(9). It is a core proceeding under 28 U.S.C. § 157(b)(2)(A),(O).

3.      This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This Court has personal jurisdiction over each of the Defendants under Fed. R. Bankr. P. 7004(f).

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>The Parties</u>

5.      Plaintiff Santa Rosa Mall is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico. Further, Santa Rosa Mall is a shopping mall located in Bayamon, Puerto Rico.

6.      Defendant Sears Holding Corporation (0798) and its affiliated co-debtors (collectively, the "Debtors" or "SHC"), filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 15, 2018 (the "<u>Petition Date</u>").  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

7.      Defendant Sears, Roebuck de Puerto Rico, Inc. (3626) ("Sears"), is a direct subsidiary of Sears Holdings Corporation and a party to a *Lease Agreement* executed on September 22, 1965, Sears leases from Santa Rosa Mall its anchor store ("Store No. 1915" or the "Demised Premises").

<u>Factual and Procedural Background</u>

8.      Pursuant to a *Lease Agreement* executed by Santa Rosa Mall and Sears on September 22, 1965, Sears leases from Santa Rosa Mall its anchor store ("Store No. 1915" or the "Demised Premises") (the "Lease Agreement").  A copy of the *Lease Agreement* is attached hereto as **Exhibit I**.

9.      In addition to the fixed rent, the *Lease Agreement* includes other monetary and non-monetary obligations typical of commercial leasing agreements.  See *Lease Agreement* at § 2.01, p. 12; § 2.03, p. 14.

10.      As part of its non-monetary obligations, Section 2.01 of the *Lease Agreement* provides that "all costs, expenses and obligations of any kind relating to the … maintenance, preservation, care, repair and operation of the Demised Premises, including all replacements, alterations, and additions … which may arise or become due during the term of this lease shall be paid by [Sears] and [Santa Rosa Mall] shall be indemnified and saved harmless by [Sears] from and against such costs, expenses· and obligations". Id., § 2.10, p. 12. The *Lease Agreement* requires Sears to "keep the Demised Premises [] in good order and repair and in such condition as may be required by law and by the terms of any insurance policies covering the Demised Premises", including repairs that are "extraordinary as well as ordinary and whether or not such repairs shall be of a structural nature []". Id. § 4.01, p. 23.

11.      Section 4.03 of the *Lease Agreement* further extends Sears' obligation for maintenance and repair, and requires that:

> [Sears] pay and discharge, and indemnify and save harmless [Santa Rosa Mall] against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon to incurred by or asserted against [Santa Rosa Mall] by reason of [] [a]ny work or thing done in, on or about the Demised Premises or any part thereof; [a]ny [] maintenance, repair or management of the Demised Premises []; [and/or] [a]ny failure on the part of [Sears] to perform or comply with any of the covenants, agreements, terms or conditions contained in [the] lease on its part to be performed or complied with.

Id. § 4.03, pp. 23-24.

12.      Section 6.01 of the *Lease Agreement further* requires that Sears "maintain at [its] sole cost and expense, for the benefit of [Santa Rosa Mall] and [Sears], insurance with respect to the Demised Premises" for risks including "windstorm". Id. § 6.01(a), p. 26. Such insurance policy "shall be secured promptly and **certificates thereof shall be furnished to [Santa Rosa Mall]**" and "**shall contain loss payable clause to [Santa Rosa Mall] and [Sears]**". Id., § 6.02(a), pp. 26-27. Renewals of the insurance policies are also subject to the foregoing. Id., 6.02(b), p. 27.

13.      In the event of damage by windstorm or any other casualty to the Demised Premises in an amount over $100,000, such as that caused by Hurricanes Irma and Maria, Section 6.03(b)(2) of the *Lease Agreement* requires Sears "proceed with all reasonable expedition to restore or rebuild [] the building so

destroyed or rendered untenantable, free from liens of any kind, in substantial accordance with the plans and specifications of the building so destroyed or rendered untenantable []". Id., § 6.03(b)(2), p. 28. Section 6.03(b)(2) triggers Section 5.02 of the *Lease Agreement*, which requires that Sears "furnish to [Santa Rosa Mall] a duplicate set of the working plans, sketches and specifications for the proposed work", "at its own cost and expense obtain or cause to be obtained all the insurance coverage specified in Section 3.04", and that "[a]ny alteration or addition [] be carried out in such a way  as to interfere as little as is reasonably possible with the operations of the Shopping Center []". Id., § 5.02(a), (c) and (d), p. 25.

14.    Section 6.03(b)(3) of the *Lease Agreement* further mandates as follows:

> **The net sums recovered by [Santa Rosa Mall] and [Sears] on account of loss or damage whether under the policies taken out as aforesaid, or under other insurance policies taken out by [Sears] and indemnifying for <u>physical loss</u>** (as distinguished from the loss of use and occupancy. or profits), **shall by <u>deposited in a special account in the name of [Santa Rosa Mall]</u> separate and distinct from all other funds of [Santa Rosa Mall] <u>in a bank or trust company of the City of San Juan, Puerto Rico, approved by [Santa Rosa Mall] and [Sears] to be applied on account of the cost of such restoration or rebuilding</u>**, as the case may be, as the work of restoration or rebuilding progresses, and [Sears] shall pay any and all additional moneys required in such restoration or rebuilding in excess of said net sums recovered, and shall be entitled to receive any surplus, if any, remaining of said deposit after such restoration .. or rebuilding has been completed as aforesaid, provided, however, that should the aforesaid damage by fire or other casualty occur within the last three years of the initial term or any extended term this lease, [Sears] shall have the option to surrender the proceeds of any insurance to [Santa Rosa Mall] and vacate the premises.

Id., § 6.03(b)(3), pp. 28-29 (emphasis and underline added).

15.    The deposit of the insurance proceeds in a separate account is essential and Section 6.03(d) explains its importance:

> If [Sears] does not commence promptly to repair or restore the injury or destruction, or if, having commenced the repair or restoration, [Sears] does not proceed diligently to complete the same, [Santa Rosa Mall] shall be entitled (but shall be under no obligation) at any time thereafter to enter the Demised Premises and repair or restore the injury or destruction and to apply any insurance proceeds in the said special account to the payment of the cost thereof; but if the insurance proceeds are insufficient for the cost of the repair, restoration or reconstruction, [Sears] shall pay to [Santa Rosa Mall], upon demand and as additional rent as the work progresses; such amounts as shall be necessary to complete the repair, restoration or reconstruction.

Id., § 6.03(d), p. 29.

16.    Section 15.01 of the *Lease Agreement* further mandates as follows:

Tenant shall on the expiration, of the term of this lease or other sooner termination hereof, Surfrider and deliver up the Demised Premises with the buildings and improvements then erected and maintained thereon into the possession of Landlord in good order, condition and repair, free and clear of all liens, tenancies and encumbrances other than those, if any, created by Landlord, and title to such buildings and improvements shall vest in the Landlord without any payment or allowance whatever by Landlord on account of or for any buildings and improvements on the Demised Premises at the time of the surrender, or for the contents thereof or appurtenances thereto.  Tenant shall execute such instruments as may be required to effectuate the transfer of title to Landlord.

The aforesaid surrender shall include all fixtures and facilities in the buildings on the Demised Premises, or forming part thereof, which are customarily regarded as real estate and as part of the buildings.  Any fixtures, trade fixtures, personal property or belongings of Tenant left upon the Demised-Premises at the time of such surrender shall be deemed to have been abandoned by Tenant.

Id., § 15.01, pp. 46-47.



23.     On or about October 25, 2017, Aon Risk Services, Inc., issued Certificate of Insurance No. 570075074281 regarding Policy No. PTNAM1701557 for the period of June 1, 2017 to June 1, 2018 (the "*Certificate of Insurance*"). As stated in the *Certificate of Insurance*, the coverage limit of the *Contract of Insurance* is of $50,000,000. A copy of the *Certificate of Insurance* is attached hereto as **Exhibit IV**.

24.     Under the "Additional Remarks Schedule" of such *Certificate of Insurance*,

**Santa Rosa Mall, LLC… and Commercial Centers Management, LLC are included as Loss Payee** in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location.

Id. at p. 3. The *Certificate of Insurance* refers to "Sears Store No. 1915 – Santa Rosa Mall, Bayamon, PR".

Id.

25.     Sears has operated Store No. 1915 at Santa Rosa Mall since September 22, 1965, following the execution of the *Lease Agreement*, until the passing of Hurricane Maria on September 20, 2017, when it closed its doors.  The Court may take judicial notice of the passing of Hurricane Maria, as well as its trajectory and aftermath under Fed. R. Evid. 201.

26.     Hurricane Maria caused substantial damage to Store No. 1915, which has remained closed

-6-

to the public, inoperative, and in ill-repair ever since.  Critically, Store No. 1915 is, has been, and continues

to be the "anchor store" and the largest store at Santa Rosa Mall, acting as the main driver of customers for

other tenants. Two (2) of the four (4) main entrances to Santa Rosa Mall are through Sears, which directly

impedes traffic flow. Store No. 1915's presence in Santa Rosa Mall is so essential that lease agreements for

other tenants include co-tenancy clauses directly related to Sears' operations, meaning that if Sears closes,

certain other tenants at the mall have a right to terminate their leases and/or if Sears closes operations for a

determined period, other tenants at the mall have the right to have their rents significantly reduced.  See

Lead Case Docket No. 2828, *Declaration of Yvette Melendez*, at ¶ 6.

27.    On October 26, 2017, SHC informed Commercial Centers Management, LLC

("Landlord") by letter that "Sears ha[d] an insurance claim for this loss", referring to Santa Rosa Mall's

damages, and that "[o]nce the insurance payment [was] received arrangements will be made for it to be

deposited with an agreed bank". *Letter from Sears to Santa Rosa Mall dated October 26, 2017* attached

hereto as **Exhibit V.**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████

29.    On October 30, 2017, Santa Rosa Mall, through its affiliate CCM Puerto Rico, issued a

letter to AIG requesting "to be informed as of the filing of any claim under the policy as well as the

processing of the same, and that any insurance proceeds be deposited as required by the Lease Agreement".

*Letter from CCM/Santa Rosa Mall to AIG dated October 30, 2017* attached hereto as **Exhibit VII.** No

response was received.  Also see Santa Rosa Mall's request to that extent in the *Motion for Entry of Order*

*for the Debtor to: (i) Disclose Status of Insurance claim; (ii) Deposit any Insurance Proceed into Separate*

*Account to be Used Exclusively to Repair the Insured Demised Premises; and (iii) Alternatively, find the*

*Automatic Stay inapplicable to the Insurance Proceeds* filed on December 14, 2018 (Lead Case Docket No.

1240).

30.    After the Petition Date, the Debtors suspended all reconstruction efforts in the Demised

Premises.

31.     In the thirteen-month period between the passing of Hurricane Maria and the Petition Date, Sears had ample time to rebuild the Demised Premises and reopen the store.  Notwithstanding, the scope of the work completed by Sears was only limited to certain demolition, clean up and roof replacement.

32.     On November 1, 2018, the Debtors filed a *Motion for Approval of Global Bidding Procedures* (the "*Global Bidding Procedures Motion*", Docket No. 429) in connection with a sale or disposition of certain assets of Sears and its debtor affiliates (the "*Global Bidding Procedures*").

33.     On November 19, 2018, the Court entered an *Order Approving Global Bidding Procedures and Granting Related Relief* (the "*Global Bidding Procedures Order*", Docket No. 816) regarding the sale/disposition of certain assets, scheduling auctions and hearings for approval of proposed sale transactions and approving the procedures for the assumption and assignment of executory contracts and unexpired non-residential leases.

34.     On November 21, 2018, the Debtors filed a *Notice of Filing of Global Bidding Procedures Process Letter* (the "*Process Letter*", Docket No. 862) soliciting bids for all or some of the Debtors' stores and related assets identified as "Go Forward Stores", either on a going concern basis or on a liquidation basis. Pursuant to the asset schedule attached thereto, the Debtors identified Santa Rosa Mall as a "Go Forward Store". <u>Id.</u>, p. 43, line no. 381.

35.     On December 14, 2018, Santa Rosa filed a *Motion for Entry of Order for the Debtor to: (i) Disclose Status of Insurance Claim; (ii) Deposit Any Insurance Proceed into Separate Account to Be Used Exclusively to Repair the Insured Demised Premises; and (iii) Alternatively, Find the Automatic Stay Inapplicable to the Insurance Proceeds* (the "*Motion for Entry of Order*", Docket No. 1240), wherein Santa Rosa Mall sustained that pursuant to the obligations under the *Lease Agreement* and the *Certificate of Insurance*, Santa Rosa Mall was a "loss payee" under the Contract of Insurance.

36.     By the *Motion for Entry of Order*, Santa Rosa Mall further sustained that the insurance proceeds were not part of the bankruptcy estate and must be exclusively applied to the restoration or rebuilding of the Demised Premises in accordance to the *Lease Agreement*.  Santa Rosa Mall was not then

or now been privy to the insurance claims filed by SHC with AIG or the insurance settlement or negotiations, if any, in spite of its express request.

37. On January 14, 2019, the Debtors commenced an Auction for the assets identified as "Go Forward Stores" in connection with the *Global Bidding Procedure* Order. See Docket No. 816, p. 32; Docket No. 1730, p. 2, ¶ 4.

38. On January 18, 2019, the Debtors filed a *Notice of Successful Bidder and Sale Hearing* (Docket No. 1730). Attached thereto as Exhibit "A" (Docket No. 1730) is a copy of the *Asset Purchase Agreement* ("*Asset Purchase Agreement*") executed by and between Sears and Transform Holdco LLC (the "Buyer"), for the purchase of the *Acquired Assets*, as defined therein, on January 17, 2019. Id. at p. 2, ¶ 4.

[redacted]

[redacted]

[redacted]

[redacted]

2 [redacted]





42.    On January 26, 2019, Santa Rosa Mall filed a *Standing Objection to Global Asset Sale Transaction* (the "*Standing Objection*", Docket No. 2013).  Pursuant to the terms of the *Asset Purchase Agreement*, specifically Section 2.1(q), Transform Holdco LLC (the "Buyer") acquired all proceeds relating to loss or damage occurring prior to the closing date of the Global Sale Transaction minus a cap of $13,000,000.00.[3]  In its *Standing Objection*, Santa Rosa Mall sustained that the insurance proceeds from the global settlement relative to Santa Rosa Mall's claim for damages should be used for the reconstruction of Store No. 1915 or be deposited in escrow with the Landlord, in accordance with the terms of the *Lease Agreement*.

43.    On February 8, 2019, the Court entered and *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith, and (IV) Granting Related Relief* (the "*Sale Order*", Docket No. 2507).

44.    As part of the *Asset Purchase Agreement*, the Debtors transferred all title to the proceeds from the global settlement to the Buyer, minus a cap of $13,000,000.00.[4] Section 2.1(q) of the *Asset*

---

[3] The $13,000,000.00 insurance cap language remained unchanged pursuant to the February 8, 2019 *Sale Order* (Docket No. 2507).
[4] *Declaration of Sunny Sigh* (Docket No. 2344 pp. 236-237, ¶¶ 9-9) ("In addition, the debtors… retain 13 million dollars in hurricane insurance proceeds").

*Purchase Agreement* specifically provides the following:

> [O]n the Closing Date, Sellers shall sell, transfer, assign, convey and deliver… to Buyer… any and all insurance proceeds… in respect of loss or damage to… any Acquired Asset… relating to a casualty occurring prior to… [the] Closing Date… less any proceeds… in an aggregate amount not to exceed $13,000,000.

Docket No. 2507-1, pp. 56-58, § 2.1(q).

45.      Schedule 2.1(q) of the *Asset Purchase Agreement* further states that the insurance proceeds described in Section 2.1(q) are derived from a claim filed on account of the Hurricane Maria Loss. For ease of reference, attached as **Exhibit IX** is Schedule 2.1(q).

46.      On that same date, February 8, 2019, the Debtors filed an *Objection* to the Motion *to Compel Insurance Proceeds* (the "*Debtor's Objection*", Docket No. 2512), arguing, for the first time, that Santa Rosa Mall is not a loss payee under the Contract of Insurance, and that the *Certificate of Insurance* provided by the Debtor to Santa Rosa Mall is erroneous and "not determinative of the extent of coverage under the Insurance Policy", despite the Debtor's obligations under § 6.02(a)  the *Lease Agreement*. Docket No. 2512, p. 10, ¶ 24.

47.      On March 13, 2019, Santa Rosa Mall filed a *Reply* to the *Debtor's Objection* (Docket No. 2828) for the *Contract of Insurance* to be reformed to specifically include Santa Rosa Mall as a loss payee in accordance with property rights obtained under the *Lease Agreement* and, in the alternative, impose an equitable lien over the insurance proceeds in favor of Santa Rosa Mall.

48.      A hearing to consider the *Motion to Compel Insurance Proceeds* was held on March 21, 2019 wherein Santa Rosa Mall proffered to the Court discovery material designated as "Confidential Material" by the Debtors in accordance with the *Amended Stipulated Protective Order* (Docket No. 1084).

49.      On April 10, 2019, Santa Rosa Mall filed Proof of Claim No. 17454 in the amount of $16,500,000.00.

50.      On April 30, 2019, the Debtors filed a *Notice of Rejection of Certain Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* (Docket No. 3449) rejecting the *Lease Agreement* for Store No. 1915. Id. at p. 11.

<u>COUNT I - BREACH OF CONTRACT</u>
Pursuant to 31 L.P.R.A. § 3374
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

51.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

52.     Property and interests in property are determined with reference to state law in the absence of any controlling federal law.  <u>See</u> <u>Butner v. United States</u>, 440 U.S. 48, 54-55 (1979).  Like most jurisdictions, Puerto Rico follows the legal doctrine of *lex rei sitae*, meaning that "real [estate] property [is subject] to the laws of the country in which it is situated".  Article 10 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 10.  In disputes involving real property, the law of the jurisdiction in which the property is located applies.  <u>See</u> <u>Weston v. Stuckert</u>, 329 F.2d 681 (1st Cir. 1964).

53.     Insurance contracts are governed by the law of the place where the contract was made, especially where the contract was to be performed.  <u>See</u> 17 <u>Couch on Insurance</u> § 24:12 (3rd ed. 2018).  As such, if the contract is to be performed in the state in which the subject matter is located, "it is governed by the laws of that state, rather than by the laws of another state in which the action is brought, or in which the insurance company is domiciled."  <u>Id.</u> at § 24:14.  New York follows a similar posture.  In New York, "the 'center of gravity' in an insurance contract dispute is generally the state where the insured risk is located".  <u>Liberty Mutual Insurance Company v. Fairbanks Company</u>, 170 F. Supp. 3d 634, 642 (S.D.N.Y. 2016) (Koeltl, D.J.).

54.     The *Lease Agreement* and the *Contract of Insurance* both hinge on real estate property located in Puerto Rico as well as insurable interests and insured risks in Puerto Rico.  Hurricane Maria, the insured casualty, also happened in Puerto Rico. Likewise, the insured risk and the Demised Properties are all in Puerto Rico.  Accordingly, both must be interpreted according to Puerto Rico law.

55.     Puerto Rico law recognizes a cause of action in favor of third-party beneficiaries to a contract.  <u>See</u> <u>M.R. (Vega Alta), Inc. v. Caribe General Elec. Products, Inc.</u>, 31 F. Supp. 2d 226, 238 (D.P.R. 1998); <u>Real Legacy Assurance Co. v. Santori Trucking, Inc.</u>, 2008 WL 11357822, at *3 (D.P.R. 2008).

56.    Article 1209 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3374, states in pertinent part that "[s]hould the contract contain any stipulation in favor of a third, he may demand its fulfilment, provided he has given notice of his acceptance to the person bound before it may have been revoked." 31 L.P.R.A. § 3374 (West translation).

57.    Pursuant to the *Contract of Insurance*, Santa Rosa Mall is included among the insured. <u>See</u> **Exhibit III**, p. 3.

58.    SHC has acknowledged that the insurance proceeds for Store No. 1915 are to be deposited in an account of Santa Rosa Mall's choosing in accordance with the *Lease Agreement*. <u>See</u> **Exhibit V**.

59.    Santa Rosa Mall accepted the *Contract of Insurance* and duly demanded its fulfillment to both SHC and Sears. Despite Santa Rosa Mall's repeated requests that Sears comply with their obligations under the *Contract of Insurance*, Sears failed to comply. As a result, Santa Rosa Mall has not received any insurance proceeds derived from the *Contract of Insurance* while the Demised Premises have remained closed to the public, inoperative, and in ill-repaired since September 20, 2017.

60.    The designation of Santa Rosa Mall as among those insured under the *Contract of Insurance* constitutes a stipulation specifically for the benefit of Santa Rosa Mall. Its actions thereafter reflect the acceptance of the same.

61.    Accordingly, Plaintiff seeks the fulfillment of the *Contract of Insurance* pursuant to Article 1209 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3374.

<div align="center">

COUNT II - BREACH OF CONTRACT
Pursuant to 31 L.P.R.A. § 3052
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

</div>

62.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

63.    The Defendants executed a *Lease Agreement* wherein they agreed to maintain property insurance with respect to the Demised Premises and include a loss payable clause in favor of both Santa Rosa Mall and Sears.

64.    The Defendants further agreed that the net sums recovered on account of loss or damage

were to be deposited in a special account in the name of Santa Rosa Mall, separate and distinct from all other funds in a bank or trust company of the City of San Juan, Puerto Rico, to be applied to the cost of the repair, restoration, or reconstruction of the Demised Premises so destroyed or rendered untenantable.

65.    Pursuant to Article 1077 of the Puerto Rico Civil Code, where a party to mutual obligation "does not comply with what is incumbent upon him… [t]he person prejudiced may choose between exacting the fulfillment of the obligation or its rescission, with indemnity for damages and payment of interest in either case." 31 L.P.R.A. § 3052 (West translation). See also Castillo-Perez v. Bosques-Cordero, 2011 WL 13233491, at 8 (D.P.R. 2011).

66.    The language of the *Lease Agreement* is clear and requires Sears keep and/or deliver, in the event of termination, the Demised Premises in good order and repair.  To such end, Sears agreed to discharge, indemnify and save harmless Santa Rosa Mall against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed, incurred by or asserted against Santa Rosa Mall by reason of any work done in, on or about the Demised Premises, any maintenance, repair, or management of the Demised Premises, and any failure on the part of Sears to perform or comply with the *Lease Agreement*, and to procure property insurance for the Demised Premises with a loss payable clause in favor of Santa Rosa Mall and furnish certificates of insurance thereof.

67.    The *Lease Agreement* further mandates that the net sums recovered on account of loss or damage under the aforementioned insurance policy or policies procured by Sears, be deposited in a special account in the name of Santa Rosa Mall, separate and distinct from all other funds, to be applied on account of the cost of restoration or rebuilding of the Demised Premises on account of an insured casualty.

68.    The importance of the loss payable clause in favor of Santa Rosa Mall is a principal obligation under the *Lease Agreement*.  As previously disclosed, if Sears does not commence promptly to repair or restore the Demised Premises so injured or destroyed by an insured event, or if, having commenced the repair or restoration, Sears does not proceed diligently to complete the same, Santa Rosa Mall is entitled to repair or restore the Demised Premises and apply any insurance proceeds towards such end.  Accordingly,

the deposit of the insurance proceeds into a separate account is critical.

69.    Following a major insurable event, the SHC and Sears Defendants cannot simply walk away and expect the Santa Rosa Mall to assume any and all of the costs of repair and/or restoration of the Demised Promises.

70.    The SHC and Sears Defendants have failed to both include a loss payable clause in favor of Santa Rosa Mall and deposit any insurance proceeds into a separate account, despite having acknowledged such obligations.  See **Exhibit V**.

71.    Santa Rosa Mall performed all its obligations under the *Lease Agreement*.

72.    In accordance with Article 1077 of the Puerto Rico Civil Code, Plaintiff has a right to demand specific performance of Section 6.02(a) of the *Lease Agreement*.

73.    In the alternative, equity favors reforming the policy to reflect the contracting parties' intent.  Where a lessee is charged with the duty of obtaining insurance on property with a loss payable clause in favor of the lessor, but the policy does not contain such a provision, equity will treat the policy as having contained the loss payable provision.

74.    As held in the U.S. Court of Appeals for the First Circuit:

> When a party asks for reformation of a contract, it is not asking the court to interpret the contract but rather to change it to conform to the parties' intent. [] Accordingly, the usual restrictions on contract interpretation, [] do not apply to a court's inquiry into the parties' intent []. In a reformation case, it does not matter that a contract unambiguously says one thing.  A court still will accept extrinsic evidence in evaluating a claim that both parties to the contract intended it to say something else.

OneBeacon America Ins. Co. v. Travelers Indem. Co. of IL, 465 F.3d 38, 41 (1st Cir. 2006). Also see Sierra Equipment, Incorporated v. Lexington Insurance Company, 890 F.3d 555, 558, n. 2 (5th Cir. 2018).

75.    Accordingly, this Court may reform the *Contract of Insurance* for Policy No. PTNAM1701557 to conform it to the parties' express intent in the *Lease Agreement*.

76.    In accordance with the above, Plaintiff seeks the specific performance of Section 6.02(a) of the *Lease Agreement* and consequent correction of the *Contract of Insurance* to include a loss payable clause in favor of Santa Rosa Mall and, in the alternative, Plaintiff seeks the equitable reformation of the

*Contract of Insurance* to treat it as having contained the loss payable provision, in accordance parties' express intent in the *Lease Agreement*, plus costs, expenses and attorneys' fees pursuant to Section 4.03(e) of the *Lease Agreement*.

<div align="center">

COUNT III - CLAIM FOR UNJUST ENRICHMENT
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

</div>

77.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

78.    Santa Rosa Mall seeks the imposition of a constructive trust and the immediate turnover of the insurance proceeds to prevent the unjust enrichment of certain Defendants.

79.    The Sears Defendants executed a *Lease Agreement* wherein they agreed to maintain property insurance with respect to the Demised Premises, include a loss payable clause in favor of both Santa Rosa Mall and Sears, and deposit net sums recovered on account of loss or damage in a special account in the name of Santa Rosa Mall, to be applied to the cost of the repair, restoration, or reconstruction of the Demised Premises.



83.    Pursuant to the agreements reached by the parties, the Defendants promised to insure the property for the Plaintiff's benefit, and apply all net sums recovered on account of loss or damage to the cost of the repair, restoration, or reconstruction of the Demised Premises so destroyed or rendered untenantable.

84.    Under Puerto Rico law, a constructive trust may be imposed to return property to its rightful

owner.  See <u>U.S. v. Garcia</u>, 532 F. Supp. 325, 332 (D.P.R. 1981).  Generally, a constructive trust may be imposed when one party has acquired legal title to property under circumstances that such party could not, in good conscience, retain the beneficial interest thereto.  See <u>Zimmermann v. Epstein Becker & Green, P.C.</u>, 657 F.3d 80, 83 (1st Cir. 2011), citing <u>Great–West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 213 (2002); 76 Am. Jur.2d <u>Trusts</u> § 168.

85.    The central objective of a court-imposed trust is to prevent unjust enrichment.  See <u>Zimmermann v. Epstein Becker & Green, P.C.</u>, 657 F.3d at 83.  Accordingly, a constructive trust presupposes a wrongful acquisition of property such as misappropriation, fraud, mistake, breach of duty, abuse of confidential relations and duress or undue influence.  See Emily L. Sherwin, <u>Constructive Trusts in Bankruptcy</u>, 1989 U. Ill. L. Rev. 297, 329 (Jan. 1989); <u>Restatement of Restitution</u> § 166; <u>In re CRS Steam, Inc.</u>, 225 B.R. 833, 836 (Bankr. D. Mass. 1998).

86.    In the instant case, the Sears Defendant purports to use the proceeds obtained from the ███████████████████████████████ for their own pecuniary benefit, as part of the general fund available for distribution to all creditors.

87.    By using the insurance proceeds to enhance their bankruptcy estates instead of applying such funds in escrow for its agreed purpose, that is, to the repair, restoration, or reconstruction of the Demised Premises, the Sears Defendant is unjustly enriched at Plaintiff's expense.

88.    Accordingly, Plaintiff seeks the imposition of an equitable remedy in the form of a constructive trust upon the insurance proceeds obtained for the Hurricane Maria Loss under Policy No. PTNAM1701557, to the extent of Plaintiff's interest, to be applied on account of the cost of the restoration or rebuilding of the Demised Premises.

<div align="center">

### COUNT IV - CLAIM FOR DECLARATORY JUDGMENT
Pursuant to Fed. R. Civ. P. 57, Fed. R. Bankr. Proc. 7001(9), 28 U.S.C. § 2201, and 11 U.S.C. 541(d)
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

</div>

89.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

90.    Santa Rosa Mall seeks a declaratory judgment that the Defendants have no present right or

title to the insurance proceeds, to the extent of Plaintiff's interest, and such funds do not comprise property of the estate, pursuant to Fed. R. Civ. P. 57, Fed. R. Bankr. Proc. 7001(9), 28 U.S.C. § 2201, and 11 U.S.C. 541(d).

91.    Bankruptcy courts may issue declaratory judgments pursuant to Fed. R. Bankr. P. 7001(9). A bankruptcy court's discretion to issue declaratory judgments is subject to the constraints of 28 U.S.C. § 2201 and the court's jurisdictional limits. See In re Kings Falls Power Corp., 185 B.R. 431, 436 (Bkrtcy. N.D.N.Y. 1995).

92.    Section 2201 of the U.S. Judicial Code states that "[i]n any case of actual controversy," a court may, "upon the filing of an appropriate pleading ... declare the rights and other legal relations of any interested party seeking such declaration," and such declaration "shall have the force and effect of a final judgment or decree." 28 U.S.C. § 2201.

93.    As stated by the U.S. Court of Appeals for the Second Circuit, "[a] declaratory judgment action presents an actual controversy if the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." In re Prudential Lines Inc., 158 F.3d 65, 70 (2nd Cir. 1998), quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941) (internal quotations omitted). See also In re Homaidan, 596 B.R. 86, 101 (Bkrtcy. E.D.N.Y. 2019).

94.    Santa Rosa Mall is included among the insured under the *Contract of Insurance*. As such, Santa Rosa Mall has an insurable interest over the insurance proceeds for the damages to the Demised Premises and a right to the proceeds of Policy No. PTNAM1701557. Accordingly, the insurance proceeds, as they relate to the damages sustained by Store No. 1915, are not property of the bankruptcy estate, and Santa Rosa Mall is entitled to payment of those proceeds.

95.    As a general rule, Section 541(a)(1) of the Bankruptcy Code provides that when a debtor files for bankruptcy, a bankruptcy estate that is created, comprised of all legal or equitable interests of the debtor in property as of the commencement of the case wherever located and by whomever held.  Section

541(a)(6) extends the bankruptcy estate to "proceeds, product, rents of profits or from property of the estate…".

96.    Although the definition of the bankruptcy estate is comprehensive, it is not all-encompassing.  In United States v. Whiting Pools, Inc., 462 U.S. 198, 204 n.8 (1983), the U.S. Supreme Court acknowledged that property of the estate does not comprise those interests in which the debtor holds only "a minor interest such as a lien or bare legal title."

97.    The parameters of estate property are circumscribed by the language of 11 U.S.C. § 541(d). Section 541(d) provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, … becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property…"  11 U.S.C. § 541(d). Accordingly, courts have concluded that Section 541(a)(1) does not extend to property in which the debtor possesses merely a reversionary interest.

98.    Insurance policies purchased and paid for by a debtor are generally property of the bankruptcy estate.  See e.g. MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 92 (2nd Cir. 1988); In re SN Liquidation, Inc., 388 B.R. 579, 583–84 (Bankr. D. Del. 2008); Ascands, Inc. v. Travelers Cas. and Sur. Co., 435 F.3d 252 (3rd Cir. 2006); Estate of Lellock v. Prudential Ins. Co. of Am., 811 F.2d 186, 189 (3rd Cir. 1987).

99.    Notwithstanding, even when a debtor's insurance policies themselves may be property of the bankruptcy estate, the proceeds of those policies may not necessarily be.  "It is well settled that ownership of an insurance policy that is property of a debtor's estate does not necessarily result in a determination that the debtor's estate owns the proceeds from a policy."  In re Hill, 174 B.R. 949 (Bankr. S.D. Ohio 1994).  "The question is not who owns the policies, but who owns the liability proceeds."  In re Louisiana World Exposition, Inc., 832 F.2d 1391, 1399 (5th Cir. 1987).

100.    As such, Bankruptcy Courts distinguish between ownership of insurance policy and the ownership of the proceeds.  The mere fact that debtor's insurance policy is included in bankruptcy estate does not necessarily mean that proceeds are also included in the estate.  See 3A Bankr. Service L. Ed. §

29:235 (2018 update).  "[T]he inquiry remains, as it has always been, a fact-specific one."  In re OGA

Charters, L.L.C., 901 F.3d 599, 603 (5th Cir. 2018).  Also see In re Sfuzzi, Inc., 191 B.R. 664, 668 (Bankr.

N.D. Tex. 1996) ("[T]he question of whether the proceeds are property of the estate must be analyzed in

light of the facts of each case.").  A party's right to receive and keep the insurance policy's proceeds is

inevitably limited by the insurance and contractual provisions resulting in the purchase of the policy.  See

In re Jones, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("the Debtor's rights to the proceeds of his policy

are inevitably subject to the contractual restrictions in his insurance policy and mortgage agreement.").

Also see 17A Am. Jur. 2d Contracts § 442 (the rights of a loss payee depend upon the substantive rights

under the contracts).

101.    The Debtors have no present right or title to the funds in accounts, and such proceeds, and

the funds contained therein, do not comprise property of the bankruptcy estate under 11 U.S.C. § 541(a)(1).

Santa Rosa Malls' contention that the insurance funds on deposit do not constitute estate property is further

supported by case law.  Santa Rosa Malls' contention that the insurance funds on deposit do not constitute

estate property is supported by case law.

102.    In re Amiel Rest. Partners, LLC, 510 B.R. 744 (Bankr. D.N.J. 2014) (Kaplan, B.J.), is a

case involving the ownership of the flood insurance proceeds.  In that case, the debtor's commercial

landlord moved the Bankruptcy Court for an order compelling Debtor to release insurance proceeds derived

from the prepetition destruction of property caused by Hurricane Sandy.  The landlord and debtor had

entered into a commercial lease agreement that required the debtor to maintain several types of insurance

coverage, including property insurance.  The Court held that the landlord had an insurable interest at the

time the property was destroyed and, as an additional insured on a flood insurance policy purchased by

debtor, was entitled to proceeds of flood insurance property.  The Court also considered that, like the *Lease

Agreement* in the instant case, the lease agreement in that case provided that at the expiration of the lease

the alterations and improvements to the leased properties would become the "sole property" of the landlord.

Compare id. at 753 with *Lease Agreement*, 1240-1, § 15.01, pp. 43-44.  Ultimately, the Court held that

under the property rights created by the lease agreement, the proceeds of the flood insurance were not property of the bankruptcy estate, and landlord was entitled to payment of those proceeds. Id. at 753.

103.    Courts within the Second Circuit have ruled in a similar vein. For instance, in Pine Bush Equipment Co. v. Florian (In re Florian), 233 B.R. 25, 26 (Bankr. D. Conn. 1999) (Krechevsky, B.J.), the plaintiff, a New York corporation in the business of leasing equipment, leased a forklift on a monthly basis pursuant to a rental agreement to the debtor. The rental agreement required the debtor to carry insurance against all risk of physical damage and that such policies of insurance will name the lessor as additional insureds. The debtor purchased, as the named insured, a general liability insurance policy from Travelers Casualty & Surety Co. which included coverage for the rental of the forklift and a certificate of insurance issued by the insurance agency provided that the plaintiff be a "Loss Payee". The forklift was damaged requiring repairs totaling $33,090. The insurance claim was submitted to Travelers Casualty. The Debtor filed a Chapter 7 bankruptcy petition. After the petition, the debtor received the insurance proceeds from the insurance company and submitted them to the Chapter 7 trustee, who refused to deliver them to the plaintiff and instead deposited them into the Chapter 7 Trustee account. The Trustee contended that the insurance proceeds were property of the bankruptcy estate because, pursuant to Section 541(a)(1) of the Bankruptcy Code, the insurance policy purchased by the debtors is property of the bankruptcy estate. The plaintiff argued that, notwithstanding an insurance policy may be property of the estate, the issue was who was entitled to the proceeds of the claim paid by the insurance carrier. The plaintiff contended that it was entitled to the check proceeds. The Court analyzed as follows:

> The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds which the insurer paid on a claim when a payment by the insurer cannot inure to the debtor's pecuniary benefit. Then that payment should neither enhance nor decrease the bankruptcy estate. In other words, when the debtor had no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.

In re Florian, 233 B.R. at 27 (emphasis added), quoting from Houston v. Edgeworth (In re Edgeworth), 993 F.2d 51, 55 (5th Cir. 1993).

104.    The <u>Florian</u> Court decided that "although the insurance policy was purchased by the debtors, [it] was intended to cover damages to non-estate property --- the forklift owned by the plaintiff" and ordered the trustee to turn over to the plaintiff the insurance proceeds plus any accrued interests.  <u>In re Florian</u>, 233 B.R. at 27.

105.    Similarly, in <u>In re McLean Industries, Inc.</u>, 132 B.R. 271, 284 (Bankr. S.D.N.Y. 1991) (Blackshear, B.J.), the Court determined that the insurance proceeds to cover damages to a damaged cargo ship were not property of the bankruptcy estate inasmuch as the U.S. Department of Transportation, Maritime Administration and Chemical Bank had been assigned the proceeds as loss payee and additional insured, respectively.

106.    In <u>In re Suter</u>, 181 B.R. 116, 119 (Bankr. N.D. Ala. 1994), the Court determined that "because AmSouth was the loss payee of the insurance policy, the proceeds of the policy are not property of the bankruptcy estate and are payable to AmSouth, at least to the extent of AmSouth's interest in the property insured."

107.    Based on the forgoing, Plaintiff moves the Court to follow the same reasoning in favor of Plaintiff and enter a declaratory judgment that the insurance proceeds obtained for the Hurricane Maria Loss under Policy No. PTNAM1701557 are not property of the bankruptcy estate to the extent they relate to the damages sustained by Store No. 1915.  Furthermore, Plaintiff is entitled to payment of those funds which shall be "deposited in a special account in the name of [Santa Rosa Mall], separate and distinct from all other funds of [Santa Rosa Mall] in a bank or trust company of the City of San Juan, Puerto Rico" and such monies must only be used to "be applied on account of the cost of such restoration or rebuilding, as the case may be, as the work of restoration or rebuilding [of the Demised Premises] progresses".  *Lease Agreement*, 1240-1, § 6.03(b)(3), p. 28.

<u>COUNT V - CLAIM FOR DECLARATORY JUDGMENT</u>
Pursuant to Fed. R. Civ. P. 57, Fed. R. Bankr. Proc. 7001(9), and 28 U.S.C. § 2201
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

108.    Plaintiff repeats ad realleges each of the allegations set forth above as if fully set forth herein.

109.     In the alternative, and pursuant to Fed. R. Civ. P. 57, Fed. R. Bankr. Proc. 7001(9), and 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment that Santa Rosa Mall has an equitable lien upon the insurance proceeds to the extent of its interest in the Demised Premises.

110.     Bankruptcy courts may issue declaratory judgments pursuant to Fed. R. Bankr. P. 7001(9). A bankruptcy court's discretion to issue declaratory judgments is subject to the constraints of 28 U.S.C. § 2201 and the court's jurisdictional limits. See In re Kings Falls Power Corp., 185 B.R. 431, 436 (Bkrtcy. N.D.N.Y. 1995). Section 2201 of the Judiciary Code states that "[i]n any case of actual controversy," a court may, "upon the filing of an appropriate pleading ... declare the rights and other legal relations of any interested party seeking such declaration," and such declaration "shall have the force and effect of a final judgment or decree." 28 U.S.C. § 2201.

111.     According to the U.S. Court of Appeals for the Second Circuit, "[a] declaratory judgment action presents an actual controversy if the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." In re Prudential Lines Inc., 158 F.3d 65, 70 (2d Cir. 1998), quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941) (internal quotations omitted). See also In re Homaidan, 596 B.R. 86, 101 (Bkrtcy. E.D.N.Y. 2019).

112.     In In re ATCORP I, Inc., 25 B.R. 340 (B.A.P. 1st Cir. 1982), the Bankruptcy Appellate Panel for the First Circuit considered the following insurance rules regarding interest on the payment of insurance proceeds to a mortgagee in equity when mortgagor has promised to insure property for mortgagee's benefit but the insurance policy did not:

> if the mortgagor covenants to keep the mortgaged property insured for the better security of the mortgagee, the latter will have an equitable lien upon the proceeds of insurance carried by the mortgagor, in case of loss, to the extent of his interest in the property destroyed, even though the policy contains no mortgagee clause and is payable to the mortgagor. Couch on Insurance 2d § 29:82 at 366.

> That rule is applicable in situations where the insurance proceeds are not payable to the mortgagee, but the mortgagor had promised to insure the property for the mortgagee's benefit, and thus, in equity, the proceeds should be payable to the mortgagee. Brown v. First National Bank of Dewey, 617 F.2d 581 (10th Cir.1980).

In re ATCORP I, Inc., 25 B.R. at 344.

113.    In In re Natale, 174 B.R. 362, 363-364 (Bankr. D.R.I. 1994), the mortgage agreement

required that insurance against loss shall be made payable to, and held by, Mortgagee as collateral security.

The debtors obtained fire and casualty insurance on the property but did not list mortgagee as a lienholder

or as a loss payee in contravention with the obligations in the mortgage agreement.  The Court held as

follows:

> Courts addressing this problem have acknowledged the equitable rights of the mortgagee,
> even where the mortgagor has elected to ignore those rights.  If the "mortgagor covenants in
> the mortgage to keep the property insured as further security for the payment of the mortgage
> debt, then the mortgagee is entitled to an equitable lien upon the insurance proceeds, even
> though the policy is in the name of the mortgagor alone." Freshwater v. Colonial Production
> Credit Ass'n, 286 S.C. 387, 334 S.E.2d 142, 144 (Ct. App. 1985) (citing Blackwell v. State
> Farm Mutual Automobile Insurance Co., 237 S.C. 649, 118 S.E.2d 701 (1961)); Nichols v.
> Baxter, 5 R.I. 491 (1858).  [] Based on these authorities and the undisputed facts in the instant
> case, we conclude that **this Court has the authority, and indeed the duty, to impose an
> equitable lien in favor of [mortgagee] on the insurance proceeds in question**, and it is so
> ORDERED.  Additionally, and quite aside from equitable considerations, we conclude that
> pursuant to paragraph 5 of the mortgage agreement [mortgagee] also has a contractual lien
> on the funds in question.

In re Natale, 174 B.R. at 364-365 (emphasis added).

114.    Courts in New York have ruled in a similar fashion.  In Rosario-Paolo v C & M Pizza

Restaurant, 84 N.Y.2d 379 (1994), the issue presented was whether plaintiff holds an equitable lien in the

insurance proceeds to the extent of its security interest in the insured premises to permit recovery.  The

parties entered into a security agreement pursuant to which defendant agreed to keep the premises insured

against loss by fire, theft and other hazards, to name the plaintiff as a beneficiary; and to deposit certificates

of insurance with plaintiff.  Despite the express provision in the security agreement, the defendant failed to

list any loss beneficiary under the insurance policy.  The Court ruled as follows:

> **The insurance against fire loss was procured by C&M to protect both its interest and
> plaintiff's interest in the secured property.**  C&M's covenant under the security agreement
> to insure the premises against fire loss for plaintiff's benefit gives plaintiff an equitable lien
> in any proceeds to the extent of its interest—in this case, the remaining unpaid portion of the
> purchase price.  Because Investors [the insurer] had notice of plaintiff's equitable claim but
> nevertheless satisfied a claim without regard to its interest, plaintiff can recover to the extent
> of its equitable lien in an action at law.

> **C&M's failure to name plaintiff as a loss beneficiary did not extinguish plaintiff's**

**interest in the secured property**, nor did it impair plaintiff's status as an equitable lienholder. In this regard, an insurance policy that contains a loss payable clause is not a separate insurance of the debt but a separate security for the debt.

**Because of the promise to insure for plaintiff's benefit that is embodied in the security agreement between plaintiff and C&M, plaintiff is entitled to enforce its covenant with C&M to recover damages to the extent of its equitable lien** [].

Rosario-Paolo, 84 N.Y.2d at 383 (emphasis added, citations omitted).

115.    In Weinreb v. M & S Bagels, 254 N.Y.S.2d 158, 159 (1964), a chattel mortgage contained

a clause requiring the mortgagor to keep the chattels insured against loss and damage by fire for the benefit

of the mortgagee.  Contrary to previous agreement, the mortgagor obtained an insurance policy which did

not name the mortgagee as an insured.  The court held that the mortgagee was entitled to the insurance

proceeds under the policy, even though the policy did not contain a mortgagee clause.  The Court concluded

as follows:

> Defendant Webster is the holder of the purchase-money mortgage covering the chattels which were destroyed by the fire. [] **The mortgage contained a clause requiring the mortgagor to carry fire insurance for the benefit of the mortgagee**. In fact insurance was carried but **the** [] **mortgagee clause was not included in the policy**. It would not have cost anything additional to include such clause and I deem its absence an inadvertent oversight. **The owner having been obligated to have a provision inserted in the policy in favor of the mortgagee, equity may treat the policy as having contained such a provision**).  That this was the clear intent of the parties is evidenced by the fact that such a provision was inserted but not until the day after the fire. []

> Had there been no provision in the mortgage for insurance in favor of the mortgagee, the result might well be different since the owner could not make a preferential assignment of the proceeds of the fire loss to one creditor. Of course, as between the owner and the mortgagee under a mortgage in which the mortgagor covenants to keep the property insured for the benefit of the mortgagee, the latter has an equitable lien upon the proceeds of insurance even though the policy contains no mortgagee clause [] The defendant Webster is entitled to the proceeds of the fire loss and since the  proceeds are less than the amount due on the mortgage there is nothing to which plaintiffs' claims can attach.

Weinreb v. M & S Bagels, 254 N.Y.S.2d at 161-162 (emphasis added).

116.    Based on the forgoing, Plaintiff seeks a declaratory judgment that Santa Rosa Mall has an

equitable lien over the insurance proceeds obtained for the Hurricane Maria Loss under Policy No.

PTNAM1701557 to the extent they relate to the damages sustained by Store No. 1915.

<u>COUNT VI - AIDING AND ABETTING FRAUDULENT MISREPRESENTATION</u>
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

117.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

118.    In accordance with the *Contract of Insurance* executed by SHC, Aon Risk Services was authorized to issue Certificate(s) or Evidence(s) of Insurance naming additional named insured(s), loss payee(s) or mortgagee(s) for their respective rights and interests, subject always to the terms, conditions and limits of endorsements in respect of such additional interests.

119.    Santa Rosa Mall LLC is included as a loss payee under the "Additional Remarks Schedule" of Certificate of Insurance Nos. 570075074205, 570075074276, and 570069032839.

120.    The *Certificate of Insurance* supplied by Aon Risk Central for the period of June 1, 2017 to June 1, 2018, was issued on or about October 25, 2017, in accordance with the policy provisions of the *Contract of Insurance* for AON Insurance Policy No. PTNAM1701557, executed by and between SHC and Lex-London, a division of AIG.

121.    The *Certificate of Insurance* was received by Plaintiff on or about October 25, 2017, that is, after the passage of Hurricane Maria on September 20, 2017.

122.    Contrary to the express wording of the *Lease Agreement* and the *Certificate of Insurance*, Defendants contend that Santa Rosa Mall was not included as a loss payee under the *Contract of Insurance*.

123.    The Defendants controlled or were provided access to the confidential information concerning the *Contract of Insurance*.

124.    Plaintiff was not a party to, nor allowed access to, the conversations between the Defendants with regard to the *Contract of Insurance* and consequent Certificate(s) of Insurance.  SHC and/or Sears settled the matter without Santa Rosa Mall's knowledge, even when Santa Rosa Mall expressly requested information regarding the status of the aforementioned *Contract of Insurance*.

125.    The Defendants willfully, knowingly or recklessly aided, abetted, counseled, commanded, induced, or caused to be presented materially false and/or misleading written statements and/or certificates regarding, or in support of, Plaintiff's status as loss payee to the *Contract of Insurance*.

126.     Each individual Defendant is responsible for the accuracy of the statements and thus liable for the misrepresentations presented, or causes to be presented.

127.     As result of the Defendants' materially false and/or misleading statements, the Plaintiff has suffered damages in an amount of no less than $20,000,000, plus costs, expenses and attorneys' fees.

128.     Based on the forgoing, Plaintiff seeks compensatory damages in an amount of no less than $20,000,000, plus costs, expenses and attorneys' fees.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against the Defendants affirming that Santa Rosa Mall is included among the insured and has a right to payment to the extent of its interest under the *Contract of Insurance*, in an amount of at least $20,836,827.00.  In the event that the Court does not order specific performance of the *Lease Agreement,* Santa Rosa Mall respectfully requests that this Court, to the extent not inconsistent, reform of the *Contract of Insurance* to include Santa Rosa Mall as loss payee; impose a constructive trust upon the insurance proceeds, to the extent of Santa Rosa Mall's interest; declare that the insurance proceeds are not part of the bankruptcy estate and must be exclusively applied to the restoration or rebuilding of the Demised Premises; impose an equitable lien over the insurance proceeds in favor of Santa Rosa Mall; damages in an amount of no less than $20,000,000; grant costs, expenses and attorneys' fees; and grant such other and further relief as the Court deems just and proper.

[Signatures in the next page]

Respectfully submitted.
Dated: June 7, 2019
Orlando, Florida

**Ferraiuoli** LLC

390 N. Orange Avenue
Suite 2300
Orlando, Florida 32801
Phone: (407) 982-7310
Fax: (787) 766-7001
221 Ponce de León Avenue
5th Floor, San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001

*/s/ Sonia E. Colon Colon*
By: Sonia E. Colón Colón
Admitted *Pro Hac Vice*
USDC-PR No. 213809
scolon@ferraiuoli.com

*/s/ Gustavo A. Chico-Barris*
Gustavo A. Chico-Barris
NY State Bar No. 929147
USDC-PR No. 224205
gchico@ferraiuoli.com

Attorneys for
*Santa Rosa Mall, LLC*

# EXHIBIT I

600-061

## SEARS LEASE

| Parcel "A" | - | Shopping Center Property |
| Parcel "B" | | (2.59 cuerdas) Parcel #3 |
| Parcel "C" | | Sears Main Store |
| Parcel "D" | - | Automotive and Community Center |

ARTICLE I - PREMISES AND TERM

| | | | | |
|---|---|---|---|---|
| Section | 1.01 | Planning Board Approval............................... | Page | 6 |
| " | 1.02 | Conditions Required for Planning Board Approval, Premises "C" and "D"................... | " | 6 |
| " | 1.03 | Leasing of Automotive and Community Center to Landlord............................. | " | 6 |
| " | 1.04 | Leasing of Premises "C" and "D" to Tenant .... | " | 7 |
| " | 1.05 | Commencement Date of Term of Lease........... | " | 7 |
| " | 1.06 | Date of Term of Lease............................. | " | 9 |
| " | 1.07 | Renewal Options................................... | " | 9 |
| " | 1.08 | Lease Year Defined................................ | " | 10 |
| " | 1.09 | Occupancy of Premises Subsequent to Expiration of Extended Term....................... | " | 10 |

ARTICLE II - RENT

| | | | | |
|---|---|---|---|---|
| Section | 2.01 | Fixed Rent........................................ | " | 11 |
| " | 2.02 | Percentage Rent and Net Sales Defined ......... | " | 12 |
| " | 2.03 | Additional Rent: Property Taxes, Utilities, etc.. | " | 14 |
| " | 2.04 | Additional Rent: Charges levied during Term of Lease........................................ | " | 17 |
| " | 2.05 | Additional Rent: Limits ........................... | " | 17 |
| " | 2.06 | Fixed Rent and Additional Rent - Premises "C" and "D"............................. | " | 17 |

ARTICLE III - DEMOLITION AND CONSTRUCTION

| | | | | |
|---|---|---|---|---|
| Section | 3.01 | Removal of Equipment, Fixtures, Personal Property, by Landlord ...................... | " | 18 |
| " | 3.02 | Commencement of Construction on Premises "C" and/or "D": Specifications....... | " | 18 |
| " | 3.03 | Government Approval of Plans and Specifications and Cost of Construction ......... | " | 20 |
| " | 3.04 | Builder's Risk Insurance...................... | " | 21 |
| " | 3.05 | Interference by Tenant and Storage of Materials during Construction.............. | " | 21 |
| " | 3.06 | Parking Areas ................................... | " | 22 |

ARTICLE IV - MAINTENANCE AND REPAIRS

| | | | | |
|---|---|---|---|---|
| Section | 4.01 | Tenant's Obligations: Fixtures and Utilities .... | " | 23 |
| " | 4.02 | Tenant's Obligations: Government Regulations .. | " | 23 |
| " | 4.03 | Tenant's Liability................................ | " | 24 |

ARTICLE V - ALTERATIONS AND ADDITIONS

| | | | | |
|---|---|---|---|---|
| Section | 5.01 | Alterations made by Tenant..................... | " | 24 |
| " | 5.02 | Alterations made by Tenant in excess of $100,000. | " | 25 |
| " | 5.03 | Tenant's Liability .............................. | " | 25 |

ARTICLE VI – INSURANCE

Section 6.01    Types of Insurance and Amounts................. Page 26
"       6.02    Tenant's Choice of Insurance Co., Renewal of
                    – Policies, etc..................... "    27
"       6.03    Indemnification of Tenant and Landlord .......... "    28
"       6.04    Repairs Made by Parent Corporation ............. "    29
"       6.05    Indemnification of Landlord .................... "    30

ARTICLE VII – CONDEMNATION

Section 7.01    Condemnation of Leased Premises............... "    30
"       7.02    Partial Condemnation: Fixed Rent, Percentage Rent "    31
"       7.03    Landlord's and Tenant's Damages ................ "    32
"       7.04    Repairs Due to Partial Condemnation ............ "    33
"       7.05    Indemnification of Landlord Due to Partial Condem-
                    nation........................... "    34

ARTICLE VIII – CONDUCT OF BUSINESS BY TENANT

Section 8.01    Use of Premises.................................. "    34

ARTICLE IX – MORTGAGE, ASSIGNMENT AND SUBLEASE

Section 9.01    Assignment of Lease by Tenant .................. "    34
"       9.02    Consent Required .............................. "    35
"       9.03    Written Agreement by Sublessee ................. "    35
"       9.04    Abandonment ................................. "    36
"       9.05    Right of Tenant to Mortgage Interest.............. "    36
"       9.06    Mortgage Lien – Parcel A and/or B ............... "    37

ARTICLE X – UTILITIES

Section 10.01   Utility Charges ................................ "    37

ARTICLE XI – PARKING AND COMMON USE AREAS AND FACILITIES

Section 11.01   Control of Common Areas by Landlord............ "    38

ARTICLE XII – COST OF MAINTENANCE OF COMMON AREAS

Section 12.01   Tenant to Bear Pro Rata Share of Expense.......... "    39

ARTICLE XIII – MERCHANT'S ASSOCIATION

Section 13.01   Tenant's Right as to Membership................. "    39

ARTICLE XIV – DEFAULT

Section 14.01   Default by Tenant............................. "    40
"       14.02   Submittal of Matter to Court by Landlord .......... "    41
"       14.03   Default by Landlord ........................... "    42
"       14.04   Waiver ...................................... "    43

ARTICLE XV – SURRENDER AT EXPIRATION

Section 15.01   Surrender of Premises by Tenant ................ "    43

ARTICLE XVI – EQUIPMENT AND FIXTURES INSTALLED

Section 16.01   Installation by Tenant .......................... "    44

ARTICLE XVII – COVENANT OF QUIET ENJOYMENT

    Section 17.01  Landlord's Covenant ........................... Page 45

ARTICLE XVIII – ESTOPPEL CERTIFICATES

    Section 18.01  Estoppel Certificates by Tenant ................ "    45
       "    18.02  Estoppel Certificates by Landlord ............... "    46

ARTICLE XIX – INVALIDITY OF PARTICULAR PROVISIONS

    Section 19.01  Partial Invalidity ............................. "    46

ARTICLE XX – NOTICES

    Section 20.01  Notices Sent by Landlord and Tenant ............ "    47

ARTICLE XXI – RESTRICTION ON NEW BUILDINGS IN SHOPPING CENTER

    Section 21.01  Construction by Landlord ....................... "    47

ARTICLE XXII – ACCESS BY LANDLORD

    Section 22.01  Right of Entry ................................. "    48

ARTICLE XXIII – MISCELLANEOUS

    Section 23.01  "The Term of this Lease" (Definition of) ......... "    48
       "    23.02  Use of Headings and Numbers as References ...... "    48
       "    23.03  Successors and Assigns ........................ "    49
       "    23.04  Modifications, Alteration, etc., of Lease only in
                       Writing ........................ "    49
       "    23.05  Counterparts Each Shall be an Original .......... "    49
       "    23.06  English as the Controlling Language ............. "    49
       "    23.07  Jurisdiction for Determination of Disputes (P. R.).. "    49
       "    23.08  Recordation of Lease  ......................... "    49


    Signatures of Parties Executing This Lease ................... "    50

## LEASE

   In the City of San Juan, Commonwealth of Puerto
Rico, this *16TH* day of *SEPTEMBER*, 1965,

### APPEAR:

   AS PARTY OF THE FIRST PART:  SANTA ROSA SHOPPING
CENTER, INC., a corporation organized and existing under the
laws of the Commonwealth of Puerto Rico, with offices at the
Santa Rosa Plaza in Bayamon, Puerto Rico, represented herein
by its President, Mr. John P. Birkelund who is of legal age,
an Executive, and resident of South Norwalk, Connecticut, here-
inafter called the "Landlord"; and

   AS PARTY OF THE SECOND PART:  BANCO CREDITO Y AHORRO
PONCENO, INC., a banking corporation organized and existing under
the Banking Laws of the Commonwealth of Puerto Rico, with princi-
pal offices in the City of San Juan, Puerto Rico, represented
herein by Mr. *Carlos J. Pou*,   , its *Vice-president*, who is
of legal age, a banker, and resident of San Juan, Puerto Rico,
hereinafter called "The Trustee"; and

   AS PARTY OF THE THIRD PART:  SEARS, ROEBUCK DE PUERTO
RICO, INC., a Delaware corporation, with principal offices in San
Juan, Puerto Rico, located at Munoz Rivera Avenue corner Coll y
Toste Streets, said corporation duly qualified to do business in
Puerto Rico and herein represented by its *President* ,
Mr. *L. R. Lauck* , of legal age, an Executive, and resident of
San Juan, Puerto Rico, hereinafter known as the "Tenant".

   The authority of all of the appearing parties to act
herein shall be demonstrated whenever and wherever required, and
they state:

   A.  The Landlord and the Trustee are owners in fee

simple of the improved real property described according to the
Registry of Property as follows:

> "URBAN:  Parcel of land dedicated to a Shopping Center
> Plaza located at Santa Rosa Development in the Ward
> of Juan Sanchez of Bayamon, Puerto Rico, now classi-
> fied and zoned as a C-Four (C-4) district, consisting
> of eighteen and forty-six hundredths "cuerdas" (18.46)
> in area, equivalent to seventy two thousand five hun-
> dred fifty-five and sixty ninth hundredths square
> meters (72,555.69) bounded as follows:  At the North,
> by a marginal street and State Highway number Two,
> distance of four hundred twenty-five and six hundredths
> lineal meters (425.06); at the South, by street number
> Two of Santa Rosa Subdivision and lands of Santa Rosa
> Development Corporation in a distance of three hundred
> nine and thirty hundredths lineal meters (309.30); at
> the East by Aguas Buenas Avenue and intersection number
> One Hundred Thirty-One in Santa Rosa sub-division and
> other lands of Santa Rosa Development Corporation, in a
> distance of two hundred forty-nine and forty-nine hun-
> dredths lineal meters (249.49); and at the West, by
> lands owned by the Puerto Rico Housing Authority in a
> distance of two hundred sixteen and twenty-eight hun-
> dredths, lineal meters (216.28)."

The above mentioned property is recorded in the Registry
of Property of Bayamon, Page Sixty-Five (over) property Twelve
Thousand Nine Hundred Fifty-Seven, Third Inscription.  This property
shall hereinafter be known as "PARCEL A".

The said property is subject to a mortgage in the principal
amount of ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000.00),
with interest at the rate of six per cent per annum, in favor of
CONNECTICUT GENERAL LIFE INSURANCE COMPANY as appears from deed num-
ber three of June twenty-four, nineteen hundred and sixty before
Notary Public, Jose Gonzalez.

Said property is also subject to utility easements in
favor of the Puerto Rico Water Resources Authority and the Puerto
Rico Acqueduct Authority and to building restrictions appearing
from the corresponding Registry of Property in Bayamon.

There has been erected on this property a complete Shop-
ping Center known as Santa Rosa Shopping Center (hereinafter called
the "Shopping Center") consisting of seven buildings all of steel
frame and masonry construction and an adjacent parking area.

B.  The Landlord is also the owner in fee simple of the
following described parcel of property:

- 2 -

"URBAN:   PARCEL OF LAND located at Section Number One
of Santa Rosa Development, in Bayamon, with an area
of TEN THOUSAND ONE HUNDRED EIGHTY-FIVE WITH TWENTY
ONE HUNDREDTHS OF A SQUARE METER (10,185.21 Sq. mts.),
equivalent to TWO CUERDAS AND FIFTY-NINE HUNDREDTHS
OF A CUERDA (2.59), bounded at the NORTH, by Plaza
Comercial Santa Rosa, distance of One Hundred Fifty-
Eight meters and Seventy Three Centimeters (158.73);
at the SOUTH, by Street Number One (1) and Residen-
tial Section Number One (1) of the principal parcel
of Santa Rosa Development, distance of One Hundred
Fifty,Two Meters (152.00); at the EAST, by Aguas
Buenas Avenue of Santa Rosa Development with a dis-
tance of Seventy-Five Meters and Twenty Centimeters
(75.20); and at the WEST, by Street Number Five (5)
of the Santa Rosa Development, distance of Forty-Six
Meters and Thirty-Two Centimeters (46.32)."

This property is inscribed in the Registry of Property
in Bayamon at volume two hundred sixty seven of Bayamon, Page One
Hundred Sixty-Five, Property Number Eleven Thousand Six Hundred
Ninety Two, second inscription.

It is understood among the parties that some claim has
been made that there may be a restriction relating to the use of
this land for community purposes, and that the Landlord is under-
taking to resolve this claim so as to permit the use of this par-
cel for a parking area and for the erection of an automotive and
community center.  This property shall hereinafter be known as
"PARCEL B".

C.  The Landlord, Trustee and Tenant have agreed to the
lease of Premise C hereinafter described and, in the event that the
Planning Board of Puerto Rico permits the use of Premise D herein-
after described as an automotive and community center, and there
is no other legal impediment to such use of Premise D, the Land-
lord, Trustee and Tenant have agreed to the lease of Premise D.
Premise C is shown on the survey of Esteban Gonzalez dated September
11, 1965 (wherein it is referred to as Premise C-1) and Premise D
is shown on the survey of Esteban Gonzalez dated August 12, 1965,
which surveys are annexed hereto initialled by the Landlord and
Tenant and made part of this agreement.  Premise C alone, or in the
event that the use of Premise D is permissible, as aforesaid, then
Premise C and Premise D, and the buildings and improvements hereafter

located thereon (i. e. excepting the buildings now located on

Premise C and to be demolished as provided in this lease), are

hereinafter referred to as the "Demised Premises":

### PREMISE C

Starting at the corner of Aguas Buenas Avenue
and Street No. 1, known as property point No. 46,
move along the inner edge of Aguas Buenas Avenue
sidewalk a distance of 419.394 feet (127.833
meters) at a bearing of N 42° 00' 40" E; thence
move a distance of 57.553 feet (17.542 meters) at
a bearing of N 47° 59' 20" W to the southeast cor-
ner of the parcel. Thence move a distance of 419.000
feet (127.713 meters) at a bearing of N 13° 18' 50"
E to the northeast corner. Thence move a distance
of 237.500 feet (72.391 meters) at a bearing of N 76°
41' 10" W to the northwest corner. Thence move a
distance of 419.000 feet (127.713 meters) at a bear-
ing of S 13° 18' 50" W to the southwest corner, and
finally move a distance of 237.500 feet (72.391
meters) at a bearing of S 76° 41' 10" E to the south-
east corner of the parcel.

The resulting area of the parcel is 99,512.50 square
feet, equal to 9,245.272 square meters.

### PREMISE D

Starting at the corner of Aguas Buenas Avenue and
Street No. 1, move along the inner edge of the side-
walk along Aguas Buenas Avenue a distance of 15.240
meters at a bearing of N 42° 00' 40" E; then move
at right angles to this line a distance of 15.240
meters at a bearing of N 47° 59' 20" W to the south-
east corner of the parcel. Move then a distance of
56.389 meters at a bearing of N 42° 00' 40" E to the
northeast corner of the parcel. Then move to 19.203
meters at a bearing of N 47° 59' 20" W to the north-
west corner of the parcel. From then move a dis-
tance of 56.389 meters at a bearing of S 42° 00' 40"
W to the southwest parcel corner and from there move
a distance of 19.203 meters at a bearing of S 47° 59'
20" E to the south east corner that was our starting
point.

The total area of the parcel is 1,082.838 square meters.

D.   In place of Premise C hereinabove described (i.e.,

Premise C-1 on the aforementioned survey annexed hereto), the Tenant

shall have the option to lease an alternative Premise C which is re-

ferred to as Premise C-2 on the survey of Esteban Gonzalez dated

September 11, 1965 annexed hereto, initialled by the Landlord and

Tenant, and made part of this agreement, and is described as follows:

### PREMISE C-2

Starting at the corner of Aguas Buenas Avenue and Street No. 1

- 4 -

known as property point No. 46, move along the inner
edge of Aguas Buenas Avenue sidewalk a distance of
392.268 feet (119.565 meters) at a bearing of N 42°
00' 40" E; thence move a distance of 52.964 feet
(16.144 meters) at a bearing of N 47° 59' 20" W to
the southeast corner of the parcel.  Thence move a
distance of 419.000 feet (127.713 meters) at a bear-
ing of N 13° 18' 50" E to the northeast corner.
Thence move a distance of 228.500 feet (69.648 meters)
at a bearing of N 76° 41' 10" W to the northwest cor-
ner.  Thence move a distance of 419.000 feet (127.713
meters) at a bearing of S 13° 18' 50" W to the south-
west corner, and finally move a distance of 228.500
feet (69.648 meters) at a bearing of S 76° 41' 10" E to
the southeast corner of the parcel.

The resulting area of the parcel is 95,741.50 square
feet, equal to 8,894.955 square meters.

The option granted herein to the Tenant is subject to

the approval by the Planning Board of Puerto Rico of the use by

Tenant of said alternative Premise C.  If the Planning Board grants

such approval, and the Tenant shall then elect to exercise its op-

tion to lease said alternative Premise C (i. e., Premise C-2), it

shall give written notice thereof to the Landlord.  In that event,

said alternative Premise C (i. e., Premise C-2) shall thereupon

constitute part of the Demised Premises in place of the original

Premise C (i. e., Premise C-1) hereinabove described in introduc-

tory paragraph "C" of this lease.

E.  The use and occupation by the Tenant of the Premises

herein demised shall include, in addition to Premise C and Premise

D (if permissible), the use in common with others entitled thereto

of the common areas, service roads, loading facilities, sidewalks,

customer car parking areas, and other facilities in Parcel A and Par-

cel B as may be designated by Landlord as areas of common use, sub-

ject, however, to the terms and conditions of this agreement and

to reasonable rules and regulations for the use thereof as prescribed

from time to time by Landlord.

All of the appearing parties of this deed of lease, hav-

ing previously agreed to the lease of Premise C and Premise D (if

permissible as aforesaid,) do hereby do so, under the following

terms and conditions:

ARTICLE I

Premises and Term

Section 1.01

Landlord shall, at its expense, obtain from the Planning Board of Puerto Rico such approval and permits as may be required for the lease of Premise C to the Tenant for the construction and operation of a retail department store and for the use of Parcel B as a parking area by the Tenant and the other tenants of Parcel A. Landlord shall also use its best efforts to obtain from said Planning Board such approval and permits as may be required to allow the lease of Premise D to the Tenant for the construction of an automotive and community center and the respective operation thereof as provided for in this lease.

Section 1.02

Landlord shall, at its expense, make and construct such improvements in the land comprising Premise C and Premise D as the Planning Board of Puerto Rico may require as a condition to granting its approval for the lease of such premises for the purposes provided in Section 1.01 hereof.

Section 1.03

In the event that the required clearances are obtained, and the Tenant builds the automotive and community center on Premise D, as hereinafter provided, then Tenant shall lease back to the Landlord or its designee that portion of Premise D which comprises the community center for a nominal rental, and Landlord or its designee shall undertake, at its expense, to operate, maintain and manage such community center and to obtain and maintain public liability insurance adequate to protect Landlord and Tenant from all claims, demands, and liabilities arising out of the operation of such community center. Such insurance shall name both Landlord and Tenant as insured and contain limits of liability of $500,000. per person and $1,000,000. per accident for bodily injury limits and $100,000. for property damage. A certificate evidencing such insurance

- 6 -

coverage shall be furnished Tenant.

Section 1.04

Landlord does hereby demise and lease to Tenant and
Tenant does hereby take and hire from Landlord (a) the premise
described in introductory paragraph "C" of this lease as Premise
C and (b) in the event of the approval by the Planning Board of
Puerto Rico, and provided further that there is no legal impedi-
ment thereto, the premises described in introductory paragraph
"C" of this lease as Premise D.

Section 1.05

The term of this lease between Landlord and Tenant shall
commence on the first of the month next following the occurrence of
all of the following events:

(a)  The issuance by the Planning Board of Puerto
Rico of whatever approval is required to permit the leasing of
Premise C to the Tenant for the construction and use contemplated
by this lease.

(b)  The vacation of all existing structures con-
tained within Premise C by all tenants thereof, and Landlord's
written notification to Tenant that same has been accomplished.

(c)  The certification by the Landlord to the Tenant
that the Landlord has obtained written consents from all the other
tenants of Parcel A (Santa Rosa Shopping Center) to the effectuation
of this lease, and Landlord's agreement to indemnify Tenant against
any loss that Tenant may incur by reason of any action, claim or
demand by any other tenant of the Santa Rosa Shopping Center in
connection with or arising out of the execution of this lease.

(d)  The receipt by Tenant of a written instrument
from each mortgagee holding a mortgage upon the Landlord's fee in-
terest in Parcel A and Parcel B which shall (1) consent to the exe-
cution and delivery of this lease and (2) either agree not to disturb
the possession of the Tenant, nor to terminate any interest of the

- 7 -

Tenant created hereunder by foreclosure or otherwise so long as
the Tenant shall comply with the terms, covenants and conditions
of this lease, or subordinate the mortgage to this lease.

(e) The receipt by Tenant of a written confirma-
tion from Landlord that all the above conditions have been satis-
fied and that Tenant may proceed with demolition of the buildings
on Premise C and construction of the new building hereinafter pro-
vided for.

It is intended that the commencement of this
lease as aforesaid shall be within 15 months from the date of exe-
cution of this instrument.  The Landlord shall commence immediately
upon the signing of this lease and shall diligently pursue the con-
struction of the new buildings to be occupied by Banco Credito y
Ahorro Ponceno, Inc. and Belk Lindsey Company and to effect the
removal of the Bank and Belk Lindsey to their new buildings.  The
Landlord shall keep the Tenant informed of its progress in complet-
ing the aforesaid conditions.  So long as the Landlord acts diligently
and in good faith, Landlord shall not be deemed to be in default un-
der this Section 1.05.  However, Landlord agrees, even though not
in default under this Section 1.05, to pay to Tenant the sum of
$500. per day (but in no event exceeding in the aggregate the sum
of $15,000.) for each day required for the completion of the fore-
going conditions in excess of fifteen months from the date of exe-
cution of this instrument, provided that said period of fifteen
months shall, for the purposes of this Section 1.05, be extended
to the extent that the Landlord cannot, by the exercise of reason-
able efforts, complete its performance within such time because of
circumstances over which it has no control including without limita-
tion strikes, lockouts, fire, floods, earthquakes or similar actions
of the elements, acts of God, acts of war or the public enemy.

The exact date of the commencement of the
term of this lease shall be specified in a written memorandum

- 8 -

signed by both of the parties hereto. In the event that Tenant
shall suffer any delay in proceeding with the demolition of the
existing buildings on Premise C or the construction of the new
building thereon by reason of any legal action brought by any
other tenant of the Santa Rosa Shopping Center, then the date of
commencement of the term of this lease shall be postponed for a
period of time equivalent to the length of such delay.

Section 1.06

The initial term of this lease shall be a term of forty-
two (42) years, beginning on the day specified in Section 1.05 of
this deed of lease and expiring forty-two years thereafter.

Section 1.07

(a) If Tenant notifies Landlord in writing at any
time after the commencement of this lease but at least eighteen
months prior to the termination of the initial term hereof that it
elects to extend the term of this lease, then this lease shall be
extended for an extended term of fifteen (15) years.

(b) If this lease is extended for the extended term
hereinabove mentioned, Tenant at its election may extend the term of
this lease for two additional successive extended terms of fifteen (15)
years each, provided Tenant notifies Landlord in writing at least
eighteen (18) months prior to the termination of the then current
extended term that it elects to extend the term of this lease for
the immediately succeeding extended term.

(c) The right to any extension of this lease shall
be upon the express condition that at the time of the election to
extend the lease, and at the beginning of the extended term, Tenant
shall not be in default under any of the terms, covenants and con-
ditions of this lease.

(d) In the event Tenant for any reason shall not
exercise its privilege to extend the term of this lease, as here-
in provided, Tenant shall have no further privilege to extend the

term of this lease and said term shall expire and come to an end upon expiration of the then current initial term or extended term. If Tenant' exercises its privilege to extend the term of this lease, as herein provided, then such election, once made, shall be irrevocable.

Section 1.08

The term "lease year" as used herein shall mean a period of twelve (12) consecutive full calendar months. The first lease year shall begin on the date of commencement of the term hereof. Each succeeding lease year shall commence on the anniversary date of the first lease year.

Section 1.09

In the event that Tenant shall have elected to extend the term of this lease for the third extended term as hereinabove provided, then the Tenant shall have the following right of first refusal with regard to occupancy of the Demised Premises subsequent to the expiration of the third extended term.

(a) During the twelve (12) month period prior to the expiration of the third extended term hereof, upon receiving any acceptable bona fide offer from a third party for the leasing of the Demised Premises, the Landlord shall transmit to the Tenant in writing all the terms and conditions of such offer.

(b) Tenant shall have thirty (30) days from the receipt of such offer to notify the Landlord in writing of Tenant's intention to enter into a lease of the Demised Premises upon the terms and conditions of such offer.

(c) Within thirty (30) days (or such extended period as may be agreed upon between the parties) from the giving of Tenant's notice referred to in (b) above, the Tenant shall sign a lease of the Demised Premises upon the terms and conditions of the said offer.

(d) In the event that the Tenant shall fail to notify the Landlord of its intention to enter into a lease of the

- 10 -

Demised Premises, as provided in (b) above, or in the event that
the Tenant shall fail to execute the lease within the period pro-
vided in (c) above, then the Landlord may enter into a lease of
the Demised Premises upon the terms and conditions of the said
offer with the third party who made such offer, and Tenant shall
have no further rights under this Section 1.09.

(e)  In the event that the Landlord has not received
an acceptable bona fide offer from a third party but intends to con-
tinue the same type of store operation upon the Demised Premises,
then, if the Tenant so elects, the Landlord and Tenant shall nego-
tiate a new lease of the Demised Premises upon terms substantially
the same as those applicable to the third extended term hereof but
for a period of time mutually acceptable to the Landlord and the
Tenant.

## ARTICLE II

### Rent

Section 2.01

As fixed rent, Tenant shall pay to Landlord at its
principal office above set forth, or at such other place designated
in writing by Landlord, at the times hereinafter set forth, without
any prior demand therefor and in money of the United States of
America which at the time of payment shall be legal tender for pub-
lic and private debts, the respective amounts hereinafter set forth:

A.  During the first two lease years of this lease
no fixed rent shall be paid.

B.  During the third lease year the amount of
$50,000.

C.  During the fourth lease year the amount of
$75,000.

D.  During the fifth lease year the amount of
$100,000.

E.  During the sixth lease year the amount of
$125,000.

F. During the seventh lease year and during each
and every subsequent lease year of the initial term and
of any extended term of this lease the amount of $150,000.

The fixed rent hereinabove provided for shall be payable
in equal monthly instalments in advance on the first business day of
each and every calendar month of each lease year during said initial
term and any extended term.  It is the purpose and intent of Land-
lord and Tenant that this lease shall yield, net to Landlord the
fixed rent specified in this Section 2.01 in each year during the
term of this lease, free of any charges, assessments, or impositions
of any kind charged, assessed or imposed on or against the Demised
Premises except as expressly hereinafter provided in Section 2.03,
and without abatement, deduction or set-off by the Tenant, and Land-
lord shall not be expected or required to pay any such charge, as-
sessment or imposition, or be under any obligation or liability
hereunder except as herein expressly set forth, and that all costs,
expenses and obligations of any kind relating to the demolition of
the structures presently located on the Demised Premises, the con-
struction of the new buildings hereinafter provided for, the main-
tenance, preservation, care, repair and operation of the Demised
Premises, including all replacements, alterations and additions,
as hereinafter provided, which may arise or become due during the
term of this lease shall be paid by Tenant, and the Landlord shall
be indemnified and saved harmless by Tenant from and against such
costs, expenses and obligations.

Section 2.02

In the event that the net sales (as hereinafter defined)
made by Tenant upon the Demised Premises during any lease year of
the initial term or any extended term hereof shall be in excess of
Fifteen Million Dollars ($15,000,000.), then the Tenant shall pay
to Landlord, as additional rental hereunder for said lease year
a sum equal to one per cent (1%) of such excess.  Said additional

- 12 -

rental, if any, shall be paid by Tenant within thirty (30) days
after the end of the respective lease year for which the same is
payable.

     (a)  The term "net sales" as used herein is hereby
defined to mean the gross sales made upon the Demised Premises by
Tenant plus the gross sales, if any, made upon the Demised Premises
by Tenant's departmental sublessees, concessionaires and licensees
occupying space upon the Demised Premises, but deducting or exclud-
ing therefrom, as the case may be, the following:

     (1)  Sales of departments or divisions not
located upon the Demised Premises;

     (2)  The amount of all sales, use, excise,
retailers' occupation or other similar taxes imposed
in a specific amount, or percentage upon, or determined
by, the amount of retail sales made upon the Demised
Premises;

     (3)  Returns and allowances, as such terms
are known and used by Tenant in the preparation of
Tenant's profit and loss statements;

     (4)  Delivery, installation and service
charges including any and all service charges for
work performed off the Demised Premises;

     (5)  Amounts in excess of Tenant's (or of
its sublessees', concessionaires' and licensees')
cash sales price charged on sales made on credit or
under a time payment plan;

     (6)  Sales of merchandise ordered through
the use of Tenant's mail order catalogs or filled
through Tenant's catalog order channels, regardless
of the place of order, payment or delivery;

     (7)  Policies of insurance sold on the De-
mised Premises and premiums collected on policies of
insurance;

     (8)  Sales off the Demised Premises of en-
cyclopedias and other educational books sold in sets;

     (9)  Sales made through the Commercial and
Industrial Sales Department of Tenant.

     (b)  Within sixty (60) days after the end of each
lease year, Tenant shall furnish to Landlord a statement certified
by an officer of Tenant showing the net sales (as hereinbefore de-
fined) made by Tenant upon the Demised Premises during such preced-
ing lease year, and the additional rental, if any, payable by Tenant
to Landlord for such lease year.  In addition, Tenant shall furnish

- 13 -

Landlord with a statement of Tenant's net sales (as above defined) for Tenant's next preceding fiscal year prepared by Tenant's certified public accountants.

(c)  Unless Landlord shall, within thirty (30) days after receipt of any such statement certified by Tenant's officer, notify Tenant to the contrary, such statement shall be deemed to have been accepted by the Landlord as correct.  In the event that Landlord shall notify Tenant of Landlord's dissatisfaction with such statement within the aforementioned period, then Tenant shall permit a reputable firm of certified public accountants doing business in the United States and Puerto Rico, which shall be mutually satisfactory to, and approved in writing by, Landlord and Tenant, to make an independent audit of Tenant's net sales (as hereinbefore defined) for the period covered by said statement.  Such independent audit shall be at Landlord's expense and the findings of such audit shall be binding upon both parties and conclusive.

(d)  Tenant makes no representation or warranty as to the sales which it expects to make upon the Demised Premises and Landlord agrees to hold in confidence all sales figures and other information with respect to Tenant's business which Landlord may obtain from Tenant or from any audit of Tenant's books and records, except that Landlord may submit all of said information to the holder or holders of mortgages upon Landlord's interest in the Demised Premises, who shall also receive same in confidence.

Section 2.03

As additional rent hereunder, Tenant shall be liable for and pay all property taxes, assessments (ordinary and extraordinary), sewer rents, water rents and charges and other taxes, duties, charges, fees or payments imposed by any governmental or public authority, which shall be imposed, assessed, levied or be or become a charge or lien upon, or arise in connection with the use, occupancy or possession of the Demised Premises or any part

- 14 -

thereof or appurtenances thereto.  Tenant shall be entitled to
a credit against, and deduction from, the additional rent payable
by it hereunder at the fixed rate of $1,240.69 a year (which figure
represents the proportionate part of all 1964 real estate taxes
upon the land comprising Parcel A which is attributable to the
land included in the Demised Premises and is subject to revision
if the option in introductory paragraph "D" hereof is exercised by
Tenant).

(a)  Promptly after the execution of this lease,
the Landlord and the Tenant shall join in an application to the
Planning Board or other governmental authority having jurisdiction
thereof, to obtain during the term of this lease the issuance of
tax bills covering only the land and buildings included in Premise
C and Premise D (if the use thereof is permissible as aforesaid)
and the issuance of separate tax bills covering the land and build-
ings in the remainder of the Shopping Center.  The tax bills cover-
ing only the land and buildings included in the Demised Premises
shall determine the Tenant's obligation for additional rental under
this Section 2.03.

(b)  If for any reason during the term of this lease,
separate tax bills cannot be obtained for only the land and build-
ings included in the Demised Premises, as provided in the preceding
paragraph, then for the purpose of determining the Tenant's obliga-
tion for property taxes under this Section 2.03, the taxes, assess-
ments, etc. attributable to the Demised Premises shall be determined
as follows:  The Landlord and Tenant shall select a reputable, ex-
pert real estate appraiser mutually acceptable to them who shall
prepare and submit to the parties a detailed appraisal of all the
land and buildings in the Shopping Center.  Such appraisal shall
be binding upon both parties and conclusive.  That proportion of
the taxes, assessments, etc. of the entire Shopping Center which
the appraised value of the land and buildings contained in the
Demised Premises bear to the appraised value of the land and build-
ings contained in the entire Shopping Center shall constitute Tenant's

obligation for additional rental (subject to the deduction herein-
above provided for). The said proportion shall be applied in any
year for which the said separate tax bills cannot be obtained. The
said appraisal shall be made and completed in the month of July during
the first year when said separate tax bills are unobtainable and shall
be repeated in the same month during each succeeding year when said
separate tax bills are unobtainable, provided, however, that the cer-
tification by the appraiser (or his mutually acceptable successor)
that there has been no material change in the values of the land
and buildings in the Shopping Center since the date of the last de-
tailed appraisal shall be accepted in lieu of a new appraisal, and
the proportion established by the last detailed appraisal shall con-
tinue to be applicable. The cost of such appraisals shall be borne
equally by Landlord and Tenant.

(c) Tenant shall pay each sum payable pursuant to
this Section 2.03 on or before the date when same becomes due and
payable. In the case of any assessment for public improvements
wherein the cost of the public improvement is permitted to be paid
in installments, the Tenant may pay the same in installments. Any
such installments falling due during the term of this lease shall
be payable by Tenant and any such installments falling due after
the expiration of the term of this lease shall be payable by Land-
lord. Real estate taxes, sewer rents, water rents and charges and
other taxes, duties and charges in said categories (whether or not
the same have become a lien upon the Demised Premises) for the tax
year in which the term of this lease shall end shall be apportioned.

(d) Tenant shall have the right at its own expense,
to contest in good faith any taxes, sewer rents, water rents, charges
or assessments imposed upon, or allocated to, the Demised Premises,
and in case any such taxes, rents, charges or assessments shall, as
a result of any such legal proceedings, be reduced, cancelled, set
aside or otherwise discharged, Tenant shall be entitled to receive
its proportion of such taxes, rents, charges or assessments, with
interest thereon, if any, which may be recovered; provided, however,
that any such contest by Tenant of any taxes, assessments or other

charges shall not endanger Landlord's fee interest in the property
demised, and Tenant shall furnish any requisite bond and shall take
such other steps as reasonably may be required to protect Landlord's
interest.'

Section 2.04

As additional rent hereunder, Tenant shall pay to Landlord
expenses and charges other than those referred to in Section 2.03
hereof, which during the term of this lease shall be levied, assessed
or imposed by any governmental authority upon or with respect to, or
incurred in connection with, the ownership, possession, occupation,
operation, alteration, maintenance, repair and use of the Demised
Premises, or the making of any additions thereto.  If at any time
during the term of this lease under the laws of the Commonwealth or
any political subdivision thereof in which the Demised Premises are
situated a tax or excise on rents or other tax, however described,
is levied or assessed by said commonwealth or political subdivision
against the Landlord or the fixed rent expressly reserved hereunder,
Tenant covenants to pay and discharge such tax or excise on rents or
other tax but only to the extent of the amount thereof which is law-
fully assessed or imposed upon Landlord and which was so assessed
or imposed as a direct result of Landlord's ownership of the Demised
Premises, or of this lease or of the rentals accruing under this
lease, it being the intention of the parties hereto that the fixed
rent to be paid hereunder shall be paid to Landlord absolutely net
without deduction of any nature whatsoever except as in this lease
otherwise expressly provided.

Section 2.05

Nothing in this lease contained shall be construed to re-
quire Tenant to pay any franchise, estate, inheritance, succession,
capital levy, or transfer tax of Landlord, or any income, excess
profits or revenue tax or any other tax or impost charged or levied
upon the rentals payable by Tenant under this lease, except as pro-
vided in Section 2.04 hereof.

Section 2.06

The fixed rent and additional rent specified in this
Article II is intended to cover both Premise C and Premise D in

the event that the Planning Board of Puerto Rico permits the use
of Premise D as an automotive and community center.  If the
Planning Board does not permit the use of Premise D as an auto-
motive center, or if there is other legal impediment to the use
of Premise D as an automotive center, then Premise D will be
excluded from this lease so long as such lack of permission or
other legal impediment exists, the Tenant will locate its auto-
motive center on Premise C, and the fixed rent and additional
rent specified in this Article II shall not be reduced, abated
or otherwise affected in any way whatsoever.

## ARTICLE III

### Section 3.01

Promptly upon the commencement of the term of this
lease, Tenant shall, at its own cost and expense, demolish and
remove the buildings or improvements now on Premise C, except for
such portion thereof, if any, as the Tenant may be able to in-
tegrate into the new building to be placed on Premise C.  Land-
lord reserves the right to remove, free of charge but at its own
expense, from any building on Premise C prior to its demolition
any personal property, fixtures or equipment which either belong
to the present lessee of said building or could be used by the
Landlord in the new building being provided for such lessee, pro-
vided, however, that the Tenant shall be entitled to retain the
air conditioning unit now serving the Belk-Lindsey store if Tenant
is able to use such unit in Tenant's new building, and such unit
shall not be removed by Landlord without Tenant's prior written
consent.

### Section 3.02

(a)  As soon as Premise C is cleared as herein-
above provided, Tenant shall, at its own cost and expense, commence
the construction on Premise C of a modern department store building
of a quality, design and construction at least equal to that of the
other department store building owned and operated by Tenant in

- 18 -

San Juan, Puerto Rico. Such building shall be designed so as to harmonize esthetically with the rest of the Shopping Center and shall have the following specifications: approximately 416 feet in the north-south direction and approximately 234 feet in the east-west direction, containing approximately 97,400 square feet of covered parking in a partial basement, 97,400 square feet of ground floor, 48,700 square feet on the second floor and 24,300 square feet of future second floor area.

(b) In the event that the Planning Board of Puerto Rico approves the use of Premise D as an automotive and community center, promptly thereafter Tenant shall, at its own cost and expense, commence the construction on Premise D of an automotive and community center of a quality, design and construction in keeping with the aforesaid building on Premise C, which building on Premise D shall have the following specifications: approximately 60 feet in the northwest-southeast direction and approximately 182 feet in the northeast-southwest direction, containing approximately 12,000 square feet of ground floor, 5,720 square feet of mezzanine floor and 12,000 square feet of second floor area.

(c) Construction of the building on Premise C and the building on Premise D (if permissible) shall be made in accordance with duplicate sets of working plans, sketches and specifications prepared by duly licensed architects and engineers theretofore submitted to Landlord, whose approval as to the general appearance of the buildings shall be required. Such approval shall not unreasonably be withheld.

(d) Fee simple title to the said buildings (but not the land upon which they are placed) shall be vested in Tenant free and clear of all existing liens and encumbrances. Upon the expiration of the term of this lease (initial or extended) or other sooner termination thereof, the title to the said buildings shall vest in the Landlord and possession of the said buildings

- 19 -

shall be surrendered and delivered to the Landlord in good order, condition and repair, reasonable wear and tear excepted, and free and clear of all liens and encumbrances. Tenant shall execute such instruments and perform such other acts as may be required to transfer fee title in said buildings to Landlord, and Tenant shall not be entitled to any compensation whatsoever in connection with such vesting and transfer of title. Tenant shall have the right to remove from said buildings free of cost all personal property and trade fixtures, provided, however, that Tenant shall promptly repair any damage caused to the building by such removal.

(e) The aforesaid buildings shall have, for Registry of Property purposes only, a value of $2,000,000.

(f) Landlord and Tenant and Trustee shall appear in and execute the appropriate Act of Edification (Acta de Edificacion) notarial deed in order that title to the buildings to be built by Tenant may be inscribed in Tenant's name in the corresponding section of the Registry of Property of Puerto Rico, and, if necessary, Landlord will cause the mortgagees of said premises to appear in and execute the said Act of Edification.

Section 3.03

(a) Before commencing the construction of the new building or buildings on the Demised Premises, Tenant shall, at its own cost and expense, obtain from all Boards, Departments and governmental offices having jurisdiction, approval of plans, sketches and specifications for the buildings together with all permits required by law for the construction of the buildings. After the said approvals and permits shall have been granted, Tenant shall, at its own cost and expense, keep the same in force and effect until the improvements shall have been completed.

(b) After commencing such construction, Tenant shall, at its own cost and expense, thereafter diligently proceed with, complete and pay for the construction of the new building or buildings

in conformity with the said plans, sketches and specifications
filed and approved as above, in good and workmanlike manner,
free from mechanics' liens and in accordance with the laws, or-
dinances and lawful requirements of the Commonwealth of Puerto Rico
and the various departments and bureaus having jurisdiction thereof.
Upon completion of any building, Tenant shall furnish Landlord with
a duly issued Certificate of Occupancy, or if local procedure makes
no provision therefor, then Tenant shall furnish Landlord with the
architect's certification that the building has been completed ac-
cording to the plans and specifications.

Section 3.04

In connection with said demolition and construction,
Tenant shall obtain, or cause contractors to obtain and maintain,
without cost or expense to Landlord, Builder's Risk (fire, wind-
storm, hail, explosion, riot, riot attending a strike, civil com-
motion, aircraft, vehicle, smoke, vandalism, malicious mischief,
sprinkler leakage, and earthquake) insurance with limits commen-
surate with the completed portion of the buildings under construction,
Public Liability insurance, with limits of $500,000. per person and
$1,000,000. per accident for bodily injury limits and $100,000. for
property damage, and Workmen's Compensation and Employer's Liability
insurance with a limit of at least $100,000. under the Employer's
Liability portion. Such insurance shall be in forms sufficient to
protect Landlord and Tenant from liability claims arising out of
said demolition and construction. Tenant shall furnish Landlord
with certificates evidencing such coverages; provided, however,
that Tenant may elect to self-insure any or all of these require-
ments in accordance with Section 6.02.

Section 3.05

The said demolition and construction shall be carried
out in such a way as to interfere as little as is reasonably possi-
ble with the operation of the Shopping Center or the rights of other

- 21 -

tenants thereof.  All materials to be stored at the site of con-
struction shall be stored on Parcel B free of charge by the Land-
lord.  Except for the said use of Parcel B, the Tenant shall confine
its activities as closely as possible to the area of the Demised
Premises.  Tenant shall erect such fence or other enclosures as are
required to carry out the intent of this Section 3.05.

Section 3.06

(a)  Either simultaneously with, or immediately sub-
sequent to, the construction of the said new building or buildings,
Tenant shall, at its own cost and expense, construct upon Parcel B
a parking area which shall be of quality, design and construction
at least equal to that of the existing parking areas in the Shopping
Center.  Such parking area shall be for the general use, in common,
of all the customers of the Shopping Center, as more fully provided
in Article XI hereof.  In addition, Tenant shall, at its own cost
and expense, also construct a comparable parking area on that por-
tion of the land occupied by buildings to be demolished by Tenant
which is outside the boundaries of Premise C.

(b)  Tenant shall have the right at any time and from
time to time during the term of this lease to improve the presently
existing parking areas in the Shopping Center so that they will con-
form to the Tenant's reasonable standards, provided, however, that
Tenant shall first obtain Landlord's written consent to any such
improvement, which consent Landlord shall not unreasonably withhold.
The cost of any such improvement shall be divided between Tenant and
Landlord.  Tenant shall pay that proportion of the total cost which
the total floor area of Tenant's new building or buildings (exclud-
ing the floor area of the community center on Premise D, if the
same should be built) shall bear to the total floor area of all
the buildings in the Shopping Center upon the completion of Tenant's
new building or buildings.

- 22 -

ARTICLE IV

Maintenance and Repair

Section 4.01

Tenant shall, at its own cost and expense, keep the
Demised Premises and the buildings and improvements hereafter
erected and maintained upon the Demised Premises in good order
and repair and in such condition as may be required by law and
by the terms of any insurance policies covering the Demised Pre-
mises, whether or not such repairs shall be interior or exterior,
extraordinary as well as ordinary, and whether or not such repairs
shall be of a structural nature, and Tenant's obligation for main-
tenance and repair shall apply to the fixtures and facilities upon
the Demised Premises or forming part thereof, including without
limitation, all water, drainage, electric lighting, heating, air
conditioning, gas, elevator, sewer, plumbing and other fixtures
and facilities thereon.

Section 4.02

Tenant shall, at its own cost and expense, promptly com-
ply with and conform to the requirements of every applicable statute,
law, ordinance, lawful regulation and order, with respect to the con-
dition, equipment, maintenance, use or occupation of the Demised
Premises and any buildings and improvements thereafter erected and
maintained thereon, and appurtenances, franchises and privileges
connected therewith, whether or not such statute, law, ordinance,
regulation or order be of a kind now within the contemplation of
the parties hereto.

Section 4.03

Tenant shall pay and discharge, and indemnify and save
harmless Landlord against and from all liabilities, obligations,
damages, penalties, claims, costs, charges and expenses, including
reasonable attorneys' fees, which may be imposed upon or incurred
by or asserted against Landlord by reason of any of the following

- 23 -

occurring during the term of this lease unless caused by the sole
negligence of the Landlord;

      (a) Any work or thing done in, on or about
the Demised Premises or any part thereof;

      (b) Any use, nonuse, possession, occupation,
condition, operation, maintenance, repair or
management of the Demised Premises or any part
thereof or any fixtures or facilities therein
contained;

      (c) Any negligence on the part of Tenant or
any of its agents, contractors, servants, employees,
licensees, concessionaires or invitees;

      (d) Any injury or damage to any person or
property occurring in or on the Demised Premises
or any part thereof;

      (e) Any failure on the part of Tenant to per-
form or comply with any of the covenants, agreements,
terms or conditions contained in this lease on its
part to be performed or complied with.

In case any action or proceeding is brought against Landlord by
reason of any such claim, Tenant will at Tenant's expense resist
or defend such action or proceeding.

## ARTICLE V

### Alterations and Additions

Section 5.01

      Subject to the conditions hereafter set forth in this
Article V, Tenant shall have the right from time to time at its
own cost and expense to make any alterations, additions or improve-
ments within the Demised Premises, including necessary demolition,
incidental to the convenient conduct of Tenant's business, pro-
vided that such alterations, additions or improvements, when
completed, do not diminish the value of the Demised Premises.
Tenant shall have the right hereunder to increase the cubic con-
tents of the new building on Premise C without incurring any
liability for an increase in the fixed rent provided for in
Section 2.01 hereof, provided, however, that any such increase in
the cubic contents shall be dependent upon compliance by the
Tenant with the parking requirements of the governmental authority
having jurisdiction thereof.

Section 5.02

All alterations and additions by Tenant within the Demised Premises shall be subject to the following:

(a) Before commencing any alteration or addition whose estimated cost is in excess of $100,000., Tenant shall furnish to Landlord a duplicate set of the working plans, sketches and specifications for the proposed work prepared by a duly licensed architect or engineer.

(b) All alterations and additions shall be made in accordance with all governmental statutes, ordinances and regulations as specified in Section 3.03 hereof.

(c) In connection with any alteration or addition, Tenant shall at its cost and expense obtain or cause to be obtained all the insurance coverage specified in Section 3.04 hereof.

(d) Any alteration or addition shall be carried out in such a way as to interfere as little as is reasonably possible with the operation of the Shopping Center or the rights of any other tenants thereof.

Section 5.03

Tenant shall have no power to do any act or make any contract which may create or be the foundation for any lien, charge or other encumbrance upon the reversion or fee estate of Landlord in the Demised Premises. Should Tenant cause any alterations, replacements, changes, additions, improvements or repairs to be made in the Demised Premises, or labor to be performed or material to be furnished therein, neither Landlord nor the Demised Premises shall under any circumstances be liable for the payment of any expenses incurred or for the value of any work done or material furnished, but all such work, labor and material shall be made, furnished and performed at Tenant's expense and Tenant shall be solely and wholly responsible to all persons furnishing and performing such labor and material. If, because of any act of Tenant, any mechanic's, laborer's or materialman's lien shall be filed

- 25 -

against the Demised Premises or against Landlord, Tenant shall,
at its own cost and expense, within 20 days after the filing
thereof, commence and diligently pursue proceedings to have the
same cancelled and discharged of record.

## ARTICLE VI
### Insurance

Section 6.01

Tenant shall maintain at Tenant's sole cost and expense,
for the benefit of Landlord and Tenant, insurance with respect to
the Demised Premises, of the following types and in the following
amounts:

(a)  Fire and extended coverage insurance (losses
due to windstorm, hail, explosion, riot, riot attending a strike,
civil commotion, aircraft, vehicles, smoke), vandalism, malicious
mischief, sprinkler leakage and earthquake insurance and insurance
against such other events as shall from time to time be added to
the extended coverage insurance carried by Tenant's Parent Corpora-
tion in an amount not less than 100% of the replacement cost
(excluding excavation and foundation values) as the same is deter-
mined at five (5) year intervals by an architect or engineer desig-
nated by Tenant and satisfactory to Landlord.

(b)  Public Liability insurance covering liability
claims occurring on the Demised Premises and arising out of the
operation of the Tenant within the Demised Premises or any interest
of the Landlord in the Demised Premises.  The limits of liability
of such insurance shall be at least $500,000. per person,
$1,000,000. per accident for bodily injury and $100,000. per
accident for property damage.

(c)  Plate glass insurance on the Demised Premises.

Section 6.02

Tenant shall have the option of effecting such insur-
ance through an insurance company of recognized standing satis-
factory to the Landlord and the holder of any mortgage on the fee
of the Demised Premises or through Tenant's Parent Corporation

(Sears, Roebuck and Company, a New York corporation) which would act as a self-insurer.

(a) If Tenant elects to effect such insurance through an insurance company, such policies shall be secured promptly and certificates thereof shall be furnished to Landlord. Such policies shall provide that they will not be cancelled without at least twenty (20) days prior written notice to the Landlord and Tenant. Such policies shall contain loss payable clauses to Landlord and Tenant as hereinbelow provided in Section 5.03.

(b) Tenant shall procure renewals of all such insurance policies at least twenty (20) days before the expiration thereof. In default of the delivery or renewal of any such insurance policy required hereunder, the Landlord may procure any such insurance and the Tenant shall, on demand, reimburse the Landlord for the cost thereof with interest thereon at the rate of 6% per annum.

(c) If Tenant elects to effect all or any portion of such insurance through its Parent Corporation, then Tenant promptly shall advise Landlord of such election and shall furnish Landlord with a duly executed certificate from its Parent Corporation specifying the exact insurance coverage which the Parent Corporation will be responsible for. Such certificate shall be accompanied by the Parent Corporation's most recent published annual report evidencing sufficient assets to cover the self-insured risks.

(d) So long as the said Parent Corporation is acting as insurer, the Tenant shall furnish to Landlord annually on the anniversary of the certificate referred to in the preceding paragraph, (1) a duly executed certificate of its Parent Corporation that the insurance coverage being provided by the Parent Corporation is in full force and effect as of the date of said certificate, and (2) the Parent Corporation's most recent published annual financial report.

Section 6.03

In the event that during the term of this lease the building or buildings referred to in Section 3.02 hereof or any additions thereto at any time erected on the Demised Premises shall be damaged by fire or other insured casualty, then:

(a) In case such damage shall amount to $100,000. or less, the loss shall be settled with Tenant and the insurance proceeds shall be paid to Tenant, and Tenant shall, at its own cost and expense, promptly proceed to repair the damage so caused.

(b) In case such damage shall amount to over $100,000:

(1) If such damage shall not be so serious as to render the said building untenantable or as to amount to a total destruction of said building, Tenant shall, at its own cost and expense, promptly proceed to repair the damage so caused;

(2) If such damage shall be so serious as to render the said building untenantable, or shall amount to a total destruction of the building, then Tenant shall proceed with all reasonable expedition to restore or rebuild, as the case may be, the building so destroyed or rendered untenantable, free from liens of every kind, in substantial accordance with the plans and specifications of the building so destroyed or rendered untenantable (the building so to be rebuilt or restored in respect of its general exterior design, and the mechanical, heating, lighting and sanitary systems therein, to be substantially in accord with the building so destroyed or rendered untenantable), or in accordance with such other plans and specifications as may be agreed upon by the parties hereto; and in connection with such rebuilding or restoration Tenant shall comply with all the rules and requirements of all Boards, Departments and governmental offices having jurisdiction of such reconstruction or restoration and shall also comply with the requirements specified in Section 5.02 hereof.

(3) The net sums recovered by Landlord and Tenant on account of loss or damage, whether under the policies taken out as aforesaid, or under other insurance policies taken out by Tenant and indemnifying for physical loss (as distinguished from the loss of use and occupancy or profits), shall be deposited in a special account in the name of Landlord, separate and distinct from all other funds of Landlord in a bank or trust company of the City of San Juan, Puerto Rico approved by Landlord and Tenant, to be applied on account of the cost of such restoration or rebuilding, as the case may be, as the work of restoration or rebuilding progresses, and Tenant shall pay any and all additional moneys required in such restoration or rebuilding in excess of said net sums recovered, and shall be entitled to receive any surplus, if any, remaining of said deposit after such restoration or rebuilding has been completed as aforesaid, provided, however, that should the aforesaid damage by fire or other casualty occur within the last three years of the initial term or any extended term

- 28 -

of this lease, the Tenant shall have the option to surrender the proceeds of any insurance to Landlord and vacate the premises.

(c)  There shall be no abatement or reduction of any fixed or additional rental payable by the Tenant by reason of any such damage or destruction or during any period of repair or restoration, nor shall the Tenant be entitled to surrender possession of the Demised Premises or to terminate this lease by reason of such damage or destruction, except as provided in subdivision (3) of Section 6.03 (b) above.

(d)  If Tenant does not commence promptly to repair or restore the injury or destruction, or if, having commenced the repair or restoration, Tenant does not proceed diligently to complete the same, Landlord shall be entitled (but shall be under no obligation) at any time thereafter to enter the Demised Premises and repair or restore the injury or destruction and to apply any insurance proceeds in the said special account to the payment of the cost thereof; but if the insurance proceeds are insufficient for the cost of the repair, restoration or reconstruction, Tenant shall pay to Landlord, upon demand and as additional rent as the work progresses, such amounts as shall be necessary to complete the repair, restoration or reconstruction.

Section 6.04

If the Tenant's Parent Corporation is the insurer of the buildings on the Demised Premises against loss from fire or other casualty, then upon the damage or destruction of such buildings, Tenant shall promptly proceed to repair the damage or to restore or rebuild, as the case may be, in accordance with the applicable provisions of Section 6.03, Subsection (a) and Subsection (b), paragraphs (1) and (2) hereof, and Tenant shall promptly furnish to Landlord the written undertaking of its Parent Corporation to provide all monies which shall be required to complete the repair or reconstruction work which the Tenant is obligated to perform.

Section 6.05

Notwithstanding the insurance required under this Article

VI, Tenant agrees to indemnify Landlord against all damage, loss or liability resulting from any insured risks referred to in this Article VI or arising out of Tenant's occupancy and operation of the Demised Premises except for damages, losses or liabilities resulting from the sole negligence of the Landlord, whether or not Tenant has placed and maintained such insurance.

## ARTICLE VII

### Condemnation

Section 7.01

(a) If at any time during the term of this lease, a fee simple interest in the whole or at least sixty per cent (60%) of the actual ground area of the Demised Premises shall be taken for any public or quasi-public purposes by any lawful power or authority by the exercise of the right of condemnation or eminent domain, then this lease and the term hereof shall terminate and expire as of the date of such taking, the fixed rent, additional rent and any other sum or sums of money and other charges herein reserved and provided to be paid by Tenant shall be apportioned and paid to date of such taking, and the Tenant shall thereupon be released from any further liability hereunder.

(b) If a fee simple interest in less than ten per cent (10%) of the actual ground area of the Demised Premises shall be taken as aforesaid, then this lease and the term hereof shall continue, but the rent payable hereunder shall be reduced as provided in Section 7.02 hereof, and Tenant shall have the duty to repair and restore the Demised Premises as provided in Section 7.04 hereof.

(c) If a fee simple interest of at least ten per cent (10%), but less than sixty per cent (60%) of the actual ground area of the Demised Premises shall be taken as aforesaid, then Tenant shall have the right to cancel and terminate this lease effective as of the date of such taking or to continue in possession of the

- 30 -

remainder of the Demised Premises for the term hereof, and Tenant
shall give to Landlord, within thirty (30) days after the date of
such taking, notice of Tenant's election to terminate or to con-
tinue this lease.  Upon termination, rents and other charges shall
be apportioned as in Subsection (a) above, and upon continuation
the rent shall be reduced as provided in Section 7.02 hereof and
the Tenant shall have the duty to repair and restore as provided
in Section 7.04 hereof.

      (d)  Upon termination of this lease as provided in
Subsections (a) and (c) above, title to the building or buildings
on the Demised Premises shall vest in the Landlord without any
compensation whatsoever by the Landlord to the Tenant, and neither
Landlord nor Tenant shall, except for obligations incurred before
the occurrence of such event, have any further obligation or
liability to the other.

Section 7.02

      In the event that this lease shall continue pursuant to
Subsection (b) of Section 7.01 hereof, or in the event that Tenant
shall elect to continue this lease, as provided in Subsection (c)
of Section 7.01 hereof, then all the terms, conditions and provi-
sions of this lease shall continue in full force and effect, pro-
vided, however, that:

      (a)  The fixed rent then payable shall abate during
the period of repair and restoration in the proportion that the
floor area of the buildings referred to in Section 3.02 hereof so
taken plus the floor area of such buildings which cannot be used by
Tenant during said period of repair and restoration bears to the
floor area of the entire buildings referred to in Section 3.02
hereof before such taking; and

      (b)  After the repair and restoration of the buildings
has been completed:

            (1)  The fixed rent payable thereafter under
this lease shall be equal to that proportion of the
fixed rent specified in Section 2.01 hereof which the

- 31 -

floor area of the entire buildings after repair and
restoration bears to the floor area of the entire
buildings referred to in Section 3.02 hereof before
such taking.

(2)  In computing percentage rent under Section
2.02 hereof, the figure of Fifteen Million Dollars
($15,000,000.) shall be replaced by a figure derived
by applying the proportion set forth in the preceding
paragraph to the said figure of Fifteen Million Dollars
($15,000,000.).

(c)  The term "floor area" as used herein shall mean
the actual number of square feet of space within the outside lines
of the exterior walls of all floors of full-story height of the
building on the Demised Premises, without any deduction for space
used or occupied for elevators, escalators, stairs, columns, or
other equipment of interior construction; excluding, however, any
area outside the building line or above the roof line and excluding
the area of the community center on Premise D (in the event that the
Planning Board permits construction of the automotive and community
center on Premise D).

Section 7.03

In the event of any condemnation proceeding involving
either the whole or any portion of the Demised Premises, both the
Landlord and the Tenant shall participate in such proceeding and
each shall be represented by its own counsel at its own cost and
expense.  Both parties shall cooperate in the prosecution and col-
lection of any award upon any taking in such condemnation proceeding
and shall request that the Court allocate the award between the fee
estate (Landlord) and the leasehold estate (Tenant) in accordance
with the following:

(a)  In the event of any such taking, partial,
whole or substantially all, as the case may be, Land-
lord shall be entitled to receive such portion of the
award therefor, with the interest thereon, as shall
represent compensation for the value of the Demised

Premises or the part thereof so taken considered as vacant and unimproved land free and clear of leases as of the date of taking.

(b)  In the event of any such taking, partial, whole or substantially all, as the case may be, that portion of the award therefor, with the interest thereon, as shall represent compensation for the value of the new building on the Demised Premises, or the part thereof which is taken, shall be allocated so that the Landlord shall receive such proportionate part as the number of full calendar years then elapsed since the commencement date of this lease bears to 64 years.  The remainder of said portion of the award shall be allocated to the Tenant.

(c)  In the event of any such taking, partial, whole or substantially all, as the case may be, Landlord shall be entitled to receive such portion of the award therefor, with the interest thereon, as shall represent compensation, if any, for consequential damages to lands, buildings and improvements adjoining or adjacent to the Demised Premises.

(d)  In the event of any taking, partial, whole or substantially all, as the case may be, Tenant shall be entitled to such portion of the award, if any, which represents compensation for the leasehold estate.

(e)  In the event of any taking of less than sixty per cent (60%) of the actual ground area of the Demised Premises and the continuation of this lease as provided in Section 7.01, Subsection (b) or Subsection (c) hereof, that portion of the award which is allocated to the Tenant shall be deposited in a special escrow account in the name of Landlord, separate and distinct from all other funds of Landlord in a bank or trust company of the City of San Juan, Puerto Rico approved by Landlord and Tenant, to be applied on account of the repair or restoration of, or addition to, the building on the Demised Premises, as the work of repair or restoration progresses in accordance with Section 7.04 hereof.

Section 7.04

In the event of any taking of less than sixty per cent (60%) of the actual ground area of the Demised Premises, and the continuation of this lease as provided in Section 7.01, Subsection (b) or Subsection (c) hereof, the Tenant shall proceed with all reasonable expedition to repair or restore the remaining part of the buildings, or to build any addition thereto, in substantial accordance with the plans and specifications of the new buildings prior to such taking, so far as applicable, or in accordance with such other plans and specifications as may be agreed upon by the parties hereto.  The Tenant shall comply with all the rules and requirements of all Boards, Departments and governmental offices having jurisdiction of such repair, restoration or addition and shall also comply with all the conditions specified in Section 5.02 hereof.

- 33 -

The deposit made pursuant to Section 7.03, Subsection (e) hereof
shall be applied on account of the cost of any such repair, resto-
ration and addition as the work progresses, and Tenant shall pay
any and all additional moneys required for any such repair resto-
ration or addition in excess of the amount of said deposit, and
shall be entitled to receive any surplus of the said deposit
remaining after all the required work has been completed as afore-
said.

Section 7.05

If during the term of this lease less than a fee title
to all or any portion of the Demised Premises shall be taken in
condemnation proceedings by any lawful power or governmental
authority for temporary use or occupancy, the foregoing provisions
of this Article shall be inapplicable to such taking; this lease
shall continue in full force and effect but the rent shall abate
in the proportion that the floor area so taken bears to the floor
area of all of Tenant's buildings referred to in Section 3.02 here-
of before such taking. In such event, Landlord shall be entitled
to claim for, recover and retain any award in respect of such
taking.

## ARTICLE VIII

### Conduct of Business by Tenant

Section 8.01

Tenant shall use the leased premises for the purpose
of conducting the business of a Sears Roebuck "Class A" depart-
ment store in a manner substantially similar to the operation now
carried on in the existing "Class A" Sears Roebuck department
stores in Puerto Rico and the United States, except as otherwise
provided for herein. Promptly after completion of the new building,
as aforesaid, Tenant shall commence such operation.

## ARTICLE IX

### Mortgage, Assignment and Sublease

Section 9.01

The Tenant at any time hereafter may assign this lease

- 34 -

and the leasehold estate hereby created, or sublet the whole of
the Demised Premises to any wholly owned subsidiary of Tenant
or to any corporation wholly owned by Tenant's Parent Corporation
or in which Tenant's Parent Corporation owns at least two-thirds
of the outstanding voting stock, subject, however, to the terms
and conditions of this lease.

Section 9.02

Except as provided in Section 9.01 hereof, Tenant
shall not assign this lease in whole or in part nor sublet the
entire Demised Premises without the prior written consent of
Landlord.  It is the intent of the parties that during the term
of this lease the Demised Premises shall not without the Landlord's
prior written consent, be used for the conduct of any business
other than that specified in Section 8.01 hereof, and it is under-
stood that the Landlord shall not consent to any assignment or
subletting unless the Landlord is reasonably satisfied that the
prospective assignee or sublessee has the standing and experience
to conduct a department store business substantially equivalent
to that specified in Section 8.01 hereof, or such other business
as is commensurate with the objectives of the Shopping Center and
does not conflict with contractual obligations of the Landlord to
other tenants in the Center.

Notwithstanding the foregoing, Tenant shall have the
right to sublease or sublicense parts of the Demised Premises to
such departmental sublessees, concessionaires and licensees as
normally occupy space in a Sears Roebuck "Class A" department
store.

Section 9.03

In the event of an assignment of this lease, or a sub-
lease of the entire Demised Premises, as permitted in Section
9.01 or Section 9.02 hereof, the assignee or sublessee shall
execute and deliver to the Landlord an agreement in writing

- 35 -

assuming all the terms, covenants and conditions on the part of
the Tenant to be kept and performed under this lease. No assign-
ment or subletting, nor the acceptance of rents or other payments
from, nor any other dealing by the Landlord with any assignee, under-
tenant, occupant or other person shall release the Tenant from its
obligation to pay the Landlord a monthly rental equivalent to the
average monthly rental paid by Tenant to Landlord during the
twelve months' period last preceding such assignment or subletting,
but, in no event shall such liability be less than the fixed
rentals hereinabove provided to be paid from time to time during
the existing term of the lease and any renewal thereof.

Section 9.04

In the event that the Tenant abandons the Demised
Premises, then this lease shall terminate and title to the build-
ing or buildings on the Demised Premises shall vest in Landlord
in accordance with the provisions of Section 14.01, Subsection (b)
hereof. Upon such termination Tenant shall pay to Landlord, as
and for liquidated and agreed damages, the amounts set forth in
Section 14.01, Subsections (c) and (d) hereof.

Section 9.05

Tenant may mortgage its interest under this lease, but
any such mortgage shall be subject and subordinate to the provi-
sions of Sections 3.02(d), 7.01(d), 9.04 and 14.01 hereof as well as
to the other provisions of this lease, and no such mortgage shall
impair any of the rights, remedies or interest of Landlord under
this lease. Landlord agrees to give notice of any default here-
under to any mortgagee of this lease who shall have given Landlord
written notice of such mortgage and furnished Landlord with a
certified copy thereof, and further agrees to accept perform-
ance by such mortgagee of the terms, covenants and conditions

- 36 -

of this lease in the manner and within the time provided for here-
under as if such performance were by Tenant, provided, however,
that such mortgagee shall be subject to the business restrictions
referred to in Section 9.02 hereof.  No mortgage of Tenant's
interest under this lease or the enforcement thereof, shall be
deemed to release or discharge Tenant from any obligation or
liability hereunder.

Section 9.06

The provisions of subdivision (d)(2) of Section 1.05
shall be complied with by any mortgagee holding a mortgage upon
Landlord's fee interest in Parcel A and/or Parcel B, and shall
be superior to the lien of any such mortgage upon Landlord's
said fee interest.

### ARTICLE X
#### Utilities

Section 10.01

Tenant shall be solely responsible for and promptly
pay all charges for heat, water, gas, electricity, telephone,
sewerage or any other utility rendered to, used or consumed in
the leased premises.  In no event shall Landlord be liable for an
interruption or failure in the supply of any such utilities to the
leased premises, provided, however, that in the event that Land-
lord fails to maintain in good working condition any utility
equipment such as a sewage pipe or utility conduit located
within the Shopping Center but utilized by the Tenant, which
utility equipment was installed by and is under Landlord's effec-
tive control, and if within ten (10) days after receiving written
notice thereof from Tenant, Landlord does not proceed promptly
to cure such condition, Tenant shall have the same right as
Landlord to cure such condition and deduct the cost thereof
from rental payments due hereunder.

ARTICLE XI

Parking and Common Use Areas and Facilities

Section 11.01

All automobile parking areas, driveways, entrances
and exits thereto, and other facilities furnished by Landlord
in or near the Shopping Center, for the general use, in common,
of tenants, their officers, agents, employees and customers, shall
at all times be subject to the exclusive control and management of
Landlord and Landlord shall have the right from time to time to
establish, modify and enforce reasonable rules and regulations
with respect to all facilities and areas mentioned in this Article.
Landlord shall have the right to construct, maintain and operate
lighting facilities on all said areas and improvements; to police
the same; from time to time to change the level, location and ar-
rangement of parking areas and other facilities hereinabove referred
to; to restrict parking by tenants, their officers, agents and em-
ployees to employee parking areas; to close all or any portion of
said areas or facilities to such extent as may, in the opinion of
Landlord's counsel, be legally sufficient to prevent a dedication
thereof or the accrual of any rights to any person or the public
therein; to close temporarily all or any portion of the parking
areas or facilities; to discourage noncustomer parking; and to do
and perform such other acts in and to said areas and improvements
as, in the use of good business judgment, the Landlord shall de-
termine to be advisable with a view to the improvement of the con-
venience and use thereof by tenants, their officers, agents, employees
and customers.  Landlord will operate and maintain the common facili-
ties referred to above in such manner as Landlord in its sole discre-
tion, shall determine from time to time.  Without limiting the scope
of such discretion, Landlord shall have the full right and authority
to employ all personnel and to make all rules and regulations pertain-
ing to and necessary for the proper operation and maintenance of the

- 38 -

common areas and facilities. Landlord shall obtain and maintain
a public liability policy of insurance with Landlord and all tenants
of the Shopping Center as insured covering liability claims arising
out of the common use and facilities areas. The coverage shall be
$500,000. and $1,000,000. for personal damages and $100,000. for
property damages. Certificates of insurance shall be issued to
the tenants.

## ARTICLE XII

### Cost of Maintenance of Common Areas

Section 12.01

Tenant shall pay to Landlord as an agreed service charge
that proportion of the cost of insuring, repaving or otherwise main-
taining, policing, landscaping and lighting the parking areas, road-
ways, service areas and sidewalks in the Shopping Center, which the
floor area of the new building or buildings on the Demised Premises
(excluding the floor area of the community center on Premise D, if
the same should be built) shall bear to the aggregate floor area of
all of the structures in the Shopping Center. Such service charge
shall be payable monthly as billed by the Landlord. Sixty (60)
days after Landlord's fiscal year, Landlord shall furnish to Tenant
a detailed statement of the aforesaid cost and the payments there-
tofore made by Tenant will be adjusted in accordance therewith. In
the event that the Landlord fails to maintain the said common areas
in a manner reasonably satisfactory to Tenant, then Tenant shall be
entitled to proceed in accordance with the provisions of Section
14.03 hereof.

## ARTICLE XIII

### Merchants' Association

Section 13.01

Tenant shall cooperate on a fair and equitable basis with
the Merchants' Association of the Shopping Center in furthering the
objects and purposes of the Merchants' Association. Tenant reserves

the right in its sole discretion, to decide whether or not to be-
come a member of said Association.

## ARTICLE XIV

### Default

Section 14.01

(a)  If default shall be made by the Tenant in the
due and punctual payment of any fixed rent or additional rent pay-
able under this lease when and as the same shall become due and
payable, and such default shall continue without correction for a
period of thirty (30) days after notice from Landlord to Tenant,
then and in such event Landlord shall have the right to terminate
this lease by giving written notice thereof to Tenant and five (5)
days after the giving of such notice this lease and the term hereby
demised and all rights of Tenant hereunder shall, subject to the
provisions of this Section 14.01, expire and terminate; provided,
however, that the non-payment of any disputed additional rent under
Section 2.02 hereof prior to the binding determination provided in
subsection (c) of Section 2.02 hereof, or the non-payment of any
taxes which Tenant is contesting in accordance with the provisions
of subsection (d) of Section 2.03 hereof, shall not be deemed to be
a default under this Section 14.01.

(b)  Upon any such termination of this lease, title
to the building or buildings erected by the Tenant on the Demised
Premises shall vest in the Landlord without any compensation whatso-
ever to the Tenant by way of payment, offset or otherwise, and Tenant
shall execute such instruments as may be required to effectuate the
transfer of title to the Landlord.  Upon any such termination of
this lease, Tenant shall quit and peacefully surrender the Demised
Premises to Landlord, and Landlord, upon or at any time after any
such termination, may without further notice, enter upon the Demised
Premises and possess itself thereof, by summary proceedings, eject-
ment or otherwise, and may dispossess Tenant and remove Tenant and
may have, hold and enjoy the Demised Premises.

(c)  In the event of any such termination Tenant shall pay to Landlord for the remainder of the then existing term of the lease, as and for liquidated and agreed damages, the equivalent of the fixed rent hereinabove provided, less the net proceeds of any reletting (after deducting all Landlord's expenses in connection with such reletting).  Tenant shall pay such damages to Landlord monthly on the days on which the fixed rent would have been payable under this lease if it were still in effect, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same shall arise.

(d)  In the event of any such termination, Landlord shall make reasonable efforts to relet the Demised Premises for such term or terms upon such conditions as Landlord, in its sole discretion, may determine and Landlord shall collect and receive the rent therefor and apply the same on a monthly basis against the liquidated damages obligations of the Tenant hereinabove provided.  So long as the Landlord acts in good faith, the Landlord shall not be responsible or liable for any failure to relet the Demised Premises or for any failure to collect any rent due upon any such reletting.

Section 14.02

If default shall be made by Tenant in the performance of or compliance with any of the covenants, agreements, terms or conditions contained in this lease other than those referred to in Section 14.01 hereof, and such default shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant, (provided, however, that Tenant's time to cure any such default shall be extended for such additional time as shall be reasonably required for the purpose if Tenant shall proceed with due diligence during such thirty (30) day period to cure such default and is unable to cure the same within the said thirty (30) days) then Landlord shall have the right, at its

election, to submit the matter to an appropriate court.  The
final determination of any such court shall be binding upon the
parties hereto.  Any award of damages to the Landlord shall be
added to the payment of fixed rent next falling due under this
lease, and Tenant's default in paying such damages shall be
deemed to be a default in the payment of fixed rent under
Section 14.01 hereof.

Section 14.03

If default shall be made by Landlord in the perform-
ance of or compliance with any of the covenants, agreements or
conditions on its part to be performed hereunder, then the Tenant
shall be entitled to proceed as follows:

(a)  If Landlord's default shall be in the perform-
ance of work which the Tenant is able and willing to perform, then
Tenant shall give the Landlord written notice specifying in detail
the work which Tenant requires and which Tenant proposes to per-
form upon Landlord's failure to do so.  Within thirty (30) days
after such written notice the Landlord shall either commence the
performance of the requested work and shall diligently proceed
therewith until the work is completed or the Landlord shall sub-
mit the matter to an appropriate court.  In the event that the
Landlord does not either proceed with the performance of the re-
quested work or submit the matter for adjudication within the
said thirty (30) day period, the Tenant shall have the right to
perform the work specified in its notice and to deduct the monies
actually expended therefor from the rental payment or payments
next falling due under this lease.

(b)  If Landlord's default shall be in some per-
formance which Tenant is either unable or unwilling to perform,
then Tenant shall give the Landlord written notice of the perform-
ance required and if within thirty (30) days after such written
notice the Landlord does not commence and diligently proceed with
the requested performance then Tenant shall have the right, at
its election, to submit the matter to an appropriate court.

(c)  The final determination by the court of any
matter submitted pursuant to paragraphs (a) or (b) of this Section
14.03 shall be binding upon the parties hereto.  Any award of damages
to the Tenant shall be deducted from the rental payment or payments
next falling due under this lease and the Tenant shall also have
the right to deduct therefrom the monies actually expended by Tenant
for work performed by Tenant pursuant to such determination.

(d)  In the event of Landlord's default which shall
be held by a court of competent jurisdiction to have constituted an
eviction of Tenant of a permanent nature, then Tenant's failure to
pay rent subsequent to such finding shall not constitute a technical
default under Section 14.01 hereof and Tenant shall be entitled to
such damages as the court deems proper.

Section 14.04

Notwithstanding the foregoing provisions of this Article
XIV, in the event of the breach by either party of the covenants,
agreements or conditions of this lease, the other party shall, in
addition to any and all other rights, be entitled to such injunctive
and other remedies as may be allowed at law, in equity, by statute
or otherwise for such breach.  No failure by either party to insist
upon the strict performance of any covenant, agreement, term or
condition of this lease or to exercise any right or remedy conse-
quent upon a breach thereof, shall constitute a waiver of any such
breach or of such covenant, agreement, term or condition.  No waiver
of any breach shall affect or alter this lease, but each and every
covenant, agreement, term and condition of this lease shall con-
tinue in full force and effect with respect to any other then exist-
ing or subsequent breach thereof.

ARTICLE XV

Surrender At Expiration

Section 15.01

Tenant shall on the expiration of the term of this lease

- 43 -

or other sooner termination hereof, surrender and deliver up the Demised Premises with the buildings and improvements then erected and maintained thereon into the possession of Landlord in good order, condition and repair, free and clear of all liens, tenancies and encumbrances other than those, if any, created by Landlord, and title to such buildings and improvements shall vest in the Landlord without any payment or allowance whatever by Landlord on account of or for any buildings and improvements on the Demised Premises at the time of the surrender, or for the contents thereof or appurtenances thereto. Tenant shall execute such instruments as may be required to effectuate the transfer of title to Landlord.

The aforesaid surrender shall include all fixtures and facilities in the buildings on the Demised Premises, or forming part thereof, which are customarily regarded as real estate and as part of the buildings. Any fixtures, trade fixtures, personal property or belongings of Tenant left upon the Demised Premises at the time of such surrender shall be deemed to have been abandoned by Tenant.

## ARTICLE XVI

### Equipment and Fixtures Installed

Section 16.01

Tenant from time to time during the initial term or any extended term may install equipment and fixtures of various kinds and descriptions for use in connection with its business, and upon the installation or placing of, any such equipment and fixtures in or on the Demised Premises by Tenant, the same shall remain at all times the property of Tenant, and, at any time during the initial term or any extended term and at the termination of the lease, Tenant shall be entitled to remove any and all of such equipment and fixtures. If any equipment or fixtures are so attached to the building as not to be readily removable without damage to the building, then, if Tenant shall remove the same, Tenant shall promptly repair and replace any damage caused to the building by such removal.

- 44 -

Upon the expiration or other termination of this lease, Landlord
may require Tenant to remove any and all of such equipment and
fixtures at the expense of the Tenant and Tenant shall promptly
repair any damage caused to the building by such removal.

Nothing herein contained shall be deemed to confer
upon Tenant any right to remove any equipment or fixtures used
in the operation of the Demised Premises (Article XV) as dis-
tinguished from fixtures used in carrying on Tenant's business.

## ARTICLE XVII

### Covenant of Quiet Enjoyment

Section 17.01

Landlord covenants and agrees that so long as Tenant
pays the fixed rent, additional rent and other charges reserved
and agreed to be paid by Tenant under this lease, and faithfully
observes all covenants, conditions and agreements herein contained,
Tenant shall quietly have and enjoy the Demised Premises and every
part thereof during the term of this lease without hindrance, ejec-
tion or molestation by Landlord or any person or persons claiming
by, through or under Landlord.  In the event that Landlord shall
hereafter convey, or in any manner be divested of title to, the
Demised Premises, Landlord shall be and hereby is entirely freed
and relieved of the performance of all covenants and obligations
of Landlord hereunder from and after such conveyance or divestiture
of title to the extent that Landlord's successor in title shall be-
come obligated, expressly or by implication of law, to perform the
covenants and obligations of Landlord hereunder, and to such extent
Tenant shall thenceforth look solely to Landlord's successor in
title for the performance of the covenants and obligations of
Landlord hereunder.

## ARTICLE XVIII

### Estoppel Certificates

Section 18.01

Tenant agrees at any time and from time to time during

the term of this lease upon not less than ten (10) days prior
notice by Landlord to execute, acknowledge and deliver to Land-
lord a statement in writing certifying that this lease is unmodi-
fied and in full force and effect (or if there have been modifica-
tions, that the same is in full force and effect as modified and
stating the modifications), and the dates to which the fixed rent
and other charges have been paid, and stating whether or not to
the best knowledge of the signer of such certificate Landlord
is in default in performance of any covenant, agreement or condi-
tion contained in this lease and, if so, specifying each such
default of which the signer may have knowledge, it being intended
that any such statement delivered pursuant to this Section 18.01
may be relied upon by any prospective purchaser of the fee or any
mortgagee thereof.

Section 18.02

Landlord agrees at any time and from time to time during
the term of this lease upon not less than ten (10) days prior no-
tice by Tenant to execute, acknowledge and deliver to Tenant a
statement in writing certifying that this lease is unmodified and
in full force and effect (or if there shall have been modifications
that the same is in full force and effect as modified and stating
the modifications) and the dates to which the fixed rent and other
charges have been paid, and stating whether or not to the best
knowledge of the signer of such certificate Tenant is in default
in performance of any covenant, agreement or condition contained
in this lease and, if so, specifying each such default of which
the signer may have knowledge, it being intended that any such
statement delivered pursuant to this Section 18.02 may be relied
upon by any prospective mortgagee of the Tenant's interest in this
lease.

## ARTICLE XIX

### Invalidity of Particular Provisions

Section 19.01

If any term or provision of this lease or the application

- 46 -

thereof to any person or circumstance shall, to any extent, be
invalid or unenforceable, the remaining terms and provisions of
this lease, or the application of such term or provision to per-
sons or circumstances other than those as to which it is held
invalid or unenforceable, shall not be affected thereby, and
each term and provision of this lease shall be valid and be en-
forced to the fullest extent permitted by law.

### ARTICLE XX

#### Notices

Section 20.01

All notices, demands and requests required or permitted
to be given hereunder by either party to the other shall be in
writing and given by registered mail return receipt requested. All
notices, demands and requests by Landlord to Tenant shall be deemed
to have been properly given if and when the original notice, de-
mand or request has been mailed by registered mail addressed to
Tenant at Office of the President, 106 Coll y Toste Streets, Hato
Rey, Puerto Rico, or at such other place as Tenant may from time
to time designate in a written notice to Landlord. All notices,
demands and requests by Tenant to Landlord shall be deemed to
have been properly given if and when mailed by registered mail
addressed to Landlord at Office of the President, Suite 2600, 70
Pine Street, New York 5, New York, or at such other place as Land-
lord may from time to time designate in a written notice to Tenant.

### ARTICLE XXI

#### Restriction on New Buildings in Shopping Center

Section 21.01

During the term of this lease Landlord shall not, with-
out the prior written consent of the Tenant, undertake or permit
the construction of new buildings upon the premises of the Shopping
Center which will (1) substantially reduce the parking area of the
Shopping Center which is then available or (2) substantially alter

the character of the Shopping Center. Nothing contained herein shall be construed to restrict in any way whatever Landlord's right to make normal repairs or alterations to existing buildings or to repair, restore or rebuild any buildings which may be damaged or destroyed by fire or other casualty or to repair or restore buildings which may be affected by condemnation.

## ARTICLE XXII
### Access By Landlord

Section 22.01

The Landlord or its agents shall have the right at all reasonable hours and upon reasonable notice, to inspect the Demised Premises. In the event the Tenant has not elected to extend the term of this lease as provided in Section 1.07 hereof, then during the one year period prior to the expiration of the initial term or the first extended term or the second extended term, as the case may be, the Landlord shall have the right to exhibit the premises to prospective tenants at reasonable hours and upon reasonable notice. The Landlord shall have the right to exhibit the premises to prospective tenants during the one year period prior to the expiration of the third extended term without any prejudice to Tenant's rights under Section 1.09 hereof.

## ARTICLE XXIII
### Miscellaneous

Section 23.01

As used herein, the expression "the term of this lease", or any variation thereof, shall be deemed to include the initial term and any and all extended terms provided for in Section 1.07 hereof.

Section 23.02

All the headings and the numbering of the Sections in this lease are for convenience of reference only and shall not affect the construction of this lease.

Section 23.03

Subject to the provisions of Article IX hereof, and without in any way enlarging Tenant's right to assign as therein set forth, this lease shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

Section 23.04

This lease may not be modified, altered, terminated or discharged orally but only by an agreement in writing signed by the parties hereto.

Section 23.05

This lease may be executed in any number of counterparts, each of which shall be an original and the counterparts shall constitute but one and the same instrument.

Section 23.06

The controlling language of this instrument shall be English.

Section 23.07

The appropriate jurisdiction for the determination of disputes arising under this lease shall be Puerto Rico.

Section 23.08

Any party hereto may, at its sole expense, elect to make this lease a public deed. In such event, the other parties hereto shall join in the execution of such instruments as may be required to effectuate such election, but the other parties shall not be responsible for any taxes, fees, costs or other expenses whatsoever incurred in connection therewith.

IN WITNESS WHEREOF, the parties hereto have caused this lease to be executed in their respective corporate names and

their respective corporate seals to be hereunto affixed by their

respective officers thereunto duly authorized, as of the day and

year first above written.

SANTA ROSA SHOPPING CENTER, INC.

By _____
PRESIDENT

SEARS, ROEBUCK de PUERTO RICO, INC.

By _____

BANCO CREDITO Y AHORRO PONCENO, INC.

By _____

- 50 -

STATE OF NEW YORK )
                  :  ss.:
COUNTY OF NEW YORK)


        Before me, a Notary Public, in and for the County and
State of New York, there came JOHN P. BIRKELUND, the President of
SANTA ROSA SHOPPING CENTER, INC., to me personally known, who
acknowledged that he is the one who executed on behalf of the above
named corporation the above instrument of lease.

        WHEREFORE, I have hereunto set my hand and seal of
office this 16th day of September, 1965.

                                  _Benjamin Blonder_

                        BENJAMIN BLONDER
                    NOTARY PUBLIC, State of New York
                         No. 31-5390125
                    Qualified in New York County
                    Commission Expires March 30, 19 66


CITY OF _Hinsdale_)
                  :  ss.:
STATE OF _Illinois_ )


        Before me, a Notary Public, in and for the City of
_Hinsdale_ and State of _Illinois_ , there came
_Th. Heuser_ , the _President_ of SEARS, ROEBUCK de PUERTO
RICO, INC., to me personally known, who acknowledged that he is
the one who executed on behalf of the above named corporation the
above instrument of lease.

        WHEREFORE, I have hereunto set my hand and seal of
office this _22nd_ day of September, 1965.

                                  _Mary Catherine Bush_


CITY OF _San Juan_  )
                    :  ss.:       Affidavit # 4245
STATE OF _Puerto Rico_ )


        Before me, a Notary Public, in and for the City of
_San Juan_  and State of _Puerto Rico_ , there came _Mr._
_Carlos J. Fiu_ , the _Vice President_ of BANCO CREDITO
Y AHORRO PONCEÑO, INC., to me personally known, who acknowledged
that he is the one who executed on behalf of the above named
corporation the above instrument of lease.

        WHEREFORE, I have hereunto set my hand and seal of
office this _9th_ day of September, 1965.
                              _October_

C-600-061Am

AMENDMENT TO THE LEASE BETWEEN SANTA ROSA SHOPPING CENTER, INC. AND
SEARS, ROEBUCK DE PUERTO RICO, INC., DATED SEPTEMBER 6, 1965

Agreement made this 3 day of     June     , 1983, in San Juan,
Puerto Rico, between Plaza Las Cumbres, Inc., a corporation organized
and existing under the laws of the Commonwealth of Puerto Rico, as
Party of the First Part, represented herein by its president, Andre
Nikitine, of legal age, married, and a resident of Puerto Rico, who
is duly authorized therefore, hereinafter called the "Landlord", and

Sears, Roebuck de Puerto Rico, Inc., a Delaware corporation with
principal offices in San Juan, Puerto Rico, as Party of the Second
Part, represented herein by its president, Donald S. Jones, of legal
age, married, and a resident of San Juan, Puerto Rico, who is duly
authorized therefore, hereinafter called the "Tenant".

Whereas, Santa Rosa Shopping Center, Inc. and Sears, Roebuck
de Puerto Rico, Inc. signed a lease agreement on September 6, 1965
(hereinafter referred to as the "Lease Agreement"), and

Whereas, subsequent to the signing of the Lease Agreement, Santa
Rosa Shopping Center, Inc. was purchased by Landlord, and

Whereas, Landlord is the successor in interest of Santa Rosa
Shopping Center, Inc. to the Lease Agreement, and

Whereas, Landlord wishes to make additions and improvements to
the mall of Santa Rosa Shopping Center (hereinafter referred to as
the "Shopping Center"), and

Whereas, the proposed addition and improvement to the mall will
affect the Demised Premises, including Tenant's department store
(hereinafter referred to as "Tenant's store") and said Shopping Center,

Now, therefore, the Parties agree as follows:

1.  Prior to beginning the construction of any addition or improvement
    to the Shopping Center, Landlord shall:

    (a)  submit to Tenant for Tenant's approval the proposed design
         and specifications for the mall, which design and specifi-
         cations:  (i) shall be similar to those for the existing
         mall building, (ii) shall not provide for any alteration in
         the precast concrete fascia panels or the structural slab

of the roof overhang at the mall entrance to Tenant's
store, and (iii) shall include roof plans illustrating
the location of roof drains and rain leaders.  Tenant's
exterior canopy may be used as the roof of the building
to be attached to the demised premises or as the roof of
the enclosed mall; provided, however, that said overhang
shall be used only as a roof, and provided further that
no equipment or materials; with the exception of a suspended
ceiling and lighting, shall be hung from said canopy or
installed on or over it.

Landlord shall further present to Tenant for its approval
all designs and specifications for the alteration of the
Demised Premises.  Said plans and specifications shall include,
inter alia:

(i)  the proposed plans for the doorway between Tenant's
store and the mall, the size of the mall configuration
at the entrance to Tenant's store, and the form in which
the mall building is to be attached to Tenant's store.
In the event that an exterior wall of Tenant's store is
used as a common wall for an adjoining building, said plans
shall include plans for the construction of an exterior
stud wall;

(ii)  the layout of parking spaces on and adjacent to the
demised premises.  Landlord shall paint any lines drawn
in the parking lot in a way that parked cars  will not
interfere with loading and unloading operations for the
demised premises, and in no event shall there be fewer
than 25 feet between the loading and unloading entrance
of Tenant's store and the parking areas for cars.

Once Tenant has approved said design and specifications,
Landlord shall prepare the site plan in accordance therewith
and shall submit said plan for Tenant's approval.  After
Tenant has approved the site plan, Landlord shall attach
said plan hereto as Exhibit II.  Landlord shall make no
modification or alterations to said plan without Tenant's
written authorization.

(b)  obtain and make available for inspection by Tenant all
     necessary approvals and permits of the Permit and Regulation
     Administration (ARPE) and the Puerto Rico Planning Board
     for additions and improvements to the Shopping Center and
     to the Demised Premises.  Landlord shall not commence or
     cause to commence any work on additions or improvements to
     the Shopping Center or to the Demised Premises until Tenant
     has reviewed and approved said approvals and permits.  Any
     changes to the proposed plans will be notified to Tenant
     for Tenant's approval.  If public hearings are necessary,
     Landlord will notify Tenant of the time, date and place
     they will take place.

(c)  obtain and present to Tenant the authorization of any
     mortgagors or creditors of Landlord that may be required
     to permit Landlord to perform the modifications and altera-
     tions referred to herein.

2.  Landlord warrants and represents that it shall:

(a)  commence construction within    days of approval of the site
     plan by Tenant and shall finish construction within    days
     of commencement.

(b)  construct all additions and improvements to the Shopping
     Center so that the entire area of the Shopping Center shall
     be covered by a sprinkler system.

(c)  place all building rain leaders designed to drain water from
     the roof in a location that does not cause rain water run
     off to flow down the entrance ramp to Tenant's lower level
     parking.

(d)  not disturb the precast concrete fascia panels or the structural
     slab of the roof overhang at the mall entrance to Tenant's
     store.

(e)  bear all costs of additions or improvements to the Shopping
     Center as well as all costs of additions or improvements to
     the Demised Premises required because of additions or im-
     provements to the Shopping Center; Landlord shall pay

the cost of the construction or remodeling of the doorway
between Tenant's store and the mall, up to a maximum of
$12,500.  Landlord will seek and obtain Sears' approval
on any and all exterior signs bearing Sears name to be put on the mall.

(f)  at Landlord's expense, cause GT Sylvania to survey Tenant's
rear parking lot after completion of the additions and
improvements to the Shopping Center.  Landlord shall provide
Tenant with a certificate from GT Sylvania stating that the
lighting of Tenant's rear parking lot is equal the current
lighting level of Tenant's front parking lot.

(g)  Building 17 on the plot plan attached hereto as Exhibit I,
to be constructed in the central part of the parking lot
of the Shopping Center fronting on Highway Number 2, and shall
construct any sign related to Building 17 in such a way that
neither the building nor the sign will be higher than the
ground level of Tenant's store, which is twenty-two feet.
Landlord further warrants and represents that it shall not
build any building or structure directly fronting on the
Demised Premises, or on or around the corner of Highway
Number 2, and Aguas Buenas Avenue.

(h)  in connection with the remodeling work to be done on the
Demised Premises, obtain, pay for, and maintain at all times
during the performance of work under this contract, through
companies and agencies approved by Tenant and pursuant to
contracts containing provisions satisfactory to Tenant,
the following Insurance:

(i)  Worker's Compensation and Employer's Liability Insurance
with statutory benefits under Worker's Compensation,
and limits of liability under the Employer's Liability
portion of not less than $500,000 containing a waiver
of subrogation in favor of Tenant executed by Landlord's
insurance company or companies,

(ii)    Comprehensive General Liability Insurance including Contractor's Protective Liability in Contractor's name, with bodily injury and property damage limits of not less than $1,000,000 per occurrence,

(iii)    Contractual Liability Insurance in Landlord's name specifically endorsed to cover the indemnity agreement in this contract. Limits of liability shall be not less than $1,000,000 per occurrence for bodily injury and property damage,

(iv)    Owner's Protective Liability Insurance with Tenant as the named insured, covering Landlord's operations and the work performed for Landlord on the job site. Such policy shall have a combined single limit of not less than $1,000,000 per occurrence for bodily injury and property damage, and

(v)    Automobile Liability Insurance with an Employer's Non-Ownership Liability Endorsement in Landlord's name. Limits of liability shall not be less than $1,000,000 per occurrence for bodily injury and property damage.

Landlord shall cause waivers of subrogation to be executed by Landlord's insurance company or companies in favor of Tenant with respect to the foregoing policies as well as with respect to any real and personal property insurance policy maintained by Landlord covering the Shopping Center.

(i)    To the fullest extent permitted by law, defend, indemnify and hold harmless Tenant and its agents and employees from and against all claims, actions, liabilities, losses, costs and expenses, including but not limited to attorneys' fees, arising out of any actual or alleged (i) bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the work itself) including the loss of use resulting therefrom, or any other damage or loss arising out of or resulting or claimed to

have resulted in whole or in part from any actual or
alleged act or omission of the Landlord, or any con-
tractor, any subcontractor, anyone directly or indirectly
employed by any of them or anyone for whose acts any of them
may be liable in the performance of the work hereunder
(for purposes of this Section 2(i), hereinafter collectively
called "Contractor"), whether or not lawful or within the
scope of their employment, and regardless of whether or not
it is caused in part by a party indemnified hereunder; or
(ii) violation by Contractor, in the performance of the work,
of any law, statute or ordinance or any governmental
administrative order, rule or regulation, on whatever amount
a Court of Justice may award on any incident alleged to
result or resulting from the Santa Rosa Shopping Center
remodeling.

In any and all claims against Tenant, or any of its agents
or employees, by any employee of the Contractor, the indemni-
fication obligation hereunder shall not be limited in any
way by (i) any limitation on the amount or type of damages,
compensation or benefits payable by or for the Contractor
under workers' compensation acts, disability benefit acts
or other employee benefit acts; or (ii) by any statutory
bar or limitaiton in any worker's compensation or other
similar type of statute.

(j)    carry out all remodeling work in such a way as to interfere
as little as reasonably possible with the operation of Tenant
on the Demised Premises.

3.    Landlord warrants and represents that Tenant shall maintain its
rights to the future expansion area previously approved by the
Planning Board, including the existing parking spaces allocated for
Tenant's future expansion.

4.    Landlord warrants and represents that the mall shall be no greater
than 28 linear feet wide at the entrance of the mall to Tenant's
Premises.

5.    For the period of June 1, 1983 to May 31, 1988, the first paragraph
of Section 2.02 shall be amended to read as follows:

-7-

"a.   In the event that the net sales (as hereinafter defined) made by Tenant upon the Demised Premises during any lease year shall be in excess of Fifteen Million Dollars ($15,000,000), then Tenant shall pay to Landlord, as additional rental hereunder for said lease year, a sum equal to one (1) per cent of such excess (said amount referred to hereinafter as "additional rental").

"b.   Tenant shall pay as an advance to Landlord the sum of $2,000 per month, which amount shall be credited against the amount due hereunder as additional rental, if any.  Said advances shall be paid prior to the first business day of each month during the aforesaid period.  In the event that at the end of any lease year that begins or ends during the period between June 1, 1983 to May 31, 1988, the sum of the monthly advances paid during said year as additional rental exceeds the total amount due as additional rental in accordance with 2.02 (a) above,  Landlord shall promptly refund such excess to Tenant, together with the interest thereon, calculated at the average prime rate established by Citibank, N. A. during the last month of the year in question.

"c.   The term 'net sales' as used herein is hereby defined to mean the gross sales made upon the Demised Premises by Tenant plus the gross sales, if any, made upon the Demised Premises by Tenant's departmental sublessees, concessionaires and licensees occupying space upon the Demised Premises, but deducting or excluding therefrom, as the case may be, the following:

     (1)  Sales of departments or divisions not located upon the Demised Premises;

(2)  The amount of all sales, use, excise retailers'
occupation or other similar taxes imposed in a specific
amount, or percentage upon, or determined by, the amount
of retail sales made upon the Demised Premises;

(3)  Returns and allowances, as such terms are known
and used by Tenant in the preparation of Tenant's profit
and loss statements;

(4)  Delivery, installation and service charges including
any and all service charges for work performed off the
Demised Premises;

(5)  Amounts in excess of Tenant's (or of its sublessees',
concessionaires' and licensees') cash sales price charged on
sales made on credit or under a time payment plan;

(6)  Sales of merchandise ordered through the use of
Tenant's mail order catalogs or filled through Tenant's
catalog order channels, regardless of the place of order,
payment or delivery;

(7)  Policies of insurance sold on the Demised Premises
and premiums collected on policies of insurance;

(8)  Sales off the Demised Premises of encyclopedias
and other educational books sold in sets;

(9)  Sales made through the Commercial and Industrial
Sales Department of Tenant.

"d. Within sixty (60) days after the end of each lease year,
Tenant shall furnish to Landlord a statement certified by
an officer of Tenant showing the net sales (as hereinbefore
defined) made by Tenant upon the Demised Premises during
such preceding lease year, and the additional rental, if
any, payable by Tenant to Landlord for such lease year.
In addition, Tenant shall furnish Landlord with a statement
of Tenant's net sales (as above defined) for Tenant's next
preceding fiscal year prepared by Tenant's certified public
accountants.

"e.  Unless Landlord shall, within thirty (30) days after receipt
of any such statement certified by Tenant's officer, notify
Tenant to the contrary, such statement shall be deemed to
have been accepted by the Landlord as correct.  In the
event that Landlord shall notify Tenant of Landlord's dis-
satisfaction with such statement within the aforementioned
period, then Tenant shall permit a reputable firm of certified
public accountants doing business in the United States and
Puerto Rico, which shall be mutually satisfactory to, and
approved in writing by, Landlord and Tenant, to make and
independent audit of Tenant's net sales (as hereinbefore
defined) for the period covered by said statement.  Such
independent audit shall be at Landlord's expense and the
findings of such audit shall be binding upon both parties
and conclusive.

"f.  Tenant makes no representation or warranty as to the sales
which it expects to make upon the Demised Premises and
Landlord agrees to hold in confidence all sales figures
and other information with respect to Tenant's business
which Landlord may obtain from Tenant or from any audit
of Tenant's books and records, except that Landlord may
submit all of said information to the holder or holders
of mortgages upon Landlord's interest in the Demised
Premises, who shall also receive same in confidence."

On June 1, 1988, the aforesaid modification shall cease to have
any force and effect and the first paragraph of Section 2.02 shall
read as originally drafted.

6.  Section 5.01 of the Lease Agreement shall be modified by the
addition of paragraph (e), as follows:

"(e)  Any section herein to the contrary notwithstanding, Tenant
shall have the right to remodel and add such additional
offices on the second level of Tenant's store as Tenant
may deem necessary, for its own use.  In the event that
such offices are added, Tenant's office employees will
use only the parking located at the rear of the Tenant's
store."

7.  Section 12.01 of the Lease Agreement, as modified be amendment
dated July 30, 1971, shall be modified to read as follows:

"A.  Tenant shall pay to Landlord as the exterior maintenance
charge a percentage of the exterior maintenance cost
(as defined below), which percentage shall be calculated
using the following formula:  Tenant's gross floor area
less basement parking area, divided by the gross leasable
area (including Tenant's gross area) of the Shopping Center.
The term 'exterior maintenance cost' shall include only:
cost of insuring, repaving or otherwise maintaining, policing,
securing, landscaping and lighting the exterior common areas
plus overhead limited to 6% of such costs.  The term 'exterior
common areas' shall mean only the parking areas, landscaped
areas, roadways, service areas, sidewalks and entrances
in the exterior of the Shopping Center.
Tenant's gross floor area, less basement parking area,
is 193,500 square feet and the gross leasable area of
the Shopping Center is 329,327 square feet, on the date
hereof, before expansion.

"B.  In addition to the payment of the aforesaid exterior
maintenance charge, Tenant shall also pay as a mall
operating charge a percentage of the operating costs
of the mall, which percentage shall be calculated in
accordance with the following formula:  The frontage
of Tenant's store onto the mall, measured in linear
feet, divided by total frontage of all leasable areas

onto the mall; provided, however, that in no event shall
Tenant be required to pay as a mall operating charge an
amount that exceeds 4% of the operating costs of the mall;
and provided, further, that in no event shall Tenant be
required to pay as a mall operating charge (including any
management or administrative expenses) an amount in excess
of $5,000 per year, such limit adjusted every five years
according to the CPI as published by the Department of
Labor of the Commonwealth of Puerto Rico.  The term 'operating
costs of the mall' shall include only the following expenses:
insurance, electricity, water, air conditioning repairs,
labor and materials used in cleaning, maintaining and making
repairs to the enclosed mall, and such management and administra-
tive costs as do not exceed 6% of the total amount of the
operating costs of the mall.  The term 'operating costs of
the mall' shall also include depreciation of ventilation equipment
installed or used in the mall area only.  For purposes
of cleaning, maintenance, and repairs, the term 'mall'
shall include:  mall flooring, ceiling, benches, planters,
plants, illumination (including emergency lights) and
ventilation equipment.

"C.  The aforesaid exterior maintenance and mall operating charge
shall be payable monthly as billed by the Landlord.  Within
sixty (60) days of the end of each lease year, Landlord
shall furnish Tenant a certified statement showing the
mall operating costs and exterior maintenance costs, as
defined above, for said lease year.  Payments made by
Tenant during said years shall be adjusted in accordance
with said statement and Tenant may credit any amounts due
to it as a result of said adjustment against any other
payments that it may owe to Landlord.  Tenant may notify
Landlord of Tenant's dissatisfaction with such statement,
in which case Landlord shall allow a certified public

-12-

accountant mutually acceptable to Tenant and Landlord to make an independent audit of the aforesaid costs, at Tenant's expense. The findings of such audit shall be binding upon both parties. In the event that the Landlord fails to maintain the exterior common areas in a manner reasonably satisfactory to Tenant, then Tenant shall be entitled to proceed in accordance with the provisions established in Section 14.03 of the Lease Agreement dated September 6, 1965."

8.  Section 12.02 of the Lease Agreement, as modified by amendment dated July 30, 1971, shall be modified to read as follows:
"In the event that Tenant expands its store or that Landlord enlarges the Shopping Center, Tenant's portion of the exterior maintenance charge and the mall operating charge shall be recalculated using the formulas set forth in Section 12.01 (A) and (B) above. Any change in Tenant's percentage of the aforesaid charges resulting from said recalculation shall be applied only to that portion of the lease year during which said expansion or enlargement was completed."

Tenant's final approval of Landlord's Santa Rosa Shopping Center remodeling is subject to Landlord submitting to Tenant the final detailed architechtural drawings for Tenant's approval. Tenant reserves the right of refusal of this contract until the final detailed architechtural drawings are given to Tenant for Tenant's approval.

All other terms and conditions of the Lease Agreement not specifically modified herein shall remain in full force and effect.

PLAZA LAS CUMBRES, INC.          SEARS, ROEBUCK DE PUERTO RICO, INC.

_____        _____
André V. Nikitine                Donald S. Jones

# EXHIBIT II
FILED UNDER
PENDING
MOTION TO SEAL

# ACORD® CERTIFICATE OF PROPERTY INSURANCE

DATE (MM/DD/YYYY) ▇

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: |
|---|---|
| ▇ | PHONE (A/C, No. Ext): ▇     FAX (A/C, No.): ▇ |
| | E-MAIL ADDRESS: |
| | PRODUCER CUSTOMER ID #: ▇ |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED | INSURER A: ▇ | ▇ |
| ▇ | INSURER B: | |
| | INSURER C: | |
| | ▇ | |
| | ▇ | |

## COVERAGES        CERTIFICATE NUMBER: ▇        REVISION NUMBER:

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE: Sears Store No. 1915 - Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X | PROPERTY | ▇ | ▇ | | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | | | | | X | EXTRA EXPENSE | ▇ |
| | | CONTENTS | | | | | RENTAL VALUE | |
| | SPECIAL | | | | | | BLANKET BUILDING | |
| | X EARTHQUAKE | | | | | | BLANKET PERS PROP | |
| | X WIND | | | | | X | BLANKET BLDG & PP | ▇ |
| | X FLOOD | | | | | X | Earthquake - Aggrega | ▇ |
| | X ALL RISK-Subject to Exclusions | | | | | X | Flood - Aggregate | ▇ |
| | Blkt B&PP Ded | | | | | | | |
| | INLAND MARINE | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | | | | | | |
| | NAMED PERILS | | POLICY NUMBER | | | | | |
| | CRIME | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

▇

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CCM Puerto Rico, A CCM Group Company<br>Santa Rosa Mall, LLC, 3 Pals Caribe, LLC<br>Commercial Centers Management Realty<br>S. en C.<br>Carr. #2, Km. 7.1<br>Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br><br>*Aon Risk Services Central, Inc.* |

Holder Identifier : A

570075074276

CERTIFICATE NUMBER:

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)        The ACORD name and logo are registered marks of ACORD

**ACORD®**

AGENCY CUSTOMER ID: ▓▓▓▓▓▓▓▓
LOC #:

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| ▓▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓▓ |
| **POLICY NUMBER**<br>See Certificate Number: ▓▓▓▓▓▓ | |
| **CARRIER**<br>See Certificate Number: ▓▓▓▓▓▓ | **NAIC CODE** | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

**FORM NUMBER:**  ACORD 24    **FORM TITLE:**  Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

**ADDITIONAL POLICIES**   If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| ▓ | PROPERTY | ▓▓▓▓ | ▓▓▓ | ▓▓▓ | ▓▓▓▓▓▓ | ▓▓▓ |

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

**ACORD**®

## ADDITIONAL  REMARKS SCHEDULE

Page _ of _

AGENCY CUSTOMER ID:
LOC #:

**AGENCY**

**POLICY NUMBER**
See Certificate Number:

**CARRIER**                                    **NAIC CODE**
See Certificate Number:

**NAMED INSURED**

**EFFECTIVE DATE:**

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**
   **FORM NUMBER:**  ACORD 24    **FORM TITLE:**  Certificate of Property Insurance

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

SPECIAL CONDITIONS / OTHER COVERAGES

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

**ACORD®**

# ADDITIONAL  REMARKS SCHEDULE

Page _ of _

**AGENCY**

**NAMED INSURED**

**POLICY NUMBER**
See Certificate Number:

**CARRIER**
See Certificate Number:

**NAIC CODE**

**EFFECTIVE DATE:**

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

   **FORM NUMBER:**  ACORD 24    **FORM TITLE:**  Certificate of Property Insurance

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# ACORD® CERTIFICATE OF PROPERTY INSURANCE

DATE (MM/DD/YYYY) ▮

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| ▮ | PHONE (A/C, No, Ext): ▮ | FAX (A/C, No.): ▮ | |
| | E-MAIL ADDRESS: | | |
| | PRODUCER CUSTOMER ID #: ▮ | | |

Holder Identifier : A

| INSURED | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| ▮ | INSURER A: ▮ | ▮ |
| | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

| COVERAGES | CERTIFICATE NUMBER: ▮ | REVISION NUMBER: |
|---|---|---|

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE: Sears Store No. 1915 – Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

570075074205

CERTIFICATE NUMBER: ▮

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X | **PROPERTY** | ▮ | ▮ | | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | | | | | X | EXTRA EXPENSE | ▮ |
| | SPECIAL | CONTENTS | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | ▮ |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggrega | ▮ |
| | Blkt B&PP Ded | | | | | X | Flood - Aggregate | ▮ |
| | **INLAND MARINE** | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | | | | | | |
| | NAMED PERILS | | POLICY NUMBER | | | | | |
| | **CRIME** | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | **BOILER & MACHINERY / EQUIPMENT BREAKDOWN** | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

▮

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CCM Puerto Rico, A CCM Group Company<br>Santa Rosa Mall, LLC, 3 Pals Caribe, LLC<br>Commercial Centers Management Realty<br>S. en C.<br>Carr. #2, Km. 7.1<br>Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br><br>*Aon Risk Services Central, Inc.* |

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)     The ACORD name and logo are registered marks of ACORD

**ACORD®**

AGENCY CUSTOMER ID: ▇▇▇▇▇▇▇

LOC #:

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
|---|---|---|
| ▇▇▇▇▇▇▇ | | ▇▇▇▇▇▇▇ |

**POLICY NUMBER**
See Certificate Number: ▇▇▇▇▇▇▇

| CARRIER | NAIC CODE |
|---|---|
| See Certificate Number: ▇▇▇▇▇▇▇ | |

**EFFECTIVE DATE:**

## ADDITIONAL REMARKS

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:**  ACORD 24   **FORM TITLE:**   Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

**ADDITIONAL POLICIES** — If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| ▇ | PROPERTY | ▇▇▇▇ | ▇▇▇▇ | ▇▇▇▇ | ▇▇▇▇▇ | ▇▇▇▇ |

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

ACORD®

# ADDITIONAL  REMARKS SCHEDULE

Page _ of _

AGENCY CUSTOMER ID: ███████
LOC #:

| AGENCY | NAMED INSURED |
|---|---|
| ██████ | ██████ |
| **POLICY NUMBER** | |
| See Certificate Number: ██████ | |

| CARRIER | NAIC CODE | EFFECTIVE DATE: |
|---|---|---|
| See Certificate Number: ██████ | | |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

FORM NUMBER: ACORD 24    FORM TITLE: Certificate of Property Insurance

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

**ACORD**®

# ADDITIONAL  REMARKS SCHEDULE

Page _ of _

**AGENCY**

▮▮▮▮▮▮▮▮

**NAMED INSURED**

▮▮▮▮▮▮▮▮

**POLICY NUMBER**

See Certificate Number: ▮▮▮▮▮

**CARRIER**

See Certificate Number: ▮▮▮▮▮

**NAIC CODE**

**EFFECTIVE DATE:**

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

**FORM NUMBER:**  ACORD 24    **FORM TITLE:**   Certificate of Property Insurance



© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT III
FILED UNDER
PENDING
MOTION TO SEAL

# Contract of Insurance

**Policy Number:**   PTNAM1701557

**Period:**   1st June 2017 to 1st June 2018

**Aon UK Limited**
Registered Office  |  The Aon Centre  |  The Leadenhall Building  |  122 Leadenhall Street  |  London  |  EC3V 4AN
Registered in England & Wales No. 210725  |  VAT Registration No. 480 8401 48
Aon UK Limited is authorised and regulated by the Financial Conduct Authority





















































































































# EXHIBIT IV

# ACORD®  CERTIFICATE OF PROPERTY INSURANCE

DATE (MM/DD/YYYY)
10/25/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Aon Risk Services Central, Inc.<br>Chicago IL Office<br>200 East Randolph<br>Chicago IL 60601 USA | PHONE (A/C. No. Ext): (866) 283-7122 | | FAX (A/C. No.): (800) 363-0105 |
| | E-MAIL ADDRESS: | | |
| | PRODUCER CUSTOMER ID #: 570000034159 | | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED | INSURER A: AIG Europe Limited | AA1112084 |
| Sears Holdings Corporation | INSURER B: | |
| dba Sears, Roebuck and Co.<br>Attn: Risk Management E3-219A<br>3333 Beverly Road<br>Hoffman Estates IL 60179 USA | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

## COVERAGES    CERTIFICATE NUMBER: 570069032839    REVISION NUMBER:

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE:  Sears Store No. 1915 - Santa Rosa Mall, Bayamón, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X PROPERTY | | PTNAM1701557 | 08/01/2017 | 08/01/2018 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | | | | | X | EXTRA EXPENSE | $50,000,000 |
| | | CONTENTS | | | | | RENTAL VALUE | |
| | SPECIAL | | | | | | BLANKET BUILDING | |
| | X EARTHQUAKE | | | | | | BLANKET PERS PROP | |
| | X WIND | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X FLOOD | | | | | X | Earthquake - Aggrega | $50,000,000 |
| | X ALL RISK-subject to Exclusions | | | | | X | Flood - Aggregate | $50,000,000 |
| | EH BAPP Ded | | | | | | | |
| | INLAND MARINE | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | POLICY NUMBER | | | | | |
| | NAMED PERILS | | | | | | | |
| | CRIME | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; Waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CCM Puerto Rico, A CCM Group Company<br>Santa Rosa Mall, LLC, 3 Pals Caribe, LLC<br>Commercial Centers Management Realty<br>S. en C,<br>Carr. #2, Km. 7.1<br>Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br><br>*Aon Risk Services Central Inc.* |

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2015/03)    The ACORD name and logo are registered marks of ACORD

**ACORD®**

## ADDITIONAL REMARKS SCHEDULE

AGENCY CUSTOMER ID: 570000034159

LOC #:

Page _ of _

| AGENCY | | | NAMED INSURED | |
|---|---|---|---|---|
| Aon Risk Services Central, Inc. | | | Sears Holdings Corporation | |
| POLICY NUMBER | | | | |
| See Certificate Number: 570069032839 | | | | |
| CARRIER | | NAIC CODE | | |
| See Certificate Number: 570069032839 | | | EFFECTIVE DATE: | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,
FORM NUMBER: ACORD 24    FORM TITLE: Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

**ADDITIONAL POLICIES** If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | PROPERTY | | | | | |
| A | | PTNAN1701557 | 06/01/2017 | 06/01/2018 | Boiler & Machinery | Included |

ACORD 101 (2008/01)    © 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMI    :    570000034159

LOC #:

*ACORD*®

## ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
|---|---|---|
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |

| POLICY NUMBER | | |
|---|---|---|
| See Certificate Number:    570069032839 | | |

| CARRIER | NAIC CODE | EFFECTIVE DATE: |
|---|---|---|
| See Certificate Number:    570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: ACORD 24    FORM TITLE: Certificate of Property Insurance

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

SPECIAL CONDITIONS / OTHER COVERAGES

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's
further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers
Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy
with respect to the property located at the above referenced Location.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: 570000034159

LOC #:

# ACORD®
## ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
|---|---|---|
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |
| **POLICY NUMBER** | | |
| See Certificate Number:    570069032839 | | |
| **CARRIER** | NAIC CODE | **EFFECTIVE DATE:** |
| See Certificate Number:    570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,
FORM NUMBER:  ACORD 24    FORM TITLE:  Certificate of Property Insurance

Property Program 6/1/17 - 6/1/18

$50,000,000 All Risk Policy Numbers:

Primary Property
ACE American Insurance Company - GPAD3739824A010 - 12% of $50M
Zurich American Insurance Company - XPP926068010 - 10% of $50M
Lloyds of London - Syndi 3000 MKL (Slip Leader) - PTNAM1701122 - 3% of $50M
*Novae Bermuda Underwriting Ltd - XR04017ADFRT - 3%of $50M
*Allied World Assurance Company, Ltd. - P003839014 - 18.33% of $50M
Lloyds of London - Synd 318 MSP (Slip Leader) - PTNAM1701562 - 7.5% of $50M
Aspen Specialty Insurance Company - PXAA52817 - 1.67% of $50M
Westport Insurance Corporation - NAP045210505 - 8% of $50M
HDI Global Insurance Company - XPD1488600 - 2.5% of $50M

Starr Companies - 5% of $50M
Starr Surplus Lines Insurance Company - SLSTPTY10966117
Chubb Custom Insurance Company - 4468121406
General Security Indemnity Company of Arizona (GSINDA) - T0234451703681
Executive Risk Specialty Insurance Company - 4468121506

Excess Property
Endurance Worldwide Insurance Ltd. (Slip Leader) - PTNAM1701564 - 2% of $50M
Lloyds of London - Synd 1414 ASC (Slip Leader) - PTNAM1701559 - 8% of $50M
Tokio Marine America Insurance Company - LCP648016706 - 4% of $50M
Liberty Mutual Fire Insurance Company - M32L9L426774037 - 4% of $50M
Ironshore Specialty Insurance Company - 000423108 - 2.5% of $50M
AIG Europe Ltd. - PTNAM1701557 - 8.5% of $50M

As indicated by ( * ), Aon Risk Solutions (U.S) is authorized to generate and distribute certificates in an
administrative capacity as evidence of insurance where required by clients of the Insured."

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# EXHIBIT V

# SEARS HOLDINGS CORPORATION

October 26, 2017

**CERTIFIED MAIL/
RETURN RECEIPT REQUESTED**
# 7016 2070 0000 0797 8220

Commercial Centers Management
PO Box 362983
San Juan, PR 00936

Via Email: balvarez@ccmpr.com

Re:      Sears 1915
         Location: Bayamon, PR
         Date of Loss: 9/21/2017
         Type of Loss: Hurricane Maria / Wind

Dear Ms. Alvarez,

This letter is in response to your letter dated October 23, 2017 (copy enclosed).

As you are aware, the Sears building sustained extensive damage from Hurricane Maria. Northstar
Recovery Services was contacted for emergency cleanup and dry-out to mitigate building damages and
protect the building from further damage. Sears is currently in the process of obtaining permanent
building repair proposals. Sears intends to repair the building on an expedited basis as material and labor
are available. Nevertheless, it may take months for repairs to be completed and the store to open.

We agree the Lease Agreement dated September 6th, 1965, requires the Tenant to repair the building for
damage or destruction by fire or other insured casualty. Sears has an insurance claim for this loss but it
will take some time for insurance proceeds to be received to this loss. Please let us know what account the
Landlord would like the insurance proceeds to be deposited to for building repair. Once the insurance
payment is received arrangements will be made for it to be deposited with an agreed bank.

Sears District Facility Manager, Luis Almanza, is the point of contact to discuss on-site permanent
building repairs, inspection and provide access to the premises. His cell phone number is (305) 725-0523

Please let us know if there is anything further at this time. As information on the cost of repairs becomes
available we will advise further.

Sincerely,

Michael Lodi
Property Analyst – Risk Management
Sears Holdings Corporation
3333 Beverly Road E3-272A; Hoffman Estates, IL 60179
Office: 847-286-2603 Email:Michael.Lodi@searshc.com

| STORE # | TYPE | LOCATION | Project MGR | Status 5/4/2018 |
|---------|------|----------|-------------|-----------------|
| 1915 | FLS | BAYAMON, PR | BARRY BRUNSON 817 689 3108 847 254 1915 | No Change Permit Plans have been processed. District supplied, Sales Support and Office plan, complete and transmitted waiting on Planning for revised Merchandise and Sales Support Plans. Store Hazardous Materials Abatement starts 4/16/2018. Store will be abated in Quadrants per floor starting on the 2nd Floor Stock Area. Please be aware of Hazardous Materials Warning signs that will be posted in the building in the areas work is being completed. Exterior Design for Building upper level Design and Repairs request have been sent to Architect for Research and Implementation into the Permit Drawings. Sandra Pechan sent a Request for Information to the District Team for Licensed Business, Cash wrap Placement and Sale Support Information. This information is needed to send correct plans to the Architect. |

| Status | Status |
|---|---|
| 5/11/2018 | 5/18/2018 |

No Change.

No Change Permit Plans have been processed. District supplied, Sales Support and Office plan, complete and Transmitted waiting on Planning for revised Merchandise and Sales Support Plans. Store Hazardous Materials Abatement starts 4/26/2018. Store will be abated in Quadrants per floor starting on the 2nd Floor Stock Area. Please be aware of Hazardous Materials Warning signs that will be posted in the building in the areas work is being completed. Exterior Design for Building upper level Design and Repairs request have been sent to Architect for Research and Implementation into the Permit Drawings. Sandra Pechan sent a Request for Information to the District Team for Licensed Business, Cash wrap Placement and Sale Support information. This Information is needed to send correct plans to the Architect.

# EXHIBIT VI

FILED UNDER

PENDING

MOTION TO SEAL

**Summary of Statement of Values and 5% TIV Deductible**
Sears Holdings Corporation
Hurricane Maria - Various Locations
Date of Loss - September 20, 2017

5% TIV
Page 1 of 1

| Store Number | Sears/ Kmart | City | Square Footage | Leased or Owned | Lease Provided | Insurance Responsibility | From SOV Building | TI&B | FF&E | Total Insurable Value | 5% TIV Building | TI&B | FF&E | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1915 | Sears | Bayamon | 195,774 | Own w/ Ground Lease | | | | | | | | | | |

MDD



Detail of Repair Costs - Sears #1915
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

Schedule 1915
Page 1 of 7

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim | | Adj. Group % Allowed to Date | Adjustment Group | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Estimate | Documented | | Allowed | In Question | Disallowed | |

Detail of Repair Costs - Sears #1915

Schedule 1915
Page 2 of 7

Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC



| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim | | Adj. Group % Allowed to Date | Adjustment Group | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Estimate | Documented | | Allowed | In Question | Disallowed | |

Detail of Repair Costs - Sears #1915
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

Schedule 1915
Page 3 of 7



Detail of Repair Costs - Sears #1915
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss – September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Documented | Adj. Group % Allowed to Date | Adjustment Group Allowed | In Question | Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |





Schedule 1915
Page 5 of 7

Detail of Repair Costs - Sears #1915
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC



| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Claim Documented | Adj. Group % Allowed to Date | Adjustment Group Allowed | Adjustment Group In Question | Adjustment Group Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Detail of Repair Costs - Sears #1915
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

Schedule 1915
Page 6 of 7

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Documented | Adj. Group % Allowed to Date | Adjustment Group Allowed | In Question | Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |



MDD FORENSIC ACCOUNTANTS



Schedule 1915
Page 7 of 7

Detail of Repair Costs - Sears #1915
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

# EXHIBIT VII



**CCM**
**PUERTO RICO**
*A CCM Group Company*
PO Box 362983, San Juan, PR  00936-2983
Tel. 787-622-9600 Fax 787-277-9601

October 30, 2017

**Via email** rolando.ortega@aig.com

AIG Insurance Company Puerto Rico
Atn. Mr. Rolando Ortega
250 Muñoz Rivera, suite 500
San Juan, PR 00918

      **Re: Insurance policy number PTNAM1701557 for the Sears store located at
Santa Rosa Mall, Bayamón, Puerto Rico**

Dear Mr. Ortega:

      The above referenced property insurance policy covers the Sears store located at
Santa Rosa Mall, and both Santa Rosa Mall, LLC and Commercial Centers Management
Realty, S en C ("CCM") are Additional Insureds under the policy.  For ease of reference,
I enclose a copy of the Certificate of Property Insurance.

      Please be advised that under Section 6.03 of the Lease Agreement, all net sums
recovered for loss or damage under any applicable insurance policy must be deposited
in a special account in the name of Landlord to be applied to the cost of rebuilding the
premises. Under the existing Lease Agreement, Sears Holding Management Corporation
("Sears") is required to promptly and expeditiously repair the damage caused and/or
rebuild the premises.  Sears is aware and has agreed to fully comply with the provisions
of the Lease herein discussed.

      CCM formally requests to be informed as to the filing of any claim under the policy
as well as the processing of the same, and that any insurance proceeds be deposited as
required by the Lease Agreement.

      Please contact the undersigned at balvarez@ccmpr.com to further discuss this
matter and coordinate necessary arrangements regarding the foregoing.

                  Cordially,

                  Betsy Alvarez
                  Senior VP of Operations and Finance

c: claims.pr@aig.com

# ACORD®  CERTIFICATE OF PROPERTY INSURANCE

**DATE (MM/DD/YYYY)** 10/25/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.  THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Aon Risk Services Central, Inc.<br>Chicago IL Office<br>200 East Randolph<br>Chicago IL 60601 USA | PHONE (A/C, No. Ext): (866) 283-7122 | | FAX (A/C, No.): (800) 363-0105 |
| | E-MAIL ADDRESS: | | |
| | PRODUCER CUSTOMER ID #: 570000034159 | | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED | INSURER A: AIG Europe Limited | AA112084 |
| Sears Holdings Corporation | INSURER B: | |
| dba Sears, Roebuck and Co.<br>Attn: Risk Management E3-219A<br>3333 Beverly Road<br>Hoffman Estates IL 60179 USA | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

**COVERAGES**   **CERTIFICATE NUMBER:** 570069032839   **REVISION NUMBER:**

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE:  Sears Store No. 1915 - Santa Rosa Mall, Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE  LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR  MAY PERTAIN, THE  INSURANCE  AFFORDED BY THE POLICIES  DESCRIBED HEREIN IS  SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X PROPERTY | | PTNA41701557 | 06/01/2017 | 05/01/2018 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | CONTENTS | | | | X | EXTRA EXPENSE | $50,000,000 |
| | SPECIAL | | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggrega | $50,000,000 |
| | Blk B&PP Ded | | | | | X | Flood - Aggregate | $50,000,000 |
| | INLAND MARINE | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | | | | | | |
| | NAMED PERILS | | POLICY NUMBER | | | | | |
| | CRIME | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CCM Puerto Rico, A CCM Group Company<br>Santa Rosa Mall, LLC, 3 Pals Caribe, LLC<br>Commercial Centers Management Realty<br>S. en C.<br>Carr. #2, Km. 7.1<br>Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Aon Risk Services Central Inc.* |

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2015/03)   The ACORD name and logo are registered marks of ACORD

Holder Identifier : 1915

CERTIFICATE NUMBER: 570069032839

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

AGENCY CUSTOMER ID: 570000034159
LOC #:
Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

| POLICY NUMBER |
|---|
| See Certificate Number: 570069032839 |

| CARRIER | NAIC CODE | EFFECTIVE DATE: |
|---|---|---|
| See Certificate Number: 570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,
FORM NUMBER: ACORD 24   FORM TITLE: Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

**ADDITIONAL POLICIES** If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| A | PROPERTY | PTWWI1701557 | 06/01/2017 | 06/01/2018 | Boiler & Machinery | Included |

ACORD 101 (2008/01)
© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMI    :    570000034159
LOC #:

*ACORD*

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
|---|---|---|
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |
| **POLICY NUMBER** | | |
| See Certificate Number:    570069032839 | | |
| **CARRIER** | **NAIC CODE** | **EFFECTIVE DATE:** |
| See Certificate Number:    570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:  ACORD 24    FORM TITLE:  Certificate of Property Insurance

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

SPECIAL CONDITIONS / OTHER COVERAGES

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location.

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

**ACORD**

AGENCY CUSTOMER ID: 570000034259

LOC #:

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
|---|---|---|
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |
| POLICY NUMBER | | |
| See Certificate Number:   570069032839 | | |
| CARRIER | NAIC CODE | EFFECTIVE DATE: |
| See Certificate Number:   570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,
FORM NUMBER: ACORD 24   FORM TITLE: Certificate of Property Insurance

Property Program 6/1/17 – 6/1/18

$50,000,000 All Risk Policy Numbers:

Primary Property
ACE American Insurance Company – GPAD3739824A010 – 12% of $50M
Zurich American Insurance Company – XPP926068010 – 10% of $50M
Lloyds of London – Syndi 3000 MKL (Slip Leader) – PTNAM1701122 – 3% of $50M
*Novae Bermuda Underwriting Ltd – XR04017ADFRT – 3%of $50M
*Allied World Assurance company, Ltd. – P003839014 – 18.33% of $50M
Lloyds of London – Synd 318 MSP (Slip Leader) – PTNAM1701562 – 7.5% of $50M
Aspen Specialty Insurance Company – PXAAS2817 – 1.67% of $50M
Westport Insurance Corporation – NAP045210505 – 8% of $50M
HDI Global Insurance Company – XPD1488600 – 2.5% of $50M

Starr Companies – 5% of $50M
Starr Surplus Lines Insurance Company – SLSTPTY10966117
Chubb Custom Insurance Company – 4468121406
General Security Indemnity Company of Arizona (GSINDA) – TO234451703681
Executive Risk Specialty Insurance company – 4468121506

Excess Property
Endurance Worldwide Insurance Ltd. (Slip Leader) – PTNAM1701564 – 2% of $50M
Lloyds of London – Synd 1414 ASC (Slip Leader)   PTNAM1701559 – 8% of $50M
Tokio Marine America Insurance Company – LCP648016706 – 4% of $50M
Liberty Mutual Fire Insurance Company – MJZL9L426/74037   4% of $50M
Ironshore Specialty Insurance Company – 000423108 – 2.5% of $50M
AIG Europe Ltd. – PTNAM1701557 – 8.5% of $50M

As indicated by ( * ), Aon Risk Solutions (U.S) is authorized to generate and distribute certificates in an administrative capacity as evidence of insurance where required by clients of the Insured."

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT VIII

# FILED UNDER

# PENDING

# MOTION TO SEAL



**AGREEMENT**







14.









The page is a redacted document. Most content is blacked out. Only the header is readable.







[redacted]:

[redacted]: [redacted]

[redacted]: [redacted]

[redacted]: [redacted]

[redacted]

[redacted] ______________________

[redacted]

[redacted] [redacted]

The page is mostly redacted with black bars.



















# EXHIBIT IX

<u>Schedule 2.1(q)</u>

**Proceeds Properties**

**INSURED: Sears Holdings
Corporation**
**POLICY TERM: 6/1/17 – 6/1/18**
**DOL: 9-20-2017**
**Loss: Hurricane Maria, CAT 1745**
**VERICLAIM FILE NO.:**



| Market | Claim Number | Market % |
|--------|-------------|----------|
| **Total** | | **100.00%** |