**Hearing Date and Time: June 27, 2019 at 2:00 p.m. (Eastern Time)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEARS HOLDINGS CORPORATION, et al.,[1] | ) | Case No. 18-23538 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**SECOND DECLARATION OF SAMUEL LEVANDER IN SUPPORT OF TRANSFORM HOLDCO LLC'S REPLY TO THE BRUCE TRUSTS' (I) DESIGNATABLE CONTRACT ASSUMPTION AND ASSIGNMENT OBJECTION, AND (II) RESERVATION OF RIGHTS**

I, Samuel Levander, declare under penalty of perjury as follows:

1.      I am an attorney duly admitted to practice before this Court, and I am an associate of the law firm Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), counsel for Transform Holdco LLC ("Transform").  I respectfully submit this declaration ("Levander

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Declaration") in connection with *Transform Holdco LLC's Reply to the Bruce Trusts' (I)
Designatable Contract Assumption and Assignment Objection, and (II) Reservation of Rights*.

2.      Attached hereto as <u>Exhibit W</u> is a true and correct copy of the Transcript of the
Deposition of Paul Bruce, taken on June 6, 2019 (the "<u>Bruce Deposition</u>").

3.      Attached hereto as <u>Exhibit X</u> is a true and correct copy of a letter from William
R. Delz of J&W Management to John F. Walsh of Kmart Corporation, dated August 17, 1993,
attaching a letter from Paul Bruce to William R. Delz, dated August 16, 1993.


Executed on June 13, 2019 in New York, New York.




                                        Respectfully submitted,



                                        _____
                                        Samuel Levander








2

# Exhibit W

*In re:  SEARS HOLDINGS CORPORATION, ET AL.*

---

*PAUL BRUCE*
*June 6, 2019*

---



*Original File 274148.txt*
*Min-U-Script® with Word Index*

18-23538-shl   Doc 4232   Filed 06/13/19   Entered 06/13/19 22:59:52   Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL.   Pg 5 of 71

PAUL BRUCE
June 6, 2019

Page 1

```
 1   UNITED STATES BANKRUPTCY COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------------X
     In re:  SEARS HOLDINGS CORPORATION, ET AL.
 4        -vs.-
 5                      Debtors.
 6   Case No.: 18-23538 (RDD)
 7   ------------------------------------------------X
 8                      2112 Pennsylvania Avenue, NW
 9                      Washington, D.C.
10                      June 6, 2019
                        9:27 a.m.
11
12             Deposition of PAUL BRUCE, pursuant
13   to Notice, before Matthew Goldstein, RPR, Notary
14   Public in and for the District of Columbia.
15
16
17
18
19
20
21
22
23        ELLEN GRAUER COURT REPORTING CO., LLC
24          126 East 56th Street, Fifth Floor
               New York, New York 10022
                   212-750-6434
25                  REF: 274148
```

Page 2

```
 1   A P P E A R A N C E S :
 2
 3   CLEARY GOTTLIEB STEEN & HAMILTON, LLP
 4   ON BEHALF OF TRANSFORM HOLDCO LLC:
 5        One Liberty Plaza
 6        New York, New York  10006
 7   BY:  SAMUEL LEVANDER, ESQUIRE
 8        KELLY LESTER, ESQUIRE
 9        212.225.2000
10
11
12   TROUTMAN SANDERS, LLP
13   ON BEHALF OF THE TRUSTS:
14        875 Third Avenue
15        New York, New York 10022
16   BY:  BRETT D. GOODMAN, ESQUIRE
17        212.704.6170
18
19
20
21
22
23
24
25
```

Page 3

```
 1   ------------------ I N D E X --------------------
 2   WITNESS            EXAMINATION BY          PAGE
 3   PAUL BRUCE         MR. LEVANDER          4, 160
 4                      MR. GOODMAN             153
 5
 6
 7   --------------- E X H I B I T S ----------------
 8   BRUCE       DESCRIPTION              FOR I.D.
 9   Exhibit 1   Declaration of Paul Bruce        9
10               in Support of the Bruce
11               Trusts' (I) Designatable
12               Contract Assumption and
13               Assignment Objection, and
14               (II) Reservation of Rights
15   Exhibit 2   Kmart Lease                    102
16   Exhibit 3   Second Amendment to Lease      105
17   Exhibit 4   Ground Lease                   111
18   Exhibit 5   Letters                        130
19
20
21            (EXHIBITS TO BE PRODUCED)
22
23
24
25
```

Page 4

```
 1   P R O C E E D I N G S
 2   Whereupon,
 3      PAUL BRUCE,
 4   being first duly sworn or affirmed to testify to
 5   the truth, the whole truth, and nothing but the
 6   truth, was examined and testified as follows:
 7   EXAMINATION BY COUNSEL FOR TRANSFORM HOLDCO LLC
 8      BY MR. LEVANDER:
 9   Q.  Can you please state your name for the
10   record?
11   A.  Paul Bruce.
12   Q.  Have you ever been known by any other
13   name?
14   A.  Say that again.
15   Q.  Have you ever gone by any other name?
16   A.  No.
17   Q.  What is your current address?
18   A.  2402 Jackstay Terrace, J-A-C-K-S-T-A-Y,
19   Reston, Virginia 20191.
20   Q.  And how long have you been living at
21   that address?
22   A.  Since around 1978.
23   Q.  And before --
24   A.  I'm sorry, yeah.  1978.
25   Q.  Before 1978, where did you live?
```

Page 5

1  A.  On -- close.
2  Q.  Where?
3  A.  It was close.  I can't -- it was -- I
4    don't remember the address actually.
5  Q.  Also in Reston?
6  A.  Yes, it was about a mile away.
7  Q.  You understand today that you're under
8    an oath to tell the truth?
9  A.  Yes.
10  Q.  And that's the same oath as if you were
11    testifying in court.
12  A.  I didn't understand that, but it's
13    probably --
14  Q.  Is there any reason why you cannot give
15    truthful testimony today?
16  A.  Not that I'm aware of.
17  Q.  And since you're under oath, it's very
18    important that you let me know if there's a
19    question that you don't understand or if you'll
20    like me to speak up so you can give accurate
21    answers.
22  A.  Okay.
23  Q.  Great.
24      And also, since we have a court reporter
25    here, it's important that only one of us speak at

Page 6

1    a time.  So if you could just wait for me to
2    finish the question before you come in with the
3    answer.
4  A.  It's very important that one of us speak
5    at a time.
6  Q.  And also, any answers that you give, it
7    would be very helpful if they're verbal as opposed
8    to a nod or something that won't show up in the
9    transcript.
10  A.  No, understood.
11  Q.  Great.
12      Now, over the course of the day, your
13    counsel may object to certain questions that I
14    ask, but you should go ahead and answer those
15    questions unless your counsel instructs you not to
16    answer on the basis of attorney-client privilege.
17      Do you understand?
18  A.  I understand what you're saying.  And if
19    he objects, I might have him confirm that I should
20    answer anyway.
21  Q.  Okay.  But you should answer -- you
22    should answer the question despite the objection.
23      And as we discussed earlier, we can take
24    regular breaks throughout the day whenever you
25    need them.  Just let me know when you're ready for

Page 7

1    a break and we can take one.  The only caveat to
2    that is I would ask that you not do that when a
3    question is pending.  So if I've just asked you
4    the question, at least wait to answer the question
5    before asking to take a break.
6  A.  Okay.
7  Q.  Okay.  Throughout the day, I may refer
8    to the Steven Bruce Revocable Trust, the Cara
9    Bruce Irrevocable Trust and the Allison Bruce
10    Irrevocable Trust collectively as just the Bruce
11    Trusts.  Is that okay with you?
12  A.  That's fine.
13  Q.  And I'll understand if you say "Bruce
14    Trusts," that's what you mean as well.
15      And, similarly, if I refer to 1001
16    Patton Avenue or the Asheville property, can we
17    agree that that refers to the property at 1000
18    Patton Avenue in Asheville that's the subject of
19    this dispute?
20  A.  Right.  It would refer to the whole
21    center.  There's -- there's a center and it -- are
22    you referring to the whole center or just the
23    Kmart space?
24  Q.  I'm referring to the property as a
25    whole.

Page 8

1  A.  So you're referring to the entire
2    center?
3  Q.  So, right, the entire -- the entire
4    property that your family owns I'm referring to as
5    1001 Patton Avenue.
6  A.  Okay.
7  Q.  You submitted a declaration to the
8    bankruptcy court; correct?
9  A.  Yes.
10  Q.  And you signed that declaration?
11  A.  Yes.
12  Q.  You attached, I believe, 31 documents to
13    that declaration?
14  A.  Yes.
15  Q.  Have you -- did you review each of the
16    documents before you signed the declaration?
17  A.  I'm not -- what do you mean by "review"?
18  Q.  Did you read each of the 31 documents
19    that were submitted along with your declaration
20    before you signed that declaration and submitted
21    it to the bankruptcy court?
22  A.  Some more so than others.
23  Q.  Are there any documents that you did not
24    read?
25  A.  No.

Page 9

1  Q.  So you read every one of the 31
2  documents?
3  A.  I'm -- you need to ask the question so
4  it's more clear.  In other words, reading means
5  different things.  Sometimes you might skim a
6  document.  Sometimes you might read it carefully.
7  Q.  So are there particular documents that
8  you could identify that you only skimmed but did
9  not read in full?
10  A.  No.
11  Q.  Okay.  So are you familiar with the
12  contents of --
13  A.  Yes.
14  Q.  -- of each of the documents?
15  A.  Yes.
16  Q.  And that would include the 87-page
17  ground lease, for example?
18  A.  I'm familiar with that document, yes.
19     MR. LEVANDER: Okay.  Can we mark
20  Mr. Bruce's declaration as Exhibit 1.  I'll have
21  copies for you.
22     (Deposition Exhibit 1 was marked for
23  identification and attached to the transcript.)
24  BY MR. LEVANDER:
25  Q.  Mr. Bruce, do you recognize the document

Page 10

1  in front of you?
2  A.  Yes.
3  Q.  What do you recognize it to be?
4  A.  The declaration of Paul Bruce in support
5  of the Bruce Trusts.
6  Q.  This is the declaration that you signed
7  and submitted to the bankruptcy?
8  A.  Yes.
9  Q.  Mr. Bruce, what is your educational
10  background?
11  A.  I've got a BS in physics and an MBA.
12  Q.  Where did you study for your BS in
13  physics?
14  A.  State University of New York at Stony
15  Brook.
16  Q.  And for your MBA?
17  A.  Different places:  MIT, University of
18  Colorado, and I got the degree from GW.
19  Q.  And what year did you -- what year did
20  you graduate from Stony Brook?
21  A.  1969.
22  Q.  And then what year did you get the MBA?
23  A.  I'm not sure.  I was going part-time and
24  it probably -- I'm guessing '72 or thereabouts.
25  Q.  So approximately three years total for

Page 11

1  the MBA?
2  A.  Year and a -- it could have been four.
3  I was working full-time and it -- I don't remember
4  how long it took to get it.
5  Q.  What was your full-time job while you
6  were studying for the MBA?
7  A.  I was a systems analyst.
8  Q.  For whom?
9  A.  MITRE Corporation.
10  Q.  And can you describe what you did as a
11  systems analyst?
12  A.  It was called the think tank.  And we
13  worked for the government, the federal government,
14  on various projects.  I was in a group that --
15  well, I was in different groups at different
16  times, but there were military projects.  There
17  were -- for a while I worked in the transportation
18  group and there were two groups.  One was they had
19  something called Dial-a-Ride, which was to replace
20  taxis.  And there was a group working for the
21  Federal Railroad Administration, which was trains.
22  Actually, my job was train safety.
23  Q.  Got it.
24     And what kinds of projects did you work
25  on related to train safety?

Page 12

1  A.  Mostly the train safety dealt with two
2  kinds of issues.  One is all the people that died,
3  almost all were grade crossing accidents.  And
4  there was also concern over hazardous materials on
5  passenger train routes, but -- and I guess running
6  over people on the tracks.
7     As a practical matter, if I remember
8  right, there were a thousand people died at grade
9  crossings and they'd run over like five.  So grade
10  crossings was the bigger.  And hazardous materials
11  didn't happen very often and neither did passenger
12  trains.  I mean, the public was concerned about
13  that, but statistically, they're not every week.
14  Q.  And what was your next job after that?
15  A.  I can't even remember.  That's a long
16  time ago.  And I can't be sure which group was
17  first, whether it was the train group or the
18  Dial-a-Ride group.
19  Q.  After you left your job as a systems
20  analyst, what was the next job or what was the
21  next company that you worked for after that?
22  A.  TRW.
23  Q.  TRW.
24     And what did you do for -- or what does
25  TRW do?

Page 13

1 A.   TRW does lots of things, but they had a
2 group that did basically the same thing that MITRE
3 did, worked on government contracts.  And it
4 involved a lot of travel.  And, again, that was a
5 long time ago also.  We're talking about the '70s.
6 Q.   And was your work similar to what it had
7 been at MITRE?
8 A.   Yes, it just paid better.
9 Q.   That's always good.
10 After TRW, what was your next job?
11 A.   I went to work for Smithy Braedon.
12 Q.   Smithy Braedon.
13 And what kind of -- what did Smithy
14 Braedon do?
15 A.   Commercial real estate.  They did
16 commercial sales and leasing and investment
17 properties.
18 Q.   And approximately what year did you
19 begin with Smithy Braedon?
20 A.   Probably around 1981, '82.
21 Q.   What kind of work did you do for Smithy
22 Braedon?
23 A.   Commercial sales.
24 Q.   What was your role?  What was your job
25 title?

Page 14

1 A.   I was an agent earning commission
2 income.
3 Q.   And what kinds of properties did you
4 sell?
5 A.   That's a broad question.  Do you want to
6 narrow it down?
7 Q.   Well, you can answer broadly.
8 A.   While I was there, I had a focus on
9 commercial land sales to developers doing mostly
10 office building projects, office parks; but my
11 first assignment was a condominium owner who was
12 near bankruptcy and they wanted me to sell it.
13 And I ended up leasing most of the space to one
14 tenant.  So there's some variability.
15 Q.   So you worked -- you had some sales and
16 some leases as well?
17 A.   Mostly sales.
18 Q.   But some leases?
19 A.   Yes.
20 Q.   Any subleases?
21 A.   At Smithy Braedon, probably not.
22 Q.   What was the largest sale you ever
23 worked on at Smithy Braedon?
24 A.   At Smithy Braedon, probably 10 million.
25 Q.   And what would your commission have been

Page 15

1 for a project like that?
2 A.   The total commission was say 450,000 and
3 it was split amongst two brokers and the house.
4 The house got half and the two brokers each got a
5 quarter.
6 Q.   What kind of project was the $10 million
7 sale?
8 A.   Mixed use.  It was office and
9 residential.
10 Q.   Where was it located?
11 A.   Fair Oaks, Virginia.
12 Q.   How about the second largest, if you can
13 remember?
14 A.   Not offhand.  I mean, again, you're
15 talking a long time ago.
16 Q.   Did you have a number of sales for
17 projects that exceeded a million dollars?
18 A.   Oh, yes.
19 Q.   Approximately how many?
20 A.   I don't know back then, my suspicion is
21 there's probably four a year.
22 Q.   Four per year.
23 And how many years did you work at
24 Smithy Braedon?
25 A.   I'm going to say four.  It could have

Page 16

1 been three.  It could have been five.
2 Q.   So would you estimate that you had more
3 than -- more than a dozen projects for where the
4 sale was for more than a million dollars?
5 A.   Probably.
6 Q.   More than 20?
7 A.   You're -- you're stretching what I
8 remember from 1983 and '4.
9 Q.   Those other projects that were over a
10 million dollars, can you describe at least one of
11 them?  Can you describe one of them?
12 A.   There was a property in Fairfax City
13 that had four office buildings planned -- or
14 enough land to build four office buildings, and
15 they were each around 125,000 square feet.  I
16 represented the buyer and it was around
17 $5 million.
18 Q.   And your commission from that type of
19 project?
20 A.   Probably -- I'm guessing, because I
21 don't remember, and I'm guessing it was in the
22 neighborhood of 3 or 4 percent.
23 Q.   And do you have an estimate of how much
24 the total -- the total sale or what the sale value
25 was for that project?

Page 17

1  A.  5 million.
2        MR. GOODMAN: Objection to form.
3  Q.  So 3 to 4 percent of 5 million would be
4  approximately 150 to $200,000?
5  A.  (No verbal response.)
6  Q.  Would 3 to 4 percent of 5 million be
7  approximately 150 to $200,000?
8  A.  You have to speak up.
9  Q.  What is 3 to 4 percent of $5 million?
10  A.  150 to $200,000.
11  Q.  Thank you.
12       Were your projects mostly located in the
13  State of Virginia?  Were the sales mostly in the
14  State of Virginia?
15  A.  Yes.
16  Q.  Were they in any other states?
17  A.  No.
18  Q.  After Smithy Braedon, what was your next
19  job?
20  A.  I opened my own office at Paul Bruce
21  Incorporated.
22  Q.  Where was Paul Bruce Incorporated
23  located?
24  A.  Tysons Corner, Virginia.
25  Q.  Do you remember the address?

Page 18

1  A.  I'm guessing it was 8500 Leesburg Pike.
2  Q.  And did it ever -- did Paul Bruce, Inc.,
3  ever relocate to a different address?
4  A.  Yes.
5  Q.  What was that address?
6  A.  It was in Reston, 1800 Michael Faraday
7  Drive.
8  Q.  When did that relocation happen?
9  A.  I had a five-year lease, so it was
10  around 1990.
11  Q.  You had a five-year lease in Tysons
12  Corner?
13  A.  Yes.
14  Q.  So you opened Paul Bruce, Inc., in 1985?
15  A.  Roughly.
16  Q.  And then moved to Virginia -- moved to
17  Reston in 1990?
18  A.  Yes.
19  Q.  And how long did you operate Paul Bruce,
20  Inc., in Reston?
21  A.  The closing was over a period of time,
22  and it was between around 2005 and 2012.
23  Q.  What kind of work did you do at Paul
24  Bruce, Inc.?
25  A.  Commercial sales.

Page 19

1  Q.  Did you have an ownership interest in
2  Paul Bruce, Inc.?
3  A.  I owned 100 percent.
4  Q.  Did you also -- were you also paid a
5  salary from Paul Bruce, Inc.?
6  A.  I don't think so.
7  Q.  Would you also be paid commission?
8  A.  Yes.
9  Q.  And what -- approximately what did you
10  make per year in commission at Paul Bruce, Inc.?
11  A.  It was more in the first few years.  My
12  plan was to make 400,000 a year.
13  Q.  Do you remember what the most you ever
14  made in one year was?
15  A.  Probably 2 million.
16  Q.  What year was that?
17  A.  When was Reagan's tax cuts?  I mean,
18  that's how I remember.  Do you remember Reagan's
19  tax cuts?
20  A.  Not personally so well.
21  A.  Well, you're kind of young; but, anyway,
22  it was around when he was cutting tax rates.  And
23  whenever that was, '86, '87.
24  Q.  Did you have other years that were
25  similar?  Did you make close to $2 million in

Page 20

1  other years or was that year an outlier?
2        MR. GOODMAN: Objection to form.
3        You can answer.
4        THE WITNESS: There were other years
5  when I made over a million.
6        BY MR. LEVANDER:
7  Q.  Approximately how many?
8  A.  I don't know.
9  Q.  More than three?
10  A.  Probably.
11  Q.  More than five?
12  A.  I don't know.
13  Q.  And how many years more than 500,000?
14  A.  I can't answer that without looking.
15  Q.  Would you say more than half of the
16  years that you had the business?
17  A.  I had a number of good years, and I'd
18  like to leave it at that.
19  Q.  Okay.  We can leave it at that.
20       Describe the types of commercial sales
21  that you worked on at Paul Bruce, Inc.
22  A.  Well, for example, the sale I mentioned
23  in Fairfax City, I sold that.  The people I sold
24  it to -- I sold that, again, to somebody else
25  about a year later when I had my own company, for

In re:  SEARS HOLDINGS CORPORATION, et al.

Page 21

1  13 million.  Same property.
2     There was a concrete plant in
3  Springfield, Virginia, that I listed, and that was
4  mixed-use apartments, office and maybe some other
5  uses, and I sold that for 6 or 7 million.
6     There was land in Springfield for houses
7  and townhouses I sold for in the neighborhood of
8  7 million.
9  Q.  Were all of your sales located in the
10  State of Virginia?
11  A.  Yes.
12  Q.  How many people worked for Paul Bruce,
13  Inc.?  How many employees did you have?
14  A.  One.
15  Q.  Does that include you?
16  A.  No, I had an assistant and me.
17  Q.  What was his or her name?
18  A.  There were different people over
19  different time.
20  Q.  But you never had more than one
21  assistant?
22  A.  There were two periods when I had more
23  than one.  When I opened, I had a very capable
24  woman who I think she had an MBA and she worked as
25  an assistant.  And there was an awful lot going on

Page 22

1  and I hired a second person, who was brilliant, I
2  mean, she went on to get her degree in business at
3  William & Mary.  And they were both working there
4  and both productive.
5     And there was another period when I
6  had -- I had to hire somebody to help me organize
7  documents that I got from my parents, and she did
8  that.  And I had someone continue helping me in
9  sales.
10  Q.  And who was the person who helped you
11  organize the documents from your parents?  What
12  was the name of the person who helped you organize
13  the documents from your parents?
14  A.  Mary.
15  Q.  Last name?
16  A.  She had one.
17  Q.  When you say that you had people who
18  worked as your assistant, do you mean that they
19  did mostly clerical work?
20  A.  Not really.  There wasn't much clerical
21  work.
22  Q.  So would they assist with sales?
23  A.  Yes.
24  Q.  Would they have their own sales or would
25  they help you with sales?

Page 23

1  A.  There was one woman who I tried to
2  transition into being a salesperson and she didn't
3  like it.  And she was the only one where I tried
4  it.
5  Q.  So what type of work would your
6  assistant do?
7  A.  I called it research.  Basically, in
8  order to compete with the big houses, I had to
9  know the market and I had to have better
10  information than the big houses.  And I had them
11  collect information.
12  Q.  What types of information?
13  A.  Sales, comparable sales data.  If there
14  was a property we sold, had an exclusive on, we
15  had to -- we were obligated to get detailed
16  information.  I'd send them to the highway
17  department.  We had the master plan in my office,
18  soil maps in my office, utility maps, and I'd have
19  them put together information on specific
20  properties that I was selling.
21  Q.  And would that information include
22  whether there was an existing lease on that
23  property?
24  A.  That was -- I'm not sure they -- I got
25  that information, but I'm not sure they were

Page 24

1  qualified to get it.
2  Q.  But you personally would perform that
3  type of analysis, determining whether there was an
4  existing lease on a property?
5     MR. GOODMAN: Objection to form.
6     You can answer.
7     MR. LEVANDER: You can answer the
8  question.
9     THE WITNESS: I didn't hear what you
10  said.
11     MR. GOODMAN: I objected to the form of
12  the question; but you can answer.  If you want, he
13  can repeat it.
14     MR. LEVANDER: I can rephrase the
15  question.
16     BY MR. LEVANDER:
17  Q.  You personally would determine whether
18  there was an existing lease on a property as part
19  of your work at Paul Bruce, Inc.?
20  A.  Yes.
21  Q.  And what types of analysis would you do
22  in support of that?
23  A.  They -- there was -- that's a very broad
24  question.  When there was sale of land, I worked
25  on the sale of a property in Tysons Corner that

Page 25

1  was leased to Kmart and a restaurant chain.  And
2  the analysis, it was short and quick.  The lease
3  had to be terminated to allow construction of a --
4  of an office project.  And there was another
5  broker who had a relationship with Kmart and we
6  got a price -- total price, and then we divided it
7  between the land and the lease.
8  Q.  You were the broker for who in that
9  deal?  You were the broker for which party?
10  A.  The offeree of land.
11  Q.  The fee owner?
12  A.  Yes.
13  Q.  And who represented -- who was the
14  broker for Kmart in that deal?
15  A.  There was a -- I think it was the
16  firm -- again, we're dealing historically.  And it
17  was a firm called Coldwell Banker, who may not
18  exist anymore.
19  Q.  What year was that deal?
20  A.  The contract must have been '87, more or
21  less.
22  Q.  You said the analysis was short and
23  quick.  What kind of analysis did you perform?
24  A.  It didn't take much.  I mean, we had a
25  copy of the lease and the people I was working

Page 26

1  with who wanted to buy it, needed to buy it
2  unencumbered.
3  Q.  So did you read the lease?
4  A.  Yes.
5  Q.  And did you analyze the lease?
6  A.  Yes.
7  Q.  And you shared that analysis with the
8  fee owners?
9  A.  I believe the fee owners understood
10  their lease very well.
11  Q.  But you -- strike that.
12      What was the -- what ended up happening
13  to that property in Tysons Corner?
14  A.  The purchaser I brought decided not to
15  buy because the market was going to hell.  And the
16  fee owners got another buyer who bought the
17  property.
18  Q.  Who was the eventual buyer?
19  A.  It was something like Metropolitan --
20  you do understand that the buyer's public name and
21  the contract buyer are different?
22  Q.  So, then, I'm interested in both.
23      Who was the contract buyer?
24  A.  I don't know.
25  Q.  What was the public name?

Page 27

1  A.  Metropolitan Partners.
2  Q.  So you didn't know who the underlying
3  fee owners were behind Metropolitan?
4  A.  That's correct.
5  Q.  Did you deal personally with anyone from
6  Kmart in that deal?
7  A.  No.
8  Q.  Did you ever personally appraise
9  property?
10  A.  What do you mean by "appraise"?
11  Q.  I think it's a fairly straightforward
12  term.
13  A.  No, it isn't.
14  Q.  Well, if there's any way in which you
15  appraised property, I would be interested to know.
16  A.  I mean, it just -- you're going to have
17  to use different words because that's really not a
18  good word, not a word that has meaning.
19  Q.  You don't understand what the word
20  "appraised" means?
21  A.  That's correct.  It can mean lots of
22  things in different contexts.
23  Q.  Did you ever determine the value of a
24  property?
25  A.  Of course.

Page 28

1  Q.  And what methodology would you use?
2  A.  There were several.
3  Q.  Describe one of them.
4  A.  There -- land residual is usually for
5  office projects and industrial projects is the
6  most meaningful.  It means you take the income
7  from a property and figure out all the cost and
8  you come up with a land value.  And what you look
9  for is a land value that would be supported by the
10  rent roll so you could sell it.  Because the
11  people who were buying it needed to get a lender.
12  Q.  And so in determining the income from a
13  property, you would need to analyze any leases for
14  that property; correct?
15  A.  You would need to know the income
16  stream.
17  Q.  So that would include determining what
18  the lease terms were for any particular year?
19  A.  You would need to be familiar with the
20  lease market --
21  Q.  And also --
22  A.  -- at a point in time.
23  Q.  And the period of -- and you would also
24  need to know the term of the lease in order to --
25      MR. GOODMAN: Objection to form.

Page 29

1  Go ahead.
2  THE WITNESS: You would need to
3  understand the full implications of the lease.
4  BY MR. LEVANDER:
5  Q.  And you were qualified to do that
6  analysis?
7  A.  Yes.
8  Q.  And you did that analysis?
9  A.  Yes.
10  Q.  Frequently?
11  A.  Yes.
12  Q.  Approximately how many times?
13  A.  20 times a year.
14  Q.  For how many years?
15  A.  20, 15.
16  Q.  So you've analyzed the full implications
17  of the lease for commercial properties several
18  hundred times throughout your career?
19  A.  Probably.
20  Q.  Would you consider the location of the
21  land when you were determining the value of a real
22  estate property?
23  A.  Yes.
24  Q.  Would you consider zoning as a factor?
25  A.  Of course.

Page 30

1  Q.  And the land would be more valuable if
2  the zoning were more permissive?
3  A.  "More permissive" is a vague term.
4  Q.  If a property could be used for both
5  residential and commercial purposes, that would be
6  more valuable or at least as valuable as if the
7  property could only be used for residential
8  purposes?
9  A.  The -- it depends on the detail.
10  Q.  Is there -- can you think of any
11  scenario in which a property would be more
12  valuable if it could only be used for residential
13  purposes?
14  A.  There are cases, many cases, where
15  planners and county officials want to see
16  something called mixed use, which has office,
17  residential and retail, and they insist on it.
18  And it's less valuable than -- if you can use it
19  for one use, the highest and best use.  And
20  there's many examples where they force you to do
21  uses that are not as economically advantageous.
22  Q.  And would you consider the property
23  taxes in valuing a property?
24  A.  No.
25  Q.  So if -- there's no difference in the

Page 31

1  value of a property if the property taxes are
2  higher or if they're lower?
3  A.  It's not a reliable indicator of
4  anything.
5  Q.  Would it matter if it was a commercial
6  property, whether the store itself were occupied
7  or dark?
8  A.  The historic what?
9  Q.  Whether there was a tenant or there was
10  not a tenant?
11  A.  It would depend on the overall
12  circumstances.
13  Q.  Generally, is a property more valuable
14  if there is a tenant present?
15  MR. GOODMAN: Objection; speculation.
16  THE WITNESS: You can't make that
17  general statement.
18  BY MR. LEVANDER:
19  Q.  Have you ever personally purchased real
20  property?
21  A.  Yes.
22  Q.  Approximately how many properties?
23  A.  I don't know.  Probably four.
24  Q.  Did you ever invest money in developing
25  that property?

Page 32

1  A.  Two were houses that I lived in.
2  Q.  What kinds improvements did you make?
3  A.  Excuse me?
4  Q.  What kinds of improvements did you make?
5  A.  In the houses that I lived in?
6  Q.  Uh-huh.
7  A.  One was a townhouse and I refinished the
8  basement.  The others -- the house we live in now
9  and there's always improvements.  Do you want to
10  know the details?  You really don't.
11  Q.  I'm happy to hear.
12  A.  Excuse me?
13  Q.  I'm happy to hear it, but we can move on
14  in the interest of time.
15  When you make those improvements, do you
16  increase the value of the house?
17  A.  When I did the basement, finished the
18  basement, I'm pretty sure it increased the value.
19  When I replaced a sliding glass door
20  with a large window, I made my wife happy.  And
21  I'm not sure it had any relevant -- you know, some
22  do and some don't.
23  I think we did a nice job on the front
24  stoop and it might have increased it, but we're
25  not talking significant.  I mean, some help and

In re:  SEARS HOLDINGS CORPORATION, ET AL.

PAUL BRUCE
June 6, 2019

---

Page 33

1    some just make you happy or my wife happy, and
2    making her happy is important.
3  Q.  Also very important.
4      I want to change directions for a
5    second, so -- and talk about the property that is
6    at dispute here.
7      So you say in your declaration, which
8    you have in front of you, that Martin and Sylvia
9    Bruce purchased a fee simple interest in the
10   property at 1001 Patton Avenue on February 1st,
11   1966 --
12  A.  Yes.
13  Q.  -- is that correct?
14  A.  Yes.
15  Q.  Who are Martin and Sylvia Bruce?
16  A.  My parents.
17  Q.  Where were your -- where were your
18   parents living in 1966?
19  A.  They moved at some time and I don't know
20   where exactly -- which house they were living in
21   in 1966.  I can't answer it.
22  Q.  What part of the country?
23  A.  The east coast.
24  Q.  What state?
25  A.  They moved at some point from Great Neck

---

Page 34

1    to Surfside, Florida.  And when they moved, I
2    don't know.
3  Q.  Got it.
4  A.  And they bought a house at Skyline
5    Plaza, which is Skyline, Bailey's Crossroads.
6  Q.  What state is that in?
7  A.  I don't know.  It's -- Skyline has a
8    number of condominium buildings, huge buildings,
9    Bailey's Crossroads would be the closest to the
10   city.
11  Q.  Do you know what state?
12  A.  Virginia.
13  Q.  Virginia.
14      So when you were growing up -- were you
15   born in Long Island?
16  A.  I was born in Queens.
17  Q.  In Queens.
18      What part of Queens?
19  A.  Jamaica.
20  Q.  And then you and your parents moved from
21   Queens to Great Neck?
22  A.  Yes.
23  Q.  And did you live in Great Neck for the
24   remainder of your childhood?
25  A.  That depends on when we moved, and I

---

Page 35

1    don't remember when it was that we moved.
2  Q.  What did your father do for a living?
3  A.  When?
4  Q.  Start at the beginning.
5      In 1966, what was your father doing for
6    a living?
7  A.  That's better.
8      In 1966, he must have been doing
9    investment.  He and my mother were doing
10   investments in 1966.
11  Q.  What kind of investments?
12  A.  Some were buying properties like this
13   and some were developing properties like this,
14   buying the land, doing the leasing and
15   construction.
16  Q.  So he was a professional real estate
17   developer at the time?
18  A.  That was part of what he did, yes.
19  Q.  And in addition -- well, what else did
20   he do?
21      MR. GOODMAN: Can we -- if we can put
22   time frames on things because we're talking about
23   several decades back and forth.
24      MR. LEVANDER: Sure.
25

---

Page 36

1      BY MR. LEVANDER:
2  Q.  In 1966, what else did he do?
3  A.  I'm not sure I was paying that much
4    attention.  I was in high school.
5  Q.  Are you aware of anything else that he
6    was doing?
7  A.  That's a lot.
8  Q.  How about before they started working in
9    investments; what did your father do?
10  A.  When?
11  Q.  Immediately before.
12  A.  There was a time after World War II, and
13   I don't know the year, it could have been way
14   after, like many years, my grandfather, my
15   mother's father, had a supermarket chain -- and
16   supermarkets was not like supermarkets, you know,
17   today.  Supermarkets were like really delis -- and
18   he worked there.  He married the boss' daughter
19   and he worked in the chain.
20  Q.  And that was what he did immediately
21   before becoming a real estate investor and
22   developer?
23  A.  I don't know if there was something else
24   involved or not.
25  Q.  And your mother, Sylvia, was the boss'

---

In re:  SEARS HOLDINGS CORPORATION, et al.

PAUL BRUCE
June 6, 2019

Page 37

1  daughter?
2  A.  Yes.
3  Q.  And did she have an interest in the
4  supermarket chain?
5  A.  What do you mean by "have an interest"?
6  Q.  Did she own any percentage of the
7  supermarket chain?
8  A.  I don't know.
9  Q.  Do you know if your father ever owned a
10  percentage of the supermarket chain?
11  A.  I really couldn't say.
12  Q.  Did your mother and father own the
13  investment company which they were -- from which
14  they were working as real estate investors and
15  developers?
16  A.  I don't know.
17  Q.  Do you remember when your mother and
18  father purchased the property at 1001 Patton
19  Avenue?
20  A.  I know the date because it's in all
21  these papers, but do I remember it personally?
22  Q.  Right.
23  A.  No.
24  Q.  When did you first learn that they had
25  purchased that property?

Page 38

1  A.  My youngest daughter -- it must have
2  been around 30 years ago because she went to
3  basketball camp and it was in North Carolina.  And
4  I said to my wife, "We'll drop off these kids" --
5  it was Ally and her friend -- "and we'll stop by
6  and look at the property on the way back."  And
7  that's my recollection of the first time.
8  Q.  That was the first time you saw the
9  property?
10  A.  Probably.
11  Q.  But you had heard of it before then?
12  A.  I must have, but, you know, when you're
13  a 16- and 17-year-old boy, your interests are not
14  in that.  Your interests are all kinds of other
15  things that are very exciting.
16  Q.  Not in the Kmart in North Carolina?
17  A.  Exactly.
18  Q.  How many other properties,
19  approximately, did your parents own?
20  A.  You want to define "property"?
21  Q.  Any kind of real property.
22  A.  Maybe 10 or 11.
23  Q.  And that includes homes as well as
24  investment properties?
25  A.  No, that would just be investment

Page 39

1  properties.
2  Q.  Can you describe some of the other
3  investment properties?
4  A.  In Akron, they built a discount store
5  and they bought a farm to build the discount store
6  on.  And the farm was maybe 25 acres and the
7  discount store took 15, so they had 10 acres left.
8  And some of it was undeveloped land.
9  They had a branch for a bank on one
10  piece.  And they had a piece that was a small
11  restaurant.  And the discount store, of course.
12  So it was five properties; but as a practical man,
13  issues one property and a lot of small
14  insignificant properties.
15  Q.  And was there -- they were always the
16  fee owner of that property?
17  A.  Yes.
18  Q.  And were they -- of all of these 11 to
19  12 properties, they were always the fee owner of
20  the property?
21  A.  On all of them, I think so.
22  Q.  And were they active landlords of any of
23  the properties?
24  A.  No.
25  Q.  Who was the landlord of these

Page 40

1  properties?
2  A.  They were the landlords.  They just
3  weren't active.
4  Q.  So who was the active landlord of the
5  properties?
6  A.  I'm not sure that term makes sense.
7  Q.  For the Akron property, who was the --
8  A.  It was a triple net lease.
9  Q.  Okay.
10  A.  Single tenant.  There was no active
11  landlord.  It's the way triple net leases work,
12  they send the check every month.
13  Q.  And the check for the Akron store was
14  sent directly to your parents by the tenant in the
15  store?
16  A.  Yeah.  And the store was the active --
17  active in terms of dealing with everything that
18  occurred.
19  Q.  So property taxes, maintenance?
20  A.  (No verbal response.)
21  MR. GOODMAN: You have to answer.
22  THE WITNESS: Excuse me?
23  MR. GOODMAN: You have to answer
24  verbally.  You can't nod.  You have to answer.
25  THE WITNESS: Okay.  You want me to

18-23538-shl   Doc 4232   Filed 06/13/19   Entered 06/13/19 22:59:52   Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL.                                    Pg 15 of 71

PAUL BRUCE
June 6, 2019

Page 41

1   answer something?
2       BY MR. LEVANDER:
3   Q.   Sure.
4   A.   What do you want me to answer?
5   Q.   The tenant there was responsible for
6   paying property taxes and maintenance?
7   A.   Yes.
8   Q.   And was the arrangement similar at the
9   other 11 to 12 stores?
10  A.   Well, they weren't all stores.
11  Q.   At the 11 to 12 properties.
12  A.   Vacant land had no active management,
13  but they liked -- they had no property management
14  division and they didn't want to deal with it.  So
15  when they set up, they set single-purpose triple
16  net leases.
17  Q.   So they never dealt with active property
18  management for any of the stores -- any of the
19  properties -- excuse me, scratch that question.
20  Let me rephrase it.
21      They were never involved in active
22  property management for any of the properties that
23  they owned as fee owners?
24  A.   "Never" is a word you shouldn't use.
25  Q.   Well, can you identify an instance in

Page 42

1   which they did serve as active property managers?
2   A.   They -- I can say in Akron, the property
3   was leased and the tenant went bankrupt and a new
4   tenant took over and they went bankrupt.  And
5   Kimco bought the 38 stores out of bankruptcy.  And
6   that store was a lemon and so they sued us to get
7   out of their lease.
8       And I remember it well because my mom
9   kind of insisted I help.  And that was in '93.
10  And they stopped paying rent as part of the
11  lawsuit.  And we had an empty store, a dispute on
12  the lease, and I had to go out to Asheville -- I
13  mean to Akron and figure out what to do because
14  they tried for years and couldn't find a tenant.
15      And, anyway, I found a tenant and took
16  care of everything and it was under triple net
17  lease, which we like much better.
18  Q.   Did you help in any other way or your
19  help was finding the tenant?
20  A.   Well, I also took care of the
21  litigation.  I hired a lawyer, hired a broker,
22  hired another lawyer to handle contracts, hired an
23  environmental firm, hired a roof specialist.  It
24  was a lot of help.
25  Q.   Sounds like it.

Page 43

1       Did your parents have any employees who
2   worked with them at the time --
3   A.   No.
4   Q.   -- in 1966?
5   A.   1966, I can't be sure.  When I was in
6   Akron, not really.
7   Q.   And your parents were never located in
8   North Carolina; correct?
9   A.   Correct.
10  Q.   Did your parents ever tell you about why
11  they purchased the property in Asheville, North
12  Carolina?
13  A.   Maybe.
14  Q.   Do you recall?
15  A.   I recall bits and pieces.
16  Q.   What do you recall?
17  A.   There were income tax issues and that
18  provided shelter, tax shelter.
19  Q.   Can you explain that in more detail,
20  please?
21  A.   I'm not sure it would be correct.  We
22  shouldn't go there.  You're stretching a vague
23  memory, trying to stretch into things that may not
24  be accurate, and that's not a good place for a
25  deposition to go.

Page 44

1   Q.   But at some point they told you that the
2   Asheville, North Carolina, property can serve as a
3   tax shelter?
4   A.   Maybe.  Your -- 1966, you've got to
5   remember, I was 18 years old and I was off to
6   college.  I had studies.  I had a girlfriend.  And
7   what my dad tried to tell me just, you know,
8   wasn't relevant particularly to anything in my
9   life.
10  Q.   But this conversation occurred in or
11  around 1966?
12  A.   You're stretching --
13      MR. GOODMAN: Objection; speculation.
14  The witness is testifying that he doesn't
15  remember.
16      THE WITNESS: You're stretching a vague
17  memory into something concrete.
18      BY MR. LEVANDER:
19  Q.   In the 1960s?
20  A.   In 1966, and I was a freshman in
21  college.
22  Q.   Did you ever later in life have a
23  discussion about the Asheville property as a tax
24  shelter?
25  A.   I don't remember.

18-23538-shl   Doc 4232   Filed 06/13/19   Entered 06/13/19 22:59:52   Main Document
In re:  SEARS HOLDINGS CORPORATION, et al.   Pg 16 of 71

PAUL BRUCE
June 6, 2019

Page 45

1    MR. GOODMAN: Objection; speculation.
2    THE WITNESS: I mean, you're really
3 trying to stretch something that's very vague.
4    BY MR. LEVANDER:
5 Q.  Do you have an understanding of how the
6 property could serve as a tax shelter?
7    MR. GOODMAN: Objection; speculation.
8 Q.  You may answer the question.
9    MR. GOODMAN: You can answer.
10    THE WITNESS: I have theoretical
11 understandings.
12    BY MR. LEVANDER:
13 Q.  Can you explain those?
14 A.  Basically you can have -- depending --
15 you know, the tax law changes.  It's always
16 permanent and changes every two years.  So it's
17 always different over time.  And there were times
18 when you could have more depreciation than your
19 initial investment.
20    Now, when those times were and how they
21 apply to specific properties, I can't answer; but
22 between 1966 and today, it's 20 major changes in
23 the tax law and a lot of them are not what you
24 think.
25    You had Obama, for instance, increase

Page 46

1 the estate tax exemption dramatically and you
2 never -- if you didn't know, you wouldn't say
3 Obama was helping the rich dramatically, but he
4 did.
5    And, you know, a few years later Reagan
6 comes up with another permanent tax law that the
7 Democrats vowed to change.  And so there were
8 times when depreciation was different than other
9 times and it goes back and forth.
10 Q.  And you specifically described a time
11 when you could have more depreciation than your
12 initial investments --
13 A.  No, no.  I know there were times when
14 you could --
15 Q.  Right.
16 A.  -- but I can't describe any in
17 particular because I really -- I keep track of the
18 tax laws as they apply to me.
19 Q.  Right.
20 A.  And how they applied to my parents, not
21 so much.
22 Q.  Do you know when the law changed related
23 to the depreciation -- the amount of depreciation
24 you could take on your real property investment?
25 A.  And how you can structure it to take

Page 47

1 full advantage, no, I don't recall those details.
2 Q.  Did your parents ever explain to you
3 what their intention was for the Asheville
4 property?
5 A.  What do you mean by "intention"?
6 Q.  Did they ever explain how they wanted to
7 use the property going forward?
8 A.  It was under a 99-year lease.  They had
9 no intention to do anything.
10 Q.  So was it a passive investment for your
11 parents?
12 A.  Once it was -- yes.
13 Q.  You were saying "once it was" -- I don't
14 want to cut you off.
15 A.  Once the lease was signed, it was a
16 30-year lease with three 23-year options.  And the
17 options and the term of the lease means you really
18 can't do anything with it for 99 years.
19 Q.  So first there was some tax benefit for
20 purchasing the property?
21 A.  Some hypothetical tax benefit maybe.
22 Q.  There was a tax benefit?
23 A.  Well, there's always a tax benefit in
24 real estate if you buy it as an investment.
25 Q.  And your parents expressed to you that

Page 48

1 that tax benefit was one of the purposes for
2 purchasing the property?
3    MR. GOODMAN: Objection;
4 mischaracterizes prior testimony.
5    THE WITNESS: I've already answered
6 whatever -- I probably said more than I know
7 already.
8    BY MR. LEVANDER:
9 Q.  Okay.  So in 1988, your parents
10 transferred the property to the Martin Bruce
11 Revocable Trust and the Sylvia Bruce Revocable
12 Trust; is that right?
13 A.  Yes.
14 Q.  Do you know why they did that?
15 A.  That's a vague question.
16 Q.  Did you ever have a discussion with them
17 about --
18 A.  No.
19 Q.  What is your understanding of why they
20 made that transfer?
21    MR. GOODMAN: Objection; speculation.
22    You can answer.
23    THE WITNESS: Before probate.
24    BY MR. LEVANDER:
25 Q.  Do you know if the Martin Bruce

Page 49

1   Revocable Trust held any other assets?
2   A.   Yes.
3   Q.   What assets?
4   A.   That's -- you ought to ask different
5   questions.
6   Q.   I asked that question.
7   A.   When?
8   Q.   In 1988, did the Martin Bruce Revocable
9   Trust hold any other assets?
10  A.   I really wouldn't know what was in the
11  trust in '88.  I could speculate if you would
12  like.
13  Q.   I won't ask you to speculate.
14      Would you have a better sense of what
15  was in the Revocable Trust at the time of your
16  father's passing?
17  A.   Oh, I know exactly what was there at the
18  time of his passing.
19  Q.   So what was in the trust at that time?
20  A.   Just because I knew, doesn't mean I can
21  specify.  I mean, eventually they transferred real
22  estate, stocks and bonds into the trust.  And
23  whether they did it in 1988 or a later year, I
24  don't know.  His passing was in 2004, so we're
25  talking 16 years.

Page 50

1   Q.   So in 2004, approximately how many
2   properties were in the trust?
3   A.   At what time?
4   Q.   In 2004.
5   A.   We sold off over time most of the
6   properties.  And what was left in 2004, I know
7   Asheville is left.  Orange Park we sold later.
8   And there was a Syracuse property we dealt with
9   that might have been sold, it might not have.
10  There was some land in Virginia Beach we sold
11  sometime.  So -- but I'd have to put together --
12  in order to answer it accurately, I'd need to put
13  together a table, an initial list of properties
14  and when they were sold.
15  Q.   What was the approximate value of the
16  assets in the Martin Bruce Revocable Trust in
17  2004?
18  A.   At what time?
19  Q.   In 2004.
20  A.   I really couldn't say without looking.
21  Q.   Do you think it exceeded $10 million?
22  A.   In that trust, no.
23  Q.   $1 million?
24  A.   Yes.
25  Q.   $5 million?

Page 51

1   A.   I'd have to look.
2   Q.   How about the Sylvia Bruce Revocable
3   Trust?
4   A.   That was --
5       MR. GOODMAN: In what time?
6       MR. LEVANDER: In 2004.
7       MR. GOODMAN: Do you want to ask again?
8       THE WITNESS: Your questions don't make
9   sense in reality.
10      BY MR. LEVANDER:
11  Q.   Understood.
12      At the time of your mother's passing,
13  how many assets --
14  A.   I understand, but it got -- we have
15  lawyers helping us and lawyers you would think
16  would make things simple and easy, but they don't.
17  Q.   Was the value of the assets in that
18  trust greater than $10 million?
19  A.   The answer to your question is -- you're
20  asking what was in that trust and assets were
21  removed from that trust and put in different
22  entities for tax purposes.  And I'm not trying to
23  be difficult.  It's just you -- lawyers create
24  entities which would presumably save us money and
25  stuff can be moved from the trust into some other

Page 52

1   entity and it wouldn't be in the trust.  So I
2   couldn't answer your question.
3   Q.   I understand.  You're just trying to be
4   accurate, not difficult, and I appreciate that.
5       When the Sylvia Bruce Revocable Trust
6   was at its maximum asset value, what was the
7   approximate value of the assets in that trust?
8   A.   By the way, "asset value" is also an
9   ambiguous term.  You may think it's not, but it's
10  not.  And you're going to have to define what you
11  mean by "asset value."
12  Q.   Would the value of the assets in the
13  Sylvia Bruce --
14  A.   No, no, you're missing the point.
15  Q.   You can answer the question any way you
16  like, but I'm asking you what the approximate
17  value was.
18  A.   I understand what you're asking.
19      MR. GOODMAN: Objection; speculation.
20      THE WITNESS: What?
21      MR. GOODMAN: If you can answer, you
22  can.
23      THE WITNESS: The difficulty is you have
24  an asset and you fill out a form called a 706.  In
25  the 706, the IRS asks for the value of assets.

Page 53

1 And you start with an asset.
2 BY MR. LEVANDER:
3 Q. Right.
4 So some assets have a different value
5 for tax purposes and for accounting purposes --
6 A. Exactly.
7 Q. -- and then their real life value if you
8 go and put them on the open market might be yet a
9 third thing, and I appreciate that.
10 A. And so your question is which value are
11 you looking for?
12 Q. So I will take your answer to all three.
13 What was the tax value, what was the approximate
14 accounting value, what was the approximate market
15 value?
16 MR. GOODMAN: Objection to form.
17 Objection; speculation. Do you want to ask them
18 in order?
19 MR. LEVANDER: Sure.
20 BY MR. LEVANDER:
21 Q. What was the approximate market value of
22 the assets in the Sylvia Bruce Revocable Trust
23 when that trust was at its highest market value?
24 MR. GOODMAN: Objection; speculation.
25 THE WITNESS: I really need to put

Page 54

1 together a table because that's kind of what you
2 have to do because you have different valuations
3 for different purposes. And in real life -- in
4 other words, the market value -- the reason the
5 accountants and the tax lawyers can come up with
6 different valuations is partly because of lack of
7 control and partly because of lack of
8 marketability. So if you have an asset worth a
9 million dollars --
10 BY MR. LEVANDER:
11 Q. I appreciate this.
12 A. I'm just saying --
13 Q. So, again, let me start with market
14 value. Would the market value have exceeded --
15 A. The market value --
16 MR. GOODMAN: Let him ask his question.
17 Q. Would the market value have exceeded
18 $1 million?
19 MR. GOODMAN: Objection; speculation.
20 You can answer the question.
21 Q. You can answer the question.
22 A. You're dealing with a half interest in
23 real estate is all I'm saying. So the market
24 value of a half interest is not the same as a half
25 of the market value of a full interest.

Page 55

1 Q. But the Martin Bruce Trust owned the
2 other half of the asset?
3 A. So?
4 Q. So the full asset was under your
5 family's control?
6 A. So?
7 Q. So does that --
8 A. You get a different answer depending on
9 the question.
10 Q. Okay. Are you unable to even identify
11 what the market value of the assets in that trust
12 would have been?
13 A. You have to define "market value." You
14 really do.
15 Q. Half of the value of the entire
16 property.
17 A. So you've made certain assumptions in
18 getting to that point --
19 Q. And --
20 A. -- and you need to specify them in order
21 to get an answer.
22 Q. Work with that assumption for a minute.
23 A. With what assumption?
24 Q. The assumption that the market value
25 would be half of the value of the property if you

Page 56

1 have a 50 percent interest in that property.
2 A. And the two interests have the same
3 goals and objectives and are working together?
4 Q. Let's make that assumption, too.
5 A. And so you get a property that's --
6 you've made a lot of assumptions to get to market
7 value which is different than the real market
8 value if you were to sell an interest. You're
9 asking --
10 Q. Why don't we answer both questions.
11 A. Okay.
12 Q. Let's start with the assumptions that
13 we've made.
14 A. Go ahead and make them.
15 Q. We've just discussed that. We don't
16 need to put that back on the record.
17 A. Why don't we read them back so I know
18 what you're talking about.
19 Q. The market value of half of the -- of
20 half of the property, and we'll assume that the
21 two interests have the goals -- the same goals and
22 objectives and are working together. With those
23 assumptions, what is the market value of the
24 property?
25 MR. GOODMAN: Objection; speculation.

Page 57

1      THE WITNESS: Of which property?  All
2  property?
3      BY MR. LEVANDER:
4  Q.   All properties in the Sylvia Bruce
5  Revocable Trust.
6  A.   It would be a rough -- very rough
7  approximation, and I'd say 4 million; but it could
8  be different if I had a chance to put together a
9  table.
10 Q.   Did you know -- so as of 1988, that's
11 when the transfer happens from your parents to the
12 revocable trusts, did you know what the
13 approximate market value of the property at 1001
14 Patton Avenue was at that time?
15 A.   No.
16 Q.   How about do you know what that value
17 would have been in 1994 when you become the
18 custodian?
19     MR. GOODMAN: Objection; speculation.
20 Q.   You can answer.
21 A.   1994, it really wasn't a concern.  And
22 you want me to look retroactively at it?
23 Q.   Do you have a sense of what the market
24 value is today?
25 A.   Yes.

Page 58

1  Q.   What is it?
2  A.   But you got to ask a specific question.
3  Q.   What is the market value of the property
4  today?
5      MR. GOODMAN: Objection; speculation.
6      THE WITNESS: You want me to speculate
7  on the outcome of the dispute?
8      BY MR. LEVANDER:
9  Q.   Why don't you give me two numbers, one
10 with the dispute coming out in one way and the
11 other with the dispute coming out in the other
12 way.
13     MR. GOODMAN: Objection; speculation.
14     THE WITNESS: That's true, it's
15 speculation on both accounts.
16     When you market a property in real life,
17 you come up with an estimate.  But in real life,
18 you don't know what it's worth until you get
19 offers.
20     BY MR. LEVANDER:
21 Q.   Have you done the work to estimate what
22 the value would be?  Have you personally done the
23 work to determine what the value would be?
24 A.   I've got an opinion, an estimate or a
25 guess.

Page 59

1  Q.   What is your opinion?
2  A.   My opinion --
3      MR. GOODMAN: Objection; speculation.
4      THE WITNESS: -- is with the Kmart in
5  place, it's worth less than if the Kmart is not
6  there.
7      BY MR. LEVANDER:
8  Q.   By approximately how much?
9  A.   Maybe half.
10     MR. GOODMAN: Objection; speculation.
11 Q.   And half of what?
12 A.   That requires a lot of speculation.  And
13 to be a range of 6 to 9 million if Kmart's gone.
14 Q.   And half of that if Kmart is there?
15 A.   Yes.
16 Q.   Who's Steven Bruce?  Who is Steven
17 Bruce?
18 A.   My brother.
19 Q.   Do you have any other siblings?
20 A.   No.
21 Q.   How old is Steven?
22 A.   69.
23 Q.   Is Steven married?
24 A.   No.
25 Q.   Does he have any children?

Page 60

1  A.   No.
2  Q.   What does he do for a living?
3  A.   Social Security -- it's something to do
4  with disabilities, which is -- I think it's mostly
5  getting Social Security for disabled people.
6  There's a disabled provision in Social Security.
7  Q.   Is he a lawyer?
8  A.   Yes.
9  Q.   How often do you talk with Steven?
10 A.   I don't.
11 Q.   You don't have a particularly close
12 relationship?
13 A.   We don't.
14 Q.   Can you describe that?
15 A.   We communicate by e-mail.
16 Q.   Do you ever talk to Steven about the
17 property at 1001 Patton Avenue?
18 A.   Yes.
19 Q.   Can you describe those discussions to
20 me?
21 A.   No.
22     MR. GOODMAN: I'm just going to caution
23 the witness to the extent that any of these
24 questions raise any questions as to privileged
25 communications that you and Steven may have had

Page 61

1    with your attorneys, you can't answer that.
2        THE WITNESS: Okay.
3        MR. LEVANDER: Of course.
4        BY MR. LEVANDER:
5    Q.  I'm not asking for any confidential
6    communications that you've had with your
7    attorneys; but to the extent that you and Steven
8    have had discussions, can you describe -- let me
9    start over.
10       What has been the subject of your recent
11   discussions about 1001 Patton Avenue with Steven?
12   A.  Mostly dealing with the dispute.
13   Q.  And other than the dispute?
14   A.  I'd say they're mostly dealing with the
15   dispute.
16   Q.  So is there another subject or no other
17   subject?
18   A.  We've had a lot of discussions with
19   Dollar General.
20   Q.  With Dollar General?
21   A.  Right.
22   Q.  To be a new lessee of the property?
23   A.  An old lessee who would like to stay.
24   Q.  An old lessee who would like to stay.
25       Have you had any discussions with any

Page 62

1    other third parties?
2        MR. GOODMAN: Again, cautioning the
3    witness to the extent third parties includes your
4    counsel, you can't testify to that.  You can
5    answer the question as long as it's not a
6    communication with your counsel.
7        THE WITNESS: We've had -- I've had
8    discussions with people who were -- I get
9    contacted all the time by people who are
10   interested in buying the property and for years,
11   I'd say for 20 years.  And whatever -- if I have
12   any conversations, I'll send him a copy.
13       BY MR. LEVANDER:
14   Q.  Have you had any of those conversations
15   recently with prospective buyers?
16   A.  I get them all the time, people call.
17   It's what brokers do.
18   Q.  Who was the last prospective buyer that
19   you had a conversation with?
20   A.  There's a guy named McKay who's most
21   recent.
22   Q.  And McKay is the name of the broker or
23   McKay is the name --
24   A.  Name of the broker.
25   Q.  And who does he -- who does McKay

Page 63

1    represent?
2    A.  I don't know.  I told him to leave me
3    alone.
4    Q.  Why did you tell him that?
5    A.  Because I didn't want to talk to him.
6    Q.  Have you had any other recent
7    discussions with prospective buyers?
8    A.  There's some brokerage firm wanted to --
9    I forget the name -- said they had a buyer and
10   sent me an e-mail, and I told them leave me alone.
11   I can't remember their name.  And there's calls
12   every week and letters and whatever.  I put the
13   letters in a pile.
14   Q.  Have you engaged with any prospective
15   buyers beyond telling them to leave you alone?
16   A.  We've had serious discussions with a
17   few.
18   Q.  Can you identify who those are?
19   A.  No.
20   Q.  Do you know who they are?
21   A.  Yes.
22   Q.  So can you tell who they were, say who
23   they were?
24   A.  That's an interesting question.  I don't
25   know if I can.

Page 64

1    Q.  Are you invoking privilege?
2    A.  I don't think I have privilege.
3    Q.  So, then, you have to answer the
4    question.
5    A.  We had a serious discussion with Venture
6    Properties.
7    Q.  Can you say that name again?
8    A.  Venture Properties.  I think it's
9    Venture Properties.
10   Q.  V-E-N-T-U-R-E, and that's the name of
11   the broker?
12   A.  No, it's the name of the -- he worked
13   for Venture Properties, the guy who called me.
14   Q.  That's the name of the brokerage firm?
15   A.  No, I think he actually worked for
16   Venture Properties.
17   Q.  And what does Venture Properties do?
18   A.  They develop.
19   Q.  And so this was -- what was their offer?
20   A.  It was a lot.  More than I thought it
21   was worth.
22   Q.  How much?
23   A.  I don't remember.
24   Q.  More than 6 million?
25   A.  Yes.

Page 65

1  Q.   More than 9 million?
2  A.   Yes.
3  Q.   More than 15 million?
4  A.   No, there was someone else who told me
5   it was worth more than that, but I didn't believe
6   him either.
7  Q.   So we said more than 9 million, but not
8   more than 15 million.  More than 10 million?
9  A.   Probably.
10  Q.   And you said there was someone else who
11   told you it was worth more than that.  Who was
12   that person?
13  A.   Mike Holland.
14  Q.   Can you say that name again?
15  A.   Mike Holland.
16  Q.   Can you spell the last name?
17  A.   I'm guessing it's H-O-L-L-A-N-D.
18  Q.   And where does Mike Holland work?
19  A.   Asheville probably.
20  Q.   What does he do?
21  A.   He's a real estate broker.
22  Q.   Do you know who his client was?
23  A.   No.
24  Q.   And was his estimate that it was worth
25   more than $9 million?

Page 66

1  A.   I asked him, because I was curious, and
2  he based it on a sale of a -- for a lease for
3  something to do with Kids "R" Us in Asheville.
4  And he based it on using the existing building.
5  And he felt that was similar.  And it was a very
6  big number.  I forget.  It was over 20 million.
7  And I didn't think it was realistic.  But, you
8  know, people call with opinions that want to get
9  your attention and some -- anyway, he called and,
10  you know, he told me how he got us 9 million --
11  20 million or whatever it was.  And I told him to
12  leave me alone.
13  Q.   And was -- you said he based it on using
14   the existing building.  Was his opinion that the
15   property was worth more with the building than
16   without the building?
17  A.   That was -- no, his opinion was what he
18   based it on was another deal where they used an
19   existing building, which is different.
20  Q.   I understand.
21  A.   I was curious because it was way
22   different than anyone else said.  And those old
23   buildings are hard to reuse because there's --
24   anyway, I'm getting off the topic.
25     MR. GOODMAN: Sam, we've been going

Page 67

1   about an hour and a half.  I don't want to
2   interrupt your flow, but if there's a point --
3     MR. LEVANDER: Is this a good time for
4   you to take a break or do you prefer to keep
5   going?  I'm flexible.
6     THE WITNESS: Probably would be a good
7   idea, maybe we can use the bathroom and eat.
8     MR. LEVANDER: That sounds good and
9   there's some coffee in the room.
10     (Recess from the record.)
11     BY MR. LEVANDER:
12  Q.   I just want to follow up on a couple of
13   quick points from our previous session.  So you
14   described two conversations that you had with --
15   one with Venture Properties and another with an
16   individual named Mike Holland.
17     The first of those, the conversation
18   with Venture Properties, when did that
19   conversation occur?
20  A.   Probably a year ago.
21  Q.   Do you have any more precise date as to
22   when that might have happened?
23  A.   No.  About a year ago is pretty precise.
24  Q.   Do you know if it was before October of
25   last year?

Page 68

1  A.   October of what?
2  Q.   Of 2018.
3  A.   You guys -- not you, but J&W gave me
4   notice in January of '18.
5  Q.   So was it before or after you got a
6   letter?
7  A.   It must have been after January of '18.
8  Q.   Okay.  And the conversation with Mike
9   Holland?
10  A.   It was several.
11  Q.   Let's start with the first.
12     MR. GOODMAN: Objection to form.
13     What was the question?  I'm sorry.
14   You're asking when?
15     MR. LEVANDER: Sure.
16     BY MR. LEVANDER:
17  Q.   When did the offer -- or sorry.
18     When did the conversation with Mike
19   Holland occur about the value of the property at
20   1001 Patton Avenue?
21  A.   It was actually fairly recent because he
22   called up and said it's worth whatever.  And I
23   said, "How do you get that?"  And he said, I need
24   you to talk to my, whatever, somebody else in his
25   organization.

Page 69

1   So he called back a few months later and
2   said -- I said, "How did you get that?"  And he
3   said, I need you to talk to somebody else.  And it
4   was maybe the third or fourth call, because I was
5   kind of focused.  You know, he came up with a
6   different number than I was expecting.  And that
7   was fairly recent, maybe within six months.  And
8   he's with a different firm now.
9   Q.  Do you know the name of either the old
10  or the new firm?
11  A.  No.  I remember his name because I
12  talked to him often -- well, for me it was often.
13  And he finally told me about how they valued it.
14  And that's -- anyway, that was --
15  Q.  And, again, the value was approximately
16  20 million?
17  A.  It could have been 25.
18  Q.  Could it have been more than 25?
19  A.  I don't know.  I mean, it's a big number
20  compared to the whole world of smaller numbers.
21  Q.  What did he tell you about how they
22  valued it?
23  A.  That's what I said, he valued it based
24  on a sale where the buyer could use the building.
25  And I never checked out the details.  And it took

Page 70

1   enough phone calls for me to get to how they did
2   it because it was different.
3   Q.  But that valuation of 20 --
4   approximately 20 to 25 million assumes that there
5   is no Kmart lease in existence; correct?
6   A.  Probably.
7   Q.  Do you have any doubt?
8   A.  I don't, but we didn't discuss it.  I
9   mean, you're asking me to speculate.  He said how
10  they got it and I'm speculating that there would
11  be no Kmart, but that's speculation.
12  Q.  Have you received any offers for the
13  property assuming that the Kmart lease remains in
14  existence?
15  A.  There was one years ago from somebody
16  who called -- I think he had a brokerage firm in
17  Tennessee.  I think his name was Sam something.
18  And he said, "We'd like to buy the property at a
19  12 cap rate."  And that was when J&W's lease was
20  active.  Not only was Kmart there, but J&W was
21  there, or Asheville K-M or whatever.  And that
22  worked out to $1 million.
23  Q.  When approximately -- approximately --
24  when, approximately, did that occur?
25  A.  It could have been two or three years

Page 71

1   ago.
2   Q.  Do you know who -- the Sam something
3   from the brokerage firm in Tennessee, do you know
4   who he represented?
5   A.  No.
6   Q.  Have you received any other offers for
7   the property assuming that the Kmart lease is in
8   existence?
9   A.  No.
10  Q.  It's fair to say that the property is
11  worth less with the Kmart lease in existence than
12  if the Kmart lease is expired?
13      MR. GOODMAN: Objection; speculation.
14      THE WITNESS: That is speculation.  What
15  happens in land is you think you know, but you
16  don't know until you get to a settlement.  And
17  it's not something that when you talk to people
18  and they tell you we think it's worth this and
19  then make an offer and whatever -- sometimes land
20  deals go away, for good reason.
21      BY MR. LEVANDER:
22  Q.  Do you think the land is more valuable
23  with the Kmart lease in existence or without the
24  Kmart lease?
25      MR. GOODMAN: Objection; speculation.

Page 72

1       THE WITNESS: I think, but it's
2   speculation at this juncture; and if you want me
3   to speculate, I will.  And you're nodding.
4       BY MR. LEVANDER:
5   Q.  Go ahead and answer the question.
6   A.  I couldn't resist laughing because you
7   were nodding and not speaking.
8       Anyway, I think, based on my own
9   valuation, but it's speculative, you never know
10  until you get to settlement what's really going on
11  in terms of value.  I'll give you an example.  I
12  told you about Metropolitan Partners and the
13  Kmart.  They bought a property, Kmart center, they
14  had sewer.  In Tysons Corner -- I don't know if
15  you know Tysons Corner, it's a big area.  It's all
16  built up, over 20 million square feet of office,
17  and -- within a very small space, lots of big
18  buildings.  And you believe they have sewer.
19  Kmart has to have sewer to open; right?  No
20  question.  You know they didn't have sewer to
21  build the new project, they didn't have capacity.
22      In order to get capacity, they had to
23  build -- replace an existing sewer line with a
24  bigger one and had to run a long distance, a mile,
25  2 miles, whatever, millions of dollars in Tysons

In re:  SEARS HOLDINGS CORPORATION, ET AL.

PAUL BRUCE
June 6, 2019

Page 73

1  Corner to get sewer where there's sewer there.  I
2  mean, as a broker, you just put it and you fill in
3  the blanks, there's sewer.  But when they got time
4  to build, there was no sewer.
5     People in Loudoun County, Virginia,
6  thought they had valuable land because they could
7  put a house -- one house per acre.  It was not
8  only in the master plan, it was zoned.  And you
9  know what the county did?  You don't know.  They
10 down zoned it.  So most of the land they could put
11 one house for 3 acres.  And you can't afford to
12 bring sewer in.  By the way, in a lot of Loudoun
13 County, you can't -- you can't put in a septic
14 field.
15 Q.  Mr. Bruce, let me refocus your attention
16 on the question I have.
17 A.  I'm just saying to the question you
18 asked, you don't know, and that's my answer, until
19 you get to settlement.
20 Q.  Let me refocus your attention on the
21 question that I asked.  You are arguing in this
22 litigation that the Kmart lease is expired;
23 correct?
24 A.  Yes.
25 Q.  And you're spending money to -- in

Page 74

1  support of that position; correct?
2  A.  Yes.
3  Q.  And you are doing that because you think
4  the land is more valuable without the Kmart lease
5  than with the Kmart lease?
6  A.  That's our belief.  That's our
7  speculation.
8  Q.  And you've received offers for the
9  property without the Kmart lease that exceed the
10 value that you've gotten for offers with the
11 property with the Kmart lease?
12    MR. GOODMAN: Objection to form.
13    THE WITNESS: We have.
14    BY MR. LEVANDER:
15 Q.  So the land, in your opinion, is more
16 valuable without the Kmart lease in existence than
17 it is with the Kmart lease?
18    MR. GOODMAN: Objection; speculation.
19    THE WITNESS: I didn't hear what you
20 said.
21    MR. GOODMAN: I objected for
22 speculation, but you can answer.
23    THE WITNESS: It's -- at this stage,
24 it's my opinion without having all the facts, it's
25 speculation.

Page 75

1     BY MR. LEVANDER:
2  Q.  Why is that your opinion?  What is the
3  basis for your opinion?
4  A.  The basis --
5     MR. GOODMAN: Objection to form.
6     THE WITNESS: -- for my opinion is
7  talking to people active in the market and
8  collecting comparable sales, and it's an opinion.
9     BY MR. LEVANDER:
10 Q.  Do you have a sense of what the market
11 rent would be for the property at 1001 Patton
12 Avenue?
13    MR. GOODMAN: Objection; speculation.
14    THE WITNESS: That's also speculation.
15 Less of a sense of the market rents.
16    BY MR. LEVANDER:
17 Q.  Can you repeat that?
18 A.  There's -- I don't know that area like I
19 do Virginia.  And I don't know the retail market
20 like I do the industrial market and the apartment
21 market and residential markets in Virginia.  I
22 know -- so my opinion, when I go out of town, and
23 that's way out of town, I mean, I normally work
24 literally within 5 or 6 miles of my house, maybe
25 8 miles.  And when I was active, I knew the market

Page 76

1  very well, every deal, every property, all the
2  details.
3     In Asheville, I don't know.  I mean, I'm
4  getting opinions from people and some of them seem
5  more knowledgeable than others, but it doesn't
6  have the depth of knowledge that you get in
7  Fairfax County; that you just don't get the
8  quality of people knowing the market and depth of
9  market knowledge.  So I'm more guessing.  And
10 that's a --
11 Q.  Is it your opinion that the Kmart lease
12 is for below market rent?
13 A.  Yes.
14    MR. GOODMAN: Objection; it's vague and
15 ambiguous.
16    THE WITNESS: That's not ambiguous.
17    BY MR. LEVANDER:
18 Q.  By how much?
19 A.  My guess is it would be around -- in the
20 neighborhood of $5 a square foot.  And the Kmart
21 lease, as of the second amendment, is $2; but all
22 the caveats about not knowing the market apply.
23 Q.  Understood.
24    And with those caveats, you're saying
25 that the Kmart lease is at approximately

Page 77

1    40 percent of market rent?
2  A.  I'm guessing, but yes.
3  Q.  Okay.  Let me return to a few questions
4    about your family, if you don't mind.  I'll try
5    not to be -- who's Diane Bruce?
6  A.  My wife.
7  Q.  How long have you been married?
8  A.  She knows exactly.
9  Q.  That's how it goes; right?
10 A.  I'd say 49 years.
11 Q.  Very impressive.
12    What does she do for a living?
13 A.  Now?
14 Q.  Now.
15 A.  We go hiking.
16 Q.  That's a good living.
17    And before, she was a professional
18  hiker?
19 A.  No.
20 Q.  What did she do?
21 A.  She spent -- she had a career as an art
22  teacher.  And it was a short career; but, yes, she
23  was an art teacher.
24 Q.  And do you have any children?
25 A.  Yes.

Page 78

1  Q.  How many?
2  A.  Two.
3  Q.  What are their names?
4  A.  Cara.
5  Q.  And?
6  A.  Allison.
7  Q.  How old is Cara?
8  A.  '73, her birthday is in November.  So
9    she's 40 something.  45, maybe 46, somewhere in
10   there.
11 Q.  And Allison, how old is she?
12 A.  She's younger.  Her birthday is in
13   March.  So she's 43.
14 Q.  What does Cara do for a living?
15 A.  She and her husband own a restaurant and
16   bar.
17 Q.  Where is that?
18 A.  Baltimore.
19 Q.  And they live in Baltimore as well?
20 A.  Yes.
21 Q.  Do they have any kids?
22 A.  No.
23 Q.  How about Allison; what does Allison do
24   for a living?
25 A.  She's a manager.

Page 79

1  Q.  A manager of what?
2  A.  At a restaurant, Fogo de Chão.
3  Q.  Brazilian steak house?
4  A.  Yes.
5  Q.  Where is that located?
6  A.  In Baltimore.
7  Q.  Do they live near each other, Allison
8    and Cara?
9  A.  Yeah, about a ten-minute ride.
10 Q.  Are they close with each other?
11 A.  Pretty close.
12 Q.  And do you have a good relationship with
13   Cara?
14 A.  Yes.
15 Q.  And do you have a good relationship with
16   Allison?
17 A.  Yes.
18 Q.  At some point, you transferred your
19   interest in the property at 1000 Patton Avenue to
20   Cara and Allison; correct?
21 A.  Yes.
22 Q.  Can you explain why?
23 A.  Yeah.  Generally moving assets from
24   myself and my wife to my kids makes sense, and it
25   was convenient because we had appraisals from one

Page 80

1    of my parents or the other which meant we could do
2    everything quick and easy and simple.  And they
3    were appraisals for low gift taxes, not real life.
4  Q.  And approximately when would the
5    appraisals have occurred?
6  A.  Well, the appraisals would have occurred
7    when my mom died for her 706 and then a second one
8    when my dad died for his 706.
9  Q.  Who is Dan Heller?
10 A.  He's an attorney.  Specializes in
11   estates and taxes.  And he's in Florida.
12 Q.  Was he your father's attorney?
13 A.  No.
14 Q.  Is he your attorney?  Have you retained
15   him as an attorney in the past?
16 A.  My brother and I hired him after -- when
17   we became trustees.
18 Q.  And he became a trustee of the Martin
19   Bruce Revocable Trust?
20 A.  Yes.
21 Q.  In around 1999?
22 A.  Yes.
23 Q.  But he was not -- he was never a
24   beneficiary of the trust?
25 A.  That's correct.

Page 81

1  Q.  So who were the -- who -- in 1999, who
2  were the beneficiaries of the trust?
3  A.  My brother and I were both
4  beneficiaries.
5  Q.  And -- so currently, the fee ownership
6  of the property at 1001 Patton Avenue, can you
7  describe what the current breakdown of the fee
8  ownership is of that property?
9  A.  The Steven Bruce Trust has 50 percent
10  and Cara and Ally have trust each at 25 percent.
11  Q.  And is Steven the sole beneficiary of
12  the Steven Bruce Trust?
13  A.  I would guess, but I would be guessing.
14  Q.  Is Allison the sole beneficiary of the
15  Allison Bruce Trust?
16  A.  Yes.
17  Q.  And is Cara the sole beneficiary of the
18  Cara Bruce Irrevocable Trust?
19  A.  Yes.
20  Q.  So you mentioned earlier that you've
21  been to the property at 1001 Patton Avenue -- or
22  that you visited the property at 1001 Patton
23  Avenue approximately 30 years ago?
24  A.  Yes.
25  Q.  Have you been there since?

Page 82

1  A.  Yes.
2  Q.  Approximately how many times?
3  A.  Probably two additional times.
4  Q.  Two additional times.
5       Can you describe the first time?  Well,
6  the second time, the first time after the first
7  time.
8  A.  I don't remember much about it.  I
9  remember we were there because I remember where we
10  stayed.  There was an old hotel that was built out
11  of the boulders.
12  Q.  Approximately what year, if you
13  remember?
14  A.  Somewhere between 30 and five.  I mean,
15  it was quite a while ago.  But it was -- that was
16  it.
17  Q.  What was the purpose of the visit?
18  A.  Well, we were in the area and we -- I
19  said we ought to go look at it, and we drove by
20  and we looked at it.
21  Q.  When you say you looked at it, what did
22  you do?
23  A.  We looked to see who the tenants were
24  and the general condition, and that was it.  I
25  mean, we spent maybe an hour, maybe less.

Page 83

1  Q.  Who were you with?
2  A.  My wife.
3  Q.  You and your wife.
4       Who were the tenants?
5  A.  I remember Kmart and I remember taking
6  pictures, but I don't know where they are.  And I
7  don't remember the other tenants at that time.
8  Q.  So did you inspect the Kmart store?  Did
9  you inspect the Kmart store?
10  A.  "Inspect" is a little vague.
11  Q.  But you took a look at the general
12  condition of the store?
13  A.  Right.  It looked -- in Ohio, the Akron
14  property, the parking lot was gravel.  It was not
15  maintained.  And this parking lot was maintained.
16  And Kmart was open.  They weren't doing much
17  business, but much more than recently.
18  Q.  Do you recall if there were any other
19  issues with the property?
20  A.  Well, there were other issues.
21  Q.  What were they?
22  A.  Well, there's -- you really don't want
23  to in -- I guess you do.
24       Every so many years I get calls about
25  vagrants and people would be very upset because

Page 84

1  there's drugs and vagrants and homeless people at
2  the center, and they'd call me.  And there was an
3  issue with graffiti and that would be calls
4  from -- not calls, certified mail from the city or
5  the county saying you have to clean it up;
6  otherwise, we'll do it and charge you.
7       And there was somebody killed in the
8  Dollar General store, I believe a couple of years
9  ago, and somebody told me about it and sent me an
10  article; but nothing -- and years ago somebody got
11  hurt at the Kmart going through a revolving door
12  and there was a lawsuit and they sued us and
13  Kmart -- and Kmart took care of it.
14       And there's -- Dollar General is there
15  and we have it worked out under the lease and
16  they're trying to figure out the lights and they
17  don't seem to be able to turn on the lights, which
18  amazes me.  I think that's all the issues.
19  Q.  And you said that this was between
20  approximately five and 30 years ago.  I just want
21  to see if we can narrow that time period a bit.
22  A.  What was?
23  Q.  Your second visit to the store.
24  A.  I really don't remember when it was.
25  Q.  Would it have been --

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL.    Pg 26 of 71

PAUL BRUCE
June 6, 2019

Page 85

1  A.  Go ahead.
2  Q.  Well, so --
3     MR. GOODMAN: Just objection;
4  mischaracterizes the testimony.
5     I think -- I don't want to testify for
6  the witness, but can I ask a question?
7     MR. LEVANDER: Go ahead.
8     MR. GOODMAN: When you testified earlier
9  that your second visit to the property was between
10  30 and five, did you mean 30 and 35 years ago or
11  did you mean 30 or five years ago?
12     THE WITNESS: Between 30 and five, in
13  other words, between the first visit and I went a
14  few years ago.
15     BY MR. LEVANDER:
16  Q.  Got it.
17     So there was an initial visit
18  approximately 30 years ago, correct, and then a
19  recent visit approximately five years ago?
20  A.  It could have been.
21  Q.  And a visit in between?
22  A.  Yes.
23  Q.  So the visit in between, would that have
24  been after you became the document custodian in
25  1994, after your mother's passing?

Page 86

1  A.  I don't know.  It wasn't particularly
2  related to the property.  There's a place called
3  Grayson, which is a state park, Grayson Highlands
4  in Virginia, and there's a place called Blowing
5  Rock and a place McAfee Knob, and those were all
6  hiking places.
7     So I'm guessing it was in conjunction
8  with someplace we went; in other words, the last
9  visit was -- we went to Skyline, White Oak Canyon,
10  Mary's Rock, and then we went down to McAfee Knob
11  and we went to Asheville and came back on the
12  Boone Fork Trail.  I mean, these are beautiful
13  places.
14  Q.  Beautiful part of the country.
15  A.  And went up to Grayson, which is my
16  favorite park.  You can walk through Grayson and
17  get on the Appalachian Trail and Mount Rogers.
18  And if we're kind of going through in that area, I
19  said, "Diane, you know, we really ought to stop.
20  We're only going to be like an hour out of the
21  way."
22  Q.  Do you think that visit was closer in
23  time to your first visit or to your third visit?
24  A.  I can't answer.
25  Q.  So you have no -- you have no sense of

Page 87

1  whether it was any time between 1989 and 2014?
2  A.  I know it was between those, and I just
3  don't remember when it was.  And the most recent
4  was -- I remember in more detail because it was
5  more recent.  And I know what we did.  And it
6  could have been three years instead of five.  And
7  it was triggered by another trip.  It wasn't
8  triggered anything to do with the property.
9  Q.  Okay.  So let's talk about the third
10  visit.  So you've said that was between three and
11  five years ago?
12  A.  Right.
13  Q.  What was the purpose of that visit?
14  A.  I just said.  The purpose was we were
15  going to be at McAfee Knob.
16  Q.  Okay.  And then what did you do once you
17  got to the property at Asheville?
18  A.  We looked at it, did a visual
19  inspection, looked at the parking lot, looked at
20  the tenants, looked at the Kmart.  And there was
21  nothing that stood out as we needed to deal with
22  and we left.  Diane went shopping.  She brought
23  something in the Dollar General store.
24  Q.  Not at Kmart?
25  A.  We walked through the Kmart, as I

Page 88

1  remember.  And we almost felt -- the Dollar
2  General store is 8,000 feet and Kmart is
3  100,000 feet.  It's much bigger.  And we almost
4  felt the Dollar General store did more business
5  than the Kmart.  And -- but we took a look and we
6  went on to Boone.
7  Q.  When you say you took a look, what did
8  you do?
9  A.  That's just what I said.  We did a
10  visual inspection.  We went in the Kmart.  We went
11  in the Dollar General.  And we saw there was a Tae
12  Kwon Do place, which was Sun Soo on their lease,
13  but actually the name didn't sound Korean when you
14  talked to them.  And that's what we did.
15  Q.  And this was three to five years ago?
16  A.  Correct.
17  Q.  So between 2014 and 2016?
18  A.  Right.
19  Q.  And Kmart was occupying the property at
20  the time?
21  A.  Yes.
22  Q.  Did you notice any change between the
23  first and the second visit when you went -- when
24  you looked at the Kmart?
25  A.  I'm sure there were changes and

Page 89

1   significant changes because Kmart's business was
2   declining.  It used to be a tremendous store, the
3   third best Kmart in the country back in -- or so I
4   was told.  And the sales were very high, like
5   $18 million.  And the sales I think in the last
6   few were 800,000 or something much less.  And so
7   Kmart went from being a vibrant business that
8   would attract customers to the center to being
9   negative.
10  Q.   Did you notice any changes in the
11  premises themselves?
12  A.   The premises always looked like they
13  were maintained adequately.
14  Q.   Between the second and the third visit,
15  did you notice any change in the premises?
16  A.   That's all.  There was nothing that
17  stood out.
18  Q.   How do you generally -- you've only been
19  to the property three times.  How do you generally
20  get information about the property at 1001 Patton?
21  A.   What kind of information would I be
22  getting?
23  Q.   So, for example, if there were a problem
24  with the property, who would you hear that from?
25  A.   You mean someone complaining that there

Page 90

1   were vagrants there?
2   Q.   Sure.  Who told you that?
3   A.   People would call.  They would be very
4   irate.
5   Q.   Which people?
6   A.   I don't know.
7   Q.   So --
8   A.   I'd write down their name and their
9   phone number if they call.
10  Q.   So some consumer who found the telephone
11  number of the fee owner, that kind of thing?
12  A.   It could have been a consumer.  It could
13  have been somebody who lived nearby who went to
14  the church or something.  It could have been
15  anybody.  They'd call and complain and they'd be
16  very upset, and I'd pass it on to J&W Management.
17  Q.   So J&W Management was involved in the
18  day-to-day management of the property?
19  A.   Yes.
20  Q.   Who was your primary contact at J&W?
21  A.   Bill Aronson.
22  Q.   Can you spell his last name?
23  A.   A-R-O-N-S-O-N.
24  Q.   What is his role at J&W?
25  A.   He's the guy I would call.  I don't know

Page 91

1   what his title was.
2   Q.   A property manager of some kind?
3   A.   He's the guy anything came up of a
4   nature of complaints, make sure the real estate
5   tax bill was paid.  They sent me the stormwater
6   bill, I'd fax him a copy.
7   Q.   What else did you talk with Bill Aronson
8   about over the years?
9   A.   It was mostly -- I mean, we had a tax
10  escrow account completely separate for that
11  property and he'd need periodically bank
12  statements.  We didn't need to do accounting
13  because it was one tenant, one tax bill and they
14  made payments.  And I'd send them -- whenever he
15  needed a statement, I'd send it to him.  And we
16  didn't talk often.  I mean, we talked a few times
17  about the graffiti.  He's very pleasant.  And he
18  got -- you know, took care of things.
19      But, I mean, we laughed a little about
20  the graffiti because they sent me lots of notices
21  by certified mail; but I talked to Glenn Howarth,
22  also at J&W, he was the general counsel.  And the
23  first big discussion he had was on the partnership
24  that wanted to do a deal on the Golden Corral.
25  Q.   What is Glenn Howarth's role at J&W?

Page 92

1   A.   He's general counsel.
2   Q.   Did you ever talk with Bill Aronson
3   about any construction on the property?
4   A.   No.
5   Q.   Did you ever talk with Bill Aronson
6   about any demolition on the property?
7   A.   No.
8   Q.   What is your understanding of J&W's role
9   in relation to the property at 1001 Patton?
10  A.   They would -- were manager.  And the
11  ground lease was bifurcated between two groups.
12  One group was Asheville K-M Associates.  And the
13  other group was -- they changed the names a lot of
14  the other group who basically did the leasing.
15  Q.   What were the names?
16  A.   Of -- I'd have to look at the paperwork
17  to get them correct because they had similar
18  names.  I mean, they had Nineteenth Asheville
19  Corp., Nineteenth Asheville Partners.
20  Q.   Nineteenth Asheville Partners?
21  A.   Excuse me?
22  Q.   And Nineteenth Asheville Partners?
23  A.   Partners.  I think it was partners.
24  Like I said, I'd have to --
25  Q.   Turn to -- can you turn to page 6 of

Page 93

1  your declaration, paragraph 32B.
2  A.  Okay.
3  Q.  Does it say Nineteenth Asheville
4  Properties?
5  A.  32B?
6  Q.  Towards the bottom of the page.
7  A.  Okay, okay.  And that's --
8  Q.  And Nineteenth Asheville Properties is
9  the defined term NAP?
10  A.  Okay.
11  Q.  And then can you turn to page -- the
12  next page, paragraph 36.  Can you read the second
13  sentence that starts with "J&W serves"?
14  A.  So you want me to read the second
15  sentence?
16  Q.  Sure.
17  A.  Was that the question?
18  Q.  That was the question.
19  A.  "Attached as Exhibit 22" --
20  Q.  No, that's the third sentence.  The one
21  that starts "J&W serves."
22  A.  Oh, okay.
23      "J&W serves as agent for NAP, the estate
24  of Walter Samuels and Marilyn Joy Samuels."
25  Q.  Right.

Page 94

1      And NAP is Nineteenth Asheville
2  Properties?
3  A.  Okay.
4  Q.  So you had said earlier that J&W was
5  agent for a number of similarly-named entities,
6  and so those include Nineteenth Asheville
7  Corporation and Nineteenth Asheville Properties?
8  A.  I'd need to go through the documents in
9  detail to answer your question whether they were
10  agent for both at the same time or one succeeded
11  the other.
12  Q.  But you understood those all to be
13  entities affiliated with J&W Management?
14  A.  Yes.
15  Q.  And J&W Management you've described as
16  the property manager for 1001?
17  A.  Right.
18  Q.  And as the entity that received the rent
19  from Kmart?
20  A.  Actually, they don't receive the rent
21  from Kmart, I don't think.  I think the rent was
22  sent to Asheville K-M Associates.
23  Q.  From Kmart?
24  A.  From Kmart.
25  Q.  So what is your understanding of how --

Page 95

1  of how Kmart's rent payments were made?
2  A.  I think they wired the money to
3  Asheville K-M Associates.
4  Q.  And then how would rent be paid to you?
5  A.  They would write a check.
6  Q.  Who would write a check?
7  A.  Asheville K-M Associates would write a
8  check.  Actually, three checks.
9  Q.  One to each of Steven, Cara and Allison?
10  A.  Right.
11  Q.  Give us just one second.
12      (Discussion off the record.)
13  Q.  Okay.  I think I just have one or two
14  more questions and then we can break for lunch.
15  How does that sound?
16  A.  I thought you were going to say we can
17  go home.
18  Q.  No, unfortunately, not quite yet.
19      Did you have a sense of who was paying
20  for the property insurance at 1001 Patton?
21  A.  Actually, I asked for a copy of the
22  insurance certificate and they'd send me one
23  annually.  And I'm sure it was on the certificate
24  who paid for it.
25  Q.  And do you know who was responsible for

Page 96

1  maintenance of the property?
2  A.  Not -- no.  I know who I talked to about
3  issues that would come up.  I talked to Bill
4  Aronson.
5  Q.  From J&W?
6  A.  From J&W.  But I couldn't tell you for
7  sure who was responsible between NAC, NAP, J&W and
8  Asheville K-M Associates; but I knew if I had an
9  issue on the insurance, I would call Erica Cohen.
10  Q.  And Erica Cohen worked where?
11  A.  She's director of leasing at J&W.  And
12  if I needed leases, I would call Erica Cohen.  And
13  if there were legal questions like to do with the
14  people who wanted to open a business, doing
15  business as Golden Corral, I talked to Glenn
16  Howarth.  And if I needed the sales figure, I
17  called Glenn, and if there was a rent issue, I'd
18  call Rachna, whatever her name was, at Asheville
19  K-M Associates.
20      THE REPORTER: I'm sorry, what was the
21  last one?
22      MR. GOODMAN: It's Rachna I think,
23  R-A-C-H-N-A.
24      BY MR. LEVANDER:
25  Q.  And when you say "rent," you mean the

Page 97

1  rent that was paid to you?
2  A.  Right.
3  Q.  But for all of those other issues, so on
4  leases or somebody opening a business or
5  insurance, you would call somebody at J&W;
6  correct?
7  A.  Right.
8  Q.  And J&W we've said is the agent for NAP?
9  A.  Right.
10  Q.  Okay.
11      MR. LEVANDER: I think we can take a
12  break for lunch.  Go off the record.
13      (Luncheon recess for lunch.)
14      A F T E R N O O N   S E S S I O N
15      (12:52 p.m.)
16  PAUL BRUCE,
17  having been previously sworn, resumed the
18  stand and testified further as follows:
19  EXAMINATION (Cont'd.)
20      BY MR. LEVANDER:
21  Q.  Okay.  What does Asheville K-M do?  What
22  business is Asheville K-M in generally?
23  A.  You mean other than send the rent
24  checks?
25  Q.  Correct.

Page 98

1  A.  I'm not sure what they do other than
2  collect income and send the rent checks.
3  Q.  So was your only interaction with
4  Asheville K-M receiving rent?
5  A.  That's correct.
6  Q.  And occasionally you would communicate
7  with them about the payment of rent?
8  A.  About what?
9  Q.  About the payment of rent.
10  A.  I mean, they did send -- they are the
11  ground lease as Asheville K-M as our tenant, and
12  when the ground -- when they didn't exercise the
13  renewal option, they were the ones to send a
14  letter saying they're not exercising the renewal
15  option.  And, for example -- so, technically they
16  are our tenant, but they've set up a relationship
17  with other entities to deal with the cent- -- I
18  mean, they have a lot of centers, and they set
19  up --
20  Q.  A lot of what?
21  A.  Centers, a lot of properties.
22  Q.  And what is your understanding as to
23  what they do with those centers, with those
24  properties?
25  A.  All I've heard is they're the

Page 99

1  descendents of Eddie Green.
2  Q.  Who's that?
3  A.  He's the guy who put together the Kmart
4  deals in the '60s. He's the guy -- the developer.
5  And when the property got sold to my parents,
6  Eddie Green was the guy who put together a number
7  of properties under different arrangements.
8  Q.  So Eddie Green structured the deal?
9  A.  He actually built the Kmart, got the
10  lease done initially.  That's my understanding.
11  Q.  So is your understanding that Eddie
12  Green is affiliated with Patton Avenue Development
13  Corporation?
14  A.  Yes.
15  Q.  Let me --
16  A.  I'd have to check on it, but he was a
17  guy known for putting together Kmart deals.  And I
18  never met him, never talked to him, but he's --
19  within a small circle, he's famous.  Like my dad
20  put together deals with certain tenants he had
21  relationships with.
22  Q.  Did you ever meet Eddie Green?
23  A.  No.
24  Q.  What is your understanding of what Eddie
25  Green's deals would look like, what the structure

Page 100

1  of his deals would be?
2  A.  The only deal I've seen with Eddie Green
3  that I'm aware of, and I'm not positive it's him,
4  is this Asheville deal.
5  Q.  And do you know how your father and
6  Eddie Green got together on the Asheville
7  property?
8  A.  No.
9      THE WITNESS: He keeps forgetting I was
10  18 years old, maybe 16.
11  Q.  And there was never any conversation
12  since 1964 about how your father and Eddie Green
13  got together on the Asheville property?
14  A.  I don't think there was any conversation
15  in 1964.
16  Q.  I'm not saying that there was, but you
17  said that you -- that you don't remember because
18  you were 18 years old, and I'm not asking about
19  when you were 18 years old.  I'm asking about
20  between 18 years old and today, whether there was
21  any conversation.
22  A.  About what?
23  Q.  About your father's relationship with
24  Eddie Green.
25  A.  I don't specifically remember any

In re:  SEARS HOLDINGS CORPORATION, ET AL.

PAUL BRUCE
June 6, 2019

Page 101

1   conversation about my father's relationship with
2   Eddie Green.
3   Q.   And why wouldn't Eddie Green remain the
4   fee owner?
5   A.   I have no idea.
6   Q.   But your understanding is that he
7   would -- he would build the Kmart and then sell it
8   on to a different fee owner?
9   A.   I mean, I can give you an answer which
10   might be correct, but I'd be speculating.  Do you
11   want that?
12   Q.   Sure.  Answer the question.
13   A.   I'd be speculating, but developers
14   build -- put together deals, acquire the land,
15   sign the leases, have a package that they can
16   sell, and they sell it for a profit.  So if Kmart
17   sold for whatever, a million five, their cost
18   might be a million two.  And there's a profit in
19   putting everything together and then selling it to
20   an investor, a development profit, and it's
21   substantial.  And that's why developers exist, to
22   make money and become president.
23   Q.   And a tax break for the subsequent
24   purchaser as well?  And there are tax benefits to
25   the subsequent purchaser as well?

Page 102

1   A.   There's tax benefits to people who buy
2   real estate in general.  And as far as the
3   specific tax benefits, I don't know; but it's
4   known for providing tax benefits.  But they always
5   come back to bite you.
6       (Deposition Exhibit 2 was marked for
7   identification and attached to the transcript.)
8       THE WITNESS: Look at that.  How
9   convenient.
10      BY MR. LEVANDER:
11   Q.   I see you're already leafing through it,
12   but do you recognize this document?
13   A.   Yeah.
14   Q.   What is this document?
15   A.   I presume it's the Kmart lease.
16   Q.   From what date?  From December 18th,
17   1964?
18   A.   Right.
19   Q.   And you -- you attached this as
20   Exhibit 1 to the declaration you submitted to the
21   court; correct?  It's paragraph 4 of your
22   declaration.
23   A.   Okay.  Good.  Okay.
24   Q.   And in that paragraph 4, you describe
25   this as the Kmart lease?

Page 103

1   A.   Correct.
2   Q.   Can we agree today that we'll call this
3   the Kmart lease?
4   A.   Okay.
5   Q.   Great.
6       By the terms of the Kmart lease, when
7   did -- when did Kmart's lease expire?
8   A.   My recollection -- well, here it is.
9   20-year term plus options.  And I believe --
10   Q.   The 20-year term is in which paragraph?
11   A.   Paragraph 2.
12   Q.   Okay.
13   A.   And then there's renewal options,
14   options to extend lease, in paragraph 12.
15   Q.   And what are the options in
16   paragraph 12?
17   A.   They're five-year renewal options.  And
18   it looks like there's three of them.
19   Q.   So when you combine the initial term in
20   paragraph 2 with the three options in paragraph
21   12, how long was the entirety of the lease?
22   A.   It was 35 years.
23   Q.   So what year would this lease have
24   expired?
25   A.   Around 1999.  You got to check.

Page 104

1   Sometimes the term isn't on the date of the lease,
2   but it's on the date of construction.  This
3   probably was on the date of the lease.
4   Q.   I think if you -- in paragraph 2, the
5   first sentence, it says, "It shall commence upon
6   the date of occupancy."
7   A.   That's what I was -- and I'm not sure
8   when the date of occupancy is.
9   Q.   But so this lease, by its own terms,
10   would expire 35 years after the date of occupancy?
11   A.   Right.
12   Q.   So did the Kmart lease expire 35 years
13   after -- after the date of occupancy?
14   A.   No.
15      MR. GOODMAN: Objection; calls for a
16   legal conclusion.
17   Q.   Why not?
18   A.   Because they did an extension.
19   Q.   What were the terms of that extension?
20   A.   I'd have to look at the second
21   amendment.
22   Q.   But it was the 1992 second amendment
23   that extended the lease?
24   A.   Right.
25      (Deposition Exhibit 3 was marked for

Page 105

1  identification and attached to the transcript.)
2  Q.  Do you recognize the document that I
3  just gave you?
4  A.  Aren't you supposed to say what it is?
5  Q.  I'm about to ask you what it is, but
6  first I'm asking if you recognize the document.
7  A.  Exhibit O.
8  Q.  Well, this has been marked as Exhibit 3
9  in this case.
10  A.  This is Exhibit 3?
11      MR. GOODMAN: For today's deposition.
12  Q.  In today's deposition.
13  A.  Can I borrow a pen?
14  Q.  And you are correct to point out that it
15  is Exhibit O to the Levander declaration, but do
16  you recognize the document?
17  A.  Yes.
18  Q.  And this is the second amendment that
19  you were referring to a minute ago?
20  A.  Right.
21  Q.  And it's dated March 3rd, 1992?
22  A.  Yes.
23  Q.  And if you look in paragraph 2, that
24  describes an initial term and then various
25  options, the last of which will expire in

Page 106

1  November 30th -- on November 30th, 2032; correct?
2  A.  Correct.
3  Q.  Let's turn back to what we marked as
4  Exhibit 2.  So that's the Kmart lease.
5      By the terms of the Kmart lease, is
6  Kmart a tenant or a subtenant of the fee owners?
7  A.  Of the fee owners?
8  Q.  Of the fee owners, is Kmart a tenant or
9  subtenant under this lease?
10  A.  Under the first lease?
11  Q.  Just under the terms of this contract
12  that you have in front of you.
13  A.  That's an interesting question.  It
14  was --
15  Q.  Well --
16  A.  I understand.
17  Q.  Go ahead if you're -- I don't want to
18  cut you off.
19  A.  The property was sold subject to this
20  lease and -- so that would -- under this lease,
21  they started out -- I'm guessing that they'd be a
22  tenant because there was nobody in the middle on
23  this lease.
24  Q.  So your understanding is that because
25  this lease was directly between the fee owner and

Page 107

1  Kmart, that Kmart became the tenant and not the
2  subtenant?
3  A.  Right, but I'm guessing.  That's really
4  a legal question that I'm not sure I'm qualified
5  to answer.
6      MR. GOODMAN: We'll object.
7  Q.  But you've read --
8      MR. GOODMAN: -- on legal conclusion.
9  Q.  You've read hundreds of leases and your
10  job for decades was to interpret leases; correct?
11  A.  That doesn't mean if I had a question, I
12  wouldn't ask an attorney.
13  Q.  Understood.
14      But you are -- you have more competence
15  than the average layperson in understanding the
16  terms of a lease?
17  A.  I may be more competent than the average
18  layperson, but not necessarily more competent than
19  an excellent attorney.
20  Q.  Right.
21      But you possess significant expertise in
22  understanding leases?
23  A.  There's no question I possess some
24  expertise.
25  Q.  So turning to the recital -- it's the

Page 108

1  first paragraph of this document --
2  A.  Okay.
3  Q.  -- that page.
4      So this reads, "This lease, made and
5  entered into as of this 18th day of December 1964,
6  between Patton Avenue Development Corporation" --
7  and then it describes where Patton Avenue
8  Development Corporation is located -- "herein
9  referred to as landlord, an S.S. Kresge Company (a
10  Michigan corporation) herein referred to as
11  tenant."
12      So would you agree that this lease is
13  directly between the fee owner, Patton Avenue
14  Development Corporation, and the tenant, S.S.
15  Kresge Company?
16  A.  There's a technical issue because also
17  there's a ground lease.
18  Q.  So what is the -- what is the date of
19  this document?
20  A.  It's 1964.
21  Q.  And what is the date of the ground
22  lease, if you remember?
23  A.  1966.
24  Q.  So as of 1964, is there a ground lease?
25  A.  There's a ground lease, but they were a

Page 109

1  tenant of Patton Avenue Development Corporation in
2  1964.
3  Q.  But in 1964, the 1966 ground lease you
4  referred to does not yet exist; correct?
5  A.  That's correct.
6  Q.  So S.S. Kresge, which is Kmart -- can we
7  agree that S.S. Kresge is Kmart?
8  A.  Yeah.
9  Q.  Kmart is the tenant of the fee owner?
10  A.  In 1964.
11  Q.  And there is no -- there is no other
12  lease in existence at the time?
13  A.  There's no ground lease.
14  Q.  There's no ground lease.
15      So there's a direct landlord tenant
16  relationship --
17  A.  Right.
18  Q.  -- between the fee owner and Kmart?
19  A.  Right.
20      MR. GOODMAN: Objection; legal
21  conclusion.
22  Q.  So you agree that in 1964, Kmart was the
23  tenant of this property at 1001 Patton Avenue?
24  A.  They were the tenant of the owner of the
25  property in 1964.

Page 110

1  Q.  And is it your position that they
2  remained the tenant or at some point, is it your
3  position that they became a subtenant?
4      MR. GOODMAN: Objection; legal
5  conclusion.
6      THE WITNESS: You have to speak up,
7  fellow.
8      MR. GOODMAN: You have to answer anyway.
9  He's catching it.
10      I objected on legal conclusion, but you
11  still have to answer his question, if you know the
12  answer.
13      THE WITNESS: After the ground lease
14  was -- what's your question again?
15      BY MR. LEVANDER:
16  Q.  Did -- in your assessment, did Kmart
17  remain a tenant or at some point did Kmart become
18  a subtenant?
19      MR. GOODMAN: Objection; legal
20  conclusion.
21  Q.  You can answer the question.
22  A.  They become -- I better take a look at
23  the ground lease.
24      Do you have a copy here?
25  Q.  Sure.

Page 111

1      MR. LEVANDER: We can mark that as
2  Exhibit 4.
3      (Deposition Exhibit 4 was marked for
4  identification and attached to the transcript.)
5  Q.  Okay.  So I've handed you what's been
6  marked as Exhibit 4.
7  A.  Right.
8  Q.  Do you recognize this document?
9  A.  Yes.
10  Q.  What is it?
11  A.  This is the ground lease.
12  Q.  Dated?
13  A.  1966.
14  Q.  And this is the document we were just
15  referring to?
16  A.  Right.
17  Q.  And this is Exhibit 5 to your
18  declaration?
19  A.  Right.
20  Q.  Can I turn your attention to --
21  A.  In Exhibit 4 in the ground lease.
22  Q.  Yeah.
23      -- to Article I --
24  A.  Okay.
25  Q.  -- which is on page 5.

Page 112

1  A.  Page 5?
2  Q.  Yes.  I think you're there.  I think you
3  have it open to the right page.
4      MR. GOODMAN: This is Article --
5      THE WITNESS: Okay.
6      BY MR. LEVANDER:
7  Q.  The end of that first paragraph says,
8  "Said premises are hired in lease subject to the
9  following."
10  A.  Okay.
11  Q.  Do you understand what that first
12  paragraph says?
13  A.  All right.
14  Q.  What does it say?
15  A.  Their lease subject to the following.
16  Q.  What does it mean to be "subject to"?
17  If one lease is subject to something else, what
18  does that mean?
19  A.  It's subject to all these things listed
20  here.
21  Q.  But what does it mean to be subject to
22  something?
23  A.  It's subject to a lot of things.
24  Q.  But generally, what does it mean for a
25  lease to be subject to something else?

Page 113

1  A.  I'm not sure how to answer the question.
2  I've seen it used, but there's things that limit
3  the lease.
4  Q.  So a lease that is subject to another
5  lease would be limited by the terms of that
6  existing lease?
7  A.  Right.
8  Q.  Can you look at Article I, subparagraph
9  D.
10  A.  Okay.
11  Q.  And Article I, subparagraph D, says that
12  "The premises are hired in lease subject to
13  existing leases"; is that correct?
14  A.  That's correct.  That's what it says.
15  Q.  So existing leases would include the
16  Kmart lease, what we've marked as Exhibit 2 in
17  this deposition?
18  A.  That would be an existing lease.
19  Q.  So the ground lease provides that the
20  ground lease is subject to the prior Kmart lease?
21  A.  Right.
22  Q.  And we've said that Kmart was a tenant
23  under the Kmart lease; right?
24  A.  Kmart is a tenant under the Kmart lease.
25  Q.  Right.  Okay.

Page 114

1      So I had previously asked you did Kmart
2  remain a tenant under the Kmart lease or at some
3  point did Kmart become a subtenant, and you asked
4  to look at the ground lease.  Has looking at the
5  ground lease clarified that question?
6      MR. GOODMAN: Objection; calls for a
7  legal conclusion.
8      If you know the answer, you have to
9  answer it.  If you know.
10      THE WITNESS: Okay.  So what's the
11  question again?
12      BY MR. LEVANDER:
13  Q.  I'll read it back.
14      I previously asked you, did Kmart remain
15  a tenant under the Kmart lease or at some point
16  did Kmart become a subtenant?  When I asked that
17  question, you asked me to look at the ground
18  lease.
19  A.  Right.
20  Q.  We've now looked at the ground lease.
21  What is your answer to my initial question?
22      MR. GOODMAN: Objection; calls for a
23  legal conclusion.
24      THE WITNESS: At some point they became
25  a subtenant.

Page 115

1      BY MR. LEVANDER:
2  Q.  Based on the ground lease itself?
3  A.  The second amendment was not written
4  between the fee owner and Kmart.  It was written
5  between our tenant, the tenant under the ground
6  lease and Kmart, or the tenant and some entity
7  related to the tenant and Kmart.  And our tenant
8  didn't have any rights as owner or wasn't the fee
9  owner.  It was written -- since it was written
10  between our tenant and Kmart, Kmart became a
11  subtenant with the second amendment.
12  Q.  So Kmart -- so Kmart was the principal
13  tenant of the fee owners for 1001 Patton Avenue up
14  until 1992?
15  A.  It may have been before because there
16  was a first amendment as well.  And at some point
17  they became a subtenant of our tenant.
18  Q.  What document made Kmart a subtenant of
19  your tenant?
20      MR. GOODMAN: Objection; legal
21  conclusion.
22      THE WITNESS: The ground lease created a
23  tenant, this ground lease, and their rights were
24  limited by the ground lease.  They were our
25  tenant.  They were no longer the fee owner.  And

Page 116

1  as such, as our tenant, there were certain
2  limitations in what they could do.
3      When Kmart signed the lease, they were
4  dealing with the fee owner and the fee owner had
5  broad rights because they own the property, but
6  our tenant didn't have those rights because we
7  were the fee owner and we didn't pass all the
8  rights on to our tenant.  So when they -- our
9  tenant modified the lease, our tenant was our
10  tenant and became a subtenant.
11      BY MR. LEVANDER:
12  Q.  When you say "our tenant," who are you
13  referring to?
14  A.  Whoever our tenant is under the ground
15  lease.
16  Q.  So is your understanding that the ground
17  lease itself made Kmart a subtenant?
18      MR. GOODMAN: Objection; calls for a
19  legal conclusion.
20      THE WITNESS: No, I'm saying when our
21  tenant -- in other words, this is the lease and
22  we've got a landlord and it's the Bruce entities,
23  as we defined earlier, and they changed.  But our
24  tenant was our tenant, and they were no longer the
25  fee owner, we were.  And there's limited rights by

18-23538-shl   Doc 4232   Filed 06/13/19   Entered 06/13/19 22:59:52   Main Document
In re:  SEARS HOLDINGS CORPORATION, et al.   Pg 34 of 71

PAUL BRUCE
June 6, 2019

Page 117

1  virtue of being our tenant.  And when they changed
2  the Kmart lease, Kmart became a subtenant of our
3  tenant.
4       BY MR. LEVANDER:
5  Q.  But you've testified earlier that the
6  Bruce entities are not the landlord -- are not the
7  landlord for the property; correct?
8  A.  No, I didn't testify to that at all.
9  Q.  I guess I just want to clarify the
10  record on this point because I think the last few
11  pages are a bit murky.  So --
12  A.  Yes, they are.
13  Q.  -- what is your understanding -- what is
14  your position as to when Kmart became a subtenant?
15  A.  I'm not sure when.  That's the legal
16  answer to your question.  But by creating the
17  ground lease, we had a tenant.  And our tenant was
18  dealing with Kmart as a subtenant.  And I'm not --
19  not in a position to say exactly when, but our
20  tenant had limited rights.  They were no longer
21  the fee owner.  They couldn't do everything.  And
22  everything they wanted, we retained some rights as
23  fee owner and their rights are listed in the
24  ground lease.
25       And at some point when they dealt with

Page 118

1  Kmart, they weren't dealing with Kmart as the fee
2  owner, they were our tenant with limited rights
3  and Kmart became their subtenant.
4       Now, as a practical matter, if you want
5  a date, I'd have to call an attorney and have him
6  tell me when the transaction occurred because it's
7  beyond my ability to say whether it happened with
8  the first amendment or the second amendment or the
9  ground lease because I really don't know.
10       And it's a question -- I may have some
11  expertise in the field, but it's not the question
12  I get asked every day or ever, except here.  And
13  so I really can't tell you when.
14       But our tenant had all the leases on the
15  property and they were dealing with subtenants,
16  and the exact date, I don't know whether it was
17  1992 or 1970s or 1966 for that matter.
18  Q.  Now, Mr. Bruce, you are the document
19  custodian for the Bruce Trusts; correct?
20  A.  Excuse me.  I think that's what I say in
21  the declaration, that I'm the document custodian.
22  Q.  We can look at the first paragraph.
23  A.  That's exactly what it says.
24  Q.  Right.
25       It says, "I'm the custodian of documents

Page 119

1  and records for the Bruce Trusts."
2       As document custodian, you are
3  responsible for maintaining the document files of
4  the Bruce Trusts?
5  A.  I keep the files, yes.
6  Q.  Is there any document in those files
7  that memorializes when in your understanding the
8  Kmart lease became a sublease?
9  A.  You know, there could be, but I wouldn't
10  know.
11  Q.  Did you review the documents in your
12  files in connection with this case?
13  A.  I have, as I said at the beginning, some
14  in more detail than others.
15  Q.  Did you review them in preparation for
16  this deposition?
17  A.  As I said in the beginning, I reviewed
18  some in more detail than others.
19  Q.  But you don't recall seeing any note in
20  the file that said on X date, Kmart became a
21  subtenant of the property at 1001 Patton?
22  A.  You know, I really don't know what date
23  they became a subtenant.
24  Q.  But you don't recall seeing any note
25  memorializing that such a thing happened?

Page 120

1  A.  I don't remember seeing such a note, but
2  there's, you know, 31 documents, some of which are
3  around a hundred pages and some of which are --
4  I'm not going to say put you to sleep when you
5  read them, but they're complicated legal
6  documents.
7       And if I wanted the answer to that
8  question, I would call legal counsel to tell me.
9  And as a broker and not as a lawyer, I'm not
10  afraid to admit that I do need legal counsel to
11  answer questions because that's just life.  I hate
12  to hire lawyers to answer questions because
13  they're expensive and sometimes they don't give
14  you the right answer; but if I don't know, I try
15  to find someone who does.
16  Q.  Were the 31 documents that you attached
17  to your declaration the entirety of the documents
18  in your file that you keep as document custodian?
19  A.  No.
20  Q.  Approximately how many other documents
21  are in that file?
22  A.  God, there's a number of plats, surveys,
23  and there's very old leases, Eckert [ph] and
24  others from whenever the expansion was built,
25  probably in the '70s.  So there's -- I think

Page 121

1  there's a Ben Franklin there, too.  Anywhere,
2  there may be five or six leases that I've never
3  read and are not attached.
4      There's a number of plats that I have
5  never read.  There's title reports that I haven't
6  attached.  Dan Heller's firm, Rubin
7  McCloskey [ph], did some title work.  There was
8  somebody else who did title work in '88.
9      There was a loan, a note and a date of
10 trust in North Carolina that was paid off and I
11 have a satisfaction of those documents.  They
12 were -- oh, God, this is not -- anyway, point
13 being, this is not everything in my possession.
14 Q.  Does that --
15 A.  And I hope you don't want it.
16 Q.  Does that file include correspondence
17   with various parties as well?
18 A.  Limited correspondence.
19 Q.  Is there correspondence between the fee
20   owners and J&W and affiliated entities?
21 A.  There's correspondence to do with, for
22   instance, the Golden Corral -- doing business as
23   the Golden Corral, that's in the box.  I think I
24   included those somewhere in here.  There's not
25   much correspondence with J&W.

Page 122

1      I mean, I'm sure there's something on
2  all the graffiti because the city sent me written
3  notice about cleaning it and I'm sure I sent it to
4  somebody, and that wasn't included here.
5      There was a newspaper article on the guy
6  who got shot, and that was not included here.  I
7  don't know if I still have it, by the way.  It was
8  an e-mail.  And --
9  Q.  So is every e-mail that you exchanged
10   with J&W, Asheville K-M, with Kmart, are those
11   documents in your file?
12 A.  No, not all of them.  And Bill Aronson I
13   don't think reads his e-mails.
14 Q.  So there is e-mail correspondence over
15   the years --
16 A.  Not much.
17 Q.  -- that you had that is not in the file?
18 A.  I don't know.
19 Q.  But it's possible?
20 A.  Possible -- well, a lot of things are
21   possible.
22 Q.  As a matter of course, whenever you
23   received an e-mail related to 1001 Patton, did you
24   systematically put that into your file?
25 A.  There were documents that were purged,

Page 123

1  mostly to deal with the escrow account and the
2  taxes.
3  Q.  When you say "documents that were
4  purged," what do you mean?
5  A.  Well, between 1994 and today is 25
6  years, and there were lots of records dealing with
7  the tax payments.  And I may have three years or
8  six years, but I don't have 25 years' worth of
9  bank accounts for the tax payments.
10     And what I mean by "purged" is probably
11 shredded.  And there was correspondence with
12 people, you know, in paying the tax bill, and I
13 didn't see any need to keep 25 years' worth of
14 that.
15     There was -- I don't know if I have all
16 the insurance records for 25 years.  I might
17 because that's thinner.  The tax bills have, you
18 know, 12 statements, plus letters and bills and
19 whatever, but the insurance is just one page.
20 It's just a certificate.
21     And there might have been a file -- I'd
22 have to look and see if I still have it -- on the
23 woman who hurt herself going through the door in
24 Kmart.  And there was a lot of paper on that.  And
25 it was a long time ago and I'm not sure I purged

Page 124

1  it or not; but the correct answer is some things
2  were purged when they got very old and there was
3  no point.
4      The woman who hurt herself in the door
5  may not even have been real, but there were a lot
6  of people notified as one of these attorneys who
7  believed in suing everybody, and he sued, if I
8  remember right, the door manufacturer, Kmart, J&W,
9  lots of people.  It was a big fat thing.  And they
10 made a deal, and I got a letter from somebody on
11 the insurance said that Kmart is taking care of
12 everything.  And I think I probably saved that
13 letter, but it's not in this exhibit.
14     So to answer your question, yes, there
15 are documents that are not here.  I don't know
16 what I did with all of them; but if there's
17 anything like in 1995, there was a lease renewal
18 document, I probably have that.
19 Q.  Right.
20 A.  And because that's -- but I don't know
21 if it's in this pile of stuff or not.
22 Q.  Right.
23     And so just to clarify because you gave
24 a somewhat long answer, there are documents since
25 1994 -- or since -- let me start over.  Strike

Page 125

1    that.
2       Since 1994, you have shredded certain
3    documents that were in the file for 1001 Patton
4    Avenue?
5    A.   I have shredded some documents that were
6    in the files.  There's multiple files.  And there
7    were documents I didn't shred.  Like I've got five
8    copies of the ground lease --
9    Q.   Right.
10   A.   -- and I didn't throw any of them out.
11   Some of them have a piece of paper attached and
12   some don't and the piece of paper attached is the
13   list of closing documents.
14      So, anyway, I think I've answered your
15   question probably more than I should have, and
16   I'll probably get beaten over the head about it
17   because Brett is tough on me about giving you
18   stuff you don't need or don't ask for.
19   Q.   Just to be clear, you have physical
20   paper files, is that correct, hard copy files?
21   A.   I don't trust computers and when I have
22   an important document, I print it and put it in a
23   file.
24   Q.   And you keep all those files in one
25   location in your house or in your office?

Page 126

1    A.   Actually, they're not quite in one
2    location; but, yes, they're in my office or in the
3    storage area in the back.  There's another
4    document I didn't send -- forget it.
5    Q.   Which document?
6    A.   What?
7    Q.   Which document?
8    A.   There was an environmental study we did
9    in 1990 something, probably '94.
10   Q.   Okay.  What was the result of the study?
11   A.   There's stuff to worry about, but
12   nothing significant.
13   Q.   Who did the assessment?
14   A.   Yes, I'd have to look at it.
15   Q.   Was it a governmental assessment or some
16   private environmental firm?
17   A.   We hired a private environmental firm.
18   We had a couple of properties, and I thought that
19   would help us get a lower appraisal.  The
20   appraiser said forget it.
21   Q.   Can I turn your attention back to what's
22   been marked as Exhibit 4 -- actually, you have it
23   open.  I just don't.
24   A.   Which is Exhibit 4?  I'll mark it
25   properly.

Page 127

1    Q.   Can you turn to page 4 of this document?
2    It looks like this.
3    A.   What article is that?
4    Q.   It's before the articles start.
5       MR. GOODMAN: Go back one page.  He's
6    using this.
7       THE WITNESS: Okay.
8       BY MR. LEVANDER:
9    Q.   This paragraph refers to a Robert Siegel
10   of 40 Schenck Avenue, Great Neck, New York.
11      Do you know who that is?
12   A.   Other than what it says here, no.
13   Q.   You never met Robert Siegel?
14   A.   No.
15   Q.   And do you know if Robert Siegel was a
16   friend of your parents?
17   A.   Other than what it says here, I know
18   nothing about Robert Siegel.
19   Q.   How about Bernard Nussinow?  I hope I'm
20   pronouncing that correctly.
21   A.   That name sounds vaguely familiar, but I
22   don't know anything about him either.
23   Q.   And Patton Plaza Associates, which is
24   the partnership consisting of Mr. Siegel and
25   Mr. Nussinow, is that an entity that you've heard

Page 128

1    of before?
2    A.   What about Patton Plaza Associates?
3    Q.   Have you ever had any other business
4    dealings with Patton Plaza?
5    A.   No.
6    Q.   To your knowledge, have your parents had
7    any business dealings with Patton Plaza?
8    A.   This is going back to when I was a
9    teenager.
10   Q.   Would now be a good time to take a break
11   for you?
12   A.   I'm fine.
13   Q.   You're okay?
14   A.   I'm ready to go home.
15      MR. GOODMAN: We can take a break.  Do
16   you want to take ten minutes and we'll come back?
17      MR. LEVANDER: If you don't mind just
18   giving me five minutes to make a bathroom break, I
19   would appreciate that.
20      MR. GOODMAN: Yeah.
21      MR. LEVANDER: Before we break, do you
22   want to make your clarification?
23      MR. GOODMAN: Yeah, we can do that now.
24   I wanted to clarify something from earlier.
25      Mr. Bruce, earlier you answered a series

Page 129

1  of questions relating to the market value of the
2  property. Do you recall that?
3      THE WITNESS: Yes.
4      MR. GOODMAN: And in connection with
5  that series of questions, I believe you testified
6  that you did not know or you would be speculating
7  to the value of that property; is that correct?
8      THE WITNESS: Yes.
9      MR. GOODMAN: Okay. And among the
10 reasons that you'd be speculating to the value of
11 the property was that you had to determine -- or
12 it had to be determined whether -- at the time of
13 settlement; is that correct?
14     THE WITNESS: You don't really know the
15 value until there's a closing.
16     MR. GOODMAN: Okay. And just to clarify
17 the record, when you used the term "settlement,"
18 did you mean the settlement of the dispute between
19 the Bruce Trusts and the purchasers or did you
20 mean any closing on a sale of the property?
21     THE WITNESS: Closing on the sale of the
22 property.
23     MR. GOODMAN: Thank you.
24     MR. LEVANDER: Thanks.
25     (Recess from the record.)

Page 130

1      BY MR. LEVANDER:
2  Q.  Okay. Can you turn back to the second
3  amendment, what's been marked as Exhibit 3. Are
4  you aware that under the second amendment, that
5  Kmart agreed to undertake construction to expand
6  the storeroom at its own expense?
7  A.  Speak up.
8  Q.  Sure. I'll repeat the question.
9      Are you aware that under the second
10 amendment, that Kmart agreed to undertake
11 construction to expand the store at its own
12 expense?
13 A.  Yes.
14 Q.  Were you aware of that at the time?
15 A.  No.
16 Q.  Were you aware that Kmart did indeed
17 undertake construction at its own expense in the
18 time period around the second amendment?
19 A.  Just from reading the second amendment.
20     MR. LEVANDER: Kelly, can you please
21 mark what we have.
22     (Deposition Exhibit 5 was marked for
23 identification and attached to the transcript.)
24     BY MR. LEVANDER:
25 Q.  Can you turn to the second page --

Page 131

1  sorry. Let's mark this --
2      MR. LEVANDER: What are we up to?
3      MS. LESTER: 5.
4      BY MR. LEVANDER:
5  Q.  What is this document?
6  A.  Which document?
7  Q.  So there's a letter from William Delz to
8  John Walsh. And then on the second page, there's
9  a fax transmittal that says from Paul Bruce, Paul
10 Bruce, Inc., 1810 Michael Faraday Drive to J&W
11 Management. And then there's a letter from you to
12 William Delz dated August 16th, 1993.
13 A.  '93?
14 Q.  1993.
15     And then there's a letter from Gene
16 Johnson to Martin Bruce, your father, dated
17 July 30th, 1993.
18     Turning to the fax transmittal page, is
19 that your -- Paul Bruce, Inc., is your company
20 we've said; right?
21 A.  Right.
22 Q.  And 1810 Michael Faraday Drive, Suite
23 202, was your work address?
24 A.  Yes.
25 Q.  And is that your work telephone number,

Page 132

1  (703) 318-9442?
2  A.  Yes.
3  Q.  And that's your fax number?
4  A.  Yes.
5  Q.  And on the subsequent page, this is a
6  letter that you wrote on your letterhead?
7  A.  It sure looks like it, yes.
8  Q.  Is that your signature?
9  A.  Yes.
10 Q.  And it -- so in this letter, you've
11 forwarded to Mr. Delz of J&W Management
12 Corporation a lien notice; is that correct?
13 A.  Say it again.
14 Q.  In the letter, dated August 16th, 1993,
15 that you wrote to William R. Delz of J&W
16 Management Corp, you say that you have enclosed a
17 copy of a lien notice for the Kmart Plaza at 1001
18 Patton Avenue Asheville, North Carolina; is that
19 right?
20 A.  Right.
21 Q.  So you were aware that there was a lien
22 notice on the property in 1993?
23 A.  Apparently.
24 Q.  And if turn to the next page, this is
25 the letter that you forwarded --

18-23538-shl   Doc 4232   Filed 06/13/19   Entered 06/13/19 22:59:52   Main Document
In re: SEARS HOLDINGS CORPORATION, ET AL.   Pg 38 of 71

PAUL BRUCE
June 6, 2019

Page 133

1 A. Okay.
2 Q. -- dated July 30th, 1993?
3 A. Okay.
4 Q. And it's addressed to your father and
5 signed by Gene Johnson. And that also encloses a
6 copy of a lien.
7 A. Okay.
8 Q. And then if you turn beyond that,
9 there's an actual notice of the claim of lien,
10 State of North Carolina, County of Buncombe.
11 A. Yeah.
12 Q. That says it's addressed to the owners
13 of the property involved, the Bruce Trusts and to
14 the Kmart Corporation, the lessee of the property.
15 A. Okay.
16 Q. So they understood Kmart to be the
17 lessee of the property at 1001?
18    MR. GOODMAN: Objection; speculation.
19 Q. They describe in this document Kmart
20 Corporation as the lessee of the property
21 involved.
22 A. Okay. That's what they said.
23 Q. And then on the following -- sorry.
24    And the property involved is a reference
25 to Kmart Plaza, 1001 Patton Avenue, Asheville,

Page 134

1 North Carolina.
2 A. Okay.
3 Q. And then if you turn to the next page,
4 this is describing the nature of the lien.
5 A. I don't have a next page.
6 Q. The page that looks like this.
7 A. Okay.
8 Q. So that says that it's for labor and
9 materials used in the renovations and/or
10 construction of an addition to a commercial
11 structure on the aforementioned property.
12 A. Okay.
13 Q. So you were aware in 1993 that there was
14 ongoing renovations and/or construction?
15 A. I may have been aware in '93, but I
16 forgot all about it.
17 Q. But you had notice that there was
18 construction?
19 A. What?
20 Q. You had notice in 1993 that there was
21 construction on the property?
22 A. There was notice that there was
23 construction on the property. And I still don't
24 remember it. And I don't know who William Delz
25 is, by the way, or any of these people.

Page 135

1 Q. But that is your letterhead; correct?
2 A. But it is my letterhead.
3 Q. And your signature?
4 A. And my signature. It looks like my
5 signature. I presume it is. I still don't
6 remember it.
7 Q. So there's correspondence from 1993
8 related to 1001 Patton Avenue that you don't
9 recall?
10 A. That's correct.
11 Q. Let's turn back to Exhibit 1, your
12 declaration.
13 A. Okay.
14 Q. In paragraph 35, which is on page 7 --
15 A. Okay.
16 Q. -- you say, "I can find no record
17 indicating that the fee owners received copies of
18 the Kmart amendments prior to December of 2017."
19 A. Right.
20 Q. And the Kmart amendments refers to both
21 the second amendment, which we've looked at
22 earlier today, and the third amendment as well?
23 A. Right.
24 Q. So your testimony in your declaration is
25 that the second amendment was signed more than 25

Page 136

1 years before you first saw it?
2 A. It was signed '92 and that would be 25
3 years before, yeah.
4 Q. But you had noticed during that period
5 that Kmart was still the tenant of the property at
6 1001 Patton Avenue; correct?
7    MR. GOODMAN: Objection; speculation.
8    THE WITNESS: What do you mean by
9 "notice"?
10    BY MR. LEVANDER:
11 Q. Well, you visited 1001 Patton Avenue and
12 Kmart was there?
13 A. That's correct.
14 Q. And you received letters about liens
15 describing Kmart as the tenant of the property?
16 A. About what?
17 Q. We just looked at letters that
18 described -- we just looked at a letter from 1993
19 that described Kmart as --
20 A. There's a letter from 1993.
21 Q. And a whole host of other things, but
22 again, the important point is you visited the
23 store?
24 A. I visited the site and I saw Kmart was
25 there, that's not ambiguous.

18-23538-shl   Doc 4232   Filed 06/13/19   Entered 06/13/19 22:59:52   Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL.   Pg 39 of 71

PAUL BRUCE
June 6, 2019

Page 137

1  Q.  So what did you understand -- when you
2  saw that Kmart was there, what did you think the
3  nature of their relationship was to the store?
4  A.  With the store?  You mean they were
5  operating a business with the name "Kmart" on the
6  sign?
7  Q.  As a tenant of the property.
8  A.  Or subtenant or whatever.  I knew they
9  were there and open for business.
10  Q.  But what lease document was the basis
11  for their tenancy at that time?
12  A.  I didn't look at any lease document at
13  the time.
14  Q.  But if you had not -- you testified
15  earlier that Kmart's tenancy was extended by the
16  second amendment?
17  A.  It was.
18  Q.  I'd like to turn your attention to the
19  second half of paragraph 35.  You say, "In
20  December 2017, I called Erica Cohen with J&W
21  Management Corp. and asked her to send me
22  subleases for the shopping center.  It was at that
23  time that I received copies of the Kmart
24  amendments."
25  A.  Yes.

Page 138

1  Q.  Can you describe that call with Erica
2  Cohen?
3  A.  I don't know if I can or not.  She was
4  always very nice and very helpful.  And I asked
5  for copies of the leases of all the subtenants,
6  and she sent me an e-mail.  And it was complete,
7  it was thorough, and had the three tenants, the
8  leases, the amendments, renewal letters.  And I
9  think there were 13 documents in all.
10  Q.  Do you still have a copy of that e-mail?
11  A.  That's a trick question.  It didn't
12  sound like a trick question, but I used to program
13  for a living back in -- during my early years at
14  MITRE, big complicated program.  And now if I look
15  for old documents on my Gmail account, I can't
16  always find them.  And they may not have been
17  deleted.  And so to answer your question, maybe.
18  Q.  But it's not part of your files on
19  1001 Patton Avenue?
20  A.  I didn't print it out.
21  Q.  So this was a very thorough summary of
22  every --
23  A.  I printed out all the attachments.
24  Q.  Are those in the file?
25  A.  In other words, she sent me 13

Page 139

1  attachments, or whatever, it could have been 12,
2  but she sent me a number of attachments to an
3  e-mail.  And I printed out all the attachments,
4  put them in manila folders, and put them in my
5  file drawer.  So I've got all the attachments.
6  Q.  But you don't have the correspondence
7  from Erica Cohen?
8  A.  I can't say I don't have it or I do have
9  it --
10      MR. GOODMAN: Objection; asked and
11  answered.
12      THE WITNESS: -- because it disappears
13  after a certain age into my e-mail account.
14      BY MR. LEVANDER:
15  Q.  But you'd agree that's key
16  correspondence related to --
17  A.  It's key correspondence.  I printed out
18  everything and made a hard copy, a paper copy, and
19  I know exactly where it is.
20  Q.  But you didn't keep a copy of the
21  correspondence itself in the file?
22  A.  I don't think I did, but I kept all the
23  leases and everything she sent with those
24  attachments.
25  Q.  So when she sent you that e-mail in

Page 140

1  December 2017, that was the first time you
2  testified that you ever saw the second amendment?
3  A.  That's correct.
4  Q.  What was your reaction when you saw that
5  document for the first time?
6  A.  Which of the documents?  You mean just
7  the second --
8  Q.  When you saw the second amendment for
9  the first time.
10  A.  I'm not sure I had a particular
11  reaction.  I sent it to our attorney.  And I
12  probably sent a copy of all the attachments to my
13  brother.
14  Q.  Were you surprised by the contents of
15  the second amendment?
16  A.  I don't know if "surprised" is a good
17  word.
18  Q.  But you had no particular reaction?
19  A.  Not that I remember.
20  Q.  Did you call up Kmart when you saw the
21  second amendment for the first time?
22  A.  I don't think so.
23  Q.  Did you call up NAP?
24  A.  When I saw the second amendment?
25  Q.  Yes.

Page 141

1  A.   Probably not.  I only had one
2  conversation with Walter Samuels, and that wasn't
3  it.
4  Q.   Can you describe the conversation with
5  Walter Samuels?
6  A.   Yeah, it was not in that time.  It was
7  around 2006.  And we had a property in Orange
8  Park, Florida, where we had what appeared to be a
9  good offer and it was one with a middleman tenant,
10  and I called to ask his advice because he seemed
11  like he had a lot of experience in this property.
12  And he owned other centers and other properties.
13  And I called to ask how the middleman -- which
14  middleman meaning with a lease between the fee
15  owner and the subtenants -- how they worked and
16  whether we were likely to get the property back
17  unencumbered.  And he said, Don't even think about
18  it.  You never, ever get the property back.
19      And we talked for a few minutes.  He was
20  very pleasant.  I had somebody introduce me,
21  somebody at J&W.  And whatever questions I had, he
22  was very helpful.  And he sounded old, in New
23  York; but it was, you know, 13 years ago and it
24  was a short call.
25  Q.   So Mr. Samuels was the principal of J&W?

Page 142

1  A.   Probably of NAP.  His signature shows up
2  on the leases, his and his wife's.
3  Q.   Right, for J&W and for NAP and for NAC?
4  A.   Whatever.  I mean, I get -- to be
5  honest, I get a little confused on who's what
6  where, but he seemed to be the guy in charge.
7  Q.   And Mr. Samuels was someone you
8  respected; right?
9  A.   Right.  I wanted his opinion.
10  Q.   Someone whose advice mattered in the
11  field?
12  A.   Well, there were a lot of people I
13  called because figuring out the value on the
14  Orange Park property was outside of my specialty,
15  which is within 5 miles of my office in Fairfax
16  County and Loudoun County, or maybe a little
17  larger.  And when something came up outside, I'd
18  call and ask for help, and he was one of many
19  people I called and asked for help to figure out
20  if we were getting a fair price.
21  Q.   And did the Asheville property come up
22  at all in that conversation?
23  A.   I don't remember it coming up directly.
24  I mean, you could say it was relevant because
25  Asheville had a middleman setup, and so did Orange

Page 143

1  Park, but I don't think we talked about Asheville
2  very much.  I just was asking advice toward making
3  a decision on another property.  And there's very
4  few people who understood the middleman
5  properties, and he would be one.
6  Q.   Was the Asheville property the only
7  basis for a connection between you and
8  Mr. Samuels?
9  A.   As far as I know.
10  Q.   So when you reached out to him, you
11  understood that he was -- he was involved with the
12  Asheville property and he understood that you were
13  as well?
14  A.   You're fading.  Your voice was fading.
15  Q.   If you don't mind, I'd like to refer
16  back to something you said earlier and just ask
17  you a question.
18      You said -- the substance of that
19  conversation, you said, "I called to ask how the
20  middleman -- which middleman meaning with a lease
21  between the fee owner and the subtenants -- how
22  they worked and whether they were likely to get
23  the property back unencumbered."  And he said,
24  'Don't even think about it.  You never, ever get
25  the property back'."

Page 144

1      What did you mean by "getting the
2  property back unencumbered"?
3  A.   Without the middleman and without the
4  subtenants.
5  Q.   And so what was your -- what was your
6  understanding of the advice he was giving you?
7  A.   He said, You never get it back that way.
8  You never get it back unencumbered.  They'll stay
9  until the end of the lease.  There's a middleman
10  lease in Orange Park and they stayed til the end
11  of the lease.
12  Q.   Can you describe what you mean by a
13  middleman lease?
14  A.   Middleman lease would be what we have.
15  The ground lease, that's a middleman lease.
16  You've got subtenants, Kmart, Sun Soo and Dollar
17  General.  We have our tenant.  And you have the
18  fee owner.  That's an unusual setup.
19  Q.   Is a middleman lease distinct from a
20  sublease?  Are those two different concepts?
21  A.   Well, a middleman lease is a lease and
22  there are subleases.  They're different.
23  Q.   Got it.
24      So the arrangement at both the Orange
25  Park, Florida, property and the Asheville, North

Page 145

1   Carolina, property were leases as opposed to
2   subleases?  That's what you're saying?
3   A.   No.  What I'm saying is in Orange Park,
4   Kmart was a subtenant of Abrams, who was our
5   tenant.  And in Asheville, Kmart, Sun Soo and
6   Dollar General were subtenants and we were the fee
7   owner, and there was a tenant in between, a
8   middleman.  They were the same.
9   Q.   I just have a very few remaining
10  questions and then we can -- I just have a few
11  more questions and then we can call it a day.  How
12  does that sound?
13  A.   Sounds good.
14  Q.   Okay.  So you send your declaration --
15  let's look back at Exhibit 1.  In paragraph 1 -- a
16  lot of documents.  I apologize.
17       You say that you took over the role of
18  custodian shortly before or upon the death of your
19  mother in 1994.
20       So was your mother the document
21  custodian before you?
22  A.   I don't know.  Document custodian is not
23  a real --
24  Q.   Those are the words you use in your
25  declaration.

Page 146

1   A.   I understand the words we use.  It
2   wasn't like a one-day transition.  It could have
3   taken place over years.  And she had certain files
4   and my dad had certain files and they both would
5   keep all the files until my dad couldn't keep them
6   anymore.  And at some point I went over and took
7   everything out of his office, everything.  And
8   after she died or had a stroke, I went down to
9   Florida and took everything out of her system and
10  had Mary organize everything.  And so it was a
11  process.
12       And she didn't have quite everything by
13  1994 and kind of turn it over to me.  It was
14  gradual.  And I accumulate things.  And
15  fortunately, Mary was there and was interested in
16  doing that.
17  Q.   So that's helpful.  I just want to
18  clarify a few points.
19       You said that your dad had certain files
20  that he kept until he couldn't keep them anymore.
21  Do you have a sense of around what year that might
22  have been?
23  A.   It was -- his dementia was starting to
24  be apparent in 1975, which was 20 years prior.
25  And he felt and believed he was functional for

Page 147

1   many years after, and he became less and less
2   functional.  And he lived till 2004, which is
3   almost 30 years after it started.  And I'm not
4   sure there's a date, but at some point I remember
5   Diane and I went over, like I said, with bags and
6   just filled -- took everything and dealt with it.
7   Q.   And when you say "certain files,"
8   hard-copy documents?
9   A.   There were only hard-copy documents in
10  his case.  He did not have a computer.
11  Q.   Did your dad ever explain to you how he
12  maintained the file or how he kept the file?
13  A.   He was going to.  At some point, he
14  wanted to set up a thing where I would come over
15  and work with him, and we had a problem.  As you
16  get the gist, there's really -- until there's an
17  event, there's very little going on.  And he was
18  trying to convince me there was a lot going on and
19  there was nothing.  So there was nothing for me to
20  do.
21       I'd go over and we'd have dinner or
22  lunch or whatever, and I said, "Dad, I really need
23  to go to work.  And this isn't helping you or me."
24  And so we didn't do much of it.  I'd say two
25  weeks.

Page 148

1   Q.   So you never discussed how he maintained
2   the specific Asheville property file?
3   A.   You really couldn't see it at some point
4   by the time I got there to take it over because he
5   wasn't using his filing system.  And --
6   Q.   So is it possible that some documents
7   got lost in that exchange?
8   A.   Possible.
9   Q.   Did you make any efforts to ensure that
10  the document collection was complete?  When you
11  took it from your father, did you just sort of
12  take whatever file was there?
13  A.   I took whatever they had.  And when
14  problems came up -- I mean, in real life, the
15  properties were designed to run themselves and I
16  wasn't going through an exercise of creating files
17  that we didn't need.
18       And we had -- for instance, on
19  Asheville, we had the ground lease and I wasn't
20  going to go look to documents from 1964 because
21  all I needed was the ground lease.  In that sense,
22  no, I didn't need complete files and I didn't need
23  them.
24       What I needed was new information on
25  properties we took over that were not treated as

Page 149

```
 1   new properties.  And my mom said she didn't want
 2   to spend the money to do that and we didn't do it.
 3   Q.   Okay.  So you said you didn't need
 4   complete files on the Asheville property.  It's
 5   also correct that you didn't have complete files
 6   on the Asheville property; correct?
 7   A.   Probably.  I would say we were probably
 8   missing some documents.
 9   Q.   Sorry, now let me ask you about your
10   mother.  So you said that at some point you went
11   down to Florida and took everything out of her
12   system.  Can you explain what the -- what her
13   system was?
14   A.   I think it was a file drawer.  And
15   everything regarding the real estate investments
16   was in the file drawer and I just took it.  And
17   while we were there, my brother and I looked in
18   their safe-deposit box and we looked -- you know,
19   we had to put together whatever they had, and we
20   did.  But she kept things labeled in manila
21   folders.  She didn't believe computers existed,
22   either.
23   Q.   And when did that happen, when you
24   picked up the files from your mother?
25   A.   I looked at them while she was alive and
```

Page 150

```
 1   we talked about them.  And I was shocked.  She's
 2   remarkably bright, experienced, knowledgeable and
 3   good judgment, for the most part, and I'd say for
 4   several years before she died.  And when things
 5   came up, she asked me to deal with them.
 6        So that's why I'm saying it might not
 7   have been '94 or '93 or '92, but we would talk
 8   about things as they came up.  And anyway, that
 9   probably answers your question.
10   Q.   Can you describe what conversation you
11   had about how she maintained the documents?
12   A.   No.
13   Q.   Did you ever --
14   A.   I mean, it was pretty self-explanatory.
15   You know, files and in the files are documents,
16   but they -- most of the files and documents, like
17   leases, were up in Virginia.
18   Q.   So you never had a conversation with
19   your mother about how she maintained the document
20   file?
21   A.   I wouldn't say that for sure, either, I
22   would say.  I don't remember that.  There were
23   things she liked to talk about and how she
24   maintained files wasn't terribly exciting to
25   anybody.
```

Page 151

```
 1   Q.   Did she ever tell you that she was
 2   giving you -- or that she had a complete file for
 3   the Asheville property?
 4   A.   She would like to talk about different
 5   things to do with real estate and so on, but I
 6   don't remember any conversation about files,
 7   period.
 8   Q.   So you have no recollection of any
 9   conversation about files with your mother?
10   A.   And that doesn't mean we didn't have
11   one.  It doesn't mean she didn't show me where it
12   was and had me look through it, but she -- that
13   wasn't the topic of interest to her.
14   Q.   And you said that you picked up the
15   final files from your mother after she passed away
16   in 1994; is that correct?
17   A.   Probably before she died, but after she
18   had her stroke.
19   Q.   And when did she have her stroke?
20   A.   '94.
21   Q.   When you picked up that final set of
22   files from your mother in 1994, did you take any
23   steps to ensure that the documents in that file
24   were complete?
25   A.   I think you've asked that already.
```

Page 152

```
 1   Q.   I asked that about your father.  I'm
 2   asking about your mother.
 3   A.   I organized what I had, and they
 4   appeared to be adequate to deal with things that
 5   came up on all the properties.  And when something
 6   big came up, you really didn't need history, you
 7   needed future and plan for the future.  And your
 8   time is best spent on planning and implementing a
 9   strategy to deal with the issues in the future.
10   Q.   But you didn't ensure that everything
11   from before 1994 was in the file?
12   A.   We already answered that.
13   Q.   The answer is that you did not do that;
14   correct?
15   A.   That's correct.
16   Q.   Just give us one second.
17        (Pause from the record.)
18   Q.   Okay.  We have no further questions.
19   A.   What?
20   Q.   We have no further questions.
21        MR. GOODMAN: You're not done yet.  I'm
22   going to ask you a few follow-up questions.
23   Hopefully we can get through them.
24
25
```

In re:  SEARS HOLDINGS CORPORATION, et al.

PAUL BRUCE
June 6, 2019

Page 153

1  EXAMINATION BY COUNSEL FOR THE TRUSTS
2     BY MR. GOODMAN:
3  Q.  I'm going to ask you if you could take a
4  look at Exhibit 4 to your deposition, which was
5  Exhibit 5 to your declaration, the ground lease.
6  A.  Okay.
7  Q.  Can you turn to page 13 of 87 on the
8  top, Section 4.01.
9  A.  Okay.
10  Q.  Okay.  Can you read that section?
11  A.  "Tenant covenants and agrees to pay
12  during the term of the lease basic annual rent of
13  $118,620 per annum, payable equal monthly
14  installments at $9,885 in advance on the first day
15  of each month commencing on the first day of the
16  term of the lease."
17  Q.  Okay.  And since you became the
18  custodian of record for the fee owners in or
19  around 1994, to this date, is this the $9,885
20  figure the monthly base rent that the fee owners
21  have received under the ground lease each month?
22  A.  Yes.
23  Q.  Did the fee owners ever receive more
24  than that amount on a monthly basis at any time
25  since you were --

Page 154

1  A.  No.
2  Q.  -- the custodian?
3     And to your knowledge as custodian, did
4  the predecessors to the fee owners ever -- I'm
5  sorry, strike that.
6     To your knowledge as custodian, did the
7  predecessors to the fee owners receive the same
8  monthly rental amount?
9  A.  The rental amount stayed the same from
10  1966 'til the lease was terminated.
11     MR. LEVANDER: Counsel, are you
12  introducing new documents?
13     MR. GOODMAN: I'd like to.  One is
14  Exhibit 2 to his declaration.
15     MR. LEVANDER: Is it responsive to an
16  issue in the deposition?
17     MR. GOODMAN: Well, since we didn't
18  bring the sandwich lease in on this deposition, so
19  I guess I can't counter on that.  All right.
20     BY MR. GOODMAN:
21  Q.  Mr. Bruce, earlier you also testified to
22  a conversation that you had with Walter Samuels.
23     Do you recall that?
24  A.  Yes.
25  Q.  Okay.  And you described to us a concept

Page 155

1  called a "middleman lease."
2  A.  Right.
3  Q.  In the Asheville -- with respect --
4  strike that.
5     With respect to the Asheville property,
6  was the middleman Asheville K-M or your ground
7  tenant under the ground lease?
8  A.  Yes.
9  Q.  And when you described your conversation
10  with Mr. Samuels, I believe that you testified
11  that Mr. Samuels told you that the middleman never
12  gives it back; is that correct?
13  A.  Yes.
14  Q.  So in the context of this transaction,
15  again, the middleman here is Asheville K-M; is
16  that correct?
17  A.  Yes.
18  Q.  And, in fact, Asheville K-M chose not to
19  renew its option and allowed the ground lease to
20  expire; is that correct?
21  A.  Yes.
22  Q.  So in the current transaction, contrary
23  to your conversation with Mr. Samuels, Asheville
24  K-M did give the property back; correct?
25  A.  Yes.

Page 156

1  Q.  Okay.  You also just recently testified
2  with respect to documents that you obtained and
3  stored from each of your parents.
4     Do you recall that testimony?
5  A.  Yes.
6  Q.  Okay.  With respect to the Asheville
7  property, did you take everything, all -- I'm
8  sorry.
9     With respect to the Asheville property,
10  did you take all records in your father's
11  possession in the manner that he had been
12  maintaining them?
13  A.  I don't know what that means.
14  Q.  When you went to take all -- when you
15  went to take possession of the Asheville records
16  from your father, did you collect them in the
17  manner that they existed?
18  A.  We collected everything.
19  Q.  So you took all of the records in your
20  father's possession relating to the Asheville
21  property that he had?
22  A.  Yes.
23  Q.  And you have preserved them as custodian
24  ever since?
25  A.  Yes.

18-23538-shl   Doc 4232   Filed 06/13/19   Entered 06/13/19 22:59:52   Main Document
In re:  SEARS HOLDINGS CORPORATION, et al.   Pg 44 of 71

PAUL BRUCE
June 6, 2019

Page 157

1  Q.   Okay.  And then with respect to the
2  Asheville property, did you take everything in
3  your mother's possession that she had in her
4  files?
5  A.   Yes.
6  Q.   Okay.  And since collecting all of those
7  documents, have you maintained and preserved them
8  in your role as custodian?
9  A.   Yes, with a few exceptions that we
10  already discussed in the deposition.
11  Q.   Can you take a look at Exhibit 1 to your
12  deposition, your declaration.  Let me know when
13  you have that.  Can you turn to paragraph 36,
14  please.
15  A.   Okay.
16  Q.   Okay.  Paragraph 36 refers to a
17  memorandum dated May 8th, 2017, from Glenn Howarth
18  to Julie Jenkins; is that correct?
19  A.   Yes.
20  Q.   And you testified earlier, and it states
21  in your declaration, that Glenn Howarth was the
22  general counsel to J&W; is that correct?
23  A.   Yes.
24  Q.   And you also testified earlier that J&W
25  functioned as an agent and representative for NAP,

Page 158

1  the Samuels and also had a relationship with NAC;
2  is that correct?
3  A.   Yes.
4  Q.   And in paragraph 37 of your declaration,
5  you refer to a statement in that memorandum.  Can
6  you read paragraph 37?
7  A.   You want me to read it out loud?
8  Q.   Yes, if you can read that.
9  A.   "In the memo, J&W stated that any Kmart
10  lease amendment should recognize that the current
11  leasehold interest of Kmart's landlord expires
12  January 31st, 2019, and no representation is made
13  that the terms of either its lease with Asheville
14  K-M Associates (the sandwich lease) or the lease
15  between Asheville K-M Associates and the fee
16  owners (the ground lease) will be extended beyond
17  such date (see X22)."
18  Q.   Thank you.
19  Do you understand the statement to be an
20  acknowledgment by J&W and its representative that
21  the Kmart lease is subject to the term of the
22  sandwich lease as defined in the declaration?
23  MR. LEVANDER: Objection.
24  What is this responsive to?
25  MR. GOODMAN: We're questioning him on

Page 159

1  his declaration, which you introduced.
2  MR. LEVANDER: You can answer the
3  question.
4  BY MR. GOODMAN:
5  Q.   You can answer.
6  A.   I can answer the question.  What was the
7  question again?
8  Q.   Okay.  I'll read it back.
9  Do you understand this statement that
10  you just read in paragraph 37 to be an
11  acknowledgment by J&W and its representative that
12  the Kmart lease is subject to the term of the
13  sandwich lease as defined in your declaration?
14  A.   Yes.
15  Q.   And, likewise -- I think this is my
16  final question -- do you have -- do you further
17  understand that this statement in paragraph 37
18  that you read to be an acknowledgment by J&W that
19  the sandwich lease is likewise subject to the term
20  of the ground lease?
21  A.   Yes.
22  Q.   Okay.  I have no further questions.
23  MR. LEVANDER: I just have one further
24  question.
25

Page 160

1  EXAMINATION BY COUNSEL FOR TRANSFORM HOLDCO LLC
2  (CONT'D)
3  BY MR. LEVANDER:
4  Q.   Mr. Goodman asked you, and since
5  collecting -- he was referring to taking
6  everything you had -- everything in your mother's
7  possession that she had from her files and he
8  asked you, and since collecting all of those
9  documents, have you maintained and preserved them
10  in your role as custodian?  And you responded,
11  yes, with a few exceptions that we already
12  discussed in the deposition.
13  When you said "a few exceptions," are
14  you referring to the documents that you shredded?
15  A.   Documents I shredded, yes.
16  Q.   No further questions.
17  MR. GOODMAN: Okay.
18  (Off the record at 2:58 p.m.)
19
20
21
22
23
24
25

Page 161

```
 1        A C K N O W L E D G M E N T

 2

 3   STATE OF          )
                        )ss:
 4

 5   COUNTY OF         )

 6

 7       I, PAUL BRUCE, hereby certify that

 8   I have read the transcript of my testimony taken

 9   under oath in my deposition of June 6, 2019; that

10   the transcript is a true, complete and correct

11   record of my testimony, and that the answers on

12   the record as given by me are true and correct.

13

14

15   _____

16   PAUL BRUCE

17

18

19   Signed and Subscribed to before me,

20   this   day of          , 2019.

21

22

23   _____

24   Notary Public

25
```

Page 162

```
 1            C E R T I F I C A T E

 2

 3   DISTRICT OF COLUMBIA )

 4

 5       I, Matthew Goldstein, RPR, Notary Public

 6   within and for the District of Columbia, do hereby

 7   certify:

 8           That I reported the proceedings in the

 9   within entitled matter, and that the within

10   transcript is a true record of said proceedings.

11           I further certify that I am not related

12   to any of the parties to the action by blood or

13   marriage, and that I am in no way interested in

14   the outcome of this matter.

15           IN WITNESS WHEREOF, I have hereunto set

16   my hand this 7th day of June, 2019.

17

18

19

20

21

22

23

24   _____

25   Matthew Goldstein, RPR
```

Page 163

```
 1             *** ERRATA SHEET ***

 2       ELLEN GRAUER COURT REPORTING CO., LLC
           126 East 56th Street, Fifth Floor
 3            New York, New York 10022
                  212-750-6434
 4

 5   NAME OF CASE:  In re:  SEARS HOLDINGS
     DATE OF DEPOSITION:  June 6, 2019
 6   NAME OF WITNESS:  PAUL BRUCE

 7   PAGE  LINE  FROM       TO        REASON

 8   ____|____|_____|_____|_____

 9   ____|____|_____|_____|_____

10   ____|____|_____|_____|_____

11   ____|____|_____|_____|_____

12   ____|____|_____|_____|_____

13   ____|____|_____|_____|_____

14   ____|____|_____|_____|_____

15   ____|____|_____|_____|_____

16   ____|____|_____|_____|_____

17   ____|____|_____|_____|_____

18   ____|____|_____|_____|_____

19   ____|____|_____|_____|_____

20   ____|____|_____|_____|_____

21                       _____

22   Subscribed and sworn before me

23   this____day of _____, 2019

24   _____    _____

25   (Notary Public)      My Commission Expires:
```

PAUL BRUCE
June 6, 2019

**$**

**$1 (3)**
50:23;54:18;70:22
**$10 (3)**
15:6;50:21;51:18
**$118,620 (1)**
153:13
**$18 (1)**
89:5
**$2 (2)**
19:25;76:21
**$200,000 (3)**
17:4,7,10
**$5 (4)**
16:17;17:9;50:25;
76:20
**$9 (1)**
65:25
**$9,885 (2)**
153:14,19

**[**

**[ph] (2)**
120:23;121:7

**A**

**ability (1)**
118:7
**able (1)**
84:17
**Abrams (1)**
145:4
**accidents (1)**
12:3
**account (4)**
91:10;123:1;138:15;
139:13
**accountants (1)**
54:5
**accounting (3)**
53:5,14;91:12
**accounts (2)**
58:15;123:9
**accumulate (1)**
146:14
**accurate (3)**
5:20;43:24;52:4
**accurately (1)**
50:12
**acknowledgment (3)**
158:20;159:11,18
**acquire (1)**
101:14
**acre (1)**
73:7
**acres (3)**
39:6,7;73:11
**active (13)**
39:22;40:3,4,10,16,

17;41:12,17,21;42:1;
70:20;75:7,25
**actual (1)**
133:9
**actually (11)**
5:4;11:22;64:15;
68:21;88:13;94:20;
95:8,21;99:9;126:1,22
**addition (2)**
35:19;134:10
**additional (2)**
82:3,4
**address (7)**
4:17,21;5:4;17:25;
18:3,5;131:23
**addressed (2)**
133:4,12
**adequate (1)**
152:4
**adequately (1)**
89:13
**Administration (1)**
11:21
**admit (1)**
120:10
**advance (1)**
153:14
**advantage (1)**
47:1
**advantageous (1)**
30:21
**advice (4)**
141:10;142:10;
143:2;144:6
**affiliated (3)**
94:13;99:12;121:20
**affirmed (1)**
4:4
**afford (1)**
73:11
**aforementioned (1)**
134:11
**afraid (1)**
120:10
**again (17)**
4:14;13:4;15:14;
20:24;25:16;51:7;
54:13;62:2;64:7;65:14;
69:15;110:14;114:11;
132:13;136:22;155:15;
159:7
**age (1)**
139:13
**agent (6)**
14:1;93:23;94:5,10;
97:8;157:25
**ago (23)**
12:16;13:5;15:15;
38:2;67:20,23;70:15;
71:1;81:23;82:15;84:9,
10,20;85:10,11,14,18,
19;87:11;88:15;
105:19;123:25;141:23

**agree (6)**
7:17;103:2;108:12;
109:7,22;139:15
**agreed (2)**
130:5,10
**agrees (1)**
153:11
**ahead (7)**
6:14;29:1;56:14;
72:5;85:1,7;106:17
**Akron (7)**
39:4;40:7,13;42:2,
13;43:6;83:13
**alive (1)**
149:25
**Allison (11)**
7:9;78:6,11,23,23;
79:7,16,20;81:14,15;
95:9
**allow (1)**
25:3
**allowed (1)**
155:19
**Ally (2)**
38:5;81:10
**almost (4)**
12:3;88:1,3;147:3
**alone (4)**
63:3,10,15;66:12
**along (1)**
8:19
**always (11)**
13:9;32:9;39:15,19;
45:15,17;47:23;89:12;
102:4;138:4,16
**amazes (1)**
84:18
**ambiguous (4)**
52:9;76:15,16;
136:25
**amendment (24)**
76:21;104:21,22;
105:18;115:3,11,16;
118:8,8;130:3,4,10,18,
19;135:21,22,25;
137:16;140:2,8,15,21,
24;158:10
**amendments (4)**
135:18,20;137:24;
138:8
**among (1)**
129:9
**amongst (1)**
15:3
**amount (4)**
46:23;153:24;154:8,
9
**analysis (8)**
24:3,21;25:2,22,23;
26:7;29:6,8
**analyst (3)**
11:7,11;12:20
**analyze (2)**

26:5;28:13
**analyzed (1)**
29:16
**and/or (2)**
134:9,14
**annual (1)**
153:12
**annually (1)**
95:23
**annum (1)**
153:13
**answered (5)**
48:5;125:14;128:25;
139:11;152:12
**anymore (3)**
25:18;146:6,20
**apartment (1)**
75:20
**apartments (1)**
21:4
**apologize (1)**
145:16
**Appalachian (1)**
86:17
**apparent (1)**
146:24
**Apparently (1)**
132:23
**appeared (2)**
141:8;152:4
**applied (1)**
46:20
**apply (3)**
45:21;46:18;76:22
**appraisal (1)**
126:19
**appraisals (4)**
79:25;80:3,5,6
**appraise (2)**
27:8,10
**appraised (2)**
27:15,20
**appraiser (1)**
126:20
**appreciate (4)**
52:4;53:9;54:11;
128:19
**approximate (7)**
50:15;52:7,16;53:13,
14,21;57:13
**approximately (26)**
10:25;13:18;15:19;
17:4,7;19:9;20:7;
29:12;31:22;38:19;
50:1;59:8;69:15;70:4,
23,23,24;76:25;80:4;
81:23;82:2,12;84:20;
85:18,19;120:20
**approximation (1)**
57:7
**area (5)**
72:15;75:18;82:18;
86:18;126:3

**arguing (1)**
73:21
**Aronson (6)**
90:21;91:7;92:2,5;
96:4;122:12
**A-R-O-N-S-O-N (1)**
90:23
**around (7)**
4:22;13:20;16:15,16;
18:10,22;19:22;38:2;
44:11;76:19;80:21;
103:25;120:3;130:18;
141:7;146:21;153:19
**arrangement (2)**
41:8;144:24
**arrangements (1)**
99:7
**art (2)**
77:21,23
**article (7)**
84:10;111:23;112:4;
113:8,11;122:5;127:3
**articles (1)**
127:4
**Asheville (64)**
7:16,18;42:12;43:11;
44:2,23;47:3;50:7;
65:19;66:3;70:21;76:3;
86:11;87:17;92:12,18,
19,20,22;93:3,8;94:1,6,
7,22;95:3,7;96:8,18;
97:21,22;98:4,11;
100:4,6,13;122:10;
132:18;133:25;142:21,
25;143:1,6,12;144:25;
145:5;148:2,19;149:4,
6;151:3;155:3,5,6,15,
18,23;156:6,9,15,20;
157:2;158:13,15
**assessment (3)**
110:16;126:13,15
**asset (8)**
52:6,8,11,24;53:1;
54:8;55:2,4
**assets (14)**
49:1,3,9;50:16;
51:13,17,20;52:7,12,
25;53:4,22;55:11;
79:23
**assignment (1)**
14:11
**assist (1)**
22:22
**assistant (5)**
21:16,21,25;22:18;
23:6
**Associates (10)**
92:12;94:22;95:3,7;
96:8,19;127:23;128:2;
158:14,15
**assume (1)**
56:20
**assumes (1)**

70:4

**assuming (2)**
70:13;71:7

**assumption (4)**
55:22,23,24;56:4

**assumptions (4)**
55:17;56:6,12,23

**attached (13)**
8:12;9:23;93:19;
102:7,19;105:1;111:4;
120:16;121:3,6;
125:11,12;130:23

**attachments (7)**
138:23;139:1,2,3,5,
24;140:12

**attention (7)**
36:4;66:9;73:15,20;
111:20;126:21;137:18

**attorney (8)**
80:10,12,14,15;
107:12,19;118:5;
140:11

**attorney-client (1)**
6:16

**attorneys (3)**
61:1;7;124:6

**attract (1)**
89:8

**August (2)**
131:12;132:14

**Avenue (29)**
7:16,18;8:5;33:10;
37:19;57:14;60:17;
61:11;68:20;75:12;
79:19;81:6,21,23;
99:12;108:6,7,13;
109:1,23;115:13;
125:4;127:10;132:18;
133:25;135:8;136:6,
11;138:19

**average (2)**
107:15,17

**aware (10)**
5:16;36:5;100:3;
130:4,9,14,16;132:21;
134:13,15

**away (3)**
5:6;71:20;151:15

**awful (1)**
21:25

---

**B**

**back (31)**
15:20;35:23;38:6;
46:9;56:16,17;69:1;
86:11;89:3;102:5;
106:3;114:13;126:3,
21;127:5;128:8,16;
130:2;135:11;138:13;
141:16,18;143:16,23;
144:2,7,8;145:15;
155:12,24;159:8

**back' (1)**
143:25

**background (1)**
10:10

**bags (1)**
147:5

**Bailey's (2)**
34:5,9

**Baltimore (3)**
78:18,19;79:6

**bank (3)**
39:9;91:11;123:9

**Banker (1)**
25:17

**bankrupt (2)**
42:3,4

**bankruptcy (5)**
8:8,21;10:7;14:12;
42:5

**bar (1)**
78:16

**base (1)**
153:20

**based (7)**
66:2,4,13,18;69:23;
72:8;115:2

**basement (3)**
32:8,17,18

**basic (1)**
153:12

**basically (4)**
13:2;23:7;45:14;
92:14

**basis (6)**
6:16;75:3,4;137:10;
143:7;153:24

**basketball (1)**
38:3

**bathroom (2)**
67:7;128:18

**Beach (1)**
50:10

**beaten (1)**
125:16

**beautiful (2)**
86:12,14

**became (17)**
80:17,18;85:24;
107:1;110:3;114:24;
115:10,17;116:10;
117:2,14;118:3;119:8,
20,23;147:1;153:17

**become (6)**
57:17;101:22;
110:17,22;114:3,16

**becoming (1)**
36:21

**begin (1)**
13:19

**beginning (3)**
35:4;119:13,17

**behind (1)**
27:3

**belief (1)**
74:6

**below (1)**
76:12

**Ben (1)**
121:1

**beneficiaries (2)**
81:2,4

**beneficiary (4)**
80:24;81:11,14,17

**benefit (5)**
47:19,21,22,23;48:1

**benefits (4)**
101:24;102:1,3,4

**Bernard (1)**
127:19

**best (3)**
30:19;89:3;152:8

**better (6)**
13:8;23:9;35:7;
42:17;49:14;110:22

**beyond (4)**
63:15;118:7;133:8;
158:16

**bifurcated (1)**
92:11

**big (10)**
23:8,10;66:6;69:19;
72:15,17;91:23;124:9;
138:14;152:6

**bigger (3)**
12:10;72:24;88:3

**Bill (10)**
90:21;91:5,6,7,13;
92:2,5;96:3;122:12;
123:12

**bills (2)**
123:17,18

**birthday (2)**
78:8,12

**bit (2)**
84:21;117:11

**bite (1)**
102:5

**bits (1)**
43:15

**blanks (1)**
73:3

**Blowing (1)**
86:4

**bonds (1)**
49:22

**Boone (2)**
86:12;88:6

**born (2)**
34:15,16

**borrow (1)**
105:13

**boss' (2)**
36:18,25

**both (11)**
22:3,4;26:22;30:4;
56:10;58:15;81:3;

**94:10;135:20;144:24;**
146:4

**bottom (1)**
93:6

**bought (5)**
26:16;34:4;39:5;
42:5;72:13

**boulders (1)**
82:11

**box (2)**
121:23;149:18

**boy (1)**
38:13

**Braedon (10)**
13:11,12,14,19,22;
14:21,23,24;15:24;
17:18

**branch (1)**
39:9

**Brazilian (1)**
79:3

**break (10)**
7:1,5;67:4;95:14;
97:12;101:23;128:10,
15,18,21

**breakdown (1)**
81:7

**breaks (1)**
6:24

**Brett (1)**
125:17

**bright (1)**
150:2

**brilliant (1)**
22:1

**bring (2)**
73:12;154:18

**broad (3)**
14:5;24:23;116:5

**broadly (1)**
14:7

**broker (11)**
25:5,8,9,14;42:21;
62:22,24;64:11;65:21;
73:2;120:9

**brokerage (4)**
63:8;64:14;70:16;
71:3

**brokers (3)**
15:3,4;62:17

**Brook (2)**
10:15,20

**brother (5)**
59:18;80:16;81:3;
140:13;149:17

**brought (2)**
26:14;87:22

**BRUCE (62)**
4:3,11;7:8,9,9,10,13;
9:25;10:4,5,9;17:20,
22;18:2,14,19,24;19:2,
5,10,20:21;21:12;
24:19;33:9,15;48:10,

**11,25;49:8;50:16;51:2;**
52:5,13;53:22;55:1;
57:4;59:16,17;73:15;
77:5;80:19;81:9,12,15,
18;97:16;116:22;
117:6;118:18,19;
119:1,4;128:25;
129:19;131:9,10,16,19;
133:13;154:21;161:7,
16

**Bruce's (1)**
9:20

**BS (2)**
10:11,12

**build (7)**
16:14;39:5;72:21,23;
73:4;101:7,14

**building (7)**
14:10;66:4,14,15,16,
19;69:24

**buildings (6)**
16:13,14;34:8,8;
66:23;72:18

**built (5)**
39:4;72:16;82:10;
99:9;120:24

**Buncombe (1)**
133:10

**business (15)**
20:16;22:2;83:17;
88:4;89:1,7;96:14,15;
97:4,22;121:22;128:3,
7;137:5,9

**buy (6)**
26:1,1,15;47:24;
70:18;102:1

**buyer (8)**
16:16;26:16,18,21,
23;62:18;63:9;69:24

**buyers (3)**
62:15;63:7,15

**buyer's (1)**
26:20

**buying (4)**
28:11;35:12,14;
62:10

---

**C**

**call (21)**
62:16;66:8;69:4;
84:2;90:3,9,15,25;96:9,
12,18;97:5;103:2;
118:5;120:8;138:1;
140:20,23;141:24;
142:18;145:11

**called (21)**
11:12,19;23:7;25:17;
30:16;52:24;64:13;
66:9;68:22;69:1;70:16;
86:2,4;96:17;137:20;
141:10,13;142:13,19;
143:19;155:1

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL.    Pg 48 of 71

PAUL BRUCE
June 6, 2019

**calls (9)**
63:11;70:1;83:24;
84:3,4;104:15;114:6,
22;116:18
**came (9)**
69:5;86:11;91:3;
142:17;148:14;150:5,
8;152:5,6
**camp (1)**
38:3
**Can (105)**
4:9;5:20;6:23;7:1,
16;9:19;11:10;14:7;
15:12;16:10,11;20:3,
19;24:6,7,12,13,14;
27:21;30:10,18;32:13;
35:21,21;39:2;41:25;
42:2;43:19;44:2;45:9,
13,14;46:25;48:22;
49:20;51:25;52:15,21,
22;54:5,20,21;57:20;
60:14,19;61:8;62:4;
63:18,22,25;64:7;
65:14,16;67:7;74:22;
75:17;79:22;81:6;82:5;
84:21;85:6;86:16;
90:22;92:25;93:11,12;
95:14,16;97:11;101:9,
15;103:2;105:13;
109:6;110:21;111:1,
20;113:8;118:22;
126:21;127:1;128:15,
23;130:2,20,25;
135:16;138:1,3;141:4;
144:12;145:10,11;
149:12;150:10;152:23;
153:7,10;157:11,13;
158:5,8;159:2,5,6
**Canyon (1)**
86:9
**cap (1)**
70:19
**capable (1)**
21:23
**capacity (2)**
72:21,22
**Cara (11)**
7:8;78:4,7,14;79:8,
13,20;81:10,17,18;95:9
**care (5)**
42:16,20;84:13;
91:18;124:11
**career (3)**
29:18;77:21,22
**carefully (1)**
9:6
**Carolina (10)**
38:3,16;43:8,12;
44:2;121:10;132:18;
133:10;134:1;145:1
**case (3)**
105:9;119:12;147:10
**cases (2)**

**30:14,14**
**catching (1)**
110:9
**caution (1)**
60:22
**cautioning (1)**
62:2
**caveat (1)**
7:1
**caveats (2)**
76:22,24
**cent- (1)**
98:17
**center (8)**
7:21,21,22;8:2;
72:13;84:2;89:8;
137:22
**centers (4)**
98:18,21,23;141:12
**certain (10)**
6:13;55:17;99:20;
116:1;125:2;139:13;
146:3,4,19;147:7
**certificate (3)**
95:22,23;123:20
**certified (2)**
84:4;91:21
**certify (1)**
161:7
**chain (6)**
25:1;36:15,19;37:4,
7,10
**chance (1)**
57:8
**change (4)**
33:4;46:7;88:22;
89:15
**changed (4)**
46:22;92:13;116:23;
117:1
**changes (6)**
45:15,16,22;88:25;
89:1,10
**Chão (1)**
79:2
**charge (2)**
84:6;142:6
**check (7)**
40:12,13;95:5,6,8;
99:16;103:25
**checked (1)**
69:25
**checks (3)**
95:8;97:24;98:2
**childhood (1)**
34:24
**children (2)**
59:25;77:24
**chose (1)**
155:18
**church (1)**
90:14
**circle (1)**

**99:19**
**circumstances (1)**
31:12
**City (5)**
16:12;20:23;34:10;
84:4;122:2
**claim (1)**
133:9
**clarification (1)**
128:22
**clarified (1)**
114:5
**clarify (5)**
117:9;124:23;
128:24;129:16;146:18
**clean (1)**
84:5
**cleaning (1)**
122:3
**clear (2)**
9:4;125:19
**clerical (2)**
22:19,20
**client (1)**
65:22
**close (3)**
5:1,3;19:25;60:11;
79:10,11
**closer (1)**
86:22
**closest (1)**
34:9
**closing (5)**
18:21;125:13;
129:15,20,21
**coast (1)**
33:23
**coffee (1)**
67:9
**Cohen (6)**
96:9,10,12;137:20;
138:2;139:7
**Coldwell (1)**
25:17
**collect (3)**
23:11;98:2;156:16
**collected (1)**
156:18
**collecting (4)**
75:8;157:6;160:5,8
**collection (1)**
148:10
**collectively (1)**
7:10
**college (2)**
44:6,21
**Colorado (1)**
10:18
**combine (1)**
103:19
**coming (3)**
58:10,11;142:23
**commence (1)**

**104:5**
**commencing (1)**
153:15
**Commercial (10)**
13:15,16,23;14:9;
18:25;20:20;29:17;
30:5;31:5;134:10
**commission (6)**
14:1,25;15:2;16:18;
19:7,10
**communicate (1)**
60:15;98:6
**communication (1)**
62:6
**communications (2)**
60:25;61:6
**company (6)**
12:21;20:25;37:13;
108:9,15;131:19
**comparable (2)**
23:13;75:8
**compared (1)**
69:20
**compete (1)**
23:8
**competence (1)**
107:14
**competent (2)**
107:17,18
**complain (1)**
90:15
**complaining (1)**
89:25
**complaints (1)**
91:4
**complete (8)**
138:6;148:10,22;
149:4,5;151:2,24;
161:10
**completely (1)**
91:10
**complicated (2)**
120:5;138:14
**computer (1)**
147:10
**computers (2)**
125:21;149:21
**concept (1)**
154:25
**concepts (1)**
144:20
**concern (2)**
12:4;57:21
**concerned (1)**
12:12
**conclusion (10)**
104:16;107:8;
109:21;110:5,10,20;
114:7,23;115:21;
116:19
**concrete (2)**
21:2;44:17
**condition (2)**

**82:24;83:12**
**condominium (2)**
14:11;34:8
**confidential (1)**
61:5
**confirm (1)**
6:19
**confused (1)**
142:5
**conjunction (1)**
86:7
**connection (3)**
119:12;129:4;143:7
**consider (3)**
29:20,24;30:22
**consisting (1)**
127:24
**construction (12)**
25:3;35:15;92:3;
104:2;130:5,11,17;
134:10,14,18,21,23
**consumer (2)**
90:10,12
**contact (1)**
90:20
**contacted (1)**
62:9
**Cont'd (2)**
97:19;160:2
**contents (2)**
9:12;140:14
**context (1)**
155:14
**contexts (1)**
27:22
**continue (1)**
22:8
**contract (4)**
25:20;26:21,23;
106:11
**contracts (2)**
13:3;42:22
**contrary (1)**
155:22
**control (2)**
54:7;55:5
**convenient (2)**
79:25;102:9
**conversation (21)**
44:10;62:19;67:17,
19;68:8,18;100:11,14,
21;101:1;141:2,4;
142:22;143:19;150:10,
18;151:6,9;154:22;
155:9,23
**conversations (3)**
62:12,14;67:14
**convince (1)**
147:18
**copies (5)**
9:21;125:8;135:17;
137:23;138:5
**copy (13)**

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL. Pg 49 of 71

PAUL BRUCE
June 6, 2019

25:25;62:12;91:6;
95:21;110:24;125:20;
132:17;133:6;138:10;
139:18,18,20;140:12
**Corner (7)**
17:24;18:12;24:25;
26:13;72:14,15;73:1
**Corp (3)**
92:19;132:16;137:21
**Corporation (11)**
11:9;94:7;99:13;
108:6,8,10,14;109:1;
132:12;133:14,20
**Corral (4)**
91:24;96:15;121:22,
23
**correctly (1)**
127:20
**correspondence (12)**
121:16,18,19,21,25;
122:14;123:11;135:7;
139:6,16,17,21
**cost (2)**
28:7;101:17
**COUNSEL (13)**
4:7;6:13,15;62:4,6;
91:22;92:1;120:8,10;
153:1;154:11;157:22;
160:1
**counter (1)**
154:19
**country (3)**
33:22;86:14;89:3
**county (10)**
30:15;73:5,9,13;
76:7;84:5;133:10;
142:16,16;161:5
**couple (2)**
67:12;84:8
**course (6)**
6:12;27:25;29:25;
39:11;61:3;122:22
**court (5)**
5:11,24;8:8,21;
102:21
**covenants (1)**
153:11
**create (1)**
51:23
**created (1)**
115:22
**creating (2)**
117:16;148:16
**crossing (1)**
12:3
**crossings (2)**
12:9,10
**Crossroads (2)**
34:5,9
**curious (2)**
66:1,21
**current (4)**
4:17;81:7;155:22;

158:10
**currently (1)**
81:5
**custodian (17)**
57:18;85:24;118:19,
21,25;119:2;120:18;
145:18,21,22;153:18;
154:2,3,6;156:23;
157:8;160:10
**customers (1)**
89:8
**cut (2)**
47:14;106:18
**cuts (2)**
19:17,19
**cutting (1)**
19:22

**D**

**dad (8)**
44:7;80:8;99:19;
146:4,5,19;147:11,22
**Dan (2)**
80:9;121:6
**dark (1)**
31:7
**data (1)**
23:13
**date (20)**
37:20;67:21;102:16;
104:1,2,3,6,8,10,13;
108:18,21;118:5,16;
119:20,22;121:9;
147:4;153:19;158:17
**dated (7)**
105:21;111:12;
131:12,16;132:14;
133:2;157:17
**daughter (3)**
36:18;37:1;38:1
**day (9)**
6:12,24;7:7;108:5;
118:12;145:11;153:14,
15;161:20
**day-to-day (1)**
90:18
**de (1)**
79:2
**deal (19)**
25:9,14,19;27:5,6;
41:14;66:18;76:1;
87:21;91:24;98:17;
99:8;100:2,4;123:1;
124:10;150:5;152:4,9
**dealing (10)**
25:16;40:17;54:22;
61:12,14;116:4;
117:18;118:1,15;123:6
**dealings (2)**
128:4,7
**deals (7)**
71:20;99:4,17,20,25;

100:1;101:14
**dealt (5)**
12:1;41:17;50:8;
117:25;147:6
**death (1)**
145:18
**decades (2)**
35:23;107:10
**December (5)**
102:16;108:5;
135:18;137:20;140:1
**decided (1)**
26:14
**decision (1)**
143:3
**declaration (29)**
8:7,10,13,16,19,20;
9:20;10:4,6;33:7;93:1;
102:20,22;105:15;
111:18;118:21;120:17;
135:12,24;145:14,25;
153:5;154:14;157:12,
21;158:4,22;159:1,13
**declining (1)**
89:2
**define (1)**
38:20;52:10;55:13
**defined (4)**
93:9;116:23;158:22;
159:13
**degree (2)**
10:18;22:2
**deleted (1)**
138:17
**delis (1)**
36:17
**Delz (5)**
131:7,12;132:11,15;
134:24
**dementia (1)**
146:23
**Democrats (1)**
46:7
**demolition (1)**
92:6
**department (1)**
23:17
**depend (1)**
31:11
**depending (2)**
45:14;55:8
**depends (2)**
30:9;34:25
**Deposition (17)**
9:22;43:25;102:6;
104:25;105:11,12;
111:3;113:17;119:16;
130:22;153:4;154:16,
18;157:10,12;160:12;
161:9
**depreciation (5)**
45:18;46:8,11,23,23
**depth (2)**

76:6,8
**descendents (1)**
99:1
**describe (18)**
11:10;16:10,11;
20:20;28:3;39:2;46:16;
60:14,19;61:8;81:7;
82:5;102:24;133:19;
138:1;141:4;144:12;
150:10
**described (7)**
46:10;67:14;94:15;
136:18,19;154:25;
155:9
**describes (2)**
105:24;108:7
**describing (2)**
134:4;136:15
**designed (1)**
148:15
**despite (1)**
6:22
**detail (6)**
30:9;43:19;87:4;
94:9;119:14,18
**detailed (1)**
23:15
**details (4)**
32:10;47:1;69:25;
76:2
**determine (4)**
24:17;27:23;58:23;
129:11
**determined (1)**
129:12
**determining (4)**
24:3;28:12,17;29:21
**develop (1)**
64:18
**developer (3)**
35:17;36:22;99:4
**developers (2)**
14:9;37:15;101:13,
21
**developing (2)**
31:24;35:13
**Development (6)**
99:12;101:20;108:6,
8,14;109:1
**Dial-a-Ride (2)**
11:19;12:18
**Diane (4)**
77:5;86:19;87:22;
147:5
**died (7)**
12:2,8;80:7,8;146:8;
150:4;151:17
**difference (1)**
30:25
**different (31)**
9:5;10:17;11:15,15;
18:3;21:18,19;26:21;
27:17,22;45:17;46:8;

49:4;51:21;53:4;54:2,
3,6;55:8;56:7;57:8;
66:19,22;69:6,8;70:2;
99:7;101:8;144:20,22;
151:4
**difficult (2)**
51:23;52:4
**difficulty (1)**
52:23
**dinner (1)**
147:21
**direct (1)**
109:15
**directions (1)**
33:4
**directly (4)**
40:14;106:25;
108:13;142:23
**director (1)**
96:11
**disabilities (1)**
60:4
**disabled (2)**
60:5,6
**disappears (1)**
139:12
**discount (4)**
39:4,5,7,11
**discuss (1)**
70:8
**discussed (5)**
6:23;56:15;148:1;
157:10;160:12
**discussion (5)**
44:23;48:16;64:5;
91:23;95:12
**discussions (8)**
60:19;61:8,11,18,25;
62:8;63:7,16
**dispute (10)**
7:19;33:6;42:11;
58:7,10,11;61:12,13,
15;129:18
**distance (1)**
72:24
**distinct (1)**
144:19
**divided (1)**
25:6
**division (1)**
41:14
**document (36)**
9:6,18,25;85:24;
102:12,14;105:2,6,16;
108:1,19;111:8,14;
115:18;118:18,21;
119:2,3,6;120:18;
124:18;125:22;126:4,
5,7;127:1;131:5,6;
133:19;137:10,12;
140:5;145:20,22;
148:10;150:19
**documents (47)**

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL    Pg 50 of 71

PAUL BRUCE
June 6, 2019

8:12,16,18,23;9:2,7,
14;22:7,11,13;94:8;
118:25;119:11;120:2,
6,16,17,20;121:11;
122:11,25;123:3;
124:15,24;125:3,5,7,
13;138:9,15;140:6;
145:16;147:8,9;148:6,
20;149:8;150:11,15,
16;151:23;154:12;
156:2;157:7;160:9,14,
15
**Dollar (10)**
61:19,20;84:8,14;
87:23;88:1,4,11;
144:16;145:6
**dollars (5)**
15:17;16:4,10;54:9;
72:25
**done (4)**
58:21,22;99:10;
152:21
**door (5)**
32:19;84:11;123:23;
124:4,8
**doubt (1)**
70:7
**down (6)**
14:6;73:10;86:10;
90:8;146:8;149:11
**dozen (1)**
16:3
**dramatically (2)**
46:1,3
**drawer (3)**
139:5;149:14,16
**Drive (3)**
18:7;131:10,22
**drop (1)**
38:4
**drove (1)**
82:19
**drugs (1)**
84:1
**duly (1)**
4:4
**during (3)**
136:4;138:13;153:12

**E**

**earlier (14)**
6:23;81:20;85:8;
94:4;116:23;117:5;
128:24,25;135:22;
137:15;143:16;154:21;
157:20,24
**early (1)**
138:13
**earning (1)**
14:1
**east (1)**
33:23

**easy (2)**
51:16;80:2
**eat (1)**
67:7
**Eckert (1)**
120:23
**economically (1)**
30:21
**Eddie (12)**
99:1,6,8,11,22,24;
100:2,6,12,24;101:2,3
**educational (1)**
10:9
**efforts (1)**
148:9
**either (6)**
65:6;69:9;127:22;
149:22;150:21;158:13
**else (14)**
20:24;35:19;36:2,5,
23;65:4,10;66:22;
68:24;69:3;91:7;
112:17,25;121:8
**e-mail (11)**
60:15;63:10;122:8,9,
14,23;138:6,10;139:3,
13,25
**e-mails (1)**
122:13
**employees (2)**
21:13;43:1
**empty (1)**
42:11
**enclosed (1)**
132:16
**encloses (1)**
133:5
**end (3)**
112:7;144:9,10
**ended (2)**
14:13;26:12
**engaged (1)**
63:14
**enough (2)**
16:14;70:1
**ensure (3)**
148:9;151:23;152:10
**entered (1)**
108:5
**entire (4)**
8:1,3,3;55:15
**entirety (2)**
103:21;120:17
**entities (3)**
51:22,24;94:5,13;
98:17;116:22;117:6;
121:20
**entity (4)**
52:1;94:18;115:6;
127:25
**environmental (4)**
42:23;126:8,16,17
**equal (1)**

153:13
**Erica (6)**
96:9,10,12;137:20;
138:1;139:7
**escrow (2)**
91:10;123:1
**estate (15)**
13:15;29:22;35:16;
36:21;37:14;46:1;
47:24;49:22;54:23;
65:21;91:4;93:23;
102:2;149:15;151:5
**estates (1)**
80:11
**estimate (6)**
16:2,23;58:17,21,24;
65:24
**even (5)**
12:15;55:10;124:5;
141:17;143:24
**event (1)**
147:17
**eventual (1)**
26:18
**eventually (1)**
49:21
**everybody (1)**
124:7
**exact (1)**
118:16
**exactly (8)**
33:20;38:17;49:17;
53:6;77:8;117:19;
118:23;139:19
**EXAMINATION (4)**
4:7;97:19;153:1;
160:1
**examined (1)**
4:6
**example (5)**
9:17;20:22;72:11;
89:23;98:15
**examples (1)**
30:20
**exceed (1)**
74:9
**exceeded (4)**
15:17;50:21;54:14,
17
**excellent (1)**
107:19
**except (1)**
118:12
**exceptions (3)**
157:9;160:11,13
**exchange (1)**
148:7
**exchanged (1)**
122:9
**exciting (2)**
38:15;150:24
**exclusive (1)**
23:14

**Excuse (6)**
32:3,12;40:22;41:19;
92:21;118:20
**exemption (1)**
46:1
**exercise (2)**
98:12;148:16
**exercising (1)**
98:14
**Exhibit (28)**
9:20,22;93:19;102:6,
20;104:25;105:7,8,10,
15;106:4;111:2,3,6,17,
21;113:16;124:13;
126:22,24;130:3,22;
135:11;145:15;153:4,
5;154:14;157:11
**exist (3)**
25:18;101:21;109:4
**existed (2)**
149:21;156:17
**existence (7)**
70:5,14;71:8,11,23;
74:16;109:12
**existing (11)**
23:22;24:4,18;66:4,
14,19;72:23;113:6,13,
15,18
**expand (2)**
130:5,11
**expansion (1)**
120:24
**expecting (1)**
69:6
**expense (3)**
130:6,12,17
**expensive (1)**
120:13
**experience (1)**
141:11
**experienced (1)**
150:2
**expertise (3)**
107:21,24;118:11
**expire (5)**
103:7;104:10,12;
105:25;155:20
**expired (3)**
71:12;73:22;103:24
**expires (1)**
158:11
**explain (7)**
43:19;45:13;47:2,6;
79:22;147:11;149:12
**expressed (1)**
47:25
**extend (1)**
103:14
**extended (2)**
104:23;137:15;
158:16
**extension (2)**
104:18,19

**extent (3)**
60:23;61:7;62:3

**F**

**fact (1)**
155:18
**factor (1)**
29:24
**facts (1)**
74:24
**fading (2)**
143:14,14
**Fair (3)**
15:11;71:10;142:20
**Fairfax (4)**
16:12;20:23;76:7;
142:15
**fairly (3)**
27:11;68:21;69:7
**familiar (4)**
9:11,18;28:19;
127:21
**family (2)**
8:4;77:4
**family's (1)**
55:5
**famous (1)**
99:19
**far (2)**
102:2;143:9
**Faraday (3)**
18:6;131:10,22
**farm (2)**
39:5,6
**fat (1)**
124:9
**father (14)**
35:2,5;36:9,15;37:9,
12,18;100:5,12;
131:16;133:4;148:11;
152:1;156:16
**father's (6)**
49:16;80:12;100:23;
101:1;156:10,20
**favorite (1)**
86:16
**fax (4)**
91:6;131:9,18;132:3
**February (1)**
33:10
**federal (2)**
11:13,21
**fee (44)**
25:11;26:8,9,16;
27:3;33:9;39:16,19;
41:23;81:5,7;90:11;
101:4,8;106:6,7,8,25;
108:13;109:9,18;
115:4,8,13,25;116:4,4,
7,25;117:21,23;118:1;
121:19;135:17;141:14;
143:21;144:18;145:6;

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL  Pg 51 of 71

PAUL BRUCE
June 6, 2019

153:18,20,23;154:4,7;
158:15
**feet (4)**
16:15;72:16;88:2,3
**fellow (1)**
110:7
**felt (4)**
66:5;88:1,4;146:25
**few (18)**
19:11;46:5;63:17;
69:1;77:3;85:14;89:6;
91:16;117:10;141:19;
143:4;145:9,10;
146:18;152:22;157:9;
160:11,13
**field (3)**
73:14;118:11;142:11
**figure (4)**
28:7;42:13;84:16;
96:16;142:19;153:20
**figuring (1)**
142:13
**file (23)**
119:20;120:18,21;
121:16;122:11,17,24;
123:21;125:3,23;
138:24;139:5,21;
147:12,12;148:2,12;
149:14,16;150:20;
151:2,23;152:11
**files (30)**
119:3,5,6,12;125:6,6,
20,20,24;138:18;146:3,
4,5,19;147:7;148:16,
22;149:4,5,24;150:15,
15,16,24;151:6,9,15,
22;157:4;160:7
**filing (1)**
148:5
**fill (2)**
52:24;73:2
**filled (1)**
147:6
**final (3)**
151:15,21;159:16
**finally (1)**
69:13
**find (4)**
42:14;120:15;
135:16;138:16
**finding (1)**
42:19
**fine (2)**
7:12;128:12
**finish (1)**
6:2
**finished (1)**
32:17
**firm (12)**
25:16,17;42:23;63:8;
64:14;69:8,10;70:16;
71:3;121:6;126:16,17
**first (33)**

4:4;12:17;14:11;
19:11;37:24;38:7,8;
47:19;67:17;68:11;
82:5,6,6;85:13;86:23;
88:23;91:23;104:5;
105:6;106:10;108:1;
112:7,11;115:16;
118:8,22;136:1;140:1,
5,9,21;153:14,15
**five (17)**
12:9;16:1;20:11;
39:12;82:14;84:20;
85:10,11,12,19;87:6,
11;88:15;101:17;
121:2;125:7;128:18
**five-year (3)**
18:9,11;103:17
**flexible (1)**
67:5
**Florida (6)**
34:1;80:11;141:8;
144:25;146:9;149:11
**flow (1)**
67:2
**focus (1)**
14:8
**focused (1)**
69:5
**Fogo (1)**
79:2
**folders (2)**
139:4;149:21
**follow (1)**
67:12
**following (3)**
112:9,15;133:23
**follows (2)**
4:6;97:18
**follow-up (1)**
152:22
**foot (1)**
76:20
**force (1)**
30:20
**forget (4)**
63:9;66:6;126:4,20
**forgetting (1)**
100:9
**forgot (1)**
134:16
**Fork (1)**
86:12
**form (10)**
17:2;20:2;24:5,11;
28:25;52:24;53:16;
68:12;74:12;75:5
**forth (2)**
35:23;46:9
**fortunately (1)**
146:15
**forward (1)**
47:7
**forwarded (2)**

132:11,25
**found (2)**
42:15;90:10
**four (7)**
11:2;15:21,22,25;
16:13,14;31:23
**fourth (1)**
69:4
**frames (1)**
35:22
**Franklin (1)**
121:1
**Frequently (1)**
29:10
**freshman (1)**
44:20
**friend (2)**
38:5;127:16
**front (4)**
10:1;32:23;33:8;
106:12
**full (6)**
9:9;29:3,16;47:1;
54:25;55:4
**full-time (2)**
11:3,5
**functional (2)**
146:25;147:2
**functioned (1)**
157:25
**further (7)**
97:18;152:18,20;
159:16,22,23;160:16
**future (3)**
152:7,7,9

## G

**gave (3)**
68:3;105:3;124:23
**Gene (2)**
131:15;133:5
**general (17)**
31:17;61:19,20;
82:24;83:11;84:8,14;
87:23;88:2,4,11;91:22;
92:1;102:2;144:17;
145:6;157:22
**Generally (6)**
31:13;79:23;89:18,
19;97:22;112:24
**gift (1)**
80:3
**girlfriend (1)**
44:6
**gist (1)**
147:16
**given (1)**
161:12
**gives (1)**
155:12
**giving (4)**
125:17;128:18;

144:6;151:2
**glass (1)**
32:19
**Glenn (6)**
91:21,25;96:15,17;
157:17,21
**Gmail (1)**
138:15
**goals (3)**
56:3,21,21
**God (2)**
120:22;121:12
**goes (2)**
46:9;77:9
**Golden (4)**
91:24;96:15;121:22,
23
**good (17)**
13:9;20:17;27:18;
43:24;67:3,6,8;71:20;
77:16;79:12,15;
102:23;128:10;140:16;
141:9;145:13;150:3
**GOODMAN (77)**
17:2;20:2;24:5,11;
28:25;31:15;35:21;
40:21,23;44:13;45:1,7,
9;48:3,21;51:5,7;
52:19,21;53:16,24;
54:16,19;56:25;57:19;
58:5,13;59:3,10;60:22;
62:2;66:25;68:12;
71:13,25;74:12,18,21;
75:5,13;76:14;85:3,8;
96:22;104:15;105:11;
107:6,8;109:20;110:4,
8,19;112:4;114:6,22;
115:20;116:18;127:5;
128:15,20,23;129:4,9,
16,23;133:18;136:7;
139:10;152:21;153:2;
154:13,17,20;158:25;
159:4;160:4,17
**government (3)**
11:13,13;13:3
**governmental (1)**
126:15
**grade (3)**
12:3,8,9
**gradual (1)**
146:14
**graduate (1)**
10:20
**graffiti (4)**
84:3;91:17,20;122:2
**grandfather (1)**
36:14
**gravel (1)**
83:14
**Grayson (4)**
86:3,3,15,16
**Great (5)**
5:23;6:11;33:25;

34:21,23;103:5;127:10
**greater (1)**
51:18
**Green (11)**
99:1,6,8,12,22;100:2,
6,12,24;101:2,3
**Green's (1)**
99:25
**ground (42)**
9:17;92:11;98:11,12;
108:17,21,24,25;109:3,
13,14;110:13,23;
111:11,21;113:19,20;
114:4,5,17,20;115:2,5,
22,23,24;116:14,16;
117:17,24;118:9;
125:8;144:15;148:19,
21;153:5,21;155:6,7,
19;158:16;159:20
**group (10)**
11:14,18,20;12:16,
17,18;13:2;92:12,13,14
**groups (2)**
11:15,18;92:11
**growing (1)**
34:14
**guess (7)**
12:5;58:25;76:19;
81:13;83:23;117:9;
154:19
**guessing (11)**
10:24;16:20,21;18:1;
65:17;76:9;77:2;81:13;
86:7;106:21;107:3
**guy (10)**
62:20;64:13;90:25;
91:3;99:3,4,6,17;
122:5;142:6
**guys (1)**
68:3
**GW (1)**
10:18

## H

**half (15)**
15:4;20:15;54:22,24,
24;55:2,15,25;56:19,
20;59:9,11,14;67:1;
137:19
**handed (1)**
111:5
**handle (1)**
42:22
**happen (3)**
12:11;18:8;149:23
**happened (3)**
67:22;118:7;119:25
**happening (1)**
26:12
**happens (2)**
57:11;71:15
**happy (6)**

18-23538-shl   Doc 4232   Filed 06/13/19   Entered 06/13/19 22:59:52   Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL  Pg 52 of 71

PAUL BRUCE
June 6, 2019

32:11,13,20;33:1,1,2
**hard (3)**
66:23;125:20;139:18
**hard-copy (2)**
147:8,9
**hate (1)**
120:11
**hazardous (2)**
12:4,10
**head (1)**
125:16
**hear (5)**
24:9;32:11,13;74:19;
89:24
**heard (3)**
38:11;98:25;127:25
**held (1)**
49:1
**hell (1)**
26:15
**Heller (1)**
80:9
**Heller's (1)**
121:6
**help (10)**
22:6,25;32:25;42:9,
18,19,24;126:19;
142:18,19
**helped (2)**
22:10,12
**helpful (4)**
6:7;138:4;141:22;
146:17
**helping (4)**
22:8;46:3;51:15;
147:23
**hereby (1)**
161:7
**herein (2)**
108:8,10
**herself (2)**
123:23;124:4
**high (2)**
36:4;89:4
**higher (1)**
31:2
**highest (2)**
30:19;53:23
**Highlands (1)**
86:3
**highway (1)**
23:16
**hiker (1)**
77:18
**hiking (2)**
77:15;86:6
**hire (2)**
22:6;120:12
**hired (10)**
22:1;42:21,21,22,22,
23;80:16;112:8;
113:12;126:17
**historic (1)**

31:8
**historically (1)**
25:16
**history (1)**
152:6
**hold (1)**
49:9
**HOLDCO (2)**
4:7;160:1
**Holland (6)**
65:13,15,18;67:16;
68:9,19
**H-O-L-L-A-N-D (1)**
65:17
**home (2)**
95:17;128:14
**homeless (1)**
84:1
**homes (1)**
38:23
**honest (1)**
142:5
**hope (2)**
121:15;127:19
**Hopefully (1)**
152:23
**host (1)**
136:21
**hotel (1)**
82:10
**hour (3)**
67:1;82:25;86:20
**house (12)**
15:3,4;32:8,16;
33:20;34:4;73:7,7,11;
75:24;79:3;125:25
**houses (5)**
21:6;23:8,10;32:1,5
**Howarth (4)**
91:21;96:16;157:17,
21
**Howarth's (1)**
91:25
**huge (1)**
34:8
**hundred (2)**
29:18;120:3
**hundreds (1)**
107:9
**hurt (3)**
84:11;123:23;124:4
**husband (1)**
78:15
**hypothetical (1)**
47:21

**I**

**idea (2)**
67:7;101:5
**identification (2)**
9:23;102:7;105:1;
111:4;130:23

**identify (4)**
9:8;41:25;55:10;
63:18
**II (1)**
36:12
**Immediately (2)**
36:11,20
**implementing (1)**
152:8
**implications (2)**
29:3,16
**important (7)**
5:18,25;6:4;33:2,3;
125:22;136:22
**impressive (1)**
77:11
**improvements (4)**
32:2,4,9,15
**Inc (12)**
18:2,14,20,24;19:2,5,
10;20:21;21:13;24:19;
131:10,19
**include (5)**
9:16;21:15;23:21;
28:17;94:6;113:15;
121:16
**included (3)**
121:24;122:4,6
**includes (2)**
38:23;62:3
**income (5)**
14:2;28:6,12,15;
43:17;98:2
**Incorporated (2)**
17:21,22
**increase (2)**
32:16;45:25
**increased (2)**
32:18,24
**indeed (1)**
130:16
**indicating (1)**
135:17
**indicator (1)**
31:3
**individual (1)**
67:16
**industrial (2)**
28:5;75:20
**information (10)**
23:10,11,12,16,19,
21,25;89:20,21;148:24
**initial (7)**
45:19;46:12;50:13;
85:17;103:19;105:24;
114:21
**initially (1)**
99:10
**insignificant (1)**
39:14
**insist (1)**
30:17
**insisted (1)**

42:9
**inspect (3)**
83:8,9,10
**inspection (2)**
87:19;88:10
**installments (1)**
153:14
**instance (3)**
41:25;45:25;121:22;
148:18
**instead (1)**
87:6
**instructs (1)**
6:15
**insurance (7)**
95:20,22;96:9;97:5;
123:16,19;124:11
**intention (3)**
47:3,5,9
**interaction (1)**
98:3
**interest (13)**
19:1;32:14;33:9;
37:3,5;54:22,24,25;
56:1,8;79:19;151:13;
158:11
**interested (4)**
26:22;27:15;62:10;
146:15
**interesting (2)**
63:24;106:13
**interests (4)**
38:13,14;56:2,21
**interpret (1)**
107:10
**interrupt (1)**
67:2
**into (8)**
23:2;43:23;44:17;
49:22;51:25;108:5;
122:24;139:13
**introduce (1)**
141:20
**introduced (1)**
159:1
**introducing (1)**
154:12
**invest (1)**
31:24
**investment (10)**
13:16;35:9;37:13;
38:24,25;39:3;45:19;
46:24;47:10,24
**investments (5)**
35:10,11;36:9;46:12;
149:15
**investor (2)**
36:21;101:20
**investors (1)**
37:14
**invoking (1)**
64:1
**involved (8)**

13:4;36:24;41:21;
90:17;133:13,21,24;
143:11
**irate (1)**
90:4
**Irrevocable (2)**
7:9,10;81:18
**IRS (1)**
52:25
**Island (1)**
34:15
**issue (5)**
84:3;96:9,17;108:16;
154:16
**issues (9)**
12:2;39:13;43:17;
83:19,20;84:18;96:3;
97:3;152:9

**J**

**J&W (37)**
68:3;70:20;90:16,17,
20,24;91:22,25;93:13,
21,23;94:4,13,15;96:5,
6,7,11;97:5,8;121:20,
25;122:10;124:8;
131:10;132:11,15;
137:20;141:21,25;
142:3;157:22,24;
158:9,20;159:11,18
**J&W's (2)**
70:19;92:8
**Jackstay (1)**
4:18
**J-A-C-K-S-T-A-Y (1)**
4:18
**Jamaica (1)**
34:19
**January (3)**
68:4,7;158:12
**Jenkins (1)**
157:18
**job (10)**
11:5,22;12:14,19,20;
13:10,24;17:19;32:23;
107:10
**John (1)**
131:8
**Johnson (2)**
131:16;133:5
**Joy (1)**
93:24
**judgment (1)**
150:3
**Julie (1)**
157:18
**July (2)**
131:17;133:2
**juncture (1)**
72:2
**June (1)**
161:9

PAUL BRUCE
June 6, 2019

## K

**keep (10)**
46:17;67:4;119:5;
120:18;123:13;125:24;
139:20;146:5,5,20

**keeps (1)**
100:9

**Kelly (1)**
130:20

**kept (4)**
139:22;146:20;
147:12;149:20

**key (2)**
139:15,17

**kids (4)**
38:4;66:3;78:21;
79:24

**killed (1)**
84:7

**Kimco (1)**
42:5

**kind (16)**
13:13,21;15:6;18:23;
19:21;25:23;35:11;
38:21;42:9;54:1;69:5;
86:18;89:21;90:11;
91:2;146:13

**kinds (6)**
11:24;12:2;14:3;
32:2,4;38:14

**K-M (18)**
70:21;92:12;94:22;
95:3,7;96:8,19;97:21,
22;98:4,11;122:10;
155:6,15,18,24;158:14,
15

**Kmart (135)**
7:23;25:1,5,14;27:6;
38:16;59:4,5,14;70:5,
11,13,20;71:7,11,12,
23,24;72:13,13,19;
73:22;74:4,5,9,11,16,
17;76:11,20,25;83:5,8,
9,16;84:11,13,13;
87:20,24,25;88:2,5,10,
19,24;89:3,7;94:19,21,
23,24;99:3,9,17;101:7,
16;102:15,25;103:3,6;
104:12;106:4,5,6,8;
107:1,1;109:6,7,9,18,
22;110:16,17;113:16,
20,22,23,24,24;114:1,
2,3,14,15,16;115:4,6,7,
10,10,12,12,18;116:3,
17;117:2,2,14,18;
118:1,1,3;119:8,20;
122:10;123:24;124:8,
11;130:5,10,16;
132:17;133:14,16,19,
25;135:18,20;136:5,12,
15,19,24;137:2,5,23;

**Kmart's (6)**
59:13;89:1;95:1;
103:7;137:15;158:11

**knew (5)**
49:17,20;75:25;96:8;
137:8

**Knob (3)**
86:5,10;87:15

**knowing (2)**
76:8,22

**knowledge (5)**
76:6,9;128:6;154:3,6

**knowledgeable (2)**
76:5;150:2

**known (3)**
4:12;99:17;102:4

**knows (1)**
77:8

**Korean (1)**
88:13

**Kresge (4)**
108:9,15;109:6,7

**Kwon (1)**
88:12

## L

**labeled (1)**
149:20

**labor (1)**
134:8

**lack (2)**
54:6,7

**land (23)**
14:9;16:14;21:6;
24:24;25:7,10;28:4,8,
9;29:21;30:1;35:14;
39:8;41:12;50:10;
71:15,19,22;73:6,10;
74:4,15;101:14

**landlord (9)**
39:25;40:4,11;108:9;
109:15;116:22;117:6,
7;158:11

**landlords (2)**
39:22;40:2

**large (1)**
32:20

**larger (1)**
142:17

**largest (2)**
14:22;15:12

**Last (10)**
22:15;62:18;65:16;
67:25;86:8;89:5;90:22;
96:21;105:25;117:10

**later (6)**
20:25;44:22;46:5;
49:23;50:7;69:1

**laughed (1)**
91:19

**laughing (1)**
72:6

**law (4)**
45:15,23;46:6,22

**laws (1)**
46:18

**lawsuit (2)**
42:11;84:12

**lawyer (4)**
42:21,22;60:7;120:9

**lawyers (5)**
51:15,15,23;54:5;
120:12

**layperson (2)**
107:15,18

**leafing (1)**
102:11

**learn (1)**
37:24

**lease (160)**
9:17;18:9,11;23:22;
24:4,18;25:2,7,25;26:3,
5,10;28:18,20,24;29:3,
17;40:8;42:7,12,17;
47:8,15,16,17;66:2;
70:5,13,19;71:7,11,12,
23,24;73:22;74:4,5,9,
11,16,17;76:11,21,25;
84:15;88:12;92:11;
98:11;99:10;102:15,
25;103:3,6,7,14,21,23;
104:1,3,9,12,23;106:4,
5,9,10,20,20,23,25;
107:16;108:4,12,17,22,
24,25;109:3,12,13,14;
110:13,23;111:11,21;
112:8,15,17,25;113:3,
4,5,6,12,16,18,19,20,
20,23,24;114:2,4,5,15,
18,20;115:2,6,22,23,
24;116:3,9,15,17,21;
117:2,17,24;118:9;
119:8;124:17;125:8;
137:10,12;141:14;
143:20;144:9,10,11,13,
14,15,15,19,21,21;
148:19,21;153:5,12,16,
21;154:10,18;155:1,7,
19;158:10,13,14,14,16,
21,22;159:12,13,19,20

**leased (2)**
25:1;42:3

**leasehold (1)**
158:11

**leases (22)**
14:16,18;28:13;
40:11;41:16;96:12;
97:4;101:15;107:9,10,
22;113:13,15;118:14;
120:23;121:2;138:5,8;
139:23;142:2;145:1;
150:17

**leasing (5)**

13:16;14:13;35:14;
92:14;96:11

**least (3)**
7:4;16:10;30:6

**leave (6)**
20:18,19;63:2,10,15;
66:12

**Leesburg (1)**
18:1

**left (5)**
12:19;39:7;50:6,7;
87:22

**legal (16)**
96:13;104:16;107:4,
8;109:20;110:4,10,19;
114:7,23;115:20;
116:19;117:15;120:5,
8,10

**lemon (1)**
42:6

**lender (1)**
28:11

**less (9)**
25:21;30:18;59:5;
71:11;75:15;82:25;
89:6;147:1,1

**lessee (6)**
61:22,23,24;133:14,
17,20

**LESTER (1)**
131:3

**letter (13)**
68:6;98:14;124:10,
13;131:7,11,15;132:6,
10,14,25;136:18,20

**letterhead (3)**
132:6;135:1,2

**letters (6)**
63:12,13;123:18;
136:14,17;138:8

**LEVANDER (73)**
4:8;9:19,24;20:6;
24:7,14,16;29:4;31:18;
35:24;36:1;41:2;44:18;
45:4,12;48:8,24;51:6,
10;53:2,19,20;54:10;
57:3;58:8,20;59:7;
61:3,4;62:13;67:3,8,
11;68:15,16;71:21;
72:4;74:14;75:1,9,16;
76:17;85:7,15;96:24;
97:11,20;102:10;
105:15;110:15;111:1;
112:6;114:12;115:1;
116:11;117:4;127:8;
128:17,21;129:24;
130:1,20,24;131:2,4;
136:10;139:14;154:11,
15;158:23;159:2,23;
160:3

**lien (6)**
132:12,17,21;133:6,
9;134:4

**liens (1)**
136:14

**life (9)**
44:9,22;53:7;54:3;
58:16,17;80:3;120:11;
148:14

**lights (2)**
84:16,17

**liked (2)**
41:13;150:23

**likely (2)**
141:16;143:22

**likewise (2)**
159:15,19

**limit (1)**
113:2

**limitations (1)**
116:2

**limited (6)**
113:5;115:24;
116:25;117:20;118:2;
121:18

**line (1)**
72:23

**list (2)**
50:13;125:13

**listed (3)**
21:3;112:19;117:23

**literally (1)**
75:24

**litigation (2)**
42:21;73:22

**little (5)**
83:10;91:19;142:5,
16;147:17

**live (3)**
4:25;32:8;34:23;
78:19;79:7

**lived (4)**
32:1,5;90:13;147:2

**living (11)**
4:20;33:18,20;35:2,
6;60:2;77:12,16;78:14,
24;138:13

**LLC (2)**
4:7;160:1

**loan (1)**
121:9

**located (7)**
15:10;17:12,23;21:9;
43:7;79:5;108:8

**location (3)**
29:20;125:25;126:2

**long (13)**
4:20;11:4;12:15;
13:5;15:15;18:19;
34:15;62:5;72:24;77:7;
103:21;123:25;124:24

**longer (3)**
115:25;116:24;
117:20

**look (27)**
28:8;38:6;51:1;

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL    Pg 54 of 71

PAUL BRUCE
June 6, 2019

57:22;82:19;83:11;
88:5,7;92:16;99:25;
102:8;104:20;105:23;
110:22;113:8;114:4,
17;118:22;123:22;
126:14;137:12;138:14;
145:15;148:20;151:12;
153:4;157:11
**looked (17)**
82:20,21,23;83:13;
87:18,19,19,20;88:24;
89:12;114:20;135:21;
136:17,18;149:17,18,
25
**looking (4)**
20:14;50:20;53:11;
114:4
**looks (5)**
103:18;127:2;132:7;
134:6;135:4
**lost (1)**
148:7
**lot (26)**
13:4;21:25;36:7;
39:13;42:24;45:23;
56:6;59:12;61:18;
64:20;73:12;83:14,15;
87:19;92:13;98:18,20,
21;112:23;122:20;
123:24;124:5;141:11;
142:12;145:16;147:18
**lots (6)**
13:1;27:21;72:17;
91:20;123:6;124:9
**loud (1)**
158:7
**Loudoun (3)**
73:5,12;142:16
**low (1)**
80:3
**lower (2)**
31:2;126:19
**lunch (3)**
95:14;97:12;147:22
**Luncheon (1)**
97:13

## M

**mail (2)**
84:4;91:21
**maintained (10)**
83:15,15;89:13;
147:12;148:1;150:11,
19,24;157:7;160:9
**maintaining (2)**
119:3;156:12
**maintenance (3)**
40:19;41:6;96:1
**major (1)**
45:22
**makes (2)**
40:6;79:24

**making (2)**
33:2;143:2
**man (1)**
39:12
**management (13)**
41:12,13,18,22;
90:16,17,18;94:13,15;
131:11;132:11,16;
137:21
**manager (5)**
78:25;79:1;91:2;
92:10;94:16
**managers (1)**
42:1
**manila (2)**
139:4;149:20
**manner (2)**
156:11,17
**manufacturer (1)**
124:8
**many (21)**
15:19,23;20:7,13;
21:12,13;29:12,14;
30:14,20;31:22;36:14;
38:18;50:1;51:13;78:1;
82:2;83:24;120:20;
142:18;147:1
**maps (2)**
23:18,18
**March (2)**
78:13;105:21
**Marilyn (1)**
93:24
**mark (5)**
9:19;111:1;126:24;
130:21;131:1
**marked (11)**
9:22;102:6;104:25;
105:8;106:3;111:3,6;
113:16;126:22;130:3,
22
**market (38)**
23:9;26:15;28:20;
53:8,14,21,23;54:4,13,
14,15,17,23,23,25;55:11,
13,24;56:6,7,19,23;
57:13,23;58:3,16;75:7,
10,15,19,20,21,25;
76:8,9,12,22;77:1;
129:1
**marketability (1)**
54:8
**markets (1)**
75:21
**married (3)**
36:18;59:23;77:7
**Martin (9)**
33:8,15;48:10,25;
49:8;50:16;55:1;80:18;
131:16
**Mary (4)**
22:3,14;146:10,15
**Mary's (1)**

**86:10
master (2)**
23:17;73:8
**materials (3)**
12:4,10;134:9
**matter (5)**
12:7;31:5;118:4,17;
122:22
**mattered (1)**
142:10
**maximum (1)**
52:6
**may (16)**
6:13;7:7;25:17;
43:23;45:8;52:9;60:25;
107:17;115:15;118:10;
121:2;123:7;124:5;
134:15;138:16;157:17
**maybe (17)**
21:4;38:22;39:6;
43:13;44:4;47:21;59:9;
67:7;69:4,7;75:24;
78:9;82:25,25;100:10;
138:17;142:16
**MBA (6)**
10:11,16,22;11:1,6;
21:24
**McAfee (3)**
86:5,10;87:15
**McCloskey (1)**
121:7
**McKay (4)**
62:20,22,23,25
**mean (60)**
7:14;8:17;12:12;
15:14;19:17;22:2,18;
25:24;27:10,16,21;
32:25;37:5;42:13;45:2;
47:5;49:20,21;52:11;
69:19;70:9;73:2;75:23;
76:3;82:14,25;85:10,
11;86:12;89:25;91:9,
16,19;92:18;96:25;
97:23;98:10,18;101:9;
107:11;112:16,18,21,
24;122:1;123:4,10;
129:18,20;136:8;
137:4;140:6;142:4,24;
144:1,12;148:14;
150:14;151:10,11
**meaning (3)**
27:18;141:14;143:20
**meaningful (1)**
28:6
**means (5)**
9:4;27:20;28:6;
47:17;156:13
**meant (1)**
80:1
**meet (1)**
99:22
**memo (1)**
158:9

**memorandum (2)**
157:17;158:5
**memorializes (1)**
119:7
**memorializing (1)**
119:25
**memory (2)**
43:23;44:17
**mentioned (2)**
20:22;81:20
**met (2)**
99:18;127:13
**methodology (1)**
28:1
**Metropolitan (4)**
26:19;27:1,3;72:12
**Michael (3)**
18:6;131:10,22
**Michigan (1)**
108:10
**middle (1)**
106:22
**middleman (19)**
141:9,13,14;142:25;
143:4,20,20;144:3,9,
13,14,15,19,21;145:8;
155:1,6,11,15
**might (14)**
6:19;9:5,6;32:24;
50:9,9;53:8;67:22;
101:10,18;123:16,21;
146:21;150:6
**Mike (6)**
65:13,15,18;67:16;
68:8,18
**mile (2)**
5:6;72:24
**miles (4)**
72:25;75:24,25;
142:15
**military (1)**
11:16
**million (41)**
14:24;15:6,17;16:4,
10,17;17:1,3,6,9;19:15,
25;20:5;21:1,5,8;
50:21,23,25;51:18;
54:9,18;57:7;59:13;
64:24;65:1,3,7,8,8,25;
66:6,10,11;69:16;70:4,
22;72:16;89:5;101:17,
18
**millions (1)**
72:25
**mind (3)**
77:4;128:17;143:15
**minute (2)**
55:22;105:19
**minutes (3)**
128:16,18;141:19
**mischaracterizes (2)**
48:4;85:4
**missing (2)**

**52:14;149:8
MIT (1)**
10:17
**MITRE (4)**
11:9;13:2,7;138:14
**Mixed (2)**
15:8;30:16
**mixed-use (1)**
21:4
**modified (1)**
116:9
**mom (3)**
42:8;80:7;149:1
**money (6)**
31:24;51:24;73:25;
95:2;101:22;149:2
**month (3)**
40:12;153:15,21
**monthly (4)**
153:13,20,24;154:8
**months (2)**
69:1,7
**more (56)**
8:22;9:4;16:2,3,4,6;
19:11;20:9,11,13,15;
21:20,22;25:20;30:1,2,
3,6,11;31:13;43:19;
45:18;46:11;48:6;
64:20,24;65:1,3,5,7,8,
8,11,25;66:15;67:21;
69:18;71:22;74:4,15;
76:5,9;83:17;87:4,5;
88:4;95:14;107:14,17,
18;119:14,18;125:15;
135:25;145:11;153:23
**most (9)**
14:13;19:13;28:6;
50:5;62:20;73:10;87:3;
150:3,16
**Mostly (11)**
12:1;14:9,17;17:12,
13;22:19;60:4;61:12,
14;91:9;123:1
**mother (13)**
35:9;36:25;37:12,17;
145:19,20;149:10,24;
150:19;151:9,15,22;
152:2
**mother's (5)**
36:15;51:12;85:25;
157:3;160:6
**Mount (1)**
86:17
**move (1)**
32:13
**moved (9)**
18:16,16;33:19,25;
34:1,20,25;35:1;51:25
**moving (1)**
79:23
**much (18)**
16:23;22:20;25:24;
36:3;42:17;46:21;59:8;

18-23538-shl   Doc 4232   Filed 06/13/19   Entered 06/13/19 22:59:52   Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL. Pg 55 of 71

PAUL BRUCE
June 6, 2019

64:22;76:18;82:8;
83:16,17;88:3;89:6;
121:25;122:16;143:2;
147:24
**multiple (1)**
125:6
**murky (1)**
117:11
**must (5)**
25:20;35:8;38:1,12;
68:7
**myself (1)**
79:24

**N**

**NAC (3)**
96:7;142:3;158:1
**name (28)**
4:9,13,15;21:17;
22:12,15;26:20,25;
62:22,23,24;63:9,11;
64:7,10,12,14;65:14,
16;69:9,11;70:17;
88:13;90:8,22;96:18;
127:21;137:5
**named (2)**
62:20;67:16
**names (4)**
78:3;92:13,15,18
**NAP (9)**
93:9,23;94:1;96:7;
97:8;140:23;142:1,3;
157:25
**narrow (2)**
14:6;84:21
**nature (3)**
91:4;134:4;137:3
**near (2)**
14:12;79:7
**nearby (1)**
90:13
**necessarily (1)**
107:18
**Neck (4)**
33:25;34:21,23;
127:10
**need (25)**
6:25;9:3;28:13,15,
19,24;29:2;50:12;
53:25;55:20;56:16;
68:23;69:3;91:11,12;
94:8;120:10;123:13;
125:18;147:22;148:17,
22,22;149:3;152:6
**needed (9)**
26:1;28:11;87:21;
91:15;96:12,16;
148:21,24;152:7
**negative (1)**
89:9
**neighborhood (3)**
16:22;21:7;76:20

**neither (1)**
12:11
**net (4)**
40:8;11;41:16;42:16
**New (10)**
10:14;42:3;61:22;
69:10;72:21;127:10;
141:22;148:24;149:1;
154:12
**newspaper (1)**
122:5
**next (9)**
12:14,20,21;13:10;
17:18;93:12;132:24;
134:3,5
**nice (2)**
32:23;138:4
**Nineteenth (9)**
92:18,19,20,22;93:3,
8;94:1,6,7
**nobody (1)**
106:22
**nod (2)**
6:8;40:24
**nodding (2)**
72:3,7
**normally (1)**
75:23
**North (10)**
38:3,16;43:8,11;
44:2;121:10;132:18;
133:10;134:1;144:25
**Notary (1)**
161:24
**note (4)**
119:19,24;120:1;
121:9
**notice (13)**
68:4;88:22;89:10,15;
122:3;132:12,17,22;
133:9;134:17,20,22;
136:9
**noticed (1)**
136:4
**notices (1)**
91:20
**notified (1)**
124:6
**November (3)**
78:8;106:1,1
**number (16)**
15:16;20:17;34:8;
66:6;69:6,19;90:9,11;
94:5;99:6;120:22;
121:4;126:18;131:25;
132:3;139:2
**numbers (2)**
58:9;69:20
**Nussinow (2)**
127:19,25

**O**

**Oak (1)**
86:9
**Oaks (1)**
15:11
**oath (4)**
5:8,10,17;161:9
**Obama (2)**
45:25;46:3
**object (2)**
6:13;107:6
**objected (3)**
24:11;74:21;110:10
**objection (43)**
6:22;17:2;20:2;24:5;
28:25;31:15;44:13;
45:1,7;48:3,21;52:19;
53:16,17,24;54:19;
56:25;57:19;58:5,13;
59:3,10;68:12;71:13,
25;74:12,18;75:5,13;
76:14;85:3;104:15;
109:20;110:4,19;
114:6,22;115:20;
116:18;133:18;136:7;
139:10;158:23
**objectives (2)**
56:3,22
**objects (1)**
6:19
**obligated (1)**
23:15
**obtained (1)**
156:2
**occasionally (1)**
98:6
**occupancy (4)**
104:6,8,10,13
**occupied (1)**
31:6
**occupying (1)**
88:19
**occur (3)**
67:19;68:19;70:24
**occurred (5)**
40:18;44:10;80:5,6,
118:6
**October (2)**
67:24;68:1
**off (10)**
38:4;44:5;47:14;
50:5;66:24;95:12;
97:12;106:18;121:10;
160:18
**offer (4)**
64:19;68:17;71:19;
141:9
**offeree (1)**
25:10
**offers (5)**
58:19;70:12;71:6;
74:8,10
**offhand (1)**
15:14

**office (17)**
14:10,10;15:8;16:13,
14;17:20;21:4;23:17,
18;25:4;28:5;30:16;
72:16;125:25;126:2;
142:15;146:7
**officials (1)**
30:15
**often (5)**
12:11;60:9;69:12,12;
91:16
**Ohio (1)**
83:13
**old (17)**
44:5;59:21;61:23,24;
66:22;69:9;78:7,11;
82:10;100:10,18,19,20;
120:23;124:2;138:15;
141:22
**Once (4)**
47:12,13,15;87:16
**one (55)**
5:25;6:4;7:1;9:1;
11:18;12:2;14:13;
16:10,11;19:14;21:14,
20,23;22:16;23:1,3;
28:3;30:19;32:7;39:9,
13;48:1;58:9,10;67:15;
70:15;72:24;73:7,11;
79:25;80:7;91:13,13;
92:12;93:20;94:10;
95:9,11,13,22;96:21;
112:17;123:19;124:6;
125:24;126:1;127:5;
141:1,9;142:18;143:5;
151:11;152:16;154:13;
159:23
**one-day (1)**
146:2
**ones (1)**
98:13
**ongoing (1)**
134:14
**only (15)**
5:25;7:1;9:8;23:3;
30:7,12;70:20;73:8;
86:20;89:18;98:3;
100:2;141:1;143:6;
147:9
**open (7)**
53:8;72:19;83:16;
96:14;112:3;126:23;
137:9
**opened (3)**
17:20;18:14;21:23
**opening (1)**
97:4
**operate (1)**
18:19
**operating (1)**
137:5
**opinion (14)**
58:24;59:1,2;66:14,

17;74:15,24;75:2,3,6,8,
22;76:11;142:9
**opinions (2)**
66:8;76:4
**opposed (2)**
6:7;145:1
**option (3)**
98:13,15;155:19
**options (9)**
47:16,17;103:9,13,
14,15,17,20;105:25
**Orange (7)**
50:7;141:7;142:14,
25;144:10,24;145:3
**order (6)**
23:8;28:24;50:12;
53:18;55:20;72:22
**organization (1)**
68:25
**organize (4)**
22:6,11,12;146:10
**organized (1)**
152:3
**others (6)**
8:22;32:8;76:5;
119:14,18;120:24
**otherwise (1)**
84:6
**ought (3)**
49:4;82:19;86:19
**out (32)**
28:7;42:5,7,12,13;
52:24;58:10,11;69:25;
70:22;75:22,23;82:10;
84:15,16;86:20;87:21;
89:17;105:14;106:21;
125:10;138:20,23;
139:3,17;142:13,19;
143:10;146:7,9;
149:11;158:7
**outcome (1)**
58:7
**outlier (1)**
20:1
**outside (2)**
142:14,17
**over (27)**
6:12;12:4,6,9;16:9;
18:21;20:5;21:18;42:4;
45:17;50:5;61:9;66:6;
72:16;91:8;122:14;
124:25;125:16;145:17;
146:3,6,13;147:5,14,
21;148:4,25
**overall (1)**
31:11
**own (13)**
17:20;20:25;22:24;
37:6,12;38:19;72:8;
78:15;104:9;116:5;
130:6,11,17
**owned (5)**
19:3;37:9;41:23;

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL.    Pg 56 of 71

PAUL BRUCE
June 6, 2019

55:1;141:12
**owner (27)**
  14:11;25:11;39:16,
  19;90:11;101:4,8;
  106:25;108:13;109:9,
  18,24;115:4,8,9,25;
  116:4,4,7,25;117:21,
  23;118:2;141:15;
  143:21;144:18;145:7
**owners (18)**
  26:8,9,16;27:3;
  41:23;106:6,7,8;
  115:13;121:20;133:12;
  135:17;153:18,20,23;
  154:4,7;158:16
**ownership (3)**
  19:1;81:5,8
**owns (1)**
  8:4

**P**

**package (1)**
  101:15
**page (21)**
  92:25;93:6,11,12;
  108:3;111:25;112:1,3;
  123:19;127:1,5;
  130:25;131:8,18;
  132:5,24;134:3,5,6;
  135:14;153:7
**pages (2)**
  117:11;120:3
**paid (8)**
  13:8;19:4,7;91:5;
  95:4,24;97:1;121:10
**paper (5)**
  123:24;125:11,12,
  20;139:18
**papers (1)**
  37:21
**paperwork (1)**
  92:16
**paragraph (26)**
  93:1,12;102:21,24;
  103:10,11,14,16,20,20;
  104:4;105:23;108:1;
  112:7,12;118:22;
  127:9;135:14;137:19;
  145:15;157:13,16;
  158:4,6;159:10,17
**parents (22)**
  22:7,11,13;33:16,18;
  34:20;38:19;40:14;
  43:1,7,10;46:20;47:2,
  11,25;48:9;57:11;80:1;
  99:5;127:16;128:6;
  156:3
**Park (9)**
  50:7;86:3,16;141:8;
  142:14;143:1;144:10,
  25;145:3
**parking (3)**

83:14,15;87:19
**parks (1)**
  14:10
**part (8)**
  24:18;33:22;34:18;
  35:18;42:10;86:14;
  138:18;150:3
**particular (5)**
  9:7;28:18;46:17;
  140:10,18
**particularly (3)**
  44:8;60:11;86:1
**parties (3)**
  62:1,3;121:17
**partly (2)**
  54:6,7
**Partners (7)**
  27:1;72:12;92:19,20,
  22,23,23
**partnership (2)**
  91:23;127:24
**part-time (1)**
  10:23
**party (1)**
  25:9
**pass (2)**
  90:16;116:7
**passed (1)**
  151:15
**passenger (2)**
  12:5,11
**passing (5)**
  49:16,18,24;51:12;
  85:25
**passive (1)**
  47:10
**past (1)**
  80:15
**Patton (37)**
  7:16,18;8:5;33:10;
  37:18;57:14;60:17;
  61:11;68:20;75:11;
  79:19;81:6,21,22;
  89:20;92:9;95:20;
  99:12;108:6,7,13;
  109:1,23;115:13;
  119:21;122:23;125:3;
  127:23;128:2,4,7;
  132:18;133:25;135:8;
  136:6,11;138:19
**PAUL (21)**
  4:3,11;10:4;17:20,
  22;18:2,14,19,23;19:2,
  5,10;20:21;21:12;
  24:19;97:16;131:9,9,
  19;161:7,16
**Pause (1)**
  152:17
**pay (1)**
  153:11
**payable (1)**
  153:13
**paying (5)**

36:3;41:6;42:10;
  95:19;123:12
**payment (2)**
  98:7,9
**payments (4)**
  91:14;95:1;123:7,9
**pen (1)**
  105:13
**pending (1)**
  7:3
**people (32)**
  12:2,6,8;20:23;
  21:12,18;22:17;25:25;
  28:11;60:5;62:8,9,16;
  66:8;71:17;73:5;75:7;
  76:4,8;83:25;84:1;
  90:3,5;96:14;102:1;
  123:12;124:6,9;
  134:25;142:12,19;
  143:4
**per (4)**
  15:22;19:10;73:7;
  153:13
**percent (9)**
  16:22;17:3,6,9;19:3;
  56:1;77:1;81:9,10
**percentage (2)**
  37:6,10
**perform (2)**
  24:2;25:23
**period (7)**
  18:21;22:5;28:23;
  84:21;130:18;136:4;
  151:7
**periodically (1)**
  91:11
**periods (1)**
  21:22
**permanent (2)**
  45:16;46:6
**permissive (2)**
  30:2,3
**person (4)**
  22:1,10,12;65:12
**personally (8)**
  19:20;24:2,17;27:5,
  8;31:19;37:21;58:22
**phone (2)**
  70:1;90:9
**physical (1)**
  125:19
**physics (2)**
  10:11,13
**picked (3)**
  149:24;151:14,21
**pictures (1)**
  83:6
**piece (4)**
  39:10,10;125:11,12
**pieces (1)**
  43:15
**Pike (1)**
  18:1

pile (2)
  63:13;124:21
**place (7)**
  43:24;59:5;86:2,4,5;
  88:12;146:3
**places (3)**
  10:17;86:6,13
**plan (2)**
  19:12;23:17;73:8;
  152:7
**planned (1)**
  16:13
**planners (1)**
  30:15
**planning (1)**
  152:8
**plant (1)**
  21:2
**plats (2)**
  120:22;121:4
**Plaza (7)**
  34:5;127:23;128:2,4,
  7;132:17;133:25
**pleasant (2)**
  91:17;141:20
**please (4)**
  4:9;43:20;130:20;
  157:14
**plus (2)**
  103:9;123:18
**pm (2)**
  97:15;160:18
**point (24)**
  28:22;33:25;44:1;
  52:14;55:18;67:2;
  79:18;105:14;110:2,
  17;114:3,15,24;
  115:16;117:10,25;
  121:12;124:3;136:22;
  146:6;147:4,13;148:3;
  149:10
**points (2)**
  67:13;146:18
**position (5)**
  74:1;110:1,3;117:14,
  19
**positive (1)**
  100:3
**possess (2)**
  107:21,23
**possession (6)**
  121:13;156:11,15,
  20;157:3;160:7
**possible (5)**
  122:19,20,21;148:6,
  8
**practical (3)**
  12:7;39:12;118:4
**precise (2)**
  67:21,23
**predecessors (2)**
  154:4,7
**prefer (1)**

67:4
**premises (5)**
  89:11,12,15;112:8;
  113:12
**preparation (1)**
  119:15
**present (1)**
  31:14
**preserved (1)**
  156:23;157:7;160:9
**president (1)**
  101:22
**presumably (1)**
  51:24
**presume (2)**
  102:15;135:5
**pretty (4)**
  32:18;67:23;79:11;
  150:14
**previous (1)**
  67:13
**previously (3)**
  97:17;114:1,14
**price (3)**
  25:6,6;142:20
**primary (1)**
  90:20
**principal (2)**
  115:12;141:25
**print (2)**
  125:22;138:20
**printed (3)**
  138:23;139:3,17
**prior (4)**
  48:4;113:20;135:18;
  146:24
**private (2)**
  126:16,17
**privilege (3)**
  6:16;64:1,2
**privileged (1)**
  60:24
**probably (35)**
  5:13;10:24;13:20;
  14:21,24;15:21;16:5,
  20;19:15;20:10;29:19;
  31:23;38:10;48:6;65:9,
  19;67:6,20;70:6;82:3;
  104:3;120:25;123:10;
  124:12,18;125:15,16;
  126:9;140:12;141:1;
  142:1;149:7,7;150:9;
  151:17
**probate (1)**
  48:23
**problem (2)**
  89:23;147:15
**problems (1)**
  148:14
**process (1)**
  146:11
**productive (1)**
  22:4

**professional (2)**
35:16;77:17
**profit (2)**
101:16,18,20
**program (2)**
138:12,14
**project (6)**
15:1,6;16:19,25;
25:4;72:21
**projects (10)**
11:14,16,24;14:10;
15:17;16:3,9;17:12;
28:5,5
**pronouncing (1)**
127:20
**properly (1)**
126:25
**properties (47)**
13:17;14:3;23:20;
29:17;31:22;35:12,13;
38:18,24;39:1,3,12,14,
19,23;40:1,5;41:11,19,
22;45:21;50:2,6,13;
57:4;64:6,8,9,13,16,17;
67:15,18;93:4,8;94:2,
7;98:21,24;99:7;
126:18;141:12;143:5;
148:15,25;149:1;152:5
**property (161)**
7:16,17,24;8:4;
16:12;21:1;23:14,23;
24:4,18,25;26:13,17;
27:9,15,24;28:7,13,14;
29:22;30:4,7,11,22,23;
31:1,1,6,13,20,25;33:5,
10;37:18,25;38:6,9,20,
21;39:13,16,20;40:7,
19;41:6,13,17,22;42:1,
2;43:11;44:2,23;45:6;
46:24;47:4,7,20;48:2,
10;50:8;55:16,25;56:1,
5,20,24;57:1,2,13;58:3,
16;60:17;61:22;62:10;
66:15;68:19;70:13,18;
71:7,10;72:13;74:9,11;
75:11;76:1;79:19;81:6,
8,21,22;83:14,19;85:9;
86:2;87:8,17;88:19;
89:19,20,24;90:18;
91:2,11;92:3,6,9;
94:16;95:20;96:1;99:5;
100:7,13;106:19;
109:23,25;116:5;
117:7;118:15;119:21;
129:2,7,11,20,22;
132:22;133:13,14,17,
20,24;134:11,21,23;
136:5,15;137:7;141:7,
11,16,18;142:14,21;
143:3,6,12,23,25;
144:2,25;145:1;148:2;
149:4,6;151:3;155:5,
24;156:7,9,21;157:2
**prospective (4)**
62:15,18;63:7,14
**provided (1)**
43:18
**provides (1)**
113:19
**providing (1)**
102:4
**provision (1)**
60:6
**public (4)**
12:12;26:20,25;
161:24
**purchased (5)**
31:19;33:9;37:18,25;
43:11
**purchaser (3)**
26:14;101:24,25
**purchasers (1)**
129:19
**purchasing (2)**
47:20;48:2
**purged (5)**
122:25;123:4,10,25;
124:2
**purpose (3)**
82:17;87:13,14
**purposes (8)**
30:5,8,13;48:1;
51:22;53:5,5;54:3
**put (24)**
23:19;35:21;50:11,
12;51:21;53:8,25;
56:16;57:8;63:12;73:2,
7,10,13;99:3,6,20;
101:14;120:4;122:24;
125:22;139:4,4;149:19
**putting (2)**
99:17;101:19

**Q**

**qualified (3)**
24:1;29:5;107:4
**quality (1)**
76:8
**quarter (1)**
15:5
**Queens (4)**
34:16,17,18,21
**quick (4)**
25:2,23;67:13;80:2
**quite (4)**
82:15;95:18;126:1;
146:12

**R**

**Rachna (2)**
96:18,22
**R-A-C-H-N-A (1)**
96:23
**Railroad (1)**

11:21
**raise (1)**
60:24
**range (1)**
59:13
**rate (1)**
70:19
**rates (1)**
19:22
**reached (1)**
143:10
**reaction (3)**
140:4,11,18
**read (23)**
8:18,24;9:1,6,9;26:3;
56:17;93:12,14;107:7,
9;114:13;120:5;121:3,
5;153:10;158:6,7,8;
159:8,10,18;161:8
**reading (2)**
9:4;130:19
**reads (2)**
108:4;122:13
**ready (2)**
6:25;128:14
**Reagan (1)**
46:5
**Reagan's (2)**
19:17,18
**real (25)**
13:15;29:21;31:19;
35:16;36:21;37:14;
38:21;46:24;47:24;
49:21;53:7;54:3,23;
56:7;58:16,17;65:21;
80:3;91:4;102:2;124:5;
145:23;148:14;149:15;
151:5
**realistic (1)**
66:7
**reality (1)**
51:9
**really (27)**
22:20;27:17;32:10;
36:17;37:11;43:6;45:2;
46:17;47:17;49:10;
50:20;53:25;55:14;
57:21;72:10;83:22;
84:24;86:19;107:3;
118:9,13;119:22;
129:14;147:16,22;
148:3;152:6
**reason (3)**
5:14;54:4;71:20
**reasons (1)**
129:10
**recall (11)**
43:14,15,16;47:1;
83:18;119:19,24;
129:2;135:9;154:23;
156:4
**receive (3)**
94:20;153:23;154:7
**received (9)**
70:12;71:6;74:8;
94:18;122:23;135:17;
136:14;137:23;153:21
**receiving (1)**
98:4
**recent (8)**
61:10;62:21;63:6;
68:21;69:7;85:19;87:3,
5
**recently (3)**
62:15;83:17;156:1
**Recess (3)**
67:10;97:13;129:25
**recital (1)**
107:25
**recognize (8)**
9:25;10:3;102:12;
105:2,6,16;111:8;
158:10
**recollection (3)**
38:7;103:8;151:8
**record (15)**
4:10;56:16;67:10;
95:12;97:12,13;
117:10;129:17,25;
135:16;152:17;153:18;
160:18;161:11,12
**records (6)**
119:1;123:6,16;
156:10,15,19
**refer (5)**
7:7,15,20;143:15;
158:5
**reference (1)**
133:24
**referred (3)**
108:9,10;109:4
**referring (9)**
7:22,24;8:1,4;
105:19;111:15;116:13;
160:5,14
**refers (4)**
7:17;127:9;135:20;
157:16
**refinished (1)**
32:7
**refocus (2)**
73:15,20
**regarding (1)**
149:15
**regular (1)**
6:24
**related (7)**
11:25;46:22;86:2;
115:7;122:23;135:8;
139:16
**relating (2)**
129:1;156:20
**relation (1)**
92:9
**relationship (10)**
25:5;60:12;79:12,15;
98:16;100:23;101:1;
109:16;137:3;158:1
**relationships (1)**
99:21
**relevant (3)**
32:21;44:8;142:24
**reliable (1)**
31:3
**relocate (1)**
18:3
**relocation (1)**
18:8
**remain (4)**
101:3;110:17;114:2,
14
**remainder (1)**
34:24
**remained (1)**
110:2
**remaining (1)**
145:9
**remains (1)**
70:13
**remarkably (1)**
150:2
**remember (44)**
5:4;11:3;12:7,15;
15:13;16:8,21;17:25;
19:13,18,18;35:1;
37:17,21;42:8;44:5,15,
25;63:11;64:23;69:11;
82:8,9,9,13;83:5,5,7;
84:24;87:3,4;88:1;
100:17,25;108:22;
120:1;124:8;134:24;
135:6;140:19;142:23;
147:4;150:22;151:6
**removed (1)**
51:21
**renew (1)**
155:19
**renewal (6)**
98:13,14;103:13,17;
124:17;138:8
**renovations (2)**
134:9,14
**rent (20)**
28:10;42:10;75:11;
76:12;77:1;94:18,20,
21;95:1,4;96:17,25;
97:1,23;98:2,4,7,9;
153:12,20
**rental (2)**
154:8,9
**rents (1)**
75:15
**repeat (3)**
24:13;75:17;130:8
**rephrase (2)**
24:14;41:20
**replace (2)**
11:19;72:23
**replaced (1)**

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL  Pg 58 of 71

PAUL BRUCE
June 6, 2019

32:19
**reporter (2)**
5:24;96:20
**reports (1)**
121:5
**represent (1)**
63:1
**representation (1)**
158:12
**representative (3)**
157:25;158:20;
159:11
**represented (3)**
16:16;25:13;71:4
**requires (1)**
59:12
**research (1)**
23:7
**residential (6)**
15:9;30:5,7,12,17;
75:21
**residual (1)**
28:4
**resist (1)**
72:6
**respect (6)**
155:3,5;156:2,6,9;
157:1
**respected (1)**
142:8
**responded (1)**
160:10
**response (2)**
17:5;40:20
**responsible (4)**
41:5;95:25;96:7;
119:3
**responsive (2)**
154:15;158:24
**restaurant (4)**
25:1;39:11;78:15;
79:2
**Reston (5)**
4:19;5:5;18:6,17,20
**result (1)**
126:10
**resumed (1)**
97:17
**retail (2)**
30:17;75:19
**retained (2)**
80:14;117:22
**retroactively (1)**
57:22
**return (1)**
77:3
**reuse (1)**
66:23
**review (4)**
8:15,17;119:11,15
**reviewed (1)**
119:17
**Revocable (13)**

7:8;48:11,11;49:1,8,
15;50:16;51:2;52:5;
53:22;57:5,12;80:19
**revolving (1)**
84:11
**rich (1)**
46:3
**ride (1)**
79:9
**Right (55)**
7:20;8:3;12:8;37:22;
46:15,19;48:12;53:3;
61:21;72:19;77:9;
83:13;87:12;88:18;
93:25;94:17;95:10;
97:2,7,9;102:18;
104:11,24;105:20;
107:3,20;109:17,19;
111:7,16,19;112:3,13;
113:7,21,23,25;114:19;
118:24;120:14;124:8,
19,22;125:9;131:20,
21;132:19,20;135:19,
23;142:3,8,9;154:19;
155:2
**rights (10)**
115:8,23;116:5,6,8,
25;117:20,22,23;118:2
**Robert (4)**
127:9,13,15,18
**Rock (2)**
86:5,10
**Rogers (1)**
86:17
**role (7)**
13:24;90:24;91:25;
92:8;145:17;157:8;
160:10
**roll (1)**
28:10
**roof (1)**
42:23
**room (1)**
67:9
**rough (2)**
57:6,6
**Roughly (1)**
18:15
**routes (1)**
12:5
**Rubin (1)**
121:6
**run (3)**
12:9;72:24;148:15
**running (1)**
12:5

**S**

**safe-deposit (1)**
149:18
**safety (3)**
11:22,25;12:1

**salary (1)**
19:5
**sale (12)**
14:22;15:7;16:4,24,
24;20:22;24:24,25;
66:2;69:24;129:20,21
**sales (20)**
13:16,23;14:9,15,17;
15:16;17:13;18:25;
20:20;21:9;22:9,22,24,
25;23:13,13;75:8;89:4,
5;96:16
**salesperson (1)**
23:2
**Sam (3)**
66:25;70:17;71:2
**same (10)**
5:10;13:2;21:1;
54:24;56:2,21;94:10;
145:8;154:7,9
**Samuels (12)**
93:24,24;141:2,5,25;
142:7;143:8;154:22;
155:10,11,23;158:1
**sandwich (5)**
154:18;158:14,22;
159:13,19
**satisfaction (1)**
121:11
**save (1)**
51:24
**saved (1)**
124:12
**saw (10)**
38:8;88:11;136:1,24;
137:2;140:2,4,8,20,24
**saying (13)**
6:18;47:13;54:12,23;
73:17;76:24;84:5;
98:14;100:16;116:20;
145:2,3;150:6
**scenario (1)**
30:11
**Schenck (1)**
127:10
**school (1)**
36:4
**scratch (1)**
41:19
**second (37)**
15:12;22:1;33:5;
76:21;80:7;82:6;84:23;
85:9;88:23;89:14;
93:12,14;95:11;
104:20,22;105:18;
115:3,11;118:8;130:2,
4,9,18,19,25;131:8;
135:21,25;137:16,19;
140:2,7,8,15,21,24;
152:16
**Section (2)**
153:8,10
**Security (3)**

60:3,5,6
**seeing (3)**
119:19,24;120:1
**seem (2)**
76:4;84:17
**seemed (2)**
141:10;142:6
**self-explanatory (1)**
150:14
**sell (7)**
14:4,12;28:10;56:8;
101:7,16,16
**selling (2)**
23:20;101:19
**send (13)**
23:16;40:12;62:12;
91:14,15;95:22;97:23;
98:2,10,13;126:4;
137:21;145:14
**sense (11)**
40:6;49:14;51:9;
57:23;75:10,15;79:24;
86:25;95:19;146:21;
148:21
**sent (15)**
40:14;63:10;84:9;
91:5,20;94:22;122:2,3;
138:6,25;139:2,23,25;
140:11,12
**sentence (4)**
93:13,15,20;104:5
**separate (1)**
91:10
**septic (1)**
73:13
**series (2)**
128:25;129:5
**serious (2)**
63:16;64:5
**serve (3)**
42:1;44:2;45:6
**serves (3)**
93:13,21,23
**session (1)**
67:13
**set (6)**
41:15,15;98:16,18;
147:14;151:21
**settlement (6)**
71:16;72:10;73:19;
129:13,17,18
**setup (2)**
142:25;144:18
**several (5)**
28:2;29:17;35:23;
68:10;150:4
**sewer (10)**
72:14,18,19,20,23;
73:1,1,3,4,12
**shall (1)**
104:5
**shared (1)**
26:7

**shelter (2)**
43:18,18;44:3,24;
45:6
**shocked (1)**
150:1
**shopping (2)**
87:22;137:22
**short (4)**
25:2,22;77:22;
141:24
**shortly (1)**
145:18
**shot (1)**
122:6
**show (2)**
6:8;151:11
**shows (1)**
142:1
**shred (1)**
125:7
**shredded (5)**
123:11;125:2,5;
160:14,15
**siblings (1)**
59:19
**Siegel (5)**
127:9,13,15,18,24
**sign (2)**
101:15;137:6
**signature (5)**
132:8;135:3,4,5;
142:1
**signed (10)**
8:10,16,20;10:6;
47:15;116:3;133:5;
135:25;136:2;161:19
**significant (4)**
32:25;89:1;107:21;
126:12
**similar (5)**
13:6;19:25;41:8;
66:5;92:17
**similarly (1)**
7:15
**similarly-named (1)**
94:5
**simple (3)**
33:9;51:16;80:2
**Single (1)**
40:10
**single-purpose (1)**
41:15
**site (1)**
136:24
**six (3)**
69:7;121:2;123:8
**skim (1)**
9:5
**skimmed (1)**
9:8
**Skyline (4)**
34:4,5,7;86:9
**sleep (1)**

120:4
sliding (1)
  32:19
small (4)
  39:10,13;72:17;
  99:19
smaller (1)
  69:20
Smithy (10)
  13:11,12,13,19,21;
  14:21,23,24;15:24;
  17:18
Social (1)
  60:3,5,6
soil (1)
  23:18
sold (14)
  20:23,23,24;21:5,7;
  23:14;50:5,7,9,10,14;
  99:5;101:17;106:19
sole (3)
  81:11,14,17
somebody (16)
  20:24;22:6;68:24;
  69:3;70:15;84:7,9,10;
  90:13;97:4,5;121:8;
  122:4;124:10;141:20,
  21
someone (7)
  22:8;65:4,10;89:25;
  120:15;142:7,10
someplace (1)
  86:8
sometime (1)
  50:11
Sometimes (5)
  9:5,6;71:19;104:1;
  120:13
somewhat (1)
  124:24
somewhere (3)
  78:9;82:14;121:24
Soo (3)
  88:12;144:16;145:5
sorry (9)
  4:24;68:13,17;96:20;
  131:1;133:23;149:9;
  154:5;156:8
sort (1)
  148:11
sound (4)
  88:13;95:15;138:12;
  145:12
sounded (1)
  141:22
Sounds (4)
  42:25;67:8;127:21;
  145:13
space (3)
  7:23;14:13;72:17
speak (6)
  5:20,25;6:4;17:8;
  110:6;130:7

speaking (1)
  72:7
specialist (1)
  42:23
Specializes (1)
  80:10
specialty (1)
  142:14
specific (5)
  23:19;45:21;58:2;
  102:3;148:2
specifically (2)
  46:10;100:25
specify (2)
  49:21;55:20
speculate (5)
  49:11,13;58:6;70:9;
  72:3
speculating (5)
  70:10;101:10,13;
  129:6,10
speculation (30)
  31:15;44:13;45:1,7;
  48:21;52:19;53:17,24;
  54:19;56:25;57:19;
  58:5,13,15;59:3,10,12;
  70:11;71:13,14,25;
  72:2;74:7,18,22,25;
  75:13,14;133:18;136:7
speculative (1)
  72:9
spell (2)
  65:16;90:22
spend (1)
  149:2
spending (1)
  73:25
spent (3)
  77:21;82:25;152:8
split (1)
  15:3
Springfield (2)
  21:3,6
square (1)
  16:15;72:16;76:20
SS (5)
  108:9,14;109:6,7;
  161:4
stage (1)
  74:23
stand (1)
  97:18
Start (8)
  35:4;53:1;54:13;
  56:12;61:9;68:11;
  124:25;127:4
started (3)
  36:8;106:21;147:3
starting (1)
  146:23
starts (2)
  93:13,21
state (11)

4:9;10:14;17:13,14;
21:10;33:24;34:6,11;
86:3;133:10;161:3
stated (1)
  158:9
statement (6)
  31:17;91:15;158:5,
  19;159:9,17
statements (2)
  91:12;123:18
states (2)
  17:16;157:20
statistically (1)
  12:13
stay (3)
  61:23,24;144:8
stayed (3)
  82:10;144:10;154:9
steak (1)
  79:3
steps (1)
  151:23
Steven (14)
  7:8;59:16,16,21,23;
  60:9,16,25;61:7,11;
  81:9,11,12;95:9
still (7)
  110:11;122:7;
  123:22;134:23;135:5;
  136:5;138:10
stocks (1)
  49:22
Stony (2)
  10:14,20
stood (2)
  87:21;89:17
stoop (1)
  32:24
stop (2)
  38:5;86:19
stopped (1)
  42:10
storage (1)
  126:3
store (23)
  31:6;39:4,5,7,11;
  40:13,15,16;42:6,11;
  83:8,9,12;84:8,23;
  87:23;88:2,4;89:2;
  130:11;136:23;137:3,4
stored (1)
  156:3
storeroom (1)
  130:6
stores (4)
  41:9,10,18;42:5
stormwater (1)
  91:5
straightforward (1)
  27:11
strategy (1)
  152:9
stream (1)

28:16
stretch (2)
  43:23;45:3
stretching (4)
  16:7;43:22;44:12,16
strike (4)
  26:11;124:25;154:5;
  155:4
stroke (3)
  146:8;151:18,19
structure (3)
  46:25;99:25;134:11
structured (1)
  99:8
studies (1)
  44:6
study (3)
  10:12;126:8,10
studying (1)
  11:6
stuff (4)
  51:25;124:21;
  125:18;126:11
subject (19)
  7:18;61:10,16,17;
  106:19;112:8,15,16,17,
  19,21,23,25;113:4,12,
  20;158:21;159:12,19
sublease (2)
  119:8;144:20
subleases (4)
  14:20;137:22;
  144:22;145:2
submitted (5)
  8:7,19,20;10:7;
  102:20
subparagraph (2)
  113:8,11
Subscribed (1)
  161:19
subsequent (2)
  101:23,25;132:5
substance (1)
  143:18
substantial (1)
  101:21
subtenant (21)
  106:6,9;107:2;110:3,
  18;114:3,16,25;115:11,
  17,18;116:10,17;117:2,
  14,18;118:3;119:21,
  23;137:8;145:4
subtenants (7)
  118:15;138:15;
  141:15;143:21;144:4,
  16;145:6
succeeded (1)
  94:10
sued (3)
  42:6;84:12;124:7
suing (1)
  124:7
Suite (1)

131:22
summary (1)
  138:21
Sun (3)
  88:12;144:16;145:5
supermarket (4)
  36:15;37:4,7,10
supermarkets (3)
  36:16,16,17
support (3)
  10:4;24:22;74:1
supported (1)
  28:9
supposed (1)
  105:4
sure (35)
  10:23;12:16;23:24,
  25;32:18,21;35:24;
  36:3;40:6;41:3;43:5,
  21;53:19;68:15;88:25;
  90:2;91:4;93:16;95:23;
  96:7;98:1;101:12;
  104:7;107:4;110:25;
  113:1;117:15;122:1,3;
  123:25;130:8;132:7;
  140:10;147:4;150:21
Surfside (1)
  34:1
surprised (2)
  140:14,16
surveys (1)
  120:22
suspicion (1)
  15:20
sworn (2)
  4:4;97:17
Sylvia (9)
  33:8,15;36:25;48:11;
  51:2;52:5,13;53:22;
  57:4
Syracuse (1)
  50:8
system (4)
  146:9;148:5;149:12,
  13
systematically (1)
  122:24
systems (3)
  11:7,11;12:19

T

table (3)
  50:13;54:1;57:9
Tae (1)
  88:11
talk (15)
  33:5;60:9,16;63:5;
  68:24;69:3;71:17;87:9;
  91:7,16;92:2,5;150:7,
  23;151:4
talked (11)
  69:12;88:14;91:16,

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL. Pg 60 of 71

PAUL BRUCE
June 6, 2019

21;96:2,3,15;99:18;
141:19;143:1;150:1
**talking (7)**
13:5;15:15;32:25;
35:22;49:25;56:18;
75:7
**tank (1)**
11:12
**tax (34)**
19:17,19,22;43:17,
18;44:3,23;45:6,15,23;
46:1,6,18;47:19,21,22,
23;48:1;51:22;53:5,13;
54:5;91:5,9,13;101:23,
24;102:1,3,4;123:7,9,
12,17
**taxes (7)**
30:23;31:1;40:19;
41:6;80:3,11;123:2
**taxis (1)**
11:20
**teacher (2)**
77:22,23
**technical (1)**
108:16
**technically (1)**
98:15
**teenager (1)**
128:9
**telephone (2)**
90:10;131:25
**telling (1)**
63:15
**ten (1)**
128:16
**tenancy (2)**
137:11,15
**tenant (70)**
14:14;31:9,10,14;
40:10,14;41:5;42:3,4,
14,15,19;91:13;98:11,
16;106:6,8,22;107:1;
108:11,14;109:1,9,15,
23,24;110:2,17;113:22,
24;114:2,15;115:5,5,6,
7,7,10,13,17,19,23,25;
116:1,6,8,9,9,10,12,14,
21,24,24;117:1,3,17,
17,20;118:2,14;136:5,
15;137:7;141:9;
144:17;145:5,7;
153:11;155:7
**tenants (6)**
82:23;83:4,7;87:20;
99:20;138:7
**ten-minute (1)**
79:9
**Tennessee (2)**
70:17;71:3
**term (18)**
27:12;28:24;30:3;
40:6;47:17;52:9;93:9;
103:9,10,19;104:1;

105:24;129:17;153:12,
16;158:21;159:12,19
**terminated (2)**
25:3;154:10
**terms (11)**
28:18;40:17;72:11;
103:6;104:9,19;106:5,
11;107:16;113:5;
158:13
**Terrace (1)**
4:18
**terribly (1)**
150:24
**testified (12)**
4:6;85:8;97:18;
117:5;129:5;137:14;
140:2;154:21;155:10;
156:1;157:20,24
**testify (4)**
4:4;62:4;85:5;117:8
**testifying (2)**
5:11;44:14
**testimony (7)**
5:15;48:4;85:4;
135:24;156:4;161:8,11
**Thanks (1)**
129:24
**theoretical (1)**
45:10
**thereabouts (1)**
10:24
**thinner (1)**
123:17
**third (10)**
53:9;62:1,3;69:4;
86:23;87:9;89:3,14;
93:20;135:22
**thorough (2)**
138:7,21
**thought (4)**
64:20;73:6;95:16;
126:18
**thousand (1)**
12:8
**three (15)**
10:25;16:1;20:9;
47:16;53:12;70:25;
87:6,10;88:15;89:19;
95:8;103:18,20;123:7;
138:7
**throughout (3)**
6:24;7:7;29:18
**throw (1)**
125:10
**til (2)**
144:10;154:10
**till (1)**
147:2
**times (14)**
11:16;29:12,13,18;
45:17,20;46:8,9,13;
82:2,3,4;89:19;91:16
**title (5)**

13:25;91:1;121:5,7,8
**today (10)**
5:7;15;36:17;45:22;
57:24;58:4;100:20;
103:2;123:5;135:22
**today's (2)**
105:11,12
**together (16)**
23:19;50:11,13;54:1;
56:3,22;57:8;99:3,6,17,
20;100:6,13;101:14,
19;149:19
**told (13)**
44:1;63:2,10;65:4,
11;66:10,11;69:13;
72:12;84:9;89:4;90:2;
155:11
**took (21)**
11:4;39:7;42:4,15,
20;69:25;83:11;84:13;
88:5,7;91:18;145:17;
146:6,9;147:6;148:11,
13,25;149:11,16;
156:19
**top (1)**
153:8
**topic (2)**
66:24;151:13
**total (5)**
10:25;15:2;16:24,24;
25:6
**tough (1)**
125:17
**toward (1)**
143:2
**Towards (1)**
93:6
**town (2)**
75:22,23
**townhouse (1)**
32:7
**townhouses (1)**
21:7
**track (1)**
46:17
**tracks (1)**
12:6
**Trail (2)**
86:12,17
**train (5)**
11:22,25;12:1,5,17
**trains (2)**
11:21;12:12
**transaction (3)**
118:6;155:14,22
**transcript (8)**
6:9;9:23;102:7;
105:1;111:4;130:23;
161:8,10
**transfer (2)**
48:20;57:11
**transferred (3)**
48:10;49:21;79:18

**TRANSFORM (2)**
4:7;160:1
**transition (2)**
23:2;146:2
**transmittal (2)**
131:9,18
**transportation (1)**
11:17
**travel (1)**
13:4
**treated (1)**
148:25
**tremendous (1)**
89:2
**trick (2)**
138:11,12
**tried (4)**
23:1,3;42:14;44:7
**triggered (2)**
87:7,8
**trip (1)**
87:7
**triple (2)**
40:8,11;41:15;42:16
**true (3)**
58:14;161:10,12
**Trust (37)**
7:8,9,10;48:11,12;
49:1,9,11,15,19,22;
50:2,16,22;51:3,18,20,
21,25;52:1,5,7;53:22,
23;55:1,11;57:5;80:19,
24;81:2,9,10,12,15,18;
121:10;125:21
**trustee (1)**
80:18
**trustees (1)**
80:17
**Trusts (10)**
7:11,14;10:5;57:12;
118:19;119:1,4;
129:19;133:13;153:1
**truth (4)**
4:5,5,6;5:8
**truthful (1)**
5:15
**TRW (5)**
12:22,23,25;13:1,10
**try (2)**
77:4;120:14
**trying (4)**
43:23;45:3;51:22;
52:3;84:16;147:18
**turn (8)**
84:17;92:25,25;
93:11;106:3;111:20;
126:21;127:1;130:2,
25;132:24;133:8;
134:3;135:11;137:18;
146:13;153:7;157:13
**turning (2)**
107:25;131:18
**two (20)**

11:18;12:1;15:3,4;
21:22;32:1;45:16;56:2,
21;58:9;67:14;70:25;
78:2;82:3,4;92:11;
95:13;101:18;144:20;
147:24
**type (3)**
16:18;23:5;24:3
**types (3)**
20:20;23:12;24:21
**Tysons (7)**
17:24;18:11;24:25;
26:13;72:14,15,25

---

## U

**unable (1)**
55:10
**under (22)**
5:7,17;42:16;47:8;
55:4;84:15;99:7;106:9,
10,11,20;113:23,24;
114:2,15;115:5;
116:14;130:4,9;
153:21;155:7;161:9
**underlying (1)**
27:2
**understandings (1)**
45:11
**understood (10)**
6:10;26:9;51:11;
76:23;94:12;107:13;
133:16;143:4,11,12
**undertake (1)**
130:5,10,17
**undeveloped (1)**
39:8
**unencumbered (5)**
26:2;141:17;143:23;
144:2,8
**unfortunately (1)**
95:18
**University (2)**
10:14,17
**unless (1)**
6:15
**unusual (1)**
144:18
**up (41)**
5:20;6:8;14:13;17:8;
26:12;28:8;34:14;
41:15;46:6;54:5;58:17;
67:12;68:22;69:5;
72:16;84:5;86:15;91:3;
96:3;98:16,19;110:6;
115:13;130:7;131:2;
140:20,23;142:1,17,21,
23;147:14;148:14;
149:24;150:5,8,15,17;
151:14,21;152:5,6
**upon (2)**
104:5;145:18
**upset (2)**

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re: SEARS HOLDINGS CORPORATION, ET AL.    Pg 61 of 71

PAUL BRUCE
June 6, 2019

83:25;90:16

**use (13)**
15:8;27:17;28:1;
30:16,18,19,19;41:24;
47:7;67:7;69:24;
145:24;146:1

**used (9)**
30:4,7,12;66:18;
89:2;113:2;129:17;
134:9;138:12

**uses (2)**
21:5;30:21

**using (4)**
66:4,13;127:6;148:5

**usually (1)**
28:4

**utility (1)**
23:18

## V

**Vacant (1)**
41:12

**vagrants (3)**
83:25;84:1;90:1

**vague (7)**
30:3;43:22;44:16;
45:3;48:15;76:14;
83:10

**vaguely (1)**
127:21

**valuable (10)**
30:1,6,6,12,18;
31:13;71:22;73:6;74:4,
16

**valuation (2)**
70:3;72:9

**valuations (2)**
54:2,6

**value (56)**
16:24;27:23;28:8,9;
29:21;31:1;32:16,18;
50:15;51:17;52:6,7,8,
11,12,17,25;53:4,7,10,
13,14,15,21,23;54:4,
14,14,15,17,24,25;
55:11,13,15,24,25;
56:7,8,19,23;57:13,16,
24;58:3,22,23;68:19;
69:15;72:11;74:10;
129:1,7,10,15;142:13

**valued (3)**
69:13,22,23

**valuing (1)**
30:23

**variability (1)**
14:14

**various (3)**
11:14;105:24;121:17

**Venture (8)**
64:5,8,9,13,16,17;
67:15,18

**V-E-N-T-U-R-E (1)**

64:10

**verbal (3)**
6:7;17:5;40:20

**verbally (1)**
40:24

**vibrant (1)**
89:7

**Virginia (16)**
4:19;15:11;17:13,14,
24;18:16;21:3,10;
34:12,13;50:10;73:5;
75:19,21;86:4;150:17

**virtue (1)**
117:1

**visit (16)**
82:17;84:23;85:9,13,
17,19,21,23;86:9,22,
23,23;87:10,13;88:23;
89:14

**visited (4)**
81:22;136:11,22,24

**visual (2)**
87:18;88:10

**voice (1)**
143:14

**vowed (1)**
46:7

## W

**wait (2)**
6:1;7:4

**walk (1)**
86:16

**walked (1)**
87:25

**Walsh (1)**
131:8

**Walter (4)**
93:24;141:2,5;
154:22

**War (1)**
36:12

**way (16)**
27:14;36:13;38:6;
40:11;42:18;52:8,15;
58:10,12;66:21;73:12;
75:23;86:21;122:7;
134:25;144:7

**week (2)**
12:13;63:12

**weeks (1)**
147:25

**weren't (4)**
40:3;41:10;83:16;
118:1

**what's (6)**
72:10;110:14;111:5;
114:10;126:21;130:3

**whenever (5)**
6:24;19:23;91:14;
120:24;122:22

**Whereupon (1)**

4:2

**White (1)**
86:9

**whole (6)**
4:5;7:20,22,25;
69:20;136:21

**Who's (5)**
59:16;62:20;77:5;
99:2;142:5

**whose (1)**
142:10

**wife (7)**
32:20;33:1;38:4;
77:6;79:24;83:2,3

**wife's (1)**
142:2

**William (5)**
22:3;131:7,12;
132:15;134:24

**window (1)**
32:20

**wired (1)**
95:2

**within (5)**
69:7;72:17;75:24;
99:19;142:15

**without (10)**
20:14;50:20;66:16;
71:23;74:4,9,16,24;
144:3,3

**WITNESS (51)**
20:4;24:9;29:2;
31:16;40:22,25;44:14,
16;45:2,10;48:5,23;
51:8;52:20,23;53:25;
57:1;58:6,14;59:4;
60:23;61:2;62:3,7;
67:6;71:14;72:1;74:13,
19,23;75:6,14;76:16;
85:6,12;100:9;102:8;
110:6,13;112:5;
114:10,24;115:22;
116:20;127:7;129:3,8,
14,21;136:8;139:12

**woman (4)**
21:24;23:1;123:23;
124:4

**word (5)**
27:18,18,19;41:24;
140:17

**words (9)**
9:4;27:17;54:4;
85:13;86:8;116:21;
138:25;145:24;146:1

**work (22)**
11:24;13:6,11,21;
15:23;18:23;22:19,21;
23:5;24:19;40:11;
55:22;58:21,23;65:18;
75:23;121:7,8;131:23,
25;147:15,23

**worked (21)**
11:13,17;12:21;13:3;

14:15,23;20:21;21:12,
24;22:18;24:24;36:18,
19;43:2;64:12,15;
70:22;84:15;96:10;
141:15;143:22

**working (8)**
11:3,20;22:3;25:25;
36:8;37:14;56:3,22

**World (2)**
36:12;69:20

**worry (1)**
126:11

**worth (13)**
54:8;58:18;59:5;
64:21;65:5,11,24;
66:15;68:22;71:11,18;
123:8,13

**write (4)**
90:8;95:5,6,7

**written (5)**
115:3,4,9,9;122:2

**wrote (2)**
132:6,15

## X

**X22 (1)**
158:17

## Y

**year (24)**
10:19,19,22;11:2;
13:18;15:21,22;19:10,
12,14,16;20:1,25;
25:19;28:18;29:13;
36:13;49:23;67:20,23,
25;82:12;103:23;
146:21

**years (58)**
10:25;15:23;19:11,
24;20:1,4,13,16,17;
29:14;36:14;38:2;
42:14;44:5,45:16;46:5;
47:18;49:25;62:10,11;
70:15,25;77:10;81:23;
83:24;84:8,10,20;
85:10,11,14,18,19;
87:6,11;88:15;91:8;
100:10,18,19,20;
103:22;104:10,12;
122:15;123:6,7,8,16;
136:1,3;138:13;
141:23;146:3,24;
147:1,3;150:4

**years' (2)**
123:8,13

**York (3)**
10:14;127:10;141:23

**young (1)**
19:21

**younger (1)**
78:12

**youngest (1)**
38:1

## Z

**zoned (2)**
73:8,10

**zoning (2)**
29:24;30:2

## 1

**1 (7)**
9:20,22;102:20;
135:11;145:15,15;
157:11

**10 (4)**
14:24;38:22;39:7;
65:8

**100 (3)**
19:3

**100,000 (1)**
88:3

**1000 (2)**
7:17;79:19

**1001 (28)**
7:15;8:5;33:10;
37:18;57:13;60:17;
61:11;68:20;75:11;
81:6,21,22;89:20;92:9;
94:16;95:20;109:23;
115:13;119:21;122:23;
125:3;132:17;133:17,
25;135:8;136:6,11;
138:19

**11 (4)**
38:22;39:18;41:9,11

**12 (9)**
39:19;41:9,11;70:19;
103:14,16,21;123:18;
139:1

**12:52 (1)**
97:15

**125,000 (1)**
16:15

**13 (5)**
21:1;138:9,25;
141:23;153:7

**15 (4)**
29:15;39:7;65:3,8

**150 (3)**
17:4,7,10

**16 (2)**
49:25;100:10

**16- (1)**
38:13

**16th (2)**
131:12;132:14

**17-year-old (1)**
38:13

**18 (7)**
44:5;68:4,7;100:10,
18,19,20

18-23538-shl    Doc 4232    Filed 06/13/19    Entered 06/13/19 22:59:52    Main Document
In re:  SEARS HOLDINGS CORPORATION, ET AL     Pg 62 of 71

PAUL BRUCE
June 6, 2019

**1800 (1)**
18:6
**1810 (2)**
131:10,22
**18th (2)**
102:16;108:5
**1960s (1)**
44:19
**1964 (12)**
100:12,15;102:17;
108:5,20,24;109:2,3,
10,22,25;148:20
**1966 (18)**
33:11,18,21;35:5,8,
10;36:2;43:4,5;44:4,
11,20;45:22;108:23;
109:3;111:13;118:17;
154:10
**1969 (1)**
10:21
**1970s (1)**
118:17
**1975 (1)**
146:24
**1978 (3)**
4:22,24,25
**1981 (1)**
13:20
**1983 (1)**
16:8
**1985 (1)**
18:14
**1988 (4)**
48:9;49:8,23;57:10
**1989 (1)**
87:1
**1990 (3)**
18:10,17;126:9
**1992 (4)**
104:22;105:21;
115:14;118:17
**1993 (11)**
131:12,14,17;
132:14,22;133:2;
134:13,20;135:7;
136:18,20
**1994 (12)**
57:17,21;85:25;
123:5;124:25;125:2;
145:19;146:13;151:16,
22;152:11;153:19
**1995 (1)**
124:17
**1999 (3)**
80:21;81:1;103:25
**1st (1)**
33:10

**2**

**2 (10)**
19:15;72:25;102:6;
103:11,20;104:4;

105:23;106:4;113:16;
154:14
**2:58 (1)**
160:18
**20 (12)**
16:6;29:13,15;45:22;
62:11;66:6,11;69:16;
70:3,4;72:16;146:24
**2004 (8)**
49:24;50:1,4,6,17,
19;51:6;147:2
**2005 (1)**
18:22
**2006 (1)**
141:7
**2012 (1)**
18:22
**2014 (2)**
87:1;88:17
**2016 (1)**
88:17
**2017 (4)**
135:18;137:20;
140:1;157:17
**2018 (1)**
68:2
**2019 (3)**
158:12;161:9,20
**20191 (1)**
4:19
**202 (1)**
131:23
**2032 (1)**
106:1
**20-year (2)**
103:9,10
**22 (1)**
93:19
**23-year (1)**
47:16
**2402 (1)**
4:18
**25 (11)**
39:6;69:17,18;70:4;
81:10;123:5,8,13,16;
135:25;136:2

**3**

**3 (9)**
16:22;17:3,6,9;
73:11;104:25;105:8,
10;130:3
**30 (10)**
38:2;81:23;82:14;
84:20;85:10,10,11,12,
18;147:3
**30th (4)**
106:1,1;131:17;
133:2
**30-year (1)**
47:16
**31 (5)**

8:12,18;9:1;120:2,16
**318-9442 (1)**
132:1
**31st (1)**
158:12
**32B (2)**
93:1,5
**35 (6)**
85:10;103:22;
104:10,12;135:14;
137:19
**36 (3)**
93:12;157:13,16
**37 (4)**
158:4,6;159:10,17
**38 (1)**
42:5
**3rd (1)**
105:21

**4**

**4 (16)**
16:8;22;17:3,6,9;
57:7;102:21,24;111:2,
3,6,21;126:22,24;
127:1;153:4
**4.01 (1)**
153:8
**40 (3)**
77:1;78:9;127:10
**400,000 (1)**
19:12
**43 (1)**
78:13
**45 (1)**
78:9
**450,000 (1)**
15:2
**46 (1)**
78:9
**49 (1)**
77:10

**5**

**5 (11)**
17:1,3,6;75:24;
111:17,25;112:1;
130:22;131:3;142:15;
153:5
**50 (2)**
56:1;81:9
**500,000 (1)**
20:13

**6**

**6 (6)**
21:5;59:13;64:24;
75:24;92:25;161:9
**60s (1)**
99:4

**69 (1)**
59:22

**7**

**7 (3)**
21:5,8;135:14
**703 (1)**
132:1
**706 (4)**
52:24,25;80:7,8
**70s (2)**
13:5;120:25
**72 (1)**
10:24
**73 (1)**
78:8

**8**

**8 (1)**
75:25
**8,000 (1)**
88:2
**800,000 (1)**
89:6
**82 (1)**
13:20
**8500 (1)**
18:1
**86 (1)**
19:23
**87 (3)**
19:23;25:20;153:7
**87-page (1)**
9:16
**88 (2)**
49:11;121:8
**8th (1)**
157:17

**9**

**9 (4)**
59:13;65:1,7;66:10
**92 (2)**
136:2;150:7
**93 (4)**
42:9;131:13;134:15;
150:7
**94 (3)**
126:9;150:7;151:20
**99 (1)**
47:18
**99-year (1)**
47:8

# Exhibit X

# J&W MANAGEMENT

810 Seventh Avenue, 28th Fl, New York, NY, 10019 • (212) 265-6600 • FAX (212) 459-9133

August 17, 1993

Mr. John F. Walsh
Resident Council
Kmart Corporation
Real Estate Department
3100 West Big Beaver Road
Troy, MI  48084

**RE:   Kmart Store, Ashville, North Carolina**
        **Our FE# 207**
        **Kmart Store # 4112**

*Rob Rathke is handling.*
*Lien will be removed*
*from property*
                    *JFW*

Dear John:

I have enclosed herewith a copy of a letter forwarded to us from the owner of the subject property relating to a lien placed upon the property W.R. McClain, Inc. The lien purportedly is for labor and materials used in renovation contracted for by Kmart.

I have checked with our maintenance department to be sure that it is not something that we contracted for.

I would appreciate it if you would take steps to resolve the problem and obtain a legal release of lien that we may forward to the property owner.

Very truly yours,

William R. Delz

WRD/emc

cc:    Paul Bruce
       c/o Paul Bruce, Inc.
       1810 Michael Faraday Drive - Suite 202
       Reston, Virginia  22090
       Bob Transom
       Paul Green
       Walter R. Samuels

Puerto Rico: Suite 202                          Michigan: 27716 W. Seven Mile Road
             1000 Munoz Rivera Ave.                       Livonia, Mi 48152
             Rio Piedras, Puerto Rico 00926              (313) 537-8282
             (809) 751-5454

1993 02:05PM   FROM                                    TO                      12124599133   P.01

# FAX   TRANSMITTAL

**TO:** J + W MGT                          8/6/93

**ATTN:** Bill Delz

**FROM:**   Paul Bruce
Paul Bruce, Inc.
1810 Michael Faraday Drive   Suite 202
Reston, VA 22090
703 / 318-9442                     FAX: 703 / 318-8288

This transmission consists of ___8___ pages, including this page.

*************************************************

MESSAGE:

# PAUL BRUCE, INC.

August 16, 1993

Mr. William R. Delz
J & W Management Corp.
810 Seventh Avenue
28th Floor
New York, N.Y. 10019

Dear Bill:

Enclosed please find a copy of a lien notice on the K-Mart Plaza, 1001 Patton Avenue, Asheville, NC. Please take care of it.

Very truly yours,

Paul Bruce

PB/cs

VAN WINKLE, BUCK, WALL, STARNES AND DAVIS
A PROFESSIONAL ASSOCIATION

ATTORNEYS AND COUNSELLORS AT LAW

11 NORTH MARKET STREET

POST OFFICE BOX 7376

ASHEVILLE, NORTH CAROLINA 28802

(704) 258-2991

FAX: (704) 255-0255

FAX: (704) 257-2767

O E. STARNES
ROY W. DAVIS, JR.
BRIAN F.D. LAVELLE¹ ᵃ
LARRY S. MCDEVITT
PHILIP J. SMITH
BARRY B. ACHESON
ALBERT L SNEED, JR.ᵃ
RUSSELL P. BRANNON
ALFRED O. ADAMSᵇ
ROBERT H. HAGGARD¹
MARLA TUGWELL ADAMS
ALLAN R. TARLETON

LARRY C. HARRIS, JR.
MICHELLE RIPPON
W. PERRY FISHER II
GENE B. JOHNSON
MICHAEL M. THOMPSON
MARK A. PINKSTON
JOHN H. ROSE
CRAIG D. JUSTUS
T. SCOTT TUFTSᵃ
W. BRADFORD SEARSON
&STEPHEN J. GRABENSTEIN

¹BOARD CERTIFIED SPECIALIST
ESTATE PLANNING AND PROBATE LAW
ᵃBOARD CERTIFIED SPECIALIST
REAL PROPERTY LAW, RESIDENTIAL AND
COMMERCIAL BUSINESS AND INDUSTRIAL TRANSACTIONS
ᵇBOARD CERTIFIED SPECIALIST
BANKRUPTCY LAW
ᵃMASTER OF LAWS IN TAXATION

KINGSLAND VAN WINKLE
1879-1972

RETIRED:
CHARLES G. BUCK
ROBERTSON WALL

HENDERSONVILLE OFFICE:
125 4TH AVENUE EAST
HENDERSONVILLE, N.C. 28792
(704) 697-6196
FAX: (704) 693-3999

July 30, 1993

**VIA CERTIFIED MAIL P 894 826 282
RETURN RECEIPT REQUESTED**

Martin Bruce, Trustee of the
Martin Bruce Revocable Trust
8919 Abbott Avenue
Surfside Branch, Florida  33154

RE:  Lien-Claimant:  W.R. McClain, Inc.
     General Contractor:  Dooley and Mack Constructors, Inc.
     Lessee:  K-Mart Corporation
     Project:  Renovations at the K-Mart Plaza, 1001 Patton Avenue,
     Asheville, NC

Dear Mr. Bruce:

     Enclosed is a copy of the Claim of Lien and Notice of Claim of
Lien by first-tier subcontractor with regard to the above-referred
to matter.  Pursuant to North Carolina law, W.R. McClain, Inc. is
entitled to a lien upon funds which are owed to Dooley and Mack
Constructors, Inc.  Upon receipt of the enclosed Notice, you are
under a duty, as the Trustee of the Martin Bruce Revocable Trust,
to retain any funds subject to the Lien up to the total amount of
$16,986.00.

     If, after receipt of the enclosed notice, you make further
payments, on behalf of the Martin Bruce Revocable Trust, to Dooley
and Mack Constructors, Inc. or other subcontractors against whose
interest the Lien is claimed, the Lien shall continue upon the
funds, and in addition, you, as Trustee of said trust, and/or the
trust, shall be liable to W.R. McClain, Inc. up to the amount of
any wrongful payments and W.R. McClain, Inc. shall be entitled to
a Lien upon the interest of the Martin Bruce Revocable Trust in the
real property described in the Claim of Lien.

Martin Bruce, Trustee of the
Martin Bruce Revocable Trust
July 30, 1993
Page 2

If you have any questions or comments concerning this matter,
please do not hesitate to contact me.

Sincerely yours,

GENE B. JOHNSON

Enclosures
cc:  Bill McClain
GBJ:wdh
50\H:\LITIQ\GBJ\2113221\CORRESP\7-30-93

STATE OF NORTH CAROLINA

NOTICE OF CLAIM OF LIEN
BY FIRST TIER SUBCONTRACTOR

COUNTY OF BUNCOMBE

To:

1.  Martin Bruce, Trustee of the Martin Bruce Revokable Trust and Sylvia Bruce, Trustee of the Sylvia Bruce Revokable Trust, 8919 Abbott Avenue, Surfside Branch, Florida  33154, owners of the property involved.

2.  K-Mart Corporation, f/k/a S.S. Kresge Company, 3100 Big Beaver Road, Troy, Michigan  48084, lessee of the property involved.

3.  Dooley and Mack Constructors, Inc., 600 North Weinbach Avenue, Suite 970, Evansville, Indiana  47711, General Contractor.

General description of the real property where labor was performed or materials were furnished:

K-Mart Plaza, 1001 Patton Avenue, Asheville, NC  28806. Reference is also made to Deed Book 1515, Page 258 and Deed Book 1515, Page 269 of the Buncombe County, North Carolina Registry for a more particular description.

General description of the undersigned Lien-Claimant's contract including the names of the parties thereto:

Subcontract Agreement between W.R. McClain, Inc. and Dooley and Mack Constructors, Inc., dated June 25, 1992 for labor and materials used in the renovations and/or construction of an addition on the aforementioned real property.

The amount of the lien claimed pursuant to the above-described contract:

$16,986.00

The undersigned Lien-Claimant gives this Notice of Claim of Lien pursuant to North Carolina law and claims all rights of subrogation to which it is entitled under Part 2 of Article 2 of Chapter 44A of the General Statutes of North Carolina.



BY

7. A general description of the labor performed or materials furnished and the amount claimed therefor is:

Labor and materials used in the renovations and/or construction of an addition to a commercial structure on the aforementioned property in the principal amount of $16,986.00.

This, the 27th day of July, 1993.

                                    VAN WINKLE, BUCK, WALL, STARNES
                                    & DAVIS, P.A.


                                    Gene B. Johnson
                                    Attorney for Lien-Claimant
                                    Post Office Box 7376
                                    Asheville, NC  28802
                                    (704) 258-2991


Filed this _____ day of June, 1993.

                                    Clerk of Superior Court
                                    Buncombe County,
                                    North Carolina


                                    By: _____


50\GBJ\MCLEAN

STATE OF NORTH CAROLINA

CLAIM OF LIEN

COUNTY OF BUNCOMBE

1.   The name and address of the person claiming the Lien is:
McClain
W.R. Nelson, Inc.
1900 Hendersonville Road
Asheville, NC  28813

c/o Gene B. Johnson, Attorney at Law
P.O. Box 7376
Asheville, NC  28802

2.   The name and address of the record owners of the real property claimed to be subject to the lien at the time the Claim of Lien is filed is:

Martin Bruce, Trustee of the Martin Bruce Revokable Trust and Sylvia Bruce, Trustee of the Sylvia Bruce Revokable Trust
8919 Abbott Avenue
Surfside Branch, Florida  33154

K-Mart Corporation, f/k/a S.S. Kresge Company, Lessee
3100 West Big Beaver Road
Troy, Michigan  48084

3.   A description of the real property upon which the Lien is claimed is:

K-Mart Plaza, 1001 Patton Avenue, Asheville, NC  28806. Reference is also made to Deed Book 1515, Page 258 and Deed Book 1515, Page 269 of the Buncombe County, North Carolina Registry for a more particular description.

4.   The name and address of the person with whom the lien-claimant contracted for the furnishing of labor or materials is:

Dooley and Mack Constructors, Inc.
600 North Weinbach Avenue, Suite 970
Evansville, Indiana  47711

5.   The date upon which labor or materials were first furnished upon said property by the lien-claimant:

July 1, 1992.

6.  The date upon which labor or materials were last furnished upon said property by the lien-claimant:

March 29, 1993.