**Hearing Date and Time: June 27, 2019 at 2:00 pm (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SEARS HOLDINGS CORPORATION, *et al.*,[1] | ) | Case No. 18-23538 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**TRANSFORM HOLDCO LLC'S REPLY TO THE BRUCE TRUSTS'[2]**
**(I) DESIGNATABLE CONTRACT ASSUMPTION AND ASSIGNMENT OBJECTION,**
**AND (II) RESERVATION OF RIGHTS**

Transform Holdco, LLC ("Transform" or the "Buyer") as Buyer pursuant to the *Order*

*(I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale*

*of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances,*

*(III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]     The "Bruce Trusts" refers to, collectively, the Steven Bruce Revocable Trust, the Allison Bruce Irrevocable Trust, and the Cara Bruce Revocable Trust (together, the "Objectors").

*Connection Therewith and (IV) Granting Related Relief* (the "Sale Order") (ECF No. 2507)

approving the sale of certain of the assets of the above-captioned debtors and debtors-in-

possession (collectively, the "Debtors") hereby submits this reply brief (the "Reply") in further

support of the Sale Order, the Court's *Order (I) Authorizing Assumption and Assignment of*

*Certain Executory Contracts and Leases and (II) Granting Related Relief* (the "Assumption and

Assignment Order") (ECF No. 3008), and *Transform Holdco LLC's Initial Response to the*

*Bruce Trusts' (I) Designatable Contract Assumption and Assignment Objection, and*

*(II) Reservation of Rights* (the "Transform Initial Brief" or the "Initial Brief") (ECF No. 3868),

and in response to the *Objection to the Supplemental Notice of Cure Costs and Potential*

*Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with*

*the Global Sale Transaction and Notice of Expiration of Lease* (ECF No. 2281), *The Bruce*

*Trusts' (I) Designatable Contract Assumption and Assignment Objection, and (II) Reservation of*

*Rights* (ECF No. 3421), and the *Memorandum of Law in Support of the Bruce Trusts'*

*(I) Designatable Contract Assumption and Assignment Objection, and (II) Reservation of Rights*

(the "Bruce Response") (ECF No. 4092).

## ARGUMENT

**I.    Objectors Do Not and Cannot Contest That They Assigned Their Rights as Landlord**

1.    Kmart has been the tenant of the property at 1001 Patton Avenue in Asheville,

North Carolina continuously since 1964 under the terms of the Kmart Lease.  That Lease has

been extended and amended, but it has never been terminated or subordinated.  The Objectors do

not rebut the plain contractual language that established the Kmart Lease, assigned the landlord

interest to NAP, and extended the Lease until November 2032.[3]

2.      *First*, the 1964 Kmart Lease established a landlord-tenant relationship between

Kmart and the fee owners, not a subtenancy.  See *Declaration of Samuel Levander in Support of*

*Transform Holdco LLC's Initial Response to the Bruce Trusts' (I) Designatable Contract*

*Assumption and Assignment Objection, and (II) Reservation of Rights* ("Levander Decl.") (ECF

No. 3870), Ex. A, Kmart Lease.

3.      *Second*, the 1966 Ground Lease and Assignment was entered into "subject to" all

"[e]xisting leases," including the Kmart Lease.  See id., Ex. E, Ground Lease and Assignment

§ 1.

4.      *Third*, section 13.07 of the Ground Lease and Assignment assigned the fee

owners' right, title, and interest as landlord under the Kmart Lease.  See id. § 13.07.  Indeed, the

Objectors nowhere attempt to refute that the plain language of section 13.07 effectively

conveyed this assignment, and for good reason—the contractual language could not be clearer:

> Subject to the prior rights of the holder of any mortgage to which this lease is or
> may be subordinate, **Landlord hereby assigns to Tenant all the right, title and**
> **interest of the Landlord in and to all leases now in effect covering the**
> **demised premises, including the right to receive and collect the rents and**
> **profits therefrom**, and Tenant assumes the performance of all of the obligations
> of the Landlord under all of such leases, and agrees to indemnify and hold the
> Landlord free and harmless against any claims of any tenants arising out of or
> relating to the said leases and the making thereof except for acts after the date
> hereof of the within named Landlord, its successors or assigns and their respective
> agents, servants or employees.

Id. (emphasis added).

5.      *Fourth*, the Second and Third Amendments between NAP, the successor of the

original landlord, and Kmart, the successor of the original tenant, provide for an extension of the

---

[3]      All capitalized terms not defined herein have the same meaning as in the Transform Initial Brief.

Kmart Lease until November 2032.  See Levander Decl., Ex. O, Second Amendment

("WHEREAS, Landlord [NAP], succeeded to the lessor's interest in the [December 18, 1964]

Lease; and WHEREAS, Landlord [NAP] and Tenant [Kmart] desire to further amend and

modify the Lease as herein provided."); id., Ex. S, Third Amendment ("WHEREAS, Landlord's

[NAP's] predecessor-in-interest and Tenant's [Kmart's] predecessor-in-interest are parties to that

certain Lease dated December 18, 1964 . . . and WHEREAS, Landlord [NAP] and Tenant

[Kmart] wish to amend the Lease as set forth herein.").

6.      Objectors' failure to respond to these points is decisive.  The upshot is that the

Kmart Lease does not expire until November 2032.

## II.    Objectors' Counterarguments are Unavailing

### a.    Objectors Bear the Burden of Showing That the Kmart Lease Expired

7.      Courts have repeatedly held that the burden of proof lies with the party asserting

that a lease is other than what it purports to be.  See In re Pillowtex, Inc., 349 F.3d 711, 716 n.6

(3d Cir. 2003); In re WorldCom, Inc., 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006); In re QDS

Components, Inc., 292 B.R. 313, 321 (Bankr. S.D. Ohio 2002); In re Owen, 221 B.R. 56, 59

(Bankr. N.D.N.Y. 1998); In re Murray, 191 B.R. 309, 316 (Bankr. E.D. Pa.), aff'd, 201 B.R. 381

(E.D. Pa. 1996); see also 3 Collier on Bankruptcy § 365.02 ("The party contending that an

agreement is not a lease has the burden of proof to establish that its rights and obligations under

the agreement are not those of a lessee.").[4]  This well-established doctrine is consistent with the

general principle of law that a party should not have to prove a negative.  See, e.g., Medtronic,

---

[4]      Objectors cite no case that stands for the proposition that the party seeking to assume and assign under 11
U.S.C. § 365 bears the burden to establish that a lease has not expired.  See Bruce Resp. 9-10 (citing In re Exide
Techs., 607 F.3d 957, 962 (3d Cir. 2010) (movant bears burden to show that a contract is executory); In re S.A.
Holding Co., LLC, 357 B.R. 51, 56-59 (Bankr. D.N.J. 2006) (same); In re Masterworks, Inc., 94 B.R. 262, 265
(Bankr. D. Conn. 1988) (party requesting relief from the automatic stay bears the burden of proof under 11 U.S.C.
§ 362(g))).

<u>Inc. v. Mirowski Family Ventures, LLC</u>, 571 U.S. 191, 200-201 (2014) (holding that the burden

of proof lies with the party asserting patent infringement so that the alleged infringer does not

"have to work in the dark . . . to negate every conceivable infringement theory."). It follows that

Objectors here bear the burden of showing that the Kmart Lease, which on its face does not

expire until November 2032, is currently expired.

### b.   Objectors Ignore the Plain Meaning of the Ground Lease and Assignment

8.      The Bruce Response focuses predominantly on attempting to rewrite the February

1, 1966 Ground Lease and Assignment. <u>See</u> Bruce Resp. 10-19. The Objectors ignore the clear

assignment found in section 13.07, and instead attempt to obfuscate the plain language by

looking elsewhere in the Ground Lease and Assignment to provisions that have no bearing on the

assignment granted by section 13.07.

### i.   Section 13.07 of the Ground Lease and Assignment Plainly Assigns the Landlord Interest under the Kmart Lease

9.      Section 13.07 of the Ground Lease and Assignment contains clear language

assigning "all the right, title and interest of the Landlord in and to all leases now in effect,"

including the Kmart Lease. Levander Decl., Ex. E, Ground Lease and Assignment § 13.07.

Objectors fail to explain why this language should not be read to give effect to its plain meaning,

instead encouraging the Court not to take it "literally" and to ignore it in favor of other, unrelated

provisions. <u>See</u> Bruce Resp. 14.

10.     North Carolina law is clear that assignments and leases should be interpreted in

accordance with basic contract principles. <u>See</u> <u>Martin v. Ray Lackey Enters., Inc.</u>, 396 S.E.2d

327, 330 (N.C. Ct. App. 1990) ("Generally, the interpretation of an assignment is governed by

rules applicable to the interpretation of a contract. When parties use clear and unambiguous

terms, a contract can be interpreted by the court as a matter of law.") (citation omitted). Courts

should interpret a contract according to the intent of the parties, and "[t]he intent of the parties is determined by examining the plain language of the contract." Brown v. Ginn, 640 S.E.2d 787, 790 (N.C. Ct. App. 2007); Walton v. City of Raleigh, 467 S.E.2d 410, 411 (N.C. 1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract."). Here, the Ground Lease and Assignment unequivocally provides that "Landlord hereby assigns to Tenant all the right, title and interest of the Landlord in and to all leases now in effect covering the demised premises, including the right to receive and collect the rents and profits therefrom," and the Tenant further "assume[d] the performance of all of the obligations of the Landlord" under the lease. Levander Decl., Ex. E, Ground Lease and Assignment § 13.07.

11.    "The terms of the assignment determine the rights and interests of the assignor and the assignee." Ray Lackey Enters., 396 S.E.2d at 331. By transferring to tenant "all the right, title and interest" in the Kmart Lease, the fee owners effectively transferred their full landlord interest in the Kmart Lease.

12.    Indeed, this provision is consistent with the fee owners' role with regard to the Asheville property: they were not active landlords, had no property management division, and were not located in North Carolina, and therefore wanted to put in place a system where the property could "run itself." Second Declaration of Samuel Levander, dated June 13, 2019 ("Second Levander Decl."), Ex. W, Bruce Depo. Tr. 39:18-24, 41:12-16, 148:14-15 ("I mean, in real life, the properties were designed to run themselves . . . ."). By assigning their rights and obligations as landlord under the Kmart Lease to a third party, the fee owners were able to maintain their desired role as passive investors. Id. 47:2-12.

6

### ii.  The Memorandum of Lease Does Not Modify or Change the Lease Itself

13.     Objectors try to circumvent the plain language of the contract by stating that

"[t]he recorded Memorandum of Lease for the Ground Lease [and Assignment] does not even

mention the assignment of the Kmart Lease."  Bruce Resp. 12.  This argument is squarely

foreclosed by section 29.01 of the Ground Lease and Assignment, which provides:

> In the event that the Landlord and Tenant shall execute and deliver a short form of lease for the purpose of recording, said short form of lease shall not in any circumstances be deemed to modify or change any of the provisions of this Lease, which shall in all instances prevail.

Levander Decl., Ex. E, Ground Lease and Assignment § 29.01.  Objectors cannot read the

assignment out of the contract by pointing to its absence in the short form Memorandum of

Lease.

### iii.  The Granting and Habendum Clauses Do Not Alter the Plain Terms of the Assignment

14.     Objectors cite cases to argue that the granting clause and habendum clause govern

what the grantor intended to convey, and that the Ground Lease and Assignment therefore

conveyed only a leasehold interest for a specified term of years without also conveying an

assignment.  Bruce Resp. 12.  This argument fails for several reasons.  *First*, the principle that

these cases all stand for – where the granting clause and habendum clause convey an estate in fee

simple, contrary clauses elsewhere in the deed would be rejected – has no application to the facts

of this case.  *Second*, Objectors cite no case that would in any way limit landlords' ability to

grant both a ground lease and an assignment through a single writing, as they did here.  *Third*,

Objectors do not cite any case law or otherwise attempt to explain how the granting and

habendum clauses in the Ground Lease and Assignment could serve to limit the assignment of

7

the Kmart Lease when those same clauses explicitly provide that the Ground Lease and Assignment is "subject to" the existing Kmart Lease.

### iv. Section 13.03 of the Ground Lease and Assignment Applies Only to Subleases and Does Not Limit Section 13.07

15.     Objectors assert that section 13.03 of the Ground Lease and Assignment prohibits Kmart's landlord from extending the Kmart Lease for a term of more than ten years without the fee owners' consent. As described in Transform's Initial Brief, section 13.03 applies only to future subleases, and has no bearing on the existing Kmart Lease. See Levander Decl., Ex. E, Ground Lease and Assignment § 13.03 ("Tenant **may sublet** any part of the Demised Premises to an occupying **subtenant** without the written consent of the Landlord . . . .") (emphasis added); Transform Initial Br. ¶¶ 58-60.

16.     Any restrictions on the extension of the Kmart Lease, as a present occupancy lease, come from section 13.10, which requires fee owners' consent to "reduce the rent" or "shorten the term." Levander Decl., Ex. E, Ground Lease and Assignment § 13.10. Since the Second Amendment increased Kmart's rent and lengthened the term of the Kmart Lease, Kmart's landlord did not require fee owners' consent under section 13.10. See id., Ex. O, Second Amendment ¶¶ 2-3.

17.     Objectors argue in response that the Court should ignore the Ground Lease and Assignment's distinction between existing or present occupancy leases and future subleases because the words "lease" and "sublease" are purportedly used interchangeably throughout the contract. Objectors' desired result would be to expand the definition of "sublease" to mean "lease," "sublet" to mean "let," and "subtenant" to mean "tenant." This argument contravenes the plain meaning of section 13.03, see E.L. Scott Roofing Co. v. State of N.C., 346 S.E.2d 515, 520 (N.C. Ct. App. 1986) (holding that when a term is not defined in a contract, the presumption

is that the term is to be given its ordinary meaning and significance), as well as the cardinal

principle of contract law that each term in a contract should be given independent meaning

where possible.  See, e.g., Williams v. Ohio Nat'l Life Assurance Co., 364 F. Supp. 3d 605, 610

(W.D.N.C. 2019) ("If possible, every word of a contract is to be given effect.") (citing Woods v.

Nationwide Mut. Ins. Co., 246 S.E.2d 773, 777 (N.C. 1978)).

18.    In support of their argument, the Objectors cite a number of contractual

provisions that purportedly use "lease" and "sublease" interchangeably.  While the term "lease,"

in certain contexts, may encompass subleases, the term "sublease" does not similarly encompass

all leases.  Contrary to Objectors' assertion, the Ground Lease and Assignment distinguishes

between (i) *existing* leases, including the Kmart Lease, (ii) *all existing and future* leases, which

category also includes the Kmart Lease, and (iii) *subleases*, which excludes the Kmart Lease.

> a.  *First*, Objectors argue that since both "sublease" and "lease" are used in section
>
> 13.03, which governs new subleases entered into by the tenant under the Ground
>
> Lease, "sublease" and "lease" must mean the same thing throughout the contract.
>
> This argument cannot stand, however, in the context of section 13.03 as a whole,
>
> as the reference to "said Lease" in section 13.03(b) plainly refers to the sublease
>
> contemplated throughout the rest of section 13.03.
>
> b.  *Second*, Objectors argue that the phrase "all leases now or hereafter existing" in
>
> section 13.08 should not be limited to the existing Kmart Lease.  Transform
>
> agrees.  The phrases "all leases now or hereafter existing" in section 13.08 and
>
> "any present or future occupancy lease" in section 13.10 sweep more broadly than
>
> "leases now in effect covering the demised premises" in section 13.07.  None of
>
> this contractual language provides any support for Objectors' argument that

references to subleases in section 13.03 should be read to include leases between a primary landlord and primary tenant.

c.  *Third*, Objectors state that the representation in section 13.12 that "Landlord has not received any securities under any subleases in effect at the date hereof" is rendered meaningless because there were no subleases in effect at the time of the execution of the Ground Lease and Assignment.  To the contrary, section 13.12 serves as an accurate representation that the fee owners had not received any securities under any subleases as of February 1, 1966, and does not assume the existence of any such subleases as of that date.

d.  *Finally*, Objectors point to section 18.09 of the Ground Lease and Assignment, which requires the Ground Lease and Assignment tenant to furnish to the Ground Lease and Assignment landlords and, upon request, mortgage holders "the names of any subtenants with the terms and conditions of their respective tenancies." Levander Decl., Ex. E, Ground Lease and Assignment § 18.09.  Objectors argue that "[i]t makes no sense that landlord (or its mortgage lender) would seek" information regarding the terms of subtenants' leases but not regarding the terms of Kmart's Lease.  Bruce Resp. 17.  On the contrary, this arrangement makes perfect sense.  The fee owners were party to the existing Kmart Lease—they did not need to be told the name of the tenant under that Lease.

19.  In short, the plain contractual language distinguishing between existing leases, future leases, and subleases is unambiguous.  Objectors' efforts to redefine "sublease" as "lease," "sublet" as "let," and "subtenant" as "tenant" should be rejected.

10

### v. Objectors' Extrinsic Evidence Does Not Support their Position

20.     Having attempted to create contractual ambiguity where there is none, Objectors

then seek to rely on post-contractual extrinsic evidence to bolster their position.  While extrinsic

evidence may be used to explain ambiguity when a contract is ambiguous, it cannot be used to

create ambiguity where a contract is otherwise unambiguous.  See Ginn, 640 S.E.2d at 790.

Even where there is ambiguity, post-contractual extrinsic evidence has little relevance to this

analysis.  See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1233 & n.11

(Del. Sup. Ct. Nov. 25, 1997) ("[R]elevant extrinsic evidence is that which reveals the parties'

intent at the time they entered into the contract. . . . [B]ackward-looking evidence gathered after

the time of contracting is not usually helpful.").  As discussed above, the Ground Lease and

Assignment unambiguously assigned fee owners' "right, title and interest" as landlord under the

Kmart Lease and the contract clearly distinguishes between existing leases and subleases, so

there is no need to consult extrinsic evidence.

21.     In any event, the extrinsic evidence proffered by the Objectors lends no support to

their position.  Objectors first cite a May 2017 memorandum from NAP to Kmart advising that

NAP's leasehold interest was expiring on January 31, 2019, and "that no representation is made

that the terms of either its lease with Asheville K-M Associates [the Sandwich Lease] or the

lease between Asheville K-M Associates and the fee owners [the Ground Lease] will be executed

beyond such date."  Bruce Resp. 18 (citing *Declaration of Paul Bruce in Support of the Bruce*

*Trusts' (I) Designatable Contract Assumption and Assignment Objection, and (II) Reservation of*

*Rights* ("Bruce Decl.") (ECF No. 4091) ¶ 37).  Objectors assert that this memorandum shows

that "NAP understood that any extension of the Kmart Lease necessarily depended on whether

the Ground Lease and, in turn, the Sandwich Lease were renewed."  Bruce Resp. 11.

22.    Objectors attempt to imbue this memorandum with meaning that can in no way be inferred from its plain language.  NAP was simply and accurately informing Kmart that NAP's leasehold interest expired on January 31, 2019; it made no representation as to the effect such termination would have on the Kmart Lease.

23.    Objectors further point to the fact that the Third Amendment bifurcated Kmart's five-year renewal so that the first option (Option 2.1) ended on January 31, 2019, and argue that "if Asheville K-M renewed the Ground Lease, then Kmart could exercise" a second option (Option 2.2) to renew its lease.  Bruce Resp. 18.  Objectors grossly mischaracterize the Third Amendment.  Under the plain language of the Third Amendment, Kmart's right to exercise Option 2.2 is not contingent on the renewal of the Ground Lease and Assignment or the Sandwich Lease; it exists even if Asheville K-M elected not to exercise its option to extend.  For Kmart, bifurcating its unilateral option to extend or terminate the lease was a no-lose proposition.

24.    Objectors also rely on documents from the negotiation of a potential sublease between Kmart and GCP Real XVI to operate a Golden Corral restaurant on the premises leased by Kmart, arguing that these documents amount to an admission by Kmart that "Fee Owner Consent was required for long term leases [since] it attempted to obtain Fee Owners' consent to a further sublease of a portion of the Shopping Center."  Id. 18-19.  These documents do not support Objectors' contentions.

25.    *First*, it is significant that the proposed sublease and Non-Disturbance Consent and Attornment Agreement ("NDA") between Kmart and GCP Real XVI are drafts that were never executed by either counterparty.  The proposed draft sublease still contains several notes indicating that it was not final.  See, e.g., Bruce Decl., Ex. 24, Proposed Ground Sublease § 7(b) (bracketed language stating "[NOTE: THESE ARE ACTION ITEMS, BECAUSE THEY MUST

BE SIGNED CONCURRENT WITH SUBLEASE, THUS DELETED FROM EXECUTION

VERSION]").  The draft proposed sublease contains further language indicating that such an

arrangement had not received approval from Kmart's parent company, Sears Holdings

Corporation.  Id. § 24(a) (bracketed language stating "[ATTACH GUARANTOR'S

FINANCIALS – IF APPROVED BY SHC]").  There is similarly no indication in the record that

Kmart ever approved the draft proposed NDA.[5]

26.     *Second*, the draft proposed sublease is at most inconsistent in describing the

Kmart Lease as a lease or sublease.  The Kmart Lease is referred to as both the "Master Lease"

and as a "certain Sublease, dated December 18, 1964."  Id. 1.  The latter reference must be

characterized as a drafting error in a draft contract, as it is inconsistent with other language in

that same paragraph that describes NAP as the successor in interest to the landlord and Kmart as

the successor to the tenant under the original Kmart Lease.

27.     *Third*, the draft proposed NDA does not support Objectors' contention that

"Kmart admitted that Fee Owner Consent was required for long term leases when it attempted to

obtain Fee Owners' consent to a further sublease of a portion of the Shopping Center."  Bruce

Resp. 18-19.  By entering negotiations for an NDA for a sublease, Kmart in no way suggested

that consent was required in order to extend the Kmart Lease.

### c.  Objectors' Arguments Regarding the Sandwich Lease are Incorrect and Irrelevant

28.     Objectors first assert that NAP's interest in the Asheville property was solely that

as subtenant under the so-called "Sandwich Lease."  In doing so, Objectors completely ignore

the assignment documents executed contemporaneously with the "Sandwich Lease," which make

---

[5]      Objectors assert that Kmart approved the terms of the draft proposed NDA and that it prepared the draft
proposed sublease, but provide no support for either contention.

clear that NAP remained fee owners' assignee as landlord under the Kmart Lease.  *See* Levander

Decl., Ex. J, Assignment, dated Dec. 23, 1975.

29.    As explained in Transform's Initial Brief, in December of 1975, Asheville K-M

and NAC entered into a series of transactions related to the Asheville property.  See id., Ex. G,

Assignment, dated Dec. 17, 1975; id., Ex. H, Assignment, dated Dec. 23, 1975; id., Ex. I,

Memorandum of Lease, dated Dec. 23, 1975; id., Ex. J, Assignment, dated Dec. 23, 1975.  When

those transactions were completed, NAP was in precisely the same position it had been in before

with respect to the Kmart Lease.  See id. Ex. K, Letter from B.L. McGaw to H.F. Jarvis, dated

Dec. 30, 1975 ("By double Assignment of Lease – from Nineteenth Asheville Corp. to Asheville

K-M Associates dated December 23, 1975 and from Asheville K-M to Nineteenth Asheville

Corp., also dated December 23, 1975, we arrive at the same landlord as heretofore . . . .").

30.    It is impossible to reconcile Objectors' contention that, after the Sandwich Lease

was executed, NAC's only rights were that of tenant under the Sandwich Lease, with the

assignment documents "transfer[ring], sell[ing], assign[ing] and set[ting] over" the Kmart Lease

to NAP.  Id., Ex. J, Assignment, dated Dec. 23, 1975.  Nor can Objectors explain how the

Sandwich Lease governs NAP's rights under the Kmart Lease when the Sandwich Lease is

explicitly subject to the Kmart Lease.  See Bruce Decl., Ex. 12, Sandwich Lease, dated Dec. 23,

1975, at sched. 1.2(b).  Rather, the December 1975 transactions resulted in NAP continuing to

occupy two distinct roles:  as tenant under the Sandwich Lease, and fee owners' assignee as

landlord under the Kmart Lease.

31.    Objectors also argue that "NAP did not comply with the Sandwich Lease when

executing the Second Amendment."  Bruce Resp. 20.  But Asheville K-M is not now arguing,

and has not argued at any point for the last 27 years, that the Second Amendment was

unauthorized because Asheville K-M withheld its consent, nor have the Objectors presented any

evidence that such consent was withheld.  Moreover, the Objectors fail to present any coherent

explanation as to why Asheville K-M's failure to consent would result in the Second

Amendment being ineffective to bind the Bruce Trusts.

> ### d.  The Kmart Lease Did Not Expire When the Ground Lease and Assignment and Sandwich Lease Expired

32.    Both the Ground Lease and Assignment and the Sandwich Lease were entered

into subject to the existing Kmart Lease, <u>see</u> Levander Decl., Ex. E, Ground Lease and

Assignment § 1(d), Bruce Decl., Ex. 12, Sandwich Lease, dated Dec. 23, 1975, at sched. 1.2(b).

As such, neither lease purported to or did alter or subordinate the Kmart Lease.

33.    As assignee of the fee owners, NAP had full authority to enter into the Second

and Third Amendments.  To the extent that Objectors assert that NAP was not the successor to

the assignee of the landlord interest under the Ground Lease and Assignment, <u>see</u> Bruce Resp. 20

n.21, that argument is easily disproved by the chain of interests as evidenced by documents in the

record:

> a.    PPA, the original tenant and assignee under the Ground Lease and Assignment,
>
>    transferred its interest to Nineteenth Asheville Corp. on November 6, 1969.  <u>See</u>
>
>    Levander Decl., Ex. H, Assignment, dated Nov. 6, 1969.
>
> b.    Nineteenth Asheville Corp. transferred its interest to Asheville K-M Associates
>
>    on December 23, 1975, which transferred its interest back to Nineteenth Asheville
>
>    Corp. that same day.  <u>See</u> <u>id.</u>, Ex. K, Letter from B.L. McGaw to H.F. Jarvis,
>
>    dated Dec. 30, 1975 ("By double Assignment of Lease – from Nineteenth
>
>    Asheville Corp. to Asheville K-M Associates dated December 23, 1975 and from

15

Asheville K-M to Nineteenth Asheville Corp., also dated December 23, 1975, we

arrive at the same landlord as heretofore . . . .").

    c.   Nineteenth Asheville Corp. transferred its interest to Nineteenth Asheville

Properties in or around January 1976.  See id., Ex. L, Letter from Arthur Seibert

to K-Mart Corporation, dated Feb. 3, 1988.

34.     Notably, the Objectors do not pinpoint when they believe the Kmart Lease

became a sublease and Kmart became a subtenant.  They do not point to any contractual

language that purportedly subordinated the Kmart Lease, nor do they identify any contractual

language providing that Kmart was entering into a subtenancy.

**III.    In the Alternative, the Kmart Lease Is Unexpired under the Principles of Agency, Ratification, Equitable Estoppel, and Laches**

    **a.   Even If the Assignment to NAP Was Ineffective, NAP Had Authority to Enter into the Second and Third Amendments**

        **i.   NAP Acted as Fee Owners' Agent**

35.     Even if the assignment to NAP was somehow ineffective, section 13.07 of the

Ground Lease and Assignment at least conveyed actual authority for NAP to act as landlord

under the Kmart Lease and enter into the Second and Third Amendments.  Objectors argue in

response that the Fee Owners did not consent to NAP acting on their behalf, and that the Fee

Owners lacked the ability to exercise any control over NAP.  Bruce Resp. 23.

36.     *First*, section 13.07 is as clear a manifestation of consent as imaginable – not only

does it give NAP all "right, title and interest" as landlord under the Kmart Lease, it also

explicitly allows NAP to "assume[] the performance of all of the obligations of the Landlord"

under that lease.  Levander Decl., Ex. E, Ground Lease and Assignment, dated Feb. 1, 1966

§ 13.07; see Hogue v. Cruz, 812 S.E.2d 915 (Table), No. COA17-122, 2018 WL 2016470, at *3

(N.C. Ct. App. May 1, 2018) ("A principal is liable upon a contract duly made by its agent with a

16

third party . . . when the agent acts within the scope of his or her actual authority.") (citation

omitted); see also Restatement (Third) of Agency § 3.01 ("Actual authority . . . is created by a

principal's manifestation to an agent that, as reasonably understood by the agent, expresses the

principal's assent that the agent take action on the principal's behalf.").

37.     *Second*, Objectors argue that NAP could not have had authority to modify the

Kmart Lease pursuant to the Ground Lease and Assignment because the Objectors did not

exercise control over NAP.  Bruce Resp. 22.  However, the fee owners did retain an element of

control over NAP based on section 13.10 of the Ground Lease and Assignment, which provides

that NAP cannot enter into an agreement affecting a pre-existing lease "which would reduce the

rent, shorten the term, permit cancellation or surrender thereof . . . or impair or threaten to impair

the value thereof."  Levander Decl., Ex. E, Ground Lease and Assignment § 13.10.

## ii.  NAP Had Apparent Authority

38.     Even if NAP did not have actual authority, it had apparent authority to act as

landlord under the Kmart Lease.  "Where a third party in good faith and with reasonable

prudence deals with an agent having apparent authority, the principal is bound by the agent's

acts." Foote & Davies, Inc. v. Arnold Craven, Inc., 324 S.E. 2d 889, 892 (N.C. Ct. App. 1985).

39.     Objectors agree that manifestations of authority by the principal to an agent

constitute a significant factor in determining the scope of that agent's authority.  See Bruce Resp.

22 (citing Munn v. Haymount Rehab. & Nursing Ctr., Inc., 704 S.E.2d 290, 295 (N.C. Ct. App.

2010).  Section 13.07 of the Ground Lease and Assignment, to a reasonable observer, clearly

represented that NAP had the authority to act as landlord and enter into amendments extending

the Kmart Lease.

40.     This contractual grant of authority, combined with the recitals in the Second and

Third Amendments that NAP was the successor of the fee owner as landlord under the Kmart

Lease, would allow a reasonable observer to understand that NAP had the authority to extend the

Kmart Lease.  This authority was further confirmed by language in the Third Amendment that

provided that NAP had the authority to execute that contract.  See Levander Decl. Ex. S, Third

Amendment ¶ 6(f).

41.    Objectors assert that they were not aware of the fact that NAP and Kmart had

entered into the Second Amendment until 2017.  Bruce Resp. 24-25.  However, Kmart had no

reason to believe that Objectors were unaware of or were required to consent to the extension of

the Kmart Lease.  In fact, the information available to Kmart suggested the opposite.  In 1993, a

mechanic's lien was placed on the Asheville property as a result of construction entered into by

Kmart pursuant to the Second Amendment.  Paul Bruce, a principal and document custodian of

the Bruce Trusts, received notice of the lien and sent it to NAP's agent, who then sent Mr.

Bruce's correspondence to Kmart.  Second Levander Decl., Ex. X, Letter from William R. Delz

to John F. Walsh, dated Aug. 17, 1993.  Kmart thus had reason to believe that the Bruce Trusts

were aware of and approved of (or at least did not object to) this construction.  Certainly, Kmart

did nothing to hide the fact that it remained a tenant of the property for more than 17 years after

2001.[6]

### b.  Objectors Ratified the Second Amendment

42.    Ratification occurs when the principal receives and retains the benefit of a

contract after acquiring knowledge of its circumstances.  Citizens' Lumber Co. v. Elias, 154 S.E.

54 (N.C. 1930); see also Restatement (Third) of Agency § 4.02 cmt. b ("If a ratification occurs,

the principal does not have the privilege of unilaterally revoking it.").  The Bruce Trusts argued

---

[6]    Indeed, the Bruce Trusts had actual notice that Kmart's tenancy continued past 2001.  See, e.g., Second
Levander Decl., Ex. W, Bruce Depo. Tr. at 136:4–137:9 ("I visited the site and I saw Kmart was there, that's not
ambiguous. . . . I knew they were there and open for business.").

that (1) they had no knowledge of the Second Amendment, (2) they did not assent to or intend to

ratify the Second Amendment, and (3) they did not benefit from the Second Amendment.  None

of these arguments withstands scrutiny.

### i. *Knowledge*

43.    Ratification occurs when a principal has knowledge of circumstances sufficient to

put a reasonable person on notice to investigate further.  Bielicki v. Terminix Int'l Co., 225 F.3d

1159, 1164 (10th Cir. 2000) ("Ratification requires '*either* knowledge of the material facts *or*

circumstances sufficient to put a reasonable person on notice to inquire into these facts,' not

both.") (citation omitted); Restatement (Third) of Agency § 4.06 (stating that ratification occurs

"when the principal is shown to have had knowledge of facts that would have led a reasonable

person to investigate further, but the principal ratified without further investigation").

44.    It is uncontroverted that the Bruce Trusts had actual notice that Kmart remained

its tenant after 2001, when the Kmart Lease would have expired without an extension.  See, e.g.,

Second Levander Decl., Ex. W, Bruce Depo. Tr. 136:4–137:9.  The Bruce Trusts also had

knowledge that Kmart made improvements to the property in 1993.  Id., Ex. W, Bruce Depo. Tr.

131:5–134:25.

45.    These facts constitute "circumstances sufficient to put a reasonable person on

notice to inquire," Bieleicki, 225 F.3d at 1164, and the Bruce Trusts' failure to do so does not

serve as a defense to ratification, Hall v. Geissell & Richardson, 103 S.E. 392, 393 (N.C. 1920)

("If the defendants were at all watchful of their interests and diligent in the prosecution and

management of their business, they would have ascertained why [plaintiff] was making these

monthly payments . . . ."); see also Fisher v. John L. Roper Lumber Co., 111 S.E. 857, 859 (N.C.

1922) (holding that where principal knew or should have known the condition of employee's

return to work, it triggered a duty to inquire about agreement concerning his employment, and

negligent failure to inquire about the terms of employment for twelve years imputed knowledge of the same ).

46.    The fact that the Bruce Trusts purport to be unable to find any "record indicating that [they] received copies of the Kmart Amendments prior to December 2017" should be entitled to very little weight given the uniquely unreliable document retention methods employed by the Bruce Trusts.  See Second Levander Decl., Ex. W, Bruce Depo. Tr. 122:9–125:8 (describing purging and shredding documents related to the Asheville property); id. 134:15-16 (stating that a record of a lien on the property and related correspondence from 1993 were missing from the file, and that deponent had "forgot[ten] all about" these documents); id. 145:17–152:15 (acknowledging that documents from before 1994 were missing from the Asheville property file).

### ii.  *Assent*

47.    Next, the Bruce Trusts argue that the Buyer has failed to point to any affirmative act taken by the Fee Owners that shows they assented to or intended to ratify the Amendments. Bruce Resp. 25.  But Buyer need not show that the Bruce Trusts made an affirmative statement to assent to Kmart's continued tenancy.  Intent to ratify "may be express or implied," and "may be inferred from failure to repudiate an unauthorized act."  Walker v. Sloan, 529 S.E.2d 236, 244 (N.C. Ct. App. 2000) (emphasis added) (quoting Espinosa v. Martin, 520 S.E.2d 108, 111 (N.C. Ct. App. 1999)).  When the Bruce Trusts became aware that Kmart remained a tenant of the Asheville Property after the Kmart Lease would have expired, their failure to repudiate or even question Kmart's tenancy for more than a decade constitutes sufficient intent to ratify.  See, e.g., GDG Acquisitions LLC v. Gov't of Belize, 849 F.3d 1299, 1307-10 (11th Cir. 2017) (holding that the Government of Belize's retention of telecommunications equipment for the duration of a ten-year lease constitutes ratification); Thermo Contracting Corp. v. Bank of N.J., 354 A.2d 291,

296 (N.J. 1976) (accepting the benefit of the bargain for a period of 6 months before raising the question of lack of authority constitutes ratification).

### iii. Benefit

48.     Finally, the Bruce Trusts' argument that they received no benefit from the improved terms of the Kmart Lease under the Second Amendment does not withstand scrutiny. Kmart's improvement of the property by expanding the storeroom conferred a clear and tangible benefit on the fee owners of the property.  Levander Decl., Ex. O, Second Amendment ¶ 1.  The increase in Kmart's annual rent from $136,700 per year to $208,900 per year benefitted the Bruce Trusts in at least two independent ways.  Id. ¶ 3.  *First*, section 13.08 of the Ground Lease and Assignment assigned Kmart's rent to the Fee Owners in the event of a default by Kmart's landlord, so an increase in Kmart's rent increased the amount of security payable to the Bruce Trusts.  *Second*, the Bruce Trusts benefited to the extent that there was a possibility they could later become entitled to receive rent directly from Kmart and, similarly, that they could benefit from Kmart's agreement to assume payment for certain real estate taxes.

### c.  Equitable Estoppel

49.     Similarly, after benefitting from the improved terms of the Second Amendment for more than 25 years, the Bruce Trusts should now be estopped from asserting that it was invalid.  See Woodring v. Swieter, 637 S.E.2d 269, 279 (N.C. Ct. App. 2006); Delk v. Hill, 365 S.E.2d 218, 221 (N.C. Ct. App. 1988); Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen, GMBH, 206 F.3d 411, 417-18 (4th Cir. 2000).  In addition to arguing that they did not benefit from the Second Amendment, the Bruce Trusts argue that Kmart did not reasonably rely on any representation by NAP that it could bind fee owners.  As discussed above, this argument is disproven by the plain language of the assignment in section 13.07 of the Ground Lease and Assignment.

### d.  Laches

50.    Finally, the Bruce Trusts fail entirely to address Transform's argument that they are barred from asserting that the Kmart Lease expired in 2001 based on the doctrine of laches, which applies in circumstances such as here where "lapse of time has resulted in some change in the condition of the property or in the relations of the parties which would make it unjust to permit the prosecution of the claim . . . and when the claimant knew of the existence of the grounds for the claim."  Abernethy v. Town of Boone Bd. of Adjustment, 427 S.E.2d 875, 878 (N.C. Ct. App. 1993).

## IV.  There Appears to Be No Outstanding Dispute between the Parties Related to Adequate Assurance or Restrictive Covenants

51.    The Objectors request that, in the alternative, assumption and assignment should be conditioned "on the Buyer providing a guaranty of performance," which they can then review and comment on.  Bruce Resp. 27.  The Objectors further request that any assumption and assignment order provides that restrictive covenants in the Kmart Lease remain in effect.  On June 13, 2019, in response to the Objectors' requests, Transform provided them with the adequate assurance materials previously provided to other objecting landlords, as well as a form of guaranty from Transform MidCo LLC as additional adequate assurance of future performance.  Transform notes that the Court has repeatedly found that Transform has demonstrated adequate assurance of future performance on this basis.[7]  Sale Order ¶ 31; Hr'g Tr. 35:11–37:19, May 8, 2019.  Transform further consents to a request that the assumption and

_____

[7]       To the extent that the Objectors argue that the "shopping center" standard should apply under 11 U.S.C. § 365(b)(3), they bear the burden of demonstrating that the Kmart Lease is a shopping center lease.  Transcript of Hearing, In re Great Atl. & Pac. Tea Co., Inc., No. 10-24549 (Bankr. S.D.N.Y. Jul. 7, 2011) ECF no. 2283 at 98 (Drain, J.) (citing In re Ames Stores, Inc., 121 B.R. 160, 163 (Bankr. S.D.N.Y. 1990)).  Objectors have adduced no evidence to prove they meet the 14-factor test for section 365(b)(3).  See In re Ames Dep't Stores, Inc., 348 B.R. 91, 95 (Bankr. S.D.N.Y. 2006).

assignment order retain restrictive covenants in the Kmart Lease and is not seeking to modify or

remove any restrictive covenants.

## **CONCLUSION**

52.    Transform requests that the Court deny the Bruce Trusts' objections and grant

assumption and assignment of the Kmart Lease pursuant to 11 U.S.C. § 365.


 Dated: June 13, 2019
        New York, New York


                        CLEARY GOTTLIEB STEEN & HAMILTON LLP


                        */s/ Luke A. Barefoot*
                        Luke A. Barefoot
                        Samuel Levander

                        One Liberty Plaza
                        New York, New York 10006
                        Telephone: (212) 225-2000
                        Facsimile: (212) 225-3999

                        *Attorneys for Transform Holdco LLC*