WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
*Attorneys for Debtors*
*and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |
| | : | |

---------------------------------------------------------------x

## OBJECTION OF DEBTORS TO MOTION OF RETIREES
## PURSUANT TO SECTION 1114(d) OF THE BANKRUPTCY CODE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT BACKGROUND ....................................................................................................2

THE SEARS RETIREE GROUP LIFE INSURANCE PLAN.......................................................4

THE MOTION SHOULD BE DENIED........................................................................................6

    A.      The Retiree Plan is Not Subject to Bankruptcy Code Section 1114........................6

    B.      Appointment of a Retiree Committee Is Not Appropriate in These Cases..............8

    C.      The Requirements of Section 1114 Should Not Apply in a Liquidating
             Chapter 11 Case .....................................................................................................8

    D.      Alternatively, If The Court Appoints A Retiree Committee, Its Role and
             Professional Fees Should be Limited....................................................................15

CONCLUSION..........................................................................................................................16

WEIL:\97064319\11\73217.0004

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alpha Nat. Res., Inc.*,
    552 B.R. 314 (Bankr. E.D. Va. 2016) ...................................................................14

*In re Chemtura Corp.*,
    No. 09-11233 (REG), 2011 Bankr. LEXIS 1301 (Bankr. S.D.N.Y. Apr. 8, 2011) ..................7

*In re Chicago Constr. Specialties, Inc.*,
    510 B.R. 205 (Bankr. N.D. Ill. 2014) ...................................................................8, 9

*In re Delphi Corp.*,
    Case No. 05-44481 (RDD), 2009 Bankr. LEXIS 576 (Bankr. S.D.N.Y. Mar. 10, 2009) .... *passim*

*In re Family Snacks, Inc.*,
    257 B.R. 884 (B.A.P. 8th Cir. 2001) ...................................................................9

*In re General Motors Corp.*,
    Case No. 09–50026 (REG) (Bankr. S.D.N.Y. July 25, 2009) .............................................7, 8

*In re GF Corp.*,
    115 B.R. 579 (Bankr. N.D. Ohio 1990) ...................................................................9

*In re Horsehead Indus., Inc.*,
    300 B.R. 573 (Bankr. S.D.N.Y. 2003) ...................................................................10

*In re Ionosphere Clubs, Inc.*,
    134 B.R. 515 (Bankr. S.D.N.Y. 1991) ................................................................... *passim*

*In re Karykeion, Inc.*,
    435 B.R. 663 (Bankr. C.D. Cal. 2010) ...................................................................10

*In the Matter of Lehman Brothers Inc.*,
    Case Nos. 08-13555 (JMP) and 08-01420 (JMP) (Bankr. S.D.N.Y. November 16, 2011) ..........13

*In re Lyondell Chem. Co.*,
    No. 09-10023 (REG), 2009 Bankr. LEXIS 4898 (Bankr. S.D.N.Y. Oct. 27, 2009) .................7

*In re Maxwell Newspapers, Inc.*,
    981 F.2d 85 (2d Cir. 1992) ...................................................................10

*In re Nat'l Forge Co.*,
    289 B.R. 803 - 811 (Bankr. W.D. Pa. 2003) ...................................................................10

*In re SAI Holdings Ltd.*,
  Case No. 06-33227, 2007 Bankr. LEXIS 1051 (Bankr. N.D. Ohio Mar. 26, 2007)...............14

*In re Tower Auto. Inc.*,
  241 F.R.D. 162 (S.D.N.Y. 2006) ...........................................................................................11

*In re United States Truck Co. Holdings*,
  2000 Bankr. LEXIS 1376 (Bankr. E.D. Mich. Sept. 29, 2000) .................................................9

**Statutes**

11 U.S.C. § 1107(a) ...................................................................................................................2

11 U.S.C. § 1108.........................................................................................................................2

11 U.S.C. § 1113.................................................................................................................8, 9, 10

11 U.S.C. § 1113(c) ....................................................................................................................9

11 U.S.C. § 1114................................................................................................................. *passim*

11 U.S.C. § 1114(e)(1)...............................................................................................................12

11 U.S.C. § 1114(g)(3) ...............................................................................................................8

**Other Authorities**

Fed. R. Bankr. P. 1015(b) ...........................................................................................................2

WEIL:\97064319\11\73217.0004

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation ("**Sears Holdings**") and certain of its affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**") submit this joint

objection (the "**Objection**") in response to the *Motion of Retirees Pursuant to Section 1114(d) of*

*the Bankruptcy Code Directing the Appointment of a Committee of Retired Employees* (ECF No.

4054) (the "**Motion**"), filed by Richard Bruce and Ronald Olbrysh (the "**Retirees**").  In support of

the Objection, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors' determination to terminate certain life insurance benefits provided to

their retirees under the Sears Retiree Group Life Insurance Plan (the "**Retiree Plan**") was one of

many difficult decisions that Debtors have had to make during these chapter 11 cases.  Given the

results of the Debtors' sale process and their limited cash resources, however, the Debtors

determined, in their business judgment, that they could not justify maintaining the Retiree Plan

and paying the premiums associated with the underlying insurance policies.  The clear language

of the Retiree Plan grants the Debtors the unilateral right to terminate or modify the benefits

available thereunder.  Consequently, consistent with prevailing case law in this jurisdiction, the

Debtors determined that section 1114 of the Bankruptcy Code was not applicable, and terminated

the Retiree Plan.

2.      After terminating the Retiree Plan, the Debtors were informed of a Stipulation (as

defined below), entered into approximately 18 years ago, which reflected an agreement to modify

certain aspects of the Retiree Plan.  Upon the Debtors' information and belief, the Retiree Plan

was never amended as agreed to in the Stipulation.  As a result, the Debtors believe that the rights

under the Retiree Plan have not vested, the unilateral right to amend or terminate the Retiree Plan remained available to the Debtors, and the termination of the Retiree Plan was proper.

3. Even if the Court were to determine that the Retirees have vested rights in the Retiree Plan, however, the Court should nevertheless deny the appointment of a retiree committee in these cases. The appointment of an official retiree committee at this juncture of the case is unwarranted and would serve no practical purpose because the Debtors lack the wherewithal to make a meaningful modification proposal to their retirees. Consequently, the Court should deny the Motion or, at a minimum, strictly limit the mandate and the budget of any retiree committee.

## RELEVANT BACKGROUND

4. Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On October 24, 2018, the United States Trustee for Region 2 appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"). No trustee or examiner has been appointed in these chapter 11 cases.

6. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

7. The Debtors and Transform Holdco LLC ("**Transform**") entered into an asset purchase agreement, dated as of January 17, 2019 (as amended, the "**Asset Purchase Agreement**") for the sale of substantially all of the Debtors' assets (the "**Sale Transaction**").

2

8.      On February 8, 2019, the Bankruptcy Court entered the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507).  The Sale Transaction closed on February 11, 2019.

9.      On April 17, 2019, the Debtors filed the *Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* (ECF No. 3275), and the *Disclosure Statement for Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 3276).  On May 16, 2019, the Debtors filed the *Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* (ECF No. 3894) and the *Disclosure Statement for Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 3895). On May 28, 2019, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors* (ECF No. 4041) (the "**Plan**") and the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* (ECF No. 4042) (the "**Disclosure Statement**").  At the hearing to consider approval of the Disclosure Statement, which was held on May 29, 2019, the Court gave its preliminary approval to the Disclosure Statement, subject to certain additional changes.  The Debtors expect to commence solicitation with respect to the Plan imminently, and the confirmation hearing is currently scheduled for July 23, 2019.

10.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

3

*Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn on October 15, 2018 (ECF No. 3).

## THE SEARS RETIREE GROUP LIFE INSURANCE PLAN

11.    Sears Holdings sponsored the Retiree Plan, which provided retiree life insurance benefits to certain retired employees of the Debtors covered under the "Allstate Financial Supplemental Group Life Plan for Retirees" (the "**Allstate Policy**") or the "Securian Financial Group Life Insurance Policy" (the "**Securian Policy**," and, together with the Allstate Policy, the "**Policies**").  As of March 15, 2019, the Allstate Policy covered twelve retirees, who are former senior executives, and the Securian Policy covered approximately 29,000 retirees.  The death benefit payable with respect to retirees who are covered under the Allstate Policy is between $356,080 and $2,680,000, while the death benefit payable to retirees who are covered under the Securian Policy is between $5,000 and $14,500.

12.    To maintain the coverage provided under the Policies, the Debtors would be required to pay an annual premium under the Allstate Policy of $647,821.00, and a monthly premium under the Securian Policy of approximately $1.3 million.  The Debtors made all premium payments required under the respective policies for the period through December 31, 2018.

13.    The Debtors determined that, given the financial circumstances of their estates, they could no longer justify paying the significant premiums for the Policies.  The Debtors recognized that, whether through termination or rejection, they would need to terminate any further post-petition obligations under the Retiree Plan.

14.    The Retiree Plan documents reserve the right of the Debtors to unilaterally amend or terminate the Retiree Plan at any time.  Specifically, the Sears Retiree Group Life Insurance Plan Summary Plan Description (the "**SPD**"), a copy of which is attached hereto as **Exhibit A**, provides that Sears Holdings "has the right to modify, amend, suspend, or terminate the Plan at

4

any time." *SPD*, p. 20. In addition, the SPD provides, in its introductory statements, that "Sears has the right to change or terminate the Plan at any time and for any reason."

15.    On March 7, 2019, the Board of Directors of Sears Holdings approved the termination of the Retiree Plan, effective as of March 15, 2019. On March 8, 2019, Sears posted on the Sears Holdings Corporation Alumni webpage a "Notice – Termination of Retiree Life Insurance Plan" to notify all Retiree Plan participants of the termination of the Retiree Plan. A copy of the notice is annexed hereto as **Exhibit B**. In the notice, Sears also provided retirees with information regarding the opportunity to convert coverage under the Securian Policy to individual life insurance policies, which conversion option has been offered to retirees by Securian. Notably, out of the 29,000 retirees that were informed of termination of the Retiree Plan, only *two* have sought the appointment of the Retiree Committee.

16.    Notwithstanding the termination of the Retiree Plan, the Allstate Policy has been amended by Sears, Roebuck and Co. ("**SRC**") and Allstate Life Insurance Company ("**Allstate**") to extend the grace period under the Allstate Policy to August 1, 2019, at no cost to the Debtors, to cover retirees until that date, while Allstate and the Debtors work to resolve how covered retirees can maintain coverage at their own cost.

17.    As of the date of the termination of the Retiree Plan, the Debtors had unpaid premium obligations relating to the Retiree Plan of approximately $3.9 million and approximately $647,821, with respect to the Securian Policy, and the Allstate Policy, respectively.

18.    After termination of the Retiree Plan, the Debtors were advised that in 2001, SRC entered into a Stipulation of Settlement (In Re: Sears Retiree Group Life Insurance Litigation Civil Action No. 97 C 7453) (the "**Stipulation**"), in connection with the reduction of certain retiree life insurance benefits available to eligible retirees at that time.

5

19.      Paragraph 3.1 of the Stipulation appears to limit SRC's ability to accelerate the rate of reduction in the amount of life insurance for any Class Member (as defined therein).  Paragraph 3.4 of the Stipulation further provides that Sears will amend the Plan and the SPD within a reasonable period after approval of the Stipulation to the extent necessary to incorporate, *inter alia*, paragraph 3 thereof.  Paragraph 3.4 also appears to limit SRC's right to amend, modify, cancel or terminate any right conferred upon a Class Member, or to diminish the value of the benefit granted to Class Members under the Stipulation.  Based on a review of their files and consultation with former Sears employees, the Debtors have not been able to find any evidence that the Retiree Plan was so amended.

## THE MOTION

20.      In the Motion, the Retirees seek the appointment of a Retiree Committee as contemplated by Section 1114 of the Bankruptcy Code.  The Retirees contend that the rights of retirees under the Retiree Plan vested because, in their view, the Stipulation modified the Debtors' rights to modify or terminate the Retiree Plan, and failure to amend the Retiree Plan in accordance with the Stipulation was a ministerial error.  Motion ¶¶ 19, 20.  Among other things, the Retirees assert that retirees are currently unrepresented in these cases, and that a retiree committee could assist the Debtors in identifying the beneficiaries of deceased retirees and could assist retirees in preparing and filing administrative expense claims against the Debtors.  Motion ¶¶ 17, 24, 30.  Additionally, the Retirees contend that such a committee could engage in negotiations regarding modification of the Retiree Plan.  Motion ¶ 32.

## THE MOTION SHOULD BE DENIED

### A.      The Retiree Plan is Not Subject to Bankruptcy Code Section 1114

21.      Section 1114(d) of the Bankruptcy Code provides as follows:

6

> The court, upon a motion by any party in interest, and after notice and a hearing, shall order the appointment of a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement. The United States trustee shall appoint any such committee.

11 U.S.C.A. § 1114(d).

22.    In what has become the seminal case on the interpretation of section 1114 in this District, this Court has previously held in *In re Delphi Corp.*:

> [T]he debtors' interpretation of Section 1114 is the correct one, and that, if, in fact, the debtors have the unilateral right to modify a health or welfare plan, that modifiable plan is the plan that is to be maintained under Section 1114(e), with the debtors' pre-bankruptcy rights not being abrogated by the requirements of Section 1114.

*In re Delphi Corp.*, Case No. 05-44481 (RDD), 2009 Bankr. LEXIS 576, at *19 (Bankr. S.D.N.Y. Mar. 10, 2009); *see also In re Chemtura Corp.,* No. 09-11233 (REG), 2011 Bankr. LEXIS 1301, at *19 (Bankr. S.D.N.Y. Apr. 8, 2011); Transcript of Record at 109-110, *In re General Motors Corp.*, Case No. 09–50026 (REG) (Bankr. S.D.N.Y. July 25, 2009)[1] ("Section 1114 doesn't apply to employee benefit plans that are terminable or amendable unilaterally by the plan sponsor. Putting it another way, section 1114 does not trump any agreement between a company and its employee that gives the company the right to amend or terminate a welfare plan.").  See also *In re Lyondell Chem. Co.,* No. 09-10023 (REG), 2009 Bankr. LEXIS 4898, at *3 (Bankr. S.D.N.Y. Oct. 27, 2009) (declining to carve executive out of order authorizing termination of retiree medical benefits, where his separation agreement incorporated provisions of underlying plans, subject to employer's rights to amend them).

---

[1] A copy of the Transcript of Record is attached hereto as **Exhibit C**.

7

23.    After conducting due diligence, the Debtors have been unable to find any evidence that the Retiree Plan was amended in a manner consistent with the Stipulation.  Nor have the Retirees provided any evidence of such an amendment.  As a result, the Debtors retained the unilateral right to modify or terminate the Retiree Plan at the time the Retiree Plan was terminated.  Consequently, consistent with *Delphi* and its progeny, section 1114 does not apply to the Retiree Plan.

**B.    Appointment of a Retiree Committee Is Not Appropriate in These Cases**

24.    Section 1114(d) has a discretionary prong, which is that a court shall order the appointment of a retiree committee of retired employees "if a court otherwise determines that it is appropriate."  As Judge Gerber stated on the record of the hearing in *General Motors*, although "a 'shall' proceeds the [second prong], but when you give me the ability to determine whether it's appropriate, it seems to me, that changes it into a discretionary determination."  Transcript of Record at 58.  As is described further below, the exercise of the Court's discretion to appoint a retiree committee is not appropriate in these cases.

**C.    The Requirements of Section 1114 Should Not Apply in a Liquidating Chapter 11 Case**

25.    If Section 1114(d) were applicable, the standard that the Court would apply to any unilateral modification of retiree benefits is whether "such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities." 11 U.S.C. § 1114(g)(3).

26.    Courts have struggled over the application of this standard, as well as the comparable standard set forth in Section 1113 of the Bankruptcy Code, in the case of a liquidation under chapter 11 of the Bankruptcy Code.  See, e.g., *In re Chicago Constr. Specialties, Inc.*, 510

8

B.R. 205, 216–18 (Bankr. N.D. Ill. 2014) (noting that "the majority of cases dealing with section 1113 are of the nonliquidating variety, . . . [and] the majority of opinions addressing section 1113 address it in the context of a debtor's reorganization," but that, in a liquidation, the factors for section 1113(c) relief "must be applied contextually, rather than strictly" with "the impending liquidation of the Debtor firmly in mind"); *In re United States Truck Co. Holdings*, 2000 Bankr. LEXIS 1376, at *28 (Bankr. E.D. Mich. Sept. 29, 2000) ("[A]pplying § 1113 to a liquidating Chapter 11 . . . is somewhat problematic because many of the § 1113 requirements and the case law interpreting them focus on or presuppose efforts to rehabilitate an ongoing business [but] . . . [t]hese standards must necessarily be construed, if possible, in a way that gives them meaning in this liquidation setting."); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 522 (Bankr. S.D.N.Y. 1991) (finding that the "consistent premise underlying § 1114 is that a reorganization is in progress."); *In re GF Corp.*, 115 B.R. 579, 585 (Bankr. N.D. Ohio 1990) ("[T]he standard that 'modification is necessary to permit the reorganization of the debtor'…, so key to the congressional consideration of this provision, is robbed of its meaning when the debtor proposes to liquidate or where, as here, the [debtor in possession's] intention to liquidate is made evident by the necessary sale of substantial assets before plan confirmation.").[2]

27.    Courts have found that "'necessary to an effective reorganization' means, in the context of a liquidation, necessary to the Debtor's liquidation." *In re Chicago Constr. Specialties, Inc.*, 510 B.R. 205, 216–18 (Bankr. N.D. Ill. 2014); *accord In re Family Snacks, Inc.*, 257 B.R. 884, 896 (B.A.P. 8th Cir. 2001) (concluding, in the context of a liquidating case, that "'necessary

---

[2] The *GF Corp* court also found that "[t]hese discrepancies indicate that when Congress enacted § 1114, it considered little of the workings of the Bankruptcy Code other than the situation which was immediately before it, the LTV filing. Section 1114 may speak directly to another LTV, but its application to the vast majority of cases will be much more troublesome. Unfortunately, § 1114 addresses a specific concern alone, and it is inattentive to the overall objectives of the Bankruptcy Code." *GF Corp.*, 115 B.R. at 585.

to permit the reorganization of the debtor' means 'necessary to accommodate confirmation of a Chapter 11 plan'"); *Ionosphere Clubs,* 134 B.R. at 522 (discussing inability to apply section 1114's analogous "necessary to permit the reorganization of the debtor" language to a debtor liquidating under chapter 11 if that language is construed literally).

28.    In a similar vein, courts have routinely found modification proposals "necessary" where they were needed to facilitate going-concern sales. *See In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir. 1992) (finding modifications to a collective bargaining agreement necessary where such modifications were required to consummate a going-concern sale that was the only way for the debtor's business to continue operating in the future); *In re Karykeion, Inc.*, 435 B.R. 663, 679 (Bankr. C.D. Cal. 2010) (finding modifications to a collective bargaining agreement necessary where a sale was needed to avoid a shut-down and hasty liquidation, and consummating the sale required relief from collective bargaining agreement provisions); *In re Nat'l Forge Co.*, 289 B.R. 803, 810 - 811 (Bankr. W.D. Pa. 2003) (finding modifications to a collective bargaining agreement necessary in a liquidating chapter 11 case in which a sale had to occur pursuant to strict timelines imposed by a lender, where ongoing disputes over the collective bargaining agreement would have impaired a proposed auction process).[3]

29.    Numerous courts have noted that Section 1114 of the Bankruptcy Code was enacted in response to actions taken by LTV Corporation and that the purpose of the provision was "to ensure that the debtors did not seek to effect reorganization 'on the back of retirees' for the benefit of other parties in interest." *Ionosphere Clubs*, 134 B.R. at 523; *see also, Delphi*, 2009 Bankr.

---

[3] The same standard that applies to motions to reject collective bargaining agreements under section 1113 of the Bankruptcy Code are applicable to motions to terminate or modify retiree benefits under section 1114. *See In re Horsehead Indus., Inc.*, 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003) (indicating that section 1113 interpretations apply equally to section 1114).

LEXIS 576, at \*10-11; *In re Tower Auto. Inc.*, 241 F.R.D. 162, 166 (S.D.N.Y. 2006). As courts have suggested, in attempting to legislate a solution to the LTV problem, Congress painted with too broad a brush. *See Delphi*, 2009 Bankr. LEXIS 576, at \*10-11 ("[A]s was made clear over seventeen years ago, the issue of whether Congress went beyond precluding a debtor to cease performing its welfare and benefit agreements without going through the process delineated in Section 1114 to actually precluding a debtor from exercising the non-bankruptcy law rights to modify or terminate those agreements was viewed as open under the statute."); *Ionosphere Clubs*, 134 B.R. at 517.

30.      In these cases, substantially all of the Debtors' assets already have been sold to Transform. Pursuant to the Plan, any remaining assets will be liquidated and the proceeds will be distributed to the Debtors' stakeholders, in accordance with their respective interests, as reflected in the Plan. It is simply not feasible for the Debtors to interact with a retiree committee in the way anticipated by the legislature and the statutory language. Over 17,000 proofs of claim, representing more than $75 billion in liabilities have been filed against the Debtors. *See* Disclosure Statement, p. 20. As reflected in the Disclosure Statement, the Debtors anticipate a distribution to holders of general unsecured claims of approximately 2.3% to 2.7% of their claims, depending on the applicable debtor. *See* Exhibit E-1 to the Disclosure Statement.[4] Every dollar that would be provided to continue any benefits under the Retiree Plan would further reduce the recoveries available to unsecured creditors. There will simply be no funds available for payments under the Retiree Plan *ad infinitum*. The only logical proposal for the Debtors to make to a retiree committee under the circumstances would be an elimination of all benefits under the Retiree Plan.

---

[4] Exhibit E-1 was filed with the *Notice of Filing of Exhibits to the Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors* [Docket No. 4060].

11

Consequently, there would be no point to imposition of the negotiation process required by section 1114 of the Bankruptcy Code and its attendant expenses.

31.     The Retirees contend that a retiree committee would proceed with negotiating with the Debtors on any modifications to the Retiree Plan – but offer no clue as to what they believe may be negotiated given the facts of these cases.   *See* Motion, ¶ 32.  Moreover, the Retirees have neither asserted nor demonstrated why the Creditors' Committee could not perform the same functions they believe a retiree committee would perform in these cases.

32.     Furthermore, given the Debtors' limited resources, imposing upon the Debtors the additional administrative expenses associated with a retiree committee will make maintaining administrative solvency more difficult.   The Debtors are in critical need of conserving cash. With a July 23, 2019 confirmation hearing approaching, no remaining significant sources of revenue, and limited remaining reserves, the Debtors need all of their remaining cash to meet their post-closing obligations, fund litigation to resolve their disputes with Transform, and wind-down their estates.  The preservation of the value of the Debtors' assets, particularly their cash, is critical to maintaining administrative solvency and integral to the efficient and timely confirmation of the Plan.[5]

33.     There is no question that Section 1114 would not be applicable in a chapter 7 case. As Judge Lifland noted in the *Ionosphere* case*:*

> Since there are no material differences between the mechanics of liquidation in Chapter 11 or Chapter 7, Congress could not have intended the results of such liquidations to differ so markedly by enhancing the claim of retirees in one instance (a Chapter 11 liquidation) but not the other (a Chapter 7 liquidation). Accordingly, where the debtor is completely liquidating its assets in Chapter 11 in contemplation of a final distribution to creditors, that

---

[5] The Debtors' Administrative Solvency Tracker, attached as Exhibit C to the Disclosure Statement, provides additional information on the Debtors' administrative expenses and the administrative expense claims asserted against the Debtors.

WEIL:\97064319\11\73217.0004

debtor should not be compelled to continue paying retiree benefits, in full, on a priority basis.

Applying § 1114 as requested by the Retiree Committee to liquidating Chapter 11 cases involving a large work force, in most instances, can result in the depletion of all, or substantially all of an estate's assets. In many cases, there would be insufficient funds even to pay administration creditors to complete the liquidation, and little or no funds for distribution to other general unsecured creditors. Such a result would be in violation of the overall objectives of the Bankruptcy Code to pursue the greatest benefit for all creditors of the estate and to promote a fair and equitable distribution.

*Ionosphere Clubs,* 134 B.R. at 523.[6]  As Judge Lifland noted, it would be incongruous if the interpretation of section 1114 were one that required a conversion to chapter 7 to preserve a recovery for general unsecured creditors. *Id.* at 525. And, as reflected in the Liquidation Analysis that is Exhibit E-1 to the Disclosure Statement, conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code would result in a drastic reduction of recoveries for general unsecured creditors from an estimated 2.3% to 2.7%, to an estimated .5% to .9%, depending on the Debtor. Clearly, Congress could not have intended for a debtor's general unsecured creditors to bear that decrease in recovery just to avoid the application of section 1114.

34.     In the instant cases, where the Debtors are working towards the confirmation hearing on a liquidating chapter 11 plan next month, substantially all of the Debtors' assets had been sold, and the Plan anticipates minimal recoveries for unsecured creditors, appointment and funding of a retiree committee is not appropriate. *See* Transcript of Record at 53, *In the Matter of Lehman Brothers Holdings, Inc.*, and *In the Matter of Lehman Brothers Inc.*, Case Nos. 08-13555 (JMP) and 08-01420 (JMP) (Bankr. S.D.N.Y. November 16, 2011) ("Counsel for the Department of Labor made a comment that no one has responded to yet that perhaps this is a situation in which

---

[6] Despite his observations, Judge Lifland felt constrained to apply section 1114 even in a liquidating chapter 11 case. However, Judge Lifland's views about the anomaly in the Bankruptcy Code certainly informed his views regarding the import of the "necessary to an effective reorganization."

WEIL:\97064319\11\73217.0004

a committee should be formed to represent the interests of beneficiaries of the group benefit plan. At this juncture in this extraordinarily protracted and complex bankruptcy case which is heading next month toward a confirmation hearing, it is too late -- especially by oral request to be forming any kind of formal committee.").[7]

35.    While there are several cases that indicate that section 1114 applies in chapter 7 liquidation cases, it is notable that in several of those cases, it was union representatives who were arguing that the provision didn't apply, and the applicable debtor was arguing that it did apply. *See In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 318 (Bankr. E.D. Va. 2016);[8] *In re SAI Holdings Ltd.*, Case No. 06-33227, 2007 Bankr. LEXIS 1051, at *12-13 (Bankr. N.D. Ohio Mar. 26, 2007).[9] And in at least one of those cases, it was not clear that the debtors were headed for liquidation. *See SAI Holdings*, 2007 Bankr. LEXIS 1051, at *21-22 ("While Debtors have presented evidence of the cost of Retiree benefits, Sandusky has not yet proposed a liquidation plan.  It is difficult, although perhaps not impossible, to determine whether or not the termination of Retiree benefits is necessary to accommodate confirmation of a Chapter 11 plan when no plan has been proposed.").

36.    The Retirees have not cited a single case that is comparable to these cases – where substantially all of the assets have been sold, the debtors have precious few assets to satisfy

---

[7] A copy of the Transcript of Record is attached hereto as **Exhibit D**.

[8] In Alpha, the court ruled in favor of the debtors, and found that the union, which opposed the debtors' modification proposals, refused to accept those proposals without cause.  *Alpha*, 552 B.R. at 336-338.

[9] In *SAI Holdings*, the court denied a motion for an order authorizing termination of retiree benefits, because it found that the debtors could not show that unsecured creditors would get less in a chapter 7 liquidation than the debtors' proposed chapter 11 plan without termination of retiree benefits, and the court found that the debtors therefore failed to show that termination of retiree benefits was "necessary to accommodate confirmation of a Chapter 11 plan."  *SAI Holdings*, 2007 Bankr. LEXIS 1051, at *26-28. Here, the Debtors' Liquidation Analysis speaks for itself, even without taking into account any retiree committee fees or administrative claims of retirees.

14

administrative expenses, and the debtor is on the verge of soliciting votes on a plan that provides

for a distribution of sale proceeds.  In fact, the only case cited by the Retirees is *Delphi*, which was

very different.  In that case, the debtors were not liquidating and the modification of Delphi's

legacy liabilities for its retirees was a critical component of its reorganization plan.

37.    For all of the foregoing reasons, the Court should determine that section 1114 is

inapposite to these cases and deny the Motion.

**D.    Alternatively, If The Court Appoints A Retiree Committee, Its Role and Professional Fees Should be Limited**

38.    In *Delphi*, the court found that the debtors had met their factual burden of

demonstrating that they had the right to modify or terminate the benefit plans and, therefore,

section 1114 was inapplicable.  *Delphi*, 2009 Bankr. LEXIS 576, at *23.  Nevertheless, the Court

appointed a retiree committee for the limited purpose of determining whether any group of retirees

would have vested rights.  Notably, the Court gave the retiree committee a limited mandate and

set a $200,000 budget for its professionals.  *Id.* at *25.

39.    To be able to confirm and effectuate their Plan, the Debtors have a critical need to

conserve cash. The Debtors' prompt emergence from chapter 11 is a matter of vital importance

given the ongoing costs of administrating these cases.

40.    The Debtors, therefore, request that, should the Court appoint a retiree committee,

the Court should limit the mandate of such a committee, limit the time within which the purpose

must be completed, and limit the expenses of the committee's professionals to no more than

$200,000.

15

## **CONCLUSION**

41.    For the foregoing reasons, the Debtors submit that the Motion should be denied.

Dated: June 14, 2019
New York, New York

/s/ *Jacqueline Marcus*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\97064319\11\73217.0004

## EXHIBIT A

### Summary Plan Description

# SEARS HOLDINGS

# Sears Retiree Group Life Insurance Plan

*Summary Plan Description*



Sears Group Life Insurance Plan was amended on November 1, 1992, to discontinue providing any life insurance coverage except to retirees and certain disabled associates.  It has been renamed the Sears Retiree Group Life Insurance Plan ("the Plan").  The Plan is sponsored and maintained by Sears, Roebuck and Co. ("Sears").

This Summary Plan Description describes the provisions of the Plan in effect as of January 1, 2007.  It applies to you if you were covered by the Plan as of January 1, 1997 or became covered by the Plan on or after January 1, 1997 in accordance with the provisions outlined.  Associates who retired after December 31, 1997, were not eligible for any coverage under the Plan unless they retired during 1998 under the Special Leave of Absence Provision described in this booklet.

Sears has the right to change or terminate the Plan at any time and for any reason.

# TABLE OF CONTENTS

**RETIREE LIFE INSURANCE** ........................................................... **1**
  **Eligibility**........................................................................................... **1**
  **Termination of Insurance** ................................................................. **2**
  **Amount of Retiree Life Insurance** ................................................... **2**
**PREMIUM WAIVER LIFE INSURANCE**........................................ **4**
  **Eligibility**........................................................................................... **4**
  **Termination of Insurance** ................................................................. **4**
  **Amount of Premium Waiver Life Insurance** ................................... **4**
**SPECIAL PROVISIONS – COLDWELL BANKER & CO.** .................. **4**
  **Retiree Life Insurance** ..................................................................... **4**
  **Premium Waiver Life Insurance** ..................................................... **5**
**SPECIAL PROVISIONS – HOMART** ............................................. **6**
  **Retiree Life Insurance** ..................................................................... **6**
  **Premium Waiver Life Insurance** ..................................................... **7**
**SPECIAL PROVISIONS – NTW and TIRE AMERICA** ................... **8**
  **Premium Waiver Life Insurance** ..................................................... **8**
  **Termination of Insurance** ................................................................. **9**
**RETIREE LIFE INSURANCE REDUCTIONS**................................. **9**
  **Special Handlings**............................................................................. **10**
**PAYMENT OF BENEFITS** ............................................................ **11**
  **Accelerated Benefits**........................................................................ **11**
**CONVERSION PRIVILEGE** .......................................................... **13**
**HOW TO FILE A DEATH CLAIM** ................................................ **13**
**DEFINITIONS** ............................................................................... **15**
**OTHER PROVISIONS** .................................................................. **16**
  **Incontestability** ................................................................................ **16**
  **Right of Recovery**............................................................................. **16**
  **Misstatements or Clerical Error** ..................................................... **16**
  **Assignment**........................................................................................ **17**
  **Payment to a Minor** ......................................................................... **17**
  **Facility of Payment** .......................................................................... **17**
  **Optional Method of Settlement** ....................................................... **18**
  **Legal Actions** ................................................................................... **18**
  **Plan Discontinuance**......................................................................... **18**
**ABOUT THE PLAN** ...................................................................... **18**
  **Plan Name and Identification** ......................................................... **18**
  **Type of Plan** ..................................................................................... **18**
  **Plan Year** ......................................................................................... **19**
  **Plan Administration**......................................................................... **19**
  **Where to Serve Legal Process** ......................................................... **19**
  **Availability of the Insurance Contract**........................................... **19**
  **Plan Financing**.................................................................................. **19**
  **Plan Amendment and Termination** ................................................. **20**
  **Surrender Value** ............................................................................... **20**
**ERISA RIGHTS**............................................................................. **20**

**PARTICIPATING COMPANIES**

The Sears Retiree Group Life Insurance Plan (the "Plan") covers disabled associates and retirees of Sears, Roebuck and Co. and the following entities:

- Sears National Bank;
- Sears Investment Management Co.;
- Sears Roebuck Acceptance Corp.;
- Sears Roebuck de Puerto Rico, Inc.;
- Sears Buying Services, Inc.;
- Sears Logistics Services, Inc., and
- Sears Shop-At-Home Services, Inc.

(collectively referred to as "Sears").

It also covers eligible disabled associates and retirees of the following companies only as described in the Special Provisions sections of this booklet:

- Coldwell Banker Residential Group;
- Coldwell Banker Parent;
- Sears Mortgage Banking Group;
- Homart Development Co.;
- NTW; and
- Tire America.

**RETIREE LIFE INSURANCE**

**Eligibility**

You are eligible for Retiree Life Insurance under the Plan if you:

- were insured under the Plan as a retiree on December 31, 1996; *or*

- were insured under the Plan or the Allstate Group Life Insurance Plan as an associate on October 31, 1992, and you retired from Sears after December 31, 1996 but before January 1, 1998 in accordance with Sears established retirement policies.  To be eligible for Retiree Life Insurance, at the time you retired you must have been:

  −at least 55 years of age with at least 20 years of continuous service; *or*
  −at least 60 years of age with at least 10 years of continuous service.

However, you are not eligible for Retiree Life Insurance if your continuous service lapsed on or after November 1, 1992 and prior to your retirement.  Continuous service is determined in accordance with Sears established personnel policy.
Associates who retired from Sears on or after January 1, 1998, are not eligible for Retiree Life Insurance.

**Exception – "Special Leave of Absence Provision":**  Associates who, as of December 31, 1997, were at least 55 years of age with at least 20 years of continuous service or at

least 60 years of age with at least 10 years of continuous service, and, as of December 31, 1997:

- were on an approved Illness, Workers Compensation, Family Care, Layoff, or Unit Closing Leave of Absence; *or*

- had received an offer of benefits under a Sears Closed Unit/Reorganization Severance Plan or a similar Plan maintained by a participating company but who had not yet been placed on Leave of Absence;

were eligible for Retiree Life Insurance if they were insured under the Plan or the Allstate Group Life Insurance Plan as an associate on October 31, 1992, and retired from Sears on or before December 31, 1998, in accordance with Sears established retirement policies. However, associates are not eligible for Retiree Life Insurance if continuous service lapsed on or after November 1, 1992 and prior to retirement. Continuous service is determined in accordance with Sears established personnel policy.

Retiree Life Insurance began on the day following your retirement date. For retirees whose insurance is being continued under the Premium Waiver provision, Retiree Life Insurance began on the day following termination of coverage under the Premium Waiver provision. Effective January 1, 1998, this Retiree Life Insurance will be subject to the reductions described in the section entitled "Retiree Life Insurance Reductions".

**Termination of Insurance**
Your Retiree Life Insurance terminates on the earlier of:

- the date the Plan is changed to end insurance for retirees;

- the date the Plan or the Group Policy terminates; *or*

- the date you fail to make any required contributions.

**Amount of Retiree Life Insurance**
Your Amount of Life Insurance is described below. MetLife will pay the described amount if:

- you die while insured under the Retiree Life Insurance provision of the Plan; and

- MetLife receives due proof of claim.

Payment will be made in accordance with the section entitled "Payment of Benefits".

1.     Retirees who were insured as retired associates under the Plan on December 31, 1996, shall continue to be insured for the Amount of Retiree Life Insurance granted them in accordance with the provisions of the Plan in effect at the time they retired. However, effective January 1, 1998, the Amount of Retiree Life Insurance became subject to the reductions described in the section entitled "Retiree Life Insurance Reductions."

2

2. Associates who:

- were insured under the plan or the Allstate Group Life Insurance Plan on August 31, 1987; *and*

- remained continuously employed and continuously insured under the Plan or the Allstate plan from September 1, 1987 through October 31, 1992, and who retired from Sears on or after January 1, 1997 and before January 1, 1998, or in accordance with the Special Leave of Absence Provision,

  will be eligible for an Amount of Retiree Life Insurance equal to the greater of:

- 40% of the Amount of Life Insurance in effect on August 31, 1987, up to a maximum Amount of Retiree Life Insurance of $100,000; *or*

- 20% of the Amount of Basic Life Insurance at Option B1 in effect on October 31, 1992, up to a maximum Amount of Retiree Life Insurance of $10,000, and a minimum Amount of Retiree Life Insurance of $2,000.

However, effective January 1, 1998, the Amount of Retiree Life Insurance became subject to the reductions described in the section entitled "Retiree Life Insurance Reductions", even if associates have not yet retired.

3. All other associates who were insured as active associates under the Plan or the Allstate Group Life Insurance Plan on October 31, 1992, became eligible if they retired from Sears on or after January 1, 1997 but before January 1, 1998, or in accordance with the Special Leave of Absence Provision, for an Amount of Retiree Life Insurance equal to 20% of the Amount of Basic Life Insurance at Option B1 in effect on October 31, 1992, up to a maximum Amount of Retiree Life Insurance of $10,000, and a minimum Amount of Retiree Life Insurance of $2,000. However, effective January 1, 1998, the Amount of Retiree Life Insurance became subject to the reductions described in the section entitled "Retiree Life Insurance Reductions", even if associates have not yet retired.

Associates who terminated employment prior to retirement are not eligible for an Amount of Retiree Life Insurance unless they were subsequently reinstated with continuous service in accordance with the Sears personnel policy and subsequently retired. However, associates who retired on or after January 1, 1998, are not eligible for an Amount of Retiree Life Insurance unless they retire in accordance with the Special Leave of Absence Provision.

**PREMIUM WAIVER LIFE INSURANCE**

**Eligibility**
You are eligible for Life Insurance under the Premium Waiver provision (referred to by MetLife as "Waiver of Contributions") if you were covered under the Premium Wavier provision of the Plan on December 31, 1996, for a Total Disability which began prior to November 1, 1992.

**Termination of Insurance**
Your Premium Waiver Life Insurance terminates in accordance with the terms of the Plan in effect at the time you became Totally Disabled.

When Premium Waiver Life Insurance terminates, retirees may be eligible for Retiree Life Insurance.  Otherwise, coverage under the Plan terminates.  However, if you die during the period in which you were eligible to exercise the Conversion Privilege described later in this booklet, MetLife will pay a death benefit equal to the maximum amount of your Premium Waiver Life Insurance that you were eligible to convert, whether or not you actually applied for conversion.

**Amount of Premium Waiver Life Insurance**
Associates whose insurance is being continued under the Premium Waiver provision shall be insured for an Amount of Life Insurance as described by the Plan provisions in effect at the time they became Totally Disabled.

MetLife will pay the described Amount of Life Insurance if:

- you die while insured under the Premium Waive provisions of the Plan; and
- MetLife receives due proof of claim.

Payment will be made in accordance with the section entitled "Payment of Benefits".


**SPECIAL PROVISIONS – COLDWELL BANKER & CO.**

Special Provisions, effective May 1, 1994, apply to the following participants:

**Retiree Life Insurance**
Employees who retired from Sears Mortgage Banking Group of Coldwell Banker & Co. on or prior to November 30, 1993, shall continue to be insured for the Amount of Life Insurance in effect under the Coldwell Banker & Co. Retiree Group Life Insurance Plan ("the Coldwell Banker Plan") on April 30, 1994.  However, effective January 1, 1998, the Amount of Retiree Life Insurance became subject to the reductions described in the section entitled "Retiree Life Insurance Reductions".

Employees who retired from Coldwell Banker Residential Group of Coldwell Banker & Co. on or prior to October 8, 1993 shall continue to be insured for the Amount of Life

Insurance in effect under the Coldwell Banker Plan on April 30, 1994, subject to contributions being paid as described below.*

Employees who retired from the Coldwell Banker Parent division of Coldwell Banker & Co. on or prior to December 31, 1993 shall continue to be insured for the Amount of Life Insurance in effect under the Coldwell Banker Plan on April 30, 1994, subject to contributions being paid as described below.*

* Retired employees of the Coldwell Banker Resident Group and the Coldwell Banker Parent division were required to contribute a portion of the total premium due for Life Insurance in effect between May 1, 1994 and April 30, 1995.  Effective May 1, 1995 the total premium due for Life Insurance became payable solely by these retired employees.

MetLife will pay the described Amount of Life Insurance if:

- you die while insured under the special Retiree Life provisions of the Plan; and
- MetLife received due proof of claim.

Payment will be made in accordance with the section entitled "Payment of Benefits".

**Termination of Insurance**

Your Retiree Life Insurance terminates on the earlier of:

- the date the Plan is changed to end insurance for retirees;
- the date the Plan or the Group Policy terminates; _or_
- the date you fail to make any required contributions.

**Premium Waiver Life Insurance**

Employees of:

- Coldwell Banker Residential Group who were Totally Disabled on October 8, 1993;
- Coldwell Banker Parent who were Totally Disabled on December 31, 1993; and
- Sears Mortgage Banking Group who were Totally Disabled on November 30, 1993;

shall continue to be insured for the Amount of Life Insurance in effect under the Coldwell Banker & Co. Group Life Insurance Plan on April 30, 1994.

MetLife will pay the described Amount of Life Insurance if:

- you die while insured under these provisions of the Plan; and
- MetLife receives due proof of claim.

Payment will be made in accordance with the section entitled "Payment of Benefits".

**Termination of Insurance**

Your Premium Waiver Life Insurance terminates on the earliest of:

- the end of the month in which you attain age 65;

- the date your Total Disability ends;

- the date you fail to give MetLife required proof of Total Disability;

- the date you fail to submit to a required exam;

- the date Sears no longer pays any required premium;

- the date the Plan is changed to end insurance for the class to which you belong; *or*

- the date the Plan or the Group Policy terminates.

When Premium Waiver Life Insurance terminates, coverage under this Plan terminates. However, if you die during the period in which you were eligible to exercise the Conversion Privilege described later in this booklet, MetLife will pay a death benefit equal to the maximum amount of the Premium Waiver Life Insurance that you were eligible to convert, whether or not you actually applied for conversion.

## SPECIAL PROVISIONS – HOMART

Special Provisions, effective April 1, 1996, apply to the following participants:

**Retiree Life Insurance**

Employees who retired from Homart prior to January 1, 1990, shall be insured for 40% of the Amount of Life Insurance in effect under the Homart Group Basic Life Insurance Plan ("the Homart Plan") on the date of retirement, maximum $100,000; provided that they qualified for Retiree Life Insurance under the Homart Plan and their insurance is not being continued under the special Premium Waiver provisions of this Plan. However, effective January 1, 1998, the Amount of Retiree Life Insurance became subject to the reductions described in the section entitled "Retiree Life Insurance Reductions".

Employees who retired from Homart on or after January 1, 1990, shall be insured for:

- 40% of the Amount of Life Insurance in effect under the Homart Plan on December 31, 1989, maximum $100,000, if any; *or*

- $10,000, if not covered under the Homart Plan on December 31, 1989, but covered under the Homart Plan on the earlier of the date of retirement or October 31, 1992;

  provided that:

- they were hired prior to November 1, 1992;

- they qualified for Retiree Life Insurance under the Homart Plan;* *and*

- their insurance is not being continued under the special Premium Waiver provisions of this Plan.

* To qualify for Retiree Life Insurance under the Homart Plan, an employee must have:
   a. retired from Homart in accordance with Homart's established retirement policies,
   b. been a member of the Homart Plan at the time of Retirement, and
   c. been covered by the Homart Plan for 10 or more consecutive years at the time of retirement (counting the period of time on Unit Closing Leave of Absence, if Unit Closing Leave preceded retirement).

Retirees will be considered to have satisfied the criteria outlined in subsection (b) above if they were members of the Homart Plan at the time they were placed on Unit Closing Leave of Absence or March 31, 1996, whichever is earlier.

Retirees will be considered to have satisfied the criteria outlined in subsection (c) above if failure to attain 10 years in the Homart Plan at the time of retirement was due solely to termination of the Homart Plan on March 31, 1996.

Retiree Life Insurance under this Plan began on the later of:

- April 1, 1996; *or*

- the day following retirement from Homart,

unless life insurance was continued on the date under the special Premium Waiver provisions of this Plan.  In this case, Retiree Life Insurance began on the day following termination of coverage under the Premium Waiver provision.  However, effective January 1, 1998, the Amount of Retiree Life Insurance became subject to the reductions described in the section entitled "Retiree Life Insurance Reductions".

MetLife will pay the described Amount of Life Insurance if:

- you die while insured under the special Retiree Life provisions of the Plan; and

- MetLife receives due proof of claim.

**Termination of Insurance**
Your Retiree Life Insurance terminates on the earlier of:

- the date the Plan is changed to end insurance for retirees;

- the date the Plan or the Group Policy terminates; *or*

- the date you fail to make a required contribution.

**Premium Waiver Life Insurance**
Employees and former employees of Homart who, on March 31, 1996, were covered by, or were in the Waiting Period to be covered by, the Disability Continuation (Premium Waiver) provisions of the Homart Plan, shall continue to be insured for life insurance and Sears will pay the premium.  The amount of Premium Waiver Life Insurance is equal to the Amount of Life Insurance in effect under the Homart Plan on the date of disability.

7

MetLife will pay the described Amount of Life Insurance if:

- you die while insured under these provisions of the Plan; and
- MetLife receives due proof of claim.

Payment will be made in accordance with the section entitled "Payment of Benefits".

**Termination of Insurance**
Premium Waiver Life Insurance will continue until the earliest of:

- the end of the month in which you attain age 60;
- the date your Total Disability ends;
- the date you fail to give MetLife required proof of Total Disability;
- the date you fail to submit to a required exam;
- the date Sears no longer pays any required premium;
- the date the Plan is changed to end insurance for the class to which you belong; *or*
- the date the Plan or the Group Policy terminates.

When Premium Waiver Insurance terminates, retirees may be eligible for Retiree Life Insurance. Otherwise, coverage under this Plan terminates. However, if you die during the period in which you were eligible to exercise the Conversion Privilege described later in this booklet, MetLife will pay a death benefit equal to the maximum amount of the Premium Waiver Insurance that you were eligible to convert, whether or not you actually applied for conversion.

## SPECIAL PROVISIONS – NTW and TIRE AMERICA

Special Provisions, effective April 1, 1997, apply to the following participants:

**Premium Waiver Life Insurance**
Employees of NTW Incorporated and Tire America who, on March 31, 1997, were covered by, or were in the Waiting Period to be covered by, the Continued Life Insurance (Premium Waiver) provisions of the NTW Life Insurance Plan ("the NTW Plan") or Tire America Life Insurance Plan ("the Tire America Plan"), shall continue to be insured for life insurance and Sears will pay the premium. The amount of Premium Waiver Life Insurance is equal to the Amount of Life Insurance in effect under the NTW Plan or Tire America Plan on the date of disability.

MetLife will pay the described Amount of Life Insurance if:

- you die while insured under these provisions of the Plan; and
- MetLife receives due proof of claim.

Payment will be made in accordance with the section entitled "Payment of Benefits".

**Termination of Insurance**

Premium Waiver Life Insurance will continue until the earliest of:

- the end of the month in which you attain age 60;

- the date your Total Disability ends;

- the date you fail to give MetLife required proof of Total Disability;

- the date you fail to submit to a required exam;

- the date Sears no longer pays any required premium;

- the date the Plan is changed to end insurance for the class to which you belong; *or*

- the date the Plan or the Group Policy terminates.

When Premium Waiver Insurance terminates, coverage under this Plan terminates. However, if you die during the period in which you were eligible to exercise the Conversion Privilege described later in this booklet, MetLife will pay a death benefit equal to the maximum amount of the Premium Waiver Insurance that you were eligible to convert, whether or not you actually applied for conversion.

## RETIREE LIFE INSURANCE REDUCTIONS

Except as otherwise provided in the "Special Handlings" section, effective January 1, 1998, your Amount of Retiree Life Insurance began reducing over a ten-year period ending January 1, 2007. Effective January 1, 2007, your final Amount of Retiree Life Insurance payable from this Plan will be $5,000.

The amount of the annual Retiree Life Insurance Reductions will be calculated as follows:

> Amount of Retiree Life Insurance subject to reduction
> Minus $5,000
> Divided by 10
> Equals the annual incremental reduction

The reductions will be effective during your lifetime as follows:

Reduction #1      January 1, 1998
Reduction #2      January 1, 1999
Reduction #3      January 1, 2000
Reduction #4      January 1, 2001
Reduction #5      January 1, 2002
Reduction #6      January 1, 2003
Reduction #7      January 1, 2004
Reduction #8      January 1, 2005
Reduction #9      January 1, 2006
Reduction #10      January 1, 2007

**Special Handlings**

- The following groups of retired associates will not be subject to the Retiree Life Insurance Reductions described above:

  – those who have an Amount of Retiree Life Insurance of $5,000 or less.

  – those who retired prior to January 1, 1978.

  – those who retired from Coldwell Banker Residential Group or Coldwell Banker Parent Division who are paying the total premium due for Retiree Life Insurance as described in the "Special Provisions" sections.

- Retired and former employees who are covered by the Premium Wavier provisions of the Plan were not be subject to the Retiree Life Insurance Reductions described above. Upon termination of Premium Waiver Life Insurance, the Retiree Life Insurance Reductions described above will be applied to the Amount of Retiree Life Insurance as though the reductions had started on January 1, 1998.

- Retired employees who were under age 60 as of January 1, 1998, and paying contributions for their Retiree Life Insurance under the provisions of the Plan in effect prior to 1987 were not be subject to the Retiree Life Insurance Reductions described above until 30 days after their 60th birthday. At that time, in accordance with the Plan provisions in effect prior to 1987, the Amount of Retiree Life Insurance reduces to 40% of its former amount (maximum $100,000). The amount of Retiree Life Insurance was then further reduced by the January 1, 1998 Retiree Life Insurance Reduction described above.

- The Amount of Retiree Life Insurance for an eligible associate who retired after January 1, 1998 but prior to January 1, 1999, was reduced at the time of retirement by the January 1, 1998 Retiree Life Insurance Reduction described above. The January 1, 1999 reduction then became effective on January 1, 1999.

10

**PAYMENT OF BENEFITS**

If you should die while insured under the Plan, after receiving proof of your death, MetLife will pay your Amount of Life Insurance to your beneficiary as described in this section or as provided in the section entitled "Facility of Payment".

At the time your Life Insurance coverage began, you should have designated the person(s) or organization(s) as the beneficiary(ies) to whom death benefits will be paid. Beneficiary designations made under the Coldwell Banker Plan, Homart Plan, NTW Plan, or Tire America Plan will be recognized as beneficiary designations under this Plan.

You have the right to change your beneficiary designation (unless you have assigned that right) by filing a written request with Sears Retiree Service Center (RSC). Call the RSC at **1-800-762-7327** to receive the necessary form. A form for that purpose can be obtained from the Sears Retiree Service Center if you are a retired associate, or from the HR Support Center if you are covered under the Premium Waiver provisions. The change will become effective when recorded by Sears, and will not affect any prior payments made by MetLife. MetLife will not incur any additional liability because of a change in your beneficiary designation that is recorded after payments have been made.

If you name more than one beneficiary, unless you specify otherwise, the surviving beneficiaries will share benefits equally.

If there is no surviving beneficiary at the time of your death, or if no beneficiary was named, MetLife has the option to pay benefits to your estate or to any of the following of your surviving relatives: spouse, children, parent(s), or brothers and sisters.

If you apply for an individual policy as described in "Conversion Privilege" and die within the period during which you are eligible to exercise the Conversion Privilege, the beneficiary you have named for the conversion insurance will be the beneficiary for any death benefits under the Plan, even if you had previously named a different beneficiary.

**Accelerated Benefits**

Accelerated Benefits will be payable to you if:

- MetLife receives and accepts a Physician's certification that your life span is drastically limited, you are not expected to recover, and you are not expected to live longer than six months; *and*

- payment is requested by you or your legal representative.

Each of the above events must occur while your Life Insurance coverage is in effect.

The amount of Accelerated Benefits payable:

- may be any amount up to 50% of your Amount of Life Insurance;

- is determined as of the date MetLife accepts the required Physician's certification;

- may not exceed $250,000; *and*

- may not be:

  −less than $5,000 if Accelerated Benefits are paid before January 1, 1998; *or*

  −less than $2,500 if Accelerated Benefits are paid on or after January 1, 1998.

If your Amount of Life Insurance will reduce within six months of the date certification is accepted, the Accelerated Benefits payable will be up to 50% of the reduced amount.

Accelerated Benefits are payable only once, and only if you are living when payment is made.  Benefits will be payable when MetLife receives satisfactory written proof of the conditions which require a physician's certification.  MetLife has no duty to ask for proof.  Any delay in submitting proof will not cause a claim to be denied if the proof is sent as soon as reasonably possible.  When proof is provided, MetLife may have you examined by Physicians of its choice and at its expense.

Payment of Accelerated Benefits will reduce your Amount of Life Insurance and the amount available for you to convert to a personal life insurance policy under the provision entitled "Conversion Privilege".

Please note that Accelerated Benefits may be taxable.  If so, you or your beneficiary may incur a tax obligation.  As with all tax matters, you should consult your personal tax advisor to assess the impact of this benefit.

Accelerated Benefits will not be payable if:

- your Life Insurance is being continued under the Premium Waiver provisions and your Life Insurance is due to terminate within the next 24 months;

- you have assigned your Life Insurance as described under the provision entitled "Assignment";

- your life expectancy is limited as a result of attempted suicide or injuring yourself on purpose;

- your Amount of Life Insurance is:

  −less than $10,000 if payment of Accelerated Benefits is requested prior to January 1, 1998; *or*

  −less than $5,000 if payment of Accelerated Benefits is requested on or after January 1, 1998;

- you are required to pay all or a portion of your Amount of Life Insurance to your former spouse as part of a divorce agreement; *or*

- you are required by a government agency to request payment of Accelerated Benefits in order to apply for, obtain, or keep a government benefit or entitlement.

**CONVERSION PRIVILEGE**

As described below, you have a right to convert your Group Life Insurance to an individual policy.  To exercise that right, you must apply for the individual policy and pay the first premium within the later of:

- 31 days after the date your Group Life Insurance Terminates; *or*

- 15 days after you are given notice of this conversion privilege, but no later than 91 days after your Group Life Insurance terminates.

You have a conversion right if your Life Insurance terminates because you are no longer eligible for insurance under the Plan.  The maximum amount you may then convert is your Amount of Life Insurance on the date your Life Insurance terminates.

You also have a conversion right if:

- your Group Life Insurance under the Plan has been in effect for at least five years; *and*

- your Life Insurance terminates because the Group Policy has terminated or has been changed to terminate Life Insurance for the class to which you belong; provided that the maximum amount you may then convert is the lesser of:

  –$10,000; *or*

  –your Amount of Life Insurance on the date your Life Insurance terminates, reduced by any amount of Group Life Insurance you become eligible for during the next 31 days.

You do not have to provide evidence of insurability in order to convert your insurance.  The individual policy will not have disability, accidental death, or other additional benefits.

The individual policy will be one of the policy forms usually issued by MetLife, but not term insurance.  The premium rate will be based on the form and amount of the policy, as well as the class or risk to which you belong and your age on the date the policy is issued.

If you die during the period in which you may apply for conversion, Life Insurance benefits will not be paid under the Plan unless the individual policy is surrendered to MetLife without a claim other than for return of premiums paid less any indebtedness.

**HOW TO FILE A DEATH CLAIM**

Your beneficiary or other survivor should notify the Sears Retiree Service Center (RSC) of your death at **1-800-762-7327**.  The RSC will file a death claim with MetLife.  Upon receipt of a certified copy of the Death Certificate, along with other needed documents, MetLife will process the claim.  Claim payments are made by MetLife.

**What if the Claim is Denied?**

If your claim is denied, the claimant will receive a written explanation that will:

- Be written in an understandable manner;

- State the specific reasons for the denial;

- Set forth the specific references to the pertinent Plan provisions on which the denial is based;

- Include an explanation of the Plan's appeal procedure and the applicable time limits, including a statement of the claimant's right to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on appeal; and

- If the claim was denied because specific information or material was not submitted to the Plan Administrator, the notice will describe the additional information or material required in connection with the claim, including an explanation of why such information or material is necessary.

If the claimant does not hear anything from MetLife within 90 days (or within 180 days if you are notified that an extension is needed), the claimant can assume the claim has been deemed denied.

The claimant will have 60 days after receiving the written claim denial in which to appeal the denial in writing to:

> MetLife
> Group Life Claims Office
> P.O. Box 3016
> Utica, NY 13504

MetLife will reevaluate all the information, and the claimant will be informed of the decision on appeal within 60 days after the date the appeal is received; provided that MetLife may extend the review period up to 60 days by notifying the claimant of the extension before the expiration of the first 60-day period in a timely manner. If MetLife denies the appeal, the claimant will receive a written determination notice that will:

- Be written in an understandable manner;

- State the specific reasons for the denial;

- Set forth the specific references to the pertinent Plan provisions on which the appeal denial is based;

- Explain that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records and other information relevant to the claim for benefits; and

- State that the claimant has the right to bring a civil action under ERISA Section 502(a).

14

**DEFINITIONS**

**Injury** means accidental bodily injury.

**Physician** means a person who is legally licensed to practice medicine.  A licensed practitioner will be considered a Physician if:

a.    there is a law that applies to this Group Policy and that law requires that any service performed by such a practitioner must be considered for benefits on the same basis as if the service was performed by a Physician; *and*

b.    the service performed by the practitioner is within the scope of his or her license.

**Sickness** means pregnancy or any disease that causes or contributes to deterioration in the state of health of the afflicted person.

**Special Leave of Absence Provision means:**

■  you were insured under the Plan or the Allstate Group Life Insurance Plan as an associate on October 31, 1992;

■  you were on an approved Illness, Family Care, Workers Compensation, Layoff, or Unit Closing Leave of Absence on December 31, 1997, or were offered benefits under a Sears Closed Unit/Reorganization Severance Allowance Plan or a similar Plan maintained by a participating company as of December 31, 1997, but had not yet been placed on leave of absence;

■  as of December 31, 1997, you are at least 55 years of age with at least 20 years of continuous service or at least 60 years of age with at least 10 years of continuous service; *and*

■  you retired in accordance with Sears established retirement policies on or before December 31, 1998.

**The Allstate Plan** means the Allstate Group Life Insurance Plan.

**The Coldwell Banker Plan** means the Coldwell Banker & Co. Retiree Group Life Insurance Plan.

**The Homart Plan** means the Homart Group Basic Life Insurance Plan.

**The NTW Plan** means the NTW Life Insurance Plan.

**The Plan** or **this Plan** means the Sears Retiree Group Life Insurance Plan.

**The Tire America Plan** means the Tire America Life Insurance Plan.

For disabilities beginning *prior to* July 1, 1989, **Total Disability** means that due to a Sickness or Injury:

15

- during the Waiting Period and during the next 12 consecutive months, you are unable to perform the material duties of your regular occupation with Sears; *and*

- thereafter, you are unable to perform the material duties of any gainful occupation for which you are reasonably fit, based on training, education, or experience.

For disabilities beginning *on or after* July 1, 1989, **Total Disability** means that due to a Sickness or Injury you are unable to perform the material duties of any gainful occupation for which you are reasonably fit, based on training, education, or experience.

**Waiting Period** means a period of 140 days out of a 180-consecutive-day period of Total Disability due to the same or related Sickness or Injury, and begins on the first day of Total Disability.

**You** and **Your** means the disabled associate or retired associate who is a covered person for Life Insurance under the Plan.

## OTHER PROVISIONS

### Incontestability
The Policy cannot be contested after it is in force for two years, except for non-payment of premiums.  No Statement made by you can be used in a contest after your insurance has been in force during your lifetime for two years.  No statement of yours can be used in any contest unless it is in writing and signed by you, and a copy was given to you or your beneficiary.

### Right of Recovery
If payments have been made by MetLife in excess of the maximum amount payable under the Plan, MetLife has the right to recover the amount of the excess from your estate or the person to whom payments were made.

### Misstatements or Clerical Error
If your age is misstated, the premiums or contributions will be adjusted as necessary.  If your insurance amount is affected by the misstated age, it will also be adjusted to the amount you are entitled to at your correct age.

A clerical error will not void insurance that should be in force, nor will it continue insurance that has ended.  When an error is found, a fair adjustment in the premium, contribution, or amount of insurance will be made.

**Assignment**

The insurance with respect to the Amount of Life Insurance may be assigned as a gift. Any such assignment will transfer all right, title, interest, and incidents of ownership, both present and future, in such benefits, including but not limited to the following:

- the privilege of obtaining an individual policy of life insurance; and

- the right to change the beneficiary.

No assignment will be binding on MetLife nor on Sears unless the assignment is in a form which is acceptable to MetLife and to Sears.  Valid assignments made under the Coldwell Banker Plan, the Homart Plan, the NTW Plan, and the Tire America Plan will be recognized as assignments under this Plan.

Neither MetLife nor Sears assumes any obligation as to the validity or the sufficiency of any assignment.

No other benefits under the Plan may be assigned prior to a loss.

**Payment to a Minor**

If any benefit under the policy becomes payable, MetLife may pay the benefit, but no more than $2,000 to any person who has incurred expense with the insured's fatal illness or burial.

If any beneficiary is:

- a minor; or

- in MetLife's opinion, legally incapable of giving valid receipt for any payment due him/her and MetLife has not received a request from an appointed guardian or other legally appointed representative,

then MetLife may make payment, not to exceed $2,000, to an individual or institution it believes has assumed custody or principal support of your beneficiary. If on the date of the insured's death, the insured was covered for more than $2,000, the remaining balance will be held in a liability account until the beneficiary documentation required  to release the remaining balance is received.

**Facility of Payment**

If there is no beneficiary at the time of the insured's death for any amount payable because of the insured's death, the amount will be paid to your estate.  However, we may instead pay all or part of the amount to one or more of the following persons related to the insured and survived by the insured
1. spouse        2. child        3. parent        4. brother and sister

Any payment will discharge MetLife's liability for the amount so paid.

17

**Optional Method of Settlement**

Your beneficiary has the option of having the Life Insurance proceeds handled through MetLife's Total Control Account Program.  This program provides for the deposit of insurance proceeds of $5,000 or more per beneficiary into an interest-bearing money market account.  This method of handling Life Insurance proceeds allows the beneficiary to retain total control of, and immediate access to, insurance proceeds through a free, personalized checkbook, while MetLife credits the money with competitive interest rates.  MetLife guarantees both the insurance proceeds and the interest earned in the Total Control Account.

A personalized checkbook is issued to your beneficiary making the money in the account immediately available.  There are no penalties or loss of interest for withdrawal of all or part of the account.

**Legal Actions**

You must wait until you have exhausted your administrative remedies under the Plan, as described under the section "How to File a Death Claim", before you may bring a legal action involving Life Insurance benefits. Legal actions may not be brought more than three years after a claim was or should have been made.

**Plan Discontinuance**

You will be given a written notice by Sears at least 15 days before the date of any discontinuance of the Retiree Life Insurance Plan.

As soon as your insurance ceases, you should contact Sears to find out what rights, if any, you may have to continue your protection.

**ABOUT THE PLAN**

**Plan Name and Identification**

The official name of the Plan is the "Sears Retiree Group Life Insurance Plan", but it is frequently referred to in this booklet as the "Plan".

The Plan is identified by the following numbers in accordance with rules of the Internal Revenue Service:

Employer Identification No. 36-1750680
Plan Number 502

**Type of Plan**

The Plan is a Group Life Insurance Plan governed by the Company's group insurance policy with Metropolitan Life Insurance Company (MetLife), 200 Park Avenue, New York, NY 10166.  The Group Policy is the controlling document in all respects.

18

**Plan Year**
The Plan year is the calendar year, January 1 through December 31.

**Plan Administration**
Effective as of January 1, 2007, the Plan Administrator is the Sears Holdings Corporation Administrative Committee. The Plan Administrator has the authority to determine questions arising under the provisions of the Plan, including the power to determine the rights and eligibility of associates, participants, or any other persons, and to remedy ambiguities, inconsistencies, or omissions.

MetLife has the responsibility of Claim Fiduciary for the provision of full and fair review of claim denials pursuant to Section 503 of ERISA.

In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for the entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

If you have questions about the Plan or your benefits, you should contact the Sears Retiree Service Center or write the Plan Administrator at the following address:

> Sears Holdings Corporation Administrative Committee
> Sears Retiree Group Life Insurance Plan
> Sears, Roebuck and Co. D707/BEN
> 3333 Beverly Road
> Hoffman Estates, IL 60179

**Where to Serve Legal Process**
Legal process may be served at the address provided immediately above.

**Availability of the Insurance Contract**
This booklet is the Summary Plan Description (SPD), and describes the key provisions of the Plan and the benefits insured by MetLife as they relate to the participants of the Plan. Complete provisions of the Plan are found in the Group Policy and certificate that govern its operation. If any information in this booklet differs from the Group Policy, the Group Policy will prevail. Upon your written request to the Plan Administrator, copies of the Group Policy and other Plan information will be provided to you. The Plan Administrator may make a reasonable charge for the copies.

**Plan Financing**
Coverage under the Plan is paid for by the Company, and you, in some cases. Sears pays monthly premiums to MetLife. Benefits are payable from MetLife.

**Plan Amendment and Termination**

The Company has the right to modify, amend, suspend, or terminate the Plan at any time.

**Surrender Value**

There is no cash surrender value or loan value to the benefits provided by the Plan.

## ERISA RIGHTS

As a participant in the Sears Group Retiree Life Insurance Plan, you are entitled to certain rights and protection under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

- Examine, without charge, at the Plan Administrator's office, and at other specified locations, all Plan documents including insurance contracts, and a copy of the Plan's latest annual report (i.e., IRS Form 5500) filed by the Plan with the IRS and the U.S. Department of Labor ("DOL").

- Obtain, upon written request to the Plan Administrator, copies of the documents governing the operation of the Plan, including the insurance contract, the Plan's latest annual report and the updated summary plan description. The Plan Administrator may impose a reasonable charge for the copies.

- Receive a summary of the Plan's annual report. The Plan Administrator is required by law to furnish each participant with a copy of this "summary annual report."

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. Certain people who operate the Plan are called "fiduciaries" of the Plan. As such they have a duty to act prudently and in the interest of you and other Plan participants and beneficiaries.

No one may discriminate against you in any way to prevent you from obtaining a Plan benefit or exercising your rights under ERISA. If your claim for a Plan benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Plan Administrator review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan Administrator and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Company or the Plan Administrator.

If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or Federal court. If it should happen that Plan fiduciaries misuse

Plan assets or if you are discriminated against for asserting your rights, you may seek assistance from the DOL, or you may file suit in a Federal court.  The court will decide who should pay court costs and legal fees.  If you are successful, the court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Plan, you should contact the Corporate Administration Office or the Plan Administrator.  If you have any questions about this ERISA statement or about your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration ("PWBA"), U.S. Department of Labor, listed in your telephone directory. Alternatively, you could contact the PWBA at:

> Division of Technical Assistance and Inquiries
> Pension and Welfare Benefits Administration
> U.S. Department of Labor
> 200 Constitution Avenue N.W.
> Washington, D.C. 20210

# **EXHIBIT B**

**Termination Notice**

**NOTICE - TERMINATION OF RETIREE GROUP LIFE INSURANCE PLAN**

Sears Holdings Corporation is terminating the Sears Retiree Group Life Insurance Plan (the "Plan"), which provides life insurance benefits to eligible retirees of Sears and its affiliates. The termination will be effective on March 15, 2019. Plan benefits are currently provided under group insurance policies issued to Sears by Securian Financial Group and Allstate Life Insurance Company, which are being cancelled. We have been informed by Securian that you will have the opportunity to convert your coverage to individual life insurance policies effective as of March 15, 2019, at your own cost. You will be receiving information from Securian about your conversion option, and the cost of this coverage, in the coming days.

## **EXHIBIT C**

**Transcript of Record, *In re General Motors Corp.***

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL MOTORS CORPORATION, et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                June 25, 2009

                9:03 AM




B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Motion of Debtors for Entry of an Order Pursuant to

3   11 U.S.C. §§ 361, 362, 363, and 364 (i) Authorizing the Debtors

4   to Obtain Post-petition Financing, Including on an Immediate,

5   Interim Basis; (ii) Granting Superpriority Claims and Liens;

6   (iii) Authorizing the Debtors to Use Cash Collateral; (iv)

7   Granting Adequate Protection to Certain Prepetition Secured

8   Parties; (v) Authorizing the Debtors to Prepay Certain Secured

9   Obligations in Full Within Forty-Five Days; and (vi) Scheduling

10  a Final Hearing Pursuant to Bankruptcy Rule 4001

11

12  HEARING re Motion of Debtors for Entry of Order Pursuant to 11

13  U.S.C. Sections 105, 363, and 364 Authorizing Debtors to (i)Pay

14  Pre-petition Claims of Certain Essential Suppliers, Vendors and

15  Services Providers; (ii)Continue Troubled Supplier Assistance

16  Program; and (iii)Continue Participation in the United States

17  Treasury Auto Supplier Support Program

18

19  HEARING re Motion of Debtors for Entry of Order Pursuant to 11

20  U.S.C. §§ 105(a) and 366 (i)Approving Debtors Proposed Form of

21  Adequate Assurance of Payment; (ii)Establishing Procedures for

22  Resolving Objections By Utility Companies; and (iii)Prohibiting

23  Utilities from Altering, Refusing, or Discontinuing Service

24

25

3

1

2   HEARING re Motion of Debtors for Entry of Orders Pursuant to 11

3   U.S.C. §§ 105, 361, 362, 363, and 507 (i)Authorizing Use of

4   Cash Collateral; (ii)Granting Adequate Protection to the

5   Revolver Secured Parties; (iii)Granting Adequate Protection to

6   the Term Loan Secured Parties, and (iv) Scheduling a Final

7   Hearing Pursuant to Bankruptcy Rule 4001

8

9   HEARING re Application For An Order Pursuant To Sections 327(a)

10  And 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a)

11  Authorizing the Employment and Retention of Evercore Group

12  L.L.C. as Investment Banker and Financial Advisor for the

13  Debtors Nunc Pro Tunc to the Petition Date

14

15  HEARING re Motion of the Debtors Pursuant to 11 U.S.C. § 363

16  for an Order Authorizing the Debtors to Employ and Retain AP

17  Services, LLC As Crisis Managers and to Designate Albert A.

18  Koch as Chief Restructuring Officer, Nunc Pro Tunc to the

19  Petition Date

20

21  HEARING re Motion to Appoint Committee Motion of Ad Hoc

22  Committee of Consumer Victims of General Motors for Appointment

23  of Official Committee of Tort Claimants Pursuant to 11 U.S.C.

24  §1102(a)(2)

25

4

1

2   HEARING re Motion to Appoint Committee Motion for an Order

3   (i)Appointing a Legal Representative for Future Asbestos

4   Personal Injury Claimants; and (ii)Directing the United States

5   Trustee to Appoint an Official Committee of Asbestos Personal

6   Injury Claimants

7

8   HEARING re Application of the General Motors Retirees

9   Association for Order to Appoint a Retiree Committee Pursuant

10  to 11 U.S.C. Section 1114(d)

11

12  HEARING re Motion of Debtors for Entry of Order Pursuant to 11

13  U.S.C. Sections 105(a) and 363(b) (i)Authorizing Debtors to Pay

14  Prepetition Obligations to Foreign Creditors; and

15  (ii)Authorizing and Directing Financial Institutions to Honor

16  and Process Related Checks and Transfers

17

18  HEARING re Motion of the Debtors Pursuant to 11 U.S.C. Sections

19  105(a) and 362 for Entry of (i)Interim and Final Orders

20  Establishing Notification Procedures Regarding Restrictions on

21  Certain Transfers of Interests in the Debtors; and (ii)Orders

22  Scheduling a Final Hearing

23

24

25

5

1

2    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

3    U.S.C. Sections 105(a), 345(b), 363(b) and 363(c) and 364(a),

4    and Fed. R. Bankr. P. 6003 and 6004 (A)Authorizing Debtors to

5    (i)Continue Using Existing Cash Management System; (ii)Honor

6    Certain Pre-petition Obligations Related to Use of Cash

7    Management System; and (iii)Maintain Existing Bank Accounts and

8    Business Forms; (B)Extending Time to Comply with 11 U.S.C.

9    Section 345(b); and (C)Scheduling a Final Hearing

10

11   HEARING re Debtors' Motion Pursuant to Section 363 of the

12   Bankruptcy Code for Authority to Exercise Put Rights

13

14   HEARING re of Debtors for Entry of Order Granting Additional

15   Time to File Reports of Financial Information or to Seek

16   Modification of Reporting Requirements Pursuant to Bankruptcy

17   Rule 2015.3

18

19   HEARING re Application of the Debtors Pursuant to 11 U.S.C. §§

20   327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) for Authority

21   to Employ Weil, Gotshal & Manges LLP as Attorneys for the

22   Debtors, Nunc Pro Tunc to the Commencement Date

23

24

25

6

1

2    HEARING re Application of the Debtors Pursuant to Section

3    327(e) of the Bankruptcy Code and Rules 2014(a) and 2016(b) of

4    the Federal Rules of Bankruptcy Procedure for Authorization to

5    Employ and Retain Jenner & Block LLP as Attorneys for the

6    Debtors, Nunc Pro Tunc to the Commencement Date

7

8    HEARING re Application Under 11 U.S.C. §§327(e) And 328(a)

9    Authorizing Debtors to Employ and Retain Honigman Miller

10   Schwartz And Cohn LLP as Special Counsel for the Debtors, Nunc

11   Pro Tunc to the Petition Date

12

13   HEARING re Application Of Debtors for Entry of Order Pursuant

14   to 28 U.S.C. § 156(c) Authorizing Retention and Employment of

15   The Garden City Group, Inc. as Notice and Claims Agent Nunc Pro

16   Tunc to the Commencement Date

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

7

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtor General Motors Corporation

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   HARVEY R. MILLER, ESQ.

9          STEPHEN KAROTKIN, ESQ.

10         JOSEPH H. SMOLINSKY, ESQ.

11

12   JENNER & BLOCK LLP

13        Proposed Special Counsel for GM

14        919 Third Avenue

15        37th Floor

16        New York, NY 10022

17

18   BY:   PATRICK J. TROSTLE, ESQ.

19

20

21

22

23

24

25

8

1

2     JENNER & BLOCK LLP

3          Proposed Special Counsel for GM

4          330 North Wabash Avenue

5          Chicago, IL 60611

6

7     BY:  DANIEL MURRAY, ESQ.

8          (TELEPHONICALLY)

9

10    KRAMER LEVIN NAFTALIS & FRANKEL LLP

11         Attorneys for Official Committee of Unsecured Creditors

12         1177 Avenue of the Americas

13         New York, NY 10036

14

15    BY:  LAUREN M. MACKSOUD, ESQ.

16         THOMAS MOERS MATER, ESQ.

17         AMY CATON, ESQ.

18

19

20

21

22

23

24

25

9

1

2      UNITED STATES DEPARTMENT OF JUSTICE

3           Office of the United States Trustee

4           33 Whitehall Street

5           21st Floor

6           New York, NY 10004

7

8      BY:   BRIAN S. MASUMOTO, ESQ.

9

10     UNITED STATES DEPARTMENT OF JUSTICE

11          U.S. Attorney's Office

12          86 Chambers Street

13          New York, NY 10007

14

15     BY:   DAVID S. JONES, AUSA

16           MATTHEW L. SCHWARTZ, AUSA

17

18     BINGHAM MCCUTCHEN LLP

19          Attorneys for Deutsche Bank AG

20          399 Park Avenue

21          New York, NY 10022

22

23     BY:   ERIN H. MAUTNER, ESQ.

24           JEFFREY S. SABIN, ESQ.

25

10

1

2    CADWALADER, WICKERSHAM & TAFT LLP

3         Attorneys for U.S. Treasury Auto Task Force

4         One World Financial Center

5         New York, NY 10281

6

7    BY:  LESLIE W. CHERVOKAS, ESQ.

8

9    CADWALADER, WICKERSHAM & TAFT LLP

10        Attorneys for U.S. Treasury Auto Task Force

11        1201 F Street, N.W.

12        Washington, DC 20004

13

14   BY:  DOULAS S. MINTZ, ESQ.

15

16   FARELLA BRAUN & MARTEL LLP

17        Attorneys for

18        Russ Building

19        235 Montgomery Street

20        San Francisco, CA 94104

21

22   BY:  NEIL A. GOTEINER, ESQ.

23

24

25

11

1

2   HONIGMAN MILLER SCHWARTZ AND COHN LLP

3        Attorneys for Debtor/Defendant General Motors Corporation

4        2290 First National Building

5        660 Woodward Avenue

6        Detroit, MI 48226

7

8   BY:  ROBERT B. WEISS, ESQ.

9

10  KELLEY DRYE & WARREN LLP

11       Attorneys for Law Debenture; LBA Realty

12       101 Park Avenue

13       New York, NY 10178

14

15  BY:  JENNIFER A. CHRISTIAN, ESQ.

16

17  MCGUIREWOODS LLP

18       Attorneys for Dominion Retail, Inc.

19       1345 Avenue of the Americas

20       Seventh Floor

21       New York, NY 10105

22

23  BY:  SHAWN R. FOX, ESQ.

24

25

12

1

2    MORGAN, LEWIS & BOCKIUS LLP

3          Attorneys for JPMorgan Chase Bank

4          101 Park Avenue

5          New York, NY 10178

6

7    BY:   RICHARD S. TODER, ESQ.

8          ANDREW GOTTFRIED, ESQ.

9

10   ORRICK, HERRINGTON & SUTCLIFFE LLP

11         Attorneys for Ad Hoc Dealer Committee

12         666 Fifth Avenue

13         New York, NY 10103

14

15   BY:   ALYSSA D. ENGLUND, ESQ.

16

17   SIMMONSCOOPER LLC

18         Attorneys for

19         707 Berkshire Blvd.

20         East Alton, IL 62024

21

22   BY:   ROBERT W. PHILLIPS, ESQ.

23

24

25

13

1

2     SIMPSON THACHER & BARTLETT LLP

3          Attorneys for Citicorp USA, Inc., as Agent

4          425 Lexington Avenue

5          New York, NY 10017

6

7     BY:  PETER V. PANTALEO, ESQ.

8          ANNE L. KNIGHT, ESQ.

9

10    STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

11         Attorneys for Ad Hoc Committee of Unsecured Creditors

12         2323 Bryan Street

13         Suite 2200

14         Dallas, TX 75201

15

16    BY:  SANDER L. ESSERMAN, ESQ.)

17

18    VEDDER PRICE P.C.

19         Attorneys for Export Development Canada

20         1633 Broadway

21         47th Floor

22         New York, NY 10019

23

24    BY:  MICHAEL L. SCHEIN, ESQ.

25

14

1

2    VINSON & ELKINS LLP

3         Attorneys for Mason Capital

4         666 Fifth Avenue

5         26th Floor

6         New York, NY 10103

7

8    BY:  DENIS F. CRONIN, ESQ.

9         CRAIG KORNREICH, ESQ.

10

11   WHITE AND WILLIAMS LLP

12        Attorneys for Nicor Gas

13        One Penn Plaza

14        250 West 34th Street

15        Suite 4110

16

17   BY:  KAREL S. KARPE, ESQ.

18

19

20

21

22

23

24

25

15

1

2    ALLARD & FISH, P.C.

3         Attorneys for Creditor Severstal North America, Inc.

4         535 Griswold

5         Suite 2600

6         Detroit, MI 48226

7

8    BY:  DEBORAH L. FISH, ESQ.

9         (TELEPHONICALLY)

10

11   ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP

12        Attorneys for LBA Realty Fund III; PruSKS Brannan

13        Associates

14        Three Embarcadero Center

15        12th Floor

16        San Francisco, CA 94111

17

18   BY:  IVAN M. GOLD, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

16

1

2    DAVIS POLK & WARDWELL

3        Attorneys for Interested Party Ford Motor Company

4        450 Lexington Avenue

5        New York, NY 10017

6

7    BY:   BRIAN M. RESNICK, ESQ.

8        (TELEPHONICALLY)

9

10   DLA PIPER LLP U.S.

11       Attorneys for Creditor Hewlett Packard

12       550 South Hope Street

13       Suite 2300

14       Los Angeles, CA 90071

15

16   BY:   KAROL K. DENNISTON, ESQ.

17       (TELEPHONICALLY)

18

19

20

21

22

23

24

25

17

1

2   FROST BROWN TODD LLC

3        Lexington Financial Center

4        250 West Main

5        Suite 2800

6        Lexington, KY 40507

7

8   BY:   ROBERT V. SARTIN, ESQ.

9        (TELEPHONICALLY)

10

11   HANGLEY ARONCHICK SEGAL & PUDLIN

12        Attorneys for NCR Corporation

13        One Logan Square

14        18th & Cherry Streets

15        27th Floor

16        Philadelphia, PA 19103

17

18   BY:   MATTHEW A. HAMERMESH, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

18

1

2    MOTLEY RICE, LLC

3         28 Bridgeside Blvd.

4         Mt. Pleasant, SC 29464

5

6    BY:  JEANETTE M. GILBERT, ESQ.

7         (TELEPHONICALLY)

8

9    SCHIFF HARDIN LLP

10        Attorneys for Columbia Gas of Ohio; Columbia Gas of

11        Virginia

12        233 South Wacker Drive

13        Suite 6600

14        Chicago, IL 60606

15

16   BY:  JASON TORF, ESQ.

17        (TELEPHONICALLY)

18

19   SIDLEY AUSTIN LLP

20        Attorneys for Multiple Lenders

21        One South Dearborn

22        Chicago, IL 60603

23

24   BY:  KENNETH P. KANSA, ESQ.

25        (TELEPHONICALLY)

19

STAHL COWDEN CROWLEY ADDIS LLC

    Attorneys for GM National Retiree Association

    55 West Monroe Street

    Suite 1200

    Chicago, IL 60603

BY:   JON D. COHEN, ESQ.

    (TELEPHONICALLY)

20

1                     P R O C E E D I N G S

2              THE COURT:  Good morning.

3              ALL:  Good morning, Your Honor.

4              THE COURT:  GM.  Mr. Miller, good morning.  You want

5     to come on up and give me your recommendation as to how you

6     believe we should proceed both with the DIP which we have on

7     for 9:00 and also for the 9:45 calendar matters?

8              MR. MILLER:  Yes, Your Honor.  Harvey Miller, Weil

9     Gotshal & Manges for the debtors.  Your Honor, there is one

10    matter on the 9:00 calendar, as you pointed out, which is the

11    motion for a final approval of the DIP financing.  I believe,

12    Your Honor, all issues with respect to that have been resolved.

13    And Mr. Karotkin will explain that as we go on.

14             As to the 9:45 calendar, Your Honor, there are listed

15    nine uncontested matters and eight contested matters.  As to

16    those contested matters, Your Honor, essentially, most of them

17    have been resolved with the exception, Your Honor, of the

18    motion for the appointment of an ad hoc committee of asbestos

19    claimants and the motion for the appointment of a retiree

20    committee.  Those two matters are still open, Your Honor, and

21    would be heard at Your Honor's convenience after the 9:45

22    calendar call.

23             The motion, Your Honor, with respect to the retention

24    of Evercore Group LLC, we are requesting, Your Honor, that that

25    matter be adjourned until the hearing scheduled for July 2,

21

1   2009.  We're hopeful to resolve that matter, Your Honor.  We

2   have scheduled tentative meetings with the U.S. trustee's

3   office in an effort to resolve that application.

4            So, Your Honor, basically, there are two matters

5   which will be submitted today for Your Honor's determination

6   with respect to the additional creditors' committees, the

7   request for the appointment of a future representative for

8   future asbestos claimants and the motion for the appointment of

9   a retirees' committee under Section 1114(b) of the Bankruptcy

10  Code.

11           THE COURT:  Okay.  Fair enough.  Do we want to go

12  straight then into DIP financing?

13           MR. MILLER:  Yes.

14           THE COURT:  You're going to hand off to your partner,

15  Mr. Karotkin, on that?

16           MR. MILLER:  I certainly want to, Your Honor.

17           THE COURT:  All right.  Mr. Karotkin, come on up,

18  please?  Good morning.

19           MR. KAROTKIN:  Good morning, Your Honor.  Stephen

20  Karotkin, Weil Gotshal & Manges for the debtors.  As Mr. Miller

21  indicated, Your Honor, we're pleased to report that in

22  connection with the motion to approve the debtor-in-possession

23  financing on a final basis, we have reached a consensus with

24  all of the objecting parties as well as with the creditors'

25  committee and the secured lenders. And that is embodied in a

22

 1    revised order which I have a blackline copy of which I'm please

 2    to hand up to the Court.

 3              THE COURT:  That would be very helpful.  Thank you.

 4              MR. KAROTKIN:  May I approach, sir?

 5              THE COURT:  Yes, sir.

 6              MR. KAROTKIN:  Your Honor, the proposed order

 7    resolves the four objections that were raised which are,

 8    basically, categorized in four categories.  One was by various

 9    governmental entities with respect to liens they have as to

10    personal property and real property.  One is with respect to

11    NCR as to their assertion of a constructive trust.  There was

12    another objection by Deutsche Bank with respect to the payment

13    of hedging obligations under the outstanding revolving credit

14    facility.  And the final objection related to a landlord which

15    wanted its lease hold interests -- the debtors' lease hold

16    interests with respect to its property carved out of the

17    collateral grant.  And all of those issues have been addressed

18    in the order.

19              THE COURT:  All right.  Do you want to pause and give

20    any counterparties to those objections a chance to confirm that

21    they're satisfied with the way by which you resolved them?

22              MR. KAROTKIN:  Sure.

23              THE COURT:  Mr. Sabin, you coming up?

24              MR. KAROTKIN:  Before Mr. Sabin speaks, in

25    anticipation of what he's going to say, hopefully to truncate

23

1    the hearing, Your Honor, we have agreed -- and I actually think

2    the DIP order is clear that in connection with the payment of

3    the pre-petition secured obligations to the JPMorgan group, the

4    Citigroup group and with respect to the hedging obligations,

5    the order provides they will be paid three business days after

6    the approval of the DIP loan on a final basis.  And we will

7    confirm on the record that when we pay the Citibank group and

8    the JPMorgan group, we will also pay the hedging obligations at

9    the same time.

10                THE COURT:  Okay.  Mr. Sabin, good morning.

11                MR. SABIN:  Good morning, Your Honor.  Jeff Sabin

12   from Bingham McCutchen on behalf of Deutsche Bank AG.

13   Paragraph 19 of the revised proposed order that's in front of

14   you reflects the agreement, resolves in full the obligations.

15   My thank you to Mr. Karotkin and everyone else for bearing with

16   us as we work through the resolution.  And I think that if this

17   Court were to enter it with those words in it, it resolves in

18   full the objections.

19                THE COURT:  Okay.  Fair enough.  Anyone else?  All

20   right.  Given that the objections have been resolved and given

21   the showings that were made at the outset of the case, I'm not

22   going to make extensive findings on the record now, Mr.

23   Karotkin.  I think they're set forth in your proposed order.

24                MR. KAROTKIN:  They are, Your Honor.  And I would

25   like to point out one of the proposed findings which is in

24

1    paragraph (f) on page 12 which has been requested by the United

2    States Treasury.  And they are here to address that if you have

3    any questions with that.

4            THE COURT:  Okay.  Also, I realize -- and I see Ms.

5    Caton, you came up perhaps to speak.  I gather there was a

6    dialogue going on with the creditors' committee.  And if

7    there's anything that is desirable for the creditors' committee

8    to put on the record, I certainly want to give it that

9    opportunity.  Ms. Caton, good morning.

10           MS. CATON:  Thank you, Your Honor.  Amy Caton from

11   Kramer Levin Naftalis & Frankel on behalf of the creditors'

12   committee.  As you noted, there were a number of modifications

13   that were made with the order at the request of the creditors'

14   committee.  And I just want to highlight a couple of those.

15           THE COURT:  Of course.

16           MS. CATON:  The first one is that one of the

17   creditors' committee's main concern here is what happens to be

18   the state after the sale closes.  And I think the parties'

19   intent from the beginning is then that 950 millions or an

20   amount up to -- well, potentially greater than but, likely, 950

21   million dollars, will be left behind to fund the wind down of

22   these estates and pay administrative and priority claims.

23   However, when we started the negotiation of the DIP order, I

24   don't believe that these provisions were really made clear.

25   And that's one of the things that we have done in the DIP

25

1    order.  And that's highlighted in paragraph 21.

2         I think that the new provisions in here will allow us

3    to hopefully confirm a Chapter 11 plan of distribution and make

4    sure that the new GM stock and warrants are distributed to

5    unsecured creditors.

6         The second point that I would like to make clear is

7    that in paragraphs 5 and 6 of the DIP order that administrative

8    and priority claims are now senior in right of payment of

9    repayment to the DIP and that the DIP is non-recourse to the

10   new GM stock and warrants because this is, as we believe,

11   intended for distribution to unsecured creditors.

12        We still think that we have a ways to go before we

13   get to a final wind down to make this -- I guess, the budgets

14   clear.  We're still negotiating the wind down budget.  We need

15   to negotiate an amendment to the DIP credit facility to make it

16   appropriate for a wind down.  Right now, there are a number of

17   covenants and events of default that are a little stricter than

18   what we would like to see on a going forward basis.  And it's

19   our understanding that the parties intend to do this prior to

20   closing of the sale.  And paragraph 21 sets out specifically

21   that the committee is to be included in the negotiations in

22   this process.

23        Lastly, we did make a few changes to the order vis-a-

24   vis the committee's rights with respect to the pre-petition

25   lenders.  The highlight of these are that the committee's

26

1    investigation period of certain claims against the pre-petition

2    lenders has been extended till July 31st.  And secondly, any

3    claims by the agent on a going forward basis after it's paid

4    next week for reimbursement of the fees is now nonrecourse to

5    the new GM stock and warrants..

6         And with those changes, Your Honor, the committee

7    supports the entry of the DIP order.

8         THE COURT:  Okay.  Fair enough.  Thank you.  Good

9    morning, Mr. Schein.

10        MR. SCHEIN:  Good morning, Your Honor.  Michael

11   Schein, Vedder Price, on behalf of Export Development Canada.

12   Just one clarification made by committee counsel, the carve-out

13   in paragraph five with respect to the admin claims of the case

14   and the DIP to priority claim come into effect after a closing

15   of the 363 sales transaction, not prior to it.

16        THE COURT:  Okay.  And you're merely helping me

17   better understand what's in this document?

18        MR. SCHEIN:  Correct.

19        THE COURT:  Okay.  Anybody else?  All right.  Forgive

20   me.  Mr. Schwartz, United States Attorney's Office.

21        MR. SCHWARTZ:  Good morning, Your Honor.  Matthew

22   Schwartz for the United States of America.  As the debtors'

23   papers amply demonstrate, the credit that's being extended by

24   the government and other lenders in this case was the only

25   credit that was available to the debtors and the deal was

27

1    negotiated at arm's length between experienced professionals.

2    Nonetheless, the source of the DIP funds in this case is

3    somewhat unusual and so we've asked for the finding that's in

4    paragraph F of the redline order before you that speaks to the

5    authority of the United States to expend TARP funds to make the

6    DIP loan.  I think that the language in the paragraph speaks

7    for itself and the basis for the finding was set forth at

8    length in the government's opening statement that was filed on

9    the first day in these cases --

10            THE COURT:  Yes.  I remember that.

11            MR. SCHWARTZ:  -- as well as the documents that were

12   attached to it and the other document that we asked that the

13   Court take judicial notice of yesterday.

14            THE COURT:  Okay.  Fair enough.  I see no reason not

15   to include that.  It'll be included.

16            MR. SCHWARTZ:  Thank you, Your Honor.

17            THE COURT:  Anything else?  Anyone?  All right.  Mr.

18   Karotkin, for the reasons set forth in the opening papers, as

19   supplemented by the submission of the United States and

20   revisions made to deal with other parties' needs and concerns,

21   the final DIP financing is approved on the form of the order in

22   which it's been presented to me and subject to the need to get

23   other stuff done today, it will be entered sometime today.

24            MR. KAROTKIN:  Thank you, sir.

25            THE COURT:  Thank you.  Have a good day.  Now --

28

1          MR. KAROTKIN:  Could I make a suggestion, Your Honor?

2          THE COURT:  Yes.

3          MR. KAROTKIN:  I'm sorry to interrupt.  The matter

4     number 1 on the agenda on page 4, which is -- it relates to two

5     proposed orders for use of cash collateral and adequate

6     protection, those are related to the DIP and those also have

7     been resolved among the parties.  The same issues were raised

8     by the landlords, the state taxing authorities, with respect to

9     those proposed orders. Again, they have been resolved on the

10    same basis.  The committee raised the same issues that Ms.

11    Caton addressed as to their time to challenge the liens and

12    claims of those parties in the same language -- virtually the

13    same language including -- included in the final DIP order has

14    been included in those proposed final cash collateral orders as

15    well.  And I do have marked copies from the interim orders

16    which I can hand up to you, sir.

17         THE COURT:  You are reading my mind, Mr. Karotkin.

18    So long as nobody is prejudiced by their not being here yet,

19    I'd like to go right into those matters and the one you

20    suggested is most logically connected.  So far as you're aware,

21    anybody who was going to be here at 9:45 is either here or told

22    you they wouldn't be here?

23         MR. KAROTKIN:  That's my understanding, sir.  We

24    circulated copies to the taxing authority's lawyers, to the

25    landlord last night and they were -- they were comfortable with

29

1    the language.  In fact, they agreed to the language, so they

2    are on board, sir.

3            THE COURT:  Okay.  Fair enough.

4            MR. KAROTKIN:  May I approach?

5            THE COURT:  In a half a second, you may.  I just want

6    to be sure that the creditors' committee doesn't want to be

7    heard in any way on this.  Ms. Caton?

8            MS. CATON:  No, Your Honor.

9            THE COURT:  Okay.  Yes, Mr. Karotkin -- well

10   actually, I'm going to ask for a variant of that.  I'm going to

11   ask that you or one of your folks provide all the orders to my

12   courtroom deputy at a convenient break.  You can hand up the

13   cash collateral to me now but the mechanics of entry will be

14   separately handled.  Am I right that this -- aside from the

15   fact that of course it's a final -- principally papers the

16   understandings with the folks who entered those limited

17   objections?

18           MR. KAROTKIN:  Yes, sir.

19           THE COURT:  Okay.  All right.  It's approved and

20   we're going to deal with this the same way we dealt with the

21   final DIP.

22           MR. KAROTKIN:  Thank you, sir.

23           THE COURT:  Thank you.  Mr. Miller?

24           MR. MILLER:  Your Honor, may I make a suggestion at

25   this time?

1          THE COURT:  Yes, please.

2          MR. MILLER:  That we could take the uncontested

3   matters that's on the 9:45 calendar.

4          THE COURT:  Yes.  Certainly.  And if you know that

5   your counterparties or folks who want to be heard on further

6   matters are already here, we can move into that as well.  Do

7   you want to handle the uncontested ones or put them on one of

8   your folks?

9          MR. MILLER:  I'll handle them, Your Honor.

10         THE COURT:  Okay.

11         MR. MILLER:  They start at number 9 on the agenda for

12  9:45.  The first motion, Your Honor, is the motion to get a

13  final order authorizing the debtors to pay for pre-petition

14  obligations to foreign creditors and authorizing and directing

15  financial institutions to honor and process related checks and

16  transfers.  This was heard, Your Honor, on June 1 and Your

17  Honor entered an interim order.  There are no objections to the

18  entry of the final order.

19         THE COURT:  Okay.  Given that and the provisions of

20  my case management order, motion granted.

21         MR. MILLER:  Thank you, Your Honor.  Number 10, Your

22  Honor, is the motion for final orders establishing notification

23  procedures regarding restrictions on certain transfers of

24  interest in the debtor.  This is the NOL motion, Your Honor.

25         THE COURT:  I remembered my dialogue with Mr.

31

1    Karotkin on this.

2          MR. MILLER:  Yeah.  He refused to take the lectern

3    this at this point, Your Honor.

4          THE COURT:  Understandably.  Granted.

5          MR. MILLER:  Thank you, Your Honor.  Number 11 is the

6    order to -- a final order.  You entered an interim order, Your

7    Honor, on cash management.  There are no objections to the

8    final proposed order.

9          THE COURT:  Granted.

10          MR. MILLER:  Number 12, Your Honor, is the motion of

11    the debtors to -- for authority to exercise a put.  This

12    relates, Your Honor, to the claims which Your Honor approved

13    the rejection some time ago at a hearing.  One the claims we

14    have a twenty-five percent interest in and a right to put our

15    interest to the other party.  As a result of this put, Your

16    Honor, the estate will recover approximately 350,000 dollars.

17          THE COURT:  Granted.

18          MR. MILLER:  Thank you.  Number 13, Your Honor, is

19    the motion to grant additional time to file reports of

20    financial information or to seek modification of reporting

21    requirements pursuant to Bankruptcy Rule 2015.3.  There are no

22    objections to that Your Honor.

23          THE COURT:  Granted.

24          MR. MILLER:  Number 14, Your Honor, is the

25    application of the debtors to engage Weil Gotshal & Manges

32

1    under a general retainer as attorneys for the debtor nunc pro

2    tunc to the commencement date.  This order, that will be

3    proposed, Your Honor, was negotiated with the Office of the

4    United States Trustee.  There are no objections to this matter.

5            THE COURT:  Granted.

6            MR. MILLER:  Number 15, Your Honor, is the

7    application of the debtors to engage the law firm of Jenner &

8    Block LLP as attorneys for the debtors, pursuant to Section

9    327(e).  Jenner & Block, Your Honor, will be serving, Your

10   Honor, as conflicts counsel and special corporate counsel.

11   There is a supplemental declaration of Mr. Murray in connection

12   with the application and there are no objections to this

13   application, Your Honor.

14           THE COURT:  Granted.

15           MR. MILLER:  Number 16, Your Honor, is the

16   application to engage under Section 327(e) the law firm of

17   Honigman, Miller, Schwartz & Cohn, LLP as special counsel.  Mr.

18   Weiss appeared before you, Your Honor, in connection with a

19   suppliant matter two weeks ago.  There are no objections to

20   this application, Your Honor.

21           THE COURT:  Granted.

22           MR. MILLER:  The last uncontested matter in this part

23   of the calendar, Your Honor, is the application authorizing the

24   retention and employment of the Garden City Group, Inc. as

25   notice and claims agent nunc pro tunc to the commencement date.

33

1    There are no objections to that, Your Honor.

2              THE COURT:  Granted.

3              MR. MILLER:  I would also note, Your Honor, that item

4    on the contested calendar motion, item number -- let me get to

5    it.  I think it's item number 6, Your Honor, which was the

6    motion of the consumer -- ad hoc consumer victims committee for

7    the appointment of an additional committee of unsecured

8    creditors to represent consumer victims was withdrawn without

9    prejudice.

10             THE COURT:  Okay.

11             MR. MILLER:  We could do some other motions, Your

12   Honor.  I don't know if --

13             THE COURT:  It's all right.

14             MR. MILLER:  Subject to Your Honor's ruling that if

15   somebody shows up at 9:45, we can always go back.

16             THE COURT:  Okay.  Do you know whether anybody has

17   indicated to you that they're going to wish to show up on the

18   motion to pay essential suppliers and all that?

19             MR. MILLER:  Mr. Smolinsky, Your Honor.

20             THE COURT:  If you're in doubt, I think I need to

21   wait till 9:45 but I would prefer to deal with the easier ones

22   most quickly.

23             MR. SMOLINSKY:  Your Honor, everything is resolved.

24   I did represent that I would put one thing on the record and as

25   long as I do that, I think we're fine to go forward.

34

1              THE COURT:  Sure.  Go ahead, Mr. Smolinsky.

2              MR. SMOLINSKY:  Your Honor, we're here today seeking

3      entry of a final order with respect to the debtors' essential

4      supplier programs.  There were two objections filed.  One was

5      filed by Panasonic Electric Works Corporation.  The other by

6      Clements (ph.) Inc.  Both objections have been voluntarily

7      withdrawn but I did agree to clarify on the record -- Your

8      Honor, you may recall that we attached to our motion a trade

9      agreement and it was the debtors' intent to require critical

10     vendors to sign a trade agreement and return it.  These two

11     objections were related to that agreement.  They had some

12     issues with it.  I think they understand --

13             THE COURT:  They didn't want to give you everything

14     you were looking for, for the benefit of the estate?

15             MR. SMOLINSKY:  That's right, Your Honor.  But the

16     answer was easy.  You don't have to sign it and you're not a

17     critical vendor.

18             THE COURT:  You anticipated the first question I

19     would be asking in the argument, if there had been one.

20             MR. SMOLINSKY:  But Your Honor, I think they wanted

21     me to clarify that because they did not sign the trade

22     agreement, they're not bound by any of the terms contained in

23     that trade agreement.

24             THE COURT:  If they don't sign an agreement, they're

25     not bound by it?

1      MR. SMOLINSKY:  That's right, Your Honor.  And with

2  that, Your Honor, the objections are resolved.  The creditors'

3  committee did engage us in some dialogue about the form of the

4  final order.  We did add some clarifying language to make

5  certain that we would provide the creditors' committee with the

6  information that they need to be up to speed on how we

7  implemented that order and I'm happy to report that I don't

8  think there are any issues with respect to that.

9      THE COURT:  All right.  Fair enough.  I do want to

10  give the creditors' committee a chance to comment if it wants

11  to.  Mr. Mater, good morning.

12      MR. MATER:  Good morning, Your Honor.  Thomas Moers

13  Mater for Kramer, Levin, Naftalis & Frankel representing the

14  committee.  We have no issues.  We have certain supplier

15  matters that are referenced in our limited objection to the

16  general transaction but we're working those through and with

17  respect to what Mr. Smolinsky put on the record, we have

18  nothing further to add.

19      THE COURT:  Fair enough.  Then with the

20  clarifications and anything that you arranged for, Mr.

21  Smolinsky, the motion's granted.

22      MR. MILLER:  Your Honor, I think we could proceed

23  with the utilities motion which is item 2.

24      THE COURT:  Fair enough.

25      MR. SMOLINSKY:  Thank you, Your Honor.  Your Honor

1    entered a final order with respect to the utility motion on

2    June 1st.  The procedures provided that objections could be

3    filed to the form of adequate assurances by the 15th of June.

4    We received -- of the 261 utilities that were noticed in

5    connection with the order, we received objections from 35

6    utilities.  We have finally resolved all of the objections

7    except for a very few, I believe two objections, and we believe

8    that we have agreements in principle with respect to those two.

9    What I'd like, Your Honor, and I could share it with chambers

10   so that the docket accurately reflects the resolution of these

11   matters is that two of the objections, it's docket number 764

12   and 915, will be adjourned until the 30th of June so that we

13   can presumably deliver final resolutions of those matters.

14          THE COURT:  Pause, please, Mr. Smolinsky.  On those

15   adjournments, you have comfort that they're not going to turn

16   off the lights on you between now and then?

17          MR. SMOLINSKY:  Yes, Your Honor, we're still within

18   the thirty days so I don't think that that would be an issue.

19          THE COURT:  Okay.

20          MR. SMOLINSKY:  With respect to the remaining

21   motions, they are resolved and I believe they can be marked off

22   calendar and we could provide Your Honor with the docket

23   numbers.

24          THE COURT:  Okay.  Are there folks who are waiting to

25   be heard on this?  Would you come up please?  And,

37

1    unfortunately, I don't know everybody.  If you could identify

2    yourself on the record.

3              MS. KARPE:  Apologize, Your Honor.  Karel Karpe,

4    White & Williams for Nicor Gas.  Your Honor, I have spoken to

5    Mr. Smolinsky and we do have an agreement in principle.  But I

6    noticed that there was a first supplemental list filed sometime

7    very early this morning.  And it looks like there's the Nicor

8    Gas accounts have been transferred to that notice.  But it does

9    look like there may be an additional one.

10             So just to preserve my client's rights, Your Honor,

11   we filed an objection at docket number 1099 which I didn't hear

12   referenced this morning.  And all I want to do is just get some

13   assurance on the record that the objection that we previously

14   filed and any other accounts that Nicor and the debtor may have

15   are all rolled over to that next one.  We believe that we will

16   have an agreement in the next day and so I don't think that

17   this is going to prejudice either the debtor and we do not plan

18   on turning off any utility.

19             THE COURT:  Okay.  Mr. Smolinsky?

20             MR. SMOLINSKY:  Your Honor, just to clarify, an

21   additional list was filed this morning, as we're entitled to do

22   under the order.  The purpose of the list was not to add any

23   contracts or any utilities.  The purpose was to actually

24   eliminate certain utilities that had claims that their

25   contracts were forward contracts and not utilities.  And that

38

1    was the agreement by which certain of the objections were

2    resolved.  So I'll work with Nicor to make sure that they're

3    comfortable, but we did not have any utility companies to that

4    list.

5             THE COURT:  Okay.  You okay with that, Ms. Karpe?

6             MS. KARPE:  Yeah, Your Honor.  The only difference

7    that I noted this morning is that there was a difference in the

8    account numbers.  I'm sure that Mr. Smolinsky and I can work

9    our issues at and we should have a resolution, we hope, by

10   tomorrow.

11            THE COURT:  Very good.  Thank you.  Mr. Fox?

12            MR. FOX:  Good morning, Your Honor.  Shawn Fox from

13   McGuireWoods on behalf of the Dominion Retail, Inc.  With the

14   debtors' representation that they're not seeking to treat

15   Dominion Retail as a utility, our objection is resolved.

16            THE COURT:  Very good.  Thank you.  All right.

17   Anybody else on 366 issues, utility issues?  There being no

18   response, your mechanism is fine, Mr. Smolinsky.  So we'll be

19   locked in for all of those that have been resolved and it'll be

20   continued for the couple that haven't been?

21            MR. SMOLINSKY:  That's right, Your Honor.

22            THE COURT:  Very good.  Okay.  Thank you.

23            MR. MILLER:  If Your Honor please, item number 3 has

24   been resolved.  Mr. Karotkin -- that's the use of cash

25   collateral and the explanation that Mr. Karotkin gave.

39

1          Item 4, which is the Evercore Group LLC, as stated,

2     Your Honor, we request that be adjourned to July 2nd.

3          In connection with item number 5, Your Honor, which

4     is the motion of the debtors to employ and retain AP Services

5     LLC as crisis managers and to designate Albert A. Koch as chief

6     restructuring officer nunc pro tunc to the commencement date,

7     we have reached an agreement, Your Honor, with the Office of

8     the United States Trustee and we have a statement to put on the

9     record.

10         (Pause)

11         MR. MILLER:  Your Honor, I am just informed by Mr.

12    Karotkin that we have to meet with the Office of the U.S.

13    Trustee during break.

14         THE COURT:  Okay.

15         MR. MILLER:  So we'll put that off.

16         THE COURT:  We'll defer that one, then.

17         MR. MILLER:  Item 6 is a report, Your Honor, has been

18    withdrawn without prejudice.  And that leaves, Your Honor,

19    items 7 and 8, 7 being the motion of the ad hoc committee of

20    asbestos personal injury claimants for an order appointing a

21    legal representative, a future asbestos personal injury

22    claimant and directing the  United States trustee to appoint an

23    official committee of asbestos personal injury claimants.

24         THE COURT:  Okay.  Mr. Esserman here?

25         MR. ESSERMAN:  Yes, Your Honor.

40

1          THE COURT:  You want to come on up, please.  Somebody

2    give Mr. Esserman a place to sit at the counsel table?

3    Although, Mr. Esserman, after my preliminary remarks I'm going

4    to want you to speak first.  And when you do, you'll be at the

5    main counsel lectern.

6          Give me a moment, please.

7      (Pause)

8          THE COURT:  All right.  Folks, make your

9    presentations as you see fit but, Mr. Esserman, when it's your

10   turn, I'm going to need you to address not just the matters

11   that were set forth in the papers but the terrain as it now

12   exists as a consequence of my ruling on Tuesday.

13          We have, as I understand it, in your motion, the

14   regular tort litigants motion having been withdrawn, double

15   barreled issues and of course the future claims rep is a little

16   different then me forming another official committee.  But on

17   the matter of the official committee, in addition to the things

18   that you've briefed, I would appreciate it if by the time that

19   you're done you help me understand how it would be, if it is in

20   fact the case, that your request is different than the one for

21   the bondholders that I addressed on Tuesday.

22          On the future claims rep portion, the debtors told us

23   that it's not looking for a channeling injunction and that

24   we're going to have a liquidation here and that the debtor

25   isn't going to be looking for a discharge.  And I need your

41

1    help in understanding why those aren't some pretty important

2    facts.

3            I also want you to address, before you're done, what

4    seemingly is the case, I forgot which of the briefs I saw said

5    that, which focus on the fact that this, unlike the other case

6    in which you've been before me, is hardly an asbestos driven

7    case and that asbestos claims, compared to the totality of the

8    claims of all the other creditors in this case, are very, very

9    small percentage.

10           So, Mr. Esserman, come on up, please.  Good to see

11   you again.  Came in from Texas?

12           MR. ESSERMAN:  I did, Your Honor.  Nice to see you.

13   Sandy Esserman of Stutzman Bromberg Esserman & Plifka in

14   Dallas, movant today, and I will address all the questions that

15   Your Honor asked.  First I'd like to say that on behalf of the

16   ad hoc committee, and we have filed a 9019 --

17           THE COURT:  You said a 9019.  Did you mean that or a

18   2019?

19           MR. ESSERMAN:  A 2019; sorry.

20           THE COURT:  I would have been delighted to hear it

21   was a 9019 but I didn't think we were quite there yet.

22           MR. ESSERMAN:  No.  I guess I was anticipating the

23   future, hopefully.  Anyway, Your Honor has raised the

24   significant issues, I think, that I will address, each one of

25   those issues.  I'd like to address them in this context, in

42

1    light of the paper filed by the creditors' committee yesterday,

2    which was, I thought, a very significant paper in which the

3    creditors' committee filed what they called a limited objection

4    to the sale but in fact was a statement by the creditors'

5    committee and a full objection that provided that any sale that

6    does occur in this case cannot bond future claimants and should

7    not bond future claimants.

8           In light of the position taken by that committee and

9    in light of where we are, I no longer wish to proceed and would

10   adjourn a portion of our motion with regard to seeking a

11   separate committee at this time.  We will continue to be active

12   in the case; the ad hoc committee is not going away.  We are

13   not seeking official status.  This case and the context it was

14   filed, the motion was filed, coming off the Chrysler situation,

15   gave us great pause, gave the ad hoc committee great pause.

16   Just to give Your Honor a context of what I'm referring to, in

17   the Chrysler case the committee was -- had a lot of creditors

18   on it which wound up being assumed and paid in full after the

19   sale was approved, which caused wholesale resignations from the

20   creditors' committee.  In fact, I think a majority of the

21   creditors' committee in Chrysler had resigned after the sale

22   was approved because they were paid in full.  And that was a

23   difficult situation for those creditors that were "left behind"

24   in Chrysler.  Hopefully that is not going to be the case in the

25   GM case or the GM committee, which would, in great part,

1    alleviate the necessity for a separate committee.

2         I would like to distinguish or answer --

3    nevertheless, I'd like to answer some of your questions very

4    briefly.  For instance, how is this any different from, say, a

5    Dana which has been referenced in many of the papers, in which

6    asbestos claims were a relatively small percentage of the

7    population of claims versus the situation -- similar situation

8    in Chrysler.

9         In Dana, the asbestos claims -- and I moved for -- it

10   was pointed out that I moved for a separate committee and I did

11   and we were very active in that case.  But in Dana, they passed

12   the asbestos claims through.  They passed them through as

13   unimpaired and there was testimony in Dana that asbestos claims

14   were not only passed through to the entity but any successor

15   liability claims that anyone wanted to bring against New Dana

16   could be brought.  There was no concession that, in fact, they

17   were good claims or that they should succeed.  But that they

18   could survive the reorganization.

19        There was also extensive testimony that there was

20   adequate assets and insurance to pay asbestos claims in full,

21   in full.  So there was a lot of testimony there that, one,

22   asbestos claims were a very small piece of that puzzle; and

23   two, they were passed through.  Three, there was adequate

24   provision made for their compensation.  And to the extent

25   people look to Dana as a model case of how to deal with this

44

1     and how to dispose of not having a futures rep and a

2     committee -- I'm not necessarily endorsing that.  We still

3     disagree with those decisions, but that example does stand.

4     And as far as I know, post confirmation, has worked.

5              In this case, if, in fact, those situations --

6     situation is going to hold true and future claims, as the

7     creditors' committee has pointed out in their paper filed

8     yesterday, and I would urge Your Honor to read it at his

9     convenience, are going to be able to be asserted against what

10    will be called the New GM.  And GM does not seek to channel or

11    restrict in any way those claims.  Perhaps a futures

12    representative may not be needed.  Perhaps a, what I'll call a

13    future tort czar, future claims tort czar, not just for

14    asbestos claims but in thinking about this last night you've

15    got future damage claims, future rollover claims, future design

16    defect claims, future gas tank explosion claims for GM cars out

17    there in the public that have not yet occurred.  And as long as

18    those claims are not impaired in any sense and can be brought

19    against the surviving entity, then I think we need to rethink

20    this whole -- the direction that I was trying to push the pile,

21    so to speak.

22             On the other hand, if GM's position is no, Mr.

23    Esserman, we are absolutely taking this issue on dead square

24    and we are going to eliminate those claims and leave them

25    behind with no compensation or no special pot or no trust or no

45

1    whatever, I think that's a different situation.  And I think we

2    need to then think about how we can protect the public and how

3    we can protect the future claimants and the people that are

4    going to be damaged in the future, be it asbestos, be it

5    consumers, be it rollover victims, be it gas tank explosions,

6    etcetera.  So perhaps this is yet to play out.

7         The way I read GM's papers, and hopefully I'm wrong,

8    is they intend to constrict those claims.  They intend not to

9    pass those claims through.  They intend to, through a 363

10   device, eliminate those claims for the "New GM" whether they

11   gave good or bad publicity on that in the future.

12        So, I think, to a certain extent, we sort of need to

13   see where GM's going to take us on this ride.  And see if, in

14   fact, they're willing to accede to the issues raised by the

15   creditors' committee and frankly raised first by me in our

16   papers in the objection to the sale.  And in fact, if you will,

17   pass those claims through the estate.

18        I would note that one comment on appointing of an FCR

19   that the debtor made was the ad hoc committee -- ad hoc

20   asbestos claimants request to appoint an FCR at this early

21   stage of these cases should be denied.  Well, I know that if it

22   had been made later it would have been too late.  And I think,

23   in fact, you need to address this issue up front in a case and

24   early.  And if Your Honor decides to or GM is going to decide

25   to severely restrict future consumer claims, future tort

1    claims, future asbestos claims, it needs to decide which

2    direction to go.  And if that's the case I think it'd be only

3    prudent and a protection of the public to appoint somebody to

4    protect those interests and make sure those interests are

5    protected.

6          If not, I think the Supreme Court, as recently as

7    last week, in the Travelers vs. Bailey decision, which I was

8    involved in from the trial court all the way to the Supreme

9    Court; and lost, I might add, ultimately.  But I think that

10   it's sort of in the eye of the beholder whether the case is a

11   loss or a win because you have to look at what the Court said.

12   And the Court, sort of, said it wasn't -- it said you can't

13   collaterally attack orders.  You can't collaterally attack,

14   say, a 1986 order in 2004.

15         But on the other hand, it left open the question as

16   to who's bound by those orders.  Were my clients, in that case,

17   Pearly Bailey -- Pearly Lee Bailey, a widow of a Mizo (ph.)

18   victim, was she bound by that order?  And the Court remanded it

19   to the Second Circuit to decide whether or not, in fact, she

20   was bound because she was not present before the Court, didn't

21   have notice, etcetera.  Those issues all remained open, which

22   is why I say there's a lot of legs left in that case and a lot

23   of legs left after that decision for me in the Second Circuit

24   and in the bankruptcy court.

25         But what we can learn from that case is, and what the

47

1    Supreme Court I think was telling the public and telling the

2    Court was, you need to protect your rights at the time.  You

3    need to have your rights protected at the time.  And Congress,

4    through 524(g) has in fact; set forth a mechanism to protect

5    future unknown claims in an asbestos situation.  And is

6    specifically referenced that protection and it said -- the

7    Court said we do not decide whether any particular respondent

8    is bound by the 1986 orders.  They assumed that everyone was

9    bound and that relates very much to this case.  I think it's

10    almost dead-on this case.

11        If GM is trying to bind everybody and all the

12    futures, I think Congress has set forth in the asbestos context

13    and the Supreme Court affirmed last week, how that's done.  And

14    that's done through a 524(g) situation.  Or I could analogize

15    to that and say that a future tort czar, to protect the

16    futures.  And if not, then due process provides that those

17    people are not bound.  And I'm willing to, frankly, live with

18    either result.  I'm willing, if GM says it wants to go the Dana

19    route, I think that's a mistake but they can go the Dana route.

20    If GM wants to proceed a different route, I'm fine with that.

21        So in many respects, I punt this to GM.  If GM is in

22    fact going to try and cut everyone off at the knees for future

23    claims, I think they need to take this podium and say that.

24    And then I think they need to either live with the consequences

25    of not having a future claims tort czar or future claims rep or

48

1    not.  And also risk whether or not the order that they want

2    gets entered by this Court.  Thank you.

3              THE COURT:  All right.  Thank you.  Mr. Miller?

4         (Pause)

5              MR. MILLER:  Harvey Miller for the debtors.  Your

6    Honor, I wish Mr. Esserman had called last evening, I might

7    have gotten another hour of sleep.  As I understand his

8    presentation, the motion for the appointment of additional

9    committee of asbestos claimants is withdrawn without prejudice.

10             THE COURT:  That's my understanding as well.  Mr.

11   Esserman?

12             MR. ESSERMAN:  We would prefer to adjourn it.

13             MR. MILLER:  We would prefer to have it withdrawn

14   without prejudice.  We don't need it on the calendar, Your

15   Honor.

16             THE COURT:  All right.  Gentlemen, one of the things

17   I would like to do is to get more money into the pockets of

18   creditors.  I don't want to make people file more pieces of

19   paper then have already been filed in this case.  I'm sure you

20   got less sleep than I did, Mr. Miller, but the goal is the

21   same.

22             That portion can be continued but, frankly, I'm going

23   to set it for a date pretty far out, Mr. Esserman, without

24   prejudice for you to advance it on the calendar.  We keep them

25   on calendar so they don't fall between the outfielders but this

49

1    is really a distinction without a difference, gentlemen.

2    Continue, Mr. Miller.

3         MR. MILLER:  So that leaves, Your Honor, the question

4    of the future representative.  As Your Honor pointed out in

5    your opening remarks, 524(g) is a section of the Bankruptcy

6    Code which relates to a debtor proposing a plan of

7    reorganization that incorporates a channeling order where

8    asbestos claims are going to be channeled to a particular fund

9    for satisfaction, which is derivative out of the Johns Mandel

10   (ph.) case.

11        As we have said in our papers, Your Honor, there is

12   no intention on the part of GM to propose a channeling order.

13   And since we are proposing to do a plan of liquidation there

14   will be no discharge.  In that context, Your Honor, there is no

15   justification for the appointment of a future claimant

16   representative.  And I would direct Your Honor's attention to

17   the case of Locks vs. U.S. Trustee at 157 B.R. 89, a decision

18   of the United States District Court for the Western District of

19   Pennsylvania which held that in a case of a liquidation, rather

20   than a reorganization, there is no mandatory requirement for a

21   future claimant representative.

22        We are not proposing, in any way Your Honor, a

23   channeling order.  And as Mr. Esserman has pointed out, there

24   are negotiations going on with the official creditors'

25   committee as to the scope of the order which will be requested

50

1    in connection with the 363 transaction.  Where those

2    negotiations come out at this point, Your Honor, we're not

3    prepared to say.  There is active negotiation on all of the

4    issues that Mr. Esserman referred to.  They will be before Your

5    Honor on the hearing on June 30th.

6          In the context of where we are today, 524(g) is

7    simply not applicable and there is no basis here, today, for

8    the appointment of a future representative for future asbestos

9    victims.  Which, and also, as the Court pointed out in Locks

10   vs. U.S. Trustee, there is an inherent conflict between the

11   current asbestos claimants and the future claimants that may

12   have to be considered at a future date.  But in the

13   circumstances where we find ourselves today, Your Honor, there

14   is no basis for the appointment of a future representative.

15   And I say that, Your Honor, without prejudice to a future

16   application if that becomes appropriate.

17          THE COURT:  Okay.  Thank you.  Mr. Esserman, any

18   reply?  Oh, forgive me.  Mr. Mayer, come on up, please.

19          MR. MAYER:  Thank you, Your Honor.  Tom Mayer, again,

20   for the official committee.  And our limited objection is

21   exactly what it states to be.  But Mr. Esserman is correct that

22   certain of the issues that he raised we decided to raise

23   ourselves.  And it was no mean fete getting a fifteen-member

24   committee to agree to take that position.  We have on that

25   committee; I think I can do this from memory, two indentured

51

1   trustees representing approximately twenty-seven billion

2   dollars of debt.  We have the PBGC whose contingent liability

3   dwarfs that of the bonds.  We have three unions who are

4   receiving quite disparate treatment.  We have three dealers who

5   are receiving quite disparate treatment.  Two suppliers, one

6   advertising agency, two product liability claimants and an

7   asbestos representative.  I think I got to fifteen.

8           And the issues that Mr. Esserman raised were debated

9   at considerable length by what is not even so much a model

10  United Nations and we took the position we took in our papers

11  with respect to future claims.

12          We agree with Mr. Miller that there is no call for a

13  futures representative at this time.  If it becomes necessary,

14  we can deal with it at a future time.  But it is our position,

15  as set forth in the papers as Mr. Esserman noted, that we don't

16  believe that an order entered by this Court can bond future

17  claimants.  We don't believe 524 is applicable here.  We don't

18  think 524 is mandatory and there was no conceivable stretch

19  under which a 524(g) plan could possibly be confirmed in this

20  case.  It will never be a case where the asbestos claimants are

21  getting a majority of an operating company and no discharge is

22  being sought for it.

23          So if at some point in the future it becomes

24  necessary to deal with a futures claim issue, we can deal with

25  it at this time.  And at this point we see no basis for either

52

1    the appointment of a committee or the appointment of futures

2    representatives.  If you have questions, I'm happy to answer.

3            THE COURT:  No, I really don't.  Thank you.

4            MR. MAYER:  Thank you, Your Honor.

5            THE COURT:  Okay.  Mr. Esserman, I'll take any reply.

6            MR. ESSERMAN:  Future claims are being passed through

7    the estate unimpaired.  I see no reason for an appointment

8    either at this time, Your Honor.  Thank you.

9            THE COURT:  All right.  Everybody sit in place for a

10   second.

11       (Pause)

12           THE COURT:  Folks, the motion is denied without

13   prejudice to renewal if either the debtor proposes a channeling

14   injunction in the future or decides to propose a standalone

15   plan.

16           Mr. Esserman, if you want to take this up on appeal,

17   I'll give you full findings of fact and conclusions of law at

18   the end of the day today, but I don't want so many people in

19   the courtroom to have to await a recess for me to deliver those

20   findings which would likely be as long as they were on Tuesday.

21           MR. ESSERMAN:  Unnecessary, Your Honor.

22           THE COURT:  All right.  Thank you.  Is our next

23   matter the retirees committee?

24           MR. MILLER:  Yes, Your Honor.

25           THE COURT:  Do you folks want to go straight into it

53

1   or do you think anybody would want or need a five or ten minute

2   break?

3           MR. MILLER:  I would ask Your Honor for a five minute

4   break.  I would like to have that opportunity to meet with the

5   U.S. trustee.

6           THE COURT:  Certainly.  Okay.  We're in recess for --

7   until -- would an extra five minutes be prudent, Mr. Miller?

8           MR. MILLER:  Absolutely, Your Honor.

9           THE COURT:  Let's resume at 10:15.  We're in recess.

10          (Recess from 9:56 a.m. until 10:15 a.m.)

11          THE COURT:  Mr. Miller?

12          MR. MILLER:  Harvey Miller for the debtors.  Your

13  Honor, may we go back to the motion to engage AP Services?

14          THE COURT:  Certainly.

15          MR. MILLER:  Mr. Karotkin, please?

16          THE COURT:  Mr. Karotkin.

17          MR. KAROTKIN:  Thank you, Your Honor.  Stephen

18  Karotkin, Weil Gotshal & Manges, for the debtors.  In

19  connection with the application of the debtors to retain AP

20  Services, Your Honor, there was only one substantive objection

21  filed by the Office of the United States Trustee.  I believe

22  that the unsecured creditors' committee either filed a pleading

23  or requested certain clarification in any proposed order, which

24  were are more than willing to address.

25          With respect to the objection raised by the Office of

54

1     the United States Trustee, we have reached a resolution of that

2     dispute which we propose to embody in a revised proposed order,

3     which we will circulate with Ms. Adams as well as with the

4     unsecured creditors' committee.  But I would like to state on

5     the record the resolution that's been agreed to, if I might?

6              THE COURT:  Yes.  Go right ahead.

7              MR. KAROTKIN:  Thank you, sir.  I'm just going to go

8     to the substantive points.  With respect to the success fee

9     described and contained in their retention agreement, there

10    would be no objection to payment of fifty percent of the

11    success fee as provided in the retention agreement, on the

12    closing of the sale transaction, subject to AP Services filing,

13    prior to such payment, a supplemental affidavit with the Court

14    summarizing the services rendered by AP Services with respect

15    to the sale transaction.

16              Second, both the payment of the balance of the

17    success fee, which is proposed to be paid one year following

18    the closing of the sale transaction, and any discretionary fee,

19    as that term is defined in the application, both of those

20    payments shall be subject to review under the reasonableness

21    standards set forth in Sections 330 and 331 of the Bankruptcy

22    Code, including the filing of an appropriate fee application by

23    AP Services, including time records.

24              And finally, Your Honor, no person from AP Services

25    involved in the engagement, can bill at a rate higher than the

55

1    rate billed by Mr. Koch, as that rate may be adjusted from time

2    to time, on notice to the Office of the United States Trustee.

3    And I believe that, I hope, accurately sets forth the

4    understanding.  And if I have stated something --

5              THE COURT:  Mr. Matsumoto, forgive me.  Could you

6    pull a nearby microphone over unless you want to come to the

7    main lectern?

8              MR. MATSUMOTO:  That's correct, Your Honor.

9              THE COURT:  Okay.

10             MR. MATSUMOTO:  He's accurately said it.

11             THE COURT:  Mr. Mater.

12             MR. MOERS MATER:  That is correct, Your Honor.  That

13   reflects the agreement with the committee.

14             THE COURT:  All right.  Did everybody who weighed in

15   on this or wanted to, have a chance to be heard?  Okay.  As

16   modified by the understandings with the U.S. trustee and the

17   creditors' committee, that retention is approved.  And at your

18   convenience, you or one of your colleagues can get me the

19   revised order papering that understanding.

20             MR. KAROTKIN:  Thank you, sir.

21             THE COURT:  Thank you.

22             MR. MILLER:  If Your Honor pleases, Harvey Miller

23   again.  Your Honor, one housekeeping detail.

24             THE COURT:  Yes.

25             MR. MILLER:  The filing of a memorandum of law in

56

1   support of the proposed Section 363 transaction is due tonight.

2   There are objections, Your Honor, that are still coming in.

3   They've come in every day.  They're still streaming in.  What

4   we would propose, Your Honor, is to file our memorandum of law.

5   But we would like the extension, Your Honor, to amend that

6   memorandum before the commencement of the hearing on June 30th,

7   to take into account the additional objections that are coming

8   in.

9        THE COURT:  I need a little help from you here, Mr.

10  Miller, in a couple of ways.  First, I thought the time for

11  objections to what you're doing had come and gone.  You're

12  dealing with the practical problem that people, either because

13  they disregarded the deadline or didn't get notice of the

14  deadline, are still giving you stuff?

15       MR. MILLER:  I think one day, Your Honor, ECF was

16  down and that delayed a lot of things.  Some people claim they

17  did not get notice.  And they're just continually streaming in,

18  Your Honor.

19       THE COURT:  I hear you.  When were you thinking of --

20  you did file one brief already.  And this, I take it, would be

21  like a reply brief to the objections?

22       MR. MILLER:  Yes, Your Honor.

23       THE COURT:  And what was your thought as to when I

24  would get something I could work with?

25       MR. MILLER:  The hearing is on Tuesday, Your Honor.

57

1    Monday, 5:00, 6:00.

2            THE COURT:  Umm --

3            MR. MILLER:  I'll make a concession, Your Honor.

4    Noon.

5            THE COURT:  I feel like I'm playing Let's Make a

6    Deal.  I'm not going to default you if you can't make noon, but

7    I'd like you to try very hard to do that.

8            MR. MILLER:  Very good, Your Honor.  Thank you.

9            THE COURT:  Thank you.  Mr. Schwartz?

10            MR. SCHWARTZ:  On that point.  Mr. Miller said that

11    the deadline was this evening.  We were under the impression

12    that it was tomorrow.  And we were intending to put in papers

13    as well, if that's acceptable.

14            THE COURT:  Sure, you can do that.

15            MR. SCHWARTZ:  Thank you.

16            THE COURT:  Okay.  Are we now up to retirees, Mr.

17    Miller?

18            MR. MILLER:  Yes, sir.

19            THE COURT:  All right.  I would like counsel for the

20    retirees to come on up, but then, only to get a place at

21    counsel table.  Make room for him, folks.  Somehow, make room

22    for him, because I have some preliminary observations.  Mr.

23    Mater, you get a place at the -- okay, that's fine.

24            Folks, make your presentations as you see fit, but by

25    the time you're done, I want you to address the following

58

1    questions and concerns.  It seems to me, subject to your rights

2    to be heard, that 1114(d) has two prongs, one of which is

3    mandatory, if it applies; the other which is discretionary.

4    The mandatory part being "shall order, if the debtor seeks to

5    modify or not pay the retiree benefits"; and the discretionary

6    part being "or if the Court otherwise determines that it is

7    appropriate."  Now a "shall" proceeds the second also, but when

8    you give me the ability to determine whether it's appropriate,

9    it seems to me, that changes it into a discretionary

10   determination.  But it also seems to me, subject to your rights

11   to be heard, that neither of those requirements applies unless

12   1114 applies at all.

13          Now, on that, it appears to me that there are two

14   principal legal issues which I'll get to in half a second.  But

15   I also have a factual question for which I'd like your help,

16   Mr. Miller, or from whoever on your team is going to be arguing

17   it; which is, are the debtors' plans the same with respect to

18   both its retiree pension plans and also its welfare plans,

19   which I understand to be its health and life insurance plans?

20   Or is there some distinction between them?  That's more in the

21   nature of a factual predicate, just so I know what we're

22   talking about, either changing or leaving subject to the

23   possibility of a change.

24          But then, when we get to the legal prongs, it seems

25   to me that one of the issues I have to deal with is whether

59

1    1114 applies at all.  And on that -- and forgive me, on behalf

2    of the retirees, I'm not sure if I got your name?

3               MR. GOTEINER:  I'm sorry, Your Honor.  Neil Goteiner.

4               THE COURT:  Goteiner?

5               MR. GOTEINER:  Yes.

6               THE COURT:  Thank you.  Mr. Goteiner, it appeared to

7    me that in arguing the issue as to whether 1114 applied, you

8    took kind of a national perspective.  And I'm wondering, and I

9    would find your help valuable, in telling me whether I should

10   take a national perspective on the one hand, or whether I, as a

11   judge sitting in the Second Circuit in the Southern District of

12   New York, can appropriately consider a national perspective, or

13   whether I have to give greater attention to a decision of the

14   Second Circuit and of the case law in the Southern District of

15   New York.

16          Now, I think many people might believe that a

17   bankruptcy judge in the Second Circuit is bound by a decision

18   of the Second Circuit, and I've got the Chateaugay decision.

19   It's also the case that I'm on record in four or five or six

20   published decisions as saying that even though I'm not bound by

21   the decisions of other bankruptcy judges in this district, that

22   I believe that the interests of consistency for the financial

23   community, for the bankruptcy community in this district, are

24   very important, and therefore that I follow the decisions of

25   other bankruptcy judges in the Southern District of New York,

60

1    in the absence of clear error.

2            Now, I was a little surprised, Mr. Goteiner, that at

3    least in your opening brief, unless I missed it, there was no

4    attention to Judge Drain's decision in Delphi.  Now, obviously,

5    there was greater discussion of it by the debtors and the

6    creditors' committee when they filed their next round of

7    briefs.  And while you mentioned it in your reply, you didn't

8    really address, unless again I missed it, the substantive

9    holdings that Judge Drain had with respect to whether 1114

10   applies or whether I should follow his decision or whether his

11   decision was incorrect in any way.  Some might regard his

12   decision, albeit originally dictated, as one of the most

13   comprehensive and extensive discussions of this area that

14   anybody has ever written at any level in the federal system.

15   So I want both sides to address Judge Drain's decision

16   extensively, either up or down, whether it's right or wrong,

17   and address whether I should follow it or not.

18           Then we get to Sprague.  As I read Sprague, and it's

19   long and it's complicated, and I'm not claiming to be the only

20   person who can read it or understand it, it appeared to me to

21   be an 8-1-1-3 en banc decision.  And it looked to me that when

22   you looked at the plans, insofar as they affected the general

23   retirees, as contrasted to the early retirees, it was a 10 to 3

24   decision, putting aside the class action issue, which isn't

25   material to our concerns.  And it also appears to me that for

61

1    either most or all of the GM community, their situation is more

2    analogous to the general retiree situation rather than the

3    early retiree situation, because the principal difference was

4    the early retirees had separate deals that may have been

5    explained to them when they were asked to take early

6    retirement.

7            Now, one thing that was a matter of some difficulty

8    for me, from both sides, is that the contentions that Sprague

9    was wrong came up only in the reply brief filed on behalf of

10   the retiree committee, your folks, Mr. Goteiner.  And that

11   forced the debtor to deal with a whole new issue in a surreply,

12   which the debtor did, but then you didn't have a chance to

13   reply to that.  Now, debtor has stated in its surreply that res

14   judicata applies, binding on the retirees here, and also even

15   that collateral estoppel applies.  I'm wondering whether the

16   more appropriate course is to analyze this, principally, on

17   bases of stare decisis where you have the classic blue Buick.

18           I don't want to foreclose you folks from other points

19   that you want to make, but by the time you're done, please be

20   sure to have covered at least those.  Okay.  Your motion, Mr.

21   Goteiner.

22           MR. GOTEINER:  Neil Goteiner, General Motors

23   Retirees' Association.  Your Honor, I think the questions you

24   asked obviously go to the core of issues, and so I'll address

25   them up front.  And basically I'll constrain my general

62

1    comments to dealing with your questions.

2            THE COURT:  You don't have to constrain them, just be

3    sure you've covered them by the time you're done.

4            MR. GOTEINER:  Well, I'm constraining -- I'm saying

5    I'm constraining them, because they're core.

6            THE COURT:  Okay.

7            MR. GOTEINER:  And I haven't thought about every

8    point, but I think I can deal with them.  Let me begin by

9    saying this.  If you look at the statute, 1114, and you look at

10   the way it's structured, you don't have that much legislative

11   history on tap.  We have some, but very little.  But if you

12   look at it, what is it doing?  It uses the word "any benefit".

13   And it's a very, very modest proposal.  And this addresses part

14   of what Judge Drain did as well.

15           What Judge Drain did and what the debtors are doing -

16   - what some courts are doing, I respectfully submit

17   incorrectly, is that they're treating this exercise as a

18   summary judgment motion.  Judge Drain asked about abrogation of

19   rights and that 1114 is not supposed to abrogate rights, and

20   he's not familiar with other sections with the Bankruptcy Code

21   that create rights.  We're not creating rights here.  All that

22   1114 did was to create a forum, a platform for discussion so

23   that people, like the 122,000 members of this retiree group who

24   are not represented, has a chance to deal with and talk with

25   management about critical -- and this is not overly florid or

63

1    dramatic -- life-threatening decisions.

2         And Congress understood that.  So what happens is,

3    there's a discussion, a conversation that occurs.  And by the

4    way, Your Honor, it can occur very, very quickly.  This is not

5    going to delay any decisions.  There are lawyers on both sides

6    who can handle these issues, and management can handle them.

7    So you have the discussion.  And usually these things work out

8    fine, because this particular group, my clients, understands

9    that there has to be cuts, that there has to be serious cuts.

10   But the point is, to have those people whose lives are being

11   affected making the decisions, and not having them be made by

12   executives; not having them been made by other people who don't

13   understand and really live these issues.

14        So that needs to be stated.  And I didn't really see

15   that discussion in the cases.  This is not a summary judgment

16   motion.  What happens is, if there's going to be a

17   disagreement, and in the unlikely event that the committee --

18   if it was selected and formed -- in the unlikely event that the

19   committee disagreed with the debtor, then what happens?  Then

20   it comes -- then and only then does it come to Your Honor.  And

21   then you deal with some of the Sprague questions versus what we

22   think should control, which is the Devlin case in the Second

23   Circuit, which also addresses one of Your Honor's questions.

24        The debtor suggests that it's Sprague all the way.

25   That's not true.  Your Honor, I have not read all Your Honor's

64

1    decisions on this, but the Second Circuit has pointed out in

2    the Caesar case, I believe, as well as in other cases when they

3    were dealing the factors versus the Pro Arcs (ph.) cases, that

4    was around 1980.  I can get the cites to you on that.  That

5    when you're dealing with federal questions, Your Honor should

6    be looking at courts in the Second Circuit.  It's national, it

7    is national, but still, when you're looking at federal

8    questions, it's perfectly appropriate, and some courts say you

9    should look to the Second Circuit.

10            Now, I know that -- and so that means the Court

11   should also consider the Devlin -- and I'm saying we shouldn't

12   even be getting into that now, but if you look at the Devlin

13   burden analysis, in the Devlin burden analysis, you determined

14   whether there's an ambiguity.  Under the Sprague analysis, the

15   burden is on the retirees there to show it was clear and

16   unambiguous.  That is not the law of the Second Circuit.

17            THE COURT:  Pause, please, Mr. Goteiner, because if I

18   heard you right as you were getting into that, you mentioned

19   Pro Arts.  And sadly, I'm well aware of that case because in

20   the Adelphia case, I had issued a decision where I expressed

21   the view that the Third Circuit couldn't understand a matter of

22   Pennsylvania law correctly, or at least a two-judge majority in

23   a Third Circuit decision, and that they ignored a decision of

24   the Pennsylvania Supreme Court.  And while I wasn't reversed on

25   the issue because there were satisfactory alternative grounds,

65

1   it was pointed out to me that I, as a bankruptcy judge, don't

2   have the ability to tell a circuit court that it was wrong when

3   it's construing a matter of state law within its home state

4   district.  And I think that's what Pro Arts stands for among --

5           MR. GOTEINER:  State law.

6           THE COURT:  State law.

7           MR. GOTEINER:  Correct.

8           THE COURT:  Now, it appeared to me that even -- when

9   I was reading Sprague, that even though there isn't much

10  discussion of Michigan law, when they're talking about contract

11  formation as contrasted to what ERISA provides, that's got to

12  be state law.

13          MR. GOTEINER:  They didn't -- Your Honor, they didn't

14  discuss it.  And my -- I have the same question.  All right?

15  And it seemed at that level and at the level that Your Honor is

16  grappling with, it seems that the state issues are subsumed in

17  federal issues.  And look, there are a lot of blanks in

18  Sprague.  And there were a lot of disconnects and

19  discontinuities between the majority decision and the dissent.

20  The majority says most of the plans had the termination

21  language.  The dissents, in a robust and animated dissent, says

22  that some of them did.  But in any event, it was clear that it

23  was all over the lot, and most could be fifty-one percent.  So

24  I'm aware of the point.  I'm also aware of Factors, in fact, it

25  was one of my first cases.  I was representing the estate of

66

1    Elvis Presley and flew down to Graceland.  I remember that case

2    very well.

3            THE COURT:  That is Pro Arts, isn't it?

4            MR. GOTEINER:  Yes, Factors, Pro Arts.  So I'm aware

5    of that case, as well.  So in dealing with these issues, I

6    think 1114 trumps the analysis for today.  And all I'm saying,

7    1114 is a very modest proposal.  And where Judge Drain was

8    wrong was he started talking about creation of rights and

9    abrogation of rights.  That's not what would happen today if

10   Your Honor appointed an 1114 committee.  And by the way, Judge

11   Drain did appoint an 1114 committee after this long analysis.

12           THE COURT:  Albeit for a fairly limited purpose.

13           MR. GOTEINER:  Albeit for a fairly limited purpose,

14   but there was -- he left wedges in his decision.  And it

15   depends on what was going to come up in that analysis.  And

16   things do come up.

17           But the point is, the fair and equitable calculus

18   that Congress imposes on the debtor, on the retirees who are

19   not represented like the UAW -- I just want to make that clear;

20   it's an obvious statement -- what Congress imposes is a very

21   reasonable and quick approach.  And that was my major problem

22   with Judge Drain's decision.  He -- and by the way, I'll tell

23   you -- I'll take responsibility for part of that because we

24   were involved in that, as Your Honor may or may not know.  And

25   we were involved in the briefing, and we were co-counsel on

67

1     that point.  But I got more involved in this matter, and as I

2     started to look at the literature and I started to look at all

3     the cases, it became clear to me that, with all due respect to

4     these -- to very distinguished lawyers and judges, the

5     fundamental aspect and driving purpose of 1114 has been missed

6     in all this.  And what's happening is -- and so what I'm

7     looking for is an Occam's razor that gets down to the

8     fundamentals and explains what 1114 is.  And 1114 is as I

9     stated, I won't repeat it, and I doubt many people would

10    disagree with me on my right, but that's what it is.

11        And then Judge Drain did more than that.  Then Judge

12    Drain talked about his analysis of 1114(l).  What does that

13    mean?  Although I don't think you have to characterize this as

14    a vested right, as I was just saying, because that's not what

15    we're doing here.  We're not aggregating rights.  But what

16    Congress did do in 1114 is to create at least a vested

17    procedure outside of bankruptcy, for the 180 days preceding

18    bankruptcy.  To me, it's a dizzying non-sequitur -- and this is

19    also why I disagree with Judge Drain -- for to say that exists

20    in a pre-bankruptcy context that doesn't exist during

21    bankruptcy.

22        1114(l) has meaning.  And it only has meaning if you

23    apply it logically and consistently, and I think Judge Drain

24    missed that.  And frankly, everyone did.  But that's what

25    1114(l) means.  And --

68

1          THE COURT:  Well, pause, please, Mr. Goteiner.

2     Because -- and maybe the creditors' committee picked this point

3     up in its opposition to you or in -- I don't remember where I

4     got this from, to tell you the truth -- but there are different

5     scenarios under which, prepetition, a debtor can adversely

6     affect its retiree rights.  It can do it by exercising the

7     right that the debtor thinks it has to amend or terminate

8     unilaterally because it contends that its plan documents

9     provide it with that entitlement or that right.  Or it can do

10    it because it says we simply can't afford it.  And we're

11    changing it and maybe those guys can sue us.  I think it's

12    agreed that in the second -- or at least not very

13    controversial -- that in the second category, adversely

14    affected retirees can have had it and go after the debtor under

15    1114(l).  But I think somebody said, again, I think it was the

16    creditors' committee, that the jury may still be out -- or the

17    legal equivalent to that -- as to whether 1114 applies when the

18    debtor uses a right of amendment or termination that it

19    otherwise has in its plan documents.  Is that your

20    understanding, as well?

21          MR. GOTEINER:  Well, that's what they're saying, but

22    the --

23          THE COURT:  That's what the creditors' committee is

24    saying, you're saying?

25          MR. GOTEINER:  Right, well, I think the debtor --

69

1          THE COURT:  Well, I guess what I'm interested in is

2     your view on that.

3          MR. GOTEINER:  Well, I'm interested in their view, as

4     well.  But my point is that the wording of 1114 is so broad, so

5     all-encompassing with any benefit, Congress was aware that

6     there are amendable benefits, and with that kind of language.

7     But when you combine that with the modest procedural rights

8     that 1114 provides, again, that's the simplest explanation of

9     what's happening here.  It's premature to decide this now.  And

10    we do know, because of announcements that they've been

11    transparent about this to a degree, that they're going to be

12    cutting two-thirds of benefits.  You know, these are critical

13    benefits.  So it's happening now.  This process is happening

14    now.  And it also happened in the six months prior to June 1,

15    which is an 1114(l) situation.

16         So I just disagree with the -- there's a lot, as I

17    say, of Talmudic analysis in all these decisions.  And

18    particularly, Judge Drain's was excellent, it's true.  I mean,

19    he covered the ground.  But the fact that he had the excellent

20    legal analysis doesn't say to me that he covered the

21    fundamental point of what 1114(a) says.  And on top -- and

22    1114(l), as well, where I think he's dead wrong.

23         But on top of that, if we even want to get into this

24    analysis, he says that bankruptcy law does not create rights.

25    Well, that's not true.  Preference rights, 1113 rights, 363

70

1      puts limits on a debtor's use of a third party lender's cash

2      collateral during a Chapter 11 case providing substantive

3      protections that don't exist outside bankruptcy.  Section 363

4      gives assets buyers the right to buy assets free and clear of

5      liens.  Section 364 gives third party post-petition lenders the

6      right, under limited circumstances, to get priming liens,

7      granting them a lien on collateral ahead of existing lenders

8      which cannot be done outside bankruptcy, so he's wrong on that

9      as well.  And, again, these points were not fully briefed.  But

10     as I read the decision, I started asking these questions, and

11     they didn't make sense.

12          So I could deal more with Judge Drain's decision, but

13     I think with respect to those fundamental points, though, and I

14     know it's the most comprehensive decision out there, today.

15     Painfully so.  But, it doesn't mean he's right.  And so I

16     respectfully suggest this is for Your Honor to wrestle with to

17     determine whether he is correct or not correct on the

18     fundamentals and also on this overarching point of whether we

19     should decide this now.  Is that what Congress had in mind?

20     And I respectfully submit they didn't.

21          So I think I have answered Your Honor's questions.

22     Let me just look at my notes for one second, Your Honor.  Ah,

23     let's address Sprague just for a minute longer because Your

24     Honor raised the res judicata possibility.  Your Honor also

25     said well, that was a class action; we don't need to involve

1    ourselves with that.  But we do.  We have --

2         THE COURT:  Your point being that they expressly

3    denied class action status for both of the two major classes?

4         MR. GOTEINER:  Precisely.  No -- class actions have

5    significant meaning, obviously, and they have significant

6    meeting, and as defendants, we sometimes stipulate to class

7    certification because of what it means for final peace, global

8    peace.  But there is no class representative there.  There is

9    nothing close to the privity type issues in these virtual

10   representation cases.

11        THE COURT:  Well, pause, please, Mr. Goteiner,

12   because you're absolutely right on the significance of class

13   action.  But is it the case that if there had been certified a

14   class action, the decision would be a no-brainer on res

15   judicata.  And the question really is, in the absence of a

16   class action, what's left?

17        MR. GOTEINER:  Well, you said stare decisis, but

18   again, Your Honor, that really has to do with, you know, there

19   are all sorts of things that occur in a class action.  Okay, I

20   do that kind of work, as well.  And there are all sorts of

21   decisions that are made.  You have to take a look at whether

22   the subclasses were defined correctly.  I don't know, I can't

23   answer your question because I also -- there are lacunae in

24   Sprague that don't make sense to me.  And it just wasn't

25   because you had an impassioned chief -- I think it was the

72

1    chief judge saying it was wrong.

2              THE COURT:  It was Martin, if I recall.

3              MR. GOTEINER:  I'm sorry?  Judge Martin was chief

4    judge --

5              THE COURT:  Yes.

6              MR. GOTEINER:  -- at that point.

7              THE COURT:  Yes.

8              MR. GOTEINER:  And it's not only the lacunae that

9    exist there, but theoretically, to me, it doesn't make sense

10   given the ambiguities that did exist.  But the Sixth Circuit

11   said, all right, this is our view, we see no ambiguity.  But

12   the Sixth Circuit went off on the Wise decision.  And that was,

13   as I recall it, that page, that was the first primary decision

14   they cited was Wise from the Fifth Circuit.  However, in

15   Devlin, the Second Circuit said we can see how the district

16   court could have been led by Wise into making the decision it

17   did, but we don't go that direction in the Second Circuit.  So

18   the core theoretical groundwork for Sprague finds itself

19   rejected in Devlin.  Now, I don't think Devlin cited -- I think

20   Devlin maybe came down a month or two after, I'm not sure.  But

21   there was no cross-referencing of the two.  And I also note

22   that in the debtors' brief, although I read it quickly, I

23   didn't see a reference to Devlin.

24             So, as I say, it's Sprague.  So I don't see

25   Sprague -- it's certainly not anything close to virtual

73

1    representation.  There's not the privity, there's not the same

2    motivation, it is not a one-on-one linkage that you found in

3    Chase.  It just isn't.  It's an aborted class action.  You

4    cannot cherry-pick from Sprague and take one point, and then

5    say it binds everyone, all the retirees.  You just can't.  It

6    is limited and it is not what the Second Circuit would buy into

7    as I read Devlin.

8            And I must say, with all due respect, Judge Drain was

9    wrong there, as well.  Now, I do recall that there was briefing

10   on this choice-of-law issue in the Delphi matter, and I'm not

11   quite sure because this came in late last night so I haven't

12   had time to check, I'm not sure because I think the judge in

13   the -- Judge Drain, in the decision that he announced from the

14   bench, said the parties hadn't briefed on him on the choice-of-

15   law issue.  Then there was briefing after that pursuant to his

16   comment.  But I don't know what happened between -- and maybe

17   counsel here does know -- I don't know what happened between

18   that briefing and Judge Drain's decision.  But clearly, he did

19   not take into account Second Circuit law, and he should have

20   because the Second Circuit controls Judge Drain in this issue.

21   Or at least, that's what the Second Circuit in Caesar (ph.)

22   said, and that's what is drawn from the analysis in Factors v.

23   Pro Arts.

24           So, let me just see if I -- I think -- Your Honor,

25   does that cover your main points?  I think it does.

74

1          THE COURT:  I think it does, too.

2          MR. GOTEINER:  So why don't I stop there and reserve

3     any additional time after I hear the opposition.

4          THE COURT:  Sure.

5          MR. GOTEINER:  Thank you very much.

6          THE COURT:  Mr. Miller?

7          MR. MATER:  Your Honor, please, Harvey Miller on

8     behalf of the debtors again.  Your Honor the law is perfectly

9     clear that Section 1111 -- I'm sorry, 1114 of the bankruptcy

10    code, does not apply with respect to a retiree plan that is

11    terminable or amendable or modifiable unilaterally by the plan

12    sponsor.  And while counsel may refer to Sprague as an aborted

13    class action case, it's certainly beside that GM had an

14    unqualified right to modify these retirement plans, and that

15    was heavily litigated, and that's what the Sixth Circuit

16    decided in the decision that you referred to.  So if GM has the

17    right to modify or terminate these retirement plans, then

18    Section 1114 does not apply and there should be no retiree

19    committee.

20          Counsel claims that Sprague decision should not be

21    binding on this Court.  And he says that the -- there's no

22    finding that the issues are exactly the same or there was an

23    alignment.  Well, what was Sprague about, Your Honor?  It was a

24    claim violation of ERISA that GM unilaterally modified and

25    terminated rights that the retirees claim in violation of

75

1    ERISA, because if it was a plan subject to ERISA, GM could not

2    do that unilaterally.  So this welfare plan, the Sixth Circuit

3    held, is modifiable by GM and it went through the different

4    plans and came to the conclusion that all of the plans reserved

5    to GM the right to modify or terminate and that right

6    continues, Your Honor.  And those are GM plans.

7         Now, counsel says, and the moving parties say, "Well,

8    now we're in the Second Circuit and Sprague doesn't apply."  We

9    argue, as we have in our brief, Your Honor, that there is

10   virtual representation.  And notwithstanding that the class

11   action certification was vacated, the claim's rights

12   asserted -- the same rights that are being asserted in

13   connection with this motion, Your Honor.  So now we move, Your

14   Honor, to the Delphi case.  And what happened in Delphi?

15   Exactly the same thing.

16        The argument was being made, by the plan

17   beneficiaries, that Delphi did not have the right to modify or

18   terminate these benefits unilaterally.  That was the issue that

19   was presented.  And the important factor in that, Your Honor,

20   is that Delphi plans were GM plans because Delphi was a spinoff

21   from GM, I think, in 1999, and those plans were all GM plans.

22   And as Your Honor pointed out, Judge Drain, in a very

23   comprehensive bench decision, came to the conclusion that

24   Delphi had the unilateral right to terminate and modify the

25   plans and therefore 1114 was not applicable, but he did appoint

76

1      a committee.  And he appointed a committee for a very limited

2      purpose.

3              There was a contention made that certain of the

4      beneficiaries had vested rights and if their rights were vested

5      then Delphi could not unilaterally modify or terminate those

6      rights.  So he appointed a committee for a specifically limited

7      purpose to explore and file a report as to whether any of the

8      rights were vested.

9              THE COURT:  Can you help me, if you know, as to why,

10     especially if these were former GM people, they might have had

11     vested rights?  Like, could they have retired before the first

12     of the plan descriptions were issued that reserved the right to

13     modify or was it some different basis?

14             MR. MILLER:  No, Your Honor.  It wasn't because of a

15     date or a time.  Within Delphi, there were other acquisitions

16     that form part of Delphi; American Axle Company and some other

17     companies.  It may have been that those companies had plans

18     that were in existence when they were merged.  And there may

19     have been the employees that came from those companies that

20     have vested benefits.

21             THE COURT:  In other words, they became Delphi

22     retirees but their retirement rights had been created back when

23     they were employees for different companies?

24             MR. MILLER:  That's correct, Your Honor, as I

25     understand it.

77

1          THE COURT:  I'm with you now, okay.

2          MR. MILLER:  Now, subsequently to the bench opinion,

3    Your Honor, which was issued on -- in the early part of 2009,

4    Judge Drain again revisited the issues that were presented and

5    in a transcript, which I was only able to get last night, Your

6    Honor.

7          THE COURT:  I think it's now on Westlaw also, maybe

8    Lexis also.

9          MR. MILLER:  It's March 11, 2009.  He considered the

10   report that came back from this committee.  And if I may, Your

11   Honor, I would hand up a copy of the transcript.

12         THE COURT:  I read it last night.

13         MR. MILLER:  And I would refer Your Honor to page --

14         THE COURT:  Finding it is a different question.  For

15   that, maybe you do have to hand it up.

16         MR. MILLER:  I have one if Your Honor would like it?

17         THE COURT:  Yes.  Why don't you do that.  Give me a

18   second, please, Mr. Miller.

19      (Pause)

20         THE COURT:  Go ahead, please.

21         MR. MILLER:  I would refer Your Honor to page 61.

22   And if I may, I would read.  This is in consideration of the

23   report that the committee that he had appointed rendered.

24         THE COURT:  Wait.  Did you say 61?

25         MR. MILLER:  61, Your Honor.

78

1      THE COURT:  Oh, I see.  The pagination on what I read

2  yesterday is different than what you just gave me.  Go ahead,

3  please.

4      MR. MILLER:  Starting with the first full sentence,

5  "With respect to the first point, as I noted, probably too much

6  I lent during oral argument, I continue to believe that the

7  Sixth Circuit Sprague decision is one in which the Sixth

8  Circuit at length determined, en banc, that there was no

9  ambiguity in the respect of GM's reservation of rights to

10  modify, at will, it's welfare plans.  Including for the

11  period" --

12      THE COURT:  Forgive me, Mr. Miller.  I'm having

13  trouble finding it in the one you gave me as well.  You said --

14  this is with respect to Sprague, right?

15      MR. MILLER:  Yes, Your Honor.

16      THE COURT:  Go on, please.  I'm not sure if I can

17  find it here, but I'll just listen to what you've given to me.

18      MR. MILLER:  All right.  "That there was no ambiguity

19  in respect of GM's reservation of rights to modify, at will,

20  it's welfare plans including for the period in question and

21  that -- or I could conclude otherwise, I would not be doing so

22  by applying a different standard than that which is applied in

23  the Second Circuit under Bouboulis v. Transport Workers Union

24  of American 442 F.3d 55 (2006), namely that the plan documents

25  contain specific written language that is reasonably

1    susceptible to interpretation as a promise to vest benefits.

2    Language quoted from Devlin v. Empire Blue Cross and Blue

3    Shield 274 F.3d 7684 (2001).  Instead, what I would be doing

4    would be, in essence, reversing the majority's conclusion in

5    the en banc Sprague opinion that there was no ambiguity in the

6    relevant documents.  And that, in fact, it was clearly

7    understood that GM had reserved the right to modify.

8         Based on the analysis of the record, which I believe

9    is one that is clearly pointed out as such by the descent of

10   Chief Judge Martin in that case, I don't believe there's any

11   difference as far as how the Sprague Court and the Second

12   Circuit would review the underlying documents.

13        In any event, I believe that that portion of the

14   report that went beyond my charge or my assignment to the

15   committee, since it, in essence, sought to reargue my earlier

16   ruling, and in addition sought to suggest that the assumption

17   by Delphi pursuant to the master separation agreement, which

18   appears at Exhibit 90 in the U.S. Employee Matter's Agreement,

19   which was referred to there and appears in here most readily at

20   supplemental Exhibit 4, provided for the transfer to Delphi and

21   the assumption by Delphi of GM's legal responsibilities for

22   OPEB claims.

23        My conclusion was in February and is now that in

24   assuming such legal responsibilities at the time, Delphi and GM

25   were both fully aware of the Sprague decision, which predated

1    these agreements which found that GM has no legal

2    responsibilities in respect to these claims.  And in light of

3    the clear evidence that all of Delphi's plans and all of GM's

4    plans, at least since 1985, contained a clear unambiguous

5    reservation of the right to terminate or plan documents contain

6    such reservation that I cannot ignore the context of the

7    Sprague decision as underlying the parameters of what Delphi

8    adequately assumed and what GM transferred to it."

9         I will submit to Your Honor, that on reconsideration,

10   Judge Drain went even further then the bench opinion.  And I

11   submit to Your Honor that it's incontestable that GM had the

12   right and has the right to modify, terminate, any of these

13   welfare plans.  And in that context, Your Honor, then GM is not

14   subject to 1114 and there is no need for a retiree's committee.

15        As to the -- Your Honor's question with respect to

16   the salaried OPEB plan and the pension plans, the pension plans

17   will be assumed by New GM and the salaried retiree plans, as

18   modified, will be assumed by New GM.  There are cuts being

19   made, Your Honor.  These are cuts, and as we pointed out in our

20   papers, since 2002 we outlined the various changes that have

21   been made by GM in these particular plans which increase the

22   cost to the employees from something like twenty-four percent

23   to forty-one percent over that decade.  And these changes were

24   made unilaterally, Your Honor, by GM and there's never been in

25   that period in time an action by any salaried retiree

81

1   contesting that that was a violation of vested benefits in any

2   way, shape or form.

3            THE COURT:  Pause, please, Mr. Miller.  Let me get it

4   straight.  I take it, for the retirees that we're talking about

5   here, they have rights of essentially three times.  They have

6   pensions, which if I heard you right, are being taken over if

7   the 363 is approved by New GM and would remain unchanged.  Then

8   they have a number two, health, and number three, insurance,

9   which would be taken over by the New GM by the modified form in

10  which they were modified before the filing date?

11           MR. MILLER:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MR. MILLER:  Now, the pension plan --

14           THE COURT:  And pause, please; a follow-up.  Are

15  there any changes contemplated beyond those that were

16  announced --

17           MR. MILLER:  Not currently.

18           THE COURT:  -- prior to the filing date?

19           MR. MILLER:  Not currently.  But I point out, Your

20  Honor, the pension plan is a defined benefits plan.  The --

21  which is a qualified plan.  The welfare plans are not

22  qualified.  These are discretionary plans with GM.

23           THE COURT:  Okay.  Continue, please.

24           MR. MILLER:  Also, Your Honor, in the March 11th oral

25  decision, subsequent oral decision by Judge Drain, he likewise

82

1   deals with 1114(l).  And he says very specifically in there,

2   Your Honor, that there is no indication whatsoever that

3   Congress intended to change the applicability of 1114 when it

4   adopted 1114(l).  In fact, there was nothing in the

5   congressional record.  There is no indication whatsoever that

6   Congress was changing the laws that existed prior to the

7   adoption of 1114(l), and I think it was in 2005.

8            So the law is, Your Honor, that if a welfare plan is

9   subject to unilateral termination or modification, then 1114

10  doesn't apply.

11           Now, in connection, Your Honor, with discussions with

12  the company, there's nothing holding back counsel and his group

13  from contacting GM.  You don't need a retiree committee to do

14  that.  There can be discussions and there is actually, a, as I

15  understand it, Your Honor, a salaried retirees' committee of

16  some type that does periodically discuss these issues with GM.

17           So we come back to the bottom line issue, Your Honor.

18  Is 1114 applicable to these particular welfare plans?  Judge

19  Drain, in his very comprehensive bench opinion said, no.

20  Subsequently, in his consideration of the report of that

21  committee which was appointed for a specific purpose, he

22  reiterated that.  He also went further, Your Honor, and said

23  that the Second Circuit, at least in his opinion, would not

24  vary at all from the Sprague decision.  And we would submit to

25  Your Honor the Sprague decision should be binding.  Yes, it's

83

1    binding on the 114 plaintiffs in that action, but when you look

2    at the issues that were litigated in that case, they are

3    precisely the issues that would come up here:  did GM have the

4    right to unilaterally terminate or modify?

5         The Second Circuit en banc, as Your Honor pointed

6    out, nature as majority, on certain issues, and 1011, on other

7    issues, found that GM had that right.  And all of the plans,

8    Your Honor, had the reservation of that right.  And it's been

9    consistent.  And in that context, Your Honor, there should be

10   no retiree committee in this case which would just simply add

11   more cost.  And as Your Honor pointed out in your decision last

12   Tuesday, all that means is you're transferring more costs to

13   the general creditors.  And in that context, Your Honor, we

14   submit there should be no committee.

15        THE COURT:  All right.  Thank you.  Mr. Mayer,

16   creditors' committee?

17        MR. MAYER:  Thank you, Your Honor.  Tom Mayer for the

18   official committee of unsecured creditors.  We echo the

19   debtors' view that because the contract provides for

20   modification at GM's will, I don't mean to minimize the

21   hardship that a termination or modification at the debtors'

22   option may impose on individuals but that's the agreement they

23   have; that's the effect of the agreement.  And with respect to

24   the Sixth Circuit versus Second Circuit, if I may pick up on a

25   comment Your Honor made, one of the unfortunate results of

84

1    going a different way here is to take a decision on these

2    precise documents and say the Sixth Circuit got wrong looking

3    at the documents before it.  I think perhaps Your Honor was

4    referring to a resonance to your earlier decision on the Third

5    Circuit.  Sixth Circuit, it's not just that it's interpreting

6    ERISA, it's interpreting these documents.  And to seek a

7    different decision in this Court when the Sixth Circuit has

8    looked at these documents, I think would be very unfortunate.

9    But that being said, there's one other major point that is sort

10    of the elephant in the room that is being overlooked and was

11    critical in the Chrysler case where we were involved, who are

12    the negotiations with, Your Honor?

13         A statement has been made that "GM" is cutting its

14    benefits by two-thirds.  Who's going to pay the one-third

15    that's left?  It's New GM.  The elephant in the room is the

16    government.  The government is the owner of New GM and any

17    relief that this committee is seeking is going to have to be

18    paid by New GM.  That's the only entity that's going to have

19    any plans going forward.  That's the only entity that's going

20    to be set up to pay retiree medical benefits going forward.

21    Any discussion has to be with New GM.

22         And if I may go back to an issue, Your Honor, at the

23    very beginning of this hearing as a shout point at 1114 and

24    there is a nay point at 1113.  We are not in the shout section,

25    no one has moved to terminate or modify retiree medical

85

1    benefits.  Largely because no -- the debtor has nothing, the

2    committee does not think that's necessary.

3        If you're in the nay part of 1114, and this is where

4    we start diverging from Delphi with respect to the need for any

5    committee in the first play, the fact of the matter is these

6    negotiations aren't with Old GM.  They're with New GM.  And I

7    think the Court should take that into account just as Judge

8    Gonzalez did in conjunction with the Chrysler decision where we

9    had a very similar set of arguments, and Judge Gonzalez

10   basically said, "Look, your discussion with new co."  And 1114

11   is not set up to facilitate a third party's discussions with an

12   acquirer.  It is the acquirer who is going to make the

13   decisions here.  That's the reality and I think that Your Honor

14   can take account of that in determining in whether you should

15   exercise discretion to appoint a committee here.  Because I

16   think that's the elephant in the room.

17       We cited to the Chrysler transcript.  We did not

18   include a copy of it in our pleading because we called chambers

19   and was told that because that transcript had not been made an

20   official record yet, it was not appropriate for us to provide

21   copies to the world by attaching it to our pleadings.  I have

22   copies here if you want --

23   TZIPPY2 14900

24       THE COURT:  This is what?  For the protection of

25   court reporters?  Because it's a public document.

86

1              MR. MILLER:  Well, yes, Your Honor.  I think that's

2     exactly what it is.  I have copies here.  I'm happy to hand

3     them out.

4              THE COURT:  Well, I must say, the most important

5     thing is to get one to Mr. Goteiner because I thought I was

6     allowed to read that transcript and I read the Gonzalez

7     transcript.

8              MR. MILLER:  I'm happy to provide it and I apologize

9     for not having done so but we were given instructions.

10             THE COURT:  Well, I think we've got to get a copy to

11    Mr. Goteiner.  I mean, you cited that transcript in your brief,

12    if I recall, at the end as your last point.  Didn't you, Mr.

13    Miller.

14             MR. MILLER:  Yes, Your Honor.  I did so and as I said

15    I apologize for not having attached it but we were told by

16    chambers, because of the court reporter's rules, that we

17    couldn't make copies available to everybody.

18             THE COURT:  Well, I'm sorry.  I didn't know that

19    chambers told you that.  Mr. Goteiner should have been given it

20    before now and I'm going to take a recess to allow him to

21    comment on it, if he wants to, before we're all done.

22             MR. MILLER:  Certain.

23             THE COURT:  I'm sorry.  Sometimes my chambers tells

24    people things that I never know about and they don't have the

25    same sensitivities that I do.  There are rules to protect

87

1   court reporters and sometimes those rules just have to be

2   trumped.  Okay.

3           MR. MILLER:  I have nothing further.

4           THE COURT:  All right.  Does anybody want to be heard

5   before I give Mr. Goteiner a chance to reply?  No.  Mr.

6   Goteiner, your option.  Would you like me to take a recess now

7   to give you a chance to read it?  The Gonzalez decision?

8           MR. GOTEINER:  Well --

9           THE COURT:  On the one hand it was referred to in Mr.

10  Miller's brief or in his firm's brief, I forgot whether he was

11  a signer, but on the other hand, the underlying transcript

12  wasn't there.

13          MR. GOTEINER:  Your Honor, if I may, might I respond

14  for a few minutes to arguments --

15          THE COURT:  Certainly.

16          MR. GOTEINER:  -- and then take a recess?

17          THE COURT:  Yes.

18          MR. GOTEINER:  Okay.  Well, the one overarching

19  argument that has not been dealt with is the 1114 process and

20  that what's gone on in some of the decisions and what debtors

21  and creditor committee wants to do is to turn this into a

22  summary judgment determination.  It's too premature for that.

23  And you know it's premature when they get back to Sprague.  I

24  also just read Drain's -- Judge Drain's decision or transcript

25  and he even points out that he's clear with respect to all the

88

1    plans, at least since 1985.  So what happens to the plans

2    before 1985?  So, there's a large number of retirees who come

3    within that time period.  Judge Drain starts talking about no

4    ambiguity but it's not a factual issue only, Your Honor.  And

5    this is -- unfortunately, we have to go back and take a look at

6    the decisions but Devlin -- it's a legal issue.  The question

7    is, what would the Devlin court decide as to whether it was

8    ambiguous.  We respectfully submit that Devlin, again, not

9    cited to except in Judge Drain's decision but with no analysis,

10   makes it real clear that under Second Circuit analysis, Judge

11   Martin was right; it was ambiguous.

12           And the notion of making a decision at this point and

13   totally sidestepping Congress' provision of an 1114 proceeding

14   because debtor suggests it's going to be more money, I think

15   absolutely flies in the face of what Congress intended

16   particularly when you're talking about billions of dollars of

17   benefits to people who truly -- this really is the archetypical

18   situation where you have widows and orphans.  And it's just --

19   it's grossly unfair.  But putting aside fairness and equity, it

20   flies in the face of 1114.  That's precisely what Congress

21   wanted to avoid; a quickly determined summary judgment

22   determination without giving the retirees a chance to sit down

23   and at least be the assistant captain of their fate.  That is

24   not what Congress had in mind and the notion of having an

25   informal ad hoc committee without portfolio as opposed to an

89

1    1114 committee, I suggest is absurd.  And again, flies in the

2    face of what 1114 does.

3            THE COURT:  Pause please, Mr. Goteiner.  I didn't

4    want to interrupt you when you made the point.  You pointed out

5    that Judge Drain's decision said, in substance, I don't

6    remember the exact words, at least since 1985 retirees had been

7    told that the company reserved the right to change the welfare

8    plans.  Do you know how many retirees there are who retired

9    before 1985 and, if I'm allowed to ask a compound question, how

10   many of them aren't sixty-five where they would get Medicare

11   rights and therefore their medical needs would be greater than

12   they would be if you got an entitlement to Medicare?

13           MR. GOTEINER:  I do not know that number.  I do not

14   know that number.  And as --

15           THE COURT:  That's almost twenty-five years ago.

16           MR. GOTEINER:  Oh, I understand.  I understand.  I

17   don't know that number but there are other rights as well.

18   There's life insurance, health bene -- you know, health

19   benefits might -- that would be an issue, I understand that but

20   if there's life insurance issues.  So, all I'm saying is that

21   there's ambiguity there as well.  And when you look at Judge

22   Martin's decision, I'm not trying to hold close to my bosom the

23   descending opinion for all purposes.  But the point is, for

24   purposes of Second Circuit analysis, it bears close reading.

25   Judge Martin pointed out how some of the materials were

90

1    deceptive.  So, yes, the majority opinion decided it was

2    unambiguous under the Wise standard.  That is not, I

3    respectfully submit, what the Second Circuit would do, not

4    withstanding Judge Drain's view of it in this transcript.

5            But again, that issue is so premature to what 1114 is

6    all about but what is does underlie is how this would be

7    singularly inappropriate, where you have that kind of

8    ambiguity, that kind of dissension about what these plan

9    documents mean and decide the issue now and say no 1114

10   committee because it's going to cost the debtor a few bucks

11   compared to the billions that are at issue for these people. It

12   doesn't make sense.  And I respectfully submit is not

13   consistent with what the Second Circuit does.

14           And there may be vested benefits.  I know the

15   debtor's counsel's saying there's no vested benefits.  That's

16   another issue.  It could well be, depending upon how the Second

17   Circuit would rule on whether there was sufficient ambiguity,

18   that they would find vested benefits.  If the Second Circuit

19   found or agreed with Judge Martin that there was, for instance,

20   deception or at least unclarity, I think the Second Circuit

21   would come out differently.  And that's what, respectfully

22   submitted, Your Honor has to grapple with.  But again, that's

23   for a different day.  There's been enough of a showing today

24   and in the papers and in everything that even Judge Drain said

25   in hi supplement, to make it clear this is singularly

1    unappropriate for the kind of judgment that defendants want

2    entered today, given what's at risk.

3         So it all -- this is more than just mother and apple

4    pie.  It really has to do with the practicalities of how these

5    decisions should be made and they can be made very quickly.

6    Your Honor could put a time period on it.  And within a couple

7    of days, the trustee can select a committee and the parties,

8    within a few more days after that, can sit down and start to

9    talk.  The down side is so miniscule compared to what's at

10   stake that I submit that cost benefit analysis mitigates very

11   heavily in terms of appointing the committee.

12        And I think that covers all issues except this

13   1411(l).  The 1411(l) statute is real clear.  There's no doubt

14   about it.  And I see a lot of evasion --

15        THE COURT:  Well, isn't it just as ambiguous as

16   1114(d) is?

17        MR. GOTEINER:  Well, Your Honor, okay --

18        THE COURT:  I mean, neither one -- each of them could

19   have said not withstanding any provision of contract that gives

20   the company greater rights and then proceed into what it says.

21        MR. GOTEINER:  Your Honor --

22        THE COURT:  Conversely, I suppose, it could've taken

23   the opposite view.  But one of the practical problems that guys

24   in my position have is we're sworn to follow instructions from

25   Congress and Congress sometimes doesn't do its job as well as

1     it might.

2              MR. GOTEINER:  Your Honor, I agree with that

3     obviously but then we have things to help judges and we have a

4     series of cases from the early 80s from the U.S. Supreme Court.

5     I think one of them was called Cannon in dealing -- at Touche

6     Ross -- in dealing with how you interpret congressional statute

7     when there is preexisting law.  And the Congress is presumed to

8     understand what the law was and yet they didn't put in that

9     little fillip at the end of the statute, why?  Because it was

10    good enough.  It said any benefit.  Congress is presumed to

11    know there is such a thing as amendable benefits.  And yes, I

12    read Judge Drain's point that there was even a proposal to deal

13    with Doxell (ph.); I saw that.  But that Congress rejects that

14    when Congress has language like any benefit, when the costs are

15    so minimal, I think speaks volumes.  And that is -- that

16    stubborn and irreducible fact and logic is something that the

17    defendant -- that the debtors have not dealt with.

18             THE COURT:  When Congress wanted to overrule Lilly

19    Ledbetter, it did so pretty clearly, didn't it?

20             MR. GOTEINER:  Sometimes they do.  Sometimes they do.

21    But when they don't, all you can do is go back to Sutherland, I

22    think that's the treatise, and go back to the Supreme Court

23    cases that talk about how you interpret statutory language when

24    there is existing law and when there is law that may be

25    inconsistent.  And again, that discussion has not taken place

93

1    enough here.  So, I think with -- that all the practicalities,

2    all the legislative interpretations that we've been discussing,

3    point to the appointment of an 1114 committee.  And again, the

4    cost benefit analysis says this very clearly.  And I'll stop

5    there, I'll take a --

6        THE COURT:  I don't want you quite to stop, Mr.

7    Goteiner --

8        MR. GOTEINER:  Okay.

9        THE COURT:  -- because on the wholly discretionary

10   point, I guess if 1114 doesn't apply at all, people can debate

11   about whether I'm even supposed to take a discretionary

12   analysis, but assume I do.  Toward the end of its brief, the

13   creditors committee pointed out that negotiation is with the

14   wrong entity and that the negotiation would have to be with

15   Treasury or new GM or somebody other than the debtor in

16   possession.  And that brings up Judge Gonzalez's holding and

17   I'm at a mind that I should give you a chance to comment on

18   that if you want it.  And since I'm going to have to take at

19   least a recess to do this anyway, just to go through what we

20   have, I wonder if you would like to reserve the right to say

21   something before I finally rule during a recess to take a look

22   at Gonzalez's decision and tell me if you thought Arthur

23   Gonzalez got it wrong.

24       MR. GOTEINER:  I'll do that, Your Honor, and you

25   know, again, I will do that.  I just want to make one more

1   point.  That -- which is subsumed in my prior points, it's

2   really not necessary for this Court to say the Sixth Circuit

3   got it wrong.  Again, not today.  It's just not.  But the only

4   thing I ask Your Honor to consider in making this decision, you

5   know debtors speak with certainty that hasn't been seen since

6   the twelfth century about what amendable benefits are and

7   whether they exist here and that is just not true.  And no

8   matter how many times you say it, that it's clear, even if

9   Judge Drain says he doesn't think there's ambiguity, that

10  doesn't make it true.  It is not certain here.  And that is

11  another point that's subsumed in Congress's wisdom about 1114

12  and I'll take a look at the transcript.

13          THE COURT:  Okay.  Thank you.

14          MR. GOTEINER:  Thank you.

15          THE COURT:  Folks, I'd like you to take an early

16  lunch and be back by 12:30.  I can't guarantee you that I'll be

17  ready by then but hopefully you can get something to eat

18  between now and then.  Give you enough time to both get a

19  sandwich down and also read Judge Gonzalez's transcript, Mr.

20  Goteiner.  And then I'll try to give you a decision after that

21  lunch break but not before giving Mr. Goteiner another chance

22  to be heard if he wants to.  Okay, we're in recess.

23      (Recess from 11:30 a.m. until 1:37 p.m.)

24          THE COURT:  I apologize for keeping you all waiting.

25  Before I come to a final decision, I want to give you, Mr.

95

1    Goteiner, an opportunity to comment on Judge Gonzalez's

2    decision since it was noted by the creditors' committee and is

3    at least arguably fairly relevant to this determination.

4          MR. GOTEINER:  Thank you, Your Honor.  Neil Goteiner,

5    Farella Braun + Martel, for the General Motors Retirees

6    Association.  I had a chance to take a look at the transcript.

7    I would just note a couple of distinctions and then get back to

8    a basic point.  Of course, here we do know that GM has

9    announced that there's going to be cuts in the order of

10    magnitude of two-thirds.  And we also know that there have been

11    prepetition cuts as well in the six-month period.

12          So were we to abandon at this point the 1114 process,

13    you would be -- what would be happening is that the committee

14    would be giving up whatever rights it has under 1114.  It would

15    lose leverage because, of course, New GM would not be a debtor.

16          And -- but I did go beyond that, obviously.  I took a

17    look at the practicalities that Judge Gonzalez was addressing,

18    and of course there are practicalities, but here it's not the

19    same sequence and it's not the same -- or different

20    personalities, completely different personalities, as in

21    Chrysler.

22          You will have committee speaking with people who are

23    going to be involved to some degree in New GM.  And lots of

24    things can happen in these negotiations.  Yes, it's possible

25    that the representatives of GM who will be in the New GM will

1    simply say okay, hats have changed, we reject what we agreed to

2    with you.  But it's quite possible that that won't happen and

3    that there will be some agreements that are reached with the

4    1114 committee participating that, in the negotiation process

5    and the relationships that develop during negotiations, will be

6    passed on to some of the same people in the New GM and they

7    will abide by what they agreed as they negotiated as part of

8    the 1114 process.

9           At least there's no reason to assume that will not

10   happen.  And, indeed, I think the way even the creditors'

11   committee phrased it is that this committee may not be the

12   appropriate person -- the appropriate party to negotiate now.

13   And anything is possible, but the atmospherics and the elements

14   are quite different here than in Chrysler.  And there's a

15   stronger argument/brief of appointing an 1114 committee.

16          And that's what 1114 says should happen in any event.

17   So that's my submission.

18          THE COURT:  Just one question before I give anyone

19   else a chance to comment, if they wish, because I like your

20   idea of being realistic.  Earlier in your remarks just a moment

21   ago you said you were concerned about giving up leverage.

22   Unrealistic to know that leverage tends to be something that

23   people think about all the time in large bankruptcy cases,

24   maybe smaller ones too.  But to what extent, in your view,

25   should I, as a judge who's supposed to call balls and strikes

97

1    the way he sees them, be guided by giving one party or another

2    leverage against the party with the different perspective?

3            MR. GOTEINER:  Well, leverage is whatever is

4    provided, and I use leverage -- I'm not backing away from the

5    word "leverage", it's a reasonable word to use, but the whole

6    panoply of dynamics that are embraced by 1114, because it has

7    to be equitable and fair, that's the leverage I'm talking

8    about.

9            So, and that, by the way -- leverages goes both ways,

10   Your Honor, because my clients, at the end of the day, have far

11   less leverage than the debtor has.  So it's far worse, from my

12   clients' point of view, than a two-way street.

13           THE COURT:  Okay.

14           MR. GOTEINER:  So that is why, I respectfully submit,

15   Your Honor should have not a moment's pause that there's any

16   untoward leverage given to the 1114 committee.  This is

17   precisely what 1114 contemplated; no more.

18           THE COURT:  Okay.  Thank you.  I know we've been at

19   this for a long time, but if either the debtors or the

20   creditors' committee who brought up Judge Gonzalez's decision

21   want to be heard before I take another brief recess, I'll

22   permit that.  Mr. Mayer?

23           MR. MAYER:  Yes, Your Honor, thank you.  Unless you

24   have questions, I don't think I have anything to add.

25           THE COURT:  Okay.  Mr. Miller?

98

1          MR. MILLER:  And if Your Honor please, I would just

2     point out, in order for --

3          THE COURT:  You're very tall, Mr. Miller.  Can you

4     either lift that microphone up or come to the main lectern?

5          MR. MILLER:  Thank you, Your Honor.  I would just

6     point out, in order for this committee to have any effect and

7     to provide the leverage which counsel says they need, you would

8     have to determine that GM does not have the right to modify or

9     terminate any of these claims.  And the record is, I think,

10    crystal clear that GM has the right to terminate or modify any

11    of these claims.

12         And what we're talking about, Your Honor, is a

13    situation which hopefully, in my view, is a few days.  The sale

14    hearing is scheduled for Tuesday.  Hopefully we will finish it

15    next week.  It's important that this company emerges -- these

16    assets emerge as part of a New GM that's going to have any

17    chance of success.

18         Counsel's talking about give the U.S. Trustee three

19    or four days to appoint a committee, the committee's got to

20    organize, it's going to have to hire professionals, probably a

21    financial advisor, a statistician, and so on.  By the time all

22    of that happens, Your Honor, hopefully, if we're right, and

23    Your Honor approves it, the transaction will have been

24    consummated.

25         So the leverage that is so important, and which is

99

1    the only purpose for which this motion has been brought, will

2    be of no avail because New GM will be off as a new OEM

3    manufacturing cars and trucks without the stigma, if I can use

4    that word, of bankruptcy, which is the objective for this

5    transaction.

6            So the negotiations, Your Honor, are going to be with

7    the debtor which is going forward with the plan of liquidation.

8    And in the context of the liquidation, even if 1114 applied,

9    it's going to have to be rejected under 1114 because there's

10   not going to be any ongoing company.

11           So what we're down to, Your Honor, and Your Honor put

12   your finger on it, is leverage, that if Your Honor would grant

13   this motion and appoint a retirees' committee, the next thing

14   that will happen is a request to defer the 363 transaction,

15   which affects a lot of parties-in-interest and affects all of

16   the creditors and affects the ability of this company to

17   survive going forward.

18           So there's a real downside, Your Honor, to this

19   motion, notwithstanding what counsel says.

20           THE COURT:  All right.  Thank you.  All right, folks,

21   I've made you wait a long time.  I'm going to ask you now to

22   sit in place and wait with me here in the courtroom for a

23   minute.

24           (Pause)

25           THE COURT:  Okay, folks once more I apologize for

100

1    keeping you all waiting.  In this contested matter in a case

2    under Chapter 11 of the Code, the General Motors Retiree

3    Association, which I'll refer to as the "Retirees Association",

4    moves for an order pursuant to Section 1114 of the Code,

5    appointing an official 1114 committee.  Its motion is opposed

6    by the debtors and the creditors' committee.

7          The motion is denied, though without prejudice to

8    reconsideration at a later time under appropriate

9    circumstances, largely in accordance with the ruling by my

10   colleague Judge Drain in Delphi on March 10 of this year.  The

11   following are my findings of fact, conclusions of law and bases

12   for the exercise of my discretion in connection with this

13   determination.

14         Turning first to my findings of fact, as facts I find

15   that GM offers retiree benefits to salaried retirees who

16   started work before 1993 under two plans:  the GM Salaried

17   Health Care Program, which I'll refer to as the "Health Care

18   Program", which includes medical, prescription drug, dental and

19   vision care; and the GM Life and Disability Benefits Program,

20   which I'll call the "Life Insurance Program", which provides

21   life insurance benefits.  I refer to the two programs together

22   as the "Welfare Plans".

23         The inference is compelling, and I so find, that the

24   benefits offered under the Welfare Plans are quite important to

25   many retirees, particularly those who are still under sixty-

1    five and who are ineligible for Medicare.

2         The salaried retirees are separate and apart from

3    hourly retirees whose interests have been represented by the

4    UAW or other unions.  At this point, they have no officially

5    designated representative, though, from everything I've seen so

6    far, the Retirees Association has been a forceful and effective

7    advocate on their behalf.  And to the extent any retirees might

8    have unsecured claims, their interests in that regard would be

9    well-protected by the official creditors' committee.

10        Retirees are required to reenroll in these plans at

11   the beginning of each calendar year, prior to which GM provides

12   enrollment forms accompanied by an enrollment brochure

13   explaining changes in benefits for the upcoming year.  The

14   debtors assert that these brochures have contained an

15   unequivocal statement of GM's right to amend, modify or

16   terminate the plans.  But that was not always so.  The Retirees

17   Association asserts that, at least between 1974 and 1987,

18   salaried retirees were performing under unilateral contracts

19   that guaranteed lifetime benefits upon retirement without

20   having also received statements reserving the right to amend or

21   terminate.  And the Retirees Association points to specific

22   language in benefit handbooks that it asserts could reasonably

23   be interpreted as a promise to provide such benefits.  However,

24   these matters were a subject of litigation, extensive

25   litigation, going all the way up to an en banc decision of the

102

1     Sixth Circuit Court of Appeals, which I'll describe more fully

2     in my conclusions of law.

3          GM effected changes in its retiree Welfare Plans from

4     time to time.  Prior to these Chapter 11 cases, three changes

5     were made that are at least arguably significant.  On July

6     2008, effective January 1, 2009, GM eliminated medical, dental,

7     vision and extended care coverage for salaried retirees, their

8     surviving spouses and their dependents age sixty-five or older.

9     In September 2008, GM changed the plans to comply with a cap on

10    salaried retiree health care; it was approved by the GM board

11    of directors in 2007.  And in February of this year, GM

12    accelerated a planned reduction in salaried retiree life

13    insurance, which had previously been announced in 2006 and was

14    going to be effective in 2017, in respect to whose details are

15    not material here, effective May 1, 2009.  All but the third

16    change, the one announced in February and effective May 1, were

17    communicated to salaried retirees more than six months prior to

18    the filing date, a time which is arguably significant to

19    parties' rights.

20         GM has not proposed any further changes in either of

21    the plans, at least insofar as it would implement them.  And

22    under the proposed sale agreement, assuming, of course, that it

23    is approved, and without prejudging that issue in any way, the

24    purchaser knew GM will assume responsibility for them going

25    forward but as modified prepetition in the manner I just

1    described to provide them in lesser amounts.

2         Turning now to my conclusions of law and bases for

3    the exercise of my discretion, as usual I start with the words

4    of the statute.  Section 1114 of the Code provides, in relevant

5    part, in its subsection (d), "The Court, upon motion by any

6    party-in-interest, and after notice and a hearing, shall order

7    the appointment of a committee of retired employees if the

8    debtor seeks to modify or not pay the retiree benefits or if

9    the Court otherwise determines that it is appropriate to serve

10   as the authorized representative, under this section, of those

11   persons receiving any retiree benefits not covered by a

12   collective bargaining agreement.  The United States Trustee

13   shall appoint any such committee."

14        Thus, under the statute, the Court must order the

15   appointment of the committee if the debtor seeks to modify or

16   not pay the retiree benefits.  Alternatively, it may order the

17   appointment if the Court otherwise determines that it's

18   appropriate to serve as a bargaining representative for

19   retirees not covered by a collective bargaining agreement.

20        The Retirees Association contends that Section 1114

21   of the Code applies to what the debtors did prepetition and

22   would do post-petition here and that I thus should appoint a

23   retirees' committee under each of the two separate regimes

24   under which a retirees' committee should be appointed.  I

25   disagree with the Retirees Association with respect to the

104

1    first, and for the most part with respect to the second,

2    although I think I should reserve room to have the ability

3    going forward to make a discretionary limited appointment if

4    circumstances not present now but in the future later warrant.

5           Turning to the matter of mandatory appointment, the

6    backdrop as to the mandatory appointment issue is the fact

7    that, as discussed in my findings of fact above, at some point

8    in time GM started to tell its employees, who were of course

9    its prospective retirees, that their welfare plans could be

10   amended, modified or terminated.  GM and the creditors'

11   committee contend that Section 1114 doesn't apply when a debtor

12   simply exercises the rights to modify or terminate that it has

13   outside of bankruptcy.  But the Retirees Association, in

14   contrast, contends that 1114 applies to any modification or

15   termination of retiree rights under a welfare plan, whether

16   such termination or modification is authorized under non-

17   bankruptcy law or not.  And thus, in substance, it argues that

18   Section 1114 improves upon non-bankruptcy law rights.

19          Though Sections 1114(d), (e) and (l) are, in my view,

20   ambiguous, and the cases are somewhat split in this area, I

21   must agree with GM and the creditors' committee.  The Retirees

22   Association says at page 9 of its motion that, quote, "A few

23   courts have held, on a divided issue of law where other courts

24   disagree, that this Section 1114 does not protect in bankruptcy

25   benefits the Debtor retained the unfettered right to amend

105

1    outside of bankruptcy", quote.  But I can't regard that as a

2    fully accurate description of the state of the law, especially

3    in this circuit and district.  In fact, I think it's exactly

4    the opposite.

5         The Retirees Association cites the Second Circuit's

6    decision in LTV Steel Company v. United Mine Workers, In re

7    Chateaugay Corporation, 945 F.2d 1205 (2nd Cir. 1991), as being

8    one of the cases that holds against the retirement committee on

9    this issue.  And, of course, Chateaugay does.  Chateaugay says,

10   in fact, "The Bankruptcy Protection Act", which was the statute

11   by which 1114's predecessor came into being, and from which

12   1114 evolved, "requires that during reorganization the parties

13   continue to provide benefits according to the plan in effect at

14   the time of the declaration of bankruptcy.  The Bankruptcy

15   Protection Act does not alter the terms of that plan."  945

16   F.2d at 1209.  And that's exactly why Judge Restani dissented

17   in that case.

18        But while acknowledging Chateaugay, the Retirees

19   Association doesn't give enough recognition, in my view, to the

20   fact that Chateaugay is a controlling decision of the Second

21   Circuit, binding on me and the other judges in this circuit.

22   Likewise, the Retirees Association cites decisions of a former

23   visiting judge who sat in this district, and a district who

24   affirmed him, in the case of Ames Department Stores,

25   insufficient attention to the fact that those decisions were,

1   with respect, strikingly lacking in consideration of the

2   applicable case law.  They can only be read as having been

3   roundly criticized by this circuit in a subsequent decision in

4   Ames (see 76 F.3d 66 at page 71), though not on direct appeal,

5   and while the thoughts were expressed in dictum.

6          The district court decision, which is available

7   electronically but isn't published, expressed its conclusions

8   in what some might say was an ipse dixit fashion, without

9   parsing the words of the statute or relying upon any case law,

10  which at that point in time included about nine cases, as

11  observed by Judge Lifland in Ionosphere Clubs, 134 B.R. 515 at

12  page 517 (1991).  Unfortunately, the decision of the bankruptcy

13  court was equally thin.

14         In that later Ames decision, the circuit held, "We

15  think that there's a substantial room for disagreement with the

16  categorical holding in the district court's orders that the

17  debtor was required to follow the requirements of Section

18  1114;" reading from page 71, 76 F.3d at 71.  And while the

19  circuit in that Ames decision merely held that it couldn't be

20  said that the argument for the debtor's interpretation was

21  frivolous, that being an appeal of a sanctions determination or

22  a denial of fees for pursuing a frivolous argument, and while

23  the circuit expressly stated that it wasn't examining the,

24  quote, "present status of the pertinent law", quote, id at 71,

25  it was hardly an endorsement of the lower court's views.  In

107

1   fact, the circuit made a point to cite Chateaugay and Doskocil,

2   Federated Department Stores, New Value, and Collier as examples

3   of authorities that had gone the other way.  And it went on to

4   observe that Collier -- Collier on Bankruptcy, of course --

5   provides that Section 1114 does not, however, protect retiree

6   benefits beyond the contractual obligations of the debtor.

7         And the circuit observed, with respect to the

8   bankruptcy court and district court Ames decisions upon which

9   the Retirees Association relies, not one of the foregoing

10  authorities was discussed or even mentioned by either the

11  bankruptcy court or the district court.  More importantly,

12  neither court cited any interpretative authority that

13  conflicted with that above cited.

14        Now, make no mistake, I don't read that decision as

15  having ruled in favor of the principle for which the debtors

16  and the creditors' committee argue here.  In fact, it expressly

17  stated that it was not then ruling on the existing law.  But

18  what I think it very effectively does, if not conclusively so,

19  is say that I shouldn't be relying on those lower court Ames

20  decisions.

21        But perhaps most importantly, in its briefing on this

22  motion the Retirees Association failed even to mention Judge

23  Drain's decision in March of this year in Delphi, 2009 WL

24  637315 (Bankr. S.D.N.Y. Mar. 10, 2009), until the Retirees

25  Association filed its reply.  And even then the Retirees

108

1    Association failed sufficiently, in my view, in that reply to

2    acknowledge all of the things Judge Drain said and to discuss

3    his substantive analysis before the retirees' committee

4    properly commented on the relatively limited relief that Judge

5    Drain had ultimately granted in Delphi.  Of course, the

6    Retirees Association made up for that in oral argument, but I

7    think Judge Drain's decision in Delphi is of great importance.

8         I've previously noted many times in writing my view

9    as to the importance of consistency in the decisions in the

10   bankruptcy court in this district and that I follow the

11   decisions of the other bankruptcy judges in this district, in

12   the absence of clear error.  But when we're talking about the

13   Delphi decision, I think that's feigned praise since, in my

14   view, Judge Drain's analysis was plainly correct and, by far,

15   the most comprehensive and well-reasoned of any of the

16   decisions in the 1114 area.

17        I note, by the way, that when I talk of Judge Drain's

18   decision, although I'm principally speaking of his decision of

19   March 10, there was a supplemental argument on or about March

20   11, as evidenced in a separate transcript to which I'll be

21   referring in a moment or two, and that getting one's arms

22   around Judge Drain's Delphi rulings is best achieved by

23   consideration of both of the two decisions.

24        Judge Drain also dealt with the argument that I also

25   heard here, that Chateaugay was overruled by statute by the

1    inclusion of new Section 1114(l) in BAPCPA.  Judge Drain

2    disagreed, and so do I.  As Judge Drain observed, Section

3    1114(l), however, does not specifically deal with the issue of

4    plans modifiable as of right and could conceivably apply to

5    pre-bankruptcy breaches by debtors in financial distress of

6    vested rights.

7         More importantly, even if it does apply to modifiable

8    plans, I do not view Section 1114(l), which applies to a

9    specific type of prepetition action, as overruling Doskocil and

10   the line of cases that follow it which apply to post-petition

11   actions.  Nor does there appear to me to be any legislative

12   history or other policy statements accompanying the 2005

13   amendment that would clearly set forth Congress's intention

14   generally in Section 1114(l) to override, beyond its specific

15   terms, the fundamental principle that bankruptcy does not give

16   new rights to individual parties-in-interest or to cut back on

17   the tenet set forth by the Supreme Court in Butner.

18        Now, I have not discussed the underlying principles

19   as thoroughly as Judge Drain did there.  In this oral dictated

20   decision, I don't know if that's necessary or appropriate.  But

21   I've carefully read Judge Drain's analysis and I concur in it

22   in full, even putting aside the deference in respect to which I

23   give the decisions of my colleague judges.  And since

24   Chateaugay and Delphi are in alignment, I'm ruling in

25   accordance with each of them that Section 1114 doesn't apply to

110

1    employee benefit plans that are terminable or amendable

2    unilaterally by the plan sponsor.  Putting it another way,

3    Section 1114 does not trump any agreement between a company and

4    its employee that gives the company the right to amend or

5    terminate a welfare plan.

6           Thus, in terms of arguably persuasive authority,

7    we're left only with the decision in Farmland Dairies.  If one

8    were to look solely at the words of the statute, which, as I've

9    noted, is ambiguous, the Farmland Dairies view is not

10   necessarily an unreasonable one.  But Farmland can't be

11   reasonable with the weight of authority in this area, only part

12   of which I've noted above, and Farmland Dairies is inconsistent

13   with the law in this circuit and district.  Of course, when I

14   speak of the weight of the authority I'm not counting noses;

15   I'm looking at it qualitatively and at what level it was

16   decided.  That consideration is particularly relevant to

17   Chateaugay and Delphi.  And, as I've noted, I regard Delphi as

18   by far the most thoughtful and comprehensive decision in this

19   area.  So for any retirees as to whom the debtor reserved the

20   right to modify before they retired, they don't have rights

21   under 1114.

22          So then we get to Sprague.  GM and the creditors'

23   committee each cite the Sixth Circuit's en banc decision in

24   Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998),

25   as having ruled that the health care programs explicitly permit

111

1   GM to unilaterally amend or terminate benefits under those

2   programs.  Sprague does hold that, although the Retirees

3   Association is correct in noting that Sprague was a split

4   decision and that it also isn't binding on me.  And I agree

5   with the Retirees Association, and perhaps the debtors agree

6   with it as well -- I don't think they addressed it one way or

7   the other -- that, on a question of federal law, Second Circuit

8   law, and not Sixth Circuit law, controls in any area where the

9   law of the two circuits is inconsistent.

10          But Judge Drain ruled, and I concur, that, and I'm

11   quoting Judge Drain, "I continue to believe that the Sixth

12   Circuit Sprague decision is one in which the Sixth Circuit at

13   length determined en banc that there was no ambiguity in

14   respect of GM's reservation of rights to modify at will its

15   welfare plans, and that, were I to conclude otherwise, I would

16   not be doing so by applying a different standard than that

17   which is applied in the Second Circuit under Bouboulis v.

18   Transport Workers Union of America, 442 F.3d 55 (2nd Cir.

19   2006), namely, that the plan documents contained, quote,

20   'specific written language that is reasonably susceptible to

21   interpretation as a promise to vest benefits', end quote."  I'm

22   quoting from the transcript of the Delphi hearing of March 11,

23   2009, which probably should be read as a supplemental and

24   second Delphi decision.  See also the comments Judge Drain made

25   in the course of argument at page 11.

112

1          And I recognize that sometimes judges say things in

2     oral argument that they don't mean or that they're throwing up

3     just to be devil's advocates, but from the context I believe

4     that Judge Drain meant it here.  If you read the opinions, they

5     really are applying the same standard.  They're basically

6     saying there was nothing ambiguous.

7          Now, when I use the words above, quote, "specific

8     written language that is reasonably susceptible to

9     interpretation as a promise", quote, those words being the

10    words that Judge Drain used, they in turn were a quotation from

11    Bouboulis, 442 F.3d at page 61.  And the Bouboulis words, in

12    turn, were a quotation from the Second Circuit's decision in

13    Devlin v. Blue Cross and Blue Shield, 274 F.3d at 84.

14         So when I rely on Judge Drain's analysis in this area

15    and I concur with it, it's very clear to me that he gave

16    careful consideration to both Bouboulis and Devlin and made a

17    knowing and accurate determination that there was no material

18    difference between Second Circuit law and Sixth Circuit law in

19    this regard.

20         Thus, at the risk of a slight repetition, stating a

21    similar thing a different way, I find insufficient basis to

22    conclude that the standard that the Sixth Circuit applied in

23    Sprague would be materially different than the standard that

24    the Second Circuit would apply.

25         Now, is the Sprague conclusion debatable under those

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

1   standards?  I think it plainly is.  And if I were writing on a

2   clean slate, I think I might well have agreed with the Boyce

3   Martin dissent.  But as to the issues upon which GM relies upon

4   it, Sprague was an eight-to-five decision as to the early

5   retirees, and a ten-to-three decision as to the general

6   retirees.  And the general retirees' analysis is the one that's

7   more closely on point here.

8          A ten-to-three split isn't close, but once more I'd

9   agree that this isn't a counting game.  Rather, I look at it

10  qualitatively and see things as Judge Drain commented on in

11  argument.  Judge Drain observed, "You may agree with Judge

12  Martin, and maybe if one were writing on a clean slate one

13  might agree with Judge Martin, but the Sixth Circuit ruled, and

14  I find it very hard for me, when there's no difference in the

15  standard, to say oh, the Sixth Circuit was wrong;" reading from

16  the March 11 transcript at page 11.

17         Where the circuit court, with ten judges no less,

18  having ruled as it did with respect to general retirees,

19  addressing the same issues we have here, I think that as a

20  matter of stare decisis I should respect its ruling and follow

21  it.

22         Folks, as is implied by what I just said, I note that

23  I'm doing so as a matter of stare decisis.  I am not so ruling

24  on the applicability of res judicata one way or the other, and

25  I'm not relying on the doctrine of res judicata.  I have some

114

1    reservations as to whether res judicata applies is not very

2    similar to those Judge Drain had.  But I don't need to reach

3    that issue.  In my view, Sprague and Delphi are so dramatically

4    on point that they counsel the result I reach here on

5    traditional bases of stare decisis.  We have what we refer to

6    in law school as the "blue Buick".

7            So now we get to the application of Section 1114(d).

8    Turning first to its mandatory portion, GM hasn't moved for

9    permission to change any retiree welfare plan benefits, which

10   is hardly surprising in light of its position that it doesn't

11   need court approval to do so and the case law that I described

12   above, and I'm going to follow that it has the right to

13   unilaterally amend or terminate such benefits.  As at least the

14   first portion of 1114 doesn't apply at all, if not the entirety

15   of 1114(d), or 1114 at all for that matter, there's no occasion

16   to apply the mandatory portion of Section 1114.  So I'm going

17   to deny appointment insofar as it's premised on the contention

18   that appointment is mandatory.

19           Turning now to discretionary appointment, though

20   appointment of a retiree committee isn't mandatory, I need also

21   to consider discretionary appointment.  As I noted, Section

22   1114(d) provides that the Court shall order the appointment of

23   a committee of retired employees if the Court otherwise

24   determines that it is appropriate.  One can make an argument

25   that if 1114 doesn't apply at all, there's no occasion to apply

1   the provision in 1114 providing discretionary authority either.

2   But I think the better view might be consistent with what Judge

3   Drain concluded in Delphi:  that bankruptcy judges should have

4   the discretion to appoint a retirees' committee, especially if

5   its budget can be kept under control, in any instances where it

6   would really accomplish something.

7        I don't reach that issue today because I here do not

8   consider the appointment of a committee now to be necessary or

9   appropriate for retirees for whom GM has the right to amend or

10  terminate benefits, for, while I well understand the importance

11  of these kinds of benefits to any retiree, believe me I do, I

12  can't change retirees' non-bankruptcy rights.  And there is no

13  need to form a committee to argue or negotiate with respect to

14  entitlements under Section 1114(l) as that can be done by the

15  Retirees Association as an ad hoc committee with rights under

16  Section 1109.  See In re Anchor Glass Container Corp., 342 B.R.

17  878 at page 882, Middle District of Florida 2005 decision by

18  Judge Alex Paskay.

19       As Judge Paskay noted in that case, "Unlike Section

20  1114(e), which contemplates motions brought by, and the debtor

21  negotiating with, an authorized representative, Section

22  1114(l), similar to Section 1114(d), depends upon a motion

23  brought by a party-in-interest.  Section 1114(l) does not

24  require, nor does it contemplate, the appointment of a

25  committee."

116

1          I also made a similar point when I considered the

2     application of the Ad Hoc Committee of Family and Dissident

3     Bondholders a couple of days ago.  In most, if not all, cases

4     under the Code, an ad hoc committee can be heard perfectly

5     satisfactorily under 1109 without being designated as a formal

6     official committee.

7          Similarly, I share concerns articulated by the

8     creditors' committee as to unnecessary costs in this case.  And

9     I also agree with another creditors' committee point, which, in

10    my view, is quite significant.  Even assuming that New GM were

11    to be making further modifications in the future, assuming, of

12    course, that I approve the 363 sale, all salaried retiree

13    benefits would be entirely New GM's responsibilities.  Thus,

14    any modifications to such benefits would have to be negotiated

15    with New GM and/or the U.S. Treasury.

16         As Judge Gonzalez noted in Chrysler, "A retiree

17    committee should be appointed only if it's necessary to

18    negotiate with the debtors, not with a purchaser of the

19    debtors' assets."  See the transcript of Judge Gonzalez's May

20    14 hearing in Chrysler at page 35.

21         With all of that said, I can't rule out the

22    possibility that appointing a retirees' committee might be

23    desirable and thus appropriate to facilitate some kind of

24    negotiations in the future or any kind of a settlement,

25    including with respect to any appeal of the determination I'm

1    making today, or in connection with some other matters where it

2    would bring something to the table beyond appearing and being

3    heard in a fashion for which it could already do that under

4    1109.  That might be helpful, by way of example, to bind absent

5    parties or dissenters.

6         That appears to be the rationale upon which Judge

7    Drain allowed the formation of a committee, or one of them --

8    the other isn't applicable here -- though with a limited

9    200,000 dollar budget.  And if it turned out to be necessary or

10   desirable to do that here, I might be of a mind to do the same

11   thing if asked.  But that isn't now necessary, if it ever will

12   be.  For instance, I don't need a supplemental report of the

13   type that Judge Drain did, and which was an element of the

14   limited appointment authority that he granted.  I'll simply

15   note now that this ruling is without prejudice to any such

16   eventuality.

17        Accordingly, the motion is denied without prejudice

18   to reconsideration in the event of an eventuality of the type I

19   just described.

20        Mr. Miller, you or your folks are to settle an order

21   in accordance with this ruling at your earliest reasonable

22   convenience.

23        MR. MILLER:  Yes, sir.

24        THE COURT:  All right, folks.  Do we have any further

25   business for today?

118

1          MR. MILLER:  No, Your Honor.

2          THE COURT:  All right, I want to thank you for

3    waiting as long as you did on the matter that I had taken under

4    advisement.  We're adjourned for the day.  Have a good day.

5          ALL:  Thank you, Your Honor.

6       (Whereupon these proceedings were concluded at 2:25 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

119

1

2                              I N D E X

3

4                            R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Debtors' motion for final order authorizing      30        20

7    debtors to pay pre-petition obligations to

8    foreign creditors and authorizing and directing

9    financial institutions to honor and process

10   related checks and transfers granted

11   Debtors' motion for final orders establishing     31         4

12   notification procedures regarding restrictions

13   on certain transfers of interest in the debtor

14   granted

15   Debtors' motion for final order on cash           31         9

16   management granted

17   Debtors' motion for authority to exercise a put   31        17

18   Debtors' motion to grant additional time to       31        23

19   file reports of financial information or to

20   seek modification of reporting requirements granted

21   Debtors' application to retain Weil Gotshal       32         5

22   & Manges as attorneys nunc pro tunc to

23   commencement date granted

24

25

120

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' application to retain Jenner & Block LLP pursuant to Section 327(e) as conflicts counsel and special corporate counsel granted | 32 | 14 |
| Debtors' application to retain under Section 327(e) Honigman, Miller, Schwartz & Cohn, LLP as special counsel granted | 32 | 21 |
| Debtors' application authorizing retention and employment of The Garden City Group, Inc. as notice and claims agent nunc pro tunc to commencement date granted | 33 | 2 |
| Debtors' motion seeking entry of final order with respect to the debtors' essential supplier programs granted | 35 | 21 |
| Motion of ad hoc committee of asbestos personal injury claimants for order appointing a future asbestos personal injury claimant denied without prejudice | 52 | 12 |

121

I N D E X, cont'd

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion to retain AP Services LLC as crisis managers and to designate Albert A. Koch as chief restructuring officer nunc pro tunc to commencement date | 55 | 17 |
| Application of the General Motors Retirees Association for order to appoint retiree committee pursuant to 11 U.S.C. Section 1114(d) denied without prejudice to reconsideration | 117 | 17 |

122

1

2                          C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9       AAERT Certified Electronic Transcriber (CET**D-486)

10

11      Also transcribed by:   Tzippy Geralnik

12                             Pnina Eilberg

13                             Penina Wolicki

14                             Dena Page

15                             Ellen Kolman

16                             Clara Rubin

17

18      Veritext LLC

19      200 Old Country Road

20      Suite 580

21      Mineola, NY 11501

22

23      Date:  June 26, 2009

24

25

## **EXHIBIT D**

**Transcript of Record,** *In the Matter of Lehman Brothers Inc.*

WEIL:\97064319\11\73217.0004

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP)(Jointly Administered),

5              08-01420(JMP)(SIPA)

6    - - - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8    LEHMAN BROTHERS HOLDINGS, INC., et al.,

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12   LEHMAN BROTHERS INC.,

13             Debtor.

14   - - - - - - - - - - - - - - - - - - - - -x

15

16             United States Bankruptcy Court

17             One Bowling Green

18             New York, New York

19

20             November 16, 2011

21             10:09 AM

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2     HEARING re Motion of Colorado Plaintiffs Authorizing 2004

3     Examination of Debtors [ECF No. 15200]

4

5     HEARING re Motion of Colorado Plaintiffs for Relief from the

6     Automatic Stay  [ECF No. 15201]

7

8     HEARING re Debtors' Motion to Establish Procedures for the

9     Consensual Amendment and Assumption of Certain Non-Terminated

10    Prepetition Derivatives Contracts [ECF No. 21297]

11

12    HEARING re Debtors' Motion Pursuant to Section 105(a) of the

13    Bankruptcy Code and Bankruptcy Rule 9019 for Approval of a

14    Settlement and Compromise with Danske Bank A/S [ECF No. 21298]

15

16    HEARING re Joint Motion of Lehman Brothers Holdings Inc. and

17    James W. Giddens, as Trustee for Lehman Brothers Inc., Pursuant

18    to Sections 105(a) and 363 of the Bankruptcy Code and Rule 9019

19    of the Federal Rules of Bankruptcy Procedure (i) for

20    Authorization and Approval of a Stock Purchase Agreement

21    Regarding the VEBA and (ii) for Authorization and Approval of a

22    Settlement Regarding the Same [Case No. 08-13555, ECF No. 21109

23    and Case No. 08-01420, ECF No. 4654]

24

25

Page 3

1

2    HEARING re The Providence Funds' Motion for an Order Settling

3    Hearing Date and Establishing Discovery and Briefing Schedule

4    or, in the Alternative, for a Status Conference [LBI ECF No.

5    4678]

6

7    HEARING re Joint Motion of Lehman Brothers Holdings Inc. and

8    James W. Giddens, as Trustee for Lehman Brothers Inc., Pursuant

9    to Sections 105(a) and 363 of the Bankruptcy Code and Rule 9019

10   of the Federal Rules of Bankruptcy Procedure (i) for

11   Authorization and Approval of a Stock Purchase Agreement

12   Regarding the VEBA and (ii) for Authorization and Approval of a

13   Settlement Regarding the Same [Case No. 08-13555, ECF No. 21109

14   and Case No. 08-01420, ECF No. 4654]

15

16   HEARING re Uvino v. Lehman Brothers Holdings Inc. [Case No. 10-

17   05428]

18

19   Adjourned Matters:

20   Motion of Official Committee of Unsecured Creditors for

21   Reconsideration of Court's September 17, 2008 Interim Order (i)

22   Authorizing Debtor to Obtain Post-petition Financing Pursuant

23   to Sections 363 and 364 of Bankruptcy Code and (ii) Granting

24   Liens and Superpriority Claims to Postpetition Lenders Pursuant

25   to Section 364 of Bankruptcy Code [ECF No. 434]

1

2   Motion of Fativa, Inc., et al. to Compel Immediate Payment of

3   Postpetition Administrative Expense Claims [ECF No. 7102]

4

5   Motion of Fidelity National Title Insurance Company to Compel

6   Compliance with Requirements of Title Insurance Policies [ECF

7   No. 11513]

8

9   Motion of Jason T. Taylor for Relief from the Automatic Stay

10  [ECF No. 14377]

11

12  Motion of Phillip Walsh for Relief from the Automatic Stay [ECF

13  No. 14571]

14

15  Motion of Giants Stadium LLC for Leave to Conduct Discovery of

16  the Debtors Pursuant to Federal Rule of Bankruptcy Procedure

17  2004 [ECF No. 16016]

18

19

20

21

22

23

24

25  Transcribed by:  Sharona Shapiro

```
 1
 2   A P P E A R A N C E S :
 3   WEIL, GOTSHAL & MANGES LLP
 4        Attorneys for Debtors
 5        767 Fifth Avenue
 6        New York, NY 10153
 7
 8   BY:  JACQUELINE MARCUS, ESQ.
 9        RICHARD KRASNOW, ESQ.
10        ERIKA DEL NIDO, ESQ.
11        LAWRENCE J. BAER, ESQ.
12
13
14   BROWN RUDNICK LLP
15        Attorneys for Providence Funds
16        Seven Times Square
17        New York, NY 10036
18
19   BY:  DAVID J. MOLTON, ESQ.
20        HOWARD STEEL, ESQ.
21
22
23
24
25
```

Page 6

```
 1   CHAPMAN & CUTLER, LLP

 2        111 West Monroe Street

 3        Chicago, IL 60603

 4

 5   BY:   JAMES HEISER, ESQ. (TELEPHONICALLY)

 6        FRANKLIN H. TOP, III, ESQ. (TELEPHONICALLY)

 7

 8

 9   HUGHES HUBBARD

10        Attorneys for SIPA Trustee

11        One Battery Park Plaza

12        New York, NY 10004-1482

13

14   BY:   MICHAEL E. SALZMAN, ESQ.

15        JEFFREY S. MARGOLIN, ESQ.

16

17

18   THE LAW OFFICES OF AVRUM J. ROSEN, PLLC

19        Attorneys for Wendy Uvino

20        38 New Street

21        Huntington, NY 11743

22

23   BY:   AVRUM J. ROSEN, ESQ.

24

25
```

```
 1    LEVIN LEE LLP

 2          Attorneys for SIPA Trustee

 3          570 Lexington Avenue, 16th Floor

 4          New York, NY 10022

 5

 6    BY:   KENNETH E. LEE, ESQ.

 7

 8

 9    LINKLATERS LLP

10          Attorneys for Lehman Brothers International (Europe)

11          1345 Avenue of the Americas

12          New York, NY 10105

13

14    BY:   JAMES R. WARNOT, JR., ESQ.

15

16

17    MILBANK, TWEED, HADLEY & MCCLOY LLP

18          Attorneys for Official Committee

19          One Chase Manhattan Plaza

20          New York, NY  10005

21

22    BY:   EVAN R. FLECK, ESQ.

23          GRACE M. GILLIGAN, ESQ.

24

25
```

Page 8

1   STUTMAN TREISTER & GLATT

2        Attorneys for Creditor, Elliot

3        1901 Avenue of the Stars, 12th Floor

4        Los Angeles, California 90067

5

6   BY:   MICHAEL NEUMEISTER, ESQ. (TELEPHONICALLY)

7        JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

8        MARINA FINEMAN, ESQ. (TELEPHONICALLY)

9

10

11  U.S. DEPARTMENT OF LABOR

12        Office of the Solicitor

13        200 Constitution Avenue, NW

14        Room N 4611

15        Washington, DC 20210

16

17  BY:   LEONARD H. GERSON, ESQ.

18

19

20

21

22

23

24

25

1   VENABLE LLP

2       Attorneys for the Deutsche Bank A/S London Branch

3       Rockefeller Center

4       1270 Avenue of the Americas

5       Twenty-Fifth Floor

6       New York, NY 10020

7

8   BY:   CAROLLYNN H.G. CALLARI, ESQ.

9

10

11  ALSO PRESENT TELEPHONICALLY:

12  ANATOLY BUSHLER, Farallon Capital Management

13  BARBARA ROTH, In Pro Per/Pro Se

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Be seated.  Good morning.

 3            MS. MARCUS:  Good morning, Your Honor.  Jacqueline

 4    Marcus of Weil Gotshal & Manges on behalf of Lehman Brothers

 5    Holdings Inc. and its affiliated debtors.

 6            Items number 1 and 2 on the agenda this morning are

 7    related to each other.  They are the motions of the Colorado

 8    plaintiffs for Rule 2004 examinations and for relief from the

 9    automatic stay.  The debtors objected to both motions several

10    months ago and since then have been trying to reach a

11    consensual resolution.

12            The Colorado plaintiffs are involved in litigation in

13    state court in Colorado.  They allege that they have claims

14    relating to the design, construction or maintenance of a golf

15    course owned by debtor LB Rose Ranch LLC.

16            The debtors and the Colorado plaintiffs have entered

17    into a stipulation, subject to the approval of the Court, which

18    provides as follows -- I have a copy of it, Your Honor, if I

19    may approach.

20            THE COURT:  Please approach.  Thank you.

21            MS. MARCUS:  The automatic stay in the cases of LBHI

22    and Rose Ranch will be modified solely to permit the Colorado

23    plaintiffs to assert any and all claims relating to the design,

24    construction or maintenance of the golf course and prosecute

25    such claims against LBHI, Rose Ranch and/or their insurers in
```

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:10    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 182 of 282

Page 11

```
 1   order to recover damages from the insurance policies and

 2   proceeds.

 3           They will also be granted relief to settle the

 4   Colorado litigation with the insurers for LBHI or Rose Ranch,

 5   and to execute or collect upon any judgment rendered in their

 6   favor in the Colorado litigation against the insurance policies

 7   and proceeds without further court approval.

 8           The automatic stay with respect to PAMI Statler

 9   remains unmodified, and the Colorado plaintiffs have agreed not

10   to assert any claims against LBHI or recover any amounts in

11   excess of the insurance proceeds from LBHI.

12            There is, however, a reservation of rights pursuant

13   to which the Colorado plaintiffs reserve their right to seek to

14   assert claims in the Rose Ranch case, to the extent that their

15   claims are not satisfied from the insurance.  And Rose Ranch

16   reserves its right to object to any claim for any reason,

17   including the fact that the bar date has passed.

18           Counsel to the creditors' committee has been provided

19   with a copy of the stipulation prior to today's hearing.  The

20   debtors believe that the terms of the stipulation are

21   reasonable.  And if the Court has no questions we'd request

22   that the Court so order the stipulation.

23           THE COURT:  This has been pending for a long time and

24   has been adjourned on numerous occasions.  I have no interest

25   in upsetting a settlement.  One question, how does this impact
```

08-13555-scc    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 183 of 211

Page 12

1    the request for 2004 examinations?

2            MS. MARCUS:  My understanding is that that request

3    will be withdrawn, Your Honor.

4            THE COURT:  I'd like that confirmed on the record.

5            MS. MARCUS:  I'm not sure if counsel -- I don't think

6    they're here.  I don't know if they're on the phone but I

7    can -- how would you like me to handle that?

8            THE COURT:  I'm going to treat the fact that it's not

9    covered in the stipulation as an indication that the motion is

10   withdrawn without prejudice.

11           MS. MARCUS:  That's fine, Your Honor.

12           THE COURT:  All right.  The stipulation will be

13   approved.

14           MS. MARCUS:  Thank you, Your Honor.

15           The next item, Your Honor, is the debtors' motion to

16   establish procedures for the consensual amendment and

17   assumption of certain nonterminated pre-petition derivatives

18   contracts.  The debtors filed the declaration of Daniel Ehrmann

19   of Alvarez & Marsal in support of the motion.

20           Just a little bit of background, Your Honor.  In light

21   of the upcoming confirmation hearing, the debtors have been

22   engaged in a massive review of all of their executory

23   contracts, and in particular their huge portfolio of

24   derivatives contracts.  In making decisions regarding

25   assumption or rejection of such contracts the debtors realized

08-13555-scc    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 94 of 291

Page 13

1    that there was a group of derivatives contracts as to which the

2    debtors might be able to pay a small sum in order to obtain

3    substitute performance by a third party and thereby obtain the

4    counter-parties' consent to assumption and assignment of in the

5    money contracts.

6            Specifically, the motion seeks authority for the

7    debtors to amend and assume any derivatives contract, determine

8    the applicable cure amount under such contract, and satisfy all

9    cure amounts and pay any fees associated with securing

10   substitute performance without further order of the Court but

11   subject to the approval of the creditors' committee and the

12   applicable counter-party.

13           We received two responses to this motion, although my

14   understanding is there's a third one that's not reflected on

15   the agenda.  The statement of Asbury Atlantic, Inc. and Asbury

16   Solomons, Inc. and the reservation of rights of Bank of

17   Montreal; I understand that U.S. Bank filed a similar

18   reservation of rights.  The responses are similar and can be

19   dealt with by the clarification on the record.

20           Asbury Atlantic and Asbury Solomons state that they

21   are filing their reservation in order to, quote, "make clear

22   that nothing in any order granting the motion shall be

23   construed as authority for the debtors to take any unilateral

24   action to amend the Asbury swaps", close quote.

25           Bank of Montreal, and I suppose U.S. Bank, state that

1   they filed their reservation of rights to preserve their

2   position that the motion does not apply to their master

3   agreement which it contends has been terminated, and to

4   preserve its right to insist upon full compliance with the

5   terms of the Bankruptcy Code.

6          As I indicated, Your Honor, we think our motion was

7   very clear, but these are only consensual agreements and

8   therefore we don't view either reservation of rights as, in

9   effect, an objection to the motion.  I'm happy to make the

10  clarification again that we're only talking about consensual

11  resolutions here.

12         THE COURT:  That's how I read the motion.

13         MS. MARCUS:  Thank you, Your Honor.

14         I would like to note that the motion does indicate

15  that the debtors reserve all their rights should it become

16  necessary at some point down the road to assume these contracts

17  over the opposition of counter-parties, but that's not the

18  subject of this motion at all.  And with that, Your Honor, we'd

19  request that the Court approve the motion.

20         THE COURT:  I'm prepared to do that but I'm going to

21  ask whether or not any of the parties that filed reservation of

22  rights wish to be heard.

23         MR. PRICE:  Good morning, Your Honor.  Craig Price

24  from Chapman and Cutler.  I'm here on behalf of both the Bank

25  of Montreal and U.S. Bank.  We filed reservation of rights and

1    we're fine with the clarification that this only applies to

2    nonterminated agreements.

3          THE COURT:  Okay.  No one else seems to want to say

4    anything.  It's approved.

5          MS. MARCUS:  Thank you, Your Honor.

6          Item 4 on the agenda is the debtors' motion pursuant

7    to sections 105(a) and 363 of the Bankruptcy Code and Rule 9019

8    for approval of a settlement and compromise with Danske Bank.

9    The debtors have filed a declaration of Daniel Ehrmann in

10   support of this motion as well.

11         The settlement resolves claims filed against LBHI and

12   LCPI by Danske relating to a 1996 master repurchase agreement.

13   Danske filed claims against LBHI and LCPI in the amount of not

14   less than approximately 699 million which the motion defines as

15   the deficiency claims.  In addition, Danske filed additional

16   claims against LBHI and LCPI in the amount of 40 million

17   dollars.

18         The settlement provides that Danske will have a

19   nonpriority general unsecured claim against each of LCPI and

20   LBHI in the amount of 580 million dollars.  Danske will also

21   waive and release the additional claims with prejudice.  Danske

22   will also cause its wholly owned subsidiary to assign a loan

23   that we've called the Playa Pelicano loan in the original

24   amount of 33 million dollars to LCPI.  And LBSF shall waive any

25   claims it may have against Danske under certain documents.

08-13555-scc    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 910 of 311

Page 16

1    There are certain Danske excluded claims which are not being

2    released under the terms of the settlement agreement.  And LBHI

3    and LCPI on the one hand and Danske on the other hand, release

4    each other from all claims under the master repurchase

5    agreement, the deficiency claims, the guarantees and related

6    documents.

7           Contemporaneously with entering into the settlement

8    agreement, Danske entered into a plan support agreement.  As

9    indicated on the agenda, no objections to the Danske settlement

10   have been filed with the Court.  For the reasons set forth in

11   the motion and the Ehrmann declaration, the debtors believe

12   that the Danske settlement is fair and equitable and in the

13   best interests of the debtors' estate, and we request that the

14   Court approve it.

15          THE COURT:  I'm prepared to do that.  It's

16   uncontested.  I would be comforted to hear that the creditors'

17   committee has reviewed this and has no issue.

18          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

19   Tweed, Hadley & McCloy on behalf of the official committee of

20   unsecured creditors.

21          Yes, Your Honor, the committee has, as was the case

22   with the Lehman Re, the State Street, the Swedbank settlements,

23   which were very similar and all part of the whole, you know,

24   repo to the street program that Lehman had engaged in for a

25   period of time.  We have reviewed the amount of the deficiency

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 188 of 282

Page 17

1    claim, in particular.  Our real estate financial advisors have

2    independently looked at the competing expert reports that went

3    into the mediation here and have compared the values ultimately

4    agreed to to their own underwriting of these properties, and

5    believe that in light of the litigation risks involved in going

6    further with a litigation on these fronts that the numbers that

7    we came out with here, 580 million, with all the other issues

8    thrown in are a fair settlement for the debtors.

9            THE COURT:  Fine.  The settlement is approved.

10           MS. MARCUS:  Thank you, Your Honor.

11           My partner Richard Krasnow will handle item number 5

12   on the agenda.

13           May I be excused, Your Honor?

14           THE COURT:  Okay.

15           MS. MARCUS:  Thanks.

16           MR. KRASNOW:  Will Your Honor bear with me for one

17   minute?  We may have resolved one of the objections.  I just

18   need to, if I may, consult?

19           THE COURT:  You may consult.

20       (Pause)

21           MR. KRASNOW:  Your Honor, Richard Krasnow, Weil

22   Gotshal & Manges on behalf of the Chapter 11 debtors.

23           I appreciate the Court's indulgence.  It will be

24   rewarded, Your Honor; we have resolved one of the objections.

25           Your Honor, the next matter on the calendar in the

1    Chapter 11 cases is the joint motion of LBHI and the SIPA

2    trustee seeking approval or authority to consummate a stock

3    purchase agreement relating to shares of Aceso, a wholly owned

4    subsidiary of LBI, and for authority for the SIPA trustee and

5    LBHI to compromise and settle disputes that they have or may

6    have with respect to Aceso and a VEBA that is controlled by

7    Aceso.

8            Your Honor, the item is item number 5 on the LBHI or

9    the debtors' agenda and item number -- I'm sorry, Your Honor --

10   number 6 on the SIPA agenda.  I assume Your Honor will consider

11   that together.

12           THE COURT:  It's item 7 on the SIPA agenda.

13           MR. KRASNOW:  I misspoke, Your Honor.

14           Your Honor, pursuant to this motion we are seeking

15   very limited relief, which is to say, Your Honor, that if the

16   Court were to be inclined to grant the relief sought in the

17   motion then that relief would be limited to a transaction

18   pursuant to which the SIPA trustee will sell and LBHI will buy

19   the shares of Aceso which are owned by the trustee for a very

20   limited purchase price of 1,885 dollars.  And LBHI would agree

21   to reduce a claim that it has asserted against LBI relating to

22   funding that had been provided by LBHI to LBI on September 12,

23   2008 of 125 million dollars of which 90 million dollars was

24   used by LBI to fund a VEBA which is controlled by Aceso.

25           Additionally, LBHI and the SIPA trustee on behalf of

1    LBI, pursuant to that agreement, would be exchanging neutral

2    releases relating to claims which are property of their

3    respective estates, no more but no less, but only claims that

4    are property of their respective estates that pertain to the

5    VEBA.  That is the only relief that we and the SIPA trustee are

6    seeking today.

7           Your Honor, there were three groups of objections that

8    were filed to the motion, one of which was filed by the

9    Department of Labor, which was the objection as to which I

10   requested the Court's indulgence to engage in a discussion with

11   the representative with the Department of Labor.  We believe we

12   have resolved that objection.

13          We have done it and will do it in two ways, the first

14   of which we've already done.  That first step was to revise the

15   order, and the blackline copy of the revised order was attached

16   to our response to the objections so that the order is even

17   clearer that the only relief that the Court would be granting

18   to us and the only approval that the Court would be granting to

19   us, if the Court is inclined to grant the motion, would be to

20   approve the sale, the transfer of the shares which I've

21   described, and the compromising settlement which is part and

22   embedded in the releases.

23          What the Department of Labor has asked that we do is

24   to revise the order further to make it clearer, although we

25   think it's clear anyway, but to make it clearer that the only

08-13555-scc    Doc 24223    Filed 06/14/12    Entered 06/14/12 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 192 of 281

Page 20

1    claims that are being released here are claims which are

2    property of the respective estates, that is to say, LBHI and

3    LBI.  Now while it's our view that we can only release claims

4    that are property of our estate, in light of the fact that if

5    we amend the order as I've so described, that apparently will

6    satisfy the Department of Labor so we do not need to consider

7    any further the objection it filed.  We're prepared to do that

8    and we believe that the SIPA trustee is similarly prepared to

9    amend the order in that regard.

10           In light of -- well, Your Honor, perhaps the

11   Department of Labor may want to speak so we can see if I am

12   accurate in that regard, and then we can deal with the other

13   objections that have been filed, if that's acceptable to the

14   Court.

15           THE COURT:  That is acceptable.  I'd first like to

16   confirm that the SIPA trustee agrees with what you have just

17   said so at least the parties to the transaction are on the same

18   page.

19           MR. KRASNOW:  Yes, Your Honor.

20           MR. LEE:  Good morning, Your Honor.  Kenneth Lee from

21   Levine Lee representing the SIPA trustee, James Giddens.

22           I would like to echo Mr. Krasnow's remarks.  The SIPA

23   trustee is in agreement with the proposed revisions to the

24   order to further clarify it that have been requested by the

25   Department of Labor, and we are in favor of granting the relief

 1    sought.

 2              THE COURT:  Okay.

 3              MR. LEE:  Thank you, Your Honor.

 4              THE COURT:  I'll hear now from counsel for the

 5    Department of Labor.

 6              MR. GERSON:  Good morning, Your Honor.  Leonard Gerson

 7    for the U.S. Department of Labor.

 8              We are in agreement with the proposed revisions that

 9    Mr. Krasnow described to the Court.  We appreciate the effort

10    that's been made to clarify the order.

11              THE COURT:  If you could just explain to me what your

12    concern was and how that concern has been resolved by virtue of

13    the language change.

14              MR. GERSON:  Under ERISA, unlike bankruptcy, there's

15    this concept of two hats.  You wear a hat with respect to

16    whatever allocations you have to your employer, the

17    corporation.  You also have separate obligations to an ERISA

18    plan if you're a fiduciary to an ERISA plan.  Part of those

19    obligations can be bringing an action if there is a violation

20    of ERISA.  That action would not be property of the estate

21    because it wouldn't be for the benefit of the estate,

22    nevertheless you have an obligation to bring that action.  So

23    we wanted it to be clear that what was not being released was

24    any obligation that LBHI or LBHI employees or officers had to

25    bring an ERISA action if there was a violation --

 1              THE COURT:  Understood.

 2              MR. GERSON:  -- with respect to the plans.

 3              THE COURT:  Thank you for the clarification.

 4              MR. GERSON:  You're welcome.

 5              THE COURT:  And I take it you're satisfied that the

 6    language being added to the order --

 7              MR. GERSON:  Right.

 8              THE COURT:  -- will resolve this to at least the

 9    Department's satisfaction.

10              MR. GERSON:  That's correct, Your Honor.  Of course it

11    wasn't just this language that was added this morning, it was

12    the earlier language that the debtors and the SIPA trustee

13    added to make it clear that all the Court was approving was the

14    transfer of the stock and the limited release in the stock

15    purchase agreement rather than any future actions that will be

16    taken by the debtors once they own the stock, and furthermore,

17    their statement in their papers that any further actions they

18    take will be in compliance with ERISA.

19              THE COURT:  All right.

20              MR. GERSON:  Thank you, Your Honor.

21              MR. KRASNOW:  Your Honor, now just to turn to the two

22    categories with remaining objections before I get into some of

23    the details of the motion which, if you will, deal with some of

24    the issues raised in the objection.

25              In addition to the formal objection that was filed by

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 194 of 282

Page 23

1    the Department of Labor which has been just been resolved,

2    there was something which I will style as a formal objection

3    filed by a Ms. Wendy Uvino.  As reflected in that document, Ms.

4    Uvino has no economic stake whatsoever with respect to this

5    motion.

6            THE COURT:  But she was, at least at one time

7    according to the objection, trustee of the VEBA.

8            MR. KRASNOW:  She was at one time, but currently --

9            THE COURT:  That's what I said.

10            MR. KRASNOW:  -- and currently is not a trustee of the

11    VEBA.  She also was, as the Court may be aware in light of the

12    pending litigation with Ms. Uvino, an officer of LBHI involved

13    with HR.  And indeed she, in that capacity, assisted the

14    debtors and their professionals in the due diligence and

15    analysis of the group benefit plan, particularly with respect

16    to retirees in connection with the ultimate termination of the

17    plan as it relates to the retirees that occurred over two years

18    ago.

19            THE COURT:  If I could just interject, and I don't

20    want to in any way deflect you from your chosen rounds of going

21    through the various objections, but I have reviewed each of the

22    objections, including the objections that were not formally

23    docketed, submitted in written form by a member of former

24    Lehman employees, some of whom are, by their own description,

25    elderly and infirm, who have expressed deep-seated concerns

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 195 of 282

Page 24

1    about this motion, whether or not there has been sufficient

2    time to respond to the motion and the potential impact that the

3    motion may have upon ongoing health care and retiree benefits

4    to which these individuals may be entitled.

5         If I understand correctly what you have represented at

6    the outset as to the limited nature of the relief being sought,

7    and if I understand what the Department of Labor's counsel has

8    said in reference to the limited nature of the releases being

9    exchanged, at least in respect of possible claims arising under

10   ERISA, is there anything for the Court to deal with in

11   reference to the pending objections?  Because it's my strong

12   sense, but I want to discuss it with you, that the relief being

13   sought is so limited that read literally it does not have any

14   direct or indirect impact upon the rights of any individual

15   beneficiary of the VEBA, although it is conceivable that if

16   future acts as suggested in the motion take place, there could

17   be an adverse impact.  But I'm not approving that now.  Do I

18   understand that all correctly?

19        MR. KRASNOW:  Your Honor took my presentation out of

20   my mind and into your own statements.  Absolutely.  That was

21   precisely the point that we attempted to make in our response

22   and I intended to address here today.

23        The concerns that have been expressed by the retirees,

24   concerns that we're very sympathetic about, one could say that

25   it's one thing for a creditor in a commercial transaction to

1    lose money as a consequence of a bankruptcy, but that's not the

2    same as retirees, as a consequence of the failure of a business

3    losing or potentially losing medical benefits.  So we're very

4    sympathetic to that.  And there is nothing that the Court would

5    be doing today that directly affects that.

6            In the motion, out of a desire to be as transparent as

7    possible, not only from the perspective of advising the Court

8    and the creditors, but more importantly the retirees, we felt

9    that the right thing to do is to advise the retirees as to the

10   source of payments to them with respect to medical benefits

11   which are not now covered by a debtors' sponsored group plan,

12   and what action we may or may not be taking in the future, in

13   part based upon what the Department of Labor may or may not do

14   with respect to an application that we have not yet filed with

15   respect to the use of certain of the VEBA funds, which funds

16   will only be used consistent with the terms of the VEBA, and

17   whatever exemption we may get from the VEBA to reimburse the

18   estate for certain monies that they expended with respect to

19   benefits.  But as far as the relief that we are seeking today

20   from the Court, were the Court to grant it, it doesn't deal at

21   all with respect to potential future events.

22           THE COURT:  Let me just ask this question because I

23   don't want to predict what may be in the minds of the

24   individual objectors who are concerned about the consequences

25   of future acts.  But how will these individuals ever know

1    what's going on with respect to the VEBA and will they have an

2    opportunity to be heard, to the extent that they have an

3    objection?

4            MR. KRASNOW:  Well, Your Honor, I'll try to answer

5    that as best I can because I'm not sure what the future events

6    will be.  To be clear, Your Honor, the VEBA was formed prior to

7    the commencement of the case, prior to any knowledge that there

8    would be a case, but with full knowledge that things were

9    somewhat in distress at Lehman.  There was a concern --

10           THE COURT:  So this was a lifeboat created for -- this

11   was a lifeboat --

12           MR. KRASNOW:  Absolutely.

13           THE COURT:  -- created for the benefit of certain

14   present and former employees to protect employee benefits at a

15   time of financial uncertainty?

16           MR. KRASNOW:  If I can -- the answer to that is yes,

17   but if I can rephrase that slightly because it becomes --

18           THE COURT:  You don't like the term lifeboat?

19           MR. KRASNOW:  Lifeboat I will accept because that's

20   accurate.  It was to try to ensure that those who were then

21   covered by the LBHI group benefit plan were assured that no

22   matter what happened there would be sufficient monies available

23   to cover what was then estimated to be six months worth of

24   medical benefits.  And those individuals who were covered by

25   that plan, generally speaking -- the plan itself, the terms of

1   the plan govern so in case I misstate I'm not intending to

2   expand the universe or decrease it -- were active employees of

3   U.S. Lehman equities, some of which, but relatively few of

4   which were employed by LBHI, most were employed by LBI and

5   maybe subsidiaries -- then subsidiaries of LBI, employees who

6   were on long-term disability and retirees.

7          At that time all medical expenses were self insured by

8   Lehman.  There was no insurance plan per se.  So in furtherance

9   of that, as I noted earlier, LBHI advanced, provided funding to

10  LBI of 125 million, of which 90 million went into this health

11  benefit trust which is the VEBA we've referred to.

12         We all know what events occurred on September 15th and

13  September 19th of 2008 with respect to LBHI and LBI and

14  thereafter for other Lehman entities.  Notwithstanding those

15  filings, health benefits were covered and were paid by the

16  VEBA.  No monies were expended by LBHI for anybody in that

17  regard because the VEBA, consistent with its terms, covered

18  those expenses.  Asiko (sic) or Aceso -- I constantly

19  mispronounce  that -- Aceso was under the control --

20         THE COURT:  Does that term have any meaning,

21  incidentally?

22         MR. KRASNOW:  If it does, Your Honor --

23         THE COURT:  You don't know it.

24         MR. KRASNOW:  -- I am completely unaware of what it

25  is.

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 199 of 281

Page 28

1          THE COURT:  All right.  So it's just a made-up word?

2          MR. KRASNOW:  Maybe.  I don't know whether it was

3     intended to stand for something.

4          But that was a wholly owned and continues today to be

5     a wholly owned subsidiary of LBI, and therefore under the

6     control of the SIPA trustee.

7          Between September and March the payments were made

8     from the VEBA as was contemplated and provided for under VEBA,

9     but in March of '09 the SIPA trustee caused the VEBA to suspend

10    all payments.  As a consequence, LBHI had to immediately step

11    in and start covering, if you will, medical expenses for its

12    active employees, and since the group benefit plan covered as

13    well retirees, the retirees as well.

14         However, given the nature of the Lehman case, we are

15    disposing of assets.  It was clear to the debtors that at least

16    as to retirees they could not, consistent with their fiduciary

17    duties to their stakeholders, continue to make those payments

18    ad infinitum.  And so in or about June or thereabouts, after

19    some thinking and analysis it was concluded that as it relates

20    to the retirees LBHI would have to take appropriate steps to

21    terminate those health benefits.

22         The question was what steps were to be taken, the

23    timing of the implementation, and what, if anything, could be

24    afforded to the retirees to cushion what could be a devastating

25    blow.  This was not going to be an action similar to that which

1   LTV in its first Chapter 11 did, which was to just terminate

2   the medical benefits and to see the kind of stories that

3   appeared when that happened some decades ago, in terms of the

4   impact on employees.

5          And so we dual tracked.  The first was, while it had

6   no obligation to do so, to explore whether or not we could

7   provide to these retirees, at their own expense, some

8   alternative.  So when we announced to them we intended to

9   terminate, we could similarly announce to them something that

10  would be available to them for medical benefits, to pay medical

11  benefits that would be a cheaper alternative than either having

12  to look to themselves or to have to themselves purchase medical

13  insurance.

14         At the same time, an analysis was undertaken, in light

15  of the provisions of the group benefit plan, that allowed for,

16  by their terms, a termination of all or any portion of the plan

17  to any of the beneficiaries, as to whether or not there were

18  any parties who had vested benefits, because it was our view,

19  based on the case law in this district, that in light of the

20  terms of those benefit plans we could terminate them without

21  having to go through the 1114 process, as to those individuals

22  who did not have vested benefits.  If somebody had vested

23  benefits we could not terminate those benefits outside of 1114.

24  And so while we were looking for alternatives, we undertook as

25  extensive a due diligence process as we thought we could, which

1    was overseen by Ms. Uvino.  And at the conclusion of that due

2    diligence process, we determined that it did not appear that

3    there were any documents that afforded to anybody any vested

4    rights for medical benefits.

5            Concurrently with that, based on discussions that we

6    had with Aetna, we were able to afford to employee -- retirees

7    a non-LBHI-sponsored plan -- a plan which, at least

8    colloquially speaking, was an Aetna plan -- which employee --

9    the retirees could avail themselves of, cheaper premiums than

10   they would otherwise have and some sort of bridge, if you will.

11           We determined that this was not something which we

12   would give thirty days' notice to or sixty days' notice to

13   employees -- or retirees.  And so, in October, we sent notices

14   out advising these retirees that we would be terminating the

15   plan as to them, effective December 31, and gave them notice of

16   this Aetna plan, if you will.

17           Notices were given to approximately 1,100 retirees.

18   There were numerous inquiries, as one would expect, in response

19   to that.  I can't characterize all of them, but my

20   understanding is many of them had indicated an expectation that

21   it was going to happen, in light of where Lehman was, and an

22   appreciation for the fact that we actually expended time and

23   effort to see whether we could at least facilitate offering to

24   them this Aetna plan.  In none of the communications that we

25   received from these parties at that time did anyone indicate

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 202 of 281

Page 31

1    that they had any vested benefits.  The group benefit plan was

2    terminated as of December 31.

3         As I previously indicated, Your Honor, the group

4    benefit plan -- or the VEBA, rather, by its terms, was to be

5    used for the benefit of beneficiaries of the plan.  Therefore,

6    effective December 31 -- or January 1, I may be off by a day --

7    that VEBA could not, by its terms, be used for anyone other

8    than active employees and those with long-term disabilities who

9    were going to be going on to a COBRA because they, too, got

10   notices, but they had COBRA available to them -- couldn't be

11   used for them either, excuse me.  I don't think it could be

12   used for COBRA.

13        In January of 2010, the SIPA trustee decided to cause

14   the VEBA to be amended so that it would include the retirees.

15   And he had the ability to cause that to happen because Aceso

16   was under his jurisdiction.

17        I should note, Your Honor, that, as reflected in the

18   motion, we have made a commitment to the trustee because he

19   made it a condition of this deal that the VEBA would continue

20   to be used for those purposes -- that is, to cover the

21   retirees -- so long as there are funds there.  We have

22   indicated that we will not only do that, but continue to use

23   the VEBA for the remaining purposes for which it exists, which

24   is to cover active employees.  And we would cover COBRA

25   payments with respect to those with long-term disabilities.  It

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:10    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 203 of 282

Page 32

1   is our intention to use the VEBA for those purposes, as we set

2   forth in the motion.

3           There is something else we are going to try to do, and

4   we made it clear in the motion papers.  As a result of the

5   trustee's suspension of the VEBA in March of 2009, as I

6   indicated, we had to take on all of those expenses.  And while

7   the VEBA was amended in January 2010 to cover the retirees as

8   well as others, the SIPA trustee only allowed the VEBA funds to

9   be used for the retirees.  He did not allow it to be used to

10  cover the LBHI active employees, even though they were clearly

11  within the then group benefit plan and today's group benefit

12  plan.

13          LBHI was required, therefore, to expend monies that

14  should have been covered by the VEBA and would have been

15  covered by the VEBA, but for the actions taken by the SIPA

16  trustee.  We believe it is appropriate to seek reimbursement --

17  not a reversion, but reimbursement -- of that which LBHI

18  expended and that should have been covered by the VEBA.

19          While I understand there may be a debate as to whether

20  or not we need an exemption from the Department of Labor in

21  order to be able to do that, we are -- it is our intention to

22  seek such an exemption.  That's not something before the Court.

23  If we obtain that exemption, then there will be the

24  reimbursement of approximately twenty-five million dollars.  If

25  the exemption is not obtained, then we will not have the

1    reimbursement and we will have to evaluate what the then uses

2    of those monies will be, consistent with the terms of the VEBA

3    and applicable law, including ERISA.

4            Now, all of that ultimately has an effect on the

5    retirees, but lest we forget, this is a limited fund in any set

6    of circumstances.  It will end.  When it will end, vis-a-vis

7    the retirees, I cannot stand here and tell you.  We believe

8    that no matter what happens, it will continue at least through

9    2012.  Whether it continues much beyond that I can't really

10   say.  But while we understand why the retirees would prefer

11   that the VEBA be used only for their benefit, the fact of the

12   matter is that the VEBA was created for the benefit of others

13   as well.  And we intend to, as we should, use it for those

14   purposes as well.

15           THE COURT:  Well, my understanding, which has been

16   clarified now on multiple occasions during this morning's

17   hearing, is that today's motion does not directly or even

18   indirectly implicate what happens in the future with respect to

19   the reimbursement claim.

20           MR. KRASNOW:  Correct, Your Honor.

21           THE COURT:  And so there's nothing in today's motion

22   that directly or indirectly impacts the rights of those who

23   have objected in their capacity of beneficiaries of the VEBA.

24           However, by virtue of the fact that the motion

25   provides reasonable transparency into the debtors' thought

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 205 of 281

Page 34

1    process with respect to a claimed entitlement to reimbursement

2    of up to twenty-five million dollars and inasmuch as effecting

3    such reimbursement reduces the funds within the VEBA available

4    to pay ongoing benefits to retirees and others, I understand

5    the reason that so many parties have chosen to be heard by

6    submitting letters to me and filing those letters on the

7    docket.

8            Which brings me back to the question I asked you about

9    fifteen minutes ago --

10           MR. KRASNOW:  Sorry, Your Honor.

11           THE COURT:  I appreciate the long explanation; it's

12    very helpful.  But the question is in what manner, if at all,

13    will these individuals and others similarly situated know about

14    what's going on with respect to the VEBA?

15           MR. KRASNOW:  We will have to -- I can't speak to what

16    is required under ERISA, but if we determine that, within a

17    reasonable period of time, the VEBA funds will not be available

18    because they will have been depleted, we will give notice to

19    the retirees because, presumably, the Aetna plan will still be

20    there.  And in order for them to avail themselves of that, they

21    will have to start making the premium payments.

22           It would not seem, to me, appropriate to give someone

23    notice of that of thirty days.  So we will give them reasonable

24    notice based upon whatever the circumstances may be at the

25    time, including an analysis of where we -- are we on the

08-13555-scc    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:10    Main Document
                        Pg 206 of 281
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 35

1    twenty-five million and what we envision the future uses will

2    be.  I cannot speak, Your Honor, to what rights, if any, the

3    retirees will have, once we give them the notice, under

4    applicable law.  But whatever rights they may have, whatever

5    notices LBHI is required to give, it will give.

6            As I noted earlier, Your Honor, it's not clear we had

7    to give ninety days' notice when we decided to terminate the

8    plan as it related to them, but we thought it was the right

9    thing to do.  I would like to think, Your Honor, that that

10   approach will continue even after our emergence from Chapter

11   11.

12           I hope I've been responsive to Your Honor.

13           THE COURT:  You have been responsive, although I

14   suspect anybody who's listening to this won't really understand

15   what, if any, notice they're going to be able to get.  And I

16   think that's probably because you don't know.

17           MR. KRASNOW:  You're absolutely right, Your Honor.

18           THE COURT:  Okay.

19           MR. KRASNOW:  I've tried to explain it as best I can.

20           THE COURT:  Now, I do have a fundamental question that

21   I just don't know the answer to on the basis of looking at the

22   papers, which is whether or not the change in equity control of

23   Aceso, A-C-E-S-O, will lead to any change in ongoing management

24   of the VEBA in terms of the identity of the trustee, the

25   decision process with respect to the VEBA and the management of

08-13555-scl    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 207 of 282

Page 36

1    its assets.

2            MR. KRASNOW:  I think the answer is we don't believe

3    there will be any.  In fact, I don't want to speak for the SIPA

4    trustee, but I think one of the motivations that the SIPA

5    trustee had in agreeing to this transaction was that we were in

6    a better position to manage the VEBA than, frankly, the SIPA

7    trustee is.  They have a different focus than we have had.

8            I don't believe that today there is a view that there

9    will be a change in who is the trustee --

10           THE COURT:  Who is the trustee now?

11           MR. KRASNOW:  Carol Rado, I think is the trustee, who

12   is an employee of either LBHI or LAMCO.

13           UNIDENTIFIED SPEAKER:  LBHI.

14           MR. KRASNOW:  Of LBHI, Your Honor.

15           So there has been an LBHI employee who has been a

16   trustee of the VEBA since the commencement of the Chapter 11

17   case.  So that's -- there -- to that extent, LBHI, if you will,

18   has been involved -- certainly has been aware.  So we do not

19   envision, as of today, any change.

20           THE COURT:  Okay.  Is there anything more you wish to

21   add at this point?

22           MR. KRASNOW:  Your Honor, for the reasons set forth in

23   the motion and on the record, and I also would refer to the

24   declaration of Mr. Hershan, which was filed with the motion, we

25   believe that the proposed transaction is in the best interest

1    of LBHI, its creditors, and should be approved.

2            THE COURT:  Before asking if any of the objectors who

3    are on the phone or present in court wish to be heard, I'm

4    going to ask counsel for the SIPA trustee to explain, from his

5    perspective, why this transaction makes sense.

6            MR. LEE:  Your Honor, Ken Lee, for the SIPA trustee.

7            The transaction makes sense from the perspective of

8    the SIPA trustee, Your Honor, because it was our conclusion,

9    after doing extensive fact investigation as to the purposes

10   behind the creation of the VEBA and the purposes for which it

11   was intended that the funds had a very limited purpose and

12   could not be really directed to the benefit for any claimants

13   in the SIPA proceeding -- any customer claims or other non-

14   customer claims -- and that, in addition to that, it was

15   requiring the trustee to expend some amount of time and

16   attention on managing an entity over which it didn't actually

17   have full control since the -- as explained, the VEBA has its

18   own trustee.  And LBHI is involved with respect to various

19   benefit plans and administering benefits to current and former

20   employees.

21           In addition to that, there were a number of disputes

22   between LBI and LBHI concerning the funding of the VEBA and as

23   to whether there were claims going in both directions for those

24   sums of money.  And this proposed transaction resolves all of

25   those claims and, therefore, settles a significant matter that

```
1    is open between LBI and LBHI.

2          So for those reasons, we believe that it is in the

3    best interest of the LBI estate as well.

4          THE COURT:  Okay.

5          MR. LEE:  Thank you, Your Honor.

6          THE COURT:  You wish to be heard on behalf of the

7    committee?

8          MR. O'DONNELL:  Dennis O'Donnell, Milbank, Tweed,

9    Hadley & McCloy, on behalf of the official committee.

10         Just to note that we have had extensive discussions

11   with the debtors about this motion as well and believe that in

12   its narrow form, the form presented to the Court today, in

13   terms of the two components, it should be granted.  Obviously,

14   based on Mr. Krasnow's presentation, there are lots of issues

15   that will need to be dealt with after this transaction is

16   consummated.  And we're simply reserving our rights with

17   respect to how all those should turn out.

18         THE COURT:  All right.  I'll now hear from anybody who

19   is in court, either as an individual or through counsel or by

20   telephone, who have lodged objections to the requested relief.

21   You can come forward if you wish.

22         Please identify yourself for the record.

23         MR. DELANEY:  Yes, sir.  Judge, first of all, thank

24   you very much for letting me come here.  My name is Steve

25   Delaney.  I am a retiree from Lehman Brothers.  I worked there
```

1    for about twenty-four years and retired in 2006.

2         I raise this just because I heard about standing.  I

3    thought it'd be good if I could just explain what the program

4    was that I was involved with.  I don't know anything about the

5    disabled programs, the COBRA programs or what have you.  But

6    when I went to work at Lehman Brothers, part of the procedure

7    and part of the policy indicated that if you stayed at Lehman

8    Brothers -- and this is back in 1983 -- and retired from Lehman

9    Brothers at fifty-five, you would have lifetime retiree health

10   benefits.

11        You had to do some things.  First of all, you had to

12   be an employee, I think, before 1990.  So the universe is

13   fairly small with regard to that.  Second thing is you had to

14   retire at age fifty-five, so you had to have longevity.  And

15   the accumulation of your age and time in service had to be

16   seventy-five pts.  In --

17        THE COURT:  Can I ask you, was fifty-five viewed as

18   regular retirement or early retirement?

19        MR. DELANEY:  I don't know the answer to that, Judge.

20   I know at fifty-five, you qualify for all the retirement

21   benefits.  There was no mandatory retirement --

22        THE COURT:  This is what bankrupted Greece, you know.

23        MR. DELANEY:  It probably may have bankrupted -- I

24   don't think this bankrupted Lehman Brothers.  I'm pretty sure

25   of that.

1            THE COURT:  All right.

2            MR. DELANEY:  So as far as standing, that's where I

3    am.  I am a retiree.  I've been receiving the benefits.

4            I heard today from counsel that this program was

5    terminated at one point in time, somewhere in 2009.  It may

6    have been terminated in the back rooms with other people

7    discussing, but the reality of it is, for the retirees, when

8    they would notify of a termination of this program, what do

9    they all do?  They all call human resources.  I called human

10   resources.  This is important benefit, what is going on?  The

11   response was not that you're not going to have health coverage.

12   The response is very simply do not worry, it's going to be

13   taken care of, you're going to continue to have your health

14   coverage and it's still going to be the same program,

15   administered by Aetna, and you'll still pay the same

16   coverage -- I have the same -- paying the same premium.

17           THE COURT:  Who made the --

18           MR. DELANEY:  So the reality of it was --

19           THE COURT:  Excuse me, just -- who made these

20   representations to you?

21           MR. DELANEY:  Human resources at Lehman Brothers HI.

22   And it wasn't so much the representations.  It was because

23   after they announced to us that we were going to get this

24   coverage and it was going to be through LBHI, we proceeded to

25   get our quarterly bill from Aetna which was the same insurance

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:10    Main Document
Pg 41 of 81
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 41

1    coverage for the exact same amount and we had the same

2    coverage.

3              And I've been having that coverage for the last two-

4    and-a-half years.  And I think it's absolutely great.  I get a

5    bill every quarter from Aetna under the term Lehman Brothers

6    Holdings, Inc.  Special program -- special statement for my

7    health insurance.

8              So as far as what I knew and what other retirees -- I

9    can't speak for them -- knew, there was no termination.  We

10   continue to have the same coverage for the same amount for the

11   period of time that we're into bankruptcy.

12             Now, I really didn't understand -- I hate to

13   apologize -- the machinations that went on before in terms of

14   what was really being asked for.  When I read the document, I

15   literally viewed this as two things: one, the holding company

16   wants to end retiree health benefits and, two, they got a pot

17   of gold of thirty-seven million dollars and they want to take

18   twenty-five million and turn that over to LBHI to pay for the

19   employee health benefits while they continue to work at Lehman

20   Brothers after the bankruptcy.

21

22   Now I can understand looking at this that the money was put

23   aside for the benefit of retirees and other people.  At some

24   point in time, there becomes an important decision as who are

25   we working for.

08-13555-scc    Doc 24223    Filed 06/14/12    Entered 06/14/12 16:08:19    Main Document
Pg 42 of 91
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 42

1        In my letter, I indicated that as of the filing of

2   bankruptcy, the Lehman creditors, really, were the only party

3   in interest as far as what was left of the estate.  If Lehman

4   Brothers at that point in time had been dissolved or liquidated

5   within six months, the creditors would have gotten X cents on

6   the dollar.  I think at the CDS auction -- I don't know -- who

7   knows -- the price was somewhere around eight and a half, nine

8   cents on the dollar.  A decision was made at the holding

9   company to keep this in operation.  Why?  For the benefit of

10  the creditors.  And it was a very good benefit, because if we

11  look at the benefits to the creditors, the value of their bonds

12  which were in CDS at eight or nine cents on the dollar, are now

13  trading -- at least on the bid side, at twenty-four, which

14  means they're probably worth a lot more.

15       So by keeping this entity alive for two and a half

16  years, what I understand from press releases, there's 160 of

17  billion of debt out there, at 18 points, keeping Lehman alive

18  has resulted in a benefit to the creditors of about 22 billion

19  dollars.  Having received that benefit, which can be totally

20  liquidated right now in the market, but I think they'll all

21  hang on for the recovery, now we have LBHI coming back to a pot

22  and saying we want twenty-five million out of that to pay for

23  the health benefits for individuals who were employed to

24  increase the value of the holdings of the creditors.  Which

25  they did.  And it's great.  And I don't begrudge, you know, the

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 43

1   creditors getting their piece of the action out of this.  But

2   we have a trust that may have come to an end in terms of health

3   benefits for LBHI in seven months; they're now trying to milk

4   this for another two and a half years while they reap the

5   benefit of this.

6          As I look through the Bankruptcy Rule -- because I've

7   got to admit I only used Google for this, so probably not the

8   most extensive coverage, there are two things that I saw about

9   benefits; one, has anyone been appointed to represent us?  I

10  don't know.  The only thing I got was that notice in the mail

11  to which I filed an objection.  It talks in terms of what's

12  fair and equitable for all parties; the debtor, the creditor,

13  retirees, whatever they may be.  The -- I understand that what

14  you did today certainly didn't impact us directly.  But I

15  think --

16         THE COURT:  I haven't done anything yet.

17         MR. DELANEY:  oh, I'm sorry, Judge.  But --

18         THE COURT:  I'm just --

19         MR. DELANEY:  -- it sounded like --

20         THE COURT:  I'm just listening.

21         MR. DELANEY:  Okay.  But it seems to me, looking at

22  what has gone on over this period of time -- it's been three

23  and a half years.  I honestly do not know what benefits I have

24  under any statute, bankruptcy or risk or anything like that.

25  We've got a million lawyers here and not one of them can tell

1    me just what my benefits are?

2           I don't want to rabble rouse, but I'd like to know

3    where we stand and I'd like to know why can't we have someone

4    appointed to represent us?  We're spending a lot of money in

5    this case for lawyers sitting around and doing things that may

6    be beneficial or not beneficial.  We have a statute that seems

7    to convey some sort of interest to the retirees in this case,

8    and if it's recognized, why can't we have someone speak on our

9    behalf who is knowledgeable?  I certainly am not knowledgeable

10   in this area.

11          And the other things -- I'm requesting is one, I'd

12   like to have someone appointed to make sure that we are fully

13   versed in what our rights are.  Second of all, I think the

14   twenty-five million payments which may not be on the floor

15   today but was certainly raised by those -- the motion should be

16   denied.  I don't know whether I'm going to around to get

17   notice.  As time goes on, the universe of these retirees gets

18   smaller and smaller.  As I say, you had to be you had to be

19   retired at fifty-five and be employed at Lehman before 1990.

20   So it's a smaller and smaller group and they're not around --

21   it would seem to that to protect these people to the extent

22   they are entitled to protection under the statute, that someone

23   should be appointed to oversee what's going on.  And I

24   definitely think it's not fair in assessing the value to all

25   parties that LBHI reap the gain of another twenty-five million

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 45 of 281

Page 45

1    while the retirees are losing health benefits.

2              THE COURT:  Okay --

3              MR. DELANEY:  Okay?

4              THE COURT:  Thanks for your --

5              MR. DELANEY:  Thank you very much.

6              THE COURT:  -- presentation, Mr. Delaney.

7              Is there anyone else who wishes to be heard?

8              You may come forward.

9              MS. RASMUSSEN:  Thank you, Your Honor.  My name is

10   Marianne Rasmussen.  I'm a beneficiary of the trust but also I

11   had been chief human resources officer at Lehman from 1994 to

12   2001 and I had twenty-nine years of experience with the firm

13   and then prior to that, Shearson Lehman and American Express,

14   so it was all bridged.

15             A few things that were said today -- just doing math,

16   when we talk about if the VEBA comes down to only twelve

17   million, my calculation is that that would probably be only,

18   like, maximum five months left.  The reason I say that is

19   because if we do the math, we've gone through almost fifty

20   million dollars of the fund so far.  So if we take away that --

21   I'm sorry; maybe it's -- 150 -- but the 12 million dollars left

22   would probably be substantially taken by year end because many,

23   many people hold all their bills and they send them and submit

24   them all at once.  So that's one part of it, so it's usually a

25   significant portion that eats up all that money at that point.

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:10    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 46 of 311

Page 46

1    And even if we have twelve million, it's probably four to five

2    months left.

3          Also, there are a couple of things that were raised in

4    counsels' response that I'd like to address.  They talked

5    about -- only about a dozen people responding.  I talked to a

6    number of people that I know.  Three of the six people said

7    they didn't even receive that one letter and the other three

8    people that I spoke to -- well, I submitted an objection letter

9    and so did Antoinette LaBelle.  Other people just feel like

10   they don't have the expertise and the ability to do it, so we

11   do it as laypeople.  But, also, Wendy Uvino's letter that was

12   sent to the Court, even though it said an objection letter, I

13   think it was more like an amicus friend of the Court letter

14   that she was trying to do because she certainly had lots of

15   experience.  Some of the things that counsel said that she had

16   to do -- well, she was employed by the firm so of course she

17   had to go through this extensive research.

18         They also said there was only some response to the

19   October 16th, 2009 letter that was Exhibit B.  I happen to know

20   that I personally tried to call and I was asked to call back

21   several times because they had so many phone calls about that.

22         Then, it was also said that people didn't really call

23   too much after -- between that two-year period of time.  Well,

24   I guess the question is why would they if they received a

25   January 11th, 2010 letter which said, in bold, "No increase in

1    your cost, new plan design applies, assuming arrangements for

2    the health care trust to pay premiums are finalized.  Your plan

3    costs for 2010 will not increase over 2009 cost and therefore

4    you will not be responsible for the full cost of coverage."  So

5    it's literally telling us it's going back to the way it was

6    three months prior to when we received that October 2009

7    letter.

8           So people -- of course they didn't respond because

9    they thought everything had been taken care of.  Again, most of

10   the people that we're talking about are not sophisticated

11   people.  Forgetting about the percentage of people that are

12   investment bankers and the traders.  Seventy percent of the

13   people were paid an average amount for their job.  They were

14   operations people, they were technology people, they were

15   secretaries, et cetera.  So when they receive a letter like

16   this, they are confused and they probably don't know what to

17   do.

18          Many of the trust beneficiaries are the old Shearson

19   people.  When I say old, I mean they're equivalent to almost

20   our parents' age.  I believe that many of them did have defined

21   vested rights because many of them had the old Shearson wording

22   and they have nothing else.  And those did not -- those summary

23   plan descriptions did not say anything about the company had

24   the right to mend (sic), change or terminate.  That was prior

25   to 1994, prior to the IPO and many of these people have been

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 219 of 282

Page 48

1    retired for many, many years.  These -- some of these people

2    that are being affected are eighty-five, ninety year old

3    people.  And, as I said before, these people also -- not only

4    are they aged people, but they also probably also lack the

5    resources -- both the ability and the finance to really address

6    some of these issues.

7           And with that, I thank the Court very much for your

8    time.

9           THE COURT:  Thank you, Ms. Rasmussen.

10           Is there anyone else in court who wishes to be heard

11    on this issue?

12           Mr. Gerson?

13           MR. GERSON:  Yes.  I -- the statements of the retirees

14    just reinforces our view in our papers that Section 1114

15    doesn't apply and even in the Delphi case, where Judge Drain

16    decided it wasn't applicable where there was an absolutely

17    right to modify, he still appointed a committee to represent

18    the interests of the retirees with respect to the open issues.

19    I think that leave exists in this case.

20           THE COURT:  Well, I hear what you said and before

21    commenting further, I'd like to ask if there are any other

22    affected retirees or objectors who wish to be heard who may be

23    on the telephone, rather than present in court?

24           MR. GERSON:  Of course, Your Honor.  Thank you.

25           THE COURT:  Okay.  I hear --

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 49

```
1              MS. ROTH:  If it please Your Honor --

2              THE COURT:  Please identify yourself.

3              MS. ROTH:  Yes, good morning, Your Honor.  My name is

4     Barbara Roth (ph.), I.D. 45606260 --

5              THE COURT:  You're going to have to speak up because

6     you're coming through in a somewhat soft way.

7              MS. ROTH:  I'm sorry, Your Honor.  Good morning, Your

8     Honor, Judge James Peck.  My name is Barbara Roth, ID number

9     4600260.  I'm calling from Clearwater, Florida and wanted to

10    thank you for the opportunity to present my case to you today

11    regarding the notice of motion and settlement agreement

12    regarding Lehman health care trust.

13             I submitted (sic) documentation from you with regard

14    to the motion which was received via mail on October 25th at 6

15    p.m. in route to the emergency room and I was admitted to the

16    hospital from 10/25 and released this past weekend which did

17    not give me the opportunity to present myself in New York.  I

18    believe that this motion was not given enough allocation (sic)

19    for me get a legal representation.  While I was in the hospital

20    I had the benefit of contacting your office, Mary Lopez, the

21    case administrator, and Epiq and also the debitors (sic) for

22    Lehman Brothers Holding, Inc. with regard to how I need to file

23    the motion.

24             According to Ms. Lopez, the lawyers filed -- excuse

25    me, Your Honor, Weil, Gotshal & Manges, a former firm that I
```

1   worked with, with Lehman, left out documentation with regard to

2   how to file, where to file and the case number was missing

3   because there were sub cases with each motion.  Furthermore,

4   per this letter, I contacted Lehman's hotline and left a voice

5   mail message to find out how I can utilize forwarding this

6   motion to you and I did not receive a response that was

7   favorable until I was specifically told we don't represent you,

8   we're not at liberty to disseminate any information.  And I

9   explained to her my scenario of being in the hospital was --

10  that I told to you --

11          THE COURT:  Excuse me for breaking in.  But I wonder

12  if you could, rather than going through the background, tell me

13  what your objection is.  Just tell me what it is in plain

14  language.

15          MS. ROTH:  Well, my objection to you is I did not

16  leave the do -- receive the documation (sic) in time to hire a

17  lawyer.  I also thought that I was vested in the company.  I

18  worked with Lehman Brothers from 1993 to 1995.  I'm on

19  disability and I've never seen any information with regard to

20  the plan being terminated.  I had various conversations with

21  Carol Rado when they notified me that it was going to be seized

22  and then I received a phone call which I had on tape stating

23  that there's no need to worry, everything will be reinstated,

24  there'll be no charges for insurance and you'll be covered.

25          THE COURT:  Okay.

Page 51

1            MS. ROTH:  And so there was a lot of confusion and --

2            THE COURT:  I think I understand what you're saying as

3      follows.

4            MS. ROTH:  I have been with the company --

5            THE COURT:  If I could just -- if I could just break

6      in for a moment because --

7            MS. ROTH:  Yes, sir.

8            THE COURT:  -- I'm sympathetic to your situation but I

9      have a docket that I need to move through.  I need to find out

10     if there are other objectors and we need to move forward with

11     this morning's calendar.

12           It seems to me from what I've heard that you complain

13     that you did not have adequate notice of today's hearing, that

14     you want an opportunity to be able to express your opposition

15     to the relief being requested in a more formal way in which you

16     believe that it is unfair for you to be deprived of ongoing

17     benefits under the plan that is before the Court.

18           Did I fully summarize your position?

19           MS. ROTH:  Yes, you did.

20           THE COURT:  Okay.

21           MS. ROTH:  And I was under the assumption since I

22     started at the very beginning with Lehman Brothers Kuhn, Loeb,

23     Inc. and went through every merger and acquisition, that I

24     still have documents here saying I'm covered until I'm sixty --

25           THE COURT:  I think I understand the nature of your

1    concern and I'm going to ask if there's anyone else who's on

2    the phone who wishes to be heard, to express something

3    different.

4          MS. ROTH:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          Is there anyone else who wishes to be heard on this

7    point?

8          MS. ROTH:  If I may add just one other issue?  I think

9    it would be fair and justice (sic) to have some type of Lehman

10   representative set up to answer questions and I guess further

11   explain the process and policies because there's so much

12   documentation that's conflicting.  And whomever I have called

13   has -- have no assistance whatsoever.

14         THE COURT:  Okay.  I understand -- I understand the

15   nature of your complaint.  Thank you very much.

16         I'm going to give the debtor through counsel an

17   opportunity to comment with reference to the individual

18   objections that have been lodged, but only if counsel feels

19   there's a need to comment.

20         MR. KRASNOW:  No, Your Honor.  We can't help but feel

21   sympathetic for some of the concerns that have been expressed,

22   but unfortunately, Lehman is where it is and we are not seeking

23   relief today that really goes to the issues that these people

24   have addressed and raised.  but to make one thing clear in

25   terms of one comment that was made, Your Honor, the -- there's

1    nothing that we are doing nor that we currently contemplate

2    doing -- we -- and it's not our plan, but that we contemplate

3    doing with respect to the Aetna plan which is really the basis

4    for which or through which these medical payments are being

5    satisfied.

6              That's it, Your Honor.  We rest on our papers.

7              THE COURT:  Okay.

8              Counsel for the Department of Labor made a comment

9    that no one has responded to yet that perhaps this is a

10   situation in which a committee should be formed to represent

11   the interests of beneficiaries of the group benefit plan.  At

12   this juncture in this extraordinarily protracted and complex

13   bankruptcy case which is heading next month toward a

14   confirmation hearing, it is too late -- especially by oral

15   request to be forming any kind of formal committee.  But, I am

16   concerned, particularly in reference to the written statements

17   that have been filed with the Court and the statements that

18   have been made by Mr. Delaney and Mr. -- Ms. Rasmussen in open

19   court today, that this is a confusing situation for the

20   individuals who are affected.  Health care in the United States

21   is a subject that the Supreme Court will be addressing next

22   year.  Courts of appeals throughout the United States have been

23   addressing the Health care law; it's a very controversial

24   subject and a subject that's politically grounded.

25             Here, we are talking about the private rights of

08-13555-scc    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
Pg 225 of 311
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 54

1    individuals who don't fully understand, even the sophisticated

2    ones, precisely what their rights are.  Notwithstanding the

3    fact that it has been represented forcefully and credibly in

4    court that appropriate correspondence went out to notify

5    parties who are beneficiaries of the VEBA as to the termination

6    of benefits and the continuation of coverage that was

7    substantially similar under what has been described as the

8    Aetna plan.

9           As I said at the outset and as Mr. Krasnow confirmed,

10   the relief that is being sought today is fairly surgical and

11   benign in relative terms.  All that is happening, as I

12   understand it, is that from a structural perspective, control

13   of the entity that in turns controls the VEBA is being

14   transferred from the trustee of LBI to LBHI and certain limited

15   releases -- limited in a manner acceptable to the Department of

16   Labor, are being exchanged.  nothing in today's motion directly

17   or indirectly affects the rights of any beneficiaries of the

18   VEBA, however, it is clear from a fair reading of the motion

19   and from the statements made by debtors' counsel that at some

20   point in the future, it is foreseeable that LBHI will be taking

21   steps, if permitted, under applicable law -- which is not

22   bankruptcy law, to reimburse itself up to twenty-five million

23   dollars from funds that are currently held by the VEBA in

24   respect of certain health care payments made directly by LBHI

25   to cover individuals who are otherwise subject to the

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:10    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 226 of 311

Page 55

1           protection of the group benefit plan.

2                   It is really that twenty-five million dollar

3           reimbursement that has been proposed but that is not part of

4           the motion itself that I believe has generated most of the

5           objections that we have heard today.  Additionally, I believe

6           that the objections are motivated by a profound sense of fear

7           and insecurity as to what will happen to particularly

8           vulnerable individuals who are dependent upon the health care

9           benefits that are funded by the VEBA.

10                  I am extremely sympathetic to the objections that have

11          been raised and I recognize that counsel for the debtor has

12          also expressed sympathy.  In effect, however, those are hollow

13          words because expressing sympathy does not provide any

14          significant relief nor does it provide the information that the

15          individuals appear to require.

16                  I will grant the relief requested but I'm going to

17          condition that relief upon something that may or may not be

18          within my powers.  I do not know whether or not I have any

19          ability to direct that the trustee of the VEBA or those working

20          at LBHI who are in control of the VEBA through Aceso, but I

21          would like the individuals who are in a position to make a

22          difference, to provide meaningful information to all of the

23          beneficiaries, both current employees, retirees and those on

24          disability, as to precisely what is going on, when action is

25          going to be taken, it may affect their rights, and provide them

1    with what amounts to a funded lawyer; a lawyer that can

2    represent the interests of the classes of affected

3    beneficiaries so that those separate classes can be advised in

4    a thoughtful and understandable way as to what their rights

5    are.  And it seems to me -- and I may not have every class

6    clearly in mind, but the three classes that may need separate

7    representation; by (sic) those who are current employees, those

8    who are retirees and those who are on disability.  It may be

9    that those who are on disability and those who are retirees

10   fall into the same category.  But I am not satisfied simply at

11   proving what amounts to a benign transaction in a setting that

12   includes so much obvious pain and concern on the part of those

13   who are looking to the VEBA as a source of Health care

14   coverage.

15          Now, having said what I've said, I do not mean to

16   overstep my prerogatives and jurisdiction.  For that reason,

17   I'm conditioning this on not an order from the Court, but a

18   strong suggestion with a request for voluntary compliance.  I

19   won't enter the order unless and until I hear a report as to

20   whether or not what I have suggested can be arranged.  If it

21   can't be, for good reason, I'll reconsider the conditions I've

22   imposed.

23          If there's anyone who wishes to say anything in

24   response to what I've said, this is the time to do it.

25   Otherwise, we're going to move on to the next agenda item.

08-13555-scl    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:10    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 228 of 282

Page 57

 1              MR. KRASNOW:  Thank you, Your Honor.  Your Honor, I

 2      believe the -- we've concluded the Chapter 11 debtors' portion

 3      of the agenda, so I will turn it over to the representatives

 4      for the SIPA trustee.

 5              MR. SALZMAN:  Good morning, Your Honor.  My name is

 6      Michael Salzman.  I'm from Hughes, Hubbard & Reed and I am here

 7      for the SIPA trustee.  And my part of the activity today

 8      concerns the motion that the Providence funds made for a

 9      schedule to proceed with litigation and I believe, therefore,

10      that Mr. Molton, on behalf of Providence, would be the

11      proponent of the motion and, therefore, it occurs to me that

12      Mr. Molton would be next up.

13              THE COURT:  He is, in fact, on his way.

14              MR. MOLTON:  Thank you, Mr. Salzman.  Good morning,

15      Your Honor.  David Molton of Brown Rudnick here with Howard

16      Steel for the four Providence funds which I'll call the funds.

17      Your Honor, I'm going to be brief.  I think our papers

18      adequately set forth our situation.  I'm going to -- I know, as

19      Your Honor knows, since the commencement of this case three

20      years ago, the funds have been persistent in asking for prompt

21      progress and determination of their disputed customer status.

22              We're not being told, reading my friend Mr. Salzman's

23      papers, that we have to, according to them, wait until sometime

24      in 2013 before our issue is even teed up, until there's a

25      determination of a disputed house claim by LBIE which may

1    implicate, arguably, some of our securities and then, possibly

2    thereafter, later in 2013, second quarter, where the omnibus

3    claim, to the extent it does not get resolved, is teed up.  I

4    think, Your Honor -- and I'll get to it in a minute -- our

5    situation is wholly independent of those issues.

6            But in any event, Your Honor, that's too long and

7    those proceedings, as I'm going to contend and submit, are

8    irrelevant.  We're asking, Judge, that this argu -- that our

9    motion or our dispute as to customer status be teed up

10   relatively quickly.  I know certain people objected to our

11   proposal for an early 2012 tee up. Needless to say, we're

12   willing to work with our friends on the other side in terms of

13   a schedule but it would be a prompt schedule.

14           I'm not going to get into the merits of the argument,

15   Your Honor.  They've got their position, we've got ours.  Your

16   Honor's seen it, Your Honor has seen it last year, Your Honor

17   saw it a couple of years ago when I stood up here.  Suffice it

18   to say there's a dispute.  That dispute is one that we believe

19   can be -- is mostly a legal dispute and one that can be

20   resolved relatively quickly on an accelerated hearing schedule.

21           We don't have any other remedy, Judge, but to come

22   here three years now.  And I know Your Honor has seen me

23   intermittently in that time asking, on occasion, for the same

24   thing.  But we have no other remedy other than to come here and

25   ask for Your Honor's intervention in this in order to compel

1   the trustee to tee up this motion concerning folks who has a

2   contractual relationship with them and argument is we're

3   customers of LBI.

4           THE COURT:  Mr. Molton, let me just break in --

5           MR. MOLTON:  Yes.

6           THE COURT:  -- and ask you a fundamental question.

7   This is really a request to jump ahead of some other matters

8   that are on the LBI docket in a manner that, at least the

9   trustee argues, in fundamentally inefficient because many of

10  the  same issues that you're concerned with are tied up in the

11  LBI house claim.  And my question to you is why is it efficient

12  to do what you're proposing?  I understand your clients are

13  impatient and you have a job to do.  Why does that mean that I

14  should do anything special for you?

15          MR. MOLTON:  Well, first of all, Judge, we're not

16  asking -- we don't think it's special for us.  We think that,

17  pursuant to the way Your Honor's case managed this case, an

18  omnibus hearing can be teed up that would affect all alleged

19  300s similarly situated, folks who are like us.  Indeed, a year

20  and a half ago, we submitted, on their request, a stipu -- a

21  proposed stipulation of uncontested facts that would guide that

22  hearing to resolve these legal situations.

23          But let me get to the crux and the gist of your

24  matter, Judge.  We don't believe that these issues are tied up

25  in the other claims.  We believe SIPA, first of all, requires

08-13558-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 60 of 211

Page 60

1   them to timely adjudicate our customer status.  The

2   finalization of that status, Your Honor is -- affects issues

3   that are wholly independent from the adjudication of the house

4   claim or the omnibus claim.  First of all, it will affect our

5   right to get advances from SIPA which may be one of the reasons

6   why they want to deny us customer status.  Because if they just

7   hold LBIE to be the customer and not these 300 other folks who

8   we argue also enjoy customer status --

9           THE COURT:  You said you weren't getting to the

10  merits, Mr. Molton.

11          MR. MOLTON:  Okay.  Put it aside.  I'll get it aside.

12  But it affects our distribution right.  To the extent there are

13  interim debtors, which we hope there are, it would affect our

14  clients right to those interim distributions to have

15  finalization as to the adjudication of our status.  It affects

16  how we deal, Your Honor, with the ongoing LBIE proceedings and

17  the allegations or the position that were found in that matter.

18  To have finalization and adjudication of our customer status

19  will allow our clients to finally understand their rights in

20  this proceeding and make decisions as to how they will go

21  forward to resolve situations globally across the board.

22          We think we're entitled to it under the statute, Your

23  Honor.  We don't believe, as our friends from the committee put

24  in their paper, that there's any connection between the

25  resolution of the LBIE claims, whether it be the house claim or

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 61

1    the omnibus claim, in connection with the resolution of what we

2    believe, again, Your Honor, will be a very legally oriented

3    decision by this Court on pretty well undisputed facts.  We're

4    not asking for preferential treatment, we're not asking to be

5    put ahead of anyone, Your Honor.  We're asking that our claim

6    be adjudicated.  We're asking Your Honor to include all of

7    those similarly situated.

8            First of all -- and in light of what I said, Your

9    Honor, for the trustee who has fiduciary duties to timely and

10   promptly pursue and adjudicate and resolve customer claim

11   status -- customer claims -- disputed customer claims, to say

12   the resolution of our claim would be meaningless, is just, from

13   our perspective, a frivolous argument.  And we're very

14   concerned, Judge, that we're being strung along, that to some

15   extent we find ourselves between a rock and a hard place, that

16   we're being a pinball between the various self-motivated claims

17   of these two brokers, one in the United States and one in

18   England, who are using us and delaying the adjudication of our

19   claim to our detriment for whatever their negotiating, as

20   they've been negotiating for now over three years to resolve

21   claims between them.

22           Again, I think that's it, Judge, unless Your Honor has

23   any further questions, I'll rely on our papers and really ask

24   that we have our day in court.

25           THE COURT:  Okay.

1             MR. MOLTON:  Thank you.

2             THE COURT:  Thank you.

3             MR. SALZMAN:  Michael Salzman again.  The fundamental

4      premise that Mr. Molton puts forth, that his claim is wholly

5      independent of the LBIE omnibus claim is false on its face.

6      It's the same exact property.  The omnibus claim was made by

7      LBIE precisely on behalf of Mr. Molton's clients and 299 other

8      funds.  And we've spent the last three years with LBIE

9      reconciling positions to come to where we are. It's not the end

10     of the road and we're very sorry that it's not the end of the

11     road and we recognize the responsibility to move to the end of

12     the road.

13             But we've gotten to the place we are by dint of

14     comparing the LBIE books and records with the LBI books and

15     records.  There were almost 200,000 different claims that had

16     to be dealt with in Lehman week.  We've dealt with them.  We're

17     now in the process of taking, really, I would say, two

18     important steps that are going on simultaneously.  One is to

19     litigate the remaining legal issues with LBIE if they cannot be

20     agreed upon and, at the same time, as our papers indicate, we

21     have started, I want to say, trialogues, three way discussions

22     with people such as Mr. Molton's clients, other of those funds

23     that are direct claimants into LBIE and on behalf of whom LBIE

24     has made the omnibus claim to us, to give those people an

25     understanding of what's involved and to make sure that they are

1    satisfied, to the extent they can be, with -- that the books

2    and records accurately show what occurred and if they have any

3    differences to let us know and work that out.

4         But it is fundamentally wrong to say that this case

5    can progress in any meaningful way by separately working in

6    this court and having discovery and litigation with these 300

7    different claimants.  And it would -- as LBIE agrees with us on

8    this point, if you saw their paper filed yesterday.  The issues

9    are -- they say intertwined; I would say they're largely the

10   same, not just intertwined, as to was particular security here

11   or there?  And I submit, Your Honor, that it would be a

12   profound mistake to get us off track now with these 300 other

13   people.

14        THE COURT:  Well, okay, let me just break in and ask

15   you a question that's relatively straightforward.  It's simply

16   about timing.  I view the motion being pressed by Mr. Molton as

17   primarily growing out of a strong sense of frustration that

18   this process has been dragging on for too long and that unless

19   he, for the benefit of his clients and others who may be

20   similarly situated, jumps in and says to me please do something

21   about this, this is going to go on indefinitely and he has no

22   control over his fate, his client's fate.  What do you say to

23   that?  And a subpart; why can't this be carved out of the LBIE

24   claim?  Why can't there be some separate determination that all

25   of these 300 or so hedge funds that have the same kind of

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 235 of 282

Page 64

1    contractual relationship, both with LBIE and LBI, can have at

2    least their customer status issues resolved?  What's wrong with

3    that?

4            MR. SALZMAN:  The omnibus claim -- the allowance of

5    the omnibus claim gives these people what they're entitled to

6    insofar as they could have customer status.  We think it's

7    clear by definition, according to the books and records,

8    they're 056 accounts.  That means they were customers of LBIE,

9    not of LBI.

10           THE COURT:  Is that really determinative?  I mean, I

11   know I saw that in your papers and I know that, from an

12   internal perspective, that kind of coding may be significant

13   but does it really determine that ultimate legal question?

14           MR. SALZMAN:  I think it's not, by itself -- it's not

15   a hundred percent but it's close to a hundred percent.  And

16   beyond that, where we've been going these last three years in

17   working with LBIE to reconcile the positions would be a

18   futility, frankly, if these people were now going to start over

19   and press direct claims.  We think that the way -- the fastest

20   way home, frankly, is to resolve the LBIE, LBI issue.  At that

21   point, the 8.3 billion dollars that's up on the table will be

22   allocable.  If it's more or less, based on whatever Your Honor

23   decides, so be it.

24           And at that point, we believe -- and we believe that

25   almost all of the other 300 people -- and I think it's notable

1    that, to this point at least, only Providence is on this motion

2    today -- that these other people recognize that if we work with

3    them, LBIE takes up the cudgels for them, to the extent there's

4    a disagreement, that that will get us home and that the 300

5    other people who have all -- most of whom have made direct

6    claims in this court, did so largely for protective reasons; we

7    won't have to litigate any of those things.  And we're

8    anticipating, as Mr. Kobak put in the interim report recently,

9    that instead of having these 300 people in court here

10   litigating, that once the omnibus claim in done, that we're

11   done.

12           THE COURT:  Okay.  Well, you've just said something

13   that makes it sound pretty simple.  Once it's done, we're done.

14   Well, what's the process for getting that done?  That's an

15   enormously protracted, fact-specific process that, I think,

16   runs out over something like eighteen months.

17           MR. SALZMAN:  But the reality, Your Honor, is that

18   getting a short answer test question answer to the question do

19   the --

20           THE COURT:  Does this mean that this group has to wait

21   eighteen months before they can do anything?  Because if that's

22   what you're saying, I suspect they're going to be saying in

23   response that's awfully long to have to wait, isn't it?

24           MR. SALZMAN:  It's --

25           THE COURT:  And we have issues that we assert are

```
 1    separate and apart from this distracting other issue.  We just
 2    want to know whether we're customers and why can't we do that
 3    now?  What's the answer to that?
 4          MR. SALZMAN:  Well, the most direct answer, without
 5    being flip in any way and being respectful, is that --
 6          THE COURT:  Respectful of whom?
 7          MR. SALZMAN:  Of both Your Honor and of these people
 8    and their interests.  Is that knowing the answer to that
 9    question does not advance the ball.  The omnibus claim --
10          THE COURT:  But it may advance the ball for them.  I
11    think what they're saying is we understand that the trustee is
12    focused on the LBIE claim, big numbers there, and believes that
13    if they can resolve that, since we're included in that
14    universe, that this will all go away more neatly.  I think they
15    understand the argument you've made but they're saying
16    something else.  They're saying we're customers and have rights
17    in the LBI case.  And we want to have those rights determined
18    and vindicated and we don't want to wait for what we say is a
19    collateral issue.  I think that's their argument.  Don't you
20    think that's their argument?
21          MR. SALZMAN:  I do think that's their argument.
22          THE COURT:  So why -- what's wrong with that argument?
23          MR. SALZMAN:  What's wrong is that it does not advance
24    the ball in terms of their getting anything.  We still have to
25    determine the omnibus claim.  It's the same exact CUSIPs, it's
```

08-13555-scc    Doc 24223    Filed 06/14/12    Entered 06/14/12 16:08:10    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 238 of 282

Page 67

1    the same exact positions, it's the same exact cash and it's

2    illogical to do anything with them and give them anything,

3    promise them anything, represent anything to them until that

4    issue is resolved.

5           When Mr. Molton refers to -- criticizes us for saying

6    it would be meaningless, I think what we're trying to convey is

7    that there is a process, it is systematic, it's going to -- it

8    deals with their property and we're going to get it to them.

9    But having separate discovery as to -- their contention, for

10   example -- and Province is one of some people but not a

11   majority of people who are saying well, we really did business

12   in New York.  We don't recognize the fact that we -- this other

13   contract with LBIE has anything to do with it.

14          To get a trial on that subject is collateral.  To have

15   discovery about that is collateral.  It's not something that

16   can be addressed in a paper without discovery.  They themselves

17   acknowledge that they're asking for discovery and so on.

18          THE COURT:  I think they say limited discovery.

19          MR. SALZMAN:  Yes.  But the books and rec -- I mean,

20   where we are right now is the books and records say 056,

21   London, they got account statements from London and trying the

22   issue of to what extent beyond the, let's say, ninety-nine

23   percent that the books and records and those account statements

24   are determinative, just takes us spinning way out from the

25   process that'll actually get us to getting them their property.

1           THE COURT:  I understand that to be your position.  I

2      want to hear from Mr. Molton on something.

3           MR. SALZMAN:  Thank you.

4           MR. MOLTON:  Your Honor.

5           THE COURT:  Having heard what I just heard --

6           MR. MOLTON:  Yes.

7           THE COURT:  -- how are you and your clients benefitted

8      in a meaningful way by having a separate litigation over your

9      customer status as to LBI when the very same CUSIPs, as I

10     understand it, are tied up in another proceeding altogether

11     which has a long timeline to resolve?

12          MR. MOLTON:  I'll answer that, Your Honor.  And I'm

13     going to answer it by referring to the fact that one thing my

14     friend Mr. Salzman didn't say is at the end of this long

15     process, we'll treat you as customers in this proceeding.  He

16     doesn't say that for a reason.  Because it's not their intent

17     to ever try and concede that issue.  What they intend to do --

18     and if you listen to it carefully, it's not the vindication of

19     our rights in this proceeding or it's not even a timely

20     adjudication of our status in this proceeding but it's

21     adjudicating what the LBIE omnibus claim is and go over there.

22     That's where you belong.  Not that we have rights in this

23     proceeding.

24          And what he doesn't say is it's not apples and apples.

25     I'm not an English lawyer but I understand that in the LBIE

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 240 of 282

Page 69

1    proceeding, because LBIE hypothecated immediately before the

2    insolvency and their filing, a good deal of all of these

3    securities, whether or not there were margin balances or not,

4    we would be treated over there as general unsecured creditors

5    which is something that I think LBIE would like.

6            Here, we have preferred customer status, if Your Honor

7    decides we're a customer.  And our whole point the last three

8    years has been to say we believe the statute contemplates this

9    too.  There could be two customers regarding the same disputed

10   property.  Indeed, Section 78fff-3(a)(5), as Your Honor

11   knows -- and I think Judge Lifland commented about that statute

12   recently regarding the feeder funds in the Madoff proceeding

13   which he said because they weren't broker-dealers or bankers,

14   that doesn't apply.  But we're accorded customer status in this

15   proceeding under that provision, entitled to advances from

16   SIPA, notwithstanding that we may have been also a customer at

17   LBIE.

18           So it's significant to me, when you actually peel back

19   the layers of what they're saying, to look at what they're not

20   saying.  They're never going to concede -- they don't say hey,

21   at the end of their dance with LBIE, you know, we're going to

22   give you customer status but everything's going to be resolved.

23   They don't say that.  Because that's not what their position is

24   going to be.  We want -- we're entitled per the statute to

25   have, as Your Honor said, our rights vindicated here.  We're

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 241 of 282

Page 70

1    asking for a determination of status.  I think that that's a

2    separate, distinct issue, recognized by the statute -- and

3    indeed, if Your Honor -- I don't want to get into merits but I

4    think the Second Circuit's decision in Madoff and what it

5    defines as customer, touches a number of undisputed facts here

6    that pulls us into that status.  But I'm not going to go there;

7    just responding to my friend's point.

8        But that's the reason why, Judge.  What they're doing

9    vis-a-vis LBIE and its claims and the house claim concerns

10   arguably their property and also the house claims to the extent

11   the house claim includes hypothecated securities that are ours

12   and the trustee wins on the denial of that claim in this

13   proceeding?  Which means that they're regulated to general

14   unsecured creditors vis-a-vis that claim in this proceeding.

15   They're probably going to get no distribution.  We don't have a

16   remedy.  If that's where our property is.  And we don't know

17   that.  We say well, they speculate that it is, they speculate

18   that it isn't, nobody's told us yes or no.

19       And I just want to put up the fact that every time I

20   appear here -- well, we're talking to people.  We're talking to

21   people like you.  Yes.  Sometimes they call us.  You know, Mr.

22   Warnot, who I know, has had my papers for a number of weeks.

23   I've seen him on other matters.  I got his paper yesterday

24   where he says I'd be glad to call Mr. Molton and talk to him.

25   The bottom line, Judge, is we're entitled to have, as Your

08-13555-scc    Doc 44222    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 242 of 282

Page 71

1    Honor said, our rights vindicated in this proceeding.  We don't

2    believe it's going to be -- in the scheme of the resources that

3    have been allocated to attorneys in this case, it's de minimis.

4    And I think Your Honor can get on with it, can make that

5    determination and I think that the determination of those 300

6    customers who have this situation, which can be done on an

7    omnibus fashion, will facilitate these guys talking to each

8    other and coming to some resolutions.

9              In any event, that's all I have to say unless Your

10   Honor has any other questions.

11             THE COURT:  Okay.  Is there more from anybody?

12             MR. WARNOT:  Your Honor, may I be heard?  I'm from

13   LBIE.

14             THE COURT:  Of course.

15             MR. WARNOT:  James Warnot from Linklaters for LBIE.  I

16   do agree with one thing that Mr. Molton said, that this is

17   taking way too long.  But most of the other things he said I

18   disagree with.  In fact, the funds are LBIE customers.  They've

19   put claims into the LBIE proceeding, they've entered into a

20   claims resolution agreement which is a very, very complicated

21   document as to how their claims will be dealt with, including

22   the impact of any recovery in this proceeding, we have asserted

23   claims on their behalf in the omnibus proceeding and so, in

24   fact, we think that's where the merits would ultimately come

25   out.

Page 72

1         To respond to one of the questions that you posed

2    earlier, I don't think it's quite as simple or that all 300 are

3    similarly situated, such that a preliminary determination could

4    be made of their customer status, whether they're LBI

5    customers.  Frankly, if they're LBI customers and they want to

6    drop their claim against us, then maybe that's okay.  But

7    you've got to look at the suite of contracts which are not the

8    same for all 300.  In fact, even the versions changed over

9    time.  You've got to look at some of these internal procedures

10   that Mr. Salzman alluded to, how the accounts are designated,

11   where the account statements go and you've got a whole course

12   of dealing as to how these clients dealt with Lehman over the

13   years.  And we think it's clear that that points to LBIE

14   customers for the very vast, vast majority of them.

15        So you can't say that our omnibus claim, which is

16   asserted solely on behalf of these 300 or so hedge funds and as

17   to which the recoveries will go to those customers, are not

18   related with the claims that these 300 are trying to assert.

19   And we just don't see how you can litigate those two things at

20   the same time.  We are pushing for as fast a schedule as is

21   possible with LBI.  We filed our objection on the 31st of

22   October.  We're negotiating a litigation schedule now.

23        But with re -- one thing that could advance the ball

24   with respect to many of these individual customers, including

25   Mr. Molton's customers, are to talk about it.  To understand

1    precisely what their claim is into LBIE, what their claim is

2    into LBI, what they owe LBIE under the margin lending agreement

3    that will cover many of the issues that Mr. Molton is referring

4    to and what is in the omni claim on their behalf.  So for all

5    those reasons, we believe that the relief requested by Mr.

6    Molton doesn't simplify things but, in fact, overly complicates

7    them.

8            THE COURT:  Okay.  Does the committee have anything to

9    say on this?

10           MR. O'DONNELL:  Of course, Your Honor.  Your Honor,

11   Dennis O'Donnell, Milbank Tweed Hadley & McCloy.  We did file a

12   statement in support of Mr. Molton's motion.  We did so because

13   I think approximately three years ago, on October 13th of '08,

14   we filed a pleading in opposition to the first motion that was

15   made for discovery here.  I felt strongly at the time that all

16   of things that have been said by the LBI trustee and by the

17   LBIE trustee here made sense; that there was a process that

18   should unfold here.

19           But it is three years later and I think what Your

20   Honor has said as well, we agree with entirely which is that

21   there are separate issues here.  I've heard it said several

22   different ways here but I -- from a very basic -- you know,

23   without -- with limited visibility and to all the facts and

24   circumstances here, but from a very basic perspective here.  It

25   would appear that there are, in fact, two sets of contractual

08-13555-scl   Doc 24223   Filed 06/14/19   Entered 06/14/19 16:08:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 245 of 282

Page 74

1    relationships here.  They can be dealt with separately.  They

2    should be evaluated separately.

3         The LBI trustee has issues letters of determination

4    with respect to all of the LBI claims and there are -- there's

5    a process for objecting to that -- whatever the

6    determination -- and having it decided by that court.  And I

7    think what Mr. Molton is saying is that that process, which

8    affects only this Court, should be allowed to play out in this

9    Court.

10         THE COURT:  Mr. O'Donnell, let's me just ask you

11   something very basic.  This would appear to be a matter as to

12   which the committee does not have a dog in the fight.  Why are

13   you here?

14         MR. O'DONNELL:  Your Honor, we're here as we have been

15   before on other LBI related matter because, as I think Your

16   Honor said very early in the case, that there is a semi-

17   permeable membrane between the LBIE case and the LBI --

18         THE COURT:  But how is the committee affected by this

19   question of how to deal with --

20         MR. O'DONNELL:  The committee --

21         THE COURT:  -- the interests of these hedge funds.

22         MR. O'DONNELL:  The committee is affected by who winds

23   up being a customer and not a customer in the LBI case and we

24   had, for the most part, ninety-nine percent of the time, been

25   on the same page as the LBI trustee as to how to handle the

1     treatment of customer claims.  We, a few weeks ago, filed a

2     statement in support of their approach to the TBD claims -- TBA

3     claims, rather, and have worked with -- you know, worked

4     constructively with the LBI trustee.  Because we view the LBHI

5     estate as a beneficiary of -- a residual beneficiary of that

6     estate which would benefit our creditors.  So I think we do

7     have -- we have had all along that interest is how things

8     develop at LBH -- at LBI and view this as a situation where we

9     just disagree as to how the treatment should be -- how these

10    claims should be treated.

11              THE COURT:  Okay.  Thank you.  Is there more?

12              The fallback relief requested in the Providence motion

13    is that we conduct a status conference under Section 105(d).

14    And I'm prepared to do that sometime after the confirmation

15    process has run its course in the LBHI case.  I don't know what

16    the right date is for scheduling that status conference but for

17    discussion purposes only, let's say that next omnibus hearing

18    after whenever a confirmation order is entered, assuming one is

19    entered.

20              If a confirmation order is not entered, we'll have it,

21    say, in February of 2012 with the understanding that between

22    now and then -- and the holidays are upon us; that probably

23    means in January -- the parties will endeavor, through good

24    faith meet and confer sessions, to achieve something

25    approaching light if not heat, with respect to the possible

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 247 of 281

Page 76

1    acceleration of the determination of customer status, in a

2    manner that will not complicate or delay resolution of the

3    omnibus claim but by LBIE.

4          I have heard all of these arguments.  I've reviewed

5    the papers that have been filed.  There is a level of

6    complexity to this that I'm not sufficiently fluent at this

7    point to address with the kind of thoughtfulness that it

8    deserves.  It troubles me that there's an even split here with

9    two respected lawyers saying we can do this and two respected

10   lawyers saying we can't do this.  Or at least we can't do it

11   efficiently.  I don't have a sufficient clarity of vision at

12   this point as to who's right.

13         And so I would like the parties to try to see if they

14   can persuade the other side, perhaps, either that there is

15   merit to waiting to merit to bifurcating.  And you can provide

16   me with a status report and I can provide you with some

17   comments when next we're together on this subject.  It seems to

18   me that it would be useful, to me, if the parties could submit

19   position papers, with respect to the matters that have been

20   discussed, that can be in the form of simple correspondence

21   that is docketed, sometime prior to the status conference.  I'm

22   not setting a date.  A day or two before.  Thereby giving me

23   some advanced notice as to what the issues have turned out to

24   be.

25         Mr. Krasnow, you've returned to the room.  Does that

1    signify anything?

2            MR. KRASNOW:  Your Honor, it simply signifies, I

3    think, that we may be at the conclusion of this morning's

4    agenda.

5            THE COURT:  That's a good thing.  We're adjourned

6    until 2 o'clock.

7        (Recess from 12:07 p.m. until 2:06 p.m.)

8            THE COURT:  Be seated, please.  Good afternoon.

9            MR. ROSEN:  Thank you, Your Honor.

10           THE COURT:  I think the only matter on this afternoon

11   is the motion to dismiss in Uvino v. Lehman, so let's proceed

12   with that.

13           MR. BAER:  Good afternoon, Your Honor, Lawrence Baer,

14   Weil, Gotshal & Manges, on behalf of Lehman Brothers.  Your

15   Honor, I will assume familiarity with background facts in this

16   case based upon the prior motion practice and the Court's May

17   decision.  Just like to add a couple of highlights of our --

18   the arguments set forth in our papers.

19           The quantum meruit argument that plaintiff makes in

20   this case is, essentially, unchanged from the quantum meruit

21   argument that was made in the original complaint.  In fact,

22   it's striking from a comparison of the blackline that I ran

23   between the original complaint and the amended complaint there

24   were no changed allegations with respect to quantum meruit.  On

25   its face, the quantum meruit allegations apply to the

1    commitment letter.  That is a claim that this Court has

2    previously dismissed; that is a -- the work of plaintiff,

3    covered by the original commitment letter, which expired on

4    December 31, 2009.

5           Plaintiff, in response to our motion to dismiss, said,

6    well, you know, we'll stipulate that the -- this new quantum

7    meruit claim set forth in the amended complaint applies only to

8    that period covered by the renewal commitment letter, that

9    being January 1st, 2010 to June 2010.  The fact of the matter

10   is the complaint says what the complaint says, and it is

11   improper to amend one's pleadings through a brief.

12          THE COURT:  I saw that.  But it's apparent to me that,

13   perhaps, through inartful pleading, perhaps, through lack of

14   diligence, perhaps, through error, there was a failure to do

15   that which the previous decision and order required.  But

16   you're not prejudiced.  And I'm not going to make that the

17   reason for dismissal, so you --

18          MR. BAER:  Well --

19          THE COURT:  -- shouldn't spend a lot of time there.

20   I'm going to deem the complaint amended so that it complies

21   totally with the Court's earlier decision.  It can't be

22   otherwise.

23          MR. BAER:  As the Court is aware, the simple -- the

24   procedural argument is not our only argument with respect to

25   the quantum meruit count set forth in the amended complaint.

08-13555-scc   Doc 24223   Filed 06/14/12   Entered 06/14/12 16:08:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 250 of 282

Page 79

1   What is clear based upon the established case law in New York

2   and as construed by the federal courts is that in order to

3   succeed on a claim for quantum meruit, the plaintiff must have

4   a reasonable expectation of increased compensation:  not merely

5   an expectation, a hope, a subjective belief that is

6   unreasonable, but a reasonable expectation of increased

7   compensation.  Here it's undisputed, as pled in the amended

8   complaint, that, certainly, as of December 3rd at the latest,

9   2009, when Lehman Brothers presented to Ms. Uvino the proposed

10  amended -- or excuse me, the proposed renewal commitment

11  letter, that the terms of her compensation were set going

12  forward.

13          The plaintiff attempts to argue in its opposition

14  papers based upon lots of back and forth that took place in

15  2009 preceding the presentation of the renewal commitment

16  letter, the handwritten comment on the original commitment

17  letter about the review and a potential for bonus potential.

18  But all that's irrelevant because as of December 3rd, 2009 when

19  Ms. Uvino received the renewal commitment letter, there was no

20  doubt whatsoever based upon the pleadings that there was no

21  reasonable expectation of increased compensation.  And indeed,

22  she said, well, if that's the case, I'm going to leave; I'm

23  going to get another job.  So for the reasons set forth in our

24  brief and as I've just highlighted, that essential element of

25  the quantum meruit is lacking --

08-13555-scc    Doc 24223    Filed 06/14/12    Entered 06/14/12 16:08:10    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 980 of 311

Page 80

 1            THE COURT:  Let me ask you --

 2            MR. BAER:  -- in the amended complaint.

 3            THE COURT:  Let me ask you a question as to how as a

 4    purely intellectual matter one gets to the conclusion that that

 5    element is lacking on a motion to dismiss as opposed to

 6    following a period of discovery, which includes the testimony

 7    of the people who were involved in the actual negotiation and

 8    drafting of the commitment letter; as well as the state of mind

 9    testimony of the plaintiff herself.  If you're talking about

10    reasonable expectation, it's not clear to me how that is

11    inferred in the absence of any record.

12            MR. BAER:  Your Honor, first of all, the negotiation

13    with respect to the original commitment letter, I would submit,

14    respectfully, is irrelevant.  What we're talk -- that -- the

15    Court has already dismissed that claim.  What we're talking

16    about is the period subsequent to the expiration of the

17    original commitment letter, which is January 2010 to --

18            THE COURT:  Forget the period of time for a moment

19    because what we're talking about is an element of the cause of

20    action of quantum meruit.  And you said in your papers and

21    you're saying now that, in effect, there is no plausible cause

22    of action that can be asserted for quantum meruit because under

23    no set of facts could this plaintiff have a reasonable

24    expectation of additional compensation, correct?

25            MR. BAER:  Yes, Your Honor.

Page 81

1          THE COURT:  That's my question to you purely as a

2    intellectual proposition.  Forget the case law; forget the

3    timeline.

4          MR. BAER:  Okay.

5          THE COURT:  We're talking now about the element of a

6    cause of action.  How is it possible to conclude on a motion to

7    dismiss where I must accept as true everything that has been

8    pleaded in the complaint that this plaintiff had no reasonable

9    expectation?  How do I do that as a matter of law?

10         MR. BAER:  Your Honor, you may rely on the plaintiff's

11   own words.  In the amended complaint at paragraph 50, she says

12   that on or about November 30th, 2009 she reviewed -- I'm

13   extrapolating because it's not the actual words -- Hershan also

14   reviewed -- Mr. Hershan was her boss -- also reviewed with

15   plaintiff the renewal terms of a second commitment period

16   beyond December 31, 2009.  On or about December 3rd, 2009,

17   Hershan hand delivered to plaintiff a renewal commitment

18   letter, a copy of which is annexed to the complaint, which sets

19   forth the terms of compensation going forward.

20         Plaintiff did not sign the commitment letter because

21   she continued to disagree with the compensation.  Now, she also

22   states in her papers that she said, well, if you're not going

23   to increase my compensation, I'm going to leave.  She knew as

24   of December 31 that it was a done deal.

25         The -- she had pled her case throughout 2009 as set

08-13555-scc    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 253 of 282

Page 82

1    forth in the pleadings.  I'm not asking Your Honor to guess

2    what was going on here.  There is -- can be no other reasonable

3    interpretation of the facts as pled by this plaintiff.

4         She went back and forth with her boss.  She pled with

5    him that she was underpaid, that the terms of the job had

6    changed, whatever her reasons were for trying to get additional

7    compensation.  Her boss ultimately sat down with her, gave her

8    her review, said, "That's all very well and good, but I'm not

9    going to give you more money.  Here are the terms going

10   forward."

11        She continued to work under those terms.  I mean

12   quantum meruit is not a doctrine where every employee who

13   believes he or she should be paid more gets to, you know, after

14   termination try to rejigger the numbers or renegotiate the

15   deal; otherwise, every employee at will would be doing that.

16   It's only where the plaintiff for this -- and in particular for

17   this period of time had any sort of reasonable belief, was lead

18   to believe, that she would get more.  She had pled her case.

19   She was told no more.  She was not only told no more, she was

20   given a piece of paper that said no more, these are the terms.

21        THE COURT:  But she didn't sign the continuation

22   commitment letter.

23        MR. BAER:  She didn't sign.  That's correct.  If --

24        THE COURT:  So couldn't she have -- and this is really

25   the proposition that I'm discussing with you now.

08-13555-scc   Doc 44223   Filed 06/14/19   Entered 06/14/19 16:08:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 983 of 211

Page 83

1          MR. BAER:  Yes, Your Honor.

2          THE COURT:  Couldn't she have the reason of:  "Well, I

3     didn't sign this.  I'm doing work that's well beyond what was

4     originally contemplated.  This group I'm now working for has

5     grown in size because of the needs of the reorganization."

6          "My responsibilities are significantly greater than

7     they used to be.  I'm not signing this.  I'm going to look for

8     another job, and I'm going to pursue claims for quantum

9     meruit."  Couldn't she have that subjective intent?

10          MR. BAER:  Her subjective intent is only a relevant

11     consideration for the Court to the extent it was a reasonable

12     subjective intent.

13          THE COURT:  Well, how do I -- that's really what I'm

14     dealing with here.

15          MR. BAER:  Yes.

16          THE COURT:  My question to you is the same question.

17     It's a motion to dismiss.

18          MR. BAER:  Yes.

19          THE COURT:  There's no discovery.  You don't have

20     anything that you're relying on to say, see, this is what she

21     said in her deposition.  You're looking at her complaint,

22     something that presumably Mr. Rosen prepared.  It's not as if

23     this is a state court pleading; this is a federal pleading.

24          MR. BAER:  I understand, Your Honor.  We --

25          THE COURT:  So, just as a purely theoretical

1   proposition, how do I get to where you want me to be by

2   determining under no set of reasonable circumstances could she

3   have believed that she had the possibility of getting

4   additional compensation for her work?

5           MR. BAER:  Your Honor, not just relying on the

6   complaint, but the documents attached to the complaint.

7           All right.  The renewal commitment letter, which is

8   admitted --

9           THE COURT:  But she didn't sign it.

10          MR. BAER:  She didn't sign it, correct.  From that

11  point forward, she continued to show up to work.  She -- if she

12  wanted to, and this is what quantum meruit was all -- is all

13  about, she could quit, say:  "You know what, I've been asking

14  for more money all year long."

15          "I didn't get it.  You now are trying to re-up me for

16  a renewal period.  I've asked for more money for the renewal

17  period.  I'm leaving."

18          And in fact, that's what she did do.  She began a job

19  search at least as alleged.  And if she began a job search,

20  that itself is evidence that she had no expectation.

21          THE COURT:  No, it's not.  It's evidence that she

22  wanted to get out; it's not evidence that she had no

23  expectation that while she was there she might earn more money.

24          MR. BAER:  The fact of the matter is, Your Honor, as

25  pled -- I'll come back to that.  I just want to address one

Page 85

1    other point that was addressed -- or that was made or implied

2    in the Court's question about the larger job.  There's no

3    allegation in the complaint that the job changed between the

4    end of December 2009 and January to June 2010.

5         The argument about the increased responsibilities, and

6    it was more than she bargained for; and it was going to be a --

7    you know, a none event liquidating a debtor with, you know, for

8    a short period of time, no employees, no HR functions, all of

9    that occurred in the period before December 31st, 2009.  That

10   was covered by the commitment letter not the renewal commitment

11   letter.  So her job didn't really change at all from December

12   31st to January 1st.

13        So her -- the expectation that she would get -- be

14   paid more based upon increased responsibilities under the

15   renewal commitment letter is also unreasonable because the job

16   responsibilities under the renewal -- under the commitment

17   letter, which -- with which she was clearly not satisfied,

18   didn't change in the renewal period.  There were the same

19   larger jobs -- larger responsibilities, more than she had

20   bargained for, I mean, assuming all of the facts as pled are

21   true.

22        THE COURT:  Okay.  Let's just assume all the facts

23   pled are true --

24        MR. BAER:  Yes.

25        THE COURT:  -- and we run through the timeline that

08-13555-scc   Doc 24223   Filed 06/14/19   Entered 06/14/19 16:08:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 980 of 211

Page 86

1    you've just given me.

2          MR. BAER:  Yes.

3          THE COURT:  She has greater responsibilities than she

4    had bargained for.  She had a signed commitment letter.  The

5    commitment letter expires.

6          She is asked to sign a renewal.  She doesn't sign the

7    renewal.  She doesn't sign the renewal because she believes the

8    terms of employment set forth in the document do not fairly

9    reflect the compensation and remuneration that someone doing

10   her job should get in the market.  "I'm not signing that," she

11   says to herself and to others.

12         MR. BAER:  Right.

13         THE COURT:  But she proceeds to continue as a good

14   professional to do her job because Lehman's reorganization, in

15   part, depends on that.  She does her job, but she feels she's

16   being unfairly treated.  She may believe because she's doing a

17   good job and had good performance reviews that she has a

18   reasonable basis, not having signed the document, not that

19   she's a lawyer, but she's been dealing with employment-related

20   issues for most of her career, to at least put in a claim "for

21   what I think I'm worth."  How do I know based upon the

22   complaint that that's not one reasonable way to read the

23   complaint?

24         We're back at the same point.  You're arguing

25   emphatically that I must find based upon this record, and there

1    is no record except for the complaint and some documents

2    attached to it, that she had no reasonable expectation.  I have

3    rather easily, I think, demonstrated that it's possible that

4    she had such an expectation.  You're still free to argue it's

5    not reasonable.

6         MR. BAER:  And indeed, Your Honor, that is the essence

7    of my argument.  I have no reason to doubt that Ms. Uvino had a

8    hope, believed that she should have been paid more.  I mean

9    that's demonstrated by the record in this case.  She, you know,

10   way back when is --

11        THE COURT:  So how do I determine reasonableness with

12   respect to a cause of action for quantum meruit in a setting

13   where there is no discovery?  There are no smoking guns yet.

14   There are no admissions against interest yet.

15        There's nothing that you can point to or that I can

16   point to.  Why should I grant this motion to dismiss as to this

17   aspect of the complaint?

18        MR. BAER:  Well, the --

19        THE COURT:  I don't see it yet.

20        MR. BAER:  The cases that I cite to Your Honor in

21   connection with this matter relied on various factors to

22   determine reasonableness.  In one case, somebody was one of --

23   the plaintiff was told, "I'm paying you too much.  I'm not

24   going to pay you X amount going forward."

25        The appellate division of the state of New York found

1     in that case -- I don't recall the plaintiff's name, but Liza

2     Minnelli was the defendant in that case -- that once told,

3     "Listen, you are not -- I can't afford to pay you the amount,

4     and I'm cutting your salary in half," there's no reasonable

5     expectation going forward that you would be paid any more than

6     half the amount.  Here the objective facts, I mean, Wendy

7     Uvino, I -- you know, I hate to be folksy, but my mother used

8     to say, you know, it's like banging your head against the wall

9     sometimes when she was -- talked to me as a child, all right.

10         Wendy Uvino could ask multiple times of Rob Hershan,

11    you know, "I'd like more money.  I'd like more money.  I'd like

12    more money. I'd like more money," put it in writing, "Here's

13    some metrics for other professionals in the field.  Look this

14    shows I'm entitled to more money," and I believe as Ms. Uvino

15    says in her amended complaint, Mr. Hershan ignored those

16    metrics and told her she wouldn't be paid any additional money.

17    At what point does it become unreasonable?  It seems to me

18    we're -- this isn't even -- isn't close.

19         And I understand, Your Honor, that you are -- you've

20    characterized my argument as emphatic because I truly believe

21    that there is no interpretation other than Ms. Uvino was being

22    unreasonable if she actually believed -- and I doubt she did,

23    quite frankly, as of December 2009, if she believed that she

24    was going to get more money after that.  She'd been asking for

25    over a year.  She provides data that says, "See, I'm entitled

1    to more."  They say --

2         THE COURT:  You've just proven to me the opposite of

3    the point you're trying to prove because you've demonstrated

4    that one way to read the complaint is that the plaintiff

5    believed that she was entitled to more compensation.  And it

6    wasn't simply a belief based upon a fanciful notion; it was

7    based upon metrics.  She had actually gone out and found

8    comparables as to what this position should be worth on the

9    market.

10        One could conclude, not necessarily conclusively

11   conclude, that it would not be unreasonable for a human

12   resources professional who has not signed a contract to believe

13   that she might enjoy a claim under quantum meruit for what

14   people who did this work in comparable settings might be paid

15   greater than the amount offered.  Now, that's not to say that

16   she would win.  That's not to say that following discovery this

17   isn't a case acceptable to motion for summary judgment based

18   upon established facts, but everything that you're presenting

19   in this argument is hypothesis.

20        MR. BAER:  Your Honor, what is not a hypothesis is

21   that when she presented the metrics, they were rejected.

22        THE COURT:  So what?  Nothing was signed.  We have an

23   unreasonable employer and a reasonable employee.  That's one

24   possibility:  an employer who was trying to save as much as

25   possible on cost to the administration.  That's a perfectly

1    honorable goal for a reorganization such as this or any other

2    reorganization.  If you can get somebody to work for less that

3    might be entitled to more, you've saved money.

4              MR. BAER:  Your Honor --

5              THE COURT:  But if that person leaves, well, I guess

6    you have to replace that person or do without the spot.

7              MR. BAER:  Right.  Your Honor, respectfully, this

8    motion, and I recognize that this is a motion to dismiss, is

9    not about whether Ms. Uvino, whether there's an argument that

10   could be made she's entitled to more money based upon the

11   metrics and the value to the estate.  I'm not attempting to go

12   there.  What --

13             THE COURT:  This is about whether she has a reasonable

14   basis to believe that she can get more money.  I don't know

15   how, which is my opening proposition, that can be conclusively

16   determined on a motion to dismiss.

17             MR. BAER:  Your Honor, when your -- when you

18   repeatedly ask your boss, "I want more money," and your boss

19   tells you, "I understand that.  I'm not going to give you more

20   money," to say that, notwithstanding, my boss' unequivocal

21   remarks and unequivocal conclusion, and --

22             THE COURT:  Tell me --

23             MR. BAER:  -- a writing --

24             THE COURT:  Tell me where in the record with respect

25   to the unsigned commitment letter everything that you have just

08-13555-scl    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
                                 Pg 93 of 311
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 91

1    said was said can be found.

2          MR. BAER:  Yes, Your Honor, it's all in the amended

3    complaint.  All right.  As I said, in the allegations

4    supporting the quantum meruit claim, Ms. Uvino, and it does

5    begin around paragraph 14 of the amended complaint and run

6    through paragraph 57, she details a course of history both

7    under the renewal -- under the original commitment letter and

8    the time leading up to the renewal commitment letter a desire

9    to have increased compensation.

10         Indeed, she writes an e-mail that is attached to the

11   amended complaint in March to Mr. Hershan setting forth all the

12   reasons that she thinks she's entitled to more money, and what

13   she gets back is -- what she -- what happens next is she has a

14   meeting with Mr. Hershan in November.  They go over the review.

15   He --

16         THE COURT:  That's in the complaint?

17         MR. BAER:  Yes, at paragraph 50.

18         THE COURT:  What does it say?

19         MR. BAER:  On November 30th, Hershan also reviewed

20   with plaintiff the renewal terms of a second commitment period

21   beyond December 31, 2009.  So that clearly sets forth, Your

22   Honor, that on November 30th plaintiff and Mr. Hershan

23   discussed the terms of employment covering the January 1st

24   period and prospectively after January 1st, so the time that

25   would have been covered by the renewal commitment letter.  As a

Page 92

1    follow on to that November 30th meeting, three days later on

2    December 3rd Mr. Hershan hand delivers to plaintiff the renewal

3    commitment letter, a copy of which is attached to the

4    complaint, which sets forth the terms of employment going

5    forward from January 1st prospectively.

6            There's no doubt what those terms are.  They were

7    discussed with her on November 30th.  They were presented to

8    her in writing on December 3rd.

9            THE COURT:  We don't know what was discussed on

10   November 30th.  We only have a bald allegation of the most

11   general nature.  We don't know what she said to him or what he

12   said to her.

13           MR. BAER:  On -- I can only take the complaint as it

14   comes, Your Honor.  The allegations on their face say that they

15   discussed the terms, the renewal terms, of a second commitment

16   period.  The very next sentence, "On December 30th, Hershan

17   hand delivered to plaintiff a renewal commitment letter, a copy

18   of which is attached as Exhibit G.  The plaintiff did not sign

19   the renewal commitment letter because she continued to disagree

20   with the terms of the compensation."  All right.

21           THE COURT:  How does this lead to dismissal?

22           MR. BAER:  Because --

23           THE COURT:  I think there's a limit to how much time

24   we should spend on this point.  I have -- what I think you have

25   already concluded is a fundamental disagreement with the

08-13555-scc    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 264 of 282

Page 93

1    conclusions that can be reasonably reached from the complaint

2    on this critical element of quantum meruit.  I don't think it's

3    there on the motion to dismiss; I think as an intellectual

4    matter it can't be done absent something more.

5            MR. BAER:  Your Honor, I know it's improper for me to

6    pose this question to the Court and I won't.  But as a -- as

7    you've put it, as a purely intellectual matter, at one -- at

8    what point does it become unreasonable in the face of continued

9    refusals both orally and in writing to give her any more money?

10   At what point does it become unreasonable for Ms. Uvino to

11   believe that she would get more money?

12           It just -- it seems to me --

13           THE COURT:  After you take --

14           MR. BAER:  -- we're well beyond that point.

15           THE COURT:  After you take a bunch of depositions in

16   this case, maybe you'll be able to prove that point.  You can't

17   prove it on a motion to dismiss to my satisfaction.

18           MR. BAER:  Very good, Your Honor.  I'd like to address

19   the second point if I may.

20           THE COURT:  Sure.

21           MR. BAER:  Second point is for a breach of contract

22   based upon the terms of the original commitment letter, and in

23   particular the handwritten entry on the commitment letter

24   during -- which sets forth in sum and substance that a review

25   will be held by June 30th, and at that time the possibility of

1    consideration of a potential increase in bonus potential --

2    very conditional statement -- would be considered.  As Your

3    Honor pointed out in your decision in May, that statement does

4    not include an enforceable promise to increase anyone's

5    compensation; it merely sets forth a time by which a review

6    would be conducted and a subject matter would be considered.

7    It is black letter law that in order to have a claim for breach

8    of contract, one must have damages and the damages must be

9    beyond merely speculative.

10           Here in response to our arguments and a case that's

11   really on all fours where a plaintiff -- the Hudson case, where

12   a plaintiff said, "Well, I didn't get my review after 90 days,

13   and therefore I'm entitled to a breach of contract claim and

14   I'm damaged thereby," the Court said, "Well, no, all you had

15   was a definite promise for a review.  You didn't have a

16   definite promise for an increase in compensation.  It's

17   entirely too speculative to go there.  No one can really tell

18   whether or not you would get the increase, so I'm going to

19   dismiss the cause of action as a matter of law."

20           Here, first of all, the Hudson case is unaddressed and

21   for that reason alone as a matter of law the claims should be

22   dismissed.  But secondly, the reasoning offered by plaintiff's

23   counsel or plaintiff is that she has damages because she would

24   have been looking for a job earlier, and she -- you know, but

25   let's assume she would have gone out and searched for a job.

1     We don't know what the timing of that would have been.  We

2     certainly don't know what -- when she would have received an

3     offer.  We certainly don't know what the terms of compensation

4     would have been had she gone out and gotten another job.  And

5     indeed, she might be making more, in which case there would be

6     no damage as a result.

7          So I mean we're really beyond the realm of speculation

8     here, Your Honor, when it comes to this issue of whether or not

9     Ms. Uvino would have had increased compensation as a result of

10    a review being conducted on or about June 30th, 2009, and

11    therefore I would ask that the Court dismiss that claim.

12          THE COURT:  Okay.  Mr. Rosen, let me hear from you.

13          MR. ROSEN:  Thank you, Your Honor.  Your Honor, first,

14    by brief defense of myself on the first cause of action, I read

15    your decision to say that I was only to amend the last cause of

16    action, and that's the instruction I gave to my associate.  So

17    when they raised it -- because I deemed it the first cause of

18    action amended by your decision, which is my -- because you

19    hadn't allowed us to re-plea it -- that, we would not ever

20    filed an amended pleading.  It would have just been deemed

21    amended by your decision.  That was my read on it.  If it

22    caused confusion, that's why I immediately offered, stipulated

23    to do it.

24          On the second issue, Your Honor, I'm not going to go

25    there because you've gotten -- you've said everything that I

08-13555-scc   Doc 24223   Filed 06/14/19   Entered 06/14/19 16:08:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 96 of 111

Page 96

1    was going to say in terms of the issue.  The only other thing I

2    would point out on that, that cause of action to dismiss the

3    quantum meruit claim is the exact cause of action that you

4    already ruled on and that motion should not even have been made

5    again.  They never appealed it:  they never saw -- came back to

6    you in any way; they just remade the exact same motion in front

7    of you.

8           Going to the contract cause of action, and Your Honor,

9    one of the things that counsel has done as a good lawyer,

10   opposing counsel, is he's parsed things that shouldn't

11   necessarily be parsed out.  When that meeting took place and on

12   the breach of contract when that meeting -- when the meeting

13   took place, and they've acknowledged that the meeting did not

14   take place until November 30th and the performance review was

15   not given until December 2nd, my client was still under the --

16   as she is today, under the position that under the contract

17   that already passed that she had damages because they had

18   breached their agreement and that she certainly wasn't going to

19   sign a new contract that was going to let them off the hook on

20   that.

21          And to reinforce that, the Court has to remember

22   something very important:  by not signing the renewal contract,

23   she lost, and it's part of our damages which is where they're

24   also wrong on the breach -- she lost $50,000 dollars worth of

25   her bonus because there was a holdback on the bonus of 20%,

08-13555-scc    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 268 of 282

Page 97

1   which would be $50,000 in this case, if you didn't sign the

2   renewal contract.  So she clearly had an expectation that she

3   was entitled to more because, otherwise, if she thought she

4   wasn't, she would have just signed it and then gotten another

5   job.  So, she had -- she most certainly had a higher

6   expectation of that, and she wasn't going to waive any of her

7   damages.

8          Let me address the Hudson case head on, all right,

9   because, first of all, it's not a mandatory authority to you.

10  Secondly, it's about a one or two line scribbled on this, and

11  it contains additional elements that are not present here.  It

12  was an oral promise to give an increase and it was an oral

13  promise to give a performance review, which never took place.

14         Here we have a written a contract with a written

15  promise to conduct a performance review by a finite period of

16  time which they clearly breached -- there is no -- there's no

17  dispute over that -- by five months -- no, six months.  I'm

18  sorry, by six months.  They breached that agreement, and it

19  said that that review was specifically to consider an enhanced

20  bonus.

21         And then what happens, that performance review

22  actually takes place.  Out of a scale of one to five, my client

23  gets a one with a one being the highest for a review, and she

24  gets no enhanced bonus whatsoever.  She gets the same 10% that

25  you got -- increase if you signed on for anyhow no matter how

1    good or bad a job review you got.  If you were asked back, you

2    got a 10% increase.

3         So we have a very different situation.  So, the issue

4    that we have here on that agreement, we said the first time

5    that they point to your footnote in the decision; but when we

6    were here the last time, you also said that language has to

7    mean something.  My client negotiated it.  She was told it's

8    already been approved by the Court; you can't change this, but

9    we can put some language in here.  She said I want more money.

10   This is before she knew she was going to have another 500

11   people to supervise, all right, but she said, "I want more

12   money.  I'm not satisfied with this."

13        "Okay.  We will sit down and look at it in six

14   months."  All right.  "In sum and substance, we will sit down

15   and look at -- give you a performance review."

16        What's in there in the terms of that, there is a

17   language and a written agreement that promises something, and

18   the mechanism is clearly not set forth.  But Judge, that's not

19   a motion to dismiss; that's the parol evidence rule, all right,

20   and that's why we need discovery in this case.  We need to find

21   out what Mr. Hershan said to my client at that point, what my

22   client said, what the expectation.

23        We have an ambiguity in a written document.  It's

24   contracts 101.  Under that circumstance, the negotiations come

25   in --

Page 99

```
 1              THE COURT:  What's ambiguous about this?

 2              MR. ROSEN:  What -- under -- what's ambiguous --

 3              THE COURT:  What's ambiguous about that handwritten

 4     note?  It seems to me to be pretty clear.

 5              MR. ROSEN:  Well, Your Honor, the question that's in

 6     there would be in terms of what would be the standards to be.

 7     Well, if it's clear, I mean it's clear to me in terms of the

 8     fact that she was to get an enhanced bonus if she got a good

 9     review after six months.

10              THE COURT:  Where does it say that?

11              MR. ROSEN:  Well, that, I think, is the inference of

12     it; otherwise, what does it mean, Your Honor?

13              THE COURT:  It means you'll get a performance review;

14     it doesn't mean anything more than that.  That's what it says.

15     How can it mean more than what it says?

16              MR. ROSEN:  Well, Your Honor, I think, to consider,

17     the answer is if you're going to have a performance review and

18     you get an excellent on it, is there no -- one of the things,

19     was there not an expectation between the parties there that

20     there would then be an increase in the bonus?

21              THE COURT:  Well, she may have been induced into

22     signing the original agreement by virtue of that handwritten

23     extra, and she may have had a state of mind that said, "You

24     know what this means to me?  This means I'm going to get a

25     performance review.  I'm going to do a great job, and I'm going
```

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 100 of 311

Page 100

1    to qualify for more money."  She may have thought that, but

2    that's not what it said.

3              MR. ROSEN:  Well, it says that she was going to get

4    the review, Judge.  So at the very least, to address their

5    damages issue because -- and this is the absolute minimal on --

6    minimum on damages, she was entitled.  There is no doubt that

7    as minimal as you may think or you may -- or take the position

8    that that language is as to what the debtor's representative

9    was --

10              THE COURT:  Well, let's --

11              MR. ROSEN:  -- required to do --

12              THE COURT:  Why don't we look at the language

13    together?  Do you have it handy?

14              MR. ROSEN:  It's in ten different places.  Let me get

15    it.  My stuff keeps sliding off this podium, Your Honor.

16              Yes, I do, Your Honor.

17              THE COURT:  Because --

18              MR. ROSEN:  "The parties agree to engage in a

19    performance review no later than 6/30/09 for consideration of a

20    potential increase in bonus potential."

21              THE COURT:  Okay.

22              MR. ROSEN:  All right.

23              THE COURT:  And that didn't happen --

24              MR. ROSEN:  So --

25              THE COURT:  -- on the date that it --

08-13555-scc   Doc 24223   Filed 06/14/19   Entered 06/14/19 16:08:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 101 of 111

Page 101

 1            MR. ROSEN:  It did not happen --

 2            THE COURT:  -- was supposed to happen?

 3            MR. ROSEN:  -- Your Honor.  And to point out something

 4    else on that, my client in March, which is attached to the

 5    complaint, the e-mail that counsel was talking about sent in

 6    March before that in preparation for that what her expectations

 7    were.  She sent a proposal.  She sent a rubrics.  She went

 8    through -- she gave them the analysis of what people in her

 9    position made, and she sent it to them.  And you do not have

10    anything back from Mr. Hershan other than, "I will look at

11    this," thus further include -- inducing her to think that this

12    was relevant in some way to the review.  And then you don't

13    have anything from him until August putting off having a

14    meeting because somebody -- I'm not sure who -- was going away

15    that day.  And then in November, six months after the review is

16    due, he gives her an excellent review, all right, and gives her

17    no raise --

18            THE COURT:  Well, see --

19            MR. ROSEN:  -- or no increased bonus.

20            THE COURT:  If that handwritten note had said, "If the

21    employee obtains an excellent review, she shall qualify without

22    further ado for a bonus computed in the following manner,"

23    you'd have a good claim.

24            MR. ROSEN:  Well, what's -- Your Honor, if I --

25            THE COURT:  The problem is that that's not there.

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 102 of 111

Page 102

1             MR. ROSEN:  Well, I guess the question for that is,

2       what is the understanding?

3             And I do think parol evidence comes in because the

4       question is, what's the definition of a performance review?

5             All right.  What was in each person's mind when they

6       were sitting down for a performance review?

7             I think if you get -- when we get -- when and if we

8       get into it, the review is going to be -- a performance review

9       is, "I sit down -- with me.  And if I've done a good job, I get

10      an increase."  Otherwise, all right, why would my client ask

11      for a performance review, or why would they then agree to give

12      it?

13            And traditionally, in this organization, one of the

14      things that would become relevant -- or in the business world

15      of what happens in a performance review?  Do you turn -- and

16      one of the other things that would become relevant, Your Honor,

17      would be in a performance review under all of this, what

18      happened to the other people in this case who were from Lehman

19      who got performance reviews and got ones?

20            All right.  If all of the other ones of them got

21      enhanced bonuses -- and there's a pattern in practice here, and

22      there's a course of dealing issue.  So I don't think it's as

23      simple as saying the words should have been clearer to say you

24      get this if everyone's expectation in the industry is that's

25      what happens at this meeting.

08-13555-scc    Doc 44223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 109 of 111

Page 103

1          THE COURT:  Well, the thing that makes it difficult to

2     talk about pattern in practice is that this is a handwritten

3     addition to a standard form agreement that was, I expect,

4     written into the document to induce your client to sign it.  It

5     may be of some significance to know what the parties were

6     saying to each other around the time that this happened, but

7     the language itself is fully integrated.  And it's probably not

8     the sort of language that one would find ordinarily because it

9     was written in.

10          One of the things that also makes this a more

11     challenging situation, frankly, for you is the position your

12     client held within the organization.  She was not

13     unsophisticated in matters of the employment relationship.

14          MR. ROSEN:  But we addressed that one, Your Honor.

15     Because she was told that this was a form agreement that had

16     already been approved by the Court, and this was the only place

17     this change could be made, was back here.  So I normally -- and

18     having known my client now, represented her for two and a half

19     years, in normal circumstances, I would agree with you, but I

20     think that's part of the inducement issue of what went on here.

21     It was kind of this is the best we can possibly give you to

22     protect you, and that's one of -- another reason why it's not

23     appropriate on a motion to dismiss.

24          Maybe it is a motion for summary judgment when we find

25     out exactly what was said.  But at this point, it's not

1    appropriate.  Your Honor -- and Your -- as I said before --

2    well, I'm not -- hang on one second -- see if I covered all of

3    what I wanted to say, Your Honor.

4            No, Your Honor, that's all I have to say.

5            THE COURT:  Okay.

6            MR. ROSEN:  I think that covers it.

7            THE COURT:  Anything more?

8            MR. BAER:  Yes, Your Honor, a couple of points.

9    Number one, plaintiff's counsel has not addressed at all the

10   speculative nature of the damages here.  I agree with Your

11   Honor:  this is a fully integrated document.  There is an

12   integration clause.  It says this is it:  the four corners of

13   the document is all one looks at.  And the document on its face

14   doesn't guarantee any compensation.  It just -- it guarantees a

15   discussion and a potential increase in bonus potential, nothing

16   more.  I'm not going to belabor that point.

17           Your Honor, I would just like to revisit, if I may,

18   the first point.  Your Honor had said that -- had cited the

19   Conley standard on motion to dismiss.  No set of facts that

20   this plaintiff could plead that would give rise to this cause

21   of action.  But the Conley standard and in fact the relevant

22   law is set forth in --

23           THE COURT:  We don't have to go to Iqbal.  I know what

24   Iqbal says.

25           MR. ROSEN:  Iqbal says plausible --

```
 1              THE COURT:  If you're talking about plausible, it's --
 2    for reasons that I'll incorporate by reference from an earlier
 3    colloquy, I myself posited a set of plausible explanations that
 4    I think could be used to blunt your motion to dismiss in terms
 5    of the complaint as drafted.  So I hear you, but I'm unmoving
 6    on that point.
 7              MR. BAER:  All right.
 8              THE COURT:  You're losing on that motion without
 9    prejudice.
10              MR. BAER:  Well, like any good lawyer, I know when to
11    sit down.  Thank you, Your Honor.
12              THE COURT:  Okay.
13              MR. ROSEN:  Your Honor, may I address the speculative
14    issue briefly?
15              THE COURT:  You can although it's a tough point for
16    you.
17              MR. ROSEN:  I know it is, Your Honor.  And let me --
18    Your Honor, first of all, it's a standard rule of construction,
19    and I've recently had to deal with this a lot in another case
20    that just went up to the 2nd Circuit on a related matter.  The
21    speculative issue as to damages is removed when the speculation
22    is caused by the other party's breach.
23              In this case, one of our arguments, there are several
24    elements of damages.  One is the fact that she could have gone
25    out -- had they sat down with her on May 30th and said exactly
```

08-13555-scc    Doc 24223    Filed 06/14/19    Entered 06/14/19 16:08:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 109 of 411

Page 106

1    what they said to her in November, okay, at that point she

2    could have started her job search and gotten another job.  And

3    she would have been in some place probably, all right, in time

4    to be there for the bonus season at the end of the year.  She

5    lost that because of this, all right.

6         But the other thing that happened there is -- and yes,

7    we don't know what job we would have got, but she had given

8    them the rubrics and there is -- this is not previously in

9    March.  This is -- it is easy to determine in this case, to

10   have expert testimony, as to what someone in her range could

11   have made.  They don't get off the hook by stalling for six

12   months and then saying, "Well, we stalled you for six months

13   before we told you, so we don't know what job you would have

14   gotten during that period.  So it's speculative," because that

15   uncertainty was caused by their breach.  And I think if you --

16   and I think that's part of the problem I have in terms of that.

17   So that's one way I try to get over my very tough road that I

18   have with you on this issue, is to realize that they caused

19   that issue, all right.

20        The other simple element of damages I have, as I said,

21   their breach on that condition, all right, excused her further

22   performance, and she's entitled to the $50,000 dollar holdback

23   that they kept from her out of the bonus for not resigning the

24   agreement because they did not give her the review when she

25   should have.  And even if she had gotten the review when she

1    should have, that bonus was supposed to kick in six months

2    earlier, so she would have been entitled to some portion on

3    that.  So there are elements here in terms of a -- yes, on a

4    proof burden.  Maybe I have some issues in terms of getting it

5    in here, or maybe we have a battle of the experts.  But I do

6    not think that, again, it meets the standard that it's so

7    speculative at this point in time that it can't go forward,

8    especially since the only case they rely on for that, the one

9    they made is the one I said before which dealt with a very,

10   very different set of circumstances.

11           And the reality is, as you said, this is not a job

12   that you leave tomorrow and find another one.  It takes -- you

13   know, she found another job in six months, which was pretty

14   good under the circumstances for a search of this time.  And as

15   we all know, during this period of time, the economy was only

16   getting worse when all of this was going on, so six months

17   could have made a big difference.  All of which, as I said, was

18   caused by them not doing the review when they were supposed to,

19   which is the one thing she bargained for.

20           Whether you want to argue whether or not there was a

21   promise of payment or whatever, she bargained to know on May

22   30th if she was going to get more money, all right, and she

23   didn't get that.  Thank you.

24           THE COURT:  Okay.  I'm denying the motion to dismiss

25   without prejudice to renewing it as a motion for summary

1    judgment after the completion of some discovery.  The quantum

2    meruit issue that we talked about does not need further

3    elaboration at this point.  I think I've expressed myself fully

4    during the argument.

5           The breach of contract element here is right at the

6    edge of dismissal.  This is highly speculative, and I don't

7    think it would be an abuse of discretion on my part were I to

8    dismiss that element of the complaint now.  But I'm going to

9    give the plaintiff an opportunity to explore the potential to

10   demonstrate any provable damages that may flow from a failure

11   to have conducted the performance review as specified in the

12   handwritten notation in the agreement.

13          I believe it to be wildly speculative.  And while I

14   hear what Mr. Rosen has said in his last argument, it's

15   possible that a rational person in the plaintiff's position

16   would immediately start looking for another job the moment that

17   there was a failure on the part of the employer to perform in

18   accordance with the terms of that agreement, but I don't know

19   what's going on within the organization at this time.  No

20   depositions have been taken of either Mr. Hershan or Ms. Uvino.

21          The amount in controversy makes the notion of a battle

22   of the experts borderline preposterous in terms of the expenses

23   of going forward.  So while I heard Mr. Rosen's comment about

24   that, it seems to me that there is a role of practicality that

25   ultimately will rule the case, and I strongly encourage the

08-13555-scc Doc 44223 Filed 06/14/19 Entered 06/14/19 16:08:19 Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 109 of 111

Page 109

1    parties to stop jockeying for position here and to start

2    thinking about whether there is a sensible business solution to

3    this spat.  We're adjourned.

4            MR. BAER:  Thank you, Your Honor.

5            MR. ROSEN:  Thank you, Your Honor.

6        (Whereupon these proceedings were concluded at 2:56 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        I N D E X

3

4                        RULINGS

5                                           Page      Line

6    Stipulation between Debtors and Colorado    12        12

7    plaintiffs  approved

8    Debtors' motion to establish procedures for  15        4

9    the consensual amendment and assumption of

10   certain nonterminated prepetition

11   derivatives contracts approved

12   Debtors' motion for approval of a settlement  17       9

13   and compromise with Danske Bank approved

14   Joint motion of LBHI and the SIPA trustee    55        17

15   granted but conditioned with a strong

16   suggestion for voluntary compliance

17   as set forth on the record

18   Providence Funds' Motion - status           75        13

19   conference to be held sometime after

20   confirmation in the LBHI case or

21   possibly in February 2012 if

22   confirmation isn't achieved.

23   Defendant's Motion to Dismiss Amended        107       25

24   Adversary Complaint, Denied

25

Page 111

1

2                     C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6
       Sharona Shapiro    Digitally signed by Sharona Shapiro
                          DN: cn=Sharona Shapiro, o, ou,
                          email=digital@veritext.com, c=US
7    _____    Date: 2012.01.11 14:23:55 -05'00'

8    SHARONA SHAPIRO

9    AAERT Certified Electronic Transcriber CET**D 492

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  November 17, 2011

17

18

19

20

21

22

23

24

25