**AMERICAN ARBITRATION ASSOCIATION**

FLATBUSH CENTER PARKING LLC,

        Claimant,

    v.

SEARS HOLDINGS CORP.,

        Respondent.

Case No. 02-18-0001-6118

### DECLARATION OF JOANNA F. WASICK IN SUPPORT OF RESPONDENT SEARS HOLDINGS CORP.'S CONFIDENTIAL MEDIATION STATEMENT

I, Joanna F. Wasick, declare under penalty of perjury that the following is true:

1.      I am an attorney with Baker & Hostetler LLP, counsel to respondent Sears Holdings Corp. ("Sears").

2.      I submit this declaration in support of Sear's mediation statement in response to the demand for arbitration filed by claimant Flatbush Center Parking ("FCP") and in advance of the parties' mediation scheduled for October 9, 2018.

3.      Attached hereto as **Exhibit A** is a true and correct copy of the Development and Operating Agreement ("DOA"), dated July 15, 1997.

4.      Attached hereto as **Exhibit B** are true and correct copies of maps of three parking areas in Brooklyn, New York: (1) a parking deck on the rooftop of a commercial building located on Tilden Avenue between Flatbush Avenue and Bedford Avenue, (2) two at-grade level parking areas owned by the City of New York located along Tilden Avenue and East 22nd Street, respectively; and (3) an at-grade level parking area adjacent to the Sears, Roebuck and Co. store located at the corner of Bedford Avenue and Beverly Road.

5.     Attached hereto as **Exhibit C** is a true and correct copy of a letter from Richard Gray to Edward Lampert, dated July 26, 2017.

6.     Attached hereto as **Exhibit D** is a true and correct copy of the 2002 budget of expenses attributable to Sears for parking lot expenses prepared by FCP's predecessor-in interest.

7.     Attached hereto as **Exhibit E** is a true and correct copy of the termination notice from Sears to FCP, dated April 15, 2010.

8.     Attached hereto as **Exhibit F** is a true and correct copy of the amendment to the DOA, dated February 2, 2011.

9.     Attached hereto as **Exhibit G** is a true and correct copy of an email from Ginger Kassin to Tammi Banaszak, dated February 24, 2014.

10.     Attached hereto as **Exhibit H** is a true and correct copy of a schedule containing revised owed CAM Expenses ("Retro CAMs") for years 2004–2012, dated April 1, 2014.

11.     Attached hereto as **Exhibit I** is a true and correct copy of a schedule containing Retro CAMs for years 2004–2017, dated October 1, 2018.

12.     Attached hereto as **Exhibit J** is a true and correct copy of reconciliations of Retro CAMs sent from FCP to Sears.


Dated: October 2, 2018
       New York, New York

Joanna F. Wasick

2

# EXHIBIT A

---

## DEVELOPMENT AND OPERATING AGREEMENT


By and Among

### FC BEDFORD ASSOCIATES, L.P.,

### FOREST CITY TILDEN ASSOCIATES, L.P.,

### SEARS, ROEBUCK AND CO.

and

### DURYEA ASSOCIATES, L.L.C.

---

As of July 15, 1997

## TABLE OF CONTENTS

| Section | | | Page Number |
|---|---|---|---|

**1    GENERAL PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**2    OPERATOR** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   2.1   Term of Appointment; Termination of Obligations . . . . . . . . . . . . . . . . . . 7
   2.2   Consent to Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   2.3   Experience; No Prohibited Person . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   2.4   Initial Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**3    INGRESS, EGRESS AND PARKING; OPERATOR'S RIGHT OF ACCESS** . . . . . . . . . 8
   3.1   Ingress, Egress and Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.2   Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.3   Construction and Surface Drainage Easement . . . . . . . . . . . . . . . . . . . . 8
   3.4   Directional Sign Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.5   Restriction on Grant of Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.6   Right of Access in Favor of Operator . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**4    Construction of Parking Facility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   4.1   Plans and Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   4.2   Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**5    RESTRICTIONS AND PROCEDURES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   5.1   Permitted Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   5.2   Noninterference with Parking Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   5.3   Nuisances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   5.4   Modifications of Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   5.5   Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   5.6   Loading and Unloading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   5.7   Electricity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   5.8   Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   5.9   Modification of Grades . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   5.10  Mechanic's or Construction Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   5.11  Unsightly Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**6    OPERATION, MAINTENANCE AND INSURANCE** . . . . . . . . . . . . . . . . . . . . . . 11
   6.1   Operator's Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   6.2   Lighting; After Hours Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.3   Rules and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   6.4   Restoration and Maintenance Obligation . . . . . . . . . . . . . . . . . . . . . . . 13
   6.5   Notification of Parcel Owners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**7    INSURANCE; CASUALTY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   7.1   Operator's Insurance Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   7.2   Parcel Owners' Insurance Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . 14
       7.2.1   Property Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
       7.2.2   Insurance During Construction . . . . . . . . . . . . . . . . . . . . . . . . 15
   7.3   General Requirements Applicable to Policies . . . . . . . . . . . . . . . . . . . . 16
       7.3.1   Insurance Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
       7.3.2   Required Forms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
       7.3.3   Evidence of Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
       7.3.4   Notice of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
       7.3.5   Required Insurance Policy Clauses . . . . . . . . . . . . . . . . . . . . 16

**Section**                                                                 **Page Number**

7.4    Additional Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.4.1   Other Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.4.2    Adjustment of Limits . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.5     Blanket Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.6    Self-Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
7.7    Annual Aggregates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.8    Determination of Replacement Value . . . . . . . . . . . . . . . . . . . 18
7.8.1   Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.8.2   Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.8.3   Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7.9    Unavailability; Failure to Maintain Insurance . . . . . . . . . . . . . . 18
7.10   Liability for Uninsured Destruction . . . . . . . . . . . . . . . . . . . . . 19
7.11   Release and Waiver of Subrogation . . . . . . . . . . . . . . . . . . . . . 19
7.12   Casualty Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8    ASSESSMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.1    Covenant for Payment of Assessments . . . . . . . . . . . . . . . . . . 20
8.2    Budget . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.3    Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.4    Interest; Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
8.5    Adjustments of Assessments . . . . . . . . . . . . . . . . . . . . . . . . . 21
8.6    Obligation for Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . 21
8.7    Certificate of Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
8.8    Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
8.9    Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

9    GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
9.1    Liability of Operator; Indemnity . . . . . . . . . . . . . . . . . . . . . . . 21
9.2    Mutuality; Successors and Assigns . . . . . . . . . . . . . . . . . . . . . 22
9.3    Attorney Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
9.4    Failure to Enforce Not a Waiver of Rights . . . . . . . . . . . . . . . . . 22
9.5    Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
9.6    Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
9.7    Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
9.8    Taxes and Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
9.9    Term of Agreement; Extinguishment . . . . . . . . . . . . . . . . . . . . 23
9.9.1   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
9.9.2   Termination by Forfeiture . . . . . . . . . . . . . . . . . . . . . . 23
9.9.3   Extinguishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
9.9.4   Partial Withdrawal Rights of Sears; Termination Rights of Sears . . . . 23
9.9.5   Withdrawal by Duryea . . . . . . . . . . . . . . . . . . . . . . . . 24
9.10   Loew's Theater Site . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
9.11   Community Open Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . 25
9.12   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
9.13   Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
9.14   No Joint Venture; Third Party Beneficiary . . . . . . . . . . . . . . . . . 26
9.15   Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
9.16   Section and Section Headings . . . . . . . . . . . . . . . . . . . . . . . . 27
9.17   Effective of Invalidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
9.18   Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
9.19   Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
9.20   Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## DEVELOPMENT AND OPERATING AGREEMENT

THIS AGREEMENT (this "Agreement") is made as of the 15th day of July, 1997 by and among FC BEDFORD ASSOCIATES, L.P. ("FCBA"), a New York limited partnership, having an address at One MetroTech Center North, Brooklyn, New York 11201; FOREST CITY TILDEN ASSOCIATES, L.P. ("FCTA"; collectively with FCBA, "Forest City"), a New York limited partnership having an address at One MetroTech Center North, Brooklyn, New York 11201; SEARS, ROEBUCK AND CO. ("Sears"), a New York corporation, having an address at 3333 Beverly Road, Hoffman Estates, Illinois 60179; and DURYEA ASSOCIATES, L.L.C. ("Duryea"), a New York limited liability company, having an address c/o Hollenberg, Levin, Solomon, Ross, Belsky & Daniels, LLP, 585 Stewart Avenue, Garden City, New York 11530.

### WITNESSETH:

WHEREAS, FCTA is the owner of a certain parcel of real property and the improvements thereon located in Kings County, New York designated on the Tax Map of the Borough of Brooklyn as Block 5126, Lots 1, 62 and 40  (the "FCTA Parcel"), as depicted on the Site Plan attached hereto as Exhibit A and made a part hereof (the "Site Plan");

WHEREAS, FCTA, as landlord, and the City, as tenant, entered into a Lease Agreement dated as of June 30, 1995 for a rooftop parking deck on top of the commercial building on the FCTA Parcel (the "Parking Deck");

WHEREAS, the City, as sublessor, and New York City Economic Development Corporation ("EDC"), a local development corporation organized pursuant to Section 1411 of the Not-For-Profit Corporation Law of the State of New York, as sublessee, entered into a Sublease Agreement dated as of June 30, 1995 for the Parking Deck, which Sublease Agreement was assigned to and assumed by FCTA pursuant to an Assignment and Assumption of Sublease Agreement between EDC and FCTA dated June 30, 1995, as same may have been amended from time to time;

WHEREAS, the City is the owner of certain real property located in Kings County, in the City of New York, designated on the Tax Map of the Borough of Brooklyn as Block 5132, Lot 17 and part of Lot 18, and Block 5133, Lots 1, 3, 8, 50, 65 and part of 14, and a mapped but unopened portion of East 22nd Street (between Duryea Place and Tilden Avenue) (the "Street"), as depicted on the Site Plan (collectively, the "City Parcel");

WHEREAS, the City, as landlord, and EDC, as tenant, entered into an Agreement of Lease dated as of the date hereof for the City Parcel, which Agreement of Lease was assigned to and assumed by FCBA pursuant to an Assignment and Assumption of Lease between EDC and FCBA dated the date hereof (collectively, the "City Parcel Lease");

WHEREAS, Duryea is the owner of certain real property located in Kings County, in the City of New York, designated on the Tax Map of the Borough of Brooklyn as Block 5132, Lot 70, as depicted on the Site Plan (the "Duryea Parcel");

WHEREAS, The Mutual Life Insurance Company of New York, as landlord, and Sears, as tenant, entered into an Indenture of Lease, dated December 12, 1946 (as the same may have been amended, the "Sears Lease") for certain real property located in Kings County, in the City of New York, designated on the Tax Map of the Borough of Brooklyn as Block 5133, Lot 14, as depicted on the Site Plan (the "Sears Leased Parcel");

WHEREAS, the parties hereto desire to create, operate and maintain a uniformly-operated parking facility (as depicted in the Plans and Specifications, as such term is hereinafter defined) consisting of (i) the Parking Deck and, if constructed, the New Deck (as hereinafter defined), (ii) at-grade level Parking Areas (as hereinafter defined) on the City Parcel, (iii) the existing Parking Areas on the Sears Leased Parcel and the Duryea Parcel, respectively, and providing a total of at least 759 parking spaces inclusive of the Duryea Parcel and 744 exclusive of the Duryea Parcel, and (iv) the Street for ingress and egress to and from the Parking Areas (collectively, the "Parking Facility"), to strengthen the retail area and mitigate traffic congestion by providing parking for the customers of the tenants, if any, of the Sears Leased Parcel, the FCTA Parcel and any future tenant of the Duryea Parcel and other retail stores along Flatbush Avenue within the Kings/Flatbush Urban Renewal Area; and

WHEREAS, the parties hereto desire to set forth their agreement with respect to the development, operation, maintenance, repair, management and supervision of the Parking Areas and the Parking Facility Improvements, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00), the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1      GENERAL PROVISIONS.

The capitalized terms used in this Agreement shall have the definitions set forth in this Section 1 unless otherwise defined herein.

1.1      "Allocable Share" means a Parcel Owner's proportionate share of all Expenses, which share Operator shall levy an Assessment, as applicable. Each Parcel Owner's Allocable Share is set forth in Exhibit B attached hereto.

1.2      "Assessment(s)" means, with respect to a Parcel Owner during a Fiscal Year, any and all of the following, together with any interest, late charges and collection costs assessed such Parcel Owner in accordance with Section 8:

1.2.1      "Regular Assessment" means a Parcel Owner's Allocable Share of any charges or assessments Operator shall levy against all Parcel Owners for annual recurring Expenses set forth in the Budget, which Regular Assessment shall be payable in twelve (12) monthly payments in advance.

1.2.2      "Reimbursement Assessment" means a charge or assessment Operator shall levy solely against a Parcel Owner to reimburse Operator for (i) its costs incurred in bringing said Parcel Owner and/or its Parcel into compliance with the provisions of this Agreement or (ii) the costs incurred in connection with an Overtime Request (as hereinafter defined) made pursuant to Subsection 6.2 hereof.

1.2.3      "Special Assessment" means a Parcel Owner's Allocable Share of any charges or assessments Operator shall levy against all Parcel Owners to pay extraordinary Expenses that Operator shall have reasonably determined are necessary to repair, maintain or replace any portion of the Parking Facility because of an order of court, threat posed to the safety of Persons making use of or on the Parking Facility or any event or

2

circumstance that either (i) is set forth in the Budget or (ii) Operator shall not have reasonably foreseen in preparing the Budget and the cost of which is levied with the Approval of the Parcel Owners.

1.3 "Budget" means the pro forma operating budget approved in accordance with Subsection 8.2 for each Fiscal Year, in which Operator shall estimate in good faith the total Expenses to be incurred for such Fiscal Year, including, without limitation, reasonable reserves for contingent liabilities, together with the necessary Assessments to be levied in support thereof.

1.4 "Building" means (i) any structure now or hereafter constructed on a Parcel with interior space enclosed by exterior walls, floor and roof that is designed for human occupancy or the conduct of the business of the applicable Parcel Owner and any service or loading areas to be used in connection with the subject Building and any canopies or other architectural treatments of the subject Building and (ii) for the purpose of clarifying the maintenance obligation of the parties hereto, the Parking Deck and, if constructed, the New Deck (excluding, however, the surface parking areas of the Parking Deck and the New Deck, which surface parking areas are not considered "Buildings" for purposes of this Agreement).

1.5 "Business Hours" means 8:00 a.m. to 11:00 p.m. Monday through Saturday and 11:00 a.m. to 6:00 p.m. on Sunday, which shall be applicable for all days of the year; provided, however, each Parcel Owner shall have access to its own Parcel twenty-four (24) hours a day. Business Hours may not be modified or changed without the Consent of the Parcel Owners.

1.6 "City" means the City of New York, a municipal corporation of the State of New York, having an address at City Hall, New York, New York 10007, and any of its agencies or instrumentalities.

1.7 "City Parcel Assignment" means an assignment by FCBA to the City of all of FCBA's right, title and interest under this Agreement and an assumption of FCBA's obligations herein by the City, which assignment and assumption shall become effective upon the City's election of the same, all pursuant to the City Parcel Lease.

1.8 "Commencement Date" means the date hereof.

1.9 "Common Utility Lines" means the conduits and/or facilities for Utilities that serve the Parking Facility.

1.10 "Consent of the Parcel Owners" or "Approval of the Parcel Owners" means the consent or approval of both Sears and Forest City.

1.11 "Construction Contract" means the fixed price construction contract, dated May 28, 1997, between FCBA, as owner, and A. Williams Trucking Company, as contractor, for the performance of the work necessary to construct the Parking Facility Improvements (other than the structural components of the Parking Deck, which have already been constructed) in accordance with the Plans and Specifications. The Construction Contract has previously been delivered to and approved by all of the Parcel Owners.

1.12 "Eligible Costs" means (i) all costs of the work attributable to the construction of the Parking Facility Improvements (other than the Parking Deck, which has already been constructed) paid or payable pursuant to the Construction Contract to contractors, subcontractors,

3

suppliers and materialmen for labor and materials utilized in connection with such work, all costs of payment and performance bonds and other costs specified in the Construction Contract in an aggregate amount not to exceed $1,708,535 (the costs described in this clause (i) being hereinafter referred to as "Hard Costs"), (ii) all costs for the design, engineering, construction contract administration and supervision services performed by the Engineer in an amount not to exceed $ 69,626 and (iii) all other soft costs attributable to the construction of the Parking Facility Improvements in an amount not to exceed $47,200.

1.13    "Engineer" means Bohler Engineering, Inc. or any other professional engineer or combined practice or association licensed in the State of New York selected by Forest City and approved by EDC on behalf of the City and approved by Sears.

1.14    "Expenses" means all costs that Operator has reasonably incurred and/or will reasonably incur in performing its duties under Section 6 and Section 7 with respect to the Parking Facility, the Designated Street Areas (as hereinafter defined) and all Parking Facility Improvements (excluding, in all cases, the improvements comprising the Parking Deck, other than the asphalt or paved surface thereof), including, but not limited to, the costs of the following:

   1.14.1    Repair, replacement, improvement, maintenance, resurfacing, restriping, cleaning, sweeping, painting, irrigation, gardening, supply of Utilities (other than electricity, which shall be paid by the applicable Parcel Owner as provided in Subsection 5.7 hereof), trash and rubbish removal, management and operation thereof;

   1.14.2    Fifteen percent (15%) of the total actual Expenses, exclusive of the costs of administration and overhead items, to fully compensate Operator for the performance of Operator's duties and obligations hereunder;

   1.14.3    Reasonable costs and fees paid in an effort to collect past due Assessments;

   1.14.4    Reasonable costs and fees paid to third parties, including managers, contractors, accountants, attorneys, architects and engineers who provide services and/or otherwise assist Operator in performance of its duties and obligations hereunder, subject to the requirement in all cases that payments made in respect of Affiliated Contracts (as hereinafter defined) shall be comparable to amounts that would be payable to third parties rendering comparable services pursuant to arm's-length transactions;

   1.14.5    Personal property taxes, if any, levied against the personal property owned and used by Operator exclusively on or in connection with the Parking Facility to perform Operator's duties hereunder;

   1.14.6    Costs of any insurance Operator is required to obtain pursuant to this Agreement;

   1.14.7    Reasonable costs incurred by Operator in forming, implementing and/or coordinating programs dealing with community meetings and forums, crime prevention and/or hazardous waste disclosure, control or removal;

   1.14.8    Reasonable reserves for Expenses, not to exceed an aggregate amount of fifteen thousand dollars ($15,000), which amount is not a per annum amount

4

and may be replenished as used;

   1.14.9    Operation, maintenance and repair of the Parking Facility directional signs and similar pylon signs (if any);

   1.14.10   Costs for towing automobiles and other vehicles from the Parking Facility and impounding same;

   1.14.11   Depreciation on maintenance and operating machinery and equipment (if owned) and rental paid for such machinery and equipment (if rented), provided, however, that in the event Operator depreciates any particular machine or piece of equipment or establishes reserves in anticipation of the replacement thereof, the aggregate amount of such depreciation and reserves with respect to such particular machine or piece of equipment shall be applied by Operator against the cost of replacing such machine and/or piece of equipment, at such time such machine is replaced; and

   1.14.12   Any other reasonable expenses incurred by or on behalf of Operator for any reason whatsoever in connection with the maintenance, management, operation, repair and/or restoration of the Parking Facility and the Designated Street Areas.

   1.15  "Fiscal Year" means such annual period as Operator shall adopt to account for Expenses.

   1.16  "Maximum Cost of the Parking Facility" means the aggregate amount of the Eligible Costs, which may not exceed $1,825,361.

   1.17  "Occupant" means any Person, together with all officers, directors, partners, employees and agents of such Person, entitled by fee ownership, leasehold interest or license to the exclusive occupancy of all, or any portion of, a Parcel.

   1.18  "Operator" means the Person appointed from time to time with the Consent of the Parcel Owners who shall operate, manage, maintain, repair and/or restore the Parking Facility for the mutual benefit of all Parcel Owners in accordance with this Agreement and shall assume all those rights and perform those duties of Operator set forth herein.

   1.19  "Parcel Owner" means, at any particular time, (i) the Person or Persons collectively holding record fee title to a Parcel or (ii) an Occupant. On the date hereof, Sears shall be deemed to be the Parcel Owner of the Sears Leased Parcel for the term of the Sears Lease, and FCBA shall be deemed to be the Parcel Owner of the City Parcel; provided, however, that from and after the occurrence of a City Parcel Assignment, the City shall be the Parcel Owner of the City Parcel and shall be deemed to be a party hereto in substitution for FCBA.

   1.20  "Parcel" means any one of the FCTA Parcel, the City Parcel, the Duryea Parcel or the Sears Leased Parcel, as applicable.

   1.21  "Parking Areas" means all surface parking areas, including, without limitation, the Parking Deck and the New Deck, if applicable (but excluding the structural components of the Parking Deck and the New Deck, if applicable), vehicular parking spaces, driveways and all other areas shown as "Parking Areas" on the Site Plan.

1.22    "Parking Facility Improvements" means all landscaping, paving and improvements of any type or kind located on the Parking Areas, including, but not limited to, Common Utility Lines, curbs, curb cuts, gutters, drives, parking spaces, driveways, walkways, sidewalks, parking facilities, security booths, fences, screening walls, trash enclosures and receptacles, retaining walls, plantings, planted trees, shrubs, directional signs and lighting standards and fixtures and poles, but excluding all Buildings.

1.23    "Permittees" means Parcel Owners and their respective officers, directors, employees, agents, contractors, customers, vendors, suppliers, visitors, invitees and licensees, and the general public.

1.24    "Person" means any individual, partnership, limited liability company, firm, joint venture, association, corporation or any other form of business entity.

1.25    "Plans and Specifications" means the drawings and plans and specifications, prepared by the Engineer, for the work to be undertaken in constructing the Parking Facility, which plans and specifications have previously been delivered to the Parcel Owners and received the Approval of the Parcel Owners.

1.26    "Prohibited Person" shall mean:

(1)    Any Person (A) that is in default or in breach beyond any applicable grace period, of its obligations under any written agreement with EDC or the City, or (B) that directly or indirectly controls, is controlled by, or is under common control with a Person that is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with EDC or the City, unless such default or breach has been waived in writing by EDC or the City, as the case may be;

(2)    Any Person (A) that has been convicted in a criminal proceeding for a felony or any crime involving moral turpitude or that is an organized crime figure or is reputed to have substantial business or other affiliations with an organized crime figure, or (B) that directly or indirectly controls, is controlled by, or is under common control with a Person that has been convicted in a criminal proceeding for a felony or any crime involving moral turpitude or that is an organized crime figure or is reputed to have substantial business or other affiliations with an organized crime figure;

(3)    Any government, or any Person that is directly or indirectly controlled (rather than only regulated) by a government, that is finally determined to be in violation of (including, but not limited to, any participant in an international boycott in violation of) the Export Administration Act of 1979, or its successor, or the regulations issued pursuant thereto, or any government that is, or any Person that, directly or indirectly, is controlled (rather than only regulated) by a government that is subject to the regulations or controls thereof;

(4)    Any government, or any Person that, directly or indirectly, is controlled (rather than only regulated) by a government, the effects of the activities of which are regulated or controlled pursuant to regulations of the United States Treasury Department or executive orders of the President of the United States of America issued pursuant to the Trading with the Enemy Act of 1917, as amended;

(5)    Any Person that has received written notice of default in the payment to the City

6

of any Taxes, sewer rents or water charges, unless such default is then being contested with due
diligence in proceedings in a court or other appropriate forum; or

      (6)    Any Person (A) that has owned at any time in the preceding three (3) years any
property which, while in the ownership of such Person, was acquired by the City by in rem tax
foreclosure, other than a property in which the City has released or is in the process of releasing
its interest to such Person pursuant to the Administrative Code of the City, or (B) that, directly or
indirectly controls, is controlled by, or is under common control with a Person that has owned at
any time in the preceding three (3) years any property which, while in the ownership of such
Person, was acquired by the City by in rem tax foreclosure, other than a property in which the City
has released or is in the process of releasing its interest to such Person pursuant to the
Administrative Code of the City.

      For purposes of the foregoing definition of "Prohibited Person", the determination as to
whether any Person is an organized crime figure or is reputed to have substantial business or
other affiliations with an organized crime figure or directly or indirectly controls, is controlled by,
or is under common control with a Person that is an organized crime figure or is reputed to have
substantial business or other affiliations with an organized crime figure shall be within the sole
discretion of the City exercised reasonably and in good faith.

      1.27    "<u>Rules and Regulations</u>" means any rules or regulations promulgated from time
to time by Operator with the Approval of the Parcel Owners regarding use of the Parking Facility
by Permittees as provided herein.

      1.28    "<u>Utilities</u>" are any or all of the following: facilities for the supply and/or return of
sanitary sewer, storm water drainage (including irrigation draining canals), domestic and fire
protection water, electricity, power, telephone service and any similar service necessary to
maintain and operate the Parking Facility.

## 2    OPERATOR.

      2.1    <u>Term of Appointment; Termination of Obligations</u>.    Operator shall perform its
obligations hereunder for a term of one (1) year commencing on the date of the completion of the
Parking Facility (as specified in writing to Operator by Forest City, with copies to the other Parcel
Owners and the City, such determination to be based on those agreements respecting the
construction of the Parking Facility or any portion thereof), which term shall be automatically
renewed annually on the anniversary of such date unless the appointment, rights and obligations
of the then acting Operator are terminated (A) by the Parcel Owners upon obtaining the Consent
of the Parcel Owners thereto and upon fifteen (15) days' prior written notice to Operator ("<u>Notice</u>"),
(B) as a result of the exercise by Sears of its rights under Subsection 9.9.4 hereof or (C) as
provided in the next sentence. Notwithstanding any provision in this Agreement to the contrary,
(i) in the event Operator shall be Forest City or an affiliate of Forest City Enterprises, then Sears
may elect to terminate the appointment, rights and obligations of such Operator at any time upon
Notice to Operator without the Consent of the Parcel Owners and (ii) in the event Operator shall
be Sears or an affiliate of Sears, then Forest City may elect to terminate the appointment, rights
and obligations of such Operator at any time upon Notice to Operator without the Consent of the
Parcel Owners. The Person appointed as Operator may terminate its rights and withdraw from
its obligations hereunder effective at the end of any calendar month on not less than sixty (60)
days' prior written notice given to each of the Parcel Owners. In the event of the withdrawal or
termination of any Person appointed as Operator (other than a termination pursuant to Subsection

7

9.9.4 hereof), the Parcel Owners agree to cooperate and use reasonable efforts to select a new Operator prior to the termination of the then-acting Operator, which selection shall be made with the Consent of the Parcel Owners. In the event of any dispute regarding the selection of a new Operator or the termination of the current Operator, such dispute shall be submitted to arbitration in accordance with Subsection 9.15 hereof.

2.2    Consent to Appointment. Each Person accepting an appointment as Operator shall evidence such consent to such appointment and assumption of the obligations of Operator hereunder by signing a duplicate counterpart of this Agreement where provided, whereupon such Person shall be bound by the terms and conditions hereof, as Operator, until the termination of its rights and obligations as provided under Subsection 2.1 hereof.

2.3    Experience; No Prohibited Person. Each Operator shall have a reasonable amount of professional experience in the management of commercial parking lots similar to the Parking Facility. No Operator shall be a Prohibited Person.

2.4    Initial Appointment. The parties hereto designate First New York Management, Inc., an affiliate of Forest City, as the initial Operator.

3    INGRESS, EGRESS AND PARKING; OPERATOR'S RIGHT OF ACCESS.

3.1    Ingress, Egress and Parking. Each Parcel Owner hereby grants to each other present and future Parcel Owner, for the benefit of each Parcel and its Parcel Owner, a nonexclusive easement on, over and through the Parking Areas on its respective Parcel, but only as shown on the Site Plan, for (i) vehicular access, ingress and egress by Permittees from public streets at the location of all curb cuts, passage of Permittees' vehicles over established circulation elements, and parking of Permittees' vehicles within designated parking stalls and (ii) pedestrian access, ingress and egress and passage by Permittees.

3.2    Utilities. Each Parcel Owner hereby grants to each other present and future Parcel Owner, for the benefit of each Parcel and its Parcel Owner, but only as shown on the Plans and Specifications, a nonexclusive easement in, to, over, under, along and across those portions of the Parking Areas necessary for the installation, use, maintenance, repair, relocation and removal of Utilities. All Utilities shall be located only as set forth in the Plans and Specifications.

3.3    Construction and Surface Drainage Easement. Each Parcel Owner hereby grants to each other present and future Parcel Owner, for the benefit of each Parcel and its Parcel Owner a nonexclusive easement for (i) construction and completion of the Parking Facility and (ii) surface drainage over the other Parking Areas through the drainage patterns and systems as are established pursuant to the Plans and Specifications.

3.4    Directional Sign Easement. The Parcel Owners hereby grant an easement in the Parking Areas for the installation and maintenance of directional signs shown in the Plans and Specifications.

3.5    Restriction on Grant of Easements. No Parcel Owner shall grant any easements over any land within the Parking Facility for the benefit of any land outside the Parking Facility if such easement might adversely impact upon the rights of any other Parcel Owner under this Agreement; provided, however, that the foregoing shall not prohibit the granting or dedicating of utility easements by a Parcel Owner on its Parcel to governmental or quasi-governmental

8

authorities or to public utilities in accordance with this Agreement.

3.6     Right of Access in Favor of Operator.  The Parcel Owners hereby grant to Operator a license for ingress, egress and passage on and over the Parking Areas for performance of Operator's rights and duties under this Agreement.  The foregoing license may be revoked only with the Consent of the Parcel Owners and shall be revoked if Operator's appointment, rights and obligations have been terminated pursuant to the provisions of Subsection 2.1 or Subsection 9.9.4 hereof or upon the termination of this Agreement.

4       Construction of Parking Facility.

4.1     Plans and Specifications.  Forest City shall cause the Parking Facility to be constructed and completed lien free in accordance with the Plans and Specifications and pursuant to the Construction Contract and all other applicable agreements binding upon Forest City in connection with any Parcel.  Only Eligible Costs for the construction and completion of the Parking Facility Improvements shall be incurred by Forest City and Eligible Costs shall not in the aggregate exceed the Maximum Cost of the Parking Facility.  Upon completion of the Parking Facility, Forest City will obtain lien waivers from all contractors performing work pursuant to the Construction Contract and will provide the other parties hereto with copies of such lien waivers.

4.2     Payment.  Upon receipt by the Parcel Owners set forth on Exhibit C attached hereto from Forest City of a request for payment of Eligible Costs from time to time as construction progresses, but no more frequently than once a month, each Parcel Owner set forth on said Exhibit C shall pay to Forest City within thirty (30) days of its receipt of such invoice its share (as set forth on said Exhibit C) of the Eligible Costs specified in such invoice.  All sums not paid to Forest City within thirty (30) days of the date when due under this Subsection 4.2 shall thereafter bear interest at the rate of 12% per annum until paid.

5       RESTRICTIONS AND PROCEDURES.

5.1     Permitted Uses.  Subject to the limitations and restrictions of this Section 5, for the term hereof, the Parking Facility shall be used only as uniformly-operated parking facility, at no cost to the Permittees, and for no other use.

5.2     Noninterference with Parking Areas.  The Parking Areas are intended for the non-exclusive use of the Permittees.  No Parcel Owner shall stage, display, store or sell any merchandise, place signs not required by law or other objects (whether or not located on an outdoor patio or outdoor sales area, which are expressly prohibited hereunder) or provide customer service or seating which will interfere with the use of the Parking Areas by Permittees for parking or reduce the number of parking spaces.

5.3     Nuisances.  No Person shall conduct any trade or activity on any portion of the Parking Facility that would be or create a public or private nuisance.  Nothing contained in Subsection 5.2 or this Subsection 5.3 shall be deemed to prevent, prohibit or impair the construction of the Parking Facility or the repair, restoration or maintenance of the Parking Facility pursuant to the terms of this Agreement.

5.4     Modifications of Improvements.  So long as the number of parking spaces on each Parcel are not reduced from the number depicted on the Site Plan, and the traffic pattern (vehicular access, ingress, egress and circulation) depicted on the Site Plan is not changed, each

9

Parcel Owner may modify its Building and other improvements on its Parcel. Without the Consent of the Parcel Owners or except as specifically depicted in the Plans and Specifications, subject to Sears right to terminate this Agreement pursuant to Subsection 9.9.4 hereof, no fence, division, partition, rail or obstruction of any type or kind shall ever be placed, kept, permitted or maintained between the Parking Areas or upon or along any of the common property lines of any portion thereof and except as may be required at any time and from time to time in connection with the construction, maintenance and repair of the Parking Facility.

    5.5    <u>Parking</u>.

        5.5.1    Each of the Parcel Owners shall ensure the continued availability of parking within the Parking Areas, on its own Parcel, upon completion of the Parking Facility. The Parking Facility shall at all times contain at least 759 spaces provided Duryea shall not have withdrawn from this Agreement or 744 spaces if Duryea shall have withdrawn from this Agreement, as hereinafter provided.

        5.5.2    Parking for the use of the Permittees shall be provided within the Parking Areas during Business Hours, but no parking at the Parking Facility shall be permitted except within the Parking Areas. The Parking Facility shall be open during Business Hours but shall be accessible at all times by the Parcel Owners. No Person shall be permitted to park for more than three (3) hours at the Parking Facility and Operator shall use reasonable efforts to arrange to tow any vehicles exceeding such three (3) hour limit.

        5.5.3    No truck, trailer, van, camper, recreational vehicle, heavy equipment or vehicle other than an automobile or other passenger vehicle or recreational vehicle that readily fits within a single, standard-sized parking space shall be parked or located on the Parking Facility except (i) in connection with the construction, maintenance and repair of the Parking Facility, Parking Facility Improvements, any Building or Parcel, (ii) in connection with deliveries to any Building and (iii) in cases of emergency.

    5.6    <u>Loading and Unloading</u>. Each Parcel Owner agrees that the loading and unloading of service vehicles shall be conducted on their respective Parcels without using the Parking Areas or public streets therefor.

    5.7    <u>Electricity</u>. Electric current furnished to each Parcel shall be separately metered or submetered. Each Parcel Owner shall pay for the cost of the electric current furnished to its Parcel.

    5.8    <u>Signs</u>. No exterior signs of any type shall be placed or maintained on the Parking Facility except as set forth in the Plans and Specifications or as required by law and except for temporary signs as may be required for maintenance or repairs, but only during the pendency of same.

    5.9    <u>Modification of Grades</u>. The grade of any Parcel shall not be substantially modified, altered or otherwise changed without the Consent of the Parcel Owners.

    5.10    <u>Mechanic's or Construction Liens</u>. If, because of any act or omission (or alleged act or omission) of any Parcel Owner or a Permittee, contractor, employee, agent or other representative of either, any mechanic's or construction lien shall be filed with respect to any portion of the Parking Facility (whether or not such lien is valid or enforceable as such), such

Parcel Owner shall cause the same to be discharged of record, or bonded, within thirty (30) days after actual notice thereof or notice from another party hereto of the filing thereof, and such Parcel Owner shall indemnify and save harmless all parties hereto, the City and all Parcel Owners from and  against any and all costs, liabilities, suits, penalties, claims and demands, including reasonable attorneys' fees resulting from such lien.

     5.11   <u>Unsightly Items</u>.  Subject to the provisions of Subsection 9.10.2 hereof, no refuse containers, trash cans, machinery or equipment which are unsightly or interfere with parking or ingress, egress or access to or from the Parking Facility are permitted upon the Parking Facility without the Consent of the Parcel Owners.

## 6    OPERATION, MAINTENANCE AND INSURANCE.

     6.1   <u>Operator's Duties</u>.

        6.1.1  Operator shall maintain, repair and replace or cause to be maintained, repaired or replaced in a good and workmanlike manner all Parking Facility Improvements as necessary, but in all respects in accordance with the standards of parking lots ancillary to retail shopping centers or malls in Kings and Queens County, New York, of a similar size as the Parking Facility, subject, however, to, and in a manner consistent with, any approved Budget and the receipt by Operator of Assessments made under this Agreement. Operator shall maintain and repair or cause to be maintained or repaired in a good and workmanlike manner the paving and improvements comprising the portions of the Street and the sidewalk along Tilden Avenue (between Bedford Avenue and Flatbush Avenue) which is adjacent to the Parking Facility, as shown on the Site Plan (the "<u>Designated Street Areas</u>") unless and until the City notifies Operator that it shall maintain and repair such paving and improvements (or portion thereof, if applicable). Such maintenance, repair and replacement may include, without limitation, all of the following as and when the same are determined by Operator as being necessary in order to abide by the foregoing standard:

        6.1.1.1      maintenance of all Parking Areas, Designated Street Areas, service drives and walkways located on the Parking Facility in a clean and safe condition, including the paving and repairing or resurfacing of such areas when necessary with the type of material originally installed thereon, or such substitute therefor as shall in all respects be at least equal thereto in quality, appearance and durability; the removal of all weeds, rubbish, debris, waste or unsightly materials or objects of any kind and prevention of the accumulation of same, and the washing or sweeping of paved areas as required; the painting and repainting of striping, markers and directional signs as required;

        6.1.1.2      cleaning, maintaining and relamping of all external lighting fixtures in the Parking Facility, except such fixtures as are the property of any utility company or governmental body;

        6.1.1.3      maintenance of landscaping;

        6.1.1.4      snow removal;

        6.1.1.5      maintenance, repair and refurbishment of all monument and/or pylon signs identifying the Parking Facility and all directional signage and markers;

6.1.1.6        inspecting, monitoring (including installation of monitoring equipment) and patrolling the Parking Facility as may be necessary or desirable in order to keep the Parking Facility secure and safe for Permittees;

6.1.1.7        towing and impounding vehicles which are in violation of the Rules and Regulations; and

6.1.1.8        except to the extent the same are not maintained by a utility company, maintaining, cleaning and repairing any and all Common Utility Lines.

6.1.2    Operator shall, subject to the terms hereof, (i) obtain all permits, licenses, approvals and authorizations necessary for performing its obligations as set forth in this Agreement in connection with the operation and maintenance of the Parking Facility and the Designated Street Areas, (ii) procure all equipment, material and supplies necessary for the operation and maintenance of the Parking Facility and the Designated Street Areas and (iii) keep the Parking Facility free and clear of all liens and encumbrances, including public improvement liens, arising in connection with Operator's duties and obligations hereunder.

6.1.3    Operator shall not make any capital expenditures in respect of any Parcel without the Approval of the Parcel Owners, such capital expenditures being the sole responsibility of the applicable Parcel Owner.

6.2    <u>Lighting; After Hours Operations</u>.  Each Parcel Owner shall cause its portion of the Parking Facility to be illuminated, as needed, during evening and night time Business Hours. Operator shall furnish to the Parcel Owners a schedule of when the lights shall be illuminated, taking into account seasonal variations of daylight, and each Parcel Owner agrees to abide by said schedule. Any Parcel Owner may request that the hours of operation of the Parking Facility be extended beyond normal Business Hours (an "<u>Overtime Request</u>") provided that the following conditions are satisfied: (i) at least one (1) week's advance written notice of the Overtime Request, specifying the extended Business Hours, is sent to each of the Parcel Owners and Operator and (ii) the Parcel Owner making the Overtime Request shall pay, within thirty days of receipt of an invoice from Operator, all of the costs and expenses relating to the operation of the Parking Facility during the extended hours including, without limitation, the additional costs of electricity and the additional costs incurred by Operator for personnel and administration.  Each Parcel Owner shall furnish promptly to Operator a statement with supporting documentation showing the additional cost of electricity incurred by such Parcel Owner with respect to the operation of the lights in connection with the applicable Overtime Request.  Operator agrees to render, as promptly as practicable,  one or more invoices (in the form of a Reimbursement Assessment) for the costs described above in this Subsection 6.2 to the Parcel Owner making the Overtime Request, and to reimburse the applicable Parcel Owners for the cost of the overtime electricity upon receipt of the payment in respect of the Overtime Request.  In the event a Parcel Owner making an Overtime Request is more than thirty (30) days delinquent in the payment of invoices for prior Overtime Requests, Operator and the other Parcel Owners shall not be required to honor such Overtime Request until all applicable Reimbursement Assessments have been paid in full.

6.3    <u>Rules and Regulations</u>.  Operator may from time to time, after obtaining the Approval of the Parcel Owners, adopt reasonable Rules and Regulations pertaining to the use of the Parking Facility by Permittees, provided that all such Rules and Regulations and other matters affecting the uses of the Parking Facility will (i) apply equally and without discrimination to all Permittees, (ii) comply with City ordinances, (iii) not impose any charge or fee to the general public

for parking at the Parking Facility (other than towing and impounding charges imposed for violation of the Rules and Regulations by Permittees) and (iv) are otherwise consistent with this Agreement.

6.4    Restoration and Maintenance Obligation.  In each instance where this Agreement imposes a maintenance or repair obligation upon Operator, such obligation or cost to maintain and repair shall be limited to the extent Operator receives payments of Assessments levied hereunder from the Parcel Owners covering the full cost of such maintenance and repair.

6.5    Notification of Parcel Owners.  Operator shall promptly notify (i) the Parcel Owners as soon as Operator is notified of any violation of law, rule or order of any Federal, state or municipal authority affecting the Parking Facility and (ii) the applicable insurance carrier of any claim made against the Parcel Owners or the Parking Facility.

7    INSURANCE; CASUALTY.

7.1    Operator's Insurance Obligation.

7.1.1    At all times during the term of this Agreement, Operator shall maintain and/or cause to be maintained commercial general liability insurance with respect to the Parking Facility and the Designated Street Areas and its operations related thereto, whether conducted on or off the premises, designating Operator as the named insured and all Parcel Owners and the City as additional insureds against claims for bodily injury, death, property damage, and personal injury occurring on the Parking Facility and the Designated Street Areas, such insurance to afford protection with a combined single limit of liability per occurrence of Five Million Dollars ($5,000,000).

7.1.2    The foregoing required commercial general liability insurance shall:

7.1.2.1    include a broad form property damage liability endorsement with fire legal liability;

7.1.2.2    contain blanket contractual liability insurance covering written and oral contractual liability under this Agreement;

7.1.2.3    contain contractual liability insurance specifically covering Operator's indemnification obligations under Subsection 9.1 hereof;

7.1.2.4    contain an unintentional errors and omissions clause;

7.1.2.5    provide for a deductible of not more than $10,000 per loss, except for flood and earthquake coverage, which if carried hereunder, shall have a deductible which is commercially reasonable under the circumstances (but in no event more than $25,000.00); and

7.1.2.6    contain coverage for suits arising from the use of reasonable force to protect persons and property including assault and battery.

7.1.3    Operator shall maintain motor vehicle liability insurance with coverage for owned and non-owned and hired vehicles with limits of $1,000,000 for bodily injury or death and property damage.

7.1.4   Operator shall maintain or cause to be maintained Statutory Workers' Compensation Insurance and New York State Disability Benefits Insurance and any other insurance required by law covering all persons employed by Operator, including Employer's Liability coverage, all in amounts not less than the statutory minimum, except that Employer's Liability coverage shall be in an amount of $1,000,000.

7.1.5   Operator warrants that any contractors or subcontractors that it shall retain to fulfill its obligations under this Agreement shall comply with the insurance requirements set forth in Subsections 7.1.1 through 7.1.4 hereof.

7.1.6   Operator shall maintain replacement value coverage for its personal property used in connection with the Parking Facility.

7.2   Parcel Owners' Insurance Obligation.

7.2.1   Property Insurance.   At all times during the term of this Agreement, each Parcel Owner shall maintain and/or cause to be maintained all-risk property damage insurance with extended coverage in an amount equal to the full replacement cost (including debris removal and demolition) of the portion of the Parking Facility Improvements located on the applicable Parcel Owner's Parcel with an "agreed amount endorsement," or its equivalent, and clauses waiving subrogation rights by the insurer against the City, the Parcel Owners, Operator and the other Permittees and their respective successors, assigns, such insurance to be primary and noncontributory to any insurance maintained by the other Parcel Owners or Operator, and to afford protection against loss or damage by fire and other hazards covered by the standard extended coverage endorsements, and by debris removal, costs of demolition, vandalism, malicious mischief, windstorm, water damage, and such other risks as are customarily covered with respect to similar parking operations in Queens and Brooklyn.   Insurance proceeds payable with respect to a property loss shall be payable to the applicable Parcel Owner and, if such party is not self-insuring as hereinafter provided, held in trust for the purpose of paying the cost and expenses incurred by a Parcel Owner in respect of any casualty restoration, and such proceeds shall be applied to the payment in full of the cost of such casualty restoration and expenses incurred by a Parcel Owner in respect of any casualty restoration, in the manner required by Subsection 7.11 hereof.   The affected Parcel Owners and Operator shall cooperate in connection with the collection of any insurance moneys that may be due in the event of loss, and said Parcel Owners and Operator shall as soon as practical execute and deliver such proofs of loss and other instruments as may be required of such Parcel Owners for the purpose of obtaining the recovery of any such insurance moneys.   The foregoing all-risk property damage insurance shall consist at least of property damage insurance under an "All-Risk" policy or its equivalent covering the applicable portion of the Parking Facility and the Parking Facility Improvements on a Parcel Owner's Parcel with replacement cost valuation endorsement in an amount not less than the full Replacement Value (as hereinafter defined), and designating the Parcel Owners, with respect to their Parcels, as loss payees as their interests may appear.   This coverage shall waive or eliminate co-insurance, and shall be primary insurance, effective from the date of completion of the construction of the Parking Facility.   The policy shall include the following coverages or clauses:

7.2.1.1   coverage for physical loss or damage to the Parking Facility Improvements on the applicable Parcel Owner's Parcel;

7.2.1.2   a replacement cost valuation without depreciation or obsolescence clause;

14

7.2.1.3          debris removal coverage;

7.2.1.4          contingent liability from operation of building laws;

7.2.1.5          increased cost of construction coverage;

7.2.1.6          an agreed amount endorsement negating any coinsurance clauses;

7.2.1.7          flood coverage;

7.2.1.8          earthquake coverage; and

7.2.1.9          hurricane coverage;

provided, however, that the flood, earthquake and hurricane insurance shall be for the maximum available amount which is commercially reasonable and need not be for 100% of replacement cost.

7.2.2   Insurance During Construction.   During the period in which construction work is being performed on, in or at the Parking Areas on any of the Parcels, the applicable Parcel Owner shall require any and all contractors working on such portion of the Parking Facility to secure and maintain in full force and effect until such construction work is completed:

7.2.2.1          commercial general liability insurance, on an occurrence basis, including contractual liability coverage (designating the indemnity provisions of any construction contracts), completed operations coverage and broad form property damage endorsement covering its operations and those of its subcontractors, providing that Operator, the City and the Parcel Owners are additional insureds, and providing appropriate liability limits, taking into account the hazards associated with the work, but in any event not less than $1,000,000 combined single limit per occurrence with respect to bodily and personal injury, death and property damage and $2,000,000 in the aggregate;      .

7.2.2.2          statutory workers' compensation, employer's liability, New York State disability benefits and other statutory forms of insurance in form and limits as required by law covering all persons employed by, and all agents of, the applicable Parcel Owner's contractors; and

7.2.2.3          automobile liability insurance covering any and all motor vehicles, whether owned or not owned, used in connection with the work being performed on or for the Parking Facility with limits of not less than $1,000,000 combined single limit per occurrence with respect to personal and bodily injury, death and property damage.

The insurance specified in Subsection 7.2.2 above shall contain (i) independent contractors coverage, (ii) specific contractual liability specifically covering any indemnification agreement protecting the City, the Parcel Owners and Operator, as their interest may appear and (iii) no exclusions other than those included in the basic forms described unless approved by the Parcel Owners.

15

7.3    General Requirements Applicable to Policies.

       7.3.1    Insurance Companies. All of the insurance policies required by this Section 7 shall be procured from companies licensed or authorized to do business in the State of New York that have a rating in the latest edition of "Bests Key Rating Guide" of "A-:VII" or better or another comparable rating reasonably acceptable to the Parcel Owners considering market conditions.

       7.3.2    Required Forms. All references to forms and coverages in this Section 7 shall be those used by the Insurance Services Office of New York or equivalent forms reasonably satisfactory to the Parcel Owners in all material respects.

       7.3.3    Evidence of Insurance. Prior to Operator or its contractors entering into possession of the Parking Facility, and concurrent with the expiration of any of the policies to be maintained by Operator, Operator shall deliver to the City and the Parcel Owners certificates of insurance evidencing the insurance coverage required to be obtained hereunder by Operator. On the Commencement Date, and concurrent with the expiration of any of the policies to be maintained by each Parcel Owner, each Parcel Owner shall deliver to the City, Operator and the other Parcel Owners certificates of insurance evidencing the insurance coverage required hereunder by such Parcel Owner (unless such Parcel Owner is self-insuring, as hereinafter provided). The certificates of insurance shall describe the coverage and provide for thirty (30) days' prior written notice to the City, the Parcel Owners and Operator by the insurance company if such policy is canceled, not renewed or materially changed during the term of this Agreement. The certificates of insurance shall be issued by the insurance company or agent therefor and shall bear the original signature of an officer or duly authorized agent having the authority to issue the certificate. The insurance company issuing the insurance shall also deliver to the City and the Parcel Owners, together with the certificates, proof reasonably satisfactory to the City and the Parcel Owners that the premiums for at least the first year of the term of each policy (or installment payments to the insurance carrier then required to have been paid on account of such premiums and are current) have been paid. If requested by the City or any Parcel Owner, Operator and each Parcel Owner shall deliver to the requesting party a copy of each entire original policy required to be obtained, or other reasonable evidence of the validity and accuracy of said certificate.

       7.3.4    Notice of Claims. Operator shall give, and shall cause its contractors to give, the insurers, the City, with respect to the City Parcel, and the affected Parcel Owners notice of all claims, accidents and losses promptly, but in any event no later than five (5) business days after Operator, or its contractors, as the case may be, acquires actual knowledge of the same.

       7.3.5    Required Insurance Policy Clauses. The policies of insurance required to be carried pursuant to the provisions of this Section 7 shall, as applicable, (i) contain a provision that no act or omission of Operator or any Parcel Owner shall affect or limit the obligation of the insurance company to pay the amount of any loss sustained by the City or any Parcel Owner, (ii) contain a written waiver of the right to subrogation with respect to the Operator, the Parcel Owners and all additional insureds, including the City, (iii) contain an agreement by the insurers that such policies shall not be canceled, materially modified, or denied renewal without at least thirty (30) days' prior written notice to the City and the Parcel Owners and (iv) require that notice of an accident or claim to the insurer providing the liability policy obtained by Operator from the City, and of the Parcel Owners with respect to their respective Parcels, or Operator shall be deemed notice by all insureds under the policy.

16

7.4     Additional Coverage.

7.4.1    Other Insurance.  Upon Approval of the Parcel Owners, Operator shall maintain such other insurance in such amounts as from time to time may be reasonably required by the Parcel Owners against such other insurable hazards as at the time are commonly insured against in the case of premises similarly situated to the Parking Facility or business operations of a size, nature and character similar to the size, nature and character of the business operations being conducted at the Parking Facility.

7.4.2    Adjustment of Limits.  All of the limits of insurance required to be carried by Operator pursuant to this Section 7 shall be subject to review by the City and the Parcel Owners and, in connection therewith, Operator shall carry such additional amounts as the City and the Parcel Owners may require from time to time.

7.5     Blanket Policies.  The insurance required to be carried pursuant to the provisions of this Agreement may be effected, at the option of Operator or the Parcel Owners, as applicable, by blanket policies issued to Operator or the Parcel Owners, as applicable, covering the various Parking Areas constituting the Parking Facility and other properties owned, leased or operated and maintained by Operator, the Parcel Owners or their respective affiliates, provided, such policies otherwise comply with the provisions of this Agreement and allocate to the Parking Facility the specified coverage, including, without limitation, the specified coverage for all insureds required to be named as insured hereunder, without possibility of reduction or co-insurance by reason of, or damage to, any other premises named therein, and if the insurance required by this Agreement shall be effected by any such blanket policies, Operator and the Parcel Owners, as applicable, shall furnish to the City and the Parcel Owners true and correct copies of such policies as provided above, together with schedules annexed thereto, setting forth the amount of insurance applicable to the Parking Facility and reasonable proof that the premiums for at least the first (1st) year of the term of each of such policies (or installment payments then required to have been paid on account and are current) shall have been paid.

7.6     Self-Insurance.  Notwithstanding any provision in Section 7 hereof to the contrary, (i) in lieu of insurance policies and certificates required under Section 7 hereof, Sears (so long as it maintains at all times a net worth of at least $200,000,000, as determined in accordance with generally accepted accounting principles or as shown on its latest audited annual report to shareholders), and the City, if it becomes a Parcel Owner, may, in whole or in part, self-insure such risks under any plan of self-insurance from time to time maintained by such Parcel Owner and (ii) if Operator, FCTA, FCBA or any other Parcel Owner which is an affiliate of Forest City Enterprises, participates under Forest City Enterprises' corporately sponsored risk management program, and provided that at least a majority of the properties owned, managed or operated by Forest City Enterprises and its subsidiary companies are covered by such program, then Operator or such Parcel Owner may have a self-insured retention of up to $250,000.00 through such program maintained by Forest City Enterprises.  The foregoing self-insurance limit of $250,000.00 may be increased from time to time by the applicable affiliate of Forest City Enterprises only with the prior written consent of Sears and the City, which consent shall not be unreasonably withheld or delayed.  To the extent that Operator or any Parcel Owner is permitted under this Subsection 7.6 to self-insure and elects to self-insure, it shall so notify the other Parcel Owners and the City, and such insurance shall be considered as insurance for purposes of complying with the terms and conditions of this Agreement including, without limitation, the requirements of Subsection 7.3.5 hereof.

7.7   Annual Aggregates.  If there is imposed under any liability insurance policy required hereunder an annual aggregate which is applicable to claims, such an annual aggregate shall not be less than two (2) times the per occurrence limit required for such insurance.

7.8   Determination of Replacement Value.

7.8.1   Definition.  The current Replacement Value of the Parking Facility with respect to a Parcel Owner's Parcel and the Parking Facility Improvements on a Parcel Owner's Parcel (the "Replacement Value") shall be the full cost of replacing such portion of the Parking Facility and the Parking Facility Improvements on such Parcel, including, without limitation, all hard costs of construction as well as the costs of post-casualty debris removal, and soft costs.  On the Commencement Date, Replacement Value shall be the total cost of such portion of the Parking Facility on a Parcel Owner's Parcel and the related Parking Facility Improvements and, thereafter, adjusted in accordance with Subsection 7.8.2 below.  In no event shall such Replacement Value be reduced by depreciation or obsolescence of the Parking Facility Improvements.

7.8.2   Adjustment.  The amount of Replacement Value shall be adjusted on each anniversary of the Commencement Date by a percentage equal to the percentage change in the Index (as hereinafter defined) in effect on such anniversary date as compared to the Index in effect on the Commencement Date.

7.8.3   Index.  As used herein, the "Index" means the Dodge Building Cost Index or such other published index of construction costs which shall be selected from time to time by the City and the Parcel Owners, provided that such index shall be a widely recognized measure of construction costs in the insurance industry and appropriate to the type and location of the Parking Facility Improvements.

7.9   Unavailability; Failure to Maintain Insurance.

7.9.1   If any of the insurance required to be carried under this Agreement shall not, after diligent efforts by the party required to obtain same, and through no act or omission on the part of such party, be obtainable from domestic carriers customarily insuring premises similar to the Parking Facility and business operations of a size, nature and character similar to the size, nature and character of the business operations being conducted by Operator and/or the Parcel Owners at the Parking Facility, then the applicable party shall promptly notify the City and the Parcel Owners of its inability to obtain such insurance and the City and the Parcel Owners shall have the right, but not the obligation, to arrange for such party to obtain such insurance.  If the City and the Parcel Owners shall be able to arrange for such insurance, then Operator or the Parcel Owner, as applicable, shall obtain the same up to the maximum limits provided for herein.  If such insurance is not obtainable, the Operator or the Parcel Owner, as applicable, shall promptly obtain the maximum obtainable, and in such case, the failure of Operator or the applicable Parcel Owner to carry the insurance which is unobtainable shall not be a default hereunder for as long as such insurance shall remain unobtainable.   Types or amounts of insurance shall be deemed unobtainable if such types or amounts of insurance are (i) actually unobtainable, or (ii) virtually unobtainable as a result of commercially unreasonable premiums for such insurance with respect to premises similar to the Parking Facility, located in New York City and used for purposes similar to those for which the Parking Facility is used.

7.9.2   If Operator or any Parcel Owner shall fail to maintain or cause to be maintained any of such insurance required hereunder, the City and the Parcel Owners may, upon

18

thirty (30) days' prior written notice to defaulting party, obtain such insurance, in such party's sole discretion, at the expense of the defaulting party and shall be reimbursed by the defaulting party on demand.

    7.10    Liability for Uninsured Destruction.    Each of Operator and the Parcel Owners shall, notwithstanding the insurance requirements of this Section 7, be liable for any loss, damage or liability arising from a failure to maintain the insurance required to be maintained by such party under the terms hereof.

    7.11    Release and Waiver of Subrogation.    Each Parcel Owner and Operator hereby releases, and to the extent legally possible for it to do so, on behalf of its insurer, each of the other Parcel Owners and Operator from any liability for any loss or damage to its property located upon the Parcels, which loss or damage is of the type covered by the casualty insurance described in this Section 7, irrespective of any negligence on the part of the other Parcel Owners or Operator which may have contributed to or caused such loss.  Each Parcel Owner and Operator covenants that it will, if generally available in the insurance industry, obtain for the benefit of the other Parcel Owners and Operator an express waiver of any right of subrogation which the insurers of such Parcel Owners or Operator may acquire against the other Parcel Owners or Operator by virtue of the payment of any such loss covered by such insurance.

    7.12    Casualty Restoration.

        7.12.1        If all or any portion of the Parking Facility or Parking Facility Improvements on a Parcel Owner's Parcel are damaged or destroyed by fire or other casualty, ordinary or extraordinary, foreseen or unforeseen, the Parcel Owner of the affected Parcel (the "Responsible Owner") shall restore or use reasonable efforts to cause the restoration of the portion of the Parking Facility or Parking Facility Improvements on the Responsible Owner's Parcel to the extent of the value and as nearly as possible as to their character as they existed immediately before such casualty and otherwise in substantial conformity with the Plans and Specifications (a "Casualty Restoration"), whether or not (i) such damage or destruction has been insured or was insurable, (ii) such Responsible Owner is entitled to receive any insurance proceeds, or (iii) the insurance proceeds are sufficient to pay in full the cost of the work in connection with the Casualty Restoration.

        7.12.2        Subject to unavoidable delays (i.e., delays beyond a Person's reasonable control, including without limitation, governmental restrictions, orders of any court of competent jurisdiction, labor disputes, accidents, mechanical breakdown, shortages or inability to obtain labor, fuel, steam, water, electricity or materials, acts of God, enemy action, removal of hazardous substances and civil commotion), the Responsible Owner shall commence or use reasonable efforts to cause to be commenced a Casualty Restoration promptly after adjustment of the insurance claim and availability of proceeds, if any, relating to the damages or destruction, but in any event within one hundred eighty (180) days of the damage or destruction, provided that during any such period after the occurrence of a casualty the Responsible owner shall have secured or caused to be secured the damaged portion of the Parking Facility against further damage, injury to persons, and/or damage to other property.

        7.12.3        If the Responsible Owner shall fail or neglect to perform any such Casualty Restoration within one (1) year of the occurrence of the damage or destruction, the other Parcel Owners (other than Duryea), or any of them, may, at any time thereafter (but prior to the completion of such Casualty Restoration), terminate this Agreement upon thirty (30) days prior

written notice to the defaulting Responsible Owner and the other Parcel Owners.

8    <u>ASSESSMENTS</u>.

8.1    <u>Covenant for Payment of Assessments</u>.  Each Parcel Owner agrees to pay all Assessments which Operator shall assess with respect to the Parking Facility from time to time, subject to the terms and conditions of this Agreement.

8.2    <u>Budget</u>.  No later than forty-five (45) days prior to the beginning of each Fiscal Year but no earlier than one hundred twenty (120) days prior to the beginning of each Fiscal Year, Operator shall deliver to each Parcel Owner a Budget estimating the total Expenses expected to be incurred for such year and estimating the Regular Assessments and Special Assessments, if any, required to fund the same. Within thirty (30) days of the receipt of the Budget, each Parcel Owner shall send a notice to Operator approving such Budget or setting forth such Parcel Owner's objections thereto. The Parcel Owners have approved a Budget for the first Fiscal Year, which is attached hereto as <u>Exhibit D</u>. Commencing on the first day of the first month of the Fiscal Year and continuing thereafter on the first day of each succeeding month, each Parcel Owner shall pay one-twelfth (1/12) of such Parcel Owner's Regular Assessment. A Parcel Owner shall pay any Reimbursement Assessment or Special Assessment in full within thirty (30) days after Operator notifies the Parcel Owner thereof. If no Budget has been delivered to a Parcel Owner prior to the commencement of a new Fiscal Year, the Parcel Owner shall continue paying its Regular Assessment from the prior Fiscal Year until such time as Operator shall have issued a revised Budget and shall have levied a new Regular Assessment in accordance with the terms hereof. Operator's failure to prepare and issue the Budget in a timely manner shall not constitute Operator's waiver of its right to levy Assessments nor a release of its duties under this Agreement. Within sixty (60) days following the end of each Fiscal Year, Operator shall deliver to each Parcel Owner a statement ("<u>Statement</u>") setting forth a break-down of the Expenses, by category and amount (including the category of Assessment to which the applicable Expense relates), incurred or accrued for the preceding Fiscal Year. The Statement shall also set forth a description of the services rendered by third parties pursuant to contracts with Operator in connection with the Parking Facility if any such third parties are affiliates of a Parcel Owner or any party hereto ("<u>Affiliate Contracts</u>"). If the amount paid by a Parcel Owner as estimated Assessments for a Fiscal Year is more than the amount of such Parcel Owner's actual obligations shown on such annual Statement, any such overpayment shall be delivered by Operator to such Parcel Owner within thirty (30) days after Operator's delivery of such Statement (or at the Parcel Owner's election, credited to the next Fiscal Year's obligation of such Parcel Owner). If the amount paid by a Parcel Owner as estimated Assessments for a Fiscal Year is less than the amount of such Parcel Owner's actual obligations shown on such annual Statement, any such underpayment shall be paid by the applicable Parcel Owner within thirty (30) days following receipt of such Statement.

8.3    <u>Disputes</u>.  In the event that each and every subsequent Budget does not receive the Approval of the Parcel Owners or there shall be a dispute regarding the imposition or amount of any Assessment or any other amount payable hereunder, then any such dispute regarding the Budget, Assessment, or other amount payable hereunder, as applicable, shall be submitted to arbitration in accordance with Subsection 9.15 hereof.

8.4    <u>Interest; Costs</u>.  If a Parcel Owner fails to pay any Regular Assessment, Special Assessment or Reimbursement Assessment on the due date therefor such Assessment shall thereupon be overdue, and, if, after thirty (30) days written notice from Operator that such Assessment is overdue, the applicable Parcel Owner has not paid such Assessment, Operator

shall have the right to recover from said Parcel Owner, all the following additional amounts:

8.4.1   reasonable costs incurred in collecting the delinquent Assessment, including reasonable attorney fees; and

8.4.2   interest on all sums due under Subsection 8.4 hereof, calculated at an annual percentage rate of twelve percent (12%), accruing thirty (30) days after notice from Operator pursuant to Subsection 8.4 that the Assessment is overdue until said Parcel Owner has paid in full the overdue Assessment and all of the foregoing costs and charges.

8.5   Adjustments of Assessments. If Operator determines that the current Assessments are, or shall become, insufficient to meet all Expenses, Operator shall revise the Budget and submit same for approval to the Parcel Owners as provided in Subsection 8.2 hereof and, upon such approval, shall levy revised Assessments.

8.6   Obligation for Assessments. Each Parcel Owner, and each successor to or assignee of each Parcel Owner, shall be deemed to covenant and agree to pay to Operator any and all Assessments levied against the applicable Parcel, subject to the terms and conditions hereof. From delinquency until paid, all Assessments, together with all charges, interest and penalties arising under Subsection 8.4 hereof, may be enforced by lawsuit or by any other method allowed by law. Each such Assessment shall also constitute the personal obligation of each Parcel Owner affected at the time that the Assessment becomes due.

8.7   Certificate of Payment. Upon request, Operator shall certify to any Parcel Owner liable for an Assessment, or to its mortgagee, the amount of any delinquency with respect thereto. Operator may collect a charge for its actual costs incurred in providing such certificate.

8.8   Audit. At its sole cost, any Parcel Owner or the City shall, at its own expense, have the right, exercisable on fifteen (15) days' notice to Operator, to audit Operator's books and records of the Budget and Expenses during normal business hours and so as not to interfere unreasonably with Operator's conduct of its duties hereunder. Within thirty (30) days after such audit, Operator and the Parcel Owner shall make the appropriate payments and reimbursements, as the case may be, to each other, as are determined to be owing pursuant to such audit.

8.9   Records. Operator shall prepare and maintain adequate journals, ledgers, accounts records, receipts, checkbooks, financial documents and reports, including the Budget, Statement, Expenses records, personnel records and payroll, all in accordance with generally accepted accounting principles.

## 9   GENERAL PROVISIONS.

9.1   Liability of Operator: Indemnity. Operator shall be liable for its negligence (including, without limitation, the failure to keep and maintain the insurance required to be obtained by Operator hereunder) or wilful misconduct to the extent not covered by insurance required to be carried hereunder. To the fullest extent permitted by law, each and every Parcel Owner, by accepting its interest or title to its interest in any Parcel, agrees to indemnify, defend and protect Operator against and from all claims and liability arising out of the construction, use, possession and/or operation of the portion of the Parking Facility and the Designated Street Areas on the Parcel occupied by, owned by or under the control of such Parcel Owner, except to the extent any such claim arises from Operator's negligence or wilful misconduct. Operator agrees to indemnify,

defend and protect the City and the Parcel Owners against and from all claims and liability, to the extent the same arise out of Operator's negligence or wilful misconduct in the performance of or failure to perform its obligations hereunder.

9.2    **Mutuality; Successors and Assigns**.  All agreements, covenants and easements contained in this Agreement are made for the direct, mutual and reciprocal benefit of each and every Parcel Owner and shall be binding upon each Parcel Owner, and its successors and assigns.

9.3    **Attorney Fees**.  In any legal or equitable proceeding for the enforcement of, or to restrain the violation of, or otherwise pertaining to a dispute concerning this Agreement or any provision hereof, by reference or otherwise, the prevailing party shall be entitled to an award of reasonable attorney fees in such amount as may be fixed by the court in such proceedings.

9.4    **Failure to Enforce Not a Waiver of Rights**.  The failure of Operator or any parties hereto or Parcel Owner to enforce any covenant, condition or restriction herein contained, by reference or otherwise, shall in no event be deemed a waiver of the right to do so thereafter, nor of the right to enforce any other covenant, condition or restriction.  All remedies provided herein at law or in equity shall be cumulative and not exclusive.

9.5    **Estoppel Certificates**  Upon thirty (30) days' prior notice, given upon the transfer, financing and/or refinancing of a Parcel and otherwise no more than once a year, Operator or a Parcel Owner, if applicable, shall provide to any requesting Parcel Owner and/or its existing or prospective mortgagee or to Operator an estoppel certificate stating, to the actual knowledge of the certifying Parcel Owner or Operator: (i) whether Operator or certifying Parcel Owner knows of any defaults under this Agreement and, if so, the nature thereof, (ii) whether this Agreement has been assigned, modified or amended in any way and, if so, the nature thereof and (iii) that this Agreement is in full force and effect as of the date of the estoppel certificate.

9.6    **Release**.  If a Parcel Owner shall sell, transfer or assign its entire Parcel or its interest therein, it shall, except as provided in this Agreement, be released from its obligations arising in respect of such Parcel from and after the date of such sale, transfer or assignment.  It shall be a condition precedent to the foregoing release and discharge of any Parcel Owner that the following conditions are satisfied: (i) such grantor or assignor shall give notice to the other Parcel Owners of any such sale, transfer, conveyance or assignment, (ii) such grantor or assignor shall pay all monetary sums due and payable under the terms of this Agreement to the date that such sale, transfer or assignment becomes effective, and (iii) the transferee shall execute and deliver to the other Parcel Owners a written statement in which: (A) the name and address of the transferee shall be disclosed; and (B) the transferee shall acknowledge its obligation hereunder and agree to be bound by this Agreement and perform all obligations hereunder in accordance with the provisions of this Agreement.  Failure to deliver any such written statement shall not affect any of the covenants or agreements contained herein.  Anything in this Subsection 9.6 to the contrary notwithstanding, it is expressly understood and agreed that no such sale, transfer or assignment or written acknowledgment by the transferee of its obligations hereunder shall effectuate a release of its transferor with respect to obligations which accrued hereunder prior to the date of the subject transfer.

9.7    **Leases**.  All agreements for the leasing or rental of a Parcel or any Building or portion thereof shall be in writing and shall provide that the lease shall be subject in all respects to the provisions of this Agreement.  Any Parcel Owner who shall lease its Parcel or Building

thereon shall be responsible for the reasonable enforcement of its tenant's compliance with this Agreement.

    9.8    Taxes and Assessments.  Each Parcel Owner shall pay, or cause to be paid, canceled or discharged of record when due all real estate taxes (general and special), assessments and water and sewer charges which may be levied, assessed, or charged by any public authority or public utility against its respective Parcel, the improvements thereon or any other part thereof (collectively, "Taxes").  In the event a Parcel Owner shall deem any Taxes (including the rate thereof or the assessed valuation of the property) to be excessive or illegal, such Parcel Owner shall have the right, at its own cost and expense, to contest same by appropriate proceedings, and nothing contained herein shall require such Parcel Owner to pay any such Taxes as long as (i) no other Parcel would be affected by such failure to pay (or bond); and (ii) the amount or validity thereof shall be contested in good faith and in accordance with applicable laws.

    9.9    Term of Agreement; Extinguishment.

        9.9.1    Term.  The term of this Agreement commences on the date hereof and shall terminate on the earlier to occur of (i) midnight on June 29, 2035, (ii) the termination of the Sears Lease or (iii) the earlier termination of this Agreement pursuant to Subsection 9.9.2, Subsection 9.9.4.3. or Subsection 7.12.3 hereof.

        9.9.2    Termination by Forfeiture.    In the event that a Parcel Owner's failure to pay timely all Taxes or perform its obligations under a superior lease or mortgage results in the loss or forfeiture of such Parcel Owner's interest in a Parcel (any one or more of the foregoing, a "Forfeiture"), then this Agreement shall terminate with respect to the Parcel or portion thereof subject to Forfeiture, unless the purchaser or purchasers in connection with such Forfeiture agree to be bound by the terms and conditions hereof and have executed an instrument to such effect in form and substance satisfactory to the other Parcel Owners.  In the event any Forfeiture results in the reduction in size of the Parking Facility by more than 25% of the total square footage of the Parking Facility existing on the date of completion of construction, then this Agreement shall terminate and be of no further force and effect.  In the event of a termination of this Agreement, the parties hereto agree to execute and deliver an instrument acknowledging same.

        9.9.3    Extinguishment.  If this Agreement shall expire or be terminated in accordance with its terms, then all easements (including, without limitation, the easements set forth in Section 3 hereof), covenants, licenses, rights of access and other rights and obligations hereof from and after the date of expiration or termination shall be terminated and extinguished and no party hereto shall have any further rights or obligations except for those obligations which accrued prior to the date of termination or expiration.   The foregoing shall not be deemed to extinguish any easements from the City in favor of Duryea and benefitting the Duryea Parcel which are created by separate written instrument.

        9.9.4    Partial Withdrawal Rights of Sears; Termination Rights of Sears.

            9.9.4.1    Management and Maintenance.

                9.9.4.1.1    Termination of Operator.  Sears shall have the right, in its sole discretion, upon sixty (60) days prior written notice to each of the other Parcel Owners, Operator and the City stating that it is not satisfied with the management, maintenance and/or

23

operation of the Parking Facility by any Operator, to terminate the appointment, rights and obligations of the then acting Operator, whereupon, at the expiration of such sixty (60) day period following such notice to the other Parcel Owners, Operator and the City, no Operator shall maintain and operate the Parking Facility and (A) each Parcel Owner shall be released from its obligations under Section 8 hereof arising from and after the date of such termination, (B) each Parcel Owner shall operate, maintain and insure its own Parcel in substantially the same manner that Operator was required to operate, maintain and insure the Parking Facility under Subsections 6.1.1, 6.1.2 and 7.1 hereof, and (C) each Parcel Owner shall continue to be bound by the provisions of Subsections 3.1-3.5, Section 4, Section 5, Section 7 and Subsections 9.2-9.10, 9.12 and 9.14-9.19 hereof for the remainder of the term hereof.

9.9.4.2     Control Devices.  If Sears shall have determined, in its sole discretion, that the number of parking spaces available for Sears' customers is compromised by the existence of the Parking Facility as a unified lot, then Sears may install various parking and traffic control devices ("Control Devices") to make sufficient parking available to Sears' customers on its Parcel including, without limitation, restriping, color coded spaces and/or signs, provided that the number of parking spaces on its Parcel is not reduced and the traffic pattern on its Parcel as shown on the Site Plan (i.e, ingress, egress, access and circulation, vehicular as well as pedestrian) is not changed or altered.  Sears agrees to provide to the other Parcel Owners and the City thirty (30) days prior written notice of its intention to implement such Control Devices, specifying in such notice the Control Devices it intends to implement.

9.9.4.3     Sears' Termination Rights.

·   9.9.4.3.1     If, following the implementation of the Control Devices, Sears determines, in its sole discretion, that such Control Devices are ineffective in making sufficient parking available to Sears' customers, then Sears may, upon sixty (60) days prior written notice to the other Parcel Owners and the City, terminate this Agreement.

9.9.4.3.2     If the landlord under the Sears Lease shall notify Sears in writing to the effect that the execution and delivery of this Agreement by Sears or the performance by Sears of its obligations hereunder is a default under the Sears Lease, then Sears may, upon thirty (30) days prior written notice to the other Parcel Owners and the City, terminate this Agreement.  The foregoing written notice of termination to the other Parcel Owners, to be effective, must include a copy of the written notice of default sent by Sears' landlord to Sears.

9.9.5   Withdrawal by Duryea.  Notwithstanding any provision to the contrary contained herein, Duryea shall have the right to withdraw from this Agreement at any time upon sixty (60) days prior written notice to each of the other parties hereto.  In the event of such withdrawal, from and after the date of such withdrawal, (i) Duryea shall be released from its obligations arising under this Agreement from and after the effective date of such withdrawal, and (ii) the Duryea Parcel shall be released from and deprived of the benefit of all easements (including, without limitation, the easements set forth in Section 3 hereof), covenants, licenses, rights of access and other rights and obligations hereof, all of which shall be extinguished with respect to the Duryea Parcel.  Upon such withdrawal, at Duryea's request, the parties hereto will execute and deliver an instrument evidencing the release of the Duryea Parcel from this Agreement, provided there are no outstanding accrued and unsatisfied obligations of Duryea with respect to this Agreement.  The foregoing shall not be deemed to extinguish any easements from the City in favor of Duryea and benefitting the Duryea Parcel which are created by separate written instrument.

24

9.10    Loew's Theater Site.

9.10.1        In the event of a sale or development of the site previously occupied
by the Loew's theater (Block 5132, Lot 18) (the "Development Site"), the City agrees to cause the
owner (whether fee or leasehold) and/or operator of the Development Site to execute an
agreement with the parties to this Agreement (the "Binding Letter") wherein such party agrees to
be bound by the terms of this Agreement, including, without limitation, the obligation to contribute
its allocable share of the Expenses in the manner provided in Exhibit E attached hereto and made
a part hereof (Exhibit E being deemed to have been substituted for Exhibit B in such event),
whereupon such owner and/or operator of the Development Site shall be deemed to be a Parcel
Owner and the New Deck shall be deemed to be a Parcel hereunder. The parties hereto agree
to sign the Binding Letter upon presentation to them.

9.10.2        The parties hereto acknowledge that the City has reserved an
easement for the development, construction and operation of a parking deck above the City Parcel
(the "New Deck") for use in conjunction with the Development Site and agree that neither the City,
EDC nor any purchaser or lessee of the Development Site shall have any obligation to the other
parties hereto to construct the New Deck. If construction of the New Deck has commenced, then
the Parcel Owners agree that (i) the City Parcel (excluding the Street) shall temporarily not be
subject to this Agreement for the period from the commencement of construction until the
completion (as evidenced by the earlier to occur of a temporary or final certificate of occupancy)
of the New Deck except as provided in clause (ii) of the following sentence. During such period,
(i) Operator and the Parcel Owner of the City Parcel shall be relieved of all obligations hereunder
with respect to the City Parcel including, without limitation, all obligations under Sections 3, 5, 6,
7 and 8 hereof, except to the extent such obligations have accrued prior to the commencement
of such period, and (ii) the City (and not FCBA) shall pay or cause to be paid the Expenses
attributable to the City Parcel (in accordance with Section 8 and Exhibit B hereto) during such
period of construction as if the City Parcel were still bound by the terms of Section 8 of this
Agreement and the City were the Parcel Owner. In addition, the City (and not FCBA) shall pay
or cause to be paid Taxes and utilities, if any, attributable to the City Parcel during such period of
construction. The City and/or the developer of the Development Site may set up temporary
staging areas on the City Parcel for the construction of the New Deck, but may not place any
staging areas or equipment on any other portions of the Parking Facility without the Consent of
the Parcel Owners. The City agrees to cause a true and correct copy of the certificate of
occupancy for the New Deck, when issued, to be delivered to each of the Parcel Owners,
whereupon (A) the New Deck shall be open to the public for parking, (B) the Site Plan shall be
deemed modified to include the New Deck, (C) the City Parcel shall again be subject to and bound
by the terms and conditions of this Agreement (thereby relieving the City of its obligations in
clause (ii) above) and (D) the surface parking areas of the New Deck (but not the structural
components of the New Deck) shall be deemed to be Parking Areas hereunder.

9.11    Community Open Meetings.    Operator shall use reasonable efforts to hold
meetings, if necessary, from time to time that are open to the public (including, without limitation
local elected officials, representatives of the Flatbush Avenue Business Improvement District, the
local Community Board, the Flatbush Development Corporation, other community stakeholders
and the Parcel Owners) for purposes of discussing any community concerns regarding the
operation of the Parking Facility.

9.12    Notices.  All notices, requests, consents or other communications provided for in
or to be given under this Agreement shall be in writing, may be delivered in person, by overnight

air courier or by certified or registered mail, and shall be deemed to have been duly given and to have become effective (i) upon receipt if delivered in person, (ii) one day after having been delivered to an overnight air courier or (iii) three days after having been deposited in the mails as certified or registered mail, all fees prepaid, directed to the parties at the following addresses (or at such other address as shall be given in writing by a party hereto):

9.12.1    If to the City or EDC:

New York City Economic Development Corporation, 110 William Street, New York, NY 10038, Attention: President; with copies to the and General Counsel and to The New York City Law Department, 100 Church Street, New York, NY 10007, Attention: Chief Economic Development Division.

9.12.2    If to FCTA or FCBA:

c/o Forest City Ratner Companies, One MetroTech Center North, Brooklyn, NY 11201, Attention: General Counsel, with copies to President.

9.12.3    If to Operator:

At the address set forth on the applicable signature page hereof for the then acting Operator.

9.12.4    If to Sears:

Sears, Roebuck and Co., 3333 Beverly Road, Hoffman Estates, Illinois, 60179, Attention: Vice President - Real Estate, with a copy to Sears, Roebuck and Co., 3333 Beverly Road, Hoffman Estates, Illinois, 60179, Attention: Assistant General Counsel - Real Estate.

9.12.5    If to Duryea:

c/o Hollenberg, Levin, Solomon, Ross, Belsky & Daniels, LLP, 585 Stewart Avenue, Garden City, NY 11530.

9.13    Good Faith.  Operator shall at all times act in good faith and shall not take any action that is materially detrimental to one Parcel Owner while at the same time benefitting other Parcel Owners without first obtaining the written consent of the Parcel Owner who is adversely affected.

9.14    No Joint Venture: Third Party Beneficiary.  Nothing contained in this Agreement shall be construed to make the parties hereto partners, reciprocal agents or joint venturers as to render any of the parties liable for the debts or obligations of any other party.  It is the intention of the parties that they shall be and remain at all times independent contractors.  Each party is specifically prohibited from holding itself out in any manner as having authority to act for or bind any other party in any respect.  Where the consent or approval of the Parcel Owners and/or the City is required hereunder, no such consent or approval shall be granted unless each Parcel Owner and/or the City shall have given its consent thereto.  Each of the Parcel Owners shall be

severally obligated for its respective portion of any amounts payable hereunder including, any Assessments or portion thereof  due to Operator and with respect to any obligation or liability arising under this Agreement or any agreement with any third party.  The City shall be deemed to be a third party beneficiary with regard to the provisions herein expressly entitling the City to notice or to approve or consent to an action to be taken pursuant to the terms hereof.

9.15    Arbitration.  In the event of a dispute by or among the parties hereto with respect to any matter specifically provided elsewhere herein to be resolved or determined by arbitration, such dispute shall be settled by arbitration under the Expedited Procedures provisions, as the same may be amended from time to time) of the American Arbitration Association (or successor thereto) in New York City.  The award shall be binding, final and conclusive on the parties, and judgment may be entered thereon and enforced in accordance with the laws of the State of New York.  Administrative fees payable to the American Arbitration Association shall be borne by the non-prevailing Parcel Owner.

9.16    Section and Section Headings.  The Section and Section headings used herein are inserted for convenience only and are not intended to be a part of this Agreement or in any way to define, limit or describe the scope and intent of the respective Sections to which they refer.

9.17    Effective of Invalidation.  If any provision (by reference or otherwise) of this Agreement is held to be invalid by any court, the invalidity of such provision shall not affect the validity of the remaining provisions hereof.

9.18    Amendments.  This Agreement shall be amended only by a written document signed and acknowledged by all of the parties hereto, the Parcel Owners and the City.

9.19   Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together constitute one and the same instrument.

9.20   Construction.  This Agreement and the obligations of the parties hereto shall be interpreted, construed and enforced in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties haves executed this Agreement as of the date first above written.

FC BEDFORD ASSOCIATES, L.P.

By:   RRG BEDFORD, INC.
      a general partner

By: _____
    Name:   Bruce Ratner
    Title:   President

FOREST CITY TILDEN
ASSOCIATES, L.P.
By:   RRG TILDEN ASSOCIATES, L.P.
By:   RRG TILDEN, INC.
      a general partner

By: _____
    Name:   Bruce Ratner
    Title:   President

SEARS, ROEBUCK AND CO.

By: _____
    Name: Barry D. Kaufman
    Title:   Vice President - Real Estate

DURYEA ASSOCIATES, L.L.C.

By: _____
    Name:
    Title:

FOR PURPOSES BEING
BOUND BY SECTION 9.10 HEREOF:

THE CITY OF NEW YORK

By: _____
    Name:
    Title:

28

9.19    Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together constitute one and the same instrument.


9.20    Construction.  This Agreement and the obligations of the parties hereto shall be interpreted, construed and enforced in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties haves executed this Agreement as of the date first above written.

FC BEDFORD ASSOCIATES, L.P.

By:

    a general partner

    By: _____
       Name:
       Title:

FOREST CITY TILDEN
  ASSOCIATES, L.P.

By:

    a general partner

    By: _____
       Name:
       Title:

PROPERTY
MANAGER
JC
LEGAL
TKH

SEARS, ROEBUCK AND CO.

By: _____
Name: Barry D. Kaufman
Title:    Vice President - Real Estate

DURYEA ASSOCIATES, L.L.C.

By: _____
    Name:
    Title:

FOR PURPOSES BEING
BOUND BY SECTION 9.10 HEREOF:

THE CITY OF NEW YORK

By: _____
    Name:
    Title:

28

    9.19   Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together constitute one and the same instrument.


    9.20   Construction.  This Agreement and the obligations of the parties hereto shall be interpreted, construed and enforced in accordance with the laws of the State of New York.

    IN WITNESS WHEREOF, the parties haves executed this Agreement as of the date first above written.

FC BEDFORD ASSOCIATES, L.P.

By:

    a general partner

    By: _____
      Name:
      Title:

FOREST CITY TILDEN
  ASSOCIATES, L.P.

By:

    a general partner

    By: _____
      Name:
      Title:

SEARS, ROEBUCK AND CO.

By:_____
    Name: Barry D. Kaufman
    Title:   Vice President - Real Estate

DURYEA ASSOCIATES, L.L.C.

By:_____
  Name: Sheila Polity
  Title:  Manager

FOR PURPOSES BEING
BOUND BY SECTION 9.10 HEREOF:

THE CITY OF NEW YORK

By:_____
  Name:
  Title:

9.19   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which taken together constitute one and the same instrument.

9.20   <u>Construction</u>.  This Agreement and the obligations of the parties hereto shall be interpreted, construed and enforced in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties haves executed this Agreement as of the date first above written.

FC BEDFORD ASSOCIATES, L.P.

By:

    a general partner

    By: _____
      Name:
      Title:

FOREST CITY TILDEN
ASSOCIATES, L.P.

By:

    a general partner

    By: _____
      Name:
      Title:

SEARS, ROEBUCK AND CO.

By:_____
    Name: Barry D. Kaufman
    Title:   Vice President - Real Estate

DURYEA ASSOCIATES, L.L.C.

By:_____
    Name:
    Title:

FOR PURPOSES BEING
BOUND BY SECTION 9.10 HEREOF:

THE CITY OF NEW YORK

By:_____
    Name: *Randy Levine*
    Title: *Deputy Mayor*

Approved as to Form

Acting Corporation Counsel

28

By its signature below, the undersigned accepts the appointment as Operator, and agrees to be bound by the terms hereof until such Operator's resignation or termination in accordance with the terms hereof.

| Name of Operator | Duly Authorized Signature | Address |
|---|---|---|
| | | |

## LIST OF EXHIBITS TO OPERATING AGREEMENT

| | |
|---|---|
| Exhibit A | Site Plan and Drawings |
| Exhibit B | Chart of Allocable Shares |
| Exhibit C | Chart of Percentage of Eligible Costs Payable by Parcel Owners |
| Exhibit D | Budget for First Fiscal Year |
| Exhibit E | Substitute Chart of Allocable Shares |

## EXHIBIT A

**See the Site Plan attached hereto and made a part hereof.**



A-1



A-2



A-3

## EXHIBIT B

### Chart of Allocable Shares

| Parcel Owner | Allocable Share |
|---|---|
| FCTA | 40% |
| FCBA | 9% |
| Duryea | 2% |
| Sears | 49% |

The following shall apply if Duryea withdraws from this Agreement:

| Parcel Owner | Allocable Share |
|---|---|
| FCTA | 41% |
| FCBA | 9% |
| Sears | 50% |

.

**32**

## EXHIBIT C

See Chart of Percentage of Eligible Costs Payable
by Parcel Owners and Breakdown of Eligible Costs
Attached Hereto and Made a Part Hereof

**FLATBUSH PARKING LOT**
**BROOKLYN**
**PROJECT BUDGET**

| DESCRIPTION<br>Total Site Acquisition | Sears | Forest City | Pohly | Total |
|---|---|---|---|---|
| **HARD COSTS** | | | | |
| Trades | 397,210 | 985,380 | 47,300 | 1,429,890 * |
| Removal of Contaminated Soil | 0 | 0 | 0 | 0 |
| Contingency for additional tonnage | | | | 0 |
| Contractor Overhead (10%) | | | | 0 |
| Contractor Profit (10%) | | | | 0 |
| Permits | | 9,000 | | 9,000 |
| General Conditions (incl.) | | | | 0 |
| Bonds | | 17,000 | | 17,000 |
| EDC Fee | | 25,000 | | 25,000 |
| Owner's Testing / Survey (included) | | 12,500 | | 12,500 |
| Contingency | 39,721 | 170,694 | 4,730 | 215,145 |
| **TOTAL HARD COSTS - BASE BUILDING** | 436,931 | 1,219,574 | 52,030 | 1,708,535 |
| | | | | |
| **TOTAL HARD COSTS** | 436,931 | 1,219,574 | 52,030 | 1,708,535 |
| | | | | |
| **SOFT COSTS** | | | | |
| A & E Base/Permits | 36,750 | 30,426 | 2,450 | 69,626 |
| A & E Reimbursables | | | | 0 |
| A & E Consultants (Relocation/Environmental) | 0 | 47,200 | 0 | 47,200 |
| **ARCHITECTURE & ENGINEERING** | 36,750 | 77,626 | 2,450 | 116,826 |
| | | | | |
| **TOTAL SOFT COSTS** | 36,750 | 77,626 | 2,450 | 116,826 |
| | | | | |
| **TOTAL ELIGIBLE PROJECT COSTS** | 473,681 | 1,297,200 | 54,480 | 1,825,361 |

*– Trades cost based on contract dated 5/28/97 between
A. Williams Trucking Co. and Fc Bedford Associates, L.P.

FL0697B.XLS                              EXHIBIT C

## EXHIBIT D

See Budget for the First Fiscal Year attached hereto and made a part hereof.

# UNIFIED PARKING FACILITY

## ANNUAL EXPENSE BUDGET

| | |
|---|---|
| Contract Services | 133,970 |
| Supplies | 16,800 |
| Repairs & Maintenance | 16,000 |
| Management Fee | 26,500 |
| Insurance | 9,900 |
| **Total Expenses** | **$203,170** |

## Supplies

| | | |
|---|---|---:|
| - | Snow Melt | $ 7,500 |
| - | Trash Liners | 3,000 |
| - | Replacement Trash Receptacles | 1,500 |
| - | Security Vehicle Fuel | 1,800 |
| - | Miscellaneous Tools | 1,500 |
| - | Miscellaneous Signage | 1,500 |
| | Total Supplies | $16,800 |

## Repairs & Maintenance

| | | |
|---|---|---:|
| - | Surface Maintenance | $ 4,000 |
| - | Lighting Maintenance | 1,000 |
| - | Restripping | 3,500 |
| - | Fence & Gate Repairs | 7,500 |
| | Total R & M | $16,000 |

Insurance                                          $ 9,900

### Contract Services
Sanitation
1 porter 8 hrs./day x 7 days x 52 wks x 12.50        $36,400

Security Attendant
1 guard Mon-Sat 12 per day
Total 72 hrs. & 8 hrs. Sunday
Total 80 hrs per week @ $12.50
& 52 weeks                                          $ 52,000

Security Vehicle Rental @ $525 per month           $   6,300

Carting Services
5 yds/day x 365 days @ $12.75 per yd               $  23,270

Snow Removal Services
Assume 10 storms, 16 hrs. per storm @
$100 per hour                                      $  16,000

                              Total                $133,970

Management Fee                                      $ 26,500

## EXHIBIT E

### Substitute Chart of Allocable Shares

| Parcel Owner | | Allocable Share |
|---|---|---|
| (1) | FCTA and FCBA | The percentage obtained by dividing the number of parking spaces on (i) the FCTA Parcel and (ii) the City Parcel by the total number of parking spaces in the Parking Facility (the "Forest City Percentage"). The Forest City Percentage shall be reduced by subtracting therefrom a percentage obtained by multiplying the Forest City Percentage by the percentage determined in paragraph (5) below, if applicable. |
| (2) | Duryea | The percentage obtained by dividing the number of parking spaces on the Duryea Parcel by the total number of parking spaces in the Parking Facility (the "Duryea Percentage"). The Duryea Percentage shall be reduced by subtracting therefrom a percentage obtained by multiplying the Duryea Percentage by the percentage determined in paragraph (5) below, if applicable. |
| (3) | Sears | The percentage obtained by dividing the number of parking spaces on the Sears Leased Parcel by the total number of parking spaces in the Parking Facility (the "Sears Percentage"). The Sears Percentage shall be reduced by subtracting therefrom a percentage obtained by multiplying the Sears Percentage by the percentage determined in paragraph (5) below, if applicable. |
| (4) | New Owner/Operator of Development Site if New Deck is Constructed | The percentage obtained by dividing the number of parking spaces on, in and/or within the New Deck by the total number of parking spaces in the Parking Facility. |
| (5) | New Owner/Operator of Development Site if New Deck is not Constructed | A percentage to be determined by the City, in an equitable manner, taking into account the use and size of the building on the Development Site but, in any case, no less than 1%. |

If Duryea withdraws from this Agreement, the number of parking spaces on the Duryea Parcel shall be omitted in the calculation of the number of spaces in the Parking Facility.

# EXHIBIT B



S1114 BROOKLYN NY  PARKING
DEVELOPMENT & OPERATING
AGREEMENT 7/15/1997

FLATBUSH
PARKING (DECK)
(GREEN)

NY CITY OWNED
PARKING (RED)

SEARS AUTO
CENTER NOT A
PART [OWNED/
LEASED]

NY CITY
OWNED
PARKING (RED)

SEARS PARKING
LOT & FLS (LEASED)
(BLUE)

DEVELOPMENT &
OPERATING
AGREEMENT
PARKING FACILITY
IN YELLOW



A-1



A-2



A - 3

# EXHIBIT C

MEYERS TERSIGNI FELDMAN & GRAY LLP
14 WALL STREET, 30TH FLOOR, NEW YORK, NEW YORK 10005-2101
TELEPHONE: (212) 422-1500, FAX: (212) 422-1650 WEB: WWW.MTFGLAW.COM

RICHARD N. GRAY
RGRAY@MTFGLAW.COM

July 26, 2017

BY EMAIL and FEDEX

Edward S. Lampert
Chief Executive Officer
Sears Holdings Corp.
3333 Beverly Road
Hoffman Estates, Illinois 60179

**Sears #1114, Brooklyn, New York**

Dear Mr. Lampert:

My firm has been retained by Flatbush Center Parking LLC ("FCP") to collect from Sears Holdings Corp. and/or affiliates ("Sears") amounts due from Sears for unpaid common area maintenance ("CAM") expenses payable pursuant to a development and operating agreement made as of July 15, 1997 (the "DOA").

We are writing to propose that we meet to explore a resolution of this matter without the necessity of commencing a formal arbitration proceeding. I understand there were some very preliminary discussions about this between the parties (without counsel) at various times between the end of 2013 and the beginning of 2016, when the discussions ceased.

It is our understanding that this matter arises as described below.

Briefly, the original parties to the DOA were FC Bedford Associates, L.P. ("FC Bedford"), Forest City Tilden Associates, L.P. ("Forest Tilden" and collectively with FC Bedford, "Forest City"), Sears, Roebuck and Co. and Duryea Associates, L.L.C. ("Duryea"). Those entities had varying interests in certain contiguous parcels of property in Brooklyn, and in conjunction with New York City, desired to create and maintain a uniformly operated parking facility on those parcels (the "Parking Facility").

More specifically, as detailed in the eighth "WHEREAS" clause of the DOA, the Parking Facility consisted of four elements: (i) the parking deck (Block 5126, Lots 1, 62 and 40) – *i.e.,* the rooftop parking deck on top of the shopping center known as Flatbush Center (the "Parking Deck"), (ii) the Sears Leased Parcel (Block 5133, Lot 14) – the at-grade parking area adjacent to the Sears building (the "Sears Lot"), (iii) the City Parcel (Block 5132, Lots 17 and part of 18 and Block 5133, Lots 1, 3, 8, 50, 65 and part of 14) – an at-grade parking area at the north end of the Sears Lot (the "City Parcel") and (iv) the street for ingress and egress to and from the Sears Lot and City Parcel. At the time the DOA was signed there was an additional parking area in the

Parking Facility, namely, a Duryea parcel. However, Duryea withdrew from the DOA early on, and that parcel was eliminated.

As set forth in the DOA, the purpose of the Parking Facility was to strengthen the retail area and mitigate traffic congestion. It was in furtherance of that objective that the original parties entered into the DOA. The entire Parking Facility was (and is) open to the public and is available for use by the parties, their customers, sub-tenants, affiliates, subsidiaries and successors.

Through an assignment and assumption agreement dated August 9, 2004 (the "FCP Assignment"), FCP acquired all of Forest City's right, title and interest in the DOA and undertook the responsibilities of the Operator of the Parking Facility. Since, as noted, Duryea had withdrawn from the DOA prior to the date of the FCP Assignment, the only remaining parties to the DOA were, and continue to be, FCP and Sears.

Pursuant to the DOA, Sears is responsible to pay to the Operator a share of the expenses to operate and maintain the Parking Facility (the "Expenses"). The Expenses are defined in the DOA as the expenses of operating and maintaining *all* of the parking areas contained in the Parking Facility (*see*, DOA Sections 1.2, 1.3, 1.14, 6 and 8). Sears' share of the Expenses was 49% up until Duryea's withdrawal, following which, Sears' share increased to 50% (DOA, Section 1.1 and Exhibit B) and has remained at that level since then.

We are advised that from and after the date of the FCP Assignment, Sears paid, as its base regular assessment under the DOA, approximately $9,611 per month. This represented what was believed at the time to be 1/12 of Sears' share of the annual estimated Expenses for the coming year. Since the base Expenses varied little from year to year, FCP simply continued to bill the same amount every month as the base regular assessment. FCP prepared and sent to Sears, together with all necessary back-up materials, a statement of the actual expenses for the preceding year. Based on the statement of actual expenses, with such changes as the parties may have agreed upon, Sears was billed, and paid, the shortfall.

In or about late 2013, FCP undertook a review and analysis (the "review") of Sears' obligations to pay a share of the expenses of operating and maintaining the Parking Facility. In this regard, the review sought to determine whether the monthly and annual bills and statements sent to Sears since the date of the FCP Assignment, and the payments previously made by Sears, complied with the DOA.

It appeared from a preliminary review of the billings and payments that Sears was substantially underpaying its share of the Expenses. The review showed that the reason for the underbilling (and the consequent underpayment) was that in computing Sears' share of the Expenses, FCP was inadvertently charging Sears for its share of the Expenses for maintaining only a portion of the Parking Facility, rather than its share of the Expenses for maintaining the entire Parking Facility as required by the DOA.

Following the conclusion of the review, FCP prepared revised annual statements based on the findings of the review. The revised statements showed that Sears was underbilled, and

underpaid, approximately $1.8 million through 2011. Since then, FCP has billed Sears in accord with the conclusions reached in the review, which amounted to an additional shortfall in excess of $1 million through 2016.

Following completion of the revised statements, FCP contacted Sears to advise it of the underbilling and shortly thereafter sent Sears a summary of the calculations as of that time. After the summary was sent to Sears, the parties engaged in sporadic brief email communications regarding the issue of underbilling and underpayment. These brief discussions continued until some time in early 2016. Since then, this matter has not been further addressed.

FCP now desires to pursue this matter, and as noted at the outset of this letter, we propose a meeting to explore a resolution without the necessity of engaging in formal arbitration proceedings. Please get back to me before August 15 to discuss this further.

We look forward to hearing from you.

Sincerely,

Richard N. Gray

# EXHIBIT D

# 1114 (a)

**FOREST CITY BEDFORD ASSOCIATES**
**ESTIMATED UNIFIED LOT CHARGES**
**ATTRIBUTABLE TO SEARS**
**FOR THE FISCAL YEAR ENDING JANUARY 31, 2002**

*Budget*

UNIFIED LOT EXPENSES

| | |
|---|---|
| PROFESSIONAL SERVICES | 11,210 |
| COMMON AREA UTILITIES | 7,420 |
| CONTRACT SERVICES | 137,133 |
| BUILDING SUPPLIES | 4,409 |
| REPAIRS & MAINTENANCE *Per Landlord* | 40,070 |
| ADMINISTRATION | 1,163 |
| INSURANCE - *General Liability* | 3,494 |
| MANAGEMENT FEE | 26,500 |

*Per the Lease OK to Bill*

TOTAL ESTIMATED UNIFIED LOT EXPENSES          231,399

SEARS PERCENTAGE SHARE OF EXPENSES          50.00%
SEARS SHARE OF EXPENSES          115,699.50

ESTIMATED MONTHLY CHARGES EFFECTIVE: 2/1/01          9,641.63

*Rick Ferrell*
*(718) 923-5615*



OK TO PAY   D/824RE
UNIT # 1114 (01)
TYPE   A/C#   AMOUNT
EG          5,745.30     2/1/01 - 7/31/01
AUTHORIZED BY *V Bimas*
07/05/01

# EXHIBIT E



James B. Terrell
Real Estate Department – 824RE
Sears Holdings Corp.
3333 Beverly Road, BC-104B
Hoffman Estates, IL  60179
847.286.3918
FAX – 847.286.7976

April 15, 2010

Flatbush Center Parking, LLC        New York City Development Corporation
c/o ACHS Management                 110 William Street
1412 Broadway, 3rd Floor            New York, NY  10038
New York, NY  10018                 Attn: President

Duryea
c/o Hollenberg, Levin, Solomon, Ross, Belsky & Daniels, LLP
585 Stewart Avenue
Garden City, NY  11530

Re:     Development and Operating Agreement dated July 15, 1997 as amended, between
        Sears, Roebuck and Co. ("Sears") and Flatbush Center Parking, LLC, successor in
        interest to FC Bedford Associates, LP and Forest City Tilden Associates, LP
        "Landlord") for the premises located at 2307 Bedford Ave., Brooklyn, NY

Dear Sir or Madam:

Please be advised that Sears is not satisfied with the management, maintenance, and the
operation of the Parking facility by the Operator.

Therefore, pursuant to Article 9.9.4.1.1 of the above referenced Operating Agreement, this
letter will serve as written notice to the Operator, that Sears hereby exercises its right to
terminate the Agreement effective sixty (60) days from the date of this letter.

Sincerely,

James B. Terrell

Vice President, Real Estate

CC:     New York City Development Corporation, General Counsel
        The New York City Law Department, Chief Economic Development Division

        Todd Lemmert (via email)
        Dave Broome (via email)
        Bill Signoretti (via email)

# EXHIBIT F

FLATBUSH CENTER PARKING LLC
c/o ACHS Management Corp.
1412 Broadway, 3rd Floor
New York, New York 10018

Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179

      Re:    <u>Supplemental Letter Agreement</u>
              <u>Sears #1114 located at 1007-1011 Flatbush Avenue, Brooklyn, NY</u>

Gentlemen and Ladies:

Reference is made to that certain Development and Operating Agreement dated as of July 15, 1997 ("DOA") by and between FC Bedford Associates, L.P. ("FC Bedford"), Forest City Tilden Associates, L.P. ("Tilden"), Sears, Roebuck and Co. ("Sears") and Duryea Associates, L.L.C. ("Duryea").

Flatbush Center Parking LLC ("Flatbush"), through an Assignment and Assumption of Agreement dated August 9, 2004, acquired all right, title and interest of FC Bedford and Tilden under the DOA.

Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the DOA.

In consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    <u>Operation, Maintenance and Insurance/Assessments</u>.    Notwithstanding anything to the contrary in the DOA and without limiting the duties and obligations of the Operator under section 6 of the DOA, the Expenses that make up the Regular Assessments for the 2010 and 2011 fiscal year, respectively, shall be capped at One Hundred Twenty Thousand Dollars ($120,000.00).

2.    <u>Sidewalk Repairs</u>.    Upon execution of this letter agreement, Flatbush shall commence repairs to the sidewalks, and said repairs shall be completed no later than thirty (30) days following the execution of this letter agreement.

DMLIB-#304701-v3-Brooklyn__NY_S-1114_-_Letter_Agreement.DOC

Furthermore, said repairs shall be included in the Expenses for the 2011 fiscal year and subject to the above cap.

3. <u>Budget – Section 8.2.</u>   Notwithstanding the foregoing provisions of section 8.2 of the DOA, in the event that an expense fails to be included in the then fiscal years Budget for Expenses, such expense shall not be included in the Budget unless the expense shall be first approved by Sears. Flatbush shall submit such expense in writing requesting Sears to consider the addition to the budget. Sears shall notify Flatbush whether it accepts or rejects the expense within thirty (30) days after receipt of the request. Failure by Sears to notify Flatbush regarding the expense shall be deemed an acceptance of the expense by Sears.

4. <u>Self-Help Rights.</u>   Notwithstanding anything to the contrary in the DOA or this *Supplemental Letter Agreement*, Flatbush agrees that for the 2010 and 2011 fiscal years, if an emergency arises that threatens imminent harm to person or property, and Sears determines, at its sole discretion, that it shall become necessary to promptly make any repairs hereby required to be made by Flatbush, Sears shall immediately notify Flatbush, in writing or verbally, of such emergency. If after Sears notifies Flatbush of such emergency, and if Flatbush does not immediately address the repairs or make arrangements for same by the end of the business day of receipt of said notice, Sears may, at its option, proceed forthwith to have such repairs made and pay the cost thereof. In the event of a non-emergency repair that is needed, Sears shall notify Flatbush of such needed repair either in writing or verbally. Flatbush shall have fifteen (15) days upon notice from Sears to commence or complete the repairs. Should Flatbush fail to commence or complete the repairs, Sears may, at its option, proceed forthwith to have such repairs made and pay the cost thereof. Flatbush agrees to reimburse Sears the cost of such emergency or non-emergency repairs upon demand. If Flatbush fails to reimburse Sears within thirty (30) days of such demand, Sears may deduct the amount of the repairs from its Allocable Share due and owing under the DOA.

5. <u>Sears Right to Terminate – Section 9.9.4.1.1.</u>   Notwithstanding anything to the contrary in the DOA, Sears reserves its right to terminate the appointment of Flatbush as Operator under the DOA in accordance with section 9.9.4.1.1. of the DOA.

Flatbush and Sears hereby agree that the provisions contained in this *Supplemental Letter Agreement* shall supersede any inconsistent provisions contained in the DOA.

Sears hereby agrees that full execution of this Supplemental Letter Agreement shall hereby rescind the termination letter sent certified mail to Flatbush, New York City



Development Corporation and Duryea Associates L.L.C. by Sears on April 15, 2010. Said termination letter is attached hereto marked as Exhibit A and made a part hereof.

Both parties represent and warrant that they have the full right, power and authority to enter into this Supplemental Letter Agreement and do not need the consent of any party, including the holder of any mortgage on the premises.

This Supplemental Letter Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute but one and the same Supplemental Letter Agreement.

IN WITNESS WHEREOF, Flatbush and Sears have executed and delivered this Supplemental Letter Agreement as of _February 2_, 2011.

FLATBUSH CENTER PARKING LLC,
a New York limited liability company

By: _____
   Name: _____ Alex Adjmi,
   Title: _____ Authorized Signatory

SEARS, ROEBUCK AND CO.,
a New York corporation

By: _____
   Name: James B. Terrell
   Title: Vice President Real Estate



James B. Terrell
Real Estate Department – 824RE
Sears Holdings Corp.
3333 Beverly Road, BC-104B
Hoffffman Estates, IL  60179
847.286.3918
FAX – 847.286.7976

April 15, 2010

Flatbush Center Parking, LLC          New York City Development Corporation
c/o ACHS Management                   110 William Street
1412 Broadway, 3rd Floor              New York, NY  10038
New York, NY  10018                   Attn: President

Duryea
c/o Hollenberg, Levin, Solomon, Ross, Belsky & Daniels, LLP
585 Stewart Avenue
Garden City, NY  11530

Re:     Development and Operating Agreement dated July 15, 1997 as amended, between
        Sears, Roebuck and Co. ("Sears") and Flatbush Center Parking, LLC, successor in
        interest to FC Bedford Associates, LP and Forest City Tilden Associates, LP
        "Landlord") for the premises located at 2307 Bedford Ave., Brooklyn, NY

Dear Sir or Madam:

Please be advised that Sears is not satisfied with the management, maintenance, and the
operation of the Parking facility by the Operator.

Therefore, pursuant to Article 9.9.4.1.1 of the above referenced Operating Agreement, this
letter will serve as written notice to the Operator, that Sears hereby exercises its right to
terminate the Agreement effective sixty (60) days from the date of this letter.

Sincerely,

James B. Terrell

Vice President, Real Estate

CC:    New York City Development Corporation, General Counsel
       The New York City Law Department, Chief Economic Development Division

       Todd Lemmert (via email)
       Dave Broome (via email)
       Bill Signoretti (via email)

EXHIBIT A

Sears #114 – Brooklyn, NY

Supplemental Agreement Deal Information

- Operating Expenses are capped or 20010 and 2011 at $120,000.00

- Sidewalk repairs shall be included in 2011 Operating Expenses

- 15 day non-emergency self help

- Right to terminate continues

- If Operator does not perform an emergency repair(s) by the end of the business day after notice by Sears, Sears may perform the repair and deduct from payment

# EXHIBIT G

**Banaszak, Tammi**

| | |
|---|---|
| **From:** | Ginger Kassin <GKassin@achsny.com> |
| **Sent:** | Monday, February 24, 2014 12:26 PM |
| **To:** | Banaszak, Tammi |
| **Subject:** | Summary of CAM charges |
| **Attachments:** | CCE02242014.pdf |

*Hi Tammi...attached is the summary sheet of the charges...The 2012 is not on this schedule because we did that year correctly...I will try to get that year scanned to you today, and will be working on the others this week....*

*Thanks,*

*Ginger Kassin*

**ACHS Management Corp**

1412 Broadway, 3rd Floor| New York | NY | 10018

w: 212.398.3970 x250| f: 212.869.8933

1

# EXHIBIT H

A C H S Management Corp.
1412 Broadway
3rd Floor
New York, NY 10018
212 398-3970

A C H S Management Corp.
1412 Broadway
3rd Floor
New York, NY 10018
212 398-3970
**Return Stub**
**with Payment**

Sears Holding Corp
Tammi Banaszak, Property Mgt
BC-131A
3333 Beverly Road
Hoffman Estates, IL 60179

| DATE | ACCOUNT NUMBER |
|---|---|
| 4/1/2014 | Sears   1 |
| INVOICE #: | |

| DATE | ACCOUNT NUMBER |
|---|---|
| 4/1/2014 | Sears   1 |
| INVOICE #: | |
| Sears Holding Corp | |
| | 000105   000164 |

MAKE CHECKS PAYABLE TO: Flatbush Center Parking LLC
MAIL CHECKS TO:        ACHS Management Corp.
                       1412 Broadway, 3rd floor, New York, NY 10018

| Date | Code | Description | Charges | Payments | Amount Due | Date | Code | Amount Due |
|---|---|---|---|---|---|---|---|---|
| 3/1/2014 | CM2 | Balance Retro CAM 2010 | 22,956.69 | 0.00 | 22,956.69 | 3/1/2014 | CM2 | 22,956.69 |
| 3/1/2014 | CM2 | Retro CAM 2012 | 154,483.00 | 0.00 | 154,483.00 | 3/1/2014 | CM2 | 154,483.00 |
| 4/1/2014 | CM2 | Retro CAM 2004 | 244,917.00 | 0.00 | 244,917.00 | 4/1/2014 | CM2 | 244,917.00 |
| 4/1/2014 | CM2 | Retro CAM 2005 | 213,515.00 | 0.00 | 213,515.00 | 4/1/2014 | CM2 | 213,515.00 |
| 4/1/2014 | CM2 | Retro CAM 2006 | 213,748.00 | 0.00 | 213,748.00 | 4/1/2014 | CM2 | 213,748.00 |
| 4/1/2014 | CM2 | Retro CAM 2007 | 539,842.00 | 0.00 | 539,842.00 | 4/1/2014 | CM2 | 539,842.00 |
| 4/1/2014 | CM2 | Retro CAM 2008 | 484,413.00 | 0.00 | 484,413.00 | 4/1/2014 | CM2 | 484,413.00 |
| 4/1/2014 | CM2 | Retro CAM 2009 | 343,386.00 | 0.00 | 343,386.00 | 4/1/2014 | CM2 | 343,386.00 |
| 4/1/2014 | PKG | Parking Income | 9,611.21 | 0.00 | 9,611.21 | 4/1/2014 | PKG | 9,611.21 |

| Current | 30 | 60 | 90 | 120 | BALANCE DUE |
|---|---|---|---|---|---|
| 2,049,432.21 | 177,439.69 | 0.00 | 0.00 | 0.00 | 2,226,871.90 |

BALANCE DUE    2,226,871.90

# EXHIBIT I

A C H S Management Corp.
1412 Broadway
3rd Floor
New York, NY  10018
212 398-3970

A C H S Management Corp.
1412 Broadway
3rd Floor
New York, NY  10018
212 398-3970

**Return Stub**
**with Payment**

Sears Holding Corp
Tammi Banaszak, Property Mgt
BC-131A
3333 Beverly Road
Hoffman Estates, IL  60179

| DATE | ACCOUNT NUMBER |
|---|---|
| 10/1/2018 | 000105-000164 |
| INVOICE #: | |

| DATE | ACCOUNT NUMBER |
|---|---|
| 10/1/2018 | 000105-000164 |
| INVOICE #: | |
| Sears Holding Corp | |
| 000105 | 000164 |

**MAKE CHECKS PAYABLE TO:**  Flatbush Center Parking LLC
**MAIL CHECKS TO:**       1412 Broadway, 3rd floor, New York, NY 10018

**PLEASE INCLUDE YOUR ACCOUNT NUMBER ON CHECK**

| Date | Code | Description | Charges | Payments | Amount Due | Date | Code | Amount Due |
|---|---|---|---|---|---|---|---|---|
| 3/1/2014 | CM2 | Balance Retro CAM 2010 | 22,956.69 | 0.00 | 22,956.69 | 3/1/2014 | CM2 | 22,956.69 |
| 3/1/2014 | CM2 | Retro CAM 2012 | 154,483.00 | 0.00 | 154,483.00 | 3/1/2014 | CM2 | 154,483.00 |
| 8/1/2014 | CM2 | CAM Retro 2013 | 226,401.00 | 0.00 | 226,401.00 | 8/1/2014 | CM2 | 226,401.00 |
| 11/5/2014 | CM2 | Retro CAM 2004 | 241,811.11 | 0.00 | 241,811.11 | 11/5/2014 | CM2 | 241,811.11 |
| 11/5/2014 | CM2 | Retro CAM 2005 | 173,956.86 | 0.00 | 173,956.86 | 11/5/2014 | CM2 | 173,956.86 |
| 11/5/2014 | CM2 | Retro CAM 2006 | 189,757.96 | 0.00 | 189,757.96 | 11/5/2014 | CM2 | 189,757.96 |
| 11/5/2014 | CM2 | Retro CAM 2007 | 491,783.15 | 0.00 | 491,783.15 | 11/5/2014 | CM2 | 491,783.15 |
| 11/5/2014 | CM2 | Retro CAM 2008 | 394,077.56 | 0.00 | 394,077.56 | 11/5/2014 | CM2 | 394,077.56 |
| 11/5/2014 | CM2 | Retro CAM 2009 | 303,929.32 | 0.00 | 303,929.32 | 11/5/2014 | CM2 | 303,929.32 |
| 7/1/2015 | CM2 | Retro CAM 2014 | 345,046.00 | 0.00 | 345,046.00 | 7/1/2015 | CM2 | 345,046.00 |
| 4/1/2016 | CM2 | Payment towards arrears | -28,971.06 | 0.00 | -28,971.06 | 4/1/2016 | CM2 | -28,971.06 |
| 10/1/2016 | RMM | Bracci Inv 7/28/16 | 1,949.96 | 0.00 | 1,949.96 | 10/1/2016 | RMM | 1,949.96 |
| 1/1/2017 | CM2 | CAM Retro 2015 | 218,302.00 | 0.00 | 218,302.00 | 1/1/2017 | CM2 | 218,302.00 |
| 5/24/2017 | CM2 | Retro CAM 2016 | 269,653.00 | 0.00 | 269,653.00 | 5/24/2017 | CM2 | 269,653.00 |
| 9/1/2017 | LG1 | Meyers Inv.7/31/17 | 11,367.50 | 0.00 | 11,367.50 | 9/1/2017 | LG1 | 11,367.50 |
| 1/1/2018 | CM2 | Retro CAM 2011 | 172,103.00 | 0.00 | 172,103.00 | 1/1/2018 | CM2 | 172,103.00 |
| 1/1/2018 | LG1 | M tersigni-5/4/17 Legal Fe | 15,000.00 | 0.00 | 15,000.00 | 1/1/2018 | LG1 | 15,000.00 |
| 6/1/2018 | CM2 | Retro CAM 2017 | 277,496.32 | 0.00 | 277,496.32 | 6/1/2018 | CM2 | 277,496.32 |
| 6/6/2018 | PKG | Estimate Reconciliation | 138,748.16 | 0.00 | 138,748.16 | 6/6/2018 | PKG | 138,748.16 |
| 7/1/2018 | PKG | Parking Income | 32,735.90 | 9,611.21 | 23,124.69 | 7/1/2018 | PKG | 23,124.69 |
| 8/1/2018 | PKG | Parking Income | 32,735.90 | 9,611.21 | 23,124.69 | 8/1/2018 | PKG | 23,124.69 |
| 9/1/2018 | PKG | Parking Income | 32,735.90 | 9,611.21 | 23,124.69 | 9/1/2018 | PKG | 23,124.69 |
| 10/1/2018 | PKG | Parking Income | 32,735.90 | | 32,735.90 | 10/1/2018 | PKG | 32,735.90 |

| Current | 30 | 60 | 90 | 120 | BALANCE DUE |
|---|---|---|---|---|---|
| 55,860.59 | 0.00 | 23,124.69 | 161,872.85 | 3,481,103.37 | 3,721,961.50 |

| BALANCE DUE | 3,721,961.50 |
|---|---|

 *Important Resident Notice*

## INTRODUCING ONLINE PAYMENTS

Dear Resident,

We are excited to introduce a fast, easy, and secure way for you to make your monthly payments online through **ClickPay**.

As the new and **_preferred way_** of accepting payments, we invite you to get started by clicking the activation link emailed to you or by creating your account below. Make one-time or automatic recurring payments online by e-check (ACH) for **FREE** or by all major credit and debit cards for a fee.

## GETTING STARTED

To get started, visit the web address below and follow the instructions listed:

## www.ClickPay.com/ACHS

① Click **Register** and then create your online profile with **ClickPay**

② **Connect Your Unit** using the account number found on your statement

③ Set up **Automatic Payments** or click **Pay Now** to make one-time payments

   DISC VER

## FEATURES & BENEFITS

 Set Up Automatic Payments           Pay by e-Check or Credit/Debit Card

 Avoid Late Fees & Save Paper          View Your Payment History

## ONLINE PAYMENT SUPPORT

For help with your account, visit **ClickPay's** support center at **www.ClickPay.com/Help** for access to FAQ's, step-by-step walkthroughs, email and phone support, and live chat.

# EXHIBIT J

Sears #1114 01/B
Brooklyn NY
Revised CAM Reconciliations

| 2006<br>Expense Item | Per Landlord<br>Flatbush Center | Per Landlord<br>Flatbush Delaware | Total |
|---|---|---|---|
| CAM Utilities | 20,607.12 | 34,891.41 | 55,498.53 |
| CAM Telephone /Alarm System | 0.00 | 2,285.61 | 2,285.61 |
| CAM Fire Protection | 0.00 | 390.00 | 390.00 |
| CAM Water/Sewer | 406.41 | 0.00 | 406.41 |
| CAM Security | 45,888.63 | 41,742.59 | 87,631.22 |
| CAM Wages | 14,300.00 | 14,300.00 | 28,600.00 |
| CAM Taxes/Benefits | 1,329.61 | 1,329.61 | 2,659.22 |
| CAM Workers Comp./Disab. | 1,658.41 | 1,658.42 | 3,316.83 |
| CAM Hardware/Supplies | 113.22 | 113.23 | 226.45 |
| CAM Locksmith Repairs | 94.83 | 94.83 | 189.66 |
| CAM Plumbing | 1,625.63 | 812.81 | 2,438.44 |
| CAM Electrical Maintenance | 2,411.34 | 0.00 | 2,411.34 |
| CAM Rubbish Removal | 14,023.47 | 0.00 | 14,023.47 |
| CAM Snow Removal | 7,190.00 | 9,990.00 | 17,180.00 |
| CAM Sidewalk Repairs | 259.75 | 0.00 | 259.75 |
| CAM Parking Lot Sweeping | 49,281.18 | 2,148.06 | 51,429.24 |
| CAM Professional Fees | 86.00 | (142.33) | (56.33) |
| CAM Travel | 0.00 | 31.00 | 31.00 |
| CAM Insurance Liability/Building | 0.00 | 56,594.91 | 56,594.91 |
| CAM Roofing Repairs | 0.00 | 143,319.71 | 143,319.71 |
| CAM Elevator Maintenance | 0.00 | 10,119.08 | 10,119.08 |
| CAM Painting | 0.00 | 30,000.00 | 30,000.00 |
| Other Professional Fees | 259.00 | 0.00 | 259.00 |
| Management Fees | 50,400.00 | 0.00 | 50,400.00 |
| Office Expenses | 0.00 | 1,662.58 | 1,662.58 |
| Legal Tax Fees | 0.00 | 350.00 | 350.00 |
| Gifts/Xmas | 0.00 | 550.00 | 550.00 |
| **Subtotal** | **209,934.60** | **352,241.52** | **562,176.12** |
| Admin Fee 15% | 0.00 | 0.00 | 76,766.00 |
| **Total CAM Expenses** | **209,934.60** | **352,241.52** | **638,942.12** |
| Sears' PRS | 50.00% | 50.00% | 50.00% |
| **PRS CAM Expenses** | **104,967.30** | **176,120.76** | **319,471.06** |
| **Less Prior Payments** | 0.00 | 0.00 | (105,723.00) |
| **Total CAM Due (Credit)** | **104,967.30** | **176,120.76** | **213,748.06** |

| 2007 Expense Item | Per Landlord Flatbush Center | Per Landlord Flatbush Delaware | Total |
|---|---|---|---|
| CAM Utilities | 19,923.11 | 34,652.13 | 54,575.24 |
| CAM Telephone /Alarm System | 0.00 | 5,531.42 | 5,531.42 |
| CAM Fire Protection | 0.00 | 748.87 | 748.87 |
| CAM Water/Sewer | 0.00 | 0.00 | 0.00 |
| CAM Security | 29,374.58 | 29,374.58 | 58,749.16 |
| CAM Wages | 14,300.00 | 14,300.00 | 28,600.00 |
| CAM Taxes/Benefits | 1,216.87 | 1,216.87 | 2,433.74 |
| CAM Workers Comp./Disab. | 1,965.36 | 1,965.36 | 3,930.72 |
| CAM Hardware/Supplies | 455.48 | 455.48 | 910.96 |
| CAM Locksmith Repairs | 0.00 | 0.00 | 0.00 |
| CAM Plumbing | 0.00 | 17,177.19 | 17,177.19 |
| CAM Sprinkler Repairs | 0.00 | 250.00 | 250.00 |
| CAM Electrical Maintenance | 0.00 | 0.00 | 0.00 |
| CAM Rubbish Removal | 2,980.34 | 0.00 | 2,980.34 |
| CAM Snow Removal | 14,090.00 | 13,090.00 | 27,180.00 |
| CAM Sidewalk Repairs | 0.00 | 0.00 | 0.00 |
| CAM Parking Lot Maintenance | 1,950.00 | 0.00 | 1,950.00 |
| CAM Misc. Repairs & Maintenance | 1,200.00 | 1,080.66 | 2,280.66 |
| CAM Parking Lot Sweeping | 45,490.19 | 0.00 | 45,490.19 |
| CAM Professional Fees | 0.00 | 67,312.50 | 67,312.50 |
| CAM Travel | 0.00 | 0.00 | 0.00 |
| CAM Insurance Liability/Building | 0.00 | 50,814.38 | 50,814.38 |
| CAM Roofing Repairs | 0.00 | 682,999.99 | 682,999.99 |
| CAM Elevator Maintenance | 0.00 | 9,576.40 | 9,576.40 |
| CAM Painting | 0.00 | 0.00 | 0.00 |
| Other Professional Fees | 259.00 | 0.00 | 259.00 |
| Management Fees | 50,200.00 | 0.00 | 50,200.00 |
| Outside Services | 0.00 | 14,062.31 | 14,062.31 |
| Office Expenses | 0.00 | 2,423.27 | 2,423.27 |
| Legal Tax Fees | 0.00 | 0.00 | 0.00 |
| Gifts/Xmas | 0.00 | 550.00 | 550.00 |
| Subtotal | 183,404.93 | 947,581.41 | 1,130,986.34 |
| Admin Fee 15% | 0.00 | 0.00 | 164,368.00 |
| Total CAM Expenses | 183,404.93 | 947,581.41 | 1,295,354.34 |
| Sears' PRS | 50.00% | 50.00% | 50.00% |
| PRS CAM Expenses | 91,702.47 | 473,790.71 | 647,677.17 |
| Less Prior Payments | 0.00 | 0.00 | (115,335.00) |
| Total CAM Due (Credit) | 91,702.47 | 473,790.71 | 532,342.17 |

| 2008 Expense Item | Per Landlord Flatbush Center | Per Landlord Flatbush Delaware | Total |
|---|---|---|---|
| CAM Utilities | 26,065.67 | 33,613.72 | 59,679.39 |
| CAM Telephone /Alarm System | 0.00 | 1,030.42 | 1,030.42 |
| CAM Fire Protection | 0.00 | 794.33 | 794.33 |
| CAM Water/Sewer | 0.00 | 0.00 | 0.00 |
| CAM Security | 39,865.42 | 39,865.43 | 79,730.85 |
| CAM Wages | 14,300.00 | 14,300.00 | 28,600.00 |
| CAM Taxes/Benefits | 1,229.62 | 1,229.62 | 2,459.24 |
| CAM Workers Comp./Disab. | 0.00 | 0.00 | 0.00 |
| CAM Building Repairs | 0.00 | 41,931.25 | 41,931.25 |
| CAM Hardware/Supplies | 0.00 | 1,620.05 | 1,620.05 |
| CAM Locksmith Repairs | 0.00 | 0.00 | 0.00 |
| CAM Plumbing | 0.00 | 31,000.62 | 31,000.62 |
| CAM Sprinkler Repairs | 0.00 | 0.00 | 0.00 |
| CAM Electrical Maintenance | 0.00 | 3,000.00 | 3,000.00 |
| CAM Rubbish Removal | 7,500.00 | 0.00 | 7,500.00 |
| CAM Snow Removal | 15,892.97 | 11,216.82 | 27,109.79 |
| CAM Sidewalk Repairs | 0.00 | 0.00 | 0.00 |
| CAM Parking Lot Maintenance | 0.00 | 0.00 | 0.00 |
| CAM Parking Lot Lighting | 6,970.42 | 0.00 | 6,970.42 |
| CAM Misc. Repairs & Maintenance | 0.00 | 4,468.50 | 4,468.50 |
| CAM Parking Lot Sweeping | 28,986.67 | 23,117.41 | 52,104.08 |
| CAM Professional Fees | 0.00 | 90,274.49 | 90,274.49 |
| CAM Travel | 0.00 | 1,417.82 | 1,417.82 |
| CAM Insurance Liability/Building | 0.00 | 80,081.08 | 80,081.08 |
| CAM Roofing Repairs | 0.00 | 6,400.00 | 6,400.00 |
| CAM Elevator Maintenance | 0.00 | 11,995.11 | 11,995.11 |
| CAM Painting | 0.00 | 0.00 | 0.00 |
| Other Professional Fees | 0.00 | 0.00 | 0.00 |
| Management Fees | 50,000.00 | 0.00 | 50,000.00 |
| Outside Services | 0.00 | 0.00 | 0.00 |
| Office Expenses | 0.00 | 0.00 | 0.00 |
| Legal Fees | 0.00 | 29,232.80 | 29,232.80 |
| Accounting | 0.00 | 5,000.00 | 5,000.00 |
| Gifts/Xmas | 0.00 | 0.00 | 0.00 |
| **Subtotal** | **190,810.77** | **431,589.47** | **622,400.24** |
| Admin Fee 15% | 0.00 | 0.00 | 1,049,561.00 |
| **Total CAM Expenses** | **190,810.77** | **431,589.47** | **1,671,961.24** |
| Sears' PRS | 50.00% | 50.00% | 50.00% |
| **PRS CAM Expenses** | **95,405.39** | **215,794.74** | **835,980.62** |
| **Less Prior Payments** | **0.00** | **0.00** | **(115,335.00)** |
| **Total CAM Due (Credit)** | **95,405.39** | **215,794.74** | **720,645.62** |

| 2009 Expense Item | Per Landlord Flatbush Center | Per Landlord Flatbush Delaware | Total |
|---|---|---|---|
| CAM Utilities | 23,152.17 | 46,040.56 | 69,192.73 |
| CAM Telephone /Alarm System | 0.00 | 3,902.84 | 3,902.84 |
| CAM Fire Protection | 0.00 | 864.78 | 864.78 |
| CAM Water/Sewer | 0.00 | 0.00 | 0.00 |
| CAM Security | 0.00 | 42,293.03 | 42,293.03 |
| CAM Wages | 14,850.00 | 14,850.00 | 29,700.00 |
| CAM Taxes/Benefits | 1,273.14 | 1,273.14 | 2,546.28 |
| CAM Workers Comp./Disab. | 0.00 | 0.00 | 0.00 |
| CAM Building Repairs | 0.00 | 1,306.50 | 1,306.50 |
| CAM Hardware/Supplies | 0.00 | 2,644.10 | 2,644.10 |
| CAM Locksmith Repairs | 0.00 | 0.00 | 0.00 |
| CAM Plumbing | 16,522.41 | 16,626.43 | 33,148.84 |
| CAM Sprinkler Repairs | 0.00 | 0.00 | 0.00 |
| CAM Electrical Maintenance | 0.00 | 0.00 | 0.00 |
| CAM Rubbish Removal | 0.00 | 0.00 | 0.00 |
| CAM Snow Removal | 26,843.73 | 21,567.82 | 48,411.55 |
| CAM Sidewalk Repairs | 0.00 | 0.00 | 0.00 |
| CAM Parking Lot Maintenance | 0.00 | 11,532.09 | 11,532.09 |
| CAM Parking Lot Lighting | 3,049.98 | 7,279.38 | 10,329.36 |
| CAM Misc. Repairs & Maintenance | 0.00 | 100.00 | 100.00 |
| CAM Parking Lot Sweeping | 28,058.50 | 18,017.30 | 46,075.80 |
| CAM Professional Fees | 0.00 | 225.00 | 225.00 |
| CAM Travel | 0.00 | 5,224.88 | 5,224.88 |
| CAM Insurance Liability/Building | 0.00 | 84,146.45 | 84,146.45 |
| CAM Roofing Repairs | 0.00 | 6,000.00 | 6,000.00 |
| CAM Elevator Maintenance | 0.00 | 24,761.42 | 24,761.42 |
| CAM Painting | 0.00 | 0.00 | 0.00 |
| CAM Contract Services | 0.00 | 28,400.00 | 28,400.00 |
| Inspection Fees | 0.00 | 350.00 | 350.00 |
| Other Professional Fees | 0.00 | 0.00 | 0.00 |
| Management Fees | 60,000.00 | 0.00 | 60,000.00 |
| Outside Services | 0.00 | 0.00 | 0.00 |
| Office Expenses | 0.00 | 0.00 | 0.00 |
| Legal Fees | 0.00 | 0.00 | 0.00 |
| Accounting | 0.00 | 5,000.00 | 5,000.00 |
| Gifts/Xmas | 0.00 | 500.00 | 500.00 |
| **Subtotal** | **173,749.93** | **342,905.72** | **516,655.65** |
| Admin Fee 15% | 0.00 | 0.00 | 0.00 |
| **Total CAM Expenses** | **173,749.93** | **342,905.72** | **516,655.65** |
| Sears' PRS | 50.00% | 50.00% | 50.00% |
| **PRS CAM Expenses** | **86,874.97** | **171,452.86** | **258,327.83** |
| **Less Prior Payments** | **0.00** | **0.00** | **(115,335.00)** |
| **Total CAM Due (Credit)** | **86,874.97** | **171,452.86** | **142,992.83** |

| 2012<br>Expense Item | Per Landlord<br>Flatbush Center | Per Landlord<br>Flatbush Delaware | Total |
|---|---|---|---|
| CAM Utilities | 11,165.19 | 33,866.49 | 45,031.68 |
| CAM Telephone /Alarm System | 0.00 | 5,846.55 | 5,846.55 |
| CAM Fire Protection | 0.00 | 863.20 | 863.20 |
| CAM Water/Sewer | 0.00 | 0.00 | 0.00 |
| CAM Security | 29,016.45 | 29,016.51 | 58,032.96 |
| CAM Wages | 0.00 | 0.00 | 0.00 |
| CAM Taxes/Benefits | 0.00 | 0.00 | 0.00 |
| CAM Workers Comp./Disab. | 0.00 | 0.00 | 0.00 |
| CAM Building Repairs | 1,200.00 | 900.00 | 2,100.00 |
| CAM Hardware/Supplies | 52.52 | 334.52 | 387.04 |
| CAM Locksmith Repairs | 0.00 | 0.00 | 0.00 |
| CAM Plumbing | 0.00 | 0.00 | 0.00 |
| CAM Sprinkler Repairs | 0.00 | 0.00 | 0.00 |
| CAM Electrical Maintenance | 452.64 | 0.00 | 452.64 |
| CAM Rubbish Removal | 0.00 | 0.00 | 0.00 |
| CAM Snow Removal | 0.00 | 0.00 | 0.00 |
| CAM Sidewalk Repairs | 0.00 | 0.00 | 0.00 |
| CAM Parking Lot Maintenance | 919.43 | 0.00 | 919.43 |
| CAM Parking Lot Lighting | 4,182.53 | 3,015.57 | 7,198.10 |
| CAM Misc. Repairs & Maintenance | 110.00 | 360.00 | 470.00 |
| CAM Parking Lot Sweeping | 0.00 | 0.00 | 0.00 |
| CAM Professional Fees | 0.00 | 0.00 | 0.00 |
| CAM Travel | 0.00 | 0.00 | 0.00 |
| CAM Insurance Liability/Building | 0.00 | 84,261.34 | 84,261.34 |
| CAM Roofing Repairs | 0.00 | 0.00 | 0.00 |
| CAM Elevator Maintenance | 0.00 | 16,905.09 | 16,905.09 |
| CAM Painting | 232.89 | 0.00 | 232.89 |
| CAM Contract Services | 0.00 | 0.00 | 0.00 |
| CAM Parking Lot Pylon Sign | 2,025.08 | 0.00 | 2,025.08 |
| CAM Sewer Plant Maintenance | 0.00 | 816.56 | 816.56 |
| Inspection Fees | 0.00 | 0.00 | 0.00 |
| Other Professional Fees | 0.00 | 0.00 | 0.00 |
| Management Fees | 60,000.00 | 0.00 | 60,000.00 |
| Outside Services | 0.00 | 0.00 | 0.00 |
| Office Expenses | 0.00 | 0.00 | 0.00 |
| Legal Fees | 0.00 | 0.00 | 0.00 |
| Accounting | 0.00 | 5,000.00 | 5,000.00 |
| Gifts/Xmas | 0.00 | 0.00 | 0.00 |
| **Subtotal** | 109,356.73 | 181,185.83 | 290,542.56 |
| Admin Fee 15% | 0.00 | 0.00 | 0.00 |
| **Total CAM Expenses** | 109,356.73 | 181,185.83 | 290,542.56 |
| Sears' PRS | 50.00% | 50.00% | 50.00% |
| **PRS CAM Expenses** | 54,678.37 | 90,592.92 | 145,271.28 |
| **Less Prior Payments** | 0.00 | 0.00 | (115,335.00) |
| **Total CAM Due (Credit)** | 54,678.37 | 90,592.92 | 29,936.28 |