UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

In re:                                                          : Chapter 11
SEARS HOLDINGS CORPORATION, et al.,                             : Case No. 18-23538 (RDD)
                                                                : (Jointly Administered)
                Debtors.:                                       :
                                                                :
------------------------------------------------------------------------x **Adversary Proceeding**
BRIAN COKE NG,                                                  : **No. _____**
                              Plaintiff,                        :
        v.                                                      :
                                                                :
SEARS HOLDINGS CORPORATION,                                     :
KMART HOLDING CORPORTION, ("**Debtors**")                       :
and PDX, INC./NATIONAL HEALTH                                   :
INFORMATION NETWORK, INC.("NHIN") **Non-Debtors**               : Jury Trial Demanded
                              Defendants                        :
------------------------------------------------------------------------x

## COMPLAINT

Plaintiff Brian Coke Ng, presents his Complaint against Defendants Sears Holdings Corporation, Kmart Holding Corporation, and PDX, INC/NHIN. respectfully alleges, on knowledge and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This Adversary proceeding had set forth a Pre-petition claim(s), and a Post-petition claim(s), reflecting in separate occurrences, occasions and instances as shown and demonstrated herein. A proof of claim had been made and already had filed with this court on March 1, 2019, and is currently on the debtor's claim register ("**Claim# 9234**"). There are ongoing disputes between these parties, that required judicial intervention and involvement. On April 11, 2019, the Plaintiff had received an email correspondence from the debtors attorney(s), to which reads in separate parts, on quote: "*I am not aware of any basis under federal law for bringing an adversary proceeding in Sears chapter 11 cases by creditor against a non-debtor like PDX. You and PDX should deal with your dispute outside of these cases.*". See a copy of such email at **Exhibit (1)** hereto.

2.      This action arises from the Defendants willful and malicious conduct to which caused injury to the Plaintiff. The Defendants and their conduct had aggravated and exacerbated the Plaintiff's preexisting medical conditions and caused the Plaintiff ongoing physically sickness and to suffer disabling asthma, mental anguish, emotional distress and depression after their acts on August 22, 2018, August 27, 2018, and November 6, 2018, respectively. Defendants Kmart pharmacy had provided Plaintiff with piece-meal medical records with various alterations and falsifications. The Defendants Kmart pharmacy had displayed malice, in response to N.Y.S Supreme Court Order issued with a Judicial Subpoena Duces Tecum dated June 29, 2018, to the Defendants Sears Holdings Corporation and Kmart Holding Corporation Pharmacy ("Kmart Pharmacy"). The Defendants malice was tailored specifically to cause injury to the Plaintiff.

3.      The Subpoena had specifically requested and demanded the following: "*Certified copy of each and every part of medication profile and all records maintained relating to the Plaintiff Brian Coke Ng, including all reports, notes, mental health information, known allergies and drug reactions, chronic distress, list of medications and relevant devices and other information reported to the pharmacist appropriate for counseling an individual regarding use of prescription and over-the-counter drugs, and a certified copy of Kmart Pharmacy Notice of Privacy Practices with effective date September 2, 2014, as well as a certified copy with effective date January 6, 2015, respectively.*" See copy of the Judicial Subpoena at **Exhibit (2)**

4.      The defendants and their Kmart Pharmacy had used the PDX Pharmacy Management Software/Application in an attempt to retrieve the plaintiff's Medical Records. However, they did not complied with the Judicial Subpoena that had been issued by Honorable Judge David B. Cohen. The PDX Pharmacy Management Software/Application is defective, in that, in order to cover-up a certain occurrence made on two (2) separate occasions, to which had truncated the Patient Education Monographs 8 paragraph text to zero (0) or no paragraph, the PDX Pharmacy Management Software/Application was modified in such way, to which later, on August 22, 2018, August 27, 2018, and November 6, 2018, created medical record documents with misleading, altered and false information.

5.    Upon attempting to retrieve the Plaintiff Medical Records, that has been demanded in the Judicial Subpoena, the Defendants Kmart Pharmacy had then provided a partial medical records reflecting fraudulent, fabricated, and falsified information with deceitful intent, all of which was created by PDX Pharmacy Management Application and delivered to Plaintiff.

6.    Of course, it is one hell of a thing for someone/something to find ways somehow, human or otherwise, to modified the PDX Pharmacy Management Software/Application to allow the Kmart Pharmacy to distribute Patient Education Monographs that automatically omitted warnings of serious risks. In any event, it s well known, or should be known, that by enabling the Defendant's Kmart Pharmacy to print patient education monographs with zero "0" or no warnings or with no patient education whatsoever, could indeed place patients at risk. **But,** it has turn into a different thing now, went right back and fabricate, fraudulently, and falsify the same medical records with deceitful intent, and did such a thing from PDX Pharmacy Management Software/Application. That is exactly what had occurred here. This matter now before this court.

7.    PDX, Inc. assumed a duty of care by undertaking to render services to Kmart Pharmacy, of a kind, it should have recognized as necessary for the protection of third person. See (*Artiglio, Supra. 18 Cal. 4th at* p.604). See also a copy of PDX/NHIN Documents filed with this court on January 25, 2019 at **Exhibit (4)**, hereto.

8.    This is an adversary proceeding seeking no less than $10 million dollars in damages for **(1)** Intentional infliction of emotional distress, and Aggravation and Exacerbation Bronchial asthma attacks **(2)** Intentional Misrepresentation/Fraud/Constructive Fraud **(3)** Violation of Section 349 of the New York General Business Law, **(4)** Product Liability, and **(5)** Negligence.

## THE PARTIES

9.      Brian Coke Ng, is the Plaintiff Pro Se, with address at 40 Ann Street, N.Y, N.Y. 10038 and mailing address at Church Street Station, P.O. Box 2723, New York, N.Y. 10008.

10.     Upon information and belief, the Defendant(s) Sears Holdings Corporation is the parent company of Kmart Holding Corporation, Defendant(s) Sears Holding Corporation is a Delaware Corporation with its principal place of business located at 3333 Beverly Road, Hoffman Estates, Illinois 60179, the Defendants operate one of their pharmacy (Kmart Pharmacy") #7777 at 770 Broadway, New York, N.Y. 10003.

11.     Upon information and belief, the Defendant(s) PDX, Inc/NHIN. is a Texas Corporation with its principal place of business located at 101 Jim Wright Freeway South, Suite 200, Fort Worth, TX 76108. PDX, Inc. ("PDX") is a developer and licensor of Software. PDX, Inc. sells Pharmacy Management Software. National Health Information Network, Inc. hereinafter ("NHIN") has the same address as PDX. NHIN Absolute AR software is the accounts receivable software and necessary for the customer's pharmacy to process claims and reporting.

## VENUE AND JURISDICTION

12.     On October 15, 2018, the Defendants filed voluntary petitions for relief under Chapter 11 of Title 11of the United States Code (11 U.S.C. § 101, *et seq.,* hereinafter, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1409(a).

13.     This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 1334(b) and (e). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Resolution of the claims herein will critically affect the debtors' reorganization, the value of the debtors' estates and any distribution to the debtors' creditors. Pursuant to 28 U.S.C.

§§ 157(a) and 28 U.S.C. §§ 157(b)(1) and the District Court's reference of proceedings to the Bankruptcy Court, the Bankruptcy Court may exercise such subject matter jurisdiction.

14.    This Adversary Proceeding has been brought in accordance with Fed. R. Bankr. P. 7001, for the kinds of debt specified in 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 523(a)(6).

## FACTUAL ALLEGATIONS/BACKGROUND

### License Agreements Between PDX, Inc. and Kmart Corporation

15.    Business relationship and license agreements between PDX, Inc. and Kmart Corporation was established on or about June 14, 1991, and since that time has been developed. See copy of such agreements at **Exhibit (3)** hereto

16.    PDX, Inc. and Kmart Corporation business relationship and license agreements had continued to developed over time. On January 25, 2019, PDX and NHIN filed and moved this court with their "*LIMITED OBJECTION OF NATIONAL HEALTH INFORMATION NETWORK, INC AND PDX, INC. TO NOTICE OF CURE COSTS AND POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS IN CONNECTION WITH GLOBAL SALE TRANSACTION*". In separate parts of their objection, NHIN/PDX had explained and stated, on quote: "*Prior to the petition Date, Debtors entered into four (4) executory contracts with NHIN and PDX. PDX, Inc. is a company that sells pharmacy management software. The implementation and use of PDX pharmacy software requires the corresponding use of the NHIN Drug File service. The contracts are summarized as follows:*

- *PDX, Inc. Software and License Agreement (the "License Agreement"): License agreement for use of proprietary PDX software for pharmacy management services.*
- *PDX Inc. HIPPA Agreement (the "HIPPA Agreement"): In connection with the implementation of the PDX and NHIN software, certain protected health information ("PHI") would be disclosed and exchanged. The purpose of this agreement is to provide satisfactory that the requisite safeguards to the privacy and security of that PHI in compliance with applicable provisions of the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191("HIPAA") and the HIPAA administrative simplification regulations.*

- *NHIN Drug File Services Agreement (the "Drug File Services Agreement"): The Database utilized in connection with the PDX software; it is a comprehensive database containing (i) descriptive, pricing, clinical, patient education, and Medicaid drug eligibility information regarding prescription drugs and selected over-the-counter products, and (ii) extensive information of physicians, dentists, podiatrists, and mid-level practitioners.*

- *NHIN Absolute$^{AR}$ Services (the "A/R Agreement"): NHIN will make available to Customer via the NHIN website or on DVDs Customer's NHIN reports generated from the sales and payment application of the ANSI X12 835 files. This software is the accounts receivable software and necessary for the Customer's pharmacy to process claims and reporting.*

17.    NHIN/PDX had further explained in their objection papers, and stated on quote: *"Each of the four contracts, the License Agreement, the HIPPA Agreement, the Drug File Services Agreement, and the A/R Agreement (collectively, the "contracts") are inter-related and work together. Three of the four contracts are required for the customer to effectively use the program. The License Agreement is akin to a "search engine." The Drug File Services Agreement is the "data." The HIPPA Agreement is necessary to avoid violation of federal health privacy regulations in the use of the software. These three Contracts work together and would not work separately. The A/R Agreement for billing and claims processing is a standalone service offering which can be used in conjunction with PDX pharmacy software or other proprietary pharmacy management systems.".* See a copy of NHIN/PDX objection papers, (Docket No. 1910), that was filed with this court on January 25, 2019, **at Exhibit (4)**.

### Plaintiff's Response To NHIN/PDX objection papers Dated January 25, 2019, (Docket No. 1910) And Address NHIN/PDX Assumption Of Risk/Duty Of Care

18.    First, NHIN/PDX, Inc. had provided the PDX Pharmacy Management Application (PMA), to which used at the defendant's Kmart Pharmacy to accomplish various tasks. NHIN/PDX had repeatedly used the term "software" with respect to the agreement(s) concerning Pharmacy Management. For clarity, software is an application if it is executable. Application performs specific tasks or variety of tasks, that's it main goal. There are many tasks performed during Pharmacy Management. So, if software is not executable, then it cannot be considered to be an application.

19.    Second, NHIN/PDX, Inc. had stated in separate parts of their objection papers the purpose of certain agreements, to which reflects upon the needs for **"satisfactory assurance"** pertaining to requisite, necessary, obligatory, mandatory, vital, and essential **"safeguards"** to the **"privacy"** and **"security"** of **"protected health information"** (PHI). NHIN/PDX, Inc. had assumed a duty of care. However, upon the various occurrences on August 22, 2018, August 27, 2018, and November 6, 2018, as detailed below and demonstrated and shown herein, there was a failure on the part of NHIN/PDX, Inc. to recognize or exercise any duty of care as they have explained and described in their objection papers dated January 25, 2019.

20.    The definition of Protected Health Information (PHI) is broadly encompassing as defined by HIPAA. Protected Health Information means individually identifiable health information:

  (1)  Except as provided in paragraph (2) of this definition, that is:

    (i)   Transmitted by electronic media;

    (ii)  Maintained in electronic media; or

    (iii) Transmitted or maintained in any other form or medium.

21.    It is true, that, many records kept in pharmacies meet the definition of PHI, including prescription records, billing records, patient profiles, and counseling records. Hence, pharmacy systems must satisfy HIPAA standards for **"privacy"** and **"security"**. Additionally, PHI is not restricted to electronic media or transmissions; and an oral communication of individually identifiable health information constitutes PHI.

22.    Third, NHIN/PDX, Inc. had made reference to **"ANSI X12 835"** files. The Plaintiff would like to clarify that and state it properly for this court to better understand. The proper way to put this is: EDI ANSI X12, which Stands for the following: Electronic Data Interchange. American National Standards Institute X12. The EDI ANSI X12 standard was developed to govern the use of EDI to exchange information electronically between businesses.

23.     The Plaintiff would also like to clarify the reference made to "**835**". The proper way to put that one correctly, is: EDI 835. In healthcare, the EDI 835 transaction set is called Health Care Claim Payment and Remittance Advice. It has been specified by HIPAA 5010 requirements for the electronic transmission of healthcare payment and benefit information. The EDI 835 is used primarily by healthcare insurance plans to make payments to healthcare providers, to provide Explanations of Benefits (EOBs) or both. When a healthcare service provider submits an 837 Health Care Claim, the insurance plan uses the 835 to detail the payment to that claim, including:

- What charges were paid, reduced or denied, if any;

- Whether there was a deductible, co-insurance, co-pay, etc.

- Any bundling or splitting of claims or line items;

- How the payment was made, such as through a clearinghouse

It is true, that a particular 835 EDI healthcare document may not necessarily match up one-for-one with a specific 837. In fact, it is not uncommon for multiple 835 transactions to be used in response to a single 837, or for one 835 to address multiple 837 submissions. As a result, the 835 is important to healthcare providers, to track what payments were received for services they provided and billed.

24.     Fourth, according to NHIN/PDX, Inc. "Prior to the Petition Date, the Debtors entered into four (4) executory contracts with NHIN and PDX, Inc.", One of those contracts summarized as the NHIN Absolute$^{AR}$ Services (the "A/R Agreement"). Upon information and believe, the Absolute$^{AR}$ Services is Accounts Receivable to which offers a full service pharmacy submission and transaction level reconciliation package to chain and independent pharmacies, and processing over 14 million claims monthly.

25.     The matter in this current case, involved very serious occurrences on August 22, 2018, August 27, 2018, and November 6, 2018. It is not a situation of some unapplied cash ended-up somewhere in Account Receivable Records. It is a defective PDX software/application.

26.    As described and shown below in the attached documents/records there are alterations and falsification and misleading fraudulent information in the plaintiff's medical records. For example:

- The documents and records created by the PDX Pharmacy management application(s) and/or software and program(s), are currently showing incorrect amounts paid and/or received;

- The documents and records created by the PDX Pharmacy management application(s) and/or software and program(s), are currently showing fictitious names of insurance carrier, fictitious plan, fictitious group, and fictitious cardholder ID, etc.;

- The documents and records created by the PDX Pharmacy management application(s) and/or software and program(s), are currently showing that the Medicaid information and details had been moved out, gone, and disappeared;

- In the Plaintiff case here at hand, there were five (5) separate transactions, those to which the plaintiff had presented his Medicaid card each time prescription was filled. The plaintiff original receipts shows and indicated that a claim was submitted processed, to which the plaintiff had then received printed insurance information each time prescription was filled, and the co-payment were made. The fact that, there are now various inconsistencies and discrepancies upon retrieving the plaintiff's medical records, also pointed to the defects in design and clearly reflects that PDX Pharmacy Management application and/or software has been modified. So much defective, it is unable to retrieve an accurate truthful medical records upon any request(s) the plaintiff had made.

- Again, the Absolute[AR] Services is Accounts Receivable to which offers a full service pharmacy submission and transaction level reconciliation package to chain and independent pharmacies, and processing over 14 million claims monthly. The general public cannot, should not be subjected to these kinds of things as a result of a modified, defective PDX Pharmacy Management Application/Software.

- Based upon information and belief, from time to time Absolute AR Account Representative(s) at National Health Information, Inc. are required to review unprocessed Electronic Remittance Advice (ERA) files and remove any duplicate files, and also required to enter CRM cases for tracking of missing days sales files

- Based upon information and belief, from time to time Absolute AR Account Representative(s) at National Health Information, Inc. are responsible for all task involved with the identification of missing days sales files, as well as responsible for recovering missing day(s) sales files;

- Based upon information and belief, from time to time Absolute AR Account Representative(s) at National Health Information, Inc. are required to research payment(s) that posted in unapplied cash as no Carrier match;

- As to benefit the best of public interests and the growing concerns, as well as for the plaintiff's review, the plaintiff requesting that NHIN/PDX, Inc. at their own expenses, to produce and provide a current up to date Independent Accountant's Report reflecting the PDX Pharmacy Management Application/Software and all other applicable Pharmacy System to show compliance with the Pharmacy Management Application criteria specified in 21 CFR parts 1300, 1304, 1306, 1311and up to current date, Electronic Prescriptions for Controlled Substances Final Rule, established by the Drug Enforcement Administration (DEA) of the U.S. Department of Justice.

27.    Plaintiff unable to have peaceful way of life and satisfied. From a customer perspective, and an individual member of the consuming public, the plaintiff had found nothing "**satisfactory**" about the occurrences at the Defendants Kmart Pharmacy on August 22, 2018, August 27, 2018 and November 6, 2018, In fact, there are nothing to support any "**Assurance**" for "**Safeguard**" to "**Privacy**" and "**Security**" as NHIN/PDX, Inc. had claimed in their objection papers (Docket No. 1910), filed with this court on January 25, 2019.

## REASONABLE ALTERNATIVE DESIGN PLAN

28. In order to developed good reasonable alternative design as it relates to the PDX Pharmacy Management System and the Absolute$^{AR}$ Services, the plaintiff suggest the following:

- Invest properly in good quality technology, consider modern Pharmacy Management system(s), hire competent, qualified and experience people to work;
- Improved on efficiency, accuracy, improve patient experience, promote and improve greater patient care, and convenience, exceed patient expectations;
- Improve and provide for positive satisfactory assurance that the requisite safeguards to the privacy and security of people PHI in compliance with applicable provisions of HIPAA, Public law 104-191 and administrative specification regulations; Maintain system flags and proactive system monitoring

29.    Plaintiff unable to have peaceful way of life and satisfied. From a customer perspective, and an individual member of the consuming public, the plaintiff had found nothing "**satisfactory**" about the occurrences at the Defendants Kmart Pharmacy on August 22, 2018, August 27, 2018 and November 6, 2018, In fact, there are nothing to support any "**Assurance**" for "**Safeguard**" to "**Privacy**" and "**Security**" as NHIN/PDX, Inc. had claimed in their objection papers (Docket No. 1910), filed with this court on January 25, 2019.

### Fiduciary Relationship Was Established Between
### Plaintiff and Defendants Kmart Pharmacy

30.     As early as May 15, 2010, Plaintiff was established as a pharmacy customer of the Defendant(s) Kmart Corporation, Kmart Holding Corporation/Sears Holding Corporation, in which he became an individual member of the consuming public that purchases pharmaceutical products from the Defendant's pharmacy (**"Kmart Pharmacy"**). As an individual member of the consuming public that purchased pharmaceutical products from the Defendant's Kmart pharmacy, Plaintiff, as did the consuming public, had and relied upon his confidential relationship with the Defendant's Kmart pharmacy and their employees regarding the purchase of his pharmaceutical products, and, as well as keeping the Plaintiff's confidential information accurate, safe and secure, and out of the hands of unauthorized person(s).

### The Medical Information Sheets/Patient Education Monographs Printouts

31.     On 05/15/2010, 06/14/2010, 07/16/2010, 08/16/2010, the Defendants through its Kmart pharmacy, sold the Plaintiff the generic drug named Sertraline HC, and on 09/17/2010 sold Plaintiff the generic drug named Bupropn HCL. Each time on 05/15/2010, 08/16/2010, and 09/17/2010, that the Kmart pharmacy sold Plaintiff these drugs, the Kmart pharmacy provided Plaintiff with an information sheets/printouts that informed him of the risks of the drug(s), but went further to confirmed among other things the pharmacy address and contact telephone number, the patient's name, address and telephone number on file, the name and date that the drug was dispensed and the full name and initials of the pharmacist who filled and did the final check on the prescription, the prescription numbers, the retail price of the drug(s), the NDC numbers, the name of the doctor who prescribed the drugs, the insurance reference numbers from each third party payer(s), the copay amounts, and accompanying copyright notice on three (3)

separate information sheets indicating that Wolters Kluwer Health, Inc. is the copyright owner, and that "all rights reserved". Specifically, the Defendant's Kmart pharmacy, had provided information sheets with representation(s) in separate parts among other things, as following:

- *Prescription fill date: 05/15/2010; Pharmacist's name: John Hellyer, ("JEH"); Ins. Ref. No# ERX5761501992; Copay: $15.00, Retail Price: $83.79";*
- *Prescription fill date: 06/14/2010: "Pharmacist's name: Marc Speert, ("MLS"); Ins. Ref. No# ERX4601116158; Copay: $15.00, Retail Price: $83.79". Notably, the pharmacist written counseling was not completed on that information sheet;*
- *Prescription fill date: 07/16/2010: "Pharmacist's name: John Hellyer, ("JEH"); Ins. Ref. No# ERX3499824459; Copay: $15.00, Retail Price: $84.79". Notably, the pharmacist written counseling was not completed on that information sheet;*
- *Prescription fill date: 08/16/2010: "Pharmacist's name: Tania Li, ("TRL"); Ins. Ref. No# ERX11311793821; Copay: $15.00, Retail Price: $84.79".*
- *Prescription fill date: 09/17/2010: Pharmacist's name: Darshanie Sankar, ("DVS"); Ins. Ref. No# ERX00006845177701; Copay: $33.63, Retail Price: $159.97".*

32.     But notably, on 06/14/2010, and 07/16/2010, the medical information sheets provided to the Plaintiff was created differently. Specifically, the Defendant's Kmart Pharmacy, provided the following stand-alone representations, instructions or counseling, which do not include anything as like previous and/or subsequent information. Each medical information sheets/printouts documents of 06/14/2010, and 07/16/2010, reads in separate parts as follows:

*"Call your doctor for medical advice about side effects. You may report side effects to    FDA at 1-800-FDA-1088."*

*"Follow directions. Do not stop without Dr. approval May cause drowsiness. Do not    mix with alcohol Use caution when driving or operating machinery Not recommended    for use while breast feeding Notify your Dr if you intend to become pregnant Check  with  Dr.  before  taking  any other medicine Promptly report unusual symptoms/effects to    Dr If condition persists or worsens notify Dr"*

33.   At all times relevant, Plaintiff relied upon the above written representations, instructions or counseling provided by the Defendants Kmart Pharmacy in deciding to consume the medications sold to the plaintiff by the Defendants Kmart Pharmacy, and for workers' compensation reimbursement purposes. The plaintiff would not have relied on those representations had they shown any signs of inconsistency, falsification, fraud, fabrication or deceitfulness in the very beginning or during the time of all purchase transactions.

34.   There are medical circumstances to which required a complete review of all the Plaintiff's medical records to which located at the Defendants Kmart Pharmacy place of business, and to which under their control. The records also was needed in order to assess damages as a result of Defendants Kmart Pharmacy and other(s).

## Kmart And Sears Authorization For Use And Disclosure

35.   The Defendants Pharmacy provided the Plaintiff with their Authorization For Use And Disclosure form to be completed in order to release all the Plaintiff medical records. Notably, the Defendants clearly stated in separate parts, the following: ("Note: We do **NOT** have records over 10 years old).

## The Patient's Medical Records

36.   The "Patient Records" (as defined in section 101 (40B) of the Bankruptcy Code) are vitally important documents in the health care industry and as such are subject to stringent Federal and State Confidentiality and disclosure regulations.

37.    It has been since September 17, 2010, and on many other occasions during the fiduciary relationship between Defendants Kmart pharmacy and Plaintiff, that the Plaintiff has been requesting a copy of all his electronic medical records from the Defendants Kmart Pharmacy. Later, on March 21, 2018, the plaintiff was forced to take legal steps, and filed a Request For Judicial Intervention with New York State Supreme Court, New York County in an effort to get a Court Order, to demand plaintiff's medical records in all its entirety and totality from this defendants Kmart pharmacy.

## Judicial Subpoena Duces Tecum Dated June 29, 2018, So Ordered and Signed By Honorable David B. Cohen

38.    On June 29, 2018, New York State Supreme Court, New York County had issued a "So Ordered Judicial Subpoena Duces Tecum" with all of its accompanying attachments, this has been Ordered by Honorable. David B. Cohen.

39.    A total of three (3) separate times, the Defendants Kmart Pharmacy was served with the Judicial Subpoena Duces Tecum dated June 29, 2018. The Plaintiff had hired a process server, who had served the Defendants Kmart pharmacy on July 10, 2018, July 11, 2018, and July 13, 2018, respectively. The total costs to served the Subpoena Duces Tecum dated June 29, 2018, by the process server, total amounts $128.00 dollars, the process server company was paid $80.00 and the remaining balance left is $48.00, and up to the date of writing this adversary proceeding document, is still currently due and owing to the Nationwide Court Services, Inc.

## (A) Partial Medical Records via Fax on August 22, 2018 and August 27, 2018

40.    On August 22, 2018, and August 27, 2018, respectively, the Defendants Kmart pharmacy willfully and maliciously created/provided the Plaintiff via fax, a partial medical record(s)/documents with various alterations and falsifications, in an all out campaign and effort made, to which the defendants Kmart Pharmacy had a complete subjective motive to inflict

injury upon the Plaintiff, and had very well knew that the injury was substantially certain to occurred as a result of their willful and malicious conduct.

41.     In a lack of consideration and unkindness, the Defendants on August 22, 2018, and August 27, 2018, had intentionally cause physical sickness upon the Plaintiff. The Defendants had provided the Plaintiff with an outrageous and extreme detail copy of Medical information sheets/printouts records, all of which have been altered and falsified and do not match the previous original information sheets/monographs/printouts records documents.

## Alterations and Falsifications Of The Medical Information Sheets/Printouts Records Created And Provided On August 22, 2018 and August 27, 2018

42.     Over eight **(8)** years later, on the medical information sheets/printouts and records pertaining to the purchased of **BUPROPN/BUPROPION**, at relevant times, all to which the Defendants had created, generated and provided on August 22, 2018, and August 27, 2018, are clearly showing alterations, modifications and falsifications, and, each specifically reads conflicts to the previous, on section to sections, paragraph to paragraphs and in great length and details, as follows:

"WARNING: Drugs like this one have raised the chance of suicidal thoughts or actions in children and young adults. The risk may be greater in people who have had these thoughts or actions in the past. All people who take this drug need to be watched closely. Call the doctor right away if signs like low mood (depression), nervousness, restlessness, grouchiness, panic attacks, or changes in mood or actions are new or worse. Call the doctor right away if any thoughts or actions of suicide occur. COMMON USES: It is used to treat low mood (depression). It is used to treat seasonal affective disorder (SAD). It may be given to you for other reasons. Talk with the doctor.

BEFORE USING THE MEDICINE: WHAT DO I NEED TO TELL MY DOCTOR BEFORE I TAKE THIS DRUG? TELL YOUR DOCTOR: If you have an allergy to bupropion or any other part of this drug. TELL YOUR DOCTOR: If you are allergic to any drugs like this one, any other drugs, foods, or other substances. Tell your doctor about the allergy and what signs you had, like rash; hives; itching; shortness of breath; wheezing; cough; swelling of face, lips, tongue, or throat; or any other signs. TELL YOUR DOCTOR: If you have ever had seizures. TELL YOUR DOCTOR: If you drink a lot of alcohol and you stop drinking all of a sudden. TELL YOUR DOCTOR: If you use certain other drugs like drugs for seizures or anxiety and you stop using them all of a sudden. TELL YOUR DOCTOR: If you ever had an eating problem like anorexia or bulimia. TELL YOUR DOCTOR: If you have any of these health problems: Kidney disease or liver disease. TELL YOUR DOCTOR: If you have taken

certain drugs used for low mood (depression) like isocarboxazid, phenelzine, or tranylcypromine or drugs used for Parkinson's disease like selegiline or rasagiline in the last 14 days. Taking this drug within 14 days of those drugs can cause very bad high blood pressure. TELL YOUR DOCTOR: If you are taking any of these drugs: Linezolid or methylene blue. TELL YOUR DOCTOR: If you are taking another drug that has the same drug in it. This is not a list of all drugs or health problems that interact with this drug. Tell your doctor and pharmacist about all of your drugs (prescription or OTC, natural products, vitamins) and health problems. You must check to make sure that it is safe for you to take this drug with all of your drugs and health problems. Do not start, stop, or change the dose of any drug without checking with your doctor.

HOW TO USE THIS MEDICINE: HOW IS THIS DRUG BEST TAKEN? Use this drugs as ordered by your doctor. Read all information given to you. Follow all instructions closely. Do not take this drug more often than you are told. This may raise the risk of seizures. Be sure you know how far apart to take your doses. Take in the morning if taking once a day. Take with or without food. If you are not able to sleep, do not take this drug too close to bedtime. Talk with your doctor. Swallow whole. Do not chew, break or crush. To gain the most benefit, do not miss doses. Keep taking this drug as you have been told by your doctor or other health care provider, even if you feel well. If you have trouble swallowing, talk with your doctor. HOW DO I STORE AND/OR THROW OUT THIS DRUG? Store at room temperature. Protect from light. Store in a dry place. Do   not store in a bathroom. Keep all drugs in a safe place. Keep all drugs out of the reach of children and pets. Throw away unused or expired drugs. Do not flush down a toilet or pour down a drain unless you are told to do so. Check with your pharmacist if you have questions   about the best way to throw out drugs. There may be drug take-back programs in your area. WHAT DO I DO IF I MISS A DOSE? Skip the missed dose and go back to your normal time. Do not take 2 doses at the same time or extra doses.

CAUTIONS: For all patients taking this drug: Tell all of your health care providers that you take this drug. This includes your doctors, nurses, pharmacists, and dentists. Avoid driving and doing other tasks or actions that call for you to be alert or have clear eyesight until you see how this drug affects you. This drug may affect certain lab tests. Tell all of your health care providers and lab workers that you take this drug. Do not stop taking this drug all of a sudden without calling your doctor. You may have a greater risk of side effects. If you need to stop this drug, you will want to slowly stop it as ordered by your doctor. High blood pressure has happened with this drug. Have your blood pressure checked as you have been told by your doctor. This drug may raise the chance of seizures. The chance may be higher in people who have certain health problems, use certain other drugs, or drink a lot of alcohol. Talk to your doctor if you have a greater chance of seizures while taking this drug. Avoid drinking alcohol while taking this drug. Talk with your doctor before you use other drugs and natural products that slow your actions. It may take several weeks to see the full effects. Some people may have a higher chance of eye problems with this drug. Your doctor may want you to have an eye exam to see if you have a higher chance of these eye problems. Call your doctor right away if you have eye pain, change in eyesight, or swelling or redness in or around the eye. If you are taking digoxin, talk with your doctor. You may need to have your blood work checked more closely while you are taking it with this drug. This drug is not approved for use in children. Talk with the doctor. If you are 65 or older, use this drug with care. You could have more side effects. Tell your doctor if you are pregnant or plan on getting pregnant. You will need to talk about the benefits and risks of using this drug while you are pregnant. Tell your doctor if you are breast-feeding. You will need to talk about any risks to your baby. If you smoke: Not all products are approved for use to help stop

smoking. Talk with the doctor to make sure that you have the right product. New or worse mental, mood, or behavior problems have happened when bupropion has been used to stop smoking. These problems include thoughts of suicide or killing someone else, depression, forceful actions, fury, anxiety, and anger. These problems have happened in people with and without a history of mental or mood problems. Talk with the doctor.

POSSIBLE SIDE EFFECTS: WHAT ARE SOME SIDE EFFECTS THAT I NEED TO CALL MY DOCTOR ABOUT RIGHT AWAY? WARNING/CAUTION: Even though it may be rare, some people may have very bad and sometimes deadly side effects when taking a drug. Tell your doctor or get medical help right away if you have any of the following signs or symptoms that may be related to a very bad side effect: Signs of an allergic reaction, like rash; hives; itching; red, swollen, blistered, or peeling skin with or without fever; wheezing; tightness in the chest or throat; trouble breathing, swallowing, or talking; unusual hoarseness; or swelling of the mouth, face, lips, tongue, or throat. Signs of high blood pressure like very bad headache or dizziness, passing out, or change in eyesight. Change in how you act. Feeling confused. Hallucinations (seeing or hearing things that are not there). If seizures are new or worse after starting this drug. A big weight gain or loss. Chest pain or pressure or a fast heartbeat. A heartbeat that does not feel normal. Swelling. Shortness of breath. Change in hearing. Ringing in ears. Passing urine more often. Swollen gland. Trouble moving around. Very bad muscle or joint pain. A very bad skin reaction (Stevens- Johnson syndrome/toxic epidermal necrolysis) may happen. It can cause very bad health problems that may not go away, and sometimes death. Get medical help right away if you have signs like red, swollen, blistered, or peeling skin (with or without fever); red or irritated eyes; or sores in your mouth, throat, nose, or eyes. WHAT ARE SOME OTHER SIDE EFFECTS OF THIS DRUG? All drugs may cause side effects. However, many people have no side effects or only have minor side effects. Call your doctor or get medical help if any of these side effects or any other side effects bother you or do not go away: Dizziness. Headache. Belly pain. Shakiness. Feeling nervous and excitable. Strange or odd dreams. Upset stomach or throwing up. Hard stools (constipation). Gas. Dry mouth. Not able to sleep. Muscle or joint pain. Nose or throat irritation. Sweating a lot. Not hungry. A change in weight without trying. For some brands, you may see the tablet shell in your stool. For these brands, this is normal and not a cause for concern. If you have questions, talk with your doctor. These are not all of the side effects that may occur. If you have questions about side effects, call your doctor. Call your doctor for medical advice about side effects. You may report side effects to the FDA at 1-800-FDA-1088. You may also report side effects at http://www.fda.gov/medwatch.

OVERDOSE: If you think there has been an overdose, call your poison control center or get medical care right away. Be ready to tell or show what was taken, how much, and when it happened.

ADDITIONAL INFORMATION: If your symptoms or health problems do not get better or if they become worse, call your doctor. Do not share your drugs with others and do not take anyone else's drugs. Keep a list of all your drugs (prescription, natural products, vitamins, OTC) with you. Give this list to your doctor. Talk with the doctor before starting any new drug, including prescription or OTC, natural products, or vitamins. This drug comes with an extra patient fact sheet called a Medication Guide. Read it with care. Read it again each time this drug is refilled. If you have any questions about this drug, please talk with the doctor, pharmacist, or other health care provider. This information should not be used to decide whether or not to take this medicine or any other medicine. Only your health care provider has the knowledge and training to decide which medicines are right for you. This information does not endorse any medicine as safe,

effective, or approved for treating any patient or health condition. This is only a brief summary of general information about this medicine. It does NOT include all information about the possible uses, directions, warnings, precautions, interactions, adverse effects, or risks that may apply to this medicine. This information is not specific medical advice and does not replace information you receive from your health care provider. You must talk with your healthcare provider for complete information about the risks and benefits of using this medicine."

43.    Over eight **(8)** years later, on each of the four (4) other medical information sheets/printouts and records pertaining to the purchased of **ZOLOFT/SERTRALINE** at relevant times, all to which the Defendants had jointly created, generated and provided on August 22, 2018, and August 27, 2018, are clearly showing alterations, modifications and falsifications, and, each specifically reads conflicts to the previous, on section to sections, paragraph to paragraphs and in great length and details, as follows:

"**WARNING:** Drugs like this one have raised the chance of suicidal thoughts or actions in children and young adults. The risk may be greater in people who have had these thoughts or actions in the past. All people who take this drug need to be watched closely. Call the doctor right away if signs like low mood (depression), nervousness, restlessness, grouchiness, panic attacks, or changes in mood or actions are new or worse. Call the doctor right away if any thoughts or actions of suicide occur. **COMMON USES:** It is used to treat low mood (depression). It is used to treat obsessive-compulsive problems. It is used to treat panic attacks. It is used to treat post-traumatic stress. It is used to treat mood problems caused by monthly periods. It is used to treat social anxiety problems. It may be given to you for other reasons. Talk with the doctor.

BEFORE USING THE MEDICINE: WHAT DO I NEED TO TELL MY DOCTOR BEFORE I TAKE THIS DRUG? **TELL YOUR DOCTOR:** If you have an allergy to sertraline or any other part of this drug. **TELL YOUR DOCTOR:** If you are allergic to any drugs like this one, any other drugs, foods, or other substances. Tell your doctor about the allergy and what signs you had, like rash; hives; itching; shortness of breath; wheezing; cough; swelling of face, lips, tongue, or throat; or any other signs. **TELL YOUR DOCTOR:** If you have liver disease. **TELL YOUR DOCTOR:** If you are taking any of these drugs: Linezolid or methylene blue. **TELL YOUR DOCTOR:** If you are taking pimozide. **TELL YOUR DOCTOR:** If you have taken certain drugs used for low mood (depression) like isocarboxazid, phenelzine, or tranylcypromine or drugs used for Parkinson's disease like selegiline or rasagiline in the last 14 days. Taking this drug within 14 days of those drugs can cause very bad high blood pressure. **TELL YOUR DOCTOR:** If you are taking any drugs that can cause a certain type of heartbeat that is not normal (prolonged QT interval). There are many drugs that can do this. Ask your doctor or pharmacist if you are not sure. This is not a list of all drugs or health problems that interact with this drug. Tell your doctor and pharmacist about all of your drugs (prescription or OTC, natural products, vitamins) and health problems. You must check to make sure that it is safe for you to take this drug with all of your drugs and health problems. Do not start, stop, or change the dose of any drug without checking with your doctor.

HOW TO USE THIS MEDICINE: HOW IS THIS DRUG BEST TAKEN? Use this drugs as ordered by your doctor. Read all information given to you. Follow all instructions closely. Take with or without food. This drug may affect how much of some other drugs are in your body. If you are taking other drugs, talk with your doctor. You may need to have your blood work checked more closely while taking this drug with your other drugs. To gain the most benefit, do not miss doses. Do not stop taking this drug all of a sudden without calling your doctor. You may have a greater risk of side effects. If you need to stop this drug, you will want to slowly stop it as ordered by your doctor. Keep taking this drug as you have been told by your doctor or other health care provider, even if you feel well. In depression, sleep and appetite may get better soon after starting this drug. Other low mood signs may take up to 4 weeks to get better. HOW DO I STORE AND/OR THROW OUT THIS DRUG? Store at room temperature. Keep lid tightly closed. Store in a dry place. Do not store in a bathroom. Keep all drugs in a safe place. Keep all drugs out of the reach of children and pets. Throw away unused or expired drugs. Do not flush down a toilet or pour down a drain unless you are told to do so. Check with your pharmacist if you have questions about the best way to throw out drugs. There may be drug take-back programs in your area. WHAT DO I DO IF I MISS A DOSE? Take a missed dose as soon as you think about it. If it is close to the time for your next dose, skip the missed dose and go back to your normal time. Do not take 2 doses at the same time or extra doses. CAUTIONS: Tell all of your health care providers that you take this drug. This includes your doctors, nurses, pharmacists, and dentists. Avoid driving and doing other tasks or actions that call for you to be alert until you see how this drug affects you. Avoid drinking alcohol while taking this drug. Talk with your doctor before you use other drugs and natural products that slow your actions. This drug may raise the chance of a broken bone. Talk with the doctor. This drug may raise the chance of bleeding. Sometimes, bleeding can be life-threatening. Talk with the doctor. This drug can cause low sodium levels. Very low sodium levels can be life-threatening, leading to seizures, passing out, trouble breathing, or death. Talk with the doctor. A type of abnormal heartbeat (prolonged QT interval) has happened with this drug. Sometimes, this has led to another type of unsafe abnormal heartbeat (torsades de pointes). Call your doctor right away if you have a fast or abnormal heartbeat, or if you pass out. Some people may have a higher chance of eye problems with this drug. Your doctor may want you to have an eye exam to see if you have a higher chance of these eye problems. Call your doctor right away if you have eye pain, change in eyesight, or swelling or redness in or around the eye. A very bad and sometimes deadly health problem called serotonin syndrome may happen. The risk may be greater if you take this drug with drugs for depression, migraines, or other drugs. Call your doctor right away if you have agitation; change in balance; confusion; hallucinations; fever; fast or abnormal heartbeat; flushing; muscle twitching or stiffness; seizures; shivering or shaking; sweating a lot; very bad diarrhea; upset stomach, or throwing up; or very bad headache, This drug may affect certain lab tests. Tell all of your health care providers and lab workers that you take this drug. If you are 65 or older, use this drug with care. You could have more side effects. This drug is not approved for use in all children. Talk with the doctor to be sure that this drug is right for your child. Use with care in children. Talk with the doctor. This drug may affect growth in children and teens in some cases. They may need regular growth checks. Talk with the doctor. Taking this drug late in pregnancy may raise the chance of breathing or feeding problems, low body temperature, or withdrawal symptoms in the newborn. Talk with the doctor. Tell your doctor if you are breast-feeding. You will need to talk about any risk to your baby. Tell your doctor if you are pregnant or plan on getting pregnant. You will need to talk about the benefits and risks of using this drug while you are pregnant.

**POSSIBLE SIDE EFFECTS: WHAT ARE SOME SIDE EFFECTS THAT I NEED TO CALL MY DOCTOR ABOUT RIGHT AWAY? WARNING/CAUTION:** Even though it may be rare, some people may have very bad and sometimes deadly side effects when taking a drug. Tell your doctor or get medical help right away if you have any of the following signs or symptoms that may be related to a very bad side effect: Signs of an allergic reaction, like rash; hives; itching; red, swollen, blistered, or peeling skin with or without fever; wheezing; tightness in the chest or throat; trouble breathing, swallowing, or talking; unusual hoarseness; or swelling of the mouth, face, lips, tongue, or throat. Signs of low sodium levels like headache, trouble focusing, memory problems, feeling confused, weakness, seizures, or change in balance. Signs of bleeding like throwing up blood or throw up that looks like coffee grounds; coughing up blood; blood in the urine; black, red or tarry stools, bleeding from the gums; vaginal bleeding that is not normal; bruises without a reason or that get bigger; or any bleeding that is very bad or that you cannot stop. Seizures. Chest pain or pressure. Not able to control bladder. Very bad headache. A big weight gain or loss. Sex problems like lowered interest in sex or ejaculation problems. For females, menstrual changes. These include lots of bleeding, spotting, or bleeding between cycles A very bad skin reaction (Stevens-Johnson syndrome/toxic epidermal necrolysis) may happen. It can cause very bad health    problems    that may not go away, and sometimes death. Get medical help right away if you have signs like red, swollen, blistered, or peeling skin (with or without fever); red or irritated eyes; or sores in your mouth, throat, nose, or eyes. Very bad and sometimes deadly liver problems have happened with this drug. Call your doctor right away if you have signs of liver problems like dark urine, feeling tired, not hungry, upset stomach or stomach pain, light colored stools, throwing up, or yellow skin or eyes. **WHAT ARE SOME OTHER SIDE EFFECTS OF THIS DRUG?** All drugs   may  cause side effects. However, many people have no side effects or only have minor side effects. Call your doctor or get medical help if any of these side effects or any other side effects  bother you or do not go away: Dizziness. Feeling sleepy. Feeling tired or weak. Feeling nervous and excitable. Upset stomach. Loose stools (diarrhea). Dry mouth. Hard stools (constipation). Not able to sleep. Sweating a lot. Shakiness. Not hungry, Belly pain. These are not all of the side effects that may occur. If you have questions about side effects, call your doctor. Call your doctor for medical advice about side effects. You may report side effects to the FDA at 1-800-FDA-1088. You may also report side effects at http://www.fda.gov/medwatch.

**OVERDOSE:** If you think there has been an overdose, call your poison control center or get medical care right away. Be ready to tell or show what was taken, how much, and when it happened.

**ADDITIONAL INFORMATION:** If your symptoms or health problems do not get better or if they become worse, call your doctor. Do not share your drugs with others and do not take anyone else's drugs. Keep a list of all your drugs (prescription, natural products, vitamins, OTC) with you. Give this list to your doctor. Talk with the doctor before starting any new drug, including prescription or OTC, natural products, or vitamins. This drug comes with an extra patient fact sheet called a Medication Guide. Read it with care. Read it again each time this drug is refilled. If you have any questions about this drug, please talk with the doctor, pharmacist, or other health care provider. This information should not be used to decide whether or not to take this medicine or any other medicine. Only your health care provider has the knowledge and training to decide which medicines are right for you. This information does not endorse any medicine as safe, effective, or approved for treating any patient or health condition. This is only a brief summary of general information about this medicine. It does NOT include all information about the possible uses, directions, warnings, precautions, interactions, adverse effects, or risks that may apply to this medicine. This information is not specific medical advice and does not replace information you

receive from your health care provider. You must talk with your healthcare provider for complete information about the risks and benefits of using this medicine."

44.    Additionally, each of the medical information sheets/printouts and records to which the Defendants had created, generated and provided on August 22, 2018, and August 27, 2018, made further misrepresentations as follows:

"KMT144431: Please try to bill Immunizations to Medicare Part B or other Medical Card
KMT144431: Please try to billing IMU MCE, Ask Patient for Medicare B or Medical Card"

45.    The statements on the medical information sheets/printouts and records that have been created, generated and provided by the Defendants on August 22, 2018, and August 27, 2018, are willful, despicable, outrageous, upsetting and extremely false, and particularly worrisome and troublesome, in that, they are negatively indicating and showing that certain written medical counseling services were given or provided to Plaintiff during the relevant dates and time, but, such things had never occurred as the Defendants Kmart pharmacy now had been claiming or showing in these medical information sheets/printouts and records.

46.    Additionally, it hold true, that all the very important sections and paragraphs of the medical information sheets/printouts dated 06/14/2010, and 07/16/2010 had been omitted, or modified, and were not provided to the plaintiff. Therefore, it is even more particularly worrisome and troublesome now, in that, the Defendants Kmart pharmacy now believe it is  so right, to provided those false misleading records of such medical information sheets/printouts documents on August 22, 2018, and August 27, 2018.

## Defendants Improper Conduct Is Complete Stress To Which Caused Physical Sickness

47.    On August 22, 2018, upon the upsetting observation and realization of the alterations and falsifications on the medical information sheets/printouts documents, the Plaintiff began to experience a sense of malaise, disquiet, dissatisfaction, unrest, low mood, uneasiness, fearful, fatigue, unable to sleep, not eating, not hungry and have been worrying about the pressing medical

information sheets/printouts documents just received from the Defendants Kmart pharmacy. Although the Plaintiff had tried various over-the-counter medications that may help and to encourage some relief, by August 27, 2018, the Plaintiff again had received additional medical information sheets/printouts from the Defendants Kmart pharmacy. Again, upon further upsetting observations realization of the alterations and falsifications on the medical information sheets/printouts documents, the Plaintiff had continued to experience disquiet, dissatisfaction, unrest, low mood, uneasiness, fearful, sadness, fatigue, unable to get good sleep, not eating, not hungry, and have been worrying every day over the matter at hand as there are cause for concerns about all of the Defendants Kmart pharmacy actions and improper conduct.

48.      The level of been worrying every day over the alterations and falsifications of the medical information sheets/printouts documents, and so much unanswered questions and concerns has led to heavy stress with accompanying headaches upon the Plaintiff overtime.

49.      On September 12, 2018, so to make matters even worsted, the defendant's attorneys had attempted to address the Plaintiff's questions and concerns, they sent an email to the Plaintiff and stated in separate parts, on quote: *"We have spoken with the custodian of records for Kmart Pharmacy and have been advised that you have been previously provided the documents sought in the Subpoena Duces Tecum from the Pharmacist at the Kmart location multiple times in the past. Therefore, the subpoena request has been complied with."*.

### Violation Of Judiciary Law Section 487

50.      Section 487, which provides both civil and criminal causes of action, reads:

*An attorney or counselor who:*

1. *Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,*
2. *Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,*

*Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.*

51.    On September 20, 2018, the New York State Supreme Court, New York County learned of the alleged non-compliance of the Judicial Subpoena Duces Tecum by defendant's. In order to justify their clients Kmart pharmacy, the pharmacy's attorney(s) had lied, and misled the Court, in that, they were not truthful and honest, and that is because, on November 6, 2018, and post-petition for bankruptcy, the Defendants pharmacy sent via fax, new and additional, never-seen-before, piecemeal medical records to the Plaintiff. The pharmacy's attorney(s) behavior, combined with the Defendants Kmart pharmacy improper conduct, shows the extent to which they are willing to go, to lied and misled the Court and to further evade any liability and/or responsibility.

52.    As a result of the Defendants pharmacy lies, and misleading statements to the New York State Supreme Court, by their attorney(s), to which they gladly and cheerfully informed the Court that they had complied with the Judicial Subpoena Duces Tecum, Honorable Judge David B. Cohen had then declined to sign an order for Civil Contempt of the Court.

**Defendants Pharmacy And Their Contumacious Conduct Caused Additional Sickness**

53.    As a result of Defendants Pharmacy false and misleading allegation to the Supreme Court, that they had complied with the Judicial Subpoena Duces Tecum and Court's Order, the Plaintiff had developed more Physical sickness overtime and worsening symptoms.

54.    The Plaintiff had very troubling encounter with the Defendants pharmacy and then have to be dealing with an increase in the frequency of furthering stress, sadness, emotional upset, grieving reactions, crying a lot over the Defendants improper conduct, power and control, sobbing, having more headaches, uncontrollable coughing, and tightness in his chest, not eating, difficulty breathing, wheezing, shortness of breath, felt breathless, trouble falling asleep etc.

55.    Then, on October 2, 2018, Plaintiff had a worrying episodes of asthma attack. the Plaintiff had received urgent care and treatments in a hospital settings, for emotional distress conditions, stress, worsening Bronchospasm and asthma exacerbation, and was placed on as many as five (5) urgent care medications for asthma exacerbation, in an effort to manage this medical circumstances. The medications are as follows: Montelukast SOD, Advair 250-50 Diskus, Albuterol SUL 2.5, Ipratropium BR 0.2, and Proair HFA. **See Exhibit (5)**

## The Defendants Pharmacy Willful And Malicious Intention To Cause Injury Upon Plaintiff

56.    The Defendants Pharmacy and through their legal counsel and attorneys knew about the Plaintiff's urgent care on October 2, 2018, and knew that the Plaintiff had received emergency medical care reflecting the Bronchospasm, but intended to cause further injury and damages, as a result of the Supreme Court Decision on September 20, 2018, that they did not totally like or happy with. The Defendants Pharmacy knew or should have known, that their willful and malicious conduct has been causing stress, intolerable burden, emotional distress and is a trigger for the Plaintiff's Bronchospasm and Bronchial asthma attacks, or believed that further injury was substantially certain to occur as a result of their conduct.

57.    After the Defendants pharmacy achievements in lying and misleading the Court and to Honorable Judge David B. Cohen September 20, 2018, the Defendants Pharmacy had continued to engage in their contumacious conduct and behavior on November 6, 2018.

## (B) Partial Medical Records via Fax on November 6, 2018

58.    On November 6, 2018, the Defendant's pharmacy sent additional despicable, outrageous, upsetting and extremely false, and particularly worrisome and troublesome medical records, a copy of such records is labeled **A**, **B** and **C** respectively, here as follows:

**(A)**

```
11-06-2018 00:58   KMART PHARMACY 7777 2126738845                        PAGE1
Patient: COKE-NG, BRIAN
                                                  Last: 11/06/2018 05/15/2010
                                                  Total #: 2        $:      15.40

Carrier: RMP              Plan:                    Group: RMP
  Plan Name: RETAIL MAINTENANCE PROGRAM
CardholderID: COKEN7777
                                          CanPHN/AltID:
                                          Medicaid ID:
  Billing Seq: 2        Effect:           Expires:
Patient Elig: Y     Relation: 1 Dependent:                   Senior Cit:
     Series:        ADC:    NH:  Clinic:            Student:      Pat Sign: 1
  Other Ins:    N   Loc:         SB:   Emp:        B/C Home:      Elig Ovr:
CMS Facility:       Residence:
Pat NoAssign:
Cardholder Information
  Name on Card: COKE-NG, BRIAN
          COKE-NG
Card Eligible: Y                        , BRIAN
  Effect Date:                     Worker's Comp: N
  Expire Date:                          Last: 11/06/2018
                                        Elig: 05/15/2010
```

**(B)**

```
11-06-2018 00:58   KMART PHARMACY 7777 2126738845                        PAGE2
Patient: COKE-NG, BRIAN
                                                  Last: 11/06/2018 08/16/2010
                                                  Total #: 2        $:      15.40

Carrier: HTR              Plan: VRI               Group: UNA4167
  Plan Name: PLEASE USE HTR-GOODRX
CardholderID: COKEN7777
                                          CanPHN/AltID:
                                          Medicaid ID:
  Billing Seq: 3        Effect:           Expires:
Patient Elig: Y     Relation: 1 Dependent: 01                Senior Cit:
     Series:        ADC:    NH:  Clinic:            Student:      Pat Sign: 1
  Other Ins:    N   Loc:         SB:   Emp:        B/C Home:      Elig Ovr:
CMS Facility:       Residence:
Pat NoAssign:
Cardholder Information
  Name on Card: COKE-NG, BRIAN
          COKE-NG
Card Eligible: Y                        , BRIAN
  Effect Date:                     Worker's Comp: N
  Expire Date:                          Last: 11/06/2018
                                        Elig: 08/16/2010
```

**(C)**

```
11-06-2018 00:58   KMART PHARMACY 7777 2126738945                          PAGE3
Patient: COKE-NG, BRIAN                             Last: 11/06/2018 09/22/2010
                                                    Total #: 2      $:    15.40

   Carrier: RXE            Plan: 7777           Group: FDCPPA
     Plan Name: RXE-AMERICAN HEALTHCARE NTWK
   CardholderID: 8182807202                     CanPHN/AltID:
                                                Medicaid ID:
   Billing Seq: 1        Effect:              Expires:              Senior Cit:
   Patient Elig: Y    Relation: 1  Dependent:            Student:   Pat Sign: 1
       Series:       ADC:     NH:   Clinic:           B/C Home:     Elig Ovr:
     Other Ins:   N      Loc:      SB:     Emp:
   CMS Facility:        Residence:
   Pat NoAssign:
Cardholder Information
   Name on Card: COKE-NG, BRIAN
          COKE-NG
   Card Eligible: Y                     , BRIAN
     Effect Date:                    Worker's Comp: N
     Expire Date:                       Last: 11/06/2018
                                        Elig: 09/22/2010
```

59.     As shown above, on exhibit **A** here, the Defendant's pharmacy records had indicated among other things pertaining to third party payers, and billing information, that, on the **"05/15/2010"** which is the date pertaining to prescription (Rx#6842949) transaction, the "total" was **"$15.40"**; the "Carrier: **RMP**"; "Group: **RMP**"; "Plan Name: **Retail Maintenance Program**"; "Cardholder ID: **COKEN7777**"; "Cardholder Information Name on Card: **COKE-NG, BRIAN**"; Card Eligible: "Y"; Workers' Comp: "**N**".

60.     At all times relevant, Plaintiff, had used his Medicaid. The Plaintiff did not have any other card, and was not a member of any group, and was not a member of any Plan as indicated in the Defendants Pharmacy records, and the Plaintiff did not signed up for any "Retail Maintenance Program", and, did not paid any $15.40 during any transaction(s). Specifically, the plaintiff did not gave anyone any consent or permission to be enrolled into the Defendant's Retail Maintenance Program (RMP). The plaintiff gave his Medicaid card to the Defendant's

Pharmacy each time prescription was filled. Therefore, any other information reflecting otherwise on such document, is clearly false and fraudulent.

61.    As shown above, on exhibit **B** here, the Defendant's pharmacy records had indicated among other things pertaining to third party payers, and billing information, that, on the "**08/16/2010**" which is the date pertaining to prescription (Rx#6845128) transaction, the "total" was "**$15.40**"; the "Carrier: **HTR**"; "Plan: **VRI**"; "Group: **UNA4167**"; "Plan Name: **PLEASE USE HTR-GOODRX**"; "Cardholder ID: **COKEN7777**"; "Cardholder Information Name on Card: **COKE-NG, BRIAN**"; Card Eligible: "**Y**"; Workers' Comp: "**N**".

62.    At all times relevant, Plaintiff, had used his Medicaid. The Plaintiff did not have any other card, and was not a member of any group, and was not a member of any Plan as indicated in the Defendants Pharmacy records, and the Plaintiff did not signed up for any " HTR-GOODRX", and, did not paid any $15.40 during any transaction(s). Specifically, the plaintiff did not gave anyone any consent or permission to be enrolled into the Defendant's "**PLEASE USE HTR-GOODRX**". The plaintiff gave his Medicaid card to the Defendant's Pharmacy each time prescription was filled. Therefore, any other information reflecting otherwise on such document, is clearly false and fraudulent.

63.    As shown above, on exhibit **C** here, the Defendant's pharmacy records had indicated among other things pertaining to third party payers, and billing information, that, on the "**09/22/2010**" which is the date pertaining to prescription (Rx#6846142) transaction, the "total" was "**$15.40**"; the "Carrier: **RXE**"; "Plan: **7777**"; "Group: **FDCPPA**"; "Plan Name: "**RXE-AMERICAN HEALTHCARE NTWK**"; "Cardholder ID: **8182807202**"; "Cardholder Information Name on Card: **COKE-NG, BRIAN**"; Card Eligible: "**Y**"; Workers' Comp: "**N**".

64.     The information on those documents shown above at exhibit **A, B** and **C** is a made up fake story, which are false, fraudulent and deceiving.

65.     At all times relevant, Plaintiff, had used his Medicaid. The Plaintiff did not have any other card, and was not a member of any group, and was not a member of any Plan as indicated in the Defendants Pharmacy records, and the Plaintiff did not signed up for any " RXE-AMERICAN HEALTHCARE NTWK", and, did not paid any $15.40 during any transaction(s). Specifically, the plaintiff did not gave anyone any consent or permission to be enrolled into the Defendant's " **RX-AMERICAN HEALTHCARE NTWK**". The plaintiff gave his Medicaid card to the Defendant's Pharmacy each time prescription was filled. Therefore, any other information reflecting otherwise on such document, is clearly false and fraudulent.

66.     After the Defendants Pharmacy had created/provided those fraudulent documents shown above at exhibit **A, B** and **C** and forward each to the Plaintiff on November 6, 2018, the Plaintiff was shocked by such new information, false statements, and developments and how far these Defendants was willing to go in order to create such fraudulent documents. As a result, the Defendants latest conduct had caused the Plaintiff to suffer disabling Depression, and stress.

67.     As a result of the Defendants latest improper conduct, the Plaintiff had received emergency/urgent care for Vomiting, Nausea, Depression, Anxiety and Stress on December 22, 2018, and was placed on medications. See copy attached hereto at **Exhibit (6).**

## Plaintiff Pre-existing Medical Conditions

68.     The Plaintiff have a pre-existing condition of Bronchial asthma. See details on history in an Examination of the Plaintiff's treating Doctor, (Dr. Wilfred Talavera, M.D.) a copy is hereby attached as **Exhibit (7).**

69.     As a result of the Defendants improper conduct, the Defendants improper conduct had caused the aggravation and exacerbation of the Plaintiff Bronchial asthma. The Defendants improper conduct had caused the Plaintiff to suffer disabling Bronchial asthma attacks.

70.     The Plaintiff have a pre-existing condition to which reflect Depression. Details are provided by two (2) of the Plaintiff's Doctors, (Dr. Joel King, M.D., and Dr. Nicholas Radcliffe, M.D.) a copy of each is hereby attached as **Exhibit (8),** and **Exhibit (9),** respectively.

71.     The Defendants Pharmacy knew and very well aware that the Plaintiff Was Psychologically and Financially vulnerable, and Solely for their own personal gain and profit intentionally inflicted further injury on the Plaintiff by their improper conduct to which had cause aggravation and exacerbation of the Plaintiff's medical problems . In fact, the Plaintiff had filled certain prescriptions for Depression, at the Defendants Pharmacy, and the Defendants Pharmacy had obtained all information from Plaintiff which appropriate for counseling an individual regarding use of prescription and over-the-counter drugs, which includes details of Plaintiff's asthma treatments and other personal medical information. Therefore, the Defendants Pharmacy cannot denied knowing any of the Plaintiff's pre-existing conditions.

## Defendant's Pharmacy Used A POS System, PDX/NHIN Systems And PDX Enterprise Pharmacy System To Process All Prescription Purchases During all relevant Times

72.     Upon information and belief, at all times relevant, Defendant's Kmart pharmacy had used a POS system and NHIN/PDX Pharmacy management application/software system(s) to process all prescription purchases by the consuming public, including the Plaintiff purchases. Upon information and belief, Defendant's Kmart pharmacy also used the PDX Enterprise Pharmacy System (EPS). The EPS features an advanced, enterprise-wide workflow engine, central patient record technology, load balancing, and integrated MTM and revenue programs.

73.    Upon information and belief, PDX, Inc. (PDX) is a developer and licensor of software. One of its programs is the PDX Pharmacy System, which assists pharmacies in filling prescriptions. Upon information and belief, Defendant's Kmart pharmacy was and still is a customer of PDX and licensed the PDX Pharmacy System during the relevant time period.

74.    Upon information and belief, among other things, PDX Pharmacy System enables pharmacist to print information sheets to distribute to patients with their medications, including Patient education monographs/information sheets. Patient education monographs/information sheets provide drug information from databases unaffiliated with PDX to Patients in concise, non-technical language. They are neither required by law nor regulated by the FDA. Prior to 2006, the default setting on the PDX Pharmacy System printed monographs with five paragraphs of information, but enabled pharmacists to print monographs with three additional pages titled "Overdose," "Before Using," and "Additional Information,"

75.    In 1996, Congress passed a law directing the Secretary of Health and Human Services to collaborate with members of the healthcare community to develop a plan for achieving certain goals relating to the dissemination of medical information. That group developed an "Action Plan for the Provision of Useful Prescription Medicine Information" containing recommendations, referred to as the "Keystone Criteria," for members of the pharmaceutical industry. The Keystone Criteria recommend information that pharmacists should provide patients along with their medications and the manner in which such information should be presented.

76.    In response to the Keystone Criteria, PDX modified its Pharmacy System to remove the option of printing five paragraph monographs, such that all monographs printed from the software would contain eight paragraphs, including the additional three noted above.

77.   Based upon information and belief, the databases that are managed by the PDX/NHIN System include **(a)** a drug database, **(b)** a physician database, **(c)** a patient database, **(d)** a third party payer database, **(e)** a drug pricing database, **(f)** a decision support database, and **(g)** a patient education leaflet/information sheet databases.

78.   Based upon information and belief, with the exception of the patient database which is generated at the Defendant's pharmacy store level when a patient presents a valid prescription to the prescription department, all of the other databases come from an outside source. The patient education leaflet/information sheet focused upon in this case was generated by a Medispan (a Wolters Kluwer Company) created and maintained database and is mostly a "one-size-fits-all" monograph concerning its advisory content it supplies.

79.   Upon information and belief, the PDX/NHIN System allows the end-users to customize the printing of the patient education leaflet/information sheet by adding headers or footers surrounding the education contents. Medispan/Wolter Kluwer may also allow the use of larger fonts when it is desired by the end-user pharmacist for easier patient readability and will allow the insertion into the information sheet/leaflet header the actual drug name being dispensed. Simply put, Defendant's Kmart pharmacy able to enter, read, delete, and query data, among other things. However, before Defendant's Kmart pharmacy can be able to enter, read, delete, and query data, PDX must first agreed and/or provide certain right(s) to the Defendant's Kmart pharmacy to do any such things.

80.   At all times relevant, in this case, the information sheets/leaflets that were presented to the Plaintiff, shows that Defendant's Kmart pharmacy had elected to print header that contains the pharmacy name and address and contact telephone number, the patient's name, address and telephone number on file, the name and date that the drug was dispensed, the full

name of the pharmacist as well as initials of that same pharmacist who did the final check on the prescriptions and filled that prescription, third-party payer name/abbreviation, the prescription #, the drug expire date, the NDC #, the doctor name that wrote the prescription, the insurance reference no#, the amount paid, and the days supply/quantity.

81.     Additionally, Upon information and belief, the PDX software selected the patient education leaflet/patient information sheet from the database published by Medispan to match the selected drug as it was typed in by the Defendant's Kmart Pharmacy staff at the relevant times. During the printing procedure of the vial label and the patient leaflet information sheet the end-user selected elements that were inserted by Defendant's pharmacy (Kmart Pharmacy) personnel into the Medispan patient education leaflet/information sheets. During each and every process to which Plaintiff prescription had been already filled, the plaintiff's medical records were established. The Defendant's Kmart pharmacy, cannot be allowed to alter and falsify those medical records, in an effort to evade any liability or to willfully and deliberately inflict injury upon the Plaintiff. That is exactly what had occurred here in this case. As such,

82.     PDX/NHIN bears the responsibility jointly and severally and is liable with the other Defendants and their Kmart pharmacy or debtors.

## AS FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS,
### Intentional Infliction Of Emotional Distress and Aggravation and Exacerbation Asthma

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the Complaint as if set forth at length herein. Further, Plaintiff incorporates herein by reference paragraphs one (1) through eighty two (82) above.

83.    The statements on the medical information sheets/printouts and records that have been created, generated and provided by the Defendants on August 22, 2018, and August 27, 2018, are willful, despicable, outrageous, upsetting and extremely false, and particularly worrisome and troublesome, in that, they are negatively indicating and showing that certain written medical counseling services were given or provided to Plaintiff during the relevant dates and time, but, such things had never occurred as the Defendants Kmart pharmacy now had been claiming or showing in these medical information sheets/printouts and records.

84.    Additionally, it hold true, that all the very important sections and paragraphs of the medical information sheets/printouts dated 06/14/2010, and 07/16/2010 had been omitted or modified, and were not provided to the plaintiff. Therefore, it is even more particularly worrisome and troublesome now, in that, the Defendants Kmart pharmacy now believe it is so right, to provided their false records of such medical information sheets/printouts documents on August 22, 2018, and August 27, 2018.

85.    On August 22, 2018, upon the upsetting realization of the alterations and falsifications on the medical information sheets/printouts documents, the Plaintiff began to experience a sense of malaise, disquiet, dissatisfaction, unrest, low mood, uneasiness, fearful, fatigue, unable to sleep, not eating, not hungry and have been worrying about the pressing medical information sheets/printouts documents just received from the Defendants Kmart pharmacy. Although the Plaintiff had tried various over-the-counter medications that may help and to encourage some relief, by August 27, 2018, in the following week, the Plaintiff again had received additional medical information sheets/printouts from the Defendants Kmart pharmacy. Again, upon further upsetting realization of the alterations and falsifications on the medical information sheets/printouts documents, the Plaintiff had continued to experience disquiet,

dissatisfaction, unrest, low mood, uneasiness, fearful, sadness, fatigue, unable to get good sleep, not eating, not hungry, and have been worrying every day over the matter at hand as there are cause for concerns about all of the Defendants Kmart pharmacy actions and improper conduct.

86.    The level of been worrying every day and have been made into daily stressor over the alterations and falsifications of the medical information sheets/printouts documents and records, and having so much unanswered questions and concerns has led to heavy unbearable and intolerable stress with accompanying headaches upon the Plaintiff over the time.

87.    The Plaintiff had encountered a very disturbing situation the Defendants, then have to be dealing with an increase in the frequency of furthering stress, sadness, emotional upset, grieving reactions, crying a lot over the Defendants improper conduct, such as their lies, power and control, sobbing, having more headaches, uncontrollable coughing, and tightness in his chest, not eating, having difficulty breathing, wheezing, shortness of breath, and feeling breathless, trouble falling asleep etc.

88.    On October 2, 2018, the Plaintiff had very worrying episodes of asthma attack. The Plaintiff had received urgent care and treatments in a hospital settings, for being in emotional distress conditions, stress, worsening Bronchospasms and asthma exacerbation, and was placed on as many as five (5) urgent care medications for this asthma exacerbation and in an effort to manage this medical circumstances. Indeed, the Defendants Pharmacy intended to cause injury upon plaintiff.

89.    The Defendants Kmart Pharmacy and through their legal counsel and attorneys knew about the Plaintiff's urgent care on October 2, 2018, and knew that the Plaintiff had received emergency medical care reflecting the Bronchospasm, but intended to cause further injury and damages, as a result of the Supreme Court Decision on September 20, 2018, that they

did not totally like or happy with. The Defendants Pharmacy knew or should have known, that their willful and malicious conduct has been causing stress, intolerable burden, emotional distress and that it is a trigger for the Plaintiff's Bronchospasm and Bronchial asthma attacks. They believe that further injury was substantially certain to occur as a result of their conduct.

90.    After the Defendants Kmart pharmacy achievement in lying and misleading the Court and to Honorable Judge David B. Cohen September 20, 2018, the Defendants Pharmacy had continued to engaged in their contumacious conduct and behavior on November 6, 2018.

91.    As a result of the Defendants improper conduct, the Plaintiff had received emergency/urgent care on December 22, 2018, and now, ongoing burden to pay for medical care has been placed upon the Plaintiff, and further suffering pure hardship. **See bills at Exhibit (10)**

92.    As a result of the Defendant's Kmart pharmacy improper conduct on August 22, 2018, August 27, 2018 and November 6, 2018, the Plaintiff pre-existing medical conditions as asthma, depression, and involuntary limb movements has been disturbed, aggravated and exacerbated. Defendant's Kmart pharmacy had displayed and showed various malice against the Plaintiff after the New York Supreme Court had issued its Order on September 20, 2018, and had intentionally caused these disabling injuries upon the Plaintiff, to interfere, and did in fact interfered with the Plaintiff health, happiness and overall quality of life, and as such, to avoid the scheduled Supreme Court hearing(s) on all the pending matters, and to evade liability.

93.    After the N.Y.S Supreme Court had issued the Judicial Subpoena Duces Tecum to be served on the Defendant's Kmart pharmacy, which, did in fact was served on the Defendant's pharmacy three separate times, the same Defendant's pharmacy, had began to display malice. The Defendant's pharmacy and their attorneys had first tried to avoid the Court issued Judicial Subpoena Duces Tecum, by refusing to accept it when attempted to serve them, those behavior

and malice had created unexpected costs upon the Plaintiff for two (2) additional services of the one Court issued Judicial Subpoena Duces Tecum. But the malice by Defendant's pharmacy did not stop there. The Defendant's pharmacy, by their attorneys, appeared in the Court and lied and misled the Court, that they had complied with the Judicial Subpoena Duces Tecum. Then, after the Court had issued its Order on September 20, 2018, which reads in parts, as follows: *"Records have been provided, Plaintiff's claim that they have been altered, is at best, an issue for the trier of fact."* The Defendants, thereafter sent the Plaintiff more records altered and false.

94.    Defendant's Kmart pharmacy knowing very well that the Plaintiff was psychologically and financially vulnerable, and solely for their own personal gain and profit intentionally inflicted egregious emotional shocks, emotional trauma and mental trauma upon Plaintiff, all of which had ultimately triggered episode and episodes of Bronchospasm and Bronchial asthma attacks and making the Plaintiff continued to suffer, and the Plaintiff had left unable to afford all the associated medical bills.

## AS FOR A SECOND CAUSE OF ACTION AGAINST SEARS HOLDINGS CORPORATION, AND KMART HOLDING CORPORTION
### Intentional Misrepresentation/Fraud/Constructive Fraud

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the Complaint as if set forth at length herein. Further, Plaintiff incorporates herein by reference paragraphs one (1) through ninety four (94) above.

95.    On August 22, 2018, August 27, 2018 and November 6, 2018, the Defendants pharmacy had created medical records, and provided the Plaintiff with such medical records showing alterations and falsifications. The records that were created on November 6, 2018, reflects an alleged third party payer(s) and billing information to which involved all Plaintiff

prescription drugs that has been filled. The Defendant's pharmacy records shows, that prescription drug benefit cards was created in the Plaintiff name, that also bears cardholder ID and other information. But the Plaintiff has never created any such cards. The Plaintiff had only given his Medicaid card and information to the Defendant's pharmacy. However, Medicaid in one report, had advised that they did not receive any claim from Defendant's pharmacy or anyone regarding any prescription. Based upon information and belief, the Defendant's pharmacy had created those benefit cards without the Plaintiffs express or written consent or permission. The Plaintiff is not willing to go silent on such matters.

96.    The Plaintiff is in need of genuine, reliable and accurate medical records from the Defendant's Pharmacy for verification and support of all out-of-pocket medical expenses, and to receive his reimbursement(s) from a workers' compensation insurance carrier.

97.    The New York State Workers' Compensation Board does not condone fraud. To submit a claim regarding workers' compensation reimbursement for out-of pocket medical expenses, the Plaintiff must state in detail among other things nature of expenses, which must include nature of services furnish; name and address of provider; amount charged, date services was rendered; and provide documentation or receipts in support of the claim.

98.    Workers' Compensation fraud consists of the following elements or acts:

- Knowingly making or causing to be made a false or fraudulent material statement or representation for the benefit of obtaining workers' compensation benefits and/or reimbursements;

- Knowingly representing or causing to be presented a false or fraudulent oral or written material statement in support of, or in opposition to, a claim for workers' compensation benefits, or for any reimbursements;

- Knowingly aiding and abetting or conspiring with another person to commit an act of workers' compensation Fraud;

- Knowingly making or causing to be made a false or fraudulent statement in regard to an entitlement to benefits with the intent to discourage and injured worker from claiming benefits or pursuing a claim.

99.    The Plaintiff cannot in good faith submit a claim to the workers' compensation insurance carrier and knows that inconsistency, discrepancy, and contradiction in the Medical records located at the Defendants Pharmacy. Indeed, that would be aiding and abetting the fraud.

100.    As a result of Defendant's pharmacy improper conduct, there is a complete breach of duty, breach of fiduciary duty, breach of trust, and confidentiality. Defendant's pharmacy acts are deceitful and fraudulent, and with the proximate causation solely for their own interests and unjust enrichment, at the expense of the Plaintiff. Defendant's pharmacy continued to gain advantage, and for purposes to deceive the Worker's Compensation Insurance Carrier, and the Plaintiff, and to further impede, hinder and delay the Plaintiff workers' compensation reimbursements claim process for out-of-pocket medication expenses involving prescription drugs already dispensed by Defendant's Kmart pharmacy.

101.    The Defendants pharmacy had created medical records on August 22, 2018, August 27, 2018 and November 6, 2018, to which contains alterations and falsifications. The Defendants pharmacy knew such arguments, statements, documentation and representations to be completely false, and knew that it was to be used to deceive the Plaintiff, the Worker's Compensation Insurance Carrier, and the Court, if the matter went to Court. And also knew it could potentially construed as aiding and abetting fraud if the Plaintiff was to submit copy of those documents to the workers' compensation insurance carrier for reimbursements.

Additionally, the Defendant's pharmacy willfully and deliberately created those medical documents containing falsification and misrepresentation in an effort to evade certain liability.

### AS FOR A THIRD CAUSE OF ACTION AGAINIST SEARS HOLDINGS CORPORATION, AND KMART HOLDING CORPORTION
#### Violation(s) Of Section 349 Of The New York General Business Law

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the Complaint as if set forth at length herein. Further, Plaintiff incorporates herein by reference paragraphs one (1) through one hundred and one (101) above.

102.   At all times relevant, Plaintiff was individual member of the consuming public to whom the Defendant directed its services and marketing and sales practices.

103.   New York General Business Law ("GBL") §349 prohibits any business or person from engaging in deceptive business practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York State.

104.   On August 22, 2018, August 27, 2018, and November 6, 2018, the Defendants Kmart pharmacy created, generated and provided the Plaintiff with medical information sheets/printouts and records that have been altered and falsified and do not match the plaintiff's original medical records. The Plaintiff did not receive such medical information as shown and described in the medical records created on August 22, 2018, and August 27, 2018, and the documents received on November 6, 2018, are false and fraudulent.

105.   For example, the medical records to which the Defendants Kmart pharmacy had created, and generated on November 6, 2018, and provided such documents to the Plaintiff, includes financial records of the transactions during the relevant times, and also reflects third party payer(s) information and billing information concerning the Plaintiff's prescription purchases. Details of these latest documents provided to the Plaintiff on November 6, 2018,

shows total of **$15.40** for prescriptions that was filled at Defendant's pharmacy. There were a total of three (3) separate fills for prescription **#6842949**, the dates were 05/15/2010; 06/14/2010; and 07/16/2010, respectively. Additionally, details of the latest documents provided to the Plaintiff on November 6, 2018, shows a total of **$15.40** to which represents for prescriptions dated 08/16/2010. Only one (1) prescription was filled on 08/16/2010, (prescription number **6845128**). Also, detail of the latest document provided to the Plaintiff on November 6, 2018, shows a total of **$15.40** to which represents for prescription dated 09/17/2010, (prescription number **6846142**). Notably here, the Plaintiff did not paid amounts totaling **$15.40**. That is false.

106. Defendant's pharmacy have not been able to produce or provide a complete and detail results of each claims that they had submitted to the third party payer(s) as suppose to be noted on the records they had provided pertaining to the prescriptions, no detail results are showing anywhere whatsoever, that suppose to reflect, properly and accurately: **(a)** Date of claim; **(b)** Status of claim; **(c)** Authorization numbers; **(d)** Reference cost; **(e)** Cost paid; **(f)** Fee paid; **(g)** Tax; **(h)** Due from; **(i)** Copay; and **(j)** Total paid. Also, third-party information must include: group number and subscriber identifier and individual relationship to the card holder.

107. Specifically, on 09/17/2010, the Plaintiff made copayments totaling $33.63 as demanded by Defendant's pharmacy. Therefore, it is clearly deceptive and misleading business practices by Defendant's pharmacy to create and provide documents on November 6, 2018, stating, showing or indicating a different transactions amounts from what is actually stated in the original medical records. Making such a misrepresentations is also a fraudulent practice.

## BROADER IMPACT ON CONSUMERS AND CUSTOMERS

108. Defendant's pharmacy has been repeatedly and persistently engaged in material deceptive or misleading consumer-related business practices and services with the Plaintiff, i.e.

alterations, falsification and misrepresentation of the Plaintiff's medication profile and medical records and potentially, to other consumers, customers, and purchasers in an effort to evade liability, in any event to which a complaint or claim is served or may file against the Defendant's pharmacy. The Defendant's pharmacy and their deceptive practices have a broader impact on consumer at large. In that, other customers/consumers have their medical records, located at the Defendant's pharmacy, and the same acts against Plaintiff could potentially affect similarly situated customers and consumers, should any attempted to make a complaint or filed a claim against the Defendant's pharmacy.

109.   For example, each time customers, consumers and purchasers purchase prescription drugs at Defendant's pharmacy, by law, the Defendant's pharmacy must create/establish a medication profile and medical records which suppose to be properly and accurately maintained. The Defendant's pharmacy, cannot and should not be allowed to feel free to access and make any alteration(s) and falsification to any customer(s), consumer(s) or purchaser(s) medical records or medication profile, in an effort to evade liability or potential liability or as a complaint or claim is filed against the Defendant's pharmacy. That is wrong.

110.   GBL § 349 (h) provides in relevant part that: "… any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice [or] an action to recover his actual damages …"

111.   Defendant's pharmacy violation of GBL § 349 has caused Plaintiff to suffer injury, including, inter alia, **(a)** As a result of Defendant's pharmacy violation of GBL § 349, by means of deceptive, falsification, alterations and misrepresentations/fraud in Plaintiff medical records, the Plaintiff cannot with good faith submit his claim to the workers' compensation insurance carrier for reimbursements pertaining to out-of-pocket medical expenses/prescription medicine costs $93.63.

112.    Defendant's pharmacy violation of GBL § 349 has caused Plaintiff to suffer injury, including, inter alia, **(b)** those described above. As a result of Defendant's pharmacy violation of GBL § 349, Plaintiff seeks an order so to prohibit and enjoin Defendant's pharmacy from the various alterations, falsification and misrepresentations in the medical records, including the plaintiff's electronic health records/electronic medical records, medication profile, medical expenses, third party payer information, billing information.

113.    Defendant's pharmacy willfully and knowingly engaged in the conduct alleged herein. Defendant's pharmacy actions made it even impossible for Plaintiff to submit a claim to the worker's compensation insurance carrier for well over-due reimbursements of out-of pocket expenses for prescription drugs. Defendant's pharmacy acted immorally and unconscionably.

114.    Plaintiff is entitled to all applicable damages, including treble, damages, injunctive relief, and attorney fees, if any, pursuant to New York GBL § 349 (h).

## AS FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS PDX, INC.
### Product Liability

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the Complaint as if set forth at length herein. Further, Plaintiff incorporates herein by reference paragraphs one (1) through one hundred and fourteen (114) above.

115.    The NHIN/PDX Pharmacy Management Application/software/programs created, designed, produced, distributed and licensed for use to retailers/licensees by Defendant(s) NHIN/PDX was defective in design in so far as it was designed and modified to print patient education monographs that automatically omitted on more than one occasions various information such as warnings, directions, possible uses, precautions, interactions, adverse effects and serious risks pertaining to the drug the patient education monographs accompanied, including, in this case Sertraline and Bupropn. Then, later on August 22, 2018, August 27, 2018,

and November 6, 2018, respectively, the NHIN/PDX Pharmacy Management Application/software/programs automatically performed or permitted various alterations and falsifications of Plaintiff's medical records, and/or allow or permit Defendants Kmart pharmacy to directly performed various alterations and falsifications that they may have needed to add in the Plaintiff's medical records, or to modify, altered or change certain information in the Plaintiff medicals records that was already established, or was previously omitted from the Plaintiff original medical records. In fact, also simply put, NHIN/PDX Pharmacy Management Application/Software including the Absolute AR are defective in design and cannot process and/or retrieve the Plaintiff electronic medical records without a false, fraudulent and well fabricated misleading medical records. In fact, some of the plaintiff's medical records were willfully destroyed, disappeared, or gone into destruction.

116.   The said defects in design caused Plaintiff to sustain the herein described injuries and damages.

117.   As a direct result of the defective software, Plaintiff BRIAN COKE NG was caused to suffer the injuries described herein.

### AS FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
#### Negligence

BRIAN COKE NG, the Plaintiff, repeats and realleges all allegations of the Complaint as if set forth at length herein. Further, Plaintiff incorporates herein by reference paragraphs one (1) through one hundred and seventeen (117) above.

118.   At all times herein mentioned NHIN/PDX owed a duty of reasonable care to Plaintiff BRIAN COKE NG, and assumed a duty of care by undertaking to render services to Defendants Kmart Pharmacy of a kind that Defendants NHIN/PDX should have recognized as necessary for the protection of third persons, including Plaintiff BRIAN COKE NG.

119.   Defendants NHIN/PDX breached its duty of reasonable care to Plaintiff by failing to create and provide reasonable, correct, truthful, reliable, adequate and accurate information pertaining to the Plaintiff's medical records, and Plaintiff's prescription for Sertraline and Bupropn. If NHIN/PDX had not intentionally modified the software to allow Defendants Kmart Pharmacy to distribute patient education monographs that automatically omitted various information such as warnings, directions, possible uses, precautions, interactions, adverse effects and serious risks pertaining to the drug the patient education monographs accompanied, including, in this case Sertraline and Bupropn. Then, later on August 22, 2018, August 27, 2018, and November 6, 2018, respectively, the NHIN/PDX software automatically performed or permitted various alterations and falsifications in the Plaintiff's medical records, and/or allow or permit Defendants Kmart pharmacy to directly performed various alterations and falsifications that they may have needed to add in the Plaintiff's medical records, or to modify or change certain information in the Plaintiff medicals records that was already established, or was previously omitted from the Plaintiff original medical records, then Plaintiff would not have sustained the injuries and damages described herein.

120.   NHIN/PDX actions were taken with malice, oppression and fraud in that NHIN/PDX intentionally modified the NHIN/PDX software to allow the distribution of patient education monographs that automatically omitted on more than one occasions various information such as warnings, directions, possible uses, precautions, interactions, adverse effects and serious risks pertaining to the drug the patient education monographs accompanied, including, in this case Sertraline and Bupropn. Then, later on August 22, 2018, August 27, 2018, and November 6, 2018, respectively, the NHIN/PDX software automatically performed or permitted various alterations and falsifications of Plaintiff's medical records, and/or allow or

permit Defendants Kmart pharmacy to directly performed various alterations and falsifications that they may have needed to add in the Plaintiff's medical records, or to modify or change certain information in the Plaintiff medicals records that was already established, or was previously omitted from the Plaintiff original medical records. The Defendants NHIN/PDX knew that such conduct to willfully altered and falsified Patient(s) medical records, including the Plaintiff's medical records is wrong and is not acceptable, and such acts rendered the medical records useless. Said conduct by Defendants was despicable and in willful and conscious disregard for the rights and safety of others. Also, when retrieving patient(s) medical records, alterations and falsifications is not part of the process, and anything of such, is wholly inappropriate, in every respect. Regardless of the situation and temptation, alteration and falsification is patently clearly wrong.

121.    Defendants Kmart Pharmacy have many and several Data breaches in the past. The Defendants Kmart Pharmacy data breaches were the results of lax anti-virus standards. Defendants Kmart Pharmacy negligent here in this case, in that, they failed to adequately protect and safeguard the Plaintiff's Electronic Medical Records.

122.    NHIN/PDX equally and evenly negligent, in that, they have incorporate Fault Tolerance System Solution into its design practices, for hardware and data center redundancies. It may seem ensures that if someone should unplug a server, the entire system won't go down because functions are being mirrored on a redundant server. But, unfortunately, however, the truth is,  **fault tolerance** offers little protection against software failure(s) which is a major cause of downtime and data center outages for most organizations. Therefore, High Availability solutions make more sense for a company that provides software driven services, where a few moments of server downtime may hurt the bottom-line, but doesn't put anyone's lives at risk.

And since high availability doesn't require every piece of physical IT infrastructure to be replicated and integrated, it is a much more cost effective solution. In fact, most organizations are willing to accept the possibility of occasional downtime over the certainty of paying to implement a fault tolerant solution that may still be compromised by software problems.

## FURTHER REASONABLE ALTERNATIVE DESIGN

123.    Alternative Design to Pharmacy Management Application/Software/Program with respect privacy and security features, such as to provide accountability for use or misuse of the patient Medical information viewed, altered or changed are as follows:

- Anomaly detection should be considered;

- Security Analytics for the electronic medical records and electronic health records;

- Build system with capabilities that can assist in the prevention, detection, investigation, and mitigation of medical identity theft

- Deploy technical fraud prevention measures such as anomaly detection and data flagging, supported by appropriate policies and processes so that all red flags are appropriately investigated

- NHIN/PDX Pharmacy Management Application/software/program" need to have in place signals/flags/alerts to which will automatically trigger a series of repeated warnings at anytime any alterations or changes made to patients existing electronic medical records (EMR) and/or patients existing electronic health records (EHR). Also, require person(s) with full and complete authority to initiate a two step signature confirmation, prior to any alterations or changes in patients existing electronic health records. Additionally, prior written notice should be sent to patient(s), and the patient's written authorization and signature should be received prior to any alterations or changes of patient existing electronic health records and/or the patients existing electronic medical records.

124.    As a direct and proximate cause of the negligent conduct by Defendants Sears Holdings Corporation, Kmart Holding Corporation, and PDX, INC/NHIN. Mr. Coke Ng sustained and will continue to sustain the injuries and damages described herein.

WHEREFORE, Plaintiff prays and respectfully request judgment against Sears Holdings Corporation, Kmart Holding Corporation, and PDX, INC/NHIN., and awarding as follows:

(a)    On the First through Fifth cause of action, including **(1)** Intentional infliction of emotional distress and Aggravation and Exacerbation Asthma **(2)** Intentional Misrepresentation/Fraud/Constructive Fraud **(3)** Violation of Section 349 of the New York General Business Law, **(4)** Product Liability, and **(5)** Negligence, damages in an amount to be determined at trial;

(b)    Punitive damages in an amount to be determined at trial;

(c)    Attorneys' fees, if any, and costs pursuant to New York GBL § 349(h)

(d)    On all cause of action, prejudgment interest, post judgment interest, attorneys' fee, if any;

(e)    Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
        June 17, 2019

All Prepare for, upon request of
BRIAN COKE NG
    40 Ann Street
    New York, NY 10038
**Mailing Address For All Mails:**
    Church Street Station, P.O.
    Box 2723, New York,
    New York, 10008
    Tel: (646) 820-9238

# EXHIBIT 1

6/9/2019     Re: Proof of Claim, In re Sears Holdings Corporation, *et al.*, debtors. Case No. 18-23538 (RDD), Jointly Administered, briancng38@gm...

18-23538-shl   Doc 4249   Filed 06/17/19   Entered 06/17/19 16:16:03   Main Document
Pg 50 of 206

On Apr 11, 2019, at 12:21 PM, Peshko, Olga <Olga.Peshko@weil.com> wrote:

Mr. Ng,

We will give you a call shortly today on your questions.

I am not aware of any basis under federal law for bringing an adversary proceeding in Sears's chapter 11 cases by a creditor against a non-debtor party like PDX. You and PDX should deal with your dispute outside of these cases.

Olga

**From:** Brian Coke Ng <briancng38@gmail.com>
**Sent:** Thursday, April 11, 2019 11:43 AM
**To:** Peshko, Olga <Olga.Peshko@weil.com>
**Subject:** Re: Proof of Claim

Good Morning Ms. Peshko,

If you may recall that during our conversation last week, you had promised to send me an email of a letter from the debtors in response to my proof of claims matters that I had raised, but that the letter was being review by another department before it could be sent to me.

It has been more than a week since I was advised of such letter, and I have not received any letter from the debtors.

You had asked how do I plan to proceed with the matters with respect to my proof of claim, and I had advised you that I was waiting on the debtors' response that you promised to send via email.

As you have mentioned, the debtors will appear in court next week on April 18, and some other date next month. As I have stated before, I do not agree to put the court on notice for a hearing and don't know the contents of the debtors response, so to give me an opportunity to be fully prepared.

During our telephone conversation you had briefly mentioned something about pre-petition and post-petition claims that may needed a court hearing to determine.

At this point, If a hearing is needed as you have mentioned last week, Then I believe it's appropriate to file a lawsuit against PDX Inc. and very soon, I plan to file with the bankruptcy court an adversary proceeding against the non-debtors PDX Inc. and bring them into the court too.

If you have questions, please contact me. Thanks

Best Regards,
Brian Coke Ng

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------------x

BRIAN COKE NG

Plaintiffs,

-against-

KMART PHARMACY
KMART HOLDING CORPORATION
SEARS HOLDINGS CORPORATION
SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.

Defendants.

--------------------------------------------------------------------------x

Index No.: 100386/18

JUDICIAL SUBPOENA
DUCES TECUM

RECEIVED
JUN 29 2018
PART 58
NYS SUPREME COURT - CIVIL

TO:    Kmart Pharmacy
770 Broadway
New York, N.Y. 10003

WE COMMAND YOU, that all business and excuses being laid aside, you and each of you produce before Hon. Presiding Justice at New York County Supreme Court, at 60 Centre Street, New York, New York 10007 on or before the 20th day of July 2018, at 9:30 o' clock, in the forenoon, on the part of the Plaintiff, the following records pertaining to: **BRIAN COKE NG (patient), D/O** ~~Reducted~~

Certified copy of each and every part of medication profile and all records maintained relating to the Plaintiff Brian Coke Ng, including all reports, notes, mental health information, known allergies and drug reactions, chronic diseases, list of medications and relevant devices and other information reported to the pharmacist appropriate for counseling an individual regarding use of prescription and over-the-counter drugs; and a Certified copy of Kmart Pharmacy Notice of Privacy Practices with effective date September 2,2014, as well as a Certified copy with effective date January 6, 2015 respectively.

(Pursuant to the Civil Practice Law and Rules Section 2301, all papers or other items delivered to the court pursuant to this subpoena shall be accompanied by a copy of this subpoena.)

Failure to comply with this subpoena is punishable as a contempt of Court and shall make you liable to the persons on whose behalf this subpoena was issued for a penalty not to exceed fifty dollars and all damages sustained by your failures to comply.

WITNESS, Honorable *DAVId B, Cohn* one of the Justices of said Court, at 60 Centre Street, New York, New York 10007 the 29th day of June, 2018.

**NO APPEARANCE REQUIRED**
Please forward medication profile
Records along with the attached
Certification of Business Records
Sworn and signed to: New York
County Supreme Court
Subpoenaed Records Room
60 Centre Street, Room 145-M
New York, New York 10007

Brian Coke Ng, (Plaintiff)
40 Ann Street
New York, N.Y. 10038
Tel: 646.318.5571

SO ORDERED

**HON. DAVID B. COHEN**
**J.S.C.**

**Kmart**



## AUTHORIZATION FOR USE AND DISCLOSURE

### MUST BE FILLED OUT COMPLETELY

BY SIGNING THIS FORM I AM INSTRUCTING KMART PHARMACY TO DISCLOSE MY PERSONAL HEALTH INFORMATION AS FOLLOWS:

Patient Name: BRIAN COKE NG

Date of Birth: ~~Redacted~~    a/k/a:

Address: 40 Ann Street, New York, N.Y. 10038    Date of Death (if applicable): N/A

I voluntarily authorize and permit disclosure of any and all medical records including pharmacy prescription and expense records for the time period of: January 2010 through June 2018 (NOTE: We do NOT have records over 10 years old) a COPY NOTICE OF PRIVACY PRACTICES Relative to my Medication profile/records

My records contain information about drug and/or alcohol abuse, mental health, HIV/AIDS and/or sexually transmitted disease. I agree to its release, only if initialed below (person signing Authorization must INITIAL those for which permission to release is given):

Drug Abuse _____

Alcohol Abuse _____

HIV/AIDS _____

Mental Health ✓

Sexually Transmitted Disease _____

Sickle Cell Anemia _____

(2) PLEASE SEND MY RECORDS TO ☐ ME OR TO ☐:
Kmart Notice of Privacy Practices

Name: New York County Supreme Court    Complete Address: 60 Centre Street, Room 145 N
Subpoenaed Records Room    New York, N.Y. 10007

The purpose of this request to release and/or disclose the personal health information described above is:

☐ Pending litigation; or ☐ Insurance Submission, or ☐ Taxes, or ☐ Other (describe)

This Authorization will expire on: during Pending Litigation or June 2028 (If I fail to specify a date this authorization will automatically expire 90 days from the day of my signature).

I understand that 1) I can revoke this Authorization at any time by giving my written revocation to the Kmart Pharmacy. My revocation is not effective as to disclosures already made and actions already taken in reliance upon this Authorization; 2) Kmart Pharmacy may NOT condition treatment, enrollment in the health plan or eligibility for benefits on whether I sign this Authorization; 3) I am authorizing disclosure of information protected under federal law; 4) This information, once disclosed, may be subject to re-disclosure by the recipient and no longer be protected by state or federal law; 5) I have the right to receive a copy of the authorization; and 6) A photocopy or facsimile of this authorization shall have the same authority as the original and may be substituted in its place.

By my signature I certify that the information provided is true and complete. If signed by the parent or legal guardian, I certify that the patient is not [varies by individual state] married, a member of the armed forces or otherwise an emancipated minor. I understand that Kmart Pharmacy may be prohibited by law from providing certain health information and that this information will be redacted from the health information Kmart provides me.

Signature: _____    Date: June 29, 2018

Printed Name: BRIAN COKE NG

Your Relationship to Patient* (Must Be Completed): Patient

*NOTICE    ALL AUTHORIZATIONS EXECUTED BY PERSONS OTHER THAN THE PATIENT, ARE REQUIRED TO BE REVIEWED BY THE LAW DEPARTMENT AT CORPORATE HEADQUARTERS, PURSUANT TO THE PROVISIONS OF THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT, 45 CFR §164.500, ET SEQ. UNLESS YOU ARE A PARENT OF AN UNEMANCIPATED MINOR PATIENT, ALL PERSONS WHO EXECUTE THIS AUTHORIZATION ON BEHALF OF THE PATIENT ARE REQUIRED TO PROVIDE DOCUMENTATION WHICH LEGALLY EMPOWERS THEM WITH THE AUTHORITY TO RELEASE THE PERSONAL HEALTH INFORMATION SOUGHT. FAILURE TO PROVIDE SUCH DOCUMENTATION WILL RESULT IN A DENIAL OF THE REQUEST TO RELEASE RECORDS.

### PHARMACIST MUST COMPLETE THIS SECTION:

VERIFICATION OF ID OF PERSON SIGNING AUTHORIZATION:

☐ Driver's License
☐ State I.D.
☐ Passport    ☐ Military
☐ School I.D. (Minor Only)

ID Number & State: _____

PHARMACISTS ACKNOWLEDGEMENT OF ID VERIFICATION:

Pharmacist Full Name: _____

Pharmacist Signature: _____

Date ID Verified: _____

SHC Pharm-001 Gen (Rev. 6-12)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No.: 100386/18

------------------------------------------------------------------x

BRIAN COKE NG

**CERTIFICATION OF
BUSINESS RECORDS**

Plaintiffs,

-against-

KMART PHARMACY
KMART HOLDING CORPORATION
SEARS HOLDINGS CORPORATION
SEDGWICK CLAIMS MANAGEMENT SERVICES. INC.

Defendants.

------------------------------------------------------------------x

STATE OF NEW YORK

COUNTY OF _____

I _____, the undersigned herein, being duly sworn, deposes and says:

1.     I am the duly authorized custodian or other qualified witness of Mr. Brian Coke Ng's medication profile/records, and the Kmart Pharmacy Notice of Privacy Practices to which maintained as business records of Kmart Pharmacy #7777, and located at 770 Broadway, New York, N.Y. 10003, and have the authority to make the certification.

2.     To the best of my knowledge, after reasonable inquiry, Mr. Brian Coke Ng's medication profile/records, and Kmart Pharmacy Notice of Privacy Practices bearing effective date:_____, and bearing the location of: New York or the copies thereof are accurate and genuine versions of the documents described in the subpoena duces tecum that are in the possession, custody or control of Kmart Pharmacy #7777, located at 770 Broadway, New York, N.Y. 10003.

3.     To the best of my knowledge, after reasonable inquiry, Mr. Brian Coke Ng's medication profile/records, and Kmart Pharmacy Notice of Privacy Practices bearing effective date(s):_____, and bearing the location of: New York, represent all the documents described in the subpoena duces tecum, except that the following documents are missing for the reason stated:_____

4.     Mr. Brian Coke Ng's medication profile/records, and Kmart Pharmacy Notice of Privacy Practices bearing effective date(s):_____, and bearing the location of: New York or copies produced were made by the personnel or staff of the Kmart Pharmacy business, or persons acting under their control, in the regular course of business, at the time of the act, transaction, occurrence or event recorded therein, or within a reasonable time thereafter, and that it was the regular course of business to make such records.

_____
Affiant's Signature

SWORN TO AND SUBSCRIBED before me on this the _____ day of _____, 2018.

SEAL

_____
Notary Public
My commission expires: _____

THE STATE OF NEW YORK
SUPREME COURT, NEW YORK COUNTY

**Index No.: 100386/18**
**Filed On:**

BRIAN COKE NG

-against-

**Affidavit of Service**
**SUBSTITUTE**

KMARK PHARMACY , KMART HOLDING CORPORATION , SEARS HOLDING CORPORATION ,
SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.

STATE OF NEW YORK, COUNTY OF NEW YORK: LAURANCE KNOX, being duly sworn, deposes and says that deponent is not party to this action, is over 18 years of age and resides in the State of New York.

That on 7/10/2018 at 3:51 PM at 30 VESEY STREET , 8TH FLOOR , NEW YORK, NY 10007, your deponent served the JUDICIAL SUBPOENA DUCES TECUM, & attachments , AUTHORIZATION FOR USE AND DISCLOSURE & CERTIFICATION OF BUSINESS RECORDS  TO BE COMPLETED    bearing Index # 100386/18 upon KMART PHARMACY C/O SOBEL PEVZNER LLC , by delivering a true copy  in a plain envelope marked 'personal and confidential' to a person of suitable age and discretion, to wit: " JANE DOE " , MANAGER OR OWNER , who verified that the intended recipient actually is employed at this location.

Your deponent describes the person so served to the best of deponent's ability at the time and circumstances of service as follows:

Gender:    Female
Skin Color:    White
Hair Color:    Brown
Approximate Age:    38 - 42
Approximate Height:    5ft 4in - 5ft 8in
Approximate Weight:    160 - 170
Other Information:    REFUSED SERVICE .
AT THE GIVEN ADDRESS I SPOKE WITH THE RECEPTIONIST WHO WENT IN THE BACK AND ASKED ANOTHER FEMALE WHO I BELIEVE TO BE THE OWNER OR MANAGER OF SOBEL PEVZNER TO COME OUT I WAS TOLD BY " JANE DOE " SHE COULD NOT ACCEPT SERVICE, BECAUSE THE DOCUMENTS WERE NOT MADE OUT TO " SOBEL " . I THEN STATED I SERVED K-MART PHARMACY AT THIS LOCATION BEFORE. SHE THEN STATED ONCE AGAIN SHE WAS NOT ACCEPTING SERVICE AT WHICH POINT I LEFT THE DOCUMENTS ON THE COUNTER. AND WALKED INTO THE ELEVATOR AND " JANE DOE " CAME INSIDE WITH ME AND STATED SHE WAS NOT ACCEPTING SERVICE. WHEN WE GOT TO THE MAIN FLOOR SHE TRIED TO GIVE ME BACK THE DOCUMENTS WHICH I DID NOT ACCEPT, SHE THEN TOLD THE DOOR MAN / GUARD AT THE MAIN DOOR NOT TO LET ME BACK INTO THE BUILDING.

That on 7/11/2018, your deponent mailed a true copy of same by First Class Mail properly enclosed and sealed in a postpaid wrapper addressed to the recipient at: 30 VESEY STREET , 8TH FLOOR , NEW YORK, NY  10007 in an envelope bearing the legend "Personal and Confidential".  Said envelope was deposited in an official depository under exclusive care and custody of the U.S. Postal Service.

That at the time of service as aforesaid, your deponent asked person spoken to whether the intended recipient was currently enrolled in military service or dependent on someone in the military service of the United States of America and received a negative reply.  Upon such information, I aver that the named recipient is not actively enrolled in nor dependent on someone in the military service of the
Sworn to before me on 7/16/2018:

LEANNA ONECIA KELLOWAN
Notary Public, State of New York
No. 01KE637801
Qualified in QUEENS County
Commission Expires 07/16/2022

LAURANCE KNOX
NYC License # -  1167432



RETURN TO: Nationwide Court Services, Inc.
20 VESEY ST REAR LOBBY
NEW YORK, NY 10007
DCA Lic#: 1037536 Ph: 212-349-3776
(NCS642375)LK 849300

# EXHIBIT 3

## LICENSE AGREEMENT

This Agreement is made as of this _14th_ day of _June_, 1991 by and between PDX, Inc., a Texas Corporation with its principal place of business in Granbury, Texas (hereinafter referred to as "Licensor") and Kmart, a _Michigan_ Corporation whose address is 3100 W. Big Beaver, Troy, MI 48084-3163 (hereinafter referred to as "Licensee").

## R E C I T A L S:

A.  Licensor represents itself to be the owner of certain copyrighted systems and programs which are described in exhibits attached hereto and made a part hereof to be used on hardware approved by Licensor. Said Systems and programs shall be referred to herein as the "System". The System incorporates application programs copyrighted by PDX, Inc.

B.  Licensee desires to use the System as an End User on hardware approved by Licensor.

## W I T N E S S E T H:

1.  **License**. Licensor hereby grants and Licensee hereby accepts upon the terms and conditions set forth herein, a non-exclusive license to use the System.

2.  **Term**. This agreement shall be in full force and effect perpetually from date of this Agreement unless terminated according to the terms of this Agreement.

3.  **Use of the System**.

a.  The license granted under this Agreement authorizes the Licensee to use the System in machine readable form on any number of central processing units (CPU's) at each Licensee retail store having a pharmacy (a "Store") provided that the license fee set forth in Exhibit "A" has been paid for the Store. For purposes of this Agreement, "use" includes the copying of any portion of the System, including instructions or data from storage units or media into the CPU for processing. If a store for which the License Fee has been paid closes or is relocated, the license may be transferred by Licensee to a new store at no additional charge.

b.  Licensee agrees that its rights to use the System are non-exclusive and that others may be licensed or


EXHIBIT
"C"

sublicensed to use the System by Licensor or someone at the direction of Licensor.

      **c.**   Because of compatibility requirements, Licensee agrees that it will use the System only in conjunction with hardware approved by Licensor. Licensor warrants that the System will perform as set forth in this Agreement, including attachments, on the hardware listed in Exhibit F, attached hereto and made a part hereof.

      **d.**   The copyright, and the ideas and expressions thereof contained in the System, and all physical embodiments thereof, and materials supplied hereunder in connection therewith and any rights of patent are represented by Licensor to be confidential and proprietary information of Licensor, and Licensee has no information or belief to the contrary. Licensee agrees that it will not provide or make available to other than those of its employees or consultants (who will sign confidentiality agreements in form reasonably acceptable to Licensor) required to use the System in its business, the System, or any part thereof, including any physical embodiment thereof, or any material supplied by Licensor in connection herewith, including but not limited to flowcharts, logic diagrams and Source Code, in any form. If Licensee is required to disclose any confidential or proprietary information provided hereunder pursuant to any governmental or legal proceedings, Licensee shall not be liable for such disclosure provided Licensee gives Licensor reasonable prior written notice of the request for disclosure so that Licensor may seek an appropriate protective order in connection therewith.

      **e.**   Licensee shall not copy nor duplicate, in whole or in part, the System nor any part thereof provided under this Agreement in computer code form except as expressly provided in Paragraph 6 and Paragraph 3a of this Agreement. Licensee may copy any user materials provided by Licensor in such quantities as may be reasonably required for operation of the System within the scope of this Agreement.

      **f.**   Licensee shall take such steps to protect and maintain the confidentiality of the System and any tapes, diskettes and other physical embodiments thereof and materials supplied hereunder as Licensee takes to protect its own confidential and proprietary information and products. Licensor agrees that any information which Licensor views through its agents or employees while on the premises of Licensee shall be considered confidential information of Licensee and treated by Licensor as such under the terms of this Agreement. Further, in the event Licensee furnishes Licensor with information, in any form, which is designated by Licensee in writing or clearly stamped "Confidential", in conjunction with this Agreement, Licensor will take such steps to protect and maintain the confidentiality of same as it takes to protect its own confidential and proprietary information. The

-2-

obligations of confidentiality and non-disclosure of the parties set forth in subparagraph (d) and this subparagraph (f) of Paragraph 3 shall not extend to information which (1) is or becomes available to the general public by acts not attributable to the receiving party, (2) is hereafter furnished to receiving party by a third party as a matter of right without restriction or disclosure, or (3) the receiving party is obligated to produce same under court or a governmental order, after having given reasonable notice to the other party with opportunity to seek protection before such court or governmental entity.

g.   Licensee shall notify Licensor of the circumstances known to Licensee surrounding any unauthorized possession, use or knowledge of the System, or any part thereof, or any physical embodiment thereof or material in connection therewith which is supplied to Licensee hereunder.

h.   Within forty-five (45) days of execution and effective date of this Agreement, Licensor agrees to deposit with an escrow agent, mutually agreed upon between Licensor and Licensee (the "Escrow Agent"), a copy of the Source Code of the System. In addition, from time to time thereafter, Licensor will deposit with the Escrow Agent a copy of the Source Code for improvements, revisions and enhancements or updates of the System within a reasonable time after creation thereof. As used herein, Source Code means the Source Code as originally deposited, and all revisions, updates or improvements that constitute additional deposits, so that, at all times, the Source Code will functionally correspond with the System actually in use by Licensee. Nothing in this Agreement shall be interpreted to deprive Licensor of Licensor's right, title and interest in the Source Code. Similarly, this Agreement will be construed to effectuate the purpose of allowing Licensee the continued benefit of the System, in the event of a default by Licensor, as defined in this paragraph. Licensor represents that it will enter into an Escrow Agreement with the Escrow Agent mutually acceptable to the parties hereunder, and will not terminate such agreement during the term of this Agreement. The Source Code will be delivered to the Escrow Agent in the form suitable for reproduction by computer and photocopy equipment, and shall include, full source language statement of the System, to the extent Licensor has same, and program maintenance documentation and other materials necessary to allow a reasonably skilled third-party programmer or analyzer to maintain or enhance this System without the help of any other person or reference to any other material. Licensee shall pay for all fees associated with the Escrow Agreement or the Escrow Agent.

Any one of the following events will constitute a default by Licensor under this paragraph thereby permitting Licensee to obtain from the Escrow Agent a copy of the Source Code as defined above, to be used by Licensee under a non-exclusive license to permit Licensee to obtain the continued benefit of the System:

-3-

(i)   Licensor fails to correct any malfunction, defect or non-conformity in the System, which prevents the System from substantially performing its intended tasks, provided that Licensee provides written notice to Licensor, specifying in detail the ways in which the System fails to so perform and provides Licensor a reasonable time within which to correct same.   A reasonable time shall be defined on a case-by-case basis, and in the event of a dispute between Licensor and Licensee as to what constitutes a reasonable time, it shall be defined by a majority of the customers of Licensor using a similar System.   It shall not be a failure on the part of Licensor to correct a malfunction, defect or non-conformity in the System if the request by Licensee actually constitutes the request for an enhancement.

(ii)  Licensor fails to discharge its maintenance obligations with respect to the System in accordance with the standards for such maintenance set forth in the Agreement or in the SOFTWARE MAINTENANCE AND SUPPORT AGREEMENT ATTACHED AS EXHIBIT B within a reasonable time after Licensee provides written notice to Licensor specifying in detail the ways in which the System is not being properly maintained.   A reasonable time shall be defined as set forth hereinabove in subparagraph (i).

(iii) Any unpermitted sale, assignment or transfer by Licensor of the System which causes maintenance of the System to be unsatisfactory to a majority of the customers of Licensor using similar software.

(iv)  Licensor discontinues selling and supporting the System, or files a voluntary petition in bankruptcy or fails to have dismissed within sixty (60) days an involuntary petition in bankruptcy, and thereby fails to provide user maintenance for the System.

On the happening of any of the foregoing events, Licensee will provide written notice to the Escrow Agent of same, will identify this Agreement, will specify the nature of the default, and will demand delivery of a complete copy of the Source Code to Licensee.   Upon receipt of such notice, Escrow Agent will immediately notify PDX of the request, and Licensor will have ten (10) days after the receipt of such notice to dispute that a default has occurred, in which case the parties shall proceed as outlined in Exhibit "G" attached hereto and incorporated herein by reference.   If Licensor does not dispute that a default has occurred as provided in Exhibit "G", the Escrow Agent will immediately thereafter give a copy of the Source Code to Licensee. Upon receipt of the Source Code under this Agreement, it is understood and agreed that the Source Code and all works associated with the System are represented by Licensor to be proprietary and confidential to Licensor and unpublished but copyrighted works belonging to Licensor and therefore are trade secrets of Licensor,

-4-

and Licensee has no belief or information to the contrary. Any person or entity furnished same will treat same as the confidential property of Licensor, and Licensee may use same only for the purpose of supporting its own use of the System consistent with the terms of this Agreement.

4. **Consideration.** The price of the System and other charges shall be determined and paid in accordance with the schedule set forth in the exhibit attached hereto and incorporated herein by reference. The System and any equipment or installation services pertaining thereto to be provided by Licensor shall be furnished in accordance with the schedule set out in the exhibits attached hereto.

It is further agreed that the prices charged to Licensee under this Agreement, or any exhibit (except that this provision does not apply to Paragraph 10 of Exhibit "A" to this Agreement, which deals with Data Center Services) shall not be increased during the first twenty-four (24) months of this Agreement, nor thereafter more than once in any twelve (12) month period, except by mutual agreement of the parties. Any such increase shall not exceed the greater of seven percent (7%) per year or the corresponding increase in the Consumer Price Index for urban wage earners and clerical workers. Such increases, if not effected in whole or in part, may not be accumulated for subsequent years. This provision shall terminate on the fifth anniversary date of ACCEPTANCE. Thereafter all prices including but not limited to price for support and data services, will be subject to negotiation between the parties.

5. **Additional Duties of Licensor.** For one hundred twenty (120) days after ACCEPTANCE, as that term is defined in the Trial Period Agreement (to which this Agreement is subject), Licensor shall, without additional charge and within a commercially reasonable time, correct System errors and issue correction releases to Licensee. Licensor's undertaking hereunder is to make, at Licensor's cost and expense within a commercial reasonable time, any necessary modifications or corrections required to render the System operable according to the system specifications.

Upon the expiration of such period, Licensor's responsibilities for the aforesaid maintenance service shall cease, unless Licensee purchases maintenance service from Licensor pursuant to Exhibit "B", attached hereto and incorporated herein by reference. Licensor agrees to provide such maintenance service to Licensee for the System under the terms and conditions of Exhibit "B", provided Licensee abides by the terms of this Agreement and the Software Maintenance and Support Agreement (Exhibit "B"), for as long as Licensee has the System installed. Licensor shall provide Licensee with detailed invoices for all charges which shall be sent to the address of Licensee set forth hereinbelow, to the attention of J. B. Osweiler, Director of CIS

-5-

Administration and Equipment Purchasing. Licensor will invoice for first $269,750.00 payment, which payment is immediately due upon execution of this agreement and will invoice Lessee for second payment which invoice is due and payable immediately upon completion of the enhancements set forth in Exhibit "D".

## 6. Permission to Copy or Modify System.

a. Except as provided under this Agreement the Licensee shall not copy or allow to be copied in whole or in part the System in printed form. The System may be copied, in whole or in part, in printed or machine-readable form, as necessary, and only as necessary, for use by Licensee at any Store, consistent with this Agreement, including, for backup or archival purposes, so long as the Store fee has been paid and Licensee is in compliance with the terms of this Agreement. The original and copies (whether in whole or in part) of the System provided or made under this Agreement shall be the property of Licensor.

b. The Licensee shall reproduce and include Licensor's copyright notice when applicable on any copies (whether in whole or in part) in any form including partial copies and modifications of the System in accordance with any copyright instructions provided by Licensor.

## 7. Documentation and Training. 
Licensor shall provide Licensee with one (1) copy of documentation for the System and training for the System, which will be in form and substance at least equal to that generally provided in the industry, and which will provide such information regarding the operation and use of the System, as is necessary for Licensee to make effective use thereof. Licensee shall have the right, at no additional cost, to reproduce all documentation for its internal purposes, provided that such reproduction shall be subject to the same restrictions on use and disclosure as are contained in this Agreement with respect to the original documentation. The documentation shall include all necessary information relating to Kmart enhancements set forth in Exhibit "D" and, if the documentation is revised at any time during the terms of this Agreement, or if additional documentation is developed by Licensor with respect to the System, Licensor shall, within a reasonable time thereafter, deliver a copy of such revised or additional documentation at no cost to Licensee.

## 8. Copyright Indemnification.

a. Licensor shall defend and indemnify and hold harmless Licensee, and its subsidiaries, and each of their agents, servants and employees, from and against all third-party claims asserted against Licensee which allege that the System infringes any patent, copyright, trademark or other proprietary right or constitutes a misuse of any trade secret information. As such, Licensor shall pay all costs of such defense and indemnification,

-6-

including reasonable and necessary attorney's fees, settlement payments or damages and all other costs arising in connection with such claims, provided that Licensor is notified in writing as follows:  Kmart agrees to promptly and timely advise Licensor of any such suit, claim or proceeding or any other information of which Kmart becomes aware which should lead Kmart to believe that such suit, claim or proceeding might result.  Kmart also agrees to fully cooperate with Licensor in the defense or settlement of such suit, claim or proceeding, but Licensor shall have sole control therefor.  This indemnification shall be provided to Licensee only so long as Licensee uses the System in substantial compliance with this Agreement and the claim for suit arises out of use of the System used within the scope of the license granted hereunder.  In the event an injunction is obtained against Licensee's use of the System, in whole or in part, Licensor, at its option, shall promptly either:  **(i)** procure for Licensee, the right to continue using the System enjoined from use, or **(ii)** replace or modify same so that Licensee's use or possession is not subject to any such injunction, or **(iii)** refund to Licensee all amounts paid to Licensor for the license for the System, custom programing services if related to the System and use of same is lost as a result of the injunction (but not including maintenance fees, or data processing services).

**b.**    Licensor shall have no liability for any claim of copyright infringement based on Licensee's use of the System with non-Licensor's programs, if such infringement would have been avoided by Licensee's use of the System without such other programs.

**c.**    The within paragraph states the entire liability of Licensor with respect to infringement by the System or any parts thereof, and Licensor shall have no liability with respect to any other proprietary rights.

**9.   Additional Responsibilities of Licensee.**  Except as otherwise provided in this Agreement, Licensee shall be exclusively responsible for the supervision, management and control of its use of the System, including but not limited to:

**a.**    Assuring proper machine configuration, program installation, audit controls and operating methods.

**b.**    Establishing adequate backup plans, based on alternate procedures and/or based on access to qualified programming personnel to diagnose, patch and repair System defects, in the event of System malfunction; and

**c.**    Implementing sufficient procedures and check points to satisfy its requirements for security and accuracy of input and output as well as restart and recovery in the event of a malfunction.

-7-

**10.** <u>**Risk of Loss.**</u>  If the System is lost or damaged during shipment, Licensor will replace the System and program storage media at no additional charge to the Licensee. If the System is lost or damaged while in the possession of the Licensee, Licensor will replace the System at a charge for program storage media unless it is provided by the Licensee.

**11.** <u>**General Indemnification.**</u>

**a.**    Licensor shall reimburse, indemnify, defend and hold harmless Licensee and its subsidiaries, and each of their employees, agents, officers, and directors, from and against any damage, loss, expense, or penalty, or any claim or action therefore, by or on behalf of any person, including without limitation, property damage and bodily injury (including death) arising out of or occurring as a result of (i) any negligent or other tortious act or omission of Licensor or its agents or employees, or (ii) all claims of Licensor's employees or agents.

**b.**    Licensee shall reimburse, indemnify, defend and hold harmless Licensor, and each of its employees, agents, officers, and directors, from and against any damage, loss, expense or penalty, or any claim or action therefore, by or on behalf of any person, including without limitation, property damage and bodily injury (including death) arising out of or occurring as a result of (i) any negligent or other tortious act or omission of Licensee or its agents or employees, or (ii) all claims of Licensee's employees or agents.

**12.** <u>**Warranty.**</u>

Licensor warrants that the System shall: (a) conform to, meet, be compatible and perform in accordance with the specifications, descriptions, standards and objectives set forth in this Agreement and the attachments (which are Exhibits "A" through "G" and the Trial Period Agreement), with the exception that this warranty shall not be effective for Exhibit "D" and any references thereto relating to Kmart enhancements until same are completed by Licensor using its best efforts to complete same as soon as reasonably possible and after Beta testing of same by Kmart; (b) be in good working order for a period of one hundred twenty (120) days from date of ACCEPTANCE; (c) together with related services provided by Licensor constitute a working System integrated within itself; (d) together with Licensor's performance of this Agreement, be in compliance with all applicable federal, state and local laws and regulations; and  (e) not infringe any patent, copyright, trademark or other proprietary right of any third party.

-8-

13.   **Limitation of Liability.**

**a.**   THE FOREGOING WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE.

**b.**   EXCEPT WITH RESPECT TO PARAGRAPH 8 (COPYRIGHT INDEMNIFICATION), PARAGRAPH 11 (GENERAL INDEMNIFICATION) AND PARAGRAPH 3F (USE OF SYSTEM-CONFIDENTIALITY): LICENSOR'S LIABILITY FOR DAMAGES, REGARDLESS OF THE FORM OF ACTION, SHALL NOT EXCEED THE TOTAL OF ALL AMOUNTS PAID BY LICENSEE UNDER THIS AGREEMENT; AND NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES ARISING IN CONNECTION WITH THIS AGREEMENT OR THE PERFORMANCE, OMISSION OF PERFORMANCE OR TERMINATION HEREOF, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND WITHOUT REGARD TO THE FORM OF ACTION.

14.   **Taxes.**   During the term of this Agreement, Licensee shall pay all taxes of whatever kind and by whomever payable on or arising out of the use of the System by Licensee, always excluding income taxes of Licensor, but including, without limitation, all sales and use taxes and all Federal, State and Local property taxes.

15.   **Termination.**

**a.**   In the event of any failure by Licensor or Licensee to perform any of its respective material obligations or duties hereunder, the other party hereto may give written notice demanding that the defaulting party perform. The defaulting party shall have ten (10) days after receipt of such notice to cure the default. At the end of such ten (10) day period, if the defaulting party has not cured the default the other party may terminate this Agreement after giving written notice of its intent to terminate. Further, if any party hereto shall commence any proceeding of bankruptcy or become bankrupt, or if any Receiver, Trustee, or Creditors Committee shall be appointed to take charge of any of the party's property, the other party hereto may terminate this Agreement upon ten (10) days written notice to the other party.

**b.**   Except as provided in paragraph 3 above and Exhibit "G", and upon the effective date of termination of this Agreement for any reason whatever, Licensee shall cease to use the System and all copies thereof in whole or in part, and all physical embodiments, and all materials delivered to it by Licensor, and all copies of such materials. Licensee shall deliver to Licensor the System and all copies thereof in whole or in part, and all physical embodiments, and all materials delivered to it by Licensor, and all copies of such materials, or shall certify destruction of all such materials in writing to Licensor. Licensee shall further certify

-9-

10 of 18·23538-shl   Doc 4249   Filed 06/17/19   Entered 06/17/19 16:18:03   Main Document
Case 1:09-cv-01448-MHC   Document 153-3   Filed 02/15/13   Page 10 of 28
Pg 66 of 206

in writing that the items so delivered to Licensor are all of those described in the preceding sentence of which Licensee has knowledge. After such termination, Licensee shall maintain in confidence all confidential information which it gained with respect to the System.

### 16.   Restrictions on Assignment.   This Agreement shall not be assigned or otherwise transferred by either party except (1) by Licensee to a subsidiary or affiliate of Licensee who shall be bound by the terms hereof, or   (2) upon sale by Licensee or Licensor of substantially all of its interest in its business or its assets. In either such event, this Agreement may be assigned to purchaser thereof, provided such purchaser agrees in writing to be bound by all of the terms hereof.

### 17.   Entire Agreement.   This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and all oral or written representations by Licensor, Licensee or representatives of either, warranties, agreements and/or inducements relating to this Agreement and/or its subject matter, prior to the execution hereof, have been included herein, or to the extent not so included, shall be deemed fully performed and discharged or deliberately omitted. No provision hereof may be waived, modified or superseded, except in writing signed by the parties hereto. If any provisions or portions thereof of this Agreement are invalid under any applicable statute or rule of law, they are to that extent to be deemed omitted.   The paragraph headings used in this Agreement are provided solely for the convenience of the parties and shall not be considered relevant in any construction of this Agreement, or be interpreted to define, expand or limit the provisions of this Agreement.   Time is of the essence to this Agreement.

### 18.   Applicable Law.   THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN EXECUTED AND DELIVERED IN TROY, MICHIGAN, AND SHALL BE CONSTRUED, INTERPRETED AND ENFORCED UNDER AND IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MICHIGAN, LICENSOR AGREES TO EXERCISE ANY RIGHT OR REMEDY IN CONNECTION WITH THIS AGREEMENT EXCLUSIVELY IN, AND HEREBY SUBMITS TO THE JURISDICTION OF, THE STATE OF MICHIGAN COURTS OF OAKLAND COUNTY, MICHIGAN OR THE UNITED STATES DISTRICT COURT AT DETROIT, MICHIGAN.

### 19.   Notices.   All notices under this Agreement shall be in writing and sent by overnight courier or by certified mail, return receipt requested, to the parties at the following addresses:

PDX, Inc.                    Kmart
300 N. Crockett              3100 W. Big Beaver
Granbury, Texas 76048        Troy, ~~MT~~ 48084-3163
Attn: Ken Hill               Attn: Kevin Browett

-10-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered on the date first written above.

LICENSEE:                                    LICENSOR:

Kmart                                        PDX, Inc.

By: _David M Carlson_                        By: _____

Date: ___6/14/91___                          Date: ___6-18-91___

00000q9s/910612

-11-

## EXHIBIT "A" TO LICENSE AGREEMENT

### BETWEEN PDX, INC. AND KMART CORPORATION

1.    PDX commits to incorporate within its software, all requirements for Version 3.1 of the Telecommunications Standard or other Versions thereof which are adopted by NCPDP, prior to the implementation date by NCPDP of such standard. This will be done at no additional cost to Kmart.

2.    PDX will begin work with Kmart in order to develop all reasonable requirements of Kmart with respect to on-line inventory management, order replenishment and needs forecasting. This will be done at no additional cost to Kmart. Any software or other works developed thereby will be owned by PDX, including all rights of copyright, trade secret or otherwise. Kmart shall have the right to use such software developed in accordance with this paragraph pursuant to the terms of the License Agreement.

3.    PDX agrees that it will not provide its goods and services to any other PDX customer at a more favorable price than it provides same to Kmart for such comparable goods and services. Kmart shall not be entitled to complain that PDX has furnished its goods and services to another customer for a better price unless Kmart is purchasing a comparable make-up of such like goods and services.

4.    PDX commits, with the cooperation of Kmart, to interface the PDX Pharmacy System to Kmart's current local and wide area communications network.

5.    PDX commits to use its best efforts to develop cost basis electronic data interchange (EDI) for drug items by the end of calendar 1992, provided that Kmart reviews and approves the specifications for same in a timely manner.

6.    PDX commits to provide its personnel and resources reasonably necessary to assist Kmart in a data file conversion that is mutually agreed upon between the parties. This will be undertaken pursuant to the terms of PDX's Standard Data Migration Agreement, a copy of which is attached as Exhibit "C" to this License Agreement.

7.    It is agreed between the parties that the cost of the license of this License Agreement shall be calculated on the basis of $415.00 per store for use of the system. Kmart will make payment of said license fee by paying $269,750.00 as a down payment upon execution of the License Agreement. This shall be considered a payment for the licenses for 650 Kmart stores. Thereafter, after PDX has completed the enhancements and development of the software

EXHIBIT "A"

Page 1

changes provided for in Exhibit "D" to this License Agreement, Kmart shall pay an additional $269,750.00 for an additional 650 licenses for its stores. Upon payment of the two payments of $269,750.00 each, Kmart shall have the right to use the system pursuant to this License Agreement in 1,300 of its stores. Thereafter, as Kmart desires to install the system in additional stores, it will pay for additional licenses to PDX at the rate of $415.00 per store.

8.  With respect to maintenance of the software, Kmart will pay to PDX $10.00 per month per store, and PDX will provide the software maintenance and support pursuant to the Software Maintenance and Support Agreement attached as Exhibit "B" to this License Agreement. It is understood and agreed by the parties that Kmart will maintain a "help desk" consisting of Kmart's personnel who are proficient in software support who will take calls for support from the various Kmart stores. This help desk shall be the contact point between Kmart and PDX for such software maintenance. It is agreed that PDX shall have the right to reasonably approve the help desk to assure compliance with operational sufficiencies.

9.  It is further agreed between the parties that Kmart is purchasing and PDX is providing support and maintenance services on certain "HOST" software utilized by Kmart. This software maintenance and support will likewise be provided through the help desk approved by PDX and shall be in accordance with the terms of the Software Maintenance and Support Agreement attached to the License Agreement as Exhibit "B". Kmart agrees to pay a charge of $750.00 per month to PDX for such HOST maintenance and support.

10.  It is understood that PDX and Kmart are presently discussing providing Data Center Services for Kmart which will be provided pursuant to a Data Center Services Agreement, the terms of which will be subsequently negotiated between the parties. At the present time, it is anticipated that the items to be provided by PDX under that Agreement will be not less than the items currently provided to Kmart by Foxmeyer that are necessary for drug file and third-party maintenance as well as any additional items that are required by the PDX system as indicated on the Data Center listing attachment which is Exhibit "E" to this License Agreement.

It is also expected that the contract will provide that the Data Center Services will be provided to Kmart at the current price of $60,000.00 per year for all Kmart pharmacy operations, with that price not to be increased for a period of three years from date of that Agreement. In addition to the price of $60,000.00 per year, it is anticipated that PDX will likewise be entitled to proceeds from the sale of Data Center transactional information to sources other than IMS. It is also expected that parties will enter into a more definitive agreement providing for indemnity in favor of Kmart by PDX for all claims from third-parties against Kmart which might arise as a result of the sale of such transactional

EXHIBIT "A"

Page 2

data.  It is also expected that the parties will obtain a letter from an authorized representative of Foxmeyer indicating that Foxmeyer will agree to a discontinuance of its current $60,000.00 fee to Kmart which is associated with the drug file and third party file maintenance. Such discontinuance would be expected to be at the time payment begins to PDX for PDX's services under the Data Service Agreement. Further, it is expected that Foxmeyer will agree to continue to support the existing Kmart pharmacy software with the drug file and third-party file maintenance until all Kmart pharmacies are converted to the PDX software. During the time that Foxmeyer continues to provide Data Center Services to Kmart, it is understood that it will sell transactional data to sources other than IMS and will be entitled to any proceeds for the sale of such data. After the discontinuance of the Data Center Services by Foxmeyer, any sale or transaction of data will be done by PDX to sources other than IMS. In addition, upon execution of the Data Center Services Agreement, it is anticipated that PDX would guaranty Kmart that there will be no interruption in service of Data Center services if Foxmeyer is unable to continue Data Center Services support when PDX begins to provide such services.

It is understood between the parties that the foregoing is not a basis for this License Agreement or any Exhibits attached hereto. However, the parties do agree to negotiate in good faith to attempt to reach mutually acceptable terms for a Data Center Services Agreement between them or in accordance with the general terms set forth hereinabove.

11.  It is agreed between the parties that the hardware which is approved by Licensor is set forth on Exhibit "F" attached to this License Agreement.

00000q9s/910612

EXHIBIT "A"                                                    Page 3

## EXHIBIT "B"

## SOFTWARE MAINTENANCE AND SUPPORT AGREEMENT

1.        **Term of Agreement.**

This Software Maintenance and Support Agreement (referred to herein as the "Agreement") shall be for a term of one (1) year, beginning on the one hundred twenty-first (121st) day following ACCEPTANCE.   This Agreement will be automatically renewed on a yearly basis thereafter, until terminated by Kmart ("Customer") at any time on thirty (30) days' written notice.   In the event of a conflict between this Agreement and the License Agreement to which this Agreement is Exhibit "B", the License Agreement (including Exhibit "A") shall supersede and control.

2.        **Rates.**

a.     The maintenance charge is outlined in the License Agreement and Exhibit "A" thereto. Subject to the provisions thereof, PDX reserves the right to make changes to the maintenance charge on sixty (60) days' written notice to the customer.

b.     Monthly charges will be payable one (1) month prior to commencement of the month to which they apply. Unless agreed in writing, if payment is not received prior to the month for which it applies, this Agreement will terminate at the beginning of that month.

c.     The Customer will have the option at the commencement of the initial or any renewal term of this Agreement, to prepay the charges for the term of this Agreement.   If the customer elects to prepay, PDX, Inc. waives its rights to increase charges during the term of the Agreement.

3.        **Service Coverage.**

a.     The maintenance charge entitles the customer to the following services relating to the software as described herein.

(1)   Repair, replacement, or adjustment of faulty or malfunctioning software, and

EXHIBIT "B"                                                        Page 1

    **(2)** Preventive maintenance required, if any, as determined by PDX, Inc.

    **(3)** Service will be provided on a replacement basis as indicated below.

    **(4)** Replacement-service under this plan will be available by express air mailing of duplicate software of similar capacity and function to customer site.  Service will be available during normal business working hours (8:30 a.m. to 8:00 p.m., Central Standard Time, Monday through Friday exclusive of holidays).

**b.** The maintenance charges do not include, and the customer will be billed for, service calls arising from:

    **(1)** Abuse or mishandling of the software.

    **(2)** Damage or malfunction caused by forces external to the software, including, but not limited to: fire, flood, or acts of God, environmental conditions such as temperature, humidity, power fluctuations or failure, and static electricity, or any cause other than ordinary use.

    **(3)** Cause which is normally a customer responsibility, including, but not limited to: failure to care for the software according to the operating instructions provided with the software, misuse of the System, failure to reasonably and timely load new releases after the installation of the first 1,300 stores, and failure to follow instructions for use of the software.

**c.** The customer agrees to allow any PDX, Inc. service representative access to the equipment and software at any reasonable time and to comply with any reasonable suggestions made by the representatives with regard to the operation of the machine and software, and to cooperate fully with PDX, Inc. in the provision of service under the terms of this Agreement.

**4.**    **Payment.**

    All additional charges not covered by the maintenance charges outlined in this Agreement will be invoiced upon completion, and will be due and payable upon receipt of invoice.

EXHIBIT "B"                                        Page 2

If payment is not made within thirty (30) days of receipt of the invoice, this Agreement shall be terminated and any such charges deducted from any refund payable under paragraph 2c.

5.    **Indemnification and Limitation of Liability.**

The parties hereby incorporate by reference the provisions of the License Agreement which relate to indemnification and limitation of liability.

6.    **Default.**

The parties hereto incorporate by reference Paragraph 15 of the License Agreement.

7.    **Miscellaneous Terms.**

   a.   The customer warrants that he is the owner of the equipment on which the software covered by this Agreement will be operated, that he is the licensee of the software covered by this Agreement, or that he is an authorized representative of such owner and licensee, and that he has the authority to enter into this Agreement.

   b.   Federal, state and/or local taxes are included in the price of services or parts provided by PDX, Inc.

   c.   Duplicate software provided under this Agreement will be of equal function and quality to the original software.  Returned software becomes the property of PDX, Inc.

   d.   PDX reserves the right to terminate this Agreement when conditions at the site represent a safety or health hazard to PDX, Inc. representatives.

   e.   Customer agrees that the software covered by this Agreement shall not be moved to another address without prior written notice to PDX, Inc.

   f.   Paragraphs 3.f, 4 and 16 through 19 from the License Agreement are hereby incorporated into this Agreement by reference.

8.    **Telephone Support.**

Telephone support shall include all reasonable calls at no charge and entitles the customer to the reasonable use of PDX, Inc.'s toll free number.

EXHIBIT "B"                                                      Page 3

18-23538-shl   Doc 4249   Filed 06/17/19   Entered 06/17/19 16:18:03   Main Document
Case 1:09-cv-01448-MHC   Document 183-9   Filed 02/15/13   Page 18 of 28
18 of 28                                     Pg 74 of 206

9.      **Maintenance and Software Support.**

Maintenance and software support shall include:

a.      Software enhancements and program updates to the extent provided to the customer base of PDX.

b.      Maintenance of the software to ensure continuing conformity to the warranties set forth in Paragraph 12 (Warranty) of the License Agreement.

c.      Use of PDX, Inc.'s toll free hot-line for problem correction, technical help and such other information as may be reasonably necessary for Customer to make effective use of the software from 8:30 a.m. to 8:00 p.m., central standard time, Monday through Friday (exclusive of holidays). All work performed other than during such normal business hours, at customer's written request, will be at the rate of $45.00 per hour paid by Customer to PDX.

d.      Monthly software updates to the extent of one (1) per month, if necessary, and made available to PDX's general customer base.

e.      Two (2) user group meetings per year, to be provided by PDX, not to include customer travel costs, similar costs or registration fees. PDX has the right to reduce to one (1) the number of user group meetings per year in its discretion.

f.      Custom programming and related services or other work not covered by this Agreement and at Customer's written request, will either be negotiated on a per-case basis, or will be billed at an hourly rate in the range of $60.00 to $150.00 per hour. It is understood that no custom programming or other work not covered by this Agreement is anticipated prior to ACCEPTANCE. If any such custom programming or other work not covered by this Agreement is requested by Kmart, any fees for same will be negotiated between the parties.

Agreement No. _____
Date: _____

Contact: Kevin Browett         Installed At: _____
Customer: Kmart                _____
Address: 3100 W. Big Beaver    _____
City: Troy                     Contact: _____

EXHIBIT "B"                                        Page 4

State: Michigan
Effective: _____
Expiration: _____          (  ) Monthly Billing
                                             (  ) Annual Billing

**Software          Description                        Charge**

_PDX Pharmacy System_ _____ (See Exhibit A) _____
_____

_____ _____
_____ _____

_____ _____
_____ _____

_____ _____
_____ _____

                                             **Total:**

_____

EXHIBIT "B"                                            Page 5

The customer acknowledges that the terms of this Agreement have been read and are hereby accepted.

**Kmart**

3100 W. Big Beaver
Troy, MI 48084-3163

_____
Authorized Signature

David M. Carlson
_____
Name (Type or Print)
Senior Vice President
Corporate Information Systems
_____
Title

**PDX, Inc.**

300 North Crockett
Granbury, TX 76048

_____
Authorized Signature

Ken Hill
_____
Name (Type or Print)

President
_____
Title

00000q9s/910612

EXHIBIT "B"                                              Page 6

EXHIBIT "C"

## AGREEMENT FOR CONVERSION OR MIGRATION OF DATA

This Agreement is made and entered into by and between PDX, Inc. ("PDX"), a Texas corporation whose principal place of business is in Granbury, Texas, and Kmart Corporation of 3100 W. Big Beaver, Troy, MI 48084, (referred to herein as "PHARMACY") on the 3rd day of May, 1991.

WHEREAS, PHARMACY is presently a user of a pharmacy computer system which was modified by the Kmart Corporation;

WHEREAS, PHARMACY desires to begin using the PDX Pharmacy System and desires to employ PDX to provide the service of converting and/or migrating certain data ~~do not change~~ which the pharmacy had on the Kmart Pharmacy System to the PDX Pharmacy System in accordance with the terms of this Agreement;

WHEREAS, customer recognizes the difficulties and risks involved in converting or migrating data from one operating system to another;

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and conditions contained herein, the parties hereto agree as follows:

1.   PHARMACY hereby contracts with PDX to acquire from PDX services of converting and/or migrating PHARMACY's data from its existing Kmart Pharmacy System to the PDX Pharmacy System in accordance with the terms of this Agreement at no additional charge to PHARMACY.

2.   PHARMACY further understands and acknowledges that PDX has not guaranteed nor warranted its services of conversion or migration of the data.  However, PDX warrants that it will use its best efforts and due care to attempt to accomplish said conversion or migration.  PDX MAKES NO OTHER WARRANTY, WHETHER EXPRESSED OR IMPLIED, AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.   THE PARTIES FURTHER INCORPORATE PARAGRAPH 13B OF THE LICENSE AGREEMENT.

3.   Except to the extent PDX breaches the warranty set forth in paragraph 2 above, (i) PHARMACY acknowledges that neither PDX its agents, servants, employees, subsidiaries, nor related companies shall be held responsible for any missing or faulty data resulting from the conversion or migration services provided hereunder; and (ii) PHARMACY agrees to verify all data being converted as to its accuracy and completeness once the conversion process is completed.   ~~PHARMACY agrees to verify all data being converted as to its accuracy and completeness once the conversion~~

EXHIBIT "C"                                                    Page 1

~~process is completed.~~ PHARMACY accepts full responsibility and liability for any drug dispensing or counseling done by PHARMACY based on that history. PHARMACY understands that, during the conversion process, certain data may be missing or may be in error due to no fault of PDX. To protect itself from any such loss, PHARMACY agrees to do appropriate backup of all its data on disks, tapes, and/or hard copy to assure no loss of same. Said backups shall be the exclusive responsibility of PHARMACY.

4.   The parties incorporate by reference the provisions of paragraphs 3f, 11, 13, and 15 through 19 of the License Agreement between the parties.

EXECUTED the day and year first written above.

The customer acknowledges that the terms of this Agreement have been read and are hereby accepted.

**Kmart**

3100 W. Big Beaver
Troy, MI 48084-3163

_____
Authorized Signature

David M. Carlson
Name (Type or Print)
Senior Vice President
Corporate Information Systems
_____
Title
00000q9s/910612

**PDX, Inc.**

300 North Crockett
Granbury, TX 76048

_____
Authorized Signature

Ken Hill
Name (Type or Print)

President
_____
Title

EXHIBIT "C"                                                                 Page 2

# Kmart Enhancements

**Main/Rx Filling** - **DATE RX WRITTEN**    USER: Kmart     REF #: 2103 RX -QA
*REQUEST:* DON'T ALLOW FUTURE DATES FOR DATE WRITTEN OR DATE FILLED DURING CHECK RX.

**Main/Rx Filling** - **DOSE-CHEK**    USER: Kmart     REF #: 2065 RX -PENDING
*REQUEST:* PROGRAM DOSE-CHEK FROM MEDISPAN TO ALLOW FOR MAXIMUM DOSAGE MESSAGES.

**Main/Rx Filling** - **INTERACTION CHECK**    USER: Kmart     REF #: 2147 RX -PENDING
*REQUEST:* DISPLAY WARNING MESSAGE THAT ORIGINAL FILL ON RX WAS AN OVER-RIDDEN INTERACTION. STORE FILE INDICATOR

**Main/Rx Filling** - **INTERACTION/ALLERGY**    USER: Kmart     REF #: 2146 RX -PENDING
*REQUEST:* STORE INTERACTION OVER-RIDE INDICATOR ON RX. STORE ALLERGY OVER-RIDE INDICATOR ON TX. REPORT SEPARATELY.

**Main/Rx Filling** - **INVENTORY CONTROL**    USER: Kmart     REF #: 2136 RX -PENDING
*REQUEST:* TRANSACTIONS SHOULD BE STAMPED WITH THE INVENTORY COST FROM THE DRUG FILE INSTEAD OF REPLENISHMENT ACQUISITION COST THIS WOULD MAKE ALL GROSS MARGIN ANALYSIS REPORTS MORE ACCURATE.

**Main/Rx Filling** - **LOW STOCK MESSAGE**    USER: Kmart     REF #: 2176 RX -QA
*REQUEST:* DISPLAY LOW STOCK MESSAGE IF SUPPLY NOT ENOUGH TO FILL RX

**Main/Rx Filling** - **NEW RX**    USER: Kmart     REF #: 2145 RX -PENDING
*REQUEST:* BE ABLE TO ASSIGN RX NUMBER ON A NEW RX (MAINTENANCE MODE). CAUSED BY SYSTEM DOWNTIME. MAY NEED STORE FILE INDICATOR PLUS PASSWORD.

**Main/Rx Filling** - **PATIENT ALLERGIES**    USER: Kmart     REF #: 2100 RX -QA
*REQUEST:* BE ABLE TO SELECT MULTIPLE ALLERGIES FROM THE ALLERGY SEARCH SCREEN TO BE BROUGHT BACK TO THE PATIENT. CURRENTLY YOU HAVE TO GO TO EACH FIELD, ENTER INTO THE ALLERGY FILE, AND SELECT ONE ALLERGY AT A TIME.

**Main/Rx Filling** - **PATIENT FILE**    USER: Kmart     REF #: 2064 RX -QA
*REQUEST:* ADD RESPONSIBLE PARTY CODE TO THE KEY OF THE PATIENT FILE SO YOU CAN SCROLL THROUGH FAMILY MEMBERS.

**Main/Rx Filling** - **PATIENT ZIP CODES**    USER: Kmart     REF #: 2113 RX -QA
*REQUEST:* ALLOW ALPHA-NUMERIC ZIP CODES ON THE PATIENT & ALL REPORTS FOR PATIENT.

**Main/Rx Filling** - **QUICK CODES FOR CITY**    USER: Kmart     REF #: 2112 RX -PROGRAM
*REQUEST:* WANT QUICK ENTRY OF A SPEED CODE TO ALLOW THE CITY, STATE, AND ZIP CODE TO AUTOMATICALLY BE ENTERED INTO THE SCREEN. FOR PATIENT, DOCTOR, VENDOR, WORKER'S COMP.

**Main/Rx Filling   - QUICK PRICE REPORT**   USER: Kmart          REF #: 2101  RX -QA
*REQUEST:* WOULD LIKE THE OPTION TO PRINT THE QUICK PRICE REPORT ON THEIR LABEL IN THE COUNSELING SECTION.

**Main/Rx Filling   - RX FILLING SCREEN**   USER: Kmart          REF #: 2139  RX -PENDING
*REQUEST:* HARD HALT FILLING RX'S OVER $9999.99.

**Main/Rx Filling   - SYSTEM DATE**   USER: Kmart          REF #: 2099  RX -QA
*REQUEST:* THE PROBLEM IS WHEN PHARMACY DOES NOT CHANGE THE DATE ON THE LOG-ON SCREEN FROM DAY-TO-DAY. CAN WE CHECK THE TIME? IN NEWRX AND LOGIN, SET A DATE & TIME VARIABLE. IF CURRENT TIME IS LESS THAN THAT TIME & DAY IS SAME, FORCE RE-LOGIN.

**Main/Rx Filling   - T/P EDITS**   USER: Kmart          REF #: 2154  RX -PENDING
*REQUEST:* CHECK THIRD PARTY REQUIREMENTS - CHECK FOR PATIENT ADDRESS REQUIRED

**Main/Rx Filling   - T/P EDITS**   USER: Kmart          REF #: 2169  RX -PENDING
*REQUEST:* NEED T/P EDIT CHECK FOR DATE OF INJURY.

**Main/Rx Filling   - T/P PLANS**   USER: Kmart          REF #: 2066  RX -DOCUMNT
*REQUEST:* CHANGE THE ELIGIBILITY FLAG FROM "Y" TO A EXPIRATION DATE.

**Main/Rx Filling   - T/P SPLIT BILLING**   USER: Kmart          REF #: 2155  RX -PENDING
*REQUEST:* CHECK THIRD PARTY REQUIREMENTS - CHECK FOR CHARGING COPAY TO A SECOND THIRD PARTY (SPLIT BILLING)

**Main/Rx Filling   - TRANSMIT DETAIL SCRN**   USER: Kmart          REF #: 2124  RX -PENDING
*REQUEST:* WHEN UPDATING CLAIMS FROM THE DETAIL SCREEN, ABILITY TO ENTER THE DATA FILES BY PRESSING [ENTER].

**General Reports   - COMPLIANCE REPORT**   USER: Kmart          REF #: 2106  RX -QA
*REQUEST:* ADD CARRIER AND PLAN TO THE COMPLIANCE REPORT. ADD IT TO THE SELECTION CRITERIA ALSO.

**General Reports   - MAILING LABELS**   USER: Kmart          REF #: 2163  RX -PENDING
*REQUEST:* CUSTOMER MAIL LISTING - SPECIFY NUMBER OF LABELS PER ROW

**General Reports   - NARCOTIC REPORT**   USER: Kmart          REF #: 2108  RX -PENDING
*REQUEST:* BE ABLE TO SELECT A NUMBER OF NDC'S (UP TO 12).

**General Reports   - PRICE CODE LIST**   USER: Kmart          REF #: 2165  RX -QA
*REQUEST:* FEE SCHEDULE LISTING - SELECT A RANGE OF FEE SCHEDULES TO LIST

**General Reports   - PRICE CODE LIST**   USER: Kmart          REF #: 2166  RX -QA
*REQUEST:* FEE SCHEDULE LISTING - PRODUCE CONDENSED LIST (ONE PER LINE) OR EXPANDED LIST (ONE FEE SCHEDULE PER PAGE)

Copyright (c) 1990, 1991
PDX, Inc. All Rights Reserved

**General Reports    - PRINTER SELECTION**    USER: Kmart          REF #: 2115  RX -PENDING
*REQUEST:*  PAPER VS. FORM ACKNOWLEDGEMENT MESSAGE TO PREVENT THE PHCST FROM
WASTING LABELS WHEN PRINTING REPORTS.

**General T/P Reports - CARDHOLDER REPORT**   USER: Kmart          REF #: 2173  RX -PENDING
*REQUEST:*   THIRD PARTY OVERLIMIT REPORT - PRINT DETAILED OR SUMMARY REPORT
(DETAILED ONLY). PRINT CARDHOLDERS THAT ARE OVER THEIR LIMITS.

**General T/P Reports - T/P HOLD REPORT**    USER: Kmart          REF #: 2197  RX -PENDING
*REQUEST:* ON THE THIRD PARTY HOLD REPORT, BE ABLE TO SORT ON RX#, DOCTOR, AND THIRD
PARTY (CARRIER + PLAN + CARDHOLDER#)

**Maintenance    - BACKUP & RESTORE**    USER: Kmart          REF #: 2148  RX -PENDING
*REQUEST:*  NEED VALIDATED BACKUP. REQUIRES A TAPE HEADER. MAY INTEGRATE KMARTS
BACKUP UTILITIES. MAY NEED MORE FIELDS AND A STORE FILE INDICATOR

**Communications    - SITE SEARCH**    USER: Kmart          REF #: 2102  RX -QA
*REQUEST:* SEARCHING THE SITE FILE, ESPECIALLY FROM THE AUTO TRANSFER SCREEN, SHOULD
SEARCH BY STATE + CITY. NEED TO HAVE A TOGGLE AT THE TOP OF THE SCREEN, AND INPUT
FIELDS FOR STATE AND CITY

**Labels    - DRUG EXPIRATION DATE**    USER: Kmart          REF #: 2153  RX -PENDING
*REQUEST:* PRINT DRUG EXPIRATION DATE ON LABEL.

**Labels    - PRESCRIPTION LABEL**    USER: Kmart          REF #: 2151  RX -PENDING
*REQUEST:* CUSTOM LABEL /W INFORMATION SHOWING SAVINGS THROUGH USE OF GENERICS

**Labels    - PRESCRIPTION LABEL**    USER: Kmart          REF #: 2170  RX -PENDING
*REQUEST:* ALLOW THE PRINTING OF DIFFERENT LABELS FOR EACH PLAN

**Labels    - PRESCRIPTION LABELS**    USER: Kmart          REF #: 2171  RX -PENDING
*REQUEST:* ALLOW THE PRINTING OF SPECIAL AUXILIARY LABELS FOR EACH TP

Total Number of Records Printed = 33

EXHIBIT E

| DRUG FILE | CURRENT | DATA CENTER |
|---|---|---|
| Number of drugs | 28,000 (approx.) | 120,000 (approx.) |
| AWP OR FOX List available | Either one | Both AWP and FOX List |
| FOX cnd | YES | YES |
| Allergy Codes | 30 members ONLY | YES |
| PHARMPAX warning labels | YES | Complete Medispan ALLBRCHBK® module |
| Generic code and indicator | YES | YES |
| SigVcrb | Only non-Formuetyct Info | Therapeutic class, DEA code, standard pack size |
| Drug interactions | NO | YES (all sides) |
| PLAN FILE | NO | YES |
| Carrier Generic Edits | YES | YES |
| Carrier Plan Specific Edits (i.e. FCS has 1281 plans as of 03/01/59) | NO | YES |
| Carrier/Plan-Fee | NO | YES |
| Carrier/Plan/Group-Co-Pay | NO | YES |
| FORMULARIES | | |
| Carrier Eligibility (Number of drugs) | YES 28,000 (approx.) | YES 420,000 (approx.) |
| Carrier/Plan Eligibility | NO | YES |
| Kmart Generics Flagged | NO | YES |
| Maintenance Drugs—Plan | NO | YES |
| Days Supply Restrictions—Plan | NO | YES |
| Quality Restrictions | NO | YES |
| Non-Maintenance Drugs—Plan (i.e. Insulin, Syringes, Niacette, OTC) | NO | YES |
| Days Supply Restrictions | NO | YES |
| Quality Restrictions | NO | YES |
| MAC Flag—Carrier | YES | YES |
| MAC FLAG—Carrier/Plan | NO | YES |
| MAC Pricing Carrier/Plan | NO | YES |

EXHIBIT "F"

## HARDWARE AND OPERATING SYSTEMS PLATFORMS APPROVED FOR PDX PHARMACY RELEASE 3.0

IBM RISC/System 6000 (all models) with AIX

IBM RT Model 115, 125 and 135 with AIX

IBM PS/2 Model 80 with SCO UNIX or XENIX

NCR 3000 Model 3340 and above with NCR UNIX 5.3

NCR 3000 Model 500, 700 and 750 with NCR UNIX 5.4

Hewlitt-Packard HP9000 Series Model 400, 700 and 800 with HP-UX

UNISYS PW2 Series 800/33A with SCO XENIX

Dell System 325P, 325D and 333D with XENIX

Any hardware platform, 100% compatible with SCO UNIX, provided that Kmart furnishes PDX complete components of such hardware with reasonable time for PDX to port the software to such hardware and further provided that Kmart shall be responsible for any required hardware maintenance of such hardware.   Kmart may loan such equipment to PDX so long as Kmart loans same for the time in which it has the System installed in any of its stores.

If the hardware furnished or loaned by Kmart hereunder becomes hardware that is alternatively approved by PDX, Kmart shall no longer be required to furnish or loan such hardware to PDX.

EXHIBIT "G"

## SOURCE CODE ESCROW

If Licensor desires to dispute the notice of default, Licensor will, within ten (10) days after the receipt thereof, deliver to the Escrow Agent an affidavit stating that in Licensor's view, no default has occurred and setting forth the facts in support of such position.

If Licensor files such an affidavit, the following procedures will be followed:

1. Licensor and Licensee will meet within five (5) days of Escrow Agent's receipt of Licensor's affidavit, each being prepared to negotiate in good faith for a reasonable settlement.

2. If the dispute cannot be resolved at this meeting, there will be a second meeting during the next five (5) days, which meeting will be attended by officers of the respective companies in an attempt to reach a mutually agreeable settlement.

3. If the dispute cannot be resolved at either of these two meetings there will be an arbitration at which a mutually acceptable third party will act as the arbitrator. During the arbitration, which will take place within fifteen (15) days after the second meeting, each party will have a reasonable time within which to present the reasons which justify its position. After each party has presented its position, each will have an additional half hour for rebuttal or response. After these presentations, the arbitrator will, within five (5) business days, make a decision as to whether there has or has not been an event of default. If the arbitrator determines that there has ~~not~~ been an event of default, he will immediately so advise the Escrow Agent who shall in turn immediately give a copy of the source code to Licensee; and if he determines that there has not been an event of default, he will instruct the Escrow Agent to continue to hold the source code for the benefit of Licensor. The losing party shall pay all fees and costs of the arbitrator incurred in connection with the arbitration.

If either party elects to file a lawsuit, the Escrow Agent will nevertheless take the actions expressly stated above, unless and until a court of competent jurisdiction renders a binding decision directing the Escrow Agent to take some other course of action. Any such court proceedings are subject to the choice of forum and law provisions set forth in Paragraph 18 of the Agreement.

## AMENDMENT TO LICENSE AGREEMENT

This Amendment (the "Amendment") is to the License Agreement by and between Kmart Corporation ("Kmart") and PDX, Inc. ("Contractor") dated June 14, 1991 (the "Original Agreement").

Kmart and Contractor each desire to amend the Original Agreement as described in this Amendment (this Amendment together with the Original Agreement, the "Agreement").

### Statement of Agreement

1. All invoices shall be addressed to Accounts Payable, P.O. Box 5003, Troy, MI 48007.

2. This Amendment shall be effective February 28, 2003 (the "Effective Date").

3. The Agreement will remain in effect until February 28, 2004 (the "Initial Term"). Thereafter, Kmart may renew for additional terms of one year upon written notice to Contractor. If the Initial Term or subsequent renewal terms expire without being formally renewed or extended but both parties continue to perform as set forth in the Agreement, the Agreement will continue in effect on a month-to-month basis until terminated by either party on 30 days written notice.

4. The Agreement may be terminated by either party in the event of (i) a material breach by the other party, (ii) a material failure of any covenant, representation or warranty of the other party set forth in the Agreement, (iii) a failure of the other party to comply with all applicable federal, state and local laws and regulations applicable to performance of the Agreement, (iv) the insolvency of, or the institution of proceedings by or against, the other party under any federal or state bankruptcy or insolvency law, (v) an assignment by the other party for the benefit of all or substantially all of its creditors, or (vi) a cessation of the operations of the other party. This termination is effective 30 days after written notice is provided by the non-breaching party that identifies the basis of the default or breach. The right of the non-breaching party to terminate is subject to the right of the breaching party to cure any default and provide evidence thereof to the non-breaching party before the otherwise effective date of termination.

5. Notwithstanding anything to the contrary in the Original Agreement, Contractor may not terminate the Agreement for grounds not expressly stated above.


EXHIBIT

6. Contractor has not filed a proof of claim in Kmart's Chapter 11 Case, No. 02-B02474, in the United States Bankruptcy Court for the Northern District of Illinois. Contractor represents and warrants that neither it nor any of its affiliates have filed other proofs of claim; have any additional claims; or have sold, assigned or otherwise transferred any claims. Further, Contractor represents and warrants that neither it nor any of its affiliates will file any proofs of claim against Kmart and its affiliates, and hereby waives any right to do so.

7. Furthermore, upon assumption of the Agreement, Contractor and its affiliates shall release and forever discharge Kmart, its past, present and future affiliates, directors, officers, employees, and successors in interest from any and all claims, causes of actions, liabilities, liens or damages of any kind, whether known or unknown, that arose in whole or in part as of the date of execution of this Amendment with the exception of any amounts due Contractor for services performed prior to the date thereof.

8. In addition to all indemnification obligations of Contractor contained in the Original Agreement, to the fullest extent permitted by law, Contractor must reimburse, indemnify, defend and hold harmless Kmart, its subsidiaries and affiliates, and Kmart's and its subsidiaries' and affiliates' officers, directors, employees and successors in interest from and against all loss, damage, expense (including attorney's fees and expenses), and penalty, and any claim or action therefore by or on behalf of any person (collectively, "Loss") arising out of or in connection with the performance or failure of performance of this Amendment, including without limitation, Loss arising out of any breach of representation or warranty contained in this Amendment. Kmart may offset and deduct from any amounts owed Contractor for any Loss.

9. If any provision of this Amendment is held to be void or unenforceable, the remaining provisions are considered to be severable and their enforceability is not affected or impaired in any way by reason of such law or holding.

10. The terms and conditions of the Original Agreement remain in effect except as otherwise stated herein. In the event that any provision of this Amendment conflicts with any of the provisions set forth in the Original Agreement, the provisions of this Amendment shall govern and control.

11. The Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof; superseding all prior understandings, agreements, contracts or arrangements between the parties, whether oral or written.

IN WITNESS WHEREOF, this Amendment is entered into by the parties and shall take effect on the Effective Date.

**PDX, INC.**

By: _____

Printed Name: E M Ingram

Title: C F O

Dated: 17 - March - 2003

**KMART CORPORATION**

By: _____

Printed Name: Karen Austin

Title: SVP, CIO

Dated: 3/24/03

**KMART CORPORATION**

By: _____

Printed Name: STEVEN HUNTER

Title: DVP

Dated: 3/24/03

# EXHIBIT 4

DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Attorneys for National Health Information Network,*
*Inc. and PDX Inc.*
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
(914) 681-0200
Julie Cvek Curley, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:

SEARS HOLDINGS CORPORATION, *et al.*,[1]

                                                    Debtor.

-------------------------------------------------------------X

Chapter 11
Lead Case No. 18-23538 (RDD)
(Jointly Administered)

## LIMITED OBJECTION OF NATIONAL HEALTH INFORMATION NETWORK, INC. AND PDX INC. TO NOTICE OF CURE COSTS AND POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS IN CONNECTION WITH GLOBAL SALE TRANSACTION

TO:    **HONORABLE ROBERT D. DRAIN,**
        **UNITED STATES BANKRUPTCY JUDGE**

National Health Information Network, Inc. ("NHIN") and PDX Inc. ("PDX"), creditors

in the above captioned Chapter 11 proceedings, by and through their attorneys, DelBello

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179. The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616, and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "Additional Debtors"). The Additional Debtors each filed a motion in their respective chapter 11 case requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure

Donnellan Weingarten Wise & Wiederkehr, LLP, submit this limited objection (the "Limited Objection") to the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (the "Cure Notice", Dkt. No. 1731). In support of this Limited Objection, the PDX and NHIN respectfully state and represent as follows:

1.    On October 15, 2018 (the "Petition Date"), Sears Holdings Corporation and certain of its affiliates, including Sears, Roebuck and Co. ("SRC"), Kmart Corporation ("Kmart"), and Sears Brands Management Corporation ("SBMC"), together with Sears Holding Corporation, SRC and Kmart, the "Initial Debtors"), commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Subsequently, three additional affiliates filed voluntary petitions on October 18, 2018, October 22, 2018 and January 7, 2019 (together with the Initial Debtors, the "Debtors").

2.    Prior to the Petition Date, the Debtors entered into four (4) executory contracts with NHIN and PDX. PDX, Inc. is a company that sells pharmacy management software. The implementation and use of PDX pharmacy software requires the corresponding use of the NHIN Drug File service. The contracts are summarized as follows:

- PDX. Inc. Software and License Agreement (the "License Agreement"): License agreement for use of proprietary PDX software for pharmacy management services.

- PDX Inc. HIPPA Agreement (the "HIPPA Agreement"): In connection with the implementation of the PDX and NHIN software, certain protected health information ("PHI") would be disclosed and exchanged. The purpose of this agreement is to provide satisfactory assurances that the requisite safeguards to the privacy and security of that PHI in compliance with applicable provisions of the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA") and the HIPAA administrative simplification regulations.

- NHIN Drug File Services Agreement (the "Drug File Services Agreement"): The Database utilized in connection with the PDX software; it is a comprehensive database containing (i) descriptive, pricing, clinical, patient education, and Medicaid drug eligibility information regarding prescription drugs and selected

over-the-counter products, and (ii) extensive information of physicians, dentists, podiatrists, and mid-level practitioners,

- NHIN Absolute[AR] Services (the "A/R Agreement"): NHIN will make available to Customer via the NHIN website or on DVDs Customer's NHIN reports generated from the sales and payment application of the ANSI X12 835 files. This software is the accounts receivable software and necessary for the Customer's pharmacy to process claims and reporting.

3.      Each of the four contracts, the License Agreement, the HIPPA Agreement, the Drug File Services Agreement, and the A/R Agreement (collectively, the "Contracts") are inter-related and work together. Three of the four Contracts are required for the customer to effectively use the program. The License Agreement is akin to a "search engine." The Drug File Services Agreement is the "data." The HIPPA Agreement is necessary to avoid violation of federal health privacy regulations in the use of the software. These three Contracts work together and would not work separately. The A/R Agreement for billing and claims processing is a standalone service offering which can be used in conjunction with PDX pharmacy software or other proprietary pharmacy management systems.

4.      On November 1, 2018, the Debtors moved this Court for Approval of Global Bidding Procedures (the "Global Bidding Procedures Motion", Docket No. 429) to facilitate sale transactions of substantially all of the Debtors' assets (the "Assets"), including the assumption and assignment of certain executory contracts.

5.      On November 19, 2018, the Court entered the Order Approving Global Bidding Procedures and Granting Related Relief (the "Global Bidding Procedures Order", Docket No. 816), approving global bidding and sale procedures substantially in the form proposed by the Global Bidding Procedures Motion.

6.      On January 14, 2019, the Debtors commenced an auction for a sale of the Assets, wherein the offer submitted by Transform Holdco LLC was determined to be the highest and best offer for the Assets.

7.      On January 18, 2019, the Debtors filed the Cure Amount Notice. Attached to the Cure Amount Notice as Exhibit A is the Schedule of Cure Amounts (the "Cure Amount Schedule"), which lists proposed cure amounts (the "Proposed Cure Amount(s)") in connection with the Debtors' potential assumption or assumption and assignment of executory contracts.

8.      The Cure Amount Schedule lists NHIN and PDX as a party to three agreements (the "Assumed Contracts") that the Debtors assert are subject to potential assumption and assignment:

| Contract No. | Counterparty Name | Contract Title | Proposed Cure Amount |
|---|---|---|---|
| 5153 | NATIONAL HEALTH INFORM NETWORK INC/ABSOLUTE AR | AR HEALTH WELLNESS ABSOLUTE MASTER AND EXHIBITS | $116,403.00 |
| 5470 | PDX INC-361857 | HEALTH WELLNESS NHS (PDX) HIPPA AGREEMENT 2015 | $75.00 |
| 5471 | PDX, INC. | LICENSE AGREEMENT | $ - |

9.      NHIN objects to the Proposed Cure Amounts pertaining to the A/R Agreement. The correct cure amount under the A/R Agreement is $123,165.07, not $116,403.00. A copy of the computation of the cure amount for the A/R Agreement is annexed hereto as **Exhibit A.**

10.     Further, NHIN and PDX assert that the Assumed Contracts cannot function without the assumption of the Drug File Services Agreement. The arrears owed by the Debtor to NHIN under the Drug File Services Agreement as of January 25, 2019 is $105,787.72. A copy of the computation of the cure amount for the Drug File Services Agreement is annexed hereto as **Exhibit B.**

11.     Based upon the foregoing, NHIN and PDX assert that in order to assume the Assumed Contracts, the Debtors must also assume the Drug File Services Agreement, and request that the Drug File Services Agreement be added to the list of Assumed Contracts, with the cure amount set forth above.

12.    NHIN and PDX assert that the Contracts to be assumed in connection with te Global Sale Transaction, and respective cure amounts are as follows:

| Counterparty Name | Contract Title | Proposed Cure Amount |
|---|---|---|
| National Health Information Network, Inc. | Absolute$^{AR}$ Agreement | $123,165.07 |
| PDX Inc. | HIPPA Agreement | $75.00 |
| PDX, Inc. | License Agreement | $0.00 |
| National Health Information Network, Inc. | Drug File Services Agreement | $105,787.72 |

13.    The Cure Amount Notice does not require NHIN or PDX to assert any objections to the assumption and assignment of the Assumed Contracts other than as such objections relate to the Proposed Cure Amounts. NHIN and PDX reserves all rights to object to assumption and assignment of the Assumed Contracts, including objections based on whether such contracts are executory and objections based on the failure to provide adequate assurance of future performance pursuant to section 365(b)(1)(C).

**WHEREFORE,** NHIN and PDX respectfully requests that the cure amounts for the Assumed Contracts be set at the amounts stated herein, and that the Drug File Services Agreement be assumed as well, with a cure amount of $105,787.72, and that NHIN and PDX be granted such other relief to which it may be entitled.

Dated: White Plains, New York
       January 25, 2019

DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Attorneys for Attorneys for National Health Information Network, Inc. and PDX Inc.*
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
(914) 681-0200

By:  */s/ Julie Cvek Curley*
      Julie Cvek Curley, Esq.

# Exhibit "A"

**National Health Information Network, Inc.**
**Schedule of Sears Holding Corp et al Cure Amounts**

**Absolute AR Services**

| Invoice Description | Invoice Number | Invoice Date | Invoice Amount | Comments |
|---|---|---|---|---|
| NHIN Absolute AR Services - August 2018 | INV12140 | 9/19/2018 | $ 30,138.13 | |
| NHIN Absolute AR Services - September 2018 | INV13309 | 10/15/2018 | $ 55,418.57 | |
| NHIN Absolute AR Services - October 7 through October 15, 2018 | INV14531 | 11/20/2018 | $ 11,233.87 | |
| NHIN Absolute AR Services - December 2018 | INV16754 | 1/10/2019 | $ 26,374.50 | |
| Total Pre and Post Petition Invoices Outstanding | | | $ 123,165.07 | |

**National Health Information Network, Inc.**

| Invoice | | Date 09/19/2018 | Page 1 |
|---|---|---|---|
| | | Invoice Number | |
| | | INV12140 | |

**Remit To:**   Accounts Receivable
PO Box 227216
Dallas, TX 75222-7216.
Fax: 817-246-0131
Phone: 800-433-5719

**Sold To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

**Ship To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

| Order No. | Order Date | Customer No. | Salesperson | PO Number | Ship Via | Terms |
|---|---|---|---|---|---|---|
| | 09/19/2018 | C115 | | | | N60 |

| Quantity | Item Number | Description | Unit Price | UOM | Extended Price |
|---|---|---|---|---|---|
| 1 | P0388 | ACTUAL RX MAC APPEALS SERVICES | 2,880.00 | Each | 2,880.00 |
| 1 | P0029 | ACQUIRE RX COLLECTION SERVICE | 5,780.00 | Each | 5,780.00 |
| 1 | P0011 | ABSOLUTE AR RECONCILIATION - CREDIT | .00 | Each | .00 |
| 1 | P0021 | ABSOLUTE RECONCILIATION - MANUAL | 715.61 | Each | 715.61 |
| 1 | P0012 | ABSOLUTE AR RECONCILIATION - PAPER | 194.88 | Each | 194.88 |
| 1 | P0013 | ABSOLUTE AR RECONCILIATION - TAPE/ELECT | .00 | Each | .00 |
| 1 | P0004 | ABSOLUTE AR RECON - PREVIOUSLY RECONCILED | .00 | Each | .00 |
| 1 | P0027 | PRIOR ABSOLUTE AR UNAPP CASH TAPE TRN | .00 | Each | .00 |
| 1 | P0022 | AFTER ABSOLUTE AR UNAPP CASH PAPER TRN | 4.70 | Each | 4.70 |
| 1 | P0023 | AFTER ABSOLUTE AR UNAPP CASH TAPE TRN | 18.96 | Each | 18.96 |
| 1 | P0019 | ABSOLUTE AR SUBMISSION-TAPE/ELECT | 6.00 | Each | 6.00 |
| 1 | P0018 | ABSOLUTE AR SUBMISSION - PAPER | .00 | Each | .00 |
| 1 | P0020 | ABSOLUTE AR TRANSACTION - RECON/TAPE | 12.00 | Each | 12.00 |
| 1 | P0369 | NHIN FREIGHT CHARGES | 20,544.35 | Each | 20,544.35 |
| | | | 1.63 | Each | 1.63 |

| | | |
|---|---|---|
| SUBTOTAL | | $30,138.13 |
| Sales Tax | | $0.00 |
| 1) ILLINOIS IL STATE TAX (6.25) | | $0.00 |
| 2) KANE IL COUNTY TAX (0) | | $0.00 |
| 3) REGIONAL TRANSPORT. AUTHORITY (RTA) IL SPECIAL TAX (0) | | $0.00 |

DETACH HERE AND RETURN BOTTOM PORTION WITH YOUR PAYENT

**National Health Information Network, Inc.**

**PAYMENT AMOUNT:** _____

If Payment amount is different from amount due, please list details

| | |
|---|---|
| **Customer:** | **Sears Roebuck and Company dba Kmart Corporation** |
| **Customer No.:** | **C115** |
| **Invoice No.:** | **INV12140** |
| **Invoice Date:** | **09/19/2018** |
| **Due Date:** | **11/18/2018** |
| **Amount Due:** | **30,138.13** |

**National Health Information Network, Inc.**

| | Invoice | | | Date 09/19/2018 | Page 2 |
|---|---|---|---|---|---|
| | | | | Invoice Number | |
| | | | | INV12140 | |

Remit To:   Accounts Receivable
PO Box 227216
Dallas, TX 75222-7216.
Fax: 817-246-0131
Phone: 800-433-5719

**Sold To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

**Ship To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

| Order No. | Order Date | Customer No. | Salesperson | PO Number | Ship Via | Terms |
|---|---|---|---|---|---|---|
| | 09/19/2018 | C115 | | | | N60 |

Comments: Absolute A/R Service August 2018 Billing Period

| TOTAL | | $30,138.13 |
|---|---|---|
| **Amount due** | | $30,138.13 |

DETACH HERE AND RETURN BOTTOM PORTION WITH YOUR PAYENT

**National Health Information Network, Inc.**

PAYMENT AMOUNT: _____

If Payment amount is different from amount due, please list details

_____

_____

_____

_____

_____

| Customer: | Sears Roebuck and Company dba Kmart Corporation |
|---|---|
| Customer No.: | C115 |
| Invoice No.: | INV12140 |
| Invoice Date: | 09/19/2018 |
| Due Date: | 11/18/2018 |
| Amount Due: | 30,138.13 |

| | Invoice | | Date 10/15/2018 | Page 1 |
|---|---|---|---|---|

**National Health Information Network, Inc.**

Invoice Number
INV13309

Remit To:    Accounts Receivable
PO Box 227216
Dallas, TX 75222-7216.
Fax: 817-246-0131
Phone: 800-433-5719

**Sold To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

**Ship To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

| Order No. | Order Date | Customer No. | Salesperson | PO Number | Ship Via | Terms |
|---|---|---|---|---|---|---|
| | 10/15/2018 | C115 | | | | N60 |

| Quantity | Item Number | Description | Unit Price | UOM | Extended Price |
|---|---|---|---|---|---|
| 1 | P0388 | ACTUAL RX MAC APPEALS SERVICES | 2,800.00 | Each | 2,800.00 |
| 1 | P0029 | ACQUIRE RX COLLECTION SERVICE | 5,600.00 | Each | 5,600.00 |
| 1 | P0021 | ABSOLUTE AR RECONCILIATION - MANUAL | 23,114.40 | Each | 23,114.40 |
| 1 | P0012 | ABSOLUTE AR RECONCILIATION - PAPER | 336.30 | Each | 336.30 |
| 1 | P0011 | ABSOLUTE AR RECONCILIATION - CREDIT | .00 | Each | .00 |
| 1 | P0004 | ABSOLUTE AR RECON - PREVIOUSLY RECONCILED | .00 | Each | .00 |
| 1 | P0013 | ABSOLUTE AR RECONCILIATION - TAPE/ELECT | .00 | Each | .00 |
| 1 | P0023 | AFTER ABSOLUTE AR UNAPP CASH TAPE TRN | .00 | Each | .00 |
| 1 | P0019 | ABSOLUTE AR SUBMISSION-TAPE/ELECT | 215.55 | Each | 215.55 |
| 1 | P0018 | ABSOLUTE AR SUBMISSION - PAPER | .00 | Each | .00 |
| 1 | P0020 | ABSOLUTE AR TRANSACTION - RECON/TAPE | 23,351.72 | Each | 23,351.72 |

| | |
|---|---|
| SUBTOTAL | $55,418.57 |
| Sales Tax | $0.00 |
| 1) ILLINOIS IL STATE TAX (6.25) | $0.00 |
| 2) KANE IL COUNTY TAX (0) | $0.00 |
| 3) REGIONAL TRANSPORT. AUTHORITY (RTA) IL SPECIAL TAX (0) | $0.00 |
| TOTAL | $55,418.57 |
| Amount due | $55,418.57 |

Comments: Absolute A/R Services September 2018 Billing Period

DETACH HERE AND RETURN BOTTOM PORTION WITH YOUR PAYENT

**National Health Information Network, Inc.**

**PAYMENT AMOUNT:** _____

If Payment amount is different from amount due, please list details

_____

_____

_____

_____

| | |
|---|---|
| Customer: | Sears Roebuck and Company dba Kmart Corporation |
| Customer No.: | C115 |
| Invoice No.: | INV13309 |
| Invoice Date: | 10/15/2018 |
| Due Date | 12/14/2018 |
| Amount Due: | 55,418.57 |

**National Health Information Network, Inc.**

| Invoice | | Date 10/15/2018 | Page 2 |
|---|---|---|---|

| Invoice Number |
|---|
| INV13309 |

Remit To:    Accounts Receivable
PO Box 227216
Dallas, TX 75222-7216.
Fax: 817-246-0131
Phone: 800-433-5719

Sold To:

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

Ship To:

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

| Order No. | Order Date | Customer No. | Salesperson | PO Number | Ship Via | Terms |
|---|---|---|---|---|---|---|
|  | 10/15/2018 | C115 |  |  |  | N60 |

DETACH HERE AND RETURN BOTTOM PORTION WITH YOUR PAYENT

**National Health Information Network, Inc.**

**PAYMENT AMOUNT:** _____

If Payment amount is different from amount due, please list details

_____

_____

_____

_____

_____

| Customer: | Sears Roebuck and Company dba Kmart Corporation |
|---|---|
| Customer No.: | C115 |
| Invoice No.: | INV13309 |
| Invoice Date: | 10/15/2018 |
| Due Date | 12/14/2018 |
| Amount Due: | 55,418.57 |

| | Invoice | | Date 11/20/2018 | Page 1 |
|---|---|---|---|---|

**National Health Information Network, Inc.**

Invoice Number: INV14531

Remit To:   Accounts Receivable
PO Box 227216
Dallas, TX 75222-7216.
Fax: 817-246-0131
Phone: 800-433-5719

**Sold To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

**Ship To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

| Order No. | Order Date 11/20/2018 | Customer No. C115 | Salesperson | PO Number | Ship Via | Terms N60 |
|---|---|---|---|---|---|---|

| Quantity | Item Number | Description | Unit Price | UOM | Extended Price |
|---|---|---|---|---|---|
| 1 | P0021 | ABSOLUTE AR RECONCILIATION - MANUAL | 8,398.60 | Each | 8,398.60 |
| 1 | P0004 | ABSOLUTE AR RECON - PREVIOUSLY RECONCILED | .00 | Each | .00 |
| 1 | P0013 | ABSOLUTE AR RECONCILIATION - TAPE/ELECT | .00 | Each | .00 |
| 1 | P0011 | ABSOLUTE AR RECONCILIATION - CREDIT | .00 | Each | .00 |
| 1 | P0012 | ABSOLUTE AR RECONCILIATION - PAPER | 38.92 | Each | 38.92 |
| 1 | P0029 | ACQUIRE RX COLLECTION SERVICE | 2,760.00 | Each | 2,760.00 |
| 1 | P0027 | PRIOR ABSOLUTE AR UNAPP CASH TAPE TRN | 5.30 | Each | 5.30 |
| 1 | P0023 | AFTER ABSOLUTE AR UNAPP CASH TAPE TRN | 31.05 | Each | 31.05 |
| 1 | P0019 | ABSOLUTE AR SUBMISSION-TAPE/ELECT | .00 | Each | .00 |

| | |
|---|---|
| SUBTOTAL | $11,233.87 |
| Sales Tax | $0.00 |
| 1) ILLINOIS IL STATE TAX (6.25) | $0.00 |
| 2) COOK IL COUNTY TAX (0) | $0.00 |
| 3) HOFFMAN ESTATES IL CITY TAX (0) | $0.00 |
| 4) REGIONAL TRANSPORT. AUTHORITY (RTA) IL SPECIAL TAX (0) | $0.00 |
| TOTAL | $11,233.87 |
| Amount due | $11,233.87 |

Comments: Absolute A/R Services October 2018 Billing Period
10/07/2018 - 10/15/2018

DETACH HERE AND RETURN BOTTOM PORTION WITH YOUR PAYENT

**National Health Information Network, Inc.**

**PAYMENT AMOUNT:** _____

If Payment amount is different from amount due, please list details

Customer:   Sears Roebuck and Company dba Kmart Corporation

Customer No.:   C115

Invoice No.:   INV14531

Invoice Date:   11/20/2018

Due Date:   01/19/2019

Amount Due:   11,233.87

| | Invoice | | Date 11/20/2018 | Page 2 |
|---|---|---|---|---|

**National Health Information Network, Inc.**

| Invoice Number |
|---|
| INV14531 |

**Remit To:**  Accounts Receivable
PO Box 227216
Dallas, TX 75222-7216.
Fax: 817-246-0131
Phone: 800-433-5719

**Sold To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

**Ship To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

| Order No. | Order Date 11/20/2018 | Customer No. C115 | Salesperson | PO Number | Ship Via | Terms N60 |
|---|---|---|---|---|---|---|

DETACH HERE AND RETURN BOTTOM PORTION WITH YOUR PAYENT

**National Health Information Network, Inc.**

**PAYMENT AMOUNT:** _____

If Payment amount is different from amount due, please list details

| | |
|---|---|
| **Customer:** | Sears Roebuck and Company dba Kmart Corporation |
| **Customer No.:** | C115 |
| **Invoice No.:** | INV14531 |
| **Invoice Date:** | 11/20/2018 |
| **Due Date** | 01/19/2019 |
| **Amount Due:** | 11,233.87 |

## National Health Information Network, Inc.

| | Invoice | | Date 01/10/2019 | | Page 1 |
|---|---|---|---|---|---|

**Invoice Number**
**INV16754**

**Remit To:**   Accounts Receivable
PO Box 227216
Dallas, TX 75222-7216.
Fax: 817-246-0131
Phone: 800-433-5719

**Sold To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

**Ship To:**

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

| Order No. | Order Date 01/10/2019 | Customer No. C115 | Salesperson | PO Number | Ship Via | Terms N60 |
|---|---|---|---|---|---|---|

| Quantity | Item Number | Description | Unit Price | UOM | Extended Price |
|---|---|---|---|---|---|
| 1 | P0004 | ABSOLUTE AR RECON - PREVIOUSLY RECONCILED | .00 | Each | .00 |
| 1 | P0021 | ABSOLUTE AR RECONCILIATION - MANUAL | 3,127.11 | Each | 3,127.11 |
| 1 | P0012 | ABSOLUTE AR RECONCILIATION - PAPER | 66.29 | Each | 66.29 |
| 1 | P0011 | ABSOLUTE AR RECONCILIATION - CREDIT | .00 | Each | .00 |
| 1 | P0013 | ABSOLUTE AR RECONCILIATION - TAPE/ELECT | .00 | Each | .00 |
| 1 | P0020 | ABSOLUTE AR TRANSACTION - RECON/TAPE | 18,700.35 | Each | 18,700.35 |
| 1 | P0029 | ACQUIRE RX COLLECTION SERVICE | 4,480.00 | Each | 4,480.00 |
| 1 | P0023 | AFTER ABSOLUTE AR UNAPP CASH TAPE TRN | .65 | Each | .65 |
| 1 | P0027 | PRIOR ABSOLUTE AR UNAPP CASH TAPE TRN | .10 | Each | .10 |
| 1 | P0019 | ABSOLUTE AR SUBMISSION-TAPE/ELECT | .00 | Each | .00 |

| | |
|---|---|
| SUBTOTAL | $26,374.50 |
| Sales Tax | $0.00 |
| 1) ILLINOIS IL STATE TAX (6.25) | $0.00 |
| 2) COOK IL COUNTY TAX (0) | $0.00 |
| 3) HOFFMAN ESTATES IL CITY TAX (0) | $0.00 |
| 4) REGIONAL TRANSPORT. AUTHORITY (RTA) IL SPECIAL TAX (0) | $0.00 |
| TOTAL | $26,374.50 |

DETACH HERE AND RETURN BOTTOM PORTION WITH YOUR PAYENT

## National Health Information Network, Inc.

**PAYMENT AMOUNT:** _____

If Payment amount is different from amount due, please list details

_____

_____

_____

_____

**Customer:**   Sears Roebuck and Company dba Kmart Corporation

**Customer No.:**   C115

**Invoice No.:**   INV16754

**Invoice Date:**   01/10/2019

**Due Date**   03/11/2019

**Amount Due:**   26,374.50

**National Health Information Network, Inc.**

| | Invoice | | Date 01/10/2019 | | Page 2 |
|---|---|---|---|---|---|
| | | | Invoice Number INV16754 | | |

Remit To:     Accounts Receivable
              PO Box 227216
              Dallas, TX 75222-7216.
              Fax: 817-246-0131
              Phone: 800-433-5719

Sold To:

    Linda DeWitte, BC-256A
    Sears Roebuck and Company dba Kmart Corporation
    MS BC-256A
    3333 Beverly Road
    Hoffman Estates, IL 60124

Ship To:

    Linda DeWitte, BC-256A
    Sears Roebuck and Company dba Kmart Corporation
    MS BC-256A
    3333 Beverly Road
    Hoffman Estates, IL 60124

| Order No. | Order Date 01/10/2019 | Customer No. C115 | Salesperson | PO Number | Ship Via | Terms N60 |
|---|---|---|---|---|---|---|

Comments: Absolute A/R Billing - December 2018 Activity

| Amount due | $26,374.50 |
|---|---|

DETACH HERE AND RETURN BOTTOM PORTION WITH YOUR PAYENT

**National Health Information Network, Inc.**

PAYMENT AMOUNT: _____

If Payment amount is different from amount due, please list details

_____

_____

_____

_____

_____

| Customer: | Sears Roebuck and Company dba Kmart Corporation |
|---|---|
| Customer No.: | C115 |
| Invoice No.: | INV16754 |
| Invoice Date: | 01/10/2019 |
| Due Date: | 03/11/2019 |
| Amount Due: | 26,374.50 |

# Exhibit B

18-23538-rdd    Doc 1910-2    Filed 01/25/19    Entered 01/25/19 16:27:48    Exhibit B -
NHIN Drug File Services Cure Schedule    Pg 2 of 3

**National Health Information Network, Inc.**
**Schedule of Sears Holding Corp et al Cure Amounts**

**Drug File Services Agreement**

| Invoice Description | Invoice Number | Invoice Date | Invoice Amount | Comments |
|---|---|---|---|---|
| NHIN Monthly Drug File Maintenance - September 2018 | INV10187 | 9/1/2018 | $ 30,878.63 | |
| NHIN Drug File Pro-Rated Maintenance Credit Memo - September 2018 | INV12247 | 9/20/2018 | $ (32.47) | |
| NHIN Monthly Drug File Maintenance - October 2018 | INV11542 | 10/1/2018 | $ 30,816.18 | |
| NHIN Monthly Drug File Maintenance - October 2018 Credit Memo | CM0046 | 10/1/2018 | $ (30,816.18) | To Credit Invoice INV11542, which was replaced by pre and post-petition period invoices |
| NHIN Monthly Drug File Maintenance - October 1 through October 14, 2018 | INV24520 | 10/1/2018 | $ 13,916.59 | |
| NHIN Monthly Drug File Maintenance - December 2018 | INV14091 | 12/1/2018 | $ 30,778.71 | |
| NHIN Monthly Drug File Maintenance - January 2019 | INV15203 | 1/1/2019 | $ 30,441.48 | |
| NHIN Drug File Pro-Rated Maintenance Credit Memo - January 2019 | INV16884 | 1/21/2019 | $ (195.22) | |
| Total Pre and Post Petition Invoices Outstanding | | | $ 105,787.72 | |

**PDX, Inc.**

| | Invoice | | Date 08/20/2018 | Page 1 |
|---|---|---|---|---|

Invoice Number
INV10682

Remit To:    Accounts Receivable
PO Box 227216
Dallas, TX 75222-7216.
Fax: 817-246-0131
Phone: 800-433-5719

Sold To:

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

Ship To:

Linda DeWitte, BC-256A
Sears Roebuck and Company dba Kmart Corporation
MS BC-256A
3333 Beverly Road
Hoffman Estates, IL 60124

| Order No. | Order Date | Customer No. | Salesperson | PO Number | Ship Via | Terms |
|---|---|---|---|---|---|---|
| | 08/20/2018 | C115 | | | | N60 |

| Quantity | Item Number | Description | Unit Price | UOM | Extended Price |
|---|---|---|---|---|---|
| 1 | P0309 | PDX POINT OF SALE INTERFACE MAINTENANCE | .000 | Each | .00 |
| 1 | P0308 | PDX PHARMACY SYSTEM MAINTENANCE | .000 | Each | .00 |
| 1 | P0304 | PDX IVR INTERFACE MAINTENANCE | .000 | Each | .00 |
| 1 | P0298 | PDX ESCRIPTS MAINTENANCE | .000 | Each | .00 |
| 1 | P0143 | PDX ELECTRONIC PHARMACY RECORD MAINTENANCE | .000 | Each | .00 |
| 1 | P0139 | PDX ePHARMACY WEB SERVICE API MAINTENANCE | .000 | Each | .00 |
| 1 | P0313 | PDX CLASSIC SYSTEM FILE CHANGE | 75.000 | Each | 75.00 |

| | |
|---|---|
| SUBTOTAL | $75.00 |
| Sales Tax | $0.00 |
| 1) ILLINOIS IL STATE TAX (6.25) | $0.00 |
| 2) KANE IL COUNTY TAX (0) | $0.00 |
| 3) REGIONAL TRANSPORT. AUTHORITY (RTA) IL SPECIAL TAX (0) | $0.00 |
| TOTAL | $75.00 |
| Amount due | $75.00 |

Comments: Reopening of #4685
PDX Classic system file change

DETACH HERE AND RETURN BOTTOM PORTION WITH YOUR PAYENT

**PDX, Inc.**

PAYMENT AMOUNT: _____

If Payment amount is different from amount due, please list details

_____

_____

_____

_____

| | |
|---|---|
| Customer: | Sears Roebuck and Company dba Kmart Corporation |
| Customer No.: | C115 |
| Invoice No.: | INV10682 |
| Invoice Date: | 08/20/2018 |
| Due Date: | 10/19/2018 |
| Amount Due: | 75.00 |

DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Attorneys for National Health Information Network, Inc. and PDX Inc.*
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
(914) 681-0200
Julie Cvek Curley, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                    :        Chapter 11
                                         :
SEARS HOLDINGS CORPORATION, *et al.*,    :        Case No. 18-23538 (RDD)
                                         :
                                         :        (Jointly Administered)
                        Debtors[1].       :
----------------------------------------------------------x

## <u>AFFIDAVIT OF SERVICE</u>

STATE OF NEW YORK          )
                           ) SS.:
COUNTY OF WESTCHESTER      )

Bryn A. Leonardo, being duly sworn, deposes:

Deponent is not a party to the action and is over 18 years of age and is an employee of the law firm of DelBello Donnellan Weingarten Wise & Wiederkehr, LLP, One Lexington Avenue, White Plains, New York 10601.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); Service Live Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.1

AOS_1_Limtiied Objection.doc
0178520-002

On the 25th day of January, 2019, Deponent caused a true and correct copy of the *Limited Objection of National Health Information Network, Inc., and PDX Inc., to Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts in Connection with Global Sale Transaction together with related Exhibits thereto* [ECF Docket No. 1910], to be served via email upon all parties listed on Service List (unless otherwise stated).


                                                    */s/ Bryn A. Leonardo*
                                                    Bryn A. Leonardo

Sworn to before me this
25th day of January, 2019

*/s/ Erica R. Aisner*
Erica R. Aisner
Notary Public ~ State of New York

# SERVICE LIST

### Bid Notice Parties

    i.    The Debtors

        Rob Riecker Rob.riecker@searshc.com

        Luke Valentino - luke.valentino@searshc.com

        Moshin Meghji - mmeghji@miiipartners.com


    ii.    Counsel to the Debtors, Weil, Gotshal & Manges

        Ray C. Schrock, P.C. - ray.schrock@weil.com

        Jacqueline Marcus, Esq. - Jacqueline.marcus@weil.com

        Garrett A. Fail, Esq. - garrett.fail@weil.com

        Sunny Singh, Esq. - sunny.singh@weil.com

    iii.    Debtors' Investment Banker, Lazard Freres & Co., LLC

        Brandon Aebersold and Levi Quaintance - project.blue.rx@lazard.com

### Buyer Parties

    i.    Buyers

        Kunal S. Kamlani - kunal@eslinvest.com

        Harold Talisman:  - harold@eslinvest.com


    ii.    Counsel

        Christopher E. Austin, Esq. - caustin@cgsh.com

        Benet J. O'Reilly, Esq. - boreilly@cgsh.com

        Sean A. O'Neal, Esq. - soneal@cgsh.com

### Consultation Parties

    i.    Bank of America

        Paul Leake, Esq. - Paul.Leake@skadden.com

        Shana Elberg, Esq. - Shana. Elberg@skadden.com

        George Howard, Esq. - George.Howard@skadden.com

    11.    Wells Fargo Bank

        Kevin J. Simard, Esq. -ksimard@choate.com

        Jonathan D. Marshall, Esq. – jmarshall@choate.com

    iii.    Committee

        Ira S. Dizengoff, Esq. - idizengoff@akingump.com

        Philip C. Dublin, Esq. - pdublin@akingump.com

        Abid Qureshi, Esq. - aqureshi@akingymp.com

        Sara L. Brauner, Esq. - sbrauner@akingump.com

Transform Holdco, LLC
c/o ESL Partners, Inc.
1170 Kane Councorse, Ste 200
Bay Harbor Island, FL 33154                    Via First Class Mail
Atten: Kunal S. Kamlani & Harold Talisman


Sears Holding Corporation
3333 Beverly Road
Hoffman Estates, IL 60179                      Via First Class Mail
Attn: General Counsel


Weil Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10153                       Via First Class Mail
Attn:   Ray C. Schrock, P.C.,
        Ellen J. Odoner, Esq.
        Gavin Westerman, Esq., and Sunny Singh, Esq.


Clearly Gottlieb Steen & Hamilton LP
One Liberty Plaza
New York, New York 10006                       Via First Class Mail
Attn:   Christopher E. Austin
        Benet J. O'Reilly and Sean A. O'Neal

# EXHIBIT 5

NewYork-Presbyterian
The University Hospital of Columbia and Cornell

## ED PATIENT DISCHARGE INSTRUCTIONS
### LMH Adult Emergency Department

Patient Name:   COKE NG, BRIAN

MRN:

Date of Birth:

Visit Number:

Visit Date and Time:

ED Attending MD: Yim, Anne

Discharge Date and Time:   10/02/2018 12:43

**Discharge Instructions Given:**

Bronchospasm, Adult, Easy-to-Read - 10/02/2018

**Follow-Up Instructions:**

Special Instructions       You were called in singulair, albuterol, atrovent , advair.

Please follow up with primary care as soon as possible.

Return to the ed for any worsening symptoms.

**Return to Emergency Department for persistent, worsening, or new symptoms**

**Radiology:**

No major radiology tests were performed in this visit

**Procedures:**

No major procedures were performed in this visit

**Patient Signature:**

<u>I Have fully understood what was explained to me:</u>

X

Patient or Guardian Signature
COKE NG, BRIAN

Signature acknowledges that Patient and/or Guardian has received this instructions and understands them. Patient and/or Guardian also understands that he/she
should follow up with his/her primary care physician once discharged.

*Please join www.mynyp.org to get your results online*

Requested: 10/02/2018   By: Susanne, Mirela (PA)

ExitCare® Patient Information

# NewYork-Presbyterian
# Lower Manhattan Hospital
170 William Street, New York, NY 10038

Lower Manhattan Hospital
Emergency Department
*212-312-5070*

### EXITCARE® PATIENT INFORMATION

Patient Name: **BRIAN COKE NG**
Attending Caregiver: <u>Yim, Anne</u>

# Bronchospasm

A bronchospasm is when the tubes that carry air in and out of your lungs
(*airways*) spasm or tighten. During a bronchospasm it is hard to breathe.
This is because the airways get smaller. A bronchospasm can be triggered
by:



- Allergies. These may be to animals, pollen, food, or mold.
- Infection. This is a common cause of bronchospasm.
- Exercise.
- Irritants. These include pollution, cigarette smoke, strong odors, aerosol sprays, and paint fumes.
- Weather changes.
- Stress.
- Being emotional.



## HOME CARE

- Always have a plan for getting help. Know when to call your doctor and local emergency services (911 in the U.S.). Know where you can get emergency care.
- Only take medicines as told by your doctor.
- If you were prescribed an inhaler or nebulizer machine, ask your doctor how to use it correctly. Always use a spacer with your inhaler if you were given one.
- Stay calm during an attack. Try to relax and breathe more slowly.
- Control your home environment:
  - Change your heating and air conditioning filter at least once a month.
  - Limit your use of fireplaces and wood stoves.
  - **Do not** smoke. **Do not** allow smoking in your home.
  - Avoid perfumes and fragrances.
  - Get rid of pests (such as roaches and mice) and their droppings.
  - Throw away plants if you see mold on them.
  - Keep your house clean and dust free.
  - Replace carpet with wood, tile, or vinyl flooring. Carpet can trap dander and dust.
  - Use allergy-proof pillows, mattress covers, and box spring covers.
  - Wash bed sheets and blankets every week in hot water. Dry them in a dryer.
  - Use blankets that are made of polyester or cotton.
  - Wash hands frequently.

## GET HELP IF:

- You have muscle aches.
- You have chest pain.
- The thick spit you spit or cough up (*sputum*) changes from clear or white to yellow, green, gray, or bloody.
- The thick spit you spit or cough up gets thicker.

ExitCare® Patient Information

- There are problems that may be related to the medicine you are given such as:
  - A rash.
  - Itching.
  - Swelling.
  - Trouble breathing.

## GET HELP RIGHT AWAY IF:

- You feel you cannot breathe or catch your breath.
- You cannot stop coughing.
- Your treatment is not helping you breathe better.
- You have very bad chest pain.

## MAKE SURE YOU:

- Understand these instructions.
- Will watch your condition.
- Will get help right away if you are not doing well or get worse.

Document Released: 10/15/2010 Document Revised: 12/23/2014 Document Reviewed: 6/10/2014.
ExitCare® Patient Information ©2015 ExitCare, LLC. This information is not intended to replace advice given to you by your health care provider. Make sure you discuss any questions you have with your health care provider.

*This information is brief and general. It should not be the only source of your information on this health care topic. It is not to be used or relied on for diagnosis or treatment. It does not take the place of instructions from your doctor. Talk to your health care providers before making a health care decision.  http://nvp.org/*

**OFFICIAL NEW YORK STATE PRESCRIPTION**

ANNE YIM, MD
LIC: 256202
NPI: 1073757753

170 WILLIAM STREET NEW YORK, NY 10038 (212) 312-5070

PRACTITIONER DEA NUMBER

Patient Name Cove NG Brian    Date 09-2-18

Address

City _____ State ____ Zip ____ Age ____ Sex M F

Rx    Singulair 10mg X 1 a day
X 30 DAYS    Asthma
Dispense 30 pills

LEP ☐ Preferred Language
Prevent medication errors. Please see back of prescription.

MAXIMUM DAILY DOSE
(controlled substances only)

Prescriber Signature X _____

THIS PRESCRIPTION WILL BE FILLED GENERICALLY UNLESS PRESCRIBER WRITES 'daw' IN THE BOX BELOW

REFILLS ☒ None
Refills: ____

ØRMBHS 01

PHARMACIST
TEST AREA:    Dispense As Written

---

**OFFICIAL NEW YORK STATE PRESCRIPTION**

ANNE YIM, MD
LIC: 256202
NPI: 1073757753

170 WILLIAM STREET NEW YORK, NY 10038 (212) 312-5070

PRACTITIONER DEA NUMBER

Patient Name Cove NG Brian    Date 10-2-19

Address

City _____ State ____ Zip ____ Age ____ Sex M F

Rx    Advair    Dispense as written

LEP ☐ Preferred Language
Prevent medication errors. Please see back of prescription.

MAXIMUM DAILY DOSE
(controlled substances only)

Prescriber Signature X _____

THIS PRESCRIPTION WILL BE FILLED GENERICALLY UNLESS PRESCRIBER WRITES 'daw' IN THE BOX BELOW

REFILLS ☒ None
Refills: ____

ØRMBHS 02

PHARMACIST
TEST AREA:

---

**OFFICIAL NEW YORK STATE PRESCRIPTION**

ANNE YIM, MD
LIC: 256202
NPI: 1073757753

170 WILLIAM STREET NEW YORK, NY 10038 (212) 312-5070

PRACTITIONER DEA NUMBER

Patient Name Cove NG Brian    Date 10-2-18

Address

City _____ State ____ Zip ____ Age ____ Sex M F

Rx    Albuterol Solution
one Box

LEP ☐ Preferred Language
Prevent medication errors. Please see back of prescription.

MAXIMUM DAILY DOSE
(controlled substances only)

Prescriber Signature X _____

THIS PRESCRIPTION WILL BE FILLED GENERICALLY UNLESS PRESCRIBER WRITES 'daw' IN THE BOX BELOW

REFILLS ☒ None
Refills: ____

ØRMBHS 03

PHARMACIST

---

**OFFICIAL NEW YORK STATE PRESCRIPTION**

ANNE YIM, MD
LIC: 256202
NPI: 1073757753

170 WILLIAM STREET NEW YORK, NY 10038 (212) 312-5070

PRACTITIONER DEA NUMBER

Patient Name Cove NG Brian    Date 10/2/1

Address

City _____ State ____ Zip ____ Age ____ Sex M F

Rx    Atrovent Solution
one box

LEP ☐ Preferred Language
Prevent medication errors. Please see back of prescription.

MAXIMUM DAILY DOSE
(controlled substances only)

Prescriber Signature X _____

THIS PRESCRIPTION WILL BE FILLED GENERICALLY UNLESS PRESCRIBER WRITES 'daw' IN THE BOX BELOW

REFILLS ☒ None
Refills: ____

ØRMBHS 04

PHARMACIST



ejection Message

wks06Alt-F1 – WS-CHAIN : Fri, 5 Oct 2018 4:33:26 PM

COKENG, BRIAN

Prescriber SUBASIC, MINELA

Gender Male    Address 40 ANN ST
NEW YORK, NY 10038 0000

NPI 1497182844    Phone No.(718)  579-5000 FAX No.(718)  579-4744

Rx Number
1115583

Drug Name PROAIR HFA 90 MCG INHALER
SIG 2 PUFF(S) INHALED ONCE A DAY X 7 DAYS INDICATION: ASTHMA EXACERBATION

NDC #  59310057922 Qty  8.5
Days Supply 25    DAW Code 0

| TP Plan Name | CYPRESS CARE WC | BIN 010876 | PCN CC | Cardholder ID 11207765 | Person Code 01 |
| Help Desk No. | (800) 419-7191 | TP Plan Code 19035 | Group PW1010 | Relationship Code H |
| Store NPI | 1134223985 | | Authorization# 182785598793010099 | Cash Price $ 70.99 |

| Ln No. | Priority | TP Plan Code | TP Plan Name | Status | Copay |
|--------|----------|--------------|--------------|--------|-------|
| 1 | Primary | 19035 | CYPRESS CARE WC | REJECTED | |

TP Plan Name    Rejection Code/Reason    Message    Preferred Products

CYPRESS CARE   REJECTED
WC
75 – PRIOR AUTHORIZATION REQUIRED

Please call Cypress Care 1-800-419-7191
Select line # in grid above to view Plan Benefit information messaging on the next screen.

Select a function and press <Enter>
Select Line (#) Patient Notes (N) Edit Rx (E) Additional Info (A) Transaction History (TH) Reprocess (R) Prior
Authorization Request (PR) Make Call (MC) Exit (X)

| Adjudication Attempts | 1 |
| Last Updated Date/Time | 10/05/2018 04:33 PM |
| Last Updated By | N.Will |

| Patient | Prescriber | Drug | Third Party | Profile | Store Portal | Clinical | Refill | Help | Credentials | Store Info | Adj Status |
| F1 | F2 | F3 | F4 | F5 | F6 | F7 | F8 | F9 | F10 | F11 | F12 |

# EXHIBIT    6

22 Dec 18  2305

Page 1  of 2

**Patient Discharge Report**
Bellevue Hospital Center Emergency Department
462 First Avenue, New York, NY 10016

Patient Name: Coke Ng,Brian

Date & Time: Sat 12/22/2018 22:57

Attending Physician:
Emergency Provider:
Diagnosis: Vomiting, unspecified
Disposition: Discharged to Home or Self Care

Tests Performed:
Procedure(s):

Discharge Instructions:

Return to the Emergency Department if you think there may be a serious threat to your health.
These problems vary depending on your underlying condition, but include such problems as high
fever, severe pain, shortness of breath, persistent vomiting, excessive diarrhea, heavy bleeding,
black stools, seizure/convulsion, or change in behavior.  Ask your doctor or nurse to inform you
of any problems that may be more specific to your visit today.

Additional Instructions from your Provider:

benadryl 25mg as needed for sleep, ativan 0.5 mg tablet as needed for anxiety once per
day for a few days only, follow up with your neurologist/psychiatrist as scheduled,
strict diabetic diet

Prescriptions provided by the Emergency Department:

| Medication | Dose | Frequency |
| --- | --- | --- |

The following prescriptions were electronically sent to the pharmacy:
CVS/pharmacy #2716 Cor of Nassau, 129 Fulton St, New York, NY, 100382716, NCPDPID: 3316812

| Medication/Dose | Provider |
| --- | --- |
| LORazepam Oral Tablet 0.5 MG *1 mg tab by mouth as directed *daily as needed for 5 days | Chiang,William K, MD |
| Benadryl Allergy Oral Capsule 25 MG *1 mg cap by mouth *daily at bedtime as needed for 20 days | Chiang,William K, MD |

Follow Up Timeframe:  follow up with your doctor as scheduled

Your Emergency Department Provider would like you to follow up with your Primary Care
Provider (your "Regular Doctor").  If you don't have a Primary Care Provider, we can assist
you in finding one near your home. Please see the next page for a list of clinics to find
one in your area.  If you are an active clinic patient at Bellevue (seen in clinic within the
past 18 months) please contact your clinic directly or call 212-562-5555 for an appointment.

Please note that Bellevue Hospital Center does not accept all insurance plans. You can
contact your health insurance provider to verify your coverage or contact the Managed

22 Dec 18  2305

**Patient Discharge Report**
Bellevue Hospital Center Emergency Department
462 First Avenue, New York, NY 10016

Patient Name: Coke Ng,Brian

Date & Time: Sat 12/22/2018 22:57

Care office at 1-800-505-5678. If you are without health insurance, you may qualify for
HHC Options. Please call 212-562-3000 to discuss HHC Options or visit:
http://www.nyc.gov/html/hhc/html/access/hhc_options.shtml.

The results of x-rays, ultrasounds, blood tests and EKGs are preliminary at this time.
They will be reviewed by a specialist, usually within 24 hours. Should it be necessary,
you will be contacted. Notify your primary care physician if you had such tests done
during your emergency visit.

It is mandatory that you have notified the physicians and nurses of all of your past
medical and surgical history as well as any medications (including over-the-counter and
herbal preparations) that you are currently taking. Continue taking any previously
prescribed medications, in addition to any new ones from today, unless otherwise informed.

The emergency examination and treatment you received today is not intended to provide you
with a complete medical workup. You should follow up with a physician for further
evaluation and treatment, and notify your physician of any new or remaining problems. If
you have any questions or concerns regarding your treatment today, please call or return
to the Emergency Department. Otherwise, follow the instructions provided. Please read any
printed educational materials that we may have provided specific to your condition.

If your symptoms are not improving, or begin worsening, contact your primary doctor. If
you believe it is an emergency, please return to this or any other Emergency Department
or call 911. If you have any questions, feel free to ask your doctor or nurse before you
leave.

Work Note/Activity Limitations Notification:

_____
Patient/ Parent/ Guardian Signature

_____
Clinician Signature

I have received these instructions and had
my questions answered.  I also certify that
my address, phone number and/or emergency
contact information that I provided are
accurate.

I have reviewed these
instructions with the patient.

# EXHIBIT 7

1

STATE OF NEW YORK

WORKERS' COMPENSATION BOARD

------------------------------------------------x

CLAIMANT:        BRIAN COKE

EMPLOYER:        INTEGRATED SECURITY

CARRIER:        PUBLIC SERVICE MUTUAL

CLAIM:

WCB:

D/O/A:        12/07/07

FSOW:        S431

------------------------------------------------x

TELECONFERENCE

September 22, 2015

2:40 p.m.

**EXAMINATION OF WILFRED TALAVERA, M.D.,**
the claimant's treating physician, held at
the above date and time, pursuant to Notice,
taken before Christina L. Ramondino, a
Reporter and Notary Public of the State of
New York.

Received by WCB Email on 9/23/2015 12:07:27 PM

Received by WCB Email on 9/23/2015 12:07:27 PM



2

A P P E A R A N C E S:


   PASTERNACK, TILKER, ZIEGLER,

   WALSH, STANTON & ROMANO, LLP.

       Attorneys for Claimant

       111 Livingston Street

       Ground Floor

       Brooklyn, New York 11201

 BY:  KELLY KOSTER, ESQ.




   FOLEY, SMIT, O'BOYLE & WEISMAN

       Attorneys for Carrier

       100 William Street

       Suite 1800

       New York, New York 10038

 BY:  BENJAMIN HECHT, ESQ.

ON TIME COURT REPORTING
516-535-3939

3

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED
by and between the attorneys for the
respective parties herein, that filing,
sealing and certification be and the
same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the
form of the question shall be reserved
to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be signed
and sworn to before any officer authorized
to administer an oath, with the same force
and effect as if signed and sworn to before
the Court.

Received by WCB Email on 9/24/2015 3:29:21 PM

4

W I L F R E D     T A L A V E R A,     M.D.,
the witness herein, having been
first duly sworn by a Notary Public
of the State of New York, was
examined and testified as follows:
BY THE REPORTER:

Q.    Please state your name for the
record.

A.    Wilfred Talavera, M.D.

Q.    Please state your address for the
record.

A.    20 Lexington Avenue, Ground Floor,
New York, New York 10016.

MS. KOSTER:  Doctor, good
afternoon.

This is Kelly Koster.  I'm
an attorney from the firm
Pasternack, Tilker.  That firm
represents your patient in the
workers' compensation case.

Before we begin, I would
like to point out to the Law Judge
that before reviewing this
transcript, the doctor has been

Received by WCB Email on 9/24/2015 3:29:21 PM

Received by WCB Email on 9/24/2015 3:29:21 PM

1    *Wilfred Talavera, M.D.*    5

2    previously deposed from what I see

3    on three prior occasions.

4        There are deposition minutes

5    transcribed, August 21, 2008,

6    August 21, 2009 and again

7    August 29, 2011, so rather than be

8    repetitive and go through all of

9    the prior testimony, we'll limit

10   our questioning to the issue at

11   hand, which is the permanency

12   issue.

13   VOIR DIRE EXAMINATION BY

14   MS. KOSTER:

15       Q.    Doctor, before we begin though, can

16   you please tell us what is your current

17   specialty?

18       A.    I'm an internist, internal medicine

19   with a subspecialty in pulmonary diseases.

20       Q.    Have there been any changes to your

21   qualifications, coding or board certification

22   since you have been last deposed?

23       A.    No, ma'am.

24           MS. KOSTER:  Mr. Hecht, any

25   questions?

*Wilfred Talavera, M.D.*                                    6

1
2           MR. HECHT:  No.
3               We stipulate as previously
4           stipulated.
5               MS. KOSTER:  Thank you.
6   DIRECT EXAMINATION BY
7   MS. KOSTER:
8       Q.    Doctor, since you have been deposed
9   previously on this case, I'll ask you, are
10  you still actively examining and treating
11  Brian Coke?
12      A.    Yes.  I see him approximately every
13  two months or so.
14      Q.    What is your working diagnosis at
15  that time?
16      A.    Bronchial asthma, severe.
17      Q.    What is his current medication
18  regimen?
19      A.    His current medical regimen -- hold
20  on one second.
21              Advair inhaler, Combivent Respimat
22  inhaler and Albuterol inhaler and Singulair
23  pills.
24      Q.    What medications of the ones you
25  just mentioned does the claimant take on a

Received by WCB Email on 9/24/2015 3:29:21 PM

Received by WCB Email on 9/24/2015 3:29:21 PM

*Wilfred Talavera, M.D.*                                    7

1    daily basis?

2         A.    I think he takes all four of them
3    on a daily basis.  I mean, subject to the
4    fact that he does not have a lot of money
5    and, you know, I give him samples and
6    sometimes he may not have enough money to
7    take his medications, but as far as I'm
8    concerned, those are the medications I have
9    prescribed for him that I expect for him to
10   take an a daily basis.

11        Q.    Doctor, when was the last
12   examination that you had with the claimant?

13        A.    I saw Brian on the 18th of June of
14   this year.

15        Q.    Do you have an opinion within a
16   reasonable degree of medical certainty
17   whether your diagnosis of the claimant is
18   permanent in nature at this juncture?

19        A.    Yes.  I do have an opinion.

20        Q.    What is your opinion as to the
21   level of permanency?

22        A.    Based on my knowing him since 2008,
23   having examined him multiple times and
24   performed numerous pulmonary function tests,

Received by WCB Email on 9/24/2015 3:29:21 PM

*Wilfred Talavera, M.D.*                    8

2  he has severe obstructive airway disease with

3  little reversibility, and he is permanently

4  disabled from this condition.

5      Q.    If I were to ask you to assess the

6  level of his disability in terms of partial

7  or total, what would your opinion be?

8      A.    Total.

9      Q.    Are you familiar with the Workers'

10  Compensation Board Impairment Guidelines?

11      A.    You know, generally, yes, but I'm

12  not -- I don't have a Workers' Compensation

13  number rating, and I don't do much Workers'

14  Compensation work, but I'm generally

15  familiar, yes.

16      Q.    Did you consult the guidelines and

17  assess an impairment level for the claimant's

18  working diagnosis?

19      A.    Yes, I have.

20      Q.    What was the impairment that you

21  rendered for the claimant?

22      A.    That he had -- his lung condition

23  was 100 percent and that that impairment was

24  permanent.

25      Q.    Did you assess a severity ranking



Received by WCB Email on 9/24/2015 3:29:21 PM

*Wilfred Talavera, M.D.*

9

and class?

 A. Severity, I think, I have impairment from the Impairment Table 12, I think, .2, and the Severity Ranking was 12.

 Q. What factors on examination led you to that conclusion?

 A. Well, as I said earlier, I had the benefit of examining him over a seven or eight-year period, and when he first came to see me, he had full reversibility with near normal lung function.  He responded to therapy.

  As the years went on, his lung function continued to deteriorate, was no longer improving with bronchodilator, and his chest exam started to change.  Essentially, what happened is he had wheezing all the time and bronchial breath sounds were markedly decreased, consistent with something we call COPD or emphysema.  I'm not calling this COPD or emphysema, but, essentially, it's becoming a progressive nonreversible obstructive airway disease.

  His clinical symptomology, always

Received by WCB Email on 9/24/2015 3:29:21 PM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Wilfred Talavera, M.D.*                    10

being short of breath, always going to the
emergency room, his pulmonary function that
went from 80 to 90 percent capacity down to
below 50 percent, and the marked decrease in
his lung sounds, which means chronicity,
putting that all together, I came to the
conclusion that his airway disease, mainly
asthma was no longer reversible, was
progressive, and as a result, he was 100
percent disabled as a result of this severe
asthma or severe obstructive airway disease.

    Q.    Have you placed any restrictions on
the claimant's activity?

    A.    Yes.  The gentleman could barely
walk.  I told him that he was incapable of
working including doing the smallest of
tasks.  He can no longer -- this is a
previously strapping guy who lifted weights
and was strong and did a lot of activities.

    I essentially told him that he no
longer can do those activities, even with the
use of his medication, because of his very
severe shortness of breath.

    Q.    When was the last pulmonary

WCB #0082 3403

1
2                      *Wilfred Talavera, M.D.*                11
function study that was performed?

3        A.      Let's see.

4                His last pulmonary function test
5    was on the 7th of April.

6        Q.      What did it specifically reveal?

7        A.      Okay.  Specifically, it showed --
8    at that time, it showed moderate to severe
9    asthma with a FEV-1 percent of 60 percent,
10   which is considered severe disease.

11       Q.      Has claimant ever been a candidate
12   for oxygen at this juncture?

13       A.      Well, his oxygenation has always
14   been pretty normal at rest, so generally
15   according to the Medicare guidelines, if he
16   has a saturation of over 90 percent, he is
17   not a candidate.  So his saturations have
18   always been a little -- about 90, a little
19   over 90 percent.

20               So based on government Medicare
21   guidelines, he was not a candidate for oxygen
22   therapy.

23       Q.      You mentioned earlier that the
24   claimant has always or always complaints of
25   shortness of breath at this time?

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/24/2015 3:29:21 PM

Received by WCB Email on 9/24/2015 3:29:21 PM

*Wilfred Talavera, M.D.*                    12

1

2       A.    Yes.

3       Q.    He has had visits to the emergency

4   room?

5       A.    Multiple emergency room visits.  I

6   think he may have been admitted on several

7   occasions over the last six or seven years

8   for severe asthma.

9       Q.    Do you know when the last

10  occurrence was for a hospital admittance?

11      A.    Well, when he came to see me in

12  June, June 18th of this year, he told me he

13  had just been hospitalized at Jamaica

14  Hospital.

15          He had both hypertension as well as

16  asthma exacerbation.

17              MS. KOSTER:  Doctor, thank

18          you.

19              I have no further questions

20          at this time.

21              MR. HECHT:  Good afternoon,

22          Doctor.

23              My name is Benjamin Hecht.

24          I'm here for the insurance company,

25          Public Service, and the claimant's

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/24/2015 3:29:21 PM

1          *Wilfred Talavera, M.D.*                    13

2          former employer, Integrated

3          Security.

4                    Just a few questions

5          regarding your opinion on the

6          claimant's permanency and ability

7          to return to work.

8    CROSS-EXAMINATION BY

9    MR. HECHT:

10        Q.    Doctor, is it your opinion that the

11   claimant cannot return to any kind of gainful

12   employment?

13        A.    That is correct.

14        Q.    You mentioned that he does not

15   require home oxygen therapy; is that correct?

16        A.    Yes.

17        Q.    And that is --

18        A.    Based on Medicare guidelines.

19                In other words, if I try to order

20   oxygen, it would be denied because he does

21   not have -- because his saturation is 90

22   percent.  Mind you, normal saturation is 98

23   percent.

24                So he does not fulfill criteria --

25   guideline criteria for oxygen, but that does

Received by WCB Email on 9/24/2015 3:29:21 PM

*Wilfred Talavera, M.D.*                                    14

1  not mean he does not have airway disease and

2  it does not mean it's not severe.

3      Q.    You mentioned that his asthma was

4  moderate to severe?

5      A.    Right. That is correct.

6      Q.    Why wouldn't Mr. Coke be able to do

7  sedentary work from home?

8      A.    Well, because he is often short of

9  breath. He uses his Albuterol several times

10  a day. He is dyspneic, meaning short of

11  breath often at rest. He has problems

12  concentrating as a result of his asthma, in

13  addition to other conditions he has such as

14  dementia.

15      So, in my opinion, and having taken

16  care of him for many years and being a

17  pulmonologist for 37 years, this situation

18  does not lend itself to be gainfully employed

19  usually. Even doing the most, you know, the

20  mildest of job tasks would be a stretch for

21  him.

22      Q.    Focusing on your area of expertise

23  as an internal medicine doctor with your

24  subspecialty in pulmonary issues, do his

Received by WCB Email on 9/24/2015 3:29:21 PM

1      *Wilfred Talavera, M.D.*                    15

2  complaints of shortness of breath correlate

3  with his oxygen levels in his blood?

4      A.    No, because the saturation is over

5  90 percent.

6           Let me tell you that, earlier when

7  I initially saw him in 2008 and 2009, his

8  symptoms, that was after the insult, the

9  occupational exposure, his saturation was in

10 the 98 to 99 percent range.

11          Most recently, it's really in the

12 90 percent range, so even though it's more

13 than 90, there has been a steady decline over

14 the last six to seven years.

15     Q.    So, what part of the claimant's

16 condition leads you to believe that he is

17 unable to return to any kind of gainful

18 employment?

19     A.    Well, his symptoms.

20     Q.    Which are?

21     A.    Which are the cough, the shortness

22 of breath with even the most minimal of

23 exertions, mucus production, chest tightness

24 and chest pain with his difficulty breathing.

25 The fact that his lung function has dropped

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/24/2015 3:29:21 PM

*Wilfred Talavera, M.D.*                16

to the severe range and that the fact that his physical examination showed a marked reduction in the quality of his breath sounds.  All of which parallel each other and speak for a chronic progressive, irreversible disease.

Q.    When Mr. Coke reports shortness of breath and chest tightness, are those subjective complaints?

A.    They are subjective.  You know, he comes in with his wife, who most certainly is a witness to how he feels at home.  When he comes to see me in the office, his respiratory rate is rapid, usually, you know, 20, 22.  His lung function is poor.  His breathing, ability to move his air in and out is all poor.

When you put that all together, I think the shortness of breath is very well correlated with his degree of functional impairment.

Q.    The insurance company had Mr. Coke examined by Dr. Head.  He is a psychiatrist who is coded by the Workers' Compensation

1          *Wilfred Talavera, M.D.*                    17
2     Board, and his testimony is to be taken.
3     Dr. Head diagnosed Mr. Coke with histrionic
4     personality disorder.
5               Can you comment on that diagnosis?
6          A.     Well, no, I can't for two reasons.
7               One -- well, I will comment, but
8     I'm not a psychiatrist, and his lung
9     function, his physical exam and his symptoms,
10    to me, does not suggest histrionics.   There
11    may be some other issues that he has where
12    that may be a prominent assessment, prominent
13    issue that leads to that assessment, but in
14    no way is this airway decrease reflective of
15    that condition.
16         Q.     How is someone who is not qualified
17    under the Medicare guidelines for the oxygen
18    therapy also at all times having shortness of
19    breath and unable to work?
20         A.     First of all, you know, it's, you
21    have to excuse me because to answer that
22    question, I have to give you a crash course
23    in physiology.
24         Q.     As brief as possible.
25         A.     Essentially, what it is, is that

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/24/2015 3:29:21 PM

Received by WCB Email on 9/24/2015 3:29:21 PM

*Wilfred Talavera, M.D.*                          18

1  you -- this is what is misleading of

2  obstructive airway disease.

3      You take someone with emphysema as

4  an example.  They are absolutely paralyzed by

5  the lung condition, but the saturation will

6  be 92 percent.  Not all lung diseases require

7  oxygen in order -- in response to their

8  symptoms.

9      So when you have obstructive airway

10  disease, there is a significant reduction in

11  oxygen, but it's not reflected by the oxygen

12  saturation which is what we measure in the

13  office.

14      I'll give you an example.  We

15  measure things in terms of partial pressure.

16  If I did a blood gas test on an individual

17  who is perfectly normal, that partial

18  pressure of oxygen would be 100 and the

19  saturation would be 100, but if he dropped

20  that partial pressure of oxygen down to 65,

21  his saturation is still 90 percent.  That is

22  the way humans are made.

23      There is something called a

24  hemoglobin association curve where in order

Received by WCB Email on 9/24/2015 3:29:21 PM

*Wilfred Talavera, M.D.*                    19

1   for you to have a saturation below 90

2   percent, which is Medicare Guidelines for

3   oxygen therapy, your oxygen has to really

4   drop from 99 to 45 or 50. And even 60 to 65,

5   which is severe impairment would still be

6   associated with an oxygen saturation with 90

7   percent.

8        So there is a very rapid dropoff

9   after you get to a partial pressure of 60 to

10  65. That explains the discrepancy between

11  how he feels, his pulmonary function, and

12  what his oxygen saturation is.

13       Q.    When Mr. Coke comes to your office,

14  does he need help walking to the examination

15  table? Is he struggling to breathe while he

16  is walking?

17       A.    Yes.  He is always short of breath.

18  He walks very slowly.  He doesn't use a

19  walker or cane or any external appliance, but

20  he walks very slowly into the office like

21  most of my patients with chronic lung

22  disease.

23       Q.    The insurance company had their

24  Dr. Friedman examine Mr. Coke, and the

Received by WCB Email on 9/24/2015 3:29:21 PM

*Wilfred Talavera, M.D.*                    20

1   insurance company doctor similarly to you

2   found a permanent lung impairment of Class 3,

3   Severity L.

4           Are you able to comment on that

5   finding, Doctor?

6       A.    No, I can't.  I don't have

7   Dr. Friedman's report in front of me.

8       Q.    If you could briefly describe how

9   you applied the guidelines to calculate your

10  severity ranking of, I believe, it was an R;

11  is that correct?

12      A.    Yes.  That was based on tables that

13  were given to me at one point.  I don't have

14  that in front of me.  I don't remember that.

15  I sort of have not memorized it, but, you

16  know, even without with the WCB rating, his

17  pulmonary function test and his long history

18  of worsening, and his change in physical exam

19  to me clearly tells me that he is

20  permanently, permanently disabled.

21      Q.    What is a normal FEV-1 for a person

22  of Mr. Coke's age?

23      A.    A normal FEV-1?  I don't have that

24  with me.  Give me a minute and I'll look

*Wilfred Talavera, M.D.*                    21

at --

A normal FEV-1 for someone in his age, weight, height and ethnic group, which is African American, his normal FEV-1 would probably be in the range of 3.4, 3.5, roughly that.

His FEV-1 most recently was about 2. So that is a very significant impairment.

Q.   My last question, what is a normal FEV-1 over FPC for someone of his age?

A.   Well, for everyone, it should be over 85 percent because that is the ratio of the two numbers.  That ratio would remain the same regardless of size and weight.

MR. HECHT:  I appreciate your testimony.

Thank you very much.

I do understand that you did have an issue with the prior fee for your deposition.

We'll contact the insurance company about that.

It is your first deposition today?

Received by WCB Email on 9/24/2015 3:29:21 PM

Received by WCB Email on 9/24/2015 3:29:21 PM



*Wilfred Talavera, M.D.*

22

THE WITNESS:  My first deposition today.  My only deposition today.

I'm actually sitting in my office seeing patients.

MR. HECHT:  Do you have any followup?

MS. KOSTER:  No further questions.

Thank you.

-oOo-

(Whereupon, the examination of WILFRED TALAVERA, M.D. was concluded at 3:01 p.m.)

_____

WILFRED TALAVERA, M.D.

Subscribed and sworn to
before me this _____ day
of _____, 2015.

_____

NOTARY PUBLIC

23

## I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| WILFRED TALAVERA, M.D. | | |
| | MS. KOSTER | 6 |
| | MR. HECHT | 13 |

Received by WCB Email on 9/24/2015 3:29:21 PM

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/24/2015 3:29:21 PM

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E

I, CHRISTINA L. RAMONDINO, a Notary
Public within and for the State of New York,
do hereby certify:

That the witness(es) whose testimony
is hereinbefore set forth was duly sworn by
me, and the foregoing transcript is a true
record of the testimony given by such
witness(es).

I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no way
interested in the outcome of this matter.

*Christina L. Ramondino*

_____

CHRISTINA L. RAMONDINO

ON TIME COURT REPORTING
516-535-3939

# EXHIBIT 8

Received by WCB Email on 9/30/2015 9:17:24 AM



1

STATE OF NEW YORK

WORKERS' COMPENSATION BOARD

-------------------------------------------x

CLAIMANT:      BRIAN COKE

EMPLOYER:      INTEGRATED SECURITY

CARRIER:       PUBLIC SERVICE MUTUAL

CLAIM:

WCB:

D/O/A:         12/07/07

FSOW:          S431

-------------------------------------------x


                    TELECONFERENCE
                    September 29, 2015
                    3:30 p.m.



        **EXAMINATION OF JOEL KING, M.D.**, the
claimant's treating physician, held at the
above date and time, pursuant to Notice,
taken before Yvonne Angeles, a Reporter and
Notary Public of the State of New York.


ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/30/2015 9:17:24 AM

2

1

2    A P P E A R A N C E S:

3

4        PASTERNACK, TILKER, ZIEGLER,

5    WALSH, STANTON & ROMANO, LLP.

6            Attorneys for Claimant

7            111 Livingston Street

8            Ground Floor

9            Brooklyn, New York 11201

10    BY:  LEWIS HELLER, ESQ.

11

12

13    FOLEY, SMIT, O'BOYLE & WEISMAN

14            Attorneys for Carrier

15            100 William Street

16            Suite 1800

17            New York, New York 10038

18    BY:  DAVID SCHWEIKERT, ESQ.

19

20

21

22

23

24

25

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/30/2015 9:17:24 AM

3

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/30/2015 9:17:24 AM

4

1

2    J O E L      K I N G,      M.D.,

3          the witness herein, having been

4          first duly sworn by a Notary Public

5          of the State of New York, was

6          examined and testified as follows:

7    BY THE REPORTER:

8        Q.    Please state your name for the

9    record.

10       A.    Joel King, M.D.

11       Q.    Please state your address for the

12   record.

13       A.    222 Middle Country Road, Smithtown,

14   New York 11787.

15            MR. HELLER:  Dr. King, thank

16        you for joining us.

17   VOIR DIRE EXAMINATION BY

18   MR. HELLER:

19       Q.    Can you tell us, are you a

20   physician duly licensed to practice medicine

21   in the State of New York?

22       A.    I am.

23       Q.    Doctor, would you tell us your

24   medical school and year of graduation?

25       A.    I am a graduate of State University

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                          5

1
2  of New York Downstate Medical Center School
3  of Medicine.   I graduated in June of 1970.
4          Q.    When were you first licensed to
5  practice medicine in the State of New York?
6          A.    1976.
7          Q.    Do you specialize?
8          A.    I do.
9          Q.    Your area of specialty?
10         A.    Psychiatry.
11         Q.    Are you Board certified?
12         A.    I am.
13         Q.    Are you coded by the New York State
14  Workers' Compensation Board to treat injured
15  workers?
16         A.    Yes, I think it's 1A, psychiatry or
17  A1 psychiatry.
18         Q.    Doctor, has your license remained
19  in good standing?
20         A.    It has.
21         Q.    Has it always been in good
22  standing?
23         A.    It has.
24         Q.    Are you licensed in any other
25  state?

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                6

1

2      A.     No, I am not.

3             MR. HELLER:  Mr. Schweikert,

4      voir dire?

5             MR. SCHWEIKERT:  I accept

6      the doctor within his coded field.

7             MR. HELLER:  Thank you very

8      much.

9  DIRECT EXAMINATION BY

10 MR. HELLER:

11     Q.     Doctor, did you have the

12 opportunity to examine and treat the claimant

13 in this case, Mr. Brian Coke, referable to an

14 injury which occurred to him while at work on

15 12/7/2007?

16     A.     I have.

17     Q.     Can you tell The Court when for the

18 first time did you see the patient?

19     A.     Just looking this up; it looks like

20 it was August 10th of 2015.

21     Q.     Is that your first time or your

22 last time?

23     A.     The patient has been treated by

24 Ashley Curtis, one of our nurse

25 practitioners.

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                                    7

1
2              According to the compensation
3    rules, I'm in the premises at all times, but
4    the patient has been treated, managed by
5    Ashley -- Ashley Curtis.
6              I have actually seen the patient, I
7    think, it's two times myself, but later on in
8    the course, that has to do with the fact that
9    Ashley King is now out on maternity leave, so
10   I was getting ready to take over his care.
11        Q.   Doctor, is it Ashley King or
12   Curtis?
13        A.   I think it's plain Curtis now, but
14   at one time it was Ashley King.  She's my
15   daughter.  Then it became Ashley King-Curtis.
16   As far as I know, she got married using just
17   Curtis.
18        Q.   Doctor, do you have the notes that
19   were kept in the regular course of practice
20   with you?
21        A.   I do and if you would just bear
22   with me.
23        Q.   What was the history that was
24   received at that time of the first
25   examination and the date of the first

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                    8

1
2      examination?

3            A.    Patient was in a usual state of

4      health until 2007.  I don't have the exact

5      date in 2007.  At which point, he was exposed

6      to toxicants in the workplace.  He

7      subsequently developed asthma and memory

8      problems.

9                  He sought psychiatric treatment,

10     started on Zoloft for depression, but,

11     unfortunately, there was some confusion about

12     how the medication was supposed to be used.

13     He developed serotonin syndrome.

14                 At the time of the initial

15     presentation, patient presented with symptoms

16     of depressed mood, hopelessness and he had

17     anhedonia.  He could not experience pleasure

18     or positive feelings.  He said he was

19     fatigued, had trouble with focus and

20     concentration.  He reported anorexia with a

21     20-pound weight loss.  He had insomnia,

22     frustration, crying spells, nightmares, night

23     sweats.  That was how he presented.

24           Q.    Doctor, the date of that first

25     treatment?

*Joel King, M.D.*

9

1

2    A.    February 19, 2015.

3    Q.    Doctor, the Board file contains a

4    treatment record of January 28, 2015.

5          Do you have that record?

6    A.    January 28, 2015.

7    Q.    Maybe that's when the -- the report

8    is dated February 29th, but the C-4 is for

9    the earlier date.

10   A.    I know I saw something else in

11   here.  I have January 28, 2015.

12   Q.    Was that the first date the

13   claimant was seen?

14   A.    I believe that to be so.

15   Q.    Doctor, can you give us the

16   diagnosis or diagnoses?

17   A.    Diagnosis was, at the time of the

18   initial evaluation, it was dementia, not

19   otherwise specified, depressive disorder.

20   Q.    Doctor, was an opinion formed as to

21   whether or not the dementia and depressive

22   disorder was causally related to the

23   claimant's toxicants exposure?

24   A.    Yes, there was.

25   Q.    What was that opinion?

Received by WCB Email on 9/30/2015 9:17:24 AM

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*

10

1

2   A.   There was causal and temporal

3   relationship based on the accident at the

4   workplace.

5   Q.   Doctor, do the office notes

6   indicate the degree of disability causally

7   related to the claimant's function, the

8   dementia and the depression that he was being

9   treated for?

10   A.   Yes, it was total.

11   Q.   Doctor, was that based solely upon

12   the conditions of dementia and depression?

13   A.   Yes.

14   Q.   Doctor, when for next time was the

15   claimant seen?

16   A.   We switched to an electronic

17   medical records system somewhere midstream

18   here.  So the next record that I have is in

19   July, which I'm sure is not accurate.

20   There's stuff here that I don't have -- hold

21   on.  February 18, 2015.

22   Q.   Was there any change in the

23   claimant's condition at that time?

24   A.   It was reported that there was a

25   partial response namely on the basis of

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                          11

1    
2    improved sleep.

3         Q.    Doctor, was the claimant being

4    given medications psychiatrically?

5         A.    Yes, he was.

6         Q.    Can you tell us the medications

7    that your office was prescribing?

8         A.    Seroquel.

9              Let me make a correction; the

10   medication was Wellbutrin, 300 milligrams

11   daily, Aricept, 10 milligrams daily and

12   Quetiapine, 15 milligrams daily.

13        Q.    Doctor, what is the Wellbutrin

14   given for?

15        A.    Depression.

16        Q.    The Aricept?

17        A.    Dementia.

18        Q.    And the Quetiapine?

19        A.    Quetiapine is to augment the

20   effectiveness of the Wellbutrin and to

21   facilitate sleep.

22             If I might add, because when the

23   patient presented to the office, he was

24   already taking the Aricept and a lower dose

25   of the Quetiapine.  The dose of Quetiapine

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*

12

1   was to raise the Aricept which had been
2   prescribed otherwise elsewhere.
3       Q.    Doctor, was the claimant still
4   totally disabled at that time?
5       A.    Yes, he was.
6       Q.    Was the total disability being
7   given by your office solely on the conditions
8   of the dementia and the depression?
9       A.    That's correct.
10      Q.    Doctor, did the office continue to
11  follow Mr. Coke?
12      A.    Yes.
13      Q.    Can you tell us briefly the dates
14  that the claimant was seen after February 19,
15  2015?
16      A.    I will do my best.  April 8, 2015.
17      Q.    Can you list the dates of treatment
18  to the present time?
19      A.    April 8, 2015; July 13, 2015;
20  August 10, 2015.
21          Today -- I didn't see him today.
22  It would be the April, July and August dates.
23      Q.    At any time, has Mr. Coke's
24  condition improved that he is anywhere other

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                    13

1    than totally disabled?

2         A.    It has not.

3         Q.    Doctor, your office and, I believe,

4    you on August 10, 2015 issued an C-4.3.

5              That's an opinion on permanency?

6         A.    Yes.

7         Q.    Can you tell us what your opinion

8    on permanency was in this case?

9         A.    Permanency exists.

10             Is that when you give percentages?

11        Q.    Do you have the C-4.3 in your file?

12        A.    I don't have that available to me.

13        Q.    Doctor, under Section D of that

14   report, which is entitled maximum medical

15   improvement, you were asked if the patient

16   reached maximum medical improvement.  The box

17   is checked no, but indicates that patient

18   remains symptomatic, depressed mood and poor

19   sense of self worth.  He continues to

20   struggle with cognitive limitations.

21             That's what you wrote under the

22   maximum medical improvement section?

23        A.    What date was that?

24        Q.    August 10, 2015.

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                    14

1

2    A.    Okay.  Repeat your question.

3    Q.    Would this form have been filed in

4    the regular course of your practice?

5    A.    Yes.

6    Q.    Doctor, when it says under

7    "psychiatric/neuro-behavioral, attached

8    document describing functional limitations,"

9    you wrote -- it's written on here with your

10   signature "patient is unable to tolerate the

11   stressors of the workplace environment.

12   Issues with memory, focus and concentration

13   not allow for productivity."

14           Doctor, if that's what the form --

15   which is contained in the Workers'

16   Compensation Board electronic case folder on

17   a form that bears your signature, would that

18   have been your findings on that date?

19   A.    That's correct.

20   Q.    Doctor, after August 10, 2015, you

21   stated the claimant was seen again on -- was

22   it yesterday or today, 9/28 or 9/29/2015?

23   A.    I didn't see him yesterday.

24   Q.    Did someone see him yesterday or

25   today?

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                                15

A.    No, unless there was a scheduling -- I did not see him.  Let me double check on that.  Let me make sure. Just bear with me for a moment.  I did not see him yesterday.

Q.    He was not seen in your office yesterday?

A.    He was not seen in this office yesterday.

Q.    If I were to ask you to read your C-4 reports into the record verbatim this afternoon for the sake of the completeness of your testimony, as well as to the veracity of your reports, would you have any difficulty in doing that?

A.    I would not.

MR. HELLER:  I'm going to move the C-4.2 and C-4.3 from Dr. King into the Board file subject to cross-examination by Mr. Schweikert.

Doctor, I want to thank you for your appearance this afternoon.

Mr. Schweikert?

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                     16

         MR. SCHWEIKERT:  Thank you.

         Doctor, can you hear me

okay?

         THE WITNESS:  Yes,

basically.

         MR. SCHWEIKERT:  If at any

point you need me to speak up or if

you need me to repeat myself, just

let me know.

         Okay?

         THE WITNESS:  Will do.

CROSS-EXAMINATION BY

MR. SCHWEIKERT:

    Q.    Doctor, Mr. Heller called your

attention to the C-4 forms that you filed.

I'm looking at the forms here and the office

address you have listed is 222 Middle Country

Road in Smithtown.

    A.    That is correct.

    Q.    Did you treat Mr. Coke in

Smithtown?

    A.    No, I did not.

    Q.    Where did you treat Mr. Coke?

    A.    In Manhattan.

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                    17

1

2    Q.    Were about in Manhattan?

3    A.    230 Park Avenue, New York,

4    New York.

5    Q.    Now, Doctor, do you know how

6    Mr. Coke is able to travel to and from his

7    home to your office?

8    A.    I do not, nor did I inquire.

9    Q.    At any point, did you restrict his

10   ability to take mass transit?

11   A.    I did not.

12   Q.    You noted earlier that you found

13   Mr. Coke to be totally disabled from all

14   types of work?

15   A.    I did.

16   Q.    I believe it was noted earlier that

17   you attributed that to issues that he would

18   not be able to tolerate the stressors of the

19   workplace and issues with memory and

20   concentration, correct?

21   A.    Correct.

22   Q.    Doctor, what part of your exam led

23   you to believe that he would not be able to

24   tolerate stressors of the workplace?

25   A.    His global presentation.  This

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                    18

1   man's level of anxiety is stunning.  He has

2   trouble staying on track.  He demonstrates

3   clear psychic anxiety.  He overworries.  He

4   is extremely difficult to reassure and the

5   level of his anxiety is palpable.

6        Q.    Doctor, are you familiar with a

7   diagnosis of a histrionic personality trait?

8        A.    Histrionic personality trait?

9              I don't know if that's an accepted

10  diagnosis in DSM3.  We can look that up.

11       Q.    It's listed as DSM5301.50.

12       A.    I wouldn't have that information

13  handy.  I would certainly agree that that

14  would probably be right if you looked it up

15  already.

16       Q.    One second, Doctor.

17             Doctor, as part of your evaluation,

18  is it part of your practice to evaluate

19  patients for potential malingering?

20       A.    I listen to what my patients tell

21  me and I do the best I can to determine if

22  what they are saying is consistent with their

23  clinical presentation.  That's what I do.

24       Q.    Doctor, the claimant's complaints

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                   19

1

2  of anxiety, would you agree that that's a

3  subjective complaint?

4      A.    Of course, all feelings are

5  subjective.

6      Q.    The other factors you noted that

7  would prohibit him from working such as lack

8  of concentration and issues with memory,

9  would you also agree that that's also a

10 subjective finding?

11                 (Whereupon, Dr. King left

12             and returned to the

13             teleconference.)

14                 THE WITNESS:  Sorry about

15             that.  I got disconnected.

16     Q.    Doctor, the claimant's complaints

17 of lack of memory, focus and concentration,

18 would you also agree that those are

19 subjective?

20     A.    Yes, I would.

21     Q.    Can you cite to any objective tests

22 or objective findings that would substantiate

23 your opinion of a total disability?

24     A.    Can you repeat that?

25     Q.    Are there any objective tests or

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*
20

1
2  any objective findings that support your
3  finding of total disability?
4      A.    That's not part of what I do in my
5  practice.  My work is based on observation,
6  taking a history, understanding pathology,
7  psychopathology.  I never used rating scales.
8  It's based on -- I'm an old-fashioned doctor.
9  It's based on listening and putting things
10  together and 44 years of experience.
11      Q.    During the time with Mr. Coke, did
12  you ever discuss how he spends his days?
13      A.    I did not.  I look for symptomatic
14  illness.  I'm very much a physician in this
15  aspect of the work.
16      Q.    Those are subjective complaints
17  that you are looking for?
18      A.    I listen to what people tell me and
19  I guess what people -- I guess what we know,
20  talk to one another, there's always -- it's
21  always subjective.
22      Q.    I know you indicated that you
23  didn't complete any rating scales.
24          Did you perform any tests such as
25  having Mr. Coke perform anything like simple

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*

21

1
2  math or perform a Beck Inventory test?

3      A.    I did not.  Again, I came in -- the
4  answer is no.

5      Q.    I apologize if I'm making you
6  repeat stuff.

7            Has there been any improvement in
8  the claimant's conditions since he has been
9  treated on either a psychiatric or
10  psychological basis?

11      A.    I didn't -- again, I have only
12  interviewed this man face-to-face twice and
13  after the first -- I changed his medication
14  immediately because I didn't think anything
15  positive was happening.  So I don't think
16  things have changed since Ashley Curtis began
17  treatment with him.

18            I can't take it back further than
19  that, but since he has been under the care of
20  our office, I do not believe there's been
21  change.

22      Q.    Does he have any complaints of
23  suicidal ideation?

24      A.    Not recently, but if you bear with
25  me, I have to check the record.

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                    22

1    The answer is no.

2    Q.    Let me ask you this.

3         You are coded by the Workers'

4    Compensation Board and I think you are

5    familiar with the ratings of disability of

6    mild, moderate and total, correct?

7    A.    Correct.

8    Q.    What about, I guess, Mr. Coke that

9    led you to believe that he has a total

10   disability as opposed to a marked disability?

11   A.    Again, my measure is my experience

12   and my own interaction and reaction to the

13   patient which is based on talking to patients

14   over the years and other people who are not

15   patients.  So this man's level of anxiety is

16   so high that I don't think he is capable of

17   handling stress; stress defined as having

18   responsibilities, needing to be places on a

19   regular basis, on time, being able to carry

20   on what we call average or normal

21   interpersonal contact and relationships and

22   dialogue.

23        So based on my clinical experience,

24   which is how I do my work which seems to be

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                    23

1
2   accepted in the community, I would say this
3   man is extremely dysfunctional and I don't
4   see how he could be gainfully employed.
5       Q.    My question is, are you able to
6   state what specific factors made him a total
7   as opposed to a marked disability?
8       A.    The level of anxiety is so high
9   that that in and of itself would preclude
10  gainful employment.
11      Q.    What specific complaints, aside
12  from him telling you I'm very anxious, leads
13  you to believe that his anxiety renders him
14  incapable of any type of work?
15      A.    Again, I'm an old-fashioned guy, so
16  I learned to be a therapist before I --
17  before we had medical psychiatry.  So years
18  of being a therapist gives one a chance to
19  gauge how a person is behaving.  Part of it
20  is how we all interact with one another, to
21  get some idea how the other person is
22  behaving, how they appear to be feeling, what
23  feeling they elicit and listening to this
24  man.  His level of anxiety is to the point
25  where one feels discomfort for him and in

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                    24

1  one's self.  You can't get anywhere with him.

2      Q.    Am I correct in saying that there's

3  no one specific complaint that led you to

4  believe that his anxiety renders him

5  incapable of work?

6      A.    No, that's not correct.  The

7  complaint is -- the complaint is he is

8  anxious and it's manifested by observation.

9  That's a major factor in psychiatric and

10  psychological evaluation, how we determine

11  how a person is actually behaving.

12      Q.    Give me an example of what

13  observations did you make that led you to

14  believe his anxiety renders him unemployable?

15      A.    Well, part of it is -- most of it

16  is actually interacting with him.  I have

17  interacted with a lot of people over the

18  course of time, in multiple, thousands of

19  patients and he would be in the class, where

20  on the basis of my clinical experience,

21  because I have done this over a long time, if

22  you send a patient back to work in this kind

23  of shape, which I did in younger days, he

24  would relapse.  This guy isn't at a point

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                    25

where he made any real positive gains, so it

would be disastrous.

Q.    I think you have access to all your

office's writeups including ones done by

Dr. King-Curtis; is that correct?

A.    Correct, I think I have them all.

Q.    There's a -- the April 8, 2015

writeup and let me know if you have that.

A.    I have it.

Q.    Doctor, at that time, the claimant

was observed as being calm and cooperative,

correct?

A.    That's what it says.

Q.    It says cognition was not formally

tested, correct?

A.    Yes.

Q.    Insight and judgment were deemed

adequate, correct?

A.    Yes.

Q.    Would you say there has been any

significant change in Mr. Coke's condition

since April 8th?

A.    No.

MR. SCHWEIKERT:    Thank you,

3

Joel King, M.D.                              26

1
2          Doctor.
3                   I have no further questions.
4   REDIRECT EXAMINATION BY
5   MR. HELLER:
6          Q.    Just briefly, Doctor, calm and
7   cooperative, is that indicative of a cure or
8   a change in his overall condition?
9          A.    Again, what we try to do with our
10  patients is to facilitate an environment that
11  is supportive so we are not challenging our
12  patients.  We may, but it would be unusual
13  that we would try to do something that would
14  evoke severe anxiety or discomfort.  So if in
15  the context of the interview and the
16  experience of the therapeutic interaction --
17  we want to be therapeutic during these
18  sessions as well as inquisitive.
19         Q.    Doctor, it was also noted at that
20  time, eye contact was fair, correct?
21         A.    Correct.
22         Q.    It was not good, it was fair,
23  correct?
24         A.    Correct.
25         Q.    What does it mean that mood is

Received by WCB Email on 9/30/2015 9:17:24 AM

Received by WCB Email on 9/30/2015 9:17:24 AM

*Joel King, M.D.*                                      27

dysphoric?

    A.    Blue, sad, down in the dumps.

    Q.    I won't go over everything that was written at the time, but can you tell us what was the impression as to degree of disability at that time?

    A.    At that time, at that session, it was reported as being total.

    Q.    Doctor, has the claimant reached maximum medical improvement at that examination?

    A.    No.

    Q.    Doctor, was the claimant under the medications that were being prescribed?

    A.    Yes.

        MR. HELLER:  I have nothing further.

        MR. SCHWEIKERT:  I have nothing additional.

        MR. HELLER:  Thank you. Doctor, is this your first testimony in a Workers' Compensation case today?

        THE WITNESS:  No.

Received by WCB Email on 9/30/2015 9:17:24 AM



*Joel King, M.D.*                                    28

    MR. HELLER:  Can you tell
The Court how many times you
testified today?

    THE WITNESS:  Total of two.

    MR. HELLER:  The judge will
set the appropriate fee and we
thank you very much for your
appearance.

    -oOo-

    (Whereupon, the examination
of JOEL KING, M.D. was concluded at
3:50 p.m.)

                                _____
                                 JOEL KING, M.D.

Subscribed and sworn to
before me this _____ day
of _____, 2015.

_____
NOTARY PUBLIC

**ON TIME COURT REPORTING**
**516-535-3939**

29

# I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| JOEL KING, M.D. | | |
| | MR. HELLER | 6,26 |
| | MR. SCHWEIKERT | 16 |

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/30/2015 9:17:24 AM

30

# C E R T I F I C A T E

I, YVONNE ANGELES, a Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

*Yvonne Angeles*

_____
YVONNE ANGELES

Received by WCB Email on 9/30/2015 9:17:24 AM

# EXHIBIT   9

1

1

2     STATE OF NEW YORK

3     WORKERS' COMPENSATION BOARD

4     - - - - - - - - - - - - - - - - - - x

5     CLAIMANT:      BRIAN COKE

6     EMPLOYER:      INTEGRATED SECURITY SERVICES

7     CARRIER:       PUBLIC SERVICE MUTUAL

8     CLAIM:

9     WCB:

10    D/O/A:         12/07/07

11    FSOW:          S431

12    - - - - - - - - - - - - - - - - - - x

13

14                        September 21, 2012
                          1:30 p.m.
15

16                        100 William Street
                          New York, New York
17

18          **EXAMINATION OF NICHOLAS RADCLIFFE,**

19    M.D., the claimant's treating physician, held

20    at the above date, time and place, pursuant

21    to Notice, taken before Christina L. Prunty,

22    a Reporter and Notary Public of the State of

23    New York.

24

25

Received by WCB Email on 9/26/2012 3:59:37 PM

Received by WCB Email on 9/26/2012 3:59:37 PM

2

1

2    A P P E A R A N C E S:

3

4    PASTERNACK, TILKER, ZIEGLER,

5    WALSH, STANTON & ROMANO

6          Attorneys for Claimant

7          111 Livingston Street

8          Brooklyn, New York 11201

9    BY: TODD JONES, ESQ.

10

11

12

13    FOLEY, SMIT, O'BOYLE & WEISMAN

14          Attorneys for Carrier

15          100 William Street

16          Suite 1801

17          New York, New York 10038

18    BY: JACQUELINE WEINBERGER, ESQ.

19

20

21

22

23

24

25

Received by WCB Email on 9/26/2012 3:59:37 PM

3

S T I P U L A T I O N S

1
2
3
4          IT IS HEREBY STIPULATED AND AGREED
5    by and between the attorneys for the
6    respective parties herein, that filing,
7    sealing and certification be and the
8    same are hereby waived.
9
10         IT IS FURTHER STIPULATED AND AGREED
11   that all objections, except as to the
12   form of the question shall be reserved
13   to the time of the trial.
14
15         IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be signed
17   and sworn to before any officer authorized
18   to administer an oath, with the same force
19   and effect as if signed and sworn to before
20   the Court.
21
22
23
24
25

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/26/2012 3:59:37 PM

4

```
 1
 2     N I C H O L A S    R A D C L I F F E,   M.D.,
 3                the witness herein, having first
 4                been duly sworn by a Notary Public
 5                of the State of New York, was
 6                examined and testified as follows:
 7     BY THE REPORTER:
 8        Q.    Please state your name for the
 9     record.
10        A.    Nicholas Radcliffe, M.D.
11        Q.    Please state your address for the
12     record?
13        A.    310 East Shore Road, Great Neck,
14     New York 11023.
15                MR. JONES:  Doctor, my name
16             is Todd Jones.  I'm an attorney
17             with Pasternack, Tilker.
18                How are you.
19                THE WITNESS:  Good, how are
20             you.
21                MR. JONES:  Pretty good.
22             We're going to start with a few
23             questions about your background.
24             Okay?
25                THE WITNESS:  Yes.
```

Received by WCB Email on 9/26/2012 3:59:37 PM

1               *Nicholas Radcliffe, M.D.*                    5

2    VOIR DIRE EXAMINATION BY

3    MR. JONES:

4        Q.    Doctor, are you licensed to

5    practice medicine in the State of New York?

6        A.    Psychology.

7        Q.    What school did you attend and what

8    was your year of school?

9        A.    Fordham University, 2001.

10       Q.    After that, what year did you

11   become licensed?

12       A.    2003.

13       Q.    Do you practice in an area of

14   specialty?

15       A.    Clinical psychology.

16       Q.    Is your license to practice in good

17   standing?

18       A.    Yes, it is.

19       Q.    Has it ever been subject to any

20   disciplinary action?

21       A.    No, I have not.

22       Q.    Are you coded by the New York State

23   Workers' Compensation Board?

24       A.    Yes, I am.

25       Q.    Do you know what your code

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/26/2012 3:59:37 PM

                    Nicholas Radcliffe, M.D.                    6

1    letters are?

2         A.    PSY.

3              MR. JONES:  Ms. Weinberger,

4         do you have any questions for the

5         doctor?

6              MS. WEINBERGER:  No, thank

7         you, not on qualifications.

8              MR. JONES:  Thank you very

9         much.

10   DIRECT EXAMINATION BY

11   MR. JONES:

12        Q.    Doctor, had you an opportunity to

13   treat a claimant named Brian Coke; is that

14   correct?

15        A.    Yes, I did.

16        Q.    Based on the electronic record of

17   this claim, it looks like you had an

18   opportunity to see the claimant four times;

19   is that correct?

20        A.    That's correct.

21        Q.    What is the first date of exam that

22   you have for the patient?

23        A.    I saw him first on October 14,

24   2010.

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*

7

1
2
    Q.    What is the last date that you have
3
for the patient?

4
    A.    I saw him on December 9, 2010.

5
    Q.    On that first date, Doctor, did the
6
claimant present to you with a history of a
7
work-related condition?

8
    A.    Yes, he did.

9
    Q.    Just briefly, what was the history
10
you were provided?

11
    A.    I have to just say right off the
12
bat that he had difficulty relating his own
13
history.  So what I'm telling you is, what I
14
was able to gleam from questioning.  He was
15
not very organized, if ever.

16
    He is a 48-year-old man.  He
17
described working as security officer at an
18
office that was freshly painted.  He talked
19
about it being small and poorly ventilated,
20
that he did not have a mask.  Immediately he
21
didn't feel comfortable with the situation he
22
was placed in.

23
    He described experiencing
24
headaches, nausea, vomiting, chest pain,
25
difficulty breathing, for which he went to

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*    8

the hospital.  Not entirely clear the
sequence of those symptoms, you know, if they
happened right away or if they happened after
he left, but what was clear was that he
immediately he felt something and then
described these symptoms, then he described
going to the hospital.

Q.    October 14th you had an opportunity
to evaluate the patient as well?

A.    Yes, I did.

Despite his difficulty with
presenting the details aspect of his
experience, he did okay in answering specific
direct questions, so that is what I mostly
did rather than opening, you know, him --
allowing him to describe things, he would do
it better when I asked him direct questions.

Mostly what I focused on was the
simple evaluation of his cognitive
functioning and his emotional state.

Q.    Doctor, if you could go into those
a bit?

A.    Right.

So the two questionnaires that I

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    9

went through with him that relate to
emotional aspect of his condition were the
Beck Depression Inventory and the Beck
Anxiety Inventory.

He was presenting with symptoms
that seemed to relate to emotional issues,
that's partly why I focused on those.  In
each of those his answers were troubling.

For the Beck Depression Inventory
and from other things that he told me, he was
experiencing -- his scale would be in the
severe range.  What that means is he
described sadness, pessimism about his
future, his sense of himself as a failure,
his inability to feel pleasure at things,
which is anhedonia, feelings of guilt about
his condition.

He described crying, feeling he is
being punched.  He has some agitation,
indecisiveness, loss of energy, sleep
disturbance, trouble sleeping, feeling tired,
difficulty concentrating, loss of appetite,
irritability.

All of those are part of the

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    10

measure that the Beck is using to show he is
depressed. These occurred when he talked to
me, so it wasn't just -- these things
recurred. It was not just that they came up
on the structured questionnaire, but came up
in conversation. That was the Beck
Depression Inventory.

He also took the Beck Anxiety
Inventory. The symptoms of anxiety that he
had were feelings of heat, trouble relaxing,
heart beat racing, feeling unsteady, scared
and nervous.

Beyond that, one of the other
significant questionnaires that I did with
him was the Cognitive Symptom Checklist,
which is a whole series of questions about
cognitive functioning. I would say that in
each of the areas of cognition his ability to
understand and respond to people,
understanding questions, understanding what
he read, he was having trouble. He was
having trouble with executive function, which
is focus, for example or keeping his train of
thought as he was speaking.

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    11

1
2          He described himself as
3    distractible to those questions.  His thought
4    process, he noted was poor, unable to think
5    clearly, indecisive, then multiple problems
6    associated with memory so that he had to note
7    things.  He forgot things including people he
8    knew well.  Answers that indicated short term
9    and long-term memory problems.
10          That's all the, I think,
11   significant questionnaires that I need to
12   share.
13         Q.    Doctor, based on your evaluation,
14   did you come to a diagnosis?
15         A.    Yes.
16          I immediately, without much
17   difficulty gave him two diagnoses.  One is
18   organic brain syndrome.
19          In the initial interview my
20   impression is organic brain syndrome, meaning
21   that for whatever reason he is having
22   cognitive difficulty, difficulty thinking,
23   keeping track of his thoughts.
24          The other diagnosis is more
25   emotional diagnosis, which may or may not be

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    12

1
2   associated, which is of severe depression.

3       Q.    Did your diagnosis change at all
4   with the benefit of the other three visits?

5       A.    No, no, they didn't really change.
6   The only change that was significant, I
7   think, was that he was less anxious in the
8   second, third and fourth visits overall, but
9   nothing that changed the diagnosis or the
10  severity of what I encountered the first
11  time.

12      Q.    Did you have an opinion, so far, as
13  causal relationship is concerned with your
14  diagnoses and the history you were provided?

15      A.    Well, what I can say is that his
16  refrain, repeated refrain was I wasn't like
17  this before.  He didn't have the -- he was
18  enough aware that he didn't have these
19  cognitive difficulties before the exposure,
20  what he described as his exposure, and that
21  his problems as he described it all came from
22  his deterioration.  Some awareness of his
23  cognitive difficulty, but more awareness of
24  the depression.

25          So at the same time he had

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    13

1  unrealistic ideas of what he can do, you

2  know, remembering his hire functioning,

3  remembering things that he used to do well,

4  without a great deal of understanding that

5  these things are a problem now and probably

6  forever beyond him.

7        It's a funny thing.  Like the one

8  time, his awareness that he used to do

9  better, at the same time unrealistic goals

10  about what he could achieve if and when he

11  got better.

12     Q.    Just for clarity sake, Doctor, he

13  said that he was aware that he was better

14  before or could you go through that again?

15     A.    That his functioning both --

16  clearly that he -- he was very aware that his

17  emotional functioning was much better, but

18  also his cognitive function was much better.

19  I think that is part of why he has the

20  feelings of guilt is the discrepancy between,

21  on the one hand, being aware that he

22  functioned better before but not being able

23  to accept that whatever changes had happened

24  with him were long lasting, so he was blaming

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    14

1    himself for a lot of what could not.

2         Q.    Doctor, when you said before, the

3    point in time being referenced, is that the

4    exposure or just when he was a kid?

5         A.    It was the exposure.

6         Q.    Did you have an opinion, Doctor,

7    over the course of the four evaluations what

8    his degree of disability was?

9         A.    Well, his degree of disability -- I

10   mean even from the beginning our diagnoses

11   were chronic cognitive impairment.

12           While that is only partially a

13   psychological diagnosis, I would say that

14   because of the combination --- the

15   interlinking between the cognitive impairment

16   and the depression, the diagnosis would be of

17   a permanent -- I would say total disability

18   on both accounts, both the cognitive and the

19   emotional.

20        Q.    Doctor, you have not seen the

21   claimant since December 9, 2010?

22        A.    That's right.

23           MR. JONES:  Doctor, thank

24           you for your time this afternoon.

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    15

Unless there's a need for re-direct, I have no further questions.

MS. WEINBERGER:  Thank you. Doctor, this is Jacqueline Weinberger.  I'm the attorney for the insurance carrier.  I'm going to ask you some questions also.

CROSS-EXAMINATION BY

MS. WEINBERGER:

Q.    Doctor, regarding the exposure that you were addressing, is that the claimant worked in an area that was recently painted?

A.    That is what he was talking about.

Q.    How long was he in that location?

A.    I don't know exactly.

Q.    Do you know how long the exposure was?

A.    What I got from him in the initial interview was that it was one shift.  I can't tell you how much longer, whether he ever went back.  It doesn't sound like it.  My impression was not that he returned but that that was the immediate sequelae of that one

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*          16

1  shift.  I couldn't swear to whether he went

2  back or not.

3      Q.    You indicated he worked as a

4  security guard?

5      A.    That's what he said, yes.

6      Q.    Do you know if his assignment was

7  to stay in one stop or if he was to walk

8  around and explore different areas?

9      A.    Again, it's been a while.  What I

10  noted was that he said he was in a small

11  office that was poorly ventilated, he didn't

12  -- just to go back to what I said when I

13  started, it was difficult to get accurate

14  information about details of his condition.

15  So, that when I asked specifically pointed

16  questions, he was able to answer some of

17  them.  He was not able to give me more

18  detailed information about that particular,

19  you know, what he did that day, if he walked

20  around.  He didn't answer that question.

21      Q.    Is it your professional opinion

22  that due to that single exposure on that

23  shift and three years later, the claimant was

24  permanently and totally both cognitively and

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    17

1  emotionally disabled from any type of work
2  whatsoever?

3      A.    I don't think I'm qualified to
4  answer that question.

5      Q.    Well, who would be qualified to
6  answer that question if not you?

7            You're his psychologist.

8      A.    Right, but I'm providing, you know,
9  a photo, a picture of what I saw.

10     Q.    Right, so I'm asking for your
11 opinion based on what you saw.

12           You saw him four times?

13     A.    I would say that definitely he had
14 depression, definitely he had cognitive
15 impairment.  The cognitive impairment that I
16 observed was entirely consisted with the
17 exposure to organic toxins.  That would be
18 okay, I would be willing to say that.

19           As to whether they did cause it, I
20 can't say because that's just not in my realm
21 of specialization.  I think that an M.D., I
22 suspect, would be -- you know, toxicology,
23 that would be, maybe, their appropriate
24 specialization.

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                18

1
2      Q.   Somehow I'm not getting things
3   clear.
4           You said the cognitive impairment
5   exposure to organic toxins caused the
6   depression or not?
7      A.   I can't say whether the exposure to
8   organic toxins gave him what appeared to be
9   an organic brain symptom.
10          Now, there is a relationship
11  between the organic brain syndrome and
12  depression, I can say with 100 percent.  That
13  would be a likely thing.
14     Q.   So organic brain syndrome can cause
15  depression; is that what you're saying?
16     A.   It would be, you know, people can
17  react in different ways, but what he
18  verbalized was what I said before, something
19  like he had an awareness of his prior
20  function being better; at the same time he
21  didn't really understand that he wasn't
22  likely going to improve.  He would always,
23  every time I saw him, he had this idea that
24  he could achieve more than, in my opinion,
25  than he could; that is, his idea of what he

Received by WCB Email on 9/26/2012 3:59:37 PM

1             *Nicholas Radcliffe, M.D.*                19

2    could do always was beyond what was, to me,

3    realistic.

4        Q.    So you're describing his --

5        A.    -- guilt and his feelings of

6    inadequacy and those are really very much the

7    depression.

8        Q.    So you described his prognosis for

9    himself as nonrealistic; is that right?

10       A.    Right.

11       Q.    Would you then also say that his

12   assessment of his prior condition was also

13   nonrealistic?

14       A.    Which?

15            I'm sorry, could you say that again

16   because I'm not sure I'm understanding.

17       Q.    Well, if he's saying I was not like

18   this before, might that also be nonrealistic

19   and maybe he was like that before?

20       A.    It's possible, but really when I

21   was talking to him it did seem as if these

22   were not crazy ideas that he had of his prior

23   functioning, they seemed to be realistic

24   descriptions of a capacity that he had that

25   he no longer enjoined.

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    20

Q.    Can you give an example?

A.    You know, he had things that he
talked about.  In terms of use -- his
experience with computers.  None of it struck
me as imaginary and, you know, having worked
with clinical population that are on the
delusional side, I would say it didn't strike
me at all as delusional or made up.

Q.    He was saying that in 2007, he was
able to use a computer but in 2010, when you
saw him he was not able to use a computer?

A.    I would say that that's probably
true, but that's not what I'm really saying.

What I'm really saying is he talked
about computers in a technical way, in a way
that seemed to indicate a deeper
understanding than the casual computer user.
Yet, to my mind, there was no way that he
could realistically do any of these things
that he was talking about in terms of -- I
can't remember what it was whether it was web
design or -- but it was something.  I do
remember it was something technical that he
was able to talk about in a way that showed

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                            21

some sophistication.

Q.     So then I think you lost me.

If he was able to talk about it in a sophisticated manner, then he was still understanding it; wouldn't that be right?

A.     You would think.  That's what I'm saying.  There was a disconnect between what he thought he could do and what he realistically could do.

It's not that he could maintain and talk about it a little bit, fragments, but he had no series of sentences that he would string together that made for, you know, okay, this is made or this is the guy that has it together and knows about these things.

There were fragments that indicated that he at one time knew, but not that he continued to dominant or understand that area.

Q.     I'm going to move on because I think I'm having a disconnect.  I'm just not getting it.

Did you have an opportunity to review any records of any of his cognitive or

Received by WCB Email on 9/26/2012 3:59:37 PM

1           *Nicholas Radcliffe, M.D.*           22

2     psychological functions before this accident,

3     any school records or testing that he had

4     done to become a security guard or anything

5     like that?

6           A.    None whatsoever.

7           Q.    And you never saw him before 2010?

8           A.    No.

9           Q.    That was a no?

10          A.    No.

11          Q.    Did he tell you what injuries he

12    sustained on 12/7/2007?

13          A.    12/7/2007?

14                No, I do not believe so.

15                Let me look.  There is one place I

16    usually write that down and I don't see

17    anything written.

18                I don't believe he said anything

19    about --

20                Oh, date of injury, just

21    12/17/2007.  That's all I have.  Nothing

22    more.

23                MS. WEINBERGER:  I have

24                nothing else.

25                MR. JONES:  Just briefly,

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/26/2012 3:59:37 PM

*Nicholas Radcliffe, M.D.*                    23

Doctor.

REDIRECT EXAMINATION BY

MR. JONES

Q.    Doctor, as best as you could tell based on your evaluations in 2010, the cognitive symptoms that the patient was experiencing came about after that exposure?

A.    Everything that I saw indicated that he was telling the truth about what he described, which is that he was functioning well before and not functioning well afterwards.  You know, a series of dramatic symptoms that happened, as he described it, after his exposure and that's all I really know.

        MR. JONES:  Thank you, Doctor.

        (Continued on next page to accommodate jurat.)

Received by WCB Email on 9/26/2012 3:59:37 PM



*Nicholas Radcliffe, M.D.*                    24

MS. WEINBERGER:  Thank you,

Doctor.

-oOo-

(Whereupon, the examination

of NICHOLAS RADCLIFFE, M.D. was

concluded at 1:53 p.m.)

_____

NICHOLAS RADCLIFFE, M.D.

Subscribed and sworn to
before me this _____ day
of _____, 2012.

_____

NOTARY PUBLIC

**ON TIME COURT REPORTING**
**516-535-3939**

Received by WCB Email on 9/26/2012 3:59:37 PM

25

# I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| NICHOLAS RADCLIFFE, M.D. | | |
| | MR. JONES | 6,23 |
| | MS. WEINBERGER | 15 |

ON TIME COURT REPORTING
516-535-3939

Received by WCB Email on 9/26/2012 3:59:37 PM

26

C E R T I F I C A T E

     I, CHRISTINA L. PRUNTY, a Notary
Public within and for the State of New York,
do hereby certify:

     That the witness(es) whose testimony
is hereinbefore set forth was duly sworn by
me, and the foregoing transcript is a true
record of the testimony given by such
witness(es).

     I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no way
interested in the outcome of this matter.


*CP*
_____
CHRISTINA L. PRUNTY


ON TIME COURT REPORTING
516-535-3939

# EXHIBIT 10

# NYC HEALTH+ HOSPITALS

Telephone #: (212) 562-6264/6265

**ADDRESS SERVICE REQUESTED**

MDG2019 00000262 01

BRIAN COKE NG
CHURCH ST ST
PO BOX 2723
NEW YORK NY 10008-2723

Patient: COKE NG ,BRIAN

Statement Date: 04/13/19

**Amount Due:**    1,797.99

Dear  BRIAN COKE NG

You have failed to respond to the above hospital's request for payment, and/or have not supplied the requested insurance information.

**This is your final notice. You must respond within fifteen (15) days of this letter.**

Make your check or money order payable to the hospital listed above, include your account number, and forward the payment to:

Bellevue Hospital Center
P.O. Box 5281 GPO
New York NY 10087-5281

If you have Medicaid, Medicare, Blue Cross or union insurance, please provide this information by completing the reverse side of this letter and mail it to the hospital at the above address, in the top left corner.

If you are unable to pay, go immediately to the hospital's Patient Accounts Office, where representatives will help you complete a Medicaid application, or arrange a mutually satisfactory payment schedule.

Failure to respond to this request will subject you to further collection action.

Very truly yours,

Office of Patient Accounts
Collection Unit

(Continua)

# NYC HEALTH+ HOSPITALS

BRIAN COKE NG
CHURCH ST ST
PO BOX 2723
NEW YORK NY 10008-2723

## Important Message

Your balance remains unpaid, please pay promptly. You may be eligible to have your fee reduced depending upon your income and family size. Please call (212) 562-6264/6265 or stop by our Financial Counseling Office to discuss our available HHC Options Program.

Su balance continua sin pagarse, tenga la bondad de pagarlo lo antes posible. Podria cumplir con los requisitos para quese le reduzcan los cargos, dependiendo de sus ingresos y del tamano de su familia. Llame al (212) 562-6264/6265 o visite nuestra Oficina de consejeria financiera (Financial Counseling Office) para discutir la disponibilidad de nuestro Programa de opciones de HHC (HHC Options Program).

## Account Summary

Patient Name:  Coke Ng ,Brian
Statement Date:        01/26/19
Service Date(s):
**Account Number:**

## Charge Summary

| | |
|---|---|
| Previous Balance: | $1,797.99 |
| New Charges: | $.00 |
| Payments/Adjustments: | $.00 |
| Account Balance: | $1,797.99 |
| **Please Pay This Amt:** | **$1,797.99** |

## Insurance Information

INS 1:
INS 2:
INS 3:
INS 4:

## Contact Us

For questions, please call our office at 212-562-6264/6265.

For more information, visit our website at/ Para obtener mas informacion, visite nuestro sitio web en

http://www.nychealthandhospitals.org/paying-for-your-health-care/hhc-options/

*Please Note: If paying by check, see message on back of coupon.*

---

Make Checks Payable To: Bellevue Hospital Center

# NYC HEALTH+ HOSPITALS

Bellevue Hospital Center
Attn: Patient Accounts
462 First Ave
New York, NY 10016

**ADDRESS SERVICE REQUESTED**

☐ Check box if your address or insurance information has changed. Please make changes on back.

MDG2019 00002751 01
BRIAN COKE NG
CHURCH ST ST
PO BOX 2723
NEW YORK NY 10008-2723

| Account Number: | Please Pay This Amount: |
|---|---|
| 35636568244 | $1,797.99 |
| Patient Name: | Due By: |
| Coke Ng ,Brian | 02/05/19 |

Card Number:

☐ VISA   ☐ MasterCard   ☐ DISCOVER   ☐

CVV2 No.*          Exp. Date:

Signature:

Amount Paid:

* The CVV2 Number is the last 3 digits on the back of your credit card, by your signature

BELLEVUE HOSPITAL CENTER
P.O. BOX 5281 GPO
NEW YORK, NY 10087

03563656824410000017979900101659D

# NYC HEALTH+ HOSPITALS

BRIAN COKE NG
CHURCH ST ST
PO BOX 2723
NEW YORK NY 10008-2723

## Important Message

Please pay this amount promptly. If you have Medicaid or other insurance, complete the back of this bill; return it to BELLEVUE HOSPITAL CENTER, P.O. BOX 5281 GPO, NEW YORK, NY 10087. If you do not have insurance or are unable to pay this bill, please call (212) 562-6264/6265 or stop by our Financial Counseling Office to discuss our available HHC Options Program.

Tenga la bondad de pagar este monto lo antes posible. Si tiene Medicaid o algun otro seguro, complete el dorso de este formulario, devuelvalo a BELLEVUE HOSPITAL CENTER, P.O. BOX 5281 GPO, NEW YORK, NY 10087. Si no tiene seguro o si no puede pagar esta cuenta, llame al (212) 562-6264/6265 o visite nuestra Oficina de consejeria financiera (Financial Counseling Office) para discutir la disponibilidad de nuestro Programa de opciones de HHC (HHC Options Program).

## Account Summary

Patient Name:   Coke Ng ,Brian
Statement Date:   12/27/18
Service Date(s):   12/22/18-12/22/18
**Account Number:**

## Insurance Information

INS 1:
INS 2:
INS 3:
INS 4:

## Charge Summary

| | |
|---|---|
| Previous Balance: | $.00 |
| New Charges: | $1,797.99 |
| Payments/Adjustments: | $.00 |
| Account Balance: | $1,797.99 |
| **Please Pay This Amt:** | **$1,797.99** |

## Contact Us

For questions, please call our office at
212-562-6264/6265.

For more information, visit our website at/ Para obtener mas informacion, visite nuestro sitio web en

http://www.nychealthandhospitals.org/paying-for-your-health-care/hhc-options/

*Please Note: If paying by check, see message on back of coupon.*

Make Checks Payable To: Bellevue Hospital Center

# NYC HEALTH+ HOSPITALS

Bellevue Hospital Center
Attn: Patient Accounts
462 First Ave
New York, NY 10016
**ADDRESS SERVICE REQUESTED**

☐ Check box if your address or insurance information has changed. Please make changes on back.

MDG2018 00008964 01

BRIAN COKE NG
CHURCH ST ST
PO BOX 2723
NEW YORK NY 10008-2723

| Account Number: | Please Pay This Amount: |
|---|---|
| 35636568244 | $1,797.99 |
| Patient Name: | Due By: |
| Coke Ng ,Brian | 01/06/19 |

☐ VISA  ☐ MASTERCARD  ☐ DISCOVER  ☐ AMERICAN EXPRESS

Card Number:                CVV2 No.*    Exp. Date:

Signature:                   Amount Paid:

* The CVV2 Number is the last 3 digits on the back of your credit card, by your signature

BELLEVUE HOSPITAL CENTER
P.O. BOX 5281 GPO
NEW YORK, NY 10087

035636568244100000179799001016590