**Proposed Hearing Date: July 18, 2019**
**Proposed Response Deadline: June 27, 2019**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

……………………………………………… X
                                            :
In re                                       :                    Chapter 11 Case No.
                                            :
SEARS HOLDINGS CORPORATION, et al.,         :                    18-23538 (RDD)
                                            :
Debtors.[1]                                 :                    (Jointly Administered)
                                            :
                                            :
……………………………………………… X

### COMMON MEMORANDUM OF LAW ON BEHALF OF THE SECOND LIEN PARTIES: (A) IN SUPPORT OF THEIR REQUESTS TO DETERMINE THE AMOUNT OF THEIR SECOND LIEN SECURED CLAIMS UNDER SECTION 506(a) AND THEIR SECTION 507(b) ADMINISTRATIVE CLAIMS PURSUANT TO BANKRUPTCY RULE 3012; AND (B) IN OPPOSITION TO DEBTORS' MOTION TO SURCHARGE THEIR COLLATERAL PURSUANT TO SECTION 506(c)

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................................ 1

PROCEDURAL HISTORY ..................................................................................................... 4

BACKGROUND ....................................................................................................................... 5

    A.    Chapter 11 Filing and Plan to Pursue a Going Concern Sale ...................................... 5

    B.    Prepetition Capital Structure .................................................................................. 6

    C.    The Debtors' Request for Debtor-In-Possession Financing and Adequate
           Protection of the Interests of the Prepetition Secured Parties ..................................... 6

    D.    The Second Lien Parties ....................................................................................... 8

    E.    The Court's Final Order Granting Adequate Protection Liens and
           Section 507(b) Superpriority Administrative Claims to the
           Second Lien Parties .............................................................................................. 8

    F.    The Sale Process ............................................................................................... 10

    G.    The Benefits of the Sale Transaction ...................................................................... 12

    H.    The Debtors' Post-Sale Spenddown of the Second Lien Parties'
           Remaining Collateral .......................................................................................... 14

    I.    The Liquidation Plan ......................................................................................... 16

ARGUMENT ......................................................................................................................... 16

I.    The Second Lien Holders Are Entitled to Receive a Significant
    Claim for Diminution in Value ................................................................................. 16

    A.    The Court Should Calculate the Diminution in Value
           by Employing a Going-Concern Valuation Methodology ........................................... 16

II.    The Debtors' Asserted Surcharges Are Inconsistent With the Governing
    Law on Section 506(c) ............................................................................................. 18

    A.    The Debtors Will Not Be Able to Meet Their Burden
           to Recover a Section 506(c) Surcharge .................................................................. 19

          1.    *The Debtors' Conclusory Assertions Are Inadequate*
               *to Meet Their Burden* ................................................................................ 20

          2.    *This Bankruptcy Proceeding Was Not Run for the Primary*
               *Benefit of the Second Lien Parties* ................................................................ 22

    B.    The Debtors' Appeal to the Equities Is Both Irrelevant and Wrong .......................... 25

          1.    *They are Irrelevant Because Equity Cannot Overcome*
               *the Explicit Protections Granted by the Code to Secured Creditors* .................... 26

          2.    *They are Wrong Because (i) the Going Concern Sale Benefitted All*
               *Parties, Not Just the Second Lien Parties and (ii) the Recovery of the*

*Second Lien Parties In a First Day Liquidation Would Have Exceeded
the Value They Received On Account of the Credit Bid* ...................................... 27

III.    The Court Should Order A Turnover From the Winddown Account to
the Second Lien Parties of the Amounts of the Second Lien Diminution
in Value from April 4, 2019 ............................................................................................ 28

CONCLUSION ...................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 506(b) ........................................................................................... 9

**Cases**

*Architectural Bldg. Components v. McClarty (In re Foremost Mfg. Co.)*,
137 F.3d 919 (6th Cir. 1998) ........................................................................ 26

*Arthur v. Sharon Steel Corp. (In re Sharon Steel Corp.)*,
206 B.R. 776 (Bankr. W.D. Pa. 1997) ......................................................... 22

*Assocs. Commercial Corp. v. Rash*,
520 U.S. 953 (1997) ...................................................................................... 17

*First Servs. Grp., Inc. v. O'Connell ex rel. Ceron (In re Ceron)*,
412 BR 41 (Bankr. E.D.N.Y. 2009) ........................................................ 19, 21

*Gen. Elec. Credit Corp. v. Levin & Weintraub, Esqs. (In re Flagstaff Foodservice Corp.)*,
739 F.2d 73 (2d Cir. 1984) ..................................................................... passim

*Gen. Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*,
762 F.2d 10 (2d Cir. 1985) ........................................................ 19, 20, 21, 28

*Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re Blackwood
Associates, L.P.)*,
153 F.3d 61 (2d Cir. 1998) ........................................................................... 26

*In re Republic Airways Holdings Inc.*,
598 B.R. 118 (Bankr. S.D.N.Y. 2019) ..................................................... 25, 26

*In re Sabine Oil & Gas Corp.*,
547 B.R. 503 (Bankr. S.D.N.Y. 2016) ........................................................... 28

*In re Sports Info. Data Base, Inc.*,
64 B.R. 824 (Bankr. S.D.N.Y.1986) .............................................................. 22

*In re Target Two Assocs., L.P.*,
No. 04 CIV. 8657(SAS), 2006 WL 3068668 (S.D.N.Y. Oct. 27, 2006), *aff'd*, 282 F.
App'x 914 (2d Cir. 2008) .............................................................................. 26

**Page(s)**

*Menorah Congregation & Religious Ctr. v. Feldman (In re Menorah Congregation & Religious Ctr.)*,
554 B.R. 675 (Bankr. S.D.N.Y. 2016) (Drain, J.).............................................................. 20

*Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*,
576 B.R. 325 (Bankr. S.D.N.Y. 2017), *appeal denied*, No. 17-CV-8712(AJN), 2018 WL 4284286 (S.D.N.Y. Sept. 7, 2018)...................................................................................... 17

*Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*,
501 B.R. 549 (Bankr. S.D.N.Y. 2013)................................................................................ 16-17

*Sw. Sec. FSB v. Segner (In re Domistyle, Inc.)*,
811 F.3d 691 (5th Cir. 2015) ............................................................................................ 18, 19, 27

*Weinman v. City of Pueblo, Colo. (In re Adam Aircraft Indus., Inc.)*,
527 B.R. 709 (D. Colo. 2014)............................................................................................ 21

Wilmington Trust National Association ("Wilmington Trust"), as Indenture Trustee and

Collateral Agent; Cyrus Capital Partners, L.P. ("Cyrus"); and ESL Investments, Inc. and certain

of its affiliated entities (including JPP, LLC and JPP II, LLC (collectively, "ESL"));

(collectively, the "Second Lien Parties") in their capacities as creditors of Sears Holdings

Corporation and certain of its affiliates (collectively, "Sears" or the "Debtors"), by their

undersigned counsel, hereby file this Common Memorandum of Law On Behalf of the Second

Lien Parties (A) in Support of Their Requests to Determine the Amount of Their Second Lien

Secured Claims under Section 506(a) and of their Section 507(b) Administrative Claims

Pursuant to Bankruptcy Rule 3012; and (B) in Opposition to Debtors' Motion to Surcharge Their

Collateral Pursuant to Section 506(c) (the "Common Memorandum").   In support of their

requests for relief, the Second Lien Parties respectfully state as follows:

## PRELIMINARY STATEMENT

At the hearing on the Rule 3012 Motion,[2] the evidence will show that on October 15,

2018, the Petition Date, the Second Lien Parties were fully secured if their collateral were

properly valued on a going concern basis.  The evidence will also show that even if there had

been a day-one liquidation, the liquidation of the collateral of Second Lien Parties would have

yielded substantial (perhaps even full) recoveries on account of the Second Lien claims.

From day one of these cases, the Debtors have made clear their two overarching goals:

(1) to conduct an auction process in support of a going concern sale designed not just to realize

the value of the collateral for the Second Lien Parties but also to try to capture additional value

for the benefit of the estates and a wide array of their other creditor constituents, including

---

[2]    Initially capitalized terms in this Preliminary Statement have the meanings accorded to them herein.  In addition to this common brief, each of the Second Lien Parties has filed its own expert report and a separate memorandum largely to discuss unique issues.

creditors secured by other collateral, vendors, employees, contract counterparties, administrative

claimants and others; and (2) to conduct an investigation of prepetition transactions involving

ESL and the conduct of Eddie Lampert in his role in the Debtors' management, in the hopes of

identifying potentially valuable claims that could ultimately be brought on behalf of those

prepetition unsecured creditors who might not benefit from a going concern sale.

The Second Lien Parties agreed not to oppose the Debtors' agenda and instead to permit

the use of their collateral and its proceeds for these purposes, as well as the priming of their liens

by a DIP facility to provide the Debtors with additional funding for their efforts.  In return, the

Debtors obtained a Final DIP Order that allowed superpriority administrative claims under

Section 507(b) of the Bankruptcy Code ("Section 507(b) Claims"), and valid and perfected

replacement and additional security interests in, and liens on, all DIP ABL Collateral to protect

the Second Lien Parties against the diminution in their collateral that would almost certainly take

place.

The Second Lien Parties' bargain facilitated a going concern sale that the Debtors loudly

pronounced as having achieved essentially all of the Debtors' reorganization objectives,

including providing the Debtors' businesses, employees, vendors and all creditors with greater

recoveries and future prospects than any other alternative.  The evidence at trial will show,

however, that as part of getting to that laudable result, the substantial collateral value supporting

the Second Lien debt that existed at the Petition Date has largely, if not entirely, disappeared.

The Second Lien Parties, as a result of their replacement adequate protection liens and Section

507(b) Claims, should now have a first call on the post-sale assets of the Debtors, which in total

(except for certain highly contingent litigation recoveries) are unlikely to be sufficient to satisfy

the Second Lien Parties' claims.  At bottom, this Motion involves the question of whether the

Parties' Court-approved adequate protection bargain—which gave the Debtors the runway they needed to execute on their going concern sale strategy—will be protected notwithstanding the fact that it may be difficult now for the Debtors to comply with their earlier promises.

Remarkably, the Debtors now seek to renege on their adequate protection obligations by undervaluing the Second Lien Parties' collateral and replacement liens and thus claiming that there has been no diminution in its value despite the significant losses they have incurred during this case, as well as by seeking an almost $1.5 billion unjustified surcharge against the Second Lien Parties' collateral pursuant to Section 506(c) of the Bankruptcy Code.

The evidence at trial will show that the Debtors' arguments have no merit.  As a factual matter, the Second Lien Parties will prove the obvious, that a significant diminution in the value of their collateral took place during this case, resulting in substantial Section 507(b) Claims. Moreover, the Debtors will not be able to meet their burden to justify their surcharge allegations by showing that their expenditures were primarily made for the purpose of benefitting, and in fact, dollar-for-dollar directly benefitted, the Second Lien Parties' collateral values.  Indeed, the Debtors' post-sale assertion of surcharge claims flies directly in the face of their own numerous, documented statements at the Sale Hearing about how the going concern sale and the preservation of litigation claims would combine to yield benefits for the estates and all of their various creditor constituents.

Finally, the Debtors' appeal for an equitable absolution from their obligations is both legally misguided and factually without merit.  There are no more reorganization objectives to be achieved here other than the fulfillment of the Debtors' adequate protection promises to the Second Lien Parties that allowed the Debtors to pursue and execute on the going concern sale that preserved 45,000 jobs and delivered $5.2 billion value to multiple creditor constituencies.

## PROCEDURAL HISTORY

On May 26, 2019, the Debtors filed a *Motion to Estimate Certain 507(b) Claims for Reserve Purposes*, ECF No. 4034 ("Estimation Motion").  On June 2, 2019, the Debtors and Second Lien Parties (collectively, the "Parties") filed a *Proposed Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims*, ECF No. 4102.  Pursuant to the stipulation, the Parties agreed that the Estimation Motion would be deemed to be a request pursuant to Bankruptcy Rule 3012 to determine the amount of the Second Lien Parties' secured claims and Section 507(b) priority administrative claims and, pursuant to Section 506(c) of the Bankruptcy Code, for a surcharge upon the collateral securing the Second Lien Parties' claims. *Id.* ¶ 1.[3]

The Second Lien Parties hereby respond to the Rule 3012 Motion and request a determination of their Section 507(b) Claims in the amounts set forth in their separate submissions, including their individual expert reports.[4]  They also oppose the Debtors' motion to surcharge their secured collateral pursuant to Section 506(c).  This Common Memorandum is submitted to set forth the fundamental facts and legal framework that are common to the Second Lien Parties and to avoid the separate submission of potentially duplicative memoranda from

---

[3]      The Estimation Motion will be referred to hereinafter as the Rule 3012 Motion.

[4]      Although, as should be expected, there are some differences in the approaches taken by the Second Lien Parties' respective experts, they all agree that there has been a substantial diminution in the Second Lien Petition Date collateral that has resulted in a substantial Section 507(b) administrative claim, and they all agree that the Debtors' proposed Section 506(c) surcharge is unjustified.  The Second Lien Parties do not have sufficient information to determine the value of their secured claims as of the plan effective date, but will provide an update to the Court with that information in advance of the July 18, 2019 hearing to the extent that the Debtors provide that necessary information.  Any recovery on account of such secured claims would reduce the Section 507(b) Claim amounts.  The Second Lien Parties reserve the right to assert additional claims for post-petition interest and all reasonable out-of-pocket expenses, including legal fees incurred by the Second Lien Parties by reason of the enforcement and protection of their rights in accordance with the applicable loan terms, plus any contingent and/or unliquidated claims not presently ascertainable.

each of them.  Beyond this Common Memorandum, the Second Lien Parties are also contemporaneously filing their own respective requests for administrative claims, supporting expert reports, and supplemental memoranda of law in support of each of their own respective claims.

## BACKGROUND[5]

### A.    Chapter 11 Filing and Plan to Pursue a Going Concern Sale

On October 15, 2018 ("Petition Date"), each of the Debtors filed a voluntary petition with the Court for relief under Chapter 11 of the Bankruptcy Code.  The week prior, the board of directors of Sears formed a Restructuring Committee comprised solely of independent directors that was charged with evaluating the best interests of Sears moving forward, including whether it would be in Sears' best interest to pursue a going concern sale.  *See Declaration of Brandon Aebersold* ¶ 9, ECF No. 2335 ("Aebersold Decl.").

In the first day filings, the Debtors described the Chapter 11 Petition as "an opportunity for Sears to once again transform its business and to position itself for success in the twenty-first century," and stated that they "hope[d] that the Company will emerge from these Chapter 11 Cases, whether pursuant to a chapter 11 plan of reorganization or a successful sale process, as a streamlined—and profitable—version of itself."  *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* ¶ 17, ECF No. 3 ("Riecker Decl."); *see also Declaration of Mohsin Y. Meghji in Support of Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain*

---

[5]    Capitalized terms used but not defined herein shall have the meaning ascribed in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief*, ECF No. 955 ("Final DIP Order").

*Protections to Prepetition Secured Parties and (D) Schedule Second Interim Hearing and Final Hearing* ¶ 10, ECF No. 10 (describing one main objective of filing as to "try to secure a going-concern sale or a reorganization involving a core group of stores").

### B.    Prepetition Capital Structure

As of the Petition Date, the Company had approximately $5.6 billion in funded debt, approximately $922 million of which was unsecured.  *See* Riecker Decl. ¶ 40.  The Debtors were indebted under the following facilities:

> (i) First Lien Credit Facility; (ii) Stand-Alone L/C Facility; (iii) Second Lien Credit Facility; (iv) Second Lien PIK Notes; (v) Second Lien Notes; (vi) IP/Ground Lease Term Loan; (vii) Consolidated Secured Loan Facility; (viii) Holdings Unsecured PIK Notes; (ix) Holdings Unsecured Notes; (x) SRAC Unsecured PIK Notes; and (xi) SRAC Unsecured Notes . . . .  Additionally, certain of the Debtors and their non-Debtor affiliates [had] issued intercompany notes (the "Intercompany Notes"), including KCD Asset-Backed Notes and SRAC Medium Term Notes . . . .

*Id.* ¶ 34.  The five largest secured claims were held by the First Lien Revolving Credit Agreement, the Consolidated Secured Note B, the 2016 First Lien Term Loan ("B"), the Second Lien Line of Credit Loans, and the Second Lien PIK Term Loan.  *See id.* sched. 3.  The total Second Lien Debt at the Petition Date was $1,151,500,000.  *Id.* ¶ 34.

### C.    The Debtors' Request for Debtor-In-Possession Financing and Adequate Protection of the Interests of the Prepetition Secured Parties

In order to obtain approval for the continued use of their cash collateral and to obtain debtor-in-possession financing for the bankruptcy proceeding, on the Petition Date, the Debtors filed the *Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing*, ECF No. 7 ("Cash Collateral / DIP Motion").  The Debtors proposed to provide new liens, replacement liens, prepetition liens and superpriority claims to the prepetition secured parties as adequate protection of their interests in the Debtors'

collateral.  *Id.* ¶ 27.  The Cash Collateral / DIP Motion also stated that the Debtors would

"establish a cash collateral account at Bank of America (the "<u>Winddown Account</u>") that, prior to

the discharge in full of all obligations under the DIP Facility, would be used only to pay

winddown costs of the Debtors following entry of the Final Order.  The Winddown Account was

to be funded with the first $200 million of proceeds from the sale of unencumbered collateral."

*Id.* ¶ 30.

On October 16, 2018, the Court approved the Cash Collateral / DIP Motion on an interim

basis.  *See Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B)*

*Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C)*

*Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties;*

*(III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related*

*Relief*, ECF No. 101 ("<u>Interim DIP Order</u>").

The Interim DIP Order granted allowed superpriority administrative claims as "adequate

protection of the interests of the Prepetition Second Lien Credit Parties in the Prepetition Second

Lien Collateral, including Cash Collateral," *id.* ¶ 17(d), and granted to the:

> Prepetition Second Lien Collateral Agent on behalf of itself and the other
> Prepetition Second Lien Credit Parties to the extent of any Second Lien
> Diminution in Value, a valid and perfected replacement and additional security
> interest in, and liens on (the "<u>Prepetition Second Lien Adequate Protection</u>
> <u>Liens</u>," and together with the Prepetition ABL Facilities Adequate Protection
> Liens, the 2018 FILO Adequate Protection Liens, and the Prepetition LC Facility
> Adequate Protection Liens, the "<u>Adequate Protection Liens</u>") all DIP ABL
> Collateral.

*Id.* ¶ 16(d).  Wilmington Trust was identified as the Prepetition Second Lien Collateral

Agent, and, both ESL and Cyrus were included in the definition of Prepetition Second

Lien Credit Parties.  *Id.* ¶ H(e).

D.      **The Second Lien Parties**

The Second Lien Parties hold the majority of the Second Lien debt.  Wilmington Trust

serves as collateral agent pursuant to the security agreement (the "Security Agreement") granting

it a lien on the Prepetition Second Lien Collateral securing all of the Prepetition Second Lien

Obligations and as indenture trustee for the 6-5/8% Senior Secured Notes due 2018 (the "2010

Notes") issued by Sears.  Cyrus and ESL were significant holders of the 2010 Notes until March

2018 when they exchanged those 2010 Notes for a new series of 6-5/8% Senior Secured Notes

due 2019 (the "2019 Notes").  The 2019 Notes are secured by the same collateral as the 2010

Notes but are senior to the 2010 Notes pursuant to the waterfalls described in the Security

Agreement.  *See Joinder of Cyrus Capital Partners, L.P. to Motion of Wilmington Trust,*

*National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition*

*Debtors' Continued Use of Collateral, Including Cash Collateral* ¶ 1, ECF No. 3142 ("Cyrus

Joinder").

E.      **The Court's Final Order Granting Adequate Protection Liens and Section**
        **507(b) Superpriority Administrative Claims to the Second Lien Parties**

The Court approved the bargain the Parties struck.  On November 30, 2018, the Court

entered the Final DIP Order, which granted the Second Lien Parties "a valid and perfected

replacement and additional security interest in, and liens on (the 'Prepetition Second Lien

Adequate Protection Liens,' and together with the Prepetition ABL Facilities Adequate

Protection Liens, the 2018 FILO Adequate Protection Liens, and the Prepetition LC Facility

Adequate Protection Liens, the 'Adequate Protection Liens') all DIP ABL Collateral owned by

the Prepetition Second Lien Loan Parties." Final DIP Order ¶ 17(d).  The term DIP ABL

Collateral was defined to include, among other things, the Debtors' inventory.[6]

The Final DIP Order also provided that:

[A]s adequate protection of the interests of the Prepetition Second Lien Credit Parties in
the Prepetition Second Lien Collateral, including any Cash Collateral, on behalf of itself
and the other Prepetition Second Lien Credit Parties, the Prepetition Second Lien
Collateral Agent, pursuant to the Interim Order, was granted an allowed administrative
claim against the Prepetition Second Lien Loan Parties' estates under section 503(b) of
the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the
Bankruptcy Code to the extent of any Second Lien Diminution in Value (the 'Prepetition
Second Lien Facilities Adequate Protection Claims,' and together with the Prepetition
ABL Adequate Protection Claims, the Prepetition 2018 FILO Adequate Protection
Claims, and the Prepetition LC Facility Adequate Protection Claims, the 'Adequate
Protection Claims') to the extent that the Prepetition Second Lien Adequate Protection
Liens are insufficient to protect the Prepetition Second Lien Credit Parties' interests in
the Prepetition Second Lien Collateral.

*Id.* ¶ 18(d).

Section 507(b) claims are afforded priority over "every other claim allowable under such

subsection." 11 U.S.C. § 507(b) (2018).  In accordance with the Bankruptcy Code, the

Prepetition Second Lien Adequate Protection Liens are senior to all administrative and other

claims except for the Carve-Out, Senior Permitted Liens, DIP ABL Liens, Prepetition ABL

Facilities Adequate Protection Liens, 2018 FILO Adequate Protection Liens, Prepetition LC

Facility Adequate Protection Liens, Prepetition ABL Liens and Postpetition Intercompany Liens.

*See* Final DIP Order § 18(d).  **As such, the adequate protection claims are senior to all other**

**administrative claims "now existing or hereafter arising."** *Id*. ¶ 18(a) (emphasis added).  All

---

[6]    Specifically, the Final DIP Order defines DIP ABL Collateral as "Prepetition ABL Collateral and all other
assets of the DIP ABL Loan Parties . . . including all deposit accounts, securities accounts, cash and cash equivalents
of the DIP ABL Loan Parties," with certain exclusions set forth in paragraph 13 of the Final DIP Order.  Final DIP
Order ¶ 13.  Prepetition ABL Collateral is in turn defined as "the 'Collateral' as defined in the Prepetition First Lien
ABL Credit Agreement, including any 'cash collateral' as defined in Section 363 of the Bankruptcy Code, and
which includes, for the avoidance of doubt, all 'Collateral' now owned or hereafter acquired, notwithstanding the
filing of the Chapter 11 Cases.'"  Final DIP Order, Article I, Definitions and Accounting Terms.

of the liens that are senior to the Prepetition Second Lien Adequate Protection Liens except for the Postpetition Intercompany Liens and the Carve-Out have been paid in full or are no longer outstanding.

The Final DIP Order also established the Winddown Account, which would be funded up to $240 million (an increase of $40 million from the amount provided in the Interim DIP Order) by the proceeds of any sales of Prepetition Unencumbered Collateral. *Id.* ¶ 23. The Winddown Account was defined as a deposit account that, "prior to the discharge and indefeasible payment in full of all obligations under the DIP ABL Facility and the Junior DIP Facility, may only be used to pay winddown costs of the DIP ABL Loan Parties at the discretion of the DIP ABL Loan Parties following entry of this Final Order." *Id.* The Final DIP Order provides that the Winddown Account "shall not be subject to any prepetition liens or any liens or superpriority claims" and "shall not constitute DIP ABL Collateral, Junior DIP Collateral or Cash Collateral." *Id.*

Relatedly, on December 28, 2018, the Court approved the Final Junior DIP Order approving a Junior DIP Loan from Cyrus and reiterating the adequate protection provided to the Second Lien Parties pursuant to the Final DIP Order. *Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief*, ECF No. 1436.

### F.    The Sale Process

Prior to the Petition Date, the Debtors engaged Lazard Frères & Co. LLC ("Lazard") to provide restructuring advice in connection with the Chapter 11 proceeding. *See* Aebersold Decl. ¶ 6. While the Restructuring Committee, Lazard and the Debtors' counsel evaluated several options for restructuring, including selling the individual Sears businesses to separate purchasers,

they ultimately "determined that a single, going-concern transaction for all or substantially all of the Debtors' businesses provided the best opportunity to maximize value for the Debtors, preserve jobs, and mitigate the creation of additional claims against the Debtors." *Id.* ¶ 11. Lazard was charged with assisting the Debtors in soliciting bids for a going concern sale transaction. During this time, Lazard, the Debtors and their other advisors engaged with over 250 potential third-party investors, responded to several hundred diligence questions, held over 40 formal diligence calls and in-person meetings with prospective bidders and their advisors, and held management presentations. *Id.* ¶ 15-18.

On December 28, 2018, the period for the Debtors to receive all binding proposals to bid on its assets, as mandated by the court-ordered Bidding Procedures, came to a close. By the December 28 deadline, only one bid to purchase substantially all of the Debtors' assets as a going concern had been submitted—by ESL. *Id.* On January 18, 2019, the Debtors named the offer submitted by Transform Holdco LLC ("Buyer"), established by ESL Investments, Inc., as the successful bid representing "the highest or best offer" and filed a copy of the executed APA.[7] *See Notice of Successful Bidder and Sale Hearing* ¶ 4, ECF No. 1730. The Debtors subsequently proclaimed that the $5.2 billion sale transaction "provides the businesses, the employees, and all creditors, with a better future and greater recoveries" and specifically delineated the many benefits to be realized by the Debtors vast array of creditor and other constituents. *Debtors' Omnibus Reply in Support of the Going Concern Sale Transaction* ¶ 5, ECF No. 2328 ("Debtors'

---

[7]        The APA refers to the Asset Purchase Agreement filed as Ex. B to the *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief*, ECF No. 2507 (the "Sale Order"), as amended by the Amendment No. 1 to Asset Purchase Agreement filed as Ex. E to the *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement*, ECF No. 2599 (the "Notice of Filing of Amendment No. 1 to the APA") and by the Amendment No. 2 to Asset Purchase Agreement filed as Ex. A to the *Notice of Filing Second Amendment to the Asset Purchase Agreement*, ECF No. 3880.

Omnibus Reply"). After a contested hearing ("Sale Hearing") in which the Court heard

extensive testimony and reviewed substantial evidence regarding the benefits and downsides of

the proposed going concern sale, on February 8, 2019, the Court approved the sale and entered

the Sale Order. The sale pursuant to the APA ("Sale Transaction") closed on February 11, 2019.

### G.      The Benefits of the Sale Transaction

The Sale Transaction provided greater benefits to the estates, all creditors, loyal vendors,

and tens of thousands of Sears employees than a liquidation outcome. Indeed, at the Sale

Hearing, the Debtors' counsel referred repeatedly to the numerous benefits and beneficiaries of

the Sale Transaction. *See, e.g.*, Hr'g Tr. 28:9-10, Feb 7, 2019 ("[t]he sale transaction [is]

superior to the winddown alternative"); *id.* 48:15-17 ("the benefits of the sale transaction really

do significantly outweigh an orderly winddown"); *id.* 52:1-5 ("There's hundreds of millions of

dollars in vendor claims. All of these parties have relationships with Sears. They will continue

to have those relationships moving forward in very large part as a result of the benefits of this

deal."); *id.* 49:3-4 ("[T]here's 45,000 people out there that are working for this company, and it

matters. These people will have jobs.").

Specifically, ESL's winning bid provided the Debtors with $5.2 billion in aggregate

value, the details of which are as follows: As set forth in Section 3.1(b)(iv) of the APA, the

purchase price included a credit bid pursuant to Section 363(k) of the Bankruptcy Code in an

aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second

Lien Line of Credit Facility; and (z) the Second Lien PIK Notes (the "Credit Bid"). The credit

bid of this second lien debt was done at the direction of ESL, as the holder of more than a

majority of the relevant second lien debt.[8]  The winning bid also included the Credit Bid Release

Consideration of $35 million in cash, as well as the roll-over of approximately $621 million of

senior indebtedness, the assumption all of the outstanding liabilities of the Sparrow entities, in

the amount of approximately $592 million; the assumption of up to $166 million of payment

obligations with respect to goods ordered by the sellers under the Asset Purchase Agreement

prior to the closing of the sale (but as to which goods the Sellers had not yet taken delivery and

title prior to closing); the assumption of up to $139 million of 503(b)(9) administrative priority

claims; the obligation to reimburse the Sellers under the Asset Purchase Agreement for up to $43

million of additional severance costs to be incurred by the Sellers; the assumption of all cure

costs related to contracts to be assumed by Transform Holdco LLC or its affiliates; the

assumption of up to $134 million of property taxes with respect to the properties to be acquired

by Transform Holdco LLC or its affiliates; the obligation to pay up to $19 million in transfer

taxes; the assumption of approximately $4 million in mechanics' liens; up to $17 million in cash

to purchase cash in store registers as of the closing of the sale; and the assumption of

approximately $1.1 billion of assumed liabilities with respect to certain protection agreements,

gift cards and accrued points under the Shop Your Way program.

An essential element of this bargain, as embodied in the APA, was the allowance of the

Second Lien Parties' claims.  *See* Sale Order ¶¶ K, L.

The Debtors also acknowledged another important benefit:  the Sale Transaction

preserved the estates' ability to seek significant recoveries in litigation from ESL, despite the fact

that ESL was the winning bidder.  *See* Debtors' Omnibus Reply ¶ 6 (sale would "[p]reserve

---

[8]    The 2010 Notes are junior in the recovery waterfall and therefore none of the holders of the 2010 Notes
participated in the Credit Bid.

13

litigation claims . . . against insiders for the benefit of creditors"); Hr'g Tr. 51:13-19, Feb. 7, 2019 ("The avoidance actions, no claims are being released in a winddown, but of course, there's a very limited release here and we thought that was very meaningful to the estates, that the litigation is very largely preserved for the benefit of the estates.  That was a key compromise that we came to in  accepting the bid.").[9]

Thus, in concert with the sales process the Debtors' Restructuring Subcommittee conducted an in-depth investigation into potential causes of action against ESL and its affiliates. *See Declaration of Alan J. Carr in Support of Restructuring Subcommittee's Response to the Objection of the Official Committee of Unsecured Creditors to the Sale of Substantially All of the Debtors' Assets to ESL Investments, Inc.* ¶ 6, ECF No. 2321 ("Carr Decl.").  This investigation included the collection and review of "millions of pages of documents," as well as "eleven on-the-record interviews of past and present senior executives and Board members (including Mr. Lampert) and the Debtors' financial advisors, lawyers, and appraisers." *Id.* ¶ 9.  A number of legal and financial advisors were engaged in connection with this investigation, which resulted in a substantial expenditure of estate funds.

### H.    The Debtors' Post-Sale Spenddown of the Second Lien Parties' Remaining Collateral

Despite all the protections granted to the Second Lien Parties, the collateral that is subject to the Prepetition Second Lien Adequate Protection Liens and that remained in the Debtors' possession following the closing of the going concern sale has been used by the Debtors to fund their ongoing operating and restructuring expenses, all of which are junior in right to the Second Lien Parties' adequate protection rights and claims, without regard to the protections that the

---

[9]    ESL believes these claims have no merit and intends to defend itself vigorously.

14

Final DIP Order was intended to ensure.  Specifically, as the Debtors have continued to sell their inventory, certain of the property to which the Prepetition Second Lien Adequate Protection Liens has attached has steadily been converted to cash.  However, rather than segregate or account for these proceeds of the Prepetition Second Lien Adequate Protection Liens, the Debtors used this cash to fund operating losses and the expenses of case administration at the expense of the Second Lien Parties.  The Debtors did not begin drawing from the Winddown Account until the Cash Collateral was nearly extinguished.  Moreover, the Debtors have represented that they will continue to fund the Winddown Account with cash collateral prior to plan confirmation.  *See Proposed Stipulation and Order Concerning Debtors' Continuing Use of Cash Collateral*, Ex. A, Weekly Cash Flow Budget Base Case, ECF No. 4155.

In an effort to staunch the outward flow of cash collateral, on April 4, 2019, Wilmington Trust filed a *Motion to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral*, ECF No. 3050 ("Wilmington Motion").  ESL and Cyrus filed joinders to the Wilmington Motion on April 11, 2019.  *See Joinder of ESL Investments, Inc. to Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral*, ECF No. 3134; Cyrus Joinder.

Following a conference between the Parties and the Court, the Parties reached an interim agreement as to the ongoing use of cash collateral pending a determination of the Wilmington Motion, which alleges that the Debtors' use of Cash Collateral after February 16, 2019, was not authorized by the Final DIP Order, and on June 7, 2019, filed a *Proposed Stipulation and Order Concerning Debtors' Continuing Use of Cash Collateral*, ECF No. 4155, which provides that "the Prepetition Second Lien Collateral Agent, on behalf of itself and the other Prepetition

Second Lien Credit Parties, shall be granted a Prepetition Second Lien Adequate Protection Lien solely to the extent of the Interim Second Lien Diminution in Value (as defined below) on the Winddown Account if, and only if, the Court determines any Second Lien Diminution in Value has occurred between the Motion Date and the date of the Determination." *Id.* ¶ 2. Pursuant to this stipulation, the Second Lien Parties were granted a replacement lien on the Winddown Account, which was created to cover post-sale expenses, resulting from loss of such Cash Collateral as a result of the Debtors' continued use of their Cash Collateral after April 4, 2019 (the "Cash Collateral Motion Date"). Funds will have to be deducted from the Winddown Account and turned over to the Second Lien Parties to compensate for such loss.

### I.    The Liquidation Plan

With the closing of the Sale Transaction, the reorganization of the estates has already effectively been completed with the preservation of approximately 45,000 jobs by the transfer of the going concern to ESL and the repayment in full of essentially all of the Debtors' secured debt, except for the Second Lien Parties' debt. The Debtors are now seeking confirmation of a liquidation plan to complete the distribution of the estates' assets, which would treat the Second Lien Parties as unsecured creditors.

### ARGUMENT

### I.    THE SECOND LIEN HOLDERS ARE ENTITLED TO RECEIVE A SIGNIFICANT CLAIM FOR DIMINUTION IN VALUE

#### A.    The Court Should Calculate the Diminution in Value by Employing a Going-Concern Valuation Methodology

The appropriate methodology for calculating the diminution in value of a secured claim depends on the specific facts of each case. Section 506(a) of the Bankruptcy Code provides that the value of a secured claim by a creditor "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." *Official Comm. of Unsecured*

*Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549, 592 (Bankr.

S.D.N.Y. 2013) (quoting 11 U.S.C. § 506(a)(1)) ("*ResCap*").  Specifically, "Section 506(a) calls

for the value the property possesses in light of the "'disposition or use'" in fact 'proposed,' not

the various dispositions or uses that might have been proposed."  *Assocs. Com. Corp. v. Rash*,

520 U.S. 953, 963-64 (1997) ("[A]ctual use . . . is the proper guide under a prescription hinged to

the property's 'disposition or use.'"); *see also Motors Liquidation Co. Avoidance Action Tr. v.

JPMorgan Chase Bank, N.A.* (*In re Motors Liquidation Co.*), 576 B.R. 325, 424 (Bankr.

S.D.N.Y. 2017) (going-concern value was the proper valuation method based on the "actual

disposition of the property, rather than a hypothetical outcome"), *appeal denied*, No. 17-CV-

8712(AJN), 2018 WL 4284286 (S.D.N.Y. Sept. 7, 2018).  In light of the fact that it was always

the Debtors' intention to operate its business in the ordinary course (save for the going out of

business stores) while pursuing a going concern sale, and the fact that one actually took place, it

is appropriate to calculate a diminution in value with reference to "the fair market value of the

collateral in the hands of the Debtors." *ResCap*, 501 B.R. at 592.

There is no doubt that the fair market value of the collateral that is subject to the

Prepetition Second Lien Adequate Protection Liens has diminished substantially in this case.

The starting point in any going concern valuation is the value of the collateral at the Petition

Date, which, based on a going concern valuation, exceeded the debt.  Since the Petition Date,

Debtors have sold substantially all of the inventory to which the Prepetition Second Lien

Adequate Protection Liens attach and purport to have little or no proceeds to show for it.

Moreover, rather than segregate or account for the proceeds of these sales to the extent cash

proceeds do exist (as required by the Final DIP Order),[10] the Debtors have continued to use the

---

[10]    *See* Final DIP Order ¶ 39 (requiring Debtors to "establish reasonable procedures . . . to trace cash proceeds
from the sale of inventory of the Debtors and to track liabilities and payables of the Debtors, including shared

remaining cash to fund operating losses and the expenses of restructuring professionals and case

administration.[11]  With the majority of the proceeds from the sale thus dispersed and

unaccounted for, the Second Lien Parties are left with virtually no collateral securing their

claims.

From these basic facts alone it is clear that the Second Lien Parties are entitled to

substantial Section 507(b) Claims.  More detail on the appropriate methodology for determining

fair market value is set forth in the supplemental memoranda of law and supporting expert

reports of the Second Lien Parties, filed herewith.  While the Second Lien Parties' submissions

vary in some respects, they are in agreement on the most important point—there has been a

substantial diminution in value of their collateral that has resulted in significant Section 507(b)

Claims.  Moreover, as set forth below, the Court should also reject Debtors' attempts to deduct

an improper surcharge from these substantial claims.

## II.    THE DEBTORS' ASSERTED SURCHARGES ARE INCONSISTENT WITH THE GOVERNING LAW ON SECTION 506(C)

The Debtors seek to avoid the firm rule that "any fees payable from [the secured

creditor's] collateral must be for services which were for the benefit of [the secured creditor]

rather than the debtor or other creditors."  *Gen. Elec. Credit Corp. v. Levin & Weintraub (In re*

*Flagstaff Foodservice Corp.)*, 739 F.2d 73, 75 (2d Cir. 1984) ("*Flagstaff I*").  The general rule is

that administrative expenses must not be satisfied out of collateral property "but must be borne

out of the unencumbered assets of the estate."  *Sw. Sec. FSB v. Segner* (*In re Domistyle, Inc.*),

811 F.3d 691, 695 (5th Cir. 2015) (quoting 4 Collier on Bankruptcy ¶ 506.05 (16th ed. 2015)).

---

services and professional fees and costs . . . and to report the same to Creditors' Committee, the DIP ABL Agents
and the Prepetition Second Lien Credit Parties on a monthly basis").

[11]    Indeed, the Court has noted that it "is kind of a stretch" to argue that there would be no diminution in value
"here given the amounts that at least the Debtors have said that they've been operating at a deficit at times."  Hr'g
Tr. 133:21–134:14, Feb. 7, 2019.

Bankruptcy Code Section 506(c) allows for a "narrow" exception to this general rule. *Id.* Section 506(c) provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property." 11 U.S.C. § 506(c). Section 506(c)'s exception is "extraordinary," *Domistyle, Inc.*, 811 F.3d at 695, and applies only to allow fees payable from a specific creditor's collateral "for services which were for the benefit of [*that particular creditor*] rather than the debtor or other creditors." *Flagstaff I*, 739 F.2d at 75.

A.    **The Debtors Will Not Be Able to Meet Their Burden to Recover a Section 506(c) Surcharge**

The Debtors bear "the burden of proving that the administration expenses for which they [seek] recovery [are] covered by section 506(c)." *Id.* at 77. To recover expenses under Section 506(c), the Debtors must show (1) "that the expenses were necessary," (2) "the amounts . . . expended were reasonable," and (3) "the expenses directly benefitted the secured creditor." *First Servs. Grp., Inc. v. O'Connell ex rel. Ceron (In re Ceron)*, 412 B.R. 41, 51 (Bankr. E.D.N.Y. 2009). With respect to the third prong, "[t]he debtor in possession also must show that its funds were expended *primarily* for the benefit of the creditor and that the creditor directly benefited from the expenditure." *Gen. Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*, 762 F.2d 10, 12 (2d Cir. 1985) ("*Flagstaff II*") (emphasis added).

As this Court has explained, though "[t]he word 'primary' does not appear in the statute, but the courts have applied it, because otherwise, as the *Domistyle* court notes . . . the interpretation could eat up the narrow nature of the statute, which is a direct benefit." Hr'g Tr. 243:25–244:21, Feb. 7, 2019. Indeed, courts have recognized that "the need for an undertaking to be *primarily* for the creditor's benefit heightens the barrier to be scaled to invoke § 506(c).

"Although a secured creditor may consent to bearing the costs of professional fees [and other

expenses] incurred by a debtor in possession, 'such consent is not to be lightly inferred.'"

*Flagstaff I*, 739 F.2d at 77 (quoting *In re S & S Indus., Inc.*, 30 B.R. 395, 398 (Bankr. E.D. Mich.

1983)).  Debtors cannot "meet this burden of proof by suggesting possible or hypothetical

benefits."  *Flagstaff II*, 762 F.2d at 12.  Moreover, "an expense cannot be said to benefit a

creditor's lien for purposes of 11 U.S.C. § 506(c)[] where, given the amount of the expense in

relation to the value of the creditor's interest in the collateral, a reasonable creditor would not

incur it."  *Menorah Congregation & Religious Ctr. v. Feldman (In re Menorah Congregation &*

*Religious Ctr.)*, 554 B.R. 675, 697 n.88 (Bankr. S.D.N.Y. 2016) (Drain, J.).

The Debtors here have not yet even begun to meet their burden of demonstrating that any

of the expenses in their purported $1.451 billion in proposed surcharge were:  (1) necessary, (2)

reasonable, and (3) expended primarily for the benefit of and directly benefitted the Second Lien

Parties.  Specifically, they have not yet offered any evidence demonstrating that their asserted

surcharge satisfies any of the three required elements.  Moreover, the main assumption on which

the Debtors' surcharge apparently rests—that the entire bankruptcy has been for the primary and

direct benefit of the Second Lien Parties—is fundamentally untrue and has already been rejected

by the Court at the Sale Hearing.

1.    *The Debtors' Conclusory Assertions Are Inadequate to Meet Their Burden*

Conclusory allegations that professional services and other expenses were rendered for

the primary and direct benefit of a creditor will not satisfy Debtors' burden under Section 506(c).

In *Flagstaff I*, the Second Circuit rejected such conclusory allegations that certain professional

fees were "rendered solely on behalf of" a creditor "and not on behalf of any other person" as

insufficient to meet the debtors' burden under Section 506(c).  739 F.2d at 76.  Here, Debtors

assert, without support, that the $1.451 billion surcharge they propose "included only those

charges which were reasonable, necessary, and of direct and primary benefit to the Second-Lien

Holders," and that this almost 1.5 billion proposed charge is "conservative." *Declaration of*

*Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for*

*Reserve Purposes* ¶ 19, ECF No. 4035.[12]  As in *Flagstaff I*, these allegations are insufficient to

sustain Debtors' burden, and the 506(c) surcharge request should accordingly be denied.

Additionally, courts have required such charges to be sufficiently itemized before a debtor may

recover. *Weinman v. City of Pueblo, Colo. (In re Adam Aircraft Indus., Inc.)*, 527 B.R. 709

(D. Colo. 2014) (rejecting proposed $1.8 million surcharge that lacked itemization of

expenditures).

Section 506(c) surcharge claims also "should be in some sensible proportion to the value

of the benefit to be received." *In re Ceron*, 412 B.R. at 52.  Here, the Debtors assert that they are

entitled to a surcharge approaching $1.5 billion that allegedly was incurred to preserve the value

of Prepetition Second Lien Collateral that had a book value of approximately two-thirds of that

amount as of the Petition Date.  Expending $1.5 billion to preserve collateral valued at

substantially less than that amount on its face would not reflect a "sensible proportion" if that

were truly the basis for these expenditures.  Here, the Debtors' argument only confirms that

those expenditures were, in truth and in fact, primarily made to achieve objectives other than

preserving the Prepetition Second Lien Collateral.

Moreover, although Debtors have failed to itemize or sufficiently justify each category of

the proposed surcharge, each category of expenses includes fees that were *also* for the benefit of

the estates, and accordingly cannot be charged to the Second Lien Parties.  *See, e.g.*, *Flagstaff II*,

---

[12]      Some of the requested 506(c) costs do not even make any sense.  For instance, the Debtors assert $51 million of professional fees, yet professional fees are already funded out of the Second Lien Parties' collateral through the Professional Fee Carveout Account.

762 F.2d 10 (payroll taxes during attempted reorganization not for primary benefit of secured creditor); *In re Sports Info. Data Base, Inc.*, 64 B.R. 824, 827 (Bankr. S.D.N.Y.1986) (payment of rent did not give rise to a Section 506(c) claim where primary benefit was to estate, not to secured creditor); *Arthur v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 206 B.R. 776, 783 (Bankr. W.D. Pa. 1997) (only "payroll of employees directly and solely involved with the disposition of a secured creditors' collateral" are allowable as 506(c) claims). The Debtors' request for a Section 506(c) surcharge should be denied on this ground alone.

2.     *This Bankruptcy Proceeding Was Not Run for the Primary Benefit of the Second Lien Parties*

Simply put, the Debtors will never meet their burden of demonstrating their expenses were all incurred for the primary and direct benefit of the Second Lien Parties because that is factually untrue. The Court has already flatly rejected this argument, and the evidence will show that from the Petition Date onward, these cases have been run to achieve a sale process intended to maximize the value of all of the Debtors' considerable assets, not just the Prepetition Second Lien Collateral, for the benefit of the estates and *all* creditors, not just the Second Lien Parties, as well as to conduct an investigation to produce claims that could be brought on behalf of unsecured creditors. ESL's going concern bid was only accepted because the Debtors concluded that it would "provide greater recoveries for the Debtors' estates and creditors than would be provided by any other practically available alternative, including, specifically, a liquidation (because, inter alia, the claims pool would be significantly higher in a winddown scenario and the recoveries in that scenario were uncertain)." Debtors' Omnibus Reply ¶ 52; *see also id.* ¶ 71 ("A sound business purpose for the sale of the debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders.").

The going concern sale provided substantial benefits to the estates, secured creditors, unsecured creditors, vendors and Sears employees, as counsel for the Debtors acknowledged repeatedly in connection with and at the Sale Hearing. *See generally* Hr'g Tr. 28:1–54:21, Feb. 7, 2019. According to Debtors, these benefits included:

- Preserv[ation of] tens of thousands of jobs and avoid[ance] of a costly and risky liquidation of the Debtors' enterprise;

- Keep[ing] Sears and Kmart stores open across the United States and internationally;

- Preserv[ing] the integrity of the Debtors' various business lines, including: Innovel, Sears Home Services, Monark, and Sears Auto Centers; . . .

- [T]he assumption of approximately $1,100 million of secured debt and administrative liabilities (including up to $139 million in 503(b)(9) claims); . . .

- [S]uperior recoveries to creditors; . . .

- [T]he assumption of contracts and a corresponding cure of all prepetition claims associated therewith; . . .

- [T]he assumption of liabilities for home warranties and protection agreements sold to about 6.5 million households across the United States;

- Rollover or refinance[ing of] approximately $1.3 billion of the Debtors' secured debt obligations with the support of those lenders;

- Satisf[action of] approximately $3 billion of secured claims . . .

Debtors' Omnibus Reply ¶ 6.

As this list of benefitted parties reveals, the Debtors understood and publicly acknowledged that creditors other than the Second Lien Parties were the primary beneficiaries of the Sale Transaction. *See id.* Hr'g Tr. 52:9-13, Feb. 7, 2019 ("When you look at the recoveries to creditors overall, there is a very significant benefit in terms of the reduction of the claims pool in conjunction with this transaction, even compared to a winddown."); *id.* 53:19–54:2 ("[T]he recovery [of] the successful bid would provide to non-ESL creditors, liquidity, the alternative to

this successful bid which is a winddown and the loss of tens of thousands of jobs. That alternative of liquidation, in our judgment, after consultation with numerous parties, was not in the best interest of stakeholders."). Moreover, the Sale Transaction, while releasing certain causes of action against ESL, preserved claims that Debtors apparently considered valuable to the estates. *See id.* 51:13-19 ("[W]e thought that was very meaningful to the estates, that the litigation is very largely preserved for the benefit of the estates. That was a key compromise that we came to in accepting the bid.").

Counsel for the Restructuring Subcommittee agreed. The Restructuring Subcomittee "determined in good faith to approve a limited credit bid release to facilitate a reorganization and came to the view that that was better for the estates than proceeding to a winddown." *Id.* 66:18–67:1. With their independent counsel and financial advisors, the Restructuring Subcommittee's analysis "showed that in the final bid, that third-party secured creditors are benefitted compared to a winddown and that's not including, obviously, ESL to the tune of $152 million." *Id.* 69:8-15. Unsecured creditors, who stood to recover nothing in a winddown, would get paid in the Sale Transaction. *Id.*; *see also* Carr Decl. ¶ 31 (explaining that, compared with liquidation, the going-concern bid benefitted non-insider lien third party secured creditors; prepetition unsecured creditors; the Debtors' estates; and 45,000 employees).

The decision to accept ESL's bid and enter into the Sale Transaction was made after an extensive process that "required a significant amount of time and resources focused on maximizing the Debtors' value for the benefit of all stakeholders." Aebersold Decl. ¶ 38. Among other things, the Debtors considered:

> (i) the nature and amount of the consideration provided; (ii) the ability of both parties to close on the proposed transaction and the timing of the same; (iii) the recovery the Successful Bid would provide to creditors and the net benefit to the Debtors' estates; and (iv) the alternative to the Successful Bid—a wind-down—

and its expected impact on creditor recoveries, on tens of thousands of jobs, and
on potential additional claims.

*Id*. ¶ 34.  A process conducted for the primary benefit of the Second Lien Parties would

presumably have looked quite different – starting with an immediate acceptance of ESL's initial

bid on terms more favorable to secured creditors than those ultimately accepted, saving the

expense of efforts to market assets individually.  Indeed, at the Sale Hearing, the Court

considered and rejected allegations that the sale process had been primarily for the benefit of

ESL.  *See* Hr'g Tr. 226:6-23, Feb. 7, 2019.

Moreover, the mere fact that the Second Lien Parties may have incidentally benefitted

from the sale is "not justification for the Court to alter otherwise legitimate contractual rights."

*In re Republic Airways Holdings Inc.*, 598 B.R. 118, 145 (Bankr. S.D.N.Y. 2019).  Any allowed

claim necessarily "hurts the interests of all other creditors by reducing the pool of available

assets for distribution."  *Id.*  And it can hardly be said that the Second Lien Parties benefitted

when they would have achieved full or nearly full recoveries on their claims in a first-day

liquidation.

### B.    The Debtors' Appeal to the Equities Is Both Irrelevant and Wrong

Having failed to meet their high burden for justifying their proposed nearly $1.5 billion

surcharge, the Debtors resort instead to an appeal to the equities supposedly underlying Section

506(c), arguing that "[e]ven if the Court were to find any merit or monetary value in the Second-

Lien Holders' 507(b) Claims," the claims should simply be ignored on equitable grounds.  Rule

3012 Mot. ¶ 52.  They relatedly argue that allowing the Second Lien Parties to recover for

diminution in value would be an "improper windfall" because the value received by virtue of the

credit bid in the sale provided more in recovery than the Section Lien Holders would otherwise

have received in a liquidation scenario. *Id.* ¶ 6.  These appeals to the purported equities are both

irrelevant and wrong.

1.  *They are Irrelevant Because Equity Cannot Overcome the Explicit
    Protections Granted by the Code to Secured Creditors*

The equitable powers of a bankruptcy court are not unlimited. They are derived from, and

limited by, the "statutory grant of such authority by Congress," and "cannot be used to

contravene provisions of the Bankruptcy Code." *In re Target Two Assocs., L.P.*, No. 04 CIV.

8657(SAS), 2006 WL 3068668, at *5 (S.D.N.Y. Oct. 27, 2006), *aff'd*, 282 F. App'x 914 (2d Cir.

2008).  As the Second Circuit has explained:

> The Code . . . deliberately protects and preserves the interests of secured creditors
> in property in which they have a security interest, and accordingly takes the
> concept of adequate protection very seriously. The Code also establishes that a
> secured creditor's interest may only be diminished to the extent that the secured
> creditor waives its right to the protections afforded by the Code, or to the extent
> that the expense granted priority directly confers a benefit on the secured creditor.

*Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp., (In re Blackwood Associates, L.P.)*,

153 F.3d 61, 68 (2d Cir. 1998).  A bankruptcy court enforcing the plain text of the Code does not

create an "improper windfall," and conversely, a bankruptcy court cannot disregard the plain text

of the Code to avoid such a purported windfall.  *See In re Republic Airways Holdings Inc.*,

598 B.R. at 144 (rejecting argument that bankruptcy court could invoke equitable powers to

invalidate certain guarantee claims to prevent inequitable windfall).  As set forth above, Section

506(c) surcharges are strictly limited in scope.

Principles of equity cannot override the Second Lien Parties' allowed superpriority

claims.  Where, as here, a debtor fails to meet its burden to justify such a surcharge, "[i]t does

not suffice for the bankruptcy court to announce that, independent of any precedent or any other

provision of the Code, 'equity' requires a surcharge." *Architectural Bldg. Components v.

McClarty (In re Foremost Mfg. Co.)*, 137 F.3d 919, 924-25 (6th Cir. 1998); *see also Flagstaff I*,

739 F.2d at 75 (district court erred in awarding professional fees outside the scope of Section 506(c)). [13]

> 2.  *They are Wrong Because (i) the Going Concern Sale Benefitted All Parties, Not Just the Second Lien Parties and (ii) the Recovery of the Second Lien Parties In a First Day Liquidation Would Have Exceeded the Value They Received On Account of the Credit Bid*

The assumptions underlying Debtors' purported appeal to the equities are also simply wrong. *First*, the Debtors claim that the Second Lien Parties are not entitled to Section 507(b) Claims because the Debtors' chapter 11 cases have been run primarily for the benefit of the Second Lien Parties, in particular ESL. As set forth above, that is not the case here. Here, as in *Flagstaff I*, "[i]t is undisputed that the chapter 11 proceedings were initiated with the hope of effectuating [the Company's] rehabilitation and with optimism that this could be accomplished." 739 F.2d at 76. "No such inequity results" in circumstances such as this in which "the estate bears the burden of general administrative costs which only incidentally benefit a secured creditor." *In re Domistyle, Inc.*, 811 F.3d at 697.

Indeed, the equities here favor the Second Lien Parties, not the Debtors. The Second Lien Parties should not be:

> [P]unish[ed] . . . for consenting to the use of their collateral and for allowing the Debtors to attempt to preserve the going concerning value of the business for the benefit of the creditors, rather than seeking to lift the stay and foreclose at the outset of the case. Such a reading is contrary to both the text of the order and long-established bankruptcy policy favoring preservation of going concern value whenever possible.

---

[13]   Indeed, Debtors' counsel acknowledged at the sale hearing that the Second Lien claims would survive the sale transaction: "ESL is heavily incentivized. They're still a very large claimant as is Cyrus in these estates to have these cases administered efficiently and I don't want that to be lost on the court. They still have claims in these cases. They still have every incentive to cooperate. They still have every incentive to work with the company to minimize the costs associated with the administration of the estate." Hr'g Tr. 42:16-22, Feb 7, 2019.

*In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 577 (Bankr. S.D.N.Y. 2016).  To the contrary, the Second Lien Parties allowed their collateral to be used for the benefit of the Debtors and all of their creditors.  As a result, 45,000 jobs were saved and countless vendors and other creditors benefitted.

*Second*, the Debtors' fundamental assumption that the Second Lien Parties obtained a better result for their Second Lien positions as a result of the going concern sale and their credit bid than they would have obtained as a result of a day one liquidation is inaccurate.  On the Petition Date, the Second Lien Parties were over-collateralized.  They are now under-collateralized (and perhaps even wholly unsecured due to the Debtors' ongoing dissipation of post-sale collateral) and assert substantial Section 507(b) Claims.  Even assuming that the reorganization helped preserve value for the Second Lien Parties, that "does not suffice to warrant section 506(c) recovery.  *Flagstaff II*, 762 F.2d at 12; *see also Flagstaff I*, 739 F.2d at 76 (holding that any benefits accruing to creditor were incidental to the reorganization, noting that "it require[d] rather strained logic to conclude that [creditor] actually benefited" since the creditor was secured at the outset of the proceedings and under-collateralized at the end).

## III.    THE COURT SHOULD ORDER A TURNOVER FROM THE WINDDOWN ACCOUNT TO THE SECOND LIEN PARTIES OF THE AMOUNTS OF THE SECOND LIEN DIMINUTION IN VALUE FROM APRIL 4, 2019

Finally, the amount of the diminution in value of the Second Lien Parties' Cash Collateral after April 4, 2019, when the Wilmington Motion was filed, must be deducted from the Winddown account, pursuant to the agreed upon terms of the Parties in the *Proposed Stipulation and Order Concerning Debtors' Continuing use of Cash Collateral*, ECF No. 4155, and the Debtors must return to the Second Lien Parties any additional Cash Collateral used at any time after February 16, 2019, as such use did not comport with the requirements of the Final DIP Order and was unauthorized.

## CONCLUSION

For the reasons set forth above, the Second Lien Parties respectfully request that the Court determine their Section 507(b) Claims and their secured claims in amounts to be determined at the hearing, deny the Debtors' request for a Section 506(c) surcharge, and grant other such relief as it deems just and proper.

[*Signature Page Follows*]

Dated:  New York, New York
        June 18, 2019


CLEARY GOTTLIEB STEEN &                    MILBANK LLP
HAMILTON LLP

By:  */s/ Thomas J. Moloney*               By:  */s/ Thomas R. Kreller*
        Thomas J. Moloney                          Eric R. Reimer (admitted pro hac vice)
        Sean A. O'Neal                             Thomas R. Kreller (admitted pro hac vice)
        Andrew Weaver                              Robert J. Liubicic
        Katherine R. Lynch
        Chelsey Rosenbloom                     *Attorneys for Cyrus Capital Partners, L.P.*
                                               2029 Century Park East, 33rd floor
    *Attorneys for ESL*                        Los Angeles, CA  90067
    One Liberty Plaza
    New York, NY 10006
    Telephone:  (212) 225-2000
    Facsimile:  (212) 225-3999



SEYFARTH SHAW LLP


By:  */s/ Edward M. Fox*
        Edward M. Fox

    *Attorneys for Wilmington Trust,*
    *National Association, as indenture*
    *trustee and collateral agent*
    620 Eighth Avenue
    New York, NY 10018
    Direct Dial:  (212) 218-4646
    Direct Fax:  (917) 344-1339