Proposed Hearing Date: July 18, 2019
Proposed Response Deadline: June 27, 2019

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

........................................................X
:
In re                                                     :        Chapter 11 Case No.
:
**SEARS HOLDINGS CORPORATION, et al.,**  :        18-23538 (RDD)
:
Debtors.[1]                                          :        (Jointly Administered)
:
:
........................................................X

**SUPPLEMENTAL MEMORANDUM OF LAW ON BEHALF OF ESL INVESTMENTS, INC. IN SUPPORT OF ITS REQUESTS TO DETERMINE THE AMOUNT OF ITS SECOND LIEN SECURED CLAIMS UNDER SECTION 506(a) AND ITS SECTION 507(b) ADMINISTRATIVE CLAIMS PURSUANT TO BANKRUPTCY RULE 3012; AND IN OPPOSITION TO THE DEBTORS' MOTION TO SURCHARGE ITS COLLATERAL PURSUANT TO SECTION 506(c)**

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ..................................................................................................2

BACKGROUND .........................................................................................................................3

    A.   Allowance of ESL's Secured Claims.............................................................................3

    B.   The Decision to Pursue the Going Concern Sale .................................................5

    C.   The Benefits of the Going Concern Sale ...........................................................8

    D.   Preserving Section 507(b) Claims Was a Recognized and
          Important Part of the Bargain ...........................................................................10

ARGUMENT ............................................................................................................................11

I.    The Debtors' Expenditures Pursuant to Their Decision to Pursue a
      Going Concern Sale Were Not Primarily for ESL's Benefit.................................11

II.   ESL Did Not Consent to a Section 506(c) Surcharge and No Case Has
      Been Made Justifying Any Such Surcharge ..........................................................15

III.  ESL's Section 507(b) Claims Are Not "Capped," But its Access to
      Certain Potential Sources of Litigation Recoveries to Satisfy Such
      Claims is Limited....................................................................................................16

CONCLUSION...........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aleynikov v. Goldman Sachs Group, Inc.*,
765 F.3d 350 (3d Cir. 2014)................................................................... 19

*First Servs. Grp., Inc. v. O'Connell ex rel. Ceron (In re Ceron)*,
412 B.R. 41 (Bankr. E.D.N.Y. 2009).................................................... 15

*Gen. Elec. Credit Corp. v. Levin (In re Flagstaff Foodservice)*,
739 F.2d 73 (2nd 1984)........................................................................ 15

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000)................................................................................. 14

*In re GSC, Inc.*,
453 B.R. 132 (Bankr. S.D.N.Y. 2011).................................................. 13

*In re Phila. Newspapers, LLC*,
599 F.3d 298 (3d Cir. 2010), *as amended* (May 7, 2010).................... 13

*Kuhn Const., Inc. v. Diamond State Port Corp.*,
990 A.2d 393 (Del. 2010) .................................................................... 18

*Osborn ex rel. Osborn v. Kemp*,
991 A.2d 1153 (Del. 2010) ................................................................... 16

*Pac. Ins. Co. v. Liberty Mut. Ins. Co.*,
956 A.2d 1246 (Del. 2008) ................................................................... 18

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012).............................................................................. 13

*Salamone v. Gorman*,
106 A.3d 354 (Del. 2014) ................................................................ 16, 17

*Sw. Sec. FSB v. Segner (In re Domistyle, Inc.)*,
811 F.3d 691 (5th Cir. 2015) ............................................................... 15

*Tennenbaum Cap. Partners LLC v. Kennedy*,
372 F. App'x 180, No. 09-3881-cv, 2010 WL 1563685 (2d Cir. Apr. 20, 2010)............... 13

1mm

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989).......................................................................................................    13-14

## **Other Authorities**

Vincent S. J. Buccola & Ashley C. Keller, *Credit Bidding and the Design of Bankruptcy Auctions*, 18 Geo. Mason L. Rev. 99 (2010) .......................................................................    13

ESL Investments, Inc. and certain of its affiliated entities (including JPP, LLC and JPP II, LLC (collectively, "ESL")), in their capacities as creditors of Sears Holdings Corporation and certain of its affiliates (collectively, "Sears" or the "Debtors"), by their undersigned counsel, hereby file this Supplemental Memorandum of Law On Behalf of ESL in Support of Its Requests to Determine the Amount of Its Second Lien Secured Claims under Section 506(a) and Its Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge Its Collateral Pursuant to Section 506(c).

As set forth in the Common Memorandum[2] filed on behalf of the Section Lien Parties,[3] on the Petition Date, the Second Lien Parties were over-collateralized and fully secured. Rather than pursue a first-day liquidation, the Debtors expended substantial funds—funds drawn from the Second Lien Parties' collateral—to continue their business operations in order to conduct an auction process in support of a going concern sale and to conduct an investigation aimed at identifying claims that could ultimately be brought against ESL and Eddie Lampert.[4] The evidence at trial will show that during the course of pursuing these objectives, the substantial collateral value supporting the Second Lien debt that existed at the Petition Date dissipated, leaving the Second Lien Parties with substantial Section 507(b) Claims. The evidence will also show that none of the considerable expenditures by the Debtors in the course of this proceeding

---

[2]    "Common Memorandum" refers to the Common Memorandum of Law On Behalf of the Second Lien Parties in Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims under Section 506(a) and their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c), filed contemporaneously herewith. In addition to the Common Memorandum, each of the Second Lien Parties has filed its own expert report and a separate memorandum largely to discuss unique issues. ESL also files herewith the Declaration of Katherine R. Lynch, dated June 18, 2019, which attaches copies of relevant excerpts of the documents cited in the Common Memorandum and herein for the Court's convenience.

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Common Memorandum or the Final DIP Order.

[4]    The Debtors' claims against ESL have no merit and ESL intends to defend against them vigorously.

are chargeable to the Second Lien Parties under Section 506(c), as the expenses were not incurred for their primary benefit.

## PRELIMINARY STATEMENT

ESL files this Supplemental Memorandum principally to address certain fundamentally incorrect assumptions made by the Debtors in their Rule 3012 Motion regarding ESL. The Debtors assert that, at bottom, *all* of the operating expenses incurred by the estates in the months following the Chapter 11 Petition were for the primary and direct benefit of ESL because its winning auction bid through Transform Holdco LLC had a Second Lien credit bid component and therefore all of these expenses were surchargeable to the Second Lien's shared collateral. The evidence will show, however, that this assertion is both factually and legally inaccurate.

While ESL expressed interest in purchasing the going concern from the outset of the bankruptcy, it was never chosen as a stalking horse bidder or provided with any of the benefits customarily provided to someone with that favored status. To the contrary, the Debtors initiated and conducted an exhaustive investigation in an attempt to evaluate their potential ability to obtain value from ESL in litigation, rather than a sale. In particular, the Restructuring Subcommittee sought to identify whether any of ESL's secured claims "could be the subject of avoidance or subordination," as subordinating ESL's secured claims would "be an enormous transfer [of] value from one constituency to another." Hr'g Tr. 125:14–126:18, Nov. 15, 2018 (P. Basta describing function of Subcommittee). It was only after they concluded that the overall benefit to other creditor constituencies would be greater from ESL's offer than what could be achieved by a liquidation and an attempt to disallow or subordinate ESL's claims that the Debtors supported ESL's winning bid. The process by which the Debtors reached that result was not directed or controlled by ESL or any other Second Lien debtholder, and was not done with the intention of providing ESL, in particular, with any benefit, much less a primary benefit.

The Debtors retained Lazard to conduct a thorough sales process.[5]  ESL emerged as the only party willing to make a going concern bid.  That bid, however, became subject to a lengthy and intense negotiation pursuant to which ESL continuously improved its offer and agreed to take on significant liabilities of the estates after being repeatedly told by the Debtors that its bid was not sufficient.  The ultimate winning bid, which was structured to include a credit bid of Second Lien debt in the amount of approximately $433 million, provided the Debtors with $5.2 billion in aggregate value.  The sale provided significant benefits to the estates, secured creditors, unsecured creditors, vendors, and Sears employees as compared to a potential liquidation—a fact that counsel for the Debtors have repeatedly acknowledged.

Moreover, prior to the auction, the Debtors pursued an in-depth investigation to search for evidence to support their purported claims against ESL.  That investigation can hardly be said to be for ESL's primary benefit.  Indeed, as part of the bargain struck in negotiating the APA, ESL agreed to allow the Debtors to preserve their rights to assert these claims against ESL and Mr. Lampert in the future, gave up the right to recover proceeds from litigation over such claims, and also limited its right to recover the proceeds of other litigation claims asserted by the Debtors.  In return, the APA expressly allowed ESL's Section 507(b) Claims for all other purposes.  The Debtors' attempt now to deny ESL its bargained-for rights and prohibit ESL from recovering anything on its substantial Section 507(b) Claims is without basis.

## BACKGROUND[6]

### A.    Allowance of ESL's Secured Claims

As set forth in the Common Memorandum, the Interim DIP Order entered in connection with the Debtors' first day motion granted ESL and the other Second Lien Parties adequate

---

[5]     *See* Common Memorandum Background Section.
[6]     Further background information is included in the Common Memorandum.

protection of their interests on an interim basis in return for their agreement to allow the Debtors

to fund the operating expenses of the estates with the Second Lien Parties' collateral, including

adequate protection liens and a Section 507(b) adequate protection claim.

The APA executed in connection with the Sale Transaction contained a provision

expressly allowing ESL's secured claims and preserving ESL's rights to pursue and recover

upon Section 507(b) Claims.  Section 9.13(b) of the APA provides that:

> Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the
> IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate
> Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit
> Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together
> with the any security interests securing any of the Claims described in the
> preceding sub-clauses (b)(i)-(vii), collectively, the "ESL Claims") shall each be
> deemed allowed for all purposes in the Bankruptcy Cases and under the
> Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the credit
> bid set forth in Section 3.1(b).

This exact language was approved by the Court in the Sale Order.  Sale Order ¶ 7(b).

As set forth in detail in the Expert Report of David M. Schulte ("Schulte Report") and

ESL's Demand for Payment, both filed contemporaneously herewith, ESL now seeks to recover

$509,675,975.22 for its allowed Section 507(b) Claim[7] as a result of a diminution in the value of

ESL's collateral.

---

[7]     The allowed amount of Second Lien debt owed to ESL, as set forth in the amended Exhibit G of the APA,
is $846,901,356.22 in total ($318,481,532.89 for the Second Lien Term Loan, $507,072,878.33 for the Second Lien
Line of Credit Facility, and $21,346,945.00 for the Second Lien PIK Notes).  ESL's Section 507(b) Claim was
calculated by subtracting its pro-rata share of the credit bid ($337,225,381) from its total allowed Second Lien debt.
ESL does not have sufficient information to determine the value of its secured claims as of the plan effective date,
but will provide an update to the Court with that information in advance of the July 18, 2019 hearing to the extent
that the Debtors provide that necessary information.  Any recovery on account of such secured claim would reduce
the Section 507(b) Claim amount.  ESL reserves the right to assert additional claims for post-petition interest and all
reasonable out-of-pocket expenses, including legal fees incurred by ESL by reason of the enforcement and
protection of its rights in accordance with the applicable loan terms, plus any contingent and/or unliquidated claims
not presently ascertainable.

### B.      The Decision to Pursue the Going Concern Sale

The decision to pursue the going concern sale was made by the Debtors' Restructuring

Committee (the "Committee") following months of negotiation.  Prior to the Chapter 11 filing,

on October 10, 2018, the Debtors established the Committee by Resolution of the Board pursuant

to Article 4, Section 1 of the By-Laws and Section 141(c) of the General Corporation Law of the

State of Delaware (the "DGCL").  *See Declaration of Alan Carr* ¶ 6, ECF No. 2321 ("Carr

Decl."); *id.*, App. 2, Proposed Resolutions of the Board of Directors (Oct. 10, 2018).  The

Committee was established to consider and evaluate various strategic alternatives available to

Sears and its affiliates and, if the Committee "deem[ed] it to be in the best interests of the

Corporation," was empowered to:  "(a) recommend to the Board that the Corporation enter into a

Non-ESL Transaction, or (b) authorize and approve an ESL Transaction."  Carr Decl. App. 2, at

2.  The Committee was composed solely of independent directors.  Hr'g Tr. 25:1-5, Oct. 15,

2018.  The company planned to be "deferential" to the Restructuring Committee.  *Id.* 25:9-11.

In the same October 10 Resolution, the Board created the Restructuring Subcommittee

(the "Subcommittee") for the purpose of investigating "any cause of action that the Corporation

may have with respect to any [Prior Transactions, as defined in the resolution], and taking, or

causing to be done, any related actions that the Subcommittee considers necessary or desirable to

carry out its mandate."  Carr Decl. App. 2, at 1.  The Subcommittee consisted of just the two new

independent board members—William Transier and Alan Carr—and had independent counsel in

Paul, Weiss, Rifkind, Wharton & Garrison LLP.  Hr'g Tr. 25:12-18, Oct. 15, 2018.  As described

in the Common Memorandum, the Committee, Lazard, and the Debtors' counsel evaluated

several restructuring options and considered other bids, in addition to ESL's.  Between the

Committee's formation and the approval of the going concern bid, the Committee met no less

than 58 times.  Hr'g Tr. 38:2–39:15, Feb. 7, 2019 ("[A]nd these were not short meetings.  These were lengthy, involved meetings, numerous in-person meetings.").

On December 28, 2018, the deadline set forth in the Bidding Procedures Order, ESL assembled and submitted a going concern bid (the "December 28 Bid").  *See Declaration of Kunal Kamlani* ¶ 15, ECF No. 2356 ("Kamlani Decl.").  Among other things, the December 28 Bid included a credit bid of approximately $1.3 billion (including approximately $433 million in Second Lien debt), the roll-over and release of $501 million in senior indebtedness, and the assumption of approximately $1.1 billion in additional liabilities.  *Id.*  ESL's was the only bid for the purchase of substantially all of the Debtors' assets as a going concern.  *See* Aebersold Decl. ¶ 17.

Representatives of ESL met with three of the four members of the Committee, including both members of the Subcommittee, and their respective advisors on January 2, 2019 at the offices of Weil Gotshal & Manges LLP to discuss ESL's going concern proposal.  *See* Kamlani Decl. ¶ 16.  A few hours after that meeting concluded, ESL was informed by representatives of the Debtors and the Committee that the December 28 Bid would not be designated a qualified bid.  *Id.*  Following discussion on January 3, 2019, ESL again worked to improve its bid, and on January 4, 2019, ESL agreed to assume approximately $225 million of administrative liabilities.  *Id.*  ESL made a further improved proposal on the evening of January 5, 2019 (the "January 5 Proposal").  *Id.* ¶ 17.  Late in the afternoon of January 6, ESL was told that the January 5 Proposal would not be qualified under the bidding procedures.  *Id.*  ESL continued to engage in negotiations with the Debtors, and again improved its bid on January 9, 2019, including by providing substantially more consideration for administrative claims.  *See id.*  The Debtors announced at a hearing before this Court that ESL would be able to participate in the January 14,

2019 auction, subject to ESL's submitting a revised bid letter and making a $120 million deposit by January 9, 2019 at 4:00 p.m. Hr'g Tr. 9:15-25, Jan. 8, 2019.[8]

The next day, ESL submitted its revised and improved bid (the "January 9 Bid") and made the required $120 million deposit. Kamlani Decl. ¶ 19. Of this deposit, $17.9 million was non-refundable and covered the expenses of delaying liquidation while the Debtors evaluated ESL's going concern bid. *See id.*; Auction Tr. 42:15-17, Jan. 15, 2019. In the January 9 Bid, ESL proposed that it would assume up to $663 million in additional liabilities, including up to $166 million of payment obligations with respect to goods ordered by the Debtors prior to the closing of the proposed transaction (but as to which goods the Debtors had not yet taken delivery and title prior to closing), up to $139 million of administrative priority claims, all cure costs related to contracts to be assumed by ESL, and up to $135 million of property taxes. Kamlani Decl. ¶¶ 18-19. With this, the Debtors designated ESL's improved bid as qualified under the court-approved bidding procedures. *Id.* ¶ 19.

This process culminated in a formal auction held from January 14 through 16 (the "Auction"). *See* Aebersold Decl. ¶¶ 26-33. At the start of the Auction, ESL submitted yet another improved bid, addressing concerns as to conditionality, adding the assumption of liabilities related to environmental law, and forfeiting its deposit in a situation where ESL failed to close on certain financing. Kamlani Decl. ¶ 19. The final bid, submitted on January 15 at the Auction, provided for over $5.2 billion in total consideration, including an additional $120 million in assumed liabilities consisting of the junior DIP rollover, an obligation to pay up to $19 million in transfer taxes, the assumption of $4 million in mechanics' liens, up to $17 million in

---

[8]    The $120 million deposit was an implicit subsidy by ESL of the competing liquidation alternative. In the event the Debtors were not satisfied they had achieved an acceptable going concern sale, they would have used that money to enhance what they would have obtained in a liquidation.

cash to purchase the cash that would be located in the stores following closing, as well as $35 million in cash and other good and valuable consideration, all of which supported allowance of ESL's $2.4 billion secured claim and ESL's right to credit bid.  *Id.* ¶ 20.

After around-the-clock negotiation sessions, the Debtors ultimately determined that ESL's bid "offer[ed] greater financial benefit to the Debtors than a wind-down."  Carr Decl. ¶ 30.  ESL's final bid was accepted, as reflected in the APA, which was executed January 17, 2019.  *Id.* ¶ 22.  As described in the Common Memorandum, the Court approved the Sale Transaction and entered the Sale Order on February 8, 2019, concluding that the going concern sale made "good business sense."  *See* Hr'g Tr. 216:7-25; 245:13-14, Feb. 7, 2019.  At the Sale Hearing, the Court also condoned the sale process, finding that the "record [was] crystal clear" that the Committee and Subcommittee:  (a) "actually had control of the Debtors with respect to the sale process"; (b) were "truly independent, as evidenced by, among other things, their rejection of numerous proposals by ESL and heated and lengthy negotiations with ESL"; (c) "were well and thoroughly advised by independent professionals"; and (d) had maintained a proper focus on whether the proposed transaction represented the highest or best available to the Debtors.  *Id.* 226:6-19.  The ESL bid, which was negotiated and ultimately chosen by an "active and informed" Committee and Subcommittee, maximized the value of the estates, minimized the risk of administrative insolvency, preserved the Debtors' right to pursue claims, and ensured maximum recovery for all of the Debtors' creditors.  *See id.* 226:19-23.

## C.    The Benefits of the Going Concern Sale

From the day they filed, the Debtors understood that the continuation of Sears as a going concern would benefit many parties other than ESL or the other Second Lien Parties.  In their early filings, the Debtors stated their intention to achieve "[a] successful sale of [Sears's] viable stores as a going concern" in an effort to not only "save Sears and Kmart, but also the jobs of

8

tens of thousands of employees that depend on the continued operation of the Debtors' stores."
*Debtors' Motion for Approval of Global Bidding Procedures* ¶ 1, ECF No. 429.

The Debtors also recognized that liquidation would reduce the potential value to the

estate as a whole when compared with a going concern sale. William Transier, one of the two

independent directors, testified that a wind-down would make it "very difficult to get market

clearing prices" for Sears' valuable real estate. Hr'g Tr. 99:7-14, Feb. 4, 2019 (testimony of

William Transier). Further, Mr. Transier noted that "compared to a wind-down, a going concern

sale . . . would: (i) present the opportunity to preserve tens of thousands of jobs; (ii) preserve the

ongoing business relationship with a multitude of vendors; (iii) provide greater recovery for

unsecured creditors due to the assumption of certain cure amounts, 503(b)(9) claims, and

protection agreements; and (iv) provide significant, additional value in excess of a wind-down to

secured creditors." *Declaration of William L. Transier* ¶ 34, ECF No. 2341.

The Subcommittee ultimately determined that the sale of Sears as a going concern

"offer[ed] a greater financial benefit to the Debtors than a wind-down of the Debtors' business,"

Carr Decl. ¶ 30, including unsecured creditors who otherwise "would not get paid in a

winddown," who stood to recover under ESL's bid, Hr'g Tr. 69:8-11, Feb. 7, 2019 (P. Basta

speaking). According to Alan Carr, an independent director, ESL's going concern bid provided

benefits to a myriad of stakeholders including: non-ESL Second Lien creditors, who received an

additional $152 million; prepetition unsecured creditors, who received an additional $534

million; non-insider creditors, who would recover nearly all the proceeds of the Debtors'

preserved litigation claims; and employees, 45,000 of whom were extended offers of

employment. The Debtors also received an additional $35 million in cash in exchange for their

limited release of claims against ESL and up to an aggregate $621 million benefit based on material administrative claims that may be assumed by ESL.  Carr Decl. ¶ 31.

### D. Preserving Section 507(b) Claims Was a Recognized and Important Part of the Bargain

An essential element of the deal, as embodied in the APA, was the allowance of ESL's claims in the amounts set forth on Exhibit G to the APA and the preservation of ESL's right to pursue Section 507(b) Claims.  *See* APA § 9.13(c).  As part of the overall bargain, ESL agreed against its own clear interests to allow the Debtors to retain the ability to pursue fraudulent conveyance claims and certain other claims against ESL and Mr. Lampert in the future.[9]  ESL also agreed that its allowed Section 507(b) Claims could not recover from any proceeds of certain causes of action, and also agreed to limit its ability to recover proceeds from certain other litigation claims pursued by the Debtors to $50 million.  *See id.*  ESL did not agree to restrict its Section 507(b) Claims' recoveries in any other way.

Transcripts from the Auction reflect that ESL's Section 507(b) Claims were heavily discussed in the auction proceedings.  *See, e.g.*, Auction Tr. 30:3-4, Jan. 14, 2019; Auction Tr. 61:9-13, 74:3-75:4, 76:10-18, Jan. 15, 2019.  In the early morning of January 16, 2019, after full-day negotiations, ESL and the Debtors reported revised terms, including that:

> ESL would retain its deficiency in 507(b) claims subject to certain limitations . . . to waive recovery on account of Section 507(b) claims [and deficiency claims, per a subsequent correction] from the proceeds of litigation related to Seritage, Lands End or other transactions involving intentional misconduct by ESL.  And ESL's recovery on account of 507(b) claims from the proceeds of other litigation would be capped at 50 million dollars.

Auction Tr. 74:4-16, Jan. 15, 2019 (S. O'Neal speaking).  Shortly thereafter, the Debtors selected ESL's offer.  *Id.* 76:20-77:5.

---

[9]      For the avoidance of doubt, ESL does not believe that any of these claims has merit.

## ARGUMENT

I.   **THE DEBTORS' EXPENDITURES PURSUANT TO THEIR DECISION TO
     PURSUE A GOING CONCERN SALE WERE NOT PRIMARILY FOR ESL'S
     BENEFIT**

ESL's "insider" status has engendered far from favorable treatment by all parties to this

proceeding.  Prior to the bankruptcy filing, on October 10, 2018, the Debtors formed the

independent Committee and Subcommittee, tasked with pursuing and obtaining the "highest or

best" offer for the Debtors' assets.  The Committee was not intended to benefit ESL, but rather to

evaluate what options for a going concern sale or potential restructuring it "deemed . . . to be in

the best interests of Sears."  Carr Decl. ¶ 6.  Moreover, the Subcommittee's role was, and

continues to be, directly adverse to ESL.  The Subcommittee was created to investigate potential

causes of action with respect to related-party transactions, including, necessarily, transactions

involving ESL.  *Id.* ¶ 7.  Working with independent counsel and financial advisors, the

Committee and Subcommittee reviewed millions of pages of documents and conducted eleven

on-the-record interviews, including of Mr. Lampert.  This costly investigation was done to

maximize recovery for the Debtors' estates, *see id.* ¶ 34, and not to benefit ESL.

In the months following their filing, the Debtors worked diligently with their outside

advisors to pursue going concern bids, with the goal of benefitting the estates.  *See* Aebersold

Decl. ¶ 38 ("The Sale and Restructuring Process required a significant amount of time and

resources focused on maximizing the Debtors' value for the benefit of all stakeholders.").  To

their disappointment, the Debtors failed to attract going concern bids besides ESL's.  *See id.*

¶¶ 17, 27.  And though ESL repeatedly improved its going concern bid, making concessions to

Debtors and assuming more liabilities by the day, the Debtors rejected ESL's offer until the last

hours of the last day of the Auction.  *See* Auction Tr. 76:19–77:12, Jan. 15, 2019 ("[T]he

restructuring committee has decided to accept the ESL offer as a higher or better offer . . . .
[T]his is not an easy decision for the restructuring committee.").

The Debtors' ultimate decision to accept ESL's going concern bid was the result of arms-
length negotiations, culminating in ESL's providing a cash payment of $885 million, credit-
bidding secured facilities totaling $1.3 billion, assuming $621 million of secured debt, and
assuming significant amounts of the Debtors' administrative liabilities.  Aebersold Decl. ¶ 37.
ESL also offered employment to tens of thousands of Debtors' employees.  *Id.*  As described in
the Common Memorandum, ESL's winning bid provided the Debtors with $5.2 billion in
aggregate value while preserving the estates' ability to seek significant litigation recoveries from
ESL, to the benefit of unsecured creditors and to ESL's detriment.  *See also Debtors' Omnibus
Reply in Support of the Going Concern Sale Transaction* ¶ 6, ECF No. 2328.  Only after months
of negotiation, including a contentious auction, did the Debtors concede that ESL's offer
represented the highest or best chance to maximize value for all of the Debtors' creditors.

Moreover, that ESL ultimately submitted the winning bid does not mean that the Debtors
intended ESL to be the primary beneficiary of that transaction, or even that ESL *was* the primary
beneficiary of that transaction.  When the Unsecured Creditors Committee stated on the record at
the Sale Hearing that the principal beneficiary of the going concern transaction was ESL, the
Court responded, "I guess that has some appeal to people who don't understand bankruptcy law.
. . . [I]t's true they are the beneficiary in the sense that they're being allowed to exercise a right
that the [S]upreme [C]ourt said they have unless the bankruptcy court says they don't for cause."
Hr'g Tr. 130:16–131:2, Feb. 7, 2019 (Drain, J. speaking).

As this Court's comments suggest, it is plainly not appropriate to saddle a secured party's
right to credit bid under Section 363(k) with the administrative expenses incurred prior to such a

sale taking place.  Not only does Section 363(k) not authorize such a charge, but this position

would undermine the protections granted to secured creditors under Section 363(k).  "Congress

has provided the credit bid mechanism as insurance for secured creditors to protect against an

undervaluation of assets sold."  *In re Phila. Newspapers, LLC*, 599 F.3d 298, 332 (3d Cir. 2010),

*as amended* (May 7, 2010) (Ambro, J., dissenting).[10]  A credit bid is "treated as cash at an

auction," and "reduces the secured creditor's claim on a dollar for dollar basis."  *In re GSC, Inc.*,

453 B.R. 132, 178-79 (Bankr. S.D.N.Y. 2011); *see also Tennenbaum Cap. Partners LLC v.

Kennedy*, 372 F. App'x 180, (2d Cir. 2010) (rejecting contention that creditor's purchase of

debtor's assets through credit bid of two tranches of debt "somehow acquitted" debtor of its

obligations with respect to unbid third tranche held by same creditor).  Credit bidding also

benefits debtors in that "every additional dollar of value realized by sale of the collateral is one

less dollar that needs to come out of the rest of the bankruptcy estate."  *Phila. Newspapers,* 599

F.3d at 333 (Ambro, J., dissenting).  If Congress intended for the narrow exception in Section

506(c) to override the protections granted to secured creditors in Section 363(k) by permitting

debtors to charge the entire cost of running the estates to a secured creditor that exercised its

statutory rights to credit bid, it would have drafted Sections 506(c) and 363(k) to explicitly

provide for that.  *See United States v. Ron Pair Enters., Inc*., 489 U.S. 235, 240-41 (1989)

("Congress worked on the formulation of the Code for nearly a decade . . . as long as the

statutory scheme is coherent and consistent, there generally is no need for a court to inquire

---

[10]      Congress likewise codified a secured creditor's right to credit bid in connection with a cramdown plan
under Section 1129(b)(2)(A).  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012)
(overruling majority decision in *Philadelphia Newspapers*).  Moreover, "[b]y enabling a creditor to bid up to the
face amount of his claim in a bankruptcy sale, credit bidding assures merely that the creditor need not pay himself
cash for his own property."  Vincent S. J. Buccola & Ashley C. Keller, *Credit Bidding and the Design of Bankruptcy
Auctions*, 18 Geo. Mason L. Rev. 99, 103 (2010) (discussing economic benefits of credit bids).

beyond the plain language of the statute."); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (rejecting interpretation of Section 506(c) contrary to the plain text of statute).

The Debtors' agenda was always to create value for unsecured creditors in the form of potential litigation recoveries by investigating the basis for any such claims and by satisfying the claims of other creditors with a priority claim to any such recoveries.  All of the estates' expenditures were dedicated to this agenda.  ESL was the target of the Subcommittee's investigation and cooperated by producing thousands of pages of documents and making its two most senior executives available for full-day interviews.  That none of this was done to benefit ESL in its capacity as a Second Lien Party was confirmed by the Debtors' insistence as part of the sale process that ESL abandon any rights to participate in any value recovered as a result of its investigations and litigation against ESL.

To the extent ESL benefitted from the going concern sale, it did so incidentally and alongside the other Second Lien creditors, who stood to receive an additional $152 million in value from the credit bid.  Carr Decl. ¶ 31.  Other parties benefitted as well:  Prepetition unsecured creditors received an additional $534 million; non-insider creditors would benefit from nearly all proceeds of the Debtors' preserved litigation claims; and 45,000 employees received offers of employment.  *Id.*  The Debtors also received an additional $35 million in exchange for the limited release of claims against ESL and ESL's assumption of a significant portion of the Debtors' material administrative claims.  *Id.*  Moreover, as explained below, ESL ultimately would have recovered more for its secured claims in a first-day liquidation.

## II.    ESL DID NOT CONSENT TO A SECTION 506(C) SURCHARGE AND NO CASE HAS BEEN MADE JUSTIFYING ANY SUCH SURCHARGE

The Debtors have not met, and will not meet, their burden of presenting evidence sufficient to demonstrate that they are entitled to a nearly $1.5 billion surcharge.  Section 506(c)'s exception is "extraordinary," *Sw. Sec. FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 695 (5th Cir. 2015), and applies only to allow fees payable from a specific creditor's collateral "for services which were for the benefit of [*that particular creditor*] rather than the debtor or other creditors," *Gen. Elec. Credit Corp. v. Levin (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73, 75 (2d Cir. 1984).  As explained further in the Common Memorandum Section II, the Debtors have not demonstrated:  (1) "that the expenses were necessary," (2) "the amounts . . . expended were reasonable," and (3) "the expenses directly benefitted the secured creditor."  *First Servs. Grp., Inc. v. O'Connell ex rel. Ceron (In re Ceron)*, 412 B.R. 41, 51-52 (Bankr. E.D.N.Y. 2009).

*First*, as set forth in great detail above, the Debtors will fail to demonstrate that either ESL or the Second Lien debt were the primary beneficiary of the Sale Transaction.  Also as set forth above, Section 506(c) does not permit the Debtors to charge ESL with the entire cost of running the estates for the course of this bankruptcy proceeding simply because ESL submitted the winning bid.

*Second*, the evidence will also show that ESL actually did not benefit at all from the Sale Transaction, as it would have likely achieved a higher recovery in a first-day liquidation scenario.  *See* Schulte Rep., Section IV.  On the Petition Date, the Second Lien Parties were oversecured in an amount of $242.7 million.  *See id.*, Section III.D.  Accordingly, had Sears chosen a first-day liquidation, there would have been a meaningful Second Lien recovery even after taking into account the costs associated with liquidating that collateral.  *See id.*, Section IV.

15

*Third*, as explained in the Common Memorandum Section II, the Debtors have utterly failed to justify sufficiently and itemize their proposed surcharge.  Moreover, as explained further in the Schulte Report, the Debtors' Section 506(c) fee calculations suffer from two fundamental methodological errors.  *First*, the Debtors ignore that the inventory collateral was sold at a profitable margin, and that these profits cover the expenses associated with that collateral.  By ignoring the profits and charging expenses against the cost basis of the Second Lien collateral, the Debtors essentially "double-count" and burden the Second Lien Collateral with the same expenses twice.  *See* Schulte Rep., Section VII.A.  *Second*, the Debtors' expert seeks to charge the Second Lien Parties with more costs than were actually incurred in operating the estates.  *Id.*, Section VII.B.

## III.    ESL'S SECTION 507(B) CLAIMS ARE NOT "CAPPED," BUT ITS ACCESS TO CERTAIN POTENTIAL SOURCES OF LITIGATION RECOVERIES TO SATISFY SUCH CLAIMS IS LIMITED

The Debtors' Motion inaccurately describes the sources of recovery available to ESL's Section 507(b) Claims by asserting, contrary to the plain text of the APA, that ESL's total recoveries for its Section 507(b) Claims are capped at $50 million.  Delaware law governs the APA[11] and "Delaware law adheres to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (citation omitted).  When a "contract is clear and unambiguous," the court "will give effect to the plain-meaning of the contract's terms and provisions," *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010), with "priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions," *Salamone*, 106 A.3d at 368

---

[11]    *See* APA § 13.8(a).

(internal quotation marks and citation omitted).  "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."  *Id.* (quoting *GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

The plain text of the APA is clear and controlling here.  If the sophisticated parties in this proceeding had intended simply to cap any ESL Section 507(b) Claims at $50 million, they would have plainly said so.  They did not.  Section 9.13(c) of the APA grants ESL the right to assert "Claims and causes of actions that it may have against the Debtors and their estates in the Chapter 11 Cases," including "Claims arising under Section 507(b) of the Bankruptcy Code."  Modifying clauses provide a few limited exceptions.  First, clause (i) provides a limited carve-out for the proceeds of litigation claims against ESL and its affiliates (the "Specified Causes of Action"):

> [N]o Claims or causes of action of ESL shall have recourse to, or any other right of recovery from, any Claims or causes of action of the Debtors or their estates related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, the "Transaction" (as that term is defined in the registration statement on Form S- 11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), any Claim or cause of action involving any intentional misconduct by ESL, or the proceeds of any of the foregoing[.]

*Id.*  Next, clause (ii) provides that:

> [A]ny ESL Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of not more than $50 million from the proceeds of any Claims or causes of action of the Debtors or their estates other than the Claims and causes of action described in the preceding clause.

*Id.*  Taken together, ESL's recoveries for its allowed Section 507(b) Claims are limited in two separate ways.  *First*, ESL cannot recover the proceeds of any distributions to the estates from the Specified Causes of Action—i.e., Debtors' claims against ESL itself.  *Second*, ESL's

recoveries from the proceeds from *other* causes of action held by Debtors—the non-ESL litigation—are limited to a $50 million cap (the "Cap").  While ESL acknowledges that it agreed to forfeit recoveries from the Specified Causes of Action and to establish an upper limit of priority recoveries from the other causes of action, ESL never agreed to any other differing treatment of its Section 507(b) Claims to the extent there are other estate assets to which its claims might attach.

Contrary to the Debtors' assertions, clause (ii) does not limit ESL's rights to proceeds from other assets of the estates.  *First*, while the Debtors attempt to read modifiers like "exclusive" or "only" into clause (ii), there is no such language in that clause.  The Debtors could have added such language if that was their intent in drafting that clause, but they failed to do so.  *See Pac. Ins. Co. v. Liberty Mut. Ins. Co.,* 956 A.2d 1246, 1259 n.53 (Del. 2008) ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not.") (citation omitted)).  *Second*, the Debtors' interpretation of clause (ii) renders the second half of the clause superfluous, in violation of the rule that courts must "give each provision and term effect, so as not to render any part of the contract mere surplusage."  *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) (citations omitted).  If the Cap were intended to apply to assets other than the Specified Causes of Action, there would have been no reason to include the language "from the proceeds of any Claims or other causes of action of the Debtors or their estates" qualifying the agreed-upon Cap.

*Third*, ESL's interpretation of clause (ii) simply makes the most sense in the context of this bankruptcy proceeding and the Sale Transaction in particular.  *See Aleynikov v. Goldman Sachs Group, Inc.*, 765 F.3d 350, 362 (3d Cir. 2014) ("In looking at extrinsic evidence to

interpret an ambiguous contractual provision, 'a court may consider evidence of prior

agreements and communications of the parties as well as trade usage or course of dealing.'"

(quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997))).

Litigation claims are commonly viewed as special assets for unsecured creditors.  ESL agreed as

part of the hard bargain the Debtors struck in connection with the APA that it would cap its

recovery to that specific category of claims in order to preserve the ability of unsecured creditors

to recover from the estates.  But ESL did not agree to cap its recoveries for its Section 507(b)

Claims with respect to *all other assets of the estates*.[12]

     *Finally*, the Debtors' own contemporaneous statements during the drafting of the APA

support ESL's interpretation of clause (ii).  At the Auction on January 15, 2019, the Debtor's

counsel emphasized that "even after the purchase of all these assets, there was no[] waiver of

507(b) claim and other claims in the estate after the purchasing the assets," which he explained

would leave ESL "with very significant claims that . . . would still threaten to take recoveries."

Auction Tr. 61:9-17, Jan. 15, 2019.  If the Debtors' counsel understood the Cap to limit all of

ESL's Section 507(b) recoveries to $50 million total, he would likely have described them

differently.  Moreover, ESL's counsel stated during the auction proceeding his understanding

that "ESL's recovery on account of 507(b) claims from the proceeds of other litigation would be

capped at 50 million dollars," *Id.* at 74:4-25, and the Debtors' counsel did not object or claim the

Cap applied more broadly.  In short, there is no indication that any party during negotiations

understood the APA to cap all of ESL's potential recoveries for its Section 507(b) Claims at $50

million.

---

[12]     Of course there is no cap at all with respect to ESL's rights to its replacement lien collateral.

## CONCLUSION

For the reasons set forth above and in the Schulte Report, ESL respectfully requests that the Court determine its Section 507(b) Claims in the amount of $509,675,975.22, and its secured claim in an amount to be determined at the hearing, deny the Debtors' request for a Section 506(c) surcharge, order a transfer of $60 million from the Winddown Account, rule that Section 9.13 of the APA does not restrict the total recoveries available to ESL's Section 507(b) Claims from all sources to $50 million, and grant other such relief as it deems just and proper.

Dated:  New York, New York
June 18, 2019

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:  */s/ Thomas J. Moloney*
Thomas J. Moloney
Sean A. O'Neal
Andrew Weaver
Katherine R. Lynch
Chelsey Rosenbloom

*Attorneys for ESL*
One Liberty Plaza
New York, NY 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999