**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------X
                                                          :
In re:                                                    :      Chapter 11
                                                          :
SEARS HOLDINGS CORPORATION, et al.,[1]                    :
                                                          :      Case No. 18-23538-rdd
                  Debtors.                                :
                                                          :      (Jointly Administered)
                                                          :
----------------------------------------------------------X
```

**DECLARATION OF KATHERINE R. LYNCH IN ON BEHALF OF ESL
INVESTMENTS, INC. IN SUPPORT OF THE SECOND LIEN PARTIES' REQUESTS
TO DETERMINE THE AMOUNT OF THEIR SECOND LIEN SECURED CLAIMS
UNDER SECTION 506(a) AND THEIR SECTION 507(b) ADMINISTRATIVE CLAIMS
PURSUANT TO BANKRUPTCY RULE 3012; AND IN OPPOSITION TO DEBTORS'
MOTION TO SURCHARGE THEIR COLLATERAL PURSUANT TO SECTION 506(c)**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, LLC (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

I, Katherine R. Lynch, declare under penalty of perjury as follows:

1.    I am an attorney duly admitted to practice before this Court, and an associate of the law firm Cleary Gottlieb Steen & Hamilton LLP, counsel for ESL Investments, Inc. and certain of its affiliated entities (including JPP, LLC and JPP II, LLC (collectively, "ESL")).

2.    I respectfully submit this declaration in order to provide for the convenience of the Court relevant excerpts of the documents cited in the Common Memorandum of Law filed contemporaneously herewith on behalf of Wilmington Trust National Association ("Wilmington Trust"), as Indenture Trustee and Collateral Agent; Cyrus Capital Partners, L.P. ("Cyrus"); and ESL; (collectively, the "Second Lien Parties); and the Supplemental Memorandum of Law filed herewith on behalf of ESL: (A) In Support of Their Requests to Determine the Amount of Their Second Lien Secured Claims Under Section 506(a) and Their Section 506(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) in Opposition to the Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c).

3.    Attached hereto as Exhibit 1 is a true and correct excerpt of the Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York, dated October 15, 2018, ECF No. 3.

4.    Attached hereto as Exhibit 2 is a true and correct excerpt of Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing, dated October 15, 2018, ECF No. 7.

5.    Attached hereto as Exhibit 3 is a true and correct excerpt of the Declaration of Mohsin Y. Meghji in Support of Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties

and (D) Schedule Second Interim Hearing and Final Hearing, dated October 15, 2018, ECF

No. 10.

6.        Attached hereto as <u>Exhibit 4</u> is a true and correct excerpt of the October 15, 2018

Hearing Transcript.

7.        Attached hereto as <u>Exhibit 5</u> is a true and correct excerpt of the Interim Order

(I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured

Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash

Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying

the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief, dated

October 16, 2018, ECF No. 101.

8.        Attached hereto as <u>Exhibit 6</u> is a true and correct excerpt of the Debtors' Motion

for Approval of Global Bidding Procedures, dated November 1, 2018, ECF No. 429.

9.        Attached hereto as <u>Exhibit 7</u> is a true and correct expert of the November 15,

2018 Hearing Transcript.

10.       Attached hereto as <u>Exhibit 8</u> is a true and correct excerpt of the Final Order

(I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured

Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash

Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying

the Automatic Stay; and (IV) Granting Related Relief, dated November 30, 2018, ECF No. 955.

11.       Attached hereto as <u>Exhibit 9</u> is a true and correct excerpt of the Final Junior DIP

Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured

Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic

Stay; and (III) Granting Related Relief, dated December 28, 2018, ECF No. 1436.

12.     Attached hereto as <u>Exhibit 10</u> is a true and correct excerpt of the January 8, 2019

Hearing Transcript.

13.     Attached hereto as <u>Exhibit 11</u> is a true and correct excerpt of the January 14, 2019

Auction Transcript.

14.     Attached hereto as <u>Exhibit 12</u> is a true and correct excerpt of the January 15, 2019

Auction Transcript.

15.     Attached hereto as <u>Exhibit 13</u> is a true and correct excerpt of the Notice of

Successful Bidder and Sale Hearing, dated January 18, 2019, ECF No. 1730.

16.     Attached hereto as <u>Exhibit 14</u> is a true and correct copy of the Declaration of Alan

J. Carr in Support of Restructuring Subcommittee's Response to the Objection of the Official

Committee of Unsecured Creditors to the Sale of Substantially All of the Debtors' Assets to ESL

Investments, Inc., dated February 1, 2019, ECF No. 2321.

17.     Attached hereto as <u>Exhibit 15</u> is a true and correct excerpt of Debtors' Omnibus

Reply in Support of the Going Concern Sale Transaction, dated February 1, 2019, ECF

No. 2328.

18.     Attached hereto as <u>Exhibit 16</u> is a true and correct excerpt of the Declaration of

Brandon Aebersold, dated February 1, 2019, ECF No. 2335.

19.     Attached hereto as <u>Exhibit 17</u> is a true and correct excerpt of the Declaration of

William L. Transier, dated February 1, 2019, ECF No. 2341.

20.    Attached hereto as <u>Exhibit 18</u> is a true and correct excerpt of the Declaration of

Kunal S. Kamlani in Support of ESL's Omnibus Response in Support of the Going Concern Sale

Transaction, dated February 1, 2019, ECF No. 2356.

21.    Attached hereto as <u>Exhibit 19</u> is a true and correct excerpt of the February 4, 2019

Hearing Transcript.

22.    Attached hereto as <u>Exhibit 20</u> is a true and correct excerpt of the February 7, 2019

Hearing Transcript.

23.    Attached hereto as <u>Exhibit 21</u> is a true and correct excerpt of the Order

(I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the

Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and

Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory

Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief, dated February

8, 2019, ECF No. 2507.

24.    Attached hereto as <u>Exhibit 22</u> are true and correct excerpts of the Asset Purchase

Agreement filed as Exhibit B to the Sale Order, Amendment No. 1 to the Asset Purchase

Agreement filed as Exhibit E to the Notice of Filing Executed (I) Employee Lease Agreement,

(II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement, ECF No.

2599, and the amended Exhibit G to the Asset Purchase Agreement.

25.    Attached hereto as <u>Exhibit 23</u> is a true and correct excerpt of the Joinder of Cyrus

Capital Partners, L.P. to Motion of Wilmington Trust, National Association, as Indenture Trustee

and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including

Cash Collateral, dated April 11, 2019, ECF No. 3142.

26.    Attached hereto as <u>Exhibit 24</u> is a true and correct excerpt of the Proposed Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims, dated June 2, 2019, ECF No. 4102.

27.    Attached hereto as <u>Exhibit 25</u> is a true and correct excerpt of the Proposed Stipulation and Order Concerning Debtors' Continuing Use of Cash Collateral, dated June 7, 2019, and Exhibit A thereto, ECF No. 4155.

Executed on June 18, 2019 in New York, New York.

Respectfully submitted,

*/s/ Katherine R. Lynch*
Katherine R. Lynch

# Exhibit 1

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
In re                                  :
                                       :          Chapter 11
SEARS HOLDINGS CORPORATION, et al.,    :
                                       :          Case No. 18-[_____] (RDD)
                                       :
           Debtors.¹                   :          (Joint Administration Requested)
-------------------------------------------------------------x
```

## DECLARATION OF ROBERT A. RIECKER
## PURSUANT TO RULE 1007-2 OF LOCAL BANKRUPTCY
## RULES FOR SOUTHERN DISTRICT OF NEW YORK

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

store base, which would be a right-sized version of the Company that would be operated as a going concern.  Additionally, the Debtors expect to market and sell certain of the Company's non-core assets, such as intellectual property and specialty businesses, to help finance the Chapter 11 Cases and maximize value.  The Debtors have moved those discussions within the confines of the Chapter 11 Cases to provide all of the Company's stakeholders, as well as the Court, with the opportunity to evaluate the wisdom of those transactions.  Unfortunately, the Debtors must close 142 stores that operate at significant losses at the outset of these Chapter 11 Cases and conduct going-out-of-business sales with respect to those stores as efficiently as possible to access much-needed liquidity, eliminate the associated cash burn, and take advantage of the winter holiday season.  As these Chapter 11 Cases progress, the Debtors will continue to evaluate their remaining stores.

16.    Time is of the essence in these Chapter 11 Cases.  The Debtors currently burn a significant amount of cash—approximately $125 million per month—in the course of operating their business.  This burn rate is due, at least in part, to the discrepancy between the Company's operational capacity, which can support a business of the Company's previous size, and the Company's current, reduced footprint that has resulted from its ongoing store closure initiative.  The Debtors hope that this imbalance will be corrected through the purchase of the Company's viable stores, but in the meantime, these Chapter 11 Cases must progress with all due speed to stem these substantial operating losses that will continue to decrease the value of the Debtors' estates.  Thus, the Debtors intend to file a chapter 11 plan shortly after the date hereof in an effort to exit chapter 11 as quickly as possible.

17.    These Chapter 11 Cases present an opportunity for Sears to once again transform its business and to position itself for success in the twenty-first century.  The Debtors

9

hope that the Company will emerge from these Chapter 11 Cases, whether pursuant to a chapter 11 plan of reorganization or a successful sale process, as a streamlined—and profitable—version of itself.  To succeed, however, the Debtors need the cooperation of their stakeholders to reach agreement on a chapter 11 plan and to exit chapter 11 as quickly and efficiently as possible, thereby minimizing both the negative impact on the Debtors' business and the costs of administering these Chapter 11 Cases.

18.     Without stakeholder cooperation and support, a reorganization simply is not possible.  Throughout these Chapter 11 Cases, therefore, the following question should remain at the forefront of every stakeholder's mind:  Will Sears be relegated to the dustbin of history, and will 68,000 Americans lose their jobs, or will Sears enter the next chapter of its life as an iconic American company, enduring yet another shift in the retail landscape?  The answer to such question lies in the level of support and cooperation that the Debtors receive from each of their stakeholders—lenders, counterparties, vendors, and employees—during these Chapter 11 Cases.

## II.
## The Company's Business

### A.     The Company's History

19.     In 1886, Richard W. Sears, a railroad station agent, purchased an unwanted collection of watches from a local jeweler in Minneapolis, Minnesota, and began reselling those watches to his coworkers.  Finding modest success selling watches, Richard W. Sears founded R.W. Sears Watch Co. and moved to Chicago, Illinois, where he partnered with watchmaker Alvah C. Roebuck.  The two men founded a new business:  Sears, Roebuck and Co.

10

18-23538-rdd    Doc 3275    Filed 10/15/18    Entered 10/15/18 08:31:05    Main Document
Pg 19 of 278

## III.
## Corporate and Capital Structure

### A.    Corporate Structure

31.    Sears Holdings was formed in 2004 as a Delaware corporation in connection with the Sears-Kmart Merger and serves as the Company's parent entity.  Sears Holdings' principal place of business is in Hoffman Estates, Illinois.  All of the Debtors are direct or indirect subsidiaries of Sears Holdings.  A chart illustrating the Company's capital and corporate organization structure, as of the date hereof, is annexed hereto as **Exhibit A**.

32.    Sears Holdings' Board is composed of eight (8) members, including five (5) independent directors:  (i) Edward S. Lampert, Chairman; (ii) Alan J. Carr (independent); (iii) Paul G. DePodesta (independent); (iv) Kunal S. Kamlani; (v) William C. Kunkler, III (independent); (vi) Ann N. Reese (independent); (vii) Thomas J. Tisch; and (viii) William L. Transier (independent).  Sears Holdings' current senior management team includes (i) Robert A. Riecker, Chief Financial Officer; (ii) J. Mitchell Bowling, Chief Executive Officer, Sears Home Services; (iii) Leena Munjal, Chief Digital Officer; (iv) Robert J. "B.J." Naedele, Chief Commercial Officer, Shop Your Way; (v) Perry "Dean" Schwartz, President, Hardlines; and (vi) Stephen L. Sitley, General Counsel and Chief Compliance Officer.[5]

33.    Additional information regarding the Sears Holdings' senior management team is set forth in **Schedule 10** annexed hereto.

### B.    Prepetition Capital Structure

34.    As of the Commencement Date, the Debtors are indebted under the following facilities, as detailed below:  (i) First Lien Credit Facility; (ii) Stand-Alone L/C

---

[5] The directors, managers, and/or officers, as applicable, of the Debtors other than Sears Holdings vary, but such directors, managers, and/or officers, as applicable, generally are employees of the Company.

WEIL:\96149431\11\73219.0006

Facility; (iii) Second Lien Credit Facility; (iv) Second Lien PIK Notes; (v) Second Lien Notes;

(vi) IP/Ground Lease Term Loan; (vii) Consolidated Secured Loan Facility; (viii) Holdings

Unsecured PIK Notes; (ix) Holdings Unsecured Notes; (x) SRAC Unsecured PIK Notes; and

(xi) SRAC Unsecured Notes (each as defined herein).  Additionally, certain of the Debtors and

their non-Debtor affiliates have issued intercompany notes (the "**Intercompany Notes**"),

including KCD Asset-Backed Notes and SRAC Medium Term Notes (each as defined herein).

Further, certain non-Debtors are indebted under the Sparrow Term Loan and Sparrow

Mezzanine Term Loan.

| As of Commencement Date: Debt Facilities | | Principal Outstanding ($ millions) |
|---|---|---|
| Revolving Credit Facility | $ | 836.0 |
|     First Lien Letters of Credit | | 123.8 |
| First Lien Term Loan A | | -- |
| First Lien Term Loan B | | 570.8 |
| FILO Term Loan | | 125.0 |
|     Total First Lien Debt | $ | 1,655.6 |
| Stand-Alone L/C Facility | $ | 271.1 |
| Second Lien Term Loan | $ | 317.1 |
| Second Lien Line of Credit | | 525.0 |
|     Alternative Tranche Line of Credit Loans | | 45.0 |
| Second Lien PIK Notes | | 175.4 |
| Second Lien Notes | | 89.0 |
|     Total Second Lien Debt | $ | 1,151.5 |
| IP/Ground Lease Term Loan | | 231.2 |
| Consolidated Secured Note A | | 108.1 |
| Consolidated Secured Note B | | 723.3 |
|     Total Secured Loan Debt | $ | 1,062.6 |
| Holdings Unsecured PIK Notes | $ | 222.6 |
| Holdings Unsecured Notes | | 411.0 |
| SRAC Unsecured PIK Notes | | 107.9 |
| SRAC Unsecured Notes | | 185.6 |
|     Total Unsecured Debt | $ | 927.0 |
| **Total Funded Debt** | $ | **5,067.8** |
| **Intercompany Notes** | | |
| KCD Asset-Backed Notes | $ | 900.0 |
| SRAC Medium Term Notes | | 2,311.8 |
| **Total Intercompany Debt** | $ | **3,211.8** |
| **Sparrow Structure** | | |
| Sparrow Term Loan | $ | 111.0 |
| Sparrow Mezzanine Term Loan | | 513.2 |
| **Total Sparrow Structure Debt** | $ | **624.2** |

WEIL:\96149431\11\73219.0006

(i) *First Lien Credit Facility*.   Pursuant to that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**First Lien Credit Agreement**"), between, among others, Bank of America, N.A., as administrative agent, co-collateral agent and swing line lender, Wells Fargo Bank, National Association, as co-collateral agent, a syndicate of financial institutions and other institutional lenders (collectively, the "**First Lien Lenders**"), Sears Roebuck Acceptance Corp. ("**SRAC**") and Kmart Corporation ("**Kmart Corp.**"), as borrowers, and Sears Holdings, the First Lien Lenders have extended (a) an asset-based revolving credit facility with current commitments of $1.5 billion (including a letter of credit sublimit of up to $1 billion (the "**First Lien Letter of Credit**")), subject to a borrowing base formula, which matures on July 20, 2020 (the "**Revolving Credit Facility**"); (b) a term loan in an original principal amount of $1 billion, which has been repaid in full (the "**First Lien Term Loan A**"); (c) a term loan in an original principal amount of $750 million, which matures on July 20, 2020 (the "**First Lien Term Loan B**"); and (d) a "first-in, last-out" term loan in an original principal amount of $125 million, which matures on July 20, 2020 (the "**FILO Term Loan**" and, together with the Revolving Credit Facility, the First Lien Term Loan A  and the First Lien Term Loan B, collectively, the "**First Lien Credit Facility**").  The obligations of SRAC and Kmart Corp. under the First Lien Credit Facility are guaranteed by Sears Holdings, SRAC, Kmart Corp., and each domestic subsidiary of Sears Holdings that owns any credit card receivables, pharmacy receivables or inventory (collectively, together with Sears Holdings, SRAC and Kmart Corp., the "**First Lien Guarantors**") and secured by a lien on, among other things, the credit card receivables, pharmacy receivables, inventory, prescription lists, deposit accounts, and cash owned by the First Lien Guarantors (the "**First Lien Collateral**").  As of the Commencement

WEIL:\96149431\11\73219.0006

Date, SRAC, Kmart Corp. and the other First Lien Guarantors are liable to the First Lien Lenders

in the aggregate principal amount of approximately $1.656 billion in respect of loans and/or

advances made and letters of credit or letter of credit guaranties issued pursuant to the First Lien

Credit Agreement,[6] plus unliquidated amounts, including interest thereon and fees, expenses,

charges, and other obligations incurred in connection therewith as provided under the First Lien

Credit Agreement.

(ii)  *Stand-Alone L/C Facility*.    Pursuant to that certain Letter of Credit and

Reimbursement Agreement, dated as of December 28, 2016 (as amended, supplemented, or

otherwise modified prior to the date hereof, the "**Stand-Alone L/C Facility Agreement**"),

among SRAC and Kmart Corp., as borrowers, Sears Holdings, Citibank, N.A., as administrative

agent and issuing bank, and a syndicate of financial institutions (including JPP, LLC and JPP II,

LLC[7]), as L/C lenders (collectively, the "**Stand-Alone L/C Facility Lenders**"), the Stand-Alone

L/C Facility Lenders have provided the Company with approximately $271.1 million in letters of

credit, which mature on December 28, 2019 (the "**Stand-Alone L/C Facility**").    The letters of

credit issued under the Stand-Alone L/C Facility are posted to guarantee certain workers'

compensation insurance policies and other obligations.    The obligations of SRAC and Kmart

Corp. under the Stand-Alone L/C Facility are guaranteed by the First Lien Guarantors and

secured jointly and *pari passu* with the obligations under the First Lien Credit Facility by a lien

on the First Lien Collateral.    In any enforcement action with respect to the First Lien Collateral,

proceeds of First Lien Collateral are applied to repay obligations under the Stand-Alone L/C

Facility only after all obligations under the First Lien Credit Facility are repaid in full.    As of the

---

[6] ESL holds approximately $70.0 million of the outstanding principal amount due under the FILO Term Loan.

[7] JPP, LLC and JPP II, LLC are affiliates of ESL.

Commencement Date, SRAC, Kmart Corp., and the other First Lien Guarantors are liable to the Stand-Alone L/C Facility Lenders in the aggregate principal amount of up to approximately $271.1 million in respect of letters of credit or letter of credit guaranties issued pursuant to the Stand-Alone L/C Facility Agreement, plus unliquidated amounts including interest thereon and fees, expenses, charges, and other obligations incurred in connection therewith as provided under the Stand-Alone L/C Facility Agreement.[8]

(iii) *Second Lien Credit Facility*.   Pursuant to that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**Second Lien Credit Agreement**"), among Sears Holdings, SRAC and Kmart Corp., as borrowers, Sears Holdings, certain subsidiaries of Sears Holdings, as guarantors, JPP, LLC as administrative agent and collateral administrator, and certain financial institutions and other institutional lenders (including JPP, LLC and JPP II, LLC), as lenders (collectively, the "**Second Lien Credit Facility Lenders**"), the Second Lien Credit Facility Lenders have provided the Debtors with (i) a term loan in an original principal amount of $300 million, which matures on July 20, 2020 (the "**Second Lien Term Loan**"), (ii) a line of credit facility (the "**Second Lien Line of Credit**"), pursuant to which the Company may from time to time borrow line of credit loans, in the sole and absolute discretion of the applicable Second Lien Credit Facility Lenders, in an amount not to exceed $600 million at any time outstanding with maximum duration of 270 days and (iii) an alternative tranche line of credit loan in an initial principal amount of approximately $45.0 million, which matures on October 15, 2018 (the "**Alternative Tranche Line of Credit Loans**" and, together with the Second Lien Term Loan and the Second Lien Line of Credit, the "**Second Lien Credit Facility**").   The Company

---

[8] ESL has backstopped approximately $105.7 million of the letters of credit outstanding under the Stand-Alone L/C Facility Agreement.

WEIL:\96149431\11\73219.0006

incurred the Alternative Tranche Line of Credit Loan as a result of a transaction that occurred in July 2018, pursuant to which an unaffiliated third-party holder of Second Lien Notes tendered such notes in exchange for a like principal amount of Alternative Tranche Line of Credit Loans (the "**Alternative Tranche Exchange**"). The obligations of SRAC and Kmart Corp., as applicable, under the Second Lien Credit Facility are guaranteed by Sears Holdings, SRAC, Kmart Corp. and each domestic subsidiary of Sears Holdings that owns any credit card receivables or inventory (collectively, together with Sears Holdings, SRAC, and Kmart Corp., the "**Second Lien Guarantors**") and secured by a lien on, among other things, the credit card receivables and inventory owned by the Second Lien Guarantors (the "**Second Lien Collateral**"), which lien is junior in priority to the lien securing the First Lien Credit Facility and the Stand-Alone L/C Facility. The relative rights and priorities of the First Lien Credit Facility Lenders, the Second Lien Credit Facility Lenders, the holders of Second Lien PIK Notes (as defined herein), and the holders of Second Lien Notes (as defined herein) are set forth in that certain Second Amended and Restated Intercreditor Agreement, dated as of October 12, 2010 (as amended and restated on September 1, 2016 and as further amended and restated on March 20, 2018). The Second Lien Term Loan is convertible at the option of the applicable Second Lien Credit Facility Lenders or, under certain circumstances, Sears Holdings, into equity of Sears Holdings. Interest on the Second Lien Term Loan is payable, at the election of Sears Holdings, in whole or in part, in cash or by increasing the principal amount of the outstanding Second Lien Term Loan. As of the Commencement Date, Sears Holdings, SRAC, Kmart Corp., and the other Second Lien Guarantors are liable to the Second Lien Credit Facility Lenders in the aggregate principal amount of approximately $887.1 million in respect of advances, plus unliquidated

WEIL:\96149431\11\73219.0006

amounts including interest thereon and fees, expenses, charges, and other obligations incurred in

connection therewith as provided under the Second Lien Credit Agreement.[9]

        (iv) *Second Lien PIK Notes.* Pursuant to that certain Indenture, dated as of March

20, 2018 (as amended, supplemented, or otherwise modified prior to the date hereof, the

"**Second Lien PIK Notes Indenture**"), among Sears Holdings, certain subsidiaries of Sears

Holdings, as guarantors, and Computershare Trust Company, N.A. as trustee, Sears Holdings

issued 6 5/8% Senior Secured Convertible PIK Toggle Notes due 2019 (the "**Second Lien PIK**

**Notes**") in an original principal amount of approximately $169.8 million. Sears Holdings issued

the Second Lien PIK Notes as a result of an exchange transaction that occurred in March 2018

(the "**Second Lien Notes Exchange**"), pursuant to which certain holders of Second Lien Notes

tendered such notes in exchange for a like principal amount of Second Lien PIK Notes. The

effect of the Second Lien Notes Exchange was to eliminate the cash interest expense associated

with, and extend the maturity by one year on, the principal amount of Second Lien Notes that

were tendered, while granting to tendering holders and, under certain circumstances, Sears

Holdings, the right to convert Second Lien PIK Notes into equity of Sears Holdings. The Second

Lien PIK Notes mature on October 15, 2019, and interest thereon is payable semi-annually, at

the election of Sears Holdings, in whole or in part, in cash or by increasing the principal amount

of the outstanding Second Lien PIK Notes. Sears Holdings' obligations under the Second Lien

PIK Notes are guaranteed by the Second Lien Guarantors and secured jointly and *pari passu*

with the obligations under the Second Lien Credit Facility by a lien on the Second Lien

Collateral. As of the Commencement Date, the outstanding principal amount of the Second Lien

Notes was approximately $175.4 million, plus unliquidated amounts including interest thereon

---

[9] ESL holds approximately $819.6 million of the outstanding principal amount due under the Second Lien Credit Facility.

and fees, expenses, charges, and other obligations incurred in connection therewith as provided under the Second Lien PIK Notes Indenture.[10]

(v)  *Second Lien Notes*.  Pursuant to that certain Indenture, dated as of October 12, 2010 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**Second Lien Notes Indenture**"), among Sears Holdings, certain subsidiaries of Sears Holdings, as guarantors, and Wilmington Trust, National Association as successor trustee and collateral agent, Sears Holdings issued 6 5/8% Senior Secured Notes due 2018 (the "**Second Lien Notes**") in an original principal amount of $1.25 billion.  The Second Lien Notes mature on October 15, 2018, and interest thereon is payable in cash semi-annually.  Sears Holdings' obligations under the Second Lien Notes are guaranteed by the Second Lien Guarantors and secured jointly and *pari passu* with the obligations under the Second Lien Credit Facility and the Second Lien PIK Notes by a lien on the Second Lien Collateral.  In any enforcement action with respect to the Second Lien Collateral, proceeds of Second Lien Collateral are applied to repay obligations under the Second Lien Notes only after all obligations under each of the Second Lien Credit Facility and the Second Lien PIK Notes are repaid in full.  As of the Commencement Date, the outstanding principal amount of the Second Lien Notes was approximately $89.0 million, plus unliquidated amounts including interest thereon and fees, expenses, charges, and other obligations incurred in connection therewith as provided under the Second Lien Notes Indenture.

(vi) *IP/Ground Lease Term Loan*.  Pursuant to that certain Term Loan Credit Agreement, dated as of January 4, 2018 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**IP/Ground Lease Term Loan Agreement**"), between, among others,

---

[10] ESL holds approximately $20.7 million of the outstanding principal amount of Second Lien PIK Notes.

SRAC and Kmart Corp., as borrowers, Sears Holdings, certain subsidiaries of Sears Holdings, as

guarantors, JPP, LLC, as administrative agent and collateral administrator, and certain financial

institutions and other institutional lenders (including JPP, LLC and JPP II, LLC), as lenders

(collectively, the "**IP/Ground Lease Lenders**"), the IP/Ground Lease Lenders made a loan in an

original principal amount of $100 million (the "**IP/Ground Lease Term Loan Facility**"),[11]

secured by a lien on, among other things, substantially all of the unencumbered intellectual

property of Sears Holdings and its subsidiaries other than intellectual property relating to the

*Kenmore*® and *DieHard*® brands, as well as by certain real property interests, in each case

subject to certain exclusions.  The obligations of SRAC and Kmart Corp. under the IP/Ground

Lease Term Loan Facility are guaranteed by Sears Holdings and each domestic subsidiary of

Sears Holdings that is a First Lien Guarantor or owns certain material intellectual property

(collectively, the "**IP/Ground Lease Guarantors**").  The IP/Ground Lease Term Loan Facility

matures on July 20, 2020.  As of the Commencement Date, SRAC, Kmart Corp., and the other

IP/Ground Lease Guarantors are liable to the IP/Ground Lease Lenders in the aggregate amount

of approximately $231.2 million, in respect of outstanding principal amount, plus unliquidated

amounts including interest thereon and fees, expenses, charges, and other obligations incurred in

connection therewith as provided under the IP/Ground Lease Term Loan Agreement.[12]

       (vii)    *Consolidated Secured Loan Facility*.    Pursuant to that certain Third

Amended and Restated Loan Agreement, dated as of June 4, 2018 (as amended, supplemented,

or otherwise modified prior to the date hereof, the "**Consolidated Secured Loan Agreement**"),

---

[11] In January and February 2018, the IP/Ground Lease Lenders, in addition to certain unaffiliated lenders, made additional advances in the aggregate principal amount of approximately $150 million.

[12] ESL holds approximately $152.4 million of the outstanding principal amount due under the IP/Ground Lease Term Loan Agreement.

between, among others, Sears, Kmart Stores of Illinois LLC, Kmart of Washington LLC, Kmart Corp., SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, Maxserv, Inc., Troy Coolidge No. 13, LLC, Sears Development Co. and Big Beaver of Florida Development, LLC, as borrowers (collectively, the "**Consolidated Secured Loan Borrowers**"), Sears Holdings, as guarantor, JPP, LLC, as agent, and JPP, LLC, JPP II, LLC, and Cascade Investment, L.L.C., as lenders (collectively, the "**Consolidated Secured Loan Facility Lenders**"), the Consolidated Loan Facility Lenders consolidated certain outstanding loans and made additional advances in an aggregate original principal amount of approximately $779.1 million (the "**Consolidated Secured Loan Facility**"),[13] secured by a lien on, among other things, a portfolio of real estate assets. The obligations of the Consolidated Secured Loan Borrowers under the Consolidated Secured Loan Facility are guaranteed by Sears Holdings. The Consolidated Secured Loan Facility matures on July 20, 2020. As of the Commencement Date, the aggregate principal amount of the Consolidated Secured Loan Facility was approximately $831.4 million, including approximately $108.1 million structured as a "first out" tranche evidenced by promissory note "A" ("**Consolidated Secured Note A**"), which note is held by Cascade Investment, LLC, and approximately $723.3 million, evidenced by promissory note "B" ("**Consolidated Secured Note B**"), which note is held by JPP, LLC and JPP II, LLC.

(viii)    *Holdings Unsecured PIK Notes*. Pursuant to that certain Second Supplemental Indenture, dated as of March 20, 2018, to that certain Indenture, dated as of

---

[13] In September 2018, the Consolidated Secured Loan Facility Lenders made an additional advance in the aggregate principal amount of approximately $75 million. In consideration for such additional advance, the Consolidated Secured Loan Borrowers granted the Consolidated Secured Loan Facility Lenders a first priority lien on an additional 20 real properties. Certain of these real properties subsequently were released from the collateral securing the Consolidated Secured Loan Facility.

WEIL:\96149431\11\73219.0006

November 21, 2014 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**Holdings Unsecured Indenture**"), between Sears Holdings and Computershare Trust Company, N.A., as trustee, Sears Holdings issued 8% Senior Unsecured Notes Convertible PIK Notes due 2019 (the "**Holdings Unsecured PIK Notes**") in an original principal amount of approximately $214 million.  Sears Holdings issued the Holdings Unsecured PIK Notes as a result of an exchange transaction (the "**Holdings Unsecured Notes Exchange**"), pursuant to which certain holders of Holdings Unsecured Notes tendered such notes in exchange for a like principal amount of Holdings Unsecured PIK Notes.  The effect of the Holdings Unsecured Notes Exchange was to eliminate the cash interest expense associated with the principal amount of Holdings Unsecured Notes that were tendered, while granting to tendering holders and, under certain circumstances, Sears Holdings, the right to convert Holdings Unsecured PIK Notes into equity of Sears Holdings.  The Holdings Unsecured PIK Notes mature on December 15, 2019, and interest thereon is payable semi-annually, at the election of Sears Holdings, in whole or in part, in cash or by increasing the principal amount of the outstanding Holdings Unsecured PIK Notes.  As of the Commencement Date, the outstanding principal amount of the Holdings Unsecured PIK Notes was approximately $222.6 million, plus unliquidated amounts including interest thereon and fees, expenses, charges, and other obligations incurred in connection therewith as provided under the Holdings Unsecured Indenture.[14]

(ix) *Holdings Unsecured Notes.*  Pursuant to the First Supplemental Indenture, dated as of November 21, 2014, to the Holdings Unsecured Indenture, Sears Holdings issued 8% Senior Unsecured Notes due 2019 (the "**Holdings Unsecured Notes**") in an original principal amount of approximately $625 million.  The Holdings Unsecured Notes mature on December 15,

---

[14] ESL holds approximately $195.1 million of the outstanding principal amount of the Holdings Unsecured PIK Notes.

WEIL:\96149431\11\73219.0006

2019, and interest thereon is payable semi-annually.    As of the Commencement Date, the
outstanding principal amount of the Holdings Unsecured Notes was approximately $411.0
million, plus unliquidated amounts including interest thereon and fees, expenses, charges, and
other obligations incurred in connection therewith as provided under the Holdings Unsecured
Indenture.

          (x) *SRAC Unsecured PIK Notes*.    Pursuant to that certain Supplemental
Indenture, dated as of March 20, 2018, to the Indenture, dated as of May 15, 1995 (as amended,
supplemented, or otherwise modified prior to the date hereof, the "**1995 SRAC Indenture**"),
between SRAC and The Bank of New York Mellon Trust Company, N.A., as successor trustee,
SRAC issued 7% / 12% PIK-Toggle Notes due 2028 (the "**SRAC Unsecured PIK Notes**") in an
original principal amount of approximately $101.9 million.    SRAC issued the SRAC Unsecured
PIK Notes as a result of an exchange transaction (the "**SRAC Unsecured Notes Exchange**"),
pursuant to which certain holders of SRAC Unsecured Notes (as defined herein) tendered such
notes in exchange for a like principal amount of SRAC Unsecured PIK Notes.    The effect of the
SRAC Unsecured Notes Exchange was to eliminate the cash interest expense associated with the
principal amount of SRAC Unsecured Notes that were tendered.    The SRAC Unsecured PIK
Notes mature on March 31, 2028, and interest thereon is payable semi-annually, at the election of
SRAC, in whole or in part, in cash at a rate of 7.00% per annum or by increasing the principal
amount of the outstanding SRAC Unsecured PIK Notes at a rate of 12.00% per annum.    SRAC's
obligations under the SRAC Unsecured PIK Notes are guaranteed by certain subsidiaries of
Sears Holdings.    As of the Commencement Date, the outstanding principal amount of the SRAC
Unsecured PIK Notes was approximately $107.9 million plus unliquidated amounts including

WEIL:\96149431\11\73219.0006

interest thereon and fees, expenses, charges, and other obligations incurred in connection therewith as provided under the 1995 SRAC Indenture.

(xi) *SRAC Unsecured Notes*.    Pursuant to the 1995 SRAC Indenture and that certain Indenture, dated as of October 1, 2002 (as amended, supplemented or otherwise modified prior to the date hereof, the "**2002 SRAC Indenture**"), between SRAC and The Bank of New York Mellon Trust Company, N.A., as successor trustee, SRAC issued certain notes having various interest rates and maturities (the "**SRAC Unsecured Notes**").    As of the Commencement Date, the weighted interest rate of the outstanding SRAC Notes was 7.049%, and the outstanding principal amount of the SRAC Unsecured Notes was approximately $185.6 million, plus unliquidated amounts including interest thereon and fees, expenses, charges, and other obligations incurred in connection therewith as provided under the 2002 SRAC Indenture.

(xii)    *Trade Claims*.    In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations (the "**Trade Claims**") to various third-party providers of goods and services (the "**Trade Creditors**") that are sold in the Debtors' stores or facilitate the Debtors' business operations.    Certain of the Trade Claims (a) are entitled to statutory priority, including approximately $126.1 million pursuant to section 503(b)(9) of the Bankruptcy Code; (b) may give rise to shippers', warehousemen's, or mechanics' liens against the Debtors' property if unpaid; (c) may relate to funds held in trust by the Debtors that are not the property of the Debtors' estates; or (d) may be secured by letters of credit, security deposits, or rights of setoff (collectively, the "**Priority Trade Claims**").

(xiii)    *Intercompany Claims and Notes*.    Certain Debtors hold claims against other Debtors and/or non-Debtor affiliates, which claims primarily result from the normal functioning of the Company's centralized cash management system, as well as, in some cases,

31

the provision of intercompany services by one Company affiliate to another Company affiliate, such as, for example, administrative support services (the "**Intercompany Claims**"). Intercompany Claims are recorded in the Company's books and records. Additionally, certain of the Debtors and their non-Debtor affiliates have issued Intercompany Notes, including (x) KCD Asset-Backed Notes and (y) SRAC Medium Term Notes (each as defined herein).

        a.    *KCD Asset-Backed Notes*. Pursuant to that certain Indenture, dated as of May 18, 2006 (as amended, supplemented or otherwise modified prior to the date hereof, the "**KCD Indenture**"), between KCD IP, LLC ("**KCD**") and U.S. Bank, National Association, as trustee, KCD issued 6.90% KCD IP, LLC Asset-Backed Notes due 2019 (the "**KCD Asset-Backed Notes**") in the an original principal amount of $1.8 billion, secured by certain intellectual property related to *Kenmore®, DieHard®*, and *Craftsman®* brands. Pursuant to the Craftsman Transaction (as defined herein), in March 2017, the intellectual property related to the *Craftsman®* brand was released from the collateral securing the KCD Asset-Backed Notes, and $900 million principal amount of KCD Asset-Backed Notes were redeemed. The KCD Asset-Backed Notes mature on June 25, 2029, and interest thereon is payable monthly. Pursuant to the Indenture, the current rate of interest on the KCD Asset-Backed Notes is 7.60% per annum. As of the Commencement Date, the outstanding principal amount amount of the KCD Asset-Backed Notes was approximately $900 million, plus unliquidated amounts including interest thereon and fees, expenses, charges, and other obligations incurred in connection therewith as provided under the KCD Indenture. The KCD Asset-Backed Notes are held by Sears Reinsurance Company Ltd. ("**Sears Re**"), a non-Debtor affiliate of the Company.

        b.    *SRAC Medium Term Notes*. Pursuant to the 2002 SRAC Indenture, SRAC has issued certain intercompany unsecured notes of various interest rates and maturities

(the "**SRAC Medium Term Notes**").  All SRAC Medium Term Notes are held by affiliates of the Company.  As of the Commencement Date, the outstanding principal amount of the SRAC Medium Term Notes was approximately $2.3 billion, plus unliquidated amounts including interest thereon and fees, expenses, charges, and other obligations incurred in connection therewith as provided under the 2002 SRAC Indenture.  Approximately $1.4 billion in SRAC Medium Term Notes are held by Sears Re, a non-Debtor affiliate of the Company.

(xiv)   *Sparrow Structure*.

a.   *Sparrow Term Loan*.   Pursuant to that certain Term Loan Agreement, dated as of March 14, 2018 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**Sparrow Term Loan Agreement**"), among SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC, as borrowers (the "**Sparrow Borrowers**"), UBS AG, Stamford Branch, as administrative agent, and the lenders party thereto (the "**Sparrow Lenders**"), the Sparrow Lenders extended a term loan facility to the Company in an original principal amount of $200.0 million (the "**Sparrow Term Loan**"),[15] secured by, among other things, the Sparrow Borrowers' interests in 138 real properties (the "**Sparrow Properties**"). Sears Holdings and Sears have provided a limited guaranty of the Sparrow Borrowers' obligations under the Sparrow Term Loan.  The Sparrow Properties are subject to that certain Amended and Restated Master Lease Agreement dated as of March 14, 2018.  The Sparrow Term Loan matures on August 30, 2019.  As of the Commencement Date, the Sparrow Borrowers are liable to the Sparrow Lenders under the Sparrow Term Loan Agreement in the aggregate amount of approximately $110.0 million in respect of outstanding principal amount, plus unliquidated amounts including interest thereon and fees, expenses, charges, and other

---

[15] On August 31, 2018, the Sparrow Lenders made an additional advance of approximately $113 million.

WEIL:\96149431\11\73219.0006

obligations incurred in connection therewith as provided under the Sparrow Term Loan Agreement.

                b.     *Sparrow Mezzanine Term Loan.*  Pursuant to that certain Term Loan Agreement, dated as of March 14, 2018 (as amended, supplemented, or otherwise modified prior to the date hereof, the "**Sparrow Mezzanine Term Loan Agreement**"), among SRC Sparrow 2 LLC, as borrower (the "**Sparrow Mezzanine Borrower**"), JPP, LLC, as administrative agent, and the lenders party thereto (including JPP, LLC and JPP II, LLC) (collectively, the "**Sparrow Mezzanine Lenders**"), the Sparrow Mezzanine Lenders extended a term loan to the Company in an original principal amount of $240.0 million (the "**Sparrow Mezzanine Term Loan**").[16]  The Sparrow Mezzanine Term Loan is secured by a pledge of equity interests in SRC O.P. LLC, which is the parent company of the other Sparrow Borrowers. Sears Holdings and Sears have provided a limited guaranty of the Sparrow Mezzanine Borrower's obligations under the Sparrow Mezzanine Term Loan.  The Sparrow Mezzanine Term Loan matures on July 20, 2020.  As of the Commencement Date, the Sparrow Mezzanine Borrower is liable to the Sparrow Mezzanine Lenders in the aggregate amount of approximately $513.2 million, in respect of outstanding principal amount, plus unliquidated amounts including interest thereon and fees, expenses, charges, and other obligations incurred in connection therewith as provided under the Sparrow Mezzanine Term Loan Agreement.[17]

                (xv)   *Equity Ownership.*  Sears Holdings is a publicly held company and files annual and quarterly reports with, and furnishes other information to, the Securities and Exchange Commission.  Sears Holdings lists its common stock on the NASDAQ Global Market

---

[16] Since the initial closing of the Sparrow Mezzanine Term Loan, the Sparrow Mezzanine Lenders made additional advances in the aggregate principal amount of approximately $273 million.

[17] ESL is the only lender under the Sparrow Mezzanine Term Loan Agreement.

under the symbol "SHLD."  ESL owns approximately 49.7% of Sears Holdings' common stock.

All other debtors are direct or indirect subsidiaries of Sears Holdings.  Sears Holdings has no

preferred stock outstanding.

### C.    Pension Plan Protection and Forebearance Agreement

35.    In March 2016, the Company entered into a five-year pension plan

protection and forbearance agreement (the "**PPPFA**") with the Pension Benefit Guaranty

Corporation ("**PBGC**").  Pursuant to the PPPFA, the Company agreed to continue to "ring

fence" the real estate assets and intellectual property (collectively, the "**Ring-Fenced Assets**")

held by certain of the Company's subsidiaries (collectively, the "**Ring-Fenced Subsidiaries**").[18]

The Ring-Fenced Subsidiaries granted the PBGC a "springing lien" on the Ring-Fenced

Assets—which included the intellectual property related to the *Kenmore®*, *Craftsman®*, and

*DieHard®* brands—which lien would be triggered (subject to certain conditions) upon the

occurrence of a limited set of conditions, including (i) the failure to make required contributions

to the Company's domestic pension plans (the "**Pension Plans**"), (ii) a prohibited transfer of

ownership interests in the Ring-Fenced Subsidiaries, (iii) the occurrence of a termination event

under the Pension Plans, and (iv) bankruptcy- or insolvency-related events with respect to the

Company or certain of its material subsidiaries (the "**Springing Lien Events**").  In exchange,

the PBGC agreed to forbear from initiating an involuntary termination of the Company's

domestic pension plan.  Upon the deposit of certain funds into an escrow account maintained by

the PBGC for the benefit of the Company's Pension Plans (the "**PBGC Escrow**") (of which

approximately $280.6 million remains on deposit), the real estate assets and the intellectual

---

[18]    At the time, the Ring-Fenced Subsidiaries consisted of (i) SRC Depositor Corporation; (ii) SRC O.P.
Corporation; (iii) SRC Real Estate (TX), LP; (iv) SRC Real Estate Holdings (TX), LLC; (v) SRC Facilities
Statutory Trust No. 2003-A; and (vii) KCD IP, LLC.

WEIL:\96149431\11\73219.0006

### C.    Cash Flow and Liquidity Issues

40.    The Company has been significantly limited in its ability to invest in and grow its business, and, as of the Commencement Date, the Company lacks sufficient liquidity to continue normal business operations.  The Company currently has approximately $5.6 billion in funded debt, approximately $922 million of which is unsecured, which it primarily incurred to offset declining revenues, honor its pension obligations, and secure inventory following a contraction in trade terms.  In addition, nearly all of the Company's assets are encumbered, including, among other things, over 200 real property locations, the Company's most valuable intellectual property, including intellectual property related to the *Kenmore®* and *DieHard®* brands, all of the Company's credit card receivables, pharmacy receivables, and inventory, as well as much of the Company's cash.  Importantly, over $1.7 billion of the Company's debt matures in what remains of Fiscal Year 2018 and Fiscal Year 2019.  As of the Commencement Date, the Company's annual cash interest expense is approximately $440 million.  With respect to cash flow, the Company currently loses approximately $125 million per month.

41.    The Company also has substantial legacy liabilities that consume a significant amount of its cash on an annual basis.  Although its Employees currently do not earn pension benefits, the Company has legacy pension obligations with respect to past service performed by its retirees.  The Company contributed approximately $546.9 million during Fiscal Year 2017 and, as of the Commencement Date, approximately $459.3 million during Fiscal Year 2018 to its Pension Plans, inclusive of direct contributions and contributions into the PBGC Escrow (as defined herein).

42.    Additionally, the Company's liquidity issues have been exacerbated by a contraction in trade terms.  Certain vendors have demanded reduced payment schedules, while others have gone further, requiring the Company to pay cash in advance as a condition to the

WEIL:\96149431\11\73219.0006

## Schedule 3

### Consolidated List of Holders of Five Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the holders, as of the Commencement Date, of the five (5) largest secured, non-contingent claims against the Debtors, on a consolidated basis.

| No. | Holder | Mailing Address | Amount of Claim | Type of Collateral | Estimated Value of Collateral |
|---|---|---|---|---|---|
| 1. | First Lien Revolving Credit Agreement (Bank of America, N.A. and Wells Fargo Bank, National Association) | Bank of America, N.A. Attn: General Counsel 100 North Tryon Street, Charlotte, NC 28255<br><br>Wells Fargo, National Association Attn: General Counsel 420 Montgomery Street, San Francisco, CA 94104 | $836,000,000 | Credit Card Receivables, Pharmacy Receivables, Inventory, Prescription Lists, Deposit Accounts, and Cash | Unknown |
| 2. | Consolidated Secured Note B (held by JPP, LLC and JPP, II L.L.C. | C/O ESL Investments, Inc. Attn: Edward S. Lampert, CEO 1170 Kane Concourse, Suite 200 Bay Harbor Islands, FL 33154 | $723,300,000 | Real Estate | Unknown |

| No. | Holder | Mailing Address | Amount of Claim | Type of Collateral | Estimated Value of Collateral |
|---|---|---|---|---|---|
| 3. | 2016 First Lien Term Loan ("B") (Bank of America, N.A. and Wells Fargo Bank, National Association) | Bank of America, N.A. Attn: General Counsel 100 North Tryon Street, Charlotte, NC 28255<br><br>Wells Fargo, National Association Attn: General Counsel 420 Montgomery Street, San Francisco, CA 94104 | $570,800,000 | Credit Card Receivables, Pharmacy Receivables, Inventory, Prescription Lists, Deposit Accounts, and Cash | Unknown |
| 4. | Second Lien Line of Credit Loans (JPP, LLC as administrative agent) | C/O ESL Investments, Inc. Attn: Edward S. Lampert, CEO 1170 Kane Concourse, Suite 200 Bay Harbor Islands, FL 33154 | $570,000,000 | Credit Card Receivables and Inventory | Unknown |
| 5. | Second Lien PIK Term Loan (6 5/8% Senior Secured Convertible PIK Toggle Notes Due 2019) | Computershare Trust Company N.A. P.O. Box 43078 Providence, RI 02940 | $317,100,000 | Credit Card Receivables and Inventory | Unknown |

2

# Exhibit 2

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : |  |
|  | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : |  |
|  | : | **Case No. 18-[_____] (RDD)** |
|  | : |  |
| Debtors.[1] | : | **(Joint Administration Requested)** |

---------------------------------------------------------------x

**DEBTORS' MOTION FOR AUTHORITY TO (A) OBTAIN
POSTPETITION FINANCING, (B) USE CASH COLLATERAL, (C) GRANT
CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES, AND
(D) SCHEDULE SECOND INTERIM HEARING AND FINAL HEARING**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Prepetition Agents, mortgages in recordable form with respect to any real estate constituting DIP ABL Collateral and identified by any of the DIP ABL Agents or Prepetition Agents on terms reasonably satisfactory to the DIP ABL Agents or Prepetition Agents, as applicable.

26.     ***Other Automatic Perfection Matters.***   To the extent that any Prepetition Agent is the secured party under any account control agreements, listed as loss payee or additional insured under any of the DIP ABL Loan Parties' insurance policies, or is the secured party under any Prepetition Loan Document, each of the DIP ABL Agents, for itself and on behalf of the DIP ABL Credit Parties is also deemed to be the secured party under such account control agreements, loss payee or additional insured under the DIP ABL Loan Parties' insurance policies, and the secured party under each such Prepetition Loan Document (in any such case with the same priority of liens and claims thereunder relative to the priority of (a) the DIP ABL Liens, and (b) the Prepetition Liens and Adequate Protection Liens, in each case, as set forth in this Interim Order), and shall have all rights and powers in each case attendant to that position (including rights of enforcement but subject in all respects to the terms of this Interim Order), and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Order and the DIP ABL Loan Documents.  The Prepetition ABL Control Co-Collateral Agent or the Prepetition Second Lien Collateral Agent, as applicable, shall serve as agent for the DIP ABL Agents for purposes of perfecting the DIP ABL Agents' security interests in and liens on all DIP ABL Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

27.     ***Proceeds of Subsequent Financing.***  If any of the DIP ABL Loan Parties, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in any of the Chapter 11 Cases or any Successor Case,

shall obtain credit or incur debt in breach of the DIP ABL Loan Documents, at any time prior to

the repayment in full in cash of all DIP ABL Secured Obligations, or all Prepetition ABL

Obligations, including subsequent to the confirmation of any plan of reorganization or

liquidation with respect to the DIP ABL Loan Parties and the DIP ABL Loan Parties' estates,

then all cash proceeds derived from such credit or debt shall immediately be turned over to the

DIP ABL Agents, or if the DIP ABL Secured Obligations have been paid in full in cash, to the

Prepetition ABL Administrative Agent, to be applied in accordance with this Interim Order and

the DIP ABL Loan Documents, the Prepetition ABL Loan Documents and the Prepetition Loan

Documents, as applicable.

28.     ***Maintenance and Disposition of DIP ABL Collateral / Cash***

***Management.***     Until the indefeasible payment in full in cash of all DIP ABL Secured

Obligations, and the termination of the obligation of the DIP ABL Credit Parties to extend credit

under the DIP ABL Facility, the DIP ABL Loan Parties shall (a) maintain and insure the DIP

ABL Collateral in amounts, for the risks, and by the entities as required under the DIP ABL

Loan Documents, (b) except as set forth in this paragraph 28, maintain their cash management

system as in effect as of the Petition Date, (i) subject to the DIP ABL Loan Documents;

(ii) subject to the Cash Management Order,[4] as may be modified, with the prior written consent

of the DIP ABL Agents by any order that may be entered by this Court; and (iii) in a manner

which, in any event, shall be satisfactory to the DIP ABL Agents.     Other than as expressly

required pursuant to the DIP ABL Loan Documents, the Cash Management Order or this Interim

---

[4]     "Cash Management Order" means an interim or final order granting the *Motion Of Debtors For Authority To (I) Continue Using Existing Cash Management System, Bank Accounts, And Business Forms, (II) Implement Ordinary Course Changes To Cash Management System, (III) Continue Intercompany Transactions, And (IV) Provide Administrative Expense Priority For Postpetition Intercompany Claims And Related Relief.*

30.     ***Application of Proceeds of Collateral, Payments and Collections.***  After
repayment in full in cash of all DIP ABL Secured Obligations and all Prepetition ABL
Obligations, any remaining proceeds of the DIP ABL Collateral shall be applied to the DIP ABL
Loan Parties' remaining outstanding and unpaid obligations, in a manner consistent with the
Bankruptcy Code and, except as may be otherwise ordered in one or more orders of this Court, in
accordance with the rights and priorities set forth in this Interim Order.

31.     ***Case Milestones.***  The DIP ABL Loan Parties shall comply with the case
milestones set forth on Annex E in the DIP ABL Term Sheet or otherwise set forth in the DIP
ABL Loan Documents (as may be amended from time to time in accordance with the DIP ABL
Loan Documents, the "Case Milestones"). For the avoidance of doubt, the failure of the DIP
ABL Loan Parties to comply with any of the Case Milestones shall (a) constitute an Event of
Default under the DIP ABL Loan Documents and this Interim Order; (b) subject to the expiration
of the Remedies Notice Period (as defined below), result in the automatic termination of the DIP
ABL Loan Parties' authority to use Cash Collateral under this Interim Order; and (c) permit the
DIP ABL Administrative Agent, subject to paragraph 33, to exercise the rights and remedies
provided for in this Interim Order and the DIP ABL Loan Documents.

32.     ***Termination Event.***  The occurrence of (a) any Event of Default (as
defined in the DIP ABL Loan Documents), or (b) the failure of the DIP ABL Loan Parties to
perform, in any respect, any of the terms, provisions, conditions, covenants or obligations under
this Interim Order are each referred to herein as a "Termination Event."

33.     ***Rights and Remedies Following a Termination Event.***

(a)     *Termination*. Immediately upon the occurrence and during the
continuation of a Termination Event, with no further action of this Court, the DIP ABL

# Exhibit 3

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C.  Schrock, P.C.
Jacqueline Marcus
Garrett A.  Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
In re                                      :
                                           :         Chapter 11
SEARS HOLDINGS CORPORATION, et al.,        :
                                           :         Case No. 18-_____ (RDD)
                                           :
               Debtors.¹                   :         (Joint Administration Requested)
-----------------------------------------------------------------x
```

### DECLARATION OF MOHSIN Y. MEGHJI
### IN SUPPORT OF DEBTORS' MOTION FOR AUTHORITY TO (A) OBTAIN
### POSTPETITION FINANCING, (B) USE CASH COLLATERAL, (C) GRANT
### CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES AND
### (D) SCHEDULE SECOND INTERIM HEARING AND FINAL HEARING

Pursuant to 28 U.S.C. § 1746, I, Mohsin Y. Meghji, hereby declare as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616);

18-23538-rdd    Doc 447    Filed 10/15/18    Entered 10/15/18 07:19:52    Main Document
Pg 4 of 7

and has become well acquainted with the Debtors' capital structure, liquidity needs, and business operations.

**<u>The Debtor's Need for DIP Financing</u>**

8.    I have reviewed the Motion, and it is my belief that the relief sought therein as it relates to the DIP ABL Facility is essential to ensure the uninterrupted operation of the Debtors' business and the success of the Debtors' chapter 11 case and is necessary to avoid immediate and irreparable harm to the Debtors' estates.

9.    The Debtors are in need of an immediate infusion of liquidity.  As discussed in greater detail in the Riecker Declaration, the Debtors enter these chapter 11 cases in dire financial straits.  Years of declining sales caused by adverse market conditions and competitive pressures from online retailers combined with high debt burden have resulted in a severe liquidity crisis.  Despite the Company's efforts to monetize assets, improve operational efficiencies and reduce overhead, Sears has not been able to stop the decline in its sales, EBITDA and overall cash position.  In addition, the Company's substantial debt burden resulted in an annualized cash interest expense of approximately $440 million.  This combination of operating pressures and a high level of interest expense resulting from an unsustainable capital structure has pressured the company's cash flow and led to a liquidity strain that ultimately precipitated the filing of these cases.

10.    Accordingly, the Debtors decided to seek chapter 11 protection to take advantage of the relief afforded by the automatic stay and obtain debtor in possession financing as they seek to execute their restructuring objectives, namely:  (i) execute GOB Sales and Non-Core Asset Sales; (ii) evaluate the "bubble" stores; and (iii) try to secure a going-concern sale or a reorganization involving a core group of stores.

4

# Exhibit 4

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  October 15, 2018

17                  2:13 PM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  NAROTAM RAI

Page 25

1   Carr and William Transier.  We have appointed a CRO who

2   reports to a restructuring committee.  That restructuring

3   committee is composed solely of independent directors.

4   There's Mr. Carr, Mr. Transier, there's Ms. Ann Reese, and

5   Mr. DePodesta, Paul DePodesta.

6           The restructuring committee is tasked with

7   overseeing the debtor's restructuring process and has full

8   decision making authority with respect to certain aspects of

9   the Chapter 11 cases.  And I think it's fair to say we're

10  going to be pretty deferential as a company to the

11  restructuring committee.

12          We've also formed a subcommittee just with those

13  two new members to review pre-petition transactions

14  involving affiliates, including ESL.  That subcommittee has

15  retained Paul Weiss.  I believe that they're in the midst of

16  retaining a banker.  We already received a document request

17  from those professionals.  And they are working very

18  quickly.

19          I won't talk about the DIP financing just yet, but

20  I did want to talk about the timeline on Page 12 that this

21  is a tight timeline.  I think it's fair to say that in our

22  experience even for a retail debtor.  But we look at this

23  and we say that -- we told ourselves that we have to move

24  quickly if we have a chance to save the enterprise.  And

25  there's a lot of people pulling and moving everything

# Exhibit 5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
In re                                            :
                                                 :        **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,        :
                                                 :        **Case No. 18-23538 (RDD)**
                                                 :
Debtors. [1]                                     :        **(Jointly Administered)**
----------------------------------------------------------------x

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POST-PETITION FINANCING, (B) GRANT SENIOR SECURED PRIMING LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE
CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of Sears Holdings Corporation ("Holdings") and

its affiliated debtors, as debtors and debtors-in-possession (collectively, the "Debtors") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases") pending in the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking entry

of an interim order (this "Interim Order") and a final order (the "Final Order" and, together with

the Interim Order, the "DIP Orders") providing for, among other things, the following relief:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity;

(v)      The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including any Avoidance Actions, against any of the Prepetition ABL Credit Parties (which shall exclude, for purposes of this stipulation, ESL Investments, Inc. or any of its affiliates) or any of their respective Representatives;

(vi)     The Debtors have, on behalf of each of their estates and any party that may try to claim by, through, or on behalf of the Debtors' estates, waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations or the validity, extent and priority of the Prepetition ABL Liens;

(vii)    The Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; and

(viii)   The Debtors have been and are in default of their obligations under the Prepetition ABL Documents, including as a result of the Chapter 11 Cases, and an Event of Default (as defined in the Prepetition ABL Credit Agreement) has occurred and is continuing.

f.      ***Intercreditor Agreement.***   The Prepetition ABL Agents, for themselves and the other Prepetition ABL Credit Parties, and the Prepetition Second Lien Collateral Agent, for itself and the other Prepetition Second Lien Credit Parties, entered into a Second Amended and Restated Intercreditor Agreement, dated as of March 20, 2018 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Intercreditor Agreement").

H.      ***Certain Second Lien Debt.***   The following descriptions are set forth herein for definitional purposes only:

a.      ***Prepetition Second Lien 2010 Notes.*** Pursuant to the Indenture, dated as of October 12, 2010 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien 2010 Indenture" and, together with

12

all notes, agreements and other documents executed or delivered in connection therewith, each as has been or may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien 2010 Indenture Documents", together with the Prepetition Second Lien 2018 Indenture Documents (as defined below), the "Prepetition Second Lien Notes Documents"), by and among (i) Holdings, as issuer (in such capacity, and as issuer of the Prepetition Second Lien Convertible Notes (as defined below), the "Prepetition Second Lien Notes Issuer"), (ii) certain subsidiaries of Holdings, as guarantors (in such capacity, and as guarantors of the Prepetition Second Lien Convertible Notes (as defined below), the "Prepetition Second Lien Notes Guarantors") and (iii) Wilmington Trust, National Association, as trustee (in such capacity, the "Prepetition Second Lien 2010 Indenture Trustee") and as collateral agent (in such capacity, the "Prepetition Second Lien Collateral Agent"), the Prepetition Second Lien Notes Issuer issued 6 5/8% Senior Secured Notes (as defined in the Prepetition Second Lien 2010 Indenture), due 2018 (together with any Exchange Securities (as defined in the Prepetition Second Lien 2010 Indenture) and any Additional Notes (as defined in the Prepetition Second Lien 2010 Indenture) issued under the Prepetition Second Lien 2010 Indenture, the "Prepetition Second Lien 2010 Notes" and the holders of such Prepetition Second Lien 2010 Notes, the "Prepetition Second Lien 2010 Notes Holders") and, pursuant to an Offering Memorandum (as defined in the Prepetition Second Lien 2010 Indenture), the Prepetition Second Lien Notes Issuer exchanged some of the Prepetition Second Lien 2010 Notes for the Prepetition Second Lien Convertible Notes (as defined below).

        b.      ***Prepetition Second Lien 2010 Notes Obligations.*** As of the Petition Date, according to the Debtors' books and records, certain principal amounts of the obligations in respect of the Prepetition Second Lien 2010 Notes totaling approximately $89 million were

outstanding, together with accrued and unpaid interest, costs, fees and expenses (the "Prepetition Second Lien 2010 Notes Obligations").

      c.    ***Prepetition Second Lien Convertible Notes.*** Pursuant to the Indenture, dated as of March 20, 2018, (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien 2018 Indenture" and, together with all notes, agreements and other documents executed or delivered in connection therewith, each as has been or may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien 2018 Indenture Documents"), by and among (i) the Prepetition Second Lien Notes Issuer, (ii) the Prepetition Second Lien Notes Guarantors and (iii) Computershare Trust Company, N.A. as trustee (in such capacity, the "Prepetition Second Lien 2018 Indenture Trustee" and, together with the Prepetition Second Lien 2010 Indenture Trustee, the "Prepetition Second Lien Trustees", and, the Prepetition Second Lien Trustees, together with the Prepetition Second Lien Credit Agreement Agent and the Prepetition Second Lien Collateral Agent, the "Prepetition Second Lien Agents" and, together with the Prepetition ABL Administrative Agent, and the Prepetition LC Facility Administrative Agent, the "Prepetition Agents"), the Prepetition Second Lien Notes Issuer issued 6 5/8% Senior Secured Convertible PIK Toggle Notes due 2019 (as defined in the Prepetition Second Lien 2018 Indenture) (together with any PIK Interest Notes (as defined in the Prepetition Second Lien 2018 Indenture) (or any increase in the principal amount of a Global Note  (as defined in the Prepetition Second Lien 2018 Indenture) related to PIK Interest (as defined in the Prepetition Second Lien 2018 Indenture)) and any Additional Notes (as defined in the Prepetition Second Lien 2018 Indenture) issued under the Prepetition Second Lien 2018 Indenture, the "Prepetition Second Lien Convertible Notes" and  the  holders  of  such

14

Prepetition Second Lien Convertible Notes, the "Prepetition Second Lien Convertible Notes Holders" and, together with the Prepetition Second Lien 2010 Notes Holders, the "Prepetition Second Lien Notes Holders").

     d.     ***Prepetition Second Lien Convertible Notes Obligations.*** As of the Petition Date, according to the Debtors' books and records, certain principal amounts of obligations were outstanding in respect of the Prepetition Second Lien Convertible Notes, together with accrued and unpaid interest, costs, fees and expenses (the "Prepetition Second Lien Convertible Notes Obligations", together with the Prepetition Second Lien 2010 Notes Obligations, the "Prepetition Second Lien Notes Obligations").

     e.     ***Prepetition Second Lien Credit Agreement.*** Pursuant to the Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Credit Agreement" and, together with all Loan Documents (as defined in the Prepetition Second Lien Credit Agreement) and all other agreements and documents executed or delivered in connection therewith, each as has been or may be amended, restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Credit Agreement Documents"), by and among (i) Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers (the "Prepetition Second Lien Credit Agreement Borrowers"), (ii) Holdings and the other Guarantors party thereto (as defined in the Prepetition Second Lien Credit Agreement) (the "Prepetition Second Lien Credit Agreement Guarantors" and, together with the Prepetition Second Lien Credit Agreement Borrowers, the "Prepetition Second Lien Credit Agreement Loan Parties", and the Prepetition Second Lien Credit Agreement Loan Parties, together with the Prepetition Second Lien Notes Issuer and the Prepetition Second Lien Notes

15

Guarantors, the "Prepetition Second Lien Loan Parties"), (iii) the lenders from time to time party thereto (collectively, the "Prepetition Second Lien Credit Agreement Lenders"), (iv) JPP, LLC, as administrative agent and collateral administrator (in such capacities, the "Prepetition Second Lien Credit Agreement Agent", together with the Prepetition Second Lien Credit Agreement Lenders and the Prepetition Second Lien Collateral Agent, the "Prepetition Second Lien Credit Agreement Credit Parties" and, the Prepetition Second Lien Credit Agreement Credit Parties, together with the Prepetition Second Lien Trustees and the Prepetition Second Lien Notes Holders, the "Prepetition Second Lien Credit Parties", and, the Prepetition Second Lien Credit Parties, together with the Prepetition ABL Credit Parties, the "Prepetition Credit Parties") and (vi) the other parties from time to time party thereto, the Prepetition Second Lien Credit Agreement Credit Parties provided the Prepetition Second Lien Credit Agreement Borrowers with a secured term loan (the "Prepetition Second Lien Credit Agreement Term Facility"), and line of credit loans (the "Prepetition Second Lien Credit Agreement Line of Credit Facility" and, collectively with the Prepetition Second Lien Credit Agreement Term Facility, the "Prepetition Second Lien Credit Agreement Facilities").

       f.    ***Prepetition Second Lien Credit Agreement Facilities Obligations.***  As of the Petition Date, according to the Debtors' books and records, certain principal amounts were outstanding under the Prepetition Second Lien Credit Agreement Facilities, comprised of (i) certain amounts under the Prepetition Second Lien Credit Agreement Term Facility and (ii) certain amounts under the Prepetition Second Lien Credit Agreement Line of Credit Facility, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury,

or hereafter granted in the Chapter 11 Cases or any Successor Case. The DIP ABL Liens shall

be valid and enforceable against any trustee or other estate representative appointed in the

Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to

a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the

dismissal of any of the Chapter 11 Cases or any Successor Case. No lien or interest avoided and

preserved for the benefit of the DIP ABL Loan Parties' estates pursuant to section 551 of the

Bankruptcy Code shall be *pari passu* with or senior to the DIP ABL Liens.

**Adequate Protection**

   16. ***Adequate Protection Liens.***

    (a) *Prepetition ABL Adequate Protection Liens.* Pursuant to sections

361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the

Prepetition ABL Credit Parties (other than the 2018 FILO Lenders and the Prepetition LC

Facility Credit Parties) in the Prepetition ABL Collateral, including Cash Collateral, against any

diminution in value resulting from the DIP ABL Loan Parties' use, sale or lease (or other decline

in value) of such collateral, the imposition of the automatic stay, the priming of the Prepetition

ABL Liens and the subordination to the Carve-Out (collectively, "ABL Diminution in Value"),

the DIP ABL Loan Parties hereby grant to the Prepetition ABL Control Co-Collateral Agent on

behalf of itself and all of the other Prepetition ABL Credit Parties (other than the 2018 FILO

Lenders and the Prepetition LC Facility Credit Parties) to the extent of any ABL Diminution in

Value a valid and perfected replacement and additional security interest in, and liens on (the

"Prepetition ABL Facilities Adequate Protection Liens") all DIP ABL Collateral. The

Prepetition ABL Facilities Adequate Protection Liens are and shall be valid, binding, enforceable

and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the execution by

the DIP ABL Loan Parties of control agreements, security agreements, pledge agreements,

35

financing statements, or other agreements) and shall (i) solely with respect to the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Permitted Prior Liens and the DIP ABL Liens, (ii) solely with respect to the Prepetition Encumbered DIP ABL Collateral, be subject to the Carve-Out, valid and perfected security interests in favor of third parties as of the Petition Date, and the DIP ABL Liens, and (iii) solely with respect to Prepetition Unencumbered Assets, subject to the Carve-Out and the DIP ABL Liens and (iv) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP ABL Collateral.

(b)    *Prepetition 2018 FILO Adequate Protection Liens*.    Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the 2018 FILO Lenders in the Prepetition ABL Collateral, including Cash Collateral, against any ABL Diminution in Value, the DIP ABL Loan Parties hereby grant to the Prepetition ABL Control Co-Collateral Agent, on behalf of  the 2018 FILO Lenders to the extent of any ABL Diminution in Value, a valid and perfected replacement and additional security interest in, and liens on (the "2018 FILO Adequate Protection Liens") all DIP ABL Collateral.  The 2018 FILO Adequate Protection Liens are and shall be valid, binding, enforceable and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the execution by the DIP ABL Loan Parties of control agreements, security agreements, pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Permitted Prior Liens, the DIP ABL Liens, and the Prepetition ABL Facilities Adequate Protection Liens, (ii) solely with respect to the Prepetition Encumbered DIP ABL Collateral, be subject to the Carve-Out, valid and perfected security interests in favor of third parties as of the Petition Date, the DIP ABL Liens and the Prepetition ABL Facilities Adequate Protection Liens, and (iii) solely with respect to Prepetition ABL Facilities Adequate Protection Liens, and (iii) solely with respect to Prepetition

36

Unencumbered Assets, subject to the Carve-Out, the DIP ABL Liens, and the Prepetition ABL Facilities Adequate Protection Liens and (iv) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP ABL Collateral.

(c)     *Prepetition LC Facility Adequate Protection Liens.*    Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition LC Facility Credit Parties in the Prepetition ABL Collateral, including Cash Collateral, against any ABL Diminution in Value, the DIP ABL Loan Parties hereby grant to the Prepetition LC Facility Administrative Agent on behalf of itself and all of the other Prepetition LC Facility Credit Parties to the extent of any ABL Diminution in Value a valid and perfected replacement and additional security interest in, and liens on (the "Prepetition LC Facilities Adequate Protection Liens") all DIP ABL Collateral.   The Prepetition LC Facilities Adequate Protection Liens are and shall be valid, binding, enforceable and fully perfected nunc pro tunc to the Petition Date (without the necessity of the execution by the DIP ABL Loan Parties of control agreements, security agreements, pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Permitted Prior Liens, the DIP ABL Liens, the Prepetition ABL Facilities Adequate Protection Liens, and the 2018 FILO Adequate Protection Liens, (ii) solely with respect to the Prepetition Encumbered DIP ABL Collateral, be subject to the Carve-Out, valid and perfected security interests in favor of third parties as of the Petition Date, the DIP ABL Liens, the Prepetition ABL Facilities Adequate Protection Liens and the 2018 FILO Adequate Protection Liens, and (iii) solely with respect to Prepetition Unencumbered Assets, subject to the Carve-Out, the DIP ABL Liens, the Prepetition ABL Facilities Adequate

Protection Liens and the 2018 FILO Adequate Protection Liens, and (iv) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP ABL Collateral.

(d)       *Second Lien Facilities Adequate Protection Liens*.  Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Second Lien Credit Parties in the Prepetition Second Lien Collateral, including Cash Collateral, against any diminution in value resulting from the DIP ABL Loan Parties' use, sale or lease (or other decline in value) of such collateral, the imposition of the automatic stay, the priming of the Prepetition Second Lien Facilities Liens and the subordination to the Carve-Out (collectively, the "Second Lien Diminution in Value"), the DIP ABL Loan Parties hereby grant to the Prepetition Second Lien Collateral Agent on behalf of itself and the other Prepetition Second Lien Credit Parties to the extent of any Second Lien Diminution in Value, a valid and perfected replacement and additional security interest in, and liens on (the "Prepetition Second Lien Adequate Protection Liens," and together with the Prepetition ABL Facilities Adequate Protection Liens, the 2018 FILO Adequate Protection Liens, and the Prepetition LC Facility Adequate Protection Liens, the "Adequate Protection Liens") all DIP ABL Collateral.  The Prepetition Second Lien Adequate Protection Liens are and shall be valid, binding, enforceable and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the execution by the DIP ABL Loan Parties of mortgages, security agreements, pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Permitted Prior Liens, the DIP ABL Liens, the Prepetition ABL Facilities Adequate Protection Liens, the 2018 FILO Adequate Protection Liens, the Prepetition LC Facility Adequate Protection Liens and the Prepetition ABL Liens, (ii) solely with respect to the Prepetition Encumbered DIP ABL

38

Collateral, be subject to the Carve-Out, valid and perfected security interests in favor of third

parties as of the Petition Date, the DIP ABL Liens the Prepetition ABL Facilities Adequate

Protection Liens, the 2018 FILO Adequate Protection Liens, and the Prepetition LC Facility

Adequate Protection Liens and (iii) solely with respect to Prepetition Unencumbered Assets,

subject to the Carve-Out, the DIP ABL Liens, the Prepetition ABL Facilities Adequate

Protection Liens, the 2018 FILO Adequate Protection Liens, and the Prepetition LC Facility

Adequate Protection Liens and (iv) otherwise be senior to all other security interests in, liens on,

or claims against any of the DIP ABL Collateral.

(e)      *Treatment of Adequate Protection Liens*.   Other than as set forth

herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or

security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case.

The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate

representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of

any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other

Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor

Case.   The Adequate Protection Liens shall not be subject to sections 510, 549 or 550 of the

Bankruptcy Code.   No lien or interest avoided and preserved for the benefit of the estate pursuant

to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens

or the Adequate Protection Liens.

17.      ***Adequate Protection Superpriority Claims.***

(a)      *Prepetition ABL Superpriority Claims.* Pursuant to section 507(b)

of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Credit

Parties (other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties) in the

Prepetition ABL Collateral, including Cash Collateral, the Prepetition ABL Control Co-Collateral Agent, for itself and for the benefit of all of the other Prepetition ABL Credit Parties (other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties), is hereby granted an allowed administrative claim against the DIP ABL Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition ABL Adequate Protection Claims").  Except as set forth herein, the Prepetition ABL Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; provided, however, that the Prepetition ABL Adequate Protection Claims shall be junior to (i) the Carve-Out and (ii) the DIP ABL Superpriority Claims.

(b)      *Prepetition 2018 FILO Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the 2018 FILO Lenders in the Prepetition ABL Collateral, including Cash Collateral, the Prepetition ABL Control Co-Collateral Agent, on behalf of the 2018 FILO Lenders, is hereby granted an allowed administrative claim against the DIP ABL Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition 2018 FILO Adequate Protection Claims").  Except as set forth herein, the Prepetition 2018 FILO Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; *provided*, *however*, that the Prepetition 2018 FILO Adequate Protection Claims shall be

junior to (i) the Carve-Out, (ii) the DIP ABL Superpriority Claims, and (iii) the Prepetition ABL Adequate Protection Claims.

(c)     *Prepetition LC Facility Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition LC Facility Credit Parties in the Prepetition ABL Collateral, including Cash Collateral, the Prepetition LC Facility Administrative Agent, for itself and for the benefit of all of the other Prepetition LC Facility Credit Parties, is hereby granted an allowed administrative claim against the DIP ABL Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition LC Facility Adequate Protection Claims").  Except as set forth herein, the Prepetition 2018 LC Facility Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; provided, however, that the Prepetition LC Facility Adequate Protection Claims shall be junior to (i) the Carve-Out, (ii) the DIP ABL Superpriority Claims, (iii) the Prepetition ABL Adequate Protection Claims, and (iv) the Prepetition 2018 FILO Adequate Protection Claims.

(d)     *Second Lien Facilities Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Second Lien Credit Parties in the Prepetition Second Lien Collateral, including Cash Collateral, on behalf of itself and the other Prepetition Second Lien Credit Parties, the Prepetition Second Lien Collateral Agent is hereby granted an allowed administrative claim against the DIP ABL Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition Second Lien Facilities Adequate

Protection Claims," and together with the Prepetition ABL Adequate Protection Claims, the Prepetition 2018 FILO Adequate Protection Claims, and the Prepetition LC Facility Adequate Protection Claims, the "Adequate Protection Claims") to the extent that the Prepetition Second Lien Adequate Protection Liens are insufficient to protect the Prepetition Second Lien Credit Parties' interests in the Prepetition Second Lien Collateral.  Except as set forth herein, the Prepetition Second Lien Facilities Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; provided, however, that the Prepetition Second Lien Facilities Adequate Protection Claim shall be junior to (i) the Carve-Out, (ii) the DIP ABL Superpriority Claims, (iii) the Prepetition ABL Adequate Protection Claims, (iv) the Prepetition LC Facility Adequate Protection Claims, and (v) the Prepetition 2018 FILO Adequate Protection Claims.

18.    *Additional Adequate Protection.*

(a)    *Prepetition ABL Credit Parties*.  As additional adequate protection of the Prepetition ABL Credit Parties' security interests in the Prepetition ABL Collateral, the DIP ABL Loan Parties are authorized and directed to provide adequate protection in the form of (i) current cash reimbursement of reasonable and documented fees and expenses and other disbursements of the Prepetition ABL Administrative Agent, the Prepetition ABL Co-Collateral Agents, and the Prepetition LC Facility Administrative Agent whether incurred before, on or after the Petition Date, including the reasonable documented fees and expenses of its professional advisors subject to the procedures set forth in paragraph 18(e) hereof, Skadden, Arps, Slate, Meagher & Flom LLP, Choate, Hall & Stewart LLP, Davis Polk & Wardwell LLP and Berkeley Research Group, LLC, whether incurred before, on or after the Petition Date; (ii)

42

# Exhibit 6

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
In re                                 :
                                      :          Chapter 11
SEARS HOLDINGS CORPORATION, et al.,   :
                                      :          Case No. 18-23538 (RDD)
                                      :
            Debtors.¹                 :          (Jointly Administered)
------------------------------------------------------------x
```

## DEBTORS' MOTION FOR APPROVAL OF GLOBAL BIDDING PROCEDURES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616, and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "**Additional Debtors**"). The Additional Debtors each filed a motion in their respective chapter 11 case requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement

1.      As previously stated, the Debtors believe that there is a viable path forward for a reorganization around a smaller footprint of profitable stores.  But this path is extremely limited.  Approximately 400 of the Debtors' stores are four-wall EBITDA positive— the Debtors intend to utilize every reasonable effort to sell these and other viable stores, or a substantial portion thereof, as a going concern pursuant to section 363 of the Bankruptcy Code. A successful sale of these viable stores as a going concern not only will save Sears and Kmart, but also the jobs of tens of thousands of employees that depend on the continued operation of the Debtors' stores.  Additionally, the Debtors intend to market and sell certain of their non-core assets, such as intellectual property and specialty businesses, to help finance these chapter 11 cases, maximize value, and, importantly, fund their hard-fought wind-down reserve.

2.      Time is of the essence.  As previously discussed, these chapter 11 cases must progress with all deliberate speed to stem the substantial operating losses that will continue to decrease the value of the Debtors' estates.  Accordingly, the prompt consummation of sale transactions that will maximize value for the Debtors' estates and preserve as many jobs as possible is a cornerstone of the Debtors' chapter 11 strategy.

3.      By this Motion, the Debtors seek approval of global bidding and sale procedures (the "**Global Bidding Procedures**") for the efficient marketing, auction and sale of

2

# Exhibit 7

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    November 15, 2018

17                    11:08 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  NAROTAM RAI

Page 125

1           MR. BASTA:  And they're both independent

2     directors.  The Subcommittee sought to retain Evercore, and

3     the Committee has objected.  The retention is supported by

4     two declarations, one from Mr. Dan Aronson, who is in the

5     court, who would be leading the engagement, as well as Mr.

6     Transier.  We'd like to move those declarations into

7     evidence.

8           THE COURT:  Okay.  Does anyone want to cross-

9     examine them on their declarations?  Okay.  I've reviewed

10    both of them and at least as of now, I don't have any

11    questions.  But I'll admit them into the evidentiary record.

12          (Declarations of William Transier and Daniel

13    Aronson Entered into Evidence)

14          MR. BASTA:  Thank you, Your Honor.  The mandate of

15    the restructuring committee is attached as an annex to Mr.

16    Transier's declaration.  And if Your Honor looks at that

17    mandate, that mandate looks backwards, and it looks

18    forwards.  It looks backwards because our job is to

19    investigate the 19 affiliate transactions.  There may be

20    more that occurred here that involve billions of dollars of

21    value.

22          It looks forward because to the extent there needs

23    to be a disposition of those litigation assets, whether it

24    be commencing litigation, or settling litigation, or looking

25    at a contribution from and defendants as part of any

Page 126

1    settlement or transaction involving potential defendants,

2    the approval of those transactions requires the approval of

3    our subcommittee, and therefore, the amount of contribution

4    that may be involved in any of those transactions also

5    requires analysis as we go forward.

6            This function of the restructuring committee, we

7    believe, is extremely important in this case.  And your

8    honor has already seen the positions of the parties start to

9    develop.  ESL has filed a number of pleadings, making it

10   clear that they think all the affiliate transactions were

11   proper.  And the Creditors' Committee has expressed very

12   significant concern regarding these transactions.

13           And ESL, who is a target of the investigation, is

14   the largest secured creditor, with $2.6 billion of secured

15   claims.  And so, to the extent those secured claims could be

16   the subject of avoidance or subordination, there would

17   obviously be an enormous transfer value from one

18   constituency to another.

19           And so, we're taking our job very, very seriously,

20   and we're going to get to the bottom of what happened here,

21   but we need Evercore to do it.  Evercore has significant

22   expertise in the areas in which we need help.  Valuation

23   including DCF comparable company transaction values,

24   evaluating the terms of the debt and any marketing process

25   that went to third parties to determine if they got the best

# Exhibit 8

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
In re                                                      :
                                                           :         **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al*.,                  :
                                                           :         **Case No. 18-23538 (RDD)**
                                                           :
          Debtors. [1]                                     :         **(Jointly Administered)**
-------------------------------------------------------------------x

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POST-PETITION FINANCING, (B) GRANT SENIOR SECURED PRIMING LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE
CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;
AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of Sears Holdings Corporation ("Holdings") and

its affiliated debtors, as debtors and debtors-in-possession (collectively, the "Debtors") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases") pending in the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking entry

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).    The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

thereby and the Carve-Out. The DIP ABL Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise. Notwithstanding anything to the contrary herein, the DIP ABL Superpriority Claims shall be of equal priority to the Junior DIP Superpriority Claims.

**DIP ABL Liens and DIP ABL Collateral.**

13.    Effective immediately upon entry of the Interim Order and as more fully set forth in the DIP ABL Loan Documents, as security for the full and prompt performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP ABL Secured Obligations, the DIP ABL Control Co-Collateral Agent was granted, for itself and for the benefit of all of the DIP ABL Credit Parties, continuing valid, binding, enforceable, non-avoidable, automatically and properly perfected, post-petition security interests in and liens (the "DIP ABL Liens") on all DIP ABL Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the DIP ABL Loan Parties (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, copyright security agreements, trademark security agreements, patent security agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the DIP ABL Agents or any other DIP ABL Credit Party of any DIP ABL Collateral. The term "DIP ABL Collateral" means Prepetition ABL Collateral and all other assets of the DIP ABL Loan Parties, whether now owned or hereafter acquired, and all proceeds thereof, including all deposit accounts, securities accounts, cash and cash equivalents of the DIP ABL Loan Parties; *provided, that* DIP ABL Collateral excludes any of the following (collectively, the "Excluded Property"): (i) (a) leases of real property except as permitted in the applicable lease or pursuant to applicable non-bankruptcy law (but in no event shall DIP ABL Collateral exclude the proceeds of such leases),

and (b) any security deposits or the Debtors' interests, if any, in pre-paid rent, unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; *provided*, *however,* that solely in the event the Debtors subsequently seek by separate motion and obtain by final order liens on all of their leases of real property in connection with a debtor-in-possession financing facility other than the DIP ABL Facility (including in connection with the Junior DIP Facility), the DIP ABL Collateral shall include all leases of real property and the DIP ABL Liens and Adequate Protection Liens shall be first in priority and senior to any other liens thereon (other than leases of real property that are Specified Collateral which the Junior DIP Liens and DIP ABL Liens shall share pari passu); (ii) the DIP ABL Loan Parties' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (the "Avoidance Actions"), but not the proceeds thereof ("Avoidance Action Proceeds"); *provided*, for the avoidance of doubt, that the DIP ABL Collateral shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions whether by judgment, settlement or otherwise, (iii) any Intellectual Property (as defined in the DIP ABL Credit Agreement) consisting of intent-to-use trademark applications and rights in and to such applications, prior to the filing of a "Statement of Use" or "Amendment to Allege Use" to the extent that a grant of security interest in such application would impair validity or enforceability, (iv) any property to the extent that the grant of a security interest therein would violate applicable law, require a consent not obtained of any Governmental Authority (as defined in the DIP ABL Credit Agreement) or constitute a breach or default under, or result in the termination of or require a consent not obtained under, any contract, non-real property lease, license or other agreement evidencing or giving rise to such

38

property, or result in the invalidation of such property or provide any party to such contract, non-real property lease, license or agreement with a right of termination of such contract, non-real property lease, license or agreement (in each case, after giving effect to applicable provisions of the New York UCC, the Bankruptcy Code or other applicable law), (v) any and all claims or causes of action against current or former directors and officers of any DIP ABL Loan Party, including without limitation, any claim for or relating to a breach of fiduciary duty by any such director or officer (the "D&O Claims"), but not proceeds thereof, (vi) the Carve-Out Account, and (vii) proceeds and products of any of the foregoing Excluded Property described in clauses (i), (iii) through (iv) above solely to the extent such proceeds and products would constitute property or assets of the type described in clauses (i), (iii) through (iv) above; *provided that* in each case of property described in clause (iv) of this definition, such property shall constitute "Excluded Property" only to the extent and for so long as such contract, non-real property lease, license or other agreement or applicable law prohibits the creation of a lien on such property in favor of the DIP ABL Control Co-Collateral Agent, and, upon termination of such prohibition, such property shall cease to constitute "Excluded Property".  Each of the Junior DIP Agent, DIP ABL Agents, their respective lenders and the Debtors are bound by the DIP Intercreditor Agreement; *provided*, that the DIP ABL Agents and the Junior DIP Agent and each of their respective lenders are contractually obligated to comply with the DIP Intercreditor Agreement, and the DIP ABL Agents and DIP ABL Lenders may enforce such agreement against the Junior DIP Agent and its respective lenders in these Chapter 11 Cases without the need for any further order of the Bankruptcy Court; *provided, further,* that the Debtors and their estates shall be deemed to be express third party beneficiaries of, and shall be entitled to enforce the provisions of Section 4.1(b)(iii) and Section 4.1(b)(iv) of the DIP Intercreditor Agreement and the

immediately succeeding sentence of this paragraph 13 (collectively, the "Reverse Marshaling Provisions"), which Reverse Marshaling Provisions shall remain enforceable by the Debtors and their estates until the repayment in full in cash of the DIP ABL Obligations and the Junior DIP Obligations.  The DIP ABL Agents shall not apply proceeds of any Prepetition Unencumbered Collateral received in connection with any Exercise of Secured Creditor Remedies (as defined in the DIP Intercreditor Agreement) or from any sale, transfer or other disposition of such assets pursuant to section 363 or section 1129 of the Bankruptcy Code (or any similar provision under the law applicable to the Chapter 11 Cases or any other Insolvency Proceeding (as defined in the DIP Intercreditor Agreement) or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws (as defined in the DIP Intercreditor Agreement)) to the repayment of obligations under the DIP ABL Facility until (x) all but a de minimis amount of Prepetition ABL Collateral of the type that is eligible to be included in the term "Borrowing Base" in the DIP ABL Credit Agreement as in effect on the date of the DIP Intercreditor Agreement (but without giving effect to any changes or adjustments to the Borrowing Base or the eligibility criteria therefor, in each case, that any DIP ABL Agent may make in its "Permitted Discretion" (as defined in the DIP ABL Credit Agreement as in effect on the date of the DIP Intercreditor Agreement)) has been sold, transferred or otherwise been disposed of and the proceeds thereof applied in accordance with the DIP Intercreditor Agreement or (y) all but a de minimis amount of Prepetition ABL Collateral of the type that is eligible to be included in the term "Borrowing Base" in the DIP ABL Credit Agreement as in effect on the date of the DIP Intercreditor Agreement (but without giving effect to any changes or adjustments to the Borrowing Base or the eligibility criteria therefor, in each case, that any DIP ABL Agent may make in its "Permitted Discretion" (as defined in the DIP ABL Credit Agreement as in effect on

the date of the DIP Intercreditor Agreement)) is otherwise no longer available to be used to apply

to and satisfy the DIP ABL Secured Obligations; *provided, however,* that if the proceeds of any

Prepetition Unencumbered Collateral (including Specified Collateral) are used to satisfy any DIP

ABL Secured Obligations or Prepetition ABL Obligations in accordance with this paragraph 13,

notwithstanding anything in this Final Order to the contrary, after the Discharge of Senior DIP

Obligations and the Discharge of Prepetition ABL Obligations (as each such term is defined in

the DIP Intercreditor Agreement), all ensuing proceeds of Prepetition ABL Collateral shall be

deemed to be proceeds of Prepetition Unencumbered Collateral (including Specified Collateral)

until such proceeds equal the amount of Prepetition Unencumbered Collateral (including

Specified Collateral) that were used to satisfy any DIP ABL Secured Obligations or Prepetition

ABL Obligations.    No amendment, modification or waiver of the Reverse Marshaling

Provisions, Section 7.4 of the DIP Intercreditor Agreement or clause (y) of Section 7.10 of the

DIP Intercreditor Agreement, nor consent to any departure of such provisions by any person,

shall be effective, nor shall any amendment or modification to any defined term used or

incorporated by reference in the Reverse Marshaling Provisions, or any component definition

thereof, be given effect in such Reverse Marshaling Provisions, unless in each case it is in a

written agreement executed by the Debtors and approved by the Creditors' Committee or the

Bankruptcy Court. In addition, no amendment, modification or waiver of Section 4.1(b)(i) or

Section 4.1(b)(ii) of the DIP Intercreditor Agreement, nor any consent to any departure of such

provisions by any person, shall be effective, nor shall any amendment or modification to any

defined term used or incorporated by reference in Section 4.1(b)(i) or Section 4.1(b)(ii) of the

DIP Intercreditor Agreement, or any component definition thereof, be given effect in such

Section 4.1(b)(i) or Section 4.1(b)(ii) of the DIP Intercreditor Agreement, unless in each case the

Creditors' Committee has been given at least three (3) days prior written notice of such proposed

amendment, modification, waiver or departure.

**Priority of DIP ABL Liens**

14.     The DIP ABL Liens on the DIP ABL Collateral shall in each case be

subject to the Carve-Out and otherwise have the following priority:

(a)     pursuant to section 364(c)(2) of the Bankruptcy Code, first priority liens
on and security interests in all DIP ABL Collateral that is not otherwise
subject to a valid, perfected and non-avoidable security interest or lien as
of the Petition Date (collectively, the "Prepetition Unencumbered
Collateral"), which liens shall be *pari passu* with the Junior DIP Liens on
Prepetition Unencumbered Collateral which constitute "Specified
Collateral" (as defined in the DIP Intercreditor Agreement, the "Specified
Collateral") but subject to any Senior Permitted Liens; *provided*, that the
proceeds of such Specified Collateral shall be shared by the Junior DIP
Lenders and the DIP ABL Credit Parties pro rata based on the aggregate
commitment amount under the Junior DIP Facility (i.e., $350,000,000)
and aggregate incremental commitments and extensions of credit under
the DIP ABL Facility (i.e., $300,000,000) without giving regard to the
roll-up portion thereof, respectively;

(b)     pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens on and
security interests in all DIP ABL Collateral (other than Prepetition ABL
Collateral) that is not subject to Prepetition ABL Liens but is subject to
valid and perfected security interests in favor of third parties as of the
Petition Date (the "Prepetition Encumbered Collateral") and any Senior
Permitted Liens; and

(c)     pursuant to section 364(d) of the Bankruptcy Code, first priority priming
security interests and liens on the Prepetition ABL Collateral of each
Debtor on which the Prepetition ABL Lenders held a first priority security
interest and lien (such liens and security interests, the "DIP ABL Priming
Liens"), in each case to the extent that such Prepetition ABL Collateral is
subject to Prepetition ABL Liens and such DIP ABL Priming Liens shall
be (x) senior in all respects to the interests in such property of the
Prepetition ABL Credit Parties under the Prepetition ABL Credit
Agreement and the other "secured parties" referred to therein, (y) senior to
the Adequate Protection Liens, and (z) subject to any Senior Permitted
Liens.

15.     Notwithstanding anything to the contrary herein, the following table sets

forth the relative priorities of the Carve-Out, the Senior Permitted Liens, the DIP ABL Liens, the

42

| Prepetition Second Lien Adequate Protection Liens | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | |
| Prepetition Second Lien Facilities Liens (except on Specified Non-Prepetition Second Lien Collateral) | | | |
| Junior DIP Liens | | | |

16.     ***Treatment of DIP ABL Liens.***  Other than as set forth herein, the DIP ABL Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereafter granted in the Chapter 11 Cases or any Successor Case.  The DIP ABL Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.  No lien or interest avoided and preserved for the benefit of the DIP ABL Loan Parties' estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP ABL Liens.

**Adequate Protection**

17.     ***Adequate Protection Liens.***

(a)     *Prepetition ABL Adequate Protection Liens.*  Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Credit Parties (other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties) in the Prepetition ABL Collateral, including Cash Collateral, against the

45

aggregate net diminution in value of the Prepetition ABL Credit Parties' (other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties) interests in the entirety of the Prepetition ABL Collateral resulting from the DIP ABL Loan Parties' use, sale or lease (or other decline in value to the extent permitted under the Bankruptcy Code) of such collateral, the imposition of the automatic stay, the priming of the Prepetition ABL Liens and the subordination to the Carve-Out (collectively, "ABL Diminution in Value"), the DIP ABL Loan Parties, pursuant to the Interim Order, granted and hereby grant to the Prepetition ABL Control Co-Collateral Agent on behalf of itself and all of the other Prepetition ABL Credit Parties (other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties) to the extent of any ABL Diminution in Value, if any, a valid and perfected replacement and additional security interest in, and liens on (the "Prepetition ABL Facilities Adequate Protection Liens") all DIP ABL Collateral.  The Prepetition ABL Facilities Adequate Protection Liens are and shall be valid, binding, enforceable and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the execution by the DIP ABL Loan Parties of mortgages, control agreements, security agreements, pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Senior Permitted Liens and the DIP ABL Liens, (ii) solely with respect to the Prepetition Encumbered Collateral, be subject to the Carve-Out, valid and perfected security interests in favor of third parties as of the Petition Date (including any Senior Permitted Liens), the DIP ABL Liens, and the Junior DIP Liens, (iii) solely with respect to Prepetition Unencumbered Collateral, subject to the Carve-Out, any Senior Permitted Liens, the DIP ABL Liens, and the Junior DIP Liens and (iv) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP ABL Collateral.

(b)    *Prepetition 2018 FILO Adequate Protection Liens*.   Pursuant to

sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the

interests of the 2018 FILO Lenders in the Prepetition ABL Collateral, including Cash Collateral,

against the aggregate net diminution in value of the 2018 FILO Lenders' interests in the entirety

of the Prepetition ABL Collateral resulting from the DIP ABL Loan Parties' use, sale or lease

(or other decline in value to the extent permitted under the Bankruptcy Code) of such collateral,

the imposition of the automatic stay, the priming of the Prepetition ABL Liens and the

subordination to the Carve-Out (collectively, the "2018 FILO ABL Diminution in Value"), the

DIP ABL Loan Parties, pursuant to the Interim Order, granted and hereby grant to the Prepetition

ABL Control Co-Collateral Agent, on behalf of the 2018 FILO Lenders to the extent of any 2018

FILO ABL Diminution in Value, if any, a valid and perfected replacement and additional

security interest in, and liens on (the "2018 FILO Adequate Protection Liens") all DIP ABL

Collateral.   The 2018 FILO Adequate Protection Liens are and shall be valid, binding,

enforceable and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the

execution by the DIP ABL Loan Parties of mortgages, control agreements, security agreements,

pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to

the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Senior

Permitted Liens, the DIP ABL Liens, and the Prepetition ABL Facilities Adequate Protection

Liens, (ii) solely with respect to the Prepetition Encumbered Collateral, be subject to the Carve-

Out, valid and perfected security interests in favor of third parties as of the Petition Date

(including any Senior Permitted Liens), the DIP ABL Liens, the Junior DIP Liens and the

Prepetition ABL Facilities Adequate Protection Liens, (iii) solely with respect to Prepetition

Unencumbered Collateral, subject to the Carve-Out, any Senior Permitted Liens, the DIP ABL

47

Liens, the Junior DIP Liens, and the Prepetition ABL Facilities Adequate Protection Liens and (iv) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP ABL Collateral.

(c)      *Prepetition LC Facility Adequate Protection Liens.*  Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition LC Facility Credit Parties in the Prepetition ABL Collateral, including Cash Collateral, against the aggregate net diminution in value of the Prepetition LC Facility Credit Parties' interests in the entirety of the Prepetition ABL Collateral resulting from the Prepetition LC Facility Credit Parties' use, sale or lease  (or other decline in value to the extent permitted under the Bankruptcy Code) of such collateral, the imposition of the automatic stay, the priming of the Prepetition ABL Liens and the subordination to the Carve-Out (collectively, the "Prepetition LC ABL Diminution in Value"), the DIP ABL Loan Parties, pursuant to the Interim Order, granted and hereby grant to the Prepetition LC Facility Administrative Agent on behalf of itself and all of the other Prepetition LC Facility Credit Parties to the extent of any Prepetition LC ABL Diminution in Value, if any, a valid and perfected replacement and additional security interest in, and liens on (the "Prepetition LC Facility Adequate Protection Liens") all DIP ABL Collateral.  The Prepetition LC Facility Adequate Protection Liens are and shall be valid, binding, enforceable and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the execution by the DIP ABL Loan Parties of mortgages, control agreements, security agreements, pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Senior Permitted Liens, the DIP ABL Liens, the Prepetition ABL Facilities Adequate Protection Liens, and the 2018 FILO Adequate Protection Liens, (ii) solely

48

with respect to the Prepetition Encumbered Collateral, be subject to the Carve-Out, valid and perfected security interests in favor of third parties as of the Petition Date (including any Senior Permitted Liens), the DIP ABL Liens, the Junior DIP Liens, the Prepetition ABL Facilities Adequate Protection Liens and the 2018 FILO Adequate Protection Liens, (iii) solely with respect to Prepetition Unencumbered Collateral, subject to the Carve-Out, any Senior Permitted Liens, the DIP ABL Liens, the Junior DIP Liens, the Prepetition ABL Facilities Adequate Protection Liens and the 2018 FILO Adequate Protection Liens, and (iv) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP ABL Collateral.

(d)    *Second Lien Adequate Protection Liens.*  Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Second Lien Credit Parties in the Prepetition Second Lien Collateral, against the aggregate net diminution in value, if any, resulting from the DIP ABL Loan Parties' use, sale or lease (or other decline in value to the extent permitted under the Bankruptcy Code) of such collateral, the imposition of the automatic stay, the priming of the Prepetition Second Lien Facilities Liens and the subordination to the Carve-Out (collectively, the "Second Lien Diminution in Value," and, collectively with the ABL Diminution in Value, the 2018 FILO ABL Diminution in Value and the Prepetition LC ABL Diminution in Value, the "Diminution in Value"), each Prepetition Second Lien Loan Party, pursuant to the Interim Order, granted and hereby grants to the Prepetition Second Lien Collateral Agent on behalf of itself and the other Prepetition Second Lien Credit Parties to the extent of any applicable Second Lien Diminution in Value, if any, a valid and perfected replacement and additional security interest in, and liens on (the "Prepetition Second Lien Adequate Protection Liens," and together with the Prepetition ABL Facilities Adequate Protection Liens, the 2018 FILO Adequate Protection Liens, and the

49

Prepetition LC Facility Adequate Protection Liens, the "Adequate Protection Liens") all DIP ABL Collateral owned by the Prepetition Second Lien Loan Parties.  For the avoidance of doubt, notwithstanding the Interim Order, the Prepetition Second Lien Adequate Protection Liens shall solely attach to property or other interests of the Prepetition Second Lien Loan Parties.  The Prepetition Second Lien Adequate Protection Liens are and shall be valid, binding, enforceable and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the execution by the Prepetition Second Lien Loan Parties of mortgages, control agreements, security agreements, pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Senior Permitted Liens, the DIP ABL Liens, the Prepetition ABL Facilities Adequate Protection Liens, the 2018 FILO Adequate Protection Liens, the Prepetition LC Facility Adequate Protection Liens the Prepetition ABL Liens, and the Post-Petition Intercompany Liens (ii) solely with respect to the Prepetition Encumbered Collateral, be subject to the Carve-Out, valid and perfected security interests in favor of third parties as of the Petition Date (including any Senior Permitted Liens), the DIP ABL Liens, the Junior DIP Liens, the Prepetition ABL Facilities Adequate Protection Liens, the 2018 FILO Adequate Protection Liens, the Prepetition LC Facility Adequate Protection Liens, and the Post-Petition Intercompany Liens (iii) solely with respect to Prepetition Unencumbered Collateral, subject to the Carve-Out, any Senior Permitted Liens, the DIP ABL Liens, the Junior DIP Liens, the Prepetition ABL Facilities Adequate Protection Liens, the 2018 FILO Adequate Protection Liens, the Prepetition LC Facility Adequate Protection Liens and the Post-Petition Intercompany Liens and (iv) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP ABL Collateral. The Prepetition Second Lien Secured Parties shall not apply proceeds of any Prepetition Unencumbered Collateral to satisfy any

adequate protection claims hereunder until all of the Prepetition Second Lien Collateral has been sold, transferred or otherwise been disposed of or is otherwise no longer available to be used to apply to, or is determined by the Bankruptcy Court to be insufficient to satisfy the Prepetition Second Lien Obligations.

(e)     *Treatment of Adequate Protection Liens.*  Other than as set forth in the DIP Orders, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case.  The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.  The Adequate Protection Liens shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

18.     ***Adequate Protection Superpriority Claims.***

(a)     *Prepetition ABL Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Credit Parties (other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties) in the Prepetition ABL Collateral, including Cash Collateral, the Prepetition ABL Control Co-Collateral Agent, for itself and for the benefit of all of the other Prepetition ABL Credit Parties (other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties), pursuant to the Interim Order, was granted an allowed administrative claim against the DIP ABL Loan

Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition ABL Adequate Protection Claims") to the extent of any ABL Diminution in Value.  Except as set forth herein, the Prepetition ABL Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; provided, however, that the Prepetition ABL Adequate Protection Claims shall be junior to (i) the Carve-Out, (ii) the DIP ABL Superpriority Claims, and (iii) the Junior DIP Superpriority Claims.

(b)      *Prepetition 2018 FILO Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the 2018 FILO Lenders in the Prepetition ABL Collateral, including Cash Collateral, the Prepetition ABL Control Co-Collateral Agent, on behalf of the 2018 FILO Lenders, pursuant to the Interim Order, was granted an allowed administrative claim against the DIP ABL Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition 2018 FILO Adequate Protection Claims") to the extent of any 2018 FILO Diminution in Value.  Except as set forth herein, the Prepetition 2018 FILO Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; *provided*, *however*, that the Prepetition 2018 FILO Adequate Protection Claims shall be junior to (i) the Carve-Out, (ii) the DIP ABL Superpriority Claims, (iii) the Junior DIP Superpriority Claims, and (iv) the Prepetition ABL Adequate Protection Claims.

52

(c)      *Prepetition LC Facility Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition LC Facility Credit Parties in the Prepetition ABL Collateral, including Cash Collateral, the Prepetition LC Facility Administrative Agent, for itself and for the benefit of all of the other Prepetition LC Facility Credit Parties, pursuant to the Interim Order, was granted an allowed administrative claim against the DIP ABL Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition LC Facility Adequate Protection Claims") to the extent of any Prepetition LC Diminution in Value.  Except as set forth herein, the Prepetition LC Facility Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; provided, however, that the Prepetition LC Facility Adequate Protection Claims shall be junior to (i) the Carve-Out, (ii) the DIP ABL Superpriority Claims, (iii) the Junior DIP Superpriority Claims, (iv) the Prepetition ABL Adequate Protection Claims, and (v) the Prepetition 2018 FILO Adequate Protection Claims.

(d)      *Second Lien Facilities Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Second Lien Credit Parties in the Prepetition Second Lien Collateral, including any Cash Collateral, on behalf of itself and the other Prepetition Second Lien Credit Parties, the Prepetition Second Lien Collateral Agent, pursuant to the Interim Order, was granted an allowed administrative claim against the Prepetition Second Lien Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code to the extent of any Second Lien Diminution in Value (the "Prepetition Second Lien Facilities Adequate

53

Protection Claims," and together with the Prepetition ABL Adequate Protection Claims, the

Prepetition 2018 FILO Adequate Protection Claims, and the Prepetition LC Facility Adequate

Protection Claims, the "Adequate Protection Claims") to the extent that the Prepetition Second

Lien Adequate Protection Liens are insufficient to protect the Prepetition Second Lien Credit

Parties' interests in the Prepetition Second Lien Collateral.  For the avoidance of doubt,

notwithstanding the Interim Order, the Prepetition Second Lien Facilities Adequate Protection

Claims shall only be against the estates of the Prepetition Second Lien Loan Parties.  Except as

set forth herein, the Prepetition Second Lien Facilities Adequate Protection Claims shall have

priority over all administrative expense claims and priority general unsecured claims against the

Prepetition Second Lien Loan Parties or their estates, now existing or hereafter arising, to the

fullest extent permitted under the Bankruptcy Code; provided, however, that the Prepetition

Second Lien Facilities Adequate Protection Claim shall be junior to (i) the Carve-Out, (ii) the

DIP ABL Superpriority Claims, (iii) the Junior DIP Superpriority Claims, (iv) the Prepetition

ABL Adequate Protection Claims, (v) the Prepetition LC Facility Adequate Protection Claims,

(vi) the Prepetition 2018 FILO Adequate Protection Claims, and (vii) the Postpetition

Intercompany Obligations (as defined below).

19.     ***Additional Adequate Protection.***

(a)     *Prepetition ABL Credit Parties.*  As additional adequate protection

of the Prepetition ABL Credit Parties' security interests in the Prepetition ABL Collateral, the

DIP ABL Loan Parties are authorized and directed to provide adequate protection in the form of

(i) current cash reimbursement of reasonable and documented fees and expenses and other

disbursements of the Prepetition ABL Administrative Agent, the Prepetition ABL Co-Collateral

Agents, and the Prepetition LC Facility Administrative Agent whether incurred before, on or

Budget minus $42 million. Such covenant shall be tested on Saturday each second week (commencing on November 10, 2018) (but shall be reported each week) on a cumulative basis from the Petition Date until the fourth (4th) week after the Petition Date and then on a rolling four (4) week basis, in accordance with the Budget Variance Report delivered by the DIP ABL Borrowers to the DIP ABL Agents and the Creditors' Committee (each such date, a "Budget Testing Date").

(e)     The DIP ABL Loan Parties shall arrange for separate weekly (unless waived by the DIP ABL Agents and the Creditors' Committee in their sole and absolute discretion) conference calls with the DIP ABL Agents and their professional advisors and the Creditors' Committee's professional advisors discussing and analyzing (A) the Approved Budget or the Budget Variance Reports and/or any other reports or information delivered pursuant to the DIP ABL Loan Documents, (B) the financial operations and performance of the DIP ABL Loan Parties' business, (C) the status of landlord negotiations, (D) the status of any Specified Store Closing Sales, (E) the status of the Chapter 11 Cases generally, (F) progress in achieving compliance with the Case Milestones (as defined below) and the Go Forward Plan (as defined in the DIP ABL Loan Documents) or (G) such other matters relating to the Debtors as the DIP ABL Agents or the Creditors' Committee (or either of their respective agents or advisors) shall reasonably request.

23.     ***Winddown Account.***     (a) Upon the consummation of any sales of Prepetition Unencumbered Collateral, the DIP ABL Loan Parties shall (i) deposit or cause to be deposited the net aggregate cash proceeds in respect of such sales into the Winddown Account[5]

---

[5]     The Winddown Account will be held at Bank of America, N.A. in an account ending in 8965.

until $240,000,000 in the aggregate has been funded into the Winddown Account; *provided* that in no event shall more than $240,000,000 be funded into such account, (ii) deposit or cause to be deposited any remaining net aggregate cash proceeds in respect of such sales into a cash collateral account maintained with Bank of America, N.A. (the "<u>Senior DIP Cash Collateral Account</u>") to secure the payment of the DIP ABL Secured Obligations (including (A) with respect to amounts available to be drawn under outstanding letters of credit issued or deemed issued under the DIP ABL Facility (or indemnities or other undertakings issued pursuant thereto in respect of such outstanding letters of credit), an amount equal to 105% of the aggregate undrawn amount of such letters of credit, and (B) with respect to Bank Products and Cash Management Services (each as defined in the DIP ABL Loan Documents) included in the DIP ABL Secured Obligations (or indemnities or other undertakings issued pursuant thereto in respect thereof), an amount of cash collateral in compliance with the terms of the DIP ABL Credit Agreement), and (iii) upon and after the indefeasible payment in full in cash of the DIP ABL Secured Obligations as described in clause (ii) above, deposit or cause to be deposited any remaining net cash proceeds in respect of such sales into a cash collateral account designated by the Junior DIP Agent (the "<u>Junior DIP Cash Collateral Account</u>") to secure the payment of the Junior DIP Facility, and (b) upon the consummation of any sales of Specified Collateral, the Junior DIP Obligors shall (i) as contemplated in paragraph 23(a)(i), deposit or cause to be deposited the net cash proceeds in respect of such sales into the Winddown Account until $240,000,000 in the aggregate has been funded into the Winddown Account; *provided* that in no event shall more than $240,000,000 be funded into such account, and (ii) deposit or cause to be deposited any remaining net cash proceeds in respect of such sales to the Senior DIP Cash Collateral Account and to the Junior DIP Cash Collateral Account, on a pro rata basis based on

74

the aggregate commitment under the Junior DIP Facility (i.e., $350,000,000) and the aggregate incremental commitments and extensions of credit under the DIP ABL Facility (i.e., $300,000,000) without giving regard to the roll-up portion thereof, until either the indefeasible payment in full in cash of the DIP ABL Secured Obligations or the Junior DIP Obligations has occurred, after which all such net cash proceeds shall be applied to the payment of the DIP ABL Secured Obligations or the Junior DIP Obligations, respectively, provided that nothing contained in this paragraph 23 shall impair or modify the Reverse Marshaling Provisions and no payments shall be made on the DIP ABL Secured Obligations or the Junior DIP Obligations in contravention thereof.  "Winddown Account" shall mean a deposit account at Bank of America, N.A. that, prior to the discharge and indefeasible payment in full of all obligations under the DIP ABL Facility and the Junior DIP Facility, may only be used to pay winddown costs of the DIP ABL Loan Parties at the discretion of the DIP ABL Loan Parties following entry of this Final Order. Notwithstanding anything to the contrary in this or any other Bankruptcy Court order, the Winddown Account and the amounts on deposit in the Winddown Account shall be available and used only to satisfy winddown costs and shall not be subject to any prepetition liens or any liens or superpriority claims granted hereunder, including liens or superpriority claims granted to the DIP ABL Credit Parties or Junior DIP Credit Parties or as Adequate Protection.  For the avoidance of doubt, the Winddown Account and the amounts on deposit in the Winddown Account shall not constitute DIP ABL Collateral, Junior DIP Collateral or Cash Collateral. Bank of America shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions of this definition.

24.    ***Modification of DIP ABL Loan Documents***.  Upon no less than three (3) business days' notice to the Creditors' Committee and the Junior DIP Agent (in each case, only to

75

the DIP ABL Agents and the other DIP ABL Credit Parties herein.  Notwithstanding the foregoing, the DIP ABL Agents' or Prepetition ABL Agents' exercise of remedies pursuant to this paragraph with respect to real property leases shall be subject to: (i) any agreement in writing between any of the DIP ABL Agents or the Prepetition ABL Agents, as applicable, and any applicable landlord, (ii) pre-existing rights of any of the DIP ABL Agents or any of the Prepetition ABL Agents, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) further order of the Bankruptcy Court following notice and a hearing.

39.   ***Intercompany Obligations.***   To the extent any Debtor owes any post-petition intercompany obligation or indebtedness to any other Debtor (the "Intercompany Obligations"), such Intercompany Obligations shall, subject to the reservation of rights set forth in paragraphs 41 and 42 hereof, be subordinated only to the DIP ABL Secured Obligations, until the DIP ABL Secured Obligations are indefeasibly repaid in full in cash and the Junior DIP Secured Obligations until the Junior DIP Secured Obligations are indefeasibly paid in full.  All Intercompany Obligations incurred after the Petition Date ("Postpetition Intercompany Obligations") shall be secured by an automatically perfected security interest in and lien on, as to any Debtor transferee, all DIP ABL Collateral including all Prepetition ABL Collateral, Prepetition Encumbered Collateral and Prepetition Unencumbered Collateral of the transferee for the benefit of the Debtor transferor (the "Postpetition Intercompany Liens") junior to the Carve-Out, the DIP ABL Liens, the Senior Permitted Liens, the Junior DIP Liens, the Adequate Protection Liens (other than the Prepetition Second Lien Adequate Protection Liens), and the Prepetition ABL Liens, and senior to all other liens, and as to any non-Debtor transferee, liens on all assets and property of such transferee.  For the avoidance of doubt, any reference in this Final

92

Order to payment (or repayment) in full shall mean: (a) indefeasible repayment of all outstanding obligations in full in cash, (b) termination or expiration of all commitments under any applicable DIP ABL Loan Documents or Prepetition ABL Loan Documents and termination or expiration of any other commitment of any DIP ABL Credit Parties or Prepetition ABL Credit Parties to make extensions of credit to any of the DIP ABL Loan Parties under any such DIP ABL Loan Documents or Prepetition ABL Loan Documents, respectively, (c) all letters of credit issued or deemed issued under the DIP ABL Loan Documents have been canceled or have expired, and all amounts drawn thereunder have been reimbursed in full in cash (or other arrangements with respect thereto satisfactory to the DIP ABL Agents in their sole discretion shall have been made), and (d) solely with respect to the Prepetition ABL Obligations (i) if no Challenge Proceeding has been timely and properly commenced with respect to the prepetition obligations subject to the ABL Roll Up, the expiration of the Challenge Period, or (ii) the date on which any order entered by the Bankruptcy Court in favor of the applicable secured party in such Challenge Proceeding becomes final and non-appealable. For the avoidance of doubt, any Intercompany Obligations shall be subordinated to the DIP ABL Secured Obligations, the DIP ABL Liens, the Adequate Protection Liens (other than Second Lien Facilities Adequate Protection Liens), and the Adequate Protection Claims (other than Second Lien Facilities Superpriority Claims), except to the extent set forth on the lien priority chart in paragraph 15. The Debtors shall establish reasonable procedures (reasonably acceptable to the Creditors' Committee, the DIP ABL Agents, and the Prepetition Second Lien Credit Parties) to trace cash proceeds from the sale of inventory of the Debtors and to track liabilities and payables of the Debtors, including shared services and professional fees and costs (collectively, the "Allocable Costs"), on an entity by entity basis, including without limitation between obligors and non-obligors under the Prepetition Second

Lien Obligations, and to report the same to the Creditors' Committee, the DIP ABL Agents and the Prepetition Second Lien Credit Parties on a monthly basis. At the time of repayment or treatment of the Postpetition Intercompany Obligations pursuant to a chapter 11 plan or otherwise, the Debtors, the Creditors' Committee, the DIP ABL Agents and the Prepetition Second Lien Credit Parties agree to cooperate in good faith to propose and adopt a fair and reasonable allocation of all Allocable Costs on an entity by entity basis.

40.     ***Prohibited Use of DIP ABL Facility, DIP ABL Collateral, Cash Collateral, Carve-Out, etc.***   Notwithstanding anything herein, prior to indefeasible payment in full in cash of the DIP ABL Secured Obligations and the Prepetition ABL Obligations, except as otherwise expressly provided in this Final Order, the DIP ABL Facility, the DIP ABL Collateral, the Cash Collateral, the Prepetition ABL Collateral, proceeds of any of the foregoing, and the Carve-Out may not be used:

(a)      for the payment of interest and principal with respect to Prepetition Obligations or any other prepetition indebtedness of the Debtors, except for: (i) the Carve-Out; (ii) prepetition employee wages, benefits and related employee taxes as of the Petition Date; (iii) prepetition sales, use and real property taxes; (iv) prepetition amounts due in respect of insurance financings, premiums and brokerage fees; (v) payment of certain expenses (which expenses shall include fees and expenses of professionals) of the Prepetition ABL Agents and the Prepetition ABL Credit Parties (solely as required under the Prepetition Loan Documents); (vi) other "first day" interim and final orders permitting payment of prepetition claims, in the case of (ii) through (vi) pursuant to an order or orders of the Bankruptcy Court in form and substance acceptable to the DIP ABL Agents in their sole and absolute discretion and subject to and in accordance with the Approved Budget; (vii) the ABL Roll Up; and (viii) other indebtedness to the extent authorized by the Bankruptcy Court and set forth in the Approved Budget;

(b)      subject to this Final Order in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation or threatened litigation (including any investigation in connection with

94

**EXECUTION VERSION**

 

 

**SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION ASSET-BASED CREDIT AGREEMENT**

Dated as of November 29, 2018

among

**SEARS HOLDINGS CORPORATION,**
a debtor and a debtor-in-possession,
as Holdings,

**SEARS ROEBUCK ACCEPTANCE CORP.**
**and**
**KMART CORPORATION,**
each debtors and debtors-in-possession,
as Borrowers,

**THE LENDERS NAMED HEREIN,**

**THE ISSUING LENDERS NAMED HEREIN,**

**BANK OF AMERICA, N.A.,**
as Administrative Agent, Co-Collateral Agent and Swingline Lender

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Co-Collateral Agent,

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

as Syndication Agent,

**CITIGROUP GLOBAL MARKETS INC.,**

as Documentation Agent,

and

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,**

**CITIBANK, N.A., and WELLS FARGO BANK, NATIONAL ASSOCIATION,**

As Joint Lead Arrangers and Bookrunners

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"**Acceptable Plan of Reorganization**" means a plan of reorganization for each of the Chapter 11 Cases that (i) provides for the termination of the Revolving Commitments and the payment in full in cash and full discharge of the Obligations (including L/C Obligations and Obligations related to Bank Products and Cash Management Services) and Prepetition ABL Obligations at emergence, (ii) contains releases and other exculpatory provisions for the Credit Parties, Prepetition Credit Parties, the Joint Lead Arrangers and each of their respective affiliates in form and substance satisfactory to the Agent and the Co-Collateral Agents in their sole and absolute discretion and (iii) is otherwise in form and substance reasonably satisfactory to the Agent with respect to any provision related to the payment of Prepetition ABL Obligations or that may adversely affect the DIP Credit Parties and/or the Prepetition Credit Parties.

"**ACH**" means automated clearing house transfers.

"**Acquisition**" means, with respect to any Person (a) a purchase or other acquisition of more than 50% of, or other controlling interest in, the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets of any Person, or more than 50% of, or other controlling interest in, the Equity Interests of any Person, in each case in any single transaction or series of related transactions.

"**Adequate Protection Liens**" has the meaning assigned to the term "Adequate Protection Liens" in the Final Financing Order.

"**Adequate Protection Superpriority Claims**" has the meaning assigned to the term "Adequate Protection Claims" in the Final Financing Order.

"**Adjusted Revolving Exposure**" means, at any time of determination, an amount equal to the lesser of (i) the then-outstanding Aggregate Revolving Commitments and (ii) the sum of (A) $50,000,000 plus (B) the Borrowing Base minus (C) the principal amount of Term Loan outstanding as of such time of determination.

"**Advance**" means any advance by a Revolving Lender to any Borrower as part of a Borrowing.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings, any Borrower, and Subsidiary Guarantor or any Subsidiary of the foregoing), at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of Holding, any Borrower or any Subsidiary Guarantor, threatened

3

against Holdings, any Borrower, any Subsidiary Guarantor or any Subsidiary of the foregoing or any property thereof.

"**Affiliate**" means, as to any Person, any other Person, (a) that directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person, (b) that beneficially owns 10% or more of the Voting Stock or any class of Equity Interests of such first Person; (c) at least 10% of whose Voting Stock or any class of Equity Interests is beneficially owned, directly or indirectly, by such first Person; or (d) who is an officer, director, partner or managing member of such first Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person by contract or otherwise.

"**Agent**" has the meaning specified in the Preamble.

"**Agent Advisors**" has the meaning specified in Section 8.02(b).

"**Agent Indemnitees**" means the Agent, each Co-Collateral Agent and their respective Related Parties.

"**Agent Professionals**" means attorneys, accountants, appraisers (including real estate appraisers), auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by the Agent or the Co-Collateral Agents, including, for the avoidance of doubt, the Agent Advisors.

"**Agent's Account**" means the account of the Agent maintained by the Agent at Bank of America, N.A., designated by the Agent in writing to the Borrowers, the Co-Collateral Agents and the Lenders.

"**Agreement**" has the meaning specified in the Preamble.

"**Aggregate Revolving Commitments**" means the Revolving Commitments of all the Revolving Lenders.

"**AML Laws**" means (i) the Currency and Foreign Transactions Reporting Act, its amendments, and other statutes relating to the subject matter of that Act (which have come to be collectively referred to as the Bank Secrecy Act), including applicable provisions of the PATRIOT Act, and regulations promulgated under any of the foregoing, including 31 C.F.R. Chapter X; and (ii) similar laws, regulations, directives adopted by the European Union, any European Union Member State, the United Kingdom, and any jurisdiction where any Group Member operates.

"**Applicable Lending Office**" means, with respect to each Lender, such Lender's Domestic Lending Office in the case of a Base Rate Advance, and such Lender's Eurodollar Lending Office in the case of a Eurodollar Rate Advance.

"**Applicable Margin**" means (a) 4.50% per annum for Eurodollar Rate Advances and (b) 3.50% per annum for Base Rate Advances.

"**Application**" means an application, in such form as the applicable Issuing Lender may specify from time to time, requesting such Issuing Lender to open a Letter of Credit.

"**Approved Budget**" means the budget prepared by the Borrowers in the form of Exhibit J and which is approved by, and in form and substance satisfactory to, the Co-Collateral Agents, each in its sole discretion, as the same may be updated, modified or supplemented from time to time as provided in Section 6.03.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Assignment and Acceptance**" means an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Agent, in substantially the form of Exhibit B hereto.

"**Authorized Officer**" means, as to Holdings, any Borrower or any other Loan Party, its Chief Restructuring Officer, president, chief executive officer, chief financial officer, vice president and controller, vice president and treasurer, vice president, finance or executive vice president, finance. Any document delivered hereunder that is signed by an Authorized Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Automatic Stay**" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"**Availability Reserves**"  means, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as any Co-Collateral Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Co-Collateral Agents' ability to realize upon the Collateral, (b) to reflect claims and liabilities that such Co-Collateral Agent determines may need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in any Co-Collateral Agent's Permitted Discretion (but are not limited to) reserves based on: (i) customs duties, and other costs to release Inventory which is being imported into the United States, (ii) accrued and unpaid Taxes and other governmental charges, including, but not limited to, ad valorem, real property, excise, personal property sales, use and other Taxes and claims of the PBGC that any Co-Collateral Agent determines rank senior to or pari passu with (in payment or Lien priority) the Obligations or the Prepetition ABL Obligations, (iii) salaries, wages and benefits due to employees of any Loan Party, (iv) reasonably anticipated changes in the Net Orderly Liquidation Value and/or Store Closing Net Orderly Liquidation Value between appraisals, (v) warehousemen's or bailees'

5

18-23538-shl   Doc 4255-1   Filed 06/18/19   Entered 06/18/19 23:13:14   Exhibit A
Pg 12 of 181

charges and other Permitted Encumbrances, (vi) Cash Management Reserves, (vii) Bank Product Reserves, (viii) amounts due to vendors on account of consigned goods, (ix) rent expense at leased Stores and DC locations, (x) royalties payable to non-Loan Parties in respect of licensed merchandise, (xi) the Gift Card Liability Reserve, (xii) Customer Deposits Reserve, (xiii) PACA Liability Reserves, (xiv) PASA Liability Reserves, (xv) amounts due to any state's lottery commission or other equivalent agency, authority or entity, or to any other Governmental Authority involved in the administration or regulation of lotteries, (xvi) Credit Card Receivables owed to Sears Protection Company (PR), Inc. and its Subsidiaries, (xvii) amounts due to Sears Authorized Hometown Stores, LLC, Sears Home Appliance Showrooms, LLC, Sears Outlet Stores, LLC and their subsidiaries, (xviii) amounts of any court-ordered charges or other liabilities that any Co-Collateral Agent determines rank senior to or pari passu with (in payment or Lien priority) the Obligations or Prepetition ABL Obligations, (xix) amounts in respect of any reclamation, setoff, recoupment or similar claims as may relate to or arise during the Chapter 11 Cases that are or that any Co-Collateral Agent reasonably believes may become senior to the Liens securing the Obligations, (xx) accrued and unpaid interest or fees on the Obligations, (xxi) the Credit Card Accounts Receivable Reserve and (xxii) amounts due with respect to fees of any professional for any liquidation, going out of business or similar sale.  Upon the determination by any Co-Collateral Agent that an Availability Reserve should be established or modified, such Co-Collateral Agent shall notify the Agent in writing and the Agent shall thereupon establish or modify such Availability Reserve and, to the extent practicable, promptly provide the Borrowers with notice thereof; provided that failure to provide such notice shall not impair the effectiveness of such Availability Reserve.

"**Available Commitment**" means as to any Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Revolving Lender's Revolving Commitment then in effect over (b) such Revolving Lender's Revolving Extensions of Credit then outstanding; provided, that in calculating any Revolving Lender's Revolving Extensions of Credit for the purpose of determining such Revolving Lender's Available Commitment pursuant to Section 2.05(a), the aggregate principal amount of Swingline Advances then outstanding shall be deemed to be zero.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank of America**" has the meaning specified in the Preamble.

"**Bank Products**" means any services or facilities provided to any Loan Party by any Lender or any of its Affiliates on account of (a) each Swap Contract that is entered into after the date hereof with any counterparty that is a Credit Party at the time such Swap Contract is entered into, (b) leasing facilities, and (c) other banking products or services (other than Letters of Credit and excluding Cash Management Services) to or for the benefit of any Loan Party agreed by the Agent and the Borrowers as being a "**Bank Product**" for purposes of this Agreement, provided that in each case, such Bank Product is added to Schedule I by the Borrowers (which addition

may be made by the Borrowers by notice to the Agent in writing); provided further, that such notice shall be deemed given with respect to any Bank Products provided by the Agent or its Affiliates.

"**Bank Product Reserves**" means such reserves as any Co-Collateral Agent may from time to time determine in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"**Banker's Acceptance**" means a time draft or bill of exchange or other deferred payment obligation relating to a Commercial L/C which has been accepted by the applicable Issuing Lender.

"**Bankruptcy Code**" has the meaning specified in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning specified in the recitals to this Agreement.

"**Base Rate**" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus one-half of one percent (0.50%), (b) the Eurodollar Rate (calculated utilizing a one-month Interest Period) plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate." The "**prime rate**" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Rate Advance**" means an Advance or a Term Loan Borrowing that bears interest as provided in Section 2.08(a)(i) or Section 2.08(b)(i), as applicable.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Blocked Accounts**" means any deposit accounts that become subject to Blocked Account Agreements pursuant to Section 6.01(i)(iii).

"**Blocked Account Agreement**" means with respect to a Blocked Account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Co-Collateral Agents, establishing control (as defined in the UCC) of such account by the Agent (as "**Control Co-Collateral Agent**") and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Agent (or any other Co-Collateral Agent which shall

succeed the Agent as "Control Co-Collateral Agent" thereunder), without the further consent of any other Person.

"**Blocked Account Bank**" means Bank of America, N.A. and each other bank with whom deposit accounts are maintained in which funds of any of the Loan Parties are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System.

"**Borrower Information**" has the meaning specified in Section 9.08.

"**Borrower Materials**" has the meaning specified in Section 9.02(d).

"**Borrowers**" has the meaning specified in the Preamble.

"**Borrowing**" means a borrowing consisting of simultaneous Advances of the same Type made by each of the applicable Lenders pursuant to Section 2.01 or Section 2.03 provided that no more than six (6) Interest Periods in the aggregate for Borrowings and Term Loan Borrowings constituting Eurodollar Rate Advances may be outstanding at any time.

"**Borrowing Base**" means, at any time, an amount equal to (a) 87.5% of the aggregate outstanding Eligible Credit Card Accounts Receivable at such time, plus (b) 87.5% of the Eligible Pharmacy Receivables at such time plus (c) (i) 87.5% of the Net Orderly Liquidation Value of Net Eligible Inventory (other than Eligible Inventory at a Store being closed) at such time and (ii) 87.5% of the Store Closing Net Orderly Liquidation Value of Net Eligible Inventory at Stores being closed, minus (d) 100% of the then Availability Reserves, minus (e) the Borrowing Base Carve-Out Reserve, minus (f) Prepetition Revolver/Term Exposure, minus (g) the Prepetition FILO Reserve; it being understood that the Agent may, in its Permitted Discretion, adjust Availability Reserves and Inventory Reserves and any other reserves used in computing the Borrowing Base.

"**Borrowing Base Carve-Out Reserve**" means, at any time, (a) the Carve-Out Reserve Amount (as defined in paragraph 21(e) of the Final Financing Order) minus (b) the then current balance of the Carve-Out Account.

"**Borrowing Base Certificate**" means a certificate, signed by an Authorized Officer of Holdings, substantially in the form of Exhibit C or another form which is reasonably acceptable to the Co-Collateral Agents in their Permitted Discretion.

"**Borrowing Base Loan Party**" means each Borrower and each guarantor of the Obligations under the Guarantee and Collateral Agreement that is also a "Subsidiary Guarantor" under and as defined in the Prepetition First Lien ABL Credit Agreement.

"**BRG**" means Berkeley Research Group, LLC, in its capacity as an Agent Advisor.

8

"**Budget Certificate**" mean a certificate, substantially in the form of <u>Exhibit M</u> hereto, by which Holdings certifies, among other things, compliance with the covenants contained in <u>Section 6.03(b)</u>.

"**Budget Variance Report**" means a weekly report certified by an Authorized Officer of Holdings to the Agent and the Co-Collateral Agents (a) showing, in each case, by line item the actual cash receipts, disbursements, inventory receipts and consignment receipts for each week, in a comparable form to the Approved Budget, noting therein the variance of the Borrower's Net Cash Flow, on a cumulative basis, for the Cumulative Four-Week Period, from the projected Net Cash Flow set forth for the Cumulative Four-Week Period in the Approved Budget, (b) including explanations for all material variances (including whether such variance is permanent in nature or timing related) and (b) for any report delivered on the Wednesday following a Budget Testing Date, containing an analysis demonstrating the Borrowers are in compliance with the budget covenant set forth in <u>Section 6.03(b)</u>, all in a form, and containing such supporting information, as is satisfactory to the Agent and the Co-Collateral Agents in their sole discretion.

"**Budget Testing Date**" has the meaning specified in <u>Section 6.03(b)</u>.

"**Business Day**" means a day of the year on which banks are not required or authorized by law to close in New York, New York or Boston, Massachusetts and, if the applicable Business Day relates to any Eurodollar Rate Advances, a day of the year on which dealings are carried on in the London interbank market.

"**Capital Lease Obligations**" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**" has the meaning specified in paragraph 21(a) of the Final Financing Order.

"**Carve-Out Account**" has the meaning specified in paragraph 21(f) of the Final Financing Order.

"**Carve-Out Reserve**" has the meaning specified in paragraph 21(e) of the Final Financing Order.

"**Case Milestones**" has the meaning specified in <u>Section 6.01(r)(i)</u>.

"**Cash Collateral**" means cash delivered to Agent to Cash Collateralize any Obligations, and all interest, dividends, earnings and other proceeds relating thereto.

"**Cash Collateralize**" means the delivery of cash to Agent, as security for the payment of Obligations, in an amount equal to 105% of the aggregate L/C Obligations. "**Cash Collateralization**" has a correlative meaning.

9

"**Cash Equivalents**" means (a) marketable obligations issued or unconditionally guaranteed by, and backed by the full faith and credit of, the U.S. government, maturing within 12 months of the date of acquisition; (b) certificates of deposit, time deposits and bankers' acceptances maturing within 12 months of the date of acquisition, and overnight bank deposits, in each case which are issued by Bank of America or a commercial bank organized under the laws of the United States or any state or district thereof, rated A-1 (or better) by S&P or P-1 (or better) by Moody's at the time of acquisition, and (unless issued by a Lender) not subject to offset rights; (c) repurchase obligations with a term of not more than 30 days for underlying investments of the types described in clauses (a) and (b) entered into with any bank described in clause (b); (d) commercial paper issued by Bank of America or rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and maturing within nine months of the date of acquisition; and (e) shares of any money market fund that has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000 and has the highest rating obtainable from either Moody's or S&P.

"**Cash Management Order**" means that certain *Interim Order Authorizing Debtors to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Ordinary Course Changes to Cash Management System, (III) Continue Intercompany Transactions, and (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims and Granting Related Relief*, (Docket No. 102) entered by the Bankruptcy Court on October 16, 2018 and any similar final order entered by the Bankruptcy Court.

"**Cash Management Reserves**" means such reserves as any Co-Collateral Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"**Cash Management Services**" means any one or more of the following types of services or facilities provided to any Loan Party by any Lender or any of its Affiliates: (a) ACH transactions, (b) cash management services, including, without limitation, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) foreign exchange facilities, (d) credit card processing services and private label letters of credit, (e) credit or debit cards, and (f) purchase cards; provided that in each case, such Cash Management Service is added to Schedule I by the Borrowers (which addition may be made by the Borrowers by notice to the Agent in writing); provided further, that such notice shall be deemed given with respect to any Bank Products provided by the Agent or its Affiliates.

"**Class**" means (a) the class consisting of Revolving Lenders and (b) the class consisting of Term Lenders. For clarity, except as expressly provided herein, each Lender shall have the same rights and obligations under this Agreement and the other Loan Documents.

"**Change in Law**" means the occurrence, after the date hereof, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided, however, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, rules,

guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

"**Chapter 11 Cases**" means the chapter 11 cases of the Debtors pending in the Bankruptcy Court.

"**Co-Collateral Agents**" has the meaning specified in the Preamble.

"**Collateral**" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, including the Prepetition ABL Collateral and all other assets of the Loan Parties, whether now owned or hereafter acquired, and all proceeds thereof, including, without limitation, any claims and causes of action of the Loan Parties of any kind or nature (including proceeds of any actions for preferences, fraudulent conveyances and other avoidance power claims under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code); it being understood that "Collateral" shall include all such property irrespective of whether any such property was excluded pursuant to the Prepetition Loan Documents.

"**Commercial L/C**" means a commercial documentary Letter of Credit under which an Issuing Lender agrees to make payments in Dollars for the account of any Borrower, on behalf of any Group Member, in respect of obligations of such Group Member in connection with the purchase of goods or services in the ordinary course of business.

"**Commitments**" means, collectively, the Revolving Commitments and the Term Commitments.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Commonly Controlled Entity**" means an entity, whether or not incorporated, that is under common control with any Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes any Borrower and that is treated as a single employer under Section 414 of the Internal Revenue Code.

"**Convert**", "**Conversion**" and "**Converted**" each refers to a conversion of Advances or a Term Loan Borrowing of one Type into Advances or a Term Loan Borrowing of the other Type pursuant to Section 2.09 or 2.10.

"**Control Co-Collateral Agent**" has the meaning specified in the Guarantee and Collateral Agreement.

"**Credit Card Accounts Receivable**" means each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to a Loan Party resulting from charges by a customer of a Loan Party on credit cards processed by such processor or issued by such

# Exhibit 8

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
In re                                         :
                                              :        Chapter 11
SEARS HOLDINGS CORPORATION, et al.,           :
                                              :        Case No. 18-23538 (RDD)
                                              :
            Debtors. [1]                       :        (Jointly Administered)
------------------------------------------------------------x
```

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING, (B) GRANT SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of Sears Holdings Corporation ("Holdings") and

its affiliated debtors, as debtors and debtors-in-possession (collectively, the "Debtors") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases") pending in the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking entry

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).   The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

thereby and the Carve-Out.  The DIP ABL Superpriority Claims shall be entitled to the full

protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any

provision hereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise.

Notwithstanding anything to the contrary herein, the DIP ABL Superpriority Claims shall be of

equal priority to the Junior DIP Superpriority Claims.

**DIP ABL Liens and DIP ABL Collateral.**

13.    Effective immediately upon entry of the Interim Order and as more fully

set forth in the DIP ABL Loan Documents, as security for the full and prompt performance and

payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP ABL

Secured Obligations, the DIP ABL Control Co-Collateral Agent was granted, for itself and for

the benefit of all of the DIP ABL Credit Parties, continuing valid, binding, enforceable, non-

avoidable, automatically and properly perfected, post-petition security interests in and liens (the

"DIP ABL Liens") on all DIP ABL Collateral *nunc pro tunc* to the Petition Date without the

necessity of the execution by the DIP ABL Loan Parties (or recordation or other filing or notice)

of security agreements, control agreements, pledge agreements, copyright security agreements,

trademark security agreements, patent security agreements, financing statements, mortgages,

schedules or other similar documents, or the possession or control by the DIP ABL Agents or

any other DIP ABL Credit Party of any DIP ABL Collateral.  The term "DIP ABL Collateral"

means Prepetition ABL Collateral and all other assets of the DIP ABL Loan Parties, whether

now owned or hereafter acquired, and all proceeds thereof, including all deposit accounts,

securities accounts, cash and cash equivalents of the DIP ABL Loan Parties; *provided, that* DIP

ABL Collateral excludes any of the following (collectively, the "Excluded Property"): (i) (a)

leases of real property except as permitted in the applicable lease or pursuant to applicable non-

bankruptcy law (but in no event shall DIP ABL Collateral exclude the proceeds of such leases),

and (b) any security deposits or the Debtors' interests, if any, in pre-paid rent, unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; *provided*, *however,* that solely in the event the Debtors subsequently seek by separate motion and obtain by final order liens on all of their leases of real property in connection with a debtor-in-possession financing facility other than the DIP ABL Facility (including in connection with the Junior DIP Facility), the DIP ABL Collateral shall include all leases of real property and the DIP ABL Liens and Adequate Protection Liens shall be first in priority and senior to any other liens thereon (other than leases of real property that are Specified Collateral which the Junior DIP Liens and DIP ABL Liens shall share pari passu); (ii) the DIP ABL Loan Parties' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (the "Avoidance Actions"), but not the proceeds thereof ("Avoidance Action Proceeds"); *provided*, for the avoidance of doubt, that the DIP ABL Collateral shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions whether by judgment, settlement or otherwise, (iii) any Intellectual Property (as defined in the DIP ABL Credit Agreement) consisting of intent-to-use trademark applications and rights in and to such applications, prior to the filing of a "Statement of Use" or "Amendment to Allege Use" to the extent that a grant of security interest in such application would impair validity or enforceability, (iv) any property to the extent that the grant of a security interest therein would violate applicable law, require a consent not obtained of any Governmental Authority (as defined in the DIP ABL Credit Agreement) or constitute a breach or default under, or result in the termination of or require a consent not obtained under, any contract, non-real property lease, license or other agreement evidencing or giving rise to such

38

property, or result in the invalidation of such property or provide any party to such contract, non-real property lease, license or agreement with a right of termination of such contract, non-real property lease, license or agreement (in each case, after giving effect to applicable provisions of the New York UCC, the Bankruptcy Code or other applicable law), (v) any and all claims or causes of action against current or former directors and officers of any DIP ABL Loan Party, including without limitation, any claim for or relating to a breach of fiduciary duty by any such director or officer (the "D&O Claims"), but not proceeds thereof, (vi) the Carve-Out Account, and (vii) proceeds and products of any of the foregoing Excluded Property described in clauses (i), (iii) through (iv) above solely to the extent such proceeds and products would constitute property or assets of the type described in clauses (i), (iii) through (iv) above; *provided that* in each case of property described in clause (iv) of this definition, such property shall constitute "Excluded Property" only to the extent and for so long as such contract, non-real property lease, license or other agreement or applicable law prohibits the creation of a lien on such property in favor of the DIP ABL Control Co-Collateral Agent, and, upon termination of such prohibition, such property shall cease to constitute "Excluded Property".  Each of the Junior DIP Agent, DIP ABL Agents, their respective lenders and the Debtors are bound by the DIP Intercreditor Agreement; *provided*, that the DIP ABL Agents and the Junior DIP Agent and each of their respective lenders are contractually obligated to comply with the DIP Intercreditor Agreement, and the DIP ABL Agents and DIP ABL Lenders may enforce such agreement against the Junior DIP Agent and its respective lenders in these Chapter 11 Cases without the need for any further order of the Bankruptcy Court; *provided, further,* that the Debtors and their estates shall be deemed to be express third party beneficiaries of, and shall be entitled to enforce the provisions of Section 4.1(b)(iii) and Section 4.1(b)(iv) of the DIP Intercreditor Agreement and the

39

immediately succeeding sentence of this paragraph 13 (collectively, the "Reverse Marshaling Provisions"), which Reverse Marshaling Provisions shall remain enforceable by the Debtors and their estates until the repayment in full in cash of the DIP ABL Obligations and the Junior DIP Obligations.  The DIP ABL Agents shall not apply proceeds of any Prepetition Unencumbered Collateral received in connection with any Exercise of Secured Creditor Remedies (as defined in the DIP Intercreditor Agreement) or from any sale, transfer or other disposition of such assets pursuant to section 363 or section 1129 of the Bankruptcy Code (or any similar provision under the law applicable to the Chapter 11 Cases or any other Insolvency Proceeding (as defined in the DIP Intercreditor Agreement) or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws (as defined in the DIP Intercreditor Agreement)) to the repayment of obligations under the DIP ABL Facility until (x) all but a de minimis amount of Prepetition ABL Collateral of the type that is eligible to be included in the term "Borrowing Base" in the DIP ABL Credit Agreement as in effect on the date of the DIP Intercreditor Agreement (but without giving effect to any changes or adjustments to the Borrowing Base or the eligibility criteria therefor, in each case, that any DIP ABL Agent may make in its "Permitted Discretion" (as defined in the DIP ABL Credit Agreement as in effect on the date of the DIP Intercreditor Agreement)) has been sold, transferred or otherwise been disposed of and the proceeds thereof applied in accordance with the DIP Intercreditor Agreement or (y) all but a de minimis amount of Prepetition ABL Collateral of the type that is eligible to be included in the term "Borrowing Base" in the DIP ABL Credit Agreement as in effect on the date of the DIP Intercreditor Agreement (but without giving effect to any changes or adjustments to the Borrowing Base or the eligibility criteria therefor, in each case, that any DIP ABL Agent may make in its "Permitted Discretion" (as defined in the DIP ABL Credit Agreement as in effect on

40

the date of the DIP Intercreditor Agreement)) is otherwise no longer available to be used to apply

to and satisfy the DIP ABL Secured Obligations; *provided, however,* that if the proceeds of any

Prepetition Unencumbered Collateral (including Specified Collateral) are used to satisfy any DIP

ABL Secured Obligations or Prepetition ABL Obligations in accordance with this paragraph 13,

notwithstanding anything in this Final Order to the contrary, after the Discharge of Senior DIP

Obligations and the Discharge of Prepetition ABL Obligations (as each such term is defined in

the DIP Intercreditor Agreement), all ensuing proceeds of Prepetition ABL Collateral shall be

deemed to be proceeds of Prepetition Unencumbered Collateral (including Specified Collateral)

until such proceeds equal the amount of Prepetition Unencumbered Collateral (including

Specified Collateral) that were used to satisfy any DIP ABL Secured Obligations or Prepetition

ABL Obligations.    No amendment, modification or waiver of the Reverse Marshaling

Provisions, Section 7.4 of the DIP Intercreditor Agreement or clause (y) of Section 7.10 of the

DIP Intercreditor Agreement, nor consent to any departure of such provisions by any person,

shall be effective, nor shall any amendment or modification to any defined term used or

incorporated by reference in the Reverse Marshaling Provisions, or any component definition

thereof, be given effect in such Reverse Marshaling Provisions, unless in each case it is in a

written agreement executed by the Debtors and approved by the Creditors' Committee or the

Bankruptcy Court. In addition, no amendment, modification or waiver of Section 4.1(b)(i) or

Section 4.1(b)(ii) of the DIP Intercreditor Agreement, nor any consent to any departure of such

provisions by any person, shall be effective, nor shall any amendment or modification to any

defined term used or incorporated by reference in Section 4.1(b)(i) or Section 4.1(b)(ii) of the

DIP Intercreditor Agreement, or any component definition thereof, be given effect in such

Section 4.1(b)(i) or Section 4.1(b)(ii) of the DIP Intercreditor Agreement, unless in each case the

Creditors' Committee has been given at least three (3) days prior written notice of such proposed

amendment, modification, waiver or departure.

**Priority of DIP ABL Liens**

14.    The DIP ABL Liens on the DIP ABL Collateral shall in each case be

subject to the Carve-Out and otherwise have the following priority:

(a)    pursuant to section 364(c)(2) of the Bankruptcy Code, first priority liens on and security interests in all DIP ABL Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date (collectively, the "Prepetition Unencumbered Collateral"), which liens shall be *pari passu* with the Junior DIP Liens on Prepetition Unencumbered Collateral which constitute "Specified Collateral" (as defined in the DIP Intercreditor Agreement, the "Specified Collateral") but subject to any Senior Permitted Liens; *provided*, that the proceeds of such Specified Collateral shall be shared by the Junior DIP Lenders and the DIP ABL Credit Parties pro rata based on the aggregate commitment amount under the Junior DIP Facility (i.e., $350,000,000) and aggregate incremental commitments and extensions of credit under the DIP ABL Facility (i.e., $300,000,000) without giving regard to the roll-up portion thereof, respectively;

(b)    pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens on and security interests in all DIP ABL Collateral (other than Prepetition ABL Collateral) that is not subject to Prepetition ABL Liens but is subject to valid and perfected security interests in favor of third parties as of the Petition Date (the "Prepetition Encumbered Collateral") and any Senior Permitted Liens; and

(c)    pursuant to section 364(d) of the Bankruptcy Code, first priority priming security interests and liens on the Prepetition ABL Collateral of each Debtor on which the Prepetition ABL Lenders held a first priority security interest and lien (such liens and security interests, the "DIP ABL Priming Liens"), in each case to the extent that such Prepetition ABL Collateral is subject to Prepetition ABL Liens and such DIP ABL Priming Liens shall be (x) senior in all respects to the interests in such property of the Prepetition ABL Credit Parties under the Prepetition ABL Credit Agreement and the other "secured parties" referred to therein, (y) senior to the Adequate Protection Liens, and (z) subject to any Senior Permitted Liens.

15.    Notwithstanding anything to the contrary herein, the following table sets

forth the relative priorities of the Carve-Out, the Senior Permitted Liens, the DIP ABL Liens, the

| Prepetition Second Lien Adequate Protection Liens | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | |
|---|---|---|---|
| Prepetition Second Lien Facilities Liens (except on Specified Non-Prepetition Second Lien Collateral) | | | |
| Junior DIP Liens | | | |

16.     ***Treatment of DIP ABL Liens.***  Other than as set forth herein, the DIP ABL Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereafter granted in the Chapter 11 Cases or any Successor Case.  The DIP ABL Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.  No lien or interest avoided and preserved for the benefit of the DIP ABL Loan Parties' estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP ABL Liens.

**Adequate Protection**

17.     ***Adequate Protection Liens.***

(a)     ***Prepetition ABL Adequate Protection Liens.***  Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Credit Parties (other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties) in the Prepetition ABL Collateral, including Cash Collateral, against the

45

aggregate net diminution in value of the Prepetition ABL Credit Parties' (other than the 2018

FILO Lenders and the Prepetition LC Facility Credit Parties) interests in the entirety of the

Prepetition ABL Collateral resulting from the DIP ABL Loan Parties' use, sale or lease (or other

decline in value to the extent permitted under the Bankruptcy Code) of such collateral, the

imposition of the automatic stay, the priming of the Prepetition ABL Liens and the subordination

to the Carve-Out (collectively, "ABL Diminution in Value"), the DIP ABL Loan Parties,

pursuant to the Interim Order, granted and hereby grant to the Prepetition ABL Control Co-

Collateral Agent on behalf of itself and all of the other Prepetition ABL Credit Parties (other than

the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties) to the extent of any ABL

Diminution in Value, if any, a valid and perfected replacement and additional security interest in,

and liens on (the "Prepetition ABL Facilities Adequate Protection Liens") all DIP ABL

Collateral.  The Prepetition ABL Facilities Adequate Protection Liens are and shall be valid,

binding, enforceable and fully perfected *nunc pro tunc* to the Petition Date (without the necessity

of the execution by the DIP ABL Loan Parties of mortgages, control agreements, security

agreements, pledge agreements, financing statements, or other agreements) and shall (i) solely

with respect to the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out,

the Senior Permitted Liens and the DIP ABL Liens, (ii) solely with respect to the Prepetition

Encumbered Collateral, be subject to the Carve-Out, valid and perfected security interests in

favor of third parties as of the Petition Date (including any Senior Permitted Liens), the DIP

ABL Liens, and the Junior DIP Liens, (iii) solely with respect to Prepetition Unencumbered

Collateral, subject to the Carve-Out, any Senior Permitted Liens, the DIP ABL Liens, and the

Junior DIP Liens and (iv) otherwise be senior to all other security interests in, liens on, or claims

against any of the DIP ABL Collateral.

46

(b)     *Prepetition 2018 FILO Adequate Protection Liens*.   Pursuant to

sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the

interests of the 2018 FILO Lenders in the Prepetition ABL Collateral, including Cash Collateral,

against the aggregate net diminution in value of the 2018 FILO Lenders' interests in the entirety

of the Prepetition ABL Collateral resulting from the DIP ABL Loan Parties' use, sale or lease

(or other decline in value to the extent permitted under the Bankruptcy Code) of such collateral,

the imposition of the automatic stay, the priming of the Prepetition ABL Liens and the

subordination to the Carve-Out (collectively, the "2018 FILO ABL Diminution in Value"), the

DIP ABL Loan Parties, pursuant to the Interim Order, granted and hereby grant to the Prepetition

ABL Control Co-Collateral Agent, on behalf of the 2018 FILO Lenders to the extent of any 2018

FILO ABL Diminution in Value, if any, a valid and perfected replacement and additional

security interest in, and liens on (the "2018 FILO Adequate Protection Liens") all DIP ABL

Collateral.   The 2018 FILO Adequate Protection Liens are and shall be valid, binding,

enforceable and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the

execution by the DIP ABL Loan Parties of mortgages, control agreements, security agreements,

pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to

the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Senior

Permitted Liens, the DIP ABL Liens, and the Prepetition ABL Facilities Adequate Protection

Liens, (ii) solely with respect to the Prepetition Encumbered Collateral, be subject to the Carve-

Out, valid and perfected security interests in favor of third parties as of the Petition Date

(including any Senior Permitted Liens), the DIP ABL Liens, the Junior DIP Liens and the

Prepetition ABL Facilities Adequate Protection Liens, (iii) solely with respect to Prepetition

Unencumbered Collateral, subject to the Carve-Out, any Senior Permitted Liens, the DIP ABL

47

Liens, the Junior DIP Liens, and the Prepetition ABL Facilities Adequate Protection Liens and (iv) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP ABL Collateral.

(c)     *Prepetition LC Facility Adequate Protection Liens.*   Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition LC Facility Credit Parties in the Prepetition ABL Collateral, including Cash Collateral, against the aggregate net diminution in value of the Prepetition LC Facility Credit Parties' interests in the entirety of the Prepetition ABL Collateral resulting from the Prepetition LC Facility Credit Parties' use, sale or lease  (or other decline in value to the extent permitted under the Bankruptcy Code) of such collateral, the imposition of the automatic stay, the priming of the Prepetition ABL Liens and the subordination to the Carve-Out (collectively, the "Prepetition LC ABL Diminution in Value"), the DIP ABL Loan Parties, pursuant to the Interim Order, granted and hereby grant to the Prepetition LC Facility Administrative Agent on behalf of itself and all of the other Prepetition LC Facility Credit Parties to the extent of any Prepetition LC ABL Diminution in Value, if any, a valid and perfected replacement and additional security interest in, and liens on (the "Prepetition LC Facility Adequate Protection Liens") all DIP ABL Collateral.  The Prepetition LC Facility Adequate Protection Liens are and shall be valid, binding, enforceable and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the execution by the DIP ABL Loan Parties of mortgages, control agreements, security agreements, pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Senior Permitted Liens, the DIP ABL Liens, the Prepetition ABL Facilities Adequate Protection Liens, and the 2018 FILO Adequate Protection Liens, (ii) solely

48

with respect to the Prepetition Encumbered Collateral, be subject to the Carve-Out, valid and perfected security interests in favor of third parties as of the Petition Date (including any Senior Permitted Liens), the DIP ABL Liens, the Junior DIP Liens, the Prepetition ABL Facilities Adequate Protection Liens and the 2018 FILO Adequate Protection Liens, (iii) solely with respect to Prepetition Unencumbered Collateral, subject to the Carve-Out, any Senior Permitted Liens, the DIP ABL Liens, the Junior DIP Liens, the Prepetition ABL Facilities Adequate Protection Liens and the 2018 FILO Adequate Protection Liens, and (iv) otherwise be senior to all other security interests in, liens on, or claims against any of the DIP ABL Collateral.

(d)     *Second Lien Adequate Protection Liens*.  Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Second Lien Credit Parties in the Prepetition Second Lien Collateral, against the aggregate net diminution in value, if any, resulting from the DIP ABL Loan Parties' use, sale or lease (or other decline in value to the extent permitted under the Bankruptcy Code) of such collateral, the imposition of the automatic stay, the priming of the Prepetition Second Lien Facilities Liens and the subordination to the Carve-Out (collectively, the "Second Lien Diminution in Value," and, collectively with the ABL Diminution in Value, the 2018 FILO ABL Diminution in Value and the Prepetition LC ABL Diminution in Value, the "Diminution in Value"), each Prepetition Second Lien Loan Party, pursuant to the Interim Order, granted and hereby grants to the Prepetition Second Lien Collateral Agent on behalf of itself and the other Prepetition Second Lien Credit Parties to the extent of any applicable Second Lien Diminution in Value, if any, a valid and perfected replacement and additional security interest in, and liens on (the "Prepetition Second Lien Adequate Protection Liens," and together with the Prepetition ABL Facilities Adequate Protection Liens, the 2018 FILO Adequate Protection Liens, and the

49

Prepetition LC Facility Adequate Protection Liens, the "Adequate Protection Liens") all DIP

ABL Collateral owned by the Prepetition Second Lien Loan Parties.  For the avoidance of doubt,

notwithstanding the Interim Order, the Prepetition Second Lien Adequate Protection Liens shall

solely attach to property or other interests of the Prepetition Second Lien Loan Parties.   The

Prepetition Second Lien Adequate Protection Liens are and shall be valid, binding, enforceable

and fully perfected *nunc pro tunc* to the Petition Date (without the necessity of the execution by

the Prepetition Second Lien Loan Parties of mortgages, control agreements, security agreements,

pledge agreements, financing statements, or other agreements) and shall (i) solely with respect to

the Prepetition ABL Collateral, be subject and subordinate only to the Carve-Out, the Senior

Permitted Liens, the DIP ABL Liens, the Prepetition ABL Facilities Adequate Protection Liens,

the 2018 FILO Adequate Protection Liens, the Prepetition LC Facility Adequate Protection Liens

the Prepetition ABL Liens, and the Post-Petition Intercompany Liens (ii) solely with respect to

the Prepetition Encumbered Collateral, be subject to the Carve-Out, valid and perfected security

interests in favor of third parties as of the Petition Date (including any Senior Permitted Liens),

the DIP ABL Liens, the Junior DIP Liens, the Prepetition ABL Facilities Adequate Protection

Liens, the 2018 FILO Adequate Protection Liens, the Prepetition LC Facility Adequate

Protection Liens, and the Post-Petition Intercompany Liens (iii) solely with respect to Prepetition

Unencumbered Collateral, subject to the Carve-Out, any Senior Permitted Liens, the DIP ABL

Liens, the Junior DIP Liens, the Prepetition ABL Facilities Adequate Protection Liens, the 2018

FILO Adequate Protection Liens, the Prepetition LC Facility Adequate Protection Liens and the

Post-Petition Intercompany Liens and (iv) otherwise be senior to all other security interests in,

liens on, or claims against any of the DIP ABL Collateral. The Prepetition Second Lien Secured

Parties shall not apply proceeds of any Prepetition Unencumbered Collateral to satisfy any

adequate protection claims hereunder until all of the Prepetition Second Lien Collateral has been

sold, transferred or otherwise been disposed of or is otherwise no longer available to be used to

apply to, or is determined by the Bankruptcy Court to be insufficient to satisfy the Prepetition

Second Lien Obligations.

(e)    *Treatment of Adequate Protection Liens.*  Other than as set forth in

the DIP Orders, the Adequate Protection Liens shall not be made subject to or *pari passu* with

any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any

Successor Case.  The Adequate Protection Liens shall be valid and enforceable against any

trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case,

upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy

Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases

or any Successor Case.  The Adequate Protection Liens shall not be subject to sections 510, 549

or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the

estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the

Prepetition Liens or the Adequate Protection Liens.

18.    ***Adequate Protection Superpriority Claims.***

(a)    *Prepetition ABL Superpriority Claims.* Pursuant to section 507(b)

of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Credit

Parties (other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties) in the

Prepetition ABL Collateral, including Cash Collateral, the Prepetition ABL Control Co-

Collateral Agent, for itself and for the benefit of all of the other Prepetition ABL Credit Parties

(other than the 2018 FILO Lenders and the Prepetition LC Facility Credit Parties), pursuant to

the Interim Order, was granted an allowed administrative claim against the DIP ABL Loan

Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition ABL Adequate Protection Claims") to the extent of any ABL Diminution in Value. Except as set forth herein, the Prepetition ABL Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; provided, however, that the Prepetition ABL Adequate Protection Claims shall be junior to (i) the Carve-Out, (ii) the DIP ABL Superpriority Claims, and (iii) the Junior DIP Superpriority Claims.

(b)    *Prepetition 2018 FILO Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the 2018 FILO Lenders in the Prepetition ABL Collateral, including Cash Collateral, the Prepetition ABL Control Co-Collateral Agent, on behalf of the 2018 FILO Lenders, pursuant to the Interim Order, was granted an allowed administrative claim against the DIP ABL Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition 2018 FILO Adequate Protection Claims") to the extent of any 2018 FILO Diminution in Value. Except as set forth herein, the Prepetition 2018 FILO Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; *provided*, *however*, that the Prepetition 2018 FILO Adequate Protection Claims shall be junior to (i) the Carve-Out, (ii) the DIP ABL Superpriority Claims, (iii) the Junior DIP Superpriority Claims, and (iv) the Prepetition ABL Adequate Protection Claims.

52

(c)    *Prepetition LC Facility Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition LC Facility Credit Parties in the Prepetition ABL Collateral, including Cash Collateral, the Prepetition LC Facility Administrative Agent, for itself and for the benefit of all of the other Prepetition LC Facility Credit Parties, pursuant to the Interim Order, was granted an allowed administrative claim against the DIP ABL Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code (the "Prepetition LC Facility Adequate Protection Claims") to the extent of any Prepetition LC Diminution in Value.  Except as set forth herein, the Prepetition LC Facility Adequate Protection Claims shall have priority over all administrative expense claims and priority general unsecured claims against the DIP ABL Loan Parties or their estates, now existing or hereafter arising, to the fullest extent permitted under the Bankruptcy Code; provided, however, that the Prepetition LC Facility Adequate Protection Claims shall be junior to (i) the Carve-Out, (ii) the DIP ABL Superpriority Claims, (iii) the Junior DIP Superpriority Claims, (iv) the Prepetition ABL Adequate Protection Claims, and (v) the Prepetition 2018 FILO Adequate Protection Claims.

(d)    *Second Lien Facilities Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Second Lien Credit Parties in the Prepetition Second Lien Collateral, including any Cash Collateral, on behalf of itself and the other Prepetition Second Lien Credit Parties, the Prepetition Second Lien Collateral Agent, pursuant to the Interim Order, was granted an allowed administrative claim against the Prepetition Second Lien Loan Parties' estates under section 503(b) of the Bankruptcy Code with superpriority pursuant to section 507(a) and (b) of the Bankruptcy Code to the extent of any Second Lien Diminution in Value (the "Prepetition Second Lien Facilities Adequate

53

Protection Claims," and together with the Prepetition ABL Adequate Protection Claims, the

Prepetition 2018 FILO Adequate Protection Claims, and the Prepetition LC Facility Adequate

Protection Claims, the "Adequate Protection Claims") to the extent that the Prepetition Second

Lien Adequate Protection Liens are insufficient to protect the Prepetition Second Lien Credit

Parties' interests in the Prepetition Second Lien Collateral.  For the avoidance of doubt,

notwithstanding the Interim Order, the Prepetition Second Lien Facilities Adequate Protection

Claims shall only be against the estates of the Prepetition Second Lien Loan Parties.  Except as

set forth herein, the Prepetition Second Lien Facilities Adequate Protection Claims shall have

priority over all administrative expense claims and priority general unsecured claims against the

Prepetition Second Lien Loan Parties or their estates, now existing or hereafter arising, to the

fullest extent permitted under the Bankruptcy Code; provided, however, that the Prepetition

Second Lien Facilities Adequate Protection Claim shall be junior to (i) the Carve-Out, (ii) the

DIP ABL Superpriority Claims, (iii) the Junior DIP Superpriority Claims, (iv) the Prepetition

ABL Adequate Protection Claims, (v) the Prepetition LC Facility Adequate Protection Claims,

(vi) the Prepetition 2018 FILO Adequate Protection Claims, and (vii) the Postpetition

Intercompany Obligations (as defined below).

19.    ***Additional Adequate Protection.***

(a)    *Prepetition ABL Credit Parties.*  As additional adequate protection

of the Prepetition ABL Credit Parties' security interests in the Prepetition ABL Collateral, the

DIP ABL Loan Parties are authorized and directed to provide adequate protection in the form of

(i) current cash reimbursement of reasonable and documented fees and expenses and other

disbursements of the Prepetition ABL Administrative Agent, the Prepetition ABL Co-Collateral

Agents, and the Prepetition LC Facility Administrative Agent whether incurred before, on or

54

Budget minus $42 million. Such covenant shall be tested on Saturday each second week (commencing on November 10, 2018) (but shall be reported each week) on a cumulative basis from the Petition Date until the fourth (4th) week after the Petition Date and then on a rolling four (4) week basis, in accordance with the Budget Variance Report delivered by the DIP ABL Borrowers to the DIP ABL Agents and the Creditors' Committee (each such date, a "Budget Testing Date").

(e)    The DIP ABL Loan Parties shall arrange for separate weekly (unless waived by the DIP ABL Agents and the Creditors' Committee in their sole and absolute discretion) conference calls with the DIP ABL Agents and their professional advisors and the Creditors' Committee's professional advisors discussing and analyzing (A) the Approved Budget or the Budget Variance Reports and/or any other reports or information delivered pursuant to the DIP ABL Loan Documents, (B) the financial operations and performance of the DIP ABL Loan Parties' business, (C) the status of landlord negotiations, (D) the status of any Specified Store Closing Sales, (E) the status of the Chapter 11 Cases generally, (F) progress in achieving compliance with the Case Milestones (as defined below) and the Go Forward Plan (as defined in the DIP ABL Loan Documents) or (G) such other matters relating to the Debtors as the DIP ABL Agents or the Creditors' Committee (or either of their respective agents or advisors) shall reasonably request.

23.    ***Winddown Account.***    (a) Upon the consummation of any sales of Prepetition Unencumbered Collateral, the DIP ABL Loan Parties shall (i) deposit or cause to be deposited the net aggregate cash proceeds in respect of such sales into the Winddown Account[5]

---

[5]    The Winddown Account will be held at Bank of America, N.A. in an account ending in 8965.

until $240,000,000 in the aggregate has been funded into the Winddown Account; *provided* that in no event shall more than $240,000,000 be funded into such account, (ii) deposit or cause to be deposited any remaining net aggregate cash proceeds in respect of such sales into a cash collateral account maintained with Bank of America, N.A. (the "Senior DIP Cash Collateral Account") to secure the payment of the DIP ABL Secured Obligations (including (A) with respect to amounts available to be drawn under outstanding letters of credit issued or deemed issued under the DIP ABL Facility (or indemnities or other undertakings issued pursuant thereto in respect of such outstanding letters of credit), an amount equal to 105% of the aggregate undrawn amount of such letters of credit, and (B) with respect to Bank Products and Cash Management Services (each as defined in the DIP ABL Loan Documents) included in the DIP ABL Secured Obligations (or indemnities or other undertakings issued pursuant thereto in respect thereof), an amount of cash collateral in compliance with the terms of the DIP ABL Credit Agreement), and (iii) upon and after the indefeasible payment in full in cash of the DIP ABL Secured Obligations as described in clause (ii) above, deposit or cause to be deposited any remaining net cash proceeds in respect of such sales into a cash collateral account designated by the Junior DIP Agent (the "Junior DIP Cash Collateral Account") to secure the payment of the Junior DIP Facility, and (b) upon the consummation of any sales of Specified Collateral, the Junior DIP Obligors shall (i) as contemplated in paragraph 23(a)(i), deposit or cause to be deposited the net cash proceeds in respect of such sales into the Winddown Account until $240,000,000 in the aggregate has been funded into the Winddown Account; *provided* that in no event shall more than $240,000,000 be funded into such account, and (ii) deposit or cause to be deposited any remaining net cash proceeds in respect of such sales to the Senior DIP Cash Collateral Account and to the Junior DIP Cash Collateral Account, on a pro rata basis based on

74

the aggregate commitment under the Junior DIP Facility (i.e., $350,000,000) and the aggregate

incremental commitments and extensions of credit under the DIP ABL Facility (i.e.,

$300,000,000) without giving regard to the roll-up portion thereof, until either the indefeasible

payment in full in cash of the DIP ABL Secured Obligations or the Junior DIP Obligations has

occurred, after which all such net cash proceeds shall be applied to the payment of the DIP ABL

Secured Obligations or the Junior DIP Obligations, respectively, provided that nothing contained

in this paragraph 23 shall impair or modify the Reverse Marshaling Provisions and no payments

shall be made on the DIP ABL Secured Obligations or the Junior DIP Obligations in

contravention thereof.  "Winddown Account" shall mean a deposit account at Bank of America,

N.A. that, prior to the discharge and indefeasible payment in full of all obligations under the DIP

ABL Facility and the Junior DIP Facility, may only be used to pay winddown costs of the DIP

ABL Loan Parties at the discretion of the DIP ABL Loan Parties following entry of this Final

Order. Notwithstanding anything to the contrary in this or any other Bankruptcy Court order, the

Winddown Account and the amounts on deposit in the Winddown Account shall be available and

used only to satisfy winddown costs and shall not be subject to any prepetition liens or any liens

or superpriority claims granted hereunder, including liens or superpriority claims granted to the

DIP ABL Credit Parties or Junior DIP Credit Parties or as Adequate Protection.  For the

avoidance of doubt, the Winddown Account and the amounts on deposit in the Winddown

Account shall not constitute DIP ABL Collateral, Junior DIP Collateral or Cash Collateral. Bank

of America shall not be responsible or have any liability for, or have any duty to ascertain,

inquire into, monitor or enforce, compliance with the provisions of this definition.

24.    ***Modification of DIP ABL Loan Documents***.  Upon no less than three (3)

business days' notice to the Creditors' Committee and the Junior DIP Agent (in each case, only to

the DIP ABL Agents and the other DIP ABL Credit Parties herein.  Notwithstanding the foregoing, the DIP ABL Agents' or Prepetition ABL Agents' exercise of remedies pursuant to this paragraph with respect to real property leases shall be subject to: (i) any agreement in writing between any of the DIP ABL Agents or the Prepetition ABL Agents, as applicable, and any applicable landlord, (ii) pre-existing rights of any of the DIP ABL Agents or any of the Prepetition ABL Agents, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) further order of the Bankruptcy Court following notice and a hearing.

39.    ***Intercompany Obligations.***    To the extent any Debtor owes any post-petition intercompany obligation or indebtedness to any other Debtor (the "Intercompany Obligations"), such Intercompany Obligations shall, subject to the reservation of rights set forth in paragraphs 41 and 42 hereof, be subordinated only to the DIP ABL Secured Obligations, until the DIP ABL Secured Obligations are indefeasibly repaid in full in cash and the Junior DIP Secured Obligations until the Junior DIP Secured Obligations are indefeasibly paid in full.  All Intercompany Obligations incurred after the Petition Date ("Postpetition Intercompany Obligations") shall be secured by an automatically perfected security interest in and lien on, as to any Debtor transferee, all DIP ABL Collateral including all Prepetition ABL Collateral, Prepetition Encumbered Collateral and Prepetition Unencumbered Collateral of the transferee for the benefit of the Debtor transferor (the "Postpetition Intercompany Liens") junior to the Carve-Out, the DIP ABL Liens, the Senior Permitted Liens, the Junior DIP Liens, the Adequate Protection Liens (other than the Prepetition Second Lien Adequate Protection Liens), and the Prepetition ABL Liens, and senior to all other liens, and as to any non-Debtor transferee, liens on all assets and property of such transferee.  For the avoidance of doubt, any reference in this Final

92

Order to payment (or repayment) in full shall mean: (a) indefeasible repayment of all outstanding obligations in full in cash, (b) termination or expiration of all commitments under any applicable DIP ABL Loan Documents or Prepetition ABL Loan Documents and termination or expiration of any other commitment of any DIP ABL Credit Parties or Prepetition ABL Credit Parties to make extensions of credit to any of the DIP ABL Loan Parties under any such DIP ABL Loan Documents or Prepetition ABL Loan Documents, respectively, (c) all letters of credit issued or deemed issued under the DIP ABL Loan Documents have been canceled or have expired, and all amounts drawn thereunder have been reimbursed in full in cash (or other arrangements with respect thereto satisfactory to the DIP ABL Agents in their sole discretion shall have been made), and (d) solely with respect to the Prepetition ABL Obligations (i) if no Challenge Proceeding has been timely and properly commenced with respect to the prepetition obligations subject to the ABL Roll Up, the expiration of the Challenge Period, or (ii) the date on which any order entered by the Bankruptcy Court in favor of the applicable secured party in such Challenge Proceeding becomes final and non-appealable. For the avoidance of doubt, any Intercompany Obligations shall be subordinated to the DIP ABL Secured Obligations, the DIP ABL Liens, the Adequate Protection Liens (other than Second Lien Facilities Adequate Protection Liens), and the Adequate Protection Claims (other than Second Lien Facilities Superpriority Claims), except to the extent set forth on the lien priority chart in paragraph 15. The Debtors shall establish reasonable procedures (reasonably acceptable to the Creditors' Committee, the DIP ABL Agents, and the Prepetition Second Lien Credit Parties) to trace cash proceeds from the sale of inventory of the Debtors and to track liabilities and payables of the Debtors, including shared services and professional fees and costs (collectively, the "Allocable Costs"), on an entity by entity basis, including without limitation between obligors and non-obligors under the Prepetition Second

Lien Obligations, and to report the same to the Creditors' Committee, the DIP ABL Agents and

the Prepetition Second Lien Credit Parties on a monthly basis. At the time of repayment or

treatment of the Postpetition Intercompany Obligations pursuant to a chapter 11 plan or

otherwise, the Debtors, the Creditors' Committee, the DIP ABL Agents and the Prepetition

Second Lien Credit Parties agree to cooperate in good faith to propose and adopt a fair and

reasonable allocation of all Allocable Costs on an entity by entity basis.

40.    ***Prohibited Use of DIP ABL Facility, DIP ABL Collateral, Cash

Collateral, Carve-Out, etc.***    Notwithstanding anything herein, prior to indefeasible payment in

full in cash of the DIP ABL Secured Obligations and the Prepetition ABL Obligations, except as

otherwise expressly provided in this Final Order, the DIP ABL Facility, the DIP ABL Collateral,

the Cash Collateral, the Prepetition ABL Collateral, proceeds of any of the foregoing, and the

Carve-Out may not be used:

    (a)    for the payment of interest and principal with respect to Prepetition Obligations or any other prepetition indebtedness of the Debtors, except for: (i) the Carve-Out; (ii) prepetition employee wages, benefits and related employee taxes as of the Petition Date; (iii) prepetition sales, use and real property taxes; (iv) prepetition amounts due in respect of insurance financings, premiums and brokerage fees; (v) payment of certain expenses (which expenses shall include fees and expenses of professionals) of the Prepetition ABL Agents and the Prepetition ABL Credit Parties (solely as required under the Prepetition Loan Documents); (vi) other "first day" interim and final orders permitting payment of prepetition claims, in the case of (ii) through (vi) pursuant to an order or orders of the Bankruptcy Court in form and substance acceptable to the DIP ABL Agents in their sole and absolute discretion and subject to and in accordance with the Approved Budget; (vii) the ABL Roll Up; and (viii) other indebtedness to the extent authorized by the Bankruptcy Court and set forth in the Approved Budget;

    (b)    subject to this Final Order in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation or threatened litigation (including any investigation in connection with

94

guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

"**Chapter 11 Cases**" means the chapter 11 cases of the Debtors pending in the Bankruptcy Court.

"**Co-Collateral Agents**" has the meaning specified in the Preamble.

"**Collateral**" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, including the Prepetition ABL Collateral and all other assets of the Loan Parties, whether now owned or hereafter acquired, and all proceeds thereof, including, without limitation, any claims and causes of action of the Loan Parties of any kind or nature (including proceeds of any actions for preferences, fraudulent conveyances and other avoidance power claims under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code); it being understood that "Collateral" shall include all such property irrespective of whether any such property was excluded pursuant to the Prepetition Loan Documents.

"**Commercial L/C**" means a commercial documentary Letter of Credit under which an Issuing Lender agrees to make payments in Dollars for the account of any Borrower, on behalf of any Group Member, in respect of obligations of such Group Member in connection with the purchase of goods or services in the ordinary course of business.

"**Commitments**" means, collectively, the Revolving Commitments and the Term Commitments.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Commonly Controlled Entity**" means an entity, whether or not incorporated, that is under common control with any Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes any Borrower and that is treated as a single employer under Section 414 of the Internal Revenue Code.

"**Convert**", "**Conversion**" and "**Converted**" each refers to a conversion of Advances or a Term Loan Borrowing of one Type into Advances or a Term Loan Borrowing of the other Type pursuant to Section 2.09 or 2.10.

"**Control Co-Collateral Agent**" has the meaning specified in the Guarantee and Collateral Agreement.

"**Credit Card Accounts Receivable**" means each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to a Loan Party resulting from charges by a customer of a Loan Party on credit cards processed by such processor or issued by such

11

# Exhibit 9

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                          :
                                               :      **Chapter 11**
**SEARS HOLDINGS CORPORATION, et al.,**        :
                                               :      **Case No. 18-23538 (RDD)**
                                               :
        Debtors. [1]                           :      **(Jointly Administered)**
------------------------------------------------------------x

## FINAL JUNIOR DIP ORDER
## (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
## POST-PETITION FINANCING AND (B) GRANT SECURED PRIMING LIENS
## AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (II) MODIFYING
## THE AUTOMATIC STAY; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of Sears Holdings Corporation ("Holdings") and

its affiliated debtors, as debtors and debtors-in-possession (collectively, the "Debtors") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases") pending in the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking entry

of an interim order (the "Interim Junior DIP Order") and a final order (this "Final Junior DIP Order"

---

1    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
     number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart
     Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774);
     SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205);
     A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel
     Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears
     Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises,
     Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears
     Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.
     (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC
     (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC
     (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc.
     (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of
     Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit
     Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida),
     L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising,
     Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears
     Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The
     location of the Debtors' corporate headquarters is 3333 Beaver Road, Hoffman Estates, Illinois 60179.

any Junior DIP Obligor in the assets set forth on <u>Schedule 2</u> hereto and all books, records, documents and data related thereto and all proceeds thereof (such collateral and proceeds, collectively, the "<u>Specified Collateral</u>") which security interest and lien shall be pari passu with the DIP ABL Liens; <u>provided</u>, that the proceeds of such Specified Collateral shall be shared by the Junior DIP Lenders and the DIP ABL Lenders pro rata based on the aggregate commitment amount under the Junior DIP Facility (i.e., $350,000,000) and aggregate incremental commitments and extensions of credit under the DIP ABL Facility (i.e., $300,000,000) without giving regard to the roll-up portion thereof, respectively.

14.    Notwithstanding anything to the contrary herein, the following table sets forth the relative priorities of the Carve-Out, the Senior Permitted Liens, DIP ABL Liens, Junior DIP Liens, Adequate Protection Liens, *provided* that the Prepetition Second Lien Adequate Protection Liens shall be asserted only against the assets of the Prepetition Second Lien Loan Parties, and the Prepetition Liens on the Junior DIP Collateral upon effectiveness of this Final Junior DIP Order:

| Prepetition ABL Collateral | Prepetition Encumbered Collateral[4] | Prepetition Unencumbered Collateral (Other than Specified Collateral) | Specified Collateral |
|---|---|---|---|
| Carve-Out | Carve-Out | Carve-Out | Carve-Out |
| Senior Permitted Liens | All valid and perfected security interests in favor of third parties as of the Petition Date and any Senior Permitted Liens | Senior Permitted Liens | Senior Permitted Liens |
| DIP ABL Liens | DIP ABL Liens | DIP ABL Liens | DIP ABL Liens, *pari passu* with Junior DIP Liens |

---

4    The priorities set forth in this column are subject to paragraph 64.

| | | | |
|---|---|---|---|
| Prepetition ABL Facilities Adequate Protection Liens | Junior DIP Liens | Junior DIP Liens | Prepetition ABL Facilities Adequate Protection Liens |
| 2018 FILO Adequate Protection Liens | Prepetition ABL Facilities Adequate Protection Liens | Prepetition ABL Facilities Adequate Protection Liens | 2018 FILO Adequate Protection Liens |
| Prepetition LC Facility Adequate Protection Liens | 2018 FILO Adequate Protection Liens | 2018 FILO Adequate Protection Liens | Prepetition LC Facility Adequate Protection Liens |
| Prepetition ABL Liens | Prepetition LC Facility Adequate Protection Liens | Prepetition LC Facility Adequate Protection Liens | Postpetition Intercompany Liens |
| Postpetition Intercompany Liens | Postpetition Intercompany Liens | Postpetition Intercompany Liens | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) |
| Prepetition Second Lien Adequate Protection Liens | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | |
| Prepetition Second Lien Facilities Liens (except on Specified Non-Prepetition Second Lien Collateral) | | | |
| Junior DIP Liens | | | |

15.  ***Treatment of Junior DIP Liens.***  Other than as set forth herein, the Junior

DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or

26

# Exhibit 10

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    January 8, 2019

17                    1:04 PM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  NAROTAM RAI

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.  Okay, good

3    afternoon in re: Sears Holding Corporation for those of you

4    who've been waiting since 11 and that includes people on the

5    phone, I apologize, but as often happens in large chapter 11

6    cases a number of very capable and talented people have been

7    working very hard to see if important agreements can be

8    reached or at least agreements as to the process can be

9    reached, and I think the time while you were waiting was

10   spent productively by those people.

11             MR. SCHROCK:  Thank you very much, Your Honor. Ray

12   Schrock, Weil, Gotshal, Manges here for the debtors along

13   with my partner, Sunny Singh.  Your Honor, first of all,

14   thank you very much for your time this morning, and for the

15   patience of frankly all the parties involved. We have what

16   we believe is some very good news for Sears and its

17   stakeholders. After you know, several days of virtually

18   around the clock negotiations and you know, some

19   conversations with the court and our consultation parties

20   the debtors have determined that they will not be adjourning

21   the auction on January 14th, and that subject to ESL putting

22   in a revised form of bid letter, APA as well as a deposit

23   for 120 million dollars by 4:00PM tomorrow, that the debtors

24   will be reviewing that bid and comparing it against the

25   company's other alternatives at an auction on January 14th.

# Exhibit 11

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4

5   In Re                              )

6   SEARS HOLDINGS CORPORATION, et al., )

7                                       )

8                  Debtors.             )

9   _____)

10

11

12

13      AUCTION OF SEARS HOLDINGS CORPORATION, et al.

14                New York, New York

15                January 14, 2019

16

17

18

19

20

21

22

23   Reported by:

24   LEONORA L. WALKER

25   JOB No.  154054

SEARS HOLDINGS CORPORATION

1   
2  the view of the company, which we spent sometime
3  talking to them about.  In the wind down there is a
4  507(b) claim that is appropriately footnoted.  The view
5  of the creditors committee is that claim is zero and
6  impossible to prove.
7        In addition, there is a Delta between the view
8  of the creditors committee as it relates to real estate
9  and what the creditors committee view is on the low end
10  that's about $300 million; on the high end it's about
11  $600 million.
12        In addition, the waterfall and wind down is
13  devoid of litigation claims, which we value at several
14  hundred million dollars.  And then there was a
15  last-minute change to the wind down about surcharging
16  ESL's debt when it's not the beneficiary of a 506(c)
17  waiver that changes the waterfall of that explanation.
18  We think it's appropriate to surcharge them.
19        A couple other things before I conclude that.
20  We've asked for the business plan.  We repeat that
21  request again so we can make an evaluation about
22  adequate assurance issues.  We've asked for sources in
23  use for the ESL bid.  We have not received that to
24  date, and we have not received the mark up that Sean
25  referenced earlier about the financing condition in

SEARS HOLDINGS CORPORATION

1   
2  change.
3        Those are the issues that creditors committee
4  has.  We look forward to talking to the Debtors and ESL
5  as the day progresses.  Thank you, Ray.
6        MR. O'NEAL:  Sean O'Neal, Cleary Gottlieb.
7        Thank you, Ira.  We will be -- we disagree with
8  virtually everything you said though we love you
9  dearly, and we will be sending you a business plan
10  right after this as well as the ABA.  Thank you.
11        MR. SCHROCK:  It's Ray Schrock for the Debtors.
12  Everybody's rights are reserved.  So nobody else has to
13  continue to stand up and say that.
14        I do think it was -- we think the wind down
15  analyses between the committee and the Debtors are
16  largely consistent.  We were happy with the limited
17  number of differences, frankly, that the Debtors have.
18  But at this time I think we'll go off the record, see
19  if we can make some progress, and hopefully get to a
20  good conclusion for the company and its stakeholders.
21  So with that, we'll go off the record.
22        (Whereupon Exhibits 3 and 4 marked for
23      the record.)
24        (Whereupon the proceedings recessed at
25      11:11 a.m.)

SEARS HOLDINGS CORPORATION

1   
2        MR. DiDONATO:  We're done for tonight.
3  You can go.
4        (TIME NOTED:  9:48 p.m.)
5   
6        --oo0oo--

SEARS HOLDINGS CORPORATION

1   
2  ----------------------I N D E X-----------------------
3   
4         E X H I B I T S
5  DESCRIPTION                         PAGE

6  Exhibit 1    Asset Purchase Agreement        17
7  Exhibit 2    Wind Down Recoveries            26
8  Exhibit 3    Confidential Letter        31
9      January 11, 2019
10  Exhibit 4    Confident Letter        31
11      January 13, 2019

# Exhibit 12

Page 36

1

2          UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     --------------------------------X

5     In re:                         Chapter 11

6     SEARS HOLDINGS                 Case No:

7     CORPORATION, et al.,           18-23538 (RDD)

8               Debtor.

9     --------------------------------X

10

11              AUCTION PROCEEDING

12              New York, New York

13               January 15, 2019

14

15

16

17    Reported by:

18    MARY F. BOWMAN, RPR, CRR

19    JOB NO. 154062

20

21

22

23

24

25

Page 41

Proceedings - 1/15/19

1  the auction will remain open or we will
2  close the action at that time.
3      Just a quick reminder, of course
4  the auction, as long as the auction
5  remains open, everyone remains bound by
6  the auction rules, especially the
7  duties of confidentiality that are
8  contained in the auction rules.
9      But thanks for your patience.
10  Shun.
11     MR. O'NEAL:  Good morning.  Sean
12  O'Neal, Cleary Gottlieb, on behalf of
13  ESL.
14     I do want to put some things on
15  the record because this is no ordinary
16  moment.  It's not an ordinary auction.
17  Really the fate of an American icon and
18  the fate of 45,000 employees hangs in
19  the balance.
20     Since December 28, ESL has
21  improved its bid, improved its offer in
22  response to an ever-increasing list of
23  demands.
24     Over the past few weeks, the

Page 42

Proceedings - 1/15/19

1  debtors have been singularly focused on
2  one thing, which is requiring ESL to
3  guarantee that the debtors will not
4  become administratively insolvent,
5  without acknowledging that their own
6  liquidation analysis, their own
7  alternatives would also lead to
8  administrative insolvency.
9      On January 7, when we had our
10  chambers conference, the alleged
11  administrative claims gap was
12  approximately 77 million.  It's on that
13  basis that ESL deposited 120 million
14  dollars.  Of that amount, approximately
15  17.9 million was described as
16  nonrefundable.
17     After the wire hit, the demands
18  grew, and as of last night, the alleged
19  gap in administrative expense claims
20  was at least 225 million.
21     As we have told the debtors --
22  and none of the things that I'm saying
23  will be news to the debtors or the
24  subcommittee -- as we have told them,

Page 43

Proceedings - 1/15/19

1  that we believe their purported
2  concerns about administrative
3  insolvency are belied by their own
4  analysis, their own liquidation
5  analysis, which ignores the statutory
6  priorities that recall ESL's adequate
7  protection super priority claims, as
8  well as the adequate protection super
9  priority claims of all second lien
10  lenders to be senior to all general
11  administrative claims.
12     In fact, by our read, the
13  debtors' liquidation analysis shows
14  that the proposed liquidation will
15  render them administratively insolvent.
16  They cannot pay ESL for Cyrus' adequate
17  protection claims.  They can only
18  purport to pay general administrative
19  claims by subordinating the second
20  lienholder adequate protection claims.
21     I will not belabor the point, but
22  we have certainly relayed it to the
23  debtors.  But we do feel compelled to
24  put that on the record today.

Page 44

Proceedings - 1/15/19

1  Now, at the beginning of the
2  auction, we described the ESL bid which
3  included numerous improvements focusing
4  on conditionality and employee-related
5  issues.
6      We were here on Friday, we were
7  here on Saturday, we were here on
8  Sunday.  We always had our principals
9  available, every moment.  And
10  yesterday, we had one of our lead
11  principals here all day until the early
12  morning hours.
13     During the day, from 8 a.m. until
14  well past midnight, we met with the
15  debtors extensively and their
16  professionals extensively.  We debated
17  and we argued and we fought, but we
18  also try to get to a deal, ESL tried to
19  get to a deal.
20     Last night, we received an
21  extraordinary fill or kill offer from
22  the debtors, including the
23  subcommittee.  I say extraordinary
24  because it simply cannot be accepted.

Proceedings - 1/15/19

1  dollar administrative claim.  It's not
2  an attempt to hold anyone up.  It is
3  just a reality.  Listen, we have got
4  administrative claims.  These are
5  super-priority claims, even if they
6  were to become a get debtor under the
7  cash management offer.
8      There is no waiver, even after
9  the purchase of all these assets, there
10 was not waiver of 507(b) claims and
11 other claims in the estate after
12 purchasing the assets.
13     So that we would be left with
14 very significant claims that I guess
15 would still threaten to take
16 recoveries.  We were hopeful we could
17 bridge the gap on that, but at the end
18 of the day those still remained on the
19 table and remained an issue for
20 everyone.
21     And then finally, I just want to
22 note that this is not an exhaustive
23 list of issues, and after Mr. Basta
24 speaks, after we go speak to the judge,

Proceedings - 1/15/19

1  this is all highly confidential until
2  the record is closed.
3      But after we speak to the judge,
4  we will come back on the record, we
5  will let you know the next steps.  But
6  I want to stress that -- I can speak
7  personally that we have done everything
8  we can to try and make this work.
9      So Paul.
10     MR. BASTA:  Hello everybody, Paul
11 Basta from Paul Weiss.  We represent
12 the subcommittee of the board of Sears
13 Holdings.
14     The mandate of the subcommittee
15 is to investigate and prosecute estate
16 causes of action including causes of
17 action against ESL and its affiliates.
18     As Ray mentioned, the mandate
19 also includes the authority to approve
20 or disapprove of any ESL transaction
21 that involves releases or the right to
22 credit bid.
23     The subcommittee has taken its
24 job incredibly seriously, the

Proceedings - 1/15/19

1  subcommittee received approximately 1.1
2  million documents from relevant
3  counterparties and we have also
4  received and reviewed confidential and
5  previously undisclosed evidence.
6      The restructuring committee
7  conducted on-the-record interviews with
8  the creditors committee with a key
9  players in this unfolding saga,
10 including Mr. Lampert of ESL.
11     The subcommittee has reached the
12 conclusion that substantial claims
13 exist against ESL and its affiliates,
14 as well as other defendants relating to
15 ESL's abuse of its control of the
16 debtors and the transfer of hundreds of
17 million of dollars of assets to ESL and
18 its affiliates for inadequate
19 consideration.  Those transfers hurt
20 Sears and its employees.
21     As a result of this conclusion,
22 we find ourselves in the unique
23 situation where the sole going concern
24 bidder for Sears is a party for which

Proceedings - 1/15/19

1  there are substantial claims against
2  which there are substantial claims.
3      Under normal circumstances, this
4  would be the end of the inquiry.  A
5  defendant would not be permitted as a
6  matter of fairness or under Bankruptcy
7  Code jurisprudence from credit bidding
8  for assets until the claims against
9  that party were resolved or if there
10 was a cash backstop to the credit bid.
11     The restructuring committee would
12 not accept that outcome because it
13 believes in the reorganization purpose
14 of the Bankruptcy Code, it owes a
15 fiduciary duty to Sears, and it cares
16 about Sears and its employees.
17     Accordingly, the subcommittee
18 proposed solutions to ESL.  The
19 subcommittee proposed that ESL could
20 credit bid, receive a release of
21 equitable subordination and
22 recharacterization claims if it
23 proposed a better transaction.  And a
24 better transaction is a transaction

Page 73

Proceedings - 1/16/19

to be approximately 17 million dollars.

Next -- and I would -- I should note that this stands as total additional value beyond this morning's bid of 156 million dollars.

In addition, the debtors to retain 13 million dollars in hurricane insurance proceeds.

And then finally, NewCo to acquire the proceeds from the sale of SHIP to Service.Com, and in the event such sale is not closed on January 22, NewCo to acquire SHIP.

In addition, there have been extensive discussions concerning a release, and I will now describe the terms of the release that ESL has proposed.

For a 35 million dollar cash payment at closing, ESL would be permitted to credit bid all of its debt claims that would be allowed and there would be no collateral attack on any conversion of the debt into NewCo

Page 74

Proceedings - 1/16/19

equity or any transactions that are approved by the court.

ESL would retain its deficiency in 507(b) claims subject to certain limitations that I will describe below.

ESL to waive recovery on account of Section 507(b) claims from the proceeds of litigation related to Seritage, Lands End or other transactions involving intentional misconduct by ESL.

And ESL's recovery on account of 507(b) claims from the proceeds of other litigation would be capped at 50 million dollars, and participation beyond that amount in any kind of recoveries for litigation claims outside of the Seritage, Lands End or those involving an intentional misconduct by ESL would be shared pro rata with unsecured claims, and then finally, ESL to not use section 507(b) claims to block any confirmation of any plan by Sears.  I think that reflects

Page 75

Proceedings - 1/16/19

the terms of our offer.  I appreciate your time and consideration.  Thank you.

MR. SCHROCK:  OK.  Thanks, Sean.

And at this time, we will have a brief adjournment just for the restructuring committee to consider the proposal that has been made on the record and we will come back on with the restructuring committee's decision.

Thanks.  So we stand adjourned.

(Pause)

MR. SCHROCK:  Back on the record for just a moment.  I should have added "and will consult with the consultation parties before coming back on record."

(Recess)

MR. SCHROCK:  Let's go back on the record.  Ray Schrock of Weil Gotshal & Manges.  It is January 16 at 2:20 a.m.  Thanks once again for everybody's patience.  I think ESL wishes to make one clarification and then I'll retake the podium.

Page 76

Proceedings - 1/16/19

MR. O'NEAL:  Sure.  I've been asked to make a clarification of one of the bullets that was stated at the prior session.  Mr. Basta has requested this to reflect actually the intent.

And I'll just read the revised language.  This is the fourth component of the credit bid concept.

And what it says is that ESL to waive recovery on account of 507(b) claims and deficiency claims from the proceeds of litigation related to Seritage, Lands End or other transactions involving intentional misconduct by ESL.  We are simply adding "and deficiency claims" to that sentence.  Thank you.

MR. SCHROCK:  Thanks Sean.

So on behalf of the debtors and particularly the restructuring committee, having considered ESL's revised proposal and the material increase and consideration that has been put on the table, after

Proceedings - 1/16/19

1  deliberation, the restructuring
2  committee has decided to accept the ESL
3  offer as a higher or better offer,
4  subject to, importantly, documentation.
5  The documentation has not been
6  completed for any of this.  I think
7  that the parties need to -- are going
8  to have to continue working on it and
9  will attempt to finish the
10  documentation as quickly as possible
11  during the day today.
12      For that reason, the auction will
13  remain open until completion of that
14  documentation and we can hopefully
15  submit it as part of the record.
16      I do want to note this is not an
17  easy decision for the restructuring
18  committee.  We do appreciate all of the
19  parties and the consultation parties on
20  what they have been able to put on the
21  table.
22      In making this decision, we did
23  take into account the Court's direction
24  at the chambers conference today and

Proceedings - 1/16/19

1  trying to come up with a solution where
2  the debtors could attempt to maximize
3  value, preserve thousands of jobs, and
4  also eliminate risk of administrative
5  insolvency where possible.
6      The Court did direct in chambers
7  that this is not an 1129 plan, that
8  there is going to be -- and there will
9  be and there is a risk for the debtors
10  on administrative solvency with this
11  bid and it's not free from risk in
12  terms of getting to the closing for the
13  debtors.
14      Now, with all of those things
15  being said, we do believe that the bid
16  is higher or better and it is the best
17  course of action for the estates.
18      I'll let the official unsecured
19  creditors committee step up.  I'm sure
20  they want to make a statement.
21      MR. DIZENGOFF:  Thanks, Ray.  Ira
22  Dizengoff, Akin, Gump, Strauss Hauer &
23  Feld on behalf of unsecured creditors
24  committee.

Proceedings - 1/16/19

1      Just so the record is clear, the
2  debtor did not -- did not consult with
3  the creditors committee before making
4  decision to accept this bid.  The bid
5  was put on the record, the debtor
6  adjourned and had its board calls and
7  restructuring committee calls and did
8  not ask for the input of its creditors
9  about that bid and this then made
10  conclusion to accept the bid.  Just so
11  we are clear on that.
12      We think the bid suffers from the
13  same deficiencies as previously
14  articulated, not material movement from
15  this afternoon.  Our math suggests,
16  your own math, excuse me, suggests that
17  the administrative deficiency here is
18  somewhere between 90 million and 200
19  million dollars and that this estate
20  will be rendered administratively
21  insolvent.
22      In addition, Judge Drain made
23  pretty clear that the company should
24  discuss conditionality and execution

Proceedings - 1/16/19

1  risks.  Those comments, whether the
2  debtors addressed that or not, we have
3  no idea because we haven't seen an
4  asset purchase agreement, but those
5  were issues that he made pretty clear
6  that should be addressed and should be
7  addressed to us.  We haven't seen that
8  yet.
9      As to the release, there is no
10  clarity in our mind what the terms of
11  the release are.  We think that there
12  is inadequate consideration for the
13  credit bid.  Per Judge Drain's explicit
14  instruction, there was supposed to be
15  an analysis.
16      But the value of the credit bid
17  under the ESL scenario versus the
18  wind-down scenario, we have not seen
19  that.  So we think that there is
20  inadequate consideration for that
21  credit bid.
22      Those are some of the highlights
23  of our concerns with this.  We reserve
24  all our rights to object to this

# Exhibit 13

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

In re                                                   :         **Chapter 11**
                                                        :
**SEARS HOLDINGS CORPORATION, *et al.*,**                :         **Case No. 18-23538 (RDD)**
                                                        :
                                                        :         **(Jointly Administered)**
                     Debtors.[1]                        :
--------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## NOTICE OF SUCCESSFUL BIDDER AND SALE HEARING

**PLEASE TAKE NOTICE THAT:**

1.      Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the "**Company**") commenced with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.      On November 19, 2018, the Bankruptcy Court entered the *Order Approving Global Bidding Procedures and Granting Related Relief* (the "**Global Bidding Procedures Order**") (ECF No. 816),[2] approving global bidding and sale procedures (the "**Global Bidding Procedures**"), substantially in the form attached to the Global Bidding Procedures Order as **Exhibit 1**, in connection with the sale or disposition of substantially all of the Debtors' assets (the "**Assets**"), among other relief.

3.      On November 21, 2018, the Debtors filed the *Notice of Filing of Global Bidding Procedures Process Letter* (ECF No. 862) (the "**Global Process Letter**") soliciting bids on the Assets including the Debtors' retail stores or groups of stores (the "**Retail Stores**") on a going concern or liquidation basis and individual target businesses, including Sears Home Services, the business unit PartsDirect, Sears Auto Centers, and Innovel (the "**Target Businesses**") (the Retail Stores together with the Target Businesses, the "**Global Assets**").

4.      On January 14, 2019, the Debtors commenced an auction for the sale of the Global Assets (the "**Auction**").  As announced on the record of the Auction, the Debtors, as directed by the Restructuring Committee, determined that the offer submitted by Transform Holdco, LLC (the "**Buyer**"), established by ESL Investments, Inc. to acquire all or substantially all of the Global Assets, was the highest or best offer for the Global Assets (the "**Successful Bid**").  A summary of the material terms of the Successful Bid are attached hereto as **Exhibit A**.

5.      Attached hereto as **Exhibit B** is a copy of the executed asset purchase agreement between the Debtors and the Buyer for purchase of the Acquired Assets (as defined in the Asset Purchase Agreement), dated January 17, 2019 (the "**Asset Purchase Agreement**", and the transactions contemplated and to be effected thereby, the "**Global Asset Sale Transaction**").

6.      A proposed form of order approving the Global Asset Sale Transaction and granting related relief (the **"Sale Order"**) is attached hereto as **Exhibit C**.

### Assumption and Assignment of Contracts and Leases

7.      The executory contracts and unexpired leases (the "**Contracts and Leases**") proposed to be assigned or assumed and assigned to the Buyer or its designee pursuant to the Asset

---

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Global Bidding Procedures Order, the Global Bidding Procedures, or the Global Process Letter, as applicable.

2

# Exhibit 14

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | Case No. 18-23538 (RDD) |
| | : | |
| Debtors. [1] | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------------x

### DECLARATION OF ALAN J. CARR
### IN SUPPORT OF RESTRUCTURING SUBCOMMITTEE'S RESPONSE TO THE OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO ESL INVESTMENTS, INC.

I, Alan J. Carr, make this declaration under 28 U.S.C. § 1746:

1.  I am a disinterested director of Sears Holdings Corporation ("Sears").[2]  In that capacity, I serve on the Restructuring Committee and the Restructuring Subcommittee of the board of directors (the "Board") of Sears.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used herein, but not otherwise defined, have the meaning ascribed to them in the accompanying motion.

1

2. I submit this declaration ("Declaration") on behalf of the Restructuring Subcommittee in response to the objection of the Official Committee of Unsecured Creditors (the "UCC") to the sale of substantially all of the Debtors' assets to Transform Holdco LLC ("NewCo"), a newly formed entity controlled by ESL Investments, Inc. ("ESL"). Except as otherwise indicated herein, the facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) information provided to me by the Debtors' employees or advisors; (iii) information provided to me by William Transier, another disinterested director of the Debtors; (iv) my knowledge and experience as a disinterested director of the Debtors; and (v) my experience as a current and former member of the boards of directors of other distressed companies that have been involved in the restructuring process. If I were called to testify as a witness in this matter, I would testify to the facts set forth herein.

## Background

3. I am the co-founder, CEO, and Managing Member of Drivetrain LLC, a firm focused on leading complex restructurings and litigations. Prior to forming Drivetrain, I served as a Managing Director at Strategic Value Partners LLC from 2003 to 2013, where I led financial restructurings for companies in North America and Europe, and as a corporate restructuring attorney at Skadden, Arps, Slate, Meagher & Flom LLP from 1997 to 2003. I have a B.A. from Brandeis University and a J.D. from Tulane University School of Law.

4. I have held management and leadership roles at many distressed companies. These roles include serving as an independent director or manager of: (i) Toys R US DE, Inc. from September 2017 to January 2019; (ii) ExGen Texas Power, LLC from April 2017 to April 2018; (iii) UCI Holdings Limited from February 2016 to December 2016; (iv) NewPage

2

Corporation from December 2015 to July 2016; (v) LightSquared Inc. from September 2013

to December 2015; (vi) Statewide Mobility Partners LLC from August 2014 to May 2015; and

(vii) Nautilus Holdings, Inc. from June 2014 to February 2015.  I also served as the Chief

Restructuring Officer for Seacastle Ship Holdings from April 2015 to March 2016.  I currently

serve as the Chairman of the Board of Directors of Kaupthing ehf, a former Icelandic bank.[3]

5.    In late September 2018, I was contacted by Ray Schrock of Weil, Gotshal

& Manges LLP, counsel to the Debtors ("Debtors' Counsel"), about possibly joining the Sears

Board as an independent director.  Before joining the Sears Board, I had no prior business or

personal relationship with Eddie Lampert, Kunal Kamlani, or any other ESL or Sears

management or leadership personnel.

6.    On October 3, 2018, I was appointed to the Sears Board as a disinterested

director, and on October 10, 2018 I was appointed to serve on the newly constituted

Restructuring Committee (the "Committee"), alongside Paul DePodesta and Ann Reese.  The

Restructuring Committee was authorized to, among other things: (i) consider, evaluate and, if

it deemed it to be in the best interests of Sears, recommend to the Board that Sears enter into a

transaction not involving ESL, or authorizing and approving a transaction involving ESL; (ii)

oversee the provision of confidential information by or on behalf of Sears and its subsidiaries

to third parties under cover of an appropriate confidentiality arrangement; (iii) oversee

discussions and negotiations with Sears' stakeholders as part of a restructuring transaction; (iv)

supervise the implementation and execution of any restructuring transaction; and (v) monitor

---

[3]  Additional information regarding my background and qualifications can be found in my resume and deal sheet,
attached to this Declaration as **Appendix 1**.

3

the work of the Debtors' Chief Restructuring Officer.  A full and complete copy of the Restructuring Committee Resolutions is attached hereto as **Appendix 2**.

7.  In addition, a Restructuring Subcommittee (the "Subcommittee") was created to investigate any potential causes of action with respect to any of the Debtors' related-party transactions.  I was appointed to the Subcommittee as its sole member at that time. Shortly thereafter, on October 11, 2018, William Transier was selected as a disinterested director of Sears, and he was appointed to serve on the Restructuring Committee and Subcommittee.  Before  Mr. Transier's appointment I had no prior business relationship with him.

8.  On November 2, 2018, the Sears Board adopted a resolution setting forth the authority and responsibilities of the Subcommittee.  Specifically, the Subcommittee was delegated full authority to, among other things: (i)  conduct an investigation on behalf of the Debtors into potential claims and causes of action arising out of the myriad of prepetition related-party transactions, and to prosecute, settle, or release any such claims; (ii)  approve or disapprove potential post-petition transactions that would affect claims arising from the related-party transactions, including proposed credit bids by ESL or its affiliates and releases of prepetition claims; and (iii)  assert or waive the Debtors' attorney-client privilege with respect to the foregoing.  A full and complete copy of the Subcommittee Resolution is attached hereto as **Appendix 3**.

## The Investigation and Analysis of Potential Claims

9.  The Subcommittee, with the assistance of its legal and financial advisors, has been conducting an in-depth investigation of material prepetition related-party

4

transactions. To date, the Subcommittee and its advisors have collected and reviewed millions

of pages of documents, conducted eleven on-the-record interviews of past and present senior

executives and Board members (including Mr. Lampert) and the Debtors' financial advisors,

lawyers, and appraisers, and performed detailed analyses of potential causes of action. This

investigation is continuing.

10. The Subcommittee has engaged experienced legal and financial advisors to

assist in its investigation. Paul, Weiss, Rifkind, Wharton & Garrison LLP and conflicts counsel

Young Conaway Stargatt & Taylor, LLP (together, "Counsel") were retained to oversee the

investigation and provide legal advice to the Subcommittee. Evercore Group LLC

("Evercore"), Alvarez & Marsal North America LLC ("A&M"), and Stout Risius Ross, LLC

("Stout") (together, the "Financial Advisors") were retained as financial advisors. Evercore

has provided, and continues to provide, valuation and financial-market advice. A&M has

conducted analyses of the Debtors' prepetition financial condition and projections, and

analyzed relevant industry and economic conditions. Finally, Stout has evaluated the real

estate that Sears transferred in the Seritage transaction (discussed below).

11. The Subcommittee's investigation has focused on the following prepetition

related-party transactions:

> (a) The Lands' End Transaction: in 2014, Sears spun off its 100%
> ownership interest in Lands' End, a successful lifestyle clothing and
> home items brand, the equity of which was valued
> contemporaneously by the Debtors' advisors at approximately $1.1
> billion (net of a $500 million pre-spinoff dividend to Sears). The
> equity in the newly independent Lands' End was provided to Sears
> shareholders, the largest of which were Mr. Lampert and ESL, for
> no consideration;

(b) The Seritage Transaction: in 2015, Sears engaged in a rights offering and sale and lease back transaction involving some of its most valuable properties. Sears sold 266 stores that it owned, or had an interest in, to a newly formed real estate investment trust, Seritage, for $2.7 billion. Since its formation, ESL has held the largest economic interest in Seritage, and Mr. Lampert has served as the Chairman of its Board. The master lease included numerous terms that benefited Seritage at the expense of Sears, including Seritage's ability to recapture some or all of the Sears stores and re-lease them to competitors. In addition, Sears conducted a rights offering where Seritage equity was offered to all Sears shareholders, the largest of which were ESL and Mr. Lampert. The value of that rights offering was at least $400 million;

(c) Loans from ESL to the Debtors: between 2016 and 2018 ESL extended over $2 billion in loans to Sears that were secured by the Debtors' property (the "ESL Loans");

(d) The Rights Offering of Sears Hometown and Outlet Stores: On October 11, 2012 Sears conducted a rights offering of Sears Hometown and Outlet stores valued at that time between $425 and $515 million; and

(e) The Partial Spin-Off and Rights Offering of Sears Canada: On November 13, 2012 Sears spun off Sears Canada, valued by the Debtors at $500 million, and on November 10, 2014 completed a $380 million rights offering to existing shareholders to reduce its Sears Canada stake to approximately 12% (collectively the "Related-Party Transactions").

12. The Subcommittee began its investigation as soon as it was formed. On October 12, 2018, it served preliminary document requests on the Debtors and ESL, seeking multiple categories of core documents associated with the Related-Party Transactions and other relevant materials (such as Board minutes and business plans) from January 2012 until the Petition Date. Between October 26 and October 28, 2018, the Subcommittee served wide-ranging supplemental document requests on the Debtors, ESL, Seritage and Fairholme (the second-largest investor in Sears), as well as the Debtors' counsel (Wachtell, Lipton, Rosen, &

6

Katz, LLP), valuation advisor (Duff & Phelps), auditor (Deloitte), financial advisor
(Centerview Partners LLC), and real estate appraisal firm (Cushman & Wakefield)
(collectively the "Producing Parties").  On November 16, 2018, the Court entered an order
authorizing the Subcommittee to obtain documents and conduct interviews pursuant to
Bankruptcy Rule 2004. (Dkt. No. 803).

13. Between October 17 and December 18, 2018, the Subcommittee received
over 9 million pages of documents from the Producing Parties, as follows:

| Party | Number of Documents | Number of Pages |
|---|---|---|
| Centerview | 14,866 | 155,629 |
| Cushman & Wakefield | 4,439 | 140,772 |
| Deloitte | 4,764 | 135,308 |
| Duff & Phelps | 32,230 | 2,066,786 |
| ESL | 11,121 | 130,413 |
| Fairholme | 4,127 | 16,473 |
| Sears | 981,085 | 6,230,017 |
| Seritage | 4,881 | 49,030 |
| Wachtell | 60,069 | 554,753 |
| **Total** | **1,117,582** | **9,479,181** |

14. In an effort to make our investigation as efficient as possible, the
Subcommittee used technology assisted review ("TAR") to prioritize which documents to
review.  To date, the Subcommittee has reviewed over 400,000 documents, consisting of over
6 million pages.

15. The Subcommittee has also conducted detailed on-the-record interviews of
eleven individuals who held key positions in Sears or its advisors.  Those individuals are:

| Date of Interview | Witness | Role at Sears | Topics |
|---|---|---|---|
| Dec. 4, 2018 | Sinha, Naren | Senior VP, Finance, Sears | Sears' Business Strategy and Financial Projections; Seritage; Lands' End |
| Dec. 5, 2018 | Riecker, Robert | CFO, Sears | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Valuation; Solvency |
| Dec. 6, 2018 | Kamlani, Kunal | Director, SHC and President ESL | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Real Estate Appraisals; Valuation; Solvency |
| Dec. 10, 2018 | Charles, Scott | Restructuring Partner at Wachtell | Sears' Financial Projections; Related-Party Loans; Seritage; Lands' End; Real Estate Appraisals; Valuation; Solvency |
| Dec. 10, 2018 | Reese, Ann | Director, SHC and RPT Committee member | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Valuation; Solvency |
| Dec. 11, 2018 | Puntus, Mark | Co-head of the Debt Advisory and Restructuring Group of Centerview Partners | Sears' Financial Projections; Related-Party Loans; Solvency |
| Dec. 11, 2018 | Schiedemeyer, Jeffrey | Managing Director, Duff & Phelps | Sears' Projections; Lands' End; Seritage; Sears Canada; Fairness Opinion; Solvency |
| Dec. 12, 2018 | Lampert, Edward | Sears Chairman and Former CEO, and principal of ESL | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Valuation; Solvency |
| Dec. 13, 2018 | Latella, Richard | Executive managing Director of Cushman & Wakefield | Real Estate Appraisals; Seritage |
| Dec. 19, 2018 | Schriescheim, Robert | Former CFO, Sears | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Solvency |
| Jan. 16, 2019 | Stollenwerk, Jeffrey | President of Real Estate, Sears | Related-Party Loans; Seritage; Real Estate Appraisals |

16. Our Financial Advisors have conducted a variety of analyses in connection with the investigation. Specifically, Evercore analyzed: (i) the third party marketing process for transferred assets and debt; (ii) the value of any transferred assets; and (iii) the terms of related-party financing transactions. A&M focused its analysis on: (i) the Debtors' prepetition financial condition and projections; (ii) contemporaneous solvency analyses; (iii) the financial performance of transferred assets; and (iv) the value of a going-concern bid. Stout analyzed real estate appraisals for the real properties that Sears transferred to Seritage. The Financial Advisors' work is being conducted at the direction of the Subcommittee's Counsel and is ongoing.

8

17. The Subcommittee receives frequent updates from both the Financial Advisors and Counsel, including regularly scheduled status calls two to three times a week and frequent communications scheduled on an ad hoc basis. These status updates include detailed discussions about the status of the investigation, the analyses being conducted by Counsel and the Financial Advisors, the strategy of the investigation, and issues related to ESL's going-concern bid. In addition, Counsel and the Financial Advisors made formal presentations to the Subcommittee on November 10, 2018, November 11, 2018, November 20, 2018, December 5, 2018, December 7, 2018, December 16, 2018, and December 26, 2018.

18. The Subcommittee also has met regularly with the Board, the full Restructuring Committee, the Debtors' Chief Restructuring Officer, and the Debtors' restructuring advisors to discuss the restructuring and issues related to the Related-Party Transactions.

19. At all points during the investigation, the Subcommittee has coordinated with the UCC. To date, the Subcommittee has produced more than two million pages of responsive, non-privileged documents to the UCC that it received from the Producing Parties, identified using the TAR process, and the Subcommittee continues to provide the UCC with documents following privilege review. The UCC's counsel has participated fully in each of the Subcommittee's on-the-record interviews (with the exception of a portion of the interview of Scott Charles, counsel for the Debtors, that involved discussion of privileged matters). At each interview, the UCC's counsel was accompanied by its own experts and conducted its own examination. Counsel for the Subcommittee has been in regular contact with the UCC's

9

counsel to discuss potential claims and theories of liability, including the Subcommittee's view of the strengths and weaknesses of potential claims.

20. Counsel for the Subcommittee also has discussed potential claims with ESL's counsel and has provided ESL's counsel opportunities to present ESL's views regarding potential claims.

21. Based on the work performed so far by Counsel and the Financial Advisors, the Subcommittee has identified valuable claims arising from the Related-Party Transactions, including claims against Mr. Lampert, ESL, and others, including claims for actual and constructive fraudulent transfer and illegal dividend payments arising from the Lands' End and Seritage transactions.  As noted, the Seritage and Lands' End claims together involve transfers in excess of $3.7 billion.

22. The Subcommittee and its advisors also have considered potential claims for equitable subordination, recharacterization and disallowance of ESL's Loans to the Debtors.  These claims are discussed below.

### <u>Negotiations with ESL</u>

23. The UCC's objection alleges that the outcome of the negotiation process was preordained in ESL's favor and that the Committee and Subcommittee were led by directors "handpicked by and beholden to Lampert and ESL."  These allegations are belied by the record.  The Committee formally voted to reject separate bids by ESL on January 9, 2019 and January 15, 2019.[4]  In addition, the Subcommittee repeatedly made clear that ESL's

---

[4]  Additional information on the sale and negotiation process can be found in the Declaration of William Transier, filed with the Bankruptcy Court on February 1, 2019.

10

demand for a global release that would fully exculpate Mr. Lampert and ESL from claims arising out of the Related-Party Transactions in return for $35 million was unacceptable.

24. In the final agreement, memorialized by the Asset Purchase Agreement ("APA") [Dkt. No. 1730 at 15–260], ESL agreed to: (i) a full refinancing of the $350 million junior DIP loan; (ii) remove $23 million in purchase price adjustments (including transfer taxes and mechanic's liens); (iii) provide for certain valuable assets—valued in the aggregate at $26 million—including insurance proceeds, the $6 million Sears Home Improvement sale deposit, and the U-Haul sale proceeds to remain with the Debtors' estates; and (iv) fully assume protection agreement liabilities estimated at $465 million.  As a result, the administrative solvency gap narrowed significantly and certain prepetition claims against the Debtors will be transferred to NewCo.

25. The final agreement also maintained concessions Mr. Lampert had made in earlier bids, such as agreeing to provide employment offers, and severance protection, to over 45,000 Sears employees.

26. The APA does *not* include a global release for claims arising from the Related-Party Transactions as ESL had previously required.  Instead, ESL agreed to the Subcommittee's demand that the release discharge *only* the equitable subordination, recharacterization, and other claims against ESL associated with its ability to credit bid (the "Limited Release").  The Limited Release expressly excludes all other claims and causes of action including:

(a)     claims for actual or constructive fraudulent transfer;

(b)     claims for illegal dividend;

(c)     claims for breach of fiduciary duty;

11

(d)     all claims related to the Lands' End or Seritage transactions; and

(e)     certain claims that have been alleged in the CCAA proceedings of Sears Canada.

27. Further, under the parties' agreement and as documented in the APA, Mr. Lampert and ESL *cannot* benefit from prospective litigation involving Seritage or Lands' End, including claims asserted by third parties or any other claims involving willful misconduct by ESL or Mr. Lampert.  Specifically,

(a)     Mr. Lampert and ESL *cannot* assert 507(b) claims or deficiency claims on proceeds of litigation involving Seritage, Lands' End, or any willful misconduct by ESL; and

(b)     Any 507(b) recoveries by ESL from the proceeds of any other litigation are limited to $50 million, with the remainder of any such 507(b) claims to be treated as unsecured prepetition deficiency claims.

28. Finally, ESL's 507(b) claims, if any, cannot be used to block confirmation of a plan.

### **Approval of Limited Release and Sale**

29. The approval of the Limited Release would allow Sears to continue as a going-concern.

30. Based upon the analyses of the Subcommittee's advisors, the Subcommittee has concluded that the sale of Sears as a going-concern, which includes providing ESL with the Limited Release, offers a greater financial benefit to the Debtors than a wind-down of the Debtors' business

31. Specifically, as compared to a liquidation, the ESL going-concern bid provides the following benefits to the Debtors' estates and creditors:

12

(a)    Non-ESL third party secured creditors will receive an additional $152 million, as illustrated by the recoveries of Cyrus ($113 million) and other third party creditors ($39 million) in the chart below.

*($ in millions)*

| | ESLBid | | | Wind Down | | | Value Delta | Adjustment[5] | ProForm | Value Accrues to | | | |
| Creditors | Gross Claim | Total Recovery | Recovery | Gross Claim | Total Recovery | Recovery | | | | ESL | Cyrus | 3rd Party | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior DIP ABL | $850 | $850 | 100% | $894 | $894 | 100% | (44) | 44 | - | - | - | - | - |
| Junior DIP | 350 | 350 | 100% | 175 | 175 | 100% | 175 | (175) | - | - | - | - | - |
| FILO (1.5) | 125 | 125 | 100% | 125 | 125 | 100% | - | - | - | - | - | - | - |
| Citi LC Facility (1.75) | 271 | 271 | 100% | 271 | 247 | 91% | 24 | - | 24 | 9 | 15 | - | 24 |
| 2nd Lien Line of Credit Loans | 570 | 232 | 41% | 570 | - | 0% | 232 | - | 232 | 205 | - | 26 | 232 |
| ESL 2nd Lien Term Loan (PIK) | 320 | 130 | 41% | 320 | - | 0% | 130 | - | 130 | 130 | - | - | 130 |
| 2nd Lien Notes (PIK) | 175 | 71 | 41% | 175 | - | 0% | 71 | - | 71 | 8 | 61 | 2 | 71 |
| 2nd Lien Notes (2.5; Cash) | 89 | - | 0% | 89 | - | 0% | - | - | - | - | - | - | - |
| Dove Loans | 831 | 544 | 65% | 831 | 429 | 52% | 115 | - | 115 | 92 | 23 | - | 115 |
| Sparrow Loans | - | - | 0% | - | - | 0% | - | - | - | - | - | - | - |
| GL / IP Loan | 231 | 231 | 100% | 231 | 159 | 69% | 72 | - | 72 | 47 | 14 | 11 | 72 |
| **Total Secured** | **3,812** | **2,804** | **74%** | **3,681** | **2,029** | **55%** | **775** | **(131)** | **644** | **493** | **113** | **39** | **644** |

---

[5]  Adjustment to reflect difference in claim balance in wind-down versus ESL bid.

(b)     Prepetition unsecured creditors will receive an additional $534 million ($453 million for protection agreement liability, $13 million for gift card liability, and $68 million for Shop Your Way liability). This excludes additional recoveries on account of cure claims;

| Creditors | ESLBid | | | Wind Down | | | Value | Adjustment | ProForma | Value Accrues to | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gross Claim | Total Recovery | Recovery | Gross Claim | Total Recovery | Recovery | | | | ESL | Cyrus | 3rd Party | Total |
| NPV Protection Agreement (PA) Liability[6] | 465 | 465 | 100% | 465 | 12 | 3% | 453 | - | 453 | - | - | 453 | 453 |
| Gift Card Liability | 13 | 13 | 100% | 13 | - | 0% | 13 | - | 13 | - | - | 13 | 13 |
| SYW Points Liability | 68 | 68 | 100% | 68 | - | 0% | 68 | - | 68 | - | - | 68 | 68 |
| **Total Unsecured** | **546** | **546** | **--** | **546** | **12** | **0%** | **534** | **-** | **534** | **-** | **-** | **534** | **534** |

(c)     ESL will pay for material administrative claims of the Debtors' estates, and the Debtors will incur materially less administrative claims under the ESL sale versus a liquidation (an aggregate $621 million benefit to the Debtors' estates) as illustrated in the chart below;

| Administrative Claims | Going Concern | | | Windown Estate | Difference |
|---|---|---|---|---|---|
| | ESL | Estate | Total | | |
| 503(b)(9) | $ 139 | $ 34 | $ 173 | $ 192 | $ 19 |
| AP[7] | 166 | 30 | 196 | 140 | (56) |
| Severance & WARN | 28 | - | 28 | 68 | 40 |
| Taxes | 134 | 4 | 138 | 210 | 72 |
| Home Office Payroll Claims | - | - | - | 246 | 246 |
| RemainCo Winddown Costs | - | 80 | 80 | 140 | 60 |
| Professional Fees | - | 102 | 102 | 72 | (30) |
| Cure Costs | 200 | - | 200 | - | (200) |
| Logistics and SG&A | - | - | - | 325 | 325 |
| Gift Card Redemptions | - | - | - | 10 | 10 |
| KEIP/KERP | - | - | - | 19 | 19 |
| PTO | - | - | - | 8 | 8 |
| Post-Petition TSA/CSA | - | - | - | 40 | 40 |
| Cash Interest and Financing Fees | - | - | - | 68 | 68 |
| Post-Petition Warranties | 27 | - | 27 | 27 | 0 |
| **Total** | **694** | **250** | **944** | **1,565** | **621** |
| **Total less Post-Petition Protection Agreement Liability** | **$ 667** | **$ 250** | **$ 917** | **$ 1,538** | **$ 621** |

---

[6]   Protection agreement liability of $465 million reflects the net present value of expected redemptions, inclusive of $27 million in administrative claims due to post-petition liability incurred prior to the Assurant transaction. Liability notional amount of $1,009 million represents a $544 million increase relative to net present value.

[7]   Assumes ESL is taking $166 million of liabilities at close.

14

(d)    As a result of the terms of the Limited Release, nearly all proceeds of the Debtors' preserved litigation claims will inure to the benefit of non-insider creditors;

(e)    Debtors will receive an additional $35 million in exchange for the Limited Release; and

(f)    NewCo will extend offers of employment to at least 45,000 of the Debtors' employees.

32. Based upon its work to date, and after consultation with the Financial Advisors and Counsel, the Subcommittee has considered the following facts in agreeing to the Limited Release:

(a)    ESL's Loans to the Debtors during 2016, 2017, and 2018 were generally new money loans that provided $2.6 billion to the Debtors;

(b)    The terms of the ESL Loans do not appear to be less favorable to the Debtors than the terms that could have been obtained from a third party;

(c)    The ESL Loans were documented in customary written agreements, prepared by outside counsel; and

(d)    The security interests appear to have been properly perfected.

33. Based on these facts, and after receiving advice from Counsel and analyses from the Financial Advisors, the Subcommittee determined that there is substantial litigation risk associated with the equitable subordination and recharacterization claims.

34. The Subcommittee determined that the value of the Debtors' estates will be maximized through a going concern transaction and the accompanying Limited Release.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

15

Executed this February 1, 2019

/s/ Alan J. Carr

Alan J. Carr
Disinterested Director
Sears Holdings Corporation

# Appendix 1

# Alan J. Carr

630 Third Avenue, 21st Floor, New York, NY 10017
+1 (212)-856-9700
+1 (917) 968-7474 m
acarr@drivetrainadvisors.com

## Profile

Experienced fiduciary and investment professional with over 20 years experience around financially distressed companies. Proven track record of maximizing value as an independent director in complicated financial restructurings. Vast experience investing in and leading -- from the principal and advisor side -- complex financial restructurings and M&A transactions through in and out of court-observed processes globally as well as serving on boards of directors of troubled and reorganized businesses in the U.S and Europe.

## Experience

**2013-Present**
**Drivetrain, LLC; New York, NY**
**Chief Executive Officer**
Founder of multi-disciplinary fiduciary services business serving the distressed investing industry with an investor's perspective. Services include acting as creditor representative on ad hoc and official creditor committees, trustee, examiner, independent and creditor-appointee directorships, valuation and pricing.

**2003-2013**
**Strategic Value Partners, L.L.C.; Greenwich, CT and London, UK**
**Managing Director**
Invested in distressed, special situations and private equity opportunities on behalf of investment manager for several hedge and private equity funds. Analyzed, recommended and managed investment opportunities, particularly with a process-intensive or legal strategy component throughout global platform. Focus on liquidation and litigation-based recovery investments. Managed outside advisors (financial, operational and legal) for investments globally. Ran complex restructurings and M&A activity globally. Served on boards of portfolio companies and creditors' committees in active role. Oversaw establishment of New Delhi office. Representative public investments include: Kloeckner Pentaplast; Pfleiderer; Quinn Group; Edison Mission; LyondellBasell; Lehman; AMR; Tribune; Eggborough; Chemtura; Nortel; NextMedia; Calpine (Canada, CalGen); Wastequip; Enron; Adelphia; Liberty Electric; Parmalat; Teesside Power; Mirant; AHBR; Tower Automotive.

**1997-2003**
**Skadden, Arps, Slate, Meagher & Flom LLC; New York, NY**
**Corporate Restructuring Attorney**
Senior attorney running all aspects of debtor and creditor representations – using both in and out-of-court strategies. Solutions included exchange offers, 144A offerings and prepackaged bankruptcies. Representations included: Mirant Corporation, Alamosa PCS, AES Corporation, Global Crossing, America West Airlines, Grove Worldwide, Levitz Furniture, Specialty Foods Corporation and senior lenders to XO Communications and Bridge Information Systems.

**1995-1997**
**Ravin, Sarasohn, Baumgarten, Fisch & Rosen; Roseland, NJ**
**Corporate Restructuring Attorney**

## Education

**Tulane Law School**, New Orleans, LA — J.D., *cum laude*

**Brandeis University**, Waltham, MA — B.A. Economics & Sociology

18-23538-rdd    Doc 42321-1    Filed 02/01/19    Entered 02/01/19 12:03:36    Appendix 1
Pg 161 of 288

## Bar admissions

New York State, New Jersey, United States Court of Appeals for the Third Circuit, United States District Courts for Southern District of New York, Eastern District of Michigan and District of New Jersey.

## Speaking Engagements

Regular speaker on distressed investing at industry (INSOL, ABI, TMA) and investor conferences.

## Representative Independent Director Board Assignments

**March 2016–Present**
**Kaupthing ehf**
**Chairman of the Board of Directors**
Chairman of former Icelandic bank in winding up proceedings. Overseeing disposition of private equity, loan and litigation claim assets. Creditor claims traded up 80% in first year after taking over Chairman role.

**September 2017–January 2019**
**Toys R Us DE, Inc.**
**Member of the Board of Directors**
Independent director for US operating subsidiary of international retail toy business.

**September 2013–December 2015**
**LightSquared, Inc. and LightSquared L.P.**
**Independent Member of the Board of Directors and Special Committee**
Member of Special Committee of Independent Directors formed to oversee M&A auction (withdrawn) and reorganization process during Chapter 11 for privately-held company that owns significant wireless and satellite spectrum through a license granted by the FCC; Special Committee formed at direction of bankruptcy court. Testified as at contested Chapter 11 confirmation hearing. Commended by Court for purity of process and credibility of testimony in plan confirmation ruling.

**August 2014–May 2015**
**Statewide Mobility Partners LLC (a/k/a Indiana Toll Road)**
**Independent Member of the Board of Directors and Member of Special Committee**
Member of special committee of directors appointed by creditors to oversee competitive marketing and sale of toll road asset. Recovered 94%+ for creditors through competitive bidding process. Debt was trading ~60% of face value when joined board.

**April 2017–April 2018**
**ExGen Texas Power, LLC**
**Independent Member of the Board of Directors**
Sole independent director appointed to oversee balance sheet restructuring and sale process of entity holding several merchant power assets in Texas. Exelon Corp. affiliate. Chapter 11 case pending and moving toward a consensual reorganization.

**April 2015–March 2016**
**Seacastle Ship Holdings Inc., et al.**
**Chief Restructuring Officer**
Marshall Islands-incorporated, Singapore-based, private equity-owned shipping company. Brought onto board to act as independent Fiduciary to negotiate multi-silo debt stack of 15 container ships. Case resolved consensually, outside of bankruptcy and insolvency.

**February 2016–December 2016**
**UCI Holdings Limited**
**Independent Member of the Board of Directors**
Independent Director of privately-held New Zealand-incorporated after-market auto parts business with operations in North America.  Led consensual out-of-court restructuring.

**February 2016–December 2016**
**American Gilsonite Company**
**Independent Member of the Board of Directors**
Independent Director of private equity-owned mining business related to the oil and gas industry.  Oversaw consensual restructuring with creditors.

**November 2016–May 2017**
**FR AFG Holdings, Inc. (a/k/a AF Global)**
**Independent Member of the Board of Directors**
Independent Director of private equity owned OEM for oil and gas exploration services.  Oversaw consensual restructuring with creditors.

**June 2017–March 2018**
**[Private Company – name withheld for confidentiality purposes]**
**Independent Member of the Board of Directors**
Independent Director of Bermuda-incorporated consumer products company with global business operations.  Currently in final negotiations with creditors aiming toward a consensual restructuring.

**September 2015–December 2016**
**Pocahontas Parkway Holdings, LLC**
**Member of the Board of Directors**
Director of company holding toll road asset in Virginia overseeing sale process.  Asset at sold at significant premium to mark.

18-23538-rdd    Doc 2321-1    Filed 02/01/19    Entered 02/01/19 12:03:36    Appendix 1
Pg 163 of 288

# Alan J. Carr

## Representative Historical  Transactions & Speaking Engagements

### Transactions

**LightSquared, Inc. and LightSquared L.P.  (September 2013– December 2015)—** member of Special Committee of Independent Directors formed to oversee M&A auction    (withdrawn) and reorganization process during Chapter 11 for privately-held company that owns significant wireless and satellite spectrum through a license granted by the FCC; Special Committee formed at direction of bankruptcy court.  Testified as at cont   ested Chapter 11 confirmation hearing.  Commended by Court for purity of process and credibility of testimony in plan confirmation ruling.

**NewPage Corporation (December 2015– July 2016)**– independent director for coated paper manufacturing business durin g its financial restructuring, resulting in a multi    -billion dollar deleverage through an expeditious and consensual Chapter 11.

**Statewide Mobility Partners LLC (a/k/a Indiana Toll Road) (August 2014– May 2015)**– one of three independent directors mandate d with running  competitive  sale process for bankrupt toll road project, concluding in a sale of asset at a price in excess of 30 times EBITDA and returning over 95% recovery to bondholders (bonds trading below 70% when engagement began)

**Seacastle Ship Holdings Inc. and subsidiaries (March 2015 – March 2016)** – Chief restructuring  Officer for owner/operator of container ship portfolio with management team in Singapore overseeing successful out-of-court restructuring.

**Nautilus Holdings No. 2 Limited and affiliates (June 2014– February 2015)** – sole independent director for 16 -vessel container shipping business during its successful Chapter 11 reorganization .

**Atlas Iron Limited (May 2016–Present)—** independent director for iron ore mining company; Chairman of Remuneration Committee.

**Dunkard Creek Water Treatment System, LLC (January 2014 – April 2015)** – sole independent director for water treatment company while parent company in Chapter 11 reorganization.

**Panolam Holdings Co. (April 2014– June 2016)** – independent director for manufacturer of laminate products owned by Apollo and Eaton Vance; sale of business in June 2016.

**FiberTower Litigation Trust (June 2014  – August 2015)** – director of litigation trust board for cellular tower business.

**Momentive Performance Materials Inc., et al. (April 2014– October 2014)** – representative of hedge fund on Official Unsecured Creditors' Committee during Chapter 11; provided means for client to obtain order from Bankruptcy Court permitting trading while h     aving representation on the UCC

**Kloeckner Pentaplast (2011-2013)** -- organized and chaired group of junior debt holders of German and US-based rigid plastic films business in restructuring;   structured and lead  hostile takeover of company from sponsor through a refinancing of senior debt and foreclosing on equity through Luxembourg process  -- believed to be situation of first impression in Europe. Served as Chairman of holding company board and director on advi sory board for German operating company.

**Quinn Group (2011-2012)** -- served on senior lender steering committee of Irish conglomerate borrower; negotiated consensual restructuring among par and secondary holders of debt and Irish government -controlled bank

**Edison Mission (2012-2013)** -- member of ad hoc bondholder committee

**Eggborough (2006-2013)** -- oversaw litigation strategy regarding exercising in -the-money purchase options from reticent owner of coal -fired power plant in northern England; negotiated and structured settlement in form of a purchase acquisition in 2010; served as Chairman of holding company.

**MACH Gen, LLC**  (April 2014 - September 2014) – director of merchant power business; appointed by minority shareholder following financial restrucutrin     g; stepped down upon shareholder's divestment

**NextMedia (2010-2011)** -- oversaw competitive restructuring process and ultimate acquisition through junior debt by repaying senior lenders; served on board of directors

**Calpine (2006-2007)** -- formed and chair ed ad hoc committee of bondholders of Canadian affiliate during restructuring; negotiated settlement with parent estate to ensure par plus accrued recovery for bonds; managed advisors in US and Canada through contemporaneous processes north and south of th e border

**Enron (2005-2008)** -- organized and chaired group of bank debt holders in litigation against two U.S. major banks for breach of fiduciary duty and aiding and abetting fraud; terms of settlement confidential

**Adelphia (2007-2012)** -- one of largest owners of post-restructuring unsecured creditors claims

**Liberty Electric (2005-2011)** -- oversaw litigation strategy for dispute between investors, leading to settlement  and acquisition  in 2007; served on board of directors , including  running sale in 2011

## Speaking Engagements

*"The Independent Director: Private Portfolio and Public Companies*," INSOL International Annual Regional Conference, San Francisco, CA, March 2015

*"America Now!"*, American Bankruptcy Institute International Insol    vency & Restructuring Symposium, London, United Kingdom, October 2014

*"Distressed Investing in Europe*," American Bankruptcy Institute International Insolvency & Restructuring Symposium, Rome, Italy, October 2012

*"Distressed Investing"*, The Pension Bridge  Private Equity Exclusive, Chicago, IL, July 2012

*"Distressed Investing: Value Funds and Their Impact Upon Restructuring*," INSOL Miami, May 2012

*"Helping Your Hedge Fund Clients Trade Claims,"* American Bankruptcy Institute New York City Bankruptcy Conference, May 2012

*"Who's Afraid of Sovereign Debt?,"* American Bankruptcy Institute Spring Meeting, Washington, DC, April 2012

*"Distressed Opportunities in Europe,"* 14th Annual Turnaround Conference, Harvard Business School, Cambridge, MA, March 2012

*"Distressed Investing Strategies and Tactics,"* Turnaround Management Association Distressed Investing Conference, Las Vegas, NV, January 2012

*"The Financing of Debtors and Insolvent Entities,"* International Bar Association's 17th Global Insolvency and Restructuring Conference, Paris, France, May 2011

*"Claims Trading: Effect of CDSs in Bankruptcy and How It Drives Negotiations and Results,"* American Bankruptcy Institute New York City Bankruptcy Conference, May 2011

*"Fast-Forward to the Past? Implications of Today's Financing Markets on Distressed Investing,"* Turnaround Management Association Spring Conference, Chicago, IL, April 2011

*"Distressed Investing Panel,"* American Bankruptcy Institute New York City Bankruptcy Conference, May 2010

18-23538-rdd Doc 2321-2 Filed 02/01/19 Entered 02/01/19 12:03:30 Exhibit 2
166 of 288

# Appendix 2

**PROPOSED RESOLUTIONS**
**THE BOARD OF DIRECTORS OF**
**SEARS HOLDINGS CORPORATION**

**October 10, 2018**

Formation of Restructuring Committee; Appointment of Members

WHEREAS, pursuant to Article 4, Section 1 of the Amended and Restated By-Laws ("By-Laws") of Sears Holdings Corporation (the "Corporation") By-laws and Section 141(c) of the General Corporation Law of the State of Delaware (the "DGCL"), the board of directors of the Corporation (the "Board") may by resolution designate one or more committees of the Board to consist of one or more of the directors of the Corporation, with responsibilities and duties of which may be prescribed by the Board, subject to such limitations as provided by law;

WHEREAS, the Board deems it advisable and in the best interests of the Corporation to establish a restructuring committee of the Board, which shall consist solely of one or more independent members of the Board (the "Restructuring Committee"), to, among other things, consider and evaluate various strategic alternatives that may be available to the Corporation and its subsidiaries (each such strategic alternative, a "Transaction") and, if the Restructuring Committee deems it to be in the best interests of the Corporation: (a) recommend to the Board that the Corporation enter into a Transaction, including with respect to a potential (i) restructuring of the indebtedness of the Corporation and its subsidiaries and/or (ii) sale, transfer, or other disposition of certain assets in connection therewith, in each case, not involving ESL Investments, Inc. or its affiliates (excluding the Corporation) ("ESL") (each such potential transaction, a "Non-ESL Transaction"), and (b) authorize and approve a Transaction where ESL has indicated an interest in participating in such Transaction, including by placing a bid, or where ESL has a conflict of interest by virtue of its security interest in an asset or otherwise (each such potential Transaction, an "ESL Transaction" and together with a Non-ESL Transaction, a "Restructuring Transaction);

WHEREAS, the Board deems it advisable and in the best interests of the Corporation to establish a subcommittee of the Restructuring Committee, consisting of one or more members of the Restructuring Committee recommended by the Nominating and Corporate Governance Committee (the "NCG Committee") of the Board (the "Subcommittee"), with the purpose of investigating any cause of action that the Corporation may have with respect to any transactions involving affiliates prior to the date hereof (the "Prior Transactions"), and taking, or causing to be done, any related actions that the Subcommittee considers necessary or desirable to carry out its mandate;

WHEREAS, the NCG Committee is responsible for recommending to the Board director nominees for each committee and for reviewing and making recommendations to the Board with respect to compensation and benefits of directors;

WHEREAS, the NCG Committee has recommended that each of Alan J. Carr, Paul G. DePodesta and Ann N. Reese, each of whom has been determined to be an independent director in accordance with applicable securities laws and NASDAQ rules, be appointed as members of

1

WEIL:\96746912\12\73219.0006

CONFIDENTIAL

the Restructuring Committee, and that Alan J. Carr be appointed as a member of the Subcommittee;

WHEREAS, the Committee has further recommended that each of the members of the Restructuring Committee receive a fee of $25,000 per month during their service on the Restructuring Committee; and

WHEREAS, upon the recommendation of the NCG Committee, the Board deems it advisable and in the best interests of the Corporation to appoint each of Messrs. Carr and DePodesta and Ms. Reese as a member of the Restructuring Committee.

NOW, THEREFORE, BE IT RESOLVED, the Board hereby establishes a Restructuring Committee, to consist solely of independent members of the Board, which shall be authorized and empowered to take the following actions:

a.　　Consider, evaluate and, if the Restructuring Committee deems it to be in the best interests of the Corporation, (a) recommend to the Board that the Corporation enter into a Non-ESL Transaction, or (b) authorize and approve an ESL Transaction;

c.　　Oversee the provision of confidential information by or on behalf of the Corporation and its subsidiaries to third parties under cover of an appropriate confidentiality arrangement;

c.　　Oversee discussions and negotiations with the Corporation's stakeholders in respect of a Restructuring Transaction;

d.　　Oversee the implementation and execution of a Restructuring Transaction;

e.　　Oversee the work of the Chief Restructuring Officer, who shall report to the Restructuring Committee; and

f.　　Take such other actions as the Restructuring Committee considers necessary or desirable in order to carry out its mandate, subject, as appropriate, to the approval of the Board;

RESOLVED FURTHER, that the Board hereby establishes the Subcommittee to investigate any cause of action that the Corporation may have with respect to any Prior Transactions, and taking, or cause to be done, any related actions that the Subcommittee considers necessary or desirable to carry out its mandate;

RESOLVED FURTHER, that, in carrying out its responsibilities, each of the Restructuring Committee and the Subcommittee is empowered and authorized to coordinate and consult with management, and professional advisors of and to the Corporation, as appropriate, regarding matters within the authority and mandate of the Restructuring Committee and the Subcommittee, as applicable;

RESOLVED FURTHER, that, after consultation with the Board, the Restructuring Committee is authorized to retain professionals for advice or assistance, as it deems necessary and proper, to carry out its responsibilities;

2

WEIL:\96746912\12\73219.0006

CONFIDENTIAL

CAT_00024964
SEARS_UCC00413861

RESOLVED FURTHER, that, following consultation with the Restructuring Committee, the Subcommittee is authorized to retain professionals for advice or assistance, as it deems necessary and proper, to carry out its responsibilities;

RESOLVED FURTHER, that the members of the Board, officers, employees, attorneys, auditors, agents and advisors of the Corporation are directed to cooperate fully with the each of the Restructuring Committee and the Subcommittee in the exercise of its duties;

REVOLVED FURTHER, that each of the members of the Restructuring Committee shall receive a fee of $25,000 per month during their service on such committee;

RESOLVED, FURTHER, that, upon the recommendation of the NCG Committee, each of Alan J. Carr, Paul G. DePodesta and Ann N. Reese, each of whom has been found to be an independent director in accordance with applicable securities laws and NASDAQ rules, be, and each hereby is, appointed as a member of the Restructuring Committee and that Alan J. Carr is a member of the Subcommittee; and

Retention of M-III Advisory Partners, LP; Appointment of Mohsin Y. Meghji as Chief Restructuring Officer

WHEREAS, the Board believes that it is advisable and in the best interests of the Corporation to appoint Mohsin Y. Meghji, Managing Partner of M-III Partners, LP, as the Chief Restructuring Officer of the Corporation with the role, responsibilities and compensation as recommended by the Compensation Committee of the Board (the "Compensation Committee"), in each case, as described in the M-III engagement letter in substantially the form attached hereto as Exhibit A (the "M-III Engagement Letter"); and

WHEREAS, the Board believes that it is advisable and in the best interests of the Corporation to retain M-III Advisory Partners, LP ("M-III") to provide services and to be compensated, as recommended by the Compensation Committee, as described in the M-III Engagement Letter.

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby appoints Mr. Meghji as Chief Restructuring Officer of the Corporation, effective as of the date of the execution of the Engagement Letter, with the role, responsibilities and compensation, and retains M-III to provide services and be compensated, in each case, as described in the M-III Engagement Letter;

RESOLVED, FURTHER, that, it is contemplated that Mr. Meghji, as Chief Restructuring Officer, shall report to the Restructuring Committee.

General Authorization

RESOLVED, FURTHER, that the executive officers of the Corporation (each a "Proper Officer"), each of whom may act without the joinder of any of the others, be, and each of them individually hereby is, authorized and directed, in the name and on behalf of the Corporation, to take or cause to be taken all such further actions, including without limitation, negotiating, signing, executing, acknowledging, certifying, attesting, delivering, accepting, recording and filing (with such changes as such Proper Officer shall approve, the execution and delivery

3

CAT_00024964

CONFIDENTIAL                                                                                                    SEARS_UCC00413862

thereof or the taking of such other action to be conclusive evidence of such approval) the M-III Engagement Letter and all such further documents, agreements, certificates and instruments and paying all fees, taxes and other expenses or payments, in each case as such Proper Officer, in such Proper Officer's sole discretion, may determine to be necessary, appropriate or desirable in order to fulfill the intent and accomplish the purposes of the foregoing resolution, such determination to be conclusively evidenced by the taking of any such further action; and

RESOLVED, FURTHER, that any actions taken by any Proper Officer, for or on behalf of the Corporation, prior to the date hereof that would have been authorized by these resolutions but for the fact that such actions were taken prior to the date hereof be, and they hereby are, authorized, adopted, approved, confirmed and ratified in all respects as the actions and deeds of the Corporation.

4

WEIL:\96746912\12\73219.0006

CONFIDENTIAL

**EXHIBIT A**
**M-III Engagement Letter**

Attached.

WEIL:\96746912\12\73219.0006

CONFIDENTIAL

CAT_00024964
SEARS_UCC00413864

# Appendix 3

# SEARS HOLDINGS CORPORATION

## SECRETARY'S CERTIFICATE

November 10, 2018

The undersigned Corporate Secretary of Sears Holdings Corporation (the "Company"), in his capacity as Corporate Secretary of the Company, hereby certifies as follows:

1.    The undersigned is the duly elected and qualified Corporate Secretary of the Company, and the signature set forth below is true and genuine.

2.    Attached hereto as Annex 1 is a true and complete copy of resolutions duly adopted by the Board of Directors of the Company at a meeting duly called and held on November 2, 2018.  Such resolutions have not in any way been amended, modified, revoked or rescinded, have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect.

*[Signature page follows]*

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned has hereunto set his name as of the date set forth above.

*Luke Valentino*

Name: Luke Valentino
Title:  Divisional Vice President, Deputy
        General Counsel and Corporate Secretary

CONFIDENTIAL                                                                SEARS_UCC00413821

## Annex 1

## RESOLUTIONS OF THE
## BOARD OF DIRECTORS OF
## SEARS HOLDINGS CORPORATION

### November 2, 2018

Authority of the Subcommittee of the Restructuring Committee

WHEREAS, pursuant to Article 4, Section 1 of the Amended and Restated By-Laws of Sears Holdings Corporation (the "Corporation") and Section 141(c) of the General Corporation Law of the State of Delaware, the Board of Directors of the Corporation (the "Board") by resolution duly established a Subcommittee (the "Subcommittee") of the Restructuring Committee of the Board (the "Restructuring Committee") consisting of one or more members of the Restructuring Committee, which consists solely of one or more independent members of the Board, with the purpose of investigating any cause of action that the Corporation may have with respect to any transactions involving affiliates prior to the date of the Subcommittee's formation (the "Prior Transactions"), and taking, or causing to be done, any related actions that the Subcommittee considers necessary or desirable to carry out its mandate;

WHEREAS, Alan J. Carr and William L. Transier were duly appointed by the Board, at the recommendation of the Nominating and Corporate Governance Committee of the Board, as members of the Subcommittee; and

WHEREAS, the Board deems it advisable and in the best interests of the Corporation to clarify the role and responsibilities of the Subcommittee.

NOW, THEREFORE, BE IT RESOLVED that the Board hereby authorizes and empowers the Subcommittee to take the following actions:

1. Prosecute, waive, release, settle, negotiate and bind the Corporation with respect to any claims or causes of action of the Corporation that arise out of or relate to Prior Transactions that are the subject of the Subcommittee's investigation (the "Specified Matters");

2. Control the Corporation's attorney-client and attorney work product privilege for any information disclosed to or developed by the Subcommittee or its advisors during the course of the Subcommittee's investigation;

3. Determine, act on behalf of and bind the Corporation with respect to the right of and/or extent to which a party that is the subject of the Subcommittee's investiga-tion may (i) credit bid pursuant to 11 U.S.C. 363(k) or (ii) take similar actions during the course of the Corporation's chapter 11 cases (the "Chapter 11 Cases") including any credit bid or similar action pursuant to a chapter 11 plan;

4. Determine, act on behalf of and bind the Corporation with respect to any proposed releases, exculpations or indemnifications by the Corporation of its current or

CONFIDENTIAL

former directors, officers or affiliates, in each case, solely with respect to the Specified Matters;

5. Determine whether a bid from or a chapter 11 plan proposed by an affiliate or equity holder of the Corporation that is the subject of the Subcommittee's investigation is higher and/or better than any other alternative, limited to the appropriateness of releases, exculpations or indemnifications by the Corporation of its current or former directors, officers or affiliates contained therein, in each case, solely with respect to to the Specified Matters;

6. Determine, act on behalf of and bind the Corporation with respect to any other matter that is within the scope of the mandate of the Restructuring Committee which the Restructuring Committee may decide to delegate to the Subcommittee without any further action of the Board, including matters that the Restructuring Committee determines pose or may pose a conflict for it to act upon. To the extent the Restructuring Committee does delegate additional matters to the Subcommittee, it shall promptly advise the Board of the same;

7. In carrying out its responsibilities, coordinate and consult with management, and professional advisors of and to the Corporation, as appropriate, regarding matters within the authority and mandate of the Subcommittee; and

8. Retain professionals for advice or assistance, as it deems necessary and proper, to carry out the responsibilities of the Subcommittee; and be it

<u>General Authorization</u>

RESOLVED, FURTHER, that the executive officers of the Corporation (each a "Proper Officer"), each of whom may act without the joinder of any of the others, be, and each of them individually hereby is, authorized and directed, in the name and on behalf of the Corporation, to take or cause to be taken all such further actions, including without limitation, negotiating, signing, executing, acknowledging, certifying, attesting, delivering, accepting, recording and filing (with such changes as such Proper Officer shall approve, the execution and delivery thereof or the taking of such other action to be conclusive evidence of such approval) all such documents, agreements, certificates and instruments and paying all fees, taxes and other expenses or payments, in each case as such Proper Officer, in such Proper Officer's sole discretion, may determine to be necessary, appropriate or desirable in order to fulfill the intent and accomplish the purposes of the foregoing resolution, such determination to be conclusively evidenced by the taking of any such further action; and be it

RESOLVED, FURTHER, that any actions taken by any Proper Officer, for or on behalf of the Corporation, prior to the date hereof that would have been authorized by these resolutions but for the fact that such actions were taken prior to the date hereof be, and they hereby are, authorized, adopted, approved, confirmed and ratified in all respects as the actions and deeds of the Corporation.

SEARS_UCC00413823

# Exhibit 15

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.0
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION, *et al*.,** | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.[1]** | : | **(Jointly Administered)** |

---------------------------------------------------------- x

## DEBTORS' OMNIBUS REPLY
## IN SUPPORT OF THE GOING CONCERN SALE TRANSACTION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

5.      Ultimately, the Debtors were successful and executed an Asset Purchase Agreement[4] with Transform within only three months.  This was no easy feat.  The Sale Transaction provides the businesses, the employees, and all creditors, with a better future and greater recoveries.  The Debtors executed the Asset Purchase Agreement with these objectives in mind and on the basis that the Debtors reasonably concluded that Transform could provide adequate assurance of future performance.  The evidence will support the Debtors' judgment.

6.      Specifically, the Asset Purchase Agreement will, among other things:

- Preserve tens of thousands of jobs and avoid a costly and risky liquidation of the Debtors' enterprise;

- Keep Sears and Kmart stores open across the United States and internationally;

- Preserve the integrity of the Debtors' various business lines, including: Innovel, Sears Home Services, Monark, and Sears Auto Centers;

- Provide for the assumption of approximately $1,100 million of secured debt and administrative liabilities (including up to $139 million in 503(b)(9) claims);

- Provide superior recoveries to creditors;

- Provide for the assumption of contracts and a corresponding cure of all prepetition claims associated therewith;

- Provide for the assumption of liabilities for home warranties and protection agreements sold to about 6.5 million households across the United States;

- Rollover or refinance approximately $1.3 billion of the Debtors' secured debt obligations with the support of those lenders;

- Satisfy approximately $3 billion of secured claims; and

---

[4]     *See* Asset Purchase Agreement, dated as of January 17, 2019, between the Debtors and certain other Sellers party thereto and Transform Holdco LLC ("**Transform**"), as established by ESL (the "**Asset Purchase Agreement**," and the transactions contemplated and to be effected thereby, the "**Sale Transaction**"), filed as <u>Exhibit B</u> to the Notice of Successful Bidder.  The Debtors will file the *Amendment No. 1 to the Asset Purchase Agreement* in advance of the February 4, 2019 hearing.

    ▪    Preserve litigation claims (other than with respect to the Credit Bid Release) against insiders for the benefit of creditors, to be dealt with in the Debtors' chapter 11 plan process.

7.    To be clear: there are no alternative offers for a going concern sale.  The only alternative to the current Sale Transaction is a mass liquidation, with: increased administrative claims; increased unsecured claims; increased pain for all parties in interest; potentially protracted litigation; uncertain prospects for recoveries; and no guarantee of administrative solvency.  Exercising their sound business judgment, the Restructuring Committee decided that the going-concern sale to Transform is the "higher or better" alternative to a mass liquidation.

8.    Unfortunately, at every stage, the Debtors have been met with unsupported allegations and opposition to any going-concern sale by the Creditors' Committee.  Almost immediately after its formation, the Creditors' Committee made its intentions crystal clear[5]—the Creditors' Committee and its advisors rallied for the <u>immediate</u> liquidation of the Debtors <u>without</u> due consideration of any alternatives.  In fact, within hours of hiring advisors, the Debtors' professionals met with the newly hired Creditors' Committee advisors and this intention was made clear.  Remarkably, the Creditors' Committee insisted blindly on a complete liquidation of the Debtors' businesses in just two weeks.  Creditors' Committee's Bidding Procedures Supp. Obj. ¶ 1.

9.    The Creditors' Committee approached these chapter 11 cases with a truly single-minded focus, to the benefit of certain of their members, such as its landlord members, but to the detriment of others—such as customers, vendors, and employees[6] that will benefit from a

---

[5]    *See Preliminary Objection of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al., to Debtors' Motion for Approval of Global Bidding Procedures* (ECF No. 640) (the "**Creditors' Committee's Objection the Global Bidding Procedures**").

[6]    The Committee has kept up the drum beat of liquidation, even suggesting in a letter that the Company commence a full-chain liquidation and distribute WARN Act notices to employees one week before Christmas.

the closing, including any liabilities owed by Sears Re to any Seller in respect of reinsurance of such warranties and protection agreements;

- (ii) certain customer credits that relate to existing customer loyalty programs, including, Shop Your Way, and any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs issued by, on behalf of or in relation to Sellers since January 1, 2018;

- (iii) all cure costs solely with respect to the agreements that ESL is assuming pursuant to the Asset Purchase Agreement;

- (iv) up to $43 million of certain severance reimbursement obligations (which may be reduced in certain circumstances);

- (v) up to $139 million of liabilities under section 503(b)(9) of the Bankruptcy Code (which may be reduced in certain circumstances);

- (vi) up to $166 million in certain accounts payable (which may be reduced in certain circumstances);

- (vii) payables for ordered merchandise not yet received by the Debtors;

- (viii) certain property taxes;

- (ix) certain environmental liabilities, among other potential claims; and

- (x) certain mechanic's liens totaling approximately $3.75 million.

*See generally* Aebersold Dec. ¶ 37; *see also* Asset Purchase Agreement.

51.     The Asset Purchase Agreement represents an integrated transaction that, in the Debtors' business judgment, after good faith negotiations, in the aggregate will maximize the value of the Debtors' estates and minimize claims.

**B.     ESL's Successful Bid Is Superior To a Controlled Winddown**

52.     As further detailed in section II.D. herein, the Restructuring Committee ultimately determined, in its business judgment, that the terms of the Asset Purchase Agreement were the higher or otherwise better than a winddown of the Debtors' businesses for several reasons, including, among other things, the following:

27

- The Asset Purchase Agreement will provide greater recoveries for the Debtors' estates and creditors than would be provided by any other practically available alternative, including, specifically, a liquidation (because, inter alia, the claims pool would be significantly higher in a winddown scenario and the recoveries in that scenario were uncertain);

- The winddown scenario does not guarantee administrative solvency;

- The terms of the Asset Purchase Agreement including the consideration for the Debtors' Assets, constitute the best terms presently available for the Debtors Assets;

- Potentially viable litigation claims against ESL were preserved; and

- A winddown or liquidation would have resulted in the loss of tens of thousands of jobs.

### C. The Debtors Consulted Extensively With the Consultation Parties, Including the Creditors' Committee

53.    The Creditors' Committee's Objection[16] alleges that throughout the Sale Process, the Creditors' Committee was insufficiently consulted.  Nothing could be further from the truth.  The Global Bidding Procedures provide that the Consultation Parties shall have "consultation rights" throughout the auction and sale process, including with respect to, among other things, extending the Bid Deadline and determining if a bidder is a "Qualified Bidder." The procedures also permit the Consultation Parties to attend auctions and require that all bids submitted to the Debtors be shared with the Consultation Parties.  Even though the Creditors' Committee made it unambiguous that its preference was a pivot to an orderly winddown on multiple occasions, the Debtors still made certain that throughout this Sale Process the Consultation Parties remained informed and consulted, as required by the Global Bidding Procedures Order.  The Debtors consulted extensively, but, consultation rights are <u>not</u> consent rights.  Indeed, at the hearing on November 15, 2018 for approval of the Global Bidding Procedures, despite the Committee's broad request for consent rights with respect to extension of

---

[16]    *See Obj. of the Official Committee of Unsecured Creditors to Sale of Substantially All of the Debtors' Assets to ESL Investments, Inc.* (ECF No. 2042) (the "**Committee's Objection**").

28

role and responsibility properly placed by the Code in another's hands." *In re Grubb & Ellis Co.*,
2012 WL 1036071, at *4.

71.    A sound business purpose for the sale of the debtor's assets outside the
ordinary course of business exists where such sale is necessary to preserve the value of the estate
for the benefit of creditors and interest holders.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788
F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063.  Here, the Debtors have
demonstrated a sound business justification for the Sale Transaction.  The single-sale transaction
proposed by ESL for all or substantially all of the Debtors' businesses both maximizes value for
the Debtors and presents the best opportunity to preserve up to tens of thousands of jobs vital to
the communities in which those employees reside.  Like here, in *In re Chrysler LLC*, the debtors
sought approval of a sale of substantially all of the assets of the company when the "only other
alternative" was the "immediate liquidation of the company" which would "result in closing of
plants and layoffs, impacting suppliers, dealers, workers and retirees. . ." 405 B.R. 84, 96-97
(Bankr. S.D.N.Y. 2009).  The circumstances surrounding this sale are not in dispute.  The
Debtors cannot continue operating absent the Sale Transaction.  In approving the sale in
*Chrysler*, the court noted that the debtors maintained the integrity of the business a going
concern and "exercised their fiduciary duty by electing the only option available other than
piecemeal liquidation." *Id* at 97.  And this decision, this transaction, must be viewed without a
bias view on the ultimate buyer.  Certain parties in interest who object to the Sale Transaction,
unfairly taint the Sale Transaction without appropriately acknowledging that the Sale
Transaction is best for the estates now and in the future.  To reiterate, as of the date of this
response, the Debtors believe that the Sale Transaction will be successful and the Debtors will be
administratively solvent at closing.  Meghji Dec. ¶ 55.

41

# Exhibit 16

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------x

<u>**DECLARATION OF BRANDON AEBERSOLD**</u>

I, Brandon Aebersold, make this declaration under 28 U.S.C. § 1746:

        1.     I am a Managing Director at Lazard Frères & Co. LLC ("**Lazard**"), the investment banker to Sears Holdings Corporation ("**SHC**") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**" or "**Sears**").[1]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations

# I.    **Background and Qualifications**[3]

4.    I am a Managing Director with Lazard, a financial advisory and investment banking firm.  I joined Lazard in 2007 and have approximately fifteen years of investment banking and restructuring experience.  Prior to joining Lazard, I practiced law at the firm of Simpson Thatcher & Bartlett LLP, where I focused on mergers and acquisitions and leveraged finance transactions.  I have advised corporate clients and creditor groups in a broad range of restructuring, reorganization, and capital raising transactions in traditional and distressed situations across a diverse variety of industries.

5.    Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years.  Lazard has dedicated professionals who provide restructuring services to its clients.  The current managing directors, directors, vice presidents, associates, and analysts of Lazard (including myself) have extensive experience working with financially troubled companies and creditors thereof in complex financial restructurings out-of-court and in chapter 11 proceedings.  Lazard and its professionals have been involved as advisors to debtors, creditors, equity constituencies, and government agencies in numerous reorganization cases.  Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing well over $1 trillion in debtor liabilities.

# II.    **Lazard's Retention**

6.    Pursuant to the terms and conditions of its engagement letter dated October 11, 2018 (the "**Engagement Letter**"), Lazard agreed to serve as the Debtors'

---

[3] Additional information regarding Mr. Aebersold's background and qualifications can be found in the *Declaration of Brandon Aebersold in Support of Debtors' Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing*, filed with the Bankruptcy Court on October 15, 2018 [ECF No. 9] ("**DIP Declaration**").

investment banker to provide general restructuring advice and advise in connection with any Restructuring, Financing, and, if mutually agreed by the Debtors and Lazard, any Sale Transaction (as such terms are defined under the Engagement Letter), which would result from the Debtors' review of strategic alternatives to address their capital structure.  In connection with its engagement, Lazard is working with the Debtors' outside counsel, Weil, Gotshal & Manges LLP ("**Weil**") and M-III Advisory Partners, LP ("**M-III**"), in analyzing, structuring, negotiating, and effecting a Restructuring or Sale Transaction pursuant to the terms and conditions of the Engagement Letter.  By order dated November 9, 2018 [ECF Nos. 606, 607], the Bankruptcy Court authorized Lazard's retention by the Debtors as investment banker in accordance with the terms of the Engagement Letter.  Lazard and the Debtors subsequently agreed that Lazard would advise with respect to certain potential Sale Transactions.  On January 18, 2019, the Bankruptcy Court authorized an amendment to the Engagement Letter in light of additional services provided by Lazard in connection with potential Sale Transactions. [ECF. No. 1775].

7.      Under my supervision, the Lazard team has worked closely with the Debtors' management and their other professionals and has become knowledgeable of and familiar with the Debtors' capital structure, liquidity needs, and business operations.

### III.    The Sale and Restructuring Process

8.      The Company owns and operates hundreds of stores under the *Sears* and *Kmart* brands across the United States and its territories.[4]  Despite Sears' long history and iconic status, the Debtors have a highly-levered capital structure and faced liquidity challenges that necessitated these chapter 11 cases.

---

[4] *See Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for the Southern District of New York*, filed with the Bankruptcy Court on October 15, 2018 [ECF No. 3] (providing a full description of the Debtors' businesses and operations).

9.     My understanding is that on October 10, 2018, in anticipation of the need to file the chapter 11 cases, the board of directors of Sears (the "**Board**") formed the Restructuring Committee comprised solely of independent directors.  *See* Exhibit A hereto (October 10, 2018 Board Resolution (SEARS_UCC00413859)).  The four members of the Restructuring Committee are Alan J. Carr, Paul G. DePodesta, Ann N. Reese and William L. Transier.  *Id.*  I have been informed that the Restructuring Committee was charged with, among other things, considering, evaluating, and, if it deemed it to be in the best interests of Sears, recommending to the Board that Sears enter into a transaction not involving ESL, or authorizing and approving a transaction involving ESL; the oversight of the provision of confidential information by or on behalf of Sears and its subsidiaries to third parties under cover of an appropriate confidentiality arrangement; the oversight of discussions and negotiations with Sears' stakeholders in respect of a restructuring transaction and the implementation and execution of such a transaction; the oversight of the Chief Restructuring Officer[5]; and such other actions considered by the Restructuring Committee to be necessary or desirable to carry out its mandate, subject, as appropriate (where not exclusively delegated to the Restructuring Committee), to the approval of the Board.  *Id.*[6]  The Restructuring Committee was involved throughout the Process (as defined below), during which Lazard participated in over 60 calls or meetings with them.

---

[5] On October 10, 2018, the Board also authorized the retention of M-III and, specifically, Mohsin Y. Meghji, as Chief Restructuring Officer ("**CRO**") to assist the Debtors with their reorganization efforts as authorized by the Bankruptcy Court.  *See Order Authorizing Debtors to Retain M-III Advisory Partners, LP to Provide a Chief Restructuring Officer and Certain Additional Personnel for Debtors Nunc Pro Tunc to Commencement Date*, entered on November 19, 2018 [ECF No. 814].

[6] I am also informed that a subcommittee of the Restructuring Committee (the "**Subcommittee**") comprised of Alan Carr and William Transier was specifically authorized to, among other things, investigate potential claims of the Debtors against ESL, and, with respect to a restructuring transaction, determine any bidder's (including ESL) ability to credit bid and the Debtors' ability to provide releases in any such transaction.

10. Since filing the chapter 11 cases, the Debtors have explored a broad array of strategic alternatives and options, including a possible sale, recapitalization, reorganization, or orderly wind-down of all or substantially all of the Debtors' businesses (the "**Sale and Restructuring Process**" or "**Process**").

11. The Restructuring Committee, Lazard, and Weil assessed and discussed these potential transactions, including sale transactions whereby all or substantially all of the Debtors' assets would be sold to an investor or buyer who would continue to operate the Debtors' businesses as a going concern, or an alternative whereby individual businesses within Sears would be sold separately to multiple purchasers. Ultimately, the Restructuring Committee, in consultation with Lazard and its other advisors, determined that a single, going-concern transaction for all or substantially all of the Debtors' businesses provided the best opportunity to maximize value for the Debtors, preserve jobs, and mitigate the creation of additional claims against the Debtors. Other alternatives, including a potential orderly wind-down of the business, were considered throughout the Process.

## A. The Sale Process

12. As part of the broader Process, and after obtaining approval from the Restructuring Committee, the Debtors, with the assistance of Lazard, Weil, and M-III, commenced a sale process for the Debtors (the "**Sale Process**"). Lazard, with the support of the Debtors' other advisors, led the Sale Process for the non-real estate assets or businesses. The initial phase of the Sale Process was designed to provide a large number of potential purchasers with information concerning the Debtors' businesses and other assets to allow such parties to submit bids and request further diligence, and was to be followed with efforts aimed at providing potential purchasers with a more thorough understanding of the Debtors' businesses prior to an

**DECLARATION OF BRANDON AEBERSOLD – Page 6**

auction of the Debtors' assets, which was to be held at Weil's New York offices on January 14, 2019, at 10:00 a.m. EST (the "**Auction**").

13.    The deadlines and requirements for the Sale Process were outlined and approved by the Bankruptcy Court on November 19, 2018, in the *Order Approving Global Bidding Procedures and Granting Related Relief* [ECF No. 816] (the "**Bidding Procedures**") and further outlined in the November 22, 2018 *Notice of Filing of Global Bidding Procedures Process Letter* [ECF No. 862] (the "**Process Letter**").

14.    Although Lazard had been preparing virtual data rooms and having discussions with interested parties on or prior to the Commencement Date, the formal Sale Process began on November 22, 2018, with the distribution of the Process Letter.

15.    Based on my experience and participation, the Sale Process led by Lazard with the support of the Debtors' other advisors was extensive, involving solicitations of interest from a diverse set of potential strategic and financial parties, and the diligence was inclusive and thorough.  Diligence included, among other information, (i) electronic data rooms containing over 17,000 documents concerning retail operations, associated intellectual property, inventory, the Sears Home Services business (including the repair and warranty business, the Sears Home Improvement Products ("**SHIP**") business, and the Parts Direct business ("**Parts Direct**"), Monark, Sears Auto Center, the Kenmore® and DieHard® brands, taxes, labor, employment, real estate, and the Debtors' tort claims against certain credit card processors (the "**Credit Card Tort Claims**"); (ii) confidential information memoranda ("**CIM**"), which contained non-public information concerning certain of the Debtors' businesses; (iii) discussions with the Debtors' management; (iv) site visits; and (v) analysis and discussion of requested legal due diligence topics.  During the overall Process, Lazard, in conjunction with the Debtors and their other

advisors, engaged with over 250 potential third-party investors, approximately 128 of which executed a confidentiality agreement ("**NDA**").

16.     The Process Letter instructed bidders to submit non-binding indications of interest by December 5, 2018 ("**Indications of Interest**"), which were required to include, among other things, descriptions of the contemplated transaction, the total purchase price to be paid, other consideration to be paid, the prospective bidder's financial wherewithal to consummate the transaction, and allocation of value.

17.     By the December 5 deadline, the Debtors received 19 Indications of Interest, including bids on one or more operating businesses, advisory and agency proposals from liquidators, and bids for the Credit Card Tort Claims.  Only ESL submitted a going-concern bid that included substantially all of the Debtors' assets, including the retail store footprint.

18.     Between December 5 and December 28, 2018, the Debtors and their advisors continued to work to determine the most effective plan for maximizing the value of the Debtors' assets and reducing creditors' exposure, including by developing analyses that compared ESL's going-concern proposal to a potential wind-down of the business (which would potentially have involved both going out of business sales at retail stores and separate sales of certain assets and businesses).  During this period, the Debtors and their advisors responded to several hundred diligence questions, held over 40 formal diligence calls and in-person meetings with prospective bidders and their advisors (approximately half of which included relevant members of the Debtors' management), and held management presentations (that were preceded by numerous preparatory sessions and in-person rehearsals).

19.     Throughout this period, the advisors for the Debtors and the Restructuring Committee regularly consulted with key constituencies, including advisors to Bank of America,

DECLARATION OF BRANDON AEBERSOLD – Page 8

## B.    The Auction

25.    In the interim between the January 9 ESL Bid and the Auction, the Debtors and their advisors engaged in continued arm's-length discussions with advisors to ESL. The Debtors conferred with advisors to the Consultation Parties throughout this period.

26.    The Auction began at Weil's New York offices on January 14, 2019, at approximately 10:00 a.m., and concluded on January 17, 2019, at 3:10 a.m.   Each potential bidder was required to confirm in writing and on the record that: (i) it had not engaged in any collusion with respect to the submission of any bid; and (ii) its bid represented a binding, good faith, and bona fide offer to purchase the Debtors' assets if selected as the successful bidder. Each attendee also affirmed the confidentiality of the Auction.   At the suggestion of and in arrangement with the UCC's investment banker, Houlihan Lokey, Inc. ("**Houlihan**"), the attendees included potential bidders for Other Assets.

27.    The January 9 ESL Bid was the only bid put on the record during the first day of the Auction.  The alternative of a wind-down was also read into the record.[10]  The Auction was conducted openly, and the Consultation Parties, and/or their advisors, attended.   The Subcommittee's advisors were also present in-person for all three days of the Auction. Throughout the Auction and Sale Process generally, the Debtors kept the Consultation Parties apprised of the key negotiations and any changes in the terms of the ESL Bid.

28.    During the morning of the first day of the Auction, ESL made certain proposed revisions to the January 9 ESL Bid, including, among other things, agreeing to delete

---

[10] *See* 1/14/19 Auction Tr. at 10:15-11:2 ("We will start with a recitation of events from the status conference on January 8th to today's auction, that ESL Investments will be permitted to put their on the record. ESL is a qualifying bidder. Next, we will allow any other competing bidders to put their bids on the record. If there are any, and they've been qualified for this auction, I don't expect that to be the case at this initial session, and then we'll summarize in brief fashion the Debtors' wind down recoveries of the company, which are among the company's alternatives and against which ESL will be competing today.").

DECLARATION OF BRANDON AEBERSOLD – Page 11

ESL's debt financing conditions, accept the forfeiture of the $120 million deposit for financing failure, assume certain environmental liabilities, and provide certain protections for employees (as so revised, the "**January 14 ESL Bid**").  The Debtors, the Restructuring Committee, and their advisors worked together and reviewed the outstanding material issues that prevented their acceptance of the January 14 ESL Bid.  Key concerns included (but were not limited to) whether certain proposed conditions to closing the transaction contemplated by the January 14 ESL Bid could be met, and whether the Debtors would be administratively solvent following the transaction.  The Debtors informed ESL of the deficiencies in the January 14 ESL Bid and, at the request of ESL's advisors, the Debtors presented potential alternatives for a revision to the January 14 ESL Bid.  ESL advised it would consider these issues and respond early the next morning.  At the same time, the Debtors and their advisors continued to consider an orderly wind-down as an alternative if ESL failed to provide a higher or otherwise better alternative.

29.    On the morning of January 15, 2019, ESL further revised the January 14 ESL Bid on the Auction record (as so revised, the "**January 15 ESL Bid**").  The January 15 ESL Bid included a number of revisions, including, among other things, modification of certain conditions precedent, acceleration of the timing of payment of certain assumed obligations, removal of the requirement that holders of protection agreements reaffirm their agreements, and elimination of a $30 million expense reimbursement requirement.

30.    The Debtors, the Restructuring Committee, and their advisors met to discuss the revisions.  After extensive discussions, that afternoon, the Restructuring Committee unanimously agreed that the January 15 ESL Bid was still not a higher or otherwise better alternative to a wind-down due to, among other things, risks that the transaction would not be executable and that the Debtors' estates could face administrative insolvency.    These

considerations were weighed against the heavy consideration that a wind-down scenario would mean the loss of tens of thousands of jobs.

31.    Following the meeting with the Restructuring Committee, I understand that at approximately 2:00 p.m. EST on January 15, the Debtors held a status conference with the Bankruptcy Court.  As the Auction was still open, following that status conference, the parties agreed that they would continue negotiating.

32.    After additional hours of negotiations with the Debtors and their advisors, ESL submitted another revised ESL Bid (the "**Revised January 15 ESL Bid**").  The Revised January 15 ESL Bid included substantial improvements, most notably providing that NewCo would assume the entirety of the $350 million Junior DIP, which represented a $120 million increase in "cash equivalent" consideration.  The Revised January 15 ESL Bid also provided that NewCo would assume an additional $23 million of liabilities and allowed the Debtors to keep $19 million of sale and insurance proceeds, which was partially offset by including SHIP (or the proceeds of a sale of SHIP) as an acquired asset.  These modifications are set forth more fully in the Proposed Sale Order.[11]

33.    After several further rounds of debate among the Restructuring Committee, the Subcommittee, and the Debtors' advisors stretching into the early hours of January 16, the Debtors, in consultation with their advisors, and consistent with the Bidding Procedures, determined that the Revised January 15 ESL Bid to purchase substantially all of the Debtors' assets, including the "go-forward" retail stores and other assets and component

---

[11] I understand that during the Auction, the Subcommittee also negotiated with ESL with respect to their ability to credit bid and a release of ESL by the Debtors.

DECLARATION OF BRANDON AEBERSOLD – Page 13

businesses as a going concern, constituted the highest or otherwise best alternatives (the "**Successful Bid**").

34.     In making this determination, the Debtors, in consultation with their advisors, considered, among other things: (i) the nature and amount of the consideration provided; (ii) the ability of both parties to close on the proposed transaction and the timing of the same; (iii) the recovery the Successful Bid would provide to creditors and the net benefit to the Debtors' estates; and (iv) the alternative to the Successful Bid—a wind-down—and its expected impact on creditor recoveries, on tens of thousands of jobs, and on potential additional claims.

35.     To my knowledge and based on my observations and experience, I believe that the Auction was conducted in good faith and the Sale Process provided a fair and reasonable opportunity to purchase components of or substantially all of the Debtors' assets and operations. Throughout the Auction, the Debtors kept the Consultation Parties apprised of the key negotiations.

## C.     The Successful Bid

36.     With the approval of the Restructuring Committee, the Debtors entered into an Asset Purchase Agreement with ESL, memorializing the terms of the Successful Bid, on January 17, 2019 (the "**APA**").  The APA sets forth the key terms of the Sale Transaction.

37.     Pursuant to the Successful Bid, ESL has agreed to commit the following as consideration in order to purchase the Debtors' assets and operations:  (i) a cash payment of $885 million; (ii) a credit bid of secured debt facilities totaling $1.3 billion; (iii) an assumption of secured debt totaling $621 million; and (iv) an assumption of administrative liabilities, including for severance obligations and other employee claims, Section 503(b)(9) claims, and post-petition accounts payable and property taxes, of up to $482 million.  In addition, the Successful Bid

provides the additional benefits to the Debtors of (i) including offers of employment to tens of thousands of employees, (ii) assuming an additional $1 billion of "protection agreement" liabilities related to consumer warranties sold by Sears Home Services, (iii) taking on cure cost obligations associated with assumed contracts, (iv) honoring approximately $81 million of "Shop Your Way" points, gift cards and other customer liabilities, and (v) purchasing up to $17 million of in-store cash.

38.    The Sale and Restructuring Process required a significant amount of time and resources focused on maximizing the Debtors' value for the benefit of all stakeholders.  In conducting that Process and negotiating with a number of interested parties, while simultaneously considering an orderly wind-down as an alternative throughout, I believe, based on my professional experience and on the input from the Debtors' management and other advisors, that the terms of the Successful Bid represent the highest or otherwise best offer currently available for the Debtors' businesses for several reasons.

39.    **First**, the terms of the Successful Bid, including the consideration for the Debtors' assets, constitute the best terms presently available under these trying circumstances.

40.    **Second**, I understand that the Successful Bid will provide greater recoveries for the Debtors' estates and creditors than would be provided by any other practically available alternative, including, specifically, a wind-down or liquidation of the business.

41.    **Third,** the Successful Bid gives the Company the opportunity to preserve tens of thousands of jobs.  While the terms of the Successful Bid do not constitute a guarantee that those jobs will persist in perpetuity, a wind-down or liquidation would have resulted in their near-term elimination.

# Exhibit 17

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :      **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : |
| | :      **Case No. 18-23538 (RDD)** |
| | : |
| **Debtors.** | :      **(Jointly Administered)** |

---------------------------------------------------------------x

<u>**DECLARATION OF WILLIAM L. TRANSIER**</u>

      I, William L. Transier, make this declaration under 28 U.S.C. § 1746:

      1.    I submit this declaration ("**Declaration**") in support of entry of the *Revised Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith, and (IV) Granting Related Relief* ("**Revised Proposed Sale Order**").[1]

      2.    Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my opinions based on my experience, my discussion with the Debtors' management and professionals, and my review of the relevant documents. If called to testify, I could and would testify competently to each of the facts set forth in this

---

[1] Capitalized terms used in this Declaration but not otherwise defined have the meanings given to them in the Revised Proposed Sale Order.

- ESL increased its assumption of liabilities to a total of $2.2 billion, including, among other things: (i) additional cure costs with no cap; (ii) approximately $4 million in mechanics liens; (iii) all consumer protection agreements without any affirmation requirements; (iv) property taxes for acquired properties not to exceed $135 million; and (v) certain severance costs and section 503(b)(9) claims;

- To obtain the right to credit bid a portion of its debt, ESL agreed to a release that was substantially more limited and narrow, releasing only equitable subordination, recharacterization, and disallowance claims, yet preserving for the benefit of the estates all remaining litigation claims against ESL and its affiliates, which the Restructuring Subcommittee, in reliance on its advisors, determined to have substantial value;

- ESL retained certain deficiency and section 507(b) claims subject to limitations, including, among other things, a $50 million cap;

- ESL agreed to purchase up to $17 million of store cash to assist the Debtors in meeting the maximum Senior DIP condition; and

- ESL agreed to provide employees with comparable benefits and prepetition severance plan protection through the end of fiscal year 2019.

33.     The Revised January 15 ESL Bid, all together, increased the total consideration to the estates by roughly $800 million compared with the initial ESL Bid. It also was significant to the Restructuring Committee that Cyrus agreed to rollover the remainder of the Junior DIP from $230 to $350 million. Over the course of the negotiations, ESL continued to assume more liabilities, provide additional liquidity, and provide greater recovery to the Debtors' estates.

34.     In further reliance on information provided by the Debtors' advisors, the Restructuring Committee considered that, compared to a wind-down, a going-concern sale contemplated by the Revised January 15 ESL Bid would: (i) present the opportunity to preserve tens of thousands of jobs; (ii) preserve the ongoing business relationship with a multitude of vendors; (iii) provide greater recovery for unsecured creditors due to the assumption of certain cure amounts, 503(b)(9) claims, and protection agreements; and (iv) provide significant,

additional value in excess of a wind-down to secured creditors, plus potentially substantial recoveries from litigation claims against ESL identified by the Restructuring Subcommittee's investigation. As a result, the Restructuring Committee, in consultation with Lazard, Weil, M-III, and its other advisors and based on marketing feedback, determined that a single, going-concern transaction for all or substantially all of the Debtors' businesses provided, among other things, the best opportunity to maximize value for the Debtors and to mitigate the creation of substantial additional claims against the Debtors.

35.    As part of its consideration of the Revised January 15 ESL Bid, the Restructuring Committee also carefully considered and discussed potential administrative solvency concerns, which it persistently addressed through the negotiations and which were significantly narrowed by the Revised January 15 ESL Bid. The Restructuring Committee carefully considered how to close the remaining gap with its advisors. The Restructuring Committee also received presentations comparing, side-by-side, the Revised January 15 ESL Bid to a wind-down scenario to help it compare the impact on creditor recoveries in the waterfall.

36.    During these discussions, I inquired whether the CRO could manage the Company's operations to close the estimated outstanding administrative solvency gap, recognizing the substantial amount of inflows and outflows of the Company, and he confirmed that he was confident this could be accomplished. I then also asked each of the advisors to give the Restructuring Committee their judgment and recommendation as to whether the Restructuring Committee should accept the bid, notwithstanding the potential administrative solvency gap. Mr. Meghji, the CRO, and Robert Riecker, the Company's CFO, agreed that the Company's liquidity could be managed to mitigate this small potential gap. Based on the advice and recommendations received from our advisors, the Restructuring Committee determined the

# Exhibit 18

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                        :
In re:                                  :      Chapter 11
SEARS HOLDINGS CORPORATION, et al.,[1]   :
                                        :      Case No. 18-23538-rdd
            Debtors.                    :
                                        :      (Jointly Administered)
                                        :
-------------------------------------------------------------X

## DECLARATION OF KUNAL S. KAMLANI IN SUPPORT OF ESL'S OMNIBUS RESPONSE IN SUPPORT OF THE GOING CONCERN SALE TRANSACTION

I, Kunal S. Kamlani, declare as follows:

1.      I am the President of ESL Investments, Inc. ("ESL"), the controlling parent of Transform Holdco LLC ("Buyer" or "New Sears"), which is seeking to purchase substantially all of the businesses and assets of Sears Holdings Corp. (the "Company" or "SHC") and its affiliated debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Sears" or the "Company"), pursuant to section 363(b) of title 11 of the United States Code (the "Sale").

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

1

with respect to Sears Home Services protection agreements, certain gift cards and Shop Your Way accrued points.

15.    Following the submission of ESL's expression of interest, the Debtors changed the assets that they were offering for sale, initiating a process to close an additional 80 Sears stores. Three weeks later, on December 28, ESL submitted a definitive going concern bid, which was modified to account for the pending closure of the 80 Sears stores.  This definitive bid offered $4.4 billion in total value, including up to $900 million in cash, a credit bid of approximately $1.3 billion, the roll-over and release of the Debtors with respect to $501 million of senior indebtedness, the assumption of approximately $1.1 billion in additional liabilities, and in exchange for certain releases, a total of $35 million in cash and the rights to purchase $100 million of non-voting securities in the new company.

16.    In the early evening of January 2, 2019, representatives of ESL met with three of the four members of Sears' Restructuring Committee to discuss ESL's going concern proposal.  A few hours after that meeting concluded, I was informed that the December 28 Bid would not be designated a qualified bid.  After further discussions the next day, ESL worked to respond to issues raised by the Subcommittee.  On January 4, 2019, ESL presented an improved bid that included assuming responsibility for an additional approximately $225 million in administrative liabilities. Despite this material improvement, the Debtors informed counsel for ESL that this improved proposal had also been rejected.

17.    ESL made a further improved proposal on the evening of January 5, 2019, which included the uncapped assumption of "cure costs," estimated to be as much as $180 million.  Late in the afternoon of January 6, 2019, ESL was again told that its going concern proposal would not be qualified.  On January 7, 2019, ESL proposed to assume an additional $257 million of additional

7

administrative liabilities and, in exchange, to acquire certain additional assets. In total, between December 28, 2018 and January 7, 2019, ESL agreed to take responsibility for an additional $482 million in administrative claims, plus cure costs in an uncapped amount. Even with these improvements, the Subcommittee rejected ESL's bid.

18.     Late at night on January 7, 2019, ESL's counsel sent a letter to the Sears Board demanding that it immediately override the Subcommittee's decision and that the failure to do so would constitute a breach of fiduciary duty. Negotiations continued the next day, narrowing the gap between ESL and the Debtors to approximately $80 million. After a Chambers Conference on January 8, 2019, ESL submitted a revised bid on January 9, 2019, improving its going concern bid by over $600 million, increasing the total value of the bid to over $5 billion and reducing the conditionality that was part of the December 28 bid. The improved bid involved the assumption of another $663 million in additional liabilities, including up to $166 million of payment obligations with respect to goods ordered by Debtors prior to the closing of the proposed transactions (but as to which goods Debtors have not yet taken delivery and title prior to closing), up to $139 million of certain administrative priority claims, up to $135 million in property taxes, and all cure costs related to assumed contracts, estimated to be up to $180 million. The bid also included $35 million in cash and other good and valuable consideration as settlement of certain potential claims and the right for ESL to credit bid.

19.     On January 9, as part of this bid, and as required by the Court, ESL submitted a $120 million deposit, $17.9 million of which was designated as non-refundable, to cover what the Debtors represented to be the cost of delaying liquidation until the Auction. With this, the Debtors designated ESL's improved as qualified under the court-approved bidding procedures. At the beginning of the Auction on January 14, ESL submitted yet another improved bid, addressing the

Debtors' concerns as to conditionality, adding the assumption of liabilities related to environmental law and forfeiting its deposit in a situation where ESL failed to close on certain financing.

20.    The final bid, submitted at the Auction on January 15, provided for over $5.2 billion in total consideration, including an additional $120 million in assumed liabilities consisting of the junior DIP rollover, an obligation to pay up to $19 million in transfer taxes, the assumption of $4 million in mechanics' liens and up to $17 million in cash to purchase the cash that will be located in the stores following closing.    The final bid also included $35 million in cash and other good and valuable consideration for allowance of ESL's $2.4 billion in secured claims and ESL's right to credit bid (the "Credit Bid Release").    In response to Debtors' concerns as to the conditionality of the bid, ESL: (1) removed the condition precedent requiring an amendment to the Seritage master lease; (2) modified the closing conditions related to the delivery of inventory and receivables to make it easier for the Debtors to satisfy those conditions; (3) provided the estates with the benefit of any inventory and receivables in excess of amounts required to satisfy closing conditions; (4) subject to lender approval, removed the marketing period requirement and eased the required information delivery obligations for marketing the Buyer's financing; (5) accelerated the timing of assumed payment obligations; (6) removed the requirement that holders of protection agreements affirm their agreements before the Buyer assumes those obligations and (7) extended the obligation to continue employee compensation and benefits through the fiscal year ending in 2020.

21.    In short, over a limited period of time, the Debtors continued to make a number of aggressive responses to ESL's bids and ensured that ESL would offer additional consideration

9

# Exhibit 19

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8

9            Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    February 4, 2019

17                    10:59 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  RAI

Page 99

1    restructuring transactions for Sears in total.

2    Q    And you would agree with me that, as a businessperson

3    sitting on the Restructuring Committee, it would be

4    difficult to go out and market real estate assets if

5    somebody on the other side was thinking that those assets

6    were going to be part of a going concern?

7    A    No, I think when asked this question in my deposition,

8    I said exactly the opposite.  I said, if we were in a wind-

9    down or a liquidation mode, I thought it would be very

10   difficult to get market clearing prices.  In fact, I think

11   just the opposite would be true in a going concern.  If you

12   had those assets, there would be a higher level of

13   confidence in and around those assets and you should expect

14   something better.  But I answered that question in respect

15   to a liquidation or a wind-down.

16   Q    I want to shift to the ESL bid that was submitted on

17   December 28th.  Do you recall that, that bid?

18   A    I do.

19   Q    Now, the short version of it is that the Restructuring

20   Committee decided not to qualify that bid.  Do you recall

21   that?

22   A    I do.

23   Q    And one of the issues with the December 28, 2018 bid

24   that you had identified was that ESL had still not complied

25   with the global bidding procedures requirement to allocate

# Exhibit 20

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  February 7, 2019

17                  9:27 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  NAROTAM RAI

1          MR. SCHROCK:  Your Honor, moving forward on Slide

2     3, the evidence in this matter is largely uncontroverted in

3     favor of a number of conclusions, including that the sale

4     transaction is subject to the business judgment standard and

5     that we meet the standard of a valid exercise of the

6     Debtors' business judgment.  The sale process was thorough,

7     competitive, and a highly public process carried out in

8     compliance with Court's approved global bidding procedures.

9          The sale transactions' superior to the winddown

10    alternative and Transform Co. has provided adequate

11    assurance of future performance.  Your Honor, the legal

12    standard is set out in 363(b)(1), that the Trustee after

13    notice and hearing may use, sell, or lease other than in the

14    ordinary course, the property of the estate.

15         Courts in this circuit and others in applying this

16    section have required that the sale of the Debtors' assets

17    must be based on the sound business judgment of the Debtor.

18    Now, where the transaction is negotiated or supervised by an

19    independent fiduciary such as the Restructuring Committee,

20    the business judgment standard, we believe, undoubtedly

21    continues to apply.

22         This is an unusual auction, Judge, in that in

23    every other auction, I think certainly that I've been

24    involved in, you are comparing two live bidders, one bid

25    being -- you know, could be a going concern bid and another

Page 29

1    bid, at least if there's a liquidation alternative, there's

2    at least a liquidator that's really putting up cash, that's

3    providing real value.  Here, the company only had one

4    qualified bid, okay, for the auction, for a going concern

5    sale.  We were comparing it to a winddown alternative run by

6    the Debtors, okay, and we took that obligation very

7    seriously nevertheless, but I do think it's worth noting

8    that the only qualified bid was for -- was from ESL and

9    Transform Co.

10            THE COURT:  Can I explore that a little bit?

11            MR. SCHROCK:  Sure.

12            THE COURT:   There really was not a whole lot in

13   the record on this, but the prior hearings leading up to the

14   auction referenced the Debtors' soliciting, in essence, bulk

15   bids from liquidators.

16            MR. SCHROCK:  Yes.

17            THE COURT:  And the Debtors announced their

18   conclusion that their retained liquidator, Abacus, actually

19   had the best of that lot, of that group.  Abacus -- when you

20   refer to Abacus being the best of that group, is that just

21   based on the terms of Abacus' retention?

22            MR. SCHROCK:  It is, Your Honor.  Based on the

23   terms of Abacus' retention and when we were looking at so-

24   called equity bids from liquidators where they were actually

25   going to be purchasing the assets, the recoveries that could

Page 30

1   be had on the company's assets was simply superior under a

2   company-run GOB, and I don't really think that issue is in

3   controversy by any of the stakeholders.

4           THE COURT:  Well, certainly no one has raised the

5   argument that any of the liquidators made a higher or better

6   bid.

7           MR. SCHROCK:  Yeah.

8           THE COURT:  But I -- those proposals including the

9   Abacus one, did they include Abacus running anything more

10  than GOB sales; i.e., did they assume that the company would

11  be -- that the Debtors would be marketing the real estate

12  assets separately from the liquidators?

13          MR. SCHROCK:  Your Honor, there were various

14  permutations of those bids and the Debtors actually ran an

15  informal auction during the first week of January among the

16  liquidators in the event that we were going to go the GOB

17  route.  The result of that auction --

18          THE COURT:  Right, and you announced that.

19          MR. SCHROCK:  Yeah.  And the result of that was

20  that Abacus was a higher or better bid, but we don't have

21  deposits, qualified bids from liquidators and I think that

22  all the parties and the Committee and the Debtors certainly

23  agreed that the recovery under -- it was in Abacus and we

24  also supplemented with SB360 -- Schottenstein, the

25  Schottenstein-run venture to provide additional capacity

Page 31

1   that those two parties running the GOBs with the Debtors

2   would provide the highest recoveries and that's what we were

3   comparing in the context of the auction in the winddown

4   alternative.

5               THE COURT:  But I guess my question is, the Abacus

6   terms, were those set forth in their retention, right, they

7   didn't change those?

8               MR. SCHROCK:  Yes, Your Honor.

9               THE COURT:  Except maybe they added SB360, which

10  sounds like a product that Sears would be selling as opposed

11  to a firm, but --

12              MR. SCHROCK:  Yes, Your Honor.  So that -- the

13  answer is yes.

14              THE COURT:  Okay.

15              MR. SCHROCK:  It was very modest --

16              THE COURT:  So --

17              MR. SCHROCK:  -- and --

18              THE COURT:  So can I interrupt you?  As I remember

19  that retention, they didn't take on the responsibility to

20  market real estate.  It was really straight GOB.

21              MR. SCHROCK:  That's correct.

22              THE COURT:  Okay, so --

23              MR. SCHROCK:  That's right.

24              THE COURT:  So when you compared the various ESL

25  proposals including the one that was ultimately accepted, to

Page 32

1    a liquidation alternative, it was a combination of Abacus,

2    GOB sales, and the Debtors' marketing of real estate?

3              MR. SCHROCK:  That's correct, Your Honor.  So we

4    used a combination of -- as provided in the testimony from

5    Mr. Meghji as well as Mr. Welch -- the combination of

6    appraisals that we had conducted for assets as well as

7    indications of interest received and comparing how we would

8    receive --

9              THE COURT:  I guess there're some miscellaneous

10   assets like potential litigation claims, credit card

11   antitrust issue that -- litigation, that sort of thing but

12   it was primarily GOB and real estate.  And you're still

13   doing the GOB.

14             MR. SCHROCK:  We are still doing the GOBs, Your

15   Honor.

16             THE COURT:  All right, so it largely comes down to

17   the real estate.

18             MR. SCHROCK:  That is it.  I think that when you

19   really looked at the differences between the Committee's

20   assumptions and the Debtors' assumptions around the

21   winddown, it really did, in our view, come down to the real

22   estate.

23             THE COURT:  Okay.

24             MR. SCHROCK:  You had from the one perspective,

25   the Debtors' valuations that are in the record.  They are

Page 33

1    uncontested.  And during Mr. Greenspan's live testimony, he

2    retracted his two important criticisms of the Welch

3    declaration and lessened his valuation by $50 to $90

4    million.

5           I note that Mr. Greenspan also was assuming what I

6    can only say is just a process that's not bound in reality

7    or 365(d)(4) of the Bankruptcy Code that you can liquidate

8    leases over the course of 20 to 24 months and saying you're

9    going to assume those leases and put them in a trust, I

10   think, just does not recognize what the legal restrictions

11   are and the assumption and assignment under the Bankruptcy

12   Code.

13          And as Mr. Welch further explained, the discounts

14   applied by M3 related to the real estate were reasonable

15   because they accounted for an unprecedented expedited bulk

16   sale of big box properties from a distressed seller.  In

17   fact, Mr. Greenspan himself testified that a sale of the

18   properties of the magnitude contemplated by the Debtors was

19   unprecedented.  The liquidation winddown analysis reasonably

20   values the real estate.

21          We think the Toys experience does support our

22   valuation, but I do believe that overall when you look at

23   the appraisals and the rigor through which the Debtors put

24   all of these properties through that test demonstrates that

25   the ESL -- and we'll talk more about it -- was, in fact,

Page 34

1   much greater for all of the creditors, writ large.

2          Your Honor, in Slide 5, we talk a little bit about

3   the marketing process, and I think it's really worth noting

4   that Mr. Aebersold's testimony in this matter is largely

5   uncontroverted.  Their initial phase was designed to provide

6   a large number of potential purchasers with information.  We

7   engaged with over 250 potential investors, 128 under NDA.

8   It was extraordinary.

9          The Debtors' and their buyers responded to several

10  hundred diligence questions, held over 40 formal diligence

11  calls and in-person meetings.  In multiple formal meetings

12  and numerous other informal discussions with the UCC, the

13  Debtors outlined their marketing strategy, shared the

14  identify of prospective bidders, facilitated in-person

15  meetings with management, and gave the opportunity to review

16  and comment on proposed purchase agreements for prospective

17  bidders.

18          Now, the UCC had the opportunity to ask Mr.

19  Aebersold about the sales process but they really didn't ask

20  a single question, I believe, about that process and they

21  cannot now challenge that process with the evidence closed.

22          THE COURT:  Well, can I interrupt you on that?

23          MR. SCHROCK:  Sure.

24          THE COURT:  You're about to go to a different

25  point.  Turning back the real estate, the Creditors'

Page 35

1    Committee asserts that the Debtors did not run a real estate

2    auction, per se.  They instead ran an auction where they

3    posited their assumed values for the real estate as a

4    counter to the one going concern proposal that was

5    qualified, which was the ESL proposal.

6         And they suggest that if you had run a parallel

7    real estate auction, that instead of the relatively modest

8    number of expressions of interest and/or -- well,

9    indications of interest, you would've gotten a much bigger

10   number.  And I guess my question is, why wasn't that done

11   and could it have been done?

12        MR. SCHROCK:  Yes, Your Honor.  I think, with due

13   respect to my friends on the Committee, I think that they

14   have a selective memory on this issue because when we first

15   undertook the global sale process and had it approved, we

16   were very open with the Committee, we were very open with

17   all parties that we have to do what's within the realm of

18   the possible.  So we'd set up the case so we had a chance to

19   run a process, an expedited process on a going concern sale.

20        We told parties in -- during December that if they

21   wanted to put in indications of interest for the Debtors to

22   consider, that we would certainly -- that we would consider

23   them, but as we told the Committee, we were going to be

24   relying also on nonbinding indications of interest which

25   were due by the 28th and the Debtors' appraisals in

1   comparing the market value.  We have plan exclusivity.

2          We think that the record -- that you don't have to

3   run a full real estate process and I think, frankly,

4   marketing 500 properties in this amount of time, when you

5   talk about what's within the realm of the possible, Your

6   Honor, in our judgment  -- and we have a lot of people

7   working on this matter -- that was not possible to run a

8   full real estate process simultaneously with running the

9   going concern process.  But we did test the market.  The

10  evidence is uncontroverted on exactly what the Debtors did

11  do.

12          I think that if -- you know, we were in contact

13  with the Committee during this time, we had a global asset

14  sale procedure process that we followed to the letter with

15  the Court and, Your Honor, during that process we found that

16  there was one -- effectively one qualified bid.  But those

17  nonbinding indications of interest, you know, we didn't have

18  a lot of deposits.  We didn't have a lot of serious offers.

19          It was our contemplation that if we weren't able

20  to have a going concern sale, because we looked at the

21  values and we made, we though, generous assumptions around

22  the real estate, that if we couldn't really substantially

23  reduce claims, have a going concern opportunity, either in

24  whole or part by selling divisions or selling the whole

25  business, that then in fact we would have to pivot during

Page 37

1    the winddown process to a full real estate liquidation

2    process.

3            THE COURT:  Okay.  So, I mean, let me make sure I

4    understand this.  To summarize, I guess this is consistent

5    with both Mr. Welch and Mr. Greenspan's testimony, you're

6    saying you could not run an actual real estate sale process

7    in the roughly month-and-a-half, two months that you had.

8    In fact, the minimum time for such a process would be four

9    months and according to Mr. Greenspan it would have to be

10   over a year.

11           MR. SCHROCK:  That's right, Your Honor.

12           THE COURT:  So you did, instead, recognizing that

13   time was valuable here and recognizing the risks of going

14   with just a going concern process without some reality check

15   beyond appraisals which is -- real estate is not like

16   valuing tech assets or -- real estate's real estate.  You

17   can do a pretty good valuation of real estate.

18           You did indicate strongly to those who might

19   believe that a liquidation process with the sale of the real

20   estate would be better to actually put their best foot

21   forward and make at least indications of interest, which is

22   frankly what I said, too, during the hearing on the approval

23   of the sale procedures, looking right at counsel for various

24   potential buyers of real estate and the Creditors'

25   Committee; i.e., if you really believe this, put your best

Page 38

1    foot forward and make a proposal.  Okay.

2            MR. SCHROCK:  And, Your Honor, building on that,

3    on Slide 6, we do note that -- and it's really worth

4    emphasizing -- this is a process that was conducted pursuant

5    to the Court-approved global bidding procedures.  We have

6    followed those procedures throughout the case.  The record

7    is uncontroverted on that piece.  We had -- we determined

8    what is a successful bid consistent with the global bidding

9    procedures, which qualified bids constitute the highest or

10   best qualified bids.  And pursuant to the auction rules,

11   that was determined in the business judgment of the Debtors.

12           We also had an independent Chief Restructuring

13   Officer that the Court heard from, Mr. Meghji, an

14   independent Restructuring Committee.  You've heard from both

15   of the subcommittee members.  They were all very active

16   during this process.  And, Your Honor, on Slide 7 we do note

17   that there -- I think the record is wholly uncontroverted

18   that the Restructuring Committee here is independent and

19   having certainly live through this, Your Honor, I can vouch

20   that it very much is.

21           There's a couple of anecdotes here just in regard

22   to that, that the testimony of Mr. Carr as well as Mr.

23   Transier is that they did not have any association or

24   interactions with Mr. Lampert prior to joining the board.

25   We put together an independent Restructuring Committee.  I

Page 39

1    think ESL knew that if they, given their position within the

2    capital structure that this is going to be necessary, but

3    there's no personal or business relationship either prior to

4    or since that time with either of the Subcommittee members.

5            This independent Restructuring Committee

6    negotiated with the authority to negotiate and approve the

7    ESL transaction, and the record in these proceedings is that

8    the Restructuring Committee was actively involved.  No less

9    than 58 times prior to the proposed ESL transaction being

10   approved did the Restructuring Committee meet since being

11   formed in October 2018, and these were not short meetings.

12   These were lengthy, involved meetings, numerous in-person

13   meetings.  The directors, the professionals, everyone took

14   their job extremely seriously and their responsibilities to

15   these estates.

16           Mr. Aebersold further testified that consistent

17   with his experience, that the sale process was extensive.

18   We have you some anecdotes to that earlier and that to his

19   knowledge and based upon his observations and experience,

20   the auction was conducted in good faith and the sale process

21   provided a fair and reasonable opportunity to purchase

22   components of substantially all the Debtors' assets and

23   operations.  That evidence is uncontroverted.

24           And further, Your Honor, in talking about how

25   independent this Committee was, Committee formally voted to

Page 40

1    reject separate bids by ESL on at least two occasions.  This

2    was, in my experience, very unusual.  I mean, it's a very

3    tight transaction, I think, for ESL as well as the estate,

4    but this is not something where anyone was pandering to

5    anyone at ESL and there's certainly no record to support

6    that.  We think the sound business justifications here are

7    consistent with the caselaw in the Second Circuit.

8              We'd point to Chrysler among others, but there's -

9    - in announcing and looking at what types of consideration

10   that the Court would consider, I think it's worth

11   reiterating just looking at what ESL and Transform Co. are

12   providing.  They're committing approximately $5.2 billion in

13   the form of cash and noncash consideration including a cash

14   payment of approximately $885 million.  There's a credit bid

15   pursuant to 363(k) of the Bankruptcy Code of secured debt

16   facilities totally approximately $1.3 billion.  There's the

17   assumption of $621 million of senior debt including $350

18   million of the amounts owed under the Junior DIP facility

19   and $271 million of the stand-along LC facility.

20             Those are all senior claims to general unsecured

21   creditors.  There's further, the assumption of certain other

22   of the Debtors' liabilities in the total amount of

23   approximately $1.3 billion including liabilities for

24   warranties and protection agreements or other service

25   contracts, certain customer credits to existing customer

Page 41

1    loyalty programs, the Shop Your Way program.  All cure costs

2    are being assumed by ESL.  There's up to $43 million of

3    certain severance reimbursement obligations.  There's up to

4    $139 million of 503(b)(9) claims, and just to hit that for

5    Your Honor, you'd asked what's the mechanism to do that.

6          The Debtors are obligated to reconcile those

7    claims and there's not an independent right of claimants to

8    go after ESL, but ESL is obligated to the estate to pay

9    those 503(b)(9) claims upon the earlier of 120 days and

10   confirmation of a plan.  Our experience -- and we do have an

11   $80 million winddown budget that's built into how we intend

12   to finish these cases -- it's our expectation that we'll do

13   the reconciliation, finish the reconciliation around the

14   503(b)(9) claims.

15         We don't expect a lot of costly litigation,

16   certainly, around the 503(b)(9) claims, but those claims are

17   going to be paid by ESL at confirmation of the plan.

18         THE COURT:  The $89 million winddown budget, is

19   that included in the projections that Mr. Meghji went

20   through on the --

21         MR. SCHROCK:  Yes.

22         THE COURT:  -- solvency analysis?

23         MR. SCHROCK:  It is, Your Honor.

24         THE COURT:  Okay.  So the Debtors will be

25   reconciling those claims, potentially objecting to them.

Page 42

1    Many of those claimants, I would assume, would have an

2    ongoing relationship with -- if I approve the sale -- the

3    buyer.

4              MR. SCHROCK:  That's right.

5              THE COURT:  Is it contemplated that there are

6    going to be some interactions since the buyer's liable for

7    them, in how to resolve those claims?

8              MR. SCHROCK:  There's going to be a lot of

9    interaction, Your Honor, and I think one thing that ESL and

10   the Debtors do recognize, if the sale's approved and we

11   close tomorrow, it's still all the same people that are

12   really doing this work at the company and we're going to be

13   working together and the TSA, the Transition Services

14   Agreement, certainly contemplates that we're going to

15   cooperate, work in good faith to finish the administration

16   of the cases.  ESL is heavily incentivized.

17             They're still a very large claimant as is Cyrus in

18   these estates to have these cases administered efficiently

19   and I don't want that to be lost on the Court.  They still

20   have claims in these cases.  They still have every incentive

21   to cooperate.  They still have every incentive to work with

22   the company to minimize the costs associated with the

23   administration of the estate.

24             But when I look at what are the noncredit bid

25   items that are really being provided for unencumbered assets

1   -- and I'm looking at Slide 13 and 14 -- all of these

2   liabilities -- okay, it's just the one -- you just have the

3   one credit bid item, but paying off senior debt, okay,

4   before unsecureds are going to be paid, the assumption of

5   all of these liabilities, the cure costs, these are all

6   things that we negotiated for in order to ensure that these

7   are unsecured claims that are getting paid:  property taxes,

8   environmental liabilities.  The mechanics' liens are senior

9   secured claims.

10          So they're all either senior or parry with general

11   unsecured creditors, but there's a lot of -- we focused on

12   the exit facility, but there's cash being paid for these

13   senior claims.  And when we look at Cyrus, Your Honor, Cyrus

14   is rolling the entire Junior DIP facility.  They went out

15   and purchased the rest of it, repurchased the claim.  They

16   put it -- and it's part of the exit financing for this

17   company upon emergence.

18          And I think that if you didn't give them something

19   in terms of an allowance of claim we would be defeating the

20   very purpose of doing this transaction because the Committee

21   could simply -- or any party could, frankly, just go

22   challenge Cyrus' claims for recharacterization.

23          So although ESL can technically drag other parties

24   within their facility along for a credit bid, if you think

25   about it, if they didn't have the ability to credit bid, if

Page 44

1    that wasn't part of the release for Cyrus, you could move to

2    recharacterize, go after those Cyrus claims and undo the

3    very transaction that we're trying to accomplish here.

4            So we have to have certainty of closing and we

5    thought that -- Your Honor, they're still liable.  The scope

6    of the release is just related to the credit bid, okay?

7    It's not -- and the allowance of their claims.  It's not any

8    broader than that and for the transaction even to work, for

9    the transaction to close, we had to provide that.

10           But we did take that into account in looking at,

11   you know, Cyrus is a very substantial claimholder.  They've

12   come into this process.  Nothing's going to affect the

13   investigation and the ongoing claims that the estate has

14   other than just related to that credit bid and we think at

15   the end of the day that was a very fair compromise as part

16   of this transaction.

17           THE COURT:  So it wouldn't pertain, for example,

18   if it turned out -- I have no view on whether it will turn

19   out this way, but if it turned out that the sale of the MTN

20   notes --

21           MR. SCHROCK:  Right.  Nothing --

22           THE COURT:  -- was somehow collusive, then that's

23   not being released.

24           MR. SCHROCK:  That is not being released.

25   Avoidance actions, not being released.  The only thing is

Page 45

1    just, again, it's consistent with the scope of the ESL

2    release and I think Mr. Basta will be hitting some of those

3    points.  Your Honor, on Slide 15 just to point it out, when

4    you look at the benefits of the wind -- the risks of the

5    winddown --

6              THE COURT:  I'm sorry, can -- before you get to

7    that slide --

8              MR. SCHROCK:  Yeah.

9              THE COURT:  So you were talking about the amount

10   of consideration in addition to the credit bid.

11             MR. SCHROCK:  Yes.

12             THE COURT:  When you look at a -- this is a

13   question for both sides.  When you look at the presumed

14   value or assumed value of the unencumbered assets, the

15   assets that, in other words, that ESL/Cyrus don't have a

16   lien on, how do they match up?  Because you can't credit bid

17   on something you don't have a lien on, so that means you

18   have to pay something else for it.

19             MR. SCHROCK:  Yes.  Of course, Your Honor.  So a

20   couple of things here.  I mean, of course when we're

21   comparing it to the alternative in the winddown, we don't

22   have the luxury of just assuming you just get all of those

23   amounts, of course.  We have to look at them in the context

24   of the winddown analysis and the continued burn that would

25   occur and costs that would be incurred that are senior to

Page 46

1    those unsecured claims.

2             But to answer your question directly, I think it's

3    fair, Your Honor.  The credit bid is $1.3 billion.

4    Everything else here, Your Honor, payment of claims that are

5    senior to unsecured creditors.  Okay, those all have to be

6    paid regardless of whether or not we're here, we're in

7    winddown --

8             THE COURT:  So just to cut through it, just to do

9    the math, you're saying that basically it's the total value

10   of the ESL deal is $5.2 billion if you subtract a billion

11   three from that --

12            MR. SCHROCK:  That's right.

13            THE COURT:  -- there's $3.9 billion of value

14   provided for the unencumbered assets.

15            MR. SCHROCK:  That's right.

16            THE COURT:  Has anyone placed a value on the

17   unencumbered assets anywhere close to $3.9 billion?

18            MR. SCHROCK:  No, Your Honor.

19            THE COURT:  Okay.

20            MR. SCHROCK:  Your Honor, we think it's

21   unquestionable that the benefits of a sale transaction

22   outweigh --

23            THE COURT:  I'm sorry, can I interrupt you again?

24            MR. SCHROCK:  No, please.

25            THE COURT:  We went --

Page 47

1              MR. SCHROCK:  That's why I'm here.

2              THE COURT:  You were going through the sale

3     process and the conduct of what people have referred to as

4     the auction here.  One of the provisions of the sale

5     procedures order, all of which are waivable in the exercise

6     of fiduciary duties, is to require qualified bidders to

7     provide an allocation of what they're -- what assets they're

8     paying what for.  It's uncontroverted that ESL did not do

9     that.  I have traditionally viewed --

10             MR. SCHROCK:  We waived it, Your Honor.

11             THE COURT:  You waived that condition?

12             MR. SCHROCK:  We did.

13             THE COURT:  I have viewed that condition which

14    appears in sale orders generally as serving the purpose of

15    letting a seller, the Debtor, and its constituents value a

16    global proposal as against piecemeal proposals so that you

17    can slice and dice the auction to see whether some

18    combination of bids will equal a global bid or a reduced

19    global bid.

20             It also, though, does have the benefit of giving

21    you the Debtors' -- giving you the buyer's viewpoint of what

22    the -- when the buyer's a credit bidder -- of what the

23    unencumbered assets are.  But maybe you can just tell me,

24    why did you waive it here?

25             MR. SCHROCK:  Your Honor, at the end of the day,

Page 48

1    we didn't have qualified bids for even sections of the

2    business and when we looked at this in total, and given that

3    the structure of the auction was going to be comparison of

4    the Debtors looking at a going concern versus a winddown,

5    while we did have some indications from ESL around

6    allocations and a view, we had to take -- and I think it's

7    fair to take -- we took a global view as to what

8    consideration was being provided to the company and we

9    understood that the entire business would have to be valued

10   as a whole.

11          But given that we didn't have any particular bids

12   or qualified bids for particular divisions, that wasn't as

13   much of a concern for the company.

14          THE COURT:  Okay.

15          MR. SCHROCK:  So the benefits of the sale

16   transaction really do significantly outweigh an orderly

17   winddown.  And, Your Honor, I know there's been press around

18   the Debtors' severance obligations and what we were doing.

19   I do want to make clear for the record that under either

20   scenario, the Debtors were honoring severance obligations.

21   Those claims are administrative claims in these cases under

22   governing Second Circuit -- Second Circuit precedent.

23          We deliberately made sure that -- and it was one

24   of the primary purposes around having the winddown, to make

25   sure we could pay severance claims.  But we are entitled to

Page 49

1    take into account in turning a highest or best offer, not

2    just the economic points.  And people make light of it, but

3    there's 45,000 people out there that are working for this

4    company, and it matters.  These people will have jobs.  As a

5    going concern, we've got uncontroverted testimony from Mr.

6    Kamlani about the steps that they're taking with this

7    business plan.

8           This business plan is being financed by major

9    commercial banks.  They and we are true believers in a going

10   concern for sales -- for Sears, rather.  In a winddown,

11   we're going to lose all those jobs.  With the exception of

12   probably a few stores and perhaps in Guam, Puerto Rico where

13   there, you know, have some highly profitable operations, we

14   would have to GOB them and we'd see that certain businesses

15   could be possibly be sold in divisions, in parts.

16          But, Your Honor, this truly is -- like many

17   retailers, it's a melting ice cube and the timing is so

18   urgent, and we saw that even with the Services.com purchase

19   of Parts Direct, which ended up with them not closing.

20   We're now going to end up having to argue with them around

21   the return of the deposit.  But we saw, and we believe the

22   evidence is uncontroverted, that there were significant

23   risks around the winddown.

24          The protection agreement liabilities are going to

25   be honored in a sale transaction.  In a winddown, they would

1   very likely be rejected unless we could find somebody to

2   take those liabilities and basically sell that part of the

3   business for zero or negative value.

4        THE COURT:  Well, while we're on this subject of

5   the protection of the warranty, the protection agreements,

6   there was some discussion yesterday about the risk that

7   there would be a delay in the approval of the KCD --

8        MR. SCHROCK:  Yes.

9        THE COURT:  -- transfer.  I thing your

10  announcement of the PBGC resolution somewhat ameliorates

11  that or more than somewhat, but you still have to go to a

12  third party to get approval.  How is the risk allocated

13  pending that approval?

14       MR. SCHROCK:  So, Your Honor, we've handled that.

15  If you take a look at Slide 27, section -- this is handled

16  in Section 2.8B of the Asset Purchase Agreement which states

17  that from the closing date until such time as the transfer

18  of the KCD notes and the assumption of purchase agreement

19  liability occurs, the buyer provides services to the

20  applicable sellers sufficient to enable the sellers to

21  perform the purchase agreement liabilities and in

22  consideration for such services, the sellers are paying to

23  the buyer an amount equal to the aggregate amounts paid by

24  buyers or sellers with respect to any licenses which buyers

25  license as the KCD IP.

1    So effectively, instead of making payments under

2    the new KCD exclusive license, the buyer is going to get to

3    keep it, but that results in the buyer paying for -- during

4    the interim period, they're paying for and bearing the

5    economic risk associated with the purchase agreement

6    liabilities.  That's -- I'm sure ESL will standup and

7    confirm that, and that amount is in excess of the royalties

8    that would ever be paid during that interim period.  So ESL

9    -- in short, ESL is bearing the risk associated with the

10   administration of the purchase agreement liabilities pending

11   --

12        THE COURT:  During that interim period.

13        MR. SCHROCK:  During that interim period.  The

14   avoidance actions, no claims are being released in a

15   winddown, but of course, there's a very limited release here

16   and we thought that was very meaningful to the estates that

17   the litigation is very largely preserved for the benefit of

18   the estates.  That was a key compromise that we came to in

19   accepting the bid.

20        Mr. Basta hit on the 507(b) claims and some of the

21   nuances around the release, but the vendors of this company

22   are -- the company has an excess of 10,000 vendors, so when

23   we talk about just, you know, there's a couple of people, I

24   think Mr. Burian mentioned that might be affected by this,

25   by Sears closing.  We beg to differ.  The company's

Page 52

1   schedules are on file.  There's hundreds of millions of

2   dollars in vendor claims.  All of these parties have

3   relationships with Sears.  They will continue to have those

4   relationships moving forward in very large part as a result

5   of the benefits of this deal.

6          The claims pool is very substantially reduced, and

7   if you take a look at the next slide, on Slide 16, we put in

8   -- we put this chart in our reply, but it bears worth

9   emphasizing.  When you look at the recoveries to creditors

10  overall, there is a very significant benefit in terms of the

11  reduction of the claims pool in conjunction with this

12  transaction even compared to a winddown as well as we --

13  some creditors getting enhanced or better treatment.  Now,

14  the Committee --

15         THE COURT:  This is before litigation, in

16  litigation of the company.

17         MR. SCHROCK:  That's right.  Litigation is not

18  included in these recoveries in either the Committee's or

19  the company's charts.  But the wind down of this company,

20  for the Committee, it's never been done.  From the company,

21  you have witnesses saying it's never been done by we would

22  do our best to manage it.

23         We have a 365(d)(4) deadline that's on May 3rd.  I

24  think everybody would try their very best in the context of

25  a winddown, but when you have a transaction like this that's

Page 53

1  on the table that actually gives the company a chance -- and

2  nothing's for certain -- but substantially reduces the claim

3  pool, treats creditors better, saves 45,000 jobs, Judge,

4  it's not close.

5          Now, the sale transaction does not guarantee

6  administrative solvency and it was certainly a very

7  important point for the company since the start of these

8  cases.  It's not required, okay, to sell assets.  You don't

9  have to have administrative solvency, but we believe we're

10  administratively solvent.  I think under the Debtors'

11  analysis, they're short -- latest shortfall's $42 million.

12          We did not take into account any litigation claims

13  in considering that.  We have opportunities in excess of

14  $100 million.  But in the context of a winddown, there's

15  certainly, according to Mr. Meghji, there's also no

16  guarantee that the company will be administratively solvent.

17  But importantly, the sale transaction, we think, gives us

18  the highest or best opportunity.

19          Mr. Transier talked about, in accepting the

20  successful bid, all of the things that they've looked at,

21  the nature and amounts, the ability of both parties to

22  close, the recovery the successful bid would provide to non-

23  ESL creditors, liquidity, the alternative to this successful

24  bid which is a winddown and the loss of tens of thousands of

25  jobs.  That alternative of liquidation, in our judgment

Page 54

1    after consultation with numerous parties, was no9t in the

2    best interest of stakeholders.

3          Now, Mr. Kamlani gave testimony around adequate

4    assurance of future performance.  It's worth noting that

5    adequate assurance does not mean absolute assurance or

6    guaranteed performance.  They have a business plan.  They

7    have financing.  They have excess availability at closing in

8    excess of $400 million.  They have a means and a business

9    plan to move this company forward with a very substantially

10   reduced balance sheet, much less debt.  They have a smaller

11   footprint, but they kept open the profitable stores and

12   giving Sears a chance, Your Honor, we think it's more than

13   warranted under the facts that are before the Court.

14         We go through, on the next couple of slides, which

15   I won't belabor, just all of the uncontroverted evidence

16   that's in favor of adequate assurance of future performance.

17   There's nothing out there that has been put forth by the

18   Committee that's really put this evidence into serious

19   question and we do think that the company's witnesses, when

20   considered overall and the Court were to make a ruling, that

21   the company's witnesses have been interested, dedicated.

22         They are very credible and they were in the

23   details compared to the high-level views that we received

24   from the Unsecured Creditors' Committee witnesses in these

25   cases.  Your Honor, overall, I'm going to cede my time and

1           MR. BASTA:  Right, yes.

2           THE COURT:  Is the release -- the release isn't

3     effective --

4           MR. BASTA:  Release is not --

5           THE COURT:  at that point, right, because they've

6     breached the agreement?

7           MR. BASTA:  Release is not effective.

8           THE COURT:  Okay.

9           MR. BASTA:  But, Your Honor, we wanted to effect

10    the -- when we looked at the release, for a long time the

11    release was on the back burner because the concept here was

12    we needed a deal.  We needed a viable deal.  It only made

13    sense to talk about a release in connection with the viable

14    deal.  So the 166 from the Subcommittee's perspective was

15    critical to get to a deal that was viable and the release

16    was predicated on that assumption.

17          THE COURT:  Okay.

18          MR. BASTA:  So the decision before the

19    Subcommittee was whether to provide a release to ESL in

20    whatever form we could negotiate in order to facilitate a

21    going concern transaction or, alternatively, to choose

22    liquidation.  That was it.  Release deal or liquidation.

23    And ultimately, the Restructuring Subcommittee determined in

24    good faith to approve a limited credit bid release to

25    facilitate a reorganization and came to the view that that

Page 67

1    was better for the estate than proceeding to a winddown.

2              THE COURT:  Can I just -- I think I have the

3    chronology here, but all of the ESL proposals that the

4    Restructuring Committee, the Subcommittee rejected contained

5    a general release, right?

6              MR. BASTA:  Yes.

7              THE COURT:  Only the one that was accepted had

8    this --

9              MR. BASTA:  Right.

10             THE COURT:  -- limited release.

11             MR. BASTA:  Right.

12             THE COURT:  Okay.

13             MR. BASTA:  Your Honor, if I can walk you through

14   that for one second.  On December 5th, 2018 was the first

15   indicative bid by ESL and it contained a broad ESL release

16   and on December 9th and 12th, it was rejected in writing by

17   both the Restructuring Committee and the Subcommittee.  On

18   December 28th bid by ESL, it contained a broad release and

19   it was rejected on January 4th.  On January 6th bid, there

20   was also a broad release and it was rejected on January 6th.

21   On January 7th, Cleary sent a letter threatening the

22   Restructuring Subcommittee with breach of fiduciary duty if

23   they did not accept the ESL bid.

24             On January 9th, ESL put a bid on the auction

25   record and we rejected it because it contained a broad

1  that stemmed from that credit bid negotiation.  They closed

2  the administrative insolvency gap by hundreds of millions of

3  dollars.  The deal provides, in our view -- when we looked

4  at this, we always look at, is the going concern better than

5  the winddown, not is the going concern good.  It's is it --

6  provide a proportionally -- a incrementally better

7  alternative.

8           Our analysis showed that in the final bid, that

9  third-party secured creditors are benefitted compared to a

10  winddown and that's not including, obviously, ESL to the

11  tune of $152 million.  It's our analysis that general

12  unsecured creditors that are getting assumed under the deal

13  which include protection agreement and other consumer-

14  related claims of $524 million are getting paid under this

15  deal and they would not get paid in a winddown.

16           I'm going to get into some more detail about that

17  later, but earlier iterations of the contract from ESL had

18  it a condition to the assumption of the protection agreement

19  liabilities that they be reaffirmed by the consumer and we

20  were able to get that out of the contract to make that an

21  absolute requirement to assume those liabilities, and that

22  allowed us to value that as a contribution to the estates.

23           There's a $621 million avoidance of additional

24  administrative claims in a reorg versus a winddown, which we

25  think is very significant and there are jobs that are being

1   preserved.  There's also a substantial limitation in ESL's

2   ability to recover from litigation proceeds with respect to

3   its deficiency claims.

4           We negotiated so that there would be no right of

5   ESL to share on any Land's End or Seritage litigation, no

6   right of ESL to share on any litigation relating to any ESL

7   misconduct, and we were able to cap ESL's 507(b) claim at

8   $50 million which -- of is there's other non-ESL litigation

9   recovery, their 507(b) claim is capped.

10          The decision to provide the limited release is

11  coming from a process where Mr. Carr and Mr. Transier

12  faithfully discharged their fiduciary duties.  There's some

13  allegation in the Committee's papers that Mr. Carr and Mr.

14  Transier were hand picked by Mr. Lampert.  There's no

15  evidence in the record to support that.  In fact, the

16  evidence in the record is that they were introduced to the

17  board by Mr. Schrock and that they had -- the evidence is

18  clear that they had no prior relationships with ESL.

19          Your Honor observed the demeanor of Mr. Transier

20  and Mr. Carr in person and I think anyone who watched that

21  testimony would see that they were not pulling any punches

22  whatsoever and were faithfully trying to do what was best

23  for the estate.  And of course, Mr. Carr and Mr. Transier

24  have found that there's hundreds of millions of dollars of

25  valuable claims against ESL and repeatedly rejected ESL's

Page 130

1    particularly once ESL's decisions in that respect are no

2    longer subject to bankruptcy court review, we shall see.

3           Your Honor, if I could turn to Slide 27.  And I

4    want to talk briefly about from the committee's perspective

5    why we view the alternative to a sale to ESL to be superior.

6    And I will come back to the employee point, Your Honor,

7    after I walk through the numbers.

8           So on this chart, Your Honor, what shows first of

9    all is the administrative insolvency.  But I also want to

10   make that point here -- and it was a point made by Mr.

11   Meghji.  Who is the principal beneficiary of the going

12   concern transaction?  And again, I'm going to come back to

13   the employees and the vendors and all the like.  The

14   principal beneficiary of the going concern transaction is

15   ESL.

16          THE COURT:  I guess that has some appeal to people

17   that don't understand bankruptcy law.  But anyone who has

18   read the RadLax decision in 363(k) knows how much is left

19   unstated in that statement.  Right?  I mean, the reason they

20   are the principal beneficiary is because they're being

21   allowed to credit bid.  And we just talked about I think a

22   pretty nuanced evaluation of that settlement which preserved

23   claims against them.  So, you know, it's true they are the

24   beneficiary in the sense that they're being allowed to

25   exercise a right that the supreme court said they have

1      unless the bankruptcy court says they don't for cause.  And

2      that's what the settlement is about.

3                  MR. QURESHI:  Part and parcel, Your Honor, of what

4      we think is going to happen post-close and whether post-

5      close this enterprise is likely to survive as a going

6      concern and whether as a result of that all of the creditors

7      that would benefit are in fact ever going to realize that

8      benefit and whether in fact all of those creditors might

9      actually be better off if we look at an alternative

10     scenario.

11                 THE COURT:  Okay, that's a separate point, but

12     that -- go ahead.

13                 MR. QURESHI:  And so on the alternative scenario,

14     Your Honor, if Your Honor turns to Slide 28.  And what Slide

15     28 is is an excerpt from Mr. Burian's declaration.  And I

16     just want to highlight to Your Honor how few things need to

17     move in order to demonstrate that creditor recoveries are

18     actually better in the alternative scenario.

19                 So for unsecured creditors, first of all, there is

20     an issue, and it's described in Mr. Burian's declaration in

21     some detail, but around the allocation of administrative

22     claims and the extent to which those administrative claims

23     burden unencumbered assets versus the ABL collateral.  We

24     don't think that the way the debtors have proposed in their

25     analysis of the wind down scenario to burden the unsecured

Page 133

1    would be litigation around the issue, but we do think there

2    is an argument that a reallocation is appropriate.

3           THE COURT:  I understand the argument.  I also

4    went through that experience with a very inexperienced

5    secured lender group in a case last year where they didn't

6    agree to carveouts and the like or to fund the case, even

7    though they wanted the case funded.  It was -- you may well

8    be better lawyers, and their lawyers -- although the lawyers

9    were pretty good for the Debtor's side, it's not an easy

10   case to win.  And it was settled with major haircuts to the

11   professionals and the administrative expense creditors

12   because the standard is a high one to make.  Second Circuit

13   has set a high standard, and that's been followed by the

14   other courts.

15          MR. QURESHI:  You know, the other significant

16   driver is --

17          THE COURT:  I didn't seen any briefing of that

18   issue, by the way.  It's just assumed by Mr. Burian, who I

19   know he's a lawyer, but he hasn't been a lawyer for a long

20   time.

21          MR. QURESHI:  Your Honor, the other issue, and we

22   do address it in our brief, is that second lien 507(b)

23   claim.  Mr. Bromley mentioned it briefly as well, so I won't

24   spend any more time there.

25          THE COURT:  Right.  You're giving no value to that

1     though, right?

2            MR. QURESHI:  In this analysis, we are not.

3            THE COURT:  No, okay.

4            MR. QURESHI:  Your Honor, if I could then move on

5     --

6            THE COURT:  Is that because the value of the

7     collateral declined or didn't -- I mean, didn't decline

8     during the case?  Is there evidence in the record to show

9     that the value of the collateral didn't decline?

10           MR. QURESHI:  Your Honor, again, that's --

11           THE COURT:  I don't think there's evidence that

12    shows it did decline, but to say that it didn't is kind of a

13    stretch here given the amounts that at least the Debtors

14    have said that they've been operating at a deficit at times.

15           MR. QURESHI:  Your Honor, if I could turn to very

16    briefly the business plan.  And this starts on Slide 30.

17    And, you know, our point with the business plan is simply

18    this; that history has to be a guide here, and it has to be

19    a guide in circumstances where you have the same management

20    team in place that put together the ESL business plan.  That

21    what evidence shows.  Obviously the same ownership structure

22    in terms of Mr. Lampert being at the helm of the go forward

23    business.  And when Your Honor looks at the historical

24    results -- I mean, frankly, Your Honor, I've never seen

25    anything like it.  Magnitudes of misses so huge.  And yet

Page 216

1    and I appreciate the analysis that the courts in this

2    district have done to apply that standard, but I have

3    consistently held, and believe that Lionel and Orion, in the

4    plain language of the statute, require more of an inquiry,

5    at least where there are substantive objections to the

6    proposed sale, which is the case here.

7              Ultimately, as laid out by the Second Circuit in

8    the Orion Pictures case, albeit that that case involved the

9    business decision to assume or reject contracts, but that

10   decision was still out of the ordinary course, and I think

11   the logic therefore applies to § 363(b).  Ultimately, as

12   laid out by the Second Circuit in the Orion Pictures is one

13   where the Bankruptcy Court has to exercise its business

14   judgment to determine, in light of all of the facts laid out

15   on the record in the summary proceeding, whether, in fact,

16   the decision does make business sense to sell the assets as

17   proposed by the Debtor.  And that's the standard that I have

18   applied here.

19             The Second Circuit, in putting that burden on the

20   Bankruptcy Court, also made it clear that the bankruptcy

21   judge is looking into the future, and therefore cannot

22   assure the benefits of the proposed transaction, but

23   nevertheless, needs to evaluate it based on what it knows in

24   the present day, to decide whether, in fact, the transaction

25   makes good business sense.  In doing so, the courts are

Page 226

1    Subcommittee.  Those independent third parties were

2    represented by independent counsel and financial advisors.

3    The two members of the Restructuring Subcommittee testified

4    in the hearing before me on the sale motion, Mr. Transier

5    and Mr. Carr.

6              I believe the record is crystal clear that the

7    Restructuring Committee and Restructuring Subcommittee, a)

8    actually had control of the Debtors with respect to the sale

9    process and the Debtors' decision throughout that process as

10   to whether to accept or reject any offers and how to conduct

11   the process, b) that they were, in fact, truly independent,

12   as evidenced by, among other things, their rejection of

13   numerous proposals by ESL and heated and lengthy

14   negotiations with ESL, c) that they were well and thoroughly

15   advised by independent professionals, and d) that their

16   focus was the proper one, which essentially, is the same

17   standard that I have already outlined: does the proposed

18   transaction represent the highest and best transaction

19   available to these Debtors?  I believe that they exercised

20   their responsibilities in an active and informed way, and

21   that they themselves were experienced in this area and

22   brought their experience to bear, as opposed to being

23   passive receptacles for their professionals' advice.  There

24   are numerous incidences in the record to reflect that.

25   Under the circumstances, therefore, I believe that the

Page 243

1    agreement, closing conditions that need to be satisfied.  I

2    am reasonably confident, based on Mr. Meghji's testimony,

3    and Mr. Riecker's testimony in particular, that they will

4    be, and further, that the parties will deal with each other

5    in good faith to enable those conditions to happen,

6    particularly given the identification of ESL with this

7    business and the consequences that would happen to it.  That

8    is, the Sears business with which it's identified, if they

9    do not deal with it -- each other in good faith to resolve

10   those conditions to closing.

11        And the last point I will make, although I believe

12   only the asset side really needs to be addressed, and I've

13   already done so, when comparison -- when comparing the ESL

14   transaction to the liquidation alternative, but I will,

15   nevertheless, mention that, in each of the committee's

16   calculations, it has made assumptions regarding the

17   treatment of ESL's claims in these cases that I believe are

18   not warranted, and that would, at a minimum, lead to

19   substantial litigation and litigation risk for the Estates.

20   Namely, the Committee has assumed that, notwithstanding a

21   pivot to a liquidation sale at its request, the Estate would

22   be able to prevail on making substantial charges to the

23   underlying collateral that secures the ESL secured debt, and

24   the DIP loans.

25        The ability to surcharge collateral under § 506(c)

Page 244

1    of the Bankruptcy Code is constrained by the language of the

2    statute itself, and the case law, including the leading case

3    of in re Flagstaff Food Service Corporation, 739 F.2d 73

4    (1984).  See also in re Domistyle, Inc., 811 F.3d 691 (5th

5    Cir. 2015), cert denied,2017 US Lexis 3509, May 30, 2017.

6           Those cases make it clear that the determination

7    of surcharging collateral is a difficult one for the Court.

8    It requires the Court to make judgments as to whether the

9    expenses incurred by a Debtor were for the primary and

10   direct benefit of the secured creditor, as opposed to other

11   parties in interest in the case.

12          This issue is usually dealt with by stipulations

13   between the parties, because they know how difficult it is

14   to litigate.  Properly here, the Committee insisted on

15   certain carveouts from 506(c) waivers, but that didn't

16   eliminate the difficulty of litigating such an issue.  The

17   word "primary" does not appear in the statute, but the

18   courts have applied it, because otherwise, as the Domistyle

19   court notes, the statute could, in essence, eat up the

20   narrow -- the interpretation could eat up the narrow nature

21   of the statute, which is a direct benefit.

22          Secondly, the Committee has completely discounted

23   any right that ESL would have under § 507(b) to a super-

24   priority administrative expense, based on the decline of its

25   collateral value since the start of the bankruptcy cases.

Page 245

1    Until disallowed, ESL's secured claim is entitled to

2    adequate protection, including under 361(3), a super-

3    priority claim under § 503(b) and § 507(b).  Determining the

4    decline in value of the collateral during the course of the

5    bankruptcy case, it's again, an extremely difficult issue.

6    It was dealt with by Judge Glenn in, in re Residential

7    Capital, LLC., 501 B.R. 549, (Bankr. S.D.N.Y. 2013).  It's

8    fact-based, dependent upon the value of the collateral at

9    Time 1 and Time 2.  To give absolutely no consideration to

10   that claim, I believe, in terms of comparing creditor

11   recoveries under a liquidation process to the ESL going

12   concern transaction, I believe, is quite inappropriate.

13          So, for all those reasons, I will grant the

14   motion.  I believe the proposed order needs some work, along

15   the lines of the marks that were stated on the record in

16   oral argument today, but that that work is relatively modest

17   and, it would appear to me, that I should be in a position

18   to enter it tomorrow morning, if it's provided to me in a

19   black line form.  It will include, for the reasons that I

20   stated on the record, a finding that the transaction and the

21   parties to it are entitled to the protection of §363(m) of

22   the Bankruptcy Code.

23          I would like to say one other thing, which is

24   simply to echo remarks that Mr. Seltzer made, not only on

25   behalf of prospective union employees, but all employees of

# Exhibit 21

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
In re                                    :        Chapter 11
                                         :
SEARS HOLDINGS CORPORATION, et al.,      :        Case No. 18-23538 (RDD)
                                         :
                                         :
                    Debtors.¹            :        (Jointly Administered)
-----------------------------------------------------------x
```

### ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG SELLERS AND BUYER, (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND LEASES IN CONNECTION THEREWITH AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated November 1, 2018 (Docket No. 429) (the "Sale Motion"),² filed

by the above-captioned debtors and debtors in possession (the "Debtors") seeking, among other

things, the entry of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the United

States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 6004,

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

² Capitalized terms used herein but not otherwise defined have the meanings given to them in the Asset Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to them in the Sale Motion.

further order of the Bankruptcy Court (the mechanic referred to in this sentence and the preceding sentence shall be referred to herein as the "Buyout Option"). Such Purchase Price, including the Credit Bid Amount, the Credit Bid Release Consideration, the Buyout Option, and other good and valuable consideration provided in connection with the Sale Transaction, constitutes the highest or best bid for the Acquired Assets. Under the facts and circumstances of these chapter 11 cases, the Purchase Price for the Acquired Assets is fair and reasonable.

Without limiting the foregoing, no objection was raised to the Sale Motion on the basis that the creditors of any particular Debtor were improperly prejudiced by the proposed sale, including by the credit bid feature of the proposed sale. Based on the evidence before the Court, the sale consideration under the proposed sale that does not constitute a credit bid constitutes adequate consideration for the Acquired Assets of each Debtor when added to the credit bid consideration, and such consideration does disadvantage the creditors of any particular Debtor except as permitted by the Bankruptcy Code.

K. **ESL Secured Claims**. In accordance with the Asset Purchase Agreement, effective upon the Closing Date ESL's Claims (as defined below) against the Debtors arising under the: (i) IP/Ground Lease Term Loan Facility; (ii) FILO Facility; (iii) Real Estate Loan 2020; (iv) Second Lien Term Loan; (v) Second Lien Line of Credit Facility; (vi) Second Lien PIK Notes; and (vii) Citi L/C Facility (together with the security interests securing any of the Claims of ESL described in the preceding sub-clauses (i)-(vii), collectively, the "ESL Claims"), shall each be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code in the amounts set forth on Exhibit G to the Asset Purchase Agreement, as reduced by the Credit Bid set forth in Section 3.1(b) of the Asset Purchase Agreement. Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, ESL or, to the extent any of the ESL Claims are assigned to

Buyer prior to the Closing Date, Buyer is hereby authorized to credit bid (or cause to be credit bid) the ESL Claims and to use such ESL Claims as a portion of the Purchase Price (the "ESL Credit Bid Amount") as set forth in Section 3.1(b) of the Asset Purchase Agreement (subject, in the case of the security interest securing the Claims described in subclauses (iv), (v) and (vi) of this Paragraph K, anything in this Order to the contrary notwithstanding, to delivery of the written consent of the Collateral Agent for such security interest). In addition, the transfer of Acquired Assets constituting "Collateral" under that certain Amended and Restated Security Agreement by and among Sears Holdings Corporation and Wilmington Trust, National Association in its capacity as Collateral Agent (the "Second Lien Collateral Agent") dated as of March 20, 2018 (as may be amended, restated, amended and restated or otherwise modified in accordance with its terms from time to time) (the "Second Lien Security Agreement") has been, or will be, directed by ESL as the "Required Secured Parties" under the Second Lien Security Agreement pursuant to one or more direction letters delivered to the Second Lien Collateral Agent (the "Second Lien Consent"). The Second Lien Consent binds all parties holding debt under the Second Lien Term Loan, Second Lien Line of Credit Facility and Second Lien PIK Notes in their capacity as such (collectively, the "Senior Second Lien Creditors", and their claims against the Debtors under such debt document, the "Senior Second Lien Claims"). The Senior Second Lien Claims shall be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid. Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, the Second Lien Collateral Agent is hereby authorized to credit bid the Senior Second Lien Claims as a portion of the Purchase Price (the "2L Credit Bid Amount", together with the ESL Credit Bid Amount (without duplication), the "Credit Bid Amount"). At the Auction, pursuant to the Asset

10

Purchase Agreement, the Buyer agreed to pay the Purchase Price, which includes the Credit Bid Amount.

L.    **Cyrus Claims**.  Effective upon the Closing Date, Cyrus' Claims (as defined below) arising under: (g) the Final Junior DIP Order[4] (the "Junior DIP Secured Obligations"[5]); (h) the Citi L/C Facility; (i) the Second Lien PIK Notes[6] (the "Cyrus Second Lien Notes Claims"); and (j) the IP/Ground Lease Term Loan Facility (the "Cyrus IP/GL Claims") together with the security interests securing any of the Claims described in the preceding sub-clauses (g)-(j), collectively the "Cyrus Claims"), shall each be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid.

M.    **No Successor or Other Derivative Liability**.  The sale and transfer of the Acquired Assets of the Debtors to the Buyer, including the assumption by the Debtors and assignment, transfer and/or sale to the Buyer of the Assigned Agreements, will not subject the Buyer or ESL to any liability (including any successor liability) under any laws, including any bulk-transfer laws, or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories, with respect to the operation of the Debtors' business prior to the Closing, and for each Assigned Agreement, the applicable Assumption Effective Date, except that, upon the Closing or such other date as specified in the Asset Purchase Agreement, the Buyer shall become liable for the applicable Assumed Liabilities.  The Buyer: (i) is not, and shall not be considered or deemed a mere continuation of,

---

[4]    The "Final Junior DIP Order" shall mean the *Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1436).

[5]    The "Junior DIP Secured Obligations" shall have the meaning ascribed to it in the Final Junior DIP Order.

[6]    As such term is defined in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* (Docket No. 3).

7.    **Approval of the Credit Bid Release**.  As set forth in Section 9.13 of the Asset Purchase Agreement:

(a)    Effective upon the Closing, in consideration for the payment by Buyer of the Credit Bid Release Consideration, and other good and valuable consideration provided to the Debtors and their estates by ESL in connection with the Transactions, each Debtor, for itself and its estate, and on behalf of each of its Subsidiaries and controlled Affiliates (each of the foregoing, a "<u>Seller Releasing Party</u>" and together, the "<u>Seller Releasing Parties</u>"), hereby absolutely, unconditionally and irrevocably: (i) releases and forever discharges ESL from any and all Released Estate Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have; and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge, dispute or collaterally attack the ESL Claims; provided, however, that the assertion of any Claim other than a Released Estate Claim shall not be deemed to violate Section 9.13(a)(ii) of the Asset Purchase Agreement.

(b)    Effective upon the Closing, the ESL Claims against the Debtors shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G to the Asset Purchase Agreement, as reduced by the credit bid set forth in Section 3.1(b) of the Asset Purchase Agreement.

(c)    After giving effect to the credit bid set forth in Section 3.1(b) of the Asset Purchase Agreement, ESL shall be entitled to assert any deficiency Claims, Claims arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may have against the Debtors and their estates in the Chapter 11 Cases, provided that: (i) no Claims or causes of action of ESL shall have recourse to, or any other right of recovery from, any Claims or

# Exhibit 22

**Exhibit B**

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JANUARY 17, 2019**

**BY AND AMONG**

**TRANSFORM HOLDCO LLC,**

**SEARS HOLDINGS CORPORATION and**

**ITS SUBSIDIARIES PARTY HERETO**

not occur at the Closing Date, Seller and Buyer shall use reasonable best efforts to complete such transfer as promptly as practicable following the Closing Date and shall enter into such agreements as may be reasonably required to provide Buyer or the applicable Assignee the benefit of such assets until such transfer is consummated.

(b)     If, at any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019, Buyer determines (in its sole discretion) that it is necessary or desirable to acquire other minority equity interests in non-U.S. Persons held by Subsidiaries of Seller (other than any Subsidiary who is a Seller) so as to ensure that Buyer or the applicable Assignee shall be able to secure the benefit of the applicable Acquired Foreign Assets, Buyer may elect, by written notice delivered to Sellers, to acquire such equity interests directly from Seller. Following any such election, Buyer and Seller shall promptly execute all documentation required to effectuate the purchase and sale of such equity interests under applicable Law.

(c)     No purchase of Acquired Foreign Assets or equity interests pursuant to this Section 2.13 shall require the delivery of any additional consideration by Buyer; provided, that to the extent required by applicable Law (including, for the avoidance of doubt, Tax Law), Buyer and Seller shall in accordance with Section 9.3(d) either (i) allocate a portion of the Purchase Price to the purchase of such equity interests or (ii) provide for nominal consideration to be paid by Buyer to Sellers in an amount no greater than the minimum amount required by applicable Law.

Section 2.14   Bulk Transfer Law.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising out of the bulk transfer Laws. In furtherance of the foregoing, each Party hereby waives, to the fullest extent permitted by applicable Law, compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws in all applicable jurisdictions in respect of the Transactions (including under any applicable Tax Laws).

## ARTICLE III

## PURCHASE PRICE

Section 3.1   Purchase Price.  The aggregate purchase price for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of the following (collectively, the "Purchase Price"):

(a)     cash in an amount (the "Closing Payment Amount") equal to:

(i)     $1,408,450,000; plus

(ii)     an amount in cash equal to the Store Cash as of 12:00 a.m. New York City time on the Closing Date; plus

(iii)     the Credit Bid Release Consideration; less

51

18-23538-shl   Doc 2507-1   Filed 06/18/19   Entered 06/18/19 15:14:32   Exhibit A
Pg 261 of 288

(iv)     the aggregate amount of (A) the credit bid set forth in <u>Section 3.1(b)(ii)</u> *plus* (B) the credit bid set forth in <u>Section 3.1(b)(iv)</u>, *plus* (C) the FILO Facility Buyout Amount (if any);

(b)     subject to Bankruptcy Court approval, a credit bid pursuant to Section 363(k) of the Bankruptcy Code of:

(i)     all outstanding obligations held by Buyer and its Affiliates as of the Closing Date under the IP/Ground Lease Term Loan Facility, *plus*

(ii)     all outstanding obligations held by Buyer and its Affiliates as of the Closing Date under the FILO Facility, *plus*

(iii)     obligations held by Buyer and its Affiliates as of the Closing Date under the Real Estate Loan 2020 in an amount equal to $544,000,000, *plus*

(iv)     obligations held by Buyer and its Affiliates as of the Closing Date in an aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second Lien Line of Credit Facility; and (z) the Second Lien PIK Notes,

in the case of each of (i), (ii), (iii) and (iv) in exchange for the collateral pledged to secure the applicable debt obligations, including any proceeds from the sale or other disposition of such collateral prior to the Closing Date to which the Liens securing such debt obligations are attached, in the same order of priority and with the same validity, force and effect as the original Liens; *plus*

(c)     cash in the amount of the outstanding obligations owed to lenders other than Buyer or its Affiliates as of the Closing Date under (i) the IP/Ground Lease Term Loan Facility (the "<u>IP/Ground Lease Buyout Amount</u>"), (ii) the FILO Facility (the "<u>FILO Facility Buyout Amount</u>"), and (iii) the Real Estate Loan 2020 (the "<u>Real Estate Loan 2020 Buyout Amount</u>"), unless such lender(s) provide written confirmation to the Sellers that such cash payment and the obligations owed to lenders by the Seller under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, are permanently waived and discharged against the Sellers; *plus*

(d)     the Securities Consideration;

(e)     the Junior DIP Consideration;

(f)     the L/C Facility Consideration; and

(g)     the assumption by Buyer of the Assumed Liabilities in accordance with <u>Section 3.5</u>.

To the extent payable, the IP/Ground Lease Buyout Amount, the FILO Facility Buyout Amount and the Real Estate Loan 2020 Buyout Amount shall each be deposited and held in separate segregated accounts of the Debtors and the Liens of the lenders other than Buyer or its Affiliates under IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, shall attach to the cash proceeds held in the applicable designated segregated account

52

in the same order of priority and with the same validity, force and effect as the original Liens of such lenders, and such proceeds shall be released to such lenders within two business days following the Closing Date and shall not otherwise be used by the Debtors without further order of the Bankruptcy Court.

Section 3.2     Cash Deposit.  On or prior to January 9, 2019, Buyer paid an aggregate amount in cash equal to $120,000,000 (the "Deposit Amount") by wire transfer of immediately available funds into an escrow account maintained by Citibank, N.A. as Escrow Agent.  Buyer's and Sellers' right to retain the Deposit Amount in the event of a termination of this Agreement shall be governed by Section 12.2.

Section 3.3     Closing Payment.

(a)     At the Closing, Buyer shall:

(i)     pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Closing Payment Amount *less* the Deposit Amount *plus* any amounts payable pursuant to Section 3.1(c); and

(ii)     deliver the Securities Consideration to the Sellers.

Section 3.4     Reserved.

Section 3.5     Discharge of Assumed Liabilities After Closing.  From and after the later of the Closing or the applicable Assumption Effective Date, Buyer shall pay, perform, discharge and satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed, discharged or satisfied, in each case in accordance with their respective terms.

**ARTICLE IV**

**CLOSING**

Section 4.1     Closing Date.  The closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights and Sellers' right, title and interest in, to and under the Acquired Assets by Sellers to Buyer contemplated hereby (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, or at such other place or time as Buyer and Sellers may mutually agree, on the third (3rd) Business Day following satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing).  Notwithstanding the immediately preceding sentence, if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), then the Closing shall occur instead on the date that is the earlier to occur of (x) any Business Day as may be specified by Buyer on no less than two (2) Business

between Sellers, on the one hand, and Buyer, on the other hand, as of midnight on the Closing Date for the period that begins prior to the Closing Date and ends after the Closing Date.

Section 9.12   Intercompany IP Agreement; Sublicenses.   As of the Closing Date, all Intercompany IP Agreements and all sublicenses to any Person thereunder, in each case that are not assigned to Buyer or assumed and assigned in accordance with this Agreement, shall be, and are hereby, automatically terminated.   Sellers shall take all necessary actions to cause such licenses, grants or sublicenses that are not terminated by virtue of the foregoing sentence to be terminated at the Closing Date.   The foregoing provision shall not affect any sublicenses under which neither any Seller nor any Affiliate of any Seller is the sublicensee, unless such sublicense is terminable without cause by a Seller pursuant to its terms.

Section 9.13   Settlement and Release.

(a)   Effective upon the Closing, in exchange for the payment by Buyer of the Credit Bid Release Consideration and other good and valuable consideration provided to the Debtors and their estates by ESL in connection with the Transactions, each Debtor, for itself and its estate, and on behalf of each of its Subsidiaries and controlled Affiliates (each of the foregoing, a "Seller Releasing Party"), hereby absolutely, unconditionally and irrevocably (i) releases and forever discharges ESL from any and all Released Estate Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have, and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge, dispute or collaterally attack the ESL Claims, provided however that the assertion of any Claim other than a Released Estate Claim shall not be deemed to violate this Section 9.13(a)(ii).

(b)   Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (c)(i)-(vi), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the credit bid set forth in Section 3.1(b).

(c)   After giving effect to the credit bid set forth in Section 3.1(b), ESL shall be entitled to assert any deficiency Claims, Claims arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may have against the Debtors and their estates in the Chapter 11 Cases, provided that (i) no Claims or causes of action of ESL shall have recourse to, or any other right of recovery from, any Claims or causes of action of the Debtors or their estates related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P., the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), any Claim or cause of action involving any intentional misconduct by ESL, or the proceeds of any of the foregoing, (ii) any ESL Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of not more than $50 million from the proceeds of any Claims or causes of action of the Debtors or their estates other than the Claims and causes of action described

96

in the preceding clause (c)(i); provided that, in the event that, in the absence of this clause (c)(ii), any such proceeds to the Debtors or their estates would have resulted in distributions in respect of such ESL Claims in excess of $50 million, the right to receive such distributions in excess of $50 million shall be treated as an unsecured claim and receive pro rata recoveries with general unsecured claims other than the Claims and causes of action described in the preceding clause (c)(i), and (iii) notwithstanding any order of the Bankruptcy Court to the contrary or section 1129 of the Bankruptcy Code, it shall not be a condition to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in part.

(d)       This Section 9.13, and all statements or negotiations relating hereto, shall be governed by Federal Rule of Evidence 408 and any corresponding state rules of evidence. Without limiting the foregoing, neither this Section 9.13 nor any statements or negotiations relating hereto shall be offered or received in evidence in any proceeding for any purpose other than to enforce the terms of this Section 9.13.

(e)       For the purposes of this Section 9.13, the terms set out below shall be defined as follows:

(i)       "Debtors" means each of the debtors and debtors in possession in the Bankruptcy Cases, including the Sellers.

(ii)      "Released Estate Claims" means any and all Claims and causes of action of the Debtors and their estates against ESL arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) equitable principles of subordination or recharacterization, or (iii) any other applicable Law that could be asserted to challenge the allowance of the ESL Claims pursuant to section 9.13(c). For the avoidance of doubt the Released Estate Claims do not include any other Claims or causes of action of the Debtors or their estates against ESL or any other Person, including but not limited to any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b) or 550(a) or any applicable state or federal law, for breach of fiduciary duty (including any Claims for breach of fiduciary duty in connection with the incurrence of any debt described on Exhibit G), or for illegal dividend under 8 Del. C. 170-174 or any other state law; (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice Court File No.:. CV-17-11846-00CL.

Section 13.4  <u>Entire Agreement</u>.  This Agreement (including the Schedules and the Exhibits), the Confidentiality Agreement and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter.  The representations, warranties, covenants and agreements contained in this Agreement (including the Schedules and the Exhibits) and the other Transaction Documents are intended, among other things, to allocate the economic cost and the risks inherent in the Transactions, including risks associated with matters as to which the party making such representations and warranties has no knowledge or only incomplete knowledge, and such representations and warranties may be qualified by disclosures contained in the Schedules.  Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 13.5  <u>No Presumption as to Drafting</u>.  Each of the Parties acknowledges that it has been represented by legal counsel in connection with this Agreement and the other Transaction Documents and the Transactions.  Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 13.6  <u>Assignment</u>.  Subject to Buyer's express rights of assignment with respect to any Assignee, this Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of Law or otherwise without the express written consent of the other Parties (which consent maybe granted or withheld in the sole discretion of such other Party); <u>provided</u>, <u>however</u>, that Buyer shall be permitted, upon prior notice to Sellers but without consent of Sellers, to assign all or any part of its rights or obligations hereunder to an Affiliate (an "<u>Affiliated Designee</u>"); <u>provided</u> that such assignment would not reasonably be expected to prevent or materially impair or delay the consummation of the Transactions or otherwise be materially adverse to Sellers; <u>provided</u> <u>further</u> Buyer shall be permitted to, at or after the Closing, collaterally assign its rights under this Agreement for purposes of creating a security interest or otherwise assigning collateral to the Financing Sources in connection with the Debt Financing; <u>provided</u> <u>further</u> that that no such assignment shall relieve Buyer of any of its obligations under this Agreement.

Section 13.7  <u>Severability</u>.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 13.8  <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by, and construed in accordance with, the procedural and substantive laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.    Notwithstanding anything herein to the contrary, all claims or causes of action (whether in contract or tort) brought against the Financing Sources that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement), including any dispute arising out of or relating in any way to the Financing or the performance thereof or the transactions contemplated thereby, shall be governed by the Laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may be based upon, arise out of or relate to this Agreement, any breach or default hereunder, or the Transactions and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings based upon, arising out of or relating to this Agreement shall be heard and determined in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of Delaware and any federal appellate court therefrom, and the Parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of Delaware and any federal appellate court therefrom) with respect to all Proceedings based upon, arising out of or relating to this Agreement and the Transactions (whether in contract or in tort, in law or in equity or granted by statute); (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any Proceeding relating to this Agreement or the Transactions (whether in contract or in tort, in law or in equity or granted by statute) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding based upon, arising out of or relating to this Agreement or the Transactions and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  The Parties

110

agree that any violation of this Section 13.8(b) shall constitute a material breach of this Agreement and shall constitute irreparable harm.  The parties hereto agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by applicable Law.  Notwithstanding anything to the contrary contained in this Agreement, each of the Parties agrees that it will not bring or support any person in any Proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any of the Financing Sources in any way relating to this Agreement or any of the transaction contemplated by this Agreement, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, in any forum other than the federal and New York state courts located in the Borough of Manhattan within the City of New York and any appellate courts therefrom.

(c)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER IN CONTRACT OR IN TORT, IN LAW OR IN EQUITY OR GRANTED BY STATUTE). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 13.8.

Section 13.9   Counterparts.   This Agreement may be executed in any number of counterparts (including via electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.  This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party.  Delivery of an executed counterpart hereof by means of electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 13.10   Parties in Interest; No Third Party Beneficiaries.   Except as set forth in Section 13.12, nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party; provided that the Financing Sources are intended third party beneficiaries of this Section 13.10, Section 13.6, Section 13.8 and Section 13.12.

Section 13.11   Fees and Expenses.   The Parties agree that, except as otherwise expressly provided in this Agreement, each Party shall bear and pay all costs, fees and expenses that it incurs, or which may be incurred on its behalf, in connection with this Agreement and the Transactions. The pre-Closing costs of any privacy ombudsman shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand, to the extent such costs are incurred in relation to the Transactions.

111

18-23538-rdd    Doc 2399    Filed 02/14/19    Entered 02/14/19 23:57:33    Main Document
Pg 185 of 909

**Exhibit E**

**Executed APA Amendment**

WEIL:\96918199\1\73217.0004

# AMENDMENT NO. 1 TO

# ASSET PURCHASE AGREEMENT

This Amendment No. 1, dated as of February 11, 2019 (this "<u>Amendment</u>"), to the Asset Purchase Agreement (the "<u>Purchase Agreement</u>"), dated as of January 17, 2019, by and among Transform Holdco LLC, a Delaware limited liability company (together with any applicable Affiliated Designee, "<u>Buyer</u>"), Sears Holdings Corporation ("<u>SHC</u>" or the "<u>Seller</u>" and together with each of its Subsidiaries party to the Purchase Agreement, the "<u>Sellers</u>") is entered into by and among Buyer and each Seller.  Terms capitalized but not defined herein shall have the meanings given to such terms in the Purchase Agreement.

WHEREAS, Buyer and the Sellers have previously entered into the Purchase Agreement pursuant to which, among other things, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, Buyer and the Sellers desire to amend the Purchase Agreement in accordance with Section 13.3 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, the representations, warranties, covenants and agreements set forth in the Purchase Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I    AMENDMENTS

<u>SECTION 1.01.</u>    Section 1.1 of the Purchase Agreement is amended as follows:

(a) The definition of "<u>Acquired Inventory</u>" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"<u>Acquired Inventory</u>" shall mean (i) with respect to any Operating Leased Property, all Inventory which is located at, on or in transit to the applicable Operating Lease Property as of the Closing Date, (ii) with respect to any Operating Owned Property, all Inventory which is located at, on or in transit to the Operating Owned Property as of the Closing Date, (iii) with respect to any IP/Ground Lease Property, all Inventory which is located at, on or in transit to the IP/Ground Lease Property as of the Closing Date, (iv) with respect to any Operating Sparrow Properties, all Inventory located at, on or in transit to the Operating Sparrow Properties, and (v) all other Inventory Related to the Business other than Inventory included in clause (ii) of the definition of Excluded Inventory.

(b) The definition of "<u>Buyer Party Release</u>" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable Acquired Foreign Asset).

(b)      If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire other minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) so as to ensure that Buyer or the applicable Assignee shall be able to secure the benefit of the applicable Acquired Foreign Assets, Buyer may elect, by written notice delivered to the Sellers, to acquire such other minority equity interests directly from the Seller it being agreed by the Parties that such equity interests will be deemed to be Acquired Foreign Assets for the purposes of this Agreement.  Following any such election, Buyer and the Seller shall promptly execute all documentation required to effectuate the purchase and sale of such other minority equity interests under applicable Law.  If (i) the proposed transfer of any such other minority equity interests triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable other minority equity interests)."

SECTION 1.23.      Section 3.1(a)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)      an amount in cash equal to the Store Cash as of 12:01 a.m. New York City time on the Closing Date (the "Store Cash Payment Amount"); *plus*;"

SECTION 1.24.      The following proviso is hereby added at the end of Section 3.1(a):

"provided, that to the extent any portion of the Closing Payment Amount will be used by Sellers to satisfy the existing indebtedness of Sellers under the DIP Credit Agreement with respect to outstanding letters of credit, Buyer shall assume, cash collateralize or backstop any such letters of credit (any such assumed, cash collateralized or backstopped letters of credit, the "Backstopped Letters of Credit").  The obligation of Buyer to pay the cash portion of the Closing Payment Amount shall be reduced on a dollar for dollar basis by the face amount of the Backstopped Letters of Credit.  Sellers shall notify Buyer on the Business Day prior to the Closing Date as to any amounts outstanding under the DIP Credit Agreement as to which Buyer shall be required to assume or backstop letters of credit."

SECTION 1.25.      Section 3.1(b)(iv) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

10

"(iv)    obligations held by, or credit bid at the direction of, Buyer and its Affiliates as of the Closing Date in an aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second Lien Line of Credit Facility; and (z) the Second Lien PIK Notes,"

SECTION 1.26.    Section 3.3 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 3.3            Closing Payment.

(a)    At the Closing, Buyer shall:

(i) pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Closing Payment Amount *less* the Deposit Amount *less* the Store Cash Payment Amount *plus* any amounts payable pursuant to Section 3.1(c); and

(ii) deliver the Securities Consideration to the Sellers.

(b)    Within one (1) Business Day following the Closing Date, the Sellers shall deliver a statement to Buyer setting forth the Store Cash Payment Amount.  On the third (3rd) Business Day following the Closing Date, Buyer shall pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Store Cash Payment Amount."

SECTION 1.27.    Section 4.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.1    Closing Date.  The closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights and the Sellers' right, title and interest in, to and under the Acquired Assets by the Sellers to Buyer contemplated hereby (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, or at such other place or time as Buyer and the Sellers may mutually agree, on the third (3rd) Business Day following satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing).  Notwithstanding the immediately preceding sentence, if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), then the Closing shall occur instead on the date that is the earlier to occur of (x) any Business Day as may be specified by Buyer on no less than two (2) Business Days' prior written notice to the Sellers and (y) two (2) Business Days following the final day of the Marketing Period. The date on which the Closing actually occurs is referred to as the "Closing Date", and for all purposes under this Agreement and any Transaction Document (including the Occupancy Agreement and the Seller Retained Occupancy Agreement), the Closing Date

make all such required payments.  All such payments will be taken into account in the forgoing prorations.  The prorations effected pursuant to this Section 9.11 shall be final and not subject to further adjustment."

SECTION 1.45.        Section 9.13 of the Purchase Agreement is hereby amended as follows:

(a) Section 9.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (b)(i)-(vii), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the credit bid set forth in Section 3.1(b).  The allowance of any ESL Claims shall not limit or preclude any claim under any applicable Law or doctrine of collateral estoppel, res judicata, claim or issue preclusion, or otherwise."

(b) Section 9.13(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)  For the purposes of this Section 9.13, the terms set out below shall be defined as follows:

(i)      "Debtors" means each of the debtors and debtors in possession in the Bankruptcy Cases, including the Sellers.

(ii)      "Released Estate Claims" means any and all Claims and causes of action of the Debtors and their estates (i) against ESL arising under sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) against ESL arising under equitable principles of subordination or recharacterization, (iii) against ESL challenging the allowance of the ESL Claims pursuant to Section 9.13(c); or (iv) against Buyer as a subsequent holder of any Claims in respect of the debt described on Exhibit G.  For the avoidance of doubt the Released Estate Claims do not include (a) any Claims or causes of action that are Acquired Assets under any subsection of Section 2.1; or (b) any Claims or causes of action of the Debtors or their estates against ESL or any other Person not specifically described in the preceding sentence, including any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b), 548 or 550(a) or any applicable state or federal Law, for breach of fiduciary duty, or for illegal dividend under 8 Del. C. 170-174 or any other state Law (including, but not limited to, any Claims for damages or equitable relief (other than disallowance of the ESL Claims) in connection with the incurrence of any

25

debt described on Exhibit G); (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted (or may be asserted in connection with these Claims and causes of action) by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice Court File No.: CV-17-11846-00CL; and in the cases captioned Sears Canada Inc., by its Court-appointed Litigation Trustee, J. Douglas Cunningham, Q.C. v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611214-00CL; Morneau Shepell Ltd. in its capacity as administrator of the Sears Canada Inc. Registered Pension Plan v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611217-00CL; FTI Consulting Canada Inc., in its capacity as Court-appointed monitor in proceedings pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c. c-36 v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611219-00CL; and 1291079 Ontario Ltd. v. Sears Canada Inc., *et al.*, Ont. Sup. Ct. J. No.: 4114/15CP."

SECTION 1.46.    The following is hereby added as Section 10.11 of the Purchase Agreement:

"Section 10.11    Pay-Down of Real Estate 2020 Loan.  To the extent not previously provided, on the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* [Docket No. 1393]."

SECTION 1.47.    Section 11.8 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 11.8    [Reserved]."

26

**Exhibit G**
**ESL's Allowed Claims Against the Debtors**

| Loan Facility | Allowed Amount Owed to ESL (as Defined in the Asset Purchase Agreement) Amounts as of October 15, 2018[1] |
|---|---|
| IP/Ground Lease Term Loan Facility | $186,189,719.91[2] |
| FILO Facility | $70,539,333.24 |
| Real Estate Loan 2020 | $726,483,196.21 |
| Second Lien Term Loan | $318,481,532.89 |
| Second Lien Line of Credit Facility | $507,072,878.33 |
| Second Lien PIK Notes | $21,346,945.00 |
| Citi L/C Facility | $108,410,464.44 |

---

[1] Amounts owed to ESL as to each claim listed are not less than the amounts set forth herein and may include additional claims for post-petition interest and all reasonable out-of-pocket expenses, including legal fees incurred by ESL by reason of the enforcement and protection of its rights in accordance with the applicable loan terms, plus any contingent and/or unliquidated claims not presently ascertainable.  In the event that the Buyer or its affiliates purchase any additional obligations outstanding under any of the debt facilities listed in this Exhibit G prior to the Closing, the allowed amount in the right hand column shall be increased by the amount of the additional purchased debt obligations.

[2] On January 3, 2019, ESL purchased $31,887,343 of obligations outstanding under the IP/ Ground Lease Term Loan Facility, which amount is included in the total of amount of ESL's allowed claim on this Exhibit G

# Exhibit 23

Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

Andrew M. Leblanc
MILBANK LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
 Telephone: (202) 835-7500

Craig M. Price
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel to Cyrus Capital Partners, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| SEARS HOLDINGS CORPORATION, *et al.*, | : Case No. 18-23538 (RDD) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| | : Re: Docket No. 3050 |

### JOINDER OF CYRUS CAPITAL PARTNERS, L.P. TO MOTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE AND COLLATERAL AGENT TO PROHIBIT OR CONDITION DEBTORS' CONTINUED USE OF COLLATERAL, INCLUDING CASH COLLATERAL

Cyrus Capital Partners, L.P. ("Cyrus") respectfully submits this joinder to the *Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral* [Docket No. 3050],

filed on April 4, 2019 (the "<u>Motion</u>").  Cyrus reserves all rights to be heard before the Court in connection with the Motion.

1.       Wilmington Trust, National Association, serves as indenture trustee and as collateral agent ("<u>Wilmington Trust</u>") for the 6-5/8% Senior Secured Notes due 2018 (the "<u>2010 Notes</u>") issued by Sears Holdings Corporation ("<u>Sears</u>").  Cyrus was a significant holder of the 2010 Notes but in March of 2018 exchanged those 2010 Notes for a new series of 6-5/8% Senior Secured Notes due 2019 (the "<u>2019 Notes</u>").  The 2019 Notes are secured by the same collateral as the 2010 Notes but are senior to the 2010 Notes pursuant to the pertinent documents.

2.       In addition, Cyrus was a Required Lender under the Junior DIP Facility (the "<u>Junior DIP</u>"), which was approved by order of this Court on December 28, 2018 (the "<u>Junior DIP Order</u>") [Docket No. 1436].  The same Approved Budget annexed to the Final DIP Order was also annexed to the Junior DIP Order, and the "budget provisions that apply to Junior DIP Obligors, the Junior DIP Documents, and this Final Junior DIP Order shall be identical (other than changes to reflect the applicable parties) as those set forth in paragraph 22 of the DIP ABL Order and the DIP ABL Documents."  Junior DIP Order at ¶ 21.

3.       Cyrus joins in the Motion for the reasons set forth below.

4.       Following the closing of the sale of substantially all of the Debtors' assets on February 11, 2019, the Debtors appear unilaterally to have been using Collateral (including Cash Collateral) in which Cyrus and other prepetition second lien lenders (collectively, the "<u>Second Lien Lenders</u>") assert liens, including postpetition adequate protection liens granted by this Court under the Final DIP Order, in contravention of the Final DIP Order and without regard for the adequate protection provided for in the Final DIP Order.  Wilmington Trust's Motion is a timely

- 2 -

# Exhibit 24

SUBJECT TO FRE 408

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 18-23538 (RDD) |
| SEARS HOLDINGS CORPORATION, *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |

### STIPULATION AND ORDER CONCERNING
### THE RESOLUTION OF CERTAIN SECTION 507(b) CLAIMS

This Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims

(the "**Stipulation**"), by and among Sears Holdings Corporation and its debtor affiliates, as debtors

and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**")

and Wilmington Trust, National Association, as Prepetition Second Lien 2018 Indenture Trustee[2]

and as Prepetition Second Lien Collateral Agent ("**Wilmington Trust**"), Cyrus Capital Partners,

L.P. ("**Cyrus**") and ESL Investments, Inc. and certain of its affiliated entities (including JPP, LLC

and JPP II, LLC) (collectively, "**ESL**"; together with Cyrus and Wilmington Trust, "**Second Lien**

**Parties**"; together with the Debtors, the "**Parties**") dated as of this 2nd day of June 2019.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, LLC (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (the "Final DIP Order") [Dkt. No. 955].

## RECITALS

WHEREAS on November 30, 2018, the Final DIP Order was entered;

WHEREAS, pursuant to Section 507(b) of the Bankruptcy Code, the Final DIP Order grants, as adequate protection of the interests of the Second Lien Parties, the Prepetition Second Lien Adequate Protection Liens and Prepetition Second Lien Facilities Adequate Protection Claims (collectively, the "**Section 507(b) Claims**");

WHEREAS on May 26, 2019, the Debtors filed the *Motion to Estimate Certain 507(b) Claims for Reserve Purposes* [Dkt. No. 4034];

WHEREAS on May 28, 2019, the Second Lien Parties submitted a letter to the United States Bankruptcy Court for the Southern District of New York (the "**Court**") proposing that their Section 507(b) Claims be resolved by a motion under Bankruptcy Rule 3012 rather than by an estimation proceeding;

WHEREAS a scheduling conference regarding the motion and the Second Lien Parties' requested relief was held before the Court on May 29, 2019; and

WHEREAS the Parties have determined to resolve the 507(b) Claims on the terms and conditions set forth herein;

**NOW THEREFORE**, based upon the foregoing recitals, which are incorporated as though fully set forth herein, it is hereby Stipulated and Agreed, and upon Court approval it shall be ordered, as follows:

1.      The Debtors' request with respect to its request for estimation is hereby withdrawn and the Debtors' motion is deemed to be a motion pursuant to Bankruptcy Rule 3012 to determine the amount, if any, of the Second Lien Parties' Section 507(b) Claims and, pursuant to Section 506(c) of the Bankruptcy Code, for a surcharge upon the collateral securing the Second Lien Parties' claims (the "**Rule 3012 Motion**").

2.      All Parties shall respond to any reasonable request for information for purposes of preparing the expert reports referred to in paragraphs 3 and 4 below within three (3) business days of any such request.

3.      The Second Lien Parties shall file their superpriority administrative expense claims pursuant to Section 507(b) of the Bankruptcy Code and requests for determination of the amount of their secured claims, supporting expert reports and a memorandum of law in support of such claims, including their response to the Debtors' request for a 506(c) surcharge, by no later than Tuesday, June 18, 2019.

4.      Any responses in opposition and opposing expert reports (collectively, the "**Responses**") shall be filed by no later than Thursday, June 27, 2019.

5.      The Second Lien Parties shall file their replies to the Responses by no later than Wednesday, July 3, 2019.

6.      Depositions of the Second Lien Parties' experts shall take place between Thursday, June 27, 2019 and Wednesday, July 3, 2019.

7.      Depositions of any experts of the opponents to the relief requested shall take place on Wednesday, July 10, 2019 and Thursday, July 11, 2019.

8.      Simultaneous exchange and submission of direct testimony from all Parties and final supplemental briefing addressing expert discovery shall take place at Noon Eastern time on Monday, July 15, 2019.

9.      A hearing on the Rule 3012 Motion shall commence at 10:00 a.m. ET on Thursday, July 18, 2019, or such other time as shall be set by the Bankruptcy Court.

10.     The above schedule may be modified only pursuant to an agreement of the Parties (which may be confirmed by email) or by the Bankruptcy Court for good cause shown.

3

11.     This Stipulation may be executed in one or more counterparts, including facsimile

or electronic counterparts, all of which together shall constitute one and the same instrument.

12.     The Bankruptcy Court shall retain jurisdiction to resolve any disputes or

controversies arising from this Stipulation.

IN WITNESS WHEREOF, this Stipulation has been executed and delivered as of the date

first above written.


Dated:  New York, New York
        June 2, 2019


SEYFARTH SHAW LLP                      WEIL, GOTSHAL & MANGES LLP


By:  __/s/ Edward M. Fox_____    By:  ___/s/ Paul R. Genender_____
        Edward M. Fox                          Ray C. Schrock, P.C.
                                                David J. Lender
        620 Eighth Avenue                       Paul R. Genender
        New York, NY 10018                      Jared R. Friedmann
        Direct Dial:  (212) 218-4646            Sunny Singh
        Direct Fax:  (917) 344-1339
        Email:  emfox@seyfarth.com              767 Fifth Avenue
                                                New York, NY  10153
        **Attorneys for Wilmington Trust,**     Telephone:  (212) 310-8000
        **National Association, as indenture**  Facsimile: (212) 310-8007
        **trustee and collateral agent**
                                                **Attorneys for Debtors and Debtors in**
                                                **Possession**


*[Remainder of page intentionally left blank]*

4

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By: ___*/s/ Thomas J. Moloney*_____
    Thomas J. Moloney
    Sean A. O'Neal
    Andrew Weaver
    Katherine R. Lynch

    One Liberty Plaza
    New York, NY 10006
    Telephone:  (212) 225-2000
    Facsimile:  (212) 225-3999

    *Attorneys for ESL*

MILBANK LLP

By: _____*/s/ Eric R. Reimer*_____
    Eric R. Reimer (admitted pro hac vice)
    Thomas R. Kreller (admitted pro hac vice)
    Robert J. Liubicic

    2029 Century Park East, 33rd floor
    Los Angeles, CA  90067

    Andrew M. LeBlanc
    1850 K Street, Suite 1100
    Washington, DC  20006
    Telephone:  (202) 835-7500

    Craig M. Price
    55 Hudson Yards
    New York, NY  10001
    Telephone:  (212) 530-5000
    Facsimile:  (212) 530-5219

    *Attorneys for Cyrus Capital Partners, L.P.*

SO ORDERED:

_____
Hon. Robert D. Drain
United States Bankruptcy Judge

5

# Exhibit 25

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| | ) Chapter 11 |
| In re: | ) |
| | ) Case No. 18-23538 (RDD) |
| SEARS HOLDINGS CORPORATION, *et al.*, | ) |
| | ) (Jointly Administered) |
| Debtors.[1] | ) |

## STIPULATION AND ORDER CONCERNING
## DEBTORS' CONTINUING USE OF CASH COLLATERAL

This Stipulation and Order Concerning Debtors' Continuing Use of Cash Collateral (the "Stipulation"), by and among Sears Holdings Corporation ("Sears") and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors") and Wilmington Trust, National Association, as Prepetition Second Lien 2018 Indenture Trustee[2] and as Prepetition Second Lien Collateral Agent ("Movant"), Cyrus Capital Partners, L.P. ("Cyrus") and ESL Investments, Inc. ("ESL"; together with Cyrus, "Joiners"; the Joiners, together with the Movant and the Debtors, the "Parties") date as of this 7th day of June, 2019.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (the "Final DIP Order") [Dkt. No. 955].

57153066v.2
WEIL:\97041173\5\73217.0004

WHEREAS a hearing on the Motion was held before the United States Bankruptcy Court for the Southern District of New York (the "Court") on April 18, 2019, and adjourned *sine die*; and

WHEREAS given the uncertainties, burden, expense, and delay of litigation over the Motion, the Parties have determined that it is in their respective best interests to address the Motion on the terms and conditions set forth herein;

**NOW THEREFORE**, based upon the foregoing recitals, which are incorporated as though fully set forth herein, it is hereby Stipulated and Agreed, and upon Court approval it shall be ordered, as follows:

1.      The Hearing on the Motion is adjourned pending a determination by the Court, or agreement among the Parties approved by the Court, in either case by final order after notice and a hearing (the "Determination") with respect to (i) the value of the Prepetition Second Lien Adequate Protection Liens, if any and (ii) the amount of the Prepetition Second Lien Facilities Adequate Protection Claims, if any.

2.      Anything in decretal paragraphs 18(d) and 23 of, or otherwise in, the Final DIP Order to the contrary notwithstanding, the Prepetition Second Lien Collateral Agent, on behalf of itself and the other Prepetition Second Lien Credit Parties, shall be granted a Prepetition Second Lien Adequate Protection Lien solely to the extent of the Interim Second Lien Diminution in Value (as defined below) on the Winddown Account if, and only if, the Court determines any Second Lien Diminution in Value has occurred between the Motion Date and the date of the Determination (the "Interim Second Lien Diminution in Value").

3.      For the period from the Motion Date through August 3, 2019 (the "Extended Budget Period"), the "Weekly Cash Flow Budget Base Case" provided by the Debtors to the Movant on June 6, 2019, and subsequently provided to Cyrus and ESL, a copy of which is

3

18-23538-rdd    Doc 4135    Filed 06/03/19    Entered 06/03/19 23:36:19    Main Document
Pg 11 of 12

**EXHIBIT A**

# Weekly Cash Flow Budget – Base Case (actualized through 6/1/19)

| Retail Month | February | | | March | | | | | April | | | | May | | | | June | | | | July | | | | August | September | October | November | December | Total Case |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | | | | | | |
| Forecast / Actual | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | ACT | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | | | | | | |
| Week Ending | 2/16/19 | 2/23/19 | 3/2/19 | 3/9/19 | 3/16/19 | 3/23/19 | 3/30/19 | 4/6/19 | 4/13/19 | 4/20/19 | 4/27/19 | 5/4/19 | 5/11/19 | 5/18/19 | 5/25/19 | 6/1/19 | 6/8/19 | 6/15/19 | 6/22/19 | 6/29/19 | 7/6/19 | 7/13/19 | 7/20/19 | 7/27/19 | 8/3/19 | | | | | | |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Wave 3 GOB Inflows | $5 | $17 | $14 | $11 | $9 | $2 | $0 | $0 | ($0) | $0 | $0 | ($0) | $0 | $0 | $0 | $0 | $- | $9 | $- | $9 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $68 |
| Cash In Transit Proceeds | 9 | - | - | - | - | 3 | - | - | - | - | - | - | - | - | - | - | - | 20 | - | - | - | - | - | - | - | - | - | - | - | - | 32 |
| Cash from Israel | - | - | - | 3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3 |
| Credit Card Receivables | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 15 | - | - | - | - | - | - | - | - | - | - | - | - | 15 |
| Cash In Stores | 9 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 9 |
| Real Estate Asset Sales | - | 4 | 5 | - | - | - | - | - | 3 | - | 2 | 2 | - | - | - | - | - | 5 | - | 17 | - | - | - | - | - | - | - | - | - | - | 37 |
| Excess Inventory Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 6 | - | - | - | - | - | - | - | - | - | - | - | - | 6 |
| ESL Closing Proceeds | 35 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 35 |
| TSA Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | 1 |
| SHIP Deposit | - | - | - | 5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Utility Deposit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 10 | - | - | - | 10 |
| Hoffman Estates Tax Credit | - | - | - | - | - | - | - | - | - | - | - | - | - | 3 | - | - | - | - | - | - | - | - | 3 | - | - | - | - | - | - | - | 6 |
| Calder Statue | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 4 | - | - | - | - | - | 4 |
| Pro-Rated Rent | - | - | - | - | - | 5 | - | - | - | - | - | - | - | - | - | - | - | 11 | - | - | - | - | - | - | - | - | - | - | - | - | 16 |
| ESL Severance Assumption[1] | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 13 | - | 13 |
| ESL 503b9 Assumption | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 139 | - | 139 |
| Other Proceeds | - | - | - | - | - | - | - | - | 0 | 0 | - | 0 | 0 | 0 | 1 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 |
| **Total Oldco Receipts** | $58 | $22 | $19 | $15 | $13 | $2 | $8 | $0 | $3 | $0 | $2 | $2 | $0 | $3 | $1 | $0 | $0 | $67 | $- | $17 | $- | $- | $- | $13 | $- | $4 | $- | $152 | $- | $- | $400 |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OldCo Accrued Payroll & Benefits | ($29) | ($14) | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | ($42) |
| Taxes | - | (5) | (7) | - | (0) | (4) | - | - | (0) | (0) | (0) | (2) | - | - | (0) | (0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (19) |
| GOB Operating Costs[1] | - | - | (6) | (6) | (3) | (1) | (3) | (4) | - | - | - | (3) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (26) |
| Professional Fee Carve Out Funding[2] | - | - | (20) | - | (15) | - | (7) | - | - | - | - | - | (19) | (1) | (8) | (1) | (3) | (3) | (3) | (2) | (2) | (2) | (2) | (5) | (6) | (4) | - | - | - | - | (104) |
| Post-Petition Payables | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (13) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (14) |
| 503(b)(9) Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (181) | - | - | - | - | - | (181) |
| TSA Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1) |
| Franchise Tax | - | - | (0) | - | - | - | - | - | - | - | - | - | - | - | - | (3) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (3) |
| Severance & WARN | - | - | - | - | (1) | - | - | - | (1) | (1) | (8) | - | - | - | - | (2) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (13) |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | (0) | (2) | - | - | - | - | - | - | - | (1) | - | - | - | - | (1) | - | - | - | - | (3) |
| Board Fees | - | - | (0) | - | (0) | - | (0) | (0) | - | - | - | - | - | (1) | - | - | (0) | - | - | - | - | (0) | - | (0) | (0) | (0) | - | (0) | (0) | (2) |
| Net Prepaid Inventory Shortfall | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (55) | - | - | - | - | (55) |
| Other Potential Liabilities | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (15) | - | - | - | - | - | - | - | - | - | - | - | - | (15) |
| Other Liabilities and Expenses | (1) | (0) | - | - | - | - | - | (0) | (3) | (1) | - | (1) | (0) | (1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (9) |
| **Total OldCo Disbursements** | ($29) | ($19) | ($33) | ($6) | ($18) | ($7) | ($10) | ($4) | ($4) | ($2) | ($9) | ($6) | ($2) | ($20) | ($2) | ($8) | ($2) | ($18) | ($3) | ($20) | ($2) | ($2) | ($2) | ($3) | ($2) | ($5) | ($6) | ($241) | ($0) | ($0) | ($486) |
| **PASS-THROUGH RECEIPTS** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| New Co Payroll Remittance | $5 | $11 | $26 | $23 | $28 | $24 | $27 | $23 | $23 | $29 | $25 | $33 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $276 |
| New Co Licensing Remittance | 5 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 3 | 4 | 5 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 66 |
| **Total Pass-Through Receipts** | $10 | $14 | $29 | $26 | $31 | $27 | $31 | $26 | $26 | $32 | $29 | $37 | $3 | $4 | $5 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $3 | $343 |
| **PASS-THROUGH DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| New Co Payroll | ($5) | ($11) | ($26) | ($23) | ($28) | ($24) | ($27) | ($23) | ($23) | ($29) | ($25) | ($33) | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | ($276) |
| Licensing Payments For New Co | (5) | (3) | (3) | (3) | (3) | (3) | (4) | (4) | (3) | (3) | (4) | (4) | (3) | (4) | (5) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (66) |
| **Total Pass-Through Disbursemen** | ($10) | ($14) | ($29) | ($26) | ($31) | ($27) | ($31) | ($26) | ($26) | ($32) | ($29) | ($37) | ($3) | ($4) | ($5) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($3) | ($343) |
| **Net Cash Flow** | 28 | 2 | (14) | 9 | (5) | (5) | (2) | (4) | (1) | (2) | (6) | (5) | (2) | (17) | (1) | (8) | (2) | 50 | (3) | (2) | (2) | (2) | (2) | 11 | (2) | (1) | (6) | (89) | (0) | (0) | (86) |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning Available Cash | $93 | $121 | $123 | $109 | $118 | $113 | $108 | $106 | $102 | $101 | $99 | $93 | $88 | $86 | $69 | $68 | $59 | $57 | $107 | $105 | $101 | $99 | $96 | $94 | $105 | $102 | $102 | $96 | $7 | $7 | $93 |
| Change in Available Cash | 28 | 2 | (14) | 9 | (5) | (5) | (2) | (4) | (1) | (2) | (6) | (5) | (2) | (17) | (1) | (8) | (2) | 50 | (3) | (2) | (2) | (2) | (2) | 11 | (2) | (1) | (6) | (89) | (0) | (0) | (86) |
| Ending Available Cash | $121 | $123 | $109 | $118 | $113 | $108 | $106 | $102 | $101 | $99 | $93 | $88 | $86 | $69 | $68 | $59 | $57 | $107 | $105 | $101 | $99 | $96 | $94 | $105 | $102 | $102 | $96 | $7 | $7 | $7 | $7 |
| **ENDING CASH BALANCES** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OldCo Operating Accounts | $28 | $31 | $16 | $21 | $15 | $11 | $9 | $5 | $11 | $9 | $0 | $9 | $7 | $5 | $4 | $3 | $1 | $46 | $43 | $23 | $21 | $18 | $16 | $26 | $24 | $24 | $17 | $- | $- | $- | $- |
| Consignment Accounts | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 8 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| Wind-Down Account | 88 | 88 | 88 | 93 | 93 | 93 | 93 | 93 | 86 | 86 | 88 | 74 | 74 | 59 | 59 | 51 | 51 | 57 | 57 | 74 | 74 | 74 | 74 | 68 | 67 | 67 | 66 | 58 | 52 | 2 | 2 |
| Professional Fee Carve Out Account | 111 | 105 | 109 | 105 | 114 | 100 | 96 | 92 | 89 | 84 | 66 | 61 | 54 | 67 | 68 | 73 | 71 | 70 | 70 | 69 | 69 | 68 | 68 | 67 | 66 | 58 | 52 | - | - | - | - |
| Total Cash | $231 | $227 | $217 | $222 | $226 | $208 | $201 | $194 | $190 | $183 | $159 | $149 | $139 | $136 | $136 | $132 | $128 | $177 | $174 | $170 | $167 | $164 | $161 | $171 | $168 | $160 | $148 | $7 | $7 | $7 | $7 |




(1)  All GOB expenses from week 9 – week 11 are assumed to be severance (2-weeks after the final store closure)
(2)  ~$104mm of total funding represents ~$107mm of total accrual from February 2019 to October 2019 less ~$10mm of accruals for the 1st week of February
      less ~$2mm Lazard accrual plus ~$9mm under funded balance for the week ending 2/9