In the United States Bankruptcy Court for the Southern District of New York

Case No. 18-23538 RDD

In re Sears Holdings Corporation, et al., Debtors

EXPERT REPORT OF MARTI P. MURRAY

June 18, 2019

# Table of Contents

I.      Qualifications ............................................................................................................ 1

II.     Scope of Engagement .............................................................................................. 4

III.    Summary of Opinions ............................................................................................. 5

IV.     Background ............................................................................................................... 8

    A.    Sears Capital Structure as of the Filing Date ............................................... 10

        1.    Sears Employs Letters of Credit in the Ordinary Course of Operating its Business ........................................................................................... 11

        2.    Sears Uses Asset-Based Lending Arrangements ..................................... 16

    B.    Management's Outlook for Sears as of the Filing Date .................................... 18

    C.    Sears Obtains Debtor-In-Possession Financing and Grants Adequate Protection to the 2L Debt ............................................................................. 19

    D.    The Debtors Undertake a Sales Process, Receive Liquidation Bids and Analyses, and Enter into a Sales Transaction .............................................. 20

    E.    The Mechanism of the Credit Bid ............................................................... 23

V.      Collateral for the Pre-Petition Debt .................................................................... 24

    A.    Collateral for the Pre-Petition ABL Debt .................................................... 24

    B.    Collateral for the 2L Debt ........................................................................... 25

VI.     Valuation of the 2L Debt Collateral .................................................................... 26

    A.    Measurement Dates for the Valuation of the 2L Debt Collateral ................... 26

    B.    Valuation Parameters .................................................................................. 26

    C.    Valuation of the 2L Debt Collateral as of the Filing Date ............................. 27

        1.    Sears Inventory ...................................................................................... 29

        2.    Cash Balances as of the Filing Date ....................................................... 34

        3.    Sears Scripts .......................................................................................... 34

        4.    Sears Credit Card Receivables ............................................................... 34

        5.    Sears Pharmacy Receivables .................................................................. 35

    D.    Valuation of the 2L Debt Collateral as of the Expected Effective Date .......... 35

VII.    The Value of the 2L Adequate Protection ......................................................... 36

VIII.   Calculation of the 2L Debt 507(b) Claim .......................................................... 36

IX.     Surcharge ............................................................................................................... 40

X.      Conclusion ............................................................................................................. 43

XI.   Appendices...........................................................................................................45
      Appendix A – Expert CV of Marti P. Murray ...........................................................46
      Appendix B – Documents Considered ......................................................................53
      Appendix C-1 – Minimum 507(b) Claim Calculation...............................................65
      Appendix C-2 – 507(b) Claim Calculation Based on Debtors' Inventory Valuation
      ...................................................................................................................................67
      Appendix C-3 – Inventory Analysis as of October 17, 2018 ....................................69
      Appendix C-4 – Cash & Cash Equivalents as of the Filing Date ..............................70

# I.    Qualifications

1.    I am a principal at The Brattle Group ("Brattle"), an economic consulting and litigation support firm. I joined Brattle in May 2019, after founding and serving as the President of Murray Analytics, Inc. ("Murray Analytics") from 2015 to 2019. Murray Analytics served as a consulting firm specializing in corporate restructuring, financial advisory, complex valuation services, and litigation support. Immediately prior to founding Murray Analytics, from 2012 until early 2015, I served as the Senior Managing Director of Goldin Associates, LLC ("Goldin Associates"), a consulting firm founded by J. Harrison Goldin, the former Comptroller of the City of New York. At both Murray Analytics and Goldin Associates, I led teams of professionals on a variety of financial advisory and litigation support engagements, and I work in this same capacity at Brattle.

2.    I have had a career of over 35 years in the financial services industry, with a focus on financial analysis, business and securities valuation, bankruptcy and restructuring, corporate credit, and investing in the distressed debt asset class. For approximately 32 of those years, since 1987, I have been directly and continuously involved in the bankruptcy and restructuring field, as an investor, financial advisor, court-appointed receiver, board member, and expert witness.

3.    I began my career in financial services in 1982 at Bank of America, where I completed a formal credit training program and ultimately managed Bank of America's relationships with Fortune 500 corporate borrowers in the consumer and industrial products segment, some of which were highly leveraged or in financial distress. My responsibilities at Bank of America included performing credit analysis on corporate bank customers, and seeking credit approval for the extension of credit to them. In 1986, I received my MBA in Finance from the NYU Stern School of Business, having been sponsored by Bank of America for the Executive MBA program. After graduation I worked for First New York Capital, a boutique investment bank serving the needs of middle market companies pursuing financings or M&A transactions.

4.  I then joined Oppenheimer & Co. in 1987 to work for a Portfolio Manager for the Oppenheimer Horizon Fund—one of the first hedge funds specifically established to invest in distressed debt. I worked at Oppenheimer as an investment analyst, evaluating potential investments for the fund, making buy/sell recommendations to the Portfolio Manager, and subsequently monitoring investments for which I was responsible. In 1990, I joined Furman Selz Incorporated ("Furman"), a broker-dealer owned by Xerox at the time, to oversee its distressed debt department. As a Senior Managing Director and department head, my responsibilities included investing capital in the distressed debt, bank debt, and high yield asset classes on the firm's behalf and for Xerox. I was also responsible for developing a money management business around the distressed debt investing specialty and launched a number of hedge fund investment vehicles.

5.  After approximately five years at Furman, I founded Murray Capital Management ("Murray Capital"), an SEC-registered investment adviser. Murray Capital specialized in investing in distressed and bankrupt companies, taking positions at all levels in the capital structure, from senior secured loans and first mortgages, to second lien debt instruments, unsecured bonds, trade claims, preferred stock, common stock, and various forms of derivatives. Peak client capital under management at Murray Capital grew to approximately $750 million, and the client base consisted of pension funds, university endowments, funds of funds, family offices, and high net worth individuals. I had ultimate responsibility for all aspects of the firm's business, including fund formation, client service, fund operations, research, portfolio management, trading, and compliance.

6.  I served as President and Portfolio Manager of Murray Capital from the firm's inception in 1995 until 2008 when the business was acquired by Babson Capital, the money management division of MassMutual Financial Group.

7.  In 2009, I retired from portfolio management and commenced providing financial advisory and litigation support services. In this capacity I have been retained to work on a variety of matters relating to, among other things, bankruptcy and restructuring, distressed companies,

2

and business and securities valuation, including with respect to numerous SEC enforcement actions. I have worked on countless distressed, bankruptcy, and restructuring cases as a principal investor, involving retailers, including, but not limited to, Hills Department Stores, Ames Department Stores, Caldor, Kmart, Gap, Tommy Hilfiger, and Levi's. I have also served on the Board of Directors of Edcon, a distressed retailer that serves as the holding company for two of South Africa's largest retailers, Edgars and Jet, selling a wide variety of clothing and consumer products. I served as a member of Edcon's audit and risk committee. In the capacity of a consulting and/or testifying expert, I have worked on matters relating to numerous bankruptcy/insolvency proceedings, including but not limited to those of GSC Capital, a multinational chemical company, Encol, The Dolan Company, Fletcher International, and W Hotel & Residences. I have also served as a Court-appointed SEC Receiver for Atlantic Asset Management LLC, an investment management firm accused of fraud by the SEC in December 2015.

8.    In addition to my professional responsibilities, over the years I have also taught as an Adjunct Professor at the NYU Stern School of Business. Between 2001 and 2013, I taught graduate level courses in Bankruptcy and Distressed Debt Investing, as well as in Valuation/Equity Analysis. In some cases I co-taught with Professor Edward I. Altman, who holds the Max L. Heine Chair in Finance, and in other cases I taught courses independently. I currently serve as the Vice-Chairman of the Academic Relations Committee of the Turnaround Management Association (the "TMA"), having previously served as a committee member for a number of years.

9.    In addition to having been a board member of Edcon, I have also served on the Board of Directors of California Coastal Communities, a public homebuilder in Southern California, and was elected to serve on the Board of two PIMCO Funds—PIMCO Income Strategy Fund I and II—after having been nominated by Brigade Capital Management and recommended by Institutional Shareholder Services ("ISS").

3

10. I hold the designation of Certified Valuation Analyst ("CVA"), awarded by the National Association of Certified Valuators and Analysts ("NACVA"). I regularly attend training on a variety of valuation topics and obtain CPE (Continuing Professional Education) credit necessary to maintain the CVA credential. I have also taught advanced valuation topics to legal professionals for CLE credit. I recently presented at the Valcon Conference, sponsored by the American Bankruptcy Institute (the "ABI"), on the topic of rights offerings.

11. I received a BA from Colgate University in 1981 with a major in World Affairs and Chinese and an MBA in Finance from the NYU Stern School of Business in 1986.

12. Prior to my work in this case, I have been retained as an expert witness in over thirty matters. A copy of my CV is attached hereto as Appendix A. Brattle is being compensated for my work at my hourly rate on this matter of $1,000. Staff at Brattle have assisted me by performing work at my direction. All the opinions and conclusions stated in this report are my own. Brattle's compensation is not contingent upon the outcome of this case.

13. My opinions are based on the materials I reviewed to date as detailed in Appendix B, hereto. I may seek to supplement or modify my opinions in the future to the extent new information becomes available.

## II.    Scope of Engagement

14. I have been engaged by Milbank LLP, counsel to Cyrus Capital Partners, LP ("Cyrus"), to opine on diminution in value relating to positions held by Cyrus in Sears Holding Corporation ("Sears") second lien debt (the "2L Debt"). Cyrus has made a claim for diminution in value, referred to as a 507(b) claim, relating to those positions (a "507(b) Claim," the "2L Debt 507(b) Claim," and the "Cyrus 2L Debt 507(b) Claim").[1] The diminution in value was calculated

---

[1]    For a complete list of the debtors' corporate names, *see* Chapter 11 Voluntary Petition for Non-Individuals Filing for Bankruptcy, Oct. 15, 2018, Docket No. 1. The 2L Debt Claims include claims held by the holders of debt under the Second Lien Credit Agreement dated September 1, 2016 (as amended, supplemented, or otherwise modified) and holders of the Second Lien PIK Notes due October 15, 2019

between October 15, 2018, the date Sears filed for bankruptcy (the "Filing Date"), and the expected effective date of the Debtors' plan (the "Expected Effective Date").

15. My work on this report was completed in accordance with the NACVA Professional Standards, as applicable to valuation engagements.[2]

## III.    Summary of Opinions

16. Based on my review and analysis of the materials, and my education, training, and experience, I have reached the opinions listed below:

17. The Cyrus 2L Debt 507(b) Claim as of the Expected Effective Date is in a range of $78.9 million to $166.1 million, with a midpoint of $122.5 million. This determination is based on a 2L Debt 507(b) Claim in the total amount of $491.6 million to $1,035.8 million, with a midpoint of $763.7 million, with Cyrus having a 16% share of the total.[3]

18. Cyrus has a minimum 2L Debt 507(b) Claim of $78.9 million as of the Expected Effective Date, and its actual claim may be materially higher:

    a.     The 2L Debt 507(b) Claim is measured as the amount by which the value of the collateral backing the 2L Debt (the "2L Debt Collateral Value") declined between the Filing Date and the Expected Effective Date, less the value of any adequate

---

issued under an indenture dated March 20, 2018 (as amended, supplemented, or otherwise modified). The 6 5/8% Senior Secured Notes due October 15, 2018 (the "Second Lien Notes") are not considered because "in any enforcement action with respect to the Second Lien Collateral, proceeds of Second Lien Collateral are applied to repay obligations under the Second Lien Notes only after all obligations under each of the Second Lien Credit Facility and the Second Lien PIK Notes are repaid in full." Robert A. Riecker Declaration ¶ 34, Oct. 15, 2018, Docket No. 3. *See* Disclosure Statement for the Second Amended Joint Chapter 11 Plan, at 13, May 28, 2019, Docket No. 4042 ("May 28 Disclosure Statement") Joinder of Cyrus Capital Partners to Motion of Wilmington Trust at 4, Apr. 11, 2019, Docket No. 3142.

[2]    "A Valuation Engagement requires that a member apply valuation approaches or methods deemed in the member's professional judgment to be appropriate under the circumstances and results in a Conclusion of Value." NACVA Professional Standards, at 6, Jun. 1, 2017. "Value can be expressed as a single number or a range." *Id.* at 6. The "purpose and use of the valuation" must be identified to "define the assignment and determine the scope of work." *Id.* at 7.

[3]    To the extent that the calculated claim amounts are in excess of the Cyrus 2L Debt holding, the Cyrus 2L Debt 507(b) Claim would be capped at $100.9 million.

protection granted to the 2L Debt (the "2L Debt Adequate Protection"). The amount of 2L Debt outstanding as of the Filing Date was $1,062.5 million.

b.      The bulk of the collateral available to the 2L Debt (the "2L Debt Collateral") was inventory. The 2L Debt Collateral also included cash, pharmacy prescription lists (the "Scripts"), credit card receivables, and pharmacy receivables.

c.      The 2L Debt Collateral Value as of the Filing Date should, at a minimum, be valued based on the amount that Sears, an insolvent retailer considering an orderly liquidation of its business, could reasonably have obtained for the collateral through company-wide going out of business ("GOB") sales.

d. 

e.      As part of the Transform Sale, $433.5 million in 2L Debt was used as currency as part of a credit bid (the "Credit Bid"), reducing the outstanding 2L Debt to $629.1 million. For purposes of this analysis, I have assumed that the value of the Credit Bid was $433.5 million.[5]

g.      As of May 4, 2019, the date of the Debtors' most recent monthly operating report ("MOR"), the maximum remaining 2L Debt Collateral held by the Debtors was $19 million in trade and/or pharmacy receivables. In calculating the 2L Debt 507(b) Claim as of the Expected Effective Date, I have assumed that the 2L Debt receives no value from those receivables, and, therefore, that the value of the 2L Collateral

---

[4]   Tiger Inventory Appraisal at 8, Sept. 28, 2018, Bates No. SEARS 507B 00001287. Tiger Inventory Appraisal at 5, Feb. 4, 2019, Bates No. SEARS 507B 00001213. ███████████████

███████ Tiger Inventory Appraisal at 5, Feb. 4, 2019, Bates No. SEARS 507B 00001213.

[5]   A determination of what the value of the Credit Bid actually was would require a valuation of the interest the 2L Debt holders received in Transform Holdco LLC on account of the Credit Bid.

as of the Expected Effective Date is zero. As a result, the total diminution in value of the 2L Debt Collateral from the Filing Date through the Expected Effective Date is a minimum of $491.9 million. To the extent that the 2L Debt does receive value for the remaining $19 million in trade and/or pharmacy receivables, then the value would become a secured claim and the 2L 507(b) Claim would be reduced by that value.

h.    Through the Expected Effective Date, the only recovery the 2L Debt could have received from the 2L Debt Adequate Protection was the assumed payment of the 2L collateral trustee's legal fees up to a cap of $250,000.[6]

i.    Thus, the 2L Debt 507(b) Claim through the Expected Effective Date is a minimum of $491.6 million, representing the minimum $491.9 million decline in Collateral Value between the Filing Date and the Expected Effective Date less the $250,000 in maximum value from the 2L Debt Adequate Protection.

j.    I understand that Cyrus's share of the total 2L Debt outstanding, after giving effect to the Credit Bid, is $100.9 million, or 16% of the $629.1 million 2L Debt outstanding.[7] Based on a total minimum 2L Debt 507(b) Claim of $491.6 million described in paragraph i. above, Cyrus therefore has a minimum 2L Debt 507(b) Claim of $78.9 million as of the Expected Effective Date. Cyrus's $78.9 million 2L Debt 507(b) Claim is a minimum claim number. If those percentages were used in this analysis, Cyrus's 2L Debt 507(b) Claim would be higher.

k.    Alternatively, if the above analysis were performed using the liquidation value that the Debtors themselves ascribed to the inventory as of October 17, 2018, then the

---

[6]    Hearing Transcript at 22:06-13, Nov. 27, 2018.

[7]    Based on information from counsel.

[8]    Tiger Inventory Appraisal at 1, Nov. 16, 2018, SEARS 507B 00001345.

2L Debt 507(b) Claims would be $1,035.8 million, and the Cyrus 2L Debt 507(b) Claim would be $166.1 million.[9]

19.    The Debtors' position that the 2L Debt 507(b) Claims are subject to a surcharge of $1,451 million under Section 506(c) of the Bankruptcy Code is not well founded nor is it supported by the facts and evidence in this matter for a number of reasons:

    a.    The Debtors' position is inconsistent with the economics of asset-based lending. The 2L Debt is asset-based secured debt. Asset-based lenders extend loans against assets, rather than cash flow, in order to manage downside risk. The Debtors' claimed surcharge represents approximately 62% of the total value of all non-cash collateral available to the 1L and 2L Debt as of the Filing Date. To apply a surcharge of this magnitude to collateral securing asset-based debt would strongly disincentivize asset based-lenders from extending credit on this basis.

    b.    In addition, the Debtors' position implies that lenders would recover only 38% of the value of the Debtors' non-cash collateral.. This is contradicted by appraisals and bids the Debtors received from inventory liquidators before and during this case. As noted above, ██████████████████████████████████████████████ Those values were net of selling expenses and therefore accounted for the cost of maintaining and realizing the value of the 2L Debt Collateral.

    c.    Finally, the Debtors' suggestion is contradicted by their own earlier position in this case. When the Debtors sought approval of the Transform Sale, their Chief Restructuring Officer, Mohsin Y. Meghji ("Mr. Meghji" or the "CRO"), assumed the imposition of only a 4% surcharge on encumbered assets sold throughout the case. The 4% surcharge was described as being available to fund the bankruptcy case, rather than as a necessary expense to maintain or achieve any particular value for the inventory.[10]

## IV.    Background

20.    Sears has had a long and storied history, dating back to the late 19th century. The company began as a mail-order business and grew over time to ultimately become the largest retailer

---

[9]    To the extent that the calculated claim amounts are in excess of the Cyrus 2L Debt holding, the Cyrus 2L Debt 507(b) Claim would be capped at $100.9 million.

[10]    Sears Holdings Corp., Wind Down Recoveries, at 2, Jan. 14, 2019, Bates No. UCC_Sears_0002236.

in the United States.[11] Sears was a household name across the country, with a mail-order catalog that was inches thick, selling a wide variety of items ranging from clothing to farm equipment.[12]

21.  In 2005, Sears and Kmart were merged. After the merger, Sears became the third largest retailer in the United States, with $55 billion in revenues and a total of 3,500 stores.[13] Sears continued to operate stores under both the Sears and Kmart banners.

22.  In the years preceding its bankruptcy filing, Sears' business had been on a downward trajectory, due to increased competition from other "brick and mortar" retailers and the explosive growth and popularity of online shopping.[14]

23.  In the five years preceding its bankruptcy, Sears' revenues had declined by approximately 54%.[15] As sales contracted, and as the company sought to close underperforming store locations, Sears also faced a liquidity squeeze. Among other challenges, trade vendors demanded tighter terms and reduced subsidies that had previously been provided.[16] In the period leading up to the Filing Date, Sears experienced approximately a 78% contraction in trade credit available, requiring the company to externally finance a significant portion of its inventory.[17]

24.  Sears ultimately filed for bankruptcy on October 15, 2018, becoming a "debtor-in-possession" under Chapter 11 of the U.S. Bankruptcy Code (the "Debtors").

---

[11]  Riecker Declaration ¶ 6, ¶ 20, Oct. 15, 2018, Docket No. 3.

[12]  From personal recollection.

[13]  Kmart and Sears Complete Merger to Form Sears Holding Corporation, SEARS HOLDINGS (Mar. 24, 2005), https://searsholdings.com/press-releases/pr/1188.

[14]  Sears also cited "economic forces adversely affecting the Company's traditional customer base, industry trends, and global shifts in consumer behavior." Riecker Declaration ¶ 8, Oct. 15, 2018.

[15]  Disclosure Statement for Second Amended Joint Chapter 11 Plan, at 38, May 28, 2019, Docket No. 4042.

[16]  *Id.* at 39.

[17]  Riecker Declaration ¶ 42, Oct. 15, 2018.

25.   As of the Filing Date, Sears operated 687 retail stores in forty-nine states, Guam, Puerto Rico, and the U.S. Virgin Islands under the Sears® and Kmart® brands.[18] These stores included Sears department stores, primarily located in shopping malls, Kmart "big-box" retail stores, and freestanding specialty stores under the Sears Auto Centers banner, offering auto maintenance, auto repair, and automotive products.[19] Sears also operated Sears Home Service, which provided appliance repair services and parts through the Sears Parts Direct website.[20] The Debtors also hosted a number of website, including sears.com, kmart.com, and Shop Your Way.[21]

26.   As of the Filing Date, Sears employed approximately 68,000 individuals, of whom approximately 32,000 were full-time employees and approximately 36,000 were part-time employees.[22]

## A.  Sears Capital Structure as of the Filing Date

27.   As of the Filing Date, Sears' capital structure consisted of debt and equity instruments. Certain contingent obligations in the form of letters of credit ("L/Cs") were unfunded as of the Filing Date, as discussed below. A schedule of Sears' reported indebtedness as of the Filing Date is as shown in Table 1 below:

---

[18]   *Id.* at ¶ 25.

[19]   *Id.* at ¶ 25-27.

[20]   *Id.* at ¶ 28.

[21]   *Id.* at ¶ 29.

[22]   *Id.* at ¶ 30.

**Table 1: Sears Capital Structure as of the Filing Date** [23]

| As of Commencement Date:<br>Debt Facilities | | Principal Outstanding<br>($ millions) |
|---|---|---|
| Revolving Credit Facility | $ | 836.0 |
| First Lien Letters of Credit | | 123.3 |
| First Lien Term Loan A | | -- |
| First Lien Term Loan B | | 570.3 |
| FILO Term Loan | | 125.0 |
| Total First Lien Debt | $ | 1,655.5 |
| Stand-Alone L/C Facility | $ | 271.1 |
| Second Lien Term Loan | $ | 317.1 |
| Second Lien Line of Credit | | 575.0 |
| Alternative Tranche Line of Credit Loans | | 45.0 |
| Second Lien PIK Notes | | 175.4 |
| Second Lien Notes | | 89.0 |
| Total Second Lien Debt | $ | 1,151.5 |
| IP/Ground Lease Term Loan | | 231.2 |
| Consolidated Secured Note A | | 108.1 |
| Consolidated Secured Note B | | 723.3 |
| Total Secured Loan Debt | $ | 1,062.6 |
| Holdings Unsecured PIK Notes | $ | 222.6 |
| Holdings Unsecured Notes | | 411.0 |
| SRAC Unsecured PIK Notes | | 107.9 |
| SRAC Unsecured Notes | | 185.5 |
| Total Unsecured Debt | $ | 927.0 |
| **Total Funded Debt** | $ | **5,067.8** |
| **Intercompany Notes** | | |
| KCD Asset-Backed Notes | $ | 900.0 |
| SRAC Medium Term Notes | | 2,311.8 |
| **Total Intercompany Debt** | $ | **3,211.8** |
| **Sparrow Structure** | | |
| Sparrow Term Loan | $ | 111.0 |
| Sparrow Mezzanine Term Loan | | 513.2 |
| **Total Sparrow Structure Debt** | $ | **624.2** |

28. Sears' common stock was publicly traded under the ticker "SHLD."

# 1. Sears Employs Letters of Credit in the Ordinary Course of Operating its Business

29. As shown in Table 1 above, Sears maintained certain lending facilities under which it had the

ability to issue L/Cs. Prior to the Filing Date, financial institutions had issued L/Cs on Sears'

behalf under the Pre-Petition ABL Facility (the "Pre-Petition ABL Facility"), as well as under

a separate Stand-Alone L/C Facility (the "Stand Alone L/C Facility").[24] As of the Filing Date,

---

[23]   *Id.* at 20.

[24]   Disclosure Statement for Second Amended Joint Chapter 11 Plan, at 27-29, May 28, 2019.

there were $123.8 million in L/Cs issued under the Pre-Petition ABL Facility and $271.1 million outstanding under the Stand-Alone L/C Facility.[25]

30.    The Debtors seek to treat the full amount of the L/Cs as funded debt, which if correct would reduce the amount of 2L Debt Collateral Value as of the Filing Date. I do not agree that it is appropriate to treat the L/Cs as though they were funded debt for the reasons stated below.

31.    An L/C is written in favor of a counterparty to support a payment or performance obligation.[26] For instance, an L/C issued in conjunction with merchandise imports might be written in favor of an overseas supplier. In this context, an L/C represents an obligation of an L/C issuer (typically, a bank) to pay an amount to a supplier should the buyer fail to perform on its payment obligations. While outstanding, the L/Cs are not funded debt. Rather, an L/C represents a contingent obligation.

32.    L/Cs can be issued in conjunction with insurance, utilities, surety bonds, and for worker's compensation insurance policies to support a company's obligation to pay under various contingencies.[27] In Sears' case, as of the Filing Date, L/Cs were primarily used to guarantee the company's performance relating to certain contingent obligations it might incur, mostly relating to workers' compensation claims that could be brought under the laws of various states.[28]

33.    A breakdown of the Debtors' L/Cs that were issued under both the Stand-Alone L/C Facility and Pre-Petition ABL Facility and outstanding as of the Filing Date appears below in Table 2:

---

[25]    Riecker Declaration at 20, Oct. 15, 2018. The sum of these numbers is $394.9 million, which is slightly different than the $███████ in L/Cs outstanding in the detailed breakdown included in Table 2.

[26]    *Letters of Credit*, EXPORT.GOV (Oct. 10, 2016), https://www.export.gov/article/id=Letters-of-Credit-and-Documentary-Collection (last visited Jun.10, 2019).

[27]    Disclosure Statement for Second Amended Joint Chapter 11 Plan, at 28.

[28]    *Id.* at 28.

12

**Table 2: Debtors' L/Cs by Category as of the Filing Date** [29]

| Category | No of LCs | Balance as of 10/15/2018 | Percentage |
|---|---|---|---|
| ███████ | ███████ | ███████ | ███████ |

34.  As Table 2 illustrates, ████████████████████████████████████████ ████████████████████████████████████████████ Instead, the L/Cs related to workers' compensation, other insurance policies, surety bonds, and utility payments.[30]

35.  Sears insured against potential claims for workers' compensation in a variety of ways depending on the state in which Sears or Kmart was operating. A majority of the states in which Sears and Kmart operated permitted these types of claims to be covered under a commercial insurance policy. This policy was provided by Ace American Insurance Company ("Ace").[31] Other states required that insurance be purchased directly from the state. In some states, Sears also self-insured.[32]

36.  Were the Debtors to liquidate, the need for the underlying workers' compensation would cease and there would only be residual claims that would relate to the period of liquidation. In addition, the need for other forms of insurance and surety bonds would cease. Therefore, these L/Cs would not be funded.

---

[29]  Excel Spreadsheet of LC Summary, Oct. 15, 2018, Bates No. CYRUS_507B_00000004

[30]  According to the Debtors' filings, of the $395 million in total L/Cs outstanding as of the Filing Date, $225 million are in support of worker's compensation. Motion to Modify Stay With Respect to the Workers' Compensation Programs, at ¶ 21, Oct. 15, 2018, Docket No. 17.

[31]  *Id.* at ¶ 19.

[32]  *Id.* at ¶ 20.

37.



**Table 3: Breakdown of "Other" Category L/Cs as of the Filing Date** [33]

| No Beneficiary | End Balance As of 10/15/2018 | Description / Comments |
|---|---|---|
| | | |
| Total | | |

38. Over the course of the Debtors' bankruptcy, ███████ in L/Cs were actually drawn out of the total L/Cs of ███████ shown in Table 2, or ███ of the total. Table 4 below shows that the highest amount of L/Cs drawn in any particular month was approximately ███████ with other months as low as ███████ Given the level of L/C draws that the Debtors actually experienced, it cannot be considered anything more than ordinary course of business activity.

---

[33] Excel Spreadsheet of LC summary, Oct. 15, 2018, CYRUS_507B_00000004.

14

**Table 4: L/Cs - Amount Drawn by Month after the Filing Date** [34]



| Month | L/Cs amount drawn |
|-------|-------------------|
| Total | $ |

39. The availability of the L/Cs was necessary for Sears to conduct business and to have proper coverage for potential workers' compensation claims and other contingencies. However, the full face amount of the L/Cs written did not represent funded debt as of the Filing Date. [35]

40. Sears did not include the L/Cs in outstanding funded debt in their public financial statements. [36] In addition, Sears did not include any amounts outstanding under the Stand-Alone L/C Facility and L/Cs issued under the Pre-Petition ABL Facility in the Liabilities Subject to Compromise disclosed in the company's public filings. [37] In the May 28 Disclosure Statement, the Debtors referred to the L/C exposure as a liability up to the amount of the L/Cs, rather than a fixed amount of liability. [38]

41. For all of these reasons, my analysis of the 2L Debt 507(b) Claim does not include the amount of L/Cs written under the Stand-Alone L/C Facility or the Pre-Petition ABL Facility as indebtedness. These L/Cs did not represent funded debt, or an actual claim against the collateral as of the Filing Date.

---

[34]    Excel Spreadsheet LC Draws, 6.16, CYRUS_507B_00000003.

[35]    The Debtor described the L/Cs issued under the Standby L/C Agreement as follows: "The letters of credit issued under the Stand-Alone L/C Facility were posted to guarantee certain workers' compensation insurance policies and other obligations." As guarantees, these L/Cs did not represent funded debt. Disclosure Statement for Second Amended Joint Chapter 11 Plan, at 28.

[36]    *See* Sears Holdings Corp., Annual Report (Form 10-K) 47, 48, 50, 83, 85, and 86 (Feb. 3, 2018).

[37]    *See* Sears Holdings Corp., Quarterly Report (Form 10-Q) 19–20 (Nov. 3, 2018).

[38]    Disclosure Statement for Second Amended Joint Chapter 11 Plan, at 15.

## 2. Sears Uses Asset-Based Lending Arrangements

42. A considerable amount of Sears' indebtedness consisted of asset-based lending, in which lenders extended credit on a secured basis against a borrowing base of inventory and receivables. In Sears' case, aside from cash, these categories of assets were considered Sears' most liquid assets, and the most easily converted to cash in a short period of time.[39] The 2L Debt was an asset-based loan secured by, among other things, inventory and receivables.[40]

43. An asset-based loan (an "ABL Loan") relies on maintaining a relationship between (i) the value that can be achieved out of the collateral by the secured lender in a situation where the borrower becomes distressed and (ii) the outstanding amount of the loan. That is why ABL Loans made against inventory and receivables are typically made at advance rates that provide for the extension of credit at a discount to the cost of inventory and face amount of receivables. The discount is meant to provide the lender with a value cushion to guard against the risk of losing money on the loan.[41]

44. If a reasonable asset-based lender actually believed that a sale of the collateral backing a loan would not be sufficient to pay off the loan, the lender would not likely underwrite the loan, because it would undermine the very purpose of making an ABL Loan in the first place—to ensure that there is adequate collateral coverage to protect the lender in a downside scenario.[42] The ABL Lender relies on an ability to exit the loan based on realizing the value of the collateral, even in the event of the borrower's insolvency.[43] In fact, ABL Loans in general

---

[39] Riecker Declaration ¶ 8, Nov. 23, 2018, Docket No. 866.

[40] Second Lien Credit Agreement, at 15–16, Sept. 1, 2016.

[41] By contrast, cash flow lending is based on a borrower's expected future cash flows over the life of a loan. Debt capacity can be assessed by evaluating coverage ratios that measure the relationship between cash flows and debt levels, such as a net debt/earnings before interest, taxes, depreciation, and amortization ("EBITDA") ratio, or an EBITDA/Interest ratio. These ratios are closely monitored over the course of a cash flow based loan because the operations and profitability of the borrower, rather than the assets, are the basis for the source of repayment for the loan.

[42] Commercial Finance Association, CFA Education ABL Step 1: An Introduction at 4, 7 and 15.

[43] *Id.* at 15.

16

have lower loss given default rates ("LGD Rates") during periods of economic stress.[44] As a result, lenders are not required to allocate as much of their capital to ABL Loans as they are required to do in relation to other lending arrangements. The lower LGD Rates are precisely because the lender can rely on the value of the collateral both before the loan is made and on the continued monitoring and valuation of the collateral over the life of the financing.[45]

45.    Consistent with the above, the 2L Debt principal amount outstanding was intended to maintain a relationship to the value of Sears' inventory and receivables. If Sears' total 1L Debt and 2L Debt exceeded an amount equal to 90% of receivables and 75% of inventory for two consecutive quarters, then Sears was required to pay down the 2L Debt to restore the relationship to the required level.[46]

46.    The Debtors' inventory was subject to regular appraisal by Tiger, at the direction of Bank of America Merrill Lynch ("BAML"), acting in its capacity as administrative agent and co-collateral agent for the Pre-Petition ABL Facility (and later for the debtor-in-possession financing facility (the "ABL DIP Facility")).[47] Tiger and its affiliated companies provide

---

[44]    *Id.* at 10.

[45]    *Id.* at 10.

[46]    Second Lien Credit Agreement at 15-16, Sept. 1, 2016.

[47]    Third Amended and Restated Credit Agreement at 77, July 21, 2015; Notice of Filing of Superpriority Senior Secured Debtor-In-Possession Asset-Based Credit Agreement at 110, Nov. 15, 2018, Docket No. 744. Tiger issued at least four inventory appraisals (collectively, the "Tiger Inventory Appraisals") between September 2018 and February 2019. *See* Tiger Inventory Appraisal, Sept. 28, 2018, SEARS 507B 00001287; Tiger Inventory Appraisal, Nov. 16, 2018, SEARS 507B 00001345; Tiger Inventory Appraisal, Dec. 14, 2018, SEARS 507B 00001151; and Tiger Inventory Appraisal, Feb. 4, 2019, SEARS 507B 00001213.

appraisal and liquidation services to retail, wholesale, and industrial companies.[48] The Tiger Inventory Appraisals were used ███████████████████████████ [49]

## B. Management's Outlook for Sears as of the Filing Date

47.   As of the Filing Date, the Debtors' stated objective was to preserve Sears as a going concern, based on a viable, smaller store footprint. Sears management intended to pursue a three-pronged plan to i) sell over 400 stores as a going concern, ii) conduct GOB Sales at a minimum of 142 stores, and iii) sell certain non-core assets, including intellectual property and certain specialty businesses.[50] The Debtors maintained that approximately 400 of the company's 687 stores were "four-wall EBITDA positive."[51] Additionally, management indicated that, in conducting the GOB Sales, the Debtors would be able to take advantage of the upcoming holiday season, given that the filing had occurred on October 15, a time when inventories were at peak levels in anticipation of the holiday season, traditionally the period of Sears' highest monthly sales volumes.[52]

48.   In October 2018, the Debtors retained Mr. Meghji to serve as the CRO of Sears. With the assistance of Sears management, Mr. Meghji constructed a business plan for Sears that he stated demonstrated that the company "had a reasonable probability of operating as a going

---

[48]  *See About Us*, TIGER, https://www.tigergroup.com/about-us/ (last visited Jun. 3, 2019); *Tiger Valuation Services LLC*, LINKEDIN, https://www.linkedin.com/company/tiger-valuation-services-llc/about/ (last visited Jun. 3, 2019).

[49]  Project Blue Rolling Cash Flow Budget (Week 15) at 7, January 30, 2019, Bates No. CYRUS_507B_00000012; Tiger Inventory Appraisal at Exhibit A-1, September 28, 2018, SEARS 507B 00001287.

[50]  Riecker Declaration ¶ 15, Oct. 15, 2018.

[51]  Riecker Declaration ¶ 15, Oct. 15, 2018; Disclosure Statement for Second Amended Joint Chapter 11 Plan, at 14.

[52]  Riecker Declaration ¶ 15, Oct. 15, 2018; Tiger Inventory Appraisal at Exhibit D-2 and D-2a–c, Nov. 16, 2018, Bates No. SEARS 507B 00001398–1401.

concern upon emerging from Chapter 11 bankruptcy."[53] Originally, the business plan had envisioned a go-forward store footprint of 505 stores. However, Mr. Meghji and Sear's Chief Financial Officer, Mr. Riecker, subsequently concluded that the footprint should be reduced to 425 stores.[54]

## C. Sears Obtains Debtor-In-Possession Financing and Grants Adequate Protection to the 2L Debt

49. In order to ensure adequate liquidity to effectuate the three-pronged plan, on the Filing Date, the Debtors sought and received approval for the DIP ABL Facility.[55] To effectuate the DIP ABL Facility, the Pre-Petition ABL Facility (other than the FILO Facility and the Stand-Alone L/C Facility) rolled the pre-petition exposure under those facilities into the DIP ABL Facility, and provided Debtors an incremental $300 million in liquidity.[56]

50. The Debtors' motion seeking approval for the DIP ABL Facility also sought adequate protection for the 2L Debt.[57] On November 30, 2018, the Bankruptcy Court entered a final order that, among other things, granted the 2L Adequate Protection against the diminution in value of the 2L Debt Collateral as a result of the Debtors' use, the imposition of the automatic stay, the priming of the 2L Debt, and the imposition of a carve-out for expenses of the bankruptcy (the "Final Adequate Protection Order" and the "Carve Out").[58] The 2L

---

[33] Mohsin Y. Meghji Declaration ¶ 7, Feb. 1, 2019, Docket No. 2336. Mr. Meghji's firm M-III had first been engaged by Sears in the Spring of 2016 to assist with liquidity and treasury planning. Hearing Tr. 28:6-11, Feb. 6, 2019. Mr. Meghji also sat on the board of ToysRUs. *Id.* at 65:10-19.

[54] Meghji Declaration ¶ 23 and ¶40, Feb. 1, 2019; Robert A. Riecker Declaration ¶ 28 and ¶ 29, Feb. 1, 2019, Docket No. 2337. ▮▮▮▮▮▮▮▮▮▮
Riecker Dep. 12:25-13:08, Jan 25, 2019. Mr. Riecker became CFO of Sears in 2017, and had worked at Sears since 2005. Hearing Transcript 136:08–14, Feb. 6, 2019. Mr. Riecker also serves in the Debtor's Office of the CEO. Riecker Declaration ¶ 2, Feb. 1, 2019.

[55] Debtors' Motion for Authority to Obtain Postpetition Financing, at 13, Oct. 15, 2018, Docket No. 7.

[56] Disclosure Statement for Second Amended Joint Chapter 11 Plan, at 46.

[57] Debtors' Motion for Authority to Obtain Postpetition Financing, at 4.

[58] Final Order Authorizing the Debtors to Obtain Post-Petition Financing, at 49, Nov. 30, 2018, Docket No. 955.

Adequate Protection consisted primarily of additional liens on prepetition encumbered collateral and certain prepetition unencumbered collateral, all subject to priority claims of other parties in interest against that same collateral (the "2L Adequate Protection Liens").[59]

51. Wilmington Trust served as the collateral agent for the 2L Debt.[60] During the bankruptcy, the Debtors agreed to pay up to $250,000 of Wilmington Trust's outside legal fees.[61]

52. On December 28, 2018, Sears also obtained approval for a Junior DIP Facility of $350 million to provide additional liquidity, for which Cyrus was the lender.[62]

## D. The Debtors Undertake a Sales Process, Receive Liquidation Bids and Analyses, and Enter into a Sales Transaction

53. The Debtors commenced a sales process to effectuate its plan to maintain Sears as a going concern. On November 1, 2018, the Debtors filed a Motion for Approval of Global Bidding Procedures.[63] On November 19, 2018, the Court entered the Order Approving Global Bidding Procedures and Granting Related Relief.[64] On November 21, 2018, the Debtors filed a form of a Global Bidding Procedures Process Letter, inviting interested parties to submit non-binding indications of interest for part or all of Sears.[65] The bids sought were for a 505 store footprint (178 stores less than the number of stores as of the Filing Date), referred to as "Retail Newco,"

---

[59] *Id.* at 42–45.

[60] Second Amended and Restated Intercreditor Agreement, at 1, Mar. 20, 2018.

[61] Hearing Transcript 22:06-13, Nov. 27, 2018. Wilmington Trust also served as the Indenture Trustee for 6 5/8% Senior Secured Notes due 2018. *Id.* at 58:10-13.

[62] Final Order Approving Junior DIP, at 2, Dec. 28, 2018, Docket No. 1436.

[63] Notice of Hearing on Debtors' Motion for Approval of Global Bidding Procedures, Nov. 1, 2018, Docket No. 429.

[64] Order Approving Global Bidding Procedures and Granting Related Relief, Nov. 19, 2018, Docket No. 816.

[65] Notice of Filing of Global Bidding Procedures Process Letter, at 5, Nov. 21, 2018, Docket No. 862. The Debtor would consider bids on both a going concern and liquidation basis.

Sears Home Service with or without PartsDirect, PartsDirect separately, or any of the underlying assets on a liquidation basis, including for owned real estate and/or leases. Definitive bids were due by December 28, 2018.[66] While the Debtors intended to attempt to sell Sears as a going concern, it also considered an orderly wind-down of the company's operations, including conducting company-wide GOB Sales.[67]

54. As of December 18, 2018, Lazard Frères & Co., LLC ("Lazard"), acting as the Debtors' investment banker, had sent out the Global Bidding Procedures Process Letter to over 70 potential bidders.[68] The Debtors also represented that, as of this date, it was considering both going-concern proposals and global liquidation proposals.[69] By this time, ESL had publicly announced that it had made an indicative bid for the Debtors and intended to maintain Sears' operations as a going concern.[70]

55. As part of the auction, the Restructuring Committee was informed of bids from liquidation agents to conduct GOB Sales.[71] The Debtors referred to this alternative as the "Debtors Organized Wind Down Plan."[72] The Wind Down Plan contemplated a company-run wind down conducted in conjunction with the Debtors' professionals.[73]

56. In December 2018, Abacus Advisors Group L.L.C. ("Abacus"), a firm that had previously assisted Sears with pre-petition store closings and that was engaged to assist with GOB Sales post-petition, provided the Debtors with a Preliminary NOLV ("NOLV")[74] analysis that

---

[66] *Id.* at 7.

[67] William L. Transier Declaration, ¶ 11, ¶ 15, Feb. 1, 2019, Docket No. 2341.

[68] Hearing Transcript 9:05-11, Dec. 18, 2018.

[69] *Id.* at 16:01-22.

[70] *Id.* at 22:04-10, 25:19-26:01.

[71] Transier Declaration, ¶ 19.

[72] Sunny Singh Declaration Ex. B 30, Feb. 1, 2019, Docket No. 2344.

[73] *Id.* at 31.

[74] NOLV is a term applied when valuing inventory that refers to the net orderly liquidation value of inventory after the deduction of expenses. *Retail Appraisals*, TIGER CAPITAL GROUP,



assumed a company-wide

57.     Over the course of the sale process, the Debtors received a total of seven bids for "inventory or going-concern businesses."[77] Five of these bids were to purchase a business and two were from parties who "proposed to serve as liquidation agent (i.e., an equity bid) to the Debtors." In addition to these seven bids, there were four advisory proposals to work with the Debtors to liquidate store inventory.[78]

58.     While the Debtors considered pivoting to a liquidation given what they viewed as deficiencies with ESL's bid,[79] it was ultimately enhanced and the Debtors entered into a sales transaction

---

https://www.tigergroup.com/services/appraisals/retail-appraisals/ (last visited Jun. 18, 2019). NOLV is specifically defined in the ABL DIP Loan governing documents as follows: ""**Net Orderly Liquidation Value**" means the product of (x) clause (i) of Net Recovery Rate and (y) the Net Eligible Inventory." Under the governing documents for the ABL DIP Facility, the Net Recovery Rate was to be based on the Tiger Inventory Appraisals. Superpriority Senior Secured Debtor-In-Possession Asset-Based Credit Agreement at 41, Nov. 30, 2018, Docket No. 955-1; and related definitions.

[75]    Abacus Advisors, Indication of Interest Letter 3, Dec. 15, 2018, Bates No. SEARS_507B_00000128. Information about Abacus is incorporated in Motion of Debtors for Approval of (I) procedures for Store Closing Sales and (II) Assumption of Liquidation Consulting Agreement, Oct. 15, 2018, Docket No. 23.

[76]    Abacus Advisors, Summary of Total Estimated Net Recovery Values on Retail Store GOB Inventory, Dec. 15, 2018, Bates No. SEARS_507B_00000131.

        Minutes of the Meeting of the Restructuring Committee of the Board of Directors of Sears Holdings Corp. 2, Dec. 17, 2018, Bates No. SEARS_UCC00413767.

[77]    Excluding bids for certain real estate. Brandon Aebersold Declaration ¶ 21, Feb. 1, 2019, Docket No. 2335.

[78]    *Id.*

[79]    Transier Declaration ¶ 22.

with Transform, a newly-formed entity controlled by ESL. The transform sale closed on February 11, 2019 (the "Transform Sale"). The assets acquired by Transform included: [80]

a) A go-forward retail footprint of approximately 425 retail stores under the "Sears" and "Kmart" brands (the "Retail Stores") and certain other owned and leased real estate interests;

b) All "Acquired Inventory," all "Acquired Receivables," all "Acquired Equipment," all "Acquired Improvements," and the right to receive certain "Pending Inventory";

c) Cash held at the Retail Stores in an amount not to exceed $17 million;

d) Any proceeds from the sale or other disposition of the collateral pledged to secure the applicable debt obligations with respect to certain credit bids; and

e) Certain bank accounts

## E.  The Mechanism of the Credit Bid

59.  The currency used to pay for the Transform Sale included secured debt that was Credit Bid, including a certain amount of the 2L Debt.[81] In the Credit Bid, ESL, in its capacity as the majority 2L Debt lender, applied $433.5 million in face amount of the 2L Debt towards the purchase price paid. As a result, the claim associated with that $433.5 million face amount of 2L Debt was deemed satisfied.[82]

60.  ESL directed Wilmington Trust, as collateral agent, to Credit Bid the 2L Debt, and the Credit Bid included 2L Debt held by other holders, including Cyrus. [83]

---

[80]   Transier Declaration ¶ 32.

[81]   Asset Purchase Agreement, at 72–73.

[82]   Order Approving the Asset Purchase Agreement Among Sellers and Buyer, at ¶ K, Feb. 8, 2019, Docket No. 2507. Alan J. Carr Declaration at ¶ 31, Feb. 1, 2019, Docket No. 2321.

[83]   Cyrus' consent was not required for the credit bid as ESL, by virtue of the amount of its holdings, was able to direct the trustee to credit bid the 2L Debt claims. *See* Hearing Transcript 117:10–11, Feb. 7, 2019. As a result of the credit bid mechanism, Cyrus became an equity participant in Transform. Hearing Transcript 201:08–17, Feb. 6, 2019.

61. No purchase price allocation was performed by ESL in connection with the Transform Sale.[84]

62. The Transform Sale itself did nothing to enhance the 2L Debt Collateral Value. As part of the sale, all of the then outstanding receivables were transferred.[85] The maximum amount of collateral that could have been left behind with the Debtors was a de minimus amount of inventory (approximately $7 million) that was in excess of the inventory level required to be transferred under the terms of the deal, together with some residual GOB inventory, and the potential right to $14.6 million in Sears' most aged receivables.[86] The Scripts were also transferred to Transform. Post the Transform Sale, the Debtors continued to incur expenses, because there was still activity at the Debtors that needed to occur, including "very significant…transition services, issues relating to executory contracts, cure reconciliation," and have continued to incur other professional fees. [87]

63. For the purposes of my analysis, I have assumed that the 2L Debt received value through the Credit Bid of $433.5 million, equal to the face amount of the Credit Bid.

# V.    Collateral for the Pre-Petition Debt

## A. Collateral for the Pre-Petition ABL Debt

64. The Pre-Petition ABL Facility was secured by a lien on the following categories of assets belonging to the grantors:[88]

- Credit card accounts receivable;

- Pharmacy Receivables;

---

[84]  Hearing Transcript 108:22–109:02, 202:23–203:01, Feb. 6, 2019. As a result, there is no specific record as to what value ESL attributed to the 2L Debt Collateral.

[85]  Hearing Transcript 48:20–49:01, Mar. 21, 2019. A dispute later arose over reserves held by the credit card processing companies, and ultimately the Debtor received credit back for those reserves.

[86]  Hearing Transcript 84:14-20, Apr. 18, 2019.

[87]  Id. at 15:13-18. In addition, the Debtor continued to employ case professionals. Debtors' Monthly Operating Report for April 7–May 4, 2019, at 18, June 14, 2019, Docket No. 4241.

[88]  The grantors were listed in Schedule 1 of the Third Amended and Restated Guarantee and Collateral Agreement, July 21, 2015.

—   All Inventory and documents relating thereto;

—   Chattel Paper relating to credit card and pharmacy receivables above;

—   Instruments relating to credit card and pharmacy receivables above;

—   Prescription Lists;

—   Deposit Accounts;

—   Cash & cash equivalents;

—   All books and records pertaining to the collateral; and

—   All proceeds, insurance claims, supporting obligations and products of any of the above.[89]

## B.   Collateral for the 2L Debt

65.   The 2L Debt was secured by a second lien after the Pre-Petition ABL Facility in the following
categories of assets belonging to the grantors:

—   Credit card accounts receivable;

—   Inventory and related documents;

—   Chattel Paper and other instruments relating to credit card accounts receivable above;

—   Books and records relating to the collateral; and

—   Proceeds, Insurance Claims, Supporting Obligations and Products of any of the above.[90]

66.   For purposes of my analysis, I have assumed that pharmacy receivables and Scripts were part
of the 2L Debt Collateral.[91] That is because the pharmacy inventory was part of the inventory
included in the 2L Debt Collateral and the 2L Debt Collateral also included any proceeds
thereof, as well as any books and records relating to the collateral.  A pharmacy receivable
would be created as a result of selling pharmacy inventory, and the Scripts would be part of
the books and records relating to the collateral.

---

[89]   Third Amended and Restated Guarantee and Collateral Agreement, at 9–10, July 21, 2015.

[90]   Amended and Restated Security Agreement, at 9, Mar. 20, 2018.

[91]   Based on counsel's review of the governing documents for the 2L Debt.

# VI.    Valuation of the 2L Debt Collateral

## A. Measurement Dates for the Valuation of the 2L Debt Collateral

67.    For purposes of this analysis, I have evaluated the diminution in the 2L Debt Collateral Value

between the Filing Date[92] and the Expected Effective Date.

## B.    Valuation Parameters

68.    In the bankruptcy context, and for purposes of determining any 507(b) Claim, value "shall be

determined in light of the purpose of the valuation and of the proposed disposition or use of

such property."[93] In this case, it is appropriate to consider the value of the 2L Debt Collateral

in the hands of the Debtors.[94]

69.    As a result, my conclusion of the minimum 2L Debt Collateral Value as of the Filing Date

reflects what Sears, an insolvent retailer considering an orderly liquidation of its business over

a 3-month period, could likely have achieved in light of the prevailing circumstances. Those

circumstances included the reasonable possibility that the collateral would have been

liquidated through company-wide GOB Sales.

70.    As a result, the values described in this report assume a company-wide GOB Sale. It therefore

follows that the 2L Debt 507(b) Claim that results from this analysis, and Cyrus's share of it,

should be viewed as a minimum. To the extent it was assumed as of the Filing Date that Sears

---

[92]    Memorandum Opinion, and Findings of Fact and Conclusions of Law, After Phase 1 Trial at 62 fn. 29, *In re: Residential Capital, LLC, et al.*, Case No. 12-12020 (Bankr. S.D.N.Y. Nov. 15, 2013), Docket No. 177 ("ResCap") ("In general, courts typically hold that, for purposes of adequate protection, the value of the collateral is to be determined either as of the petition date or as of the date on which the request for adequate protection was made."). In this case, the request for adequate protection was made on the Filing Date and therefore it is appropriate to value the collateral as of the Filing Date.

[93]    Bankruptcy Code Section 506(a)(1).

[94]    *See* Memorandum Opinion, *supra* note 90, at 4 ("Thus in determining the value of the JSN Collateral on the Petition Date, the Court must apply that value based on the proposed disposition of the collateral – fair market value in the hands of the debtors.").

was going to continue as a going concern, it is likely that the Filing Date value of the collateral was higher than in the context of company-wide GOB Sales. That is because the retail value of the inventory ███████████████████████████████████████████████████

████████████ 95

71.    To calculate the 2L Debt 507(b) Claim, I first established the minimum 2L Debt Collateral Value as of the Filing Date. I calculated the minimum 2L Debt Collateral Value as of the Filing Date by first determining the value of all 2L Debt collateral, and then satisfying the principal amount of all funded first lien debt (the "Funded 1L Debt") from that value. The residual amount of collateral value after satisfying the funded 1L Debt represents the 2L Debt Collateral Value.

## C.  Valuation of the 2L Debt Collateral as of the Filing Date

72.    There is a considerable amount of contemporaneous evidence in the record as to the 2L Debt Collateral Value as of the Filing Date, and continuously over the course of the Sears bankruptcy. With respect to the value of the Debtors' inventory, which is the largest component of the 2L Debt Collateral Value, the record contains valuation evidence from two highly sophisticated retail consulting firms involved in the Sears bankruptcy – Tiger and Abacus. These firms have been involved in a large number of high profile retail bankruptcies, in the capacity of liquidating agent and/or appraiser. For instance, Tiger was engaged in ToysRUs (Tiger was part of a joint venture that liquidated inventory in the retailer's remaining 735 stores, announced company-wide store closings in March 2018), Aéropostale, Inc. (Tiger was part of a joint venture that conducted wind down sales for all 41 stores and outlets across Canada, 2016), and Sports Authority (Tiger liquidated inventory at 132 stores

---

95    Tiger Inventory Appraisal at Exhibit A-2, September 28, 2018, SEARS 507B 00001287.

pre-bankruptcy, 2016).[96] According to its website, Abacus has participated in almost every major restructuring of a retailer for the past twenty years, including Filene's Basement (engaged as the Chief Restructuring Officer for the Chapter 11 case, 2009), Penn Traffic Company (advised the Official Creditor's Committee on the sale of substantially all of the regional supermarket company's assets, 2010), and Montgomery Ward (advised on the final wind down, including the disposition of $1.8 billion in retail inventory, 2001).[97]

73.  It is reasonable to rely on work prepared by Tiger and Abacus because i) both firms are recognized specialists in retail, with specific knowledge about collateral values and the process of liquidating inventory collateral, ii) both firms were retained by case parties and involved with Sears during the relevant time period, iii) both firms' work would reflect their experience with other large distressed retailers seeking to liquidate inventory collateral, iv) their work was contemporaneous, and was relied on by the parties, including the Debtors and the lenders,[98] and v) Tiger and Abacus' work was not prepared in the context of a litigation over 507(b) Claims.

---

[96]  *Tiger Capital Group and Great American Group to Support Previously Announced Closure of All 41 Aeropostale Stores in Canada*, TIGER CAPITAL GROUP (May 13, 2016), https://www.tigergroup.com/news/retail-news/tiger-capital-group-and-great-american-group-to-support-previously-announced-closure-of-all-41-aeropostale-stores-in-canada/ (last visited Jun.16, 2019); *Case Study: Sports Authority; Strategic Advisor to PJT Partners, and the Junior Secured Term Lenders*, TIGER CAPITAL GROUP, https://www.tigergroup.com/services/capital-solutions/case-study-sports-authority/ (last visited Jun.16, 2019). I have requested all of the reports and correspondence relating to Tiger and Abacus and to date Debtors have produced four Tiger Inventory Appraisals. I have not received any form of periodic reporting from Abacus. Order Authorizing the Debtors to Wind-Down U.S. Operations, *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. Mar. 22, 2018), Docket No. 2344.

[97]  *Abacus Advisors Pleased with Outcome of Filene's Basement Asset Sale*, ABACUS ADVISORS (July 9, 2009), http://www.abacusadvisor.com/pressreleases/070909.pdf (last visited Jun.14, 2019); *Abacus Advisors Engaged by Penn Traffic Creditors Committee to Advise on Sale of Company Assets*, ABACUS ADVISORS (Jan. 11, 2010), http://www.abacusadvisor.com/pressreleases/011110.pdf (last visited Jun.14, 2019); Retailing Case Histories, Abacus Advisors, http://www.abacusadvisor.com/retail.html#montgomery (last visited Jun.14, 2019).

[98]  The Tiger Inventory Appraisals formed the basis for ███████████████████████████ ██████████████████████████████████████. *See* Sears Holdings Corp., Project Blue Rolling Cash Flow Budget (Week 15) at 7, January 30, 2019, Bates No. CYRUS_507B_00000012; Tiger Inventory Appraisals.

## 1. Sears Inventory

74.  There is a substantial body of evidence in the record as to the value of the inventory as of the Filing Date.[99] After reviewing the evidence and applying my judgment, I conclude that the inventory had a minimum value of $2,195.9 million as of the Filing Date. This reflects ███████████████████████████████████████████████ [100] A detailed analysis of the value of the inventory as of the Filing Date is attached as Appendix C-1.

75.  In assessing the minimum value of the inventory as of the Filing Date, I relied on valuation work performed by Tiger, which is the same valuation work relied on by the Pre-Petition ABL Lenders and the ABL DIP Facility Lenders.

76.  As administrative agent and co-collateral agent for the Pre-Petition ABL Facility and the DIP ABL Facility, BAML engaged Tiger to determine the net recovery value for Sears' inventory in the context of a potential company-wide GOB Sale.[101] In its report dated November 16, 2018, Tiger stated that "████████████████████████████████████

---

[99]   The actual date that was used was October 13, 2018, two days prior to the Filing Date, given the Debtor's financial reporting protocols in which information was reported in seven day increments of which the 13th is the day closest to the Filing Date.

[100]   Sears Holdings Corp., PWP Requests 3-5 Spreadsheet, Lazard Preliminary 507 (b) calculation at Borrowing Base Certificate, October 13, 2018 Bates No. CYRUS_507B_00000001 ████████████████████████████████████████████

Tiger Inventory Appraisal at 2, September 28, 2018, SEARS 507B 00001287. ████████

Tiger Inventory Appraisal at 12, November 16, 2018, SEARS 507B 00001345.

[101]   Third Amended and Restated Credit Agreement, at 94, July 21, 2015; Final Order Authorizing the Debtors to Obtain Post-Petition Financing, Granting Adequate Protection, Modifying the Automatic Stay, and Granting Related Relief, at 2, Nov. 30, 2018, Docket No. 955; Tiger Inventory Appraisal at 1, November 16, 2018 SEARS 507B 00001345.



77.

78.

79.

80.  I applied

To that figure I then added inventory

---

[102]  *Id.* at 1.

[103]  Tiger Inventory Appraisal at 2, Sept. 28, 2018, SEARS 507B 00001287.

Tiger Inventory Appraisal at 1, Nov. 16, 2018, SEARS 507B 00001345.

[104]  Tiger Inventory Appraisal at Exhibit A-2, Sept. 28, 2018, SEARS 507B 00001287.

[105]  Tiger Inventory Appraisal at 6 and Exhibit A-2, Sept. 28, 2018, SEARS 507B 00001287.

[106]  Tiger Inventory Appraisal at 2 and Exhibit F, Sept. 28, 2018, SEARS 507B 00001287.

in-transit, and applied ███████████████████████████████████████
███████████████████████ [107]

81. The resulting concluded value of the inventory as of the Filing Date is ████████████

82. The Tiger Inventory Appraisals should be viewed as conservative. The appraisals were prepared ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [108] This means that Tiger and its affiliate would be taking on risk, which would further incentivize Tiger to be conservative.

83. In addition to Tiger's determination that the inventory projected as of ████████████ would be worth ██████████ there are other indicators of value that I considered. These indicators support the use of a considerably higher value for the Debtors' inventory as of the Filing Date above what I have concluded to be the minimum value of $████████████ These include a declaration from Mr. Riecker, entered into the record on November 23, 2018 (the "November 23 Riecker Declaration"), the Wind Down Analysis, an Advisory Bid Comparison that was presented to the Restructuring Committee of the Board of Directors on January 5, 2019, and a January 11, 2019 presentation prepared by Houlihan Lokey ("Houlihan"), FTI, and Akin Gump Strauss Hauer & Feld ("Akin Gump"), in their capacity as the legal and financial advisors to the unsecured creditors committee (the "UCC" and the "January 11, 2019 UCC Presentation").

---

[107] Tiger Inventory Appraisal at 5, Feb. 4, 2019, SEARS 507B 00001213.

[108] Tiger Inventory Appraisal at 1, November 16, 2018, SEARS_507B_00001345. Tiger Inventory Appraisal at 1, December 14, 2018, SEARS_507B_00001151. Tiger Inventory Appraisal at 1, February 4, 2019, SEARS 507B 00001213.

84. In the November 23 Riecker Declaration, Mr. Riecker stated that, around the Filing Date, the NOLV was equal to $2.74 billion, which is ███████ higher than the minimum Filing Date inventory value I have concluded.[109] In preparing this report, I requested that the Debtors supply supporting documentation for the $2.74 billion figure in the November 23 Riecker Declaration. In response, the Debtors provided a 9-page collection of documents all dated October 17, 2018 showing ████████████████████████████ ██████████ On each of the pages there was ████████████ █████████████████████████████████ The $2.74 billion figure would represent ███████████ which would suggest a view that the inventory was worth ██████████ An analysis of the October 17, 2018 inventory data provided by the Debtors is attached as Appendix C-3.

85. In addition to the November 23, 2018 Riecker Declaration, there are other indicators of value that further support the view that my minimum value conclusions should be viewed as conservative. The January 14, 2019 Wind Down Analysis prepared by Mr. Meghji indicated that the Debtors believed that the NOLV of the inventory at that time was approximately 90%, after taking into account selling costs.[110] These costs included, for example, store operating expenses during liquidation, severance claims, merchandise accounts payable, logistics expenses, and home office support expenses.[111] The Debtors also believed that the

---

[109] Riecker Declaration at ¶8, Nov. 23, 2018.

[110] Sears Holdings Corp., Wind Down Recoveries at 2, Jan. 14, 2019, Bates No. UCC_Sears_0002236. In formulating his view, Mr. Meghji had reviewed "data derived from the 1) going-out-of business ("GOB") sales of approximately 750 Sears stores and their inventory in the past three years; 2) the recent wind-down and full-chain liquidation of Toys 'R Us; (3) bids to purchase components of the Debtors' assets and operations received in connection with the Sale Process; (4) bids to liquidate the Debtors' assets and operations received in connection with the Sale Process; (5) the Company's detailed payroll, benefits, merchandise, tax, and other business records; and (6) guidance and input from Lazard and Weil". It should also be noted that the 90% NOLV presented in the Wind Down Analysis was determined after deducting selling expenses from the proceeds. Meghji Declaration ¶ 13, February 1, 2019, Docket No. 2337.

[111] Meghji Declaration ¶ 17, Feb. 1, 2019.

GOB Sales would take 11 weeks, in line with historical results.[112] The CRO believed these assumptions were reasonable, given the history and present circumstances in which a full chain liquidation was being modelled.[113]

86.  An analysis prepared for the benefit of the Restructuring Committee of the Board of Directors of Sears (the "Restructuring Committee") for presentation on January 5, 2019 also supports the view that my valuation conclusions should be viewed as conservative. This analysis indicated ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
██████████[15]█████████████████████████████████████████████████████

87.  The January 11, 2019 UCC Presentation is entitled Illustrative Recovery Considerations, and compares estimated recoveries for unsecured creditors in a liquidation versus alleged administrative insolvency in connection with the pending ESL bid.[116] In building up the recoveries in a liquidation analysis, the UCC Advisors assumed that 425 of the Debtors' stores would conduct GOB sales with the assistance of Abacus and SB360, and that the Debtors would achieve NOLVs of approximately 90%, with upside.[117]

---

[112]  Sears Holdings Corp., Wind Down Recoveries at 4, Jan. 14, 2019, Bates No. UCC_Sears_0002236.

[113]  Meghji Declaration ¶ 20, Feb. 1, 2019.

[114]  Minutes of the Meeting of the Restructuring Committee of the Board of Directors of Sears Holdings Corp., Jan. 5, 2019, Bates No. SEARS_UCC00413723; Advisory Bid Comparison, Jan. 5, 2019, Bates No. RS_UCC_00002828.

[115]  Advisory Bid Comparison, Jan. 5, 2019, Bates No. RS_UCC_00002828. ███████████████████
█████████████████████████████████████████████████████████████████████████
████████████████ See Minutes of the Meeting of the Restructuring Committee, December 30, 2018, SEARS_UCC00413809-412811; Project Blue—Liquidation Bids Review at 3, 5, and 7, December 2018.

[116]  Illustrative Recovery Considerations at 1-5, Jan. 11, 2019, Bates No. SEARS_UCC00365797-365801.

[117]  *Id.*

88. Considering these various data points together, it is apparent that the Debtors, and professionals working on behalf of the Debtors, the banks, and the UCC all considered the net value of the inventory to be ████████████████████████████ ████████ resulting in my conclusion of the minimum value of the inventory.

89. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

## 2. Cash Balances as of the Filing Date

90. As shown in Appendix C-4, as of the Filing Date, the Debtors' unrestricted cash balance was $123.2 million. For purposes of my analysis, I have assumed that this cash reflects proceeds from the sale of inventory and the collection of receivables. As a result, I have included it in 2L Debt Collateral as of the Filing Date.

## 3. Sears Scripts

91. The Tiger Inventory Appraisals ████████████████████████ [118] Tiger cited ████ ██████████████████████████████ [19] The Debtors have represented that ████████████████████████████ ████ [20]

## 4. Sears Credit Card Receivables

92. Sears credit card receivables were ████████████████████████
████████████████████████████████

---

[118] Tiger Inventory Appraisal at 8, September 28, 2018, Bates No. SEARS_507B_00001287.

[119] *Id.*

[120] Estimated Script Asset Value.xlsx, Bates No, SEARS_507B_00001508



## 5. Sears Pharmacy Receivables

93.   Sears pharmacy receivables were $███████ as of the Filing Date.[121]

## D. Valuation of the 2L Debt Collateral as of the Expected Effective Date

94.   As of the Expected Effective Date, virtually all inventory had been liquidated or written down. I have assumed that no cash will be available to the 2L Debt. The Scripts were also transferred to Transform.  There was a maximum total of $19 million in receivables (either credit card or pharmacy), all of which were 31-60 days past due.[123]

---

[121]   Sears Holdings Corp., PWP Requests 3-5 Spreadsheet, Lazard Preliminary 507 (b) calculation, Bates No. CYRUS_507B_00000001; Id. at Borrowing Base Certificate as of October 13, 2018, Bates No. CYRUS_507B_00000001.

[122]   Sears, Holdings Corp., PWP Requests 3-5 Spreadsheet, Lazard Preliminary 507 (b) calculation, Bates No. CYRUS_507B_00000001.

[123]   $119 million accounts receivable less $100 million receivable relating to the Debtor's dispute with Transform. Debtors' Monthly Operating Reports for April 7–May 4, 2019, at 5 and 20, June 14, 2019, Docket No. 4241.

## VII.    The Value of the 2L Adequate Protection

95.    The maximum potential adequate protection benefit that the 2L Debt received from the 2L
Adequate Protection Liens between the Filing Date and the Transform Sale Date was the
value of i) the remaining GOB Sale inventory that was left behind, in the amount of $62
million, ii) any inventory that was in excess of the amount required to deliver, and iii) any
remaining rights to receivables.[124] However, through the Expected Effective Date, the 2L Debt
has never received any monetary benefit or value, or is it expected to through the Expected
Effective Date.

96.    As additional 2L Adequate Protection, the 2L Debt was entitled to reimbursement for up to
$250,000 in legal fees incurred by Seyfarth Shaw, counsel to Wilmington Trust, the Indenture
Trustee for the 6 5/8% due 2018, and the 2L Debt Collateral Agent, as well as reporting and
information rights equivalent to those granted to the agents of the ABL DIP Facility.[125]

97.    The Adequate Protection Order provided that, to the extent there was a 2L Debt 507(b) Claim,
the claim would have superpriority administrative claim status in the Sears bankruptcy.[126]

98.    I conclude that the total maximum value of the 2L Adequate Protection, including
reimbursement for legal fees, was $250,000, to the extent Wilmington Trust actually incurred
up to $250,000 in legal fees in connection with its role as Collateral Trustee.

## VIII.    Calculation of the 2L Debt 507(b) Claim

99.    Under Section 507(b) of the Bankruptcy Code, and under the Adequate Protection Order, the
2L Debt holders are entitled to a superpriority administrative claim equal to the diminution

---

[124]    Before taking into account the payment of the Collateral Trustee's legal fees.

[125]    The reporting and information rights would not have monetary value sufficient to materially change a
conclusion with respect to the 2L Debt 507(b) Claim.

[126]    Final Order Authorizing Post-Petition Financing and Granting Adequate Protection, at ¶ 18(d), Nov.
30, 2018, Docket No. 955.

in value of the 2L Debt Collateral less the value of any 2L Adequate Protection received by the 2L Debt holders.[127]

100. Calculations of the 2L Debt 507(b) Claim appear in Appendix C-1 and Appendix C-2. Appendix C-1 is an analysis of the minimum 2L Debt 507(b) Claim, and Appendix C-2 is an analysis that applies the Debtors' own, higher valuation for the inventory as of the Filing Date. As shown, between the Filing Date and the Expected Effective Date, the 2L Debt 507(b) Claim is in a range of $491.6 million to $1,035.8 million, with a midpoint of $763.7 million. The Cyrus 2L Debt 507(b) Claim as of the Expected Effective Date is in a range of $78.9 million to $166.1 million, with a midpoint of $122.5 million.[128]

101. A summary of the minimum 2L Debt 507(b) Claim calculation appears below in Table 5:

---

[127] Final Order Authorizing Post-Petition Financing and Granting Adequate Protection, at 29 and ¶ 17-19, Nov. 30, 2018, Docket No. 955.

[128] To the extent that the calculated claim amounts are in excess of the Cyrus 2L Debt holding, the Cyrus 2L Debt 507(b) Claim would be capped at $100.9 million.

## Table 5: Minimum 2L Debt 507(b) Claim Summary

| Capital Structure | | |
|---|---|---|
| ($ in millions) | Filing Date | Expected Effective Date |
| Total 1L Funded Debt | 1,531.8 | – |
| Total 2L Debt (excluding Second Lien Notes due 21 | 1,062.5 | 629.1 |
| Cyrus 2L Debt | | 100.9 |
| Cyrus 2L Debt % | | 16.0% |

| 2L Debt 507(b) Claim Waterfall Calculation | | | |
|---|---|---|---|
| | Filing Date | Expected Effective Date | Diminution in Value |
| 1L and 2L Shared Collateral | | | |
| Inventory Value | 2,195.9 | – | 2,195.9 |
| Cash | 123.2 | – | 123.2 |
| Scripts | | - | |
| Credit Card Receivables | | – | |
| Pharmacy Receivables | | – | |
| Total 1L and 2L Shared Collateral Value | 2,457.1 | – | 2,457.1 |
| Less: Total 1L Funded Debt | (1,531.8) | – | |
| 2L Debt Collateral Value | 925.3 | – | 925.3 |
| Less: Credit Bid | (433.5) | | |
| Credit Bid Adjusted 2L Debt Collateral Value | 491.9 | - | 491.9 |
| Less: Value of 2L Adequate Protection | | | (0.3) |
| 2L Debt 507(b) Claim | | | 491.6 |
| Cyrus 2L Debt 507(b) Claim | | | 78.9 |

Sources: see Appendix C1 – Minimum 507(b) Claim Calculation

102. A summary of the 2L Debt 507(b) Claim calculation based on the Debtors' own inventory valuation appears below in Table 6:

#### Table 6: 2L Debt 507(b) Claim Summary Based on Debtors' Inventory Valuation

| Capital Structure | | |
|---|---|---|
| ($ in millions) | Filing Date | Expected Effective Date |
| Total 1L Funded Debt | 1,531.8 | - |
| Total 2L Debt (excluding Second Lien Notes due | 1,062.5 | 629.1 |
| Cyrus 2L Debt | | 100.9 |
| Cyrus 2L Debt % | | 16.0% |

| 2L Debt 507(b) Claim Waterfall Calculation | | | |
|---|---|---|---|
| | Filing Date | Expected Effective Date | Diminution in Value |
| 1L and 2L Shared Collateral | | | |
| Inventory Value | 2,740.0 | – | 2,740.0 |
| Cash | 123.2 | – | 123.2 |
| Scripts | ■ | – | ■ |
| Credit Card Receivables | ■ | – | ■ |
| Pharmacy Receivables | ■ | – | ■ |
| Total 1L and 2L Shared Collateral Value | 3,001.3 | – | 3,001.3 |
| Less: Total 1L Funded Debt | (1,531.8) | – | |
| 2L Debt Collateral Value | 1,469.5 | – | 1,469.5 |
| Less: Credit Bid | (433.5) | | |
| Credit Bid Adjusted 2L Debt Collateral Value | 1,036.0 | – | 1,036.0 |
| Less: Value of 2L Adequate Protection | | | (0.3) |
| 2L Debt 507(b) Claim | | | 1,035.8 |
| Cyrus 2L Debt 507(b) Claim | | | 166.1 |

Sources: see Appendix C2 – 507(b) Claim Calculation Based on Debtors' Inventory Valuation

103. Over the course of the bankruptcy, the Debtors had performed its own analysis of the 2L Debt 507(b) Claims. The Wind Down Analysis prepared by the Debtors, which was submitted by Debtors' counsel and formed part of the auction record, contemplated that, in an orderly wind down scenario, the 2L Debt would have a 507(b) claim of $331 million as of January 5, 2019.[129] In arriving at this determination, among other things, the Debtors considered bids that had been received from liquidators in connection with a potential orderly wind down.[130]

---

[129] Sears Holdings Corp., Wind Down Recoveries at 7, Jan. 14, 2019, Bates No. UCC_Sears_0002236.

[130] Meghji Declaration at ¶13, Feb. 1, 2019.

Underlying the Wind Down Analysis was the assumption that the Debtors could achieve a recovery of 90% of cost for company-wide inventory, net of all selling costs, which could be achieved in 11 weeks.[131] The Debtors' $331 million 507(b) calculation would need to be updated for further diminution in value since the time the analysis was performed in January, which would increase the $331 million claim through the Expected Effective Date and thereafter even further.

## IX.  Surcharge

104. The Debtors have taken the extreme position that the 2L Debt 507(b) Claim should be reduced to reflect a 506(c) surcharge that the Debtors and their advisor M-III now contend should be $1.451 billion, which they believe should be charged to reflect the Debtors' costs in achieving value for the collateral.[132] The practical effect of applying the Debtors' theory would be to eliminate any 2L Debt 507(b) Claim that might otherwise exist. The proposed surcharge would also equal approximately 62% of the $2.457 billion concluded noncash total value of the 2L Debt Collateral as of the Filing Date available for both the 1L Debt and the 2L Debt. In my opinion, the Debtors' position on the surcharge is not well founded, nor is it supported by the evidence in this matter, for the following reasons:

105. First, the Debtors' position is inconsistent with the economics of asset-based lending. One of the main reasons lenders extend asset-based loans against current assets, as opposed to lending against a company's cash flow, is to manage downside risk. If an asset-based lender extending credit against a company's most liquid non-cash assets thought that a borrower had a legitimate basis in a bankruptcy to claim that the value of its inventory and receivables should effectively be reduced by 62% through a 506(c) surcharge, then the asset-based lender would be highly disincentivized to extend credit on this basis.

---

[131]  Sears Holdings Corp., Wind Down Recoveries at 4, Jan. 14, 2019, Bates No. UCC_Sears_0002236.

[132]  Debtors' Motion To Estimate Certain 507(b) Claims for Reserve Purposes at ¶ 44; Brian J. Griffith Declaration at Ex. A, May 26, 2019.

106. Second, the Debtors' position is inconsistent with the contemporaneous valuation evidence
discussed throughout this Report.



[134] By contrast, the Debtors now imply that, due to the surcharge purportedly required, the lenders would only recover 38% of the value of the inventory—a conclusion that appears to lack a solid basis.[135]

107. The $925.3 million minimum 2L Debt Collateral Value as of the Filing Date reflects, and is net of, all the expenses that would have reasonably been incurred to liquidate the collateral through company-wide orderly GOB Sales over a three-month period.[136] As a result, I see no basis for assessing any additional surcharge to reflect the reasonable and necessary costs to preserve or enhance the value of the collateral for the benefit of the 2L Debt holders because

[137]

---

[133] Letter from Abacus Advisors to Mohsin Y. Meghji and Colin M. Adams with attached Sears Holdings Corporation Total Company Summary of Total Estimated Net Recovery Values on Retail Stores GOB Inventory, Draft – Subject to Further Refinement, at 131, Dec. 15, 2018, Bates No. SEARS_507B_00000128.

[134] Sears Holdings Corp. Total Company Summary of Total Estimated Net Recovery Values on Retail Stores GOB Inventory, Draft – Subject to Further Refinement, Dec. 15, 2018, Bates No. SEARS_507B_00000131.

[135]

[136] For reference to an orderly wind down, see Transier Declaration ¶ 11 and ¶ 15, Feb. 1, 2019 and Aebersold Declaration at ¶ 11, Feb. 1, 2019. For three month time-frame, see Tiger Appraisal Report at 9 – Estimated Sale Term by Banner, Nov. 16, 2018, Bates No. SEARS 507B 00001345; Sears Holdings Corp., Wind Down Recoveries, at 4, Jan. 14, 2019, Bates No. UCC_Sears_0002236.

[137] See Tiger Inventory Appraisal at 6, Sept. 28, 2018, Bates No. SEARS 507B 00001287. Tiger Inventory Appraisal at 9, Nov. 16, 2018, Bates No. SEARS 507B 00001345. Tiger Inventory Appraisal at 9, Dec. 14, 2018, Bates No. SEARS 507B 00001151. Tiger Inventory Appraisal at 10, Feb. 4, 2019, Bates No. SEARS

108. Finally, the record shows that the Debtors' current position on the 506(c) surcharge represents a sea change from their earlier position. In the context of preparing the Wind Down Analysis, the Debtors and the Debtors' CRO Mr. Mr. Meghji assumed "the imposition of a 4% charge on encumbered assets sold throughout the case . . . ."[138] This surcharge was described as part of what would permit the Debtors to continue to fund their case.[139]

is in stark contrast to, and calls into question, the Debtors' current position of a 62% surcharge against the total 1L and 2L Debt Collateral Value as of the Filing Date.

109. I understand that the standard for assessing a surcharge under 506(c) is that any surcharge should reflect the reasonable, necessary costs of preserving the value of the collateral for the primary and direct benefit of the lender.[141] While the $1.451 billion in costs detailed by the Debtors in their filings may have been a practical necessity in order to permit Sears to achieve a worthy objective – maintaining the business through a sales process that would, among other positive attributes, ultimately preserve jobs – these expenditures were not necessary to achieve the collateral values discussed in this report.

---

507B 00001213. *See also* Project Blue — Liquidation Sale Process Update at 7, Dec. 2018, Bates No. SEARS_507B_00000095.

[138] Meghji Declaration ¶ 16, Feb. 1, 2019; Sears Holdings Corp., Wind Down Recoveries, at 2, Jan. 14, 2019, Bates No. UCC_Sears_0002236. The 4% suggested surcharge did not apply to the first lien and prepetition ABL collateral and Junior DIP collateral, due to Section 506(c) waivers granted to these lenders in their capacity as DIP lenders.

[139] Sears Holdings Corp., Wind Down Recoveries, at 2, January 14, 2019, Bates No. UCC_Sears_0002236.

[140] Meghji Deposition at 280:18-282:08 and 287:17-288:04, Jan. 29, 2019.

[141] *See* Bankruptcy Code 506(c) which reads: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."

# X.    Conclusion

110. On May 28, 2019, the Debtors filed the Second Amended Joint Chapter 11 Plan and disclosure statement (the "Second Amended Plan" and the "May 28 Disclosure Statement"). Under the Second Amended Plan, any Cyrus 507(b) Claim would fall under the category of "Other 507(b) Priority Claims."[142]

111. Under the Amended Plan, Other 507(b) Priority Claims are to be paid in full in cash from the "Net Proceeds of Total Assets" on the latest of 1) the effective date of the plan, 2) 30 days after it became an Other 507(b) Priority Claim, or 3) the next distribution date after it is allowed.[143]

112. Other 507(b) Priority Claims are entitled to superpriority administrative expense priority status, other than with respect to fee claims. Other 507(b) Priority Claims are not entitled to any cash remaining in the Wind Down Account.[144]

113. Based on my analysis, the 2L Debt 507(b) Claim is in a range of $491.6 million to $1,035.8 million, with a midpoint of $763.7 million. The Cyrus 2L Debt 507(b) Claim as of the Expected Effective Date is in a range of $78.9 million to $166.1 million, with a midpoint of $122.5 million.[145] These claims are entitled to superpriority administrative expense priority status, subject to the limitations described above and in the Second Amended Plan.

---

[142]  Second Amended Joint Chapter 11 Plan of Sears Holding Corporation and its Affiliated Debtors, at 24, May 28, 2019, Docket No. 4041.

[143]  *Id.*

[144]  *Id.*

[145]  To the extent that the calculated claim amounts are in excess of the Cyrus 2L Debt holding, the Cyrus 2L Debt 507(b) Claim would be capped at $100.9 million.

114. For the reasons stated, there is no legitimate basis to assess any surcharge on the value of the collateral available to the 2L Debt as of the Filing Date.

Dated: New York, New York
       June 18, 2019

_____

Marti P. Murray

# XI.    Appendices

# Appendix A – Expert CV of Marti P. Murray

**MARTI P. MURRAY**
Principal

New York, NY                    +1.212.789.3650                    Marti.Murray@brattle.com

Marti P. Murray is a principal of The Brattle Group, with subject matter expertise in corporate financial distress and restructuring, securities trading, business and securities valuation, solvency, fraud (including Ponzi schemes), and industry custom and practice in the alternative investment management industry. She has had a 35+ year career in the financial services industry, including leadership roles at both alternative investment management firms and business restructuring financial advisory firms. She has also served on numerous boards of directors and has acted as a court-appointed SEC Receiver for an investment adviser accused of fraud.

Earlier in her career, Ms. Murray was the founder, president, and portfolio manager of Murray Capital Management, Inc, an SEC-registered distressed debt hedge fund firm which she ran from 1995-2008. The distressed debt business of Murray Capital was acquired by Babson Capital in April 2008.

Ms. Murray served as an adjunct professor at the NYU Stern School of Business from 2001-2013, teaching courses in bankruptcy, distressed debt investing, and equity analysis/valuation. While at NYU Stern she was the recipient of awards for excellence in teaching, including the Teacher of the Year Prize. Ms. Murray has written for numerous publications, and was a contributing author to Managing Hedge Fund Risk: From the Practitioner's Perspective, edited by Virginia Reynolds Parker, published in 2001.

Ms. Murray holds the Certified Valuation Analyst credential (CVA), awarded by the National Association of Certified Valuators and Analysts (NACVA). She also serves as the Vice-Chair of the Academic Relations Committee of the Turnaround Management Association and is a full member of the National Association of Federal Equity Receivers (NAFER).

## TESTIMONY

- SPCP Group, LLC v. UBS AG – Litigation over a failed trade of distressed bank debt. Provided expert report and deposition testimony. Issues included industry custom and practice in the distressed debt trading market and analysis of mitigation strategies, including damages calculations. (August 2010)
- In re SW Boston Hotel Venture LLC, et.al. – Litigation over plan feasibility, solvency, financial projections, claim amount, diminution of collateral, and cram-down rate of interest. Deposed and provided expert testimony before the United States Bankruptcy Court for the District of Massachusetts. (June 2011)
- Riad Tawfiq Al Sadik v. Investcorp Bank BSC, et al. – Litigation over major losses suffered in 2008. Provided three expert reports and testified at trial in the Grand Court of the Cayman Islands. (February 2012)
- J.P. Morgan Securities, Inc. v. Jason Ader, et al. – Litigation over financial arrangements between a hedge fund and a seed capital provider. Provided multiple expert reports and was deposed twice. (May 2012)
- Deephaven Distressed Opportunities Trading, et al. v. Imperial Capital, LLC – FINRA arbitration over liability for damages related to a failed trade of a distressed trade claim against a bankrupt



MARTI P. MURRAY

company. Issues included industry custom and practice in the distressed debt trading market, analysis and valuation of trade claims, and mitigation strategies including damages analysis. Provided expert report and testified at arbitration. (July 2012)

- In re The Dolan Company – Financial advisor and testifying valuation expert for the Official Committee of Equity Security Holders in the Dolan bankruptcy. Provided expert report and was deposed three times on a wide range of issues relating to business valuation, and industry custom and practice with respect to bank loan amendment fees. (May 2014)
- Green v. KeyCorp – Expert witness with respect to Austin Capital Management, a hedge fund-of-funds firm. Provided expert report and was deposed twice. (August 2014)
- In re GSC Group, Inc., et al. – Litigation over assumed management contracts for CLOs, Private Equity, and ABS CDOs, affiliate transfers, and investments made in hedge funds and CLOs. Provided multiple expert reports, was deposed, and testified in US Bankruptcy Court for the Southern District of New York. (February 2015)
- PICCIRC, LLC et al. v. Commissioner of Internal Revenue Service (United States Tax Court) – Retained as expert witness by the Internal Revenue Service with respect to an investment in a trade claim against Encol during its bankruptcy. Issues included industry custom and practice with respect to hedge fund and trade claim investing, trade allocation, principal transactions, and the economic substance of the trade. Provided expert report and testified at trial. (March 2015)
- Brown Jordan International, Inc., et al. v. Christopher Carmicle – Retained as expert witness by Brown Jordan. Provided expert report and deposition testimony. (August 2015)
- Confidential SEC Matter – Retained as an expert witness by the Securities and Exchange Commission with respect to alleged conflicted transactions of an investment adviser. Provided expert report and deposition testimony. (May 2018)

## WORK EXPERIENCE

### The Brattle Group, Inc.
- **Principal** (May 2019—Present)

### Murray Analytics, Inc.
- **Founder & President** (April 2015 – May 2019)
- Professional services firm specializing in corporate restructuring, financial advisory, litigation support, and complex valuation products and services
- 2017 Winner HFMWeek US Service Provider Awards – Best Valuation Service – Hard to Value Assets; 2017 Finalist – Best Overall Advisory Firm; 2018 Finalist – Best Valuation Service – Hard to Value Assets

### New York University Stern School of Business
- **Adjunct Professor** (2001 – 2013)
- Teaching courses in Bankruptcy and Distressed Debt Investing and Valuation/Equity Analysis
- Recipient of Teacher of the Year Prize
- Recipient of Excellence in Teaching Award



MARTI P. MURRAY

### Goldin Associates, LLC
- **Senior Managing Director and Member of Management Committee** (2012 – 2015)
- Team leader on financial advisory engagements including for Pulse Electronics, Fletcher International, The Dolan Company, and casino industry engagement
- Numerous litigation support engagements with respect to alternative investment funds, investment advisers, trading matters, and bankruptcy/restructuring matters

### Murray & Burnaman, LLC
- **Managing Member** (2009 – 2012)
- Co-founder of Murray & Burnaman, LLC, officially launched in October 2010
- Represented debtor and creditor constituencies in bankruptcies and out of court restructurings and provided independent third party expert witness/litigation support

### Babson Capital Management (Mass Mutual)
- **Managing Director & Head of the Distressed Debt Investing Group** (2008 – 2009)
- The distressed debt investing business of Murray Capital Management was acquired by Babson Capital in 2008
- Ran the group as a business unit inside Babson Capital
- Invested in secured and unsecured bonds, equities, mortgages, bank debt, private claims, trade claims, options, credit default swaps, derivatives and aircraft lease debt obligations

### Murray Capital Management, Inc.
- **Founder, President & Portfolio Manager** (1995 – 2008)
- Founded and served as President/Portfolio Manager of Murray Capital Management, an SEC registered investment adviser firm specializing in distressed debt with peak client assets under management of $750MM
- Invested in secured and unsecured bonds, equities, mortgages, bank debt, private claims, trade claims, options, credit default swaps, derivatives and aircraft lease debt obligations

### Furman Selz Incorporated
- **Senior Managing Director & Head of Distressed Debt Investing Group** (1990 – 1995)
- Founded ReCap Partners, L.P. and ReCap International LLC
- Developed a third-party money management business in the distressed debt asset class

### Oppenheimer & Co. Inc.
- **Senior Vice President** (1987 – 1990)
- Research Analyst for the Oppenheimer Horizon hedge funds, investing in distressed debt and private claims

### First NY Capital
- **Associate** (1986 – 1987)
- Associate at boutique investment banking firm doing middle-market mergers and acquisitions, capital raises and fairness opinions



MARTI P. MURRAY

## Bank of America, N.T. & S.A.
- **Assistant Vice President** (1982 – 1986).
- Relationship Manager for the Bank's Fortune 500 clients
- Completed Bank of America's formal credit training program

## City of New York – Department of Housing Preservation & Development
- Worked in unit responsible for business relocations as a result of eminent domain proceedings (1981 – 1982).

## FIDUCIARY ROLES / BOARD MEMBERSHIPS

## Atlantic Asset Management, LLC
- **Receiver** (January 2016 – May 2019)
  - Atlantic Asset Management ("AAM") was a registered investment adviser specializing in fixed income investment strategies
  - AAM was the subject of an SEC enforcement action alleging securities fraud; certain of AAM's professionals are also the subject of a criminal action brought by the US Attorney's Office
  - Appointed on December 21, 2015 by Hon. William H. Pauley III, United States District Court, Southern District of New York as temporary Independent Monitor and subsequently as Receiver

## Edcon
- **Director** (February 2017 – August 2018)
  - Edcon is the largest non-food retailer in South Africa, with over 1,400 stores in a variety of formats, including Edgars and Jet
  - Member of the Audit and Risk Committee

## Private For-Profit Education Company
- **Interim Advisor**
  - Provided interim management services to a for-profit education company with a focus on medical career training
  - Services included aspects of general corporate and financial management, human resources, and school accreditation

## PIMCO Income Strategy Fund, PIMCO Income Strategy Fund II
- **Director**
  - Nominated by Brigade Capital Management and recommended by Institutional Shareholder Services, Inc. (ISS)

## ReCap International (BVI), Ltd.
- **Director**
  - Distressed debt investment fund for non-US taxable investors

## California Coastal Communities
- **Director**
  - Former NASDAQ-listed California homebuilder that went through bankruptcy proceedings
  - Member of audit committee and compensation committee

## Asphalt Green
- **Trustee**



MARTI P. MURRAY

- A not-for-profit organization dedicated to assisting individuals of all ages and background achieve health through a lifetime of sports and fitness

**Kent Place School**
- **Trustee**
  - An all-girls K-12 nonsectarian, college preparatory day school whose focus is to provide a superior education for young women who demonstrate strong scholastic and creative ability

## PROFESSIONAL AFFILIATIONS

- Certified Valuation Analyst (CVA), awarded by the National Association of Certified Valuators and Analysts (NACVA)
- IMS ExpertServices
  - EliteXpert – invitation only membership is granted to experts identified by IMS, a leading expert witness search firm.
- Turnaround Management Association (TMA)
  - Vice-Chair – TMA Academic Relations Committee
- American Bankruptcy Institute (ABI)
- National Association of Federal Equity Receivers (NAFER)
  - Full Member – limited to individuals who have been appointed as equity receivers in complex proceedings or who have served as primary counsel or forensic accountants to a receiver

## PUBLICATIONS

- "Assessing the Reasonableness of Rights Offerings Raising Exit Financing in the Context of a Chapter 11 Bankruptcy Proceeding," *Bankruptcy & Restructuring 2019: Expert Guide*, published by Corporate LiveWire.
- "Notes from the Road – The Bankruptcy Cases Everyone is Talking About and the Issues that Make Them Controversial," *ABI Young and New Members Committee Newsletter*, Volume 9, Number 3; June 2011.
- Contributing Author to the First Edition, *Managing Hedge Fund Risk: From the Seat of the Practitioner: Views From Investors, Counterparties, Hedge Funds and Consultants*, ed. Virginia Reynolds Parker, 2000.
- Co-Author with S. Peter Valiunas of *Money Jobs: Training Programs Run by Banking, Accounting, Insurance, and Brokerage Firms – And How to Get into Them*, 1984.

## PRESENTATIONS

- Invited to speak at numerous hedge fund and distressed debt industry conferences, including GAIM, 100 Women in Hedge Funds, Infovest and VALCON, sponsored by the American Bankruptcy Institute.
- Brown Rudnick Advanced Valuation Seminar for CLE Credit (2014). Taught seminar as part of 2013/2014 Finance and Restructuring Training: Challenges to Valuation.



MARTI P. MURRAY

## EDUCATION

MBA in Finance, New York University Stern School of Business, 1986
B.A. in World Affairs, Chinese, Colgate University, 1981

THE **Brattle** GROUP

# Appendix B – Documents Considered

# Documents Considered

*In considering the documents listed below, a review was performed of those portions of documents
that were relevant to Brattle's analysis and evaluation of the issues addressed in this report*

## In re Sears Holdings Corp., et al. Case Filings

- Chapter 11 Voluntary Petition for Non-Individuals Filing for Bankruptcy, dated October 15, 2018 (DN 1).
- Debtors' Motion for Authority to Obtain Postpetition Financing, dated October 15, 2018 (DN 7).
- Debtors' Motion to Modify Automatic Stay with Respect to the Workers Compensation Programs, dated October 15, 2018 (DN 17).
- Debtors' Motion for Approval of Procedures for Store Closing Sales and Assumption of Liquidation Consulting Agreement, dated October 15, 2018 (DN 23).
- Notice of Hearing on Debtors' Motion for Approval of Global Bidding Procedures, dated November 1, 2018 (DN 429).
- Certificate of No Objection to Motion to Modify Stay, dated November 12, 2018 (DN 661).
- Order Approving Global Bidding Procedures and Granting Related Relief, dated November 19, 2018 (DN 816).
- Notice of Filing of Global Bidding Procedures Process Letter, dated November 21, 2018 (DN 862).
- Final Order Approving Procedures for Store Closing Sales and Liquidation Consulting Agreement, dated November 26, 2018 (DN 876).
- Final Order Authorizing the Debtors to Obtain Post-Petition Financing, Granting Adequate Protection, Modifying the Automatic Stay, and Granting Related Relief, dated November 30, 2018 (DN 952 & 955).
- Final Order Approving Junior DIP, dated December 28, 2018 (DN 1436).
- Schedule of Assets and Liabilities of Sears Holdings Corporation, dated January 17, 2019 (DN 1609).
- Schedule of Assets and Liabilities for Kmart Operations LLC, dated January 17, 2019 (DN 1611).
- Schedule of Assets and Liabilities for Sears Operations LLC, dated January 17, 2019 (DN 1613).
- Schedule of Assets and Liabilities for ServiceLive, Inc., dated January 17, 2019 (DN 1615).
- Schedule of Assets and Liabilities for A&E Factory Service, LLC, dated January 17, 2019 (DN 1617).
- Schedule of Assets and Liabilities for A&E Home Delivery, LLC, dated January 17, 2019 (DN 1619).
- Schedule of Assets and Liabilities for A&E Lawn and Garden, LLC, dated January 17, 2019 (DN 1621).
- Schedule of Assets and Liabilities for A&E Signature Service, LLC, dated January 17, 2019 (DN 1623).
- Schedule of Assets and Liabilities for FBA Holdings Inc., dated January 17, 2019 (DN 1625).
- Schedule of Assets and Liabilities for Innovel Solutions, Inc., dated January 17, 2019 (DN 1627).
- Schedule of Assets and Liabilities for Kmart Corporation, dated January 17, 2019 (DN 1629).
- Schedule of Assets and Liabilities for MaxServe, Inc., dated January 17, 2019 (DN 1631).
- Schedule of Assets and Liabilities for Private Brands, Ltd., dated January 17, 2019 (DN 1633).

- Schedule of Assets and Liabilities for Sears Development Co., dated January 17, 2019 (DN 1635).
- Schedule of Assets and Liabilities for Sears Holdings Management Corporation, dated January 17, 2019 (DN 1637).
- Schedule of Assets and Liabilities for Sears Home and Business Franchises, Inc., dated January 17, 2019 (DN 1639).
- Schedule of Assets and Liabilities for Sears Home Improvement Products, Inc., dated January 17, 2019 (DN 1641).
- Schedule of Assets and Liabilities for Sears Insurance Services, L.L.C., dated January 17, 2019 (DN 1643).
- Schedule of Assets and Liabilities for Sears Procurement Services, Inc., dated January 17, 2019 (DN 1645).
- Schedule of Assets and Liabilities for Sears Protection Company, dated January 17, 2019 (DN 1647).
- Schedule of Assets and Liabilities for Sears Protection Company (PR), Inc., dated January 17, 2019 (DN 1649).
- Schedule of Assets and Liabilities for Sears Roebuck Acceptance Corp., dated January 17, 2019 (DN 1651).
- Schedule of Assets and Liabilities for Sears, Roebuck De Puerto Rico, Inc., dated January 17, 2019 (DN 1653).
- Schedule of Assets and Liabilities for SYW Relay LLC, dated January 17, 2019 (DN 1655).
- Schedule of Assets and Liabilities for Wally Labs LLC, dated January 17, 2019 (DN 1657).
- Schedule of Assets and Liabilities for Big Beaver of Florida Development, LLC, dated January 17, 2019 (DN 1659).
- Schedule of Assets and Liabilities for California Builder Appliances, Inc., dated January 17, 2019 (DN 1661).
- Schedule of Assets and Liabilities for Kmart of Washington LLC, dated January 17, 2019 (DN 1663).
- Schedule of Assets and Liabilities for Florida Builder Appliances, Inc., dated January 17, 2019 (DN 1665).
- Schedule of Assets and Liabilities for Kmart Stores of Illinois LLC, dated January 17, 2019 (DN 1667).
- Schedule of Assets and Liabilities for KBL Holding Inc., dated January 17, 2019 (DN 1668).
- Schedule of Assets and Liabilities for KLC, Inc., dated January 17, 2019 (DN 1671).
- Schedule of Assets and Liabilities for Kmart Stores of Texas LLC, dated January 17, 2019 (DN 1673).
- Schedule of Assets and Liabilities for Sears Protection Company (Florida), L.L.C., dated January 18, 2019 (DN 1675).
- Schedule of Assets and Liabilities for MyGofer LLC, dated January 18, 2019 (DN 1677).
- Schedule of Assets and Liabilities for Sears Brands Business Unit Corporation, dated January 18, 2019 (DN 1679).
- Schedule of Assets and Liabilities for Sears Holdings Publishing Company, LLC, dated January 18, 2019 (DN 1681).
- Schedule of Assets and Liabilities for Kmart of Michigan, Inc., dated January 18, 2019 (DN 1683).
- Schedule of Assets and Liabilities for SHC Desert Springs, LLC, dated January 18, 2019 (DN 1685).
- Schedule of Assets and Liabilities for SOE, Inc., dated January 18, 2019 (DN 1687).

- Schedule of Assets and Liabilities for StarWest, LLC, dated January 18, 2019 (DN 1689).
- Schedule of Assets and Liabilities for STI Merchandising, Inc., January 18, 2019 (DN 1691).
- Schedule of Assets and Liabilities for Troy Coolidge No. 13, LLC (DN 1693).
- Schedule of Assets and Liabilities for Bluelight.com, Inc., dated January 18, 2019 (DN 1695).
- Schedule of Assets and Liabilities for Sears Brands, L.L.C., dated January 18, 2019 (DN 1697).
- Schedule of Assets and Liabilities for Sears Buying Services, Inc., dated January 18, 2019 (DN 1699).
- Schedule of Assets and Liabilities for Kmart.com LLC, dated January 18, 2019 (DN 1701).
- Schedule of Assets and Liabilities for Sears Brands Management Corporation, dated January 18, 2019 (DN 1703).
- Schedule of Assets and Liabilities for SHC Licensed Business LLC, dated January 18, 2019 (DN 1705).
- Schedule of Assets and Liabilities for SHC Promotions LLC, dated January 18, 2019 (DN 1707).
- Schedule of Assets and Liabilities for SHC Promotions LLC, dated January 18, 2019 (DN 1708).
- Schedule of Assets and Liabilities for Kmart Holding Corporation, dated January 18, 2019 (DN 1713).
- Notice of Successful Bidder and Sale Hearing, dated January 18, 2019 (DN 1730).
- Motion to File Under Seal Portions of Unsecured Creditors Committee's Objection to the Sale, dated January 26, 2019 (DN 2028).
- Objection of the Unsecured Creditors Committee to the Sale, dated January 28, 2019 (DN 2042).
- Motion to Extend Exclusive Periods, dated January 31, 2019 (DN 2312).
- Debtors' Omnibus Response in Support of the Going Concern Sale Transactions, dated February 1, 2019 (DN 2328).
- ESL's Omnibus Response in Support of the Going Concern Sale Transactions, dated February 4, 2019 (DN 2379).
- Order Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, dated Feb. 8, 2019 (DN 2507).
- Joinder of Cyrus Capital Partners, L.P. to Motion of Wilmington Trust, dated April 11, 2019 (DN 3142).
- Debtor's Monthly Operating Reports, Reporting Period: March 3-April 6, 2019, dated May 3, 2019 (DN 3596).
- Disclosure Statement for Amended Joint Chapter 11 Plan, dated May 15, 2019 (DN 3895).
- Notice of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes, dated May 26, 2019 (DN 4034).
- Second Amended Joint Chapter 11 Plan of Sears Holding Corporation and its Affiliated Debtors, dated May 28, 2019 (DN 4041).
- Disclosure Statement for Second Amended Joint Chapter 11 Plan, dated May 28, 2019 (DN 4042).
- Notice of Hearing on Motion to Further Extend Exclusive Periods, dated June 10, 2019 (DN 4171).
- Debtors' Monthly Operating Report for April 7–May 4, 2019, dated June 14, 2019 (DN 4241).

## *In re Sears Holdings Corp., et al.* Governing Documents for Loan Agreements

- Intercreditor Agreement by and among ABL Agents and Second Lien Agent, dated October 12, 2010.
- Amended and Restated Intercreditor Agreement by and among ABL Agents and Second Lien Agent, dated September 1, 2016.
- Third Amended and Restated Credit Agreement, dated July 21, 2015.
- Third Amended and Restated Guarantee and Collateral Agreement, dated July 21, 2015.
- Second Lien Credit Agreement, dated September 1, 2016.
- First Amendment to Second Lien Credit Agreement, dated July 7, 2017.
- Amended and Restated Security Agreement, dated March 20, 2018.
- Second Amended and Restated Intercreditor Agreement by and among ABL Agents and Second Lien Agent, dated March 20, 2018.
- Superpriority Senior Secured Debtor-In-Possession Asset-Based Credit Agreement, dated November 29, 2018.
- Consent of Noteholder, dated January 5, 2018 (CYRUS_507B_00000013-20).
- Second Amendment to Second Lien Credit Agreement, dated January 9, 2018.
- Asset Purchase Agreement by and among Transform Holdco LLC, Sears Holdings Corporation and its Subsidiaries Party Hereto, dated January 17, 2019.

## *In re Sears Holdings Corp., et al.* Hearing Transcripts

- Hearing Transcript, October 15, 2018.
- Hearing Transcript, October 25, 2018.
- Hearing Transcript, November 11, 2018.
- Hearing Transcript, November 15, 2018.
- Hearing Transcript, November 27, 2018.
- Hearing Transcript, December 14, 2018.
- Hearing Transcript, December 18, 2018.
- Hearing Transcript, December 20, 2018.
- Hearing Transcript, January 2, 2019.
- Hearing Transcript, January 8, 2019.
- Hearing Transcript, January 18, 2019.
- Hearing Transcript, February 4, 2019.
- Hearing Transcript, February 6, 2019.
- Hearing Transcript, February 7, 2019.
- Hearing Transcript, February 14, 2019.
- Hearing Transcript, March 21, 2019.
- Hearing Transcript, April 18, 2019.
- Hearing Transcript, May 8, 2019.
- Hearing Transcript, May 29, 2019.

## *In re Sears Holdings Corp., et al.* Auction Transcripts

- Auction Proceeding Transcript, January 14, 2019.
- Auction Proceeding Transcript, January 15, 2019.

- Auction Proceeding Transcript, January 16, 2019.

## *In re Sears Holdings Corp., et al.* Deposition Transcripts

- Deposition of Robert Riecker, dated January 25, 2019, and selected exhibits.
- Deposition of Mohsin Meghji, dated January 29, 2019, and selected exhibits.
- Deposition of Saul Burian, dated January 30, 2019, and selected exhibits.
- Deposition of Brandon Aebersold, dated January 31, 2019, and selected exhibits.

## *In re Sears Holdings Corp., et al.* Declarations

- Declaration of Robert A. Riecker, dated October 15, 2018, and selected exhibits (DN 3).
- Declaration of Mohsin Y. Meghji, dated October 15, 2018, and selected exhibits (DN 10).
- Declaration of Robert A. Riecker, dated November 23, 2018, and selected exhibits (DN 866).
- Declaration of Matthew Diaz, dated January 26, 2019, and selected exhibits (DN 2309-2).
- Declaration of Alan J. Carr, dated February 1, 2019, and selected exhibits (DN 2321).
- Declaration of Brandon Aebersold, dated February 1, 2019, and selected exhibits (DN 2335).
- Declaration of Mohsin Y. Meghji, dated February 1, 2019, and selected exhibits (DN 2336).
- Declaration of Robert A. Reicker, dated February 1, 2019, and selected exhibits (DN 2337).
- Declaration of William L. Transier, dated February 1, 2019, and selected exhibits (DN 2341).
- Declaration of Sunny Singh, dated February 1, 2019, and selected exhibits (DN 2344).
- Declaration of Kunal S. Kamlani, dated February 1, 2019, and selected exhibits (DN 2356).
- Supplemental Declaration of Saul Burian, dated February 3, 2019, and selected exhibits (DN 2429-1).
- Supplemental Declaration of Matthew Diaz, dated February 5, 2019, and selected exhibits (DN 2429-2).
- Declaration of Brian G. Griffith, dated May 26, 2019, and selected exhibits (DN 4035).

## Party Documents

- Tiger Valuation Services, LLC, *Sears Holding Corporation: Inventory Appraisal, Net Orderly Liquidation Value*, September 28, 2018 (SEARS_507B_00001287).
- Tiger Valuation Services, LLC, *Sears Holding Corporation: Inventory Appraisal, Net Orderly Liquidation Value*, November 16, 2018 (SEARS_507B_00001345).
- Tiger Valuation Services, LLC, *Sears Holding Corporation: Inventory Appraisal, Net Orderly Liquidation Value*, December 14, 2018 (SEARS_507B_00001151).
- Tiger Valuation Services, LLC, *Sears Holding Corporation: Inventory Appraisal, Net Orderly Liquidation Value*, February 4, 2019 (SEARS_507B_00001213).
- Sears Holding Corp., *UCC Discussion Materials*, October 31, 2018 (UCC_SEARS00002236-2242).
- Sears Holding Corp., *Project Blue—Liquidation Bids Review*, December 2018.
- Sears Holding Corp., *Project Blue—Liquidation Sale Process Update*, December 2018 (SEARS_507B_00000095-108).
- Sears Holding Corp., *Advisory Bid Comparison*, January 5, 2019 (RS_UCC_0002828).
- Sears Holding Corp., *Estimated Script Asset Value* (SEARS_507B_00001508)
- Sears Holding Corp., *Illustrative Recovery Considerations*, January 11, 2019 (SEARS_UCC00365797-365804).
- Sears Holding Corp., *Wind Down Recoveries*, January 14, 2019 (UCC_SEARS0002236).

- Sears Holding Corp., *Project Blue—Rolling Cash Flow Budget (Week 15),* January 30, 2019 (CYRUS_507B_00000005-12).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 8, 2018, 5:00pm-5:50pm (SEARS_UCC00413653).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 9, 2018, 9:30pm-10:05pm (SEARS_UCC00413654).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 10, 2018, 5:30pm-5:55pm (SEARS_UCC00413655).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 11, 2018, 7:00pm-6:20pm [SIC] (SEARS_UCC00413656).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 12, 2018, 5:00pm-5:30pm (SEARS_UCC00413657-413658).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 13, 2018, 6:00pm-6:30pm (SEARS_UCC00413659).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 14, 2018, 6:30pm-7:00pm (SEARS_UCC00413660-413664).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 16, 2018, 5:00pm-5:25pm (SEARS_UCC00413665).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 17, 2018, 5:00pm-5:30pm (SEARS_UCC00413666).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 18, 2018, 5:00pm-5:35pm (SEARS_UCC00413667-413668).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 19, 2018, 5:00pm-5:15pm (SEARS_UCC00413669).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 21, 2018, 5:00pm-5:25pm (SEARS_UCC00413670-413671).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 22, 2018, 5:00pm-5:25pm (SEARS_UCC00413672).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 24, 2018, 5:00pm-5:50pm (SEARS_UCC00413752-413753).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 25, 2018, 5:00pm-5:30pm (SEARS_UCC00413673-413675).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 26, 2018, 5:00pm-5:15pm (SEARS_UCC00413676).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 29, 2018, 5:00pm-5:20pm (SEARS_UCC00413677).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, October 31, 2018, 5:00pm-6:05pm (SEARS_UCC00413678-413682).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 1, 2018, 6:30pm-7:20pm (SEARS_UCC00413613-413615).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 5, 2018, 6:00pm-7:00pm (SEARS_UCC00413616-413671).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 6, 2018, 7:00pm-8:30pm (SEARS_UCC00413622-413633).

- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 7, 2018, 5:00pm-5:30pm (SEARS_UCC00413634-413637).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 11, 2018, 12:30pm-5:30pm (SEARS_UCC00413638-413641).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 14, 2018, 5:00pm-5:30pm (SEARS_UCC00413642-413645).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 16, 2018, 5:00pm-5:40pm (SEARS_UCC00413646-413647).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 19, 2018, 5:00pm-5:10pm (SEARS_UCC00413807).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 26, 2018, 5:00pm-5:25pm (SEARS_UCC00413647-413649)
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 28, 2018, 5:00pm-5:45pm (SEARS_UCC00413650-413652).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, November 30, 2018, 5:00pm-5:10pm (SEARS_UCC00413808).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 3, 2018, 5:00pm-5:35pm (SEARS_UCC00413683-413686).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 5, 2018, 5:00pm-6:00pm (SEARS_UCC00413687).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 6, 2018, 5:00pm-5:40pm (SEARS_UCC00413690-413691).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 11, 2018, 1:30pm-4:35pm (SEARS_UCC00413692-413700).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 13, 2018, 4:30pm-5:00pm (SEARS_UCC00413763-413766).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 14, 2018, 5:00pm-5:30pm (SEARS_UCC00413701-413702).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 17, 2018, 12:30pm-4:50pm (SEARS_UCC00413767-413777).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 19, 2018, 5:00pm-5:40pm (SEARS_UCC00413703-413704).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 21, 2018, 5:00pm-5:20pm (SEARS_UCC00413705).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 24, 2018, 9:00am-9:45am (SEARS_UCC00413706).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 26, 2018, 5:00pm-9:45am [SIC] (SEARS_UCC00413707).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 28, 2018, 5:00pm-5:20pm (SEARS_UCC00413708).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, December 30, 2018, 3:30pm-4:40pm (SEARS_UCC00413809-413816).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 2, 2019, 2:00pm-4:45pm (SEARS_UCC00413709-413715).

- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 2, 2019, 7:30pm-7:55pm (SEARS_UCC00413716-413717).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 3, 2019, 9:15pm-11:20pm (SEARS_UCC00413718-413723).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 4, 2019, 12:30pm-1:25pm (SEARS_UCC00413780-413783).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 5, 2019, 4:00pm-4:50pm (SEARS_UCC00413723-413730).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 6, 2019, 12:30pm-1:30pm (SEARS_UCC00413778-413779).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 6, 2019, 3:30pm-4:15pm (SEARS_UCC00413784-413786).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 7, 2019, 6:15pm-7:20pm (SEARS_UCC00413731-413732).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 8, 2019, 7:30am-8:00am (SEARS_UCC00413787-413788).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 8, 2019, 5:45pm-6:10pm (SEARS_UCC00413733).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 9, 2019, 5:00pm-5:30pm (SEARS_UCC00413790-413792).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 11, 2019, 5:00pm-5:25pm (SEARS_UCC00413734-413737).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 12, 2019, 1:30pm-2:10pm (SEARS_UCC00413738-413741).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 13, 2019, 1:30pm-2:30pm (SEARS_UCC00413754-413756).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 14, 2019, 6:30pm-6:55pm. (SEARS_UCC00413742-413746)
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 15, 2019, 12:00pm-1:05pm (SEARS_UCC00413757-413762).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 16, 2019, 1:00am-1:35am (SEARS_UCC00413793-413795).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 16, 2019, 6:30pm-7:40pm (SEARS_UCC00413796-413801).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 16, 2019, 9:45pm-10:15pm (SEARS_UCC00413802-413803).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 16, 2019, 11:30pm-12:00am (SEARS_UCC00413804-413806).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 18, 2019, 5:00pm-5:20pm (SEARS_UCC00413747).
- Sears Holding Corp., Minutes of a Meeting of the Restructuring Committee of the Board of Directors, January 21, 2019, 6:00pm-6:30pm (SEARS_UCC00413748-413751).
- Sears Kmart, *Lender Presentation*, January 24, 2019 (UCC_Sears0000068).
- Lazard, MIII, Weil, *Project Blue—Indicative Bid Summary*, December 17, 2018 (SEARS_507B_00000089).

- Excel Spreadsheet of LC Summary, October 15, 2018 (CYRUS_507B_00000004 ).
- Lazard, Excel Spreadsheet of Funds Flow, February 11, 2019 (CYRUS_507B_00000002).
- PWP Requests 3-5 Spreadsheet (CYRUS_507B_00000001).
- Excel Spreadsheet of LC Draws, June 6, 2016 (CYRUS_507B_00000003).
- Abacus Advisors LLC, *Indication of Interest*, December 15, 2018 letter from Alan Cohen of Abacus Advisors to Mohsin Meghji and Colin M. Adams (SEARS_507B_00000128).
- Abacus Advisors LLC, *Summary of Total Estimated Net Recovery Values on Retail Store GOB Inventory*, December 15, 2018 (SEARS_507B_00000131).
- Abacus Advisors LLC, *Indication of Interest,* December 28, 2018 letter from Alan Cohen of Abacus Advisors to Mohsin Meghji and Colin M. Adams (SEARS_507B_00001080).
- Gordon Brothers Retail Partners, LLC & Hilco Merchant Resources, LLC, *Store Closing Program— Consulting Agreement*, December 14, 2018 (SEARS_507B_00001138).
- Gordon Brothers Retail Partners, LLC & Hilco Merchant Resources, LLC, *Agency Agreement*, December 19, 2018 (SEARS_507B_00001111).
- Gordon Brothers Retail Partners, LLC & Hilco Merchant Resources, LLC, *Proposal*, December 28, 2018 letter from Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners (SEARS_507B_00000689).
- Gordon Brothers Retail Partners, LLC & Hilco Merchant Resources, LLC, *Store Closing Program— Consulting Agreement*, December 28, 2018 (SEARS_507B_00000567).
- Gordon Brothers Retail Partners, LLC & Hilco Merchant Resources, LLC, *Escrow Agreement*, December 28, 2018 (SEARS_507B_00000483).
- Gordon Brothers Retail Partners, LLC & Hilco Merchant Resources, LLC, *Agency Agreement*, December 28, 2018 (SEARS_507B_00000579).
- Gordon Brothers Retail Partners, LLC & Hilco Merchant Resources, LLC, Email from Cindi M. Giglio Regarding Proposal, January 4, 2019 (SEARS_507B_00000560).
- SB360 Capital Partners, LLC, *Proposals to Conduct Store Closing Sales for Kmart Corporation ("Kmart") and Sears, Roebuck and Co ("Sears")*, December 17, 2018 (SEARS_507B_00000960).
- SB360 Capital Partners, LLC, *Proposals to Conduct Store Closing Sales for Kmart Corporation ("Kmart") and Sears, Roebuck and Co ("Sears")*, December 28, 2018 (SEARS_507B_00000955).
- Tiger Capital Group, LLC & Great American Group, LLC, *Store Closing Proposal*, December 14, 2018 (SEARS_507B_00001523).
- Tiger Capital Group, LLC & Great American Group, LLC, *Store Closing Proposal*, December 18, 2018 (SEARS_507B_00000911).
- Tiger Capital Group, LLC & Great American Group, LLC, *Store Closing Proposal,* January 4, 2019 letter from Mark P. Naughton, Senior General Counsel of Tiger Capital Group, LLC (SEARS_507B_00000842).
- Proposed 407(b) Settlement Terms (SEARS_507B_00001422).

## Public Regulatory Filings

- Sears Holding Corp., Form 10-K for the Period Ending February 3, 2018.
- Sears Holding Corp., Form 10-Q for the Period Ending August 4, 2018.
- Sears Holding Corp., Form 10-Q for the Period Ending November 3, 2018.

## Other Publicly Available Documents

- 11 U.S.C. § 506(a).
- 11 U.S.C. § 507(b).
- Memorandum Opinion, and Findings of Fact and Conclusions of Law, After Phase I Trial, *In re: Residential Capital, LLC, et al.*, No. 13-01243-MG, November 15, 2013 (DN 177).
- Order Authorizing the Debtors to Wind-Down U.S. Operations, Authorizing the Debtors to Conduct U.S. Store Closings, Establishing Administrative Claims Procedures, and Granting Related Relief. *In re: Toys "R" Us, Inc., et al.*, No. 17-34665-KLP, March 22, 2018 (DN 2344).
- Abacus Advisors. "Abacus Advisors Engaged by Penn Traffic Creditors Committee to Advise on Sale of the Company's Assets." Press Release. January 11, 2010.
- Abacus Advisors. "Abacus Advisors 'Pleased with Outcome' of Filene's Basement Asset Sale." Press Release. July 9, 2009.
- Abacus Advisors. "Our Professionals: Alan Cohen." Accessed June 13, 2019, http://www.abacusadvisor.com/alan_cohen.html.
- Abacus Advisors. "Retailing Case Histories." Accessed June 13, 2019, http://www.abacusadvisor.com/retail.html.
- Beede Waste Oil Site. "About the Beede Site." Accessed June 13, 2019, http://www.beedewasteoilsite.com/about-beede/.
- Bonner, Nadine. "Tiger Group: Raising the Bar on Accuracy in a Risk-Laden Environment." *ABF Journal*, 15(5), July/August 2017. Accessed June 13, 2019 via Tiger Capital Group, LLC, https://www.tigergroup.com/news/corporate-news/tiger-group-raising-bar-accuracy-risk-laden-environment/.
- CenterPoint Properties. "About Centerpoint." Accessed June 13, 2019, https://www.centerpoint.com/about-centerpoint/.
- Commercial Finance Association. "CFA Education – ABL Step 1 An Introduction." Accessed June 15, 2019, http://www.oas.org/en/sla/dil/docs/gm_jamaica_feb_2015_presentations_Richard_Hawkins_1.pdf.
- Commercial Finance Association. "About Us." Accessed June 17, 2019, https://community.cfa.com/aboutus.
- Denman, Harrison. "Turning the Page: The Demise of the 'Queenan Doctrine' Requiring the Adoption of a Foreclosure Valuation Methodology in Chapter 11 Cases." *University of Miami Business Law Review*, 25(47), Spring 2017.
- Kaufman, Leslie with Claudia H. Deutsch. "Montgomery Ward to Close its Doors." *The New York Times*. December 29, 2000.
- Madison Title Agency. "Menu of Services." Accessed June 13, 2019, https://www.madisontitle.com/Title.Site/Frontend/Services/ServicesMenu.aspx.
- Robert A. Modansky, CPA/CFF and Jerome P. Massimo, CPA. "Asset-Based Financing Basics." *Journal of Accountancy*, August 1, 2011. Accessed June 17, 2019, https://www.journalofaccountancy.com/issues/2011/aug/20113992.html.
- National Association of Certified Valuators and Analysts (NACVA), *Professional Standards*, June 1, 2017.
- Sears Holdings Corp. "Kmart and Sears Complete Merger to Form Sears Holdings Corporation." Press Release, March 24, 2005.

- Tiger Capital Group, LLC. "About Us." Accessed June 3, 2019. https://www.tigergroup.com/about-us/.
- Tiger Capital Group, LLC. "Case Study: Sports Authority." Accessed June 16, 2019. https://www.tigergroup.com/services/capital-solutions/case-study-sports-authority/.
- Tiger Capital Group, LLC. LinkedIn webpage. Accessed June 3, 2019. https://www.linkedin.com/company/tiger-group-llc.
- Tiger Capital Group, LLC. "News: Retail." Accessed June 14, 2019. https://www.tigergroup.com/category/news/retail-news/.
- Tiger Capital Group, LLC. "Retail Appraisals." Accessed June 17, 2019. https://www.tigergroup.com/services/appraisals/retail-appraisals/.
- Tiger Capital Group, LLC. "Tiger Capital Group and Great American Group to Support Previously Announced Closure of All 41 Aéropostale Stores in Canada." Press Release. May 13, 2016.
- Tiger Valuation Services, LLC. LinkedIn webpage. Accessed June 3, 2019. https://www.linkedin.com/company/tiger-valuation-services-llc/about/.
- "Un-Till Death Do Us Part? Assessing the Rights of Secured Creditors in Chapter 11." National Conference of Bankruptcy Judges. September 28, 2015.
- U.S. Commercial Service, "Letters of Credit," *A Basic Guide to Importing*, published October 20, 2016. Export.gov, The International Trade Administration, U.S. Department of Commerce, accessed June 10, 2019, https://www.export.gov/article?id=Letters-of-Credit-and-Documentary-Collection.

# Appendix C-1 – Minimum 507(b) Claim Calculation

$ in millions

| Capital Structure [1] | | | |
|---|---|---|---|
| As of | | Filing Date [2] | Expected Effective Date |
| 1L Funded Debt | | | |
| ABL Revolving Credit Facility / DIP ABL Revolver | | 836.0 | – [3] |
| ABL Term Loan / DIP ABL Term Loan | | 570.8 | – [3] |
| FILO Term Loan | | 125.0 | – [3] |
| **Total 1L Funded Debt** | | **1,531.8** | **–** |
| 2L Debt | | | |
| Second Lien Term Loan | | 317.1 | |
| Second Lien Line of Credit | | 570.0 | |
| Second Lien PIK Notes | | 175.4 | |
| **Total 2L Debt (excluding Second Lien Notes due 2018)** | | **1,062.5** | **629.1** [4] |
| Cyrus 2L Debt | | | 100.9 [5] |
| *Cyrus 2L Debt %* | | | *16.0%* |

| Collateral Values | | | | |
|---|---|---|---|---|
| As of | Filing Date | | Expected Effective Date [8] | Diminution in Value |
| 1L and 2L Shared Collateral | | | | |
| Inventory Book Value | 2,391.5 [6] | $ | – | |
| Inventory NOLV | [7] | | | |
| Inventory Value | | | – | ■ |
| Plus: | | | | |
| Inventory in-Transit | [6] | | | |
| Inventory in-Transit NOLV | [9] | | | |
| Inventory in-Transit Value | | | | |
| **Total Inventory Value** | **2,195.9** | | **–** | **2,195.9** |
| Cash | 123.2 [10] | | – | 123.2 |
| Scripts | [11] | | – | |
| Credit Card Receivables | [6] | | – | |
| Pharmacy Receivables | [6] | | – | |
| **Total 1L and 2L Shared Collateral Value** | **2,457.1** | | **–** | **2,457.1** |

| 2L Debt 507(b) Claim Waterfall Calculation | | | |
|---|---|---|---|
| As of | Filing Date | Expected Effective Date | Diminution in Value |
| Total 1L and 2L Shared Collateral Value | 2,457.1 | – | |
| Less: Total 1L Funded Debt | (1,531.8) | – | |
| 2L Debt Collateral Value | 925.3 | – | 925.3 |
| Less: Credit Bid | (433.5) | | |
| Credit Bid Adjusted 2L Debt Collateral Value | 491.9 [12] | – | 491.9 |
| Less: Value of 2L Adequate Protection | | | (0.3) [13] |
| **2L Debt 507(b) Claim** | | | **491.6** |
| **Cyrus 2L Debt 507(b) Claim** | | | **78.9** |

Notes to Appendix C-1

(1) Claims reflect principal amounts only.

(2) Riecker Declaration ¶34, Oct. 15, 2018.

(3) Disclosure Statement for the Second Amended Joint Chapter 11 Plan, at 32, May 16, 2019, Docket No. 3895; Asset Purchase Agreement, at 52, dated Jan. 17, 2019 (Docket No. 1730).

(4) $433.5mm or 40.7% of 2L Claims were Credit Bid. Asset Purchase Agreement at 52.

| Total 2L Debt as of the Filing Date | $ | 1,062.5 |
|---|---|---|
| Less: Credit Bid | | (433.5) |
| Post Credit Bid 2L Debt | $ | 629.1 |

(5) Based on information from counsel.

(6) Borrowing Base Certificate, October 13, 2018 (CYRUS_507B_00000001).

(7) ███ represents Net Eligible Inventory NOLV. Borrowing Base Certificate, October 13, 2018, derived from ████████████████ ████ s per Tiger Inventory Appraisal at 2, September 28, 2018 (SEARS_507B_00001287).

(8) Assumes that 2L Debt is not expected to receive any value at the confirmation of the plan.

(9) ██████████████████████████████████████ Tiger Inventory Appraisal at 8, September 28, 2018 (SEARS_507B_00001287). In a later appraisal, ████████████████ Tiger Inventory Appraisal at 5, February 4, 2019 (SEARS_507B_00001213).

(10) Debtors' Schedules of Assets and Liabilities. See Appendix C-4.

(11) Estimated Script Asset Value.xlsx (SEARS_507B_00001508).

(12) Assumes that the Credit Bid 2L Debt received value equal to its face amount.

(13) Reimbursement for up to $250,000 in legal fees. Final Order Authorizing the Debtors to Obtain Post-Petition Financing at 58, Nov. 30, 2018, Docket No. 955.

# Appendix C-2 – 507(b) Claim Calculation Based on Debtors' Inventory Valuation

$ in millions

| Capital Structure [1] | As of | Filing Date [2] | Expected Effective Date | |
|---|---|---|---|---|
| 1L Funded Debt | | | | |
| ABL Revolving Credit Facility / DIP ABL Revolver | $ | 836.0 | $ | – [3] |
| ABL Term Loan / DIP ABL Term Loan | | 570.8 | | – [3] |
| FILO Term Loan | | 125.0 | | – [3] |
| **Total 1L Funded Debt** | $ | 1,531.8 | $ | – |
| 2L Debt | | | | |
| Second Lien Term Loan | | 317.1 | | |
| Second Lien Line of Credit | | 570.0 | | |
| Second Lien PIK Notes | | 175.4 | | |
| **Total 2L Debt (excluding Second Lien Notes due 2018)** | $ | 1,062.5 | 629.1 | [4] |
| Cyrus 2L Debt | | | 100.9 | [5] |
| *Cyrus 2L Debt %* | | | *16.0%* | |

| Collateral Values | As of | Filing Date | Expected Effective Date [6] | Diminution in Value |
|---|---|---|---|---|
| 1L and 2L Shared Collateral | | | | |
| Inventory Book Value | | | | |
| Inventory NOLV | | | | |
| Inventory Value | | 2,740.0 [7] | – | 2,740.0 |
| Cash | | 123.2 [8] | – | 123.2 |
| Scripts | | [9] | – | |
| Credit Card Receivables | | [10] | – | |
| Pharmacy Receivables | | [10] | – | |
| **Total 1L and 2L Shared Collateral Value** | | 3,001.3 | – | 3,001.3 |

| 2L Debt 507(b) Claim Waterfall Calculation | As of | Filing Date | Expected Effective Date | Diminution in Value |
|---|---|---|---|---|
| Total 1L and 2L Shared Collateral Value | | 3,001.3 | | |
| Less: Total 1L Funded Debt | | (1,531.8) | – | |
| 2L Debt Collateral Value | | 1,469.5 | – | 1,469.5 |
| Less: Credit Bid | | (433.5) | | |
| Credit Bid Adjusted 2L Debt Collateral Value | | 1,036.0 [11] | – | 1,036.0 |
| Less: Value of 2L Adequate Protection | | | | (0.3) [12] |
| **2L Debt 507(b) Claim** | | | | 1,035.8 |
| **Cyrus 2L Debt 507(b) Claim** | | | | 166.1 |

Notes to Appendix C-2

[1]    Claims reflect principal amounts only.
[2]    Riecker Declaration ¶34, Oct. 15, 2018.
[3]    Disclosure Statement for the Second Amended Joint Chapter 11 Plan, at 32, May 16, 2019, Docket No. 3895; Asset Purchase Agreement, at 52, dated Jan. 17, 2019 (Docket No. 1730).
[4]    $433.5mm or 40.7% of 2L Claims were Credit Bid. Asset Purchase Agreement at 52.

| Total 2L Debt as of the Filing Date | $ | 1,062.5 |
| Less: Credit Bid | | (433.5) |
| Post Credit Bid 2L Debt | $ | 629.1 |

[5]    Based on information from counsel.
[6]    Assumes that 2L Debt is not expected to receive any value at the confirmation of the plan.
[7]    Riecker Declaration ¶8, Nov. 23, 2018.
[8]    Debtors' Schedules of Assets and Liabilities. See Appendix C-4.
[9]    Estimated Script Asset Value.xlsx (SEARS_507B_00001508).
[10]   Borrowing Base Certificate, October 13, 2018 (CYRUS_507B_00000001).
[11]   Assumes that the Credit Bid 2L Debt received value equal to its face amount.
[12]   Reimbursement for up to $250,000 in legal fees. Final Order Authorizing the Debtors to Obtain Post-Petition Financing at 58, Nov. 30, 2018, Docket No. 955.

# Appendix C-3 – Inventory Analysis as of October 17, 2018[146]



| Location | Merchant | Cost |
|---|---|---|
| | | $ |
| Total | | $ |
| NOLV per Riecker Declaration | | $ 2,740,000,000.00 |
| Implied NOLV % | | |

---

[146] Stock Ledger Detail Inquiry, October 17, 2018, SEARS_507B_00001514. Riecker Declaration at ¶ 8, Nov. 23, 2018.

# Appendix C-4 – Cash & Cash Equivalents as of the Filing Date

|   | Docket No* | Debtor Entity | Amount |
|---|---|---|---|
| 1 | 1651 | Sears Roebuck Acceptance Corporation | $ 83,818,773 |
| 2 | 1629 | Kmart Corporation | 30,839,294 |
| 3 | 1647 | Sears Protection Company | 3,551,632 |
| 4 | 1613 | Sears Operations LLC | 1,649,500 |
| 5 | 1611 | Kmart Operations | 1,394,458 |
| 6 | 1649 | Sears Protection Company (PR) Inc | 799,338 |
| 7 | 1683 | Kmart of Michigan Inc | 487,095 |
| 8 | 1667 | Kmart Stores of Illinois LLC | 230,995 |
| 9 | 1653 | Sears Roebuck de Puerto Rico Inc | 198,503 |
| 10 | 1663 | Kmart of Washington LLC | 150,620 |
| 11 | 1673 | Kmart Stores of Texas LLC | 41,466 |
| 12 | 1637 | Sears Holdings Management Corporation | 11,674 |
| 13 | 1701 | Kmart.com LLC | 11,619 |
| 14 | 1665 | Florida Builder Appliances Inc | 800 |
| 15 | 1639 | Sears Home & Business Franchise | 760 |
| 16 | 1661 | California Builder Appliances Inc | 750 |
| 17 | 1689 | Starwest LLC | 500 |
| | | **Total** | **$ 123,187,776** |

*Source: Schedules of Assets and Liabilities dated Jan. 17 and Jan.18, 2019