FERRAIUOLI LLC
390 N. Orange Avenue
Suite 2300
Orlando, Florida 32801
Telephone: (407) 982-7310
Facsimile: (787) 766-7001
Email: scolon@ferraiuoli.com
Email: gchico@ferraiuoli.com

Counsel for *Santa Rosa Mall, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |
| SANTA ROSA MALL, LLC, <br> Plaintiff, <br> v. <br> SEARS HOLDINGS CORPORATION; and SEARS, ROEBUCK DE PUERTO RICO, INC. <br> Defendants. | Adversary Proceeding <br> Case No. 19-08266 (RDD) |

## COMPLAINT[1]

TO THE HONORABLE COURT:

COMES NOW Santa Rosa Mall, LLC ("Santa Rosa Mall" or "Plaintiff"), by and through its undersigned counsel, and pursuant to Fed. R. Bankr. P. 7001, hereby alleges as follows:

### Nature of Action

1.      This is an adversary proceeding by the Plaintiff for breach of contract, specific performance, unjust enrichment, aiding and abetting fraudulent misrepresentation, and relief in the form of

---

[1] The Plaintiff's supporting papers and exhibits hereto contain Confidential Material, as defined in the *Amended Stipulated Protective Order* (the "*Amended Protective Order*", Docket No. 1084). The Complaint and its exhibits are being filed under seal in accordance with Paragraph 13 of the *Amended Protective Order*, Fed. R. Bankr. P. 9037(d), SDNY LBR 5005-2 and 9018-1, and the Chamber Rules of the Hon. Judge Robert D. Drain. See *Order* granting *Motion to File Under Seal* (Docket No. 4300).

declaratory judgment.

Jurisdiction and Venue

2.      This adversary proceeding is commenced pursuant to Fed. R. Bankr. P. 7001(1), (2) and 7001(9). It is a core proceeding under 28 U.S.C. § 157(b)(2)(A),(O).

3.      This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This Court has personal jurisdiction over each of the Defendants under Fed. R. Bankr. P. 7004(f).

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

The Parties

5.      Plaintiff Santa Rosa Mall is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico. Further, Santa Rosa Mall is a shopping mall located in Bayamon, Puerto Rico.

6.      Defendant Sears Holding Corporation (0798) and its affiliated co-debtors (collectively, the "Debtors" or "SHC"), filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 15, 2018 (the "Petition Date").  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

7.      Defendant Sears, Roebuck de Puerto Rico, Inc. (3626) ("Sears"), is a direct subsidiary of Sears Holdings Corporation and a party to a *Lease Agreement* executed on September 22, 1965, Sears leases from Santa Rosa Mall its anchor store ("Store No. 1915" or the "Demised Premises").

Factual and Procedural Background

8.      Pursuant to a *Lease Agreement* executed by Santa Rosa Mall and Sears on September 22, 1965, Sears leases from Santa Rosa Mall its anchor store ("Store No. 1915" or the "Demised Premises") (the "Lease Agreement").  A copy of the *Lease Agreement* is attached hereto as **Exhibit I**.

9.      In addition to the fixed rent, the *Lease Agreement* includes other monetary and non-monetary obligations typical of commercial leasing agreements.  See *Lease Agreement* at § 2.01, p. 12; § 2.03, p. 14.

10.    As part of its non-monetary obligations, Section 2.01 of the *Lease Agreement* provides that "all costs, expenses and obligations of any kind relating to the … maintenance, preservation, care, repair and operation of the Demised Premises, including all replacements, alterations, and additions … which may arise or become due during the term of this lease shall be paid by [Sears] and [Santa Rosa Mall] shall be indemnified and saved harmless by [Sears] from and against such costs, expenses· and obligations". Id., § 2.10, p. 12. The *Lease Agreement* requires Sears to "keep the Demised Premises [] in good order and repair and in such condition as may be required by law and by the terms of any insurance policies covering the Demised Premises", including repairs that are "extraordinary as well as ordinary and whether or not such repairs shall be of a structural nature []". Id. § 4.01, p. 23.

11.    Section 4.03 of the *Lease Agreement* further extends Sears' obligation for maintenance and repair, and requires that:

> [Sears] pay and discharge, and indemnify and save harmless [Santa Rosa Mall] against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon to incurred by or asserted against [Santa Rosa Mall] by reason of [] [a]ny work or thing done in, on or about the Demised Premises or any part thereof; [a]ny [] maintenance, repair or management of the Demised Premises []; [and/or] [a]ny failure on the part of [Sears] to perform or comply with any of the covenants, agreements, terms or conditions contained in [the] lease on its part to be performed or complied with.

Id. § 4.03, pp. 23-24.

12.    Section 6.01 of the *Lease Agreement further* requires that Sears "maintain at [its] sole cost and expense, for the benefit of [Santa Rosa Mall] and [Sears], insurance with respect to the Demised Premises" for risks including "windstorm". Id. § 6.01(a), p. 26. Such insurance policy "shall be secured promptly and **certificates thereof shall be furnished to [Santa Rosa Mall]**" and "**shall contain loss payable clause to [Santa Rosa Mall] and [Sears]**". Id., § 6.02(a), pp. 26-27. Renewals of the insurance policies are also subject to the foregoing. Id., 6.02(b), p. 27.

13.    In the event of damage by windstorm or any other casualty to the Demised Premises in an amount over $100,000, such as that caused by Hurricanes Irma and Maria, Section 6.03(b)(2) of the *Lease Agreement* requires Sears "proceed with all reasonable expedition to restore or rebuild [] the building so

destroyed or rendered untenantable, free from liens of any kind, in substantial accordance with the plans and specifications of the building so destroyed or rendered untenantable []". Id., § 6.03(b)(2), p. 28. Section 6.03(b)(2) triggers Section 5.02 of the *Lease Agreement*, which requires that Sears "furnish to [Santa Rosa Mall] a duplicate set of the working plans, sketches and specifications for the proposed work", "at its own cost and expense obtain or cause to be obtained all the insurance coverage specified in Section 3.04", and that "[a]ny alteration or addition [] be carried out in such a way  as to interfere as little as is reasonably possible with the operations of the Shopping Center []". Id., § 5.02(a), (c) and (d), p. 25.

14.    Section 6.03(b)(3) of the *Lease Agreement* further mandates as follows:

> **The net sums recovered by [Santa Rosa Mall] and [Sears] on account of loss or damage whether under the policies taken out as aforesaid, or under other insurance policies taken out by [Sears] and indemnifying for <u>physical loss</u>** (as distinguished from the loss of use and occupancy. or profits), **shall by <u>deposited in a special account in the name of [Santa Rosa Mall]</u> separate and distinct from all other funds of [Santa Rosa Mall] <u>in a bank or trust company of the City of San Juan, Puerto Rico, approved by [Santa Rosa Mall] and [Sears]</u> to be applied on account of the cost of such restoration or rebuilding**, as the case may be, as the work of restoration or rebuilding progresses, and [Sears] shall pay any and all additional moneys required in such restoration or rebuilding in excess of said net sums recovered, and shall be entitled to receive any surplus, if any, remaining of said deposit after such restoration .. or rebuilding has been completed as aforesaid, provided, however, that should the aforesaid damage by fire or other casualty occur within the last three years of the initial term or any extended term this lease, [Sears] shall have the option to surrender the proceeds of any insurance to [Santa Rosa Mall] and vacate the premises.

Id., § 6.03(b)(3), pp. 28-29 (emphasis and underline added).

15.    The deposit of the insurance proceeds in a separate account is essential and Section 6.03(d) explains its importance:

> If [Sears] does not commence promptly to repair or restore the injury or destruction, or if, having commenced the repair or restoration, [Sears] does not proceed diligently to complete the same, [Santa Rosa Mall] shall be entitled (but shall be under no obligation) at any time thereafter to enter the Demised Premises and repair or restore the injury or destruction and to apply any insurance proceeds in the said special account to the payment of the cost thereof; but if the insurance proceeds are insufficient for the cost of the repair, restoration or reconstruction, [Sears] shall pay to [Santa Rosa Mall], upon demand and as additional rent as the work progresses; such amounts as shall be necessary to complete the repair, restoration or reconstruction.

Id., § 6.03(d), p. 29.

16.    Section 15.01 of the *Lease Agreement* further mandates as follows:

Tenant shall on the expiration, of the term of this lease or other sooner termination hereof, Surrider and deliver up the Demised Premises with the buildings and improvements then erected and maintained thereon into the possession of Landlord in good order, condition and repair, free and clear of all liens, tenancies and encumbrances other than those, if any, created by Landlord, and title to such buildings and improvements shall vest in the Landlord without any payment or allowance whatever by Landlord on account of or for any buildings and improvements on the Demised Premises at the time of the surrender, or for the contents thereof or appurtenances thereto.  Tenant shall execute such instruments as may be required to effectuate the transfer of title to Landlord.

The aforesaid surrender shall include all fixtures and facilities in the buildings on the Demised Premises, or forming part thereof, which are customarily regarded as real estate and as part of the buildings.  Any fixtures, trade fixtures, personal property or belongings of Tenant left upon the Demised-Premises at the time of such surrender shall be deemed to have been abandoned by Tenant.

Id., § 15.01, pp. 46-47.

17.    In accordance with Section 6.02(a), of the *Lease Agreement*, Sears furnished to Santa Rosa Mall certificates of insurance for the period of June 1, 2015 to June 1, 2016 (Certificate No. 570075074205) and June 1, 2016 to June 1, 2017, Certificate No. 570075074276.  A copy of the *Certificate of Insurance Nos. 570075074205* and *570075074276* is attached hereto as **Exhibit II**.

18.    The "Additional Remarks Schedule" of Certificate of Insurance Nos. 570075074205 and 570075074276, read as follows:

Santa Rosa Mall, LLC… and Commercial Centers Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location.

Id. at p. 3. Certificate of Insurance Nos. 570075074205 and 570075074276 refer to "Sears Store No. 1915 – Santa Rosa Mall, Bayamon, PR".  Id.

19.    On or about May 30, 2017, SHC executed a *Contract of Insurance* (the "*Contract of Insurance*" or "*Insurance Policy*") with AIG for AON Policy No. PTNAM1701557 for the period comprised of June 1, 2017 to June 1, 2018. The wording and endorsements contained in the *Contract of Insurance* were agreed to by Lex-London a division of AIG Europe Limited. A copy of such *Contract of Insurance* is attached hereto as **Exhibit III**.

20.    Pursuant to the *Contract of Insurance*, Santa Rosa Mall is included among the insured.

NAMED INSURED    The Sears Holdings Corporation and any subsidiary, affiliated, associated, or

allied company, corporation, firm, organization, partnership, joint venture, joint lease, or joint operating agreement as now or hereafter constituted or acquired, as their respective interest may appear; and **any other party for which the Insured has the responsibility for providing insurance,** as their respective interest may appear.

Id. at p. 3 (emphasis added).

21.      In the event of an inadvertent errors and/or omission, Paragraph 37 of the *Contract of Insurance* provides that such error, "shall [not] prejudice the Insured's right of recovery, but shall be corrected when discovered." Id. at p. 26, ¶ 37.

22.      Paragraph 39 of the *Contract of Insurance* further provides:

It is agreed that Aon Risk Services, Inc. are authorized to issue Certificate(s) or Evidence(s) of Insurance… naming Additional Named Insured(s), Loss Payee(s) or Mortgagee(s), and others for their respective rights and interests, subject always to the terms, conditions and limits of endorsements in respect of such additional interests.

Id. at p. 27, ¶ 39.

23.      On or about October 25, 2017, Aon Risk Services, Inc., issued Certificate of Insurance No. 570075074281 regarding Policy No. PTNAM1701557 for the period of June 1, 2017 to June 1, 2018 (the "*Certificate of Insurance*").  As stated in the *Certificate of Insurance*, the coverage limit of the *Contract of Insurance* is of $50,000,000. A copy of the *Certificate of Insurance* is attached hereto as **Exhibit IV**.

24.      Under the "Additional Remarks Schedule" of such *Certificate of Insurance*,

**Santa Rosa Mall, LLC… and Commercial Centers Management, LLC are included as Loss Payee** in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location.

Id. at p. 3. The *Certificate of Insurance* refers to "Sears Store No. 1915 – Santa Rosa Mall, Bayamon, PR". Id.

25.      Sears has operated Store No. 1915 at Santa Rosa Mall since September 22, 1965, following the execution of the *Lease Agreement*, until the passing of Hurricane Maria on September 20, 2017, when it closed its doors.  The Court may take judicial notice of the passing of Hurricane Maria, as well as its trajectory and aftermath under Fed. R. Evid. 201.

26.      Hurricane Maria caused substantial damage to Store No. 1915, which has remained closed

to the public, inoperative, and in ill-repair ever since. Critically, Store No. 1915 is, has been, and continues to be the "anchor store" and the largest store at Santa Rosa Mall, acting as the main driver of customers for other tenants. Two (2) of the four (4) main entrances to Santa Rosa Mall are through Sears, which directly impedes traffic flow. Store No. 1915's presence in Santa Rosa Mall is so essential that lease agreements for other tenants include co-tenancy clauses directly related to Sears' operations, meaning that if Sears closes, certain other tenants at the mall have a right to terminate their leases and/or if Sears closes operations for a determined period, other tenants at the mall have the right to have their rents significantly reduced. See Lead Case Docket No. 2828, *Declaration of Yvette Melendez*, at ¶ 6.

27.   On October 26, 2017, SHC informed Commercial Centers Management, LLC ("Landlord") by letter that "Sears ha[d] an insurance claim for this loss", referring to Santa Rosa Mall's damages, and that "[o]nce the insurance payment [was] received arrangements will be made for it to be deposited with an agreed bank". *Letter from Sears to Santa Rosa Mall dated October 26, 2017* attached hereto as **Exhibit V.**

28.   Upon information and belief, SHC filed a claim with AIG relating to the damages sustained by the Demised Premises, in an amount of $20,836,827.00. A "*Detail of Repair Costs - Sears #1915"* is attached as **Exhibit VI.**

29.   On October 30, 2017, Santa Rosa Mall, through its affiliate CCM Puerto Rico, issued a letter to AIG requesting "to be informed as of the filing of any claim under the policy as well as the processing of the same, and that any insurance proceeds be deposited as required by the Lease Agreement". *Letter from CCM/Santa Rosa Mall to AIG dated October 30, 2017* attached hereto as **Exhibit VII.** No response was received. Also see Santa Rosa Mall's request to that extent in the *Motion for Entry of Order for the Debtor to: (i) Disclose Status of Insurance claim; (ii) Deposit any Insurance Proceed into Separate Account to be Used Exclusively to Repair the Insured Demised Premises; and (iii) Alternatively, find the Automatic Stay inapplicable to the Insurance Proceeds* filed on December 14, 2018 (Lead Case Docket No. 1240).

30.   After the Petition Date, the Debtors suspended all reconstruction efforts in the Demised

Premises.

31.    In the thirteen-month period between the passing of Hurricane Maria and the Petition Date, Sears had ample time to rebuild the Demised Premises and reopen the store.  Notwithstanding, the scope of the work completed by Sears was only limited to certain demolition, clean up and roof replacement.

32.    On November 1, 2018, the Debtors filed a *Motion for Approval of Global Bidding Procedures* (the "*Global Bidding Procedures Motion*", Docket No. 429) in connection with a sale or disposition of certain assets of Sears and its debtor affiliates (the "*Global Bidding Procedures*").

33.    On November 19, 2018, the Court entered an *Order Approving Global Bidding Procedures and Granting Related Relief* (the "*Global Bidding Procedures Order*", Docket No. 816) regarding the sale/disposition of certain assets, scheduling auctions and hearings for approval of proposed sale transactions and approving the procedures for the assumption and assignment of executory contracts and unexpired non-residential leases.

34.    On November 21, 2018, the Debtors filed a *Notice of Filing of Global Bidding Procedures Process Letter* (the "*Process Letter*", Docket No. 862) soliciting bids for all or some of the Debtors' stores and related assets identified as "Go Forward Stores", either on a going concern basis or on a liquidation basis. Pursuant to the asset schedule attached thereto, the Debtors identified Santa Rosa Mall as a "Go Forward Store". Id., p. 43, line no. 381.

35.    On December 14, 2018, Santa Rosa filed a *Motion for Entry of Order for the Debtor to: (i) Disclose Status of Insurance Claim; (ii) Deposit Any Insurance Proceed into Separate Account to Be Used Exclusively to Repair the Insured Demised Premises; and (iii) Alternatively, Find the Automatic Stay Inapplicable to the Insurance Proceeds* (the "*Motion for Entry of Order*", Docket No. 1240), wherein Santa Rosa Mall sustained that pursuant to the obligations under the *Lease Agreement* and the *Certificate of Insurance*, Santa Rosa Mall was a "loss payee" under the Contract of Insurance.

36.    By the *Motion for Entry of Order*, Santa Rosa Mall further sustained that the insurance proceeds were not part of the bankruptcy estate and must be exclusively applied to the restoration or rebuilding of the Demised Premises in accordance to the *Lease Agreement*.  Santa Rosa Mall was not then

or now been privy to the insurance claims filed by SHC with AIG or the insurance settlement or negotiations, if any, in spite of its express request.

37.    On January 14, 2019, the Debtors commenced an Auction for the assets identified as "Go Forward Stores" in connection with the *Global Bidding Procedure* Order. See Docket No. 816, p. 32; Docket No. 1730, p. 2, ¶ 4.

38.    On January 18, 2019, the Debtors filed a *Notice of Successful Bidder and Sale Hearing* (Docket No. 1730). Attached thereto as Exhibit "A" (Docket No. 1730) is a copy of the *Asset Purchase Agreement* ("*Asset Purchase Agreement*") executed by and between Sears and Transform Holdco LLC (the "Buyer"), for the purchase of the *Acquired Assets*, as defined therein, on January 17, 2019. Id. at p. 2, ¶ 4.





42.     On January 26, 2019, Santa Rosa Mall filed a *Standing Objection to Global Asset Sale Transaction* (the "*Standing Objection*", Docket No. 2013).  Pursuant to the terms of the *Asset Purchase Agreement*, specifically Section 2.1(q), Transform Holdco LLC (the "Buyer") acquired all proceeds relating to loss or damage occurring prior to the closing date of the Global Sale Transaction minus a cap of $13,000,000.00.[3]  In its *Standing Objection*, Santa Rosa Mall sustained that the insurance proceeds from the global settlement relative to Santa Rosa Mall's claim for damages should be used for the reconstruction of Store No. 1915 or be deposited in escrow with the Landlord, in accordance with the terms of the *Lease Agreement*.

43.     On February 8, 2019, the Court entered and *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith, and (IV) Granting Related Relief* (the "*Sale Order*", Docket No. 2507).

44.     As part of the *Asset Purchase Agreement*, the Debtors transferred all title to the proceeds from the global settlement to the Buyer, minus a cap of $13,000,000.00.[4] Section 2.1(q) of the *Asset*

---

[3] The $13,000,000.00 insurance cap language remained unchanged pursuant to the February 8, 2019 *Sale Order* (Docket No. 2507).
[4] *Declaration of Sunny Sigh* (Docket No. 2344 pp. 236-237, ¶¶ 9-9) ("In addition, the debtors… retain 13 million dollars in hurricane insurance proceeds").

*Purchase Agreement* specifically provides the following:

> [O]n the Closing Date, Sellers shall sell, transfer, assign, convey and deliver… to Buyer… any and all insurance proceeds… in respect of loss or damage to… any Acquired Asset… relating to a casualty occurring prior to… [the] Closing Date… less any proceeds… in an aggregate amount not to exceed $13,000,000.

Docket No. 2507-1, pp. 56-58, § 2.1(q).

45.     Schedule 2.1(q) of the *Asset Purchase Agreement* further states that the insurance proceeds described in Section 2.1(q) are derived from a claim filed on account of the Hurricane Maria Loss. For ease of reference, attached as **Exhibit IX** is Schedule 2.1(q).

46.     On that same date, February 8, 2019, the Debtors filed an *Objection* to the Motion *to Compel Insurance Proceeds* (the "*Debtor's Objection*", Docket No. 2512), arguing, for the first time, that Santa Rosa Mall is not a loss payee under the Contract of Insurance, and that the *Certificate of Insurance* provided by the Debtor to Santa Rosa Mall is erroneous and "not determinative of the extent of coverage under the Insurance Policy", despite the Debtor's obligations under § 6.02(a)  the *Lease Agreement*. Docket No. 2512, p. 10, ¶ 24.

47.     On March 13, 2019, Santa Rosa Mall filed a *Reply* to the *Debtor's Objection* (Docket No. 2828) for the *Contract of Insurance* to be reformed to specifically include Santa Rosa Mall as a loss payee in accordance with property rights obtained under the *Lease Agreement* and, in the alternative, impose an equitable lien over the insurance proceeds in favor of Santa Rosa Mall.

48.     A hearing to consider the *Motion to Compel Insurance Proceeds* was held on March 21, 2019 wherein Santa Rosa Mall proffered to the Court discovery material designated as "Confidential Material" by the Debtors in accordance with the *Amended Stipulated Protective Order* (Docket No. 1084).

49.     On April 10, 2019, Santa Rosa Mall filed Proof of Claim No. 17454 in the amount of $16,500,000.00.

50.     On April 30, 2019, the Debtors filed a *Notice of Rejection of Certain Unexpired Leases of Nonresidential Real Property and Abandonment of Property in Connection Therewith* (Docket No. 3449) rejecting the *Lease Agreement* for Store No. 1915. Id. at p. 11.

COUNT I - BREACH OF CONTRACT
Pursuant to 31 L.P.R.A. § 3374
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

51.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

52.     Property and interests in property are determined with reference to state law in the absence of any controlling federal law.  See Butner v. United States, 440 U.S. 48, 54-55 (1979).  Like most jurisdictions, Puerto Rico follows the legal doctrine of *lex rei sitae*, meaning that "real [estate] property [is subject] to the laws of the country in which it is situated".  Article 10 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 10.  In disputes involving real property, the law of the jurisdiction in which the property is located applies.  See Weston v. Stuckert, 329 F.2d 681 (1st Cir. 1964).

53.     Insurance contracts are governed by the law of the place where the contract was made, especially where the contract was to be performed.  See 17 Couch on Insurance § 24:12 (3rd ed. 2018).  As such, if the contract is to be performed in the state in which the subject matter is located, "it is governed by the laws of that state, rather than by the laws of another state in which the action is brought, or in which the insurance company is domiciled."  Id. at § 24:14.  New York follows a similar posture.  In New York, "the 'center of gravity' in an insurance contract dispute is generally the state where the insured risk is located".  Liberty Mutual Insurance Company v. Fairbanks Company, 170 F. Supp. 3d 634, 642 (S.D.N.Y. 2016) (Koeltl, D.J.).

54.     The *Lease Agreement* and the *Contract of Insurance* both hinge on real estate property located in Puerto Rico as well as insurable interests and insured risks in Puerto Rico.  Hurricane Maria, the insured casualty, also happened in Puerto Rico. Likewise, the insured risk and the Demised Properties are all in Puerto Rico.  Accordingly, both must be interpreted according to Puerto Rico law.

55.     Puerto Rico law recognizes a cause of action in favor of third-party beneficiaries to a contract.  See M.R. (Vega Alta), Inc. v. Caribe General Elec. Products, Inc., 31 F. Supp. 2d 226, 238 (D.P.R. 1998); Real Legacy Assurance Co. v. Santori Trucking, Inc., 2008 WL 11357822, at *3 (D.P.R. 2008).

-12-

56.     Article 1209 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3374, states in pertinent part that "[s]hould the contract contain any stipulation in favor of a third, he may demand its fulfilment, provided he has given notice of his acceptance to the person bound before it may have been revoked." 31 L.P.R.A. § 3374 (West translation).

57.     Pursuant to the *Contract of Insurance*, Santa Rosa Mall is included among the insured. <u>See</u> **Exhibit III**, p. 3.

58.     SHC has acknowledged that the insurance proceeds for Store No. 1915 are to be deposited in an account of Santa Rosa Mall's choosing in accordance with the *Lease Agreement*. <u>See</u> **Exhibit V**.

59.     Santa Rosa Mall accepted the *Contract of Insurance* and duly demanded its fulfillment to both SHC and Sears.  Despite Santa Rosa Mall's repeated requests that Sears comply with their obligations under the *Contract of Insurance*, Sears failed to comply. As a result, Santa Rosa Mall has not received any insurance proceeds derived from the *Contract of Insurance* while the Demised Premises have remained closed to the public, inoperative, and in ill-repaired since September 20, 2017.

60.     The designation of Santa Rosa Mall as among those insured under the *Contract of Insurance* constitutes a stipulation specifically for the benefit of Santa Rosa Mall.  Its actions thereafter reflect the acceptance of the same.

61.     Accordingly, Plaintiff seeks the fulfillment of the *Contract of Insurance* pursuant to Article 1209 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3374.

COUNT II - BREACH OF CONTRACT
Pursuant to 31 L.P.R.A. § 3052
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

62.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

63.     The Defendants executed a *Lease Agreement* wherein they agreed to maintain property insurance with respect to the Demised Premises and include a loss payable clause in favor of both Santa Rosa Mall and Sears.

64.     The Defendants further agreed that the net sums recovered on account of loss or damage

-13-

were to be deposited in a special account in the name of Santa Rosa Mall, separate and distinct from all other funds in a bank or trust company of the City of San Juan, Puerto Rico, to be applied to the cost of the repair, restoration, or reconstruction of the Demised Premises so destroyed or rendered untenantable.

65.    Pursuant to Article 1077 of the Puerto Rico Civil Code, where a party to mutual obligation "does not comply with what is incumbent upon him… [t]he person prejudiced may choose between exacting the fulfillment of the obligation or its rescission, with indemnity for damages and payment of interest in either case." 31 L.P.R.A. § 3052 (West translation). See also Castillo-Perez v. Bosques-Cordero, 2011 WL 13233491, at 8 (D.P.R. 2011).

66.    The language of the *Lease Agreement* is clear and requires Sears keep and/or deliver, in the event of termination, the Demised Premises in good order and repair.  To such end, Sears agreed to discharge, indemnify and save harmless Santa Rosa Mall against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed, incurred by or asserted against Santa Rosa Mall by reason of any work done in, on or about the Demised Premises, any maintenance, repair, or management of the Demised Premises, and any failure on the part of Sears to perform or comply with the *Lease Agreement*, and to procure property insurance for the Demised Premises with a loss payable clause in favor of Santa Rosa Mall and furnish certificates of insurance thereof.

67.    The *Lease Agreement* further mandates that the net sums recovered on account of loss or damage under the aforementioned insurance policy or policies procured by Sears, be deposited in a special account in the name of Santa Rosa Mall, separate and distinct from all other funds, to be applied on account of the cost of restoration or rebuilding of the Demised Premises on account of an insured casualty.

68.    The importance of the loss payable clause in favor of Santa Rosa Mall is a principal obligation under the *Lease Agreement*.  As previously disclosed, if Sears does not commence promptly to repair or restore the Demised Premises so injured or destroyed by an insured event, or if, having commenced the repair or restoration, Sears does not proceed diligently to complete the same, Santa Rosa Mall is entitled to repair or restore the Demised Premises and apply any insurance proceeds towards such end.  Accordingly,

the deposit of the insurance proceeds into a separate account is critical.

69.     Following a major insurable event, the SHC and Sears Defendants cannot simply walk away and expect the Santa Rosa Mall to assume any and all of the costs of repair and/or restoration of the Demised Promises.

70.     The SHC and Sears Defendants have failed to both include a loss payable clause in favor of Santa Rosa Mall and deposit any insurance proceeds into a separate account, despite having acknowledged such obligations.  See **Exhibit V**.

71.     Santa Rosa Mall performed all its obligations under the *Lease Agreement*.

72.     In accordance with Article 1077 of the Puerto Rico Civil Code, Plaintiff has a right to demand specific performance of Section 6.02(a) of the *Lease Agreement*.

73.     In the alternative, equity favors reforming the policy to reflect the contracting parties' intent.  Where a lessee is charged with the duty of obtaining insurance on property with a loss payable clause in favor of the lessor, but the policy does not contain such a provision, equity will treat the policy as having contained the loss payable provision.

74.     As held in the U.S. Court of Appeals for the First Circuit:

> When a party asks for reformation of a contract, it is not asking the court to interpret the contract but rather to change it to conform to the parties' intent. [] Accordingly, the usual restrictions on contract interpretation, [] do not apply to a court's inquiry into the parties' intent []. In a reformation case, it does not matter that a contract unambiguously says one thing.  A court still will accept extrinsic evidence in evaluating a claim that both parties to the contract intended it to say something else.

OneBeacon America Ins. Co. v. Travelers Indem. Co. of IL, 465 F.3d 38, 41 (1st Cir. 2006). Also see Sierra Equipment, Incorporated v. Lexington Insurance Company, 890 F.3d 555, 558, n. 2 (5th Cir. 2018).

75.     Accordingly, this Court may reform the *Contract of Insurance* for Policy No. PTNAM1701557 to conform it to the parties' express intent in the *Lease Agreement*.

76.     In accordance with the above, Plaintiff seeks the specific performance of Section 6.02(a) of the *Lease Agreement* and consequent correction of the *Contract of Insurance* to include a loss payable clause in favor of Santa Rosa Mall and, in the alternative, Plaintiff seeks the equitable reformation of the

*Contract of Insurance* to treat it as having contained the loss payable provision, in accordance parties' express intent in the *Lease Agreement*, plus costs, expenses and attorneys' fees pursuant to Section 4.03(e) of the *Lease Agreement*.

<u>COUNT III - CLAIM FOR UNJUST ENRICHMENT</u>
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

77.      Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

78.      Santa Rosa Mall seeks the imposition of a constructive trust and the immediate turnover of the insurance proceeds to prevent the unjust enrichment of certain Defendants.

79.      The Sears Defendants executed a *Lease Agreement* wherein they agreed to maintain property insurance with respect to the Demised Premises, include a loss payable clause in favor of both Santa Rosa Mall and Sears, and deposit net sums recovered on account of loss or damage in a special account in the name of Santa Rosa Mall, to be applied to the cost of the repair, restoration, or reconstruction of the Demised Premises.

80.      Upon information and belief, the Demised Premises sustained damages in an amount of $20,836,827.00.  <u>See</u> **Exhibit VI.**

81.      Upon information and belief, SHC filed a claim with AIG relating to A "*Detail of Repair Costs - Sears #1915"* is attached as **Exhibit VI.**

█████  █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████

83.      Pursuant to the agreements reached by the parties, the Defendants promised to insure the property for the Plaintiff's benefit, and apply all net sums recovered on account of loss or damage to the cost of the repair, restoration, or reconstruction of the Demised Premises so destroyed or rendered untenantable.

84.      Under Puerto Rico law, a constructive trust may be imposed to return property to its rightful

owner.  See U.S. v. Garcia, 532 F. Supp. 325, 332 (D.P.R. 1981).  Generally, a constructive trust may be imposed when one party has acquired legal title to property under circumstances that such party could not, in good conscience, retain the beneficial interest thereto.  See Zimmermann v. Epstein Becker & Green, P.C., 657 F.3d 80, 83 (1st Cir. 2011), citing Great–West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002); 76 Am. Jur.2d Trusts § 168.

85.    The central objective of a court-imposed trust is to prevent unjust enrichment.  See Zimmermann v. Epstein Becker & Green, P.C., 657 F.3d at 83.  Accordingly, a constructive trust presupposes a wrongful acquisition of property such as misappropriation, fraud, mistake, breach of duty, abuse of confidential relations and duress or undue influence.  See Emily L. Sherwin, Constructive Trusts in Bankruptcy, 1989 U. Ill. L. Rev. 297, 329 (Jan. 1989); Restatement of Restitution § 166; In re CRS Steam, Inc., 225 B.R. 833, 836 (Bankr. D. Mass. 1998).

86.    In the instant case, the Sears Defendant purports to use the proceeds obtained from the *Confidential Settlement and Release Agreement* for their own pecuniary benefit, as part of the general fund available for distribution to all creditors.

87.    By using the insurance proceeds to enhance their bankruptcy estates instead of applying such funds in escrow for its agreed purpose, that is, to the repair, restoration, or reconstruction of the Demised Premises, the Sears Defendant is unjustly enriched at Plaintiff's expense.

88.    Accordingly, Plaintiff seeks the imposition of an equitable remedy in the form of a constructive trust upon the insurance proceeds obtained for the Hurricane Maria Loss under Policy No. PTNAM1701557, to the extent of Plaintiff's interest, to be applied on account of the cost of the restoration or rebuilding of the Demised Premises.

COUNT IV - CLAIM FOR DECLARATORY JUDGMENT
Pursuant to Fed. R. Civ. P. 57, Fed. R. Bankr. Proc. 7001(9), 28 U.S.C. § 2201, and 11 U.S.C. 541(d)
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

89.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

90.    Santa Rosa Mall seeks a declaratory judgment that the Defendants have no present right or

title to the insurance proceeds, to the extent of Plaintiff's interest, and such funds do not comprise property of the estate, pursuant to Fed. R. Civ. P. 57, Fed. R. Bankr. Proc. 7001(9), 28 U.S.C. § 2201, and 11 U.S.C. 541(d).

91.     Bankruptcy courts may issue declaratory judgments pursuant to Fed. R. Bankr. P. 7001(9). A bankruptcy court's discretion to issue declaratory judgments is subject to the constraints of 28 U.S.C. § 2201 and the court's jurisdictional limits. See In re Kings Falls Power Corp., 185 B.R. 431, 436 (Bkrtcy. N.D.N.Y. 1995).

92.     Section 2201 of the U.S. Judicial Code states that "[i]n any case of actual controversy," a court may, "upon the filing of an appropriate pleading ... declare the rights and other legal relations of any interested party seeking such declaration," and such declaration "shall have the force and effect of a final judgment or decree." 28 U.S.C. § 2201.

93.     As stated by the U.S. Court of Appeals for the Second Circuit, "[a] declaratory judgment action presents an actual controversy if the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." In re Prudential Lines Inc., 158 F.3d 65, 70 (2nd Cir. 1998), quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941) (internal quotations omitted). See also In re Homaidan, 596 B.R. 86, 101 (Bkrtcy. E.D.N.Y. 2019).

94.     Santa Rosa Mall is included among the insured under the *Contract of Insurance*.  As such, Santa Rosa Mall has an insurable interest over the insurance proceeds for the damages to the Demised Premises and a right to the proceeds of Policy No. PTNAM1701557.  Accordingly, the insurance proceeds, as they relate to the damages sustained by Store No. 1915, are not property of the bankruptcy estate, and Santa Rosa Mall is entitled to payment of those proceeds.

95.     As a general rule, Section 541(a)(1) of the Bankruptcy Code provides that when a debtor files for bankruptcy, a bankruptcy estate that is created, comprised of all legal or equitable interests of the debtor in property as of the commencement of the case wherever located and by whomever held.  Section

541(a)(6) extends the bankruptcy estate to "proceeds, product, rents of profits or from property of the estate…".

96.     Although the definition of the bankruptcy estate is comprehensive, it is not all-encompassing.  In <u>United States v. Whiting Pools, Inc</u>., 462 U.S. 198, 204 n.8 (1983), the U.S. Supreme Court acknowledged that property of the estate does not comprise those interests in which the debtor holds only "a minor interest such as a lien or bare legal title."

97.     The parameters of estate property are circumscribed by the language of 11 U.S.C. § 541(d). Section 541(d) provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, … becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property…"  11 U.S.C. § 541(d). Accordingly, courts have concluded that Section 541(a)(1) does not extend to property in which the debtor possesses merely a reversionary interest.

98.     Insurance policies purchased and paid for by a debtor are generally property of the bankruptcy estate.  <u>See e.g.</u> <u>MacArthur Co. v. Johns-Manville Corp.</u>, 837 F.2d 89, 92 (2nd Cir. 1988); <u>In re SN Liquidation, Inc.</u>, 388 B.R. 579, 583–84 (Bankr. D. Del. 2008); <u>Ascands, Inc. v. Travelers Cas. and Sur. Co.</u>, 435 F.3d 252 (3rd Cir. 2006); <u>Estate of Lellock v. Prudential Ins. Co. of Am.</u>, 811 F.2d 186, 189 (3rd Cir. 1987).

99.     Notwithstanding, even when a debtor's insurance policies themselves may be property of the bankruptcy estate, the proceeds of those policies may not necessarily be.  "It is well settled that ownership of an insurance policy that is property of a debtor's estate does not necessarily result in a determination that the debtor's estate owns the proceeds from a policy."  <u>In re Hill</u>, 174 B.R. 949 (Bankr. S.D. Ohio 1994).  "The question is not who owns the policies, but who owns the liability proceeds."  <u>In re Louisiana World Exposition, Inc.</u>, 832 F.2d 1391, 1399 (5th Cir. 1987).

100.    As such, Bankruptcy Courts distinguish between ownership of insurance policy and the ownership of the proceeds.  The mere fact that debtor's insurance policy is included in bankruptcy estate does not necessarily mean that proceeds are also included in the estate.  <u>See</u> 3A <u>Bankr. Service L</u>. Ed. §

29:235 (2018 update).  "[T]he inquiry remains, as it has always been, a fact-specific one."  In re OGA

Charters, L.L.C., 901 F.3d 599, 603 (5th Cir. 2018).  Also see In re Sfuzzi, Inc., 191 B.R. 664, 668 (Bankr.

N.D. Tex. 1996) ("[T]he question of whether the proceeds are property of the estate must be analyzed in

light of the facts of each case.").  A party's right to receive and keep the insurance policy's proceeds is

inevitably limited by the insurance and contractual provisions resulting in the purchase of the policy.  See

In re Jones, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("the Debtor's rights to the proceeds of his policy

are inevitably subject to the contractual restrictions in his insurance policy and mortgage agreement.").

Also see 17A Am. Jur. 2d Contracts § 442 (the rights of a loss payee depend upon the substantive rights

under the contracts).

101.    The Debtors have no present right or title to the funds in accounts, and such proceeds, and

the funds contained therein, do not comprise property of the bankruptcy estate under 11 U.S.C. § 541(a)(1).

Santa Rosa Malls' contention that the insurance funds on deposit do not constitute estate property is further

supported by case law.  Santa Rosa Malls' contention that the insurance funds on deposit do not constitute

estate property is supported by case law.

102.    In re Amiel Rest. Partners, LLC, 510 B.R. 744 (Bankr. D.N.J. 2014) (Kaplan, B.J.), is a

case involving the ownership of the flood insurance proceeds.  In that case, the debtor's commercial

landlord moved the Bankruptcy Court for an order compelling Debtor to release insurance proceeds derived

from the prepetition destruction of property caused by Hurricane Sandy.  The landlord and debtor had

entered into a commercial lease agreement that required the debtor to maintain several types of insurance

coverage, including property insurance.  The Court held that the landlord had an insurable interest at the

time the property was destroyed and, as an additional insured on a flood insurance policy purchased by

debtor, was entitled to proceeds of flood insurance property.  The Court also considered that, like the *Lease

Agreement* in the instant case, the lease agreement in that case provided that at the expiration of the lease

the alterations and improvements to the leased properties would become the "sole property" of the landlord.

Compare id. at 753 with *Lease Agreement*, 1240-1, § 15.01, pp. 43-44.  Ultimately, the Court held that

under the property rights created by the lease agreement, the proceeds of the flood insurance were not property of the bankruptcy estate, and landlord was entitled to payment of those proceeds. Id. at 753.

103.    Courts within the Second Circuit have ruled in a similar vein.  For instance, in Pine Bush Equipment Co. v. Florian (In re Florian), 233 B.R. 25, 26 (Bankr. D. Conn. 1999) (Krechevsky, B.J.), the plaintiff, a New York corporation in the business of leasing equipment, leased a forklift on a monthly basis pursuant to a rental agreement to the debtor.  The rental agreement required the debtor to carry insurance against all risk of physical damage and that such policies of insurance will name the lessor as additional insureds.  The debtor purchased, as the named insured, a general liability insurance policy from Travelers Casualty & Surety Co. which included coverage for the rental of the forklift and a certificate of insurance issued by the insurance agency provided that the plaintiff be a "Loss Payee".  The forklift was damaged requiring repairs totaling $33,090.  The insurance claim was submitted to Travelers Casualty.  The Debtor filed a Chapter 7 bankruptcy petition.  After the petition, the debtor received the insurance proceeds from the insurance company and submitted them to the Chapter 7 trustee, who refused to deliver them to the plaintiff and instead deposited them into the Chapter 7 Trustee account.  The Trustee contended that the insurance proceeds were property of the bankruptcy estate because, pursuant to Section 541(a)(1) of the Bankruptcy Code, the insurance policy purchased by the debtors is property of the bankruptcy estate.  The plaintiff argued that, notwithstanding an insurance policy may be property of the estate, the issue was who was entitled to the proceeds of the claim paid by the insurance carrier.  The plaintiff contended that it was entitled to the check proceeds.  The Court analyzed as follows:

> The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds which the insurer paid on a claim when a payment by the insurer cannot inure to the debtor's pecuniary benefit.  Then that payment should neither enhance nor decrease the bankruptcy estate.  In other words, when the debtor had no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.

In re Florian, 233 B.R. at 27 (emphasis added), quoting from Houston v. Edgeworth (In re Edgeworth), 993 F.2d 51, 55 (5th Cir. 1993).

104.    The Florian Court decided that "although the insurance policy was purchased by the debtors, [it] was intended to cover damages to non-estate property --- the forklift owned by the plaintiff" and ordered the trustee to turn over to the plaintiff the insurance proceeds plus any accrued interests. In re Florian, 233 B.R. at 27.

105.    Similarly, in In re McLean Industries, Inc., 132 B.R. 271, 284 (Bankr. S.D.N.Y. 1991) (Blackshear, B.J.), the Court determined that the insurance proceeds to cover damages to a damaged cargo ship were not property of the bankruptcy estate inasmuch as the U.S. Department of Transportation, Maritime Administration and Chemical Bank had been assigned the proceeds as loss payee and additional insured, respectively.

106.    In In re Suter, 181 B.R. 116, 119 (Bankr. N.D. Ala. 1994), the Court determined that "because AmSouth was the loss payee of the insurance policy, the proceeds of the policy are not property of the bankruptcy estate and are payable to AmSouth, at least to the extent of AmSouth's interest in the property insured."

107.    Based on the forgoing, Plaintiff moves the Court to follow the same reasoning in favor of Plaintiff and enter a declaratory judgment that the insurance proceeds obtained for the Hurricane Maria Loss under Policy No. PTNAM1701557 are not property of the bankruptcy estate to the extent they relate to the damages sustained by Store No. 1915.  Furthermore, Plaintiff is entitled to payment of those funds which shall be "deposited in a special account in the name of [Santa Rosa Mall], separate and distinct from all other funds of [Santa Rosa Mall] in a bank or trust company of the City of San Juan, Puerto Rico" and such monies must only be used to "be applied on account of the cost of such restoration or rebuilding, as the case may be, as the work of restoration or rebuilding [of the Demised Premises] progresses". *Lease Agreement*, 1240-1, § 6.03(b)(3), p. 28.

COUNT V - CLAIM FOR DECLARATORY JUDGMENT
Pursuant to Fed. R. Civ. P. 57, Fed. R. Bankr. Proc. 7001(9), and 28 U.S.C. § 2201
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

108.    Plaintiff repeats ad realleges each of the allegations set forth above as if fully set forth herein.

109.   In the alternative, and pursuant to Fed. R. Civ. P. 57, Fed. R. Bankr. Proc. 7001(9), and 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment that Santa Rosa Mall has an equitable lien upon the insurance proceeds to the extent of its interest in the Demised Premises.

110.   Bankruptcy courts may issue declaratory judgments pursuant to Fed. R. Bankr. P. 7001(9). A bankruptcy court's discretion to issue declaratory judgments is subject to the constraints of 28 U.S.C. § 2201 and the court's jurisdictional limits. See In re Kings Falls Power Corp., 185 B.R. 431, 436 (Bkrtcy. N.D.N.Y. 1995). Section 2201 of the Judiciary Code states that "[i]n any case of actual controversy," a court may, "upon the filing of an appropriate pleading ... declare the rights and other legal relations of any interested party seeking such declaration," and such declaration "shall have the force and effect of a final judgment or decree." 28 U.S.C. § 2201.

111.   According to the U.S. Court of Appeals for the Second Circuit, "[a] declaratory judgment action presents an actual controversy if the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." In re Prudential Lines Inc., 158 F.3d 65, 70 (2d Cir. 1998), quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941) (internal quotations omitted). See also In re Homaidan, 596 B.R. 86, 101 (Bkrtcy. E.D.N.Y. 2019).

112.   In In re ATCORP I, Inc., 25 B.R. 340 (B.A.P. 1st Cir. 1982), the Bankruptcy Appellate Panel for the First Circuit considered the following insurance rules regarding interest on the payment of insurance proceeds to a mortgagee in equity when mortgagor has promised to insure property for mortgagee's benefit but the insurance policy did not:

> if the mortgagor covenants to keep the mortgaged property insured for the better security of the mortgagee, the latter will have an equitable lien upon the proceeds of insurance carried by the mortgagor, in case of loss, to the extent of his interest in the property destroyed, even though the policy contains no mortgagee clause and is payable to the mortgagor. Couch on Insurance 2d § 29:82 at 366.

> That rule is applicable in situations where the insurance proceeds are not payable to the mortgagee, but the mortgagor had promised to insure the property for the mortgagee's benefit, and thus, in equity, the proceeds should be payable to the mortgagee. Brown v. First National Bank of Dewey, 617 F.2d 581 (10th Cir.1980).

In re ATCORP I, Inc., 25 B.R. at 344.

113.    In In re Natale, 174 B.R. 362, 363-364 (Bankr. D.R.I. 1994), the mortgage agreement

required that insurance against loss shall be made payable to, and held by, Mortgagee as collateral security.

The debtors obtained fire and casualty insurance on the property but did not list mortgagee as a lienholder

or as a loss payee in contravention with the obligations in the mortgage agreement.   The Court held as

follows:

> Courts addressing this problem have acknowledged the equitable rights of the mortgagee,
> even where the mortgagor has elected to ignore those rights.  If the "mortgagor covenants in
> the mortgage to keep the property insured as further security for the payment of the mortgage
> debt, then the mortgagee is entitled to an equitable lien upon the insurance proceeds, even
> though the policy is in the name of the mortgagor alone." Freshwater v. Colonial Production
> Credit Ass'n, 286 S.C. 387, 334 S.E.2d 142, 144 (Ct. App. 1985) (citing Blackwell v. State
> Farm Mutual Automobile Insurance Co., 237 S.C. 649, 118 S.E.2d 701 (1961)); Nichols v.
> Baxter, 5 R.I. 491 (1858).  [] Based on these authorities and the undisputed facts in the instant
> case, we conclude that **this Court has the authority, and indeed the duty, to impose an
> equitable lien in favor of [mortgagee] on the insurance proceeds in question**, and it is so
> ORDERED.  Additionally, and quite aside from equitable considerations, we conclude that
> pursuant to paragraph 5 of the mortgage agreement [mortgagee] also has a contractual lien
> on the funds in question.

In re Natale, 174 B.R. at 364-365 (emphasis added).

114.    Courts in New York have ruled in a similar fashion.   In Rosario-Paolo v C & M Pizza

Restaurant, 84 N.Y.2d 379 (1994), the issue presented was whether plaintiff holds an equitable lien in the

insurance proceeds to the extent of its security interest in the insured premises to permit recovery.   The

parties entered into a security agreement pursuant to which defendant agreed to keep the premises insured

against loss by fire, theft and other hazards, to name the plaintiff as a beneficiary; and to deposit certificates

of insurance with plaintiff.   Despite the express provision in the security agreement, the defendant failed to

list any loss beneficiary under the insurance policy.   The Court ruled as follows:

> **The insurance against fire loss was procured by C&M to protect both its interest and
> plaintiff's interest in the secured property.**   C&M's covenant under the security agreement
> to insure the premises against fire loss for plaintiff's benefit gives plaintiff an equitable lien
> in any proceeds to the extent of its interest—in this case, the remaining unpaid portion of the
> purchase price.  Because Investors [the insurer] had notice of plaintiff's equitable claim but
> nevertheless satisfied a claim without regard to its interest, plaintiff can recover to the extent
> of its equitable lien in an action at law.

> **C&M's failure to name plaintiff as a loss beneficiary did not extinguish plaintiff's**

**interest in the secured property**, nor did it impair plaintiff's status as an equitable lienholder. In this regard, an insurance policy that contains a loss payable clause is not a separate insurance of the debt but a separate security for the debt.

**Because of the promise to insure for plaintiff's benefit that is embodied in the security agreement between plaintiff and C&M, plaintiff is entitled to enforce its covenant with C&M to recover damages to the extent of its equitable lien** [].

Rosario-Paolo, 84 N.Y.2d at 383 (emphasis added, citations omitted).

115.     In Weinreb v. M & S Bagels, 254 N.Y.S.2d 158, 159 (1964), a chattel mortgage contained a clause requiring the mortgagor to keep the chattels insured against loss and damage by fire for the benefit of the mortgagee.  Contrary to previous agreement, the mortgagor obtained an insurance policy which did not name the mortgagee as an insured.  The court held that the mortgagee was entitled to the insurance proceeds under the policy, even though the policy did not contain a mortgagee clause.  The Court concluded as follows:

Defendant Webster is the holder of the purchase-money mortgage covering the chattels which were destroyed by the fire. [] **The mortgage contained a clause requiring the mortgagor to carry fire insurance for the benefit of the mortgagee.** In fact insurance was carried but **the** [] **mortgagee clause was not included in the policy**. It would not have cost anything additional to include such clause and I deem its absence an inadvertent oversight. **The owner having been obligated to have a provision inserted in the policy in favor of the mortgagee, equity may treat the policy as having contained such a provision**). That this was the clear intent of the parties is evidenced by the fact that such a provision was inserted but not until the day after the fire. []

Had there been no provision in the mortgage for insurance in favor of the mortgagee, the result might well be different since the owner could not make a preferential assignment of the proceeds of the fire loss to one creditor. Of course, as between the owner and the mortgagee under a mortgage in which the mortgagor covenants to keep the property insured for the benefit of the mortgagee, the latter has an equitable lien upon the proceeds of insurance even though the policy contains no mortgagee clause [] The defendant Webster is entitled to the proceeds of the fire loss and since the proceeds are less than the amount due on the mortgage there is nothing to which plaintiffs' claims can attach.

Weinreb v. M & S Bagels, 254 N.Y.S.2d at 161-162 (emphasis added).

116.     Based on the forgoing, Plaintiff seeks a declaratory judgment that Santa Rosa Mall has an equitable lien over the insurance proceeds obtained for the Hurricane Maria Loss under Policy No. PTNAM1701557 to the extent they relate to the damages sustained by Store No. 1915.

COUNT VI - AIDING AND ABETTING FRAUDULENT MISREPRESENTATION
Against Sears Holding Corporation and Sears, Roebuck de Puerto Rico, Inc.

117.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

118.    In accordance with the *Contract of Insurance* executed by SHC, Aon Risk Services was authorized to issue Certificate(s) or Evidence(s) of Insurance naming additional named insured(s), loss payee(s) or mortgagee(s) for their respective rights and interests, subject always to the terms, conditions and limits of endorsements in respect of such additional interests.

119.    Santa Rosa Mall LLC is included as a loss payee under the "Additional Remarks Schedule" of Certificate of Insurance Nos. 570075074205, 570075074276, and 570069032839.

120.    The *Certificate of Insurance* supplied by Aon Risk Central for the period of June 1, 2017 to June 1, 2018, was issued on or about October 25, 2017, in accordance with the policy provisions of the *Contract of Insurance* for AON Insurance Policy No. PTNAM1701557, executed by and between SHC and Lex-London, a division of AIG.

121.    The *Certificate of Insurance* was received by Plaintiff on or about October 25, 2017, that is, after the passage of Hurricane Maria on September 20, 2017.

122.    Contrary to the express wording of the *Lease Agreement* and the *Certificate of Insurance*, Defendants contend that Santa Rosa Mall was not included as a loss payee under the *Contract of Insurance*.

123.    The Defendants controlled or were provided access to the confidential information concerning the *Contract of Insurance*.

124.    Plaintiff was not a party to, nor allowed access to, the conversations between the Defendants with regard to the *Contract of Insurance* and consequent Certificate(s) of Insurance.  SHC and/or Sears settled the matter without Santa Rosa Mall's knowledge, even when Santa Rosa Mall expressly requested information regarding the status of the aforementioned *Contract of Insurance.*

125.    The Defendants willfully, knowingly or recklessly aided, abetted, counseled, commanded, induced, or caused to be presented materially false and/or misleading written statements and/or certificates regarding, or in support of, Plaintiff's status as loss payee to the *Contract of Insurance*.

126.    Each individual Defendant is responsible for the accuracy of the statements and thus liable for the misrepresentations presented, or causes to be presented.

127.    As result of the Defendants' materially false and/or misleading statements, the Plaintiff has suffered damages in an amount of no less than $20,000,000, plus costs, expenses and attorneys' fees.

128.    Based on the forgoing, Plaintiff seeks compensatory damages in an amount of no less than $20,000,000, plus costs, expenses and attorneys' fees.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against the Defendants affirming that Santa Rosa Mall is included among the insured and has a right to payment to the extent of its interest under the *Contract of Insurance*, in an amount of at least $20,836,827.00.  In the event that the Court does not order specific performance of the *Lease Agreement,* Santa Rosa Mall respectfully requests that this Court, to the extent not inconsistent, reform of the *Contract of Insurance* to include Santa Rosa Mall as loss payee; impose a constructive trust upon the insurance proceeds, to the extent of Santa Rosa Mall's interest; declare that the insurance proceeds are not part of the bankruptcy estate and must be exclusively applied to the restoration or rebuilding of the Demised Premises; impose an equitable lien over the insurance proceeds in favor of Santa Rosa Mall; damages in an amount of no less than $20,000,000; grant costs, expenses and attorneys' fees; and grant such other and further relief as the Court deems just and proper.

[Signatures in the next page]

Respectfully submitted.
Dated: June 7, 2019
Orlando, Florida

**Ferraiuoli** LLC

390 N. Orange Avenue
Suite 2300
Orlando, Florida 32801
Phone: (407) 982-7310
Fax: (787) 766-7001
221 Ponce de León Avenue
5th Floor, San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001

 /s/ Sonia E. Colon Colon
By: Sonia E. Colón Colón
Admitted *Pro Hac Vice*
USDC-PR No. 213809
scolon@ferraiuoli.com

/s/ Gustavo A. Chico-Barris
Gustavo A. Chico-Barris
NY State Bar No. 929147
USDC-PR No. 224205
gchico@ferraiuoli.com

Attorneys for
*Santa Rosa Mall, LLC*

# EXHIBIT I

## SEARS LEASE

Parcel "A" — Shopping Center Property

Parcel "B" — (2.59 cuerdas) Parcel #3

Parcel "C" — Sears Main Store

Parcel "D" — Automotive and Community Center

## ARTICLE I - PREMISES AND TERM

| | | | |
|---|---|---|---|
| Section 1.01 | Planning Board Approval................... | Page 6 | |
| " 1.02 | Conditions Required for Planning Board Approval, Premises "C" and "D"............ | " | 6 |
| " 1.03 | Leasing of Automotive and Community Center to Landlord...................... | " | 6 |
| " 1.04 | Leasing of Premises "C" and "D" to Tenant .... | " | 7 |
| " 1.05 | Commencement Date of Term of Lease........... | " | 7 |
| " 1.06 | Date of Term of Lease...................... | " | 9 |
| " 1.07 | Renewal Options........................ | " | 9 |
| " 1.08 | Lease Year Defined...................... | " | 10 |
| " 1.09 | Occupancy of Premises Subsequent to Expiration of Extended Term............... | " | 10 |

## ARTICLE II - RENT

| | | | |
|---|---|---|---|
| Section 2.01 | Fixed Rent............................ | " | 11 |
| " 2.02 | Percentage Rent and Net Sales Defined........ | " | 12 |
| " 2.03 | Additional Rent: Property Taxes, Utilities, etc.. | " | 14 |
| " 2.04 | Additional Rent: Charges levied during Term of Lease............................ | " | 17 |
| " 2.05 | Additional Rent: Limits .................. | " | 17 |
| " 2.06 | Fixed Rent and Additional Rent - Premises "C" and "D"............................ | " | 17 |

## ARTICLE III - DEMOLITION AND CONSTRUCTION

| | | | |
|---|---|---|---|
| Section 3.01 | Removal of Equipment, Fixtures, Personal Property, by Landlord ................. | " | 18 |
| " 3.02 | Commencement of Construction on Premises "C" and/or "D": Specifications........ | " | 18 |
| " 3.03 | Government Approval of Plans and Specifications and Cost of Construction ......... | " | 20 |
| " 3.04 | Builder's Risk Insurance.................. | " | 21 |
| " 3.05 | Interference by Tenant and Storage of Materials during Construction.............. | " | 21 |
| " 3.06 | Parking Areas .......................... | " | 22 |

## ARTICLE IV - MAINTENANCE AND REPAIRS

| | | | |
|---|---|---|---|
| Section 4.01 | Tenant's Obligations: Fixtures and Utilities .... | " | 23 |
| " 4.02 | Tenant's Obligations: Government Regulations .. | " | 23 |
| " 4.03 | Tenant's Liability....................... | " | 24 |

## ARTICLE V - ALTERATIONS AND ADDITIONS

| | | | |
|---|---|---|---|
| Section 5.01 | Alterations made by Tenant ................ | " | 24 |
| " 5.02 | Alterations made by Tenant in excess of $100,000. | " | 25 |
| " 5.03 | Tenant's Liability ...................... | " | 25 |

ARTICLE VI - INSURANCE

Section 6.01   Types of Insurance and Amounts.................   Page 26
"      6.02   Tenant's Choice of Insurance Co., Renewal of
                -- Policies, etc...................   "   27
"      6.03   Indemnification of Tenant and Landlord ..........   "   28
"      6.04   Repairs Made by Parent Corporation ............   "   29
"      6.05   Indemnification of Landlord ..................   "   30

ARTICLE VII - CONDEMNATION

Section 7.01   Condemnation of Leased Premises ..............   "   30
"      7.02   Partial Condemnation: Fixed Rent, Percentage Rent   "   31
"      7.03   Landlord's and Tenant's Damages ..............   "   32
"      7.04   Repairs Due to Partial Condemnation .........   "   33
"      7.05   Indemnification of Landlord Due to Partial Condem-
                nation.............................   "   34

ARTICLE VIII - CONDUCT OF BUSINESS BY TENANT

Section 8.01   Use of Premises........................   "   34

ARTICLE IX - MORTGAGE, ASSIGNMENT AND SUBLEASE

Section 9.01   Assignment of Lease by Tenant ...............   "   34
"      9.02   Consent Required .......................   "   35
"      9.03   Written Agreement by Sublessee ..............   "   35
"      9.04   Abandonment .........................   "   36
"      9.05   Right of Tenant to Mortgage Interest .............   "   36
"      9.06   Mortgage Lien - Parcel A and/or B .............   "   37

ARTICLE X - UTILITIES

Section 10.01   Utility Charges .......................   "   37

ARTICLE XI - PARKING AND COMMON USE AREAS AND FACILITIES

Section 11.01   Control of Common Areas by Landlord............   "   38

ARTICLE XII - COST OF MAINTENANCE OF COMMON AREAS

Section 12.01   Tenant to Bear Pro Rata Share of Expense..........   "   39

ARTICLE XIII - MERCHANT'S ASSOCIATION

Section 13.01   Tenant's Right as to Membership................   "   39

ARTICLE XIV - DEFAULT

Section 14.01   Default by Tenant......................   "   40
"      14.02   Submittal of Matter to Court by Landlord ..........   "   41
"      14.03   Default by Landlord .....................   "   42
"      14.04   Waiver .............................   "   43

ARTICLE XV - SURRENDER AT EXPIRATION

Section 15.01   Surrender of Premises by Tenant ..............   "   43

ARTICLE XVI - EQUIPMENT AND FIXTURES INSTALLED

Section 16.01   Installation by Tenant ....................   "   44

ARTICLE XVII – COVENANT OF QUIET ENJOYMENT

    Section 17.01  Landlord's Covenant ..........................  Page 45

ARTICLE XVIII – ESTOPPEL CERTIFICATES

    Section 18.01  Estoppel Certificates by Tenant ................  "  45
       "  18.02  Estoppel Certificates by Landlord ...............  "  46

ARTICLE XIX – INVALIDITY OF PARTICULAR PROVISIONS

    Section 19.01  Partial Invalidity .............................  "  46

ARTICLE XX – NOTICES

    Section 20.01  Notices Sent by Landlord and Tenant .............  "  47

ARTICLE XXI – RESTRICTION ON NEW BUILDINGS IN SHOPPING CENTER

    Section 21.01  Construction by Landlord .......................  "  47

ARTICLE XXII – ACCESS BY LANDLORD

    Section 22.01  Right of Entry ................................  "  48

ARTICLE XXIII – MISCELLANEOUS

    Section 23.01  "The Term of this Lease" (Definition of) .........  "  48
       "  23.02  Use of Headings and Numbers as References ......  "  48
       "  23.03  Successors and Assigns ........................  "  49
       "  23.04  Modifications, Alteration, etc., of Lease only in
                 Writing .....................................  "  49
       "  23.05  Counterparts Each Shall be an Original ...........  "  49
       "  23.06  English as the Controlling Language .............  "  49
       "  23.07  Jurisdiction for Determination of Disputes (P. R.)..  "  49
       "  23.08  Recordation of Lease   .......................  "  49

    Signatures of Parties Executing This Lease ....................  "  50

LEASE

.In the City of San Juan, Commonwealth of Puerto

Rico, this /6*TH* day of SEPTEMBER, 1965,

APPEAR:

AS PARTY OF THE FIRST PART:  SANTA ROSA SHOPPING

CENTER, INC., a corporation organized and existing under the

laws of the Commonwealth of Puerto Rico, with offices at the

Santa Rosa Plaza in Bayamon, Puerto Rico, represented herein

by its President, Mr. John P. Birkelund who is of legal age,

an Executive, and resident of South Norwalk, Connecticut, here-

inafter called the "Landlord"; and

AS PARTY OF THE SECOND PART:  BANCO CREDITO Y AHORRO

PONCENO, INC., a banking corporation organized and existing under

the Banking Laws of the Commonwealth of Puerto Rico, with princi-

pal offices in the City of San Juan, Puerto Rico, represented

herein by Mr. Carlos J. Pau,    , its Vice-president, who is

of legal age, a banker, and resident of San Juan, Puerto Rico,

hereinafter called "The Trustee"; and

AS PARTY OF THE THIRD PART:  SEARS, ROEBUCK DE PUERTO

RICO, INC., a Delaware corporation, with principal offices in San

Juan, Puerto Rico, located at Munoz Rivera Avenue corner Coll y

Toste Streets, said corporation duly qualified to do business in

Puerto Rico and herein represented by its President

Mr. L. R. Lauek , of legal age, an Executive, and resident of

San Juan, Puerto Rico, hereinafter known as the "Tenant".

The authority of all of the appearing parties to act

herein shall be demonstrated whenever and wherever required, and

they state:

A.  The Landlord and the Trustee are owners in fee

simple of the improved real property described according to the

Registry of Property as follows:

> "URBAN: Parcel of land dedicated to a Shopping Center
> Plaza located at Santa Rosa Development in the Ward
> of Juan Sanchez of Bayamon, Puerto Rico, now classi-
> fied and zoned as a C-Four (C-4) district, consisting
> of eighteen and forty-six hundredths "cuerdas" (18.46)
> in area, equivalent to seventy two thousand five hun-
> dred fifty-five and sixty ninth hundredths square
> meters (72,555.69) bounded as follows: At the North,
> by a marginal street and State Highway number Two,
> distance of four hundred twenty-five and six hundredths
> lineal meters (425.06); at the South, by street number
> Two of Santa Rosa Subdivision and lands of Santa Rosa
> Development Corporation in a distance of three hundred
> nine and thirty hundredths lineal meters (309.30); at
> the East by Aguas Buenas Avenue and intersection number
> One Hundred Thirty-One in Santa Rosa sub-division and
> other lands of Santa Rosa Development Corporation, in a
> distance of two hundred forty-nine and forty-nine hun-
> dredths lineal meters (249.49); and at the West, by
> lands owned by the Puerto Rico Housing Authority in a
> distance of two hundred sixteen and twenty-eight hun-
> dredths, lineal meters (216.28)."

The above mentioned property is recorded in the Registry

of Property of Bayamon, Page Sixty-Five (over) property Twelve

Thousand Nine Hundred Fifty-Seven, Third Inscription. This property

shall hereinafter be known as "PARCEL A".

The said property is subject to a mortgage in the principal

amount of ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000.00),

with interest at the rate of six per cent per annum, in favor of

CONNECTICUT GENERAL LIFE INSURANCE COMPANY as appears from deed num-

ber three of June twenty-four, nineteen hundred and sixty before

Notary Public, Jose Gonzalez.

Said property is also subject to utility easements in

favor of the Puerto Rico Water Resources Authority and the Puerto

Rico Acqueduct Authority and to building restrictions appearing

from the corresponding Registry of Property in Bayamon.

There has been erected on this property a complete Shop-

ping Center known as Santa Rosa Shopping Center (hereinafter called

the "Shopping Center") consisting of seven buildings all of steel

frame and masonry construction and an adjacent parking area.

B.  The Landlord is also the owner in fee simple of the

following described parcel of property:

- 2 -

"URBAN:  PARCEL OF LAND located at Section Number One
of Santa Rosa Development, in Bayamon, with an area
of TEN THOUSAND ONE HUNDRED EIGHTY-FIVE WITH TWENTY
ONE HUNDREDTHS OF A SQUARE METER (10,185.21 Sq. mts.),
equivalent to TWO CUERDAS AND FIFTY-NINE HUNDREDTHS
OF A CUERDA (2.59), bounded at the NORTH, by Plaza
Comercial Santa Rosa, distance of One Hundred Fifty-
Eight meters and Seventy Three Centimeters (158.73);
at the SOUTH, by Street Number One (1) and Residen-
tial Section Number One (1) of the principal parcel
of Santa Rosa Development, distance of One Hundred
Fifty Two Meters (152.00); at the EAST, by Aguas
Buenas Avenue of Santa Rosa Development with a dis-
tance of Seventy-Five Meters and Twenty Centimeters
(75.20); and at the WEST, by Street Number Five (5)
of the Santa Rosa Development, distance of Forty-Six
Meters and Thirty-Two Centimeters (46.32)."

This property is inscribed in the Registry of Property

in Bayamon at volume two hundred sixty seven of Bayamon, Page One

Hundred Sixty-Five, Property Number Eleven Thousand Six Hundred

Ninety Two, second inscription.

It is understood among the parties that some claim has

been made that there may be a restriction relating to the use of

this land for community purposes, and that the Landlord is under-

taking to resolve this claim so as to permit the use of this par-

cel for a parking area and for the erection of an automotive and

community center.  This property shall hereinafter be known as

"PARCEL B".

C.  The Landlord, Trustee and Tenant have agreed to the

lease of Premise C hereinafter described and, in the event that the

Planning Board of Puerto Rico permits the use of Premise D herein-

after described as an automotive and community center, and there

is no other legal impediment to such use of Premise D, the Land-

lord, Trustee and Tenant have agreed to the lease of Premise D.

Premise C is shown on the survey of Esteban Gonzalez dated September

11, 1965 (wherein it is referred to as Premise C-1) and Premise D

is shown on the survey of Esteban Gonzalez dated August 12, 1965,

which surveys are annexed hereto initialled by the Landlord and

Tenant and made part of this agreement. Premise C alone, or in the

event that the use of Premise D is permissible, as aforesaid, then

Premise C and Premise D, and the buildings and improvements hereafter

located thereon (i. e. excepting the buildings now located on

Premise C and to be demolished as provided in this lease), are

hereinafter referred to as the "Demised Premises":

## PREMISE C

Starting at the corner of Aguas Buenas Avenue
and Street No. 1, known as property point No. 46,
move along the inner edge of Aguas Buenas Avenue
sidewalk a distance of 419.394 feet (127.833
meters) at a bearing of N 42° 00' 40" E; thence
move a distance of 57.553 feet (17.542 meters) at
a bearing of N 47° 59' 20" W to the southeast cor-
ner of the parcel. Thence move a distance of 419.000
feet (127.713 meters) at a bearing of N 13° 18' 50"
E to the northeast corner. Thence move a distance
of 237.500 feet (72.391 meters) at a bearing of N 76°
41' 10" W to the northwest corner. Thence move a
distance of 419.000 feet (127.713 meters) at a bear-
ing of S 13° 18' 50" W to the southwest corner, and
finally move a distance of 237.500 feet (72.391
meters) at a bearing of S 76° 41' 10" E to the south-
east corner of the parcel.

The resulting area of the parcel is 99,512.50 square
feet, equal to 9,245.272 square meters.

## PREMISE D

Starting at the corner of Aguas Buenas Avenue and
Street No. 1, move along the inner edge of the side-
walk along Aguas Buenas Avenue a distance of 15.240
meters at a bearing of N 42° 00' 40" E; then move
at right angles to this line a distance of 15.240
meters at a bearing of N 47° 59' 20" W to the south-
east corner of the parcel. Move then a distance of
56.389 meters at a bearing of N 42° 00' 40" E to the
northeast corner of the parcel. Then move to 19.203
meters at a bearing of N 47° 59' 20" W to the north-
west corner of the parcel. From then move a dis-
tance of 56.389 meters at a bearing of S 42° 00' 40"
W to the southwest parcel corner and from there move
a distance of 19.203 meters at a bearing of S 47° 59'
20" E to the south east corner that was our starting
point.

The total area of the parcel is 1,082.838 square meters.

D. In place of Premise C hereinabove described (i.e.,

Premise C-1 on the aforementioned survey annexed hereto), the Tenant

shall have the option to lease an alternative Pr~ se C which is re-

ferred to as Premise C-2 on the survey of Esteban Gonzalez dated

September 11, 1965 annexed hereto, initialled by the Landlord and

Tenant, and made part of this agreement, and is described as follows:

## PREMISE C-2

Starting at the corner of Aguas Buenas Avenue and Street No. 1

known as property point No. 46, move along the inner
edge of Aguas Buenas Avenue sidewalk a distance of
392.268 feet (119.565 meters) at a bearing of N 42°
00' 40" E; thence move a distance of 52.964 feet
(16.144 meters) at a bearing of N 47° 59' 20" W to
the southeast corner of the parcel. Thence move a
distance of 419.000 feet (127.713 meters) at a bear-
ing of N 13° 18' 50" E to the northeast corner.
Thence move a distance of 228.500 feet (69.648 meters)
at a bearing of N 76° 41' 10" W to the northwest cor-
ner. Thence move a distance of 419.000 feet (127.713
meters) at a bearing of S 13° 18' 50" W to the south-
west corner, and finally move a distance of 228.500
feet (69.648 meters) at a bearing of S 76° 41' 10" E to
the southeast corner of the parcel.

The resulting area of the parcel is 95,741.50 square
feet, equal to 8,894.955 square meters.

The option granted herein to the Tenant is subject to
the approval by the Planning Board of Puerto Rico of the use by
Tenant of said alternative Premise C.  If the Planning Board grants
such approval, and the Tenant shall then elect to exercise its op-
tion to lease said alternative Premise C (i. e., Premise C-2), it
shall give written notice thereof to the Landlord.  In that event,
said alternative Premise C (i. e., Premise C-2) shall thereupon
constitute part of the Demised Premises in place of the original
Premise C (i. e., Premise C-1) hereinabove described in introduc-
tory paragraph "C" of this lease.

E.    The use and occupation by the Tenant of the Premises
herein demised shall include, in addition to Premise C and Premise
D (if permissible), the use in common with others entitled thereto
of the common areas, service roads, loading facilities, sidewalks,
customer car parking areas, and other facilities in Parcel A and Par-
cel B as may be designated by Landlord as areas of common use, sub-
ject, however, to the terms and conditions of this agreement and
to reasonable rules and regulations for the use thereof as prescribed
from time to time by Landlord.

All of the appearing parties of this deed of lease, hav-
ing previously agreed to the lease of Premise C and Premise D (if
permissible as aforesaid,) do hereby do so, under the following
terms and conditions:

ARTICLE I

Premises and Term

Section 1.01

Landlord shall, at its expense, obtain from the Planning Board of Puerto Rico such approval and permits as may be required for the lease of Premise C to the Tenant for the construction and operation of a retail department store and for the use of Parcel B as a parking area by the Tenant and the other tenants of Parcel A. Landlord shall also use its best efforts to obtain from said Planning Board such approval and permits as may be required to allow the lease of Premise D to the Tenant for the construction of an automotive and community center and the respective operation thereof as provided for in this lease.

Section 1.02

Landlord shall, at its expense, make and construct such improvements in the land comprising Premise C and Premise D as the Planning Board of Puerto Rico may require as a condition to granting its approval for the lease of such premises for the purposes provided in Section 1.01 hereof.

Section 1.03

In the event that the required clearances are obtained, and the Tenant builds the automotive and community center on Premise D, as hereinafter provided, then Tenant shall lease back to the Landlord or its designee that portion of Premise D which comprises the community center for a nominal rental, and Landlord or its designee shall undertake, at its expense, to operate, maintain and manage such community center and to obtain and maintain public liability insurance adequate to protect Landlord and Tenant from all claims, demands, and liabilities arising out of the operation of such community center. Such insurance shall name both Landlord and Tenant as insured and contain limits of liability of $500,000. per person and $1,000,000. per accident for bodily injury limits and $100,000. for property damage. A certificate evidencing such insurance

- 6 -

coverage shall be furnished Tenant.

Section 1.04

Landlord does hereby demise and lease to Tenant and Tenant does hereby take and hire from Landlord (a) the premise described in introductory paragraph "C" of this lease as Premise C and (b) in the event of the approval by the Planning Board of Puerto Rico, and provided further that there is no legal impediment thereto, the premises described in introductory paragraph "C" of this lease as Premise D.

Section 1.05

The term of this lease between Landlord and Tenant shall commence on the first of the month next following the occurrence of all of the following events:

(a)  The issuance by the Planning Board of Puerto Rico of whatever approval is required to permit the leasing of Premise C to the Tenant for the construction and use contemplated by this lease.

(b)  The vacation of all existing structures contained within Premise C by all tenants thereof, and Landlord's written notification to Tenant that same has been accomplished.

(c)  The certification by the Landlord to the Tenant that the Landlord has obtained written consents from all the other tenants of Parcel A (Santa Rosa Shopping Center) to the effectuation of this lease, and Landlord's agreement to indemnify Tenant against any loss that Tenant may incur by reason of any action, claim or demand by any other tenant of the Santa Rosa Shopping Center in connection with or arising out of the execution of this lease.

(d)  The receipt by Tenant of a written instrument from each mortgagee holding a mortgage upon the Landlord's fee interest in Parcel A and Parcel B which shall (1) consent to the execution and delivery of this lease and (2) either agree not to disturb the possession of the Tenant, nor to terminate any interest of the

- 7 -

Tenant created hereunder by foreclosure or otherwise so long as
the Tenant shall comply with the terms, covenants and conditions
of this lease, or subordinate the mortgage to this lease.

(e) The receipt by Tenant of a written confirma-
tion from Landlord that all the above conditions have been satis-
fied and that Tenant may proceed with demolition of the buildings
on Premise C and construction of the new building hereinafter pro-
vided for.

It is intended that the commencement of this
lease as aforesaid shall be within 15 months from the date of exe-
cution of this instrument. The Landlord shall commence immediately
upon the signing of this lease and shall diligently pursue the con-
struction of the new buildings to be occupied by Banco Credito y
Ahorro Ponceno, Inc. and Belk Lindsey Company and to effect the
removal of the Bank and Belk Lindsey to their new buildings. The
Landlord shall keep the Tenant informed of its progress in complet-
ing the aforesaid conditions. So long as the Landlord acts diligently
and in good faith, Landlord shall not be deemed to be in default un-
der this Section 1.05. However, Landlord agrees, even though not
in default under this Section 1.05, to pay to Tenant the sum of
$500. per day (but in no event exceeding in the aggregate the sum
of $15,000.) for each day required for the completion of the fore-
going conditions in excess of fifteen months from the date of exe-
cution of this instrument, provided that said period of fifteen
months shall, for the purposes of this Section 1.05, be extended
to the extent that the Landlord cannot, by the exercise of reason-
able efforts, complete its performance within such time because of
circumstances over which it has no control including without limita-
tion strikes, lockouts, fire, floods, earthquakes or similar actions
of the elements, acts of God, acts of war or the public enemy.

The exact date of the commencement of the
term of this lease shall be specified in a written memorandum

- 8 -

signed by both of the parties hereto. In the event that Tenant shall suffer any delay in proceeding with the demolition of the existing buildings on Premise C or the construction of the new building thereon by reason of any legal action brought by any other tenant of the Santa Rosa Shopping Center, then the date of commencement of the term of this lease shall be postponed for a period of time equivalent to the length of such delay.

Section 1.06

The initial term of this lease shall be a term of forty-two (42) years, beginning on the day specified in Section 1.05 of this deed of lease and expiring forty-two years thereafter.

Section 1.07

(a)  If Tenant notifies Landlord in writing at any time after the commencement of this lease but at least eighteen months prior to the termination of the initial term hereof that it elects to extend the term of this lease, then this lease shall be extended for an extended term of fifteen (15) years.

(b)  If this lease is extended for the extended term hereinabove mentioned, Tenant at its election may extend the term of this lease for two additional successive extended terms of fifteen (15) years each, provided Tenant notifies Landlord in writing at least eighteen (18) months prior to the termination of the then current extended term that it elects to extend the term of this lease for the immediately succeeding extended term.

(c)  The right to any extension of this lease shall be upon the express condition that at the time of the election to extend the lease, and at the beginning of the extended term, Tenant shall not be in default under any of the terms, covenants and conditions of this lease.

(d)  In the event Tenant for any reason shall not exercise its privilege to extend the term of this lease, as herein provided, Tenant shall have no further privilege to extend the

- 9 -

term of this lease and said term shall expire and come to an end
upon expiration of the then current initial term or extended term.
If Tenant exercises its privilege to extend the term of this lease,
as herein provided, then such election, once made, shall be irrevo-
cable.

Section 1.08

The term "lease year" as used herein shall mean a period
of twelve (12) consecutive full calendar months. The first lease
year shall begin on the date of commencement of the term hereof.
Each succeeding lease year shall commence on the anniversary date
of the first lease year.

Section 1.09

In the event that Tenant shall have elected to extend
the term of this lease for the third extended term as hereinabove
provided, then the Tenant shall have the following right of first
refusal with regard to occupancy of the Demised Premises subsequent
to the expiration of the third extended term.

(a) During the twelve (12) month period prior to the
expiration of the third extended term hereof, upon receiving any ac-
ceptable bona fide offer from a third party for the leasing of the
Demised Premises, the Landlord shall transmit to the Tenant in writ-
ing all the terms and conditions of such offer.

(b) Tenant shall have thirty (30) days from the re-
ceipt of such offer to notify the Landlord in writing of Tenant's
intention to enter into a lease of the Demised Premises upon the
terms and conditions of such offer.

(c) Within thirty (30) days (or such extended period
as may be agreed upon between the parties) from the giving of Tenant's
notice referred to in (b) above, the Tenant shall sign a lease of
the Demised Premises upon the terms and conditions of the said offer.

(d) In the event that the Tenant shall fail to
notify the Landlord of its intention to enter into a lease of the

- 10 -

Demised Premises, as provided in (b) above, or in the event that
the Tenant shall fail to execute the lease within the period pro-
vided in (c) above, then the Landlord may enter into a lease of
the Demised Premises upon the terms and conditions of the said
offer with the third party who made such offer, and Tenant shall
have no further rights under this Section 1.09.

(e)  In the event that the Landlord has not received
an acceptable bona fide offer from a third party but intends to con-
tinue the same type of store operation upon the Demised Premises,
then, if the Tenant so elects, the Landlord and Tenant shall nego-
tiate a new lease of the Demised Premises upon terms substantially
the same as those applicable to the third extended term hereof but
for a period of time mutually acceptable to the Landlord and the
Tenant.

## ARTICLE II

### Rent

Section 2.01

As fixed rent, Tenant shall pay to Landlord at its
principal office above set forth, or at such other place designated
in writing by Landlord, at the times hereinafter set forth, without
any prior demand therefor and in money of the United States of
America which at the time of payment shall be legal tender for pub-
lic and private debts, the respective amounts hereinafter set forth:

A.  During the first two lease years of this lease
no fixed rent shall be paid.

B.  During the third lease year the amount of
$50,000.

C.  During the fourth lease year the amount of
$75,000.

D.  During the fifth lease year the amount of
$100,000.

E.  During the sixth lease year the amount of
$125,000.

F.  .During the seventh lease year and during each
and every subsequent lease year of the initial term and
of any extended term of this lease the amount of $150,000.

The fixed rent hereinabove provided for shall be payable
in equal monthly instalments in advance on the first business day of
each and every calendar month of each lease year during said initial
term and any extended term.  It is the purpose and intent of Land-
lord and Tenant that this lease shall yield, net to Landlord the
fixed rent specified in this Section 2.01 in each year during the
term of this lease, free of any charges, assessments, or impositions
of any kind charged, assessed or imposed on or against the Demised
Premises except as expressly hereinafter provided in Section 2.03,
and without abatement, deduction or set-off by the Tenant, and Land-
lord shall not be expected or required to pay any such charge, as-
sessment or imposition, or be under any obligation or liability
hereunder except as herein expressly set forth, and that all costs,
expenses and obligations of any kind relating to the demolition of
the structures presently located on the Demised Premises, the con-
struction of the new buildings hereinafter provided for, the main-
tenance, preservation, care, repair and operation of the Demised
Premises, including all replacements, alterations and additions,
as hereinafter provided, which may arise or become due during the
term of this lease shall be paid by Tenant, and the Landlord shall
be indemnified and saved harmless by Tenant from and against such
costs, expenses and obligations.

Section 2.02

In the event that the net sales (as hereinafter defined)
made by Tenant upon the Demised Premises during any lease year of
the initial term or any extended term hereof shall be in excess of
Fifteen Million Dollars ($15,000,000.), then the Tenant shall pay
to Landlord, as additional rental hereunder for said lease year
a sum equal to one per cent (1%) of such excess.  Said additional

- 12 -

rental, if any, shall be paid by Tenant within thirty (30) days after the end of the respective lease year for which the same is payable.

(a) The term "net sales" as used herein is hereby defined to mean the gross sales made upon the Demised Premises by Tenant plus the gross sales, if any, made upon the Demised Premises by Tenant's departmental sublessees, concessionaires and licensees occupying space upon the Demised Premises, but deducting or excluding therefrom, as the case may be, the following:

(1) Sales of departments or divisions not located upon the Demised Premises;

(2) The amount of all sales, use, excise, retailers' occupation or other similar taxes imposed in a specific amount, or percentage upon, or determined by, the amount of retail sales made upon the Demised Premises;

(3) Returns and allowances, as such terms are known and used by Tenant in the preparation of Tenant's profit and loss statements;

(4) Delivery, installation and service charges including any and all service charges for work performed off the Demised Premises;

(5) Amounts in excess of Tenant's (or of its sublessees', concessionaires' and licensees') cash sales price charged on sales made on credit or under a time payment plan;

(6) Sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's catalog order channels, regardless of the place of order, payment or delivery;

(7) Policies of insurance sold on the Demised Premises and premiums collected on policies of insurance;

(8) Sales off the Demised Premises of encyclopedias and other educational books sold in sets;

(9) Sales made through the Commercial and Industrial Sales Department of Tenant.

(b) Within sixty (60) days after the end of each lease year, Tenant shall furnish to Landlord a statement certified by an officer of Tenant showing the net sales (as hereinbefore defined) made by Tenant upon the Demised Premises during such preceding lease year, and the additional rental, if any, payable by Tenant to Landlord for such lease year. In addition, Tenant shall furnish

- 13 -

Landlord with a statement of Tenant's net sales (as above defined) for Tenant's next preceding fiscal year prepared by Tenant's certified public accountants.

(c)   Unless Landlord shall, within thirty (30) days after receipt of any such statement certified by Tenant's officer, notify Tenant to the contrary, such statement shall be deemed to have been accepted by the Landlord as correct. In the event that Landlord shall notify Tenant of Landlord's dissatisfaction with such statement within the aforementioned period, then Tenant shall permit a reputable firm of certified public accountants doing business in the United States and Puerto Rico, which shall be mutually satisfactory to, and approved in writing by, Landlord and Tenant, to make an independent audit of Tenant's net sales (as hereinbefore defined) for the period covered by said statement. Such independent audit shall be at Landlord's expense and the findings of such audit shall be binding upon both parties and conclusive.

(d)   Tenant makes no representation or warranty as to the sales which it expects to make upon the Demised Premises and Landlord agrees to hold in confidence all sales figures and other information with respect to Tenant's business which Landlord may obtain from Tenant or from any audit of Tenant's books and records, except that Landlord may submit all of said information to the holder or holders of mortgages upon Landlord's interest in the Demised Premises, who shall also receive same in confidence.

Section 2.03

As additional rent hereunder, Tenant shall be liable for and pay all property taxes, assessments (ordinary and extraordinary), sewer rents, water rents and charges and other taxes, duties, charges, fees or payments imposed by any governmental or public authority, which shall be imposed, assessed, levied or be or become a charge or lien upon, or arise in connection with the use, occupancy or possession of the Demised Premises or any part

- 14 -

thereof or appurtenances thereto. Tenant shall be entitled to a credit against, and deduction from, the additional rent payable by it hereunder at the fixed rate of $1,240.69 a year (which figure represents the proportionate part of all 1964 real estate taxes upon the land comprising Parcel A which is attributable to the land included in the Demised Premises and is subject to revision if the option in introductory paragraph "D" hereof is exercised by Tenant).

(a) Promptly after the execution of this lease, the Landlord and the Tenant shall join in an application to the Planning Board or other governmental authority having jurisdiction thereof, to obtain during the term of this lease the issuance of tax bills covering only the land and buildings included in Premise C and Premise D (if the use thereof is permissible as aforesaid) and the issuance of separate tax bills covering the land and buildings in the remainder of the Shopping Center. The tax bills covering only the land and buildings included in the Demised Premises shall determine the Tenant's obligation for additional rental under this Section 2.03.

(b) If for any reason during the term of this lease, separate tax bills cannot be obtained for only the land and buildings included in the Demised Premises, as provided in the preceding paragraph, then for the purpose of determining the Tenant's obligation for property taxes under this Section 2.03, the taxes, assessments, etc. attributable to the Demised Premises shall be determined as follows: The Landlord and Tenant shall select a reputable, expert real estate appraiser mutually acceptable to them who shall prepare and submit to the parties a detailed appraisal of all the land and buildings in the Shopping Center. Such appraisal shall be binding upon both parties and conclusive. That proportion of the taxes, assessments, etc. of the entire Shopping Center which the appraised value of the land and buildings contained in the Demised Premises bear to the appraised value of the land and buildings contained in the entire Shopping Center shall constitute Tenant's

obligation for additional rental (subject to the deduction herein-above provided for). The said proportion shall be applied in any year for which the said separate tax bills cannot be obtained. The said appraisal shall be made and completed in the month of July during the first year when said separate tax bills are unobtainable and shall be repeated in the same month during each succeeding year when said separate tax bills are unobtainable, provided, however, that the certification by the appraiser (or his mutually acceptable successor) that there has been no material change in the values of the land and buildings in the Shopping Center since the date of the last detailed appraisal shall be accepted in lieu of a new appraisal, and the proportion established by the last detailed appraisal shall continue to be applicable. The cost of such appraisals shall be borne equally by Landlord and Tenant.

(c) Tenant shall pay each sum payable pursuant to this Section 2.03 on or before the date when same becomes due and payable. In the case of any assessment for public improvements wherein the cost of the public improvement is permitted to be paid in installments, the Tenant may pay the same in installments. Any such installments falling due during the term of this lease shall be payable by Tenant and any such installments falling due after the expiration of the term of this lease shall be payable by Landlord. Real estate taxes, sewer rents, water rents and charges and other taxes, duties and charges in said categories (whether or not the same have become a lien upon the Demised Premises) for the tax year in which the term of this lease shall end shall be apportioned.

(d) Tenant shall have the right at its own expense, to contest in good faith any taxes, sewer rents, water rents, charges or assessments imposed upon, or allocated to, the Demised Premises, and in case any such taxes, rents, charges or assessments shall, as a result of any such legal proceedings, be reduced, cancelled, set aside or otherwise discharged, Tenant shall be entitled to receive its proportion of such taxes, rents, charges or assessments, with interest thereon, if any, which may be recovered; provided, however, that any such contest by Tenant of any taxes, assessments or other

- 16 -

charges shall not endanger Landlord's fee interest in the property demised, and Tenant shall furnish any requisite bond and shall take such other steps as reasonably may be required to protect Landlord's interest.'

Section 2.04

As additional rent hereunder, Tenant shall pay to Landlord expenses and charges other than those referred to in Section 2.03 hereof, which during the term of this lease shall be levied, assessed or imposed by any governmental authority upon or with respect to, or incurred in connection with, the ownership, possession, occupation, operation, alteration, maintenance, repair and use of the Demised Premises, or the making of any additions thereto. If at any time during the term of this lease under the laws of the Commonwealth or any political subdivision thereof in which the Demised Premises are situated a tax or excise on rents or other tax, however described, is levied or assessed by said commonwealth or political subdivision against the Landlord or the fixed rent expressly reserved hereunder, Tenant covenants to pay and discharge such tax or excise on rents or other tax but only to the extent of the amount thereof which is lawfully assessed or imposed upon Landlord and which was so assessed or imposed as a direct result of Landlord's ownership of the Demised Premises, or of this lease or of the rentals accruing under this lease, it being the intention of the parties hereto that the fixed rent to be paid hereunder shall be paid to Landlord absolutely net without deduction of any nature whatsoever except as in this lease otherwise expressly provided.

Section 2.05

Nothing in this lease contained shall be construed to require Tenant to pay any franchise, estate, inheritance, succession, capital levy, or transfer tax of Landlord, or any income, excess profits or revenue tax or any other tax or impost charged or levied upon the rentals payable by Tenant under this lease, except as provided in Section 2.04 hereof.

Section 2.06

The fixed rent and additional rent specified in this Article II is intended to cover both Premise C and Premise D in

- 17 -

the event that the Planning Board of Puerto Rico permits the use
of Premise D as an automotive and community center.  If the
Planning Board does not permit the use of Premise D as an auto-
motive center, or if there is other legal impediment to the use
of Premise D as an automotive center, then Premise D will be
excluded from this lease so long as such lack of permission or
other legal impediment exists, the Tenant will locate its auto-
motive center on Premise C, and the fixed rent and additional
rent specified in this Article II shall not be reduced, abated
or otherwise affected in any way whatsoever.

## ARTICLE III

### Section 3.01

Promptly upon the commencement of the term of this
lease, Tenant shall, at its own cost and expense, demolish and
remove the buildings or improvements now on Premise C, except for
such portion thereof, if any, as the Tenant may be able to in-
tegrate into the new building to be placed on Premise C.  Land-
lord reserves the right to remove, free of charge but at its own
expense, from any building on Premise C prior to its demolition
any personal property, fixtures or equipment which either belong
to the present lessee of said building or could be used by the
Landlord in the new building being provided for such lessee, pro-
vided, however, that the Tenant shall be entitled to retain the
air conditioning unit now serving the Belk-Lindsey store if Tenant
is able to use such unit in Tenant's new building, and such unit
shall not be removed by Landlord without Tenant's prior written
consent.

### Section 3.02

(a)  As soon as Premise C is cleared as herein-
above provided, Tenant shall, at its own cost and expense, commence
the construction on Premise C of a modern department store building
of a quality, design and construction at least equal to that of the
other department store building owned and operated by Tenant in

- 18 -

San Juan, Puerto Rico.  Such building shall be designed so as to harmonize esthetically with the rest of the Shopping Center and shall have the following specifications:  approximately 416 feet in the north-south direction and approximately 234 feet in the east-west direction, containing approximately 97,400 square feet of covered parking in a partial basement, 97,400 square feet of ground floor, 48,700 square feet on the second floor and 24,300 square feet of future second floor area.

(b)  In the event that the Planning Board of Puerto Rico approves the use of Premise D as an automotive and community center, promptly thereafter Tenant shall, at its own cost and expense, commence the construction on Premise D of an automotive and community center of a quality, design and construction in keeping with the aforesaid building on Premise C, which building on Premise D shall have the following specifications:  approximately 60 feet in the northwest-southeast direction and approximately 182 feet in the northeast-southwest direction, containing approximately 12,000 square feet of ground floor, 5,720 square feet of mezzanine floor and 12,000 square feet of second floor area.

(c)  Construction of the building on Premise C and the building on Premise D (if permissible) shall be made in accordance with duplicate sets of working plans, sketches and specifications prepared by duly licensed architects and engineers theretofore submitted to Landlord, whose approval as to the general appearance of the buildings shall be required.  Such approval shall not unreasonably be withheld.

(d)  Fee simple title to the said buildings (but not the land upon which they are placed) shall be vested in Tenant free and clear of all existing liens and encumbrances.  Upon the expiration of the term of this lease (initial or extended) or other sooner termination thereof, the title to the said buildings shall vest in the Landlord and possession of the said buildings

- 19 -

shall be surrendered and delivered to the Landlord in good order,
condition and repair, reasonable wear and tear excepted, and free
and clear, of all liens and encumbrances.  Tenant shall execute
such instruments and perform such other acts as may be required
to transfer fee title in said buildings to Landlord, and Tenant
shall not be entitled to any compensation whatsoever in connection
with such vesting and transfer of title.  Tenant shall have the
right to remove from said buildings free of cost all personal
property and trade fixtures, provided, however, that Tenant shall
promptly repair any damage caused to the building by such removal.

(e)  The aforesaid buildings shall have, for Regis-
try of Property purposes only, a value of $2,000,000.

(f)  Landlord and Tenant and Trustee shall appear
in and execute the appropriate Act of Edification (Acta de Edifica-
cion) notarial deed in order that title to the buildings to be built
by Tenant may be inscribed in Tenant's name in the corresponding
section of the Registry of Property of Puerto Rico, and, if neces-
sary, Landlord will cause the mortgagees of said premises to appear
in and execute the said Act of Edification.

Section 3.03

(a)  Before commencing the construction of the new
building or buildings on the Demised Premises, Tenant shall, at
its own cost and expense, obtain from all Boards, Departments and
governmental offices having jurisdiction, approval of plans, sketches
and specifications for the buildings together with all permits re-
quired by law for the construction of the buildings.  After the said
approvals and permits shall have been granted, Tenant shall, at its
own cost and expense, keep the same in force and effect until the
improvements shall have been completed.

(b)  After commencing such construction, Tenant shall,
at its own cost and expense, thereafter diligently proceed with,
complete and pay for the construction of the new building or buildings

- 20 -

in conformity with the said plans, sketches and specifications filed and approved as above, in good and workmanlike manner, free from mechanics' liens and in accordance with the laws, ordinances and lawful requirements of the Commonwealth of Puerto Rico and the various departments and bureaus having jurisdiction thereof. Upon completion of any building, Tenant shall furnish Landlord with a duly issued Certificate of Occupancy, or if local procedure makes no provision therefor, then Tenant shall furnish Landlord with the architect's certification that the building has been completed according to the plans and specifications.

Section 3.04

In connection with said demolition and construction, Tenant shall obtain, or cause contractors to obtain and maintain, without cost or expense to Landlord, Builder's Risk (fire, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicle, smoke, vandalism, malicious mischief, sprinkler leakage, and earthquake) insurance with limits commensurate with the completed portion of the buildings under construction, Public Liability insurance, with limits of $500,000. per person and $1,000,000. per accident for bodily injury limits and $100,000. for property damage, and Workmen's Compensation and Employer's Liability insurance with a limit of at least $100,000. under the Employer's Liability portion. Such insurance shall be in forms sufficient to protect Landlord and Tenant from liability claims arising out of said demolition and construction. Tenant shall furnish Landlord with certificates evidencing such coverages; provided, however, that Tenant may elect to self-insure any or all of these requirements in accordance with Section 6.02.

Section 3.05

The said demolition and construction shall be carried out in such a way as to interfere as little as is reasonably possible with the operation of the Shopping Center or the rights of other

- 21 -

tenants thereof. All materials to be stored at the site of con-
struction shall be stored on Parcel B free of charge by the Land-
lord. Except for the said use of Parcel B, the Tenant shall confine
its activities as closely as possible to the area of the Demised
Premises. Tenant shall erect such fence or other enclosures as are
required to carry out the intent of this Section 3.05.

Section 3.06

(a) Either simultaneously with, or immediately sub-
sequent to, the construction of the said new building or buildings,
Tenant shall, at its own cost and expense, construct upon Parcel B
a parking area which shall be of quality, design and construction
at least equal to that of the existing parking areas in the Shopping
Center. Such parking area shall be for the general use, in common,
of all the customers of the Shopping Center, as more fully provided
in Article XI hereof. In addition, Tenant shall, at its own cost
and expense, also construct a comparable parking area on that por-
tion of the land occupied by buildings to be demolished by Tenant
which is outside the boundaries of Premise C.

(b) Tenant shall have the right at any time and from
time to time during the term of this lease to improve the presently
existing parking areas in the Shopping Center so that they will con-
form to the Tenant's reasonable standards, provided, however, that
Tenant shall first obtain Landlord's written consent to any such
improvement, which consent Landlord shall not unreasonably withhold.
The cost of any such improvement shall be divided between Tenant and
Landlord. Tenant shall pay that proportion of the total cost which
the total floor area of Tenant's new building or buildings (exclud-
ing the floor area of the community center on Premise D, if the
same should be built) shall bear to the total floor area of all
the buildings in the Shopping Center upon the completion of Tenant's
new building or buildings.

- 22 -

## ARTICLE IV

## Maintenance and Repair

Section 4.01

Tenant shall, at its own cost and expense, keep the Demised Premises and the buildings and improvements hereafter erected and maintained upon the Demised Premises in good order and repair and in such condition as may be required by law and by the terms of any insurance policies covering the Demised Premises, whether or not such repairs shall be interior or exterior, extraordinary as well as ordinary, and whether or not such repairs shall be of a structural nature, and Tenant's obligation for maintenance and repair shall apply to the fixtures and facilities upon the Demised Premises or forming part thereof, including without limitation, all water, drainage, electric lighting, heating, air conditioning, gas, elevator, sewer, plumbing and other fixtures and facilities thereon.

Section 4.02

Tenant shall, at its own cost and expense, promptly comply with and conform to the requirements of every applicable statute, law, ordinance, lawful regulation and order, with respect to the condition, equipment, maintenance, use or occupation of the Demised Premises and any buildings and improvements thereafter erected and maintained thereon, and appurtenances, franchises and privileges connected therewith, whether or not such statute, law, ordinance, regulation or order be of a kind now within the contemplation of the parties hereto.

Section 4.03

Tenant shall pay and discharge, and indemnify and save harmless Landlord against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon or incurred by or asserted against Landlord by reason of any of the following

- 23 -

occurring during the term of this lease unless caused by the sole negligence of the Landlord:

> (a)  Any work or thing done in, on or about the Demised Premises or any part thereof;

> (b)  Any use, nonuse, possession, occupation, condition, operation, maintenance, repair or management of the Demised Premises or any part thereof or any fixtures or facilities therein contained;

> (c)  Any negligence on the part of Tenant or any of its agents, contractors, servants, employees, licensees, concessionaires or invitees;

> (d)  Any injury or damage to any person or property occurring in or on the Demised Premises or any part thereof;

> (e)  Any failure on the part of Tenant to perform or comply with any of the covenants, agreements, terms or conditions contained in this lease on its part to be performed or complied with.

In case any action or proceeding is brought against Landlord by reason of any such claim, Tenant will at Tenant's expense resist or defend such action or proceeding.

## ARTICLE V

### Alterations and Additions

Section 5.01

Subject to the conditions hereafter set forth in this Article V, Tenant shall have the right from time to time at its own cost and expense to make any alterations, additions or improvements within the Demised Premises, including necessary demolition, incidental to the convenient conduct of Tenant's business, provided that such alterations, additions or improvements, when completed, do not diminish the value of the Demised Premises. Tenant shall have the right hereunder to increase the cubic contents of the new building on Premise C without incurring any liability for an increase in the fixed rent provided for in Section 2.01 hereof, provided, however, that any such increase in the cubic contents shall be dependent upon compliance by the Tenant with the parking requirements of the governmental authority having jurisdiction thereof.

Section 5.02

All alterations and additions by Tenant within the Demised Premises shall be subject to the following:

(a)  Before commencing any alteration or addition whose estimated cost is in excess of $100,000., Tenant shall furnish to Landlord a duplicate set of the working plans, sketches and specifications for the proposed work prepared by a duly licensed architect or engineer.

(b)  All alterations and additions shall be made in accordance with all governmental statutes, ordinances and regulations as specified in Section 3.03 hereof.

(c)  In connection with any alteration or addition, Tenant shall at its cost and expense obtain or cause to be obtained all the insurance coverage specified in Section 3.04 hereof.

(d)  Any alteration or addition shall be carried out in such a way as to interfere as little as is reasonably possible with the operation of the Shopping Center or the rights of any other tenants thereof.

Section 5.03

Tenant shall have no power to do any act or make any contract which may create or be the foundation for any lien, charge or other encumbrance upon the reversion or fee estate of Landlord in the Demised Premises. Should Tenant cause any alterations, replacements, changes, additions, improvements or repairs to be made in the Demised Premises, or labor to be performed or material to be furnished therein, neither Landlord nor the Demised Premises shall under any circumstances be liable for the payment of any expenses incurred or for the value of any work done or material furnished, but all such work, labor and material shall be made, furnished and performed at Tenant's expense and Tenant shall be solely and wholly responsible to all persons furnishing and performing such labor and material. If, because of any act of Tenant, any mechanic's, laborer's or materialman's lien shall be filed

against the Demised Premises or against Landlord, Tenant shall, at its own cost and expense, within 20 days after the filing thereof, commence and diligently pursue proceedings to have the same cancelled and discharged of record.

## ARTICLE VI

### Insurance

Section 6.01

Tenant shall maintain at Tenant's sole cost and expense, for the benefit of Landlord and Tenant, insurance with respect to the Demised Premises, of the following types and in the following amounts:

(a)  Fire and extended coverage insurance (losses due to windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, smoke), vandalism, malicious mischief, sprinkler leakage and earthquake insurance and insurance against such other events as shall from time to time be added to the extended coverage insurance carried by Tenant's Parent Corporation in an amount not less than 100% of the replacement cost (excluding excavation and foundation values) as the same is determined at five (5) year intervals by an architect or engineer designated by Tenant and satisfactory to Landlord.

(b)  Public Liability insurance covering liability claims occurring on the Demised Premises and arising out of the operation of the Tenant within the Demised Premises or any interest of the Landlord in the Demised Premises. The limits of liability of such insurance shall be at least $500,000. per person, $1,000,000. per accident for bodily injury and $100,000. per accident for property damage.

(c)  Plate glass insurance on the Demised Premises.

Section 6.02

Tenant shall have the option of effecting such insurance through an insurance company of recognized standing satisfactory to the Landlord and the holder of any mortgage on the fee of the Demised Premises or through Tenant's Parent Corporation

(Sears, Roebuck and Company, a New York corporation) which would
act as a self-insurer.

(a)  If Tenant elects to effect such insurance
through an insurance company, such policies shall be secured
promptly and certificates thereof shall be furnished to Landlord.
Such policies shall provide that they will not be cancelled with-
out at least twenty (20) days  prior written notice to the Landlord
and Tenant.   Such policies shall contain loss payable clauses to
Landlord and Tenant as hereinbelow provided in Section 6.03.

(b)  Tenant shall procure renewals of all such
insurance policies at least twenty (20) days before the expira-
tion thereof.  In default of the delivery or renewal of any such
insurance policy required hereunder, the Landlord may procure any
such insurance and the Tenant shall, on demand, reimburse the
Landlord for the cost thereof with interest thereon at the rate
of 6% per annum.

(c)  If Tenant elects to effect all or any portion
of such insurance through its Parent Corporation, then Tenant
promptly shall advise Landlord of such election and shall furnish
Landlord with a duly executed certificate from its Parent Corpora-
tion specifying the exact insurance coverage which the Parent Cor-
poration will be responsible for.   Such certificate shall be
accompanied by the Parent Corporation's most recent published
annual report evidencing sufficient assets to cover the self-
insured risks.

(d)  So long as the said Parent Corporation is
acting as insurer, the Tenant shall furnish to Landlord annually
on the anniversary of the certificate referred to in the preceding
paragraph, (1) a duly executed certificate of its Parent Corpora-
tion that the insurance coverage being provided by the Parent
Corporation is in full force and effect as of the date of said
certificate, and (2) the Parent Corporation's most recent pub-
lished annual financial report.

- 27 -

Section 6.03

In the event that during the term of this lease the
building or buildings referred to in Section 3.02 hereof or any
additions thereto at any time erected on the Demised Premises shall
be damaged by fire or other insured casualty, then:

(a) In case such damage shall amount to $100,000.
or less, the loss shall be settled with Tenant and the insurance
proceeds shall be paid to Tenant, and Tenant shall, at its own
cost and expense, promptly proceed to repair the damage so caused.

(b) In case such damage shall amount to over $100,000;

(1) If such damage shall not be so serious
as to render the said building untenantable or as to
amount to a total destruction of said building,
Tenant shall, at its own cost and expense, promptly
proceed to repair the damage so caused;

(2) If such damage shall be so serious as
to render the said building untenantable, or shall
amount to a total destruction of the building, then
Tenant shall proceed with all reasonable expedition
to restore or rebuild, as the case may be, the build-
ing so destroyed or rendered untenantable, free from
liens of every kind, in substantial accordance with
the plans and specifications of the building so de-
stroyed or rendered untenantable (the building so to
be rebuilt or restored in respect of its general ex-
terior design, and the mechanical, heating, lighting
and sanitary systems therein, to be substantially
in accord with the building so destroyed or rendered
untenantable), or in accordance with such other plans
and specifications as may be agreed upon by the
parties hereto; and in connection with such rebuild-
ing or restoration Tenant shall comply with all the
rules and requirements of all Boards, Departments and
governmental offices having jurisdiction of such re-
construction or restoration and shall also comply
with the requirements specified in Section 5.02 hereof.

(3) The net sums recovered by Landlord and
Tenant on account of loss or damage, whether under
the policies taken out as aforesaid, or under other
insurance policies taken out by Tenant and indem-
nifying for physical loss (as distinguished from the
loss of use and occupancy or profits), shall be de-
posited in a special account in the name of Landlord,
separate and distinct from all other funds of Land-
lord in a bank or trust company of the City of San
Juan, Puerto Rico approved by Landlord and Tenant,
to be applied on account of the cost of such restora-
tion or rebuilding, as the case may be, as the work
of restoration or rebuilding progresses, and Tenant
shall pay any and all additional moneys required in
such restoration or rebuilding in excess of said net
sums recovered, and shall be entitled to receive any
surplus, if any, remaining of said deposit after such
restoration or rebuilding has been completed as afore-
said, provided, however, that should the aforesaid
damage by fire or other casualty occur within the last
three years of the initial term or any extended term

of this lease, Tenant shall have the option to
surrender the proceeds of any insurance to Land-
lord and vacate the premises.

(c) There shall be no abatement or reduction of
any fixed or additional rental payable by the Tenant by reason of
any such damage or destruction or during any period of repair or
restoration, nor shall the Tenant be entitled to surrender posses-
sion of the Demised Premises or to terminate this lease by reason
of such damage or destruction, except as provided in subdivision
(3) of Section 6.03 (b) above.

(d) If Tenant does not commence promptly to repair
or restore the injury or destruction, or if, having commenced the
repair or restoration, Tenant does not proceed diligently to com-
plete the same, Landlord shall be entitled (but shall be under no
obligation) at any time thereafter to enter the Demised Premises
and repair or restore the injury or destruction and to apply any
insurance proceeds in the said special account to the payment of
the cost thereof; but if the insurance proceeds are insufficient
for the cost of the repair, restoration or reconstruction, Tenant
shall pay to Landlord, upon demand and as additional rent as the
work progresses, such amounts as shall be necessary to complete
the repair, restoration or reconstruction.

Section 6.04

If the Tenant's Parent Corporation is the insurer of
the buildings on the Demised Premises against loss from fire or
other casualty, then upon the damage or destruction of such build-
ings, Tenant shall promptly proceed to repair the damage or to
restore or rebuild, as the case may be, in accordance with the
applicable provisions of Section 6.03, Subsection (a) and Subsec-
tion (b), paragraphs (1) and (2) hereof, and Tenant shall promptly
furnish to Landlord the written undertaking of its Parent Corpora-
tion to provide all monies which shall be required to complete the
repair or reconstruction work which the Tenant is obligated to
perform.

Section 6.05

Notwithstanding the insurance required under this Article

VI, Tenant agrees to indemnify Landlord against all damage, loss or liability resulting from any insured risks referred to in this Article VI or arising out of Tenant's occupancy and operation of the Demised Premises except for damages, losses or liabilities resulting from the sole negligence of the Landlord, whether or not Tenant has placed and maintained such insurance.

## ARTICLE VII

### Condemnation

Section 7.01

(a) If at any time during the term of this lease, a fee simple interest in the whole or at least sixty per cent (60%) of the actual ground area of the Demised Premises shall be taken for any public or quasi-public purposes by any lawful power or authority by the exercise of the right of condemnation or eminent domain, then this lease and the term hereof shall terminate and expire as of the date of such taking, the fixed rent, additional rent and any other sum or sums of money and other charges herein reserved and provided to be paid by Tenant shall be apportioned and paid to date of such taking, and the Tenant shall thereupon be released from any further liability hereunder.

(b) If a fee simple interest in less than ten per cent (10%) of the actual ground area of the Demised Premises shall be taken as aforesaid, then this lease and the term hereof shall continue, but the rent payable hereunder shall be reduced as provided in Section 7.02 hereof, and Tenant shall have the duty to repair and restore the Demised Premises as provided in Section 7.04 hereof.

(c) If a fee simple interest of at least ten per cent (10%), but less than sixty per cent (60%) of the actual ground area of the Demised Premises shall be taken as aforesaid, then Tenant shall have the right to cancel and terminate this lease effective as of the date of such taking or to continue in possession of the

remainder of the Demised Premises for the term hereof, and Tenant

shall give to Landlord, within thirty (30) days after the date of

such taking, notice of Tenant's election to terminate or to con-

tinue this lease. Upon termination, rents and other charges shall

be apportioned as in Subsection (a) above, and upon continuation

the rent shall be reduced as provided in Section 7.02 hereof and

the Tenant shall have the duty to repair and restore as provided

in Section 7.04 hereof.

(d)  Upon termination of this lease as provided in

Subsections (a) and (c) above, title to the building or buildings

on the Demised Premises shall vest in the Landlord without any

compensation whatsoever by the Landlord to the Tenant, and neither

Landlord nor Tenant shall, except for obligations incurred before

the occurrence of such event, have any further obligation or

liability to the other.

Section 7.02

In the event that this lease shall continue pursuant to

Subsection (b) of Section 7.01 hereof, or in the event that Tenant

shall elect to continue this lease, as provided in Subsection (c)

of Section 7.01 hereof, then all the terms, conditions and provi-

sions of this lease shall continue in full force and effect, pro-

vided, however, that:

(a)  The fixed rent then payable shall abate during

the period of repair and restoration in the proportion that the

floor area of the buildings referred to in Section 3.02 hereof so

taken plus the floor area of such buildings which cannot be used by

Tenant during said period of repair and restoration bears to the

floor area of the entire buildings referred to in Section 3.02

hereof before such taking; and

(b)  After the repair and restoration of the buildings

has been completed:

(1)  The fixed rent payable thereafter under

this lease shall be equal to that proportion of the

fixed rent specified in Section 2.01 hereof which the

floor area of the entire buildings after repair and
restoration bears to the floor area of the entire
buildings referred to in Section 3.02 hereof before
such taking.

(2) In computing percentage rent under Section
2.02 hereof, the figure of Fifteen Million Dollars
($15,000,000.) shall be replaced by a figure derived
by applying the proportion set forth in the preceding
paragraph to the said figure of Fifteen Million Dollars
($15,000,000.).

(o) The term "floor area" as used herein shall mean
the actual number of square feet of space within the outside lines
of the exterior walls of all floors of full-story height of the
building on the Demised Premises, without any deduction for space
used or occupied for elevators, escalators, stairs, columns, or
other equipment of interior construction; excluding, however, any
area outside the building line or above the roof line and excluding
the area of the community center on Premise D (in the event that the
Planning Board permits construction of the automotive and community
center on Premise D).

Section 7.03

In the event of any condemnation proceeding involving
either the whole or any portion of the Demised Premises, both the
Landlord and the Tenant shall participate in such proceeding and
each shall be represented by its own counsel at its own cost and
expense. Both parties shall cooperate in the prosecution and col-
lection of any award upon any taking in such condemnation proceeding
and shall request that the Court allocate the award between the fee
estate (Landlord) and the leasehold estate (Tenant) in accordance
with the following:

(a) In the event of any such taking, partial,
whole or substantially all, as the case may be, Land-
lord shall be entitled to receive such portion of the
award therefor, with the interest thereon, as shall
represent compensation for the value of the Demised

Premises or the part thereof so taken considered as vacant and unimproved land free and clear of leases as of the date of taking.

(b)  In the event of any such taking, partial, whole or substantially all, as the case may be, that portion of the award therefor, with the interest thereon, as shall represent compensation for the value of the new building on the Demised Premises, or the part thereof which is taken, shall be allocated so that the Landlord shall receive such proportionate part as the number of full calendar years then elapsed since the commencement date of this lease bears to 64 years.  The remainder of said portion of the award shall be allocated to the Tenant.

(c)  In the event of any such taking, partial, whole or substantially all, as the case may be, Landlord shall be entitled to receive such portion of the award therefor, with the interest thereon, as shall represent compensation, if any, for consequential damages to lands, buildings and improvements adjoining or adjacent to the Demised Premises.

(d)  In the event of any taking, partial, whole or substantially all, as the case may be, Tenant shall be entitled to such portion of the award, if any, which represents compensation for the leasehold estate.

(e)  In the event of any taking of less than sixty per cent (60%) of the actual ground area of the Demised Premises and the continuation of this lease as provided in Section 7.01, Subsection (b) or Subsection (c) hereof, that portion of the award which is allocated to the Tenant shall be deposited in a special escrow account in the name of Landlord, separate and distinct from all other funds of Landlord in a bank or trust company of the City of San Juan, Puerto Rico approved by Landlord and Tenant, to be applied on account of the repair or restoration of, or addition to, the building on the Demised Premises, as the work of repair or restoration progresses in accordance with Section 7.04 hereof.

Section 7.04

In the event of any taking of less than sixty per cent (60%) of the actual ground area of the Demised Premises, and the continuation of this lease as provided in Section 7.01, Subsection (b) or Subsection (c) hereof, the Tenant shall proceed with all reasonable expedition to repair or restore the remaining part of the buildings, or to build any addition thereto, in substantial accordance with the plans and specifications of the new buildings prior to such taking, so far as applicable, or in accordance with such other plans and specifications as may be agreed upon by the parties hereto.  The Tenant shall comply with all the rules and requirements of all Boards, Departments and governmental offices having jurisdiction of such repair, restoration or addition and shall also comply with all the conditions specified in Section 5.02 hereof.

The deposit made pursuant to Section 7.03, Subsection (e) hereof shall be applied on account of the cost of any such repair, restoration and addition as the work progresses, and Tenant shall pay any and all additional moneys required for any such repair restoration or addition in excess of the amount of said deposit, and shall be entitled to receive any surplus of the said deposit remaining after all the required work has been completed as aforesaid.

Section 7.05

If during the term of this lease less than a fee title to all or any portion of the Demised Premises shall be taken in condemnation proceedings by any lawful power or governmental authority for temporary use or occupancy, the foregoing provisions of this Article shall be inapplicable to such taking; this lease shall continue in full force and effect but the rent shall abate in the proportion that the floor area so taken bears to the floor area of all of Tenant's buildings referred to in Section 3.02 hereof before such taking. In such event, Landlord shall be entitled to claim for, recover and retain any award in respect of such taking.

## ARTICLE VIII

### Conduct of Business by Tenant

Section 8.01

Tenant shall use the leased premises for the purpose of conducting the business of a Sears Roebuck "Class A" department store in a manner substantially similar to the operation now carried on in the existing "Class A" Sears Roebuck department stores in Puerto Rico and the United States, except as otherwise provided for herein. Promptly after completion of the new building, as aforesaid, Tenant shall commence such operation.

## ARTICLE IX

### Mortgage, Assignment and Sublease

Section 9.01

The Tenant at any time hereafter may assign this lease

and the leasehold estate hereby created, or sublet the whole of
the Demised Premises to any wholly owned subsidiary of Tenant
or to any corporation wholly owned by Tenant's Parent Corporation
or in which Tenant's Parent Corporation owns at least two-thirds
of the outstanding voting stock, subject, however, to the terms
and conditions of this lease.

Section 9.02

Except as provided in Section 9.01 hereof, Tenant
shall not assign this lease in whole or in part nor sublet the
entire Demised Premises without the prior written consent of
Landlord. It is the intent of the parties that during the term
of this lease the Demised Premises shall not without the Landlord's
prior written consent, be used for the conduct of any business
other than that specified in Section 8.01 hereof, and it is under-
stood that the Landlord shall not consent to any assignment or
subletting unless the Landlord is reasonably satisfied that the
prospective assignee or sublessee has the standing and experience
to conduct a department store business substantially equivalent
to that specified in Section 8.01 hereof, or such other business
as is commensurate with the objectives of the Shopping Center and
does not conflict with contractual obligations of the Landlord to
other tenants in the Center.

Notwithstanding the foregoing, Tenant shall have the
right to sublease or sublicense parts of the Demised Premises to
such departmental sublessees, concessionaires and licensees as
normally occupy space in a Sears Roebuck "Class A" department
store.

Section 9.03

In the event of an assignment of this lease, or a sub-
lease of the entire Demised Premises, as permitted in Section
9.01 or Section 9.02 hereof, the assignee or sublessee shall
execute and deliver to the Landlord an agreement in writing

- 35 -

assuming all the terms, covenants and conditions on the part of
the Tenant to be kept and performed under this lease. No assign-
ment or subletting, nor the acceptance of rents or other payments
from, nor any other dealing by the Landlord with any assignee, under-
tenant, occupant or other person shall release the Tenant from its
obligation to pay the Landlord a monthly rental equivalent to the
average monthly rental paid by Tenant to Landlord during the
twelve months' period last preceding such assignment or subletting,
but, in no event shall such liability be less than the fixed
rentals hereinabove provided to be paid from time to time during
the existing term of the lease and any renewal thereof.

Section 9.04

In the event that the Tenant abandons the Demised
Premises, then this lease shall terminate and title to the build-
ing or buildings on the Demised Premises shall vest in Landlord
in accordance with the provisions of Section 14.01, Subsection (b)
hereof. Upon such termination Tenant shall pay to Landlord, as
and for liquidated and agreed damages, the amounts set forth in
Section 14.01, Subsections (c) and (d) hereof.

Section 9.05

Tenant may mortgage its interest under this lease, but
any such mortgage shall be subject and subordinate to the provi-
sions of Sections 3.02(d),7.01(d), 9.04 and 14.01 hereof as well as
to the other provisions of this lease, and no such mortgage shall
impair any of the rights, remedies or interest of Landlord under
this lease. Landlord agrees to give notice of any default here-
under to any mortgagee of this lease who shall have given Landlord
written notice of such mortgage and furnished Landlord with a
certified copy thereof, and further agrees to accept performance
ance by such mortgagee of the terms, covenants and conditions

of this lease in the manner and within the time provided for here-
under as if such performance were by Tenant, provided, however,
that such mortgagee shall be subject to the business restrictions
referred to in Section 9.02 hereof. No mortgage of Tenant's
interest under this lease or the enforcement thereof, shall be
deemed to release or discharge Tenant from any obligation or
liability hereunder.

Section 9.06

The provisions of subdivision (d)(2) of Section 1.05
shall be complied with by any mortgagee holding a mortgage upon
Landlord's fee interest in Parcel A and/or Parcel B, and shall
be superior to the lien of any such mortgage upon Landlord's
said fee interest.

ARTICLE X

Utilities

Section 10.01

Tenant shall be solely responsible for and promptly
pay all charges for heat, water, gas, electricity, telephone,
sewerage or any other utility rendered to, used or consumed in
the leased premises. In no event shall Landlord be liable for an
interruption or failure in the supply of any such utilities to the
leased premises, provided, however, that in the event that Land-
lord fails to maintain in good working condition any utility
equipment such as a sewage pipe or utility conduit located
within the Shopping Center but utilized by the Tenant, which
utility equipment was installed by and is under Landlord's effec-
tive control, and if within ten (10) days after receiving written
notice thereof from Tenant, Landlord does not proceed promptly
to cure such condition, Tenant shall have the same right as
Landlord to cure such condition and deduct the cost thereof
from rental payments due hereunder.

- 37 -

## ARTICLE XI

## Parking and Common Use Areas and Facilities

Section 11.01:

All automobile parking areas, driveways, entrances
and exits thereto, and other facilities furnished by Landlord
in or near the Shopping Center, for the general use, in common,
of tenants, their officers, agents, employees and customers, shall
at all times be subject to the exclusive control and management of
Landlord and Landlord shall have the right from time to time to
establish, modify and enforce reasonable rules and regulations
with respect to all facilities and areas mentioned in this Article.
Landlord shall have the right to construct, maintain and operate
lighting facilities on all said areas and improvements; to police
the same; from time to time to change the level, location and ar-
rangement of parking areas and other facilities hereinabove referred
to; to restrict parking by tenants, their officers, agents and em-
ployees to employee parking areas; to close all or any portion of
said areas or facilities to such extent as may, in the opinion of
Landlord's counsel, be legally sufficient to prevent a dedication
thereof or the accrual of any rights to any person or the public
therein; to close temporarily all or any portion of the parking
areas or facilities; to discourage noncustomer parking; and to do
and perform such other acts in and to said areas and improvements
as, in the use of good business judgment, the Landlord shall de-
termine to be advisable with a view to the improvement of the con-
venience and use thereof by tenants, their officers, agents, employees
and customers. Landlord will operate and maintain the common facili-
ties referred to above in such manner as Landlord in its sole discre-
tion, shall determine from time to time. Without limiting the scope
of such discretion, Landlord shall have the full right and authority
to employ all personnel and to make all rules and regulations pertain-
ing to and necessary for the proper operation and maintenance of the

common areas and facilities. Landlord shall obtain and maintain
a public liability policy of insurance with Landlord and all tenants
of the Shopping Center as insured covering liability claims arising
out of the common use and facilities areas. The coverage shall be
$500,000. and $1,000,000. for personal damages and $100,000. for
property damages. Certificates of insurance shall be issued to
the tenants.

## ARTICLE XII

### Cost of Maintenance of Common Areas

Section 12.01

    Tenant shall pay to Landlord as an agreed service charge
that proportion of the cost of insuring, repaving or otherwise main-
taining, policing, landscaping and lighting the parking areas, road-
ways, service areas and sidewalks in the Shopping Center, which the
floor area of the new building or buildings on the Demised Premises
(excluding the floor area of the community center on Premise D, if
the same should be built) shall bear to the aggregate floor area of
all of the structures in the Shopping Center. Such service charge
shall be payable monthly as billed by the Landlord. Sixty (60)
days after Landlord's fiscal year, Landlord shall furnish to Tenant
a detailed statement of the aforesaid cost and the payments there-
tofore made by Tenant will be adjusted in accordance therewith. In
the event that the Landlord fails to maintain the said common areas
in a manner reasonably satisfactory to Tenant, then Tenant shall be
entitled to proceed in accordance with the provisions of Section
14.03 hereof.

## ARTICLE XIII

### Merchants' Association

Section 13.01

    Tenant shall cooperate on a fair and equitable basis with
the Merchants' Association of the Shopping Center in furthering the
objects and purposes of the Merchants' Association. Tenant reserves

- 39 -

the right in its sole discretion, to decide whether or not to be-
come a member of said Association.

## ARTICLE XIV

### Default

Section 14.01

(a) If default shall be made by the Tenant in the
due and punctual payment of any fixed rent or additional rent pay-
able under this lease when and as the same shall become due and
payable, and such default shall continue without correction for a
period of thirty (30) days after notice from Landlord to Tenant,
then and in such event Landlord shall have the right to terminate
this lease by giving written notice thereof to Tenant and five (5)
days after the giving of such notice this lease and the term hereby
demised and all rights of Tenant hereunder shall, subject to the
provisions of this Section 14.01, expire and terminate; provided,
however, that the non-payment of any disputed additional rent under
Section 2.02 hereof prior to the binding determination provided in
subsection (c) of Section 2.02 hereof, or the non-payment of any
taxes which Tenant is contesting in accordance with the provisions
of subsection (d) of Section 2.03 hereof, shall not be deemed to be
a default under this Section 14.01.

(b) Upon any such termination of this lease, title
to the building or buildings erected by the Tenant on the Demised
Premises shall vest in the Landlord without any compensation whatso-
ever to the Tenant by way of payment, offset or otherwise, and Tenant
shall execute such instruments as may be required to effectuate the
transfer of title to the Landlord. Upon any such termination of
this lease, Tenant shall quit and peacefully surrender the Demised
Premises to Landlord, and Landlord, upon or at any time after any
such termination, may without further notice, enter upon the Demised
Premises and possess itself thereof, by summary proceedings, eject-
ment or otherwise, and may dispossess Tenant and remove Tenant and
may have, hold and enjoy the Demised Premises.

(c) In the event of any such termination Tenant shall pay to Landlord for the remainder of the then existing term of the lease, as and for liquidated and agreed damages, the equivalent of the fixed rent hereinabove provided, less the net proceeds of any reletting (after deducting all Landlord's expenses in connection with such reletting). Tenant shall pay such damages to Landlord monthly on the days on which the fixed rent would have been payable under this lease if it were still in effect, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same shall arise.

(d) In the event of any such termination, Landlord shall make reasonable efforts to relet the Demised Premises for such term or terms upon such conditions as Landlord, in its sole discretion, may determine and Landlord shall collect and receive the rent therefor and apply the same on a monthly basis against the liquidated damages obligations of the Tenant hereinabove provided. So long as the Landlord acts in good faith, the Landlord shall not be responsible or liable for any failure to relet the Demised Premises or for any failure to collect any rent due upon any such reletting.

Section 14.02

If default shall be made by Tenant in the performance of or compliance with any of the covenants, agreements, terms or conditions contained in this lease other than those referred to in Section 14.01 hereof, and such default shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant, (provided, however, that Tenant's time to cure any such default shall be extended for such additional time as shall be reasonably required for the purpose if Tenant shall proceed with due diligence during such thirty (30) day period to cure such default and is unable to cure the same within the said thirty (30) days) then Landlord shall have the right, at its

election, to submit the matter to an appropriate court. The
final determination of any such court shall be binding upon the
parties hereto. Any award of damages to the Landlord shall be
added to the payment of fixed rent next falling due under this
lease, and Tenant's default in paying such damages shall be
deemed to be a default in the payment of fixed rent under
Section 14.01 hereof.

Section 14.03

     If default shall be made by Landlord in the perform-
ance of or compliance with any of the covenants, agreements or
conditions on its part to be performed hereunder, then the Tenant
shall be entitled to proceed as follows:

     (a) If Landlord's default shall be in the perform-
ance of work which the Tenant is able and willing to perform, then
Tenant shall give the Landlord written notice specifying in detail
the work which Tenant requires and which Tenant proposes to per-
form upon Landlord's failure to do so. Within thirty (30) days
after such written notice the Landlord shall either commence the
performance of the requested work and shall diligently proceed
therewith until the work is completed or the Landlord shall sub-
mit the matter to an appropriate court. In the event that the
Landlord does not either proceed with the performance of the re-
quested work or submit the matter for adjudication within the
said thirty (30) day period, the Tenant shall have the right to
perform the work specified in its notice and to deduct the monies
actually expended therefor from the rental payment or payments
next falling due under this lease.

     (b) If Landlord's default shall be in some per-
formance which Tenant is either unable or unwilling to perform,
then Tenant shall give the Landlord written notice of the perform-
ance required and if within thirty (30) days after such written
notice the Landlord does not commence and diligently proceed with
the requested performance then Tenant shall have the right, at
its election, to submit the matter to an appropriate court.

(c)   The final determination by the court of any

matter submitted pursuant to paragraphs (a) or (b) of this Section

14.03 shall be binding upon the parties hereto. Any award of damages

to the Tenant shall be deducted from the rental payment or payments

next falling due under this lease and the Tenant shall also have

the right to deduct therefrom the monies actually expended by Tenant

for work performed by Tenant pursuant to such determination.

(d)   In the event of Landlord's default which shall

be held by a court of competent jurisdiction to have constituted an

eviction of Tenant of a permanent nature, then Tenant's failure to

pay rent subsequent to such finding shall not constitute a technical

default under Section 14.01 hereof and Tenant shall be entitled to

such damages as the court deems proper.

Section 14.04

Notwithstanding the foregoing provisions of this Article

XIV, in the event of the breach by either party of the covenants,

agreements or conditions of this lease, the other party shall, in

addition to any and all other rights, be entitled to such injunctive

and other remedies as may be allowed at law, in equity, by statute

or otherwise for such breach. No failure by either party to insist

upon the strict performance of any covenant, agreement, term or

condition of this lease or to exercise any right or remedy conse-

quent upon a breach thereof, shall constitute a waiver of any such

breach or of such covenant, agreement, term or condition. No waiver

of any breach shall affect or alter this lease, but each and every

covenant, agreement, term and condition of this lease shall con-

tinue in full force and effect with respect to any other then exist-

ing or subsequent breach thereof.

ARTICLE XV

Surrender At Expiration

Section 15.01

Tenant shall on the expiration of the term of this lease

- 43 -

or other sooner termination hereof, surrender and deliver up the Demised Premises with the buildings and improvements then erected and maintained thereon into the possession of Landlord in good order, condition and repair, free and clear of all liens, tenancies and encumbrances other than those, if any, created by Landlord, and title to such buildings and improvements shall vest in the Landlord without any payment or allowance whatever by Landlord on account of or for any buildings and improvements on the Demised Premises at the time of the surrender, or for the contents thereof or appurtenances thereto. Tenant shall execute such instruments as may be required to effectuate the transfer of title to Landlord.

The aforesaid surrender shall include all fixtures and facilities in the buildings on the Demised Premises, or forming part thereof, which are customarily regarded as real estate and as part of the buildings. Any fixtures, trade fixtures, personal property or belongings of Tenant left upon the Demised Premises at the time of such surrender shall be deemed to have been abandoned by Tenant.

## ARTICLE XVI

### Equipment and Fixtures Installed

Section 16.01

Tenant from time to time during the initial term or any extended term may install equipment and fixtures of various kinds and descriptions for use in connection with its business, and upon the installation or placing of, any such equipment and fixtures in or on the Demised Premises by Tenant, the same shall remain at all times the property of Tenant, and, at any time during the initial term or any extended term and at the termination of the lease, Tenant shall be entitled to remove any and all of such equipment and fixtures. If any equipment or fixtures are so attached to the building as not to be readily removable without damage to the building, then, if Tenant shall remove the same, Tenant shall promptly repair and replace any damage caused to the building by such removal.

- 44 -

Upon the expiration or other termination of this lease, Landlord may require Tenant to remove any and all of such equipment and fixtures at the expense of the Tenant and Tenant shall promptly repair any damage caused to the building by such removal.

Nothing herein contained shall be deemed to confer upon Tenant any right to remove any equipment or fixtures used in the operation of the Demised Premises (Article XV) as distinguished from fixtures used in carrying on Tenant's business.

## ARTICLE XVII

### Covenant of Quiet Enjoyment

Section 17.01

Landlord covenants and agrees that so long as Tenant pays the fixed rent, additional rent and other charges reserved and agreed to be paid by Tenant under this lease, and faithfully observes all covenants, conditions and agreements herein contained, Tenant shall quietly have and enjoy the Demised Premises and every part thereof during the term of this lease without hindrance, ejection or molestation by Landlord or any person or persons claiming by, through or under Landlord. In the event that Landlord shall hereafter convey, or in any manner be divested of title to, the Demised Premises, Landlord shall be and hereby is entirely freed and relieved of the performance of all covenants and obligations of Landlord hereunder from and after such conveyance or divestiture of title to the extent that Landlord's successor in title shall become obligated, expressly or by implication of law, to perform the covenants and obligations of Landlord hereunder, and to such extent Tenant shall thenceforth look solely to Landlord's successor in title for the performance of the covenants and obligations of Landlord hereunder.

## ARTICLE XVIII

### Estoppel Certificates

Section 18.01

Tenant agrees at any time and from time to time during

the term of this lease upon not less than ten (10) days prior

notice by Landlord to execute, acknowledge and deliver to Land-

lord a statement in writing certifying that this lease is unmodi-

fied and in full force and effect (or if there have been modifica-

tions, that the same is in full force and effect as modified and

stating the modifications), and the dates to which the fixed rent

and other charges have been paid, and stating whether or not to

the best knowledge of the signer of such certificate Landlord

is in default in performance of any covenant, agreement or condi-

tion contained in this lease and, if so, specifying each such

default of which the signer may have knowledge, it being intended

that any such statement delivered pursuant to this Section 18.01

may be relied upon by any prospective purchaser of the fee or any

mortgagee thereof.

Section 18.02

Landlord agrees at any time and from time to time during

the term of this lease upon not less than ten (10) days prior no-

tice by Tenant to execute, acknowledge and deliver to Tenant a

statement in writing certifying that this lease is unmodified and

in full force and effect (or if there shall have been modifications

that the same is in full force and effect as modified and stating

the modifications) and the dates to which the fixed rent and other

charges have been paid, and stating whether or not to the best

knowledge of the signer of such certificate Tenant is in default

in performance of any covenant, agreement or condition contained

in this lease and, if so, specifying each such default of which

the signer may have knowledge, it being intended that any such

statement delivered pursuant to this Section 18.02 may be relied

upon by any prospective mortgagee of the Tenant's interest in this

lease.

<u>ARTICLE XIX</u>

<u>Invalidity of Particular Provisions</u>

Section 19.01

If any term or provision of this lease or the application

thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remaining terms and provisions of this lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this lease shall be valid and be enforced to the fullest extent permitted by law.

### ARTICLE XX

### Notices

Section 20.01

All notices, demands and requests required or permitted to be given hereunder by either party to the other shall be in writing and given by registered mail return receipt requested. All notices, demands and requests by Landlord to Tenant shall be deemed to have been properly given if and when the original notice, demand or request has been mailed by registered mail addressed to Tenant at Office of the President, 106 Coll y Toste Streets, Hato Rey, Puerto Rico, or at such other place as Tenant may from time to time designate in a written notice to Landlord. All notices, demands and requests by Tenant to Landlord shall be deemed to have been properly given if and when mailed by registered mail addressed to Landlord at Office of the President, Suite 2600, 70 Pine Street, New York 5, New York, or at such other place as Landlord may from time to time designate in a written notice to Tenant.

### ARTICLE XXI

### Restriction on New Buildings in Shopping Center

Section 21.01

During the term of this lease Landlord shall not, without the prior written consent of the Tenant, undertake or permit the construction of new buildings upon the premises of the Shopping Center which will (1) substantially reduce the parking area of the Shopping Center which is then available or (2) substantially alter

the character of the Shopping Center. Nothing contained herein

shall be construed to restrict in any way whatever Landlord's

right to make normal repairs or alterations to existing buildings

or to repair, restore or rebuild any buildings which may be damaged

or destroyed by fire or other casualty or to repair or restore

buildings which may be affected by condemnation.

## ARTICLE XXII

### Access By Landlord

Section 22.01

The Landlord or its agents shall have the right at all

reasonable hours and upon reasonable notice, to inspect the Demised

Premises. In the event the Tenant has not elected to extend the

term of this lease as provided in Section 1.07 hereof, then during

the one year period prior to the expiration of the initial term or

the first extended term or the second extended term, as the case

may be, the Landlord shall have the right to exhibit the premises

to prospective tenants at reasonable hours and upon reasonable

notice. The Landlord shall have the right to exhibit the premises

to prospective tenants during the one year period prior to the

expiration of the third extended term without any prejudice to

Tenant's rights under Section 1.09 hereof.

## ARTICLE XXIII

### Miscellaneous

Section 23.01

As used herein, the expression "the term of this lease",

or any variation thereof, shall be deemed to include the initial

term and any and all extended terms provided for in Section 1.07

hereof.

Section 23.02

All the headings and the numbering of the Sections in

this lease are for convenience of reference only and shall not

affect the construction of this lease.

Section 23.03

          Subject to the provisions of Article IX hereof, and without in any way enlarging Tenant's right to assign as therein set forth, this lease shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

Section 23.04

          This lease may not be modified, altered, terminated or discharged orally but only by an agreement in writing signed by the parties hereto.

Section 23.05

          This lease may be executed in any number of counterparts, each of which shall be an original and the counterparts shall constitute but one and the same instrument.

Section 23.06

          The controlling language of this instrument shall be English.

Section 23.07

          The appropriate jurisdiction for the determination of disputes arising under this lease shall be Puerto Rico.

Section 23.08

          Any party hereto may, at its sole expense, elect to make this lease a public deed.  In such event, the other parties hereto shall join in the execution of such instruments as may be required to effectuate such election, but the other parties shall not be responsible for any taxes, fees, costs or other expenses whatsoever incurred in connection therewith.

          IN WITNESS WHEREOF, the parties hereto have caused this lease to be executed in their respective corporate names and

their respective corporate seals to be hereunto affixed by their

respective officers thereunto duly authorized, as of the day and

year first above written.

SANTA ROSA SHOPPING CENTER, INC.

By _____
                    PRESIDENT

SEARS, ROEBUCK de PUERTO RICO, INC.

By _____

BANCO CREDITO Y AHORRO PONCENO, INC.

By _____

- 50 -

STATE OF NEW YORK )
                  :  ss.:
COUNTY OF NEW YORK)

Before me, a Notary Public, in and for the County and State of New York, there came JOHN P. BIRKELUND, the President of SANTA ROSA SHOPPING CENTER, INC., to me personally known, who acknowledged that he is the one who executed on behalf of the above named corporation the above instrument of lease.

WHEREFORE, I have hereunto set my hand and seal of office this 16th day of September, 1965.

BENJAMIN BLONDER
NOTARY PUBLIC, State of New York
No. 31-5350125
Qualified in New York County
Commission Expires March 30, 19 66

CITY OF *Lindell*
                :  ss.:
STATE OF *Illinois* )

Before me, a Notary Public, in and for the City of *Lindell* and State of *Illinois*, there came *J. K. Smith*, the *President* of SEARS, ROEBUCK de PUERTO RICO, INC., to me personally known, who acknowledged that he is the one who executed on behalf of the above named corporation the above instrument of lease.

WHEREFORE, I have hereunto set my hand and seal of office this *22nd* day of September, 1965.

*Mary Catherine Dodd*

CITY OF *San Juan*  )
                    :  ss.:
STATE OF *Puerto Rico* )

*Affidavit # 4245*

Before me, a Notary Public, in and for the City of *San Juan* and State of *Puerto Rico*, there came *Mr. Carlos J. Puu*, the *Vice President* of BANCO CREDITO Y AHORRO PONCENO, INC., to me personally known, who acknowledged that he is the one who executed on behalf of the above named corporation the above instrument of lease.

WHEREFORE, I have hereunto set my hand and seal of office this 9th day of September, 1965.
*October*

*C-600-061 Am*

AMENDMENT TO THE LEASE BETWEEN SANTA ROSA SHOPPING CENTER, INC. AND
SEARS, ROEBUCK DE PUERTO RICO, INC., DATED SEPTEMBER 6, 1965

Agreement made this 3 day of    June    , 1983, in San Juan,
Puerto Rico, between Plaza Las Cumbres, Inc., a corporation organized
and existing under the laws of the Commonwealth of Puerto Rico, as
Party of the First Part, represented herein by its president, Andre
Nikitine, of legal age, married, and a resident of Puerto Rico, who
is duly authorized therefore, hereinafter called the "Landlord", and

Sears, Roebuck de Puerto Rico, Inc., a Delaware corporation with
principal offices in San Juan, Puerto Rico, as Party of the Second
Part, represented herein by its president, Donald S. Jones, of legal
age, married, and a resident of San Juan, Puerto Rico, who is duly
authorized therefore, hereinafter called the "Tenant".

Whereas, Santa Rosa Shopping Center, Inc. and Sears, Roebuck
de Puerto Rico, Inc. signed a lease agreement on September 6, 1965
(hereinafter referred to as the "Lease Agreement"), and

Whereas, subsequent to the signing of the Lease Agreement, Santa
Rosa Shopping Center, Inc. was purchased by Landlord, and

Whereas, Landlord is the successor in interest of Santa Rosa
Shopping Center, Inc. to the Lease Agreement, and

Whereas, Landlord wishes to make additions and improvements to
the mall of Santa Rosa Shopping Center (hereinafter referred to as
the "Shopping Center"), and

Whereas, the proposed addition and improvement to the mall will
affect the Demised Premises, including Tenant's department store
(hereinafter referred to as "Tenant's store") and said Shopping Center,

Now, therefore, the Parties agree as follows:

1.  Prior to beginning the construction of any addition or improvement
    to the Shopping Center, Landlord shall:

    (a)  submit to Tenant for Tenant's approval the proposed design
         and specifications for the mall, which design and specifi-
         cations:  (i) shall be similar to those for the existing
         mall building, (ii) shall not provide for any alteration in
         the precast concrete fascia panels or the structural slab

of the roof overhang at the mall entrance to Tenant's
store, and (iii) shall include roof plans illustrating
the location of roof drains and rain leaders.  Tenant's
exterior canopy may be used as the roof of the building
to be attached to the demised premises or as the roof of
the enclosed mall; provided, however, that said overhang
shall be used only as a roof, and provided further that
no equipment or materials; with the exception of a suspended
ceiling and lighting, shall be hung from said canopy or
installed on or over it.

Landlord shall further present to Tenant for its approval
all designs and specifications for the alteration of the
Demised Premises.  Said plans and specifications shall include,
inter alia:

(i)  the proposed plans for the doorway between Tenant's
store and the mall, the size of the mall configuration
at the entrance to Tenant's store, and the form in which
the mall building is to be attached to Tenant's store.
In the event that an exterior wall of Tenant's store is
used as a common wall for an adjoining building, said plans
shall include plans for the construction of an exterior
stud wall;

(ii)  the layout of parking spaces on and adjacent to the
demised premises.  Landlord shall paint any lines drawn
in the parking lot in a way that parked cars  will not
interfere with loading and unloading operations for the
demised premises, and in no event shall there be fewer
than 25 feet between the loading and unloading entrance
of Tenant's store and the parking areas for cars.

Once Tenant has approved said design and specifications,
Landlord shall prepare the site plan in accordance therewith
and shall submit said plan for Tenant's approval.  After
Tenant has approved the site plan, Landlord shall attach
said plan hereto as Exhibit II.  Landlord shall make no
modification or alterations to said plan without Tenant's
written authorization.

(b)   obtain and make available for inspection by Tenant all
necessary approvals and permits of the Permit and Regulation
Administration (ARPE) and the Puerto Rico Planning Board
for additions and improvements to the Shopping Center and
to the Demised Premises.  Landlord shall not commence or
cause to commence any work on additions or improvements to
the Shopping Center or to the Demised Premises until Tenant
has reviewed and approved said approvals and permits.  Any
changes to the proposed plans will be notified to Tenant
for Tenant's approval.  If public hearings are necessary,
Landlord will notify Tenant of the time, date and place
they will take place.

(c)   obtain and present to Tenant the authorization of any
mortgagors or creditors of Landlord that may be required
to permit Landlord to perform the modifications and altera-
tions referred to herein.

2.   Landlord warrants and represents that it shall:

(a)   commence construction within      days of approval of the site
plan by Tenant and shall finish construction within      days
of commencement.

(b)   construct all additions and improvements to the Shopping
Center so that the entire area of the Shopping Center shall
be covered by a sprinkler system.

(c)   place all building rain leaders designed to drain water from
the roof in a location that does not cause rain water run
off to flow down the entrance ramp to Tenant's lower level
parking.

(d)   not disturb the precast concrete fascia panels or the structural
slab of the roof overhang at the mall entrance to Tenant's
store.

(e)   bear all costs of additions or improvements to the Shopping
Center as well as all costs of additions or improvements to
the Demised Premises required because of additions or im-
provements to the Shopping Center; Landlord shall pay

the cost of the construction or remodeling of the doorway
between Tenant's store and the mall, up to a maximum of
$12,500.  Landlord will seek and obtain Sears' approval
on any and all exterior signs bearing Sears name to be put on the mall.

(f)   at Landlord's expense, cause GT Sylvania to survey Tenant's
rear parking lot after completion of the additions and
improvements to the Shopping Center.  Landlord shall provide
Tenant with a certificate from GT Sylvania stating that the
lighting of Tenant's rear parking lot is equal the current
lighting level of Tenant's front parking lot.

(g)   Building 17 on the plot plan attached hereto as Exhibit I,
to be constructed in the central part of the parking lot
of the Shopping Center fronting on Highway Number 2, and shall
construct any sign related to Building 17 in such a way that
neither the building nor the sign will be higher than the
ground level of Tenant's store, which is twenty-two feet.
Landlord further warrants and represents that it shall not
build any building or structure directly fronting on the
Demised Premises, or on or around the corner of Highway
Number 2, and Aguas Buenas Avenue.

(h)   in connection with the remodeling work to be done on the
Demised Premises, obtain, pay for, and maintain at all times
during the performance of work under this contract, through
companies and agencies approved by Tenant and pursuant to
contracts containing provisions satisfactory to Tenant,
the following insurance:

(i)   Worker's Compensation and Employer's Liability Insurance
with statutory benefits under Worker's Compensation,
and limits of liability under the Employer's Liability
portion of not less than $500,000 containing a waiver
of subrogation in favor of Tenant executed by Landlord's
insurance company or companies,

(ii)   Comprehensive General Liability Insurance including
Contractor's Protective Liability in Contractor's
name, with bodily injury and property damage limits
of not less than $1,000,000 per occurrence,

(iii)  Contractual Liability Insurance in Landlord's name
specifically endorsed to cover the indemnity agreement
in this contract. Limits of liability shall be not
less than $1,000,000 per occurrence for bodily injury
and property damage,

(iv)   Owner's Protective Liability Insurance with Tenant as
the named insured, covering Landlord's operations and
the work performed for Landlord on the job site. Such
policy shall have a combined single limit of not less
than $1,000,000 per occurrence for bodily injury and
property damage, and

(v)    Automobile Liability Insurance with an Employer's Non-
Ownership Liability Endorsement in Landlord's name.
Limits of liability shall not be less than $1,000,000
per occurrence for bodily injury and property damage.

Landlord shall cause waivers of subrogation to be executed
by Landlord's insurance company or companies in favor of
Tenant with respect to the foregoing policies as well as with
respect to any real and personal property insurance policy
maintained by Landlord covering the Shopping Center.

(i)   To the fullest extent permitted by law, defend, indemnify
and hold harmless Tenant and its agents and employees from
and against all claims, actions, liabilities, losses, costs
and expenses, including but not limited to attorneys'
fees, arising out of any actual or alleged (i) bodily
injury, sickness, disease or death, or to injury to or
destruction of tangible property (other than the work itself)
including the loss of use resulting therefrom, or any other
damage or loss arising out of or resulting or claimed to

have resulted in whole or in part from any actual or
alleged act or omission of the Landlord, or any con-
tractor, any subcontractor, anyone directly or indirectly
employed by any of them or anyone for whose acts any of them
may be liable in the performance of the work hereunder
(for purposes of this Section 2(i), hereinafter collectively
called "Contractor"), whether or not lawful or within the
scope of their employment, and regardless of whether or not
it is caused in part by a party indemnified hereunder; or
(ii) violation by Contractor, in the performance of the work,
of any law, statute or ordinance or any governmental
administrative order, rule or regulation, on whatever amount
a Court of Justice may award on any incident alleged to
result or resulting from the Santa Rosa Shopping Center
remodeling.

In any and all claims against Tenant, or any of its agents
or employees, by any employee of the Contractor, the indemni-
fication obligation hereunder shall not be limited in any
way by (i) any limitation on the amount or type of damages,
compensation or benefits payable by or for the Contractor
under workers' compensation acts, disability benefit acts
or other employee benefit acts; or (ii) by any statutory
bar or limitaiton in any worker's compensation or other
similar type of statute.

(j)   carry out all remodeling work in such a way as to interfere
as little as reasonably possible with the operation of Tenant
on the Demised Premises.

3.   Landlord warrants and represents that Tenant shall maintain its
rights to the future expansion area previously approved by the
Planning Board, including the existing parking spaces allocated for
Tenant's future expansion.

4.   Landlord warrants and represents that the mall shall be no greater
than 28 linear feet wide at the entrance of the mall to Tenant's
Premises.

5.   For the period of June 1, 1983 to May 31, 1988, the first paragraph
of Section 2.02 shall be amended to read as follows:

-7-

"a.  In the event that the net sales (as hereinafter defined) made by Tenant upon the Demised Premises during any lease year shall be in excess of Fifteen Million Dollars ($15,000,000), then Tenant shall pay to Landlord, as additional rental hereunder for said lease year, a sum equal to one (1) per cent of such excess (said amount referred to hereinafter as "additional rental").

"b.  Tenant shall pay as an advance to Landlord the sum of $2,000 per month, which amount shall be credited against the amount due hereunder as additional rental, if any.  Said advances shall be paid prior to the first business day of each month during the aforesaid period.  In the event that at the end of any lease year that begins or ends during the period between June 1, 1983 to May 31, 1988, the sum of the monthly advances paid during said year as additional rental exceeds the total amount due as additional rental in accordance with 2.02 (a) above,  Landlord shall promptly refund such excess to Tenant, together with the interest thereon, calculated at the average prime rate established by Citibank, N. A. during the last month of the year in question.

"c.  The term 'net sales' as used herein is hereby defined to mean the gross sales made upon the Demised Premises by Tenant plus the gross sales, if any, made upon the Demised Premises by Tenant's departmental sublessees, concessionaires and licensees occupying space upon the Demised Premises, but deducting or excluding therefrom, as the case may be, the following:

     (1)  Sales of departments or divisions not located upon the Demised Premises;

(2)   The amount of all sales, use, excise retailers'
occupation or other similar taxes imposed in a specific
amount, or percentage upon, or determined by, the amount
of retail sales made upon the Demised Premises;

(3)   Returns and allowances, as such terms are known
and used by Tenant in the preparation of Tenant's profit
and loss statements;

(4)   Delivery, installation and service charges including
any and all service charges for work performed off the
Demised Premises;

(5)   Amounts in excess of Tenant's (or of its sublessees',
concessionaires' and licensees') cash sales price charged on
sales made on credit or under a time payment plan;

(6)   Sales of merchandise ordered through the use of
Tenant's mail order catalogs or filled through Tenant's
catalog order channels, regardless of the place of order,
payment or delivery;

(7)   Policies of insurance sold on the Demised Premises
and premiums collected on policies of insurance;

(8)   Sales off the Demised Premises of encyclopedias
and other educational books sold in sets;

(9)   Sales made through the Commercial and Industrial
Sales Department of Tenant.

"d. Within sixty (60) days after the end of each lease year,
Tenant shall furnish to Landlord a statement certified by
an officer of Tenant showing the net sales (as hereinbefore
defined) made by Tenant upon the Demised Premises during
such preceding lease year, and the additional rental, if
any, payable by Tenant to Landlord for such lease year.
In addition, Tenant shall furnish Landlord with a statement
of Tenant's net sales (as above defined) for Tenant's next
preceding fiscal year prepared by Tenant's certified public
accountants.

"e.   Unless Landlord shall, within thirty (30) days after receipt

of any such statement certified by Tenant's officer, notify

Tenant to the contrary, such statement shall be deemed to

have been accepted by the Landlord as correct.   In the

event that Landlord shall notify Tenant of Landlord's dis-

satisfaction with such statement within the aforementioned

period, then Tenant shall permit a reputable firm of certified

public accountants doing business in the United States and

Puerto Rico, which shall be mutually satisfactory to, and

approved in writing by, Landlord and Tenant, to make and

independent audit of Tenant's net sales (as hereinbefore

defined) for the period covered by said statement.   Such

independent audit shall be at Landlord's expense and the

findings of such audit shall be binding upon both parties

and conclusive.

"f.   Tenant makes no representation or warranty as to the sales

which it expects to make upon the Demised Premises and

Landlord agrees to hold in confidence all sales figures

and other information with respect to Tenant's business

which Landlord may obtain from Tenant or from any audit

of Tenant's books and records, except that Landlord may

submit all of said information to the holder or holders

of mortgages upon Landlord's interest in the Demised

Premises, who shall also receive same in confidence."

On June 1, 1988, the aforesaid modification shall cease to have
any force and effect and the first paragraph of Section 2.02 shall
read as originally drafted.

6.   Section 5.01 of the Lease Agreement shall be modified by the

addition of paragraph (e), as follows:

"(e)   Any section herein to the contrary notwithstanding, Tenant

shall have the right to remodel and add such additional

offices on the second level of Tenant's store as Tenant

may deem necessary, for its own use.  In the event that

such offices are added, Tenant's office employees will

use only the parking located at the rear of the Tenant's

store."

7.   Section 12.01 of the Lease Agreement, as modified be amendment

dated July 30, 1971, shall be modified to read as follows:

"A.   Tenant shall pay to Landlord as the exterior maintenance

charge a percentage of the exterior maintenance cost

(as defined below), which percentage shall be calculated

using the following formula:  Tenant's gross floor area

less basement parking area, divided by the gross leasable

area (including Tenant's gross area) of the Shopping Center.

The term 'exterior maintenance cost' shall include only:

cost of insuring, repaving or otherwise maintaining, policing,

securing, landscaping and lighting the exterior common areas

plus overhead limited to 6% of such costs.  The term 'exterior

common areas' shall mean only the parking areas, landscaped

areas, roadways, service areas, sidewalks and entrances

in the exterior of the Shopping Center.

Tenant's gross floor area, less basement parking area,

is 193,500 square feet and the gross leasable area of

the Shopping Center is 329,327 square feet, on the date

hereof, before expansion.

"B.   In addition to the payment of the aforesaid exterior

maintenance charge, Tenant shall also pay as a mall

operating charge a percentage of the operating costs

of the mall, which percentage shall be calculated in

accordance with the following formula:  The frontage

of Tenant's store onto the mall, measured in linear

feet, divided by total frontage of all leasable areas

onto the mall; provided, however, that in no event shall
Tenant be required to pay as a mall operating charge an
amount that exceeds 4% of the operating costs of the mall;
and provided, further, that in no event shall Tenant be
required to pay as a mall operating charge (including any
management or administrative expenses) an amount in excess
of $5,000 per year, such limit adjusted every five years
according to the CPI as published by the Department of
Labor of the Commonwealth of Puerto Rico.  The term 'operating
costs of the mall' shall include only the following expenses:
insurance, electricity, water, air conditioning repairs,
labor and materials used in cleaning, maintaining and making
repairs to the enclosed mall, and such management and administra-
tive costs as do not exceed 6% of the total amount of the
operating costs of the mall.  The term 'operating costs of
the mall' shall also include depreciation of ventilation equipment
installed or used in the mall area only.  For purposes
of cleaning, maintenance, and repairs, the term 'mall'
shall include:  mall flooring, ceiling, benches, planters,
plants, illumination (including emergency lights) and
ventilation equipment.

"C.   The aforesaid exterior maintenance and mall operating charge
shall be payable monthly as billed by the Landlord.  Within
sixty (60) days of the end of each lease year, Landlord
shall furnish Tenant a certified statement showing the
mall operating costs and exterior maintenance costs, as
defined above, for said lease year.  Payments made by
Tenant during said years shall be adjusted in accordance
with said statement and Tenant may credit any amounts due
to it as a result of said adjustment against any other
payments that it may owe to Landlord.  Tenant may notify
Landlord of Tenant's dissatisfaction with such statement,
in which case Landlord shall allow a certified public

accountant mutually acceptable to Tenant and Landlord to make an independent audit of the aforesaid costs, at Tenant's expense. The findings of such audit shall be binding upon both parties. In the event that the Landlord fails to maintain the exterior common areas in a manner reasonably satisfactory to Tenant, then Tenant shall be entitled to proceed in accordance with the provisions established in Section 14.03 of the Lease Agreement dated September 6, 1965."

8. Section 12.02 of the Lease Agreement, as modified by amendment dated July 30, 1971, shall be modified to read as follows:

"In the event that Tenant expands its store or that Landlord enlarges the Shopping Center, Tenant's portion of the exterior maintenance charge and the mall operating charge shall be recalculated using the formulas set forth in Section 12.01 (A) and (B) above. Any change in Tenant's percentage of the aforesaid charges resulting from said recalculation shall be applied only to that portion of the lease year during which said expansion or enlargement was completed."

Tenant's final approval of Landlord's Santa Rosa Shopping Center remodeling is subject to Landlord submitting to Tenant the final detailed architechtural drawings for Tenant's approval. Tenant reserves the right of refusal of this contract until the final detailed architechtural drawings are given to Tenant for Tenant's approval.

All other terms and conditions of the Lease Agreement not specifically modified herein shall remain in full force and effect.

PLAZA LAS CUMBRES, INC.              SEARS, ROEBUCK DE PUERTO RICO, INC.

_____      _____
André V. Nikitine                    Donald S. Jones



# EXHIBIT II

# ACORD® CERTIFICATE OF PROPERTY INSURANCE

**DATE (MM/DD/YYYY)**
02/14/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Aon Risk Services Central, Inc. Chicago IL office 200 East Randolph Chicago IL 60601 USA | PHONE (A/C. No. Ext): (866) 283-7122 | FAX (A/C. No.): (800) 363-0105 |
| | E-MAIL ADDRESS: | |
| | PRODUCER CUSTOMER ID #: 570000034159 | |

Holder Identifier : A

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED | INSURER A: AIG Europe Limited | AA112084 |
| Sears Holdings Corporation dba Sears, Roebuck and Co. Attn: Risk Management E3-219A 3333 Beverly Road Hoffman Estates IL 60179 USA | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

| COVERAGES | CERTIFICATE NUMBER: 570075074276 | REVISION NUMBER: |
|---|---|---|

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE:  Sears Store No. 1915 - Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

CERTIFICATE NUMBER: 570075074276

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X **PROPERTY** | | WB1600580 | 06/01/2016 | 06/01/2017 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | | | | | X | EXTRA EXPENSE | $50,000,000 |
| | SPECIAL | CONTENTS | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggrega | $50,000,000 |
| | Blkt B&PP Ded | | | | | X | Flood - Aggregate | $50,000,000 |
| | **INLAND MARINE** | TYPE OF POLICY | | | | | | |
| | CAUSES OF LOSS | | | | | | | |
| | NAMED PERILS | POLICY NUMBER | | | | | | |
| | **CRIME** | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | **BOILER & MACHINERY / EQUIPMENT BREAKDOWN** | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; Waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CCM Puerto Rico, A CCM Group Company Santa Rosa Mall, LLC, 3 Pals Caribe, LLC Commercial Centers Management Realty S. en C. Carr. #2, Km. 7.1 Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *Aon Risk Services Central, Inc.* |

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)    The ACORD name and logo are registered marks of ACORD

CONFIDENTIAL                                                    SEARS_SantaRosaMall 00000114

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

| POLICY NUMBER | | |
|---|---|---|
| See Certificate Number:  570075074276 | | |

| CARRIER | NAIC CODE | |
|---|---|---|
| See Certificate Number:  570075074276 | | EFFECTIVE DATE |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

**FORM NUMBER:**  ACORD 24    **FORM TITLE:**  Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

| ADDITIONAL POLICIES | If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits. |
|---|---|

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | PROPERTY | | | | | |
| A | | WB1600580 | 06/01/2016 | 06/01/2017 | Boiler & Machinery | Included |

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

CONFIDENTIAL

SEARS_SantaRosaMall 00000115

**AGENCY CUSTOMER ID:** 570000034159
**LOC #:**

ACORD®

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

| POLICY NUMBER | |
|---|---|
| See Certificate Number:  570075074276 | |

| CARRIER | NAIC CODE | EFFECTIVE DATE |
|---|---|---|
| See Certificate Number:  570075074276 | | |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ACORD 24    **FORM TITLE:** Certificate of Property Insurance

**LOCATION OF PREMISES / DESCRIPTION OF PROPERTY**

**SPECIAL CONDITIONS / OTHER COVERAGES**

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

CONFIDENTIAL

SEARS_SantaRosaMall 00000116

AGENCY CUSTOMER ID:    570000034159
LOC #:

# ACORD®

## ADDITIONAL  REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

**POLICY NUMBER**
See Certificate Number:   570075074276

| CARRIER | NAIC CODE | |
|---|---|---|
| See Certificate Number:   570075074276 | | **EFFECTIVE DATE** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**
  **FORM NUMBER:**  ACORD 24    **FORM TITLE:**  Certificate of Property Insurance

Property Program 6/1/16 - 6/1/17


Primary $50,000,000 All Risk Policy Numbers:

QBE Insurance Corporation - CFE0951604
Starr Surplus Lines Insurance Company - SLSTPTY10856116
Chubb Custom Insurance Company - 4468121405
Executive Risk Specialty Insurance Company - 4468121505
General Security Indemnity Company of Arizona - T0234451602839
Zurich American Insurance Company - XPP926068009
Tokio Marine America Insurance Company - LCP648016705
ACE American Insurance Company - GPAD3739824A009
Aspen Specialty Insurance Company - PXAA52816
Allied World Assurance Company, Ltd. - P003839013
Endurance Worldwide Insurance Ltd. - WB1600602
Syndicate No. 3000 MKL (Slip Leader) - WB1600435
Westport Insurance Corporation - NAP045210504
Ironshore Specialty Insurance Company - 000423107
Liberty Mutual Fire Insurance Company - MJ2L9L426774036
Syndicate 2007 NVA - XR04016ADFRT
Syndicate No. 1414, ASC (Slip Leader) - WB1600581
Syndicate No. 318 MSP (Slip Leader) - WB1600584

**ACORD 101 (2008/01)**                                         © 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

CONFIDENTIAL                                                 SEARS_SantaRosaMall 00000117

# ACORD®

## CERTIFICATE OF PROPERTY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 02/14/2019 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.  THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Aon Risk Services Central, Inc. Chicago IL Office 200 East Randolph Chicago IL 60601 USA | PHONE (A/C. No. Ext): (866) 283-7122 | | FAX (A/C. No.): (800) 363-0105 |
| | E-MAIL ADDRESS: | | |
| | PRODUCER CUSTOMER ID #: 570000034159 | | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED | INSURER A: Westport Insurance Corporation | 39845 |
| Sears Holdings Corporation dba Sears, Roebuck and Co. Attn: Risk Management E3-219A 3333 Beverly Road Hoffman Estates IL 60179 USA | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

Holder Identifier : A

| COVERAGES | CERTIFICATE NUMBER: 570075074205 | REVISION NUMBER: |
|---|---|---|

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE:  Sears Store No. 1915 – Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE  LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR  MAY PERTAIN, THE  INSURANCE  AFFORDED BY THE POLICIES  DESCRIBED  HEREIN IS  SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X **PROPERTY** | | NAP045210503 | 06/01/2015 | 06/01/2016 | BUILD NG | | |
| | CAUSES OF LOSS | DEDUCT BLES | | | | PERSONAL PROPERTY | | |
| | BASIC | BUILD NG | | | | BUSINESS INCOME | | |
| | BROAD | | | | | X EXTRA EXPENSE | | $50,000,000 |
| | | CONTENTS | | | | RENTAL VALUE | | |
| | SPECIAL | | | | | BLANKET BUILD NG | | |
| | X EARTHQUAKE | | | | | BLANKET PERS PROP | | |
| | X W ND | | | | | X BLANKET BLDG & PP | | $50,000,000 |
| | X FLOOD | | | | | X Earthquake - Aggrega | | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X Flood - Aggregate | | $50,000,000 |
| | Blkt B&PP Ded | | | | | | | |
| | **INLAND MARINE** | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | | | | | | |
| | NAMED PERILS | | POLICY NUMBER | | | | | |
| | **CRIME** | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | **BOILER & MACHINERY / EQUIPMENT BREAKDOWN** | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; Waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CCM Puerto Rico, A CCM Group Company Santa Rosa Mall, LLC, 3 Pals Caribe, LLC Commercial Centers Management Realty S. en C. Carr. #2, Km. 7.1 Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.  AUTHORIZED REPRESENTATIVE  *Aon Risk Services Central, Inc.* |

CERTIFICATE NUMBER: 570075074205

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)       The ACORD name and logo are registered marks of ACORD

CONFIDENTIAL

SEARS_SantaRosaMall 00000110

**ACORD®**

# ADDITIONAL  REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |
| **POLICY NUMBER** | |
| See Certificate Number:  570075074205 | |

| CARRIER | NAIC CODE | EFFECTIVE DATE |
|---|---|---|
| See Certificate Number:  570075074205 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

**FORM NUMBER:** ACORD 24    **FORM TITLE:** Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

| **ADDITIONAL POLICIES** | If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits. |
|---|---|

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE  (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | PROPERTY | | | | | |
| A | | NAP045210503 | 06/01/2015 | 06/01/2016 | Boiler & Machinery | Included |

ACORD 101 (2008/01)

The ACORD name and logo are registered marks of ACORD

© 2008 ACORD CORPORATION. All rights reserved.

CONFIDENTIAL

**AGENCY CUSTOMER ID:** 570000034159

**LOC #:**

# ACORD®  ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

**POLICY NUMBER**
See Certificate Number: 570075074205

| CARRIER | NAIC CODE |
|---|---|
| See Certificate Number: 570075074205 | |

**EFFECTIVE DATE**

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ACORD 24   **FORM TITLE:** Certificate of Property Insurance

**LOCATION OF PREMISES / DESCRIPTION OF PROPERTY**

**SPECIAL CONDITIONS / OTHER COVERAGES**

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy with respect to the property located at the above referenced Location.

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

CONFIDENTIAL

SEARS_SantaRosaMall 00000112

AGENCY CUSTOMER ID:    570000034159
LOC #:

**ACORD®**

# ADDITIONAL  REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

| POLICY NUMBER | | |
|---|---|---|
| See Certificate Number:   570075074205 | | |

| CARRIER | NAIC CODE |
|---|---|
| See Certificate Number:   570075074205 | |

EFFECTIVE DATE

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:**  ACORD 24    **FORM TITLE:**  Certificate of Property Insurance

```
                      Property Program 6/1/15 - 6/1/16


Property Limit - $50,000,000

Primary $50,000,000 All Risk Policy Numbers:
QBE Insurance Corporation - CFE0951604
XL Insurance America, Inc. - US00067292PR15A
Starr Surplus Lines Insurance Company - SLSTPTY10753715
Chubb Custom Insurance Company - 44681214-04
Executive Risk Specialty Insurance Company - 44681215-04
General Security Indemnity Company of Arizona - T0234451502050
Zurich American Insurance Company - XPP9260680-08
Tokio Marine America Insurance Company - LCP6480167-04
ACE American Insurance Company - GPA D3 739824A 008
Aspen Specialty Insurance Company - PXAA52815
Lexington Insurance Company - WB1500682
Montpelier Reinsurance Ltd - B15FZ66265-21
Allied World Assurance Company, Ltd - P003839/012
Endurance Worldwide Insurance Ltd - WB1500691
Underwriters at Lloyd's of London - WB1500684
Underwriters at Lloyd's of London - WB1500692
```

ACORD 101 (2008/01)                                    © 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

CONFIDENTIAL                                        SEARS_SantaRosaMall 00000113

# EXHIBIT III

# Contract of Insurance

**Insured:**        SEARS HOLDINGS CORPORATION

**Policy Number:**        PTNAM1701557

**Period:**        1st June 2017 to 1st June 2018

**Type:**        All Risk Of Direct Physical Loss Or Damage
Including Flood, Earthquake and Boiler &
Machinery Insurance.

**Limit:**        USD440,000,000 (Excess of USD10,000,000
Non Stock Deductible)


Aon UK Limited
Registered Office  |  The Aon Centre  |  The Leadenhall Building  |  122 Leadenhall Street  |  London  |  EC3V 4AN
Registered in England & Wales No. 210725  |  VAT Registration No. 480 8401 48
Aon UK Limited is authorised and regulated by the Financial Conduct Authority


**Empower Results®**

# Information for Aon Clients

This document is the Insurer agreed Contract of Insurance which provides evidence of cover in accordance with the heading "Insurer Contract Documentation" in the Risk Details section.

The Contract Administration and Advisory Sections facilitate the administration of the placement between the Insurer and Broker.

**To ensure that the insurance coverage we have placed for you meets your needs, please review this document carefully (including but not limited to applicable limits, sub-limits, deductibles, terms and conditions). In the event that this document contains errors or otherwise does not meet your needs, please advise us immediately as this will reduce the chance that you later sustain uninsured losses. This also applies to any queries you may have about the document. Unless we hear from you to the contrary within 30 days, we and you will deem the document provided to you fully conforms with your needs and instructions.**

### Remuneration

Aon may act as a Managing General Agent (MGA) on behalf of an Insurer for a single product, product line or their participation. In addition to any commission earned by the Global Broking Centre (GBC), the MGA is remunerated for the work undertaken on behalf of the Insurer and this may include profit or contingent commission.

Any participation placed via such an arrangement can be clearly identified as Aon Underwriting Managers (AUM) or Maven Underwriters on behalf of the applicable Insurer within the Security Details Section.

Aon may earn other remuneration from Insurers in respect of administration and management activities it undertakes at the time of placement, or during the period of the Insurance, in relation to specific products and facilities which facilitate the Insurers' own activities. Insurers may also ask the GBC to place facultative reinsurance, and may independently remunerate the GBC for these services through the payment of commission.

Further details will be provided by Aon on request.

### Taxes

Over the course of the placement of your Insurance Aon collect information relating to the underlying risks and the location of such risks. This information can assist in identifying premium allocations by country/territory and to produce tax schedules for inclusion in contract documentation. It is your obligation to ensure the accuracy of such information.

Where applicable, Aon will collect the tax amounts due and pass them to the Insurer(s) to settle with the relevant tax authorities. Insurers will be responsible for confirming that the taxes identified for collection in the tax schedule are correct. In certain circumstances, taxes may be payable by the Insured . Whilst we endeavour to identify such taxes, please note that Aon is not a tax adviser and it is your responsibility to ensure that such taxes are correctly identified and remitted. If you require independent advice on your tax liabilities, you should consult with your tax adviser.

It is important to note that where a tax schedule is completed this merely represents a proposed apportionment of premium calculated on a pro rata basis, and utilises rates that Aon has taken from tax calculation systems, as at the date the tax schedule was produced. The purpose of tax schedules is to provide information to Insurers which they may, if they wish, use in establishing an apportionment of premium for taxation and legislative reporting purposes.

This procedure in no way changes Insurers' responsibilities for making this calculation and/or ensuring that the correct tax rates are applied.

## RISK DETAILS

| | |
|---|---|
| **UNIQUE MARKET REFERENCE** | B1526PTNAM1701557 |

**NAMED INSURED**

The Sears Holdings Corporation and any subsidiary, affiliated, associated, or allied company, corporation, firm, organization, partnership, joint venture, joint lease, or joint operating agreement as now or hereafter constituted or acquired, as their respective interest may appear; and any other party for which the Insured has the responsibility for providing insurance, as their respective interest may appear.

but in no event shall this include the following entities or their subsidiaries:

Sears Canada Inc.
Sears Technology Services, Inc.
ST Holdings, Inc.

Whose mailing address is:

Sears Holdings Corporation
Risk Management Department
3333 Beverly Road E3-237A
Hoffman Estates, Illinois 60179

**all hereafter referred to as the "Insured."**

**POLICY TERM**

This policy attaches and insures from June 1, 2017 to June 1, 2018 beginning and ending at 12:01AM Local Standard Time at the location of the property involved.

**TERRITORY**

This policy insures worldwide; except as respects the following countries   Afghanistan, Angola, Bosnia-Herzegovina, Burma (Myanmar), Congo (The Democratic Republic Of Congo or formally known as Zaire), Croatia, Cuba, El Salvador, Guam, Haiti, Iran, Iraq, Laos, Lebanon, Liberia, Libya, Nicaragua, North Korea, Serbia-Montenegro, Slovenia, Sudan, Syria, Zimbabwe, Yugoslavia and/orterritories formerly known as Yugoslavia;, or any country where trade relations are unlawful as determined by the Government of the United States of America or it's agencies, unless the Insured has been granted a U.S. Treasury Department Foreign Assets Control license to do business in that country and then coverage is provided only to the extent legally permitted as a result of the issuance of the license, subject to all other terms and conditions found in this policy.

**PERILS INSURED (LOSS OR DAMAGE INSURED)**

All Risk of direct physical loss or damage including flood earthquake, Boiler and Machinery Insurance as defined in Contract Wording and Endorsements.

**LOSS OR DAMAGE EXCLUDED**

As fully detailed in Contract Wording and Endorsements.

**PROPERTY AND INTERESTS INSURED**

As fully detailed in Contract Wording and Endorsements.

Policy Number:PTNAM1701557

| | |
|---|---|
| **SPECIAL CONDITIONS** | As fully detailed in Contract Wording and Endorsements. |
| **PROPERTY EXCLUDED** | As fully detailed in Contract Wording and Endorsements. |
| **VALUATION** | As fully detailed in Contract Wording and Endorsements. |

**LIMITS OF LIABILITY**

USD 440,000,000 per occurrence

In excess of:

USD 10,000,000 per occurrence Non-Stock Deductible

Which in turn to pay excess of Deductibles and limited by Program Sublimits as detailed below.

When a Program Sublimit is shown as applying in the Aggregate During Any Policy Year, the Limit of Liability detailed above shall also be applied in the Aggregate During Any Policy Year separately for each applicable Program Sublimit and shall not exceed such Program Sublimit during any policy year.

| **PROGRAM SUBLIMITS** | | |
|---|---|---|
| | USD100,000,000 | per **Occurrence** and in the aggregate for the period in full as respects the peril of **Earthquake** |
| | USD100,000,000 | per **Occurrence** and in the aggregate for the period in full as respects the peril of **Flood** |
| | USD100,000,000 | per **Occurrence** as respects the peril of **Named Windstorm for the entire States of; Florida, Hawaii and Tier 1 counties** |
| | USD200,000,000 | per **Occurrence** as respects Demolition and Increased Cost of Construction |
| | USD200,000,000 | per **Occurrence** as respects Extra Expense |
| | USD100,000,000 | per **Occurrence** as respects Automatic Coverage (120 Days), except: |
| | USD100,000,000 | per **Occurrence** as respects Service Interruption / Off Premises Power |
| | USD100,000,000 | per **Occurrence** as respects Errors and Omissions |
| | USD50,000,000 | or 25% of the actual physical damage loss whichever is lesser, for Debris Removal |
| | USD5,000,000 | per **Occurrence** as respects Fine Arts |
| | USD100,000,000 | per **Occurrence** as respects **Miscellaneous Unnamed** Locations including Exhibition, Fair or Tradeshow; |
| | USD3,000,000 | per **Occurrence** as respects Professional Fees; |

| USD2,500,000 | per **Occurrence** and in the aggregate for the period in full as respects Decontamination and Clean-up |
| USD50,000,000 | per **Occurrence** as respects Leasehold Interest |
| USD50,000,000 | per **Occurrence** as respects Rental Income and Rental Value |
| USD200,000,000 | per **Occurrence** as respects Transit |
| USD100,000,000 | per **Occurrence** as respects Property in the Course of Construction |
| USD100,000,000 | or 90 days, whichever is less, as respects Ingress/Egress — within 10 statute miles of an insured location. |
| USD100,000,000 | or 90 days, whichever is less, as respects Interruption by Civil or Military Authority — within 10 statute miles of an insured location. |
| USD5,000,000 | per **Occurrence** as respects Extended Increased Cost of Construction |

**BELOW SUBLIMITS ONLY APPLY TO HOFFMAN ESTATES, IL LOCATIONS:**

| USD5,300,000 | per **Occurrence** as respects Gross Earnings as respects Hoffman Estates, IL |
| USD1,000,000 | per Occurrence as respects Gross Earnings as respects 7615 Golden Triangle Drive, Eden Prairie, MN 55344 |
| USD10,000,000 | per **Occurrence** as respects Contingent Time Element |

**TIME LIMITS (Applicable to All Coverages):**

| Ninety (90) consecutive days | as respects Civil or Military Authority. |
| Ninety (90) consecutive days | as respects Ingress/Egress. |
| One Hundred Twenty (120) | as respects the Automatic Coverage provision. |
| 180 days | per occurrence as respects Extended Period of Indemnity |

**DISTANCE LIMITS (Applicable to All Coverages):**

| 10 statute miles | as respects Civil or Military Authority |
| 10 statute miles | as respects Ingress/Egress. |

The total amount to be indemnified under this policy and/or any

admitted version of this policy issued by the insurer shall not exceed the overall limit or applicable sublimits stated in this policy

**PROGRAM DEDUCTIBLES**

In each case of loss covered by this policy, the Company will be liable only if the Insured sustains a loss in a single **Occurrence** greater than the applicable deductible(s) specified below, and only for its share of that greater amount.

Unless otherwise stated below, when this policy insures more than one location, the deductible will apply against the total loss covered by this policy in any one **Occurrence**.

All losses or damages arising out of any one **Occurrence** shall be adjusted as one loss, and from the amount of such adjusted loss shall be deducted the sum USD5,000,000 per **Occurrence**, except:

The following shall apply for losses arising from the specific critical catastrophic perils below:

A.    Five percent (5%) of the value per unit of insurance at the time when such loss occurs for insured property situated in a **Flood** zone A and V for **Flood**, subject to a minimum of USD5,000,000 in total for all units of insurance per **Occurrence**. This deductible shall apply only to those units of insurance suffering a loss in the **Occurrence**. However, this deductible shall not apply to insured property located outside of the above designated **Flood** zone.

B.    Five percent (5%) of the value per unit of insurance at the time when such loss occurs at locations within the state of California for the peril of Earthquake subject to a minimum of USD5,000,000 in total for all units of insurance per **Occurrence**. This deductible shall apply only to those units of insurance suffering a loss in the **Occurrence**.

C.    Five percent (5%) of the value per unit of insurance at the time when such loss occurs at locations within the entire state of Florida and Tier 1 counties as more fully defined in the policy for the peril of **Named Windstorm** subject to a minimum of USD5,000,000 in total for all units of insurance per **Occurrence**. This deductible shall apply only to those units of insurance suffering a loss in the **Occurrence**.

D.    Three percent (3%) of the value per unit of insurance at the time when such loss occurs at locations within the entire state of Hawaii for the peril of **Named Windstorm** subject to a minimum of USD5,000,000 in total for all units of insurance per **Occurrence**. This deductible shall apply only to those units of insurance suffering a loss in the **Occurrence**.

The amount of the deductibles above shall be determined by applying the above percentages, separately to each of the following units of insurance:

(1)    Each building or structure, not including the value of its foundations, which has sustained loss or damage;

(2)    Personal property within each building or structure if that personal property sustains loss or damage;

(3)    Personal property in the open that sustains loss or damage;

Policy Number:PTNAM1701557

As to the calculation of deductibles under Paragraphs 4A, 4B, 4C and 4D, above, the insured shall have the option to determine what unit(s) of insurance shall be included in its loss. Additionally, stock and/or inventory is not to be considered one of the units of insurance in Paragraphs 4A, 4B, 4C and 4D above, unless the underlying Stock Throughput limits have been exhausted.

## WAITING PERIOD

Service Interruption                ( 24 ) hours

### Deductible Clarifications:

(1) If two or more deductible amounts in this policy apply to a single **Occurrence**, the total to be deducted shall not exceed the largest deductible.

(2) The deductible amounts specified above shall not apply to general average contributions and salvage charges.

(3) If other insurance applies to the same property as insured hereunder, and to the extent recovery is made from such other insurance, the deductible under this policy shall be reduced by such recovery, but in no event shall the deductible under this policy be less than shown in the policy. If recovery from such other insurance is greater than the deductible in this policy, then the deductible under this policy shall not apply.

(4) Whenever mortgage or lease conditions require insurance protection without deductibles, or with deductibles less than are provided herein, **Insurers** agree to make payment without consideration of the applicable deductible.  The Insured agrees to reimburse the **Insurers** for any payments so made within 30 days of such payment.

(5) This Policy recognises there are separate Stock Throughput Policies, with coverage no greater than this Policy, in effect    for the Policy Term with a USD50,000,000 per Location, per Occurrence policy limit subject to annual aggregates for Flood, Earthquake and Named Windstorm.
   a) In the event of a loss occurrence insured under both this Policy and the Stock Throughput Policy, the USD5,000,000 deductible within this Policy only applies, in the event the stock / inventory loss is less than USD5,000,000. The amount then applied is only for the difference between USD5,000,000 and the amount of the stock / inventory damage.

   b) Deductibles 4A, 4B, 4C and 4D still apply but only for the difference between USD5,000,000 (or the amount of the stock/inventory loss if less than USD5,000,000) and the applicable percentage deductibles.

This clause will not apply, in the event the Stock Throughput Policies are completely exhausted.

**NON-STOCK DEDUCTIBLE**        This policy also recognises that the insured shall retain an additional non-stock deductible in the amount of USD10,000,000 per occurrence excess of the deductibles listed in the Deductibles section of the policy

above. This non-stock deductible applies on the non-stock portion of the loss and shall also be aggregated annually and separately, as respects the perils of Earthquake and Flood.

**LOSS ADJUSTORS**    Each and every loss expected to exceed the standard deductible will be adjusted by Vericlaim located at 1833 Centre Pointe Circle, Suite 139, Naperville, IL 60563-1484; unless otherwise agreed by the Insured and the Insurer.

**CONDITIONS**    Contract Wording and Endorsements as agreed by Lex-London a Division of AIG Europe Limited on Aon Policy Number PTNAM1701557, which contains the following endorsements:

Endorsement No.1 - Earthquake and Wind Zones
Endorsement No.2 - Participation Endorsement
Endorsement No.3 - Biological or Chemical Materials Exclusion – NMA 2962
Endorsement No.4 - Asbestos Endorsement – LMA 5019 (Modified) – Listed Perils: Fire; Explosion; Lightning; Windstorm; Hail; Flood; Collapse; Direct Impact of Vehicle; Aircraft or Vessel; Riot or Civil Commotion; Vandalism or Malicious Mischief; or Accidental Discharge of Fire Protective Equipment
Endorsement No.5 - Electronic Data Endorsement A- NMA 2914 (Modified): Sublimit: USD25,000,000 Listed Perils: Fire, Explosion, Lightning, Earthquake, Falling Aircraft, Flood, Smoke, Impact Damage, Windstorm or Tempest, Sprinkler Leakage, Collapse, Theft.
Endorsement No.6 - Mold, Mildew and Fungus Clause – Sublimit: USD2,500,000 per occurrence and in the aggregate for the period.
Endorsement No.7 - Application of Sublimits – LMA 5130 (Modified)
Endorsement No.8 - Extended Increased Cost Of Construction

**SUPPLEMENTAL CLAUSES**    The following endorsements are detailed in Supplemental Clauses:

Sanction Limitation and Exclusion Clause - LMA3100
Service of Suit Clause (USA) - NMA1998
Terrorism Exclusion Endorsement - NMA2920
U.S. Terrorism Risk Insurance Act of 2002 as amended - Not Purchased Clause - LMA5219
Illinois Surplus Lines Notice - LMA9046

Premium Payment Condition (Time on Risk basis) - PPC5 4/86.
Date for the payment of premium: 30 Jul 2017

**CHOICE OF LAW AND JURISDICTION**    Choice of jurisdiction to be determined in court of competent jurisdiction as stated in the Service of Suit Clause in Supplemental Clauses. Choice of law to be determined by same court.

**PREMIUM**    USD 5,900,000    (100%) Annual in respect of All Risks.

Split as follows:

USD 5,737,750    (100%) Annual In respect of USA Exposure
USD 141,010    (100%) Annual In respect of Puerto Rico Exposure

|  |  |  |
|---|---|---|
| | USD 13,570 | (100%) Annual In respect of US Virgin Islands Exposure |
| | USD 7,670 | (100%) Annual In respect of Guam Exposure |

**PAYMENT TERMS**    Premium payment to underwriters to be effected by Aon Limited on behalf of the (Re)Insured in line with terms of trade as defined herein in respect of Lloyd's or XIS Underwriters or as per accounting procedures in operation with underwriters hereon.

**TAXES PAYABLE BY (RE)INSURED AND ADMINISTERED BY UNDERWRITERS**    Nil.

**RECORDING, TRANSMITTING & STORING INFORMATION**    All documentation and information to be recorded and/or transmitted electronically and stored electronically in Aon Limited repositories.

**INSURER CONTRACT DOCUMENTATION**    This document details the contract terms entered into by the (Re)Insurers and constitutes the contract document.

**NOTICES**    It is your Broker's responsibility to advise you of the full terms and conditions of your contract with the Underwriters and if any terms, clauses or conditions are unclear you are advised to contact your Broker immediately.

# RISK DETAILS - WORDING

**Named Insured**

The Sears Holdings Corporation and as more fully detailed in Risk Details.

**1.    Policy Term**

As fully detailed in Risk Details.

**2.    Territory**

As fully detailed in Risk Details.

**3.    Limits of Liability**

In the event of direct physical loss or damage insured under this policy, this **Insurer** shall be liable for its proportional share of Limits of Liability as detailed in Risk Details, excess of the policy deductibles, except as respects the following:

**Program Sub-Limits:**   As fully detailed in Risk Details.

**Time Limits Applicable to All Coverages**: As fully detailed in Risk Details.

**Distance Limits Applicable to All Coverages**: As fully detailed in Risk Details.

The total amount to be indemnified under this policy and/or any admitted version of this policy issued by the **Insurer** shall not exceed the overall limit or applicable sublimits stated in this policy.

**4.    Deductibles:**

As fully detailed in Risk Details.

**5.    Loss or Damage Insured**

This policy insures against all risk of direct physical loss or damage to property insured by this policy including General Average, salvage, and all other charges on shipments insured hereunder except as hereinafter excluded.

**6.    Loss or Damage Excluded**

This policy does not insure the following:

A.    1.    Loss or damage caused by hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual, impending, or expected attack:

(a)    by any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces;

(b)    or by military, naval, or air forces;

(c)    or by an agent of such government, power, authority, or forces;

2.    Indirect or remote loss or damage

3.    Mysterious disappearance, or loss or shortage disclosed on taking inventory or any unexplained loss.

4.    Loss or damage caused by any weapon employing atomic fission or fusion;

5.    Loss or damage caused by rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against such **Occurrence**;

6.    Loss or damage caused by seizure or destruction by order of public authority, except destruction by order of public authority to prevent spread of, or to otherwise contain, control or minimize loss, damage, or destruction which occurs due to loss or damage insured under this policy;

7.    Risks of contraband or illegal trade.

8.    Any act of terrorism. For the purpose of this policy an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, (including the intention to influence any government and/or to put the public or any section of the public in fear), committed for political purposes by any person or group(s) of persons whether acting alone or on behalf of or in connection with any organization(s) or government(s). This policy also excludes loss, damage, cost or expense of whatsoever nature directly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism.

If the Company alleges that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Insured.

In the event any portion of this exclusion 8. is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

B.    Loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, attributed to, or aggravated by loss or damage insured herein except:

1.    The **Insurer** shall be liable for loss or damage caused by sudden or accidental radioactive contamination, including resultant radiation damage for each **Occurrence** from material used or stored or from processes conducted on insured premises, provided at the time of loss there is neither a nuclear reactor capable of sustaining nuclear fission in a self-supporting chain reaction nor any new or used nuclear fuel on the insured premises;

2.    If an insured loss ensues, liability is specifically assumed by the **Insurer** for such ensuing direct loss or damage insured hereunder but not including any loss due to nuclear reaction, nuclear radiation or radioactive contamination.

C.    Loss or damage caused by **fraudulent or dishonest act or acts** committed by the Insured or any of the Insured's employees. This exclusion does not apply to physical loss or damage resulting from the Insured voluntarily parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense, nor shall this exclusion apply to willful acts of destruction committed by the Insured's employees.

D.    Wear and tear, or deterioration, defect, depletion, rust, corrosion, inherent vice or latent defect unless physical loss or damage not excluded in this policy ensues, and then this policy shall insure only the ensuing loss or damage. This exclusion shall not apply if the ensuing loss or damage constitutes an Accident to an Object.

E.  The cost of making good defective design, faulty material, or faulty workmanship, except, if physical loss or damage not excluded in this policy ensues, then this policy shall insure only the ensuing physical loss or damage. This exclusion shall not apply if the ensuing loss or damage constitutes an Accident to an Object.

F.  Except as provided in Clause 16, Land and Water Decontamination and Clean Up Expense, loss or damage arising out of the dispersal, release or escape of contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but not excluding resultant loss or damage from contaminants or pollutants to insured property caused by or resulting from loss or damage not otherwise excluded.

If loss or damage not excluded in this policy causes the dispersal, release or escape of contaminants or pollutants, then the entire loss or damage is insured by this policy.

G.  Delay or loss of market.

H.  Settling, cracking, shrinking, bulging, or expansion of foundations, floors, walls or pavements.

I.  Insect or vermin damage

## 7.  Coverage

This policy insures the interest of the Insured in the following:

### A.  Real and Personal Property

Real and personal property while such property is located anywhere within the territorial limits of this policy in which the insured has an insurable interest, including while in due course of transit which is owned, used, or contracted for use by the Insured, or acquired by the Insured, and property of others in the Insured's care, custody and control including the Insured's liability for such property and including the costs to defend any allegations of liability for loss or damage to such property, and any allegations under a lease as a result of such loss or damage; including the following:

1.  Improvements and betterments.  The **Insurer** agrees to accept and consider the Insured as sole and unconditional owner of the improvements and betterments, notwithstanding any contract or lease to the contrary.

2.  At the option of the Insured, personal property of the Insured's officials and employees, while in the Insured's care, custody or control, or while on the Insured's premises.

3.  Contractor's and/or subcontractor's (of any tier) and vendor's interests in property insured to the extent of the Insured's liability imposed by law or assumed by contract, whether written or oral.

4.  At the option of the Insured, the interest of the Insured's customers in property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan including property which is leased to customers under a lease/purchase agreement.

5.  Real and/or Personal Property of others, including that which the Insured leases or has agreed to insure prior to loss or damage whilst within the Insured's care, custody or control and at the Insured's option the interest of the owner of such property.

6.  Property while in the course of construction and/or during erection, assembly and/or installation.

7.  This policy also insures, in accordance with the Automatic Coverage clause of this policy, property (including Time Element coverage as provided by this policy) at any location rented, leased, used, purchased, constructed, or acquired by the Insured after the inception date of this policy.

8.  All real and personal property at a Miscellaneous Unnamed Location. A miscellaneous unnamed location as used herein shall be defined as a location at which the Insured has property of the type insured hereunder which has not been reported to the Company. Upon report to the Company of said location, the Policy Limit shall apply.

**B.  Business Interruption - Gross Earnings (as respects Hoffman Estates, IL and 7615 Golden Triangle Drive, Eden Prairie, MN 55344)**

1.  Loss due to the necessary interruption of business conducted by the Insured, whether total or partial, including all interdependencies between or among companies owned or operated by the Insured resulting from physical loss or damage insured herein and occurring during the term of this policy to real and/or personal property described in Clause 7.A, Real and Personal Property.

2.  Such loss shall be adjusted on the basis of the actual loss sustained by the Insured, consisting of the net profit which is prevented from being earned including **ordinary payroll** and payroll;

**and**

all charges and other expenses (including **soft costs**) to the extent that these must necessarily continue during the interruption of business, but only to the extent to which such charges and expenses would have been incurred had no loss occurred.

3.  In determining the amount of net profit, charges, and expenses insured hereunder for the purposes of ascertaining the amount of the actual loss sustained, due consideration shall be given to the experience of the business before the date of the loss or damage and to the probable experience thereafter had no loss occurred.

4.  In the event of insured physical loss or damage to property as described in Clause 7.A. which results in an interruption of research and development activities, which in themselves would not have produced income during the recovery period, this policy shall insure the actual loss sustained of the continuing charges and expenses, including **ordinary payroll**, and payroll, directly attributable to such research and development activities.

5.  As respects coverage provided under Clause Business Interruption – Gross Earnings, the **Insurer** shall not be liable for any loss resulting from loss or damage to **finished stock** or **stock in process** nor for the time required to reproduce said **finished stock** or **stock in process**.

**C.  Extra Expense**

1.  Extra Expense incurred by the Insured in order to temporarily continue as nearly as practicable the normal operation of the Insured's business following loss or damage insured herein and occurring during the term of this policy to real and/or personal property as described in Clause 7.A, Real and Personal Property.

2.    The term Extra Expense, as used herein, is defined as the excess (if any) of the total cost chargeable to the operation of the Insured's business, over and above the total cost that would normally have been incurred to conduct the business had no loss or damage occurred, including soft costs.

3.    Notwithstanding any provision to the contrary, the term Extra Expense, as used herein, will include the expense incurred for no longer than 90 days from the date of loss for the payroll of salaried and hourly employees to retain the Insured's work force after a covered event.

4.    The term Extra Expense, as used herein, shall include the reasonable and necessary extra costs of temporarily using property or facilities of others.

5.    The term Extra Expense, as used herein, shall include the reasonable and necessary extra costs of temporary repair of physical damage to property insured by this Policy and the extra costs of expediting the permanent repair or replacement of such damaged property including in-house hourly labor for clean-up, restocking, redisplaying merchandise and fixtures, and the Insured's construction project management personnel.

**D.    Accounts Receivable**

In the event of insured physical loss or damage to records or accounts receivable from customers caused by loss or damage insured herein, this **Insurer** will indemnify the Insured as follows:

1.    All sums due the Insured (from customers), provided the Insured is unable to effect collection thereof as a result of loss or damage to records of accounts receivable by loss or damage insured by this policy.

2.    All sums due the Insured from factoring transactions, when the property of the debtor has been lost or damaged by loss or damage insured by this policy and the Insured has been unable to effect collection thereof.

3.    Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage.

4.    Collection expenses in excess of normal collection cost and made necessary because of such loss or damage.

5.    Other expenses, when reasonably incurred by the Insured in reestablishing records of accounts receivable following such loss or damage.

For purpose of this insurance, charges under a credit card company and maintained on **EDP Media** shall be deemed to represent sums due the Insured from customers.

When there is proof that a loss of records of accounts receivable has occurred by the Insured and the Insured cannot more accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be computed as follows:

1.    The monthly average of accounts receivable during the last available twelve (12) months shall be adjusted in accordance with the percentage increased or decreased in the twelve (12) months average of monthly gross revenues which may have occurred in the interim;

2.    The monthly amount of accounts receivable thus established shall be further adjusted in accordance with any demonstrable variance from the average for the particular month in which the loss occurred, due consideration also being

given to the normal fluctuations in the amount of accounts receivable within the fiscal month involved.

There shall be deducted from the total amount of accounts receivable, however established, the amount of such accounts evidenced by records, not lost or damaged, or otherwise established or collected by the Insured and an amount to allow for probable bad debts which would normally have been uncollectible by the Insured.

### E.   Leasehold Interest

1. This policy provides coverage for the leasehold interest of the Insured.

   (a) Pro rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on the Insured's interest in:

   i. The amount of bonus paid by the Insured for the acquisition of the lease not recoverable under the terms of the lease;

   ii. Improvements and betterments to real property which are not covered under any other section of this policy;

   iii. The amount of advance rental paid by the Insured and not recoverable under the terms of the lease;

   when property is rendered wholly or partially untenantable by any covered loss during the term of this policy and the lease is canceled by the party not the Named Insured under this policy in accordance with the conditions of the lease or by statutory requirements of the appropriate jurisdiction in which the damaged or destroyed property is located; and

2.

   (a) "The Interest of the Insured as Lessee or Lessor" when property is rendered wholly or partially untenantable by any covered loss during the term of this policy and the lease is cancelled by the party not the Named Insured by this policy in accordance with the conditions of the lease or by statutory requirements of the appropriate jurisdiction in which the damaged or destroyed property is located.

   (b) "The Interest of the Insured as Lessee or Lessor" as referred to herein shall be paid for the first three months succeeding the date of the loss and the "Net Lease Interest" shall be paid for the remaining months of the unexpired lease.

3. Definitions:

The following terms, wherever used in this section shall mean::

   (a) "The Interest of the Insured as Lessee" is defined as:

   i. the excess of the rental value of similar premises over the actual rental payable by the lessee (including any maintenance or operating charges paid by the lessee) during the unexpired term of the lease; and

   ii. the rental income earned by the Insured from sublease agreements, to the extent not covered under any other section of this policy, over and above the rental expenses specified in the lease between the Insured and the lessor.

(b) "The Interest of the Insured as Lessor" is defined as the difference between the rents payable to the lessor under the terms of the lease in effect at the time of loss and the actual rent collectible by the lessor during the unexpired term of the lease provided the lease is canceled by the lessee, to the extent not covered under any other section of this policy.

(c) "Net Lease Interest" is defined as that sum, which placed at 6% interest compounded annually will be equivalent to the "The Interest of the Insured as Lessee or Lessor."

4. It is understood and agreed that in the event that an insured physical loss or damage results in both loss of Rental Income and/or Rental Value and loss of The Interest of the Insured as Lessor, the provisions and limit of liability of the Rental Income and Rental Value coverage will be applied first in accordance with the applicable period of recovery. The coverage provided by the Leasehold Interest provisions and limit of liability shall be applied and commence at the cessation of the Rental Income and Rental Value coverage and continue until the expiration of the lease.

This Company shall not be liable for any increase of loss which may be occasioned by the suspension, lapse or cancellation of any license or by the Named Insured exercising any option to cancel the lease. Furthermore, the Named Insured shall use due diligence including all things reasonably practicable to diminish loss under this clause and under the Rental Value and Rental Income clause.

## F.   Rental Value and Rental Income

1.   This policy provides coverage for Loss of Rental Income and/or Loss of Rental Value of the Insured caused by physical loss or damage insured herein occurring during the term of this policy to property and/or premises rented, leased or occupied by the Insured and/or rented or leased by the Insured to others, including loss of use.

2.   Rental Income:

(a)   Rental Income shall mean the total anticipated gross rental income from tenant(s) of the Insured's building(s) and structure(s), and

(b)   The amount of all charges assumed by tenant(s) except those charges which do not continue, which would otherwise be obligations of the Insured, and

(c)   The fair rental reasonably expected from unrented portions of such property.

Rental Income Insurance also applies in those situations where the Insured is required under a lease or rental agreement to maintain such insurance on behalf of any landlord.

Furthermore, if the Insured leases premises and   the premises becomes wholly or partially untenantable or unusable and the lease agreement requires continuation of the rent, this Policy shall indemnify the Insured for the actual rent payable for the unexpired term of the lease.

Rental Income Insurance shall include expenses incurred by the Insured in excess of the expenses which would have been incurred had a leased or rented premises not been damaged or destroyed by loss or damage insured herein.

Such coverage will apply for all additional expenses incurred during the period of untenantability or if the lease cannot be terminated until its expiration.

3.  Rental Value:

    Rental Value shall mean the fair rental for that portion of the Insured Location occupied by the Insured, including the loss of use, without deduction for non-continuing expenses.

4.  Experience of the Business:

    In determining the amount of Rental Income covered hereunder, due consideration shall be given to the rental experience before the date of damage or destruction and to the probable experience thereafter had no loss occurred to above said property.

5.  (Applicable to both Rental Income and Rental Value)

    With respect to alterations, additions, and property while in the course of construction, erection, installation, or assembly, due consideration shall be given to the available rental experience of the business after completion of the construction, erection, installation, or assembly.

6.  (Applicable to both Rental Income and Rental Value)

    Period of Recovery: the length of time for which a loss may be claimed under this provision shall be in accordance with the loss provisions applicable under the Period of Recovery clause 9.A of this policy.

G.  **Royalties**

1.  Loss of Royalties, Fees and Commissions which would have been earned under Royalties, Fees or Commission Agreements between the Insured and any concern(s), as a result of physical loss or damage to the property of a type not excluded in this Policy of such concern(s) caused by loss or damage insured herein occurring during the term of this policy.

2.  Such loss shall be adjusted on the basis of actual loss sustained of such income which would have been earned had no loss occurred.

H.  **Transit**

This insurance is extended to insure physical loss or damage to insured property in **transit** including resulting loss as afforded under the Business Interruption – Gross Earnings; Business Interruption – ; Extra Expense; Rental Value and Rental Income; and Royalties clauses of this policy.

1.  This insurance is also extended to insure physical loss or damage to property:

    (a)  sold and shipped by the Insured under terms of F.O.B. point of origin or other terms usually regarded as terminating the shipper's responsibility short of points of delivery;

    (b)  at the Insured's option, which is incoming to the Insured.

2.  This policy also insures loss or damage:

    (a)  arising out of any unauthorized person(s) representing themselves to be the proper party(ies) to receive goods for    shipment    or    to accept goods for delivery;

(b)    occasioned by the acceptance by the Insured, by its agents, or by its customers of fraudulent bills of lading, shipping and delivery orders, or similar documents;

**I.    Automatic Coverage**

This Policy covers insured property at any location rented, leased, purchased, by the Insured after the inception date of this Policy. This coverage applies from the date of rental, lease, purchase.

This coverage will apply until whichever of the following occurs first:

1.    The location is reported to the Insurer; upon which the Policy Limit shall apply;

2.    Agreement is reached that the Location will not be insured under this Policy;

3.    The Time Limit shown in the LIMITS OF LIABILITY clause of this Policy has been reached.

**8.    Extensions of Coverage**

THIS CLAUSE EXTENDS THE FOLLOWING COVERAGES AS DESCRIBED ABOVE: Business Interruption and Extra Expense

A.    This policy insures loss resulting from or caused by physical loss or damage insured herein to the following:

1.    **Contingent Business Interruption (applicable to Hoffman Estates and 7615 Golden Triangle Drive, Eden Prairie, MN 55344 locations, only):**

Property of a type not excluded in this Policy, that directly prevents and/or hinders a direct supplier of goods and/or services to the Insured from rendering their goods and/or services, or property that prevents and/or hinders direct customers of goods and/or services from the Insured from accepting the Insured's goods and/or services.

There is no liability for any loss or damage as insured under the Service Interruption/Off Premises Power clause herein.

2.    **Contingent Extra Expense** (applicable to all Locations)

Property of a type not excluded in this Policy, that directly prevents and/or hinders a direct supplier of goods and/or services to the Insured from rendering their goods and/or services, or property that prevents and/or hinders direct customers of goods and/or services from the Insured from accepting the Insured's goods and/or services.

3.    **Service Interruption/Off Premises Power:** Any property of the following providers of services, including, but not limited to, electricity, water, gas, sewerage, steam, telephone, telecommunications or their respective transmission and distribution lines within 5 mile of the affected insured location or utility plants which directly provide incoming or outgoing services to the Insured situated on or outside of the Insured's premises.

4.    **Impounded Water:** Dams, reservoirs or equipment connected therewith when water used as a raw material or used for power or for other manufacturing purpose stored behind such dams or reservoirs is released from storage and causes an interruption of business as a result of lack of adequate water supply from such sources for up to        30 days.

B.    **Interruption by Civil or Military Authority**

This policy is extended to cover, starting from the time of physical damage, for up to the number of consecutive days as stated in the Limits of Liability clause of this policy, the Business Interruption or Extra Expense loss sustained during the period of time when access to covered real or personal property of the Insured is impaired by order or action of civil or military authority issued as a direct result of physical damage of the type insured against to property of the type not excluded which is within the number of statute miles as stated in the Limits of Liability clause of this policy.

C.    **Ingress/Egress**

This policy is extended to cover, starting from the time of physical damage, for up to the number of consecutive days as stated in the Limits of Liability clause of this policy, the Business Interruption or Extra Expense loss sustained during the period of time when, as a direct result of physical damage of the type insured against to property of the type not excluded is within the number of statute miles as stated in the Limits of Liability clause, ingress to or egress from real or personal property is impaired.

The provisions of this paragraph shall also extend to include the extensions of coverage described under the Service Interruption, Contingent Business Interruption, Contingent Extra Expense and Attraction Properties provisions described above.

9.    **Loss Provisions Applicable to Clauses 7.B, 7.C, 7.E, 7.F, 7.G, 7.H. and 8.**

A.    Period of Recovery

The length of time for which loss may be claimed is referred to as the period of recovery and:

1.    shall commence with the date of such loss or damage and shall not be limited by the date of expiration of this policy;

2.    shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace the property that has been destroyed or damaged;

**and**

3.    such additional length of time to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

(a)    the date on which the liability of the **Insurer** for loss or damage would otherwise terminate; or

(b)    the date on which repair, replacement or rebuilding of the property that has been damaged is actually completed and the Insured has resumed normal operations.

but in no event for more than one hundred eighty (180) consecutive days as stated in the Limits of Liability clause of this policy thereafter from said later commencement date;

4.    with respect to alterations, additions, or property while in the course of construction, erection, installation, or assembly, due consideration shall be given to the level of production or level of business operations that would

reasonably have been achieved after construction and start up would have been completed had no loss or damage occurred.

B.    Expense to Reduce Loss but not applicable to Extra Expense coverage

This policy also insures such expenses as are necessarily incurred for the purpose of reducing any loss under this policy. Such expenses may not exceed the amount by which the loss under this policy is thereby reduced.

C.    Experience of the Business

In determining the amount of loss insured hereunder due consideration shall be given to the experience of the business before the date of loss or damage and to the probable experience thereafter had no loss or damage occurred.

10.    **Property Excluded**

This policy does not insure loss or damage to:

A.    Watercraft over forty (40) feet only while waterborne, aircraft and motor vehicles licensed for highway use when not on the Insured's premises, except this exclusion shall not apply to contractor's equipment, nor to such property which constitutes stock or which is on exhibit or being repaired.

B.    Land, except as insured under Clause 16, Land and Water Decontamination and Clean Up Expense. This exclusion shall not apply to the cost of reclaiming, restoring or repairing land improvements.  Land improvements as described hereunder include, but are not limited to, any alteration to the natural condition of the land by grading, excavating, landscaping, earthen dikes or dams, as well as additions to land such as pavements, roadways, ponds, golf courses, or similar works;

C.    Currency, money, gold bullion, evidence of debt, except accounts receivable as defined in the policy, notes or securities.

D.    Growing crops, standing timber to be used for industrial processes, and live animals not used for research.

E.    Water, except as insured under Clause 8.A.4. Impounded Water, Clause 16. Land and Water Decontamination and Clean Up Expense, or when contained in any form of piping system, processing system or holding tank or used in the manufacturing process.

F.    Export and import shipments after loading on board the oceangoing watercraft and during ocean transit, but coverage will attach after unloading at the destination port. However,  this exclusion will not apply to:

1.    ferry shipments to, from and between countries in Continental Europe, the United Kingdom and Ireland; and
2.    air or inland waterway shipments to, from and between countries in Continental Europe.

G.    Waterborne shipments via the Panama Canal.

H.    Waterborne shipments to and from Alaska, to and from Hawaii, and to and from Puerto Rico, Guam and the Virgin Islands.

I.    Bridges, roadways, dams and dikes other than coverage  as provided  in 10.B

11.    **Valuation**

Unless otherwise endorsed hereon, adjustment of property loss under this policy shall be:

(a)    on stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges;

(b)    on finished goods manufactured by the Assured, the regular selling price prior to all discounts and charges to which the merchandise would have been subject had no loss occurred;

(c)    on other merchandise not manufactured by the Assured, the regular selling price prior to all discounts and charges to which the merchandise would have been subject had no loss occurred;

(d)    on exposed film, records, manuscripts, and drawings, the value blank plus the cost of transcription, if copies are available, otherwise the full replacement value;

(e)    on media, data, and programs for electronic and elctromechanical data processing and production equipment, the cost of reproducing such media, data and programs;

(f)    on real property including machinery and equipment permanently installed and affixed thereto, and the Assured's improvements and betterments to real property of others not otherwise covered herein, the cost to repair or replace new with materials of like kind and quality However, as respects the Assured's improvements and betterments not replaced, the actual cash value;

(g)    on furniture, fixtures and equipment (including tools and dies) except such equipment as included under (f) above, the cost to repair or replace new with materials of like kind and quality ;

(h)    Fine arts owned by the Assured at the cost of reasonably restoring the property to its condition immediately prior to the loss, or in the event that the property cannot be restored at the appraised value prior to the loss. In absence of such appraisal, at the market value at the time of loss, plus the Assured's costs.

Fine Arts, which is the property of others, at the Assured's option, either at the cost of reasonably restoring the property to its condition immediately prior to loss, or the Assured's contractual or legal liability.

(i)    property of others at the amount agreed to prior to loss or for which the Assured is contractually or legally liable, not to exceed the cost to repair or replace new with materials of like kind and quality ;

(j)    All other property, not otherwise mentioned above, at the cost to repair or replacement cost new whichever is less; if not repaired or replaced within three years, then at the actual cash value

all to be computed at the time and place of loss

It is understood and agreed that as respects replacement cost new, the Insured shall have the option of replacing equipment having technological advantages and/or representing an improvement in function and/or forming part of a program of system enhancement provided that such replacement can be accomplished without increasing the **Insurer's** liability.

The Insured, using reasonable discretion, shall be the sole judge as to whether electrical and mechanical equipment are damaged and unusable. This **Insurer** shall be allowed to dispose of, as salvage, any non-proprietary property deemed unusable by the Insured.

As respects 11.F., 11.G. and 11.J., the insured may elect not to replace the real and/or personal property lost, damaged, or destroyed and obtain loss settlement on a replacement cost basis if the proceeds of such loss settlement are expended in any other capital expenditures related to

the Insured's operations, provided such capital expenditure is unplanned prior to the occurrence.

Permission is granted for the Insured to replace the property with similar property at the same or another site within the territorial limits of the policy, but recovery is limited to no more than what it would cost to replace on same site.

12. **Demolition and Increased Cost of Construction**

In the event of physical loss or damage insured under this policy that causes, at the time , the enforcement of any law, ordinance and/or governmental directive in force at time of such physical loss or damage regulating the construction, repair or use of the property, the **Insurer** shall be liable for:

A.      The cost of demolishing the undamaged property including the cost of clearing the site;

B.      The proportion that the value of the undamaged part of the property bore to the value of the entire property prior to loss;

C.      The increased cost of repair or reconstruction of the damaged and undamaged property on the same site and limited to the costs that would have been incurred in order to comply with the minimum requirements of such law, ordinance and/or governmental directive regulating the repair or reconstruction or use of the damaged property on the same site or another site.  However, the **Insurer** shall not be liable for any increased cost of construction loss unless the damaged property is actually rebuilt or replaced;

D.      The increase in loss, including, but not limited to, Business Interruption, Extra Expense, Rental Value, Leasehold Interest or Royalties or extensions thereof arising out of the additional time required to comply with said law, ordinance and/or governmental directive.

13. **Contingent Exposures**

It is agreed that this Policy is extended to cover to the limit of the Insured's interest in personal property and inventory at dealer stores. When a claim of loss or damage as covered under this Policy results from the non-existence, inadequacy, or uncollectiblity, except for insolvency or failure of dealers insurance, in whole or in part ( by the Insured) of dealers' insurance, whether or not the loss or damage was required to be insured under the dealer agreement. In no event is coverage provided by this Clause deemed to be greater than otherwise recoverable under this Policy less any recoveries from other insurance.

14. **Fire Brigade Charges and Extinguishing Expenses**

This policy insures the following expenses resulting from:

A.      fire brigade charges and other extinguishing expenses for which the Insured may be assessed;

B.      loss of fire extinguishing materials expended.

15. **Debris Removal**

(1)      In the event of physical loss or damage to the property insured hereunder, this policy (subject otherwise to its terms, conditions and limitations, including but not limited to any applicable deductible) also insures:

(a)      expenses reasonably incurred in removal of debris of the property insured hereunder destroyed or damaged from an insured location;

Policy Number PTNAM1701557

(b)     expenses reasonably incurred in removal of debris of the property insured hereunder which is destroyed or damaged while in transit;

(c)     expenses reasonably incurred in removal of debris of property not insured under this policy blown onto the insured location by wind or deposited onto the insured location by **Flood;**

(d)     cost of cleanup at an insured location made necessary as a result of such physical loss or damage;

provided that this policy does not insure against the costs of decontamination or removal of land or water or the contaminant on or in land or water except as provided in the Land and Water Decontamination and Clean Up Expense clause of this policy.

(2)     It is a condition precedent to recovery under this extension that the Company shall have paid or agreed to pay for direct physical loss or damage to the property insured hereunder unless such payment is precluded solely by the operation of any deductible and that the Insured shall give notice to the Company of the intent to claim for the cost of removal of debris or cost of cleanup NO LATER THAN 12 MONTHS AFTER THE DATE OF SUCH PHYSICAL LOSS OR DAMAGE.

**16.**     **Land and Water Decontamination and Clean Up Expense**

This policy insures any cost or expense of decontamination or removal or disposal of water, soil or any similar substance on or under the premises of the Insured incurred during emergency measures undertaken in order to mitigate any circumstances pertaining to seepage, pollution and/or contamination, whether or not at the instruction of any government agency or other authority.

It is the condition precedent to recovery under this clause that the **Insurer** shall have paid, or agreed to pay for, loss or damage to the property insured hereunder unless such payment is precluded solely by the operation of any deductible.

It is also a condition precedent to recovery under this clause that the insured shall give written notice to the insurer of intent to claim for decontamination and cleanup expense not later than 180 days after the date of such loss or damage.

**17.**     **Notice of Loss**

The Insured shall report to the **Insurer** any loss or damage which may become a claim under this insurance policy as soon as may be practicable after it becomes known to the Director of the Risk Management Department (or the individual acting in a similar capacity) of the Insured.

**18.**     **Knowledge of Occurrence**

It is agreed that knowledge of an **Occurrence** by an agent, servant or employee of the Insured shall not in itself constitute knowledge by the Insured. Knowledge is understood to occur only when the Director of the Risk Management Department (or the individual acting in a similar capacity) of the Insured shall have received notice from its agent, servant or employee.

**19.**     **Proof and Payment of Loss**

A detailed Proof of Loss shall be filed with the **Insurer** as soon as practicable. Loss shall be adjusted with the Risk Management Department of the Insured or assigned representatives, and all adjusted claims, including partial claims, shall be paid to the Insured or its order within Thirty (30) days after reaching agreement on the value of the claim or any part thereof.

**20.**     **Non-Reduction of Limits of Liability**

Policy Number PTNAM1701557

Any loss hereunder shall not reduce the limit(s) of liability under this policy except for aggregate limits as described in the Limits clause of the policy.

21.    **Subrogation and Subrogation Waiver**

A.    It is agreed that upon payment of any loss, this **Insurer** is subrogated to all the rights of the Insured to the extent of such payment.

Any release or waiver of liability entered into by the Insured in the course of their business prior to loss (including but not limited to bills of lading and/or receipts from carriers, bailees, warehouseman, lighterman, processors, limiting or releasing their liability) hereunder shall not prejudice the Insured's rights of recovery under this policy.

B.    The right of subrogation against the Insured's subsidiary, affiliated, or associated corporations or companies, joint ventures, partnerships or individuals, or any other party required to be insured, or any other corporations or companies associated with the Insured through ownership or management is waived, and at the option of the Insured, subrogation is waived against any tenant or landlord of the Insured.

C.    In the event of any payment under this policy, except where subrogation rights have been waived, the **Insurer** shall be subrogated to the extent of such payment to all the Insured's rights of recovery therefore.   The Insured shall execute all papers required and shall take reasonable and necessary action to secure such subrogation rights.   The **Insurer** will act in concert with all other interests concerned, i.e., the Insured and any other company(ies) participating in the payment of any loss as primary or excess insurers, in the exercise of such rights of recovery.   The Insured and the Insurer shall mutually agree upon subrogation counsel for the pursuit of their mutual subrogation interests.   Further, the Insured shall have the right to pursue any uninsured interest independently of the mutual subrogation interests.   If any amount is recovered, after deducting the costs of recovery, payment will first be made to the Insured to the full extent of the deductible applied to the loss.

22.    **Protection and Preservation of Property**

In case of actual or imminent physical loss or damage of the type insured against by this policy, the expenses incurred by the insured in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder shall be added to the total physical loss or damage, if any, otherwise recoverable under the policy and be subject to the applicable deductible and without increase in the limit provisions contained in this Policy.

23.    **Appraisal**

In case the Insured and this **Insurer** shall fail to agree as to the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within Twenty (20) days of such demand.   The appraisers shall select a competent and disinterested umpire; and, failing for Fifteen (15) days to agree upon such umpire, then on request of the Insured or the **Insurer**, such umpire shall be selected by a judge of a district court of a judicial district in accordance with the Jurisdiction and Suit clause of this policy.   The appraisers shall then appraise the loss, separating the loss to each item; and, failing to agree, shall submit their differences only to the umpire.   An award in writing, so itemized of any two when filed with the **Insurer**, shall determine the amount of loss.   Each appraiser shall be paid by the party selecting each respective appraiser and the expenses of appraisal and umpire shall be paid by the parties equally.

24.    **Brands and Labels**

In case of insured physical loss or damage to property bearing a brand or trademark or which in any way carries or implies the guarantee or the responsibility of the manufacturer or the Insured, the salvage value of such damaged property shall be determined after removal in the

customary manner, at the expense of the Insurer, of all such brands or trademarks or other identifying characteristics.

25.    **Control of Damaged Merchandise**

The Insured shall have full right to the possession of all merchandise manufactured, sold or distributed by the Insured involved in any loss under this policy and shall retain control of all damaged merchandise. The Insured, exercising reasonable discretion, shall be the sole judge as to whether the merchandise involved in any loss under this policy are fit for consumption, sale or use and any merchandise so deemed by the Insured to be unfit for consumption, sale or use shall not be sold or otherwise disposed of except by the Insured or with the Insured's consent, but the Insured shall allow this **Insurer** any salvage proceeds obtained by the Insured on any sale or other disposition of such merchandise.

26.    **Salvage and Recoveries**

Except as described in Clause 23, after expenses incurred in salvage or recovery are deducted, any salvage or other recovery, except recovery through subrogation proceedings and/or from underlying and/or excess insurance as described herein, shall accrue entirely to the benefit of this **Insurer** until the sum paid by the **Insurer** has been recovered.

27.    **Expediting Expense**

This policy insures the reasonable extra cost of temporary repair or replacement and of expediting the repair or replacement of damaged property insured hereunder, including overtime and express freight or other rapid means of transportation.

28.    **Jurisdiction and Suit**

It is hereby understood and agreed that:

A.    In the event of the failure of the **Insurer** to pay an amount claimed to be due hereunder, at the direction of the Insured, the **Insurer** will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such jurisdiction. All matters arising hereunder shall be determined in accordance with the law and practice of such court.

B.    In any suit instituted against it under this policy, the **Insurer** will abide by the final decision of such court or any appellate court in the event of an appeal.

29.    **Pair and Set/Consequential Reduction in Value**

In the event of insured loss or damage to personal property, this policy shall insure the resulting reduction in value of the remaining undamaged components or parts of products customarily sold as individual units or sold as pairs, sets or lots or ranges of sizes or colors.

30.    **Consequential/Sequential Damage**

This policy insures consequential/sequential loss or damage caused by or resulting from the change in temperature or humidity caused by, but not limited to, interruption of power, heat, light, air conditioning, refrigeration, telephone or telegraphs, supply water or telecommunications to property/equipment or plants used to provide refrigeration, cooling, humidifying, dehumidifying, air conditioning, heating, generating, converting power, or telephone or telegraphs, or telecommunications, including all connections and supply from transmission lines and pipes within one mile, power generating equipment, utility plants or sources, whether or not such equipment is on or off the premises of the Insured.

31.    **Permits**

Permission is hereby granted for any building(s) to be and remain vacant and unoccupied without limit of time and without prejudice to the Insured's right of recovery for claim under this policy.

32.    **Contributing Insurance**

Permission is granted for other policies written upon the same terms, conditions, and provisions irrespective of limit or attachment point as those contained in this policy.   This policy shall contribute to the total of each loss otherwise payable herein to the extent of the participation of this policy in the total limit of liability stated herein.

33.    **Excess Insurance**

Permission is granted for the Insured to have excess insurance over the limit of liability in this policy without prejudice to this policy and the existence of such insurance, if any, shall not reduce any liability under this policy.

34.    **Underlying Insurance**

Permission is granted for the Insured to purchase insurance on all or any part of the deductible and against all or any of the coverage provided by this policy.   The existence of such underlying insurance shall not prejudice or affect any recovery otherwise payable under this policy.   This includes all Stock Throughput Policies, which cover stock and/or inventory.

Notwithstanding the above, it is a condition precedent that the Policy and Limit(s) of the Stock Throughput Policies shall be maintained in full force and effect, except for any reduction or exhaustion of the separate annual aggregates for Flood, Earthquake and Named Windstorm solely by the amount of loss(es) paid or admitted during the Policy Term.

35.    **Other Insurance**

Except as referred to in Clauses 32, 33 and 34, if any property included in the terms of this policy shall, at the time of any loss, be insured with other valid and collectible insurance, the Insured shall have the option of choosing which policy to utilise to respond first to loss or damage, unless otherwise agreed.   If the Insured elects for such other insurance to be applied first, then this insurance shall be excess of and/or supplementary to such other insurance.

Notwithstanding the above, the insurance provided by this Policy shall always be excess of USD50,000,000 (reduced only by reduction of the separate annual aggregates for Flood, Earthquake and Named Windstorm) regardless of the uncollectibility (in whole or in part) under the Stock Throughput Policy for any reason, including but not limited to the financial impairment or insolvency of the Stock Throughput Insurer.

36.    **Coinsurance Waiver**

This policy is not subject to Coinsurance or Average Clause.

37.    **Errors & Omissions**

No inadvertent error, omission or failure in making reports or other data hereunder shall prejudice the Insured's right of recovery, but shall be corrected when discovered.   It is further understood and agreed that any error in description of locations, or values of projects insured or to be insured by this policy shall not invalidate or reduce the policy limit of liability, or otherwise prejudice any recovery under this policy.

38.    **Titles of Paragraphs**

The several titles of the various paragraphs of this policy (and of Endorsements and Supplemental Policies, if any, which are attached to this policy) are inserted solely for

convenience or reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

**39.    Certificates of Insurance**

It is agreed that Aon Risk Services, Inc. are authorized to issue Certificate(s) or Evidence(s) of Insurance being the Acord Certificate of Property Insurance 24 (1/95), naming Additional Named Insured(s), Loss Payee(s) or Mortgagee(s), and others for their respective rights and interests, subject always to the terms, conditions and limits of endorsements in respect of such additional interests. The Certificate(s) or Evidence(s) of Insurance may show a deductible amount less that the policy deductible, but the Insured agrees to reimburse The Company immediately after The Company has mad a loss payment to the extent this agreement results in a larger loss payment or a payment with the policy deductible.

**40.    Partial Payment of Loss**

It is understood and agreed that this Insurer will make partial payments of claims subject to the policy provisions and the normal policy adjustment provisions.

**41.    Mortgage Interests and Obligations**

If loss hereunder is made payable in whole or in part, to a designated mortgagee not named herein as the Insured, such interest in this Policy may be cancelled by giving to such mortgagee ten (10) days written notice of cancellation.

If the Insured fails to render proof of loss, such mortgagee, upon notice, shall render proof of loss in the form herein specified within sixty (60) days thereafter and shall be subject to the provisions hereof relating to appraisal and time of payment and of bringing suit. If The Company shall claim that no liability existed as to the mortgagor or owner, it shall, to the extent of payment of loss to the mortgagee, be subrogated to all the mortgagee's right to sue, or it may pay off the mortgage debt and require as assignment thereof and of the mortgage. Other provisions relating to the interests and obligations of such mortgagee may be added hereto by agreement in writing.

**42.    Special Mortgage Clause**

The following mortgage clause applies in favor of any mortgagee named in the Certificate or Evidence of Insurance to the location under which the mortgagee is named:

Loss, if any, under this Policy to Real Property only, unless otherwise indicated, shall be payable to the indicated Mortgagee [or Trustee] (hereafter referred to as Mortgagee) as its interest may appear under all present or future mortgages upon the described property in which the aforesaid may have an interest as Mortgagee, in order of precedence of said mortgages; and this insurance, as to the interest of the Mortgagee therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to said property, nor by any change in the title or ownership of said property, nor by the occupation of the location for the purposes more hazardous than are permitted by this Policy; provided, that in case the mortgagor or owner shall neglect to pay any premium due under this Policy, the Mortgagee shall, on demand, pay the same.

Provided, also that the Mortgagee shall notify The Company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of the Mortgagee and, unless permitted by this Policy, it shall be noted hereon and the Mortgagee shall, on demand, pay the premium for such increase hazard for the term of the use thereof; otherwise this agreement shall be null, and void.

The Company reserves the right to cancel this Policy at any time as provided by its terms, but in such case this Policy shall continue in force for the benefit only of the Mortgagee for ten (10)

days after written notice to the Mortgagee of such cancellation and shall then cease, and The Company shall have the right, on like notice, to cancel this agreement.

43.    **Cancellation**

A.    This policy may be cancelled at any time at the request of the first named Insured, or it may be cancelled by the **Insurer** by mailing via registered or certified mail to

Sears Holdings Corporation
Risk Management Department
3333 Beverly Road E3-237A
Hoffman Estates, Illinois 60179

and with copies provided to

Aon Risk Services
200 E Randolph St
Chicago, Illinois 60601

during the term of this policy, written notice stating when no less than Ninety    (90) days thereafter,    such cancellation shall be effective.

This insurance may be canceled at any time by the Insured by surrender of this policy to the **Insurer** or by mailing or delivery to the **Insurer** written notice stating when thereafter such cancellation shall take effect. Return premium shall be allowed the Insured on a pro rata basis if the **Insurer** or Insured cancels.

Payments or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

B.    The mailing of notice as described in A. above shall be sufficient proof of notice and the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Insured or by this **Insurer** shall be equivalent to mailing.

C.    Cancellation shall not affect coverage on any shipment in transit on the date of cancellation. Coverage will continue in full force until such property is safely delivered and accepted at place of final destination.

44.    **Inspection and Audit**

This **Insurer** shall be permitted, but not obligated, to inspect the Insured's property at any reasonable time. Neither the **Insurer's** right to make inspections, nor the making thereof, nor any report thereon, shall constitute an undertaking, on behalf of or for the benefit of the Insured or others, to determine or warrant that such property is safe.

45.    **Loss Adjustment Expenses**

This policy is extended to insure the expenses incurred by the Insured, or by the Insured's representatives for assessing, preparing and/or certifying details of a claim resulting from a loss which would be payable under this policy. However, this policy does not insure the expenses of Public Adjustors.

46.    **Currency**

It is hereby understood and agreed that all amounts used herein are in United States currency and that premiums shall be paid and all losses shall be adjusted and paid in United States currency. In the event of a loss adjustment involving foreign currency, conversion into the currency of the United States of America shall be calculated as follows:

A.    As respects real and personal property, the cost of repair, replacement or reconditioning shall be converted, at the option of the Insured, based on any of the following:

    1.    date of loss;

    2.    date of repair, replacement or reconditioning;

    3.    date of acceptance or proof of loss or settlement.

Options A.1. - A.3. shall be based on the rate of exchange quoted in the Wall Street Journal.

If the property is not replaced or repaired, the conversion into the currency of the United States of America shall be at the rate of exchange quoted in the Wall Street Journal as of the date of loss.

B.    As respects all other coverages, currency shall be converted at the rate of exchange quoted in the Wall Street Journal and such rate of exchange shall be based on the average of the daily rate of exchange quoted in the Wall Street Journal for the period of loss.

**47.    Tax Liability**

A.    In the event that a loss insured hereunder cannot be paid in the country where the loss insured under this policy has occurred, this Insurer shall be liable for an additional loss payment in accordance with the following formula:

Loss payment due under this section =    $[a(1 - c) / (1-b)] -a$

Where:

a    =    Loss otherwise payable under this Policy except for operation of this coverage, after due consideration for any applicable deductible(s).

b    =    The net effective rate of the sum of: any taxation (a positive number) plus tax any relief/credit (a negative number) that accrues in the country where loss payments are received.

c    =    The net effective rate of the sum of: any taxation (a positive number) plus tax any relief/credit (a negative number) that accrues in the country where the loss occurred.

2.    The formula herein will not apply if the calculation of additional payment results in an amount less than zero. The rates referred to herein will be the respective corporate income tax rates in effect on the date of the loss.

3.    The Insured will cooperate with the Insurer in making every reasonable effort to pay the loss or portion thereof locally in the country in which the loss occurred.

4.    Any payment under this coverage will be made only after completion and acceptance by the Insurer of audited tax returns for the period in question for both the country where a payment hereunder is made and the country where the loss occurred. The actual payment under this coverage will be adjusted and reduced by all appropriate tax credits and/or tax relief entitled and/or received by the Insured and/or the local entity where the loss occurred provided that an income tax liability is incurred.

**48.    Difference in Conditions**

Subject to all other terms and conditions set forth herein, coverage under this policy is to apply only when coverage and/or definitions and/or conditions set forth herein are broader in meaning or scope than those of specific underlying or primary policies except for Stock Throughput Policies. The insurance provided by this policy will apply as contributing or excess insurance as respects loss arising from loss or damage insured under such other policies. In the absence of any other valid and collectible insurance, this policy shall become primary, subject to the terms and conditions of this policy.

**49.   Tax Treatment of Profits**

This policy is extended to insure the additional loss sustained by the Insured resulting from loss or damage insured by this policy in the event the tax treatment of:

A.   the profit portion of a loss recovery involving finished stock manufactured or purchased by the Insured; and/or

B.   the profit portion of business interruption loss proceeds;

differs from the tax treatment of profits that would have been incurred had no loss occurred.

**50.   Tenants and Neighbors Liability**

This policy insures:

A.   1.   The liability, which the Insured incurs as tenant or occupant under the articles of any civil or commercial code, because of damage to real and personal property by loss or damage insured by this policy;

2.   The liability, which the Insured incurs under articles of any civil or commercial code, for damage to real or personal property from loss or damage spreading from the Insured's premises to the premises of neighbors, cotenants and other third parties;

3.   The liability, which the Insured as landlord incurs under articles of any civil or commercial code, for loss or damage to the personal property of tenants insured by this policy as a result of constructional defects or lack of maintenance;

B.   This extension applies only to liability incurred in those countries or jurisdictions in which a Napoleonic or other civil or commercial code applies due to loss or damage as defined by such code and as insured hereunder.

**51.   Severability of Interest**

Each of the Insureds insured by this policy will have the same protection and obligations as if the policy has been issued individually to each of them, except as respects the obligations associated with the **Cancellation** clause. However, the inclusion of more than one Insured will not operate to increase the limit of liability of the **Insurer** beyond the limit of liability stated in this policy.

**52.   Loss Adjustors**

As fully detailed in Risk Details.

**53.   Loss Payable**

Loss, if any, shall be adjusted with and payable to Sears Holdings Corporation or as directed by it.

54. **Priority of Payments (applicable to primary or underlying policy(ies) only)**

Any recoveries made under this policy shall first apply to loss or damage not insured by the excess policy(ies). Upon exhauston of this policy's limit, the excess policy(ies) shall step down and be liable for the loss in excess of the amount attributed to this policy as respects loss or damage insured thereunder subject to the excess policy(ies) limits.

It is further herby understood and agreed that this policy provides secondary and excess coverage to that provided by the Named Insured's stock throughput policies for physical loss or damage covered under this policy to any and all stock and/or inventory values. The Named Insured's stock throughput policies are deemed primary and more specific for purposes of payment of physical loss or damage to any and all stock and/or inventory values. This policy will pay to the full extent of coverage afforded hereunder for the physical loss or damage to any and all stock and/or inventory values in excess of the limits of liability provided by the Named Insured's stock throughput policies.

55. **Step Down / Drop Down (applicable to excess policies only)**

In determining the amount of any loss or damage for which this policy is excess, the total loss caused by any combination of loss or damage, all of which are insured against under the primary policy or **underlying policy**, shall be used even though such loss or damage is not insured against under this excess policy.

A.    Any recoveries made under the primary or **underlying policy** shall first apply to loss or damage not insured against by this policy. Upon exhaustion of the primary or **underlying policy** limits, this policy shall apply in excess of the   amount attributed to the primary or **underlying policy** as respects loss or damage insured hereunder subject to the limit of this policy.

B.    If there is any other excess insurance insuring the property insured hereunder for loss or damage insured against in the primary or **underlying policy** but not insured by this policy, this policy shall then allocate any loss recoveries made under the primary or **underlying policy** in the same proportion as the amount of loss or damage insured against by this policy bears to the combined total loss.

Upon exhaustion of the primary or **underlying policy** limits, this policy shall apply in excess of the amount attributed to the primary or **underlying policy** as respects loss or damage insured hereunder subject to the limit of this policy.

C.    Sub-Paragraph B. above shall not apply, however, when the amount of loss attributed to loss or damage insured under the primary or **underlying policy**, but not insured under this policy, exceed the total amount of insurance provided by the primary and excess coverages with respect to said loss or damage. In this situation, any recoveries made under the primary or **underlying policy** shall first apply to loss or damage not insured by this policy. Upon exhaustion of the primary or **underlying policy** limits, this policy shall apply in excess of the amount attributed to the primary or **underlying policy** as respects loss or damage insured hereunder subject to the limit of this policy.

D.    It is further agreed, in the event the **Flood** and/or **Earthquake** annual aggregate limits of any primary or **underlying policy** and/or the **Named Windstorm** aggregate limit of the stock throughput policy are diminished or exhausted in any one policy year, any loss or damage insured under this policy for **Flood** and/or **Earthquake** and/or **Named Windstorm** as respects stock and/or inventory, shall apply as excess of any undiminished or unexhausted limits subject to the policy deductibles herein.

56. **Statement of Values**

The Statement of Values is for informational purposes only and does not bear on the coverages provided by this Policy.

**57.    Definitions**

The following terms whenever used in this policy shall mean:

**A.    Accident to an Object (Boiler and Machinery Coverage)**

The term "Accident to an Object", if used herein, is defined solely for the determination of the limits of liability and/or deductible(s) and application of the            suspension   section   only. The term "accident" shall not limit or define the perils or   coverages provided elsewhere in this policy.

The term "accident to an object" shall mean: Any condition or **Occurrence** within boilers or fired or unfired vessels owned by, operated by, or under the control of the Insured and subject to pressure or vacuum including piping or apparatus attached to and forming a part thereof, except that the words "any condition or **Occurrence**" shall not include explosion, other than explosion of the parts of a steam boiler containing steam or water, steam piping, steam turbines, or steam engines;

      (1)    mechanical breakdown of any machine or apparatus arising out of any condition or **Occurrence** within such machine or apparatus;

      (2)    electrical injury or disturbance to electrical appliances, devices, fixtures, wiring, or other electrical or electronic equipment caused by electrical currents artificially generated.

However, the term "accident" does not include:

      (1)    loss or damage from fire or from the use of water or other means to extinguish fire; and

      (2)    the normal operation of any safety or protective device;

The term "accident" shall not apply to the following property:

      (1)    property in transit;

      (2)    property while in the course of construction, erection, installation, or assembly;

      (3)    electronic data processing systems used for administrative, statistical, or accounting purposes;

      (4)    any sewer piping, any piping forming a part of a fire protective system, or any water piping other than:

            (a)    boiler feed water piping;

            (b)    boiler condensate return piping;

            (c)    water piping used in a heat transfer system for cooling, humidifying, or space heating purposes;

      (5)    any vehicle, aircraft, or self-propelled equipment or floating vessel;

      (6)    any elevator, crane, ladle or bucket, hoist, power shovel, drag line, excavator, scale, or conveyor, but not excluding any pressure vessel, gears, engines or electrical equipment used with a machine.

**B.    Architect Fees and Engineering Fees**

Any cost associated with the preparation of plans for the repair or reconstruction of the damaged property.

C.    **Earthquake**

Quaking, vibratory or undulating movement of a portion of the earth's crust, produced by underground volcanic forces or by breaking and shifting of rock beneath the earth's crust.

It is understood and agreed that, wherever used in this policy, the term "loss caused by" or "loss arising from" Earthquake shall be restricted exclusively to the actual, specific cracking, rupturing, shifting or toppling of property and shall not include ensuing loss or damage, not otherwise excluded, resulting from other loss or damage insured. However, Earthquake shall include loss arising from tsunami, tide or tidal water, that result from an Earthquake.

D.    **EDP Systems**

Electronic Data Processing Systems shall include, but not be limited to, transferring equipment, computer systems, telecommunications systems or electronic control equipment and component parts.

E.    **EDP Media**

All forms of data, converted data, electronically converted data and/or programs and/or applications and/or instructions and/or media vehicles employed.

F.    **Fine Arts**

Fine Arts shall include, but not be limited to, bona fide works of art, works of rarity, works of historical value, works of artistic merit, photographs, (positives and negatives) lithographs, illustrations, galley proofs, original records.

G.    **Finished Stock**

Stock manufactured by the Insured which, in the ordinary course of the Insured's business, is ready for packing, shipment or sale.

H.    **Fire Brigade Charges/Fire Extinguishing Materials and Expenses**

Fire fighting and/or containment charges and/or fire department service charges and other extinguishing expenses.

I.    **Flood**

Waves, tide or tidal water, rapid accumulation of surface waters, or the rising (including overflowing or breaking of boundaries) of lakes, reservoirs, rivers, streams or other bodies of water. It is understood and agreed that, whenever used in this policy, the term "loss caused by" or "loss arising from" flood shall not include ensuing loss or damage, not otherwise excluded, resulting from other loss or damage insured.

J.    **Fraudulent or Dishonest Acts**

Fraudulent or dishonest acts committed by the Insured or the Insured's employees with the manifest intent to:

1.    cause the Insured to sustain such loss; and

2.    obtain financial benefit for the Insured, Insured's employee, or for any other person or organization intended by the Insured or the employee to receive such benefit for such fraudulent or dishonest act or acts.

K.    **Miscellaneous Unnamed Location**

A Miscellaneous Unnamed Location as used herein shall be defined as a location at which the Insured has property of the type insured hereunder which has not been reported to the Company: Upon report to the Company of said location, the Policy Limit shall apply.

L.    **Named Windstorm**

A Named Windstorm is a storm cell and/or weather condition that is declared by the National Weather Bureau and/or National Hurricane Center and/or any other similar weather center in foreign countries as a Named Hurricane or Storm.

It is understood and agreed that, whenever used in this policy, the term "loss caused by" or "loss arising from" Named Windstorm shall not include ensuing loss or damage, not otherwise excluded, resulting from other loss or damage insured. However, such Named Windstorm shall include loss arising from rain, flood, storm surge or any other water damage that results from the Named Windstorm.

M.    **Object**

Means any boiler, fired or unfired vessel subject to pressure or vacuum, including piping or apparatus attached thereto and forming a part thereof, and any mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power.

N.    **Occurrence**

Loss, or a series of losses or several losses, which are attributable directly to one cause or disaster or to one series of causes or disasters arising from a single event. All such losses shall be added together and the total amount of such losses shall be treated as one **Occurrence** irrespective of the period of time or area over which such losses occur.

When the term applies to windstorms, it shall be defined as the sum total of all losses arising directly out of or caused by the same atmospheric disturbance during any period of 72 consecutive hours. The Insured shall have the right to elect the moment from which the 72 hour period shall be deemed to have commenced, provided always that no elected period of 72 hours shall commence within the period of any previous **Occurrence**.

When the term applies to **earthquake** , it shall be defined as the sum total of all the Insured's losses arising directly out of or caused by **earthquake** during any period of 168 consecutive hours by reason of one **earthquake** or a series of **earthquake shocks**. The Insured may elect the moment from which the 168 hour period shall be deemed to have commenced, provided always that no elected period of 168 hours shall commence within the period of any previous **Occurrence**.

When the term applies to **flood**, it shall be defined as the sum total of all losses arising directly out of or caused by reason of one **flood** or a series of **floods**.

O.    **Ordinary Payroll**

Ordinary Payroll is the entire payroll expense for all employees of the Insured except officers, executives, employees under contract, and other critical employees.

P.    **Soft Costs**

Expenses related to the delay of completion of a project over and above those costs which would have been incurred, including, but not limited to, attorneys fees, fines, interest payments on financing under loan agreements and real estate taxes accruing during the period of delay.

Policy Number PTNAM1701557

Q.     **Transit**

Shipments within and between the territorial limits of this policy, including the coastal waters thereof, by any means of conveyance, from the time the property is moved for purpose of loading and continuously thereafter while awaiting and during loading and unloading and in temporary storage including temporary storage on any conveyance intended for use for any outbound or used for inbound shipment, including during deviation and delay, until safely delivered and accepted at place of final destination.

R.     **Underlying Policy**

An insurance policy issued to the Insured which is similar as respects the terms and conditions of this policy and issued for limits below the attachment point or deductible of this policy.

S.     **Valuable Papers & Records**

Written, printed or otherwise inscribed documents, and records including but not limited to books, maps, films, drawings, abstracts, deeds, mortgages, mortgage files, manuscripts and micro or electronically/magnetically inscribed documents, but not including the monetary value of monies and/or securities.

## ENDORSEMENT 1

## EARTHQUAKE AND WIND ZONES

### TIER 1 WIND COUNTIES

Tier One counties are outlined below and include any county bordering the Gulf of Mexico and/or Atlantic Ocean.

| | |
|---|---|
| Virginia - | Accomack, Northhampton, Gloucester, Isle of Wright, James City, Lancaster, Mathews, Middlesex, Newport News Northumberland, Suffold, Surry, Westmoreland York. Independent Cities: Chesapeake, Norfolk, Virginia Beach. |
| North Carolina - | Beaufort, Bertie, Bladen, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Duplin, Hyde, Jones, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrell, Washington. |
| South Carolina - | Beaufort, Berkley, Charleston, Colleton, Dorchester, Florence, Georgetown, Hampton, Horry, Jasper, Marion, Williamsburg Georgia – Brantley, Bryan, Chatham, Camden, Effingham, Glynn, Liberty, Long, McIntosh |
| Florida - | The entire state |
| Alabama - | Baldwin, Mobile |
| Mississippi - | George, Hancock, Harrison, Jackson, Pearl River |
| Louisiana - | Assumption, Calcasieu, Cameron, Jefferson Davis, Vermilion, Iberia, St. Mary, Terrebonne, La Fourch, Plaque Mines, St. Martin, St. Bernard, St. Tammany, Jefferson, Orleans |
| Texas - | Jefferson, Chambers, Harris, Bazoria, Galveston, Matagorda, Jackson, Calhoun, Refugio, Nueces, Aransas, Liberty, Orange, San Patricio, Kenedy, Kleberg, Wilacy, Cameron |
| Guam | |
| Puerto Rico | |
| U.S. Virgin Islands | |

Policy Number PTNAM1701557

## NEW MADRID EARTHQUAKE COUNTIES

| ARKANSAS | Arkansas | Ashley | Chicot | Desha |
|---|---|---|---|---|
| | Drew | Fulton | Grant | Izard |
| | Jefferson | Lincoln | Lonoke | Monroe |
| | Prairie | Pulaski | Saline | White |
| | Woodruff | | | |

| ILLINOIS | Bond | Calhoun | Christian | Clark |
|---|---|---|---|---|
| | Clay | Clinton | Coles | Crawford |
| | Cumberland | Edwards | Effingham | Fayette |
| | Greene | Jasper | Jersey | Lawrence |
| | Macoupin | Madison | Marion | Monroe |
| | Montgomery | Morgan | Pike | Randolph |
| | Richland | Sangamon | Scott | Shelby |
| | St. Clair | Wabash | Washington | Wayne |

| INDIANA | Crawford | Daviess | Dubois | Gibson |
|---|---|---|---|---|
| | Greene | Knox | Lawrence | Martin |
| | Orange | Perry | Pike | Posey |
| | Spencer | Sullivan | Vanderburgh | Warrick |

| KENTUCKY | Breckinridge | Butler | Christian | Daviess |
|---|---|---|---|---|
| | Hancock | Logan | Ohio | Simpson |
| | Todd | Trigg | Warren | |

| MISSISSIPPI | Alcorn | Benton | Bolivar | Calhoun |
|---|---|---|---|---|
| | Carroll | Chickasaw | Choctaw | Clay |
| | Grenada | Holmes | Humphreys | Issaquena |
| | Itawamba | Lafayette | Lee | Leflore |
| | Lowndes | Marshall | Monroe | Montgomery |
| | Oktibbeha | Pontotoc | Prentiss | Sharkey |
| | Sunflower | Tippah | Tishomingo | Union |
| | Warren | Washington | Webster | Yalobusha |
| | Yazoo | | | |

| MISSOURI | Audrain | Callaway | Cole | Crawford |
|---|---|---|---|---|
| | Dent | Franklin | Gasconade | Howell |
| | Iron | Jefferson | Lincoln | Maries |
| | Marion | Miller | Montgomery | Oregon |
| | Osage | Phelps | Pike | Pulaski |
| | Ralls | Reynolds | Shannon | St. Charles |
| | St. Francois | St. Louis | St. Louis City | |
| | Ste. Genevieve | Texas | Warren | Washington |

| TENNESSEE | Cheatham | Decatur | Dickson | Hardin |
|---|---|---|---|---|
| | Hickman | Houston | Lawrence | Lewis |
| | McNairy | Mongomery | Perry | Robertson |
| | Stewart | Wayne | | |

## PACIFIC NORTHWEST EARTHQUAKE COUNTIES

| WASHINGTON | Clallam | Clark | Cowlitz |
|---|---|---|---|
| | Grays Harbor | Island | Jefferson |
| | King | Kitsap | Lewis |
| | Mason | Pacific | Pierce |
| | San Juan | Skagit | Thurston |
| | Wahkiakum | | |

| OREGON | Benton | Clackamas | Clatsop |
|---|---|---|---|
| | Columba | Lane | Lincoln |
| | Marion | Multnomah | Polk |
| | Tillamook | Washington | Yamhill |

Policy Number PTNAM1701557

## ENDORSEMENT 2

## PARTICIPATION ENDORSEMENT

Notwithstanding anything contained in the policy to the contrary the total amount to be indemnified under this policy shall not exceed USD450,000,000 in respect of any limits of liability shown in Clause 3 of the policy – Limits of Liability nor USD450,000,000 of the recoverable loss in any one Occurrence.

## INSURER PARTICIPATION

Subject to the terms and conditions contained herein and in consideration of the Insured, named herein or named in endorsements or amendments attached hereto, having paid or agreed to pay an annual Net premium, in the amount indicated in the table below, to the Insurer who has hereto subscribed it's name, the Insurer agrees to pay the Insured or the Insured's successors and assigns for loss or damage, all as more fully set forth herein, during the period of this insurance stated herein for an amount not to exceed the Limits stated herein and limited to the Insurer's participation as described below.

## ENDORSEMENT 3

It is hereby understood and agreed that with effect from inception, the following Clause is included in this insurance:

## Biological or Chemical Materials Exclusion

It is agreed that this Insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto.

Malicious use of chemical materials does not include Arson or any materials used in connection with same.

**NMA2962 (Modified)**
**06/02/03**

All other terms, conditions and limitations of this policy remain unaltered.

## ENDORSEMENT 4

It is hereby understood and agreed that with effect from inception, the following endorsement is included in this insurance:

### ASBESTOS ENDORSEMENT

A.   This Policy only insures asbestos physically incorporated in an insured building or structure, and then only that part of the asbestos which has been physically damaged during the period of insurance by one of these Listed Perils:

As defined in Part I – Risk Details

This coverage is subject to each of the following specific limitations:

1.   The said building or structure must be insured under this Policy for damage by that Listed Peril.

2.   The Listed Peril must be the immediate, sole cause of the damage of the asbestos.

3.   The Assured must report to Underwriters the existence and cost of the damage as soon as practicable after the Listed Peril first damaged the asbestos. However, this Policy does not insure any such damage first reported to the Underwriters more than 12 (twelve) months after the expiration, or termination, of the period of insurance.

4.   Insurance under this Policy in respect of asbestos shall not include any sum relating to:

(i)    any faults in the design, manufacture or installation of the asbestos;

(ii)   asbestos not physically damaged by the Listed Peril including any governmental or regulatory authority direction or request of whatsoever nature relating to undamaged asbestos.

B.   Except as set forth in the foregoing Section A, this Policy does not insure asbestos or any sum relating thereto.

**LMA5019 (Modified)**
**14/09/2005**
All other terms, conditions and limitations of this policy remain unaltered.

## ENDORSEMENT 5

It is hereby understood and agreed that with effect from inception, the following endorsement is included in this insurance:

### ELECTRONIC DATA ENDORSEMENT A

**1.  Electronic Data Exclusion**

Notwithstanding any provision to the contrary within the Policy or any endorsement thereto, it is understood and agreed as follows:

(a)  This Policy does not insure loss, damage, destruction, distortion, erasure, corruption or alteration of ELECTRONIC DATA from any cause whatsoever (including but not limited to COMPUTER VIRUS) or loss of use, reduction in functionality, cost, expense of whatsoever nature resulting therefrom, regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

ELECTRONIC DATA means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes programmes, software and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

COMPUTER VIRUS means a set of corrupting, harmful or otherwise unauthorised instructions or code including a set of maliciously introduced unauthorised instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. COMPUTER VIRUS includes but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

(b)  However, in the event that a peril listed below results from any of the matters described in paragraph (a) above, this Policy, subject to all its terms, conditions and exclusions, will cover physical damage occurring during the Policy period to property insured by this Policy directly caused by such listed peril.

Listed Perils – As detailed in Risk Details.

## 2. Electronic Data Processing Media Valuation

Notwithstanding any provision to the contrary within the Policy or any endorsement thereto, it is understood and agreed as follows:

Should electronic data processing media insured by this Policy suffer physical loss or damage insured by this Policy, then the basis of valuation shall be the cost to repair, replace or restore such media to the condition that existed immediately prior to such loss or damage, including the cost of reproducing any ELECTRONIC DATA contained thereon, providing such media is repaired, replaced or restored. Such cost of reproduction shall include all reasonable and necessary amounts, not to exceed sublimit as detailed in Risk Details any one loss, incurred by the assured in recreating, gathering and assembling such ELECTRONIC DATA. If the media is not repaired, replaced or restored the basis of valuation shall be the cost of the blank media. However this Policy does not insure any amount pertaining to the value of such ELECTRONIC DATA to the Assured or any other party, even if such ELECTRONIC DATA cannot be recreated, gathered or assembled.

25/01/01
NMA2914

All other terms, conditions and limitations of this policy remain unaltered.

## ENDORSEMENT 6

It is hereby understood and agreed that the following clause is added hereon:

## MOLD, MILDEW AND FUNGUS CLAUSE

It is understood and agreed that:-

A.      This policy only insures physical loss or damage to insured property by mold, mildew or fungus that directly results from physical loss or damage to property insured by this policy during the policy period by one of the following listed perils:

> Fire; Explosion; Lightning; Windstorm; Hail; Direct Impact of Vehicle; Aircraft or Vessel; Riot or Civil Commotion; Vandalism or Malicious Mischief; Accidental Discharge of Fire Protection Equipment; Water Damage or Flood.

This coverage is subject to all limitations in the policy to which this endorsement is attached and, in addition, to each of the following specific limitations:

1.      The said property must otherwise be insured under this policy for physical loss or damage by that Listed Peril.

2.      The Insured must report to the Insurers the existence and cost of the physical loss or damage by mold, mildew or fungus as soon as practicable, but no later than six (6) months after the Listed Peril first caused any physical loss or damage to insured property during the policy period. This policy does not insure any physical loss or damage by mold, mildew or fungus first reported to underwriters after that six (6) month period.

3.      Regardless of circumstances or other policy provisions, the maximum amount insured and payable under this policy for all mold, mildew or fungus caused by or resulting from any Listed Peril is as detailed in Risk Details.

B.      Except as set forth in the foregoing Section A., this policy does not insure any loss, damage, claim, cost, expense, or other sum directly or indirectly arising out of or relating to mold, mildew or fungus of any type, nature or description.

All other terms, conditions and limitations of this Policy remain unaltered.

## ENDORSEMENT 7

## APPLICATION OF SUBLIMITS ENDORSEMENT

It is hereby understood and agreed that the Application of Sublimits Endorsement is deleted and replaced with the following:

1.    **Application To Insured Interests.**    Each sublimit stated in this policy applies as part of, and not in addition to, the overall policy limit for an occurrence insured hereunder. Each sublimit is the maximum amount potentially recoverable from all insurance layers combined for all insured loss, damage, expense, time element or other insured interest arising from or relating to that aspect of the occurrence, including but not limited to type of property, construction, geographic area, zone, location, or peril.

2.    **Application Within Perils.**    If insured under this policy, any sublimit for earthquake, earth movement, flood, named storm, or named windstorm is the maximum amount potentially recoverable from all insurance layers combined for all insured loss, damage, expense, time element or other insured interest arising from or relating to such an occurrence.    If flood occurs in conjunction with a named storm, named windstorm, earthquake or earth movement, the flood sublimit applies within and erodes the sublimit for that named storm, named windstorm, earthquake or earth movement.

This endorsement takes precedence over and, if in conflict with any other wording in the contract bearing on the application of sublimits, replaces that wording.

All other terms, conditions and limitations of this Policy remain unaltered.

**LMA5130 (Modified)**

## ENDORSEMENT 8

### EXTENDED INCREASED COST OF CONSTRUCTION

This policy also provides coverage for increased cost of construction due to the enforcement of any law, ordinance and/or governmental directive regulating the construction, repair or use of property that comes into force and effect within 12 months after the date of loss.

All other terms, conditions and limitations of this Policy remain unaltered

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10
LMA3100

# SERVICE OF SUIT CLAUSE (U.S.A.)

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon Messrs Mendes & Mount, 750 Seventh Avenue, New York, New York 10019-6829, U.S.A. and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

24/4/86
NMA1998

## TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or

indirectly caused by, resulting from or in connection with any act of terrorism regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2920

## U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
### Not Purchased Clause

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5219
12 January 2015

## ILLINOIS SURPLUS LINES NOTICE

**Notice to Policyholder:   This contract is issued, pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.**

01/09/13
LMA9046

## PREMIUM PAYMENT CONDITION (TIME ON RISK)

It is a condition of this contract of Insurance that the premium due at inception must be paid to and received by Insurers on or before midnight on the date specified under Risk Details.

If this condition is not complied with, then this contract of Insurance shall terminate on the above date with the Insured hereby agreeing to pay premium calculated at not less than pro rata temporis.

**PPC5 (TOR) 4/86**

# INFORMATION

Total Insured Values:

USD 22,765,315,021

**Submissions provided to (Re)insurer(s) and, for those markets that use EbixExchange, added to the Data Pack**

## CONTRACT ADMINISTRATION AND ADVISORY SECTIONS

## SUBSCRIPTION AGREEMENT

**SLIP LEADER**

The Slip Leader is Lex-London a Division of AIG Europe Limited

In respect of electronic lines, the Slip Leader is as defined in Security Details herein.

**BUREAU(X) LEADER(S)**

The Bureau(x) Leader(s) (where applicable) is Lex-London a Division of AIG Europe Limited

**BASIS OF AGREEMENT TO CONTRACT CHANGES**

General Underwriting Agreement (February 2014) with:

Non-Marine Schedule (October 2001) except as below:

- Agree extend for up to one calendar month at pro rata additional premium as agreed by Slip Leader only;

- Extensions to any Premium Payment Warranty (PPW), Premium Payment Condition (PPC), Prompt Payment Discount (PPD) or Settlement Due Date (SDD) are to be agreed by the Slip Leader only;

- When details of agreed endorsements are required to be provided to following (re)insurer(s), email and/or other electronic means may be used by Aon UK Limited.

Wherever practicable, between the broker and each (re)insurer which have at any time the ability to send and receive ACORD messages:

1. the broker agrees that any proposed contract change will be requested via an 'ACORD message' or using an ACORD enabled electronic trading platform;

2. whilst the parties may negotiate and agree any contract change in any legally effective manner, each relevant (re)insurer agrees to respond via an appropriate 'ACORD message' or using an ACORD enabled electronic trading platform;

3. where a (re)insurer has requested to receive notification of any contract change the broker agrees to send the notification via an 'ACORD message' or using an ACORD enabled electronic trading platform.

**OTHER AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR PART TWO GUA CHANGES ONLY**

Where no Other Agreement Parties for contract changes are stated herein, the Agreement Parties will be the Slip Leader only.

**AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR THEIR PROPORTION ONLY**

None.

**BASIS OF CLAIMS AGREEMENT**

Claims to be managed in accordance with:

- The Lloyd's Claims Scheme (Combined), or as amended or any successor thereto. The applicable Scheme/part will be determined by the rules and scope of the Scheme(s);

- IUA claims agreement practices;

Policy Number PTNAM1701557

    -   The practices of any (re)insurer(s) electing to agree claims in respect of their own participation.

Unless otherwise detailed in the Risk Details, the Slip Leader may instruct any third party expert to investigate and adjust any claim or circumstance notified to the contract.

**CLAIMS AGREEMENT PARTIES**

The Lead Claims Agreement Party is deemed to be the Slip Leader unless otherwise specified here.

For Lloyd's syndicates, the leading Lloyd's syndicate and, where required by the applicable Lloyd's Claims Scheme, the second Lloyd's syndicate. The second Lloyd's syndicate is ACT 9536.

For company (re)insurers, all IUA subscribing companies agree to follow the IUA claims agreement practices

All other subscribing (re)insurers, each in respect of their own participation, that are not party to the Lloyd's or IUA claims agreement practices, agree to follow the decisions of the Lloyd's and IUA claims agreement parties or the lead Claims Agreement Party where such is not otherwise the Lloyd's or IUA lead, excepting those that may have opted out below.

**CLAIMS ADMINISTRATION**

Aon UK Limited will notify claims agreement parties, and where applicable following (re)insurer(s) that do not participate in the Lloyd's and IUA claims schemes, of claims submitted to the contract, and provide material updates. Wherever possible such notifications and updates will be given and administered via ECF or other electronic platform at Aon UK Limited's election.

**RULES AND EXTENT OF ANY OTHER DELEGATED CLAIMS AUTHORITY**

None, unless otherwise specified here by any of the claim agreement parties shown above.

**EXPERT(S) FEES COLLECTION**

Aon UK Limited will not undertake the collection of any fee invoices rendered by third parties unless the fees form part of the (re)insured's claim or the work is for the exclusive benefit of the (re)insured.

In the event of Aon UK Limited not collecting third party fees the following applies:

Xchanging Claims Services Limited to collect fees for all slip security, including overseas (re)insurers unless the leading claims agreement party elects an alternate on a case by case basis.

**SETTLEMENT DUE DATE**

30th July 2017
Unless otherwise stated by (re)insurer(s), the Settlement Due Date is 90 days from inception in respect of direct business and 120 days from inception in respect of reinsurance business.

In respect of electronic lines, please refer to the Settlement Information shown under Security Details herein which is deemed to supersede the above.

**NOTICE OF CANCELLATION DELIVERY PROVISIONS**

Where the terms and conditions of this Contract allow for notice of cancellation to be issued, such notice of cancellation shall be provided to Aon UK Limited by email to aon.gbc.noc@aon.co.uk.

Failure to comply with this delivery requirement will make the notice null and void.

Delivery of the notice in accordance with this requirement will cause it to be effective irrespective of whether Aon UK Limited has acknowledged receipt.

**BUREAUX ARRANGEMENTS**

Aon UK Limited will submit de-linked accounts to Xchanging Ins-Sure Services Ltd (XIS) where possible.

In respect of any PPW, PPC, PPD or SDD the following apply:

- Premium payment requirements are deemed met by presentation of premium/accounts to XIS on or before the SDD and will not be recorded as a late signing or payment;

- The SDD is deemed in all instances to be the same as the PPW, PPC or PPD due date;

- Where the PPW, PPC or PPD has been updated then the SDD shall be deemed to be updated in parallel, unless otherwise stated to the contrary;

- The PPW, PPC, PPD or SDD shall not be deemed to be breached if the original presentation of the electronic submission to XIS is in time, but subsequently amendments to the electronic submission are notified as being required to enable the premium signing to be completed. In such event Aon UK Limited shall have an additional period of seven days from such notification to complete the amendments and resubmit the electronic submission to XIS;

- Where a PPW, PPC, PPD or SDD falls on a weekend or public holiday, presentation to XIS on the next working day will be deemed in compliance with the PPW, PPC, PPD or SDD.

(Re)insurer(s) hereby agree that any premium payable in instalments under this contract will be processed as delinked Additional Premium entries other than when submitted under the Deferred Account Scheme. However any annual instalments to be allocated to respective year of account.

(Re)insurer(s) authorise XIS to issue separate signing numbers and dates for their participations only and issue a single claims FDO signing where applicable.

Where payments are received by Aon UK Limited in convertible currencies, (re)insurer(s) agree to accept/settle accounts at rate(s) of exchange obtained by Aon UK Limited.

In respect of convertible currencies, (re)insurer(s) instruct XIS to accept settlement in any valid settlement currency as determined by Aon UK Limited.

In the event of this contract stating multiple insurance and/or reinsurance premiums (each to be paid from a different source); and/or separate entries/sections for taxation/regulation reporting purposes, XIS are instructed to leave the premium advice notes ungrouped so that each can be released separately once paid by the respective client.

In the event of partial premium received by Aon UK Limited, (re)insurer(s) agree to accept premium as paid to and endorsed by Aon UK Limited.

XIS are authorised to sign premium from individual Insureds / territories / sections separately as and when received by Aon UK Limited.

(Re)insurers agree that Aon UK Limited may settle premiums for

this contract/release de-linked premium for this contract into settlement at different times.

**NON BUREAUX ARRANGEMENTS**

Where a PPW, PPC, PPD or SDD falls on a weekend or public holiday, presentation to (re)insurer(s) hereon as applicable on the next working day will be deemed in compliance with the PPW,PPC, PPD or SDD.

Where payments are received by Aon UK Limited in convertible currencies, (re)insurer(s) agree to accept/settle accounts at rate(s) of exchange obtained by Aon UK Limited.

In respect of convertible currencies, (re)insurer(s) agree to accept settlement in any valid settlement currency as determined by Aon UK Limited.

In the event of partial premium received by Aon UK Limited, (re)insurer(s) agree to accept premium as paid to and endorsed by Aon UK Limited.

# FISCAL AND REGULATORY

**TAX PAYABLE BY
(RE)INSURER(S):**            5.00% Premium Tax in respect of US Virgin Islands

**COUNTRY OF ORIGIN:**        United States of America

**OVERSEAS BROKER:**          Aon Risk Services Central Inc (Formerly Known As Aon Risk
                             Services Inc Of Illinois)
                             Aon Center
                             200 East Randolph Street
                             Chicago
                             Illinois 60601
                             United States of America

**SURPLUS LINE BROKER:**      Aon Center
                             200 East Randolph Street
                             Chicago
                             Illinois
                             United States of America
                             60601Licence Number:- 2122152

**STATE OF FILING**           Illinois

**US CLASSIFICATION:**        **Surplus Lines**
                             USClassification                            100.0000%
                                                          **Total:   100.0000%**

                             **In respect of International Premium only:**

                             Puerto Rico                                    86.81%
                             US Virgin Islands                               8.44%
                             Guam                                            4.75%
                                                          **Total:     100.0000%**

**NAIC CODES:**               Not applicable

**ALLOCATION OF
PREMIUM TO CODING:**          P2 for 100%

                             In respect of electronic lines, please refer to the Settlement
                             Information shown under Security Details herein.

**REGULATORY CLIENT
CLASSIFICATION:**             Large Risk

| State of Exposure | Licensee | Location | License |
|---|---|---|---|
| IL | William M Murphy | Chicago, IL | 2122152 |

Policy Number PTNAM1701557

## BROKER REMUNERATION AND DEDUCTIONS

**TOTAL BROKERAGE:**         10.00%

**OTHER DEDUCTIONS
FROM PREMIUM:**              Nil.

# SECURITY DETAILS

## (RE)INSURER'S LIABILITY:

### (Re)insurer's liability several not joint

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

### Proportion of liability

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333 (amended)

**ORDER HEREON:**          As per total signed lines as detailed in Security Details

**BASIS OF WRITTEN
LINES:**                  ☒  Percentage of Whole
                          ☐  Percentage of Order
                          ☐  Part of Whole
                          ☐  Part of Order

**BASIS OF SIGNED LINES:** ☒  Percentage of Whole
                          ☐  Percentage of Order
                          ☐  Part of Whole
                          ☐  Part of Order

**SIGNING PROVISIONS:**

In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (re)insurers.

However:

   a) in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

   b) the (re)insured may elect for the disproportionate signing of (re)insurers' lines, without further specific agreement of (re)insurers, providing that any such variation is made prior to the commencement date of the period of insurance, and that lines written "to stand" may not be varied without the documented agreement of those (re)insurers.

The signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

**WRITTEN LINES:**        As per attached

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the lead (re)insurer.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

Policy Number: (UMR) B1526PTNAM1701557

# SECURITY DETAILS

## REFERENCES

Policy No: PTNAM1701557
Market Submission Version: 30/5/2017 2
EbixExchange Version: 1.0
Date contract published to EbixExchange Marketplace: 12:00PM 30 May 2017 (GMT)
UMR (Unique Market Reference): B1526PTNAM1701557

# SIGNED UNDERWRITERS

**Lex-London a Division of AIG Europe Limited**

Jonathan McCombie

| | | | |
|---|---|---|---|
| **Written Line** | 8.50 % | **Signed Line** | 8.50 % |
| **Agreed on** | 11:42AM 31 May 2017 Greenwich Mean Time | **Effective from** | Inception |

| For and on behalf of: | % of Written Line | Written Line | Signed Line |
|---|---|---|---|
| **Lex-London a Division of AIG Europe Limited** | 100.00 % | 8.50 % | 8.50 % |
| **Bound as Slip Leader** | | | |
| *Reference:* | 87076781_2017 | | |

**Line Conditions**

Line to Stand
All contract amendments to be agreed.

# EXHIBIT IV

# ACORD® CERTIFICATE OF PROPERTY INSURANCE

DATE (MM/DD/YYYY)
10/25/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT |
|---|---|
| Aon Risk Services Central, Inc.<br>Chicago IL Office<br>200 East Randolph<br>Chicago IL 60601 USA | NAME:<br>PHONE (A/C, No, Ext): (866) 283-7122   FAX (A/C, No): (800) 363-0105<br>E-MAIL ADDRESS:<br>PRODUCER CUSTOMER ID #: 570000034159 |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED<br>Sears Holdings Corporation<br>dba Sears, Roebuck and Co.<br>Attn: Risk Management E3-219A<br>3333 Beverly Road<br>Hoffman Estates IL 60179 USA | INSURER A: AIG Europe Limited | AA112084 |
| | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

Holder Identifier : 1915

## COVERAGES    CERTIFICATE NUMBER: 570069032839    REVISION NUMBER:

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE:  Sears Store No. 1915 - Santa Rosa Mall, Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X PROPERTY | | PTNA41703557 | 06/01/2017 | 06/01/2018 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | | | | | X | EXTRA EXPENSE | $50,000,000 |
| | SPECIAL | CONTENTS | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggrega | $50,000,000 |
| | BM BAPP Ded | | | | | X | Flood - Aggregate | $50,000,000 |
| | INLAND MARINE | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | | | | | | |
| | NAMED PERILS | | POLICY NUMBER | | | | | |
| | CRIME | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; Waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CCM Puerto Rico, A CCM Group Company<br>Santa Rosa Mall, LLC, 3 Pais Caribe, LLC<br>Commercial Centers Management Realty<br>S. en C.<br>Carr. #2, Km. 7.1<br>Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Aon Risk Services Central Inc.* |

CERTIFICATE NUMBER: 570069032839

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)    The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID:    570000034159

LOC #:

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

| POLICY NUMBER | | |
|---|---|---|
| See Certificate Number:    570069032839 | | |

| CARRIER | NAIC CODE | |
|---|---|---|
| See Certificate Number:    570069032839 | | EFFECTIVE DATE: |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:  ACORD 24    FORM TITLE:   Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

| ADDITIONAL POLICIES | If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits. |
|---|---|

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | PROPERTY | | | | | |
| A | | PTNAM1701557 | 06/01/2017 | 06/01/2018 | Boiler & Machinery | Included |

ACORD 101 (2008/01)

The ACORD name and logo are registered marks of ACORD

© 2008 ACORD CORPORATION. All rights reserved.

AGENCY CUSTOMI   :   570000034159
LOC #:

*ACORD*

# ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
|---|---|---|
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |

POLICY NUMBER
See Certificate Number:   570069032839

| CARRIER | NAIC CODE | EFFECTIVE DATE: |
|---|---|---|
| See Certificate Number:   570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:  ACORD 24    FORM TITLE:  Certificate of Property Insurance

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

SPECIAL CONDITIONS / OTHER COVERAGES
rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's
further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers
Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy
with respect to the property located at the above referenced Location.

© 2008 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: 570000034159

*ACORD®*

LOC #:

## ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
|---|---|---|
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |
| **POLICY NUMBER** | | |
| See Certificate Number:   570069032839 | | |
| **CARRIER** | **NAIC CODE** | |
| See Certificate Number:   570069032839 | | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:  ACORD 24      FORM TITLE:  Certificate of Property Insurance

Property Program 6/1/17 - 6/1/18

$50,000,000 All Risk Policy Numbers:

Primary Property
ACE American Insurance Company - GPAD3739824A010 - 12% of $50M
Zurich American Insurance Company - XPP926068010 - 10% of $50M
Lloyds of London - Syndi 3000 MKL (Slip Leader) - PTNAM1701122 - 3% of $50M
*Novae Bermuda Underwriting Ltd - XR04017ADFRT - 3%of $50M
*Allied World Assurance Company, Ltd. - P003839014 - 18.33% of $50M
Lloyds of London - Synd 318 MSP (Slip Leader) - PTNAM1701562 - 7.5% of $50M
Aspen Specialty Insurance Company - PXAA52817 - 1.67% of $50M
Westport Insurance Corporation - NAP045210505 - 8% of $50M
HDI Global Insurance Company - XPD1488600 - 2.5% of $50M

Starr Companies - 5% of $50M
Starr Surplus Lines Insurance Company - SLSTPTY10966117
Chubb Custom Insurance Company - 4468121406
General Security Indemnity Company of Arizona (GSINDA) - T0234451703681
Executive Risk Specialty Insurance Company - 4468121506

Excess Property
Endurance Worldwide Insurance Ltd. (Slip Leader) - PTNAM1701564 - 2% of $50M
Lloyds of London - Synd 1414 ASC (Slip Leader) - PTNAM1701559 - 8% of $50M
Tokio Marine America Insurance Company - LCP648016706 - 4% of $50M
Liberty Mutual Fire Insurance Company - MJ2L9L426774037 - 4% of $50M
Ironshore Specialty Insurance Company - 000423108 - 2.5% of $50M
AIG Europe Ltd. - PTNAM1701557 - 8.5% of $50M

As indicated by ( * ), Aon Risk Solutions (U.S) is authorized to generate and distribute certificates in an
administrative capacity as evidence of insurance where required by clients of the Insured."

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT V

# SEARS HOLDINGS CORPORATION

October 26, 2017

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
# 7016 2070 0000 0797 8220

Commercial Centers Management
PO Box 362983
San Juan, PR 00936

Via Email: balvarez@ccmpr.com

Re:     Sears 1915
        Location: Bayamon, PR
        Date of Loss: 9/21/2017
        Type of Loss: Hurricane Maria / Wind

Dear Ms. Alvarez,

This letter is in response to your letter dated October 23, 2017 (copy enclosed).

As you are aware, the Sears building sustained extensive damage from Hurricane Maria. Northstar Recovery Services was contacted for emergency cleanup and dry-out to mitigate building damages and protect the building from further damage. Sears is currently in the process of obtaining permanent building repair proposals. Sears intends to repair the building on an expedited basis as material and labor are available. Nevertheless, it may take months for repairs to be completed and the store to open.

We agree the Lease Agreement dated September 6th, 1965, requires the Tenant to repair the building for damage or destruction by fire or other insured casualty. Sears has an insurance claim for this loss but it will take some time for insurance proceeds to be received to this loss. Please let us know what account the Landlord would like the insurance proceeds to be deposited to for building repair. Once the insurance payment is received arrangements will be made for it to be deposited with an agreed bank.

Sears District Facility Manager, Luis Almanza, is the point of contact to discuss on-site permanent building repairs, inspection and provide access to the premises. His cell phone number is (305) 725-0523

Please let us know if there is anything further at this time. As information on the cost of repairs becomes available we will advise further.

Sincerely,

Michael Lodi
Property Analyst – Risk Management
Sears Holdings Corporation
3333 Beverly Road EJ-272A; Hoffman Estates, IL 60179
Office: 847-286-2603 Email:Michael.Lodi@searshc.com

| STORE # | TYPE | LOCATION | Project MGR | Status |
|---------|------|----------|-------------|--------|
| | | | | 5/4/2018 |
| 1915 | FLS | BAYAMON, PR | BARRY BRUNSON 817 689 3108 847 254 1915 | No Change Permit Plans have been processed. District supplied, Sales Support and Office plan, complete and transmitted waiting on Planning for revised Merchandise and Sales Support Plans. Store Hazardous Materials Abatement starts 4/16/2018. Store will be abated in Quadrants per floor starting on the 2nd Floor Stock Area. Please be aware of Hazardous Materials Warning signs that will be posted in the building in the areas work is being completed. Exterior Design for Building upper level Design and Repairs request have been sent to Architect for Research and implementation into the Permit Drawings. Sandra Pechan sent a Request for Information to the District Team for Licensed Business, Cash wrap Placement and Sale Support information. This information is needed to send correct plans to the Architect. |

| Status | Status |
|---|---|
| 5/11/2018 | 5/18/2018 |

No Change.

No Change Permit Plans have been processed. District supplied, Sales Support and Office plan, complete and transmitted waiting on Planning for revised Merchandise and Sales Support Plans. Store Hazardous Materials Abatement starts 4/16/2018. Store will be abated in Quadrants per floor starting on the 2nd Floor Stock Area. Please be aware of Hazardous Materials Warning signs that will be posted in the building in the areas work is being completed. Exterior Design for Building upper level Design and Repairs request have been sent to Architect for Research and Implementation into the Permit Drawings. Sandra Pechan sent a Request for Information to the District Team for Licensed Business, Cash wrap Placement and Sale Support information. This information is needed to send correct plans to the Architect.

# EXHIBIT VI

**5% TIV**
Page 1 of 1

**Summary of Statement of Values and 5% TIV Deductible**
Sears Holdings Corporation
Hurricane Maria - Various Locations
Date of Loss - September 20, 2017

| Store Number | Sears/ Kmart | City | Square Footage | Leased or Owned | Lease Provided | Insurance Responsibility | From SOV | | | Total Insurable Value | 5% TIV | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Building | TI&B | FF&E | | Building | TI&B | FF&E | Total |
| 1915 | Sears | Bayamon | 195,774 | Own w/ Ground Lease | Yes | SHC | 16,640,790 | 978,870 | 7,815,641 | 25,435,301 | 832,040 | 48,944 | 390,782 | 1,271,765 |

SHC Maria 10.17 meeting Discussion Purposes Only.xlsx
2/4/2019



Preliminary - For Discussion Purposes Only

CONFIDENTIAL

SEARS_SantaRosaMall 00000060

Schedule 1915
Page 1 of 7

**Detail of Repair Costs - Sears #1915**
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss – September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Claim Documented | Adj. Group % Allowed to Date | Adjustment Group Allowed | Adjustment Group In Question | Adjustment Group Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/03/18 | 1915-SSR-01 | De La Torre | Interior renovations - Initial payment in accordance with Services Proposal dated March 14, 2018. 10% of service fees $19,800 and 4% IVU tax $792 | Building | Building | $ 20,592 | $ 20,592 | 100.00% | $ 20,592 | $ - | $ - | |
| 07/09/18 | 1915-SSR-02 | De La Torre | Additional Services - Exterior Façade, Renovation - Initial payment and pre-design phase in accordance with Services Proposal dated May 10, 2018. 10% of service fees $5,960 and 4% IVU tax $238 | Building | Building | 6,198 | 6,198 | 100.00% | 6,198 | - | - | |
| 08/27/18 | 1915-SSR-03 | De La Torre | Additional Services - Exterior Façade Renovation - Construction drawings - 50% of service fees $14,900 and 4% IVU tax $596 | Building | Building | 15,496 | 15,496 | 100.00% | 15,496 | - | - | |
| 01/19/18 | 1712454 | GLE | Mold assessment. Labor - $780, other expenses - $15. | EE | EE | 795 | 795 | 100.00% | 795 | - | - | |
| 04/04/18 | Contract | GLE | Asbestos Consulting and Air Monitoring | EE | Building | 25,767 | 25,767 | 100.00% | 25,767 | - | - | |
| 04/12/18 | 1803400 | GLE | Mold assessment. Labor - $915 | EE | EE | 915 | 915 | 100.00% | 915 | - | - | |
| 05/10/18 | 1804404 | GLE | Asbestos abatement monitoring - ACM Consulting. Total contract $91,875 | EE | Building | 23,999 | 23,999 | 100.00% | 23,999 | - | - | |
| 06/12/18 | 1805413 | GLE | Mold assessment. Labor - $988, other expenses - $39,292. | EE | EE | 40,279 | 40,279 | 100.00% | 40,279 | - | - | |
| 07/13/18 | 1806497 | GLE | Professional services rendered through 6/29/18 | EE | EE | 6,111 | 6,111 | 100.00% | 6,111 | - | - | |
| 10/12/17 | 2136 | IRWPR | Emergency roof repairs | EE | EE | 18,000 | 18,000 | 100.00% | 18,000 | - | - | |
| 11/15/17 | 2307 | IRWPR | Haul away 7 loads of roof debris. Total project cost - $320,000. | Building | Building | 86,400 | 86,400 | 100.00% | 86,400 | - | - | |
| 12/18/17 | 2460 | IRWPR | Upper roof - remove existing roof and install new roof and new JM TPO, install new walkway pad, haul away roof debris. Ponderosa restaurant - remove existing roof, install new JM TPO, install new walk way pads, haul away roof debris. Haul away 7 loads of roof debris. Total project cost - $320,000. | Building | Building | 115,200 | 115,200 | 100.00% | 115,200 | - | - | |
| 06/19/18 | 2798 | IRWPR | Upper roof - remove existing roof and install new roof and new JM TPO, install new walkway pad, haul away roof debris. Ponderosa restaurant - remove existing roof, install new JM TPO, install new walk way pads, haul away roof debris. Total project cost - $320,000. | Building | Building | 57,600 | 57,600 | 100.00% | 57,600 | - | - | |

SHC Maria 10.17 meeting Discussion Purposes Only.xlsx
2/4/2019


MDD FORENSIC ACCOUNTANTS

Preliminary - For Discussion Purposes Only

CONFIDENTIAL

**Schedule 1915**
Page 2 of 7

**Detail of Repair Costs - Sears #1915**
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Claim Documented | Adj. Group % Allowed to Date | Allowed | In Question | Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Contract | IRWPR | Upper Roof Repair & Café Roof Repair (Labor Only). Total project cost $320,000 | Building | Building | 60,800 | 60,800 | 100.00% | 60,800 | - | | |
| 10/24/17 | 17344-L | JM Electrical Inc. | Labor to clean and replace breakers in multiple departments | Building | Building | 3,328 | 3,328 | 100.00% | 3,328 | - | | |
| 10/09/17 | 17329-L | JM Electrical Inc. | Labor to install electrical for the A/C in computer room and replacement of damaged receptacle in refrigerator area. | Building | Building | 411 | 411 | 100.00% | 411 | - | - | |
| 10/09/17 | 17329-M | JM Electrical Inc. | Miscellaneous electrical materials | Building | Building | 152 | 152 | 100.00% | 152 | - | - | |
| 10/24/17 | 17344-M | JM Electrical Inc. | Miscellaneous electrical materials including 200 breakers, 20 AMPs and 40 absorbent cans. | Building | Building | 15,131 | 15,131 | 100.00% | 15,131 | - | - | |
| 10/27/17 | 901659711 | Johns Manville | Roofing materials - Membranes, accessories, fasteners, cement & coatings | Building | Building | 83,406 | 83,406 | 100.00% | 83,406 | - | - | |
| 10/27/17 | 901659712 | Johns Manville | Roofing materials - Polyisocyanurate foam insulation | Building | Building | 46,488 | 46,488 | 100.00% | 46,488 | - | - | |
| 02/05/18 | 901717785 | Johns Manville | Roofing materials - Ancillary fittings stainless | Building | Building | 7,565 | 7,565 | 100.00% | 7,565 | - | - | |
| | Multiple invoices | NorthStar | Emergency Remediation | EE | EE | 6,119,573 | 6,119,573 | 99.56% | 6,092,825 | - | 26,748 | Agreed adjustment |
| 01/29/18 | 7100359827 | Schindler | Labor to troubleshoot freight car. | Building | Building | 2,637 | 2,637 | 100.00% | 2,637 | - | - | |
| 07/20/18 | 7401438357 | Schindler | Furnish & Install four escalators. Original contract $677,488. Current payment $213,407 | Building | Building | 213,407 | 213,407 | 100.00% | 213,407 | - | - | |
| 12/08/17 | 4096-7546 | Stericycle | Hazardous Waste Removal - Service Date of 12/8/17 | EE | EE | 1,059 | 1,059 | 100.00% | 1,059 | - | - | |
| 04/19/18 | 4112-0339 | Stericycle | Hazardous Waste Removal - Service Date of 4/19/18 | EE | EE | 91,406 | 91,406 | 100.00% | 91,406 | - | - | |
| 01/05/18 | 254725 | Watterson | Emergency response on 10/13/17. | EE | EE | 320 | 320 | 100.00% | 320 | - | - | |
| 11/29/17 | 2984 | Wincon | Phase 1 and phase 2 services, airfare, meal money, airport parking and mileage | Building | Building | 5,189 | 5,189 | 100.00% | 5,189 | - | - | |
| 03/26/18 | 3061 | Wincon | Phase 3 services - roof consulting | Building | Building | 2,625 | 2,625 | 100.00% | 2,625 | - | - | |
| Allocated Expenses | | | Shipping costs - See details on Schedule 3 | EE | EE | 25,967 | 25,967 | 100.00% | 25,967 | - | - | |
| Allocated Expenses | | | IT - See details on Schedule 4 | FF&E | FF&E | 293,486 | 289,390 | 72.71% | 213,388 | 80,098 | | ACV allowance 75% ($71,221) and "unallocated" costs ($8,877), will be considered based on incurred for the actual store location |
| Allocated Expenses | | Simon Roofing | See details on Schedule 9 | EE | EE | 2,953 | 2,953 | 100.00% | 2,953 | - | - | |
| Allocated Expenses | | Entech, USI Cleaning Premier Transport | See details on Schedule 9 | EE | EE | 69,859 | 69,859 | 100.00% | 69,859 | - | - | |
| Subtotal Invoiced Costs | | | | | | 7,463,112 | 7,459,017 | | 7,356,267 | 80,098 | 26,748 | |



Preliminary - For Discussion Purposes Only

CONFIDENTIAL
SEARS_SantaRosaMall 00000062

Schedule 1915
Page 3 of 7

**Detail of Repair Costs - Sears #1915**
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Claim Documented | Adj. Group % Allowed to Date | Adjustment Group Allowed | Adjustment Group In Question | Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | EAB | | General Conditions - On site supervisor | Building | Building | 60,000 | 60,000 | 70.00% | 42,000 | 18,000 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | General Conditions - Dumpster for demo, fixture packaging, merchandise packaging & construction materials. | Building | Building | 12,000 | 12,000 | 70.00% | 8,400 | 3,600 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | General Conditions - Scissor lifts, Scaffolding, Constructions Rentals, Other | Building | Building | 294,767 | 294,767 | 70.00% | 206,337 | 88,430 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | General Conditions - Emergency Materials Needed for Island Temporary Repairs | Building | EE | 1,180 | 1,180 | 100.00% | 1,180 | - | - | |
| | EAB | | General Conditions - 20 weeks Sears Requirement for Project Coordinator | Building | Building | 70,000 | 70,000 | 0.00% | - | 70,000 | | Covered by Sears Project Management; provide support for incurred. |
| | EAB | | Demolition - Cinder block walls on upper level not stable, demo required. | Building | Building | 4,500 | 4,500 | 70.00% | 3,150 | 1,350 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Site Preparation - Build Back to pre-hurricane conditions for all Offices and Sales support | Building | Building | 201,675 | 201,675 | 70.00% | 141,173 | 60,503 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Site Preparation - Prepare sub floor for new flooring throughout store | Building | Building | 34,500 | 34,500 | 70.00% | 24,150 | 10,350 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Masonry - Clad Upper Section of Building to Architects Recommended Plans | Building | Building | 571,000 | 571,000 | 70.00% | 399,700 | 171,300 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Steels/Metals - Sears wall installation | Building | Building | 289,000 | 289,000 | 0.00% | - | 289,000 | - | Potential duplication with FF&E package; provide contract outlining full scope of work and cost. |
| | EAB | | Woods/Plastics | Building | Building | 8,640 | 8,640 | 70.00% | 6,048 | 2,592 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | BOJ Displays | Building | Building | 17,600 | 17,600 | 0.00% | - | 17,600 | - | Potential duplication with FF&E package; provide contract outlining full scope of work and cost. |
| | EAB | | Doors/Wind/Hardware - Replace Mall Roll Up Door | Building | Building | 41,600 | 41,600 | 70.00% | 29,120 | 12,480 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Doors/Wind/Hardware - Stockroom and Room Doors. All wood doors damaged. | Building | Building | 21,932 | 21,932 | 70.00% | 15,352 | 6,580 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Gypsum Board - All sheetrock walls demising, offices, salesfloor, etc., are abated. All new sheetrock in entire store. | Building | Building | 989,654 | 989,654 | 70.00% | 692,758 | 296,896 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Gypsum - Rebuild all Fitting Rooms to Sears standards | Building | Building | 166,400 | 166,400 | 70.00% | 116,480 | 49,920 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Acoustical Ceilings - Install all new ceiling grid & drop in panels. All selling and non-sales support areas. All ceiling and lights being removed for remediation. | Building | Building | 1,040,000 | 1,040,000 | 70.00% | 728,000 | 312,000 | - | Allowed based on MKA estimate; ACV allowance 70% |

SHC Maria 10.17 meeting Discussion Purposes Only.xlsx
2/4/2019


MDD FORENSIC ACCOUNTANTS

Preliminary - For Discussion Purposes Only

CONFIDENTIAL

SEARS_SantaRosaMall 00000063

**Detail of Repair Costs - Sears #1915**
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Claim Documented | Adj. Group % Allowed to Date | Adjustment Group Allowed | Adjustment Group In Question | Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | EAB | | Vinyl Tile (VCT) - Cove Base installation for entire store. | Building | Building | 15,620 | 15,620 | 70.00% | 10,934 | 4,686 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Vinyl Tile (VCT) - Flooring | Building | Building | 377,600 | 377,600 | 70.00% | 264,320 | 113,280 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Floor Treatment - MPU Repair | Building | Building | 41,800 | 41,800 | 70.00% | 29,260 | 12,540 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Painting - Paint all interior surface walls per design criteria. Paint store exterior to cover wind and debris damage. | Building | Building | 600,486 | 600,486 | 70.00% | 420,340 | 180,146 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Partitions - Sears Wall - Labor | Building | Building | 360,360 | 360,360 | 70.00% | 252,252 | 108,108 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Partitions - Sears Wall - Materials provided by GC | Building | Building | 120,120 | 120,120 | 70.00% | 84,084 | 36,036 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Fixture Assembly by GC - All new fixtures and counters. Nothing re-usable excluding metal frames of Maddix or Lozier in Hardlines | FF&E | FF&E | 603,520 | 603,520 | 50.00% | 301,760 | 301,760 | - | Allowed based on MKA Estimate; provide contract outlining full scope of work and cost |
| | EAB | | Stock Shelving Labor - Replace all porous surfaces abated and rework stock room | Building | Building | 187,200 | 187,200 | 70.00% | 131,040 | 56,160 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Fire Protection - New sprinkler heads throughout building per Puerto Rico code and adjustment to sprinkler height as needed for ceiling grid | Building | Building | 127,500 | 127,500 | 70.00% | 89,250 | 38,250 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Plumbing - All store restrooms will be remediated; Walls, fixtures, ceiling. Lighting total loss from water damage | Building | Building | 200,000 | 200,000 | 70.00% | 140,000 | 60,000 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | HVAC - All duct work to be replaced due to remediation and ACM abatement | Building | Building | 150,000 | 150,000 | 70.00% | 105,000 | 45,000 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Basic Electrical - Refurbish damaged lines. Reconnect electrical to replacement fixtures. Inspect and repair lines. | Building | Building | 385,661 | 385,661 | 70.00% | 269,963 | 115,698 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Emergency Lighting - All new emergency lighting | Building | Building | 12,300 | 12,300 | 70.00% | 8,610 | 3,690 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | General Lighting - All new light fixtures sales floor. | Building | Building | 356,000 | 356,000 | 70.00% | 249,200 | 106,800 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Permits/Fees | Building | Building | 88,430 | 88,430 | 70.00% | 61,901 | 26,529 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Contractor Fee | Building | Building | 294,767 | 294,767 | 70.00% | 206,337 | 88,430 | - | Allowed based on MKA estimate; ACV allowance 70% |


MDD FORENSIC ACCOUNTANTS

Preliminary - For Discussion Purposes Only

CONFIDENTIAL

SEARS_SantaRosaMall 00000064

**Detail of Repair Costs - Sears #1915**
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC ...... ..... ... ...

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Claim Documented | Adj. Group % Allowed to Date | Adjustment Group Allowed | Adjustment Group In Question | Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/05/19 | Quote SHC02052018B-01915 | NetRelevance | Infrastructure site survey - $600, cabinets & peripherals - $22,662, fiber & copper backbone - $48,373, voice & data drops - $65,250, wireless installation & survey - $76,920, hourly labor - $25,000, paging system - $49,334, lift rentals - $1,467, other - $20,000 | FF&E | FF&E | 308,607 | 308,607 | 75.00% | 231,455 | 77,152 | - | ACV allowance 75% |
| | EAB | | Other - 12% local tax on total after completion | Building | Building | 976,042 | 976,042 | 70.00% | 683,229 | 292,813 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | EAB | | Other - Watch repair / optical and key shop - complete rebuild | Building | Building | 80,451 | 80,451 | 70.00% | 56,316 | 24,135 | - | Allowed based on MKA estimate; ACV allowance 70% |
| | Quote | IRWPR | Lower Roof Replacement - Labor | Building | Building | 181,958 | 181,958 | 75.00% | 136,469 | 45,490 | - | ACV allowance 75% |
| | | IRWPR | Lower Roof Replacement - Material estimate based on 38,976 sq. ft. at $1.57/sq. ft. (equal to the upper level cost per square foot) | Building | Building | 61,047 | - | 0.00% | - | 61,047 | | Provide invoice - Materials not typically provided by IRWPR. |
| 09/19/18 | Contract | EV Mechanical Contractors | Supply and install (2) Marley Cooling Tower PVC. Fill replacement kit for (2) towers. Includes removal and disposal of existing fill material for both towers and installation of new fill material. Material $25,740, labor $13,860 and tax $4,554. | Building | Building | 44,154 | 44,154 | 100.00% | 44,154 | - | - | |
| | | Wincon | Roof consulting services, balance of contract not invoiced | Building | Building | 6,186 | 6,186 | 0.00% | - | 6,186 | - | Will be considered based on incurred |
| | | | FF&E Plan | FF&E | FF&E | 2,109,496 | 2,109,496 | 100.00% | 2,109,496 | - | - | |
| 04/19/18 | Contract | DeLa Torre - Estevez Architects | A&E for interior plans - Remaining balance of contract $206,920 not invoiced. | Building | Building | 170,832 | 170,832 | 69.72% | 119,102 | 51,730 | - | Allowance of 75%; pending receipt and review of building contract. |
| 08/19/18 | Change Order | DeLa Torre - Estevez Architects | A&E for interior plans - Remaining balance of change order $30,992 not invoiced. | Building | Building | 24,794 | 24,794 | 68.75% | 17,046 | 7,748 | - | Allowance of 75%; pending receipt and review of building contract. |
| | | | Interior Signs Labor | FF&E | FF&E | 18,800 | - | 100.00% | 18,800 | - | - | |
| | Quote | Apex | Site survey, manufacture & install (3) sets of 8ft OAH channel letters reading "SEARS", includes tax and freight. | FF&E | FF&E | 43,521 | 43,521 | 75.00% | 32,641 | 10,880 | - | ACV allowance 75% |
| 02/07/18 | Quote 020718-1 R1.1 | Spencer Technologies | Installation of IP phone system, includes software, station modules, cards, licenses and support. | FF&E | FF&E | 22,982 | 22,982 | 75.00% | 17,237 | 5,746 | - | ACV allowance 75% |
| | Quote - 6827 | Advanced Project Solutions | CCTV - Moves, Adds, and Changes | FF&E | FF&E | 197,655 | 197,655 | 75.00% | 148,242 | 49,414 | - | ACV allowance 75% |
| | Letter | Schindler | Call for passenger elevator water damage | Building | Building | 597 | 597 | 70.00% | 418 | 179 | - | ACV allowance 70% |



Preliminary - For Discussion Purposes Only

CONFIDENTIAL

SEARS_SantaRosaMall 00000065

**Detail of Repair Costs - Sears #1915**
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Claim Documented | Adj. Group % Allowed to Date | Adjustment Group Allowed | Adjustment Group In Question | Adjustment Group Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/12/18 | Contract | Schindler | Furnish & Install four escalators - Remaining balance of contract not invoiced. | Building | Building | 677,488 | 677,488 | 68.50% | 464,081 | – | 213,407 | Duplication of invoiced costs |
| | Letter | Schindler | GC work by others (estimated) | Building | Building | 37,830 | 37,830 | 70.00% | 26,481 | 11,349 | – | ACV allowance 70% |
| 09/12/18 | Contract | Schindler | New Passenger Elevator - Remove existing passenger elevator and machine room elevator equipment. Install new holeless hydraulic passenger elevator serving (3) landing. | Building | Building | 112,170 | 112,170 | 100.00% | 112,170 | – | – | |
| 06/14/18 | Contract | Schindler | Furnish & Install Freight Elevator | Building | Building | 72,829 | 72,829 | 100.00% | 72,829 | – | – | |
| | Proposal | Stericycle | Hazardous Waste PR Cleanout - Remaining balance to be invoice | EE | EE | 37,448 | 37,448 | 0.00% | – | – | 37,448 | Duplication of invoiced costs |
| | | | Extra Payroll Expense | EE | EE | 11,732 | 11,732 | 100.00% | 11,732 | – | – | |
| | | | Continuing Labor Expenses - 9/21/17 | EE | EE | 115,634 | 115,634 | 100.00% | 115,634 | – | – | |
| | | | Project Management - See details on Schedule 2 | EE | EE | 160,232 | 160,232 | 10.49% | 16,812 | 143,420 | – | Future periods not currently allowed. |

SHC Maria 10.17 meeting Discussion Purposes Only.xlsx
2/4/2019



Preliminary - For Discussion Purposes Only

CONFIDENTIAL

**Detail of Repair Costs - Sears #1915**
Sears Holdings Corporation
Hurricane Maria - Bayamon, Puerto Rico
Date of Loss - September 20, 2017
Own with Ground Lease; Duty to Insure - SHC

| Invoice Date | Invoice Number | Vendor | Description | Claimed Category | Restated Category | Claim Estimate | Claim Documented | Adj. Group % Allowed to Date | Adjustment Group Allowed | Adjustment Group In Question | Adjustment Group Disallowed | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Non-abated Rent | EE | EE | 155,417 | 155,417 | 100.00% | 155,417 | - | - | |

Subtotal Estimates and Other          13,373,714   13,293,867          9,627,857   3,495,002   250,855

Total Store 1915          $ 20,836,827   $ 20,752,884          $ 16,984,124   $ 3,575,100   $ 277,603

| Category | Claim Estimate | Documented | Restated Claim Estimate | | Adjustment Group Allowed | Adjustment Group In Question | Adjustment Group Disallowed |
|---|---|---|---|---|---|---|---|
| Building | $ 10,331,295 | $ 10,270,248 | $ 10,379,881 | | $ 7,259,844 | $ 2,906,630 | $ 213,407 |
| FF&E | 3,598,067 | 3,575,171 | 3,598,067 | | 3,073,018 | 525,049 | - |
| EE | 6,907,465 | 6,907,465 | 6,858,879 | | 6,651,263 | 143,420 | 64,196 |
| Total | $ 20,836,827 | $ 20,752,884 | $ 20,836,827 | | $ 16,984,124 | $ 3,575,100 | $ 277,603 |


MDD FORENSIC ACCOUNTANTS

CONFIDENTIAL

# EXHIBIT VII



## CCM
## PUERTO RICO
*A CCM Group Company*
PO Box 362983, San Juan, PR 00936-2983
Tel. 787-622-9600 Fax 787-277-9601

October 30, 2017

**Via email rolando.ortega@aig.com**

AIG Insurance Company Puerto Rico
Atn. Mr. Rolando Ortega
250 Muñoz Rivera, suite 500
San Juan, PR 00918

> **Re: Insurance policy number PTNAM1701557 for the Sears store located at Santa Rosa Mall, Bayamón, Puerto Rico**

Dear Mr. Ortega:

The above referenced property insurance policy covers the Sears store located at Santa Rosa Mall, and both Santa Rosa Mall, LLC and Commercial Centers Management Realty, S en C ("CCM") are Additional Insureds under the policy. For ease of reference, I enclose a copy of the Certificate of Property Insurance.

Please be advised that under Section 6.03 of the Lease Agreement, all net sums recovered for loss or damage under any applicable insurance policy must be deposited in a special account in the name of Landlord to be applied to the cost of rebuilding the premises. Under the existing Lease Agreement, Sears Holding Management Corporation ("Sears") is required to promptly and expeditiously repair the damage caused and/or rebuild the premises. Sears is aware and has agreed to fully comply with the provisions of the Lease herein discussed.

CCM formally requests to be informed as to the filing of any claim under the policy as well as the processing of the same, and that any insurance proceeds be deposited as required by the Lease Agreement.

Please contact the undersigned at balvarez@ccmpr.com to further discuss this matter and coordinate necessary arrangements regarding the foregoing.

Cordially,

Betsy Alvarez
Senior VP of Operations and Finance

c: claims.pr@aig.com

# ACORD® CERTIFICATE OF PROPERTY INSURANCE

DATE (MM/DD/YYYY)
10/25/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE, OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | | | |
|---|---|---|---|---|
| Aon Risk Services Central, Inc. Chicago IL office 200 East Randolph Chicago IL 60601 USA | PHONE (A/C. No. Ext): (866) 283-7122 | | FAX (A/C. No.): (800) 363-0105 | |
| | E-MAIL ADDRESS: | | | |
| | PRODUCER CUSTOMER ID #: 570000034159 | | | |
| | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| INSURED | INSURER A: AIG Europe Limited | | | AA112084 |
| Sears Holdings Corporation | INSURER B: | | | |
| dba Sears, Roebuck and Co. Attn: Risk Management E3-219A 3333 Beverly Road Hoffman Estates IL 60179 USA | INSURER C: | | | |
| | INSURER D: | | | |
| | INSURER E: | | | |
| | INSURER F: | | | |

**COVERAGES**     **CERTIFICATE NUMBER:** 570069032839     **REVISION NUMBER:**

LOCATION OF PREMISES/ DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

RE: Sears Store No. 1915 — Santa Rosa Mall, Bayamon, PR.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|---|---|
| A | X PROPERTY | | PTNAM1701557 | 06/01/2017 | 05/01/2018 | | BUILDING | |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | |
| | BASIC | BUILDING | | | | | BUSINESS INCOME | |
| | BROAD | CONTENTS | | | | X | EXTRA EXPENSE | $50,000,000 |
| | SPECIAL | | | | | | RENTAL VALUE | |
| | X EARTHQUAKE | | | | | | BLANKET BUILDING | |
| | X WIND | | | | | | BLANKET PERS PROP | |
| | X FLOOD | | | | | X | BLANKET BLDG & PP | $50,000,000 |
| | X ALL RISK-Subject to Exclusions | | | | | X | Earthquake - Aggregate | $50,000,000 |
| | Bld B&PP Ded | | | | | X | Flood - Aggregate | $50,000,000 |
| | INLAND MARINE | | TYPE OF POLICY | | | | | |
| | CAUSES OF LOSS | | POLICY NUMBER | | | | | |
| | NAMED PERILS | | | | | | | |
| | CRIME | | | | | | | |
| | TYPE OF POLICY | | | | | | | |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Coverage subject to the lease requirements, if any. Replacement Cost Valuation; No Coinsurance; waiver of Subrogation included; Mold Coverage Excluded; All real and personal property owned, acquired by, used by, intended for use by the insured, including real and personal property of others in the insured's care, custody or control; extra expense, contingent extra expense, rents,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CCM Puerto Rico, A CCM Group Company Santa Rosa Mall, LLC, 3 Pals Caribe, LLC Commercial Centers Management Realty S. en C. Carr. #2, Km. 7.1 Bayamón PR 00960 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Aon Risk Services Central, Inc.* |

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2015/03)     The ACORD name and logo are registered marks of ACORD

Holder Identifier : 1915

CERTIFICATE NUMBER: 570069032839

ACORD®

AGENCY CUSTOMER ID:    570000034159

LOC #:

## ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

| POLICY NUMBER | |
|---|---|
| See Certificate Number:    570069032839 | |

| CARRIER | NAIC CODE | EFFECTIVE DATE: |
|---|---|---|
| See Certificate Number:    570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

**FORM NUMBER:** ACORD 24    **FORM TITLE:** Certificate of Property Insurance

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER | |
| INSURER | |
| INSURER | |
| INSURER | |

**ADDITIONAL POLICIES**    If a policy below does not include limit information, refer to the corresponding policy on the ACORD certificate form for policy limits.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|
| | **PROPERTY** | | | | | |
| A | | PTNAM1701557 | 06/01/2017 | 06/01/2018 | Boiler & Machinery | Included |

ACORD 101 (2008/01)

The ACORD name and logo are registered marks of ACORD

© 2008 ACORD CORPORATION. All rights reserved.

**ACORD®**

## ADDITIONAL REMARKS SCHEDULE

LOC #:

Page _ of _

| AGENCY | NAMED INSURED |
|---|---|
| Aon Risk Services Central, Inc. | Sears Holdings Corporation |

| POLICY NUMBER | | |
|---|---|---|
| See Certificate Number: 570069032839 | | |

| CARRIER | NAIC CODE | EFFECTIVE DATE: |
|---|---|---|
| See Certificate Number: 570069032839 | | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: ACORD 24   FORM TITLE: Certificate of Property Insurance

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY

SPECIAL CONDITIONS / OTHER COVERAGES

rental income, leasehold interests, valuable papers, and records, accounts receivable and other coverage's
further described in the policy form.  Santa Rosa Mall, LLC, 3 Pals Caribe, LLC and Commercial Centers
Management, LLC are included as Loss Payee in accordance with the policy provisions of the Property policy
with respect to the property located at the above referenced Location.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID:   570000034159
LOC #:

# ACORD®

## ADDITIONAL REMARKS SCHEDULE

Page _ of _

| AGENCY | | NAMED INSURED |
|---|---|---|
| Aon Risk Services Central, Inc. | | Sears Holdings Corporation |
| POLICY NUMBER | | |
| See Certificate Number:   570069032839 | | |
| CARRIER | NAIC CODE | EFFECTIVE DATE: |
| See Certificate Number:   570069032839 | | |

### ADDITIONAL REMARKS

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,
FORM NUMBER: ACORD 24    FORM TITLE: Certificate of Property Insurance

Property Program 6/1/17 - 6/1/18

$50,000,000 All Risk Policy Numbers:

Primary Property
ACE American Insurance Company - GPAD3739824A010 - 12% of $50M
Zurich American Insurance Company - XPP9260068010 - 10% of $50M
Lloyds of London - Syndi 3000 MKL (Slip Leader) - PTNAM1701122 - 3% of $50M
*Novae Bermuda Underwriting Ltd - XR04017ADFRT - 3%of $50M
*Allied World Assurance Company, Ltd. - P003839014 - 18.33% of $50M
Lloyds of London - Synd 318 MSP (Slip Leader) - PTNAM1701562 - 7.5% of $50M
Aspen Specialty Insurance Company - PXAA52817 - 1.67% of $50M
Westport Insurance Corporation - NAP045210505 - 8% of $50M
HDI Global Insurance Company - XPD1488600 - 2.5% of $50M

Starr Companies - 5% of $50M
Starr Surplus Lines Insurance Company - SLSTPTY10966117
Chubb Custom Insurance Company - 4468121406
General Security Indemnity Company of Arizona (GSINDA) - T0234451703681
Executive Risk Specialty Insurance Company - 4468121506

Excess Property
Endurance Worldwide Insurance Ltd. (Slip Leader) - PTNAM1701564 - 2% of $50M
Lloyds of London - Synd 1414 ASC (Slip Leader) - PTNAM1701559 - 8% of $50M
Tokio Marine America Insurance Company - LCP648016706 - 4% of $50M
Liberty Mutual Fire Insurance Company - MJ2L9L426774037 - 4% of $50M
Ironshore Specialty Insurance Company - 000423108 - 2.5% of $50M
AIG Europe Ltd. - PTNAM1701557 - 8.5% of $50M

As indicated by ( * ), Aon Risk Solutions (U.S) is authorized to generate and distribute certificates in an
administrative capacity as evidence of insurance where required by clients of the Insured."

# EXHIBIT VIII

# FILED UNDER SEAL





467818.1



467818.1









467818.1



467818.1











████████████████████████████████████ ██

████████████████████████████████ _____

██████████ ██ ████████████████████████

████████ ██ ████████████████████████

████████████████████████ e ████████████ ████████████ ████

██████████ ██

57818.1



57818.1







467818.1

████████████████████████████ █:

By: ███████████████████████ _____

██████████: ███████████████████████

████████: ███████████████████████

██ ████████████████ e █████████ y _____ █

████████ _____

█7818.1



467818.1

467818.1

# EXHIBIT IX

## Schedule 2.1(q)

### Proceeds Properties

**INSURED: Sears Holdings
Corporation**
**POLICY TERM: 6/1/17 - 6/1/18**
**DOL: 9-20-2017**
**Loss:  Hurricane Maria, CAT 1745**
**VERICLAIM FILE NO.:**



| Market | Claim Number | Market % |
|---|---|---|

| **Total** | | **100.00%** |