**Hearing Date and Time: July 18, 2019 at 10:00 a.m. (prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.,* : | |
| : | **Case No. 18-23538 (RDD)** |
| : | |
| **Debtors.**[1] : | **(Jointly Administered)** |

------------------------------------------------------------ x

### DEBTORS' (I) OPPOSITION TO SECOND-LIEN HOLDERS' REQUESTS TO DETERMINE AMOUNT OF SECOND-LIEN SECURED CLAIMS UNDER SECTION 506(a) AND SECTION 507(b) ADMINISTRATIVE CLAIMS AND (II) REPLY IN SUPPORT OF DEBTORS' RULE 3012 MOTION TO DETERMINE THE AMOUNT, IF ANY, OF 507(b) CLAIMS AND TO SURCHARGE SECOND-LIEN COLLATERAL PURSUANT TO SECTION 506(c)

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ................................................................................................................ 8

    **A.**    Second-Lien Holders' Collateral and Related Protections .................................... 8

    **B.**    The Debtors' Going-Concern Sale Was for the Primary Benefit of the
Second-Lien Holders ............................................................................................. 9

    **C.**    Second-Lien Holders Benefited From a Sale Transaction and Would Have
Received No or Negligible Recovery in a Liquidation ...................................... 12

    **D.**    *Potential* Diminution in Value of Second-Lien Collateral ................................ 13

ARGUMENTS AND AUTHORITIES .............................................................................. 14

    **A.**    The Second Lien Holders Have Not Carried Their Burden; the Facts Show
That the Value of the Second Lien Holders' Collateral *Increased* Rather
Than Diminished ................................................................................................. 15

        **i.**    The Parties' Fair Market Value Approach ............................................... 15

        **ii.**    Notable Differences in the Parties' Approaches ...................................... 17

    **B.**    The Court Should Determine the Second Lien Holders' 507(b) Claims to
be $0. .................................................................................................................. 18

    **C.**    The Applicable 506(c) Surcharges Dwarf Any Second-Lien Diminution in
Value Resulting from *Any One* of the Various Approaches Offered by the
Second-Lien Holders' Purported Experts ........................................................... 20

        **i.**    "Primarily" Does Not Mean "Solely" ..................................................... 22

        **ii.**    Second-Lien Holders Received a Direct and Quantifiable Benefit ........... 24

        **iii.**    The 506(c) Surcharges were Reasonable and Necessary ......................... 26

        **iv.**    The Second-Lien Holders' Request for the Return of Additional
Cash Collateral Is Baseless .................................................................... 27

    **D.**    The Facts and Record in These Chapter 11 Cases Make Clear That the
Equities Support the Court Not Allowing *Any* of the Second-Lien Holders'
507(b) Claims. .................................................................................................... 28

CONCLUSION ................................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ceron*,
    412 B.R. 41 (Bankr. E.D.N.Y. 2009) ...................................................................20

*In re Compton Impressions*,
    217 F.3d 1256 (9th Cir. 2000) .............................................................................20

*In re Domistyle, Inc.*,
    811 F.3d 691 (5th Cir. 2015) ................................................................. 17, 18, 19

*Matter of Iberica Mfg., Inc.*,
    180 B.R. 707 (Bankr. D.P.R. 1995) ....................................................................20

*In re Kent Manor Inn, LLC*,
    Case No. 16-18048-TJC, 2017 WL 2267241 (Bankr. D. Md. May 23, 2017) ......18

*In re Kohl*,
    421 B.R. 115 (Bankr. S.D.N.Y. 2009) ................................................................18

*In re McLean Industries, Inc.*,
    84 B.R. 340 (Bankr. S.D.N.Y. 1988) ..................................................................18

*In re Residential Capital, LLC*,
    501 B.R. 549 (Bankr. S.D.N.Y. 2013) ................................................................13

**Statutes**

*11 U.S.C. § 506(a)* ...................................................................................... 1, 4, 13, 14

*11 U.S.C. § 507(b) and (II)*...................................................................................13

Bankruptcy Code section 503(c)(3) ........................................................................12

Bankruptcy Code section 506(c)...................................................................*passim*

Bankruptcy Code Section 507(b).................................................................*passim*

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**"), file this response in opposition to the Second-Lien Holders' requests to determine the amount of their second lien secured claims under section 506(a) and their section 507(b) administrative claims pursuant to Bankruptcy Rule 3012 ("**Response**") and reply ("**Reply**") in support of *The Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* [ECF No. 4034] ("**Rule 3012 Motion**"),[1] which includes, among other things, the Debtors' motion to surcharge the Second-Lien Holders' Collateral pursuant to section 506(c), and, in support, state the matters set forth below.

## PRELIMINARY STATEMENT

1.      Nothing has changed since the Debtors filed their Rule 3012 Motion.  The burden remains with the Second-Lien Holders to prove any diminution in value and, in this, the Second-Lien Holders have failed.  Namely, *the Second-Lien Holders' 507(b) Claims are $0*.  As the Debtors make clear in this brief:

- *First*, based upon the facts in the record or otherwise admitted by the Second-Lien Holders, the Second-Lien Holders have not carried their burden.  The facts establish as a matter of law that, under the very legal standards the Second-Lien Holders advocate, the Second-Lien Holders suffered no diminution in value of their collateral as a result of the Debtors' sale process.  Instead, and to the contrary, the Second-Lien Holders have established that their collateral *increased* in value.

- *Second*, the Court may, in its discretion, rule on the papers the parties have submitted without a hearing and simply determine that the Second-Lien Holders' 507(b) claims are $0.  There is no need for the multiple expert

---

[1]     All capitalized terms used, but not defined herein, shall have the meanings set forth in the Debtors' Rule 3012 Motion, which was deemed to be a motion pursuant to Bankruptcy Rule 3012 to determine the amount, if any, of the Second-Lien Holders' section 507(b) claims and, pursuant to section 506(c) of the Bankruptcy Code, for a surcharge upon the collateral securing those asserted claims, as set forth in the agreed *Stipulation and Order Concerning the Resolution of Certain Section 507(b) Claims* [ECF No. 4316] ("**Stipulation**").  The Debtors fully incorporate their Rule 3012 Motion, including all arguments and authorities included in the same, by reference in this Response and Reply.

reports submitted by the Second-Lien Holders, which are based on faulty assumptions, conflate the real issues and improperly invade the province of the Court on multiple fronts.[2]

- **Third**, even if the Second-Lien Holders were to prove some diminution in value of their collateral (they cannot), the applicable 506(c) Surcharges (or even a percentage of the 506(c) Surcharges) dwarf any second-lien diminution in value resulting from **any one** of the various approaches offered by the Second-Lien Holders' purported experts—a position that can be accepted by the Court based upon the calculations offered by the Second-Lien Holders' own Court filings[3] with no need to apply the Debtors' approach on Section 506(c) surcharges.

- **Fourth**, the factual record makes clear that equities of these cases support the Court not allowing **any** Section 507(b) claim for the Second-Lien Holders.

2.    The below table illustrates an easy application of the Debtors' position, without even applying a section 506(c) surcharge, which all parties stipulate[4] is fully applicable to the Second-Lien Holders under the terms of the DIP Order:

---

[2]    The Debtors expressly reserve the right to move to strike each of these "expert" reports prior to the scheduled hearing on the Motion.

[3]    *See* Exhibit 2A to Expert Report of William Henrich in Connection with Assessment of § 507(b) Adequate Protection Claims Asserted by Wilmington Trust, National Association at Exhibit J to *Request of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent for Payment of an Administrative Expense Pursuant to 11 U.S.C. § 503(a) with Priority Over All Other Administrative Expenses Pursuant to 11 U.S.C. § 507(b) and for Allowance of a Secured Claim to the Extent of Remaining Collateral Pursuant to 11 U.S.C. § 506(a)* [ECF No. 4279 – Confidential] (reflecting $206.7 million of 506(c) adjustments).

[4]    Recognizing that certain of the values are not stipulated.

| | |
|---|---|
| Total Gross Collateral (comprised of the book value of inventory and accounts receivable)[5] | $2.746 billion |
| Inventory and Accounts Receivable Purchase Price as a percentage of Book Value[6] | 85.0% |
| **Net Collateral** | **$2.334 billion** |
| (-) First Lien Debt (principal amounts, including application of approximately $34 million[7] of accrued postpetition interest) | ($1.961 billion) |
| **Remaining Collateral for Second-Lien Holders** | **$373 million** |
| **Second-Lien Holder Recovery on Account of Credit Bid[8]** | **$433.5 million** |
| **Section 507(B) Diminution in Value Claim (Before Considering the Application of Any Section 506(c) Surcharge)** | **$0[9]** |

Based upon the simple chart above, the remaining distributable collateral as of the Petition Date for Second-Lien Holders was, at most, approximately $373 million. And this number is generous.

Upon consummation of the Sale, the Second-Lien Holders received approximately $433.5 million on account of the Credit Bid, *already surpassing what Second-Lien Holders would have recovered on the Petition Date, even before consideration of any application of a 506(c) Surcharge*. Put simply, and based upon the indisputable facts, there was no diminution in value.

---

[5]     This represents the total stock ledger of the inventory and eligible credit card accounts receivable in the Week 36 Borrowing Base Certificate. This number excludes pharmacy receivables of approximately $15 million, which are not Second-Lien Collateral.

[6]     Pursuant to section 10.9 of the APA, ESL required the Company to have inventory and accounts receivables in the aggregate amount of $1.657 billion at closing. Pursuant to section 3.1(a)(1), the purchase price paid by ESL for such inventory and accounts receivables, excluding store cash and credit bid consideration, was approximately $1.408 billion, or 85.0% of the required inventory and receivables combined.

[7]     $34 million of postpetition interest is calculated assuming the non-default interest rate over a three-month period in bankruptcy.

[8]     *Common Memorandum of Law on Behalf of the Second Lien Parties: (A) in Support of Their Requests to Determine the Amount of Their Secured Claims under Section 506(a) and Their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) in Opposition to Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)* [ECF No. 4272] ("**Common MOL**") at 12 ($433,450,000).

[9]     While the Debtors submit this is the most accurate determination of the Second-Lien Holders' diminution in value claim, the Debtors have also taken into account two downside scenarios which are based on certain assumptions by the Second-Lien Holders' proffered experts. *See infra*, Arguments and Authorities, § C. Either of the alternative diminution amounts are easily dwarfed by the most incontrovertible 506(c) Surcharges set out below.

The Second-Lien Holders have already offered or stipulated to facts to prove that they are entitled to no Section 507(b) claim.

3.      The Second-Lien Holders recovered significantly more from the Debtors' chapter 11 process, including from the successful going-concern Sale and the expenses required to secure the same, than they would have recovered in a liquidation.  Griffith Supp. Decl. ¶ 6 (as defined below).  ESL was fully aware that a going-concern Sale would be far more beneficial overall, and specifically to the Second-Lien, compared to a liquidation; ESL at all times pursued a going-concern bid and then made a voluntary choice to pursue a credit bid.  If ESL believed that liquidation was more favorable to it, it did not need to credit bid.  **But ESL and all relevant Second-Lien Holders did credit bid and never favored liquidation**.  The other Second-Lien Holders[10] are not blameless.  They voluntarily signed up to an investment in the Second Lien Term Loan, Second Lien Line of Credit Facility, and the Second Lien PIK Notes that pursuant to their respective indentures, allowed a majority of noteholders to drag along the minority in a credit bid—they benefited by such provisions and have through such provisions increased their recoveries.  Further, Cyrus unilaterally chose to roll its Junior DIP Facility; no one compelled Cyrus to do so.  Yet, despite all of these facts, the Second-Lien Holders continue to want more at the expense of the Debtors' Estate and all other stakeholders even after the Debtors accepted their voluntary Credit Bid.[11]

4.      In Response to the Second-Lien Holders' assertions, the Debtors state as follows:  ***First, the Second-Lien Holders Were Not Fully Secured as of the Petition Date.***  The

---

[10]    Approximately 94% of the Credit Bid facilities (the Second Lien Term Loan, Second Lien Line of Credit Facility, and the Second Lien PIK Notes) is owned by ESL and Cyrus.  The holders of the remaining 6% of such facilities, ultimately Credit Bid their holdings pursuant to their respective indentures.  With the exception of the (subordinated) Second Lien Notes, all of the Second Lien Debt was credit bid on a pro rata basis.

[11]    The Debtors want to make clear all professional fees incurred by these estates relating to the diminution in value (if any) as raised by the Second-Lien Holders should undoubtedly be borne by the Second Lien Holders as part of the section 506(c) surchargeable expenses.

Second-Lien Holders cannot claim with a straight face—though they try—that the Second-Lien Holders were "fully secured" as of the Petition Date[12] or that the Sale "did nothing to enhance the [Second-Lien Holders'] Debt Collateral Value."[13]    Even applying conservative facts and calculations, the gross value of collateral as of the Petition Date was approximately $2.746 billion, and when applying 85% of book value (the uncontroverted value ESL paid for inventory in the Sale), the value of collateral was approximately $2.334 billion.    After deducting the senior, First Lien Debt, the remaining collateral for Second-Lien Holders was approximately $373 million, nothing close to the over $1.0 billion of Second-Lien Debt.

5.      ***The Debtors' Chapter 11 Process Was Not a Vehicle to Merely Prosecute Claims against ESL.***    Certain of the Second-Lien Holders allege that the primary objective of these chapter 11 cases was to "capture additional value for the benefit of the estates and a wide array of [the Debtors'] other creditor constituents" and investigate certain transactions involving ESL and the conduct of Eddie Lampert "in the hopes of identifying potentially valuable claims that could ultimately be brought on behalf of those prepetition unsecured creditors who might not benefit from a going concern sale."    To be clear, an investigation of ESL transactions would have been pursued regardless of the form of these cases—whether the Debtors pursued a sale or a full-scale liquidation at the outset.    To claim that these chapter 11 cases were somehow nefarious or injurious to the Second-Lien Holders who "agreed to not oppose the Debtors' agenda"[14] is absurd and wholly unsupported by the facts.    Moreover, most of the investigation (if not all of it) was

---

[12]    *See, e.g.*, *Expert Report of William Henrich in Connection with Assessment of § 507(b) Adequate Protection Claims Asserted by Wilmington Trust, National Association* [ECF No. 4279 at "Exhibit J"] ("**Henrich Report**") at 1, ¶ 1; *Supplemental Memorandum of Law on Behalf of ESL Investments, Inc. in Support of Its Requests to Determine the Amount of Its Second Lien Claims under Section 506(a) and Its Section 507(b) Administrative Claims pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge Its Collateral Pursuant to Section 506(c)* [ECF No. 4273] ("**ESL Brief**") at 1 (stating "the Second Lien Parties were over-collateralized and fully secured").

[13]    *See Expert Report of Marti P. Murray*, dated June 18, 2019 ("**Murray Report**") at 24, ¶ 62.

[14]    *See* Common MOL at 1–2.

necessary to allow ESL to voluntarily credit bid—again, something ESL voluntarily pursued, Cyrus voluntarily facilitated, and the other Second-Lien Holders voluntarily signed on to when they first made their investment.  The facts and circumstances surrounding this case—the majority of which, if not all, are undisputed—reflect the reality that the Debtors continued to explore all available strategic alternatives in an effort to maximize stakeholder value and, ultimately, the primary beneficiary of such efforts were the Second-Lien Holders.

6.      ***The Second-Lien Holders Are the Primary Beneficiaries of the Sale and These Chapter 11 Cases.***    The Second-Lien Holders cannot rewrite history to their benefit, including the indisputable fact that they were the primary beneficiaries of the Debtors' chapter 11 process and their direct benefit was significant; in fact, the chapter 11 process enhanced, not reduced, the value of the Second-Lien Holders' claims.  ESL contends that they were never the primary beneficiaries of these chapter 11 cases or even the Sale because they were "never chosen as a stalking horse bidder or provided with any of the benefits customarily provided to someone with that favored status" and similarly the process by which the Debtors reached the decision to go forward with the Sale was not directed by ESL.  ESL Brief at 2.  Again, their recollection of past events is selective; the Debtors' Restructuring Committee did not, and could not, determine ESL's initial bid (submitted on December 28, 2018) actionable, declare it a "Qualified Bid," or provide any stalking-horse bidder protections because ESL's bid was deficient in numerous and significant aspects.[15]  In fact, ESL's ongoing bids continued to be deficient and were insufficient to qualify for any stalking horse protections.  Nevertheless, the Debtors continued to work with ESL to ultimately reach the Successful Bid (as defined in the Debtors' Sale Reply)—an outcome

---

[15]     *See Debtors' Omnibus Reply in Support of the Going Concern Sale Transaction* [ECF No. 2328] (the "**Debtors' Sale Reply**") at 14–27.

6

that was a net benefit to the Estate, but also clearly a significantly positive outcome for ESL and related parties.

7.      As an outcome of the Sale, not only did ESL (via Transform) purchase substantially all of the Debtors' assets, but the Second-Lien Holders also received dollar-for-dollar value on account of the $433.5 million credit bid—providing the Second-Lien Holders with substantially *more* in recovery than they would have otherwise received if the Debtors had liquidated. Even further, as part of the Sale, the ESL Claims (as defined in the APA) were allowed in the amounts set forth on Exhibit G to the APA. Whether the minority Second-Lien Holders would have individually pursued the Credit Bid is of no moment. They gave up that right when they made a voluntary investment decision to buy the Second Lien Term Loan, Second Lien Line of Credit Facility, and the Second Lien PIK Notes. And Cyrus cannot seriously contend that it had no choice in connection with the Credit Bid; Cyrus voluntarily converted the Junior DIP Facility, full stop. Although the Debtors worked throughout the Sale process and these chapter 11 cases to maximize the value of the estates for all stakeholders, such endeavor is not mutually exclusive to, nor does such endeavor change, the fact that the primary beneficiary remains the Second-Lien Holders.

8.      In focusing on what other stakeholders received in an attempt to minimize the significance of their own recoveries, the Second-Lien Holders seek an improper windfall by discounting, in their entirety, the applicable 506(c) Surcharges that directly benefited the Second-Lien Holders. The Second-Lien Holders' proposed approach simply contradicts the applicable law and the realities of this case which, together, only further buttresses the zero-dollar recovery for Second-Lien Holders' 507(b) Claims.

9.      In support of the Debtors' Response and Reply, the Debtors will rely on the following declarations, each dated and filed contemporaneously herewith and incorporated by reference in full:

- The Declaration of Brandon Aebersold, Managing Director at Lazard Frères & Co. LLC, the Debtors' investment banker (the "**Aebersold Decl.**"); and

- The Declaration of Brian Griffith, Managing Director at M-III Advisory Partners, LP, the Debtors' restructuring advisor (the "**Griffith Suppl. Decl.**").

## BACKGROUND

### A.      Second-Lien Holders' Collateral and Related Protections

10.     As of October 15, 2018 (the "**Petition Date**"), there was approximately $1.078 billion in outstanding Second-Lien Debt. *See Declaration of Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes*, dated May 26, 2019 ("**Griffith Decl.**") at Exhibit A.  As noted in their Common MOL, the Second-Lien Holders hold the majority of the Second-Lien Debt.  Common MOL at 8.  The remaining $89 million in Second Lien Notes is subordinated to the Second Lien Term Loan, Second Lien Line of Credit Facility, and the Second Lien PIK Notes.  It is undisputed that Second-Lien Holders are subject to the Intercreditor Agreement and subordinate to all senior, First-Lien Debt. *See Notice of Filing DIP Intercreditor Agreement* [ECF No. 892] ("**Intercreditor Agreement**") Exhibit 1 at 12–14. Pursuant to such Intercreditor Agreement, all First-Lien Debt (including for the avoidance of doubt the Standalone L/C Facility and First Lien Letters of Credits (the "**Letters of Credit**")) must be paid before any payments can be made on account of the Second-Lien Debt. *Id.*

11.     It is also undisputed that, upon entry of the Sale Order, certain ESL Claims (as defined in the APA) in the amounts as scheduled on Exhibit G to the APA were allowed.

12.     As of the Petition Date, the total gross Prepetition Second Lien Collateral (as defined in the Final DIP Order) was valued at approximately $2.746 billion.  *See* Griffith Suppl. Decl. ¶ 7 at Ex. A.

13.     In exchange for the Debtors' use of cash collateral and priming of the Second-Lien Debt, the Debtors granted the Second-Lien Holders an adequate protection package, including certain section 507(b) superpriority claims "to the extent of the aggregate net diminution in value of their interests in the [Collateral]" in the Final DIP Order, which was entered by the Court on November 30, 2018.  Final DIP Order § O(i), ¶ 18(d).

**B.     The Debtors' Going-Concern Sale Was for the Primary Benefit of the Second-Lien Holders**

14.     Before filing these chapter 11 cases, it was unknown to the Debtors and their various stakeholders, including the Second-Lien Holders, if or how the Collateral would be used during the Debtors' chapter 11 process.  As the Court will recall, as of the Petition Date, the Debtors contemplated, among other things, a going-concern sale, recapitalization, reorganization, and orderly wind-down.  *See Declaration of Brandon Aebersold* dated February 1, 2019 [ECF No. 2335] ("**Aebersold Sale Decl.**") at ¶ 10.  Despite all parties recognizing that a single, going-concern sale transaction for all or substantially all of the Debtors' businesses would be value-maximizing, a going-concern sale was far from certain and would be understandably difficult to achieve.[16]  *See* Aebersold Sale Decl. at ¶ 11.

15.     The Debtors ultimately decided to proceed with and consummated the Sale. However, the Sale was never a foregone conclusion.  The Debtors began their chapter 11 cases

---

[16]   *See generally*, the Debtors' Rule 3012 Motion at 6 (citing *Declaration of William L. Transier* [ECF No. 2341] ("**Transier Decl.**") ¶¶ 17–18, 22–38; Griffith Decl. ¶ 5; and *Supplemental Objection of the Official Committee of Unsecured Creditors of Sears Holdings Corp., et al. to Debtors' Motion for Approval of Global Bidding Procedures* [ECF No. 729] ¶ 2).

seeking authority to immediately conduct going-out-of-business sales at closing stores, and continued to conduct such sales and store closings while considering other strategic alternatives. *See Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* [ECF No. 3].  The Debtors also engaged in a thorough and public sale process, seeking indications of interest not only for the business as a going concern but also parts or divisions of the businesses, real estate, and liquidator bids.  Aebersold Decl. ¶ 10; *see* Aebersold Sale Decl. ¶ 17.  In fact, throughout the Sale process, the Debtors pivoted their focus numerous times to a proposed liquidation[17] and at each such juncture, there was no louder proponent for the Sale than ESL—the largest Second-Lien Holder.

16.     Specifically, on or around January 7, 2019, ESL's counsel sent a letter directly to the Board of Directors of Sears Holdings Corporation (the "**Board**"), entitled "Re: Going Concern Sale/Liquidation," demanding that the Board "immediately override the decision of the Subcommittee of the Restructuring Committee of the Board (the "Subcommittee") to reject ESL's improved going concern bid referred to below to prevent an imminent breach of fiduciary duties."  *See* Exhibit C to Aebersold Decl., ¶ 22 (the "**ESL January 7 Letter**").  The ESL January 7 Letter goes on to state that, "Quite simply, it would be a terrible tragedy if Sears were to liquidate."  *Id.*  ESL's view was that rejection of its going-concern proposal would guarantee that the Debtors' largest creditor, ESL, would "receive a materially lower recovery on its claims than if the January 7 proposal were accepted."  *Id.*  The ESL January 7 Letter alleges that rejecting ESL's going-concern sale bid in favor of a liquidation alternative would be a violation of the Board's fiduciary duties to maximize value for the estates, as well "the very real duties that the

---

[17]    *Id.* (citing Transier Decl., ¶¶ 21–31).

Board and the Subcommittee owe to ESL and to Cyrus" as the Debtors' largest senior secured creditors. *Id.*

17.     ESL made it very clear from the beginning of these cases that their stated preference was a going-concern sale and that no other alternative was acceptable.  For example, on or around October 31, 2018, counsel for ESL sent a letter to Weil seeking "the prompt cooperation of the Debtors and their advisors in connection with ESL's ongoing efforts to help arrange for DIP financing and a going-concern bid for "substantially all the Debtors' assets" and expressing the view that a going-concern sale was "the best way for the Debtors to maximize the value of the estates." *See* Exhibit A to Aebersold Decl., ¶ 22 (the "**ESL October 31 Letter**"). There is no mention in ESL's October 31 Letter of a potential liquidation alternative.  *Id.*

18.     On or around November 2, 2018, counsel for ESL again sent a letter to Weil restating "its intention to pursue a going concern bid for substantially all of the Debtors' assets . . . represent[ing] Sears' best chance for maximizing value for the estates, while also preserving jobs for thousands of working people." *See* Exhibit B to Aebersold Decl., ¶ 22 (the "**ESL November 2 Letter**").  The ESL November 2 Letter further cautioned the Debtors against any further store liquidations, because "the Debtors' priority should be preserving the Debtors' going concern value through at least December 15" and there was "no economic or business justification to begin further liquidation sales prior to the going concern bid deadline." *Id.*

19.     Undoubtedly, the initial pursuit of a going-concern sale and the continued effort to consummate a going-concern transaction was at the behest of ESL, supported by Cyrus and with the ability to drag along the minority Second-Lien Holders.  For ESL and Cyrus to now attempt to rewrite history is disingenuous at best.

20.     Importantly, the ultimate Sale process, like these chapter 11 cases, was run expeditiously; monitored closely with respect to what costs and expenses were incurred (i.e., all costs were necessary and reasonable); and mitigated the larger, more substantial costs to stakeholders that would be attributable to a liquidation.  Griffith Suppl. Decl. ¶ 22.  Further, all expenditures were made to preserve the value of the collateral eventually sold pursuant to the APA. *Id.* ¶ 20.  Overall, the successful Sale minimized claims and maximized recovery for the Second-Lien Holders.  *Id.* ¶ 23.

**C.     Second-Lien Holders Benefited From a Sale Transaction and Would Have Received No or Negligible Recovery in a Liquidation**

21.     The Debtors' decision to ultimately pursue the Sale was made, in part, because the Debtors' creditors would receive greater recoveries than would be provided for by any other practically available alternative, including, specifically, a wind-down or liquidation of the business.  *See* Aebersold Sale Decl. at ¶ 40.  The Second-Lien Holders' recovery, as the Debtors' largest senior secured creditors, was of course an important consideration, and they particularly benefitted from the Sale.

22.     Had there been an immediate liquidation on the Petition Date, the Letters of Credit would have been drawn or fully cash collateralized and the Second-Lien Holders would have received zero recovery as a secured creditor on account of their Collateral.  *See* Griffith Suppl. Decl. ¶¶ 7–11, 13.  In the context of a full-scale retail liquidation, the margins in a fire sale would have been low; among other things, inventory would flood the market, the Debtors would face significant challenges associated with contraction and vendor flight, and the Debtors would be unable to collect certain receivables.  *Id.* ¶ 9.  Additionally, the Debtors likely would have lost a significant portion of both their senior management and store-level employees.  *Id.* ¶ 10.  The exodus of institutional knowledge would lead to less efficient inventory management, higher

12

inventory shrinkage, and significant logistical challenges. *Id.* It is also unlikely the Debtors' other assets—such as real estate or its stand-alone businesses—would have been sold or liquidated in a way that maximized value. *Id.* Finally, chapter 7 distributions are typically subject to U.S. Trustee fees of up to 3%, thereby further diminishing creditor recoveries. *Id.*

23.    ESL, the largest Second-Lien Holder, already has admitted that, if Sears were to liquidate, there would be an "attendant loss of tens of thousands of jobs and enormous value." *See* ESL January 7 Letter. To be sure, while all of the Debtors' stakeholders benefited from the going-concern sale, the largest beneficiary by far was undoubtedly ESL. *See* Griffith Suppl. Decl. ¶ 23.

24.    Further, had the Debtors liquidated at *any* time subsequent to the Petition Date, including in January or February 2019, the Second-Lien Holders would have had a similar result (of minimal to no recovery) because the applicable 506(c) Surcharges would have applied directly to the Second-Lien Holders' Collateral given that the senior lenders [First-Lien Lenders] had valid 506(c) waivers. *See* Final DIP Order ¶ 44. Simply put, *all* expenses associated with a liquidation of the Collateral would come directly out of the Second-Lien Holders' pockets and would wipe out any potential recovery, *even if* there was some value available in excess of what was owed to the First-Lien Lenders. *Id.* By successfully consummating the Sale, the Debtors avoided those additional liquidation expenses and were able to deliver significant value to the Second-Lien Holders, including in the form of a 100% recovery on their credit bid. Griffith Suppl. Decl. ¶ 10.

D.    *Potential* **Diminution in Value of Second-Lien Collateral**

25.    The gross book value of the Collateral as of the Petition Date was $2.746 billion. *Id.* ¶ 7. The value of the Second-Lien Holders' Collateral for purposes of determining any *potential* diminution in value is most accurately reflected by the ultimate recovery

from the sale of the Collateral. *Id.* Pursuant to section 10.9 of the APA, ESL required the Company to have inventory and accounts receivable in the aggregate amount of $1.657 billion[18] at consummation of the Sale. *See id.* The purchase price paid by ESL for such inventory and accounts receivable, excluding store cash and credit bid consideration, was approximately $1.408 billion, or 85% of the required inventory and receivables combined. *Id.* After applying the 85% of book value, the net collateral would be approximately $2.334 billion, and after deducting the amount of First Lien Debt, the Second-Lien Holders could share in approximately $373 million of remaining Collateral. *Id.* With the Second-Lien Holders receiving approximately $433.5 million on account of the Credit Bid, there is no diminution in value. *Id.* And as stated previously, the distributable value to the Second-Lien Holders in a liquidation (or even an orderly liquidation) would be minimal or non-existent and would reflect a far lower percentage of book value (e.g., the price of inventory would be lower due to fire sales). *See id.* ¶¶ 8–11.

## **ARGUMENTS AND AUTHORITIES**

26.     Regardless of the approach taken by the Debtors or ***any one*** of the Second-Lien Holders upon application of the 506(c) Surcharges that were intended to (and ultimately did) directly benefit the Second-Lien Holders from any potential recovery attributable to 507(b) Claims, there is a huge deficit and, therefore, no resulting value for the Second-Lien Holders' asserted 507(b) Claims. *Id.* ¶ 19. Moreover, according to section 503(c)(3) of the Bankruptcy Code, "[n]otwithstanding subsection (b), there shall neither be allowed, nor paid – (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case." Here, where the facts indisputably support the conclusions that (1) when valuing the Collateral in the hands of the Debtors and the "proposed disposition or

---

[18]     Section 10.9 of the APA requires delivery of an aggregate $1.657 billion of Acquired Inventory, Credit Card Accounts Receivable, and Pharmacy Receivables (which includes pharmacy scripts).

use of the Collateral," there is no diminution in value; (2) the Second-Lien Holders recovered significantly more from the Debtors' chapter 11 process, including from the successful going-concern Sale and the expenses required to secure the same than they would have recovered in a liquidation; and (3) the Second-Lien Holders were the primary beneficiaries of these chapter 11 cases and, more specifically, the Sale process in which the Second-Lien Holders voluntarily Credit Bid and Cyrus rolled its Junior DIP Facility, the facts and circumstances do not support *any* additional payments for claims on account of the Second-Lien Debt. *See id.* ¶¶ 6, 23.

A.    **The Second Lien Holders Have Not Carried Their Burden; the Facts Show That the Value of the Second Lien Holders' Collateral *Increased* Rather Than Diminished.**

27.    To recover on an adequate protection claim, a secured creditor "must show that the aggregate value of [its] collateral diminished from the Petition Date to the Effective Date." *In re Residential Capital, LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013).  As shown below, the Second-Lien Holders cannot meet their burden of proving any substantial diminution in value.  By virtue of the Credit Bid, the Second-Lien Holders already recovered more than they would as of the Petition Date (with a generous 85% of book value).  Even, however, in a scenario in which the parties calculated the value of collateral as of the Petition Date and effective date (applying the same 85% of book value, as is required by the case law cited above in this paragraph), any diminution in value is eclipsed by an applicable 506(c) Surcharge.

*i.    The Parties' Fair Market Value Approach*

28.    It is significant that the Second-Lien Holders, collectively, agree with the Debtors that the most appropriate (and yet conservative) methodology to value any 507(b) Claims under these circumstances is the fair market value of the Collateral in the hands of the Debtors at

the Petition Date.[19]  *Cf.* Common MOL at 17 *with* Griffith Decl. ¶ 13.  The Debtors applied that

same fair-market methodology to the Collateral at the Effective Date.  *Id.*  While the Second-Lien

Holders' positions are generally silent on that second "goalpost" of the analysis, only noting

generally that there will be minimal to no assets available for recovery at the Effective Date,[20]

Wilmington Trust argues (without **any** support) that "[s]uch a methodology would always deny

the secured creditor a claim for diminution in value of its collateral."  *See* Wilmington Trust Brief

at 14.  This uncorroborated, conclusory statement, however, contravenes controlling precedent and

common sense.  Setting aside that the diminished inventory and the Credit Bid are the true

kryptonite to the Second-Lien Holders' diminution in value claim here, section 506 is clear that

the valuation should be informed by "proposed disposition of the collateral."   11 U.S.C.

§ 506(a)(1); *In re Residential Capital, LLC*, 501 B.R. at 592.

        29.     Accordingly, the Debtors valued the Collateral at 85% of book value—an

amount which reflects the value that was ultimately recovered on the Collateral at the Sale—at

both the Petition Date and the Effective Date.  Griffith Decl. ¶¶ 14–15; *see also id.* at Ex. A.  After

accounting for the pay down of the First-Lien Debt and taking into account the Debtors' use of

cash collateral post-Sale, there is no diminution in value.  *Id.*

---

[19]   While Wilmington Trust makes a misplaced argument that the *Debtors* attempt to use a liquidation value, the
Debtors' analysis demonstrates the precise opposite.  *Cf.* Debtors' Rule 3012 Motion at ¶¶ 37–39 *with
Supplemental Memorandum of Law of Wilmington Trust, National Association, as Indenture Trustee and
Collateral Agent, (I) in Support of Motion Pursuant to Bankruptcy Rule 3012 for Determination of Amount of
Secured Claim Pursuant to 11 U.S.C. § 506(a) and Amount of Claim Entitled to Priority Pursuant to 11 U.S.C.
§ 507(b) and (II) in Opposition to Debtors' Motion Pursuant to 11 U.S.C. § 506(c)* [ECF No. 4280] ("**Wilmington
Trust Brief**") at 8.

[20]   *See Expert Report of David M. Schulte in Support of Supplemental Memorandum of Law on Behalf of ESL
Investments, Inc. in Support of Its Requests to Determine the Amount of Its Second Lien Claims under
Section 506(a) and Its Section 507(b) Administrative Claims pursuant to Bankruptcy Rule 3012; and in
Opposition to the Debtors' Motion to Surcharge Its Collateral Pursuant to Section 506(c)* [ECF No. 4286]
("**Schulte Report**") at 14; Murray Report at 35.

### *ii.    Notable Differences in the Parties' Approaches*

30.    Cyrus took a somewhat different position and used different NOLV values to calculate a range of values.  *See* Murray Report at ¶ 14.  This resulted in a purported 507(b) Claim totaling between approximately $492 million and $1.035 billion.  *Id.* at ¶ 17.

31.    Wilmington Trust did not use an NOLV but, rather, applied a mark-up to the cost of inventory and deducted approximately $207 million, including certain corporate overhead expenses and $51 million of professional fees as a 506(c) Surcharge, resulting in a diminution in value of $718 million.

32.    ESL also takes an approach that differs markedly from that of the Debtors by improperly attempting to ignore the $50 million ESL Cap and claiming a diminution in value of over $500 million.  ESL's assertion that "the APA expressly allowed ESL's Section 507(b) Claims for all other purposes" beyond ESL's (a) "rights to recover proceeds from litigation over [claims against ESL and Eddie Lampert]" and (b) "limited" rights to recover "proceeds from other litigation claims asserted by the Debtors" is misplaced and contradicts the express, unambiguous terms of the parties' agreement as memorialized in the APA.  ESL Brief at 3 (citing APA § 9.13(c); Auction Tr. 74:4-16, Jan 15 2019 (S. O'Neal speaking)).  Section 9.13(c) of the APA states, in pertinent part:

> [A]ny ESL Claim arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of ***not more than $50 million from the proceeds of any Claims or causes of action of the Debtors or their estates other than the [Specified Causes of Action]***[21] . . . . (emphasis added).

---

[21]    "**Specified Causes of Action**" means, collectively, "any Claims or Causes of Action of the Debtors or their Estates related to Lands' End, Inc., the "spin off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), any Claim or Cause of Action involving any intentional misconduct by ESL (as defined in the Asset Purchase Agreement), or the proceeds of any of the foregoing . . . ."  Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors § 1.165, dated May 28, 2019 [ECF No. 4041].

That section further explains that for any ESL 507(b) Claims in excess of $50 million, such claims "shall be treated as an unsecured claim and receive pro rata recoveries with general unsecured claims other than the [Specified Causes of Action]." *Id.*

33.    Thus, as expressly conveyed by the APA, ESL's 507(b) Claims are entitled to distributions, capped at $50 million (with any excess 507(b) Claim being treated as an unsecured deficiency claim), from the proceeds of any claims or causes of action of the Debtors or their estates *other than* the Specified Causes of Action (i.e., the Other Causes of Action (as defined in the Plan)). This means ESL can *only* recover any potential 507(b) Claim amounts from the proceeds of Other Causes of Action, and only up to $50 million, maximum. *See id.*[22] Regardless of the ultimate diminution in value, ESL's 507(b) Claim is capped at $50 million.

## B.    The Court Should Determine the Second Lien Holders' 507(b) Claims to be $0.

34.    As explained in the Debtors' Rule 3012 Motion, the Second-Lien Holders have benefited immensely from the Debtors' chapter 11 process. Rule 3012 Motion at 3. There can be no question that this process has *enhanced* the value of their claims. *Id.* Specifically, the value received by the Second-Lien Holders by virtue of the $433.5 million Credit Bid provided the Second-Lien Holders with $433.5 million *more* recovery than they would have received had the Debtors liquidated at the outset of these cases. The Second-Lien Holders, including and especially ESL, not only received a dollar-for-dollar recovery on their credit bid, they also benefited from the Sale—effectively buying the company and its assets *and* receiving recoveries on account of other claims held in these chapter 11 cases. *See* Apr. 18, 2019 Hr'g Tr. ("**Hr'g Tr.**") at 97:13-14 ("[THE COURT:] [ESL got] what it wanted. So it's hard to argue [it was] diminished."). Accordingly, to allow the Second-Lien Holders to recover anything on their 507(b)

---

[22]    *See generally, Response of the Restructuring Subcommittee to the Objections of ESL Investments, Inc. and the Official Committee of Unsecured Creditors* [ECF No. 4039].

Claims would give them an enormous windfall and, moreover, would deal a catastrophic and inequitable blow to the other stakeholders in these cases given the facts and circumstances.

35.     Under these circumstances, the Court should determine the value of the Second-Lien Holders' 507(b) Claims at $0. *See In re MacDonald*, 128 B.R. 161, 164–65 (Bankr. W.D. Tex. 1991) ("Courts have . . . assumed that the estimation process in Section 502(c) may be equally employed for estimating post-petition claims, when necessary to avoid delaying the administration of the bankruptcy case (especially when it comes to the confirmation process.") (emphasis added) (internal citations omitted); *see also* Hr'g Tr. 22:8–13 and 22:19–20 ("[THE COURT:] [I]t's a lot easier to decide at this point . . . that should be a much easier process."). The value of the Second-Lien Holders' collateral is, as the Court itself has acknowledged, evident in the sale price. *See* Hr'g Tr. 22:20-21. The Debtors had thus hoped to avoid extensive discovery, voluminous expert reports, and dueling valuations and, in so doing, preserve limited Estate resources. It was not to be, however. The Second-Lien Holders have sought to turn what should be a straightforward exercise—and one well within this Court's discretion and authority—into a convoluted, costly, and time-consuming battle of the experts, all at the expense of the Debtors and their stakeholders.

36.     The Second-Lien Holders' efforts cannot avail them. The governing law is clear that the Court may determine the value of the Second-Lien Holders' 507(b) Claims,[23] and the facts show that the Court should determine them to be $0. *See generally* Griffith Suppl. Decl. Such a result would ensure efficient administration of the Estate in the best interests of all parties.

---

[23]    *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007) (Bankruptcy courts have broad discretion in estimating claims "so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization must be accomplished quickly and efficiently.").

C.     **The Applicable 506(c) Surcharges Dwarf Any Second-Lien Diminution in Value Resulting from *Any One* of the Various Approaches Offered by the Second-Lien Holders' Purported Experts.**

37.     Even assuming the Second-Lien Holders' Collateral has diminished in value to the greatest amount legitimately asserted by the Second-Lien Holders, such diminution is fully eclipsed by the applicable 506(c) Surcharges or some percentage of the same—all of which were necessary, reasonable, incurred before the Sale, and to the direct and primary benefit of the Second-Lien Holders.  Griffith Decl. ¶ 17; Ex. A; *see also* Griffith Suppl. Decl. ¶¶ 18–19.  As explained in the Debtors' Rule 3012 Motion and below, to wholly ignore the reasonable and necessary expenses that were incurred by the Debtors through the Sale for the primary benefit of the Second-Lien Holders—as the Second-Lien Holders attempt to do—would result in an improper, inequitable windfall.  *See In re Domistyle, Inc.*, 811 F.3d 691, 696 (5th Cir. 2015) ("A secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost.") (internal quotation marks and citations omitted).

38.     To put this in context, listed below are two potential downsides which demonstrate potential 507(b) Claims due to the Second-Lien Holders:

\* \* \*

*Remainder of page intentionally left blank*

\* \* \*

20

| | *Debtors' Calculation* | *Downside 1* | *Downside 2 (using Tigers' pharmacy script valuation)* |
|---|---|---|---|
| Total Gross Collateral (comprised of the book value of inventory and accounts receivable) | $2.746 billion | $2.746 billion | $2.746 billion |
| Inventory and Accounts Receivable Purchase Price as a percentage of Book Value[24] | 85.0% | 85.0% | 85.0% |
| **Net Collateral** | **$2.334 billion** | **$2.334 billion** | **$2.334 billion** |
| (-) First Lien Debt (principal and approximately $34 million[25] of accrued postpetition interest) | ($1.961 billion)*  <br><br>• Adds $34M of interest expense | ($1.792 billion)**  <br><br>• Adds $34M of interest expense  <br>• Removes approximately $169 million on account of cash, prescription lists, and pharmacy receivables  <br>• $86m – Debtors' cash number as the beginning balance in the DIP Budget. In a liquidation scenario, the Debtors believe this cash would not be available.  <br>• $11m – pharmacy receivables  <br>• $72M – scripts | ($1.837 billion)**  <br><br>• Adds $34M of interest expense  <br>• Removes approximately $124 million on account of cash, prescription lists, and pharmacy receivables  <br>• $86m – Debtors' cash number as the beginning balance in the DIP Budget. In a liquidation scenario, the Debtors believe this cash would not be available.  <br>• $11m – pharmacy receivables  <br>• $27M – scripts; based on the same Tiger appraisal the Second-Lien Holders reference for their inventory valuations |
| **Remaining Collateral for Second-Lien Holders** | **$373 million** | **$542 million** | **$497 million** |
| **Second-Lien Holder Recovery on Account of Credit Bid** | **$433.5 million** | **$433.5 million** | **$433.5 million** |
| **Section 507(B) Diminution in Value Claim (Before Considering the Application of Any Section 506(c) Surcharge)** | **$0** | **$108.5 million** | **$63.5 million** |

---

[24]  Pursuant to section 3.1(a)(1) of the APA, ESL required the Company to have inventory and accounts receivables in the aggregate amount of $1.657 billion at closing. The purchase price paid by ESL for such inventory and accounts receivables, excluding store cash and credit bid consideration, was approximately $1.408 billion, or 85.0% of the required inventory and receivables combined.

[25]  $34 million of postpetition interest is calculated assuming the non-default interest rate over a three-month period in bankruptcy.

Any of these potential 507(b) amounts are more than dwarfed by any reasonable 506(c) Surcharge in this case.

39.    As recognized by the Second-Lien Holders, section 506(c) of the Bankruptcy Code allows the Debtors to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." *See* 11 U.S.C. § 506(c); Common MOL at 19. Courts allow debtors to recover 506(c) Surcharges if, among other things, such expenses ***were necessary, reasonable, and of direct and primary benefit to the secured creditor***. *See In re McLean Indus., Inc.*, 84 B.R. 340, 350 (Bankr. S.D.N.Y. 1988); *In re Kohl*, 421 B.R. 115, 123 (Bankr. S.D.N.Y. 2009) ("A secured creditor is interpreted as having received a benefit if the expense preserved the value of its collateral."). Most importantly, 506(c) Surcharges can be deducted from asserted 507(b) adequate protection claims. *See In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2nd Cir. 1998) (noting in a discussion of § 506(c) and § 507(b) that while the Bankruptcy Code "takes the concept of adequate protection very seriously," a secured creditor's interest can still be diminished "to the extent that the expense granted priority directly confers a benefit on the secured creditor").

### *i.    "Primarily" Does Not Mean "Solely"*

40.    Where the Second-Lien Holders misunderstand or, worse, mischaracterize section 506(c) is in their lengthy, repeated argument that the 506(c) Surcharges do not apply because the fees were "also for the benefit of the estates, and accordingly cannot be charged to the Second Lien Parties." *See* Common MOL at 21 (emphasis added). But that is not the test. "Primarily" for the Second-Lien Holders' benefit does not mean "solely" in this context. *See, e.g., Sw. Sec., FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 698 (5th Cir. 2015) (quoting *PSI, Inc. v. Aguillard (Matter of Senior—G&A Operating Co.)*, 957 F.2d 1290, 1300 (5th Cir. 1992))

("reject[ing] the creditor's argument that primarily means solely with a common-sense explanation: the 'very fact that [the secured creditor] received 59.5% of the production rendered the workover expenses 'primarily' for its benefit'"); *In re Kent Manor Inn, LLC*, Case No. 16-18048-TJC, 2017 WL 2267241, at *5 (Bankr. D. Md. May 23, 2017) (finding that the "direct and quantifiable benefit" element was met where the going concern sale generated more recoveries as a whole, including that the secured creditor received more through the same than it would have been paid through a foreclosure); *cf*. Common MOL at 19 (citing *Flagstaff I*, 739 F.2d at 75 (refusing to allow professional fees that benefited "the debtor or other creditors" rather than the secured creditor)).

41.    Put simply, "[t]he possibility at the time the expenses were incurred that they could also benefit other creditors does not render [the] surcharge unavailable." *In re Domistyle, Inc.*, 811 F.3d at 698. There is no dispute here that **all** creditors, including the Second-Lien Holders, benefited from the Sale. *See, e.g.*, Common MOL at 12; ESL Brief at 3 and 8. Importantly, the majority of time spent during these chapter 11 cases, at the behest of ESL and, to an extent, Cyrus, was in pursuit of the Sale Process, and during the Sale process itself the Debtors spent significant time working with the Second-Lien Holders and determining how to make their bid actionable, to thereby increase their (and other Second-Lien Holders') recovery, which it did.

42.    Throughout the Sale and Restructuring Process, ESL was the primary party that expressed interest in a going-concern sale. *See* Aebersold Decl. ¶ 23. If not for the existence of ESL as a potential going-concern buyer and the strong views expressed and actions taken by certain Second Lien Parties during the Sale and Restructuring Process in support of a going-concern sale and against liquidation, then the rationale for maintaining the enterprise would

have been substantially removed and the only likely viable option would have been the immediate pursuant of a wind down.  *Id.*

### *ii.* *Second-Lien Holders Received a Direct and Quantifiable Benefit*

43.     There can be no doubt but that the Debtors and their Restructuring Committee, with advice and assistance from their advisors, ran a thorough and competitive Sale and Restructuring Process.  Aebersold Decl. ¶¶ 10-21. The benefits received by the Second-Lien Holders from such a Sale process, including the expenses incurred in connection with the same, were not hypothetical or possible—the Second-Lien Holders received a direct and quantifiable benefit in the form of 100% dollar-for-dollar recovery on their credit bid.  *Cf.* Common MOL at 20 (citing *Gen. Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*, 762 F.2d 10, 12 (2d Cir. 1985) for the proposition that the burden is not met by hypothetical or possible benefits). Moreover, as part of the Sale, the Debtors agreed to allow certain of the ESL Claims in the amounts as scheduled in Exhibit G to the APA.  Neither of these tangible benefits would have occurred but for the Sale or these chapter 11 cases.

44.     Ignoring the entire Sale process run for ESL's and ultimately the Second-Lien Holders' benefit, ESL and Cyrus—the two largest beneficiaries in the Sale—now claim they were not the primary beneficiaries of the 506(c) Surcharges.  As discussed, throughout the Sale process, the Debtors pivoted their focus numerous times to a proposed liquidation and at each such juncture, there was no louder proponent for the Sale than ESL—the largest Second-Lien Holder. Transier Decl., ¶¶ 21–31.  During this time, the Debtors incurred significant expenses in preserving the going-concern value based on ESL's representations.  Indeed, between December 28, 2018, ESL's first bid, and Closing, the Debtors spent approximately $527 million—net of GOB expenses and professional fees—to preserve the value of the going-concern enterprise and the collateral

24

while ESL pressured the Debtors' to continue negotiating and avoid a pivot to liquidation.  Griffith Suppl. Decl. ¶ 25.

45.    Further, as set forth in the Griffith Supplemental Declaration, the Second-Lien Holders were the primary beneficiaries of over $254 million—again, net of GOB expenses and professional fees—in necessary expenses incurred between the Effective Date and the Closing of the APA to support the "continued operation of the [D]ebtors' business."  *In re Strategic Labor, Inc.*, 467 B.R. 11, 23 (Bankr. D. Mass. 2012) (surcharging compensation and benefits to management team through the sale date when "it [was] clear that the continued operation of the debtor's business was a prerequisite to the sale"); *In re Lunan Family Restaurants Ltd. Partnership*, 192 B.R. 173, (Bankr. N.D. Ill. 1996) (surcharging employee payroll because "[t]he [collateral] could not have been sold without the employees that kept working during the bankruptcy process," and therefore "their employment directly benefited the [creditor]."); Griffith Suppl. Decl. ¶ 25.  Delivering a going-concern business with assets at certain threshold values was a condition precedent to the Sale.  *See, e.g.*, APA § 10.  Further, the Debtors were required to operate their business in the ordinary course.  *See, e.g.*, *id.* § 8.

46.    At the very least, the Debtors should be entitled to 506(c) Surcharges in the amount ESL ***knew*** the Debtors were incurring for its primary benefit.  On January 8, 2019, after ESL (again) had submitted an unsatisfactory bid and (again) requested that the Debtors avoid a pivot to liquidation, the Debtors agreed to hold the auction subject to ESL's payment of a $120 million deposit.  Approximately $17.9 million of that deposit was nonrefundable and "intended to cover the [Debtors'] actual costs" of foregoing a pivot to litigation for one week and "get the results of the auction."  Jan 8, 2019, Hr'g Tr. 10:8-22.  ESL was the sole beneficiary of this accommodation, which required the Debtors to make all necessary and reasonable expenses

25

for an additional week.  This imputes that the Debtors' actual costs—again, only looking at the six-week period between ESL's first bid and the Closing—of approximately $108 million.  There can be no dispute but that at least these expenses were necessary, reasonable, or for the primary benefit of the Second-Lien Holders.

### *iii.    The 506(c) Surcharges were Reasonable and Necessary*

47.    The calculation of the applicable 506(c) Surcharges only included expenses that were reasonable, necessary, and of direct and primary benefit to the Second-Lien Holders. Griffith Suppl. Decl. ¶ 18.  Employee payroll and taxes, rent, property taxes, logistics, critical vendor payments, utility and telephone expenses, advertising expenses, employee travel and business expenses, equipment expenses, and various security and emergency services, were all necessary for any operating retail business.  *Id.* ¶ 20; *Matter of Iberica Mfg., Inc.*, 180 B.R. 707, 713 (Bankr. D.P.R. 1995) ("Necessary expenses are those unavoidably incurred").  All of the 506(c) Surcharges were in "sensible proportion" to the value received by the Second-Lien Holders. *In re Ceron*, 412 B.R. 41, 52 (Bankr. E.D.N.Y. 2009); *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260 (9th Cir. 2000) (internal citation omitted) (citing *In re Chicago Lutheran Hosp. Ass'n*, 89 B.R. 719, 727 (Bankr. N.D. Ill. 1988)) (measuring reasonableness against "the amount that the secured creditor would have necessarily incurred through foreclosure and disposal of the property").

48.    In this case, each expense was well within the "normal range" for its category.  *See* Griffith Decl. ¶ 22; *see, e.g., Felt*, 402 B.R. at 524–27 (professional fees were reasonable as they did "not appear outside the normal range").  Other than KEIP and KERP payments that were specifically approved by the Court, the Debtors' employee payroll, benefits, and payroll-tax expenditures—the largest 506(c) Surcharge category by a factor of three—were consistent with or below prepetition levels.  Griffith Suppl. Decl. ¶ 21.  Further, the Debtors

obtained certain protections afforded by the chapter 11 process. *Id.* For example, the Debtors were able to lock-in favorable terms with their critical vendors. *Id. See Final Order (I) Authorizing Debtors to Pay Certain Prepetition Obligations to Critical Vendors; (II) Approving Procedures to Address Vendors Who Repudiate and Refuse to Honor Their Contractual Obligations to the Debtors; and (III) Granting Related Relief* [ECF No. 793]. And utility providers are prevented from exerting leverage over the Debtors under the threat of discontinued services. Griffith Suppl. Decl. ¶ 21; *see Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service* [ECF No. 431].

49.     As it relates to professional fees, the success fees earned by financial advisors in the Sale are standard for the industry. Griffith Suppl. Decl. ¶ 22. *See* Common MOL at 21, n.12. The other professional fees accurately reflect the magnitude of this bankruptcy and the enormous effort expended by all involved. *Id.*

### *iv.* *The Second-Lien Holders' Request for the Return of Additional Cash Collateral Is Baseless*

50.     Finally, the Second-Lien Holders request, without any legal or factual support, that the Debtors return any additional Cash Collateral "used at any time after February 16, 2019, as such use did not comport with the requirements of the Final DIP Order and was unauthorized," out of the Debtors' Wind-Down Account. Common MOL at 28. The Debtors disagree with any assertion that Cash Collateral was used in contravention to the Final DIP Order, and while the Second-Lien Holders' request addresses, at most, a potential ***source*** of recovery, ***if and only if*** the Court finds the Debtors used such monies in contravention of the Final DIP Order,

it does not affect the overall analysis.[26]   Regardless of where the monies are located, the Second-Lien Holders cannot (and have not) shown any significant diminution in value that would exceed even a portion of the applicable 506(c) Surcharge and, therefore, are not entitled to any recovery on their asserted 507(b) Claims.  Moreover, should it be required, the Debtors can and will demonstrate that even the expenses incurred after the consummation of the Sale through the Effective Date were reasonable, necessary, and for the primary and direct benefit for the Second-Lien Holders.[27]

### D.   The Facts and Record in These Chapter 11 Cases Make Clear That the Equities Support the Court Not Allowing *Any* of the Second-Lien Holders' 507(b) Claims.

51.   In closing, the facts and record in these chapter 11 cases make clear that the equities support the Court not allowing *any* of the Second-Lien Holders' 507(b) Claims. Bankruptcy courts may look to equitable considerations in determining whether to allow a creditor's 507(b) claim.  *See* 11 U.S.C. 503(c)(3).

52.   As discussed above and in their Rule 3012 Motion, the Second Lien-Holders reaped an immense benefit from the Sale.  ESL was the primary beneficiary of the Sale—a sale to which the Debtors dedicated substantial money and resources.  That sale maximized the value of the very assets now in ESL's possession.  The other Second-Lien Holders, including Cyrus and the Collateral Agent, likewise benefited from the Sale, under-secured second-lien debt for a ***100% recovery*** on account of their $433.5 million Credit Bid.  In spite of these immense benefits, the Second-Lien Holders—whose hunger for the Debtors' assets appears

---

[26]   The Debtors refer, generally, to the *Stipulation and Order Concerning Debtors' Continuing Use of Cash Collateral* [ECF No. 4287] and fully incorporate by reference the *Debtors' Objection to Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, including Cash Collateral* [ECF No. 3198] ("**Cash Collateral Objection**").

[27]   The Debtors expressly reserve the right to supplement any necessary calculations of 506(c) surchargeable expenses from the consummation of the Sale through the effective date of the plan, through submission of additional briefing.

insatiable—have nevertheless clamored for many millions more and, in the process, seek to invade the province of the Court through their inconsistent and faulty proffered expert reports and have wasted the parties', the Court's, and all stakeholders' valuable time and resources.  On the basis of these equitable considerations—as well as the other arguments advanced herein—the Court should grant the Debtors' Motion.

## **CONCLUSION**

53.     For all of the reasons stated in this Response and Reply, the Debtors respectfully request that the Court:

(a)     grant the Debtors' Rule 3012 Motion;

(b)     refuse to allow any recoveries on behalf of the Second-Lien Holders' asserted 507(b) Claims; and

(c)     grant the Debtors such other and further relief, at law or in equity, as it deems just and proper.

Dated: June 27, 2019
       New York, New York

/s/ Ray C. Schrock, P.C.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors
and Debtors in Possession*