WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re                                              :
                                                   :    **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,          :
                                                   :    **Case No. 18-23538 (RDD)**
                                                   :
    Debtors.                                       :    **(Jointly Administered)**
---------------------------------------------------------------x

SUPPLEMENTAL DECLARATION OF
BRIAN J. GRIFFITH IN SUPPORT OF THE DEBTORS'
(I) OPPOSITION TO SECOND-LIEN HOLDERS' REQUESTS
TO DETERMINE AMOUNT OF SECOND-LIEN SECURED CLAIMS
UNDER SECTION 506(a) AND SECTION 507(b) ADMINISTRATIVE
CLAIMS AND (II) REPLY IN SUPPORT OF DEBTORS' RULE 3012
MOTION TO DETERMINE THE AMOUNT, IF ANY, OF 507(b) CLAIMS AND
TO <u>SURCHARGE SECOND-LIEN COLLATERAL PURSUANT TO SECTION 506(c)</u>

I, Brian J. Griffith, make this declaration under 28 U.S.C. § 1746:

1. I submit this declaration ("**Declaration**") in support of the *Debtors' (1) Opposition to Second-Lien Holders' Requests to Determine Amount of Second-Lien Secured Claims Under Section 506(a) and Section 507(b) Administrative Claims and (II) Reply in Support of the Debtors' Rule 3012 Motion to Determine the Amount, if Any, of 507(b) Claims and to Surcharge the Second-Lien Collateral Pursuant to Section 506(c)* ("**Response**"), filed concurrently with this Supplemental Declaration, and as a supplement to the *Declaration of*

<u>**SUPPLEMENTAL DECLARATION OF BRIAN J. GRIFFITH** – Page 1</u>

*Brian J. Griffith in Support of the Debtors' Motion to Estimate Certain 507(b) Claims for Reserve Purposes* [ECF No. 4035].[1]

2. I have been a Managing Director of M-III Advisory Partners, LP ("**M-III**") for the past five years. As Managing Director at M-III, I am responsible for leading deal teams where we are retained by either creditors or debtors. Assignments range from operational improvement to distressed situations both in and out of court. Depending on the assignment, deal responsibilities range from short-term profit improvement roles to multi-year turnaround advisory assignments in numerous industries, including: retail, financial services, real estate development, healthcare, energy, consumer products, manufacturing, automotive, and food services. Typical areas of focus on debtor engagements are treasury, cash forecasting, process improvement, cost reductions, development of strategic alternatives, and negotiations with creditors and parties-in-interest. Prior to my current role with M-III, I served in interim management roles, including as a chief financial officer and chief restructuring officer.

3. In October 2018, the Debtors[2] retained M-III to provide the Debtors and their other professionals with financial advisory services in connection with the Debtors'

---

[1] All capitalized terms not otherwise defined in this Declaration shall have the meanings prescribed to them in the Response.

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); SR – Rover de Puerto Rico, LLC (f/k/a Sears, Roebuck de Puerto Rico, Inc.) (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc.

evaluation and development of strategic alternatives to wind-down and liquidation. Specifically, M-III has advised the Debtors regarding the value of, among other things, potential adequate protection claims held by Cyrus Capital Partners, L.P. ("**Cyrus**"), ESL Investments, Inc. ("**ESL**"), and Wilmington Trust, N.A., as collateral agent of certain prepetition second-lien debt on its own behalf and on behalf of all other Prepetition Second Lien Credit Parties ("**Collateral Agent**," collectively with Cyrus and ESL, the "**Second-Lien Holders**"), pursuant to section 507(b) of the Bankruptcy Code and as permitted by the Final DIP Order ("**507(b) Claims**"). M-III performed this analysis in connection with the Motion and the Second-Lien Holders' allegations regarding their purported, aggregate amount of 507(b) Claims.

4. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge of the Debtors' operations and finances acquired during the course of my engagement with the Debtors; my discussions with other members of the M-III team and the Debtors' other advisors; my review of relevant documents; and my views based upon my experience. If called to testify, I would testify competently to each of the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of M-III for the Debtors.

5. I, along with my associates at M-III, have reviewed the expert reports[3] submitted by Cyrus, ESL, and Wilmington Trust in support of the *Common Memorandum of Law on Behalf of the Second Lien Parties: (A) in Support of Their Requests to Determine the Amount*

---

(7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[3] The expert reports submitted are: (i) the *Expert Report of William Henrich in Connection with Assessment of § 507(b) Adequate Protection Claims Asserted by Wilmington Trust, N.A.* [ECF No. 4279] (the "**Henrich Report**"); (ii) the *Expert Report of Marti P. Murray* [ECF No. 4314] (the "**Murray Report**"); and (iii) the *Expert Report of David M. Schulte in Support of Supplemental Memorandum of Law on Behalf of ESL Investments, Inc. in Support of its Requests to Determine the Amount of its Second Lien Secured Claims under Section 506(a) and its Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge its Collateral Pursuant to Section 506(c)* [ECF No. 4286] (the "**Schulte Report**," or, collectively, the "**Reports**").

*of Their Second Lien Secured Claims under Section 506(a) and Their Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and (B) in Opposition to Debtors' Motion to Surcharge Their Collateral Pursuant to Section 506(c)* [ECF No. 4272] ("**Second-Lien Holders' Common Memorandum of Law**") and the Second-Lien Holders' supporting memoranda.[4]

6. After carefully reviewing the Reports, I find no need to alter the testimony in my previous declaration: (1) the Second-Lien Holders recovered significantly more from the Debtors' chapter 11 process, including from the successful going-concern Sale and the attendant expenses required to secure the same, than they would have recovered in a liquidation; (2) the Second-Lien Holders suffered no diminution in value; and (3) any diminution in value is eclipsed by the $1.451 billion in reasonable and necessary expenses that inured to the primary and direct benefit of the Second-Lien Holders. Further, I identified several serious flaws in the Reports that result in overstated conclusions of the diminution in value that belie the facts and circumstances of these Chapter 11 cases. *First*, each of the Reports rely on incorrect or misapplied data taken from other sources. *Second*, each uses a different and incorrect methodology to calculate the value of the Debtors' inventory. *Third*, two of the three Reports incorrectly assume that the $395 million aggregate Standalone L/C Facility and First Lien Letter of Credit (the "**Letters of Credit**") would

---

[4] The supplemental memoranda submitted are: (1) the *Supplemental Memorandum of Law on Behalf of ESL Investments, Inc. in Support of Its Requests to Determine the Amount of Its Second Lien Secured Claims under Section 506(a) and Its Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012; and in Opposition to the Debtors' Motion to Surcharge Its Collateral Pursuant to Section 506(c)* [ECF No. 4273] ("**ESL's Supplemental Memorandum**"); (ii) the *Supplemental Memorandum of Law of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent, (I) in Support of Motion Pursuant to Bankruptcy Rule 3012 for Determination of Amount of Secured Claim Pursuant to 11 U.S.C. § 506(a) and Amount of Claim Entitled to Priority Pursuant to 11 U.S.C. § 507(b) and (II) in Opposition to Debtors' Motion Pursuant to 11 U.S.C. § 506(c)* [ECF No. 4280] ("**Wilmington Trust's Supplemental Memorandum**"); and (iii) the *Memorandum of Law in Support of Request of Cyrus Capital Partners, L.P. to Determine the Amount of Secured Claims under Section 506(a) and Section 507(b) Administrative Claims Pursuant to Bankruptcy Rule 3012 and in Opposition to Debtors' Request to Surcharge Collateral Pursuant to Section 506(c)* ("**Cyrus's Supplemental Memorandum**," or, collectively, the "**Supplemental Memoranda**").

not be fully drawn or cash collateralized in a liquidation, and the third, Schulte, only makes the correct assumption in one of his alternative scenarios. **Fourth**, and finally, none of the Reports fully recognize the significant expenses incurred to protect the value of the Second-Lien Holders' Collateral.

**The Second-Lien Holders Recovered Significant Value Pursuant to Their Credit Bid**

7. The gross book value of the Collateral as of the Petition Date was $2.746 billion.[5] *See* Week 36 Borrowing Base Certificate, SEARS_507B_00001430; a true and correct copy is attached to the declaration as **Exhibit A**. As I stated in my previous declaration, the value of the Second-Lien Holders' Collateral for purposes of determining any potential diminution in value is most accurately calculated by using the Second-Lien Holders' recovery from the sale of the Collateral. Pursuant to the APA, the Company delivered inventory and accounts receivable in the aggregate amount of $1.657 billion.[6] The purchase price paid by ESL for such inventory and accounts receivables excluding store cash and credit bid consideration was approximately $1.408 billion, or 85.0% of the required inventory and receivables combined. Accordingly, the value of the Second-Lien Holders' Collateral for purposes of determining any potential diminution in value is most accurately calculated by utilizing 85%—the ultimate recovery from the sale of the Collateral. After applying the 85% to the book value of the Collateral as of the Petition Date, the net Collateral value as of the Petition Date would be approximately $2.334 billion, and after deducting the amount of First Lien Debt, the Second-Lien Holders could then share in approximately $373 million of remaining Collateral. With the Second-Lien Holders

---

[5] This change from the first Declaration reflects the removal of approximately $15 million in Pharmacy Receivables which are not Second-Lien Collateral.
[6] Section 10.9 of the APA requires delivery of an aggregate $1.657 billion of Acquired Inventory, Credit Card Accounts Receivable, and Pharmacy Receivables (which includes the Pharmacy Scripts).

ultimately receiving approximately $433.5 million on account of their Credit Bid, as part of the Sale, there is no diminution in value. This is depicted in the table below:

| | |
|---|---|
| Total Gross Collateral (comprised of the book value of inventory and certain accounts receivable) | $2.746 billion |
| Inventory and Accounts Receivable Purchase Price as a percentage of Book Value | 85.0% |
| **Net Collateral** | **$2.334 billion** |
| (-) First Lien Debt (principal amounts, including application of approximately $34 million[7] of accrued postpetition interest) | ($1.961 billion) |
| **Remaining Collateral for Second-Lien Holders** | **$373 million** |
| **Second-Lien Holder Recovery on Account of Credit Bid** | **$433.5 million** |
| **Section 507(B) Diminution in Value Claim (Before Considering the Application of Any Section 506(c) Surcharge)** | **$0** |

8. The implied value of 85% as applied to the gross book value of the Second-Lien Holders' Collateral far exceeds the value that would have otherwise been obtained in either a wind-down or a liquidation scenario. Although the September 28, 2019 Tiger appraisal, with an inventory date as of October 6, 2018, projects a ten-to-eleven week NOLV of 88.7%,[8] it is not an appropriate metric. The Tiger appraisal only deducts direct sale expenses and a limited subset of non-direct sale expenses, including royalty payments, base liquidation fees, and corporate overhead required to support the retail GOB sales. It does not consider all of the necessary costs associated with a liquidation as of the Petition Date. For instance, the projected recoveries do not

---

[7] Assumes the First Lien Debt has a three-month weighted average life during bankruptcy.
[8] The 88.7% NOLV determined in the October Tiger appraisal is a percentage of net eligible inventory, which does not include certain inventory in transit and categories of inventory that have lower recoveries than retail store merchandise. The net inventory liquidation value of $2,196 million in the Cyrus Report is approximately 82% of total stock ledger inventory per the week 36 borrowing base certificate; that approximately 82% compares on a like-for-like basis to the 85% used by the Debtors.

include professional fees, DIP-related financing fees, full corporate overhead costs, or any other administrative claims incurred in a liquidation, all of which would impact the recoveries of the Second-Lien Holders. The Debtors also had, as of the Petition Date, certain obligations due to severance and The Worker Adjustment and Retraining Notification Act (the "**WARN Act**") that would inflate the costs associated with either a winddown or full retail-liquidation.

9. A wind-down or, more drastically, a full retail-liquidation of the Debtors would have been unprecedented, injecting additional uncertainty and risk and reducing overall recoveries. The margins in a fire-sale would be lower, as among other things, inventory floods the market, the Debtors face complications with vendor flight and contraction, and the Debtors are unable to collect on certain receivables. The market's view of such risks is reflected in the equity bids' guaranteed rates received by the Debtors during the Sale, suggesting a Collateral value of 79–82%. *See* Dec. 28, 2018, Proposed Tiger/Great American Agency Agreement § 3.1(a), SEARS_507B_00001694; a true and correct copy is attached to the Declaration as **Exhibit B**; Dec. 28, 2018 Proposed Gordon Bros./Hilco Agency Agreement § 3.1(a), SEARS_507B_00000772; a true and correct copy is attached to the Declaration as **Exhibit C**. The contemporaneous Tiger Report projected a 85.4% NOLV.

### Chapter 7 Liquidation Scenario

10. Had the Debtors entered chapter 7 on the Petition Date, numerous and significant considerations would have further limited the recoveries of Second-Lien Holders' Collateral. It is unlikely that the process would have resembled the orderly process contemplated by the NOLV valuations. In addition to the risks described above, concerning market saturation, vendor flight, and uncollectible receivables, the Debtors likely would have lost a significant portion of both their senior management and store-level employees. The exodus of institutional

knowledge would have led to less efficient inventory management, higher inventory shrinkage, and significant logistical challenges. It is also unlikely that the Debtors' other assets—such as real estate or its stand-alone businesses—would have been sold or liquidated in a way that maximized value. Finally, chapter 7 distributions are typically subject to U.S. Trustee fees of up to 3%, thereby further diminishing recoveries. By successfully consummating the Sale, the Debtors avoided those additional liquidation expenses and were able to deliver significant value to the Second-Lien Holders, including in the form of a 100% recovery on the Credit Bid.

### Equity Bid Scenario

11.     To avoid the risks described above, it is possible the Debtors would have accepted an equity bid for the liquidation of the company. In addition to minimizing uncertainty, equity bids provide immediate liquidity to navigate the bankruptcy process. The Tiger/Great American equity bid, for example, included only a 79% guarantee in December of 2018 when the NOLV was set at 85.4%. The Tiger/Great American bid included a 3% fee and a 50/50 sharing provision on proceeds in excess of the guarantee. This bid, or another similar equity bid, would have resulted in lower recoveries than the either the 88.7% NOLV or 85% fair market value and very likely would have further reduced recovery by the Second-Lien Holders.

### The Second-Lien Holder Reports

12.     Each Report utilizes a different methodology to conduct what should be a straight-forward calculation, with diminutions of value ranging from $718 million to $1.501 billion. This is driven in large part by a difference of $700 million in the starting-point total Collateral valuation. Each Report contains significant methodological flaws and faulty assumptions that result in highly overstated diminution of value calculations.

13. First, neither the Schulte, Murray, nor Henrich Reports assume the full $395 million aggregate Letters of Credit would be fully drawn or fully cash collateralized. This assumption is objectively unreasonable and accounts for a dollar-for-dollar increase to the concluded diminution in value—the full $395 million in the Schulte and Murray Reports. In a liquidation scenario, letters of credit are almost always fully drawn or fully cash collateralized because leaving undrawn amounts exposes the counter-parties. Likewise, none of the Reports properly include approximately $34 million of post-petition interest on account of the over-secured First Lien Debt in the deductions for first lien recoveries.

14. The Schulte Report also takes an unrealistic view of Second-Lien Holder recoveries in an orderly wind-down. By way of example, Mr. Schulte utilizes a 95% NOLV for post-petition GOB sales to support his Pollyanna view of Second-Lien Holder recoveries in a liquidation. That 95% is incorrect, and is based on an outdated expense rate calculation from a 2017 Tiger appraisal. Mr. Schulte's projected inventory recovery rate of 88–92% appears to reject the equity bids of 79% and 82% included in his Report, ignoring the market's view of the risk and the full panoply of costs associated with administering a wind-down or liquidation. Finally, Mr. Schulte assumes the book value of inventory for the Go Forward Stores, with no cost deductions—implying that the inventory would be purchased for 100% of the replacement value in a going concern sale and that there are zero overhead costs to maintain that inventory until a purchaser is found. This analysis, of course, entirely discounts the 85% value paid by Mr. Schulte's client, ESL, after the Debtors held and maintained the inventory for almost five months.

15. The Henrich Report concludes the Collateral value on the Petition Date is significantly higher than the other Reports. Mr. Henrich achieves this result—which inflates the

diminution in value—by grossing up the value of the inventory in excess of Mr. Schulte's highly-inflated valuation.

16. The Murray Report fails to account for administrative expenses not included in the NOLV value, such as actual corporate overhead, professional fees, DIP-related financing fees, severance obligations, WARN Act obligations, as well as other costs. Further, the Murray Report includes the Debtors' cash on the assumption that "cash reflects proceeds from the sale of inventory and the collection of receivables." While that may be a reasonable assumption, cash is not Collateral of the Second-Lien Holder. In any event, any cash would likely be tied up in escrow by request of the the Official Committee of Unsecured Creditors in a liquidation, making it unavailable to satisfy Second-Lien Debt. This error also artificially increases the purported diminution in value.

## Adjusted Cyrus Valuation

17. An analysis which largely adopts the NOLV valuation used in the Reports, after certain necessary corrections are made, leads to the conclusion that there was no diminution in value. For instance, in the Murray Report's minimum 507(b) claim calculation, properly including the entire $395 million aggregate Letters of Credit obligation and excluding the cash, pharmacy scripts, and pharmacy receivables that are not Second-Lien Holder Collateral results in no diminution in value.

## 506(c) Surcharges

18. As discussed in my previous declaration, the Debtors incurred $1.451 billion in administrative expenses in their efforts to preserve the value of the Second-Lien Holders' Collateral. Further, the calculation of the applicable 506(c) Surcharges only included expenses that were reasonable, necessary, and of direct and primary benefit to the Second-Lien

Holders. That calculation reflects and the Debtors' the rigorous sale process and efforts to sell the company as a going concern. If an NOLV valuation approach is used, however, certain reductions to the 506(c) Surcharges—i.e., certain store-level expenses and corporate overhead allocations—would need to be made to account for the costs included in the NOLV values in the Tiger appraisal.

19. Regardless of the approach taken by the Debtors or any of one of the Second-Lien Holders, upon application of the 506(c) Surcharges that were intended to (and ultimately did) directly benefit the Second-Lien Holders from any potential recovery attributable to 507(b) Claims, there is a huge deficit and, therefore, no resulting value for the Second-Lien Holders' asserted 507(b) Claims.

20. In particular, all expenditures made by the Debtors after the decision was made to pursue a going concern sale, were made to preserve the value of the collateral eventually sold to ESL pursuant to the APA. All the while ESL continued to pressure the Debtors' to continue negotiations and to avoid a pivot to liquidation. As the Debtors continued to run their business and run a rigorous sale process, the Debtors made payments on account of employee payroll and taxes, rent, property taxes, logistics, critical vendor payments, utility and telephone expenses, advertising expenses, employee travel and business expenses, equipment expenses, and various security and emergency services; all necessary for any operating retail business.

21. Further, pursuant to certain protections afforded by the chapter 11 process, these expenses were reasonable. For example, the Debtors were able to lock-in favorable terms with their critical vendors. Utility providers are prevented from exerting leverage over the Debtors under the threat of discontinued services. Other than KEIP and KERP payments that were specifically approved by the Court, the Debtors' employee payroll, benefits, and payroll-tax

expenditures—the largest 506(c) Surcharge category by a factor of three—were consistent with or below prepetition levels.

22. The Sale process itself was run expeditiously; monitored closely with respect to what costs and expenses were incurred; and mitigated the larger, more substantial costs to stakeholders that would be attributable to a liquidation. The success fees earned by financial advisors in the Sale are standard for the industry. The other professional fees incurred accurately reflect the magnitude of this bankruptcy and the enormous effort expended by all involved.

23. Overall, the successful Sale ultimately minimized claims and maximized recovery for the Second-Lien Holders. The Second-Lien Holders were the primary beneficiaries of these chapter 11 cases—or more specifically, the Sale process in which the Second-Lien Holders voluntarily credit bid and Cyrus rolled its Junior DIP. The Schulte Report correctly notes that "the benefits of the transaction accrued to many stakeholders." Admittedly, the Sale did prevent a substantial number of administrative claims; but, benefits would only accrue to the other junior stakeholders if unencumbered assets were to materialize. Further still, ESL is the primary beneficiary of increased recovery in the Secure Real Estate Loans (Note A & Note B) and IP/Ground Lease Term Loan as the majority holder in each facility. As discussed above, it was the Second-Lien Holders who benefited the most compared to a day-one liquidation through the Credit Bid.

24. The Murray and Schulte Reports each assert that the Debtors are entitled to a $0 recovery for the 506(c) Surcharges because none of the expenses incurred to preserve a going concern transaction were for the primary benefit of the Second-Lien Holders. On the other hand, the Henrich Report concedes that certain 506(c) expenses are appropriate, but the 506(c) Surcharge Mr. Henrich applies in the context of his Report is insufficient, given the high fixed costs and

overhead of Sears, but all necessary and reasonable under the circumstances. These three conclusions as incorrectly reached by Mr. Murray, Mr. Schulte, and Mr. Henrich drastically—in most cases, completely—discount the reasonable and necessary expenses the Debtors incurred for the primary benefit of the Second Lien Holders.

25. Even a subset of the 506(c) Surcharges incurred by the Debtors would still be more than sufficient to eliminate a diminution in value, if any. For example, between January 17, 2019—the date of the APA's execution, and February 11, 2019—the consummation of the Sale, the Debtors managed the business in the ordinary course and as to meet certain financial conditions precedent in the APA. Every dollar spent was both reasonable and necessary to protect the going concern for the primary and direct benefit of the Second-Lien Holders. During that period, the Debtors spent approximately $254 million—net of GOB expenses and professional fees—to operate the business and eventually deliver the going concern to Second-Lien Holders. Between December 28, 2018—ESL's first bid, and consummate of the Sale, the Debtors spent approximately $527 million—again, net of GOB expenses and professional fees—to preserve the value of the going concern enterprise and the collateral.

Dated: June 27, 2019  
       New York, New York

By: /s/ *Brian J. Griffith*  
    Brian J. Griffith  
    Managing Director  
    M-III Advisory Partners, LP