# *EXHIBIT B*

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is entered into as of this [●] day of [●], 2019, by and between [Sears Holdings Corporation], a Delaware corporation, and its undersigned subsidiaries (collectively, "Merchant"), and Tiger Capital Group, LLC and Great American Group, LLC (jointly, severally and collectively, the "Agent"; and collectively with Merchant, the "Parties").

## RECITALS

WHEREAS, on October 15, 2018, Merchant, together with certain of its affiliates, filed voluntary petitions for relief commencing cases under chapter 11 of Title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The chapter 11 cases are currently pending before the Bankruptcy Court under case number 18-23538 (the "Bankruptcy Case").

WHEREAS, Merchant operates certain retail stores in the United States and desires that Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located in certain of Merchant's retail store locations identified on Exhibit A-1 attached hereto (each individually a "Store", and collectively the "Stores") and certain of Merchant's distribution centers identified on Exhibit A-2 attached hereto (the "Distribution Centers"), inclusive of In-Transit Merchandise and Distribution Center Merchandise (each as defined below) that is received in the Stores on or before the Receipt Deadline (defined below), and (b) to the extent so elected by Merchant, selling all of the Owned FF&E (as hereinafter defined) located in the Stores (but not the Distribution Centers or Merchant's corporate offices (the "COs")) (subject to Section 15 below), in each case by means of such themed sale as more fully set forth herein (as further described below, the "Sale").

WHEREAS, Merchant has entered into one or more consulting agreements with Abacus Advisors LLC (the "Abacus Agreements") to sell all merchandise[,furniture, fixtures and equipment] located at the retail stores identified on Exhibit A-3 (the "Fee Stores") (which consulting agreements are the sole agreements governing liquidation sales at the Fee Stores, the sales at which will not be governed by this Agreement).

WHEREAS, reference is made to (i) that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended, supplemented or otherwise modified from time to time), by and among Sears Roebuck Acceptance Corp. and Kmart Corporation (individually, a "Borrower", and collectively, the "Borrowers"), Merchant and the other guarantors party thereto from time to time, Bank of America, N.A., as Administrative Agent (as defined therein), and Bank of America, N.A. and Wells Fargo Bank, National Association, each as Co-Collateral Agent (as defined therein), and the lenders party thereto (and other parties secured jointly therewith) from time to time, (ii) that certain Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as amended, supplemented or otherwise modified from time to time), by and among Merchant, the Borrowers, the financial institutions party thereto from time to time as L/C Lenders, and Citibank N.A., as Administrative Agent and Issuing Bank, (iii) that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, supplemented, or otherwise modified from time to time), by and among Merchant, the Borrowers, the lenders party thereto, and JPP,

TIGER GA 12 28 18

LLC as administrative agent and collateral administrator, (iv) Indenture, dated as of October 12, 2010 (as amended, supplemented, or otherwise modified from time to time), by and among Merchant, the guarantors party thereto and Wilmington Trust, National Association as Trustee and Collateral Agent, governing the 6 5/8% Senior Secured Notes which mature on October 15, 2018 and the noteholders thereof, (v) Indenture, dated as of March 20, 2018 (as amended, supplemented, or otherwise modified from time to time), by and among Merchant, the guarantors party thereto and Computershare Trust Company, N.A, governing the 6 5/8% Senior Secured Convertible PIK Toggle Notes which mature on October 15, 2019, (vi) that certain Superpriority Senior Secured Debtor-In-Possession Asset-Based Credit Agreement, dated as of November 29, 2018, by and among, the Borrowers, Merchant and the other guarantors party thereto from time to time, the lenders from time to time party thereto (the "Senior DIP Lenders"), Bank of America, N.A., as administrative agent (the "Senior DIP Agent"), and Bank of America, N.A. and Wells Fargo Bank, National Association, each as co-collateral agent, and (vii) that certain Superpriority Junior Lien Secured Debtor-In-Possession Credit Agreement, dated as of November 29, 2018 (as amended, restated, supplemented or otherwise modified from time to time), by and among the Borrowers, Merchant and the other guarantors party thereto from time to time, the lenders from time to time party thereto (such lenders, together with the Senior DIP Lenders, the "DIP Lenders"), Cantor Fitzgerald Securities, as administrative agent (together with the Senior DIP Agent, the "DIP Agents").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Definitions and Exhibits

1.1    Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Abacus Agreements | Recitals |
| Additional Agent Merchandise | Section 8.10(a) |
| Additional Agent Merchandise Proceeds | Section 3.1(c) |
| Additional Taxes and Penalties | Section 8.3(a) |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(b)(ii) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent's Fee | Section 3.1(b) |
| Agent's FF&E Commission | Section 15(a) |
| Agent Claim | Section 12.5 |
| Agent Collateral | Section 16.11(a) |
| Agent Indemnified Parties | Section 8.3(a) |
| Agreement | Preamble |
| Applicable General Laws | Section 2(c) |
| Approval Order | Section 2(b) |

- 2 -

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL

| | |
|---|---|
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1(c) |
| Borrower(s) | Recitals |
| Central Services | Section 4.1 |
| Central Services Expenses | Section 4.1 |
| COs | Recitals |
| Cost File | Section 5.3(a) |
| Cost Factor | Section 3.1(f) |
| Cost Value | Section 5.3(a) |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Section 3.3(b) |
| DIP ABL Financing Order | Section 3.3(e) |
| DIP Agent | Recitals |
| DIP Lenders | Recitals |
| Distribution Centers | Recitals |
| Distribution Center Expenses | Section 4.1 |
| Distribution Center Merchandise | Section 5.2 |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| Excluded Defective Merchandise | Section 5.2(b) |
| Excluded Price Adjustments | Section 5.3(b) |
| Expenses | Section 4.1 |
| Fee Stores | Recitals |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 8.7(b) |
| Final Reconciliation Settlement Date | Section 8.7(b) |
| Force Majeure Event | Section 8.8 |
| FF&E Commission Option | Section 15(a) |
| FF&E Disposition Budget | Section 15(a) |
| FF&E Disposition Expenses | Section 15(a) |
| FF&E Guaranty Amount | Section 15(a) |
| FF&E Guaranty Option | Section 15(a) |
| FF&E Sale Election Deadline | Section 15(a) |
| FF&E Sale Option | Section 15(a) |
| Gross Rings | Section 5.3(b) |
| Gross Rings Period | Section 5.3(b) |
| Guaranteed Amount | Section 3.1(a) |
| Guaranty Percentage | Section 3.1(a) |
| Hazardous Materials | Section 15(d) |
| In-Transit Merchandise | Section 5.2(b) |
| Initial Guaranty Payment | Section 3.3(a) |
| Interested Parties | Section 3.3(f) |
| Inventory Date | Section 5.1(a) |

- 3 -

HIGHLY CONFIDENTIAL

SEARS_507B_00001696

| Inventory Taking | Section 5.1(a) |
| Inventory Taking File | Section 5.1(b) |
| Inventory Taking Instructions | Section 5.1(a) |
| Inventory Taking Service | Section 5.1(a) |
| Inventory Taking Files | Section 5.1(c) |
| Letter of Credit | Section 3.1(e) |
| Liquidation Sale Laws | Section 2(c) |
| Membership Program Discount | Section 8.6(b) |
| Merchandise | Section 5.2(a) |
| Merchandise Threshold | Section 3.1(e) |
| Merchant | Preamble |
| Merchant Consigned Goods | Section 5.4 |
| Merchant's Designated Account | Section 3.3(a) |
| Merchant Indemnified Parties | Section 8.3(a) |
| Net FF&E Proceeds | Section 15(a) |
| Non-CAM Trash Removal Charges | Section 4.1 |
| Non-Inventoried Stores | Section 5.1(a) |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 15(a) |
| Parties | Preamble |
| Payment Date | Section 3.3(a) |
| Prevailing Discount Adjustment | Section 5.3(b) |
| Prevailing Discount Deadline | Section 5.3(b) |
| Proceeds | Section 3.3(a) |
| Receipt Deadline | Section 5.2(a) |
| Remaining Merchandise | Section 3.2 |
| Retail Price | Section 3.1(f) |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3(a) |
| Sales Tax Account | Section 8.3(a) |
| Sharing Amount | Section 3.1(b) |
| Sharing Threshold | Section 3.1(b) |
| Shipping Variance | Section 5.1(c) |
| Shipping Variance Response | Section 5.1(c) |
| Store(s) | Recitals |
| Test Store(s) | Section 5.1(a) |
| Test Store Results | Section 5.1(b) |
| Third party | Section 4.1 |
| UCC | Section 8.10(d) |

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                          SEARS_507B_00001697

Vacate Date                     Section 6.2
Vacate Notice                   Section 6.1
Variance                        Section 5.1(b)
WARN Act                        Section 9.1

1.2    Exhibits.  The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section Reference | Description |
|---------|-------------------|-------------|
| Exhibit A-1 | Recitals | Stores |
| Exhibit A-2 | Recitals | Distribution Centers |
| Exhibit A-3 | Recitals | Fee Stores |
| Exhibit 2(c) | Section 2(c) | Firearms and Ammunition Sales |
| Exhibit 3.1(e) | Section 3.1(e) | Merchandise Threshold Adjustment |
| Exhibit 3.1(f) | Section 3.1(f) | Cost Factor Adjustment |
| Exhibit 3.3(a) | Section 3.3(a) | Merchant's Designated Account |
| Exhibit 3.3(e) | Section 3.3(e) | Form of Letter of Credit |
| Exhibit 4.1(a) | Section 4.1(a) | Store Occupancy Expense Schedule |
| Exhibit 5.1(a) | Section 5.1(a) | Test Stores |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 10.1(b) | Section 10.1(b) | Form of Approval Order |
| Exhibit 11.1(c) | Section 11.1(c) | Pre-Existing Liens |
| Exhibit 11.1(k) | Section 11.1(k) | Pending Matters |

Section 2.    Appointment of Agent/Liquidation Sale Laws/Approval Order

(a)    Appointment of Agent.  Effective on the date hereof, but subject to the entry of the Approval Order, Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and, in accordance with the terms of Section 15, disposing of Merchant's Owned FF&E at the Stores (but not the Distribution Centers or the COs), in accordance with the terms and conditions of this Agreement.

(b)    Approval Order.  Merchant shall seek entry of an order from the Bankruptcy Court approving this Agreement and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof (the "Approval Order").  The Approval Order shall be in substantially the form annexed hereto as Exhibit 10.1(b), and otherwise be reasonably satisfactory to the Merchant and Agent, and provide, inter alia, that:

(i)    this Agreement (and each of the transactions contemplated hereby, including, without limitation, the Sale) is approved in its entirety;

(ii)    Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby (including, without limitation, the Sale and completing the Final Reconciliation);

- 5 -

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00001698

(iii)    Agent shall be entitled to sell all Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and (to the extent so elected by Merchant) Owned FF&E hereunder free and clear of all liens, claims, interests or encumbrances thereon (including, without limitation, any liens, claims, interests or encumbrances in favor of any Interested Parties), with any such presently existing liens encumbering all or any portion of the Merchandise, Merchant Consignment Goods, Owned FF&E, the Proceeds or any proceeds of the foregoing attaching, as applicable, only to the Guaranteed Amount and other proceeds thereof to be received by Merchant under this Agreement;

(iv)    Agent shall have the right to use the Stores and Distribution Centers, and all related services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order;

(v)    subject to the Sale Guidelines, Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as set forth in Sections 2(c) and 8.1 below;

(vi)    Agent shall be granted a limited non-exclusive royalty-free license and right to use until the Sale Termination Date the trademarks, trade names, logos, customer lists, website, URL, social media sites (including Facebook and Twitter), mailing lists and email lists relating to and used in connection with the operation of the Stores, solely for the purpose of promoting, advertising and conducting the Sale in accordance with the terms of this Agreement, all of which assets, rights and interests shall remain property of the Merchant;

(vii)    the Bankruptcy Court shall retain jurisdiction over all parties to this Agreement to enforce this Agreement;

(viii)    Agent shall be authorized to include Additional Agent Merchandise in the Sale subject to the provisions hereof;

(ix)    Agent shall be granted a valid, binding, enforceable and perfected security interest and lien as provided for in Section 16.11 hereof without the necessity of filing financing statements or other steps to perfect the security interest or lien (other than entry of the Approval Order);

(x)    Merchant's decisions to (A) enter into this Agreement and (B) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest;

(xi)    this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and Agent is entitled to the protection of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xii)    Agent's performance under this Agreement will be, and payment of the Guaranteed Amount, the Sharing Amount, if any, and other amounts payable under this

- 6 -

HIGHLY CONFIDENTIAL                    SEARS_507B_00001699

Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xiii)   the terms of this Agreement shall be binding on any trustee appointed for the Merchant under any provision of the Bankruptcy Code, whether the Bankruptcy Case of the Merchant is proceeding under chapter 7 or chapter 11 of the Bankruptcy Code (the "Trustee");

(xiv)   the application of any automatic stay of enforcement of the Approval Order is waived;

(xv)   the Approval Order constitutes an authorization of the conduct of Merchant and Agent in connection herewith;

(xvi)   Agent shall be entitled to be heard on all issues in the Bankruptcy Case in any way related to or otherwise connected with this Agreement or the transactions contemplated hereby; and

(xvii)   nothing contained in this Agreement and none of Agent's actions taken in respect of this Agreement or the transactions contemplated hereby shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees (except for Agent's obligations to pay Expenses), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

(c)   Advertisement.  Subject to entry of the Approval Order, Agent shall be authorized to conduct and advertise the Sale as a "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sale and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety, the environment, and, as more specifically provided on Exhibit 2(c), firearm and ammunition sales, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than, to the extent provided in the Approval Order, all applicable laws, rules and regulations in respect of "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sales, including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply to the Sale, but excluding those designed to protect public health and safety (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines, the Approval Order and the provisions of Section 8.1 below.

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00001700

(d)    <u>Authority</u>.  Except as otherwise specifically provided in this Agreement, Agent shall have no authority, and shall not represent that it has any authority, to enter into any contract, agreement, or other arrangement or take any other action by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent.

Section 3.    <u>Guaranteed Amount and Other Payments</u>

   3.1    <u>Payments to Merchant and Agent.</u>

      (a)    As a guaranty of Agent's performance hereunder, in addition to the payment of Expenses (as provided for in Section 4.1 hereof), Agent guarantees that Merchant shall receive an amount equal to seventy nine percent (79%) (the "<u>Guaranty Percentage</u>") of the aggregate Cost Value of Merchandise (the "<u>Guaranteed Amount</u>").  The Guaranteed Amount will be calculated based upon the product of (x) the Guaranty Percentage *multiplied by* (y) the aggregate Cost Value of the Merchandise (in the case of (y), as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking by the Inventory Taking Service after verification and reconciliation thereof by Merchant and Agent, (B) the aggregate amount of Merchandise subject to Gross Rings (as adjusted for shrinkage per this Agreement), (C) to the extent not included in clauses (A) or (B), the aggregate Cost Value of In-Transit Merchandise and Distribution Center Merchandise included in the Sale (as counted and calculated in accordance with the terms of this Agreement); (D) to the extent not included in clauses (A), (B) or (C), the aggregate Cost Value of Returned Merchandise not otherwise included in the Inventory Taking; and (E) any other adjustments to Cost Value as expressly contemplated by this Agreement).  Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

      (b)    To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, <u>plus</u> (y) Expenses of the Sale <u>plus</u> (z) an amount equal to three percent (3%) of the aggregate Cost Value of the Merchandise included in the Sale (the "<u>Agent's Fee</u>"; and the sum of (x), (y) and (z) being collectively defined as the "<u>Sharing Threshold</u>"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Merchant (Merchant's share of Proceeds beyond the Sharing Threshold is the "<u>Sharing Amount</u>") and fifty percent (50%) to Agent.  Agent shall pay the Sharing Amount, if any, to Merchant (or its designee), on the first business day after the completion of the Final Reconciliation conducted pursuant to Section 8.7(b) and shall remit such payment to the Merchant's Designated Account.

      (c)    All proceeds of the sale of Additional Agent Merchandise (the "<u>Additional Agent Merchandise Proceeds</u>") shall be Proceeds hereunder.

      (d)    To ensure accurate sales audit functions, and the accurate calculation of the Sharing Amount, Agent shall use Merchant's existing point-of-sale system for recording all sales (including, without limitation, any sales of Additional Agent Merchandise) in the Stores, and Merchant shall ensure that Agent shall have access and use of such point of sale system for the duration of the Sale Term.

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL    SEARS_507B_00001701

(e)    The Guaranty Percentage has been fixed based upon the Merchant's representation that the aggregate Cost Value of the Merchandise included in the Sale is not less than $1,150,000,000 (the "Merchandise Threshold"). To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(e) attached hereto, as and where applicable. Any adjustment to the Guaranty Percentage provided for under this Section 3.1(e) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, but not limited to, any adjustment provided for under Sections 3.1(f) hereof.

(f)    The Guaranty Percentage has also been fixed based upon the assumption that the aggregate Cost Value of the Merchandise (as defined herein) included in the Sale as a percentage of the aggregate Retail Price (as defined herein) of the Merchandise (as defined herein) included in the Sale (without taking into account (i) any Prevailing Discount Adjustment, (ii) any Excluded Price Adjustments or (iii) any shrink adjustment otherwise applied to Merchandise sold during the Gross Rings Period) (the "Cost Factor") shall be no greater than 38.3% (the "Cost Factor Threshold"). In the event that the actual Cost Factor for the Merchandise is greater than the Cost Factor Threshold, then such deviation shall not constitute a breach of any representation or warranty contained herein or an Event of Default hereunder; provided, however, that the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(f) attached hereto, as and where applicable. Any adjustment to the Guaranty Percentage provided for under this Section 3.1(f) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, but not limited to, any adjustment provided for under Sections 3.1(e) hereof.

3.2    <u>Payments to Agent</u>.  Subject to Agent's obligation to pay in full the Guaranteed Amount, the Sharing Amount (if any), and all Expenses, Agent shall be entitled to retain any remaining Proceeds. Provided that no Event of Default has occurred and continues to exist on the part of Agent, all Merchandise remaining at the conclusion of the Sale ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims, interests and encumbrances of any kind or nature. Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo. Subject to any applicable exemption, upon the conclusion of the Sale, Agent shall be solely responsible for payment of any Sales Taxes (including any Sales Tax payable to Merchant with respect to the effective transfer of ownership from Merchant to Agent) and the preparation and filing of all applicable reports with the applicable taxing authorities with respect to the Remaining Merchandise.

3.3    <u>Time of Payments; Proceeds; Control of Proceeds</u>

(a)    On the first business day after entry of the Approval Order (the "Payment Date"), Agent shall pay to the Merchant's Designated Account (as hereinafter defined) an amount (the "Initial Guaranty Payment") equal to [eighty percent (80%)] of the product of the Guaranty Percentage *multiplied by* the estimated aggregate Cost Value of the Merchandise in the Stores and Distribution Centers as reflected on Merchant's books and records maintained in the ordinary course of business at the close of business on the last day immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount"); provided that the Estimated Guaranteed Amount payable by Agent on the Payment Date shall be calculated based on

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00001702

Merchandise located in the Stores and Distribution Centers as of the close of business on the last business day immediately preceding the Sale Commencement Date and shall expressly exclude any In-Transit Merchandise not then located at a Store or Distribution Centers. On the Payment Date, the Initial Guaranty Payment shall be made by wire transfer of immediately available funds to the account designated on Exhibit 3.3(a) attached hereto (the "Merchant's Designated Account"). The balance of the Guaranteed Amount, if any (including, without limitation, any portion of the Guaranteed Amount attributable to any In-Transit Merchandise reconciled and reported as part of the Final Inventory Report), shall be paid by Agent by wire transfer of immediately available funds to the Merchant's Designated Account on the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise counted by the Inventory Taking Service following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by Merchant and Agent (the "Final Inventory Report"). In the event of a dispute as to the calculation of the remaining portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof. Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion.

(i)     For purposes of this Agreement, "Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Merchandise (inclusive of any Distribution Center Merchandise and In-Transit Merchandise included in the Sale) made under this Agreement, in each case during the Sale Term and exclusive of Sales Taxes, (ii) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term relating to the Merchandise, (iii) any and all proceeds received by Agent from the disposition of Remaining Merchandise and (iv) Additional Agent Merchandise Proceeds. For the avoidance of doubt, the following shall not constitute "Proceeds" hereunder: (1) all proceeds from the sales at Merchant's Stores for periods prior to the Sale Commencement Date, including, without limitation, the cash or checks located at the Stores or Distribution Centers on the Sale Commencement Date, and for the avoidance of doubt cash or checks in transit; (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 below (subject to Agent's right to receive the commission under Section 5.4 below); (3) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring prior to the Sale Commencement Date; (4) proceeds from the sale or other disposition of Owned FF&E (subject to Agent's right to receive the FF&E Commission to the extent provided in Section 15 below) or the FF&E Guaranty Amount, as applicable; (5) payments made by Agent on account of the Guaranteed Amount, the Sharing Amount, Expenses, and the Letter of Credit; (6) any service revenues or proceeds of warranty sales; (7) any proceeds of the sales governed by the Abacus Agreements; and (8) any other amounts not expressly included in the definition of "Proceeds."

(ii)     If, and to the extent, Agent over-funds any amounts in respect of the Guaranteed Amount provided for herein (as determined pursuant to the express terms hereof) and such funding or payment cannot be recovered by Agent from Merchant under Section 3.3(a) or Section 3.3(c) hereof, by means of an offset or otherwise, then Merchant shall be required to (or if Merchant shall be unable to or otherwise for any reason fails to, and any of the Interested Parties have received payment from Merchant of any funds in respect of such overfunding, the applicable Interested Parties (including the applicable

- 10 -

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                            SEARS_507B_00001703

agent acting with respect to its own accounts and not jointly and severally with the other applicable agents, and in each case not to exceed the allocable portion of the overfunded amount actually received by such agent for the applicable lenders), shall be required to) reimburse the undisputed amount of such overfunded amount to Agent within two (2) business days of written demand thereof by Agent in the inverse order in which the overfunded amount (or portion thereof) was received by such Interested Parties.

(b)    All Proceeds shall be controlled by Agent in the manner provided for below:

(i)    Prior to the date Agent establishes the Agency Accounts (see clause (ii) below), all Proceeds and proceeds of the sale of Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E (in each case including all cash, credit card payments, checks and similar items of payment and deposits) shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Stores, which accounts shall be designated for the deposit of Proceeds and any other amounts contemplated by this Agreement (including, without limitation, proceeds from the sale of Owned FF&E, Additional Agent Merchandise, and Merchant Consignment Goods), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). Subject to the provisions of Section 16.11 hereof, the Approval Order shall provide (A) that Merchant grants to Agent a first priority security interest in and lien upon each Designated Deposit Account to the extent of any Proceeds and any other amounts payable to Agent deposited therein, and (B) for turnover to Agent of any such Proceeds (and any other amounts payable to Agent deposited therein) in accordance with the terms and provisions of this Agreement and the Approval Order, as applicable. If, notwithstanding the provisions of this Section, Merchant receives or otherwise has dominion over or control of any Proceeds, or other amounts due to Agent, Merchant shall hold the same and other amounts in trust for Agent, and shall not deposit such Proceeds or other amounts due Agent hereunder in any account except a Designated Deposit Account or as otherwise instructed by Agent. Until such time as Agent establishes the Agency Accounts (see clause (ii) below), Merchant and Agent shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds and other amounts contemplated by this Agreement as being payable to Agent that are deposited into the Designated Deposit Accounts.

(ii)    After payment of the Initial Guaranty Payment and delivery of the Letter of Credit, Agent may establish its own accounts (including, without limitation, credit card accounts and systems), dedicated solely for the deposit of the Proceeds and other amounts contemplated by this Agreement, and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement (including, without limitation, proceeds from the sale of Owned FF&E, Additional Agent Merchandise, and Merchant Consignment Goods), in each case including

- 11 -

HIGHLY CONFIDENTIAL                                            SEARS_507B_00001704

all cash, credit card payments, checks and similar items of payment and deposits, and the distribution of amounts payable hereunder; provided that, in the event (A) Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, and (B) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds and/or other amounts payable to Agent under this Agreement, then Merchant and Agent shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds and other such amounts contemplated by this Agreement as being payable to Agent.  Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to the Agency Accounts; provided that, in the event Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, Merchant shall deliver to Agent copies of all bank statements and other information relating to such accounts to enable Agent to track and trace deposited funds that constitute Proceeds and other amounts contemplated by this Agreement.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts (including if Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts), whether received during or after the Sale Term.  Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale and all other amounts contemplated by this Agreement shall be deposited into the Agency Accounts.

(iii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, and Merchant identification number(s) and existing bank accounts for credit card Proceeds solely for purposes of the Sale, and for processing transactions relating to Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E.  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures.  Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds (and proceeds from Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E) for Agent's own account.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and Owned FF&E sold during the Sale, whether received during or after the Sale Term.

(iv)    Commencing on the first business day following the Payment Date, and continuing on each business day thereafter, Merchant shall promptly pay to Agent, by wire transfer of immediately available funds, all funds constituting Proceeds, and proceeds from Merchant Consignment Goods, Additional Agent Merchandise, and Owned FF&E that are deposited into the Designated Deposit Accounts for the prior day.  Agent shall, within a reasonable period of time after the date of each such payment by Merchant, notify

- 12 -

HIGHLY CONFIDENTIAL    SEARS_507B_00001705

Merchant of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of any undisputed shortfall.

(c)     Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after two (2) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after two (2) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(d)     All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds, which shall be wired by Agent or Merchant, as applicable, no later than 2:00 p.m. (prevailing Eastern Time) on the date that such payment is due; provided that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (prevailing Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

(e)     Guaranty Security. To secure payment of the balance of any unpaid portion of the Guaranteed Amount, the Sharing Amount, Expenses, the Additional Agent Merchandise Fee, and other amounts due to Merchant hereunder, Agent shall deliver to Merchant, to be held by Merchant for the benefit of parties with security interests in the Merchandise (the "Interested Parties"), in each case, in accordance with the lien priorities set forth in the DIP ABL Financing Order (as defined below), an irrevocable standby letter of credit, substantially in the form of Exhibit 3.3(e) attached hereto, in an original stated amount equal to the aggregate of (x) twenty percent (20%) of the product of the Guaranty Percentage *multiplied by* the estimated aggregate Cost Value of the Merchandise in the Stores and Distribution Centers (based upon Merchant's books and records maintained in the ordinary course at the close of business on the last day immediately preceding the Sale Commencement Date, but excluding for purposes hereof the In-Transit Merchandise), and (y) two (2) weeks' estimated Expenses (the "Letter of Credit"). The Letter of Credit shall name Merchant and [•] (in accordance with the lien priorities set forth in the DIP ABL Financing Order) as co-beneficiaries. The Letter of Credit shall be delivered to Merchant no later than the Payment Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant. In the event that Agent fails to timely pay any amount hereunder in respect of the Guaranteed Amount, the Sharing Amount, the Additional Agent Merchandise Fee, Expenses and/or any other amounts due by Agent as required under this Agreement, Merchant, on behalf of itself and the applicable Interested Parties, shall be entitled to draw on the Letter of Credit to fund such amount or obligation after three (3) business days' written notice to Agent. Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount (other than the Initial Guaranty Payment; provided, however, until the Final Reconciliation has been completed, under no circumstances shall the face amount of the Letter of Credit be reduced to an amount less than three (3) weeks' estimated Expenses. The Letter of Credit shall expire no earlier than sixty (60) days after the Sale

- 13 -

HIGHLY CONFIDENTIAL                    SEARS_507B_00001706

Termination Date; provided that, if, as of the tenth (10th) business day prior to the scheduled expiration date of the Letter of Credit, there remains any unresolved dispute as to the Guaranteed Amount, the Sharing Amount, the Additional Agent Merchandise Fee, Expenses and/or any other amounts due by Agent under this Agreement and/or Expenses, Agent shall cause the expiration date of the Letter of Credit to be extended for successive thirty (30) day intervals (or such other longer duration as Merchant and Agent may agree) until the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount, the Sharing Amount, the Additional Agent Merchandise Fee, Expenses and/or any other amounts due by Agent under this Agreement have been paid to Merchant.  If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the expiration date of the Letter of Credit (as may have been extended previously), Merchant shall have the right to make a drawing under the Letter of Credit in an amount equal to the amount(s) Merchant asserts are then owing to Merchant.  After completion of the Final Reconciliation and payment in full of all amounts owing by Agent (including, but not limited to, the Guaranteed Amount, the Sharing Amount, the Additional Agent Merchandise Fee, and Expenses), Merchant shall surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated.

As used herein, the "DIP ABL Financing Order" means the Final Order (I) Authorizing the Debtors to (A) Obtain Post-petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief (Docket No. 955, entered by the Bankruptcy Court on November 30, 2018), as may be amended, supplemented or modified from time to time.

(f)     Agent shall purchase all cash in the Stores and Distribution Centers as of the close of business on the day immediately prior to the Sale Commencement Date on a dollar for dollar basis, with such payment to be made concurrently with the payment of the Initial Guaranty Payment.

Section 4.     Expenses of the Sale

4.1     Expenses.  Agent shall be unconditionally responsible for all "Expenses", which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent and/or Merchant may review or audit the Expenses at any time.  As used herein, "Expenses" shall mean the Store-level (and where expressly applicable, Distribution Center-level and COs-level) operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)     (i) Occupancy Expenses for the Stores on a per location basis in an amount up to the per diem amount set forth on Exhibit 4.1(a) hereto, plus (ii) the pro-rated portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale to the extent set forth on Exhibit 4.1(a), plus (iii) the pro-rated portion of any percentage rent obligations attributable to the sale of Additional Agent Merchandise during the Sale to the extent set forth on Exhibit 4.1(a) (in each case as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1);

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                   SEARS_507B_00001707

(b)    actual wages for all Store-level Retained Employees used in conducting the Sale for actual days/hours worked during the Sale Term; provided that, Agent shall only be obligated to pay 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the wages for Retained Employees used during the Inventory Taking;

(c)    amounts payable by Merchant for benefits accrued during the Sale Term for Retained Employees (including payroll taxes, FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) for Store-level Retained Employees used in the Sale, in an amount up to 20% of base wages for all Store-level Retained Employees (the "Benefits Cap");

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    all costs and expenses of Agent's on-site supervision of the Stores, Distribution Centers, and COs, including, but not limited, to any and all fees, wages, bonuses, deferred compensation, taxes, and third party payroll costs and expenses of Agent's field personnel, travel to, from or between the Stores, Distribution Centers, and the COs, and all out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(f)    all costs and expenses of banners, sign walkers, and interior and exterior signs that are produced for the Sale;

(g)    the promotional costs, including, without limitation, email blasts, sign walkers, television, ROP, other advertising and direct mail, attributable to the Sale and ordered or requested by Agent;

(h)    the costs and expenses of obtaining additional supplies used at the Stores and Distribution Centers as may be required by Agent in the conduct of the Sale;

(i)    postage/overnight delivery/courier charges to and from or among the Stores to the extent relating to the Sale;

(j)    credit card and bank card fees, chargebacks, and discounts relating to the Sale;

(k)    any and all costs of moving, transferring, or consolidating Merchandise between the Stores;

(l)    a pro rata portion for the Sale Term of Merchant's premiums in respect of general liability, casualty, property, inventory, and other insurance policies attributable to the Merchandise and the Stores;

(m)    third-party payroll processing fees associated with the Sale;

(n)    armored car service and security personnel;

- 15 -

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00001708

(o)     Agent's (i) reasonable legal fees and expenses in an amount not to exceed $150,000, (ii) letter of credit fees, (iii) insurance (as provided in Section 12.4 hereof), and (iv) actual cost of capital;

(p)     actual costs of the Designated Deposit Accounts (including Agent Accounts) attributable to the Sale Term, including bank fees and wire charges;

(q)     Agent's 50% share (pursuant to Section 5.1 hereof) of the third party fees and expenses of the Inventory Taking;

(r)     subject to Section 8.1(c), Central Service Expenses in an amount equal to $1,500,000 per week for the Sale Term (payable to Merchant) in respect of the cost of Merchant providing Central Services in accordance with Section 8.1 hereof;

(s)     Store cash thefts and other Store cash shortfalls in registers;

(t)     any costs and expenses incurred in connection with the acquisition (including costs of goods), delivery, processing and transfer of any Additional Agent Merchandise;

(u)     subject to Section 8.1(c), Distribution Center Expenses in an amount not to exceed $3,500,000 per week, until the date on which all Merchandise is removed from the Distribution Centers (payable to Merchant in respect of the cost of Merchant providing Distribution Center Services, including without limitation, as initiated by Agent, any and all delivery and freight costs of moving, transferring, or consolidating Merchandise between the Distribution Centers and the Stores);

(v)     costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale (to the extent approved by Merchant); and

(w)     the actual costs and expenses of Agent providing such additional services as Agent deems appropriate for the Sale, provided that such additional services were approved by Merchant in advance in writing.

"Expenses" shall not include:  (i) Central Service Expenses in excess of the amount set forth in Section 4.1(r); (ii) Distribution Center Expenses in excess of the amount set forth in Section 4.1(u); (iii) Excluded Benefits; (iv) any rent or other occupancy expenses for the Stores other than Occupancy Expenses in accordance with Section 4.1(a) hereof to the extent actually incurred; or (v) any costs, expenses or liabilities other than the Expenses listed above.  All costs or expenses related to the Sale not included as Expenses shall be paid by Merchant promptly when due during the Sale Term.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.  Notwithstanding anything herein to the contrary, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses and Distribution Center Expenses) with respect to any Store or Distribution Center incurred after the earlier of the Sale Termination Date or the applicable Vacate Date for such Store or Distribution Center.  Notwithstanding anything herein to the contrary, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses and Distribution Center Expenses) with respect to (i) any Fee

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                    SEARS_507B_00001709

Store, or (ii) any Store or Distribution Center incurred, and relating to the period, prior to the Sale Commencement Date.

As used herein, the following terms have the following meanings:

"Central Service Expenses" means costs and expenses for Merchant's Central Services.

"Central Services" means those Merchant central administrative services necessary for the conduct and support of the Sale, including, but not limited to, use or and access to Merchant's: (i) inventory control system, (ii) payroll system, (iii) accounting system, (iv) office facilities, (v) MIS and POS services, (vi) cash and inventory reconciliation, (vii) central administrative services and personnel to process and perform sales audit, banking, and other normal course administrative services customarily provided to or for the benefit of operating the Stores and including data processing and reporting, email preparation and distribution, and information technology updates, functionality, and maintenance, (viii) such other central office services reasonably necessary (in the reasonable judgment of Agent) for the Sale, and (ix) to use reasonably sized offices located at Merchant's central office facility to effect the Sale.

"Distribution Center Expenses" means the actual costs and expenses, including use and Occupancy Expenses and Distribution Center employee payroll and other obligations, of the operations of the Distribution Centers, and the actual costs and expenses (including inbound or outbound freight) related to the processing, transfer, and consolidation of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and supplies in the Distribution Centers and from the Distribution Centers to the Stores (and the provision of such services shall be referred to as collectively, the "Distribution Center Services"). Agent shall not use Merchant's Distribution Centers for purposes of receiving or shipping Additional Agent Merchandise unless otherwise agreed to by Merchant and Agent and the associated cost has been paid by Agent to Merchant.

"Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

"Occupancy Expenses" means actual rent, percentage rent, common-area maintenance, landlord promotional fees, real estate and use taxes, merchant association dues and charges, HVAC, utilities, telecom/telephone charges, point-of-sale systems maintenance, store security systems, routine repairs and maintenance, taxes and licenses, costs of all local, long-distance, and international telephone, satellite broadband connections, T-1 lines, broadband internet, and other telecommunications services, trash removal (to the extent excluded as a fixed charge component of lease obligation), snow removal, and ordinary course third-party cleanings, pest control services, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(a) attached hereto and in an amount not to exceed to the specific amounts set forth on Exhibit 4.1(a) attached hereto and calculated in accordance with Section 4.1(a), including any percentage rent obligations indicated thereon and incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise (including In-Transit Merchandise and Distribution Center Merchandise that arrives in the Stores on or prior

- 17 -

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00001710

to the Receipt Deadline) and (y) Additional Agent Merchandise included in the Sale. Merchant and Agent agree that Exhibit 4.1(a) shall specify the actual applicable percentage and any applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s). Merchant and Agent further agree that in the event Exhibit 4.1(a) does not specify the actual applicable percentage and/or the applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s), Agent shall have no obligation to pay percentage rent other than as set forth on Exhibit 4.1(a). Notwithstanding anything to the contrary set forth in this Agreement, Merchant and Agent further agree that to the extent that, in connection with the conduct of the Sale and/or Agent's vacating of the Stores (but not in connection with the disposition of any unsold Owned FF&E or other non-Merchandise assets being abandoned or otherwise disposed of by Merchant), Merchant incurs additional trash removal charges at a Store, other than the fixed charge component of Merchant's lease obligation for a particular Store provided for on Exhibit 4.1(a) (the "Non-CAM Trash Removal Charges"), such Non-CAM Trash Removal Charges shall be paid by Agent as an Expense of the Sale, in addition to any trash removal charges as may be set forth in Exhibit 4.1(a) hereof.

"Third-party" means, with reference to any Expenses, a party that is not affiliated with or related to Merchant.

4.2     Payment of Expenses.  From and after the Sale Commencement Date, Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant immediately following the weekly reconciliation by Merchant and Agent pursuant to Section 8.7(a) below, based upon invoices and other documentation reasonably satisfactory to Merchant and Agent.

Section 5.     Inventory Valuation; Merchandise.

5.1     Inventory Taking.

(a)     Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a Retail Price, SKU-level physical inventory (the "Inventory Taking") of the Merchandise located in the [150] Stores listed on the attached Exhibit 5.1(a) (each a "Test Store" and collectively, the "Test Stores"), which Inventory Taking shall be completed in each such Test Store no later than [●] calendar days after the Sale Commencement Date. The date of the Inventory Taking at each such Test Store shall be referred to as the "Inventory Date" for such Test Store. Merchant and Agent shall jointly employ WIS International or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking in the Test Stores. The Inventory Taking shall be conducted in accordance with the procedures and instructions mutually agreed upon by Merchant and Agent (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service. The balances of such fees and expenses shall be paid by Merchant. Except as provided in the immediately preceding sentence, Merchant and Agent shall each bear their respective costs and expenses related to the Inventory Taking; provided that, Agent shall be obligated to pay fifty percent (50%) of the payroll and related benefit costs (subject to the

- 18 -

HIGHLY CONFIDENTIAL                                                                                                          SEARS_507B_00001711

Benefits Cap) for Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining fifty percent (50%) of the payroll and related benefit costs for Retained Employees used during the Inventory Taking. Merchant and Agent shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking in each of the Test Stores, the applicable Test Store shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking at such Test Store has been completed, as agreed by Merchant and Agent. The Inventory Taking shall not take place on Saturdays, Sundays or federal holidays.  Merchant and Agent further agree that from and after the Sale Commencement Date until the Inventory Taking in each particular Test Store is complete, neither Agent nor Merchant shall (i) transfer any Merchandise to or from that Test Store (other than Distribution Center Merchandise and In-Transit Merchandise, which, in each case, is distinctly tagged or otherwise marked as such or recorded in Agent's transfer log), (ii) deliver any Additional Agent Merchandise to such Test Store (unless such merchandise is tracked by unique SKU that can be tracked separately), (iii) move Merchandise within or about the Test Stores so as to make any such items unavailable for counting as part of the Inventory Taking, or (iv) remove or add any Merchant hang tags, price tickets, inventory control tags, or other indicia of pricing affixed to or related to any Merchandise. Merchant and Agent shall use their reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion. In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following completion of the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof; provided, however, that none of Merchant, Agent or any other party in interest in the Bankruptcy Cases shall be permitted to assert that the Test Stores are not representative of the Stores or that the extrapolation of the results of the Inventory Taking to Stores other than the Test Stores (the "Non-Inventoried Stores") in accordance with Section 5.1(b) hereof should otherwise be set aside.

(b)     The results of the Inventory Taking at the Test Stores (the "Test Store Results") shall be used to determine appropriate adjustments to the books and records of Merchant in connection with the calculation of the aggregate Cost Value of the Merchandise as follows: (i) with respect to the Test Stores, the actual Test Store Results for the Inventoried Stores, as adjusted by Gross Rings in accordance with Section 5.3(b)(iv); (ii) with respect to the Non-Inventoried Stores, the actual aggregate Test Store Results for all of the Test Stores shall be compared to the books and records of Merchant for such Test Stores (as adjusted in accordance with Section 5.3 hereof), as adjusted by Gross Rings in accordance with Section 5.3(b)(iv), and with respect to the aggregate Cost Value of the Merchandise, an aggregate percentage variance (the "Variance") from the books and records of Merchant shall be calculated in accordance with mechanics to be agreed upon between the Agent and the Merchant (the "Inventory Taking File"), and the Variance shall be applied with respect to the Merchandise located at the Non-Inventoried Stores.

(c)     Distribution Center Merchandise and In-Transit Merchandise received at a Store after the Inventory Date for such Store shall be counted and reconciled within five (5) business days after receipt of such goods in the Stores in accordance with the procedures set forth below. Absent prior notification and agreement of Merchant, failure to report any variance between the received shipment from the respective shipping documents (each a "Shipping Variance"), within such five (5) business day period shall, result in such receipts being confirmed received consistent with the applicable shipping documents. Merchant shall have five (5) business days to

- 19 -

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                        SEARS_507B_00001712

verify a timely issued Shipping Variance (each a "<u>Shipping Variance Response</u>"), and absent prior notification and agreement of Agent, failure to respond to an asserted Shipping Variance within such five (5) business day period shall result in such Shipping Variance being deemed valid. If Merchant timely issues a Shipping Variance Response that disputes the asserted Shipping Variance, Merchant and Agent shall cooperate with each other to verify and resolve such dispute; <u>provided</u> that, in the event Merchant and Agent are unable to resolve such dispute within ten (10) business days from Agent's receipt of a Shipping Variance Response from Merchant (or such greater period as Merchant and Agent may mutually agree), such dispute shall be resolved in the manner provided for resolution of disputes under Section 8.7(b)(ii) hereof. Distribution Center Merchandise and In-Transit Merchandise received at a Store prior to the Inventory Date for such Store shall be counted using Gross Rings or as part of the Inventory Taking, as applicable.

5.2    <u>Merchandise Subject to this Agreement.</u>

(a)    For purposes of this Agreement, including but not limited to the calculation of the Guaranteed Amount, "Merchandise" means all new, first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant, customarily sold to customers in the ordinary course of Merchant's business and located in the Stores (or, with respect to Returned Merchandise, In-Transit Merchandise and Distribution Center Merchandise, received at the Stores by the dates specified in this Agreement), including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date; (iii) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto); and (iv) In-Transit Merchandise and Distribution Center Merchandise received in the Stores on or before March 31, 2018 (the "<u>Receipt Deadline</u>"). Notwithstanding the foregoing, "Merchandise" shall not include (i) goods that belong to sublessees, licensees, or concessionaires of Merchant; (ii) goods held by Merchant on memo, on consignment, or as bailee; (iii) Excluded Defective Merchandise; (iv) Additional Agent Merchandise (although Additional Agent Merchandise Proceeds shall constitute Proceeds); (v) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Stores, Distribution Centers or COs; <u>provided</u> that, if Merchant so elects, Agent shall be permitted to sell Owned FF&E as set forth in this Agreement; (vi) In-Transit Merchandise and Distribution Center Merchandise that is received at the Stores after the Receipt Deadline; (vii) any merchandise or other assets located at the Fee Stores; and (viii) any asset, or interest in any asset, owned by Merchant except those assets expressly constituting Merchandise, including, but not limited to, accounts, cash, cash proceeds, chattel paper, commercial tort claims, deposit accounts, commercial tort claims, general intangibles other than consumer goods inventory, instruments, investment property, letter of credit rights, payment intangible, and records all as defined under UCC 9-102, real estate and interests in real estate, and intellectual property and interests in intellectual property, including copyrights, trademarks, patents, and brands.

(b)    As used in this Agreement, the following terms have the respective meanings set forth below:

"<u>Defective Merchandise</u>" means any item of Merchandise identified and agreed upon by Merchant and Agent as defective in that it is damaged, defective, scratched, soiled, ripped, torn, stained, faded, discolored, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mis-mated or near-sized, items typically sold as a set which are incomplete, or gift

- 20 -

HIGHLY CONFIDENTIAL                                    SEARS_507B_00001713

with purchase items, or otherwise affected by other similar defenses rendering it not first quality. Sample merchandise and merchandise on display in the Stores shall not per se be deemed to be Defective Merchandise.

"Distribution Center Merchandise" means those items of new, finished, first-quality, saleable in the ordinary course of business that are located in Merchant's Distribution Centers and which inventory shall be delivered by Merchant to the Stores as directed by Agent (in accordance with the schedule referenced below) after the Sale Commencement Date; provided, however, it is agreed and understood that between the date of this Agreement and the Sale Commencement Date, Merchant shall have the right to allocate and distribute Distribution Center Merchandise to the Stores in the ordinary course of business consistent with past practices. Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation of the Distribution Center Merchandise to the Stores not later than two (2) days after the Sale Commencement Date; provided, further, that the Parties agree that the allocation schedule shall provide that all such Distribution Center Merchandise shall be allocated and shipped to the Stores no later than the Prevailing Discount Deadline. For the avoidance of doubt, the inventory associated with the E-Commerce Platform shall not be treated as Distribution Center Merchandise.

"Excluded Defective Merchandise"  means (a) any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose, (b) [parts or components not sold separately by Merchant to consumers in the ordinary course of business], and/or (c) Spoiled Goods. Excluded Defective Merchandise located in the Stores shall be identified and counted during the Inventory Taking and thereafter removed from the sales floor. Agent shall use commercially reasonable efforts to identify and segregate Excluded Defective Merchandise located in the Distribution Centers prior to being shipped from the Distribution Centers and segregated. To the extent that goods in transit to the Stores or located at the Distribution Centers constitute Excluded Defective Merchandise and such goods arrive at the Stores, such goods shall be identified during the Inventory Taking or, to the extent such goods arrive in a Store after the Inventory Date for such Store, such goods shall be reasonably identified by Agent within five (5) business days after receipt at such Store and shall be segregated.

"In-Transit Merchandise" means items of inventory that were ordered by Merchant and which (i) were on order or in-transit to the Stores or Distribution Centers as of the Sale Commencement Date and (ii) consist of new, finished, first-quality goods inventory; provided, however, it is agreed and understood that between the date of this Agreement and the Sale Commencement Date, Merchant shall have the right to allocate and distribute In-Transit Merchandise to the Stores in the ordinary course of business consistent with past practices. Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation of the In-Transit Merchandise to the Stores not later than two (2) days after the Sale Commencement Date; provided, further, that the Parties agree that the allocation schedule shall provide that all In-Transit Merchandise shall be allocated and shipped to the Stores no later than the Prevailing Discount Deadline.

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00001714

"Spoiled Goods" means spoiled perishable inventory, including, without limitation, opened boxes, bottles or cans containing perishable inventory, expired or out of date goods and goods that would not be bought by a customer in the ordinary course because they are rotted, spoiled, or subject to similar defect.

5.3    Valuation.

(a)    For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (i) Merchant's actual cost or, if multiple actual costs, Merchant's average cost of such item as reflected in Merchant's inventory item master cost file[s] entitled [INSERT FILE NAME(S)] (together with all updated files delivered by Merchant to Agent and specifically identified as an updated cost file at or prior to the entry of the Approval Order, the "Cost File") (provided that Merchant shall have the right to modify the Cost File at any time to correct manifest error with respect to the cost of an item) or (ii) the Retail Price. The Cost Value, as calculated in accordance with this definition, shall be inclusive of all costs of freight with respect to each item of Merchandise so long as such costs are reflected in the Cost File. For purposes of calculating the Cost Value, if the Cost File as updated and provided by the Merchant at or prior to the entry of the Approval Order to Agent at or prior to the entry of the Approval Order contains a new SKU, the Cost Value of that new SKU set forth in the Cost File as updated and provided by Merchant to Agent shall control.

"Retail Price" shall mean with respect to each item of Merchandise, the lowest ticketed, hard-marked, Merchandise file price for such item, excluding any Excluded Pricing Adjustments. For the purposes of this Agreement, if an item of Merchandise has more than one ticketed or file price, or if multiple items located in any Store of the same SKU are marked at different prices, the lowest ticketed or file price on any such item shall prevail for such item, or for such multiple items with the same SKU located in such Store (but not all Stores), as the case may be, unless it is reasonably determined by Merchant and Agent that the lowest ticketed or file price was mismarked, in which case the higher ticket price shall control.

(b)    Anything in Section 5.3(a) and 3.1(e) to the contrary notwithstanding, Merchant and Agent further agree as follows:

(i)    the Cost Value of any item of In-Transit Merchandise or Distribution Center Merchandise that is not received in a Store after February 27, 2018 (the "Prevailing Discount Deadline"), but on or before the Receipt Deadline, shall be the otherwise applicable Cost Value of such item (determined in accordance with Section 5.3(a) above), *multiplied* by the inverse of the excess of the (i) the prevailing Sale discount in effect on the date such item arrives in the applicable Store *over* (ii) the Merchant's discount with respect to such item as of the Sale Commencement Date (provided such excess is a positive number) (the "Prevailing Discount Adjustment"). Agent shall coordinate and schedule shipments of Distribution Center Merchandise and In-Transit Merchandise from the Distribution Centers to the Stores so as to minimize the effect of the Prevailing Discount Adjustment;

(ii)    the Cost Value of Defective Merchandise shall be determined by mutual agreement of Merchant and Agent; if Merchant and Agent are unable to so agree,

- 22 -

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                  SEARS_507B_00001715

or if an item is determined to be Excluded Defective Merchandise, such goods shall be excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder, including, without limitation, calculation of the Guaranteed Amount, the Sharing Amount and Proceeds;

(iii)    (A) Excluded Price Adjustments shall not be taken into account in determining the Retail Price of any item of Merchandise and (B) "Excluded Price Adjustments" means the following discounts or price adjustments offered by the Merchant: (i) point of sale discounts or similar adjustments (regardless of duration); (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) coupons (Merchant's or competitors'), catalog, website, or circular prices, or "buy one get one" type discounts; (vi) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (vii) obvious ticketing or marking errors; (viii) instant (in-store) or mail in rebates; and (ix) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations; and

(iv)    if the Sale commences prior to the completion of the Inventory Taking at any Store, then for the period from the Sale Commencement Date until the Inventory Date for such Store (the "Gross Rings Period"), Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings") and (ii) cash reports of sales within such Store. Agent and Merchant shall keep a strict count of register receipts and reports to determine the aggregate Merchandise actually sold by SKU during the Gross Rings Period. All such records and reports shall be made available to Merchant and Agent during regular business hours upon reasonable notice. For each item of Merchandise included in the Sale using the Gross Rings inventory taking method, such item shall be included in Merchandise using the actual Cost Value of the Merchandise plus one percent (1%) shrink provision.

5.4    Excluded Goods. Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder and shall remove, at Merchant's expense, such goods from the Stores and Distribution Centers prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable. If Merchant so elects during the first two (2) weeks of the Sale Term, Agent shall accept those goods not included as "Merchandise" hereunder and as identified by Merchant for sale (including for these purposes any In-Transit Merchandise or Distribution Center Merchandise that is not received at the Stores on or prior to the Receipt Deadline) (collectively, the "Merchant Consignment Goods"). Merchant Consignment Goods shall be sold at prices mutually agreed upon by Merchant and Agent. Agent shall retain twenty percent (20%) of the sale price (less applicable Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive eighty percent (80%) of the sale price (less applicable Sales Taxes) in respect of sales of Merchant Consignment Goods. Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly reconciliation by Merchant and Agent pursuant to Section 8.7(a) below. Except as expressly provided in this Section 5.4, Agent shall have no cost, expense, or responsibility in connection with any goods not included in Merchandise, including but not limited to sales commissions and percentage rent.

- 23 -

HIGHLY CONFIDENTIAL

Section 6.    Sale Term.

6.1    Term.  The Sale shall commence at each of the Stores and Distribution Centers on the first business day after entry of the Approval Order but in no event later than February 2, 2019 (the "Sale Commencement Date").  Agent shall complete the Sale and vacate the premises of each Store and Distribution Center in favor of Merchant or its representative or assignee on or before [May 15], 2019 (the "Sale Termination Date").  The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "Sale Term."   The Sale Termination Date as to any Store may be (a) extended by mutual written agreement of Agent and Merchant or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than seven days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice").  So long as Agent provides timely notice to Merchant in accordance with the preceding sentence, Agent shall be responsible for its pro rata share of the Occupancy Expenses for any month during which the applicable Store was vacated (based on the number of days of the applicable month during which the applicable Store was occupied by Agent).  If Agent fails to provide Merchant with timely notice of an acceleration of the Sale Termination Date for a Store, Agent shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice in accordance with the terms of this Agreement.

6.2    Vacating the Closing Stores and Distribution Centers.  Subject to the terms of Section 6.1 hereof, Agent shall provide Merchant with not less than seven days' advance written notice of its intention to vacate any Store or Distribution Center (as to each, as applicable, the "Vacate Date").  On the Vacate Date, Agent shall vacate such Store or Distribution Center in favor of Merchant or its representatives or assignee, (subject to Agent's right to abandonment) remove all Remaining Merchandise, all Merchant Consignment Goods and any unsold Additional Agent Merchandise from the Store or Distribution Center, and leave such Store or Distribution Center in "broom clean" condition (ordinary wear and tear excepted) subject to the right to abandon, neatly in place, any assets of the Merchant (including, without limitation, any unsold Owned FF&E).  Agent's obligations to pay all Expenses, including Occupancy Expenses or Distribution Center Expenses, for each Store or Distribution Center subject to Vacate Notice shall continue only until the earlier of the (a) applicable Vacate Date for such Store or Distribution Center, or (b) the Sale Termination Date.  All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores or Distribution Centers, to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent.  Any reference in this Section 6 to vacating the Stores or Distribution Centers means vacating the Stores or Distribution Centers, as applicable, in favor of Merchant, its representatives, or assignee and shall not mean Merchant vacating possession or disclaimer of lease in favor of the landlord or owner of the Store or Distribution Center premises.  Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent, or licensee thereof) to any Store or Distribution Center during the Sale Term, ordinary wear and tear excepted.  Agent shall have the right to abandon in place any asset of Merchant (including, without limitation, any unsold Owned FF&E).  Agent shall provide Merchant with a Vacate Notice for the Distribution Centers such that the Vacate Date shall be no later than March 31, 2018.

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                        SEARS_507B_00001717

Section 7.    Intentionally Omitted.

Section 8.    Conduct of the Sale.

8.1    Rights of Agent and Merchant.    Subject to the Approval Order and the Sale Guidelines, Agent shall be permitted to conduct a "going out of business", "total liquidation", "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sale at the Stores or Distribution Centers throughout the Sale Term.  Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Approval Order, all governing laws and applicable leases, reciprocal easement agreements, ground leases, documents of record, and such other related documents and agreements to which Merchant is a party.  Agent shall conduct the Sale in accordance with the sale guidelines annexed hereto as Exhibit 8.1 and approved by the Approval Order (the "Sale Guidelines"), whether by in-store promotion, media advertising, or other promotional materials.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business, so long as Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.  In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the following rights, limited by the Sale Guidelines:

(a)    except as otherwise provided in the Approval Order, to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages, or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws; and will not extend the hours of operation at one or more of the Stores beyond the hours historically operated by Merchant;

(b)    to use without charge during the Sale Term (except where otherwise designated as an Expense pursuant to Section 4.1 hereof), (i) all furniture, fixtures and equipment and leasehold improvements, (ii) bank accounts, (iii) Store-level, Distribution Center-level, and corporate computer hardware and software, (iv) customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with advertising the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data; and, for the avoidance of doubt, Agent shall have no rights with respect to the E-Commerce Platforms (as defined in Section 8.9 hereof)), (v) existing supplies located at the Stores or Distribution Centers, (vi) intangible assets (including Merchant's names, logos, and tax identification numbers), (vii) Stores and Distribution Centers' keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores and Distribution Centers, (viii) reasonably sized and placed office space at Merchant's COs and Distribution Centers to coordinate the management of the Sale; and (ix) any other assets of Merchant located at the Stores or Distribution Centers (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses.  Agent shall exercise due care and return to Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

- 25 -

WEIL:\96854468\4\73217.0004

 SEARS_507B_00001718

(c)     subject to Agent's payment (if applicable) in accordance with Sections 4.1(r) and (u) above in respect of Central Services Expenses and Distribution Center Expenses, Merchant agrees and covenants that it shall be responsible for performing and providing to Agent such Central Services and Distribution Center Services necessary or incident to the conduct of the Sale, including, but not limited to, use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale to the extent such services are directly provided by Merchant in the ordinary course of business; provided, however, that, in the event Agent expressly requests Merchant to provide services other than those normally provided to the Stores and/or Distribution Centers by Merchant in the ordinary course of business or as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)     to establish Sale prices and implement advertising, signage (including A-frame, interior and exterior banners and signs and sign walkers), and promotional programs consistent with the sale theme described herein, and as otherwise provided in the Approval Order and the Sale Guidelines, as and where applicable (including, without limitation, by means of media advertising, A-frame, interior and exterior banners and signs, use of sign walkers and similar signage);

(e)     once the Inventory Taking is complete at both the transferring Store and the receiving Store, to transfer Merchandise between and among the Stores;

(f)     to use Merchant's website for the limited purposes of advertising, promoting and conducting the Sale at the Stores, periodically (no more than once per week or such greater frequency as Merchant and Agent may agree) updating such advertising and promotions and maintaining and updating the Store locator function;

(g)     to supplement the Merchandise at the Stores with Additional Agent Merchandise in accordance with Section 8.10 hereof; and

(h)     to conduct the Sale in accordance with the Sale Guidelines attached hereto as Exhibit 8.1.

8.2     Terms of Sales to Customers.  Subject to Agent's compliance with applicable law (as determined with reference to the Approval Order), all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized credit and debit cards (including Sears' card).  Agent shall not honor any discount or adjustment that constitutes an Excluded Pricing Adjustment hereunder.  Merchant shall have no obligation to reimburse Agent for any amounts related to Merchant's any such Excluded Pricing Adjustment, nor shall any such amounts constitute an Expense.  During the Sale Term, Agent shall not accept coupons or groupons.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term, so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                  SEARS_507B_00001719

8.3     Sales Taxes.

(a)     During the Sale Term, all sales, excise, gross receipts, transfer and other taxes attributable to sales of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and/or Owned FF&E as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and/or Owned FF&E and collected by Agent in trust for Merchant at time of sale and except for Sales Taxes for Additional Agent Merchandise, shall be paid over to Merchant.  All Sales Taxes that are paid over pursuant to the preceding sentence shall be deposited on no less than a bi-weekly basis into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  If Agent does not timely remit the applicable Sales Taxes to Merchant, Merchant shall be permitted to draw on the Letter of Credit in the full amount of the applicable Sales Taxes collected by Agent in the preceding week in accordance with Section 3.3(f).  Provided that Agent has collected all applicable Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all applicable Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities.  Notwithstanding anything to the contrary herein, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Merchant Consignment Goods and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "Additional Taxes and Penalties").  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  Agent shall be solely responsible for payment of any sales taxes and the preparation and filing of all applicable reports with the applicable taxing authorities with respect to the (i) Additional Agent Merchandise and (ii) Remaining Merchandise subsequent to the conclusion of the Sale.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant and its officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties (including but not limited to all Additional Taxes and Penalties) that Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and remit them to Merchant and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, any taxing authority, or any other party, and Merchant shall indemnify and hold harmless Agent and its officers, directors, employees, agents and Supervisors (collectively, "Agent Indemnified Parties") from and against all claims, demands, assessments, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to the failure by Merchant to promptly pay such taxes (other than Sales Taxes with respect to Additional Agent Merchandise and Remaining Merchandise) to the proper taxing authorities and/or the failure by Merchant to

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                      SEARS_507B_00001720

promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.

(b)    Without limiting the generality of Section 8.3(a) hereof, the Parties intend that because Agent will conduct the Sale solely as agent for Merchant, the various payments that this Agreement contemplates (including the payment by Agent of the Guaranteed Amount) in respect of the Sale do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4    <u>Supplies</u>.    Agent shall have the right to use all existing supplies necessary to conduct the Sale (e.g., boxes, bags, and twine, but not gift certificates, rain checks, merchandise credits, or the like) located at the Stores and/or Distribution Centers at no charge to Agent.  In the event that additional supplies are required in any of the Stores or the Distribution Centers and Agent requests such additional supplies, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; <u>provided</u>, <u>however</u>, that if reasonably requested by Agent, Merchant shall assist Agent in obtaining supplies, at Agent's expense, from Merchant's vendors at Merchant's usual and customary costs for such supplies.  Merchant does not warrant that Merchant's existing supplies as of the Sale Commencement Date are adequate for purposes of the Sale.

8.5    <u>Returns of Merchandise</u>.    During the first thirty (30) days of the Sale, Agent shall (a) accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "<u>Returned Merchandise</u>") and (b) maintain a separate log recording each such return.  Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise.  To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise and for purposes of the calculation of the Guaranteed Amount and shall be valued at the Cost Value applicable to such item, *multiplied* in each case, solely to the extent the applicable return occurs after the Prevailing Discount Deadline, by the inverse of the excess of the (i) the prevailing Sale discount in effect on the date such item is returned *over* (ii) the Merchant's discount with respect to such item as of the Sale Commencement Date (provided such excess is a positive number).  Subject to Merchant's reimbursement to Agent of the amount of any store credit or refund granted for any such Returned Merchandise, the aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly.  If the Returned Merchandise is not first quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Cost Value attributable thereto; <u>provided</u> that, in the event Merchant and Agent cannot agree on the Cost Value to be attributed to any particular item(s) of Returned Merchandise, than such item(s) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder.  Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the weekly reconciliation pursuant to Section 8.7(a) hereof.  Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the final reconciliation provided for under Section 8.7(b) hereof.

- 28 -

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                                    SEARS_507B_00001721

8.6     Gift Cards; Merchandise Credits; Membership Program.

(a)     Until (and inclusive of) the date that is thirty (30) days after the Sale Commencement Date, Agent shall accept Merchant's gift cards, merchandise credits and other similar Merchant-issued credits, if any; provided, however, Agent shall not advertise the acceptance of gift cards, merchandise credits and other similar Merchant issued credits. Merchant shall reimburse Agent in cash for gift card, merchandise credit, and other similar Merchant issued credit amounts redeemed during the Sale Term as part of the weekly sale reconciliation provided for in Section 8.7(a) hereof.

(b)     To the extent Merchant maintains any customer membership or customer loyalty discount programs (including, without limitation, ShopYourWay), Agent may at its sole discretion permit said customers to take advantage of discounts afforded customers in connection with Merchant's customer membership or customer loyalty discount programs ("Membership Program Discounts") in addition to the then-prevailing Sale discounts being offered by Agent (for example, a "take an additional 10% off" Membership Program Discount may be combined with Agent's thirty percent (30%) prevailing sale discount, such that the affected customer would receive an effective discount of thirty-seven percent (37%)), but Agent shall not be reimbursed by Merchant for any incremental increased discount nor shall such increased discount constitute an Expense. During the Sale Term, Merchant and Agent shall not continue to accrue benefits under Merchant's customer membership or customer loyalty discount programs; provided that Merchant alone shall be obligated to prevent such accrual and Agent shall not be liable in any fashion for Merchant's failure to do so.

(c)     Except as expressly set forth in this Agreement, all sales will be made only for cash, nationally recognized bank credit cards, and, in Agent's discretion, personal checks, provided, however, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefor.

8.7     Sale Reconciliation.

(a)     Weekly Reconciliation.   On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Merchant (in consultation with the Official Committee of Unsecured Creditors appointed in this Bankruptcy Case (the "Committee")) and Agent shall cooperate to reconcile Expenses, Gross Rings, proceeds of Additional Agent Merchandise, Returned Merchandise, and such other Sale-related items (as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), pursuant to procedures agreed upon by Merchant and Agent. On a weekly basis, Agent shall also provide Merchant (who shall provide a copy to the administrative agent for [•], the indenture trustee for [•], and the Committee) with a report (in electronic format acceptable to Merchant) of all sales of Additional Agent Merchandise, which report shall detail by Store, at a minimum, gross sales and type of items sold. To ensure accurate sales audit functions, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores.

(b)     Final Reconciliation.

- 29 -

WEIL:\96854468\4\73217.0004

                              SEARS_507B_00001722

(i)        Within thirty (30) days after the Sale Termination Date applicable to the last Store in which the Sale is concluded, Merchant and Agent shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, Additional Agent Merchandise Proceeds, sales of Merchant Consignment Goods, proceeds of Owned FF&E, Expenses, and any other accountings required hereunder (the "Final Reconciliation").  Within five (5) days after completion of the Final Reconciliation (the "Final Reconciliation Settlement Date"), Agent shall pay to Merchant or Merchant shall pay to Agent (as the case may be) any and all amounts due the other as set forth in the Final Reconciliation, including, but not limited to, any undisputed and unpaid Expenses.  In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of Merchant and Agent or as determined in the manner prescribed in Section 8.7(b)(ii) hereof.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes, Additional Agent Merchandise Proceeds, sales of Merchant Consignment Goods, proceeds of Owned FF&E, Expenses, and other Sale-related items to review and audit such records.

(ii)        In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise, (y) the Final Reconciliation and/or (z) any other dispute relating to this Agreement, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.  In the event of a dispute as to (x), (y) or (z) above, Agent shall extend the Letter of Credit in accordance with the provisions of Section 3.3.  If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the applicable expiration date (as may have been extended previously), Merchant shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the amounts Merchant asserts are then owing to Merchant in accordance with the terms of Section 3.3(f).

8.8    Force Majeure.  If any casualty, act of war or terrorism, or act of God prevents the conduct of business in the ordinary course at any Store for a period in excess of ten (10) consecutive days (a "Force Majeure Event"), such Store and the Merchandise located at such Store (unless subject to insurance proceeds or transferred to another Store) shall be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale that is not the subject of insurance proceeds or consolidated by Agent into another Store(s) and, to the extent Agent has paid the Guaranteed Amount to Merchant, Merchant shall reimburse Agent for the amount by which the Guaranteed Amount is so reduced prior to the end of the Sale Term.  If a Store is eliminated from the Sale due to a Force Majeure Event, Agent will use its best efforts to transfer therefrom all Merchandise that is not the subject of insurance proceeds and include such Merchandise in the Sale at other Stores.

- 30 -

HIGHLY CONFIDENTIAL                                                                                   SEARS_507B_00001723

8.9     E-Commerce Platform.  With respect to the e-commerce sales platforms related to or associated with sears.com and kmart.com (each, the "E-Commerce Platform"), Agent and Merchant agree that any inventory related thereto is not Merchandise hereunder.

8.10     Additional Agent Merchandise.

(a)     Agent shall have the right to supplement the Merchandise in the Sale with additional first quality goods procured by Agent which are of like kind and no lesser quality than the Merchandise in the Sale ("Additional Agent Merchandise"); provided that the costs associated with procuring any Additional Agent Merchandise and expenses related to, or incurred in connection with, obtaining, handling, transporting, delivering, unloading, storing, marketing and sale of the Additional Agent Merchandise for Additional Agent Merchandise sold during the Sale shall constitute Expenses hereunder.

(b)     Agent and Merchant intend that the transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  Subject to the Additional Agent Merchandise Proceeds being Proceeds hereunder, at all times and for all purposes the Additional Agent Merchandise shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Merchandise.  The Additional Agent Merchandise shall at all times remain subject to the exclusive control of Agent.

(c)     If requested by Agent, Merchant shall, at Agent's expense as an Expense hereunder, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Merchandise.

(d)     Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code in the State of [New York] (the "UCC").  Subject to Agent's obligation to pay the Additional Agent Merchandise Fee, if any, Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise Proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required or desirable notices and file all necessary or desirable financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise as consigned goods hereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Merchandise).

(e)     Agent and Merchant shall reasonably cooperate so as to ensure that the Additional Agent Merchandise is marked in such a way that a reasonable consumer could identify the Additional Agent Merchandise as non-Merchant goods.  Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Merchandise have been included in the Sale.

- 31 -

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00001724

Section 9.    <u>Employee Matters.</u>

9.1    <u>Merchant's Employees</u>.  Subject to the applicable provisions of the Approval Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's Store employees in the conduct of the Sale to the extent Agent deems expedient, and Agent may select and, after consulting with Merchant, schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such Store employees to be used in connection with the Sale (each such employee, a "<u>Retained Employee</u>") prior to the Sale Commencement Date.  Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.  Merchant and Agent agree that except to the extent that wages, payroll taxes, benefits, and other costs relating to the employment of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("<u>WARN Act</u>") claims, and other termination-type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

9.2    <u>Termination of Employees by Merchant</u>.  Agent may in its discretion stop using any Retained Employee at any time during the Sale.  In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for termination "for cause" (such as dishonesty, fraud, or breach of employee duties), in which case the seven (7) day notice period shall not apply; <u>provided</u>, <u>however</u>, that Agent shall notify Merchant of the basis for such "cause".  During the Sale Term, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld).  Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's actionable treatment of such Retained Employees as provided for in Section 13.2 below.

9.3    <u>Payroll Matters</u>.  Subject to Section 4.1 hereof, during the Sale Term Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.

9.4    <u>Employee Retention Bonuses</u>.  Agent shall pay, as an Expense hereunder, retention bonuses ("<u>Retention Bonuses</u>") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable) up to a maximum of approximately 10% of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause", as Agent shall determine in its sole discretion.  The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its discretion, and shall be processed through Merchant's payroll system.

- 32 -

HIGHLY CONFIDENTIAL                                                  SEARS_507B_00001725

Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within three (3) business days after the Sale Commencement Date. Agent shall not utilize the Retention Bonus as a mechanism to encourage Retained Employees to act contrary to Merchant's best interests.

Section 10.    Conditions Precedent.

10.1    Conditions to Agent's Obligations.    The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(a)    All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)    No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement (including, without limitation, the Sale);

(c)    The Bankruptcy Court shall have entered the Approval Order, in substantially the form annexed hereto as Exhibit 10.1(c) or as otherwise reasonably acceptable to Agent, on or before [February 1], 2019; and

(d)    This Agreement shall have been duly executed and delivered by all Parties.

10.2    Conditions to Merchant's Obligations.    The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(a)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date, in each case solely as a result of Agent's conduct;

(b)    The Bankruptcy Court shall have entered the Approval Order; and

(c)    This Agreement shall have been duly executed and delivered by all Parties.

Section 11.    Representations, Warranties and Covenants.

11.1    Merchant's Representations, Warranties, and Covenants.    Merchant hereby represents, warrants, and covenants in favor of Agent as follows:

(a)    Merchant (i) is a corporation duly organized, validly existing, and in good standing under the laws of the Delaware; (ii) has all requisite power and authority to own, lease, and operate its assets and properties and to carry on its business as presently conducted and to grant the rights intended to be granted herein as provided herein; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in

- 33 -

WEIL:\96854468\4\73217.0004

                                      SEARS_507B_00001726

each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which any Store is located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Subject to the entry of the Approval Order, (i) Merchant has the right, power, and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations hereunder, (ii) Merchant has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale, (iii) each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid, and binding obligation of Merchant, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law), and (iv) no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement.

(c)     Merchant (i) except as set forth on Exhibit 11.1(c), owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise, Merchant Consignment Goods and (unless otherwise sold by Merchant in accordance with Section 15) Owned FF&E free and clear of all liens, claims, and encumbrances of any nature; provided that, following the sale of the applicable Merchandise, Merchant Consignment Goods, Owned FF&E or Additional Agent Merchandise, the liens identified in Exhibit 11.1(c) shall attach only to the Guaranteed Amount, the Sharing Amount (if any), the Additional Agent Merchandise Fee (if any), amounts paid or reimbursed to Merchant on account of Expenses and such other amounts due Merchant hereunder in the same extent and priority that such liens had in the Merchandise, Merchant Consignment Goods and Owned FF&E; and (ii) Merchant shall not create, incur, assume, or suffer to exist any security interest, lien, or other charge or encumbrance upon or with respect to any of the Merchandise, Merchant Consignment Goods, Owned FF&E (unless otherwise sold by Merchant in accordance with Section 15), Additional Agent Merchandise, the Proceeds, the Additional Agent Merchandise Proceeds and the proceeds of the sale of Merchant Consignment Goods and the sale of Owned FF&E, in each case, except for such liens and security interests as shall have been disclosed by Merchant to Agent and identified in Exhibit 11.1(c) hereof, which liens and security interests shall, pursuant to the Approval Order and following the sale of the applicable Merchandise, Merchant Consignment Goods, Owned FF&E or Additional Agent Merchandise, attach only to the Guaranteed Amount, the Sharing Amount (if any), the Additional Agent Merchandise Fee (if any), Expenses, and any other amounts payable to Merchant hereunder.

(d)     The Cost File is true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein (without consideration of Excluded Pricing Adjustments) as of the dates and for the periods indicated therein. Merchant represents that (i) all registers located at the Stores are programmed to correctly compute all Sales Taxes

- 34 -

HIGHLY CONFIDENTIAL                                                                    SEARS_507B_00001727

required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider; and (ii) the Cost File does not include Excluded Price Adjustments.

(e)     Subject to the provisions of the Approval Order, Agent shall have the right for the duration of the Sale Term to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores.  Merchant shall not assign, reject or otherwise terminate any lease relating to any such Store, or vacate any such Store, until the applicable Sale Termination Date or Vacate Date.   Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair (at its own expense, except as expressly set forth herein) all cash registers, POS systems, heating systems, air conditioning systems, elevators, escalators, alarm systems and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores. Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(f)     Subject to the Approval Order, Merchant has paid and shall continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Stores' employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(g)     Except for (i) the Bankruptcy Case and (ii) the matters set forth on Exhibit 11.1(k), no action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would materially adversely affect the conduct of the Sale.

(h)     There are currently no strikes, work stoppages, or other labor disturbances affecting any Store, the Distribution Centers, or the COs.

(i)     As of the Sale Commencement Date, the mix of goods as to type and as to category shall in all material respects be consistent with the respective levels and mixes set forth in the files provided to Agent dated as of December 3, 2018.

(j)     As of the date of this Agreement, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including, without limitation, increasing salaries or other amounts payable to employees (except to the extent an employee was due a raise in the ordinary course).

(k)     Since December 1, 2018, other than in the ordinary course of business, Merchant (i) has not (and shall not, up to the Sale Commencement Date) marked up or raised the price of any items of Merchandise, (ii) has not reduced the price of any items of Merchandise, and (iii) has sold inventory during such period at customary prices consistent with the ordinary course of business.

(l)     No Store lease or similar occupancy agreement has expired, nor shall expire at any time until the conclusion of the Sale Term in such Store (by its terms or otherwise).

- 35 -

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL

11.2    <u>Agent's Representations, Warranties and Covenants</u>.    Each entity comprising Agent hereby represents, warrants, and covenants in favor of Merchant as follows:

(a)    Each entity comprising Agent (i) is a limited liability company duly and validly existing and in good standing under the laws of the state of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)    Each entity comprising Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Each entity comprising Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of any entity comprising Agent for such entity to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by each entity comprising Agent and constitutes the legal, valid, and binding obligation of such entity enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).  No court order or decree of any federal, provincial, state, or local governmental authority or regulatory body is in effect that would prevent or impair or is required for each entity comprising Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which any entity comprising Agent is a party or by which any entity comprising Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against any entity comprising Agent, or has been settled or resolved, or to the knowledge of any entity comprising Agent, has been threatened against or affects any such entity, which questions the validity of this Agreement or any action taken or to be taken by any such entity in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon the ability of any entity comprising Agent to perform its obligations under this Agreement.

(d)    No change shall be made by Agent to the ticketed price, shelf price, hang-tag price, stickered, PLU or other hard-marked price of any Merchandise at any Store on and after the Sale Commencement Date through the Inventory Date for such Store.

Section 12.    <u>Insurance.</u>

12.1    <u>Merchant's Liability Insurance</u>.  Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, general liability, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with

- 36 -

HIGHLY CONFIDENTIAL

Merchant's operation of the Stores, and shall endeavor to cause Agent to be named an additional insured with respect to all such policies with respect to the Stores. Prior to the date that is two (2) business days after the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation or non-renewal. In the event of a claim under any such policies, (a) Merchant shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent such claim arises from or relates to the alleged acts or omissions of Merchant or its employees (other than Retained Employees acting on Agent's instructions), agents (other than Agent's employees), or independent contractors (other than Agent and Supervisors hired by Agent in conjunction with the Sale) and (b) Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts (which amounts shall constitute Expenses) to the extent such claim arises from or relates to the alleged acts or omissions of Agent or its employees, agents, or independent contractors, including Retained Employees acting on Agent's instructions.

12.2    <u>Merchant's Casualty Insurance</u>. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft, and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds. Prior to the date that is two (2) business days after the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof in form and substance reasonable satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation or non-renewal. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date (as may be extended from time to time as set forth herein) without Agent's prior written consent.

12.3    <u>Worker's Compensation Insurance</u>. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4    <u>Agent's Insurance</u>. As an Expense of the Sale, Agent shall maintain throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability, and automobile insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the date that is two business days after the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant. In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent such claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or Supervisors.

- 37 -

HIGHLY CONFIDENTIAL                                      SEARS_507B_00001730

12.5    <u>Risk of Loss</u>.    Merchant and Agent agree that, subject to the terms of this Agreement, Agent shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term to the extent any such claim arises  from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (including Retained Employees to the extent acting at Agent's instructions or otherwise under Agent's supervision) (an "<u>Agent Claim</u>"). In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement.    To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.    In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

Section 13.    <u>Indemnification.</u>

13.1    <u>Merchant Indemnification</u>.    Merchant shall indemnify and hold Agent and each Agent Indemnified Party harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    any failure of Merchant to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)    any consumer warranty, products liability, intellectual property infringement, or other claims relating to Merchandise;

(d)    any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its employees or representatives (other than Agent or Retained Employees to the extent acting at Agent's instructions or otherwise under Agent's supervision); and

(e)    the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent), or representatives.

The indemnification obligations set forth in this Section 13.1 shall be in addition to (and shall not limit) any other indemnification obligations of Merchant set forth in this Agreement, including without limitation those set forth in Section 8.3(a). Notwithstanding anything to the contrary herein, the indemnification obligations set forth in this Section 13.1 shall not apply to any Agent Claims.

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                              SEARS_507B_00001731

13.2    <u>Agent Indemnification</u>.    Agent shall jointly and severally indemnify and hold harmless Merchant and the Merchant Indemnified Parties from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Merchant resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Agent):

(a)    Agent's material breach of or failure to comply with any Safety Laws (as defined in the Approval Order) or any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)    any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, Supervisors, or other officers, directors, or representatives of Agent (including Retained Employees to the extent acting at Agent's instructions or otherwise under Agent's supervision);

(c)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)    any Agent Claims;

(e)    any Additional Taxes and Penalties arising out of Agent's failure to collect and/or remit to Merchant correct amounts of Sales Taxes;

(f)    any Sales Taxes with respect to Additional Agent Merchandise, Remaining Merchandise and, in the event Merchant elects the FF&E Guaranty Option, Owned FF&E;

(g)    the gross negligence, willful misconduct, or fraud of Agent or any of its officers, directors, employees, agents, or representatives (including Retained Employees to the extent acting at Agent's instructions or otherwise under Agent's supervision); and

(h)    any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Merchandise.

The indemnification obligations set forth in this Section 13.2 shall be in addition to (and shall not limit) any other indemnification obligations of Agent set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

Section 14.    <u>Defaults.</u>

The following shall constitute "<u>Events of Default</u>" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party;

(b)    any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term;

- 39 -

HIGHLY CONFIDENTIAL

(c)    the entry of a final non-appealable order (i) converting or dismissing Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or (ii) appointing a chapter 11 trustee; or

(d)    subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at any Store for a period of at least five consecutive days for any reason other than (i) an Event of Default by Agent or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party (in the case of (a) or (b) above, or Agent in the case of (c) or (d) above) may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not effected by the defaulting party.

Section 15.    <u>Fixtures.</u>

(a)    Subject to the provisions of the Approval Order and except as otherwise provided in the Approval Order, with respect to any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) owned by Merchant and located at the Stores (but not the Distribution Centers or the COs) (collectively, the "<u>Owned FF&E</u>"), Merchant may elect (the "<u>FF&E Sale Option</u>"), and, if Merchant so elects, Agent shall sell, the Owned FF&E either (i) on a commission basis (the "<u>FF&E Commission Option</u>"), or (ii) on a guaranteed recovery basis (the "<u>FF&E Guaranty Option</u>"); <u>provided</u> that, the FF&E Guaranty Option shall be subject to Merchant and Agent agreeing on a mutually acceptable guaranteed amount and FF&E/asset listing.  For the avoidance of doubt, Merchant shall not be required to have Agent sell all or any portion of the Owned FF&E or exercise either the FF&E Commission Option or the FF&E Guaranty Option with respect to the Owned FF&E at the Stores.  If Merchant elects to do so, Merchant shall exercise the aforementioned FF&E Sale Option by written notice to Agent by the date that is not later than ten (10) calendar days after the Sale Commencement Date (such date being defined as the "<u>FF&E Sale Election Deadline</u>").  In the event Merchant elects the FF&E Commission Option, Agent shall be entitled to receive a commission equal to fifteen percent (15%) of the gross proceeds (net of applicable Sales Taxes) from the sale of such Owned FF&E ("<u>Agent's FF&E Commission</u>"); <u>provided</u>, <u>however</u>, in such case Merchant shall be responsible for payment of expenses incurred in connection with the disposition of the Owned FF&E ("<u>FF&E Disposition Expenses</u>") in accordance with a budget to be mutually agreed upon between Merchant and Agent ("<u>FF&E Disposition Budget</u>"), and all proceeds realized from the disposition of the Owned FF&E, after deduction of applicable Sales Taxes, Agent's FF&E Commission, and the FF&E Disposition Expenses (collectively, the "<u>Net FF&E Proceeds</u>"), shall be paid to Merchant.  In the event Merchant elects the FF&E Guaranty Option, Agent shall pay Merchant a lump sum payment in an amount to be agreed by Merchant and Agent (hereinafter, the "<u>FF&E Guaranty Amount</u>"), in which case all costs and expenses associated with the disposition of Owned FF&E shall be borne by Agent (and which shall not constitute Expenses hereunder), and all proceeds realized from the sale or other disposition of the Owned FF&E (after payment of the applicable FF&E Guaranty Amount and net of any applicable sales taxes) shall be retained by Agent for its sole account.  In the event Merchant elects the FF&E Guaranty Option, notwithstanding anything to the contrary

- 40 -

HIGHLY CONFIDENTIAL

herein, subject to any applicable exemption, Agent shall be solely responsible for payment of any Sales Taxes (including any Sales Tax payable to Merchant with respect to the effective transfer of ownership from Merchant to Agent) and the preparation and filing of all applicable reports with the applicable taxing authorities with respect to the Owned FF&E.

(b)    Anything in this Agreement to the contrary notwithstanding and except as otherwise provided in the Approval Order, Agent shall be authorized to abandon any and all unsold Owned FF&E (and all other furniture, fixtures, and equipment at the Stores and the Distribution Centers) in place without any cost or liability to Agent.  Agent shall have no responsibility whatsoever with respect to furniture, fixtures, and equipment located at the Stores, or the Distribution Centers which are not owned by Merchant.

(c)    Merchant hereby represents to Agent that:  (i) subject to the Approval Order, all Owned FF&E may be sold by Agent on Merchant's behalf, free and clear of all claims, liens and encumbrances of any kind; and (ii) all such Owned FF&E is devoid of Hazardous Materials.

(d)    Anything in this Agreement to the contrary notwithstanding, Agent will not have any obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any Hazardous Materials that may be located at the Stores, the Distribution Centers or otherwise.  Agent shall have no liability to any party for any environmental action brought:   (i) that is related to the storage, handling, treatment, disposition, generation, or transportation of Hazardous Materials, or (ii) in connection with any remedial actions associated therewith or the Stores or the Distribution Centers.  Merchant (and not Agent) shall be solely responsible to remove from the Stores or the Distribution Centers all Hazardous Materials.  For purposes of this Agreement, the term "Hazardous Materials" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. 9601(14), as a "hazardous substance", (ii) the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste", or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public health or welfare or to the environment or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation.

Section 16.    Miscellaneous.

16.1    Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by e-mail, and/or a recognized overnight delivery service, as follows:

If to Agent:
Tiger Capital Group
350 North LaSalle Street, 11th Floor
Chicago, IL 60654
Attn:   Mark P. Naughton
Facsimile: 617 523 3007
Email: mnaughton@tigergroup.com

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                    SEARS_507B_00001734

Great American Group
21255 Burbank Blvd, Suite 400
Woodland Hills, CA 91367
Attn:    Scott K. Carpenter
Facsimile: [•]
Email:  scarpenter@greatamerican.com

If to Merchant:
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Attention: General Counsel
Facsimile: (847) 286-2741
E-mail: counsel@searshc.com

With a copy (which shall not constitute notice hereunder) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Ray C. Schrock, P.C., Gavin Westerman, Sunny Singh
Facsimile: (212) 310-8007
E-mail: ray.schrock@weil.com, gavin.westerman@weil.com, sunny.singh@weil.com

16.2    Governing Law; Consent to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court (and the District Court and Circuit Court of Appeal with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3    Entire Agreement.    This Agreement, the Exhibits hereto, and the Agency Documents (subject, in each instance, to the Approval Order) contain the entire agreement between the Parties with respect to the transactions contemplated hereby and supersede and cancel all prior agreements, including but not limited to all proposals, letters of intent, or representations, written or oral, with respect thereto.

16.4    Amendments.    This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of Merchant and Agent.

16.5    No Waiver.    No party's consent to or waiver of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure

- 42 -

HIGHLY CONFIDENTIAL

to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of Agent and Merchant, including but not limited to any chapter 11 or chapter 7 trustee.  Neither Party shall be permitted to assign any or all of its rights or obligations under this Agreement, in whole or in part, without the prior written consent of the other Party.  For the avoidance of doubt, any entity comprising Agent may assign its right to receive payments under this Agreement collaterally to its lender as security.

16.7    <u>Execution in Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8    <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    <u>Survival</u>.  All representations, warranties, covenants and agreements made herein shall be continuing, shall be considered to have been relied upon by the Parties and shall survive the execution, delivery, and performance of this Agreement.

16.10    <u>Termination</u>.  This Agreement may be terminated at any time before the Sale Commencement Date as follows:

(a)    upon written notice by Agent or Merchant, if the Sale Commencement Date has not occurred on or prior to [February ●], 2019 and the failure of the Sale Commencement Date to occur is not caused by or the result of a material breach of this Agreement by the party giving such notice;

(b)    by mutual written consent of Merchant and Agent;

(c)    automatically and without any action or notice by either Agent or Merchant, immediately upon the issuance of a final and non-appealable order by any agency, division, subdivision, audit group, procuring office, or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state thereof, any foreign government or state or any municipal or other political subdivision thereof to restrain, enjoin, or otherwise prohibit the transfer of the assets contemplated hereby; or

(d)    upon written notice by Agent, upon an order of the Bankruptcy Court approving, or the filing by or on behalf of Merchant of a motion or other request to approve, any financing, refinancing, acquisition, divestiture, public offering, recapitalization, business combination or reorganization of or involving all or a material portion of, collectively, the Merchandise and the Owned FF&E or any standalone plan of reorganization for Merchant involving the Merchandise and the Owned FF&E in a manner inconsistent with this Agreement;

- 43 -

HIGHLY CONFIDENTIAL    SEARS_507B_00001736

(e)     upon written notice by Agent if Agent is not in material breach of this Agreement and there has been a material violation or breach by Merchant of any representation, warranty, covenant or agreement contained in this Agreement that (A) has rendered the satisfaction of any condition to the obligations of Agent set forth in Section 10.1 impossible, (B) has not been waived by Agent, and (C) is not capable of being cured or, if capable of being cured, is not cured in all material respects within seven (7) days following receipt of written notification thereof by Agent;

(f)     upon written notice by Merchant if Merchant is not in material breach of this Agreement and there has been a material violation or breach by Agent of any representation, warranty, covenant or agreement contained in this Agreement that (A) has rendered the satisfaction of any condition to the obligations of Merchant set forth in Section 10.2 impossible, (B) has not been waived by Merchant, and (C) is not capable of being cured or, if capable of being cured, is not cured in all material respects within seven (7) calendar days following receipt of notification thereof by Merchant.

In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination; provided, however, that the provisions of Section 16 shall survive any such termination and shall be enforceable hereunder; provided further, however, that nothing in this Section 16.10 shall be deemed to release any party from liability for any breach of its obligations under this Agreement arising prior to any such termination.

16.11   Agent's Security Interest.

(a)     In consideration of and subject to payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to Merchant, Merchant hereby grants to Agent security first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon:  (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) in the event Merchant elects the FF&E Guaranty Option, the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E after payment of the FF&E Guaranty Amount; or, alternatively, the FF&E Commission (to the extent Merchant elects for Agent to sell any Owned FF&E); and (vi) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  Upon entry of the Approval Order, and subject to payment of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to Merchant (on behalf of itself and the applicable Interested Parties), the security interest granted to Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)     Without any further act by or on behalf of Agent or any other party (including, without limitation, any Interested Party), Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other security interests and liens, provided, however, that

- 44 -

WEIL:\96854468\4\73217.0004

SEARS_507B_00001737

(x) until the Merchant receives payment in full of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, the security interest granted to Agent hereunder shall be junior and subordinate in all respects to the security interests of the Interested Parties in the Agent Collateral, subject to and in accordance with the terms of the DIP ABL Financing Order, but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder and (y) upon payment in full of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, any security interest or lien of the Interested Parties in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent in the Agent Collateral.

(c)    In the event of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC.

16.12  Third Party Beneficiaries.  Except with respect to the Merchant Indemnified Parties, and the right of syndication below, this Agreement shall not be deemed to confer any rights or remedies upon any person or entity (including any landlord of Merchant) that is not a party hereto.

16.13  Syndication.  The Agent shall have the right to syndicate its rights and obligations under this Agreement with one or more third parties previously disclosed to the Merchant by providing written notice of such syndication to the Merchant no less than twenty four (24) hours prior to the Sale Commencement Date. In that respect, the Merchant acknowledges that Agent intends to solicit commitments from such third parties that would become parties to the Agency Agreement on a joint and several basis with the Agent. If the right of syndication hereunder is exercised, any such additional parties included in the syndicate shall thereafter be deemed to be included in references to "Agent" hereunder for all purposes.

WEIL:\96854468\4\73217.0004

HIGHLY CONFIDENTIAL                                                                    SEARS_507B_00001738

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**A Contractual Joint Venture comprised of TIGER CAPITAL GROUP, LLC and GREAT AMERICAN GROUP, LLC**

By: _____
Name:  Mark P. Naughton
Title: Senior General Counsel of Tiger Capital Group, LLC

**MERCHANT:**
SEARS HOLDINGS CORPORATION, Debtor and Debtor in Possession

By: _____
Name:
Title:

- 46 -

HIGHLY CONFIDENTIAL